Pages 1 - 260

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

IN RE: ROUNDUP PRODUCTS           )
LIABILITY LITIGATION              )
                                  )     **NO. 16-md-02741 VC**
                                  )
_____)

San Francisco, California
Wednesday, February 13, 2019

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

        ANDRUS WAGSTAFF PC
        7171 W. Alaska Drive
        Lakewood, Colorado  80226
   BY:  **AIMEE H. WAGSTAFF, ATTORNEY AT LAW**
       **DAVID J. WOOL, ATTORNEY AT LAW**

        ANDRUS WAGSTAFF PC
        6315 Ascot Drive
        Oakland, California  94611
   BY:  **KATHRYN M. FORGIE, ATTORNEY AT LAW**

        WEITZ & LUXENBERG PC
        700 Broadway
        New York, New York  10003
   BY:  **ROBIN L. GREENWALD, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Marla F. Knox, RPR, CRR
           Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
           Official Reporters

**APPEARANCES**:   (CONTINUED)

For Plaintiffs:

                MOORE LAW GROUP
                1473 South 4th Street
                Louisville, Kentucky  40208
        BY:  **JENNIFER MOORE, ATTORNEY AT LAW**

                THE MILLER FIRM LLC
                108 Railroad Avenue
                Orange, Virginia  22960
        BY:  **BRIAN BRAKE, ATTORNEY AT LAW**

                LAW OFFICES OF TESFAYE W. TSADIK
                The California Building
                1736 Franklin Street - 10th Floor
                Oakland, California  94612
        BY:  **TESFAYE W. TSADIK, ATTORNEY AT LAW**

                BAUM HEDLUND ARISTEI GOLDMAN PC
                12100 Wilshire Blvd. - Suite 950
                Los Angeles, California  90025
        BY:  **ROBERT BRENT WISNER, ATTORNEY AT LAW**

                ANDRUS ANDERSON LLP
                155 Montgomery Street - Suite 900
                San Francisco, California  94104
        BY:  **LELAND H. BELEW, ATTORNEY AT LAW**

                AUDET & PARTNERS LLP
                711 Van Ness Avenue - Suite 500
                San Francisco, California  94102
        BY:  **MARK E. BURTON, ATTORNEY AT LAW**

```
 1   APPEARANCES:  (CONTINUED)

 2   For Defendant:
                       WILKINSON   WALSH ESKOVITZ LLP
 3                     2001 M Street, NW - 10th Floor
                       Washington, D.C.  20036
 4            BY:  BRIAN L. STEKLOFF, ATTORNEY AT LAW
                   RAKESH N. KILARU, ATTORNEY AT LAW
 5                 TAMARRA MATTHEWS JOHNSON, ATTORNEY AT LAW
                   JULIE RUBENSTEIN, ATTORNEY AT LAW
 6
                       COVINGTON & BURLING LLP
 7                     One City Center
                       850 Tenth Street, NW
 8                     Washington, D.C.  20001
              BY:  MICHAEL X. IMBROSCIO, ATTORNEY AT LAW
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1    <u>**Wednesday - February 13, 2019**</u>                    <u>**9:37 a.m.**</u>

 2                        <u>**P R O C E E D I N G S**</u>

 3                            **---oOo---**

 4        **THE CLERK:**  Calling Case Number 16-MD-2741, in Re:

 5    Roundup Products Liability Litigation.

 6        Counsel, please step forward and state your appearances

 7    for the record.

 8        **MS. WAGSTAFF:**  Good morning, Your Honor.  Aimee

 9    Wagstaff on behalf of Plaintiffs.

10        **THE COURT:**  Good morning.

11        **MS. WAGSTAFF:**  And with me, I have Brent Wisner, Robin

12    Greenwald, Kathryn Forgie, Brian Brake, David Wool, Jennifer

13    Moore and Tesfay Tsadik and Mark Burton.

14        **THE COURT:**  Good morning.

15        **MR. STEKLOFF:**  Good morning, Your Honor.  Brian

16    Stekloff on behalf of Monsanto.  Along with me I have Rakesh

17    Kilaru, Tamarra Matthews Johnson, Julie Rubenstein and Michael

18    Imbroscio.

19        **THE COURT:**  Good morning.  Okay.  So first on my

20    agenda is the statute of limitations issue, but if people want

21    to talk about -- if anybody has any burning issue they want to

22    talk about first, that's fine.  Let's talk about statute of

23    limitations.

24        So, Mr. Tsadik, let me start with you.  I don't understand

25    how I could conclude that there is a genuine fact issue on the

1  question whether the clock started running.  When Mr. Gebeyehou

2  was talking to his doctor about -- about whether Roundup caused

3  his NHL -- or in the month preceding that really because he

4  watched the TV show -- he told his doctor by e-mail that he was

5  90 percent sure that his NHL was caused by Roundup, and -- and

6  he -- in his deposition he was asked whether he told his wife

7  about the Dr. Oz Show, and his response was, I don't think I

8  talked to her about that show because she already knew that I

9  had been researching this very heavily, right.

10      So in light of -- I don't see how there is a genuine --

11  there could be a genuine fact dispute on that question.  It

12  seems clear that he subjectively believed -- and strongly

13  believed -- maybe not to a certainty but strongly suspected at

14  a minimum, that Roundup caused his cancer.

15      And so one of your arguments seems to be that there is a

16  genuine fact dispute on that issue -- on whether the clock

17  should start -- should -- should start at that time; and if

18  that is indeed one of your arguments, I don't understand it.

19      So let's start with that.

20      **MR. TSADIK:**  Thank you.  Your Honor, I have two really

21  main points.  One is really if the Court accepts in this case

22  340.8 applies here.

23      **THE COURT:**  Okay.

24      **MR. TSADIK:**  And if you analyze the case based on

25  that, aware or should have been aware standard, you know, that

```
 1   is the standard in the statute, you know.  When the statute is
 2   so clear, the plain language really is important.  You can't go
 3   interpreting the statute if the plain language says aware or
 4   should have been aware.  I mean, you can't impose suspicion
 5   standard on that.
 6           THE COURT:  Well --
 7           MR. TSADIK:  I say that because if you look --
 8           THE COURT:  Let me interrupt you, just to make sure I
 9   understand what you are saying.
10           MR. TSADIK:  Yeah.
11           THE COURT:  So give me a second.  I'm pulling up the
12   statute.
13           MR. TSADIK:  I have a copy if you want --
14           THE COURT:  No.  I have it.
15       (Whereupon, a brief pause was had.)
16           THE COURT:  So you are saying that if 340.8 applies --
17           MR. TSADIK:  Yes.
18           THE COURT:  -- the standard is that he has to be aware
19   of it?
20           MR. TSADIK:  Yes.  And should have been aware.
21           THE COURT:  But certainly that cannot mean that he
22   needs to be aware of it to a certainty.
23           MR. TSADIK:  No.  I mean, he should --
24           THE COURT:  Otherwise nobody could ever sue on
25   Roundup.
```

1        **MR. TSADIK:**  I understand.  You see, he should have

2   been aware, not to a certainty.  At least you know that there

3   is causation information in terms of what he had.  If you look

4   at his deposition testimony, I will refer you to page 54 and

5   page -- I believe -- 66 -- 21 to -- 21 to 24 and page 54 -- he

6   refers to all of these as rumors, rumors, repeating them.  I

7   have to send these rumors to Dr. Oz, that kind of statement he

8   is making.

9        **THE COURT:**  Well, but the undisputed evidence in the

10  record is that he told his doctor he was the 90 percent sure

11  that Roundup caused his cancer, and he stated that his wife --

12  he had been doing tons of research on the issue, and his wife

13  was aware of all the research that he was doing on the issue.

14       **MR. TSADIK:**  I will --

15       **THE COURT:**  So he -- at a minimum, he had a very

16  strong suspicion that Roundup caused his cancer, and so what

17  you seem to be saying is that having a very strong suspicion

18  that something caused your cancer is not enough to start the

19  clock under Section 340.8?

20       **MR. TSADIK:**  You have to be aware.  Standard -- I

21  mean, the quantum of information you need under suspicion or

22  strong suspicion is quite different from the quantum of

23  information you need to have knowledge, okay.

24       **THE COURT:**  So are you saying that the standard is

25  different under Section 340.8 than it is under Section 335.1?

1          **MR. TSADIK:**  Absolutely.

2          **THE COURT:**  Okay.  Do you have any case law to support

3    the idea that the standard is different?  The typical discovery

4    rule does not apply in the 340.8 context.

5          **MR. TSADIK:**  Okay.  I will refer you to *O'Connor*

6    *versus Boeing* case, which is 311 F.3d --

7          **THE COURT:**  O'Connor versus what?

8          **MR. TSADIK:**  Boeing Airlines.

9          **THE COURT:**  And what is the cite again?

10         **MR. TSADIK:**  311, 149.  That's the -- you will see

11   there --

12         **THE COURT:**  At 311 F.3d?

13         **MR. TSADIK:**  Yes.

14         **THE COURT:**  149?

15         **MR. TSADIK:**  Yes.  1149, I'm sorry.

16         **THE COURT:**  1149.  Hold on a second.  This is not my

17   normal courtroom.  I don't know how equipped I am to pull up

18   that case.  Just give me a second.

19       (Whereupon, a brief pause was had.)

20         **THE COURT:**  1139?

21         **MR. TSADIK:**  1149, Your Honor.

22         **THE COURT:**  I think it is 1139.

23         **MR. TSADIK:**  39, I'm sorry.

24         **THE COURT:**  Okay.  One moment.

25         **MR. TSADIK:**  There you see --

1          **THE COURT:**  Let me make sure I have the right --

2          **MR. TSADIK:**  Sure.

3      (Whereupon, a brief pause was had.)

4          **THE COURT:**  Okay.  So show me where, where is your

5    language in this case?

6          **MR. TSADIK:**  You will see there in the -- on page -- I

7    have here.

8          **THE COURT:**  This is a CERCLA case?

9          **MR. TSADIK:**  Yes, the standard you see here.

10         **THE COURT:**  What does that have to do --

11         **MR. TSADIK:**  Let me explain to Your Honor.  You will

12   understand why I take this position.

13         **THE COURT:**  Okay.

14         **MR. TSADIK:**  You will see there the statute class

15   there is Plaintiff knew or should have known standard.

16         **THE COURT:**  Okay.

17         **MR. TSADIK:**  And the district court in Los Angeles

18   applied the California suspicious standard.  You will see there

19   on the -- I believe, you know, on page 1146.

20         **THE COURT:**  Okay.  The district court made an error in

21   twofold.  First, in concluding the federal discovery rule

22   commences -- to California discovery rule, which is suspicious

23   rule, you know, okay, and apply the California rule.

24      The Court was saying, you know, the suspicious standard is

25   much, much lower than what knew or should have known standard

 1  would provide.  That is what essentially the Court is saying in

 2  there.  That is making it --

 3       **THE COURT:**  I understand what you are saying, but I

 4  just -- I'm not sure I understand how that helps you because

 5  that's -- that's a case in which the Court said, look, the

 6  discovery rule under CERCLA preempts the State discovery rule,

 7  and the federal statute has a different rule than California

 8  law has; but here we have two different statutes under

 9  California law, and what is the reason that I should assume --

10  on what basis should I assume that the discovery rule is not

11  the same under these two statutes?

12       **MR. TSADIK:**  You see, because the knew or aware or

13  should have been aware standard is much higher than suspicious

14  standard.  I mean, that's really -- it is the common sense

15  determination.

16       **THE COURT:**  Well, but you say -- you know, you keep

17  saying "suspicion standard."

18       **MR. TSADIK:**  Yeah.

19       **THE COURT:**  I don't think it is exactly right to say

20  that it is a suspicion standard.  As I understand the standard

21  under California law, you either have to have a subjective

22  belief that this caused your injury or you have to be on

23  inquiry notice, which means there is enough information from

24  which a reasonable person would conclude that they need to

25  conduct an investigation, right.  And -- do you agree that is

1   the discovery rule?

2          **MR. TSADIK:**  I think --

3          **THE COURT:**  In California?

4          **MR. TSADIK:**  That is one element there.

5          **THE COURT:**  Okay.  So in this case he subjectively

6   believed that Roundup caused his cancer and so -- so you seem

7   as to be saying that that is not -- that is the normal

8   discovery rule in California, but it is not the test under

9   340.8.

10         **MR. TSADIK:**  That is one.  And the other thing is even

11  under the suspicion standard, Courts are saying, you know, that

12  the subjective belief can also be somehow compromised by

13  objective evidence.  You can have any kind of subjective

14  evidence, a belief, but the objective evidence in this case, a

15  clear medical opinion from the doctor, controverts your point

16  of view.  That should be taken into account.

17         **THE COURT:**  But one thing I don't understand -- what I

18  don't understand about that argument, right, is that if you

19  have a subjective belief that something caused your injury and

20  you start investigating it, and then somebody tells you, no,

21  no, it didn't cause your injury, and then later you find out

22  some other information that suggests that it did cause your

23  injury, I don't -- I don't understand why that would cause the

24  clock to start running from the beginning again.

25     I mean, it sounds more like a tolling argument that you

1   are making.  I mean, none of it changes the fact that at the

2   outset as applied to this case, what you are saying is, okay --

3   it seems like what you are saying is my client had a subjective

4   belief that his Roundup was -- that his cancer was caused by

5   Roundup, and then the doctor told him something that threw him

6   off the trail; and then later he found out about the IARC

7   report, IARC classification.

8        And, therefore, the clock should start running again from

9   the start when he learned about the IARC classification.  Now,

10  I don't really understand that because the clock starts running

11  when you have the test -- the clock starts running when you

12  have a subjective belief that your injury was caused by this

13  product.

14        **MR. TSADIK:**  I see.  At the time -- you see, there are

15  two issues in this case you should also take into account

16  which, I believe, is indicated in the deposition.  I believe we

17  pointed out in our opposition to his statement that 95 percent,

18  I'm sure is simply an exaggeration to get the attention of the

19  doctor.  That's what he said, you know.

20        **THE COURT:**  I understand that, but he said --

21        **MR. TSADIK:**  Meaning he didn't subjectively believe.

22  Because he didn't subjectively believe and he didn't hear from

23  the doctor, he continued to use Roundup after that,

24  continuously.  Okay.  And that is consistent that -- with his

25  belief, subjective belief, that he did not really believe that

1   Roundup causes his cancer.  Why would he otherwise continue to

2   use the thing, you know?

3        **THE COURT:**  But that's -- I mean, I don't see how --

4   he sent an e-mail saying he is 95 percent sure it was caused by

5   Roundup, and he was doing extensive investigation on the topic.

6   And I just -- I don't understand how I could conclude that

7   there is a -- in light of that, that there is a genuine issue

8   of fact on whether he subjectively believed that Roundup caused

9   his cancer.

10       I mean, yes, you can -- I understand the idea -- yeah, I

11  was overstating my -- the strength of my belief because I

12  wanted to get my doctor's attention.  But, I mean, all of the

13  conduct, when you look at it together, I don't see how any

14  reasonable juror could conclude that he did not believe that

15  Roundup was causing -- that Roundup had caused his cancer at

16  that time.

17       **MR. TSADIK:**  So to me sometimes it could be a

18  credibility question, whether you believe him when he said he

19  is exaggerating.

20       **THE COURT:**  No.  I'm saying let's assume he was

21  exaggerating.  Still --

22       **MR. TSADIK:**  Also the other thing which really came to

23  my mind is when you talk about investigation, one should ask,

24  what would have investigation yielded at that time.  We are

25  talking about really a window period of 12 days, from

1    September 24 to October 7.  That's when he filed his complaint.

2        So in that window period, 12 days window period, he

3    investigated.  You think, you know, he has all the information

4    he needed to make a conclusion at that time.  I mean, that's

5    really highly difficult to conclude based on the record here.

6        **THE COURT:**  You are saying he couldn't have -- he

7    couldn't have sued on his belief until the IARC classification

8    came out?

9        **MR. TSADIK:**  No.  I would say during the window

10   period.  The window period is from October 24, when you

11   conclude that he was suspicious and he started investigation,

12   from that part, time period.  You see he filed on October 7, 12

13   days later, his claim.  So that is the time period we are more

14   concerned.

15       What information did he have during that time period to

16   believe -- make anyone believe, you know, that the

17   investigation during that time period --

18       **THE COURT:**  No.  The point is that you have to sue

19   within two years of either believing that the injury was caused

20   by the Defendant or -- or being on sufficient notice, inquiry

21   notice -- you have to sue within two years, and he didn't sue

22   within two years.

23       **MR. TSADIK:**  What we are saying is if you say he

24   actually had suspicion on September 24th and started

25   investigation, you are assuming that on September 24, the

1   investigation concluded on September 24, he should have filed

2   his complaint to meet his two-year standard.  That's what you

3   are saying.  That is really not possible.

4          THE COURT:  You are saying he needed 12 more days?

5          MR. TSADIK:  No.  What I'm saying is somebody has to

6   point out what the investigation would have shown at that point

7   for any reasonable person to file a lawsuit during that time

8   period, because the fact is disputed.

9          THE COURT:  Showing the same thing that he knew 12

10  days later when he filed the lawsuit.  I mean, I don't

11  understand what you are talking about.

12         MR. TSADIK:  I think really the standard is -- really,

13  to me, if you are actually talking about investigation, one has

14  to look into what the investigation would have shown --

15         THE COURT:  It would have shown the same thing that it

16  showed --

17         MR. TSADIK:  -- before he filed.

18         THE COURT:  It would have shown the same thing that it

19  showed when he filed 12 days later.  In other words, he didn't

20  learn any new information in the 12 days after the limitation

21  period ran, arguably.

22         MR. TSADIK:  Because, you know, IARC really is sort of

23  the scientific consensus that established at that time --

24         THE COURT:  Yeah, but the point is that he was on --

25  he believed that Roundup caused his cancer in September of

```
 1   2014.  The IARC classification came out when?  In the spring

 2   of --

 3              MR. TSADIK:  Yeah, March of 2015.

 4              THE COURT:  2015?

 5              MR. TSADIK:  Yes.

 6              THE COURT:  So all he needed to do was sue before

 7   September of 2016, but he didn't.  He sued in October of 2016.

 8   So he arguably blew the limitations period.

 9              MR. TSADIK:  What I'm saying is when you look at the

10   limitation period, you know, you look at -- in terms of really

11   he has the right to file his complaint two years from the date

12   he knew.

13              THE COURT:  Right.

14              MR. TSADIK:  Okay.  So the point is, in this case, the

15   statute expired for 12 days.  That's what happened in this

16   case.  The question to ask is really what would somebody have

17   to get to to file on September 14, his complaint, 2007?  Does

18   he have all the --

19              THE COURT:  2000 when?

20              MR. TSADIK:  2014 -- I'm sorry, September 14, 2016.

21   He has to file it.  Okay.  But in this case, the delay was

22   only, in terms of the information for the statute to expire,

23   was only 12 days, you know.

24              THE COURT:  I don't understand that argument.  But I

25   would have thought that you would have come in here and argued,
```

1   okay, let's assume for the sake of argument that my client had

2   a subjective belief in September of 2014 that Roundup caused

3   his cancer.  And let's assume for the sake of argument that the

4   clock started ticking in September of 2014.  It was told -- the

5   limitations period was told at the time my client's doctor

6   suggested to him that it wasn't Roundup, and the time

7   between -- so his doctor, my client's doctor, threw him off the

8   scent essentially.

9         And the time from -- the period between the doctor

10   throwing him off the scent and the time your client's other

11   doctor friend sent your client the news about the IARC

12   classification, that that -- that there should be tolling

13   during that period because he was thrown off the scent.

14         But you don't seem to be making that argument.  You seem

15   to be arguing that --

16            MR. TSADIK:  I mean --

17         THE COURT:  -- that the doctor -- that the fact that

18   the doctor threw him off the scent means that he -- that my

19   client never really truly suspected that he had -- that Roundup

20   caused his cancer and, therefore, the clock never started in

21   the first place.

22            MR. TSADIK:  But the question really is also we still

23   have to examine, you know, the issue of what facts, what facts

24   would have been the -- would the investigation have revealed in

25   terms of the causation until he came across IARC.  It is just

1   like, you know, a tobacco causing cancer.  I mean, we have been

2   talking about this --

3          **THE COURT:**  But the IARC, the IARC is not a -- the

4   IARC classification is not based on a new study.  The IARC

5   concluded that glyphosate was -- is a probable carcinogen, as

6   IARC defines that term, based on a review of preexisting

7   studies for the most part, right.  And all the epidemiological

8   studies that the experts in this case rely on were in existence

9   before the IARC reached its conclusion.

10       So I -- I don't --

11         **MR. TSADIK:**  I would say --

12         **THE COURT:**  I don't understand why -- by the way,

13  people sued -- including, I believe, Mr. Hardeman -- people

14  sued on -- people sued Monsanto alleging that Roundup caused

15  their NHL before the IARC announced its classification

16  decisions.

17         **MR. TSADIK:**  That may be.  The only thing I would say,

18  Your Honor, is my client was not aware of that information.

19  The question is:  Is there, in toxicology evidence, before IARC

20  came -- I think, you know, it is almost close to that point,

21  you know, that the toxicology evidence came up.  You know, and

22  confirming -- it is just after -- after September, I would say,

23  you know.  I mean -- September 2014.

24       So the point I'm really making is I think really his

25  subjective belief, which was couched in doubt, saying he is

1    exaggerating, saying it is a rumor and continuing to use

2    glyphosate, you know, that simply negates, you know, his

3    subjective belief, you know.  This should be -- the jury

4    question, you know, to believe him or not to believe him, you

5    know.  I mean, we can't just simply --

6            **THE COURT:**  Okay.  I understand your argument on that

7    point, but let me ask you --

8            **MR. TSADIK:**  Yeah.

9            **THE COURT:**  -- just because I want to give you every

10   chance to make every point you could possibly make for your

11   client -- do you have a tolling argument?  Do you have an

12   argument -- I mean, if I disagree with you that the clock

13   didn't start -- your position is that the clock never started,

14   right, the clock never started until your client learned of the

15   IARC classification?

16           **MR. TSADIK:**  Yes.

17           **THE COURT:**  If I disagree with you about that, do you

18   have an argument that even if the clock started in

19   September 2014, it stopped -- it paused when Mr. Gebeyehou's

20   doctor kind of suggested that there is no firm evidence of a

21   link between Roundup and NHL and then didn't start again until

22   Mr. Gebeyehou learned of the IARC classification.  Do you have

23   a tolling argument?

24           **MR. TSADIK:**  Yes, I do.

25           **THE COURT:**  And what is your case law to support that

1    sort of tolling argument?

2         **MR. TSADIK:**  I provided you yesterday two cases,

3    Your Honor.

4         **THE COURT:**  But those cases were not about tolling.

5    Those cases were about whether somebody developed a sufficient

6    level of subjective belief in the first place.

7         **MR. TSADIK:**  That's very true, but it also talks about

8    that subjective belief being negated by the --

9         **THE COURT:**  Right.

10        **MR. TSADIK:**  -- objective medical evidence.

11        **THE COURT:**  But those cases -- on that point --

12        **MR. TSADIK:**  Yes.

13        **THE COURT:**  -- I don't think those cases help you.  I

14   mean, first of all the one that is unpublished, you described

15   it as unpublished.

16        **MR. TSADIK:**  Yes.

17        **THE COURT:**  It was ordered de-published by the

18   California Supreme Court.  And I think the reason is that there

19   are a lot of problems with those type of cases.

20        But -- but the published case, the one that starts with

21   the K.

22        **MR. TSADIK:**  *Kitzig*.

23        **THE COURT:**  What is it?

24        **MR. TSADIK:**  *Kitzig*.

25        **THE COURT:**  *Kitzig*.  I mean, that case I don't think

1  really helps you on this point that you are trying to argue

2  because the main point of the *Kitzig* case was that she -- that

3  was the one about the dentists, right?

4       So she -- the main point is that she suspected that there

5  was something wrong with her, but it turned out that -- that

6  there was not something -- that that particular thing was not

7  wrong with her, and then she later sued the dentist based on

8  different injuries.  So that's -- so -- so the fact that she

9  went to a second dentist in Los Angeles to explore the first

10 problem is no evidence at all that she believed that she had

11 the second problem that she later sued the dentist on.

12      So I don't understand how that case helps you.  And even

13 if they were the same problems, which they weren't, the

14 strength of Mr. Gebeyehou's belief is indisputably much more

15 than the sort of level of suspicion that Ms. Kitzig had in that

16 case.  And so that's why when I read that case, I said, well,

17 that's the best he has on, you know, negating the idea that his

18 clients had a subjective belief that Roundup caused his NHL?

19      That's when I turned to the question of, well, does he --

20 that can't be right.  But does he have a tolling argument?  And

21 those cases that you cited in your letter from yesterday or the

22 day before, whenever it was, are not about tolling.

23      So I'm wondering if you have any cases that would stand

24 for the proposition that your client is entitled to tolling

25 during that period between the time his doctor communicated

1    with him about it and the time he discovered the IARC

2    classification.

3        MR. TSADIK:  I mean, I don't have specific case on

4    this one, Your Honor.  I think I still would go back to the

5    argument that -- two arguments.  One is that his subjective

6    belief that is really based on the deposition testimony to --

7    in my opinion, it is equivocal; meaning, it is not really for

8    sure.  It is doubtful, you know what I mean.  I would say that.

9        And, number two, Your Honor, with respect to the

10   investigation you raised, you know, I mean, I think you know I

11   would submit, Your Honor, listening from all this expert

12   testimony here, the toxicology evidence were not publicly

13   available at that time until IARC came out with that -- you

14   know, was not publicly available.  So even if he had to

15   research the cause of his injury, I think one of the biggest

16   strand of his causation period would be the finding of

17   toxicology studies.  So that did not really exist publicly, and

18   he could not have investigated, you know.

19       And also to me, it would be a huge burden to impose on

20   Plaintiff to do investigation of really -- of a complicated,

21   scientific causation.  And also at the same time, changing --

22   science publications keep changing, you know.  Even Monsanto, I

23   mean, couldn't point out to a single evidence against

24   Mr. Gebeyehou to show that the glyphosate actually was causing

25   concern during that time period.  Of course they could not do

1  that to disprove him because that would be undermining their

2  position.

3       So really normally the Defendant has the duty to point out

4  to a specific document what investigation would have shown to

5  establish causation as a -- as part of their having this motion

6  filed in this case.  That, they did not do.  That's --

7            THE COURT:  Ms. Rubenstein.

8            MS. RUBENSTEIN:  I just want to respond to the

9  theoretical tolling argument that could be made because

10  Your Honor has referred to it a number of times.  This idea

11  that Mr. Gebeyehou's doctor threw him off the scent, that is

12  just not at all borne out by the record here.  It is

13  undisputed.

14            THE COURT:  All right.  But I'm happy for you to

15  answer that question, but if his doctor did throw him off the

16  scent -- hypothetically, if his doctor said, Look, I can tell

17  you I have looked at this really carefully.  I'm an expert in

18  this; and I can tell you, Roundup did not cause your cancer,

19  would there be tolling?

20            MS. RUBENSTEIN:  I don't think so because the only --

21  the only scenario in which I have seen that come up, and it is

22  not even on all fours, are the two cases that Mr. Tsadik

23  submitted to the Court.  I have not seen --

24            THE COURT:  But I think those Courts -- I mean, I

25  think maybe that was one of the problems with the

1    unpublished -- published decision, is that they were thinking

2    of it in terms of restarting the clock, but they should have

3    been thinking of it in terms of tolling.  And that's what -- so

4    that -- and maybe that's one of the reasons that the opinion

5    was de-published.  I don't know.

6        But -- but it made me wonder is there a tolling argument

7    like that.  So, for example, in the case, in the unpublished

8    decision whose name I can't remember --

9            **MS. RUBENSTEIN:**  It is *Duncan*, Your Honor.

10           **THE COURT:**  -- they eventually found a staple -- the

11   doctor left a staple in her, right.  So you -- you have your

12   first surgery; the doctor leaves the staple in there.  You

13   don't know that the doctor left a staple in there.  You are

14   experiencing discomfort.  You suspect that the doctor messed

15   up.  Maybe the doctor committed malpractice, okay, and so the

16   clock starts running.

17       Then you have the second exploratory surgery to see what

18   is wrong in there.  The doctor -- you wake up, and the doctor

19   says it is just scar tissue.  You don't need to worry about,

20   you know, anything more serious having happened as a result of

21   the first surgery.  So I would think at that point the statute

22   of limitations, the limitations period would be tolled.

23       And then you are continuing to have problems, and you have

24   your third surgery; and they find the staple that the first

25   doctor left in there.  And when they find that, then the clock

starts running again, right.  I would think that it would have

to be that the -- that the -- that there is tolling during that

period.

 I would not say that it negates, you know, the subjective

belief the person had at the outset, but there would have to be

tolling during that period.  So that's why I ask you the

hypothetical, if the doctor -- if Mr. Gebeyehou's doctor said,

I'm an expert and I can guarantee you, I have read all the

studies; and I can guarantee you that Roundup doesn't cause

NHL, how could there not be tolling in that circumstance?

 **MS. RUBENSTEIN:**  So it is a good question, and I

thought a lot about this in reading through those cases.  What

I can say is that that -- the idea that a doctor can provide

this objective medical opinion that allays -- I think is the

term that is used in the case -- allays someone's suspicion,

even to start the tolling period seems to be applicable in

these med-mal cases where there is a fiduciary relationship

between the Plaintiff and the Defendant.

 **THE COURT:**  I understand -- in a lot of med-mal cases

it is like that, but not in this case, though, that we are

talking about.  In this case we are talking about the Plaintiff

went to the second doctor and did the exploratory surgery.  And

it was the second doctor, not the Defendant, who said you have

nothing to worry about here.

 **MS. RUBENSTEIN:**  Right.  Understood.  But there is

1   something -- the cases seem to be applying that standard only

2   in -- in fact, in the two cases that Mr. Tsadik cited are

3   expressly interpreting 340.5, which is a limitation period that

4   we agree doesn't apply in this case.

5       So I -- I don't see a basis in the law to apply that

6   standard here.  I think it's clear from cases such as *Norgart*

7   and *Jolly*, which we have cited in our papers that a different

8   standard applies.

9           **THE COURT:**  And on that point -- I know I have

10  distracted you about telling me from the evidence and what the

11  doctors said, and I do want to give you a chance to get to

12  that; but on that point, Mr. Tsadik says that the standard is

13  different for 335.1 than 340.8.  Is there authority on that

14  issue?

15          **MS. RUBENSTEIN:**  I confess, I haven't read the

16  *O'Connor* case.  I don't think it is cited in his papers.

17          **THE COURT:**  It doesn't seem like it is on point.

18          **MS. RUBENSTEIN:**  I haven't seen anything to suggest --

19  and we can go back and research this, but I haven't seen

20  anything to suggest that 340.8 and 335.1 are different.

21          **THE COURT:**  Have you seen anything to suggest that

22  they are treated the same?

23          **MS. RUBENSTEIN:**  Other than -- I guess -- I don't -- I

24  can't cite to anything that is exactly on point.  I just -- the

25  answer is in short no.  We can go back and research it, but my

1  understanding is that the Court is generally applying the same

2  rule, the same discovery rule.

3          **THE COURT:**  Okay.  Now, I will let you get to your

4  point.

5          **MS. RUBENSTEIN:**  Sure.  So this idea that

6  Mr. Gebeyehou's doctor somehow threw him off the scent is not

7  at all supported by the factual record.  We know it is

8  undisputed that Mr. Gebeyehou sent the e-mail on the 24th.

9  Mr. Gebeyehou testified under oath that the doctor did not

10  respond on the substance of that.  He responded, you know, I

11  think with some administrative points, but did not respond on

12  the substance of it.

13     Mr. Gebeyehou also testified that he never raised it with

14  the doctor, and there is a snip that I can point you to --

15          **THE COURT:**  You mean, he testified that he never

16  followed up on that aspect of his e-mail with the doctor?

17          **MS. RUBENSTEIN:**  That's correct, Your Honor.

18          **THE COURT:**  Okay.  Where is that?

19          **MS. RUBENSTEIN:**  That is at -- I can hand you actually

20  a full copy of the deposition transcript.

21          **THE COURT:**  I was going to ask --

22          **MS. RUBENSTEIN:**  I think we only submitted an excerpt.

23          **THE COURT:**  I was going to ask for the full copy.

24          **MS. RUBENSTEIN:**  And I can point you to pages --

25  page 54 at lines 12 through 23.  And then again at pages 76 to

1  78.

2      (Whereupon, a brief pause was had.)

3          **THE COURT:**  Okay.  So -- but his doctor testified that

4  he did have some sort of discussion with Mr. Gebeyehou about

5  it, right?

6          **MS. RUBENSTEIN:**  Actually, Your Honor, what the doctor

7  testified -- and I can also hand up a copy of that, if you

8  would like -- is that he didn't recall one way or another

9  whether he had a follow-up discussion with Mr. Gebeyehou.  He

10  said in a typical case he might have that conversation, but he

11  emphatically said, and I can give you the cite, I don't recall

12  if I had a conversation with Mr. Gebeyehou.

13          **THE COURT:**  Do we have the full transcript?

14          **MS. RUBENSTEIN:**  Yes, I can hand that to you as well.

15      (Whereupon, a brief pause was had.)

16          **THE COURT:**  File those both on the docket also just so

17  that it is part of the record.

18          **MS. RUBENSTEIN:**  Sure.

19          **THE COURT:**  Okay.  Now, where?  Show me where that is.

20          **MS. RUBENSTEIN:**  Yep.  Give me one moment.

21      (Whereupon, a brief pause was had.)

22          **MS. RUBENSTEIN:**  That is at page 49, Your Honor,

23  starting at line 17, and it goes through the middle of the next

24  page.

25      (Whereupon, a brief pause was had.)

1          **THE COURT:**  Okay.

2          **MS. RUBENSTEIN:**  So there is really just no evidence

3    that Mr. Gebeyehou was, you know, thrown off the trail.  In

4    fact, his doctor simply, according to Mr. Gebeyehou's sworn

5    testimony, didn't respond one way or the other.

6          I think the -- I know Your Honor just read it, but the

7    part on page 76 he says, he didn't tell me no.  He didn't tell

8    me yes.  He didn't respond one way or the other.

9          So this idea that the period would be tolled is just based

10   on a factual scenario that doesn't exist here.

11         **THE COURT:**  Can I ask you another question about

12   tolling?

13         **MS. RUBENSTEIN:**  Absolutely.

14         **THE COURT:**  I understand you may not be prepared to

15   answer it because he has not really focused on a tolling

16   argument, but is it a judge question or a jury question?

17         **MS. RUBENSTEIN:**  I think it is a judge question

18   because I don't think there is any undisputed facts here.  I

19   don't see what fact the jury would --

20         **THE COURT:**  If there were a disputed fact question on

21   tolling, would that be a jury question?

22         **MS. RUBENSTEIN:**  Honestly, Your Honor, I haven't

23   researched it so I can't say for sure.  But I just don't see

24   what the dispute would be over tolling because we agree -- I

25   mean, it is undisputed when he sent the e-mail.  It is

1  undisputed what his doctor said in response.  So I don't know

2  what the predicate would be for tolling to take place.

3        **THE COURT:**  If you assume that Mr. Gebeyehou

4  subjectively believed that Roundup caused his cancer in

5  September 2014.

6        **MS. RUBENSTEIN:**  Correct, which I think we have to

7  believe based on his -- based on the documentary evidence.

8        **THE COURT:**  Okay.  Do you -- let me -- I mean,

9  obviously, you know, statute of limitations issues are

10  difficult because on the one hand, you know, the results are

11  very harsh.  But on the other hand, you know, Courts are

12  required to apply statute of limitations harshly sometimes.  It

13  is a decision that the Court makes.  But somebody has to bring

14  a lawsuit, and, you know, unless there is a real tolling

15  argument, you know, the Court -- the Court can't extend the --

16  the limitations period that the legislature has decided upon

17  and -- but it is a big deal to throw a case out on statute of

18  limitations.

19      So let me ask you:  Do you want another opportunity to

20  brief this tolling issue that I have raised --

21        **MR. TSADIK:**  Yes, I would.

22        **THE COURT:**  -- and to try to identify cases that might

23  stand for the proposition that Mr. Gebeyehou is entitled to

24  tolling from the period that he talked to his doctor to the

25  period that he discovered the IARC classification?

```
 1              MR. TSADIK:  Yes, Your Honor.  I would appreciate very
 2    much.
 3              THE COURT:  Okay.  And -- so you can brief that
 4    question.  You can brief the question of whether the same
 5    discovery rule applies to 340.8?
 6              MR. TSADIK:  That's good, Your Honor.
 7              THE COURT:  As 335.1?  Do I have the numbers right?
 8              MR. TSADIK:  Yes, you are right.  335.1, yeah.
 9              THE COURT:  So that's Question Number 2 that you can
10    file supplemental briefing on.
11         And Question Number 3 is:  Would this be a -- if there is
12    a disputed issue of fact on the tolling question, would that be
13    for a jury to resolve or would it be for the judge to resolve?
14         So those are the three questions that you can address in
15    supplemental briefing.
16              MR. TSADIK:  Thank you.
17              THE COURT:  When would you like to file your
18    supplemental brief?
19              MR. TSADIK:  I would say by the end of this month,
20    Your Honor.
21              THE COURT:  Sorry?
22              MR. TSADIK:  By the end of this month.  Would that be
23    all right?
24              THE COURT:  By the end of this month?
25              MR. TSADIK:  Yes.
```

```
 1              THE COURT:  That would be fine.

 2              MR. TSADIK:  Thank you.

 3              THE COURT:  So what date is that?  You want to say

 4     March 1st?  Friday, March 1st?

 5              MR. TSADIK:  Yes, thank you, Your Honor.

 6              THE COURT:  And then Monsanto can respond in, I don't

 7     know, a week later, March 8th.

 8          And then I will deem it under submission after that.

 9          One question, I guess -- one practical question I have

10     is -- I mean, I assume you are working around the clock.

11              MR. TSADIK:  Absolutely, Your Honor.

12              THE COURT:  Preparing your client's case for trial.

13              MR. TSADIK:  Yes.

14              THE COURT:  You know, I'm wondering if we should press

15     the pause button on that until I issue a ruling on the statute

16     of limitations question.

17              MR. TSADIK:  That would help, Your Honor.

18              THE COURT:  So what -- so why don't you -- why don't

19     you meet and confer with opposing counsel about how to provide

20     you with some relief in terms of your workload, and I would be

21     fine with -- even if it means that the -- that Mr. Gebeyehou's

22     case is not ready to go to trial in May, I would be fine

23     with -- if you-all agree to stop all other proceedings until I

24     issue a ruling on this.

25              MR. TSADIK:  Yes.
```

1         **THE COURT:**  So why don't you confer about that and

2  submit a stipulation, if you can agree to something.

3         **MR. TSADIK:**  Thank you, Your Honor.  I appreciate it.

4         **THE COURT:**  Thank you.

5    Why don't we talk about the Plaintiffs' specific causation

6  experts, and I will want to talk -- I will want to start with

7  Monsanto's lawyer on that.

8         **MR. STEKLOFF:**  Your Honor, understanding that I may

9  not be -- may not show you a single slide in this deck that I

10  have prepared because you may just have questions, we have

11  prepared a deck, and I have -- I just gave it to you -- and I

12  have multiple copies.  We labeled it Exhibit 2200, just for

13  purposes of the hearing.

14         **THE COURT:**  Thank you.  So I guess my tentative view

15  on the Plaintiffs' specific causation experts is similar to my

16  view on general causation, which is that I think that their

17  opinions are of pretty low quality.  I think that they, you

18  know, have some credibility issues.

19    I think the -- particularly as it relates to Mr. Hardeman,

20  but probably as it relates to all three of the Plaintiffs, the

21  evidentiary basis for a conclusion that Roundup caused their

22  NHL seems fairly weak, but particularly given the way the Ninth

23  Circuit approaches Daubert questions, you know, it is not clear

24  that the experts' opinions fall so far outside the range of,

25  you know, acceptable possible expert opinions that I should --

1     that I should exclude them.

2         My -- I think the two biggest concerns with the opinions

3     are, you know, one as it relates to Mr. Hardeman, you know,

4     kind of blowing off -- blowing off hep C.  And as it relates,

5     I guess, to all of them -- but, again, perhaps particularly

6     Mr. Hardeman -- the idea that just because you rule out other

7     things kind of automatically means that it must be Roundup that

8     caused the NHL.  I mean, it seems like a more reasonable

9     conclusion given the current state of the science is that we

10    simply don't know what caused these people's NHL.

11        But whether those flaws rise to the level of a

12    methodological defect in their opinion such that I should

13    exclude it, that seems -- that's tough.  And I'm sort of

14    tentatively inclined to say that the -- the problems that I

15    have identified with those opinions -- those expert opinions

16    are more -- they are flaws for you to point out to the jury,

17    not reasons for me to exclude the opinions on methodological

18    grounds, so --

19        **MR. STEKLOFF:**  So just responding to what Your Honor

20    said, and I think it actually might be helpful, at least by

21    starting to walk through the slide deck that I have prepared.

22    But I think there are two methodological flaws that even under

23    Ninth Circuit law demonstrate that they have not engaged in a

24    proper differential diagnosis.  And I think -- I'm going to

25    walk through the admissions that I think establish those flaws.

I think there are two flaws.

One is I think that all three experts have demonstrated that general causation equals specific causation.  That, if they -- because based on your PTO45, they have in some way, whether individually or holistically, survived general causation that that allows them to automatically rule in Roundup.

THE COURT:  And I will tell you, that -- that causes me some discomfort, but I wonder if it's the product of your insistence and my agreement that the proceedings should be bifurcated, right.  I wonder if it is kind of an unfortunate byproduct of that because the opinions that the Plaintiffs' experts offered at the general causation stage were not merely that glyphosate is capable of causing cancer, right.  The opinions that they offered was that there is a very strong association, a very strong link, between Roundup and NHL, right.  And I think that's one of the reasons why I said that I -- you know, the Plaintiffs' experts have credibility problems, right, because, you know, it seems rather dubious to say -- you know, it is one thing to say there is an association or there is a potential link.  It is another thing to say, I know to a certainty that there is a very strong link and that Roundup is causing cancer, you know, across the country with regularity, right, which is the -- effectively the opinions that they gave and the opinions that I allowed them to give,

1    right, even though I had tendency to disagree with it.

2         And then -- so now we fast forward to specific causation,

3    and we said, well, the specific causation experts are allowed

4    to piggyback off of those general causation opinions.  So if

5    the general causation opinions had been Roundup is a risk

6    factor, but it is a fairly weak risk factor because we don't

7    know that much yet, the science hasn't developed enough yet,

8    then I would be inclined to agree with you that to the extent

9    the expert merely piggybacks on the general -- to the extent

10   the specific causation expert merely piggybacks on the general

11   causation expert's testimony -- opinion, and concludes that

12   because there is general causation, there must be specific

13   causation after having ruled out all these other factors, I

14   think that would be a problem.  But given the -- their opinion

15   about how strong the link was, maybe it's not a problem.

16        **MR. STEKLOFF:**  What I would say is that we know under

17   California law that at that -- even if they can survive the

18   general causation hurdle, even if this had not been bifurcated

19   -- so it had all been at once and they are trying to survive

20   the general causation hurdle first, and they are hearing

21   everything at once, and they come in with the opinion there is

22   a strong association, Your Honor, in PTO45 that disagrees with

23   them and says it goes to the weight of their opinion.

24        I'm not trying to characterize your words, but it tends to

25   seem it is a weaker association than the Plaintiffs' experts

have said.  We know in the specific causation phase, and you
cite this in footnote 30 of PTO45, and there is case law
demonstrating that at the specific causation phase you need
more.  You need to show a doubling of the risk because you
cannot say more likely than not in an individual that he or she
had his non-Hodgkin's lymphoma caused by glyphosate unless you
can show a doubling of the risk -- and I'm going to touch on
that -- where in this context they are relying only on
unadjusted numbers.

     And so they can't show that 2.0, but I think more
fundamentally that demonstrates that even this had been done at
once, it is not enough, even if your opinion is the association
is strong, which is based not just on the epidemiology, all of
their experts admitted, I think, that the epidemiology did not
get them there alone.  So that's why they had to tie in the
animal data and the genotoxicity data.

     So I think as a fundamental foundation of California law,
regardless of whether you bifurcate the proceedings, they have
more to do at the specific causation phase.

     Now, going back to where I started.  The other fundamental
point that I want to flag for you, that is a flaw in their
methodology, is that even if the Ninth Circuit accepts
differential diagnosis, we had different versions about the
experts, what they do in clinical practice versus the law about
differential diagnosis.  There is no dispute that a

 1   differential diagnosis requires a proper ruling in of risk

 2   factors and a proper ruling out of risk factors, and what their

 3   methodology demonstrated was that they are unwilling, even once

 4   they rule in Roundup -- and I'm going to talk about why that

 5   was improper.

 6        Once they rule it in, there was no room in their

 7   methodology whatsoever to consider ruling it out in any single

 8   case because either they say, Well, if it's the only thing

 9   left, and otherwise this might be idiopathic because I don't

10   think the association is so strong that in a hundred out of a

11   hundred or a thousand out of a thousand cases it is the

12   substantial contributing factor; and I could never say it is

13   idiopathic.  And that --

14        **THE COURT:**  At least given the exposure level that the

15   three Plaintiffs experienced.

16        **MR. STEKLOFF:**  Well, I will talk about that because I

17   think that's where Dr. Weisenburger tried to come in after we

18   had fairly clean testimony from Dr. Shustov and Dr. Nabhan

19   about the floor that they set.  We had a lot of back-and-forth

20   with Dr. Weisenburger about that he was somehow considering

21   their individual exposure.  I think where we ended up at the

22   end of the day when you said, should you have said that, you

23   are saying that -- you are comparing Mr. Hardeman to the people

24   in *McDuffie* and *Eriksson* and saying that their exposure -- his

25   exposure is so much higher.  He, Dr. Weisenburger, took that

 1   back and said, I probably shouldn't have said that.  And so he

 2   is exactly in the same place as Dr. Shustov and Dr. Nabhan on

 3   that, and they're --

 4        **THE COURT:**  Well -- I'm happy to explore this

 5   potential difference between Shustov and Nabhan on the one hand

 6   and Weisenburger on the other, but I don't think you are

 7   accurately characterizing Dr. Weisenburger's testimony.

 8        Dr. Weisenburger did not say that it doesn't matter

 9   whether somebody is exposed for ten lifetime days or, you know,

10   a thousand lifetime days.  I mean, he did not -- when he said,

11   I take that back, I shouldn't have said that, he wasn't saying

12   there is no difference between those two.  What he is saying

13   is, I should not have assumed that Mr. Hardeman was at -- had a

14   risk factor of greater than 2.0 because he was exposed more

15   than ten lifetime days.  That is different from saying -- I

16   mean, he is assuming -- he continues to believe, at least my

17   interpretation of his testimony, is that he continues to

18   believe, and it is reasonable to continue to believe, that

19   somebody who is exposed to ten lifetime days of Roundup, has

20   ten lifetime days of exposure to Roundup, is a lot less at risk

21   than somebody who is exposed to -- who has a thousand lifetime

22   days of exposure to Roundup.  That's certainly an obvious

23   point, I think.  I don't think he took that back.

24        **MR. STEKLOFF:**  Okay.  I will try to show you this.  I

25   will jump ahead in my presentation to try to convince you that

1    he took that back.

2        The deck is frozen.  But, Your Honor, if you can turn to

3    Slide 15 of the hard copy.  So this, Your Honor, on Slide 15 is

4    the testimony in the *Gordon* deposition.  The *Gordon* deposition

5    is a Missouri case, but he used the same methodology there.

6    And he was asked:  Okay.  So is it -- just to push a little bit

7    on that, is it fair to say that you would -- that your minimum

8    exposure would be at least two times --

9        **THE COURT:**  I know what he said in his deposition,

10   and -- but what he was -- and he took that -- and he took that

11   back.  He said -- in his testimony he said, look, if somebody

12   was only exposed for ten lifetime days, I would not conclude

13   that -- I would not be comfortable concluding that they got

14   their NHL from that.  He took that back.  I understand that.

15       But, of course, Mr. Hardeman was not merely exposed

16   over -- for ten lifetime days.  He was exposed a lot more than

17   that.

18       **MR. STEKLOFF:**  Either was Ms. Gordon.  And in the

19   Gordon deposition he said that even in the hypothetical where

20   she was only exposed two days per year and ten lifetime days --

21       **THE COURT:**  Well, I understand that, but are you

22   saying that his opinion should be excluded because he took back

23   something he said in a prior deposition in a different case?

24       **MR. STEKLOFF:**  Well, I think that that prior

25   deposition in a different case demonstrates his methodology.

1    It demonstrates -- so we have a history here, right.

2    Dr. Shustov comes in and says, two days per year, ten days.

3        I don't think there is any hesitation there.  If someone

4    hits that, he is going to rule it in and we can talk about it

5    but then automatically keep it in.  I think Dr. Nabhan did the

6    same thing.  He said there was a strong association, but he

7    said two days, ten days, that is the minimum.  I'm going to

8    rule it in.  And my argument is he is never going to rule it

9    out.

10       I think Weisenburger then --

11       **THE COURT:**  That's not what they said.  All right.

12   They didn't say they would never rule it out.

13       **MR. STEKLOFF:**  Well, that's where I think that the

14   problem is -- they say essentially -- I mean, they were never

15   asked directly, would you never rule it out; but their other

16   admissions demonstrate that they would never rule it out

17   because there are two scenarios.

18       There is a scenario where someone is otherwise idiopathic

19   and either because they say this person didn't have all these

20   viruses -- this person never had HIV; this person was never

21   exposed to hepatitis C -- so I have ruled in Roundup, and I am

22   not considering age or risk factor so Roundup is it.  Roundup

23   is automatic.

24       **THE COURT:**  Right.  So given the fact that they are

25   permitted to rely on expert opinions, that -- that there is a

1    very, very strong link between Roundup use and NHL, and that

2    the more -- you know, the more you are exposed, the stronger

3    the association is, why is that not okay?

4              **MR. STEKLOFF:**  Because --

5              **THE COURT:**  In other words, it seems like the general

6    causation opinions stand for the proposition that, you know,

7    you can almost think of it like smoking and lung cancer, right.

8    So if you had -- if you had no other -- if the person is

9    otherwise idiopathic, but they have smoked a half a pack a day

10   for ten years, you would opine in a hundred out of a hundred

11   cases, I would think, that the smoking caused their lung

12   cancer, right?

13             **MR. STEKLOFF:**  Because that, Your Honor, is saying

14   that even if they have a very flawed methodology to survive

15   general causation with that opinion, but for all the -- shaky

16   and it is weak, but that's a question for the jury under Ninth

17   Circuit precedent, that then can't be enough.  They have to do

18   more.

19        And the problem here is what more have they done.  Now, I

20   understand they have reviewed the medical records, but they

21   have done nothing beyond saying, I think there is a strong

22   association; and I'm allowed to say that because we are -- some

23   of our experts have --

24             **THE COURT:**  In my smoking example, would you be making

25   the same argument?  Would you be saying that if there are

1    general causation opinions saying that there is a very strong

2    link between tobacco and lung cancer, and a specific causation

3    expert comes in and piggybacks off of that general causation

4    expert and says, the person is otherwise idiopathic.  Smoking a

5    half a pack a day for ten years is the only thing that I have

6    been able to identify as a risk factor.  Therefore, I conclude

7    that the smoking caused this person's lung cancer.  Would you

8    be sitting here and saying, Well, under California law they

9    have to be doing something more?

10        **MR. STEKLOFF:**  I think they -- well, I have two

11   comments.

12        **THE COURT:**  And if the answer is yes, what more do

13   they have to do in that hypothetical?

14        **MR. STEKLOFF:**  I have -- I have three responses.

15       First, is I don't think that's a -- the right analogy

16   because here we have admissions that 70 to 90 percent of NHL is

17   idiopathic, and I don't think in lung cancer there is a

18   position that 70 to 90 percent of lung cancer in the clinical

19   practice is idiopathic.

20       The second thing is that I think even in that scenario,

21   under a proper differential diagnosis, the experts would in

22   some way have to recognize that they would be willing to rule

23   out smoking if there were other reasons based on the

24   individual.  I don't -- here --

25        **THE COURT:**  But they said that here.  I mean, the

Nabhan case law said --

      **MR. STEKLOFF:**  Yeah.

      **THE COURT:**  -- I would -- depending on the individual circumstances, I might be willing to rule it out, depending on the circumstances of the particular individual.

      **MR. STEKLOFF:**  They said that, but what their methodology demonstrates is they actually wouldn't do that. I mean, I guess hypothetically if someone was exposed to radiation for 15 years every day, they might say in that .00001 percent chance -- I think Dr. Shustov said that -- absent that they are saying, I never need to rule it out because if I can't identify any other risk factors in the real world, which would be idiopathic, I, nonetheless, am just going to say this is the only thing left, so it is in.

      I think the hepatitis C in Mr. Hardeman demonstrates two things.  One, they treat other risk factors like hepatitis C that are known causative risk factors differently.  So they go to leaps of logic, would be our position, to try to excuse those risk factors.  Take Dr. Shustov and his argument to excuse hepatitis C; that Mr. Hardeman didn't even have chronic hepatitis C, despite medical record -- medical record and the other experts admitting that he was exposed to 25 to 40 years.

      The other thing is that when they are caught with that -- so Dr. Weisenburger is a good example of this.  Says, well, you know what, they are both comparative causes.  They are both

1   substantial and contributing factors, so I don't need to rule

2   out the Roundup; and I think all three of them gave that.  So

3   we have a scenario where --

4          **THE COURT:**  That is an issue that I'm going to want to

5   discuss further with you when we get to jury instructions, but

6   anyway --

7          **MR. STEKLOFF:**  Okay.  And I think that there is an

8   analogous situation -- and I can show you the case in another

9   litigation I have been involved in -- where -- which is

10  hormonal therapy litigation.  Hormonal therapy was subject to

11  litigation about breast cancer.  Breast cancer is largely

12  analogous to non-Hodgkin's lymphoma in that it is considered

13  widely idiopathic, absent one gene, the BRCA, B-R-C-A, gene,

14  sort of, doctors will tell you it is idiopathic.  So I think it

15  is very similar.

16       In that litigation there was a double-blind controlled --

17  randomized controlled trial run by the National Institutes of

18  Health that demonstrated an increased relative risk.  So I

19  think sort of the general causation hurdle was surpassed.

20       But the experts there, nonetheless -- and I will get you

21  the case.  It is called *Scroggin*.  It's an Eighth Circuit

22  case -- that validates the methodology of the specific

23  causation expert, looked at the individual plaintiffs; and what

24  the Court -- what the specific causation expert did there was

25  they had tested the tumors of the women who developed breast

cancer, and there were hormone receptors that were positive.

So they said there, well, we know that these cancers are dependent on hormones.  Where are the Plaintiffs getting the hormones from?  They are either getting it internally or they are getting it from some other source.

They were willing to rule out hormone therapy as the cause, even though there was a general cause link, unless they could show that there were no endogenous hormones, that the women -- the plaintiffs could not have been developing breast cancer with their own hormones and, therefore, the hormones -- the breast cancer had to be caused by outside hormones.

I use that as an analogy because there is nothing similar here.  They have done general causation, and then they can't point to anything in any of the individual plaintiffs that somehow ties to Roundup.  They can't tie anything in their tumors.  They can't tie anything in their medical records. They can't tie any sort of specific genetic mutation like we could with hepatitis C.

And so I understand maybe the science hasn't --

**THE COURT:**  That can't be -- I mean, that can't be a reason in itself to -- I mean, that means -- that simply means that nobody -- I mean, I think your argument stands for the proposition that nobody could ever get past specific causation or general causation with respect to Roundup because there's no marker you can identify that associates the NHL with the

Roundup.

    MR. STEKLOFF:  I'm not conceding the general causation ruling here, but I think you can view that you can get past general causation.  I think the point is you have to do something more with the individual to get past specific causation.  They have the burden.  They haven't done that.

    They have simply said because we get past the general causation hurdle --

    THE COURT:  But on the theory that you're articulating now, nobody could ever get past specific causation.  On the theory you're articulating now, even if you could get past general causation and have an admissible opinion that glyphosate is capable of causing NHL, nobody could ever get past specific causation even if they were, you know, showering in Roundup every day for 20 years; right?  Because there's no marker linking the NHL to the glyphosate.

    MR. STEKLOFF:  Well, I don't think that the marker is the only way I'm using it as an example, but maybe they could -- you know, Dr. Weisenburger --

    THE COURT:  Why is that Eighth Circuit case relevant then?  I don't understand.

    MR. STEKLOFF:  Because I think it demonstrates that even where there was general causation, it demonstrates that to establish specific causation, the experts were able to do something more and were willing to consider ruling out hormone

therapy despite hormone therapy being ruled in in every case because the plaintiffs all used hormone therapy, that was undisputed, and there was an increased risk that the experts there thought was a strong risk.

**THE COURT:** Okay.

**MR. STEKLOFF:** They here haven't done anything other than saying "I think there's a strong risk so in every single case I am going to then rule it in and I don't need to rule it out," and that is the problem.

I agree that it seems like a very challenging hurdle for them, but that also was expressed in PTO 45, that this was a daunting hurdle. And now that daunting hurdle has been, "You know what? I'm not really relying on data" -- even if you take Dr. Weisenburger that he didn't somehow pull this back -- "I'm just speculating that somehow Mr. Hardeman's risk is higher than these people in the studies. I think it's strong. You've told me I'm allowed to say that it's strong. That's enough."

That really is their methodology at the end of the day. And I think that, again, the hepatitis C, it is specific to Mr. Hardeman but I view it as a more fundamental problem across -- that applies to all the cases and their methodology holistically because it demonstrates that they are treating other risk factors different than Roundup.

How is it that those -- you know, we heard Dr. Weisenburger say "I think hepatitis C is a very, very weak

1   risk factor."  I don't remember -- "You know, it's one in this
2   many cases."  Well, he's not treating Roundup in the
3   epidemiology there the same.
4       You know, they have these problems of mechanism of action.
5   So they'll just --
6           **THE COURT:**  Yeah, and that gets back to my point that
7   it's kind of a by-product of this bifurcation procedure, you
8   know.  Because they're allowed -- the specific causation
9   experts are allowed to piggyback on these general causation
10  opinions that have already been allowed in.
11          **MR. STEKLOFF:**  But that's not -- I mean, I wasn't part
12  of the proceedings when that happened, but let's say that you
13  had done it all back in 2018.  You still would have had the
14  same experts come through:  Dr. Portier and Dr. Ritz,
15  Dr. Nabhan, Dr. Weisenburger, Dr. Neugut.  They would have all
16  offered their opinions.  You would have had to gauge whether
17  the general causation experts survived general causation.  Then
18  they still would have had to do the exact same thing that they
19  did here at the same time, and you could have made a ruling at
20  that time.
21      I think that actually -- I don't agree that it's strong,
22  but I think that they probably survive general causation if you
23  look at the way they treated the *Bradford Hill* criteria and you
24  look at Ninth Circuit precedent, but that doesn't mean that
25  that alone allows them to survive specific causation.

1        So I don't think that -- I mean, had you treated it all at

2   the same time, you would have been dealing with these issues

3   back in 2018.  They still would have had to do more at the

4   specific causation phase, and it can't be that they're just

5   saying "Because I think this is strong."  Whether it's

6   Dr. Weisenburger, who believes it's strong; whether it's

7   Dr. Nabhan, who believes it's strong but his opinions were

8   excluded and he still can't separate himself from them; or

9   whether it's Dr. Shustov who says, "I actually don't even know

10  whether it's strong or weak."  He says, "I'm not even weighing

11  the risk factors.  I'm just doing this 2 day/10 day thing.

12  I've been told to rule it in because you're going to allow this

13  in general causation."

14       So there's also a difference between the three, but I

15  don't think that you can treat the three of them equally even

16  in that regard.  I think Dr. Weisenburger, you know, because he

17  survived general causation still has as much of a problem

18  because he hasn't done anything more in specific causation, but

19  I think also they should be treated individually.

20            **THE COURT:**  Okay.

21        **MR. STEKLOFF:**  So I guess -- I mean, I defer to

22  Your Honor -- I mean, I think there are a couple -- I guess

23  there are some admissions that I think are quickly worth

24  walking through in this slide that I'd like to try to

25  demonstrate this, but --

```
 1              THE COURT:  If you want to take a couple minutes to do

 2      that, go ahead.

 3              MR. STEKLOFF:  Okay.  So --

 4              THE COURT:  Let me ask you a question.  How much do

 5      you care about -- this is a time management question.  How much

 6      do you care about my tentative ruling about your specific

 7      causation experts?  Like, are you guys going to want to be

 8      spending a chunk of time discussing that or are you --

 9              MR. STEKLOFF:  Oh.

10              THE COURT:  I can imagine you saying "We can live with

11      that," we can deal with it.

12              MR. STEKLOFF:  Mr. Kilaru is arguing that.  I think we

13      want to deal with your ruling on the margins is what I would

14      say.  So I don't think it is a long argument at all.

15              THE COURT:  Okay.  Okay.  So go ahead.

16              MR. STEKLOFF:  Okay.  And I'll see if this works both

17      on the screen and in the hard copy.  I'm going to start

18      actually back at the beginning.

19          All right.  So if we can start -- I won't remind you about

20      the language in PTO 45 but we have that in here.

21          If we can skip to page 4, I think this demonstrates from

22      Dr. Weisenburger that general causation carries the day, that

23      he didn't do more.  And obviously the whole quote is here, but

24      if you look at his final answer, when you were pushing him

25      hypothetically, he says (reading):
```

1           "And I think it goes back to the initial

2     interpretation of all of the general causation data; and

3     if you believe that Roundup causes NHL -- can cause NHL,

4     then -- and you believe that there is strong evidence,

5     which I think there is, then you would use that to -- in

6     your interpretation of specific causation, sure."

7     And so I think that demonstrates -- I mean, I'm going to

8  show more why he didn't do more, but this is sort of his

9  starting point.  I think it's strong.  I think general

10  causation is enough.

11     **THE COURT:**  And before -- I'm happy to let you go

12  through this, but just while it's on my mind, for the

13  proposition that this is not enough in this context where we've

14  already kind of established that there isn't -- you know,

15  there's an expert opinion that's admissible that the link is

16  strong, you cited this Eighth Circuit case.

17     **MR. STEKLOFF:**  Yes.

18     **THE COURT:**  Are there any other cases you want to cite

19  for that specific proposition just to make sure I read them?

20     **MR. STEKLOFF:**  Yes, Your Honor.  There is the *Lipitor*

21  case that we cite in our brief, and the -- there's another case

22  in here that I would like to cite.  I think that *In Re Bextra*

23  *and Celebrex* at 524 F.Supp. 2d 1166 here in the

24  Northern District of California also supports this point.

25     **THE COURT:**  Okay.

```
1          MR. STEKLOFF:  So those are the two cases that I would
2    focus on.
3          THE COURT:  Okay.
4          MR. STEKLOFF:  I also want to at some point
5    distinguish Wendell, which I think is sort of the case that you
6    have to consider in the Ninth Circuit, but I think through
7    Dr. Shustov's testimony we demonstrated why the circumstances
8    of Wendell are very different than those here.
9          THE COURT:  Okay.
10         MR. STEKLOFF:  If you turn to Slide 5, Your Honor,
11   Slide 5 then is where Dr. Weisenburger takes it to the next
12   step.  And, again, this is you questioning him and sort of
13   going back to the premise of your question is (reading):
14         "I'm trying to remember what you did at the general
15         causation phase."
16    And he says (reading):
17         "Well, I think when you do the differential etiology,
18         whether it is a strong link or even a weak link, in the
19         end, when you go through your list and it is the only link
20         left, then you know the conclusion is more likely than not
21         that was the cause."
22    And I think -- so there he's not even completely relying
23   on the strong link.  He is saying, "Even if it is a weak
24   link" -- so, Judge, even if you were right in PTO 45, so this
25   isn't the smoking-lung-cancer analogy; this is very
```

different -- "I would still rule it in automatically and then never rule it out and say it was the substantial contributing factor."  I think that is a real problem for them.

Slide 6 I think we can hit on quickly, which just shows that Dr. Nabhan claimed to not be offering general causation opinions; but I think he demonstrated that despite being excluded by Your Honor at the general causation phase, he nonetheless cannot escape his own personal views of the general causation evidence, and that's demonstrated on page 7.  He doesn't say "I'm relying on Dr. Ritz or Dr. Portier or Dr. Weisenburger.  I -- you know, it is my opinion that the evidence actually is very strong between NHL and Roundup and, as a clinician, I cannot ignore that."

Then he goes on to make this, like, speculative smoking-to-lung cancer comparison saying I think -- you know, which is just -- I don't think I should even have to go into the differences between the two here and now because -- but it really, I think, undermines both his methodology and his credibility that that is the basis for his opinions to rule in Roundup and then never rule it out.

And then, finally, Dr. Shustov on Slide 8, again, simply assumes Roundup is the cause.  And to be clear to the question that Your Honor asked, which is, "Well, they're all saying that this is a very strong association," he actually makes clear that he is not doing that.  He says (reading):

"I was not asked to opine on the strength of the
association."

So he's simply saying, "I'm allowed to say it's a general
cause."  So he's a little more similar to what I think we saw
from Dr. Weisenburger a few slides ago.  Whether it's weak or
whether it's strong, he's automatically going to rule it in;
and then there is no room for him, even if it is weak, because
he's not opining on the strength, to rule it out.  He is not
including that whole second half, the rule-out part of his
differential diagnosis, which is required under any case that
requires a differential diagnosis, Ninth Circuit or otherwise.

Jumping to Slide 10, and I raised this earlier, how is it
that we know that you have to do more at specific causation
whether the proceedings are bifurcated or not?  This is just
taking Your Honor's language from PTO 45 in Footnote 30 that
you -- where there was an argument in the general causation
phase about needing a 2.0 doubling of the risk.

But the case that you cite, which I'm also pointing
Your Honor to, which is *In Re Bextra and Celebrex*, explains
that that, while not relative -- you know, not necessary for
general causation is necessary for specific causation.

We know --

**THE COURT:**  That's not how I described the case, but
you're saying the case itself says that?

**MR. STEKLOFF:**  Well, it's saying it's probative.  But

1    I do think it is necessary between -- if you turn to the next

2    slide, under the *Cooper* case, that you must show a relative

3    risk greater than 2.0 to be useful to the jury.  So I think

4    California law, that case makes clear that at the specific

5    causation stage, experts must meet the 2.0 standard.

6              THE COURT:  Okay.

7              MR. STEKLOFF:  And it makes sense, Your Honor, because

8    they're trying to say more likely than not, which is, you know,

9    50.1 percent.  So you need a doubling of the risk to be able to

10   say that.  It makes sense in the specific causation context.

11        So what did all three of the experts here do?  They relied

12   on two studies.

13             THE COURT:  You don't need to explain the fact that

14   they relied on studies that were not adjusted for pesticide --

15   the other pesticides, they relied on numbers that were not

16   adjusted.  I understand all that.

17             MR. STEKLOFF:  I understand, but it is -- but we do

18   think it is a problem, to be clear, Your Honor.

19        So if you jump ahead back to 15, I do think it is quickly

20   worth walking through, and I won't belabor it, Dr. --

21             THE COURT:  It's pretty amazing actually, I mean, just

22   on that point.  I mean, given all of the time that we spent at

23   general causation establishing that numbers unadjusted for

24   other pesticide use are much less helpful than numbers adjusted

25   for other pesticide use and given that even the plaintiffs'

1    experts all admitted that, as I recall, that they would

2    choose -- that the lawyers would choose to put in the expert

3    reports, the unadjusted numbers.  I mean, it was pretty

4    amazing.

5           MR. STEKLOFF:  Well, I agree that it's remarkable but

6    let me explain to you why that happened.  It's because they

7    know they have to meet the 2.0 hurdle and they can't meet the

8    2.0 hurdle absent relying on unadjusted numbers.  If they could

9    meet the 2.0 hurdle relying on adjusted numbers, then we would

10   have seen adjusted numbers.  They knew that they could only

11   point to studies that met 2.0.

12          THE COURT:  Okay.  Anything else?

13          MR. STEKLOFF:  I'll try --

14                 (Pause in proceedings.)

15          MR. STEKLOFF:  You know, I do want to raise just

16   quickly -- I mean, I'll more explain what we have in here.  I

17   think we have admissions, if you turn to page starting

18   Slide 23, that establish that they will never rule out Roundup

19   because the first set of admissions starting on page 24 with

20   each of the three experts demonstrates that Roundup is always

21   going to be a substantial factor under their methodology.

22          Starting at page 28, that's sort of a little bit more in

23   the idiopathic context.  We demonstrate with admissions that

24   even considering other causative risk factors that they

25   acknowledge, they will still nonetheless necessarily rule out

1    Roundup.  And so I think we have clean admissions from all

2    three experts on that point.

3         I won't belabor the hepatitis C point, but I do think that

4    it demonstrates that they are not treating Roundup in the

5    rule-out phase the same -- in the same way, both from an

6    epidemiological standard but also in their review of the

7    medical records, in any way the same that they are treating

8    Roundup, which calls into question the entire methodology for

9    all three of them.

10        I think Slide 39 distinguishes from Dr. Shustov the

11   *Wendell* case, which I'm sure, you know, is a focus of

12   plaintiffs' brief and is Ninth Circuit precedent that is

13   binding on this Court.  But in that case they were dealing with

14   a very rare cancer, 1 in 6 million were the odds of that

15   individual plaintiff developing that cancer absent -- in any

16   other circumstance absent the medicines.  And Dr. Shustov, as

17   you heard, had treated this more than anyone else, that

18   specific type of cancer.

19            **THE COURT:**  Yeah.  I mean, on that point, I'll sort of

20   give you a chance maybe to answer this:  You know, it's not --

21   I don't view the *Wendell* case as somehow binding with respect

22   to this question.  However, I think when you take the totality

23   of Ninth Circuit law on *Daubert* questions on expert opinions,

24   you come away with -- and I will admit to you that I haven't

25   gone back and read all the cases that I read at the general

1   causation stage, but when I did that at the general causation

2   stage -- so if something's changed about Ninth Circuit law, you

3   should let me know -- but when I did that at the general

4   causation stage, you come away with a pretty strong feeling

5   that, you know, the Ninth Circuit is more tolerant of shaky

6   expert opinions than other circuits; and that the Ninth Circuit

7   is more likely to -- let me put it this way:  The Ninth Circuit

8   ties judges' hands -- trial judges' hands a little more tightly

9   than other circuits when it comes to excluding things.  Do you

10  agree with that?

11          MR. STEKLOFF:  I would not -- I would agree with that

12  on a macro basis in respect to *Daubert*.  I don't think that

13  there is Ninth Circuit precedent that says as part of a

14  differential diagnosis, you can just rely on your general

15  causation and ignore the rule -- completely ignore the rule-out

16  step even under California law.

17          Slide 43, Your Honor, references another case that I think

18  you should -- it's up to Your Honor, but we would point you to

19  that sort of touches on these issues generally, which is in the

20  Eastern District of Washington and it's talking about specific

21  causation analyses in the context of largely idiopathic

22  diseases and the need to factor that in.  And I think, then, we

23  lead to a series of admissions from all three experts that

24  demonstrate that they did not do that.

25          I sort of think we have a series of admissions from

1   Dr. Nabhan that sort of -- I've never heard such a definition

2   of "idiopathic," especially when you pushed him on the heart

3   attack analogy, even though he said that -- you said, "Well,

4   what if someone drank a little bit but didn't exercise as much

5   as they should have" -- I'm paraphrasing -- "and didn't have

6   the most perfect diet.  Would you say that that caused their

7   heart attack?"

8        And he basically said, "Yes, you cannot call that

9   idiopathic."  I mean, that is not how -- I think we had

10  testimony and just common sense tells you -- doctors would

11  treat that.

12       His strange definition of "idiopathic" is that it's only

13  idiopathic if you can't even identify, like, a minor, minor,

14  minor hypothetical risk factor.  He specifically says in

15  page 46 (reading):

16           "Idiopathic in that example would be somebody who is

17        in their late 30s who exercises, who is fit, who is not

18        overweight at all, who has never smoked, who has no family

19        history of heart attack.  That is idiopathic."

20       So, again, that is a problem where you have to consider

21  idiopathic under precedent.  He is just not doing it properly.

22  I think that is also true with respect to Dr. Weisenburger and

23  Dr. Shustov, which we have in here.

24       And at the end of the day what we would say is that their

25  methodology is really *ipse dixit*:  We've survived general

 1    causation.   I say Roundup is a strong factor.   I'm ruling it

 2    in, and so -- and because I say so and because I want to just

 3    dismiss hepatitis C or anything else, it's a substantial

 4    contributing factor.

 5        I just want to raise one last point in differentiating

 6    between the three of them.   I don't think you can ignore that,

 7    one, Dr. Nabhan has been excluded on general causation but just

 8    can't separate himself from that; and, two, I don't think that

 9    you can ignore Dr. Shustov's plagiarism.   I mean, when he came

10    in here and said --

11            THE COURT:   Well, but, I mean, the problem with that

12    is that -- you call it plagiarism.   I really take strong issue

13    with that.

14        The way expert opinions usually work is that the lawyer

15    drafts the expert report and sends it to the expert and the

16    expert reviews it and makes changes, and they go back and forth

17    on the drafts until it's something that both the lawyer and the

18    expert can get behind.

19        So in that respect, virtually every expert report is,

20    quote/unquote, "plagiarized."   And so, you know, to say that

21    Shustov used, you know, a partial cut-and-paste job or even a

22    full cut-and-paste job as a starting point for his report, I

23    just -- you know, I don't know why you spent so much time on

24    that, to be honest.

25            MR. STEKLOFF:   Well, I think it calls into question

 1   whether the methodology that he's engaging in in the sense of

 2   whether he's doing an independent review, for example, of

 3   the --

 4          **THE COURT:**  Well --

 5          **MR. STEKLOFF:**  -- risk factors.

 6          **THE COURT:**   -- maybe we should have a rule that all

 7   experts should just do the first draft of their opinions.

 8   Actually, that probably should be a good rule, but the reality

 9   is that in the vast majority of cases, lawyers do the first

10   draft of expert reports.

11          **MR. STEKLOFF:**  Except that he said -- I mean, we

12   didn't get into the detail -- he said he wrote every word in

13   his report.  So in a world in which he said "I went back and

14   forth with the lawyers," maybe that would be okay, but he

15   didn't say that.  Both in his deposition and here before

16   Your Honor he did not say that.

17          **THE COURT:**  Okay.

18          **MS. WAGSTAFF:**  So we've been going an hour and a half.

19   Could we take a few-minutes break?

20          **THE COURT:**  Well, I have to -- I have -- that would be

21   fine if you want to do that.  I have a lunch appointment at

22   11:45 so I was planning on going till then and then breaking;

23   but if you want to take a five-minute break now, that will be

24   fine.

25          **MS. WAGSTAFF:**  Yeah, that will be great.

```
 1              THE COURT:  Okay.

 2              MR. STEKLOFF:  Your Honor, I'll just hand a copy of

 3    the Scroggin case that I referenced, two copies to Your Honor

 4    and opposing counsel.

 5              THE COURT:  Sure.

 6         So let's make it real quick and just come back at 10

 7    after.  Okay?

 8              MS. WAGSTAFF:  Okay.

 9              THE CLERK:  Court is in recess.

10                   (Recess taken at 11:06 a.m.)

11                   (Proceedings resumed at 11:12 a.m.)

12              MR. WISNER:  I think she just went to the restroom so

13    can I bring up something while she's in the restroom?

14              THE COURT:  Yeah.  Yeah.

15              MR. WISNER:  Your Honor, I'd like to give the Court

16    something that was published last week.  It's a brand new

17    meta-analysis that looks at the AHS and glyphosate.  It was

18    actually published -- if I may -- it was actually published by

19    people who participated in the Scientific Advisory Panel for

20    Roundup -- or for glyphosate, and --

21              THE COURT:  You mean for the IARC?

22              MR. WISNER:  No, no.  For EPA.

23              THE COURT:  Oh, okay.

24              THE CLERK:  Mr. Wisner, do you have a second copy for

25    our law clerk?
```

1          **MR. WISNER:**  Yes, I do.

2      This just got published and it's really relevant to the

3  issues of strong evidence or weak evidence as these authors

4  conclude that there is a compelling link between GBH,

5  glyphosate-based herbicides, and an increased risk for NHL.

6      So I just wanted to bring that to the Court's attention.

7  It's something that I think defense counsel and I have been

8  discussing.

9      Do you want to talk about the issues with Dr. Portier

10 right now?

11         **MR. STEKLOFF:**  I defer to the Court.  I have an issue

12 to raise with this paper, but I defer to the Court the timing.

13         **THE COURT:**  Sure.  Whatever you want to do.

14         **MR. WISNER:**  Why don't we just do it now and get it

15 out of the way.

16         **THE COURT:**  Use our time efficiently.  Whatever you

17 want to talk about.

18         **MR. STEKLOFF:**  Okay.  So our -- well, there are

19 numerous flaws, methodological flaws, that probably are not --

20 this is probably not the time to debate them with Your Honor,

21 so we were -- so this paper was published online, became

22 available online this Monday, so on the 11th, and that's the

23 accepted version of the paper.

24      We learned that in the Pilliod case, which is the state

25 case in Oakland set to go to trial before Judge Smith in March,

that a version of the paper was used in a deposition last

week --

        **THE COURT:**  Okay.

        **MR. STEKLOFF:**  -- which threw red flags in our world

because it was not publicly available.

    And so Mr. Wisner and I have been having, to be clear,

very transparent and productive discussions about the

Dr. Portier deposition since it's coming up and we're trying to

coordinate on that; and he has told me that he is going to use

this paper not only with Dr. Portier to support Dr. Portier's

opinions but I think, I'm sure, Dr. Ritz and others will also

want to rely on this paper.

    I think we have concerns about, given that this was used

at a deposition last week, how it is that plaintiffs' counsel

had the paper early and how -- and, therefore, whether there

was any involvement from plaintiffs' experts in the paper

itself or plaintiffs' counsel is strange to us.

    And so one thing that we would --

        **THE COURT:**  It doesn't sound particularly strange to

me, but anyway what are you -- we're not going to decide any

issue relating to this paper today so what do you want to --

        **MR. STEKLOFF:**  What we have requested is that, at

least initially with respect to Dr. Portier because his

deposition is coming up, if he has had -- and I will concede

that our requests yesterday were broader than this, but I think

1    if he has had communications with either authors on the

2    paper -- and we have testimony from him in this proceeding back

3    in 2018 where he had communications with one of the authors,

4    Dr. Sheppard, about both -- other studies and his testimony

5    before Your Honor, but if he now has communications about this

6    paper, we think we are entitled to those before we go in and he

7    relies on this paper, and we need to understand whether in some

8    way he was involved in any way in this paper.

9         So we are asking as an initial matter for discovery

10   associated with this paper from Dr. Portier.  I think we'd also

11   be entitled to it from plaintiffs' other experts; and maybe if

12   plaintiffs' counsel has had interactions that would not be

13   privileged with either the editors of the journal or the

14   authors of the journal about the paper, I think we'd be

15   entitled to those.

16        I also think we're entitled to know how it is that they

17   obtained a version of this article before it was publicly

18   available.  I mean, we've had a lot of issues about academic

19   privilege and other things in the history of this litigation.

20   How is it that they received the paper of -- an early version

21   of this paper?

22             **THE COURT:**  I don't know if you're entitled to know

23   that.  I'm sure -- I'm guessing Mr. Wisner is going to happily

24   tell us how he got the paper.

25        But the other stuff, I mean, my gut reaction is that stuff

1    seems discoverable.

2         **MR. WISNER:**  Well, Your Honor, I mean, when the AHS

3    came out, they didn't have to produce every communication

4    between Lorelei Mucci and every single author, editor.

5         **THE COURT:**  Did you ask for it?

6         **MR. WISNER:**  Well, no, because it's irrelevant.  I

7    mean, unless we have factual basis to presume that she was

8    somehow associated with that article, then it's just a pure

9    fishing expedition.  It's an invasion of --

10        **THE COURT:**  But I think they could have -- you could

11   have asked her about that.  Don't you think -- all of those --

12   he's saying "We're entitled to discovery of documents on this

13   topic and that topic and the other topic."  Maybe he is, maybe

14   he isn't, but they could certainly ask Portier all those

15   questions, couldn't they --

16        **MR. WISNER:**  Sure.

17        **THE COURT:**  -- at the deposition?

18        **MR. WISNER:**  I don't have any objection to him asking

19   the question.  They're going to get the answer he didn't have

20   anything to do with this paper so it's all just for naught.

21        I'll tell you how I got it, Your Honor, if you want.

22        **THE COURT:**  Sure.  Go ahead.

23        **MR. WISNER:**  Sure.  The editor of the manuscript

24   reached out to one of our experts in this case and said, "Hey,

25   you recently published an article on glyphosate.  I'd like a

 1  copy of it so I can share it with the authors of this paper."

 2  It was going through the peer-review process.  So he gave them

 3  a copy and said, "Can you please give us a copy when this

 4  article comes out?"  And he said, "Sure."

 5      And when it came out, they sent it to him, and that was --

 6  as you can see, it was accepted February 5th.  They sent it to

 7  him on February 6th, and then we used it in the deposition.

 8          THE COURT:  And who's the expert?

 9          MR. WISNER:  Benbrook, Dr. Benbrook.

10          THE COURT:  Dr. Benbrook.

11          MR. WISNER:  So, I mean, there's nothing

12  particularly -- none of the plaintiffs' counsel have had any

13  communications with these editors.  This is all just a bunch of

14  smoke with no fire.  I mean --

15          THE COURT:  I mean, look, I think that -- I'm not

16  going to rule on anything with respect to this paper that was

17  just handed to me.

18          MR. WISNER:  Sure.

19          THE COURT:  I had an initial gut reaction that they

20  might be entitled to get those documents -- get documents as

21  described.  I certainly think they can ask Dr. Portier about it

22  at deposition.  If there's -- I may be wrong that they're

23  entitled to those documents.  I'm not sure.  I just gave you my

24  gut reaction.  It sounds like it wouldn't be hard to respond to

25  those document requests based on what you've said.

 1          MR. WISNER:  Well --

 2          THE COURT:  But, in any event, if there's a discovery

 3     dispute, tee it up for me and I'll resolve it; but other than

 4     that, just go forward and enjoy -- I look forward to reading

 5     this paper.

 6          MR. WISNER:  Okay, Your Honor.

 7       The real issue that I had was that the document requests

 8     were very broad, and so maybe we can meet and confer and see

 9     if --

10          THE COURT:  I mean, it didn't sound broad.  I mean, he

11     said they were broader than what he just described here so

12     maybe you-all can narrow it.

13          MR. WISNER:  Okay.  We can talk about it and see if we

14     can work it out.

15          MR. STEKLOFF:  Can I raise one issue, Your Honor?

16     Because I want to hand you the exhibit that was used at the

17     deposition last week, and I'll pass out multiple copies.  It is

18     not -- but I just --

19          THE COURT:  I don't really care.  I don't need you to

20     hand it up to me.  If it becomes part of a discovery dispute or

21     an evidentiary dispute, you can submit it then.  I don't really

22     care right now.

23          MR. STEKLOFF:  Can I just clarify the record, though,

24     Your Honor?  It is not the public version of the document.  It

25     is -- so what -- so what you were just told is not accurate.

1    You can look at it on its face and it has significant

2    differences than the publicly available version that you were

3    handed by Mr. Wisner.

4            **MR. WISNER:**  It's identical.

5            **THE COURT:**  As I sit here today, I don't care whether

6    it's identical or not.

7            **MR. WISNER:**  Okay.

8            **THE COURT:**  Okay?  It doesn't -- it's not obvious to

9    me why that would matter; but if there's an issue that you need

10   to tee up for me later on, a discovery issue or whatnot, you're

11   obviously free to do so.

12           **MR. WISNER:**  Thank you.

13           **THE COURT:**  Okay.  Ms. Wagstaff?

14           **MS. WAGSTAFF:**  Yes.  Thank you, Your Honor.

15       So as a general proposition, the plaintiffs agree with

16   Your Honor's initial reaction that Monsanto's request to

17   bifurcate this matter has created some unique procedural issues

18   in this matter.

19       And as Your Honor will recall, we spent two years

20   basically ruling in Roundup.  That's sort of what the general

21   causation phase was.

22       And now, as Your Honor acknowledged in PTO 74 that was

23   issued a few days ago, plaintiffs' specific causation experts

24   are relying on the testimony of our general causation experts,

25   which includes, as Your Honor has acknowledged today, an

1   opinion that the association between Roundup exposure and

2   non-Hodgkin's lymphoma is a strong association.

3        So Mr. Stekloff suggests that a 2.0 doubling of the risk

4   is necessary to prove specific causation; and, in fact, in his

5   slide, I think he pointed out Slide Number 10 in which he was

6   quoting Your Honor, he said that it was necessary.  And when

7   Your Honor pushed him, he said, "Okay.  In fact it's

8   probative."

9        And then the cite that he gave you was to a *Cooper* cite,

10  and I'd like Your Honor to -- I'm sure Your Honor is familiar

11  with that case, but if not, in fact what the *Cooper* -- they did

12  not have mechanistic data.  They did not have toxicology.  And

13  so it was almost that the 2.0 requirement, the 2.0 --

14       **THE COURT:**  Those are based on whether one study

15  could --

16       **MS. WAGSTAFF:**  Exactly.  That's exactly what it was.

17  It was just saying that you could prove specific causation

18  alone on a 2.0 doubling of the risk.

19       First of all, we have a 2.0 doubling of the risk in

20  De Roos '03 from our general causation experts, which is one of

21  the reasons, as Your Honor heard in 2016 and '17 and the

22  beginning of '18 as to why they thought the causation was

23  strong.  And so our specific causation opinions are relying on

24  that testimony through this creation of the bifurcation; right?

25       **THE COURT:**  In your explanation of the reports, why

1    would you choose to emphasize the unadjusted odds ratios that

2    are over 2.0 rather than sort of the totality of the evidence

3    that we considered at the general causation phase?

4         **MS. WAGSTAFF:**  Yeah, sure.  So if Your Honor will

5    recall, there's a never/ever analysis in epidemiology, which is

6    you've used it or you haven't used it and then there's sort of

7    a dose-response; right?

8         And so these numbers from the McDuffie and the Eriksson

9    are because these are the studies that looked at a

10   dose-response that our experts in the general causation ruled

11   in, and so they're not ignoring the adjusted numbers.  What

12   they're doing is saying "For us to say now that we have ruled

13   in those papers because they consider unadjusted numbers, we're

14   now ruling that into our specific causation opinion; and they

15   are the only ones that show an association in line with our

16   strong causation opinion that show a dose-response."

17        So it would be difficult to say never/ever; right?  I

18   mean, those don't tell -- those don't give you any sort of

19   information on threshold use.  So that's why the Eriksson and

20   the McDuffie papers were utilized in that fashion.

21        They weren't to say that the association is stronger or

22   weaker; right?  That was considered by our general causation

23   opinions who considered all of the evidence as Your Honor has

24   already ruled on.  They were to help identify once those cases

25   had been ruled in and once that opinion had been confirmed by

1    Your Honor's PTO 45 that it was sufficient to go to the jury.

2           **THE COURT:**  Okay.

3           **MS. WAGSTAFF:**  Does that make sense?

4           **THE COURT:**  Anything else?

5           **MS. WAGSTAFF:**  Yeah.

6       So also Mr. Stekloff talked about that we used -- that our

7    experts used a difference methodology in ruling out hep C, then

8    ruling out Roundup, and that's actually just not true.  I think

9    the two factors will show that our experts looked at the

10   exposure to, in this case it would be the virus -- right? -- at

11   the time of the NHL and the latency, and we talked at length

12   about all of the latency.  And so I think that's the same thing

13   that they considered with respect to the NHL.

14      With respect to whether or not our experts automatically

15   ruled in Roundup, I would like to just, in the interest of

16   time, point to a few citations in the *Daubert* testimony from

17   Dr. Shustov.  I would point you to page 176:15 to 177:10.

18          **THE COURT:**  Can you give me that one more time?

19          **MS. WAGSTAFF:**  176:15 to 177:10, and that's where he

20   states that he relied on the general causation opinions.

21      And then you asked him on page 177:22 to 180:8 -- 180

22   colon 8 -- you ask him (reading):

23          "Just to understand your methodology, but once you

24      established that a plaintiff exceeded that floor --

25      okay? -- is it then automatically your conclusion that

1          Roundup was a substantial factor in causing their NHL, or

2          is there any other analysis that needs to be conducted

3          before you reach that conclusion?

4               "No, Your Honor, I would not make it a substantial

5          contributing factor because then I have to go through my

6          differential diagnosis or deductive method and see what

7          else patient -- excuse me -- what else patients were

8          exposed to or whether there are any other factors that I

9          believe would be more significant than the Roundup

10         exposure."

11         **THE COURT:**  Right.  But my recollection of that

12    exchange is that I then responded by saying something to the

13    effect of, no, you're not answering my question.  My question

14    is:  Once you've already gone through and determined that there

15    are no other risk factors affecting this patient and all you

16    have is, you know, Roundup at this floor, would your conclusion

17    be that it was the Roundup that caused their NHL?

18         And I don't remember what he said in response to that, but

19    I think he said something to the effect of yes.

20         **MS. WAGSTAFF:**  Okay.  Well, I don't have that in here

21    too so we can look that up, but I would just direct Your Honor

22    to look at that area.  And that was page 177:21 to 180:8.

23         **THE COURT:**  Okay.

24         **MS. WAGSTAFF:**  I would also request that the Court

25    look at 182:2 to 14, also 180:15 to 181:2, also 220:1 to

1    221:25.

2          With respect to Dr. Nabhan, I would request that the Court

3    look at page 6 of his expert report and also page 7.

4          I would request that with respect to his testimony, that

5    you look at page 93:5, 95:2, also 93:3 to 101:19, 242:1 to 14,

6    250:20 to 252:19, and then 257:16 to 262:12.

7          And then with respect to Dr. Weisenburger -- I think this

8    is actually one of their slides, but I don't have a quote from

9    it because the transcript came out after hours yesterday, but

10   when you asked -- I think Mr. -- or Dr. Weisenburger was pretty

11   clear when you asked him whether or not a person who only had

12   the risk factor of two days a year for five years, so 10 total

13   days, if that would be enough, one, he said he would tell the

14   lawyers to settle that case because it wasn't good; two, he

15   said that he would probably say "We don't know."  And he would

16   probably say "Which is another way for saying idiopathic";

17   right?

18          **THE COURT:**  Right.  I remember that.  And so I guess

19   one question I have is if Weisenburger had answered the

20   question differently, if Weisenburger had said, "No, Your Honor

21   there are no -- there were no other risk factors that I

22   identified.  The only risk factor -- potential risk factor that

23   I have left is Roundup and I see that the patient was exposed

24   to Roundup only for 10 lifetime days, I would conclude that the

25   Roundup caused their cancer," if he had given that opinion,

1 would it be an admissible expert opinion?

2         MS. WAGSTAFF:  I believe it would be, Your Honor,

3 because we spent years discussing the association between the

4 two -- between Roundup exposure and NHL; right?  And we came to

5 the conclusion -- or you came to the conclusion that that

6 testimony was admissible, and we have experts that will say it

7 is strong.  And, in fact, Dr. Ritz, I think -- or I think

8 Mr. Stekloff said that none of our experts alone will say that

9 epidemiology is enough, but I believe that Dr. Ritz actually

10 does say that epidemiology alone is enough.

11     But we spent years --

12         THE COURT:  One of the many ways in which the

13 plaintiffs' experts opinions have changed over time.

14         MS. WAGSTAFF:  So we spent a couple of years talking

15 about whether or not that was admissible evidence, and it turns

16 out that Your Honor found that we could take that to a jury.

17     So, yeah, I do think it would still be admissible opinion

18 because, as you started off this discussion, is that there is

19 admissible testimony on our side that the association is

20 strong.  And so I think our specific causation experts are

21 allowed to rely on that.

22     And ironically, if you play --

23         THE COURT:  But I'm asking a different question.

24         MS. WAGSTAFF:  Okay.

25         THE COURT:  Okay?  I get that point.

1              MS. WAGSTAFF:  Uh-huh.

2          THE COURT:  But to say that it's strong is different

3     from saying that if there are no other risk factors and the

4     person was only exposed for 10 lifetime days, I'm going to

5     conclude that the NHL caused their cancer -- that Roundup

6     caused their cancer.

7              MS. WAGSTAFF:  Sure, and --

8          THE COURT:  That's a very different opinion; right?

9          MS. WAGSTAFF:  Well, I think that --

10          THE COURT:  Because, as we discussed with

11     Dr. Weisenburger on Monday, you know, that was just the cutoff

12     for the -- I can't remember if it was the Eriksson study or the

13     McDuffie study, but that -- or both, but that was just the

14     cutoff; right?

15          The people in that universe who showed, pursuant to those

16     studies, an elevated risk of NHL or an elevated association

17     with Roundup and NHL, the people in that pool didn't all get

18     exposed only for 10 lifetime days.  Presumably most of the --

19     the vast majority of the people in that pool got exposed a lot

20     more.

21          And so what Weisenburger is saying is, "Yeah, that's a

22     good point.  You're right.  I shouldn't have said otherwise;

23     and if somebody was only exposed for 10 lifetime days and

24     didn't have any other risk factor, I would conclude that we

25     don't know what caused their cancer.  I would not conclude that

Roundup caused their cancer."

       And so I'm asking you if somebody gave a different opinion
and said, "Yes, I would conclude -- if there are no other risk
factors and the person only was exposed to 10 lifetime days of
Roundup, I would conclude that Roundup caused their cancer,"
you're saying that that would be an admissible expert opinion?

       **MS. WAGSTAFF:**  Yeah.  I think that -- yes, I think
that it would be, and I think that it would be subject to
cross-examination at trial.

       And I think what Dr. Weisenburger was saying, and I
remember the question and answer between the two of you, was he
had said, you know, Mr. Hardeman actually would have a higher
risk factor than that shown in Eriksson and McDuffie.

       **THE COURT:**  Right.

       **MS. WAGSTAFF:**  And when Your Honor pushed him back and
you said, "Well, hang on a second.  It's not like every single
person in this" --

       **THE COURT:**  Right.

       **MS. WAGSTAFF:**  -- "thing had the 2 and 10 days," and
he said, "You're probably right."  But Dr. Weisenburger never
said that those were inaccurate numbers to use in terms of a
dose-response.

       And in terms of once a specific causation -- or general
causation expert -- excuse me -- has gone through all of the
literature -- unadjusted, adjusted, toxicology -- you know,

1    we're doing the weight of the analysis as well if you'll

2    recall -- and done the toxicology, mechanistic data, and

3    established a strong opinion, I don't think any of our experts

4    have said that those numbers are inappropriate to use to rule

5    it in; right?

6         And so then I think on cross-examination at trial, sure,

7    Mr. Stekloff --

8              THE COURT:  Well, Weisenburger said, "No, if there's

9    no other risk factor and it's only the 10 lifetime days, I

10   would not conclude that the Roundup caused the NHL."  He was

11   very clear about that, at least in his testimony, I don't know

12   what he said in his deposition; but in his life testimony here.

13             MS. WAGSTAFF:  Well, I don't remember him being as

14   definitive as that, but --

15             THE COURT:  But you're saying that that -- if he had

16   answered the opposite, his opinion would be admissible because

17   the evidence of the link between Roundup and NHL is so strong,

18   that if there are no other risk factors that we've identified

19   at the specific causation stage and we've identified that they

20   were -- the patient was exposed only 10 times to Roundup, that

21   we can conclude that the Roundup caused their NHL as opposed to

22   simply saying we don't know what caused their NHL.

23             MS. WAGSTAFF:  Yes.

24             THE COURT:  Okay.  And what's your best case for that?

25             MS. WAGSTAFF:  Can I submit it to you this afternoon?

 1              THE COURT:  Sure.

 2          Okay.  Anything else you want to discuss on this issue?

 3              MS. WAGSTAFF:  No, Your Honor.

 4              MR. STEKLOFF:  I'd like to just briefly respond.

 5              THE COURT:  Okay.  You're taking away -- you're going

 6      to have ten minutes to discuss Monsanto's specific causation

 7      experts so you're taking away from that time.

 8              MR. STEKLOFF:  I'll use one minute.

 9          Slide 25 -- so you're pointing out a problem, which is

10      that if you're -- if you agree that 10 days/2 days per year is

11      not enough, Dr. Weisenburger has, if you accept his shifting

12      testimony, has completely undermined Dr. Nabhan and

13      Dr. Shustov.  They clearly just relied on the 2 days/10 days.

14              THE COURT:  But you can put up experts who have

15      different opinions; right?  You can put up experts who disagree

16      with each other.  The question is whether one of them has such

17      a deep methodological flaw that they need to be excluded.

18              MR. STEKLOFF:  Right, and I understand that they are

19      trying to defend the methodology.  I think it's a

20      methodological flaw.

21          I also think that even accepting -- I mean,

22      Dr. Weisenburger made very clear in his deposition that 2 days

23      per year and 10 days was enough.  I understand he came in here

24      and changed his testimony having a preview of what happened

25      with Dr. Nabhan and Dr. Shustov.

1    But then even where he says it's more, and he walked it

2    back, which is Slide 20 in the back, he said, "I have no data

3    to support" -- you know, there was this colloquy with him where

4    you pushed him on whether or not he -- what his position really

5    was.  And the end of his answer is, "Well, I guess I'm saying

6    there's more, but I don't have data to support that."  That is

7    not a proper methodology, to base that on something without

8    data.

9        The last point I just want to make, Your Honor, is if you

10   go back in their reports, what happened here with hep C and

11   with general causation is not what they have testified to.  So

12   I understand that they have seized on the October hearing where

13   there was a colloquy that Mr. Kilaru is about to discuss with

14   you about relying on it, but their reports all walk through

15   general causation in detail.

16       That is a problem for them because now they're just coming

17   and trying to say "I'm assuming," but they did something very

18   different in their reports.

19       They also just dismissed hep C out of hand.  So when

20   Ms. --

21           THE COURT:  I understand the argument.

22           MR. STEKLOFF:  -- Wagstaff comes up here and says

23   they've done the same methodology, that's just not true.

24           THE COURT:  Okay.

25           MR. STEKLOFF:  Okay.

1          **MS. WAGSTAFF:**  Your Honor, before we move on, the

2    discussion that he's talking about with respect to

3    Dr. Weisenburger and his --

4          **THE COURT:**  I don't need to hear any more argument on

5    this.  Thanks.

6          **MS. WAGSTAFF:**  Well, it was cleaned up in redirect, so

7    if --

8          **THE COURT:**  I understand.

9          **MS. WAGSTAFF:**  Okay.

10         **THE COURT:**  Okay.  What do you want to discuss with

11   respect to -- the first thing I want to say on this issue of

12   Monsanto's specific causation experts is that I would like to

13   take part of the blame for the confusion.

14        I should have been more definitive earlier on about how we

15   were going to treat specific causation in light of the fact

16   that we'd already done general causation for two years.  And so

17   I apologize for not being more clear about that.

18        But when October of last year rolled around -- so part

19   of -- that's part of why I asked you --

20         **MR. KILARU:**  Right.

21         **THE COURT:**  -- in my order how is Monsanto prejudiced

22   by any of this.

23         **MR. KILARU:**  Right.  So --

24         **THE COURT:**  So October rolls around.  I make this

25   statement about how it's going to go.  Why isn't it -- why

1  shouldn't it go that way?

2       **MR. KILARU:**  Very briefly, Your Honor, I think just on

3  the past point, I think we did understand under PTO 7 that new

4  general causation experts would be permitted.

5       But that being said, I don't think that actually matters

6  for the debate about what our specific causation experts would

7  do.

8       I do want to be clear coming out of that October hearing,

9  it is not our intent and would not be our intent, and I

10 understand you wouldn't permit it, but it wasn't our intent to

11 have these specific causation experts come in and substitute

12 for or replace what the general causation experts did.  So, for

13 example, Dr. Grossbard we would not have proffered to come in

14 and basically do the epidemiological analysis that Dr. Mucci or

15 Rider did.

16      Where we have -- and I think Mr. Stekloff said this

17 correctly -- concerns on the margins of the order, I think that

18 addresses the point I just made, the end of your order where

19 you talk about the time wasting.

20      Where I think we have concerns on the margins is with what

21 we wanted our specific causation experts to do and the

22 testimony we would hope to elicit from them is looking at the

23 question of what caused these particular plaintiffs' NHL from

24 the perspective of a clinician.  And one of the things that

25 they did in doing that was look at in some cases the general

1    causation literature, in some cases whether there are tumor

2    markers or whatever the case may be.  But those are the types

3    of things that a clinician would do in evaluating that point.

4         To give you a hypothetical -- not a hypothetical, a real

5    example, when talking about hepatitis C, some of the experts

6    talk about epidemiological literature.  And so I think our

7    concern would be, as the order is phrased, it seems to suggest

8    that the expert would have to say "For Roundup, I don't think

9    it's a risk factor basically because someone I haven't met says

10   it's not a risk factor, the general causation expert."

11        I don't think we want to go substantially beyond that, but

12   I do think they should be allowed to explain to the jury what

13   they would explain to a patient, which is, "When confronted

14   with something new that I don't think is a risk factor, I've

15   looked at the literature and here's what I think about that."

16   It wouldn't be a laborious presentation, but I do think it's

17   important to avoid giving the jury a misimpression.

18        **THE COURT:**  Well, why couldn't it be something as

19   simple as "I was not brought here to testify about the

20   epidemiological literature.  I'm relying on the testimony that

21   others have provided for the proposition that it's not capable

22   of causing cancer.  I agree with that based on my review of the

23   literature, but I'm not here to -- I've not been brought here

24   to provide an opinion about that"?  I mean, isn't that --

25   wouldn't that be enough?  I mean, they may object to that but

1  wouldn't that be enough?

2      **MR. KILARU:**  More or less, Your Honor, but I think it

3  then gets into, like, when they're talking about that risk

4  factor versus another risk factor, does it look like they did a

5  real methodology for that as opposed to something like

6  hepatitis C.  When you put the two side by side, it looks like

7  in one instance they're taking this new thing that actually all

8  the experts agree they wouldn't tell a patient about in

9  clinical practice and just saying, "I assume because someone

10  else told me it's not in, and" --

11      **THE COURT:**  No, not because somebody else told me.  I

12  assume that what they would do is they would say, "You know,

13  I'm not here to provide an opinion on this because I've been

14  brought here to provide a more limited opinion, but I'm relying

15  on the conclusion that it's not capable of causing cancer,

16  which I happen to agree with.  Even if it were capable of

17  causing cancer in this particular instance, I would rule it out

18  and here's why."

19      **MR. KILARU:**  Because I think in them explaining the

20  method they would use to a patient and in them explaining the

21  analysis they would do, they, A, shouldn't have to testify to

22  something that is a little bit of a fiction, which is that they

23  didn't do as much analysis as they did.  But even more

24  importantly than that, because I recognize what you just said

25  would allow them to say in a limited way "I did some of this

1    analysis" --

2          **THE COURT:**  Yeah.

3          **MR. KILARU:**  -- I think the concern we would have is

4    with when they're describing the methodology that they used to

5    the jury, it's giving the jury kind of an artificially limited

6    perspective of how and how thoroughly they considered the risk

7    factor that we're really here to discuss as opposed to the risk

8    factor that plaintiffs are ruling in.

9          **THE COURT:**  "I considered the risk factor thoroughly,

10   and I agree with the general causation opinions and I don't

11   believe it's a risk factor."  But, again, I mean, I think this

12   is an awkward by-product of the bifurcation process.

13         **MR. KILARU:**  Right.

14         **THE COURT:**  I'm sort of curious, you know, in these

15   MDLs or these other product liability cases, how many cases get

16   past the general causation phase; right?  It seems like a good

17   idea to do general causation because, you know, it might not

18   get past the general causation phase.  The case may be over and

19   save everybody a bunch of money and time and stuff like that.

20        You know, I'm interested someday in doing a study of all

21   the cases where it got past general causation, how challenging

22   did that make it for the trial.  Somebody should write an

23   article on that, but I guess I don't -- there is a degree of

24   artificiality to it, I agree with you.

25         **MR. KILARU:**  Right.

1          **THE COURT:**  But in the context -- I mean, experts do

2     that sort of thing all the time; right?  Experts get up and

3     they offer opinions and they say, "You know, I'm adopting this

4     assumption and I'm adopting that assumption."  And what I'm

5     saying to you is not only could they potentially say "I'm

6     adopting this assumption and I'm adopting that assumption,"

7     like I said, experts do that all the time and then the jury

8     gets to decide whether the assumption is valid, and you're

9     going to have other experts who are going to testify in support

10    of that assumption that the specific causation expert is using.

11         So in general I'm not sure how different it would be from

12    any trial where we have expert testimony where experts are

13    using assumptions; but what I'm saying to you is that

14    additionally they can say, "And I've done my own independent

15    analysis and I agree with it."

16         You know, I just don't understand how that -- you know,

17    how that would -- if you allow that, how that would render one

18    of your experts' opinions independent or weaker, or something

19    like that, or less convincing.

20         **MR. KILARU:**  Again, I think we really are talking

21    largely on the margins here.  I mean, to the hypothetical

22    point -- and I think a lot of the cases where they assume a

23    hypothetical, they didn't do the underlying analysis.  They're

24    just sort of presented with a hypothetical.

25         **THE COURT:**  Right.

1          **MR. KILARU:**  So it is different in that regard.

2          **THE COURT:**  Right.

3          **MR. KILARU:**  As to the second point, I do think for

4     the sake of thoroughness and for explaining to the jury what

5     they did, they should at least be allowed to say what they

6     looked at in coming to that conclusion.

7          And, again, I don't think we ever envisioned them going

8     point by point through AHS or any of the studies, but at least

9     being able to explain to the jury what it was that they looked

10    at themselves to get to that point so the jury doesn't think

11    that they're sort of artificially and unrealistically, given

12    what they did, taking Roundup off the table and then, you know,

13    doing a very comprehensive literature search for something else

14    or, you know, assuming what someone else told them is the sole

15    basis for their opinion.

16         But, again, I don't think it's very different from what

17    you propose, but we do think that there has to -- we believe

18    that to avoid the jury thinking that our experts, you know,

19    aren't very good clinicians or didn't approach this in a very

20    responsible manner, it is important for them to be able to

21    provide at least some more context than the tentative permits

22    as to what they did without necessarily getting into a detail

23    or replicating wholesale and wasting time with what other

24    experts would do if we do indeed call those experts.

25         **MS. WAGSTAFF:**  So, Your Honor, by definition that

1   would be cumulative of their general causation experts, and we

2   would need to then explore their analysis of every single one

3   of those papers if they're going to be putting on what McDuffie

4   means or what De Roos means or what the AHS is or maybe put

5   more weight on the AHS than they would put on some other paper.

6   I mean, we spent two years doing this.

7        And I understand and appreciate because it applies to our

8   experts as well but, you know, I think you'll see Dr. Shustov

9   says in there we didn't ask him to do a general causation

10  opinion because we were operating under what Your Honor has

11  been telling us to operate under.

12       So now if they come in and they're allowed to have their

13  specific causation experts opine, then I think that plaintiffs

14  are unfairly prejudiced.  And I think what Your Honor has said

15  is fair, that they can't offer new general causation opinions

16  or new general causation experts.

17       **THE COURT:**  Yeah, I understand your point and I

18  suspect that it's generating a fair amount of discomfort among

19  your experts; right?  What?  I have to go and I can't --

20       **MR. KILARU:**  Right.

21       **THE COURT:**  I understand that.  But I think the

22  concern -- it may be kind of a big deal to them but, you

23  know -- but I think from the standpoint of presenting a full

24  picture to the jury, I really don't -- I don't think it's a big

25  deal.

1         **MR. KILARU:**  I guess --

2         **THE COURT:**  If you want to sort of propose, you know,

3    a few sentences that they might -- you know, that they might

4    want to say about it or you think they should be allowed to say

5    about it just as an example, you know, you could do that and

6    I'll look at it.

7         **MR. KILARU:**  Okay.

8         **THE COURT:**  But I'm just -- I'm not seeing why they

9    need to do it.

10        **MR. KILARU:**  I guess, if I get to make two brief

11   points, I think -- we will do that.

12       I do think if there's going to be cross-examination into

13   their evaluation of Roundup, then at that point they certainly

14   have to be able to explain what they did.

15        **THE COURT:**  Of course.

16        **MR. KILARU:**  And so that -- I guess the only other

17   point I'd make just very briefly, this is what Mr. Stekloff

18   said at the end, but their experts --

19        **THE COURT:**  If you-all want to take this up a little

20   bit after lunch, we could finish the conversation.

21        **MR. KILARU:**  That's fine, if you prefer that,

22   Your Honor.

23        **THE COURT:**  So why don't we resume at 12:30 and we'll,

24   you know, finish up this conversation; and then other than

25   that, I think it's just all pretrial stuff.

```
 1        Oh, no.  There are a couple of nonspecific causation
 2   experts that I guess we need to chat about.
 3             MR. KILARU:  Yeah.
 4             THE COURT:  Okay.  Thank you.
 5             MR. KILARU:  Thank you.
 6             MS. WAGSTAFF:  Thank you, Your Honor.
 7                  (Luncheon recess taken at 11:48 a.m.)
 8   AFTERNOON SESSION                             12:43 p.m.
 9             THE COURT:  Okay.  Anything -- do you want to continue
10   that discussion briefly?  I will offer one observation that
11   came to me as I was leaving the courtroom before lunch, which
12   is you know, you are taking Nabhan to task for saying that he
13   can't really separate out his opinions on the epidemiology,
14   sort of from a general causation standpoint, from his specific
15   causation opinion.  You are taking him to task for that, and
16   you are saying he should be excluded for that reason; but you
17   are saying that your experts need to be able to say something
18   along the lines of what Nabhan has said.
19        MR. KILARU:  I don't think it is inconsistent for a
20   couple reasons.  I think one reason it is not inconsistent is
21   that the opinions that Dr. Nabhan is, we think, attempting to
22   bootstrap in has been excluded as unreliable.  I think that is
23   a distinction.
24        I think the second one is that we don't have the burden of
25   proof here.  I think rebutting what their experts are trying to
```

```
1    do is part of what our experts are entitled to do as well, and
2    the point I was going to make right before lunch, which I think
3    goes to this point is, I actually don't think that there is --
4    if you look at the reports that the Plaintiffs' experts filed
5    on specific causation, Nabhan, Weisenburger, and Shustov, it is
6    not as if the reports take general causations as a given and
7    just do a rule in and rule out.  There is an analysis of the
8    epidemiological literature --
9            THE COURT:  That's fine -- they are not going to be
10   able to provide that -- with the exception of Weisenburger,
11   right, they are not going to be able to provide that at trial.
12           MR. KILARU:  I think that is helpful.  I think --
13   other than that, Your Honor, I think all we would say is we
14   would welcome an opportunity to craft something like you
15   suggested, perhaps more proximate in time to those witnesses.
16   And beyond that I don't think we have anything more on this.
17           THE COURT:  Okay.  Sounds good.
18           MS. WAGSTAFF:  Just as long as we are -- have the
19   opportunity to respond whatever they craft to Your Honor, we
20   will rest on our papers.
21           THE COURT:  Okay.  Sounds good.  So I want to bring up
22   the topic of the jury questionnaires briefly, just to give you
23   all an update.  98 prospective jurors filled out
24   questionnaires.  What we are going to do -- I would be shocked
25   if we needed to bring in more than 98 people.
```

1          However, what we thought we might do internally, in

2     chambers, is take a break about two hours from now and spend

3     like 20 minutes going through the questionnaires to see -- very

4     sort of surface review, to see how many people disqualified --

5     might have disqualified themselves in their written responses

6     so that we -- and if a lot of them have, then we might call

7     more jurors in tomorrow to fill out more questionnaires because

8     we still have people left in the jury pool who didn't call in.

9          So at about -- what is it now -- quarter to 1:00.  So

10    about a quarter to 3:00, we will take about a half-hour break

11    to allow us to do that; and you all get the questionnaires at

12    the end of the day, okay.

13         And I heard that there was a concern because you all

14    wanted more than one copy or something like that.  Fine to give

15    you more than one copy as long as it is controlled by the

16    appropriate confidentiality protections.  I was a little bit

17    nervous about transmitting them electronically.  I would rather

18    not do that if we can avoid that.

19         **MS. MOORE:**  I understand that, Your Honor.  I

20    appreciate the concern about the privacy.  I did check with my

21    IT person this morning.  There is a way to encrypt the

22    questionnaires and send it password protected.  My staff is in

23    Kentucky, and I was planning on them reviewing the

24    questionnaires, and that would be really helpful if we were

25    able to do that.  I can sign an affidavit that we did encrypt

1   the material; that they will not print the material; that they

2   will only used the scanned copy that is password protected.

3   I'm happy to do an affidavit to that effect.

4       We talked about an affidavit that we would be happy to do

5   as far as the number of copies.  We don't want to put that

6   burden on you all, on the Court, and that we would return all

7   sets of the copies to the Court.

8       **THE COURT:**  Okay.  Why don't you put something

9   together?

10      **MS. MOORE:**  Okay.  Thank you so much.

11      **MR. WISNER:**  Your Honor, quick clarification.  You

12  said you, as in your chambers, are going to take a look to see

13  if any are disqualified?

14      **THE COURT:**  We are not going to make any decisions.

15  We are just going to flip through and see, you know, what

16  percentage of these 98 people seem like they might have real

17  problems.

18      **MR. WISNER:**  Got it.

19      **THE COURT:**  Okay.  What I would like to do, I know

20  that we still have the specific -- the nonspecific causation

21  experts to talk about, but I would like to jump to motions in

22  limine if possible because I think to the extent that we run

23  out of time, it is more important that we go through the

24  motions in limine.  It is less important that I hear argument

25  on those nonspecific causation experts, I think.

1          So, motions in limine.

2               **MS. WAGSTAFF:**  Your Honor, would you like to just --

3     how would you like to organize this?

4               **THE COURT:**  Well, I think that it might be best to go

5     through it roughly in the order that we categorized it in the

6     guidance document that we put out last night or early this

7     morning or something.  That's the way my brain has started

8     working on these.  Maybe that's the best way to do it.

9          Is that okay?

10              **MR. STEKLOFF:**  That works for us.

11              **MS. WAGSTAFF:**  That works for us.

12              **THE COURT:**  Okay.  So then the first issue is the --

13    what foreign regulators have done, what the EPA has done, and

14    what IARC has done.  And you saw my tentative about that.  I

15    would say that this idea of, you know, at least as to --

16    particularly as to Phase One, the fact of the approval or the

17    fact of the conclusion and the fact that EPA has approved

18    Roundup, the fact that IARC has classified it as a probable

19    carcinogen comes in, but not the documents.  It is sort of an

20    idea -- thought that just came to me yesterday.  I don't know

21    how -- I don't know if it will work, but I wanted to float it

22    with you all and see what you think.

23              **MS. WAGSTAFF:**  So, Your Honor, the way that we --

24              **THE COURT:**  I will say that I don't need to hear

25    argument on whether IARC and the EPA's conclusions come in.

```
 1    I believe that it is appropriate -- it would be inappropriate

 2    to entirely bootstrap those, and I don't need to hear argument

 3    on that.  It is just a question of how do we limit it.

 4         MS. WAGSTAFF:  Yeah.  So, Your Honor, with respect to

 5    the IARC Monograph itself, we are okay with treating it as a

 6    peer-reviewed literature in the respect that the agreement that

 7    I believe we have come to -- I'm not sure if we have come to

 8    it -- but Mr. Stekloff proposed it on Monday, that we can

 9    publish it but it doesn't go back as an exhibit.  And I'm not

10    quite sure if that is what Your Honor was contemplating in this

11    guidance, but Plaintiffs are okay treating the actual IARC

12    Monograph in that respect.

13         THE COURT:  So, in other words, you all have come to

14    an agreement or you have made a proposal that -- that the

15    peer-reviewed literature upon which the experts rely will be --

16    can be shown to the jury -- excerpts of it can be shown to the

17    jury but they won't actually be admitted as exhibits?

18         MR. STEKLOFF:  With -- I'm not conceding this with

19    respect to the IARC Monograph, but say the McDuffie study.  I

20    think that can be shown to the jury under Rule 803-18,

21    published in the sense that some expert wants to call out

22    portions and show a table and show the odds ratios, that is

23    allowed.  It would just not be admitted as an exhibit that

24    would then go back to the jury during their deliberations.  And

25    I think the reasoning behind that is that you need experts to
```

1    explain those types of things so experts can rely on them, but

2    the jury shouldn't then be trying to interpret scientific

3    literature on their own without expert testimony.

4        **THE COURT:**  It is the expert's opinion that they

5    should be thinking about back in the jury room, not the 10,000

6    papers that the experts cited or relied upon.

7        **MR. STEKLOFF:**  Yes.  And trying to interpret parts of

8    literature that is very complicated that has not been discussed

9    by experts, for example.

10        **THE COURT:**  Okay.  And that sounds like a good plan

11   with respect to the peer-reviewed literature.

12        So then the question is why might -- why wouldn't it be

13   okay to treat the IARC Monograph that way?

14        **MR. STEKLOFF:**  Well, because --

15        **THE COURT:**  And by the way, the EPA papers as well.

16        **MR. STEKLOFF:**  Okay.

17        **THE COURT:**  I mean, I assume -- I assume that we would

18   treat both in a similar way.

19        **MR. STEKLOFF:**  Okay.  Having said that, then I have a

20   less of a concern.  My concern was that somehow the IARC

21   Monograph would be treated differently than -- I mean, I still

22   want to address a little bit about the foreign regulatory

23   issue.  But I think if the EPA -- we just want equal treatment

24   one way or the other.  So I think if the EPA paper is about

25   approval, including the EPA paper's post-IARC, which

1    specifically addressed the IARC decision can be displayed to

2    the jury, I think that that is fair.

3         **THE COURT:**  And the question will be on that -- and

4    the reason why I proposed that the fact of the EPA's decisions

5    and the fact of the IARC's decisions could go in but maybe we

6    shouldn't put in the documents is because they are not primary

7    source documents so to speak, right.  They are not actual

8    studies.  They are reviews of the literature, and reviews of

9    the literature are less important than the actual studies

10   themselves.

11        So it may be that if we have the -- the Monograph and the

12   EPA papers available to display to the jury, so that the

13   experts can call out portions of it, it may be that that

14   becomes a 403 issue, and that we should not be -- we should not

15   do that for either document because it just -- the parties are

16   going to not be able to help themselves.  They are not going to

17   be able to help but spend excessive time on those papers.

18   Distracting the jury from the primary inquiry, so that's the

19   issue we should be discussing, I think.

20        **MS. WAGSTAFF:**  So Mr. Wisner is going to address the

21   EPA documents.  We sort of split it that way.  I think one

22   notable difference, however, is I do understand that the IARC

23   Monograph is sort of review, but we are bringing a primary

24   reviewer.  We are bringing Dr. Jameson to talk about his

25   review.  He participated in it.  He has been deposed as a fact

witness.  He has been deposed as an expert witness.  He has

offered testimony in this chair.

      **THE COURT:**  I can't remember.  Jameson was excluded

from general causation, not because he wasn't -- not because he

gave a bad opinion but just because it wasn't enough, right?

      **MS. WAGSTAFF:**  He relied -- in your opinion he relied

too much on IARC, so we are bringing him to testify about his

experience at IARC.  He is the reviewer who actually

participated, who voted, who -- you know, he voted unanimously

in the entire 2A decision and that sort of thing.  So in

that --

      **THE COURT:**  I assume that would be during Phase Two.

      **MS. WAGSTAFF:**  Well, we were planning on bringing him

during Phase One.

      **THE COURT:**  I don't think so.  I mean, why?  Given

what I just said about the secondary importance of the IARC's

conclusion, why would we get into a big trial about what

happened at IARC?

      **MS. WAGSTAFF:**  Well, we are bringing in somebody who

has actually reviewed all of the literature that IARC has

reviewed, that he has reviewed that and has come to a

conclusion -- and he has actually someone who has --

      **THE COURT:**  But his opinion, his conclusion, was

excluded.

      **MS. WAGSTAFF:**  I don't think it was excluded in total.

1          **THE COURT:**  Because --

2          **MR. WISNER:**  He was admitted for --

3          **THE COURT:**  I didn't exclude the opinion.  That's

4    right.  I said he could talk about the animal studies.

5          **MS. WAGSTAFF:**  Right.

6          **THE COURT:**  Is that right?

7          **MS. WAGSTAFF:**  So we have identified him -- we have

8    identified him in our witness list, and we have told Monsanto's

9    attorneys for weeks now that we intend to bring him to testify

10   in Phase One.  I was just told this morning that they plan to

11   make some sort of a motion.

12         **THE COURT:**  I assume you could have him testify at

13   Phase One about the animal studies, but I'm not sure this war

14   that you guys are having about, you know, the IARC process and

15   how honest or dishonest the IARC process was, you know, I don't

16   think that's for Phase One.  Just like a war about how honest

17   or dishonest the EPA approval process was would not be for

18   Phase One.

19         **MS. WAGSTAFF:**  Well, sure.  However, if the IARC

20   Monograph is coming in -- you know, so if we come in and bring

21   it in, then can't they attack IARC in Phase Two?  That's sort

22   of the way I put it in my head is that we would be able to --

23   the same way that other hairs are being split in this case.

24   The bifurcation procedure has created these hurdles that aren't

25   sometimes the most intuitive thing, but we are saying that here

 1    is a guy who has reviewed all of this literature.  He is going

 2    to come in.  You have allowed him to testify as an expert with

 3    respect to toxicology, but he is also a fact witness that they

 4    have moved to compel to depose as a fact witness.  So he has

 5    actually been rendered a fact witness in this case.

 6         Now, they are going to say yeah --

 7              THE COURT:  A fact witness about how things went down

 8    at IARC?

 9              MS. WAGSTAFF:  In part, yeah -- his opinion --

10              THE COURT:  How things went down at IARC is, you know,

11    if anything, for Phase Two.

12              MS. WAGSTAFF:  Sure.  Exactly.  But I think that

13    when -- when he comes and testifies to his opinion, I think

14    that we could ask him about his experience with this material

15    and his experience with IARC.

16              THE COURT:  You can establish that he worked on the

17    IARC -- on the IARC committee or whatever you call it.  I mean,

18    I would think you would be able to establish that as part of

19    establishing his qualifications.

20              MS. WAGSTAFF:  Sure.

21              THE COURT:  But Phase One is not for the big fight

22    that you are all having about whether the IARC process was pure

23    or impure, shall we say.

24              MS. WAGSTAFF:  Sure, yeah.

25              MR. WISNER:  So, Your Honor, I think that's -- I think

1    you are right.  I think that's -- but here is the problem --

2    and this happened in *Johnson*.  So whether it be the EPA or

3    IARC, we believe that the fact that IARC has concluded what it

4    concluded is -- strengthens the opinions of our experts that

5    have gone farther than IARC, but they did conclude what they

6    conclude; and so insofar that IARC came to the conclusion that

7    they know about it, the basis of it, it supports their opinion.

8    I understand you don't want what happened at IARC -- it sounds

9    like a bad '80s flick, what went down at IARC -- but I think

10   here is where the problems start.

11        **THE COURT:**  It is actually kind of interesting what

12   went down at IARC.  Actually be an interesting '80s flick,

13   caucusing and deciding if we are going to change our votes and

14   stuff.  Anyway, go ahead.

15        **MR. WISNER:**  Southern beach in France.

16      All right.  So, but with EPA, here is what happened -- and

17   this is why I think it is really a 403 question, and that is --

18   for Portier, for example, 90 percent of his cross-examination

19   in *Johnson* was, well, the EPA doesn't agree with you, right.

20   That was the cross.

21        **THE COURT:**  Right.  It's going to have to be

22   different.

23        **MR. WISNER:**  Fair enough.  And that was a large part

24   of the directs of their experts, was the EPA agrees with me.

25   So if we are not going to be able to go into the details of

1    EPA, then it causes a separate problem.

2        The approval in and of itself we believe is wrong, all

3    right.  And we have -- we have evidence to support why it is

4    wrong.  We have scientific evidence, right.  We have the

5    scientific advisory panel.  We have, for example, this recent

6    publication, the Benbrook article that came out earlier this

7    year comparing the genotox analysis.  We have scientific

8    evidence --

9            THE COURT:  That is what we are going to talk about is

10   the scientific evidence.  We are not going to talk about -- we

11   are not going to focus on whether there was anything

12   problematic about the process by which EPA reached its

13   conclusion or anything problematic about the process by which

14   IARC reached its conclusion.  We are going to talk about the

15   evidence.

16          MR. WISNER:  Sure.

17          THE COURT:  If you want to couch it in terms of who is

18   right and who is wrong, that is not that big of a deal, I would

19   think; but we are going to -- we are going to talk about the

20   actual evidence, not the process by which those agencies

21   reached their conclusions.

22          MR. WISNER:  Okay.  So that's what I started getting

23   at.  So they are allowed to say, ladies and gentlemen, the EPA

24   said it doesn't cause cancer, in Phase One.  I understand that

25   by your ruling they are allowed to do that, right.  It seems

1  like there is a fundamental handicap for us to say, well, hold

2  on, there is some scientific reasons why that answer -- that

3  conclusion was wrong.

4       **THE COURT:**  I know, but that gets us to the jury

5  instructions and the proposed draft jury instructions that I

6  put out, which is regulatory agencies and other health

7  organizations have reviewed the science surrounding glyphosate

8  and reached conclusions about it.  These evaluations, I might

9  say these conclusions, are not a substitute for your own review

10  of the scientific evidence.

11       **MR. WISNER:**  Okay.  I guess I think then -- the

12  problem that I'm trying to cure, whether it be for IARC or

13  EPA -- I really goose-gander here at this point -- is just if

14  they are allowed to say, the EPA says it doesn't cause cancer,

15  right, that opens up a whole line of questioning -- of

16  scientific questioning about the EPA, about whether or not they

17  followed the guidelines, whether or not they counted tumors

18  over a thousand --

19       **THE COURT:**  Yeah, and maybe you will choose to use

20  your time at Phase Two to get into that, but you are not

21  getting into it in Phase One.

22       **MR. WISNER:**  Well, that is what I am suggesting, is

23  maybe we shouldn't allow it at all, right, and simply say -- or

24  maybe have an instruction that says you are going to hear

25  evidence --

```
 1              THE COURT:  Not allow any information about EPA or

 2     IARC?

 3              MR. WISNER:  No, no.

 4              THE COURT:  Just EPA?

 5              MR. STEKLOFF:  We will take that, Your Honor.

 6              MR. WISNER:  No, no, no.  This is good for both sides.

 7     This is what I'm suggesting, that there be a curative

 8     instruction in addition to what you have that says the parties

 9     are not going to spend time explaining why one agency or

10     another is right or wrong.  That will be something that may be

11     discussed later.

12         Just so that is not left as a hanging fruit.  And so if I

13     was a defense lawyer, I would say, ladies and gentlemen, we

14     told you the EPA causes cancer, and you know what they didn't

15     do, they didn't tell you why they were wrong.  And that's what

16     they are going to say, and that's a couple hours of testimony.

17              THE COURT:  If either one of you says that, you will

18     be upstairs in the holding cell --

19              MR. WISNER:  Okay.  Good.

20              THE COURT:  -- on the 20th floor.  So it doesn't seem

21     to me to be necessary to give an instruction like that because

22     you are not going to do it.

23              MR. WISNER:  Sure.  Right.

24              THE COURT:  And it would be inconsistent with my

25     entire ruling.  So, you know, it doesn't seem to me that an
```

1    instruction like that is necessary, but I'm happy to entertain

2    one if somebody wants to propose one.

3            MR. WISNER:  Okay.  I think we will propose something

4    that sort of hits that point because I think if we do that,

5    then we can spare both sides considerable time.  They don't

6    have to explain why IARC is wrong, and we don't have to explain

7    why EPA is wrong.  It is just it happened and then we move on.

8            THE COURT:  So where does that leave us on the

9    question we started talking about, which is --

10           MR. WISNER:  Publication.

11           THE COURT:  -- whether experts can call out excerpts

12   from the IARC Monograph and the EPA papers?

13           MR. WISNER:  I would think under that -- sorry -- our

14   position would be then with this understanding -- and assuming

15   we can work this out -- that it should not be published because

16   it will then become, let's look at all 89 pages of the EPA or

17   IARC report.

18           MR. STEKLOFF:  I'm fine with that, Your Honor.  But

19   there is one part -- I think one part of your tentative ruling

20   that I still -- we still need to address, which is --

21           THE COURT:  The foreign regulatory agencies?

22           MR. STEKLOFF:  Well, that -- two parts.  Sorry, on the

23   IARC portion, if we are now trying to keep it pretty clean,

24   there was an IARC ruling and there was an EPA ruling, and we

25   support the instruction that you just read from.

1          The problem is -- and I just want to refer to this

2     sentence, which is, but the experts can explain why they relied

3     on part on the IARC classification to reach their own

4     conclusions.

5          So that's taking the IARC classification and bolstering

6     their opinion, which should be independent of IARC.  I think --

7     I think that they should not be allowed to do that.

8          I understand the concerns the Plaintiffs have raised and

9     that -- and I'm not pushing back on whether IARC should come in

10    at all, but it should be clean.  It should be factually like

11    one witness says, by the way, yes, we say we get to bring out

12    that EPA has approved this -- and then I will touch on foreign

13    regulatory in a moment, put that to the side -- and then they

14    get to say there is this group, IARC, and IARC made this

15    decision.  And then your instructions will allow the jury to

16    consider that, period.

17         If they, then, are allowed to say we are right because

18    we -- because IARC supports us, and you can just go to their

19    brief to see how they are going to do this.  Their brief on the

20    IARC issue says the jury should be permitted to hear that

21    Plaintiffs' experts opinion are supported by the conclusions of

22    a prestigious research organization when deciding how much

23    weight to afford Plaintiffs' scientific evidence.

24         That is a problem for us because then we don't get to show

25    under, where we are discussing this now, all of the regulatory

1   agencies that have disagreed with IARC since IARC and --

2        **THE COURT:**  I see your point, and -- so let me ask:

3   What is it that the Plaintiffs' experts would be prevented from

4   explaining if they could not rely on the IARC's analysis?  If

5   they were -- if we said, look, we are going to have a clean

6   rule.  You know, the experts -- IARC didn't conduct any new

7   studies; IARC just examined what was out there.  And the EPA

8   didn't conduct any new studies; it just examined what was out

9   there.  So what would be wrong with limiting the Plaintiffs'

10  experts to discussing what was out there?  What -- in other

11  words, why isn't he right on that point?

12       **MR. WISNER:**  Let's give a very crystal-clear example:

13  The AHS, they are going to go up and tell this jury that the

14  National Cancer Institute, the National Institute of Health,

15  the most premier organization of the United States, they

16  conducted the most amazing --

17       **THE COURT:**  I got it.

18       **MR. WISNER:**  So they are going to bolster --

19       **THE COURT:**  We have a lot to talk about today.

20       **MR. WISNER:**  -- by citing the credibility of their

21  reliances.  We have the right to say, IARC is actually more

22  credible.  It has been around longer, and it's world renowned.

23       **THE COURT:**  But the AHS was an actual direct study.

24  The IARC is -- you know, is a bunch of scientists reviewing the

25  existing studies.  EPA is a bunch of scientists reviewing the

1   existing studies.  You think there is something wrong with

2   those scientists and their process; they think there is

3   something wrong with the IARC scientists and their process.

4        **MR. WISNER:**  They are actually different.  So IARC

5   actually did a meta-analysis.  They actually did one.  They

6   actually did the science and numbers.  They ran statistical

7   numbers on all the annual studies that they have in front of

8   them.  They actually did something that is different than just

9   what was publicly out there.  They created new data.

10       **THE COURT:**  So I had forgotten about that.  I thought

11  that they -- I thought they looked at three meta-analyses.

12  This is a long time for me, so forgive me if I'm misremembering

13  it.  But I thought they looked at three meta-analyses that were

14  already out there and decided to throw one of them out, but

15  relied on the other two.  I did not recall that they conducted

16  their own meta-analysis.

17       **MR. WISNER:**  They did.  They conducted their own

18  meta-analysis.  It was --

19       **THE COURT:**  Where is that in the Monograph?

20       **MR. WISNER:**  I can find it.  I don't have the page.

21  My mind says page 48, but I don't know if that's right.

22  Sometimes I'm good at that.  But my instinct is that -- and it

23  was a big issue with Dr. Blair because they said, Well, if you

24  would have included the AHS updated data, would that have made

25  it no longer statistically significant.  And he says, I don't

 1  know.

 2       And so that was a big fight we had with Dr. Blair about

 3  that exact point.  My understanding is that they actually

 4  weighted the studies like in a meta-analysis and actually

 5  conducted a statistical analysis of it.

 6       I know they also did a statistical analysis of the mouse

 7  and rat studies that they had in front of him, specifically

 8  looking for Knezevich & Hogan, which is the mass or tumor

 9  study.  They actually said, no, there is an elevated rate for

10  kidneys here, as an example.  That disagreed obviously with the

11  EPA, but they disagreed with the study and they actually looked

12  at the data that was available.

13       So there is a little bit more than just a review, but I

14  mean, that all said, that's not something we need to spend a

15  whole lot of time on.  I mean, what I'm trying to work through

16  here is, you know, this idea that, I don't think we should

17  publish the IARC Monograph.  We don't have to have that at this

18  time.  If they can't publish the EPA, we can't publish the

19  IARC.  That's fine.

20       And because we have a proceeding, we have to figure out a

21  way to sort of make sense; and I think the way it makes sense

22  is our experts say, yeah, I relied on IARC.  This is what it

23  means.  This is what they looked at, and that's it, right.

24       We don't have to go into a lengthy discussion of what did

25  you talk about when you were there and who are the scientists

 1   and all that kind of stuff.  I think there's -- we can do it

 2   relatively quickly, like ten minutes.  But this shows that for

 3   what it is worth, these opinions from IARC are opinions that

 4   both Dr. Portier and Dr. Jameson, you know, were exposed to

 5   before they were ever involved in this litigation.  So it goes

 6   straight to their credibility.  It goes to their experience

 7   researching the molecule.  It has a lot more factual -- they

 8   don't have anyone from the EPA, I believe --

 9          THE COURT:  Well, all of your -- so other than the

10   part about IARC doing its own independent meta-analysis, I

11   think all of -- all of the other aspects of that, they can

12   bolster their credibility by saying that they, you know, are

13   part of the IARC committee, and that this is -- you know, a

14   famous, well-respected international body of scientists and all

15   of that; but they can -- in explaining their opinion for why

16   glyphosate is capable of causing NHL or why Roundup caused NHL

17   in Mr. Hardeman's particular case, they don't need to say, you

18   know, the IARC concluded this; the IARC concluded that.

19       They can say, I conclude this; I conclude that based on

20   all of the studies that are out there.

21          MR. WISNER:  Sure.

22          THE COURT:  If one of the studies is an IARC study,

23   then maybe they can.  I just -- I didn't remember that IARC

24   conducted its own independent meta-analysis; but if that is

25   indeed the case, then maybe they can say, IARC did its own

 1  meta-analysis, which I agree with.  That may be right.

 2        MR. WISNER:  Okay.  I think that's fair.  And I think

 3  that's kind of the -- we don't want to spend much time on it

 4  because of these 403 issues in Phase One.  Whether or not we do

 5  a much more -- what went down in the IARC in Phase Two, I think

 6  is a conversation we can probably have later.

 7        THE COURT:  And part of that might be in Phase Two a

 8  lot of it is going to be simply how you all decide to budget

 9  your precious time.

10      By the way, I thought you weren't doing this trial.  Has

11  that changed?

12        MR. WISNER:  I'm not doing any openings or closing,

13  Your Honor.  I will be doing the direct of Portier in

14  Australia.  I'm leaving on Saturday.

15        THE COURT:  Oh, in Australia.  You get to go to

16  Australia.  They all have to stay in this courtroom and

17  actually try the case.

18        MS. MOORE:  That's correct, Your Honor.

19        MR. WISNER:  The sacrifices we make, Your Honor.

20        MR. STEKLOFF:  Okay.  So I think there is a 403

21  problem if we go beyond where I was before.

22        THE COURT:  Is it right that the IARC did its own

23  meta-analysis?

24        MR. STEKLOFF:  There is seven paragraphs that is

25  very -- I'm not so sure how robust it was, but I think it is

```
 1   true that they claim to do their own meta-analysis.
 2           THE COURT:  Okay.
 3           MR. STEKLOFF:  I think the problem is once you start
 4   to open the door beyond where I was, then for context --
 5           THE COURT:  Did the EPA do its own meta-analysis?
 6           MR. STEKLOFF:  EPA did its own statistical analysis.
 7   I will concede I don't know the answer.  But put that aside,
 8   Your Honor.  I want to focus -- I think this really comes down
 9   to Portier and Jameson.  I don't think that this IARC and
10   EPA -- and I still want to be able to touch briefly on foreign
11   regulatory, comes in on Phase One with any other experts.
12       When we talk specifically about Dr. Portier -- and
13   depending on how far he can go -- the problem with Dr. Portier
14   is that Dr. Portier did post-IARC and -- I'm going to try to
15   use a non-pejorative verb -- he tried to convince regulators
16   around the world that they should follow IARC.  And then
17   regulators around the world -- and it is not every regulator.
18   To be clear, it is Europe.  It included things to the EPA, and
19   then there recently where Health Canada -- objections to Health
20   Canada -- I don't know whether Dr. Portier was involved or not,
21   but his -- his letter that was sent to Europe was attached.  So
22   Canada certainly was considering his criticisms of their
23   regulatory review.  And he is trying to bolster the IARC
24   opinion and saying, you need to follow IARC.  They all come
25   back and say, no.  Canada comes out and says we left no stone
```

 1   unturned.  They are considering his letter that he sent to

 2   Europe.

 3       And I guess -- my problem is I'm fine not getting into any

 4   of that; but I think once we get past where I was before, it

 5   seems very unfair to say --

 6           THE COURT:  If IARC has conducted its own

 7   meta-analysis, why is it not okay to say here are the, you

 8   know, sources that I'm relying on to conclude that Roundup

 9   causes cancer?  The *McDuffie* study, the *Eriksson* study, the *De*

10   *Roos* meta-analysis and the IARC meta-analysis, what is wrong

11   with that?

12           MR. STEKLOFF:  Let me just check something.

13       (Whereupon, a brief pause was had.)

14           MR. STEKLOFF:  I can now tell you with the Monograph,

15   it is one paragraph on page 30.  It says 2.4 meta-analysis --

16   and it so short that I can read it to you.  I will try to read

17   slowly.

18       Schinasi and Leon conducted a systematic review and

19   meta-analysis of NHLs and occupational exposure to agricultural

20   pesticides, including glyphosate.  The meta-analysis for

21   glyphosate included six studies, and it lists *McDuffie* --

22           THE COURT:  Schinasi and Leon are people within the

23   IARC working group?

24           MR. STEKLOFF:  No.  It is a separate meta-analysis

25   that their experts relied upon and they can talk about it

1   separately.

2       It then goes on to say:  And yielded a meta-risk ratio of

3   1.5.  The working group noted that the most fully adjusted risk

4   factor from the articles by *Hardell* and *Eriksson* were not used

5   in the analysis.  After considering the adjusted estimates of

6   the two Swedish studies in the meta-analysis, the working group

7   estimated, and then they give them risk.

8       That is the entire discussion.  I mean --

9           THE COURT:  In other words, it sounds like what you

10  are saying is they kind of tweaked the Schinasi and Leon by

11  adding the data from *Hardell* and *Eriksson*?

12          MR. WISNER:  Adjusted data.

13          THE COURT:  Oh, right, because Schinasi and Leon used

14  the unadjusted data from *Hardell* and *Eriksson*.  The working

15  group was not comfortable with that so they put in the adjusted

16  data -- so basically to say they conducted their own

17  meta-analysis seems like an overstatement to me.  It seems like

18  they took the data and they kind of adjusted -- they tweaked

19  the Schinasi and Leon data to make it more reliable.

20          MR. WISNER:  Well, they would have to do a full

21  statistical regression on it.  So they have a model and a

22  statistical software, and they have a statistician in there.

23  And, I believe, Dr. Blair testified that they did do their own

24  meta-analysis.  So while I agree --

25          THE COURT:  What you are talking about is that the

1   experts would simply -- among the things they rely on would be

2   Schinasi and Leon.  It would be *Hardell* and *Eriksson* and

3   *McDuffie* and *De Roos* and this paragraph from the IARC

4   Monograph.

5           **MR. WISNER:**  I think that's right.

6           **THE COURT:**  And to -- if Jameson was involved in it, I

7   gather he probably wasn't because he was a -- a tox person,

8   right.  And maybe Portier was not involved in this part of it

9   either.  But, you know, if they were capable of explaining in

10  more detail what they did, you know, in terms of adjusting the

11  numbers or whatever, maybe they can talk about that.  But

12  that's a far cry from calling out any other part of the IARC

13  Monograph, which is simply a review of the literature, review

14  of the studies.

15          **MR. WISNER:**  That's right.  I think we are okay with

16  that.

17          **THE COURT:**  Okay.

18          **MR. WISNER:**  And just for what it is worth, my concern

19  is can we say IARC concluded X, Y and Z, which we should be

20  allowed to say what they concluded if they are allowed to say

21  EPA concluded.

22          **THE COURT:**  Well, I understand the arguments.  I will

23  give it a little thought in the morning.  We will talk about

24  the foreign regulators.

25          **MR. STEKLOFF:**  I want to touch on Dr. Jameson very

1  quickly, which is that they have disclosed Dr. Jameson in the

2  joint pretrial statement and witness list, and then in the

3  description that is required only as a fact witness.  So I

4  agree that you allowed him after the general causation

5  testimony to testify -- you limited his testimony, but then

6  allowed him to testify on animal studies.  Whether they can now

7  re-visit it, they -- based on you sort of limiting their

8  ability to call him, they did not disclose him in this case

9  that -- it is clear that they only intended on calling him as a

10  fact witness.  We have concerns about that, and I have told him

11  we are planning on filing a motion because his opinions -- I

12  mean, if they had called him as an animal studies expert, we

13  would have been fine.

14       **THE COURT:**  Weren't the motions in limine supposed to

15  be filed already?

16       **MR. STEKLOFF:**  The joint pretrial statement and the

17  witness list came out -- and that description came out after

18  the motions in limine exchange had already happened.

19       **THE COURT:**  Okay.

20       **MR. STEKLOFF:**  To be clear, they had told me on a

21  phone call that they intended on calling Dr. Jameson as a fact

22  witness, but the most -- we didn't know what your ruling on

23  IARC would be, and the actual descriptions and whether they

24  were calling him also as an expert was not clear to us.

25       **THE COURT:**  Okay.  So they haven't disclosed him as a

```
1    toxicology expert witness for Phase One of the trial?

2            MR. STEKLOFF:  Correct.  And --

3            THE COURT:  Okay.

4            MR. WISNER:  And I think -- well -- I guess it doesn't

5    sound like he can come in as a fact witness in Phase One, which

6    we agree with it.  So maybe we don't need to litigate that.

7        To the extent they are now trying to call him as an animal

8    expert, I guess, the question is just the timing issue.  If we

9    were -- if he was going to be allowed to come in and go into

10   detail about the IARC process, we would --

11           THE COURT:  He is definitely not testifying as a fact

12   witness in Phase One.  There is no question about that.

13           MR. STEKLOFF:  So we will find out what they are going

14   to do with him as an expert witness.

15           MR. WISNER:  I think your Court's ruling, whatever

16   comes out will guide us on what we do.

17           MR. STEKLOFF:  On the foreign regulatory issue,

18   Your Honor, just very briefly.  I think that it can be short.

19   It does not have to go into detail.  We do not have to show

20   documents.  But to suggest -- I think there is a very

21   incomplete story that is suggested to the jury, if they only

22   hear about EPA and then the World Health Organization, they are

23   told in 2015 came out with this probable carcinogen finding, it

24   leaves an open question.  And, I mean, I don't know what will

25   be in the juror's minds of, well, was this the first decision
```

1    by the rest of the world beyond the EPA.

2         So I do think that it is necessary for us to be able to

3    bring out that the world -- the other regulatory bodies around

4    the world had similarly approved glyphosate, and continue to

5    approve glyphosate.  I mean, it doesn't cut off at 2015, to be

6    clear, including post-IARC.

7              **THE COURT:**  I mean, you know, I hadn't thought about

8    this concern, but I think you are right that it is a concern.

9    I mean, a lot of people, you know -- you often hear people

10   say -- and I'm not -- I remember -- I'm not talking about

11   Roundup, although I probably have heard it in the context of

12   Roundup also, but with respect to chemicals or things that

13   might be harmful to people, you often hear people say, I wish

14   we could be more like the Europeans, right?  So there could be

15   this assumption if you just have IARC and EPA, the natural

16   assumption may be that Europe is like IARC, right?  So I hear

17   what you are saying.

18        The question is:  Could it be done in a way that is fair

19   and appropriately cabined?

20             **MR. STEKLOFF:**  And subject to your limiting

21   instruction, Your Honor.

22             **MR. WISNER:**  So, I mean, I think that concern you just

23   voiced, Your Honor, is directly handled by your curative

24   instruction on foreign agencies.  You said don't make up your

25   own mind.  They are just an opinion to look at.

1              If we start bringing in foreign regulatory agencies, and

2      there is a lot of them, there are factual issues about each one

3      of them that we --

4              **THE COURT:**  Is there a foreign regulatory agency that

5      has banned glyphosate or required a warning?

6              **MR. WISNER:**  Yeah.

7              **THE COURT:**  Which?

8              **MR. WISNER:**  I believe Sri Lanka.  Canada.  Denmark

9      has banned it.  I think France is phasing it out.  Germany is

10     about to get rid of it.  I mean, I can walk into a --

11             **THE COURT:**  Germany is about to get rid of it?

12             **MR. WISNER:**  Yeah, they passed a law.  They are

13     phasing it out by 2020.  That's my understanding.

14             So for what it is worth, we can get into this fight, but

15     it is a long fight; and it is an unnecessary one.  And then

16     when you throw in the fact that, wait, we are going to be

17     talking about New Zealand but not about the California EPA, now

18     we are getting into, I think, really prejudicially unfair

19     territory.  If they are going to want to bring in New Zealand,

20     I can say, Well, California EPA looked at it too and agreed

21     with IARC.  That's what they said.

22             **THE COURT:**  They didn't look at it.  It is by

23     operation of law that it has to go --

24             **MR. WISNER:**  I actually think Your Honor needs to take

25     a look closely at that because there is actually two issues.

1    One is the initial listing.

2              **THE COURT:**  Okay.  But we are not going to argue that.

3    I don't need to hear argument about Prop 65.  Prop 65 isn't

4    coming into this trial.  All the experts have to be instructed

5    very clearly that Prop 65 is not coming in.  If I hear a lawyer

6    mention Prop 65, 20th floor.

7              **MR. WISNER:**  Upstairs?

8              **THE COURT:**  Yeah.

9              **MR. WISNER:**  Is there really a holding room up there,

10   Your Honor?

11             **THE COURT:**  Oh, yeah.  It is for the lawyers.

12      It is for the defendants because the defendants are housed

13   mostly in Alameda County Jail, and they are brought here for

14   appearances.  Lawyers have been sent -- I have seen lawyers get

15   sent up there actually.

16             **MR. WISNER:**  Have you ever?

17             **THE COURT:**  I have never done it.  Don't make it a

18   first.

19      So, okay.  I understand the issue.  I will think about it

20   and I will issue a ruling.

21             **MR. STEKLOFF:**  Can I just ask you one other question?

22   We have a -- we have the Portier -- Dr. Portier deposition next

23   week.  Understanding that it is -- you know, that -- that in

24   Phase One that they shouldn't get into -- they should now,

25   depending on what your ruling is, cabin their IARC testimony

1   appropriately, we will do the same with the regulatory

2   information.  They also shouldn't be attacking EPA in Phase One

3   and its review.

4        There is this question of bias, which is that there are

5   numerous instances post-IARC and post being retained -- so

6   Dr. Portier is retained by Plaintiffs' counsel, nine days after

7   the IARC decision.  Then there are various instances in which

8   he is taking steps to try to convince various bodies, either

9   Parliament members or regulatory bodies or there are other

10  areas as well, to agree with his view of the carcinogen -- the

11  IARC view and his view of the carcinogenicity of glyphosate.

12  And there are numerous instances in which he does not disclose

13  that he has been retained as a Plaintiffs' lawyer, has received

14  a retainer and is working with counsel.  And so -- if I had a

15  solution, I would tell you --

16       THE COURT:  Isn't the answer to that, take your

17  complaint to the regulator who Portier was trying to influence

18  and say, Hey, Portier is trying to influence you and he didn't

19  disclose he was working for the Plaintiffs?  It is not clear to

20  me why that is relevant to this trial, the fact that he didn't

21  disclose to the European Union or whatever that he was working

22  for the Plaintiffs.

23       MR. STEKLOFF:  Well, I think it goes to his -- he is a

24  true believer.

25       THE COURT:  He is a true believer.  He is an advocate.

 1   You are going to be able to establish that.

 2       **MR. STEKLOFF:**  But I think that the fact that he felt

 3   the need to maintain -- in his mind -- and this is an argument

 4   and they will argue to the contrary to be clear -- but needed

 5   to take the steps of not disclosing his relationship with

 6   Plaintiffs' counsel, to maintain credibility as part of his

 7   advocacy is relevant to the jury's factoring of his credibility

 8   and bias.

 9       **THE COURT:**  Perhaps in a very peripheral sort of way,

10   but it's probably -- I would say that -- my -- you know, if you

11   want to submit something on it, you can.  But my pretty strong

12   gut reaction is that under Rule 403, that that should not be

13   part of -- at least be part of Phase One.

14       That under Rule 403, you know, you then -- A, it is not --

15   it is not terribly relevant to the trial.  You will be able to

16   establish that he is an advocate and a true believer without

17   getting into the fact that he didn't disclose his -- his

18   affiliation with the Plaintiffs' lawyers when he was advocating

19   with regulatory bodies, and it sort of -- it seems like it

20   would be a waste of time.  So that's my pretty strong gut on

21   that is that that nondisclosure issue would be excluded under

22   403.

23       You will be able to, you know, establish that he is an

24   advocate.  And part of that will -- that will at least

25   implicitly bring out the issue that -- you know, regulatory

1    bodies have not already banned glyphosate.  I'm not sure there

2    is anything that can done about that, other than my sort of

3    limiting, preventing you from going too far down that road

4    during cross-examination.

5         But, okay.  I get the issues.

6         **MR. STEKLOFF:**  I guess what I would just ask is that

7    it would be helpful to clarify -- because I think we both have

8    agreed we would like to not -- I won't be there.  I will be

9    here, but not call you during next week -- I mean, limit the

10   calls as much as possible.  So if there is any guidance about

11   the extent to which we can, without getting into the details or

12   showing the documents of the post-IARC reviews by regulators,

13   demonstrate that he was engaged in that process and that they

14   didn't agree with him, without going into the details.

15        **THE COURT:**  Well, I don't know why you have to say

16   that they didn't agree with him.  Why not just say you are an

17   advocate.  You advocate with regulatory bodies that they should

18   change their position on glyphosate, sort of leave it at that.

19   Why do we have to get into whether they agree with him or not?

20        **MR. STEKLOFF:**  I think it also goes to the credibility

21   of his opinions.

22        **THE COURT:**  But whether they agreed with him or not,

23   that gets back to my point, which is that's not what -- the

24   jury is not supposed to substitute, you know, an agency's

25   judgment for its own.  And if the jury is not supposed to

 1  substitute an agency's judgment for its own, it doesn't matter

 2  that much whether the -- you know, Canada agrees with

 3  Dr. Portier or not.  So okay, I get that.

 4          **MR. STEKLOFF:**  Okay.  Thank you.

 5          **MR. WISNER:**  There is a jury instruction about IARC.

 6  I would like to talk about that when we get to jury

 7  instructions.

 8          **THE COURT:**  You want to talk about it now since we are

 9  on the topic?

10          **MR. WISNER:**  Sure.  So, I mean, I have four issues

11  with the proposed jury instructions, and I don't want to talk

12  about all four of them, just talk about the IARC issue now.

13          **THE COURT:**  That's fine.

14          **MR. WISNER:**  But I can talk about all four if you

15  want.

16      So Your Honor has prepared this instruction, and you are

17  quoting portions of an out-of-date preamble.

18          **THE COURT:**  What do you mean out-of-date?  It is still

19  on there.

20          **MR. WISNER:**  No.  They changed it.

21          **THE COURT:**  Since when?

22          **MR. WISNER:**  They changed it actually in January of

23  this year I think largely in response to your analysis of it.

24  That's my suspicion, because I think that they believe --

25          **THE COURT:**  It is not my analysis of it.  It is what

1   they said.

2            **MR. WISNER:**  Sure.

3            **THE COURT:**  I just quoted what they said.

4            **MR. WISNER:**  Well, I mean, for example, there is a

5   letter by Dr. Wilde explaining what this means saying, we do

6   look at exposure, real-world exposures.

7        And I think putting aside the issue right now, my concern

8   is about the factual question and a legal question.  The

9   factual question is IARC can identify something as a hazard

10  without looking at real-world exposure to something.  I will

11  give you that premises.  I don't know if I highly agree with

12  that, but I will give you that.

13       That doesn't mean that's what they did with glyphosate.

14  Okay.  We know that because Dr. Wilde from IARC wrote a letter

15  saying, that's not what we did here.  We can do that.

16           **THE COURT:**  That's not actually what he said.

17           **MR. WISNER:**  Well, he came pretty close to saying

18  that.  He said, we have been accused of not looking at

19  real-world exposures, but we did here because we were looking

20  at the epidemiology.  Those look at real-world exposures.

21       So this is a real hazard that is occurring in the real

22  world, and that's -- I'm paraphrasing.  I'm not trying to spin.

23  I'm just trying my best to paraphrase it.  So I think that, you

24  know, quoting a hearsay document here, right, to the jury

25  without providing the counter hearsay I think really is

1    factually a problem, right.  And then from a legal perspective

2    it creates way more focus on IARC, and specifically now the

3    Court is basically saying something that Monsanto wants to say

4    about IARC; and I think that's not really where it belongs.  If

5    they want to criticize IARC, they should do it with their

6    witnesses.

7         And so we don't believe this is a proper jury instruction.

8    They can argue it.  They can use it if they want to go down

9    this IARC path.  But for Phase One this really is -- I mean,

10   more words are given to it than the causation instruction, and

11   I think that is probably a problem.

12       **THE COURT:**  Is your issue with quoting the language

13   from the Monograph, or is the -- is your issue with providing

14   an instruction along these lines?  I mean, I have issued a

15   ruling in this case which you, of course, disagree with, which

16   says that the IARC conclusion that glyphosate is a probable

17   carcinogen is insufficient to get a Plaintiff to a jury on the

18   issue of whether glyphosate caused their cancer.

19       **MR. WISNER:**  Sure.

20       **THE COURT:**  Right.  More that they believe -- the IARC

21   inquiry is too abstract or too high a level of generality, not

22   grounded enough in people's everyday exposure levels, whatever

23   it was that I said.  And it seems to me that the jury should be

24   instructed -- that is the law of this case, and it seems to me

25   wise to instruct the jury on that law of this case.

1    And they -- you say it is wrong.  Maybe I will be proven

2  wrong in the end, but -- so I under -- I guess that is sort of

3  the long way of saying I understand your concerns about quoting

4  this document and giving it to the jury, but don't you think

5  reserving all your objections to my ruling about what the law

6  is of this case, don't you think it is an appropriate thing to

7  instruct the jury on?

8          MR. WISNER:  Well, no.  First of all, until someone

9  says to the jury, IARC is enough, right, the law isn't

10  implicated, right.  None of our witnesses are going to say IARC

11  is enough.  That's the Court's ruling.

12    Now if we overstep that, by all means, a curative

13  instruction about the law makes sense.  But going --

14  preemptively striking that, crossing of a line that hasn't

15  happened puts an undue emphasis on -- the Court is essentially

16  saying, listen, IARC is too speculative to be really helpful by

17  itself, right, and no one has actually said that.

18          THE COURT:  So let me ask you this --

19          MR. WISNER:  Sure.

20          THE COURT:  What if we only gave the first sentence of

21  that instruction, of my preposed instruction?  In addition,

22  IARC's decision to classify glyphosate as a probable

23  carcinogen, even if you agree with it, is not sufficient on its

24  own to support a conclusion that glyphosate is capable of

25  causing non-Hodgkin's lymphoma at exposure levels similar to

1  what Mr. Hardeman experienced?

2          **MR. WISNER:**  Okay.  We obviously object to that, but

3  playing this down the rabbit hole, wouldn't the EPA also apply

4  there?  New Zealand?  I mean, you are basically reiterating

5  what you say in the previous paragraph, is you cannot

6  substitute your opinion with that of any agency or group.

7          **THE COURT:**  Right, but even if you agree with -- you

8  can't substitute your opinion, but even if you come to the same

9  opinion as IARC, it's not enough for you to vote for -- rule

10 for the Plaintiffs.

11         **MR. WISNER:**  Sure.  But what about EPA?  I mean, you

12 are singling out --

13         **THE COURT:**  The problem is if you end up agreeing with

14 EPA, then that is enough to rule for the defendants, because

15 EPA has concluded that glyphosate is not a hazard.  So I'm --

16         **MR. WISNER:**  I'm confused about that, Your Honor.

17         **THE COURT:**  This is a separate point about IARC that

18 is different from EPA.  In other words, if you agree with EPA,

19 Defendant wins.  If you agree with IARC, Plaintiff does not

20 necessarily win.  The Plaintiff has to show more.  That's the

21 point I'm trying to capture by this instruction.

22         **MR. WISNER:**  But I mean you are trying to fix

23 something that hasn't happened yet, right.  I mean, this is a

24 jury instruction that is singling out a specific finding, and

25 it is going to be, according to them, the one that goes against

1    the regulatory agencies; and you are going to tell the jury

2    that's not enough.  That is going to make --

3            THE COURT:  That's what I ruled in the case.

4            MR. WISNER:  No, no.  And the problem is, is that's

5    assuming that we have argued that it's enough.

6            THE COURT:  Okay.  So I think the best way to handle

7    this -- of course, this is not -- these substantive

8    instructions are not being given to the jury before the start

9    of trial.

10           MR. WISNER:  Sure.

11           THE COURT:  They are being given when they go

12   deliberate, right?

13           MR. WISNER:  Sure.

14           THE COURT:  So when -- you know, you have sort of

15   talked me into the idea of crossing out the remainder of that

16   instruction and probably giving the first sentence, but we can

17   make a decision on that, you know, when -- close to the close

18   of evidence at Phase One.

19           MR. WISNER:  I think at the very least, if we were to

20   have the first sentence, you have to have the other side of

21   that.  That is --

22           THE COURT:  The other side of that is if you agree

23   with the EPA, Defendant wins.  So you don't want the other side

24   of that?

25           MR. WISNER:  No.  That -- I mean the other side of

1    IARC.  So you are saying it is not enough, but you have to say

2    but you are welcome to consider it in assessing the evidence of

3    causation in this case.

4           **THE COURT:**  Maybe.

5           **MR. WISNER:**  I mean, you have to say it both ways.

6           **THE COURT:**  You are welcome to consider IARC's, you

7    know, independent number crunching.

8           **MR. WISNER:**  Sure.

9           **THE COURT:**  Maybe, yeah.

10          **MR. WISNER:**  But, I mean, it definitely has to be

11   balanced that way.  With that all said, I don't think we need

12   to do this unless someone goes up there and says, IARC is

13   enough.  By the way, on direct if they try to cross-examine

14   with an impeachment, I do believe someone has testified that's

15   not fair.  They can't open the door and get the answer.  So I

16   mean, if we don't present a case, IARC gets you there.

17          **THE COURT:**  Okay.

18          **MR. WISNER:**  I think this really is prejudicial, and

19   it doesn't serve --

20          **THE COURT:**  I don't understand why -- as I have

21   proposed to modify it, I don't understand how it can be

22   prejudicial since it is the law of the case.

23          **MR. WISNER:**  I mean, you also said some things in your

24   order about the quality of our evidence.

25          **THE COURT:**  That would be prejudicial.

1          **MR. WISNER:**  Yeah, that's the law of the case, Your

2  Honor.

3          **THE COURT:**  No.  That's not the law of the case.  That

4  is my view of the evidence, which I did not actually base my

5  ruling on.  I said, despite my view of the evidence, I'm

6  allowing these experts to testify.

7          **MR. WISNER:**  Fair enough.  But this, Your Honor, is a

8  weighing of evidence.  You are weighing the value of IARC.

9          **THE COURT:**  No.  I made a legal determination that the

10  IARC's classification is insufficient to get a Plaintiff to the

11  jury --

12          **MR. WISNER:**  Okay.

13          **THE COURT:**  -- on causation.  That is a legal

14  determination.

15          **MR. WISNER:**  I think we should see how it comes in,

16  and maybe discuss this before reading it to the jury.  You

17  know, see if it needs to be done at all.  I think we will be

18  very good about not crossing the line.

19          **THE COURT:**  But I might give it anyway.  I think -- my

20  strong leaning is that this should be given because it is too

21  likely that the jury would assume otherwise.

22          **MR. WISNER:**  I want to say one last thing, sorry.

23  There have been many cancer trials done in the United States

24  that involve IARC classifications.  I have never seen this

25  given.

1        **THE COURT:**  I know.  And I think that people tend to

2   assume that the IARC classification is enough to conclude that

3   something causes cancer, and I think that that assumption is

4   incorrect.  I think many Courts have been operating on an

5   incorrect assumption with respect to IARC.

6        **MR. STEKLOFF:**  What I would say is I agree with the

7   concept of let's wait to see how the evidence comes in.  I

8   think something will be necessary, and it might be this whole

9   paragraph because I think even if they don't bolster their

10  opinions, we are going to hear so much about the elite 18

11  scientists --

12       **THE COURT:**  Well, you will not hear so much about it

13  because I will put it a stop to it.

14       **MR. STEKLOFF:**  That's what I hope.

15       **MR. WISNER:**  That's what I'm saying.  Based on what we

16  have talked about today, I don't see how we will ever get close

17  to this line, that he was invited to IARC, that he

18  participated.  That's about all we will say.

19       **THE COURT:**  My tentative ruling at that point on this

20  instruction is that I would cross out everything except for the

21  first sentence, but that I would give the second sentence

22  regardless of how -- sorry, give the first sentence regardless

23  of how the evidence comes in, but when -- you know, when we put

24  together the final jury instructions --

25       **MR. WISNER:**  And when we get there, we might propose

```
 1   an additional clause that we mentioned a second ago.

 2          THE COURT:  Okay.  All right.  That gets us through

 3   the first group of motions in limine, right?

 4          MR. WISNER:  Yes, Your Honor.

 5          THE COURT:  And the second group of motions in limine

 6   is about -- is the motions about Monsanto's conduct, a variety

 7   of conduct that Monsanto has engaged in.  And so the -- what I

 8   wanted to -- the first motion I wanted to hear argument on is

 9   the -- the issue of marketing materials.

10       So for me on this one -- there are two different people up

11   here all of the sudden.

12          MS. MOORE:  There is a lot to cover, Your Honor.

13          MR. KILARU:  You look down, there is someone new.

14          THE COURT:  I don't -- I don't have a great

15   understanding of the state of the evidence on this issue.  If

16   there is no testimony that a Plaintiff saw any marketing

17   materials or relied on any marketing materials or was exposed

18   to any marketing materials, then I guess I don't quite

19   understand why it would be necessary to put in testimony and

20   evidence about Monsanto's marketing materials in this case.

21          MS. MOORE:  Your Honor, to cut to the chase, we are

22   not saying that it would come in during Phase One unless they

23   open the door.

24          THE COURT:  Okay.

25          MS. MOORE:  And what I mean by that obviously is if
```

1   they start talking about how, you know, the Plaintiffs failed

2   to use PPE, protective equipment or gloves, then that is going

3   to open the door to talk about marketing.  So we don't

4   anticipate that in Phase One.

5        With respect to Phase Two, we have a failure of warning

6   claim in all three of these cases, and so I do think their

7   marketing comes in a failure-to-warn situation.  That is

8   something we can re-visit if you want.

9        **THE COURT:**  Why is it -- I mean, since we are on the

10  topic now, we should deal with it now.

11       **MS. MOORE:**  That's fine.

12       **THE COURT:**  Why -- it will help you plan how to put

13  together your case in Phase Two.  If a Plaintiff has not been

14  exposed to any marketing materials, why would the marketing

15  materials be relevant in a -- for the failure-to-warn claim?

16  Why would they be admissible?

17       **MS. MOORE:**  The testimony will -- Ms. Stevick did

18  testify she does recall an ad being seen.  So there is

19  testimony to that effect.

20       With respect to Mr. Hardeman and Mr. Gebeyehou -- their

21  marketing over the last 40 years, they have never said, one,

22  Roundup causes cancer.  We know that for sure.  They also

23  have --

24       **THE COURT:**  They will stipulate to that.

25       **MS. MOORE:**  If they did, then I can go home,

```
 1    Your Honor.
 2             THE COURT:  They will stipulate to the fact that
 3    they --
 4             MS. MOORE:  That they never did that.  Fair point.
 5    Fair point.
 6         If they will stipulate to that, then we are good.
 7         But over the years, their marketing had -- they have ads
 8    where there is no gloves, there is no protective --
 9             THE COURT:  I don't understand that.
10             MS. MOORE:  -- it goes to the failure-to-warn claim.
11    It is evidence of that.  If they are going to come in in
12    Phase Two and say, these people should have been wearing
13    gloves, we should be able to say, look at all your marketing
14    over the years to the public, and just because the Plaintiff
15    says I don't recall a particular ad --
16             THE COURT:  But I don't think they're going to come in
17    and say they should have been wearing gloves.  Are you?
18             MS. MOORE:  But we don't know that, Your Honor.
19             THE COURT:  Are you?
20             MR. KILARU:  I don't anticipate doing that,
21    Your Honor.  I think it will sort of depend on how the evidence
22    comes in.
23         But I think the key point is the one you mentioned, which
24    is if the plaintiff didn't see any of this material, there's no
25    proximate causation or evidence that the failure to warn was
```

```
1    relevant to them.  And the motion is targed to advertisements
2    and marketing they didn't see.  So the Stevick example is
3    actually set apart.
4          THE COURT:  So on that point, putting aside Stevick
5    for a moment, I guess, like, what the plaintiffs I think would
6    say about that is:  Yeah, I never gave any thought to wearing
7    gloves when I was using Roundup because I've never seen anybody
8    else use gloves when using Roundup.  I've never heard of the
9    idea of using gloves when using Roundup.  And even if I have
10   never seen any marketing materials that Monsanto disseminated
11   that shows pictures of people using Roundup without gloves, the
12   point is that if Roundup had been telling people to use gloves,
13   then even without my having seen any particular advertisement,
14   it would have -- that knowledge would have disseminated through
15   the population and I would have known to wear gloves.
16         MR. KILARU:  I guess that's different from what we're
17   anticipating, Your Honor, which is them introducing the
18   marketing materials that don't relate to the plaintiff in any
19   way to say, "Look, how they're marketing it.  It doesn't
20   contain this warning."
21       I mean, the plaintiffs' testimony will be the plaintiffs'
22   testimony, but I think that's different from the evidence
23   that's the focus of this motion, which is introducing the
24   marketing material that it's undisputed no one saw.
25         THE COURT:  Okay.  But if an issue at trial is
```

1    whether -- I mean, let me ask you this question:  Is Monsanto

2    going to stipulate that, you know, at the time Mr. Hardeman was

3    using Roundup, it never told anybody to use gloves?

4         **MR. KILARU:**  I'm not sure if I can stipulate to that

5    at this point, Your Honor.  I think we'd have to look back at

6    sort of each of the individual ads and see what they have and

7    what they don't.  But I think the point is, none of the

8    advertisements actually --

9         **MS. MOORE:**  And, Your Honor, the ads actually show

10   people in shorts.

11        **MR. KILARU:**  I think our position would be that what's

12   on the label is, you know, what was disseminated.  And if

13   there's advertising that says something the label doesn't say,

14   we wouldn't get into that and say that that was told to people.

15        **THE COURT:**  Okay.  But let me try and put it a

16   slightly different way.

17        If an issue in the trial is that the plaintiff could have

18   protected themselves by wearing gloves -- right? -- and if

19   Monsanto argues anything or presents any testimony to suggest

20   that, well, the plaintiff could have protected themselves by

21   using gloves, then surely at that point Monsanto's marketing

22   materials would show people using Roundup without gloves would

23   become relevant; right?  Do you agree with that?

24        **MR. KILARU:**  I believe so, Your Honor.  I guess my

25   point that I was making earlier is, if there's -- if the label

1    that was in effect at the time didn't say something about

2    protective equipment, we're not going to say the plaintiff

3    should have been wearing protective equipment.

4              THE COURT:  Right.

5              MR. KILARU:  I think that addresses the point you're

6    making.

7              THE COURT:  Well, I think so.  But the question is --

8    so you're saying the labels come in in Phase II?

9              MR. KILARU:  Yeah.

10             THE COURT:  And it's the marketing materials that

11   don't come in, and the reason that the marketing materials

12   don't come in is that no plaintiff was exposed to any of these

13   marketing materials; but, of course, if we sort of try to lay

14   blame at the feet of the plaintiffs for getting NHL because

15   they didn't use the proper protective equipment, then our

16   marketing materials would come in because the plaintiffs would

17   be entitled to show that it's Monsanto's fault that nobody is

18   using protective equipment.

19             MR. KILARU:  Yes, Your Honor.  I think if -- I think

20   this won't arise because I don't think we're going to say the

21   plaintiff should have done anything to prevent their NHL or

22   alleged NHL -- I guess in Phase II it will be NHL -- based on

23   something that's not in the warning label.

24             THE COURT:  Okay.

25             MR. KILARU:  So I don't think that would arise and the

1    marketing material would come in.

2           **THE COURT:**  Okay.

3           **MS. MOORE:**  And our position, Your Honor, with respect

4    to this is that it was such a broad *motion in limine* when

5    you're dealing with a failure to warn claim that we don't think

6    it would be fair to say absolutely you can't.

7           **THE COURT:**  Okay.  But assuming that for

8    Mr. Hardeman -- let's talk about Mr. Hardeman now.  Assuming

9    that they don't blame Mr. Hardeman for not wearing protective

10   materials, why should the marketing materials come in?

11          **MS. MOORE:**  Well, they have experts here that are

12   going to testify about how you should be wearing long sleeves

13   and have gloves on.  That's not what the label said when

14   Mr. Hardeman was using it.  It's not what their ads show, and I

15   think that's fair game especially, you know, when -- well, you

16   were alluding to basically --

17          **THE COURT:**  So they have experts who are going to come

18   in and testify that when you use Roundup, you should be wearing

19   long sleevers and gloves?

20          **MS. MOORE:**  Their exposure expert, Dr. Sullivan, talks

21   about how -- you know, if you wear -- I mean, that's the whole

22   purpose of the exposure experts, which we haven't gotten to

23   today, Your Honor.  But, you know, it changes if you have long

24   sleeves on and gloves, and --

25          **THE COURT:**  It changes but if the testimony --

1   certainly if Monsanto says anything to suggest that Hardeman

2   should have been wearing gloves and long sleeves, then we would

3   revisit the issue.

4        But assuming Monsanto doesn't say anything to suggest that

5   Hardeman should have been wearing gloves and long sleeves and a

6   mask or whatever, what's your argument for why the marketing

7   materials would come in?

8        **MS. MOORE:**  Well, on that, I mean, going back to the

9   failure to warn claim, what you were alluding to earlier is

10  that it's really subliminal.  So it permeates throughout

11  society.  They've been advertising for 40 years with people out

12  there spraying, you know, in shorts.

13       **THE COURT:**  But aren't they going to stipulate --

14  aren't you going to stipulate that you didn't warn Hardeman

15  about this, about --

16       **MR. KILARU:**  What?  I guess it depends on what.

17       **THE COURT:**  NHL.

18       **MR. KILARU:**  Yes.

19       **THE COURT:**  And you didn't warn Hardeman about the

20  need to wear protective gear?

21       **MR. KILARU:**  I'd have to look at that version of the

22  label in effect at the time.  I can do that, but it sort of

23  depends on -- again, it depends on what was in the version of

24  the label that was on the product that he used.

25       **THE COURT:**  Okay.  All right.

1      **MS. MOORE:**  So maybe we can revisit this, Your Honor.

2      **THE COURT:**  Yeah.  I mean, I think the --

3      **MS. MOORE:**  And then --

4      **THE COURT:**  -- answer will be then that the motion

5    would be granted because it would only be if Monsanto opens the

6    door that the marketing materials would come in.

7      **MS. MOORE:**  And then the only other piece of it,

8    Your Honor, is that we do have a punitive claim, and I do think

9    that some of their marketing materials may come in with respect

10   to punitive damages.

11     **THE COURT:**  But the punitive damages -- I mean, I

12   understand that it's -- you know, part of awarding punitive

13   damages is to deter future conduct and to send a message, and I

14   get that and I believe that you should be able to say things

15   like that, but the punitive damages award still needs to be

16   tied to the conduct that the defendant engaged in vis-a-vis the

17   plaintiff.

18     So, again, if the plaintiff didn't see marketing

19   materials, I don't -- I'm not sure why marketing materials

20   would come in for that.

21     **MS. MOORE:**  Well, here would be an example -- and we

22   cite to this in our opposition brief, Your Honor -- is that the

23   EPA -- and this is going back to 1988.  And the Court will

24   recall Mr. Hardeman used Roundup from approximately 1985 up

25   until 2012.

1    And so in 1988 there was a letter from the EPA to Monsanto

2    warning Monsanto about their advertisements that downplay the

3    need to wear protective clothing while administering Roundup,

4    and Monsanto assured the EPA that proper protective gear would

5    be demonstrated in advertisements.

6        But they did not go ahead and start circulating those

7    advertisements.  And so -- and, again, those ads still never

8    disclosed that it caused cancer.  I mean, they don't do that

9    today.  So I do think that does go to the punitive claim, and

10   we would ask that the Court reconsider that.

11          THE COURT:  Well, if I recall correctly, EPA took that

12   back; right?

13          MS. MOORE:  Well, I mean, again, that's -- you know,

14   going back to should they be wearing protective clothing, they

15   never put that out in their ads; and maybe it is something that

16   we will look at if they open the door, but my reading of their

17   expert reports is that there will be experts who talk about

18   that.

19          THE COURT:  Okay.  Let's see, what else did I -- what

20   else in that category did I --

21          MR. KILARU:  I think there's Motion 7, which is

22   actually on, arguably, a somewhat related issue regarding

23   post-use conduct.

24          MS. MOORE:  We're going to switch people, Your Honor.

25   Sorry.

 1          THE COURT:  That's fine.

 2          MR. KILARU:  I'll grab my notepad.

 3                      (Pause in proceedings.)

 4          THE COURT:  Okay.  So I guess the general ruling is

 5   that -- the general tentative ruling is that post-use conduct

 6   by Monsanto should not come in sort of for the same reasons

 7   that I just discussed.

 8        So are you in agreement with that or --

 9          MR. WISNER:  Well, no, Your Honor.

10        So there's a practical issue and there's a factual legal

11   issue.  The practical issue is the vast majority of the

12   discovery that has been conducted and provided by Monsanto is

13   recent because their documents just don't go back that far.

14        But on a legal issue, all --

15          THE COURT:  But I don't understand.  We're not talking

16   about what Monsanto has produced recently.  We're talking about

17   what Monsanto has done since Mr. Hardeman --

18          MR. WISNER:  Stopped using it.

19          THE COURT:  -- stopped using it.

20          MR. WISNER:  Yes.  That's the heart of the argument.

21        So what Monsanto has --

22          THE COURT:  What argument?

23          MR. WISNER:  What?

24          THE COURT:  The Hardeman argument?

25          MR. WISNER:  The heart of the argument.

1          **THE COURT:**  The heart of the argument.

2          **MR. WISNER:**  Sorry.  The heart of Hardeman.

3      So the issue, Your Honor, is what Monsanto did following

4  the IARC monograph was directly relevant to punitive damages.

5  We got into it at length in the *Johnson* trial.  And

6  specifically they engaged in something called orchestrating

7  outcry, and we have the documents.  We have the testimony.  And

8  they did all these articles to sort of attack IARC and did all

9  this stuff on the Hill and --

10          **THE COURT:**  I'm guessing IARC has never experienced

11  anything close to what Monsanto unleashed upon them.

12          **MR. WISNER:**  No.  I mean, it's unprecedented.

13          **THE COURT:**  But why -- so if the punitive damages

14  award is to be tied to the wrongdoing that was committed

15  against Mr. Hardeman, why is that attack on IARC relevant to

16  punitive damages?

17          **MR. WISNER:**  So fair enough.  So Hardeman and his

18  family have undergone an incredible amount of stress bringing

19  this lawsuit against Monsanto.  Monsanto spokespeople are out

20  there every day saying Monsanto -- the CEO said Monsanto --

21  IARC is junk science.  They're saying all these really harsh

22  things to put pressure with their neighbors and their families

23  related to "Are you bringing a frivolous lawsuit?"

24          **THE COURT:**  Are you saying that it comes in for

25  punitive damages because Monsanto's advocacy activities have

1    caused stress to the Hardemans?  Is that your argument?

2              MR. WISNER:  It comes -- in part.

3              THE COURT:  What other arguments do you have?

4              MR. WISNER:  Well, it shows punitive intent.  We have

5    to show malice, reckless disregard for human health.

6              THE COURT:  With respect to the conduct that injured

7    the plaintiffs.

8              MR. WISNER:  Sure.  The conduct that they were doing

9    with regards to IARC is the same thing that they were doing in

10   2012 with Seralini.

11             THE COURT:  So then put on evidence of what they were

12   doing in 2012.

13             MR. WISNER:  Sure.  And they -- okay.  Fair enough,

14   Your Honor.

15        We also have evidence that they did all this conduct

16   specifically to influence regulators, to influence further

17   assessments, to deter lawsuits.

18             THE COURT:  And the stuff that they did before 2012 it

19   seems can come in in support of your punitive damages claim.

20   What's wrong -- I mean, the point that you're not responding to

21   is, correct me if I'm wrong, but I thought that the idea was

22   that the punitive damages award needs to be tied to the

23   wrongdoing that harmed the plaintiff.

24             MR. WISNER:  Sure.

25             THE COURT:  And you agree with that?

1              MR. WISNER:  Sure.

2              THE COURT:  Okay.  So then how is Monsanto's

3    conduct -- after Monsanto stopped harming Mr. Hardeman, how is

4    Monsanto's conduct admissible in support of your punitive

5    damages?

6              MR. WISNER:  Because it shows a ratification of the

7    let nothing go, freedom to operate stuff that existed starting

8    in the 2000s.  And we can document --

9              THE COURT:  Starting in the 2000s you can put all that

10   stuff in.

11             MR. WISNER:  Okay.

12             THE COURT:  We're just talking about 2012 to 2018.

13             MR. WISNER:  But what they did following IARC shows

14   company misconduct directed not just to Mr. Hardeman, directed

15   at every single person in the United States.  It shows a

16   reckless disregard for science.

17        They then went and --

18             THE COURT:  But I thought we weren't supposed to be

19   worried about what they were doing to the rest of the people in

20   the United States.  I thought we were supposed to be worried

21   about the harm -- you know, punitive damages award I thought we

22   were supposed to be worried about the harm they caused

23   Mr. Hardeman.

24             MR. WISNER:  Mr. Hardeman lives in the United States.

25   He's part of the people that that conduct was directed at.

1    When they go out there and they say IARC's junk science and

2    they haven't even read the monograph, when they attack

3    Mr. Blair, Dr. Blair, when they do the things that they did --

4              THE COURT:  I know what they did --

5              MR. WISNER:  Okay.

6              THE COURT:  -- in response to the Seralini --

7              MR. WISNER:  When they do that and then they created

8    the Intertek articles that all of their experts rely upon, the

9    EPA relies upon it, they fabricate this data, they engage in

10   this conduct, and it's not just limited to one person.  It's

11   limited to everybody.

12             THE COURT:  You haven't said this, but I would have

13   expected you to say, yes, it's the harm that -- punitive

14   damages are about the harm that was caused to the plaintiff but

15   punitive damages are also to deter future misconduct; and if

16   punitive damages are in part about deterring future misconduct,

17   then the jury ought to be able to learn that the misconduct is

18   continuing.  Even if the misconduct did not continue to hurt

19   Hardeman because Hardeman stopped using Roundup, that the

20   conduct -- the misconduct is continuing and so, you know, to

21   the extent that you might think that sometime after 2012

22   Monsanto changed its behavior, it hasn't.

23             MR. WISNER:  Unfortunately, I think Mr. Hardeman

24   stopped using in 2015; right?

25             MS. MOORE:  No.  2012.

1              **MR. WISNER:**  Is it '12?  I'm sorry.  I misunderstood

2    that fact.

3         In any event, yes, Your Honor, that's a great argument.

4              **THE COURT:**  Okay.  What about that argument?

5              **MR. KILARU:**  Okay.  A couple things.

6         First, Your Honor, I think there isn't -- I don't know

7    that -- well, I guess I won't -- there is the obvious point, I

8    think, that there isn't sort of a freestanding claim

9    Mr. Hardeman has for ongoing emotional distress that's related

10   from post conduct.

11             **THE COURT:**  Of course.

12             **MR. KILARU:**  Okay.  As to that point, I think two

13   things.  The first is that you are right, that punitive damages

14   are supposed to be based on the conduct that actually injured

15   the plaintiff and deterring that misconduct.

16             **THE COURT:**  But there are also supposed to be -- when

17   we say deterring that misconduct, we're not saying preventing

18   them from doing it to Mr. Hardeman again.  We are saying, by

19   definition, deterring that misconduct means preventing them

20   from doing it to others going forward.

21             **MR. KILARU:**  Right.  And I think on that there's two

22   things.  The first is that I think it's clear from the case law

23   that a defendant isn't to be punished, if there's a basis for

24   punishment, for just being sort of an unsavory person or

25   general bad practices.  It has to be tied to the plaintiffs.

1      And the concern with the approach that I think you've

2  allowed is that that is what the cases talk about when they

3  talk about the concerns of duplicative, triple, you know, four

4  or five times down the line punitive damages recovery.  Because

5  if every plaintiff gets to argue there were bad things that

6  happened after the things that happened to me, every plaintiff

7  is going to recover for the same sort of conduct.

8      **THE COURT:**  But the point -- but the purpose of a

9  punitive damages award -- the thing that I can't -- I mean, I'm

10 with you mostly, but the thing I can't get past is if the

11 purpose of a punitive damages award is in part to deter future

12 misconduct, why is it not highly relevant that the defendant is

13 continuing to engage in that misconduct even after the

14 defendant stopped hurting the plaintiff?

15     You know, when you think about your closing argument, you

16 know, lest the jury -- lest you think that this company has

17 changed the way it acts, let me show you all the things that

18 it's continuing to do, all the same stuff that it did to

19 Hardeman but worse.

20     **MR. KILARU:**  Because, first, that isn't -- again, it's

21 not actually related to the plaintiff; and the evidence -- as

22 you said, there's a lot of evidence they can try to introduce,

23 some of it we will likely object to, about the things that

24 happened from 2000 to 2012, and the point of the punitive

25 damages award is to deter that type of conduct from happening

1   in the future and introducing evidence of that conduct does

2   that.

3            THE COURT:  I don't know why it would be limited to

4   2000.

5            MR. KILARU:  Sorry.  I just used the number that was

6   thrown out, but it would be whatever year there's evidence for

7   subject to our objections.

8            THE COURT:  Okay.

9            MR. KILARU:  But the second point I think, and also an

10  important point, is this point about duplicative recovery.

11  There are other plaintiffs who are going to bring this claim.

12           THE COURT:  But we have a way for dealing with that at

13  the back end -- right? -- which is *BMW versus Gore* and all

14  that.

15           MR. KILARU:  Right.  But I think that if in every case

16  we're introducing a whole panoply of evidence that doesn't

17  relate to the plaintiff, you know, we are, even within the

18  world of *BMW v. Gore*, I mean, those are outer due process.  We

19  still have a prospect of --

20           THE COURT:  I understand your point.  I do understand

21  your point, but I still don't understand how we would say that

22  the defendant's continuing conduct would not be relevant if

23  part of punitive damages is to deter future misconduct, to put

24  a stop to the conduct that the defendant is engaging in.

25           MR. KILARU:  And I think the point of the award as to

1   the past conduct is to do that, and I don't think under the law

2   the future conduct comes in as ratification.  I think it's a

3   separate claim that a future plaintiff affected by that conduct

4   would bring.

5          **THE COURT:**  Okay.  I'll think about that.

6      I said that my tentative was that it would be excluded

7   subject to a couple limitations.  Do you have a beef with those

8   limitations?

9          **MR. KILARU:**  To the extent an expert...  I think, as I

10  understood this, and I don't know if this is exactly what's

11  written on the paper, as I understood this would be a, for

12  example, one of our experts relied on a study that they could

13  then impeach with authorship.  It wouldn't be that their

14  experts could introduce a study.

15         **THE COURT:**  Of course.

16         **MR. KILARU:**  With that understanding, then, no.

17         **THE COURT:**  Okay.  All right.

18     I understand those arguments and will think a little

19  further about that.

20         **MR. WISNER:**  One issue, Your Honor, just on the expert

21  issue I just want to point out is that a lot of the statements

22  and admissions made by Monsanto's experts following IARC are --

23  kind of go directly to some of the general causation issues as

24  well.  I mean, we're not going to bring it in in Phase I.

25     But we have -- here's a great example.  I took Monsanto's

1    deposition a week and a half ago, and they took the position

2    that there's no evidence across the board.  So it's the

3    opposite of our experts.  They're saying there's no evidence at

4    all that there's any association with non-Hodgkin's lymphoma.

5           **THE COURT:**  You mean Monsanto is as unreasonable as

6    your experts are?  Is that what you're saying?

7           **MR. WISNER:**  I have made no comment about that,

8    Your Honor.

9           And they took this position and so I showed them study

10   after study and they say still no evidence, still no evidence.

11   And then one of the things that was pretty remarkable is I

12   showed them Dr. Acquavella's e-mail where they're talking about

13   the evidence and they say -- their experts say "We can't say

14   that there's no evidence.  There's obviously some evidence.  We

15   can say that it's not convincing evidence."

16          **THE COURT:**  So how does this relate to the *Motion in*

17   *Limine* Number 7 that we're talking about?

18          **MR. WISNER:**  That e-mail and those conversations are

19   all post-2012 is the problem.  So this is a very sweeping

20   *motion in limine* and it says anything after 2012 is out, and

21   that's -- that's a problem because it's in a vacuum.

22          **THE COURT:**  Well, no.  It's about Monsanto's post-2012

23   conduct; but if Monsanto made an admission post -- let's say

24   Monsanto said -- you know, you got your hands on an e-mail from

25   2015 that said, "You know, we all know this causes NHL," that

1  would be admissible.  That wouldn't -- I would not -- I was

2  certainly not envisioning that as falling within -- and I don't

3  think they were either -- envisioning that as post-use conduct.

4  That's an admission about the state of the evidence.

5           MR. WISNER:  Okay.  Fair enough, Your Honor.  I just

6  want to make sure because the motion as written is actually

7  excluding all documents post-2012.

8           MR. KILARU:  The topic is the limitation of the

9  evidence inside.  The topic is post-use corporate conduct.

10          MR. WISNER:  Yeah, I know but corporate conduct --

11          THE COURT:  I don't think that's true.  I don't think

12  the motion was to exclude all documents postdated --

13          MR. WISNER:  If it's by a Monsanto employee, that's

14  conduct.  So I just want to make sure we understand what this

15  is actually ruling on.

16          THE COURT:  I think we do.

17          MR. WISNER:  Okay.  Could I raise one issue,

18  Your Honor?

19          THE COURT:  Sure.

20          MR. WISNER:  You did not want to hear argument on

21  Seralini, and I think that I just want to point out, because

22  this is right on this exact issue, and that is I don't --

23          THE COURT:  I don't want to hear argument on Seralini.

24          MR. WISNER:  Fair enough.  I just don't believe it was

25  brought for causation purposes.  I think Seralini is a punitive

1   damages/liability story primarily and you've put it under the

2   causation header, and I actually think this goes right into

3   2012 corporate conduct.

4           **THE COURT:**  It's not admissible.  The Seralini study

5   is not admissible.

6           **MR. WISNER:**  Well, it's not the study.  It's what

7   Monsanto did to Seralini.

8           **THE COURT:**  Oh.  Well, I don't know if that was

9   necessarily subject of that *motion in limine*.

10          **MR. WISNER:**  They're saying any reference to Seralini

11  should be excluded, and that's what I'm saying I have a problem

12  with.  I actually --

13          **THE COURT:**  I didn't interpret the motion to be about

14  that --

15          **MR. WISNER:**  Okay.

16          **THE COURT:**  -- about what Monsanto did in response --

17  what they did to Seralini.  Am I misremembering?

18          **MR. KILARU:**  Let me turn to my colleague who's

19  handling that motion, Your Honor.

20          **THE COURT:**  There's a lot.  I might be misremembering.

21  It's hard to keep track of all this.

22          **MS. MATTHEWS JOHNSON:**  Right, Your Honor.

23      The heart of the issue with Seralini is the exclusion of

24  the study and of the pictures, which are -- I think we've all

25  heard about and are featured.  And I can pull up the motion

further.  I think we do have it.  It wasn't slated for argument

today, but we do have it here.

     The concern is that Seralini itself was a discredited

study, a study that Dr. Portier said it's a study --

          **THE COURT:**  Right.  Again, I'm granting --

          **MS. MATTHEWS JOHNSON:**  -- and all those things.

          **THE COURT:**  I want to grant --

          **MS. MATTHEWS JOHNSON:**  Exactly.

          **THE COURT:**  I said your motion is going to be granted

on that.

          **MS. MATTHEWS JOHNSON:**  Right.

          **THE COURT:**  But I don't remember in your motion a

discussion of evidence about stuff Monsanto -- I think it

probably is not admissible.

          **MS. MATTHEWS JOHNSON:**  And I believe it's in there,

yes, and I think we define that as a continuation of a baseless

study.

          **THE COURT:**  Monsanto's efforts to discredit it.  On

that I would say it sort of depends on what Monsanto did.  I

mean, if Monsanto sent somebody to threaten Seralini's family,

then that might come in.

          **MS. MATTHEWS JOHNSON:**  Yes.

          **THE COURT:**  But if Monsanto was seeking to undermine

Seralini's credibility, I don't think that comes in.

          **MS. MATTHEWS JOHNSON:**  I think that's right.  I think

1   the efforts of Monsanto were to show that in fact it was a

2   scientifically flawed and baseless study that did not involve

3   extortion or any other threat.

4        **THE COURT:**  So is there any particular thing that you

5   have in mind that you want to introduce?

6        **MR. WISNER:**  Yeah.  I mean, in our motion we kind of

7   walk through all of it, what they did, and that's why it's so

8   relevant.

9        The conclusion of the Seralini study --

10        **THE COURT:**  Do you want to tell me what -- give me an

11   example something that they did to Seralini that you think

12   should be admissible in the punitive damages phase.

13        **MR. WISNER:**  Sure.  Okay.  So after the publication

14   comes out, Monsanto had entered into a consultancy agreement

15   with the editor in chief, Wally Hayes.  I actually took his

16   deposition last week.  And Dr. Hayes was the one who made the

17   decision to do the retraction.

18        And it's in the article.  Your Honor, I actually have the

19   testimony that I think hits everything.  It's from the Monsanto

20   deposition.  They authenticated all the documents.  I

21   highlighted it.  It's about 80 pages, but I think if you read

22   it and you see this clearly is Phase II punitive damages stuff.

23        **THE COURT:**  Why don't you tell me what -- give me an

24   example of something they did to Seralini that you think should

25   be admissible.

 1              **MR. WISNER:**  Okay.  So Dr. Hayes says, "Listen, I'm
 2     getting -- I'm reading all these blog posts, but I need letters
 3     to the editor so I can substantiate a decision to retract."  So
 4     CropLife America sends out the next day an e-mail to all these
 5     people saying "Listen, send a letter to the editor.  Here's
 6     what you need to say.  If you do this, Dr. Hayes will retract
 7     the article."  Right?

 8              **THE COURT:**  Right, but your own expert said that the
 9     article is garbage.

10              **MR. WISNER:**  That's not correct.  That is not true at
11     all, Your Honor.  What Dr. Portier said was it doesn't help you
12     with the causation.

13         Dr. Seralini never concluded it caused cancer.  And this
14     is part of the misinformation that Monsanto spread about this
15     study.  The conclusion of the Seralini study is that we need to
16     study Roundup, the formulated product, not just glyphosate.
17     That's his conclusion.

18         And if you look at the internal documents, Monsanto's
19     response to that is "We're not going to do that because that
20     would set a dangerous precedent.  It would cost a million
21     dollars, a million and a half to do the study.  It would take
22     three years, and we don't want to have to do that on all our
23     products."  And that's the admissions within the internal
24     company.  They have their argument about why that's wrong.

25         But if you read this testimony, Your Honor, it's

abundantly clear we're not using it to show causation.  We're

using it to show that the one time, the only time a long-term

Roundup study was ever done on rats, Monsanto orchestrated

essentially an attack against Seralini that got the publication

retracted.

The letter to the editor -- the editor who retracted it

issued a notice saying, "Actually I looked at all the raw data.

This is all accurate.  There's nothing false or misleading

here.  It's inconclusive so we're retracting it."

And then hundreds of authors said what Monsanto did to

create this orchestrated outcry was scientifically invalid and

it was improper, including Dr. Portier long before he was ever

involved in this litigation.

THE COURT:  I will -- since I put it in the category

of general causation, Monsanto's specific scientific knowledge,

you have said that you want to introduce it for a different

purpose -- maybe I've put it in the wrong category -- I'll take

another look at it, but I don't want to hear any more argument

about it right now.

MR. WISNER:  Would you like the testimony, Your Honor,

that I --

THE COURT:  No.  Not right now.

MR. WISNER:  Okay.

THE COURT:  So --

MR. WISNER:  And this testimony was after we briefed

1  so that's why I have it because you've never seen it.

2          THE COURT:  Okay.  If I need it, I'll let you know.

3          MR. WISNER:  Okay.

4          THE COURT:  So, anyway, moving on to the category of

5  Monsanto -- motions regarding general causation and Monsanto's

6  scientific knowledge, let me see, what did I want to hear

7  argument about again?

8      Ah, nothing.  Good.

9      And then -- so motions regarding specific causation.

10 We've already discussed Plaintiffs' Motion Number 2 and

11 addressed everything in that; right?  We dealt with that

12 already.

13         MS. MATTHEWS JOHNSON:  Yes, Your Honor.

14         MS. MOORE:  I think that's right, Your Honor.  If I

15 could just raise one brief thing.

16     On the *motion in limine*, and it is Number 7, it's the

17 unrelated medical conditions, I understand the Court's ruling

18 but basal cell carcinoma, none of the defendant's experts

19 testified -- or not testified, but put in their reports that

20 basal cell carcinoma either, one, contributed --

21         THE COURT:  I don't believe it ever came up in

22 anybody's deposition testimony.  It's possible that I'm

23 misremembering that.

24         MS. MOORE:  Yeah.  So the reports -- I went back and

25 looked at their expert reports.  It's my understanding from the

1   defense expert reports no one is going to testify that basal

2   cell carcinoma either, one, contributed or caused

3   Mr. Hardeman's NHL.  That's why we believe it should be

4   excluded.  It's prejudicial, it will confuse the jury, and it's

5   not relevant.

6         **THE COURT:**  But couldn't the experts still --

7   couldn't -- sorry.

8       Couldn't Monsanto still cross-examine your experts on

9   whether they conducted any investigation into whether basal

10  cell carcinoma was a cause?

11        **MS. MOORE:**  But there's no basis for that, Your Honor.

12  It's completely unrelated to NHL, and their own experts --

13        **THE COURT:**  But why can't the plaintiffs' experts say

14  that?

15        **MS. MOORE:**  So the defense took -- cross-examined

16  Dr. Turk, who is Mr. Hardeman's primary care physician, and

17  they asked very clearly, and I have the testimony, Your Honor,

18  it's on page 127 of Dr. Turk's deposition, and Monsanto's

19  counsel said (reading):

20            "With respect to the 2018 carcinoma or melanoma, let

21        me ask you" --

22      Well, let me go back to it.  (reading)

23            "Is there any reason to think that the 2005 basal

24        cell carcinoma that Mr. Hardeman was diagnosed with had

25        anything to do with his later diagnosis of NHL?"

1      And Dr. Turk testified no.

2      And so just like they've already agreed that glaucoma or

3   sciatica or anything -- any other medical condition that has

4   nothing to do with NHL is not relevant and shouldn't come in,

5   it's the same for basal cell carcinoma and the same for

6   melanoma.  These are skin cancers and the plaintiffs' experts,

7   if they were asked, they would say this is from sun exposure,

8   but this is just not relevant.

9          **THE COURT:**  But -- hold on one second.  Whose

10   testimony did you just cite for me that you said it was

11   Hardeman's treating physician?

12          **MS. MOORE:**  Dr. Turk, Your Honor.

13          **THE COURT:**  Hardeman's treating physician?

14          **MS. MOORE:**  Yes.  Yes, Your Honor.

15          **THE COURT:**  You were describing it as if it was like

16   an admission by Monsanto or something, but it's Hardeman's --

17          **MS. MOORE:**  No, I'm not saying that.  I'm saying they

18   asked Dr. Turk, Your Honor, it's on page 127, if there's any

19   reason to think...  It's line 16 through 20.

20          **MR. STEKLOFF:**  Your Honor, Dr. Turk also doesn't think

21   glyphosate has anything to do with the cancer.  So if Dr. Turk

22   carries the day, then we can all go home.

23          **MS. MOORE:**  Your Honor, I'm not saying that.  The

24   whole point -- under 401, it's relevant evidence is what is

25   supposed to come in at trial; and the fact that he had a skin

cancer, whether it's melanoma or basal cell carcinoma, has

nothing to do with the question the jury is being asked to

answer during jury instructions -- during jury deliberations,

and that is whether Roundup caused -- was a substantial factor.

THE COURT:  Okay.  What about -- so what they say in

their opposition brief is that the McDuffie study identifies

risk factors for NHL and one risk factor for NHL is a personal

history of cancer.  This is a cancer and, therefore, they

should be able to cross-examine your experts on whether they

inquired whether basal cell carcinoma could have contributed to

the NHL.

It sounds like the answer may be basal cell carcinoma is

not a risk factor and it's going to be explained very quickly.

But what's the big deal?

MS. MOORE:  Well, it's jury confusion, Your Honor.

And, first of all, it's no expert, plaintiff or defense is

going to come into trial and say that basal cell carcinoma has

anything to do with him getting NHL.  It's simply not relevant.

It's going --

THE COURT:  You said their experts do not identify --

I didn't read their expert reports that carefully because you

didn't call them in to testify, but none of them identifies

basal cell carcinoma as a potential risk factor?

MS. MOORE:  None of them say that it is a contributing

factor to Mr. Hardeman developing NHL or a substantial factor

1   or a cause of the NHL.  It's simply not --

2           **THE COURT:**  Did they identify it as a potential risk

3   factor?

4           **MS. MOORE:**  They talk about his past medical history.

5   Dr. Levine goes through and analyzes his past medical history

6   from her review of the medical records.  She talks about

7   eczema.  She talks about the basal cell carcinoma and the

8   melanoma.  She talks about sciatica.  But she doesn't conclude

9   that any of that has anything to do with the NHL.

10      And they've agreed to exclude everything else except for

11  this, and the reason they want to put that in front of the jury

12  is because they want to be able to say he's eaten up with

13  cancer.  That's the argument they're going to make, Your Honor,

14  and that is highly prejudicial.  It goes right to the heart of

15  403.  It's a waste of time, it's confusing, and it's

16  prejudicial.

17          **THE COURT:**  It doesn't sound like it's going to be

18  very prejudicial if all their experts said it wasn't a factor

19  in causing NHL.

20          **MS. MOORE:**  I understand, Your Honor, but I do

21  think --

22          **THE COURT:**  My ruling stands and, as I said, I didn't

23  want to hear argument on that one.

24          **MS. MOORE:**  Okay.  Thank you, Your Honor.

25          **THE COURT:**  Let's see, so I don't think -- was there

1    anything else on specific causation that I wanted to hear

2    argument on?  I think the answer to that is no.

3        That takes us to miscellaneous.  Perhaps we should have

4    put Seralini in miscellaneous but, in any event, let me see --

5    oh, yeah, the benefits of glyphosate.  I didn't really

6    understand the argument for putting in evidence about the

7    benefits of glyphosate other than a basic -- other than

8    providing some basic background information.

9        I know that sometimes there's, like, a risk-benefit or a

10   cost-benefit analysis that's conducted in negligence-type

11   cases, but I think it's a case-by-case thing, and I don't

12   think -- I don't see what role it has in this case.  So I

13   wanted to give you one more chance to explain to me why it's

14   relevant that glyphosate has benefits.

15       **MR. KILARU:**  Sure, Your Honor.  Phase I I think

16   actually the way you ruled is consistent with the way in which

17   we'd intend to present it, which is basic mechanistic evidence

18   and at a pretty high level.

19       At Phase II we have been talking about, and we've heard I

20   think recently what the arguments will be, particularly with

21   respect to punitive damages in terms of Monsanto's motive in

22   the pre, I guess it would be, 2012 conduct of profiting, of

23   basically putting money over the safety of a plaintiff, and so

24   on and so forth.  And I think the benefits of the product are

25   actually relevant to rebutting that evidence of motive.

 1          I agree with you that it doesn't --

 2          **THE COURT:**  Why?

 3          **MR. KILARU:**  Because it goes to explain what the

 4     actual motive was for any of the conduct that the plaintiffs

 5     are challenging.  I mean, they're going to tell the jury

 6     presumably --

 7          **THE COURT:**  Well, do any -- let me ask.  Do any of the

 8     claims stand -- do any of the plaintiffs' claims stand for the

 9     proposition that glyphosate should never have been put on the

10     market?

11          Because if any of the claims stand for the proposition

12     that glyphosate should not be on the market, then I would

13     understand your point; but as I understand this lawsuit,

14     they're not saying that glyphosate should not be on the market.

15     They are simply saying that you need to warn people about

16     glyphosate.

17          So if I'm wrong in my basic --

18          **MR. KILARU:**  Well, there is a design defect claim,

19     Your Honor.  It's not just failure to warn.

20          **THE COURT:**  Okay.  And the design defect claim stands

21     for the proposition that Roundup should simply not be on the

22     market?

23          **MR. KILARU:**  That's -- I understand the claim to be

24     that it's defectively designed because it causes NHL, which is,

25     I would think, a claim that it shouldn't be on the market

1    because of a design defect.

2         THE COURT:  Okay.  So if that's the case, then

3    maybe -- so it wasn't clear to me that that's what that claim

4    stood for.  If it is what that claim stands for, then I think,

5    then, maybe there is room for kind of a weighing of the costs

6    and benefits.

7         But -- so let's put that aside for a second --

8         MR. KILARU:  Okay.

9         THE COURT:  -- and think about the other claims.

10        Would there be any reason to explain -- you know, pitch to

11   the jury all the benefits of glyphosate absent that?

12        MR. KILARU:  So I think in response to the point you

13   raised earlier, I don't think it would enter into the

14   traditional negligence, reasonableness, failure to warn test

15   balancing.  I agree with that.  But to the extent in attempting

16   to prove punitive damages, plaintiffs are adding on top of the

17   substance evidence to the claim, and we think there's arguments

18   they shouldn't be allowed to do this, but to the extent they're

19   adding on top of the substance of evidence arguments about

20   motive, about the company's financial profits and the desire to

21   put profits over safety so often then to that effect, I think

22   that's where the benefits come in as rebuttal to that argument

23   of motive.

24        THE COURT:  Why?  I mean, because if the argument is

25   not that glyphosate should not be off the market, so putting

1   aside the design defect claim, if the argument is they never

2   should have done this but if the argument is merely they should

3   have been more responsible about investigating the health

4   effects of this and they should have done a better job in their

5   marketing materials and they should have done a better job of

6   warning people to wear protective gear and warning people of

7   the risks, then I don't understand where the benefits of

8   glyphosate come into that discussion.

9           MR. KILARU:  Because I think it goes to why there

10  was -- to the extent there was pushback, why there was pushback

11  on a warning, and part of the answer is certainly that we

12  didn't believe there was a science-based reason to do so.

13      But I guess it comes down to the question of how much is

14  layered on top of what Your Honor talked about in terms of

15  motive.

16          THE COURT:  This product is great.  This product is

17  fantastic.  It's very effective, but you've got to be careful

18  when you use it because there's a risk that it causes NHL.  I

19  mean, I don't -- that's what -- they're saying that's what

20  Monsanto should have said.

21      So, in other words, with the possible exception of the

22  design defect claim, I don't see how any of the claims call

23  into question the benefits of glyphosate -- of Roundup, and so

24  I don't understand why it would become relevant.

25          MR. KILARU:  Because the benefits could also

1    provide -- to some degree the benefits evidence could also

2    provide a reason why a plaintiff might use the product

3    independent of whether there's a warning or not.  I mean, if

4    it's a really good product and it works very well, which is our

5    position, the plaintiff could say "I'm going to keep using it

6    no matter what."

7           **THE COURT:**  But if it caused Mr. Hardeman's NHL and

8    there wasn't a warning, then why is it -- why is that question

9    relevant whether the plaintiff would have -- whether a

10   plaintiff -- are you going to argue that this product is so

11   good that Mr. Hardeman would have used it anyway even if we had

12   warned him about NHL?

13          **MR. KILARU:**  I mean, I think it depends on how the

14   testimony comes in.  I don't anticipate that, but I think it

15   would depend on how the testimony comes in.

16          **THE COURT:**  Right.  And so if you don't anticipate

17   that, then why shouldn't the ruling be to grant the

18   *motion in limine* subject to the door being opened?

19          **MR. KILARU:**  I think --

20          **THE COURT:**  I mean, subject to this defect claim that

21   we've put aside.

22          **MR. KILARU:**  Because I think -- so with that caveat

23   and I think the caveat that it's rebuttal to plaintiffs putting

24   in evidence of financial profit motive, outside of those two

25   things, I think it would be a door-opening issue.

1     **THE COURT:**  That part I don't understand, the part

2  about the plaintiffs putting in evidence of profit motive.  I

3  mean, why are the benefits of glyphosate relevant to Monsanto's

4  profit?

5     **MR. KILARU:**  Because they're saying the motive --

6  presumably they would be saying in that world that the motive

7  for Monsanto's conduct, the reason they did it is because all

8  they care about is money.

9     **THE COURT:**  Right.

10    **MR. KILARU:**  And a different motive for Monsanto's

11  conduct is that they think it's a very effective product that

12  has significant benefits to society.

13    **THE COURT:**  But if they think it's a very effective

14  product, they can still sell it.  They should just be providing

15  a warning.  I mean, the decision not to provide a warning, I

16  don't see how -- this is a great product so we're -- and we

17  want to make sure that everybody can use it so we're not going

18  to provide a warning that it might kill them.

19     **MR. KILARU:**  Right.  I guess, Your Honor, I'm not --

20     **THE COURT:**  What are you talking about?

21    **MR. KILARU:**  I'm talking about the fact that if

22  they're bringing in evidence of why that was, we should be

23  allowed to rebut it.

24     **THE COURT:**  Because they're greedy.

25    **MR. KILARU:**  Right.  And we should be allowed to rebut

```
 1   that with evidence --

 2         THE COURT:  They should have taken a lower profit and

 3   spent the money studying the issue objectively rather than

 4   constantly advocating and attacking everybody who raised

 5   questions about it, and they should have spent the money to

 6   warn people.

 7         MR. KILARU:  Right.  And I think our rebuttal to that,

 8   which I think we're entitled to present, would be that, no, we

 9   believe that the product is safe, it's science supported, the

10   science supports its safety, and it has great benefits to

11   society and that's why we did what we did.

12         THE COURT:  You believe it's safe, I get that part.

13   No, we didn't have to do that.  We didn't have to spend the

14   money looking at this issue objectively.  We didn't have to

15   warn anybody because we believe the product is safe.  I get

16   that part.

17      But we didn't have to warn anybody that this product is

18   dangerous because we believe that it's a really good product,

19   that part I don't get and I have a feeling that you would not

20   remotely even consider saying that to a jury.

21         MR. KILARU:  Right.  I think, Your Honor, again --

22         THE COURT:  So, therefore, I don't understand how it's

23   relevant.

24         MR. KILARU:  I think it depends, I think I've been

25   trying to say, on how they present this evidence of motive and
```

1    the arguments and the degree to which that evidence comes in

2    and the nature of the arguments they make in support of that.

3           THE COURT:  Well, I think the ruling would be --

4    putting aside what is perhaps this very big issue of the design

5    defect claim, the ruling stands, which is that it's not

6    admissible.  And with all *motions in limine*, it's subject to

7    the door being opened, but it's not admissible as it stands

8    now.

9           But what about the design defect claim?

10          MR. WOOL:  Well, so for the design defect claim, I

11   think there's a little bit of a debate as to which test should

12   apply, whether it's the consumer expectations test in which I

13   think it's fairly clear that it doesn't come in, or the

14   risk-benefit test.

15          And I think it's important, and I don't think the Court

16   has to decide that today, but I think it's important to

17   consider if the Court does determine that the risk-benefit test

18   applies, that Mr. Hardeman and all of the Tier 1 plaintiffs

19   used Roundup for residential purposes, not agricultural

20   purposes and not ITNO purposes.

21          And so what we are most concerned about is what I would

22   call Monsanto's sort of feed-the-world argument, which is

23   essentially that but for glyphosate, people would starve and

24   the planet wouldn't survive or, you know, the Apocalypse would

25   ensue or something like that.  And I think that that argument

 1    is highly prejudicial, it's irrelevant, and sort of that's the

 2    principal reason why, under the design defect claim, that it

 3    still shouldn't come in under that claim.

 4         THE COURT:  Well, but I guess it sort of begs the

 5    question of what if Monsanto -- I don't recall if you drew this

 6    distinction between feed the world and kill the poison oak in

 7    your motion, but I guess it begs the question of whether -- of

 8    what you would say if Monsanto wanted to say "This is the most

 9    effective thing ever at killing poison oak and not killing

10    other plants."

11         MR. WOOL:  Well, I think that we would be less

12    concerned with that argument and just say that it's effective

13    at killing poison oak.  I think Mr. Hardeman would probably say

14    I used it because it killed the poison oak.

15         THE COURT:  Okay.

16         MR. WOOL:  But --

17         THE COURT:  So your motion is one to essentially

18    preclude feed-the-world arguments?

19         MR. WOOL:  Yes, arguments with respect to agricultural

20    uses, GMO crops and that sort of thing.

21         THE COURT:  Other than that basic background

22    information.

23         MR. WOOL:  Yes.  And to be clear, I know Monsanto

24    addressed that, but our argument was never that basic

25    background facts about glyphosate are irrelevant.  I think the

1    jury has to hear something about that.

2         **THE COURT:**  Okay.  I understand the arguments.

3         **MR. WOOL:**  Thank you.

4         **MR. KILARU:**  Your Honor, I think this goes without

5    saying, but we do not agree that the consumer expectation

6    exceptions apply.  I think that's an issue for later.

7         **THE COURT:**  Well, yeah, I actually was just going to

8    say that.

9         **MR. KILARU:**  Yeah.

10        **THE COURT:**  I don't know at what point we need to

11   decide that.  Is it when we're putting together jury

12   instructions for Phase II?

13        **MR. KILARU:**  I think that would be right because I

14   think that's when we're talking about the nature of the claim

15   that's going to be submitted to the jury, but I just wanted to

16   make clear that that --

17        **THE COURT:**  I understand.

18        **MR. WOOL:**  We agree with that.

19        **THE COURT:**  Okay.

20        **MS. WAGSTAFF:**  I think the next one is Monsanto's

21   *Motion in Limine* Number 5.1.

22        **THE COURT:**  So the only issue I want to hear argument

23   on for that one is whether the exception should apply; that is,

24   asking questions of the experts about their compensation.  I

25   don't think there's any serious question that references to the

other litigation, to the thousand other cases -- it's way more
than a thousand; right?  It's like -- that's not part -- the
fact that there's been a thousand other cases is not part of
this trial.

So really the only question I wanted to talk through was
this exception -- should there be this exception and if so, how
will it work.

MR. IMBROSCIO:  Yeah, so I can speak to that first,
Your Honor.

This is an issue, as you might imagine, that comes up in
virtually every sort of mass tort type case.

THE COURT:  Because -- you mean the general issue or
the issue about asking experts about their compensation?

MR. IMBROSCIO:  The expert issue.  Exactly this issue.

THE COURT:  Okay.

MR. IMBROSCIO:  Because, you know, from the
plaintiffs' perspective, you can't ask about any money except
the time they walk through the door into this courtroom for
this plaintiff.  The defense perspective is every penny you've
ever gotten from the time in the beginning.

And I think the concern that you make -- that you raise in
your motion and that the plaintiffs raise -- in your order and
the plaintiffs raised is, okay, where to draw that line.

I think how it -- how it's worked out recently -- we did
this in *Pradaxa*; we did it in *Accutane* -- is distinguishing

between a general causation expert and a specific causation

expert on one level.  And so for the general causation expert,

the work done to form their general causation opinion should

all be -- should all be in play.  That's the time they spent to

come into court and offer that opinion.

If they happen to testify in another trial, so, for

instance, to make a real-world example, *Johnson*, that time is

not on the clock essentially.  So it's all the work done for

the general opinion but not a trial-specific case.

**THE COURT:**  Okay.

**MR. IMBROSCIO:**  And the parties can exchange limited

information, which is how we do it in *Pradaxas*.  You know,

what's the total and what's the total minus any case-specific

cases.  That's the general causation rule, which tends to work

pretty well.

**THE COURT:**  Although presumably you can -- each side

can cross-examine the other side's expert about testimony in

other trials; right?  I mean, it may not be that you're asking

about their compensation in other trials, but wouldn't -- for

example --

**MS. WAGSTAFF:**  Your Honor, they did it in *Daubert*

numerous times.

**MR. IMBROSCIO:**  Yeah.

**THE COURT:**  Right, but we're talking about the trial.

So why would -- wouldn't it be appropriate for you to

cross-examine, you know, Dr. Nabhan and say, "Look, isn't it true that you've testified 20 times each time for the plaintiff in a case like this?"

**MR. IMBROSCIO:**  That's certainly an examination that's done for other litigations.

**THE COURT:**  Right.

**MR. IMBROSCIO:**  "You've done 15 litigations, all for the plaintiff, common."

**THE COURT:**  Right.

**MR. IMBROSCIO:**  I do think it gets closer when you start saying "another Roundup plaintiff" or "a different Roundup plaintiff" because then I think it does lend the argument is that opening the door.  At least we can talk about this other plaintiff.

I think that's a strategy decision that we have to make. If we decide to say "Didn't you testify across the Bay," then that, at least to some degree, might open the door and we fully acknowledge that's an issue that we'll need to make.

And as a typical matter, you know, if you have to impeach someone, you can use language like "Didn't you give testimony on a prior occasion or" -- without mentioning another specific plaintiff, which I think is probably how we would do it.  So it doesn't open the door to another lawsuit but the testimony becomes something they can be impeached on, and they don't get -- you know, and the charge that they've charged for that

particular plaintiff or that particular trial isn't part of the

total number.  That's at least one way to work it out.

       **THE COURT:**  So you're saying there's sort of a model

from other trials, there's sort of a model ground rule for this

sort of thing?

       **MR. IMBROSCIO:**  I don't know if it's a model.  I mean,

it's something that's been worked out over time.

       **THE COURT:**  What would you point me to?  Is there

something in writing?

       **MR. IMBROSCIO:**  I'm trying to think.  It's usually a

stipulation between lawyers.  I can submit what we -- what the

lawyers have agreed to in the *Pradaxa* litigation where we've

had six or seven trials.  We're happy to do that afterwards.

    So the way it's worked is before each trial, Dr. Plunkett,

who is a repeat player, her current number is X, which is her

general plus, you know, any work in this particular case, but

maybe not the other two trials so the 10,000 or $15,000 for

coming to trial number three or trial number four.

       **THE COURT:**  And that's -- on a gut level, that sounds

sensible for the general causation experts.

       **MR. IMBROSCIO:**  Okay.

       **THE COURT:**  What about the --

       **MR. IMBROSCIO:**  Yeah, so it's specific -- it's

similar.  So the work that's done generally to learn the case

for sort of Plaintiff Number 1, that they would have to do for

1    any Plaintiff 2, 3, 4, or 5, that's part of -- that's in the

2    mix, and then the work done for this particular plaintiff.

3        So let's say this is Plaintiff Number 3 or 4.  Then it

4    would be the beginning, the general set, plus the work done for

5    Plaintiff Number 4, not the amount spent for 2, 3, 5, and 6,

6    for instance.

7        And to be clear, these are -- these are agreements that

8    the lawyers on both sides have reached as a compromise because

9    it sort of balances it.  I'm not sure I have a court order.  I

10   don't have any court order that imposes this, but it seems like

11   a pretty -- that's a pretty good rule to have and it sort of

12   balances their concern, which is a legitimate concern, and our

13   concern that the jury has a right to hear about the money.

14   That's what we would propose.

15       MS. WAGSTAFF:  So, Your Honor, I'm not involved in

16   *Pradaxa* so I tried to follow what he said but I'm not quite

17   sure I can fully agree to that, but what I can agree to, I

18   think this happened in the *Johnson* trial, I'm trying this case

19   and I can work with the trial lawyers for Monsanto and we can

20   try to reach a number that we agree to for each expert; and to

21   the extent we want to ask them, we'll say, "Okay.  You know,

22   Dr.  Weisenburger, you were paid this much for this case."  And

23   we can do that beforehand; and if we can't agree to it, we'll

24   come bring it to you.

25       THE COURT:  I think that's probably the best way to

```
 1    handle this.

 2              MR. IMBROSCIO:  Yeah.  So I'm happy to work that out.

 3    The one issue we have with Dr. Portier, which is next week, is

 4    it would be nice to have what his number -- what they're going

 5    to propose his number would be.

 6              THE COURT:  Why don't you-all try to work it out

 7    before next week?

 8              MR. IMBROSCIO:  We will do so.

 9              MS. WAGSTAFF:  We can try to do that.

10              MR. IMBROSCIO:  We will do so.  Thank you, Your Honor.

11              THE COURT:  Okay.

12              MS. WAGSTAFF:  I believe the next ones are 11.1 and

13    11.2.

14              THE COURT:  Oh, the magic tumor, the IBT/Craven

15    studies.

16              MS. MATTHEWS JOHNSON:  Yes, Your Honor.

17         I think on the magic tumor, the tentative ruling would put

18    the onus on us to begin the argument.

19              THE COURT:  Yes.

20              MS. MATTHEWS JOHNSON:  And it's a very narrow point at

21    this juncture.

22              THE COURT:  It is, but it -- and let me just say at

23    the outset, so this -- I'm almost reluctant to say this out

24    loud.  You know, the magic -- rhetoric like "magic tumor,"

25    "champagne corks popping," I don't really know if there's
```

1    anything wrong with that, to be honest with you.

2        I mean, I -- you know, I think what is a real problem is

3    to say -- is in your closing argument to say that champagne

4    corks are popping and then to have an objection sustained and

5    then to go back to champagne corks popping at the end; right?

6    That's totally inappropriate.  That's 20th floor stuff.

7        But, actually, I don't know.  I mean, what's wrong with

8    using colorful language like that to encapsulate your point?

9        MS. MATTHEWS JOHNSON:  Well, Your Honor, let me say, I

10   think you honed in on the issue.  You're talking about closing

11   and what people do in closing, and I probably have had some

12   colorful phrases in my time in some closings, but what we're

13   trying to head off is my understanding from the *Johnson*

14   litigation was that this was excluded with reference to a

15   particular expert who wanted to characterize this particular

16   tumor that has been accepted to have existed.

17       This is the tumor that I believe plaintiffs asked for the

18   slides about -- Mr. Wisner will correct me if I'm wrong -- and

19   the slides came back and we never heard a word about there

20   being a problem with the tumor being found in those slides.

21       THE COURT:  But what's the big deal with -- I mean,

22   you know, the lawyer calls it -- characterizes it as a magic

23   tumor.  The jury is reminded that lawyer argument is not

24   evidence.  And you get up and you say, "You know, he called it

25   a magic tumor.  That really creates some credibility problems

1  for him because, as you can see, the tumor was actually there.

2  There's nothing magic about it."  So what's the big deal?

3  　　　　**MS. MATTHEWS JOHNSON:**  I think that's a closing

4  posture.  I want to be clear for the record, in closing I think

5  people make those kinds of choices, will you draw an action.

6  Our issue is the characterization in opening where you're

7  talking about a statement, not an argument, and also

8  potentially this use by experts.

9  　　　　**THE COURT:**  That kind of thing went on -- sorry.  I

10  didn't understand -- I understood your motion to be to preclude

11  reference to magic tumor altogether at the trial.

12  　　　　**MS. MATTHEWS JOHNSON:**  And I read that.

13  　　　　**THE COURT:**  Of course, it would not be appropriate to

14  do that at opening.

15  　　　　**MS. MATTHEWS JOHNSON:**  Okay.

16  　　　　**THE COURT:**  Of course, that would not be appropriate.

17  　　　　**MS. MATTHEWS JOHNSON:**  All right.  And I'm not sure

18  how well we tailored it.  I went back and read it, but let me

19  focus.

20  　　　The idea that people use rhetoric in closing and you make

21  your choice as to whether you're going to draw an objection

22  that's going to be sustained or whether you're going to leave

23  yourself open to a response is a fair point, but we're heading

24  off an opening issue, use by experts.

25  　　　And I think that was the ruling in *Johnson* too.  I don't

1    believe experts were permitted to use that term.

2         **MR. WISNER:**  I think we agreed not to use it in

3    *Johnson*.  Whether you call it "magic tumor," "ghost tumor,"

4    "tumor that never existed," whatever, we call it what we call

5    it.  It's just a name.

6         I mean, what I drew -- what I got --

7         **THE COURT:**  So you want to agree not to use the term

8    "magic tumor"?

9         **MR. WISNER:**  No.  I'm not trying this case.  I can't

10   agree to that.  And for what it's worth, we can use whatever

11   language we want in closing and bear the -- you can come back

12   and say, "It ain't magic.  It's right here in black and white."

13   You know, whatever they want to do.  That's trial lawyering,

14   and so we bear the risk of going there.

15        **THE COURT:**  But that sort of thing, I mean, I think

16   it's worth -- I mean, I think everybody on both sides of this

17   case is an experienced trial lawyer, and so I'm not

18   anticipating as many of these kinds of problems as I sometimes

19   get in my trials; but, you know, that is certainly not an

20   appropriate thing to say in opening statement.

21        **MR. WISNER:**  Sure.

22        **THE COURT:**  Right?

23        **MR. WISNER:**  Sure.

24        **THE COURT:**  Opening statement is about explaining what

25   the evidence will show, not making argument; and lawyers

1    conflate the two all the time, but I'm anticipating that you

2    will not.

3         Okay.

4              MR. WISNER:  Is the issue just whether or not we call

5    it the "magic tumor"?  I mean, is that the issue here?

6              THE COURT:  I'm sure -- I don't think that's the

7    issue --

8              MR. WISNER:  Okay.

9              THE COURT:  -- because I think you can think of 10

10   other names for it --

11             MR. WISNER:  Sure.

12             THE COURT:  -- that would be equally objectionable to

13   them than "magic tumor."

14        Okay.  And then what about the last one was the IBT/Craven

15   studies.

16             MR. WISNER:  The IBT and Craven Lab studies?

17             THE COURT:  Yeah.  I didn't really understand -- I

18   didn't understand -- you know, I'm getting a little tired now

19   and maybe it's -- but I would like to kind of plow through this

20   before we take our break and go look at the questionnaires, but

21   you seemed to be saying in your opposition to this motion that

22   you had shown in the discovery dispute or in the -- I can't

23   remember if it was the discovery dispute or -- the previous

24   evidentiary issues where each side teed up three evidentiary

25   issues, that you had already established the relevance of

1   the -- of this, and I did not take away from our discussion of

2   those three prior evidentiary issues that this was relevant.

3           **MR. WISNER:**  Sure.  Fair enough.  If that's --

4           **THE COURT:**  I don't understand what --

5           **MR. WISNER:**  Sure.

6           **THE COURT:**  I'll need you to -- let me just give you

7   another shot at explaining why these should be admitted.

8           **MR. WISNER:**  Sure.  Let's put Craven Laboratories

9   aside for a second because that's sort of a different issue.

10  Craven Labs is about food residue levels.  I don't think we

11  have a fight about that.

12      Let's talk about IBT.  Mr. Hardeman started using it in

13  1985.  Between essentially when it was approved in 1974 and

14  actually up until 1991, the approval of Roundup was based on

15  the IBT Lab study, which the EPA has deemed to be invalid.

16  Okay?

17      And it was a product of this whole fraudulent fabrication

18  of data story around the IBT where this guy Paul Wright who

19  worked at Monsanto, he goes to IBT.  During that time, they

20  conduct lots of studies for Monsanto, including Roundup, the

21  carcinogenicity study.

22      Then he comes back to Monsanto after that and is the

23  liaison between Monsanto and IBT.  Five years later, he's

24  indicted for fraud.  He actually goes to jail because there's a

25  six-month trial.  It's a historic trial in Chicago.

1          So -- or maybe it was in New York.

2          In any event, so the whole purpose of the IBT story is to

3     show that when Monsanto learned that this product -- the safety

4     of it with regard to carcinogenicity was based on a bad,

5     invalid study, they didn't take the stuff off the market.  They

6     kept selling it not knowing if it was safe or not.  They kept

7     saying it didn't cause cancer in its labeling.  And so -- and

8     that wasn't -- and that actually goes right up until 1985 when

9     our client starts using it.

10          So putting aside the fraud issue and whether or not Paul

11     Wright, you know, worked at Monsanto, I think they say "We're

12     victims of it."  I think if they go there, then we can come

13     with the Paul Wright story; but simply saying that for the

14     first 10 years it was based on an invalid study, I think that's

15     what we want because it goes straight to the failure to warn

16     and the value of science in Phase II; right?

17          And it also will come back --

18          **THE COURT:**  Is the punitive damages because, as in

19     every other case, it seems as if Monsanto has not responded to

20     concerns objectively but, rather, as a fierce advocate for the

21     safety of Roundup?

22          **MR. WISNER:**  Precisely.  And the door also opens very

23     quickly if they say a 40-year record of safety because that's

24     that crack.  The first 10 years or so are not.  It's unknown.

25     And so that's where it comes in and that's what we would -- I

1    mean, I would be willing to work with defense counsel to work

2    out, you know, provided they don't open doors, we don't have to

3    get into Paul Wright, you know, working in for Monsanto and

4    going to jail for fraud stuff, but at the very least that for

5    the first 10 years it was based on an invalid study.  I think

6    that's relevant to Phase II.

7            MS. MATTHEWS JOHNSON:  So, Your Honor, just to maybe

8    set the table on this, this is a lab fraud situation, lab

9    frauds that others have dealt with with toxicologists, with

10   drugs, everything else.  This was not an individual who was

11   specifically linked to Monsanto and went over.  Those links

12   that he's making are temporally there, but not --

13           THE COURT:  How do you respond to his point?

14           MS. MATTHEWS JOHNSON:  This is a lab fraud

15   situation --

16           THE COURT:  Why don't you respond to his point, which

17   is that this was an invalid study and that he is saying, we

18   don't want the fraudster, at least Monsanto is saying the

19   fraudster should come in.  What we are saying is that this was

20   an invalid -- for the first ten years' approval of glyphosate

21   was based on an invalid study, and Monsanto's reaction to that

22   was less than objective.

23           MS. MATTHEWS JOHNSON:  Right.  I think we would, first

24   of all, dispute that arc of information, and that's why it

25   began with a lab.  Multiple companies used this laboratory.

 1    Mr. Wright and three other scientists were tried in Chicago and

 2    convicted, and that is why it was a six-month trial because

 3    when you find labs were operating fraudulently, you have lots

 4    of victims.  You are going to have lots of problems, leading to

 5    detail.

 6         And so the connection he was trying to make in terms of

 7    what Monsanto did in response is simply not true.  When the EPA

 8    brought it to Monsanto's attention, Monsanto re-did every

 9    single study that was drawn into question by IBT.  I know

10    Mr. Wisner knows these facts better than me.  He can certainly

11    correct me, but my understanding is they re-did every single

12    study to the tune of millions of dollars.

13         So the notion that Monsanto as a part of a panoply of

14    companies who finds out they had been victimized by a

15    fraudulent laboratory, which has happened to prosecutors and

16    everybody across the country, are suddenly now going to be

17    hamstrung to the fact that they were lied upon or defrauded,

18    re-did the studies, found they were still safe -- and this is

19    going to come into court -- is squarely inadmissible is our

20    position.

21         **THE COURT:**  Well, but -- so -- do you have some

22    specific conduct that you want to point to that Monsanto

23    engaged in or some specific statements that Monsanto made in

24    the wake of the realization that the study was invalid --

25         **MR. WISNER:**  Sure.

1          **THE COURT:**  -- that you think would go to punitive

2     damages?

3          **MR. WISNER:**  Sure.  They didn't take it off the

4     market.  That's right there.  They have a product that they are

5     selling.  The label says it doesn't cause cancer, and they

6     don't know that.  That's -- that's improper.

7        A responsible company would have said, you know what, we

8     are taking this off the market until we know it is safe,

9     studying it and then we will put it out when the EPA --

10         **THE COURT:**  Was that the study that resulted in

11    initial approval to put it on the market?

12         **MR. WISNER:**  That's correct.

13         **THE COURT:**  So --

14         **MR. WISNER:**  And then the repeat study was the

15    Knezevich & Hogan study.  So that is the predicate for how we

16    get to the '80s, and we are still fighting about whether or not

17    it causes cancer.

18         **MS. MATTHEWS JOHNSON:**  First, for the record, there

19    were multiple studies, Your Honor.  And it was not the case

20    that all of the studies were invalidated, so that is not the

21    situation.

22        I think there is -- you know, we can certainly dig into

23    this even more, but there are reports that actually show which

24    of the studies the EPA deemed needed to be replaced or not to

25    be replaced.  This is not every study.  There is no basis.  We

 1   have no way of knowing this is safe.  That is not the record.

 2           **MR. WISNER:**  To be clear, there was one cancer study

 3   ever done in the '70s.  It was done by IBT.  The EPA looked at

 4   it and declared it invalid.  That is undisputed facts.  There

 5   was no other carcinogenicity study done.  Four of the five

 6   mutagenicity studies done by IBT were also deemed invalid.

 7   There was one mutagenicity study done by a different lab.  I

 8   can go through the facts on this all day.

 9           **THE COURT:**  Well, no, what I was going to say -- I'm

10   sure you can.  But what I was going to suggest actually on this

11   one is we know it is not coming in in Phase One.  We know --

12   and now -- and we know that what we are really talking about is

13   the IBT study and not this guy going to jail -- what was his

14   name?

15           **MR. WISNER:**  Paul Wright.

16           **MS. MATTHEWS JOHNSON:**  Wright, among others.

17           **THE COURT:**  Not Wright going to jail and all that.

18   The study was invalidated, and Monsanto's reaction to response

19   to that fact, right, and so what -- what I would be happy to do

20   is have you file another supplemental brief in support of that

21   motion, or I guess it would be a supplemental brief in

22   opposition to that motion in limine explaining sort of the --

23   explaining in -- with precision what conduct it is that you

24   think should come in, which of Monsanto's conduct in response

25   to the invalidation of the study you think should come in.

1    Identify that with precision and explain why.

2          And then I will let you file -- you can file a response to

3    that -- Monsanto can file a response to that supplemental

4    brief, and I will decide it before we get to Phase Two.  File

5    that within seven days, and you file that within fourteen days;

6    response within fourteen days.

7               **MS. MATTHEWS JOHNSON:**  Thank you, Your Honor.

8               **THE COURT:**  You want more time?

9               **MR. WISNER:**  I'm going to Australia.

10              **THE COURT:**  Oh, yeah.  You can't write it on the

11   plane?

12              **MR. WISNER:**  I'm preparing for his testimony on the

13   plane.  As much as it sounds like a vacation, it really is not.

14              **THE COURT:**  Can somebody else on your team do it?

15              **MR. WISNER:**  Your Honor, I think seven days will make

16   it work.

17              **MS. MOORE:**  Could we have ten days, Your Honor?

18              **THE COURT:**  Sure.

19              **MS. MOORE:**  Thank you.

20              **THE COURT:**  You can have ten days, and then seven days

21   after Monsanto will file its response.

22              **MS. MATTHEWS JOHNSON:**  Thank you, Your Honor.

23              **THE COURT:**  Okay.  So that gets us through the motions

24   in limine, right.

25          So good time to take a break.  I will be back in about a

1    half an hour.  Do you have something else?

2         MR. STEKLOFF:  I was going to say I don't think there

3    is too much more -- I don't know if there is less.  We wanted

4    to ask you about the number of jurors, and I have one question

5    about Dr. Portier's reliance list, heading into the deposition.

6    But I'm not sure that there is --

7         MR. WISNER:  We also have jury instructions.

8         THE COURT:  So there is jury instructions, which we

9    could talk about later.  We could talk about on Friday.  We are

10   going to be back together on Friday, right?

11        So let's take -- let's figure out if we can knock out the

12   rest of the stuff on Friday when we get back together.

13        So there is jury instructions.  There is the verdict form.

14   There is the issue of sealing -- and I will tell you now

15   that -- I want to fix the over-sealing before the trial, okay.

16   So this is a -- this is a case that has generated a lot of

17   public interest, and I don't want the documents in this case to

18   be over-sealed coming into trial.

19        So I was planning on -- I'm not sure I am quite ready to

20   talk to you about that yet.  But you are going to need to go

21   back and fix all the over-redactions, and I think re-file

22   everything.  Unless -- you know, hopefully there will be a

23   number of situations where we can just file -- you file a

24   redacted and an unredacted version, and the redacted version

25   you file under seal.  Hopefully we can just -- sorry, the

1  unredacted version you file under seal.  And hopefully we can

2  just lift the seal on a lot of those documents so you don't

3  have to go back through and do it again.  I think that probably

4  will be the case for a lot of them.  That is something that is

5  going to happen before the trial.

6        **MS. MOORE:**  We can talk about that on Friday,

7  Your Honor.  It would be great if we go ahead and do the jury

8  instructions and verdict forms after the break, and then we

9  also have Dr. Sawyer and Dr. Sullivan left too.

10        **THE COURT:**  Oh, yeah.  Sawyer and Sullivan.

11        **MS. MOORE:**  Just for planning purposes, it would be

12  nice to have that today, Your Honor.

13        **MR. WISNER:**  The reason on the jury instructions,

14  Your Honor, is I will not be here on Friday; and I'm sort of

15  taking the lead on that.

16        **THE COURT:**  Okay.  So let's take a half-hour break.

17  Be back at 20 after.  And I will hopefully be back at that time

18  to report to you on the jury numbers, and we will talk about

19  the rest of the stuff.

20        **MS. MOORE:**  Thank you, Your Honor.

21        **THE COURT:**  Thanks.

22        **THE CLERK:**  Court is in recess.

23     (Whereupon, a short break was had.)

24        **THE COURT:**  Okay.  Just to give you an update, very

25  loose -- I actually didn't look at any of them myself.  The

1  clerks looked at them, but they came up with a very rough, you

2  know, estimate that half the people either say they have a

3  hardship, like their scheduling and they have to take the kids

4  to school or something like that so they can't do it or they

5  claim sort of that they couldn't be fair in a way where we

6  might very well just kick them on the papers.

7       So I think actually the numbers will be fine, but in an

8  abundance of caution we are going to have like 20 or 25 more

9  people fill out questionnaires tomorrow and -- so that we will

10 have a slightly larger pool to go through Friday.

11      I think it's -- like I said, I don't think it's going to

12 be necessary.  I think we might end up not calling any of those

13 20 to 25 people in for jury selection on Wednesday, but we

14 might as well have it in an abundance of caution.  So that's

15 that.

16      What do you all want to talk about next, jury

17 instructions?

18           **MR. WISNER:**  Yes, Your Honor.

19           **THE COURT:**  Okay.

20           **MR. WISNER:**  Do you have the instructions in front of

21 you, Your Honor?

22           **THE COURT:**  Yeah.

23           **MR. WISNER:**  Okay.  So there is -- other than we have

24 talked about IARC, so there is really three issues that I want

25 to raise.

1          **THE COURT:**  Okay.

2          **MR. WISNER:**  Two are not, I think, that serious, but

3     we care about them; and the other one is probably a bigger

4     issue.  So we will start with the easy one.

5          In the second paragraph of opening guidance, it says,

6     starting on the third sentence, In the first phase you will be

7     asked to determine whether Mr. Hardeman can prove that his use

8     of Roundup caused his non-Hodgkin's lymphoma.

9          **THE COURT:**  Okay.

10         **MR. WISNER:**  And we think that the way that that is

11    phrased can be interpreted as creating a different burden.

12         **THE COURT:**  Okay.

13         **MR. WISNER:**  We will propose you will be asked to

14    determine whether Mr. Hardeman's use of Roundup was a

15    substantial factor in causing his non-Hodgkin's lymphoma, which

16    I think is almost verbatim what the -- the jury instruction on

17    causation.

18         **THE COURT:**  Hold on.  Let me re-read it with an eye

19    towards all of that.

20         (Whereupon, a brief pause was had.)

21         **THE COURT:**  I don't have strong feelings about it

22    either way.  I think it will probably be fine to say whether

23    he -- whether his -- whether Roundup was a substantial factor

24    in causing Hardeman's lymphoma.  I think whether -- I think it

25    would also be fine to say whether Roundup caused Mr. Hardeman's

1    lymphoma and then wait until -- and explain the -- you know,

2    there may actually be an argument to wait to explain the

3    meaning of causation when the jury gets its instructions when

4    it goes back to deliberate so --

5            MR. WISNER:  Our concern wasn't so much that as much

6    as the --

7            THE COURT:  Can prove.

8            MR. WISNER:  -- can prove that.

9            THE COURT:  Yeah.

10           MR. WISNER:  So whether Mr. Hardeman's use of Roundup

11   caused his non-Hodgkin's lymphoma would be preferable.

12           MR. IMBROSCIO:  But that's what the burden is.

13           THE COURT:  They will, of course, be instructed on the

14   burden.

15           MR. IMBROSCIO:  Yeah.

16           THE COURT:  And I believe the burden is reflected in

17   the special verdict form?

18           MR. IMBROSCIO:  Yes.

19           MR. WISNER:  That's correct.

20           THE COURT:  So I think, though, for this instruction,

21   I'm more interested in sort of being -- sort of short and

22   direct with people.  So I think it would be fine to say whether

23   Roundup --

24           MR. WISNER:  Mr. Hardeman's use of Roundup caused his

25   non-Hodgkin's lymphoma.

1          **THE COURT:**  Why not just say Roundup caused his --

2          **MR. WISNER:**  That's fine.

3          **THE COURT:**  Whether Roundup caused Mr. Hardeman's

4   non-Hodgkin's lymphoma.

5          **MR. WISNER:**  Yeah.

6          **MR. IMBROSCIO:**  That's fine.

7          **THE COURT:**  Okay.

8          **MR. WISNER:**  Sort of another one, we would request the

9   causation instruction.

10          **THE COURT:**  Okay.

11          **MR. WISNER:**  It says Mr. Hardeman must prove that

12   Roundup caused his non-Hodgkin's lymphoma.  We would only ask

13   to throw in the burden of proof there.  So Mr. Hardeman must

14   prove by a preponderance of the evidence that Roundup causes

15   lymphoma.

16          **THE COURT:**  I think that sounds fine.

17          **MR. IMBROSCIO:**  No objection to that.  That's

18   reasonable.

19          **MR. WISNER:**  Okay.  So there there's sort of the

20   larger question, which I think is something that you probably

21   anticipated would be the crux of the conversation.

22          **THE COURT:**  Yeah.

23          **MR. WISNER:**  And that is the issue of causation and

24   multiple causation.

25          **THE COURT:**  Yeah.

1          **MR. WISNER:**  And you know last time we talked about

2     this, I had the CACI instructions.  I don't want to give them

3     again to you, Your Honor, unless you want to look at them.

4          **THE COURT:**  I think I have them too in here.

5          **MR. WISNER:**  You have them too?

6          **THE COURT:**  Yeah.

7          **MR. WISNER:**  Okay.  So when you look at the

8     substantial factor, which is 430 instruction, I mean, the first

9     issue is we have removed the last sentence on that instruction

10    all together, right.  So it says, it does not have to be the

11    only cause of the harm, right.  And that's actually not in here

12    at all.

13         **THE COURT:**  Right.

14         **MR. WISNER:**  So I don't understand why we would take

15    that out, regardless of multiple causations.

16         **THE COURT:**  Well, I guess I thought of it as confusing

17    in this context because -- I mean, you know, I'm obviously open

18    to discussion about it, but my sense of the opinions offered by

19    your experts are that this was not a multiple causation

20    situation.  Roundup caused the cancer.

21         So given that the evidence in the case from the Plaintiffs

22    is that Roundup caused the cancer, we should remove any

23    reference -- we should remove any language from the jury

24    instructions that is designed to get at the issue of multiple

25    causation.

1        And if the -- if the Plaintiffs had presented opinion from

2    experts that this was a multiple causation situation, then it

3    would probably make that -- make sense for that sentence to

4    come in.  But in every case, you have to tailor the model

5    instructions to the facts of your own case.  And it struck me

6    that that sentence didn't fit given the evidence that the

7    Plaintiffs have put forward and the expert opinions that the

8    Plaintiffs have put forward on the causation of Mr. Hardeman's

9    cancer.

10        So that's -- that was my thinking there.

11        MR. WISNER:  Sure.  So the issue is if it was just our

12    experts testifying, I think you would be right.  But they are

13    having their experts testify that hep C was a substantial

14    contributing factor to causing his cancer.  That is clear as

15    day in several of their expert reports.

16        THE COURT:  Right.

17        MR. WISNER:  And if they are raising the issue of

18    multiple causation, then they don't get this instruction.  So

19    if they want to abandon hep C and these other causations and

20    make it just about Roundup, great.

21        THE COURT:  But I don't think they are issuing the

22    raising the issue of multiple causation either, right.  They

23    are saying hep C caused it, not Roundup.  So we have experts on

24    one side saying Roundup caused it, not hep C.  And experts on

25    the other side saying hep C caused it, not Roundup.  Nobody is

1    offering an opinion that it was caused by both, as far as I can

2    tell.

3         MR. WISNER:  Well --

4         THE COURT:  If that's right, if I'm right about that,

5    that nobody is offering an opinion that it is caused by both,

6    then the question becomes why do we need that language -- that

7    sentence, which is it does not have to be the only cause of the

8    harm.

9         MR. WISNER:  For a couple of reasons.

10        One, the first issue is they are going to hear evidence

11   that there are two possible causes to his cancer, right.  That

12   is what the evidence is going to be presented to them.  And

13   when they are presented with that, it is easy to think, oh, if

14   hep C was a possible cause, right, then you don't recover.  And

15   that's exactly why that sentence is in there.

16        If you look at the instructions on use, it actually talks

17   about situations where the Defendant specifically created

18   alternate causes.  And when that happened, it created the issue

19   of having to have this multiple causation instruction.  So it

20   actually contemplates --

21        THE COURT:  Wait.  I'm sorry.

22        MR. WISNER:  Sure.

23        THE COURT:  Are you talking about the sentence, it

24   doesn't have to be the only cause of harm, or are you talking

25   about the multiple causation instruction, or are you talking

1   about both?

2        MR. WISNER:  Fair enough.  Let's take it one at a

3   time.

4        I don't think it has to be only cause.  It has to be in

5   there if they are going to raise the possibility of there being

6   another cause, even if they think it is only one other cause.

7   The jury is going to hear it is hep C and they are going to

8   hear it is Roundup.  It is easy to think, oh, well, if hep C

9   was also a cause, then they don't win.  And that is not the

10  law.  The law is was Roundup a substantial contributing factor.

11       So it doesn't have to be the only cause.  So I think just

12  on the facts of this case that sentence really needs to be in

13  there.

14       THE COURT:  Okay.

15       MR. WISNER:  The second issue, though, is for what it

16  is worth, I don't believe their experts say it is just hep C.

17  I think they say obesity.  They talk about a bunch of other

18  things that they say.  I think their experts offer multiple

19  causation opinions.

20       For example, I have Dr. Levine, in the last sentence in

21  her report, it is scientifically improper to dismiss the other

22  factors which might have been contributors to Mr. Hardeman's

23  DLBCL, including the history of hepatitis B infection, his

24  obesity and obesity, neither of which should be excluded.

25       So their own experts are bringing in multiple causation,

1  for what it is worth.

2          THE COURT:  I get the point about adding the sentence

3  back in 430 --

4          MR. WISNER:  Okay.  So now the second issue.

5          THE COURT:  Or the causation instruction that we give.

6          MR. WISNER:  So then the second issue, Your Honor, is

7  whether or not the last sentence, which is the --

8          THE COURT:  Wait.  Hold on.  I want to make sure I

9  understand what you are asking for now.

10          MR. WISNER:  Sure.

11          THE COURT:  What you are asking for and what you have

12  been talking about up until now is to add that sentence back

13  into -- add that sentence into the causation instruction that I

14  drafted.

15          MR. WISNER:  Correct.

16          THE COURT:  The sentence being, it does not have to be

17  the only cause of harm.

18      Okay.  I think I'm with you on that.  They can obviously

19  have a chance to respond.

20      And what else?

21          MR. WISNER:  Okay.  So now the second issue is the

22  next sentence in the instruction.  It is exposure to a product

23  is not a substantial factor in causing harm if the same harm

24  would have occurred without exposure to that product.

25      And what we have here is that is the bracketed

1  instruction, the CACI instruction.  And it says specifically,

2  the but-for test, which is what it is referring to, of the last

3  optional sentence does not apply to concurrent independent

4  causes, which are multiple forces operating at the same time

5  and independently, each of which would have been sufficient by

6  itself to bring about the same harm.

7       Accordingly, do not include the last sentence in a case

8  involving concurrent independent causes.  And while

9  Plaintiff --

10      **THE COURT:**  That, I guess, is -- goes back to my

11 question, which is I don't understand this to be about multiple

12 concurrent independent causes.  I don't understand anybody to

13 be offering an opinion about that.

14      **MR. WISNER:**  I think that's exactly what the

15 Defendants have offered.

16      **THE COURT:**  Do you have any experts who are offering

17 an opinion to that effect?

18      **MR. WISNER:**  I do believe Dr. Weisenburger's testimony

19 pretty clearly says hep C is a potential risk factor but it is

20 a less likely one.

21      **THE COURT:**  Right.  And some of your experts casually

22 said on the stand maybe it's both.  But did they ever -- has

23 anybody actually offered an opinion that Mr. Hardeman's

24 non-Hodgkin's lymphoma was caused by both hep C and Roundup?

25      **MR. WISNER:**  Not that exact opinion, but they did say

1    that hep C is a risk factor.

2          THE COURT:  Right.  But then they discounted hep C.

3    They ruled out hep C.

4          MR. WISNER:  Precisely.

5          THE COURT:  All of your experts ruled out hep C.

6          MR. WISNER:  Sure.  They ruled it out so far as saying

7    it is not likely a cause, right.

8          THE COURT:  Right.

9          MR. WISNER:  And because of the latency and --

10         THE COURT:  I assume they could have offered an

11    opinion which said, I believe that Roundup caused the NHL.  And

12    at an absolute minimum, I believe that there were concurrent

13    causes of the NHL, and both of them were substantial factors,

14    right.  One was hep C and the other was Roundup.  I assume they

15    could have, if they wanted to, if you had wanted them to,

16    offered that opinion.

17         MR. WISNER:  Well, I think -- I think it is a little

18    too black and white, Your Honor.  I think when you talk about

19    specific causation it is a probability, right.  I don't think

20    anyone can say definitely that one thing was the cause of one

21    person's cancer.  Even in my lung cancer cases with tobacco,

22    you can't say that, right.  But you can say --

23         THE COURT:  But couldn't -- my question is, couldn't

24    they have offered that opinion?

25         MR. WISNER:  Well --

1        **THE COURT:**  Couldn't they have said, I think it is

2   Roundup but I also think -- but even if hep C was a cause -- I

3   think there is one or two possibilities.  Either it was caused

4   by Roundup or it was caused by a combination of Roundup and

5   hep C.  The could have -- my question to you is:  Couldn't they

6   have offered that opinion?

7        **MR. WISNER:**  So by the way, the combination concept is

8   not this, right.  They have to be multiple independent causes,

9   right.

10        **THE COURT:**  Okay.

11        **MR. WISNER:**  It can't be a synergistic type of thing.

12   I just want to make sure we are talking about the same thing.

13      But they did offer that opinion by saying that hep C was a

14   risk factor.

15        **THE COURT:**  They ruled out hep C.  They all ruled out

16   hep C.

17        **MR. WISNER:**  Hold on.  They ruled in hep C as a risk

18   factor.

19        **THE COURT:**  As a risk factor, and ruled it out as a

20   cause.

21        **MR. WISNER:**  Then specifically as it relates to him,

22   it is not likely the cause of his cancer.

23        **THE COURT:**  Right.

24        **MR. WISNER:**  So the rule out doesn't mean it had

25   nothing to do with it whatsoever.  It is less likely a cause

1   than Roundup, which is the most likely cause.  That is all

2   about probability.

3       So by virtue of saying it is a legitimate risk factor, and

4   by virtue of saying Mr. Hardeman had this risk factor -- I'm

5   considering obesity as well, right -- they are introducing

6   concurrent causes as part of their analysis.  And they are

7   saying, you know what --

8           **THE COURT:**  All of them offer an opinion that it was

9   not hep C; it was Roundup.

10          **MR. WISNER:**  I think that's a simplistic

11  characterization of their opinion.

12          **THE COURT:**  Show me where in their report that they

13  say it might have been concurrent causes.

14          **MR. WISNER:**  That's not what I said, Your Honor.  They

15  are saying it is not hep C.  That is not how a scientist

16  speaks.  It is not fair.

17          **THE COURT:**  Show me where in the report.  You said

18  that they offered up the possibility that there were concurrent

19  causes.  Show me where in their reports they offer up the

20  possibility that it was concurrent causes.

21          **MR. WISNER:**  Okay.  My understanding is

22  Dr. Weisenburger testified that hep C was a contributing factor

23  but it was not a substantial contributing factor.  That is my

24  understanding of his testimony.

25          **THE COURT:**  I seem to recall in passing him saying,

1  well, maybe hep C, maybe it was caused by both.  But I don't

2  remember him actually offering an opinion, either in his report

3  or his deposition testimony or his Daubert testimony in court,

4  that it was -- that it was -- that they were concurrent causes.

5       MR. WISNER:  I can't cite to you the record right now.

6  If you give me an opportunity, I will send you a letter about

7  that.

8       THE COURT:  Let's assume for argument's sake that none

9  of your experts offered that opinion.

10       MR. WISNER:  Great.  That's where I wanted to go.

11    Okay.  So assuming that's the case it is immaterial,

12  because their experts have offered alternative causes

13  independent causes saying this is what causes cancer, not

14  Roundup.

15       THE COURT:  Right.

16       MR. WISNER:  When the jury is presented with two

17  plausible, substantiated with expert testimony, opinions about

18  what caused Mr. Hardeman's cancer, then you get the multiple

19  instructions causation.  We didn't get this in Johnson.  He had

20  no other risk factors.  We argued that potentially it was, you

21  know, his race or something like that that might have affected

22  it.  The judge said no, that doesn't count.  That's not an

23  alternative cause.  So we actually didn't get the multiple

24  causation instruction there.

25       But here the entire crux of their --

1          **THE COURT:**  Okay.  What are you asking for?

2          **MR. WISNER:**  I'm asking for --

3          **THE COURT:**  Are you asking to remove this sentence?

4    You keep saying we get -- you seem like you are arguing for,

5    quote, the multiple causation instruction.

6          **MR. WISNER:**  Sure.

7          **THE COURT:**  But you keep like changing what you seem

8    to be arguing for.  So can you be a little more clear what you

9    are arguing for?

10          **MR. WISNER:**  Maybe the background --

11          **THE COURT:**  I thought you were arguing for the removal

12   of the final sentence of my draft instruction.

13          **MR. WISNER:**  Because if you read the instructions,

14   Your Honor, it says you don't get that sentence when you have

15   this multiple concurrent causes potential issue, factual

16   evidence.  And you get the multiple -- you have to give the

17   multiple causation instruction, which is 431.  That is why I

18   keep -- I'm not changing conversations.  They go hand in hand.

19          **THE COURT:**  Okay.

20          **MR. WISNER:**  If you read the instructions, it says, do

21   not include the last sentence in a case involving concurrent

22   independent causes.  In cases of multiple concurrent causes,

23   multiple causation should be given.

24          **THE COURT:**  But that's the problem, is, again, I don't

25   think anybody has argued that there are multiple concurrent

1   causes.  There is -- there has been no suggestion that there

2   are multiple concurrent -- nobody has offered an opinion that

3   there are multiple concurrent causes.

4           **MR. WISNER:**  Fair enough.

5           **THE COURT:**  I don't know if that was a strategic

6   misstep on your part to not get your experts to offer that, but

7   not having offered opinions to that effect, I just don't

8   understand why we would give that instruction.

9           **MR. WISNER:**  Well, I do believe -- so, for example,

10  Weisenburger on page 5 of his report says, obesity may have

11  been a minor contributing factor.

12          **THE COURT:**  But he ruled out obesity.

13          **MR. WISNER:**  No, no.  When you say ruled out --

14          **THE COURT:**  Let's go to his report.

15          **MR. WISNER:**  He is weighing -- okay.

16          **THE COURT:**  Let's go to his report.  Hang on a second.

17          **MR. WISNER:**  Does anyone have a report?

18          **MS. WAGSTAFF:**  Yeah.

19      (Whereupon, a brief pause was had.)

20          **THE COURT:**  Let's go to his report in Hardeman.

21          **MR. WISNER:**  It is not on page 5.  It is only three

22  pages long.  I was told page 5.  That is incorrect.  What page

23  is it?

24      For example, the second-to-last paragraph on the last

25  page --

1          THE COURT:  Hold on.

2       (Whereupon, a brief pause was had.)

3          THE COURT:  Okay.

4          MR. WISNER:  The last sentence on the first paragraph,

5    that is mid-paragraph, it says, During adulthood Mr. Hardeman

6    weighed on average 190 pounds with a height of 5 feet,

7    9 inches, BMI of 28.1, and this may have been a minor

8    contributing factor in this case.

9          And earlier he --

10          THE COURT:  Right, not a substantial factor.

11          MR. WISNER:  That's right.  But that's not what we

12    have to prove.  That's my point.

13          If it is a minor contributing factor, right, that's simply

14    because -- he explains why in his analysis.  But that is an

15    independent potential cause of his cancer.  And the jury goes,

16    well, hold on a second.  I don't think Roundup was the only

17    thing.  You agreed obesity could have been part of it, so you

18    don't win.

19          And that's exactly what the instructions are trying to

20    avoid, is that misunderstanding of the law.

21          And so here we have -- and for what it is worth,

22    Your Honor, putting aside whether or not any specific -- I read

23    to you the sentence where their own expert specifically says

24    there is two other causes, right.  Putting that issue aside,

25    you conform the instructions to the evidence presented and the

 1  evidence presented to the jury is on one hand that it is caused

 2  by Roundup, by our experts, that is the primary cause.  And

 3  then you hear from them saying, no, it is actually hep C and

 4  obesity.

 5      THE COURT:  Right, but the causation -- the multiple

 6  causation instruction you are asking me to give --

 7      MR. WISNER:  Sure.

 8      THE COURT:  -- is not appropriate for Weisenburger's

 9  testimony because he says that obesity is not a substantial

10  cause.  And the multiple causation instruction that you are

11  asking me to give says that the Defendant cannot avoid

12  responsibility that some other person was also a substantial

13  factor in causing the harm.

14      MR. WISNER:  Precisely.  They are saying --

15      THE COURT:  Not precisely.  Precisely is wrong.  What

16  you said is precisely wrong, because what Weisenburger says in

17  his report is that obesity is not a substantial factor.

18      MR. WISNER:  Absolutely.  I agree with you,

19  Your Honor.  Their experts say the opposite.  That's my point.

20      THE COURT:  Why are you talking to me about obesity?

21      MR. WISNER:  Because he literally says right here that

22  it is improper to dismiss other factors that could have been

23  contributors to Mr. Hardeman's NHL, including hepatis C and his

24  obesity.  Neither one should be excluded.

25      So they are raising the specter of another cause

 1    factually.  They are saying those experts are wrong,

 2    Weisenburger is wrong.  Hepatitis B, hepatitis C, his eczema,

 3    whatever, those are all proximate causes.  And if that's the

 4    case, the jury could conclude, you know what, I do think

 5    hepatitis played a role in his cancer.  I do.  I think it was a

 6    substantial contributing factor.  But I also think Roundup was.

 7         If they also think Roundup is, we win.  And so that's why

 8    that instruction has to be given, because conceivably without

 9    that instruction they won't understand that.

10         THE COURT:  Okay.

11         MR. IMBROSCIO:  Let me begin with maybe a broad

12    principle and then respond.

13         The Court in its general causation ruling made a point

14    that the evidence was weak but allowed certain experts to

15    proceed.  The Court in its general causation ruling said the

16    individual experts proving specific causation will be a

17    daunting task, but it is a task --

18         THE COURT:  I know what I said.  Can we get to the

19    point?  We don't have a lot of time.

20         MR. IMBROSCIO:  Fair enough, Your Honor.

21         What -- basically -- what we are concerned about, frankly,

22    is that through this effort, they -- they essentially want the

23    jury to have only one possible conclusion, and basically to

24    avoid their burden of proof, which is to prove that it was the

25    Roundup that caused their NHL, which is a difficult thing,

1   which is why I think they are fighting --

2        **THE COURT:**  They have to prove that it was a

3   substantial factor in causing their NHL.

4        **MR. IMBROSCIO:**  Yeah, which substantial factor is the

5   California standard for sure, but it's not just a factor.  It

6   is a substantial factor as defined by the law.

7        And I think the concern here is if you don't give the

8   but-for instruction, which I hear Mr. Wisner say is not

9   appropriate, and you give the competing contributing factors,

10  then you end up in a situation where there is very little to

11  prove because the average juror will say, well, it's kind of a

12  big mix.  You know, it could have played a little role.  Could

13  have played a role.  They all played a role.

14       That's how they plan to argue the case.  I think that is

15  just fundamentally, from our perspective, unfair.  It doesn't

16  give us a fair shot.

17       We think the way Your Honor had it originally, even

18  without that sentence, is important because it is confusing in

19  this case that, you know, basically the law says, and we cite

20  cases, that just because you point to a different cause doesn't

21  mean they are independent substantial -- excuse me --

22  concurrent independent causes, which has a unique definition

23  under California law, which is laid out in our cases.

24       You have got to be -- you have to have evidence that that

25  thing by itself is sufficient.  And as Your Honor has

commented, no one has given that testimony that there were two

things that were equally independently causing the NHL.  They

have their view.

Our experts principally just, you know, criticizing

methodology, I think effectively what Plaintiffs are asking for

is burden shifting, essentially asking -- putting the burden on

us to disprove it, which I don't think is appropriate.

**THE COURT:**  Well, but I guess what Mr. Wisner is

saying is that they should be able to argue to the jury that

even if you agree with Monsanto's experts that hep C was a

substantial factor in causing Hardeman's NHL, it is also the

case that Roundup was a substantial factor in causing his NHL.

And so even if you buy -- even if you really liked that expert

that Monsanto put up and you agree with them, you still must

find in favor of Mr. Hardeman because we met our burden of

proving that Roundup was also a substantial factor in causing

the NHL.

**MR. IMBROSCIO:**  But part of that burden in this

medical causation case has got to be that he would not have

gotten NHL without exposure to Roundup, because they don't have

an expert to say, as Your Honor said, he would have gotten --

he would have gotten NHL by virtue of obesity.  He would have

gotten NHL by virtue of his hep C.  No one says that.

And they need to say that to demonstrate the concurrent

independent causes; otherwise, they just -- it becomes very

 1   squishy and you lose the fact that -- you lose the but-for

 2   aspect that really is incumbent in their burden.

 3       That's -- I mean if they don't have that, there is very

 4   little to prove, and I think that impedes our ability to have a

 5   fair trial about whether Roundup actually caused Mr. Hardeman's

 6   NHL.  That's -- if they can sort of devalue the burden of proof

 7   and what they he have to prove, it becomes very difficult to

 8   have, from our perspective, a fair trial.

 9       **THE COURT:**  Do you think they shouldn't be able to

10   argue what I just said, which is --

11       **MR. IMBROSCIO:**  I don't --

12       **THE COURT:**  -- even if you think hep C was a

13   substantial factor in the cause of Mr. Hardeman's NHL, we also

14   met our burden of proving that Roundup is a substantial factor

15   in the cause of his NHL.

16       **MR. IMBROSCIO:**  I don't think so because they have to

17   establish that Mr. Hardeman would not have gotten NHL without

18   exposure.

19       **THE COURT:**  No.  That sort of begs the question, I

20   think.  I mean -- in other words, why can't they argue that

21   this is a multiple causation situation, given that Monsanto is

22   putting up -- is saying that this was a substantial factor and

23   the Plaintiffs are saying that was a substantial factor.

24       **MR. IMBROSCIO:**  Well, I guess, I would come back -- I

25   would say no to your question and then come back to the point

1   that that was really not part of their expert's methodology.

2   That's not how they approach the case.  And it is their burden

3   to prove this up, and so they should not be able to say, even

4   though our own expert, you know, ruled out hep C, ruled out

5   obesity, you can still throw it all into the big mix because --

6           **THE COURT:**  Why not?  Lawyers do that in trials all

7   the time, right, in closing arguments.  They say, even if you

8   agree -- or even if you disagree with us that X, Y, Z happened,

9   you still must find in our favor because A, B, C happened.

10          **MR. IMBROSCIO:**  Well, I think --

11          **THE COURT:**  What is difference about this?

12          **MR. IMBROSCIO:**  Well, I think in many of those cases,

13  you know, you sort of -- your example harkens into how this all

14  got started, the two fires case.  You have two people setting a

15  fire and both would, you know, burn down the house.

16      When you are talking about a complex issue of medical

17  causation, which is what we have here, that gets very, very

18  dangerous to say that that same rule applies because of an

19  idiopathic disease like NHL.  I mean, it is idiopathic.  No

20  one -- their own experts agree 70 percent are unknown.  And in

21  the context of a trial where there is an injured person there,

22  the tendency for the jury to say, well, it was all one big

23  thing, that's our concern.  And I don't think the law allows

24  that.

25          **THE COURT:**  I assume the quintessential case for the

1    model -- for this model multiple causation instruction would be

2    like an asbestos case where somebody was exposed to asbestos

3    from a lot of different companies, right.  And so they -- you

4    know, they have mesothelioma and they worked in five different

5    locations and all five locations had asbestos they were exposed

6    to, and, you know --

7             **MR. IMBROSCIO:**  Those are five different tortfeasors.

8             **THE COURT:**  Right.  That's what I'm saying.

9             **MR. IMBROSCIO:**  But asbestos was the cause.

10            **THE COURT:**  Right.

11            **MR. IMBROSCIO:**  A different example may be --

12            **THE COURT:**  You are resisting me, but I think I'm

13   making a point that is helpful to you.

14            **MR. IMBROSCIO:**  Yes, I'm sorry.  Yes, please.  I think

15   that's -- I think that's right.  I mean, I think it's just when

16   you are talking about medical cause versus tortfeasor, I think

17   that is where some of the confusion comes in.

18            **THE COURT:**  Okay.  Do you want to have the last word

19   on this and I will go back and think about this?

20            **MR. WISNER:**  Sure.

21       Two things, Your Honor.  Look at the asbestos instruction

22   on causation in CACI.  It specifically says what I'm saying.

23   So I think that this has been worked through the Courts.

24       And the last thing --

25            **THE COURT:**  My point is that the asbestos situation is

1    different from this one.

2           **MR. WISNER:**  Okay.

3           **THE COURT:**  My point is that this is a situation where

4    we know that asbestos causes mesothelioma.  We know that this

5    person has mesothelioma.  We know they have been exposed to

6    asbestos from five different tortfeasors.  And, you know, the

7    point of this instruction is they can't all point the finger at

8    the other tort feasor to get off, right, which is not this

9    case.

10          **MR. WISNER:**  Sure.  I'm with you on that.

11          **THE COURT:**  And so I don't -- I sort of feel like we

12   are already -- at a minimum, we have moved away from the

13   heartland of cases where this multiple causation instruction

14   would be given.

15          **MR. WISNER:**  Well, I think the multiple causation

16   instruction -- there is a case on this.  It couldn't be more on

17   point.  It is the *Logacz v. Limansky*, 1999, 71 Cal.App.4th

18   1149.

19          **THE COURT:**  Okay.

20          **MR. WISNER:**  And in that case, Your Honor, it was a

21   blood-clotting case.  They were accusing -- they were trying to

22   say that the blood clot was caused by some product or problem.

23          **THE COURT:**  What was the cite again?

24          **MR. WISNER:**  71 Cal.App.4th 1149.

25          And the judge -- and the defendants had argued that it was

1   actually his obesity that caused the blood clotting.  It wasn't

2   their product.  And the district -- the trial judge did not --

3   this is obviously state court.  The trial judge didn't give the

4   multiple causation instruction, and it was reversed on appeal

5   saying, no, you have to.  They argued that the cause of the

6   person's injury, you got to give the multiple causation

7   instruction.  That is the law, substantive law in California.

8        The idea of a but-for causation, I think he called it

9   squishy, well, California has kind of squishy law on this

10  point.  And that is just how the law is.  And we have to under

11  *Erie* apply substantive California law on causation.

12       And while they don't like it, I'm sorry.  They didn't

13  waive lexicon.  We could have done an out-of-state case here if

14  we wanted to, but they chose to stick to California, in which

15  cases and the California law -- and the California law is good

16  for Plaintiffs.  It is specifically good on causation, and

17  that's just how it is.  And I think that if you -- I think we

18  have to remove the but-for causation sentence.  And we should

19  give the multiple causation instruction, as we proposed in our

20  original jury instructions.  I think that is required to get a

21  proper jury impaneled.

22            **THE COURT:**  Okay.

23            **MR. IMBROSCIO:**  Just on that case, I was just showed

24  it when I read it the first time, in that case you will see the

25  Plaintiffs actually conceded that these additional factors may

1    have contributed to the decedent's death in that case, which I

2    think is a very different situation than what we have here

3    where they have, again, ruled out hepatitis C to give that as

4    an example.  It shouldn't be that because our experts offer

5    differing views of causation that we back our way into what can

6    be a very confusing situation on the multiple independent

7    causation.

8          THE COURT:  I agree it is confusing.  I mean, I --

9    certainly my gut is that, you know, this case -- it doesn't

10   seem appropriate for this case, but we are -- I mean, we are

11   applying California law, and he is right that California law

12   can be squishy on these kinds of questions.  So I will -- you

13   know, I will go back and look at it one more time, and I will

14   think about it a little more.

15       But in the meantime, I mean, at a minimum for opening

16   statements, I don't think -- I'm assuming that the Plaintiffs

17   are not planning on saying that this was caused by -- that

18   Roundup was just one of the causes.  Your focus is on what your

19   expert -- the opinions that your experts gave, which is that

20   Roundup is the cause.

21         MR. WISNER:  That's correct.  For opening I think we

22   are okay.

23         THE COURT:  And the other factors have been ruled out.

24         MR. WISNER:  That's correct.  And I think that --

25         THE COURT:  And that's what your experts have

1    testified to.

2         **MR. WISNER:**  That's correct.  We are going to say what

3    they are going to offer the opinions of.  But I do believe,

4    though, what -- I won't keep arguing.

5         **THE COURT:**  Okay.  I understand.

6    Anything else on jury instructions?

7         **MR. WISNER:**  That was it for the Plaintiffs,

8    Your Honor.

9         **THE COURT:**  Anything from the Defendants?

10   Anything further?

11        **MR. IMBROSCIO:**  Nothing further, Your Honor.

12        **THE COURT:**  What about the verdict form?  Do you want

13   to -- do you want to argue -- do you want to argue for two

14   questions?

15        **MR. WISNER:**  Your Honor, I think we have made our

16   record.  We will move on from this.

17        **MR. IMBROSCIO:**  We are fine with the verdict question

18   that is written.

19        **THE COURT:**  Okay.  Let's see.

20   On the sealing -- I mean, that actually reminds me of

21   another comment I had about the sealing is that I wonder -- so

22   it strikes me that there are probably only two categories of

23   information that can be sealed, and they are very small.

24   One is like personal identifying information, like a

25   social security number or something.  And the other is causes

1    of hep C.

2        Other than that, like -- I think all of the medical

3    records should not be sealed.  You might ask Mr. Hardeman if he

4    is fine with just unsealing everything.  I don't know how much

5    he cares about this information.  It is up to Mr. Hardeman,

6    right.

7        Go ahead.

8        **MS. WAGSTAFF:**  I have actually spoken to Mr. Hardeman

9    about this, and it is his preference that the cause of the

10   hep C remained under seal.

11       **THE COURT:**  Okay.

12       **MS. WAGSTAFF:**  Just because of the community he lives

13   in and the stigma associated with some of that stuff.

14       **THE COURT:**  Sure.  That's fine.

15       So I mean I think what it's going to be -- and I may, you

16   know, provide you with further guidance on this on Friday, but

17   I think what it is going to be is everything needs to be

18   unredacted, except for those two things.  And I apologize.  I

19   know it -- it requires a lot of work, but you need to make it

20   happen before the trial.

21       **MR. IMBROSCIO:**  The one thing on -- you asked

22   Ms. Rubenstein to file in the record Mr. Gebeyehou's deposition

23   transcript.  I think his lawyer has asked to have that filed

24   under seal.

25       Would you be okay, given the briefing schedule in place,

1  that we work out the sealing with this guidance, and it may not

2  be filed by today --

3          THE COURT:  Yes.  It sounds like a good idea.

4      Okay.  Let's see what else do we need to talk about?

5      The Sawyer and Sullivan is the only remaining thing for us

6  to talk about today?

7          MS. MOORE:  I believe so, Your Honor.

8          THE COURT:  My brain is pretty fried, so remind me.

9  So Sawyer, if I recall correctly, Sawyer was a Plaintiff's

10  expert?

11          MS. MOORE:  That's correct, Your Honor.

12          THE COURT:  And Sawyer had two things.  One, he had a

13  specific causation opinion about Stevick; is that right?

14          MS. MOORE:  Yes, Your Honor.  He did -- he did a dose

15  analysis there with Ms. Stevick.

16          MR. KILARU:  In Stevick he offers an opinion as to

17  specific causation that it was a substantial factor.

18          THE COURT:  Okay.

19          MR. KILARU:  Not just dose.

20          THE COURT:  Okay.  And then his -- then he has a more

21  general opinion, which is about how glyphosate is absorbed into

22  the body if you don't use protective equipment.  Did I remember

23  that roughly correctly?

24          MS. MOORE:  Essentially so, yes, Your Honor.

25          THE COURT:  Okay.  And what is the -- since he

didn't -- since we know that he -- about his opinion about how

glyphosate is absorbed into the body without the use of

protective equipment could not be offered if we considered that

a general causation opinion because he didn't -- you didn't put

him up at that stage -- what is the -- what is the reason for

offering an opinion -- a general opinion on how glyphosate is

absorbed into the body without the use of protective equipment?

     **MS. MOORE:**  Well, first of all, Your Honor, it is not

a general causation opinion that we are tendering him for.

     **THE COURT:**  Okay.  You can label it however you want,

but my question to you is:  What is the purpose of it?

     **MS. MOORE:**  Sure.  Absolutely, Your Honor.

     So the purpose of it is that we believe it is helpful for

the jury, Mr. -- Dr. Sullivan -- Dr. Sawyer is a toxicologist.

And it will be helpful for them to understand the various

factors as far as, you know, if you are not wearing protective

gear, if you are not using protective equipment, the way that

you spray the Roundup, how then that actually absorbs into the

skin.  I mean, that is not something that is just simple to

understand.  And so that's why he is being tendered as an

expert.

     As the Court will recall that during the general causation

phase of the litigation, and I quote, Plaintiffs need not

establish any particular level of exposure.  And that neither

Monsanto nor the Plaintiffs disclosed an expert regarding

1  exposure during general causation.  Neither Dr. Sawyer or their

2  expert Dr. Sullivan offered --

3        THE COURT:  Right.  But you have experts about --

4  there are experts about how Mr. Hardeman's exposure, right?

5  There are competing expert witnesses on that, if I'm

6  remembering correctly.

7        MS. MOORE:  That's right.  It is Dr. Sawyer and

8  Dr. Sullivan.

9        THE COURT:  On Mr. Hardeman's exposure.  You have an

10 expert on Dr. Hardeman's exposure.

11       MR. IMBROSCIO:  Yes, they don't have an expert on

12 Hardeman's exposure because Dr. Sawyer didn't do those

13 calculations.

14       THE COURT:  Okay.  So this is what I'm trying to

15 understand.  We -- why -- if it is not an -- if it is not an

16 opinion about Hardeman's exposure, what is it and why is it

17 anything other than a general causation opinion.

18       MS. MOORE:  Well, it is not a general causation

19 opinion because he is not offering an opinion as to whether or

20 not Roundup is capable of causing non-Hodgkin's lymphoma.

21       THE COURT:  Okay.  But there are three prongs to the

22 general causation phase.  The first was the epidemiology.  The

23 second was the toxicology.  And the third was the mechanism by

24 which Roundup affects the body.  Right?

25       MS. MOORE:  Right.

1          **THE COURT:**  And the witnesses who testified on that

2     third topic talked about how Roundup is absorbed into the body

3     and then causes cell damage; right?

4          **MS. MOORE:**  Right.

5          **THE COURT:**  And they might have even said, if you wear

6     protective gear, it is not being going to be absorbed into the

7     body.  But if you don't wear protective gear, it is going to be

8     absorbed into the body.

9          And, again, we have these studies of all these people in

10    Ecuador who were exposed to Roundup and we found that it was

11    absorbed into the body, okay.

12         So far what you have described to me sounds a lot like

13    what those people were testifying about in the general

14    causation phase.  So I will let you take another shot at it.

15    Explain to me why this is different and what this goes to, if

16    not general causation.

17         **MS. MOORE:**  Okay.  It goes to the exposure level of

18    Roundup, of the formulation.  And this is the same thing that

19    happened in the *Whitlock versus Pepsi* case.  Dr. Sawyer was an

20    expert in that case as well, Your Honor.

21         And I have a cite for the Court.  Actually I have a copy

22    of the opinion if you would like it, Your Honor.

23         May I?

24         **THE COURT:**  Sure.

25         **MS. MOORE:**  And in this case the district court,

Your Honor, excluded Dr. Sawyer's testimony.  And on appeal the

Ninth Circuit reversed -- they granted summary judgment as a

result of that.  And the Ninth Circuit reversed, and they

actually said that -- and this is on the second page of the

opinion -- it is -- the pinpoint side is 661 to 662.

It says, because Dr. Sawyer's opinion rests on reliable

foundation and is relevant to the task at hand, what he offered

in that case, in *Whitlock*, was exposure levels of a chemical

were within a reasonable range of that known from several

studies to induce the alleged injuries; and the Ninth Circuit

to found that to be admissible testimony.  It is not admissible

for causation purposes.  It is general applicability to help

the jury understand what it is.  And exposure --

**THE COURT:**  I don't understand.  I mean, this was not

a case -- I gather this was not a case where it was bifurcated

and there was this division between general causation and

specific causation.

And I also gather -- hold on a second.

**MS. MOORE:**  I'm not aware of that, Your Honor.

**THE COURT:**  The opinion that Dr. Sawyer offered in

this case was about the Plaintiff's exposure, and that the

Plaintiff's exposure fell within a reasonable range of that

known from several studies to induce the alleged injury.  You

are not offering Dr. Sawyer to talk about Hardeman's exposure;

right?

1              MS. MOORE:   That's correct, Your Honor.

2          THE COURT:   So you are just talking generally about

3     the ability -- he is talking generally -- in contrast to this

4     case, Sawyer is talking generally about the ability of

5     glyphosate to be absorbed in the body.

6              MS. MOORE:   That's correct, Your Honor.  And that's

7     what he also testified to in Johnson.  He talked about from a

8     general standpoint, and he also talked about specifically

9     related to Mr. Johnson.  Here we are only having him testify to

10    the jury with respect to the general applicability of the

11    absorption.

12             THE COURT:   Why can't your -- you had experts testify

13    at the general causation phase about that.  Why aren't you just

14    calling them?

15             MS. MOORE:   Well, that is a little different,

16    Your Honor.  So the exposure itself does not automatically

17    equal the mechanistic data.  So what we were talking about

18    during general causation was oxidative stress, genotoxicity.

19    He is not going to come up here and do that.  We are not going

20    to be cumulative whatsoever.  He is not going to offer a

21    general causation opinion, but exposure is different.  As the

22    Court will recall, there is four different aspects to IARC.  So

23    there is the Epi, the tox, mechanism and then exposure.  And it

24    was our understanding during the general causation phase that

25    we would not have to offer an exposure expert.  And that is

 1  exactly what the defense did.  The defense didn't offer a

 2  general causation expert either.

 3      Dr. Sullivan, when we deposed him --

 4      **THE COURT:**  We heard testimony about how it is

 5  absorbed into the body, as I recall, at the general causation

 6  phase.  It is possible I'm misremembering, but I thought we

 7  heard plenty of testimony about that from the mechanism people.

 8      **MS. MOORE:**  Right, but then there is also Monsanto has

 9  a number of dermal exposure studies, and we did not go through

10  that during general causation.  So when we are talking about

11  the dermal -- the dermal exposure, that is relevant and it is

12  helpful for the jury to hear that testimony.  It is going to be

13  very narrow, Your Honor.

14      **THE COURT:**  What dermal exposure studies are you

15  talking about?

16      **MS. MOORE:**  Those are the ones from Monsanto.  I

17  wasn't part of general causation.  I don't want to misspeak on

18  that.

19      **MR. WISNER:**  I can explain, Your Honor.

20      So, for example, there was a series of studies done here

21  at the University of California San Francisco, where they had

22  monkeys that they applied dosages dermally and then measured

23  how much it was actually secreted in the urine and feces.

24  There was another study done as well later on.

25      And there was also operator exposure studies where they

 1  measure how much gets sprayed into -- how much gets absorbed

 2  into people when they are spraying with certain levels of

 3  protective gear.  All of that is really about whether or not --

 4          THE COURT:  We talked about all of that stuff at

 5  general causation.

 6          MR. WISNER:  No, this stuff never came up in general

 7  causation.

 8          THE COURT:  I don't remember monkey studies, but I

 9  certainly remember the amount of glyphosate in people's urine

10  and you were talking about --

11          MR. WISNER:  Sure.

12          THE COURT:  -- your experts were relying on the

13  studies from South America where people were sprayed and --

14          MR. WISNER:  Sure.  That was looking at the

15  genotoxicity of their cells and seeing how the -- how the

16  actual DNA was damaged from exposure to Roundup.  That's a

17  mechanistic study.  That is a very different issue.

18      So one of the arguments is that it doesn't absorb.  They

19  are going to say it washes off quickly.  It is not something

20  you even have to worry about when you are using it.  That's why

21  you don't have to wear gloves.

22      And he is going to say, no, no, you do because this is all

23  the absorption that happens when it touches your skin.  He

24  actually diagrammed the skin, how it's a surfactant, how it

25  penetrates.  It is just sort of an overview how it gets into

1    the body, and that wasn't really part of causation because it

2    really wasn't -- it depends on how the person is being exposed.

3              **THE COURT:**  Okay.

4              **MS. MOORE:**  Your Honor, so we asked Dr. Sullivan in

5    his deposition, do you have an opinion on whether or not

6    exposure to glyphosate causes cancer.

7         And his response, was on page 10, that's outside the scope

8    of my work.

9         And similarly do you have an opinion on whether or not

10   exposure to Roundup causes cancer.

11        Again, that is outside -- I'm not doing -- I'm not

12   providing any opinion regarding causation.

13        So their expert, who is the counterpoint to Dr. Sawyer,

14   testified that he is not providing causation opinion.  As

15   Mr. Wisner said, this is a dermal --

16             **THE COURT:**  Who is -- whose testimony were you

17   reading?

18             **MS. MOORE:**  This is Dr. Michael Sullivan.  It is

19   page 10 of his deposition, Your Honor.

20             **THE COURT:**  Okay.

21             **MS. MOORE:**  And it goes on to the top of page 11 where

22   he says, I am offering no causation opinion at all.

23        So, again, we think that it would be helpful to the jury

24   to understand the general overview of how it absorbs into the

25   skin.  There was a great deal of time spent during

1  Mr. Hardeman's deposition about when did he take showers, when

2  did he wash his hands, did he use the garden hose to wash his

3  hands afterwards, or did he go back to the house.  And so,

4  again, it is not going to be case specific, but Dr. Sawyer will

5  be able to testify -- should be able to testify to explain to

6  the jury what does it mean when it lands on your hand, on your

7  arm, on your leg?  What does it actually do to your body.

8       And we are not talking about the cellular level there.

9            **THE COURT:**  Okay.

10           **MR. KILARU:**  Couple things, Your Honor.

11      First, that testimony can't actually be tied to

12  Mr. Hardeman in anyway because Dr. Sawyer didn't do an analysis

13  of that.

14      In Stevick's case, he did a calculation of dose --

15           **THE COURT:**  No.  I understand.  I understand that.

16           **MR. KILARU:**  So none of that actually ties to him.

17           **MS. MOORE:**  And that's not what I am saying,

18  Your Honor.

19           **MR. KILARU:**  No, I know.  I think there, then, is also

20  a fit question of what that has to do with this case.  If it is

21  just general commentary of how Roundup works in the air, it is

22  at that point general testimony.  I don't think that because

23  our expert disclaimed -- our rebuttal expert to Dr. Sawyer

24  disclaimed an opinion as to causation that that means they get

25  to introduce Dr. Sawyer as part of their case as to the issue

1    of causation.

2         THE COURT:  Well, let me ask you this:  This is part

3    of Monsanto's case at trial that it rolls off the skin easily

4    and it doesn't -- because of the surfactants or whatever, that

5    it doesn't really absorb into the skin?  Is that part of

6    Monsanto's case at trial?

7         MR. KILARU:  Well, I just -- the answer is I don't

8    think it is part of Plaintiff's case either.

9         THE COURT:  I know, but I'm asking whether it is part

10   of your case.

11        MR. KILARU:  I don't think we intend to get into that

12   now, Your Honor.  Again, sort of depending on how things

13   unfold.  But I will note that during the Daubert hearing

14   Dr. Shustov, who is one of their causation experts, was asked

15   if any of this matters to his analysis.  He was asked -- and

16   this is page 182 of the trial transcript.

17        Does it matter if glyphosate came into contact with skin?

18   Does it matter if the Plaintiff showered?  Does it matter how

19   big of an area they were spraying?  Does it matter what type of

20   Roundup they used?

21        And their causation expert said, no, it doesn't matter.

22        So it is sort of general testimony --

23        THE COURT:  This was here?

24        MR. KILARU:  It was the video testimony with

25   Dr. Shustov.

1          THE COURT:  I don't remember that.

2          MR. KILARU:  Yeah, and I can provide the transcript if

3     you would like.  But it is pages 182 through 184 of day one of

4     the Daubert hearing.  And so their experts are saying that the

5     testimony Dr. Sawyer is providing doesn't advance the ball as

6     to causation.  We don't think it has any basis for coming in.

7          MS. MOORE:  Except we don't know, Your Honor, the

8     answer to your question, which is will Monsanto get into

9     whether or not it -- it doesn't -- if it washes off the skin

10    and there is actually no absorption to Roundup.  He didn't

11    answer that question.

12        So our problem is that in our case in chief we want to

13    present Dr. Sawyer to talk about how it actually does absorb

14    through the skin, and that would be helpful for the jury to

15    hear.

16         THE COURT:  Well, maybe the answer is that if Monsanto

17    doesn't dispute that it absorbs into the skin, that there is no

18    point in putting Sawyer up on that issue.

19         MR. KILARU:  Your Honor, we don't intend to ask those

20    questions, the questions that were talked about to

21    Mr. Hardeman.

22         THE COURT:  Say that one more time.

23         MR. KILARU:  Sorry.  We don't intend to ask the

24    questions about Mr. Hardeman's use of gloves, any of that sort

25    of stuff at trial.

1          **THE COURT:**  But do you contend to contest the idea

2     that -- do you intend to put on any evidence?  Let's assume for

3     the sake of argument that the Plaintiffs don't put on any --

4     don't put on Sawyer, okay, or they are precluded from putting

5     on Sawyer.  Let's say that -- would Monsanto, then, in its case

6     put on any evidence of the inability of the skin to absorb

7     glyphosate or anything along those lines?

8          **MR. KILARU:**  No, I don't think so, Your Honor, because

9     what we -- the rebuttal to Dr. Sawyer is Dr. Sullivan who did a

10    different exposure calculation about how much he thinks would

11    have been absorbed.  And that is not something we would have

12    offered.  It is a different calculation.  It is not an outright

13    denial of absorption, if that makes sense.

14         **MS. MOORE:**  Your Honor, it is my understanding they

15    argue it is less than 1 percent absorption rate.  Dr. Sawyer

16    testified that it is up to a 10 percent absorption rate.

17         **THE COURT:**  It sounds like it is something that

18    wouldn't come in.  The thing that is weird about this is I do

19    understand your, you know, explanation of the distinction

20    between the mechanistic evidence that was put on in Phase One

21    and the type of testimony that Dr. Sawyer wants to give, but

22    it's not specific to Hardeman, right.  He is not offering an

23    opinion about -- about how much glyphosate Hardeman absorbed

24    into his skin, and it sounds like they are not -- other than

25    maybe in rebuttal -- they are not offering an opinion about how

1   much glyphosate Hardeman absorbed into his skin.

2       **MS. MOORE:**  Well, my --

3       **THE COURT:**  And if that's the case, then I'm left

4   wondering whether there's -- whether Mr. Sawyer's testimony

5   would be helpful to the jury within the meaning of the

6   Rule 702.

7       **MS. MOORE:**  Well, my understanding is that they have

8   disclosed Dr. Sullivan to testify, that I thought they were

9   bringing him live to testify here for that very reason, which

10  is why we wanted Dr. Sawyer to testify.  And our whole plan

11  would be -- I don't want to get into trial strategy, but we

12  would like him in our case in chief to cut him off at the pass.

13  And so that's why we want him in Phase One.

14      **THE COURT:**  Just as a parenthetical, I'm all in favor

15  of cutting off at the pass if we -- you know, I don't think we

16  need to be hyper-technical about, oh, you can't come in and do

17  this, and so rebuttal, if it is a situation where we know

18  Monsanto is going to put something on, you can cut it off at

19  the pass in your case in chief.  That's fine.

20      **MS. MOORE:**  Well, I appreciate that, Your Honor.

21      **THE COURT:**  The question is, is this something that

22  you need to cut off at the pass.  You probably -- your

23  colleague is shaking his head --

24      **MR. KILARU:**  I believe I said the answer is no

25  already, that we don't intend -- Dr. Sullivan was styled as a

1   rebuttal witness to Dr. Sawyer.  So if Dr. Sawyer doesn't

2   testify, Dr. Sullivan wouldn't either.

3         MS. MOORE:  That's the first I heard about that.  So

4   that does change some things, Your Honor.

5         THE COURT:  We are doing a nice job of paring down.

6         MS. MOORE:  That's what you said on Monday, so yes.

7         THE COURT:  We have got -- I'm understanding why you

8   might have had 50 hours in the Johnson case.  I'm guessing you

9   spent about 49 hours of those hours talking about what Monsanto

10  did between 2012 and 2018, and maybe you spent -- maybe

11  Dr. Sawyer's testimony --

12        MS. MOORE:  And the marketing hours.

13        MR. WISNER:  49.5.

14        MS. MOORE:  Your Honor, one other thing, though, is so

15  we have been focused on Phase One.

16        For Phase Two, though, for Dr. Sawyer, as I mentioned

17  earlier today, several hours ago, we have a failure-to-warn

18  claim too.  And so that goes to -- you know, what were they

19  putting on the label and when.  And that's why Dr. Sawyer's

20  testimony would be important in Phase Two.

21        We would at least -- because, again, he goes back to

22  absorption rate.  And it would have made a difference if they

23  had given a warning and Mr. Hardeman would have seen that, you

24  know, if I don't wear gloves, this is going to get into my

25  skin, that makes a difference.  And that is the crux of the

1   failure-to-warn claim.

2         **THE COURT:**  At Phase II, if they try to make it an

3   issue that it wouldn't have mattered, I'm not getting the sense

4   that they're going to argue this, but if at Phase II they argue

5   it wouldn't have mattered if he wore protective gear or not,

6   then I assume Dr. Sawyer's testimony would become helpful to

7   the jury.

8         But, you know, I think as the case stands now, as the way

9   the case is being teed up now, it seems like Dr. Sawyer's

10  testimony, A, is not helpful to the jury within the meaning of

11  702; and/or is kind of an unnecessary waste of time under

12  Rule 403.

13        **MS. MOORE:**  And the only thing I would bring to

14  Your Honor's attention is obviously we're juggling lots of

15  schedules with experts and bringing them live and being

16  cognizant of that, and so my concern is we have Dr. Sawyer

17  coming on a certain time period in Phase I, if you're going to

18  allow him to testify in Phase I.

19        And so if the Court is inclined to say, "Well, let's see

20  if they open up the door in their case-in-chief" or maybe they

21  open up the door on cross-examination of one of our other

22  experts, because that's feasible too, Your Honor, or if

23  Mr. Hardeman is on the stand, they could open up the door that

24  way, it's just, you know, we've got to be on standby to get an

25  expert here, and so it creates a little bit of a scheduling

1    nightmare too.

2          **THE COURT:**  So you want a ruling on that issue

3    quickly?

4          **MS. MOORE:**  Well, not -- well, I guess it depends on

5    the ruling, Your Honor.  So, I mean, you know, again where I

6    was going with that, if you are inclined to say, "Well, you

7    could bring him as a rebuttal," you know, our preference -- I

8    mean, we want him to be able to testify so --

9          **THE COURT:**  As I said, I mean, all in favor of cutting

10   off at the pass, if we -- you know, if we know that it's going

11   to be relevant at rebuttal, then you can bring somebody in

12   their case-in-chief.

13         **MS. MOORE:**  Right.

14         **THE COURT:**  You know, there's -- we can order the

15   trial testimony that way to make it as convenient as possible

16   for everybody involved.  It just doesn't seem to me, based on

17   this discussion, that this is going to be one of those

18   situations.

19         **MS. MOORE:**  Okay.  Well, and if they agree not to call

20   Dr. Sullivan, then I'd like to confer with everyone too because

21   it goes for all three cases, and just maybe we can come back on

22   that.  Because if they're going to withdraw Dr. Sullivan, that

23   may change our position.

24         **THE COURT:**  It sounds like they've only designated him

25   as a rebuttal expert.

1    Is that true in all three cases?

2         MR. KILARU:  I think the cases are a little different

3    because the Stevick case, for example, there is -- I can't --

4    for example, right now I don't think I can say we wouldn't call

5    Sullivan in the Stevick case because in the Stevick case

6    Dr. Sawyer did do a very complicated and extensive dose

7    calculation that we think we'd have a right to rebut.

8         In Hardeman and Gebeyehou Dr. Sawyer did not do those

9    things, and so I think to the extent that we've described

10   Dr. Sullivan as a rebuttal witness, I don't think it's relevant

11   in those cases.

12        THE COURT:  Okay.

13   Okay.  So do we have agreement at this point that at least

14   in Gebeyehou's case and Hardeman's case that Sawyer and

15   Sullivan should not be witnesses?

16        MS. MOORE:  Well, for Phase I, Your Honor, you know,

17   if they're not going to raise that issue in Phase I, then I

18   think we can reach an agreement on that with the caveat if

19   something -- if someone opens the door, if Monsanto opens the

20   door --

21        THE COURT:  As always.

22        MS. MOORE:  -- you know, then we want to bring

23   Dr. Sawyer, but we would want to be able to have him come in

24   Phase II because of the failure to warn claim.

25        THE COURT:  Yeah.  Then that part I guess I'm not --

 1  I'm not sure I understand.  I mean, we could -- sorry.

 2          MR. WISNER:  Let me explain it really quickly.

 3      So there's the failure to warn that it could cause cancer;

 4  right?  That's a failure to warn claim and if they had done

 5  that, he wouldn't have used it, et cetera, et cetera.  They're

 6  not disputing that.  Different issue.

 7      There's another --

 8          THE COURT:  Failure to warn by telling people to wear

 9  protective gear?

10          MR. WISNER:  Exactly.

11          THE COURT:  I understand.

12          MR. WISNER:  And if they had told him to wear gloves,

13  he would have worn gloves --

14          MS. MOORE:  Right.

15          MR. WISNER:  -- and then his exposure would have been

16  down and he wouldn't have gotten cancer even though he was

17  using it.

18          THE COURT:  No, I get that.  I understand that.  But I

19  assume what that means is that if they were to contend at

20  Phase II that wearing gloves wouldn't have made a difference,

21  then Sawyer's testimony would be relevant; right?

22          MR. WISNER:  It's a little farther than that.  They're

23  going to contend they didn't need to make that warning because

24  the data didn't support that requirement, and Dr. Sawyer will

25  walk into the science saying, "Yeah, your studies did show it.

1   It says right here you're having this absorption rate and, in

2   fact" --

3        THE COURT:  So is your intention at Phase II to make

4   that argument?

5        MR. KILARU:  Your Honor, I think we talked about this

6   earlier with the marketing material.  I don't think we intend

7   to get into this protective gear issue, and so I don't think

8   this is an issue.

9       I mean, we have heard a lot about what we are apparently

10  going to do, and I'm telling you that based on what I said

11  earlier, I don't think that that's going to be an issue.

12       THE COURT:  But the burden is on them; right?  And so

13  presumably as part of the failure to warn claim, they need to

14  prove that it would have mattered, the warning would have made

15  a difference.  I haven't looked at those jury instructions

16  yet --

17       MS. MOORE:  That's correct, Your Honor.

18       THE COURT:  -- but I assume they have to prove that

19  the warning would have made a difference; right?

20       MR. KILARU:  Uh-huh.

21       THE COURT:  So maybe Dr. Sawyer's testimony is

22  relevant on that front.  Maybe Dr. Sawyer's testimony would be

23  helpful within the meaning of 702 and not a waste of -- you

24  know, not a waste of time under 403 for those purposes.

25      I mean, I'm not sure I've -- I'm not sure I've spent

```
 1   enough time thinking about Phase II to be able to engage in a
 2   more meaningful discussion on it, and maybe everybody needs to
 3   go back and be giving -- and give that some more thought.  But
 4   it sounds like we're in agreement that Sawyer and Sullivan are
 5   not testifying at Phase I.
 6           MS. MOORE:  And, Your Honor, just to clarify, and
 7   that's --
 8           THE COURT:  Does everybody agree on that?  Everybody
 9   comfortable with that resolution?
10           MS. MOORE:  That's fine, Your Honor.  I just want to
11   clarify that that has nothing to do with Dr. Sawyer's
12   qualifications or the opinions he would be giving.
13           THE COURT:  Oh, yeah.
14           MS. MOORE:  It's just a matter of the evidence that's
15   going to be presented or the defense has raised in this
16   particular case.
17           THE COURT:  That's right.  I mean, it doesn't have
18   anything to do either way with his qualifications or the
19   methodology of his opinions because I don't think there's a
20   need to get to that --
21           MS. MOORE:  Okay.
22           THE COURT:  -- to conclude.  But thank you for asking
23   that.  That's an important question to ask.
24           MS. MOORE:  It's an important for the expert.  He
25   would ask me.
```

1          **THE COURT:**  Yeah.  So I appreciate you asking that,

2     and you're correct that it has nothing to do with either of

3     those things.

4          **MS. MOORE:**  Thank you, Your Honor.

5          And then on Phase II is the plan, then, that the Court

6     will reserve ruling on Dr. Sawyer being able to testify and we

7     could revisit that?

8          **THE COURT:**  I think kind of -- I think given -- my

9     sense is that maybe collectively we have not thought that issue

10    through sufficiently to reach a conclusion on it now.

11         **MS. MOORE:**  That's probably fair.

12         **MR. KILARU:**  I think, as I think your order

13    envisioned, we'll have another round of *Dauberts* if we get to

14    Phase II with some of the other experts so perhaps we can just

15    address that in connection with those.  For example,

16    Dr. Benbrook.

17         **THE COURT:**  Yeah.  I also think that one thing that

18    this discussion really highlights is that you-all should give

19    some careful consideration, and particularly Monsanto should

20    give some careful consideration, to what you may be willing to

21    stipulate to at Phase II; right?

22         Because this may be an example of something where it may

23    not be appropriate for me to say that they can't call Sawyer at

24    Phase II because it's their burden of proof, but there may be

25    some stipulation Monsanto is willing to reach with the

```
 1   plaintiffs that obviates the need to call Sawyer at Phase II;

 2   right?  That's just the Court kind of thinking out loud.

 3          MR. KILARU:  Sure.

 4          THE COURT:  But I think there have been a number of

 5   examples of that today in this eight-hour long discussion that

 6   sort of highlight the need for Monsanto to think about what

 7   it's going to be willing to stipulate to at Phase II.

 8          MR. KILARU:  Fair enough.

 9          MS. MOORE:  Right.  Thank you, Your Honor.

10          MR. BRAKE:  Your Honor, if I may, one point of

11   clarification.  Brian Brake.  I'm the primary counsel in

12   Stevick.

13       The understanding about Mr. or Dr. Sawyer not testifying

14   in Phase I, that's not an agreement we have with respect to

15   Stevick because he has a specific dose calculation.

16          THE COURT:  Right.  And we'll --

17          MR. BRAKE:  I just wanted to make sure the record was

18   clear on that.

19          THE COURT:  Yes.

20          MR. BRAKE:  Thank you.

21          THE COURT:  And we're putting off that issue.

22          MR. BRAKE:  Yes, sir.  Thank you.

23          MR. KILARU:  We do have, as I think you know from the

24   papers, a methodological challenge in that case as well, but we

25   can take that when we need to.
```

1          **THE COURT:**  Yes.

2          **MS. MOORE:**  All right.  Thank you, Your Honor.

3          **THE COURT:**  Does that cover it for today?

4          **MS. MOORE:**  I believe so, Your Honor.

5          **MR. IMBROSCIO:**  Shall we talk about Portier?

6          **MR. WISNER:**  Yeah.

7          **THE COURT:**  Before you get to Portier, I'm already

8     getting tired of hearing about Portier, but I want to talk

9     about the questionnaires.  Have you-all used the breaks to

10    reach an agreement about the protocol for the use of the

11    questionnaires?

12         **MS. MOORE:**  I believe so, Your Honor.

13         **MR. STEKLOFF:**  I think, Your Honor, we were going to

14    propose each taking the copy that we have today, making 12

15    copies internally, and then document -- Ms. Moore and I will

16    both -- we will attest to the Court in whatever form you would

17    like that we have --

18         **MS. MOORE:**  We can draft a form if you want.

19         **MR. STEKLOFF:**  -- that we complied to your order.  To

20    the extent something is scanned, it will be encrypted and

21    everything will be destroyed and all 12 copies plus the

22    original copy we receive today will be returned to the Court as

23    necessary, and we will attest to whatever you need us to attest

24    to, that no one is keeping anything.

25         **THE COURT:**  So I put out -- I think I put out a draft

order governing this.

     **MR. STEKLOFF:**  Yeah.

     **MS. MOORE:**  Yes.

     **THE COURT:**  So is that -- should I make that -- should I issue that as a final order and you're saying that the at a station that you're contemplating would be consistent with that?  I'm not remembering --

     **MR. STEKLOFF:**  It may need to be supplemented a little bit where we're attesting that -- because I think your draft order said we couldn't even make copies.  So I think that this would say -- this might be a little bit different.  We're happy to submit something to you quickly.

     **MS. MOORE:**  Your Honor, I mean, if you want -- Ms. Mellen, if she wants to e-mail us your version, the parties could confer and then we could send back a version for Your Honor to review and sign if that's easier.

     **THE COURT:**  I'd like to issue an order concurrent with giving you the questionnaires.

     **MS. MOORE:**  Oh, okay.

    I think on your order, I have it here, Your Honor -- here, you can look at it.  That's fine.

    But it says that -- is it on the first page?

     **MR. STEKLOFF:**  Yes.  I think where it says --

     **THE COURT:**  I think I forgot to bring that one.  So give me a second and let me pull it up.

```
 1              MS. MOORE:  The second sentence of the first

 2   paragraph, Your Honor.

 3              THE COURT:  Okay.  Hold on.  Give me a second to pull

 4   it up.  What date is it?

 5              MS. MOORE:  Today is the 13th and it was filed last

 6   night or yesterday 2/12.  It's Docket Number 2705.

 7              THE COURT:  2705?

 8              MS. MOORE:  Yes.  Pretrial Order 76.

 9              THE COURT:  It's not my worst case, though.  I think I

10   have a case -- isn't the Emma C case worse than that in terms

11   of docket entries?

12              THE CLERK:  (Nods head.)

13              MR. WISNER:  We're just getting started.

14              THE COURT:  Okay.  My computer is malfunctioning.  So,

15   anyway.

16              MS. MOORE:  It says (reading):

17               "The questionnaires may not be photocopied, scanned,

18        or otherwise duplicated" -- here's an extra copy --

19              THE COURT:  Thank you.

20              MS. MOORE:  It's that first full paragraph,

21   Your Honor, second sentence.

22              THE COURT:  Okay.  So is that the only thing we would

23   need to change?

24                        (Pause in proceedings.)

25              MR. STEKLOFF:  I believe so, Your Honor.
```

1          **MS. MOORE:**  I believe so.

2          **MR. STEKLOFF:**  I think it just needs to contemplate

3     that we can make whatever, a certain number of copies and can

4     in encrypted format scan -- this is -- they want the scanning

5     to be clear -- but encrypted format scan everything but that

6     everything will be destroyed and the copies will be returned to

7     the court.  Unless you want us to just destroy them or we can

8     bring the boxes back.

9          **THE COURT:**  Destroy.  Destroy.

10         **MR. STEKLOFF:**  Okay.

11         **MS. MOORE:**  That's fine.

12         **THE COURT:**  So each side can make 12 copies?

13         **MS. MOORE:**  Yes, Your Honor.

14         **THE COURT:**  And create an electronic version that can

15    only be -- it's password -- it's encrypted and password

16    protected?

17         **MS. MOORE:**  That's fine, Your Honor, yes.

18         **THE COURT:**  And, Kristen, are you comfortable with

19    saying just that they should destroy them as opposed to return

20    them?

21         **THE CLERK:**  Yes.  I mean, they're officers of the

22    court so...

23         **THE COURT:**  Yeah.

24       Okay.  Yes, and we'll say that you have to destroy them.

25         **THE CLERK:**  We can file something after everything's

1    been destroyed electronically in hard copy attesting to that.

2            **THE COURT:**  Okay.

3        Okay.  We'll make those changes and put that on file so

4    you can grab your questionnaires that I know you've been

5    salivating over for the last few hours.

6            **MS. MOORE:**  Thank you, Your Honor.

7            **THE COURT:**  So what --

8            **MS. MOORE:**  Your Honor, for the 20 or so jurors who

9    are going to be completing questionnaires tomorrow, what

10   process should we go through in order to get copies of those?

11           **THE COURT:**  Do you want to send somebody to pick them

12   up tomorrow afternoon?

13           **MS. MOORE:**  That's fine.  About what time do you

14   think, Your Honor?

15           **THE CLERK:**  3:00.

16           **THE COURT:**  3:00.

17           **MS. MOORE:**  3:00?  Okay.  Thank you.

18           **MR. STEKLOFF:**  And while we're on the topic of jury

19   selection, is it your intent to pick eight jurors?

20           **THE COURT:**  Good question.  I was pondering nine

21   jurors.  Does that sound -- you're both nodding your head.

22           **MS. MOORE:**  It's better than eight, Your Honor.  I'm

23   just nervous because of the length of the trial and, of course,

24   obviously we have to have six at the end of the day.  And so,

25   you know.

1        **THE COURT:**  And I haven't gone back to look at the

2    rules.  That doesn't give you any more peremptory challenges;

3    right?  Still three peremptories for each?

4        **MS. MOORE:**  Can I get back to you on that Friday,

5    Your Honor?

6        **MR. STEKLOFF:**  Yeah, I don't know the answer.

7        **THE COURT:**  In the criminal cases, as you know, it

8    changes depending on how many jurors you have and alternates.

9    You get more --

10       **MS. MOORE:**  Right.

11       **THE COURT:**  Not depending on how many jurors you have,

12   but depending on how many alternate jurors you have.  But, yes,

13   so let's do nine either way.

14       **MS. MOORE:**  Okay.

15       **THE COURT:**  I'm going to assume it's three peremptory

16   challenges per side unless you tell me that the rules require

17   otherwise.

18     And what time are we getting together on Friday?

19       **MS. MOORE:**  I believe it's 10:30, Your Honor.

20       **THE COURT:**  Okay.  That sounds good.

21     Anything else?  Was there something about Portier?

22       **MS. MOORE:**  Okay.  I'm going to leave the podium then.

23   Thank you, Your Honor.

24       **MR. IMBROSCIO:**  Just quickly on that, since it may be

25   our only time to talk until next week, I think three small

1  issues.

2      One is, given that we're going to Australia, it may be

3  that --

4          **THE COURT:**  Are you going to Australia?

5          **MR. IMBROSCIO:**  Some people are going to Australia.  I

6  am.  I'm going, Your Honor.

7      Given the fluid nature of the trial and how doors may be

8  opened and closed and reopened and the like, I take it that if

9  we end up asking questions that remain off limits, we just

10  won't designate them.  It's not a ground for stop the

11  deposition.  We're going to, you know, call.

12          **THE COURT:**  Yes.

13          **MR. IMBROSCIO:**  Okay.  I want to make sure just so

14  that's clear.

15          **THE COURT:**  That's certainly what I was assuming, that

16  in that respect it would be treated like depo designations.

17          **MR. IMBROSCIO:**  Understood.  Fair enough.

18      Two is just the timing of it.  I think Mr. Wisner has

19  given sort of his estimate of what the time is going to be.  I

20  just want to make sure we have time.  We don't want to get

21  squeezed out given we're going to be there.  And I think that

22  should not be an issue; but if it gets to be we're up to hour

23  seven and Mr. Wisner is still going on his Phase I direct and

24  he insists on proceeding, we may have to call the Court.  We

25  hope that doesn't happen, but we don't want to get squeezed out

1   given that we're starting the trial on Monday and we have

2   basically three sessions of four to four and a half hours, as I

3   understand it, which should be more than enough time by a long

4   stretch, but we're just nervous about --

5          THE COURT:  I didn't really understand anything that

6   you said.

7          MR. IMBROSCIO:  You sound like my wife.  You sound

8   like my wife, Your Honor.

9       Just we wanted to make sure we don't get squeezed out on

10  the time since --

11         THE COURT:  Squeezed out on what times?

12         MR. IMBROSCIO:  That we have enough time to conduct

13  the examination that we think we need to conduct for this

14  trial, Your Honor.

15         THE COURT:  Right.  So what have you agreed to on it?

16         MR. WISNER:  I don't know what problem we're trying to

17  solve here.

18         THE COURT:  You need to talk about this.

19         MR. IMBROSCIO:  Here's the issue.  The money.  We do

20  need to resolve that for him given --

21         MR. WISNER:  Money.

22         MR. IMBROSCIO:  And what I had proposed to Mr. Wisner

23  is that we would think that a good compromise would be that

24  Mr. -- or Dr. Portier's payments for everything except the

25  *Johnson* trial should be the number that is used.  I think

```
 1    Mr. Wisner has taken the position it should not include the

 2    Daubert hearing in this court, and I think that's --

 3              MR. WISNER:  Both of them.

 4              MR. IMBROSCIO:  -- the dispute.

 5              MR. WISNER:  So it would actually be more than that.

 6    So we agreed that we would calculate the time he took before he

 7    prepared his expert report and then his second report on the

 8    AHS.  But then having to come here twice and prepare for

 9    testimony twice, that is a considerable expense that was

10    borne -- you know, the purposes of the general causation phase,

11    that wasn't borne by Monsanto's expert.  So it's going to

12    inflate his fee higher than I think is appropriate.  It was

13    court ordered.

14        Also we're going to exclude -- he's been deposed many

15    times in many other cases, and we're going to exclude all that.

16    So we would agree to all that time plus whatever time he spent

17    for this case, which I think is a fair compromise.

18              THE COURT:  I need to get into Dr. Portier's will

19    somehow.  How much money has he made?

20              MR. WISNER:  I actually don't know, but it's probably

21    close to half a million over the last --

22              THE COURT:  That's all?  I would have guessed more.

23              MR. WISNER:  It might be more than that, Your Honor.

24    I actually don't know so I'm just guessing.  And for what it's

25    worth, half of it's been paid already or taxed to the Johnson
```

1    case.

2         **THE COURT:** Because you didn't get enough money in the

3    *Johnson* case to pay for all of it?

4         **MR. WISNER:** Hey, man, there's a rule that says -- we

5    said, "Pay us $6 million, we'll go away." They said, "Go

6    fish." And we said, "Okay."

7         **THE COURT:** All right. So you believe that -- so when

8    you're -- for your experts, Mucci and the general causation

9    experts, you're saying that the amount that we should say they

10   are compensated for this case would include obviously any work

11   that they've done to prepare to testify at trial and their

12   trial testimony and their reports and the costs associated with

13   coming to and testifying at the *Daubert* hearing?

14        **MR. IMBROSCIO:** Yeah.

15        **THE COURT:** And you say that that inflates Portier

16   because he had to come back twice?

17        **MR. WISNER:** And Ritz, yeah.

18        **THE COURT:** What?

19        **MR. WISNER:** And Ritz.

20        **THE COURT:** And Ritz?

21        **MR. WISNER:** Yeah.

22        **THE COURT:** I think that is a fair point. So why

23   don't we just have -- why don't we just say that their second

24   trips don't count.

25        **MR. WISNER:** Okay. That's fine. We're not going to

1   include other cases obviously that were not in the MDL.

2          **THE COURT:**  Right.  And you are in agreement on that?

3          **MR. IMBROSCIO:**  Yeah.  I think that's fine.  Yeah, the

4   other testimony, we agree that that's a fair compromise.

5          **THE COURT:**  Okay.  So we have agreement on that.

6          **MR. WISNER:**  We do.  However, I will issue our --

7   lodge our objection that if they're going to start hammering

8   him on the amount of money he's gotten paid, I think it starts

9   opening the door to him saying, "Well, hold on.  I don't just

10  represent Mr. Hardeman.  I'm not just here for Mr. Hardeman.

11  There's thousands of cases."

12      So they have to walk that line.  If they want to hammer

13  him on it, then, I'm sorry, they open the door, otherwise it's

14  just unfair.

15         **MR. IMBROSCIO:**  Well, it's --

16         **THE COURT:**  But it's --

17         **MR. IMBROSCIO:**  I'm sorry, Your Honor.

18         **THE COURT:**  But it's what he's paid in -- we're

19  reaching an agreement about what he's paid in connection with

20  this case.

21         **MR. WISNER:**  But, no.  So I don't agree with that.

22  This is what we're going to say to the jury.  What he's gotten

23  paid in connection to this case is not that.  It's that divided

24  by 10,000.  That's the actual number.  So if you want to do

25  that number, fine, we'll do that; but I'm coming to some sort

1  of, you know, kind of untruth for the jury but they have to be

2  careful about how far they go because if they did, they're

3  going to open the door.  He's going to say, "Hold on a second.

4  I'm working for 10,000 people here.  This is not just the

5  Hardemans footing a half-a-million-dollar bill or whatever that

6  is."

7       THE COURT:  I think there's probably some line that

8  they would cross, but I'm not sure I can predefine what that

9  line is.

10       MR. WISNER:  Yeah, I know.

11       THE COURT:  Okay.

12       MR. IMBROSCIO:  We got on Monday for Dr. Portier a new

13  reliance list with 70-plus publications, about 20 or so of

14  which were -- existed before he testified at the *Daubert*

15  hearing.  It puts us in a tough situation.

16       THE COURT:  I'm sure they're all seared into your

17  brains.

18       MR. IMBROSCIO:  We don't -- what's not seared into the

19  brains is what he's going to say about them, and --

20       MR. WISNER:  That's not true.

21       MR. IMBROSCIO:  -- like if we get -- the reason you do

22  discovery and the reason that we had a *Daubert* hearing was to

23  make sure that they're using these materials appropriately and

24  within the realm of reliability, and now we've got, you know,

25  70 articles that he's going -- we don't know what he's going to

1   say about them.

2        THE COURT:  But you said 30 of them were -- so a bunch

3   of them are new; right?

4        MR. IMBROSCIO:  Yes, although 20 -- 50 of them roughly

5   are since he testified at the *Daubert* hearing, 20 of them

6   existed before he testified at the second time at the *Daubert*

7   hearing; but none of which we have any discovery on how he's

8   relying on them and what his views are on them, and that just

9   presents a discovery challenge for us.

10      We're going to go into a trial.  It's like someone dumping

11  on us the day before someone goes on the stand, "Oh, these are

12  20 more articles that he's going to talk about."  That just

13  seems to violate the fundamental basics of pretrial discovery.

14       MR. WISNER:  That's just not true.  He's been deposed

15  repeatedly since *Daubert* in Missouri cases and elsewhere where

16  they had an opportunity to ask him about these questions.  I

17  think the real question to be presented to the Court is how

18  many are on this list that weren't on the last time they took

19  his testimony.  It's probably five or ten and they're all new.

20      So let's get our facts straight about what they've had the

21  opportunity.  They deposed this guy for days.

22       THE COURT:  You're talking about all the cases

23  throughout the country collectively and all the depositions

24  collectively that he's submitted to?

25       MR. WISNER:  Exactly.  And every time he gets deposed

1   again, we give him a new reliance list to update it.  We've

2   added some stuff that was added to his reliance list, but

3   they've had a chance to ask him questions about it.  So if they

4   think they don't know what his opinions are, that's madness.  I

5   think they have, like, four days' worth of testimony.  I mean,

6   it's absurd.

7         THE COURT:  I don't think there's anything I can say

8   about it now other than, you know, if he gives some testimony

9   about new material that was only, you know, disclosed for the

10  first time, you know, now, you know, and Monsanto finds that

11  that testimony is particularly prejudicial to Monsanto's case,

12  then Monsanto can take it up with me afterwards and move to

13  strike that testimony and we can talk about it then.

14        MR. WISNER:  Sounds good.

15        THE COURT:  I sort of doubt it will come to that --

16        MR. WISNER:  Yeah.

17        THE COURT:  -- but we can -- but if it does, we can --

18  you know, Monsanto can raise it.

19        MR. IMBROSCIO:  That's fair, Your Honor.  Thank you.

20        THE COURT:  Anything else?

21        MR. WISNER:  Would you like any souvenirs from

22  Australia?

23        THE COURT:  I will not construe that as a bribe offer.

24        MR. WISNER:  Oh, Good Lord.

25                    (Laughter)

1        **MR. WISNER:**  That was a joke.

2        **THE COURT:**  See you on Friday.  Thank you.

3        **ALL:**  Thank you, Your Honor.

4        **THE CLERK:**  Court is adjourned.

5            (Proceedings adjourned at 5:08 p.m.)

6                    ---oOo---

7

8

9                **CERTIFICATE OF REPORTERS**

10        I certify that the foregoing is a correct transcript

11   from the record of proceedings in the above-entitled matter.

12

13   DATE:   Wednesday, February 13, 2019

14

15

16

17   _____

18        Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                U.S. Court Reporter
19

20

21   _____

22        Marla F. Knox, RPR, CRR
                U.S. Court Reporter
23

24

25