# EXHIBIT 11

Jay Irwin Goodman, Ph.D.

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3

 4   IN RE: ROUNDUP            )

 5   PRODUCTS LIABILITY        )   MDL No. 2741

 6   LITIGATION                )

 7   ------------------------) Case No.

 8   THIS DOCUMENT RELATES     )   16-md-02741-VC

 9   TO ALL CASES              )

10   ------------------------)

11              FRIDAY, SEPTEMBER 22, 2017

12

13

14              The videotaped deposition of JAY IRWIN

15   GOODMAN, PH.D., called for examination, taken pursuant

16   to the Federal Rules of Civil Procedure of the United

17   States District Courts pertaining to the taking of

18   depositions, taken before JULIANA F. ZAJICEK, a

19   Registered Professional Reporter and a Certified

20   Shorthand Reporter, at the offices of

21   Warner Norcross & Judd LLP, 120 North Washington

22   Square, Lansing, Michigan, on September 22, 2017, at

23   9:12 a.m.

24
```

Jay Irwin Goodman, Ph.D.

```
 1   PRESENT:

 2   ON BEHALF OF THE PLAINTIFFS:

 3         ANDRUS WAGSTAFF

 4         7171 West Alaska Drive

 5         Lakewood, Colorado 80226

 6         303-376-6360

 7         BY:  DAVID WOOL, ESQ.

 8              david.wool@andruswagstaff.com

 9

10         SILL LAW GROUP

11         14005 North Eastern Avenue

12         Edmond, Oklahoma 73013

13         405-509-6300

14         BY:  TARA TABATABAIE, ESQ.

15              tara@sill-law.com

16

17         LOCKRIDGE GRINDAL NAUEN P.L.L.P.

18         100 Washington Avenue South, Suite 2200

19         Minneapolis, Minnesota 55401

20         612-339-6900

21         BY:  ROSA S. TREMBOUR, ESQ. (Telephonically)

22              rstrembour@locklaw.com

23

24
```

Jay Irwin Goodman, Ph.D.

```
 1   PRESENT: (Continued)

 2        THE MILLER FIRM, LLC

 3        The Sherman Building

 4        108 Railroad Avenue

 5        Orange, Virginia 22960

 6        540-672-4224

 7        BY:  TIMOTHY LITZENBURG, ESQ. (Telephonically)

 8             tlitzenburg@millerfirmllc.com

 9

10   ON BEHALF OF DEFENDANT MONSANTO:

11        HOLLINGSWORTH LLP

12        1350 I Street, N.W.

13        Washington, DC  20005

14        202-898-5800

15        BY:  HEATHER A. PIGMAN, ESQ.

16             hpigman@hollingsworth.com

17             ERICA T. KLENICKI, ESQ.

18             eklenicki@hollingsworth.com

19

20   THE VIDEOGRAPHER:

21        MR. MARC MYERS,

22        Golkow Technologies.

23

24   REPORTED BY:  JULIANA F. ZAJICEK, RPR, CSR.
```

Jay Irwin Goodman, Ph.D.

1                         I N D E X

2

3   WITNESS:                                    PAGE:

4    JAY IRWIN GOODMAN, PH.D.

5         EXAM BY MR. WOOL.....................   7

6         EXAM BY MS. PIGMAN..................  233

7         FURTHER EXAM BY MR. WOOL............  241

8

9                        *****

10

11                    E X H I B I T S

12   EXHIBIT                          MARKED FOR ID

13    No. 25-1  Report by Jay Irwin Goodman........   8

14    No. 25-2  Supplemental Materials
                Considered List....................   9
15
      No. 25-3  Retention Letter 12/29/15...........  30
16
      No. 25-4  Invoices from Jay Goodman..........  31
17
      No. 25-5  Article: "Cytotoxic and
18              DNA-damaging properties of
                glyphosate and Roundup in
19              human-derived buccal epithelial
                cells," by Koller et al.;
20              MONGLY00327331 - 339...............  85
21    No. 25-6  Article: "Genotoxic Activity of
                Glyphosate and Its Technical
22              Formulation Roundup," by
                Bolognesi et al.;
23              WEEDPROD00001252 - 257............. 100

24

Jay Irwin Goodman, Ph.D.

 1                    E X H I B I T S (Continued)

 2    EXHIBIT                                MARKED FOR ID

 3     No. 25-7  Article: "Clastogenic Effects of
                 Glyphosate in Bone Marrow Cells
 4               of Swiss Albino Mice," by Prasad
                 et al............................. 123
 5
       No. 25-8  Article:  "Biomonitoring of
 6               Genotoxic Risk in Agricultural
                 Workers from Five Colombian
 7               Regions:  Association to
                 Occupational Exposure to
 8               Glyphosate," by Bolognesi et
                 al.; MONGLY04882823 - 834........... 200
 9
       No. 25-9  Article: "Evaluation of DNA
10               damage in an Ecuadorian
                 population exposed to
11               glyphosate," by Paz-y-Mio et al.... 209

12     No. 25-10 Article: "Determination of
                 glyphosate and AMPA in blood and
13               urine from humans:  About 13
                 cases of acute intoxication"........ 220

14

15

16

17

18

19

20

21

22

23

24

Jay Irwin Goodman, Ph.D.

1          THE VIDEOGRAPHER:  We are now on the record.  My

2    name is Marc Myers.  I am a videographer for Golkow

3    Technologies.  Today's date is September 22nd, 2017.

4    The time is now 9:12 a.m.  This video deposition is

5    being held in Lansing, Michigan, in the matter of In

6    Regards to the Roundup Products Liability and it's

7    pending in the United States District Court, Northern

8    District of California.  The deponent is Dr. Jay

9    Goodman.

10          And at this time will the attorneys please

11   introduce themselves and will the court reporter,

12   Juliana Zajicek, please swear in the witness.

13          MR. WOOL:  David Wool for the Plaintiffs.

14          MS. TABATABAIE:  Tara Tabatabaie for the

15   Plaintiffs.

16          MR. WOOL:  And do we have anybody on the phone?

17          MS. TREMBOUR:  Good morning.  Rosa Trembour,

18   Lockridge Grindal Nauen.

19          MS. PIGMAN:  Heather Pigman from Hollingsworth

20   on behalf of Monsanto.

21          MR. KLENICKI:  Erica Klenicki from Hollingsworth

22   on behalf of Monsanto.

23               (WHEREUPON, the witness was duly

24                sworn.)

Jay Irwin Goodman, Ph.D.

```
 1              JAY IRWIN GOODMAN, PH.D.,

 2   called as a witness herein, having been first duly

 3   sworn, was examined and testified as follows:

 4                    EXAMINATION

 5   BY MR. WOOL:

 6        Q.   Good morning, Dr. Goodman.  How are you?

 7        A.   Terrific.

 8        Q.   Will you please state your name for the

 9   record?

10        A.   Jay Irwin Goodman.

11        Q.   And have you ever given a deposition

12   before?

13        A.   Yes.

14        Q.   You have, okay.  Well, so you probably

15   know the drill, but I'm going to go over a couple of

16   ground rules.

17        A.   Okay.

18        Q.   I'm going to be asking you a series of

19   questions today.  Your counsel will -- will object at

20   certain times, so it's important that you give your

21   counsel a moment after I ask my question for her to

22   get her objection in when she does.

23              Also, it is important that you give

24   audible answers to all of my questions, so no nodding
```

Jay Irwin Goodman, Ph.D.

1    yes or shaking your head no.

2              Does that sound fair?

3         A.    Yes.

4         Q.    Okay.  And I assume that if you give me an

5    answer that you have understood my question.  If at

6    any point you don't understand the question that I've

7    asked you, just please ask me and -- and I'll repeat

8    it.

9              And the last thing is that I tend to talk

10   fast, so if you want me to slow down or anything in

11   that respect, just ask me and I'll do my best to

12   accommodate.

13             Fair enough?

14        A.    Fair enough.

15                  (WHEREUPON, a certain document was

16                  marked Deposition Exhibit No. 25-1,

17                  for identification, as of

18                  09/22/2017.)

19   BY MR. WOOL:

20        Q.    Okay.  I'm going to hand you what has been

21   marked as Exhibit 1.

22             Do you recognize that document?

23        A.    The top page is the -- the top -- the top

24   page is the top page of the report that I provided,

Jay Irwin Goodman, Ph.D.

```
1    yes.

2         Q.    Okay.  And that document contains your

3    resume, correct?

4         A.    I don't know.  I'd have to look to see.

5         Q.    Okay.  Well, take a moment to -- to look,

6    if you don't mind.

7         A.    I haven't verified every page, but it

8    certainly looks like my resume is there.

9         Q.    Okay.  Do you -- do you remember

10   submitting your resume along with your expert report?

11        A.    Yes, of course.

12        Q.    And is everything contained in that resume

13   that you submitted up-to-date?

14        A.    Yes, it is accurate up to and including

15   today.

16                    (WHEREUPON, a certain document was

17                     marked Deposition Exhibit No. 25-2,

18                     for identification, as of

19                     09/22/2017.)

20   BY MR. WOOL:

21        Q.    Okay.  I'm going to hand you what has been

22   marked as Exhibit 2.  And this document is described

23   as your supplemental reliance list?

24        A.    It appears to be so.
```

Jay Irwin Goodman, Ph.D.

1        Q.    Okay.  I'm going to go back to those in

2    a -- in a minute.

3              What is your -- is your specialty?

4        A.    My specialty is -- my specialty is in

5    toxicology and more specifically in terms of

6    carcinogenesis, particularly mechanisms underlying

7    carcinogenesis, rational approaches to evaluating the

8    carcinogenic potential of chemicals and includes

9    hypothesis-driven research relative to mechanisms

10   underlying carcinogenesis.

11             In terms of specialty, in terms of

12   teaching, if that -- if -- if that is what you meant

13   to include?

14       Q.    Sure.

15       A.    In terms of teaching, my responsibilities

16   for teaching to the medical students, partic- --

17   typically in the area of chemotherapy, and for

18   graduate students, typically in the areas of

19   toxicology related to carcinogenesis, safety

20   assessment, and basic aspects of toxicology.

21       Q.    Okay.  And when you say "safety

22   assessment," what do you mean by that term?

23       A.    By that term I mean evaluating the

24   potential of a chemical to -- to cause harm, and with

Jay Irwin Goodman, Ph.D.

1    me it is usually but not always with related --

2    related to the potential to act as a cancer-causing

3    agent.

4         Q.    Are you familiar with the term "hazard

5    assessment"?

6         A.    Yes, of course.

7         Q.    Okay.  Is that analogous to what you just

8    described as a safety assessment?

9         A.    No.  Certainly I'm familiar with hazard

10   assessment.  I know what that is, but a hazard -- a

11   hazard assessment is like night and day different from

12   a safety assessment.

13        Q.    Are you familiar with the term "risk

14   assessment"?

15        A.    I am.

16        Q.    Okay.  Is that analogous to the term you

17   just described as safety assessment?

18        A.    You know, sort of, it is.  We can say

19   safety assessment, risk assessment.  It's -- it's sort

20   of whether you are going to look at the side of the

21   coin in terms of conditions under which this might

22   cause adverse effects or you are going to look at the

23   side of the coin under -- certainly with an interest

24   in whether or not it causes adverse effects -- but

Jay Irwin Goodman, Ph.D.

```
 1    under what conditions might it not cause adverse

 2    effects.

 3         Q.    So -- so --

 4         A.    So they are very closely related.

 5         Q.    Okay.  So just so that I'm clear, what are

 6    the differences between a safety assessment and a risk

 7    assessment, as you understand it?

 8         A.    First of all, I consider expertise in --

 9    in both, which I should have said, and many times --

10    many times I use this interchangeably.

11         Q.    Okay.

12         A.    It's -- it's -- it's a nuanced and a bit

13    from perspective.  Again, safety assessment, in terms

14    of, well, what are the conditions under which this

15    chemical might -- might not be problematic, risk

16    assessment, part of the conditions under which it

17    could be problematic, but the difference is really

18    nuanced.  I -- we can use them interchangeably.

19         Q.    Okay.  Have you ever been hired by a -- a

20    chemical company as a consultant?

21         A.    Yes, I have -- I have been retained by a

22    chemical company as a consultant.

23         Q.    Now, I don't want you to get anything --

24    into anything that is -- is confidential, but if you
```

Jay Irwin Goodman, Ph.D.

1    can, can you tell me what chemical companies you have

2    done consulting work for?

3         A.    The only chemical company that I can tell

4    you that I've consulted for, because I do have

5    confidentiality agreements with them, is -- there is

6    one chemical company where it -- it is in the public

7    record, because I was coauthor on a manuscript.  At

8    the time I was a consultant to the company and a

9    couple of the coauthors worked for the company, and

10   that is Syngenta.

11        Q.    And can you tell me whether you ever

12   served as a consultant for Monsanto?

13        A.    Never.

14        Q.    Never.

15              What was the work that you did for

16   Syngenta -- or did -- or sorry, strike that.

17              What -- did your work for Syngenta involve

18   a specific product?

19        A.    It did.

20        Q.    It did.

21              What was that?

22        A.    I have a confidentiality agreement with

23   them and I -- I really cannot talk about the

24   specifics.

Jay Irwin Goodman, Ph.D.

```
1        Q.    Fair enough.

2              You said that you produced a -- a

3   publicly-available manuscript --

4        A.    That is correct.

5        Q.    -- as part of that work?

6              And what was the title of that manuscript,

7   if you remember?

8        A.    The title was something about evaluating

9   the user -- something about using toxicogenomics

10  relative to evaluating an aspect of carcinogenesis.

11  If -- if you want, I can quickly thumb through my CV

12  and --

13       Q.    I -- I don't need you to do that.

14       A.    Okay.

15       Q.    Can you just give me the approximate date

16  when you performed that consulting work for Syngenta?

17       A.    Oh, gosh.  I would say that was more

18  recent than 10 years ago and probably -- probably

19  at -- at least two or three years ago and certainly

20  more recent than 10 years ago.

21       Q.    Fair enough.

22              Have you ever served as an expert witness

23  before?

24       A.    I have.
```

Jay Irwin Goodman, Ph.D.

```
 1        Q.    What was the nature of the case for which
 2   you served as an expert witness?
 3        A.    First of all, let me say that in terms of
 4   serving as an expert witness before, in terms of being
 5   deposed, this was decades ago.  Probably it could be
 6   25 to 35 years ago.
 7        Q.    Okay.
 8        A.    And since I have -- have done that.
 9        Q.    Do you remember what that case was about
10   or involved?
11        A.    One case involved medical malpractice and
12   it involved a question of dosing and side effects of a
13   corticosteroid.  And the others -- you know, it is so
14   far away, the -- the other two or three, which
15   involved allegations of contamination of groundwater
16   from in two cases a municipal and in one case a
17   private landfill.
18        Q.    So if I understand your testimony
19   correctly, there were two cases, two separate cases
20   involving groundwater contamination and you served as
21   an expert witness in both of those cases?
22        A.    Let me be more clear.
23              As I remember, I think there were three.
24   Two of them involved landfills owned by a municipality
```

Jay Irwin Goodman, Ph.D.

```
 1    and one was private.

 2         Q.    A private landfill?

 3         A.    Privately owned.

 4         Q.    A privately-owned landfill.

 5               And did the two involving a -- a

 6    municipality -- strike that.

 7               Did the -- the same municipality own

 8    the -- the landfill in the -- the two cases that you

 9    described as -- as publicly-owned landfills, I guess?

10         A.    No.  There was -- there -- they were two

11    different municipalities.

12         Q.    Okay.  Did all three of those cases

13    involve the same or similar allegations?

14         A.    It was a long time ago.  Similar.

15         Q.    Okay.  Did they involve a specific

16    chemical or compound?

17         A.    You know, again, it -- it was a long time

18    ago and we were dealing in -- in each case with more

19    than one compound.

20         Q.    Did you testify --

21         A.    Well, with -- with more than one -- more

22    than one chemical.  In some cases they were metals and

23    those would not be a compound.

24         Q.    And were you retained by the defendants in
```

Jay Irwin Goodman, Ph.D.

1   all three of those cases?

2        A.    In those cases, it was for the defense.

3        Q.    Do you regard -- strike that.

4              Do you remember the -- the allegations

5   that the plaintiffs were alleging in those cases?

6        A.    In general, the plaintiffs were alleging

7   contamination of groundwater as a -- from -- from a

8   particular landfill.

9        Q.    Were they alleging that they had suffered

10  personal injuries as part of that contamination?

11       A.    In one case the answer is yes, but I -- I

12  just don't recall the details.

13       Q.    Fair enough.

14             And there are no other cases that you can

15  recall as you sit here today for which you testified

16  as an expert witness?

17       A.    That's correct.  There might be another

18  one, but as I sit here today, that is what I recall.

19       Q.    And the approximate date of those

20  three cases was sometime, you said, about 25 years

21  ago?

22       A.    In terms of the four, including the

23  medical malpractice, this -- this was roughly in the

24  order of 25, it could be 30 years ago.

Jay Irwin Goodman, Ph.D.

```
 1        Q.    And do you recall the outcome of any of
 2   those -- the three cases involving groundwater
 3   contamination?
 4        A.    Any of the three.
 5              I do recall that on one of them the case
 6   was -- on one of them the -- the court's decision was
 7   against the defendant and that was reversed on appeal.
 8   In terms of the other two, I -- I don't recall.
 9        Q.    Did you know any -- strike that.
10        A.    And I should tell you that in terms of the
11   appeal, I participated in -- in -- in -- in that also.
12        Q.    What did you do for the appeal, if you
13   recall?
14        A.    It was an extension of the original
15   evaluations that I made.
16        Q.    So would it be fair to say that you
17   testified to approximately the same opinions that you
18   gave at the -- at the trial court?
19        A.    In the appeal there was no -- there was no
20   testimony by me.  It is my vague recollection that
21   this consisted of documents prepared by the attorneys
22   that were submitted to the court.  And I -- I do not
23   know -- I certainly did not testify during the appeal
24   or as part of the appeal.
```

Jay Irwin Goodman, Ph.D.

1      Q.    So if I'm understanding correctly, you

2  advised the attorneys on -- in the appeal as to the,

3  say, accuracy of their scientific representations to

4  the court?

5      A.    Yeah, I was -- I was involved in -- in

6  providing some toxicology input to that and that's

7  really the best that I recall.

8      Q.    Now, prior to being retained as an expert

9  in this case, did you know anybody who is or was at

10  any time an employee of Monsanto?

11      A.    Yes.

12      Q.    Okay.  And who was that?  Or who were

13  those people, I should say?

14      A.    There weren't many.  Let me tell you that

15  I -- I have been in the -- in the toxicology area for

16  many years and I travel around a lot, fortunately, and

17  I get to meet a lot of people.  So there is the

18  possibility that I have on a casual occasion met.

19  Two -- two of them -- three of them that I can recall.

20  One is James Sherman who I believe no longer works for

21  Monsanto.  Another one, who I've met on brief

22  occasions, not recently, is a fellow named Larry Kier.

23  And the third person who I know is a person named

24  Jerry Hjelle.  And it's -- I'm going to mix this up.

Jay Irwin Goodman, Ph.D.

```
 1   Jerry Hjelle, and it's -- the name is something like
 2   H-I-J-L-E (sic) or -- who I believe is now retired
 3   from Monsanto.
 4        Q.    And how did you know Mr. Sherman?
 5        A.    I knew Mr. Sherman because I met him at
 6   some scientific meetings that I attended and met him
 7   as -- at some organization I was involved in where he
 8   had some involvement and met -- met him there.
 9        Q.    And what was the approximate timeframe
10   when you met him?
11        A.    We are talking about Jim Sherman?
12        Q.    Sherman, yes.
13        A.    I would say I probably first met Jim
14   Sherman -- again, we are talking approximate.
15        Q.    Okay.  Right, approximately.
16        A.    I -- I guess I first met Jim Sherman
17   probably 10 or 12 years ago and I have not seen him
18   for probably two to four years.
19        Q.    Have you communicated him -- with him
20   since -- strike that.
21              Have you communicated with Mr. Sherman in
22   the past two to four years?
23        A.    I have not.
24        Q.    Now, how did you meet Larry Kier?
```

Jay Irwin Goodman, Ph.D.

```
 1        A.    Basically, the same way that I met -- that
 2   I met Jim Sherman.  I probably met him at a Society of
 3   Toxicology meeting or two and also as part of an
 4   organization that I was involved in, he was involved
 5   in that organization, and I see him at some of their
 6   meetings.  Not very often.  And we did not have
 7   lengthy, deep interactions.
 8        Q.    And approximately when did you meet
 9   Mr. Kier?
10        A.    Larry Kier, I -- I met Larry Kier, again,
11   it probably would be, I want to say, about roughly
12   15 years ago, and I don't think I've seen him in the
13   last five years.
14        Q.    Did you ever communicate with Mr. Kier
15   personally about glyphosate or Roundup?
16        A.    No.
17        Q.    No.
18              And -- and I -- I know you just answered
19   this question, so I'm sorry, but when was the last
20   time you said that you saw Mr. Kier?
21        A.    The last time I saw him must have been
22   five years ago, roughly.
23        Q.    Okay.  And have you communicated with him
24   in any way within the past five years?
```

Jay Irwin Goodman, Ph.D.

```
 1        A.    No.

 2        Q.    And you said you saw him, and maybe I'm --

 3   I'm missing this, at a Society of Toxicology meeting

 4   or some other sort of -- of meeting of that nature?

 5        A.    I think -- well, probably once or twice in

 6   terms of a hello in passing at an annual Society of

 7   Toxicology meeting, and then a particular organization

 8   that brings various scientists together is one that

 9   both he and I were involved in for a period of time,

10   and I got to meet him in a casual sort of way several

11   times.

12        Q.    And what organization was that?

13        A.    That would be the International Life

14   Sciences Institute and most -- mostly with one of

15   their subdivisions called the Health and Environmental

16   Sciences Institute -- Institute.

17        Q.    And what does that subdivision do?

18        A.    All of -- and in the International Life

19   Sciences Institute, if we could use just the acronym

20   ILSI --

21        Q.    Okay.

22        A.    -- I-L-S-I, I think is the best

23   organization in the world in terms of bringing

24   together scientists from industry, government and
```

Jay Irwin Goodman, Ph.D.

```
1    academia to advance science-based safety assessment.

2         Q.    And you were at that meeting as a

3    representative of the -- of Michigan State University?

4         A.    No.  I -- I -- I -- I -- I cannot

5    represent Michigan State University.  That would take

6    approval of probably the president of the university.

7    So any -- any of these activities that I am involved

8    in, it is as -- as Jay Goodman.

9         Q.    Okay.  So no industry group sponsored

10   your -- your attendance to -- to that meeting?

11        A.    That is -- that is not correct.  The

12   International Life Sciences Institute is funded to a

13   large extent by contributions they receive from

14   industry.

15        Q.    And do you receive any financial

16   compensation from your work for the -- the ILSI?

17        A.    No.  What -- what they did is they -- they

18   reimbursed me for travel expenses.  There was no -- no

19   honorarium involved.

20        Q.    Now, the last Monsanto employee that you

21   testified that you were acquainted with is Jerry

22   Hjelle, am I -- I saying that correctly?

23        A.    It's some -- it's Jerry Hjelle.

24        Q.    Hjelle.
```

Jay Irwin Goodman, Ph.D.

```
 1        A.    And it's spelled something like H-I-J-L-E.

 2        Q.    And how do you know Mr. Hjelle?

 3        A.    Primarily through the International Life

 4   Sciences Institute, and there was a period of time

 5   when he and I were involved and there was some, excuse

 6   me, some overlap.

 7        Q.    Okay.  And to the best of your

 8   recollection, those are the only three Monsanto

 9   employees that you were acquainted with prior to being

10   retained as an expert in this case?

11        A.    To the best of my recollection, that's

12   correct.

13        Q.    Okay.  Now, are you acquainted with a Sir

14   Colin Barry?

15        A.    I am.

16        Q.    Okay.  And how do you know Sir Colin?

17        A.    I know him from seeing him, speaking with

18   him at some scientific meetings, and we are probably

19   talking now about three or four scientific meetings.

20   I know him through some corres- -- e-mail

21   correspondence that we have.  And some of that

22   correspondence does relate to a -- a manuscript that

23   we were coauthors on, and -- I think.  And then on --

24   I think that's it.  And -- and -- and then we -- we
```

Jay Irwin Goodman, Ph.D.

1    also might be, I'll have to think about that, we might

2    be in the future contributing manuscripts separately,

3    separately, to a special issue of a particular

4    journal.  And I think that his name was on the list of

5    possible contributors, but it would be not a

6    coauthored.  It would be separate publications.

7         Q.    And what is that issue?

8         A.    This is a special issue of a journal of

9    the British Toxicology Society.  And I'm cringing a

10   little bit, it's coming, coming close to the time when

11   the -- my manuscript is due.

12        Q.    And does -- strike that.

13              What does -- what does your manuscript

14   involve?  Does it involve a specific chemical or...?

15        A.    No.  My manuscript in -- in a very broad

16   sense will be some aspects of the -- of the standard

17   rodent bioassay.  I haven't really -- I haven't really

18   defined it thoroughly yet.

19        Q.    And what manuscript were you coauthors on?

20        A.    It was a -- with Colin Barry, there was a

21   manuscript that I'm going to call The Appeal.

22        Q.    Okay.  I'm -- I'm familiar with that.

23        A.    And we were coauthors on that.  And with

24   The Appeal there was a -- like a letter, a short

Jay Irwin Goodman, Ph.D.

1   letter to the editor that had probably 200 or so

2   people who sort of signed and Colin was also one of

3   the signers of that.

4        Q.    Have you ever communicated with Colin

5   Barry about glyphosate and/or Roundup?

6        A.    No communication from me to him dealt

7   with -- dealt with glyphosate or Roundup.  On

8   one e-mail that he sent as part of the underlying

9   discussions before what I'm going to call The Appeal

10  manuscript was completed, there is a -- a line at the

11  bottom of one e-mail -- excuse me -- where -- where he

12  says something about I am -- I am going to a Monsanto

13  shareholders meeting.  Glyphosate is going to be

14  discussed.  Should be interesting.

15       Q.    And you did not -- strike that.

16             Did you have any oral communications with

17  Sir Colin Barry about -- regarding glyphosate?

18       A.    Never.

19       Q.    Same question about Roundup?

20       A.    Never.

21       Q.    Okay.  Now, you know a Helmut Greim as

22  well, is that correct?

23       A.    I do.

24       Q.    And how do you know -- I presume it is

Jay Irwin Goodman, Ph.D.

1    Dr. Greim?

2         A.    It is.

3         Q.    Okay.  How are you acquainted with him?

4         A.    I'm acquainted with him because I do --

5    have seen him on occasion at -- at scientific

6    meetings.  Helmut Greim, Dr. Greim, was also involved

7    with International Life Sciences Institute, and I

8    probably first met him through some International Life

9    Sciences Institute meetings or projects.

10        Q.    Have you ever communicated with Dr. Greim

11   about Roundup or glyphosate?

12        A.    Never.

13        Q.    Never.

14              Now, I'm not going to make you flip

15   through your -- your resume, but at one point you were

16   President of the Society of Toxicology, is that

17   correct?

18        A.    That's correct.

19        Q.    Okay.  And what is the Society of

20   Toxicology?

21        A.    The Society of Toxicology is the largest

22   professional society of toxicologists in the world.

23   The membership today is probably about 8,000 to 8500

24   and it was probably 5 or 6,000 when I was -- at the

Jay Irwin Goodman, Ph.D.

1    time I was president.

2         Q.    How does the Society of Toxicology receive

3    its funding, if you know?

4         A.    The society receives its funding, A, from

5    member dues.  It receives the bulk of its funding from

6    its annual meeting in terms of registration fees and

7    as part of the annual meeting there is a very large

8    presence of -- of exhibitors, in terms of exhibitors

9    that are in the business of selling scientific

10   instruments, some of them are some contract

11   laboratories, some of them are, like, the National

12   Institute of Environmental Health Sciences has a

13   booth, and they all pay something for this.  And there

14   are also some donations from industry.  The bulk of it

15   comes -- the bulk of the finances come from the annual

16   meeting.

17        Q.    Did you receive any compensation --

18        A.    I should say also, they -- they are now

19   having some, what I will call, freestanding meetings

20   outside of their annual meeting, but I don't think

21   that -- I -- I don't think that those are moneymakers.

22   If they -- if they are, it's very little money that is

23   made on that.  It's really done for the -- to advance

24   the science.

Jay Irwin Goodman, Ph.D.

1      Q.   And were you compensated for your time as

2  President of the Society of Toxicology?

3      A.   No.

4      Q.   No.

5      A.   Except -- I -- I -- when I -- when I

6  traveled to -- when I -- when I -- when I traveled to

7  board meetings, there were times that I did travel on

8  behalf of the Society of Toxicology, I was reimbursed

9  for travel expenses, but no -- no salary, no

10  honorarium, no help in terms of any office-type

11  expenses.

12      Q.   Okay.  And different toxicologists have

13  different philosophies, is that fair?

14      A.   I would -- I would put it a little bit

15  different.  I would say that different -- different

16  toxicologists might have different perspectives.

17      Q.   And would you agree that some

18  toxicologists view their role as to try to find the

19  poison, so to speak?

20      MS. PIGMAN:  Objection; calls for speculation.

21  BY THE WITNESS:

22      A.   I -- I don't -- I don't think that that is

23  correct.  There may -- I don't think -- I have not met

24  toxicologists who have told me that my role is to find

Jay Irwin Goodman, Ph.D.

1    the poison.

2    BY MR. WOOL:

3        Q.    Okay.  So is it fair to say you don't view

4    that as your role?

5        A.    I do not view that as my role and I can

6    only speak for a limited number of toxicologists who

7    I've met and I've never heard any of them articulate

8    what you just said.

9        Q.    Fair enough.

10            I'm going to hand you what will be marked

11   as Exhibit 25-3, and I will represent that this is

12   your retention letter with the Hollingsworth firm.

13                    (WHEREUPON, a certain document was

14                     marked Deposition Exhibit No. 25-3,

15                     for identification, as of

16                     09/22/2017.)

17   BY MR. WOOL:

18       Q.    Do you recall receiving this letter?

19       A.    Yes.

20       Q.    And the date on the retention letter is

21   December 29th, 2015, is that correct?

22       A.    That is correct.

23       Q.    When were you first contacted about

24   serving as an expert in this litigation?

Jay Irwin Goodman, Ph.D.

1        A.      Approximately.

2        Q.      Approximately.

3        A.      The first week of December of 2015.

4        Q.      And who contacted you?

5        A.      Mr. John Kalas.

6        Q.      And let me go ahead and mark Exhibit 4 and

7    I'll ask you about this in a minute.

8                        (WHEREUPON, a certain document was

9                         marked Deposition Exhibit No. 25-4,

10                        for identification, as of

11                        09/22/2017.)

12   BY MR. WOOL:

13       Q.      Now, prior to being contacted by

14   Mr. Kalas, had you performed any research on

15   glyphosate and/or Roundup?

16       A.      Prior to being contacted by him, I did

17   read the -- what I'll call the write-up that IARC had

18   published in a journal called the Lan -- Lancet.  And

19   also a number of years ago I was a member of the Board

20   of Scientific Counselors of the National Toxicology

21   Program, and the National Toxicology Program did,

22   not -- not a bioassay, but they did a 90-day toxicity

23   study on glyphosate and I was a member of the board at

24   the time that that 90-day study was reviewed.

Jay Irwin Goodman, Ph.D.

1        Q.    Were you involved in -- in the review of

2   that study?

3        A.    Yes.  The Board of Scientific -- this was

4   for the National Toxicology Program, and it is

5   typical, not always, that their documents are

6   submitted to the Board of Scientific Counselors for

7   review prior to having them made public.

8        Q.    Had you formed an opinion on the

9   carcinogenicity of Roundup and/or glyphosate after

10  participating in that review?

11       A.    I did not.  That was -- that was not a

12  carcinogenicity study.  It was a -- a 90-day study

13  which is designed to ask about potential toxicity at

14  various organ sites but not carcinogenicity, because a

15  study for a duration of 90 days is certainly not

16  sufficiently long.

17       Q.    Now, had you formed an opinion about the

18  genotoxicity of Roundup and/or glyphosate prior to

19  December 29th, 2015?

20                    (WHEREUPON, there was a short court

21                     reporter clarification.)

22  BY MR. WOOL:

23       Q.    Had you formed an opinion about the

24  genotoxicity of Roundup and/or glyphosate prior to

Jay Irwin Goodman, Ph.D.

1  being retained by the Hollingsworth firm in December

2  of 2015?

3      A.   What I can tell you is that part of this

4  90-day study did include a -- a separate series of

5  evaluations of the genotoxic potential of glyphosate

6  and those evaluations turned out to be negative.  And

7  so, based on that, it appeared to me, but without a

8  firm conclusion, those -- based on those three, it

9  appeared that glyphosate is not genotoxic.

10     Q.   And do you recall what tests were

11  performed in that review?

12     A.   Oh, certainly Ames test was performed.  So

13  I was on the Board of Scientific Counselors roughly

14  from 1989 to 1992 or so.  So we are talking a while

15  ago.  Certainly it was the Ames test.  It was probably

16  one or two of the mammalian tests in vitro and I just

17  do not recall if an in vivo study was -- was

18  performed.

19     Q.   Do you believe that you could form a firm

20  opinion as to the genotoxicity of Roundup based only

21  on the Ames test or on -- on in vitro tests?

22     A.   My answer to that is no.  In my opinion,

23  in terms of a firm opinion, I think that the inclusion

24  of some in vivo studies is appropriate.  So this

Jay Irwin Goodman, Ph.D.

1    evaluation that the NTP did was -- was somewhat

2    limited, although, again, the -- the thrust of the NTP

3    evaluation was this 90-day toxicity study.

4         Q.    And your involvement, and I'm sorry if I

5    asked this, was limited to reviewing that study --

6         A.    My involvement --

7         Q.    -- the entire NTP study?

8         A.    My involve -- involvement was limited to

9    reviewing that study.  I was not involved in the

10   planning of the protocols.

11        Q.    Okay.  Now, I marked as Exhibit 4 your

12   invoices.

13              Can you take a look through those really

14   quick?

15        A.    Sure.

16        Q.    I -- I just want to make sure that those

17   reflect all of the invoices and -- and are accurate,

18   et cetera.

19        A.    These are the invoices that I have

20   submitted, yes.

21        Q.    And do these accurately reflect all of the

22   time that you have spent on your glyphosate and

23   Roundup opinions up to August 6th -- 6th, 2017?

24        A.    As -- as -- as noted on the August 6th,

Jay Irwin Goodman, Ph.D.

1    2017 invoice, right under Invoice it says the period

2    covered is June 7 through July 24.

3         Q.    Oh, so my apologies.

4         A.    It -- it -- it accurately covered --

5    accurately represents my invoices up to and including

6    July 24, 2017.

7         Q.    And how much time do you believe you've

8    billed since this invoice was submitted?

9         A.    I don't know.  I'm sorry.

10        Q.    And you can approximate.

11        A.    Sin- -- since -- since the -- since the

12   one dated August 17th was submitted?

13        Q.    Correct.

14        A.    I have not billed for any time since then.

15   There -- there have -- there has been some time

16   accruing, if you will, but the most recent invoice

17   that I have received is the one that I have -- the

18   most recent invoice that I have submitted is the one

19   dated August 6th, 2017.

20        Q.    And how do you document the time that you

21   spend working on -- on this Roundup case?

22        A.    I keep -- I keep notes.

23        Q.    Does anybody help you with keeping notes

24   or --

Jay Irwin Goodman, Ph.D.

1         A.     Just me.

2         Q.     Just you.

3         A.     It's just me.

4         Q.     Okay.  And how much time do you believe

5    that you have spent since July 24th, 2017, working on

6    this case?

7         A.     Well, you know, I -- I keep notes.  I -- I

8    don't keep a running -- I don't keep a running tally.

9    I would say that it is, in rough ballpark terms,

10   something between 25 and 50 hours.

11        Q.     Okay.  Now, if you turn to the invoice

12   dated August 23rd, 2016, which I believe is the third

13   page going chronologically.

14        A.     I see that.

15        Q.     Now, if you look at Item No. 2, it states:

16               "Initial draft report sent to H. Pigman

17   and E. Klenicki on 6/15 of '16," is that correct?

18        A.     Correct.

19        Q.     Okay.  And on June -- so is -- is it

20   accurate to say that on June 15th, 2016, you submitted

21   your first draft report to Ms. Pigman and

22   Ms. Klenicki?

23        A.     Yes, that's what I mean by "initial."

24        Q.     And at that point in time had you formed a

Jay Irwin Goodman, Ph.D.

1   firm opinion as to the genotoxicity of glyphosate

2   and/or Roundup?

3        A.    At that point my -- I -- I had not formed

4   a firm opinion, but I was starting to develop a

5   preliminary opinion was starting to gel.

6        Q.    And so as of June 15th, 2016, it would be

7   fair to say that you had not formed a definitive

8   opinion as to the genotoxicity of Roundup?

9        A.    That is correct.

10       Q.    Okay.  Now, in performing your work on --

11   on the Roundup case, did you receive any help from

12   a -- a research assistant or -- or anything like that?

13       A.    None.  It's all me.

14       Q.    It's all you.

15             Did anybody help you summarize articles?

16       A.    It's all me.

17       Q.    Did anybody from Monsanto send you article

18   summaries or anything like that?

19       A.    Never.

20       Q.    Okay.  I'll ask you to take a look at

21   Exhibit 2.  You can probably put Exhibits 3 and 4 to

22   the side for a while.

23             And what is Exhibit 2?

24       A.    Exhibit 2 is titled "Supplemental

Jay Irwin Goodman, Ph.D.

```
 1    Materials Considered List."  Along with my report
 2    there was a listing of materials considered.  And
 3    since my report was submitted, I have not stopped in
 4    terms of, if you will, keeping an eye out for
 5    glyphosate-related literature.
 6         Q.    And as you sit here today, does that list
 7    in Exhibit 2 represent everything that you have read
 8    or relied upon in forming your opinions?
 9         A.    It does.
10         Q.    It does.
11               And have you reviewed everything that's on
12    that list?
13         A.    I have.
14         Q.    I mean read every article, not read the --
15    reviewed the entries?
16         A.    The -- the -- I -- I have.  Now, for some
17    of the articles I spent more time on than -- than some
18    others, but I did review the materials on this
19    Supplemental Materials Considered -- on this Materials
20    Considered List with the supplements added to it.
21         Q.    Okay.  And in Exhibit 1, your expert
22    report contains an appendix which is a number of EPA
23    tables, is that correct?
24         A.    That's correct.
```

Jay Irwin Goodman, Ph.D.

1      Q.    And did you review all of the studies that

2   are summarized in those tables?

3      A.    The answer is yes.  The answer is yes.  I

4   could have constructed those tables on my own.  It

5   would have taken a long period of time.  It is my

6   opinion that the EPA's Office of Pesticide Programs

7   tables, which -- which are -- are my appendix here,

8   are -- are very thorough.  I think that they did a

9   very good job.  And that's why, with proper

10  referencing, I've included their tables.  But I did

11  ask the Hollingsworth attorneys if they could send me

12  the references on the tables, and you will see that

13  that is part of this Materials Considered List.

14          So while I have the EPA tables here, in no

15  way did I simply rely on those tables.  I -- I did

16  want to -- it was -- it was not -- it was imperative

17  in terms of looking at the underlying references.

18     Q.    Okay.  Let me go back to -- to Exhibit 1

19  and specifically your resume really quick.

20     A.    Sure.

21     Q.    So I -- I just wanted to touch briefly

22  upon your role on, I believe you serve as an editor

23  or -- or on the board of two journals, is that

24  correct?

Jay Irwin Goodman, Ph.D.

```
1        A.     Currently that's correct.

2        Q.     Okay.  And what are those journals?

3        A.     One is Toxicology where I am a member of

4   the editorial board.  The other is Regulatory

5   Toxicology and Pharmacology where I am a -- one of the

6   associate editors.

7        Q.     Okay.  And for Toxicology, what do you do

8   in your capacity as -- let's see, what did you say --

9   as an editor on the board?

10       A.     As a member of the editorial board, I

11  do -- when -- when a -- when a manuscript is submitted

12  to the journal, the editor, and in the case of

13  Toxicology there is an editor for North America and

14  there is a separate editor for, I think, Europe and

15  the rest of the world.  And manuscripts that these two

16  individuals receive, they then send out for review.

17  Often at least one of the reviewers is a member of the

18  editorial board.  They do have -- sometimes all of the

19  reviewers -- multiple reviewers review each

20  manuscript.  Sometimes they are all members of the

21  editorial board, sometimes it's members of the

22  editorial board and someone who may not be on the

23  editorial board.  And so at their decision, they would

24  ask me if I -- if I have the time and feel that I have
```

Jay Irwin Goodman, Ph.D.

1   the expertise to do a thorough review of a particular

2   manuscript submitted for publication.

3        Q.   And what do you do for the -- for the

4   other journal?

5        A.   For the other journal --

6        Q.   Similar?

7        A.   I -- I do something that is really very --

8   that is very similar.  I think that as an associate

9   editor there are times where I may receive some of

10  the, in quotes, more difficult manuscripts.

11       Q.   What do you mean by more difficult

12  manuscripts?

13       A.   They may be more complex, they may be

14  more -- more complex, they may be more involved.

15  That -- that is not always -- that is not always the

16  case.

17       Q.   Okay.  So let me just ask you some basic

18  questions about your expert report -- expert report --

19       A.   Sure.

20       Q.   -- in Exhibit 1.

21            Are all of the opinions that you intend to

22  offer at trial confined in that report?

23       A.   Yes.

24       Q.   As you sit here today, to the best of your

Jay Irwin Goodman, Ph.D.

1    knowledge, do you intend to offer only those opinions

2    that appear in that report?

3        A.    As of today, this report is -- is my

4    independent report based on my evaluation and as of

5    today the opinions expressed here are what I

6    anticipate presenting, if -- if I am involved in this

7    court proceeding that you are alluding to.

8        Q.    Are the opinions contained in your report

9    complete?

10       A.    The opinions, the opinions are complete.

11   The report is, in my opinion, is still, if you will, a

12   sort of a -- well, my opinion, I'll -- in a sense sort

13   of a living document because, as I indicated here,

14   since submitting the report I have not stopped in

15   terms of looking at glyphosate-related -- related

16   papers.  I -- I cannot see how my opinions here

17   would -- would change, but depending upon what happens

18   in the literature, I can't tell you that something is

19   absolutely 100 percent not possible.

20       Q.    Fair enough.

21              As you sit here today, are there any

22   changes or edits that you feel you would need to make

23   to your report to -- to make it complete and accurate?

24       A.    No.  I think my report -- my -- I think --

Jay Irwin Goodman, Ph.D.

```
1    I -- I feel that -- I feel that my report today is --
2    is accurate.  On this date the report we -- on this
3    date my current opinion is not -- opinions are no
4    different than the opinions expressed on 31 July of
5    this year.
6         Q.    And do you anticipate doing any specific
7    additional work on your report?
8         A.    Well, as I -- as I said, I -- I continue
9    to look at the glyphosate-related literature.  So
10   there will be some additions to this -- these
11   materials considered.  At this point right now I do
12   not -- I do not anticipate revising my report.  As I
13   said, the opinions expressed in the report are the
14   opinions that I hold today, but in terms of something
15   happening in the literature, I -- I -- I can't tell
16   you absolutely nothing ever, never will change.  Right
17   now these are my opinions.
18        Q.    And is there any information that you
19   wanted to form your opinions that you didn't receive?
20        A.    If -- if what you're asking is:  Was there
21   a time that I requested information, such as when I
22   requested the actual papers that are referenced in the
23   EPA tables, if what you are asking is:  Did I make a
24   request for information and then that request was
```

Jay Irwin Goodman, Ph.D.

1    denied, if that is your question, my answer is no.

2         Q.    Okay.  So there are no studies that you're

3    aware of that you wanted to see or -- or review that

4    you didn't have access to?

5         A.    That is correct.  But I would tell you

6    that a -- a large number of the papers referenced in

7    this Materials Considered List are papers that I found

8    or the papers that I knew about that were relevant

9    here.

10        Q.    Okay.  And the opinions contained in your

11   report, are -- strike that.

12               How would you describe the level of

13   confidence that you have in your opinions as they are

14   represented in your report?

15        A.    I describe the level of confidence I have

16   as extremely high.

17        Q.    Okay.  And you are not offering an opinion

18   in your expert report related to epidemiology?

19        A.    You are correct.  I -- I am not an

20   epidemiologist.  I do not claim expertise in

21   epidemiology.

22        Q.    Okay.  And you aren't offering an opinion

23   on any of the long-term animal cancer studies, is that

24   correct?

Jay Irwin Goodman, Ph.D.

1      A.    I am not offering -- at -- at -- in the

2   early -- in the early, early time of my involvement, I

3   did review a number of the cancer bioassays.  I did

4   review a number of the cancer bioassays, I did become

5   familiar with them, and that becomes necessary in

6   terms of placing in context the report that I wrote.

7      Q.    Sure.

8            But are -- are there any opinions specific

9   to the animal cancer bioassays that are contained

10  within your report?

11     A.    My report does not provide opinions on the

12  cancer bioassays.

13     Q.    Okay.  And would it be fair to say that

14  your opinions are limited to those involving the

15  genotoxicity and oxidative stress of Roundup

16  glyphosate-based formulations and glyphosate?

17     A.    Opinions on that per se and opinions on

18  how that might relate to potential carcinogenicity.

19     Q.    And it is your opinion that a substance

20  can be carcinogenic but not be genotoxic, is that

21  accurate?

22     A.    Yes.

23     Q.    And a substance can be carcinogenic and

24  not promote oxidative stress, is that also accurate?

Jay Irwin Goodman, Ph.D.

1       A.    My opinion is that I think that, while

2   there are a lot of papers in the literature, a lot of

3   discussion about the role of oxidative stress in

4   carcinogenesis, I do not believe that the information

5   that I have seen allows one to then make the leap that

6   because in some experimental systems some aspect of

7   oxidative stress was observed, that this means that

8   carcinogenesis will result.

9       Q.    Okay.  So am I correct that you do not

10  intend to offer opinions related to any potential

11  mechanism for carcinogen- -- genesis other than

12  genotoxicity and oxidative stress?  As it relates to

13  glyphosate-based formulations and glyphosate?

14      A.    Well, if -- if one is going to offer

15  opinions in terms of genotoxicity, as you just alluded

16  to, there are some non-genotoxic compounds that are

17  carcinogenic and I consider my expertise in the -- in

18  the area of -- area of carcinogenesis.  So, but my

19  opinion is what is presented here.

20      Q.    Okay.  So -- so, to ask my question again,

21  so it would be fair to say that you are not offering

22  any opinions related to any other potential mechanisms

23  of carcinogenesis in this litigation other than your

24  opinions related to genotoxicity and oxidative stress?

Jay Irwin Goodman, Ph.D.

```
 1        A.    At this point, the answer is yes.

 2        Q.    Okay.  And do you have any reason to

 3   anticipate that changing down the road?

 4        A.    I have -- as I sit here today, I do not

 5   have reason to believe that that will change.  But I

 6   cannot tell you that absolutely, unequivocally it will

 7   not change.

 8        Q.    Fair enough.

 9              So before we really dig into your report,

10   I -- I want to kind of ask you about some of the --

11   the definitions and -- and terms that you use just so

12   that we can be sure that we are on the same page.

13        A.    Good idea.

14        Q.    All right.

15              Now, you describe a number of studies

16   as -- as both positive and negative throughout your

17   report.  Fair?

18        A.    That is correct.

19        Q.    Okay.  And what do you mean, just so we

20   are on the same page, by the term "positive"?

21        A.    Well, if we are talking about -- if we are

22   talking about a genotoxicity study, then when I say

23   positive, I am saying that in my opinion that this is

24   a properly-conducted study and the results of the
```

Jay Irwin Goodman, Ph.D.

1    properly-con -- properly-conducted study provide a

2    indication that the compound in question was genotoxic

3    in this particular assay.

4            So what I'm saying is that it is not just

5    looking at, for example, whether a particular author

6    said, I observed genotoxicity.  But I think one has to

7    look in a constructive, critical fashion at the study,

8    at the study design, in terms of the procedures that

9    we used and -- and make a -- an in-depth evaluation.

10    Q.   Okay.  So -- so I think I understood your

11   answer.  I just -- I just want to make sure that I am

12   clear that when a study is described in the body of

13   Exhibit 1, which is your expert report, as positive,

14   that means that that description of positive is your

15   opinion of the -- the study, having completed a

16   thorough review of -- of the materials?

17        MS. PIGMAN:  Objection; vague and

18   mischaracterizes the portions of the report.

19   BY MR. WOOL:

20    Q.   Okay.  Let -- let's strike that.

21            So when you characterize a study as

22   positive in the body of your report, is that your

23   opinion that -- that it -- the study is positive?

24        MS. PIGMAN:  Again, objection; vague.  It

Jay Irwin Goodman, Ph.D.

1    mischaracterizes portions of the report.

2    BY THE WITNESS:

3         A.    Well, if -- if in the report I said,

4    Auth- -- Author X in his or her paper said that

5    compound X was -- was genotoxic, that is me just

6    reading or saying what the author said.  If in the

7    report I say that my opinion in terms of eval- --

8    evaluating this is that the study was positive or that

9    the study was negative, then that's my opinion of the

10   particular study based on a constructive, in-depth

11   consideration of experimental protocol, methodology,

12   et cetera.

13   BY MR. WOOL:

14        Q.    Okay.  So this isn't meant to be a -- a

15   trick question or anything.  I'm just trying to make

16   sure that -- that we are on the same page and that I

17   understand what exactly you are saying.  So if -- and

18   maybe this would be best if we looked at an example.

19             So if you will turn with me to page, let's

20   see, 18 of your report.

21        A.    I'm there.

22        Q.    Okay.  You described the results of a

23   number of Ames tests related to glyphosate-based

24   formulations, correct?

Jay Irwin Goodman, Ph.D.

1      A.     Yes.

2      Q.     Okay.  And you state:  "All of the studies

3   were negative" at the end of the first paragraph,

4   correct?

5      A.     Yes.

6      Q.     Okay.  And that statement is your opinion,

7   not the -- not a reflection of -- of the description

8   of the reports by the authors?

9      A.     Correct.  That statement -- that statement

10   is based upon my reading and evaluation of the

11   particular report or study.

12      Q.     Okay.  And -- and so would I be -- strike

13   that.

14           Would -- would it be fair to assume that

15   but for those instances where you described the

16   conclusion as that of the author of the study that --

17   that when I see the word "positive," that means that

18   that is your opinion as it relates to the -- to the

19   study?

20      MS. PIGMAN:  Objection; vague and out of

21   context.  It misstates his report.

22   BY THE WITNESS:

23      A.     It would be helpful to me if you could

24   clarify a bit and point to an example of -- of what

Jay Irwin Goodman, Ph.D.

1    you are talking about.

2    BY MR. WOOL:

3        Q.    Okay.  We'll get to that in a minute.

4             So just really quickly, I don't want to

5    spend too much time on this, when you describe a study

6    as negative, what do you mean by that term?

7        A.    Well, when I describe the study as

8    negative, what I mean is that the results of the study

9    indicate that the compound in question did not produce

10   genotoxicity in that particular test system.  And if I

11   said that, then it is -- it means that I have reviewed

12   aspects of the experimental protocol and reviewed the

13   study overall and -- and did more than just look at

14   the author's bottom-line conclusion.

15       Q.    Okay.  So would it be fair to say you

16   reviewed the experimental protocol in all of the

17   studies that you describe as negative in your expert

18   report?

19       A.    I would say that I reviewed the -- I

20   reviewed the information that was available to me.  In

21   some of the Monsanto, I'll call them, internal

22   studies, I reviewed them as best I could based upon

23   the information provided.  And there was some, some

24   variability in terms of the depth to which they went

Jay Irwin Goodman, Ph.D.

1    into the protocol, but if I did review them, it --

2    it -- then it means that there was sufficient

3    information for me to -- to reach a conclusion.

4        Q.    Okay.  And do you include studies that you

5    might describe as inconclusive within the -- the term

6    "negative" as it is presented throughout your report?

7        MS. PIGMAN:  Objection; vague.

8    BY THE WITNESS:

9        A.    I -- I look at the -- I mean, I -- just in

10   isolation, I -- I look at the term "in" --

11   "inconclusive" does not have, to me, the same meaning

12   as positive or negative.  In -- to me, inconclusive

13   means, in this context, based upon the data presented,

14   that one cannot draw a firm opinion in terms of plus

15   or minus.

16   BY MR. WOOL:

17       Q.    Fair enough.

18             Now, you use the -- the term "underlying

19   study report" fairly frequently throughout your expert

20   report.

21             What -- when you use that phrase, what do

22   you mean by "underlying study report"?

23       A.    Could you give me an example so that --

24       Q.    Yeah.

Jay Irwin Goodman, Ph.D.

```
 1        A.    I just -- I really want to be clear when I

 2   respond to you.

 3        Q.    So -- so at the top of Page 18, in

 4   describing the -- the 38 Ames tests, the first line

 5   reads:  "I have reviewed the underlying study

 6   reports" --

 7        A.    Yes, yes.

 8        Q.    So --

 9        A.    What that -- what that means is -- what

10   that means is that I -- I did not simply look at a

11   table, like, for example, one of the EPA Office of

12   Pesticide Programs table and just read across in terms

13   of what was on the table and -- and -- and accept that

14   without looking at the reference for it.  And that's

15   what I mean by "the underlying report."

16        Q.    So -- so I -- I feel like you sort of told

17   me what you didn't do when you say you reviewed the

18   underlying study report.  I -- I'm just trying to --

19   to get a sense as to does -- does that include the, I

20   guess, all of the underlying data for -- for those

21   studies or --

22        A.    It includes the underlying data that --

23   that were -- it includes the underlying data that were

24   available to me.
```

Jay Irwin Goodman, Ph.D.

```
1        Q.    Okay.  Now, would you say that you

2   employed a -- a specific methodology in reaching your

3   opinions, such as weight of the evidence, for example?

4        A.    Just -- just to clarify, when you are

5   talking about in terms of reach my opinion, for

6   example, my opinion relative to genotoxicity and

7   glyphosate-based formulations?

8        Q.    Correct.

9        A.    I would say what I did was I reviewed a --

10  a very large body of -- of information and came to a

11  conclusion based on that.  What I did not do was say

12  that here is a stack of pluses and here is a stack of

13  minuses and somehow put them on a balance.  It -- it's

14  based on an overall review of the body of literature.

15       Q.    Okay.  And would you agree that -- that

16  some tests -- or strike that.

17            Did you afford some of the -- the various

18  tests that you describe as genotoxicity tests or tests

19  for oxidative stress, did you afford some of those

20  tests greater weight than others?

21       A.    In general it's my opinion that the -- in

22  general, it's my opinion that the in vivo studies

23  trump the in vitro studies.  So I do give more weight

24  to in vivo studies.
```

Jay Irwin Goodman, Ph.D.

1       Q.    Okay.  Now, if -- if we take this outside

2   of the context of -- of your report, just looking at

3   if you were evaluating anything within the -- the

4   context of genotoxicity, would it -- would that be the

5   same approach that you would take?

6       A.    Yes.  Yes.  I mean, the approach that I

7   took in terms of evaluating the data that forms the

8   basis for this report is an approach that's taken

9   over -- over decades -- over my decades in -- in terms

10  of working, researching in this area.

11              And so when I review this literature, in

12  a -- in a sense this is really not different than my

13  role as a editor for a journal reviewing a manuscript.

14  It is not different than my role in reviewing a grant

15  application submitted to a particular grantor.  It is

16  not different than the approach I take when a

17  colleague of mine comes to me and says, Jay, I'm

18  drafting this manuscript.  Could you take a look at it

19  and -- and give me opinions.

20      Q.    Sure.

21              Now -- now, again, outside of the context

22  of your report, and I know that you have quarrels with

23  the -- the -- the human studies, how would you

24  prior -- prioritize human studies evidencing evidence

Jay Irwin Goodman, Ph.D.

1    of genotoxicity or oxidative stress relative to in

2    vivo and in vitro studies?

3         A.    By human studies, am I correct that you

4    are talking about living human beings?

5         Q.    Correct.

6         A.    As opposed to human cells and culture.

7         Q.    Correct, living human beings.

8         A.    Yeah, I -- I -- again, I -- I -- I think

9    that in vivo studies, in -- in my opinion, in general

10   trump in vitro studies.

11        Q.    Right.  So -- so I guess I'm asking, if

12   you found a -- a study that you considered to be

13   reliable and methodolog- -- methodologically sound

14   that measured genotoxicity in living humans, would

15   that be afforded more weight than an in vitro study or

16   in vivo, or I guess that would be an in vivo study,

17   that -- that's how you would characterize it?  Strike

18   that question.

19        A.    You know, I -- I -- I'm a little confused.

20   Could you please rephrase?

21        Q.    So I'm saying, would you consider --

22   let -- let me ask this:

23              Would you consider a study measuring

24   genotoxicity in living humans to be an in vivo study?

Jay Irwin Goodman, Ph.D.

```
 1        A.    Yes.

 2        Q.    Okay.  And if you were evaluating the

 3   ultimate question of whether a chemical caused

 4   genotoxic or genotoxicity in humans, would you

 5   prioritize an in vivo human study above an in vivo

 6   animal study, for example?

 7        A.    First that would depend, again, on a -- a

 8   review of the study and the methodology.

 9        Q.    Right, assuming it was reliable and

10   methodologically sound.

11        A.    But in -- in -- in general, again, I -- I

12   think that studies in vivo trump studies in -- in

13   vitro.  That doesn't mean that the in vitro studies

14   are worthless.  That doesn't mean that the in vitro

15   studies are automatically discounted, but I would tend

16   to give more weight to the in vivo.

17              On the other hand, if you have a situation

18   where you have one in vivo study, do I think that that

19   is going to erase a whole host of well done in vitro

20   studies and well done in vivo studies in rodents, the

21   answer is -- the answer is no.  But I still, in

22   general, would give more weight to the in vivo study.

23        Q.    And it's fair to say that you give more

24   weight to the mammalian studies versus non-mammalian
```

Jay Irwin Goodman, Ph.D.

1    studies?

2        A.    The answer -- the answer is -- is yes.

3    You know, in all of what we are talking about is

4    context related, and -- and -- and it really depends

5    on -- on the particular -- on the particular context.

6        Q.    Okay.  So in the context of your report,

7    do you believe that any of the non-mammalian tests

8    should be afforded any weight?

9        A.    I do think that the -- I do think that

10   what we'll call the Ames test, which is -- involves

11   bacteria in in vitro is something that certain --

12   that's something that should be certainly afforded

13   some weight, that it -- it is valuable.  And if you

14   want to mention another non-mammalian test system,

15   then we can -- we can talk about that.

16       Q.    I -- I guess we'll get to that soon

17   enough.

18            Okay.  So let's talk about the Ames test.

19   So you can turn to Page 18 of Exhibit 1.

20       A.    I'm there.

21       Q.    You are there already.

22            Okay.  So first, I guess, let's -- let's

23   make sure that we are on the same page as far as

24   definitions can -- go.

Jay Irwin Goodman, Ph.D.

1              You use the acronym GBF, which I take to

2    mean glyphosate-based formulations, is that correct?

3         A.    That is correct.

4         Q.    Okay.  And what do you mean by

5    glyphosate-based formulations?

6         A.    I mean formulations that contain

7    glyphosate along with other chemicals.

8         Q.    Are there any specific chemicals that --

9    that you consider to be contained within

10   glyphosate-based formulations or are you just talking

11   about it's glyphosate and -- and something else?

12        A.    Well, I'm -- first, I'm talking about it

13   is glyphosate and something else.  Among the something

14   else are some chemicals that are called surfactants.

15        Q.    Okay.  So when you use glyphosate-based

16   formulation throughout your report, does that include

17   formulations that contain surfactants?

18        A.    Yes.

19        Q.    And what is a surfactant, so we are clear

20   on that?

21        A.    Surfactant is a chemical that tends to

22   adhere to surface of cells.

23        Q.    And so what are the surfactants that --

24   that you are aware of that are contained within

Jay Irwin Goodman, Ph.D.

1    glyphosate-based formulations?

2         A.    You know, I can't really give you the

3    chemical names.  These are long, convoluted chemical

4    names and I -- I can't give you the -- the specific

5    names.

6         Q.    Okay.  So what is the Ames test designed

7    to tell us?

8         A.    The Ames test is a test that is designed

9    to tell us whether a mutation has occurred.

10             In the Ames test -- in the Ames test what

11   one is doing is monitoring for what we would call a

12   reverse mutation.  That is, the Ames test consists of

13   bacteria that have a mutation in a gene that encodes a

14   product which is involved in synthesis of a chemical

15   that the organisms require for growth.

16             The amino acid histidine is -- is one of

17   these.  And so these bacteria have been selected

18   because they contain a particular mutation in a

19   crucial gene.  And then, in the Ames test, what we are

20   looking for is a mutation that reverses this and

21   mutates the mutated gene so that it is back to normal.

22        Q.    So do you believe it's possible that a

23   substance can be genotoxic in humans and not promote a

24   mutation in bacteria in the Ames test?

Jay Irwin Goodman, Ph.D.

1      A.    Yes.

2      Q.    Okay.  How many strains of bacteria are

3  typically used in an Ames test?

4      A.    There are at least four strains of

5  Salmonella typhimurium and then there can be several

6  strains of another bacteria and it just slips my mind.

7      Q.    I'm sorry?

8      A.    It just slips my mind.

9      Q.    Okay.

10     A.    These proceedings are rather foreign to me

11  and it just slips my mind.

12     Q.    When you say, "These proceedings are

13  rather foreign to" you, are you talking about the

14  deposition --

15     A.    Yes.

16     Q.    -- or the -- okay.

17     A.    Yes.

18     Q.    I figured it wasn't the Ames test.

19     A.    I'm talking about the deposition.  So --

20  so it's -- no, no, no.  So excuse me.  That's all

21  right.

22          And so each of these strains contains a

23  different type of mutation.  So one may contain what

24  we call a point mutation, which means a switch in a

Jay Irwin Goodman, Ph.D.

1  particular base pair, one may contain an addition or

2  deletion, which leads to what we call a frame shift.

3          And so what one is doing, really, in the

4  Ames test is you're able to evaluate, for example,

5  whether it was a point mutation or whether it was an

6  addition or deletion that caused a frame shift

7  mutation.  It is really rather elegant.

8      Q.    Okay.  So, in the first line on Page 18,

9  you say that you:  "have reviewed the underlying study

10  reports for 38 Ames tests as well as the relevant

11  study summaries for at least 12 additional Ames

12  tests."

13          Is that correct?

14      A.    Yes.

15      Q.    Okay.  And if I look at Appendix 1, which

16  is Page 45 of your report.

17      A.    Just one moment, please, and I'll -- I'll

18  be there.

19      Q.    Okay.  I -- I'm just trying to make sure

20  I -- I have a grasp on all of the -- the studies that

21  you've looked at.

22      A.    I'll -- I'll be there quickly.

23      Q.    Okay.  I think that -- so by my count

24  there are 31 tests listed in Appendix 1.  And then --

Jay Irwin Goodman, Ph.D.

1      A.    I'm sorry.  Excuse me.  We are on Page 45?

2      Q.    Correct.

3      A.    Okay.

4      Q.    And then you Count 12 -- sorry.  Strike

5   that.

6            So when you say re -- you reviewed the

7   underlying study reports for 38 Ames tests, are all of

8   the results contained in Appendix 1 within that

9   38-study-report number that you report on Page 18?

10     A.    Should be.

11     Q.    Okay.

12     A.    Are you saying that there is --

13     Q.    No, no.  I -- what I'm -- I'm just trying

14  to -- to ask is, so -- and a better way of asking it,

15  I -- I guess, is that you reviewed the underlying

16  study reports for all of the test results contained in

17  Appendix 1, is that correct?

18     A.    That is correct.  I did receive the -- the

19  references which are listed under the Reference column

20  and -- and I -- I certainly did look at and consider

21  those.  So my evaluation is not, not simply based on

22  looking at the table.

23     Q.    Right.  Okay.  And so my question is, by

24  my count there are 31 tests reported in Appendix 1.

Jay Irwin Goodman, Ph.D.

```
 1    So I'm curious, if you know, what the other seven

 2    tests were for which you reviewed the underlying study

 3    reports?

 4         MS. PIGMAN:  I'm sorry.  Are you asking him to

 5    compare Appendix 1 to his Materials Considered List --

 6         MR. WOOL:  I'm just asking him if -- if he --

 7         MS. PIGMAN:  -- and figure out which ones are

 8    not there or --

 9         MR. WOOL:  Yeah, I'm just -- right.  So what I'm

10    asking is just if he knows or if he has a way to, I

11    guess, possibly quickly -- quickly direct me to what

12    additional seven Ames tests he -- he reviewed the

13    underlying study reports for.

14    BY MR. WOOL:

15         Q.    And if you can't, if you don't know,

16    that's fine.  It is not a big deal.  I am not fixated

17    on that.

18         A.    Well, let me...

19               It will take me a little time to --

20         Q.    Okay.

21         A.    -- try -- to -- to try to reconcile this.

22         Q.    Okay.  So I -- I'm not really that hung up

23    on -- on that.

24               Okay.  So do all of the underlying study
```

Jay Irwin Goodman, Ph.D.

1    reports that you reviewed comply with OECD guidelines?

2        A.    Some of the -- some of the -- some of the

3    reports were performed quite a while ago and some of

4    them were probably performed before there were OE --

5    OECD guidelines, that could be, and some of them were

6    probably performed before the most current OECD

7    guidelines.

8        Q.    Okay.  For -- are you aware of any that

9    were performed after the most current OECD guidelines

10   that do not comply with OECD guidelines?

11       A.    I'm not.

12       Q.    Okay.  And you state you reviewed 12

13   additional study summaries.

14             So -- so what do you mean by a study

15   summary in this context?

16       A.    The additional studies, the additional

17   study summaries were summaries from Monsanto.

18       Q.    Okay.  So as a -- a peer reviewer on

19   either of the two journals that you serve on, would it

20   be enough for you to review a study summary in your

21   review of articles submitted for publication?

22       A.    In -- in -- in this particular context

23   where there is so much of a genotoxicity data, the --

24   the answer would -- the answer is yes.

Jay Irwin Goodman, Ph.D.

1      Q.    Okay.  Let's see.  So your conclusion is

2   that:

3            "All of these studies indicate that GBFs

4   do not cause mutations in bacterial-based systems."

5      A.    Yes.

6      Q.    Is that correct?

7      A.    Yes.

8      Q.    And can you -- strike that.

9            And is your opinion that this data set is

10  conclusive?

11     MS. PIGMAN:  Object.  Objection; vague.

12            I'm sorry.  Go ahead, you can answer.

13  BY MR. WOOL:

14     Q.    You can answer.

15     A.    It is my opinion that this data set is --

16  it is my opinion that this data set is -- is highly

17  convincing.  I'm not sure exactly what you mean by the

18  word "conclusive."

19     Q.    I'm --

20     A.    I think the data set is highly persuasive.

21     Q.    Okay.

22     A.    I think it's convincing.

23     Q.    Yeah, that -- that's a good enough answer.

24            Are there any studies contained within

Jay Irwin Goodman, Ph.D.

1   this data set of glyphosate-based formulations that

2   have -- or Ames tests regarding glyphosate-based

3   formulations that you did not consider due to

4   methodological flaws?

5       A.    I considered the studies that were -- were

6   provided to me and I did not -- I did not exclude any

7   of them.

8       Q.    Okay.  And out of this data set, do you

9   know how many, if any, of the studies were publicly

10  available?

11      A.    The -- the ones that were received from

12  Monsanto, I think that some of them are publicly

13  available in that glyphosate has been on the market a

14  long time and, for example, the Environmental

15  Protection Agency as well as in Europe periodically

16  review and re-review chemicals that -- that they

17  permit.  It's not -- it's not that we approve this

18  chemical and it's approved for eternity.  And so I

19  think that in either the initial reports or subsequent

20  ones that there are genotoxicity data and that if one

21  looked at, for example, the EPA report as they

22  reviewed and re-reviewed, that you would find -- find

23  these.

24      Q.    Okay.  I think that's probably enough.

Jay Irwin Goodman, Ph.D.

1            Okay.  So for the studies that were

2    provided to you, were there any occasions where you

3    found the provided data insufficient or you needed

4    more information for this Ames test data set that we

5    are discussing?

6         A.    I did not find the data -- the studies

7    that were provided to me contained sufficient

8    information for me to -- for me to draw a conclusion.

9         Q.    Okay.  Do you mind if we take a quick --

10        MS. PIGMAN:  I was going to ask the same

11   question, if you were ready to --

12        MR. WOOL:  Yeah.  No, I'm --

13        MS. PIGMAN:  -- take a quick break.

14        MR. WOOL:  Need a quick bathroom break.

15        MS. PIGMAN:  It sounds great.

16        THE VIDEOGRAPHER:  Off the record at 10:45 a.m.

17              (WHEREUPON, a recess was had

18              from 10:45 to 10:53 a.m.)

19        THE VIDEOGRAPHER:  This the beginning of Disk

20   No. 2 and we are back on the record at 10:53 a.m.

21   BY MR. WOOL:

22        Q.    Okay.  Dr. Goodman, I believe I was asking

23   you about the Ames tests as they relate to -- or

24   the -- the glyphosate-based formulation results of the

Jay Irwin Goodman, Ph.D.

1    Ames test.  Before we move off of Ames test, let me

2    just ask you really quickly about the -- the results

3    of the Ames test related only to glyphosate.

4            For any of the tests related to

5    glyphosate, did you discount any of the studies due to

6    methodological flaws?

7        A.    No.

8        Q.    Did you discount any of those studies due

9    to noncompliance with OECD guidelines?

10       A.    No.

11       Q.    Okay.  So let's talk about the in vitro

12   studies with glyphosate-based formulations, which I

13   believe began on Page 19 of your report.

14       A.    I am there.

15       Q.    Okay.  So in your own words, what does

16   this test tell us?

17       A.    Well -- well --

18       MS. PIGMAN:  Objection; vague.  Which -- which

19   test?

20   BY MR. WOOL:

21       Q.    No, no, I'm not talking about a specific

22   test.  I'm just asking in general, an in vivo

23   chromosomal aberration or -- or a test for chromosomal

24   damage in mammalian cells, what is that?

Jay Irwin Goodman, Ph.D.

```
 1        A.    Excuse me.  Maybe I didn't hear you right.
 2   I thought you said in vivo.  Here we are talking about
 3   in vitro.
 4        Q.    I'm sorry.  I meant in vitro.  You caught
 5   me.
 6        A.    That's fine.
 7        Q.    What does an in vitro test for chromosomal
 8   damage tell us?
 9        A.    Well, first of all, in vitro means cells
10   in culture.  And actually the original meaning was --
11   for in vitro is in -- in glass, and we don't use glass
12   anymore, but we keep the -- keep the name.
13            So in vitro test means we are evaluating
14   cells in --
15        Q.    And -- and to be clear, I'm -- I'm just
16   sort of asking for what the -- the results of an in
17   vitro test for chromosomal damage reveal to you as
18   a -- as a genotoxicologist?
19        A.    What it reveals to me is whether there was
20   damage to -- to the cell -- the chromosomes of the
21   cell.
22        Q.    Okay.  And are these typically performed
23   in rodent and human cells, is that accurate?
24        A.    The vast, vast majority that I have seen
```

Jay Irwin Goodman, Ph.D.

1    are in -- in rodent and/or human cells.

2        Q.    Okay.  And so there are two tests that you

3    evaluated within this data set, one positive and one

4    negative, correct?

5        A.    Um-hum.

6        Q.    Okay.  And the Koller, am I pronouncing

7    that correctly, test was reported as positive,

8    correct?

9        A.    One moment, please.

10       Q.    By -- by the author, I mean.

11       A.    Correct.

12       Q.    Okay.  And your conclusion for Koller, as

13   I understand it, is that the positive results seen in

14   the test were secondary to cytotoxicity?

15       A.    Yes, the -- the -- it is -- it is -- it is

16   based upon the Koller et al. publication that there

17   was damaged cell membranes, an aspect of cytotoxicity,

18   even at the lowest concentration employed.

19       Q.    And did the test also show chromosomal

20   damage?

21       A.    It did.

22       Q.    Okay.  And can you definitively rule out

23   genotoxicity as a cause for that damage?

24       A.    The issue here now revolves around the

Jay Irwin Goodman, Ph.D.

1    definition of genotoxicity.  In my opinion, a compound

2    that is genotoxic -- a genotoxic compound, a compound

3    that is genotoxic is where the compound itself or a

4    metabolite damages -- can damage the genetic material

5    in terms of is that compound genotoxic.  One can have

6    genotoxicity, that is damage to the genetic material,

7    that might occur secondarily or tertiary to an event

8    that the compound produces.  And under those

9    conditions, in my opinion, it is not appropriate to

10   label the compound as being genotoxic.

11       Q.   Okay.  And -- and so I'm asking in Koller,

12   can you definitively rule out that the

13   glyphosate-based formulation caused the positive -- or

14   sorry.  Strike that.

15            Can you definitively rule out that the

16   glyphosate-based formulation caused chromosomal damage

17   that was not secondary to cytotoxicity?

18       A.   What I can say is that the cytotoxicity

19   observed is a very large confounding effect and based

20   upon that it -- in my opinion, it would be

21   inappropriate to use Koller et al.'s results to claim

22   that glyphosate is a genotoxic compound.

23       Q.   Okay.  So the other test that you looked

24   at within this data set is Holeckova, if I'm saying

Jay Irwin Goodman, Ph.D.

1    that correctly?

2              Is that correct?  It is at the top of or

3    the kind of the main body paragraph on Page 19.

4         A.    Yes.

5         Q.    Okay.

6         A.    In terms of the pronunciation, I -- I

7    don't know the individual.

8         Q.    Right.

9         A.    So I'm not sure what the correct

10   pronunciation is.

11        Q.    And you don't provide any criticisms of

12   the -- the study divine -- design in Holeckova,

13   correct, in your expert report?

14        A.    That is correct.

15        Q.    Now, at the bottom -- okay.  So, in the --

16   in the middle of the paragraph, you stated that:

17              "The author reported a slight but

18   statistically significant increase in polyploidy...at

19   only one of the concentrations tested, the 56 molar

20   concentration," correct?

21        MS. PIGMAN:  Objection.  You read only part of

22   the sentence.

23   BY MR. WOOL:

24        Q.    I guess I didn't read the -- the

Jay Irwin Goodman, Ph.D.

1    parentheses, but is that the -- the gist of what you

2    were saying?

3        A.    Yeah, there were three different

4    concentration -- three different concentrations listed

5    here and there was no chromosomal damage reported at

6    any of those three concentrations.

7        Q.    Okay.  And is it your opinion as you sit

8    here today that statistical tests were performed for

9    the other concentrations?

10       A.    You know, I've reviewed so much in terms

11   of this.  I would -- I would have to look at the

12   actual Holeckova paper before opining.

13       Q.    Okay.  Is -- well, strike that.

14             Okay.  Let's go to the in vivo mammalian

15   gene mutation assay.  It's on Page 25 and I'm not

16   going to ask you too many questions on this.

17             You state that you reviewed the underlying

18   study reports or relevant study summaries for four in

19   vitro mammalian gene mutation assay studies on

20   glyphosate.

21             Is that correct?

22       A.    Yes.

23       Q.    Okay.  Do you know which study summaries

24   you reviewed for this data set?

Jay Irwin Goodman, Ph.D.

1    A.    Right now, right now at this moment, I

2  cannot tell you.  If I go back and have time to go

3  through the materials considered, I could eventually

4  dig that out.

5    Q.    Did you discount any studies in this data

6  set due to perceived methodological flaws?

7    A.    No.

8    Q.    No.  Did you discount --

9    A.    By -- by discount, meaning just toss it

10  aside?

11    Q.    Did you -- did you say that they were

12  unreliable and -- and afford them no weight, for

13  example?

14    A.    No.

15    Q.    Did you review the studies in this data

16  set to ensure that they were OECD compliant?

17    A.    I reviewed them in terms of whether I

18  thought that it was a properly conducted study.  I did

19  not take it and lay it down side by side with the OECD

20  guidelines.

21    Q.    Okay.  So going down now to C, which is

22  the in vitro tests for chromosomal aberrations in

23  mammalian cells, can you sort of describe where this

24  test fits within the hierarchy of -- of tests -- in --

Jay Irwin Goodman, Ph.D.

1    in respect to sort of importance or weight?

2        MS. PIGMAN:  Objection to the form and assumes

3    facts not in evidence.

4    BY THE WITNESS:

5        A.    Where it fits.

6              In general, in terms of evaluating the

7    genotoxicity of compounds, there are several tests

8    that are employed, if you will, as a battery of tests.

9    One of them includes the Ames test, and recognizing

10   that the Ames test with different test strains had a

11   lot of sub tests, but one is the Ames test.  Another

12   would be to use a test in terms of mammalian cells in

13   culture in vitro, looking for indications of

14   mutagenicity.  Another would be to use mammalian cells

15   in vitro looking for indications of chromosomal

16   damage.  And another would be in vivo looking for an

17   aspect of genotoxicity, and -- and typically what one

18   is looking for are a question of whether or not there

19   is an increase in micronuclei in bone marrow.

20   BY MR. WOOL:

21       Q.    Okay.  So if you look on page --

22       A.    That -- that would be the general -- the

23   basic general approach in terms of saying, here is a

24   compound, is it genotoxic.

Jay Irwin Goodman, Ph.D.

1       Q.    Sure.

2             So, now, if you look on Page 26, and this

3    is just a housekeeping question, you cite to Matsumoto

4    1995 as a reported negative study.

5       A.    One moment, please, so I can get there.

6       Q.    It is in the sort of second paragraph.

7       A.    Okay.  I see it.

8       Q.    And I'm just asking about this study --

9       A.    Sure.

10      Q.    -- because I don't believe it appeared on

11   your reliance list and we weren't able to find it on

12   PubMed, so I just wanted to ask if you had a copy of

13   the study and ask where you -- where you got the

14   study?

15      A.    Matsumoto is not on the list?

16      Q.    I do not believe so.

17      A.    Can I take a really fast look?

18      Q.    Yeah, you can take a quick look.

19      A.    You know, there are hundreds of these.  I

20   apologize.  It is not on the list.

21      Q.    Right.  So I -- so I guess my second

22   question is just if -- if you recall where you got the

23   study?

24      A.    Sitting here today, I can't recall where

Jay Irwin Goodman, Ph.D.

1    I -- where I -- I can't recall where I got the study.

2    I would --

3         Q.    Fair enough.

4         A.    Well, I -- it's -- I -- it's -- it's

5    concerning to me that it's in the report and not on

6    the list.  I will have to look into that.

7         Q.    Well, if -- if you want to amend later, we

8    won't object.

9              Okay.  So, now, in the last paragraph

10   before we get to Point D, you discuss the Lioi 1998

11   study?

12        A.    I do.

13        Q.    Okay.  And the criticism that you have of

14   this study, if I'm correct, is that the author should

15   have conducted a cytotoxicity evaluation at 72 hours.

16             Is -- is that accurate?

17        A.    Yes.  And the reason is the 72-hour time

18   point was the time point that was used to ask the

19   question of whether there was an indication of

20   genotoxicity.

21        Q.    Okay.  Now, just so I'm clear, if you go

22   to Appendix 8, there are two Lioi studies that are

23   listed, both from 1998, I believe, and -- and both

24   positive.

Jay Irwin Goodman, Ph.D.

1              Is this criticism for both of the -- the

2    studies, both Lioi 1998 A and B, or is it confined

3    to --

4         A.    What --

5         Q.    -- to one of them?

6         A.    Tell me which --

7         MS. PIGMAN:  I'm sorry.  What appendix, please?

8    BY THE WITNESS:

9         A.    -- appendix, please?

10        MR. WOOL:  Appendix 8.

11        MS. PIGMAN:  8, thank you.

12        MR. WOOL:  Page 59.

13   BY THE WITNESS:

14        A.    One second, please.

15              It is -- it is 1998 A, because 1998 A Lioi

16   is looking at human lymphocytes and in 1998 B they are

17   looking at bovine lymphocytes.

18   BY MR. WOOL:

19        Q.    Okay.  Would -- strike that.

20              Do OECD regulations or other regulations

21   that you are aware of require testing for cytotoxicity

22   at the 72-hour interval?

23        A.    The OECD regulations, as best I can

24   recall, do not specify the -- do not specify 72 hours,

Jay Irwin Goodman, Ph.D.

1   but the OECD -- OECD regulations do very clearly talk

2   about the importance of a cytotoxicity evaluation.

3        Q.    Okay.  But in -- in this test it looks

4   like they evaluated for cytotoxicity at six hours,

5   correct?

6        A.    It does.

7        Q.    Okay.  So what do you believe indicates

8   that cytotoxicity would have been present at the

9   72-hour interval?

10       A.    The fact that it wasn't evaluated means

11  that I don't know.  What we do know is that as -- as

12  cells are cultured with a chemical, there can be

13  progressive changes over time.  And the difference

14  between six hours and 72 hours is a rather substantial

15  period of time and, therefore, we just don't know

16  whether there was cytotoxicity, cytotoxicity at

17  72 hours.

18       Q.    Would measuring the mitotic index indicate

19  whether there was cytotoxicity?

20       A.    That could be a -- that could be an -- an

21  indication, for example, if mitotic index decreased

22  markedly.

23       Q.    Okay.  So if glyphosate was cytotoxic in

24  this study, would you expect to see a significant

Jay Irwin Goodman, Ph.D.

1    decrease in the mitotic index?

2         A.    It doesn't have to be necessarily, but it

3    could -- it could happen, that is a decrease at

4    72 hours would be -- could be indicative of

5    cytotoxicity and...

6         Q.    If there was no decrease at 72 hours,

7    would that provide evidence of the absence of

8    cytotoxicity?

9         A.    It would provide some evidence of the

10   absence of cytotoxicity.  Here and -- here they --

11   I -- I do think they should have, again, done the same

12   viability evaluation at 72 hours as they did at

13   six hours.

14        Q.    Is it plausible that the results of these

15   studies were due to the genotoxicity -- genotoxic

16   properties of glyphosate?

17        A.    I can't rule that out and I can't rule

18   that in without having them have done their cell

19   viability evaluation.

20        Q.    Okay.  For -- and I'm just referring to

21   the in vitro tests for chromosomal aberration in

22   mammalian cells as that -- those test results relate

23   to glyphosate.

24             Were there any negative tests that you

Jay Irwin Goodman, Ph.D.

1    decided not to consider due to methodological flaws in

2    the study design?

3         MS. PIGMAN:  Objection; vague.  Are we -- is it

4    just glyphosate or both glyphosate and

5    glyphosate-based formulations?

6         MR. WOOL:  It -- I haven't specified.  It -- it

7    is just glyphosate.

8         MS. PIGMAN:  Okay.

9    BY THE WITNESS:

10        A.    Not that I can recall.

11   BY MR. WOOL:

12        Q.    Okay.  Did you discount or afford less

13   weight to any of the studies due to -- any of the

14   negative studies just within the glyphosate in vitro

15   tests for chromosomal aberrations, did you afford any

16   of the negative tests less weight due to noncompliance

17   with OECD guidelines?

18        A.    I did not, but I did not take these tests

19   and lay them down next to the OECD guidelines and

20   compare point by point.  I did evaluate them.  I -- I

21   did ask whether or not that they in general appeared

22   to follow the OECD guidelines, but, again, I did not

23   lay them down and see that they followed it point by

24   point.

Jay Irwin Goodman, Ph.D.

1      Q.    Okay.  So let's move on to the in vitro

2  tests for micronu- -- micronuclei induction in

3  mammalian cells.  You see I have a pretty difficult

4  time with some of these words.

5      A.    It's -- it's understood.  It is a lexicon

6  all to its own.

7      Q.    Okay.  And out of this data set, you

8  report six studies, four positive, two equivocal, is

9  that correct?

10      MS. PIGMAN:  I'm sorry.  What -- we are still on

11  Page 26?

12      MR. WOOL:  Well, it -- it goes on to --

13      MS. PIGMAN:  Okay.

14      MR. WOOL:  -- 26 to 27.

15      MS. PIGMAN:  Oh, thank you.

16      MR. WOOL:  So I guess to the top of 27.

17      MS. PIGMAN:  Thank you.  Sorry.

18  BY THE WITNESS:

19      A.    Yeah, what you said is correct.

20  BY MR. WOOL:

21      Q.    Okay.  And the first positive study that

22  you describe is the -- the Koller study, which I

23  believe we -- we've talked about a little bit before,

24  is that correct?

Jay Irwin Goodman, Ph.D.

1        A.    We have talked about Koller et al. 212

2   before.

3        Q.    Okay.  And micronuclei induction is

4   evidence of genotoxicity, is that fair?

5        A.    Yes, micronuclei induction is evidence of

6   genotoxicity.

7        Q.    Okay.  And so you discount the results of

8   this study due to cytotoxicity, fair?  Or strike that.

9              You discount this study because you --

10  your opinion is that the genotoxicity -- genotoxic

11  effects observed are secondary to cytotoxicity?

12       MS. PIGMAN:  Objection; form.

13  BY THE WITNESS:

14       A.    Once you see -- once you -- once -- once

15  you observe cytotoxicity at the concentration used to

16  evaluate genotoxicity, this is a major confounding

17  event.  And once that -- once that happens, the --

18  BY MR. WOOL:

19       Q.    No, no.  I'm just telling her --

20       A.    -- and one -- and once that happens I

21  think that one cannot use the results of the study to

22  talk about that genotoxicity was a direct result of

23  the chemical in question.

24       Q.    Okay.  So I'm going to mark, I believe we

Jay Irwin Goodman, Ph.D.

1    are on 5, Exhibit 5, which is the study by Koller et

2    al., and this one has a Bates number which is

3    MONGLY00327331.

4                    (WHEREUPON, a certain document was

5                     marked Deposition Exhibit No. 25-5,

6                     for identification, as of

7                     09/22/2017.)

8    BY MR. WOOL:

9         Q.    Okay.  I'm handing you that study.

10        MS. PIGMAN:  Thank you.

11   BY MR. WOOL:

12        Q.    Okay.  Now, I'll ask you to turn to

13   Page 808 of this study, please.

14        A.    I'm there.

15        Q.    Okay.  Now, if you look at the bottom, you

16   will see Figures -- or it is described as Figure 1.  C

17   and D are the bottom two graphs.

18        A.    Correct.

19        Q.    Okay.  So what are Figures C and D showing

20   us?  And you can take a minute to...

21        A.    C and D are looking at -- C and D are

22   looking at two parameters that could be involved in

23   terms of cytotoxicity.  It will take me a minute to

24   see what they mean exactly by SRB and NR.  I just

Jay Irwin Goodman, Ph.D.

1    don't want to say something without seeing the --

2         Q.    Sure, take -- take your time.

3         A.    -- seeing their definition of the acronym.

4         Q.    Yeah, so -- so I think the acronyms are on

5    the first page.  If you look, it says abbreviations.

6         A.    Okay.

7         Q.    Okay.  So now having seen the

8    abbreviations, what are Figures C and D telling us?

9         A.    These are some evaluations for

10   cytotoxicity and what they are telling us in Figure C

11   is that we are seeing some cytotoxicity at

12   100-milligrams per liter of concentration, and in

13   Figure D, some aspect of cytotoxicity, again, at

14   100-milligrams per liter of concentration.

15        Q.    Okay.  And for which compound are we

16   seeing evidence of cytotoxicity in Figure C?

17        A.    Let me look at the method to be sure.

18        Q.    Okay.  And if you look under --

19        A.    I'm just not sure here whether it's

20   glyphosate or glyphosate-based formulation.

21        Q.    Right.  So in -- in Figure 1 sort of

22   under the -- the graphs -- the legend, I believe it

23   describes what the -- the two respective symbols

24   indicate.  If I'm not mistaken, the triangle with the

Jay Irwin Goodman, Ph.D.

1    cross line is glyphosate and Roundup is the circle

2    with the cross line.

3         A.    Okay.

4         Q.    Okay.  So let's look at -- at Figure D,

5    for example.  The line with the -- the triangle in the

6    cross line appears to be more or less straight across.

7              Is that an accurate description?

8         A.    Yes.

9         Q.    Okay.  And the -- and the other line

10   appears to -- to plummet downwards, is -- is that an

11   accurate description?

12        A.    Correct.

13        Q.    So what does the straight across line

14   on -- with the triangles indicate?

15        A.    Straight across, a cross line, would be by

16   this parameter that cellular integrity was intact.

17        Q.    Okay.  Okay.  Now, if you -- okay.  Now I

18   would ask you to turn to the next page, Page 809.

19        A.    Okay.

20        Q.    Okay.  And in the Discussion section, the

21   first line reads:

22              "Our results show that R," which I'll

23   represent is Roundup, "but not its active principle

24   G," which I'll represent is glyphosate, "causes

Jay Irwin Goodman, Ph.D.

```
 1    pronounced cytotoxic effects in human-derived buccal

 2    epithelial cells."

 3             Did I read that correctly?

 4        A.    You did.

 5        Q.    Okay.  And -- and it also goes on to say:

 6             "Furthermore, the genotoxicity tests show

 7    that the herbicide as well as its formulation induces

 8    strand breaks that lead to formation of comets as well

 9    as nuclear anomalies that reflect DNA instability

10    including chromosomal damage."

11             Did I read that correctly?

12        A.    You did.

13        Q.    Okay.  So, I guess, do you disagree with

14    that conclusion?

15        A.    Well, if we could look at Figure 1 in

16    terms of the portion of it in the upper left,

17    Figure 1-A, here we are looking at lactate

18    dehydrogenase release from the cells.  Release of

19    lactate dehydrogenase from the cells is an indication

20    of damage to the cell membrane, such as it becomes

21    leaky and cell contents can leak out of the cell.  And

22    what we are seeing is with the formulation you are

23    seeing evidence of cytotoxicity at 10 milligrams per

24    liter.
```

Jay Irwin Goodman, Ph.D.

1      Q.    Okay.  And what about with glyphosate?

2      A.    One is not seeing that with glyphosate

3   until getting to higher concentrations.

4      Q.    All right.  Now, within this same data

5   set, so you can put that exhibit aside --

6      A.    I'm sorry.  I can put -- put No. 5 aside?

7      Q.    Yes.

8      A.    Okay.

9      Q.    Okay.  You talk about the Roustan 2014

10  study and you note that:

11         "Roustan et al. 2014 failed to demonstrate

12  the dose-response relationship which is anticipated if

13  induction of micronuclei were due to treatment with

14  glyphosate," correct?

15     A.    Yes.

16     Q.    Okay.  And you don't provide any other

17  opinions for discounting this study in your expert

18  report, is that correct?

19     A.    Yes.  I think dose -- dose-response is

20  a -- is an important consideration.

21     Q.    And sitting here today, it is your belief

22  that Roustan did not show a clear dose-response,

23  correct?

24     A.    Correct.

Jay Irwin Goodman, Ph.D.

1      Q.    Okay.  All right.  So for the in vitro

2   micronuclei induction in mammal cells data set as it

3   relates only to glyphosate, you're not aware of

4   negative studies, is that correct?

5      MS. PIGMAN:  Objection; vague.

6   BY THE WITNESS:

7      A.    Well, I -- I was not clear as to the

8   question.  Please rephrase that.

9   BY MR. WOOL:

10     Q.    Okay.  Within this data set, are there any

11  studies that you would consider to be negative?

12     A.    Such as -- the "this" refers to which data

13  set please?

14     Q.    The -- in Number E, the in vivo -- wait.

15  Did I -- hold on.  Sorry, I -- I clipped the wrong

16  page.

17          The in vitro tests for micronuclei

18  induction in mammalian cells for glyphosate only.

19     MS. PIGMAN:  So this is Section D of his report,

20  just to be clear?

21     MR. WOOL:  Correct.

22     MS. PIGMAN:  Okay.

23     MR. WOOL:  On Page 26.

24  BY THE WITNESS:

Jay Irwin Goodman, Ph.D.

```
1        A.    Okay.  So what are you asking now?

2  BY MR. WOOL:

3        Q.    So -- so there are no negative tests that

4  you note within this data set, am I correct?

5        A.    Yeah, correct.  I -- I think the four --

6  four were possibly suggestive and there were two that

7  were equivocal.

8        Q.    Okay.  So if you'll look on page --

9        A.    As reported by the authors.

10        Q.    But you performed an independent

11  evaluation?

12        A.    That's correct.

13        Q.    Okay.  I just wanted to be clear about

14  that.

15              Okay.  So now let's move on to for

16  glyphosate only the in vivo test for chromosomal

17  aberrations in mammals, which is on Page 27.

18        A.    I see it.

19        Q.    E of your report.

20              So I've asked you this question several

21  times, but you report that you read some of the

22  underlying study reports or the relevant study

23  summaries for three of the chromosomal aberration

24  tests and two rodent dominal -- dominant lethal tests
```

Jay Irwin Goodman, Ph.D.

1    and all were negative, which in parentheses you write,

2    "(no indication of genotoxic potential.)"

3              Is that correct?

4        A.    Yes.

5        Q.    Okay.  And do you recall which summaries

6    you reviewed and which underlying study reports you

7    reviewed for this data set?

8        A.    I -- excuse me.  I cannot tell you that

9    today.

10       Q.    Okay.  Would you have a -- well, I -- I

11   guess strike that.  I -- I don't need to know.

12             Okay.  So let's go to Page 29, if you

13   will, which is --

14       A.    I'm there.

15       Q.    -- in vivo tests for micronuclei induction

16   tests in mammals related to glyphosate.

17             And by your count there are 19 total

18   tests, three positive and 16 negative, correct?

19       A.    That's what the first paragraph says.

20       Q.    Okay.

21       A.    And -- and what this is, the -- this is as

22   reported by the author.

23       Q.    Did you discount any of the negative

24   studies due to method -- methodological flaws --

Jay Irwin Goodman, Ph.D.

1        A.      No.

2        Q.      -- in study design?

3                Did you discount any of the negative

4    studies due to noncompliance with the OECD guidelines?

5        A.      No, but, again, I did not lay down each

6    study and look at it in parallel to the OECD

7    guideline.

8        Q.      Okay.  This is just a -- a quick sort of

9    housekeeping question.  If you will turn to Page 6 --

10   Pages 64 and 65 of your report, which is Appendix 11.

11       A.      Okay.  Let me -- let me just straighten

12   this out so I don't get myself confused.

13               Appendix which page, please?

14       Q.      11.  64 and -- and really 65 is -- is what

15   I'm asking about.

16       A.      I'm on 64 now.  Okay.

17       Q.      So if you just look at the top of Page 65,

18   there is a blank for the test endpoint and -- and a

19   lot of blanks for the -- for various data points in --

20   in this test.  I was just curious if you knew what --

21   what this top row on Page 65 in Appendix 11 was

22   referring to?

23       A.      Yeah.  I think that the top row in

24   Appendix 11, I think, is really -- belongs to --

Jay Irwin Goodman, Ph.D.

1    should be a continuation of the bottom row on Page 64.

2         Q.   Okay.  Perfect.  That -- that's what I

3    thought.  I just wanted to -- to make certain of that.

4         A.   Well --

5         Q.   Well, maybe not certain, but best guess?

6         A.   No, the confusion was on my part.  I -- I

7    should have broken the table in a more clear fashion.

8         Q.   That's fine.

9              Okay.  So I -- I just wanted to clear that

10   up and -- and make sure I wasn't missing anything.

11        A.   Under -- understood.

12        Q.   You can -- you can turn back to -- to

13   Page 29 now.

14        A.   I'm there.

15        Q.   Okay.  Now, one of the positive in vivo

16   tests for micronuclei induction in mammals for the

17   glyphosate-only data set was Bolognesi study in -- in

18   1997, is that correct?

19        A.   Bolognesi, yes.

20        Q.   Okay.

21        A.   Bolognesi is one -- is one of those we are

22   talking about, yes.

23        Q.   And you criticized the study because of

24   the IP route of administration, correct?

Jay Irwin Goodman, Ph.D.

1       A.      Correct.

2       Q.      And just so we are clear, what is the IP

3    route of administration?

4       A.      The IP route of administration is when the

5    material of interest is put into a syringe fitted with

6    a hypodermic needle and injected into the abdominal

7    cavity.  So it would be injected into the abdominal

8    cavity which is -- has a very, very rich blood supply

9    and typically what is injected in this fashion gets

10   very, very rapidly absorbed as compared to a more -- a

11   more slow, if you will, more physiological absorption

12   as if one ingested material containing the compound.

13      Q.      When you say "a more physiological

14   absorption," what -- what do you mean by that?

15      A.      Well, if -- if I could, please, first, I

16   called the IP a highly non-physiological route of

17   administration, and that is, we do not get exposed to

18   compounds by having them injected into our peritoneal

19   cavity.

20      Q.      Okay.

21      A.      And it gives a very, very rapid absorption

22   in a sense something similar to if you administer the

23   compound intravenously.

24      Q.      Okay.  But when you say a -- a

Jay Irwin Goodman, Ph.D.

1    physiological route of absorption, within the -- the

2    context of your report, what are you considering to be

3    a physiological route of absorption?

4         A.    Physiological --

5         Q.    A physiologically relevant route of

6    absorption?

7         A.    Physiologically relevant would be from

8    oral absorptions, it could be from inhalation and

9    could be from dermal absorption, that is, absorption

10   from something that landed on our skin.

11        Q.    Okay.  And going back to Bolognesi for a

12   minute, you are critical of the study because IP

13   administration, as you say, might result in toxicity

14   that would not be observed following a more

15   physiological route of administration, correct, that's

16   one of the criticisms?

17        A.    That is one of the criticisms.  And the

18   other is that one of the things that we are trying to

19   do in our experiments is to ask about the potential

20   human, human relevance here.  And if one is using a

21   route of administration that is unphysiological, as

22   I've discussed before, it is not giving you a

23   reflection of what can happen from -- from real-world

24   exposure.

Jay Irwin Goodman, Ph.D.

```
1       Q.    Right.

2             And but, so your criticism related to the

3  IP route of administration is that it doesn't reflect

4  real-world -- world exposure.  You are -- you are not

5  saying, if I understand it correctly, that the IP

6  administration itself is resulting in cytotoxicity, am

7  I correct about that?

8       MS. PIGMAN:  Objection.  Sorry.  Let him finish

9  his question.  Sorry to interrupt.

10      MR. WOOL:  Okay.  Sorry, sorry.

11 BY MR. WOOL:

12      Q.    No.  And I'm just trying to understand

13 that you -- I mean, you do have a secondary criticism

14 that cytotoxicity cannot be ruled out.  But are you

15 saying that the IP route of administration can result

16 in -- in cytotoxicity?

17      MS. PIGMAN:  Objection; misstates the report and

18 the testimony.

19 BY THE WITNESS:

20      A.    I believe that -- that because of what I

21 just described, that the IP route of administration

22 by -- by giving you a very rapid absorption and very

23 high blood level very quickly can result in adverse

24 effects that might not be seen if the same dose was
```

Jay Irwin Goodman, Ph.D.

1    administered by a physiological route of

2    administration.

3    BY MR. WOOL:

4        Q.    And when you say "adverse effects," are

5    you talking about adverse genotoxic effects?

6        A.    Geno- -- genotoxicity would be an adverse

7    effect, an example of an adverse effect, yes.

8        Q.    Okay.  So, this particular quarrel about

9    the route of administration is not related to whether

10   or not the -- the test shows genotoxicity, it is that

11   the test is -- is not physiologically relevant, if I'm

12   understanding correctly?

13       MS. PIGMAN:  Object.  Objection; misstates the

14   testimony and the report.

15   BY THE WITNESS:

16       A.    There is a difference between having an

17   observation under some experimental conditions --

18   BY MR. WOOL:

19       Q.    Right.

20       A.    -- and then whether that observation has

21   some relevance to the in vivo situation, to the human

22   in vivo situation, and using a non-physiological -- a

23   highly non-physiological route of administration has

24   the possibility to be a -- a very, very real

Jay Irwin Goodman, Ph.D.

1    confounding factor.

2            Now, if Bolognesi et al. did do -- did do

3    some evaluations for cytotoxicity and that these were

4    bona fide, good, well-characterized, well-performed

5    studies for cytotoxicity, and they were negative, then

6    my criticism of the route of administration would not

7    be as severe as it is.

8        Q.    Okay.

9        A.    And so that's why in about the middle of

10   that paragraph I point out that there was no

11   evaluation of cytotoxicity in the study.

12       Q.    Okay.  And can you tell me what -- what is

13   the PCE/NCE ratio?

14            Does -- does that mean anything to you?

15       A.    Well, it's a -- polychromatic

16   erythrocytes --

17       Q.    And --

18       A.    -- versus --

19       Q.    Go ahead.

20       A.    -- versus non-chromatic.

21       Q.    And what is that a measure of?

22       A.    That is -- polychromatic would be an -- an

23   indication of micronuclei.  That is because you have

24   these micronuclei which are clusters of genetic

Jay Irwin Goodman, Ph.D.

1    material, when the cell is stained, these clusters can

2    show up as highly stained spheres.  And so, but

3    polychromatic meaning that instead of having the

4    uniform staining that you would expect from the normal

5    genetic material, you have some heterogeneity in the

6    staining.

7         Q.    So what does a measure of -- of that ratio

8    reveal?

9         A.    That is an indication of micronuclei --

10   that is taken as an indication that micronuclei have

11   been present.

12                   (WHEREUPON, a certain document was

13                   marked Deposition Exhibit No. 25-6,

14                   for identification, as of

15                   09/22/2017.)

16   BY MR. WOOL:

17        Q.    Okay.  So I'm going to hand you what's

18   marked as Exhibit 25-6.  This has a Bates number which

19   is WEEDPROD00001252.  And this is the Bolognesi 1997

20   study.

21             Okay.  So I just want you to turn to

22   Page 1959 of the study.  And if you look at --

23        A.    I'm there.

24        Q.    -- Table 1.

Jay Irwin Goodman, Ph.D.

1                I -- I just want to know what Table 1 is

2      telling us with respect to the PCE/NCE column?

3          A.    Well, it is telling us whether there was

4      an increase in these polychromatic erythrocytes versus

5      the -- those that appear normal in the -- in the -- in

6      the saline.

7          Q.    Okay.  And that's really probably all I

8      wanted to ask about this one for right now.  We might

9      come back to it later.

10               Okay.  So now within this in vivo test for

11     micronuclei induction in mammals as it relates to

12     glyphosate, I believe for Appendix 11 I counted nine

13     studies by IP injection.

14               And you can turn to Appendix 11, which is,

15     I think, on 64 and 65 again, and you can just verify

16     if I was correct about that.

17               I guess it starts on -- on Page 62.

18         A.    Okay.  All of them on -- all four on 62

19     are IP administration.  All four of them on Page 63

20     were IP administration.  And one out of six on Page 64

21     is IP administration.

22         Q.    Okay.  And did you discount any of the

23     negative studies due to perceived methodological

24     errors or shortcomings?

Jay Irwin Goodman, Ph.D.

```
 1        MS. PIGMAN:   Objection; vague.

 2   BY THE WITNESS:

 3        A.    The -- the answer is no.  And so -- the

 4   answer is no, I did not.

 5   BY MR. WOOL:

 6        Q.    And -- and to clarify, I was just speaking

 7   about the -- the negative IP injection studies.

 8        A.    Okay.

 9        Q.    Same -- same answer?

10        A.    Same answer.

11        Q.    Okay.  Now, what is the importance, if

12   any, you'll note on that some of the -- the tests

13   utilized two treatments, it seems like some only one.

14             What is the significance, if any, to you

15   of multiple doses versus a single dosing in any -- in

16   this particular test?

17        A.    Overall I think that the multiple dosing

18   is a more -- multiple dosing I think is -- is a

19   somewhat more -- more thorough test, if you will.

20        Q.    And why is that?

21        A.    It is because one is pushing the system in

22   terms of using more dosing as compared to using less

23   dosing.

24        Q.    Do you think multiple dosing is more
```

Jay Irwin Goodman, Ph.D.

```
1    physiologically relevant?

2         A.    It depends on -- it depends on -- on --

3    on -- on -- on route of administration and depends on

4    amount of compound -- of compound used.  I do think

5    that under -- under appropriate conditions of the test

6    system that those tests that are using multiple doses,

7    reasonable tests, I think is providing a more

8    stringent evaluation.

9         Q.    And what do you mean by "a more stringent

10   evaluation," just so I'm clear?

11        A.    More sensitive.

12        Q.    Okay.  And -- and if you look at the top

13   of Page 62 at the Bolognesi study and the, I believe

14   it's pronounced Maas study, directly underneath it,

15   this table indicates that both of those studies

16   utilized two treatments.

17              Am I reading that correctly?

18        A.    You are.

19        Q.    All right.  Okay.

20        A.    Two intraperitoneal treatments.

21        Q.    Right, right.

22              Do you distinguish between two -- strike

23   that.  We can just move on.

24              If you want to turn back to -- to Page 29,
```

Jay Irwin Goodman, Ph.D.

1    I think I have one more question or a quick line of

2    questions related to this data set.

3         A.    I'll get there.

4               Okay.  I'm on Page 29.

5         Q.    Okay.  And you state:

6               "In one study, a significant" -- and I'm

7    reading the -- the second sentence.

8               "In one study, a significant" --

9         A.    Ex -- excuse me, the second sentence?

10        Q.    Of the -- sorry.  Of the bottom paragraph.

11        A.    Okay.

12        Q.    "In one study, a significant increase was

13   reported to occur in female mice following treatment

14   with a dose of 500" -- I mean, "5,000 milligrams per

15   kilogram," and that's in parentheses, "(Suresh

16   1993a)."

17              And you go on to state:  "This is in

18   contrast to two studies," which are "(Jensen 1991; Fox

19   and Mackay 1996) which reported negative results when

20   glyphosate doses of 5,000 milligrams per kilogram were

21   used."

22              The next sentence:  "To place this

23   extremely high dose into perspective, it should be

24   noted that the US EPA estimates that the exposure of

Jay Irwin Goodman, Ph.D.

```
 1    the US population to glyphosate by food and water is

 2    .08 milligrams per kilogram a day," which is citing to

 3    "(Solomon 2016) and US EPA considers children 1 to

 4    2 years old the most highly exposed subpopulation with

 5    an estimated combined exposure of 0.47 milligrams per

 6    kilogram a day," cited to the "(EPA 2016) making a

 7    5,000 milligram per kilogram dose to the mice

 8    equivalent to 56,818 and 10,638 times higher than the

 9    human daily dose, respectively."

10              Did I read that correctly?

11         A.    You did.

12         Q.    Okay.  So what is the -- the relevance to

13    you of the EPA estimate that you cite on Page 29?

14         A.    Well, the relevance of this is that we are

15    looking at a -- an estimate of real world -- an

16    estimate, and I think it is a -- EPA typically makes

17    conservative estimates, of a -- a real-world exposure

18    and this value is the EPA estimate for children.  And

19    they are making -- it's -- it's -- it's really a

20    pretty high number, but it's a conservative number.

21         Q.    So do you believe that exposure to

22    glyphosate through food and water is relevant to the

23    claims asserted by the -- the Plaintiffs in this

24    lawsuit?
```

Jay Irwin Goodman, Ph.D.

1      A.    Could you, just to be sure we are on the

2   same page, what -- what claims are you talking about?

3      Q.    Well, let me -- let me ask you this:

4            What is your understanding of the

5   exposures that -- that Plaintiffs in this lawsuit --

6   strike that.

7            What -- what is your understanding of the

8   exposure claims that are being asserted by Plaintiffs

9   in this lawsuit?

10     A.    My understanding is that the claim is that

11  people who are exposed to glyphosate through

12  glyphosate-based formulations contracted cancer

13  because of that and more specifically non-Hodgkin's

14  lymphoma.

15     Q.    And what is your understanding of the --

16  the mechanism through which they are alleging they

17  were exposed to glyphosate and glyphosate-based

18  formulations?

19     A.    I do not know that.

20     Q.    Is that relevant in determining whether a

21  mechanism of exposure is -- is physiologically

22  relevant or not?

23     A.    Well, help me a little bit.  What routes

24  of exposure are they?

Jay Irwin Goodman, Ph.D.

```
1        Q.    Well, I'll -- I'll probably ask you

2   about -- about this again --

3        A.    Sure.

4        Q.    -- but we can -- we can move on.  Let's

5   see.  Okay.  Let me just finish this up and then I

6   guess lunch might be here, maybe, hopefully.

7              Okay.  So your conclusion, which is

8   stated -- okay.  Sorry.

9              So would I be fair in characterizing your

10  conclusion of the in vivo tests for micronuclei

11  induction in mammals related only to glyphosate is

12  that this data set demonstrates that glyphosate is not

13  genotoxic?

14       A.    By the -- by the particular test used, the

15  test did not show glyphosate genotoxic by this

16  particular test, and I can think that that consider --

17  is factored into the overall evaluation.

18             And -- and furthermore, you know, with --

19  with this EPA estimated combined -- combined exposure

20  of .47-milligram per kilogram per day, which is really

21  the highest estimated exposure that I have -- have

22  seen, you know, one can really take this a -- a step

23  further to gain more insight.

24             And so, for example, one can say, Well,
```

Jay Irwin Goodman, Ph.D.

1    rather than just children, what if people in general

2    were exposed to this .47-milligram per day, which is

3    the highest estimated exposure, and you could say,

4    Well, if we're interested in what is happening in the

5    body, what does -- what could this represent in terms

6    of what the cells are -- are bathed in, if you will.

7            And so if you look at .47-milligram per

8    kilogram per day and we take our average person, the

9    typical is that the average person weighs

10   70 kilograms, which would be 100 and -- 154 pounds.

11   So we can multiply .47 by 70 and say this is the

12   amount in milligrams that a person would take in per

13   day.

14           We know that of the body weight, about

15   60 percent is fluid.  And so we can say for a

16   70-kilogram person, this is about 42 -- that may not

17   be right -- 42 liters of fluid.  So we can say we have

18   .47-milligram per kilogram per day times 70 is the

19   total intake in 42 liters of fluid.  And that comes

20   out to about 780-milligrams per liter or 0 point --

21   .78-milligrams per liter or .78 micrograms per

22   milliliter.

23           And then we can then say in terms of any

24   of these dosing scenarios, let us say that a person

Jay Irwin Goodman, Ph.D.

```
1    exposed -- was exposed to 5,000 milligram per kilogram
2    and we can multiply this by -- by -- by 70, go through
3    the body water, and then say, Well, if we look at what
4    the result is from the EPA high level exposure, what
5    is the ratio of that to what these doses might have
6    produced, if we assume that all of it is absorbed and
7    we have some blood level.
8             And it turns out to be -- in this case it
9    will turn out to be hundreds of thousands of times
10   higher than what one could estimate under a very
11   conservative scenario for an individual who was
12   exposed to EPA's high estimate.
13        Q.    And -- and you stated in your report, sort
14   of a basic maxim of toxicology is that the dose makes
15   the poison?
16        A.    Correct.
17        Q.    And would you consider sort of the
18   effective dose, as in the amount that is actually
19   absorbed or amount of a substance that is absorbed to
20   be more relevant than the amount of administered dose?
21   In -- in --
22        A.    Yes, I -- I -- yes, I do think that if --
23   I do think that it -- when we have data on blood level
24   or plasma level of a particular -- particular chemical
```

Jay Irwin Goodman, Ph.D.

1    that this is important because we really don't have a

2    situation where 100 percent of the dose is absorbed,

3    and that's why in the calculations I referred to

4    earlier I made this conservative assumption that all

5    of it is absorbed.

6        Q.    Okay.  And -- and that sort of calculation

7    that's -- that you just detailed, is -- is it fair for

8    me to -- to assume that that is part of how you

9    calculated physiological relevance as it's described

10   throughout your expert report?

11       A.    Well, I talk about physiological relevance

12   in terms of -- in terms of route of administration, I

13   do talk about it in terms of dosing, I try to make

14   some estimate in terms of the dosing used versus

15   real-world exposure and with the most recent example I

16   gave you tried to make some estimate of what you were

17   just alluding to, and that is the internal dose and

18   what might be the ratio, if you will, between the

19   internal dose for a person who had this EPA-estimated

20   combined exposure very high of .47-milligrams per

21   kilogram versus what we are seeing here in some of the

22   experimental situations.

23       Q.    And you considered that EPA dose to be

24   very high for the purposes of your expert report?

Jay Irwin Goodman, Ph.D.

```
1          A.     I considered the EPA estimate to be high

2    because there really -- there really are three, I

3    think three numbers that I've seen around.  One is

4    this estimate of combined food and water of

5    .088-milligram per kilogram per day.  A second is in

6    terms of applicators at the 90th percentile, meaning

7    looking at the high exposure applicators, and there I

8    think this was in the Solomon 2016, it was estimated

9    at point -- point -- 0.02-milligram per kilogram per

10   day.  And the third number that I see is this

11   0.47-milligram per kilogram per day.  That is the most

12   conservative number.  And so that is the number that I

13   used in my -- in my example.

14         Q.     Okay.  Fair enough.

15                Okay.  So we kind of got off track for a

16   minute.  So let's kind of -- I just want to make sure

17   that -- that we are on the same page because I'm going

18   back to the in vivo micronuclei data set as it relates

19   to glyphosate and this is what I --

20         A.     So which -- which page are we on, please?

21         Q.     We are on Page 29 --

22         A.     Okay.

23         Q.     -- to 30.

24         A.     I'm there.
```

Jay Irwin Goodman, Ph.D.

1      Q.    I've probably got three more questions and

2   then we can break for lunch.

3      A.    It's -- it's all right.

4      Q.    Okay.  So is it plausible that the

5   positive results in Bolognesi, Suresh and -- and Maas

6   were due to genotoxicity?

7      A.    Because of the confounding effect --

8   because of the confounding situations that I pointed

9   out, I think that we -- you just cannot say that the

10   results shed light -- the -- the -- you cannot say

11   that the results are an indication of genotoxic

12   potential of the compound.  When we have these

13   confounding situations, I think that you cannot draw a

14   conclusion from the paper.

15      Q.    Okay.  So you -- you cannot definitively

16   rule out genotoxicity as a -- a cause of the --

17   genotoxicity in glyphosate as a cause of the results,

18   fair?

19      A.    Not quite.

20      Q.    You can rule it out?

21      A.    I -- I -- I'm -- you know, there are very

22   few and maybe no circumstances where -- where

23   something is absolutely definitive, and so -- there is

24   no absolutely definitive.

Jay Irwin Goodman, Ph.D.

1          What I can say is that I think that these

2    studies should be interpreted as not providing

3    evidence for glyphosate being genotoxic.

4          Q.    Okay.  And within this data set that we've

5    just been discussing, did you discount any of the

6    negative studies due to methodologic -- methodological

7    flaws?

8          A.    I did not.

9          Q.    Did you discount any of the negative

10   studies due to noncompliance with OECD guidelines?

11         A.    I did not.  And, again, I did not line

12   them up with the OECD guidelines and go line by line

13   down the list.

14         Q.    Okay.  Fair enough.

15         MR. WOOL:  And I'm -- I'm ready for a break if

16   everyone else is.

17         THE VIDEOGRAPHER:  Going off the record at

18   11:57 a.m.

19                  (WHEREUPON, a recess was had

20                   from 11:57 to 12:50 p.m.)

21         THE VIDEOGRAPHER:  This is the beginning of Disk

22   No. 3 and we are back on the record at 12:50 p.m.

23   BY MR. WOOL:

24         Q.    How was your lunch, Dr. Goodman?

Jay Irwin Goodman, Ph.D.

```
1        A.    Terrific.

2        Q.    Awesome.  What sandwich did you have?

3        A.    Turkey Tom, No. 4.

4        Q.    Not the Gargantuan.

5              If you can, could you please turn to

6   Page 20 of your expert report, which is the in vivo

7   test for chromosome aberrations in mammals.

8        A.    I'm there.

9        Q.    Okay.  Now, you report three tests, two

10  positive and one negative, correct?

11       A.    That's correct.

12       Q.    And -- and to be clear, the -- the

13  positive test, I'm not saying that's your conclusion,

14  that's indicated to be the author's conclusion.

15       A.    That is right.

16       Q.    Okay.  So do you believe that the Dimitrov

17  test that you cite to provides evidence that

18  glyphosate-based formulations are not genotoxic?

19       A.    Yes.

20       Q.    Okay.  So can you describe how the

21  Dimitrov study was designed for me, please?

22       A.    I reviewed so many papers that I can't

23  recall this specific one in detail, but if you have a

24  copy of it, we can talk about it.
```

Jay Irwin Goodman, Ph.D.

```
 1        Q.    I -- I think this is one that we --
 2   take -- take a look, I might go into something else,
 3   but unfortunately I feel like this might be one
 4   that -- that we don't have a copy of, so I'll just ask
 5   some basic questions about this.
 6             So do you know whether Dimitrov measured
 7   cytotoxicity?
 8        A.    I can't -- I cannot -- I cannot recall
 9   offhand.
10        Q.    Okay.  And I would assume the same answer
11   for whether Dimitrov involved one or -- or multiple
12   doses of the glyphosate-based formulation?
13        A.    As I said, I reviewed a lot a lot of
14   different studies and I really need to see the -- see
15   the paper in order to opine.
16        Q.    Okay.  And let's just take a look at
17   Appendix 3 really quick, which is on Page 50 of your
18   report.
19        A.    I'm there.
20        Q.    Okay.  And do you recall, I can't remember
21   if your report says, is this one of the -- the studies
22   that you reviewed the -- the underlying study for?
23        A.    For -- for all --
24        Q.    For Dimitrov?
```

Jay Irwin Goodman, Ph.D.

1       A.    For all of the -- for all of the papers in

2  the EPA's tables, I -- I did look at the underlying

3  study.  I did not base my opinion simply on the -- on

4  the table.

5       Q.    Fair enough.

6             And so I'm correct that Dimitrov involved

7  one oral dose of the glyphosate-based formulation?

8       A.    I don't see that.  I see .05, .01, .5 and

9  1.

10      Q.    Okay.  And the test material stated in the

11 EPA table is Roundup, correct?

12      A.    Correct.

13      Q.    Okay.  So in a test like this, would you

14 agree that it's important that the authors use a

15 sufficient dose to ensure that the compound reaches

16 the bone marrow of the animal?

17      A.    I think that -- I think one does have to

18 have sufficient dosing.  It is really -- really --

19 certainly, certainly not routine in these studies that

20 actual measurements of the compound in bone marrow are

21 made.

22      Q.    So looking at a negative study like --

23 like Dimitrov, and -- and maybe this is my fault for

24 not giving you the study, is there a way that you can

Jay Irwin Goodman, Ph.D.

1    measure that the compound actually reached the bone

2    marrow?

3        A.    I cannot.

4        Q.    For any of the negative studies, whether

5    they are glyphosate or involve glyphosate-based

6    formulations, can you definitively say whether the

7    compound reached the bone marrow?

8        A.    Well, you know, we can turn this around,

9    because there are some studies using Roundup that are

10   reported as positive.

11       Q.    Right, right.

12       A.    And -- and so in -- in none of these

13   studies can I definitively tell you that it reached

14   the bone marrow.  In the positive study, it certainly,

15   certainly appears that way because there -- because

16   there is a -- a positive result.

17            I also think that in terms of their all

18   data, and I can't put my finger on it right now, in

19   terms of showing that following the oral

20   administration that there is some absorption of

21   Roundup into the blood.  If it is in blood, then

22   certainly it is getting to the bone marrow, but I

23   can't tell you in this specific study how much.

24       Q.    After Roundup is absorbed to the blood,

Jay Irwin Goodman, Ph.D.

1   what is the time interval at -- at which you would

2   expect it to reach the bone marrow?

3       A.    Very quickly.  Bone marrow is one of the

4   tissues in the body that has a -- a very rich -- a

5   very rich blood supply.  By very rich, I mean there is

6   a lot of blood that is flowing through bone marrow.

7       Q.    But sitting here today for any individual

8   negative study, whether with glyphosate or

9   glyphosate-based formulation, you wouldn't be able to

10  definitively tell me whether or not the active

11  ingredient or -- or compound reached the -- the bone

12  marrow, correct?

13      A.    I would have to reason by analogy and say

14  that there are -- but I can't put my finger on it --

15  studies that show that following oral administration

16  that one does get Roundup, glyphosate levels in the

17  blood.  If there is a level in the blood, then one is

18  going to have it appear in bone marrow.

19      Q.    So after it appears in -- in bone marrow,

20  how long would you expect to -- strike that.

21            How long after the -- the whatever

22  compound we are talking about reaches the bone marrow

23  would you expect to see measurable results?

24      A.    I'd say it has to be -- I -- I -- I think,

Jay Irwin Goodman, Ph.D.

1    I think that it has to be in terms of multiple hours,

2    because -- but I can't -- I can't tell you -- I can't

3    tell you the exact number.  In other words, I don't --

4    I don't think it was -- it would be something that

5    would happen in a matter of moments, but I can't tell

6    you how many hours that would take.

7         Q.    So sitting here today for Dimitrov, for

8    the Dimitrov study, or any study, really, that -- that

9    involves bone marrow, you could not definitively say

10   that the negative result observed was due to an

11   absence of genotoxic activity without knowing

12   definitively whether or not the -- the substance

13   reached the bone marrow, fair?

14        A.    No.  Again, reasoning by analogy,

15   administration of Roundup or glyphosate results in

16   measurable blood levels of the compounds of interest.

17   If it is in the blood, it is going to get to the bone

18   marrow.  And the fact that we also have some other

19   studies that purport to be -- to be positive might be

20   an indication of getting to bone marrow, but one has

21   to, again, review the studies.  In sum -- in summary,

22   because glyphosate was not measured in bone marrow, I

23   cannot tell you how much glyphosate was there.

24   Because there are data in the literature about

Jay Irwin Goodman, Ph.D.

1  absorption of glyphosate into the blood following oral

2  administration, I can say that following oral

3  administration one will get some glyphosate in the --

4  in the -- in the bone marrow.

5      Q.   And how long after oral administration

6  would you expect the compound to reach the bone

7  marrow?

8      A.   I would expect that -- I would expect that

9  it might take more than just a couple of minutes.  I

10 certainly think that by the time we get to 15 minutes

11 to two hours it should have reached the bone marrow.

12 Probably quicker than 15 minutes.

13     Q.   So is it your testimony sitting here today

14 that for any of the tests measuring bone marrow, that

15 an oral dose of glyphosate definitively reached the

16 bone marrow?

17     A.   I think that with a high degree of

18 certainty I can tell you that it reached the bone

19 marrow and this is based on reports that I can't put

20 my finger on right now that following oral

21 administration one does get blood levels of the

22 compound.  Again, if it is in the blood, there is a

23 very large, heavy, rich blood supply to bone marrow

24 and so what is in the blood, some of it is certainly

Jay Irwin Goodman, Ph.D.

1     going to get to the bone marrow.

2          Q.    So for -- in of the -- any of the oral

3     studies looking at bone marrow, are you aware or can

4     you point me to a source that measures peak

5     concentrations of glyphosate in the blood?

6          A.    You know, offhand I cannot do that.  I am

7     not an -- offhand I cannot point you to a study where

8     they included what I'm going to call toxicokinetics,

9     absorption, distribution, metabolism, along with the

10    evaluation of chromosome aberrations in this case.

11         Q.    Is it your belief that -- that there are

12    some of the negative -- or there are some negative

13    studies out there that did take that measurement of

14    peak concentrations in the blood for the negative bone

15    marrow studies where glyphosate or Roundup was

16    administered orally?

17         A.    I cannot recall seeing such studies.

18         Q.    Okay.  For the Dimitrov study, do you know

19    or -- or did you look to see whether that study

20    complied with OECD guidelines?

21         A.    Again, I did not lay them down side by

22    side, but I will tell you that the methodology,

23    procedure that I used here was -- used here was the

24    same in terms of all of the studies that I evaluated.

Jay Irwin Goodman, Ph.D.

1   So there was not a unique set of criteria applied to

2   positive studies and a unique set of criteria applied

3   to studies that reported negative results.

4        Q.   All right.  So you go on to discuss the

5   Prasad 2009 study?

6        A.   Excuse me, are we back on Page --

7        Q.   We are back on Page 20 --

8        A.   -- 20?  Okay.

9        Q.   -- if you'll follow me.

10       A.   Sure, sure.

11       Q.   And let's see, I believe your first

12   criticism is that the GBF used was cytotoxic to the

13   bone marrow, correct?

14       A.   Yes.

15       Q.   Okay.  And we talked about the mitotic

16   index before?

17       A.   Yes.

18       Q.   Okay.  And do you believe that based on,

19   was it a -- was it a decrease or an increase in this

20   one in the mitotic in- -- index -- a decrease in the

21   mitotic index -- that you could, therefore, attribute

22   the results of that study to cytotoxicity?

23            Am I following you?

24       A.   The decrease in -- the decrease in mitotic

Jay Irwin Goodman, Ph.D.

1    index -- back up.

2          Mitotic index is a -- is a -- a -- a

3    measure of cell proliferation.  The decrease in the

4    mitotic index of cell proliferation is a indicator of

5    cytotoxicity.  And under conditions where there is

6    evidence of cytotoxicity, I think that that is a major

7    confounding factor that does not let you draw a

8    conclusion from the study that the compound in

9    question is genotoxic, because the genotoxicity might

10   have occurred, might likely have occurred secondary to

11   the cytotoxicity.

12       Q.   Let's take a look at the Prasad study real

13   quick.  I just want to make sure that I didn't write

14   on the --

15       A.   Is that in one of the exhibits you gave

16   me?

17       Q.   No, no, I'm about to --

18       A.   Oh, okay.

19       Q.   -- hand it to you.

20       A.   Okay.

21       Q.   I'm marking it as Exhibit 25-7.

22               (WHEREUPON, a certain document was

23                marked Deposition Exhibit No. 25-7,

24                for identification, as of

Jay Irwin Goodman, Ph.D.

```
 1                    09/22/2017.)

 2   BY THE WITNESS:

 3        A.    Thank you.

 4        MS. PIGMAN:  Thank you.

 5   BY MR. WOOL:

 6        Q.    Okay.  And I believe if you look -- let's

 7   just go to Page 4, if you will.

 8              I'll note, if you look at Table 2, I

 9   believe that's measuring the effect of -- of the

10   glyphosate on the mitotic index.

11              Am -- am I correct?

12        A.    That's what it says.

13        Q.    Okay.  And if you look at what is

14   described as Group 2 --

15        A.    Excuse me.  Okay.  So Group 2 you are

16   talking about the benzo(a)pyrene (BAP)?

17        Q.    Correct.  And is that what you would call

18   a positive control?

19        A.    Yes.

20        Q.    And what is the purpose of a positive

21   control?

22        A.    The purpose of a pos- -- positive control

23   is to ask, Is my system working?  So in this case you

24   have a test system, excuse me, that is designed to
```

Jay Irwin Goodman, Ph.D.

1    evaluate an aspect of genotoxicity.  We are taking

2    a -- a -- a known genotoxic compound and saying, Do we

3    have -- is -- is this known genotoxic compound giving

4    a positive result.  If the answer is yes, then you

5    say, Well, my -- my system is -- is working.

6         Q.    Okay.  And if you look at Group 2, it says

7    (B)AP.

8         A.    Which stands for benzo(a)pyrene.

9         Q.    And that's a known genotoxin, correct?

10        A.    Correct.

11        Q.    And if I am reading the table correctly,

12   which I -- I might not be, so correct me if I'm wrong.

13        A.    Well, let's discuss it.

14        Q.    Well -- so, it -- it appears to me that

15   benzo(a)pyrene is showing a even more pronounced

16   effect in the mitotic index, am I correct?

17        A.    More pronounced than what, please?

18        Q.    Than either Group 3 or 4.

19        A.    That's correct.

20        Q.    So you would not conclude from these

21   results that -- that benzo(a)pyrene is not a

22   genotoxin?

23        A.    No. 1, benzo(a)pyrene is a -- is well

24   known from a variety, a variety of studies as being

Jay Irwin Goodman, Ph.D.

1    genotoxic.  If I were doing and I were designing this

2    particular study, I would have done a dose-response

3    with benzo(a)pyrene, a concentration response with

4    benzo(a)pyrene to ask about cytotoxicity versus

5    genotoxicity.  And if I was designing this study, I

6    would have selected a -- emphasized a concentration of

7    benzopyrene that did not produce cytotoxicity.

8            One of the potential problems here is that

9    benzopyrene itself is not genotoxic.  It has to be

10   metabolized to a form that is genotoxic.  And it is

11   possible -- I don't know the specifics -- it is

12   possible that Swiss albino mice may -- I don't know

13   what their capacity is to metabolically activate it,

14   from the -- but the main point is that if I was doing

15   this study, I would have done a benzopyrene

16   dose-response evaluating cytotoxicity and genotoxicity

17   and picked from my marker of is the system working a

18   concentration of benzopyrene that did not produce

19   cytotoxicity.

20      Q.    For either Groups 3 or 4, are the

21   decreases in the mitotic index statistically

22   significant?

23      A.    According to the author, the supercript --

24   superscript -- superscripted symbol after 4.12

Jay Irwin Goodman, Ph.D.

1    plus/minus .05 and 3.54 plus/minus .01 says that the

2    p-value is less than .05 and the author says this

3    represents a significant decrease compared to

4    untreated control.

5        Q.    Okay.  Now, is it your opinion that --

6    that the results of this Prasad study could indicate

7    genotoxicity in glyphosate-based formulations?

8        A.    That it could indicate genotoxicity?

9        Q.    Right.  Can you definitively say that the

10   observed results are due to cytotoxicity?

11       A.    What I can say to you is that because of

12   the cytotoxicity in combination with the highly

13   unphysiological IP route of administration, that

14   the -- these -- this -- this -- these represent

15   serious confounding factors, and based on that, I

16   think that one cannot interpret the results of these

17   studies as indicating that the compound in question is

18   genotoxic.

19       Q.    Okay.  So the -- the physiological

20   relevance of the route of administration, does -- do

21   you believe that goes to the question of whether the

22   substance being tested is genotoxic or whether the

23   results are relevant for humans?

24       A.    In terms of the non-physiological route of

Jay Irwin Goodman, Ph.D.

```
 1   administration, that is something that I think is --
 2   indicates that while the result reported by the author
 3   might be true, that is -- this is, the author did this
 4   and the author saw that.
 5        Q.    Right.
 6        A.    The biological relevance or significance
 7   for humans be -- is -- is highly questionable.
 8        Q.    Okay.  So to -- to answer my question,
 9   the -- the issue of physiological relevance goes to
10   whether you can extrapolate the results to humans, not
11   to the question of genotoxicity generally, correct?
12        MS. PIGMAN:  Objection; misstates his testimony.
13   BY THE WITNESS:
14        A.    Now, I -- I think that if one is seeing
15   genotoxicity under these particular circumstances that
16   one cannot say that the genotoxicity observed is a
17   direct effect of the chemical itself.
18             Again, I am considering a genotoxic
19   compound as one where the compound itself or a
20   metabolite can -- can bind to damage the genetic
21   material.  And while the author under their
22   experimental conditions observed what they report to
23   be as a genotoxic effect, it very likely, in my view,
24   could be something secondary to the compound of
```

Jay Irwin Goodman, Ph.D.

1    interest rather than a primary effect of the compound

2    of interest.

3    BY MR. WOOL:

4         Q.    But that is due to cytotoxicity, correct,

5    that -- that's your testimony?

6         A.    Yes, I think that would be, with the

7    unphysiological route of administration, that you can

8    have cytotoxicity and genotoxicity secondary to that.

9              On top of that, in the Prasad et al. 2009

10   paper you actually have evidence of cytotoxicity in

11   the relevant cell population.

12        Q.    Right.  So -- so my -- my question is,

13   which I don't think you've answered, is much simpler.

14             So your issue with the route of

15   administration, as -- as I understand it, what -- what

16   I'm trying to determine is whether this is -- the

17   quarrel that you have with IP route of administration

18   just goes to whether you can extrapolate the results

19   to humans.  Like let's say for a minute that humans

20   were only exposed to glyphosate-based formulations via

21   IP injection.

22        MS. PIGMAN:  Objection; form and misstates his

23   testimony, asked and answered.

24   BY THE WITNESS:

Jay Irwin Goodman, Ph.D.

1      A.    So I apologize if I -- if I have not been

2  clear.

3  BY MR. WOOL:

4      Q.    Sure.

5      A.    So let me please try once more.

6            I think that with the IP route of

7  administration one might get cytotoxicity which then

8  could lead to genotoxicity and under those

9  circumstances I would not -- I would not consider the

10  compound itself to be genotoxic, because I believe

11  that the appropriate definition of a genotoxic

12  chemical is where the chemical itself or a metabolite

13  directly interacts with, binds with, damages the

14  genetic material.  So I think that the result might be

15  a, what could be called a genotoxic endpoint, but that

16  it could be very likely occurring secondary rather

17  than as a primary effect of the chemical.

18      Q.    So is your testimony that administering

19  glyphosate-based formulations via the IP route, that

20  that route of administration itself has an effect on

21  cytotoxicity?

22      MS. PIGMAN:  Objection; asked and answered.

23  BY MR. WOOL:

24      Q.    You -- you can answer.

Jay Irwin Goodman, Ph.D.

 1          A.      I'm saying that -- that I think -- I'm

 2   saying that I think that it very well could, and if we

 3   could please go back to some of my comments this

 4   morning, I indicated that in terms of IP injection it

 5   leads to a -- a very high, very quick, very rapid

 6   blood level and that the effects from this could be

 7   cytotoxicity.  And, again, in this particular Prasad

 8   et al. 2009 publication, we actually have empirical

 9   data saying that there was cytotoxicity in the

10   relevant cell population being evaluated.

11          Q.      Okay.  So going to my question from a

12   minute ago, and I know that -- that cytotoxicity can

13   have genotoxic-like effects, but -- but are you able

14   to definitively say that the effects that you were

15   observing in Prasad, for example, are due to

16   cytotoxicity?

17              Can you make that definitive conclusion

18   due to the increases that you see --

19          A.      My -- my --

20          Q.      -- or decreases in the mitotic index?

21          A.      My -- my answer is that in light of the

22   cytotoxicity observed, that this is a serious

23   confounding phenomenon and that that makes it, in my

24   view, not appropriate to conclude that the results of

Jay Irwin Goodman, Ph.D.

1    the test indicate that glyphosate is a genotoxic

2    compound.

3         Q.    Would it also be inappropriate to conclude

4    that the effects that we are seeing in Prasad are

5    definitively due to cytotoxicity?

6              Would that be a scientifically-reliable

7    conclusion?

8         A.    I -- you know, I -- I think we are sort

9    of --

10        Q.    I'm just asking you if you can --

11        A.    -- passing --

12        Q.    -- if you can --

13        A.    -- passing each other.

14        Q.    Sure.

15             So, and -- and again, so, can -- would it

16   be scientifically reliable for me to say that the

17   observed effects in Prasad are due to cytotoxicity?

18        A.    But that's not the way I think --

19        Q.    But --

20        A.    -- one should evaluate this.

21        Q.    Sure.

22        A.    I said one could --

23        Q.    But that's not the question.

24        A.    -- say that there is a serious confounding

Jay Irwin Goodman, Ph.D.

1    issue here, which means that this, the results of this

2    test are not -- are not valid with regard to

3    evaluating genotoxic potential.

4         Q.    And, again, you haven't answered my

5    question.  I -- I understand that -- that you're

6    disregarding the tests and -- and that -- that's not

7    something that -- that I'm quarreling with you on.

8              I am simply trying to -- to get at the --

9    what I believe was my original question, which is that

10   it appears to me that you cannot definitively rule out

11   genotoxicity as a result, as a cause of the results

12   that you see in -- in Prasad?

13        MS. PIGMAN:  Objection; asked and answered,

14   form, and misstates his testimony.

15   BY THE WITNESS:

16        A.    I think what you're proposing -- what

17   you're -- what you're proposing is really not the way

18   to evaluate these genotoxicity tests.  If the -- if

19   the -- if -- if there are some serious confounding

20   aspects here that one cannot draw the conclusion that

21   the reported observation of genotoxicity is related to

22   the compound of interest.

23   BY MR. WOOL:

24        Q.    Okay.  Right.

Jay Irwin Goodman, Ph.D.

1              But -- but so we would agree that the

2     positive control demonstrated a -- a decrease in the

3     mitotic index as well, correct?

4          A.    That is correct.

5          Q.    Okay.  And the conclusion that you would

6     draw from that is not necessarily that the positive

7     control -- strike that.

8              And the -- the -- the conclusion that you

9     would draw from that is not that benzo(a)pyrene is not

10    genotoxic, correct, can we agree on that?

11         A.    Only -- we can agree on that only because

12    there is such a wealth of information in the

13    literature with regard to benzo(a)pyrene being

14    genotoxic.  And what we can -- can conclude from here

15    is that they really should not have simply used one

16    concentration of benzo(a)pyrene, that there should

17    have been a dose-response consideration and they

18    should have chosen to focus on doses, concentrations

19    that did not cause cytotoxicity.

20         Q.    Okay.  We can move on.

21              So let me ask you about the Helal and

22    Moussa art -- article.

23         A.    Excuse me.  Excuse me.  Let me -- let

24    me -- let me just --

Jay Irwin Goodman, Ph.D.

1       Q.     Put it away.

2       A.     -- put this one away.

3       Q.     And I think you are already there.  It is

4   at the bottom of Page 20.

5       A.     I'm there.

6       Q.     Okay.  And you state that -- that Helal

7   and Moussa might be positive, that's your ultimate

8   conclusion, correct?

9       A.     Yes.

10      Q.     And if you turn the page, you state that,

11   in effect, that you give the study less weight because

12   it didn't comply with the OECD guidelines.

13      MS. PIGMAN:  Objection; misstates the report.

14   BY MR. WOOL:

15      Q.     Okay.  Why -- why don't you tell me how

16   much weight you gave Helal and Moussa.

17      MS. PIGMAN:  Objection; misstates his testimony.

18   BY MR. WOOL:

19      Q.     Okay.  Well, did you give Helal and Moussa

20   any weight?

21      A.     I did.  I said -- I -- I did.  I said

22   that -- I said that -- that I consider their study as

23   might -- as might be positive.

24      Q.     Okay.

Jay Irwin Goodman, Ph.D.

```
1        A.    So I -- I did give it weight.

2        Q.    And am I fair in saying that you gave it

3   less weight because it didn't comply with the OECD

4   guidelines?

5        MS. PIGMAN:  Objection; vague.

6        MR. WOOL:  I'm asking it.

7   BY THE WITNESS:

8        A.    I think it's fair to say that I gave it

9   less weight because in my opinion they should have

10  used -- they should have evaluated more cells.  And

11  while I reference the OECD guidelines for -- for 200,

12  but I think -- I think, basically, my concern is that

13  they used too -- too few cells.

14       Q.    Okay.  Let's move on to the in vivo tests

15  for micro -- micronuclei induction in glyphosate-based

16  formulations which should be in the middle of Page 21

17  on --

18       A.    I'm there.

19       Q.    -- your report.

20             All right.  Now, if you look at

21  Appendix -- well, first, you state that you reviewed

22  20 studies and essentially all were negative, correct?

23       A.    Well, I -- that I reviewed 20 studies

24  reported to be negative, yes.
```

Jay Irwin Goodman, Ph.D.

1      Q.    Okay.  And if we look at Appendix 4 in

2   your report, which is on Page 51.

3      A.    I'm there.

4      Q.    Okay.  So the -- the first study is the

5   Bolognesi study, which this table reports as positive.

6            Is your description of all 20 being

7   negative an indication that you believe that the --

8   the Bolognesi study is negative?

9      A.    No, I think we -- we -- we had discussed

10  the Bolognese study and I -- I do not think that it's

11  positive.

12     Q.    Okay.  Would you describe the Bolognesi

13  study as negative for micronuclei induction in

14  mammals?

15     A.    I would describe the study as being --

16  being very compromised because of the intraperitoneal

17  route of administration and because they -- they did

18  not evaluate cytotoxicity.  So I would consider it

19  as -- as compromised, as confounded, and I would not

20  use this as evidence that glyphosate is a genotoxic

21  compound.

22     Q.    Okay.  And -- and I'm not -- this isn't

23  a -- a tricky question, but so I will represent to you

24  that I believe there -- there are 20 studies listed in

Jay Irwin Goodman, Ph.D.

1    Appendix 4.

2          So your opinion should be that -- that you

3    reviewed the 20 studies and that 19 were negative,

4    maybe one equivocal, fair?

5       MS. PIGMAN:  Objection; misstates his report.

6    BY MR. WOOL:

7       Q.   So, and I'm just trying to -- to correct.

8    So -- so you would agree that there are not 20

9    negative studies?

10      A.   I would agree that -- I would agree -- I

11   would agree that there are not 20 studies where the

12   author reports a negative effect.

13      Q.   Okay.  And I believe the Prasad study that

14   we just looked at also measured micronuclei

15   inductions.

16          And do you have that?  I'm not going to

17   ask you about the study.  I just want to know because

18   I -- I don't think that's included, and I believe that

19   suggested a positive result for micronuclei induction.

20      A.   For Prasad?

21      Q.   Yes.

22      A.   Let's see.

23      Q.   I think that it's --

24      A.   Yeah.

Jay Irwin Goodman, Ph.D.

1      Q.    -- that study.

2      A.    That is not included.

3      Q.    Okay.  So, and, again, not a trick

4   question, so the numbers should be 19 negatives and we

5   can describe Prasad and -- and Bolognese however we

6   want, but you would agree that both of those studies

7   are not negative for micronuclei induction?

8      MS. PIGMAN:  Objection; misstates his report and

9   the testimony.

10  BY THE WITNESS:

11     A.    Could you repeat that, please?

12  BY MR. WOOL:

13     Q.    Would -- would you agree that the

14  Bolognese study and Prasad study are not properly

15  characterized as negative studies for in vivo

16  induction of micronuclei and glyphosate-based

17  formulations?

18     A.    Well, first of all, in terms of -- in

19  terms of these 20 studies, with all of these data

20  somehow I missed the Prasad.

21     Q.    Fair, yeah.

22     A.    Okay.  I missed the Prasad.

23     Q.    I'm not...

24     A.    What I would agree -- what I would agree

Jay Irwin Goodman, Ph.D.

1   with is that I think that the Bolognese study, which

2   is in the table, I think that one, based on what I

3   said previously, cannot conclude that it is positive.

4   I think that at best one can say that this is

5   inconclusive because of the confounding factors.  And

6   I would say the same for the Prasad 2009 paper that

7   you just showed me.

8        Q.    For Bolognese, do you believe that a

9   reasonable scientist could reach a different

10  conclusion about the -- the Bolognese study?

11       A.    If you -- if you want to say in terms of

12  a -- a reasonable scientist in the broad sense, they

13  might, but I would disagree with them.

14       Q.    Fair enough.

15       A.    For the -- for the reasons that I

16  present --

17       Q.    Right.  And --

18       A.    -- excuse me, for the reasons that I

19  presented.

20       Q.    And I'm just asking because the EPA, I'm

21  assuming, based on this table result, viewed it

22  differently than -- than you?

23       A.    Well, I think that what the EPA is doing

24  here is they have reported the result as reported by

Jay Irwin Goodman, Ph.D.

1    the author of the manuscript.

2        Q.    Okay.  And we had talked about

3    cytotoxicity and Prasad.  I can't remember if we spoke

4    about it specifically to micronuclei formation, so if

5    I asked you this already, I apologize.

6            But is it your testimony that cytotoxicity

7    would -- would increase the number of observed

8    micronuclei?

9        A.    My -- my -- it is my testimony that

10   cytotoxicity likely can increase the number of

11   micronuclei.

12       Q.    Can cytotoxicity decrease the number of

13   micronuclei?

14       A.    If you get cytotoxicity to the point that

15   you are killing the cells and the cells totally

16   fragment, then you won't see micronuclei.

17       Q.    So is it possible that cytotoxicity can

18   mask the results of a genotoxic compound in -- in that

19   regard?

20       A.    If you -- if you did have -- if you did

21   have a massive amount of cytotoxicity, then it could

22   mask this and that's why I am saying, that when you

23   see cytotoxicity, it is a major confounding issue and

24   that this makes the study inconclusive.  But you --

Jay Irwin Goodman, Ph.D.

1    you are correct.  Massive cytotoxicity could mask.

2         Q.    Okay.  Now, you single out a Kier 1992

3    article that evaluated the ability of RODEO to cause

4    formations of micronuclei.

5         A.    I did.

6         Q.    Okay.  Why did you single out that study?

7         A.    Well --

8         Q.    Kier, I mispronounced his name.

9         A.    It's -- it's all right.

10             Well, there is -- there is such a massive

11   amount of literature that we are trying to get our

12   hands around, and I decided that what I should do is

13   not restrict myself to just the studies that the

14   Environmental Protection Agency looked at.  And I

15   thought it best to go a bit beyond what they did.  And

16   going a bit beyond what they did, I picked out another

17   study.  And there came Larry Kier 1992.

18        Q.    And earlier we had talked about the

19   definition of glyphosate --

20        A.    But -- but -- but in terms of the Kier

21   paper, if I could, please.

22        Q.    Sure.

23        A.    I think -- I think that the Kier paper

24   is -- is really rather -- rather important in terms of

Jay Irwin Goodman, Ph.D.

1    this is one that used male and female mice, this is

2    one that used -- really, upped some doses that were --

3    were very high, it did use a positive control that

4    worked, and the highest dose used is close to the

5    lethal dose and one did not see micronuclei.

6            Now, to your point before, is it possible

7    that there was a massive amount of cytotoxicity --

8        Q.    I'm -- I'm not asking that.

9        A.    But you still have the lower doses, the

10   lower doses here, and the lower doses that Kier used

11   are still high doses.

12       Q.    Sure.

13           Now, earlier when we talked about the

14   definition of glyphosate-based formulations, I believe

15   your definition included a surfactant, am I correct?

16       A.    Yes, to the -- to the best of my

17   knowledge, the glyphosate formulations --

18   glyphosate-based formulations include one or more

19   surfactants.

20       Q.    And sitting here today, do you know if the

21   RODEO formulation that was tested contained a

22   surfactant?

23       A.    The answer is that I do not know this for

24   a fact.

Jay Irwin Goodman, Ph.D.

1      Q.    Would you agree that -- that the presence

2   of surfactants or absence thereof is an important

3   consideration in determining whether a

4   glyphosate-based formulation is, in fact, genotoxic?

5      A.    Well, if one wants to evaluate

6   genotoxicity of glyphosate-based formulations, this

7   has been done, there are many, many studies that have

8   been done on this.  It is -- it is -- it is -- it is

9   my understanding, I might be wrong, my understanding

10   that all of the glyphosate-based formulations do

11   contain one or more surfactants.

12      Q.    Okay.  Okay.  And now, within the data set

13   which we just discussed, which to be clear are the in

14   vivo tests for micronuclei induction in animals using

15   glyphosate-based formulations, are there any studies

16   that you discounted due to methodological flaws?

17      A.    Any studies I discounted?

18      Q.    Any negative studies, I should clarify.

19      A.    The answer -- the answer to that question

20   is no, but let me please remind you of my earlier

21   comment that the -- the overall criteria that I used

22   in looking at these studies was, was/is consistent and

23   there was not a, a set of criteria for positive

24   studies and a separate set of criteria for negative

Jay Irwin Goodman, Ph.D.

1    studies.  It was measured against one set of criteria.

2        Q.    Okay.  Let's go to the next section, which

3    is at the bottom of 21, which are other assays for

4    detecting DNA damage.

5              Are you following me?

6        A.    I am.

7        Q.    And am I correct that you did not consider

8    any of -- or you did not put any weight on any of

9    these studies within this category?

10       A.    I think that -- I did not put any weight.

11   I -- I think that as -- as stated in my -- as stated

12   in my report, I do think that there are some issues

13   associated with these other studies as enunciated

14   in -- in my report.

15       Q.    Sure.

16             So do you give any evidentiary weight

17   to -- to studies outside of the confines of the -- the

18   four types that -- that you outline as -- as being the

19   most reliable?

20       A.    I did not -- I did not call them -- the

21   four that you are talking about, I did not call them

22   the most re- -- the most reliable.

23             What I did say is that typically when

24   hand -- when, metaphorically speaking, handed a

Jay Irwin Goodman, Ph.D.

1    compound and asked to evaluate its genotoxic

2    potential, that typically one would do, one, an Ames

3    test which involves multiple sub tests, one would do,

4    two, a test in mammalian cells and culture that --

5    that reports -- can -- can report evidence of

6    genotoxicity, and this would be either the mouse

7    lymphoma test which tests at the thymidine kinase

8    locus, or using Chinese hamster ovary cells which

9    tests at the HGPRT locus, hypoxanthine-guanine

10    phosphoribosyltransferase, that one would use a

11    mammalian test system in in vitro either for

12    chromosome aberrations or micronuclei in vitro.  So we

13    are looking in vitro for an indication of mutation and

14    for an indication of, if you will, larger scale damage

15    to the genome, and then a study in vivo, typically,

16    which would be the bone marrow micro -- micronucleus

17    evaluation.

18         Q.    Okay.  So, let -- let me ask it like this,

19    I guess.

20              Do you consider the Sister Chromatid

21    Exchange assay to be fundamentally unreliable?

22         MS. PIGMAN:  Objection; misstates his report.

23         MR. WOOL:  I'm asking him if he considers it to

24    be.

Jay Irwin Goodman, Ph.D.

```
 1    BY THE WITNESS:

 2        A.    I -- I -- the -- the problem I have with

 3    the Sister Chromatid Exchange assay, where I was

 4    happy, happy, happy to see that it has been -- that

 5    OECD dropped it is, you know, frankly, I always had

 6    difficulty in trying to understand the underlying

 7    basis for that assay.  And -- and so I think that -- I

 8    think OECD was right.  I wish that it happened a few

 9    years earlier in terms of dropping this for -- from

10    consideration.  I just -- I just don't have a good

11    feeling if -- if it comes to using a particular assay

12    where I can't really get my hands around, if you will,

13    what's going on.

14        Q.    So that I think in a roundabout way you

15    might have answered my question, but so to be clear,

16    do you consider this assay to be unreliable?

17        A.    I consider that this assay should not be

18    used because of a lack of understanding of, if you

19    will, what it -- what is going on.

20        Q.    Okay.  Now, if we look at your opinions on

21    Page 30, which is still other assays --

22        A.    I'll -- I'll be right there.

23        Q.    -- for evaluating DNA damage, but this is

24    just limited to glyphosate.
```

Jay Irwin Goodman, Ph.D.

```
 1        A.    I'll be right there.

 2              Okay.  I'm there.  I'm on Page 30.

 3        Q.    In the first two lines of the last

 4   paragraph on Page 30, it appears you state that the:

 5              "Positive results using the Comet assay

 6   were reported by Maas et al. 2009b and Alvarez-Moya

 7   et al. 2014.  However, neither of these studies

 8   included an evaluation of glyphosate-induced

 9   toxicity."

10              And, in effect, you go on to say that

11   because a positive result in the Comet assay can be

12   secondary to cytotoxicity, you cannot view the results

13   as evidence of genotoxicity.

14              Fair enough?

15        A.    Not quite.

16        Q.    Okay.

17        A.    Because I also say there was a lack of

18   dose-response.

19        Q.    Okay.  So is it your opinion sitting here

20   today that these tests did not show a clear

21   dose-response?

22        A.    Yes.

23        Q.    Okay.  And is it your opinion sitting here

24   today that they did not evaluate for cytotoxicity?
```

Jay Irwin Goodman, Ph.D.

1        A.    Yes.

2        Q.    Okay.  Were it for not -- strike that.

3              But for those shortcomings, would you have

4    given weight to these two studies?

5        A.    Well, but that's a -- that's a big but.

6        Q.    Sure.

7        A.    That's a big but.  If -- if -- if these --

8    if these -- if these studies were conducted

9    properly -- well, let me -- let me -- let me try to be

10   clear on both of these.

11             In my opinion a properly-conducted Comet

12   assay is a, one, a very appropriate way to estimate,

13   evaluate potential genotoxicity.

14       Q.    And to be proper, it must evaluate for

15   cytotoxicity and show dose-response, fair?

16       A.    I think that in -- that in terms, those

17   are two -- those are two very important criterion,

18   yes.

19       Q.    Okay.  And -- and the absence of those two

20   criterion in -- in these two studies which we just

21   described, which are Maas 2009b and Alvarez-Moya

22   2014, is what renders those tests unreliable in your

23   opinion, correct?

24       A.    In -- in my opinion that is -- that pro --

Jay Irwin Goodman, Ph.D.

1    those are confounding issues and in my opinion that

2    precludes drawing a conclusion from these studies.

3        Q.    What is the trypan blue test?  Have you

4    heard of that before?

5        A.    I have.

6        Q.    And what is that?

7        A.    Try -- trypan blue is a -- is a dye and

8    typically when cells are -- are viable, they do not

9    take up -- they do not transport this dye from the

10   outside of their cell membranes to the inside.

11       Q.    Is the trypan blue test a measure of

12   cytotoxicity?

13       A.    It can be.

14       Q.    It can be.

15             Do you consider it a reliable measure of

16   cytotoxicity?

17       A.    I con -- I consider it a measure of

18   cytotoxicity.

19       Q.    If somebody had measured cytotoxicity in a

20   study that they submitted to you in your capacity as a

21   reviewer for the journals that you serve on, would you

22   consider that adequate in -- in testing for

23   cytotoxicity --

24       A.    Yes.

Jay Irwin Goodman, Ph.D.

1      Q.     -- in your decision to publish it?

2      A.     Yes.

3      Q.     Okay.

4             Let's go back to Page 22 of your report,

5      which is still the other assay section, but this time

6      looking at glyphosate-based formulations.

7      A.     I'm there.

8      Q.     Okay.  And -- okay.  Let me ask you some

9      questions about the Peluso study which is detailed at

10     the bottom of Page 22.

11            So, first of all, is evaluating DNA

12     adducts in mice using the 32-P-postlabeling technique

13     a valid way for assessing genotoxicity?

14     A.     When the 32-P-postlabeling technique is --

15     is -- is performed -- performed properly, it -- it

16     is -- it is a way -- it is -- it is a way of

17     evaluating genotoxicity in terms of evaluating

18     reaction of the chemical in question or adducts of the

19     chemical in question with a DNA base.

20     Q.     Okay.  And you discount this study.

21     The -- I guess the only criticism that I see is that

22     it utilized the IP route.

23            Is -- is that correct?

24     A.     Yes, yes.

Jay Irwin Goodman, Ph.D.

1        Q.     And --

2        A.     And -- and -- and -- and -- and also as

3    I -- as I recall, although not right in here, as I

4    recall they did not do an evaluation for cytotoxicity.

5        Q.     And your criticism that -- that they did

6    not do an evaluation for cytotoxicity for the Peluso

7    et al. 1998 study utilizing the 32 post -- the

8    32-P-postlabeling technique, that opinion is not

9    contained within this paragraph at the bottom of

10   Page 22, am I correct?

11       A.     The comment about cytotoxicity?

12       Q.     Correct.

13       A.     That is correct.

14       Q.     So as you sit here today, it is your

15   belief that -- that they did -- that Peluso et al.

16   1998 did not measure for cytotoxicity?

17       A.     As -- as I -- as I recall.  And, again,

18   there have been a lot of, a lot of lot of studies that

19   are reviewed.  As I recall, Peluso et al. did -- did

20   not evaluate for cytotoxicity.

21       Q.     Okay.  And we've discussed the IP route of

22   administration, so you don't have to explain your --

23   your opinions about it again, but as it relates to the

24   32-P-postlabeling technique, is -- is there any reason

Jay Irwin Goodman, Ph.D.

1   that that particular test would make the IP route of

2   administration less reliable?

3        A.    I think, I -- I think that in terms of

4   the -- if -- if -- if there is cytotoxicity produced

5   in any of these genotoxicity evaluations, then I think

6   that that is a major confounding issue.

7        Q.    So what is DNA adduct formation?

8        A.    A adduct is a covalent binding of the

9   chemical of interest or a metabolite with DNA,

10  typically with one of the DNA bases.  So you actually

11  have a covalent bond formed.

12       Q.    And is -- is that adduct formation

13  evidence of genotoxicity?

14       A.    Correct.

15       Q.    And how does cytotoxicity impact that DNA

16  adduct formation, or how does it confound the DNA

17  adduct formation, I should say?

18       A.    Well, in terms of -- in term -- in terms

19  of cytotoxicity, as you have cells that are damaged

20  and -- and -- and possibly moribund, the -- one of the

21  things that happens is that some internal components

22  of the cell can release enzymes which degrade DNA and

23  this can lead to potential artifacts, if you will, or

24  call it potential spots that one sees in the P-32

Jay Irwin Goodman, Ph.D.

1    postlabeling.

2            So once you start releasing enzymes, they

3    have a chance to start chewing up the DNA, this can

4    possibly be reflected as a positive in the

5    postlabeling.

6            So do you want me to describe...

7    Q.    All right.  Is that -- is that true for

8    both necrotic and apoptotic cell death?

9    A.    Is what true, please?

10   Q.    That -- right, what you just described,

11   that -- that the internal components can release

12   enzymes which degrade the DNA?

13   A.    Yes, I believe so.

14   Q.    Okay.  And let's go back to the Bolognese

15   2007 study, because I believe they -- they touch on

16   some of the DNA damage that we are discussing in this

17   section.

18   A.    Would you -- which page are you on -- are

19   you on, please?

20   Q.    Let me -- let me grab it first and then I

21   will tell you.

22            So it's the 1997 Bolognese study.  And

23   let's see.  And in your report on Page 23.

24   A.    I'm there.

Jay Irwin Goodman, Ph.D.

1      Q.    Okay.  So Bolognese also evaluated DNA for

2   oxidative damage, correct, accurate description of the

3   '97 study?

4      A.    Yes.

5      Q.    Okay.  And am I correct that the two

6   reasons that you give for discounting the study are

7   the lack of evaluation of cytotoxicity again and the

8   IP route of absorption?

9      A.    The IP route -- the IP route of

10  administration, yes.

11     Q.    Of administration.  I'm sorry.  Okay.

12           So let's turn now, I want to address your

13  conclusions regarding glyphosate and then

14  glyphosate-based formulations.

15           So -- so you conclude on Page 20 -- oh,

16  wait, I'm looking at glyphosate-based formulations.

17           Okay.  So you conclude on Page 31 --

18     A.    I'm almost there.

19           I'm there.

20     Q.    Okay.

21           -- that:  "Based on the data and

22  discussion presented above, I conclude that glyphosate

23  should be viewed as a non-genotoxic compound.  While

24  there were occasional positives, some of which might

Jay Irwin Goodman, Ph.D.

```
 1  have occurred by chance, among the very numerous tests

 2  for genotoxicity, these are far outweighed by the

 3  overwhelmingly negative results."

 4          Correct?

 5      A.  Yes.

 6      Q.  Okay.

 7      A.  That's what I wrote and that's what I

 8  believe today.

 9      Q.  Okay.  That accurately reflects your

10  opinion?

11      A.  Correct.

12      Q.  Okay.  And when you say it should be

13  viewed as non-genotoxic, just so I am clear, are you

14  saying that the evidence indicates that it is

15  definitively not genotoxic or that there is not

16  sufficient evidence to conclude that it is genotoxic?

17          Do you understand the -- the distinction

18  that I'm drawing?

19      A.  Okay.  So you are asking me what I

20  conclude.

21          What I conclude is based upon this --

22  based upon my independent and thorough evaluation of

23  this big body of -- of data is that after all of this

24  due consideration, that glyphosate should be viewed as
```

Jay Irwin Goodman, Ph.D.

1   a non-genotoxic -- as a non-genotoxic compound based

2   upon all of these data.

3        Q.    And -- and so I guess -- I don't know that

4   that answers my question.

5             I guess, do you view the -- the data that

6   you reviewed regarding glyphosate as conclusively

7   showing that it is not genotoxic?

8        A.    In my opinion the re -- my review of this

9   large body of data leads me to conclude that

10  glyphosate should not be viewed, should not be

11  characterized as a -- as a genotoxic compound.  This

12  is a huge, huge data set.

13       Q.    All right.  And you go on to note that

14  your conclusion is consistent with a number of

15  agencies and -- and a couple of articles.

16       A.    That is correct.

17       Q.    Okay.  And let's see.  So why, if you go

18  to page -- or I guess let me ask this:  Do you believe

19  that the European -- the European Food Safety

20  Authority is an authoritative source of information as

21  it relates to the genotoxicity of glyphosate?

22       A.    I would not use the word "authoritative."

23  In my mind, the European Food Safety Administration is

24  a -- a very -- is a well -- is a highly-regarded

Jay Irwin Goodman, Ph.D.

1    organization.  And -- and I'm using the word

2    "organization" loosely because I'm not sure if it's

3    actually a...  In my -- in my opinion, EFSA is a

4    highly-regarded organization.  I think EFSA has a

5    great degree of credibility in my opinion.  I have not

6    done a scientific survey, but generally I think EFSA

7    is viewed as a credible organization.

8         Q.    Is that why you put that your conclusion

9    is consistent with EFSA in your report?

10        A.    Is that why?

11              Yeah, what -- what I did is I made an

12   independent, in-depth, constructively critical

13   evaluation of this large body of data here related to

14   genotoxicity and reached my conclusion and then I

15   said, like, And by the way, it's consistent with.

16              So if the EFSA report did not exist, if

17   there was no EFSA report, not one word of my

18   conclusion would change.

19        Q.    Did EFSA's conclusion impact your opinions

20   at all?

21        A.    Impact my opinion?

22        Q.    Did you believe that it bolstered your

23   opinion?

24        A.    No.  I made -- I -- I made my opinion

Jay Irwin Goodman, Ph.D.

1   based upon my review of the literature.  The EFSA

2   report did not bolster my opinion.  And I put in that

3   "my conclusion is consistent with" in terms of naming

4   a number of different organizations and some review

5   articles that reached a -- a similar conclusion.

6          Q.   Okay.  So next you talk about the joint

7   Food and Agricultural Organization, FAO, of the

8   United States World Health Organization.

9          A.   Excuse me.  I don't think it is the

10  United States.

11         Q.   I'm sorry.  You're right.  You're right.

12         A.   It is just World Health Organization.

13         Q.   United Nations.  Good -- good catch.

14              Okay.  Now, the joint FAO/WHO conclusion

15  was limited to expose -- exposures via the oral route,

16  correct?

17         A.   Yes, yes.  WHO limits itself to -- to

18  food.

19         Q.   Okay.

20         A.   The -- not the WHO.  Excuse me.  JMPR

21  limits its consideration to residues on -- on food.

22         Q.   Okay.  Now, let's go down to No. 5.  You

23  cite that your conclusion is consistent with Williams

24  et al. 2000, which I believe is an article by -- is it

Jay Irwin Goodman, Ph.D.

1    Gary Williams?

2          A.    That is correct.

3          Q.    Okay.  Do you know Gary Williams?

4          A.    I do.

5          Q.    How do you know him?

6          A.    Gary Williams is a well-known,

7    well-respected pathologist.  He is a human

8    pathologist, M.D., pathologist and toxicologist.

9          Q.    What do you mean by "well-respected"?

10         A.    I think that there are many people who --

11   who read and -- his -- his publications, who read

12   them, evaluate them and think highly of his -- of his

13   publications.  In addition to presentations that he

14   has made at -- at meetings.

15         Q.    So you would say his name carries a lot of

16   weight within the genotoxological community?

17         A.    I'd say that -- I -- I would say that I

18   think that he is a -- a -- a well-respected

19   scientist --

20         Q.    Does that mean --

21         A.    -- in the area of toxicology.

22         Q.    Does that mean -- or strike that.

23                Now, this article, the 2000 article was

24   published in Regulatory Toxicology and Pharmacology?

Jay Irwin Goodman, Ph.D.

1        A.    It was.

2        Q.    Is that -- remind me, is that the journal

3    that you served on the board of or as an editor for?

4        A.    As an associate editor for, you are

5    correct.

6        Q.    Okay.  Did you serve -- did you work

7    for -- or work on that journal in any capacity in 2000

8    when this article was published?

9        A.    Thinking back, I could have been on the

10   editorial board at that -- I -- I don't remember if I

11   was on the editorial board 15 years ago.

12       Q.    Fair.

13       A.    17 years ago.  Possibly not.

14       Q.    Is it possible that you were a reviewer

15   for this article?

16       A.    You know, when --

17       Q.    I'm not asking you if you remember

18   specifically.  I'm just asking if it's -- if it's

19   possible.

20       A.    I do not recall specifically.

21       Q.    Okay.  What -- and you currently serve as

22   an editor for Regulatory Toxicology and Pharmacology,

23   correct?

24       A.    I currently serve as an associate

Jay Irwin Goodman, Ph.D.

```
 1   editor --

 2        Q.    An associate.

 3        A.    -- for the -- for this journal, you are

 4   correct.

 5        Q.    And does that mean that you have some --

 6        MR. WOOL:  It is really hot in here.

 7   BY MR. WOOL:

 8        Q.    -- have some decision-making authority in

 9   terms of what articles are or are not published?

10        A.    Some decision-making authority is -- is

11   correct.  All of my -- what I do is I -- I make

12   recommendations to the editor and the editor has the

13   ultimate authority.

14        Q.    Does Regulatory Toxicology and

15   Pharmacology require that all authors who contribute

16   significantly to a work be acknowledged?

17        A.    For Regulatory Toxicology and

18   Pharmacology, and for other journals, I do not think

19   the instructions for authors explicitly say what you

20   are saying.  What they do ask is for individual

21   authors, they ask questions about potential conflicts

22   of interest and there are -- Regulatory Toxicology and

23   Pharmacology now uses, which many other journals use,

24   a sort of generally-accepted form that they ask
```

Jay Irwin Goodman, Ph.D.

1    authors to fill out which relates to conflict of

2    interest.  Whether or not that form was used in 2000,

3    I don't know.  In other words, I -- I -- I -- that

4    form might have come into being after 2000.

5        Q.    If I wrote an article and gave it to you

6    and asked you to put your name on it to try to -- and

7    pretending you weren't an editor, and we submitted

8    that to Regulatory Toxicology and Pharmacology with

9    your name on it, would it be improper for the journal

10   to publish that article?

11       MS. PIGMAN:  Objection; form.

12   BY THE WITNESS:

13       A.    No.  What -- what would be improper, of

14   course, is if I were the reviewer of an article that I

15   submitted.  That would never happen because it is the

16   editor who determines the reviewers and the editor

17   would never send a manuscript submitted by Individual

18   X to Individual X to be reviewed.

19   BY MR. WOOL:

20       Q.    So you are telling me that if -- if I

21   wrote an article, just gave it to you to slap your

22   name on and we took my name off, that that would be

23   proper for publication in Regulatory Toxicology and

24   Pharmacology?

Jay Irwin Goodman, Ph.D.

```
1        A.    Absolutely not.  That is -- that is

2   absolutely not what I said.

3        Q.    Okay.  Is -- is the situation that I just

4   described -- strike that.

5             Would the situation that I just described

6   be acceptable to you as an editor for Regulatory

7   Toxicology and Pharmacology?

8        A.    Just to be clear, are you asking me if an

9   individual who made substantial contributions to a

10  manuscript should be considered an author, or the

11  other way around, if an individual made substantial

12  contributions to a manuscript, would it be wrong not

13  to consider him or her as an author?

14            Is -- is that basically what you are

15  asking me?

16       Q.    No, what I'm asking is if I made

17  substantial contributions to the article and then,

18  essentially, asked somebody who did not contribute to

19  the article to put their name on it and remove my name

20  so that the article would either get published or

21  carry more weight, would that be improper?

22       A.    That would be highly, highly improper.

23       Q.    Okay.  And if you as an editor on that

24  journal -- on Regulatory Toxicology and Pharmacology
```

Jay Irwin Goodman, Ph.D.

1    discovered an instance of -- of that sort of

2    impropriety, what sort of action would you take?

3         MS. PIGMAN:  Objection; beyond the scope of the

4    report, calls for speculation.

5    BY MR. WOOL:

6         Q.    You -- you can answer.

7         A.    Well, I could tell you that we're talking

8    hypothetically now.  I can tell you that at the very

9    least I would go to the author, assuming that we have

10   solid evidence that what you said is true, is go to

11   the authors, at the very least, and say that you have

12   to issue a correction saying that Individual X should

13   have been listed as an author.  At -- at the very

14   least that's what I would do.

15        Q.    You said "at the very least."  What would

16   you do at the very most?

17        MS. PIGMAN:  Objection; be call -- beyond the

18   scope of his report and calls for speculation.

19   BY THE WITNESS:

20        A.    At the very most I suppose there could be

21   consideration for having the manuscript withdrawn,

22   but, but this really is context dependent.  It is a

23   case-by-case consideration and one would have to have

24   a lot of specific detail.

Jay Irwin Goodman, Ph.D.

```
1    BY MR. WOOL:

2        Q.    Okay.  So kind of just because we are on

3    this -- the topic and I think you mentioned that part

4    of your criteria in evaluating some of these articles

5    was what you would do in -- in your capacity as -- as

6    an editor on -- on various journals, if somebody

7    submitted to you for publication an article that was

8    not compliant with OECD guidelines, is that a reason

9    that you would consider in not publishing the article?

10        MS. PIGMAN:  Objection; misstates his testimony.

11   BY THE WITNESS:

12        A.    No.  No.  Because I think that when you

13   look at the, what I'll call the research community,

14   particularly the academic research community, there is

15   not a need for them, in terms of if they are doing a

16   genotoxicity evaluation, to follow the letter of the

17   OECD guidelines.  There is a need for them to be very

18   careful and very thorough in terms of performing what

19   I will call a -- a credible study.  So if it is a

20   study that involves a genotoxicity evaluation, it is

21   in my mind imperative that there be some evaluation of

22   cytotoxicity, that there be some questions and some

23   evaluations of dose and/or time response, that there

24   be some real consideration given to the rationale
```

Jay Irwin Goodman, Ph.D.

1    for -- for dose selection.  These are the sorts of

2    things that we would look for.

3    BY MR. WOOL:

4         Q.    And would you reject an article for

5    publication because it utilized the IP route of

6    administration in evaluating genotoxicity, say, in an

7    in vivo test for micronuclei induction,

8    hypothetically?

9         A.    For that one, for that one piece, again,

10   this is all context related, so I cannot tell you,

11   given that one piece of information, what I would do

12   in terms of -- a re -- review articles are on a -- on

13   a case-by-case basis.

14        MS. PIGMAN:  David, when you have a moment, can

15   we take a quick break?

16        MR. WOOL:  Yeah, and if we can turn -- I don't

17   know if we can do anything about the -- we -- we can

18   go off the record now.

19        THE VIDEOGRAPHER:  Going off the record at

20   2:13 p.m.

21                    (WHEREUPON, a recess was had

22                     from 2:13 to 2:23 p.m.)

23        THE VIDEOGRAPHER:  This is Disk No. 4.  We are

24   back on the record at 2:23 p.m.

Jay Irwin Goodman, Ph.D.

 1   BY MR. WOOL:

 2       Q.    All right.  Dr. Goodman, I believe before

 3   we went off the record I had asked you about your

 4   conclusions regarding the genotoxic -- toxicity tests

 5   performed on glyphosate.  And so I wanted to ask you

 6   some similar questions about your conclusions

 7   regarding glyphosate-based formulations.

 8           So if you can, will you turn to Page 24 of

 9   your expert report.

10       A.    I'm there.

11       Q.    Okay.  And your conclusion as stated in

12   your expert report is, quote:

13           "I conclude that GBFs are not genotoxic.

14   It is important to note that the results of the

15   reliable, reproducible guideline studies indicate that

16   GBFs are not genotoxic.  The few non-guideline studies

17   which report that GBFs are genotoxic have

18   methodological faults."

19           Did I read that correctly?

20       A.    You did.

21       Q.    And does that accurately state your

22   opinion regarding glyphosate-based formulations?

23       A.    Yes.

24       Q.    Now, you mention in there "reproducible

Jay Irwin Goodman, Ph.D.

1    guideline studies," correct?

2         A.    I do.  I -- I mean, when I say, "it's

3    important to note and talk about guideline studies,"

4    this paragraph, what I say, "I conclude that GBFs are

5    not genotoxic," this is based on the whole body of

6    relevant literature that I reviewed and is not limited

7    to these guideline studies.

8         Q.    Okay.  Fair -- fair enough.

9         A.    I just added a sentence about the

10   guideline studies.

11        Q.    And what is the importance of

12   reproducibility in the -- the scientific community?

13        A.    Well, it -- it -- it -- it is -- it is

14   very important even if experiments are -- are very

15   well and very thoroughly performed, there is always a

16   chance that a hiccup happened and so re -- the

17   question of reproducible -- reproducibility is an

18   important aspect.

19        Q.    And of these studies that you reviewed

20   pertaining to glyphosate-based formulations, would you

21   agree that a significant number are not publicly

22   available?

23        A.    I -- you know, with -- without -- without

24   quibbling as to what does a significant number mean,

Jay Irwin Goodman, Ph.D.

```
 1   many, many of them are not available publicly.

 2        Q.    Do you believe that the different

 3   compositions of glyphosate-based formulations could

 4   have an effect on the reported results of any of the

 5   studies?

 6        A.    That -- that is -- that is possible.

 7        Q.    Did all of the studies that you reviewed

 8   clearly identify their component parts?  And, again,

 9   I'm talking about glyphosate-based formulations.

10        A.    They did not fully identify the component

11   parts.  Some of them, but not all of them, referred to

12   a particular formulation.  So some of them referred

13   to -- to Roundup.  I think there was one in terms of

14   it may have been one with Larry Kier who talked about

15   a formulation called RODEO, but beyond that, in terms

16   of them saying, And this Roundup product contained

17   this and this and this and this and this, the answer

18   is no.

19        Q.    Is it possible in your view that

20   glyphosate could interact with a surfactant to produce

21   a result not seen in glyphosate alone?

22        A.    Yeah, it is -- as you worded, it is -- it

23   is possible that as part of a mix -- that with any

24   chemical, that when it is part of a mixture one might
```

Jay Irwin Goodman, Ph.D.

1   get, in our case, toxicological results that are not

2   quite the same as when the chemical is evaluated as a

3   pure chemical.

4       Q.    So sitting here today, how can you state

5   conclusively that any of the positive tests -- or

6   strike that.

7           So is it -- do you believe that it's

8   important to identify all of the component parts of

9   any given glyphosate formulation?

10      A.    You know, I think I'd say to you that you

11  have to be specific in terms of "identify all of the

12  components."  The analytical chemist these days has

13  a -- a very powerful telescope and we can start

14  measuring smaller and smaller and smaller quantities.

15      Q.    Is it important to know the relative

16  concentrations of all of the glyphosate-based

17  formulations?

18      A.    Important to know for what reason?

19      Q.    In measuring the genotoxic effects or lack

20  thereof of glyphosate-based formulations?

21      A.    Evaluation of the genotoxic potential can

22  be done without -- without knowing the individual

23  components, because what we are evaluating is the

24  effect of the mixture.

Jay Irwin Goodman, Ph.D.

1      Q.    But do you believe that, let's say, two

2   different compounds, both with the same chemicals but

3   with different concentrations of each, so a different

4   percentage of -- of Roundup and surfactant in one

5   versus the other can have different genotoxic effects?

6      A.    Well, excuse me.  In terms of different

7   concentrations of -- of Roundup, I think you meant

8   different concentrations of glyphosate?

9      Q.    Right, so -- so different -- yes,

10   you're -- good catch.

11          Yes, so I -- I guess my question is:  In

12   evaluating the genotoxic potential of a

13   glyphosate-based formulation, is it important to you

14   to know not only the chemical composition of -- of

15   that formulation, but also the amounts of -- of each

16   chemical contained therein?

17      MS. PIGMAN:  Objection; form, asked and

18   answered.

19   BY THE WITNESS:

20      A.    Well, it -- yeah.  If the objective of a

21   study is to ask, in our case, about genotoxic

22   potential of Product X, one can evaluate that mixture

23   as a mixture and make a conclusion in terms of what

24   was or was not -- what were or were not the effects of

Jay Irwin Goodman, Ph.D.

1    this mixture without knowing the individual

2    components.

3    BY MR. WOOL:

4         Q.    Can you extrapolate the results of -- the

5    results as they relate to that one mixture to

6    glyphosate-based formulations on the whole?

7         A.    Well, you know, mixtures toxicology is --

8    I don't want to cop out now -- is a tough, tough

9    issue.  It is a tough, tough issue.  It seems that

10   there is a -- a lot of similarity but not identity

11   between these different glyphosate-based formulations.

12   And within the studies that I have reviewed, a number

13   of different glyphosate-based formulations have been

14   used.  So, in terms of my conclusions, my conclusions

15   are certainly based primarily -- are based on this

16   evaluation of some different formulations.

17        Q.    And so, as I understand it, the -- the

18   results on the whole that you've looked at regarding

19   glyphosate-based formulations are that the results are

20   negative, more or less fair, negative for genotoxic

21   potential?

22        MS. PIGMAN:  Objection; form, it misstates his

23   testimony.

24   BY THE WITNESS:

Jay Irwin Goodman, Ph.D.

1      A.   My conclusion is that the glyphosate-based

2   formulations should not be viewed as genotoxic, that

3   they are not genotoxic, that they should not be

4   considered as genotoxic.

5   BY MR. WOOL:

6      Q.   And how many different Roundup

7   formulations do you believe exist on -- on the market

8   or -- or have been avail -- made available to

9   consumers?

10     A.   I do not know.

11     Q.   Okay.  Do you know the number of different

12  formulations that were considered in the tests that

13  we've talked about today?

14     A.   I did not -- I did not segregate the --

15  the information in that fashion.

16     Q.   Is it possible that glyphosate-based

17  formulation components other than the active

18  ingredient itself could have genotoxic properties?

19     A.   By "the active ingredient," we mean

20  glyphosate --

21     Q.   Right.

22     A.   -- is involved?

23     THE COURT REPORTER:  I'm sorry.  I didn't hear

24  that.

Jay Irwin Goodman, Ph.D.

```
 1    BY THE WITNESS:

 2         A.    I said by the -- by the act -- excuse

 3    me -- by the active component, I presume that you mean

 4    glyphosate, and now you are talking about other --

 5    BY MR. WOOL:

 6         Q.    Well, you -- you changed it a little bit.

 7    You said "active component."  I said "active

 8    ingredient."

 9         A.    Active ingredient.

10         MS. PIGMAN:  Well, why don't we just have a

11    clean record, David --

12         MR. WOOL:  Right.

13         MS. PIGMAN:  -- if you could ask your question

14    again, and we'll --

15         MR. WOOL:  Sure.

16    BY MR. WOOL:

17         Q.    Okay.  So is it possible that components

18    of glyphosate-based formulations other than the active

19    ingredient can have genotoxic properties?

20         A.    You know, on -- on a -- on a theoretical,

21    hype -- hypothetical basis, the answer might be yes.

22         Q.    Okay.

23         A.    But among the key components of the

24    glyphosate-based formulations are surfactants.  There
```

Jay Irwin Goodman, Ph.D.

```
 1    are a variety of reports from the Environmental

 2    Protection Agency where they have evaluated a number

 3    of different -- of different surfactants and have not

 4    expressed concern with regard to genotoxicity and in

 5    many cases with regard to potential carcinogenicity.

 6    There was one, which I can't put my finger on right

 7    now, where they did say that for this particular

 8    component, it's -- and now I'm paraphrasing --

 9    reasonable to use as long as the concentration does

10    not exceed 30 percent.  But I can't put my finger on

11    that particular report right now.

12         Q.    And to the best of your recollection --

13         A.    30 percent is a lot.

14         Q.    Right.  And to the best of your

15    recollection, what did they say happened if -- if you

16    exceeded 30 percent?

17         A.    They didn't.  They didn't -- they -- they

18    didn't.  They -- they -- they talked about evaluating

19    it, and I do not recall.  I do not know if they did.

20    I do not recall what they said would happen if you

21    exceeded 30 percent.

22         Q.    And so did you believe that a surfactant

23    combined with glyphosate could have an effect not --

24    not seen in either -- a genotoxic effect that would
```

Jay Irwin Goodman, Ph.D.

1    not be present in studies involving either of those

2    two components alone?

3         MS. PIGMAN:   Objection; form.

4    BY THE WITNESS:

5         A.    Well, first of all, we have a wealth of

6    data on genotoxicity evaluation of glyphosate-based

7    formulations, and I think, when evaluating this, it is

8    proper to say that the GBFs, glyphosate-based

9    formulations, are -- are not -- are not genotoxic.

10   BY MR. WOOL:

11        Q.    Okay.  So I don't think you -- you've

12   really ask -- answered my question, so maybe I'll ask

13   it a different way.

14        A.    Okay.

15        Q.    As an a genotoxicologist, if you were

16   asked to evaluate the genotoxicity of a formulation,

17   not a glyphosate formulation, just that you know there

18   is an active ingredient and different component parts,

19   would you rather test the formulation or would you

20   prefer to test the component parts individually?

21        A.    Well, I think the component parts should

22   be evaluated and I think some evaluation should be

23   done on the formulation, as was -- as was done here.

24        Q.    So your answer is that they should both be

Jay Irwin Goodman, Ph.D.

1    tested, both the component parts and the formulation?

2        A.    I think that I would qualify my answer,

3    though, and that is if you have multiple, multiple,

4    multiple different formulations, then I -- I really

5    think that it becomes problematic if you are going to

6    ask for every test to be done on every formulation.

7        Q.    Do you believe that the data set regarding

8    glyphosate-based formulations and their relationship

9    to genotoxicity is robust enough to reach a definitive

10   conclusion that glyphosate-based formulations are --

11   are not genotoxic?

12       A.    I think it's robust enough to reach the

13   conclusions that I have reached in my report.  This is

14   based upon the large, large body of information that

15   I -- that I have reviewed and including -- including

16   more than one glyphosate-based formulation.

17       Q.    Did you review any of the genotoxicity

18   tests involving any of the alleged inert ingredients

19   in glyphosate-based formulations?

20       A.    The only other data that -- I did review

21   information available from the Environmental

22   Protection Agency on surfactants, but -- but in terms

23   of getting into what other components might be

24   present, the answer is no.

Jay Irwin Goodman, Ph.D.

1      Q.    If there were genotoxicity tests involving

2  various surfactants used in glyphosate-based

3  formulations, would you want to review those tests?

4      A.    Well, I did review some EPA reports on a

5  variety of surfactants and I -- at this point, again,

6  I -- I -- I cannot tell you the names of those

7  surfactants.

8      Q.    Are those reports listed on your reliance

9  list, your supplemental reliance list?

10      A.    Yes.  Yes.

11      Q.    Approximately, if you can, how many

12  surfactants did you review reports for?

13      A.    I, roughly now, I -- I think that we're

14  talking about six or eight -- somewhere between six

15  and nine reports and each of the reports involved more

16  than one surfactant.

17      Q.    Did those reports run the surfactants

18  through all or any number of the -- the four tests

19  that you highlight as being the most reliable?

20      A.    A number of them did involve the Ames

21  test, some of them involved some other tests, some of

22  them involved looking at what we'll call chemical

23  structure activity relationships, but I can't recall

24  if all of the reports involved all of the studies that

Jay Irwin Goodman, Ph.D.

1    we've talked about.

2        Q.    And -- and the tests involving chemical

3    structure relationships, can you reliably infer

4    genotoxicity or the absence thereof from a -- a

5    chemical structure --

6        A.    Structure activity.

7        Q.    Activity, yeah.

8        A.    I think that it's certain -- it is

9    certainly not definitive.  I think it provides a -- an

10   indication, but it is -- it is -- it is -- it is not

11   definitive.

12       Q.    Do you recall if any of the reports that

13   you reviewed involved the surfactant POEA?

14       A.    I do not recall.

15       Q.    Have you heard the term "POEA" before?

16       A.    The answer is yes.  I'm trying to think

17   where.  The answer is yes and it -- it might be one on

18   that -- it might be one of those that the EPA

19   reviewed.

20       Q.    Do you have an opinion on whether POEA is

21   genotoxic?

22       A.    I know right now I cannot tell you because

23   I don't remember if POEA was in the EPA report.

24       Q.    Have you heard of the chemical

Jay Irwin Goodman, Ph.D.

1    1,4-dioxane?

2        A.    Yes.

3        Q.    Do you have an opinion on whether

4    1,4-dioxane is genotoxic?

5        A.    I don't know.

6        Q.    Do you have an opinion on whether it's

7    carcinogenic?

8        A.    I don't know.

9        Q.    In what context did you hear about

10   1,4-dioxane?

11       A.    It was probably in some paper or papers

12   that I've read.  Years ago there were times when one

13   would sometimes mistakenly consider 1,4-dioxane with

14   an environmental contaminant called dioxin and they

15   are two very, very, very different molecules.  But I

16   really do not have anything -- I have nothing

17   approaching in-depth knowledge of dioxane.

18       Q.    Of 1,4-dioxane?

19       A.    Of 1,4-dioxane.

20       Q.    Okay.  All right.  Let's talk about AMPA

21   very briefly.  I'm probably not going to spend too

22   much time.

23       A.    Excuse me.  Are we on a particular page

24   or --

Jay Irwin Goodman, Ph.D.

1      Q.    No, no, no, no.  I was just trying to

2    think of where I'm going to go next.

3             So I believe if you go to Page 9 of your

4    report.

5      A.    I'm there.

6      Q.    Okay.  At the very bottom you note that:

7             "Importantly, a genotoxicity evaluation is

8    one screening tool that can be employed when

9    considering the potential of a chemical to cause

10   toxicity (e.g., cancer) and the results of this should

11   be viewed within a context that can include rodent

12   cancer bioassay and epidemiological data."

13            Did I read that correctly?

14     A.    You did.

15     Q.    And that accurately reflects your opinion?

16     A.    It does.

17     Q.    Okay.  And so -- so my question to you is:

18   Is it possible to infer causality with rodent cancer

19   bioassay data alone?

20     MS. PIGMAN:  Objection; form, vague, outside the

21   scope of his report.

22   BY MR. WOOL:

23     Q.    You can answer.

24     A.    The rodent bioassay is a qualitative test

Jay Irwin Goodman, Ph.D.

1    which asks whether or not, under the particular

2    conditions of the test, which are typically very high

3    doses that are employed, does the chemical in question

4    cause cancer at one or more particular sites in male

5    and female rats and male and female mice, and it can

6    be various strains involved, or stocks involved.

7         Q.    In the context of determining

8    carcinogenicity, is it possible to infer causality

9    with genotoxicity evidence alone?

10        A.    No.  I think that genotoxicity data is one

11   piece of the -- is one piece of the evaluation.

12        Q.    Now, the -- the same question, is it

13   possible to infer causality on the basis of

14   epidemiological data alone?

15        A.    I am not an epidemiologist.

16        Q.    Fair.

17        A.    I am not an expert in epidemiology.  What

18   I do know is that what epidemiology can tell us is

19   whether there is an association between A and B.  If

20   indeed there is an association between A and B, that

21   in no way means that A causes B.

22        Q.    Okay.  That's fine.

23              Let's go to Page 35, which should be --

24        A.    Almost there.

Jay Irwin Goodman, Ph.D.

1          Okay.

2     Q.    Okay.  And in the middle paragraph, you

3     discuss the findings of an article by Maas et al.

4     2009, correct?

5     A.    I do.

6     Q.    Okay.  And that report demonstrated a

7     statistically significant increase in micronuclei

8     following treatment with doses of 200 and

9     400-milligrams per kilogram using the IP injection

10    method, correct?

11    A.    Yes.

12    Q.    Okay.  And so is it your belief as we sit

13    here today that Maas didn't show a dose-response

14    relationship in that study?

15    A.    Yes.

16    Q.    Do you believe that dose-response is a

17    necessary prerequisite to -- to show genotoxicity?

18    A.    I think it is a -- I think it is a

19    important -- a important aspect in terms of whether or

20    not one -- one sees dose-re -- dose-response.  I think

21    it is an important aspect.  However, it is certainly

22    possible as long as we are staying below doses in

23    concentrations that cause cytotoxicity, it is possible

24    that in a hypothetical particular test system, perhaps

Jay Irwin Goodman, Ph.D.

1    they use three doses and the low and the middle dose

2    did not produce a positive result and the high dose

3    did.  Under those conditions, as long as we did not

4    have genotox- -- have cytotoxicity and cytotoxicity

5    was evaluated, then I would probably consider that as

6    a valid test.

7        Q.    Is it possible for a substance to be

8    genotoxic in certain lower doses but -- but not -- but

9    have a different effect at higher doses or have no

10   dose at a higher -- or have no effect at a higher

11   dose?

12       A.    The answer is -- the -- the -- the answer

13   is that -- that that is correct.  And, again, I think

14   that this points to a need for a cytotoxicity

15   evaluation.

16            So, for example, one can have adduct

17   formation with DNA and adduct formation with DNA is

18   not a mutation.  It takes a few rounds of replication

19   to, quote, fix that into a mutation.  So if you have a

20   very, very high dose and you have adduct formation but

21   you've killed the cells, then you are not going to see

22   mutation.

23       Q.    Now, you said that you have adduct

24   formation, but it takes a couple of rounds of

Jay Irwin Goodman, Ph.D.

1   replication -- of --

2        A.    Of cell replication.

3        Q.    -- to fix it?

4        A.    Correct.

5        Q.    So --

6        A.    By -- by -- excuse me.  By "fix," I don't

7   mean "fix" in the sense of repair.  But what I mean

8   "fix" in the sense of translate that into a mutation.

9        Q.    Okay.  So I'm -- I'm just trying to

10  understand.  So a couple of rounds of improper

11  replication can lead to a mutation, is -- is that?

12       A.    No, no, no, no.

13       Q.    No?

14       A.    So -- that is -- that is not correct.

15       Q.    Okay.

16       A.    So one can have a, for example, an add --

17  with DNA we are dealing with what I'll call DNA bases

18  and there are antiparallel strings and the bases base

19  pair with each other, so -- in a specific way.  One

20  can have adduct formation that results in what I will

21  call mispairing, that is, the base doesn't pair with

22  what it normally does.  And if that's the case, then

23  one round of replication can put in a base that didn't

24  belong there.  The second round of replication could

Jay Irwin Goodman, Ph.D.

1    put in the base that pairs with the base that didn't

2    belong there and now you have an inheritable mutation.

3        Q.    Okay.  So your third criticism of the

4    Maas study is that the doses were extremely high and

5    then you note that:

6            "Since AMPA is a biodegradation product of

7    glyphosate which is sometimes found in the soil, it is

8    reasonable to assume that exposure to it is much less

9    than exposure to glyphosate."

10           I guess, why do you believe it's fair to

11   assume that -- that there is less exposure to AMPA

12   than glyphosate?

13       A.    Well, first because it is a biodegradation

14   product.  Not all of the glyphosate is degraded to

15   AMPA.  And second, because it is sometimes found, not

16   always found, and so because it is a degradation

17   product and because it is sometimes found in soil, I

18   think that there would be much less exposure.  In

19   other words, because it's found in soil, I mean, the

20   only way you are going to be exposed is if you -- if

21   you step on it barefoot, if you happen to pick up the

22   soil in your hand, if you happen to eat the soil, or

23   if you throw dry soil in the air and inhale it.  These

24   are really rather unlikely scenarios.

Jay Irwin Goodman, Ph.D.

1      Q.   You don't believe somebody could be

2  exposed to AMPA through dermal absorption from -- from

3  spraying glyphosate-based pro -- formulations?

4      A.   Not -- not -- not directly.  It is -- it

5  is my understanding that it's microbes in soil that do

6  the degradation.  So if what you are saying is that

7  glyphosate could be sprayed, land on the ground, some

8  of the microbes in the soil do degrade some of its

9  AMPA, and I, for example, happen to walk barefoot over

10  that spot, perhaps there would be a small amount

11  absorbed through my skin.

12      Q.   Okay.  And your conclusion is that the

13  results of the four mammalian-based AMPA genotoxicity

14  assays are inadequate for use in making a decision

15  regarding whether or not AMPA is a genotoxic compound?

16      A.   Yes, based on the -- based on the

17  rationale as presented.

18      Q.   And this conclusion differs somewhat from

19  the conclusions regarding glyphosate-based

20  formulations and glyphosate, correct?

21      A.   Yeah, yeah, yeah, it -- it -- it -- it --

22  it differs -- it differs a bit because I do think that

23  in these studies there are confounding effects and

24  that because of those -- and those confounding effects

Jay Irwin Goodman, Ph.D.

 1    rise to a level that make interpretation of the study

 2    into a yes or a no, not possible.

 3         Q.    Fair enough.

 4               So let's talk about your opinions related

 5    to oxidative stress really quick.  I believe that

 6    starts on Page 37 of your report.

 7         A.    Could be.

 8               I'm there.

 9         Q.    Okay.  Now, would you describe yourself as

10    an expert in oxidative stress?

11         A.    I think I describe myself as someone who

12    has expertise in oxidative stress as it relates to

13    the, what I will call the -- the cancer problem or to

14    carcinogenesis, because in order to -- to be an expert

15    in carcinogenesis, one has to gain substantial

16    knowledge about factors that might or might not

17    contribute to carcinogenesis.

18         Q.    Now, can I use the acronym ROS to describe

19    what you would know as reactive octave -- oxygen

20    species?

21         A.    Please do that.

22         Q.    Okay.  Thank you.

23               Are you of the opinion that ROS formation

24    and oxidative stress can only be involved in carc- --

Jay Irwin Goodman, Ph.D.

1  carcinogenicity when a compound has been found to be

2  genotoxic?

3      A.    I think that the -- the role of oxidative

4  stress in carcinogenicity is really unclear.  It is a

5  fascinating body of literature.  There is a lot of

6  indication and talk that it may play some role, but

7  what we really lack is we really lack studies that

8  really do a thorough job in terms of dose-response and

9  temporal relationships relative to carcinogenicity.

10     Q.    So fair to say there isn't conclusive

11 evidence that genotoxicity is a necessary prerequisite

12 to show that oxidative stress can be involved in

13 carcinogenesis?

14     A.    Oxidative stress might produce a genotoxic

15 event.  It might do it directly, it might do it

16 indirectly.  That -- that -- that is theoretically

17 possible.

18     Q.    So do you believe that oxidative stress

19 can cause cancer?

20     A.    I don't believe that we have the data that

21 would permit me to make that conclusion.  I -- I think

22 the, if you will, no -- no pun intended, I think the

23 jury is out on this.  There is a need for a -- a

24 considerable more research in this area.  It's a

Jay Irwin Goodman, Ph.D.

1    fascinating area and should be researched.

2        Q.    So as you sit here today, to the -- to the

3    best of your knowledge, it's possible that oxidative

4    stress could promote carcinogenesis regardless of

5    whether there is concurrent genotoxic activity?

6        A.    You know, I cannot tell you with regard to

7    oxidative stress or anything else that something is

8    absolutely, totally, completely impossible.  I -- I --

9    I -- I -- I cannot -- I cannot tell you that.

10        Q.    Fair enough.

11        MR. WOOL:  Do you guys want to take a quick

12    break?

13        MS. PIGMAN:  Okay.

14        THE WITNESS:  Sure, if I can get out where it is

15    a little cooler.

16        THE VIDEOGRAPHER:  Going off the record at

17    3:01 p.m.

18                (WHEREUPON, a recess was had

19                 from 3:01 to 3:11 p.m.)

20        THE VIDEOGRAPHER:  We are back on the record at

21    3:11 p.m.

22    BY MR. WOOL:

23        Q.    All right.  Dr. Goodman, I'm going to try

24    and get us out of here sometime in the -- in the next

Jay Irwin Goodman, Ph.D.

1    hour, hopefully.

2              So I have a couple of more questions for

3    you about IP injection studies and -- and

4    physiological routes of exposure.

5              Do you know if the EPA uses IP injection

6    studies to measure genotoxicity?

7         A.   I -- I do -- I do not know.  If -- if they

8    do, then I hope that they are including a cytotoxicity

9    evaluation.

10        Q.   Does the European Food Safety Authority

11   use IP injection studies to measure genotoxicity?

12        A.   I don't know.  If they do, then they

13   should be using -- in -- incorporating an evaluation

14   of cytotoxicity.

15        Q.   Does -- do you know if Monsanto uses IP

16   injection studies to measure genotoxicity?

17        A.   I don't know.

18        Q.   Do you believe that IP injection studies

19   are a generally-accepted methodology to measure

20   genotoxicity?

21        A.   If -- if one is doing this and evaluating

22   cytotoxicity, then I think that it -- in my opinion,

23   it is less than ideal and could -- could be deemed

24   acceptable.

Jay Irwin Goodman, Ph.D.

1      Q.     Now, you are not an industrial hygienist,

2   correct?

3      A.     Correct.

4      Q.     Do you have any expertise in measuring or

5   calculating exposure?

6      A.     No.  Except -- except in terms of some of

7   the calculated examples, which are really rather

8   simplistic, in my report and the -- the way I expanded

9   on it this morning in terms of calculating what

10  hypothetically could be a body fluid level and

11  comparing the highest daily dose that EPA talks about

12  with a in vitro concentration or in vivo dose.

13     Q.     Okay.  Now -- now, that leads me to sort

14  of my next point.  You talked about the highest daily

15  dose that the EPA calculated, and I believe --

16     A.     Excuse me.  I'm not sure if calculate --

17  it is either calculated or estimated.

18     Q.     Oh, okay.  Fair enough.

19            And I believe the other source that you

20  provided for human dose was from Solomon 2016, is that

21  correct?

22     A.     That is correct.  Solomon 2016 certainly

23  was the one I referred to with regard to the

24  applicator exposure.

Jay Irwin Goodman, Ph.D.

```
 1        Q.    And --

 2        A.    I did talk about -- I'm sorry.

 3        Q.    No, no.  You -- you can go ahead.

 4        A.    I did talk about -- and I should say

 5   the -- the .47 milligram per kilogram a day for

 6   children was summed -- was EPA said was summed up for

 7   multiple routes of exposure.  I did also say that from

 8   food and water, I think it is EPA that made the

 9   estimate of .088 milligram per kilogram per day.

10        Q.    Now, aside from Solomon 2016 and the EPA

11   article that you referenced, are you aware of any

12   publications or articles that measure exposure among

13   humans?

14        A.    I am not.  The estimated -- estimated

15   exposures are the three that I -- that I talked about

16   and I -- I did not go further than that.

17        Q.    Okay.  And the -- the estimated exposure

18   in Solomon 2016 was based upon measuring the amount of

19   glyphosate excreted in the urine of the applicator

20   surveyed, is that correct?

21        A.    It's been a while since I've looked at

22   that publication.  I'd really like to see it before

23   saying yes or no.  I am confident that in terms of

24   the -- at the 90th percent level, the higher level of
```

Jay Irwin Goodman, Ph.D.

1    exposure estimated for applicators was .021-milligram

2    per kilogram per day.

3         Q.    If Monsanto had reason to know that

4    glyphosate absorbed dermally was primarily excreted

5    through the feces, would it be inappropriate to

6    measure glyphosate excreted through urine as a method

7    of -- of measuring exposure?

8         A.    Based upon the information that you've

9    given me, I would say -- I would say no.  But then

10   we'd have to talk in context as to -- as to just -- as

11   to just -- just what was done.

12        Q.    So hypothetically speaking, if you as a

13   genotoxicologist knew that a potential toxic compound

14   was primarily excreted through the feces, would it be

15   an appropriate measure of exposure to look only at

16   urine?

17        A.    First of all, maybe I should have said

18   this earlier, I -- I view myself more than a

19   genotoxic -- toxicologist, as it -- as I did --

20        Q.    Fair.

21        A.    -- act on my expertise earlier.

22              If, in fact, the individual who did the

23   exposure evaluation based on urine was cognizant of

24   the fact that most of it is excreted in feces, and it

Jay Irwin Goodman, Ph.D.

1  depends what they did.  If they said, Well, we

2  measured it in urine, we found some in urine, and so

3  there was some exposure.  If they left it like that,

4  okay.

5           If, on the other hand, they want to relate

6  what is in urine in a more quantitative sense as to

7  exposure, then it would have been, in my view,

8  incumbent upon them to show that they're cognizant of

9  a large amount being excreted in feces and, if you

10  will, make a correction, in other words, to say, If we

11  see such and such amount in urine, then we know there

12  is such and such amount in feces, and assuming the

13  data are there to support that.

14      Q.    And without knowing that correlation,

15  would it then be inaccurate to rely solely on the

16  amount of a chemical excreted in urine to infer total

17  exposure?

18      MS. PIGMAN:  Objection; this is all far beyond

19  the scope of his report.

20  BY THE WITNESS:

21      A.    I -- I'm not an exposure, exposure expert.

22  I think, again, that if one wanted to say, ask whether

23  or not there was exposure in sort of a yes-or-no

24  measurable level and one looked at urine, I think that

Jay Irwin Goodman, Ph.D.

1    would be -- would be okay.

2    BY MR. WOOL:

3        Q.    But if you wanted to quantify the total

4    amount of exposure to a chemical in -- in milligrams

5    per kilogram a day, would looking only at urine in the

6    hypothetical that I gave you be proper?

7        MS. PIGMAN:  Objection; beyond the scope of his

8    report and outside of his area of expertise, as he

9    stated.

10   BY THE WITNESS:

11       A.    Yeah, I think there, there are other

12   factors that would have to be accounted for, and I

13   cannot tell you in depth.  I can't go in depth beyond

14   the generality that I just stated.

15   BY MR. WOOL:

16       Q.    Okay.  And -- and this is one of the last

17   points on this topic, but on, say, the bottom -- or

18   the middle paragraph of Page 20 of your report, you

19   state that --

20       MS. PIGMAN:  Hold on.  Can you give us a second.

21   BY THE WITNESS:

22       A.    Excuse me.  I'm getting there.

23             Almost there.

24             I'm there.

Jay Irwin Goodman, Ph.D.

```
 1    BY MR. WOOL:

 2         Q.    Okay.   The bottom sentence of the middle

 3    paragraph states:

 4              "The much higher rate of absorption

 5    following IP administration might result in toxicity

 6    that would not be observed following dosing under more

 7    physiologically" -- "physiological routes of

 8    administration."

 9              Did I read that correctly?

10         A.    You did.

11         Q.    So what -- what I'm asking about is you --

12    the -- the first part of this sentence where you say,

13    "the much higher rate of absorption."

14              I guess first, what -- what you're

15    referring to, the absorption of the chemical into

16    the -- into the bloodstream, is that what that's

17    referring to?

18         A.    Yes, there -- as -- as I indicated this

19    morning, there is a very, very rich blood supply in

20    the peritoneal cavity and administering compounds by

21    the intraperitoneal route results in a very quick, and

22    in addition to very quick, probably a very high

23    percent of the material being absorbed really quickly.

24    So you get really high peak blood levels.
```

Jay Irwin Goodman, Ph.D.

1      Q.    Okay.  So -- so that's what I wanted to --

2    to get at.

3            So you are -- you are saying that this

4    results in higher peak concentrations in the blood?

5      A.    Yes.

6      Q.    And do you have a citation for that or is

7    that just well known within the field?

8      A.    I can't give you a citation off the top of

9    my head, but in the field I think it is -- it is well

10   known that the IP route of administration gives you a

11   very, very quick absorption, quicker than you would

12   get by a oral administration or -- or dermal

13   application.

14     Q.    And -- and it is your opinion that that

15   results in higher peak concentrations in the blood,

16   correct?

17     A.    From the IP administration, then one would

18   get higher peak concentrations in the blood and,

19   therefore, those higher peak concentrations might

20   cause adverse effects that were not seen -- that would

21   not be seen where the blood level is lower.

22     Q.    Okay.  Let's talk about some of the -- the

23   human tests, which are -- which you discuss starting

24   on Page 12 of your report.  Although let's actually

Jay Irwin Goodman, Ph.D.

1    start with Bolognese, which is on Page 15.

2         A.    Okay.  I'm sorry.  Are we on Page 12 or

3    14?

4         Q.    I'm sorry.  Page 15 of Exhibit 1.

5         A.    I'm there.

6         Q.    All right.  So this is a biomonitoring

7    study in five Columbian regions, correct?

8         A.    Yes.

9                   (WHEREUPON, a certain document was

10                   marked Deposition Exhibit No. 25-8,

11                   for identification, as of

12                   09/22/2017.)

13   BY MR. WOOL:

14        Q.    Okay.  And I will mark as Exhibit 8 a copy

15   of Bolognese's study and it has a MONGLY number at the

16   bottom which is MONGLY04882823.  I'm handing you

17   Exhibit 8.

18        MS. PIGMAN:  Thank you.

19   BY MR. WOOL:

20        Q.    Okay.  And if you turn to the Method

21   section, which is on page -- or actually, let's just

22   look at the -- the author's description.

23        A.    Excuse me.  Do you mean the summary?

24        Q.    Yes, the summary.

Jay Irwin Goodman, Ph.D.

1              So, in essence, the study was carried out

2    over five regions in Columbia.  Some where aerial

3    spraying occurred, some where it -- it did not, fair?

4         A.    Some where there was aerial spraying of a

5    glyphosate-based formulation and some where there was

6    no aerial spraying of a glyphosate-based formulation,

7    yes.

8         Q.    Okay.  And it says sort of in the -- in

9    the middle of that:

10             "Lymphocytes were cultured and a

11   cytokinesis-block micronucleus cytome assay was

12   applied to evaluate chromosomal damage in

13   cytotoxicity."

14             Do you see that sentence?

15        A.    I do.

16        Q.    Okay.  Now, is that a valid method of

17   measuring genotoxicity?

18        A.    In gen --

19        Q.    In general?

20        A.    In -- in general the answer is yes.

21        Q.    Okay.

22             And in your report, I just want to make

23   sure I am clear, you were not disagreeing that

24   genotoxicity was noted within the exposed populations,

Jay Irwin Goodman, Ph.D.

1    is that correct?  Your...

2         A.    That is correct.  That is correct.

3         Q.    Okay.

4         A.    I am not disagreeing that there was some

5    genotoxicity noted in some populations.

6         Q.    Okay.  And the authors noted a significant

7    increase in the frequency of binucleated micronuclei?

8         A.    Yes.

9         Q.    Is that correct?

10              Okay.  And you were not -- or are you

11   disagreeing with that finding of the authors?

12        A.    I am not disagreeing with that finding.

13        Q.    Okay.  And BNMN, binucleated micronuclei,

14   is an effect of genotoxicity, is -- is that accurate?

15        A.    The presence -- the presence of

16   micronuclei is an -- is a indicator -- can be used as

17   a indicator of genotoxicity.

18        Q.    Okay.  And so one of your criticisms, if

19   you look at the middle of the page, you state:

20              "However, the highest reported frequency

21   of BNMN was in Boyaca where no aerial spraying of

22   glyphosate was conducted."

23              That's in the middle of the page.

24        A.    That's correct.  I see that and that is

Jay Irwin Goodman, Ph.D.

```
 1   correct.

 2        Q.    Okay.  And so is it your belief that the

 3   highest rates of BNMN occurred in Boyaca?

 4        A.    It -- it is.  I'm -- I'm taking what the

 5   author has said as -- as correct based upon, based

 6   upon the information presented in the manuscript.

 7        Q.    And is it your belief that the highest

 8   rates of BNMN occurred in Boyaca following the

 9   exposures in the other areas?

10        MS. PIGMAN:  Objection; form.

11   BY THE WITNESS:

12        A.    I'm not clear on that.

13   BY MR. WOOL:

14        Q.    Meaning, I guess what I mean by that is

15   that Boyaca had the highest frequency of BNMN compared

16   to the exposed populations in the other regions?

17        A.    Yes, but the -- the key aspect that --

18   that I would like to include here is that Boyaca was

19   the -- an area where there was no aerial spraying,

20   and -- and I know that they say glyphosate, but I'm

21   pretty sure they mean a glyphosate-based formulation.

22        Q.    Okay.  So why is it pertinent to you in

23   your discussion of Bolognese that the highest reported

24   frequency of BNMN was in Boyaca?
```

Jay Irwin Goodman, Ph.D.

```
1        A.    Well, that is important to me because

2   in -- in evaluating the results of this study, the

3   thing that was paramount in my mind was whether there

4   would be a -- an appropriate positive correlation

5   between the degree, level of spraying of the -- in

6   this case they are -- they are saying glyphosate and

7   the genotoxicity reported.  So while the report might

8   be correct in terms of saying, Yes, we did observe

9   micronuclei, the question is, Can you from that say

10  that this is due to glyphosate or a glyphosate-based

11  formulation.

12       Q.    Is it your belief that the population of

13  Boyaca was not exposed to glyphosate or

14  glyphosate-based formulations?

15       A.    I am taking the -- you know, I forgot -- I

16  just don't know whether it is a he or she.  So I am

17  taking the -- the -- the author's word for this when

18  the -- when the author says that there was no

19  glyphosate spraying.  And, again, I'm sure that he or

20  she means glyphosate formulation spraying in this

21  area.

22       Q.    Okay.  So --

23       A.    I have no independent knowledge of this.

24       Q.    So if you turn to Page 991 of the
```

Jay Irwin Goodman, Ph.D.

1    Bolognese study, I'd ask you to look at Table 2.

2        A.    I'm there.

3        Q.    So on the left-hand column it says

4    "Region" and below that "Phase 1."

5              Are -- are you following me?

6        A.    I am.

7        Q.    Okay.  And below Phase 1 it says, "Number

8    of subject" -- "subjects" and then "BNMN."

9        A.    Yes.

10       Q.    Correct?

11             Okay.  Okay.  And I guess in the -- in the

12   table description it defines Phase 1 as five days

13   after spraying, correct?  Oh, sorry.  Phase 1 as -- as

14   being before exposure and then Phase 2, five days

15   after spraying, and then Phase 3, four months later?

16       A.    It looks like that.  It looks to me that's

17   what it says.

18       Q.    Okay.  Now, if you go down to BNMN

19   reported in Phase 1, under Boyaca it reports 5.64?

20       A.    That's correct.

21       Q.    Okay.  And so am I correct that that is

22   the frequency of BNMN prior to aerial spraying of

23   glyphosate-based formulations in any of the other

24   regions?

Jay Irwin Goodman, Ph.D.

1      A.    Yeah, Phase 1 was -- was --

2      Q.    Okay.

3      A.    -- was before.

4      Q.    And -- okay.  And if we go down to

5   Phase 2, the number that I see for Boyaca is 4.96.

6      A.    I see that.

7      Q.    Okay.  And that number appears to be lower

8   to me than the number under Valle de -- del Cauca, I

9   guess is how I pronounce that, the -- the furthest

10  province to the right?

11     A.    It does.  It's -- it's also rather

12  interesting that there doesn't seem to be any

13  statistical analysis here.

14     Q.    Okay.  But so in -- in this section, if we

15  are looking at Phase 2, does it appear to you as

16  though the frequency of BNMN is higher in both Valle

17  del Cauca and Nario than Boyaca?

18     A.    The number -- the -- the -- the numbers

19  are higher.  Whether there is a statistical

20  difference, I don't know.

21     Q.    Okay.  Now, if you turn to Page 988, which

22  I think is back a page or two -- or actually...

23     A.    I'm sorry...

24     Q.    You know, I might just skip that question.

Jay Irwin Goodman, Ph.D.

1    Let me just go to the bottom of Page 994.  And if you

2    look at the -- the very last paragraph on -- on that

3    page that carries over to the next page, the authors

4    state in the second sentence that:

5              "The frequencies of BNMN in Nario and

6    Putumayo during the second and third sampling fell

7    within the range of values observed in Boyaca, an area

8    where people were exposed to a complex miss" --

9    "mixture of different pesticides (including

10   glyphosate)."

11             Do you have any reason to believe that the

12   people in Boyaca who were sampled by this study were

13   not exposed to glyphosate?

14        A.   Based upon -- based upon what is said

15   here, the an -- the answer is no, but because they

16   were exposed to a complex mixture, I don't see how you

17   are able to point to any one or combination of

18   those -- to any one of those and say that the effect

19   observed was due to this particular chemical.

20        Q.   Do you believe that the subjects in the

21   exposed populations of the Bolognese study experienced

22   significantly elevated levels of micronucleus

23   formation and peripheral blood lymphocytes following

24   exposure?

Jay Irwin Goodman, Ph.D.

1      A.    By "significant," do you mean

2   statistically significant?  Because I don't see that

3   they did statistics.

4      Q.    Okay.  Let's just ask if the levels were

5   increased, do you have any reason to disagree with

6   that finding?

7      MS. PIGMAN:  Objection; form.

8   BY THE WITNESS:

9      A.    If you just look -- if you just look at

10  the numbers, you can say that one number appeared to

11  be higher than the other.  Now, is that really

12  different, meaning was it a different population, you

13  can't really start talking about that without some

14  statistical analysis.

15  BY MR. WOOL:

16     Q.    Can you definitively rule out exposure to

17  glyphosate-based formulations as a cause of both the

18  BNMN and the micronucleus formation and peripheral

19  blood lymphocytes for the exposed populations in this

20  study?

21     A.    Well, I think that the -- I think that --

22  I think that the authors really speak for themselves

23  on this point where they say, "There is not sufficient

24  information to correlate the frequency of micronuclei

Jay Irwin Goodman, Ph.D.

1    to the pesticide exposure."

2        Q.    So you would defer to the authors?

3        A.    Well, I look here and look at the paper, I

4    think that the authors have placed a -- a proper

5    context on their -- on their -- on their -- on their

6    findings.

7        Q.    I'm going to hand you the -- the

8    Paz-y-Mino study.

9        A.    So are we finished with No. 8 for the time

10    being?

11        Q.    Yes, we are finished with -- well, hold

12    on.

13            I'm going to mark the Paz-y-Mino study as

14    Exhibit 9?

15        MS. PIGMAN:  Which one?

16        MR. WOOL:  The 2007 study, which I believe is

17    the first that you discuss in the Human Study section.

18            (WHEREUPON, a certain document was

19             marked Deposition Exhibit No. 25-9,

20             for identification, as of

21             09/22/2017.)

22    BY THE WITNESS:

23        A.    Thank you.

24        MS. PIGMAN:  Thank you.

Jay Irwin Goodman, Ph.D.

1    BY MR. WOOL:

2        Q.    And take a moment to glance over the study

3    if you need to.

4        A.    I do.

5        Q.    Okay.  And you describe these --

6        A.    I -- I mean I do need a moment to --

7        Q.    Oh, yeah, yeah, yeah.  Okay.  Go ahead.

8        A.    All right.  I've looked it over.

9        Q.    Okay.  And this study is -- conducted a

10   Comet assay, is that correct?

11       A.    That is correct.

12       Q.    And what is a -- a Comet assay?  You might

13   have answered that earlier.  If so, I apologize.

14       A.    I do not think I described that earlier.

15       Q.    Okay.  Very well.

16       A.    So, what is a Comet assay.

17             A Comet assay is an indirect measure of --

18   of genotoxicity.  When compounds interact with DNA

19   cells have an ability to repair the damage.  Repair of

20   the damage starts with making a strand break in the

21   DNA strand near the damaged site as the cell then

22   tries to cut out this damaged site and patch over it.

23   During this process, there is a break in the strand of

24   DNA as it's trying to cut out that one patch.  So if

Jay Irwin Goodman, Ph.D.

1   one then places the cell -- isolates the nuclei and

2   places the cells under alkaline pH conditions, this

3   causes the DNA strands to unwind.  And if there are

4   strand breaks, one will see fragments of the DNA.  And

5   if there are no strand breaks, then you'll see big

6   pieces of DNA.

7       Q.    And do you believe -- oh, go ahead.

8   Sorry.

9       A.    And then one puts these nuclei in an

10  electrical field, the DNA is negatively charged, and

11  that means that in the electrical field the negatively

12  charged DNA will move towards the positively charged

13  anode and what you will see is -- what you will see is

14  streaming, if you will, of the DNA.  If the -- if

15  there are no strand breaks, you'll see that most of

16  the DNA will stay bunched up to where the nucleus was.

17  If there are a modest amount of strand breaks, you'll

18  see some streaming.  If there is a great amount of

19  strand breaks, you'll see more streaming.  And if you

20  picture this and then you use your imagination a

21  little bit, you can say, Well, you know, this looks a

22  little bit like a comet that has a head and then has a

23  faint tail.  And so that's why this is called a Comet

24  assay.

Jay Irwin Goodman, Ph.D.

```
 1        Q.    And is a Comet assay a valid test for

 2   assessing genotoxicity?

 3        A.    Yeah.  You know, actually, I think we did

 4   go over this part a little bit this -- this morning.

 5        Q.    Yeah, that's what I was thinking.

 6        A.    But the -- the answer is that a -- in my

 7   opinion, that a properly-formed Comet assay is

 8   certainly a -- a -- a good test to use for evaluating

 9   genotoxicity.

10        Q.    Okay.  And if you turn to Page 457, the

11   Paz-y-Mino study.

12        A.    Okay.  I'll -- I'll get there.

13              I'm there.

14        Q.    Okay.  The first full paragraph states

15   that:  "The exposed group consisted of 24 random" --

16        A.    I'm sorry.

17        Q.    Are you there?

18        A.    Yes.  I -- I just touched her papers.  I

19   said I was sorry.

20        Q.    It states:

21              "The exposed group consisted of 24

22   randomly selected individuals" in "(Table 1) who lived

23   3 kilometers or less from an area on the border

24   between Ecuador and Columbia where aerial spraying
```

Jay Irwin Goodman, Ph.D.

1    with a glyphosate-based herbicide had occurred

2    continuously during three days between December 2000

3    and March 2001, sporadic aerial spraying continuing

4    for three weeks following continuous spraying (MREE,

5    2003, at Accon Ecolgica 2004)," is the source for

6    that.

7                  So do you have any reason to disagree that

8    the exposed group was exposed to at least multiple

9    days of aerial-based glyphosate formulation spraying?

10       A.    Do I have any reason to disagree with --

11       Q.    Yes, to -- to make that?

12       A.    No, I do not.

13       Q.    All right.  Now, if you go to Page 12 of

14   your report, you indicate that you have four major

15   concerns that cast serious doubt on the validity of --

16   of this study.

17       A.    That is correct.

18       Q.    Okay.  Now, is it a totality of those four

19   concerns or does any one concern on its own in your

20   mind render the results of the paper invalid or

21   questionable?

22       A.    I think each individual concern, each

23   individual concern that I ar- -- I articulated raises

24   a level of concern in my mind.  And my level of

Jay Irwin Goodman, Ph.D.

1    concern gets raised higher as we start looking at one,

2    two, three and four.  So each individual one would

3    raise a level of concern.  The combination of them is

4    additive, if you will.

5         Q.    But none of the four concerns listed on

6    pages -- pages 12 and 13 taken individually would --

7    would cause you to kind of invalidate in -- in your

8    mind the results of the study?

9         MS. PIGMAN:  Objection; misstates his testimony.

10   BY THE WITNESS:

11        A.    Yeah, what -- what I said was that each

12   one individually I think is, as I said, a major

13   concern.  And with that major concern for any one of

14   them, I would have questioned the validity of the

15   study.  When I see four of them, I really, really

16   question the validity of the study.

17   BY MR. WOOL:

18        Q.    So let's talk about the first one, I

19   guess.

20             Fair to say that the subjects, the exposed

21   subjects in the Paz-y-Mino study experienced a -- a

22   number of wide ranging health effects, if you will?

23        A.    I have a Ph.D.  I am not a medical doctor,

24   but it seems to me, looking at these different

Jay Irwin Goodman, Ph.D.

1    effects, it seems to me that these individuals were,

2    in a layman's term, hurting.

3         Q.    And you state after quoting the article

4    that:

5              "These people appear to be seriously ill.

6    A thorough investigation would have been necessary in

7    order to ascertain the cause or causes of their

8    illness, including what other chemicals they were

9    exposed to, and how that might have contributed to the

10   DNA strand breaks reported.  Under these

11   circumstances, it is not appropriate to simply

12   conclude that DNA damage is related directly to GBF

13   exposure."

14        A.    That's what I said and that's what I

15   believe today.

16        Q.    Okay.  Do you have any reason to believe

17   that the subjects were exposed to something else that

18   would have caused those symptoms?

19        A.    I am a Ph.D., not a medical doctor, but it

20   seems to me, again, that -- that these folks were, in

21   layman's terms, hurting.  It just looks like a -- a

22   variety of problems here and I think that it would

23   have been highly appropriate to inquire as to was

24   there anything else that they were exposed to besides

Jay Irwin Goodman, Ph.D.

```
1   glyphosate that might have caused these symptoms and,

2   B, if one or more of those other factors were factors

3   that could have contributed to the genotoxicity

4   results reported.

5        Q.    But sitting here today -- or -- or strike

6   that.

7              Okay.  If you look at the top of Page 5 --

8   458, I'm sorry, top of Page 458?

9        A.    I'm there.

10       Q.    Okay.  The second paragraph down states:

11             "None of the indi" -- "individuals

12   analyzed in this study (neither the exposed group nor

13   the control group) smoked tobacco, drank alcohol, took

14   non-prescription drugs or had been exposed to

15   pesticide" -- "pesticides during the course of their

16   normal daily lives.  All of the individuals included

17   in this study mainly worked at home, sometimes

18   cultivating and harvesting crops without the use of

19   pesticides" -- I mean "without the use of herbicides,

20   pesticides or similar substance" -- "substances in the

21   named activities and their windowed houses did not

22   contain asbestos in the ceiling or roofs."

23             I know I struggled with that, but I -- did

24   I read that correctly?
```

Jay Irwin Goodman, Ph.D.

```
 1          A.     You did.

 2          Q.     Okay.  Do you have any reason to disagree

 3   with that finding?

 4          A.     No.

 5          Q.     And sitting here today, do you have any

 6   reason to believe that something else caused these

 7   symptoms?

 8          A.     Again, as a layman looking at this laundry

 9   list, long laundry list of symptomology, it's --

10   appears to me that -- that these people are hurting

11   and that there should have been some evaluation as to

12   what might be the cause of all of these different

13   symptoms that they were exhibiting.

14          Q.     And sitting here today, you don't believe

15   that glyphosate-based formulation exposure could have

16   caused all of these symptoms?

17          A.     What I'm saying is, as a -- as a -- as a

18   layman, I'm not making a -- a diagnosis.  If I do not

19   know exactly what the symptoms are and all of the

20   symptoms are of glyphosate poisoning, it would -- I

21   think that it would have been highly appropriate for

22   the authors of this study to have sought some medical

23   advice as to are any or all of these symptoms

24   associated with glyphosate poisoning.  If so, how much
```

Jay Irwin Goodman, Ph.D.

```
 1    glyphosate would it take to cause this and what are

 2    other factors that may cause this plethora of malaise.

 3         Q.    Now, if you look at the end of the second

 4    paragraph on Page 457 of the Bolognese study --

 5         A.    Are we --

 6         Q.    -- or sorry, the first --

 7         A.    Which column?

 8         Q.    The -- the left-most column.

 9         A.    Excuse me.  We are talking Paz-y-Mino,

10    right?

11         Q.    Yes.  Did I say Bolognese?

12         A.    You did.

13         Q.    I'm sorry.  It's been a long day.

14         A.    That's -- that's okay.  I understand.

15         Q.    So I'm looking at the last sentence of the

16    first full paragraph.

17         A.    Oh, on the right or left column?

18         Q.    The left column.

19         A.    Okay.

20         Q.    And it said -- and it states:

21               "Exposed group individuals manifested

22    symptoms of toxicity after several exposures to aerial

23    splay" -- "spraying, with half of the individuals in

24    the group having received spraying directly over their
```

Jay Irwin Goodman, Ph.D.

1    houses and the other half living within 200 meters to

2    3 kilometers from the sprayed areas."

3              Did I read that correctly?

4         A.    You did.

5         Q.    Do you have any reason to disagree with

6    that finding?

7         A.    No.

8         Q.    So it sounds to me like the authors are

9    saying that these symptoms manifested after exposure,

10   is that correct?

11        MS. PIGMAN:  Objection; vague and form.

12   BY THE WITNESS:

13        A.    Well, they -- they did say "after several

14   exposures," but this does not get to the point that I

15   was making in terms of what else might have been going

16   on in their environment that could have contributed to

17   the -- these symptoms.  I mean, for -- for example,

18   we -- we -- we would not do experiments on animals

19   that started exhibiting this laundry list of -- of --

20   of -- of symptoms --

21   BY MR. WOOL:

22        Q.    So --

23        A.    -- without investigation and calling in a

24   veterinarian and saying what might be going on here.

Jay Irwin Goodman, Ph.D.

1      Q.    So to the best of your knowledge, those

2   symptoms are not consistent with the acute toxicity

3   caused by glyphosate exposure?

4      MS. PIGMAN:  Objection; asked and answered.

5   BY MR. WOOL:

6      Q.    You can answer.

7      A.    That's -- that's -- that -- that is --

8   that is -- that is not correct.  What I said is I am a

9   Ph.D., not a medical doctor, and I do not know all of

10  the symptoms of glyphosate poisoning and I do not know

11  the particular concentrations, exposures necessary to

12  cause this particular plethora of -- of ailments.

13     Q.    Okay.  I'm going to mark Exhibit 25-10 for

14  you, which is --

15     A.    So, are we finished with --

16     Q.    We -- we might come back to it.

17     A.    Okay.

18              (WHEREUPON, a certain document was

19               marked Deposition Exhibit No. 25-10,

20               for identification, as of

21               09/22/2017.)

22  BY MR. WOOL:

23     Q.    And I believe that you reference and

24  discuss this article in another part of your report.

Jay Irwin Goodman, Ph.D.

```
1        A.    Which one are we on now?

2        Q.    This is an article by Zouaoui.

3        A.    Yes.

4        Q.    Okay.  And this article, in sum, describes

5   acute intoxications after ingesting glyphosate and

6   this is for cases where, and I believe there were

7   attempted suicides and -- and some accidental cases,

8   correct?

9        A.    That is correct.

10       Q.    Okay.  Now, if you look in the Abstract

11  section, it is roughly in the middle, there is a

12  sentence that reads:

13            "The most common symptoms were

14  oropharyngeal ulceration, nausea and vomiting.  The

15  main altered biological parameters were high lactate

16  and acidocid" -- "acidosis.  We also noted respiratory

17  distress, cardiac arrhythmia, hyperkalemia, impaired

18  renal function, hepatic toxicity and altered

19  consciousness."

20            Did I read that correctly?

21       A.    You did.

22       Q.    Okay.  And does that sound similar to you,

23  I know you're not a medical doctor, but to the

24  symptoms that you describe on Page 12 of your expert
```

Jay Irwin Goodman, Ph.D.

1   report?

2        A.    The symptoms that I describe on my expert

3   report were taken verbatim from the Paz-y-Mino study

4   and there is some relatively slight overlap between

5   the malaise reported in Paz-y-Mino 2007 and some of

6   the symptoms that you just read from the abstract of

7   the Zouaoui 2013 paper.

8        Q.    Do you believe the Zouaoui 2013 paper is a

9   methodologically-sound article?

10       A.    Yes.

11       Q.    Okay.  Let's go to Page 13 of your expert

12  report and sub-point 3.

13       A.    I'm there.

14       Q.    Okay.  So can you explain what the issue

15  is that -- that you're sort of describing with the --

16  the rank number methodology in Zouaoui?

17       A.    In reading this --

18       Q.    I'm sorry.  Not in Zouaoui.  In -- in

19  Paz-y-Mino?

20       A.    Paz-y -- this is -- it's okay.

21            In reading -- in reading this, I, frankly,

22  was confused by what they meant by -- by "rank

23  number."  And because I was confused by that, I looked

24  at the reference that they gave for the way they

Jay Irwin Goodman, Ph.D.

```
 1    approached the evaluation, which is the Anderson et
 2    al. 1994 reference, saying to myself, Ah-Ha, I am
 3    going now to find out what rank number means and how
 4    one arrives at this.  And to my surprise, the Anderson
 5    et al. 1994 paper doesn't say anything about a rank
 6    number from 0 (A) to 400 (E), at which -- which
 7    surprised me.
 8        Q.    And does that shortcoming lead you to
 9    question the results reported by Paz-y-Mino?
10        A.    The shortcoming leads me to wonder about
11    the analysis.  And Paragraph 3 also contains a -- a
12    second concern.  So Paragraph 3 is really a --
13        Q.    So let's --
14        A.    -- a multi-concern paragraph.
15        Q.    Right.  So -- so let's talk about that
16    second concern.  What -- to -- in sum, you sort of
17    take issue with the -- actually, why don't you just
18    explain the -- the second concern to me in your own
19    words.
20        A.    Okay.
21            So I did describe the Comet assay to you,
22    and you can see, I hope, by my description, and if not
23    I'll be glad to try to clarify, that there can be --
24    if one is doing this by eyeball, which is what was
```

Jay Irwin Goodman, Ph.D.

1    done, just a person looking, you can see that there

2    can be some subjectivity in terms of is the tail

3    bigger, how much bigger is this tail.  There can be

4    some subjectivity here.  And one way to try to

5    minimize variability coming in from subjectivity --

6    and by subjectivity I don't mean anything in terms of

7    somebody being malicious, I don't mean anything in

8    terms of somebody trying to -- to put their finger on

9    the scale to skew things.  I'm just talking about

10   honest subjectivity.  And so one way to try to

11   minimize this is to have a individual read the results

12   as opposed to having one individual read this piece of

13   the results and another that piece and another that

14   piece of the results.

15            And so in Anderson et al., which is the

16   reference that Paz-y-Mino referred to in terms of

17   their methodology, makes a point, and I think a very

18   valid point, that one can minimize variability due to

19   subjectivity by having a individual do the analysis.

20   And what I point out here is that in light of citing

21   this particular reference, I find it strange that

22   Paz-y-Mino did not say, And according to our reference

23   for the methodology, Author X on the paper is the one

24   who did the scoring.  The lack of that leads me to

Jay Irwin Goodman, Ph.D.

1    suspect that perhaps there were multiple individuals

2    involved in the -- in the scoring.

3         Q.    But would you agree that the suspicion is

4    speculative?

5         A.    Absolutely, yes, it is speculative but,

6    speculative but.  If it were not for the fact that

7    Paz-y-Mino et al. 2007 referred to Anderson et al.

8    1994 as their reference for the way they performed

9    this aspect of the analysis, I don't think this would

10   have risen to such a level of concern, but since they

11   point to Anderson, and Anderson did this with one, if

12   you will, observer, it is strange to me that

13   Paz-y-Mino did not point -- did not point out that

14   they had one person.  And if they did not point it

15   out, one can suspect that there may have been several.

16          Is this speculative, the answer is yes,

17   but I ask you to view that within the context of the

18   analysis I just gave you.

19        Q.    And had multiple people actually reviewed

20   the results, would that have rendered the results

21   unreliable, saying they didn't cite to this Anderson

22   article, they just said, We used multiple reviewers,

23   would -- would that have rendered the results under --

24   unreliable?

Jay Irwin Goodman, Ph.D.

```
 1       A.    If they used multiple reviewers --

 2   multiple reviewers, I would have expected them to say

 3   something about comparison, how these reviewers

 4   compared, how the -- how the results reported by these

 5   reviewers compared, compared with, with each other.  I

 6   think it could have been problematic if -- if, for

 7   example, speculating, that there was one individual

 8   that reviewed controls and that there was another

 9   individual who reviewed some of the mid dose and

10   another some of the high dose and then another some

11   more of the high dose and another some more of the --

12   of the mid dose.

13            I am not at all saying that anybody did

14   anything malicious.  I'm not even suggesting that

15   anybody put their finger on the scale to tilt

16   anything, just that eyeballing with this type of

17   analysis can be -- there is subjectivity that comes

18   into it, to play.

19       Q.    So using multiple reviewers per se

20   wouldn't be unreliable, it would depend on how they

21   used those reviewers --

22       A.    It would --

23       Q.    -- is that correct?

24       A.    It -- using multiple reviewers -- multiple
```

Jay Irwin Goodman, Ph.D.

1    reviewers or multiple observers, however we want to

2    categorize this, in and of itself, in my opinion,

3    would not be problematic, but I would have expected

4    them to talk about how the different reviewers

5    compared with each other and, again, I think it could

6    be problematic if you have one individual review a

7    piece of the results and another individual review

8    another piece, and another one another piece and then

9    you put them together.

10        Q.    Fair enough.

11              So let's go to your second criticism of --

12    of the Paz-y-Mino 2007 study.

13        A.    We are back on Page 12?

14        Q.    We are on Page 12 to -- to 13.

15        A.    Okay.

16        Q.    And your issue is the -- the lag time --

17    sorry.  Or why don't -- why don't you describe briefly

18    why this issue that you raise in Point No. 2 makes you

19    question the validity of the results?

20        A.    Well, I question it because if one is

21    going to do the -- take the blood samples, a -- a

22    reasonably long time after the exposure to the

23    glyphosate-based formulation, then there is the very

24    real chance that these individuals were exposed to

Jay Irwin Goodman, Ph.D.

1    another compound or compounds that could have produced

2    the genotoxic effect.

3         Q.   But, again, that's somewhat speculative,

4    fair, that there is another compound that they were

5    exposed to?

6         A.   Yes, it is speculative, but it -- I think

7    it's -- it's -- it's reasonably speculative because a

8    period of a couple of weeks to a couple of months is a

9    relatively long time and provides opportunity for

10   exposure to I don't know what else.

11        Q.   Okay.  So viewing the -- kind of the

12   results and conclusions of Paz-y-Mino 2007 and the

13   2000 -- is it '9 Bologne- -- yeah, Bolognese article,

14   is it plausible that the observed effects were due to

15   the genotoxic properties of glyphosate-based

16   formulations?

17        A.   It's my view that the concerns that I've

18   raised rise to the level where one cannot come to a

19   yes-or-no conclusion in terms of genotoxicity on the

20   data presented.  Yes, they did measure and observe a

21   measure of genotoxicity, but I think, based upon my

22   concerns, that one cannot say that it was glyphosate

23   or a glyphosate-based formulation that produced these

24   effects.

Jay Irwin Goodman, Ph.D.

```
1        Q.    Okay.  Okay.  So I think I'm finished

2  with -- with those two studies.

3             And let me just ask you a -- a quick

4  question on -- do you recall when you received your

5  Notice of Deposition?

6        A.    Oh, do I recall when I received my Notice

7  of Deposition?  Yeah.  The -- I received the Notice of

8  Deposition while I was in -- in Europe.  I travel so

9  much.  Time changes, which could have been a week or

10 10 days ago or a week ago or when did I get that.  So

11 I returned from Europe on last Thursday --

12       MS. PIGMAN:  If you don't -- you don't have to

13 guess or speculate.

14 BY THE WITNESS:

15       A.    Some -- some -- sometime between five and

16 ten days ago.

17 BY MR. WOOL:

18       Q.    Okay.  Do you recall when you departed for

19 Europe?

20       A.    Oh, well --

21       MS. PIGMAN:  Objection.  Irrelevant and --

22 BY THE WITNESS:

23       A.    Yes, I do.  September 6th.  September 6th.

24 BY MR. WOOL:
```

Jay Irwin Goodman, Ph.D.

```
 1        Q.    September 6th, okay.

 2              And we -- we talked about the materials

 3   that you produced, but did anybody help you gather --

 4   aside from the -- the attorneys at Hollingsworth who

 5   probably viewed them -- or reviewed the materials for

 6   relevance, but did anybody help you look through your

 7   publications, materials reviewed, anything like that

 8   to search for responsive articles to the -- responsive

 9   documents to the Notice of Deposition?

10        A.    No.  Nobody.  It -- it was me and my

11   computer.

12        Q.    Okay.  So I've asked you a number of

13   questions today about whether or not you might have

14   discounted any negative studies due to methodological

15   flaws or noncompliance with the OECD guidelines,

16   correct?

17        A.    You -- you did say that a number of times

18   and my response is that there is a set of criteria

19   that I employed and that set of criteria was employed

20   to the studies and regardless of whether it was a

21   study where the author reported a positive effect or

22   the author reported a negative effect.

23        Q.    Okay.  Sitting here today, can you point

24   to a negative article cited in your expert report that
```

Jay Irwin Goodman, Ph.D.

1    you disregarded due to methodological flaws?

2         A.    I cannot.  I cannot.

3         Q.    Okay.  And can I assume that for any

4    opinion that we didn't specifically discuss today that

5    your accurate and complete opinion or opinions are

6    contained within your expert report?

7         MS. PIGMAN:  Objection; asked and answered.

8    BY THE WITNESS:

9         A.    I --

10        MS. PIGMAN:  You can answer.

11   BY THE WITNESS:

12        A.    I -- I stand by my report.  The opinions

13   that are expressed in the report were my final

14   opinions on 31 July 2017 and I stand by them today.

15   BY MR. WOOL:

16        Q.    Okay.  Do you have, I believe it's

17   Exhibit 2, your -- your supplemental reliance list

18   handy?

19        A.    I do have it handy.  I do have it handy.

20   I think it is -- it's not there.  I do have it.  It is

21   in my hand.

22        Q.    Okay.  I'll ask you to turn to Page 2.

23        A.    I'm there.

24        Q.    Okay.

Jay Irwin Goodman, Ph.D.

1        A.    It starts with Reference 12.

2        Q.    And -- oh, no.  I want you to look at

3    Reference No. 18.

4              And can you tell me if you relied upon

5    that study?

6        A.    If it is in this list, it is one of the

7    papers that I reviewed, looking in terms of the large,

8    large number of papers that I reviewed.  If you want

9    to ask me something specific about this, I'll really

10   have to see the paper.

11       Q.    It -- I just want to ask, it appears to be

12   an Ames test, is that correct?

13       A.    It -- it does -- it -- it -- it is -- it

14   is not an Ames test.  It is not an Ames test.  They

15   are looking here for some type of genetic

16   recombination and then this -- this is not within the

17   scope of the Ames test as I described to you -- to you

18   earlier.

19       Q.    Okay.  Let's see.  Do you recall at all

20   whether you relied upon that article in -- in forming

21   any of your opinions?

22       MS. PIGMAN:  Objection; asked and answered.

23   BY THE WITNESS:

24       A.    If it is on the materials list, it is an

Jay Irwin Goodman, Ph.D.

1    article that I -- that I did look at and my opinion is

2    based on an evaluation of this large body of -- of

3    information.

4    BY MR. WOOL:

5        Q.    Okay.  Why don't you take a look at No. 11

6    on your reliance list, and I don't know if you'll be

7    able to tell me, but just looking at the -- the name

8    of the study what type of study that is?

9        A.    I'm sorry.  In terms of all of these

10   articles, I -- I -- I -- I would have to see the -- I

11   would have to see the reference before opining.

12       Q.    Okay.  Fair enough.

13           MR. WOOL:  I think that's it.

14       MS. PIGMAN:  Okay.  Well, let's go off the

15   record, take a quick break.

16       THE VIDEOGRAPHER:  Going off the record at

17   4:15 p.m.

18                  (WHEREUPON, a recess was had

19                   from 4:15 to 4:33 p.m.)

20       THE VIDEOGRAPHER:  This the beginning of Disk

21   No. 5.  We are back on the record at 4:33 p.m.

22                      EXAMINATION

23   BY MS. PIGMAN:

24       Q.    And, Dr. Goodman, I know we've been here a

Jay Irwin Goodman, Ph.D.

1   while today, so forgive me.  I'm going to jump around

2   quite a bit and just touch on a few things that you

3   and Mr. Wool discussed earlier.  If I lose you in my

4   jumping around, please let me know, and like Mr. Wool,

5   I'll be happy to repeat or rephrase the questions so

6   that they make sense.

7           Earlier today, toward the beginning of the

8   day, I think, you were asked if you considered or

9   reviewed the items on your Materials Considered List

10  and your supplemental Materials Considered List.

11          Do you recall that series of questions?

12      A.   I do.

13      Q.   In addition to those -- the materials on

14  that list, is there anything else that you relied on

15  in reaching your opinions in this case?

16      A.   Well, in addition to a thorough review of

17  the materials on the list, this is really done with a

18  background of -- of decades in terms of toxicology, in

19  terms of toxicology research, teaching, in areas

20  related directly to the matter at hand.

21      Q.   And so is it fair to say that you brought,

22  in working on this matter and reaching your opinions,

23  you also relied on the training and experience you've

24  accumulated over the years?

     1        MR. WOOL:  Objection to form.

     2   BY THE WITNESS:

     3        A.    That -- that is -- that -- that is

     4   correct.  It is a body of -- of knowledge built up

     5   over decades.

     6   BY MS. PIGMAN:

     7        Q.    Okay.  We're going to jump topics.

     8              You were asked a series of questions

     9   throughout the day, I think, about whether you

    10   compared what were reported by the authors as negative

    11   studies to OECD guidelines.

    12              Do you remember those questions?

    13        A.    I do.

    14        Q.    And just so we're clear, what was your

    15   review methodology for the positive and negative

    16   studies that you looked at?

    17        A.    Well, what I tried to take into

    18   consideration were questions of -- questions of -- of

    19   dose-response, questions of toxicity, questions of

    20   appropriateness of dosing, particularly whether

    21   excessive doses were used, dose time responses, and

    22   basically the template, if you will, was used for all

    23   of the studies evaluated.

    24        Q.    In addition to the things that you just

Jay Irwin Goodman, Ph.D.

1    named, did you also consider, for example, root of

2    exposure?

3         A.    Yes.

4         MR. WOOL:  Objection; leading.

5    BY MS. PIGMAN:

6         Q.    And did you also consider whether the

7    study had a sufficient amount of test material or

8    subjects?

9         A.    Yes, I did look at -- at this in terms of

10   did it appear to be a -- a reasonable number of --

11   reasonable number of subjects.

12        Q.    And how, if at all, did the methodology

13   you applied to the studies compare to the OECD

14   guidelines?

15        A.    The methodology I applied in -- in my

16   opinion is -- is consistent -- consistent with the

17   OECD guidelines, although it -- it is not necessarily

18   exactly following, but it is certainly consistent with

19   the guidelines and consistent with the -- with the --

20   with the spirit of the guidelines.  We have to

21   remember that a lot of, a lot of, a lot of the studies

22   that I looked at are studies in the -- that were in

23   the peer-reviewed literature, studies that come from

24   academic laboratories where they are or should be

Jay Irwin Goodman, Ph.D.

1   following good basic experimental techniques and

2   approaches, but, frankly, my -- my academic colleagues

3   vary greatly in terms of their knowledge of OECD

4   guidelines.  And so I think what we're looking at,

5   basically, is for good, solid, reliable

6   experimentation and when this -- when this is done,

7   even if the author doesn't re -- doesn't know it, they

8   are still doing it consistent with basically the

9   spirit of the OECD guidelines.

10       Q.    Did you do a weight of evidence analysis?

11       A.    I did not.  It sounds to me like by weight

12   of evidence what you are asking is did I say this

13   number of studies were positive and that number were

14   negative and -- and sort of weigh them.  What I did is

15   my own independent, constructively critical, in-depth

16   analysis and reached a conclusion based upon an

17   evaluation of a very large body of data.

18       Q.    Another quick jump in topic.

19             You were asked a lot of questions about

20   whether you discounted any studies reporting negative

21   results due to inconsistencies with that methodology

22   you just described.

23             Do you recall those questions?

24       A.    I do.

Jay Irwin Goodman, Ph.D.

1      Q.    And, for example, do you recall being

2   asked whether you discounted negative reports, again,

3   by the authors using the IP route of administration?

4      A.    I recall I was asked that, yes.

5      Q.    And what did you -- and I -- if I recall

6   correctly, and please correct me if this is wrong, but

7   your testimony was that you did not, is that right?

8      A.    That's right.  The IP route of

9   administration is, as I said, it's non-physiological,

10  it is very extreme.  One gets rather very high blood

11  levels that you would not see by normal routes of

12  administration.  And so I think that one can look at

13  this and say, Well, you know, if I don't see an

14  effect, and in this case a genotoxic effect, under

15  some extraordinary, in quotation marks, harsh testing

16  conditions, then I'm not going to see an effect under

17  mild conditions.

18     Q.    And is mild another word for appropriate?

19     A.    Mild is another word for appropriate.

20     Q.    Do you -- another jump.

21           Do you recall earlier that Mr. Wool asked

22  you about whether you reviewed genotoxicity studies

23  related to surfactants?

24     A.    I do.

Jay Irwin Goodman, Ph.D.

1      Q.    And I believe you testified that you

2   reviewed various EPA reports describing genotoxicity

3   studies on surfactants, is that right?

4      A.    I did.

5      Q.    Did you also consider any, what I will

6   call primary or original data authors generated about

7   the genotoxicity of surfactants?

8      A.    I did, and I -- I did review a number of

9   those studies, a number of -- they are and there is

10  a -- a handful, eight, ten, fifteen that are in the

11  supplemental material.  As I said earlier, these --

12  these proceedings are -- this -- this venue is --

13  is -- is very new to me and in coping with this venue,

14  I -- there was some things I did forget to mention.

15     Q.    And is it true that for the assessing the

16  genotoxicity of surfactants, you reviewed the

17  underlying study reports where those were available to

18  you?

19     A.    Yes, which, again, is somewhere between

20  eight or ten or fifteen of the references provided in

21  the supplemental Materials Considered List.

22     Q.    We are going to jump topics again.  I

23  again apologize for that, but do you recall being

24  asked questions about whether the route of

Jay Irwin Goodman, Ph.D.

 1   administration used in a study goes to the assessment

 2   of genotoxicity or to the relevance of that study's

 3   findings to humans?

 4        A.    Mr. Wool did ask me a question like that,

 5   yes.

 6        Q.    And just so we're clear on the record,

 7   which of those things does it go to?

 8        A.    In my opinion, it goes to both.

 9        Q.    And could you explain that for us?

10        A.    Well, it goes to both in terms of the

11   appropriateness of the study and whether it is a -- a

12   problematic confounding factor and if it is a

13   problematic confounding factor, it goes to the

14   approp- -- appropriateness of using that study as a

15   basis for, if you will, translation of the results to

16   humans.  So it goes to both.

17        Q.    Okay.  I have one last question which

18   requires one last jump in topics.

19              Do you recall being asked questions about

20   whether oxidative stress is a sign of carcinogenicity?

21        A.    I was asked a question along those lines.

22   I don't remember now if that is the exact wording, but

23   that certainly is the meaning that I took away from

24   the question.

Jay Irwin Goodman, Ph.D.

```
 1        Q.    And -- and what is your answer to that?

 2        A.    My answer, my answer to that is that the

 3   available data in terms of glyphosate,

 4   glyphosate-based formulations and oxidative stress

 5   in -- in my opinion cannot be used as a basis to claim

 6   that glyphosate or glyphosate-based formulations cause

 7   cancer.  And that this is taking into account also the

 8   fact that in many, if not all of these studies, but at

 9   least in many of them there were very, very high

10   concentrations used and using that information that I

11   gave you in terms of even using the EPA's high dose

12   estimate for glyphosate -- for glyphosate exposure of

13   the 0.78 micrograms per mL, we can see that in the

14   experimental conditions they were many tens to many

15   hundreds of times higher than that.

16        MS. PIGMAN:  All right.  Doctor, given with

17   that, subject to potentially questions if Mr. Wool has

18   any more, I am finished.

19        MR. WOOL:  I'll be quick.

20                     EXAMINATION

21   BY MR. WOOL:

22        Q.    Can you take a look at Reference 185 on

23   your supplemental reliance list, please.

24        MS. PIGMAN:  That's Exhibit 2?
```

Jay Irwin Goodman, Ph.D.

1        MR. WOOL:  In Exhibit 2, correct.

2        MS. PIGMAN:  Okay.  And I'm sorry.  180?

3        MR. WOOL:  5.

4   BY MR. WOOL:

5        Q.    And my question is, if you will recall

6   earlier I asked you some questions about the Ames

7   tests that were not reported in Appendix 1 or

8   Appendix 6.  And I just wanted to ask you if -- if you

9   recognize that test as one of the Ames tests that you

10  report as negative in your report that -- that you

11  relied on that is not in Appendix 1 or 6?

12       A.    You know, I -- I just can't answer that

13  question at this time.

14       Q.    Fair enough.

15       A.    Because -- excuse me.  I almost made it

16  without coughing.  Because of all of the materials

17  that I reviewed, I -- I just can't respond at this

18  time.

19       Q.    Okay.  And if you'll turn to Page 24 of

20  your report, which is Exhibit 1.

21       A.    I'll be -- I'll be there in a moment.

22             I'm there.

23       Q.    Okay.  Your opinion about glyphosate --

24  about the genotoxic potential of glyphosate-based

Jay Irwin Goodman, Ph.D.

1    formulations is that glyphosate-based formulations are

2    not genotoxic, correct?

3        A.    That they are not genotoxic, should not be

4    considered genotoxic, and I consider those

5    phraseologies as having the same meaning.

6        Q.    And that conclusion is not limited to

7    geno -- I -- I mean, sorry, that conclusion is not

8    limited to glyphosate-based formulations being

9    non-genotoxic in humans in physiologically-relevant

10   routes of exposure, is it?

11       A.    Maybe could you rephrase that, please.

12       Q.    Is -- is this conclusion limited to

13   genotoxic -- sorry, sorry.  Strike that.  I keep --

14   okay.

15            Is this conclusion limited to genotoxic --

16   glyphosate-based formulations through

17   physiologically-relevant routes of exposure in humans?

18       MS. PIGMAN:  Objection; form.

19   BY THE WITNESS:

20       A.    It is -- it is -- it is not limited.  It

21   is a deliberately broad statement that in my opinion

22   glyphosate-based formulations should not be considered

23   genotoxic.  Glyphosate-based formulations are not

24   genotoxic based on an evaluation of this large body of

Jay Irwin Goodman, Ph.D.

1   literature.

2   BY MR. WOOL:

3       Q.    And so it would be your conclusion that if

4   glyphosate-based formulations were injected into a

5   human via the IP route of exposure in large doses like

6   you've seen in some of the studies, you would not

7   expect to see genotoxic effects?

8       A.    A --

9       Q.    Related to geno --

10      A.    A, I would hope nobody ever did that.

11      Q.    For sure.

12      A.    B, I think that in the -- if that horrific

13  scenario were true, I think that if one overloaded a

14  person with -- with glyphosate, that there is a chance

15  that one could produce cytotoxicity and have

16  genotoxicity secondary or tertiary to that, but we're

17  really talking about a extreme, extreme hypothetical.

18      Q.    Right.  But -- but in that extreme

19  hypothetical, it is your opinion that you would not

20  expect to see genotoxic effects related to the -- or

21  caused by the glyphosate-based formulation, the

22  effects would be secondary to cytotoxicity, correct?

23      A.    To the extent that there were any

24  genotoxic effects observed in this hypothetical

Jay Irwin Goodman, Ph.D.

1   scenario, it's my opinion that it would be due to

2   secondary or tertiary effects and would not fall into

3   the definition of a genotoxic compound that I gave

4   you, and that is where the compound itself or a

5   metabolite binds to, damages genetic material.

6       Q.   I'm -- I'm going to ask this one question

7   again just because I worded it so horribly and -- and

8   you objected, just so I get a clear answer.

9            And so is it your conclusion that

10  glyphosate-based formulations are not genotoxic to

11  humans regardless of the -- the route of exposure, and

12  setting aside genotoxicity that's secondary to

13  cytotoxicity?

14      MS. PIGMAN:  Objection; form.

15  BY THE WITNESS:

16      A.   I -- my -- my -- my conclusion is really

17  what is stated in the report.  I conclude that

18  glyphosate-based formulations are not genotoxic.

19  BY MR. WOOL:

20      Q.   Okay.

21      A.   I conclude that glyphosate-based

22  formulations should not be viewed as genotoxic.  And I

23  view these two statements as -- as having the same

24  meaning.

Jay Irwin Goodman, Ph.D.

1        MR. WOOL:  I don't have anything else.

2        MS. PIGMAN:  Nothing further.

3        THE VIDEOGRAPHER:  This concludes the

4    deposition.  We are going off the record at 4:51 p.m.

5             (Time Noted:  4:51 p.m.)

6             FURTHER DEPONENT SAITH NOT.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Jay Irwin Goodman, Ph.D.

```
1                     REPORTER'S CERTIFICATE

2               I, JULIANA F. ZAJICEK, C.S.R. No. 84-2604,

3    a Certified Shorthand Reporter, do hereby certify:

4               That previous to the commencement of the

5    examination of the witness herein, the witness was

6    duly sworn to testify the whole truth concerning the

7    matters herein;

8               That the foregoing deposition transcript

9    was reported stenographically by me, was thereafter

10   reduced to typewriting under my personal direction and

11   constitutes a true record of the testimony given and

12   the proceedings had;

13              That the said deposition was taken before

14   me at the time and place specified;

15              That I am not a relative or employee or

16   attorney or counsel, nor a relative or employee of

17   such attorney or counsel for any of the parties

18   hereto, nor interested directly or indirectly in the

19   outcome of this action.

20              IN WITNESS WHEREOF, I do hereunto set my

21   hand on this 24th day of September, 2017.

22

23

24              JULIANA F. ZAJICEK, Certified Reporter
```

Jay Irwin Goodman, Ph.D.

```
 1                INSTRUCTIONS TO WITNESS

 2

 3                Please read your deposition

 4   over carefully and make any necessary

 5   corrections.  You should state the reason

 6   in the appropriate space on the errata

 7   sheet for any corrections that are made.

 8                After doing so, please sign

 9   the errata sheet and date it.

10                You are signing same subject

11   to the changes you have noted on the

12   errata sheet, which will be attached to

13   your deposition.

14                It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24
```

Jay Irwin Goodman, Ph.D.

```
 1                  -   -   -   -   -   -

                       E R R A T A

 2                  -   -   -   -   -   -

 3

 4    PAGE   LINE   CHANGE

 5    _____  _____  _____

 6         REASON:  _____

 7    _____  _____  _____

 8         REASON:  _____

 9    _____  _____  _____

10         REASON:  _____

11    _____  _____  _____

12         REASON:  _____

13    _____  _____  _____

14         REASON:  _____

15    _____  _____  _____

16         REASON:  _____

17    _____  _____  _____

18         REASON:  _____

19    _____  _____  _____

20         REASON:  _____

21    _____  _____  _____

22         REASON:  _____

23    _____  _____  _____

24         REASON:  _____
```

Jay Irwin Goodman, Ph.D.

```
 1

 2          ACKNOWLEDGMENT OF DEPONENT

 3

 4              I,_____, do

 5    hereby certify that I have read the

 6    foregoing pages, and that the same is

 7    a correct transcription of the answers

 8    given by me to the questions therein

 9    propounded, except for the corrections or

10    changes in form or substance, if any,

11    noted in the attached Errata Sheet.

12

13

14     _____

15    JAY IRWIN GOODMAN, PH.D.          DATE

16

17

18    Subscribed and sworn

      to before me this

19    _____ day of _____, 20____.

20    My commission expires:_____

21

      _____

22    Notary Public

23

24
```