# EXHIBIT 17

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION — MDL No. 2741

Case No. 16-md-2741-VC

______________________

This document relates to:

Hardeman v Monsanto Co., et al.

Case No. 3:16-cv-00525

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEO DEPOSITION OF

CHADI NABHAN, M.D.

December 14, 2018

8:39 a.m.

Chicago Marriott O'Hare

8835 West Higgins Road, Park Ridge, Illinois

Deanna Amore, CRR, CSR, RPR, 084-003999
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

APPEARANCES OF COUNSEL

On Behalf of the Plaintiff, EDWIN HARDEMAN:

ANDRUS WAGSTAFF
MS KATHRYN M FORGIE
1901 Harrison Street
Suite 1101
Oakland, California 94612
(310) 339-8214
kathryn forgie@andruswagstaff com
- and -
ANDRUS WAGSTAFF
MS AIMEE H WAGSTAFF
7171 West Alaska Drive
Lakewood, Colorado 80226
(303) 376-6360
aimee wagstaff@andruswagstaff
- and -
WEITZ & LUXENBERG, P C
MS ROBIN L GREENWALD
700 Broadway
New York, New York 10003
(212) 558-5500
rgreenwald@weitzlux com

On Behalf of the Defendant, MONSANTO COMPANY:

ARNOLD & PORTER KAYE SCHOLER, LLP
MR BERT L SLONIM
250 West 55th Street
New York, New York 10019-971
(212) 836-8572
bert slonim@arnoldporter com
- and -
WILKINSON WALSH + ESKOVITZ
MR BRIAN L STEKLOFF
MS CALI COPE-KASTEN
2001 M Street, NW
10th Floor
Washington, D C 20036
(202) 847-4030
bstekloff@wilkinsonwalsh com
ccope-kasten@wilkinsonwalsh com

ALSO PRESENT:
Anthony Micheletto, Videographer
* * * * *

INDEX

| WITNESS | EXAMINATION |
|---|---|
| CHADI NABHAN, M.D. | |
| EXAMINATION BY MR. STEKLOFF | 6 |
| EXAMINATION BY MS. WAGSTAFF | 117 |
| FURTHER EXAMINATION BY MR. STEKLOFF | 122 |

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | 11.20.2018 Expert Report of Dr. Chadi Nabhan | 16 |
| Exhibit 2 | Innovative Oncology Consulting, LLC, Invoice for Services Rendered in Hardeman v Monsanto; NABHNMDLGROUP100057 | 27 |

THE VIDEOGRAPHER: We are now on the record. My name is Anthony Micheletto. I'm the videographer for Golkow Litigation Services.

Today's date is December 14, 2018. The time is 8:39 a.m. as indicated in the video screen.

This video deposition is being held in Chicago, Illinois, in the matter of Hardeman versus Monsanto Company, et al., Case No. 316-cv-00525 in the United States District Court, Northern District of California.

Our deponent today is Chadi Nabhan MD, MBA.

Will counsel please identify themselves for the video record?

MS. WAGSTAFF: Aimee Wagstaff from Andrus Wagstaff in Denver, Colorado, and I'm here with my partner Kathryn Forgie from Oakland, California.

MS. GREENWALD: Robin Greenwald, Weitz & Luxenberg. I'm one of the plaintiff attorneys in this litigation.

MR. STEKLOFF: Brian Stekloff, Wilkinson Walsh on behalf of Monsanto.

MS. KASTEN: Cali Cope-Kasten, Wilkinson Walsh, on behalf of Monsanto.

MR. SLONIM: Bert Slonim, Arnold & Porter, on

behalf of Monsanto.

THE VIDEOGRAPHER: Our court reporter today is Deanna Amore. Please swear in the witness.

(Whereupon, the witness was duly sworn.)

THE WITNESS: I do.

MS. WAGSTAFF: So before we start, I just wanted to put on the record that Plaintiffs Gebeyehou, Hardeman, and Mrs. Stevick are offering Dr. Nabhan today for specific causation opinions, and to the extent that anything in his report goes to general causation, it is either as a background to his -- or in support of his specific causation opinion or it is consistent with the general causation opinions that Judge Chhabria has allowed in this MDL.

MR. STEKLOFF: I just reserve the right to -- I mean, it seems like we might be seeing enough issues. So potentially we can agree in front of Judge Chhabria on how specific causation experts are going to be allowed to delve into or touch on generic causation opinions, and so I think we can explore that a little bit today potentially with the doctor. But I preserve all rights -- I reserve all rights to challenge any opinions in his report,

including anything that's general causation or anything that has been excluded under Judge Chhabria's July 1 -- July 10, 2018, opinion on general causation.

Good morning, Doctor.

THE WITNESS: Good morning.

CHADI NABHAN, M.D.,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. STEKLOFF:

Q. You've been deposed before; right?

A. I have been.

Q. So you are familiar with the background rules of how these go forward?

A. Yes.

Q. So I'm just going to cover two. If you need a break for any reason, as long as a question is not pending, just let me know.

A. Sure.

Q. And if you answer a question, I'm going to assume that you understood the question. Is that fair?

A. To the best of my ability, yes.

Q. You'll let me know if you don't understand

something that I ask?

A. Yes.

MS. WAGSTAFF: Objection.

BY MR. STEKLOFF:

Q. Which may happen, I will tell you.

And so I don't get it wrong, how do you pronounce your last name?

A. Nabhan.

Q. Nabhan. Okay.

And, Dr. Nabhan, when do you believe Mr. Hardeman first developed non-Hodgkin lymphoma?

A. Between late 2014 and beginning of 2015, I believe he had the biopsy that confirmed his disease somewhere around February 2015, but he developed the lymph nodes that led to the diagnosis several weeks earlier.

Q. And so is it your opinion, to a reasonable degree of medical certainty, that his non-Hodgkin lymphoma first appeared in his body in late 2014 or the beginning of 2015?

MS. WAGSTAFF: Object to form.

THE WITNESS: Yes.

BY MR. STEKLOFF:

Q. And that would include cancerous cells that later manifested themselves in the tumor that

was biopsied?

A. Yes, he did have the lymphoma. It's just in the beginning when he developed the swollen lymph nodes initially he was told just to monitor them a little bit, see if they go away on their own. And when they did not go away on their own, he was referred to ENT and initially had a fine needle aspiration, I believe, around February 6 of 2015, and that showed just necrotic tumor. So it was diagnostic. And subsequently he underwent an excisional biopsy when the lymph node was removed, which led to the diagnosis of diffuse large B-cell lymphoma.

Q. And my question is a little bit different for his diffuse large B-cell lymphoma, that is a collection of cancerous cells that builds over time; correct?

A. Yes.

Q. And my question is it's your opinion, to a reasonable degree of medical certainty, that the first of those cancerous cells that were later diagnosed in 2015 formed in early -- in late 2014 or early 2015; is that correct?

A. December 2014 to January 2015.

Q. Prior to December of '14, it's your

opinion, to a reasonable degree of medical certainty, that Mr. Hardeman did not have cancerous cells in his body; correct?

A. I wasn't able to see in the records he had lymphoma, but I think in the early 2000 had a basal cell cancer that emerged from the skin. But I'm unable to see that he had any evidence of large-cell lymphoma prior to 2014.

Q. So that's a good clarification. Let me ask a -- let me clarify my question.

Prior to December of 2014, it's your opinion, to a reasonable degree of medical certainty, that Mr. Hardeman did not have any lymphoma cancer cells in his body; correct?

A. According to the records I reviewed, this is correct.

Q. And even beyond the records you reviewed, based on everything you've done in your experience and your review of literature and your entire -- and everything that forms the basis of your opinions here, it's your opinion, to a reasonable degree of medical certainty, that Mr. Hardeman did not have any lymphoma cancer cells in his body prior to December of 2014; correct?

A. Well, when a patient is diagnosed has

nothing to do with the literature; it's when a patient is diagnosed. So what I can go by, the records I reviewed, Mr. Hardeman's deposition, which I reviewed, and according to these two, the diagnosis was made in 2014 -- was made in 2015, but he started having symptoms in late 2014. So I don't have any reason to believe he had large-cell lymphoma prior to that date.

Q. Right.

And you have no reason to believe, based on your experience treating patients with lymphoma, that he had any cancerous lymphoma cells in his body prior to December of 2014; correct?

A. I am not sure how my experience in other patients would lead to knowing when another patient was actually diagnosed. But this type of lymphoma, which is large-cell lymphoma, is an aggressive type of lymphoma, and generally, it happens within a very short period of time before diagnosis. So is it possible he started having the lymphoma cells develop, let's say, theoretically, in late fall 2014 and then the diagnosis was made couple of months later? It's possible. But there is no way that this type of lymphoma, the large-cell lymphoma, was present several years earlier because

if it goes untreated, patients die.

I hope this answers your question.

Q. Yes. I'm not trying to repeat the questions, but I just want to make sure I understand.

Based on your expertise and your review of the medical records and your review of Mr. Hardeman's testimony, it is your opinion, to a reasonable degree of medical certainty, that the first lymphoma cancer cell in Mr. Hardeman's body existed December 2014 or later; correct?

MS. WAGSTAFF: Objection. Misstates his testimony. You've now asked him four or five times the same question.

BY MR. STEKLOFF:

Q. You can answer.

A. I mean, I'll answer it again. You can't tell exactly the exact date when a lymphoma cell emerges in the body. All what you can go by is the fact that the patient presented to his health care professionals sometime in December 2014 with these swollen lymph glands. They were watched, eventually biopsied, the diagnosis was made, and if my memory serves me right, probably February 26, 2015. He had the fine needle

aspiration that showed the necrotic tumor on February 6, 2015.

So this type of lymphoma usually is an acute, aggressive type of lymphoma. He wouldn't have had it in 2013, let's say, but when in 2014 the first time -- because your question is the first time his lymphoma cell present in his body, I don't know. All I can tell you is he went to the doctor in December 2014. Is it possible he had something brewing in October, November 2014? Certainly, I mean, that's -- I mean, that's really the best of my ability to answer your question.

Q. Do you know if Mr. Hardeman was using Roundup in 2014?

A. Yes, that's when he stopped, I believe.

Q. When did he stop?

A. In 2014.

Q. When in 2014?

A. I think when he -- he's been asked that question in his depositions, and I've asked him that question. He said when he got sick. So I believe sometime when it was probably in December 2014.

Q. Does it matter when he stopped using Roundup -- I'll start over. I'll strike that.

Does when he started using -- story.

Does when he stopped using Roundup impact your opinions in any respect?

A. No.

Q. It wouldn't have mattered?

A. Well, I mean, it matters when he started more important; right? I mean, he started sometime in the '80s, late '80s, and he stopped in 2014. So what matters to me is the duration of exposure, and so if he stopped in 2014 or middle 2014, late 2014, it doesn't really impact how long he's been exposed to. But if he started using it in 1987 and he stopped in 1988, one year, it would matter, but in this case, he's been exposed to it for such a long period of time that stopping a couple of months later or earlier would not really impact the opinion.

Q. What if he had stopped in 2013, would it impact your opinion?

A. Again, you'll have to -- this is a very hypothetical question. You'll have to look at the exposure for every single year of use. So I will -- you know, I mean, probably 2013, it still wouldn't matter because you have to look at how many hours and exposure he's had in any given year

and whether that exposure collectively is analogous or similar to what has been published in the epidemiological literature that linked Roundup to large-cell lymphoma or lymphoma in general.

Q. But take Mr. Hardeman's testimony about his use of Roundup. Let's say he had stopped in December of 2013 with the exact same use he testified to. Would that impact your opinion at all about what caused his lymphoma?

A. I don't believe 2013 would have mattered.

Q. And so for you to form an opinion that Roundup or glyphosate is a substantial contributing factor to an individual's non-Hodgkin lymphoma, they do not have to be actively using non-Hodgkin lymphoma at the time of their --

MS. WAGSTAFF: I don't think you meant to say that.

THE WITNESS: Actively using Roundup.

BY MR. STEKLOFF:

Q. Okay. And so for you to form an opinion that Roundup or glyphosate is a substantial contributing factor in an individual's non-Hodgkin lymphoma, they do not have to be actively using Roundup at the time of -- at the time that their cancer first develops; is that fair?

A. Yeah, they don't need to be actively using it at the time of diagnosis, if they have used it enough during their lifetime to a degree that meets what has been published in the epidemiological literature.

Q. And it's your understanding, based on Mr. Hardeman's testimony, that he used Roundup beginning in the late 1980s; correct?

A. Yes. Initially, initially, he used it a little bit, not too much, and I think he got to know about it from his landscaper in the original property he lived in. I believe he sold that property, and he moved to a much bigger property after that, and that's when he started using it himself for about seven, eight months of the year and several hours each month.

Q. For several years; right?

A. No, for more than -- for about 27 years, until 2014.

Q. Yes.

And so it's your testimony, to a reasonable degree of medical certainty, that for the first 26 years of his Roundup use, he did not develop any lymphoma cancer cells; correct?

A. Yes. I mean, there is nothing in the

record to suggest he's had this type of lymphoma before December 2014.

Q. So I want to shift topics a little bit. I am going to hand you the report in Mr. Hardeman's case, and I'll mark it as Exhibit 1.

(Whereupon, Exhibit 1 (Hardeman) was marked for identification.)

BY MR. STEKLOFF:

Q. Dr. Nabhan, this is a copy of your report in Mr. Hardeman's case; correct?

A. Yes.

Q. And did you draft this report -- I'm not asking for any attorney-client privileged information -- but did you draft this report yourself?

A. I did.

Q. You took pen to paper and put everything -- you wrote everything yourself?

A. Explains some of the typos, yes.

Q. And does this report contain all of the opinions that you intend to offer in Mr. Hardeman's case?

A. It does.

Q. I saw yesterday -- I don't have it with me -- that counsel provided me with a supplemental

reliance list where you reviewed some of the reports that Monsanto has offered through its experts; is that correct?

A. Yes, I was provided case specific experts' report in Mr. Hardeman's case, and some of these reports had a lot of references. Some of them I had reviewed previously, and some of them I reviewed recently at a higher level.

Q. And does that change any of the opinions that you intend to offer in this case?

A. No, they don't.

Q. But understanding if I ask you something new today, I can find anything you're going to say at trial in Mr. Hardeman's case in this document; is that fair?

A. I hope so.

MS. WAGSTAFF: Object to form.

BY MR. STEKLOFF:

Q. And you previously provided a general causation report in the MDL in 2017. Do you recall that?

A. I have.

Q. And you testified in front of Judge Chhabria?

A. I have.

Q. And you understand that those opinions that you offered in that report cannot be offered at the trial in Mr. Hardeman's case?

MS. WAGSTAFF: Object to form. That's not exactly what it said, but that's a legal question that Dr. Nabhan probably has no idea what the Daubert order said or doesn't say.

MR. STEKLOFF: That's fair. I'll ask a different question.

BY MR. STEKLOFF:

Q. Have you read Judge Chhabria's Daubert opinion?

A. I have.

Q. Well, we'll go through this report later.

Did you bring any other materials with you today in terms of notes that you might have or anything along those lines?

A. No, I have no more notes. This is what I have. My examination of him and meeting with him were incorporated into the report.

Q. So that was one of my questions. You didn't make any handwritten notes during your examination of Mr. Hardeman?

A. No, I typed.

Q. Yeah. So everything that you and

Mr. Hardeman discussed or any part of your medical examination of Mr. Hardeman is incorporated into this report?

A. Yes.

Q. I want to talk to you about your current medical practice. What are you doing now?

A. My current role?

Q. Yes.

A. So I'm currently a chief medical officer at Cardinal Health Specialty Solutions, which is a division within Cardinal Health, and in that capacity, I work with oncologists as well as with various manufacturers to provide strategic health, making sure they are able to survive in an ever-changing health care environment. So I do not actively see patients at the present time, if that's your question.

Q. How long have you been in that position?

A. About two and a half years, give or take.

Q. So when was the last time you were actively seeing patients?

A. I resigned from the University of Chicago on August 12, 2016.

Q. And what was your medical practice -- what role were you playing when you were at -- what role

were you playing when you were at University of Chicago?

A. So the University of Chicago, my administrative role was a medical director of the clinical cancer center and cancer clinics. I oversaw the clinical operations of the outpatient cancer center, and we saw at the time when I was there about 48,000 visits. The last fiscal year we had over 5,000 new patients at the time. I was also overseeing the international office and the international programs for cancer and strategically helping international patients coming to the University of Chicago for cancer opinions.

In addition to that, I had a very active lymphoma practice. So I was part of the lymphoma group, and I was active in clinical trials for lymphoma, as well as teaching medical students, residents and fellows.

My research in lymphoma continued beyond leaving the University of Chicago. It shifted a little bit into health economics outcomes research, patient-reported outcomes, oncology care delivery with a lot of focus on lymphoma. At the last American Society of Hematology meeting, which we just finished two weeks ago, actually, in

San Diego, I had nine posters and nine presentations, all of them on lymphoid malignancies, but that was my role at University of Chicago at the time.

Q. And you've treated a number of patients with non-Hodgkin lymphoma; correct?

A. Hundreds.

Q. And same with diffuse large B-cell lymphoma?

A. Hundreds.

Q. And you've never told a patient that his or her non-Hodgkin lymphoma was caused by Roundup or glyphosate; correct?

A. Not by Roundup. But I did take care of some farmers where I would discuss pesticide exposure in my clinical practice.

Q. But to answer my question, you've never told a patient that his or her non-Hodgkin lymphoma was caused by Roundup or glyphosate; correct?

A. I did not.

Q. And you've never -- strike that.

When you were at the University of Chicago, you never told any of your fellow oncologists that you thought Roundup or glyphosate was a cause -- a general cause of

Page 22

non-Hodgkin lymphoma; correct?
A. We talked about pesticides in general. I did not say about Roundup specifically.
Q. Okay. And that would be true if I asked you about -- beyond oncologists, if I asked you about pathologists that you were working with as well; correct?
A. Yes.
Q. And that would be true of the medical students that you were teaching. You never told them that you thought Roundup or glyphosate caused non-Hodgkin lymphoma; correct?
A. Yes, I stated we talked about pesticides in general.
Q. That is also true -- you never told residents or fellows that you thought glyphosate or Roundup caused non-Hodgkin lymphoma; correct?
A. Correct.
Q. And as the chief medical officer at Cardinal, you said that you currently work with a number of oncologists; correct?
A. Yes.
Q. And you've never told those oncologists that you believe that Roundup or glyphosate caused non-Hodgkin lymphoma; correct?

Page 23

A. In my current role, this subject would not come up because I work more in oncology and health care delivery and several educational platforms, but the short answer to your question, no, I have not.
Q. But you do work with oncologists who are treating patients?
A. Yes.
Q. And they are treating patients who are diagnosed with non-Hodgkin lymphoma; correct?
A. Yes.
Q. And they care about their patients; correct?
A. Absolutely.
Q. Now, you mentioned that you recently presented at a conference of the American Society of Hematology?
A. Yes, every December we have our annual meeting, and the last meeting we had was two weeks ago.
Q. And did you present at that conference?
A. Yes.
Q. And you did not present on glyphosate or Roundup-related issues; correct?
A. That was not a topic of my presentations.

Page 24

Q. You've never presented, at any conference, your opinions that glyphosate or Roundup causes non-Hodgkin lymphoma; correct?
A. I did not.
In many of the prior talks and prior meetings, my focus was mainly on treatment of lymphoma and clinical trials and novel agents. So it was not a topic that I presented on or lectured upon.
Q. And you've never published any peer-reviewed literature related to the association you claim exists between glyphosate and Roundup and non-Hodgkin lymphoma; correct?
A. I did not publish on that.
Q. You are not in the process of drafting anything; correct?
A. Not right now.
Q. When you were treating patients at the University of Chicago, you never noted in the medical records of any of your patients that glyphosate or Roundup caused a patient's cancer; correct?
A. As I said, we talked about pesticides in general in some of the patients that worked in farming, but I did not write that in the medical

Page 25

records on Roundup, no.
Q. And when you say "pesticides in general," you never spoke even to any of your farming patients, agriculture patients -- patients that were involved in agriculture specifically about Roundup or glyphosate; correct?
A. Not specifically, no.
Q. At Cardinal Health you've never given a lecture to anyone, whether it's administrators, oncologists or other entities that you're working with, regarding your opinions about glyphosate and Roundup and that they cause non-Hodgkin lymphoma; correct?
A. I did not.
Q. And you are not conducting any research, independent research that aren't litigation based about the relationship between Roundup or glyphosate and non-Hodgkin lymphoma; correct?
MS. WAGSTAFF: Object to form.
THE WITNESS: Not at the present time.
BY MR. STEKLOFF:
Q. Have you resigned -- this is not a pejorative question, but do you have active credentials at the University of Chicago Hospital or another hospital?

A. No, I resigned those.
Q. And so it's been approximately over two years since you've seen patients?
A. In clinical practice. A lot of my patients actually still call me and text me, and we actually do meet at coffee shops to talk about their cases. But in clinic, yes.
Q. And with those patients, you haven't discussed any -- that you've continued to talk in the last few years, you haven't discussed glyphosate or Roundup use, have you?
A. We have not.
Q. And some of those patients have had non-Hodgkin lymphoma?
A. 90 percent, actually. I just got a text last week from a patient of mine asking me about their treatment. When you form a bond with patients over many years, people trust you and they still consult with you even though you are not actively in clinical practice. And it's humbling, and it's wonderful to see.
Q. That's a great thing.
But you don't know if any of those patients have ever used Roundup or glyphosate; is that correct?

A. I don't know.
Q. I received some invoices from counsel yesterday about your work in the three cases, and I'm only here to ask about the Hardeman case. But how many hours have you invoiced thus far in the Hardeman case?
A. I honestly haven't sent. This is what I collected so far, and there are more hours. I have spent a lot this week but I haven't sent an actual invoice. I plan on doing that at the end of the year. Maybe I can --
MS. WAGSTAFF: This one has notes on it. I am sure he has it.
BY MR. STEKLOFF:
Q. I'll hand you what I received yesterday and you can just look at it.
A. Sure.
(Whereupon, Exhibit 2 (Hardeman) was marked for identification.)
BY MR. STEKLOFF:
Q. Dr. Nabhan, I'm handing you what I have marked as Exhibit 2. Is this a document that you would have prepared?
A. Yes.
Obviously, more hours have been added

since December 5 to prepare for this, but this is up until December 5.
Q. So I see -- I haven't done the math ahead of time -- 41 hours that you've spent on the Hardeman case; correct?
A. Up until December 5.
Q. At $550 per hour?
A. Yes.
Q. Do you charge the same rate for deposition testimony?
A. Yes.
Q. And trial testimony?
A. Being in trial?
Q. Yeah. If you were testifying in an actual trial, is your rate different or the same?
A. Usually, if I go to trial and I have to fly there, it's $5,000 for the entire day.
Q. Can you approximate for me, since December 5, approximately how many hours you've worked on the Hardeman case?
A. I do have them somewhere in my computer, maybe add another 10 to 12.
Q. Okay. So approximately 50 to 55 hours; is that fair?
A. Fair.

Q. Do you have -- have you submitted an invoice for all of the work that you did relating to your -- the general causation opinions in the MDL back in 2017?
MS. WAGSTAFF: Object to form.
THE WITNESS: Yes, I have. I have not submitted anything since August of 2018, but everything else in '017, yes, a while back.
BY MR. STEKLOFF:
Q. Sitting here -- and I'll take any approximation. Can you proximate for me, if you consider all of the work you've done in this litigation, including the Johnson case, how many hours you spent or how much money you've been paid?
MS. WAGSTAFF: Objection. If you know.
THE WITNESS: I'm not sure I know. I mean, I'll have to go back to the records. I'm sure I've been paid less than all of the lawyers, but I'm not really sure how many hours I spent. I'll have to go back and work. I mean, you should have these records because everything is submitted to all of the law firms.
MR. STEKLOFF: Okay. I just want to make sure we have all of his invoices throughout the entire litigation and if we don't, I'm asking for those

invoices.

MS. WAGSTAFF: I mean, every time you've deposed him, we've produced invoices. So you would just need to add them up.

MR. STEKLOFF: Okay. This is not a dispute. I just want to make sure -- and maybe we'll email. I just want to -- I will see all the invoices that we have from the various depositions, and then I'll ask if you can double-check them. And if we haven't received any, I think we are entitled to them, and I'd ask that we receive them.

MS. WAGSTAFF: Okay. We can talk about it later.

BY MR. STEKLOFF:

Q. Is it -- are you able to approximate, Dr. Nabhan -- well, first of all, when were you retained in the litigation, approximately, if you recall?

A. I was asked to look at the literature just generally on Roundup and glyphosate back in the spring of 2016, somewhere around that, and I requested some time just to go through literature and actually to look through everything that was by the Miller firm out east. And it took me several months to look at the literature, review a lot of

the data before saying that this is very convincing, and I'm more than happy to help on this case.

Q. And in the approximately two and a half years that you've been working as an expert for the plaintiffs, can you approximate how much of your total income has been received from your work in the litigation as a percentage?

A. That's actually a good exercise for me to do on a personal level. I did not think about it, and I don't know the answer to that. Do I guess? Do I just throw a number?

MS. WAGSTAFF: No, don't guess. If you don't know the answer, you don't know the answer.

THE WITNESS: I mean, I don't want to say something that is not accurate. I really can't tell in terms of percentage, but this is the only litigation work I've ever done. So I don't know. It will be a guess, and if counsel says not to guess, I don't think I'm going to guess.

BY MR. STEKLOFF:

Q. We don't want you to guess. You can't give me an educated estimate, even approximate percentage-wise?

MS. WAGSTAFF: Objection. He said he doesn't

know.

THE WITNESS: What does that mean now?

BY MR. STEKLOFF:

Q. If you can -- I don't want you to guess out of thin air, but if you can, based on -- take your time. If you can approximate -- and I'm not saying it needs to be an exact number -- but approximate, I would ask that you do that.

A. Less than 20 percent.

Q. I'm not going to ask the names, but have you reviewed any cases of individual plaintiffs where you have determined that Roundup was not a substantial contributing factor into his or her development of NHL?

THE WITNESS: Is that privileged?

MS. WAGSTAFF: You can --

MR. STEKLOFF: I'm looking for a yes-or-no answer.

THE WITNESS: Yes, I have.

BY MR. STEKLOFF:

Q. I want to ask you about hepatitis C.

A. Sure.

Q. You probably knew that would be a topic of today's deposition.

A. It should be.

Q. Actually, before I do that --

A. Turn to a page or something or no?

Q. Just in a moment.

What did you do to prepare for this deposition?

And I'm not asking about any specific conversations you had with counsel.

A. As I always do, I refreshed my memory with all the medical records. So the past week I reviewed all of the medical records again of Mr. Hardeman just to familiarize myself with his diagnosis, his treatment history, his comorbidities, everything pertaining to his history. I reviewed my own report, as well as the literature that I have relied on, and as I told you, I was able to look at the reports of your experts from Mr. Hardeman's case. And I also reviewed some of the references that they relied on at a high level.

Q. Did you meet with counsel?

A. We met yesterday, yes.

Q. Who was part of that meeting?

A. Counsel Greenwald, Forgie, and Wagstaff.

Q. Was anyone on the phone?

A. No.

Q. Have you ever met Dr. Weisenburger?
A. I've never met him personally, but I've heard him speak. I'm sure he's heard me speak at national conferences.
Q. You've never discussed this litigation with him?
A. No.
Q. Have you reviewed his report in the Hardeman case?
A. I have.
Q. Do you have any criticisms of his report?
A. No.
Q. Have you reviewed -- have you ever met Dr. Shustov?
A. I have.
Q. Have you ever discussed the litigation with Dr. Shustov?
A. I have not.
Q. In what context have you met Dr. Shustov?
A. Only from what people know each other. So I met him -- I actually even moderated a webinar with him a couple of years ago. We did a Webex for oncologists as two experts discussing T-cell lymphoma at the time, but we never talked about this litigation at all or any litigation for that

matter.
Q. Did you review his report in Mr. Hardeman's case?
A. I have.
Q. Do you have any criticisms of his report?
A. No.
Q. But you never discussed his report with him?
A. No.
Q. Okay. So now let's talk about hepatitis C. I don't need you to turn to anything, but I'm also not trying to restrict you from turning to anything in your report.
Do you agree that hepatitis C is a risk factor for non-Hodgkin lymphoma?
A. I do.
Q. Do you agree that hepatitis C can cause non-Hodgkin lymphoma in some individuals?
A. I do.
Q. And do you agree that the mechanism through which hepatitis C can cause non-Hodgkin lymphoma is that the virus causes genetic mutations that become cancerous?
A. I'm not sure we know 100 percent the actual mechanism by which hep C causes the

non-Hodgkin lymphoma. It's -- there are a lot of theories when you read the literature. Some of them, they talk about chronic antigen stimulation of actual lymphocytes that eventually end up developing lymphoma, but this is one of the theories. I think the exact mechanism by which hepatitis C contributes to the development of non-Hodgkin lymphoma is not 100 percent clear. This is one of them.
Q. But do you agree that the exact mechanism by which glyphosate contributes to the development of non-Hodgkin lymphoma, which is your opinion, is not 100 percent clear?
A. Yeah, I agree with that.
I think there are some plausible reasons how Roundup causes non-Hodgkin lymphoma, but nobody can tell you this is 100 percent of mechanism and everything else is not. So I think there are a variety of theories, similar to hepatitis C.
Q. And with respect to hepatitis C, do you agree that regardless of the exact mechanism, hepatitis C can cause genetic mutations that become cancerous?
A. It can.
Q. And do you agree that the longer an

individual is exposed to hepatitis C, the more likely he or she is to have those genetic mutations occur?
A. I think that's pretty much with every single known occupational hazard and viral antigen and so forth, yes.
Q. Do you know if IARC has classified hepatitis C as a carcinogen?
A. I do.
Q. And what group has IARC classified hepatitis C as?
A. Group 1.
Q. Do you agree that there is no marker for a lymphoma caused by hepatitis C?
A. Can you --
Q. Like a pathological marker that you could see, say, on a slide.
A. Can you define that for me?
Do you mean if I'm looking at the slides can I identify if it's caused by hepatitis C?
Q. Exactly.
A. I don't think you can. I think pretty much you just see large-cell lymphoma. I don't think by looking at the slides you are able to tell if it's hepatitis C related or not.

Q. And that's true with glyphosate or Roundup; correct?

A. Both the same.

Q. Do you know the latency period for cancer caused by hepatitis C?

A. You're talking cancer or lymphoma?

Q. Let's talk specifically about non-Hodgkin lymphoma.

A. Yeah. You know, I said that before, and I say that again, the latency period for patients who get diagnosed with non-Hodgkin lymphoma, regardless of the offending agent, really varies. You will see that some patients have shorter latency period to developing non-Hodgkin lymphoma from being exposed to agent X, whatever that X is, and you have others that may have a longer latency period.

So I think in non-Hodgkin lymphoma, in general, it's not really a binary formula where you have to have an X number of years or months beyond which you would develop non-Hodgkin lymphoma versus not. I think, you know, we don't know the actual latency period for any of these, but it's measured -- you know, in hepatitis C, it's probably measured in years because oftentimes patients will

need many years to develop some damage to the liver that we call cirrhosis. And it's very unlikely that patients with -- who are exposed to hepatitis C would have a form of cancer without having -- related to hepatitis C without having some form of liver damage.

Q. Have you treated hepatitis C before?

A. No, I'm not a gastroenterologist or hepatologist. I have had patients who had lymphoma plus hepatitis C or another form of hepatitis, but I have not treated actual hepatitis C. That is usually treated by a gastroenterologist or hepatologist.

Q. And -- but you are aware that even for patients with hepatitis C, where the hepatitis C is treated and is no longer active, that they continue to be monitored to see if they develop liver cancer; is that correct?

A. They continue to be monitored to, A, to see if they actually develop cirrhosis because sometimes cirrhosis could occur later on, and usually, the cancer would occur if the cirrhosis continues to worsen. So if you have somebody with hepatitis C that they have some form, let's say, mild cirrhosis, you monitor them to see if the

cirrhosis gets worse, and if the cirrhosis gets worse, they become at higher risk of developing some form of cancer. So that's why you continue to monitor them. So that's really the reason why you continue to monitor these patients even though you treat them because they could still develop some form of cirrhosis.

Q. And if you have a patient who has had hepatitis C, developed cirrhosis and then was treated for hepatitis C, you would still monitor that patient to see if he or she developed liver cancer; correct?

A. You would still monitor them to see if they -- their cirrhosis gets worse because if the cirrhosis gets worse, then they could develop liver cancer, which is hepatocellular carcinoma, which is not the lymphoma piece.

I just want to make sure, for the record, when we talk liver cancer, you mean liver cancer, which is hepatocellular carcinoma, not non-Hodgkin lymphoma.

So, yes, you continue to see these patients and monitor them by repeating liver function tests and sometimes occasionally do ultrasounds here and there to check if there is any

change in the nodularity of the liver, any change in the cirrhosis of the liver because that might give you a clue that there is a possibility of developing hepatocellular carcinoma, which is different than non-Hodgkin lymphoma.

Q. But just because a patient is cleared doesn't mean that he or she wouldn't develop liver cancer because of the -- caused by the hepatitis C; correct?

A. So when you treat hepatitis C, the likelihood of developing non-Hodgkin lymphoma after hepatitis C is almost negligible. If you are talking about the liver cancer or the hepatocellular carcinoma, oftentimes these patients continue to be monitored if they had this evidence of cirrhosis at the time of diagnosis of hepatitis C because that cirrhosis might worsen with time, despite treatment of the hepatitis C. And that's why they get monitored, to take a look at the possibility of cirrhosis worsening and whether this might lead to the development of hepatocellular carcinoma.

I think the monitoring varies between hepatologists and gastroenterologists. I've seen it all over the place. Some people have ultrasound

every couple of years. Some people say, "Well, you know, the ultrasound has been stable. We don't need to keep repeating the ultrasound," and etcetera. I have not seen it standardized after treatment, and after eradication, I see how often these patients are monitored.

Q. You agree Mr. Hardeman had hepatitis C; correct?

A. Yes, I do.

Q. And is it your view, to a reasonable degree of medical certainty, that he had active hepatitis C for approximately 40 years?

A. I don't think we know. I don't think we -- I can't find anything in the records as to when his hepatitis C was present. All I can tell you is that the hepatitis C was diagnosed for the first time in 2005 when he had an ultrasound and was found to have a load of cirrhosis, and his primary physician sent him to a gastroenterologist, and they found the cirrhosis.

And he did the workup, and they found he had hepatitis C. And then he got treated, as you know, between '05 and '06. I don't think anyone can tell when he actually, indeed, had the hepatitis C for the first time. So I can't answer

that. I don't know when it first started. There is nothing that could tell me when it was first diagnosed beyond 2005. Obviously before 2005, I just don't know when.

Q. Did you see Mr. Hardeman's testimony and references in his medical records to things he was doing in the 1960s that may have led to hepatitis C?

A. Yes.

[REDACTED] He did tell me that in 1970 when he enlisted in the Army, he had a lot of tests, and they told him he is fine. And he was discharged from the Army in 1973.

So I think, you know, it is possible that this is when he had the initial exposure. I just can't tell you when the actual -- I mean the time from exposure to having the actual virus in the body, I just don't know the answer to that, but, yes, I'm aware of the -- what he has done in the

late '60s.

Q. Well, let me ask a different question.

Does it matter to your opinions at all -- first of all -- strike that.

Is it your opinion hep- -- that Mr. Hardeman's hepatitis C played no role in the development of his non-Hodgkin lymphoma?

A. So you need -- so this is very good question, and you need to look very critically at his particular case because you can't dismiss any particular possible factor, especially factors that you know they are at risk of developing non-Hodgkin lymphoma. So I don't dismiss these easily, and I look at them very critically before deciding one way or another.

In Mr. Hardeman's case, hepatitis C was diagnosed in 2005 and was treated effectively in 2006, and after that there was no evidence of this virus by pretty fairly sensitive methods of detection. And when he was diagnosed in 2015, ten years later, he had good liver reserve, and there was no evidence of hepatitis C. And, in fact, he got treated, as you know, with chemotherapy, which suppresses the immune system and brings the immune system down. And you would think if his hepatitis

C was going to cause problems, when you suppress the immune system with chemotherapy, the hepatitis C would get activated and something would show up. But none of that happened.

So his hepatitis C is certainly something on the differential that I thought about, but in his particular case, I don't believe hepatitis C played a role in developing non-Hodgkin lymphoma. If it did, very, very minor role, and the reason for that, it was treated effectively for over 10 years without evidence of the virus by sensitivity detection methods. And, more importantly, when you give a patient chemotherapy and suppress the immune system, you would think if there is a virus, it could be reactivated, but it didn't.

Q. So you may have saved me from having a lot of questions. I just want to try to get a more clean answer to my question.

Is it your opinion that Mr. Hardeman's hepatitis C played no role or at most a little, little role in the development of non-Hodgkin lymphoma? The answer to that is yes; correct?

A. The answer to that is yes in this particular case.

Q. And in forming that opinion, does it matter at all how long Mr. Hardeman had the hepatitis C virus in his body prior to 2005? In other words, what I am trying to get at is it doesn't really matter to your opinion whether he had it since the 1960s or the 1970s or the 1980s or the 1990s, regardless, your opinion would be the same; correct?

A. Well, everything matters. I don't think that's really correct to say it doesn't matter. It does matter, but sometimes I may not be able to find the answer of something that matters because it just doesn't exist.

[redacted] enlisted in the Army, and he was diagnosed in 2005. I would like to know all the facts, and I would like to always look at things objectively. But there are times where you just cannot be 100 percent certain when the person first had the hepatitis C. What matters more is that it was treated and was treated effectively. So, to me, that really matters the most, but every piece of data, in my opinion, should matter and is very important to look at.

Q. Okay. So let's take the most conservative

scenario. Let's assume he had active hepatitis C virus in his body since 1966. Would your opinion be different about whether hepatitis C played a role in the development of his non-Hodgkin lymphoma?

A. It would be either no role or a very minor role, as we just said.

Q. Let's move along the spectrum. Let's say active virus appeared in his body in the 1970s. Your opinion would be the same; right?

A. In his particular case, yes.

Q. Same in the 1980s; correct?

A. Yes.

Q. Same in the 1990s; correct?

A. Yes.

Q. Same if it first appeared between 2000 and 2005; correct?

A. Correct.

Q. And, again, assuming that active hepatitis C was in his body beginning in the 1960s, 1966 to 1969, it's your opinion, to a reasonable degree of medical certainty, that that hepatitis C did not cause any genetic mutations that ultimately led to the development of his lymphoma; correct?

A. Well, whatever it caused, it didn't cause

development of lymphoma because up to 2005, after -- what? 40 years -- is it 40 years? 30 years? 40 years? -- there was no evidence of non-Hodgkin lymphoma as of 2005. And after that it was treated effectively for 10 years. So the assumption that it would have caused non-Hodgkin lymphoma in 2015 after 50 years versus 2005 after 40 years just has no clinical or scientific merit.

Q. And so the answer to my question is you don't believe that there was any cancerous lymphoma cells in his body as of 2005 when he was diagnosed with hepatitis C; correct?

MS. WAGSTAFF: Objection. Asked and answered.

THE WITNESS: He did not have lymphoma in 2005. He had lymphoma, as we said, in the beginning late 2014 to 2015.

BY MR. STEKLOFF:

Q. Not even a single lymphoma cell that would be undetectable was within his body; correct?

MS. WAGSTAFF: Objection. Asked and answered.

THE WITNESS: How could anybody answer this question?

It's -- I mean, nobody -- I mean, when you say "a single cell," I don't know when the lymphoma started. I think what I've told you before is the

type of lymphoma that he has, which is large-cell lymphoma, is an aggressive type of lymphoma. There is no way it could be in the body, this type of lymphoma, without being treated. It would kill patients. I mean, patients would die without therapy.

So some patients could develop it for several months before diagnosis, and then you treat it. But you can't have this type of lymphoma for 10 years without being treated and a patient still be alive. But your question, one small, single cell, really, nobody can answer that specific question to you.

BY MR. STEKLOFF:

Q. Well, there are patients who have diffuse large B-cell lymphoma that -- where the latency has taken 10 years to develop; correct?

A. You're talking after being exposed to a particular pathogen?

Q. Or idiopathic.

There are patients that develop diffuse large B-cell lymphoma where the latency period is even 20 years; correct?

A. So I want to make sure we are saying the same thing. Define "latency" for me. Because you

Page 50

just said two different things. You know, are you saying latency from the time being exposed to a particular pathogen or an offending agent to the development of clinical disease?

Q. I understand.

A. That would never be 10 years in large-cell lymphoma.

Q. In diffuse large B-cell lymphoma, is it possible to have -- for it to take -- what is the longest it could take from the development -- forget about exposure -- from the development of the first cell to a clinically recognizable tumor that can be identified?

MS. WAGSTAFF: Object to the form.

BY MR. STEKLOFF:

Q. Do you understand the question?

A. I actually don't understand the question. But let me just make sure --

Q. I'll ask a better question, if you don't understand.

A. Sure.

I mean, large-cell lymphoma is an aggressive type of non-Hodgkin lymphoma. So what you can tell when you go retroactively, you have a patient that gets diagnosed -- let's take

Page 51

Mr. Hardeman as an example -- in February 2015.

Given the nature of this type of lymphoma, which is an aggressive form of lymphoma, diffuse large B-cell lymphoma, which, by the way, usually, the minority with hepatitis C get that. Usually, they get the indolent lymphoma.

But the large-cell lymphoma, there is no way it was present clinically in his body for more than six months before because, again, this is a fatal lymphoma if gone untreated. That's what I'm trying to say. I think what you're asking more along years before, and that's why I'm confused what your question is.

Q. I understand why I confused you about the latency in terms of exposure to a substance or item and then when it develops. I think you just answered my question.

You think that approximately -- I'm not going to hold you to this exact time frame -- that from the first cell of a diffuse large B-cell lymphoma until it becomes -- to the extent that it can be diagnosed, it takes approximately six months, if you're talking about diffuse large B-cell lymphoma?

A. But that's not the time from the initial

Page 52

mutation that may be undetected. I mean patients can have some genetic damage in their body that goes undetected first; right? I mean, it just happens. And then they start developing the clinical disease at the very microscopic level before it becomes detected.

So I think, you know, when you talk about latency, either you are talking latency from the time of being exposed to an offending agent, to the first type of mutation that does not get detected at all or latency from the time you get exposed to something until you have clinically overt disease, like lymph node or something you can examine.

Q. Now we are getting on the same page. I want to focus on the former, which is the genetic mutation.

A. I see.

That we cannot detect clinically.

Q. Correct.

It's in the body, but no one can see it. A pathologist cannot see it. There is no tumor. There is nothing to see. That's what I want to focus on is that in these questions. Okay?

A. Okay.

Q. So what is the length of time with diffuse

Page 53

large B-cell lymphoma generally that that first genetic mutation can occur up until the time that it becomes clinically diagnosed -- you can clinically diagnose it?

A. But you just went back to the clinical diagnosis. You just said -- you just said we are not going to talk about the clinical overt diagnosis, I thought.

Q. So assume the clinical --

A. Again, the -- in this type of lymphoma that is an aggressive form of lymphoma, you go -- when you go retroactively, if you have somebody who has this type of lymphoma -- for different types of lymphomas, you can go for several years, the indolent ones, but for this type of lymphoma, the large-cell lymphoma, if you're diagnosing it sometime in the beginning of 2015, really, the best you can tell, as a clinician, because of how aggressive this disease is, that maybe the lymphoma existed for a couple of months before, and now we are diagnosing it, which is exactly what he went through.

He started having the lymphoma nodes in December 2014. They didn't go away because cancer doesn't go away on its own. Then they did a

biopsy, then diagnosed. Then they had it removed. That's really all what you can say in terms of how long he's had this lymphoma in his body, which is the first question you started with earlier. You were trying to get at when he was first had lymphoma in his body, and I thought we covered that.

Q. I understand. Now I'm asking a different question.

Assume this type of cancer. So we are talking about the same type of cancer Mr. Hardeman had. When is it possible the first genetic mutation occurred?

A. You can't tell. I'm not sure you can tell. I'm not sure you can answer that. To my knowledge, this has not been looked at in a way that you can really answer this question accurately.

Q. Is it possible that a genetic mutation occurred during the time period in which he had hepatitis C?

A. So when would that be? You're talking 2005?

Q. Prior to 2005.

A. A genetic mutation. It's extremely

unlikely because of this type of lymphoma. It's an aggressive type of lymphoma. In my opinion it's unlikely.

Q. So to a reasonable degree of medical certainty, you don't think his hepatitis C caused any genetic mutations that later became part of his lymphoma; is that correct?

A. I don't believe his hepatitis C contributed, and if it did, very minor contribution because it just didn't exist at the time of his diagnosis 10 years after he was effectively treated.

Q. My question was a little bit different. It wasn't whether it contributed.

My question was, to a reasonable degree of medical certainty, you don't think his hepatitis C caused any genetic mutations that later became part of his lymphoma; correct?

MS. WAGSTAFF: Objection. He answered your question, if you reread his testimony.

THE WITNESS: Yeah, I don't believe that, but nobody really looked at the genetic mutations, to my knowledge, in his particular case. So we don't know that. But, again, to what you're saying from a clinical standpoint, from a lymphoma standpoint,

it is very unlikely that this has happened in his situation.

BY MR. STEKLOFF:

Q. So, similarly, Roundup did not cause any genetic mutations between the 1980s and 2005; correct?

A. Say again?

Q. Roundup did not cause any genetic mutations in Mr. Hardeman between the 1980s and 2005; correct?

A. I think we've talked about this a while back. When you talk about genetic mutation, you are really going down to the mechanisms of action. And I think, you know, again -- you know, we just answered this. The mechanism of action by which any of these particular offending agents, the hepatitis C or the Roundup, contribute to the development of non-Hodgkin lymphoma, the actual mechanisms are not clear, are not 100 percent.

There are plausible mechanisms of action for both of them in terms of how Roundup causes non-Hodgkin lymphoma and how hepatitis C causes non-Hodgkin lymphoma. I gave you an example, the chronic antigen stimulation of lymphocytes that happen with hepatitis C has been suggested as a

mechanism of action how some patients develop non-Hodgkin lymphoma with hepatitis C, but we just don't know really the actual hundred percent underlying mechanisms.

They are still being investigated. I mean, we don't still know 100 percent how tobacco causes certain cancers. We know it does, but we just don't know 100 percent how it does it.

Q. But sitting here today, based on everything you have looked at, to a reasonable degree of medical certainty, do you agree that Roundup did not cause any genetic mutations in Mr. Hardeman between the 1980s and 2005?

MS. WAGSTAFF: Objection. Asked and answered. He just gave a three-page --

THE WITNESS: Similar to what I just said about hepatitis C, we don't know the answer to that. We just don't know. It may have; it may have not. We don't know.

BY MR. STEKLOFF:

Q. You certainly can't say, to a reasonable degree of medical certainty, that there were any genetic mutations caused by Roundup in the 1980s and 2005?

MS. WAGSTAFF: Objection. Asked and answered

three times now.
THE WITNESS: Do you want to define "genetic mutations" for me just so I understand?
BY MR. STEKLOFF:
Q. How would you define a genetic mutation that leads to the development of --
A. Well, there is a difference between genetic, like a chromosomal breakage and DNA breakage and actual mutation in a particular gene that actually occurs. When you say "genetic mutation," I just don't know if it occurred or not. I don't think anybody can. I don't know.
MR. STEKLOFF: Can we go off the record?
MS. WAGSTAFF: Sure.
THE VIDEOGRAPHER: We are off the record at 9:41 a.m.
(A short break was taken.)
THE VIDEOGRAPHER: We are back on the record at 9:56 a.m.
BY MR. STEKLOFF:
Q. Dr. Nabhan, I wanted to discuss your methodology with you for a few moments.
A. Sure.
Q. So I saw recently you were deposed in a case called the Gordon case. Do you recall that?

A. I do.
Q. And understanding that the individual circumstances and medical history and medical records are completely different, was your methodology the same in that case as it is here in Mr. Hardeman's case?
A. Yes, it is.
MS. WAGSTAFF: Object to form.
BY MR. STEKLOFF:
Q. So any questions in that deposition that you were asked about your methodology, as a general matter, would apply here; is that fair?
A. Right.
So essentially what is important any time you are dealing with a disease such as non-Hodgkin lymphoma and you are looking at causation is to look at all of the factors and be very inclusive in investigating all potential contributing factors to this disease, and then you really have to weigh these factors and apply them in every specific case and make a determination whether one of these factors contributed -- more than one of these factors contributed or none of these factors contributed, and when none of the factors contribute, that's what we call "idiopathic."

And I think it's important to mention that, because in the Johnson case, the defense counsel said I never really mentioned anything about idiopathic. Well, idiopathic, by default, you actually don't know what the cause is. So all that we're talking here about is potential known factors, and we look at all of them, be very inclusive and then do the process of elimination, call it a differential diagnosis, call it differential etiology, whatever you want to call, but then you start looking at all of the causes and try to eliminate the ones that don't stand the rigors -- the test of rigor.
Q. Do you agree there is a difference between a "risk" and a "cause"?
A. Well, I mean, not every risk factor is going to cause a disease. There is a difference between a "risk" and a "cause." Some risk factors cause the disease, and some of them don't.
Q. And when talking just about risk factors, have you ever heard the phrase "causative risk factor" as opposed to "non-causative risk factor"?
A. From a clinical standpoint, there are many -- there are risk factors that are inherent and known for a particular disease, and in each

individual case you have to determine whether these risk factors were causative to the development of this disease versus not. So that's really the best of my ability in answering your question. I believe it did.
Q. Yeah. And my question is a little different.
When you're looking at -- when you're trying to identify the risk factors that you must consider, do you ever distinguish between -- things that are potential causative risk factors as compared to potential non-causative risk factors?
A. I am very inclusive. I have to put all of the risk factors in. You have to look at all of the risk factors that a patient can possibly have, and then you do the process of elimination. Like I said, some of these risk factors will not end up contributing to the actual disease, and some of them end up possibly contributing to the disease. So you really have to look at every single particular risk factor that a specific patient has and anytime you're looking at causation for any disease, not just lymphoma, and obviously, this applies for lymphoma as well.
Q. But you don't group them as causative --

when they are all included, you don't group them as causative risk factors or non-causative risk factors, correct?

A. I start by putting all of them as risk factors that may contribute to development of disease, and I'll look at each one individually and look at how each one applies in this particular case. I think we just went over, in the last hour, for hepatitis C, for example. In this particular case I looked at it, and it may not be the same in a different patient who may have not gotten treated, as an example. In this patient he got treated, and there was no disease whatsoever. So the weight of evidence how hepatitis C may contribute in this patient might be very different in another patient that may have gone untreated, and disease was still there.

Q. So if another doctor, not you, as part of a differential etiology said that certain risk factors are causative risk factors and can be considered differently than non-causative risk factors, you would disagree with that methodology; is that fair?

MS. WAGSTAFF: Object to form.

THE WITNESS: No, I would not disagree. It's

just semantics how you define it. Like I said, we are probably both saying the same thing. That particular physician may want to group the risk factors as causative versus not. I prefer to put all of them as potentially contributing to the disease. So I want to look at all of the risk factors. I don't want to dismiss even the ones you may look at as non-causative.

That particular physician may say that's not causative, so I'm not going to look at them critically. I prefer to look at all of the risk factors critically, all of them, and not dismiss any of them and then look at each one individually and how they apply to this particular case. My methodology and my opinion is way more inclusive than separating the causative, non-causative and then dismissing non-causative entirely. I don't like to dismiss any of these risk factors. I look at each one.

BY MR. STEKLOFF:

Q. If you had 10 patients with the exact medical history and circumstances as Mr. Hardeman, would you say, to a reasonable degree of medical certainty, that any of them had their cancer, their non-Hodgkin lymphoma caused by hepatitis C?

MS. WAGSTAFF: Objection.

You're saying the exact same circumstances, everything is the same?

MR. STEKLOFF: Uh-huh.

THE WITNESS: Do you mind repeating the question?

BY MR. STEKLOFF:

Q. Sure.

Everything is the same. If you had 10 patients with the exact same medical history and exposure to Roundup and everything as Mr. Hardeman, would you say that all of their non-Hodgkin lymphoma -- now I totally butchered that question, so let me start over, but it is the exact same.

If you have 10 patients with the exact same medical history and circumstances as Mr. Hardeman, would you say, to a reasonable degree of certainty, that any of them had their cancer caused by hepatitis C?

A. By hepatitis C?

Q. Yes.

A. I just told you that the hepatitis C did not cause Mr. Hardeman's cancer.

Q. But so if you had 10 other people with the exact same circumstances, you would say in all 10

it was always the Roundup and never hepatitis C; is that correct?

MS. WAGSTAFF: Object to this hypothetical.

THE WITNESS: It's either not or very minor contribution.

And, again, the reason for that, I just want to emphasize that he has received proper therapy and complete eradication of the virus of his disease. So he did not have hepatitis C at the time of diagnosis. To assume that he will develop non-Hodgkin lymphoma, a very aggressive type of lymphoma, in the absence of the actual virus for over 10 years, since he was initially diagnosed, is -- in my opinion, has no scientific merits whatsoever. And not to mention the fact that the majority of non-Hodgkin lymphomas that get associated with hepatitis C are called marginal zone lymphoma and splenic marginal zone lymphoma. Yes, there are some associations with diffuse large B-cell lymphoma but that's the minority as opposed to splenic and the indolent lymphomas.

So, that's -- I mean -- I'm sorry. I'm going too fast.

THE COURT REPORTER: There you were.

THE WITNESS: I apologize.

So, again, that's an assumption that I cannot agree with that the hepatitis C was treated, cured, not active, yet, somehow, magically, it caused a non-Hodgkin lymphoma without, by the way, causing worse cirrhosis. Because he had very minor cirrhosis when he was first diagnosed, and when he was -- when he presented in 2015, he had excellent liver function. He never -- he didn't have any worsening cirrhosis.

So to assume that this hepatitis C that was treated, cured, not active, somehow did not cause any worsening cirrhosis for 10-plus years but magically caused a non-Hodgkin lymphoma that is less likely to be associated with hepatitis C is completely speculative, and I can't agree with that.

BY MR. STEKLOFF:

Q. Was his cirrhosis treated between 2006 and 2015?

A. It didn't require therapy because it was very minor, very mild.

Q. So now I want to ask a different hypothetical. You have 10 patients. Everything is the same as Mr. Hardeman except that those patients never used Roundup. Are you with me?

A. Whenever you say "hypothetical," I have to think carefully to make sure I understand the hypothesis because it's hypothetical.

So 10 patients exactly like Mr. Hardeman in terms of age and comorbidities and hep C and everything except --

Q. That they never used Roundup.

A. Never used Roundup. Okay.

Q. And in those 10 cases would you say that the cause was idiopathic?

A. Yes, I would. Or minor. Remember, I said either no role or very minor role of the hep C. That was my testimony.

Q. And it's certainly possible for individuals to develop the diffuse large B-cell cancer that Mr. Hardeman developed without being exposed to Roundup; correct?

A. Yes.

Q. So I want to understand the sort of literature review you did related to hepatitis C. So can you describe that for me and maybe break it down by first what you did prior to drafting your report and then what you've done since your report?

A. Yeah, sure.

I mean, so there are certain things that

don't necessarily need much literature review because, being a lymphoma specialist, I am obviously fully aware of the fact that hepatitis C is a known risk factor for non-Hodgkin lymphoma. So I don't need to really look at 20 to 30 references telling me exactly what I already knew with 20 years of practice. So I didn't need to look necessarily to look at the fact as to whether hepatitis C is a known risk factor because I knew that.

I did, however, look at the IARC report for hepatitis C just to familiarize myself with the methodology as well. I think there was Monograph 100 or something that looked at hepatitis C.

And what I was really very interested in in reviewing the literature with hepatitis C is along the lines as what are the risks of developing non-Hodgkin lymphoma in patients who had eradication of the virus or they had treatment of hepatitis C. I'm less interested in knowing the risk of non-Hodgkin lymphoma in patients who have active hepatitis C because I think we know that's a risk factor.

It's more pressing, in this particular

patient's case, to understand once you treat the hepatitis C, once you eradicate the virus in the blood and you're unable to detect the virus, what are the risks of developing non-Hodgkin lymphoma associated with hepatitis C? And based on the literature that I saw, the risk was negligible.

I also looked at the -- you know, the possibility of what would happen in terms of hepatitis C and developing cirrhosis of the liver, and the reality is that, you know, if the hepatitis C is active and is present, you know, generally speaking, you would expect the cirrhosis to worsen, and that did not apply in this case.

So that's really what I did with looking at hepatitis C prior to receiving some of the experts' reports. When I got some of your experts' reports, a lot of the information they mentioned in terms of the risk between non-Hodgkin lymphoma and hepatitis C, I'm fully aware of. I did not need to -- I think everybody who does lymphoma understands that.

I looked specifically at the subtypes of non-Hodgkin lymphoma that are more associated with hepatitis C versus not, and when you look at the literature, the majority of non-Hodgkin lymphoma

that is associated with hepatitis C is of the indolent subtype. So, like I said, the marginal zone lymphoma, the splenic marginal zone lymphoma, as opposed to the large-cell lymphoma -- not to say that large-cell lymphoma has not been described as associated -- but, again, we are talking about more common versus not.

I did review a lot of references that some of the experts -- your experts have provided, and none of them, actually, changed my mind. None of them -- it's completely -- all of it is hypothetical and assumption that just because you cleared the hepatitis C, it still could cause non-Hodgkin lymphoma, which, as I told you, I wholeheartedly agree with. It has no scientific merit.

In fact, if that is the case, why do we treat it? If hepatitis C, whether it's present or not, has no impact on developing non-Hodgkin lymphoma or liver cancer, then let it be.

The reason we treat it is because by treating it we eliminate the cause of non-Hodgkin lymphoma. Otherwise, no need to treat. Why bother and give somebody interferon and ribavirin for a full year?

We treat this disease to mitigate and eliminate the risk of cancer. If the theory is treatment or not, doesn't matter, then I'd like to see how these expert would approach their next patient. Maybe they shouldn't treat them.

That's the extent of what I did.

Q. You don't think that any of our experts think that hepatitis C shouldn't be treated, do you?

A. Well, but I'll ask them that question. If treating hepatitis C has no impact on developing lymphoma or liver cancer, then why do they treat? You have to have a reason to treat somebody; right? I mean, if you have a virus that you believe eradicating it versus not causes no impact on developing cancer, I make the argument, why are you treating? What's the goal?

Q. Well, you can decrease the risk without eliminating the risk -- without -- right?

A. You should decrease the risk substantially or eliminate it if you treat. Otherwise, again, you would make an argument, why would you treat something unless you are convinced that you are decreasing the risk of developing a malignancy substantially or you are near eliminating it?

Q. A rabbit hole not worth going down.

So you said you reviewed IARC, you mentioned, 100. Did you review the IARC monograph on that that related to other types of cancers and then the more recent one, which is I think 100B relating to non-Hodgkin lymphoma?

A. I just reviewed the recent one, I believe. I don't think I reviewed more than one.

Q. And --

A. Very high level, though.

Q. And in the materials you that reviewed, were they provided to you by counsel, or did you identify materials related to hepatitis C that formed the basis of your opinions on your own?

A. No, I did all of my literature review. What was provided by counsel to me was the experts' reports of your physicians.

Q. Okay. So when you did a literature search for hepatitis C before you began drafting your report, do you recall the details of how you went about that?

A. I thought I just described it.

Q. I mean, I'm actually asking, like, what you searched for and how you identified articles.

A. Well, I mean, I use a lot of PubMed as a

search engine and Google Scholar. I use those, and I looked at some of the -- you know, lots of articles that you end up pulling out, usually, they have references in those articles that they reference to. So I also looked at the references as they pertain to the actual article. So that's -- pretty much, that's what I always do when I do a literature search.

Q. With respect to literature that you believe demonstrated that if the hepatitis C is eradicated that shows that it's no longer -- or no longer a meaningful risk, did you cite all of that literature in your report?

A. I cited the --

Q. I'm looking at page 4.

A. Yeah, I cited some of it. I did not put every single paper. I actually wasn't sure how long the report should be. So I cited examples to illustrate what -- you know, you are not going to cite, you know, 50 and 60 references. I personally thought it's way too much to do that. So I cited a few references that illustrate the points I was trying to make.

Q. After you reviewed the defense expert reports and you went to look at the literature

that's being cited in those reports, did you look to see whether patients in those studies were -- had their HCV eradicated or not?

A. Yeah, there are some -- there are some of the -- some of the references, not all of them, and, again, I apologize, I did not read every single reference, some of them just the abstracts because there were just way too many that was provided to me about 10 days ago.

But I did read a lot of these papers. And some of them do show that the hepatitis C was eradicated by therapy, but they were able to detect it by ultrasensitive methods. So, in other words, what that means, sometimes you can get rid of a virus and you don't see it by Method A, but if you apply very ultrasensitive ways for detection, you might still be able to detect that virus, but it does not have any clinical correlation. It didn't necessarily correlate that by detecting something, like a very ultrasensitive method, it means anything on clinical grounds, which is what matters here.

There is lots of tests that are happening that you can detect something that may be clinically irrelevant. Just because a test is able

detect something at the miniscule or molecular level that other tests have missed may not necessarily imply that this particular detection is leading to particular disease organically.

Q. But did you see studies cited by the defense experts that demonstrated that their findings on odds ratios and other things included patients who may have had an HCV eradicated at the time of their cancer diagnosis?

MS. WAGSTAFF: Objection. Asked and answered.

THE WITNESS: Can you show me some of these? Do you want me to look at a particular reference so I could answer you or just the general?

BY MR. STEKLOFF:

Q. First I want to ask generally if you looked for that in the studies.

A. There are a study -- I recall a study that was a total of nine patients that looked at eradication of hepatitis C and followed patients for a total of 88 weeks, the max, I believe, and what the study said, that if we apply ultrasensitive methods, we can still see -- we can still detect that virus in some of these nine patients. Of course, that's great. I don't know what that means in terms of implications

clinically, development of liver cancer, development of non-Hodgkin lymphoma, or what that study, for example, told me. This is just one example published by Chen and colleagues in 2013.

All that example told me, if you have a supersensitive method, you can detect the virus more, and the less sensitive method may not detect it. But it didn't really tell me what does that mean on clinical grounds. Does it really reduce the risk? Does it continue to have the risk of non-Hodgkin lymphoma? Does it continue to have the risk of liver cancer? Nothing whatsoever on that.

Q. What do you think is the relative risk for non-Hodgkin lymphoma in patients who have HCV, but it was eradicated, and it's not detectable by these supersensitive mechanisms?

MS. WAGSTAFF: Object to form.

THE WITNESS: I can't quantify that. I can tell you if you eradicate the virus, and the virus has not existed for many years, such as this case, the likelihood of this virus contributing to the disease is none to minimal. I just cannot quantify that for you in a percentage-wise because I'm not aware of literature that quantifies this particular thing in terms of a percentage. But if you have a

particular paper that your experts have cited, I'm more than happy to look at it and try to read it.

BY MR. STEKLOFF:

Q. I noticed in your report one of the things you relied on -- I'm on page 3 -- and this is with respect to hepatitis B -- was data from the SEER Medicare database. Do you recall that?

A. I do recall that.

Q. And I think you actually cite the SEER database at another point in your report: I can probably find the reference.

A. Just to clarify, this is not inclusive of everything I looked at. I provide just the examples because I didn't think I should put 50 or 60 references in the report, but I'll do that with my next report.

Q. I'm not crit- -- I just wanted to know.

A. Just your experts had, like, 70 references, which I could have easily done. I just thought I don't need to bombard people with so many references saying the same thing, but, you know, again, that's why I provide an example because I want to make sure it's clear this is a sample of the references relied on.

Q. You also cite to your data, just so you

can see, on page 5 in the middle of the first full bullet.

A. One second. In the BMI bullet?

Q. Yes.

A. Yes.

Q. And so is it fair to say that you find SEER data reliable?

A. I think it has limitations because you are not talking all the United States. As you know, I think it's probably 9 or 11 states. I forgot exactly on a percent. Depending on what you're looking at, I think it's very valuable depending on what you're looking at. It is missing a lot of details.

I actually published a lot of -- my papers used SEER data when I was looking at specific disparities in care between men, women, older, younger in patients with lymphoma, I used SEER database. But it has a lot of limitations. So I would say it depends on your objectives. It could be very valuable depending what you're looking at.

Q. But you've cited it in peer-reviewed published literature before that?

A. And I've used it in my own research as

well. Again, it depends what you're looking at.

Q. It certainly can give you a lot of information about the incidence rate of NHL in the United States; correct?

A. I mean, yeah, but I don't think that is -- I mean, I don't use SEER for the incidents. I believe it gives you more than just the incidence. The incidence probably can be used -- you can get that from different than SEER.

Q. Okay. I think I know the answer, but I'll ask.

Do you think that Mr. Hardeman's hepatitis B played any role in his development of NHL?

A. I don't believe so.

Q. And beyond what you've written here on page 3 of the report, are there any other bases for that opinion?

A. Again, this is just to repeat -- I mean, this is just an illustration of some of the literature that has been published on possibility of hepatitis B and linked to non-Hodgkin lymphoma. Hepatitis B is more linked, in my opinion, with hepatocellular carcinoma in liver cancer as opposed to non-Hodgkin lymphoma. So I don't really believe

that hepatitis B, in his particular situation, played a role in development of disease.

And, again, the only reason that they did that hepatitis -- they looked at hepatitis B and got treated for it is because he was receiving chemotherapy, and chemotherapy could reactivate the virus. And that's why he received the treatment, and as we talked earlier, it, thankfully, did not reactivate any of the viruss.

Q. Is there a plausible -- I know no one knows 100 percent certainty, but is there a plausible mechanism of action where hepatitis C can cause genetic mutations that later turn into non-Hodgkin lymphoma? Hypothetically. Sorry.

MS. WAGSTAFF: I thought we already covered this.

BY MR. STEKLOFF:

Q. I'll restate the question just so it's clear on the record.

Is there -- I know it's not 100 percent certain, but is there a plausible mechanism of action through which hepatitis B can cause genetic mutations which can later develop into non-Hodgkin lymphoma?

A. I don't know by which mechanism of action

that linked any of the hepatitis with the possibility of developing non-Hodgkin lymphoma. Is it plausible that hep B in some situations could cause some genetic alteration? It could. As we talked, similar to Roundup, similar to hepatitis C, these can occur. We just don't know if this is a mechanism by which all of these agents contribute to the development of disease.

Q. In your interview -- I want to talk about your sort of question-and-answer with Mr. Hardeman and then your actual medical evaluation. So I want to separate those two things.

So what was the purpose of your discussion with him of -- that you reported in your report?

A. Well, I mean, I think it goes without saying that the best source of information, in my opinion, a lot of times, is what the patient tells you. You have to factor in the fact that patients who have undergone chemotherapy and treatment, they may be forgetful sometimes, and they have the chemo brain that we are all aware of. So they may not have all the facts straight.

But I strongly believe that they provide a very valuable source of information into what they went through, what they have experienced when they

were diagnosed, when they underwent therapy and treatment, the type of side effects, the type of toxicities they suffered from, and how they are doing today, how they are doing currently with everything.

So, you know, I think it's very important to get that face-to-face time. I don't think it's ever replaceable. So if we can and he's able to travel, that's always my preference.

Q. I'm going to ask you to look specifically at page 8 of your report. You met with Mr. Hardeman in person on Friday, November 16, 2018?

A. Yes.

Q. Did he come here to Chicago?

A. He did.

Q. Where did you meet with him?

A. In my office.

Q. Was anyone else present?

A. No, just myself.

Q. No one else was listening on the phone?

A. No.

Q. And he shared a photo with you of his lymph node enlargement when he was initially diagnosed?

A. Yeah. He just said -- he showed me a picture on his -- I can't say iPhone because I don't know what phone -- but his smartphone that he took a picture of himself when he was first -- had lymph nodes.

Q. And you already were aware he had noted large lymph nodes from having reviewed his medical records; is that right?

A. Yes.

Q. And that didn't change any of your opinions; correct?

A. No.

Q. Next you discussed his chemotherapy as stated and summarized above earlier in your report; right?

A. Yes.

Q. And you were already familiar with that based on the review of his medical records?

A. Yes.

Q. So that didn't change any of your opinions; correct?

A. It didn't.

Just I wanted to understand from him what type of side effects he went through and things like that which sometimes the medical records don't

always reflect accurately. So we talked about that a little bit more.

Q. But nothing that he told you changed your opinions; right?

A. Oh, not my opinion, no.

Q. And to be clear, you think that he was well treated by his treating physicians; correct?

A. He was adequately treated, yes.

Q. Do you have any criticisms of the treatment of Mr. Hardeman by his doctors?

A. I don't.

Q. And have you read their depositions?

A. I read for Dr. Ye and Dr. Turk. I think there is probably another physician that was deposed. I did not read his deposition. I am not sure if I had it or I don't recall, but those are two the depositions I read.

Q. It was quite uneventful we can all say.

MS. WAGSTAFF: Brian and I were there.

BY MR. STEKLOFF:

Q. Did any of their testimony change your opinions?

A. No.

Q. But you have no criticisms whatsoever of them?

A. No.

Q. You talked to him about his melanoma in situ in August 2016 and his basal cell cancer that he had in approximately 2000. Did that change any of the opinions that you had?

A. No.

Q. You talked about him -- talked with him [redacted] None of -- we've already talked about that, but none of that changed any of your opinions; correct?

A. It did not.

Q. You talked to him about some of his employment history and his family, in the next two bullets. None of that changed any of your opinions; correct?

A. Correct.

Q. And he had a negative family history for lymphomas, and you talked to him about his siblings. None of that changed any of your opinions; correct?

A. Correct.

Q. And even had he had a family history of lymphomas, is it fair to say that you would have found that, to a reasonable degree of medical certainty, that Roundup was a substantial

contributing factor to his NHL?

MS. WAGSTAFF: Form.

THE WITNESS: Based on his exposure, yes, but I'd like to know what type of family history it is. It's very different if you have everybody in your family has lymphoma and you'd like to do genetic testing and genetic counseling versus you have one person who has lymphoma. So I think it -- you know, you have to take each case differently, but just the fact that you have one risk factor does not eliminate another risk factor; right? So if you have a family history and that's a risk factor does not really make Roundup not a risk factor.

I mean, I'll draw an analogy just to explain and illustrate. If you have somebody that has hypertension and diabetes, both are known risks of developing cardiac disease and having a heart attack, and you smoke. It doesn't mean smoking now did not add to the risk of hypertension and diabetes. It just became an additional risk factor that the patient has. So having one risk factor does not eliminate another.

BY MR. STEKLOFF:

Q. And you talked to him about his hypertension and glaucoma for which he takes

medicines, and none of that changed your opinion; correct?

A. No.

Q. And so is it fair to say nothing that you and Mr. Hardeman discussed impacted your opinions that you offered in your report?

A. Correct.

MS. WAGSTAFF: Object to form.

BY MR. STEKLOFF:

Q. Okay. Now you also performed a brief physician examination; correct?

A. Yes.

Q. And you put what you observed here at the top of page 9; is that right?

A. That's right.

Q. And is it fair to say that nothing in that brief physical examination impacted the opinions that you've offered?

A. Correct.

Q. How do you define "a reasonable degree of medical certainty"?

A. More likely than not.

Q. So in your -- are you applying -- so 50.1 percent?

A. Well --

Q. It's a legal standard, I understand.

A. The clinicians don't think this way all the time; right? I mean, as clinicians, I understand it's 50.1 percent, 50.0001 percent. But as clinicians, again, you look at everything. You see if it's more likely than not that it was causative or contributing to a particular disease. But you also have to factor in the other elements of a patient's history before you reach that conclusion, and sometimes you may not be able to reach that threshold and say, you know, "I can be more than 50 percent certain that this is contributing," and sometimes you can.

In this case it's very clear, in my opinion, that it is more likely than not that his Roundup caused his non-Hodgkin lymphoma.

Q. Is it fair to say that your use of reasonable degree of medical certainty here in 50.001 percent is a legal definition?

MS. WAGSTAFF: Object to form.

THE WITNESS: So it's more likely than not. If that's what you guys usually define, more likely than not, then, yes.

MS. WAGSTAFF: Objection to the legal question.

BY MR. STEKLOFF:

Q. I want to ask you about page 6 of your report.

A. 6?

Q. Yes.

So on page 6 you also talk about -- you also describe the discussion you had with Mr. Hardeman about his Roundup and glyphosate use and exposure; correct?

A. Yes, I did.

Q. And when you are having that discussion, are you judging whether you believe him or not?

A. So I started by having an open-ended question of not interrupting the patient. I just simply say, "Tell me how you used it, when and how and why." At some point you have to -- at some point you want to make sure that you have the pinpoint question, but really the first five minutes, just trying to listen to the patient what he says in terms of when did he use it, why, and all of these things.

And what you're looking for is, again, you're looking with a point of criticism or rigor to see if that type of exposure in that particular patient, in that particular patient, given

everything that he went through, has merit of causing non-Hodgkin lymphoma or not. But -- and, you know, and then you look at whether that type of exposure that the patient describes fits within the epidemiological literature that we are all aware of that linked Roundup to non-Hodgkin lymphoma. And if it fits within that and I don't believe there are other risk factors, you can't dismiss something that's already been linked, and it's a risk factor in this particular patient.

Q. And I was hopeful to understand how you go about the interview, but my question is as part of that discussion, whether you are asking open-ended question or pinpoint questions, do you have to determine whether you believe what you're hearing?

And I'm not suggesting Mr. Hardeman was lying to you, but do you have to judge whether you believe he truly had that amount of exposure?

A. I don't have a lie detector test in -- device in my office. So I will always believe the patient. There is no reason for me to doubt that the patient is telling me the truth. I do recognize that some patients do miss dates here and there, they may be forgetful, and they may not really remember exactly the date when he maybe

bought a property or how many gallons he used or maybe the type of chemotherapy he had.

These are things that he may not remember, but there is no reason for me to doubt that the patient is telling me the truth. I mean, I've done 20 years of clinical practice, and I can't assume my patients are lying to me. Same applies here. Why would I assume he's lying?

Q. So you're judging his credibility, but you believe -- with Mr. Hardeman, specifically, you were judging his credibility, but you believe he was telling you the truth?

A. I had no reason to believe he's lying to me.

Q. And in order to understand his exposure, you had to make a determination about whether he was lying to you or not?

A. I don't -- I didn't have a reason to think he is lying to me. So I'll have to believe that what he is telling me is the truth, and it was corroborated by reading his deposition. There are a few missed dates here and there, which I think, we all sometimes would forget, especially somebody who has gone through chemotherapy. But what he told me was corroborated with what he said in his

deposition and what he told the other experts as well. I did not see any significant discrepancy. So, again, there is no reason for me to believe that the patient sitting in front of me and telling me about his story has a reason to lie. I can't assume that somebody is just lying for the sake of lying.

Q. Right.

But he's not your patient; correct?

A. He's not my patient, but I approach him like I approach any patient.

Q. And I'm not suggesting that Mr. Hardeman is lying, but as a -- as part of your methodology, you need to judge his credibility, including by comparing what he tells you to what he's told other experts and what he's testified to under oath; correct?

MS. WAGSTAFF: Objection. Asked and answered.

THE WITNESS: Yeah, I do hear what he's telling me. I obviously read his deposition. I read Mrs. Hardeman's deposition as well. I read what the other two experts wrote in terms of their conversation and discussion with him, and the differences between what he told me and others are very, very minimal, which are expected in somebody

that has been using this for several decades. So I didn't have any reason to doubt his credibility or the accuracy of the facts that he provided.

BY MR. STEKLOFF:

Q. And what is the minimal amount of exposure that you would have needed to hear or corroborate from Mr. Hardeman for you to have determined that Roundup was a substantial contributing factor to his non-Hodgkin lymphoma?

A. Well, I don't believe anyone knows the answer to that question. I don't think anybody really knows the minimum amount of exposure that patients need to have in order to develop a disease. We don't know the answer to that in a scientific manner. What we know is what has been published in the epidemiologic literature, that if you are exposed, for example, you know, more than 2 days a year or more than 10 days in a lifetime and so forth, you are at substantially higher risk of having your lymphoma caused by Roundup.

But I don't know -- we don't have the minimum answer yet, and in his particular situation, we know that his exposure well exceeded what has been written in the epidemiologic literature. But the short answer to your question

is that's actually an unknown, what's the minimum exposure needed.

Q. Okay. In Mr. Hardeman's case, assume everything about him was the same except his exposure, and his exposure was two times a year for five years. Would you have reached the same conclusions about whether Roundup was a substantial contributing factor for his non-Hodgkin lymphoma?

MS. WAGSTAFF: Objection. Hypothetical.

THE WITNESS: You can't answer that question. You need to know -- when you say "two times a year," you need to know how many hours, how many days, how much was he exposed to, how many gallons he used. I mean, these are just very difficult questions to answer.

I mean, I have the actual facts in his particular situation, and in every case you have to get the facts as they pertain to this particular situation. So I can't answer the question without having so many details of the question you're asking.

BY MR. STEKLOFF:

Q. Let's provide the details. Two times a year --

A. So this is a hypothetical scenario of --

Q. Yeah, hypothetical.

A. -- of somebody that I don't know his comorbidities. I don't know what he has, hep B, hep C --

Q. No, everything is exactly the same except I want to ask -- I just want to change one -- the only variable I'm changing is his Roundup use.

A. Okay.

Q. Everything is exactly the same.

And he uses it two times a year in a large quantity, no protective gear, spraying for four hours, two times a year for five years. Would it change any of your opinions?

MS. WAGSTAFF: Objection. Hypothetical.

MR. STEKLOFF: You are allowed to ask experts hypothetical.

MS. WAGSTAFF: I'm allowed to object as well.

MR. STEKLOFF: I agree.

THE WITNESS: I mean, I -- so twice a year each time is four hours.

BY MR. STEKLOFF:

Q. In large quantities and spraying across his same property, the large property that you talked about earlier, it took him four hours twice a year for five years?

A. I mean, eight hours for five years, that's -- I think that's, you know, 40 hours total time. I'm not -- it's hard for me to tell. I mean, it depends how you define a day. Is a day two hours? Is a day seven hours? Because you look at the total number of exposure. I think in your example, you said, eight hours a year? That's what you suggested?

Q. Sure.

A. The entire year, eight hours, and you said it's five years. So that's 40 hours of a lifetime. Am I correct in my assumption?

Q. Yes, under the current hypothetical, yes.

MS. WAGSTAFF: I'm also going to object to you are asking a general causation opinion when we are only offering him on specific causation to Mr. Hardeman's facts.

MR. STEKLOFF: Okay. Well, I'm asking him about Mr. Hardeman's facts and changing one variable.

MS. WAGSTAFF: Don't answer if you don't know.

BY MR. STEKLOFF:

Q. You can answer a hypothetical. I want to understand if it would change -- I want to understand if it would change your opinion.

A. So, again, let me explain exactly how -- I mean, I think I've already explained how I reached an opinion in terms of looking at all of the factors and so forth.

When it comes to Roundup, you look at the exposure of a particular patient, and you look whether that exposure is aligned with what is published in the epidemiologic literature. Your example is hypothetical, and you are giving me eight hours of high-volume exposure a year for a total of five years. And then the patient developed non-Hodgkin lymphoma when?

Q. Everything else is exactly the same.

A. So he was exposed 1987 to 1992. I'm just trying to understand -- it's five years now.

Q. Okay. Let's start there. 1987 to 1992, would it change your opinions?

A. So, I mean, again, you have 40 hours of a lifetime, and then it depends, again, how you quantify these hours in terms of days.

Q. Well, how did -- based on the epidemiology that you are relying on that you just referenced, how did they quantify the number of hours and number of days?

A. Well, again, they -- I think it depends --

in some of the epidemiologic literature, they may quantify a day as seven hours, and some might say less than seven hours. But I think, you know, between five to seven hours is usually a fair assessment in terms of how you quantify days in my view.

Q. Okay. So I'll ask a different hypothetical.

Eight hours a day, twice a year, five years, and let's say it's between 2007 and 2012. Does it change any of your opinions? Everything else is the same, the time of diagnosis, type of diagnosis, every other risk factor.

A. So eight hours a day for two days a year?

Q. Yes.

A. And for how many years?

Q. Five years.

A. So that's 90 hours total. I just want to make sure that -- I mean, it's 90 hours lifetime exposure?

Q. Yes.

A. Of large quantities and no protective gear and the same disease and so forth?

Q. Yes.

A. I mean, I think it's -- I think that would

probably meet the threshold. I mean, the threshold that I've gone by looked at more than 10 days of lifetime, regardless of, again, you know, if you divide those 90 hours by seven-hour days or six-hour days, you'd still be above the ten days of a lifetime or two days per year, which is still over the minimum threshold.

MS. WAGSTAFF: So I just want to just put something on the record because this hypothetical changing of circumstances is going really fast, and when we read the transcript, we will read it really slow. So you changed it from 40 years to 5 years, and then you told him when the 5 years was in relationship to his diagnosis and everything. And I just want to make sure that he understands your question is it five years prior to hep C being eradicated or is it five years after?

I just don't know when those five years fit in, and I want to make sure Dr. Nabhan and you are on the same page on that because that happened really fast, that exchange.

BY MR. STEKLOFF:

Q. I will read back my exact question, and you can tell me if you'd change your answer.

"I'll ask a different hypothetical. Eight

hours a day" --

MS. WAGSTAFF: Same question or different hypothetical?

MR. STEKLOFF: I'm reading it back so he can make sure that what he just said is accurate.

BY MR. STEKLOFF:

Q. "I'll ask a different hypothetical. Eight hours a day, twice a year, five years and let's say it's between 2007 and 2012. Does it change any of your opinions? Everything else is the same -- type of diagnosis" -- I repeated -- "type of diagnosis, every other risk factor."

A. So, you know, in 2005 he was treated, and his hepatitis C was eradicated, as we know in this particular case. And, you know, when you are exposed eight hours a day for two days a year, that's, you know, 16 hours in a given year of a high volume without wearing protective gears. And with five years, that's about 80 hours of a lifetime, and 80 hours of a lifetime with high exposure to Roundup.

You know, again, I've been dividing this number of hours by seven. I was calculating the days as seven hours, but I recognized when I actually looked at -- you know, that particular

division is not always -- it always depends who is doing it. I'm sure you are aware of this. Some people say a day is considered two or three hours and so forth, and you divide that.

But the way I've been doing it, I've been dividing this by seven. So you divide 80 by 7 and I think you get about 11 or plus lifetime days, and when you look at some of the literature, such as the Eriksson paper, I believe it looked at more than 10 days in a lifetime as association or causation between Roundup and non-Hodgkin lymphoma.

So that particular example appears to me would be -- if everything is the same and hepatitis C is eradicated and treated and is gone between 2007, 2012, he developed the disease several years after he stopped using Roundup. It appears to me to be -- for me is appropriate, but, again, this is very hypothetical. So I'm answering to the best of my ability.

Q. Okay. Now, let's respond to Aimee's long, speaking objection. Let's say everything is the same except for 2000 to 2005. What opinion do you come to?

A. Do you mind repeating now everything is the same?

Q. Everything is the same, what you just said, 80 hours divided by 7, and everything else is the same. But I'm shifting the time period instead of 2007 to 2012, because this was raised by your counsel, shifting the time period from 2000 to 2005?

MS. WAGSTAFF: I was just seeking clarification of your question. The question and answer was going really fast. I thought you guys were talking over each other, which wouldn't be shown on the transcript. So I was trying to clear it up. I wasn't asking questions.

THE WITNESS: Yeah, I mean, I think that would be more difficult because between 2000 and 2005 you have active hepatitis C that has not been treated. I'm not -- you know, you wouldn't know because it wasn't detected until 2005, but I presume what you're trying to get at is we know he has hepatitis C between 2000 and 2005. Am I correct in my assumption?

BY MR. STEKLOFF:

Q. I'm not really trying to get at anything. I just want to know based on --

A. To accurately answer you, I just want to know am I assuming that the 2000, 2005 and

hepatitis C is active?

Q. Yes, because everything else is the same. So you can assume that.

A. So, I mean, when you have an active hepatitis C that has not been necessarily treated, I think it becomes difficult to assume that this is the only contributing factor in this particular case and -- which is very different than his situation.

In his situation the disease was eradicated, the hepatitis C, between '00 and '05, in your hypothetical example, the hepatitis C is still active. So you can't really eliminate it fully, and you'll have to assume that the hepatitis C also added and contributed to the development of his disease.

Q. So I just want to be clear, if he had the exact same cancer diagnosed in 2015, but his Roundup use was limited, as we've discussed, between 2000 and 2005, you would say that the hepatitis C was a substantial contributing factor to his 2015 NHL?

A. Well, I said after you treated the hepatitis C, it's either negligible, contributing factor or minor contribution.

But if the disease is active, I don't know if I can say "minor." It is obviously possibly contributing, and I will have to look at the facts. For example, did he have active cirrhosis? Was his liver function test good? Bad? Was there any disease that was actually causing problems or not before you can answer that question.

Q. But I'm not asking you to change any of those assumptions. His hepatitis C is the exact same as it is in the real world. Okay? So it was -- existed between some unknown point and 2005. It was then eradicated and his cancer diagnosis occurs in 2015. The only thing I'm asking you to change is that his Roundup use is limited to 2000 to 2005 but meets that 80-hour threshold in large amounts.

A. Right.

Again, Roundup will still be a major contributing factor to the development of his non-Hodgkin lymphoma because of the use that you are describing. You are describing a very heavy use over a five-year period, and that use is above the threshold of what is published in the epidemiologic literature. So you can't discount it based on that example that you provided.

Q. Can you turn to page 6 of your report?

A. Yes.

Q. And I am now done with the exposure bullet, and I want to move to the next bullet. You previously offered a report on general causation; correct?

A. I did.

Q. And I -- just now I understand the answer to this, but I'm just trying to get us on the same page. You also have read Judge Chhabria's opinion about -- the general causation Daubert opinion; correct?

A. I mean, a while back. This was when he provided the opinion. That was, I think, six or seven months since I read it. I haven't read it for this case.

Q. And here I just want to try to understand what you're doing. In applying your differential diagnosis, tell me if this is a fair characterization: Was it necessary -- did you feel like it was necessary to provide your general causation views of glyphosate or Roundup as a possible risk factor before you could rule it in or rule it out?

A. So I wasn't providing general causation here. I wasn't providing general causation at all.

What I was trying to explain -- and that's why these bullet points are sequential to each other. I described his particular exposure to Roundup and what he had told me about his exposure, and then I provided the evidence about Roundup and non-Hodgkin lymphoma as it pertains to his particular case.

So I wanted to provide the context and explain in the report why would I think that Roundup in Mr. Hardeman's case was causative to his non-Hodgkin lymphoma. So the extent of what I'm providing here is just to illustrate and explain the specific causation of his particular case. It wasn't -- I wasn't really providing here any general causation opinion whatsoever.

MS. WAGSTAFF: I am going to object to questioning him about the demarcation between general causation and specific causation. That is a legal issue that is specific to the MDL, and it's specific to Judge Chhabria's opinion. And to expect a medical doctor to know and be able to understand a 70-page legal an opinion that even we probably wouldn't agree on, I think, is unfair and inappropriate.

BY MR. STEKLOFF:

Q. I just wanted to go through the bullets to try to understand.

A. Sure.

Q. Your first bullet is about IARC's finding of --

A. Page 6, right?

Q. Page 6, yes, sir.

And starting in March 2015, starting with that bullet.

A. Sure.

Q. That bullet is just identifying that IARC found glyphosate to be a probable human carcinogen, Class 2A; correct?

A. Correct.

Q. That was also something that you relied on in your general causation report?

A. I'm not sure I could say "general causation," but, yes.

Q. In your 2017 report?

A. Yes.

But, again, I want to make sure that you understand why I have it here. This is -- I'm not giving any general causation opinion here. I'm providing an opinion in Mr. Hardeman's case, but in

order for me to explain how Roundup, in his particular case caused, non-Hodgkin lymphoma, I need to explain where I got this from, what type of epidemiologic literature that links that to this but I'm not providing an opinion in general causation. I just hope this is clear.

Q. It is clear. Actually -- that answer is almost exactly what I wanted, so I think we can end.

MS. WAGSTAFF: No. My objection is because I think that you're trying to set up an argument that I've been having with you and Ms. Yates. And to be very clear, and I think what Judge Chhabria has said on the record, which is why I objected earlier to you asking him legal questions, is that specific causation experts cannot give new or general causation opinions. And it's our belief and it's our opinion that Monsanto specific causation opinions are giving new and different general causation opinions.

We said at the very beginning of this case or of this deposition that Dr. Nabhan is giving only specific causation opinions, and to the extent he's giving general causation opinions, they are consistent what has been allowed for plaintiffs to

opine on at Daubert. And I believe that's what he said at the last status conference, and we can leave it at that.

MR. STEKLOFF: Okay. I'll save my response for later if we have to go down that road.

MS. WAGSTAFF: You can give it now.

MR. STEKLOFF: I don't need to.

MS. WAGSTAFF: Okay. And, by the way, when I say "consistent with what has been allowed for plaintiff to opine on," I mean all plaintiffs, all MDL plaintiffs.

MR. STEKLOFF: Actually, can we go off the record?

THE VIDEOGRAPHER: We are off the record at 10:53 a m.

(A short break was taken.)

THE VIDEOGRAPHER: We are back on the record at 11:07 a m.

BY MR. STEKLOFF:

Q. I think I just have two more topics, Dr. Nabhan.

First of all, with respect to Dr. Hardeman's treatment, you agree he's been in remission now for over three years?

A. Yes, he is.

Q. It's a good thing?
A. It's a good thing.
Q. You are not expecting him, based on your clinical practice, to have a recurrence; right? It doesn't mean it's impossible, but you're not expecting it; correct?
A. Less likely.
Q. And then hopefully we all agree if he hits the five-year mark, then you would view him as cured of his non-Hodgkin lymphoma?
A. So it's extremely unlikely for his type of non-Hodgkin lymphoma to recur after five years. There are some reports of late reoccurrences as you are aware, but it's extremely unlikely. He would be more at risk of developing another type of lymphoma just because patients that develop one type of lymphoma could develop another type of lymphoma, and he could be at risk of developing side effects from the chemotherapy that he received longer term.
And that's really why we monitor these patients forever. Even after five years, the current guidelines recommended that these patients need to be seen once a year because what you're looking for, the possibilities of long-term

toxicities from the chemotherapy that he received as well as the possibility of emergent different type of lymphoma than the one he had. But it would be extremely unlikely for his large-cell lymphoma to recur.
Q. And the last topic I want to cover is -- well, whether you refer to your report or not -- is his body mass index.
A. Page -- do you want me to look at the page? Page 7?
Q. Discussed on page 5.
A. Sure.
Q. Do you agree that obesity is a risk factor for non-Hodgkin lymphoma?
A. Yeah, I mean, it's a controversial topic with obesity and all cancers because when you try to do a lot of research on obesity, you'll find folks talking about it as a risk factor for pretty much all types of cancer: esophageal, gastric, endometrial, ovarian, breast, non-Hodgkin lymphoma, thyroid cancer, gallbladder cancer and so forth.
So I think any time that something is linked with every single cancer as a potential risk factor, you start questioning the specificity of really how much does it contribute to a particular

disease. So it is a controversial topic whether obesity is a true risk factor or not. I tend to believe it's something we need to look at in every single patient that develops cancer, but I would say it's inconclusive at the present time.
Q. So you can't say, to a reasonable degree of medical certainty, that obesity is a risk factor for non-Hodgkin lymphoma?
A. As I said, it's a risk factor for all cancers almost. I think I listed in my report all of the malignancies, and that's not even inclusive of everything. When you research obesity and cancer, you will see the suggestion that it's really linked or a risk factor for all of these cancers. I think when you look specifically at obesity and non-Hodgkin lymphoma, you will have to see that -- you will come to the conclusion that that risk is inconclusive based on the literature that I was able to review.
You will find some papers that actually link obesity to non-Hodgkin lymphoma and some that don't, and you just have to look at -- the collective evidence, in my opinion, it's inconclusive.
Q. So is it fair to say, therefore, you

cannot say, to a reasonable degree of medical certainty, that obesity is a risk factor for non-Hodgkin lymphoma?
MS. WAGSTAFF: Objection.
THE WITNESS: I usually include it, and that's actually why I have it here. If I didn't really think of it as a risk factor, I wouldn't mention it. I included all of the risk factors that I'm aware of that possibly contribute or could be linked to non-Hodgkin lymphoma. As I told you, I'm more inclusive. It never hurts to put everything that you know is a risk factor in that basket, and then you start the process of elimination and trying to see is obesity as a risk factor causative or not because that's really what we are trying to look at. And I can't find conclusive evidence to support that obesity causes non-Hodgkin lymphoma.
BY MR. STEKLOFF:
Q. What would you need to find conclusive evidence?
A. I just reviewed what I was able to find in the literature, and I think the largest paper that I was able to find that had thousands of patients from the United States, as well as Europe and Australia, came up with the conclusion that it's

inconclusive. We need more research to do to be able to tell and determine whether obesity could cause non-Hodgkin lymphoma.

Q. So is it fair to say you would never find, therefore, that an individual's obesity was a substantial contributing factor to his or her non-Hodgkin lymphoma?

A. Again, it depends on the individual. So, I mean, you have here somebody who has other risk factors that are clearly more pressing in terms of the literature in terms of the available evidence as causative of non-Hodgkin lymphoma. So you think about it. You put it in and then you decide whether the obesity in this particular individual has lead to the development of non-Hodgkin lymphoma. I think the definition of obesity has changed over the years that, you know, before you know it, everybody around this table will be considered obese. So it's a problem because it all depends on the body mass index, and that definition of body mass index continues to change.

So currently in the United States, one third of people -- and I think we are, what, 400 million right now -- are considered obese, and about 40 percent are overweight or obese. So that

means over 100 million people are considered obese or overweight, and the instance of cancer in the U.S., new cancers, is about 1.8 million. So given the fact that everybody says obesity is a risk for all of these cancers, I don't really see that there is, you know, hundreds of millions of patients diagnosed with cancer.

You'll have to look -- you can't just take -- you have to look critically at every single risk familiar, like we did at hepatitis C, like we look at hep B, like we look at obesity, and then decide whether obesity in this particular individual has a role or not. And that's what I did in this case.

Q. And I understand every individual is different, but you can't point to me a scenario in which you would find that someone's obesity was a substantial contributing factor to his or her development of non-Hodgkin lymphoma; correct?

MS. WAGSTAFF: Objection. Asked and answered.

THE WITNESS: It's a very hypothetical -- I'd have to look at each case individually. You'll have to give me medical records. You'll have to give me patient -- actual patient to be able to tell you if that patient will have that. I can't

create a phantom patient and tell you that obesity was a cause of non-Hodgkin lymphoma.

BY MR. STEKLOFF:

Q. But given that what you told me already about all the statistics of cancer, all of the confusion or differing definitions about obesity, all of uncertainty and inconclusiveness about whether it's a risk factor, you would never say -- isn't it true that you would never say that someone's obesity was a substantial contributing factor to his or her non-Hodgkin lymphoma in the absence of any other risk factors?

MS. WAGSTAFF: Objection. Asked and answered.

THE WITNESS: It would be very difficult for me to say that obesity by itself was the cause of any particular cancer, not just non-Hodgkin lymphoma by itself.

BY MR. STEKLOFF:

Q. And you've never told a patient that his or her obesity was a cause of his or her non-Hodgkin lymphoma; correct?

A. I've always counseled patients about diet and exercise and losing weight. I think you have to do it, and they either hate you or love you for it. But you always do that, but I have not told a

patient that just the fact you are overweight is the reason why you had cancer and not just lymphoma. In my opinion, linking obesity to any type of cancer is very, very soft.

MR. STEKLOFF: I am done with my questions. I might have more after Ms. Wagstaff, but I pass the witness.

EXAMINATION

BY MS. WAGSTAFF:

Q. Just following up on Monsanto's lawyer talking about obesity, Monsanto's lawyer talking about obesity, so obesity is a sliding scale; correct?

A. Yes.

Q. Okay. And so somebody could be 100 pounds overweight or 200 pounds overweight, and both could be considered obese; is that right?

A. Absolutely.

Q. And --

A. And then they say also lose weight during -- you know, for a few years, and then they gain weight, and then they lose weight. And the definition of obesity changes. It's just a very soft way to link obesity to cancer, in my opinion, any cancer.

Q. And I won't ask which half of us in here might be considered obese. But you could look at somebody, and they could be clinically obese, and the general population wouldn't necessarily consider them obese; is that right?

A. And, frankly, when I met Mr. Hardeman in person -- and that's how important it is to meet somebody in person, and there is so much value in seeing a patient and being able to tell a patient versus just hypothetical, he did not strike me as obese at all. Frankly, from reading the records and the BMI, I was expecting somebody I have to open two doors for, and it wasn't. It was, like, normal, average person you would see walking the street.

Q. Okay. And you brought up meeting with Mr. Hardeman, and I think Monsanto's lawyer had asked you about that meeting. And I believe he asked you two different lines of questioning. One line of questioning was the question and answer you had with Mr. Hardeman, and then the other line of questioning was the clinical exam you did of Mr. Hardeman. Do you remember those questions?

A. I do.

Q. And I believe the word he uses was

"impacted" or "affected," and I think that what he was asking you was how did the line of questioning and the clinical examination either impact or affect your opinions. And I'm not quite sure what your response was, but I wanted to make sure we were on the same page.

What impact did meeting with Mr. Hardeman have on your opinions? How important was that to your opinion?

MR. STEKLOFF: Objection to form.

THE WITNESS: Well, it's very important. I mean, I think -- you can read the medical records and review the medical records, but ultimately, you have to put these medical records in the context of sitting down with the patient, talking to the patient, listening to the patient and examining the patient. I just -- in my view, it would be very difficult to form an opinion on that particular patient or any particular individual without having this dialogue and the conversation or understanding from that person how it is.

And, as you know, in the patient that I will be deposed about later on today, he just -- he wasn't able to travel because of his comorbidities, and I wanted to talk to him. And we spent an hour-plus

on the phone talking and trying to understand, telling me what he thinks. So there is a lot of impact, number 1, in trying to understand toxicities that he went through and trying to understand from him what he actually did as well as his own risk factors and just learn from him in person what he went through.

BY MS. WAGSTAFF:

Q. Okay. And while we were discussing your meeting with Mr. Hardeman, and I believe it's on page 6 of your report at the very top where the paragraph starts "During my meeting with him"?

A. Yes.

Q. And if you go through, it says -- you've actually reported here that he sprayed between 1988 and 2012. Do you see that?

A. Yes, and I think I misspoke earlier. I said 2014. That would just -- that was on me. 2012 is the accurate thing that he told me.

Q. Okay. And so all of the questions you can remember -- this deposition hasn't been very long. It's just been a couple hours. And do you remember at the beginning of the deposition the questioning that Monsanto's lawyer was asking you?

A. Yes, I do.

Q. Do any of your opinions change if he stopped spraying at 2012?

A. No, they don't.

Q. And when you were going through your opinion, did you consider Mr. Hardeman's age?

A. I did.

Q. Did you consider Mr. Hardeman's gender?

A. I did.

Q. Did you consider Mr. Hardeman's ethnicity?

A. I did.

Q. Did you -- you testified that you have read Monsanto's -- the expert reports provided by Monsanto; correct?

A. I have.

Q. Okay. I just want to look at one just so I get the actual wording correct. Dr. Levine, Alexander Levine provided a report. Did you read that report?

A. I did.

Q. And in that report Dr. Levine discusses as a possible cause of Mr. Hardeman's NHL, autoimmune disease, atopic disease, eczema, in parenthesis, and use of corticosteroids. Did you consider those possible risk factors?

A. I don't believe these apply to him at all.

Q. So you ruled those out or you have actually --

A. I didn't do a report. I mean, I don't believe he used corticosteroids or immunosuppressant therapy for a long period of time, if any, and if he did, he used it topically which is something negligible. I wholeheartedly agree with that statement whatsoever.

Q. You wholeheartedly do or you don't?

A. I disagree with the statement that eczema or whatever she's mentioning regarding corticosteroid and any impact on his non-Hodgkin lymphoma because, again, that's really part of the importance of talking to a patient and asking these questions. I can't really find anything compelling in the story that this is an issue.

MS. WAGSTAFF: Okay. No further questions.

FURTHER EXAMINATION

BY MR. STEKLOFF:

Q. You formed your opinions after you reviewed Mr. Hardeman's medical records; correct?

A. I reviewed his medical records, and I had a very important opinion about this. But that was solidified further after I met him and I talked to him.

Q. After you reviewed his medical records, you believed, to a reasonable degree of medical certainty, that his Roundup exposure was a substantial contributing factor to his non-Hodgkin lymphoma; correct?

A. His medical records did not actually talk about his Roundup exposure. If you read the entire medical record, there is nothing specifically that talks about the amount of exposure, how much he was exposed, all of these things. It did not necessarily discuss other risk factors and so forth. The medical record helped me in understanding when he was diagnosed, the chronology of orders, what he was treated with, some of the side effects he went through, the other comorbidities, the fact he was treated for hepatitis C, the fact he was treated for -- to prevent reactivation of his hepatitis B and so forth, but they didn't necessarily talk a lot about occupational -- about residential exposure, the amount of exposure and so forth.

So that's where I needed to do additional talking to him and asking him and then reviewing his depositions and what he was deposed on to be able to form a complete opinion.

Q. Actually, his medical records didn't mention Roundup or glyphosate whatsoever; correct?

A. I don't recall the actual medical records discuss that.

Q. And did you review his deposition before or after you met with him in person?

A. You will see that I think I met him first on November 16, and I reviewed his deposition on November 21.

And, by the way, a lot of these medical records don't always discuss, you know, Roundup or -- and other things. It's simply the fact physicians are more worried about treatment. "I'm going to treat you for this disease, and I'm going to get you therapy and so forth."

And a lot of the treating physicians that he had, like many other patients, some physicians may want to do the extra research to try to see whether there is any causative factor to a particular disease, and some don't. They just want to treat you and move on. This is what we are going to treat you with and move on. So not everybody necessarily is aware unless they do the proper epidemiologic research.

Q. You, in your practice, when you were

treating patients, you wanted to know if there was a causative factor a specific disease that you were taking care of a patient for, didn't you?

A. I was a lymphoma specialist, and I'm a lymphoma specialist. And I think there are many general oncologists that may have not the expertise of lymphoma. I think very different. I was seeing lymphomas. I saw thousands of patients with lymphoma.

So I think -- I don't believe that the physicians of Dr. -- of Mr. Hardeman are lymphoma specialists who have a particular interest in the disease. They were general oncologists treating all-comers. So I think it's apples and oranges.

Q. To answer my question, I didn't ask you a single thing about his treaters right there. Can you answer my question? You, in your practice when you were treating patients, you wanted to know if there was a causative fact for a lymphoma you were taking care of a patient for; correct?

A. I did ask the appropriate questions to see if I could illustrate a causative factor or not.

Q. If you could find the cause, you would have wanted to know the cause when you were treating patients?

A. Absolutely.

MS. WAGSTAFF: I may have one more question. Can we take a break, please?

THE VIDEOGRAPHER: We are off the record at 11:25 a.m.

(Brief interruption.)

THE VIDEOGRAPHER: We are back on the record at 11:26 a.m.

MS. WAGSTAFF: No more questions.

THE VIDEOGRAPHER: We are off the record at 11:26 a.m. This concludes the videotaped deposition of Chadi Nabhan MD, MBA.

C E R T I F I C A T E

I, DEANNA AMORE, a Shorthand Reporter and notary public, within and for the State of Illinois, County of DuPage, do hereby certify:

That CHADI NABHAN, M.D., the witness whose examination is hereinbefore set forth, was first duly sworn by me and that this transcript of said testimony is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 14th day of December 2018.

___________________________

Deanna M. Amore, CSR, RPR

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: ROUNDUP PRODUCTS MDL No. 2741
LIABILITY LITIGATION
________________________ Case No. 16-md-2741-VC
This document relates
to:
Hardeman v Monsanto Co., et al.
Case No. 3:16-cv-00525

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the above-captioned matter or the same has been read to me and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the ______ day of ______________, 20__.

________________________________________

CHADI NABHAN, M.D.

ERRATA SHEET

CORRECTIONS:

Page ____ Line ____ Reason ____
From ____________________ to __________________
Page ____ Line ____ Reason ____
From ____________________ to __________________
Page ____ Line ____ Reason ____
From ____________________ to __________________
Page ____ Line ____ Reason ____
From ____________________ to __________________
Page ____ Line ____ Reason ____
From ____________________ to __________________
Page ____ Line ____ Reason ____
From ____________________ to __________________
Page ____ Line ____ Reason ____
From ____________________ to __________________
Page ____ Line ____ Reason ____
From ____________________ to __________________
Page ____ Line ____ Reason ____
From ____________________ to __________________
Page ____ Line ____ Reason ____
From ____________________ to __________________
Page ____ Line ____ Reason ____
From ____________________ to __________________
Page ____ Line ____ Reason ____
From ____________________ to __________________
Page ____ Line ____ Reason ____
From ____________________ to __________________
Page ____ Line ____ Reason ____
From ____________________ to __________________
Page ____ Line ____ Reason ____
From ____________________ to __________________
Page ____ Line ____ Reason ____
From ____________________ to __________________

