# EXHIBIT 18

Chadi Nabhan, M.D.

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE:  ROUNDUP PRODUCTS      MDL No. 2741

LIABILITY LITIGATION

_____           Case No. 16-md-02741-VC

This document relates

to:

Stevick v Monsanto Co., et al.

Case No. 3:16-cv-2341-VC

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEO DEPOSITION OF

CHADI NABHAN, M.D.

December 14, 2018

2:50 p.m.

Chicago Marriott O'Hare

8835 West Higgins Road, Park Ridge, Illinois

Deanna Amore, CRR, CSR, RPR, 084-003999

Golkow Litigation Services - 877.370.DEPS

Chadi Nabhan, M.D.

### Page 2

```
 1           APPEARANCES OF COUNSEL
 2  On Behalf of the Plaintiff, ELAINE STEVICK:
 3        ANDRUS WAGSTAFF
          MS. KATHRYN M. FORGIE
 4        1901 Harrison Street
          Suite 1101
 5        Oakland, California 94612
          (310) 339-8214
 6        kathryn.forgie@andruswagstaff.com
             - and -
 7        WEITZ & LUXENBERG, P.C.
          MS. ROBIN L. GREENWALD
 8        700 Broadway
          New York, New York 10003
 9        (313) 800-4170
          rgreenwald@weitzlux.com
10           - and -
          THE MILLER FIRM, LLC
11        MR. BRIAN BRAKE (via telephone)
          108 Railroad Avenue
12        Orange, Virginia 22960
          (540) 672-4224
13        bbrake@millerfirmllc.com
14  On Behalf of the Defendant, MONSANTO COMPANY:
          ARNOLD & PORTER KAYE SCHOLER, LLP
15        MR. BERT L. SLONIM
          250 West 55th Street
16        New York, New York 10019-971
          (212) 836-8572
17        bert.slonim@arnoldporter.com
             - and -
18        WILKINSON WALSH + ESKOVITZ
          MS. CALI COPE-KASTEN
19        2001 M Street, NW
          10th Floor
20        Washington, D.C. 20036
          (202) 847-4030
21        ccope-kasten@wilkinsonwalsh.com
22    ALSO PRESENT:
23        Anthony Micheletto, Videographer
24                * * * *
25
```

### Page 3

```
 1              I N D E X
 2  WITNESS                    EXAMINATION
 3  CHADI NABHAN, M.D.
 4    EXAMINATION BY MR. SLONIM          7
 5    EXAMINATION BY MS. GREENWALD      57
 6              EXHIBITS
 7  NUMBER       DESCRIPTION          PAGE
 8  Exhibit 1   Innovative Oncology     8
 9              Consulting, LLC Invoice
10              for Services Rendered in
11              Stevick v Monsanto;
12              NABHANMDLGROUP1000058
13  Exhibit 2   11.20.2018 Expert Report  9
14              of Dr. Chadi Nabhan
15
```

### Page 4

```
 1              EXHIBITS
 2  NUMBER       DESCRIPTION          PAGE
 3  Exhibit 3   World Health Organization  19
 4              Classification of Tumours
 5              of Haematopoietic and
 6              Lymphoid Tissues
 7  Exhibit 4   9.6.2018 The Permanente   31
 8              Medical Group Kaiser
 9              Foundation Hospitals
10              Medical Record for Elaine
11              M. Stevick;
12              Confidential-Stevick-
13              EStevick-KPNValley-MD-
14              00010
```

### Page 5

```
 1              EXHIBITS
 2  NUMBER       DESCRIPTION          PAGE
 3  Exhibit 5   3.12.2015 The Permanente  31
 4              Medical Group Kaiser
 5              Foundation Hospitals
 6              Medical Record for Elaine
 7              M. Stevick;
 8              Confidential-Stevick-
 9              EStevick-KPNValley-MD-
10              002173
11  Exhibit 6   11.9.2018 Excerpt of the  33
12              Deposition of Elaine
13              Stevick
```

2 (Pages 2 to 5)

Chadi Nabhan, M.D.

Page 6

1      THE VIDEOGRAPHER:  We are now on the record.
2      My name is Anthony Micheletto, videographer for
3  Golkow Litigation Services.
4      Today's date is December 14, 2018.  The time is
5  2:50 p.m. as indicated in the video screen.
6      This video deposition is being held in Chicago,
7  Illinois, in the matter of Stevick versus Monsanto
8  Corporation, et al., Case No. 3:16-cv-2341 in the
9  United States District Court, Northern District of
10 California.
11     The deponent today is Chadi Nabhan, MD, MBA.
12     Will counsel please identify themselves for the
13 video record?
14     MS. GREENWALD:  Robin Greenwald for the
15 plaintiff.
16     MS. FORGIE:  Kathryn Forgie of Andrus Wagstaff
17 for the plaintiff.
18     MR. SLONIM:  Bert Slonim with Arnold & Porter,
19 on behalf of Monsanto.
20     MS. COPE-KASTEN:  Cali Cope-Kasten,
21 Wilkinson Walsh, on behalf of Monsanto.
22     MR. BRAKE:  This is Brian Brake on behalf of
23 the plaintiffs.
24     THE VIDEOGRAPHER:  Our court reporter today is
25 Deanna Amore.  Please swear in the witness.

Page 7

1          (Whereupon, the witness was
2             duly sworn.)
3      THE WITNESS:  I do.
4      MR. SLONIM:  Good afternoon, Mr. Nabhan.  Would
5  you please state your name and full business
6  address for the record?
7      THE WITNESS:  Sure.  First name is
8  Chadi, C-h-a-d-i, last name is Nabhan, N-a-b-h-a-n.
9  Current business address is 3651 Birchwood Avenue
10 in Waukegan, Illinois 60085.
11            CHADI NABHAN, M.D.,
12 called as a witness herein, having been first duly
13 sworn, was examined and testified as follows:
14                EXAMINATION
15 BY MR. SLONIM:
16     Q.  And you are a medical doctor; correct?
17     A.  Yes.
18     Q.  And do I understand that you have reviewed
19 the medical records of Ms. Elaine Stevick and
20 assessed her medical condition as part of your work
21 in this matter?
22     A.  I have.
23     Q.  I am going to mark as Deposition
24 Exhibit No. 1 a record that's been produced to us
25 reflecting your invoice in this matter.

Page 8

1      A.  Sure.
2          (Whereupon, Exhibit 1 (Stevick)
3          was marked for identification.)
4  BY MR. SLONIM:
5      Q.  Does this reflect the amount of time
6  you've spent working on the Stevick case?
7      A.  Until December 3rd.  There are additional
8  hours I spent that I have not written in this
9  report.
10     Q.  Okay.  I don't think you totaled these up.
11 If I did the arithmetic correctly -- and you are
12 welcome to check me -- it looks to me like this was
13 30 hours of time that was spent up and through
14 December 3, 2018; is that correct?
15     A.  Correct.
16     Q.  And you bill your time at $550 an hour;
17 correct?
18     A.  I do.
19     Q.  And then --
20     A.  I have not billed this yet, but that's
21 what I plan on billing.
22     Q.  Okay.  What's your best estimate of
23 additional time that you have spent on this matter
24 subsequent to December 3?
25     A.  Maybe 10 to 15 at most.

Page 9

1      Q.  So you would estimate 40 to 55 hours total
2  on the Stevick matter?
3      A.  40 to 45.  Less than 50.  I would say
4  between 40 and 50.
5      Q.  Thank you.  I misadded.
6      A.  Sure.
7      Q.  This indicates that you -- it looks like
8  you spent an hour meeting with and examining
9  Ms. Stevick?
10     A.  Yes, I did meet her on November 1, '018.
11     Q.  And she came to your office in Chicago?
12     A.  Yes.
13     Q.  Did you conduct any tests of any type?
14     A.  I just did a physical -- I mean, I did an
15 interview and a physical exam, but there was no
16 testing.
17     Q.  No blood draws or imaging studies or
18 anything of that sort?
19     A.  No.
20         (Whereupon, Exhibit 2 (Stevick)
21         was marked for identification.)
22 BY MR. SLONIM:
23     Q.  I've marked this Deposition Exhibit No. 2,
24 your expert report in this matter.
25         (Discussion off the record.)

3 (Pages 6 to 9)

Page 10

1   BY MR. SLONIM:
2      Q. Can you identify this as your report
3   regarding Ms. Stevick?
4      A. It is.
5      Q. And is that your signature on the last
6   page?
7      A. Yes, it is.
8      Q. Did you personally author all of the
9   substantive statements in this report?
10     A. I have.
11     Q. And does this disclose all of the opinions
12  that you intend to offer in this matter?
13     A. Yes, unless something new happens between
14  now and trial.
15     Q. And does this also disclose all of the
16  bases for your opinions?
17     A. Yes.
18     Q. And you do not intend to offer any
19  opinions regarding Ms. Stevick that are not
20  disclosed in your expert report; correct?
21     A. I don't.
22     Q. Do I understand correctly that you never
23  provided any medical care or treatment to
24  Ms. Stevick?
25     A. I did not.

Page 11

1      Q. Now, Ms. Stevick was diagnosed with
2   non-Hodgkin lymphoma in late December 2014; is that
3   right?
4      A. Correct.
5      Q. And she was age 63 at that time?
6      A. Yes, she was.
7      Q. And is it your understanding that at that
8   time she went to see her primary care physician,
9   Dr. Gonzalez, with complaints of dizziness and
10  confusion?
11     A. Yeah, she was having a lot of nonspecific
12  symptoms for a while before, for several months
13  before. Even at work -- she was having some issues
14  at work in terms of accuracy of the reports she was
15  writing when she was seeing patients and so forth,
16  and she had some memory lapses. And, eventually,
17  she presented to her physician with these
18  complaints, and there was a plan to do some testing
19  as an outpatient, but she ended up in the hospital
20  through the emergency room prior to that.
21     Q. When you say she was "seeing patients,"
22  Ms. Stevick, at that time, in December 2014, was a
23  speech pathologist; is that right?
24     A. That's what I meant, yeah.
25     Q. And one of the examinations or studies

Page 12

1   that was performed in response to these complaints
2   was a CT scan; is that correct?
3      A. Yeah. A CT scan and MRI. I'm not sure
4   whether one was done before the other, but she
5   eventually had an MRI.
6      Q. Okay. In any event, she had one or more
7   images studies; is that fair?
8      A. Yes.
9      Q. And these imaging studies showed evidence
10  of a cerebellar mass; is that right?
11     A. Yes.
12     Q. And once that mass was identified in
13  imaging studies, Ms. Stevick then underwent surgery
14  to remove the mass and pathological examination of
15  the tissue that was removed was performed; is that
16  correct?
17     A. Yes.
18     Q. And is it also the case that bone marrow
19  biopsies and cerebrospinal fluid analysis were also
20  performed?
21     A. After the mass was determined to be
22  diffuse large B-cell lymphoma, the spinal fluid and
23  the bone marrow were done as part of the staging
24  process. Bone marrow would not have been done
25  unless they found out this was lymphoma. So that's

Page 13

1   why it was done.
2      Q. Okay. I want to come back to the
3   pathology on the tissue that was removed in the
4   biopsy and just spend a second on these other
5   pathological examinations.
6         Is it correct that the bone marrow biopsy
7   and the cerebrospinal fluid analyses indicated that
8   apart from the cerebellar mass, there was no
9   evidence that Ms. Stevick had any malignant disease
10  in any other parts of her body?
11     A. Correct.
12     Q. Okay. Now, let's talk about the
13  cerebellar tissue then. That was examined by a
14  pathologist; is that right?
15     A. Yes.
16     Q. And the pathology determined that the
17  particular type -- that it was non-Hodgkin
18  lymphoma; correct?
19     A. Yes, diffuse large B-cell lymphoma.
20     Q. There is a specific subtype of diffuse
21  large B-cell lymphoma in her case that's called
22  primary diffuse large B-cell lymphoma of the
23  central nervous system; correct?
24     A. We call it primary CNS lymphoma for
25  simplicity.

Page 14

1    Q.  Okay.  So and that's what I was going to
2  ask you, and sometimes that's referred to by its
3  initials PCNSL?
4    A.  Correct.
5    Q.  And that is a specific subtype of
6  non-Hodgkin lymphoma according to the World Health
7  Organization classification of non-Hodgkin
8  lymphoma.  That's actually separate from diffuse
9  large B-cell lymphoma and other types of
10  non-Hodgkin lymphoma; correct?
11    MS. GREENWALD:  Objection.  Form.
12    THE WITNESS:  Yeah, it's a different -- it's a
13  different type of non-Hodgkin lymphoma, and it's
14  also treated differently.  So it's a -- it's
15  different than the other diffuse large B-cell
16  lymphoma, for example, that we talked about earlier
17  today.
18  BY MR. SLONIM:
19    Q.  So in terms of --
20    A.  It's the same cells.  You just find them
21  only in the brain, and you don't find them anywhere
22  else.  So the cells are not -- it's the same.  It's
23  diffuse large B-cell lymphoma.  The cells are
24  large-cell lymphoma cells, but they happen to be
25  only present in the brain and nowhere else in the

Page 15

1  body, and that's why we call it primary CNS
2  lymphoma.
3    Q.  And there are other distinguishing
4  characteristics that the pathologist has
5  identified, and as a result of all of that, in the
6  World Health Organization categorization system,
7  this PCNSL is given its own separate classification
8  different and apart from the other types of
9  non-Hodgkin lymphoma; correct?
10    A.  Yeah.  And I can explain why it's given a
11  different classification.  But you are correct.
12  It's classified as a different subtype because some
13  of the PCNSL may not always be DLBCL, but they are
14  treated -- they are all treated the same kind of.
15  You always treat PCNSL similarly, regardless of the
16  types of cells you see under the microscope, and
17  you treat them differently than DLBCL outside of
18  the brain.  So the treatment is different.  The
19  prognosis is different, and that's why they are
20  completely separated as a different category.
21    Q.  Okay.  Good.  Thank you.
22        Do you agree that Ms. Stevick had PCNSL?
23    A.  I do.
24    Q.  Did you personally review the pathology of
25  her lesion?

Page 16

1    A.  The report.  I have not looked at the
2  slides or any of that stuff.  I'm not a
3  pathologist, but I looked at the report.
4    Q.  Okay.  And let's talk about some of the
5  risk factors for cancer and then for this
6  particular type of cancer.
7    A.  Sure.
8    Q.  So, first of all, I think, as we talked
9  about earlier today, as patients age, the risk of
10  developing any type of cancer increases; correct?
11    A.  Correct.
12    Q.  And if we focus specifically on
13  non-Hodgkin lymphoma, the same is true, that as
14  people age, the risk of contracting or developing
15  non-Hodgkin lymphoma increases; correct?
16    A.  Yes.
17    Q.  And Ms. Stevick was 63 years old at the
18  time she was diagnosed with her non-Hodgkin
19  lymphoma, this PCNSL?
20    A.  Yes.
21    Q.  And you would agree with me that PCNSL can
22  affect patients of any age, but the peak incidence
23  is in the fifth or seventh decade of life?
24    MS. GREENWALD:  Object to form.
25    THE WITNESS:  I agree with that.  I see a lot

Page 17

1  of these patients.
2  BY MR. SLONIM:
3    Q.  The median age of patients at the time of
4  PCNSL diagnosis is 56 years old; is that correct?
5    A.  Yes, 50s to 60s, when we see these
6  patients, yes.
7    Q.  And Ms. Stevick was in her fifth to
8  seventh decade of life, and she was seven years
9  older than the median age of PCNSL patients at the
10  time of her diagnosis; correct?
11    MS. GREENWALD:  Objection.  Form.
12    THE WITNESS:  Sure.  I mean, you know, when you
13  see a patient at the best age at clinic, you would
14  say it's about the median age where these patients
15  get diagnosed, so, yeah.
16  BY MR. SLONIM:
17    Q.  So in 2014 at the time Ms. Stevick was
18  diagnosed, she was in the typical age range of
19  patients who are diagnosed with this particular
20  type of non-Hodgkin lymphoma; correct?
21    A.  Yes, plus or minus several years, like you
22  just mentioned.
23    Q.  And so her PCNSL could simply be the
24  result of her age; correct?
25    MS. GREENWALD:  Objection.  Form.

Chadi Nabhan, M.D.

Page 18

1  THE WITNESS: Not in her situation because she
2  has other risk factors as we are going to go
3  through, I presume, in terms of exposure to
4  Roundup, but in her particular situation, you can't
5  state or assume that age by itself was the reason
6  why she developed this disease. But in other
7  patients maybe that may have had no other risk
8  factors, it could be that age developed -- caused
9  it.
10  BY MR. SLONIM:
11      Q.  If you saw a patient presenting in this
12  age range with this particular disease, you would
13  not be surprised to see it in a patient of that
14  age; correct?
15      A.  No, I would not.
16      Q.  It's accepted by the World Health
17  Organization that the etiology of PCNSL in a
18  patient who is not immunocompromised is unknown;
19  correct?
20      A.  You are talking about PCNSL?
21      Q.  Yes.
22      A.  In an immunocompetent patient?
23      Q.  Correct.
24      A.  Yeah. Yeah, it's -- you know, the PCNSL
25  is -- usually happens more than in patients who are

Page 19

1  immunocompromised, specifically this type of
2  lymphoma by the WHO. It occurs more in patients
3  who are immunocompromised, and she wasn't. She was
4  immunocompetent, and that actually raises more
5  question as to investigate why possibly she
6  developed this disease. So it's not really clear
7  why some patients developed this when they are
8  immunocompetent, but it's important to investigate.
9      Q.  I am going to mark as Deposition
10  Exhibit No. 3 the World Health Organization
11  classification of tumors of hematopoietic and
12  lymphoid tissues. And it's a big document and --
13      A.  Is that the paper by Swerdlow and
14  colleagues?
15      Q.  That's the -- that is the treatise by
16  Swerdlow and colleagues that runs several hundred
17  pages, but what I've done is just excerpted out the
18  few pages that deal with primary diffuse large
19  B-cell lymphoma of the nervous system.
20          (Whereupon, Exhibit 3 (Stevick)
21          was marked for identification.)
22  BY MR. SLONIM:
23      Q.  We've marked that as Deposition Exhibit
24  No. 3. I'm going to hand it to you.
25      A.  Thank you.

Page 20

1      Q.  Doctor, do you recognize this as the World
2  Health Organization classification of non-Hodgkin
3  lymphoma, among other types of tumors?
4      A.  I'm just trying to see the date of this
5  publication. What date is it?
6      Q.  When I asked my legal assistants to copy
7  it, I asked them to copy that.
8      A.  I mean, that's fine. Nothing drastic has
9  changed, but the last classification was published
10  in 2016. I just want to make sure this is the last
11  one. I can't see a date on it. But we can talk
12  about it -- that's fine -- but there is no date
13  here.
14      Q.  Doctor, you are correct, and that was my
15  fault.
16      A.  That's okay.
17      Q.  This is supposed to have been -- this
18  should be the most recent classification. I think
19  it's the -- is it the fourth edition?
20      A.  So, yeah, the last paper that came out on
21  the WHO classification was published sometime in
22  the spring or summer of 2016. So it's about two
23  and a half years ago. So -- and this was published
24  in the journal "Blood," which I actually reference
25  in my expert report. I believe this is coming from

Page 21

1  a textbook that references this WHO classification.
2  I just want make sure that this is the latest
3  iteration of the classification because these do
4  change a lot.
5      Q.  Okay. Fair enough. If I have the
6  opportunity, maybe we can 100 percent confirm that.
7          In any event, could I ask you please to
8  take a look at -- so it would be page 300.
9      A.  Yep.
10      Q.  Do you see that?
11          So this is the World Health Organization
12  classification description of the specific type of
13  non-Hodgkin lymphoma that Ms. Stevick was diagnosed
14  with; correct?
15      A.  Correct.
16      Q.  And they indicate on the top that there
17  were several different names, primary diffuse large
18  B-cell lymphoma of the CNS, and they also indicate
19  that's sometimes referred to as a synonym as
20  primary CNS lymphoma; correct?
21      A.  Yes, I see that.
22      Q.  They say "synonyms."
23          And do you see that there is -- on the
24  left-hand side there is a description of the
25  etiology of this particular subtype of non-Hodgkin

6 (Pages 18 to 21)

Chadi Nabhan, M.D.

Page 22

1  lymphoma?
2      A.  Yes, I see that.
3      Q.  "Etiology" means causation, what causes a
4  condition; correct?
5      A.  Yes, that's correct.
6      Q.  And according to the World Health
7  Organization, immunocompetent individuals, the
8  etiological factors are unknown.  Did I read that
9  correctly?
10     A.  If you take on a population level, yes.
11 But for the most part we really don't know what
12 causes it, and that's why we assess each patient
13 individually.
14     Q.  I read the statement correctly --
15 right? -- that an immunocompetent individual the
16 etiological factors are unknown?
17     A.  Yes, you read the statement correctly.
18     Q.  And Ms. Stevick was an immunocompetent
19 individual at the time she was diagnosed; correct?
20     A.  Yes, she was.
21     Q.  There is no study or scientific article
22 that associates Roundup or glyphosate with primary
23 diffuse large B-cell lymphoma of the central
24 nervous system; correct?
25     A.  They don't really look -- the studies that

Page 23

1  associate glyphosate or Roundup with non-Hodgkin
2  lymphoma, they don't always look at the subtypes or
3  the subclassification of non-Hodgkin lymphoma for
4  the simple reason that these have changed over the
5  years.  So if you're looking at a study, let's say,
6  in 2016, the subtypes would be very different in
7  2008, 2001.  So the studies that linked Roundup
8  with non-Hodgkin lymphoma looked at non-Hodgkin
9  lymphoma in totality.  They did not look at the
10 subtypes.
11     Q.  Well, you are not representing to the
12 Court that none of the studies that looked at
13 Roundup and non-Hodgkin lymphoma failed to look at
14 subtypes, are you?
15     MS. GREENWALD:  Objection.
16     MR. SLONIM:  Let me rephrase that.
17 BY MR. SLONIM:
18     Q.  You know that there are studies of Roundup
19 and the risk of non-Hodgkin lymphoma that look at
20 various subtypes of non-Hodgkin lymphoma; correct?
21     A.  Some studies have attempted to look at the
22 subtypes as the subtypes were known at the time of
23 particular analysis and depends on the number of
24 cases that you are looking at.  Because ultimately
25 it's a matter of numbers of how many patients with

Page 24

1  this particular subtype, and I think you and I know
2  that the ability to diagnose a particular subtype
3  in the early 2000s is very different than the
4  ability to do so in 2018, and that's really why the
5  limitation of every study being able to look at
6  these subtypes.  But some studies did.
7      Q.  And you agree with me there is no study or
8  scientific article that reports an association
9  between Roundup or glyphosate and this particular
10 subtype of non-Hodgkin lymphoma that Ms. Stevick
11 was diagnosed with?
12     MS. GREENWALD:  Objection.  Form.
13     THE WITNESS:  No study that looked specifically
14 at this particular subtype in particular.
15 BY MR. SLONIM:
16     Q.  And do you see on the left-hand side when
17 it talks about epidemiology?
18     A.  I see that.
19     Q.  Right in the middle of the page?
20     A.  Yes.
21     Q.  And I think you've already testified to
22 this, the World Health Organization says that the
23 peak incidence is in the fifth to seventh decade of
24 life, and the median patient age is 56 years old;
25 correct?

Page 25

1      A.  Correct.
2      Q.  And that is -- exactly the fifth to
3  seventh decade is exactly where Ms. Stevick fits,
4  and she's a few years above the median age for this
5  type of patient; correct?
6      A.  Correct.
7      Q.  Now I wanted to turn our attention to
8  Ms. Stevick's family history of cancer.  In your
9  expert report that we've marked as a deposition
10 exhibit, you did not mention Ms. Stevick's family
11 history of cancer; correct?
12     A.  I didn't see any specific family history
13 of lymphoma in the family that I was able to
14 identify in the medical records or in talking to
15 her with non-Hodgkin lymphoma, unless I missed
16 something.
17     Q.  Did you see in the medical records that
18 she had a number of relatives who had -- had a
19 number of relatives who had various types of
20 cancers?
21     MS. GREENWALD:  Objection.  Form.
22 BY MR. SLONIM:
23     Q.  Including but not limited to lymphoma.
24     MS. GREENWALD:  Same objection.
25     THE WITNESS:  I don't recall that there was

Chadi Nabhan, M.D.

Page 26

1    evidence of non-Hodgkin lymphoma in the family.
2    I'd like to see that. I may have missed it.
3    I don't remember seeing that.
4    BY MR. SLONIM:
5        Q. When you interviewed her, did you talk to
6    her about a family history of cancer?
7        A. Yes.
8        Q. What did she tell you? What did she tell
9    you?
10       A. I would have written what she told me in
11   the expert's report that you have if there was
12   anything specific pertaining to lymphoma in the
13   family history. I don't recall she mentioned
14   anything to me at the time pertaining to family
15   history of non-Hodgkin lymphoma.
16       Q. Did she tell you anything about cancer in
17   the family?
18       MS. GREENWALD: Objection. Form.
19       THE WITNESS: I usually ask about the
20   association or whether non-Hodgkin lymphoma is
21   prevalent in the family or Hodgkin lymphoma. So
22   that's really what I focus on to know more whether
23   there is any possibility of familial
24   predisposition. I think we went through this just
25   earlier. There are lots of sporadic cancers, and

Page 27

1    many families are affected by solid tumors and so
2    forth. But I don't recall there was anything
3    specific in her family history that was a red flag
4    that this could be an inherited disease whatsoever.
5    BY MR. SLONIM:
6        Q. Did you read her deposition?
7        A. I did read her deposition a while back.
8    That was -- it's been about three or four weeks,
9    November 18, I read the deposition, but if you want
10   me to look at something in her deposition that
11   I may have missed, please show me. I am more than
12   happy to look at it.
13       Q. When you read her testimony, did you read
14   anything about a family history of cancer?
15       MS. GREENWALD: Objection. Form. He said he
16   couldn't remember and asked you for a copy of it.
17       THE WITNESS: I'm sure if you are asking,
18   probably there is. I'm more than happy to look at
19   it, but I don't recall. It was about four weeks
20   ago. Sorry my memory is not that good.
21   BY MR. SLONIM:
22       Q. We agree that in your expert report you
23   make no reference or give any consideration
24   whatsoever to any family history of any type of
25   cancer; correct?

Page 28

1        MS. GREENWALD: Objection. Form.
2        THE WITNESS: Well, what I said is that in
3    examining her and talking to her and in looking at
4    the family history in the medical records, I did
5    not see anything pertains to the fact that there is
6    a familial predisposition for her having
7    non-Hodgkin lymphoma.
8        And I think, in general, if there is a familial
9    predisposition for patients developing particular
10   cancer or non-Hodgkin lymphoma, they would develop
11   the disease early on in life. They wouldn't
12   develop the disease at the time when you expect
13   people to develop the disease, which is the point
14   you were trying to make earlier. So somebody with
15   a very strong family history of non-Hodgkin
16   lymphoma that you think is related to familiar
17   predisposition, they wouldn't have the disease at
18   63. They would probably have it in their 40s.
19       So these statements contradict each other. I'm
20   more than happy to look at her deposition. I don't
21   remember reading that there is any familial
22   predisposition to this patient developing
23   non-Hodgkin lymphoma.
24   BY MR. SLONIM:
25       Q. What question did I ask you?

Page 29

1        A. You said --
2        MS. GREENWALD: Objection. Form. That's not a
3    proper question.
4        THE WITNESS: The court reporter can read it
5    back.
6        MR. SLONIM: No.
7    BY MR. SLONIM:
8        Q. Doctor, what question did I ask you?
9        MS. GREENWALD: Objection. Form. He's already
10   told you he'd like to know what the question was.
11       THE WITNESS: Can she read the question back to
12   me?
13   BY MR. SLONIM:
14       Q. Doctor, if you listen to my question and
15   answer my question, we'll have a better
16   conversation.
17       Can I have the court reporter read back
18   the question, please?
19           (Whereupon, the record was
20           read.)
21       MS. GREENWALD: Same objection.
22       THE WITNESS: That's actually incorrect,
23   because I give consideration for family history
24   pertaining to non-Hodgkin lymphoma, and I'm not
25   aware that she has a strong family history of

Page 30

1  non-Hodgkin lymphoma that make her disease familial
2  or related to her family history. If I did,
3  I would write that in my report.
4  BY MR. SLONIM:
5      Q. Do you have your report, Deposition
6  Exhibit No. 2, in front of you?
7      A. Yes, the one you gave me.
8      Q. Can you show me any reference to
9  Ms. Stevick's family history of any form of cancer?
10     A. If I didn't write that there is a family
11 history of lymphoma, then it wasn't important
12 enough to write. I can't show you because I didn't
13 write it if it's not important.
14     Q. Do we agree your report as written does
15 not reference any type of family history of any
16 type of cancer?
17     A. If I don't believe it's relevant, yes, we
18 agree to that.
19     Q. Okay.
20     A. But I've asked for you to show me the
21 deposition if I missed something in her deposition.
22 I haven't seen that.
23     Q. Do you agree that Ms. Stevick's mother and
24 father each had colon cancer?
25     A. I remember that one of them had colon

Page 31

1  cancer. I don't remember if it's both, but, again,
2  that's not relevant in non-Hodgkin lymphoma. There
3  is no reason for me to believe that they don't have
4  it, if it's in the records.
5          (Whereupon, Exhibit 4 was
6          marked for identification.)
7  BY MR. SLONIM:
8      Q. Marked as Deposition Exhibit No. 4, a
9  medical record for Ms. Stevick, and looking at the
10 date of the record -- and I don't see it -- it has
11 Bates number, though, KPNValley-MD, and the last
12 two digits of the Bates number are 10.
13         (Whereupon, Exhibit 5 was
14         marked for identification.)
15 BY MR. SLONIM:
16     Q. Marked as Deposition Exhibit No. 5, a
17 medical record for Ms. Stevick dated
18 March 12, 2015. It's got Bates number
19 KPNValley-MD, and the last four digits of the Bates
20 number are 2173.
21         So these medical records discuss
22 Ms. Stevick's family history of cancer; correct?
23     A. Cancer, not lymphoma, correct.
24     Q. Let's go through things in systemic order.
25         So, first of all, according to these

Page 32

1  medical records, Ms. Stevick's father had colon
2  cancer, diagnosed at age 54; correct?
3      A. Yes, correct.
4      Q. And her mother had colon cancer, and it
5  was diagnosed at age 64 or 65; correct?
6      A. Yes.
7      Q. And it also indicates that Ms. Stevick's
8  maternal grandmother and her maternal grandfather
9  each had colon cancer; correct?
10     A. Correct.
11     Q. And I think if you look at the
12 Exhibit No. 5, it indicates that Ms. Stevick's
13 maternal cousin had breast cancer; correct?
14     A. Correct.
15     Q. Now, in Ms. Stevick's deposition --
16     A. Although in the previous one, it says
17 "paternal," and this one says "maternal." I am not
18 sure if it's a typo. The first record you showed
19 me says "paternal cousin," and this one shows
20 "maternal cousin."
21     Q. In any event, she had a cousin who had
22 breast cancer; correct?
23     A. Right.
24     Q. And according to Ms. Stevick's testimony
25 at her deposition, she had a paternal uncle who had

Page 33

1  throat cancer; correct?
2      A. As I told you, I don't recall this the
3  deposition.
4      Q. It is your testimony you read her
5  deposition, though?
6      A. I did. I just don't remember this
7  particular thing.
8      Q. Did you read her deposition before or
9  after you prepared your expert report?
10     A. I mean, it's written right here. I read
11 the deposition on November 18, 2018, so around the
12 time where I was finalizing the report, and
13 I submitted the report by the 20th of November.
14         (Whereupon, Exhibit 6 was
15         marked for identification.)
16 BY MR. SLONIM:
17     Q. I've marked as Deposition Exhibit No. 6,
18 Ms. Stevick's deposition transcript of a deposition
19 that was taken on Friday, November 9, 2018. Do you
20 have that in front of you?
21     A. I do. Thank you.
22     Q. And it's a long deposition. I excerpted
23 the pertinent pages. And let me direct your
24 attention to pages 177 and 178. Do you have those
25 in front of you?

Chadi Nabhan, M.D.

Page 34

1  A. Yes, I appreciate it. Thanks.
2  Q. And do you agree with me that, according
3  to the deposition transcript, that Ms. Stevick
4  testified under oath that she had an uncle with
5  throat cancer besides the other relatives that had
6  cancer that we discussed?
7  A. Yes, she did.
8  Q. And do you agree with me that she also
9  testified that she had an uncle, her Uncle Frank,
10 who had lymphoma?
11 A. Yes, he did have a lymphoma when he was 90
12 and survived it. He lived until 98, she said.
13 Q. So you agree with me that Ms. Stevick's
14 family history of cancer consists of both of her
15 parents, both of her maternal grandparents, a
16 cousin, a paternal uncle and another paternal uncle
17 who had an aggressive lymphoma?
18     MS. GREENWALD: Objection. Form.
19     THE WITNESS: None of these -- I agree with
20 that. These are accurate statements which is
21 described, if you just want yes or no. So I agree
22 with that.
23 BY MR. SLONIM:
24 Q. And that is a very large amount of cancer
25 to happen by just coincidence in a single-family,

Page 35

1  isn't it?
2      MS. GREENWALD: Objection. Form.
3      THE WITNESS: The colon cancer, yes, but the
4  other ones, no. The colon cancer in this situation
5  is what concerns me because the colon cancer of
6  having, you know, the maternal grandfather and
7  maternal grandmother and father and so forth, this
8  is the one that concerns in terms of colon cancer.
9  So she would require pretty good investigation to
10 consider whether the colon cancer is not familial
11 or inherited, but the other ones appear sporadic.
12 BY MR. SLONIM:
13 Q. And aren't there germline mutations that
14 are linked to colon cancer that are linked to
15 DLBCL?
16 A. I am not aware of that.
17 Q. Is there any medical literature that
18 reports that germline mutations that are linked to
19 colon cancer are also linked to an increased risk
20 of DLBCL?
21 A. I'm not aware of that specific literature
22 you're citing, but when it comes to colon cancer,
23 we specifically investigate in this situation
24 whether the patient had what we would call
25 quote/unquote "Lynch syndrome," which looks at

Page 36

1  microsatellite instability and the frequency of
2  microsatellite stability to determine whether her
3  disease is related to, again, this genetic or
4  inherited predisposition to the disease or not.
5      In my opinion, none of this history or
6  family history links lymphoma that she developed
7  into a familial or a genetic predisposition to
8  developing this disease. I am not aware of colon
9  cancer, hereditary colon cancer linking to primary
10 CNS lymphoma to my knowledge.
11 Q. Let's talk about another consideration.
12 Exposure to ionizing radiation is a risk factor of
13 brain cancer and lymphoma; correct?
14 A. Correct.
15 Q. Ms. Stevick has a history of exposure to
16 ionizing radiation in her occupation as a speech
17 therapist?
18 A. I didn't think -- I remember this part of
19 her deposition, as well as when we talked briefly
20 about what she did. I didn't think that she has
21 significant exposure that would lend this to the
22 possibility. I think you really don't see this
23 type of disease per se more prevalent in speech
24 pathologists or even in folks who are in the
25 medical profession who are exposed to radiation.

Page 37

1  Her exposure is not high enough or impressive
2  enough to suggest this is related to it.
3  Q. How much exposure would she need?
4  A. I don't think that's been determined in
5  the literature.
6  Q. Isn't any exposure to radiation too much?
7      MS. GREENWALD: Objection to form.
8      THE WITNESS: I'm not sure I agree with that.
9  Otherwise, people would never have chest X-rays or
10 CAT scans or MRI. I think we know that these tests
11 are being done all the time on patients and on
12 people that need any medical investigation. So
13 you'd like to minimize any type of radiation
14 exposure, but you see that, you know, either --
15 when you get imaging studies, cardiologists, when
16 they do cardiac cath or radiologists and so forth.
17 So you like to avoid it because you don't know
18 really the minimum versus maximum amount that is
19 needed to cause a particular cancer, but it's
20 sometimes unavoidable.
21 BY MR. SLONIM:
22 Q. When Ms. Stevick was involved in medical
23 diagnostic tests that involved ionizing radiation,
24 she wore a lead bib to protect her torso and a
25 collar to protect her thyroid gland around her

Chadi Nabhan, M.D.

Page 38

1  neck; correct?
2      A.  When you have to do a particular testing
3  in speech pathology, sometimes you need to do that,
4  if you are doing fluoroscopy to determine speech
5  pathology.  And not all the time, sometimes the
6  testing can be bedside.  You don't need the --
7      Q.  So her torso and thyroid and neck, those
8  were protected by a lead bib; correct?
9      A.  When you need to, yes.
10     Q.  But there was no protection of her brain,
11 was there?
12     A.  That's not something that is customary for
13 any type of medical profession, whether you are a
14 cardiologist, radiologist, or speech pathologist.
15 It's just people don't wear that.
16     Q.  So her head and brain were exposed to
17 ionizing radiation that her torso was protected
18 from; correct?
19     A.  She was exposed to some form radiation.
20 I'm not sure we have the quantity of radiation she
21 was exposed to.
22     Q.  You don't make any reference of exposure
23 to ionizing radiation in your report, do you?
24     A.  I don't, no.
25     Q.  Her PCNSL could be the result of radiation

Page 39

1  exposure in her occupation as a speech therapist;
2  correct?
3      A.  I don't believe so.
4      Q.  On what basis can you rule it out?
5      A.  Because, again, you'll have -- to my
6  knowledge, speech pathologists don't get exposed
7  enough to radiation to suggest even radiation
8  remotely involved in the pathogenesis of any
9  particular type of brain cancer or brain lymphoma.
10 It's not -- this is just -- I mean, just by the way
11 their profession is, they are not in the cath lab
12 every single day.  They are not doing fluoroscopy
13 every single day.  Their exposure is very minimal,
14 in my opinion.
15     Q.  None of Ms. Stevick's blood tests show the
16 presence of glyphosate; correct?
17     A.  No, I don't believe it was tested for.
18     Q.  And none of her imaging studies show the
19 presence of glyphosate; correct?
20     A.  Correct.  There is no imaging study to
21 determine that.
22     Q.  And none of her cancer pathology has any
23 indication of exposure to glyphosate; correct?
24     A.  Correct.  There is no such thing.  None of
25 her pathology, by the way, suggests it was

Page 40

1  radiation related or radiation exposure either.
2  Just you don't have such a thing pathologically.
3      Q.  No medical record states that Roundup or
4  glyphosate caused her cancer or increased the risk
5  of her cancer; correct?
6      A.  Correct.
7      Q.  No medical test of any type shows the
8  presence of glyphosate in her system; correct?
9      A.  Correct, it was not tested for.
10     Q.  So if you had a patient with the same
11 precise medical history as Ms. Stevick but no
12 exposure to Roundup, what would you say caused her
13 PCNSL?
14     A.  I would say it's unknown, if she didn't
15 have any exposure and she developed the disease at
16 her age, and I've had these patients.  I mean, I've
17 actually treated a lot of PCNSL.  I was a principal
18 investigator on a large national trial for this
19 disease.  So I'm very familiar with it, but if she
20 didn't have the exposure, given her particular
21 situation, I would say it's idiopathic, and it's
22 unknown.
23     Q.  And these same unknown causes could have
24 caused Ms. Stevick's PCNSL; correct?
25     MS. GREENWALD:  Objection.  Form.

Page 41

1      THE WITNESS:  That's similar to previous
2  question.  The unknown causes, we just don't know
3  yet in the medical profession?
4  BY MR. SLONIM:
5      Q.  Yes.
6      A.  Sure.  There may be something that we find
7  out five years from now that we determine that it's
8  related but...
9      Q.  I mean, something causes the cases of
10 immunocompetent individuals who get PCNSL, but
11 scientists and doctors just don't know what those
12 causes are; correct?
13     MS. GREENWALD:  Objection.  Form.
14     THE WITNESS:  And we are never going to answer
15 all of these questions forever.  We would love to,
16 but it's just not going to happen.  But you are
17 correct, something may have contributed to the
18 development of the disease.  Today we are incapable
19 of identifying that in an immunocompetent
20 individual.  Maybe in the future we find out, maybe
21 not.
22 BY MR. SLONIM:
23     Q.  And that same group of unknown causes
24 could have been the cause of Ms. Stevick's PCNSL;
25 correct?

Page 42

1  MS. GREENWALD: Objection. Form.
2  THE WITNESS: Could have contributed. I am not
3  sure it would be the sole cause in her particular
4  situation unless you're talking the hypothetical
5  patient who did not have exposure but could have
6  been -- could have contributed as well to her
7  disease.
8  BY MR. SLONIM:
9  Q. If Ms. Stevick had the same medical
10  history, including Roundup, exposure to Roundup,
11  but she also had a 40-year history of infection
12  with viral hepatitis C, you would still say Roundup
13  was the cause of her PCNSL, wouldn't you?
14  MS. GREENWALD: Objection. Form.
15  THE WITNESS: Her exposure is substantial.
16  And, again, I mean, for, hepatitis C, I think we
17  went through that earlier, generally speaking, the
18  type of lymphoma that occurs with hepatitis C is
19  the indolent type, the marginal zone lymphoma, the
20  splenic marginal zone lymphoma. Very rare you
21  would see the diffuse large B-cell lymphoma, and
22  much more seldom you would see the PCNSL.
23  BY MR. SLONIM:
24  Q. I am glad you raised this.
25  A. We did talk about that earlier.

Page 43

1  Q. You know that the literature reports that
2  viral hepatitis C more than doubles the risk of
3  DLBCL; correct?
4  A. I'm aware of that, yes.
5  Q. And you also know that the medical
6  literature says that viral hepatitis C is not only
7  a risk factor for diffuse large B-cell lymphoma,
8  but that it is a causal risk factor; correct?
9  A. I'm aware of that.
10  Q. And, yet, if you had a patient with the
11  same history as Ms. Stevick, who had a 40-year
12  history of viral hepatitis C --
13  A. Treated or untreated? That's an important
14  distinction.
15  Q. Let's take them both ways.
16  A. Sure.
17  Q. 40-year history and then treated and
18  several years later developed non-Hodgkin lymphoma,
19  you would still say it's Roundup that was the
20  cause; right?
21  A. If it's treated effectively and there is
22  no evidence of the virus -- I think you heard my
23  prior testimony -- I don't believe you can link it.
24  If it's not treated, it's a different story, but if
25  it's treated effectively, then, yes.

Page 44

1  Q. And if she had an active -- if the
2  virus -- if the 40-year history of viral
3  hepatitis C, if that was present up until the -- or
4  shortly before the time of diagnosis, would you
5  still say it was the Roundup?
6  A. If it's active, you can't dismiss
7  hepatitis C as a causal factor in developing the
8  non-Hodgkin lymphoma, and it is very possible that
9  the Roundup had an additional -- is an additional
10  causative factor to non-Hodgkin lymphoma, and
11  I think I provided you with an example earlier on.
12  I mean, if you have somebody -- everybody around
13  this table knows that diabetes mellitus is a risk
14  factor for developing cardiac disease. This does
15  not mean if a diabetic patient smokes, that all of
16  a sudden it's only diabetes, and smoking does not
17  add as a risk factor to developing heart disease.
18  The same thing here, if you have
19  hepatitis C that is untreated, it's certainly one
20  of the causative factors to develop the non-Hodgkin
21  lymphoma. You can dismiss that because it's a
22  known factor, but that does not mean that the
23  Roundup did not also add to the development of
24  non-Hodgkin lymphoma. You could have two or three
25  causative factors of a particular disease happening

Page 45

1  at the same time.
2  Q. You don't have any evidence of synergistic
3  risk factors for non-Hodgkin lymphoma; do you?
4  A. Not in that -- not in what you're talking
5  about. It has not been looked at, but more on a
6  molecular level, we have that.
7  Q. You can't cite me to any medical
8  literature that states that risk factors for
9  non-Hodgkin lymphoma have any kind of synergistic
10  effect, can you?
11  A. Not necessarily synergistic effect but
12  could be, again, an additional effect. I mean,
13  when you talk synergy, you are meaning the -- both
14  mechanisms of action are being synergized, and they
15  are adding to either other. But at the same time,
16  there is nothing in the medical literature that I'm
17  aware of that says diabetes and hypertension are
18  synergistic to cardiac disease, but we know -- we
19  know that they are both risk factor; right?
20  I mean they may cause -- hypertension
21  could cause problems with the arteries, and
22  diabetes could add the problem to the arteries, all
23  of these things. But on -- I think having several
24  risk factors for a particular disease is well
25  known, whether synergy is established or not.

Page 46

1  Sometimes you could have synergy; sometimes you
2  don't.  But you could have more than one risk
3  factor for a particular disease.  That's what I'm
4  trying to say.
5      Q.  I just want to make sure.  I appreciate
6  the fact you're an oncologist, and you're here
7  testifying as an expert on oncology.
8          Is it your testimony that there is not
9  medical evidence of synergistic effects for heart
10 disease as between diabetes and hypertension?
11     A.  That's not what I said.  What I said is
12 sometimes you could have two causal factors to a
13 particular disease.  Occasionally, you see synergy
14 between them; sometimes you don't.  Just because
15 you can't establish synergy does not mean that two
16 factors cannot cause a particular disease at the
17 same time.
18     Q.  Let's focus in on non-Hodgkin lymphoma.
19     A.  Sure.
20     Q.  And let's take -- let's separate it out.
21 Can you cite any medical literature that says risk
22 factors for non-Hodgkin lymphoma are synergistic?
23     A.  Right now I can't.
24     Q.  Can you cite any medical literature that
25 says that risk factors for non-Hodgkin lymphoma are

Page 47

1  additive?
2      A.  Okay.  Do you want to explain to me what
3  you mean by synergistic versus additive so I make
4  sure we are speaking the same language?
5      Q.  You tell me.  What's it mean to you?
6      MS. GREENWALD:  Objection.  Form.  You used it.
7      THE WITNESS:  I need to understand your
8  definition so I can answer your question properly.
9  You brought it up.  So I'm trying to -- to answer
10 your question, can you explain to me?
11 BY MR. SLONIM:
12     Q.  Do you have any basis -- do you have any
13 basis to say that a person that has one risk --
14 that has multiple risk factors for non-Hodgkin
15 lymphoma has -- is at an increased risk as compared
16 with a person who has only one risk factor?
17     A.  To me that's common sense.  I mean, again,
18 this is -- you know, again, there are certain
19 things that you don't need a trial or a study for
20 every single answer or every single question.
21 Unfortunately, we'd love to answer any question
22 with a citation or with literature, but if you have
23 one risk factor versus three risk factors, if you
24 ask a hundred oncologists, a hundred of them will
25 say that somebody who has three risk factors is at

Page 48

1  higher risk than somebody who has one risk factor.
2  We don't need a study for that.  We don't need a
3  citation for that.  It's common sense.
4      Q.  Okay.  Let's continue on on Ms. Stevick.
5      A.  Sure.
6      Q.  If Ms. Stevick had her same medical
7  history, but she also had been exposed to viral
8  hepatitis B and had viral hepatitis B core
9  antibodies positive, would you still say it was
10 Roundup that was the cause of her disease?
11     A.  I think it's similar to the answer I just
12 provided.  I think, again, we know that hepatitis B
13 is active or chronic active hepatitis B is a
14 contributing factor to the development of
15 non-Hodgkin lymphoma.  I think we've talked about
16 this earlier on, and we all agree on that.  So you
17 can't dismiss it, and you, obviously, will have to
18 factor that in.  And you can't -- what you will be
19 able to say is maybe Roundup is not the sole
20 contributing factor.  Maybe there is some element
21 of the -- that hepatitis B has added to it, but it
22 wouldn't be necessarily substantial because the
23 link between hepatitis B, as we discussed earlier,
24 and non-Hodgkin lymphoma in patients who have the
25 core antibody positive but the surface antigen

Page 49

1  negative is weak, is small.  So that's why it's
2  not -- it's not something you would really presume
3  hep B played a major role on it, similar to the
4  previous case we talked about it.
5      Q.  So in that case, you would say it's the
6  Roundup rather than the hep B?
7      A.  It would be the Roundup more than the
8  hep B or other factors.
9      Q.  If Ms. Stevick had a BMI, a body mass of
10 greater than 30, otherwise the same risk factors,
11 you would say it's the Roundup, not the body mass
12 index that was responsible for her disease;
13 correct?
14     A.  Correct.
15         I have looked at obesity extensively, and
16 I don't believe obesity increases the risk of
17 non-Hodgkin lymphoma.  The evidence is beyond weak.
18     Q.  You agree with me there is more than one
19 report, study in the medical literature that
20 reports an odds ratio of greater than two?
21     A.  I've seen these reports, but you have to
22 look at the entire body of evidence.  You have to
23 look at each study and each trial, and you look at
24 the largest body of evidence.  I believe the
25 evidence of obesity and non-Hodgkin lymphoma is

Page 50

1  weak.
2      Q.  But you believe -- strike that.
3      A.  It requires additional studies --
4      Q.  But in any event, she had a BMI of greater
5  than 30 or greater than 35 even, you would still
6  say it's not obesity related.  It's the Roundup
7  that's responsible; right?
8      MS. GREENWALD:  Objection.  Form.  Asked and
9  answered.
10     THE WITNESS:  I will always have to look at the
11 case fresh.  I will always have to look at all of
12 the information, the records and so forth.
13 Provided everything is exactly the same, as I told
14 you, obesity is not -- I looked at it.  I factored
15 it.  I've written about it.  And I just don't
16 believe the evidence that obesity supports as a
17 causative factor of non-Hodgkin lymphoma.
18 BY MR. SLONIM:
19     Q.  If Ms. Stevick smoked, otherwise the same
20 history, but she smoked, you would still say it was
21 the Roundup that caused the non-Hodgkin lymphoma;
22 isn't that right?
23     A.  I don't believe tobacco use or abuse has
24 been linked to non-Hodgkin lymphoma.
25     Q.  If Ms. Stevick -- a patient that had the

Page 51

1  same history of Ms. Stevick presented but she also
2  had Crohn's disease, you would still say it was
3  Roundup that was the cause of her disease; correct?
4      A.  You'll have to look at that case a little
5  bit differently -- right? -- because Crohn's
6  disease is an autoimmune disease that obviously,
7  you know, suppresses the immune system and, that's
8  the type of autoimmune disease we talked about
9  earlier that is important to look at carefully.  So
10 I can't answer that question because you really
11 want to look at the extent of Crohn's disease, how
12 long she's had it, has she received
13 immunosuppressive therapies for the Crohn's
14 disease.  Because certain immunosuppressive
15 therapies are given for Crohn's disease are known
16 to cause lymphoma or not.  So that I cannot answer
17 because it really requires a lot of information.
18 It's much more difficult than just smoking or not.
19     Q.  Holding aside the Crohn's disease, in your
20 opinion, as long as a person used Roundup for more
21 than 2 days per year or more than 10 total days in
22 their life, you would say Roundup was the cause of
23 their non-Hodgkin lymphoma; correct?
24     MS. GREENWALD:  Objection.  Form.
25     THE WITNESS:  No, you will have to look at

Page 52

1  every occasion individually.  I mean, again, we
2  have lots of situations where you have to look
3  at -- you just gave one example where I told you
4  I can't when you bring Crohn's disease as an
5  example or ulcerative colitis or you bring somebody
6  with a very bad lupus, for example, with different
7  diseases or drugs they're receiving and so forth.
8  You really can't say that without looking at each
9  case individually.
10     But when you're look at Roundup specifically,
11 you do need to have that minimum threshold of
12 exposure that has been reported in the medical
13 literature, in the epidemiologic literature.  So
14 just Roundup exposure that does not meet the
15 minimum threshold of what has been published is not
16 enough.  So you have to look at everything
17 pertaining to the case.  I don't believe this can
18 be answered in two seconds.
19 BY MR. SLONIM:
20     Q.  How many days of exposure did the people
21 that were in the Adreotti study have?
22     A.  Is that relevant to this -- to
23 Ms. Stevick's case specifically?
24     I'm just asking because I realize that
25 we're doing case specific as opposed to general

Page 53

1  causation.  So I'm trying to link that question to
2  this.  Is this --
3      Q.  Can you answer my question?
4      A.  I am trying to remember.  If you have the
5  paper -- I think probably 40 -- I don't want to say
6  something wrong.  I believe it was a median of 48,
7  but I apologize if I'm plus or minus a few days
8  here and there.  I believe it was 48, but I may be
9  off by a couple of days.
10     Q.  Ms. Stevick started on chemotherapy on
11 January 27, 2015; correct?
12     A.  Yes.
13     Q.  Turn to your report on page 2.
14     A.  Sure.
15     Q.  I think these are noncontroversial.
16     A.  Sure.  I'm just trying to follow --
17     Q.  Yeah, fair enough.
18     A.  -- where you want me to read.
19     Q.  And then she had her second treatment on
20 -- about a month later, February 24, 2015; correct?
21     A.  Correct.
22     Q.  And about a month after that, an MRI
23 imaging study was done; correct?
24     A.  Correct.
25     Q.  And that showed your words, I think,

Chadi Nabhan, M.D.

Page 54

1  "remarkable improvement"?
2      A.  Yes.
3      Q.  That's good, right?
4      A.  Excellent.
5      Q.  Then she had another imaging study that
6  was done a couple of months later on May 19, 2015?
7      A.  Correct.
8      Q.  And that further -- that second imaging
9  study showed only postoperative changes, but it
10 showed no evidence of any kind of cancer or
11 malignancy or anything; right?
12     A.  Correct.
13     Q.  And then she received her last cycle of
14 chemotherapy on June 18, 2015?
15     A.  Yes.
16     Q.  So that was three and a half years ago;
17 right?
18     A.  Yes, she's been in remission for three and
19 a half years.
20     Q.  And all of her MRIs have been stable since
21 completing chemotherapy?
22     A.  Correct.  The last one was in August '018.
23     Q.  And that last MRI in August of 2018, that
24 showed no evidence of active disease; correct?
25     A.  Correct.

Page 55

1      Q.  And the next MRI was planned to be six
2  months from that, which would mean from the
3  August one, which was scheduled for roughly
4  February of 2019; correct?
5      A.  I think February.  I believe I asked her,
6  and she said six months.
7      Q.  So there has been no evidence of any
8  recurrence of the cancer since it was diagnosed
9  nearly four years ago; right?
10     A.  Correct.
11     Q.  And at this point you would not expect her
12 to have any recurrence of her cancer; correct?
13     MS. GREENWALD:  Objection.  Form.
14     THE WITNESS:  The CNS lymphoma, it's a little
15 bit tough.  It's just different than the DLBCL
16 without the CNS.  So I still think it's less
17 likely.  I treated this disease a lot, and just
18 this type of brain lymphoma is -- if any type of
19 lymphoma will come back, this is the type that
20 could.  So I'd like to see a little bit more, but
21 I would say more likely than not, she would not
22 recur, if anything.  But I will still -- if she
23 were my patient, I will still continue MRIs for
24 maybe for a couple more years before I say, "Let's
25 stop doing the MRIs."

Page 56

1      MR. SLONIM:  Why don't we take a break?
2      THE VIDEOGRAPHER:  We are off the record at
3  3:53 p.m.
4          (A short break was taken.)
5      THE VIDEOGRAPHER:  We are back on the record at
6  4:06 p.m.
7  BY MR. SLONIM:
8      Q.  Dr. Nabhan, I don't have further questions
9  at this time.
10     MR. SLONIM:  I pass the witness.
11     MS. GREENWALD:  I have a couple of questions.
12     MR. SLONIM:  Oh, I'm so sorry.  I was
13 overanxious.
14 BY MR. SLONIM:
15     Q.  Dr. Nabhan, while we were on the break,
16 I was able to pull up, on a computer, the lengthy
17 document from which the WHO classification system
18 had been excerpted.  That document is 592 pages,
19 and when my legal assistants copied the beginning,
20 they didn't get to page 5, unfortunately.  Page 5
21 indicates that this is from the revised fourth
22 edition, which was published by IARC in 2017.  With
23 that representation, is it your belief that this is
24 the most current classification?
25     A.  Yes, it is.

Page 57

1      Q.  Thank you.
2      MR. SLONIM:  No further questions.
3              EXAMINATION
4  BY MS. GREENWALD:
5      Q.  I'm just going to ask a few questions.
6  Mr. Slonim showed you some documents identifying
7  Ms. Stevick's family history of cancer.  Do you
8  remember that?
9      A.  I do.
10     Q.  Did you consider that family history in
11 rendering your opinions in this case?
12     A.  Of course I did.
13     Q.  Why didn't you put that in your expert
14 report?
15     A.  It wasn't relevant to her particular case.
16 Her family history, as she was describing it to me
17 when we met, clearly looked at several relatives
18 who had colon cancer -- colorectal cancer, and that
19 puts this patient at higher risk of developing
20 colon cancer as opposed to non-Hodgkin lymphoma.
21 There is really nothing in the family history
22 whatsoever to suggest that her development of
23 lymphoma is familial, or there is a familial
24 predisposition to developing non-Hodgkin lymphoma.
25         Patients who have -- patients who have

Chadi Nabhan, M.D.

Page 58

1  familial history of developing particular cancers
2  or non-Hodgkin lymphoma, they would develop that at
3  a much younger age, and she didn't. So there is
4  really no familial history in her particular
5  situation to develop non-Hodgkin lymphoma.
6      And the only uncle that she had who
7  developed the disease was not, again, a first
8  degree relative and was much older, at the age
9  of 90, when he developed the disease. So I did not
10 put that in my expert report because I did not
11 think it was relevant to this particular case, but
12 of course, it was considered.
13     Q.  I am going to ask you some questions also
14 about the radiation exposure. Do you remember Mr.
15 Slonim asking you some questions about radiation
16 exposure of Ms. Stevick? Do you recall those
17 questions?
18     A.  I recall these questions.
19     Q.  Did you consider her history of an
20 exposure to radiation in rendering your opinions in
21 this case?
22     A.  I did.
23     Q.  And why didn't you put that in your expert
24 report?
25     A.  It's negligible. This is again -- and

Page 59

1  I recall in her deposition, I think she mentioned
2  maybe either 10, 14 or maybe 15 times at the most
3  where she had that exposure. Speech pathologists,
4  from the type of profession that they do, they are
5  not usually exposed to that much of radiation. So,
6  again, it's considered, but it was not relevant.
7  It was not contributory in this particular case to
8  put in the report. That's really why.
9      MS. GREENWALD:  I don't have any other
10 questions.
11     MR. SLONIM:  Nothing.
12     THE WITNESS:  Thank you.
13     MR. SLONIM:  Thank you very much, Mr. Nabhan.
14     THE VIDEOGRAPHER:  We are off the record at
15 4:10 p.m. This includes concludes the video
16 deposition of Chadi Nabhan MD, MBA.
17
18
19
20
21
22
23
24
25

Page 60

1               C E R T I F I C A T E
2
3      I, DEANNA AMORE, a Shorthand Reporter and
4  notary public, within and for the State of
5  Illinois, County of DuPage, do hereby certify:
6      That CHADI NABHAN, M.D., the witness whose
7  examination is hereinbefore set forth, was first
8  duly sworn by me and that this transcript of said
9  testimony is a true record of the testimony given
10 by said witness.
11     I further certify that I am not related to
12 any of the parties to this action by blood or
13 marriage, and that I am in no way interested in the
14 outcome of this matter.
15
16     IN WITNESS WHEREOF, I have hereunto set my
17 hand this 14th day of December 2018.
18
19
20     _____
21     Deanna M. Amore, CSR, RPR
22
23
24
25

Page 61

1            UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF CALIFORNIA
3  IN RE: ROUNDUP PRODUCTS     MDL No. 2741
4  LIABILITY LITIGATION
5  _____        Case No. 16-md-2741-VC
6  This document relates
7  to:
8  Stevick v Monsanto Co., et al.
9  Case No. 3:16-cv-2341-VC
10     DECLARATION UNDER PENALTY OF PERJURY
11     I declare under penalty of perjury that I have
12 read the entire transcript of my deposition taken
13 in the above-captioned matter or the same has been
14 read to me and the same is true and accurate, save
15 and except for changes and/or corrections, if any,
16 as indicated by me on the DEPOSITION ERRATA SHEET
17 hereof, with the understanding that I offer these
18 changes as if still under oath.
19
20     Signed on the _____ day of
21 _____, 20__.
22 _____
23     CHADI NABHAN, M.D.
24
25

Chadi Nabhan, M.D.

|  | Page 62 |
|---|---|
| 1 | ERRATA SHEET |
| 2 | CORRECTIONS: |
| 3 | Page _____ Line _____ Reason _____ |
|  | From _____ to _____ |
| 4 | Page _____ Line _____ Reason _____ |
| 5 | From _____ to _____ |
| 6 | Page _____ Line _____ Reason _____ |
|  | From _____ to _____ |
| 7 | Page _____ Line _____ Reason _____ |
| 8 | From _____ to _____ |
| 9 | Page _____ Line _____ Reason _____ |
|  | From _____ to _____ |
| 10 | Page _____ Line _____ Reason _____ |
| 11 | From _____ to _____ |
| 12 | Page _____ Line _____ Reason _____ |
|  | From _____ to _____ |
| 13 | Page _____ Line _____ Reason _____ |
|  | From _____ to _____ |
| 14 | Page _____ Line _____ Reason _____ |
| 15 | From _____ to _____ |
| 16 | Page _____ Line _____ Reason _____ |
|  | From _____ to _____ |
| 17 | Page _____ Line _____ Reason _____ |
| 18 | From _____ to _____ |
| 19 | Page _____ Line _____ Reason _____ |
|  | From _____ to _____ |
| 20 | Page _____ Line _____ Reason _____ |
| 21 | From _____ to _____ |
| 22 | Page _____ Line _____ Reason _____ |
|  | From _____ to _____ |
| 23 | Page _____ Line _____ Reason _____ |
|  | From _____ to _____ |
| 24 |  |
| 25 |  |