# EXHIBIT 23

Andrei Shustov, M.D.

Page 1

UNITED STATES DISTRICT COURT


NORTHERN DISTRICT OF CALIFORNIA


_____

IN RE:  ROUNDUP PRODUCTS                )

LIABILITY LITIGATION                    )

_____       ) MDL No. 2741

                                        )

This document relates to:               ) Case No. 16-md-02741-VC

                                        )

Gebeyehou v. Monsanto Co., et al.       )

Case No. 3:16-cv-5814-VC                )

                                        )

                                        )

                                        )

_____


VIDEOTAPED DEPOSITION OF ANDREI SHUSTOV, M.D.


December 16, 2018


Seattle, Washington

Andrei Shustov, M.D.

## Page 2

```
 1              APPEARANCES
 2
    For the Plaintiff:
 3
       R. BRENT WISNER, ESQ.
 4     Baum, Hedlund, Aristei & Goldman, P.C.
       10940 Wilshire Boulevard
 5     17th Floor
       Los Angeles, California 90024
 6     310.207.3233
       rbwisner@baumhedlundlaw.com
 7
 8  For Defendant Monsanto Co.:
 9     AARON H. LEVINE, ESQ.
       DAVID KERSCHNER, ESQ.
10     Arnold & Porter Kaye Scholer, LLP
       250 West 55th Street
11     New York, New York 10019
       212.836.8000
12     aaron.levine@arnoldporter.com
       david.kerschner@arnoldporter.com
13
14  For Defendant Bayer:
15     LINDLEY J. BRENZA, ESQ.
       Bartlit Beck, LLP
16     1801 Wewatta Street
       Suite 1200
17     Denver, Colorado 80202
       303.592.3100
18     lindley.brenza@bartlitbeck.com
19
    Also present: Allison Borgida, videographer
20
21
22
23
24
25
```

## Page 3

```
 1            EXAMINATION INDEX
 2  EXAMINATION BY:              PAGE NO.
 3  Mr. Brenza                6
 4  Mr. Wisner              145
 5  Mr. Brenza              167
 6  Mr. Wisner              175
 7  Mr. Brenza              177
 8
 9             EXHIBIT INDEX
10  EXHIBIT NO.    DESCRIPTION       PAGE NO.
11  Exhibit No. 26  Monsanto Company's Notice to   5
                    Take Oral and Videotaped
12                  Deposition of Dr. Andrei
                    Shustov.
13
    Exhibit No. 27  Expert Report of Dr. Andrei   5
14                  R. Shustov.
15  Exhibit No. 28  Expert Report of Dr. Chadi   11
                    Nabhan.
16
    Exhibit No. 29  Seattle Cancer Care Alliance   45
17                  website printout:
                    "Non-Hodgkin Lymphoma Facts."
18
    Exhibit No. 30  Encounter record dated   68
19                  11/22/2006 for Simoun
                    Gebeyehou. Labeled
20                  Confidential-Gebeyehou-
                    SGebeyehou-KPNValley-MD-
21                  003815.
22  Exhibit No. 31  Office visit record dated   72
                    10/8/2006 for Simoun
23                  Gebeyehou. Labeled
                    Confidential-Gebeyehou-
24                  SGebeyehou-KPNValley-MD-
                    000013.
25
```

## Page 4

```
 1          EXHIBIT INDEX (Continuing)
 2  EXHIBIT NO.    DESCRIPTION       PAGE NO.
 3  Exhibit No. 32  Encounter record dated   80
                    6/22/2016 for Simoun
 4                  Gebeyehou. Labeled
                    Confidential-Gebeyehou-
 5                  SGebeyehou-KPNValley-MD-
                    003277.
 6
    Exhibit No. 33  Critical Reviews in   92
 7                  Toxicology: "Review of
                    Genotoxicity Studies of
 8                  Glyphosate and
                    Glyphosate-Based
 9                  Formulations."
10  Exhibit No. 34  Environmental Health   102
                    Perspectives: "Glyphosate
11                  Biomonitoring for Farmers and
                    Their Families: Results from
12                  the Farm Family Exposure
                    Study."
13
    Exhibit No. 35  Agricultural Health Study.   118
14                  Study Update 2018.
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
 1          BE IT REMEMBERED that on Sunday,
 2  December 16, 2018, at 1900 Fifth Avenue, Seattle,
 3  Washington, at 8:49 a.m., before JOHN M.S. BOTELHO,
 4  Certified Court Reporter, appeared ANDREI SHUSTOV,
 5  M.D., the witness herein;
 6          WHEREUPON, the following
 7  proceedings were had, to wit:
 8
 9              <<<<<< >>>>>>
10
11          (Exhibit Nos. 26 and 27
12          marked for identification.)
13
14          THE VIDEOGRAPHER:  We are now on
15  the record. Today's date is Sunday, December 16th,
16  2018. And the time is 8:49 a.m. This video
17  deposition is being held at 1900 Fifth Avenue,
18  Seattle, Washington 98101 in the matter of Gebeyehou
19  vs. Monsanto Company for the United States District
20  Court, Northern District of California. The deponent
21  is Dr. Andrei Shustov. My name is Allison Borgida,
22  and I'm the videographer for Golkow Litigation
23  Services. The court reporter is John Botelho.
24          Will counsel please state your appearances and
25  affiliations for the record, and then the court
```

Andrei Shustov, M.D.

Page 6

1   reporter may swear in the witness.
2          MR. WISNER: Brent Wisner on behalf
3   of the plaintiffs and the deponent.
4          MR. BRENZA: Lin Brenza with Bartlit
5   Beck for Bayer.
6          MR. KERSCHNER: David Kerschner from
7   Arnold & Porter for Monsanto.
8          MR. LEVINE: Aaron Levine from Arnold
9   & Porter for Monsanto.
10
11  ANDREI SHUSTOV, M.D.,      having been first duly sworn
12                             by the Certified Court
13                             Reporter, deposed and
14                             testified as follows:
15
16         MR. WISNER: Before we get started, I
17  just want to maintain the same objection we discussed
18  yesterday concerning the scope of this deposition being
19  limited to specific causation and specifically for the
20  plaintiff in this case, Gebeyehou.
21
22
23              EXAMINATION
24  BY MR. BRENZA:
25  Q  What is your name?

Page 7

1   A  Andrei Shustov.
2   Q  Will you spell your last name, please?
3   A  S-h-u-s-t-o-v.
4   Q  Where is your business address?
5   A  Seattle Cancer Care Alliance, 825 Eastlake Avenue East,
6   Seattle, Washington 98109.
7   Q  Do you live in Seattle?
8   A  I live outside Seattle.
9   Q  What's your home address?
10  A  ████████████████████████████████████
11  Q  Are you a medical doctor?
12  A  I am.
13  Q  Did you receive your medical degree in the Ukraine?
14  A  I did.
15  Q  Did you come to the United States to pursue postdoctoral
16     studies?
17  A  That's correct.
18  Q  Are you currently associated with the Seattle Cancer
19     Care Alliance at the University of Washington Medical
20     Center?
21  A  I am.
22  Q  Do you see in front of you a document that I've marked
23     as Exhibit 26?
24  A  I do.
25  Q  Do you see that Exhibit 26 is a notice for your

Page 8

1   deposition today?
2   A  I do.
3   Q  Have you seen Exhibit 26 before?
4   A  I did.
5   Q  Did you review the list of documents requested that's
6      attached to Exhibit 26?
7   A  I did.
8   Q  Did you collect the documents that you had in your
9      possession that were responsive to the deposition
10     notice?
11         MR. WISNER: Objection. Answer that
12  question to the extent it doesn't call for any
13  privileged attorney communications.
14         THE WITNESS: To the best of my
15  abilities.
16  Q  (By Mr. Brenza) Did that include any e-mails that you
17     received forwarding materials that you used in your
18     expert report?
19         MR. WISNER: Objection.
20         THE WITNESS: None that would come
21  from anybody but the attorneys.
22  Q  (By Mr. Brenza) Did you include any e-mails that you
23     received that provided you materials that you relied on
24     for your expert report?
25         MR. WISNER: Same objection and

Page 9

1   admonishment. Answer to the extent it doesn't call for
2   privileged communication.
3          THE WITNESS: I did include it, the
4   material they relied on, yes.
5   Q  (By Mr. Brenza) You did include those?
6   A  Yeah.
7   Q  Is -- is the list of all the materials you relied on for
8      your expert report set out in the document we marked
9      yesterday as Exhibit 4?
10         MR. WISNER: I'd also just note that
11  we submitted a supplemental reliance list as well that's
12  not included in Exhibit 4.
13         THE WITNESS: Yes, I believe so.
14         THE REPORTER: What list?
15         MR. WISNER: Supplemental reliance
16  list.
17  Q  (By Mr. Brenza) Directing your attention to Exhibit 4,
18     is that a partial list of the materials that you relied
19     on in your expert report?
20  A  To my knowledge, it's a complete list that I relied on.
21  Q  Are the materials listed on Exhibit 4 materials that you
22     found to be reliable for purposes of forming your expert
23     report in this case?
24  A  Yes.
25  Q  Are there any materials on Exhibit 4 that you did not

Andrei Shustov, M.D.

## Page 10

1    rely on in forming your opinions that are set out in
2    your expert report?
3                MR. WISNER:  Objection; vague.
4                THE WITNESS:  I believe I put them
5    there on purpose of disclosing what I used for my
6    report, so I don't think, to the best of my knowledge,
7    that anything listed here I did not rely on.
8    Q  (By Mr. Brenza)  Okay.  Getting back to your deposition
9    notice, you had your deposition taken yesterday, and so
10   you're somewhat familiar with this process now.  But I
11   want to just set out a couple ground rules.
12        If you don't hear or don't understand my question,
13   just let me know, and I'll rephrase it or repeat it.
14   A  Sure.
15   Q  We need to not speak over each other.  There was a
16   problem with that yesterday.  I'll try to finish my
17   question, then let you answer before I start asking
18   another.  Okay?
19   A  Sure.
20   Q  Is the -- let's back up.
21        The document I've marked as Exhibit 27 in front of
22   you, do you see that?
23   A  I do.
24   Q  That's your expert report in the case of Gebeyehou?
25   A  That's correct.

## Page 11

1    Q  Is that how you pronounce the name, or will you
2    understand what I'm talking about if I pronounce it that
3    way?
4    A  Yes.
5    Q  Okay.  Did you prepare Exhibit 27 yourself?
6    A  Yes.
7    Q  Did you write every word of Exhibit 27?
8    A  I wrote most of Exhibit 27 myself, and I used the
9    verbiage from other sources to express my opinion in
10   this report.
11   Q  I'm going to hand you what I've marked -- what I'm
12   marking now as Exhibit 28.
13                (Exhibit No. 28 marked for
14                identification.)
15
16   Q  (By Mr. Brenza)  This is the expert report of Dr. Nabhan
17   in the Gebeyehou case.
18   A  Thank you.
19   Q  Have you seen the expert report of Dr. Nabhan before I
20   just handed it to you?
21   A  I don't recall seeing it.
22   Q  Do you remember yesterday we looked at your report in a
23   different case, and you had confirmed that you used some
24   of the language of Dr. -- of Nabhan's report in your own
25   report?  Do you remember that?

## Page 12

1    A  I do remember that.
2    Q  Did you do the same thing with the Gebeyehou report?
3       Did you use Dr. Nabhan's language in your own report?
4    A  I used -- I type all three reports I was asked to do
5    pertaining to Monsanto case with the same diagnosis at
6    the same time, and I used the language from one report
7    to another that was pertinent from -- for all the
8    plaintiffs to save time.
9    Q  Did you use the language of Dr. Nabhan's report in your
10   own report in the Gebeyehou case?
11   A  In -- to my recollection, Gebeyehou case, I used the
12   report that I created for previous plaintiff that I
13   constructed first in preparing all three reports.
14   Q  Who was the first plaintiff who you prepared a report
15   for?
16   A  If I recall correctly, Mr. Hardeman.
17   Q  So you wrote Dr. Hardeman's report using language from
18   Dr. Nabhan's report, correct?
19   A  That is correct.
20   Q  And then you copied language that you'd used in the
21   Hardeman report for the Gebeyehou report?
22   A  That is correct.  It was appropriate for the same
23   report, for this report.
24   Q  And this is language -- if you look at your own report
25   on Page 6 and the Nabhan report, it's language that has

## Page 13

1    to do with -- this is language that you used from
2    Dr. Nabhan that has to do with general causation issues,
3    right?
4    A  That is correct.
5    Q  Did you use Dr. Nabhan's language for general causation
6    issues because you're not an expert in glyphosate
7    general causation?
8                MR. WISNER:  Objection; calls for a
9    legal conclusion.
10               THE WITNESS:  No.  I used the
11   language from Dr. Nabhan report because it would -- it
12   reflected my conclusion that I drew in reviewing brief
13   evidence -- reviewing briefly papers in general
14   causation to supplement my report, and the language
15   would accurately reflect my understanding of general
16   causation.  So to save time, I used his language.
17   Q  (By Mr. Brenza)  And your understanding of general
18   causation comes from Dr. Nabhan, right?
19   A  No.  My understanding of general causation comes from
20   experts in general causation, Dr. Ritz and Dr. Portier,
21   but I've decided to look at some literature to
22   familiarize myself with -- with the topic.
23   Q  Let me direct your attention to Page 6 and 7 and 8 of
24   your expert report that we've marked as Exhibit 27.
25   Tell me when you're there.

Andrei Shustov, M.D.

Page 14

1    A  So 6, 7, 8.  I'm here.
2    Q  You see the section that you had titled "Discussion of
3       Mr. Gebeyehou's Lymphoma Causation"?
4    A  Yep.
5    Q  Is that a discussion of general causation?
6    A  If you read all the bullet points, it is a discussion of
7       general causation.
8    Q  And are these the sections that you ultimately trace
9       back to Dr. Nabhan's report?
10   A  I believe they're the sections for some of which I used
11      the verbiage of Dr. Nabhan report.
12   Q  Do you have the e-mail that you received where you
13      received Dr. Nabhan's report?
14          MR. WISNER:  Objection; assumes facts
15   not in evidence.
16          THE WITNESS:  I must have it
17   somewhere in e-mail that I received from my attorney,
18   yeah.  I received via e-mail, so it must be in my
19   e-mail.
20   Q  (By Mr. Brenza)  And you didn't list that on your
21      materials you relied on?
22   A  I did not rely on that report to make my opinion.  I did
23      not feel this was a document I relied on.  I used the
24      verbiage from that report, but I did not rely on that to
25      make my opinion.  I didn't feel that it's appropriate.

Page 15

1       If I'm erroneous, I apologize.
2    Q  Did you make an independent analysis of all the medical
3       studies that were discussed in Dr. Nabhan's report?
4    A  I made --
5          MR. WISNER:  Objection; scope.  Are
6    you talking about the section on general causation?
7          MR. BRENZA:  Yes.
8          MR. WISNER:  Okay.
9          THE WITNESS:  I made my brief
10   conclusions to familiarize -- familiarize myself with
11   general causation, but I relied on general causation
12   expert to formulate my opinion in specific causation.
13   Q  (By Mr. Brenza)  Have you previously testified for
14      individuals who were claiming to have been injured by
15      glyphosate?
16   A  No.  Not outside current proceedings.
17   Q  Okay.  Have you done any research involving glyphosate?
18   A  No.
19   Q  Have you ever written anything about glyphosate?
20   A  No.
21   Q  Have you ever spoken about glyphosate?
22   A  No.
23   Q  Are you an expert in glyphosate?
24   A  No.
25   Q  Was the first time you opined that glyphosate was a

Page 16

1    possible cause of cancer in this litigation?  First time
2    you ever said that, right?
3    A  In this particular litigation?
4    Q  Yes.
5    A  Yes.
6    Q  Does your expert report that we've marked as Exhibit 27
7       encompass all of your opinions about Gebeyehou?
8    A  Not all of my opinions regarding Gebeyehou, but my
9       opinions pertaining to his diagnosis, his disease, his
10      treatment, and specifically to support my conclusion
11      about special causation.
12   Q  What opinions about Mr. Gebeyehou are not included in
13      your expert report?
14          MR. WISNER:  Objection; scope.
15          THE WITNESS:  Anything that I was not
16   asked to do.
17   Q  (By Mr. Brenza)  As you sit here today, do you have an
18      understanding of any opinions that you -- you formed
19      about Mr. Gebeyehou that are not in your report?
20          MR. WISNER:  Objection; beyond the
21   scope.
22          THE WITNESS:  It is very confusing,
23   but I would say, when I encounter the patient, I
24   obviously form comprehensive impression of his disease,
25   his medical history, and I only extract the relevant

Page 17

1    information for specific purpose of this report.
2    Q  (By Mr. Brenza)  Are there any opinions you have
3       about -- about Dr. Gebeyehou that you're concealing
4       from -- from this proceeding?
5    A  I'm not concealing anything.  I did not --
6    Q  Concealing -- that you didn't disclose in your expert
7       report?
8          MR. WISNER:  Objection; scope.  We're
9    talking about medical opinions, right?
10          MR. BRENZA:  Yes.  Yes.
11          MR. WISNER:  Because you might think
12   he's a nice guy, for example.
13          MR. BRENZA:  Yes.
14   Q  (By Mr. Brenza)  I just want to know, if we talk about
15      your expert report, have we covered everything that
16      you've decided about Doct -- Mr. Gebeyehou?
17   A  Yes.  I apologize.  It's very -- that's -- I've
18      explained it.  If he told me that how nice his house
19      was, it's not in my report, yeah.
20   Q  Yes.
21      But in terms of medical opinions, they're all in
22      your report?
23   A  Yeah.
24   Q  Did you ever provide any medical care to Mr. Gebeyehou?
25   A  No.

5  (Pages 14 to 17)

Andrei Shustov, M.D.

Page 18

1  Q  Had you ever seen him before you saw him in connection
2     with his lawsuit?
3  A  No.
4  Q  Did you examine him in connection with his lawsuit?
5  A  I did.
6  Q  When did you examine him?
7  A  On November 7th, 2018.
8  Q  So about five weeks ago?
9  A  That's correct.
10 Q  Where did you examine him?
11 A  At Marriott, Lake Union, Seattle.
12 Q  So in a hotel?
13 A  That's correct.
14 Q  You just get a conference room or something, or...?
15 A  That's correct.
16 Q  Who was there?
17 A  Was Mr. Gebeyehou, his wife, and his son.
18 Q  Did you examine any -- his wife or his son?
19 A  No.
20 Q  Did you interview them or elicit any information from
21    them?
22 A  No.  I interviewed him.
23 Q  Just spoke to Mr. Gebeyehou?
24 A  Mm-hmm.
25 Q  What did your physical examination of Mr. Gebeyehou tell

Page 19

1     you?
2  A  I did not find any evidence of residual lymphoma at this
3     time.
4  Q  He had made a complete recovery as far as you could
5     tell?
6  A  He has some sequelae from his lymphoma and chemotherapy,
7     in my opinion, he continues to recover from.  But he has
8     residual neurologic deficits and neurologic symptoms
9     that, in my professional opinion, I believe related to
10    his recently treated lymphoma and toxicity of
11    chemotherapy.
12 Q  But with respect to the lymphoma, with respect to the
13    cancer, itself, it was cured, right?
14 A  I don't know that yet he is in remission.
15 Q  When you say he's in remission, that means he doesn't
16    have any cancer at the moment, right?
17 A  He does not have detectable cancer at the moment that we
18    can detect with the technology that we use to look for
19    responses.
20 Q  Do you -- do you know when Mr. Gebeyehou was first
21    diagnosed with his cancer?
22 A  It was in February of 2014.
23 Q  And he was treated during that year, 2014, right?
24 A  That is correct.
25 Q  And so now it's 2018.  He has been cancer-free for four

Page 20

1     years, right?
2  A  That is correct.
3  Q  It's true that with non-Hodgkin's lymphoma, the most
4     likely time for it to occur is in the first two years,
5     right?
6  A  That is correct.
7  Q  So he's made it past that?
8  A  That is correct.
9  Q  And if you make it past more years, it's even more
10    unlikely to come back?
11 A  That is correct.
12 Q  Is Mr. Gebeyehou's prognosis with respect to his
13    lymphoma very good?
14 A  It gets better the further away he gets from treatment.
15 Q  Would you expect, as you sit here today, that he likely
16    won't have any further recurrence from his lymphoma?
17        MR. WISNER:  Objection; speculation.
18        THE WITNESS:  He's less likely to
19    relapse at this time and in the future than he was in
20    the first two years.
21 Q  (By Mr. Brenza)  And so I'm asking a slightly different
22    question about what your opinion is about what he should
23    expect in being cancer-free going forward.
24    Isn't it true that he can expect to be cancer-free going
25    forward?

Page 21

1  A  He is more likely to be cancer-free, but late relapses
2     happen in lymphoma even eight, ten years after
3     treatment.  Those are uncommon, but it does happen.
4  Q  There's no guarantee, but if you were going to pick what
5     was expected, what's expected is he probably won't have
6     any further cancer?
7  A  It is more likely at this point that he's not going to
8     relapse than he will, yes.
9  Q  Are the causes of non-Hodgkin's lymphoma unknown in the
10    majority of patients?
11 A  Unknown to the degree that we generally do not look for
12    causes in most of the patients.
13 Q  I'm not sure that answered my question.
14    Are the causes of non-Hodgkin's lymphoma unknown in
15    the majority of patients?
16        MR. WISNER:  Objection; asked and
17    answered.
18        THE WITNESS:  Once again, it's --
19    it's -- the question that can be answered different
20    ways.  It can be stated they're unknown, but it can also
21    be stated that they're unknown because we never made
22    queries into every particular patient and specific
23    investigation into risk factors in general medical
24    practice.
25 Q  (By Mr. Brenza)  But as you sit here today, without

Andrei Shustov, M.D.

Page 22

1    having done research into what might be the causes, you
2    don't -- you don't know the causes of non-Hodgkin's
3    lymphoma in the vast majority of patients that present
4    with it, right?
5                MR. WISNER:  Objection; vague,
6    speculation.
7                THE WITNESS:  For the majority of
8    patients diagnosed with non-Hodgkin lymphoma, yes, we
9    don't know.
10   Q  (By Mr. Brenza)  And we looked at some studies yesterday
11   on epidemiolog -- epidemiology of non-Hodgkin's
12   lymphoma.  You remember those?
13   A  I do.
14   Q  So somebody's out there trying to find out what causes
15   non-Hodgkin -- non-Hodgkin's lymphoma, right?
16   A  That's correct.
17   Q  And they do that by looking at large numbers of people
18   and trying to find something that they may all have in
19   common or some of them have in common, right?
20   A  Sure.
21   Q  Is that the right way to try to figure out what causes
22   non-Hodg -- non-Hodgkin's lymphoma?
23               MR. WISNER:  Objection; calls for
24   outside the scope.
25               THE WITNESS:  That's probably the

Page 23

1    best available way to try to figure that out.  It's not
2    the best way, but it's the best available way.
3    Q  (By Mr. Brenza)  What is the -- what would be the best
4    way?  Or is -- are you referring to the experiment that
5    we concluded was ethically improper yesterday?
6    A  No.  The -- the hypothetical best available way would be
7    to tag a newborn with a chip that would record every
8    single event in his life and record all he eats and
9    where he travels and exposure to radiation through his
10   life, as -- I'm just hypothesizing, giving you an
11   example.  That would be the best way.  And then lymphoma
12   is diagnosed, and you pull up the record and put it all
13   into massive cloud and calculate probabilities.  That
14   would be -- if we could do that, then we would know
15   probably causes for most lymphomas.
16   Q  So if you had perfect information about everybody and
17   then could look at that after the fact, you might be
18   able to figure out what --
19   A  That is --
20   Q  -- factors cause it?
21   A  That is correct.
22   Q  And that's true for all cancer, right?  I mean, the
23   causes of cancer are many and varied, and no -- no one's
24   really sure what they are?
25               MR. WISNER:  Objection; speculation.

Page 24

1                THE WITNESS:  That is true for many
2    cancers, but it is also true for many cancers we have
3    identified causes in many patients.  We cannot dismiss
4    those.
5    Q  (By Mr. Brenza)  The type of cancer that Mr. Gebeyehou
6    had was called diffuse large B-cell lymphoma, right?
7    A  That is correct.
8    Q  And I'll refer to it as DLBCL.  As much as I hate
9    acronyms, it's just too long to say it any other way.
10   Okay?
11   A  That's okay.
12   Q  I'm sure you're familiar with it, because you probably
13   have to say it even more than I do.
14   A  That's how we use it.
15   Q  What is diffuse large B-cell lymphoma?
16   A  DLBCL and diffuse large B-cell lymphoma is an aggressive
17   form of lymphoid cancer or lymph node cancer that arises
18   from B lymphocytes.
19   Q  Is it a particular species of cancer within the
20   non-Hodgkin's lymphoma universe?
21   A  It is a particular species, yes, of non-Hodgkin
22   lymphoma.
23   Q  And non-Hodgkin's lymphoma is made up of about 60 or
24   more different types of cancer, right?
25   A  That is correct.

Page 25

1    Q  Each of those types of cancer is different from each
2    other as non-Hodgkin's lymphoma is from other kinds of
3    cancer?
4    A  They're different, and they're similar.  There is a
5    great overlap, and there is certain specific features of
6    these lymphomas.  That is why majority of them are
7    treated the same way, but in some cases we implement
8    slightly different types of treatment.  So they have
9    similarities and overlap sometimes even in molecular
10   pathways that they use, but there is something that
11   defines them separate enough to call them a specific
12   entity.
13   Q  Do the different entities of non-Hodgkin's lymphoma have
14   different risk factors?
15   A  It's a very broad question, and we have -- we think that
16   in some specific type of non-Hodgkin lymphomas, there is
17   a specific cause.  But for majority of them, it is not
18   inconceivable that they have commonalities in what
19   caused them.
20       As an example, patients who are exposed to
21   radiation as professional activities or in any other
22   capacities can develop any type of lymphoma.  Patients
23   who are infected with HTLV-1 virus can develop a very
24   specific T-cell lymphoma.  EBV causes very specific type
25   of lymphoma, but not others.  But exposure to common

Andrei Shustov, M.D.

Page 26

1      carcinogens may cause any type of lymphoma.  That's a
2      very broad question.
3    Q  So you've set out some of the risk factors.  Is one of
4      the risk factors for DLBCL environmental factors such as
5      exposure to chemicals?
6    A  Again, it's a broad statement, but chemicals that are
7      known carcinogen, yes.
8    Q  And that includes, you mentioned yesterday, military
9      chemicals?
10   A  The chemicals that have been linked, identified as cause
11     of non-Hodgkin lymphomas and potential other cancers,
12     yes, found in military environment, industrial,
13     households.  In the military, examples would be well-
14     known Agent Orange and jet fumes, exposure to asbestos
15     in the Navy in the past.  Those are examples.
16   Q  You also mentioned agricultural-related chemicals,
17     right?
18   A  Did I?
19   Q  Yesterday.
20   A  Yes.
21   Q  And that includes a wide variety of chemicals that might
22     be encountered on a farm, right?
23   A  Potentially.
24   Q  Not just -- it's not just glyphosate.  It's all
25     pesticides, all fungicides, rodenticides, fertilizers,

Page 27

1      diesel fumes, all kinds of chemicals?
2    A  Well, it's a very broad statement as a clinician.  And
3      if I were to look at the cause, I would refer to sources
4      to advise me specifically what chemicals were herbicides
5      and that are specifically linked with development of
6      lymphomas.  I would try not to do a very general, broad
7      statement like that.
8    Q  Well, it's not -- it's not just herbicides, right?  It's
9      all farm chemicals?
10   A  I did say that.  And I don't think it's fair to say --
11     lump everything together.  Once again, I would defer to
12     experts in epidemiology, general causation, toxicology,
13     where I would go to sources and see if this particular
14     chemical is listed as potential carcinogens.
15       And this happens occasionally when patient would
16     bring me the list of, say, chemicals that are provided
17     by the employer and ask me to opine on whether or not
18     this was a occupational hazard, et cetera.  So there is
19     a specific list that is provided by organizations like
20     DOD or -- I -- I can't recall that -- all the, again,
21     antigens that patient use.
22       VA has the list of defined carcinogens that they
23     give to patients diagnosed with cancer that for the
24     particular purpose is defined, so whether or not they
25     cover their services, et cetera.  But there is a list of

Page 28

1      agreed and defined carcinogens for different areas of
2      human activity, military, occupational, et cetera.
3    Q  Do you know that farmers are often exposed to a variety
4      of chemicals related to their work?
5        MR. WISNER:  Objection; lacks
6      foundation, speculation.
7        THE WITNESS:  I do not work with
8      farmers.  I would absolutely have to speculate, and I --
9      I would assume that they have -- they use various
10     chemicals in their practice.  Again, this is assumption.
11     I've never been a farmer.  I grew up in a city.  I
12     didn't study farming.  That's complete speculation on my
13     part.
14   Q  (By Mr. Brenza)  Has the -- do you know that farmers
15     have a higher rate of non-Hodgkin's lymphoma than other
16     professions?
17   A  That is the fact that, to the best of my recollection, I
18     have encountered before.  But if you ask me my -- my
19     general opinion as an oncologist, I would say "yes."
20     And if you ask specific, I'll have to go in literature
21     and look.
22   Q  You haven't done that as you sit here today?
23   A  I have -- I have not specifically did a search on
24     farmers and risk of non-Hodgkin lymphoma.  I have
25     encountered some statements in the reference papers that

Page 29

1      were in the discussions, but I have not done independent
2      search to look into that.
3    Q  And those references that you mention identify exposure
4      to multiple chemicals, right?  They're not just about
5      glyphosate?
6    A  Again, this is very -- we went through the references
7      yesterday.  It's a very general statement.  We looked at
8      some papers yesterday that adjusted for various
9      pesticides, look at various pesticides.  For the -- I
10     feel for sake of current discussions, once again, I
11     believe farmers exposed to multiple chemicals, but I
12     don't believe that all of them can be lumped into
13     carcinogens.  And I would, again, rely on the
14     epidemiologic literature to advise clinicians, and in a
15     very more beneficial way, I would rely on opinion and
16     expertise of epidemiologists and toxicologists to advise
17     clinicians that whether this particular chemical is
18     carcinogen or not.
19   Q  You -- you understand, though, when somebody's exposed
20     to multiple chemicals, you have to control for the
21     effect of those other chemicals to figure out whether
22     any particular one is causing an effect, right?
23       MR. WISNER:  Objection; incomplete
24     hypothetical, vague.
25       THE WITNESS:  As a -- as a research

Andrei Shustov, M.D.

Page 30

1      method, I would say that that's probably what needs to
2      be done in those studies.
3      Q   (By Mr. Brenza)  Has the rate of non-Hodgkin's lymphoma
4          been increasing in the United States for many decades?
5      A   That is true.
6      Q   Did the increase begin in the 1950s and 1960s?
7      A   That is true, and that's the time where epidemiologic
8          studies in the United States really started to become
9          consolidated and reliable information started to be
10         collected.  It does not mean that the rate has not been
11         increasing before that.  It's just the epidemiologic
12         science and reliable correction of data.
13             The answer is, again, it's a broad question for
14         academician.  I would say "yes," but there is a reason
15         for that.  And collection of information was starting to
16         really consolidate in those times, the formation of SEER
17         registry and epidemiologic institution databases, and
18         they were not developed in early 1900s or last century,
19         but -- so we cannot say they were not increasing before
20         that, but in a simple answer is, yes, it was increasing.
21     Q   Has the rate of increase in non-Hodgkin's lymphoma
22         leveled off in the last decade or two?
23     A   I would have to do a quick search to answer that
24         question.  I think so that the rate is -- the -- the
25         curve is not as steep.  But, again, I would have to make

Page 31

1      a quick reference.  It's not something I look at
2      every -- in my everyday practice.
3             MR. WISNER:  If you're going to move
4      on to another topic, can we take a quick break off the
5      record?
6             MR. BRENZA:  Sure.
7             THE VIDEOGRAPHER:  All right.  We're
8      going off record.  The time is 9:26 a.m.
9             (Pause in proceedings.)
10
11            THE VIDEOGRAPHER:  We are back on
12     record.  The time is 9:37 a.m.
13     Q   (By Mr. Brenza)  Doctor, what do you consider to be your
14         areas of expertise?
15     A   I'm -- I would consider myself to be expert in cancer,
16         specifically high expertise in lymphoma, lymphoma
17         diagnosis, lymphoma signs, lymphoma treatment, and
18         management of patient with lymphomas.  Designing,
19         executing clinical trials in investigating drugs for
20         non-Hodgkin and Hodgkin lymphoma.  And having background
21         in immunology based on my bench research that I have
22         done at the University of Washing -- University of
23         Maryland before.
24     Q   Did any part of your background in immunology involve
25         the ability of viruses to cause cancer in cells?

Page 32

1      A   No.
2      Q   With -- with respect to the areas that you're not expert
3          in -- I'm going to go through a list.  And it's not to
4          disparage the areas that you are an expert in.  I just
5          want to make sure I understand the limits of your --
6          your expertise.
7      A   Sure.
8      Q   Okay?
9             So you're not an expert in toxicology, right?
10     A   No.
11     Q   You're --
12            MR. WISNER:  I'm just going to have a
13     standing objection -- I don't want to do it each time --
14     to legal conclusion on the word "expert."
15            MR. BRENZA:  Got it.
16     Q   (By Mr. Brenza)  You're not an expert in epidemiology,
17         right?
18     A   No.
19     Q   You're not an expert in glyphosate?
20     A   No.
21     Q   You're not an expert in glyphosate-based formulations?
22     A   No.
23     Q   You're not an expert in surfactants?
24     A   No.
25     Q   You are not an expert in cancer caused by -- identifying

Page 33

1      cancer caused by radiation?
2      A   That's a nonsensical question.  I can't answer that.
3      Q   Why do you say that?
4      A   It just doesn't make any sense to oncologist and
5          clinician, not being an expert in cancer caused by
6          radiation.  There's no expertise in cancer caused by
7          radiation.  It's one of the cause -- causes of cancer in
8          humans, but there is no such a thing as expertise in
9          cancer caused by radiation.  It's just absolutely
10         nonsensical to oncologist or any medical professional.
11     Q   Is it correct that just looking at the cancer, you can't
12         tell whether it was caused by radiation, chemicals,
13         infection, or something else?
14            MR. WISNER:  Objection; overbroad.
15            THE WITNESS:  In the vast majority of
16     cases, yes.
17     Q   (By Mr. Brenza)  And is that true in Mr. Gebeyehou's
18         case?
19     A   That is correct.
20     Q   Getting back to the list of topics, are you an expert in
21         chemistry?
22            MR. WISNER:  Objection; broad.
23            THE WITNESS:  No.
24     Q   (By Mr. Brenza)  Are you an expert in pathology?
25     A   No.

9 (Pages 30 to 33)

Andrei Shustov, M.D.

Page 34

1  Q  Are you an expert in chemical exposures?
2        MR. WISNER:  Objection; vague.
3  Q  (By Mr. Brenza)  Calculating exposures?
4  A  No.
5  Q  Are you an industrial hygienist?
6  A  No.
7  Q  Are you an expert in statistics?
8  A  No.
9  Q  Are you an expert in infectious disease?
10 A  Not in a general definition of expertise, no.
11 Q  Did your method in your report involve something called
12    a differential diagnosis?
13 A  That is correct.
14 Q  For a differential diagnosis -- we talked a little
15    yesterday about that -- is -- is usually referred -- you
16    referred to a method used to diagnose a disease in
17    patients, right?
18 A  That is correct.
19 Q  And when you use differential diagnosis to diagnose a
20    disease, you can then go and verify your diagnosis by
21    testing for it, right?
22 A  Well, part of the differential diagnosis in diagnosing
23    the disease is already having all available information
24    at hand to make a diagnosis.
25 Q  So the tests are part of that information?

Page 35

1  A  That is correct.
2  Q  Does differential diagnosis require you to have
3    knowledge about all the possible diseases that the
4    person may have and the probability that that disease is
5    the accurate one?
6        MR. WISNER:  Objection; vague.
7        THE WITNESS:  It is a very broad
8    question.  Because as an example, if I created
9    differential diagnosis of enlarged lymph node in
10   somebody, whether or not it is cancer or it is
11   inflammation, information like somebody having psoriasis
12   or somebody having a broken toe is irrelevant.
13     So if you take a regular medical practice and you
14   interview the physician in particular specialty area or
15   asking about particular diagnosis for which differential
16   diagnosis was created, the differential -- listing the
17   differential diagnosis would not include dozens of
18   irrelevant facts, medical facts about this patient.
19 Q  (By Mr. Brenza)  When you use differential diagnosis to
20   diagnose a disease, you said you have the results of
21   specific tests for various diseases, right?
22 A  Preferably.  And some of the tests then will be
23   triggered based what is in the differential diagnosis.
24 Q  I didn't understand that last part.  Some of the -- you
25   said some of the tests will trigger?  Just explain it to

Page 36

1    me.
2  A  So differential diagnosis is a continuous process.  To
3    give an example, if patient comes in my area of
4    expertise with enlarged lymph node and, say, symptoms of
5    inflammation and also has findings on physical exam of
6    lymphadenopathy, enlarged lymph nodes, or even a CT
7    scan, and I say, Okay, this patient has enlarged lymph
8    nodes.  It could be infection.  Could be inflammation.
9    Could be sarcoidosis.  But then it triggers the biopsy.
10   I don't have results of the biopsy before.  Then biopsy
11   might be suggestive of different disease that -- that
12   opens up a -- different possibilities and they need to
13   order tests.  So I have -- I would have a set of tests
14   before that help me create differential diagnosis, but
15   then it also triggers subsequent investigation to rule
16   out possibilities on my list or rule something new in
17   that collectively I already refer to as hypothetical
18   deductive method, but it's a continuous process.
19 Q  Okay.  So you start with a list of could-be's and
20   then -- is that right?
21 A  That is correct.
22 Q  And then you do additional tests to determine which of
23   the could-be's are wrong.  And what's left is what
24   you're going to go with, what you're going to diagnose?
25 A  If the tests are appropriate for the situation.  And in

Page 37

1    some situations, there are no additional testing
2    required and you have to think about probabilities and
3    eliminate them based on already available information.
4       Many times there are confirmatory tests.  But many
5    times in the clinical situation, we come up with
6    differential diagnosis and then again create this
7    deduction method where this is less likely, this is less
8    likely, this is less likely, until you ideally come to a
9    single diagnosis.  But in many cases, medicine being not
10   exact science, you say, This could be this, it could be
11   this, and you make your best clinical judgment call.
12 Q  In order to do the analysis you just described, you have
13   to understand what's less likely, what the probabilities
14   are of the various options you're considering, right?
15 A  That is correct.
16 Q  And that's true for the way that you used differential
17   diagnosis to identify a cause of Mr. Gebeyehou's
18   non-Hodgkin's lymphoma in this case, right?
19 A  That is true.
20 Q  You'd have to know the probabilities of all the other
21   possible causes of non-Hodgkin's lymphoma?
22 A  Causes that either identifiable or are relevant to
23   somebody's case.
24 Q  Did you have access to information that allowed you to
25   quantify the probabilities of all the risk factors that

10  (Pages 34 to 37)

Andrei Shustov, M.D.

Page 38

1    Mr. Gebeyehou encountered over the course of his
2    lifetime?
3    A  In most scenarios in medicine, we do not have ability to
4    quantify the offending factor and make, like I said,
5    clinical judgment call whether or not it is probable,
6    possible, or most likely related to the problem at hand;
7    in this case, causing cancer or contributing to causing
8    cancer.
9    Q  So just to be sure I understood your last answer, did
10   you have access to the probabilities of each of the risk
11   factors Mr. Gebeyehou encountered during the course of
12   his life?
13           MR. WISNER:  Objection; vague,
14   assumes facts not in evidence.
15           THE WITNESS:  I -- I don't think I
16   would say that access to probabilities is -- is -- is
17   sort of, to me, as a medical -- this is a nonsensical
18   question.  I have access, as much as I have, to risk
19   factors that he had throughout his life, but I don't
20   understand what access to probabilities mean.
21   Q  (By Mr. Brenza)  Well, you -- you understood the risk
22   factors he had encountered, right?
23   A  That is correct.
24   Q  And my question to you is:  Did you have any precise
25   information about how much those risk factors increased

Page 39

1    his risks?
2    A  Well, that is the information that I extract and rely on
3    from general causation literature; as an example,
4    twofold increase, threefold increase, or X number
5    increase.  That's the information that I rely on; having
6    identified that, yes, this patient has been exposed to
7    particular factors.
8    Q  Okay.  We'll get -- we'll get back to some of that.  I
9    just want to make sure I understand your overall
10   approach.
11           Did you at any time attempt to evaluate
12   Mr. Gebeyehou's exposure to any particular chemical?
13   A  No.
14   Q  Did you at any time evaluate the latency that might be
15   required for cancer to develop from a given exposure?
16           MR. WISNER:  Objection; vague.
17           THE WITNESS:  In his particular case?
18           MR. BRENZA:  Yes.
19           MR. WISNER:  Also objection;
20   overbroad.
21           THE WITNESS:  To -- to a medical
22   profession, the evaluation of latency is basically
23   asking the patient when he or she was exposed to known
24   carcinogens and the time he was diagnosed.  As a
25   clinician, that's information I have at hand to say he

Page 40

1    was exposed, say, four or five years ago.  Now he's
2    diagnosed with cancer.  So this is my definition of
3    latency if I believe that a factor contributed to
4    development of his cancer.
5    Q  (By Mr. Brenza)  Do you have a specific opinion about
6    how long it takes for any particular chemical to cause
7    cancer?
8           MR. WISNER:  Objection; overbroad.
9           MR. BRENZA:  Let me narrow it.
10   Q  (By Mr. Brenza)  Do you have an opinion about how long
11   it took for an exposure that Mr. Gebeyehou had to any
12   chemical that might have caused his cancer to produce
13   that cancer?
14           MR. WISNER:  Also overbroad.
15           THE WITNESS:  Again, to me, it's as
16   if it's a fact that he was exposed and he was diagnosed
17   at this time, and that's where I'm able to say his
18   latency period, if I believe this was his causative
19   factor, is certain number of years.  I don't understand,
20   again, as a -- as a medical profession, how do you
21   evaluate latency in the particular person?
22       Latency can be evaluated on population, population
23   level where you take hundred or a thousand patients and
24   calculate the median latency period in population
25   exposed to the same factor, but you can not apply this

Page 41

1    to a particular person to evaluate his latency.  He
2    either has three-year latency or five-year latency.
3       So I operate on general statistical median for
4    latency if it's known for certain carcinogen.  But in a
5    one person, you just state that his cancer, he was
6    exposed as an example to radiation five years ago for
7    the treatment of breast cancer, or she, and five years
8    later developed leukemia.
9       So that's the latency for this particular patient.
10   But the average latency for this particular factor would
11   be calculated based on numerous patients who received
12   radiation.  It -- just as a concept, I -- I don't think
13   you can evaluate latency in -- in the particular person
14   outside the fact that looking at his exact time to
15   develop cancer from the exposure.
16   Q  (By Mr. Brenza)  Is it generally true that the level of
17   exposure to a potential risk factor is relevant to
18   determining the probability that risk factor caused any
19   cancer?
20   A  It is generally true.
21   Q  So the more radiation you're exposed to, the more likely
22   you're going to have cancer from that radiation?
23   A  It is generally true.
24   Q  And that's true for chemicals too, that the more of a
25   chemical you're exposed to, the more likely it's going

Andrei Shustov, M.D.

Page 42

1    to produce a cancer?
2            MR. WISNER: Objection; incomplete
3    hypothetical, overbroad.
4            THE WITNESS: As -- as a general
5    statement, yes.
6    Q  (By Mr. Brenza)  And is the reverse also true?  The less
7        you're exposed, the less likely it's going to cause a
8        problem?
9            MR. WISNER: Same objection.
10           THE WITNESS: It is generally true.
11   And it is also true that the single exposure to a factor
12   can produce a single right mutation that might
13   eventually lead to cancer.  But as a general statistical
14   statement, you're correct.  The --
15   Q  (By Mr. Brenza)  The less -- the less you're exposed,
16       the less your risk?
17           MR. WISNER: Same objection.
18           THE WITNESS: That is correct.
19   Q  (By Mr. Brenza)  When you examined Mr. Gebeyehou, was
20       there anything about your examination that affected your
21       determination of what might have caused his cancer?
22           MR. WISNER: Objection.
23           MR. BRENZA: And I'm talking now
24   about the physical examination.
25           THE WITNESS: No.

Page 43

1    Q  (By Mr. Brenza)  Is your conclusion about the cause of
2        his cancer based on your review of the literature?
3    A  My conclusion about causes of his cancer is based on
4        primarily referring to published literature and facts
5        from causes of lymphoma, and in most part, by examining
6        his risk factors that he was exposed to throughout
7        lifetime.
8    Q  And when you say "examining his risk factors," what you
9        did was you asked him to tell you what his risk factors
10       were, right?
11   A  That is correct.
12           MR. WISNER: Objection.
13   Q  (By Mr. Brenza)  And the -- the examination that you
14       made was listening to what Mr. Gebeyehou told you?
15   A  No.  In my world, examination means I pulled out my
16       stethoscope and I listen to his heart and lungs, I
17       examine his neurologic status, his eyes, his skin, his
18       clotting system.  That's examination.
19   Q  But that part of the examination didn't affect your
20       conclusion about the causes of his cancer, right?
21   A  That is correct.
22   Q  You said that.
23       So with respect to the causes of cancer, that's
24       what I'm asking you about.
25   A  Mm-hmm.

Page 44

1    Q  Your opinion is based on the medical literature?
2            MR. WISNER: Objection; misstates his
3    testimony.
4            THE WITNESS: Again, no.  In my
5    opinion, my conclusion is based on reviewing his history
6    of exposures that he provided to me and information I
7    could extract from his medical records that would also
8    supplement his answers.  And then creating a
9    differential list of possible causes of his lymphoma and
10   applying the principle of differential diagnosis -- you
11   can call it differential etiology -- hypothetical
12   deductive method to come up with best probability.
13   Q  (By Mr. Brenza)  Did Mr. Gebeyehou tell you anything
14       about his risk factors that you didn't include in your
15       report?
16   A  No.
17   Q  Is non-Hodgkin's lymphoma a common type of cancer?
18           MR. WISNER: Objection; vague as to
19   "common."
20           THE WITNESS: It is a common type of
21   cancer in humans.
22   Q  (By Mr. Brenza)  Is DLBCL the most common form of
23       non-Hodgkin's lymphoma?
24   A  In adults, yes.
25   Q  And Mr. Gebeyehou was an adult, right?

Page 45

1    A  That is correct.
2    Q  He was in his 70s, right?
3    A  That is correct.
4            (Exhibit No. 29 marked for
5                 identification.)
6
7    Q  (By Mr. Brenza)  I'm going to hand you what I'm marking
8        now as Exhibit 29.  Exhibit 29 is a printout of the
9        material on a website from Seattle Cancer Care Alliance.
10       Do you see that?
11   A  Yes.
12   Q  And that's the -- that's where you work, right?
13   A  Yes.
14   Q  So are you familiar with the material that I've handed
15       you as Exhibit 29?
16   A  Yes.
17   Q  Do you see under the first question on the first page,
18       "What is non-Hodgkin's lymphoma?"
19   A  I do.
20   Q  And the answer -- there are a list of bullet points
21       there --
22   A  Mm-hmm.
23   Q  -- that answer that question?
24       And the last one says, "NHL can be cured."
25       Do you see that?

12  (Pages 42 to 45)

Andrei Shustov, M.D.

Page 46

1  A  Yes.
2  Q  That's what happened with Mr. Gebeyehou as far as we
3      know right now, right?
4  A  We hope that's what happened.  And as we stated, the
5      longer he goes from chemotherapy, his chances of relapse
6      dwindle away.  And after five years, our vast majority
7      of patients who did not relapsed by that time will not
8      relapse in their lifetime, so could -- could be
9      considered cured.
10  Q  If you would direct your attention to the second-to-last
11      page.  And your -- I don't know if yours has
12      highlighting on it.  If it does, I'll -- I'll take
13      responsibility for that.  That's not part of the
14      original.
15         You see where it says, "Doctors do not know what
16      causes NHL"?
17             MR. WISNER:  On Page 5 of 6?
18             MR. BRENZA:  Yes.
19             MR. WISNER:  Okay.
20             THE WITNESS:  Yeah, I do see that.
21  Q  (By Mr. Brenza)  And you agree with that, right?
22  A  It is a very broad statement.
23  Q  Broad but true?
24  A  Once again, the problem with broad statements is that
25      they can be true, or if you ask specific questions, they

Page 47

1      are not true.  But as a broad, general statement, it is
2      true.  But general statements do not always apply to a
3      particular person.
4  Q  This statement does apply to Mr. Gebeyehou, though,
5      right?
6             MR. WISNER:  Did you say "does"?
7             MR. BRENZA:  "Does."
8             MR. WISNER:  Oh.
9             MR. BRENZA:  Yeah.
10             THE WITNESS:  That is a question can
11      be answered both ways.  If you take a general statement
12      for -- with hundred percent certainty, nobody can say
13      what caused Dr. Gebeyehou's lymphoma.  But the reason we
14      do all the epidemiologic research and try to identify
15      causes in some patients, and in some cases we succeed,
16      that in -- in some particular patients, we have an idea
17      what caused lymphoma.  That -- that is the problem with
18      broad statements.
19         So this website is designed for patients.  And if
20      you wanted to really make a statement that is hundred
21      percent accurate, this paper would be probably 400 pages
22      long.  But if you want to make just general statement to
23      the public, that is acceptable because it is true.  But
24      it is -- also might not be true to a particular patient.
25      Because a patient who, again, was exposed to radiation

Page 48

1      or was exposed to HTLV virus and was exposed to other
2      carcinogens, we potentially know in some patients what
3      caused their lymphoma.
4  Q  (By Mr. Brenza)  Do you -- do you see the paragraph that
5      follow that sentence that says, "You may be at higher
6      risk if any of these are true"?
7  A  Yes.
8  Q  And there are three bullet points.  Do you see that?
9  A  Yes.
10  Q  First one says, "Your immune system is weakened by an
11      inherited disease, autoimmune disease, human
12      immunodeficiency virus (HIV) or drugs given because you
13      had an organ transplant."
14         Do you see that?
15  A  Yes.
16  Q  Are immune system abnormalities a possible cause of
17      non-Hodgkin's lymphoma?
18  A  As a very broad, general statement, it has the same
19      problems.  You can say "yes," but it would not be true
20      for majority of autoimmune diagnosis.
21  Q  So there are many people who have that risk factor that
22      do not get non-Hodgkin's lymphoma.  Is that what you're
23      saying?
24  A  There are a lot of -- there are a lot of people who have
25      autoimmune disease that has nothing to do with

Page 49

1      non-Hodgkin lymphoma.  Again, for a public -- for a
2      public, it is okay to make a general, broad statement
3      like that.  But it's hard to apply it in many cases to a
4      particular patient situation.  Because autoimmune
5      disease might involve a little patch of eczema on the
6      skin.  It might involve a very minor autoimmune
7      condition like seasonal allergies.  It might involve
8      allergic itching of your eye.  So those are all
9      autoimmune conditions.  But they have nothing to do with
10      lymphoma.
11         But big autoimmune conditions like Crohn's disease
12      and rheumatoid arthritis and lupus have been linked to
13      lymphoma.  So if you make a broad statement, do
14      autoimmune condition associate with lymphoma?  Yes.  But
15      if you start diving in and look at the particular
16      examples, then the answer could also be "no."
17         It's very hard to make broad statement like this if
18      you can imagine.  Again, if you really wanted to make
19      definitive statement about immune conditions and other
20      risk factors, this would be a very, very big document.
21  Q  Do you see the second bullet point that talks about
22      infection with certain viruses?
23  A  That is correct.
24  Q  Is certain viral infections also a potential risk factor
25      for non-Hodgkin's lymphoma?

13  (Pages 46 to 49)

Andrei Shustov, M.D.

Page 50

1  A  That is correct.
2  Q  Does that include hepatitis c?
3  A  That is correct.
4  Q  Epstein-Barr virus?
5  A  That is correct.
6  Q  Hepatitis B?
7  A  In particular situations.  As a broad statement, yes.
8     As I explained then, it has a caveat of looking at the
9     details of particular patient.
10 Q  Do those include infections with bacteria such as
11    Helicobacter pylori?
12           MR. WISNER:  Well done.
13           THE WITNESS:  Good job.
14       As a broad statement, again, if you say it --
15    does it involve bacteria, if I say "yes," then the --
16    there are only two or three examples of thousands of
17    bacteria that were associated with -- with lymphoma.
18    But the vast majority of bacteria were not.  That's why
19    it's listed specifically.
20 Q  (By Mr. Brenza)  Is the same thing true about the next
21    one where it talks about chemicals that can be a risk
22    factor for non-Hodgkin's lymphoma?
23 A  Correct.
24 Q  And that includes pesticides, herbicides, solvents, and
25    fertilizers?

Page 51

1  A  Correct.
2  Q  Those are all possible risk factors?
3  A  The same rule applies to me as a scientist/clinician.
4     You have to look at the particular examples of a
5     patient, and particular in this case, pesticides,
6     herbicides.
7  Q  If you take all the risks that are known in connection
8     with non-Hodgkin's lymphoma that have been identified in
9     this document we're looking at and evaluate how many
10    cases of non-Hodgkin's lymphoma they would be expected
11    to produce, is there a large amount of non-Hodgkin's
12    lymphoma that isn't explained by any of these factors?
13           MR. WISNER:  Objection; speculation.
14           THE WITNESS:  That is correct.
15 Q  (By Mr. Brenza)  Is it fair to say that the majority of
16    non-Hodgkin's lymphoma isn't explained specifically by
17    any of the factors we've just discussed?
18           MR. WISNER:  Objection; speculation.
19           THE WITNESS:  This is to me a broad
20    statement that requires clarification.  As a general
21    statement, yes, the majority of cases of non-Hodgkin
22    lymphoma have not had documented cause, with a caveat
23    that in majority of cases, non-Hodgkin lymphomas, we do
24    not look at their causes because 90 percent of patients
25    are treated in the community and it's not a job of

Page 52

1     community physicians to look at causality of cancer, but
2     if you look at just published literature that's skewed
3     towards what comes to academia, and yes.
4  Q  (By Mr. Brenza)  Another risk factor that's not listed
5     here is age, right?
6  A  I do not believe age is a risk factor.
7  Q  Does cancer become more common as people age?
8  A  As people age, everything becomes more common, including
9     cancer.
10 Q  And that's true for Mr. Gebeyehou too, right?  Not
11    immune from the ravages of aging, right?
12 A  No.
13 Q  He was -- he was in his 70s when he was first diagnosed
14    with non-Hodgkin's lymphoma, right?
15 A  That is correct.
16 Q  That's not an uncommon age to be diagnosed if you're
17    going to have non-Hodgkin's lymphoma, right?
18 A  That is correct.
19 Q  And I think you said yesterday that age, in your
20    opinion, doesn't independently cause cancer, but it
21    signifies the accumulation of insults that your body has
22    withstood over the course of your lifetime, and they add
23    up?
24 A  If I remember correctly -- I would have to look at my
25    deposition -- I did not, or then I should not have

Page 53

1     stated age causes cancer.  Statistically, we identify
2     lymphomas more commonly in older patients.  And it is my
3     opinion -- and I would believe it would be shared with
4     majority of my peer expert -- lymphoma is a reflection
5     of longer times of exposure to either known or unknown
6     carcinogens and accumulation of more diseases as we age.
7     As stated here, in some patients, autoimmune disease
8     also more prevalent with age.
9        But age, itself, does not cause cancer.  It's a
10    reflection of -- it's a surrogate marker for a longer
11    time of exposure to factors that do cause cancer.  And
12    maybe -- just came something to -- let me just give you
13    an example.  We discuss this actually as an exercise at
14    one of the sessions with fellows.
15       Bald people have more prostate cancer.  Does it
16    mean that baldness causes prostate cancer?  It has
17    nothing to do with it.  Right?  People age, and they get
18    bald more frequently, and prostate cancer is more
19    prevalent in old men.  If you do statistical analysis,
20    bald people -- baldness would be associated with
21    prostate cancer.  Does it have anything to do with
22    prostate cancer?  No, it doesn't.
23       Statistically, you have to define the right goal in
24    your research and make a reasonable parameter to look
25    at.  Because you can look at unreasonable parameters and

14  (Pages 50 to 53)

Andrei Shustov, M.D.

Page 54

1   still find statistical significance. So for any
2   sensible research oncologist, scientist, you have to
3   have first some mechanistic idea that it could be
4   causing cancer, and then you interrogate in
5   epidemiologic study.
6       If I say we're going to look at cataracts and
7   pancreatic cancer, and pancreatic cancer is common in
8   older people, contacts are common in older people, I can
9   guarantee we'll find association. Does it mean
10  cataracts cause pancreatic cancer? It has nothing to do
11  with it. Right? So we have to define reasonable goals
12  in the statistical analysis.
13      Because for exercise, we can look at anything. So
14  to me, age is an exercise where age does not cause
15  lymphomas. So we have to really identify
16  mechanistically what's likely causing lymphomas and then
17  interrogate it in the epidemiologic studies.
18  Q  Is the effect you've described where -- just taking the
19      first of your examples -- baldness and prostate cancer.
20  A  Mm-hmm.
21  Q  Is that called covariance?
22              MR. WISNER:  Objection; beyond the
23      scope.
24              THE WITNESS:  It depends on the
25      context of how you research that, so...

Page 55

1   Q  (By Mr. Brenza)  It's two things that aren't causing
2       each other but travel together.
3   A  That is correct. And, again, in my opinion, that
4       reflects the role of age in, as you -- what you stated,
5       causing lymphoma. I do not think, as a lymphoma
6       scientist and expert, age causes lymphomas. We see
7       lymphomas more commonly with older people. But with all
8       the knowledge and experience in lymphomas that I have,
9       to me it means it's a reflection that older people have
10      longer time of exposure or chance to be exposed, move
11      around the country, move different location. The longer
12      you live, you accumulate risk factors in your life.
13  Q  So it's important, if you're looking for associations,
14      that you make sure you're not picking up two things that
15      travel together that don't necessarily have anything to
16      do with each other?
17  A  Exactly right.
18  Q  And that can happen if you don't define your -- your
19      study correctly?
20  A  As you -- if you -- if you pick your statistical
21      variables incorrectly and randomly, you might find
22      associations, like you said, have nothing to -- to do
23      with one another, but statistically travel together.
24  Q  Did Mr. Gebeyehou tell you about any immune disorders
25      that he had during the course of his life?

Page 56

1   A  According to my collected history -- and that also would
2       include my review of his medical records -- I did not
3       implicate identifiable relevant autoimmune disorders in
4       this case.
5   Q  Did Mr. Gebeyehou tell you about any exposures to
6       ionizing radiation?
7   A  I don't believe so.
8   Q  You know that Mr. Gebeyehou had had hepatitis B virus at
9       some point in his life, right?
10  A  Based on test that I reviewed, his immune system has
11      encountered, so he had encounter with hepatitis B virus.
12  Q  And you know that he was an immigrant from Ethiopia,
13      right?
14  A  That is correct.
15  Q  And in Ethiopia, hepatitis B is a common virus?
16  A  It's more prevalent in Ethiopia than first-world
17      countries, yes.
18  Q  Hepatitis B virus, once it's in your body, it -- its
19      potential to -- it has the potential to stay forever,
20      right?
21  A  Hypothetically has potential in some patients. And in
22      some patients, there is no evidence that it stayed in
23      the body after either being cured or, again, in many
24      patients, immune system potentially cleared it, because
25      beyond the initial encounter, we do not find any

Page 57

1   evidence of viral particles or viral DNA beyond the fact
2   that immune system remembers the encounter that we
3   measure by hep B core antibodies.
4   Q  Hepatitis B virus, even when it's not at detectable
5       levels, can still be hiding somewhere in your body once
6       you've encountered it, right?
7               MR. WISNER:  Objection; vague.
8               THE WITNESS:  Hypothetically. Not
9       just hypothetically. Yes, it can be. Because we do see
10      reactivation in some patient, meaning it was sitting
11      somewhere.
12  Q  (By Mr. Brenza)  So -- so when Mr. Gebeyehou had to have
13      Rituxan as part of his treatment, the possibility of
14      reactivation of his hepatitis B infection was something
15      the doctors had to account for, right?
16  A  If doctors believe that he has possibility of having --
17      being carrying hepatitis B virus, yes.
18  Q  Did you know that he was given a antiviral treatment
19      while he was getting Rituxan to prevent a recurrence of
20      his hepatitis B virus infection?
21  A  Yes.
22  Q  And that's because of the possibility that hepatitis B,
23      the hepatitis B virus was still in his body, right?
24  A  Because of the possibility, yes. That's the principle
25      of prophylactic treatments that we use, even people who

15  (Pages 54 to 57)

Andrei Shustov, M.D.

Page 58

1  don't have infections.  And we might find in his records
2  as well that when we give somebody chemotherapy like
3  CHOP and Rituxan, we also give patients prophylactic
4  antibacterial agents even though they don't have
5  infection.  And there are other chemotherapy regimens --
6  that I can name four or five off top of my head -- that
7  we give patients prophylactic antibiotics starting in
8  four months after chemotherapy even though they don't
9  have any infections.
10          It's -- it's a good medical practice to do -- to
11  overtreat patients for potentially life-threatening
12  conditions.  And it is not a proof of him having an
13  infection.  But the -- the devastation for patient and
14  doctor for missing one out of thousand chance of
15  something happening is unbearable.  That's why, if you
16  go to emergency room with chest pain, we don't do any
17  test.  You get so-called mono-treatment for heart attack
18  even though your chances of having heart attack are
19  probably 4 or 5 percent statistically.  But if we do
20  miss it, the results are devastating.  That's why we put
21  patients on prophylactic therapy, but they are not
22  necessarily proof of somebody has infection.
23  Q   But in Mr. Gebeyehou's case, this was more than a
24      hypothetical risk.  He had actually had a hepatitis B
25      infection at some point in his life, right?

Page 59

1          MR. WISNER:  Objection; speculation.
2          THE WITNESS:  He had encounter or
3  hepatitis B virus entered his body at some point.  I
4  don't have any proof that he had clinical hepatitis B
5  infection.  Again, the same thing.  Like treating chest
6  pain with -- you have chest pain.  It's a real thing.
7  It's not just you come into emergency room with toe
8  infection and we give you heart attack treatment.
9  Right?  So if there is any possibility that it could be,
10  you get treatment as if you had something that might
11  kill you.
12          So that's the good analogy with his case where,
13  yes, his immune system encountered hepatitis B virus and
14  the doctors did not have any evidence of infection, but
15  one in a -- I don't know -- one in a million chance that
16  it does, he could die from hepatitis B.  So he's being
17  put on prophylactic therapy for that chance that hard to
18  enumerate, because we cannot -- because the failure to
19  do so is devastating.
20  Q   (By Mr. Brenza)  Is the way that hepatitis B virus can
21      hide out inside a human body by incorporating itself
22      within a cell?
23  A   As a general statement, yes.
24  Q   And is that process of incorporating itself within a
25      cell also the way that viruses can cause mutations that

Page 60

1  lead to cancer?
2  A   In order for viruses to do this, in my level of
3      knowledge of virology and immunology, viruses do have to
4      be active and activate the machinery to reproduce
5      themselves and activate their genes that mechanistically
6      can cause mutations in the cells that they're
7      incorporated into.
8          If viruses incorporate themselves and sit silent
9  for 50 years, it is unlikely that there is a mechanism
10  how they do that.  The example of that would be, or
11  correlate of that would be we're all exposed to
12  Epstein-Barr virus, we're exposed to chicken pox, and we
13  harbor those viruses our whole life.  And those viruses
14  sit somewhere in your neural tissue and -- and immune --
15  and immune system your whole life without doing
16  anything.  Occasionally they reactivate.  People have
17  shingles.  But then they fall back to sleep.
18          So you can carry a virus in your system without any
19  viral activity.  That's how viruses persist in human
20  body.
21  Q   And that -- is that the -- is that the mechanism that
22      Mr. Gebeyehou was faced with when he began to get
23      Rituxan?
24          MR. WISNER:  Objection; vague.
25          THE WITNESS:  If he had virus in his

Page 61

1  system, then that would be the mechanism for virus to
2  reactivate when somebody has low immune system that the
3  virus can start acting up.  There is a possibility of
4  that.  But like I said, I don't have any evidence in his
5  medical records he had clinical infection, meaning
6  replication of the virus, clinical hepatitis, and --
7  Q   (By Mr. Brenza)  But he would have had clinical
8      infection at some point in his life or else he wouldn't
9      have had antibodies to the hepatitis B virus, right?
10          MR. WISNER:  Objection.
11          THE WITNESS:  That --
12          MR. WISNER:  Speculation.
13          THE WITNESS:  That is not true.  So
14  if your body encounters the infection, if your immune
15  system is capable of fighting it back, he might not have
16  clinical hepatitis with liver damage and elevation of
17  liver enzymes.  So when we talk about clinical
18  infection, that infection causing symptoms, laboratory
19  abnormalities, organ damage.  Just having the presence
20  of the virus in the system, we in most cases refer as a
21  carrier state.  We can carry a lot of viruses in our
22  body without having clinical infection.
23          So he might have had encounter with hepatitis B
24  virus that was fought off by his immune system and never
25  had clinical hepatitis, what we call syndrome of

16  (Pages 58 to 61)

Andrei Shustov, M.D.

Page 62

1    hepatitis.
2    Q  (By Mr. Brenza)  But there's -- you don't know that,
3        right?  That's not in his medical records?
4    A  That's the only thing I can -- I can go by.  So I go by
5        what presented to me.
6    Q  You have no way of independently verifying whether
7        Mr. Gebeyehou had clinical hepatitis or not at some
8        point in his life, right?
9    A  Well, like I said, the only thing I can look at, look at
10       evidence, look at his medical records.
11   Q  Right.
12       And his medical records begin after he spent 30
13       years in Ethiopia?
14   A  Sure.
15   Q  So you don't have any access to the days when he was
16       first exposed to the virus?
17               MR. WISNER:  Objection; assumes facts
18       not in evidence.
19               THE WITNESS:  I don't have any -- any
20       medical records beyond what I was provided.  So --
21               MR. BRENZA:  Okay.
22               THE WITNESS:  -- I -- I make my
23       conclusions/opinions based on information that I have.
24   Q  (By Mr. Brenza)  Is there any way you can rule out that
25       hepatitis B caused Mr. Gebeyehou's non-Hodgkin's

Page 63

1    lymphoma?
2    A  With hundred percent certainty, no.  But if we talk
3        about likelihoods with information that I have, as I
4        state in my report, without having any clinical evidence
5        of hepatitis or viral activity, it makes it very
6        unlikely.  But if you're asking clinician about hundred
7        percent certainty, we don't operate on these levels.
8    Q  (By Mr. Brenza)  Did you take a family history of
9        Mr. Gebeyehou?
10   A  I did.
11   Q  Did you determine that there had been -- that he had had
12       relatives that had died of cancer?
13   A  Yes, I did.  If I could take 30 seconds --
14   Q  Sure.
15   A  -- to review my report on his family history.
16       Yes, so what he shared with me in his family
17       history, once again -- excuse me -- the family social
18       history in medical practice collected from the patient,
19       what he shared with me:  That his mother had ovarian
20       cancer at age of 84.  His father passed in 1975 from
21       unknown cause.  He had one sister, one full sister with
22       no history of cancer.  He has two sons with no cancer
23       diagnosis.  That family history he provided to me.
24   Q  Is cancer in your parents a risk factor for getting
25       cancer yourself?

Page 64

1               MR. WISNER:  Objection; overbroad.
2               THE WITNESS:  Just like our previous
3        discussions with other causes and statements, it is a --
4        an extremely broad statement that can be answered either
5        way depending on particular situation.  There are
6        cancers for which germ line mutations have been
7        identified and confirmed and proven.  Examples would be
8        BRCA1, BRCA2 in -- in women with breast/ovarian cancer,
9        Lynch syndrome in hereditary colon cancer, and
10       retinoblastoma gene in eyeball cancer.  So there are few
11       or very few defined mutations that you pass to next
12       generation to cause their cancers.
13       Having a cluster of particular diagnosis in a
14       family without identifiable or known germ line mutation
15       raises the suspicion for what we call familial cancer,
16       not hereditary cancer.  There's a big difference between
17       those.  Because familial cancer could be related to
18       common exposure of the family if they drank water from
19       somewhere that source with carcinogen being in the same
20       household, say that this particular family
21       has brand-new, not-yet-identified genetic factor.
22       So there are research that's been done in MD
23       Anderson and now Dow institution looking at those really
24       rare cases of familial lymphomas and leukemias where, on
25       the general platform, we do not believe that lymphoma is

Page 65

1    inherited cancer.
2    Q  (By Mr. Brenza)  Did Mr. Gebeyehou tell you that he was
3        a former smoker?
4    A  I believe he did.  Let me confirm this in my...
5        Yes, he did.
6    Q  Smoking is a risk factor for non-Hodgkin's lymphoma,
7        right?
8    A  Not to my understanding and not to my knowledge.  It's a
9        much more well-defined risk factor for lung cancer,
10       bladder cancer, leukemias.  But I do not believe that
11       there is a clear association between smoking and
12       lymphomas.
13   Q  Does smoking damage DNA?
14               MR. WISNER:  Objection; vague.
15               THE WITNESS:  As a general statement,
16       yes.  With a caveat that this -- studies, if I remember
17       correctly, were performed in -- in lung cancer setting.
18       This is the question I would have to really do my
19       research to give more detailed answer.  But as a general
20       statement, it can cause DNA breaks.
21   Q  (By Mr. Brenza)  And I believe you testified yesterday
22       that once those DNA breaks occur, the body never repairs
23       them?
24               MR. WISNER:  Objection.
25   Q  (By Mr. Brenza)  Is that right?

17  (Pages 62 to 65)

Andrei Shustov, M.D.

Page 66

1    MR. WISNER:  Objection.
2    THE WITNESS:  As a broad, general
3    statement, yes.
4  Q  (By Mr. Brenza) So any DNA breaks that Mr. Gebeyehou
5    caused from his ten years of smoking, he would have
6    carried those forward for the rest of his life?
7  A  It's a very broad statement, and there's no indication,
8    literature evidence that I know of that smoking causes
9    specifically DNA breaks in lymphocytes.  I'd be happy to
10   do a search and review the topic, but to my best of my
11   knowledge and lymphoma specialist, I do not recall
12   seeing evidence that specifically in lymphocytes smoking
13   causes mutations.
14  Q  So my -- my question was:  Whatever DNA breaks
15   Mr. Gebeyehou had as a result of his ten years of
16   smoking, he would have carried those through for the
17   rest of his life, right?
18  A  Wherever they are.
19   MR. BRENZA:  Okay.  Why don't we take
20   a brief minute and get some stuff together.
21   THE VIDEOGRAPHER:  All right.  We're
22   going off record.  The time is 10:31 a.m.
23   (Pause in proceedings.)
24
25   THE VIDEOGRAPHER:  We are back on

Page 67

1    record.  The time is 10:43 a.m.
2  Q  (By Mr. Brenza) Doctor, one more question I had on
3    Exhibit 29.  If you would pull that one out.
4  A  I'm here.
5  Q  The last page.  And we just didn't make it all the way
6    to the end.
7    Do you see the sentence that begins with the words,
8    "Keep in mind"?
9  A  I do.
10  Q  It says, "Keep in mind that many people who get the
11   disease have none of these risk factors, and most people
12   with these risk factors do not develop the disease."
13   Do you see that?
14  A  I see that.
15  Q  Is that a true statement about non-Hodgkin's lymphoma
16   with respect to the most common risk factors?
17  A  Well, I believe that this sentence refers to what's
18   listed in this, three bullet points.  And I don't think
19   this is a complete list of things can be -- that can
20   cause non-Hodgkin's lymphoma, first of all.  And
21   secondly -- I think we went through this several
22   times -- in most people, we do not do diligence
23   eliciting this information.  As a general statement for
24   a patient on a public website, it is an acceptable
25   statement, but you really have to look at any particular

Page 68

1    person.
2  Q  The risk factors we did talk about in the three
3    preceding bullet points, those are -- those cover a
4    large and broad array of the risk factors for
5    non-Hodgkin's lymphoma, right?
6  A  They would cover significant proportion.  It don't list
7    a radiation.  It's -- it's very specific.  But it would
8    cover significant proportion of known cause -- causes of
9    lymphoma.
10  Q  Would you say that they encompass the most common risk
11   factors for non-Hodgkin's lymphoma?
12  A  More or less, yes.
13  Q  And the sentence we read before, "Keep in mind that many
14   people who get the disease have none of these risk
15   factors, and most people with these risk factors do not
16   develop the disease," that's a -- that's a true
17   statement with respect to the risk factors that are
18   enumerated above it, right?
19  A  Sure.
20  Q  Okay.  You can put that one aside for a moment.
21   I'm going to hand you what I'm marking as 30.
22   (Exhibit No. 30 marked for
23   identification.)
24
25  Q  (By Mr. Brenza) Do you see that Exhibit 30 is a medical

Page 69

1    record of Mr. Gebeyehou's?
2  A  Yes.
3  Q  And do you see that there is -- I've highlighted certain
4    items on that medical record.  And do you see that
5    the -- that the date of the visit was November of 2006?
6  A  Correct.
7  Q  And the impression of the physician treating
8    Mr. Gebeyehou was that he had immune mediated
9    fluctuating hearing loss, cochlear Meniere's, and
10   rhinitis.  Do you see that?
11  A  Mm-hmm.
12  Q  You need to answer with a word, "yes" or "no."
13  A  Yes.
14  Q  Okay.  I just -- again --
15  A  Got it.
16  Q  -- this goes back to the fact the court reporter needs
17   to write everything down.  So I'm not -- I'm not trying
18   to mess with you.  I'm just trying to make sure the
19   transcript comes out okay.
20   MR. WISNER:  He does a pretty good
21   job of writing "mm-hmm," for what it's worth.
22   THE WITNESS:  I fully understood.
23  Q  (By Mr. Brenza) Okay.  Is immune mediated fluctuated
24   hearing loss an immune condition?
25  A  If this statement is correct and he, in fact, did have

18  (Pages 66 to 69)

Andrei Shustov, M.D.

Page 70

1    that, then it is an immune mediated condition.
2  Q  And that means something's wrong with Mr. Gebeyehou's
3    immune system at the time of this medical record?
4  A  No.  There is something wrong with his hearing.  And the
5    mechanism of hearing loss, as physician suspected, in
6    this particular location was immune system attacking his
7    hearing apparatus, which in most cases is diagnosis of
8    exclusion when we don't find -- there is no specific
9    test for Meniere's disease.  And it's an exclusionary
10   diagnosis where we look for other causes of hearing loss
11   like cerumen plaques or plaques in the ear or damage to
12   the tympanic membrane that the specialist will look at,
13   sclerosis of the hearing bones and tumors in the hearing
14   nerve.
15       And he excludes everything, and he says, Well, I
16   can't find any specific causes.  It must be autoimmune
17   because there is such a thing.  But there is no specific
18   test to really prove that.  So if -- if this were really
19   true back in 2006, that would be an immune damage to
20   hearing apparatus specifically there.
21  Q  So something about Mr. Gebeyehou 's immune system in
22   2006 was found to be affecting his hearing; is that
23   right?
24  A  Was suspected, yes.
25  Q  Does that in your mind constitute a risk factor for

Page 71

1    potential non-Hodgkin's lymphoma caused by an immune
2    condition?
3  A  Not at all.  Not even close.
4  Q  Why do you say that?
5  A  Because, as I mentioned before, that the autoimmune
6    condition causing lymphomas for medical profession is an
7    extremely broad statement, and it pertains to very
8    defined severe systemic autoimmune conditions like
9    lupus, rheumatoid arthritis, scleroderma.  And some of
10   the proven and defined autoimmune condition associated
11   with very specific lymphomas like Hashimoto's
12   inflammation in the thyroid causes thyroid lymphoma and
13   autoimmune Sjogren's syndrome in the salivary glands
14   causing specific salivary gland lymphoma.  And going
15   back, systemic high-intensity autoimmune conditions like
16   Crohn's and rheumatoid and lupus putting people at risk
17   of other lymphomas.
18       However, autoimmune disease world of rheumatology
19   encompasses dozens of autoimmune conditions that have no
20   associations with lymphoma.  Again, that is the problem
21   with broad statements like this.  You can say, Does
22   autoimmune disease causes lymphoma?  Sure.  There are
23   examples of that.  But does Meniere's cause lymphoma?
24   No.  What do you tell public about this?  You say, in
25   general, yes, it can cause lymphoma.

Page 72

1        Also, having said that, as a physician, just if you
2    extract something like this from a medical record, I
3    have no idea if this is the fact.  Right?  Just because
4    the doctor said so, as a physician I can tell you we
5    make impressions or assumptions on the impressions,
6    sometimes followed by likely to be immune rhinitis or
7    immune Meniere's and less likely this.  And I would --
8    not criticizing the physician.  I would need to see the
9    subsequent note, whether he confirmed that, if this was
10   Meniere's disease, did he treat this patient with
11   steroids.  Because that's how we treat immune disease.
12   What was his thinking about this hearing loss?
13       I'm not questioning the diagnosis.  That's the
14   other part of the kind of discussing this topic.
15  Q  Whether the diagnosis was right or wrong, it is -- you
16   agree that Mr. Gebeyehou was experiencing hearing loss
17   in 2006, right?
18  A  I believe so.  It's even in my -- I don't know if I put
19   it -- I -- I have a recollection whether from his
20   records or what he's telling me, yes.
21  Q  Okay.  I'm going to hand you now what I'm marking as
22   Exhibit 31.
23            (Exhibit No. 31 marked for
24              identification.)
25   ////

Page 73

1  Q  (By Mr. Brenza)  It's another set of medical records for
2    Mr. Gebeyehou, the top one of which dates from October
3    of 2008.  Do you see that?
4  A  I do.
5  Q  And if you would page to, it's a record dated April 2nd,
6    2009, and it has a number on the bottom right-hand
7    corner ending in Nos. 56.
8  A  Okay.
9  Q  And do you see this represents a visit Mr. Gebeyehou
10   made to his doctor in April of 2009?
11  A  Yes.
12  Q  Do you see a list of diagnoses?
13            MR. WISNER:  You're on the wrong
14   page, sir.
15            THE WITNESS:  56?
16            MR. WISNER:  56, yeah.  There you go.
17            THE WITNESS:  Oh.  55.
18            MR. WISNER:  So, Doctor, there's a 56
19   at the bottom and there's a 55 in the record, itself.
20   He's referring to the one on the bottom.
21            MR. BRENZA:  Oh.  I'm sorry.  Yes.
22            MR. WISNER:  That's all right.
23            THE WITNESS:  Thank you.
24            MR. BRENZA:  I thought I was being
25   clear on that.  Tell me when you're ready.

Andrei Shustov, M.D.

| Page 74 |
| --- |

```
 1            THE WITNESS:  I do see the list of
 2    diagnosis.
 3    Q  (By Mr. Brenza)  Okay.  The first diagnosis is --
 4            MR. WISNER:  Let's go off the record.
 5            MR. BRENZA:  Off the record.
 6            THE VIDEOGRAPHER:  We're going off
 7    record.  The time is 10:54 a.m.
 8            (Pause in proceedings.)
 9
10            THE VIDEOGRAPHER:  We are back on
11    record.  The time is 11:00 a.m., and this marks the
12    beginning of Media Unit 2.
13    Q  (By Mr. Brenza)  Doctor, we were talking about the
14    document marked as Exhibit -- is it 31?
15            THE WITNESS:  Yes.
16            MR. WISNER:  That's right.
17    Q  (By Mr. Brenza)  And directing you to the page ending in
18    the -- the number MD-000056.  Do you see that?
19    A  Yes.
20    Q  And we're looking at the diagnoses.  Do you see that?
21    A  Yes.
22    Q  The first one is disequilibrium?
23    A  Yes.
24    Q  Do you see that?
25            And actually, just to back up, the date of this
```

| Page 75 |
| --- |

```
 1    record is April of 2009, right?
 2    A  That's correct.
 3    Q  So this precedes Mr. Gebeyehou being diagnosed with
 4    non-Hodgkin's lymphoma by many years, four or five
 5    years?
 6    A  That is correct.
 7    Q  The first diagnosis is disequilibrium?
 8    A  Yes.
 9    Q  Does that mean lack of balance?
10    A  That's correct.
11    Q  And did Mr. Gebeyehou tell you anything about the
12    disequilibrium he had been experiencing well before he
13    was diagnosed with cancer?
14    A  Let me consult my history with him.
15            According to my report, he did not mention
16    disequilibrium at this time.
17    Q  You don't have any reason to question that he had some
18    problems with his stability and balance back in April of
19    2009, do you?
20    A  I don't have any reason to question other physician's
21    report here.
22    Q  Okay.  And do you see the next diagnosis is glaucoma?
23    A  I do.
24    Q  Glaucoma has something to do with the eyes, right?
25    A  That is correct.
```

| Page 76 |
| --- |

```
 1    Q  What exactly is it?
 2    A  It's a disease of impaired drainage of the eye fluid,
 3    causing increased pressure inside the eyeball.
 4    Q  Does that result in the eye not working correctly?
 5    A  It can impair vision.
 6    Q  Okay.  Is one of the possible outcomes double vision?
 7    A  Not being a ophthalmology specialist, not an eye
 8    specialist, I would say possibly, but that's not my area
 9    of expertise.
10    Q  The next diagnosis is hearing loss.  Do you see that?
11    A  I do.
12    Q  Do you have any reason to question whether Mr. Gebeyehou
13    had hearing loss years before he was ever diagnosed with
14    cancer?
15    A  I don't have any reason to question the medical record
16    here.
17    Q  And do you see the next diagnosis was tinnitus?
18    A  Yes.
19    Q  That's a ringing of the ears?
20    A  Correct.
21    Q  Any reason to question that diagnosis?
22    A  No.
23    Q  Do you see at the bottom of this record, there's a
24    paragraph talking about Mr. Gebeyehou's family history?
25    A  Yes.
```

| Page 77 |
| --- |

```
 1    Q  And that's the paragraph that begins with the letters
 2    "FH," right?
 3    A  That is correct.
 4    Q  Does the record record that his mother died at 84 of
 5    ovarian cancer?
 6    A  That is correct.
 7    Q  And do you see this record records that his father also
 8    died of cancer, right?
 9    A  That is correct.
10    Q  It goes on to say that Mr. Gebeyehou immigrated from
11    Ethiopia 35 years ago as engineering student and studied
12    in Italy, San Jose, US -- UCB and Stanford.  Retired a
13    few years ago from PG&E as managers and planner for
14    nuclear power plant.
15            Do you see that?
16    A  Yes.
17    Q  Did Mr. Gebeyehou tell you anything about working in a
18    nuclear power plant?
19    A  Mr. Gebeyehou, when I asked his working history, told me
20    that he -- throughout his life, he worked, I believe,
21    manager in office work.  Let me consult my report that I
22    took from him.
23            So what I recorded from talking with Mr. Gebeyehou,
24    he worked as engineer, including design and drafting,
25    civil engineering, and mechanical engineering, until his
```

Andrei Shustov, M.D.

Page 78

1    retirement in 1996. And I specifically questioned about
2    exposure during his employment years. He told me that
3    he does not report any workplace exposure during those
4    years.
5  Q  But Mr. Gebeyehou didn't tell you that he worked at a
6    nuclear power plant, right?
7  A  Again, this -- this begs the question in my mind whether
8    he worked in a nuclear power plant or he worked in a, as
9    he states -- again, I -- I have no reason to question
10   this. But if he worked on the power plant with exposure
11   to nuclear radiation, it would be one thing. If he
12   worked for the power plant company in an office like he
13   stated and nowhere in close proximity, that would be a
14   different opinion that I would form about his exposure.
15  Q  You said -- sorry. Are you finished?
16  A  No. I would like to point out he states here again that
17   begs the further questioning -- I can't make any
18   assumptions -- that he worked as a manager and planner
19   for nuclear power plant. I don't know whether this is
20   -- location has nothing to do with nuclear power plant,
21   itself. Based on what he told me, he didn't have an
22   exposure. Again, all I have to go by, what he told me,
23   and this has some possibilities.
24  Q  And you said, as a doctor, when -- when you're taking
25   history from a patient, it's your job to believe them,

Page 79

1    right?
2  A  That is correct.
3  Q  But you haven't interviewed patients who have lawsuits
4    that they're looking for your help with in the past
5    using that same method, right?
6  A  Sure.
7  Q  You understand, when you interview somebody with a
8    lawsuit, they have an incentive to selectively report to
9    you exposures they may have had that are inconsistent
10   with the claims they're making?
11         MR. WISNER: Objection; speculation.
12         THE WITNESS: Well, it's -- you know,
13   it's -- I -- I don't want to answer this question,
14   because what you asked me, to believe that he lied to
15   me, so as --
16  Q  (By Mr. Brenza) I'm not asking you to believe anything.
17  A  Yeah.
18  Q  I'm just saying, the level of skepticism you'd have
19   about a patient's personal history should be different
20   when you're dealing with someone in litigation as
21   opposed to somebody who's seeking your medical care,
22   correct?
23         MR. WISNER: Objection. Objection;
24   speculation.
25         THE WITNESS: As a physician, I -- I

Page 80

1    don't allow myself to approach any patient with
2    skepticism. I'm -- I'm a doctor, so I cannot imply that
3    patients are lying to me if -- I approached him as a --
4    as a physician. You asked me to evaluate him as a
5    medical doctor.
6         MR. BRENZA: Okay.
7         THE WITNESS: And in my psyche, I do
8    not make any assumptions. And --
9  Q  (By Mr. Brenza) And in approaching him as a physician,
10   you accepted everything he said without question?
11  A  That is correct.
12  Q  Okay. Put that one aside. I'm going to hand you what
13   I'm marking as Exhibit 32.
14         (Exhibit No. 32 marked for
15             identification.)
16
17  Q  (By Mr. Brenza) Exhibit 32 is another medical record of
18   Mr. Gebeyehou dated June 22nd, 2016.
19   Do you see that, Doctor?
20  A  Yes.
21  Q  So this -- this is after he completed his treatment for
22   non-Hodgkin's lymphoma, right?
23  A  That is correct.
24  Q  And do you see that there's a list of medical conditions
25   that are listed that he has?

Page 81

1  A  Yes.
2  Q  And the very first one is Parkinson's disease?
3  A  That is correct.
4  Q  What's Parkinson's disease?
5  A  Parkinson's disease is a neurologic disorder that has to
6    do with deregulation and so-called pyramidal system that
7    controls the movement and some other brain -- some other
8    functions of the body.
9  Q  Can one of the symptoms of Parkinson's disease be a loss
10   of stability and balance?
11  A  Could be.
12  Q  Can one of them be muscle rigidity?
13  A  Could be.
14  Q  Voice changes?
15  A  Less likely, but it could be.
16  Q  And speech problems?
17  A  Could be.
18  Q  Does chemotherapy cause Parkinson's disease?
19  A  Not to the best of my knowledge.
20  Q  If you would go back to your expert report we've marked
21   as Exhibit 27. Page 2. Do you see at the top of that
22   page, you've listed some symptoms that you believe may
23   have been caused by Mr. Gebeyehou's chemotherapy?
24  A  That is correct.
25  Q  Do you see now that all of the symptoms that you flagged

Andrei Shustov, M.D.

Page 82

1    as possibly caused by his chemotherapy were symptoms
2    that he either had long before he ever got chemotherapy
3    or were caused by a condition that has nothing to do
4    with chemotherapy?
5    A   Yes, based on my review with Mr. Gebeyehou, again
6        from -- I believe I mentioned in my report -- and I have
7        to double-check -- that he admitted having those
8        symptoms that have gotten worse at the time of
9        diagnosis.  So if -- even if cancer or lymphoma does not
10       cause certain symptoms, it certainly can make it worse,
11       depending on particular clinical scenario.
12           If I could just take 30 seconds and see if my
13       recollection -- we were discussing that if I mention in
14       my report.
15           Yeah, what I stated, I had progressive --
16       progressive numbness and mild pain in -- in his jaw.  I
17       recall he mentioning that the symptoms that he had
18       before have gotten worse at the time of diagnosis, which
19       is not uncommon for lymphomas to, if they didn't cause
20       something, to exacerbate chronic conditions or
21       chemotherapy to exacerbate symptoms caused by other
22       disorders.  Example being, if patients have diabetes and
23       diabetic neuropathy and one of the CHOP components
24       causes neuropathy, it can make neuropathy worse even if
25       it was caused by underlying condition.

Page 83

1    Q   But in this case, the conditions Mr. Gebeyehou relayed
2        to you were conditions that he already had well before
3        he had cancer or chemotherapy, right?  We just saw the
4        medical record from five years earlier?
5    A   That is correct.
6    Q   So the only thing you're flagging here is that
7        Mr. Gebeyehou told you that these conditions he already
8        had were worse?
9    A   It is my recollection from -- from his -- from his
10       encounter.  But what also I'm listing here are the
11       potential long -- long-lasting sequelae of chemotherapy
12       that are known to be produced by certain agents.
13   Q   And you don't have any way of knowing whether the double
14       vision or the stability and balance problems or the
15       muscle rigidity, all these factors that you've
16       identified in this paragraph that pre-existed
17       Mr. Gebeyehou ever getting chemotherapy, really are
18       worse than what they were when he was originally
19       presenting with them five years before, right, other
20       than what Mr. Gebeyehou told you?
21   A   It would be very hard to quantify or -- or quantify the
22       severity of symptoms or quantify the relative
23       contribution of underlying disease --
24   Q   That's just that information you had, right?
25   A   Yeah.

Page 84

1           THE REPORTER:  "Disease," what?
2           THE WITNESS:  From underlying disease
3    -- whether they are from underlying disease or sequelae
4    of chemotherapy.
5    Q   (By Mr. Brenza)  Now, getting back to the -- a topic we
6        were discussing earlier about the differential diagnosis
7        you conducted -- actually, I should say you used the
8        differential diagnosis methodology to ascribe a cause to
9        Mr. Gebeyehou's non-Hodgkin's lymphoma, right?
10   A   That is correct.
11           Could I add something to the previous discussion
12       just occurred to me too, or --
13   Q   Yes.
14   A   -- am I allowed to?
15   Q   Go ahead.
16   A   Okay.  Yeah, so I would also point out, just thinking
17       more about this -- and I'm not a neurologist, and
18       there's a specialty that identifies and treats
19       Parkinson's disease.  But my knowledge of this area as
20       internal medicine physician and oncologist and sometimes
21       treating cancer in patients with this, that Parkinson's
22       disease is also diagnosis of exclusion.  And I have no
23       reason to doubt the diagnosis in his case made by -- by
24       a professional.
25           But I would expect, in cases of clinically relevant

Page 85

1    or debilitating Parkinson's, somebody would start
2    therapy for Parkinson's disease.  And at the time I
3    discussed -- I had any encounter with him, I did not
4    identify Parkinson's disease medication.  It does not
5    mean that he was not taking them, but they did not come
6    up.  So I would also ask either I would need to review
7    this or if you have any knowledge of him taking
8    anti-Parkinson's treatment.
9           Because if he was identified to have Parkinson's
10       disease with the symptoms, there are medicines that
11       prevent progression of Parkinson's disease.  I would be
12       surprised that his treating physician did not start
13       therapy if diagnosis is solid.  So that would be my
14       comment.
15   Q   Okay.  Let's get back to the method you use to ascribe
16       cause to Mr. Gebeyehou's non-Hodgkin's lymphoma.
17           You use the method of differential diagnosis, but
18       in this case you employed it for a different purpose.
19       You used it to ascribe a cause of a particular disease,
20       right?
21   A   That is correct.
22   Q   And to do that, you need to know the risk factors that
23       could have caused the disease and the probabilities that
24       they cause the disease?
25           MR. WISNER:  Objection; compound.

Andrei Shustov, M.D.

Page 86

1    THE WITNESS:  I would have to create
2    a list of possibilities just like for diagnosis in this
3    case, a list of positive causative -- positive --
4    possible causations, and then use the method of
5    differential diagnosis or deductive method to eliminate
6    less likely one or identify which ones are more likely
7    to contribute or which ones would be just as likely to
8    contribute.
9    Q  (By Mr. Brenza)  And in the case of differential
10   diagnosis used to ascribe a cause, there's no way to
11   test whether the diagnosis -- or whether the cause
12   you've identified is the correct one, is there?
13            MR. WISNER:  Objection; vague.
14            THE WITNESS:  In most cases -- in
15   most cases, no.  If --
16   Q  (By Mr. Brenza)  Well, let's not talk about most.  Let's
17   talk about this case.  There's no way to tell whether
18   the cause you've identified through differential
19   diagnosis is the actual cause of Mr. Gebeyehou's cancer,
20   is there?
21            MR. WISNER:  Objection; vague.
22            THE WITNESS:  In his particular case,
23   I would not have any specific test to prove my
24   conclusion, either radiographic test or laboratory test,
25   if that's what you're referring to.

Page 87

1    Q  (By Mr. Brenza)  Well, yes, that's the -- that's the
2    nature of it.  But I'm referring to any and all tests
3    that exist in the medical science to determine a cause
4    of a particular non-Hodgkin's lymphoma.  None of those
5    tests, whatever tests may exist, can tell you what
6    caused Mr. Gebeyehou's non-Hodgkin's lymphoma, right?
7            MR. WISNER:  Objection; vague.
8            THE WITNESS:  To my knowledge, not
9    tests currently available in clinical practice.
10   Q  (By Mr. Brenza)  So there's no way to look at a
11   pathology slide of Mr. Gebeyehou's tumor and determine
12   whether it was caused by radiation, smoking, Roundup, or
13   anything else, right?
14   A  That is correct.
15   Q  There's no genetic signature that we know of that would
16   tell you that, is there?
17   A  That is correct.
18   Q  There's no test that -- of Mr. Gebeyehou at any time in
19   his life that showed that he even had glyphosate in his
20   system, right?
21   A  I would only comment on test available that FDA approved
22   to my practice.  I don't know if there is test that
23   manufacturer has or toxicologist have.  But to my
24   knowledge in medicine, there is no test that I can order
25   in clinical practice to test for glyphosate.

Page 88

1    Q  Well, and whether that test is available to you or not,
2    there's nothing in his medical records that shows he
3    ever had glyphosate in his body, right?
4    A  I think the medical records would be wrong place to look
5    for it.  But, no, there is nothing in the medical
6    records.  That's not --
7    Q  Well, and I'll open it up beyond medical records.  Do
8    you know of any evidence ever that Mr. Gebeyehou had
9    glyphosate in his body?
10           MR. WISNER:  Objection; overbroad,
11   vague.
12           THE WITNESS:  Not ones presented to
13   me.
14   Q  (By Mr. Brenza)  Okay.  Is the process of -- that you
15   used of, we'll say differential causation, to capture
16   the idea that you're using differential diagnosis to
17   ascribe a cause?  Is that fair?
18   A  It is.
19   Q  Is the process of differential causation a
20   scientifically validated process for identifying the
21   cause of a disease?
22   A  It is not scientifically established, but it's a most
23   common cause used in clinical practice where scientific
24   evidence is lacking for particular questions.  And as a
25   matter of fact, majority of things in medicine are not

Page 89

1    hundred percent certain and require a degree of clinical
2    judgment and estimation to either confirm diagnosis,
3    confirm treatment.  And this is the case with
4    differential causation, differential diagnosis
5    methodology.
6    Q  And the method you used of differential causation or
7    differential diagnosis used for a causation and
8    conclusion, there's no study that shows that that's an
9    accurate way of ascribing causation, is there?
10   A  I am not familiar with any study, either with
11   differential causation methodology or differential
12   diagnosis.  It is something that was established by
13   generations of physicians to arrive at diagnosis where
14   we lack a specific test to identify either diagnos --
15   diagnosis or cause of -- of the disease.
16   Q  Is it -- is it -- is it a method you use when you don't
17   really have a -- a scientific way of identifying the
18   cause of a disease?
19   A  Well, again, in a broad sense, any method is, as a
20   degree of science, a hypothetically deductive method.
21   It is a scientific method that is different from
22   performing a chemical test.  It is different from
23   performing statistical analysis on data population, but
24   it is a method that we apply to diagnose or come to
25   conclusion when we have -- we are presented with

23  (Pages 86 to 89)

Andrei Shustov, M.D.

Page 90

1    multiple options for diagnosis or causation.
2         And like I said, I think it is to create
3    this deductive -- hypothetically deductive method, you
4    might disagree, call it science.  It is -- it is a
5    scientific method to some degree to determine.
6    Q   But it's not proven to be accurate, right?
7         MR. WISNER:  I'm just going to
8    object.  By the way, I think he was actually still
9    testify --
10        MR. BRENZA:  I'm sorry.
11        MR. WISNER:  -- when you spoke.
12        MR. BRENZA:  If I -- if I cut you
13   off --
14        MR. WISNER:  It's not a big deal.  I
15   think he was --
16        MR. BRENZA:  -- please continue.
17        MR. WISNER:  -- coming to the end.
18        THE WITNESS:  Yeah, I was going to
19   end that it came up in a discussion yesterday that is an
20   error rate.  No, we don't know the error rate.  But it
21   would not be difficult to test if somebody were to fund
22   such a study and employ hundred physicians and make
23   hundred physician make a diagnosis based on differential
24   diagnosis and then have another five blinded experts to
25   have specific test.  And you -- you can define error

Page 91

1    rate, right?
2         So it is a method where you can actually come up
3    with scientific evidence.  It's just such study would
4    never be funded, and -- and if there is some interest, I
5    would welcome such a study, and we would have error rate
6    and differential diagnosis in average academic
7    physician.  We have, actually occurred to me, looked in
8    this in some of the studies that I am involved with when
9    we compare the rate of diagnostic error between
10   community pathologists and academic pathologists and
11   identifying very rare types of lymphomas, and we have
12   reported in some of our publications where this rate
13   was, as an example, we'll say 8 percent.  Right.
14        So there is a way to test the error in clinical
15   judgment.  Because pathologist's diagnosis is a clinical
16   judgment.  They also create differential diagnosis.  But
17   the error rate like this can be measured.  We just never
18   measured it in a clinical practice where we test how
19   many times physicians make mistake in making a
20   diagnosis.  So you can make it more scientific if
21   somebody actually invests money and effort looking at
22   what is error rate of this.
23   Q   (By Mr. Brenza)  But that investment hasn't been made,
24   to your knowledge, to -- to date, right?
25   A   To my knowledge, I have not seen a study saying that the

Page 92

1    error rate of differential diagnosis in clinical
2    practice is such-and-such, no.
3    Q   We just don't know what the error rate would be?
4    A   Correct.
5         (Exhibit No. 33 marked for
6         identification.)
7
8    Q   (By Mr. Brenza)  I'm going to hand you what I'm marking
9    now as Exhibit 33.
10        MR. WISNER:  Counselor, can I put the
11   medical records aside?
12        MR. BRENZA:  For the time being,
13   yeah.
14   Q   (By Mr. Brenza)  I've handed you what I've marked as
15   Exhibit 33.  It's an article entitled "Review of
16   Genotoxicity Studies of Glyphosate and Glyphosate-Based
17   Formulations" by Larry Kier and David Kirkland dated
18   2013.
19        Do you see that?
20   A   Yes.
21   Q   And do you see that on Exhibit 4, your list of materials
22   relied upon, it was one of the materials that you relied
23   upon for your report, so Item No. 33?
24   A   Yes.
25        MR. WISNER:  Sorry.  I just had it

Page 93

1    handy.
2    Q   (By Mr. Brenza)  You spoke earlier about the need to
3    ascribe a plausible mechanism to any cause-and-effect
4    variables that you were -- that one might try to analyze
5    with respect to anything including non-Hodgkin's
6    lymphoma, right?
7    A   Correct.
8    Q   Do -- as you sit here today, do you have an
9    understanding of what the mechanism by which glyphosate
10   or Roundup, in your opinion, might cause non-Hodgkin's
11   lymphoma?
12   A   I do not have understanding of intrinsic mechanism.
13   It's a toxicology question.  The way I use this
14   references is the brief review of conclusions from this
15   papers or statements regarding whether or not glyphosate
16   was implicated in genotoxicity.
17   Q   And which page are you looking at?
18   A   I haven't looking at a page.  I'm just --
19   Q   Okay.
20   A   -- saying how I used the literature in -- in
21   genotoxicity.  I'm not an expert in genotoxicity.  So I
22   listed this because I pulled the paper and very briefly
23   looked at facts whether genotoxicity was implicated.  So
24   this -- again, this would be a question to toxicologist
25   to whether or not this is true.  I take this as a -- my

Andrei Shustov, M.D.

Page 94

1   reference point where general toxicity was implicated.
2   I'm not questioning in genotoxicity. I would be a wrong
3   person to argue the mechanism, whether what they report
4   here is true. So that's a...
5   Q  Are you saying, as you sit here today, you have -- you
6   have -- you have no basis to accept or -- or refute the
7   material in this paper?  I'm not sure whether you were
8   saying you were accepting it or whether you were
9   questioning it.
10  A  I'm accepting the fact that glyphosate was implicated in
11  genotoxicity as basis -- the basis for my specific
12  causation.  So I'm not questioning a general causation
13  whether glyphosate is genotoxic. Yeah, I'm -- I -- I
14  cannot be -- pretend to be an expert on genotoxicity. I
15  would -- I would rely on expert reports on that. And as
16  I stated, basis for my report is acceptance that it has
17  genotoxicity. I have no reason to question that. But I
18  would not be an expert to argue whether findings in
19  papers on genotoxicity are true or not. It's not my
20  expertise.
21  Q  I'll have you direct your attention to the Page 310 of
22  this article. The very last paragraph, where the
23  authors give their conclusion. Tell me when you're
24  there.
25  A  I'm having trouble, so --

Page 95

1   Q  It's just above the word "Acknowledgments."
2   A  "Authors" -- okay.
3   Q  Do you see it?
4   A  The paragraph above the "Acknowledgment"?
5   Q  Yes. It begins with the words, "This evaluation."
6   A  Okay.
7   Q  Do you see that?
8       It says, "This evaluation of the large volume of
9   genotoxicity data available presents a convincing weight
10  of evidence supporting the lack of genetic" --
11  "genotoxic potential for both glyphosate and typical
12  GBFs in core gene mutation and chromosomal effect
13  endpoints."
14      Do you see that?
15  A  I do.
16  Q  Did you accept this paper as establishing that
17  glyphosate and glyphosate-based formulations do not have
18  the potential to be genotoxic?
19  A  I cannot, again, opine on this, because that's not my
20  expertise. If I were reading a paper on lymphomas and
21  lymphoma treatment, I might accept or not accept
22  something that's even published. Because I'm extremely
23  knowledgeable in area of lymphomas. And even if
24  something is published, I can say I disagree with that
25  paper even though it's published. For paper that we

Page 96

1   published, everybody in the field does not have to agree
2   with this, and that's why we have expert review in
3   papers. I would be the wrong person to criticize this
4   paper. I do not have expertise in rendering my opinion.
5   As I mention, I based my opinion in all the cases with
6   the assumption that glyphosate has genotoxicity.
7   Q  Okay. But you'd agree the sentence I just read to you
8   from this paper you relied on concludes that glyphosate
9   doesn't have the potential to be genotoxic, right?
10  A  I did not rely on that specific statement in my --
11  generate my report.
12  Q  And I'm just -- as you sit here today, do you understand
13  what this statement said from this paper you relied on
14  is that -- that -- that glyphosate isn't genotoxic?
15  A  Again, when I reviewing papers and I was -- I would have
16  to read the paper and tell you where I saw the reference
17  that they make. Because you know, when authors refer
18  in -- make discussion in their papers, they frequently
19  point out deficiencies in their studies and say this and
20  this author confirm genotoxicity, and we think it's not.
21  It takes -- again, this is kind of information, to me,
22  it could be used extracting the paper. Again, I would
23  have to read and see what was the basis of my just
24  assuming that is genotoxic, but...
25  Q  Well, if you --

Page 97

1   A  It would be un --
2   Q  Go ahead.
3   A  It would be unfair for me just point out one piece of
4   the paper and say, Do you accept that? I --
5   Q  Well, this isn't just a random piece of paper. This is
6   the last paragraph where the authors summarize their
7   conclusions, right?
8   A  Once again, I would need to look. Because there might
9   be something in the body of the discussion that says,
10  well, under certain circumstances or what have you, like
11  we -- we demonstrated yesterday that, yeah, the
12  conclusion might apply to as a general statement, but
13  authors themself can say, Well, in these situations, I
14  would have to really read the paper.
15  Q  Let me just direct you to the next couple sentences.
16  You see it says, "Given this conclusion, and for other
17  reasons discussed, the observation of DNA damage effect
18  seems likely to be secondary to cytotoxic effects."
19      Do you see that?
20  A  Okay.
21  Q  And do you see it goes on to say, "The lack of genotoxic
22  hazard potential evidenced by core gene mutation and
23  chromosomal effects studies, coupled with the very low
24  human and environmental species systemic exposure
25  potential discussed above, indicate that glyphosate and

Andrei Shustov, M.D.

Page 98

1    typical GBFs present" -- "present negligible
2    genotoxic" -- "toxicity risk."
3         Do you see all that?
4    A   Okay.
5    Q   Did you accept that the conclusions of the authors was
6        that glyphosate and glyphosate-based formulations
7        present negligible genotoxicity risk?
8    A   Based on few papers that I referred and I briefly
9        reviewed to generate my report, as a cumulative
10       impression that I had, not being expert in genotoxicity,
11       that there is evidence in literature of possible
12       genotoxicity.
13   Q   Well, you'd have to agree that at least based on this
14       paper, there's evidence to the contrary as well, right?
15   A   Well, based on what authors concluded.
16   Q   Is that a "yes" or a "no"?  You want me to ask the
17       question again?
18   A   If I -- if I take for the face value just one paragraph
19       out of this paper, and with absolute belief that
20       everything here is correct, and that's "yes."  But as
21       academician, I generally would need to question any
22       findings without taking this as a bible and saying,
23       Well, what they found is absolute truth.  But I'm not an
24       expert to criticize the paper.
25   Q   But if the -- if the authors are right and glyphosate

Page 99

1        and glyphosate-based formulations present negligible
2        genotoxicity risk, that undermines whether there's a
3        plausible mechanism between glyphosate and non-Hodgkin's
4        lymphoma, doesn't it?
5    A   If toxicology experts conclude and everybody agrees,
6        then that undermines the plausible cause.  But I'm not
7        the right expert to make the determination.
8    Q   By the way, did you -- when you were looking through the
9        literature, did you notice that some of the literature
10       involves Monsanto or Monsanto employees?
11   A   That's a very good question.  I did not pay attention to
12       that.
13   Q   Did you have -- did you notice anything that was written
14       by any Monsanto or Monsanto employees that you thought
15       was inaccurate or -- or false?
16            MR. WISNER:  Objection; overbroad,
17       vague, lacks foundation.
18            THE WITNESS:  Well, that's assuming
19       that authors from maybe scientists from Monsanto were
20       not truthful, which I never hold against the scientists
21       who work for a pharmaceutical company or Monsanto
22       Company.  My -- my belief and hope is that even though
23       they work for Monsanto, they still report true findings.
24       So I -- I generally do not pay much attention to whether
25       authors are -- when I review papers as a reviewer, I

Page 100

1    take into my consideration what papers.  I review papers
2    for many journals.  I briefly take a look at this, but
3    again, in -- in our good-faith academic world, even if
4    coauthors are from a pharmaceutical industry, it does
5    not mean to me the paper's wrong.
6    Q   And that's -- as part of that, that when a paper is
7        published, there's people who check on the accuracy, and
8        you have to jump through some hoops to get things
9        published in many journals?
10   A   There are peer-review process where the paper is sent
11       to, in some cases, two or three or four known entities
12       in the field that review it.  And if it passes the
13       minimum sort of requirements in editor's view, then
14       paper gets published.
15            Having said that, being a reviewer for many
16       journals, just to give you the idea of the process, many
17       times when I reject the paper, it still gets published,
18       or when I accept the paper, it doesn't get published,
19       because it's a cumulative opinion of key opinion leaders
20       in the field.  It is -- and -- and we do receive our mutual
21       assessments of the paper.  And I -- I don't know who
22       reviewed it.  It's a confidential process.  But I see
23       that, Oh, we all agreed on it.
24            But few times, say, Well, that -- that reviewer did
25       not really like the paper and reject it and I accept it.

Page 101

1    And sometimes what happens, editor sends it to extra
2    reviewer.
3         So the point I was trying to make, that the
4    published work is not necessarily proof that even
5    reviewers agreed on what's in the paper or the experts
6    in the field agreed with the paper.  That's why if you
7    want to really get to nitty-gritty whether this is
8    really valid study, you have to talk to the experts in
9    that toxicology field.
10        So me not being an expert in toxicology, I don't
11   have reason to doubt the conclusion and also have no
12   reason to believe that's absolute proven fact.
13   Q   Okay.  And just to be clear, when you're referring to
14       reason to doubt or proven fact, you're talking about
15       Exhibit 33, right?
16   A   That would be one of the examples of published
17       literature, yeah.
18   Q   Okay.
19   A   Can I make sort of -- just to make sure that I express
20       all my thoughts about this additional statement, that as
21       an expert in the field, in medicine and medical science,
22       there are a lot of controversial issues that are being
23       published on them.  Some authors disagree with other
24       authors.  And as an expert, then you form opinion
25       knowing the subject really well and looking at multitude

26 (Pages 98 to 101)

Andrei Shustov, M.D.

Page 102

1 of publications.
2        Like, say if somebody was to ask me on whether this
3 type of treatment is good for this type of lymphoma.  I
4 can see papers in the literature that say, well, this
5 one says it's not good, this one says it's good, but
6 have very intrinsic knowledge and knowledge about dozens
7 of other publications in the field makes me more of an
8 expert to opine, I still think that this is a good
9 treatment even though that paper says it's not good.  So
10 I don't have that expertise in -- in criticizing
11 toxicology paper.
12 Q  Okay.  I'm going to hand you what I've marked as 34.
13        (Exhibit No. 34 marked for
14         identification.)
15
16        MR. WISNER:  This De Roos '05?
17        MR. BRENZA:  No.
18        MR. WISNER:  Oh.  Oh.  34?
19        MR. BRENZA:  34.
20        (Discussion off the record.)
21
22        MR. BRENZA:  Need a break?
23        MR. WISNER:  The witness said he
24 needs to take a restroom break.  Is that okay?
25        MR. BRENZA:  Sure.  That's fine.

Page 103

1        THE VIDEOGRAPHER:  All right.  We're
2 going off the record.  The time is 11:44 a.m.
3        (Pause in proceedings.)
4        (Mr. Kerschner not present.)
5
6        THE VIDEOGRAPHER:  All right.  We are
7 back on record.  The time is 11:50 a.m.
8 Q  (By Mr. Brenza)  Doctor, I've handed you what I've
9 marked as Exhibit 34.  It's a article --
10        (Mr. Kerschner enters.)
11
12 Q  (Continuing by Mr. Brenza)  -- entitled "Glyphosate
13 Biomonitoring for Farmers and Their Families:  Results
14 from the Farm Family Exposure Study."
15        Do you see that?
16 A  Yes.
17 Q  And you see it's -- the authors are listed.  The first
18 author is Acquavella?
19 A  Uh-huh.
20 Q  And he's an employee for Monsanto.  You see that?
21 A  Yes.
22 Q  And it's dated March of 2004, published March of 2004?
23 A  Yes.
24 Q  And do you see that, if you refer back to your list of
25 materials relied on, this is another document that you

Page 104

1 relied on for the purposes of your expert report.  Do
2 you see that?
3 A  Correct.
4 Q  Did you rely on Exhibit 34 for the purposes of
5 evaluating the potential dose that Mr. Gebeyehou may
6 have been exposed to?
7 A  I'm trying to remember with all these references what
8 specifically I used, and I remember looking briefly over
9 this paper, and I list that I -- I think I relied on
10 this paper for the purpose of exposure reference, the
11 amount of exposure, if I remember correctly.  That's the
12 best of my recollection.
13 Q  And exposure is important because, as we discussed
14 earlier, the -- the less you're exposed, the lower your
15 risk; more you're exposed, the greater your risk?
16 A  As a general statement.  And as we discussed, as a
17 general statement for carcinogens.
18 Q  And that's a general statement for just about anything,
19 right?  That the -- that the -- it's the dose that --
20 that produces the effect.  At some dose, there won't be
21 an effect?
22 A  Again, this is very general statement that requires
23 clarification as a general statement because a lot of
24 chemicals and factors would have plateau effect, right?
25 So you might have for certain carcinogens the threshold

Page 105

1 where it causes toxic effect, and then you can go ten
2 times over, you already reached your plateau effect.  So
3 as a general statement, I can't say that it applies to
4 every situation.
5 Q  Not every -- but that's a rare event when -- a plateau
6 effect, right?  I mean, take something like salt or
7 water or things like that.  You can take enough of those
8 substances that you can hurt yourself, but in small
9 enough doses, they don't hurt you, right?
10 A  I don't know how rare it is.  It's, again, you're asking
11 me to make assumptions about dozens and dozens.  I mean,
12 it's -- it's --
13 Q  No.
14 A  -- very -- what I'm saying is, there is a plateau effect
15 for scientist and clinician for some of the carcinogens
16 where, be on certain level, say you get radiation at
17 certain level and the -- you already have sufficient
18 amount to cause cancer, and then you can be exposed to
19 radiation ten times and it doesn't matter at that point.
20 You already reached that plateau that already break in
21 the DNA, but...
22 Q  What about the other direction?  Isn't it true that
23 there's a small enough dose of almost anything that it
24 won't cause any harm?
25        MR. WISNER:  Objection; overbroad.

27 (Pages 102 to 105)

Andrei Shustov, M.D.

Page 106

1    THE WITNESS:  As a -- as a broad
2    hypothetical statement, if you keep going down to very
3    minute level of anything, you -- you lose any kind of
4    impact on whatever you're trying to measure.  It's a --
5    it's a very kind of basically hypothetical type -- how
6    should I put it? -- pharmacokinetic or chemical
7    principle.
8  Q  (By Mr. Brenza)  So I'm not -- I'm not sure that
9    answered the question.  But isn't it true that, for just
10    about anything, there's a dose so small that it won't
11    cause harm?
12  A  Sure.  As a broad statement.
13  Q  And do you know what a reference dose is?
14  A  It has to -- well, to be a reference dose, you need to
15    give me reference for what reference dose.
16  Q  Right.  Right now I'm just -- I'm just getting the
17    general concept of a reference dose.
18       Do you know what a reference dose is not with
19    respect to any particular chemical?
20  A  I can't give you off the top of my head a definition of
21    reference dose.  I have a concept of a reference dose.
22    We operate in kind of my world with MIC50 or minimum
23    inhibitor concentration or optimum biologic dose.  Any
24    of those could be reference depending on what the
25    question you're asking.

Page 107

1  Q  What about the lowest no-effect level?  Is that a
2    concept you're familiar with?
3  A  Not in my world.  So, again, and I -- I operate in
4    lymphoma research where we usually push things up, not
5    down.  So that's not my kind of...
6  Q  Okay.  Did you see that in the Acquavella paper, he and
7    his coauthors analyzed the amount of glyphosate in urine
8    samples from people who apply glyphosate in their
9    families?
10  A  Could you please point to me, for the sake of time,
11    where --
12  Q  Sure.
13  A  -- exactly --
14  Q  Well, I'm just reading right now from the -- the summary
15    paragraph that begins the -- the paper.  Do you see in
16    the upper left-hand corner on the first page?  It's
17    small?
18       MR. WISNER:  It's in blue.
19       THE WITNESS:  Yeah.
20  Q  (By Mr. Brenza)  It's in blue on your copy.
21  A  Okay.  Thank you.
22  Q  It's in italics?
23  A  Mm-hmm.
24  Q  It says, "We evaluated urinary glyphosate concentrations
25    for 48 farmers, their spouses, and their 78 children"?

Page 108

1  A  Yes.
2       MR. WISNER:  Objection.  I think it
3    says "79 children" and not --
4       MR. BRENZA:  79.  You're -- you're
5    right.  Thank you.
6       MR. WISNER:  It's not italicized.
7    It's just...
8       MR. BRENZA:  Okay.
9       MR. WISNER:  Sorry.  I just --
10       MR. BRENZA:  It looks like it on
11    mine.
12       MR. WISNER:  Okay.
13       MR. BRENZA:  But I defer to you.
14  Q  (By Mr. Brenza)  And then he goes on to say, "We
15    evaluated 24-hour composite urine samples for each
16    family member the day before, the day of, and for three
17    days after glyphosate application."
18       Do you see that?
19  A  I do.
20  Q  It goes on to say, "60 percent of the farmers had
21    detectable levels of glyphosate in their urine on the
22    day of application.  The geometric mean concentration
23    was 3 parts per billion.  The maximum value was 233
24    parts per billion, and the highest estimated systemic
25    dose was .004 milligrams per kilogram."

Page 109

1       Do you see that?
2  A  Okay.
3  Q  And then if you skip down a few sentences, there's a
4    sentence beginning with the word, "None."
5       Do you see that?  It's one, two, three, four -- six
6    lines from the bottom.  "None of the systemic doses"?
7  A  Okay.
8  Q  It says, "None of the systemic doses estimated in this
9    study approach the U.S. Environmental Protection Agency
10    reference dose for glyphosate of 2 milligrams per
11    kilogram per day."
12  A  Okay.
13  Q  Do you see that?  Do you see that?
14  A  Yeah.
15  Q  Are those the exposure estimates that you used when
16    eval -- when evaluating what kind of exposure Mr.
17    Gebeyehou may have been -- may have received from his
18    application of glyphosate?
19  A  As you pointed out, I did not have any measurements of
20    glyphosate in Mr. Gebeyehou's urine or blood or -- what
21    you're referring here is the concentrations of
22    glyphosate in these farmers.  As we established, we do
23    not have medical tests to quantify it in -- in patients.
24  Q  What I'm asking is, did you use this information about
25    how much glyphosate farmers get exposed to in estimating

Andrei Shustov, M.D.

Page 110

1    what Mr. Gebeyehou may have been exposed to?
2    A  No, I did not use this number specifically to quantify
3    his exposure.  For exposure, again, as yesterday we
4    discussed, I was referencing the populational studies,
5    not the estimation of concentration studies.  Because I
6    do not have concentration in his bodily fluids as part
7    of the information provided to me.
8    Q  Did you understand this paper to provide evidence that
9    farmers who applied Roundup had hundreds or -- or
10   thousands of times less glyphosate in their body than
11   the EPA reference dose?
12   A  I do not recall my understanding or conclusion from this
13   paper like that.
14   Q  Is it important to you that, in this study, it was shown
15   that farmers had extraordinarily little glyphosate
16   inside their bodies after applying glyphosate?
17   A  For the purpose of my specific causation report, no.
18   Because now we're getting into, in my opinion, to the
19   area of toxicology and genotoxicity, what is the minimum
20   level and what is the correlation between the dose
21   and -- and the -- toxicity that was not part of my
22   thinking during this report and not part -- not a goal
23   of my report to look at this specific parameters, and I
24   Q  Well, you made some conclusions about the fact that
25   Mr. Gebeyehou told you he applied Roundup every three

Page 111

1    weeks at his property, right?
2    A  Something like that.  That's correct.
3    Q  And did you conclude from the fact that Mr. Gebeyehou
4    used Roundup roughly every three weeks for many months
5    of the year for a number of years, that he had had a
6    certain exposure to -- to glyphosate?
7    A  I did.
8    Q  Within his body sufficient to produce some sort of
9    causal reaction?
10   A  Correct.
11   Q  Do you have any reason to believe that Mr. Gebeyehou
12   was -- absorbed glyphosate more readily than the farmers
13   that were studied by the authors of Exhibit 34?
14          MR. WISNER:  Objection; speculation.
15          THE WITNESS:  It's hard for me, a
16   clinician, to opine to sort of absorption kinetics.
17   I -- I don't know whether I have to apply certain other
18   factors.  It is a good toxicology question.  For -- for
19   the clinician, I can't know factors that affect the
20   absorption of glyphosate in different populations.  And
21   this is really a toxicology question, and I don't want
22   to throw my opinion without being expert in this field.
23   Q  (By Mr. Brenza)  Yeah, my question to you is:  Do you
24   have any reason to conclude Mr. Gebeyehou was different
25   than the farmers that were studied in Exhibit 34 in

Page 112

1    terms of how much glyphosate he absorbed?
2          MR. WISNER:  Objection; speculation.
3          THE WITNESS:  I honestly don't have
4    any reason to be -- to believe -- I can't really opine
5    on this.  Do I have evidence in front of me that he
6    would be different?  No.  But I also cannot say he is
7    not different, because I'm not an expert in what effects
8    glyphosate absorption or -- I don't know whether he had
9    some other factors in his particular house or whether
10   it's a temperature of the house as opposed to median
11   temperature on the farm.  So I can speculate things.  I
12   can -- I can -- I can hypothesize three, four factors
13   that might affect absorption, but I'm not a
14   toxicologist.
15   Q  Okay.  You --
16          MR. WISNER:  I'm going -- sorry.
17   Sorry.  I'm going to interrupt you.  I'm going to object
18   that this is beyond the scope.  We have preferred an
19   exposure expert, so I don't know why --
20   Q  (By Mr. Brenza)  You had to --
21          MR. WISNER:  -- you're asking him.
22   Q  (By Mr. Brenza)  You had to make some conclusions about
23   how much glyphosate Mr. Gebeyehou internalized from his
24   spraying of Roundup in order to make conclusions about
25   whether it had any plausible causal connection to his

Page 113

1    non-Hodgkin's lymphoma, right?
2          MR. WISNER:  Objection.
3          THE WITNESS:  The -- hypothesizing
4    about his absorption of glyphosate was not the main or
5    any driver in my conclusion because my exposure
6    statement was -- my reference point as far as exposure
7    was to epidemiologic studies that we discussed from --
8    from general causation that I use primarily to -- as a
9    reference in those studies, how many days a year
10   patients -- patients were exposed or people exposed to
11   glyphosate.
12   I -- I -- again, it would be unfair for me to
13   answer question for anybody that pertain to toxicology
14   and not an expert.  I cannot opine whether he had more
15   readily absorbing glyphosate or less readily.  There
16   might be an expert in this field that say, well, farmers
17   also live in west part of the country where winds are --
18   again, I -- I can intellectually hypothesize why it
19   could be different, but I'm not -- I don't want to say
20   something that it's just not fair to anybody --
21   Q  You would agree that if --
22          THE REPORTER:  "Not fair to anybody,"
23   what?
24          THE WITNESS:  Not to anybody involved
25   in figuring out the facts in this case.

Andrei Shustov, M.D.

Page 114

1  Q  (By Mr. Brenza)  You would agree that a knowledge of how
2     much glyphosate Mr. Gebeyehou actually absorbed would be
3     more probative of his actual risks, if any, from
4     glyphosate than a days-per-year analysis, right?
5           MR. WISNER:  Objection; speculation,
6     calls for a legal conclusion.
7           THE WITNESS:  From a medical
8     standpoint, I would say that would also require evidence
9     that different levels affect -- blood levels affect a
10    risk of lymphoma differently and somebody determining on
11    the pharmacokinetic level or a toxicology level, like
12    mentioned reference point, or if -- or there is a
13    correlation between urine samples levels or blood levels
14    with -- that would be a different driver to the
15    conclusion.  So my conclusion was based on exposure that
16    I referenced in epidemiologic literature.
17 Q  (By Mr. Brenza)  Do you know that Mr. Gebeyehou's
18    exposure from spraying some Roundup in his yard was
19    equivalent to the days-per-year exposures from
20    agricultural workers that you relied on in your report?
21          MR. WISNER:  Objection; misstates the
22    record.
23          THE WITNESS:  I don't.  And I don't
24    think anybody can know this.  You're asking for details
25    that are, in my opinion, would be -- you know, be

Page 115

1     different to compare.  The answer is, no, I don't.
2           MR. BRENZA:  Okay.
3           THE WITNESS:  How -- how his
4     particular exposure with his hands and skin surface
5     relates to those studied in epidemiologic literature.
6  Q  (By Mr. Brenza)  Are you aware of any epidemiologic
7     literature that studies home and garden users of Roundup
8     as opposed to agricultural workers?
9           MR. WISNER:  Objection; ambiguous.
10          THE WITNESS:  It's a question I would
11    have to look.  I would again have to go back, and even
12    the reference I made, this is not area where I can off
13    the top of my head identify the study population.  I
14    would have to again look at the references that are
15    listed, and I can't memorize them, whether they included
16    gardeners versus farmers.  Off top of my head, I cannot.
17 Q  (By Mr. Brenza)  How about this.  Can you reference any
18    reference at all that shows that home and garden users
19    had an increased risk of non-Hodgkin's lymphoma from
20    glyphosate?
21 A  Once again --
22          MR. WISNER:  Objection; ambiguous.
23          THE WITNESS:  Once again, in a normal
24    scenario, I would go on PubMed or Amgen and see if
25    there's any reference.  Off top of my head, I -- I

Page 116

1     cannot produce a reference, in the middle of nowhere,
2     something that's not area of my expertise.
3  Q  (By Mr. Brenza)  Well, it's not -- it's certainly not in
4     your report, right?
5  A  You mean the reference?
6  Q  Yeah.  There's no -- I mean, you had opportunity to do
7     all the research you wanted to and put it all in your
8     report, and there's no reference in your report to any
9     study that specifically ascribes risks to home and
10    garden users of Roundup, right?
11 A  Not to my recollection.  And I would say that it's not
12    true I had any opportunity.  If -- if I would take a
13    year off work and study every possible scenario here, it
14    will require very extensive amount of work if you're --
15    if I were to say I had any time in the world to.  I had
16    limited time to address specific question I was asked to
17    address.  I --
18 Q  Is it fair to say that there wasn't enough time to
19    address the question of what the risks actually were for
20    home and garden users of glyphosate?
21 A  I was not asked to address the specific question.  It's
22    not a matter of time.
23 Q  Okay.  And because you weren't asked to address it, you
24    didn't address it, right?
25 A  Specifically looking at home and garden use?

Page 117

1  Q  Yes.
2  A  No, I did not specifically look at home and garden use.
3  Q  Are large statistical studies the best way to identify
4     potential causal factors of non-Hodgkin's lymphoma?
5           MR. WISNER:  Objection; vague.
6           THE WITNESS:  It's a very broad
7     question there.  One of the -- one of the ways and
8     potentially reliable ways of identifying causes of
9     non-Hodgkin lymphoma depending on the -- depending on
10    the factor under study.
11 Q  (By Mr. Brenza)  Isn't it true that when you're trying
12    to identify small increases in risk, the larger the
13    study, more participants, the more power that study has
14    to tell you the truth about whether there's a causal
15    connection or not?
16          MR. WISNER:  Objection; vague.
17          THE WITNESS:  As a broad statistical
18    question, the larger the study, the higher will be
19    statistical power and more reliable confidence
20    intervals.  But, again, as we discussed, you can make a
21    general statement like this.  I have to look at the
22    study.  And studies might have other flaws, or I would
23    say, yeah, this is a good study.
24 Q  (By Mr. Brenza)  Okay.  But everything else being equal,
25    the bigger the study, the more power it has to tell you

Andrei Shustov, M.D.

Page 118

1    the truth?
2    A  That is correct.
3    Q  Are you familiar with the Agricultural Health Study?
4    A  I believe so.  It's one of the things I -- I looked at,
5       if I remember correctly.
6    Q  And it's one of the things you -- you provided a website
7       in your report that links to a place where that study's
8       reported, right?
9    A  I recall that, yeah.
10   Q  I'm going to hand you what I've marked Exhibit 35.
11             (Exhibit No. 35 marked for
12             identification.)
13
14   Q  (By Mr. Brenza)  Exhibit 35 is a document entitled
15      "Agricultural Health Study.  Study Update 2018."
16       Do you see that?
17   A  Yep.
18   Q  And I'll represent to you this is one of the pages that
19      you get to when you follow the link provided in your
20      report for the Agricultural Health Study.  I think the
21      link's on Page 7 of your report --
22   A  Mm-hmm.
23   Q  -- as you were there.
24        Was the Agricultural Health Study a 25-year study
25      of farmers that have been exposed to various types of

Page 119

1    pesticides?
2    A  I believe so.
3    Q  And, again, we said earlier that the bigger the study,
4       the better.  Is it also true that the longer the study,
5       the better for purposes of establishing whether
6       something causes cancer or not?
7    A  As a general statement.
8    Q  So 25 years is a very long study, isn't it?
9             MR. WISNER:  Objection; speculation.
10            THE WITNESS:  Again, if this is the
11      only parameter of the study we're looking at, it's a --
12      it's a good duration study.
13   Q  (By Mr. Brenza)  Okay.  If you look at the next page, it
14      talks about the enrollment of the first participants in
15      the study.  Do you see that?
16   A  Right here?
17   Q  Yep.  Actually, I shouldn't say "yes."
18   A  "Dear Agricultural" --
19   Q  No, at the second page.  It says, "Enrollment ('93 to
20      '97)."
21   A  I see.
22   Q  It says, "A total of 89,655 participants joined the
23      study, including 52,394 licensed private pesticide
24      applicators and 32,345 of their spouses from North
25      Carolina and Iowa."

Page 120

1    I'll stop there.  Do you see that?
2    A  Mm-hmm.  I do.
3    Q  Is 89,655 participants larger than any of the other
4       studies that you referenced in your report?
5             MR. WISNER:  Objection; ambiguous,
6       vague, speculation.
7             THE WITNESS:  It looks like it's the
8       largest, but I have to look.  I can't remember all the
9       references.
10   Q  (By Mr. Brenza)  Okay.  It's the largest, not just by a
11      little, but by thousands and thousands and thousands of
12      participants, isn't it?
13            MR. WISNER:  Objection.
14   Q  (By Mr. Brenza)  I mean, I can show you, if you -- if
15      there's one that -- I think all the studies you relied
16      on are in that stack right in front of you there.
17   A  Right.  I would have to take your word for it.  If I
18      can't do this, I can go through all the studies.  But
19      possibly.  Again, I -- I don't remember all the
20      population numbers in my references, but it appears that
21      this is the largest study.
22   Q  I mean, again, if you -- if you need to, I believe all
23      of your studies are in this pile that we've marked
24      yesterday.  But -- but let's -- let's try to move on for
25      now unless you want to stop and look at them all.

Page 121

1    A  In my opinion as a clinician, it's -- it would have
2       little impact.
3    Q  Actually, there's one study that might help you.
4       Because I think it -- here, let me just make sure before
5       we get it out.  No, I'm wrong.  Okay.  We'll look --
6       we'll get to this in a little while, but...
7        Do you see on the last page of Exhibit 35, there's
8       a summary of the conclusions that have been reached
9       after the 25 years of study being reached in 2018?
10   A  The last page, that paragraph states "2015 to present"?
11   Q  That's part of what's on the page, yes.
12        Do you see the last bullet point under 2015 to the
13      present?
14   A  I do.
15   Q  And it says, "Glyphosate use was not associated with
16      overall cancer risk."
17        Do you see that?
18   A  I do.
19   Q  Do you have any reason to disbelieve the -- that
20      conclusion of the Agricultural Health Study?
21            MR. WISNER:  Objection; clearly
22      outside the scope.  That is a question about general
23      causation.
24        Answer it, but that's not what he's been proffered
25      to opine about.

Andrei Shustov, M.D.

Page 122

1    THE WITNESS:  Yeah, as person who
2  have very limited to no expertise in populational
3  studies or -- or general causation, as a clinician, I
4  don't have any reason to disbelieve that, but it's -- I
5  would be a wrong person to ask that.  It's not the area
6  of my expertise.
7  Q  (By Mr. Brenza)  Well, if -- if glyphosate doesn't have
8     any connection to cancer, then how can you conclude that
9     Mr. Gebeyehou's cancer was caused by glyphosate?
10  A  I --
11    MR. WISNER:  Objection.  Same thing.
12  Calls for a general causation opinion.
13    THE WITNESS:  The basis of my report
14  is the assumption from general causation that it does
15  cause cancer.  And the questions, like I said, you ask
16  in here, in my opinion, need to be addressed to
17  epidemiologists and general causation folks.
18    My -- the basis -- the very beginning of forming my
19  opinion is an assumption that glyphosate causes cancer.
20  I'm not disputing this point.
21  Q  (By Mr. Brenza)  So let me just stop you on that.  If
22     you're wrong about that and glyphosate doesn't cause
23     cancer, then your report is wrong, right?
24  A  If -- if it is proven that glyphosate is -- is -- is not
25     carcinogen, I would have to basically rethink my -- my

Page 123

1  entire report.
2  Q  And you'd have to rethink it because if glyphosate
3     doesn't cause cancer, there's no way that Mr. Gebeyehou's
4     cancer was caused by glyphosate, right?
5  A  As a clinician, if glyphosate is removed from causation
6     of cancer, that I would not be discussing it to begin
7     with.  Yeah, I would say, Well, there is nothing to
8     discuss here for the clinician.
9  Q  Meaning your report would be wrong?
10  A  Under that assumption, my report would have no meaning
11     because it was started as -- from the basis that
12     glyphosate is, based on general causation, is the cancer
13     risk agent.  I'm not trying to dispute whether it is or
14     it's not.  The basis for my opinion and my differential
15     causation is the assumption that glyphosate is a risk
16     factor.
17  Q  So if you -- if you assumed that glyphosate is a -- is a
18     risk factor, what expertise did you bring to bear in
19     terms of concluding that Mr. Gebeyehou's cancer was
20     caused by glyphosate as opposed to something else?
21    MR. WISNER:  I'm sorry.  Could you --
22    THE WITNESS:  I think --
23    MR. WISNER:  I'm sorry.  Could you
24  read the question back?  I didn't actually understand
25  it.

Page 124

1    (Question on Page 123, Lines
2    17 through 20, read by the
3    reporter.)
4
5    MR. WISNER:  Sorry.  I don't do that
6  frequently.  Just indulgence.
7    MR. BRENZA:  It's fine.
8    THE WITNESS:  I think it's a whole
9  discussion today.  After I assume this, I used the --
10  the differential diagnosis methodology or deductive
11  method to derive to my conclusion that we discuss the
12  entire -- entire deposition.  So that's the method used,
13  with the assumption that glyphosate is risk for
14  lymphoma.  We discussed my methodology, I think,
15  multiple times and questioned it and discussed it.  And
16  so that's the method that I used, with the assumption
17  that glyphosate is risk for lymphoma.
18  Q  (By Mr. Brenza)  In eliminating risk factors other than
19     glyphosate, did you have proof that those alternative
20     causal factors did not cause Mr. Gebeyehou's cancer?
21  A  I think they -- the whole basis of my testimony is my
22     clinical judgment based on evidence presented to me,
23     that I believe those factors discussed are much less
24     likely to be contributing.  I don't think in medicine --
25     I know maybe in your guys' world, certainty is something

Page 125

1  you desire.  In medicine, nothing is certain.  I
2  eliminated those to reasonable degree of probability as
3  a clinician.  And in medicine, most of the time we
4  operate by reasonable degree of certainty, even making
5  life-and-death decisions.
6    So did I eliminate them hundred percent?  No.  I
7  have no means of eliminating something hundred percent
8  in human body or in medicine, but I believe to the best
9  of my abilities I assess their being less likely to be
10  contributing factors.
11    Can I eliminate something hundred percent?  I --
12  I'm a human.  I can't prove hundred percent that
13  something did or didn't do it.  The best I can do is to
14  use information in my knowledge to give you that -- my
15  assessment of probability, what less likely or more
16  likely to cause something, contribute something, or
17  bring certain effects.
18  Q  So in this case, you discounted the risk factors
19     associated with hepatitis B and smoking, right?
20  A  I did not discount them.  I considered them to be much
21     less likely the factors and unlikely to contribute to
22     the lymphoma.
23  Q  But those are risk factors you've encountered in your
24     professional work dealing with people who have
25     non-Hodgkin's lymphoma, right?

Andrei Shustov, M.D.

Page 126

1  A  As a general statement.
2  Q  Yeah.
3     But glyphosate is not a risk factor you've ever
4     considered before.  It's just one that you considered in
5     the midst of this lawsuit, right?
6  A  I considered glyphosate as part of the agricultural
7     exposure.  Because in medical practice, we do not
8     necessarily dive into specific causes of patients'
9     cancer, but treat their cancer.  For the purpose of this
10    case, I was asked to specifically look into causes.  So
11    that's why I paid attention to all the details what
12    could have caused Mr. Gebeyehou's cancer, and this is
13    more exhaustive work that I would do on a regular basis
14    in clinical practice, because that's not the purpose of
15    my clinical practice.
16       I did not discount those factors.  I evaluated all
17    the facts about hepatitis and age and smoking.  And
18    after looking at all the evidence, I felt that was my
19    conclusion that they're unlikely to be contributing
20    factors.  I didn't discount them.
21 Q  Well, I mean, when I say "discount," I didn't mean
22    ignore.  I meant you concluded they were not big enough
23    factors to explain the cancer that you observed.
24 A  It was my judgment.
25 Q  The -- how much did Mr. Gebeyehou's use of Roundup in

Page 127

1     his backyard increase his risk of non-Hodgkin's
2     lymphoma?
3        MR. WISNER:  Objection; vague.
4        THE WITNESS:  That's -- that's a
5     very -- very sort of, again, nonsensical question in the
6     way you want me to apply epidemiological data to a
7     particular person.  And in my everyday practice, when
8     patient ask me, "What is my rate of surviving this?" and
9     I say, Statistics don't apply to you.  You're one
10    person.
11       For Mr. Gebeyehou, it was, You're a hundred.  He
12    either have cancer or he doesn't.  If you look at the
13    populational studies that we kept discussing and general
14    causation, it is in the range of twofold increased odds
15    ratio.  So can I say that maybe Mr. Gebeyehou's personal
16    risk was 2X?  No, nobody can say that.  That would be
17    prohibitive because he's not a population.  Because in
18    that range of the odds ratio of 2, there was a range.
19    His risk might have been 4, might have been 1.8.  But on
20    average, for population like him, it's -- it's twice as
21    high.  That's the populational study.
22       What his risk is personally nobody can say.  Just
23    like anybody's personal risk of cancer.  But it is clear
24    to me that based on populational studies that it was
25    risk of him developing lymphoma, and after eliminating

Page 128

1     other possibilities, it is likely or it was -- more
2     likely be his contributing factor that it wasn't.
3  Q  When you say you assumed his increased risk was on the
4     order of two times what it would otherwise have been,
5     does that compare his exposures to those that are
6     reported in the epidemiological literature?
7        MR. WISNER:  Objection.
8        THE WITNESS:  I didn't say his risk
9     was two times.  I say the populational risk was two
10    times.  His risk, he -- he assumed the risk of lymphoma
11    by being exposed to glyphosate.  I cannot -- nobody can
12    estimate the -- the personal risk, was -- was fourfold
13    or twofold.  But population like him exposed to
14    glyphosate, based on the epidemiologic studies, I would
15    have 2, 2.1, 2 -- the average around 2 in those studies,
16    increased risk of developing lymphoma.  If you want --
17 Q  (By Mr. Brenza)  So you -- are you done?  I'm sorry.
18 A  If you want me to apply populational studies to a
19    person, which in my world is a wrong thing to do, then I
20    would say, yes, his risk was around two, two times
21    higher than otherwise he wouldn't have.
22 Q  Can you rule out the possibility that Mr. Gebeyehou's
23    risk was 1 or less than 1?  No -- no increased risk at
24    all?
25       MR. WISNER:  Objection; vague.

Page 129

1  Q  (By Mr. Brenza)  You said it's a range.  So I'm
2     wondering, how -- how did you come up with the range
3     that you just provided Mr. Gebeyehou?
4  A  I'm quoting you the range of -- of confidence intervals
5     from those studies.
6  Q  Okay.  And you refer to those studies as studying people
7     like him?
8  A  People exposed to glyphosate.
9  Q  Just any exposure?  I mean, did you take into account
10    the differences in exposure from -- that someone
11    experiences when they use it in agricultural versus when
12    they use it in their backyard?
13 A  Again, I did not dive further details of exposure or
14    toxicology.  I operated on the assumption that
15    glyphosate causes risk of lymphoma.  And Mr. Gebeyehou
16    was exposed to glyphosate that put him at risk of
17    developing lymphoma.  In any particular person, you're
18    asking me multiple times, "Is there a test?"  No.  I
19    don't have his urine tests.  I don't have a test to
20    prove hundred percent that he had lymphoma from -- from
21    glyphosate.  But glyphosate significantly increased his
22    risk of lymphoma.  And that's the best I can do in my
23    statement, that based on my elimination method, this was
24    a substantial contributing factor.
25       Do we have certain hundred percent of medicine?

33  (Pages 126 to 129)

Andrei Shustov, M.D.

Page 130

1    No.  I can't tell you hundred percent certainty what
2    caused his cancer.  I can tell you that, after assessing
3    his risk, what put him at risk of developing lymphoma
4    and make it --
5    Q  Well --
6    A  -- more likely.
7    Q  -- let me ask -- let me ask you this.  If somebody with
8    Mr. Gebeyehou's medical history and identical of
9    Mr. Gebeyehou in every respect, if ten patients like him
10   came to you, how many would you say got their
11   non-Hodgkin's lymphoma from glyphosate?
12             MR. WISNER:  Objection; improper
13   hypothetical, speculation.
14             THE WITNESS:  Again, I -- you're
15   asking me to answer question that has no basis, has
16   nothing to do with Mr. Gebeyehou.  So we can --
17   Q  (By Mr. Brenza)  Well, I'm making it have to do with
18   Mr. Gebeyehou by defining the question to be people who
19   are identical to him.
20   So ten people with exactly the same medical
21   history, exactly the same personal history come to you.
22   How many of them are you going to say glyphosate caused
23   their non-Hodgkin's lymphoma?
24             MR. WISNER:  Objection; misstates his
25   testimony.

Page 131

1             THE WITNESS:  Hypothetically, if you
2    give me ten Mr. Gebeyehous with the same exposure, with
3    the same medical history, and you ask me to assess the
4    risk of lymphoma, I will say, in all of these ten
5    patients, glyphosate increased the risk of lymphoma,
6    because of the exposure and every factor we discussed.
7    Q  (By Mr. Brenza)  Well, you didn't -- you changed the
8    answer.  I didn't ask you how many would you say
9    increased -- experienced increased risk.  I asked you,
10   how many would you say the glyphosate actually caused
11   their non-Hodgkin's lymphoma?
12             MR. WISNER:  Objection; misstates his
13   testimony and his opinion.
14   Q  (By Mr. Brenza)  You're saying that glyphosate caused
15   Mr. Gebeyehou's non-Hodgkin's lymphoma in this case,
16   right?
17   A  I said it might have caused his lymphoma.  I didn't say
18   caused his lymphoma.  There's no test to prove what
19   caused his lymphoma.
20   Q  But you're saying it's -- it's more likely than not,
21   right?
22   A  Correct.
23   Q  So my question to you is:  How many times would you say
24   that if ten people exactly like Mr. Gebeyehou came to
25   you and asked to be evaluated?

Page 132

1    A  That more likely than not for every single one of them.
2    Q  Every single one.
3    And is there any way to -- to prove that you're
4    wrong about any of those other than --
5             MR. WISNER:  Objection.
6    Q  (Continuing by Mr. Brenza)  -- by showing that
7    glyphosate doesn't even cause cancer?
8             MR. WISNER:  Objection; overbroad.
9    I'm sorry.  Are you talking about the ten
10   hypotheticals --
11             MR. BRENZA:  Yeah.
12             MR. WISNER:  -- or just --
13             MR. BRENZA:  Of the ten.
14             MR. WISNER:  -- for him?
15             MR. BRENZA:  No.  Of the ten.
16             THE WITNESS:  So if --
17             MR. WISNER:  The ten.
18             THE WITNESS:  If somebody came up
19   with the evidence that glyphosate has nothing to do with
20   cancer.
21   Q  (By Mr. Brenza)  Let's -- let's put that aside.  Let's
22   assume that.
23   A  Okay.
24   Q  Because you've assumed that it does.  Is there any other
25   way to prove that you're wrong about any of the ten

Page 133

1    patients you've said their non-Hodgkin's lymphoma was
2    caused by glyphosate?
3    A  I did not say it was caused by glyphosate.  Increased
4    the risk of -- of non-Hodgkin lymphoma.  As we discussed
5    multiple times, you -- you're pushing me to say
6    definitive hundred --
7    Q  Well, you --
8    A  -- percent answer.
9    Q  You've made a definitive statement in --
10            THE REPORTER:  "You're pushing me to
11   say," what?
12            THE WITNESS:  To make a definitive
13   statement what specifically caused lymphoma in
14   Mr. Gebeyehou's case.
15   Q  (By Mr. Brenza)  You've made a definitive statement
16   about that in this case, right?
17   A  I said it might be caused his lymphoma.
18   Q  Well, you're saying it's more probable than not, right?
19   A  It does not mean that I can prove that hundred percent
20   certainty it caused his lymphoma.
21   Q  I'm not asking you that.  But if you're -- if you're
22   willing to say that it's more probable than not in this
23   case, then you -- as I understood you to say, you'd be
24   willing to say that about all ten patients that show up
25   that are just like Mr. Gebeyehou, right?

Andrei Shustov, M.D.

Page 134

1    A  What I said for every one of ten patient, I would say
2       the same thing, that it might have caused or made it
3       more likely for them.  I did not say that it caused
4       their lymphoma.
5    Q  But --
6    A  I -- I'm not --
7    Q  -- would you say it's more probably than not for each of
8       those ten patients?
9    A  That is correct.
10   Q  And my question to you is:  How could we prove that
11      you're wrong about any of those ten?
12            MR. WISNER:  Objection; incomplete
13      speculative, hypothetical.
14            THE WITNESS:  I don't know how you
15      prove I'm wrong.  I made in my conclusion on, again, the
16      methods that we described, and you gave me
17      hypothetically the identical scenario, so my --
18   Q  (By Mr. Brenza)  Do you know the scientific concept of
19      falsifiability?
20   A  I would have to look it up.
21   Q  Well, I'll tell you what it means.  Falsifiability is --
22      is -- is the characteristic of a scientific theory that
23      it could be proven wrong.  Have you ever heard that
24      before?
25   A  I don't recall.  I -- maybe I heard it, but it's not

Page 135

1       something I use every day.
2    Q  And do you know that statements that are not
3       falsifiable, like they can never be proven wrong, are
4       not generally considered to be science?
5            MR. WISNER:  Objection.
6    Q  (By Mr. Brenza)  They're statements of belief?
7            MR. WISNER:  Objection; speculation,
8       improper hypothetical.
9            THE WITNESS:  Well, I would --
10           MR. WISNER:  Witness --
11           THE WITNESS:  Again --
12           MR. WISNER:  Attorney's testifying.
13           THE WITNESS:  -- in the philosophy of
14           MR. WISNER:  Sorry.
15           THE WITNESS:  In --
16           MR. WISNER:  Attorney's testifying.
17           MR. BRENZA:  I'm asking him what he
18      knows.
19           THE WITNESS:  In the philosophy of
20      science.  But I made a definitive statement in terms of
21      probabilities.  And when I say "definitive," I also
22      point out multiple times it's my judgment.  I did not
23      say you cannot prove me wrong.  I just don't know how
24      it'd prove me wrong.  I would have to think hard about
25      that, what would be the method to dispute physician's

Page 136

1       clinical judgment.
2            Short of if it turns out to be wrong in my
3       decision, I will accept that I was wrong based that my
4       clinical judgment was wrong.
5            MR. BRENZA:  How much time do we have
6       left?
7            THE VIDEOGRAPHER:  We are three hours
8       and 15 minutes in.
9            MR. WISNER:  And for the record, it
10      is 12:37 p.m.
11           THE VIDEOGRAPHER:  Yes.  I've got
12      about a half hour on this tape too.
13           MR. BRENZA:  Yeah, we'll be done by
14      then.
15           THE VIDEOGRAPHER:  Okay.
16   Q  (By Mr. Brenza)  If glyphosate -- if -- strike that.
17      If home use of glyphosate like -- like the use
18      Mr. Gebeyehou made of it was a significant cause of
19      non-Hodgkin's lymphoma, you'd expect to see a spike in
20      the number of cases of non-Hodgkin's lymphoma around the
21      time that glyphosate became available for home use.
22           MR. WISNER:  Objection.
23   Q  (By Mr. Brenza)  Wouldn't you?
24           MR. WISNER:  Sorry.  Objection;
25      incomplete hypothetical, speculation.

Page 137

1            THE WITNESS:  This is the fact
2       that -- this is the statement that is so multifactorial
3       in the mind of lymphoma physician that it has no answer.
4       It might or might not.  If glyphosate went up, what if
5       we found a cure for half lymphomas at the same time or
6       our treatments improved?  Some of them will go up, but
7       we cure half of them, or we found how to prevent
8       lymphomas or -- those are hypotheticals.  But what if
9       there was a population spike at the same time in terms
10      of -- in terms of aging or populational shifts who are
11      more at risk of lymphoma?
12           So if this was the only factor you're looking at,
13      and the percentage of lymphoma increase by glyphosate
14      out of all the other lymphomas is substantial, it can
15      produce the spike in lymphomas.  But there could be so
16      many covariates, populational covariates, that you might
17      not detect it.
18           So the answer could be, it could happen with a
19      spike, you would increase the use of glyphosate and
20      you'll increase lymphomas.  At the same time, you might
21      not detect it because of the other factors.
22   Q  (By Mr. Brenza)  Are you aware if there is such a spike
23      in the -- in incidence of non-Hodgkin's lymphoma?
24   A  There was an increase in non-Hodgkin lymphomas over time
25      in the United States for multiple reasons, and sort of

Andrei Shustov, M.D.

Page 138

1    decreases.  But --
2    Q  And we --
3    A  -- a lot of time --
4    Q  We talked about that in terms of the time frame of that.
5       That's -- but go ahead.  I'm sorry.  I shouldn't have
6       interrupted you.
7    A  I would have to look.  So it's -- off top of my head,
8       again, I -- I don't -- it's not my daily life.  I would
9       have to go up and see where was the spike, look at
10      American Cancer Society, what have you, really look at
11      the facts.
12   Q  Would you pull out the -- the study we've previously
13      marked as Exhibit 19.
14   A  19 is exactly missing, so...
15                 MR. WISNER:  Looks like this.
16                 (Discussion off the record.)
17
18   Q  (By Mr. Brenza)  Do you have it?
19   A  I have it.  I have it.
20   Q  Do you see this is the article from Andreotti?
21   A  Yes.
22   Q  And this is also an article based on the Agricultural
23      Health Study.  Do you see that?
24   A  Yes, I do.
25   Q  Everything else being equal, a study that's more current

Page 139

1    has a better chance of being accurate than one that's
2    quite old, right?
3                 MR. WISNER:  Objection; rampant
4    speculation.
5                 MR. BRENZA:  Well, let me -- let
6    me -- let me ask it a different way.
7    Q  (By Mr. Brenza)  Is -- is Exhibit 19 the -- the most
8       recent word on whether -- what effects glyphosate has on
9       farmers and their families?
10                MR. WISNER:  Objection.
11                THE WITNESS:  It appears very recent,
12   the best I can say.  I don't know if anything was
13   published since that time.  But since it's 2018, I doubt
14   it.  Without excluding it, yes, it looks very recent.
15   Q  (By Mr. Brenza)  And if you'll look at Page 515, first
16      full paragraph.  Tell me when you're there.  You ready?
17   A  I got it.
18   Q  Says, "In our study, we observed no associations between
19      glyphosate use and NHL overall or any of its subtypes."
20         Do you see that?
21   A  Okay.
22   Q  Now, you -- you have some criticisms of the AHS study in
23      your report, correct?
24   A  I believe so.
25   Q  What did you feel was lacking in the Agricultural Health

Page 140

1    Study?
2    A  I think I listed them.  There was -- if I remember
3       correctly, it was significant dropout rate, and we
4       discussed yesterday farmers' exposure.  And there was
5       something else.
6    Q  Feel free to refer to your report, if you want.  It's on
7       Page 7.
8    A  Yes, we've discussed it yesterday.
9    Q  So let me try to take the second one first.  What's your
10      criticism about including farmers with known risk for
11      non-Hodgkin's lymphoma?
12   A  As I believe we discussed for a clinician, farmers --
13      and we mention this also -- are subject to multiple
14      environmental factors and agricultural factors.  And I
15      believe it's hard to account for complexity of it as a
16      clinician perception.  And the multitude of agricultural
17      agents they're exposed to would be very difficult to
18      account for, as well as the use of glyphosate based on
19      self-reporting would be difficult to accurately
20      quantify.  Those were my thoughts when I reviewed the
21      study.
22         Again, this is -- to proper criticize or accept
23      this, it would have to be epidemiologic mind with
24      knowledge of epidemiology going through this, but these
25      are thoughts of the clinician who typically thinks more

Page 141

1    in a -- in sense of clinical studies.
2    Q  Wouldn't the fact that farmers are exposed to a lot of
3       different chemicals tend to artificially increase the
4       number of cancers attributed to glyphosate?
5                 MR. WISNER:  I'm going to object.
6    This is definitely general causation.  But go ahead.
7                 MR. BRENZA:  Well, he -- he
8    criticized it in his report.
9                 THE WITNESS:  Right.  I would
10   hypothesize from a clinician standpoint, not going into
11   specifics of general causation, that if you have the
12   control arm that expose to other potential carcinogens,
13   your control arm will artificially have increased
14   incidence that would dilute the difference between
15   glyphosate group and non-glyphosate group, that again
16   this is clinician thinking of paper on general causation
17   or epidemiology paper.  I could not do the detailed
18   analysis as well as epidemiologist would do, but this
19   would be my criticism being not an expert in
20   epidemiology.
21         And you can sense that this is a clinician way of
22   thinking about farmers and exposure and potential risk
23   for the control arm.  But I'm not a scientist in
24   agricultural chemistry or agricultural applications.
25   This is a clinician way of looking at this and saying,

Andrei Shustov, M.D.

Page 142

1    Wow, as a clinician, it seems to me that control arm
2    might have a problem with that.
3    Q  (By Mr. Brenza)  Do you know that they had a problem
4       with that, or are you just concerned that they might?
5    A  That is my clinician criticism of paper.  But, again,
6       this would be the question to epidemiologist whether or
7       not findings in this paper are valid or nonvalid, and
8       argument for -- for general causation.  I'm giving you
9       impression and opinion of clinician stating that I'm not
10      an expert at epidemiology.
11   Q  What's your -- what's your other criticism about the
12      dropout rate?
13   A  So in studies that we conduct in my clinical research
14      world, the dropout rate of 40 percent generally
15      invalidates most of the studies by compromising initial
16      statistical design.  So if you have dropout rate,
17      typically when I design studies, my colleague design
18      studies, we incorporate a possible dropout an order of 5
19      to 10 percent not to affect statistical design.
20         The dropout of 40 percent for studies that I'm used
21      to looking at and analyzing is prohibitively large.
22      That would break the interpretation and primary
23      endpoints of the study.  Again, for epidemiologic
24      studies, there might be a way that very skilled
25      statisticians can go around it.  But clinicians look at

Page 143

1    the fact that there was 40 percent dropout rate.  I
2    would say I -- to me, it sounds like the study -- it's
3    the study's biggest flaw.
4       You might ask the statistician and they say, Well,
5    this is okay.  But this is a clinical researcher's
6    criticism of epidemiologic paper.  But I would not
7    pretend that I would take the sort of liberty of
8    analyzing every finding in this paper with expertise
9    that can be offered by epidemiologist.
10   Q  Did you consider the ways that the authors of the
11      Andreotti study accounted for the dropout -- the dropout
12      rate?
13   A  Once again, I did consider this.  I cannot intelligently
14      opine on that.  And I mentioned this paper, and just to
15      make a reference in general causation that I did not
16      pretend to be expert in or was not goal of my report.
17      That would be a good question to -- to epidemiologist.
18   Q  Do you see in the -- on Page 515, is that where you are?
19      Yeah.
20   A  I'm here.
21   Q  In the second column, about halfway down the first full
22      paragraph, sentence beginning, "We imputed glyphosate."
23      Tell me when you see it.
24   A  On the right side, right column, first full paragraph?
25   Q  Yes.  About halfway down.  "We imputed glyphosate

Page 144

1    exposure information."
2    A  Yeah, I see it.
3    Q  So do you see that they describe there that -- how they
4       dealt with the dropout rate?  They write, "We imputed
5       glyphosate exposure information for participants who did
6       not complete the follow-up questionnaire to evaluate
7       cancer risk in the full cohort.  Results for the full
8       cohort (including imputed data) were similar to those
9       that did not include imputed data, but only included
10      people who completed the follow-up questionnaire."
11         Do you see that?
12   A  Yeah, I see that.
13   Q  So you see that they mathematically accounted for the
14      people who didn't complete the follow-up, and even if
15      you just ignore them, they don't change the results?
16   A  I would have to basically take it on faith, because that
17      requires specific epidemiologic knowledge to see whether
18      it's a valid adjustment or not.  I'm not saying that's
19      not a valid adjustment.  I'm saying that it would have
20      to be expert in general causation to accept or say,
21      Well, I disagree with this.
22         I would restrict my opinion to, again, a
23      clinician's statement that I already did, that it
24      concerns me.  It might or might not be addressed in this
25      paper, but it's a question to general causation folks.

Page 145

1       MR. WISNER:  Counselor, we are past
2    the three-and-a-half mark, so...
3       MR. BRENZA:  All right.  Let's go off
4    the record for just a minute, then.  Give me a second.
5    I may wrap up.
6       THE VIDEOGRAPHER:  All right.
7       MR. BRENZA:  I mean, I will wrap up.
8       THE VIDEOGRAPHER:  We're going off
9    record.  The time is 12:52 p.m.
10         (Pause in proceedings.)
11
12      THE VIDEOGRAPHER:  We are back on
13   record.  The time is 12:53 p.m.
14      MR. BRENZA:  I'm going to pass the
15   witness.
16      MR. WISNER:  Thank you.
17
18
19         EXAMINATION
20   BY MR. WISNER:
21   Q  Doctor, can I direct your attention to Exhibit 19, which
22      is the Agricultural Health Study that we were looking
23      at?
24   A  I'm here.
25   Q  Are you there?  Okay.

Andrei Shustov, M.D.

Page 146

1      And there was a -- a statement that counsel showed
2   you on Page 515, first full paragraph on the left
3   column.  Do you see that?  And it says, "In our study,
4   we observed no associations between glyphosate use and
5   NHL overall or any of its subtypes."
6      Do you see that?
7   A  I see that.
8   Q  What is your understanding of that sentence?
9   A  Just exactly what it says.
10  Q  Okay.  So if there was an elevated rate association in a
11     subtype, that sentence would be false?
12  A  That's correct.
13  Q  All right.  Say, look, if we look at Page 51 -- well,
14     let's actually look at 514.  Are you there, sir?
15  A  Yep.
16  Q  And then you see on the right side, this is a table:
17     "Cancer Incidence in Relation to Lag Intensity Weighted
18     Lifetime Days of Glyphosate Use."
19     Do you see that?
20  A  I see that.
21  Q  And you see on the right, there's a 20-year lag.  Do you
22     see that?
23  A  I do.
24  Q  20-year lag.  That refers to waiting 20 years to see if
25     cancer developed in a cohort study?

Page 147

1   A  That's correct.
2   Q  All right.  If you go down towards the bottom,
3      "Non-Hodgkin lymphoma T-cell."
4      Do you see that?
5   A  I see it.
6   Q  And in the 20-year lag, the lower median has a risk
7      ratio of 2.97.  Do you see that?
8   A  I see that.
9   Q  And statistically significant?
10  A  Yes.
11  Q  So that statement that there are no associations in any
12     of the subtypes that counsel read to you is actually a
13     false statement even in its own publication?
14  A  That would be wrong statement.
15  Q  Okay.
16            THE REPORTER:  What was the answer?
17            THE WITNESS:  That would be the wrong
18     statement.
19  Q  (By Mr. Wisner)  Now, there was a question about
20     falsifi -- falsifiability.
21            MR. WISNER:  What did you say,
22     Counselor?  I want to say it right.
23            MR. BRENZA:  Falsifiability.
24  Q  (By Mr. Wisner)  Falsifiability of a fact, right?
25  A  Correct.

Page 148

1   Q  All right.  So I want to explore that just very briefly.
2      We agree that this symbol here on this speakerphone
3      is red or reddish, right?
4   A  Correct.
5   Q  Is that a falsifiable fact?
6   A  I don't think so.
7   Q  Well, hypothetically, sir, could we all be living in a,
8      you know, world that we're all attached to machines like
9      in "The Matrix," and this is actually not even there;
10     this is just an illusion?
11  A  Hypothetically.
12  Q  Right.
13     And hypothetically, when we talk about the
14     probability of whether or not Roundup caused this
15     plaintiff's cancer, we could come up with hypothetical
16     explanations as to why that conclusion could be wrong?
17  A  Correct.
18  Q  It could be that Mr. Gebeyehou happens to be an alien
19     that is immune to the effects of Roundup?
20  A  Hypothetically.
21  Q  Right.
22     But these are all hypotheticals.  And what we base
23     our conclusions on in science is actually what we
24     observe and experience; is that right?
25  A  That's correct.

Page 149

1   Q  And based on the actual evidence of Mr. Gebeyehou's
2      cancer, do you have any reason to disagree with your
3      conclusion that his Roundup exposure played a
4      substantial -- had a substantial contributing factor in
5      causing his cancer?
6   A  No, I don't.
7   Q  Okay.  There was some discussions and questions about
8      you regarding whether or not farmers' exposure to
9      glyphosate is somehow different than, you called them
10     home and -- home -- home and garden users?  Do you
11     recall that?
12  A  Yes.
13  Q  And he asked you, you know, these -- he implied that
14     these epidemiological studies related to farmers.  Do
15     you recall that?
16  A  I do.
17  Q  Let's look at one of them.  Exhibit 17.  Can you pull
18     that up?  This is the McDuffie study.
19     Do you have it, sir?
20  A  Yes.
21  Q  And this Exhibit 17, this is one that has the greater
22     than two days' use statistically significant rate?
23  A  I recall that, yeah.
24  Q  Okay.  Now, this is a case control study, right?
25  A  Correct.

Andrei Shustov, M.D.

Page 150

1   Q   And it actually -- if you read the title, it says
2       "Non-Hodgkin's Lymphoma and Specific Pesticide Exposures
3       in Men: Cross-Canada Study of Pesticides and Health."
4           Do you see that?
5   A   Yes.
6   Q   It says "Cross-Canada."
7           Do you see that?
8   A   Yes.
9   Q   All right. And if we go to the introduction on the
10      first page, close to the bottom of that paragraph, see
11      the sentence that says, "Our study"?
12  A   I'm looking. First paragraph in introduction?
13  Q   Yeah. Go down. The sentence that begins, "Our study,"
14      towards the bottom. "Our study encompassed six" --
15  A   I see it.
16  Q   Okay. It reads, "Our study encompassed six provinces of
17      Canada with diverse agricultural practices and a number
18      of different types of occupational and nonoccupational
19      exposures to pesticides."
20          Do you see that?
21  A   I do.
22  Q   What does "nonoccupational exposure" mean?
23  A   Anything that's not related to people's employment. If
24      I were to sort of describe examples would be in
25      gardening, home use, used in other parts of personal

Page 151

1       property, et cetera, but outside the professional use
2       such as farming.
3   Q   And so would it be fair to say, then, this
4       epidemiological study was not just on farmers?
5   A   That's correct.
6   Q   Okay. And this is one of the studies you used to
7       categorize the exposure level for Mr. Gebeyehou as well
8       as the other plaintiffs in this case?
9   A   Make a reference to, yes.
10  Q   Okay. Let me show you another epidemiological study.
11      It was Study 18 -- I'm sorry -- Exhibit 18. It's the
12      Eriksson study.
13  A   I have it.
14  Q   Okay. This was a study published in 2008 and relates to
15      a case control study conducted in Sweden, right?
16  A   Correct.
17  Q   All right. If you read just in the abstract, the second
18      sentence, it says, "Male and female subjects aged 18
19      through 74 years living in Sweden were included during
20      December 1, 1999, to April 30th, 2002."
21          Do you see that?
22  A   I do.
23  Q   It says the "controls were selected from the national
24      population registry."
25          Do you see that?

Page 152

1   A   Yeah.
2   Q   So this study, this population-based study was not on
3       farmers, was it?
4   A   It doesn't say that.
5   Q   This was based on populations, right?
6   A   That's correct.
7   Q   Now, one of the things that opposing counsel tried to
8       raise was this idea about the size of the study. Do you
9       recall that?
10  A   Yeah.
11  Q   Now, in a cohort study, you start off with a specified
12      population and you follow them for a period of time,
13      right?
14  A   That's correct.
15  Q   And that's why in AHS you have 80,000 participants that
16      he discussed with you.
17          Do you recall that?
18  A   I do.
19  Q   Now, in a population-based study, you actually look at
20      those cases that already exist drawn from a population,
21      right?
22  A   That's correct.
23  Q   And the population you're drawing from is in the
24      millions of people, right?
25  A   That's correct.

Page 153

1   Q   So comparing the 80,000 population in the AHS, it would
2       be dwarfed comparing it to case control studies that
3       draw upon millions of people?
4   A   That's correct. That's why I made a general statement,
5       or the statement that's -- that's a general assumption
6       but doesn't apply to all the studies.
7   Q   Now, to the best of your knowledge, there's been one
8       cohort study ever conducted on glyphosate and
9       non-Hodgkin's lymphoma?
10  A   To my recollection, yes.
11  Q   Okay. And so by virtue of that one study existing, it
12      is the largest cohort study, right?
13  A   That's correct.
14  Q   Okay. There was a discussion about a farm family
15      exposure study. Do you recall that?
16  A   I do.
17  Q   And I believe it's -- I don't have the exhibit number in
18      front of me, but -- here's 24. Maybe 25. No, it would
19      have been higher than that. It's 20 -- 34.
20  A   Got it.
21  Q   Do you have it, sir?
22  A   I do.
23  Q   Okay. And in this study, there's a reference to the
24      Environmental Protection Agency reference dose. Do you
25      notice that?

Andrei Shustov, M.D.

## Page 154

1  A  Yeah, I do.
2  Q  Okay.  Couple of quick general questions.  Do you know
3     what the reference dose refers to?
4  A  In general.  Unrelated to this.  Well, let's --
5  Q  Well, no.  The reference dose that they're specifying in
6     this article.  Do you know what it refers to?
7  A  Let me just --
8  Q  Let me strike that question.  I think you already
9     answered that question.  I think a better question is:
10        Is there any statement in this article saying that
11    the reference dose refers to carcinogenicity?
12  A  That I don't think so.
13  Q  Okay.  Are you aware that the reference dose referenced
14    in this case, in this article, refers to birth defects
15    associated with Roundup?
16  A  I remember seeing that.
17        MR. BRENZA:  Object to form.
18  Q  (By Mr. Wisner) Okay.  There was also a discussion
19    about them looking at the urine samples in this article.
20    Do you recall that?
21  A  I remember that.
22  Q  Nowhere in this article did they look at the feces of
23    the subjects?
24  A  I don't recall that.  I -- I could confirm looking
25    through it, but I don't recall that.

## Page 155

1  Q  And if, in fact, Monsanto, who conducted this study,
2     knew that the majority of Roundup actually was excreted
3     through the feces, measuring the urine would be a bit
4     deceptive, wouldn't it?
5         MR. BRENZA:  Object to form.
6         THE WITNESS:  That would be one of
7     the reasons, and that's why I made a general statement
8     that making decisions on measuring substances and wrong
9     bodily fluids or -- it has to have really proven
10    correlation with actual data and their effect on cancer
11    development or other -- and -- and effect of the
12    substance.
13  Q  (By Mr. Wisner) Okay.  Look at Exhibit 33.  It's the
14    article by Kier and Kirkland.
15  A  I have it.
16  Q  Okay.  There is a -- I just want to ask you some general
17    questions.
18        Did counsel, when he showed you this document, show
19    you any documents evidencing that this document was
20    prepared by Monsanto in defense of glyphosate
21    litigation?
22  A  He didn't mention that.
23  Q  Did he show you any documents reflecting that this
24    document was, in fact, ghostwritten by Monsanto
25    employees?

## Page 156

1         MR. BRENZA:  Object to form.
2         THE WITNESS:  He didn't mention that.
3  Q  (By Mr. Wisner) Did he discuss with you whether or not
4     the journal that actually published this article has
5     recently issued an expression of concern due to the lack
6     of transparency and honesty of these authors in
7     publishing this document?
8         MR. BRENZA:  Object to form.
9         THE WITNESS:  He did not --
10        MR. BRENZA:  Assumes matters --
11        THE WITNESS:  -- mention that.
12        MR. BRENZA:  -- not in evidence.
13  Q  (By Mr. Wisner) So did he show you anything about the
14    validity of this document beyond just asking you to
15    assume it's true?
16  A  No.
17        MR. BRENZA:  Object to form.
18  Q  (By Mr. Wisner) Are you aware or did he explain to you
19    that Monsanto hired a guy by the name of Dr. James Parry
20    in the late 1990s to examine the genotoxicity of
21    glyphosate or Roundup?
22        MR. BRENZA:  Object to form.  Beyond
23    the scope.
24        THE WITNESS:  No, I was not informed.
25  Q  (By Mr. Wisner) Okay.  And did he tell you that their

## Page 157

1     own internal scientist concluded that, in fact, Roundup
2     was genotoxic?
3         MR. BRENZA:  Object to form.  Assumes
4     matters not in evidence, beyond the scope.
5         THE WITNESS:  I was not informed of
6     that.
7  Q  (By Mr. Wisner) Okay.  All right.  I want to talk a
8     little bit about -- there was a question asked of you,
9     and it was something to the effect of, do you have any
10    evidence that Mr. Gebeyehou used Roundup?  Or something
11    to that effect.  Do you recall that question?
12        MR. BRENZA:  Object to form.
13        THE WITNESS:  I do.
14  Q  (By Mr. Wisner) And when he -- when opposing counsel
15    used the word "evidence," did you understand that to
16    mean, like, a chemical or a medical test?
17  A  Can you ask this again?
18  Q  Well, let me put it this way.  Evidence in the legal
19    profession is more broad than just, like, a lab result.
20    Okay?  It includes testimony, for example.
21  A  Okay.
22  Q  And if you brought in that definition of "evidence" --
23    for example, communications you may have had with
24    Mr. Gebeyehou -- do you have any evidence that he, in
25    fact, sprayed or was exposed to glyphosate?

Andrei Shustov, M.D.

Page 158

1   A  If his statements to me is evidence, then yes.
2   Q  Okay.  Doctor, what is chemotherapy?
3   A  Chemotherapy is the way that we treat and cure cancers,
4      and it defines cytotoxic drugs that were studied and
5      proven to be beneficial in killing cancer cells.  So
6      it's a method of treating cancer.
7                  MR. WISNER:  Okay.  Let's go off
8      record.
9                  THE VIDEOGRAPHER:  All right.  We are
10     going off record.  The time is 1:08 p.m.
11                 (Pause in proceedings.)
12
13                 THE VIDEOGRAPHER:  We are back on
14     record.  The time is 1:12 p.m., and this marks the
15     beginning of Media Unit 3.
16  Q  (By Mr. Wisner)  Now, just before we switched over, I
17     asked you what chemo was.  And I guess my next question
18     is:  What does chemotherapy do to the human body?
19  A  Besides killing cancer, it has substantial effect on
20     multiple organ systems in humans.  Because chemotherapy
21     was developed with a single principle in mind to kill
22     rapidly dividing cells.  And it does not discriminate
23     whether those cells are cancerous or healthy.  And there
24     are numerous systems in our body that rely on rapid cell
25     division.  Numerous systems.  So chemotherapy would have

Page 159

1      substantial impact on health of the bone -- bone marrow,
2      gastrointestinal tract, hairs, organ systems.  And
3      besides general effect on rapidly dividing cells, it has
4      multitude of specific organ toxicities demanding --
5      depending on -- on the drug.  So it has substantial
6      detrimental effect on human body.
7   Q  And that -- that sort of broad, sweeping damage that
8      chemotherapy does to the body, can that exacerbate
9      physical conditions that are already present in a
10     person?
11  A  Of course.
12                 MR. BRENZA:  Object to form.
13  Q  (By Mr. Wisner)  And do you believe that that, based on
14     what you've observed in your review of Mr. Gebeyehou's
15     file, that that in fact occurred?
16                 MR. BRENZA:  Object to form.
17                 THE WITNESS:  I suspected that the
18     symptoms he described after chemotherapy were at least
19     exacerbated by exposure to chemotherapeutic drugs.
20  Q  (By Mr. Wisner)  That's something you've seen happen in
21     your regular practice?
22  A  Every day.
23  Q  Treating thousands of patients with a lymphoma?
24  A  That's correct.
25  Q  There was a question about whether or not having a

Page 160

1      history of cancer in the family leads to a higher
2      probability that somebody will have cancer.  Do you
3      recall there was a question about that?
4   A  I do.
5   Q  Is there any scientific evidence whatsoever to suggest
6      that lymphoma in your family actually leads to a greater
7      increase of lymphoma?
8   A  Not to my knowledge.
9   Q  And be more specifically, is there any -- I understand
10     that his mother passed away from -- what type of cancer?
11  A  Ovarian cancer.
12  Q  Is there any evidence to suggest that ovarian cancer in
13     a mother increases the risk of lymphoma in a child?
14  A  Absolutely not.  It would be nonsensical to imply for an
15     oncologist, especially having ovarian cancer diagnosed
16     at the age of 90-plus, that would have impact on having
17     lymphoma in a child.
18  Q  Or just even in the progeny of that person even if
19     they're older?
20  A  Correct.
21  Q  Okay.  There was a question about whether or not the
22     mutations caused by smoking could persist later on in
23     life.  Do you recall that?
24  A  I do.
25  Q  Has there actually been studies done about the duration

Page 161

1      between the stopping of smoking and the risks of cancer
2      associated with smoking?
3   A  It's very interesting, but actually, yes, despite the
4      fact that there is possibility that mutation could
5      persist for life.  But when patient stops smoking, the
6      subsequent risk of developing lung cancer, which is the
7      most common consequence of cancer in the realm of
8      oncology, goes down as decades -- as patients progress
9      decades after stopping smoking, to the point that -- I
10     would have to look up exact number.  By 20 to 30 years,
11     I believe, the risk returns to the baseline of
12     nonsmokers.  Again, don't quote me on the number just
13     yet, but I can look it up.  But there is the fact that,
14     after a certain point after smoking cessation, the risk
15     of lung cancer returns to baseline.
16  Q  And for Mr. Gebeyehou, he quit smoking in the '70s,
17     right?
18  A  That's correct.
19  Q  So he -- he didn't develop non-Hodgkin's lymphoma till
20     almost 40 years after he stopped smoking?
21  A  That is correct.  As well as the fact that, in the
22     oncology world, there is no perception or there is no
23     knowledge that smoking is a risk factor for non-Hodgkin
24     lymphoma.
25  Q  That's exactly right.  So considering that his smoking

Andrei Shustov, M.D.

Page 162

1    was over 40 years ago and there's actually no
2    relationship between smoking and lymphoma, does that
3    fact have really any relevance to his particular case?
4              MR. BRENZA:  Object to form.
5              THE WITNESS:  In a view of an
6    oncologist that I'm sure would be shared by over a
7    majority of colleagues, it would not be a risk factor
8    for lymphoma.
9    Q   (By Mr. Wisner)  Okay.  There was a question that
10   counsel asked that implied that Mr. Gebeyehou was
11   exposed to hepatitis B when he was living in Ethiopia.
12   Do you recall that?
13   A   I do.
14   Q   Do you have any evidence to indicate that he, in fact,
15   was exposed to hepatitis B when he was in Ethiopia?
16   A   I don't have any evidence.
17   Q   That would just be rampant speculation?
18   A   That was -- it was hypothetical question that he was
19   exposed.  But I don't have any evidence.
20   Q   In my understanding, the hepatitis B antibodies that
21   were located in Mr. Gebeyehou's blood that, didn't
22   even -- wasn't even observed until he was undergoing
23   chemo; is that right?
24             MR. BRENZA:  Object to form.
25             THE WITNESS:  To -- to my

Page 163

1    recollection, yes, that's when I remember seeing it on
2    his tests.
3    Q   (By Mr. Wisner)  In fact, one of the things that helps
4    tell you whether or not somebody had an actual virus or
5    an actual infection is, when you give them chemo,
6    sometimes the infection returns?
7    A   That's the risk in a person who harvests hepatitis B
8    infection.  And as we discussed, that's why preemptively
9    we treat everybody to find those few that actually
10   harbor -- might harbor the virus.
11   Q   But notwithstanding that fact --
12   A   Correct.
13   Q   -- even though Mr. Gebeyehou had significant
14   chemotherapy, there was no evidence of any recurrence or
15   even emergence of hepatitis B?
16   A   That's correct.
17   Q   What relevance is that in your differential diagnosis?
18   A   Well, to begin with, having no evidence of active or
19   clinically active hepatitis or persistence of activity
20   of hepatitis B virus, it would be very hard for me to
21   link his real evidence history of hepatitis B virus
22   exposure to development of lymphoma.
23   Q   All right.  There was a question about whether or not
24   non-Hodgkin's lymphoma was a common cancer.  Do you
25   recall that?

Page 164

1    A   I do.
2    Q   And I'm worried that that -- that's -- that phrase could
3    be a little misleading.
4              Is it fair to say that most people get lymphoma?
5    A   No.
6    Q   In fact, it's pretty rare amongst people, right?
7              MR. BRENZA:  Object to form.
8              THE WITNESS:  If you just take
9    population in general, it is a rare occurrence for
10   somebody to develop lymphoma.
11   Q   (By Mr. Wisner)  But in the area of cancer, which is
12   already rare, lymphoma is a common cancer?
13   A   Of course.  If you start narrowing down into specific
14   population and try to determine fraction of that, it's
15   all about denominator.
16   Q   There's also a question about the -- whether or not --
17   of the cancers that are non-Hodgkin's lymphoma, a lot of
18   them more commonly are in people under 70s; is that
19   right?
20   A   Correct.
21   Q   Okay.  But is it fair to say that the majority of people
22   with non-Hodgkin's lymphoma are in their 70s?
23   A   That's correct.
24   Q   Okay.  Does that mean, however, that people who are --
25   well, strike that.

Page 165

1              Okay.  Finally, there was some questions that
2    opposing counsel asked you about whether or not you were
3    experts in all these fields.  Do you remember those
4    questions?
5    A   I do.
6    Q   Okay.  And there was a question about whether or not you
7    were, for example, an expert in chemistry, right?
8    A   I remember that.
9    Q   Okay.  How are you defining the word "expert"?
10   A   In -- in my opinion, the word "expert" is somebody who
11   has experience in dealing with particular type of
12   problems, particular type of experiences, has proper
13   education for this type of activity, and has done
14   research, published in this area.  Those are kind of
15   criteria.
16   Q   Now, if I were to define "expert" simply as having
17   specialized training or expertise in something.  Okay?
18   So not what you said.  Use my term.  Would you be an
19   expert in pathology?
20             MR. BRENZA:  Object to form.
21             MR. WISNER:  Let me withdraw that
22   question and put it another way.
23   Q   (By Mr. Wisner)  Do you have specialized training and
24   experience looking at pathology?
25   A   I have studied pathology in medical school.  I have

42 (Pages 162 to 165)

Andrei Shustov, M.D.

Page 166

1   reviewed a lot of pathology examples with my pathology
2   colleagues.  And I have general understanding and
3   probably better understanding than, say, general
4   practitioner when I look at the slides of lymphoma
5   patient.  But I would be much less expert compared to
6   somebody who has training in pathology for years and
7   specializes in pathology.
8   Q   Exactly.  And I understand doctors are very hesitant
9       to -- to call themselves experts in fields when there's
10      other experts who do that as a profession.  I understand
11      that.
12          But notwithstanding that, as a person who went to
13      medical school and has done postdoctorate work, for
14      example, you have knowledge about chemistry that most
15      people don't have?
16              MR. BRENZA:  Object to form.
17              THE WITNESS:  I have enough knowledge
18      of chemistry that is probably I would define better than
19      somebody who did not have my level of education.
20   Q  (By Mr. Wisner)  And, I guess, the question I'm really
21      getting at is:  Notwithstanding the fact that you don't
22      consider yourself a, quote/unquote, expert in all those
23      fields listed, do you believe you have sufficient
24      understanding of those topics to be able to offer the
25      opinions you're giving in this case?

Page 167

1              MR. BRENZA:  Object to form.
2              THE WITNESS:  I believe so.
3              MR. WISNER:  Thank you.  No further
4       questions.
5              MR. BRENZA:  Just got a few more.
6
7
8              FURTHER EXAMINATION
9   BY MR. BRENZA:
10  Q   Let me begin, Doctor, with the Exhibit 19.  I was
11      unclear exactly what you were identifying when you were
12      trying to point out the cancer that had a increased risk
13      under the Agricultural Health Study.
14   A   Okay.
15   Q   Exhibit 19.
16   A   Yeah, I have it.
17   Q   Could you -- could you just point that out to me now?
18   A   What we just discussed?
19   Q   Yes.
20   A   The question that counsel asked me, if you look at
21      Page 515.
22   Q   Yes.
23   A   And you go to the left column, second paragraph, the
24      authors' conclusion in this part state that, "In our
25      study, we observed no association between glyphosate use

Page 168

1       and NHL overall or any of its subtypes."
2   Q   Yes.
3   A   And he pointed out that in Table 3, there was actually
4       significant association for non-Hodgkin's T-cell
5       lymphoma with 20-year lag, odds ratio 2.97, was
6       statistical significance.  And I believe that he makes a
7       statement which -- which I agreed that T-cell
8       non-Hodgkin lymphoma is a subtype of non-Hodgkin
9       lymphoma.  And if you make a statement there, say that
10      there was no association with any subtype of non-Hodgkin
11      lymphoma, that's a wrong statement.  Because there was
12      association in T-cell lymphoma, which is a subtype of
13      non-Hodgkin lymphoma.
14   Q   Okay.  And so just looking at Table 3, Tables 2 and 3,
15      there are a number of different cancers, right, that are
16      identified?  Different kinds of cancer?
17   A   I see that.
18   Q   So if you go back all the way to the beginning of 2, it
19      lists -- let's see -- 22 types of cancer.  Does that
20      sound right in Table 2?
21   A   2 and 3.
22   Q   Start with Table 2.
23   A   Yeah, but they overlap.
24   Q   Well, Table 2 is intensity-weighted lifetime days.
25      Table 3 -- maybe they do overlap.

Page 169

1          Well, let's start with Table 2.
2   A   Okay.
3   Q   Table 2, there's 22 types of cancer.  None of them have
4       a statistically significant risk caused by glyphosate,
5       right?
6              MR. WISNER:  Objection.
7              THE WITNESS:  Not in Table 2.
8   Q  (By Mr. Brenza)  And -- and Table 2 not only breaks down
9       22 types of cancer, but it breaks down each type of
10      cancer into four separate exposure levels, right?
11   A   Correct.
12   Q   And, again, none of them shows statistically significant
13      increased risk --
14   A   Okay.
15   Q   -- from glyphosate, right?
16          And then Table 3 lists 12 types of cancer, each of
17      which is broken down into approximately four exposure
18      levels?
19   A   Uh-huh.
20   Q   And of all those findings, the only one that shows a
21      statistically significant increase is the one for
22      non-Hodgkin's lymphoma T-cell 20-year lag, right?
23   A   Correct.
24   Q   Do you know what the definition of "statistical
25      significance" means?

43  (Pages 166 to 169)

Andrei Shustov, M.D.

Page 170

1        MR. WISNER:  Objection; well beyond
2    the scope, but...
3        MR. BRENZA:  I'm just -- you -- you
4    questioned him about it.
5        THE WITNESS:  So statistical
6    significance, again, I -- I can't say that I'll quote
7    the definition from statistic science, but it is the
8    significance proven beyond the established error rate,
9    which in most cases is beyond a P value of .05.
10   Q   Which is 5 percent?
11   A   Correct.
12   Q   So when something is found to be a statistically
13      significant correction, one time out of 20, it's going
14      to be wrong.  It's actually not a true finding, right?
15       MR. WISNER:  Objection.
16       THE WITNESS:  Well, in a -- in a --
17   in pure statistical discussion, yes.
18   Q   (By Mr. Brenza)  And we've looked at, on Table 2 and 3,
19      there's way more than 20 comparisons being made here.
20      There's hundreds, right?
21   A   Okay.
22   Q   And this many comparisons, you'd expect at least one
23      spurious positive, wouldn't you?
24       MR. WISNER:  Objection; speculation.
25       THE WITNESS:  I think it would be

Page 171

1    wrong way of looking at it, because they're all
2    different comparisons.  So if you say -- the way I would
3    apply statistical significance, I would look at every
4    particular one and say, within every particular
5    category, we have 5 percent chance of being erroneous
6    results.  Not out of all the categories say, Oh, one of
7    them is not statistically significant.  That's why it's
8    an error.
9    Q   (By Mr. Brenza)  But each category has a 5 percent
10      chance of being a spurious result.  And you look at
11      hundreds of categories.
12   A   Okay.
13   Q   You're going to generate at least one spurious positive,
14      right?
15   A   No.  Because these categories, they were -- they were
16      assessed independently.
17   Q   I understand that.  But even independent observations,
18      if you make enough of them, more than 20 of them, you're
19      going to start to see false positives, right?
20   A   Well, again, you're questioning the level of statistical
21      significance.  That's -- that -- you know, that's a
22      whole different issue.  But with -- within the T-cell
23      lymphomas, there was statistically significant odds
24      ratio, meaning whatever the statistical boundary they
25      defined, within that boundary, they found statistical

Page 172

1    significance.  Had nothing to do with any other
2    categories.
3    Q   Okay.  Is it fair to say that the vast majority of these
4       observations find no connection between glyphosate and
5       non-Hodgkin's lymphoma or any of its subtypes?
6    A   In this paper, in this table, yes.
7    Q   And notably for this case, Mr. Gebeyehou had DLBCL,
8       right?
9    A   That's right.
10   Q   Diffuse large -- and you see there's a specific category
11      for that type of cancer on Table 3?
12   A   I do.
13       MR. WISNER:  I'll object.  This is
14   well beyond the scope of my cross.
15       MR. BRENZA:  I'm going to be done in
16   just a second.
17   Q   (By Mr. Brenza)  Do you see that every single entry for
18      every single time period and exposure level for diffuse
19      large B-cell lymphoma shows no significant increase of
20      risk due to glyphosate?
21   A   I see that in this paper, in this table.
22   Q   You talked -- you were questioned on direct about
23      hepatitis B.  Mr. Gebeyehou -- you don't dispute
24      Mr. Gebeyehou had antibodies in his blood to the
25      hepatitis B virus, do you?

Page 173

1    A   I don't.
2    Q   And to get antibodies in your blood, that means you were
3       exposed to the virus, right?
4    A   That's correct.
5    Q   The body can't just make those out of nowhere.  It
6       means -- it only makes them in response to being
7       infected by the virus?
8        MR. WISNER:  Objection; misstates his
9    testimony.
10   Q   (By Mr. Brenza)  I'm -- I'm asking you.
11   A   So --
12       MR. WISNER:  You just changed your
13   words.
14       THE WITNESS:  In order to make the
15   antibody specific to certain agents, you have to have
16   exposure to that --
17       MR. BRENZA:  Okay.
18       THE WITNESS:  -- infection agent.
19   Q   (By Mr. Brenza)  And so Mr. Gebeyehou was exposed to the
20      virus?
21   A   At some point in his life.
22   Q   And he was -- you were asked about the fact that he
23      didn't have a recurrence when he was given chemotherapy.
24      Remember that?
25   A   Recurrence of...?

Andrei Shustov, M.D.

Page 174

1  Q  Of hepatitis B.
2  A  Of -- re -- basically resurgence of the virus, yes.
3  Q  Yeah.  Your counsel asked you and said he didn't have a
4      resurgence; therefore, he wasn't exposed to the virus?
5          MR. WISNER:  Objection; misstates my
6      question.
7  Q  (By Mr. Brenza)  Do you remember something along those
8      lines?
9  A  I did not say that he was not exposed.  We have evidence
10     he was exposed.
11 Q  Okay.  And he didn't have a recurrence because he was
12     given antiviral medicine in connection with his
13     chemotherapy, right?
14 A  No.  He was given antiviral agent just in case.  But it
15     does not prove that he had a virus, and there is -- it
16     does not prove that if he didn't give -- didn't get
17     antiviral agent, he would not have recurrence.  It's a
18     standard practice to account for very minute risk of
19     life-threatening complications.
20 Q  I understand that.  But the -- but the point is, the
21     fact that he didn't have a recurrence, you can't tell
22     whether it wouldn't have been a recurrence or it was
23     because the -- he was given antiviral medicine to
24     prevent a recurrence, right?
25 A  Those both hypotheticals are correct.

Page 175

1  Q  Either way, he didn't have a recurrence?
2  A  He did not have recurrence.  Whether he did not have
3      recurrence because he didn't have virus in the first
4      place or because the doctor gave him lamivudine, both of
5      those hypothetical considerations.
6          MR. BRENZA:  Okay.  That's -- I'm
7      done.
8
9
10          FURTHER EXAMINATION
11 BY MR. WISNER:
12 Q  I just want to clear up:  Opposing counsel asked you a
13     question about whether or not he was exposed to the
14     hepatitis B virus.  Do you recall that?
15 A  I do.
16 Q  And then immediately afterwards, he goes, That means he
17     was infected.
18     Are exposure and infection the same thing?
19 A  No.
20 Q  What's the difference?
21 A  So the infection is a clinical syndrome where a virus
22     causes the disease.  So that implies infection of the
23     target tissues, like liver, replication of the virus,
24     waking up the function of the virus, and in the way,
25     causing damaging action to the organ that is the target.

Page 176

1      So that would be the clinical definition or definition
2      of clinical infection.
3  Q  Is there any evidence that you've seen in all of
4      Mr. Gebeyehou's records or in your investigation that
5      indicates that he actually had an infection of
6      hepatitis B?
7  A  I did not see any evidence.
8  Q  And have you -- and is it your understanding that you
9      have to have an infection of hepatitis B before it
10     becomes a substantial contributing risk factor for
11     non-Hodgkin's lymphoma?
12 A  You have to have viral function and presence of
13     replication like DNA evidence in the serum and other
14     evidence of viral function.
15 Q  And just to clean up the question on the AHS about the
16     error rate of 25 -- 5 percent.  Do you recall that?
17 A  Yeah.
18 Q  Okay.  Were you trying to say that the P value related
19     to T-cell lymphoma means that if you were to check the
20     data against the real population, the hypothetical real
21     population, one out of 20 times, this result would be
22     wrong?
23 A  In T-cell lymphoma.
24 Q  Exactly.
25 A  Yes.

Page 177

1          MR. WISNER:  Okay.  No further
2      questions.
3          MR. BRENZA:  Just one more.
4
5
6          FURTHER EXAMINATION
7  BY MR. BRENZA:
8  Q  T-cell lymphoma isn't the kind of cancer we're talking
9      about in this case, right?
10 A  Not in Mr. Gebeyehou's case.
11         MR. BRENZA:  Okay.  That's it.
12         MR. WISNER:  Thank you for your time,
13     sir.
14         THE VIDEOGRAPHER:  All right.  We are
15     going off record at 1:36 p.m.  And this concludes the
16     video deposition of Dr. Andrei Shustov.
17         (Signature reserved.)
18         (Deposition concluded at
19         1:36 p.m.)
20
21
22
23
24
25

45  (Pages 174 to 177)

Andrei Shustov, M.D.

| Page 178 | Page 180 |
|---|---|

**Page 178**

1   STATE OF WASHINGTON )   I, John M.S. Botelho, CCR, RPR,
            ) ss a certified court reporter
2   County of Pierce   )   in the State of Washington,
            do hereby certify:

3

4

5       That the foregoing deposition of ANDREI SHUSTOV,
    M.D., was taken before me and completed on December 16,
6   2018, and thereafter was transcribed under my direction;
    that the deposition is a full, true and complete transcript
7   of the testimony of said witness, including all questions,
    answers, objections, motions and exceptions;
8       That the witness, before examination, was by me
    duly sworn to testify the truth, the whole truth, and
9   nothing but the truth, and that the witness reserved the
    right of signature;

10

11      That I am not a relative, employee, attorney or
    counsel of any party to this action or relative or employee
12  of any such attorney or counsel and that I am not
    financially interested in the said action or the outcome
13  thereof;

        IN WITNESS WHEREOF, I have hereunto set my hand
14  this 18th day of December, 2018.

15

16

17

18

19

20      _____
        John M.S. Botelho, CCR, RPR
21      Certified Court Reporter No. 2976
        (Certification expires 5/26/19.)

22

23

24

25

**Page 180**

1   WITNESS:  Andrei Shustov, M.D.

2   DATE: December 16, 2018

3   CASE:   Gebeyehou v. Monsanto Co., et al.

4   Please note any errors and the corrections thereof on this

5   errata sheet.  The rules require a reason for any change or

6   correction.  It may be general, such as "To correct

7   stenographic error," or "To clarify the record," or "To

8   conform with the facts."

9

10  PAGE  LINE  CORRECTION              REASON FOR CHANGE

11  ____  ____  _____     _____

12  ____  ____  _____     _____

13  ____  ____  _____     _____

14  ____  ____  _____     _____

15  ____  ____  _____     _____

16  ____  ____  _____     _____

17  ____  ____  _____     _____

18  ____  ____  _____     _____

19  ____  ____  _____     _____

20  ____  ____  _____     _____

21  ____  ____  _____     _____

22  ____  ____  _____     _____

23  ____  ____  _____     _____

24  ____  ____  _____     _____

25  ____  ____  _____     _____

**Page 179**

1           CERTIFICATE OF DEPONENT

2

3       I hereby certify that I have read and examined the
    foregoing transcript, and the same is a true and accurate
    record of the testimony given by me.

4

5       Any additions or corrections that I feel are necessary,
    I will attach on a separate sheet of paper to the original
    transcript.

6

7       _____
        Andrei Shustov, M.D.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

46  (Pages 178 to 180)