# EXHIBIT 25

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

______________________________________________________________

IN RE: ROUNDUP PRODUCTS )
LIABILITY LITIGATION )
________________________________ )
) MDL No. 2741
This document relates to: )
) Case No. 16-md-02741-VC
Stevick v. Monsanto Co., et al. )
Case No. 3:16-cv-2341-VC )
)
)
)

______________________________________________________________

VIDEOTAPED DEPOSITION OF ANDREI SHUSTOV, M.D.

December 16, 2018

Seattle, Washington

APPEARANCES

For the Plaintiff:

R. BRENT WISNER, ESQ.
Baum, Hedlund, Aristei & Goldman
10940 Wilshire Boulevard
17th Floor
Los Angeles, California 90024
310.207.3233
rbwisner@baumhedlundlaw.com

For Defendant Monsanto Co.:
AARON H. LEVINE, ESQ.
DAVID KERSCHNER, ESQ.
Arnold & Porter Kaye Scholer, LLP
250 West 55th Street
New York, New York 10019
212.836.8000
aaron.levine@arnoldporter.com
david.kerschner@arnoldporter.com

For Defendant Bayer:
LINDLEY J. BRENZA, ESQ.
Bartlit Beck, LLP
1801 Wewatta Street
Suite 1200
Denver, Colorado 80202
303.592.3100
lindley.brenza@bartlitbeck.com

Also present: Allison Borgida, videographer

EXAMINATION INDEX

| EXAMINATION BY: | PAGE NO. |
|---|---|
| Mr. Brenza | 6 |
| Mr. Wisner | 80 |

EXHIBIT INDEX

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| Exhibit No. 36 | Monsanto Company's Notice to Take Oral and Videotaped Deposition of Dr. Andrei Shustov. | 4 |
| Exhibit No. 37 | Expert Report of Dr. Andrei R. Shustov. | 4 |
| Exhibit No. 38 | Expert Report of Dr. Chadi Nabhan. | 18 |
| Exhibit No. 39 | Clinical Summary for Elaine M. Stevick dated 9/6/2018. Labeled Confidential-Stevick-EStevick -KPNValley-MD-000010. | 56 |
| Exhibit No. 40 | Decision/Reason, dated 7/14/2016. Labeled Confidential-Stevick-EStevick -PPR-000158. | 60 |
| Exhibit No. 41 | Office visit for Elaine M. Stevick dated 8/2/2018. Labeled Confidential-Stevick-EStevick -KPNValley-MD-005067. | 62 |

BE IT REMEMBERED that on Sunday, December 16, 2018, at 1900 Fifth Avenue, Seattle, Washington, at 2:35 p.m., before JOHN M.S. BOTELHO, Certified Court Reporter, appeared ANDREI SHUSTOV, M.D., the witness herein;

WHEREUPON, the following proceedings were had, to wit:

<<<<<< >>>>>>

(Exhibit Nos. 36 and 37 marked for identification.)

THE VIDEOGRAPHER: We are on record at 2:35 p.m. on Sunday, December 16, 2018, in the matter of Stevick vs. Monsanto. The deponent today is Dr. Andrei Shustov.

Will counsel and -- counsel please identify themselves for the record, and then the court reporter may swear in the witness.

MR. WISNER: Brent Wisner on behalf of the deponent and the plaintiffs in this case.

MR. BRENZA: Lin Brenza with Bartlit Beck on behalf of Bayer.

MR. KERSCHNER: David Kerschner

from Arnold & Porter on behalf of Monsanto.

MR. LEVINE: Aaron Levine from Arnold & Porter on behalf of Monsanto.

MR. WISNER: Technically Bayer is not a party to this case.

MR. BRENZA: I don't know.

MR. WISNER: Okay.

MR. BRENZA: I'll be on behalf of Monsanto if you want me to be.

MR. WISNER: Okay.

MR. BRENZA: So -- I'm sorry. Go ahead.

ANDREI SHUSTOV, M.D., having been first duly sworn by the Certified Court Reporter, deposed and testified as follows:

MR. WISNER: Before you begin, sir, just the same objections as last time. He's being offered for a specific cause only, not general cause, and this is related specifically to Mrs. Stevick's case.

////

////

EXAMINATION

BY MR. BRENZA:

Q Doctor, I know it's been long, a long --

A Yes, it has been.

Q -- two days. We're -- hopefully we're getting near the end here. We have one more plaintiff to talk about. It's Ms. Stevick.

Did you -- well, let me just ask you before we get into Ms. Stevick: Did you do the same procedures to prepare your report for Ms. Stevick that you did for the other plaintiff that we talked about today?

A I did.

Q Did you examine Ms. Stevick?

A I did.

Q Did you examine her at a hotel conference room?

A That's correct.

Q Was that also at the Marriott?

A Correct.

Q In Seattle?

A That's correct.

Q When did you examine her?

A I met with Ms. Stevick on November 7th, 2018.

Q And who else was there?

A She was accompanied by her husband.

Q Anybody else?

A No.

Q What did you do?

A I, once again, collected a comprehensive history according to standards of medical practice, including her recollection of history of present illness, social history, family history, exposures, specific exposure pertaining to glyphosate. Performed physical exam. And prior to examine, I reviewed her medical records provided to me.

Q How -- how long did you spend reviewing Ms. Stevick's medical records, examining her, and preparing your report about her?

A I'd say, altogether, I would estimate about 20 hours.

Q What kind of physical exam did you perform?

A I performed a standard comprehensive physical exam that includes major body systems and organ systems and body anatomical locations.

Q Did you conclude that Ms. Stevick had been -- her cancer had been cured?

A I've concluded that she, as of my date of my exam, is in remission.

Q And remission means there's no detectable cancer?

A With standard techniques that we use to look for cancer, yes.

Q And Ms. Stevick has been in remission for close to

five years, right? Close to four years? Sorry.

A That's correct.

Q Is -- Ms. Stevick had a different type of lymphoma than others that you've evaluated, right?

A Histologically, she had the same type of lymphoma. By anatomical location, she had a sub-subtype of diffuse large B-cell lymphoma called primary CNS lymphoma.

Q You said histologically?

A That is correct.

Q What is -- what is histologically?

A It means that --

Q What does that mean?

A -- if somebody looks in the microscope on diffuse large B-cell lymphoma extracted from the brain and from any other location, it would appear the same on the microscope. And pathologist would not be able to determine whether this is primary CNS lymphoma versus diffuse large B-cell lymphoma from the lymph node except for the fact that there'll be some brain tissue around it as opposed to lymph node tissue around it. If you isolate specific lymphoma cells and present it to pathologist, they would not be able to say the difference.

Q So it's -- would it be right to say it's a species of

DLBCL, or is it -- is it just exactly DLBCL but in a different physical location?

A So, once again, histologically defined by appearance, it's exactly DLBCL. Clinically, it is subspecies of DLBCL that happen to arise in the brain. So when you talk about our current classification of lymphomas, we define it as clinical and pathologic classification. So a subtype of lymphoma defined there, two things that go into definition of the entity to say this is the species of lymphoma are pathologic characteristics and clinical characteristics.

Q So pathologically it's DLBCL. Clinically it's something unto its own; is that right?

A Clinically it is DLBCL of the -- of the central nervous system.

Q What's -- what's the clinical significance of noting that it's in the central nervous system?

A The approaches to treatment of primary brain diffuse large B-cell lymphoma are different from those that arise outside central nervous system.

Q So it's a different treatment regimen?

A That is correct.

Q And is that because PCNS, chemotherapies have to cross the blood-brain barrier?

A That is correct.
Q And what's the consequence of that?
A In what sense?
Q How does it affect your treatment regimen?
A Oh. So there are defined chemotherapeutic agents that chemically are known to have capacity to penetrate something called blood-brain barrier. And examples of drugs like that would be methotrexate at very high doses that we do not use for other malignancies, and high doses of a drug called cytarabine. And those, used again in high doses, as well as other regimens, knowing that their capacity to penetrate into the brain and kill lymphoma cells in the brain. The standard CHOP components not believed to penetrate into the brain tissue with enough concentrations to provide cure or put remission in PNC -- primary CNS DLBCL.
Q Is the expected prognosis of somebody like Ms. Stevick who has PCNS similar to what we discussed with respect to another patient who had DLBCL, in the sense that if it's going to recur, the most likely time is within two years of the treatment?
A It is more likely early after treatment than later after treatment.
Q And then every year that goes by after that, it gets

a little bit more unlikely that the person will ever have a recurrence of that cancer, right?
A That is correct.
Q Okay. So at this point, Ms. Stevick is -- should expect to have no further recurrence if you had to make a guess about what's in the future for her?
A She has more likelihood of being cured than have recurrence in the future.
Q When you examined her, did you -- she was -- she had been cured for a number of years by then. Was there anything to observe that had to do with her PCNS?
A Let me consult. I do not recall specifically. And let me confirm with my documentation of her exam before I make definitive statement.
I did not see any evidence of recurrent or residual lymphoma or lymphoma-associated symptoms on my exam.
Q But did she appear to be energetic and mentally engaged?
A Yes.
Q Were there any other sequelae from her PCNS or -- or the treatment?
A I don't believe so. She had slight abnormality on one of the cerebellar tests, I believe, when -- so cerebella is the part of the brain that controls the

balance. And there is specific cerebellar tests that we perform in the exam to look for balance or coordination. And to my recollection -- I'll try to confirm with my note -- she had slight difficulty in -- we ask patients to walk tippy-toe and -- and in a straight line, and she had a little bit of imbalance there, but it was minor. Other than that, I believe I did not detect any impairments.
Q And is that degree of imbalance that you observed within the range of normal?
A Well, it's not normal to detect it. But, no, because I demonstr -- I had to say, demonstrate to her how I do it. I ask her husband, like, see how he does it. And so it was a slight deviation. So I would say it's a mild, a residual sequela of most likely treated tumor because of the location would make clinical sense to me because it was cerebella location.
Q Did you form an opinion from your physical examination, review of medical records or any other way, as to when Ms. Stevick's tumor may have first formed?
A It's -- I don't think it's possible from, again, physical exam performed, or actually any cases to say when first it appeared. So it did not give me any

conclusions when her tumor first arose, on either my clinical exam or review of records besides when she clinically presented with her diagnosis.
Q The type of cancer that Ms. Stevick had progresses rapidly if untreated, right?
A That is correct.
Q Did that in any way allow you to retrospectively evaluate when that tumor might have first occurred?
A It might give a physician or lymphoma specialist the range roughly. The best I can -- patient ask this question all the time -- that I can estimate, Well, I can tell you with certain degree of certainty that it is most likely, say, within last six months or very likely not more than one year. But that's the physician estimate. It's not based on evidence.
Q We'll get back to your report in a minute. I just want to just deal with some of the other housekeeping items.
I've handed you your deposition notice for this deposition, marked as Exhibit 36. Do you see that?
A It is notice of deposition. Is that what you're asking?
Q Yes.
A Yeah.
Q And have you had a chance to look at that before the

deposition?
A I did.
Q And I'll ask you the same questions. Have you provided all the documents to your counsel that are responsive to the documents requested in this notice?
MR. WISNER: Objection. Answer that question to the extent that doesn't disclose privileged communications with counsel.
THE WITNESS: To the best of my ability, yes.
Q (By Mr. Brenza) And like the -- well, let me strike that.
Was the list of materials that you relied on the same list that we've previously marked in depositions that we've taken today and yesterday? Do you need me to --
A Can I verify?
Q Yeah. It's going to be in --
A Exhibit 4.
Q -- that stack. It's Exhibit 4.
A It's for previous case or for...?
Q It's a previ -- we marked it previously, so I'm --
A Is it --
Q -- asking if we need to remark another copy or if it's the same exact copy and we'll just -- you can

just say that.
MR. WISNER: Are the medical records listed on there? Is that --
MR. BRENZA: No.
MR. WISNER: Oh.
MR. BRENZA: It's maybe in the supplemental one, but then this one -- it's --
MR. LEVINE: --
MR. BRENZA: It's just articles and expert reports.
THE REPORTER: What was that, Mr. Levine, you said?
MR. LEVINE: I said medical records are not in the supplemental either.
Q (By Mr. Brenza) Do you have Exhibit 4?
A Yes. That's what I'm looking for, looking at.
Q You're just verifying. Okay. Good.
A Do you -- do you have the actual list for this case? I want to verify something.
Q I may.
MR. LEVINE: There wasn't a list for this case other than the expert reports you reviewed.
MR. WISNER: That's right. I'm thinking of the expert disclosures that we did.

MR. BRENZA: It was one -- it was one for all, wasn't it?
MR. WISNER: Yeah, it was one for all, and then we stated plus any references cited in the expert report.
MR. LEVINE: Right.
MR. WISNER: This is what we said.
MR. LEVINE: Yeah.
MR. BRENZA: Okay. So --
MR. LEVINE: That's -- I'm just clarifying that also.
MR. WISNER: Yeah.
MR. LEVINE: Yeah.
THE WITNESS: Okay.
Q (By Mr. Brenza) So the answer is this is the same list of materials that you relied on for this case as previously?
A Yes, the same list. Except I'm looking for references. There's an additional references I added for primary CNS lymphoma where they were listed. They were not relevant to prior two cases, where they were added -- because that's the only --
Q I think those may be in the text of your report.
MR. WISNER: Exactly.
THE WITNESS: Okay. So that --

that answers my question.
Q (By Mr. Brenza) So if you'll look at Paragraph 6 of your -- oh, we haven't marked your report. So I've previously handed you what I've marked as Exhibit 37.
A 36. There we go.
MR. WISNER: It's in your hand.
THE WITNESS: Yeah.
Q (By Mr. Brenza) Do you see that that's your expert report prepared in Ms. Stevick's case?
A That is correct.
Q If you'll look at the Paragraph 6, do you see that there are some references that had to do with PCNS?
A Are you talking about Page...?
Q Page 5.
A Yes, I do see that.
Q And are those the references that you were looking for on the materials relied upon?
A That's correct.
Q Okay?
A Because that's a different type of lymphoma. Making sure that we covered this in references.
THE REPORTER: "We covered," what?
THE WITNESS: We covered them in the references.
////

(Exhibit No. 38 marked for identification.)

Q (By Mr. Brenza) And I also have marked, I think it says 38. Dr. Nabhan's report --
A Mm-hmm.
Q -- in the Stevick case. Do you see that?
A I do.
Q And is this -- do we have the same situation here where you borrowed language from Dr. Nabhan's report and used it in your report for Ms. Stevick?
A I see the same language in general causation section that I used.
Q Okay. Did Ms. Stevick provide to you a history that you were -- you used to try to identify risk factors she may have had?
A She did.
Q Did you -- did you write -- and did you write it down? Did you have to take notes at the time?
A At the time, yes.
Q Do those notes still exist?
A I don't believe so.
Q What did Ms. Stevick tell you?
A So when I asked her about standard set of questions, that when I question cancer patient about prior

exposures to typical carcinogens like radiation and agricultural, industrial, military chemicals, her answers that I document in my report were that she did not have specific exposures to known agricultural, household, military carcinogens, ionizing radiation, except for using glyphosate.
Q Did you conclude that the -- the sole known risk factor Ms. Stevick had was her use of glyphosate to kill weeds in her garden?
A That was my conclusion, that exposure to glyphosate was the main substantial contributing factor.
Q Did you do that by eliminating other factors that you believed were risk factors for non-Hodgkin's lymphoma?
A That is correct. In her case, there were not many factors that I brought to bear except for generally discussed risk factors.
Q Ms. Stevick's family had extensive history, an extensive history of cancer, right?
A She has significant history of colon cancer.
Q Was her paternal uncle diagnosed with aggressive lymphoma?
A That is correct.
Q And he died of that?
A At the age of 90. I'm sorry. 98. He was diagnosed

at the age of 90, yes.
Q Both her -- her father and her mother had colon cancer?
A That is correct.
Q Her maternal grandmother had colon cancer?
A That is correct.
Q Her paternal uncle had throat cancer?
A That is correct.
Q Her paternal cousin had breast cancer?
A That is correct.
Q Are some -- are there genes passed through families that cause cancer?
A For very specific types of cancer, to the best of medical knowledge as of today. So there are very few hereditary cancers so far identified, and I think I mentioned them earlier today. Best examples would be breast/ovarian cancer, hereditary colon cancer like Lynch syndrome, and a few others.
Q And are those cancers caused by single gene mutations?
A That is correct.
Q Isn't it true that most cancer is probably not caused by single gene mutations?
A That is correct.
Q And to the extent that it's a multifactorial genetic

cause, it wouldn't necessarily be known what genes are causing cancer at this time?
A We don't consider it multifactorial genetic cause. I would not state that.
Q Is that -- is that based on any research you've done or just your personal feeling?
A It is based on lack of evidence that cancers outside those defined hereditary cancers have any genetic markers that pass through the germ line.
Q That just means you don't know what genes are causing --
A Well, that's what I'm --
Q -- the cancer. It doesn't mean that genes aren't causing it?
A Well, until we know that, that's the knowledge that we possess as an oncologic community, that there are very few hereditary cancers. We can speculate about in the future what we find, but as of today, as I mention, there are few defined hereditary cancer syndromes, but outside that, we in general do not consider majority of cancers as passed through the germ line mutations.
Q So is it your opinion that the fact that Ms. Stevick's paternal uncle, mother and father, grandmother, grandfather, paternal uncle, and

paternal cousin all had cancer, that's just chance?
A It might not be chance. And in this kind of situation, if she developed colon cancer, the GI oncologist would initiate screening for known genetic mutations that cause hereditary colon cancer syndromes. And if none of those mutations are found, then we say it might be specifically for colon cancer, be genetic predisposition.
It also plays a substantial role in hereditary cancers, whether cancers are diagnosed in early age or they're diagnosed in late stages. So in most of the hereditary cancers, one of the ways we suspect them, if cancer is diagnosed at early age, whether it's breast cancer, ovarian cancer, or colon cancer, if you have history of -- let's say the best known situation, breast cancer hereditary syndromes.
If you have two, three family members diagnosed with breast cancer above the age of, I believe, 55 or 50, then we do not even initiate screening of the patient related to those relatives. If you have a single or two relatives or immediate family relatives diagnosed with breast cancer at the age of, say, 30 or 35, that immediately raises the red flag that it is not the age group we diagnose breast cancer that triggers the screening for known genetic -- genetic

cancers.
The same thing with colon cancers. If it's diagnosed over the age of 55, it does not necessarily trigger the investigation into hereditary colon cancer. If she had even half of that amount of relatives diagnosed in early stage -- I'm sorry -- early age and she had colon cancer, that would trigger investigation into the colon cancer.
But having a variety of cancers in the family of different age and unrelated histology cancers do not trigger automatic thought that her lymphoma could be related to colon cancer in her immediate family. At least not in oncologist's mind.
Is it possible that she -- that her family has some predisposition? It is possible. But to the best available evidence, the only information we have, yeah, she has several family members, but we also do not know the family members were growing up in conditions that are predisposed to cancer.
So to answer your question simply, there is no direct correlation between that history and her being diagnosed with lymphoma later in life.
Q In your experience, is that a substantial history, family history of cancer, what Ms. Stevick has?
A I don't know what to -- how to define substantial

cancer.
Q It's an unusual amount of cancer in one family, in your experience?
MR. WISNER: Object to the speculation.
THE WITNESS: I'd say it is more than average. 'Cause cancer is, as we established, a common human condition especially with aging. And as an example, I don't recall the ages for most of these family members. But as you probably aware -- or we can just discuss that -- 1 in 11 men, 1 in 10 women, or maybe not exact percentage, but close, will develop prostate and breast cancer, respectively. It's a very common cancer if we take people in their 80s and 90s. Then -- and if your family members were diagnosed at that age, and say, Wow, this is the appropriate age group for this type of cancer.
So it would be much less impactful to me to consider family history as opposed to early age of diagnosis. Once again, when we talk about hereditary cancers, that in oncologist's mind pertains to diagnosis of the same type of cancer in a patient in front of you. There are several defined cancer syndromes where single gene mutations like retinoblastoma gene can give rise to several

different cancers, but there was a usually well-defined histologic type of cancer.
Q You mentioned age as being a relevant factor in evaluating the significance of the family history of cancer of Ms. Stevick.
How old was Ms. Stevick when she was diagnosed with PCNS?
A So she was diagnosed in late 2014. If you could remind me her date of birth. I don't have it in my records, or can calculate that.
Q Well, we may find it in some medical records. I'm not going to testify for you.
But is it safe to say that she was in her mid 60s when she was diagnosed?
A It is -- it is fair to say.
Q And by mid 60s, the incidence of cancer in people that age has started to increase?
A That is true, compared to 50s and 40s, yes.
Q And that's true for non-Hodgkin's lymphoma and its subspecies?
A It is true.
Q By the way, is -- is PCNS, is it a -- is it assumed that it originates in the brain, or is it cancer that's migrated there and -- and that's where it's first found?

A It is a -- how should I put it? -- internal question so far in oncologic community or in the lymphoma community. So we -- we don't know the answer to that. It is reasonable to assume it originates in the brain because we don't find evidence of it outside the brain at the time of diagnosis. However, we also do know that patients who are treated with primary CNS lymphomas sometimes relapse outside CNS. That begs the question that there were small amount of cancer outside CNS that was treated concurrently, and then the treatment for CNS was not enough to cure it and they just manifest themselves. So there's no definitive answer to that question. But it is a reasonable speculation in the medical community.

Q Would you expect that the same mechanisms that are responsible for DLBCL in the body are responsible for PCNS in the brain?

A I do not have reasons to exclude it. That's possibility.

Q And would you expect that, if it's the same cancer, that it's going to have the same cause?

A When you say the same cancer, the same diagnosis?

Q No. I'm now talking about what might cause this cancer. Right? So we talked about DLB -- DLBCL as being a very common form of non-Hodgkin's lymphoma.

And you've said it's -- there are various things that can cause it.

What I'm wondering is: Is it the same case with PCNS, or is it so different that it has different causes, different probabilities, different everything?

A I would expect it to have similar causations to other type of -- or subtype of diffuse large B-cell lymphoma. It might have in the future identifiable additional risks specific for this lymphoma, but as of today, I would say based on my knowledge of lymphomas in published literature, that I would assign the same risk factors for primary CNS, DLBCL.

Q And when you say you'd assign the same risk factors, would you also assign the same probabilities to those risk factors?

A I wouldn't have any reasons to believe that would be different.

Q Is it -- is it true for PCNS, as it was for DLBCL, that the vast majority of the cases, the cause is unknown?

A I would have some difficulty answering that because a proportion of primary CNS DLBCLs are known to arise in the setting of HIV infection and infection with Epstein-Barr virus. So in those cases, we do know

the -- the -- the causation that likely related to viral agent, specifically EBV. But in cases of nonimmunocompromised host or the patient and non-HIV infected and EBV negative primary CNS lymphomas, I would make the same statement, that for majority of those, we have not identified a reliable -- reliable cause. And I would apply the same risk factors that we do to other lymphomas.

Q Would you say the same thing you said about other lymphomas, that the amount of cause that's not attributable to any known cause is greater than all the causes that are known?

MR. WISNER: I'm going to object.

MR. BRENZA: Do you understand the question?

THE WITNESS: I'm trying to process it.

MR. BRENZA: Do you want me to -- I'll ask it again, if you like.

THE WITNESS: Could you?

MR. BRENZA: Sure.

Q (By Mr. Brenza) If -- if you look at all the causes that are known for PCNS and you add up all those probabilities, it's -- it's true that the amount of PCNS that's caused by other things still unknown is

greater than the amount that's caused by the known risk factors?

MR. WISNER: I'll object as to improper hypothetical.

THE WITNESS: Outside clinical scenario just described in HIV patient, immunocompromised patients, I would say that for majority of diagnosis, we do not have or we cannot identify with hundred percent certainty what caused primary CNS lymphomas.

Q (By Mr. Brenza) And I'm just trying to get a little bit more precise of a statement.

I know that you can't say with a hundred percent certainty. But isn't it true that the majority of cases, even accounting for all the known risk factors, remain unexplained by those risk factors?

A I think if you -- I would just consider the risk factors, if -- as possible causes of lymphoma as we discussed before. So you -- you cannot lump the lymphomas where we know that patients possess risk factors into unknown causes. Because by definition, having the risk factor increases their risk of developing lymphoma.

Then we're getting into the same discussion: Is it hundred percent certainty or not? In patients who

do not have identifiable risk factors for lymphomas, let's say there -- that there we're in a situation where we don't know what -- what could have potentially caused the lymphoma.

Q Well, this kind of goes to that statement that we -- that was on the Seattle website we talked about, Exhibit 29. Seattle Cancer Care Alliance website.

A Yes.

Q So my -- and my question is: With respect to the risk factors for PCNS, is it true that many people who get the disease don't have any of those risk factors, and most people with the risk factors don't get PCNS?

MR. WISNER: Objection; compound.

MR. BRENZA: Let me break it apart.

Q (By Mr. Brenza) Is it true with PCNS that many people who get the disease don't have any of the known risk factors?

A I don't know what propor -- yes, there will be patients that will --

THE REPORTER: It will, what?

THE WITNESS: Yes, there will be no -- there will be patients with no known risk factors for lymphomas, and there'll be patient with PCNS who have, again, risk factors like exposure to radiation,

industrial chemicals, military compounds as we discussed, pesticides. So there'll be a proportion of patients with primary CNS lymphomas who are exposed to known factors that can cause lymphomas.

And what is the relationship between those proportions? I don't know. You would have to basically ask all the P -- primary CNS DLBCL patients whether or not they have all of those. I don't know whether it's majority or minority, but there'll be patients where you say, Well, there's no risk factors for lymphoma, period, and patients who have primary CNS lymphoma who have risk factors for lymphoma.

Q (By Mr. Brenza) And it's also true that most people that have risk factors for PCNS don't develop PCNS, right?

A That is true.

Q Did Ms. Stevick have Epstein-Barr virus?

A Not to my knowledge. And I would have to also qualify my remark when I linked Epstein-Barr virus to primary CNS lymphoma. The Epstein-Barr virus has to be present in the central nervous system. So it's not just exposure to Epstein-Barr virus like mononucleosis where you're young or having mono in later age is a risk factor for primary CNS lymphomas. It's specific situation; in most cases, HIV positive

patients with immunosuppression where EBV causes specifically primary CNS lymphoma.

Q Is it -- is it the combination of HIV and EBV that cause it, or can either one?

A HIV on its own does not cause primary CNS lymphoma. It provides, in that setting, immunosuppression for EBV virus to proliferate. EBV on its own, without evidence of HIV infection or the immunosuppression, would be an unusual cause of primary CNS lymphoma, but there are described cases.

Q And in those cases, do they actually test the tumor and find the virus in the tumor?

A That is correct. So in those cases, we do testing on spinal fluid to look for CN -- for EBV particles. And in those cases, tumor cells would uniformly be infected with EBV.

Q There's no comparable verification test for other causes of PCNS, right?

A No.

Q So, for example, you can't test a tumor and see if it was caused by a pesticide or a particular herbicide?

A That is correct.

Q Are you aware of any evidence that Ms. Stevick ever had detectable levels of glyphosate in her body?

A I'm not aware of any test results or any testing of

glyphosate levels in Ms. Stevick.

Q Are you aware of any medical testing that could confirm whether glyphosate played a role in Ms. Stevick's PCNS?

A I'm not.

Q Can you exclude the possibility that Ms. Stevick's PCNS was primarily cased just by her age?

A Well, as I stated before, I did not consider age as a causative factor for any lymphoma, but a reflection of other factors that are more prevalent in older population. And to answer your question in that setting, I cannot exclude possibility that her primary CNS lymphoma was caused by other factors than, say, glyphosate exposure.

Q What's referred to by idiopathic causes?

A Idiopathic causes are causes that we cannot identify.

Q Is the knowledge about PCNS and NHL in general still evolving?

A Of course.

Q Is there still a lot to learn about what causes it?

A Sure.

Q Apologize if I've already asked this. But is the majority of PCNS caused by idiopathic causes, causes that to date are still unknown?

MR. WISNER: Objection; vague.

THE WITNESS: I can't speculate on a proportion of lymphomas caused by unknown causes. As I stated before, the reason in many patients they are unknown, because we do not really look for them. And I make distinction between causes that we are not even aware of or causes we do not consider when we treat patients with lymphomas.

I believe that if part of medical care was to take a very deep look what caused patients' cancer, we would -- we would have a higher proportion of lymphomas and other cancers that we would document possible risk factors. But because it's not part of the standard medical practice especially outside academic practice, we say we don't know what caused it.

Now, there are also causes that we -- don't even aware of. But the proportion between those sectors of causes I cannot comment on. As a simple statement to the public and to the patients, as you saw on the website, say majority is unknown. But within that unknown, as an academic physician, like I said, I define unknown because we never would make an effort to look at that. And those that, if we look, we don't find anything, then we don't know at all what caused it.

Q (By Mr. Brenza) Now, you keep saying that, We don't look for causes of non-Hodgkin's lymphoma. But somebody does, right? I mean, there are -- you've looked at studies in this -- in your report that look at certain causes?

A Sure.

Q Why do you think that other studies exploring a wider range of possible causes of non-Hodgkin's lymphoma aren't done?

A That goes to a completely nonmedical discussion. Because those studies are expensive. You need resources to do populational studies or any kind of studies in medicine. And there is very limited amount of patient information time that we have.

If we have capacity to study, as an example, every candidate drug and lymphoma in realtime and perform 500 trials a year as opposed to 30 trials a year, we would be much better off curing lymphomas. If we were able to do ten times more studies looking at the causes of lymphoma, we would be much better off having more causes on our list when I create my differential etiology.

So that's not a medical -- that's the real, real-life scenario. So, but I think it doesn't change the fact that -- it will never change that we

will have a cluster -- out of all the lymphoma patients, we will have patients that, even if we look on all known causes, we won't see identifiable out of current list and it will be patients where we say, Well, there was a known cause, but if you really start asking, this patient had something growing up. This parent is, okay, this is a cluster of patients where we have known risk factors, but we never questioned before. And then we have patient that we say, Well, in this category, we know most likely what caused it.

Q So with respect to PCNS and non-Hodgkin's lymphoma generally, there aren't any clusters?

A Of cases?

Q Of cases.

A The only cluster that I know is in the HIV population.

Q And isn't there -- isn't another reason why this kind of question isn't answered that you can't just look at the people who present with the disease in order to figure out what's causing it? You have to look at people who didn't get the disease as well?

A In a -- in a -- epidemiologic studies, yes.

Q And that involves looking at more people, large numbers of people?

A As we discussed, the, in general, larger studies are better than smaller studies, but that's not an only criteria that make the study reliable.

Q Is ionizing radiation a risk factor for PCNS?

A It is a risk factor for any type of cancer, including lymphomas.

Q What exposure to ionizing radiation did Ms. Stevick tell you when you interviewed her?

A She did not identify any history of ionizing radiation in her life.

Q Would it have mattered to you if she had?

A I would have to look at exactly what the exposure was and the doses of radiation she received, and -- and then I would make my determination.

Q How much would it take for you to conclude that exposure was a potential risk factor for her?

A So in a -- what we deal with in the medical world is the level of radiation that people receive during cancer treatment, like in radiation oncology, where they receive anywhere from 20 to 60 gray of radiation for treating their cancer. And the other example would be, once again, are patients occupationally exposed to situations like nuclear power plants or -- work in nuclear submarine if it's military, or other accidental exposure to ionizing radiation in amounts

that are considered significant.
Q Is -- is the same standard, 20 to 60 gray, applicable to occupation exposures, or is it a higher --
A Well, hopefully --
Q -- or different threshold?
A -- people will not have that amount of exposure. Because that's really harmful levels of radiation that are employed out of necessity to treat cancer. I think there are defined levels and different scales by other industries for people who work in, like I said, ionizing radiation occupational environment. And I don't know off the top of my head what the -- it -- it might be EPA standards or the -- their industry standards that define safe and unsafe. That's why folks wear dosimeters in those facilities. There is, I know, 20 to 40 gray, it's the medical world. That's something I deal with.
Q Well, and so by 20 to 40 gray, clearly you've taken on some risk. Is there a risk of PCNS before you get up to a level that high?
A The studies in medicine, when the studies pertaining to radiation therapy treatment have instructed us that the dose of radiation matters. 'Cause over time, we started employing lower doses of radiation, say, to treat Hodgkin lymphoma, non-Hodgkin lymphoma.

And long-term studies indicate that the incidence of secondary cancers are lower if you use 20 versus 40 or even 30 versus 40. And at that level of radiation makes a difference.
Q And my question was: Are there levels below 20 gray that still increase the risk of PCNS?
A I do not have information on that. So, again, I operate on the facts. And clinical trials, we know exactly the dose of radiation patients receive, but the -- any information about levels lower than that were not studied at least in my medical world, so I'm not aware.
Q Well, and I guess my question is: Based on the analysis you're using in this case, would you -- would you find exposures less than 20 gray to nevertheless add to the risk of PCNS in Ms. Stevick's case?
A I -- I don't recall her being exposed to radiation.
Q My question was simply: What -- what would you conclude if -- if she told you that she'd been exposed? And you said, Well, that would depend on how much. And so I'm now telling -- now trying to find out where -- how much do you need before it becomes a risk factor?
A So I -- I cannot answer this question. I don't have

knowledge of minimum amount of radiation that's -- that becomes non, basically, carcinogenic. I have to be complete sort of unfounded hypothesis, say, well, I can't quantify it, but potentially you could have additional impact from whatever radiation you received.
Q With respect to chemical causes of -- or chemical -- chemicals that increase the risk of PCNS, did you find any chemical exposures of Ms. Stevick that you thought were significant risk factors that you would consider?
A I just want to kind of make the, first of all, defining statement that I would consider this discussion of this causation in the setting of diffuse large B-cell lymphoma because primary CNS lymphomas are very rare. And so when you -- when you define this, I would fall back on discussions of DLBCL.
We can continue to say risk factors for primary CNS lymphoma, but that would not sort of change my determination whether we call it DLBCL or primary CNS lymphoma.
Q And are you saying that with respect to chemical causes only or all the causes that we've talked about?

A All of the causes. Except for EBV. That's a very specific cluster.
Q And EBV is specific to PCNS?
A EBV in the setting of HIV infection. But EBV is not specific only to primary CNS lymphoma. It's also a known cause of so-called extranodal nasal NK-cell lymphoma. And if you really want to dive into it, NK-cell lymphoproliferative disorder with childhood or aggressive NK-cell leukemia. So there's a cluster of lymphoid cancers that specifically associated with EBV. In a -- and also post-transplant lymphoproliferative disease. Again, I can -- I don't --
Q Yeah.
A -- want to spend time if you don't -- yeah.
Q That's enough. Unless you want to add more. But what I really want to do is get to something that has to do with Ms. Stevick.
So with respect to chemical exposures, obviously you've made a conclusion about Roundup. Were there any other chemical exposures that you found were a risk factor for Ms. Stevick?
A I don't recall identifying, based on her statements and our encounter that she mentioned, I would consider her a significant risk.

Page 42

Q And you said earlier that chemical exposures do not discriminate as to the types of non-Hodgkin's lymphoma they cause. Is that your view?

A It is my view.

Q And when you -- when you said that, was it your position that, if a chemical causes one kind of non-Hodgkin's lymphoma, it would cause all the types of non-Hodgkin's lymphoma?

A Mechanistically that would be my -- my impression, my conclusion. Statistically epidemiologically, we already discussed there might be interesting variations, and my curiosity in those cases is whether those also have other significant contributing factors in specific subtypes that separate those out in the setting of chemical exposure. Because mechanistically I cannot identify the pathway or path why would -- a chemical exposure would increase the risk of a particular type of lymphoma based on mechanistic impact of carcinogenic chemicals.

Q Are you saying that because the same mechanism could work on any lymphocyte, that something that employs that mechanism should be able to cause cancer in any lymphocyte?

A In terms of chemical exposure and radiation exposure.

Page 43

Q Is that true for not just for all types of non-Hodgkin's lymphoma but all types of cancer?

MR. WISNER: Objection; speculation, overbroad.

THE WITNESS: As a -- as a broader -- I'm stating my opinions, my hypothesis. Right? So this -- I don't have literature to basically state that. I say this as a lymphoma physician, investigator, that a mechanistic path that causes DNA breakdown by, say, ionizing radiation and chemical exposure would have, in my mind, capacity to cause cancer of any type.

Now, having said that again -- and this is a broad statement -- give an example: Radiation put -- we know that would have potentially a different threshold of causing different types of cancers. That is suggested from just the radiation -- radiation therapy world. But mechanistically I would imagine that the chemical factors and radiation factors would have capacity for DNA breakage in any type of cells unless there is particular biologic reason that this chemical is restricted from particular type of cell.

Q In thinking about the mechanisms of certain chemicals, is there a test called the Ames test

Page 44

that's used?

A I'm not familiar with the Ames test.

Q Is there any literature that supports your view that a chemical cause of -- a certain type of non-Hodgkin's lymphoma can cause all forms of non-Hodgkin's lymphoma?

A No. As I stated, this is my view, hypothesis, based on how I imagine mechanistic impact on living cell. I cannot cite any literature on that.

Q Okay. And so when you say it's you're hypothesis, you're not necessarily saying it's true. It's just an idea that you have?

A That is correct.

Q How much Roundup or glyphosate did you find Ms. Stevick had been exposed to?

A First on my finding is based on questioning the patient, which I didn't have reason to doubt what Ms. Stevick informed me, that she was using Roundup from 1989 through 2014 and that she was spraying Roundup once a month for ten month a year, March through December. She did not use -- yes, so this was the amount of -- in duration.

Q And the use that Ms. Stevick told you she made of Roundup was for her garden, home and garden?

A That's what she said. In her own words, quote, she

Page 45

loved gardening, and in 1989 she started using Roundup to control unwanted vegetation in her garden and some areas around her property, including the lawn, as was suggested by her landscaper.

Q Did you make any calculation of how much Roundup Ms. Stevick may have absorbed over the course of her entire use of Roundup?

A No, I have no means of calculating that.

Q Did you make any assumptions about how she applied it?

A I did not make assumptions. I -- she -- when I asked her how she applied it, she used this by hand spraying, and she also, herself, used to dilute Roundup concentrate, with frequent spills. But I cannot have -- I do not have means to confirm that. This is from patient's words. So she stated that she was using the sprayer, hand sprayer.

Q And you don't have any means to quantify it, right?

A I don't have any means qualifying how many gallons she used or how much she sprayed as far as volume or quantity.

Q Or how much she got on her hands or -- or any other means of exposure?

A No, I don't have means of quantifying that.

Q Just going back to something I asked earlier. When

you physically examined Ms. Stevick, how long did you spend on the exam?
A 20 to 30 minutes.
Q How long did you interview her for?
A Our whole encounter was around an hour and a half.
Q So about an hour of talking?
A Yes.
Q Have you had any further dealings with her since then?
A Any further encounters?
Q Yes.
A No.
Q Had you ever treated Ms. Stevick prior to that event?
A No.
Q Had you ever met her or talked to her in any way prior to the day that you met her at the Marriott to examine her?
A No.
Q Did you -- who set up the meeting?
A The counselor's group.
Q So one of Ms. Stevick's lawyers in this case?
A I don't actually know who set it up. I received the e-mail that I was asked to see the patient and e-mail, I believe, with -- from Kathryn Forgie. I -- I don't remember who was copied on it, but I don't

know who actually set it up.
Q Were you provided any materials to prepare for the meeting?
A I was provided with medical history of Ms. Stevick.
Q And when you say a medical history, what -- what do you -- was it a summary, or...?
A I'm sorry. Medical records.
Q Medical records. Okay.
So you reviewed her records before you met her?
A That is correct.
Q Do you still have all those records?
A Yes. I have electronic file of her medical records.
Q In Paragraph 5 of Page 4 of your report, you talk about a variant of R-CHOP that Ms. Stevick received. What was the -- what was the precise regimen that Ms. Stevick was given?
A Paragraph 5. What page are you talking about?
Q Page 4, Paragraph 5. It's the paragraph beginning with the word "R-CHOP."
Do you see it?
A The very last paragraph?
Q Yes.
A Can I have a minute to review it?
Okay. So what's the question? I'm sorry.
Q What was the variant of R-CHOP, if there -- if there

was one, that was used for Ms. Stevick?
A Ms. Stevick received a different therapy for primary CNS lymphomas that I describe in her treatment history. I can't really call it a variant of R-CHOP.
Q Well, the paragraph you wrote refers to R-CHOP or, quote, "similar combination chemotherapy regimes, including the one that Ms. Stevick received."
Do you see that?
A I do.
Q So what was the -- was the treatment she received a similar combination chemotherapy regime, or regimen?
A It is not very similar but has some of the same components that R-CHOP, specifically vincristine and rituximab. And she had --
THE REPORTER: "Specifically," what?
THE WITNESS: Vincristine and rituximab.
Q (By Mr. Brenza) Could you spell those? Just because we'll never get them right otherwise.
A Sure. Rituximab spelled as r-i-t-u-x-i-m-a-b. And the second, V-i-n-c-r-i-s-t-i-n-e.
And the remainder of the agents were different from R-CHOP.
Q Do you know what the other ones were?

A Yes. It's as stated in my ---
Q Where?
A -- treatment history on Page 2 of my report. The third full paragraph.
Q Okay. I see it.
A Could I request a bathroom break?
Q Sure.
A Okay.
THE VIDEOGRAPHER: All right. We're going off record. The time is 3:48 p.m.
(Pause in proceedings.)
(The following held off the videotape record.)

MR. WISNER: At this time the plaintiffs designate this deposition, the one before, and the one before that, all related to Dr. Shustov, as confidential pursuant to the protective order.
(The following held on the videotape record.)

THE VIDEOGRAPHER: We are back on record. The time is 4:03 p.m.
Q (By Mr. Brenza) Doctor, just to verify something that I think you'll agree with as just consistent

with how you've testified: The method you're using for Ms. Stevick is the same as you've used in the past, which is the differential diagnosis method, right?
A That is correct.
Q And that's the method where you identify what you consider to be the universe of risks and then eliminate all the risks until the remaining risks account for the cancer, in your mind?
A That is correct.
Q And like when I've asked you before, there's no -- there's no study or protocol that validates that kind of procedure for determining the cause of a cancer or a tumor, right?
MR. WISNER: Objection; vague.
THE WITNESS: I am not aware of a study that would use such methodology to determine cause of cancer in -- in the research study, per se. But that's the methodology that is frequently used by practicing physicians in daily practice and for specific reasons to identify most probable syndrome or diagnosis, or in this case, as I would apply to -- to causes of person's cancer.
Q (By Mr. Brenza) And there's no protocol that you're aware of for conducting causal analyses that would

recommend or validate the procedure that you've used in this case of -- of differential diagnosis?
MR. WISNER: Objection; vague.
Q (Continuing by Mr. Brenza) Right?
A I am not aware of any.
THE REPORTER: What was that, Doctor?
THE WITNESS: I am not aware of any.
Q (By Mr. Brenza) And I'm going to ask you the same question I asked before. If ten people showed up with exactly Ms. Stevick's history and medical background and exposures, how many of those ten people would you say had PCNS caused by glyphosate?
A As -- as we -- as I stated before, that I would make the statement and all those ten people I would conclude that glyphosate was the -- more likely was the contributing factor than it wasn't.
Q And when you say more -- more likely it was a contributing factor, are you saying that in all ten people you'd say that glyphosate was the -- more likely than not the cause of the PCNS?
A That's correct.
Q Would this be true if it were a hundred or a thousand people with exactly the same background?

A I don't see why I would discriminate any other patient with exactly the same history to state the probability based on, again, my methodology.
Q And with respect to any of those thousand patients presenting with identical medical backgrounds, would there be any way to prove that you were wrong about what actually caused their PCNS?
MR. WISNER: Objection; incomplete hypothetical, speculation, vague.
THE WITNESS: Well, from your question, I understand that saying that we assume that -- let me rephrase that.
So the way I understand the question, that you're saying that in those thousand patients, I stated that glyphosate caused their lymphoma, which is not my statement, unless I understand it incorrectly. For same number of people, say hundred or thousand, I would say, in the identical situation, that if they had same exposure of glyphosate, that more likely than not to cause it, I cannot with hundred percent certainty say what caused their cancer.
Q (By Mr. Brenza) But you would say it, more likely than not, it was caused by glyphosate?
A I'm just processing hypothetical situation. It's not every -- it's not usual way of thinking.

Yes, so more likely than not that it either contributed or caused the lymphoma.
Q And when you say contributed or caused, you're talking about more likely than not?
A More likely than not either contributed or caused. When I say contributed, I cannot with hundred percent certainty exclude other significant contributing factors.
Q And with respect to those thousand identical patients, there's no way to show that you were wrong about any of them in terms of what actually caused their tumor, right?
MR. WISNER: Objection; overbroad, vague, speculative.
THE WITNESS: I guess the way to show I'm wrong would be if somebody comes up with a test on biopsy that shows definitively the causative --
Q (By Mr. Brenza) Some sort of --
A -- sort of --
Q -- a tag, around that tag or whatever, like a definitive mutation or something?
A Something like that, yeah.
Q But short of that, which isn't known right now, right? There's no such thing as a test?

A There's no such thing.
Q Short of that, there's no way any of those thousand diagnoses that you would have made could be challenged?
MR. WISNER: Objection.
THE WITNESS: Well --
MR. WISNER: Improper --
THE WITNESS: What I'm --
MR. WISNER: -- hypothetical.
THE WITNESS: What I'm making is, it's my assessment of probability that I believe that it's as precise I can get, as vague as I can get with not having definitive tag, which you called it, to identify the source, that based on information discussed in all these depositions, that it's more likely than not. It does not mean hundred percent it was caused by glyphosate. But information at hand, I'm just stating probability.
Q (By Mr. Brenza) And that probability would -- would hold with respect to all 1,000 of those patients?
MR. WISNER: Objection; improper hypothetical, speculative.
THE WITNESS: Identical scenario. I don't see why I would discriminate any of those thousand patients compared to other. They have the

same exact story.
Q (By Mr. Brenza) Have you ever used Roundup?
A No.
Q Do you know that Roundup is commonly used?
MR. WISNER: Objection; beyond the scope, speculation.
THE WITNESS: I don't know how widely it's used. I've seen walls of Roundup at Lowe's when I go shopping there. But I don't know how extensively -- what the -- what the sales are or how extensively used.
Q (By Mr. Brenza) It's not something that comes up with your patients?
Let me ask it --
A It's not something frequently comes up in a discussions, first encounter, unless patients point out specifically. And like I said, I do elicit as diligently as I can, every new encounter, whether patients are exposed to agricultural, herbicides, pesticides, et cetera. It -- no, it does not come on -- come up that often.
Q Okay. And it comes up in the context of all kinds of chemical exposures?
A I don't know if patients, themselves, lump it into -- I don't specifically ask about Roundup. My usual

line of questioning in medical practice is: Do -- are you exposed to any significant amount, in your mind, to pesticides, agricultural chemicals, and risk that we discussed. If patients say "no," I don't dig into the specifics. If patients -- I can assume that if patients don't know what Roundup is, some -- you know, they're oblivious to it, they would say "no" to these questions. So I do not in regular daily practice dig into details.
Q Have you ever told one of your patients to stop using Roundup?
A I don't recall discussions about Roundup with patient. Like I said, it doesn't come up. I don't remember last time we even -- it was brought up in the discussion in my -- in my clinic.
(Exhibit No. 39 marked for identification.)

Q (By Mr. Brenza) If you would direct your attention to what I've previously marked as Exhibit 39. Do you see that that's a medical record concerning Ms. Stevick dated November -- sorry -- September 2018?
A Yes, I do.
Q And I just have this record to review Ms. Stevick's medical history. And do you see under "Family

Medical History," there's a list of relations and the problems that they've experienced?
A I do see it.
Q And do you see it refers to a cousin who had breast cancer?
A Yeah.
Q Father who had colon cancer?
A Yep.
Q Maternal grandmother who had colon cancer?
A Yep.
Q Another maternal grandmother who that colon cancer?
A Yep.
Q Mother that had colon cancer?
A Yep.
Q Father had melanoma? That's skin cancer, right?
A That's correct.
Q And then the maternal aunt who had multiple myeloma?
A Yep, I see that.
Q And is multiple myeloma a lymphatic cancer?
A It's -- it's in the larger subfamily of lymphocytic cancers.
Q Is that medical history consistent with what you understood Ms. Stevick's family history of cancer was?
A Well, we can compare it to my report from her

recollection at the time. I would document everything she told me.

Paternal uncle, aggressive lymphoma. We can match this if -- one by one. So additional cancer. Colon cancer, both her dad and mom, maternal grandmother, grandfather. So that's four. Is that correct? One, two, three, four. So we captured that. We capture aggressive lymphoma in her uncle.

Q I'm not sure that's on the 39, Exhibit 39. Do you see it?

A That's what I'm trying to match with my records, yeah. So paternal uncle. I actually don't see that. Do you see that? That's what she told me.

Q They don't match up exactly. There's some that are on Exhibit 39 that are not in her --

A Okay.

Q -- report. Some that are in her report that are not on Exhibit 39.

A Okay. Most of them match, yeah. Breast cancer in her cousin, right? So we have that. Cousin, breast cancer. And so the only thing that mismatched or I don't have in my report that she might have forgotten, melanoma. Do I have that there? I don't think so. And multiple myeloma, maternal aunt. I don't recall that. Okay.

Q Do any of the new items of family history concerning cancer affect your view of whether her family history of cancer was an independent risk factor?

A No.

MR. WISNER: Just for the record, there was a throat cancer in your report as well. We didn't get that far.

THE WITNESS: Where is that?

MR. WISNER: At the very end.

THE WITNESS: Okay. Okay. Paternal uncle.

Q (By Mr. Brenza) Is Exhibit 39 consistent with your prior view that this is a above-average amount of cancer to have in one family?

A It's a vague statement. It just -- my sort of general perception how many members of families can be affected by cancer, say above average. The most concerning this history for me would be one, two, three -- four members of immediate family affected by colon cancer. So that's somebody that, if I saw this, her in my clinic as a treating physician, besides her lymphoma, I would say, I'd like you to see our genetic counselor or the colon cancer physician intake department to see if they want to screen you for hereditary colon cancer conditions.

(Exhibit No. 40 marked for identification.)

Q (By Mr. Brenza) Exhibit 40 is a decision on benefits -- I forget who it was from -- California Insurance Department.

MR. WISNER: Where do you see that?

MR. BRENZA: I see it on the -- second to last -- page, or last page. But I'm not sure if that's --

MR. WISNER: No.

MR. BRENZA: -- where we're looking at.

MR. WISNER: I think that's -- that's if you want a report. Yeah.

Q (By Mr. Brenza) Did you discuss with Ms. Stevick her -- her work history?

A Yes.

Q Did you discuss with her the time you met with her whether she was able to go back to work?

A I do not recall that specific discussion. I can check my -- I -- I don't recall discussing that.

Q We'll come back to this one later.

MR. WISNER: For what it's worth, I looked at the record, and it looks like there's a --

her first two are a company called Unum. I don't know if that's...

MR. BRENZA: This could be, like, supplemental insurance benefits or something.

MR. WISNER: Yeah.

MR. BRENZA: It's produced by you guys, I think. Is that --

MR. WISNER: Yeah.

MR. BRENZA: -- what PPR is?

MR. WISNER: That would make sense. On Page 4 of 6, though, it says, "After 24 months of payments, Unum defines another occupation as." So I don't know if that's a proper noun or not.

Q (By Mr. Brenza) Based on your examination of Ms. Stevick, did you see any reason why she could not return to work?

MR. WISNER: Objection; beyond the scope.

THE WITNESS: As a general oncologist or oncologist specializing in lymphomas, I never do these determinations when specifically asked by board compensation groups or -- we refer patients to special physical therapy department. But as a clinician's assessment, I did not see significant reasons for her to return to work at the time I

examined her.
But, again, I'm not -- this determination is typically done by specialized professionals who test patients for their strength and for their -- it's -- even in my practice, it's beyond the skills besides me just saying, Medically, I clear you for work. You don't have infections. You don't have particular medical conditions that I'm concerned about, bleeding or what have you, low platelets. But as far as her abilities to perform duties, that requires special testing, and they do strength assessment and their endurance and how they walk steps and all that. So from medical standpoint, I did not see, in my opinion, contraindications to going back to work.
Q (By Mr. Brenza) Okay. So just to make sure. I think you may have misspoke earlier. Did you find any reason that she couldn't go back to work if she wanted to?
A In my capacity, no.
(Exhibit No. 41 marked for identification.)
Q (By Mr. Brenza) Okay. If you look at Exhibit 40 -- sorry -- 41.
A I have it.

Q This is a medical record dated August 2018 from her provider, Jerome Kim. See that?
A Yes, I do.
Q And you know Mr. Kim, Dr. Kim, was a doctor who treated Ms. Stevick for her illness?
A I think I recall his name from medical records.
Q Do you see that he's given a subjective evaluation of Ms. Kim on August of 2018?
A That's the clinic note from the visit on that date, yes.
Q And his assessment is: Energy good; no limitations in daily activities; no headaches; no vision changes; no focal weakness or numbness; no night sweats, unintentional weight loss, fatigue.
Do you see that?
A I do.
Q Is that consistent your examination of Ms. Stevick that she had good energy and no limitations on her daily activities?
A That is correct.
Q Okay. That's all I've got on that one.
Are there any epidemiological studies on which you rely that specifically relate to PCNS?
A No.
Q Do you rely on -- to the extent you do rely on

epidemiological studies, do you rely on those studies that deal with diffuse large B-cell lymphoma?
A That is correct.
MR. BRENZA: Can we take a few minutes? I might be -- I might be done. I just want to make sure.
THE VIDEOGRAPHER: All right. We're going off record. The time is 4:25 p.m.
(Pause in proceedings.)
THE VIDEOGRAPHER: We are back on record. The time is 4:33 p.m.
Q (By Mr. Brenza) Coming down the homestretch. If you would take out Exhibit 37, your expert report in the Stevick matter, please. And I just want to verify which sections you borrowed from you borrowed from Dr. Nabhan and which sections you were the original author of.
Can we go page by page and you just tell me whether you authored them or you borrowed them from Dr. Nabhan?
A Okay. I would like to say I -- I'm an author of this report, and I used the language from Dr. Nabhan's for some of the statements to save me time, but I stand by the statement, and I -- I feel I authored this

report. And it's not uncommon practice in even our academic world to borrow each other's slides to save time. So it does not undermine my standing behind any word in this report.
Q So which -- are the portions of your report that you used Dr. Nabhan's language for the parts that have to do with general causation?
A That's correct.
Q And is that the part that begins under "Discussions of Ms. Stevick Lymphoma Causation" on Page 6 of Exhibit 37 and continues to the end?
A Well, I can't really -- again, this was not subconscious or unconscious cut and copy. I was generating the report. I would have to look where I inserted my own words or where I did, and I don't have sort of memory, Oh, this is mine; this is not mine. Because, to me, it's all -- I generate this report by typing and using the language as we established with Dr. Nabhan report and typing something in. So I -- we can look at it, so I don't know exactly.
Q Are you saying that you don't know which portions of your report you actually wrote versus which portions you took language from Dr. Nabhan?
A I --

MR. WISNER: Objection; misstates his testimony.

THE WITNESS: I -- I wrote all of my report. Like I said, the -- some of the sections, I used the language as saving time to state the - exactly the same facts.

Q (By Mr. Brenza) And are those the sections that have to do with general causation? is my other question.

A Yes, I believe so.

Q So is that the section beginning on Page 6, "Discussion of Ms. Stevick Lymphoma Causation," portion that's under that?

A Well, it would help me to go, then, and see what exactly portions I put. And I -- I don't remember that. It's -- like I said, it's --

Q Well, do you know, was it the Dr. Nabhan's report in this case that you were using, in Ms. Stevick's case?

A I believe I stated yesterday, that when I was writing all three reports at the same time and Mr. Hardeman's report was first, I generate Mr. Hardeman's report, then I was typing the other two reports and composing them as I go using, you know, the first report I generated, and...

Q Okay. So it would be the portion that doesn't have to do specifically with Ms. Stevick, then, since you

copied it from the Hardeman report? Is that what you're saying?

A Say it again.

Q Is it -- is the portion of Exhibit 37, your report on Ms. Stevick that traces back to Dr. Nabhan, the portion that doesn't have to do specifically with Ms. Stevick, the general causation --

A Correct. So these -- these are general facts, but not my specific assessment of Ms. Stevick or specific causation or anything that relates to specific causation.

Q And, again, just trying to identify what part of this report that would be. Is that the part on Page 6 under "Discussion of Ms. Stevick Lymphoma Causation" to the end of the report?

A I believe this is the portion that had most overlap, as other counsel highlighted yesterday. But, again, to verify that, you have just to open Mr. Nabhan's report, and we can go --

Q And you have it. So if you want to look --

A Okay.

Q -- at it, you're welcome to. I just didn't -- I thought you said that this is not the report that you've used, but --

A I'm sorry?

Q I thought you had said that Dr. -- the report we've marked from Dr. Nabhan with respect to Ms. Stevick wasn't the report that you -- that you used. But if it'll help you, refer to it.

A I used Mr. Nabhan's report to use the language in my first report on Mr. Hardeman, so -- and as you stated, by default, I have my Hardeman's report, and I'm typing other two reports. And because it's the same type of lymphoma and the same description of general education about lymphoma. So I transfer this, as you can see also, discussion of lymphoma in general from other reports, my reports, that I was typing all at the same time.

Q Okay. So can you verify which parts you -- which parts derive to Dr. Nabhan and which parts do not?

MR. WISNER: Counselor, I think the -- I think the confusion here -- I'm just going to throw it out there -- might be that -- are you asking for, like, each word or are you looking for just --

MR. BRENZA: No.

MR. WISNER: -- general section?

MR. BRENZA: General sections. Large -- general sections that -- that are largely if not entirely derived from Dr. Nabhan.

THE WITNESS: Okay. Can we

identify -- this is Stevick's report. I don't believe I have Stevick's report from Dr. Nabhan. We would have to find the --

MR. BRENZA: So --

THE WITNESS: -- report that I used.

MR. WISNER: And, Counsel, this was the -- the document that we said we would agree to produce --

MR. BRENZA: Right.

MR. WISNER: -- once we found...

MR. BRENZA: So, Doctor, I don't have that report to show you right now.

THE WITNESS: No, I was asking for the documents where other counsel highlighted. This was, I think...

MR. BRENZA: Those will be in the exact.

MR. WISNER: Exhibit 13.

MR. LEVINE: Exhibit 10.

MR. WISNER: 13.

MR. LEVINE: Oh. 13?

MR. BRENZA: Every exhibit we talked about yesterday is in this stack.

THE WITNESS: Okay. That's why I'm

asking.

MR. WISNER: I believe it's memory. See if my memory is...

THE WITNESS: Give me a moment to find that report.

It is 10, is it?

MR. WISNER: No. It's 13, the highlight.

THE WITNESS: 13. Sorry.

MR. WISNER: It's nice to have a eidetic memory.

THE WITNESS: I have it.

MR. WISNER: So, Dr. Shustov, what I would do is I would take this one and then look at yours and just kind of go through them.

THE WITNESS: Take this and this?

MR. WISNER: Yeah. And just compare them. And just for what it's worth, he just wants to know if the general causation section in your report is the portion that has the information. And if so, then I think that would satisfy you.

MR. BRENZA: Yeah, I meant, let's start with that and see if -- what he says.

THE WITNESS: Yes, it is in the section on general causation that I see the overlap,

yes.

Q (By Mr. Brenza) So taking out Exhibit 37, if you would, can we just go -- can we just show me, identify by page and paragraph the portions that are substantially derived from Dr. Nabhan?

MR. WISNER: I'm just going to object to "substantially derived." But is that the phrase we're using to characterize what he said earlier?

MR. BRENZA: I'm trying not to say "copied," or --

MR. WISNER: Yeah.

MR. BRENZA: -- I'm trying to give him the room to say it's not word for word.

MR. WISNER: Okay. Are you writing on your report?

THE WITNESS: Oh.

MR. WISNER: It's okay. The markings on Exhibit 37 were written by the doctor. Just make that clear. It's fine.

THE WITNESS: I'm sorry.

MR. WISNER: No. It's okay. Just had to make sure there was a record of it.

MR. BRENZA: Do you just want to go off the record while --

MR. WISNER: Sure.

MR. BRENZA: -- doctor does this?

THE VIDEOGRAPHER: All right. We're going off record. The time is 4:45 p.m.

(Pause in proceedings.)

THE VIDEOGRAPHER: We're back on record. The time is 4:47 p.m.

Q (By Mr. Brenza) Doctor, have you had the opportunity to review your report in the Stevick matter and compare it to whatever you wanted to look at concerning Dr. Nabhan's reports?

A I did.

Q And did you identify in your Stevick report the portions that were substantially derived from Dr. Nabhan?

A The -- yes I did.

Q And could you identify those for me by page and paragraph, going through Exhibit 37?

A So at Page 6, portions or significant portions of Paragraph 1.

Q And it's a bullet point, right?

A Correct.

Q First bullet point. "The link between"?

A That paragraph.

Q Okay.

A And I found "In March 2015" paragraph.

Q What about these other two bullet points on Page 6?

A Either I missed them or I couldn't find them. I apologize. I thought I identified all of them.

MR. WISNER: Want to go off the record again?

MR. BRENZA: Sure.

THE WITNESS: I'm sorry.

MR. BRENZA: It's okay.

MR. WISNER: It's okay.

THE VIDEOGRAPHER: All right. We're going off record. The time is 4:49 p.m.

(Pause in proceedings.)

THE VIDEOGRAPHER: We are back on record. The time is 4:55 p.m., and this marks the beginning of Media Unit 2.

Q (By Mr. Brenza) Doctor, let's -- let's go through. Did the portions of your Stevick report marked as Exhibit 37 that are substantially derived from Dr. Nabhan begin on Page 6 of your report?

A Yeah, the language that I used from Dr. Nabhan on Page 6 and 7 -- 6, 7, and 8, in general causation section.

Q And what I want to do is go through page and paragraph, and you tell me if --
A Okay.
Q -- this paragraph substantially derives from Dr. Nabhan or not.
Let's start with the paragraph with the first bullet point on Page 6 of your report we've marked as Exhibit 37. Paragraph beginning, "The link between."
A Yes.
Q Is that one borrowed from Dr. Nabhan?
MR. WISNER: Objection to "borrowed."
MR. BRENZA: Well --
THE WITNESS: I use the language from Dr. Nabhan's report.
Q (By Mr. Brenza) Okay. The next bullet point, paragraph beginning, "Most of American cancer centers"?
A Yes.
Q Is that borrowed from Dr. Nabhan?
A Yes.
MR. WISNER: Standing objection to "borrowed," but --
MR. BRENZA: What would you like me to say?

MR. WISNER: I don't know the word that I'm ever going to like, so just --
MR. BRENZA: Okay. And I'm just -- I'm not -- I'm not trying to jam you.
MR. WISNER: I like "substantially derived." That was a good term -- phrase.
Q (By Mr. Brenza) The third bullet point, beginning with the words "The association between," on Page 6 of Exhibit 37, is that language substantially derived from Dr. Nabhan?
A Yes.
Q And is the first hollow bullet point on Page 6, paragraph beginning, "In March 2015," is that substantially derived from Dr. Nabhan?
A Yes.
Q Page 7 of your report we've marked as Exhibit 37, first hollow bullet, the paragraph beginning, "As of the last update," do you see that paragraph?
A Yes.
Q Is that one substantially derived from Dr. --
A Yes.
Q -- Nabhan?
The next hollow bullet, paragraph beginning "IARC reviews"?
A Yes.

Q Is that one from Dr. Nabhan?
A Yes.
Q And then there are -- rather -- we can do a few of these at once.
Do you see there are four square bullets following?
A Yes.
Q Are each of those from Dr. Nabhan?
A Language that I borrowed from Dr. Nabhan, yes.
Q And then on Page 7, the last hollow bullet beginning, "Group 2A," paren, "(probable)," close paren, is that language substantially derived from Dr. Nabhan?
A Yes.
Q Last page of your report we've marked as Exhibit 37, Page 8, first hollow bullet, paragraph beginning, "The results of the IR" -- "IARC investigation," is that paragraph substantially derived from Dr. Nabhan?
A Yes.
Q The next hollow bullet, beginning, "Epidemiological studies," is that one from Dr. Nabhan?
A That's correct.
Q And the conclusions at the end with two bullet points, first one beginning, "Ms. Stevick has been exposed," and the next one beginning, "In performing the thorough differential diagnosis," are both of

those substantially derived from Dr. Nabhan?
A I use similar language of Dr. Nabhan, yes.
Q Does that cover all the portions of your report concerning Ms. Stevick that we've marked as Exhibit 37 that are in whole or in part derived from Dr. Nabhan?
A I believe so.
Q I have one more line of questioning on the substance of your report. This has to do with Page 6, your -- your opinions that are expressed concerning the meta-analysis by Schinasi and Leon. Do you see that paragraph?
MR. WISNER: The first bulleted paragraph?
MR. BRENZA: Correct.
THE WITNESS: Yeah, I see it.
Q (By Mr. Brenza) Okay. And do you see -- at the end of that paragraph, you state, "Furthermore, I have observed that several of the case control studies cited above adjusted for other pesticides as potential confounding factors; whereas some did not. I have taken this issue into account in my analysis."
Do you see that?
A I do.
Q How did you take the issue of confounding pesticides

in the studies relied on in the Schinasi meta-analysis, how did you take that into account in your analysis?
A I gave to go again. It's -- at the time of writing, I had -- I decided that this was the, again, proper way of state how I adjusted my impression from those studies.
Q Are you done?
A I don't -- what?
Q You still answering, or...?
A Yes, I'm trying to still think how to answer your question.
Q Okay.
A I can't tell you specifics how exactly I adjusted that without, again, opening discussion of those publications. 'Cause I don't explain specifically how I did it.
Q And you don't remember, as you sit here now, how you took account of whether they control or didn't control for confounding pesticides?
A I don't recall my train of thought at the time.
Q Do you recall your analysis, how you took it into account in your analysis?
A As we discussed before for general causation analysis, I performed very brief review of the

literature that we went over several times and looked at the limited amount of information in tables, and without having a deep dive into general causation, that really is not my area of expertise. So I don't -- I can't give you specifically, without looking at the studies again in area of general causation, what specific terms or what specific factors I looked at.
Q Do you remember what method you used to conduct your analysis?
A I read the papers. Again, for general causation, I used as a reference just to familiarize myself with general causation.
Q Did you do any mathematics or anything to satisfy yourself that you could rely on studies that didn't adjust for other pesticide use?
A I didn't do any calculations on my own.
Q Did you receive calculations from anyone else?
A No.
Q Do you remember anything else about the method you used?
A Method of...?
Q Of taking into account whether the studies did or didn't adjust for confounding pesticides.
A Again, I've taken into consideration reading the

paper. I did not do any specific considerations or a specific analysis on...
MR. BRENZA: Okay. That's all I have. Thank you. Pass the witness.
MR. WISNER: Thank you.

EXAMINATION
BY MR. WISNER:
Q Couple quick questions, Doctor. We'll get you out of here. It's been a long --
A Sure.
Q -- couple of days.
A Appreciate it.
Q The first is on the confounding issue that we were just talking about. When you say "taking into account," does that just mean you looked and see if those studies did adjust or did not adjust?
A At the level that I looked at those papers, I did not do any specific analysis on general causation papers.
Q Sure. And yesterday I believe we actually discussed one of the articles. It was De Roos 2003. I believe it was Exhibit 20?
A I remember the paper. I don't remember the number of exhibit.

Q Okay. It was Exhibit 20. And that was the study where they adjusted for 47 other pesticides. Do you recall?
A I remember that.
Q Okay. And you remember we discussed there's language in there showing that these other pesticides, for example, didn't confound. Do you recall?
A I do remember that.
Q Okay. The phrase "idiopathic causes," is that a cogent sentence or phrase?
A In a way, "idiopathic causes" is kind of an oxymoron because it means we don't know the cause. We use this kind of liberally just to say we don't know the cause. It's kind of, I'd say, almost inappropriate to call it "the cause" because we don't know the cause. I -- you know, we can call it unidentified -- uni -- unidentifiable causes, but the "idiopathic causes," it's kind of nonsensical, but it's very frequently used.
Q Is it possible to rule out an unknown cause?
A Well, technically you cannot rule out something you don't know what you're ruling out.
Q Okay.
A So if...
Q All right. And then there was some discussion about

ionizing radiation. I just want to get a sense of -- you discussed how much radiation would be required in a medical context to -- to start being worried about it being a cause of cancer. Do you recall that?
A Yeah.
Q What was that measurement that you gave?
A Well, the -- to any reliable degree, we sort of reduce the amount of treatment level radiations to about 20 gray, where studies have shown substantial reduction even in a realm of high-dose radiation in incidence of secondary cancers.
Q So 20 grays.
For me, I'm not a -- I'm not a medical doctor, but my experience with ionizing radiation would be x-rays. Okay? Just give me a context. How many x-rays would I have to get to experience just 1 gray of radiation?
A That'd be thousands.
Q Okay. So if -- I mean, so I guess my question is: In assessing all these plaintiffs -- but specifically we'll talk about Mrs. Stevick. Absent an extreme number of x-ray exposures, would that be an issue that you would have to consider in doing a differential?
A You mean radiation?

Q Yeah.
A No.
Q Okay. So when you talk about ionizing radiation as potential cause, what are you talking about?
A I'm talking about radiation of significant doses that are, in the literature and experience of in oncology, known to pose risk of secondary malignancies or secondary cancers. And, again, what's close to -- to home in my field, that would be measured in tens of grays. So 20 gray of radiation is substantial dose to cause cellular damage and kill cells, because we use this dose to kill cancer. And, unfortunately, the way -- the way radiation kills cancer is by damaging its DNA. And that does the same thing to normal cells. And the usual -- the more common dose of radiation used to treat lymphomas is about 40 gray. In some more resistant cancers like head and neck cancer, patients receive radiation 50 to 60 gray. This is the highest we go in therapeutic realm. So those are doses that we are concerned about in a -- in a reasonable level of concern that patients can develop secondary malignancies. But even reduction from 40 to 20 substantially reduce that risk.
Q If, for example, Mrs. Stevick had received 50 x-rays

in her life, would that be a potential substantial contributing factor?
A That would be negligible.
MR. WISNER: Okay. Pass the witness.
MR. BRENZA: Nothing further.
THE VIDEOGRAPHER: All right. That concludes the video deposition of Dr. Andrei Shustov. We're now going off record at 5:09 p.m.
(Signature reserved.)
(Deposition concluded at 5:09 p.m.)

STATE OF WASHINGTON ) I, John M.S. Botelho, CCR, RPR,
) ss a certified court reporter
County of Pierce ) in the State of Washington,
do hereby certify:

That the foregoing deposition of ANDREI SHUSTOV, M.D., was taken before me and completed on December 16, 2018, and thereafter was transcribed under my direction; that the deposition is a full, true and complete transcript of the testimony of said witness, including all questions, answers, objections, motions and exceptions;

That the witness, before examination, was by me duly sworn to testify the truth, the whole truth, and nothing but the truth, and that the witness reserved the right of signature;

That I am not a relative, employee, attorney or counsel of any party to this action or relative or employee of any such attorney or counsel and that I am not financially interested in the said action or the outcome thereof;

IN WITNESS WHEREOF, I have hereunto set my hand this 18th day of December, 2018.

John M.S. Botelho, CCR, RPR
Certified Court Reporter No. 2976
(Certification expires 5/26/19.)

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me.

Any additions or corrections that I feel are necessary, I will attach on a separate sheet of paper to the original transcript.

______________________________

Andrei Shustov, M.D.

WITNESS: Andrei Shustov, M.D.

DATE: December 16, 2018

CASE: Stevick v. Monsanto Co., et al.

Please note any errors and the corrections thereof on this errata sheet. The rules require a reason for any change or correction. It may be general, such as "To correct stenographic error," or "To clarify the record," or "To conform with the facts."

| PAGE | LINE | CORRECTION | REASON FOR CHANGE |
| --- | --- | --- | --- |
| ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ |