# EXHIBIT 33

Dennis Weisenburger, M.D.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


IN RE: ROUNDUP PRODUCTS ) MDL NO. 2741
LIABILITY LITIGATION )
_____ )
                                ) Case No. 16-md-02741-VC
This document relates to:       )
                                )
Stevick v Monsanto Co., et al. ) Volume I
Case No. 3:16-cv-2341-VC        ) Pages 1 to 154
                                )
_____ )




          Videotaped Deposition of Dennis

     Weisenburger, M.D., Volume I, taken on behalf of

     the Defendant Monsanto Co., at 700 West

     Huntington Drive, Monrovia, California 91016,

     commencing at 8:35 a.m., Tuesday, December 18,

     2018, before Elizabeth Borrelli, a Certified

     Shorthand Reporter in the State of California,

     License No. 7844.

Dennis Weisenburger, M.D.

**Page 2**

```
 1          A P P E A R A N C E S
 2
 3   For the Plaintiff:
 4      ANDRUS WAGSTAFF
        BY:  KATHRYN M. FORGIE
 5      Attorney at Law
        1901 Harrison Street
 6      Suite 1100
        Oakland, California 94612
 7      (310) 339-8214
        kathryn.forgie@andruswagstaff.com
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1   APPEARANCES (Continued)
 2
 3   For the Defendants:
 4
        ARNOLD & PORTER KAYE SCHOLER LLP
 5      BY:  JULIE du PONT
        BY:  AARON H. LEVINE
 6      Attorneys at Law
        250 West 55th Street
 7      New York, New York 10019-9710
        (212) 836-8572 (direct)
 8      (212) 836-7586 (direct)
        julie.dupont@arnoldporter.com
 9      aaron.levine@arnoldporter.com
10           -AND-
11      ARNOLD & PORTER KAYE SCHOLER
        BY:  KATHRYN M. PODSIADLO
12      Attorney at Law
        777 South Figueroa Street
13      44th Floor
        Los Angeles, California 90017-5844
14      (213) 243-4273 (direct)
        kathryn.podsiadlo@apks.com
15
             -AND-
16
        BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
17      BY:  MARK S. OUWELEEN
        Attorney at Law
18      54 West Hubbard Street
        Chicago, Illinois 60654
19      (312) 494-4435
        mark.ouweleen@bartlit-beck.com
20
21   Also Present:
22      RICHARD SMITH, videographer
        BRIAN BRAKE, telephonically
23
24
25
```

**Page 4**

```
 1              I N D E X
 2   WITNESS              EXAMINATION
 3   DENNIS WEISENBURGER, M.D.
 4   By MS. du PONT                8, 146
 5   By MS. FORGIE                 140
 6
 7
 8
 9              EXHIBITS
10
11   WEISENBURGER                  PAGE
12   Exhibit 1    Monsanto Company's Notice to      9
                  Take Oral and Videotaped
13                Deposition of Dr. Dennis
                  Weisenburger, 8 pages
14
                  Curriculum Vitae for Dr. Dennis   10
15   Exhibit 2    Weisenburger, 118 pages
16   Exhibit 3    Document titled "Dr.              11
                  Weisenburger Materials List -
17                November 13, 2018," 27 pages
18   Exhibit 4    Document titled "Bill for Work    13
                  on Case of Elaine Stevick," 2
19                pages
20   Exhibit 5    Collection of photographs, 4      18
                  pages
21
22   Exhibit 6    Expert Report of Dr. Dennis D.    19
                  Weisenburger, 5 pages
23   Exhibit 7    Document titled "WHO              37
                  Classification of Tumours of
24                Haematopoietic and Lymphoid
                  Tissues," 6 pages
25
```

**Page 5**

```
 1   Exhibit 8    Article titled "Cancer           47
                  Epidemiology Biomarkers &
 2                Prevention," 10 pages
 3   Exhibit 9    Paper titled "Pesticide          53
                  exposure as risk for
 4                Non-Hodgkin lymphoma including
                  histopathological subgroup
 5                analysis," 14 pages
 6   Exhibit 10   Article titled "Glyphosate Use    63
                  and Cancer Incidence in the
 7                Agricultural Health Study," 14
                  pages
 8
 9   Exhibit 11   Article titled "Roundup Weed      70
                  Killer Has Probable Carcinogen,
10                U.N. Says," 6 pages
11   Exhibit 12   Document titled "Addendum to     116
                  Dr. Weisenburger's Reference
12                List," 7 pages
13   Exhibit 13   Printout from Mayo Clinic        122
                  titled "Non-Hodgkin's
14                lymphoma," 6 pages
15   Exhibit 14   Printout from City of Hope       130
                  website titled "Lymmoma," 18
16                pages
17   Exhibit 15   Memo with the subject "Detailed  137
                  account of Roundup usage," 6
18                pages
19   Exhibit 16   Article titled "An Detailed      146
                  Evaluation of Glyphosate Use
20                and the Risk of Non-Hodgkin
                  Lymphoma in the North American
21                Pooled Project (NAPP)," 22
22                pages
23
24
25
```

2 (Pages 2 to 5)

Golkow Litigation Services - 877.370.DEPS

Dennis Weisenburger, M.D.

| | Page 6 |
|---|---|
| 1 | INFORMATION REQUESTED |
| 2 | (None) |
| 3 | UNANSWERED QUESTIONS |
| 4 | Page  Line |
| 5 | 71  21 |
| 6 | |
| 7 | |
| 8 | /// |
| 9 | /// |
| 10 | /// |
| 11 | /// |
| 12 | /// |
| 13 | /// |
| 14 | /// |
| 15 | /// |
| 16 | /// |
| 17 | /// |
| 18 | /// |
| 19 | /// |
| 20 | /// |
| 21 | /// |
| 22 | /// |
| 23 | /// |
| 24 | /// |
| 25 | /// |

Page 8

1    Monsanto.
2         MS. PODSIADLO:  Kathryn Podsiadlo on
3    behalf of Monsanto.
4         MR. LEVINE:  Aaron Levine on behalf of
5    Monsanto.
6         MR. OUWELEEN:  Mark Ouweleen on behalf of
7    Monsanto.
8         THE VIDEOGRAPHER:  Will the -- will the
9    court -- the court reporter is Liz Borrelli and will
10   now swear in the witness.
11        DENNIS WEISENBURGER, M.D.,
12          having been duly administered
13          an oath in accordance with CCP 2094,
14          was examined and testified as follows:
15        MS. FORGIE:  So, just for the record,
16   Dr. Weisenburger is being offered today only for
17   case-specific testimony in the Stevick case, not
18   general causation.
19             EXAMINATION
20   BY MS. du PONT:
21        Q.  Okay.  Doctor, can you please just introduce
22   yourself on the record and give us your business
23   address?
24        A.  My name is Dennis Weisenburger.  My
25   business address is 1500 East Duarte Road, Duarte,

Page 7

1         MONROVIA, CALIFORNIA; TUESDAY, DECEMBER 18, 2018
2                   8:35 A.M.
3
4         THE VIDEOGRAPHER:  We're on record.  My
5    name is Ryan Schaefer.  I'm a videographer for
6    Golkow Litigation Services.  Today's date is
7    December 18, 2018, and the time is 8:35 a.m.
8         This video deposition is being held in 700
9    West Huntington Drive, Monrovia, California for the
10   U.S. District Court, Northern District of
11   California.  The deponent is Dr. Dennis
12   Weisenburger.
13        Counsel will be noted on the stenographic
14   record.  Will counsel -- and will now counsel please
15   identify themselves.
16        MS. FORGIE:  Kathryn Forgie of Andrus
17   Wagstaff for the Plaintiff Stevick.
18        MS. du PONT:  Julie du Pont on behalf
19   of --
20        MR. BRAKE:  This is Brian -- oh, I'm so
21   sorry.  Go ahead.
22        MS. du PONT:  Go ahead, Brian.
23        MR. BRAKE:  This is Brian Brake of the
24   Miller firm for the plaintiff.
25        MS. du PONT:  Julie du Pont on behalf of

Page 9

1    California.
2         Q.  And you are at City of Hope Hospital?
3         A.  Yes.
4         Q.  And you've previously given sworn testimony on
5    behalf of plaintiffs in the Roundup litigation against
6    Monsanto, correct?
7         A.  Yes.
8         Q.  And do you believe your prior testimony was
9    the truthful and accurate?
10        A.  Yes.
11        Q.  And do you stand by that testimony today?
12        A.  Yes.
13        (Whereupon Exhibit 1 was marked for
14        identification.)
15   BY MS. du PONT:
16        Q.  I'm -- I've marked as Exhibit 1 the notice of
17   your deposition that's taking place today, which asks
18   you to bring with you to the deposition various
19   materials.  And I will represent to you that your
20   counsel has provided us with various materials for the
21   deposition today, and I'm going to go ahead and just
22   mark those and walk through those with you, okay?
23        A.  Okay.
24        Q.  First --
25        MS. FORGIE:  And, for the record, we've

Dennis Weisenburger, M.D.

Page 10

1      also filed objections -- served objections, I mean
2      --
3             MS. du PONT:  Understood.
4             MS. FORGIE:  -- not filed.
5             (Whereupon Exhibit 2 was marked for
6             identification.)
7      BY MS. du PONT:
8         Q.  I -- marked as Exhibit 2 is an August 1, 2018
9      copy of your CV.
10            MS. FORGIE:  Thank you for bringing it,
11     but I'm going to pass.
12     BY MS. du PONT:
13        Q.  And is -- is this your most current CV?
14        A.  Yes.
15        Q.  And is there anything on the CV that you
16     haven't had a chance to put on here that you think is
17     relevant and important?
18        A.  There are things, but nothing important
19     and relevant to this case.
20        Q.  Okay.  So as of today, this is your most
21     current CV for your professional experience?
22        A.  Yes.
23        Q.  Okay.  You can set that aside.
24            We were also provided with an updated
25     exhibit list, which I will mark as -- updated

Page 11

1      materials considered list, I should say.
2             (Whereupon Exhibit 3 was marked for
3             identification.)
4             MS. du PONT:  We'll mark this as
5      Exhibit 3.
6             MS. FORGIE:  I will take an extra one of
7      those, please, if you have one.  Thank you.  And
8      this is Exhibit 3?
9             MS. du PONT:  Yes.
10     BY MS. du PONT:
11        Q.  And this materials considered list was served
12     with your report in this matter and was, again, provided
13     in response to the deposition notice by your counsel --
14     by Counsel.
15            Do you have any additional materials your
16     -- you want to add to this list at this time?
17            THE WITNESS:  Does this include all of the
18     references that I gave you?
19            MS. FORGIE:  No, there's an addendum,
20     which was served on you also.
21            MS. du PONT:  This is the addendum.
22            MS. FORGIE:  Oh.
23            MS. PODSIADLO:  Are you talking about with
24     the additional depositions --
25            MS. FORGIE:  Yes.

Page 12

1             MS. PODSIADLO:  -- and -- yeah, that's --
2             MS. FORGIE:  Oh.
3             MS. PODSIADLO:  -- all here.
4             MS. du PONT:  That's all here.
5             THE WITNESS:  That's all here?
6             MS. du PONT:  Yes.
7             MS. FORGIE:  Sorry.
8      BY MS. du PONT:
9         Q.  This also concludes a list of case-specific
10     materials, the last page, and then the supplemental
11     reliance list that includes the reports of Dr. Arber,
12     Bello and Villablanca.
13        A.  Well, as long as it --
14            MS. FORGIE:  I don't --
15            THE WITNESS:  -- includes --
16            MS. FORGIE:  -- I don't think --
17            THE WITNESS:  -- everything that --
18            MS. FORGIE:  -- it does include addendum.
19            THE WITNESS:  I -- there wasn't an -- an
20     addendum list that --
21            MS. FORGIE:  No.
22            THE WITNESS:  -- I gave to Kathryn last
23     week that --
24            MS. FORGIE:  It was served on you with the
25     objections.

Page 13

1             MS. du PONT:  This is the list that was
2      served on us with the objection, so whatever was
3      served with the objections and responses, this is
4      it.
5             THE WITNESS:  Updated through last Friday.
6             MS. FORGIE:  Because this looks like the
7      original list to me, which had 297, and the addendum
8      has 123.
9             MS. du PONT:  Well, why don't we deal with
10     this on a break?
11            MS. FORGIE:  Okay.  Yeah, let's do that.
12            MS. du PONT:  Let's set it aside for now.
13            MS. FORGIE:  That's a good idea.
14     Because -- but, yeah, that's a good idea.
15     BY MS. du PONT:
16        Q.  In addition to the materials considered list
17     that we will come back to, you also provided an invoice
18     for your time on the Stevick matter, which I'll mark as
19     Exhibit 4.
20            (Whereupon Exhibit 4 was marked for
21            identification.)
22            MS. FORGIE:  No, thank you.
23            [Reporter requests clarification.]
24            MS. FORGIE:  I said no, thank you.  Sorry.
25     My --

4 (Pages 10 to 13)

Dennis Weisenburger, M.D.

| Page 14 | Page 16 |
|---|---|
| 1   THE REPORTER: That won't help anyway. | 1   I billed after that, I think, because I did them all |
| 2   Can you keep your voice up? I'm not hooked up to | 2   at the same time. |
| 3   the mics. | 3   BY MS. du PONT: |
| 4   MS. FORGIE: Oh. | 4   Q. Okay. Since November 19th, have you done any |
| 5   BY MS. du PONT: | 5   additional work on Ms. Stevick's case? |
| 6   Q. So -- | 6   A. Yes. |
| 7   MS. FORGIE: Sorry. | 7   Q. What additional work have you done? |
| 8   BY MS. du PONT: | 8   A. An additional 13 hours. |
| 9   Q. So this is an invoice that says "Bill for work | 9   Q. And that's also at $500 per hour? |
| 10   on case of Elaine Stevick"; is that right, | 10   A. Yes. |
| 11   Dr. Weisenburger? | 11   Q. So you've made an additional $2,500? Am I |
| 12   A. Correct. | 12   doing my math right? |
| 13   Q. And it looks like you've billed for time | 13   MS. FORGIE: Don't look at me. |
| 14   starting on September 21st through November 19th, and | 14   THE WITNESS: No, wait. It's over -- |
| 15   the total amount of time you've billed for is 20 hours? | 15   MR. LEVINE: 6500. |
| 16   A. That's correct. | 16   THE WITNESS: -- 5,000. 6500. |
| 17   Q. And your rate per hour is $500 per hour, | 17   MR. LEVINE: 6500. |
| 18   correct? | 18   MS. du PONT: 6500. |
| 19   A. Yes. | 19   BY MS. du PONT: |
| 20   Q. So as of November 19th -- I assume this is | 20   Q. So you've earned an additional $6500 on the |
| 21   2018 -- you've worked 10 -- you've billed $10,000 for | 21   Stevick matter since November 19th? |
| 22   your work on the Stevick matter? | 22   A. Yes. |
| 23   A. That's correct. | 23   Q. And have you billed for that time yet? |
| 24   Q. And you had already received a retainer for | 24   A. No. |
| 25   $5,000 for the Stevick matter? | 25   Q. Do you intend to bill for that time? |

| Page 15 | Page 17 |
|---|---|
| 1   A. Yes. | 1   A. Yes. |
| 2   Q. So you had a balance due of $5,000; is that | 2   Q. And you will also bill for $5,000 for this |
| 3   correct? | 3   half-day deposition? |
| 4   A. Yes. | 4   A. Yes. |
| 5   Q. And have you been paid that $5,000? | 5   Q. So, in total, you will bill $21,500 for the |
| 6   A. Yes. | 6   Stevick case as of today? |
| 7   Q. When were you paid that? | 7   A. I believe that's correct. |
| 8   A. A couple weeks ago. | 8   Q. And on November 26th in the Gordon case, you |
| 9   Q. Were you paid after your deposition that you | 9   testified that you had made over $300,000 working on the |
| 10   gave on November 26, 2018? | 10   Roundup litigation so far. |
| 11   A. I haven't given a deposition in this case. | 11   Am I to assume that now you've made at |
| 12   This is the deposition. | 12   least -- well, let me just ask this: How much have |
| 13   Q. You gave a deposition -- | 13   you earned as of today on the Roundup litigation as |
| 14   A. Previous deposition? | 14   a whole? |
| 15   Q. Right. You gave a deposition in the Adams | 15   MS. FORGIE: Objection. |
| 16   matter -- | 16   THE WITNESS: Paid and billed? |
| 17   A. Gordon matter. | 17   MS. du PONT: Yes. |
| 18   Q. -- on November -- | 18   THE WITNESS: I've been billed -- I billed |
| 19   MS. FORGIE: Gordon. | 19   but not paid. So it's probably -- probably $380 or |
| 20   MS. du PONT: -- 26th -- | 20   90,000. |
| 21   THE WITNESS: The Gordon matter. | 21   BY MS. du PONT: |
| 22   MS. du PONT: Gordon, sorry. | 22   Q. Okay. Now, you also -- your counsel also |
| 23   [Reporter requests attorney and witness | 23   provided some photos of the sprayer that Ms. Stevick |
| 24   speak one at a time.] | 24   used to spray Roundup. I'll mark that as Exhibit 5. |
| 25   THE WITNESS: The Gordon matter, yeah. So | 25   /// |

Dennis Weisenburger, M.D.

Page 18

1           (Whereupon Exhibit 5 was marked for
2       identification.)
3   BY MS. du PONT:
4       Q.  And explain to me --
5           MS. FORGIE:  I will take one of those, if
6   you have an extra, please.  Thank you.
7   BY MS. du PONT:
8       Q.  This -- this Exhibit 5 was just provided you
9   by counsel --
10      A.  Yes.
11      Q.  -- for plaintiff?
12          And what is the relevance of this -- these
13  pictures for your opinion?
14          MS. FORGIE:  Objection.
15          THE WITNESS:  Well, it shows the container
16  that she used to apply the Roundup that was mixed by
17  her husband.
18  BY MS. du PONT:
19      Q.  Any other relevance to you other than that?
20      A.  No.
21      Q.  Okay.  You can set that aside.
22          Now, you prepared a report for
23  Ms. Stevick's case; is that correct?
24      A.  Yep.
25      Q.  Okay.

Page 19

1       A.  Yes.
2           MS. du PONT:  We are going to mark that as
3   Exhibit 6.
4           (Whereupon Exhibit 6 was marked for
5       identification.)
6           MS. du PONT:  Ms. Forgie, would you like a
7   copy?
8           MS. FORGIE:  No, thank you.  But thank you
9   for offering.
10  BY MS. du PONT:
11      Q.  Can I actually see that one for a second just
12  to make sure...
13          Thanks.
14          Does this appear to be the report that you
15  prepared in Ms. Stevick's case that we've marked as
16  Exhibit 6?
17      A.  Yes.
18      Q.  And you prepared this report yourself?
19      A.  I did.
20      Q.  No one else prepared it for you?
21      A.  No.
22      Q.  You didn't copy this -- any part of your
23  report from anyone else's report, correct?
24      A.  No.
25      Q.  That wouldn't be appropriate, would it?

Page 20

1       A.  No.
2           MS. FORGIE:  Objection.
3   BY MS. du PONT:
4       Q.  And does this report disclose all of the
5   opinions you intend to offer at trial for Ms. Stevick's
6   case?
7       A.  Yes.
8       Q.  And it also discloses all the basis for your
9   opinions that you intend to offer at trial in
10  Ms. Stevick's case?
11          MS. FORGIE:  Objection.
12          THE WITNESS:  Yes.
13  BY MS. du PONT:
14      Q.  And does the report disclose all the documents
15  and materials you relied on in forming your opinions in
16  Ms. Stevick's case?
17      A.  I would say no, because I reviewed a lot
18  of documents for this case and other cases that I
19  didn't reference.
20      Q.  Okay.
21      A.  But they are on the reference list that
22  you received.
23      Q.  So all of the materials that you are -- have
24  reviewed and are relying on are -- if they're not
25  referenced specifically in this report are on the

Page 21

1   materials considered list that your counsel has provided
2   in response to the notice for this deposition; is that
3   correct?
4       A.  Yes.
5           MS. FORGIE:  Yeah, I think the other point
6   I kept objecting about is that there's also a
7   general causation component to it, which we're not
8   here for today, but when you say Stevick's case, in
9   the trial, he probably will give that also, so that
10  will -- as part of discussing --
11          MS. du PONT:  And you can object, but you
12  don't need to answer the question for him, okay,
13  Ms. Forgie?
14          MS. FORGIE:  Well, I'm just trying to help
15  you clarify.
16          MS. du PONT:  Okay.
17          MS. FORGIE:  Because I think it's
18  confusing.
19  BY MS. du PONT:
20      Q.  Did you read the reports of Ms. Stevick's
21  other experts in this case?
22      A.  I did.
23      Q.  That's not on any of the -- the lists, though,
24  that we got.
25          THE WITNESS:  Would it be on the most

Dennis Weisenburger, M.D.

Page 22

1    recent list?
2         MS. FORGIE:  I'm not allowed to answer.
3         MS. du PONT:  Well --
4         THE WITNESS:  I don't know.  I sent the
5    list -- I obtained all of the reports on the --
6    the experts on the three cases that we're doing.
7         MS. du PONT:  Right.
8         THE WITNESS:  And I read them.  They were
9    provided to me by Ms. Forgie, and I'm assuming that
10   she added them to my list.  I don't know --
11        MS. du PONT:  Okay.
12        THE WITNESS:  -- whether she did.
13   BY MS. du PONT:
14        Q.   So you did consider the reports of Dr. Nabhan
15   and Shustov?
16        MS. FORGIE:  Objection.
17        THE WITNESS:  I saw the Nabhan one, not
18   the Shustov one.
19   BY MS. du PONT:
20        Q.   Okay.  And are you taking -- are you relying
21   on any of his opinions to form your own opinions in this
22   case?
23        A.   No.
24        Q.   Did you review any transcripts of the
25   depositions for Dr. Nabhan or Dr. Shustov?

Page 23

1        A.   Yes.  I also reviewed the depositions of
2    Nabhan but not Shustov.
3        Q.   What depositions of Dr. Nabhan did you review?
4    His deposition in this case?
5        A.   In this case and the other two cases we're
6    dealing with this week.
7        Q.   So his depositions in --
8        A.   Gebeyehou.
9        Q.   -- Gebeyehou, as well as Hardeman?
10       A.   Hardeman, yes.
11       Q.   And did you review rough transcripts?
12       A.   Yes.
13       Q.   Did you review any drafts of Dr. Nabhan's
14   expert reports before filing -- or before serving your
15   report in this case?
16       A.   No.
17       Q.   Did you review any depositions of fact
18   witnesses in Ms. Stevick's case?  Let me -- let me
19   help --
20       A.   For --
21       Q.   -- a little.
22       A.   For example...
23       Q.   For example, did you review the deposition of
24   Mr. and Mrs. Stevick?
25       A.   Yes.

Page 24

1        Q.   Did you review the deposition of Dr. Kim
2    (phonetic), her treating oncologist?
3        A.   No.
4        Q.   Was that not important for you to review?
5        MS. FORGIE:  Objection.
6        THE WITNESS:  It wasn't provided for my
7    review.  I did review the medical records.
8    BY MS. du PONT:
9        Q.   Did you ask your -- ask Counsel if you could
10   review the depositions of her treating doctors?
11       A.   No.
12       Q.   Was it not important for you to review the
13   depositions of the treating doctors?
14       MS. FORGIE:  Objection.
15       THE WITNESS:  I don't know whether it was
16   important or not.  I didn't ask for it.  Sometimes
17   the lawyers will send me the documents and I will
18   review them.  In this case, I didn't review them.
19   BY MS. du PONT:
20       Q.   Okay.  So I take it you did not review the
21   deposition transcript for Dr. Gonzalez (phonetic)?
22       A.   I did not.
23       Q.   And you did not review the deposition
24   transcript for Dr. Sedreck (phonetic)?
25       A.   I did not.

Page 25

1        Q.   You mentioned that you did, however, review
2    Ms. Stevick's medical records --
3        A.   Yes.
4        Q.   -- right?
5             Did you review select records?
6        A.   No.  I had some big books of records,
7    thank you.
8        Q.   Okay.  Do you believe you reviewed all of her
9    medical records?
10       A.   To the best of my knowledge, yes.
11       Q.   And you also reviewed some pathology for
12   Ms. Stevick --
13       A.   Yes.
14       Q.   -- is that right?
15       A.   I reviewed her -- the bi -- the slides of
16   her diagnostic biopsy, yes.
17       Q.   And were those original slides from the
18   biopsy, or were they recuts from the biopsy?
19       A.   They were originals.
20       Q.   Did you review the immunohistochemistry
21   slides?
22       A.   I did not.
23       Q.   Was there anything in your review of the
24   original slides from her surgical biopsy -- let me
25   withdraw that question.

7 (Pages 22 to 25)

Dennis Weisenburger, M.D.

Page 26

1      In reviewing the original slides from her
2  biopsy, was there anything that you saw in the
3  pathology that caused you to disagree with what the
4  original pathologist wrote in the report for
5  Ms. Stevick?
6      A.  No, but I made a more specific diagnosis.
7  His -- the diagnosis of record is more, how to say,
8  more general or vague diagnosis.
9      Q.  Can you describe that in a little bit more
10 detail?
11     A.  Well, the diagnosis made by the local
12 pathologist was aggressive B-cell non-Hodgkin
13 lymphoma, of which diffuse large B-cell lymphoma is
14 one of the aggressive B-cell lymphomas.  So I made a
15 more specific diagnosis.
16     Q.  And your more specific diagnosis was what?
17     A.  Diffuse large B-cell lymphoma.
18     Q.  And we'll get -- we'll get more into that in
19 a -- in a bit.  I'm going to come back to that.
20     But let me ask:  Did you review any
21 of the pathology slides for her bone marrow testing?
22     A.  No.
23     Q.  And did you review any pathology slides for
24 her cerebral spinal fluid testing?
25     A.  No.

Page 27

1      Q.  Did you look at the cytometry testing on her
2  chromosomes?
3      A.  Just the reports.
4      Q.  So with respect to the bone marrow testing,
5  the cerebral spinal fluid testing and the cytometry
6  testing, you're relying solely on the reports and not
7  the pathology itself?
8      A.  Yes.
9      Q.  Did you review any of the MRI imaging itself?
10     A.  No.
11     Q.  You just, again, were -- are relying on the
12 reports?
13     A.  Yes.
14     Q.  In preparing your report in Ms. Stevick's
15 case, did you conduct any additional literature
16 searches?
17     A.  I did.
18     Q.  What literature searches did you conduct?
19     A.  I did a literature search on the
20 relationship of radiation to non-Hodgkin lymphoma.
21 I think that was the main -- the main one I did.
22     Q.  And did you do that before or after you wrote
23 the report?
24     A.  After I wrote the report.
25     Q.  And why did you do that after you wrote the

Page 28

1  report?
2      A.  Well, because it was brought up in one of
3  the defense expert's report, so I thought well, I
4  should read about this and refresh my memory.
5      Q.  Okay.  Any other additional literature
6  searches that you did with respect to Ms. Stevick's
7  case?
8      A.  I don't believe so.
9      Q.  Did the lawyers provide you with any specific
10 literature with respect to Ms. Stevick's case?
11     A.  No.
12     Q.  Now, you had a telephone meeting with
13 Ms. Stevick on October 26, 2018?
14     A.  Yes.
15     Q.  And did you review her medical records in
16 advance of that telephone meeting?
17     A.  Yes.
18     Q.  How long did you spend reviewing her medical
19 records before you talked to her on the phone?
20     A.  I don't know.  Part of that 20 minutes.
21 Probably half or more of that 20 hours.
22     Q.  Was the -- if we look back at the invoice --
23 let me see if I can find it.  I think we marked it as --
24     A.  Here it is.
25     Q.  If you look back at the invoice, it looks like

Page 29

1  you billed four, six, seven -- eight hours prior to
2  October 26; is that correct?
3      A.  October 26th.
4      MS. FORGIE:  Objection.
5      THE WITNESS:  Four, six -- nine hours, I
6  think.
7  BY MS. du PONT:
8      Q.  Including --
9      A.  Four, six, eight -- nine hours.
10     Q.  Four?  Very challenged today with my math.
11     How are you getting nine hours?
12     A.  Well, 3.5 plus .5 is 4, and 2 is 6, and 1
13 is 5, and 5 is 7 -- let's see.  Four, six, seven --
14 you're right, it's eight.
15     Q.  Okay.
16     A.  Maybe I'm challenged.
17     MS. FORGIE:  I did -- I did the same thing
18 you did.
19 BY MS. du PONT:
20     Q.  So you had billed eight hours prior to
21 October 26 on her -- her case.
22     Was all of that reviewing medical records
23 or was just a part of it?
24     A.  Pretty much medical records, yes.
25     Q.  And then it looks like you spent a half an

8  (Pages 26 to 29)

Dennis Weisenburger, M.D.

Page 30

1  hour talked to her on October 26?
2     A.  That's correct.
3     Q.  Okay.  And do you have any notes of that
4  meeting that you had with her?
5     A.  I do.
6     Q.  Did you bring those with you to the deposition
7  today?
8     A.  No.  I was instructed not to bring them.
9     Q.  Okay.
10       MS. du PONT:  And maybe I'll just make a
11  request right now for the notes of his interview
12  with Ms. Stevick.
13       MS. FORGIE:  Yeah, we're not going to
14  provide them pursuant to pretrial order No. 7.  The
15  notes and drafts are not -- they're not required to
16  be produced and we're not producing them.
17  BY MS. du PONT:
18     Q.  Okay.  Did you rely on those notes in
19  preparing your report in this matter?
20     A.  Yes.
21       MS. du PONT:  Okay.  I'm going to
22  disagree, but I'm just going to request that you
23  provide those notes, and we can discuss it more off
24  the record.
25       MS. FORGIE:  We're not going to provide

Page 31

1  them.
2       MS. du PONT:  I understand that's your
3  position.  I have the opposite position.
4       MS. FORGIE:  I understand.
5  BY MS. du PONT:
6     Q.  Okay.  Other than this one meeting on
7  October 26th, did you have any other discussions with
8  Ms. Stevick?
9     A.  No.
10     Q.  And what -- what questions did you ask her on
11  October 26th?
12     A.  So I asked her a lot of questions about
13  her use of Roundup and her exposure to Roundup, and
14  I asked her pertinent questions about other known
15  risk factors for non-Hodgkin lymphoma.
16     Q.  What known risk factors did you ask her about?
17     A.  Well, I asked her about the -- the ones
18  that are -- that I couldn't find any record in the
19  medical records, so things like autoimmune disease,
20  viral infections, immunodeficiency, other kinds of
21  infections.
22     Q.  Did you ask her about radiation?
23     A.  I didn't.
24     Q.  Did you ask her about her family history of
25  cancer?

Page 32

1     A.  Yes.
2     Q.  And what did she tell you?
3     A.  Well, she had a -- a fair -- a fairly
4  significant family history of -- of cancer of
5  various types, most -- most impressive was the
6  history of colon carcinoma, colon cancer, but there
7  were a variety of other cancers as well.
8     Q.  But you chose not to write any of that in your
9  report, correct?
10       MS. FORGIE:  Objection.
11       THE WITNESS:  I -- I didn't include it
12  because I didn't think it was relevant to her as a
13  risk factor for her lymphoma.
14  BY MS. du PONT:
15     Q.  Okay.  Do you agree that non-Hodgkin's
16  lymphoma is a heterogeneous disease?
17       MS. FORGIE:  Objection.
18       THE WITNESS:  Yes.
19  BY MS. du PONT:
20     Q.  In fact, there's at least -- or more than 60
21  subtypes of non-Hodgkin's lymphoma, correct?
22     A.  Yes.
23     Q.  And would you agree that there are -- that
24  different subtypes can have different risk factors?
25     A.  Yes.

Page 33

1     Q.  And different subtypes can have different
2  causes, correct?
3       MS. FORGIE:  Objection.
4       THE WITNESS:  Yes.
5  BY MS. du PONT:
6     Q.  So I just want to talk a little bit about
7  Ms. Stevick's case.  In December of 2014, she presented
8  to her primary care doctor, Dr. Gonzalez, with dizziness
9  and confusion.
10       Do you agree with that?
11     A.  Yes.
12     Q.  And she eventually, a couple days later, went
13  to the emergency room with the same symptoms of
14  dizziness and weakness, right?
15     A.  Yes.
16     Q.  And you note in your report that she had --
17  had a slow cognitive decline for several months --
18     A.  Yes.
19     Q.  -- right?
20     A.  Yes.
21     Q.  And, in fact, Ms. Stevick had gone to her
22  primary care physician, Dr. Gonzalez, in February of
23  2013, which is more than several months, with symptoms
24  such as trouble sleeping, problems with concentration,
25  making errors at work, correct?

Dennis Weisenburger, M.D.

Page 34

1    A.  Yes.
2    Q.  And do you believe that those symptoms in
3  February 2013 were related to her non-Hodgkin's
4  lymphoma?
5    A.  Probably they were.  It's unclear whether
6  they were or not, but I would say probably they
7  were, yes.
8    Q.  And do you have an opinion about when
9  Ms. Stevick's non-Hodgkin's lymphoma began?
10    MS. FORGIE:  Objection.
11    THE WITNESS:  No.  Sometime prior to that.
12  BY MS. du PONT:
13    Q.  Do you think it began prior to 2011 when she
14  was experiencing headaches and fell off a chair at work?
15    MS. FORGIE:  Objection.  Asked and
16  answered.
17    THE WITNESS:  I don't believe so because
18  she had an MR -- MRI at that time that did -- was
19  negative.
20  BY MS. du PONT:
21    Q.  So your opinion is that her cancer began
22  sometime between 2011 when she was having the headaches
23  and 2013 when she was having these symptoms of sleeping
24  problems, concentration and errors at work?
25    MS. FORGIE:  Objection.

Page 35

1    THE WITNESS:  Yes.
2  BY MS. du PONT:
3    Q.  So in December of 2014 when she went to the
4  emergency room with these complaints, they actually did
5  an MRI, right?
6    A.  Yes.
7    Q.  And that MRI showed a cerebellar mass,
8  correct?
9    A.  Yes.
10    Q.  And following that MRI, they did various
11  imaging of her pelvis, chest and abdomen, and that did
12  not show any evidence of metastatic disease, correct?
13    A.  Correct.
14    Q.  And they eventually, on December 29, 2014, did
15  a biopsy of the cerebellar mass; is that right?
16    A.  Yes.
17    Q.  And the reason and -- and the differential
18  diagnosis that they were doing was to figure out whether
19  it was a glioblastoma, metastatic cancer or lymphoma,
20  right?
21    A.  Yeah, among other things, but those would
22  be the main things you would think about.
23    Q.  Okay.  And the biopsy came back, and they
24  determined it was a lymphoma, correct?
25    A.  Yes.

Page 36

1    Q.  And the pathology -- the pathologist
2  eventually -- let me withdraw that.
3    She was eventually diagnosed with a
4  particular type of non-Hodgkin's lymphoma called
5  primary diffuse large B-cell lymphoma of the central
6  nervous system.
7    Do you agree with that?
8    A.  Yes.
9    Q.  But in your report, you refer to Ms. Stevick's
10  diagnosis as diffuse large B-cell non-Hodgkin's
11  lymphoma, right?
12    A.  Right.
13    Q.  And why did you not -- why were you not as
14  specific to describe it as a primary diffuse large
15  B-cell lymphoma of the central nervous system?
16    A.  Well, that's more of a clinical diagnosis.
17  So the pathologist looks at the slides.  He can just
18  say that it's a diffuse large B-cell lymphoma.  So
19  to -- to make that more specific diagnosis, you have
20  to do all the workup that they did, which you
21  mentioned, to make sure that it was only in the
22  brain and then probably arising in the brain.  So
23  the diagnosis of primary diffuse large B-cell
24  lymphoma of the central nervous systems is a -- more
25  of a clinical diagnosis.

Page 37

1    Q.  Do you -- but you agree that that is the
2  correct diagnosis for Ms. Stevick --
3    A.  Yes.
4    Q.  -- correct?
5    A.  Yes.
6    Q.  And, in fact, the World Health Organization
7  has classified primary CNS lymphoma as a specific
8  subtype of non-Hodgkin's lymphoma, correct?
9    A.  It has.
10    Q.  And your opinion in this case is that Roundup
11  caused Ms. Stevick's primary CNS lymphoma?
12    A.  Yes.
13    MS. du PONT:  I'm going to mark as
14  Exhibit 7 the WHO ex- -- the World Health
15  Organization excerpt with regards to the primary
16  diffuse large B-cell lymphoma of the CNS.  This
17  comes from the WHO classification of tumors of
18  hematopoietic and lymphoid tissues.  I probably
19  mispronounced that.  You're gonna --
20    THE WITNESS:  You did --
21    MS. du PONT:  -- correct me.
22    THE WITNESS:  You did well.
23    (Whereupon Exhibit 7 was marked for
24  identification.)
25    MS. FORGIE:  Thank you.  What -- what

Dennis Weisenburger, M.D.

Page 38

1  number is this?
2       MS. du PONT:  This is Exhibit 7.
3       MS. FORGIE:  Thank you.
4  BY MS. du PONT:
5       Q.  If you can just turn to the second page.  This
6  is page 300 of the WHO classifications of tumors of the
7  hematopoietic and lymphoid tissues, and you see that
8  there's a -- a definition for primary diffuse large
9  B-cell lymphoma of the CNS.
10      Do you see that?
11      A.  Yes.
12      Q.  And can you just read for me what that
13 definition is?
14      A.  "Primary diffuse large B-cell lymphoma of
15 the CNS is defined as diffuse large B-cell lymphoma
16 arising within the brain, spinal cord, leptomeninges
17 or eye.  Excluded are lymphomas of the dura,
18 intervascular large B-cell lymphomas, lymphomas with
19 evidence of systemic disease or secondary lymphomas
20 and all immunodeficiency-associated lymphomas."
21      Q.  Okay.  And you agree that Ms. Stevick would be
22 considered immunocompetent, correct?
23      A.  Yes.
24      Q.  And do you see under "Etiology" the WHO
25 classification states, "In immunocompetent individuals,

Page 39

1  the etiological factors are unknown."
2       Do you see that?
3       A.  That's what they say.
4       Q.  Do you agree with that?
5       A.  No.
6       Q.  And they go on to say that various viruses "do
7  not play a role" in this type of lymphoma, correct?
8       A.  Correct.
9       Q.  Okay.  And under the epidemiology, do you see
10 that it says that "CNS diffuse large B-cell lymphoma
11 accounts for less than 1 percent of all non-Hodgkin
12 lymphomas and 2.4 to 3 percent of all brain tumors."
13      Do you see that?
14      A.  Yes.
15      Q.  And do you agree with that?
16      A.  Yes.
17      Q.  Are you aware of any published literature that
18 shows that the genetic mutation patterns in primary CNS
19 lymphomas differ from diffuse large B-cell lymphomas not
20 otherwise specified?
21      MS. FORGIE:  Objection.
22      THE WITNESS:  There is literature on that,
23 yes.  The primary CNS lymphomas tend to have what's
24 called an activated B-cell phenotype.  And those
25 lymphomas occur throughout the body, but also are

Page 40

1  the predominant type of primary CNS lymphomas and
2  they have a certain pattern of mutations.
3  BY MS. du PONT:
4       Q.  So --
5       A.  But it's similar to the other activated
6  B-cell types.
7       Q.  But there -- there is literature showing that
8  there are distinct differences between primary diffuse
9  large B-cell lymphoma and diffuse large B-cell lymphoma
10 not otherwise specified?
11      A.  Well --
12      MS. FORGIE:  Objection.
13      THE WITNESS:  Well, not really, no.  I
14 mean, as I said, diffuse large B-cell lymphoma not
15 otherwise specified --
16      [Reporters asks counsel to slow down
17      when talking.]
18      THE WITNESS:  Diffuse large B-cell
19 lymphoma not otherwise specified has different
20 subtypes.  One of them is called the activated
21 B-cell type, okay?  And it just so happens that the
22 primary CNS lymphomas are mainly of the activated
23 B-cell type.  So they have the same mutation
24 patterns --
25      MS. du PONT:  Okay.

Page 41

1       THE WITNESS:  -- whether they're in the
2  CNS or outside the CNS.
3       Her -- her tumor actually was CD10
4  positive, which puts it in the other category of
5  diffuse large B-cell lymphoma, NOS, which is called
6  the germinal center B-cell type, and those have a
7  different mutation pattern, whether they're in the
8  CNS or whether they're in other parts of the body.
9  BY MS. du PONT:
10      Q.  But you agree that she did have primary CNS
11 lymphoma, correct?
12      A.  Yes.
13      Q.  And you're not aware sitting here today that
14 there are -- there's any literature that shows there are
15 higher frequencies of some mutated genes occurring with
16 primary CNS versus diffuse large B-cell lymphoma not
17 otherwise specified?
18      MS. FORGIE:  Objection.
19      THE WITNESS:  I've already answered that
20 question.
21 BY MS. du PONT:
22      Q.  So you're not aware of any literature that --
23 that is contrary to what you've already answered?
24      MS. FORGIE:  Objection.
25      THE WITNESS:  The -- the patterns of the

Dennis Weisenburger, M.D.

Page 42

```
1   mutations are the same whether it occurs in the
2   brain, this activated B-cell type, or whether it
3   occurs primarily outside of the brain. It's the
4   same pattern. Some mutations may be a little more
5   frequent in the brain than outside the brain, but
6   it's the same mutations. It's the same pattern of
7   mutations.
8       MS. du PONT: Okay. So I was asking a
9   slightly different question.
10  BY MS. du PONT:
11      Q. My que-- -- my -- my question is: Are you
12  aware of any literature that suggests that the patterns
13  are different between primary CNS lymphoma and diffuse
14  large B-cell lymphoma not otherwise specified?
15      MS. FORGIE: Objection.
16      THE WITNESS: They're -- they're
17  different, but they're quantitative not qualitative.
18  BY MS. du PONT:
19      Q. So you are aware of literature that shows that
20  there are -- there are differences between primary
21  CNO -- CNS lymphoma and diffuse large B-cell lymphoma
22  not otherwise specified?
23      A. So there's some mutations in the activated
24  B-cell type of primary CNS lymphoma, which are more
25  frequent than in the non -- in the systemic
```

Page 43

```
1   activated B-cell type. But it's the same mutations;
2   it's just that the frequency is somewhat different,
3   okay?
4       Q. Okay. Is the opinion you're offering in this
5   case that Roundup causes all types of non-Hodgkin's
6   lymphoma?
7       MS. FORGIE: Objection. That goes to --
8       THE WITNESS: My opinion in this case --
9       MS. FORGIE: -- general causation.
10      THE WITNESS: -- is that --
11      MS. FORGIE: -- but you can answer.
12      THE WITNESS: -- it causes --
13      [Reporter requests attorney and witness
14      speak one at a time.]
15      MS. FORGIE: I said objection. That goes
16  to general causation, but you can answer.
17      THE WITNESS: Yeah. My opinion in this
18  case is that it causes diffuse large B-cell
19  lymphoma.
20  BY MS. du PONT:
21      Q. Have you reviewed any literature that reports
22  that Roundup causes each of the different types of
23  non-Hodgkin's lymphoma?
24      MS. FORGIE: Objection. Goes to general
25  causation.
```

Page 44

```
1       You can answer.
2       THE WITNESS: Well, there is -- there --
3   there is a little bit of literature on subtypes.
4   There's the Eriksson paper, which listed the various
5   subtypes and showed increased odds ratios for most
6   or all of the subtypes. They weren't statistically
7   significant because of the small numbers, but they
8   were increased. And then there's at the NAPP study,
9   which looked at the major subtypes, flicker
10  lymphoma, diffuse large B-cell lymphoma, small
11  lymphocytic lymphoma/chronic lymphocytic leukemia,
12  and then the other less common subtypes. And odds
13  ratios were increased for all the different
14  subtypes.
15  BY MS. du PONT:
16      Q. So your -- your testimony is that in the
17  Eriksson paper and the NAPP paper, there was an
18  increased risk that was statistically significant for
19  all the different subtypes?
20      A. No, most --
21      MS. FORGIE: Objection.
22      THE WITNESS: For -- for most of the
23  subtypes the odds ratios were increased, but the
24  increases were not statistically significant.
25      MS. du PONT: Okay. So we'll -- we'll get
```

Page 45

```
1   into those articles in a -- in a second.
2   BY MS. du PONT:
3       Q. Did you conduct a specific search to answer
4   the question of whether there's a link between primary
5   CNS lymphoma and Roundup or gly- -- glyphosate?
6       MS. FORGIE: Objection.
7       [Reporter requests clarification.]
8       MS. du PONT: Glyphosate.
9       THE WITNESS: No, because there's no
10  literature on that specific question.
11  BY MS. du PONT:
12      Q. So you didn't review or rely on any
13  epidemiological studies that found an association
14  between the type of non-Hodgkin lymphoma that
15  Ms. Stevick had, primary CNS lymphoma, and Roundup or
16  glyphosate exposure; is that correct?
17      MS. FORGIE: Objection.
18      THE WITNESS: Yes, because there is no
19  literature. There's nothing to review.
20  BY MS. du PONT:
21      Q. And there's no -- you didn't review or rely on
22  any case reports in the literature about an association
23  between primary CNS lymphoma and Roundup or glyphosate
24  exposure, correct?
25      MS. FORGIE: Objection.
```

Dennis Weisenburger, M.D.

Page 46

1    THE WITNESS: I -- I did not. I -- I
2  don't believe there are any such reports.
3  BY MS. du PONT:
4    Q.  So your testimony is that there's no published
5  literature whatsoever establishing a link between
6  primary CNS lymphoma and Roundup or glyphosate exposure,
7  correct?
8    MS. FORGIE:  Objection.
9    THE WITNESS:  There's no published
10  literature on that.
11  BY MS. du PONT:
12    Q.  Now, Ms. Stevick was not using Roundup in the
13  agricultural sense, right?  She wasn't a farmer?
14    A.  Correct.
15    Q.  She was using Roundup at her home, home use,
16  right?
17    A.  Yes.
18    Q.  And in your report you rely on two -- in the
19  report for Ms. Stevick you rely on two specific
20  published articles for your opinion that her exposure
21  placed her in the high-risk category for the development
22  of NHL; is that correct?
23    A.  Yes.
24    Q.  And the two articles are McDuffie and
25  Eriksson, right?

Page 47

1    A.  Yes.
2    MS. FORGIE:  Objection.
3    MS. du PONT:  I'm going to mark as Exhibit
4  8 the McDuffie article.
5    (Whereupon Exhibit 8 was marked for
6    identification.)
7    MS. du PONT:  Would you like a copy,
8  Kathryn?
9    MS. FORGIE:  Sure, if we're going to
10  discuss it.
11    Thank you.  This is Exhibit 8?
12    THE WITNESS:  8.
13    MS. FORGIE:  Thank you.
14  BY MS. du PONT:
15    Q.  So we've marked as Exhibit 8 an article by
16  McDuffie, et al entitled "Non-Hodgkin's lymphoma and
17  specific pesticide exposures in men cross Canada study
18  of pesticides and health."
19    Do you see that Dr. Weisenburger?
20    A.  Yes.
21    Q.  And so this, as the title states, is a study
22  of pesticide use in Canada, right?
23    A.  Yes.
24    Q.  And this is a case control study?
25    A.  Yes.

Page 48

1    Q.  And it wasn't only looking at glyphosate
2  exposure; it was looking at a bunch of different
3  exposures to various pesticides, fungicides, herbicides,
4  correct?
5    A.  Yes.
6    Q.  And the total population involved in the study
7  looks like was 2,023; is that right?  If you take a look
8  at the abstract, that might help.
9    A.  517 cases and 1506 controls.
10    Q.  So the total study population was 2,023, if
11  you add those together?
12    A.  Correct.
13    Q.  And of -- we've looked at page 1158.  There's
14  a Table 2, "Herbicides: Frequency of Exposure to
15  Herbicides Classified Into Major Chemical Classes and as
16  Individual Compounds."
17    Do you see that table?
18    A.  Yes.
19    Q.  And one of the major chemical classes includes
20  individual phosphonic herbicides, and glyphosate is
21  listed there, correct?
22    A.  Yes.
23    Q.  And it appears that there were a total of 51
24  cases of NHL in glyphosate users, right?
25    A.  Yes.

Page 49

1    Q.  And there were 133 controls --
2    A.  Yes.
3    Q.  -- is that correct?
4    A.  Right.
5    Q.  So in this study, there were a total of 184
6  cases and controls exposed to Roundup, correct?
7    A.  Yes.
8    Q.  And if we turn to page 1155 -- actually, just
9  stay on the table for a second.
10    With respect to glyphosate, they report
11  two separate odds ratios in this table, correct?
12    A.  Yes, uh-huh.
13    Q.  And the first odds ratio was adjusted for age
14  and province of residence, correct?
15    A.  Correct.
16    Q.  And that showed -- that did not show a
17  statistically significant increased risk of NHL with
18  exposure to glyphosate, correct?
19    A.  It showed a small risk but was not
20  statistically significant.
21    Q.  So the answer to my question is there was not
22  a statistically significant increased risk of
23  non-Hodgkin's lymphoma with glyphosate use in this
24  table, correct?
25    MS. FORGIE:  Objection.

13  (Pages 46 to 49)

Dennis Weisenburger, M.D.

Page 50

```
 1          THE WITNESS:  Correct.
 2          MS. FORGIE:  Asked and answered.
 3          THE WITNESS:  Correct.
 4  BY MS. du PONT:
 5      Q.  And they also did a separate odds ratio
 6  calculation where they controlled for some additional
 7  medical variables.
 8          Do you see that?
 9      A.  Yes.
10      Q.  And that, likewise, did not show a
11  statistically significant increased risk of
12  non-Hodgkin's lymphoma with exposure to glyphosate, did
13  it?
14      A.  That's correct.
15      Q.  Now, you are relying on a specific table for
16  your opinion in this case.  It's Table 8, which is on
17  page 1161.
18          And that table shows an odds ratio of 2.12
19  for greater than two days of exposure to glyphosate,
20  correct?
21      A.  Yes.
22      Q.  But this figure here in Table 8 is not
23  controlled or adjusted for other pesticide use, correct?
24          MS. FORGIE:  Objection.
25          THE WITNESS:  It's not adjusted for other
```

Page 51

```
 1  pesticide use, no.
 2  BY MS. du PONT:
 3      Q.  And you didn't mention that in your report,
 4  did you?
 5      A.  I did not.  It is mentioned in my general
 6  causation report.
 7      Q.  But it's not referenced in your specific --
 8  your specific report for Ms. Stevick --
 9          MS. FORGIE:  Object --
10  BY MS. du PONT:
11      Q.  -- correct?
12          MS. FORGIE:  Objection.  Asked and
13  answered.
14          THE WITNESS:  That's correct.
15          MS. FORGIE:  You can answer it again.
16          THE WITNESS:  That's correct.
17  BY MS. du PONT:
18      Q.  And if you turn to the conclusion in this
19  article, the last paragraph of the article, it states,
20  "Our results support previous findings of an association
21  between NHL and specific pesticide exposures."  And if
22  you go to the last two sentences of the -- that last
23  paragraph, it states, "In our final models,
24  non-Hodgkin's lymphoma was associated with a personal
25  history of cancer, a history of cancer in first-degree
```

Page 52

```
 1  relatives and exposure to dicamba-containing herbicides,
 2  to mecoprop and to Aldrin."
 3          Do you see that?
 4      A.  Yes.
 5      Q.  It doesn't conclude that non-Hodgkin's
 6  lymphoma was associated with Roundup or glyphosate,
 7  correct?
 8          MS. FORGIE:  Objection.
 9          THE WITNESS:  It does not.
10  BY MS. du PONT:
11      Q.  And you didn't mention that in your report for
12  Ms. Stevick either, did you?
13      A.  I did not.
14      Q.  And it doesn't conclude that greater than two
15  days' exposure of Roundup glyphosate causes
16  non-Hodgkin's lymphoma, does it?
17          MS. FORGIE:  Objection.
18          THE WITNESS:  Well, it just -- it shows
19  the odds ratio with greater than two days.  It
20  doesn't come to that conclusion, no.
21  BY MS. du PONT:
22      Q.  And it doesn't conclude that greater than two
23  days' exposure of -- of glyphosate is sufficient to
24  determine cause in an -- in an individual patient,
25  correct?
```

Page 53

```
 1          MS. FORGIE:  Objection.
 2          THE WITNESS:  Correct.
 3  BY MS. du PONT:
 4      Q.  And you didn't mention that in your report
 5  either, did you?
 6      A.  I did not.
 7      Q.  Now, the McDuffie paper, it does not look
 8  specifically at the risk of non-Hodgkin's lymphoma for
 9  any of the non-Hodgkin's lymphoma subtypes, does it?
10      A.  It did not.
11      Q.  Okay.  You can set that aside.
12          Are you doing okay?  Do you want to take a
13  break?  We have been going for about --
14      A.  I'm fine.
15      Q.  -- 55 minutes.
16          Okay.
17          MS. FORGIE:  And I'm okay.
18          MS. du PONT:  Good.
19          Okay.  So I'm going to mark as Exhibit 9
20  the Eriksson paper.
21          (Whereupon Exhibit 9 was marked for
22          identification.)
23  BY MS. du PONT:
24      Q.  And you cited the Eriksson paper in page 3 of
25  your report for your opinion that greater than 10 days
```

14 (Pages 50 to 53)

Dennis Weisenburger, M.D.

Page 54

1  of total lifetime exposure to Roundup places someone at
2  high risk for NHL, correct?
3       A.  Correct.
4       Q.  And the -- now, this Eriksson paper, which we
5  have marked as Exhibit 9, it's entitled "Pesticide
6  Exposure as Risk Factor for Non-Hodgkin's Lymphoma
7  Including Histopathological Subgroup Analysis, Eriksson,
8  et al."  It's published in the -- I'm missing it.
9       A.  International Journal of Cancer.
10      Q.  International Journal of Cancer.  Thank you.
11          Okay.  And this was a study done in
12  Sweden, right?
13      A.  Yes.
14      Q.  And in this study, there were a total of 910
15  cases and 1,016 controls; is that right, if you look at
16  the abstract?
17      A.  Yes.
18      Q.  And that's a total study population of 1,926;
19  is that right?
20      A.  Yes.
21      Q.  And of those cases and controls, if we go to
22  Table 2, it shows the numbers that were exposed to
23  glyphosate in the cases and controls.
24          And do you see that there were 29 cases
25  exposed to glyphosate and 18 controls exposed to

Page 55

1  glyphosate?
2       A.  Yes.
3       Q.  So that's a total of 47 cases and controls
4  that were exposed to Roundup, correct?
5       A.  Correct.
6       Q.  And you cite this Table 2 in your report for
7  your opinion that glyphosate increases the risk in
8  patients who were exposed for greater than 10 days,
9  right?
10      A.  Yes.
11      Q.  But, again, this number presented in Table 2
12  for glyphosate for greater than 10 days' exposure was
13  not controlled for other pesticides, correct?
14      A.  That's correct.
15          MS. FORGIE:  Objection.
16  BY MS. du PONT:
17      Q.  And this finding about greater than 10 days'
18  use is not specific to any subtype of non-Hodgkin's
19  lymphoma, is it?
20      A.  That's correct.
21      Q.  So let's take a look at Table 3 of the
22  Eriksson paper.
23          And that does break it down by the various
24  different lymphoma entities or subtypes, correct?
25      A.  Yes.

Page 56

1       Q.  And this table looks specifically at diffuse
2  large B-cell lymphomas, correct?
3       A.  Correct.
4       Q.  And if we look at diffuse large B-cell
5  lymphomas and glyphosate, there is not a statistically
6  significant increased risk of diffuse large B-cell
7  lymphoma reported with glyphosate, correct?
8       A.  That's correct.
9       Q.  Now, the -- the authors in Eriksson conducted
10 what's referred as to a multivariate analysis; is that
11 right?
12      A.  Yes.
13      Q.  And that is discussed -- unfortunately, there
14 are not page numbers on this, but the last --
15          MS. FORGIE:  You can use the Bates number.
16  BY MS. du PONT:
17      Q.  -- number of the Bates number is 2796.  And at
18  the bottom of the page, they talk about the multivariate
19  analysis.
20          Do you see that?
21      A.  Yes.
22      Q.  And they say, "Since mixed exposure to several
23 pesticides was more a rule than an exception and all
24 single agents were analyzed without adjusting for other
25 exposure, a multivariate analysis was made to elucidate

Page 57

1  the relative importance of different pesticides."
2          Do you see that?
3       A.  Yes.
4       Q.  So the authors here saw that pesticides could
5  be a potential confounder, so they adjusted the results
6  with respect to Roundup to control for that confounder,
7  correct?
8          MS. FORGIE:  Objection.
9          THE WITNESS:  Correct.
10  BY MS. du PONT:
11      Q.  And if we look at Table 7 with respect to
12  glyphosate, when they did the multivariate analysis for
13  glyphosate, they -- and they controlled for other
14  pesticides, glyphosate showed no statistically
15  significant increased risk for non-Hodgkin's lymphoma,
16  correct?
17      A.  The risk is increased, but it's not
18  statistically significant, that's correct.
19      Q.  So Table 7 states that there was not a
20  statistically significant increased risk for
21  non-Hodgkin's lymphoma with glyphosate, correct?
22          MS. FORGIE:  Objection.
23          THE WITNESS:  Correct.
24  BY MS. du PONT:
25      Q.  So, Doctor, you're relying on two

Dennis Weisenburger, M.D.

Page 58

1  peer-reviewed medical articles published in the
2  scientific literature to support your opinion that
3  Ms. Stevick's exposure put her at high risk for
4  non-Hodgkin's lymphoma, correct?
5       MS. FORGIE:  Objection.
6       THE WITNESS:  Correct.
7  BY MS. du PONT:
8       Q.  But none of the odds ratios you rely on in
9  those two articles controlled for other pesticide use,
10  correct?
11       MS. FORGIE:  Objection.
12       THE WITNESS:  That's correct.
13  BY MS. du PONT:
14       Q.  In fact, you cannot cite to any peer-reviewed
15  and published scientific article that controlled for
16  other pesticide use that supports your opinion that
17  greater than two days of use per year or greater than 10
18  days of lifetime use put someone at high risk of
19  non-Hodgkin's lymphoma, can you?
20       MS. FORGIE:  Objection.
21       THE WITNESS:  It's true.  Although the
22  NAPP study, which hopefully will soon be published,
23  will -- will show a statistically significant
24  increased risk.
25  BY MS. du PONT:

Page 59

1       Q.  But the NAPP study hasn't been published yet,
2  correct?
3       A.  That's correct.
4       Q.  So let me ask my question.
5            You can't cite to any peer-reviewed and
6  published scientific article that controlled for
7  other pesticide use that supports your opinion that
8  greater than two days of use a year or greater than
9  10 days of lifetime use puts someone at high risk
10  for non-Hodgkin's lymphoma, can you?
11       MS. FORGIE:  Objection.  Asked and
12  answered.
13            You can answer again.
14       THE WITNESS:  There's nothing published
15  today.
16  BY MS. du PONT:
17       Q.  Did you consider any scientific literature
18  that is contrary to your opinion that greater than two
19  days of use per year or greater than 10 time -- 10 days
20  of lifetime exposure puts someone at a risk for
21  non-Hodgkin's lymphoma?
22       MS. FORGIE:  Objection.  I believe this
23  goes into general causation.
24       THE WITNESS:  Well, I looked at all the --
25  all the epidemiological literature on the subject of

Page 60

1  glyphosate and non-Hodgkin's lymphoma.
2  BY MS. du PONT:
3       Q.  And was any of it contrary to your opinion
4  that greater than two days of use per year or greater
5  than 10 days of lifetime -- lifetime days of exposure
6  puts someone like Ms. Stevick at a risk for
7  non-Hodgkin's lymphoma?
8       A.  Well, the agricultural health study is a
9  negative study, so that would contradict --
10       Q.  Okay.
11       A.  -- the conclusion.
12       MS. du PONT:  Why don't we just take a
13  brief break --
14       MS. FORGIE:  Okay.
15       MS. du PONT:  -- okay?  This is a good
16  stopping point.
17       MS. FORGIE:  Can we take enough of a break
18  to get coffee?
19       MS. du PONT:  Yes.
20       MR. LEVINE:  Very good idea.
21       MS. FORGIE:  I will get coffee --
22       THE REPORTER:  Can you wait until he's off
23  the record?
24       MS. FORGIE:  The time is now 9:35 a.m. and
25  we're off the record.

Page 61

1       (Recess.)
2       THE VIDEOGRAPHER:  The time is now
3  9:57 a.m. and we're back on the record.
4  BY MS. du PONT:
5       Q.  Okay.  Now, before the break, Doctor, we were
6  talking about the agricultural health study.
7            Do you recall that?
8       A.  Yes.
9       Q.  And the most recent publication from the
10  agricultural health study was published in 2018 by the
11  lead author Andreotti; is that right?
12       A.  Yes.
13       Q.  And Andreotti and the agricultural health
14  study did look at cumulative days' exposure to Roundup,
15  didn't it?
16       A.  Yes.
17       Q.  And in that analysis, they did, in fact,
18  control for other pesticides, didn't they?
19       MS. FORGIE:  Okay.  I'm going to object to
20  all of this as going to general causation.
21            But you can answer.
22            If you want me to -- can I just have a
23  standing objection to any time --
24       MS. du PONT:  You can have a standing
25  objection.  And I just want to reply that he has

Dennis Weisenburger, M.D.

Page 62

1    a -- an opinion in his case-specific report on how
2    much exposure qualifies Ms. Stevick for high risk,
3    and that's the opinion I'm exploring here.
4          MS. FORGIE:  I still object.
5          MS. du PONT:  Okay.  So let me go back and
6    ask my question before --
7          MS. FORGIE:  Also, I wanted to state for
8    the record that we -- we did serve the addendum on
9    Friday.
10         [Reporter requests clarification.]
11         MS. FORGIE:  Serve the addendum reference
12   list on Friday and we confirmed that.
13         MS. du PONT:  And we will mark a copy of
14   that as soon as we can get a copy of it.
15         MS. FORGIE:  Thanks.
16   BY MS. du PONT:
17     Q.  Okay.  So with respect to the agricultural
18   health study, it's your understanding that the -- that
19   the agricultural health study did look at cumulative
20   days' exposure for glyphosate, correct?
21     A.  Yes.
22     Q.  And the agricultural health study did control
23   for other pesticide use in that analysis, correct?
24     A.  I don't --
25         MS. FORGIE:  Objection.

Page 63

1          THE WITNESS:  I don't remember that.
2          MS. du PONT:  Okay.  Well, we'll -- we'll
3    look at it.
4          So I will mark as Exhibit 10 to the
5    Weisenburger deposition an article by Andreotti
6    entitled "Glyphosate Use in Cancer Institute" --
7    "Incidence in the Agricultural Health Study
8    published in the journal of national cancer
9    institute in 2018."
10         (Whereupon Exhibit 10 was marked for
11         identification.)
12         MS. du PONT:  Oops.  Give me that back.
13   Hold on.  Wrong one.
14         There you go.
15         MS. FORGIE:  You gave him the marked-up
16   copy.
17   BY MS. du PONT:
18     Q.  Now, the agricultural health study was a study
19   in the United States, correct?
20     A.  Yes.
21     Q.  And it looked at 5 -- or, sorry, 54,251 public
22   applicators; 44,932 used glyphosate, correct?
23     A.  Yes.
24     Q.  And if we turn to page 513 and we look at
25   Table 2, with respect to non-Hodgkin's lymphoma, do you

Page 64

1    see that there were a total of 440 -- 440 cases of
2    non-Hodgkin's lymphoma reported in those people that
3    were exposed to glyphosate?  And, Doctor, I'm adding up
4    the numbers from Q1, Q2, Q3 and Q4 to get 440.
5      A.  Okay.
6          MS. FORGIE:  Objection.  This clearly goes
7    to general causation.
8          MS. du PONT:  You have a standing
9    objection.
10         MS. FORGIE:  And I don't like it.
11         MS. du PONT:  And I have a standing
12   response.
13         MS. FORGIE:  I'm going to keep objecting.
14         [Reporter requests clarification.]
15         MS. FORGIE:  I said I decided I don't like
16   the standing.  I'm going to keep objecting.
17   BY MS. du PONT:
18     Q.  So do you agree, Doctor, that there were 440
19   cases of non-Hodgkin's lymphoma reported in those people
20   that were exposed to glyphosate?
21         MS. FORGIE:  Objection.
22         THE WITNESS:  Just your math?
23         MS. du PONT:  Yes.
24         THE WITNESS:  Yes.
25   BY MS. du PONT:

Page 65

1      Q.  Okay.  So that means if there were 440 cases
2    of non-Hodgkin's lymphoma reported out of 44,932 exposed
3    to glyphosate, that means that 99 percent of people
4    exposed to Roundup did not develop non-Hodgkin's
5    lymphoma, correct?
6          MS. FORGIE:  Objection.
7          THE WITNESS:  Approximately, yes, that's
8    correct.
9    BY MS. du PONT:
10     Q.  And if you refer back to the abstract at the
11   beginning of the study, you would -- would agree with me
12   that the agricultural health study found no association
13   between glyphosate and non-Hodgkin's lymphoma?
14         MS. FORGIE:  Objection.
15         THE WITNESS:  That's correct.
16   BY MS. du PONT:
17     Q.  And if we look at the abstract, it also states
18   that in this large -- the conclusion in the abstract is
19   "In this large, prospective cohort study, no association
20   was apparent between glyphosate and any solid tumors or
21   lymphoid malignancies overall, including non-Hodgkin's
22   lymphoma and its subtypes."
23         Do you see that?
24     A.  Yes, that's what they say.
25     Q.  So there was also no association found between

17 (Pages 62 to 65)

Dennis Weisenburger, M.D.

Page 66

1 diffuse large B-cell lymphoma and Roundup, correct?
2     MS. FORGIE: Objection.
3     THE WITNESS: Correct.
4 BY MS. du PONT:
5   Q. And you didn't mention this specific article
6 in your Stevick report, correct?
7   A. No, but I discussed it at some length in
8 my general causation report.
9   Q. Okay. And if you refer to page 510, under
10 "Statistical Analysis," and it's about halfway down the
11 column under "Statistical Analysis." The authors state,
12 "Based on the distribution among all cancer cases, we
13 categorized cumulative lifetime days and
14 intensity-weighted lifetime days of glyphosate exposure
15 into quartiles, textiles or the median, such that there
16 were at least five exposed cases in each category. The
17 categories for lifetime days of glyphosate use are as
18 follows." Quartile 1, is 1 to 13.74; quartile 2 is
19 13.75 to 38.74; quartile 3 is 38.75 to 108.4, and
20 quartile 4 is 108.5.
21     Do you see that?
22   A. Yes.
23     MS. FORGIE: Objection.
24 BY MS. du PONT:
25   Q. And if we take a look at the analysis where

Page 67

1 they look at cumulative exposure, and that's back to
2 Table 2, do you see under the note under Table 2, it
3 says, "All models adjusted for age, state of
4 recruitment, education, cigarette smoking status,
5 alcohol per month, family history of cancer, atrazine,
6 alachlor, metolachlor, trifluralin, and 2.4-D."
7     Do you see that?
8   A. Yes.
9   Q. So the cumulative date exposure analysis in
10 the agricultural health study did, in fact, control for
11 other pesticide use, correct?
12     MS. FORGIE: Objection.
13     THE WITNESS: I'm just trying to see where
14 the --
15     MS. du PONT: The note is right above the
16 discussion on page 513.
17     THE WITNESS: Yeah, but I'm -- but
18 that's --
19     MS. FORGIE: But read as much as you want.
20     THE WITNESS: It has a -- it has a -- I
21 don't know, a symbol. I'm trying to find the symbol
22 in the table.
23     Yeah, you're right. That's correct.
24 BY MS. du PONT:
25   Q. And so controlling for other pesticide use

Page 68

1 when the agricultural health study looked at
2 non-Hodgkin's lymphoma generally, they did not show any
3 dose-response relationship with respect to glyphosate
4 use and non-Hodgkin's lymphoma, correct?
5     MS. FORGIE: Objection.
6     THE WITNESS: In this table, that's
7 correct.
8 BY MS. du PONT:
9   Q. And the same holds true for diffuse large
10 B-cell lymphoma: When they looked specifically at
11 diffuse large-B cell lymphoma and controlled for other
12 pesticide use, they did not show an increased risk of
13 non-Hodgkin's lymphoma with increasing exposure to
14 glyphosate or Roundup, correct?
15     MS. FORGIE: Objection.
16     THE WITNESS: In this table, that's true,
17 but if you look at Table 3, you -- you find a
18 different result. If you look at the 20-year lag
19 time, the highest dose had an increased odds ratio
20 of 1.35 --
21     [Reporter requests clarification.]
22     THE WITNESS: Increased odds ratio of
23 1.35.
24 BY MS. du PONT:
25   Q. And --

Page 69

1   A. Although it wasn't statistically
2 significant.
3   Q. So you're referring to Table 3 where it looks
4 at diffuse large B-cell lymphoma over time, but you
5 agree with me that it is not statistically -- a
6 statistically significant increased risk in Q4, correct?
7   A. On Table --
8     MS. FORGIE: Objection.
9     THE WITNESS: -- Table 3?
10     MS. du PONT: Table 3.
11     THE WITNESS: Yes.
12 BY MS. du PONT:
13   Q. And the risk is numerically lower for the
14 third quartile versus the second quartile, correct?
15     MS. FORGIE: Objection.
16     THE WITNESS: Yes. That often happens
17 with small numbers.
18 BY MS. du PONT:
19   Q. But Table 3 does not show a statistically
20 significant increased risk for any of the four quartiles
21 for diffuse large B-cell lymphoma, correct?
22     MS. FORGIE: Objection.
23     THE WITNESS: That's correct.
24     MS. du PONT: Okay. You can put that
25 aside.

Dennis Weisenburger, M.D.

Page 70

1    I'm going to mark as Exhibit 11 a U.S.
2  News report regarding "Roundup Weed Killer Has
3  Probable Carcinogen, U.N. says."  And this is dated
4  March 20, 2015.
5    (Whereupon Exhibit 11 was marked for
6    identification.)
7  BY MS. du PONT:
8    Q.  And have you seen this article -- this U.S.
9  News article prior to today, Doctor?
10   A.  No.
11   Q.  And if you turn to page 3 of 6, do you see how
12 the article reports that "The French agency's experts
13 said the cancer risks of the weedkiller were mostly from
14 occupational exposure."
15     Do you see that?
16     MS. FORGIE:  Objection.  This goes to
17 general causation on an article he's never seen.
18     THE WITNESS:  Well, that's be --
19     MS. FORGIE:  Completely inappropriate.
20     THE WITNESS:  That's because the -- it's
21 true.  That's because the -- the studies were done
22 in farmers.
23 BY MS. du PONT:
24   Q.  So do you know who Kate Guyton is?
25   A.  No.

Page 71

1    Q.  I believe there's an article on your reference
2  list where she is one of the authors.  I'll represent to
3  you that she is someone associated with Iarc.
4     MS. FORGIE:  There's no question.
5  BY MS. du PONT:
6    Q.  Do you -- does that --
7    A.  Well, it says --
8     MS. FORGIE:  Wait for a question.
9  BY MS. du PONT:
10   Q.  Does that refresh your recollection of who she
11 is?
12   A.  No, but it says here "Kate Guyton of
13 Iarc."
14   Q.  Okay.  And she -- she stated here, "I don't
15 think home use is the issue.  It's agricultural use that
16 will have the biggest impact.  For the moment, it's just
17 something for people to be conscious of."
18     Do you see that?
19   A.  Yes.
20     MS. FORGIE:  Objection.
21 BY MS. du PONT:
22   Q.  So Iarc is saying it's not home use, right?
23     MS. FORGIE:  Objection.  Don't answer
24 that.  This goes into general causation.
25     MS. du PONT:  You can answer.

Page 72

1    MS. FORGIE:  It's far afield -- no.
2    MS. du PONT:  You can state --
3    MS. FORGIE:  I'm instructing him not to
4  answer.
5    MS. du PONT:  There's no privilege issue
6  here.  There's no --
7    MS. FORGIE:  I'm instructing him not to --
8    MS. du PONT:  -- confidential issue here.
9  He can answer.
10     MS. FORGIE:  I'm instructing him not to
11 answer.  This is way far afield.  It's not
12 appropriate, and you're using this to get at the
13 general causation.
14     MS. du PONT:  You can object and instruct
15 someone not to answer if it's a confidential trade
16 secret matter or if there's a confidentiality issue.
17 That -- that is -- that is not your objection.
18     He can answer --
19     MS. FORGIE:  I don't --
20     MS. du PONT:  -- the question.
21     MS. FORGIE:  -- need instructions from you
22 on how to practice law.  I'm well familiar with the
23 rules in this case.  At Monsanto's request,
24 everything was bifurcated as to general causation
25 and specific causation, so there's an exception to

Page 73

1  that.  He's not getting into general causation.
2  This is unfair.
3     Don't answer.
4     MS. du PONT:  So he is offering an opinion
5  about home use in Ms. Stevick's case.  This is
6  discussing home use.  So I believe it is
7  particularly pertinent to this case, and that's why
8  I'm asking the question.
9     MS. FORGIE:  I understand.
10     MS. du PONT:  Are you still instructing
11 him not answer?
12     MS. FORGIE:  I am.
13     MS. du PONT:  So we reserve the right to
14 reopen this deposition at a later date because you
15 have instructed him not to answer that question.
16     MS. FORGIE:  You can take it up with the
17 Court.
18     MS. du PONT:  Okay.  You can put that
19 aside.
20     MS. FORGIE:  At some point, the rules have
21 to be followed.
22     MS. du PONT:  I believe I'm following the
23 rules.
24     MR. LEVINE:  Yeah, the rules say you
25 should let him answer.

19  (Pages 70 to 73)

Dennis Weisenburger, M.D.

Page 74

1    MS. du PONT: Yes. Under the rules, you
2  should definitely let him answer. Last I checked,
3  the only way you can instruct a witness not to
4  answer is if there's a trade secret or a
5  confidentiality issue, and neither are present here.
6  BY MS. du PONT:
7    Q. Okay. Doctor, would you agree with me that
8  the same type of non-Hodgkin's lymphoma in Ms. Stevick,
9  primary CNS lymphoma, occurs in patients who were not
10  exposed to Roundup?
11    A. Yes.
12    Q. And do you have any measurement of
13  Ms. Stevick's glyphosate levels?
14    A. No, just --
15    [Reporter requests clarification.]
16    MS. du PONT: Levels.
17    THE WITNESS: No.
18  BY MS. du PONT:
19    Q. So you don't know what her glyphosate level
20  was before she used Roundup, right?
21    MS. FORGIE: Objection.
22    THE WITNESS: I don't think she ever had
23  it measured, at least to my knowledge.
24  BY MS. du PONT:
25    Q. So there was no measurement of her -- while

Page 75

1  she was using Roundup of her glyphosate level, correct?
2    A. Correct.
3    Q. And there was no measure of her glyphosate
4  level before she was diagnosed with lymphoma, correct?
5    A. Correct.
6    Q. And there was no measure of her glyphosate
7  level any time after she was diagnosed with lymphoma,
8  correct?
9    A. Correct.
10    MS. FORGIE: Objection.
11  BY MS. du PONT:
12    Q. And there's been no diag- -- or there's been
13  no measurement of her glyphosate level at any time after
14  she stopped using Roundup, correct?
15    A. Correct.
16    Q. And would you agree with me that the vast
17  majority of diffuse large B-cell lymphoma occurs in
18  patients who were never exposed to Roundup?
19    A. That's correct, to the best of my
20  knowledge.
21    Q. In fact, the vast majority of every specific
22  subtype of non-Hodgkin's lymphoma occurs in patients who
23  were never exposed to Roundup, correct?
24    MS. FORGIE: Objection. General
25  causation.

Page 76

1    THE WITNESS: Correct.
2  BY MS. du PONT:
3    Q. Now, you can't tell by looking at
4  Ms. Stevick's biopsy specimen under the microscope
5  whether she used Roundup or not, correct?
6    A. Correct.
7    Q. And you reviewed the pathology from the biopsy
8  for -- for Ms. Stevick, right?
9    A. Yes.
10    Q. And you said earlier it was the original
11  slides.
12    How do you know it was the original slides
13  and not a recut?
14    A. Usually, the recut slides say the word
15  "recut" on the label, and I don't believe the slides
16  that they sent had that written on the label, so, I
17  mean, there's no way to know for sure, but usually
18  when they recut the slides, it says the word
19  "recut," and I -- I don't -- I don't believe it was
20  on the -- on the label.
21    Q. Okay. And you didn't ask the -- Kaiser
22  whether they were recuts or originals, correct?
23    A. Yeah. It wouldn't have made any
24  difference. They were big -- nice, big biopsies.
25    Q. Okay. So it wouldn't make a difference to you

Page 77

1  whether you looked at the original slides or recuts
2  of -- of the biopsy; you would have had the same
3  opinion --
4    A. Yes.
5    Q. -- regardless?
6    [Reporter requests clarification.]
7    MS. du PONT: Regardless of -- okay.
8  BY MS. du PONT:
9    Q. Now, you didn't perform any diagnostic test or
10  look at a specific biomarker in her tumor to identify
11  whether Roundup caused or contributed to her NHL,
12  correct?
13    A. Correct.
14    Q. And by "her" -- I mean Ms. Stevick.
15    A. Yes.
16    Q. -- do you understand that?
17    And there is no geno- -- genomic signature
18  for NHL that's associated with Roundup use, correct?
19    A. It's never been investigated so we don't
20  really know.
21    Q. And none of the medical records that you
22  looked at for Ms. Stevick referenced glyphosate or
23  Roundup and indicated that it had caused her
24  non-Hodgkin's lymphoma, correct?
25    MS. FORGIE: Objection.

Dennis Weisenburger, M.D.

Page 78

1    THE WITNESS:  Correct.
2    BY MS. du PONT:
3    Q.  So let's say you had two patients, okay?
4    That's the hypothetical.  Both are women; both are age
5    63; both have a family history of colon cancer,
6    significant family history of colon cancer; both have an
7    uncle with non-Hodgkin's lymphoma and both have primary
8    CNS lymphoma.  One of the woman used Roundup and one of
9    them didn't.
10       How do you determine which of those women
11   used Roundup if you don't know -- know which one
12   because it's blinded to you?
13       MS. FORGIE:  Objection.
14       THE WITNESS:  Well, you can't know unless
15   you talk to the patient and elicit a history that --
16   that stated that she used Roundup.
17   BY MS. du PONT:
18   Q.  So the only way you could distinguish between
19   those women is to ask them if they used Roundup or not,
20   correct?
21   A.  Correct.
22       MS. FORGIE:  Objection.
23   BY MS. du PONT:
24   Q.  When you're doing a differential diagnosis to
25   determine the symptoms that are associated with a

Page 79

1    certain condition, the reason that you're doing that is
2    to eventually come to a conclusion about what treatment
3    is appropriate for that patient, correct?
4    A.  Yes.
5    Q.  And the reason why you want to do that and --
6    well, let me withdraw that for a second.
7        One way to confirm that you're right about
8    your diagnosis is to see how that condition responds
9    to the treatment that you give, right?
10   A.  That's one way, if you're not sure.
11   Q.  It would confirm for you that your diagnosis
12   was correct if the treatment works, right?
13       MS. FORGIE:  Objection.
14       THE WITNESS:  Right.
15   BY MS. du PONT:
16   Q.  And there's no treatment that's given to a
17   patient with non-Hodgkin's lymphoma that targets a
18   patient's glyphosate levels, correct?
19   A.  Correct.
20   Q.  And there's no different treatment for someone
21   with diffuse large B-cell lymphoma who is exposed to
22   Roundup than there is for someone who wasn't exposed to
23   Roundup; the treatment is the same regardless, right?
24   A.  Yes, the treatment is the same.
25   Q.  And that's true also for someone who's

Page 80

1    diagnosed with primary CNS lymphoma:  There's no
2    different treatment that you give to that patient simply
3    because they were exposed to Roundup, correct?
4    A.  Yes, that's correct.
5    Q.  In the methodology you used in this case to
6    determine what caused Ms. Stevick's cancer, did it
7    matter to you whether there had been contact with the
8    skin -- that Roundup had contacted the skin?
9    A.  Yes.
10   Q.  So how many times is enough for skin contact?
11       MS. FORGIE:  Objection.
12       THE WITNESS:  I don't know.  Many times.
13   BY MS. du PONT:
14   Q.  More than two?
15   A.  Yes, more than two.
16   Q.  More than 10?
17   A.  Probably more than 10.
18   Q.  More than 50?
19       MS. FORGIE:  Objection.
20       THE WITNESS:  Here, we get into a gray
21   zone.
22   BY MS. du PONT:
23   Q.  So it's somewhere between 10 times it comes
24   into contact with the skin and 50; that's enough for
25   there to be sufficient exposure under your methodology?

Page 81

1    A.  Or more.
2        MS. FORGIE:  Objection.
3        THE WITNESS:  Or more.  I don't -- I don't
4    have a specific number.
5    BY MS. du PONT:
6    Q.  And does it matter to your methodology whether
7    when it comes into contact with the skin, it's washed
8    off immediately?
9    A.  Yes.
10   Q.  How does it matter?
11   A.  Well, the -- the exposure would be less if
12   it was washed off immediately.
13   Q.  And did you consider that in Ms. Stevick's
14   case, whether she had washed her hands immediately after
15   she -- or her skin immediately after she had been
16   exposed?
17   A.  Yes.
18   Q.  Does it matter to your methodology how large
19   or small the area is that the plaintiff is -- is
20   spraying?
21   A.  It's a -- it's an -- it's a surrogate or
22   an index for how much spraying she did, but it's not
23   a very good one.
24   Q.  Why is it not a very good one?
25   A.  Well, because you -- you -- you wouldn't

Dennis Weisenburger, M.D.

Page 82

1    spray the whole area.  You would spray certain --
2    certain parts of the area.
3        Q.  Okay.  So does it matter how long a patient
4    used Roundup?
5        A.  I think that's also an index of exposure,
6    yes.
7        Q.  And in order for there to be sufficient
8    exposure, is there a certain minimal amount of time a
9    patient needs to have used Roundup?
10       A.  I don't have a specific minimum time, no.
11       Q.  So is -- do you want to take a break for a
12   second?
13       A.  No, that's okay.
14       MS. FORGIE:  Sorry.
15       THE WITNESS:  I just got some coffee on my
16   shirt.
17   BY MS. du PONT:
18       Q.  So can there be just -- is one day of exposure
19   to Roundup enough?
20       A.  Enough for what?
21       Q.  Enough for there to be sufficient exposure
22   under your methodology.
23       MS. FORGIE:  Objection.
24       THE WITNESS:  That's an incomplete
25   question.  Sufficient exposure for what purpose?

Page 83

1    BY MS. du PONT:
2        Q.  So they're exposed to Roundup.  They're
3    spraying their yard for one day for a couple hours.
4            Is that sufficient enough under your
5    methodology to conclude that Roundup caused their
6    non-Hodgkin's lymphoma?
7        A.  No.
8        Q.  So how about if they sprayed for five days for
9    a couple hours, would that be sufficient to lead you to
10   conclude that Roundup caused their non-Hodgkin's
11   lymphoma?
12       MS. FORGIE:  Objection.  Asked and
13   answered.
14       THE WITNESS:  Five days during their
15   lifetime?
16       MS. du PONT:  Yes.
17       THE WITNESS:  Probably not.
18   BY MS. du PONT:
19       Q.  Would 20 days of exposure during their
20   lifetime be sufficient to say Roundup caused their
21   non-Hodgkin's lymphoma?
22       MS. FORGIE:  Objection.
23       THE WITNESS:  I would --
24       MS. FORGIE:  Asked and answered.
25       You can answer.

Page 84

1        THE WITNESS:  I would have to look at
2    every case individually to see what was the level of
3    exposure.  Just the number of times may not be
4    sufficient.  So, for example, if the patient was
5    wearing, you know, all kinds of protective
6    equipment, it would make a difference.  So -- so one
7    has to look at all the factors, which is what I
8    tried to do in my interview of the patient and in my
9    report.
10   BY MS. du PONT:
11       Q.  Does it matter to your methodology what the
12   latency is from when the patient discontinued Roundup to
13   when they were diagnosed with non-Hodgkin's lymphoma?
14       A.  No.  The latency is measured from the time
15   they first used Roundup until they were diagnosed.
16   That's -- that's the latency.
17       Q.  So I guess what I'm asking is if they stopped
18   using Roundup five years before they develop
19   non-Hodgkin's lymphoma, would that factor into your
20   analysis?
21       MS. FORGIE:  Objection.
22       THE WITNESS:  I would certainly consider
23   that, yes, but, you know, if there was significant
24   exposure prior to that time, it probably wouldn't
25   change my opinion, everything else being equal.

Page 85

1    BY MS. du PONT:
2        Q.  So is there a certain cutoff in time where,
3    for example, if they had stopped using Roundup 10 years
4    prior to the diagnosis of non-Hodgkin's lymphoma, would
5    you think there was sufficient exposure to have caused
6    the non-Hodgkin's lymphoma?
7        MS. FORGIE:  Objection.
8        THE WITNESS:  Again, I'd have to look at
9    every case specifically and really try to determine
10   what was the level of exposure prior to them
11   stopping.  I don't have a specific cutoff time.
12   BY MS. du PONT:
13       Q.  Does it matter to your methodology how many
14   gallons of Roundup exposure there was per year?
15       A.  Well, I think it's another index of level
16   of exposure.  The more gallons, the more exposure.
17       Q.  So if there was only one gallon of exposure
18   per year, would that be sufficient to say that Roundup
19   caused a non-Hodgkin's lymphoma?
20       MS. FORGIE:  Objection.
21       THE WITNESS:  I don't know.  I'd have to
22   look at all the other variables.
23   BY MS. du PONT:
24       Q.  Does it matter to your methodology what
25   surfactants were in the Roundup that was sprayed?

22  (Pages 82 to 85)

Dennis Weisenburger, M.D.

Page 86

1    A.  All the -- you know, Roundup has -- all of
2  Roundup has surfactants, so, you know, I -- and I
3  think in different formulations of Roundup, there
4  are -- I think there are different surfactants, so
5  it -- it doesn't really matter to my decision, no.
6    Q.  Does it matter to your methodology and your
7  opinion about whether Roundup caused non-Hodgkin's
8  lymphoma whether the Roundup was inhaled by the
9  plaintiff?
10    A.  I think any -- any form of exposure, skin
11  exposure or other types of exposure, like
12  inhalation, are important.
13    Q.  Does it cause a different type of cancer
14  when -- or different subtype of non-Hodgkin's lymphoma
15  when you're exposed by the skin versus inhaling it?
16    A.  There's no evidence -- there's no
17  literature on that.  I would say probably not.
18    Q.  So it probably doesn't matter to you whether
19  it's -- let me withdraw that for a second.
20      Your opinion is that it doesn't matter
21  whether it was skin exposure or -- or inhalation; it
22  can cause any type of non-Hodgkin's lymphoma?
23      MS. FORGIE:  Objection.  General causation
24  again.
25      THE WITNESS:  Yes.

Page 87

1  BY MS. du PONT:
2    Q.  And by "it," I mean Roundup.
3    A.  Yes.
4    Q.  So I want to talk to you a little bit about
5  your statements in the Stevick report about Roundup use.
6      Do you have the report in front of you
7  still?
8    A.  Yes.
9    Q.  Okay.  Now, you write on the bottom of page 1
10  of your -- the body of your report that "She sprayed
11  half of the property, about 2,650 square feet, once per
12  month for 10 months of the year."
13      Do you see that?
14    A.  Yes.
15    Q.  And you agree that she didn't spray the entire
16  2,650 square feet, right?
17    A.  Correct.
18    Q.  She sprayed smaller parts within that 2,650
19  foot -- square foot area, right?
20    A.  Correct.
21    Q.  So you state, "She sprayed along the driveway,
22  sidewalks and patio, as well as around her vegetable
23  garden and rose beds. "
24      Do you see that?
25    A.  Yes.

Page 88

1    Q.  And you got that information about where she
2  sprayed from your interview with her?
3    A.  Yes, and from other -- from the deposition
4  and other documents that I was sent.
5    Q.  Okay.  What were the other documents you were
6  sent?
7    A.  There was a memo from the Miller firm that
8  sort of summarized what's in the deposition.
9    Q.  Okay.
10    A.  But I interviewed her and confirmed
11  everything.  I -- you know, I -- I went over
12  everything to make sure it was correct.
13    Q.  And did you rely on that memo from the Miller
14  firm in preparing your report in this case?
15    A.  No.
16      MS. FORGIE:  Objection.
17      THE WITNESS:  I mostly relied on the
18  deposition and on my interview.
19  BY MS. du PONT:
20    Q.  Okay.  But you did consider the memo from the
21  Miller firm in preparing your report in the case?
22    A.  Yes.
23      MS. FORGIE:  Objection.  Mischaracterizes
24  his testimony.
25      THE WITNESS:  Yes.

Page 89

1      MS. du PONT:  And I would just request, as
2  I requested the notes that he took during the
3  interview, that the memo from the Miller firm be
4  produced following the deposition.
5      MS. FORGIE:  I have noted your request.
6  BY MS. du PONT:
7    Q.  Now, do you agree with me, because you've read
8  her deposition testimony, that she didn't spray nonstop
9  for that whole hour she was spraying Roundup each month?
10      MS. FORGIE:  Objection.
11      THE WITNESS:  That's correct.
12  BY MS. du PONT:
13    Q.  And you're aware that she didn't -- or you
14  write in your report that Ms. Stevick "used a hand-pump
15  sprayer with either a one- or three-gallon container."
16      Do you see that?
17    A.  Yes.
18    Q.  But you're aware she didn't even spray
19  three gallons at a time, right?  She never sprayed
20  three gallons at a time?
21    A.  Well, I never asked her what was the
22  maximum she ever sprayed.  She said on -- on
23  average, she sprayed one to one-and-a-half gallons
24  each time.
25    Q.  That's what she said during your interview?

Dennis Weisenburger, M.D.

Page 90

1    A.  Yes.
2    Q.  Are you aware that she testified that she
3    would only fill the three-gallon container with one
4    gallon of Roundup each time?
5    A.  I wasn't aware of that.
6    Q.  Do you have any reason to disagree that at her
7    deposition when she was asked, "And do you remember how
8    many gallons the sprayer was?"  She testified, "I think
9    we always bought, like, about a three-gallon total size,
10   but we'd only mix to the level, you know, of the
11   concentrate.  Like, it would be, like, an equivalent of
12   a gallon."
13       Do you have any reason to disagree that
14   that was her testimony at her deposition?
15       MS. FORGIE:  Objection.
16       THE WITNESS:  No, but I think there are
17   other areas in her deposition and also in my
18   interview with me that said she sprayed one to
19   one-and-a-half gallons each time.  So some of the
20   time, she must have sprayed more.
21   BY MS. du PONT:
22   Q.  So took a look at her deposition, and are you
23   aware that at her deposition when she was asked, "You
24   would empty an entire gallon each time you sprayed, is
25   that your testimony?"

Page 91

1        She answered, "I would say -- I would say
2    -- yeah, I would say a gallon.  I would use a gallon
3    as I would go in a course -- course of a month.
4        "Would you use a gallon for two months or
5    a gallon for one month?
6        "I was using about a gallon a month when I
7    was spraying, is what I remember."
8        Do you have any reason to disagree that
9    that was the testimony that she gave at her
10   deposition?
11   A.  No, but I --
12       MS. FORGIE:  Objection.  Asked and
13   answered.
14       THE WITNESS:  I think there are --
15       MS. FORGIE:  You can answer again.
16       THE WITNESS:  -- other areas of the
17   deposition where she says one-and-a-half gallons,
18   and that's what -- that's what she told me when I
19   interviewed her, so it -- I think it just depended
20   on how many weeds there were that day.  Some days
21   she sprayed one gallon.  Sometimes days she sprayed
22   a gallon and a half.
23   BY MS. du PONT:
24   Q.  So I looked through her deposition, and I
25   didn't see any testimony from her at her deposition

Page 92

1    under oath that she had sprayed one-and-a-half gallons.
2        MS. FORGIE:  Wait.  There's no question.
3    BY MS. du PONT:
4    Q.  Did you -- can you refer --
5    A.  Well --
6    Q.  Can you take a look at the deposition and find
7    for me where she testified to that?
8        MS. FORGIE:  Objection.  Asked and
9    answered.
10       You can answer it again.
11       THE WITNESS:  I -- I -- I would have to go
12   through the deposition page by page and find it.
13   And I don't remember whether it's actually there or
14   not.  I think it is, but I know that's what she told
15   me in the interview.
16   BY MS. du PONT:
17   Q.  So she told you in the interview that she
18   would spray between one and one-half gallons, but you
19   can't tell me right now that at her deposition, when she
20   was testifying under oath, whether she testified that
21   she sprayed 1.5 gallons, correct?
22       MS. FORGIE:  Objection.  Asked and
23   answered.
24       You can answer it again.
25       THE WITNESS:  I would have to go back and

Page 93

1    look at the deposition.  I -- I don't remember -- I
2    don't remember that, but I -- I -- I thought that
3    she said that in the deposition as well, since she
4    contradicts herself in the deposition in -- in a
5    number of places, so...
6        MS. FORGIE:  Would you like him to read
7    the deposition?
8        MS. du PONT:  No.  We're not going to --
9    we only have three-and-a-half hours today.  It would
10   take him a while to read it on the record.
11   BY MS. du PONT:
12   Q.  But you --
13       MS. FORGIE:  Is the tape on?
14       MS. du PONT:  Can you stop doing that?
15   I'm sorry.
16       THE VIDEOGRAPHER:  Sorry.
17       MS. du PONT:  It's causing me...
18       MS. FORGIE:  And -- and me too.  I'm,
19   sorry, but I'm, like, what's going on over there?
20   BY MS. du PONT:
21   Q.  So you would have -- your testimony today is
22   you would have to go back and look at the deposition,
23   but you can't remember, to the best of your recollection
24   sitting here today, that she testified at her deposition
25   that she used more than one gallon at any time she

Dennis Weisenburger, M.D.

Page 94

1   sprayed, correct?
2        MS. FORGIE:  Objection.  Asked and
3   answered three times.
4        THE WITNESS:  I --
5        MS. FORGIE:  You can answer again.
6        THE WITNESS:  I can't specifically
7   remember that, but I'd like to go back and look.
8   BY MS. du PONT:
9        Q.   Okay.  You also write that Ms. Stevick
10  remembered "two to three spills by" -- "while mixing"
11  Roundup."
12        That's in -- on page 2 of your report?
13       A.   Yes.
14       Q.   And are you aware that she testified that she
15  had no specific recollection of spilling Roundup on her
16  hands more than one to two times, and she washed her
17  hands right after she spilled?
18       A.   Yes, I remember that.
19       Q.   So your report is inconsistent with the
20  testimony that she gave at her deposition, correct?
21        MS. FORGIE:  Objection.
22        THE WITNESS:  This is what she told me in
23  my interview.  So I would say that she is somewhat
24  inconsistent in the history that she's giving.  One
25  to two, two to three, I mean, who remembers that

Page 95

1   over 30 -- 25 or 30 years, right?
2   BY MS. du PONT:
3        Q.   But --
4        A.   These are estimates.  These are
5   guesstimates.
6        Q.   But --
7        A.   These are not precise numbers, okay?
8        Q.   I understand.
9        But you chose to write in your report just
10  the two to three spills, and not that she had given
11  inconsistent testimony at her deposition about only
12  spilling one to two times, correct?
13        MS. FORGIE:  Objection.
14        THE WITNESS:  I wrote in my report what
15  she told me during my interview.
16  BY MS. du PONT:
17       Q.   Okay.  But not what she testified to at her
18  deposition, right?
19       A.   Correct.
20       Q.   And then you write that Ms. Stevick "is
21  estimated to have used approximately 350 gallons of
22  mixed Roundup during this time period."
23        Do you see that on page 2?
24       A.   Yes.
25       Q.   And how did you arrive at that number?

Page 96

1        A.   Well, again, it's just an estimate.  So I
2   took the number of days per month, number of months
3   per year, number of gallons per day and the number
4   of years and multiplied it.  So if you take 1.5, it
5   comes to 380.  If you take 1.1 -- it actually comes
6   to 280.  I don't know where I got the 330.  It's
7   probably 280.  So it's between 280 and 380 gallons.
8   And if you sort -- and so what she told me was that
9   when her husband was mixing it, she used more
10  because that was early on in the timeframe when she
11  was using it.  So the 150 comes from sort of --
12  well, it's sort of an in-between number, but it
13  comes from actually using the 1.5 gallons for the
14  first period of time when her husband was mixing for
15  her and the 1.1 gallons when she was actually buying
16  it off the shelf.  So, you know, I -- I would say
17  between 280 and 380 gallons.  That's probably a more
18  accurate estimate.  She also said she sometimes used
19  it more than once a month, so I didn't factor that
20  in either.
21       Q.   So -- but if we -- if we looked at the
22  testimony that I quoted to you earlier where she said
23  she sprayed one gallon every time, every month, that
24  would come out to more like 250 gallons, correct?
25       A.   280 gallons.  I think it was 1.1 gallons.

Page 97

1        Q.   If she testified that she would use a gallon,
2   not 1.1-gallon, a gallon every month for 10 months --
3        A.   Then it would be two --
4        Q.   -- for 25 years --
5        A.   It would be 250, right.
6        Q.   Okay.
7        A.   I was --
8        MS. FORGIE:  Having math issues today.
9        THE WITNESS:  I mean, I was told that the
10  -- the container she bought had 1.1-gallons, so --
11  which doesn't make a lot of sense, but that's what I
12  was told.
13  BY MS. du PONT:
14       Q.   And does the fact that she sprayed 250 gallons
15  or 350 gallons, does that change your opinion at all?
16       A.   No.
17       Q.   Now, besides her exposure to Roundup, you
18  state, "Ms. Stevick had no significant exposure to other
19  pesticides or chemicals."
20        Do you recall that --
21       A.   Yes.
22       Q.   -- stating that in your report?
23       A.   Yes.
24       Q.   What other pesticides and chemicals did you
25  ask her about during your interview?

Dennis Weisenburger, M.D.

Page 98

1    A.   Well, I asked her about other herbicides
2   or insecticides, fungicides, et cetera.  The only
3   use she had was once a year she used a - a product
4   on her roses, which was mainly a fungicide, and that
5   was the only other exposure that she really had to
6   any other types of pesticides.  And -- and I asked
7   her about solvents.  And I asked her about paints
8   and paint thinners and other known chemical causes
9   of non-Hodgkin lymphoma.
10   Q.   And what did she tell you about the solvents
11  and paint thinners?
12   A.   She said that she didn't -- she didn't use
13  them.  She wasn't exposed to them.  Her husband used
14  them in his business but that she wasn't really
15  involved in the day-to-day operations of his
16  business.
17   Q.   But his business was in their home, correct?
18   A.   Well, his business was in their yard and
19  in their shed so it wasn't their home.
20   Q.   Isn't -- I believe it was in the garage.
21        Is that --
22   A.   Yeah, they --
23   Q.   -- what you remember?
24   A.   They stored things in the garage, but he
25  actually -- his actual work area was in the -- in

Page 99

1   the yard.
2    Q.   And you're aware that he, in his -- his work,
3   was using various chemicals, including solvents, paint,
4   paint thinners in his work?
5    A.   Yes.
6    Q.   And he was doing that work over the course of
7   30 years --
8    A.   Yes.
9    Q.   -- correct?
10   A.   Yes.
11   Q.   And did she ever observe him using these
12  materials in their home?
13   A.   She probably did.  I don't -- I don't
14  know.  She probably did.  Not -- not often.
15   Q.   That's what she told you, not often?
16   A.   I think he said it in his deposition that
17  he -- when he was working in their house to
18  refurbish it, she was usually not there.
19   Q.   Did she explain that she had had any exposure
20  whatsoever, though, to the paints and paint thinners and
21  solvents he had been using, considering that they were
22  in the home?
23        MS. FORGIE:  Objection.
24        THE WITNESS:  She said she didn't have any
25  exposure, and he said the same.

Page 100

1   BY MS. du PONT:
2    Q.   Now, you agree that age is a risk factor for
3   non-Hodgkin's lymphoma, correct?
4    A.   Yes.
5    Q.   And a person's risk of developing
6   non-Hodgkin's lymphoma increases as they get older,
7   right?
8    A.   Yes.
9    Q.   And Ms. Stevick was 63 years old when she was
10  diagnosed; is that correct?
11   A.   I believe so, yes.
12   Q.   And you would agree that with respect to
13  primary CNS lymphoma, the type of non-Hodgkin's lymphoma
14  that Ms. Stevick had, that it can affect patients at any
15  age, but the peak incidence is between the fifth and
16  seventh decade of life, correct?
17   A.   I think that's correct, yes.
18   Q.   And in the past two decades, there's been an
19  increased incidence reported among patients greater than
20  60.
21        Do you believe that to be correct as well?
22        MS. FORGIE:  Objection.
23        THE WITNESS:  I think that is correct,
24  yes.
25  BY MS. du PONT:

Page 101

1    Q.   And you would agree with me that Ms. Stevick
2   was in her fifth to seventh decade at the time of her
3   diagnosis, correct?
4    A.   Yes.
5    Q.   And she was over 60, correct?
6    A.   Yes.
7    Q.   So when Ms. Stevick was diagnosed in
8   late 2014/early 2015, she was in the typical age range
9   of patients diagnosed with primary CNS lymphoma,
10  correct?
11   A.   Yes.
12   Q.   And so Ms. Stevick's primary CNS lymphoma
13  could simply be a result of her age, couldn't it?
14        MS. FORGIE:  Objection.
15        THE WITNESS:  I don't think age is
16  actually a cause of non-Hodgkin's lymphoma.  It's a
17  risk factor, but --
18  BY MS. du PONT:
19   Q.   Can -- can --
20   A.   It's not really a cause.  The difference
21  between -- there are causative risk factors and
22  there are non-causative risk factors.
23   Q.   And can you rule out the non-causative risk
24  factor of age in her case?
25   A.   I ruled it out, yes.

Dennis Weisenburger, M.D.

Page 102

1    Q.  And what methodology did you use to rule out
2  her age here?
3    A.  Well, first of all, age is not a causative
4  risk factor, okay?  Age does not cause lymphoma.
5  There are things about being older, which we don't
6  necessarily understand, that increase risk, but just
7  the age of the person is not really a cause of the
8  risk factor.  So, I mean, in a case like this, I
9  really wouldn't consider age in my -- in my
10  differential etiology because it's not -- it's not a
11  cause of non-Hodgkin's lymphoma.  It's a risk factor
12  of non-Hodgkin's lymphoma.
13    Does that make sense?
14    Q.  I'm not sure it does, but -- but that's okay.
15    Would you agree with me, though, that
16  Ms. Stevick could have developed the exact same
17  tumor without any exposure to Roundup?
18    A.  Yes.
19    Q.  So I'm going to switch gears a little bit.
20    You would agree with me that cancer is a
21  genetic disease, right?
22    A.  Yes.
23    MS. FORGIE:  Objection.
24  BY MS. du PONT:
25    Q.  Cancer is caused by changes in genes that

Page 103

1  control the way cells function, right?
2    A.  Yes.
3    Q.  And are you aware of any medical studies that
4  report that diffuse large B-cell lymphoma is linked to
5  certain germline genetic mutations that predispose a
6  person to develop diffuse large B-cell lymphoma?
7    A.  There are -- there are -- I think there
8  are some germline mutations that would predispose to
9  diffuse large B-cell lymphoma.  There are some.
10  There are some hereditary syndromes that --
11    [Reporter requests clarification.]
12    THE WITNESS:  Hereditary syndromes, yeah.
13  BY MS. du PONT:
14    Q.  And there have been germ -- germ -- genetic
15  germline mutations identified in diffuse large B-cell
16  lymphomas that have also been identified in colon
17  cancer, correct?
18    MS. FORGIE:  Objection.
19    THE WITNESS:  I don't -- I don't know the
20  answer to that.  It -- it -- it's usually a
21  different set of genes in the different cancers, so
22  I don't think there's much overlap between the genes
23  that predispose to non-Hodgkin lymphoma and the
24  genes that predispose to colon cancer.
25  BY MS. du PONT:

Page 104

1    Q.  So you're not aware of any medical literature
2  that says that the genes that predispose someone to
3  diffuse large B-cell lymphoma are similar to the genes
4  that predispose someone to colon cancer?
5    A.  I'm not.
6    MS. FORGIE:  Objection.
7  BY MS. du PONT:
8    Q.  And we talked a little bit earlier about how
9  you had talked to Ms. Stevick about her family history
10  of cancer in your interview.
11    A.  Yes.
12    Q.  But you said you didn't note any that -- any
13  of that family history in your report, right?
14    A.  No, because I didn't think it was
15  relevant.
16    Q.  But did she tell you that she had a mother and
17  father each that had colon cancer?
18    A.  Yes.
19    Q.  And she told you that she had a maternal
20  grandmother and grandfather each that had colon cancer?
21    A.  Yes.
22    Q.  And she also told you she had -- had a
23  maternal cousin that had breast cancer?
24    A.  Yes.
25    Q.  And did she tell you she had a paternal uncle

Page 105

1  with throat cancer?
2    A.  I don't remember that.
3    Q.  At her deposition, which I understand you
4  reviewed, correct?
5    A.  Yes.
6    Q.  She testified that her Uncle John, also his
7  brother, died of carcinoma in the throat.
8    Does that refresh your recollection that
9  she had an uncle with throat cancer?
10    A.  No; I'll take your word for it.
11    Q.  And are you aware that she had another
12  paternal uncle that had lymphoma?
13    A.  Yes.
14    Q.  And did you -- did you get that information
15  from her deposition or from the interview you had with
16  her?
17    A.  From the interview.
18    Q.  And -- but you didn't feel like it was
19  important enough in your report to note the fact that
20  she had an uncle with lymphoma, correct?
21    A.  No, because it's first-degree relatives
22  that give an increased risk for other cancers,
23  hematopoietic cancers.  So --
24    [Reporter requests clarification.]
25    THE WITNESS:  Hematopoietic cancers.

Dennis Weisenburger, M.D.

Page 106

1    So, you know, having an uncle or a cousin
2    with lymphoma really doesn't impart an increased
3    risk for lymphoma in -- in the person we're talking
4    about. It's first-degree relatives, so it would be
5    father, mother, siblings, children. None of them
6    had any hematopoietic cancer.
7        So the other cancers are really irrelevant
8    to -- to the medical history in terms of risk for
9    non-Hodgkin's lymphoma. That's why I didn't include
10   them in my report.
11   BY MS. du PONT:
12   Q.  Okay. If Ms. Stevick had not used Roundup, do
13   you agree that her primary CNS lymphoma could just be
14   the result of an unknown idiopathic cause?
15   A.  Yes.
16   Q.  In interviewing Ms. Stevick, did you learn
17   that she was exposed to ionizing radiation in her job as
18   a speech therapist?
19   A.  Yes. That was in her deposition.
20   Q.  And you said you did some research after you
21   had read the defense expert reports on -- on radiation,
22   correct?
23   A.  Right. So, I mean, I have done -- I've
24   done research on this in the past, and so I just
25   wanted to make sure that there wasn't any more

Page 107

1    recent literature on the subject. So I did some
2    searches, and, you know, what I found is that the --
3    the level of exposure that she had would not
4    increase her risk of non-Hodgkin's lymphoma. In
5    general, radiation is not a risk factor for
6    non-Hodgkin's lymphoma unless it's very high doses
7    of radiation, like an atomic bomb or some other kind
8    of exposure that's a very large exposure.
9    Q.  And what medical literature are you relying on
10   for that opinion?
11   A.  Well, it's on my reference list that you
12   hopefully will receive.
13   Q.  Okay.
14   A.  But, again, it wasn't -- to me, it wasn't
15   relevant to my report and so I didn't include it.
16   Q.  So even though Ms. Stevick testified that she
17   would be present during swallowing studies in her
18   pat- -- in her patients using fluoroscopy, a type of
19   medical ionizing beam radiation, it's your opinion that
20   that was not significant enough exposure to rise to the
21   level of a -- even a risk factor for her?
22   A.  Correct.
23   Q.  And so you didn't consider that risk factor in
24   your report?
25   A.  I considered it, but I rejected it.

Page 108

1    Q.  So I just want to ask you a hypothetical.
2    Let's assume you have a patient with the same medical
3    history as Ms. Stevick but no Roundup use, okay?
4        Do you understand that?
5    A.  Yes.
6    Q.  And there's no exposure to Roundup, but she
7    still could have been diagnosed with non-Hodgkin's
8    lymphoma, correct?
9    A.  Yes.
10   Q.  And women in their 60s get non-Hodgkin's
11   lymphoma all the time, correct?
12   A.  Yes.
13   MS. FORGIE:  Objection.
14   THE WITNESS:  Yes.
15   BY MS. du PONT:
16   Q.  And people with no risk factors for
17   non-Hodgkin's lymphoma get NHL all the time, correct?
18   MS. FORGIE:  Objection.
19   THE WITNESS:  Correct.
20   BY MS. du PONT:
21   Q.  And people who have never been exposed to
22   Roundup get non-Hodgkin's lymphoma all the time,
23   correct?
24   A.  Yes, because there are probably many
25   causes of non-Hodgkin's lymphoma.

Page 109

1    Q.  If Ms. Stevick had exposure to Roundup but
2    also had a 40-year history of hepatitis C infection,
3    would you still say Roundup was the cause?
4    MS. FORGIE:  Objection.
5    THE WITNESS:  Well, I'd have to look very
6    carefully at the medical history. We have a case
7    later this week where we have a person with a story
8    like that. So you would have to look at the medical
9    history, was it an active infection, how long did he
10   have it, et cetera.
11   MS. du PONT:  Okay.
12   THE WITNESS:  So it's a -- it's a
13   difficult question to answer without all the
14   details.
15   BY MS. du PONT:
16   Q.  How about if she smoked, would you still say
17   Roundup was the cause if those were the only two risk
18   factors in her background?
19   A.  Yes.
20   MS. FORGIE:  Objection.
21   THE WITNESS:  Smoking is not a risk factor
22   for non-Hodgkin lymphoma.
23   BY MS. du PONT:
24   Q.  How about if she had a BMI greater than 30,
25   would you still say Roundup was the cause?

Dennis Weisenburger, M.D.

Page 110

1    MS. FORGIE:  Objection.
2    THE WITNESS:  Yes, because obesity at that
3  level gives an odds ratio of about 1.3, so it's --
4  and we don't really know whether it's the obesity or
5  something associated with the obesity that's
6  actually the cause, but the odds ratio is much less
7  than what hers was for Roundup.  So it's possible
8  obesity could be a contributing cause but probably
9  not to the level of Roundup.
10  BY MS. du PONT:
11    Q.  So in that case of Ms. Stevick, assuming she
12  did have a BMI of greater than 30 and Roundup use, you
13  would say it was -- the Roundup was the -- was a cause
14  but that obesity was also a contributing factor to her
15  non-Hodgkin's lymphoma?
16    MS. FORGIE:  Objection.
17    THE WITNESS:  Yes.
18  BY MS. du PONT:
19    Q.  How about if she had exposure to Roundup and
20  Crohn's disease, would you still say Roundup was the
21  cause?
22    MS. FORGIE:  Objection.
23    THE WITNESS:  Again, I'd have to look at
24  the -- the whole medical history around Crohn's
25  disease, because I think, with regard to Crohn's

Page 111

1  disease, the risk for a non-Hodgkin lymphoma is
2  really associated with the treatments rather than
3  the disease itself.  So I would have to see what
4  treatment -- how was she -- how was she treated,
5  what drugs did she receive.  So, again, you'd need a
6  more detailed history than that.
7  BY MS. du PONT:
8    Q.  Is -- are there details in a patient history
9  that you could provide for me right now that would make
10  you say that the Crohn's disease was the cause versus
11  Roundup?
12    A.  She has no history of Crohn's disease.
13    Q.  Right.  I understand that.
14    In a hypothetical -- can you think of a
15  hypothetical situation where someone has Crohn's
16  disease but has also used Roundup where you would
17  say Crohn's disease was the cause and not Roundup?
18    MS. FORGIE:  Objection.
19    THE WITNESS:  Well, if she was treated
20  with certain drugs, like Methotrexate, which is one
21  of the drugs that's commonly used and increases risk
22  for lymphoma, or she was treated with some
23  immunosuppressant drugs, which are sometimes used in
24  ulcerative colitis, then perhaps it would -- I would
25  say that there was more than one cause.  So there

Page 112

1  can be more than one cause for a disease.  So in
2  that hypothetical, I would have to look carefully at
3  her history of treatment for Crohn's disease to see
4  once whether she had other risk factors associated
5  with that.
6  BY MS. du PONT:
7    Q.  So --
8    A.  So I have no problem saying that there's
9  more than one substantial risk factor for lymphoma
10  because sometimes people have more than one.
11    Q.  So does your methodology that you're using, do
12  you rank risk factors according to their relative risk
13  or odds ratios?
14    A.  That's one way to do it.
15    Q.  Is that what you're doing, though?  That's
16  what I'm trying to figure out.
17    A.  Well, I do that, yes.  You know, I --
18  when you have -- when you have multiple risk factors
19  that are real, then you have to say well, how --
20  which of these which of these is the most important?
21  And one of the things you would look at is the odds
22  ratio --
23    Q.  So --
24    A.  -- among other things.
25    MS. du PONT:  Okay.  We're going to have

Page 113

1  to take a brief break because we need to change the
2  DVD.
3    THE WITNESS:  Okay.
4    THE VIDEOGRAPHER:  The time is now
5  10:57 a.m. and we are off the record.
6    (Recess.)
7    THE VIDEOGRAPHER:  The time is now
8  11:20 a.m. and we are back on the record.
9  BY MS. du PONT:
10    Q.  Okay.  Doctor, before the break we were
11  talking about your meth -- methodology and the fact that
12  you rank risk factors for their relative contribution to
13  non-Hodgkin's lymphoma.
14    Do you recall that?
15    A.  Yes.
16    Q.  And explain to me, how do you go about ranking
17  the risk factors?
18    A.  Well, the higher the odds ratio, the more
19  likely the risk factor is a real risk factor, and
20  the higher the odds ratio, the more likely that that
21  risk factor is going to be the most important risk
22  factor.
23    Q.  Okay.  And what if two risk factors have
24  similar odds ratios, are they both equal in terms of
25  their contribution to the non-Hodgkin's lymphoma?

Dennis Weisenburger, M.D.

Page 114

1    A.  Well, you'd have to --
2       MS. FORGIE:  Objection.
3       THE WITNESS:  You -- you would have to
4    look at the exposure to each one to make sure that
5    it was a significant exposure, and if -- and if the
6    odds ratios were equal and you couldn't decide that
7    one was more important than the other, then you
8    would have to give them equal weight, I guess, is
9    the way I would do it.
10   BY MS. du PONT:
11      Q.  And how do you go about picking the odds ratio
12   you use for a given risk factor?
13      A.  Well, you look at the epidemiological
14   literature and you use the odds ratios that seem to
15   be the most appropriate for what you're trying to
16   do.
17      Q.  So in looking at the epidemiological
18   literature, do you use an odds ratio across various
19   studies that look at that risk factor, or do you use a
20   specific article?
21      A.  Well, it would -- just depends on what
22   data is available.  So in some situations, I use the
23   odds ratio from a meta analysis.  And other times,
24   like in this report, I used odds ratios specifically
25   from certain studies that were most relevant to what

Page 115

1    I was asked to demonstrate.
2       Q.  And the odds ratios you used in the specific
3    studies that we talked about earlier, none of those odds
4    ratios controlled for pesticide use, correct?
5       MS. FORGIE:  Objection.
6       THE WITNESS:  Except for the NAPP study,
7    yes.
8    BY MS. du PONT:
9       Q.  But that study has not been published in the
10   medical literature, correct?
11      MS. FORGIE:  Objection.
12      THE WITNESS:  Well, it's been presented at
13   meetings and abstracts have been published, so there
14   are summaries, but the actual article has not yet
15   been published.
16   BY MS. du PONT:
17      Q.  So in the situation where you're -- you're
18   ranking the risk factors, if you had an odds ratio that
19   was four times versus the odds ratios of basically two
20   times that you're -- you're using for -- for Roundup,
21   would that other risk factor -- would you say that other
22   risk factor is the main contributor to the non-Hodgkin's
23   lymphoma?
24      A.  Well, again, I would have to look at the
25   specifics.  You know, if -- if one exposure was very

Page 116

1    significant and the other exposure was not, then you
2    would put the weight where the exposure was
3    significant.  So -- so you have to look at the whole
4    picture, the whole story, not just the odds ratios,
5    but the odds ratios play an important part.
6       (Whereupon Exhibit 12 was marked for
7       identification.)
8    BY MS. du PONT:
9       Q.  At the break, we did get your addendum to your
10   reference list that was provided to us on Friday by
11   counsel for the plaintiff.  And I've marked that as
12   Exhibit 12.
13      Can you just verify for me that's the
14   addendum to your references that we were talking
15   about earlier in the deposition?
16      A.  Yes, I think this is it, yes.
17      Q.  And you prepared that addendum after you
18   served your report in this matter in November --
19      A.  Yes.
20      Q.  -- correct?
21      A.  I prepared it last week.
22      Q.  Okay.  And what -- what specifically have you
23   added to the addendum list and why?
24      A.  Well, on this list are a bunch of articles
25   on hepatitis B and C that I had collected --

Page 117

1       Q.  Okay.
2       A.  -- in preparation of writing my report.
3    Some of the articles I referenced in the report, a
4    bunch of articles I didn't really feel were
5    relevant, so I didn't reference them, and then after
6    I read the expert reports for the three cases, there
7    were additional references that I -- that I -- that
8    I went to obtain, including the ones on radiation,
9    additional ones on hepatitis and some other issues
10   and topics that were raised by the -- the other
11   experts.  So this is sort of a summation of all
12   those articles.
13      Q.  Okay.
14      A.  Some of them I had from when I wrote my
15   report and others I collected within the last week
16   or so.
17      Q.  So some of them you had at the time you wrote
18   your report, but you didn't feel like you needed to put
19   them on the original reference list, but now you feel
20   like it's important to include them?
21      MS. FORGIE:  Objection.
22      THE WITNESS:  Yes.  So the original
23   reference list was the one that was submitted for
24   Gordon, I think.  And so all these references --
25   there weren't any references relevant to hepatitis

Dennis Weisenburger, M.D.

Page 118

1    for Gordon, so I didn't include them.
2         [Reporter requests clarification.]
3         THE WITNESS:  No.
4         And then so, you know, the reference list
5    could have been updated sooner, but it was a work in
6    progress.
7    BY MS. du PONT:
8         Q.  Okay.  And you're not -- you -- you did not
9    serve any sort of rebuttal report along with this
10   addendum, correct?
11        A.  No.
12        Q.  Okay.  You can put that aside.
13        Now, we've just been talking about how
14   non-Hodgkin's lymphoma can be multi --
15   multifactorial, right?
16        A.  Yes.
17        Q.  There can be more than one cause for a
18   non-Hodgkin's lymphoma, correct?
19        A.  Yes.
20        MS. FORGIE:  Objection.
21   BY MS. du PONT:
22        Q.  And can you say what mechanism it is that --
23   let me withdraw that.
24        You can't say sitting here today the
25   mechanism by which Roundup is causing or

Page 119

1    contributing to Ms. Stevick's primary CNS lymphoma,
2    can you?
3         A.  Well, Roundup has genotoxic properties,
4    so, you know, I -- the way it would contribute to
5    her non-Hodgkin's lymphoma is by creating genetic
6    damage, either mutations or translocations or other
7    genetic abnormalities that would lead to the
8    development of non-Hodgkin's lymphoma.
9         Q.  So are you saying that Roundup caused the
10   initial cancer mutation in Ms. Stevick?
11        A.  I don't know whether it caused the initial
12   one, but I believe that it was involved in causing
13   genetic damage that led to the development of
14   non-Hodgkin's lymphoma.
15        Q.  So you cannot say to a reasonable degree of
16   medical certainty that it initiated the initial cancer
17   mutation in Ms. Stevick, correct?
18        MS. FORGIE:  Objection.  Asked and
19   answered.
20        You can answer again.
21        THE WITNESS:  It had the potential to do
22   that, but I don't know whether it did.  There's no
23   way to know that.
24   BY MS. du PONT:
25        Q.  And you can't say to a reasonable degree of

Page 120

1    medical certainty that Ms. Stevick's cancer -- sorry,
2    when Ms. Stevick's cancer was initiated, correct?
3         A.  I can't.
4         Q.  Now, Ms. Stevick began chemotherapy treatment
5    in January of 2015; is that your understanding?
6         A.  Yes.
7         Q.  And about six months later on July 15, 2015,
8    you -- you note in your report that an MRI scan of her
9    brain showed no evidence of disease --
10        A.  Yes.
11        Q.  -- is that right?
12        A.  Yes.
13        Q.  And you note that Ms. Stevick has recovered
14   neurological function and was thought to be fully
15   recovered and active by July 18, 2016; you would agree
16   with that, correct?
17        A.  Yes.
18        Q.  And you also note that subsequent MRIs were
19   also negative and she has continued to be in remission
20   and fully active, right?  You note that --
21        A.  Yes.
22        Q.  -- in the report?
23        And so she's been in remission for over
24   three years now, right?
25        A.  Yes.

Page 121

1         Q.  And at this point, you would not expect her to
2    have any recurrence of her primary CNS lymphoma,
3    correct?
4         MS. FORGIE:  Objection.
5         THE WITNESS:  Well, we really can't know
6    that.  One of the features of these primary CNS
7    lymphomas is they can recur late.  So I -- you know,
8    she -- she could have a recurrence in the future.
9    BY MS. du PONT:
10        Q.  But her -- the likelihood of her having a
11   recurrence in the future is low at this point, correct?
12        MS. FORGIE:  Objection.
13        THE WITNESS:  I don't -- I don't -- I
14   don't -- I can't answer that.  That's not an area
15   that is an expertise of mine, so...
16   BY MS. du PONT:
17        Q.  So you will not be offering an opinion at
18   trial about what Ms. Stevick's chances of having a
19   recurrence are, correct?
20        MS. FORGIE:  Objection.
21        THE WITNESS:  Correct.
22   BY MS. du PONT:
23        Q.  Now, on your reliance list that you provided
24   with your report in Ms. Stevick's case, the longer list
25   that we marked, I believe, as Exhibit 3, you refer to a

Dennis Weisenburger, M.D.

Page 122

```
1    website from the Mayo Clinic.
2         Do you recall that, relying on a website
3    from the Mayo Clinic?
4         A.  I've never relied on a website from the
5    Mayo Clinic.
6         Q.  Let me see if I can look back at this, then.
7         If you can take a look at Exhibit 3.  We
8    marked it as Exhibit 3, which is what is listed as
9    Dr. Weisenburger materials list, November 13, 2018.
10        MR. LEVINE:  You have it there.
11        MS. du PONT:  Yeah, that's it.
12        THE WITNESS:  Where is it?
13        MS. du PONT:  If you look at reference 204
14   in that list.
15        THE WITNESS:  Oh, well.  That's something
16   that Kathryn added to the list.
17   BY MS. du PONT:
18        Q.  So --
19        MS. FORGIE:  Objection.  Don't answer
20   that.
21        (Whereupon Exhibit 13 was marked for
22        identification.)
23   BY MS. du PONT:
24        Q.  So we're -- what we've marked as Exhibit 13
25   is -- is -- a -- something from the Mayo Clinic on their
```

Page 123

```
1    website discussing non-Hodgkin's lymphoma.
2         Doctor, it's your testimony today that
3    this reference was provided to you by your counsel
4    and added to your list by your -- by Counsel?
5         A.  She may have --
6         MS. FORGIE:  Objection.
7         THE WITNESS:  She may have given it to me.
8    I don't remember.
9         MS. FORGIE:  Wait.  Objection.
10        Don't answer that.
11        THE WITNESS:  Okay.
12        MS. FORGIE:  Communications between us are
13   privileged.
14   BY MS. du PONT:
15        Q.  Do you --
16        MS. FORGIE:  Pretrial order No. 7.
17   BY MS. du PONT:
18        Q.  Do you remember --
19        [Reporter requests clarification.]
20        MS. FORGIE:  Pretrial order No. 7 from
21   Judge Chhabria.
22        MS. du PONT:  So pretrial order No. 7
23   applies to this case?
24        MS. FORGIE:  Absolutely.
25        THE REPORTER:  And I didn't get the judge.
```

Page 124

```
1         MS. FORGIE:  Judge Chhabria.
2         Why -- why wouldn't it?
3         MS. du PONT:  I'm just asking a question.
4    I just wanted to confirm that.
5         MS. FORGIE:  Yeah, this is an MDL case.
6         MS. du PONT:  Okay.
7         MS. FORGIE:  And it clearly states that
8    communications between counsel and experts are not
9    discoverable.
10   BY MS. du PONT:
11        Q.  Do you know how this reference got on your --
12   your reference list without revealing any communications
13   between --
14        A.  I -- I don't.
15        Q.  -- you and your counsel?
16        A.  I don't.
17        Q.  Okay.  Have you seen this before?
18        A.  I don't remember it.  I may have.
19        Q.  And if you take a look -- well, let me just
20   ask this:  The Mayo Clinic is a leading medical
21   institution in the United States, correct?
22        A.  Yes.
23        Q.  And if you look under "Causes," which is on
24   the second page of this document --
25        A.  Okay.
```

Page 125

```
1         Q.  -- do you see how the Mayo Clinic states, "In
2    most cases, doctors don't know what causes non-Hodgkin's
3    lymphoma"?
4         MS. FORGIE:  Do you have an extra copy --
5         MS. du PONT:  Oh, I apologize.
6         MS. FORGIE:  -- copy, please?
7         MS. du PONT:  I did not mean to not give
8    you.
9         There you go.
10        MS. FORGIE:  And what page are you on,
11   please?
12        MS. du PONT:  2.
13        MS. FORGIE:  Thank you.
14   BY MS. du PONT:
15        Q.  Sorry.  Do you see that it states here that in
16   most cases people diagnosed with non-Hodgkin's lymphoma
17   don't -- hold on.  I just lost my place.
18        That in most cases, doctors don't know
19   what causes non-Hodgkin's lymphoma, do you see where
20   it states that?
21        A.  Yes.
22        Q.  And it also goes on to say that "In some
23   cases, it's due to a weakened immune system, but it
24   begins when your body produces too many abnormal
25   lymphocytes, a type of white blood cell."
```

32  (Pages 122 to 125)

Dennis Weisenburger, M.D.

Page 126

1          Do you see that.
2     A.  Yes.
3     Q.  And do you agree with those statements?
4     A.  Yes.
5     Q.  Now let's look at the section under "Risk
6  Factors."
7     A.  Okay.
8     Q.  And do you see how it states that "In most
9  cases, people diagnosed with non-Hodgkin's lymphoma
10  don't have any obvious risk factors and many people who
11  have risk factors for the disease never develop it."
12          Do you see that?
13     A.  Yes.
14     Q.  And do you agree with that?
15     A.  Yes.
16     Q.  And then it lists a number of factors that may
17  increase the risk of non-Hodgkin's lymphoma.
18          Do you see that?
19     A.  Yes.
20     Q.  And would you agree that not all risk
21  factories for cancer are causes?
22     A.  Yes.
23          [Reporter requests clarification.]
24          MS. du PONT:  Yes.
25          THE WITNESS:  Are not causes, yeah.

Page 127

1  BY MS. du PONT:
2     Q.  And then it lists a number of factors here,
3  medications that suppress your immune system.
4          Do you see that?
5     A.  Yes.
6     Q.  So if you've had an organ transplant, you're
7  more susceptible to developing non-Hodgkin's lymphoma
8  because immunosuppressive therapy has reduced your
9  body's ability to fight new illnesses; is that right?
10     A.  Yeah.  It's a simplified explanation, yes.
11     Q.  Do you agree with that simplified explanation?
12     A.  More or less, yeah.
13     Q.  And then it states, "Infection with certain
14  viruses and bacteria."  It states, "Certain viral and
15  bacterial infections appear to increase the risk of
16  non-Hodgkin's lymphoma.  Viruses linked to increased
17  non-Hodgkin's lymphoma risk include HIV and Epstein-Barr
18  infection.  Bacteria linked to an increased risk of
19  non-Hodgkin's lymphoma include the ulcer-causing
20  Helicobacter pylori."
21     A.  Yes.
22     Q.  Do you see that?
23          And do you agree with that?
24     A.  Yes.
25     Q.  And then it states, under "Chemicals,"

Page 128

1  "Certain chemicals such as those used to kill insects
2  and weeds may increase your risk of developing
3  non-Hodgkin's lymphoma."
4          Do you see that?
5     A.  Yes.
6     Q.  And this website does not specifically refer
7  to glyphosate or Roundup, correct?
8          MS. FORGIE:  Objection.
9          THE WITNESS:  Correct.
10  BY MS. du PONT:
11     Q.  And --
12     A.  It just uses very general terms, like
13  applying insecticides or herbicides.
14     Q.  But it does not specifically refer to Roundup
15  or glyphosate, correct?
16     A.  It does not.
17     Q.  And, in fact, it notes "More research is
18  needed to understand the possible link between
19  pesticides and the development of non-Hodgkin's
20  lymphoma.
21          Do you see that?
22     A.  Yes.
23     Q.  And then it also notes that "Older age.
24  Non-Hodgkin's lymphoma can occur at any age, but the
25  risk increases with age.  It's most common in people 60

Page 129

1  or over."
2          Do you see that?
3     A.  Yes.
4     Q.  And you agree with that?
5     A.  Yeah.  As I said, I don't think it's a
6  cause; it's a risk factor.
7     Q.  And that's what's stated here in the --
8     A.  Well --
9     Q.  -- Mayo --
10     A.  -- it's actually listed under "Causes,"
11  so...
12     Q.  I thought it was listed --
13     A.  No, it's listed --
14     Q.  -- under "Risk Factors."
15     A.  -- under "Risk Factors," you're right.
16  You're right.
17     Q.  All right.  We can set this aside for a
18  second.
19          Now --
20          MS. FORGIE:  I'm sorry, what number
21  exhibit was that, please?
22          THE WITNESS:  204.
23          MS. du PONT:  No.
24          MS. FORGIE:  204?
25          MS. du PONT:  It's 13.

33 (Pages 126 to 129)

Dennis Weisenburger, M.D.

Page 130

1        Just for the record, the Mayo Clinic
2   website non-Hodgkin's lymphoma excerpt is
3   Exhibit 13.
4        MS. FORGIE:  Thank you.
5   BY MS. du PONT:
6        Q.  Now, Doctor, you work at City of Hope?
7        A.  Yes.
8        Q.  And have you taken a look at what is on the
9   website for City of Hope about lymphoma?
10       A.  I haven't.
11       Q.  Okay.  Let's take a look.
12       A.  I guess I'm going to get to see it.
13       Q.  You are.
14          (Whereupon Exhibit 14 was marked for
15          identification.)
16          THE WITNESS:  Is this on my reference list
17   too?
18          MS. du PONT:  It is -- I don't think it's
19   on your reference list.  Not yet.  So let's take a
20   look at what is on the City of Hope website.
21   BY MS. du PONT:
22       Q.  You'll see it states that "Lymphoma is an
23   umbrella term describing dozens of cancers that begin in
24   the immune system."
25          Do you see that?

Page 131

1        A.  Yes.
2        Q.  And you agree that?
3        A.  Yes.
4        Q.  "Lymphomas are the most common type of blood
5   cancer and are broadly characterized as either Hodgkin
6   or non-Hodgkin disease."
7          Do you see that?
8        A.  Yes.
9        Q.  And you agree with that?
10       A.  Yes.
11       Q.  And it notes "All lymphoma subtypes combined
12   are the seventh most common cancer in the United
13   States."
14          Do you agree with that?
15       A.  Yes.
16       Q.  Okay.  And if you turn to the third page under
17   "Facts," it asks "What is lymphoma?"
18          Do you see that?
19       A.  Yep.  Yes, I do.
20       Q.  And, again, it's similar to what is stated in
21   the introduction.  It says, "Lymphoma is an umbrella
22   term describing dozens of cancer that begin in the
23   immune system."
24          And you agree with that?
25       A.  Yes.

Page 132

1        Q.  And, again, it notes that it's seventh most
2   common cancer in the United States, and you agree with
3   that?
4        A.  Yes.
5        Q.  And it states, "This year, approximately
6   74,690 adults and children in the United States will be
7   diagnosed with non-Hodgkin's lymphoma."
8          Do you agree with that statistic?
9        A.  Yes.
10       Q.  And then if we turn to the next page, it looks
11   at what are the types of lymphoma.
12          Do you see that?
13       A.  Yes.
14       Q.  And do you see that it lists diffuse large
15   B-cell lymphoma as the most common type of non-Hodgkin's
16   lymphoma?
17       A.  Yes.
18       Q.  But if you turn to the next page, it lists
19   central nervous system lymphoma, which develops in lymph
20   tissues located in the brain and spinal cord, as a
21   separate type of non-Hodgkin's lymphoma, correct?
22       A.  Here, they're being very general --
23   general -- they're generalizing to any lymphoma
24   that's occurring in the CNS.  So it's not just
25   diffuse large B-cell lymphoma.  There are other

Page 133

1   lymphomas that occur primary in the CNS as well.
2        Q.  But that's listed -- the primary CNS lymphomas
3   are listed separately from diffuse large B-cell
4   lymphomas, correct?
5        A.  Yes.
6        Q.  And then it asks, "What increases your risk of
7   lymphoma?"  And it states there, "Doctors do not know
8   what causes most lymphomas, and there is very little
9   that can be done to avoid being diagnosed.  For most
10   patients, it is not one but a combination of factors
11   that likely contributes to developing lymphoma."
12          Do you see that?
13       A.  It's a very general statement, yes.
14       Q.  Do you agree with it?
15          MS. FORGIE:  Objection.
16          THE WITNESS:  I don't -- I -- I don't
17   disagree -- agree or disagree.  I -- I don't know
18   what basis they make that -- they make that
19   statement.  It's a very general statement.  I don't
20   know what they mean by "factors."
21   BY MS. du PONT:
22       Q.  So you can't say one way or the other whether
23   you agree or disagree with that statement?
24       A.  Yes.
25       Q.  But it does list here several risk factors for

Dennis Weisenburger, M.D.

Page 134

1  lymphoma.
2      Do you see that?
3  A.  Yes.
4  Q.  And age is listed, correct?
5  A.  Yes.
6  Q.  And you agree age is a risk factor?
7  A.  Yes.
8  Q.  It lists family history --
9  A.  Yes.
10  Q.  -- do you see that?
11  A.  Uh-huh.
12  Q.  And you agree that family history is a risk
13  factor?
14  A.  Yes.
15  Q.  And it lists chemicals, and under that it
16  says, "pesticides and an exposure to other toxins like
17  Agent Orange and benzene may be linked to developing
18  lymphoma," correct?
19  A.  Yes.
20  Q.  And there, it notes that it may be linked to
21  developing lymphoma, right?
22  A.  That's what it says.
23  Q.  And this does not specifically refer to
24  Roundup, correct?
25  A.  No.

Page 135

1      MS. FORGIE:  Objection.
2      THE WITNESS:  It's a -- it's a very
3  general statement.
4  BY MS. du PONT:
5  Q.  And so it -- it does refer, however, to
6  benzene exposure, right?
7  A.  Yes.
8  Q.  Are you -- is it your opinion in this case
9  that the -- the ex -- the exposure to benzene in causing
10  non-Hodgkin's lymphoma -- let me withdraw that.
11      Is it your opinion in this case that the
12  time period for exposure for benzene for
13  non-Hodgkin's lymphoma is similar to the time period
14  for the exposure for Roundup and non-Hodgkin's
15  lymphoma?
16      MS. FORGIE:  Objection.
17      THE WITNESS:  You mean the latency?
18      MS. du PONT:  Yes.
19      MS. FORGIE:  Objection.
20      THE WITNESS:  I would say in general, yes,
21  because for most chemicals, there's environmental
22  chemicals, there are exposures that occur over a
23  significant period of time before people get cancer.
24  So for -- for -- for chemicals like benzene that --
25  mixed solvent exposures, then the median latency is

Page 136

1  about 20 to 25 years.
2  BY MS. du PONT:
3  Q.  And you would say they're -- the same median
4  length latency would apply to Roundup use?
5  A.  Well, it's hypothetical, but I would say
6  yes.  It may take a long time to develop lymphoma
7  from glyphosate exposure.  We -- we don't --
8      [Reporter requests clarification.]
9      THE WITNESS:  Glyphosate, Roundup.
10      MS. FORGIE:  Were you going to finish?
11  You started to say something else before the court
12  reporter --
13      THE WITNESS:  Yeah, so we don't really
14  know for -- for Roundup what the latency is, but,
15  you know, if I was to hypothesize, I would say it's
16  probably long, like -- like benzene-like solvents.
17      MS. du PONT:  Okay.  I'm just going to
18  take a little bit of a break.  I may not have any
19  further questions, but I just want to go through my
20  notes.
21      MS. FORGIE:  Okay.  How about 10, 15
22  minutes?
23      MS. du PONT:  10 minutes is great.
24      MS. FORGIE:  Okay.  So I'll start getting
25  ready for mine, then.

Page 137

1      MS. du PONT:  Okay.
2      MS. FORGIE:  Just to make it go faster.
3      THE VIDEOGRAPHER:  The time is now
4  11:46 a.m. and we are off the record.
5      (Recess.)
6      THE VIDEOGRAPHER:  The time is now
7  12:07 p.m. and we are back on the record.
8  BY MS. du PONT:
9  Q.  Okay.  Doctor, I just have a few more
10  questions.
11      Earlier in the deposition you had referred
12  to a memo that was provided to you by the Miller
13  firm regarding Ms. Stevick's Roundup usage.
14      Do you recall that discussion?
15  A.  Yes.
16      (Whereupon Exhibit 15 was marked for
17      identification.)
18  BY MS. du PONT:
19  Q.  And so on a break, we were able to get a copy
20  of that memo.  It was sent to us.  We were able to
21  forward it to someone here at the Marriott to print, and
22  they have since deleted it.  So we now have that marked
23  as Exhibit 15.  And I just want to show that to you.
24      MS. FORGIE:  Can I -- did anyone check
25  is -- Brian, are you back on the phone?

35 (Pages 134 to 137)

Dennis Weisenburger, M.D.

Page 138

1      MR. BRAKE:  I'm here.
2      MS. FORGIE:  Okay.  Just checking since we
3  disconnected.
4      MR. BRAKE:  Thank you for checking on me,
5  I appreciate it.
6  BY MS. du PONT:
7      Q.   And --
8      MS. FORGIE:  Someone has to.
9  BY MS. du PONT:
10     Q.   And is the -- the memo that you were referring
11  to earlier that you had been provided --
12     A.   Yes.
13     Q.   -- by the Miller firm?
14     A.   Yes.
15     Q.   And this is a memo regarding a telephone call
16  to he Elaine and Christopher Stevick on November 11,
17  2018 from 5:00 to 6:30 p.m.
18      Do you see that?
19     A.   Yes.
20     Q.   And this was a telephone call that you did not
21  participate in, correct?
22     A.   I did not.
23     Q.   So it was a conference call with Elaine and
24  Christopher Stevick and Brian Brake, I'm guessing.
25      Is that what you can determine from this

Page 139

1  memo?
2      MS. FORGIE:  Objection.
3      THE WITNESS:  I don't know who was on the
4  call.
5  BY MS. du PONT:
6      Q.   But you were not on the call?
7      A.   I was not on the call, no.
8      Q.   And it goes through a number of issues in
9  relation to her Roundup usage, including mixing,
10  frequency, amount of usage, talks about the area she was
11  spraying.
12      Is -- I think you stated earlier that you
13  did not rely on this memo as much as you relied on
14  the testimony from her deposition and your own
15  interview; is that --
16     A.   That's --
17     Q.   -- accurate?
18     A.   That's correct.
19     Q.   Did you rely on this memo for any of the facts
20  that are put forth in your report?
21     A.   I don't believe so.
22     MS. du PONT:  Okay.  I have no further
23  questions at this time.
24     MS. FORGIE:  Okay.  I just have a few.
25  ///

Page 140

1           EXAMINATION
2  BY MS. FORGIE:
3      Q.   Doctor, you earlier mentioned something about
4  the NAPP study.
5      Do you recall that?
6      A.   Yes.
7      Q.   What is the NAPP study?
8      A.   So the NAPP study is a pooled study of
9  Canadian and U.S. case control studies that is
10  looking at a whole bunch of different things, but
11  one of the things that it's looking at is the use of
12  glyphosate and risk for non-Hodgkin's lymphoma and
13  its subtypes.
14     Q.   And you -- you reference the NAPP study in
15  your expert report, correct?
16     A.   Yes.
17     Q.   And you stated that the risk estimate for
18  diffuse large B-cell NHL was 2.45 -- 2.49, 95 percent
19  confidence interval 1.2 --
20     [Reporter requests clarification.]
21     MS. FORGIE:  95 percent confidence
22  interval 1.23 to 5.04 for use greater than two days
23  per year.
24     MS. du PONT:  Objection.  Leading.
25  BY MS. FORGIE:

Page 141

1      Q.   And you reference that in your expert
2  report --
3      A.   Yes.
4      Q.   -- correct?
5      A.   Yes.
6      MS. du PONT:  Objection.  Form.
7  BY MS. FORGIE:
8      Q.   And with regard to that confidence interval,
9  is that a statistic -- does that indicate that the odds
10  ratio of 2.49 is statistically significant?
11     A.   Yes.
12     Q.   Okay.  And has the --
13     MS. du PONT:  Objection.  Form.  Sorry.
14     [Reporter requests clarification.]
15     MS. du PONT:  I just had an objection to
16  form.
17  BY MS. FORGIE:
18     Q.   Has the NAPP study been presented at various
19  conferences?
20     A.   Yes.  It has been presented at least three
21  times.
22     Q.   Okay.  And are you aware that the abstract
23  itself has been peer reviewed?
24     A.   It usually -- for these kind of
25  conferences, the abstracts usually are peer

Golkow Litigation Services - 877.370.DEPS

Dennis Weisenburger, M.D.

Page 142

1    reviewed, yes.
2        Q.  Okay.  And what is the significance of the
3    NAPP study to you vis-a-vis the NAPP study alone and
4    also with regard to the McDuffie and Eriksson studies
5    that were also referenced --
6        A.  Well --
7        Q.  -- in your report?
8        A.  -- the NAPP study is important because it
9    has a large num- -- larger number of cases and
10   controls being exposed to glyphosate and it allows
11   for adjustment for the use of other pesticides, as
12   well as it has enough cases to actually look at the
13   major subtypes of non-Hodgkin lymphoma.
14       Q.  Okay.  And you were asked a series of
15   questions about subtypes and NHL overall.
16           Do you recall those questions?
17       A.  Yes.
18       Q.  And with regard to subtypes, how is it that
19   you're not always able to determine odds ratios for
20   particular subtypes in some of the epidemiological
21   studies?
22       A.  Well, often, there aren't enough cases
23   of specific subtypes to really -- to really do
24   meaningful analyses.  So they did it in the Eriksson
25   study, but they -- they didn't have a lot of cases

Page 143

1    of the various different subtypes then.  So,
2    although you see elevated odds ratios, they -- they
3    generally aren't statistically significant.  So I
4    think the NAPP study is nice because it -- it pools
5    together studies that are very similar in their
6    design and it is able to actually report -- it's
7    actually able to -- to adjust for the use of other
8    pesticides as well as look at some of the major
9    histologic subtypes.
10       Q.  Okay.  And would you say that Mrs. Stevick's
11   use of Roundup fits within the NAPP criteria?
12       A.  Well, it does.  See, I mean, she used it
13   more than two days per year.  She used it at least
14   10 times a year for 25 years.
15       Q.  Okay.  And you were asked a couple questions
16   about latency periods.
17           Do you recall those questions?
18       A.  Yes.
19       Q.  With regard to the latency period in
20   Mrs. Stevick's case between the time she was first
21   exposed to Roundup and her development of non-Hodgkin's
22   lymphoma, would you say that that would sufficiently
23   seem indicate that the Roundup could cause her or did
24   cause her non-Hodgkin's lymphoma?
25           MS. du PONT:  Object to form.

Page 144

1            THE WITNESS:  Yes.  Her -- so the latency
2    period in her case was 25-and-a-half years, which is
3    a long latency period, which is what you generally
4    expect for chemical exposures that cause cancer.
5    BY MS. FORGIE:
6        Q.  Okay.  And do you -- with regard to
7    Mrs. Stevick, did you perform a differential diagnosis
8    with regard to etiology?
9        A.  I did.  I -- by reviewing her medical
10   record, by reviewing her deposition and by talking
11   to her on the phone, I was able to basically go
12   through the list of common risk factors for NHL and
13   eliminate all the risk fact- -- the causative risk
14   factors except for glyphosate exposure.
15       Q.  And that differential diagnosis statement is
16   included in your report when you talk about the
17   elimination of other risk factors; is that correct?
18       A.  It is.
19           MS. du PONT:  Object to form.
20           THE WITNESS:  It is, yes.
21   BY MS. FORGIE:
22       Q.  Okay.  And then you were asked several
23   questions about the AHS study.
24           Do you recall those questions?
25       A.  Yes.

Page 145

1        Q.  And do you have criticisms of the AHS study
2    that were included in your general causation report?
3            MS. du PONT:  Object to form.
4            THE WITNESS:  Yes.  I mean, one reason I
5    didn't use the AHS study in this report, it was
6    because I discussed it at length in my general
7    causation report and -- and explained why I didn't
8    place a lot of weight on that study as compared to
9    other studies.  So that's all explained in my
10   general causation report.
11   BY MS. FORGIE:
12       Q.  And that's why you didn't include it in your
13   report for Mrs. Stevick; is that correct?
14       A.  That's correct.
15           MS. du PONT:  Object to form.
16           MS. FORGIE:  I don't have anything
17   further.
18           MS. du PONT:  Just give me five minutes.
19           MS. FORGIE:  Sure.  Do you want to go off
20   the record?
21           MS. du PONT:  Yes, please.
22           MS. FORGIE:  Sure.
23           THE VIDEOGRAPHER:  The time now is
24   12:15 p.m. and we are off the record.
25           (Recess.)

37  (Pages 142 to 145)

Dennis Weisenburger, M.D.

Page 146

1     THE VIDEOGRAPHER:  The time is now 12:22
2   p.m. and we are back on the record.
3         FURTHER EXAMINATION
4   BY MS. du PONT:
5     Q.  Okay.  Doctor, before the break, you were --
6   you responded to a number of questions by Ms. Forgie
7   regarding the NAPP study.
8         Do you recall that?
9     A.  Yes.
10    Q.  And I'm going to mark as Exhibit 16 a
11  presentation about the NAPP study that was given at the
12  CSEB conference in Mississauga, Ontario on June 3, 2015
13  entitled "A Detailed Evaluation of Glyphosate Use and
14  the Risk of Non-Hodgkin lymphoma in the North American
15  Pooled Project."
16        [Reporter requests clarification.]
17    MS. du PONT:  Pooled project.
18    MS. FORGIE:  Do you have a copy for me?
19    MS. du PONT:  Yes.
20    THE WITNESS:  NAPP.
21    (Whereupon Exhibit 16 was marked for
22    identification.)
23    MS. du PONT:  Oh, can I -- that's fine.
24  Thanks.
25  BY MS. du PONT:

Page 147

1     Q.  And we've marked this as Exhibit 16.
2         Is -- is this familiar to you, Doctor?
3     A.  Yes.
4     Q.  And, in fact, this is the reference on your
5   Stevick reliance list.  I think it's reference three.
6     A.  Yes.
7     Q.  And Ms. Forgie had asked you about a -- an
8   abstract that had been peer reviewed, right?
9     A.  Right.
10    MS. FORGIE:  Objection.
11  BY MS. du PONT:
12    Q.  And -- and this is not an abstract, right?
13    A.  No.  This is the present -- there's an
14  abstract that's submitted, and then, if it's
15  accepted, usually you can either have a platform
16  presentation where you prepare a slide deck like
17  this or a poster presentation where you prepare a
18  poster, so there's a -- the abstract is the summary
19  of this data.
20    Q.  But that abstract did not refer to this odds
21  ratio of 2.49, did it?
22    A.  I don't --
23    MS. FORGIE:  Objection.
24    THE WITNESS:  I don't remember whether it
25  did or not.

Page 148

1     MS. du PONT:  Okay.
2     THE WITNESS:  I don't remember.
3   BY MS. du PONT:
4     Q.  But this -- this presentation that was given,
5   this actual document was not peer reviewed, correct?
6     MS. FORGIE:  Objection.
7     THE WITNESS:  Correct.
8   BY MS. du PONT:
9     Q.  And I just want to refer you -- actually,
10  there's not any pages on this PowerPoint presentation,
11  but let me just count them.
12        So on the 13th page of the PowerPoint
13  there is a table that looks at duration, number of
14  years, of glyphosate use and NHL risks.
15        Do you see what page I'm referring to?
16    A.  Yes.
17    Q.  And this is a breakdown that looked at the
18  number of -- it broke it down by number of years, so it
19  looked at 0 years' exposure -- 0 years of glyphosate
20  use, 0 to 3.5 years of glyphosate, and then a greater
21  than 3.5 year use of glyphosate; is that correct?
22    A.  Yes.
23    Q.  And this actually showed a statistically
24  significant increased risk for diffuse large B-cell
25  lymphoma for use between 0 to 3.5 years, but it did not

Page 149

1   show an increased risk for greater than 3.5 years; is
2   that correct?
3     A.  That's correct.
4     Q.  So this does not establish a dose-response
5   relationship -- at least this -- this table that's
6   looking at glyphosate use by years does not establish a
7   dose-response relationship for glyphosate use and NHL,
8   correct?
9     MS. FORGIE:  Objection.
10    THE WITNESS:  That's correct.
11  BY MS. du PONT:
12    Q.  And this analysis did control for other
13  pesticide use, correct?
14    A.  Yes.
15    Q.  And then if you refer to the 15th page where
16  it looks at lifetime days of glyphosate use and NHL
17  risks, do you see that table?
18    A.  Yes.
19    Q.  And here, again, it breaks it down between
20  zero, zero to seven, and then greater than seven days of
21  lifetime use.
22        Do you see that?
23    A.  Yes.
24    Q.  And for diffuse large B-cell lymphoma in this
25  table, there was no statistically significant trend for

38  (Pages 146 to 149)

Dennis Weisenburger, M.D.

Page 150

1    increasing days of use, correct?
2         A.   That's correct.
3              MS. FORGIE:  Objection.
4              THE WITNESS:  That's correct.
5    BY MS. du PONT:
6         Q.   And there -- this, again, was controlled for
7    other pesticide use, correct?
8         A.   Yes.
9              MS. du PONT:  I don't have any further
10   questions at this time.
11             MS. FORGIE:  Nothing.
12             MS. du PONT:  Okay.  We're all set.
13             THE WITNESS:  Okay.  Thank you.
14             MS. du PONT:  Thank you.
15             THE VIDEOGRAPHER:  The time is now
16   12:27 p.m. and we are off the record.
17             (Whereupon we went off the video record
18        but stayed on the official record.)
19             THE REPORTER:  I assume, Counsel, you
20   would like a copy?
21             MS. FORGIE:  Yes.  And he would like to
22   read and sign.
23             MS. du PONT:  We have a standing order.
24             THE WITNESS:  I want one to proof and
25   correct, yeah.

Page 151

1              THE REPORTER:  And, Mark, do you need a
2    copy of the transcript?
3              MR. OUWELEEN:  No.
4         (Whereupon, the deposition adjourned at 12:28 p.m.)
5                        -oOo-
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 152

1
2
3
4
5
6
7
8              I, DENNIS WEISENBURGER, M.D., do hereby
9    declare under penalty of perjury that I have read
10   the foregoing transcript; that I have made any
11   corrections as appear noted, in ink, initialed by
12   me, or attached hereto; that my testimony as
13   contained herein, as corrected, is true and
14   correct.
15        Executed this _____ day of
16   _____, 20____, at
17   _____, _____.
18        (City)              (State)
19
20
21
22
23             _____
               DENNIS WEISENBURGER, M.D.
24             Volume I
25

Page 153

1    STATE OF CALIFORNIA      )
                              )  ss.
2    COUNTY OF LOS ANGELES    )
3
4         I, Elizabeth Borrelli, Certified Shorthand
5    Reporter, Certificate No. 7844, for the State of
6    California, hereby certify:
7         I am the deposition officer that
8    stenographically recorded the testimony in the
9    foregoing deposition;
10        Prior to being examined the deponent was
11   first duly sworn by me;
12        The foregoing transcript is a true record
13   of the testimony given;
14        Before completion of the deposition,
15   review of the transcript [X] was [ ] was not
16   requested.  If requested, any changes made by the
17   deponent (and provided to the reporter) during the
18   period allowed are appended hereto.
19
20   Dated_____.
21
22
23             _____
               ELIZABETH BORRELLI, CSR 7844
24
25

Dennis Weisenburger, M.D.

Page 154

```
1    NAME OF CASE:  Roundup litigation: Stevick v. Monsanto
2    DATE OF DEPOSITION:  Tuesday, December 18, 2018
3    NAME OF WITNESS:  Dennis Weisenburger, M.D.
4    Reason Codes:
5        1. To clarify the record.
6        2. To conform to the facts.
7        3. To correct transcription errors.
8    Page _____ Line _____ Reason _____
9    From _____ to _____
10   Page _____ Line _____ Reason _____
11   From _____ to _____
12   Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
17   From _____ to _____
18   Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
21   From _____ to _____
22
23
24        _____
                Signature of Deponent
25
```

40 (Page 154)