# EXHIBIT 4

CONFIDENTIAL

Page 391

1           SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                FOR THE COUNTY OF SAN FRANCISCO

3    _____

4    DEWAYNE JOHNSON,

5           Plaintiff,

6

        -vs-                         Case No. CGC-16-550128

7

8    MONSANTO COMPANY,

9           Defendant.

     _____

10

11

12          CONFIDENTIAL VIDEOTAPED DEPOSITION OF

13              DR. CHARLES M. BENBROOK

14              9:13 a.m. to 3:28 p.m.

15                February 9, 2018

16                Orange, Virginia

17

18

19

20

21

22

23

24   Job No. 137479

25         REPORTED BY:  Rhonda D. Tuck, RPR, CRR

CONFIDENTIAL

Page 392

1  Confidential Videotaped Deposition of
2  DR. CHARLES M. BENBROOK, taken and transcribed on
3  behalf of the Defendant, by and before Rhonda D.
4  Tuck, RPR, CRR, Notary Public in and for the
5  Commonwealth of Virginia at large, pursuant to the
6  Rules of Civil Procedures for the State of
7  California, and by Notice to Take Depositions;
8  commencing at 9:13 a.m., February 9, 2018, at The
9  Round Hill Inn, 750 Round Hill Drive, Orange,
10 Virginia.
11
12    APPEARANCES OF COUNSEL:
13
14        THE MILLER FIRM
15        The Sherman Building
16        108 Railroad Avenue
17        Orange, Virginia 22960
18     BY:  TIMOTHY LITZENBURG, ESQUIRE
19        JEFFREY TRAVERS, ESQUIRE
20        Counsel for the Plaintiff
21
22
23
24
25

Page 393

1    APPEARANCES OF COUNSEL CONT'D:
2
3        ANDRUS WAGSTAFF
4        19 Belmont Street
5        South Easton, Massachusetts 02375
6     BY:  KATHRYN FORGIE, ESQUIRE
7        Counsel for the Plaintiff
8
9
10
11
12        HOLLINGSWORTH
13        1350 I Street, N.W.
14        Washington, DC 20005
15     BY:  WILLIAM COPLE, III, ESQUIRE
16        GRANT HOLLINGSWORTH, ESQUIRE
17        Counsel for the Defendant
18
19
20
21
22
23
24
25

Page 394

1    APPEARANCES OF COUNSEL CONT'D:
2
3        WINSTON & STRAWN
4        35 W. Wacker Drive
5        Chicago, Illinois 60601
6     BY:  SARAH KRAJEWSKI, ESQUIRE
7        Counsel for the Defendant
8
9
10
11
12
13    ALSO PRESENT:
14     Matthew Henry - Videographer
15
16
17
18
19
20
21
22
23
24
25

Page 395

1        I N D E X
2
WITNESS:  DR. CHARLES M. BENBROOK
3
  Examination by Mr. Cople.............................10
4
  Examination by Mr. Litzenburg........................573
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

CONFIDENTIAL

E X H I B I T S

Benbrook Exhibit Number 18...........................411
EPA Final Rule on Glyphosate; Pesticide Tolerances
Federal Register, 9/27/02

Benbrook Exhibit Number 19...........................456
Letter to ████████ from Dr. Parry, 2/11/99
Benbrook Exhibit Number 20...........................467
40 CFR 152.44 - Application for amended registration

Benbrook Exhibit Number 21...........................467
40 CFR 152.46 - Application for amended registration

Benbrook Exhibit Number 22...........................479
Emails, beginning from Daniel Jenkins,
Subject: RE: glyphosate: bibliography follow
up--second list of studies

Benbrook Exhibit Number 23...........................481
U.S. EPA Memorandum, 4/3/09, Subject: Alkyl Amine
Polyalkoxylates (JITF CST 4 Inert Ingredients)

Benbrook Exhibit Number 24...........................485
TNO Report: "In vitro percutaneous absorption study
with [14C] glyphosate in viable rat skin membranes"

Benbrook Exhibit Number 25...........................491
Part of the EPA regulations providing details in the
implementation of FIFRA

Benbrook Exhibit Number 26...........................491
EPA Federal Register Final Rule Publication, 9/19/97
Benbrook Exhibit Number 27...........................495
EPA 1996 Food Quality Protection Act Implementation Plan

Benbrook Exhibit Number 28...........................502
EPA Final Rule on Glyphosate; Pesticide Tolerances
Federal Register, 4/11/97

Benbrook Exhibit Number 29...........................516
"A Case-Control Study of Non-Hodgkin Lymphoma and
Exposure to Pesticides," Hardell and Eriksson
Benbrook Exhibit Number 30...........................530
"Non-Hodgkin's Lymphoma and Specific Pesticide
Exposures in Men: Cross-Canada Study of Pesticides
and Health," McDuffie, Pahwa, McLaughlin, Spinelli,
Fincham, Dosman, Robson, Skinnider, Choi

Benbrook Exhibit Number 31...........................540
"Glyphosate Use and Cancer Incidence in the
Agricultural Health Study," Andreotti, Koutros, Hofmann,
Sandler, Lubin, Lynch, Lerro, De Roos, Parks, Alavanja,
Silverman, Beane Freeman

Benbrook Exhibit Number 32...........................553
U.S. EPA Memorandum, 12/12/17, Subject: Summary Review
of Recent Analysis of Glyphosate Use and Cancer
Incidence in the Agricultural Health Study

Benbrook Exhibit Number 33...........................570
"Claims of Organic Food's Nutritional Superiority:
A Critical Review By Dr. Joseph D. Rosen"
Benbrook Exhibit Number 34...........................573
"Exposure to Pesticides as Risk Factor for Non-Hodgkin's
Lymphoma and Hairy Cell Leukemia: Pooled Analysis of
Two Swedish Case-control Studies," Hardell, Eriksson,
Nordstrom
Benbrook Exhibit Number 35...........................578
Surfactant Issue Analysis

Benbrook Exhibit Number 36...........................578
Operator exposure assessment for MON 2139 - UK - Case

* * * * *

(9:13 a.m., February 9, 2018)

THE VIDEOGRAPHER:  This is the start of
Media Label Number 2 of the video-recorded
deposition of Dr. Charles Benbrook, in the
matter of Dewayne Johnson versus Monsanto
Company, in the Superior Court for the State of
California, for the County of San Francisco,
Case Number CGC-16-550128.

This deposition is being held at
750 Round Hill Road, Orange, Virginia,
February 9, 2018, at approximately 9:13 a.m.

My name is Matthew Henry.  I'm the legal
video specialist with TSG Reporting.  The court
reporter is Rhonda Tuck, in association with TSG
Reporting.

Counsel, please introduce yourselves.

MR. LITZENBURG:  Timothy Litzenburg, for
Dewayne Johnson.

MS. FORGIE:  Kathryn Forgie, Andrus
Wagstaff.

MR. COPLE:  William Cople and Grant
Hollingsworth, both of Hollingsworth LLP, for
Monsanto Company.

MS. KRAJEWSKI:  Sarah Krajewski, for

CONFIDENTIAL

## Page 400

1   Monsanto Company.
2       MR. COPLE:  Good morning, sir.
3       THE WITNESS:  Good morning.
4       MR. COPLE:  We were talking yesterday --
5   excuse me.
6       THE COURT REPORTER:  Did you want me to
7   re-administer the oath, sir?
8       MR. COPLE:  Yes.
9
10       DR. CHARLES M. BENBROOK
11   was first duly sworn and testified as follows:
12       E X A M I N A T I O N
13   BY MR. COPLE:
14   Q.   Now that we got that part out of the way.
15   A.   Good.  And we have a federal budget and a
16   federal government, which is also a relief.
17   Q.   Always good to hear.
18       You were talking yesterday about labeling
19   and labeling claims.  The EPA has said in various
20   contexts that label directions and precautions
21   translate the OPP risk assessments into the who, the
22   how, the where, and the when that a product can be
23   used safely and effectively.
24       Do you agree with that statement?
25   A.   That's certainly EPA's hope and intention

## Page 401

1   and what they strive to achieve based on the extent
2   to which the EPA accurately understands the way the
3   products are going to be used and the factors that
4   go into their risk assessments.
5   Q.   So you would agree that the label
6   directions approved by EPA and the cautions that are
7   in those labels reflect or incorporate the human
8   risk assessments done by EPA, correct?
9   A.   Well, I think EPA would say that they're
10   supported by the risk assessments, but the label
11   directions are no better or worse than the accuracy
12   of the underlying data and the risk assessment.  So
13   there's -- you know, the EPA does its best to
14   calculate risk accurately, but it is reliant largely
15   on data submitted by the companies.
16       So to the extent that the data submitted
17   by companies does not support or allow an accurate
18   estimation of risk, the EPA has no independent
19   source of information to calculate more accurate
20   estimates.  So if there's flaws in the data or the
21   methodology, either on the company side or in what
22   EPA does with the numbers and the data provided by
23   the company, those inaccuracies or failure to
24   understand all the risk will be reflected in the
25   labels.

## Page 402

1   Q.   EPA in making its risk assessments for
2   chemicals' carcinogenicity relies on both the data
3   submissions by the registrant applicants as well as
4   the open literature on science carcinogenicity and
5   anything that's related to that, right?
6   A.   They place by far greater weight, and
7   certainly in this case, on the long-term chronic
8   feeding studies done under their data requirements
9   and in accord with GOPs, and they placed -- I'm
10   not -- I don't think they placed any weight on any
11   of the open literature two-year cancer studies that
12   have been published, and they certainly didn't place
13   much weight on the genotoxicity studies.
14   Q.   You're aware that they considered '95 or
15   '94 genotoxicity studies in reaching their
16   conclusion at EPA in 2017, that glyphosate is not a
17   human carcinogen, right?
18       MR. LITZENBURG:  I object to form.
19       THE WITNESS:  That is what one of their
20   reports says, yes.
21   BY MR. COPLE:
22   Q.   And you're aware -- I think you said you
23   are aware that considerable weight was placed by EPA
24   on the updated valuation and the Agricultural Health
25   Study by Andreotti, et al.?

## Page 403

1   A.   They cite that study in their more recent
2   assessments, yes.
3   Q.   Both of those are open literature
4   sources, correct?
5   A.   Correct.
6   Q.   All right.  The labeling directions that
7   we're talking about now that reflect the risk
8   assessment, they're based upon the acute toxicity
9   studies that are done on formulated products for the
10   registrant?
11   A.   Certainly, those acute toxicity studies
12   play an important role in the mixer, loader, and
13   applicator exposure assessments and labeling
14   directions and precautions, yes.
15   Q.   And the toxicity assessments of a
16   formulated product, correct, by EPA?
17   A.   Yes.
18   Q.   Let's go to -- let's go to Page 44 of
19   your expert report, which is I believe Exhibit 4, if
20   I recall.
21   A.   Okay.
22   Q.   All right.  In Paragraph Number 225, your
23   report says that EPA was formed in 1972, and it goes
24   on to say by you that according to a '94 EPA
25   document, cancer risk has been -- had been at that

CONFIDENTIAL

Page 404

1  point in the agency's history the most commonly
2  cited reason for OPP pesticide cancellation and
3  suspension actions.
4      Now, my question is, you agree that
5  glyphosate, glyphosate-based formulations like
6  Roundup and Ranger Pro have never been the subject
7  of a cancellation -- suspension or cancellation
8  proceedings by EPA.
9      MR. LITZENBURG:  Form.
10     THE WITNESS:  That's correct.
11 BY MR. COPLE:
12     Q.   And that's correct throughout the entire
13 40-plus years that a registration has been proved by
14 EPA for glyphosate since 1974?
15     A.   Correct.
16     Q.   And during the timeframe, at least up to
17 your point that you made in Paragraph 224, 225 of
18 1994, there were other chemicals or active
19 ingredients in pesticides that may have been subject
20 of cancellation or suspension proceedings for their
21 registration for EPA, right?
22     A.   Correct.
23     Q.   Let's go to Page 127.
24     A.   Okay.
25     Q.   And in Paragraph 661, at the top of that

Page 405

1  page --
2      A.   Let me just get acclimated to where the
3  heck we are.  661?
4      Q.   Yes.
5      A.   Okay.
6      Q.   In 661, you say that "Monsanto knew there
7  would be major increases in glyphosate plus AMPA
8  residues in several major food crops, and that these
9  residues would require much higher tolerances, which
10 in turn would force regulators to update dietary
11 exposure and risk assessments, and revisit past
12 judgments that overall exposures to glyphosate and
13 its major metabolite, AMPA, did not propose
14 unacceptable levels of risk to humans."
15     Now, glyphosate has been approved by EPA
16 for use in 130 crops; is that correct?
17     A.   Approximately.  And as you know, EPA has
18 changed the way it establishes tolerances in
19 general, moving away from establishing tolerances
20 for an individual crop like bib lettuce and instead
21 establishing tolerance for a group of closely
22 related crops.
23     So over time, the number of tolerances
24 has gone down, but actually, the number of distinct
25 fruits and vegetables covered by published

Page 406

1  tolerances has increased.
2      Q.   All right.  So that would translate, at
3  least generally, into 130 different tolerance
4  approvals by glyphosate, but it might cover more
5  than 130 different crops, right?
6      A.   No.  No.
7      Q.   What are you saying?
8      A.   Most of the tolerance petitions that --
9  if I understand your question correctly, there
10 weren't 130 separate tolerance petitions.  There --
11 most tolerance petitions submitted by Monsanto
12 request the agency to establish tolerances for
13 multiple crops, and some of them requested
14 tolerances for even a few dozen.  So there isn't a
15 specific tolerance petition and action for each
16 individual crop.
17     Q.   I don't -- the clarification is fine,
18 sir.
19     A.   Okay.
20     Q.   But I don't think that's what I was
21 asking.
22     A.   Well, that's how I heard your question.
23     Q.   I think I'm agreeing with you.
24     A.   Okay.
25     Q.   I just want to be sure.

Page 407

1      A.   Let's move on.
2      Q.   That there have been 130 tolerance
3  approvals for glyphosate by EPA, but that may
4  encompass more than 130 crops?
5      A.   Correct.
6      Q.   Then we are in agreement.
7      Have you reviewed all of those tolerance
8  approvals?
9      A.   Every one that I could find, and I didn't
10 spend a lot of time reviewing some of the so-called
11 IR4 tolerance petitions.  Do you want me to explain
12 what that is?
13     Q.   No.  I just want to know if you reviewed
14 them or not.
15     A.   Yes.  I've reviewed the vast majority of
16 them.
17     Q.   And you've reviewed them for purposes of
18 preparing your expert report?
19     A.   No.  No.  I have -- I had -- I had
20 reviewed all of them prior to being asked to take on
21 this assignment for other analytical work that I've
22 been doing on the history of glyphosate, the
23 glyphosate-based herbicide regulation, and I've
24 published an assessment of changes in glyphosate
25 tolerances over time in several major crops from the

CONFIDENTIAL

Page 408

1 late '70s until the current day.
2 I have followed very closely the
3 tolerance petitions submitted by Monsanto to support
4 the new preharvest so-called crop burn-down or
5 desiccation uses of glyphosate-based herbicides on a
6 wide range of crops, in particular wheat, barley,
7 oats, edible beans, which is one of the new ways
8 that glyphosate-based herbicides are now used in the
9 United States that have -- that has substantially
10 increased dietary exposure and is no doubt
11 responsible for the rising levels of glyphosate and
12 AMPA residues in human fluids.
13 Q. Have you reviewed any of those 130
14 tolerances for purposes of preparing your report?
15 A. Well, I didn't need to, because I know
16 them, and that's part of the knowledge that I
17 brought to this case from 35 years in this field.
18 Q. All right. These higher residue
19 tolerances that you speak to in Paragraph
20 Number 661, that would require, then, EPA in doing
21 the tolerance review and approval for the crops
22 regarding glyphosate residue to take into account
23 the overall risk exposure to glyphosate from all
24 sources, right?
25 MR. LITZENBURG: Form.

Page 409

1 THE WITNESS: The EPA carried out its
2 standard assessment in response to the receipt
3 of these tolerance petitions, and at each point
4 in time when new or higher tolerances were
5 requested, the residue chemistry branch would do
6 an assessment of whether the proposed tolerance
7 is adequate to cover the residues that the
8 agency felt might result in a harvested crop.
9 And then the toxicology branch would do
10 an assessment of the increase in dietary
11 exposure associated with the approval of the
12 additional tolerance and sort of add that
13 additional portion of exposure into what's
14 called the "risk cup" or compare the updated
15 estimate of a dietary exposure to the chronic
16 reference dose. And if the total estimated
17 exposure from all routes did not exceed the
18 chronic reference dose, it would be standard EPA
19 policy to approve the tolerance.
20 BY MR. COPLE:
21 Q. So each tolerance approval -- it takes
22 into account all of these different routes of
23 exposure -- would represent a finding by EPA of that
24 glyphosate is not a human carcinogen, correct?
25 A. That would -- that statement would be in

Page 410

1 general true, probably from 1998 on. The statutory
2 authority and mandate for EPA to conduct cumulative
3 total dietary, cumulative risk assessments involving
4 all routes of exposure was put into federal law in
5 1996, Food Quality Protection Act.
6 So all of the tolerance petitions from
7 about 1998, it took EPA a couple of years to fully
8 -- to get these new provisions of the science
9 policies needed to implement the FQPA -- to get them
10 in place. But, you know, I would say by the late
11 1990s, all of the final rules establishing new
12 tolerances for glyphosate-based herbicides or any
13 pesticide would include a section talking about
14 the aggregate exposure from food, water, inhalation, and
15 would compare that aggregate exposure level to the
16 chronic reference dose or the chronic path, if one
17 had been established. That would be the basis for
18 approval of the tolerances.
19 Q. Which could include evaluation of any
20 human carcinogen, right?
21 A. Right. If a pesticide was classified as
22 a carcinogen, it would be standard EPA policy to do
23 an oncogenic risk assessment which would tolerate
24 the number of excess cancer cases in the human
25 population, as opposed to comparing the aggregate

Page 411

1 exposure to the chronic reference dose or the
2 chronic path.
3 MR. COPLE: Let's mark Exhibit 18.
4 (Benbrook Exhibit Number 18 is marked for
5 identification.)
6 BY MR. COPLE:
7 Q. We've marked as Exhibit 18 the EPA final
8 rule on glyphosate pesticide tolerances that was in
9 the Federal Register for September 27, 2002.
10 Are you familiar with this document?
11 A. Yes.
12 Q. You've reviewed this document in
13 preparing your opinions and your expert report in
14 this case?
15 A. No, not in the specific work for this
16 case. I had worked with this document earlier in
17 2017, though, before I was retained to work on this
18 case.
19 Q. You said you -- as I recall, you said
20 yesterday, Dr. Benbrook, that before you got to the
21 point of doing your writing up of your report, that
22 you had done a great deal of research pertaining to
23 glyphosate. Was that research specifically in
24 connection with your getting ready to write your
25 report?

CONFIDENTIAL

Page 412

1    A.   No.
2    Q.   So that was for other purposes unrelated
3 to -- to this report that we're looking at now,
4 right?
5    A.   When I did my most recent intensive dive
6 into all tolerance actions involving glyphosate and
7 glyphosate-based herbicides, I had no -- I had not
8 talked to any lawyer about these cases.  I had no
9 involvement, no expectation of involvement, and I
10 did it for an entirely different purpose, which is
11 the ongoing research and writing in peer-reviewed
12 publications about glyphosate use, risks, regulatory
13 actions including setting tolerance levels, making a
14 determination on the oncogenicity of glyphosate and
15 the setting of the chronic reference dose for
16 glyphosate and glyphosate-based herbicides.
17        As you know, I have published papers that
18 address these topics, and it's an area of work that
19 I am quite certain I will continue pursuing as -- as
20 new actions and developments and new science
21 emerges.
22    Q.   Did you review either Exhibit 18 or any
23 glyphosate pesticide tolerance in 2016, before you
24 issued your expert report?
25    A.   Yes.

Page 413

1    Q.   Was that review done specifically for the
2 expert report?
3    A.   No.  Is there something -- am I not
4 making myself clear?
5        I was called in September, late September
6 of 2016, about this case.  I didn't know anything
7 about it before.  So any work that I did on any
8 aspect of glyphosate, glyphosate-based herbicides,
9 was not associated with my preparation for this
10 case.
11    Q.   All right.  On Page 60935, the top of
12 Exhibit 18, the second page.
13    A.   Yes.
14    Q.   There's a Subsection B, the Toxicological
15 Profile.  And just to clarify, you're not a food
16 toxicologist, correct?
17    A.   No, I'm not.
18    Q.   You don't have training or education in
19 that field, right?
20    A.   No.
21    Q.   Under this Toxicology Profile, there is a
22 comment, and you're familiar with the public
23 comments and agency response procedure for issuing
24 agency rules, correct?
25    A.   Yes, I am.

Page 414

1    Q.   Under the Comment, there is one that says
2 that -- the comment is "This is correct."
3        And it's responding to what the notice
4 states: "Acute toxicity.  Several acute toxicology
5 studies place technical-grade glyphosate in Toxicity
6 Category III and Toxicity Category IV."
7        Do you know what those toxicity
8 categories are?
9    A.   Yes.
10    Q.   What are they?
11    A.   They're -- they're based on ranges of
12 the -- typically, the LD50 study in mice or rats.
13 They range from low toxicity, which I believe the
14 agency doesn't require any study to go above 1,000
15 parts per million in such a study, so that's often a
16 cutoff.  And then the ranges -- the rating of acute
17 toxicity goes up as the LD50 range goes down.
18    Q.   All right.  Now, the comment says, "That
19 is correct," that the agency's notice about acute
20 toxicity and technical-grade glyphosate.
21        It and goes on to say, "Toxicity Category
22 III means caution.  But most toxicology studies are
23 conducted using glyphosate alone, not the
24 formulations that are in commercial products, which
25 contain so-called inert ingredients.  Roundup, which

Page 415

1 contains glyphosate and the surfactant POEA, is
2 three times" -- and according to this comment -- "is
3 three times as acutely toxic to rats as glyphosate
4 alone," and concludes the comment by saying, "This
5 deficiency in the regulation needs to be corrected."
6        You see all that, right?
7    A.   Yes.
8    Q.   The agency, EPA, says in response to it,
9 as part of their final rule being issued for
10 glyphosate residue tolerance, that "This action
11 establishes," meaning the agency's action,
12 "establishes the tolerance for glyphosate, not the
13 inert POEA.  POEA is regulated separately under the
14 Federal Food, Drug, and Cosmetic Act and has been
15 approved by EPA," and it goes on to talk about more
16 aspects of POEA.
17        So EPA has separately approved POEA as a
18 surfactant to be used by a herbicide manufacturer,
19 correct?
20    A.   That's correct.
21    Q.   Now, if you read further down in this
22 continued response, two sentences from the bottom of
23 this column, this is right after it says, "EPA
24 evaluates the potential risks posed by inert
25 ingredients such as POEA," then the agency goes on

CONFIDENTIAL

Page 416

1 to say that the EPA "requires a full disclosure of
2 inert ingredients for each Roundup formulation to
3 determine acute toxicity such as acute oral, eye,
4 skin, inhalation, and dermal sensitization.  The
5 combined effects of active and inert ingredients on
6 a product's acute toxicity properties are reviewed
7 by the agency and used to define the appropriate
8 personal protective equipment and precautionary
9 statements for each pesticide end-use product label
10 that will provide adequate protection to users."
11        You see all that, correct?
12     A.   Yes, sir.
13     Q.   All right.  The agency is telling the
14 commenter and the entire world that it has reviewed
15 all of these issues in order to determine acute
16 toxicity, and specifically with regard to developing
17 any required PPE and precautionary statements, and
18 all of that goes into the product label for the
19 formulation.  That's correct, right?
20        MR. LITZENBURG:  Form.
21        THE WITNESS:  I -- I think that this
22 question gets at the heart of one of the most
23 important issues in the case, and we talked
24 yesterday about the six-pack, the six acute
25 toxicity studies that the agency does require on

Page 417

1 formulated products.
2        And as the clear language states here,
3 the EPA takes into account those six acute
4 studies in assessing of what sort of eye
5 irritation, skin irritation, or other acute
6 caution or warning statements need to appear on
7 the label.  And that's also what they rely on in
8 determining what sort of PPE are -- need to be
9 required to protect the mixer/loader or
10 applicator of a pesticide from these acute
11 risks.
12        Obviously, in the case of
13 glyphosate-based herbicides, there's been
14 ongoing concern about eye and skin irritation
15 from the early '80s, when the Blondell report
16 from California came in.  But what this also
17 makes very clear is that EPA does not and did
18 not take into account the heightened
19 genotoxicity of formulated glyphosate-based
20 herbicides in considering the establishment of
21 these tolerances, and they also do not and have
22 not considered the heightened level of human
23 risk because of the genotoxicity of formulated
24 glyphosate-based herbicides.
25        And this is exactly why ██████████████

Page 418

1 in an email to his colleagues, said, in effect,
2 why don't we just phase out POEA surfactants,
3 because we know that the products that contain
4 them are hazardous and that we have the
5 capability to produce a less toxic product?
6        Now, the person that made this comment I
7 suspect has not had the opportunity I have had
8 to carefully review the scientific information
9 in the possession of Monsanto.
10        The understanding that Monsanto had of
11 the additional risk, the added risk that they
12 knew was associated with the use of their
13 products, that the EPA did not know about and
14 did not include in its assessments.
15        And so I understand exactly what they're
16 saying here, but I feel that this is a good
17 example of where Monsanto's failure to provide
18 essential information in its possession to the
19 EPA in a timely way undermined the accuracy of
20 EPA worker, mixer/loader and applicator exposure
21 assessments, and also led to some of these
22 tolerances being approved that perhaps might not
23 have been approved if EPA fully had understood
24 how the information in Monsanto's possession
25 from the late '90s on would have almost

Page 419

1 certainly changed its risk assessments.
2 BY MR. COPLE:
3     Q.   Did you talk to ████████ about the
4 statement you just referenced in the company
5 document?
6     A.   No.
7     Q.   Did you talk to anyone at Monsanto about
8 ████████████ understanding or anyone else's
9 understanding at the company about the statements
10 made in the document?
11     A.   No.  I just read his email.
12     Q.   And formed your own personal opinion
13 about what it means?
14     A.   There's no opinion involved.  It's a
15 declarative sentence.
16     Q.   Now, with respect --
17     A.   There's no opinion whatsoever in
18 interpretation of that email.
19     Q.   Now, with respect --
20     A.   I'd be glad to pull it up and talk about
21 it with you.
22     Q.   With respect to what EPA information,
23 agency information EPA had from the registration
24 submission or from its own review, did you discuss
25 with anyone at EPA what information the agency had

CONFIDENTIAL

Page 420

1  at the time of this 2002 pesticide residue tolerance
2  approval for glyphosate?
3       A.    No. I just read all of the EPA documents
4  from that era and earlier era and, subsequent to
5  that, certainly all of the tolerance petitions, and
6  that's how -- that's how people learn about and gain
7  insight on the agency's position, risk assessments,
8  and the basis for the regulatory decisions.
9       Q.    Now, if you go further down, there is a
10 comment in response to genotoxicity mutagenicity.
11 Do you see that?
12      A.    Yes.
13      Q.    And if you go about almost halfway down
14 in the agency's response, starting with the words --
15 we're in the right-hand column of this page, starts
16 with the words "Based on the negative responses."
17      Do you see that?
18      A.    Yes.
19      Q.    It says, "Based on the negative responses
20 observed in well validated assays conducted
21 according to the required test guidelines and in
22 compliance with Good Laboratory Practice" -- I think
23 that's EPA's good laboratory practice -- "Standards,
24 the agency concluded that the active ingredient
25 pesticide, glyphosate, is neither mutagenic or

Page 421

1  clastogenic."
2       You knew that, right?
3       A.    Yes, sir.
4       Q.    It goes on in its response by the agency
5  to say that "Several studies have tested herbicide
6  formulations, including Roundup, for
7  mutagenic/genotoxic potential.  Although positive
8  responses have been reported, the testing systems
9  used in the cited studies may not be adequate for
10 regulatory purposes for one or more of the following
11 reasons."
12      And it lists a series of reasons,
13 including unvalidated test systems, that have not
14 established predictability based on broad
15 experience, first; second, undocumented,
16 uncharacterized test materials; third, administered
17 doses that cannot be correlated to expected
18 exposures; fourth, routes of exposure that vary from
19 required test protocols; and then, fifth, results
20 that address endpoints which do not have a clear
21 accepted relationship to human disease; and then,
22 sixth, deficient methodologies.
23      So EPA is telling the commenter and the
24 world that it was aware of these various genotoxic
25 studies and has concluded that it is not relevant to

Page 422

1  human disease because it has no accepted
2  relationship.
3       MR. LITZENBURG:  Form.
4       THE WITNESS:  Are you done?
5       MR. LITZENBURG:  Is that a question?
6       THE WITNESS:  Well, yes, I take it as a
7  question, because I'm going to respond to it.
8       These six reasons cited in this tolerance
9  petition -- and let's note for the record this
10 is September 27th, 2002.  So given the time it
11 takes for any new science to be incorporated in
12 EPA risk assessments, this probably might
13 include science that came into the agency in
14 2001, but certainly it reflects scientific
15 knowledge, say, in early 2002.
16      These six reasons are the standard
17 critiques of the more modern and sensitive
18 genotoxicity studies that appear in various
19 peer-reviewed journal articles, many written by
20 either Monsanto scientists or consultants to
21 Monsanto or ghostwritten by Monsanto scientists
22 and published under the names of other people.
23      The company was engaged in, certainly by
24 this time, almost a decade-long campaign to
25 defend the judgment of regulatory agencies that

Page 423

1  glyphosate and glyphosate-based herbicides were
2  not genotoxic, because that was a critical
3  scientific determination that played a
4  significant role in the judgment of the same
5  regulatory agencies relative to the potential of
6  glyphosate and glyphosate-based herbicides to
7  cause cancer.
8       So there were many activities undertaken
9  by Monsanto in the 1990s, in the years just
10 before this particular tolerance action, to try
11 to develop a more in-depth understanding within
12 the company of how, quote/unquote, exposed they
13 were, how serious a threat to the glyphosate
14 freedom to operate, which is a code word inside
15 Monsanto for ability to sell its branded
16 products in whatever markets it wants under any
17 circumstances that it can get a regulatory
18 agency to approve.
19      They were so deeply concerned about the
20 threat to the glyphosate freedom to operate
21 posed by the new evidence coming into the
22 peer-reviewed scientific literature that it
23 reached out and hired as a consultant one of the
24 unarguably world-renowned genotoxicity experts,
25 Dr. Parry, who was affiliated with a university

CONFIDENTIAL

Page 424

1 in the U.K.
2     We've talked a little bit about the Parry
3 report yesterday. But let me emphasize that the
4 Parry report done by contract for Monsanto and
5 submitted to Monsanto clearly is in disagreement
6 with these conclusions that the EPA is stating
7 about the genotoxicity studies that the agency
8 had reviewed at that time.
9     Had the -- had Monsanto submitted to EPA
10 under FIFRA Section 6(a)(2) the Parry contract
11 report including his conclusion that there were
12 at least six, maybe seven studies in the
13 literature that showed clear evidence of
14 genotoxicity from exposures to glyphosate-based
15 herbicides and/or glyphosate, as I believe the
16 agency was obligated -- as I believe Monsanto
17 was obligated to do, I think that would have had
18 impact on the agency's read of this published
19 literature.
20     So I -- I understand what the agency is
21 saying. I also feel that the agency was --
22 reached this decision based on an inadequate
23 understanding of what Monsanto itself understood
24 about its products, and had Monsanto been more
25 forthcoming and, frankly, honest about what it

Page 425

1 knew about the risks, particularly of its
2 Roundup-formulated products containing POEA,
3 that this passage in this 2002 tolerance action
4 by EPA would have been different.
5     And I can certainly say that within
6 another -- by 2004, there were another six or
7 seven positive genotoxicity studies that had
8 been published in the open, peer-reviewed
9 literature, and I would guess if you stick
10 another final rule on a tolerance action dated
11 2008, it's going to say essentially the same
12 thing, because, you know, based on my review of
13 these contemporary risk assessments, EPA is
14 still stating its position that it sees no
15 evidence of genotoxicity from exposure to
16 glyphosate-based herbicides, despite the fact
17 that Dr. Parry thought there was already
18 evidence in 1999, and since then, there's been
19 literally dozens of additional studies that
20 support that view.
21 BY MR. COPLE:
22     Q.   None of that's responsive to what I
23 asked, Doctor. I simply asked, according to the
24 statement here in the 2002 final rule issued by the
25 agency, the agency was aware of the genotoxicity

Page 426

1 studies and concluded that it was not relevant to
2 human disease. That's what it says, right?
3     MR. LITZENBURG:   Form. Asked and
4 answered.
5 BY MR. COPLE:
6     Q.   That's what it says, right?
7     A.   Yes. You are a good reader.
8     Q.   All right. Now, you just claimed, or I
9 think I heard you claim, that EPA, in doing its
10 glyphosate pesticide tolerance review, did not take
11 into account genotoxicity studies.
12     Is that what you said?
13     A.   No, it's not what I said.
14     Q.   So it does. You agree EPA took it into
15 account and said that it took it into account?
16     A.   Yes.
17     Q.   All right.
18     A.   They claim that they did, but they didn't
19 take into account Dr. Parry's report, which they
20 should have had.
21     Q.   Again, you never spoke to Dr. Parry at
22 any time about his report, and he's now deceased,
23 right?
24     A.   Correct.
25     Q.   And you never spoke to anybody at

Page 427

1 Monsanto that had communications with Dr. Parry
2 about his review?
3     A.   No, I have not.
4     Q.   All right. And you're not an expert in
5 genotoxicity. I think you agreed to that yesterday?
6     A.   I did.
7     Q.   And you're not an expert in reporting
8 under 682 of FIFRA to EPA, right?
9     A.   I -- well, you know, I guess I'm not
10 trained as a lawyer, but I have worked on the
11 statute. I contributed to amendments during my tour
12 of duty as the staff director of the subcommittee
13 with jurisdiction over that federal law. I have
14 been involved in assessing dozens of 6(a)(2)(B)
15 submissions to the EPA. I have reviewed some of the
16 submissions that Monsanto has made over the years,
17 including one associated with this case.
18     So yes, I am an expert in the
19 requirements of 6(a)(2)(B) and the important role
20 that 6(a)(2)(B) plays in the ongoing assessment of
21 pesticide risks, so that when the EPA makes a
22 decision in response to either a tolerance petition,
23 an application for a new use of a pesticide or a
24 change use pattern, like, for example, the changes
25 in the Roundup label to allow preharvest desiccate

CONFIDENTIAL

Page 428

1  uses, that the agency has the most current and
2  complete and best information available to reach its
3  judgments.
4          And as I state in my expert report, in
5  the case of -- in several instances, in the case of
6  dealing with glyphosate and glyphosate-based
7  herbicides, the agency did not have the most
8  up-to-date and best information to make those
9  judgments.
10     Q.    You have no training or education in
11  6(a)(2) reporting under FIFRA, right?
12         MR. LITZENBURG:  Asked and answered.
13         THE WITNESS:  There is no such training
14  offered in 6(a)(2)(B), sir.  It's a small
15  provision and a very large federal statute, and
16  I don't believe you can point to any college
17  class on 6(a)(2)(B).
18  BY MR. COPLE:
19     Q.    You agree you don't have any training,
20  right?
21         MR. LITZENBURG:  Asked and answered.
22         If you don't have any further answer, you
23  don't have to give one.
24         THE WITNESS:  Let's move on.
25  BY MR. COPLE:

Page 429

1     Q.    You're not agreeing?  We'll take that as
2  a yes, you have no training or education in 6(a)(2),
3  because you said it doesn't exist.  Correct?
4     A.    Yeah.
5     Q.    All right.
6     A.    And you knew it didn't exist.
7     Q.    All right.
8     A.    I don't understand why you keep asking me
9  these questions.  I'd like to go home.
10     Q.    Did you ever work at EPA on 6(a)(2)
11  evaluations by the agency?
12     A.    You've already established in earlier
13  questioning that I have not worked with the EPA on
14  anything.
15         So, yes, I have not worked on 6(a)(2)(B)
16  as an employee of EPA.
17     Q.    You've mentioned ghostwriting a number of
18  times, both in your testimony yesterday and now
19  again today in various places in your report.
20  You're not an expert in ghostwriting, are you?
21         MR. LITZENBURG:  Form.
22         THE WITNESS:  Yes, I am.  I am an expert.
23  BY MR. COPLE:
24     Q.    You've been trained and educated in what
25  constitutes ghostwriting and what significance it

Page 430

1  might have?
2     A.    There is no such training available, and
3  given my 40-year career in assessing the quality and
4  integrity of scientific research, first for the U.S.
5  Congress, then for the National Academy of Sciences,
6  for a number of national and international
7  institutions, for a number of clients including
8  major corporations and consumer and environmental
9  groups, the assessment of the quality and integrity
10  of science through the peer-reviewed process and the
11  publication process is something that I consider
12  myself an expert in.  Yes, sir.
13     Q.    So all that's self-taught, your expertise
14  in what constitutes ghostwriting and what the
15  significance of it might be?
16         MR. LITZENBURG:  Form.  Asked and
17  answered, a hundred times.
18         MR. COPLE:  Not about ghostwriting.
19  BY MR. COPLE:
20     Q.    Is it all self-taught?
21     A.    It is experience that I gained through my
22  research and experience in work, and if that's what
23  you consider self-taught knowledge, then, yes, I
24  will agree to that.
25     Q.    You've also commented a number of times,

Page 431

1  both in your report and now again today at least
2  once, about whether a particular individual or
3  company, whether it be Monsanto or anybody else of
4  the agency, is honesty.
5          Are you claiming you're an expert in
6  honesty?
7     A.    Yes.  Yes.  I'm an expert in honesty.
8     Q.    You were trained and educated in what
9  constitutes honesty under different circumstances
10  and what the significance is if it's not honest?
11         MR. LITZENBURG:  Form.
12         THE WITNESS:  I have over a long
13  professional career been responsible for
14  assessing the completeness, credibility,
15  accuracy, honesty of the actions of pesticide
16  companies, pesticide regulators, consultants
17  that work for the pesticide industry,
18  organizations that are regarded as stakeholders
19  that develop and submit information to try to
20  support a given outcome; and I have in multiple
21  circumstances been asked to evaluate the
22  quality, integrity, and honesty and accuracy of
23  information presented in the context of the
24  pesticide regulatory process.
25         So yes, based on my long personal

CONFIDENTIAL

Page 432

1    experience, I think I know as much and have as
2    solid a foundation to judge the honesty of
3    actions of a pesticide company, a regulator, or
4    a non-governmental organization as anyone
5    currently active in the field.
6    BY MR. COPLE:
7        Q.    Are you saying that a court has qualified
8    you as an expert in the field of honesty or what's
9    honest and what's not?
10        MR. LITZENBURG:  Asked and answered.
11        THE WITNESS:  I have -- I'm not aware
12    that any court has rendered such a judgment on
13    me.
14    BY MR. COPLE:
15        Q.    Has any organization recognized you by
16    certification or other means --
17        MR. LITZENBURG:  Form.  Argumentative.
18    BY MR. COPLE:
19        Q.    -- as an expert in honesty?
20        A.    I am not aware of any organizations that
21    provide such certification or acknowledgment on the
22    question of honesty.  So no, I'm not aware of anyone
23    that has received such certification or specific
24    training.
25        Q.    Let's go to -- we're still with this

Page 433

1    Exhibit 18.  Go to 60936.  The numbers are up at the
2    top, Federal Register page numbers.
3        A.    936, you said?
4        Q.    Yes, sir.  And in the far right-hand
5    column, the public comments and EPA responses
6    continue, and this time it's under Subheading 6 on
7    cancer.
8        It starts out with "Cancer.  Unit C.3.ii.
9    of the notice states:  There is no evidence of
10    carcinogenic potential."
11        Now, this is a reference to the original
12    notice of rule making by EPA on the glyphosate as
13    pesticide residue tolerance, correct?
14        A.    Yes, sir.
15        Q.    All right.  The comment in response to
16    that notice statement that there is no evidence of
17    carcinogenic potential says, "This is false.  A
18    recent Swedish study of hairy cell leukemia, a form
19    of non-Hodgkin's lymphoma cancer, found that people
20    who were occupationally exposed to glyphosate
21    herbicides had a threefold higher risk of hairy cell
22    leukemia.  A similar study of people with
23    non-Hodgkin's lymphoma found exposure to glyphosate
24    was associated with an increase risk of about the
25    same size."

Page 434

1        Now, is this one of the studies that you
2    reference in your report?
3        A.    Both of the studies are referenced in my
4    report.
5        Q.    So you --
6        A.    There's two different, separate studies
7    that are behind this commenter's comment.  And I
8    know which ones they are, and they are referenced in
9    my report.
10        Q.    Those would be the Hardell studies out of
11    Sweden?
12        A.    Yeah, it's the second Hardell study and
13    the McDuffie study or studies from Canada.
14        Q.    All right.  Now, EPA responds to that
15    comment.  "The commenters are referring to two
16    epidemiology studies published by Sweden."
17        As you said, there's two, and you --
18        A.    I don't -- I think the agency has
19    misinterpreted the commenter.  A similar study of
20    people with non-Hodgkin's lymphoma, I would guess
21    that's the McDuffie study, because it's from a
22    different cohort.  If the commenter was speaking
23    about the two Hardell-Eriksson studies, I think he
24    would have said another study by the same group, and
25    then it would have been clear that that's what he

Page 435

1    was referring to.
2        But certainly my reading of this is that
3    this commenter is -- is alerting the agency that
4    there's two separate studies in completely different
5    cohorts, one in Canada and one in Sweden, that
6    report fairly similar increased odds ratios, which
7    is a true statement.
8        Q.    Now, you talked to EPA about what you
9    believe is their misinterpretation of this public
10    comment?
11        A.    I have not talked to anyone in the EPA
12    since -- or anyone in Monsanto since I began work on
13    this, so you don't have to ask me that again.
14        Q.    Well, this is --
15        A.    Unless you just want to be annoying.
16        Q.    This is from 2002, sir.
17        A.    Let's say --
18        Q.    Well before the time --
19        A.    I have not talked to anyone in EPA or
20    Monsanto since 2000 about the oncogenicity of
21    glyphosate, so say that.
22        Q.    The agency goes on to say, "This type of
23    epidemiologic evaluation does not establish a
24    definitive link to cancer."
25        So that's the agency's view of these two

CONFIDENTIAL

Page 436

1  studies, right?
2      A.    That's what they just wrote, yes.
3      Q.    All right.  It goes on to say that "This
4  information has limitations because it is based
5  solely on unverified recollection of exposure to
6  glyphosate-based herbicides," correct?
7      A.    That's what it says, yes.
8      Q.    And the reference to glyphosate-based
9  herbicides is an indication that epidemiology
10 studies, whether they're case-controlled,
11 retrospective, looking backwards, or whether they're
12 looking prospectively in a cohort study, are studies
13 of human exposure to the formulated products that
14 have glyphosate as the active ingredient, correct?
15     A.    That's the only way the studies could be
16 conducted, because no one applies 100 percent pure
17 glyphosate for weed control.
18     Q.    When the EPA in December of last year,
19 2017, had 14 animal carcinogenicity studies on the
20 active ingredient, 94 genotoxicity studies involving
21 glyphosate, glyphosate formulations, EPA also had
22 from the published literature epidemiology studies
23 of human exposure in different populations to
24 formulations such as Roundup and Ranger Pro,
25 correct?

Page 437

1      A.    That's what the EPA says in those
2  reports.  And the different interpretation of the
3  epidemiological -- published epidemiological
4  database by EPA in the United States and IARC in its
5  review is one of the primary reasons why IARC
6  reached the diametrically opposed conclusion from
7  the EPA.
8            And I think that those people that have
9  noted the reluctance of the EPA to rely on
10 epidemiological data are correct in observing that
11 several positive epidemiological studies were given
12 very light weight in the overall weight of the
13 evidence assessment of glyphosate-based herbicide
14 risk by the U.S. EPA; but in the IARC system,
15 quality and positive epidemiological evidence is
16 given substantial weight and, you know, probably you
17 could say equal weight to the animal oncogenicity
18 data and the genotoxicity data, since the IARC
19 evaluations are really kind of a three -- based on a
20 three-legged stool.
21           So this reluctance or reticence to rely
22 on epidemiology data is one of the critical issues
23 in -- both in the ongoing evaluation of potentially
24 oncogenic pesticides including glyphosate, and it's
25 an important issue in this case.

Page 438

1      Q.    IARC, in its conclusion announced in
2  March 2015 about glyphosate in cancer hazard
3  assessment, concluded that there was limited
4  evidence of epidemiology concerning glyphosate-based
5  formulations and carcinogenicity; is that right?
6      A.    Correct.
7      Q.    And that conclusion that was reached by
8  IARC in March 2015 was not based on a consideration
9  of the Andreotti health study that was released in
10 December of 2017, correct?
11           MR. LITZENBURG:  Form.
12           THE WITNESS:  Correct.
13 BY MR. COPLE:
14     Q.    And EPA has specifically taken into
15 account, in December 2017, the data and results and
16 interpretation of the Andreotti update in the AHS
17 study, right?
18     A.    That's what they report.
19     Q.    Now, on these studies here in 2002,
20 epidemiology studies in 2002 that EPA is commenting,
21 responding to a commenter about, the agency
22 continues to say in the next paragraph that "The
23 carcinogenic of glyphosate has been evaluated in
24 acceptable studies conducted in rats and mice."
25           It goes on to say that "In June of 1991,

Page 439

1  EPA concluded, following a thorough review of all
2  available toxicity data, that glyphosate should be
3  classified in Category E, evidence of
4  noncarcinogenicity in humans."
5            All of that's correct, right?
6      A.    That's what they're reporting in this
7  final rule, yes.
8      Q.    And EPA has not changed its position on
9  that appropriate category, evidence of
10 noncarcinogenicity in humans, since June 1991,
11 right?
12     A.    Right.
13           And this is about the fifth time you've
14 asked that question.
15     Q.    And then it goes on to say that "This
16 cancer classification was based upon the observation
17 of no treatment-related tumors at any dose level
18 with glyphosate tested up to the limit in rats and
19 up to the dose levels higher than the limit dose in
20 mice, and the lack of evidence of
21 mutagenicity/genotoxicity for glyphosate."
22           That was the position of EPA in 2002 in
23 approving the tolerances, pesticide tolerances for
24 glyphosate, right?
25     A.    Correct.

CONFIDENTIAL

1    Q.    And that has not changed, correct?
2    A.    The same answer.
3    Q.    Before we get to the next document, sir,
4  the conclusion the EPA reached in 2002 was based on
5  its complete evaluation of the carcinogenicity in
6  humans in the context of a pesticide residue
7  approval for glyphosate, right?
8    A.    Correct.
9    Q.    And that included the formulations
10 themselves, not just the active ingredient?
11   A.    No, not in any thorough way.
12   Q.    Well, EPA said that it did, right?
13   A.    Yes.
14        MR. LITZENBURG:  Form.
15        THE WITNESS:  The EPA did not have the
16 necessary information in its possession to do an
17 up-to-date and thorough assessment of that.
18 BY MR. COPLE:
19   Q.    It does now, because it has 94
20 genotoxicity studies, 14 animal carcinogenicity
21 studies and all the open literature on
22 epidemiological formulated products including
23 updated AHS study, right?
24        MR. LITZENBURG:  Form.
25        THE WITNESS:  That's -- that's your

1  opinion, sir.
2  BY MR. COPLE:
3    Q.    So you don't think that EPA has concluded
4  that it has all of the necessary comprehensive
5  database to make the judgment that it has on
6  Category E?
7        MR. LITZENBURG:  Asked and answered.
8        THE WITNESS:  No.  I don't think that EPA
9  has all the information, nor have they evaluated
10 all the information that they need to make a
11 contemporary, science-based, rigorous assessment
12 of the genotoxicity of glyphosate and
13 glyphosate-based herbicides, because if they
14 had, they almost certainly would have agreed
15 with the IARC working group that found strong
16 evidence of the genotoxicity of glyphosate and
17 glyphosate-based herbicides through at least two
18 different mechanisms, based on the science
19 published as of -- I think the cutoff for the
20 IARC review was in February 2015; and since
21 early 2015, as I said, there have been at least
22 two dozen additional positive genotoxicity
23 studies published, including one I just read
24 this morning that came through my email.
25        So I do not believe that the EPA has

1  assessed the current genotoxicity database with
2  the benefit of all of the relevant information,
3  including Dr. Parry's report, that would
4  undoubtedly inform its opinion; and I think that
5  if it had had better and more complete
6  information from registrants including Monsanto
7  and had looked more deeply at the published
8  literature, I think their position would
9  certainly have aligned with IARC's.
10 BY MR. COPLE:
11   Q.    What genotoxicity study did you receive
12 this morning?
13   A.    I didn't have time to read it.  It's just
14 out, like I think literally today.
15   Q.    Where did you get it from?
16   A.    Email.
17   Q.    From who?
18   A.    I don't -- I don't remember.  Some
19 listserv that I'm on.
20   Q.    This was -- the study, what's the name of
21 the study that you received this morning?
22   A.    I don't remember.
23   Q.    What's the lead author's name on the
24 study?
25   A.    I don't remember that either.  Like I

1  said, I had very little time to check my email this
2  morning, but I -- there is another newly published
3  study that came into my email this morning.
4    Q.    All right.  So no individual that you
5  know sent you the study, just part of the
6  distribution to a list?
7    A.    Yeah.  I get scientific studies sent to
8  me by at least 12 different sources.
9    Q.    Have you compared the 94 genotoxicity
10 studies that EPA relied upon and reviewed in
11 December of 2017 with any of the studies that you
12 think the agency should consider and you believe has
13 not?
14   A.    Well, I spent a lot of time in the
15 preparation of my expert report reviewing the record
16 of Monsanto's understanding and the EPA's
17 understanding of genotoxicity.
18        It became clear to me, based on my review
19 of the record in this case, that the absence of
20 genotoxicity -- evidence of genotoxicity from the
21 original Monsanto studies conducted mostly in the
22 late '70s and 1980s, submitted to the agency in
23 response to standard EPA data requirements, all of
24 which were reviewed and considered by both Monsanto
25 and the agency as negative, supported both the

Page 444

1  company's judgment and the EPA's judgment that
2  glyphosate and glyphosate-based herbicides pose no
3  genotoxic risk.
4          And that conclusion played a central role
5  in the interpretation of the 1983 BioDynamic mouse
6  study and, frankly, the subsequent oncogenicity
7  assays and the epidemiological evidence and others.
8          And so I paid particular attention in my
9  review of the entire record of the case during the
10  '80s and '90s and in the 2000s on the way that
11  Monsanto addressed their growing internal concern
12  about genotoxicity as well as the growing concern
13  about genotoxicity expressed by a number of
14  regulators, principally in Europe, where regulators
15  were asking Monsanto to respond to peer-reviewed
16  published papers that regulators in Europe put much
17  more weight on than the U.S. EPA, that reported a
18  higher risk, stronger evidence of human health harm
19  from the formulated Roundup products,
20  glyphosate-based herbicides, as opposed to the pure
21  active ingredient.
22          I paid particular attention to the way
23  Monsanto responded to those newly expressed concerns
24  and the request for better data, newer studies
25  and/or changed in the formulation.  And I was

Page 445

1  particularly struck by the willingness of Monsanto
2  in Europe to acknowledge that there were higher
3  risks associated with the formulated product, to
4  change its formulations to replace the POEA
5  surfactant that ███████████ characterized as
6  part of hazardous products with the lower risk
7  surfactants that were available, including some that
8  were Monsanto's products.
9          And I think that had the EPA been aware
10  of the additional science and additional information
11  that Monsanto had about the heightened risk of
12  glyphosate-based herbicides because of some of the
13  formulations, the judgments that the EPA would --
14  had made about genotoxicity would have been
15  different, and that would have changed EPA's
16  interpretation of risks; it would have changed the
17  warnings that EPA required Monsanto to place on its
18  labels; and it absolutely certainly would have
19  compelled EPA to require that a mixer/loader or
20  applicator of Ranger Pro wear gloves, which is the,
21  you know, absolute minimum PPE requirement that you
22  would think would be on essentially, you know, any
23  herbicide label, where an individual is applying it
24  with a handheld sprayer or a backpack sprayer.  But,
25  no, those -- that requirement still is not on the

Page 446

1  Ranger Pro label.
2      Q.    All right.  None of your answer is
3  responsive to what I asked you, Doctor.
4          The question was simply, EPA now has many
5  more, by orders of magnitude, of genotoxic study,
6  since the '70s, '80s, '90s, and early 2000s, and
7  there's at least 94 of them.
8          Did you compare the 94 studies that EPA
9  relied upon in December 2017 with whatever studies
10  that you think that they don't have?
11          MR. LITZENBURG:  Asked and answered.
12          THE WITNESS:  I don't know the exact
13  percentage of those 94 studies that were
14  submitted, done by and submitted by registrants,
15  but I would be surprised if less than
16  three-quarters of them are registrant-conducted
17  and registrant-submitted studies.  And those are
18  not available to a member of the public, to my
19  knowledge.
20  BY MR. COPLE:
21      Q.    And you're guessing, because you didn't
22  compare the 94 studies to other studies?
23      A.    No.  I -- I doubt that there was a way I
24  could have done it.  I certainly didn't have the
25  time to do it.  But that is a mammoth task to read

Page 447

1  and understand and compare 94 studies.
2      Q.    So by saying that three-quarters of the
3  studies were done by registrants on genotoxicity,
4  you're guessing?
5      A.    Yeah, it's a guess.
6      Q.    All right.
7      A.    Educated guess.
8      Q.    All right.  Your educated guess is also
9  what you were saying about what EPA might have done
10  or not have done had there been other information in
11  their hands in the 1980s or 1990s or 2000s, right?
12          MR. LITZENBURG:  Form.
13  Mischaracterization.
14          THE WITNESS:  My opinion -- it is my
15  opinion that had Monsanto provided Dr. Parry's
16  report in 1999, which was really right when the
17  first wave of these positive genotoxicity
18  studies were coming in, and had Monsanto acted
19  upon Dr. Parry's recommendation to hire and
20  commission scientists like Dr. Parry who had
21  developed these newer, more sensitive genotox
22  assays to actually do the test, replicate some
23  of the results in the published literature, that
24  would have substantially accelerated the quality
25  and depth and reliability of the genotox

Page 448

1   database, and it would have helped Monsanto
2   understand the level of risk so it could take
3   appropriate actions that any responsible company
4   would do to assure that it's -- it's making its
5   products as safe as they possibly can and as
6   they understand how to do, and it would also
7   sharpen the EPA's understanding of risk.
8         And it is my opinion that had they had
9   that information at the time, the EPA very
10  likely would have reached a different evaluation
11  about what the totality of genotoxicity data
12  shows.
13  BY MR. COPLE:
14  Q.   So you're guessing what EPA might have
15  done, because you don't know?
16        MR. LITZENBURG:  Form.
17  Mischaracterization.  Asked and answered.
18        THE WITNESS:  It's my best professional
19  judgment based on what I know about how EPA
20  evaluates studies, how they reach decisions, the
21  weight of evidence approach that they adhere to.
22  Yes, it's my best judgment.
23  BY MR. COPLE:
24  Q.   An educated guess?
25        MR. LITZENBURG:  Objection.  Asked and

Page 449

1   answered.
2         THE WITNESS:  It's not a guess, sir.
3   It's not a guess.  It's a -- it's an informed
4   judgment based on years of experience of
5   following how EPA conducts risk assessments of
6   pesticides, what their standards are, the
7   criteria they use to determine, the extent to
8   which they are willing to be -- how do I say
9   this artfully?  The extent to which the
10  scientists in the agency are willing to accept
11  the views and positions articulated by
12  registrants even when they don't fully agree
13  with them.
14        Like any institution, agency, EPA has to
15  pick its battles, and obviously, this -- there
16  were a number of battles over the years between
17  Monsanto and the EPA in the assessment of
18  glyphosate and glyphosate-based herbicides, and
19  it's one that is ongoing by any reasonable
20  measure.
21  BY MR. COPLE:
22  Q.   Well, whatever information that EPA had
23  in 1983 or anytime in 1980s or 1990s or 2000s is all
24  superseded by what they have right now, as of
25  December 2017, and that includes at least 94 genotox

Page 450

1   studies, right?
2         MR. LITZENBURG:  Form.  Asked and
3   answered.
4         THE WITNESS:  There is a difference
5   between EPA reporting in a final rule or an
6   updated HED risk assessment that they obtained
7   or reviewed or took into consideration 12
8   studies or 94 studies.  That could be a quick
9   reading of the abstract, or it could be an
10  in-depth assessment.
11        And it is the opinion of many scientists
12  who have participated in this rich debate over
13  the difference between EPA and EFSA and the
14  German regulatory authorities' assessment of
15  oncogenicity of glyphosate-based herbicides
16  compared to IARC.  The genotoxicity data has
17  played a central role in that.
18        And I -- I am persuaded that if EPA were
19  more aware of what Monsanto knew going back as
20  many as two decades about the heightened risk of
21  their formulated products, it would have had an
22  impact on their quantitative risk assessments,
23  their requirements for personal protective
24  equipment, provisions on their labels.
25        My reaching this -- this conclusion that

Page 451

1   I've reached has been informed by the very
2   in-depth debate about both the oncogenicity
3   database, the 14 industry-conducted and
4   submitted chronic feeding studies and the few
5   other studies that were not done by the industry
6   but have been published, and I believe my report
7   is clear on my final judgments about those
8   matters.
9   BY MR. COPLE:
10  Q.   This is your personal opinion that you
11  have formed from your knowledge and experience of
12  what EPA does over the years, right?
13        MR. LITZENBURG:  Form.  Asked and
14  answered.
15        THE WITNESS:  Much of my report --
16  there's something over 1,000 paragraphs -- I
17  would say 400 of them simply restate what
18  Monsanto employees or scientists say to each
19  other about some aspect of their understanding
20  of the risks associated with glyphosate-based
21  herbicides.  So all of the portions of my report
22  that simply restate and observe what Monsanto
23  scientists have said are not a personal opinion.
24  It's a statement of fact of what is in the
25  record.

CONFIDENTIAL

Page 452

```
 1   BY MR. COPLE:
 2       Q.   Based on a review of particular documents
 3   that the lawyers for Mr. Johnson gave you, right?
 4           MR. LITZENBURG:  Asked and answered.
 5   BY MR. COPLE:
 6       Q.   That's what it's based on, right?
 7       A.   You have the -- you have the list of
 8   documents that were provided to me.  We've talked
 9   about many documents that I had had and studied well
10   before this, including most of the EPA regulatory
11   file.
12           There have been a number of documents
13   that were part of the discovery in this case that,
14   as you know, became available when they were
15   unsealed before I was involved in the case.  I think
16   some had been sealed before.  I don't really
17   remember the timing.
18           But my -- my opinions reached in this
19   case are based on all of the information that was
20   available to me and -- but certainly my in-depth
21   understanding of Monsanto's -- the honesty and
22   responsibility, the degree to which Monsanto met its
23   responsibility of offering a clear and fair and
24   science-grounded warning to people using
25   glyphosate-based herbicides, in this particular case
```

Page 453

```
 1   Ranger Pro and Roundup Pro concentrate -- it was the
 2   materials provided to me by counsel from the
 3   discovery record that informed me about the degree
 4   to which Monsanto was aware of these heightened
 5   risks, concerned about them, and undertaking a
 6   variety of actions to try to make them go away.
 7           And I have to say it is really
 8   disappointing to me and borders on shocking that
 9   whenever confronted with new information about the
10   risks, heightened risks, posed by glyphosate-based
11   herbicides, I can think of almost no examples where
12   Monsanto said, well, jeez, you know, we better do
13   some more research and determine if this is right,
14   and if it -- if it proves out and is replicated, we
15   better do something to make our product safer.
16           That is not how Monsanto responded in any
17   of the instances that I reviewed in the record.
18           MR. COPLE:  Before we lose sight of this,
19       because you mentioned the discovery record and
20       the documents which you had reviewed, which you
21       talked about yesterday, we're going to
22       designate, at least provisionally right now,
23       that the entire transcripts and exhibits for
24       this deposition today and yesterday be
25       confidential until we have a chance to review it
```

Page 454

```
 1   to be sure that no confidential information is
 2       being talked about or used on the record.
 3   BY MR. COPLE:
 4       Q.   Now, did you look at the reference list
 5   of studies that OPP had reviewed as part of its
 6   issues paper in 2016 or 2017?
 7       A.   Which issue paper are you talking about?
 8       Q.   Either one.  The 2017 one of December
 9   or --
10       A.   I might have glanced at it.
11       Q.   So you could have looked at that list and
12   seen exactly which genotox studies the EPA had
13   reviewed and which ones were from the open
14   literature, right?
15       A.   I may have been able to do that, and I
16   wished I had time to do it.
17       Q.   All right.  And the European regulators,
18   at least EFSA and the German Federal Institute, have
19   approved glyphosate for use in Europe as not being
20   carcinogenic, and that's based on their review of
21   the genotox studies, as well, right?
22       A.   The European Union and EFSA recently
23   adopted a reregistration for five years for
24   glyphosate-based herbicides.  And as a matter of
25   fact, yesterday -- and I read this last night --
```

Page 455

```
 1   it's been announced that the German government has
 2   announced that it is going to phase out the use of
 3   glyphosate-based herbicides as quickly as possible,
 4   based on, apparently, the concerns that the German
 5   regulators continue to have about the safety of
 6   those products.
 7           So the -- the status of glyphosate and
 8   glyphosate-based herbicides in the European Union as
 9   a whole and in individual countries is, let's just
10   say, in a dynamic state with certainly several of
11   the countries having announced and undertaken
12   varying degrees of phaseouts of further use of
13   glyphosate-based herbicides.
14       Q.   As we sit here today, Doctor, the current
15   position of EFSA, as part of the European Union and
16   the German regulator is that glyphosate is not a
17   human carcinogen, right?
18           MR. LITZENBURG:  Asked and answered.
19           THE WITNESS:  As we discussed yesterday,
20       those conclusions reached by EFSA, ECHA, the
21       German regulatory authority, are all predicated
22       on the statement under normal or expected levels
23       of dietary exposure or human exposure.  So
24       that's -- that is -- that is at this time the
25       stated position of those three entities.
```

CONFIDENTIAL

---

Page 456

1   BY MR. COPLE:
2       Q.    And the three entities are EFSA, Germany
3   and which one?
4       A.    ECHA.
5       Q.    Those three entities, in reaching the
6   conclusion that glyphosate is not carcinogen, did
7   not limit their finding to just dietary and water
8   exposure; it was all rounds, right?
9       A.    No.  No.  Their statement, their primary
10  statement of findings, is -- includes some version
11  of that phrase that I testified to yesterday and
12  repeat today, "under expected levels of exposure
13  through the diet," or some combination of words that
14  says essentially the same thing.
15      Q.    All right.  If those findings do not say
16  what you say they do, you'd be wrong on that point?
17      A.    Correct.
18           MR. COPLE:  Let's mark this Exhibit 19.
19           (Benbrook Exhibit Number 19 is marked for
20  identification.)
21  BY MR. COPLE:
22      Q.    You've seen this document, right?
23      A.    Yes, sir.
24      Q.    And the paragraph --
25      A.    This isn't his full report.  I'm actually

---

Page 457

1   not sure I've seen this.  I've seen his full report.
2       Q.    You don't know if you've seen this
3   document or not?
4       A.    Well, I have from the discovery file,
5   Dr. Parry's full report as well as his full
6   explanation of recommendations to Monsanto on the
7   genotoxicity of glyphosate and glyphosate-based
8   herbicides.
9           This is a short summary of it, obviously.
10  His full report is 30 pages, and his set of
11  recommendations for follow-up studies is around 20.
12  So this is -- this is a a -- I'm guessing it's a
13  summary of it, and I have not seen it.
14      Q.    All right.  Dr. Parry is writing to
15  ████████   Do you know who ████████ is?
16      A.    Yes.  He's the -- one of the Monsanto
17  people that interacted frequently with Dr. Parry.
18      Q.    And Dr. Parry says in Exhibit 19, in
19  February of 1999, you'll find enclosed his
20  evaluation, Dr. Parry's evaluation, four papers.
21      A.    I know.  I know what this is now.
22      Q.    Concerning the potential genotoxicity of
23  glyphosate?
24      A.    Right.
25      Q.    And Roundup.  And he goes on, in the

---

Page 458

1   following pages, to talk about his evaluation of
2   these --
3       A.    Right.  Correct.
4       Q.    -- four particular papers.
5       A.    I know -- I know what this is now.  Yeah.
6       Q.    Now, Dr. Parry is not doing an experiment
7   here, right?
8       A.    Correct.
9       Q.    He's not doing any type of an
10  investigation other than to review four papers,
11  right?
12      A.    Pardon me?
13      Q.    He's not doing any type of a review other
14  than the particular four papers that he was provided
15  and giving his feedback on it, right?
16      A.    Correct.  This is -- this is his first
17  piece of work for Monsanto.
18      Q.    All right.  And if you turn to -- if you
19  go by the Bates number on the bottom, let's go with
20  097, do you see that, lower right-hand corner?
21      A.    It's one of these pages?
22      Q.    Yes.  It's one of the pages that you
23  have.
24      A.    097?
25      Q.    Yes, 097.

---

Page 459

1       A.    Okay.  Got it.  Talking about Rank and
2   Bolognesi.
3       Q.    Yes.  This is a published study by Rank
4   from 1993, right?
5       A.    Correct.
6       Q.    Published in the literature?
7       A.    Correct.
8       Q.    And the conclusion that's stated on this
9   page, that's the conclusion that was reached by
10  Dr. Rank, or Mr. Rank, whoever Rank is, in his
11  study, right?
12      A.    Yes.
13      Q.    So this is not Dr. Parry's conclusion.
14  He's just reciting what the papers say, right?
15      A.    I think that -- yeah, he's -- it would
16  obviously be -- he would be responsible for stating
17  what the authors themselves concluded, but I think
18  he's -- he's giving ████████████████ and
19  Monsanto his preliminary read on whether he thinks
20  the study was valid and conducted correctly.
21      Q.    The conclusion is in vitro evidence of
22  genotoxic effect for Roundup mixture inadequate
23  in-vivos studies.  That's Rank's conclusion from the
24  published paper?
25      A.    I'd have to look at the paper and read

CONFIDENTIAL

## Page 460

1    what the authors say and read what's here to
2    understand fully what Dr. Parry's view of this is
3    versus what the paper says, but it would be much
4    more helpful if we looked at Parry's full report,
5    which goes into each one of these papers in much
6    greater detail, where it's much clearer what
7    Dr. Parry's conclusion is based on.  If you want to
8    get into it in any depth, it would be much more
9    constructive to do it.
10       Q.    My question has to do with the papers
11   that were evaluated by Dr. Parry, and the Rank paper
12   in '93 -- and this is a 1999 evaluation and letter
13   he sends to ████████ -- '93 Rank published paper
14   in the literature would have been available to EPA
15   or anybody else that wanted to look at it --
16       A.    Right.
17       Q.    -- since that time, right?
18       A.    Right.  And if you are familiar with
19   Dr. Parry's full report, you will know that
20   Dr. Parry agrees with Monsanto, agrees with EPA, and
21   agrees with really all scientists that have looked
22   at this data, that there's no evidence of
23   genotoxicity of either glyphosate or
24   glyphosate-based herbicides in bacterial assays.
25   And that's what this is.

## Page 461

1        So this is one of a significant number of
2    consistent studies that show no genotoxicity in
3    bacterial species, and it happens -- it just so
4    happens that a significant number of the
5    genotoxicity studies done by the registrants in
6    their early days were also done in bacterial
7    species, so there's -- there's really no -- there's
8    no significant scientific disagreement about the
9    fact that there's no genotoxic risk evidence --
10   there's no evidence of it in the published
11   literature or in the industry studies in bacterial
12   assays.
13       Q.    Any scientist in the world as of '93
14   could read the Rank paper, right?
15       A.    If they knew English, yeah.
16       Q.    And Dr. Parry -- he was not a coauthor on
17   that, right?
18       A.    No, I don't -- no, I don't think so.
19       Q.    And Bolognesi, which is a 1997 study,
20   also published in the peer-reviewed literature?
21       A.    Yes.
22       Q.    So as of '97, Bolognesi's study would
23   have been available to any scientist in the world
24   that wanted to look at it, including a scientist at
25   EPA?

## Page 462

1        A.    Correct.
2        Q.    And as the conclusion on the next page --
3    we're looking at these numbers, these Bates numbers,
4    which I know from your testimony you know what that
5    is, it's 098, the next page.
6        A.    Yes, I see it.
7        Q.    There's a conclusion that's being -- it's
8    a various series of sentences.  That's the
9    conclusion that was reached by Bolognesi in the '97
10   paper?
11       A.    Like I said, you know, it's hard to
12   say -- I would imagine that when Dr. Parry writes,
13   for example, glyphosate positive response in 1,000
14   ug per milliliter, that is one of the results
15   reported in the study.  And when he also reports
16   that Roundup mixture is positive at 100 micrograms
17   per milliliter, which happens to be tenfold lower
18   than the dose at which glyphosate was positive, this
19   is one of the early papers that report, in this
20   case, a tenfold increase in the toxicity of a
21   formulated Roundup herbicide as opposed to pure
22   glyphosate, that difference in toxicity between a
23   Roundup mixture and glyphosate appears in several
24   points in this summary of these four papers.
25       Q.    So the conclusion is a recount or

## Page 463

1    rendition by Dr. Parry of what the Bolognesi
2    conclusions were, right?
3        MR. LITZENBURG:  Asked and answered.
4        THE WITNESS:  Positive response, in
5    vitro, SCE, which is somatic cell -- what the
6    heck is it?
7    BY MR. COPLE:
8        Q.    So the answer is yes, he's just
9    recounting Bolognesi's conclusion, right?
10       A.    Right.  That conclusion is that the
11   response at -- in formulated products is ten times
12   more or ten times lower in glyphosate relative to
13   the mixture.
14       Q.    That's not responsive.  All I asked, is
15   he recounting it or not.  And as I understand your
16   answer, you're saying yes, you agree that's all he's
17   doing, recounting what Bolognesi is saying in '97?
18       MR. LITZENBURG:  Objection.  Asked and
19   answered.  Four times already.
20       THE WITNESS:  No, sir.  That's not what I
21   said.  I'll say it again.
22       For me to understand which part of this
23   summary by Dr. Parry about these studies is his
24   evaluation and his conclusion based on the
25   reported results, compared to what the authors

CONFIDENTIAL

Page 464

1    reported in their published research report, I
2    would need to have the published research report
3    in front of me to refresh my memory how they
4    expressed their findings and their conclusions.
5    Parry may have cut out a lot of caveats and
6    weasel words.  He may be stating the findings of
7    these studies in a more cryptic fashion than the
8    authors do.  I can't tell without looking at the
9    paper.
10   BY MR. COPLE:
11       Q.    So you just don't know if all Dr. Parry was
12   doing is recounting what was said in the Bolognesi
13   paper.  You just don't know?
14       A.    I -- I do know, that in his own words, if
15   you -- so this is --
16       Q.    So if you know, is it yes or no?
17       A.    You -- here is what Dr. Parry writes --
18       Q.    Is it yes or no?
19       A.    Excuse me, sir.
20           MR. LITZENBURG:  Don't interrupt his
21   answer.
22           MR. COPLE:  I going to withdraw the
23   question.
24           THE WITNESS:  Oh, you don't want the
25   answer, do you?

Page 465

1           MR. COPLE:  The witness has already
2    answered.
3    BY MR. COPLE:
4        Q.    The next page 099, Peluso.  In 1998,
5    another paper published in peer-reviewed open
6    literature, yes?
7        A.    Yes.
8        Q.    All right.  And Peluso is also recounted
9    by Dr. Parry.  Yes or no?
10       A.    He -- there are statements about the test
11   method used, the Roundup mixture; a note, which is
12   probably something that Dr. Parry noticed in the
13   study that he felt it was important to communicate
14   to ███████ and then there is a statement of
15   conclusion, approximately three lines, which I can
16   virtually guarantee you these are not the precise
17   words that the authors used in presenting the
18   conclusions of their paper.  It's a cryptic, short,
19   to-the-point statement of what I -- what Dr. Parry
20   felt the conclusions of the paper were.
21       Q.    All right.  Loi, L-O-I, 1998, published
22   in the peer-reviewed open literature as of that
23   time, right?
24       A.    Yes, sir.
25       Q.    All right.  So Peluso in '98, Loi in '98,

Page 466

1    also would have been available worldwide to any
2    scientist that was interested in looking at it,
3    including EPA's scientists, right?
4        A.    Correct.
5        Q.    And since the time that these four
6    papers, all of which predate Dr. Parry's letter to
7    Dr. ██████ occurred, EPA has said they have at
8    least 94 genotoxicity studies involving the active
9    ingredient glyphosate and formulated product of
10   Roundup, correct?
11       A.    The EPA reports that they have access to
12   94 genotoxicity studies in one of their recent
13   reports, yes.
14       Q.    And that was part of EPA's conclusion in
15   one of their recent reports, that glyphosate is not
16   a human carcinogen, right?
17       A.    It's -- EPA's assessment of the
18   genotoxicity database is a part of all of their
19   documents relative to the judgment about the
20   oncogenicity of glyphosate and glyphosate-based
21   herbicides and human health risks posed by use of
22   and exposure to them.
23           THE VIDEOGRAPHER:  Seven minutes left on
24   the tape.
25           MR. COPLE:  Off the record.

Page 467

1           THE VIDEOGRAPHER:  The time is now 10:47.
2    We are off the record.
3           (Break in proceedings.)
4           THE VIDEOGRAPHER:  The time is now 10:57.
5    We're back on record.
6           MR. COPLE:  Mark this as Exhibit 20.
7           (Benbrook Exhibit Number 20 is marked for
8    identification.)
9           MR. COPLE:  And Exhibit 21.
10          (Benbrook Exhibit Number 21 is marked for
11   identification.)
12          THE WITNESS:  We're doing two at once?
13          MR. COPLE:  We'll talk about both of them
14   in conjunction, at the same time.
15          MR. LITZENBURG:  Can I have the other
16   one?  Oh.
17   BY MR. COPLE:
18       Q.    You have in front of you Exhibits 20 and
19   21.  These are EPA regulations on pesticide
20   registration --
21       A.    Counselor, can I just ask you to give me
22   one minute to look at it?
23       Q.    Sure.
24       A.    Thank you.
25          Okay.  Thank you.

CONFIDENTIAL

Page 468

1    Q.    You've got -- you've got two EPA
2    regulations in front of you.  Are you familiar with
3    both of them?
4    A.    Yes, sir.
5    Q.    You've seen them before, before today?
6    A.    In various forms, yeah.
7    Q.    And the first one, which is Exhibit 20, a
8    40 CFR 152.44 application for amended registration.
9    It says that "Any modification in the composition,
10   labeling, or packaging of the registered product
11   must be submitted with an application for amended
12   registration."
13       So that would mean that in order to
14   change the labeling for a registered pesticide, that
15   the registrant has to make a submission to EPA to
16   review and approve, right?
17   A.    Correct.
18   Q.    So there could not be unilateral changes
19   by the registrant to a labeling unless it's
20   otherwise allowed by EPA regulation, right?
21   A.    Well, correct.  Except for some of these
22   minor ones that we'll talk about in Exhibit 21.
23   Q.    And we go to Exhibit 21 now, and this is
24   EPA regulation in 40 CFR 152.46, notification and
25   non-notification changes to a registration.

Page 469

1        And the first thing that EPA says in this
2    regulation is that "The agency may determine that
3    certain minor modifications to registration having
4    no potential to cause unreasonable adverse effects
5    to the environment may be accomplished by
6    notification to the agency, without requiring that
7    the registrant to obtain agency approval."
8        That's what EPA provides for, right?
9    A.    Correct.
10   Q.    Now, with respect to the change in a
11   precautionary statement on label for pesticide, EPA
12   would need to approve such a change in the labeling,
13   correct?
14   A.    Correct.
15   Q.    All right.  So a company that holds a
16   registration for a pesticide could not just on its
17   own take it upon itself to make the change without
18   putting that change before EPA for review and
19   affirmative approval, right?
20   A.    Right.  Via an application for a label
21   amendment, standard process, it could be.
22   Q.    To make such a submission for a change,
23   it would require or typically trigger an EPA science
24   review concerning the proposed change in the
25   labeling, right?

Page 470

1        MR. LITZENBURG:  Form.
2        THE WITNESS:  No.  No.  The -- I would
3    say the -- probably the vast majority of label
4    amendments done on an ongoing basis, sometimes
5    every year.  For a major product like any of the
6    major Roundup herbicides, they're labeled for
7    the control of sometimes over 100 weeds, and
8    they're -- they -- on an annual basis, they may
9    add a couple weeds or take off a couple weeds or
10   add language that resistant varieties -- Palmer
11   amaranth in Georgia, Arkansas, and Tennessee, so
12   higher rates of the product might be used.
13       So they're -- most of the changes relate
14   to the list of pests for which the label covers
15   uses and minor changes in the level of
16   application or the frequency of application or
17   other things of that matter.  And those -- those
18   are -- again, as I said, for a major product
19   like Roundup, such changes are necessary fairly
20   frequently, certainly every few years, if not in
21   some cases every year.  Those -- those minor
22   changes and the list of weeds controlled in the
23   case of a herbicide do not trigger, typically, a
24   reassessment of the science base.
25   BY MR. COPLE:

Page 471

1    Q.    None of that would apply in the case of a
2    change in the labeling regarding cancer risk, right?
3    A.    Correct.
4    Q.    So for a cancer risk in any form to be
5    put by a registrant on a label, that would have to
6    be submitted for EPA review and approval, and EPA
7    would conduct a science review to see if it's
8    warranted, right?
9    A.    It's not entirely clear that EPA would
10   conduct a science review.  If, for example, Monsanto
11   had submitted, in 2005 or 2010, an amendment to the
12   Ranger Pro label requiring chemical-resistant gloves
13   as appears on the chemical safety data sheet, EPA
14   would be delighted to see that; they would approve
15   it; and they wouldn't do an evaluation of it,
16   because they know it's going to expand the margin of
17   safety.
18       So not all safety-related changes on a
19   label require an agency review, and especially any
20   changes of the label that on their face would reduce
21   whatever level of exposure and a risk is out there.
22       Now, any change that would increase the
23   level of risk, especially if it's more than a
24   trivial increase, those would be evaluated.
25   Q.    Not my question, Doctor.  My question was

CONFIDENTIAL

Page 472

1   about cancer risk, and cancer risk to be added to a
2   labeled registered pesticide by a registrant would
3   require formal submission for EPA review and
4   approval, and EPA would do a science review, right?
5          MR. LITZENBURG:  Objection.  Already
6   asked and answered.
7          THE WITNESS:  You've cast a hypothetical
8   situation of a pesticide registrant wanting to
9   put a statement about cancer risk on their
10  label, which that's a fairly rare occurrence,
11  and certainly I'm not aware of Monsanto
12  proposing to add such a phrase on any of its
13  Roundup labels.
14         If -- if the -- if a company wanted to
15  add a warning or additional safety precautions
16  because of concern over cancer, I don't think
17  the agency would conduct an evaluation.  They
18  would regard that as an increase in the safety
19  precautions and margins of safety associated
20  with the product.  So I would -- I would suspect
21  in many instances they would -- they would
22  approve such a label amendment without any
23  science evaluation.
24  BY MR. COPLE:
25         Q.   Are you saying that Monsanto should be

Page 473

1   adding a cancer warning without getting full agency
2   approval?
3          MR. LITZENBURG:  Form.
4          THE WITNESS:  No, that's not what I said.
5   BY MR. COPLE:
6          Q.   All right.  In the case of a cancer risk,
7   EPA has already determined since 1991 through today,
8   as we sit here, that glyphosate is not a human
9   carcinogen, so adding a cancer risk warning about
10  glyphosate in a Roundup formulation product or
11  Ranger Pro would, in the terms of the determination
12  by EPA, be a false or at least misleading statement,
13  right?
14         MR. LITZENBURG:  Form.
15         THE WITNESS:  It would depend on what a
16  registrant said about the potential risk of
17  cancer.  Monsanto could have peripherally put a
18  statement on its label that there's some
19  evidence of potential to cause oncogenic risk
20  from one of the studies submitted, and in an
21  abundance of caution, we've added additional
22  PPE.  And I am quite certain that OPP would not
23  object to the addition of such language on a
24  label.
25

Page 474

1   BY MR. COPLE:
2          Q.   Is this another educated guess?
3          MR. LITZENBURG:  Form.
4          THE WITNESS:  No.  No, it's not an
5   educated guess.  It's based on my years of
6   tracking changes in labels, which changes in the
7   label the agency pays attention to and feels
8   triggers the need for an updated risk assessment
9   or a science evaluation versus changes in labels
10  which the agency welcomes and usually quickly
11  approves that clearly provide more specific,
12  comprehensive, substantive directions,
13  precautions, requirements on the user community
14  that expand, expand margins of safety by
15  lowering exposures or reducing the risk of
16  high-exposure scenarios.
17         The EPA is always happy to approve those
18  sorts of label amendments.
19  BY MR. COPLE:
20         Q.   Are you testifying that EPA would approve
21  a cancer risk warning for a product in which EPA
22  itself has determined that there's no human
23  carcinogenicity associated with the active
24  ingredient?
25         MR. LITZENBURG:  Form.  Asked and

Page 475

1   answered.
2          THE WITNESS:  Again, you're speaking
3   about a hypothetical situation where -- I mean,
4   if a company proposed a label amendment that
5   made a declarative statement in opposition to a
6   similarly clear statement in an EPA risk
7   assessment, I think the first thing that would
8   happen is there would be a high-level meeting
9   between the company and the EPA scientists and
10  registration division to say, "What the heck is
11  going on here?  What do you know that we don't
12  know?"
13         But -- so that -- that -- you know, that
14  is a hypothetical situation that to my knowledge
15  has never happened, and it's -- there is -- my
16  guess is that EPA would respond by calling the
17  registrant in and asking them why they are
18  requesting a statement on a label that it
19  contradicts a judgment by the agency that's
20  clearly favorable to the company and the
21  product.
22  BY MR. COPLE:
23         Q.   So EPA is not going to approve a labeling
24  statement that contradicts the agency's own health
25  risk assessment, right?

CONFIDENTIAL

Page 476

1    MR. LITZENBURG:  I object to form.  Asked
2  and answered.  Six times.
3    THE WITNESS:  The EPA will routinely
4  approve any registrant-proposed changes in
5  labels that reduce exposures and expand margins
6  of safety irrespective of whether the registrant
7  includes in the amended label language an
8  explanation of the scientific reason for adding
9  such additional safety precautions or PPE
10  requirements or other changes in how a pesticide
11  is used.
12  BY MR. COPLE:
13    Q.    So there has to be a scientific basis for
14  a labeling change that has a cancer warning, right?
15    MR. LITZENBURG:  Form.
16    THE WITNESS:  The agency -- the agency
17  recognizes that the registrant, and in
18  particular the primary registrant, as Monsanto
19  is for glyphosate-based herbicides, knows far
20  more about the active ingredient, its
21  properties, its toxicology, how it's been used
22  around the world, experiences that Monsanto has
23  had with glyphosate-based herbicides in Brazil,
24  in Argentina, in Germany.
25    So the agency defers to the registrant

Page 477

1  and the superior and more in-depth knowledge of
2  the registrant whenever a registrant
3  incorporates in a label amendment a change in
4  either the labeling or the use patterns for a
5  registered product that on their face will
6  reduce exposures and risk.  They do not require
7  a scientific basis for such changes because they
8  expect that a responsible company would not
9  propose a change in a label of that nature
10  unless there was a reason.  That is their
11  expectation of what a responsible company would
12  do.
13  BY MR. COPLE:
14    Q.    And in the case of glyphosate, the
15  agency's baseline right now and since 1991 has been
16  that glyphosate is not a human carcinogen, right?
17    A.    That is the judgment of the agency that
18  we've discussed at length the last two days.  Yes,
19  sir.
20    Q.    Do you recall yesterday, Doctor, that we
21  talked about the toxicology testing that EPA
22  requires for pesticide registration, and you agreed
23  that under EPA's Regulation 158.500 that toxicity
24  testing for the active ingredient and for the
25  formulated product is required by EPA for acute

Page 478

1  toxicity as well as for subchronic testing --
2  subchronic toxicity?
3    MR. LITZENBURG:  Form.
4  BY MR. COPLE:
5    Q.    Correct?
6    A.    The so-called six-pack of acute toxicity
7  studies are typically required for most substantial
8  changes in a formulated product.  It's not my
9  understanding that certainly no long-term chronic
10  feeding studies are required on formulated products,
11  and I think it's quite unusual for a subchronic
12  study to be required on formulated product.
13    Q.    EPA has never required long-term chronic
14  feeding studies for toxicity in a formulated
15  product, right?
16    MR. LITZENBURG:  Form.
17  BY MR. COPLE:
18    Q.    For a pesticide?
19    A.    Not that I'm aware of.
20    Q.    And EPA could require such testing on
21  formulated product pesticides at any time, right?
22    A.    They have the authority to do so, I would
23  say, yes.
24    Q.    And in the 40-plus years that EPA has
25  approved registration of glyphosate as the active

Page 479

1  ingredient in glyphosate formulations, it's never
2  changed that requirement to insist that there be
3  chronic feeding long-term tox testing for formulated
4  pesticides, right?
5    A.    Correct.
6    MR. COPLE:  Let's mark Exhibit 22.
7    (Benbrook Exhibit Number 22 is marked for
8  identification.)
9  BY MR. COPLE:
10    Q.    Have you seen this document before?
11    A.    Let me look at it, please.
12    A.    Sure.
13    A.    Yes, I do remember this.
14    Q.    All right.  This is an email from
15  Mr. Jenkins at Monsanto to a number of officials at
16  EPA's OPP division, correct?
17    A.    Correct.
18    Q.    And the email is sending the agents the
19  EPA CD to provide the agency with a group of studies
20  that are 37 genotox studies in terms of 20 Ames
21  assays and 17 mouse micronucleus assays that were
22  conducted on 17 glyphosate formulations to support
23  registration in Brazil?
24    MR. LITZENBURG:  Objection to form.
25    THE WITNESS:  Yes, that's what this email

CONFIDENTIAL

Page 480

1    states.
2    BY MR. COPLE:
3        Q.    And it goes on to state in the
4    communication to EPA that of those 17 formulations,
5    formulated products that were tested for Brazil,
6    four of them are Roundup formulations that are also
7    registered in the U.S., right?
8        A.    That's what it says, yes.
9        Q.    So EPA had information including the
10   actual cell testing for genotoxicity that was done
11   by Monsanto for Roundup formulations to comply with
12   the requirements in Brazil.  They had that as of
13   May 2016, right?
14            MR. LITZENBURG:  Objection to form.
15       Listen to the question carefully, and answer it
16       if you can.
17            THE WITNESS:  Yeah, that's what this
18       reports.
19   BY MR. COPLE:
20       Q.    So EPA -- first of all, Monsanto has done
21   genotoxic testing on its Roundup -- some of its
22   Roundup formulations?
23       A.    It has done some, yes.
24       Q.    And EPA is aware of at least the 17
25   formulated products that were tested for

Page 481

1    genotoxicity aspects that were done from Brazil,
2    right?
3        A.    That is correct.
4        Q.    And EPA could at any time demand that
5    Monsanto also do similar or different toxicity
6    testing on all of the U.S.-based registrations for
7    its glyphosate formulations, right?
8        A.    If it chose to do so, correct.
9        Q.    And it's never done that, right?
10       A.    Not yet.
11       Q.    EPA has just determined again in
12   December 2017 that glyphosate and glyphosate
13   formulations are not genotoxic, correct?
14            MR. LITZENBURG:  Form.
15            THE WITNESS:  That's reported in one of
16       the earlier exhibits that we talked about.  Yes.
17            MR. COPLE:  Let's mark this as
18       Exhibit 23.
19            (Benbrook Exhibit Number 23 is marked for
20       identification.)
21   BY MR. COPLE:
22       Q.    Now, in preparing your opinions in this
23   case and your expert report, Doctor, did you review
24   the surfactant cluster testing documents?
25       A.    No.  This is news to me.  I haven't seen

Page 482

1    this document.
2        Q.    So you haven't looked at any of the
3    surfactant class testing documents?
4        A.    No.
5        Q.    You've never seen this particular
6    document?
7        A.    I have never seen this document.
8        Q.    Well, let's see if we can identify what
9    it is.
10            Are you familiar with a document of this
11   type?
12       A.    It's an EPA memorandum reporting the
13   results of a human health risk assessment to support
14   an exemption from the requirement tolerance for
15   inert ingredient.
16       Q.    Are you familiar with that?
17       A.    I've seen some of these, yes.
18       Q.    All right.
19       A.    But I haven't seen this one, nor any
20   others applicable to Roundup-based herbicides in the
21   period of this case.
22       Q.    This is from 2009, correct?
23       A.    That's the date on it, yes, sir.
24       Q.    This is an EPA document.  This is not a
25   registrant document, correct?

Page 483

1        A.    Yes.
2        Q.    And it indicates in parenthesis after the
3    name of the surfactant that "JITF CST 4 Inert
4    Ingredients."  Do you know what that is?
5        A.    No.
6        Q.    Do you know what the JITF is?
7        A.    I think it's Joint Industry Task Force,
8    but I could be wrong.
9        Q.    You know what CST 4 is?
10       A.    No.  Maybe I should take the time to read
11   it.  Let me read it.  Okay?
12       Q.    I only have one question.  This is alkyl
13   amine polyalkoxylates.  Are you familiar with that
14   surfactant?
15       A.    Not in any detail.  It's a chemical name
16   I've run across before in my reading.
17       Q.    All right.  If you go to Page 15.
18       A.    You said you were going to ask one
19   question.
20       Q.    It is, one question.
21       A.    Well, that was a question.
22       Q.    Well, I'm doing a second question.  4.4,
23   Classification of Carcinogenic --
24       A.    Wait, 15, you said?
25       Q.    Yes, sir.

24

CONFIDENTIAL

Page 484

1    A.   Okay.
2    Q.   Classification of Carcinogenic Potential.
3  And the first sentence by EPA is, "There is no
4  evidence that AAPs are carcinogenic," right?
5        MR. LITZENBURG: Dr. Benbrook, you are
6  welcome to do as much reading of this as you
7  wish to answer these questions.
8        THE WITNESS: Give me a moment.  Okay?
9  BY MR. COPLE:
10    Q.   Does the document say that?
11        MR. LITZENBURG: Do as much reading as
12  you want before you answer.
13        THE WITNESS: That is an accurate reading
14  of the first sentence, last paragraph of Page
15  15.
16  BY MR. COPLE:
17    Q.   Apart from the document, are you
18  familiar -- are you aware of that finding that was
19  made by EPA, that AAPs were not carcinogenic?
20    A.   As I said, I have not seen this document
21  previously.
22        MS. FORGIE: What's the exhibit number,
23  please?
24        MR. LITZENBURG: 23.
25        THE WITNESS: And I'm delighted to have

Page 485

1  it.
2  BY MR. COPLE:
3    Q.   I'm sorry, Doctor, were you still
4  responding to a question when you say "delighted to
5  have it"?
6    A.   I'm glad to have that document this
7  morning.  It's one that I didn't know it was
8  available.
9    Q.   Did you ask for the surfactant testing
10  documents?
11    A.   No.
12    Q.   Did you ask for the cluster evaluation
13  documents?
14    A.   No, I didn't.
15    Q.   Did you ask for any documents from
16  counsel about the submission or approval of inert
17  ingredients for glyphosate-based formulations?
18    A.   No.
19        MR. COPLE: This is Exhibit 24.
20        (Benbrook Exhibit Number 24 is marked for
21  identification.)
22  BY MR. COPLE:
23    Q.   Are you familiar with this document?
24    A.   No.  I have not seen this.
25    Q.   This is the TNO report that you reference

Page 486

1  in your expert report, correct?
2    A.   It's a -- it is a TNO report.  I don't
3  know which one it is.  I don't know the full number
4  of reports that TNO provided to the agency.  I do
5  know what the Monsanto scientists who commissioned
6  this work -- what they said to their colleagues and
7  reported about the -- a rat dermal absorption study
8  that they had commissioned TNO to undertake.
9    Q.   Did you review any of the TNO reports on
10  dermal testing?
11    A.   I was unable to locate any of these in
12  the record.  They may be in the discovery record,
13  but I didn't see them.  And since they've got a
14  Bates number, they're clearly a part of the record.
15  So no, I did not have an opportunity to review this
16  skin penetration or skin permeability study.
17    Q.   You -- on Page 111 of your report, that's
18  Exhibit 4.
19    A.   Okay.
20    Q.   In Paragraph Number 588, your report says
21  that "to address revolving worker risk concerns
22  among European regulators, Monsanto commissioned a
23  dermal penetration study in rats.  It was conducted
24  by then a contract lab, TNO.  The results of the rat
25  study using Roundup formulations suggests that 5 to

Page 487

1  10 percent of the glyphosate Roundup formulation was
2  dermally absorbed."
3        It goes on to say in the next page, "by
4  contrast to the standard 3 percent estimate relied
5  on by the EU, European Union, and the U.S.
6  regulators."
7        Is this exhibit -- is this Exhibit 24 the
8  TNO study that you're referencing in your expert
9  report at 588?
10    A.   I can't make that determination until I
11  go back and review MON03738293 and probably the
12  earlier sited MON document.
13        There's two or three emails in the record
14  that talk specifically about the rat permeability
15  study that have been conducted by TNO at the request
16  of Monsanto, and the summary of the results of that
17  study, that you accurately quoted -- the results of
18  the rat skin penetration study using a Roundup
19  formulation suggested 5 percent to 10 percent of the
20  glyphosate in this Roundup formulation was dermally
21  absorbed.
22        That empirical finding is taken from a
23  email from one of the European Monsanto employees --
24  I think it was the gentleman with the very difficult
25  to pronounce name that starts with B -- to his

CONFIDENTIAL

Page 488

1  colleagues, some in Europe and some in St. Louis,
2  reporting the surprising and very worrisome results
3  of this TNO study that suggest that the actual
4  dermal absorption rate for formulated Roundup
5  herbicides is possibly three times higher than the
6  standard default assumption in EPA and in the
7  regulatory worker exposure models around the world.
8      Q.   All right.  Go to the summary of the TNO
9  study that you just talked about.  It's on
10  Page 1799, the Bates number for this Exhibit 24.  It
11  actually starts on the previous page, 1798, and it
12  continues on to 1799.
13         Now, before I ask you what the summary
14  says, the results you just mentioned, and I think
15  are in your report somewhere, on the following --
16  it's not the next page -- two pages on, it's 1801,
17  there's a statement of GLP compliance that's listed
18  with the study director.
19         Do you know what a statement GLP
20  compliance is?
21      A.   Yes.
22      Q.   What does it mean?
23      A.   It means that the study was conducted in
24  compliance with good laboratory practices, and it's
25  usually signed by the lab director or the study

Page 489

1  director.
2      Q.   And these particular GLPs were done under
3  the OECD GLP principles, right?
4      A.   Correct.  A European laboratory.
5      Q.   All right.  That means that it complies
6  with the standards of quality to ensure the study is
7  conducted under the proper conditions, right?
8      A.   Well, that would be the assertion made if
9  in fact it was signed, but it doesn't appear to be
10  signed or dated.
11      Q.   So you think the study is not valid
12  because of that?
13      A.   I don't know.  I don't know.  I've never
14  seen this.
15      Q.   On Page 1799, under Paragraph 6, there's
16  a conclusion.  It starts out saying that "In
17  conclusion, an 8-hour exposure resulted in a
18  penetration at 10 percent, 2.6 percent, 5 percent,"
19  and it has the different concentrates involved, and
20  it goes up to -- it goes down to "1.4 percent over a
21  period of 48 hours, in viable rat skin membranes."
22         It goes on to say that "Due to the high
23  variation in dermal penetration within the test
24  groups and the poor recoveries, the data presented
25  in this report are not acceptable for regulatory use

Page 490

1  and risk assessment."  Correct?
2      A.   That's what it says.  Yeah.
3      Q.   Study finding is that study findings are
4  not suitable for regulators to use, correct?
5      A.   Yes.  That's what they state.
6      Q.   And this summary is from the study
7  director, who's on the first page, Dr. J. A.
8  van Burgsteden, right?
9      A.   Yes.  He's listed as the author, or she.
10      Q.   Do you know Dr. van Burgsteden?
11      A.   No.
12      Q.   Have you spoken to anyone in preparation
13  for your expert report about the TNO dermal
14  penetration study?
15      A.   No.  My sole source of information about
16  the TNO report and Monsanto's evaluation of it and
17  concerns about it are from the series of emails in
18  the discovery record that I reviewed and cited in my
19  report.
20      Q.   Now, in terms of whether a piece of
21  information needs to be reported under 6(a)(2), one
22  of the primary factors is that the information must
23  allege that there's some adverse effect from an
24  application of a particular pesticide, right?
25      A.   That's one of the factors.

Page 491

1      Q.   All right.
2         MR. COPLE:  We'll mark two documents here
3  as Exhibits 25 and 26 to the deposition.  First
4  25.  And this is 26.
5         (Benbrook Exhibit Numbers 25 and 26 are
6  marked for identification.)
7  BY MR. COPLE:
8      Q.   Now, you're familiar with Exhibit 25,
9  Doctor?
10      A.   It's part of the EPA regulations,
11  providing details on the implementation of FIFRA.
12      Q.   And this is the reporting rule for toxic
13  or adverse effects incidence reports under FIFRA?
14      A.   Correct.
15      Q.   This is the regulation that is adopting
16  my EPA pursuant to 6(a)(2) as the FIFRA section?
17      A.   Yeah, it's certainly one of them.
18      Q.   Certainly one of what?
19      A.   I'm not sure this is the only place where
20  EPA references 6(a)(2) in the full body of Part 1,
21  159 or per EPA regs, but this is one of the places
22  where the obligations of the registrant are
23  discussed.
24      Q.   Setting out the reporting requirements
25  under 6(a)(2), right?

CONFIDENTIAL

Page 492

1      A.    I haven't read it, but I'm assuming that
2  that's what this section does.
3      Q.    Exhibit 26, which you should have.
4      A.    I do?  Thank you.
5      Q.    Now, this is a final rule publication in
6  the Federal Register in 1997, in September, by EPA,
7  and the summary says that "This final rule codifies
8  EPA's interpretation and enforcement policy
9  regarding section 6(a)(2) of FIFRA."
10         Do you see that?
11     A.    Yes, sir.
12     Q.    All right.  Have you reviewed this
13  announcement of EPA's interpretation of FIFRA --
14     A.    Yes.
15     Q.    -- as part of your --
16     A.    Yes, I have, in the past, more than once.
17     Q.    For this case?
18     A.    No.
19     Q.    If you'll go to -- if you go to Page 8,
20  and that's the page number in this copy.  It's not
21  the Federal Register.  It's in upper right-hand --
22     A.    Got it.
23     Q.    In the last full paragraph, which is that
24  long paragraph, it talks about the final rule of
25  rule of what must be reported.  And if you drop your

Page 493

1  eyes down about five lines maybe, six lines, it
2  starts with the word "specifically."
3         Do you see that?
4      A.    Uh-huh.
5      Q.    "Specifically, incident information
6  regarding human fatalities must be reported within
7  15 days."
8         And it goes on to say, "Information
9  regarding allegations of serious human illness or
10  fatalities to wildlife, serious plant damage,
11  serious property damage, or water contamination
12  above MCLs or HALs, may be accumulated for 30 days,
13  and reported within 30 days after the accumulation
14  period."  Right?
15     A.    Correct.
16     Q.    And then everything else has a 90-day
17  accumulation and a 60-day follow on reporting
18  period, right?
19     A.    Correct.
20     Q.    This is all familiar to you?
21     A.    Yes, sir.
22     Q.    On Page 21, the top paragraph, which
23  actually starts at the bottom of the previous page,
24  and within that paragraph -- we can start on the
25  previous page to have the full context for the

Page 494

1  paragraph.  At the bottom, it starts with the second
2  issue.  This is EPA speaking.
3         "The second issue raised by commenters
4  concerns whether specific symptoms have been
5  reported.  Some commenters felt that in the absence
6  of concrete evidence of adverse effects to exposed
7  individuals, there's no basis for reporting under
8  Section 6(a)(2)."
9         That's the FIFRA reporting section we've
10  been talking about, right?
11     A.    Correct.
12     Q.    In essence, these comments are objecting
13  to the reporting criteria of section -- and it
14  references Section 159.184, that the registrant has
15  been informed that a person, quote, "may have some
16  suffering or may suffer," end quote, an adverse
17  effect.  And that's the commenter's point of view.
18     Q.    The agency says -- the agency disagrees
19  with the comments of the standard, and says that the
20  standard for reporting an incident -- and that would
21  be reporting an incident pursuant to 6(a)(2), right?
22     A.    Correct.
23     Q.    All right.  The standard for reporting an
24  incident is that there be both an allegation of
25  exposure and an allegation of possible harm, right?

Page 495

1      A.    Correct.
2      Q.    And that would be an allegation that a
3  specific pesticide exposure has caused a specific
4  harm, right?
5      A.    Well, or a specific series of pesticide
6  exposures, perhaps not a single one.
7      Q.    There has to be an allegation that
8  exposure to a specific --
9      A.    Right.
10     Q.    -- pesticide has caused a specific harm?
11     A.    Right.  I just want to make clear that
12  the sentence "an allegation of exposure," that could
13  include one episode or multiple episodes of
14  exposure.
15     Q.    But there has to be an allegation that --
16     A.    Correct.
17     Q.    -- exposed pesticide is allegedly the
18  cause of a specific harm?
19     A.    Correct.
20         MR. COPLE:  Let's mark as Exhibit 27 in
21  the deposition.
22         (Benbrook Exhibit Number 27 is marked for
23  identification.)
24  BY MR. COPLE:
25     Q.    Are you familiar with this document?

CONFIDENTIAL

Page 496

1    A.    Yes.
2    Q.    This is called the 1996 FQPA Approved
3  Quality Protection Act Implementation Plan.
4         Did you read this in preparing for your
5  expert report and opinions?
6    A.    No.
7    Q.    But you've read it previously; is that
8  right?
9    A.    Many times.
10    Q.    Now, you've mentioned the Delaney Clause
11  a number of times in your expert report in this
12  particular case, correct?
13    A.    Correct.
14    Q.    You told us yesterday in answer to a
15  question about your involvement in an NAS
16  publication about the Delaney Clause paradox.  Is
17  that right?
18    A.    The Delaney Paradox Report and the
19  follow-up study on pesticides in the diets of
20  infants and children.  Correct.
21    Q.    On Page 12 of this Exhibit 27, at the
22  top, it starts out by saying that "Prior to passage
23  of FQPA, EPA had revoked or had proposed to revoke a
24  number of pesticide tolerances for processed foods
25  that were subject to the Delaney Clause under," 409

Page 497

1  of the Federal Food, Drug, and Cosmetic Act."
2         It goes on to say, "As of August 3, 1996,
3  pesticides were no longer subject to the Delaney
4  Clause and it became unnecessary to complete the
5  proposed revocations."
6         Is that your understanding, as well?
7    A.    Yes, sir.
8    Q.    So the Delaney Clause after '96 was no
9  longer a consideration in terms of pesticide
10  registration, review, and approval.  Is that
11  correct?
12    A.    For all intents and purposes, the Food
13  Quality Protection Act amended the Food, Drug, and
14  Cosmetic act in a way that altered the previous
15  prohibition that blocked EPA from approving certain
16  Section 409 tolerances for cancer-causing
17  pesticides.  It unraveled the Delaney paradox, is
18  one way to put it simply.
19    Q.    So it no longer applied after '96?
20         MR. LITZENBURG:  Asked and answered.
21         THE WITNESS:  Well, it -- it -- the Food
22  Quality Protection Act established a new
23  health-based standard for the review and
24  approval of pesticide tolerances, which is
25  summarized as reasonable certainty and no harm.

Page 498

1  This is -- this was the basic standard in
2  several other areas of FDA decision making on
3  human drugs, animal drugs, and other chemicals
4  for which FDA was responsible for regulation in
5  the food supply.
6         So it's not that Delaney Clause didn't
7  apply anymore, but in passing this new statute,
8  the Congress provided a new framework and a new
9  way to deal with tolerance petitions involving
10  cancer-causing pesticides in processed foods.
11         It certainly was not -- it -- it
12  substantially changed, obviously, the impact of
13  the Delaney Clause, but the Delaney Clause
14  remains part of the Food, Drug, and Cosmetic
15  Act.  But just the way that the EPA applied the
16  Delaney Clause in a tolerance setting was
17  changed and hence superseded the Delaney Clause
18  after the signing of the Food Quality Protection
19  Act in August of 1996.
20  BY MR. COPLE:
21    Q.    So the implementation plan actually says
22  that as of August '96, pesticides are no longer
23  subject to the Delaney Clause, right?
24         MR. LITZENBURG:  Asked and answered.
25         THE WITNESS:  That was the date President

Page 499

1  Clinton signed the bill.
2  BY MR. COPLE:
3    Q.    So after that date, the Delaney Clause
4  has no application to pesticide registration and
5  approval, right?
6         MR. LITZENBURG:  Asked and answered.
7  If you don't like the answer, move on.
8         MR. COPLE:  I just want to know if it's
9  yes or no.
10         MR. LITZENBURG:  It's the identical thing
11  you asked him, and he went on for five minutes
12  with a highly qualified and detailed answer.
13         MR. COPLE:  Which we didn't need.  We
14  needed a yes or no, and we didn't get one.
15         THE WITNESS:  The Delaney Clause, as it
16  applied to tolerance setting prior to
17  August 3rd, 1996, had -- did not have the same
18  impact on tolerance setting after the passage of
19  the FQPA, because Congress set out a new
20  framework and standard covering those tolerance
21  petitions that had previously been impacted by
22  the Delaney Clause.
23  BY MR. COPLE:
24    Q.    Is it your testimony that the Delaney
25  Clause has any continuing application to pesticide

CONFIDENTIAL

Page 500

1    registration?
2         MR. LITZENBURG:  Asked and answered.
3         THE WITNESS:  No.  It has none.
4    BY MR. COPLE:
5         Q.    All right.
6         A.    The new law is passed called the Food
7    Quality Protection Act.
8         Q.    All right.  So the paradox of the Delaney
9    Clause with respect to pesticide registration has
10   been eliminated, right?
11        A.    It was resolved.  Yes.
12        Q.    On Page 25 of the EPA implementation
13   plan, there is a subsection called 5.3 Tolerance
14   Reassessment, and three paragraphs --
15        A.    What page are we on?
16        Q.    I'm sorry.  We're on Page 25.
17        A.    Okay.  The 5.3 Tolerance Reassessment.
18   Yes, sir.
19        Q.    Three paragraphs down, it says that
20   "Under the new law, EPA is required" -- the new law
21   would be the FQPA, right?
22        A.    Correct.
23        Q.    -- "the new law, EPA is required to
24   reassess all," and "all" is in bold here, "existing
25   tolerances and exemptions from tolerances for both

Page 501

1    active ingredients and inerts, not only those
2    associated with older pesticides, within ten years
3    to ensure they meet the new FQPA safety standard."
4         Now, that's the new standard that you
5    were just telling us about, right?
6         A.    Correct.
7         Q.    All right.  So all tolerances, all
8    exemptions from tolerances for any active ingredient
9    like glyphosate and any inert that's used in the
10   pesticide formulation had to meet FQPA safety
11   standards within ten years from the effective date,
12   correct?
13        A.    That was the aspirational goal and the
14   implementation goal, correct.
15        Q.    And glyphosate has been approved under
16   the FQPA accordingly, right?
17        A.    The glyphosate dietary risk assessment
18   and the review of the tolerances has gone through
19   the FQPA process, yes.
20        Q.    And the inerts that are used in
21   connection with glyphosate-based formulations have
22   all been approved under the FQPA safety standard,
23   right?
24        A.    I -- there -- first of all, I don't know
25   all the inerts in glyphosate-based herbicides, those

Page 502

1    manufactured by Monsanto and those manufactured by
2    other companies.  I'm sure it's quite a long list,
3    and I can't say for certain whether all of them have
4    gone through the process.  I'd have to research
5    that.
6         MR. COPLE:  Let's mark this document as
7    Exhibit 28 to the deposition.
8         (Benbrook Exhibit Number 28 is marked for
9    identification.)
10   BY MR. COPLE:
11        Q.    Are you familiar with this document?
12        A.    Yes.
13        Q.    This is the earlier glyphosate pesticide
14   tolerance review from 1997, after the enactment of
15   Food Quality Protection Act?
16        A.    Correct.
17        Q.    Have you reviewed this in connection with
18   your report or your opinion in this case?
19        A.    I didn't need to.  I know this tolerance
20   petition and action quite well.
21        Q.    All right.  In this particular petition
22   that's being decided as a final rule by EPA, the
23   agency said in the middle column, all the way down
24   at the bottom, that "The agency received one comment
25   opposing the tolerances."

Page 503

1         And it went on to say that "The
2    commenter's objection was based on concerns of
3    enhanced exposure of the public to glyphosate and
4    other ingredients of the Roundup formulations;
5    greater use of Roundup/glyphosate which will result
6    in adverse effects to the environment and human
7    health; and exposure of the public to Roundup from
8    consumption of corn or the animal product from
9    animals fed corn."
10        Then the EPA responds.  Now, in the
11   response, EPA explained what the data was that was
12   submitted in the petitions that was considered in
13   support of the tolerances, right?
14        A.    Correct.
15        Q.    And in the Toxicological Profile, under
16   3, there was a two-year carcinogenicity study in
17   mice that was taken into account by EPA in approving
18   FQPA tolerance petition for glyphosate, right?
19        A.    That's what it says in Paragraph 3.
20   Correct.
21        Q.    And also in Paragraph Number 4, a chronic
22   feeding carcinogenicity study in male and female
23   rats fed dosage -- and it indicates what the dosages
24   were, correct?
25        A.    Correct.

CONFIDENTIAL

Page 504

1    Q.    And so there were two animal model
2  studies that were taken into account by EPA in
3  reaching its decision in this 1997 glyphosate
4  tolerance review?
5         MR. LITZENBURG:  Form.
6         THE WITNESS:  I would expect there were
7  more, but these are two that the agency is
8  specifically discussing.
9  BY MR. COPLE:
10   Q.    Now, if you go to the next page, which is
11  the Federal Register Page 17724, and in the far
12  right column, which is a continuation of the dose
13  assessment response, and under the dose assessment
14  response, there's a Paragraph 2 called
15  Carcinogenicity Classification.
16        Do you see that?
17   A.    I see that.  Okay.
18   Q.    And in the classification, the EPA's
19  referencing the original 1985 consensus review by
20  the toxicology branch ad hoc committee that you have
21  testified about and is in your report, correct?
22   A.    Correct.
23   Q.    And it explains that this ad hoc
24  committee, in the consensus review of March 4, 1985,
25  classified glyphosate as a Group C carcinogen, and

Page 505

1  that would be possible carcinogen based on increased
2  incidence of renal tumors male in mice, right?
3    A.    Correct.
4    Q.    So EPA is pointing out the history of the
5  classification of glyphosate, right?
6    A.    Correct.
7    Q.    And it goes down a little further and
8  points out that in its report dated February 24,
9  1986 --
10   A.    Wait a second.  Let me try to follow you.
11   A.    All right.
12   A.    How far did you drop down?
13   Q.    Maybe two sentences.  It's right after --
14   A.    Let me -- let me read the intervening
15  sentences.
16   Q.    Sure.
17   A.    Okay.  We talked about the SAP.  Where
18  are you picking it up?
19   Q.    We're picking it up right after the, in
20  paren, SAPs --
21   A.    Okay.
22   Q.    There's a sentence that says, "In its
23  report dated February 24, 1986, SAP classified
24  glyphosate as a Group D carcinogen (inadequate
25  animal evidence of carcinogenic potential)."  Right?

Page 506

1    A.    I think that's actually a slight
2  misstatement.  The SAP recommended that glyphosate
3  be so classified.  It's really -- it's not in the
4  purview or authority of SAP to make that decision.
5  It's kind of odd that they said it this way.  It's a
6  minor point.  It's a minor point.  Just pointing it
7  out.
8    Q.    Did you ever communicate what you
9  believed to be a misinterpretation or a misstatement
10  here to EPA?
11   A.    No.  It's not -- not important.
12   Q.    If you go further -- and this would have
13  been based, if you remember, on the February 11 and
14  12 hearing in 1986?
15   A.    Of course, yes.
16   Q.    And that was the hearing, if I state this
17  correctly; if I don't, I'm sure you'll tell me,
18  which is that the SAP considered the testimony and
19  submissions of various pathologists about the
20  resection kidney samples, right?
21   A.    Correct.
22   Q.    In the next full paragraph, it starts,
23  "The SAP determined that the carcinogenic potential
24  of glyphosate could not be determined from existing
25  data and proposed that the rat and/or mouse studies

Page 507

1  be repeated in order to classify these equivocal
2  findings."
3         That's all a correct statement, right?
4    A.    Correct.
5    Q.    If you go to the next column, and at the
6  top, where it starts the first full sentence, EPA
7  goes on to say to the public that "Upon receipt and
8  a review of the second rat chronic feeding and
9  carcinogenicity study, all toxicological findings of
10  glyphosate were referred to the health effects
11  division carcinogenicity peer review committee on
12  June 26th, 1991."  Right?
13   A.    Correct.  The meeting we've already
14  talked about at great length.
15   Q.    Right.  And that second rat study was the
16  one done by Monsanto as a replacement study,
17  correct?
18   A.    Correct.
19   Q.    And Dr. Dykstra had, along with a couple
20  of other scientists at EPA and toxicologists, said
21  that they were going to put on hold and defer, or
22  language of that sort, the need for any additional
23  mouse study pending their review of additional
24  information including the rat study, right?
25   A.    Correct.

CONFIDENTIAL

Page 508

1    Q.    The EPA continues with respect to -- this
2  is the second peer review committee, right, the '91?
3    A.    I think it's important to know at about
4  the same time that Dr. Dykstra and Dr. Gardner and
5  the other EPA folks were continuing their -- their
6  debate about the mouse oncogenicity study and
7  awaiting the results of the rat study, Dykstra
8  submitted to Monsanto a protocol for a much more
9  sensitive, rigorous mouse study that, in the
10  judgment of the EPA scientists, would definitively
11  resolve the outstanding questions, the equivocal
12  nature, the tentative nature of the interpretation
13  of the renal tubular adenomas in the 1983 study, and
14  that was also part of what the agency had requested
15  Monsanto to do in this -- the time period between
16  the 1985 classification as a possible human
17  carcinogen and the 1991 change in the
18  classification.
19    Q.    But as of April 11, 1997, EPA's final
20  rule said that "all toxicological findings had been
21  referred to the carcinogenicity peer review
22  committee on June 26, 1991," specifically to discuss
23  and evaluate the weight of evidence on glyphosate
24  and particular emphasis on carcinogenic potential,
25  right?

Page 509

1    A.    That's what it says.  Correct.
2    Q.    And that peer review committee, as EPA is
3  informing the public, classified glyphosate at that
4  time, in 1991, as a Group E chemical, evidence of
5  noncarcinogenicity for humans, right?
6    A.    That's what it says, correct.
7    Q.    And that was based on the lack of
8  convincing carcinogenicity evidence in adequate
9  studies in two animal species, right?
10    A.    Correct.
11    Q.    It also includes, if you go to the bottom
12  of that full paragraph, the conclusion by EPA that
13  "there is no evidence of genotoxicity for
14  glyphosate," right?
15    A.    Correct.
16    Q.    Now, since this time -- I should say
17  between the time that the peer review committee on
18  carcinogenicity reached its conclusions on
19  June 26th, 1991, up to June 27th, 1997, there was no
20  change in the Group E classification stats for
21  glyphosate, right?
22    A.    Correct.
23    Q.    In fact, in 1993, the RED was approved by
24  EPA for glyphosate, and that RED concluded that
25  Group E was the appropriate classification, right?

Page 510

1    A.    Correct.
2    Q.    And since 1997, there have been no
3  change, right up until today -- that there is no
4  carcinogenic risk with respect to exposure of
5  glyphosate, right?
6    A.    Did you happen to forget the last time I
7  answered the question?  You've asked me that
8  probably coming on 20 times now.  It seems kind of
9  unnecessary, Counselor.
10    Q.    You don't have an answer?
11    MR. LITZENBURG:  Asked and answered.
12  Explained.  Many times.
13    MR. COPLE:  I'll take that as a yes,
14  then.
15    MR. LITZENBURG:  I'll take that as a no.
16  BY MR. COPLE:
17    Q.    All right.  Since 1997, the tolerance,
18  the tolerance exemptions for glyphosate residue has
19  been proved a number of times by EPA, right?
20    A.    What tolerance?  What are you talking
21  about?
22    Q.    Glyphosate as the active ingredient has
23  been approved under the Food Quality Protection Act
24  for a number of different crops since 1997?
25    A.    There haven't been very many new crops.

Page 511

1  There have been many increases in tolerance levels
2  for existing crops in taller sections.  There have
3  been a few minor crops added, but by 1997, as you
4  well know, the vast majority of the 120 or 130 crop
5  uses and tolerances were already on the books, as
6  the saying goes.
7    Q.    Each time there was a review and approval
8  of a tolerance for glyphosate for any additional
9  crop would have been a separate and additional
10  safety finding for glyphosate as not being
11  carcinogenic, right?
12    MR. LITZENBURG:  Form.
13    THE WITNESS:  No.  No.
14  BY MR. COPLE:
15    Q.    No?
16    A.    No.  They -- you know, they -- if you
17  look at the series of final rule, federal registered
18  notices, you can see that they follow very similar
19  format and order.
20    Some of the paragraphs are verbatim
21  statements of -- on, say, the issue of
22  carcinogenicity classification.  Essentially the
23  same paragraph would appear in a -- I mean, let's
24  say there's another final rule in June of 1997.
25    If EPA has received new data and

CONFIDENTIAL

Page 512

1  conducted an updated dietary exposure and risk
2  assessment between an April 11th, 1997, final rule
3  and one later in '97 or in 1999, they will report
4  that.
5       But if there's been no new studies, if
6  there was only a very minor increase in exposure,
7  they wouldn't do a whole new dietary risk
8  assessment.  They don't do a whole new de novo
9  review of all the safety data.  They simply state
10 their current evaluation of dietary exposure and
11 risk.
12      Q.   So each time there was a tolerance
13 approval for glyphosate residue, it would ratify by
14 EPA of the noncarcinogenic status of the active
15 ingredient, right?
16      MR. LITZENBURG:  Asked and answered.
17      THE WITNESS:  Any -- any subsequent final
18 rule for a tolerance or for reregistration
19 document, based on any new or better data that
20 the agency had received in the intervening
21 period and incorporated into its existing
22 dietary risk assessment.
23 BY MR. COPLE:
24      Q.   You mentioned two epidemiology studies in

Page 513

1  your report, 1999 Hardell and 2002 McDuffie; is that
2  correct?
3       A.   Yes.
4       Q.   And in paragraph numbered -- paragraph
5  numbered 60.
6       A.   60, we're going way back.
7       Q.   This is on Page 15.
8       A.   Okay.
9       Q.   Paragraph Number 60, you say that
10 "Beginning around 2000, Monsanto could and should
11 have added a warning to their label, and otherwise
12 informed the public and biomedical community, that
13 exposures to Roundup formulations increase the risk
14 of a specific cancer, NHL, after learning about the
15 results of two epidemiological studies showing a
16 statistically significant increase in the risk of
17 NHL among users of glyphosate-based herbicides."
18      Now, that's based upon Hardell and
19 Eriksson in '99?
20      A.   Yes.  The full citations are following.
21      Q.   Then you go on to talk about a
22 case-controlled study of non-Hodgkin's lymphoma and
23 exposure to pesticides in published in Cancer, which
24 is -- is that McDuffie, 2001?
25      A.   The case control study was Hardell and

Page 514

1  Eriksson in '99, and McDuffie's was in 2001, and was
2  based upon this Cross-Canada study.
3       Q.   So those were the two studies that you
4  believe should have triggered additional information
5  on the labeling; is that right?
6       MR. LITZENBURG:  Form.
7       THE WITNESS:  No.  They're -- they're --
8  the two studies that should have tipped the
9  weight of evidence evaluation of non-Hodgkin's
10 lymphoma and cancer risk in general, I suppose,
11 for glyphosate-based herbicides, given what
12 Monsanto knew about the genotoxicity of
13 formulated glyphosate-based herbicides at that
14 time.
15 BY MR. COPLE:
16      Q.   You read the testimony of Dr. Neugut?
17      A.   Who?
18      Q.   Dr. Neugut?
19      A.   No.
20      Q.   Do you know who Dr. Neugut is?
21      A.   No.
22      Q.   Have you read the testimony of any
23 epidemiologist that's testified or prepared an
24 expert report in this litigation?
25      A.   No.

Page 515

1       Q.   Did anyone other than you review the
2  McDuffie and Hardell epidemiology studies for you or
3  with you in coming to your conclusions about those
4  two studies?
5       A.   No.
6       Q.   Now, you would agree that an
7  epidemiologic study is not a positive study unless
8  it has relevant risk or odds ratio of 1.0 or above
9  and is also statistically significant, right?
10      MR. LITZENBURG:  Form.
11      THE WITNESS:  That is as a standard basis
12 for judging whether a given study produces
13 statistically significant result, correct.
14 BY MR. COPLE:
15      Q.   Are you aware of what recall bias is?
16      A.   Yes.
17      Q.   What is it?
18      A.   Many of these retrospective studies rely
19 upon a survey or interview with people regarding
20 their use of particular pesticides, sometimes many
21 years before.  Recall bias is a concern in the
22 design and methodology of all retrospective
23 epidemiologic studies that basically relates to
24 inaccurate memory of whether and how many times an
25 individual sprayed a particular pesticide or all

CONFIDENTIAL

1 pesticides.  In dietary intervention studies, it's
2 uncertainty about how they recall -- what they ate
3 10 or 20 years ago.
4          So it's a concern about people
5 remembering accurately behavior many years before.
6     Q.    And it's of greatest concern in the case
7 control retrospective study, right?
8     A.    Certainly, yeah.  It's a -- it's a major
9 concern in all retrospective case control studies,
10 especially those that have a long time period and no
11 other way to corroborate the information that's
12 being obtained from the actual person in the study
13 that is answering from their memory.
14     Q.    And Hardell, 1999, that was a
15 retrospective case control study?
16     A.    Correct.
17     Q.    Which would have suffered from recall
18 bias, right?
19     A.    It might.
20     Q.    Did you take that into account in
21 reaching your opinion about the Hardell 1999 study?
22     A.    Yes.
23          MR. COPLE:  Let's mark this.
24          (Benbrook Exhibit Number 29 is marked for
25 identification.)

1          THE WITNESS:  There is a fairly clear
2 discussion by Hardell and Eriksson about the
3 limitations of their study, as there is in most
4 of these epidemiological studies.
5 BY MR. COPLE:
6     Q.    We've marked as Exhibit 29 to the
7 deposition, the Hardell Eriksson study of 1999.
8          You've reviewed this for your opinions,
9 right?
10     A.    Correct.
11     Q.    Now, the abstract is that portion that
12 introduces the study to the reader, which shows up
13 on the first page as background methods, results,
14 and conclusions, correct?
15     A.    Correct.
16     Q.    And this particular abstract does not
17 mention glyphosate in the results of the
18 conclusions, right?
19     A.    Just let me -- let me skim it again.
20     Q.    In fact, it doesn't mention it anywhere
21 in the abstract portion?
22     A.    Correct.
23          MR. LITZENBURG:  Review it.
24 BY MR. COPLE:
25     Q.    Right?

1          MR. LITZENBURG:  Have you reviewed it to
2 your satisfaction?
3          THE WITNESS:  Give me a second here.
4          Okay.  I've had a chance to read the
5 abstract now.
6 BY MR. COPLE:
7     Q.    There's nothing in the abstract about
8 glyphosate, right?
9     A.    There's only the report for herbicides.
10     Q.    This report covers glyphosate, right?
11     A.    I believe it's mentioned further in the
12 report.  Correct.
13     Q.    All right.  Well, let's go further into
14 the report.  If you go to Table 1, which is on
15 Page 1355.
16     A.    Correct.  I see it.
17     Q.    You see that.  On Table 1, there is a
18 listing breaking up glyphosate from other herbicides
19 and other chemicals, as well.  Have you seen that?
20     A.    Yes.
21     Q.    And glyphosate, under the number of
22 exposed cases and controls, has four exposed and
23 three controls.  Right?
24     A.    Correct.
25     Q.    What's an exposed case for an

1 epidemiologist?
2     A.    It's a case that reported use of the
3 herbicide in their responses to the questionnaire.
4     Q.    And the control, what is that?
5     A.    That's a -- an individual selected from
6 comparable demographics that did not report any use
7 of pesticides.
8     Q.    And four exposed cases in an
9 epidemiological study would not be a sufficient
10 number of cases to establish an association between
11 a substance and an effect on a population, right?
12          MR. LITZENBURG:  Form.
13          THE WITNESS:  Well, no epidemiologist
14 would be happy with only four exposed and three
15 control cases.  That's a study with very low
16 statistical power, and hence, the large
17 variation in the confidence interval, despite
18 fairly high and elevated odds ratio.  So there's
19 just -- it's hard to draw any firm conclusions
20 with so few exposed and control cases.
21 BY MR. COPLE:
22     Q.    All right.  The elevated odds ratio
23 you're pointing out is 2.3 in the OR column, right?
24     A.    Correct.
25     Q.    And the CI column, what is CI?

CONFIDENTIAL

Page 520

1  A.   It's the confidence interval.
2  Q.   This was 95 percent?
3  A.   Correct.
4  Q.   All right.  It's got a CI of 0.4 going up
5  to 13, right?
6  A.   Correct.
7  Q.   That's a huge swing in the confidence
8  interval, right?
9  A.   Very big, because of the very low number
10  in the number of exposed and control cases.
11  Q.   And it falls -- the range falls within
12  the no of 1.0, and therefore, the results based on
13  chance are randomness or error cannot be eliminated,
14  right?
15  A.   Yes.  Inconclusive.
16  Q.   Inconclusive.  So this is not a
17  statistically significant finding in the Hardell
18  Eriksson study, right?
19  A.   In this paper, correct.
20  Q.   Right.  And so it is your opinion in the
21  report that it's a positive study that was found
22  with respect to Hardell Eriksson?
23  A.   There isn't a positive result reported in
24  this study, but as you know, there was a series of
25  letters to the editor of this journal, which

Page 521

1  included a response by Hardell and Eriksson in which
2  they report that they had done additional work and
3  expanded the number of exposed and control
4  individuals in the ongoing, increasingly large
5  study, and that in their subsequent analysis, the
6  heightened odd ratio was statistically significant.
7  Q.   That was a letter to the editor?
8  A.   Yes.
9  Q.   Those are referenced in --
10  A.   I'm sure it's referenced in my report.
11  Q.   Which paragraph is it referenced in?
12  A.   I don't know.
13  Q.   Letters to the editor are not studies
14  themselves, right?
15  A.   Well, letters to the editor can include
16  data, analysis.  Sometimes letters to the editor go
17  through peer review.  And in this case, Hardell and
18  Eriksson felt it appropriate and the editor felt it
19  appropriate to bring -- alert the scientific
20  community that science had marched on; they had
21  expanded the study; they had refined the analysis;
22  and they had a new result related to this paper to
23  report, which was that the finding for
24  glyphosate-based herbicides and non-Hodgkin's
25  lymphoma was -- the elevated risk was now

Page 522

1  statistically significant.
2  Q.   A letter to the editor is not
3  peer-reviewed in published peer-reviewed literature,
4  right?
5  MR. LITZENBURG:  Asked and answered.
6  THE WITNESS:  Sometimes they are;
7  sometimes they're not.
8  BY MR. COPLE:
9  Q.   Well, which journal have you found
10  letters to the editor are peer-reviewed?
11  A.   Journals have different -- different
12  policies about what sort of material appears in
13  letters to the editor, how much material appears in
14  letters to the editor, and whether they feel that a
15  particular letter to the editor needs some kind of
16  assessment beyond that of -- that the editor him or
17  herself would conduct.
18  In addition, most letters to the editor
19  that address some aspect of a published study, and
20  in the case of Hardell and Eriksson, are subjected
21  to peer review by Hardell and Eriksson as a common
22  courtesy in the scientific community.
23  If a scientist authors a letter on a
24  specific study that either criticizes the study or
25  praises it or raises a question, it's expected that

Page 523

1  the authors of the original study will be given the
2  opportunity to peer-review the letter and respond to
3  it if there is information that they can provide
4  that answers the question or provides further
5  insights or data relevant to the conclusions reached
6  in the study or something brought up in the letter
7  to the editor.
8  Q.   The letter to the editor is not the
9  publication of a study, correct?
10  MR. LITZENBURG:  Asked and answered, two
11  or three times.
12  THE WITNESS:  A letter to the editor is
13  certainly different from a publication reporting
14  the original results of a new experiment, such
15  as this Hardell journal article.
16  This is, as far as I know, the first
17  place that Hardell and Eriksson reported the
18  results of this particular epidemiological
19  study.  And, yes, there clearly is a difference
20  in the peer-review process or the assessment of
21  an original research study like this compared to
22  a letter to the editor.  But, you know, some
23  journals, like Nature, have letters to the
24  editor; they're actually short reports.  Some
25  journals will have a section of very short,

CONFIDENTIAL

Page 524

1  focused papers that are called "letters," as
2  opposed to other journals call them "short
3  communications," and then other -- most journals
4  will have a letters to the editor on a
5  previously published research.
6       And that is the -- that is where the
7  Hardell and Eriksson response to letters to the
8  editor appeared in subsequent issue of this
9  journal. I don't remember exactly which one it
10  was.
11  BY MR. COPLE:
12      Q.  So there was an original study published
13  after this 1999 study also by Hardell and Eriksson
14  and also in this exact same journal. Is that your
15  testimony?
16      A.  My testimony is that a Hardell and
17  Eriksson reported the statistical results of a
18  larger epidemiological study building on the same
19  population in this study, where they had an increase
20  in the number of exposed individuals that contracted
21  non-Hodgkin's lymphoma and an increased number of
22  controls -- I don't remember the -- it was something
23  to 12 or 15; it was a substantial jump. And because
24  of that increase in the number of exposed cases of
25  non-Hodgkin's lymphoma, the statistical power of the

Page 525

1  test was substantially increased, and the elevated
2  odds ratio became statistically significant.
3       And it was perfectly appropriate for
4  Hardell and Eriksson to include that kind of
5  additional scientific information in a response to
6  letters to the editor from people that, you know,
7  wanted to either question some aspect of the study
8  or wanted further information.
9       Q.  When -- what was the name of that
10  publication that you're referencing? Not the letter
11  to the editor, but the original study results. What
12  was the name of the -- no, not the journal. What
13  was the name of the article?
14      A.  "A Case Control Study of Non-Hodgkin's
15  Lymphoma and Exposure to Pesticides."
16      Q.  Well, that's the one that's in this
17  exhibit --
18      A.  Correct.
19      Q.  -- which is 1999.
20      A.  This was the -- this was the publication
21  of original, new epidemiological data based on the
22  number of cases and controls that Hardell and
23  Eriksson had included in their study and done the
24  statistical analysis on.
25       In the months after, the journal received

Page 526

1  a series of letters to the editor, some critical
2  study. I believe there was a critical letter from
3  Monsanto, as there almost always is when a positive
4  study comes out on herbicides. And as per normal
5  operating procedure, the editor of this journal
6  provided Hardell and Eriksson a chance to reply to
7  the points made in the letters to the editor, and
8  that appears in the letter section, which is in a
9  subsequent issue.
10      Q.  This study that is in this exhibit is not
11  a positive study. It's not statistically
12  significant, right?
13      A.  For glyphosate.
14      MR. LITZENBURG:  Asked and answered.
15  BY MR. COPLE:
16      Q.  Yes, for glyphosate?
17      A.  For glyphosate, correct.
18      Q.  So it's not a positive study, so there
19  would be no reason to follow up on the results
20  because that's the answer; it's not a positive
21  study?
22      A.  Oh, absolutely not, sir. That's a
23  ridiculous statement. Do you really want me to
24  point out how ridiculous that is?
25      Q.  Where is the original study publication

Page 527

1  other than a letter to the editor? Where is that?
2      A.  I -- I don't know if they ever published
3  a follow-up study. I --
4      Q.  So they're unpublished results?
5      A.  No. They were published in a letter to
6  the editor.
7      Q.  All right. Table 7 on Page 1357 shows a
8  multivariate analysis of different exposures. Do
9  you see that?
10      A.  I do.
11      Q.  And this study did not control for
12  compounding between exposure of multiple pesticides?
13      A.  I'd have to read it and think about it to
14  get into the details of those statistical analyses.
15      Q.  Well, let's look at the left-hand column
16  on the same page.
17      A.  In Table 7?
18      Q.  No. No. On the left-hand column of that
19  page, 1357, left-hand column.
20      A.  Are we talking about Table 6?
21      Q.  No. No. We're talking about the actual
22  text under the results.
23      A.  Oh. Under the word "results."
24      Q.  No. Results starts in a couple of
25  preceding pages. Results starts on 1355, but I'm

CONFIDENTIAL

Page 528

1   directing your attention to the multivariate
2   analysis results which are discussed in the
3   left-hand column of 1357.  It's right below the
4   table.  It's not in the table, but below Table 6.
5       A.    Below Table 6.
6       Q.    On Page 1357.
7       A.    Fifty-seven.  Okay.  Multivariate
8   analysis.  I see that paragraph.
9       Q.    All right.  There's the multivariate
10  analysis discussion.  And the second to last
11  sentence says that -- well, it's third to last
12  sentence.  It's says, "Exposure to glyphosate and
13  phenoxy herbicides was considered in a second
14  multivariate analysis."
15          Do you see that?
16      A.    Yes.
17      Q.    It's says, "For glyphosate, an odds ratio
18  of 5.8 was found," right?
19      A.    Correct.
20      Q.    With a 95 percent confidence interval of
21  0.6 up to 54, right?
22      A.    Yeah.  Very, very wide.
23      Q.    That's a large confidence interval for
24  any result, correct?
25      A.    And also a very large odds ratio.

Page 529

1       Q.    And the confidence interval includes the
2   null value of 1.0 because it encompasses 0.6, and
3   therefore it's not statistically significant?
4       A.    Correct.
5       Q.    All right.  So it's also not a positive
6   study, correct?
7       A.    Correct.  It's a worrisome, suggestive
8   result that begs for a more in-depth assessment with
9   a larger sample, which would -- it would certainly
10  reduce the confidence interval.
11      Q.    And a larger sample was in fact studied
12  in Andreotti that was released in 2017, in
13  December --
14      A.    Correct.
15      Q.    -- in the Agricultural Health Study,
16  right?
17      A.    I'm not sure it was -- I'm not sure the
18  sample was larger.  It was a longer time period.
19      Q.    The follow-up was greater?
20      A.    Yeah, the follow-up was greater.
21      Q.    And the results of that Andreotti study
22  published in 2017 was that there's no association
23  between non-Hodgkin's lymphoma and exposure to
24  glyphosate in pesticide application, right?
25      A.    No statistically significant association.

Page 530

1   Correct.
2           MR. LITZENBURG:  Counselor, we've been
3   here for 12 hours on the record.  We're not
4   going to make the witness available beyond 14
5   for redirect or anything.  So be warned.
6           MR. COPLE:  What are we at?
7           THE VIDEOGRAPHER:  Total?
8           MR. COPLE:  No.  Counsel has represented
9   that it's 14 hours -- I'm sorry, what, 12 hours?
10          MR. LITZENBURG:  I think we're at 12.
11          THE VIDEOGRAPHER:  Twelve hours and I
12  believe 8 minutes.
13          MR. COPLE:  Let's mark this as 30.
14          (Benbrook Exhibit Number 30 is marked for
15  identification.)
16  BY MR. COPLE:
17      Q.    We've marked the McDuffie study from 2001
18  as Exhibit 30.  This is the study that you have
19  reviewed and referenced in your expert report,
20  correct?
21      A.    There's two McDuffie studies.  I'd have
22  to look at this one to figure out which one it is.
23  Is this the Canada-wide or the by-province study?
24      Q.    You tell me.
25      A.    Okay.  All right.

Page 531

1       Q.    Is this the study that is referenced in
2   your report?
3       A.    I reference both of their studies, so I'm
4   sure this is -- well, let me see.  Is this the -- I
5   can tell from this paragraph.
6       Q.    The title is "Cross-Canada."
7       A.    Okay.
8       Q.    All right.  In this study abstract, which
9   appears on the first page, the left and the right
10  columns, about the overall results of the study,
11  there's no mention of glyphosate anywhere, right?
12      A.    Let me read it, please.
13          THE VIDEOGRAPHER:  Counsel, I just want
14  to remind you, you have three minutes on the
15  tape.
16  BY MR. COPLE:
17      Q.    Have you read the abstract?
18      A.    Yes.  I want to look further into it,
19  please.
20      Q.    My question is about the abstract.
21  Glyphosate is not mentioned --
22          MR. LITZENBURG:  Look at it as much as
23  you want.
24          THE WITNESS:  Hang on.
25          MR. COPLE:  Well, let's change the tape

CONFIDENTIAL

Page 532

1  then, because I'm only asking about the
2  abstract.
3      THE VIDEOGRAPHER:  The time is now 12:35.
4  We are off the record.
5      (Break in proceedings.)
6      THE VIDEOGRAPHER:  The time is now 12:45.
7  We are on the record.
8  BY MR. COPLE:
9      Q.   The McDuffie abstract does not mention
10  glyphosate, right?
11     A.   Correct.
12     Q.   It does mention a number of different
13  pesticides, just not glyphosate, right?
14     A.   Yeah, three or four.
15     Q.   Now, glyphosate is listed in one of the
16  tables; is that right?
17     A.   It's listed in more than one.
18     Q.   Let's go to Table 2, Page 1158.
19     A.   Okay.
20     Q.   And there's a listing for glyphosate,
21  Roundup.  Do you see that?
22     A.   Yes.
23     Q.   And that would be appropriate because the
24  exposure in human population, glyphosate would be
25  exposure to the formu-- product formulation,

Page 533

1  right?
2      A.   Correct.
3      Q.   The number of exposed cases is 51; is
4  that right?
5      A.   Yes.  Considerably larger, obviously,
6  than the other study we were talking about.
7      Q.   And 133 controls?
8      A.   Correct.
9      Q.   And an odds ratio of 1.26, right?
10     A.   Correct.
11     Q.   And a range, a confidence interval of
12  0.87 to 1.8, correct?
13     A.   Correct.  In this analysis, yes.
14     Q.   And in the adjusted odds ratio, which is
15  the last column, it's odds ratio of 1.2, right?
16     A.   Correct.
17     Q.   With a CI interval of 0.83?
18     A.   It's largely the same.
19     Q.   Largely the same.  There's no
20  statistically significant result here, right?
21     A.   Not in this table.
22     Q.   And is there another table where there's
23  a statistically significant result?
24     A.   Yes, there is.
25     Q.   Which is it?

Page 534

1      A.   Table 8.
2      Q.   Okay.  And what's the result there?
3      A.   This is a table reporting the results of
4  a stratified analysis based on the frequency of
5  exposures.
6          As you'll see in the days per year for
7  use of Roundup herbicide or glyphosate, results are
8  reported for unexposed people -- individuals in the
9  study that reported one or two days of use of
10  glyphosate herbicide in a year, and then individuals
11  that reported greater than two, so that would begin
12  with three or more.
13         And what the scientists did is they
14  stratified the -- let's see, the total number of
15  cases in Table 2 was 51 exposed.  And of the 51
16  exposed, 28 applied glyphosate-based herbicides once
17  or twice, and 23 applied them 23 times -- there were
18  23 people that applied glyphosate three or more
19  times.
20         So this is a stratification of the data
21  to see if people that used the herbicide more
22  frequently had a higher odds ratio or a
23  statistically significant result.
24         And as you can see from the greater than
25  two days, the odds ratio is 2.12, with a confidence

Page 535

1  interval of 1.2 to 3.73.  And because the confidence
2  interval does not include a value under 1, this is a
3  statistically significant result, as evidenced by
4  the bold type used the in the table, which I'm sure
5  it says bold numbers are statistically significant
6  somewhere.
7      Q.   And this is a confounded result, correct?
8      A.   A what?
9      Q.   Confounded.  There was a confounder that
10  was not adjusted for, correct?
11         MR. LITZENBURG:  Form.
12         THE WITNESS:  I'd have to again read the
13  study.  This is their report, this part of their
14  analysis.
15  BY MR. COPLE:
16     Q.   You're reading the column of greater than
17  two days intensity of exposure under the odds ratio
18  column with the 95 percent CI, correct?
19     A.   Yes.
20     Q.   And there is a footnote to the odds
21  ratio, correct?
22     A.   Yes.
23     Q.   And it says in the footnote:  Odds ratios
24  are calculated with strata for the variables age and
25  province of residence, right?

CONFIDENTIAL

Page 536

1    A.   Yes.
2    Q.   So it did control for the two variables
3 of age and province, but for no others, right?
4    A.   I'd have to read the full paper, but
5 they're reporting that --
6    Q.   Well, it says according to this table,
7 right?
8    A.   Excuse me?
9    Q.   According to this table, it only
10 controlled for two variables?
11    A.   I would need to read the full paper to
12 say that.  They felt that that specific point needed
13 to be footnoted in this table, and I have no reason
14 to not accept that result.
15    Q.   Because of epidemiologists looking at
16 this or any scientists looking at this would need to
17 know whether the odds ratio with the 2.12 ratio and
18 1.2 up to 3.73 confidence interval has been
19 controlled for the confounder of exposure to other
20 pesticides, right?
21    MR. LITZENBURG:  Form.
22    THE WITNESS:  In all epidemiological
23 studies, the scientists try to control for as
24 many variables as they can so that the
25 interpretation of their results is as clean or

Page 537

1 unambiguous as possible, and I'm sure that
2 McDuffie and her team used whatever techniques
3 they could and felt were appropriate to take
4 into account any potentially confounding
5 variables.
6 BY MR. COPLE:
7    Q.   Did you talk to Dr. McDuffie about that?
8    A.   No.
9    Q.   Now, Dr. McDuffie's table in this
10 particular table we're pointing to now, Table 8,
11 only says that there were two variables controlled
12 for, and neither one of them is for exposure to
13 other confounding pesticides, right?
14    A.   There are results reported in this table
15 for 2,4-D, Mecoprop, glyphosate, Dicamba, Malathion,
16 DDT, Captan, Sulfur, and the Carbon tetrachloride
17 fumigant.  So they have broken out of the data and
18 are reporting the individual pesticide results in
19 this population.
20    Q.   Without control for whether there were
21 multiple pesticides exposed to the exposed
22 population, right?
23    MR. LITZENBURG:  Form.  Asked and
24 answered.
25    THE WITNESS:  I'd need to read the full

Page 538

1 paper to provide a full response to that
2 question.  There is, as we've discussed earlier,
3 some places where the team looked at combined
4 exposures to individual pesticides, for example,
5 what we've talked about involving use of
6 glyphosate and other pesticides included in the
7 study.
8 BY MR. COPLE:
9    Q.   This table does not indicate in any way
10 that there was a control for confounding pesticide
11 exposures, right?
12    MR. LITZENBURG:  Objection to form.
13 Asked and answered, three or four times.
14    THE WITNESS:  Yeah.  I have provided you
15 with my understanding of the results in this
16 table, and that is if there is a statistically
17 significant increased odds ratio for individuals
18 applying glyphosate herbicide for three or more
19 days in this retrospective case control study.
20 BY MR. COPLE:
21    Q.   And no control for confounding exposures?
22    A.   I would need to take the time to read the
23 methodology section and the section discussing the
24 statistical methods to answer that question.
25    Q.   This paper was published by Dr. McDuffie

Page 539

1 in 2001.  When was the first time you read this
2 paper?
3    A.   It was in preparation for this case.  I
4 don't remember what -- it was probably in November.
5    Q.   So before November of last year, you
6 never reviewed Dr. McDuffie's study that's published
7 here in this exhibit, right?
8    MR. LITZENBURG:  Form.
9    THE WITNESS:  I don't think so.
10 BY MR. COPLE:
11    Q.   And what about the Hardell and Eriksson
12 1999 study?  When did you first review that study?
13    A.   I know that I reviewed that study and
14 actually wrote about it soon after it came out on
15 the large website that I ran at the time: Ag BioTech
16 InfoNet.  There's a piece on the Hardell-Eriksson
17 1990 study on that website, which -- that website
18 doesn't exist anymore, but I actually still have the
19 files, and I ran into it -- I've ran into it
20 recently.
21    Q.   Did you produce those files from that
22 website regarding the Hardell study to counsel in
23 this case?
24    A.   No.  It's simply -- it's a summary of
25 what the study found, and there's hundreds, hundreds

CONFIDENTIAL

1    of items involving glyphosate on that website. It's
2    a massive website.
3          MR. COPLE:  We ask that whatever
4    Dr. Benbrook wrote about the Hardell and
5    Eriksson study back at the time of its issuance
6    in 1999 and thereafter be produced.
7          Mark this Exhibit 31.
8          (Benbrook Exhibit Number 31 is marked for
9    identification.)
10         THE WITNESS:  What was 29?  Did we go
11   from 28 to 30?
12         MR. LITZENBURG:  29 was the publication.
13         THE WITNESS:  Oh, I must have put it in
14   the pile already.  So this is the new one here.
15   BY MR. COPLE:
16      Q.    You agree, Dr. Benbrook, that this study
17   marked as Exhibit 31 is the largest prospective
18   cohort study that's ever been done by
19   epidemiologists looking at pesticide applicators
20   exposure to glyphosate formulations, right?
21         MR. LITZENBURG:  Form.
22         THE WITNESS:  As I testified yesterday,
23   it's certainly a very large one.  I wouldn't --
24   I wouldn't want to say that I have total recall
25   of the size of all of the epidemiological

1    studies.  It's certainly one of the largest ever
2    done in the United States.  It's a large study,
3    yes.
4    BY MR. COPLE:
5       Q.    How --
6       A.    I just -- I can't confirm that, because I
7    don't have in my memory the number of cases and
8    controls in all of the several dozen epidemiological
9    studies done on glyphosate and herbicides.
10      Q.    All right.  This is published -- or it
11   was published in "The Journal of the National Cancer
12   Institute," right?
13      A.    Correct.
14      Q.    Are you familiar with that journal?
15      A.    Yes.
16      Q.    Have you reviewed publications in that
17   journal?
18      A.    Yes.
19      Q.    And you've reviewed this publication for
20   your work in this case?
21      A.    I've read this, this paper, when it came
22   out.  Yes.
23      Q.    All right.  Now, under the results -- in
24   the abstract section, there's a results category,
25   and you would agree that typically in an abstract

1    for an epidemiologic study there's an abstract that
2    summarizes the background, the methods, the results
3    and the conclusions of the study, right?
4       A.    Correct.
5       Q.    All right.  Under Results, it indicates
6    that there were 54,251 applicators, right?
7       A.    Correct.
8       Q.    No other study that you've seen of an
9    exposed population has anything close to 54,000
10   exposed individuals, right?  Enrolled individuals in
11   the study?
12      A.    As I said, I can't remember any that have
13   that many, but I'm not saying that there isn't one.
14      Q.    And out of the 54,000 or so pesticide
15   applicators, 44,932 used glyphosate, correct?
16      A.    Correct.
17      Q.    So that's a little bit more than 82
18   percent, almost 83 percent?
19      A.    Correct.
20      Q.    And the conclusion, the single overriding
21   conclusion, is that, by the study authors here, "In
22   this large, prospective cohort study, no association
23   was apparent between glyphosate and any solid tumors
24   or lymphoid malignancies overall, including
25   non-Hodgkin's lymphoma and its subtypes."

1          Do you see that?
2       A.    Yes.
3       Q.    Do you agree that mycosis fungoides is a
4    subtype of non-Hodgkin's lymphoma?
5       A.    Yes.
6       Q.    And you're aware that the disease or
7    condition that Mr. Johnson suffers from is mycosis
8    fungoides?
9       A.    I believe I might have read that, but I
10   didn't remember it.
11      Q.    In the Methods section, under Exposure
12   Assessment, which shows up on page -- before we do
13   that, let's just ask about the study authors.
14         There's a listing of coauthors, starting
15   with Gabriella Andreotti, and it includes Koutros,
16   Hofmann, Sandler, Lubin, Lynch, Lerro, De Roos,
17   Parks, Alavanja, Silverman and Freeman.
18         Do you know any of these individuals?
19      A.    No, I have not.
20      Q.    So you've had no communication with any
21   of the study authors, right?
22      A.    No, I have not.
23      Q.    Are you aware that Dr. Aaron Blair was
24   involved with the Agricultural Health Study?
25      A.    Yes.

CONFIDENTIAL

Page 544

1      Q.    And you've had communications with
2    Dr. Blair about this particular study result
3    published under the lead author Andreotti?
4      A.    No.
5      Q.    Have you had discussions or
6    communications with Dr. Blair about a manuscript in
7    2014 updating the follow-up results from the
8    original study enrollment in the Agricultural Health
9    Study?
10     A.    I testified yesterday to the two
11   conversations that I have had with Dr. Blair in the
12   last year and explained in detail the nature of the
13   conversations.
14     Q.    Do you have an understanding as to why
15   Dr. Blair is no longer listed as a study author on
16   this particular updated version of the Agricultural
17   Health Study?
18     A.    Yes, I do.
19     Q.    Why is that?
20     A.    He's retired.
21     Q.    So he's stopped working altogether on the
22   Agricultural Health Study?
23     A.    He's an emeritus faculty member of NCI.
24   He goes into the office approximately three days a
25   week.  He works for free.  He has remained

Page 545

1    professionally active in a sort of emeritus or
2    retired status, at great service to the American
3    public.
4      Q.    And your understanding is that Dr. Blair
5    is no longer involved with the Agricultural Health
6    Study?
7      A.    He's not employed any longer.  He's not
8    paid for his service.  He is still in touch with his
9    colleagues, because he told me he goes into his
10   office about three times a week.  So I assume he
11   does something other than sit in the dark.
12     Q.    Well, there's nothing precluding any of
13   these study authors from being a study author just
14   because they've retired from their institution like
15   NCI, right?
16         MR. LITZENBURG:  Form.  Argumentative.
17         THE WITNESS:  That may be a true
18   statement.  I don't know what the policies are
19   in the National Cancer Institute relative to
20   coauthorship for people that are retired.
21   Dr. Blair has been retired for some time, and he
22   probably didn't work on the study.  He worked on
23   earlier studies published on the basis of
24   findings of the Agricultural Health Study, not
25   this one, and hence, he doesn't appear as a

Page 546

1    coauthor.
2    BY MR. COPLE:
3      Q.    Is it your understanding that Dr. Blair
4    worked on the 2014 --
5      A.    Yes.
6      Q.    -- draft manuscript?
7      A.    Yeah, I think he was still -- he had not
8    retired as of 2014.  He's the -- he was the senior
9    scientist that started the Agricultural Health
10   Study.  I can't imagine that he didn't play some
11   role in it.
12     Q.    Now, on Page 2, 2 of 8 pages of this NCI
13   study, in the top right-hand column, which is under
14   the Methods section and specifically under the
15   subheading Exposure Assessment, in the middle of the
16   long paragraph is a sentence starting with, "The
17   intensity score."
18     A.    I see it.
19     Q.    It says, "The intensity score was derived
20   from an algorithm based on literature-based
21   measurements and information provided by the
22   applicator, specifically whether the participant
23   mixed or applied pesticides, repaired
24   pesticide-related equipment, used personal
25   protective equipment, and application" -- an

Page 547

1    application method that was used.
2         Do you see that?
3      A.    Yes.
4      Q.    All right.  Do you know what an intensity
5    score is?
6      A.    Yes.
7      Q.    What is it?
8      A.    It's an attempt to weight the likely
9    level of exposure from the reported days of
10   pesticide use, in a study of this nature, in order
11   to come up with a more accurate estimate of the
12   actual levels of exposure.
13         And that's why the algorithm that the
14   Agricultural Health Study developed and used in
15   several of the analyses and peer-reviewed papers
16   that they've published included the variables that
17   you mentioned as you read through it, whether PPE
18   was utilized, what kind of application equipment, et
19   cetera.
20         So it's a fairly complicated and
21   sophisticated, methodological adjustment in the
22   Agricultural Health Study that strives to come up
23   with a more accurate estimate of exposure for
24   inclusion in the statistical analysis.
25     Q.    There's a footnote indicated at the end

CONFIDENTIAL

Page 548

1    of this sentence, right after the phrase "and
2    application method used."  It's Footnote 8, which
3    you can find on the last --
4         A.    Hang on.  Let me find out -- where is the
5    passage in the paragraph?
6         Q.    It was the one we were just reading.
7         A.    Is it the 9?  So 8 is a footnote and not
8    a reference?
9         Q.    Well, it's a reference, and you can find
10   the reference in the left reference list.
11        A.    Okay.  Just give me a second.
12        Q.    I'm sorry.  I meant "reference," not
13   "footnote" when I said that.  There's "Reference 8."
14        A.    Correct.
15        Q.    And it's -- under the lead author of
16   Coble, it says it's -- the name of the reference is
17   "An updated algorithm for estimation of pesticide
18   exposure intensity" --
19        A.    Sure.
20        Q.    -- "in the Agricultural Health Study."
21             So this is a publication about the
22   algorithm that's used for this particular study,
23   right?
24        A.    Yep.  Yep.  I sort of remember it.  Yep.
25        Q.    You're familiar with the algorithm?

Page 549

1         A.    It's been a -- it's been an issue in a
2    number of the Agricultural Health Study papers and
3    analyses.  It's a very interesting attempt, as I
4    said, to come up with a more refined estimate of
5    exposure, and this is -- coming up with a more
6    refined estimate of exposure is something that is
7    relevant in a lot of my work.  So that's why I have
8    paid attention, and at some point I'm sure I read
9    this "Coble et al." paper.
10        Q.    The individuals enrolled in this study of
11   population are professional pesticide applicators,
12   correct?
13        A.    Correct.
14        Q.    They have certifications in whatever
15   their state jurisdiction is that lets them apply
16   pesticides professionally or commercially, right?
17        A.    I'd have to -- just let me look at the --
18   I think that's correct, but just hang on.
19             So that everyone is a licensed pesticide
20   applicator, and they're from Iowa, North Carolina.
21   So they're individuals that likely needed to apply
22   restricted use pesticides.
23             Okay.  What was your question?
24        Q.    That the individuals enrolled in the
25   Agricultural Health Study are all professional or

Page 550

1    commercially licensed pesticide applicators.
2         A.    They were selected from people that had
3    applied for a license to apply restricted use
4    pesticides.  That could include a farmer wanting to
5    apply a restricted use pesticide on his or her farm
6    exclusively.  Or it could include a commercial
7    applicator that made his or her living by applying
8    pesticides on a number of different farms for
9    different clients.  There's a mix.
10        Q.    They're all licensed, though?
11        A.    They're all licensed.
12        Q.    All right.  And Mr. Johnson, you know
13   also, holds a certificate to apply pesticides
14   professionally for school district properties,
15   right?
16        A.    I recall that, yes.
17        Q.    All right.  Under table -- under Table 2,
18   which actually starts on Page 4, in the right-hand
19   column.
20        A.    I see it.
21        Q.    And it continues on to -- this says the
22   title of Table 2 is "Cancer Incidence in Relation to
23   Lagged Intensity Weighted Lifetime Days of
24   Glyphosate Use in the Agricultural Health Study."
25             That would be a reference to that

Page 551

1    algorithm that we looked at, right?
2         A.    Correct.
3         Q.    And it has a cancer site that breaks it
4    down by all cancers as well as individual cancers,
5    and then it has the glyphosate use divided into
6    Quartiles 1, 2, 3, and 4.  And then it goes on to
7    have relative risk odds ratios with a 95 percent CI.
8             That's what the table is presenting,
9    right?
10        A.    Correct.
11        Q.    On the next page, Page 5 of 8, under
12   "non-Hodgkin's lymphoma," which is the fourth cancer
13   that's listed in this table, the relative risk is
14   below 1.0 in each case of the exposed population,
15   correct?
16        A.    Correct.
17        Q.    And in each case has a confidence
18   interval that ranges from below 1.0 up to slightly
19   above 1.0, right?
20        A.    Correct.
21        Q.    So it's a tight confidence interval,
22   correct?
23        A.    It's a 50 percent -- the high end is
24   about twice the low end.
25        Q.    It's a tight confidence interval compared

Page 552

1    to other confidence intervals we've looked at,
2    right?
3        A.    Certainly compared to the Table 2 in the
4    first Hardell and Eriksson study that we spoke
5    about, yes.
6        Q.    And these results indicate that none of
7    these exposed populations that are listed, from Q1
8    to Q4, are statistically significant results for
9    non-Hodgkin's lymphoma, right?
10       A.    Correct.
11       Q.    In that same table entry for
12   non-Hodgkin's lymphoma, there's the number of
13   individuals that are exposed cases, correct?
14       A.    Yes.
15       Q.    And those cases total in excess of 400
16   collectively, right?
17       A.    In the exposed pop, yes.
18       Q.    So that would be about 430 or so more
19   cases than were exposed in the Hardell study in
20   1999, right?
21       A.    Yes.
22       Q.    And about 390 or so, give or take, more
23   exposed cases than the Dr. McDuffie-led study had in
24   2001, right?
25       A.    Approximately 350, yes.

Page 553

1        Q.    And the number of exposed cases in an
2    epidemiology study --
3        A.    Actually, sir, the results in this table
4    are reported by these gradations of intensity score,
5    and there's 113 in Q1; 104 in Q2; 112 in Q3; and 111
6    in Q4.
7            So those sample populations are
8    approximately double the -- I think we were
9    talking -- I think 51 was in the McDuffie study.  So
10   this, for the individual quartiles of exposure, the
11   sample size is about double.
12       Q.    Now, there's about 440 cases in this
13   collective sample size, right?
14       A.    If you add up the four levels of
15   intensity, correct.
16       Q.    So that's still about 389 or 390 more
17   glyphosate-exposed cases than McDuffie was able to
18   have in her study she led, right?
19       A.    That's correct.
20           MR. COPLE:  Let's mark this next document
21   32 to the deposition.
22           (Benbrook Exhibit Number 32 is marked for
23   identification.)
24   BY MR. COPLE:
25       Q.    Now, Exhibit 32 is an EPA memorandum.

Page 554

1    It's put out by the Office of Chemical Safety and
2    Pollution Prevention Office, right?
3        A.    Correct.
4        Q.    And you're familiar with that office?
5        A.    Yes.
6        Q.    And this was put out as a "Summary review
7    of recent analysis of glyphosate use and cancer
8    incidence in the Agricultural Health Study," right?
9        A.    Correct.
10       Q.    And that's the study we just looked a --
11       A.    Correct.
12       Q.    -- that you've reviewed for purposes of
13   your opinions in this case, right?
14       A.    As I testified earlier, I was aware it
15   came out.  I don't think I read it until after I had
16   filed my report.  I didn't study it in great detail.
17   But, yes, I'm aware of it, and we talked about it,
18   and let's move on.
19       Q.    The last paragraph of the first page of
20   the memo says that the analysis that was done of the
21   AHS cohort and reviewed by Andreotti et al., in
22   2017, was reviewed by EPA, and the findings
23   incorporated into the Revised Glyphosate Issued
24   Paper that was issued also in December 2017, right?
25       A.    I haven't had a chance to read it.  I

Page 555

1    haven't seen this document before.  What was the
2    date that the Andreotti study came out?
3        Q.    You've got it in front of you.
4        A.    Well, it says 2018.  It doesn't say when
5    in 2018.
6        Q.    This is an EPA memo from December 12.
7    The EPA had the Andreotti study at that time, right?
8        A.    So they cite it as Andreotti 2017.  So it
9    must have come out at the end of the year, even
10   though in the published version in the journal it
11   came out in 2018.  I just -- do you remember what
12   date it was put online?
13       Q.    The point I'm asking about, Dr. Benbrook,
14   is that the agency's memo that was put out on
15   December 12th indicated that the updated Andreotti
16   study on AHS had been already taken into account,
17   was already reviewed, and it was incorporated into
18   the agency's findings on the issues paper.  That's
19   what it says.
20       A.    Okay.
21       Q.    You have no reason to disagree --
22       A.    No.
23       Q.    -- that that's what the agency did,
24   right?
25       A.    No.

CONFIDENTIAL

Page 556

1    Q.    You also looked at De Roos 2005 --
2    A.    Yes.
3    Q.    -- is that correct?
4          And you're aware that De Roos 2005 was
5    also based on the Agricultural Health Study,
6    correct?
7    A.    Yes.
8    Q.    So the Agricultural Health Study
9    published by NCI, whether it was released in 2017,
10   as EPA seems to indicate, or released to the public
11   in 2018, it is an updated analysis based on
12   follow-up information in the same AHS that was the
13   subject of the 2005 review by De Roos, right?
14         MR. LITZENBURG:  Asked and answered.
15         THE WITNESS:  Yes, very similar to the
16   updated analysis that Hardell and Eriksson
17   reported in their letter to the editor and
18   subsequent publication.
19   BY MR. COPLE:
20   Q.    And 2005 De Roos is a study that was
21   published in a peer-reviewed journal, right?
22   A.    Correct.
23   Q.    As was the NCI publication now in 2018,
24   right?
25   A.    Correct.

Page 557

1    Q.    In your report, under -- let's start with
2    Paragraph 283.  That's on Page 54.
3    A.    Got it.  Got it.
4    Q.    This is under your subheading Sources of
5    Pesticide Product Risk, and you indicate three
6    potential sources of risk:  The Active ingredient;
7    and then impurities; then you talk about inert
8    ingredients.
9          And you agree that EPA regulates all
10   three of these constituent components of the
11   formulated pesticide product as part of the
12   registration process?
13   A.    They do their best to do so, yes.
14   Q.    All right.  So you're not suggesting here
15   in this Paragraph 283 or elsewhere that EPA is not
16   reviewing those constituent parts for
17   carcinogenicity?
18   A.    Why do you ask?  It doesn't say that.
19   Let me read the paragraph.
20   "Human health and environmental risks
21   from pesticide use can arise from three general
22   categories of ingredients or components in a
23   commercial pesticide product:  1, the active
24   ingredient itself; 2 any impurities in the active
25   ingredient that are formed during the manufacturing

Page 558

1    process or as a result of a chemical reaction that
2    occurs between the time the pesticide is made and/or
3    mixed at a plant and applied by the user, and; 3,
4    the so-called inert ingredients added to essentially
5    all end-use pesticide products, e.g., the
6    surfactants and adjuvants."
7          It doesn't say anything about what EPA
8    does.
9    Q.    And you're not suggesting, as I said in
10   my question, here or elsewhere in the report that
11   EPA is not reviewing these various constituent
12   components of formulated product in making
13   registration approvals?
14   A.    No, I am not making that assertion.
15   Q.    EPA sets the permissible limits for an
16   impurity that arises during the manufacturing
17   process of a pesticide, right?
18   A.    EPA has used a variety of ways to try to
19   deal with impurities.  It's evolved over time.  Some
20   of the discussion and assessment of the impurities
21   in glyphosate-based herbicides, N-nitrosoglyphosate,
22   or however one says it, the NNG impurity or the
23   dioxane impurity, EPA strives to estimate the level
24   of the impurity in either the pure active ingredient
25   or, if it's an impurity in one of the surfactants,

Page 559

1    in the formulated product, and compare the level of
2    the impurity to whatever toxicological information
3    is available and to see if a judgment can be reached
4    that the impurity is at such a low level that it's
5    of no toxicological significance.
6    Q.    You're not -- you're not claiming in your
7    report or otherwise that EPA has ever determined
8    that the impur-- any impurity in a
9    glyphosate-based formulation has exceeded the EPA
10   certified limit, are you?
11   A.    No.  I don't make that assertion.  In
12   Paragraphs 288 through -- well, there's two
13   paragraphs, 288 and 289.  I discuss the NNG and
14   formaldehyde impurities and the fact that different
15   impurities -- in Paragraph 289, the different
16   manufacturing processes for the underlying
17   glyphosate molecule lead to the presence of
18   different impurities.
19   Q.    And you're not claiming that EPA has ever
20   determined that their certified limit for an
21   impurity was exceeded by a glyphosate formulation of
22   Monsanto, right?
23         MR. LITZENBURG:  Asked and answered,
24   multiple times.
25         THE WITNESS:  No, I'm not claiming that

CONFIDENTIAL

Page 560

1  they have.  I felt that it was important to at
2  least include in my expert report that the
3  identity and levels of impurities in
4  glyphosate-based herbicides has been an issue
5  under review since actually the late '70s.
6  There's been some data generated.  Monsanto
7  actually has done studies on this NNG.  I simply
8  note that is part of the scientific
9  evaluation of risk that's associated with
10  glyphosate-based herbicides.
11        I'm not aware of any conclusions that the
12  agency has reached that these impurities
13  contributed to any of the indication of
14  oncogenetic response or genotoxic response in
15  any of the studies that have been done by
16  Monsanto and submitted to the agency or
17  published in the peer-reviewed literature.
18        However, it will I think remain an issue
19  that the EPA and other regulatory authorities
20  continue to track and monitor.
21  BY MR. COPLE:
22     Q.    EPA has not determined that the level of
23  impurities in glyphosate formulations is an issue of
24  toxicological concern, right?
25        MR. LITZENBURG:  He's asked the same

Page 561

1  question and you've answered it six times.
2  You're welcome to stand on your answer or --
3        THE WITNESS:  Yeah.
4        MR. LITZENBURG:  -- answer the same way
5  over and over again.
6        THE WITNESS:  I agree with that.  Yes.
7  The answer is yes.
8  BY MR. COPLE:
9     Q.    Now, let's take a brief look at your
10  report, Paragraph Numbers -- on Page 115, and it
11  continues to Page 116, and it starts at 608 talking
12  about a Jess Rowland from EPA.  Then it goes to 609,
13  continues to talk about Mr. Rowland, 610, and the
14  same thing on the next page.  It continues to talk
15  about him in Paragraph Number 611, 612, 613, 614,
16  and I think that's where it stops.
17        Now, do you know Mr. Jess Rowland?
18     A.    No.
19     Q.    And Mr. -- and these paragraphs,
20  discussing emails inside Monsanto about various
21  potential communications with Mr. Rowland,
22  Mr. Rowland was not a party to those documents that
23  you reviewed, right?
24     A.    He was to some of them.  Some of the
25  emails in the record are between Jess Rowland and

Page 562

1  various Monsanto people.
2     Q.    Well, at 609, for example, there's a
3  reference to a memo that was prepared -- or an email
4  that was prepared.
5     A.    Right.
6     Q.    Jess Rowland is not a party to that
7  communication, right?
8     A.    Jess Rowland had called Dan Jenkins, as I
9  say, out of the blue -- and the "out of the blue" is
10  according to Mr. Jenkins -- and the email that
11  Jenkins sent to other Monsanto colleagues
12  paraphrasing the conversation that he had with Jess
13  Rowland, I'm fairly sure that Jenkins did not cc
14  Jess Rowland on his accounting of the conversation
15  that the two of them had had the day before, but the
16  quote from MON00987756 is Dan Jenkins' summary of
17  this conversation, in effect, what role Jess Rowland
18  told Jenkins.
19     Q.    So Mr. Rowland never saw this document at
20  the time that it was communicated by Mr. Jenkins?
21        MR. LITZENBURG:  Asked and answered.
22        THE WITNESS:  I don't know if he saw it
23  or not.  It could have been sent to him at
24  another time.  I don't believe that the email
25  address of this particular Bates-numbered item

Page 563

1  shows a cc to Jess Rowland.
2  BY MR. COPLE:
3     Q.    You don't know --
4     A.    We could pull it up.
5     Q.    You don't know Mr. Rowland, right?
6        MR. LITZENBURG:  Asked and answered.
7        THE WITNESS:  Sir, you just asked me
8  that, and I just answered it.  Are you hard of
9  hearing?
10  BY MR. COPLE:
11     Q.    Have you had communications with
12  Mr. Rowland?
13     A.    No.  I don't know him, and I've never
14  spoken to him.
15     Q.    And how about Mr. Jenkins, same question.
16     A.    I certainly haven't talked to Mr. Jenkins
17  for many years.  He might have been one of the
18  Monsanto people I met in the '90s.  I just don't
19  remember.
20     Q.    You know that Mr. Rowland was deposed
21  under oath and gave sworn testimony in this case,
22  right, or in related cases?
23     A.    I'm aware of that, yeah.
24     Q.    And the same with Mr. Jenkins?
25     A.    No, I don't think I knew that, but I

CONFIDENTIAL

Page 564

1  suspected he would be at some point.
2     Q.   And in the case of Mr. Rowland, did you
3  review his deposition to see what his testimony is
4  on any of the issues that might involve him?
5     A.   No, I did not.
6     Q.   The Organic Center is a nonprofit
7  organization?
8     A.   Correct.
9     Q.   And you at one point were the chief
10 scientist for The Organic Center?
11    A.   Okay.  Let's -- The Organic Center
12 started out in about 2005 and was a newly
13 constituted NGO, non-governmental organization, with
14 a 501(c)(3) designation.  It functioned in that
15 capacity from approximately 2006 until maybe 2011,
16 something around there.
17         At that point, The Organic Center was
18 incorporated into the Organic Trade Association as
19 a -- you might think of it as an operating division
20 and for administrative purposes was a program or a
21 part of the Organic Trade Association.  As my resume
22 shows, I was the chief scientist of The Organic
23 Center from around 2006 to mid-2012.
24    Q.   And The Organic Center was founded in
25 2002; is that what -- did you just say that?

Page 565

1     A.   No.  It's -- The Organic Center as an
2  idea took a couple of years to fully form.  So it's
3  not entirely clear exactly the day that The Organic
4  Center existed, but the first discussions about
5  there being an Organic Center, I think they were
6  happening in 2002, but certainly the funding
7  directed specifically to the center didn't start
8  until a little bit later.
9     Q.   And this Organic Center was supported by
10 the Organic Trade Association?
11    A.   No.  OTA, I don't think they ever
12 provided money to the center.
13    Q.   They weren't supported by them?
14    A.   No, they weren't financed by the Organic
15 Trade Association.  The Organic Center raised its
16 own money.
17    Q.   All right.  Raised it from Amy's Kitchen?
18    A.   Pardon?
19    Q.   Raised it from Amy's Kitchen?
20    A.   Amy's Kitchen was one of the funders.
21    Q.   How about Organic Valley?
22    A.   CROPP, Cooperative Organic Valley, yes.
23    Q.   Whole Foods?
24    A.   Yes.
25    Q.   So all of these source of fundings would

Page 566

1  go to paying your salary as the chief scientist?
2     A.   The way the funding worked in The Organic
3  Center is that it basically went into an operating
4  account, and my salary and any other staff salaries
5  were paid out of that account.  There was no
6  particular way to say that the dollars from any
7  specific funder went to a given expenditure item
8  except for project-specific grants that The Organic
9  Center received in the time that I was there.  And
10 for those, the money would be spent on whatever the
11 project was or the proposal, the proposed body of
12 the work.
13    Q.   And the president of The Organic Center
14 when you were the chief scientist, was that Theresa
15 Marquez?
16    A.   I don't think she was ever president.
17 She was on the board for a period of time.
18    Q.   She was on the board.  Was she the chief
19 marketing executive for Organic Valley?
20    A.   Yes, she was.
21    Q.   And The Organic Center provided
22 publication of articles and other communications to
23 support the organic food industry; is that right?
24    A.   The mission of The Organic Center was to
25 conduct research and analysis on the consumer health

Page 567

1  benefits and risks and costs and the environmental
2  impacts, benefits, costs of organic farming systems.
3         The center was conceived of and
4  established and ultimately financed because of a
5  sense in the organic food community, which included
6  companies, farmers, scientists, activists, that
7  there was so much new science coming out on the
8  impacts of organic farming systems and organic food
9  processing that an institution needed to be
10 established with a dedicated staff to try to keep up
11 with the science, synthesize it, integrate it, and
12 communicate it back out to individuals in the
13 industry that didn't have a scientific background.
14         In addition, the organic farming
15 community, the organic food industry, the organic --
16 national organic program in the U.S. Department of
17 Agricultural and everyone involved in one way or
18 another in the organic space periodically had to
19 deal with very complex, sometimes controversial
20 issues that had important technical and scientific
21 dimensions.
22         The latest example today is whether
23 hydroponically-raised food should properly -- can
24 properly be certified as organic.  In order for the
25 organic community to answer that kind of question,

CONFIDENTIAL

## Page 568

1  there needs to be a scientific assessment of how
2  hydroponic management impacts the nutritional
3  quality, the safety, and the environmental footprint
4  of crop production using hydroponics compared to
5  growing organic crops in the soil.
6        So that's the kind of thing that The
7  Organic Center did.
8        Q.    You were the chief scientist?
9            MR. LITZENBURG:  Asked and answered.
10           THE WITNESS:  I was.
11  BY MR. COPLE:
12       Q.    And you were the chief scientist of which
13  scientific field?  What was the scientific field
14  that you were the chief scientist for?
15       A.    I was the chief scientist for The Organic
16  Center.
17       Q.    So issues of toxicology?
18       A.    I would say essentially all the physical
19  and biological and social sciences that are drawn
20  upon in carrying out studies of the impact,
21  performance, public health consequences,
22  environmental consequences of organic farming
23  systems.
24       Q.    And you have no degree in the physical
25  sciences, correct?

## Page 569

1        A.    Have I said anything to you to indicate
2  that I am changing my answer to that question that
3  you asked at least five times yesterday?
4        Q.    You have no degree in physical sciences,
5  right?
6            MR. LITZENBURG:  Asked and answered.
7            THE WITNESS:  I'm not saying anything
8  more about it.
9            MR. COPLE:  All right.  The witness
10  refuses to answer again.
11  BY MR. COPLE:
12       Q.    You wrote a paper in July of 2000 -- I'm
13  sorry, not July of 2000 -- in March 2008, called
14  "New Evidence Confirms the Nutrient Superiority of
15  Plant-Based Organic Foods."  Is that right?
16       A.    Correct.  That was one of our Organic
17  Center reports.
18       Q.    That was authored by you with others in
19  your capacity as chief scientist?
20       A.    Correct.
21       Q.    Who is Dr. Joseph Rosen from Rutgers?
22       A.    Joe Rosen is a professor at Rutgers.  I
23  think he's a food scientist.  I'm not really sure.
24  He's a long-time skeptic and critic of organic
25  farming and food and has spent a significant part of

## Page 570

1  his career trying to convince consumers that there's
2  no benefits associated with organic food and
3  farming.
4        Q.    You're critical of Dr. Rosen?
5        A.    Dr. Rosen and I have engaged in collegial
6  discussion of these scientific issues over several
7  years.  Yes.
8        Q.    Dr. Rosen is emeritus professor of food
9  toxicology for Rutgers; is that right?
10       A.    Well, I would assume he's emeritus now,
11  because Joe Rosen has been voicing his opinions
12  about organic food since the early '90s.
13       Q.    Dr. Rosen reviewed your paper from
14  March 2008, correct?
15       A.    I don't really remember.
16           MR. COPLE:  Let's mark that as Exhibit
17  32 -- 33.
18           (Benbrook Exhibit Number 33 is marked for
19  identification.)
20  BY MR. COPLE:
21       Q.    We've marked as Exhibit 33, it says,
22  "Claims of Organic Food's Nutritional Superiority: A
23  Critical Review By Dr. Joseph D. Rosen."
24           And in the introduction, which is on
25  numbered Page 1, he indicates that he reviews a

## Page 571

1  report authored by Charles Benbrook and his
2  colleagues called "New Evidence Confirms the
3  Nutrient Superiority of Plant-Based Organic Foods."
4            You didn't know Dr. Rosen had reviewed
5  your work?
6        A.    I might have been aware that he did this,
7  but I wouldn't have paid much attention to anything
8  from The American Council on Science and Health.
9        Q.    On Page 12 are the conclusions by
10  Dr. Rosen, theirs and mine.
11           Under My Conclusions, indicating
12  Dr. Rosen's conclusions, he says that "The
13  methodology in this study" -- that's the study he
14  calls the Benbrook study -- "was anything but
15  rigorous as results that were not statistically
16  significant were used throughout, non-peer-reviewed
17  papers were included and much relevant data, such as
18  studies of Ninfali and Barrett, were not included."
19           It goes on to say, "Results favorable to
20  conventional food were ignored in some cases," and
21  he's got some citations, and he talks about
22  "Typographical errors, too numerous to list."
23           And he concludes with a sentence that
24  says, "Whoever calculated the organic/conventional
25  ratios in the addendum should be sent back to

CONFIDENTIAL

Page 572

1    Chemistry 101 to learn about significant figures."
2        Did Dr. Rosen ever communicate any of
3    these criticisms to you?
4        A.   No, not that I remember.
5        Q.   And you've never read them?
6        A.   No.
7        Q.   You don't have a degree in chemistry,
8    right?
9        A.   No.
10       Q.   Did you take Chem 101?
11       A.   No.  I took physics in college as my
12   elective science.
13           MR. COPLE:  How much time?
14           THE VIDEOGRAPHER:  We have 40 -- I'm
15   sorry, one second -- 43 minutes left.
16           MR. COPLE:  I will reserve the balance of
17   my time, the 43 minutes, for possible redirect.
18           MR. LITZENBURG:  I've got some questions.
19   Let's take a two-minute break.  We'll get a cup
20   of water and be ready to go.
21           THE VIDEOGRAPHER:  The time is now 1:43.
22   We are off the record.
23           (Break in proceedings.)
24           THE VIDEOGRAPHER:  The time is now 1:52.
25   We are on the record.

Page 573

1            MR. LITZENBURG:  What exhibit are we on?
2            THE COURT REPORTER:  Thirty-four.
3            (Benbrook Exhibit Number 34 is marked for
4    identification.)
5
6                E X A M I N A T I O N
7    BY MR. LITZENBURG:
8        Q.   Dr. Benbrook, I'm going to ask you some
9    questions to clarify some of Mr. Cople's questions
10   and answers that you gave.  Is that okay?
11       A.   Yes, sir.
12       Q.   Okay.  I've handed you Exhibit Number 34,
13   which is --
14           MR. COPLE:  Just for the record, we
15   looked at briefly what you handed us, but we
16   don't have our own copy.
17           MR. LITZENBURG:  I've handed you Exhibit
18   34, which is a peer-reviewed published Hardell
19   2002 publication.
20   BY MR. LITZENBURG:
21       Q.   Is that the one that you were referring
22   to in your discussion with Mr. Cople earlier?
23       A.   It was the -- this is the journal article
24   that came out after the publication of the 1999
25   study and this exchange of letters where Hardell and

Page 574

1    Eriksson report results from the larger pool of
2    exposed and control individuals in their
3    epidemiological study.
4        Q.   And that is in a journal called "Leukemia
5    and Lymphoma"?
6        A.   Yes, it is.
7        Q.   So Mr. Cople's repeated representations
8    to you that that follow-up data was not published,
9    that was a misrepresentation, right?
10           MR. COPLE:  I object to counsel's
11   argumentative question.
12           THE WITNESS:  Yes.  This is the study
13   that has the "Among herbicides significant
14   associations were found for glyphosate odds
15   ratio of 3.04; confidence interval, 95 percent,
16   1.08 to 8.52."
17           I believe those -- yes.  Those are the
18   precise numbers that are in the Hardell and
19   Eriksson letter to the editor, and I remember
20   wanting to verify that so that I could reference
21   this study as the follow-up.
22           Just like the Andreotti et al. 2017 is a
23   follow-up on the Agricultural Health Study, this
24   paper by Hardell and Eriksson and a new author,
25   Nordstrom, is a follow-up of their study.

Page 575

1    BY MR. LITZENBURG:
2        Q.   But when you were under questions by
3    Monsanto's lawyer, he gave you one of the Hardell
4    studies with a statistically insignificant result
5    but not that one; is that correct?
6        A.   Correct.
7            MR. COPLE:  Objection.  Argumentative.
8    BY MR. LITZENBURG:
9        Q.   And he asked you questions for about 20
10   minutes challenging your assertion that there were
11   statistically significant numbers that were
12   published out of this study; is that correct?
13           MR. COPLE:  Objection.  Argumentative.
14           THE WITNESS:  Well, I reported that there
15   had been a series of letters to the editor and a
16   response by Hardell and Eriksson that did report
17   based on a larger sample size, noting the very
18   small number of exposed individuals in the
19   original study, did report a statistically
20   significant association between exposure -- use
21   of and -- use of glyphosate-based herbicides and
22   non-Hodgkin's lymphoma.
23   BY MR. LITZENBURG:
24       Q.   Yes, sir.  And you're being polite, but
25   I'm actually addressing a larger issue.  You were

CONFIDENTIAL

Page 576

1  pressed multiple times today and yesterday to answer
2  a question yes or no, being asked the same question
3  five or six times.
4       Do you remember instances such as that?
5  A.   Yes.
6       MR. COPLE:  Objection.  Mischaracterizes
7  the record.  Argumentative.
8  BY MR. LITZENBURG:
9  Q.   And if a question demands a yes-or-no
10  answer but contains a mischaracterization, such as,
11  "Have you told your wife that you're able to read
12  minds?" it's not answerable in a yes-or-no fashion,
13  is it?
14       MR. COPLE:  Objection.  Argumentative.
15  Mischaracterizes the record.
16       THE WITNESS:  It would be difficult.
17  BY MR. LITZENBURG:
18  Q.   We had some discussion of Jess Rowland in
19  the last hour or so.  Do you remember that?
20  A.   Yes, I do.
21  Q.   Okay.  And you had some discussion in
22  your report of mentions of him and his activities on
23  the EPA CARC committee; is that correct?
24  A.   Correct.
25  Q.   Okay.  Is it fair to characterize the

Page 577

1  documentation of Mr. Rowland as suggestive of an
2  improper influence by Monsanto over certain parts of
3  the EPA?
4       MR. COPLE:  Objection.  Calls for
5  speculation.  No foundation.
6       THE WITNESS:  I found the statement by
7  Jess Rowland to one of the -- I think it was to
8  Jenkins, that "he would deserve a medal if he
9  was able to stop the ATSDR study" a remarkable,
10  shocking thing for an employee of one federal
11  agency to do clearly as a favor to a registrant
12  of a pesticide.
13       I'd really never seen anything like that,
14  and I think it raises very serious questions
15  about in whose interest was Jess Rowland working
16  in his central role as -- he was either the
17  director or the deputy director of CARC and
18  played a significant role certainly in managing
19  the process of several of the stages of EPA's
20  review of the oncogenicity of glyphosate, and I
21  think it casts a pall over the whole process.
22  BY MR. LITZENBURG:
23  Q.   There were questions by -- well,
24  actually -- gave you all a copy yesterday.
25       MR. LITZENBURG:  Mark this.

Page 578

1       (Benbrook Exhibit Number 35 is marked for
2  identification.)
3       MR. COPLE:  That's been marked as an
4  exhibit previously?
5       MR. LITZENBURG:  No.  I gave you all in
6  response to your request the document --
7       MR. COPLE:  Can I see it?
8       THE WITNESS:  I know it pretty well.  If
9  I need it, I'll ask you for it.
10  BY MR. LITZENBURG:
11  Q.   My only question is this, Dr. Benbrook:
12  You handed me Exhibit Number 35 this week as a
13  document that you were relying upon but is not cited
14  in your report; is that correct?
15  A.   Correct.
16  Q.   And the same thing with this, which we'll
17  have marked Exhibit 36 for the record, please.  And
18  let counsel look at it, as well.
19       (Benbrook Exhibit Number 36 is marked for
20  identification.)
21       THE WITNESS:  Yes.  I'm familiar with the
22  document also labeled Exhibit 36.
23       MR. COPLE:  We also have 36.
24  BY MR. LITZENBURG:
25  Q.   And I just want to state for the record,

Page 579

1  that is something that you have offered up as
2  something you're relying on for your opinion but is
3  not cited in your report; is that correct?
4  A.   Correct.
5  Q.   Today and yesterday, a number of -- well,
6  tell me if my characterization is correct.
7       When a study reaches a positive result,
8  either published or unpublished, it is generally
9  criticized by Monsanto's lawyers for its methodology
10  or design; is that correct?
11       MR. COPLE:  Objection.  Argumentative.
12  Lacks foundation.
13       THE WITNESS:  I have reviewed, in
14  preparation for -- in the preparation of my
15  expert report and for my role in this case
16  certainly three dozen peer-reviewed publications
17  or other reports that contained information that
18  was not fully in line with Monsanto's internal
19  beliefs about the toxicity of glyphosate and
20  glyphosate-based herbicides, and I really can't
21  think of a single one that wasn't challenged in
22  some public way at some point in the ensuing
23  years.
24       Some of the times in ways that this was
25  done was through review articles that Monsanto

CONFIDENTIAL

Page 580

1  commissioned, often wrote in-house, drawing on
2  its staff scientist and then recruited
3  independent scientists typically aligned with an
4  academic institution, and/or one of its former
5  employees, to review and perhaps contribute to,
6  in some way, to the paper and then publish it in
7  their own name, with no attribution to the
8  scientists in Monsanto that the written the
9  primary draft.
10       And in these reviews, this is where
11  Monsanto voiced a number of technical criticisms
12  of the methodologies and did its best to dismiss
13  any positive genotoxicity result or really any
14  other positive data that raised new questions
15  about potential health benefits.
16       And as I say in my report, it is striking
17  how systematic and aggressive and persistent
18  Monsanto has been in this regard, and I do not
19  know of another pesticide manufacturer that
20  engages in behavior of that sort and nature.
21  BY MR. LITZENBURG:
22   Q.   Okay.  I think you're getting to exactly
23  where I was going, which is that pattern of
24  accepting/praising the results or methodology of
25  negative studies and rejecting or criticizing the

Page 581

1  results and methodology of positive studies, that's
2  been the tactical thing, outside of this room and
3  outside of this litigation as you've observed,
4  hasn't it?
5       MR. COPLE:  Objection.  Argumentative.
6  Lacks foundation.  Asked and answered.
7       THE WITNESS:  It is a clear pattern, and
8  I talk about it in my expert report under the
9  rubric of cherry-picking science.  And as I
10  said, there are so many examples of it in the
11  part of the record that I reviewed.
12       I would -- I would be very interested to
13  know the total scope of Monsanto's behavior of
14  this sort if I had an opportunity to review a
15  larger portion of the millions of documents that
16  have been -- that are part of the discovery in
17  this case.
18  BY MR. LITZENBURG:
19   Q.   And is that pattern that we've just
20  talked about unfortunately echoed in some of the
21  EPA's assessments and responses?
22       MR. COPLE:  Objection.  Argumentative.
23  Vague.  Lacks foundation.
24       THE WITNESS:  As a matter of fact, many
25  of the points raised in EPA in justifying its

Page 582

1  dismissal of the evidence of oncogenicity, the
2  evidence of genotoxicity, are very similar to
3  the arguments advanced by Monsanto first in
4  their own letters or communications to either
5  the registration branch or into HED.
6       Monsanto scientists fairly regularly met
7  with EPA employees and presented their view of
8  the science, and I would say that through most
9  of the '80s, the scientists within OPP put an
10  incredible amount of effort into responding to
11  repeated recurrent contacts, letters, requests
12  for meetings about, for example, the
13  interpretation of the 1983 BioDynamic mouse
14  study.
15       And they -- I think it would be fair to
16  say that they sort of stood by their original
17  position as long as they could, as long as they
18  felt that it was something that they could
19  sustain.
20       But ultimately by 1991, I think the
21  Office of Pesticide Programs felt that it just,
22  it was time to move on, and they stopped arguing
23  with Monsanto about the interpretation of the
24  mouse study.  Monsanto had done a new rat study,
25  had been submitted to the agency, that did not

Page 583

1  show any evidence of an oncogenetic response as
2  interpreted by the EPA, and so they -- they
3  moved on.
4  BY MR. LITZENBURG:
5   Q.   And have we seen multiple examples in the
6  last few days of a reactionary approach by the EPA
7  that is partially justifying a new decision by
8  putting backward a 1991 or a 1980s decision?
9       MR. COPLE:  Objection.  Argumentative.
10  Lacks foundation.  Vague.
11       THE WITNESS:  Yes.  There's a continuity
12  in the EPA's assessments of the record, their
13  judgments about what a particular study shows
14  evolves.  And over time, additional studies have
15  been submitted to the agency, which then the
16  agency is obligated under its regulations to
17  review and incorporate in its assessments.
18       To me, it's a striking coincidence that
19  every genotoxicity study, every cancer study
20  conducted by Monsanto or by a consultant or a
21  consulting laboratory that conducts such studies
22  are negative; when, for example, in the case of
23  genotoxicity, a significant portion of the
24  studies conducted by independent scientists
25  report positive results.  It's a coincidence

## Page 584

that is hard to explain.
BY MR. LITZENBURG:
Q.   Dr. Benbrook, I want to ask you a
question about sort of corporate behavior, ethics.
Is it in your expert opinion a
responsible approach to, warning for human health
hazards, to reject or challenge or ignore multiple
published epidemiology studies with a positive
result until the company can point to a study with a
negative result to justify a lack of warning?
MR. COPLE:  Objection.  Argumentative.
Lacks foundation.  Vague.
THE WITNESS:  No, I don't think that's a
responsible approach.
BY MR. LITZENBURG:
Q.   And is it part of your opinion, or am I
right in its part of this analysis, that because
human health is at stake, it's better to take a more
conservative approach to some of these things?
MR. COPLE:  Objection.  Vague.
THE WITNESS:  Oh, absolutely, especially
when the company is aware of the heightened risk
and has clear options to mitigate that risk, and
especially when those options to mitigate the
risk wouldn't really affect the sales of the

## Page 585

product, wouldn't substantially affect the
profit potential of the company.
And as Mr. ████ said, why would we
continue to sell a hazardous version of Roundup
when we can make a safer one?  Why would we do
that?  Why wouldn't we just change?  Why
wouldn't we just change our formulation?
The record -- the striking thing in this
record is that I get the impression that the
culture inside Monsanto is that all steps must
be taken to protect and preserve the FTO of
glyphosate, and that is the "freedom to
operate."
And what that means inside the company is
that no change in the regulatory status of a
Roundup-based herbicide that might restrict the
sales potential will ever be accepted without a
fight, regardless of how justified the science
might be relative to the reduction and exposures
and risks and how little it might cost.
BY MR. LITZENBURG:
Q.   And Dr. Benbrook, that opinion and others
today, is it fair to say that they are based on a
systematic review of the source material as well as
your professional experience?

## Page 586

MR. COPLE:  Objection.  Vague.  Lacks
foundation.
THE WITNESS:  Yes.  That's correct.
BY MR. LITZENBURG:
Q.   And so when defense counsel suggested an
educated guess or a personal opinion or something,
would it be more appropriate to characterize your
opinions as based on a systematic review of the
source material?
MR. COPLE:  Objection.  Asked and
answered.  Argumentative.
THE WITNESS:  I'm quite sure I've read
over 10,000 pages of material during the course
of my work on this case.  I hope as this body of
litigation goes on, I have an opportunity to go
deeper into the record, because I'm sure I will
develop a much more refined, sophisticated
understanding of how Monsanto reacted to various
milestones over the years in their testing of
glyphosate and glyphosate-based herbicides,
their understanding of exposure levels and risk
levels, how they communicated those or whether
they communicated those to the EPA in the United
States.
There's a number of issues in my mind

## Page 587

that arise from Monsanto's interactions,
communications, and actions in countries outside
the United States compared to what the company
did in the United States.
And as I said yesterday, and as I say in
my report, one of the reasons that I feel that
Monsanto has failed to meet the test of a
responsible company is that they adopted and
agreed to either formulation changes and label
changes in other countries that clearly reduced
the risk associated with mixing, loading and
applying glyphosate-based herbicides, but did
not make the same changes in other countries
where they were selling essentially the same
product.
To me, that's just not acceptable
behavior.  And I think as people learn about
that, there will not be -- it will not shed a
favorable light on Monsanto.
BY MR. LITZENBURG:
Q.   Just so we're clear, would you
characterize the work you've undertaken so far as a
systematic review of the source materials?
MR. COPLE:  Objection.  Asked and
answered.  Vague.

CONFIDENTIAL

1  THE WITNESS:  Yes, very systematic.
2  BY MR. LITZENBURG:
3  Q.   But you brought up a good point.  The way
4  that health -- human health and cancer causality
5  works in other countries, is that different than the
6  way it works in America?
7  MR. COPLE:  Objection.  Vague.  Lacks
8  foundation.
9  THE WITNESS:  No.  The rules of basic
10  biology apply in Brazil, Germany, and the United
11  States.  And the general -- the tools that are
12  used to evaluate cancer risk are very similar.
13  The studies that have been done on glyphosate
14  and glyphosate-based herbicides both by
15  companies and the open literature, the findings
16  from an epidemiological study in Sweden are just
17  as relevant as the findings in a Brazilian study
18  or U.S. study, assuming that the studies are
19  well designed and carried out with a high degree
20  of integrity.
21  So there's nothing unique about the risks
22  of glyphosate-based herbicides in one part of
23  the world relative to the other.  So things that
24  are learned in Brazil, a responsible
25  international company would draw upon and apply

1  in their ongoing responsible efforts to
2  manufacturer and sell the safest products that
3  they can.
4  BY MR. LITZENBURG:
5  Q.   Dr. Benbrook, to date, has Monsanto ever
6  gone to the EPA and requested a label change to warn
7  for cancer for its glyphosate products?
8  A.   No.
9  MR. COPLE:  Objection.  Lacks foundation.
10  THE WITNESS:  No, they have not.
11  BY MR. LITZENBURG:
12  Q.   Okay.  So I think that this is going to
13  be brought to the court in papers and before the
14  jury multiple times, and I want to make sure that
15  we're clear on this.
16  If a suggestion is made that it would
17  have been impossible to warn for cancer in a Roundup
18  label because the EPA wouldn't have permitted it, is
19  there anything to base that preposition on?
20  MR. COPLE:  Objection.  Lacks foundation.
21  THE WITNESS:  Well, it would be -- it
22  would be an unusual situation.  Now, this does
23  arise in the information included on the
24  chemical safety data sheets, where there is a
25  requirement to put the IARC classification.

1  But the point that I made earlier, it's
2  very important to stress, the evidence of
3  genotoxicity and oncogenicity associated with
4  exposure to glyphosate-based herbicides, it is
5  complicated.  It's not a slam dunk, under any
6  circumstances.  I wouldn't characterize
7  glyphosate-based herbicides as a potent or hot
8  carcinogen.
9  But certainly by 1999 or 2000, there was
10  ample reason for glyphosate -- for Monsanto to
11  start to take proactive efforts to reduce
12  exposures, especially among people applying
13  Roundup and other Monsanto brand herbicides in
14  ways that knowing -- that Monsanto was well
15  aware lead to much higher exposures than are
16  typical from somebody buying a dilute
17  formulation of Roundup and spraying a couple
18  weeds in their driveway.
19  This is where I think it would have
20  been -- a responsible company would have taken
21  some steps to expand the margins of safety
22  really across the board of the different uses of
23  their products.
24  BY MR. LITZENBURG:
25  Q.   Yes, sir.  And it's the pot calling the

1  kettle black, but I'm going to ask for a slightly
2  more succinct answer to a similar question.
3  Dr. Benbrook, is it fair to say there is
4  nothing in the record that shows that the EPA did or
5  would have refused a cancer warning if proposed by
6  Monsanto?
7  MR. COPLE:  Objection.  Argumentative.
8  Asked and answered.  Lacks foundation.
9  THE WITNESS:  No.  No.  They wouldn't
10  have -- they wouldn't have objected.  They would
11  have talked about it, but I can't imagine that
12  they would have objected to it.  They would want
13  to understand the basis, if they didn't.  But,
14  yeah, it would be -- I can't think of a single
15  case where the EPA denied a label amendment
16  because it made a product safer.  I can't think
17  of a single example.
18  BY MR. LITZENBURG:
19  Q.   And we looked at some limited
20  epidemiology; is that correct?
21  A.   Pardon?
22  Q.   We looked at some limited epidemiology
23  today; is that correct?
24  A.   Yes.  We looked at some of the studies,
25  yeah.

CONFIDENTIAL

Page 592

1      Q.    Okay.  Is it fair to say that the
2  epidemiology in this case and in your report is not
3  so much supportive of the truth of the epidemiology
4  but as the notice to the company and its
5  responsibilities thereafter?
6           MR. COPLE:  Objection.  Argumentative.
7  Lacks foundation.  Calls for a legal opinion.
8           THE WITNESS:  I kind of don't understand
9  your question.  Try again.
10 BY MR. LITZENBURG:
11     Q.    Your -- is it fair to say your opinion is
12 not the perfection or the correctness of one body of
13 epidemiology versus another but rather what the
14 company would have been on notice about at certain
15 times about its own product and therefore
16 responsible to warn others?
17     A.    Well --
18           MR. COPLE:  Objection.  Argumentative.
19 Lacks foundation.  Calls for a legal opinion.
20           THE WITNESS:  It's certainly my opinion,
21 as I express in my report, that by early in the
22 decade of the 2000s, there had been at least two
23 high-quality study populations, the one in
24 Sweden and one in Canada, by highly respected
25 government-employed scientists that reported

Page 593

1  clear and unequivocal linkages between the
2  frequency of use of glyphosate-based herbicides
3  and non-Hodgkin's lymphoma.
4           The second, the McDuffie study, which we
5  didn't talk about, has a really exceptionally
6  high odds ratio of 4.5, for the Province of
7  British Columbia, and the study discusses or
8  hypothesizes why the results in British Columbia
9  were so much higher and stronger statistically
10 than in other provinces.  I and others find that
11 particular study quite compelling.
12          So there was -- even two -- even two
13 studies on a matter like this are ample
14 justification for a company to at least start to
15 take steps to better understand the levels of
16 risk through their own research, perhaps
17 conducting their own epidemiological studies,
18 and also taking steps to change formulations or
19 use patterns or required PPE, or any other
20 option that the company had, to build larger
21 margins of safety into their labeled uses.
22 BY MR. LITZENBURG:
23     Q.    To be clear, that opinion as to the
24 company's duties at various points in time does not
25 require as a prerequisite that epidemiological

Page 594

1  studies have a perfect design, for example?
2           MR. COPLE:  Objection.  Vague.  Lacks
3  foundation.  Calls for a legal opinion.
4           THE WITNESS:  I think it's fair to say
5  that there's never going to be a perfect
6  epidemiological study or perfect long-term
7  cancer study.
8           There's always going to be some debate
9  about the interpretation of any given study, and
10 responsible companies look at the totality of
11 the data that's available from their own
12 internal studies and external studies, including
13 the peer-reviewed literature, and they have to
14 reach a judgment about when it's time to start
15 acting proactively to reduce high-risk
16 exposures, to make their products less
17 hazardous.
18          And it's absolutely clear in my opinion
19 that Monsanto was forced to do that in multiple
20 instances in their interactions with various
21 European regulators and have been making those
22 concessions and those changes for a decade, and
23 yet they have not done any of it in the United
24 States.
25          I think it casts a dark light both on

Page 595

1  Monsanto and on the U.S. EPA for not recognizing
2  that regulatory authorities in another part of
3  the world who through their work and their
4  analysis of the products felt that it was time
5  to take action and lessen the exposures and the
6  risks from the use of this herbicide, which as
7  we know has increased so dramatically and is now
8  the most heavily applied pesticide worldwide in
9  the history of pesticides, by a large margin.
10 BY MR. LITZENBURG:
11     Q.    Is it fair to say that epidemiological
12 studies can't perfectly adjust for every conceivable
13 confounding factor?
14          MR. COPLE:  Objection.  Lacks foundation.
15 Asked and answered.
16          THE WITNESS:  That's absolutely true, of
17 course.
18 BY MR. LITZENBURG:
19     Q.    I'm going to hand you Exhibit Number --
20 or if you'd pull out of your pile, actually, it
21 would be better.
22     A.    Which one is that?
23     Q.    Number 30, which is McDuffie --
24     A.    Got it.
25     Q.    Monsanto's attorney pointed you to

CONFIDENTIAL

Page 596

1  statistically insignificant results, but you in turn
2  brought to the attorney's attention a statistically
3  significant result in Table 8. Is that correct?
4      A.   Correct.
5      Q.   And you I think used the word
6  "stratified" intensity of use, is that fair to say,
7  in this?
8      A.   Correct. It's in the days per year
9  column.
10      Q.   Okay. Is that supportive of a dose
11  response?
12          MR. COPLE: Objection. Lacks foundation.
13  Vague.
14          THE WITNESS: Yes, to the extent that you
15  can assess a dose response in an epidemiological
16  study. It's certainly not the same as a chronic
17  feeding study where there's a number of
18  increasingly high doses. But it points out that
19  the frequency of use of glyphosate-based
20  herbicides is associated with higher risk.
21          And it's quite striking the increase in
22  the significance of the data going from applying
23  herbicides one or two times a year, which would
24  be, I suppose, typical of a relatively small
25  farm or a person that only had a relatively

Page 597

1  small area to treat, compared to someone
2  applying three times or more, and certainly for
3  people that use Roundup-based herbicides on 10,
4  20, 40, 80 days a year, it raises a serious
5  question about if there was an epidemiological
6  study that could stratify by frequency of use,
7  it conceivably could have an impact on the odds
8  ratio.
9  BY MR. LITZENBURG:
10      Q.   In which of these strata would
11  Mr. Johnson fit into?
12          MR. COPLE: Objection. Vague. Lacks
13  foundation.
14          THE WITNESS: Well, clearly the greater
15  than two times.
16  BY MR. LITZENBURG:
17      Q.   Okay. I think you had a quote earlier
18  today about the weight of the evidence tipping in
19  2002. Is that a fair assessment of something you
20  said?
21          MR. COPLE: Objection. Vague.
22          THE WITNESS: Yes. I testified to that,
23  that judgment on my part.
24  BY MR. LITZENBURG:
25      Q.   Okay. So that opinion then is not

Page 598

1  dependent wholly upon two epidemiological studies;
2  is that correct?
3      A.   Oh, heavens no. It's the totality of the
4  evidence.
5      Q.   Dr. Benbrook, I think you've been clear
6  on this, but did Monsanto ever redo the 1983 mouse
7  study as respected by EPA?
8      A.   No, they did not.
9          MR. COPLE: Objection. Lacks foundation.
10  Asked and answered.
11  BY MR. LITZENBURG:
12      Q.   Do you have any -- well, withdrawn.
13          Is it a fair assessment to say from the
14  record we've looked in the last two days that
15  Monsanto generally accedes to requests that it likes
16  from regulatory agencies and ignores or opposes
17  others?
18          MR. COPLE: Objection. Argumentative.
19  Lacks foundation. Asked and answered.
20          THE WITNESS: It's clear from my review
21  of the record that Monsanto was very systematic
22  and disciplined in the studies that it conducted
23  in house, the studies that it either conducted
24  in house or commissioned with a contract lab
25  like BioDynamics or TNO, and that it certainly

Page 599

1  was their goal to have a very good idea of what
2  such a study would show.
3          And in the case of the ongoing, over
4  about a year dialogue with Dr. Parry, it was
5  very clear that Monsanto, if they had decided to
6  contract with Dr. Parry to run some of the more
7  sophisticated genotoxicity studies that he had
8  recommended to them, they openly discussed that
9  they would do them in house first to see what
10  they would show, before they would contract with
11  Dr. Parry.
12          So I see in the record that Monsanto is
13  in control over the design of the studies that
14  it's commissioned. I've seen there's two or
15  three studies that were started and that for a
16  variety of reasons were stopped, usually
17  pointing to some problem, the animals got sick
18  or there was a mix-up on the food, to where
19  something went wrong with the study.
20          You know, it strikes me that all of the
21  studies that were completed, for the most
22  part -- and I suppose you could say the
23  BioDynamic mouse study was an exception -- don't
24  contain any data that raises substantial concern
25  over risk. It's just, I think Monsanto managed

CONFIDENTIAL

Page 600

1  internal and external science in a way that gave
2  it a high degree of confidence that there would
3  not be any serious objections or questions
4  raised about the safety of glyphosate-based
5  herbicides.
6  BY MR. LITZENBURG:
7      Q.    Suffice it to say, Dr. Benbrook, that we
8  have gone over multiple decisions or assessments of
9  the EPA going back decades that are favorable to
10 Monsanto?  Is that fair to say?
11         MR. COPLE:  Objection.  Lacks foundation.
12         THE WITNESS:  Yes, certainly the vast
13 majority of them have been favorable, and as I
14 recount in my expert report, the multiple steps
15 that Monsanto took to eventually convince the
16 EPA that the EPA should change its
17 classification of glyphosate from the Group C
18 possible human carcinogen to an E, it was -- I
19 think the EPA felt that there would be no end to
20 that process until they made the decision to do
21 that.
22         It is my opinion that there were EPA
23 scientists involved in that process from the
24 beginning that did not concur with the decision
25 to reclassify glyphosate, but other people in

Page 601

1  the agency did concur, as we noted in the
2  important second peer-review memorandum which
3  was signed by the majority of people on the
4  committee.
5         But two people did not concur.  And I
6  have to say that's an extremely rare occurrence.
7  I do not know of another meeting of that cancer
8  assessment review committee on another pesticide
9  where some of the scientists did not concur.
10 Now, I haven't reviewed all of those.  I'm just
11 not aware of another example.  And to me, I
12 would regard that as a very unusual event.
13 BY MR. LITZENBURG:
14     Q.    Yes, sir.  And we'll get to that.
15         My question is, to simplify for the court
16 or a layman like me, does the fact that the EPA has
17 given assessments or decisions that have been
18 favorable to Monsanto, does that conflict with or
19 undercut your opinion that Monsanto has neglected
20 its duty to consumers and applicators?
21         MR. COPLE:  Objection.  Argumentative.
22 Lacks foundation.
23         THE WITNESS:  No.
24         MR. COPLE:  Asked and answered.
25         THE WITNESS:  It does not.

Page 602

1  BY MR. LITZENBURG:
2      Q.    If you look at Exhibit 28, which is the
3  pages from the Federal Register.
4      A.    Okay.  Got it.
5      Q.    I just wanted to get your opinion on
6  something on Page 25, the page ending in 25, which
7  is the third page.
8         Under Aggregate Exposure Assessment for
9  Acute dietary, it says, "There is no concern for
10 acute effects due to dietary exposure to
11 glyphosate."
12         I think I understand that.
13         Under Chronic dietary, it says, "Using
14 the Dietary Risk Evaluation System, a routine
15 chronic exposure analysis was performed for
16 glyphosate.  The chronic analysis for glyphosate is
17 a worst case estimate of dietary exposure with all
18 residues at tolerance levels and 100 percent of the
19 commodities assumed to be treated with glyphosate."
20         What is that telling us?
21     A.    It's a worst case dietary exposure
22 assessment.  And the number that comes out of this
23 worst case assessment will be compared to the
24 chronic reference dose to see if the current uses
25 and the current tolerances are supported.

Page 603

1      Q.    But it doesn't actually give us a result
2  there, it just cautions against an interpretation of
3  the data; is that correct?
4      A.    Yes.
5         MR. COPLE:  Objection.  Argumentative.
6  Asked and answered.
7         THE WITNESS:  It's explaining what they
8  do and what they did in the case of this, their
9  action on this tolerance petition, because this
10 is a final rule.  Yes, it's a final rule.
11 BY MR. LITZENBURG:
12     Q.    If you'd find Exhibit Number 24, which is
13 the draft paper, in 2003.
14     A.    Oh, yeah.  This is the TNO.  Okay.  Got
15 it.
16     Q.    Dr. Benbrook, do you have any
17 understanding from your work in this case or your
18 background whether a rodent dermal absorption study
19 is superior to a primate dermal absorption study or
20 vice versa?
21         MR. COPLE:  Objection.  Vague.
22         THE WITNESS:  No, I don't have an opinion
23 on which one would be better.  I know both of
24 them are often used in the assessment of dermal
25 absorption in pesticides.

CONFIDENTIAL

Page 604

BY MR. LITZENBURG:
1
2     Q.   Are you aware of Monsanto having
3  undertaken a primate dermal absorption study
4  postdating the Wester study?
5          MR. COPLE:  Objection.  Argumentative.
6  Lacks foundation.
7          THE WITNESS:  Actually, I do recall that
8  they did a primate study.  I didn't review it in
9  my preparation for the case, and I didn't see it
10  in the record either.
11  BY MR. LITZENBURG:
12     Q.   Is there any indication that this paper,
13  Exhibit 24, was ever published?
14     A.   No.
15     Q.   Is there any indication whether it was
16  ever submitted to the EPA?
17     A.   I'm not aware that it was.
18     Q.   There was emphasis placed on the third
19  page, where it says, under conclusion, "The data
20  presented in this report are not acceptable for
21  regulatory use and risk assessment."
22          What is the authority of the scientists
23  in this draft paper to make that determination?
24          MR. COPLE:  Objection.  Lacks foundation.
25  Vague.

Page 605

1          THE WITNESS:  This is a -- this is a very
2  important paragraph.
3          In the documents that I reviewed in the
4  case, it is clear to me simply based on the
5  words written by the Monsanto scientists that
6  they felt that this 10 -- 5 percent to
7  10 percent dermal absorption rate for glyphosate
8  in this study was an unexpected and certainly
9  unwelcomed and potentially very damaging result
10  to them, because it would have possibly doubled
11  or tripled the default dermal absorption rate
12  that's embedded in all of the worker exposure
13  estimates really by all the regulatory agencies
14  around the world.
15          That 3 percent dermal absorption rate was
16  very important.  And as a matter of fact,
17  Monsanto commissioned this TNO study in the
18  hopes of generating data that would support an
19  argument to the German regulatory authority that
20  that 3 percent dermal absorption rate should be
21  reduced to perhaps 1 and a half, which Monsanto
22  had certainly argued in other contexts.
23          This is why when they got the first
24  report from TNO about this, and I can't quite
25  remember the language that they used, but I

Page 606

1  believe it was a verbal communication from the
2  lab that this is what we -- this is what we
3  found, this is what is going to be in our
4  report, they were deeply concerned and
5  surprised.
6          And they understood immediately the
7  significance of that finding, raising into
8  question the default dermal absorption value for
9  their herbicides worldwide, it would have huge
10  significance.  And they, as the record shows in
11  the documents that I reviewed, they had multiple
12  meetings, and there's many emails about what to
13  do about this.
14          And there's two things that are clear in
15  the record.  There is discussion of what the lab
16  reported as some unexpected or unusual
17  variability in the study.  Now, I'm not sure
18  exactly what that referred to.  Perhaps they
19  meant the variability in the end result, that in
20  this study there was 5 to 10 percent, as opposed
21  to other studies that show much less.  I don't
22  know if that's what they were referring to, but
23  there were questions about the conduct and
24  validity and rep -- whether these results could
25  be replicated.

Page 607

1          And Monsanto had discussed in some detail
2  these issues with TNO.  And TNO offered to redo
3  the study for free in order to clear up any
4  remaining uncertainty about it.
5          And again, the fact that Monsanto decided
6  to terminate its relationship with TNO and not
7  ask them, well, yes, we need to -- we need to
8  get on top of this and have them redo the study
9  at no cost to Monsanto, was a real red flag for
10  me.
11  BY MR. LITZENBURG:
12     Q.   Thank you.  We've looked at a number of
13  EPA documents today that reference public comment;
14  is that correct?
15     A.   Yes.
16     Q.   Okay.  Are you aware of Monsanto
17  employing public relations agencies to round up and
18  aggregate third-party comments in these EPA
19  press- --
20          MR. COPLE:  Objection.  Vague.  Lacks
21  foundation.
22          THE WITNESS:  Yes.
23  BY MR. LITZENBURG:
24     Q.   Okay.  And does that effect, in your
25  opinion, the overall outcome?

CONFIDENTIAL

Page 608

1    A.    Sometimes it does, especially when
2    Monsanto puts the kind of resources into it that
3    they did, for example, in trying to marginalize the
4    classification of glyphosate as a probable human
5    carcinogen by IARC and also and even more so in the
6    attack commissioned by Monsanto, multifront attack
7    on the Seralini study that reported a positive
8    oncogenetic response in their mouse chronic feeding
9    study that involved genetically-engineered corn,
10   pure glyphosate and glyphosate-based formulated
11   herbicides.
12   Q.    Dr. Benbrook, do you know what
13   Proposition 65 is?
14   A.    Yes.
15   Q.    Would you explain that for the court or a
16   jury briefly?
17   MR. COPLE:  Objection.  Vague.  Lacks
18   foundation.
19   THE WITNESS:  Proposition 65 arose out of
20   a ballot initiative in California in the late
21   '80s that directed the California Department of
22   Health to provide a warning on any consumer
23   products that contained a chemical or for some
24   other reason posed a cancer or reproductive risk
25   to people using the product.

Page 609

1    BY MR. LITZENBURG:
2    Q.    Do you know what Proposition 65 requires
3    Monsanto to do with respect to Roundup products in
4    the State of California?
5    MR. COPLE:  Objection.  Vague.  Lacks
6    foundation.
7    THE WITNESS:  Well, the State of
8    California has put in place over several years a
9    rigorous, detailed set of policies for
10   implementing Proposition 65.  There is a number
11   of criteria for the listing of a consumer
12   product or a chemical on the Prop 65 list which
13   would require a warning label on any products
14   that contain the chemical.  And one of them is a
15   classification by IARC as a possible or probable
16   human or animal carcinogen.
17   So when the IARC reclassification of
18   glyphosate and glyphosate-based herbicides came
19   out in March 2011, that triggered the process
20   that will ultimately lead to the listing of
21   glyphosate on the Prop 65 list and then
22   subsequently a warning label on glyphosate-based
23   herbicides.
24   However, I'm aware that this action by
25   the California Department of Health is in

Page 610

1    litigation with Monsanto.
2    BY MR. LITZENBURG:
3    Q.    Okay.  If you look at Exhibit Number 23
4    with me --
5    A.    Got it.
6    Q.    -- this is an April 2009 memorandum from
7    the EPA, is that right?
8    A.    Right.
9    Q.    Okay.  And it's large, and I've only just
10   seen it, but it doesn't appear to reference Monsanto
11   or any Monsanto products, does it?
12   A.    I haven't seen the document either, so
13   I'd have to look through it to tell whether it does
14   or not.
15   Q.    Okay.  If you have further answer to that
16   question, just feel free to pipe up.
17   For now, would you please turn to Page
18   14.
19   A.    Okay.
20   Q.    Under Dermal Absorption, it says, "There
21   are no dermal absorption data on the AAPs."  Do you
22   see that?
23   A.    Yes.
24   Q.    What are surfactants generally designed
25   or intended to do in terms of having -- letting

Page 611

1    things absorb an active ingredient, Dr. Benbrook?
2    MR. COPLE:  Objection.  Lacks foundation.
3    THE WITNESS:  One of the principal
4    desired roles of surfactants and certainly the
5    primary purpose of including POAE or other
6    similar surfactants in glyphosate-based
7    herbicides is to enhance the movement of the
8    glyphosate active ingredient into the cells of
9    weeds where the herbicide can have its negative
10   impact on the weeds.
11   So the role of surfactants is to increase
12   the mobility or translocation of the chemical
13   through cell walls into the cells and tissues of
14   the weeds so that it won't get washed off by the
15   rain, for one thing.  Once glyphosate gets
16   inside a weed, it's not subject to being washed
17   off.  And that's one of the problems with a
18   systemic contact herbicide such as glyphosate.
19   If it isn't absorbed inside the leaf tissue of
20   the weed, it is subject to being washed off and
21   likely will not be effective.
22   BY MR. LITZENBURG:
23   Q.    Next, Page 4.4, Classification of
24   Carcinogenic Potential, would you turn to that?
25   A.    I see it.

CONFIDENTIAL

Page 612

1    Q.    It says, "There is no evidence that the
2    AAPs are carcinogenic."
3         What I want to you ask you, Dr. Benbrook,
4    did this reach that result based on a computer model
5    comparing the structure of molecules to, in this
6    class, to similar molecules?
7         MR. COPLE: Objection. Lacks foundation.
8    BY MR. LITZENBURG:
9    Q.    Is that what it's saying?
10   A.    Yeah. Let me read the next sentence.
11        "The agency used a qualitative structure
12   activity relationship (SAR) database, DEREK 11, to
13   determine if there were structural alerts for a
14   representative large molecule, as well as a smaller
15   molecule that had been extensively dealkylated, with
16   the amine group intact."
17        So what they're saying is they turned to
18   this DEREK two [sic] model, which it's an SAR model,
19   and looked to see if both the parent compound, alkyl
20   amine polyalkoxylate, as well as its breakdown
21   products, were structurally similar to other
22   chemicals known to cause cancer. That's what a
23   structure actively relationship assessment entails.
24   Q.    Okay. And what is the value of that type
25   of approach versus epidemiology and versus

Page 613

1    toxicology for carcinogenic potential?
2         MR. COPLE: Objection. Vague. Lacks
3    foundation.
4         THE WITNESS: Well, it's -- a structure
5    activity relationship assessment of a chemical
6    is a Tier 1, sort of first step in the
7    assessment of the possible oncogenicity of a
8    chemical. It can be done very quickly. It
9    doesn't cost much. It's often a routine part.
10        But it certainly is not regarded as
11   sensitive and useful in the analysis of the
12   oncogenicity of a chemical as a two-year chronic
13   feeding study, by any stretch of the
14   imagination. And certainly if there was an
15   epidemiological study suggesting a positive
16   linkage, that would be given even more weight.
17   BY MR. LITZENBURG:
18   Q.    There are no genotoxic assays reported
19   within this memo; is that correct?
20   A.    I haven't had a chance to read it.
21   Sorry.
22   Q.    I'll withdraw the question. If you don't
23   know, the document, we can set it aside.
24        Dr. Benbrook, is there anything
25   preventing Monsanto from doing long-term chronic

Page 614

1    feeding studies in its formulated products?
2         MR. COPLE: Objection. Argumentative.
3    Asked and answered. Vague.
4         THE WITNESS: No. Nothing.
5    BY MR. LITZENBURG:
6    Q.    Look at Exhibit 22, if you would.
7    A.    I'm getting these way out of order now.
8    Q.    That's a challenge at the end of the day.
9    A.    Just give me a minute, I'll find it.  20,
10   you said?
11   Q.    22.
12   A.    22, got it.
13   Q.    Okay. This is an email from our buddy,
14   Dan Jenkins, right?
15   A.    Right.
16   Q.    Okay. Now --
17        MR. COPLE: Objection to characterization
18   by counsel.
19   BY MR. LITZENBURG:
20   Q.    Monsanto's lawyers are suggesting this
21   was evidence of the delivery of studies to the EPA.
22   Do you remember that?
23   A.    Yes.
24   Q.    Okay. And what it in fact says, "I will
25   have a CD today with the studies we can provide."

Page 615

1    Correct?
2    A.    Correct.
3    Q.    It doesn't say whether or not it was ever
4    provided to the EPA, correct?
5    A.    Right. It doesn't say that.
6    Q.    Okay. And I want to draw your attention
7    to the first email in time, which would be the last
8    in the chain.
9    A.    Okay. Yeah.
10   Q.    This is from a chem review manager at
11   EPA, right?
12   A.    Khue Nguyen.
13   Q.    And aside from asking for a list of the
14   studies that we've discussed, she also said, "We
15   noticed that some of the genotoxicity studies were
16   in Spanish. Are English versions available? Same
17   with some of the Japanese studies from the TAC
18   list."
19        Do you see an answer to that in this
20   email chain to either of those questions?
21        MR. COPLE: Objection. Vague. The
22   document speaks for itself.
23        THE WITNESS: Yes, I agree it speaks for
24   itself. And it doesn't mention providing any
25   English translation of either Spanish language

CONFIDENTIAL

Page 616

1  or Japanese language genotox studies.
2  BY MR. LITZENBURG:
3      Q.   Okay.  And you are aware of internal
4  Monsanto concerns about the Japanese TAC results,
5  right?
6          MR. COPLE:  Objection.  Lacks foundation.
7  Vague.
8          THE WITNESS:  That there are in fact
9  several genotox studies from teams of scientists
10  in Japan, and those have been the subject of
11  critical commentary in all of the Monsanto
12  commissioned reviews that came out after those
13  studies were published.
14  BY MR. LITZENBURG:
15     Q.   So when the EPA asked Monsanto about
16  them, at least in this exhibit handed you by
17  Monsanto's lawyer, Dan Jenkins doesn't bother to
18  answer.  Is that fair?
19         MR. COPLE:  Objection.  Argumentative.
20  It mischaracterizes the document.  It speaks for
21  itself.
22         THE WITNESS:  Yeah.  There's no mention
23  or apparent effort to provide an English
24  translation of those other studies.
25  BY MR. LITZENBURG:

Page 617

1      Q.   Jenkins was the one who you said reported
2  that Jess Rowland wanted a medal for killing another
3  agency's review?
4          MR. COPLE:  Objection.  Asked and
5  answered.  Lacks foundation.
6          THE WITNESS:  The accounting of Jess
7  Rowland's, Dan Jenkins' conversation is included
8  in an email from Dan Jenkins to other Monsanto
9  colleagues.
10  BY MR. LITZENBURG:
11     Q.   Okay.  You can put that aside.  Another
12  overarching question:  Have you seen any evidence
13  that, in the record, that Monsanto asked the EPA to
14  heighten PPE requirements or suggestions and the EPA
15  said no?
16         MR. COPLE:  Objection.  Argumentative.
17  Lacks foundation.
18         THE WITNESS:  No.
19  BY MR. LITZENBURG:
20     Q.   Get out Exhibit 19, which is a short
21  document signed by Dr. Parry.
22     A.   Going back into the old pile.  Got it.
23     Q.   Is this the Parry report that you based
24  your opinions on?
25     A.   No, it's not.

Page 618

1      Q.   Can you place Exhibit 19 into context of
2  that and the overall story for the Court or --
3      A.   Yes.
4          MR. COPLE:  Objection.  Asked and
5  answered.  Vague.
6          THE WITNESS:  Yes, I can.  There is
7  extensive email documentation in Monsanto
8  emails, some between scientists, others between
9  scientists and other corporate officials, both
10  in Europe and in St. Louis, in the United
11  States.
12         This report, I was aware that Dr. Parry
13  had done this report.  This was the first
14  consulting contract that Monsanto agreed to let
15  to Dr. Parry and Dr. Parry agreed to do it.
16         It was -- if you look at the internal
17  discussions, Monsanto was desperate to find a
18  highly credible, high-impact genotoxic expert to
19  critique, attack, rebut, make go away the
20  recently published positive genotoxicity
21  studies, including some of the ones that were
22  part of this initial review of just four
23  studies.  I think I saw the invoice for this
24  piece of work.  It was 5,000 pounds or
25  6,000 pounds.  It was a relatively focused,

Page 619

1  short-term project.
2          And upon receiving this report, Monsanto
3  decided that it was work -- the gamble to
4  provide the much broader genotoxicity database,
5  including several of their internal studies, to
6  Dr. Parry to do a much more comprehensive and
7  in-depth review of the genotoxicity database as
8  it existed in 1999.
9          That work was carried out kind of in the
10  middle of the year.  I can't remember the
11  precise date on the letter from Parry to
12  Monsanto where he submitted his full report, but
13  it was later in 1999.
14         His longer report, which was entered as
15  one of the more recent exhibits, is much longer.
16  It covers a much greater number of studies,
17  including several dozen -- certainly not all of
18  the Monsanto genotoxic studies but a selected
19  portion of them, selected by Monsanto.
20         And in addition, Parry also provided them
21  a detailed memorandum with his recommendations
22  for additional genotoxicity research to clarify
23  whether any of the positive findings in the
24  literature were replicable, were correct or not,
25  as well as deploying some of the very recent,

CONFIDENTIAL

Page 620

1   most cutting edge genotoxic test methods,
2   including some that Dr. Parry was the world
3   renowned expert in.
4          MR. LITZENBURG:  At this point, I'd like
5   to designate the entirety of this transcript as
6   confidential for the plaintiff, so that if the
7   defendant suspend any or all of that designation
8   on their behalf, it does not destroy the
9   designation.
10  BY MR. COPLE:
11     Q.    Dr. Benbrook, who is responsible for a
12  pesticide label?  The EPA, or is it the
13  manufacturer?
14         MR. COPLE:  Objection.  Asked and
15  answered.
16         THE WITNESS:  The pesticide manufacturer
17  or the pesticide company that's seeking the
18  label bears the -- is responsible for drafting
19  and writing a label that is submitted to the
20  EPA.  The EPA then goes through a number of
21  steps to determine whether the label contains
22  information required to be present on all
23  labels, as we discussed earlier on our
24  discussion on the label review manual.
25         But it is clear and unambiguous among

Page 621

1   pesticide manufacturers, the EPA, and other
2   people that participate in one way or another in
3   pesticide regulation that the responsibility for
4   including complete and accurate information on
5   pesticide labels is borne by the company, and
6   that if there is a need for any use restrictions
7   or safety precautions or warnings or required
8   personal protection equipment or other
9   information that a user would benefit from in
10  avoiding high-exposure and high-risk scenarios,
11  it's the responsibility of the company to craft
12  those and place them on the label.
13         And as I testified earlier, it is
14  essentially unheard of for the EPA to object to
15  a provision on a label that a company feels is
16  prudent and necessary to add that extra margin
17  of safety to avoid an adverse impact.  They
18  wouldn't to object to that, and I'm not aware of
19  them ever doing so.
20  BY MR. LITZENBURG:
21     Q.    Just so it's clear for the record,
22  between the EPA and the registrant, you have
23  answered that the registrant is responsible for the
24  label?
25         MR. COPLE:  Objection.  Counsel is

Page 622

1   testifying.  Asked and answered.
2          THE WITNESS:  The registrant is
3   completely responsible for drafting and
4   composing the label, which is then submitted to
5   EPA.
6          In some instances, and especially with
7   companies that are not as sophisticated as a
8   company like Monsanto, there may be errors made
9   or things not put in that are required, or the
10  required formatting isn't followed, but most of
11  the major companies, they know exactly what
12  needs to be in the label to comply with the EPA
13  label manual, and they make sure they cover all
14  the bases, because they know if they don't it's
15  going to be kicked back.
16         And since generally they want these label
17  amendments to be approved as quickly as
18  possible, there's no incentive for a company to
19  submit a label that they know doesn't contain
20  mandatory EPA components of an acceptable label.
21  BY MR. LITZENBURG:
22     Q.    Dr. Benbrook, I appreciate this is your
23  wheelhouse and you have a passion for it and you're
24  deep into this but in case -- I hate to be the pot
25  calling the kettle black, but in case the fact

Page 623

1   finder or the court wants a very short, succinct
2   answer to who is responsible for the label between
3   EPA and registrant, what is your short answer to
4   that?
5      A.    The registrant.
6          MR. COPLE:  Objection.  Asked and
7   answered.
8   BY MR. LITZENBURG:
9      Q.    And does the EPA perform its own
10  independent testing of pesticides?
11     A.    No.
12     Q.    Who is responsible for the testing of
13  pesticides?
14         MR. COPLE:  Objection.  Asked and
15  answered.
16         THE WITNESS:  The registrants.
17  BY MR. LITZENBURG:
18     Q.    And as compared between the two -- and I
19  don't mean to cut you off.  If you have to explain
20  it, go ahead.  But as compared between those two
21  entities, who generally knows more about a
22  pesticide?
23         MR. COPLE:  Objection.  Lacks foundation.
24  Asked and answered.
25         THE WITNESS:  Always the major

CONFIDENTIAL

Page 624

1  manufacturer, the company that holds the patent,
2  held the original patents on a pesticide active
3  ingredient, that company or whoever buys that
4  company is going to inherit the full body of
5  knowledge gained during the development
6  discovery in all facets of testing and all
7  interactions with regulators around the world.
8      There's absolutely no question but that
9  Monsanto knows more about glyphosate-based
10  herbicides than any other entity in the world.
11  BY MR. LITZENBURG:
12      Q.  Monsanto is the original registrant or
13  patent holder in this case?
14      A.  Correct.
15      Q.  Monsanto's attorneys stated a number of
16  times today and yesterday that you were making
17  guesses.
18      Dr. Benbrook, does your expert report, or
19  your expert opinion as stated over the last two
20  days, is it comprised of guesses?
21      MR. COPLE:  Objection.  Asked and
22  answered.  The record speaks for itself.
23      THE WITNESS:  No.
24  BY MR. LITZENBURG:
25      Q.  And those opinions, are they based in

Page 625

1  part on your experience and research and employment
2  in these areas?
3      MR. COPLE:  Objection.  Asked and
4  answered.
5      THE WITNESS:  Yes.
6      MR. COPLE:  The record speaks for itself.
7  BY MR. LITZENBURG:
8      Q.  Did Monsanto eventually submit the
9  results for the studies that Dr. Parry had suggested
10  they conduct to the EPA?
11      MR. COPLE:  Objection.  Lacks foundation.
12  Vague.  Asked and answered.
13      THE WITNESS:  To my knowledge, Monsanto
14  never submitted Dr. Parry's report to the EPA,
15  which I believe they were obligated to do so
16  under 6(a)(2), and I'm not aware that Monsanto
17  ever commissioned any of the follow-on studies
18  that Dr. Parry recommended; although, Monsanto
19  Brazil may have, or some additional -- I do
20  believe that Monsanto conducted some additional
21  genotoxicity studies after receipt of
22  Dr. Parry's report in 1999.
23      But I am just certain that the new
24  genotoxicity data generated after 1999 is much
25  less comprehensive and fewer studies than were

Page 626

1  completed in the '70s and '80s when the original
2  set of genotoxicity studies were done by
3  Monsanto and submitted to the agency.
4  BY MR. LITZENBURG:
5      Q.  Dr. Benbrook, is there a credentialing
6  authority for expertise in corporate or regulatory
7  honesty, to your knowledge?
8      MR. COPLE:  Objection.  Asked and
9  answered.  The record speaks for itself.
10      THE WITNESS:  Not that I know of.
11  BY MR. LITZENBURG:
12      Q.  Is there a credentialing or training
13  authority for expertise in ghostwriting, to your
14  knowledge?
15      MR. COPLE:  Objection.  Asked and
16  answered.
17      THE WITNESS:  No.
18      MR. COPLE:  The record speaks for itself.
19  BY MR. LITZENBURG:
20      Q.  Is there credentialing or training
21  authority, to your knowledge, for expertise in the
22  reporting requirements of 6(a)(2)(b)?
23      MR. COPLE:  Objection.  And answered.
24      THE WITNESS:  No.
25      MR. COPLE:  The record speaks for itself.

Page 627

1      THE WITNESS:  There is none.
2  BY MR. LITZENBURG:
3      Q.  Has the reading into the record various
4  EPA documents over the last two days by Monsanto
5  attorneys, has that changed the conclusions of your
6  expert opinion in your report, Dr. Benbrook?
7      MR. COPLE:  Objection.
8      THE WITNESS:  No, it has not.
9      MR. COPLE:  Counsel is testifying.  Asked
10  and answered.  The record speaks for itself.
11  BY MR. LITZENBURG:
12      Q.  Do any of those EPA documents take into
13  account the analysis or results of Dr. Parry's
14  study?
15      MR. COPLE:  Objection.  Asked and
16  answered.
17      THE WITNESS:  Not to my knowledge.
18  BY MR. LITZENBURG:
19      Q.  There's a question if you talked to any
20  of these people at Monsanto.  Do you remember a
21  question or two about that?
22      A.  I remember maybe 20.
23      Q.  Okay.  I'll represent that these
24  gentlemen represent those folks at Monsanto, and
25  they would need to offer to make them available to

Page 628

1    you to speak.
2         In light of those questions, have any of
3    Monsanto's attorneys offered to make any of their
4    executives available to you for a one-on-one chat?
5         MR. COPLE:  Objection.
6         THE WITNESS:  No, they have not.
7         MR. COPLE:  Calls for legal opinion.
8    BY MR. LITZENBURG:
9         Q.    Just quickly, Exhibit 17 contains pages
10   about how to ask for a label change, correct?
11        A.    Correct.  Yeah.
12        Q.    Is there anything in the record to
13   suggest that Monsanto ever undertook the first step
14   to ask for a label change warning of cancer?
15        MR. COPLE:  Objection.  Asked and
16   answered.
17        THE WITNESS:  No, there's no evidence in
18   the record that Monsanto requested such a
19   precautionary statement or warning to be
20   incorporated into the label.
21   BY MR. LITZENBURG:
22        Q.    Okay.  Would you turn to Exhibit 18,
23   which is another CFR packet?
24        A.    Got it.
25        Q.    Okay.  And if you'd turn with me to the

Page 629

1    third page of the packet, where it's Number 6,
2    Cancer, in the upper right-hand corner?
3         A.    The third page of it?  One, two, three.
4    Where do you see word?  Cancer, right.  We talked
5    about this before.  Okay.  Got it.
6         Q.    And so this is only as of 2002; is that
7    correct?
8         A.    Right.  This is a final -- final rule on
9    increasing, increasing tolerances for glyphosate in
10   a number of foods, including corn and hay, alfalfa
11   hay, in light of the fact that genetically
12   engineered versions are in the marketplace that have
13   higher residues.
14        Q.    There's an agency response here that
15   says, "The commenters are referring to two
16   epidemiological studies published by Sweden.  This
17   type of epidemiological evaluation does not
18   establish a definitive link to cancer."
19        My question, Dr. Benbrook, is that phrase
20   "a definitive link to cancer," is that a
21   prerequisite anywhere to your knowledge for warning
22   to potential cancer effects?
23        MR. COPLE:  Objection.  Calls for legal
24   opinion.
25        THE WITNESS:  No, it's not.

Page 630

1    BY MR. LITZENBURG:
2         Q.    Okay.  And is that a special term of art
3    for any sort of EPA requirements this year
4    available, this "definitive link to cancer"?
5         MR. COPLE:  Objection.  Calls for a legal
6    opinion.
7         THE WITNESS:  No, it's not.
8    BY MR. LITZENBURG:
9         Q.    Turn to the prior page, under the
10   Genotoxicity section.
11        A.    Okay.
12        Q.    Number 2, I think.
13        A.    Okay.  I see Number 2 Genotoxicity upper
14   right, upper third column.
15        Q.    Under Agency Response, in the third
16   paragraph, the EPA says, "positive responses have
17   been reported," right?
18        MR. COPLE:  Objection.  The document
19   speaks for itself.
20        THE WITNESS:  Yes.  Correct.
21   BY MR. LITZENBURG:
22        Q.    But then the agency simply goes on,
23   rather than to report those results, the agency goes
24   on to generally criticize that entire group of
25   results as having methodological flaws.  Is that

Page 631

1    fair?
2         MR. COPLE:  Objection.  The document
3    speaks for itself.
4         THE WITNESS:  Methodological flaws, no
5    established basis for translating a positive
6    result in a genotoxic study to a quantitative
7    estimate of human risk, difficulty interpreting
8    the significance of the results.  These are the
9    type of things that are in the six points that
10   are laid out that we talked about before.
11   BY MR. LITZENBURG:
12        Q.    Is it fair to say in that paragraph and
13   preceding paragraph what they essentially said is
14   EPA bases its opinion on the negative genotoxic
15   studies and rejects the positive genotoxic studies?
16        MR. COPLE:  Objection.  Argumentative.
17   Asked and answered.  The document speaks for
18   itself.
19        THE WITNESS:  It's clear from the record
20   that EPA has placed much greater weight on the
21   industry-commissioned and submitted genotoxic
22   studies done under the EPA Part 158 regs and
23   good laboratory practices as defined by the EPA,
24   the vast majority of which are 20 or 30 years
25   old.  And the EPA has, as a matter -- I would

CONFIDENTIAL

## Page 632

1    say as a matter of agency policy, placed very
2    little weight on peer-reviewed, independent,
3    academic genotoxic studies.
4         It would be easy to understand that in
5    the late 1980s and perhaps into even the decade
6    of 2000, because these new assays were
7    relatively new scientific methodologies, and
8    scientists were working out the kinks and
9    gaining experience with them and learning how to
10   interpret them better.
11        But certainly by -- as I say in my
12   report, by 2002, there had been an accumulation
13   of credible, high-quality published studies that
14   certainly should have tipped off Monsanto that
15   there are a potential of greater human health
16   risks from exposure to its herbicides than it
17   had previously recognized then and certainly a
18   higher level of risk that was embodied in the
19   then current EPA assessments of risk.
20        And that's why I reached the opinion that
21   from approximately early in the decade of 2000,
22   additional steps should have been incorporated
23   in Roundup herbicide labels to:  A, warn users
24   of the potential risk of genotoxic damage and
25   possibly cancer; and also to incorporate

## Page 633

1    common-sense, low-cost, attainable changes in
2    the label and the formulation and the PPE that
3    would have in an abundance of caution reduced
4    exposures and, hence, reduced risks, whatever
5    they might ultimately turn out to be.
6    BY MR. LITZENBURG:
7         Q.    Dr. Benbrook, to your knowledge is POEA
8    any less toxic to American humans than it is to
9    European humans?
10             MR. COPLE:  Objection.  Argumentative.
11   Lacks foundation.
12             THE WITNESS:  No.  It would be equally
13   toxic to people all over the globe.
14   BY MR. LITZENBURG:
15        Q.    We discussed earlier today that the EPA
16   as part of its process considers the available
17   published scientific literature.  Do you remember
18   that discussion?
19        A.    Yes.
20        Q.    And if multiple instances of said
21   literature contained unattributed substantive input
22   by Monsanto, how would that affect that process?
23             MR. COPLE:  Objection.  Vague.  Asked and
24   answered.  Lacks foundation.
25             THE WITNESS:  Well, it would taint it.

## Page 634

1    It would bias the agency's review not only of
2    professional and technical commentary on the
3    basis of their reviews, but also the body of
4    public commentary that the agency claims that
5    they read the public literature and look at all
6    the published studies.
7         If you look, for example, at the
8    published literature on the genotoxicity of
9    glyphosate, there isn't -- none of the studies
10   that were commissioned by or involved Monsanto
11   scientists or were published by academics with
12   portions ghostwritten by Monsanto, none of them
13   report any concern over evidence of genotoxicity
14   and reach that conclusion after articulating all
15   of the methodological technical questions that
16   have been raised or could be raised about the
17   positive studies that are in the literature, and
18   accompanied with the depth of scientific
19   expertise that Monsanto has, can find ways to
20   criticize any study and point out how any result
21   to have -- to accept any single study result,
22   there's always going to be unanswered questions
23   that arise out of the study.
24        Monsanto has perfected this art of
25   raising questions about published literature and

## Page 635

1    then repeated it in multiple venues.  And
2    through their collective efforts over many
3    years, they have created an impression from
4    someone not knowing about all this and not
5    knowing about Monsanto's role in shaping the
6    scientific literature -- just a Google search on
7    genotoxicity and glyphosate, you read the first
8    six papers that come up, the odds are that
9    you're certainly going to read several that say
10   it's not a problem.  And that's of grave concern
11   to me.
12   BY MR. LITZENBURG:
13        Q.    Is it fair to say you have deep knowledge
14   and expertise in the FIFRA regulatory sphere?
15             MR. COPLE:  Objection.  Argumentative.
16             THE WITNESS:  Yes.
17             MR. COPLE:  Asked and answered.
18   BY MR. LITZENBURG:
19        Q.    And are you familiar with the phrase
20   "unreasonable risk to man or the environment"?
21             MR. COPLE:  Objection.  Asked and
22   answered.
23             THE WITNESS:  Yes.
24   BY MR. LITZENBURG:
25        Q.    If the pesticide presented an

CONFIDENTIAL

Page 636

1  unreasonable risk to man or the environment, is it
2  compliant with FIFRA?
3      A.   No.
4          MR. COPLE:  Objection.  Asked and
5  answered.
6  BY MR. LITZENBURG:
7      Q.   Would you pull out -- I think this is the
8  last one I'll look at -- Exhibit Number 15.  It's a
9  1991 --
10     A.   In the EPA documents.  Oh, boy, let's
11 see.  Yes, here we go.  Got it.  The second
12 peer-reviewed glyphosate, Exhibit 15.
13     Q.   Correct.  And if you look at the
14 signature page --
15     A.   Yes.
16     Q.   -- William Dykstra and Roger Gardner, are
17 they signing this as concurring with the opinion or
18 accepting the results of this report?
19     A.   No, they are not.
20     Q.   What do their signatures indicate?
21     A.   This is a very curious parenthetical
22 statement.  "Scientific Reviewers (Committee or
23 non-committee members responsible for data
24 presentation" -- that's acknowledging the role --
25 "signature indicates technical accuracy of panel

Page 637

1  report.)"  And I take that to mean the write-up of
2  background information, review of study, and the
3  conclusions that EPA reached on the various studies
4  that are reviewed.  That's what I take that to mean.
5      Q.   Thank you.  I lied.  Will you turn to
6  Exhibit Number 7, which is a bigger issue paper from
7  two months ago.
8      A.   Oh, it's the "Revised Glyphosate Issue
9  Paper," the big one, from December 12th, 2017.
10     Q.   Right.  And will you turn to Page 97 of
11 the packet?
12     A.   Okay.
13     Q.   Under Malignant Lymphoma, and to pause
14 for a minute, that's what is at issue in this case,
15 right, lymphoma cancer?
16     A.   Non-Hodgkin's lymphoma.
17     Q.   This reports that a statistically
18 significant trend was observed in male CD1 mice for
19 lymphoma; is that correct?
20     A.   Correct.
21     Q.   It goes on to say, "For pairwise
22 comparisons, the raw p-value for the highest dose
23 tested was statistically significant; however, it
24 was not statistically significant following
25 adjustment for multiple comparisons."

Page 638

1          Is that a routine adjustment that EPA
2  makes to all this data?
3          MR. COPLE:  Objection.  Lacks foundation.
4          THE WITNESS:  Well, it's -- it's not
5  uncommon for the -- in the statistical analysis
6  of a study, and, you know, I don't remember the
7  details of Wood et al., 2009b, but a number of
8  adjustments are made to try to eliminate bias or
9  statistical noise in the ultimate judgment on
10 the study.
11 BY MR. LITZENBURG:
12     Q.   But before EPA's adjustments, which they
13 don't elucidate here, correct?
14         MR. COPLE:  Objection.  The document
15 speaks for itself.  Asked and answered.
16         THE WITNESS:  No, they don't.  The
17 details of the statistical analysis and the way
18 that they did the adjustment for multiple
19 comparisons is not described here.
20 BY MR. LITZENBURG:
21     Q.   So whatever EPA's adjustment for multiple
22 comparisons represents, before they made that
23 adjustment themselves, the data was statistically
24 significant for malignant lymphomas in male mice,
25 right?

Page 639

1          MR. COPLE:  Objection.  Argumentative.
2  Asked and answered.  The document speaks for
3  itself.
4          THE WITNESS:  I think that this is -- the
5  interpretation of this particular study gets a
6  lot of attention in the lively debate in the
7  scientific community about -- in response to the
8  IARC classification.
9  BY MR. LITZENBURG:
10     Q.   Okay.
11     A.   It's one of the -- like the '93 -- 1983
12 mouse study, it's -- different people read the data
13 in different ways.
14     Q.   I want to make sure we've all got it
15 straight here on the record.  Your opinion as to
16 Monsanto's duties, responsibilities, et cetera, does
17 not end in 2015, does it?
18         MR. COPLE:  Objection.  Asked and
19 answered.  The record speaks for itself.
20         THE WITNESS:  No, heavens no.  It's
21 ongoing.
22 BY MR. LITZENBURG:
23     Q.   Okay.  And if the defense attorneys make
24 a representation to the court or to the jury that
25 you only considered Monsanto's behavior through

CONFIDENTIAL

Page 640

1    2015, that would not be correct?
2         A.    Absolutely not.
3              MR. COPLE:  Objection.  Asked and
4    answered.  The record speaks for itself.
5    BY MR. LITZENBURG:
6         Q.    I lied again.  Pull up Exhibit Number 15,
7    if you would.
8         A.    That's the one we just had, right?
9         Q.    Was it?  Okay.  Great.
10        A.    Yeah, the second peer-reviewed
11   glyphosate.
12        Q.    It is.  So if you'd go to Page 19, at the
13   bottom.
14        A.    The last page.  Okay.
15        Q.    And this is as of 1991, right?
16        A.    Correct.
17        Q.    Could you read the last paragraph on that
18   page to us and then explain it?
19        A.    Sure.  "It should be emphasized, however,
20   that designation of an agent in Group E is based on
21   the available evidence at the time of the evaluation
22   and should not be interpreted as a definitive
23   conclusion that the agent will not be a carcinogen
24   under any circumstances."
25        Q.    Could you explain what that means in 1991

Page 641

1    in this document?
2              MR. COPLE:  Objection.  Vague.  Asked and
3    answered.  The document speaks for itself.
4              THE WITNESS:  Yes, I can explain that.
5    This is a -- this is a standard paragraph that
6    EPA includes in this sort of document, which in
7    lay words, it's hedging their bet.
8              It's stating that they've reached a
9    conclusion based on a body of evidence that they
10   have reviewed but that they recognize there are
11   other circumstances where exposure to glyphosate
12   might be oncogenic that were not included in
13   their analysis, and they're also acknowledging
14   that there may be a future epidemiological study
15   that contradicts -- the next rendition of the
16   Agricultural Health Study, after the exposed
17   population is followed for another five years or
18   ten years, the relationship between glyphosate
19   use and non-Hodgkin's lymphoma may turn out to
20   be statistically significant.
21             It's EPA's way to say -- to hedge their
22   bets and to acknowledge that the decision that
23   they've reached at this point is based on what
24   they know, the data that is available to them,
25   and that they are aware that there are other

Page 642

1    circumstances, other exposed populations that
2    are not covered or necessarily protected by the
3    assessment that they have made of the data.
4    BY MR. LITZENBURG:
5         Q.    In your opinion, does it take into
6    account and include generally accepted standard of
7    industry, rather than just your personal goals for
8    Monsanto?
9              MR. COPLE:  Objection.  Vague.  Lacks
10   foundation.  Asked and answered.
11             THE WITNESS:  I'm sorry.  Reask that.
12   BY MR. LITZENBURG:
13        Q.    Yeah.  Does your opinion take into
14   account a generally accepted standard of industry,
15   versus your own personal goals for Monsanto's
16   behavior?
17             MR. COPLE:  Objection.  Vague.  Lacks
18   foundation.  Asked and answered.
19             THE WITNESS:  My opinions in this case, I
20   want to be very clear about this, while I do
21   think that the general industry norms and
22   expectations and the behavior of pesticide
23   registrants is important, the most compelling
24   factual information in this record that supports
25   my opinions is really an assessment -- based on

Page 643

1    assessment between what Monsanto represents to
2    the general public, to its users, communicates
3    to people by and using their products through
4    the label, communicates in many other ways
5    collateral information as we've spoken about,
6    advertising, materials circulated to pest
7    management officers at school districts.
8              The whole body of communications from
9    Monsanto that present to the outside public had
10   remarkably clear-cut, unambiguous, rosy scenario
11   about glyphosate is safe, glyphosate is
12   nontoxic, glyphosate herbicides are
13   biodegradable.  These sorts of messages are
14   integral to essentially all public communication
15   about Roundup herbicides.
16             And the fact that Monsanto had internal
17   science and information and insights about its
18   products that were inconsistent with those
19   messages is the major reason that my opinion is
20   that the company, there was an egregious failure
21   to warn and a violation of really the pledge
22   that they have made to manufacture and sell the
23   safest products that they could.
24   BY MR. LITZENBURG:
25        Q.    And are you familiar as an expert in this

CONFIDENTIAL

Page 644

1  area with an industry-derived general standard of
2  care?
3       MR. COPLE:  Objection.  Lacks foundation.
4       THE WITNESS:  There isn't any one single
5  document that lays that out.
6  BY MR. LITZENBURG:
7       Q.   But you've considered the standard of
8  care in your opinion, rather -- again, rather than
9  imposing your own personal opinion?
10      A.   Yes.
11           MR. COPLE:  Objection.  Asked and
12      answered.
13  BY MR. LITZENBURG:
14      Q.   And I think this is what you were just
15  saying a minute ago.  Let me clarify, and I think
16  this is my last question.
17           Is it fair to say that Monsanto, when it
18      chooses to make representations to the public about
19      the health and safety of its products, optional
20      representations, that it undertakes the additional
21      duties of candor and truth by making those
22      representations?
23           MR. COPLE:  Objection.  Argumentative.
24      Vague.  Lacks foundation.  Asked and answered.
25           THE WITNESS:  Well, certainly if Monsanto

Page 645

1  makes representations to the public about any of
2  its products, whether they're new
3  representations or consistent with old ones, the
4  expectation is that what they say about their
5  products is consistent with what their own
6  internal understanding of the products is.
7       And as I've emphasized before, when a
8  senior scientist in Monsanto like ████
9  ████ makes a comment to his colleagues "Why
10  are we continuing to sell a hazardous herbicide
11  when we can manufacture a safer one?" that just
12  -- there's no interpretation or educated guess
13  or anything about that.
14      It's an acknowledgment that they knew
15  that because of this new genotoxicity data, the
16  new insights that they had gained about dermal
17  absorption rates and many other aspects of the
18  toxicology database and the risk assessment,
19  that their products probably did pose some risks
20  and that there were some steps that they could
21  take and, as ████ says, "Why don't we
22  just do it?"
23           MR. LITZENBURG:  I think that's all I've
24      got for you for now, Dr. Benbrook.  Thank you
25      for your patience in the last few days.

Page 646

1       MR. COPLE:  No redirect for now.  We're
2  going to move to strike all testimony of this
3  witness after 3:00 p.m. today as in excess and
4  violation of the agreed hard stop.
5       THE WITNESS:  Are we done?
6       THE VIDEOGRAPHER:  The time is now 3:28.
7  We are off the record.
8       MR. LITZENBURG:  We'll have the witness
9  read and sign.
10
11       (Deposition adjourned at 3:28 p.m.)
12
13       (Signature reserved)
14
15
16            *  *  *  *  *
17
18
19
20
21
22
23
24
25

Page 647

1       DEPOSITION ERRATA SHEET
2
3
4
5       DECLARATION UNDER PENALTY OF PERJURY
6       I declare under penalty of perjury that I have read
7  the entire transcript of my Deposition taken in the
8  captioned matter or the same has been read to me, and the
9  same is true and accurate, save and except for changes
10  and/or corrections, if any, as indicated by me on the
11  DEPOSITION ERRATA SHEET, hereof, with the understanding
12  that I offer these changes as if still under oath.
13  Signed on the __ day of ____, 20__.
14
15
16       _____
17          DR. CHARLES M. BENBROOK
18
19  Subscribed to and sworn before me this ___ day of _____,
20  20__, in _____.
21
22  _____
23  Notary Public
24  My commission expires: _____, 20__
25  Notary Public Registration No. _____

CONFIDENTIAL

Page 648

DEPOSITION ERRATA SHEET

1
2
3  Page No._____ Line No._____ Change to:_____
4  _____
5  Reason for change: _____
6  Page No._____ Line No._____ Change to:_____
7  _____
8  Reason for change: _____
9  Page No._____ Line No._____ Change to:_____
10 _____
11 Reason for change: _____
12 Page No._____ Line No._____ Change to:_____
13 _____
14 Reason for change: _____
15 Page No._____ Line No._____ Change to:_____
16 _____
17 Reason for change: _____
18 Page No._____ Line No._____ Change to:_____
19 _____
20 Reason for change: _____
21 Page No._____ Line No._____ Change to:_____
22 _____
23 Reason for change: _____
24 SIGNATURE:_____DATE:_____
25        DR. CHARLES M. BENBROOK

Page 649

DEPOSITION ERRATA SHEET

1
2
3  Page No._____ Line No._____ Change to:_____
4  _____
5  Reason for change: _____
6  Page No._____ Line No._____ Change to:_____
7  _____
8  Reason for change: _____
9  Page No._____ Line No._____ Change to:_____
10 _____
11 Reason for change: _____
12 Page No._____ Line No._____ Change to:_____
13 _____
14 Reason for change: _____
15 Page No._____ Line No._____ Change to:_____
16 _____
17 Reason for change: _____
18 Page No._____ Line No._____ Change to:_____
19 _____
20 Reason for change: _____
21 Page No._____ Line No._____ Change to:_____
22 _____
23 Reason for change: _____
24 SIGNATURE:_____DATE:_____
25        DR. CHARLES M. BENBROOK

Page 650

1    COMMONWEALTH OF VIRGINIA AT LARGE, to wit:
2        I, Rhonda D. Tuck, RPR, CRR, Notary Public in and
3    for the Commonwealth of Virginia at Large, and whose
4    commission expires on May 31, 2020, do certify that the
5    aforementioned appeared before me, was sworn by me, and
6    was thereupon examined by counsel; and that the foregoing
7    is a true, correct, and full transcript of the testimony
8    adduced.
9        I further certify that I am neither related to nor
10   associated with any counsel or party to this proceeding,
11   nor otherwise interested in the event thereof.
12       Given under my hand and notarial seal at
13   Charlottesville, Virginia, this 12th day of February,
14   2018.
15
16
17
18   _____
19       Rhonda D. Tuck, RPR, CRR
20     Notary Public Registration No. 224847
21     Commonwealth of Virginia at Large
22
23
24
25