# EXHIBIT 56

Confidential - Pursuant to Protective Order

```
 1      SUPERIOR COURT OF THE STATE OF CALIFORNIA
             FOR THE COUNTY OF SAN FRANCISCO
 2
 3   DEWAYNE JOHNSON,          )
                               )
 4        Plaintiff,           )   Case No.:
                               )   CGC-16-550128
 5   vs.                       )
                               )   Judge: Honorable
 6   MONSANTO COMPANY,         )   Curtis E.A.
     STEVEN D. GOULD,          )   Karnow
 7   WILBUR-ELLIS COMPANY      )
     LLC, and WILBUR-ELLIS     )   Dept. 304
 8   FEED, LLC,                )
                               )
 9        Defendants.          )
10           TUESDAY, FEBRUARY 27, 2018
11   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
                       - - -
12
13          Videotaped deposition of Daniel A.
14   Goldstein, M.D., held at the offices of HUSCH
15   BLACKWELL, L.L.C., 190 Carondelet Plaza,
16   Suite 600, St. Louis, Missouri, commencing at
17   8:53 a.m., on the above date, before Carrie
18   A. Campbell, Registered Diplomate Reporter,
19   Certified Realtime Reporter, Illinois,
20   California & Texas Certified Shorthand
21   Reporter, Missouri & Kansas Certified Court
22   Reporter.
23                     - - -
            GOLKOW LITIGATION SERVICES
24       877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
25
```

Page 2

APPEARANCES:

THE MILLER FIRM LLC
BY: MICHAEL J. MILLER, ESQUIRE
      mmiller@millerfirmllc.com
      NANCY MILLER, ESQUIRE
108 Railroad Avenue
Orange, Virginia 22960
(540) 672-4224
Counsel for Plaintiffs

HOLLINGSWORTH LLP
BY: MARTIN C. CALHOUN, ESQUIRE
      mcalhoun@hollingsworthllp.com
      GARY I. RUBIN, ESQUIRE
      grubin@hollingsworthllp.com
1350 I Street, N.W.
Washington, D.C. 20005
(202) 898-5800

WINSTON & STRAWN LLP
BY: SARAH A. KRAJEWSKI, ESQUIRE
      skrajewski@winston.com
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-8132
Counsel for Defendant Monsanto

VIDEOGRAPHER:
   JACOB ARNDT,
   Golkow Litigation Services
      — — —

Page 3

INDEX

                              PAGE
APPEARANCES.................................. 2
EXAMINATIONS
   BY MR. MILLER............................. 7
   BY MR. CALHOUN........................... 151
   BY MR. MILLER............................ 181

           EXHIBITS
No.  Description                    Page
1    Photograph of Dewayne Johnson and    11
     family

2    LinkedIn profile printout of Daniel   12
     Goldstein
3A   Monsanto's Commitment to Safety      17
     printout

3B   Monsanto Code of Business Conduct,   17
     MONGLY04770656 - MONGLY04770685
4    E-mail(s),                           28
     MONGLY07459156

5    E-mail(s),                           46
     MONGLY00965390
6    "Human Exposure/Adverse Effect       47
     Incidents Involving Monsanto Lawn &
     Garden Products,"
     MONGLY00965391 - MONGLY00965397

7    E-mail(s),                           62
     MONGLY02031949 - MONGLY02031952
8    "Project Green - Medical Liability   64
     Analysis, Daniel A. Goldstein, MD,"
     MONGLY01739577 - MONGLY01739579

Page 4

9    Metadata sheet for Exhibit 8         64
10   E-mail(s),                           73
     MONGLY01249878 - MONGLY01249881

11   E-mail(s),                           76
     MONGLY02932440 - MONGLY02932441
12   E-mail(s),                           76
     MONGLY02932442 - MONGLY02932443

13   Monsanto private memo                84
     MONGLY00886014 - MONGLY00886017
14   E-mail(s),                           87
     MONGLY00890492 - MONGLY00890494

15   E-mail(s),                           90
     MONGLY00887558 - MONGLY00887560
16   E-mail(s),                           92
     MONGLY06262795 - MONGLY06262796

17   E-mail(s),                           97
     MONGLY03101108 - MONGLY03101109
18   E-mail(s),                           99
     MONGLY01992784 - MONGLY01992785

19   "Pesticide exposure as risk factor   99
     for non-Hodgkin lymphoma including
     histopathological subgroup
     analysis," Eriksson.
     MONGLY01992788 - MONGLY01992801

20   E-mail(s) from Swarthout, 6/16/2014, 108
     No Bates stamping
21   "Recognition and Management of       115
     Pesticide Poisonings," EPA

22   E-mail(s),                           120
     MONGLY02649473 - MONGLY02649484
23   E-mail(s),                           129
     MONGLY02063852 - MONGLY02063859

24   E-mail(s),                           140
     MONGLY01991403 - MONGLY01991405

Page 5

25   E-mail(s),                           143
     MONGLY02793243 - MONGLY02793244

26   "Glyphosate Listed Effective July 7, 147
     2017, as Known to the State of
     California to Cause Cancer," OEHHA

27   "Glyphosate Use and Cancer Incidence 172
     in the Agricultural Health Study,"
     Andreotti

28   Testimony of Anna B. Lowit, Science  176
     Advisor, Office of Pesticide
     Programs, US Environmental
     Protection Agency, Before the House
     Committee on Science, Space, and
     Technology, February 6, 2018
29   E-mail(s),                           186
     MONGLY02682357 - MONGLY02682371

30   "Carcinogenicity of                  199
     tetrachlorvinphos, parathion,
     malathion, diazinon, and
     glyphosate," Lancet
31   E-mail(s),                           209
     MONGLY03827415 - MONGLY03827416

32   "IARC Monographs: 40 Years of        209
     Evaluating Carcinogenic Hazards to
     Humans," Pearce,
     MONGLY03827417 - MONGLY03827454

(Exhibits attached to the deposition.)

Confidential - Pursuant to Protective Order

Page 6

1      VIDEOGRAPHER:  We are now on
2  the record.  My name is Jacob Arndt.
3  I'm a videographer representing Golkow
4  Litigation Services.  Today's date is
5  February 27, 2018, and the time is
6  8:53 a.m.
7      This video deposition is being
8  held in St. Louis, Missouri, in the
9  matter of Dewayne Johnson versus
10  Monsanto Company, et al., for the
11  Superior Court of the State of
12  California for the County of San
13  Francisco.
14      The deponent is Daniel
15  Goldstein, MD.
16      Counsel, please identify
17  yourselves.
18      MR. MILLER:  Michael Miller and
19  Nancy Miller both attorneys for Lee
20  Johnson.
21      MR. CALHOUN:  Martin Calhoun,
22  counsel for Monsanto.
23      VIDEOGRAPHER:  Okay.  The court
24  reporter is Carrie Campbell and will
25  now swear in the witness.

Page 7

1      DANIEL A. GOLDSTEIN, M.D.,
2  of lawful age, having been first duly sworn
3  to tell the truth, the whole truth and
4  nothing but the truth, deposes and says on
5  behalf of the Plaintiff, as follows:
6
7      DIRECT EXAMINATION
8  QUESTIONS BY MR. MILLER:
9      Q.    Good morning.
10      A.    Good morning.
11      Q.    And please state your full
12  name.
13      A.    Daniel A. Goldstein.
14      Q.    And you're a medical doctor?
15      A.    I am.
16      Q.    I will refer to you then as
17  Dr. Goldstein.
18      A.    Thank you.
19      Q.    Okay.  And you work for the
20  Monsanto Company?
21      A.    I do.
22      Q.    And how long have you worked
23  for the Monsanto Company?
24      A.    It will be 20 years in May.
25      Q.    Okay.  Part of your job

Page 8

1  responsibility at Monsanto is to deal with
2  complaints and consumer safety; is that fair?
3      MR. CALHOUN:  Objection to the
4  form of the question.
5      THE WITNESS:  I would narrow
6  that somewhat.  I -- being a
7  physician, I'm more focused on
8  concerns and complaints related to
9  human health.
10  QUESTIONS BY MR. MILLER:
11      Q.    Excuse me, I have the hiccups,
12  and I'll try to get rid of them as we go
13  along.
14      You're also a toxicologist?
15      A.    Yes, an MD toxicologist or a
16  clinical toxicologist, that is correct.
17      Q.    All right.  And so you review
18  complaints of human health that would come to
19  Monsanto from people that perceive rightfully
20  or wrongfully that a product of Monsanto has
21  caused them an ill effect; is that a fair
22  statement?
23      A.    I would review some of them.  I
24  may not see all of them.
25      Q.    I understand.

Page 9

1      And how long have you generally
2  speaking been performing that job function at
3  Monsanto?
4      A.    The entire time that I've been
5  with the company.
6      Q.    Okay.  And it's a full-time
7  position at Monsanto?
8      A.    It is.
9      Q.    So you have not been in the
10  clinical practice of treating patients, if
11  ever, and how long?
12      A.    Well, I was in clinical --
13      MR. CALHOUN:  Objection to the
14  form of the question.
15      THE WITNESS:  Sorry.
16      I was in clinical practice in
17  Colorado for roughly 12 years, you
18  know, actually doing critical care
19  medicine as well as environmental and
20  industrial medicine.  And at Monsanto,
21  I certainly continue to advise on
22  management and treatment in regards to
23  employees and occupational medicine
24  issues.
25

Page 10

1  QUESTIONS BY MR. MILLER:
2      Q.    You understand that I am and my
3  co-counsel are here today, we represent
4  Dewayne Lee Johnson.
5          Do you understand that?
6      A.    Yes, I do.
7      Q.    And you, of course, have been
8  deposed before?
9      A.    Yes, I have.
10     Q.    Approximately how many times
11 have you been deposed as an employee of
12 Monsanto?
13     A.    As an employee, five or six
14 times prior to this deposition.
15     Q.    I understand.
16         And you understand or have
17 reviewed documents where you had some
18 involvement, and we can talk about how
19 limited or how broad, in responding to Lee
20 Johnson's communications with Monsanto about
21 his health?
22         MR. CALHOUN:  Objection to the
23     form of the question.
24         THE WITNESS:  Yes, I have seen
25     documents.

Page 11

1          (Goldstein Exhibit 1 marked for
2      identification.)
3  QUESTIONS BY MR. MILLER:
4      Q.    Okay.  And I'm here to ask you
5  a series of questions about that issue, but
6  first I want to show you what's been marked
7  as Exhibit 1.  This is Lee Johnson and his
8  family out on a ski trip, I believe, at Lake
9  Tahoe near where they live.
10         Have you seen it before?
11     A.    No.
12         MR. CALHOUN:  Objection to the
13     form of the question.
14         Let me get my objection in.
15     Okay?
16 QUESTIONS BY MR. MILLER:
17     Q.    Have you ever seen any pictures
18 of Lee Johnson before?
19     A.    No.
20     Q.    Do you understand that we have
21 medical testimony in this case that Lee
22 Johnson will be dead within the next six
23 months from a form of non-Hodgkin's lymphoma?
24         MR. CALHOUN:  Objection to the
25     form of the question.  Lacks

Page 12

1  foundation.  Misstates the record.
2          THE WITNESS:  I have not seen
3      that information.
4  QUESTIONS BY MR. MILLER:
5      Q.    Have you been advised of that
6  information?
7      A.    No.
8          (Goldstein Exhibit 2 marked for
9      identification.)
10 QUESTIONS BY MR. MILLER:
11     Q.    I'll mark as Exhibit 2, and I
12 do have a copy for counsel.  Please identify
13 this document, sir.
14     A.    This is a printout of my
15 LinkedIn profile.  I'm not entirely certain
16 that it is complete, but that, at least, is
17 the source of the document.
18     Q.    It says in pertinent part in
19 Exhibit 2 that "I" -- this is talking about
20 you, right?  "I am responsible for evaluating
21 product safety for consumer and farm use."
22         Did I read that correctly?
23         MR. CALHOUN:  Objection.
24     Counsel, you're marking on the
25     original exhibit; we object to that,

Page 13

1  highlighting by you on the original
2  exhibit.  We ought to keep the
3  exhibits clean.
4          MR. MILLER:  Your objection is
5      noted.
6  QUESTIONS BY MR. MILLER:
7      Q.    Did I read that correctly?
8      A.    The document does say that,
9  yes.
10     Q.    And that's true, isn't it?
11     A.    Yes.  I'm not the only
12 individual responsible for that function, but
13 I have responsibility in that area.
14     Q.    Okay.  It was in this
15 responsibility that Lee Johnson reached out
16 to Monsanto and was directed to you to see if
17 you could get some answers to his problems;
18 isn't that fair?
19         MR. CALHOUN:  Objection to the
20     form of the question.  Lacks
21     foundation.  States facts not in
22     evidence.
23 QUESTIONS BY MR. MILLER:
24     Q.    You can answer.
25     A.    I have seen documents relating

Page 14

1 to his communications with Monsanto, yes.
2    Q.   And before we look at them, you
3 and I can agree that before a company sells a
4 product, it has to do some reasonable attempt
5 to determine whether that product causes
6 cancer; isn't that fair?
7        MR. CALHOUN:  Objection to the
8    form of the question.  Vague.  Calls
9    for speculation.
10       THE WITNESS:  I don't think I
11   can state that as a generalization.
12   It depends on the nature of the
13   product and its intended use.
14 QUESTIONS BY MR. MILLER:
15   Q.   Okay.  So you would say then
16 that there are situations where companies can
17 manufacture products, sell them to the public
18 and not test them to see if they cause
19 cancer, that's okay then?
20       MR. CALHOUN:  Objection to the
21   form of the question to the extent
22   that you're asking him about other
23   kinds of products and other kinds of
24   companies.  We're here to talk about
25   Monsanto and glyphosate-based

Page 15

1 products.
2        THE WITNESS:  You've changed
3    the nature of your question in terms
4    of --
5        MR. MILLER:  I'll do that all
6    day long, and I object to counsel's
7    speaking objections.  It's against the
8    rules in California.  Please stop.
9        MR. CALHOUN:  I object to your
10   interfering with his ability to
11   answer.  You may not like the answer,
12   but at least let him finish his answer
13   so that we're not -- two people are
14   talking at once.
15       MR. MILLER:  Right, and I don't
16   like speaking objections either
17   because they break the rules.
18 QUESTIONS BY MR. MILLER:
19   Q.   Now let's start again.
20       Is it your testimony, sir, that
21 it's okay then to make a product and have it
22 out on the market and not test to see if it
23 causes cancer; is that okay?
24       MR. CALHOUN:  Objection to the
25   form of the question.  Vague.

Page 16

1    Argumentative.
2        THE WITNESS:  It depends upon
3    the nature of the product and it
4    depends upon the intended use of that
5    product.
6 QUESTIONS BY MR. MILLER:
7    Q.   A chemical that is going to be
8 spread across crops and lawns and schools and
9 other areas, is it okay to make such a
10 product without testing it to see if it
11 causes cancer, Dr. Goldstein?
12   A.   I can't answer that question in
13 regard to general chemicals.  There are many
14 different chemicals for many uses.  If you're
15 talking about herbicides or other pesticides,
16 we are legally required to conduct a safety
17 assessment, and that safety assessment
18 includes assessment regarding risk of cancer.
19   Q.   And your company before having
20 glyphosate approved had such tests performed
21 by a company called IBT?
22       MR. CALHOUN:  Objection to the
23   form of the question.
24       THE WITNESS:  There have been a
25   number of such tests done over the

Page 17

1    years, including some by IBT.
2 QUESTIONS BY MR. MILLER:
3    Q.   And IBT, you're aware of,
4 committed scientific fraud and had members of
5 its organization go to jail for criminal
6 conduct in that kind of testing.  You're
7 aware of that, aren't you?
8        MR. CALHOUN:  Object to the
9    form of the question.
10       THE WITNESS:  I am aware of
11   that, and all of that testing was
12   replaced with new studies.
13 QUESTIONS BY MR. MILLER:
14   Q.   You're saying every test
15 performed by IBT was replaced; is that your
16 testimony?
17   A.   Every test that EPA wished to
18 have replaced was replaced with new studies.
19       (Goldstein Exhibits 3A and 3B
20   marked for identification.)
21 QUESTIONS BY MR. MILLER:
22   Q.   Let me hand you, Doctor, what
23 we're going to mark as Exhibit 3 to your
24 deposition produced by Monsanto or pulled off
25 your website.

Page 18

1 All right. Here's Exhibit 3.
2 Two documents. One entitled "Monsanto's
3 Commitment to Safety," and the other
4 "Monsanto Code of Business Conduct," which
5 begins at 04770656, and I also have a copy
6 for counsel.
7 MR. CALHOUN: And just to
8 clarify the record, the two documents
9 you're marking collectively as one
10 exhibit, Exhibit 3?
11 MR. MILLER: I am, sir, yes.
12 MR. CALHOUN: And before you
13 ask the question, Mr. Miller, let me
14 just make a brief statement. I meant
15 to make this at the beginning of the
16 deposition. We provisionally
17 designate the entire deposition and
18 the exhibits as confidential pursuant
19 to the protective order, and we
20 reserve the right at a later time to
21 review and revise those designations.
22 QUESTIONS BY MR. MILLER:
23 Q. You've seen the first document
24 in Exhibit 3, sir?
25 A. Yes, I do.

Page 19

1 Q. It says, "Monsanto's Commitment
2 to Safety."
3 Do you see that?
4 A. Yes, I do.
5 Q. Okay. It says, "The safety of
6 our products, people, and communities has
7 been, and always will be, a top priority."
8 Is that true?
9 MR. CALHOUN: Objection.
10 Again, you're marking the exhibit.
11 Can I just have a standing objection
12 to your marking the exhibits --
13 MR. MILLER: You may.
14 MR. CALHOUN: -- so I don't
15 have to restate it at every time you
16 do it?
17 MR. MILLER: Yes, that's
18 agreeable.
19 QUESTIONS BY MR. MILLER:
20 Q. You can answer the question.
21 A. During my tenure at the
22 company, that certainly has been our
23 practice.
24 Q. All right. We're going to look
25 at some documents and -- or talk about that

Page 20

1 here, but before we do, I want to look at one
2 other document here. It says on Exhibit 3,
3 "A critical step ensuring the safety of our
4 products is transparency."
5 Is that true?
6 A. Yes, I think it's important
7 that we share information about our products
8 within limits related to certain types of
9 data.
10 Q. When Lee Johnson had cancer and
11 reached out to Monsanto, did you share any of
12 the knowledge you had about the association
13 between glyphosate and cancer with Lee
14 Johnson?
15 MR. CALHOUN: Objection to the
16 form of the question. Assumes facts
17 not in evidence.
18 THE WITNESS: I don't recall.
19 QUESTIONS BY MR. MILLER:
20 Q. If you had, would you have put
21 some sort of written statement in the file in
22 that regard?
23 MR. CALHOUN: Objection to the
24 form of the question. Asks for
25 speculation.

Page 21

1 THE WITNESS: I may have. I
2 didn't always put written statements
3 in.
4 QUESTIONS BY MR. MILLER:
5 Q. So is there a possibility then,
6 Dr. Goldstein, that you said -- well, let's
7 back up.
8 Do you remember talking to Lee?
9 A. I don't recall.
10 Q. Okay. Have you ever told
11 anyone that called or reached out to Monsanto
12 that there was an association reported in the
13 scientific literature between glyphosate and
14 any form of non-Hodgkin's lymphoma?
15 MR. CALHOUN: Objection to the
16 form of the question.
17 THE WITNESS: Yes, I have.
18 QUESTIONS BY MR. MILLER:
19 Q. And when did you start doing
20 that?
21 A. I --
22 MR. CALHOUN: Same objection.
23 THE WITNESS: I began to do
24 that after the IARC decision, which
25 would have been in, I guess, early

Confidential - Pursuant to Protective Order

Page 22

1    2015, early 2014 --
2  QUESTIONS BY MR. MILLER:
3    Q.    March 2015, I don't mean to
4  interrupt, but --
5    A.    Yeah.  Yeah.
6        So after the IARC decision,
7  that is the first ever report of such an
8  allegation that was determined by a -- an
9  agency.  I won't call it a regulatory agency.
10  It isn't a regulatory agency.  But that
11  report certainly prompted some concerns and a
12  number of people called and we discussed that
13  report.
14    Q.    Let's go to -- we're going to
15  mark as 3A, all right, off the web page, and
16  3B is Monsanto's Code of Business Conduct.
17        I want to ask you a question or
18  two about this document which was produced to
19  us by Monsanto.
20        If you'll look with me, please,
21  on the first page, "A message from our
22  chairman, Hugh Grant."
23        And you know who Hugh Grant is,
24  right?
25    A.    I do.

Page 23

1    Q.    Chairman, chief executive
2  officer of the company?
3    A.    Yes.
4    Q.    Okay.  And it says, "Our
5  business decisions have a direct impact on
6  our customers."
7        That's true, isn't it?
8    A.    I'm sorry, I don't understand
9  the scope of that question.
10    Q.    Well, Mr. Grant, the chief
11  executive officer of Monsanto, says in part,
12  quote, "Our business decisions have a direct
13  impact on our customers."
14        And I'm just asking you, sir,
15  if you agree that's true.
16    A.    Well, I have no doubt that our
17  business decisions do have some impacts on
18  our customers.  I don't know specifically
19  what he intended to include in that
20  statement.
21    Q.    Well, he's telling you in this
22  statement, "That means we always need to do
23  what is right."
24        Is that the way you understood
25  your job was supposed to be?

Page 24

1        MR. CALHOUN:  Objection to the
2  form of the question --
3        MR. MILLER:  I wasn't finished
4  with the question.
5        MR. CALHOUN:  Oh, I'm sorry, my
6  apologies.
7  QUESTIONS BY MR. MILLER:
8    Q.    Does that statement, "that
9  means we always need to do what is right," is
10  that a statement that guided your work there
11  at Monsanto?
12    A.    Yes.
13        MR. CALHOUN:  Objection to the
14  form of the question.
15  QUESTIONS BY MR. MILLER:
16    Q.    So if someone called in and
17  said, "I'm spraying Roundup and I have a skin
18  rash," you and I agree at least after IARC
19  the right thing to do would be to tell them
20  there has been an association by some
21  scientists between our product and forms of
22  non-Hodgkin's lymphoma?
23        MR. CALHOUN:  Objection to the
24  form of the question.  Speculation.
25        THE WITNESS:  I can't answer

Page 25

1  that as a generalization.  It depends
2  on the specific circumstances and
3  specific individual.
4  QUESTIONS BY MR. MILLER:
5    Q.    So some individuals who call
6  asking that question would be told there is
7  an association between non-Hodgkin's lymphoma
8  and the use of glyphosate and some would not?
9        MR. CALHOUN:  Objection to the
10  form of the question.
11        THE WITNESS:  In my custom and
12  practice if they're calling about a
13  concern regarding cancer, I would
14  discuss the cancer literature.
15        If they're calling about a skin
16  rash, I would give them appropriate
17  information, understanding and advice
18  related to their particular concern.
19  QUESTIONS BY MR. MILLER:
20    Q.    Well, you're a medical doctor,
21  yes, sir?
22    A.    Yes, I am.
23    Q.    And a toxicologist?
24    A.    Yes.
25    Q.    And you know something about

Page 26

1 non-Hodgkin's lymphoma, right?
2    A.    Yes.
3    Q.    And part of what you know, I
4 would surmise, Doctor, correct me if I am
5 wrong, is that there is a cutaneous form of
6 non-Hodgkin's lymphoma, correct?
7    A.    Yes, there is.
8    Q.    And by "cutaneous" we mean
9 starting in the skin?
10       MR. CALHOUN:  Objection to the
11    form of the question.
12       THE WITNESS:  It certainly
13    presents clinically in the skin.
14 QUESTIONS BY MR. MILLER:
15    Q.    Yes.
16    A.    Where it originates, I -- I'm
17 not sure.
18    Q.    The word "cutaneous" means of
19 the skin, of the epidermis, right?
20    A.    Correct.
21    Q.    Yeah.
22       Okay.  Let's go to 3B, page
23 Roman Numeral V and it says "Our Pledge," and
24 I assume that means the pledge of Monsanto
25 Corporation; is that a fair assumption?

Page 27

1    A.    I'm sorry, I --
2       MR. CALHOUN:  Roman Numeral V.
3    Do you mind if I direct him to where
4    you are?
5       MR. MILLER:  No, I do not mind
6    at all.
7       THE WITNESS:  Oh, okay.  There
8    we go.
9 QUESTIONS BY MR. MILLER:
10    Q.    When it says, "Our Pledge," we
11 can assume that means the Monsanto pledge,
12 right?
13    A.    Yes, that is from corporate.
14    Q.    "Transparency, we will ensure
15 that information is available, accessible and
16 understandable," right?
17    A.    Yes.
18    Q.    Did you make any information
19 available, accessible or understandable to
20 Lee Thompson {sic} when he reached out to you
21 with skin cancer after repeatedly spraying
22 glyphosate?
23       Did you make any information
24 about the association available, accessible
25 and understandable for Lee Johnson?

Page 28

1       MR. CALHOUN:  Objection to the
2    form of the question.
3       THE WITNESS:  I don't recall
4    having spoken with him.  It would be
5    my custom and practice to try and do
6    so, and I've seen documents that
7    indicate that I had an intention to do
8    so, but I don't recall a conversation.
9       (Goldstein Exhibit 4 marked for
10    identification.)
11 QUESTIONS BY MR. MILLER:
12    Q.    Let's take you then to the
13 first time that Lee Johnson reached out to
14 you with concern about his skin cancer or
15 what he thought was skin cancer at the time
16 on November 11, 2014.  We're marking that as
17 Exhibit 4.
18       All right.  Exhibit 4 and a
19 copy for counsel.  This was produced to us in
20 discovery, Doctor, from Monsanto, and it's an
21 e-mail, isn't it?
22       MR. CALHOUN:  Objection to the
23    form of the question to the extent
24    that there was a preface to the
25    question.  That misstates evidence.

Page 29

1       THE WITNESS:  It is an e-mail,
2    yeah.
3 QUESTIONS BY MR. MILLER:
4    Q.    And it's an e-mail that begins
5 at the bottom from a Patricia Biehl, she's a
6 contractor, on Tuesday, November 11th at 2:12
7 in the afternoon.
8       She sends it to who, Doctor?
9    A.    To me.
10    Q.    Daniel Goldstein, right,
11 concerning the subject of what?
12    A.    Was Ranger Pro exposure.
13    Q.    Now, you and I both know that
14 Ranger Pro is a Monsanto product, right?
15    A.    That is correct.
16    Q.    And it also -- like Roundup, it
17 has the active ingredient glyphosate?
18    A.    Correct.
19    Q.    And like Roundup, it has a
20 surfactant in it, right?
21    A.    It does.
22    Q.    Okay.  So what do you
23 understand Patricia Biehl's job function to
24 be, sir, at this time?
25    A.    So Patricia Biehl is a

Confidential - Pursuant to Protective Order

Page 30

1 long-term Monsanto individual who works in
2 our -- in our consumer response center as a
3 product support specialist. So they take a
4 wide range of calls regarding our products,
5 some subset of which could sometimes be
6 medical in nature.
7     Q.    Okay. So she's a product
8 support specialist, right?
9     A.    That is correct.
10     Q.    And she's employed by Monsanto,
11 right?
12     A.    She's marked as a contractor
13 and so I don't know who her actual legal,
14 nominal employer is. She has worked in the
15 safety center for many, many years, and so
16 for practical purposes from my standpoint,
17 she is functioning as a Monsanto employee.
18     Q.    Yes, sir. I understand.
19         So let's see what this is about
20 then. Ranger Pro exposure is the subject
21 matter, right, sir?
22     A.    Yes.
23     Q.    "Spoke with Dewayne Johnson,"
24 that's Lee's first name, and it gives us this
25 Mr. Johnson's phone number and tells us this

Page 31

1 is his story, right?
2     A.    That is what the document says.
3     Q.    Okay. So on November 11, 2014,
4 Lee Johnson told Patricia he "works for a
5 school district in California and about nine
6 months ago he had a hose break on a large
7 tank sprayer."
8         That e-mail was forwarded to
9 you, wasn't it, sir?
10     A.    Yes.
11     Q.    "This resulted in him becoming
12 soaked to the skin, on his face, neck and
13 head with" --
14         What, sir?
15     A.    The document says Ranger Pro.
16     Q.    "He said he was wearing a white
17 exposure suit and it even went inside that."
18         Do you see that, sir?
19         MR. CALHOUN: Objection to the
20     form of the question. Just it's not
21     clear whether you're reading the
22     document or not.
23 QUESTIONS BY MR. MILLER:
24     Q.    Well, let me read it again.
25 "He" meaning Lee Johnson, "he said he was

Page 32

1 wearing a white exposure suit and it even
2 went inside that," end quote.
3         Did I read that correctly, sir?
4     A.    Yes, you did, that is what the
5 document states.
6     Q.    Okay. "A few months after this
7 incident, he noticed a rash on his knee, then
8 on his face and later on the side of his
9 head."
10         Did I read that correctly?
11     A.    You did.
12     Q.    "He said he changed his laundry
13 detergent, dryer sheets and used all creams
14 available to him but nothing seemed to help."
15         What's the medical significance
16 of that, sir?
17         MR. CALHOUN: Objection to the
18     form of the question. Asks for
19     speculation.
20         THE WITNESS: I don't know.
21     Not being his treating physician or
22     seeing his medical records, typically
23     when you see that, that is someone who
24     is trying to address the possibility
25     of a skin allergic or irritant

Page 33

1 condition from some type of product.
2 QUESTIONS BY MR. MILLER:
3     Q.    As a physician, would you have
4 said that patient had anxiety?
5         MR. CALHOUN: Objection to the
6     form of the question. Asks for
7     speculation.
8         THE WITNESS: I can't speculate
9     as to -- as to anxiety. I've never
10     spoken with the patient that I can
11     recall, and I am not his treating
12     physician.
13 QUESTIONS BY MR. MILLER:
14     Q.    Have you ever spoken to a
15 patient who his entire body covered and
16 doctors were telling him it was skin cancer
17 who didn't have anxiety?
18         MR. CALHOUN: Objection to the
19     form of the question.
20         THE WITNESS: I don't think
21     I've ever spoken to a patient that has
22     made that particular claim or had that
23     particular presentation.
24 QUESTIONS BY MR. MILLER:
25     Q.    Okay. Let's look at exactly

Confidential - Pursuant to Protective Order

Page 34

1 what the document says.
2          He tells Patricia on
3 November 11, 2015, quote, "His entire body is
4 covered in this now and doctors are saying it
5 is skin cancer."
6          It's a pretty serious call,
7 isn't it?
8          MR. CALHOUN:  Objection to the
9 form of the question.
10          THE WITNESS:  Well, it is first
11 and foremost a call that makes no
12 sense to me from the strictly medical
13 standpoint.  That's not an attempt to
14 be critical in any way of
15 Mr. Johnson's {sic}.  Patients don't
16 always fully understand their medical
17 condition, but as a physician looking
18 at this, skin cancer does not present
19 that way.  And so I am looking at
20 something, which as noted in my
21 response, makes no sense to me from a
22 medical standpoint.
23 QUESTIONS BY MR. MILLER:
24     Q.    Now, there are doctors called
25 cancer doctors or oncologists, right?

Page 35

1     A.    Yes.
2     Q.    And you're not one of them,
3 right?
4     A.    That's correct.
5     Q.    Okay.  And as a non-Hodgkin's
6 lymphoma that started in the skin, this makes
7 perfect sense, doesn't it?
8          MR. CALHOUN:  Objection to the
9 form of the question.  States facts
10 not in evidence.
11          THE WITNESS:  I have not seen
12 him, but at the -- just at a
13 superficial level, I can say that
14 being covered extensively is
15 consistent with a T cell lymphoma of
16 the skin, but that is not the subject
17 that was raised in this e-mail.  In
18 the e-mail it's stated to be a skin
19 cancer.
20 QUESTIONS BY MR. MILLER:
21     Q.    But this description, you and I
22 agree, is consistent with a T cell lymphoma
23 in the skin, right?
24          MR. CALHOUN:  Objection to the
25 form of the question.

Page 36

1          THE WITNESS:  Without seeing
2 the rash and knowing the details of
3 the clinical presentation, I can't
4 purport to make a diagnosis on a
5 patient I have never seen.  A T cell
6 lymphoma of the skin can certainly
7 present with widely disseminated rash.
8 QUESTIONS BY MR. MILLER:
9     Q.    Well, then I assume you did the
10 right thing and asked Patricia to get you the
11 information you needed in order to help
12 Mr. Johnson out; is that true?
13          MR. CALHOUN:  Objection to the
14 form of the question.
15          THE WITNESS:  I don't recall
16 what happened at that time.
17 QUESTIONS BY MR. MILLER:
18     Q.    Well, let's see what happened.
19          I didn't mean to interrupt you.
20 Are you finished?
21     A.    No, my custom and practice, as
22 indicated here, would be to try and contact
23 the patient myself rather than to have
24 Patricia Biehl do so because Patricia Biehl
25 is not someone with medical background.

Page 37

1     Q.    Now, have you read Dewayne
2 Johnson's repeated depositions?
3     A.    No.
4     Q.    This is a man that's been told
5 he's dying from cancer and he's testified
6 under oath that you never called him.
7          Are you aware of that?
8          MR. CALHOUN:  Objection to the
9 form of the question.
10          THE WITNESS:  No, I'm not.
11 QUESTIONS BY MR. MILLER:
12     Q.    As Mr. Johnson has stated under
13 oath that you never called him, can you sit
14 here and say, "Oh, no, I did call him"?
15          MR. CALHOUN:  Objection to the
16 form of the question.
17          THE WITNESS:  I do not recall.
18 QUESTIONS BY MR. MILLER:
19     Q.    Okay.  Here's what record we
20 have of Patricia sharing this information
21 with you.  This is from you, an e-mail,
22 right, from Daniel Goldstein, right, sir?
23     A.    Yes.
24     Q.    And this is about six hours
25 after she sent you her e-mail, right?

Page 38

1    A.    Yes.
2    Q.    Okay.  And it's, again,
3  about -- it's to Patricia and it's about
4  Ranger Pro, right, sir?
5    A.    Yes.
6    Q.    You told her you would call
7  him, but there's no record of you ever
8  calling him, right?
9        MR. CALHOUN:  Objection to the
10   form of the question.
11       THE WITNESS:  I don't recall
12   whether I called him or not.  That
13   would normally have been my custom and
14   practice, but I have no record or
15   recollection that I did, in fact,
16   speak with him at that time.
17 QUESTIONS BY MR. MILLER:
18   Q.    Okay.  You say to the e-mail to
19 Patricia, "The story is not making any sense
20 to me at all," right?
21       Is that what you said?
22   A.    Well, that is, in fact, what I
23 said.  Those are the words in the -- in the
24 e-mail.  What I meant by that is what I had
25 referred to previously.  It states his entire

Page 39

1  body is covered with skin cancer, and that is
2  not a presentation that you will see with
3  what I would consider to be a true skin
4  cancer.  So it's not making sense to me from
5  that standpoint.
6    Q.    So you would need more
7  information to be able to help Mr. Johnson as
8  he struggles to find out why he has this --
9  this cancer all over his body?
10       MR. CALHOUN:  Objection to the
11   form of the question.
12       THE WITNESS:  Well, it's
13   doubtful that I could help him to
14   answer that question.  The science is
15   fairly sound that this product would
16   not be expected to cause either a skin
17   cancer or a T cell lymphoma, so I
18   doubt that I can help him in that
19   sense.  Nor can I treat him; he's out
20   of state, so I'm not his treating
21   physician.
22       But to answer the question, it
23   would certainly be helpful to have
24   spoken with him, and I don't recall
25   whether I did.

Page 40

1  QUESTIONS BY MR. MILLER:
2    Q.    Dr. Goldstein, you just said
3  there was no scientific evidence that
4  glyphosate increases the risk of
5  non-Hodgkin's lymphoma.
6        Did I hear you correctly?
7        MR. CALHOUN:  Objection to the
8    form of the question.  Misstates his
9    testimony.
10       THE WITNESS:  I said that sound
11   science supports the contention that
12   glyphosate does not cause cancer.
13 QUESTIONS BY MR. MILLER:
14   Q.    You've known since -- more than
15 ten years before Lee Johnson reached out to
16 you for help that there was credible,
17 scientific evidence in the peer-reviewed
18 journals showing a significant association
19 between the exposure to Roundup and a patient
20 then getting non-Hodgkin's lymphoma.
21       Sir, you've known about it and
22 wrote about that for over ten years before
23 you talked to Lee Johnson; that's true, isn't
24 it?
25       MR. CALHOUN:  Objection to the

Page 41

1        form of the question.  Misstates the
2    evidence.  Argumentative.
3        THE WITNESS:  There are
4    epidemiologic, you know, human
5    publications that span that time
6    frame.  The weight of the scientific
7    evidence has been that glyphosate is
8    unlikely to cause cancer, and that
9    conclusion has been reached by
10   regulatory agencies around the world,
11   including our own Environmental
12   Protection Agency.
13       MR. MILLER:  Well, move to
14   strike the last part of that answer as
15   nonresponsive.
16 QUESTIONS BY MR. MILLER:
17   Q.    But, in fact, Doctor, the
18 Environmental Protection Agency has a
19 textbook out that says chronic exposure to
20 herbicides like glyphosate, even specifically
21 mentioning glyphosate, increases one's risk
22 of non-Hodgkin's lymphoma.
23       Are you aware of that?
24       MR. CALHOUN:  Objection to the
25   form of the question.  Lacks

Confidential - Pursuant to Protective Order

Page 42

1 foundation.
2 THE WITNESS: I'm sorry, no,
3 I'm not.
4 QUESTIONS BY MR. MILLER:
5 Q. Okay. And you're aware that a
6 scientific advisory panel has many members
7 that have concluded that IARC was quite
8 correct when they said glyphosate is a
9 probable human carcinogen for a very specific
10 cancer called non-Hodgkin's lymphoma, are you
11 aware of that?
12 MR. CALHOUN: Objection to the
13 form of the question. Misstates the
14 evidence.
15 THE WITNESS: I have not
16 reviewed the scientific advisory
17 panel.
18 QUESTIONS BY MR. MILLER:
19 Q. Sir, at the time that you wrote
20 this e-mail on November 11, 2014, you already
21 knew that IARC was going to have a meeting in
22 March of 2015 and look at this issue, whether
23 glyphosate -- whether the science showed that
24 glyphosate increased the risk of
25 non-Hodgkin's lymphoma.

Page 43

1 You knew about that meeting
2 already, didn't you?
3 MR. CALHOUN: Objection to the
4 form of the question. Lacks
5 foundation.
6 THE WITNESS: We were aware
7 that IARC was going to take glyphosate
8 into consideration, yes.
9 QUESTIONS BY MR. MILLER:
10 Q. And you had said to your other
11 colleagues that you expected IARC to either
12 classify glyphosate as a possible human
13 carcinogen or if things are really bad, a
14 probable human carcinogen.
15 Do you remember having that
16 general conversation?
17 MR. CALHOUN: Objection.
18 QUESTIONS BY MR. MILLER:
19 Q. With your coworkers in e-mails?
20 MR. CALHOUN: Objection to the
21 form of the question.
22 THE WITNESS: I stated in a
23 number of places and in conversations
24 that that was my expectation; however,
25 that conclusion is not supported by

Page 44

1 the science.
2 QUESTIONS BY MR. MILLER:
3 Q. Well, we're going to let the
4 jury decide what conclusion is supported by
5 the science.
6 Let me ask you this, sir:
7 Whether you agree with it or not, you knew
8 for ten years there was a body of scientific
9 evidence that you just apparently did not
10 agree with that showed the association
11 between glyphosate and non-Hodgkin's
12 lymphoma.
13 Why not tell Lee Johnson about
14 it? Why not tell him, "Hey, we don't agree
15 with it, but there is this body of science
16 out there that says our product is
17 associated. Use it as you wish, my friend"?
18 Give him the truth, be transparent like your
19 document says you would.
20 MR. CALHOUN: Objection to the
21 form of the question. Compound.
22 Argumentative. Misstates the record.
23 Lacks foundation and for numerous
24 other reasons.
25

Page 45

1 QUESTIONS BY MR. MILLER:
2 Q. You can answer.
3 A. I have done exactly that with
4 other individuals. What I do not recall is
5 whether I spoke with Mr. Johnson.
6 Q. Doing that with other
7 individuals isn't much help to Lee Johnson,
8 can we agree on that?
9 MR. CALHOUN: Objection to the
10 form of the question. Argumentative.
11 THE WITNESS: I think it
12 depends what you mean by "help."
13 There's nothing I could provide him in
14 the way of information that would
15 modify his condition in any way. If
16 he's seeking information, that
17 information can be provided.
18 QUESTIONS BY MR. MILLER:
19 Q. But, Dr. Goldstein, let me ask
20 you if you're aware of this, sir: When he
21 wrote on November 11, 2014, he was not
22 terminal yet. He continued to spray
23 glyphosate. He got no information from
24 anyone at Monsanto. He later became terminal
25 after continuing to spray the glyphosate.

Confidential - Pursuant to Protective Order

Page 46

1          Are you aware of that, sir?
2          MR. CALHOUN: Objection to the
3    form of the question. Misstates the
4    record. Lacks foundation.
5          THE WITNESS: I have not seen
6    his medical records.
7    QUESTIONS BY MR. MILLER:
8          Q.   You know your company has them;
9    you just haven't bothered to look at them?
10         MR. CALHOUN: Objection to the
11    form of the question.
12         You know that's improper,
13    Mr. Miller. Stop it. Let's move on.
14    QUESTIONS BY MR. MILLER:
15         Q.   You can answer.
16         A.   I don't know whether my company
17    or its representatives has those records or
18    not. I have not seen them.
19         (Goldstein Exhibit 5 marked for
20    identification.)
21    QUESTIONS BY MR. MILLER:
22         Q.   I'm going to show you now what
23    we've marked as Exhibit 5, Lee Johnson's
24    second attempt to reach out to Monsanto for
25    answers about his cancer. I have a copy here

Page 47

1    for counsel. This was produced to us by
2    Monsanto in discovery.
3          Have you seen this before, sir?
4          A.   Yes, I have.
5          MR. CALHOUN: Objection to the
6    form of the question, to the
7    predicates.
8    QUESTIONS BY MR. MILLER:
9          Q.   Explain to us what this is.
10         A.   This is an e-mail. It is from
11    Joy Thompson at the Missouri Regional Poison
12    Control Center to Monsanto. Subject of this
13    is March 2015 FIFRA 6(a)(2) reports.
14         (Goldstein Exhibit 6 marked for
15    identification.)
16    QUESTIONS BY MR. MILLER:
17         Q.   Now and the attached reports
18    we're going to mark as Exhibit 6. Let me
19    give you a copy of those as well and a copy
20    for counsel.
21         All right. So Exhibit 5 is a
22    list of reports that come, and they come to
23    you, right, sir?
24         A.   I am copied on the
25    communication, yes.

Page 48

1          Q.   All right. And let's look from
2    the top.
3          Who is Joy Thompson?
4          A.   Joy Thompson is a nurse at the
5    Missouri Regional Poison Control Center.
6          Q.   And they're under some sort of
7    contract with Monsanto to do these intakes,
8    or what's the process?
9          MR. CALHOUN: Objection to the
10    form of the question.
11         THE WITNESS: We have an
12    agreement with them to provide case
13    consultation and medical response on
14    individuals who contact us regarding
15    our products.
16    QUESTIONS BY MR. MILLER:
17         Q.   Okay. So here we have
18    Mr. Johnson who -- well, let's first look at
19    the e-mail and then we'll go to the report.
20         Okay. So she sends that to
21    Matthew Graneto, who is an employee at
22    Monsanto, right, sir?
23         A.   That is correct.
24         Q.   On April 15, 2015, right, sir?
25         A.   Yes.

Page 49

1          Q.   And you are copied, Daniel
2    Goldstein, right, sir?
3          A.   Yes.
4          Q.   And attached to this is a list
5    of people who have called asking questions,
6    right, sir?
7          MR. CALHOUN: Objection to the
8    form of the question.
9    QUESTIONS BY MR. MILLER:
10         Q.   And we'll put Exhibit 6 up
11    which you're now looking at. It's the "Human
12    Exposure/Adverse Effect Incidents Involving
13    Monsanto Lawn & Garden Products."
14         Have I read that correctly?
15         A.   Yes, but there's an unanswered
16    question pending.
17         MR. CALHOUN: Objection to the
18    form of the question.
19    QUESTIONS BY MR. MILLER:
20         Q.   And this is for the period
21    between March 1, 2015 - March 31, 2015,
22    right, sir?
23         A.   Yes, it is.
24         Q.   Which ironically is the period
25    when the 17 scientists who compose the IARC

Confidential - Pursuant to Protective Order

Page 50

1 committee held their vote to determine that
2 glyphosate was a probable human carcinogen.
3 It was during that same time frame, right?
4        MR. CALHOUN:  Objection to the
5    form of the question.
6        THE WITNESS:  Yes, that's
7    correct.
8 QUESTIONS BY MR. MILLER:
9    Q.    All right.  And so during that
10 time period, go with me, please, to page 5395
11 in the numbers on the bottom right.  Here's
12 another call, Ranger Pro, herbicide from
13 Monsanto.
14        That's the substance that the
15 caller is calling about, right?
16    A.    Yes.
17    Q.    And it says, "Medical outcome,
18 major effect H-B."
19        And what does that mean?
20    A.    So EPA in its reporting
21 requirements asked us to classify outcomes
22 according to a categorization scheme.  H-B
23 would indicate a serious or persistent
24 medical effect that is being stated by the
25 individual.

Page 51

1    Q.    All right, sir.
2        So the active ingredient of
3 this Ranger Pro is 41 percent glyphosate,
4 right?
5    A.    That is correct, yes.
6    Q.    And the caller lives in
7 California, right?
8    A.    Yes.
9    Q.    Where Lee Johnson lives, right?
10    A.    Correct.
11    Q.    "Caller states he has been
12 using Ranger Pro as part of his job for two
13 to three years."
14        Did I read that correctly?
15    A.    Yes.
16    Q.    "He has recently been diagnosed
17 with cutaneous" --
18        And you and I agree that means
19 skin, right?
20    A.    Yes.
21    Q.    -- "T cell lymphoma.  He has
22 concerns about continuing to use Roundup as
23 part of his job and questions if Roundup
24 could be a source of his cancer."
25        Do you see that?

Page 52

1    A.    Yes.
2    Q.    What effort did you make to get
3 back to Mr. Johnson and tell him whether
4 there had been an association between
5 glyphosate and non-Hodgkin's lymphoma after
6 receiving this, sir?
7        MR. CALHOUN:  Objection to the
8    form of the question.
9        THE WITNESS:  Well, this was a
10    call to the poison control center, not
11    to Monsanto or to me personally.
12        I don't necessarily follow up
13    on calls to the poison center if the
14    poison center has discussed the
15    product with the individual.
16 QUESTIONS BY MR. MILLER:
17    Q.    We've just shown how this
18 document was sent to you, right?
19    A.    Yes.
20    Q.    Okay.  So this was sent to you.
21        Do you read them when they're
22 sent to you?
23    A.    I don't necessarily read all of
24 them.
25    Q.    Would you read the ones about a

Page 53

1 fatal form of cancer?
2        MR. CALHOUN:  Objection to the
3    form of the question.
4        THE WITNESS:  If I would miss
5    it on the monthly reporting, I would
6    see it in the annual reporting.  So at
7    some point, yes, I would see anything
8    that was a serious outcome.
9 QUESTIONS BY MR. MILLER:
10    Q.    But you don't remember ever
11 getting back to Mr. Johnson and telling him,
12 "Hey, this group of scientists have just
13 concluded there is a probable association
14 between glyphosate and non-Hodgkin's
15 lymphoma."
16        Nothing like that ever
17 happened, right?
18        MR. CALHOUN:  Objection to the
19    form of the question.
20        THE WITNESS:  I don't recall
21    speaking with him.
22 QUESTIONS BY MR. MILLER:
23    Q.    I see.
24        As the call progressed, "Caller
25 said that doctors are unsure how to treat his

Confidential - Pursuant to Protective Order

Page 54

1 condition, and they are not even sure if it
2 is cancer. Caller states he works with
3 Ranger Pro using a 50-gallon tank and also
4 using a backpack sprayer."
5         Did I read that correctly?
6     A.    Yes, you did.
7     Q.    So if you would have read that
8 in March of 2015, you would have known that
9 he's still using Ranger Pro, still using it
10 in a backpack sprayer, fair?
11        MR. CALHOUN: Objection to the
12    form of the question. It asks for
13    speculation.
14        THE WITNESS: That is what the
15    document states.
16 QUESTIONS BY MR. MILLER:
17     Q.    He goes on to say, "He dilutes
18 10 ounces of Roundup per gallon for the
19 50-gallon tank and 4 ounces of Roundup per
20 gallon when using the backpack sprayer."
21        Nothing out of the ordinary
22 there, right?
23        MR. CALHOUN: Objection to the
24    form of the question to the extent
25    that you didn't read the document

Page 55

1    completely and correctly.
2        THE WITNESS: Nothing out of
3    the ordinary in terms of the use,
4    that's correct.
5 QUESTIONS BY MR. MILLER:
6     Q.    "He recalls having been exposed
7 to Roundup twice in the past two to three
8 years, both from the backpack
9 leaking/malfunction. In one case he was
10 wearing personal protective equipment but it
11 soaked through the PPE and his clothing."
12        You're aware that can happen,
13 right?
14        MR. CALHOUN: Objection to the
15    form of the question, though. You
16    didn't read the document correctly.
17        THE WITNESS: It can happen,
18    yes.
19 QUESTIONS BY MR. MILLER:
20     Q.    "The caller's level of fear is
21 rising over his continued use of Ranger Pro."
22        Why didn't somebody call him
23 back?
24        MR. CALHOUN: Objection to the
25    form of the question. Asks for

Page 56

1    speculation.
2        THE WITNESS: He spoke to
3    individuals at the Missouri Regional
4    Poison Control Center about his
5    concerns.
6 QUESTIONS BY MR. MILLER:
7     Q.    Did you tell anybody at the
8 Missouri Poison Control Center when people
9 call, tell them to stop using Ranger Pro
10 because it's been associated with cancer?
11        MR. CALHOUN: Objection to the
12    form of the question. Misstates the
13    evidence.
14        THE WITNESS: No, and I would
15    have no basis for doing that looking
16    at the science.
17 QUESTIONS BY MR. MILLER:
18     Q.    So even if you had talked to
19 Lee Johnson, you would not have told him to
20 stop using Ranger Pro?
21        MR. CALHOUN: Objection to the
22    form of the question. Seeks
23    speculation.
24        THE WITNESS: No, I would not.
25

Page 57

1 QUESTIONS BY MR. MILLER:
2     Q.    You think he could use it
3 tomorrow and that would be good? That would
4 be okay?
5        MR. CALHOUN: Objection to the
6    form of the question. Lacks
7    foundation.
8        THE WITNESS: Yes.
9        MR. CALHOUN: Lacks personal
10    knowledge.
11        THE WITNESS: Sorry. Yes.
12 QUESTIONS BY MR. MILLER:
13     Q.    "He states he continues to get
14 unexplained rashes and nodules over his body."
15 Missouri Regional Poison Control discussed
16 the product toxicity. The symptoms are not
17 an expected response from the product."
18        That's just not true, is it,
19 Dr. Goldstein?
20        MR. CALHOUN: Objection to the
21    form of the question. Argumentative.
22    Lacks foundation. Misstates the
23    evidence.
24        THE WITNESS: Yes, it is true.
25

Page 58

QUESTIONS BY MR. MILLER:

Q.    So IARC got it wrong?

A.    Yes.

Q.    State of California that says that glyphosate is a known cause of non-Hodgkin's lymphoma, you're aware of that, aren't you?

MR. CALHOUN:  Objection to the form of the question.  Misstates the evidence.  Lacks foundation.  Asks for a legal conclusion.

THE WITNESS:  I can't speak to the legal decisions in the state of California.  I can tell you that California's own EPA looked at glyphosate and determined that it was unlikely to cause cancer.

QUESTIONS BY MR. MILLER:

Q.    You've been fighting the Proposition 65 conclusion in California as part of your job ever since it happened, right?

MR. CALHOUN:  Objection to the form of the question.  Argumentative.

Page 59

QUESTIONS BY MR. MILLER:

Q.    It's part of your job?

MR. CALHOUN:  Objection.  Same objections.

THE WITNESS:  Me personally, no.

QUESTIONS BY MR. MILLER:

Q.    Yes.

A.    I have not.  I have not had direct involvement in the Proposition 65 discussions.

Q.    We'll look at some documents in a minute.

So is it your testimony as you sit here that you don't know that California has determined that glyphosate is a known cause of non-Hodgkin's lymphoma; you're unaware of that?

MR. CALHOUN:  Objection to the form of the question.

The federal court just ruled to the contrary yesterday, so let's move on, Mr. Miller.  He's not a lawyer.  We're not here to discuss his legal opinions.

Page 60

QUESTIONS BY MR. MILLER:

Q.    Answer the question.

A.    They didn't determine anything.  Proposition 65 requires listing based upon IARC.  If you look at what California's EPA actually determined when they looked scientifically at the product, they concluded that it was unlikely to be a cause of cancer.

Q.    Was the head of the California EPA on the IARC committee?

MR. CALHOUN:  Objection to the form of the question.  Vague.  Ambiguous.

THE WITNESS:  An individual from California's EPA, in fact, was on the IARC committee.  I do not remember her name.

QUESTIONS BY MR. MILLER:

Q.    Lauren Zeise.

A.    I don't recall.

MR. CALHOUN:  Objection to the form of the question.

QUESTIONS BY MR. MILLER:

Q.    Two members of the Environmental Protection Agency for the

Page 61

United States Environmental Protection Agency were on the IARC panel that concluded glyphosate is a probable form of human cancer.

You know that, don't you, sir?

MR. CALHOUN:  Objection to the form of the question.  Misstates the evidence.  Argumentative.

THE WITNESS:  They were not on the panel.  They were observers.

QUESTIONS BY MR. MILLER:

Q.    They were observers and not -- okay.  We'll take a look at a document in a minute.

All right.  So you don't remember when you read this second call from Lee Johnson, true?

A.    Correct.

Q.    And you have no memory of responding to it in any way, true?

A.    That's correct.

Q.    One of your jobs at Monsanto is to manage the punitive damage liability arising from all of this, right, Dr. Goldstein?

Confidential - Pursuant to Protective Order

Page 62

1    MR. CALHOUN:  Objection to the
2  form of the question.  Argumentative.
3  Seeks a legal conclusion.
4    THE WITNESS:  My role is
5  strictly in a medical capacity.  I
6  don't manage liability.
7    (Goldstein Exhibit 7 marked for
8  identification.)
9  QUESTIONS BY MR. MILLER:
10    Q.    Let's take a look at an e-mail.
11  I'm marking an e-mail sent by you in June
12  of 2004, seven years before you talked to
13  Mr. Johnson or saw the e-mail from
14  Mr. Johnson, I should say.  I'll ask you if
15  you recognize this.
16    MR. CALHOUN:  Objection to the
17  form of the question to the extent
18  that you put some predicates into the
19  question that are not correct and
20  misstate the record.
21  QUESTIONS BY MR. MILLER:
22    Q.    All right.  This Exhibit 7 is
23  an e-mail sent by you in 2004, June, right,
24  sir?
25    A.    Yes, that is correct.

Page 63

1    Q.    And it's about Roundup, right,
2  sir?
3    A.    Yes.
4    Q.    And you state here in part,
5  quote, "Some people take -- seem to take
6  offense at the idea of helping us manage our
7  punitive damage liability."
8    Right, sir?
9    MR. CALHOUN:  Objection to the
10  form of the question.  You left out
11  the rest of the sentence that's
12  important to understanding the
13  sentence.
14  QUESTIONS BY MR. MILLER:
15    Q.    We'll read the whole thing.
16  This is what you said in June of 2004, quote,
17  "Some people seem to take offense at the idea
18  of helping us manage our punitive damage
19  liability, often without realizing that,
20  quote, 'doing the right thing,' and quote,
21  'managing liability,' are oftentimes one and
22  the same."
23    Did I read that correctly, sir?
24    A.    You did.
25    Q.    And so would it be fair to say

Page 64

1  that managing punitive damages is one of your
2  job titles, right, sir?
3    MR. CALHOUN:  Objection to the
4  form of the question.  Misstates the
5  evidence.
6    THE WITNESS:  No, that's not
7  correct.  This was part of a
8  discussion between myself and someone
9  at the college of medical toxicology
10  regarding transmission of information
11  and the reasons for transmitting that
12  information.  It has nothing to do
13  with my specific job role at all.
14  QUESTIONS BY MR. MILLER:
15    Q.    And that was in 2004, right?
16    A.    Yes.
17    (Goldstein Exhibits 8 and 9
18  marked for identification.)
19  QUESTIONS BY MR. MILLER:
20    Q.    Okay.  In 2005, it's still your
21  job role.  Let's take a look at a document
22  produced from Monsanto.
23    This is entitled "Project
24  Green - Medical Liability Analysis, Daniel A.
25  Goldstein, MD."  There's a copy for you, sir,

Page 65

1  and a copy for counsel.
2    A.    Thank you.
3    Q.    And we'll mark as Exhibit 9 the
4  metadata for this document which indicates it
5  was --
6    A.    I think I have an extra copy.
7    Q.    Yes, sir.  Thank you.
8    All right.  Exhibit 9 simply
9  shows that it was prepared in 2005.  It's a
10  metadata sheet.
11    Do you have a copy here, sir?
12  There you go.  That's Exhibit 9.
13    A.    Okay.
14    Q.    Yes, sir.
15    So this is prepared by you,
16  Daniel A. Goldstein, MD, right, sir?
17    A.    Yes.
18    MR. CALHOUN:  And objection to
19  the form of the question to the extent
20  that you had lots of predicates built
21  into the prior part of the question.
22  I don't know if you withdrew those or
23  not, so to that extent, I object to
24  the form of the question.
25

Page 66

1  QUESTIONS BY MR. MILLER:
2     Q.    Focusing on paragraph 2,
3  "Punitive damages which are not necessarily
4  proportional to injury but can be addressed
5  via appropriate actions to defend one's
6  conduct relative negligence."
7        Did I read that correctly?
8        MR. CALHOUN:  Objection to the
9     form of the question.  You left out
10    prior parts of the paragraph.
11       MR. MILLER:  I'll read it
12    again, but the witness is here to
13    answer, not the attorney.
14  QUESTIONS BY MR. MILLER:
15    Q.    Quote -- if I read it wrong,
16  you can tell me, Dr. Goldstein, but I'm going
17  to try to read it correctly.
18        You wrote this in 2005, quote,
19  "Punitive damages which are not necessarily
20  proportional to injury but can be addressed
21  via appropriate actions to defend one's
22  conduct relative negligence."
23        Did I read that correctly?
24       MR. CALHOUN:  Objection to the
25    form of the question.  You left out

Page 67

1  the beginning of the paragraph.
2        THE WITNESS:  Yes, you did.
3     I'm talking here about multiple
4     different types of potential
5     liabilities because I was asked by our
6     legal department to assess the medical
7     issues relative to a series of
8     products.
9  QUESTIONS BY MR. MILLER:
10    Q.    And one of the products you
11  were assessing in 2005 was glyphosate and
12  hematologic cancers, right?
13       MR. CALHOUN:  Objection.  We
14    need to take a break.  We need to go
15    off the record.
16       MR. MILLER:  No, let's
17    finish --
18       MR. CALHOUN:  I need to confer
19    with the witness about a potential
20    attorney-client privilege issue and
21    that's the one issue that I allowed
22    to take a break and confer with him
23    while a question is pending.  That's
24    all I'm going to talk to him about.
25       MR. MILLER:  All right.  We'll

Page 68

1  take a break.
2        MR. CALHOUN:  Let's take a
3  break and go off the record.
4        VIDEOGRAPHER:  We're going off
5  the record at 9:52 a.m.
6   (Off the record at 9:52 a.m.)
7        VIDEOGRAPHER:  We are back on
8  the record at 10:13 a.m.
9        MR. MILLER:  All right.  We
10  took a 20-minute break.  Counsel, you
11  wanted to say something?
12       MR. CALHOUN:  Yes, I did.
13  After conferring with Dr. Goldstein
14  and my colleagues, we're going to
15  claim attorney-client privilege and
16  attorney work product doctrine
17  protection as to Exhibit 8.  It was
18  inadvertently produced.
19       The document makes clear that
20  Dr. Goldstein was being asked for
21  advice with respect to potential
22  liability, potential litigation.  This
23  document was produced -- it's a draft
24  document that was produced by
25  Dr. Goldstein at the request of the

Page 69

1  legal department at Monsanto and was
2  forwarded to the legal department at
3  Monsanto.  So on those bases, we
4  object.
5        We object to further
6  questioning about the substance of the
7  document.  We invoke the clawback
8  procedures that are in place in both
9  the multi-district litigation
10  confidentiality and protective order
11  and the Dewayne Johnson
12  confidentiality and protective order.
13  We will proceed in accordance with
14  those orders to effectuate the
15  clawback request.
16       And I also object to prior
17  questions about this document as
18  precluded or barred by the
19  attorney-client privilege and the work
20  product doctrine.
21       MR. MILLER:  We are discussing
22  Exhibit 8 and Exhibit 9, the metadata
23  for Exhibit 8.  There's not one shred
24  of evidence in either document that
25  this was ever sent to any lawyers.

Page 70

1  This is pure and simple
2  obstructionism.
3       This document does not say it
4  is prepared for legal department.  It
5  is not sent to the legal department.
6  It is not copied to the legal
7  department.  It is a Project Green -
8  Medical Liability Analysis prepared by
9  Dr. Daniel A. Goldstein.  The metadata
10  analysis says it's produced by
11  Monsanto Company.  It was produced on
12  September 1, 2016, over a year and a
13  half ago.
14       It does not say anything in it
15  about being provided to any attorneys.
16  It does not say anything in it about
17  being prepared at the instruction of
18  any attorneys.  It says it was on a
19  private archive of Daniel A.
20  Goldstein, and it's a 2005 archive.
21  And unless the witness is -- or
22  counsel is going to make a proffer
23  that they can show when this was
24  transferred to lawyers or when lawyers
25  ordered this or when this was sent to

Page 71

1  lawyers, this is nothing but bad faith
2  and obstructionism.
3       Do you have any proffer
4  whatsoever other than ipse dixit that
5  this is an attorney-prepared document?
6       MR. CALHOUN:  Let me address
7  that, Mr. Miller.  On just the first
8  page alone, there are numerous
9  references to liability, potential
10  liability, likelihood of litigation.
11  The document repeatedly discusses
12  Dr. Goldstein's analysis of potential
13  litigation.  Every page of the
14  document has language like that.
15       We have confirmed with
16  Dr. Goldstein that this was prepared
17  at the request of the legal department
18  and was forwarded to the legal
19  department.  We don't need to make
20  more of a proffer than that.  We have
21  a good faith basis to claim
22  attorney-client privilege protection
23  and protection under the work product
24  doctrine because this was prepared in
25  anticipation of litigation.

Page 72

1       There is a procedure in place
2  in the protective orders for how these
3  assertions of privilege are supposed
4  to be handled, and we will comply with
5  those procedures.  They don't require
6  us to make more of a proffer at this
7  time than I just made.
8       MR. MILLER:  We will oppose
9  your clawback.  We will seek to reopen
10  Dr. Goldstein's deposition to complete
11  it after the Court in San Francisco
12  has ruled on the issue.  Let's move
13  on.
14       MR. CALHOUN:  Well, we disagree
15  with that, but we agree that we should
16  move on.
17  QUESTIONS BY MR. MILLER:
18       Q.   One of your jobs,
19  Dr. Goldstein, was to play Whac-A-Mole with
20  problems that came up in Roundup, right?
21       MR. CALHOUN:  Objection to the
22  form of the question.  Argumentative.
23       THE WITNESS:  Well, playing
24  Whac-A-Mole was not part of the job
25  description.  I think it's something

Page 73

1  that we use as jargon internally;
2  issues pop up and we're called upon to
3  deal with them.
4  QUESTIONS BY MR. MILLER:
5       Q.   Okay.  And issues would pop up
6  concerning Roundup, right?  You played
7  Whac-A-Mole with those issues, right?
8       MR. CALHOUN:  Objection to the
9  form of the question.  Compound.
10  Argumentative.
11       THE WITNESS:  Issues would come
12  up and we would endeavor to address
13  them.
14       (Goldstein Exhibit 10 marked
15  for identification.)
16  QUESTIONS BY MR. MILLER:
17       Q.   Let's take a look at
18  Exhibit 10, an e-mail sent by you and others
19  at Monsanto.  A copy for you and counsel.
20       All right.  Sir, let's look at
21  the first page.  This is an e-mail from you,
22  March 3, 2010, Daniel Goldstein, right, sir?
23       A.   Yes.
24       Q.   And it's sent to Eric Sachs and
25  Donna Farmer, two other employees at

Page 74

1 Monsanto, right?
2          MR. CALHOUN:  Objection to the
3    form of the question.
4          THE WITNESS:  Yes.
5 QUESTIONS BY MR. MILLER:
6    Q.    And subject matter is another
7 mole needing a whacking, right?
8    A.    That is correct, yes.
9          MR. CALHOUN:  Objection to the
10   form of the question to the extent
11   that that suggests that was
12   Dr. Goldstein's title.
13 QUESTIONS BY MR. MILLER:
14   Q.    Did you write this e-mail,
15 Dr. Goldstein?
16   A.    I wrote the second e-mail down.
17 I did not create that title.  That title or
18 subject line actually came externally from
19 Dr. Bruce Chassy.
20   Q.    Let's read the part that you
21 created.  "Two comments.  One:  Funny you
22 should say that, Donna Farmer, glyphosate
23 tox, and I have been playing" --
24          What, sir?
25   A.    Whac-A-Mole.

Page 75

1    Q.    -- "for years," right?
2    A.    Yes.
3    Q.    "And calling it just that.  We
4 were joking about it yesterday. "
5          Did I read that correctly?
6    A.    That's correct.  It's humor.
7    Q.    Yes.
8          And that's what you thought
9 about Lee Thompson's {sic} calls, right, is
10 it was time to play Whac-A-Mole again, wasn't
11 it?
12          MR. CALHOUN:  Objection to the
13   form of the question.  Argumentative.
14   Lacks foundation.
15          THE WITNESS:  No.
16 QUESTIONS BY MR. MILLER:
17   Q.    You knew, sir, in 2015 that
18 Monsanto has very limited credibility when
19 talking about the safety of glyphosate, true?
20          MR. CALHOUN:  Objection to the
21   form of the question.  Argumentative.
22          THE WITNESS:  Like any
23   manufacturer, we have some limitations
24   on our credibility when we are
25   speaking as Monsanto publicly.

Page 76

1          (Goldstein Exhibits 11 and 12
2    marked for identification.)
3 QUESTIONS BY MR. MILLER:
4    Q.    Let me go before we get to IARC
5 to the year 2000, which would be 14 years
6 before Lee Johnson reaches out to you and ask
7 you to look at this e-mail that you received
8 in the year 2000.  And we'll mark it as
9 Exhibit 11.  And there's our attachment there
10 we're going to mark as Exhibit 12.
11          So these are copies, gentlemen,
12 of 11 and 12, the e-mail and the attachment.
13   Okay?
14   A.    Those are the same, I think.
15 Do you have two documents here?
16   Q.    I do, sir.
17   A.    Okay.
18   Q.    Yes, sir.
19          And this is an e-mail from John
20 Acquavella.  You know him, right?
21   A.    Yes, I do.
22          MR. CALHOUN:  And just a
23   second.  Object to the form of the
24   question.  You had it larded up with a
25   lot of preface to it.  So to the

Page 77

1    extent that was part of the question,
2    I object to the form of the question.
3 QUESTIONS BY MR. MILLER:
4    Q.    Who's John Acquavella?
5    A.    John Acquavella is an
6 epidemiologist who at that time would have
7 been employed at Monsanto.
8    Q.    And one of his jobs was to
9 review any scientific articles that came out
10 on the issue of glyphosate and its potential
11 associations with any condition, fair?
12   A.    Yes.
13   Q.    Okay.
14   A.    I think that's fair.
15   Q.    And so in this May 2000, year
16 2000, e-mail John Acquavella is writing an
17 e-mail and its subject is non-Hodgkin's
18 lymphoma abstract, isn't it, sir?
19   A.    Yes.
20   Q.    And it's the -- what we both
21 have come to call the McDuffie article,
22 right?
23          MR. CALHOUN:  Objection to the
24   form of the question.
25          THE WITNESS:  It's not the

Page 78

1     article. It is a preliminary abstract
2     that relates to a later publication.
3 QUESTIONS BY MR. MILLER:
4     Q.    That's absolutely fair, and I
5     appreciate your correction.
6         I think by now the jury has
7 heard the difference between abstract and
8 article, but why don't you explain it to us.
9     A.    So an abstract is something
10 that the scientific authors typically present
11 at a meeting. It is usually work that is in
12 progress and in this particular case was a
13 preliminary analysis of their data. And so
14 John Acquavella, in fact, I believe was
15 physically at that meeting and is commenting
16 upon the abstract.
17     Q.    At the meeting where
18 Dr. McDuffie presented her findings in
19 abstract form?
20     A.    Correct.
21     Q.    Okay. And let's take a look at
22 them. That would be Exhibit 12. These
23 are -- "Non-Hodgkin's Lymphoma and the
24 Pesticide Hypothesis: Dose Response."
25         Tell the jury what the

Page 79

1 significance is of a dose response.
2         MR. CALHOUN: Are you on 12
3 now, Counsel?
4         MR. MILLER: I am, sir.
5         MR. CALHOUN: All right. I
6 object to the form of the question to
7 the extent that the date of this is
8 August 21, 2000, and the date of the
9 prior e-mail was May 12, 2000, so I'm
10 not sure these two documents to go
11 together. I don't know one way or the
12 other. You have put them together,
13 but I don't know whether they belong
14 together.
15         MR. MILLER: Monsanto put them
16 together. Counsel, if you look at the
17 Bates pages, Exhibit 11 is Bates
18 stamped 32440 and 441; Exhibit 12 is
19 32442.
20         MR. CALHOUN: I understand that
21 they're consecutively Bates numbered,
22 Counsel. I'm just saying that as we
23 sit here today, the dates don't seem
24 to match up, so it may -- they may or
25 may not belong together. So I've made

Page 80

1     my statement for the record.
2         MR. MILLER: Sure.
3 QUESTIONS BY MR. MILLER:
4     Q.    Well, the question on the table
5 was what is a dose response?
6     A.    So a dose response is something
7 that we look for when we're evaluating human
8 or animal data. With any substance that is
9 having an effect, we expect that we will see
10 more of an effect as the dose, you know, the
11 amount that one is exposed to and absorbed
12 goes up.
13     Q.    Sure.
14         And what Dr. McDuffie and her
15 coauthors found in this abstract were that,
16 "Models which explored the relationships
17 among the number of days per year of
18 personally applying/mixing individual
19 compounds and risk of non-Hodgkin's lymphoma
20 showed, A, no relationship to increasing days
21 of exposure for" -- and other -- other
22 compound, bromoxynil and phenoxyherbicides,
23 unrelated to Roundup. I'm not suggesting it
24 is.
25         And then, "B, more than two

Page 81

1 days per year of exposure to glyphosate
2 resulted in an OR" --
3         Is that an odds ratio, sir?
4     A.    Yes.
5     Q.    -- "of 2.11," right?
6         MR. CALHOUN: Objection to the
7 form of the question.
8         Are you asking right whether
9 you read it correctly, or are you
10 asking him right whether he agrees
11 with it?
12         MR. MILLER: If you don't
13 understand my questions, will you let
14 me know. With and without coaching
15 from counsel, you let me know. Okay?
16         MR. CALHOUN: No coaching. An
17 appropriate objection, Counsel,
18 because your question was vague and
19 ambiguous and unclear. So I object to
20 form.
21 QUESTIONS BY MR. MILLER:
22     Q.    Let's go back and make it clear
23 as a bell.
24         This scientist, Dr. McDuffie,
25 together with one, two, three, four, five,

Page 82

1 six authors at a scientific meeting on
2 August 21 of 2000, the date of the document,
3 looks at non-Hodgkin's lymphoma and certain
4 agriculture exposures and in B states -- and
5 let me read it -- quote, "More than two days
6 per year of exposure to glyphosate resulted
7 in an OR" --
8          And I'm asking you now, sir,
9 what is an OR?
10     A.    That would refer to an odds
11 ratio in this context.
12     Q.    Yes, sir.
13          -- "of 2.11"; is that right,
14 sir?
15     A.    Yes.
16          MR. CALHOUN:  Objection to the
17     form to the question to the extent
18     that you didn't read the document
19     completely and correctly.
20 QUESTIONS BY MR. MILLER:
21     Q.    You can answer.
22     A.    That is what the document says,
23 odds ratio 2.11.
24     Q.    Yes, sir.
25          And with a statistically

Page 83

1 significant confidence interval, right?
2     A.    Yes.
3     Q.    Okay.
4          MR. CALHOUN:  Again, objection
5     to the form of the question.  Not
6     clear whether you're asking him
7     whether you read it correctly or
8     whether he agrees with the document.
9 QUESTIONS BY MR. MILLER:
10     Q.    This information that existed
11 in the scientific literature 14 years before
12 Lee Thompson {sic} reached out to Monsanto
13 was not shared with Mr. Thompson {sic} by
14 you, true?
15          MR. CALHOUN:  Objection to the
16     form of the question.  I'm not clear
17     whether this was part of the
18     literature or not, and I object to the
19     rest of the question about Mr. Johnson
20     reaching out to Monsanto.
21 QUESTIONS BY MR. MILLER:
22     Q.    Now you can answer.
23     A.    It would not have been shared
24 with him because it was superseded ultimately
25 by the publication of this data.  So there's

Page 84

1 no reason I would share a preliminary
2 abstract, and there were some serious issues
3 with data quality and reproducibility.
4     Q.    So you shared the final article
5 on McDuffie with Lee Thompson {sic}, or is
6 the true you never did that either?
7          MR. CALHOUN:  Objection to the
8     form of the question.  Argumentative.
9          THE WITNESS:  As I've already
10     stated, I do not recall whether I had
11     a conversation with him.
12          (Goldstein Exhibit 13 marked
13     for identification.)
14 QUESTIONS BY MR. MILLER:
15     Q.    Well, let me show you a memo
16 prepared by John Acquavella and sent to you
17 on August 24, 2000, the year 2000, several
18 days after our last exhibit, discussing this
19 study and ask you a few questions about it.
20     Okay?
21     Marked as Exhibit 13.  A copy
22 for you, sir, and a copy for counsel.
23          Now, this document is marked
24 "Monsanto Private."
25          See that, sir?

Page 85

1     A.    Yes.
2     Q.    And it's from John Acquavella,
3 who you've told us was an epidemiologist
4 employed at the time by Monsanto, right?
5     A.    Yes.
6     Q.    And it was sent to you, among
7 others, right?  You and Donna Farmer both
8 received this it looks like?
9     A.    That is correct.
10     Q.    Yes, sir.
11          It says in paragraph 1 that,
12 quote, "Non-Hodgkin's lymphoma and the
13 pesticide hypothesis:  dose response," end
14 quote, by Helen McDuffie.
15          Do you see that, and others?
16     A.    Yes.
17     Q.    All right, sir.  And what John
18 Acquavella goes on to say about this in the
19 year 2000, if you please turn with me to the
20 next page, it tells us "additional analysis
21 found a significant relationship for more
22 than two days use/year for glyphosate."  And
23 he lists the odds ratio that we discussed in
24 the last document.
25          Do you see that, sir?

Confidential - Pursuant to Protective Order

Page 86

1    MR. CALHOUN:  Objection to the
2 form of the question to the extent
3 that you didn't read the document
4 correctly.
5 QUESTIONS BY MR. MILLER:
6    Q.    You can answer.
7    A.    Yes, I do.
8    Q.    And John Acquavella actually
9 had a chance to speak to the author,
10 Dr. McDuffie, and he reports on that.  He
11 tells us, quote, "I had the opportunity to
12 spend some time with the author.  She struck
13 me as a reasonable person."
14    So at least John Acquavella
15 thought that this scientist who reported this
16 paper was a reasonable person, right?
17    MR. CALHOUN:  Objection to the
18 form of the question.  Compound.
19    THE WITNESS:  I have no idea
20 what he meant to imply by using that
21 term.
22 QUESTIONS BY MR. MILLER:
23    Q.    Well, one thing he expressly
24 states is, "She doesn't seem to have any
25 preconceived notions about glyphosate,"

Page 87

1 right?
2    A.    Yes.
3    Q.    So by the time the article
4 comes out, the full article, for McDuffie in
5 November of 2001, you and Donna Farmer were
6 very happy that if someone searched that
7 article, they couldn't find glyphosate in the
8 abstract.
9    Did you remember that?
10    MR. CALHOUN:  Objection to the
11 form of the question.
12    THE WITNESS:  I remember that
13 there was some conversation of that
14 nature.
15    (Goldstein Exhibit 14 marked
16 for identification.)
17 QUESTIONS BY MR. MILLER:
18    Q.    Let's take a look at it,
19 Exhibit 12.  I'm sorry, we're going to mark
20 this as Exhibit 14.  Excuse me, Exhibit 14.
21 This is a series of e-mails
22 produced by Monsanto.  I'm going to ask you a
23 few questions about them.  A copy for you and
24 counsel.
25    So this is on November 29,

Page 88

1 2001?
2    A.    Yes.
3    Q.    From Donna Farmer to John
4 Acquavella and you and others, right?
5    A.    Yes.
6    Q.    And it's about the McDuffie
7 article?
8    A.    Correct.
9    Q.    And the subject is glyphosate
10 not mentioned in the abstract.
11    It's still in the article, but
12 it's not in the abstract, right?
13    A.    Yeah, let me look at the
14 document for a moment, if I could.
15    Q.    Yes, sir.
16    A.    The formatting is a bit odd, so
17 it's difficult to read.  Okay.  Sorry.
18    Q.    What Donna Farmer was writing
19 to you and others about at Monsanto was, "I
20 know we don't know yet what it says in the
21 small print, but the fact that glyphosate is
22 no longer mentioned in the abstract is a huge
23 step forward.  It removes it from being
24 picked up by abstract searches, exclamation
25 point."

Page 89

1    Do you see that?
2    A.    Yes, I do.
3    Q.    So she was happy that people
4 wouldn't be able to find the findings about
5 glyphosate in an abstract search; that's what
6 that says?
7    MR. CALHOUN:  Objection to the
8 form of the question.
9    THE WITNESS:  I can't tell you
10 what was in her mind at the time.  I
11 neither wrote it nor agreed with it in
12 the correspondence, but that is what
13 the document says.
14 QUESTIONS BY MR. MILLER:
15    Q.    Well, that was on
16 November 29th.  Seven, eight days later you
17 were copied on another e-mail from another
18 Monsanto employee discussing the same issue
19 and happy that it wasn't in the abstract any
20 longer.
21    Do you remember that?
22    MR. CALHOUN:  Objection to the
23 form of the question.
24    THE WITNESS:  I don't recall
25 that without seeing the document.

Page 90

1      (Goldstein Exhibit 15 marked
2   for identification.)
3   QUESTIONS BY MR. MILLER:
4      Q.   Sure, understandable.
5      Here's Exhibit 15, six days
6   later, an e-mail chain from Donna Farmer to
7   you and others and there's, we're going to
8   talk about the bottom here, William Heydens.
9      Let me know when you're ready.
10     A.   Go ahead.
11     Q.   Yes, sir.
12     So this is an e-mail chain and
13  the one I want to ask about is from William
14  Heydens to you and John Acquavella on
15  December 6, 2001, about the same issue, the
16  McDuffie paper.
17     Do you see that, sir?
18     MR. CALHOUN:  Objection to the
19  form of the question.
20     THE WITNESS:  Yes.
21  QUESTIONS BY MR. MILLER:
22     Q.   So -- and who is Bill Heydens
23  or William Heydens?
24     A.   Bill Heydens is a regulatory
25  toxicologist.

Page 91

1      Q.   Employed by Monsanto?
2      A.   Yes, that's correct.
3      Q.   Okay.  And so he writes, "John,
4   so if I understand the situation correctly,
5   even though the reference to glyphosate
6   wasn't removed entirely, there was a
7   substantial reduction in emphasis, including,
8   but not limited to, removal from the
9   abstract."
10     Did I read that correctly?
11     A.   You did.
12     Q.   Why was it such a big deal to
13  make it so people couldn't search abstracts
14  and find the association between glyphosate
15  and non-Hodgkin's lymphoma?
16     MR. CALHOUN:  Objection.
17  QUESTIONS BY MR. MILLER:
18     Q.   Why was that important?
19     MR. CALHOUN:  Objection to the
20  form of the question.
21     THE WITNESS:  Honestly, I don't
22  know what the writers were thinking at
23  the time.  What matters to me is the
24  data and so I don't know what the
25  individuals who were making those

Page 92

1   statements at the time were trying to
2   imply.
3   QUESTIONS BY MR. MILLER:
4      Q.   In 2003, more independent,
5   scientifically published data came out
6   showing the association between glyphosate
7   and non-Hodgkin's lymphoma, true?
8      MR. CALHOUN:  Objection to the
9   form of the question.
10     THE WITNESS:  I don't remember
11  the exact dates for the various
12  publications.  If you have a document
13  that would refresh my memory, it would
14  be helpful.
15     (Goldstein Exhibit 16 marked
16  for identification.)
17  QUESTIONS BY MR. MILLER:
18     Q.   I do.  Let's look at
19  Exhibit 16, an e-mail from John Acquavella to
20  you in 2003.
21     A.   Yes.
22     Q.   So let's take a look at this
23  e-mail.  This is again from the
24  epidemiologist at Monsanto, John Acquavella,
25  right?

Page 93

1      A.   Correct.
2      Q.   And it's in September of 2003?
3      A.   Yes.
4      Q.   And it's sent to you, Donna
5   Farmer and others at Monsanto, right, sir?
6      A.   That's correct.
7      Q.   And it's regarding -- an
8   article that is regarding non-Hodgkin's
9   lymphoma and glyphosate and some other
10  chemical, right?
11     A.   That is correct.
12     Q.   All right, sir.
13     And it states that it's about
14  the De Roos paper, which is -- we'll call
15  that 2003 De Roos.
16     Okay?
17     A.   Yes.
18     Q.   Okay.  And it says in pertinent
19  part that this paper -- this is a paper from
20  investigators at the National Cancer
21  Institute, right?
22     A.   Correct.
23     Q.   All right.  If my math is
24  right, this is 11 years before Lee Johnson
25  reached out for information from Monsanto?

Confidential - Pursuant to Protective Order

Page 94

1    MR. CALHOUN:  Objection to the
2 form of the question.  Misstates the
3 evidence.  Lacks foundation.
4 QUESTIONS BY MR. MILLER:
5    Q.   Is that right?
6    MR. CALHOUN:  Same objection.
7    THE WITNESS:  Yes, it would be
8 11 years from 2003 to 2014.
9 QUESTIONS BY MR. MILLER:
10    Q.   Right.
11    And what John Acquavella, the
12 epidemiologist at Monsanto, tells us here is
13 that, "Strangely glyphosate looks to be one
14 of the pesticides most associated with
15 non-Hodgkin's lymphoma in this analysis."
16    Did I read that correctly?
17    A.   You did, and then he goes on to
18 explain the reasons why he finds that to be
19 unusual.
20    Q.   And he also states that this is
21 going to "add more fuel to the fire for
22 Hardell."
23    Who is Hardell?
24    A.   Hardell is --
25    MR. CALHOUN:  Objection to the

Page 95

1 form of the question.
2    THE WITNESS:  Hardell is a
3 scientist who had previously published
4 on the topic of non-Hodgkin's lymphoma
5 and glyphosate.
6 QUESTIONS BY MR. MILLER:
7    Q.   And Hardell had found an
8 association in his study between glyphosate
9 and non-Hodgkin's lymphoma?
10    MR. CALHOUN:  Objection to the
11 form of the question.
12    THE WITNESS:  It was reported
13 in that study.  Without looking at the
14 study, I don't remember the
15 statistical significance.
16 QUESTIONS BY MR. MILLER:
17    Q.   John Acquavella, Monsanto's
18 epidemiologist, closes with, "It looks like
19 non-Hodgkin's lymphoma and other
20 lymphopoietic cancers continue to be the main
21 cancer epidemiology issues for both
22 glyphosate," and the other drug, right?
23    A.   The other herbicide.
24    Q.   Yes, another herbicide.
25    "We're assembling a panel of

Page 96

1 experts to work on this."
2    Did I read that correct?
3    A.   Yes, you did.
4    Q.   I'm no scientist, but one way a
5 chemical can cause a cancer is by damaging
6 the DNA of a cell.
7    Is that a fair understanding
8 that us lay people should have?
9    MR. CALHOUN:  Objection to the
10 form of the question.
11    THE WITNESS:  That is one
12 mechanism by which a chemical could
13 contribute to risk of cancer.
14 QUESTIONS BY MR. MILLER:
15    Q.   Yes, sir.
16    And by 2007, you knew it was
17 old news that glyphosate damaged the DNA of
18 cells, right, sir?
19    MR. CALHOUN:  Objection to the
20 form of the question.
21    THE WITNESS:  No, that would be
22 counter to all of the regulatory
23 determinations that I'm familiar with.
24 There certainly is an extensive body
25 of genotoxicity data, but my belief is

Page 97

1 that the weight of the evidence
2 supports nongenotoxic effect.
3    (Goldstein Exhibit 17 marked
4 for identification.)
5 QUESTIONS BY MR. MILLER:
6    Q.   Let's take a look at an e-mail
7 chain from 2007 between you and others at
8 Monsanto on this issue.  Here's a copy for
9 you and counsel, sir.
10    You've seen this before, right,
11 sir?
12    A.   Yes, I have.
13    Q.   Let's look at the article that
14 you and Monsanto employees are discussing,
15 which is the second page of Exhibit 17.
16    And what it tells us is that
17 aerial spraying of herbicide damages DNA.
18 That's the title anyway, right?
19    A.   Yes.
20    Q.   And what this reports is,
21 quote, "Aerial spraying of a herbicide by the
22 Colombian government on the border of
23 Colombia and Ecuador has caused a high degree
24 of DNA damage in local Ecuadorian people
25 according to the study."

Confidential - Pursuant to Protective Order

Page 98

1    Right?
2    A.    So this is not a study.  This
3 is a newspaper article --
4    Q.    Yes.
5    A.    -- regarding the underlying
6 study.
7    Q.    That's fair, and thank you for
8 that clarification, yes.
9    It's called the Miño study or
10 Hermann Miño study?
11    MR. CALHOUN:  Objection to the
12 form of the question.
13 QUESTIONS BY MR. MILLER:
14    Q.    And I can highlight that.  "DNA
15 damage may activate genes associated to the
16 development of cancer, lead researcher Cesar
17 Paz y Miño told sciencedevelopment.net."
18    A.    You had stated it's called the
19 Miño study.  I don't know if that is the
20 correct first citation for this.  I'm not
21 sure which of several studies it actually is
22 making reference to.
23    Q.    All right, sir.
24    In any event, you commented on
25 the study in the e-mail chain that is

Page 99

1 Exhibit 17.  I just want to ask you a few
2 questions about that, sir.
3    You state -- actually, Eric
4 Sachs.
5    Now, who is Eric Sachs?
6    A.    Eric Sachs in 2007, well, he
7 would have an individual in our scientific
8 outreach group I believe at that point in
9 time.
10    Q.    And what he's telling other
11 employees is -- as he copies you and Donna
12 Farmer, "Darren and Andy," these other
13 employees, he says, quote, "Please engage
14 Donna and Dan as this is an old issue and
15 they have extensive experience and
16 information on this topic."
17    Right?
18    A.    Yes.
19    Q.    You had been dealing with this
20 issue for a while, fair?
21    MR. CALHOUN:  Objection to the
22 form of the question.
23    THE WITNESS:  It had certainly
24 come up before, yes.
25    (Goldstein Exhibits 18 and 19

Page 100

1 marked for identification.)
2 QUESTIONS BY MR. MILLER:
3    Q.    I want to talk to you now about
4 the new Hardell paper in 2008 on these issues
5 and ask you about some e-mails that you sent
6 or received on the issue, if I can.  I have
7 copies for you.  I'll mark them as
8 Exhibit 18.
9    Sir, here are copies of 18 and
10 19, the article that these e-mails are
11 referencing.
12    All right, sir.  Here we are in
13 2008, and Andy Hedgecock, that's an employee
14 at Monsanto, right?
15    A.    Yes.
16    Q.    Is e-mailing you and others
17 about the Hardell, the new Hardell paper,
18 right?
19    A.    He's actually e-mailing us
20 about a variety of articles in the scientific
21 literature that had come out in the preceding
22 week, among them is this particular paper.
23    Q.    Sure.
24    He attached the new Hardell
25 paper.  He attached something about The

Page 101

1 Chicago Tribune raising a global stink,
2 issues, management, Argentina, and other
3 issues, right?
4    MR. CALHOUN:  Objection to the
5 form of the question.
6    THE WITNESS:  That's correct.
7 QUESTIONS BY MR. MILLER:
8    Q.    And the importance was high,
9 right?
10    A.    That's what he indicated, yes.
11    Q.    Okay.  If it was you and Donna
12 Farmer in the room, it would be -- we're
13 playing Whac-A-Mole, aren't we?
14    MR. CALHOUN:  Objection to the
15 form of the question.  Argumentative.
16    THE WITNESS:  No, I wouldn't
17 characterize this type of response to
18 epidemiological literature that way,
19 but we do make an effort to respond to
20 issues in literature which arises.
21 QUESTIONS BY MR. MILLER:
22    Q.    And this article by Hardell
23 that you're responding to and looking at was
24 published in a peer-reviewed journal called
25 the International Journal of Cancer, right?

Confidential - Pursuant to Protective Order

Page 102

1    A.    Yes.
2    Q.    And it was by four independent
3 scientists, that is, they do not work at
4 Monsanto, right?
5    A.    Correct, they don't work at
6 Monsanto.
7    Q.    Okay.  And in this
8 peer-reviewed article entitled, quote,
9 "Pesticide exposure as risk factor for
10 non-Hodgkin's lymphoma including
11 histopathological subgroup analysis."
12         You're a doctor.  What does
13 histopathological subgroup analysis mean?
14    A.    They're looking at different
15 types of non-Hodgkin's lymphoma.
16    Q.    I see.  Thank you.
17         All right.  And so what these
18 independent scientists in this peer-reviewed
19 journal tell us, if you can please turn to
20 the Bate Stamp 92792, in their peer-reviewed
21 study of 2008, they tell us that glyphosate,
22 if you use it less than ten days, you have an
23 increased risk but it's not statistically
24 significant, is it?
25    A.    No.

Page 103

1    Q.    However, if you use glyphosate
2 greater than ten days per year, it is
3 statistically significant, right?
4    A.    Yes.
5         MR. CALHOUN:  Objection to the
6    form of the question to the extent
7    that it is not clear whether you're
8    asking him whether you read the
9    document correctly or whether he
10   agrees with what is set forth in the
11   document.
12 QUESTIONS BY MR. MILLER:
13   Q.    And they go on to state in this
14 peer-reviewed article, quote, "Dose-response
15 analysis regarding herbicides in total and
16 glyphosate yielded an increased odd ratio in
17 the higher exposed group."
18        Did I read that correctly?
19   A.    You did.
20        I did not get a chance to
21 finish my prior answer, however.
22        MR. CALHOUN:  Go ahead and
23   finish your prior answer,
24   Dr. Goldstein.
25        THE WITNESS:  So you had asked

Page 104

1 about the increased odds ratio and,
2 yes, it does approach -- in fact, it
3 reaches statistical significance with
4 glyphosate exposure greater than ten
5 days; however, I don't believe that's
6 true of the T cell lymphoma subgroup,
7 and it -- the association with
8 glyphosate overall and cancer did not
9 reach statistical significance in a
10 multivariant analysis that took
11 account of other exposures.
12 QUESTIONS BY MR. MILLER:
13   Q.    And univariant analysis versus
14 multivariant analysis is something unique in
15 the field of epidemiology, right?
16        MR. CALHOUN:  Objection to the
17   form of the question.
18        THE WITNESS:  I don't know that
19   it's entirely unique to the field of
20   epidemiology.  It certainly is
21   something that is used in that field
22   routinely to look at the impact of
23   other exposures or potential
24   confounders on risk.
25

Page 105

1 QUESTIONS BY MR. MILLER:
2    Q.    What these independent
3 scientists concluded from their peer-reviewed
4 study in 2008, if you turn with me to
5 page 99, please, "Furthermore, our earlier
6 indication of an association between
7 glyphosate and non-Hodgkin's lymphoma has
8 been considerably strengthened."
9         Did I read that correctly?
10   A.    That is what they concluded.  I
11 would say the data are weak, but that is
12 their conclusion.
13   Q.    Yes.
14        And, in fact, this paper, this
15 peer-reviewed, independently published paper,
16 was one of the pieces of scientific evidence
17 used by IARC to conclude that glyphosate was
18 a probable form of non-Hodgkin's lymphoma,
19 true?
20        MR. CALHOUN:  Objection to the
21   form of the question.
22        THE WITNESS:  I'm sorry, the
23   question as you asked it makes no --
24   makes no sense.  I think you just
25   misspoke.

Confidential - Pursuant to Protective Order

Page 106

1 QUESTIONS BY MR. MILLER:
2    Q.    Well, I sure didn't mean to.
3        The scientists at IARC when
4 they spent a week-plus together evaluating
5 the science of glyphosate and non-Hodgkin's
6 lymphoma looked at scientific, public papers;
7 you understand that, right?
8    A.    Yes.
9        MR. CALHOUN:  Objection to form
10    of the question.
11 QUESTIONS BY MR. MILLER:
12    Q.    And this Hardell paper was one
13 of the papers they looked at?
14        MR. CALHOUN:  Same objection.
15        THE WITNESS:  Yes, that's
16    correct.
17 QUESTIONS BY MR. MILLER:
18    Q.    And when they looked at and
19 reviewed this Hardell paper with the other
20 pieces of scientific evidence, they concluded
21 that glyphosate was a probable form of
22 non-Hodgkin's lymphoma?
23        MR. CALHOUN:  Objection to the
24    form of the question.  Misstates the
25    record.

Page 107

1        THE WITNESS:  That was their
2    conclusion based on the limited scope
3    of science that they reviewed.
4 QUESTIONS BY MR. MILLER:
5    Q.    And this was in 2008, the
6 Hardell paper, so that would be since Lee
7 Johnson reached out to you in 2014, six years
8 before Lee Johnson reached out to Monsanto,
9 right?
10        MR. CALHOUN:  Objection to the
11    form of the question.
12        THE WITNESS:  It's correct.
13 QUESTIONS BY MR. MILLER:
14    Q.    Let's move on.  You know what
15 the Shinasi meta-analysis is?
16    A.    Yes.
17    Q.    Okay.  And it would be fair to
18 say that the Shinasi meta-analysis -- well,
19 first of all, explain to the jury what a
20 meta-analysis is.
21    A.    So a meta-analysis is a way of
22 taking different epidemiology studies and
23 trying to combine those results together in
24 order to get additional reliability and
25 additional information by using all of the

Page 108

1 available data together.
2    Q.    And the Shinasi meta-analysis
3 was funded by Monsanto?
4        MR. CALHOUN:  Objection to the
5    form of the question.
6        THE WITNESS:  Maybe I'm
7    confused --
8        MR. CALHOUN:  Misstates the
9    record.
10        THE WITNESS:  -- on documents,
11    but I don't believe that is the case.
12        (Goldstein Exhibit 20 marked
13    for identification.)
14 QUESTIONS BY MR. MILLER:
15    Q.    Okay.  Well, we'll look at it
16 later.  I'm asking, not testifying, and we'll
17 look at that later.
18        Let's look at an e-mail that
19 you were involved in in looking at the
20 Shinasi meta-analysis.  Okay.  We're going to
21 mark it as Exhibit 20 to your deposition and
22 it's an e-mail chain from June of 2014.
23        One second, Doctor.  I'll be
24 right back.  Excuse me.
25    A.    Actually, if you need to look

Page 109

1 at that, I could use a quick break.
2        MR. MILLER:  Sure.  Let's take
3    a short break.
4        THE WITNESS:  I'm happy to make
5    it very quick.
6        MR. MILLER:  That's quite all
7    right, sir.
8        VIDEOGRAPHER:  We're going off
9    the record at 11:05 a.m.
10    (Off the record at 11:05 a.m.)
11        VIDEOGRAPHER:  We are back on
12    the record at 11:15 a.m.
13 QUESTIONS BY MR. MILLER:
14    Q.    I'll withdraw that question
15 about Shinasi being funded by Monsanto.  It
16 wasn't, and I doubled-checked.  I apologize
17 for even asking.  I thought -- I was wrong.
18 I withdraw that.
19        Okay.  Let's go back on the
20 record.  I guess we're already on the record.
21        My next question:  I've handed
22 you Exhibit 20, which is a series of e-mails
23 between you and others at Monsanto regarding
24 the Shinasi epidemiological paper, and I'd
25 like to ask you a few questions about it.

Confidential - Pursuant to Protective Order

Page 110

1      Okay?
2      A.    Yes.
3      Q.    All right, sir.
4          So this was -- and here you're
5  on the e-mail chain regarding this new paper,
6  right, sir?
7      A.    Yes, I'm at least on this first
8  e-mail at the top.  I guess that would be the
9  more recent of the e-mails.
10     Q.    All right.  And what this other
11 employee, John Swarthout, tells you and
12 others there is that in this new paper, it
13 was a meta-analysis of 44 papers exploring
14 the impact of pesticide exposure on
15 non-Hodgkin's lymphoma.
16         MR. CALHOUN:  Are you done?
17         MR. MILLER:  I am.
18         MR. CALHOUN:  All right.
19 Objection to the form of the question
20 because what you just highlighted is
21 not the statement from John Swarthout.
22 It appears to be the statement of
23 somebody else, so the question is
24 misleading and inaccurate.
25         MR. MILLER:  That's a fair

Page 111

1  correction.  You're absolutely right.
2  QUESTIONS BY MR. MILLER:
3      Q.    It appears to be from Tracey,
4  right?
5          MR. CALHOUN:  Objection to the
6  form of the question.
7          It appears to be from Charles
8  Benbrook at the bottom, if you go to
9  the bottom of the page, but I'm just
10 guessing about the document.
11 QUESTIONS BY MR. MILLER:
12     Q.    Why don't we let the witness
13 answer.
14         Do you have an understanding as
15 to who wrote this?
16     A.    Actually, no, I don't.  That
17 was going to be my comment.  I'm completely
18 perplexed by the chain here.
19         This latter document appears to
20 be a replication of something that came from
21 Chuck Benbrook, or at least appears to be
22 signed by Chuck Benbrook, who is an academic
23 outside of Monsanto.  So, honestly, I do not
24 understand the nature and origin of this
25 document.

Page 112

1      Q.    Yes, sir.
2          Do you know who Chuck Benbrook
3  is then, I guess?
4      A.    I know who he is.  He was a
5  professor at, I believe, Washington State
6  University, if I'm not mistaken.  I know he's
7  up in the Northwest.  He's no longer with the
8  university.
9      Q.    I see.
10         Do you know he's an expert in
11 this case?
12     A.    No, I do not.  Now I do.
13     Q.    Excuse me?
14     A.    Now I do.
15     Q.    Yes, sir.
16         All right.  And whoever wrote
17 this, it says:  "Dan, John, have we assessed
18 this paper?  Tracey."
19         And somebody cut and paste -- I
20 don't know where the rest of this came from,
21 and you don't either, or do you?
22     A.    I don't know the origin of the
23 rest of this.  I can only tell you -- this is
24 Tracey Reynolds, who at the time would have
25 been the head of our group, our department.

Page 113

1  And obviously something was forwarded to her,
2  and she is asking John and myself whether we
3  have done an assessment on the paper.
4          At that time, you know, we were
5  both covering various issues, so we would be
6  the appropriate people to ask, and that's
7  about all I can tell you about the e-mail.
8      Q.    That's fair enough.
9          Whoever wrote this e-mail, it
10 says about the Shinasi paper, "The data on
11 glyphosate is also worth looking over.
12 Table 4, page 4505, summarizes six studies on
13 glyphosate and non-Hodgkin's lymphoma, three
14 or four of which report significant increases
15 in the risk ratio."
16         Did I read that correctly?
17     A.    You did, but there was some
18 serious issues with the quality of work in
19 this paper.  And this data was reanalyzed by
20 Delzell, and they found a number of
21 significant statistical errors in their work
22 and -- recalculating it in accordance with
23 their own analysis plan, these relationships
24 were no longer anywhere near as statistically
25 significant.

Confidential - Pursuant to Protective Order

Page 114

1    Q.    You know that the Shinasi paper
2  of 2014, this meta-analysis, was one of the
3  pieces of scientific evidence upon which IARC
4  concluded that glyphosate was a -- probably
5  associated with non-Hodgkin's lymphoma.  It
6  was one of the pieces of evidence used;
7  you're aware of that, right?
8          MR. CALHOUN:  Objection to the
9    form of the question.
10         THE WITNESS:  It was cited in
11   their document, so they had looked at
12   it, that is correct.  I don't think
13   they looked at everything, but they
14   had looked at that.
15  QUESTIONS BY MR. MILLER:
16   Q.    And the date of this is
17  significant for me to ask this.  This is in
18  June of 2014.  This meta-analysis was done
19  before Lee Johnson first reached out to
20  Monsanto, right, sir?
21   A.    Yes, that is correct.
22   Q.    Now, we talked about the EPA.
23  I think you mentioned the EPA in your
24  testimony here this morning.
25         Have you, sir?

Page 115

1    A.    I have, yes.
2          (Goldstein Exhibit 21 marked
3    for identification.)
4  QUESTIONS BY MR. MILLER:
5    Q.    Let's take a look at
6  Exhibit 21, published by the United States
7  Environmental Protection Agency, "Recognition
8  and Management of Pesticide Poisonings."
9          Have you seen that before, sir?
10   A.    Yes.
11         MR. CALHOUN:  All right.  Take
12   a moment to look at the document,
13   please.  It's many pages.
14  QUESTIONS BY MR. MILLER:
15   Q.    I'm going to ask you about
16  something on page 222.
17         And on this page in this EPA
18  book they talk to us about non-Hodgkin's
19  lymphoma and other hemopoietic cancers,
20  right?
21   A.    That is the topic of that
22  section, yes.
23   Q.    One of the chemicals that they
24  mention in this non-Hodgkin's lymphoma cancer
25  section is glyphosate, right, sir?

Page 116

1    A.    It is mentioned, but I think
2  it's important to realize who the "they" is
3  when you're talking about this document.  So
4  this is not an EPA safety assessment of
5  glyphosate or any other pesticide.  This is a
6  book for clinicians that is produced on
7  contract for EPA.  It is a useful, general
8  reference, but it does not represent an EPA
9  opinion on any particular subject.
10   Q.    Let's take a look at that
11  point, sir.  Support for this publication was
12  provided by Office of Pesticide Programs,
13  United States Environmental Agency, right?
14   A.    That is correct, but it is not
15  a document that goes through EPA in terms of
16  policy review or approval process for any
17  particular chemical.
18   Q.    Dr. Roberts and Dr. Reigart are
19  the authors of the document, right, sir?
20   A.    Yes, that's correct.
21         And you will notice neither of
22  them are EPA.
23   Q.    Right.
24         And neither one of them are
25  able to be lobbied by Monsanto either, right?

Page 117

1          MR. CALHOUN:  Objection to the
2    form of the question.  Argumentative.
3    Lacks foundation.
4          THE WITNESS:  I'm sorry, what
5    was the last question?
6  QUESTIONS BY MR. MILLER:
7    Q.    Because they're not OPP, Office
8  of Pesticide Programs, at the EPA, Monsanto
9  doesn't get the opportunity to lobby them,
10  right?
11         MR. CALHOUN:  Objection to the
12   form of the question.  Same objections
13   as prior -- as previously stated.
14         THE WITNESS:  Well, I think
15   that if you define lobbying as only
16   going to government agencies, then
17   obviously they're not a government
18   agency and they can't be lobbied.
19         We can certainly communicate
20   with them, and I have communicated
21   with both of them over the years.  So
22   these are not people that we are
23   unable to communicate with.
24         MR. MILLER:  Sure.
25         MR. CALHOUN:  And let me just

Page 118

1 interpose another objection.
2      You have on the screen,
3 Mr. Miller, only part of the page.
4 The very bottom of the page says, "Nor
5 does it necessarily reflect the
6 position of the EPA" on the same page.
7      So I ask that you put the
8 entire page on the screen to make sure
9 that the record is accurate and so
10 that you're not withholding
11 information from the jury.
12      MR. MILLER:  I'll strike that
13 as absurd and ridiculous.  And you get
14 the chance to examine the witness.
15 It's part of the Rules of Civil
16 Procedure.  I commend you to do so.
17      MR. CALHOUN:  I object that
18 you're putting up only part of the
19 page, and you haven't included the
20 part that is important to put your
21 question in context and show that
22 you're asking a misleading question.
23 QUESTIONS BY MR. MILLER:
24      Q.    Do you know what ghostwriting
25 is, Dr. Goldstein?

Page 119

1      MR. CALHOUN:  Objection to the
2 form of the question.  Vague.
3 Ambiguous.
4      THE WITNESS:  I can't give you
5 a specific definition.  I've certainly
6 seen the term used in various
7 contexts.
8      We're finished this with
9 document, I assume?
10      MR. MILLER:  For the moment --
11      THE WITNESS:  For the moment.
12      MR. MILLER:  -- yeah, but we'll
13 be back to it.
14 QUESTIONS BY MR. MILLER:
15      Q.    What is ACSH?
16      A.    The -- I'm sure it stands for a
17 number of things, but in this context you're
18 most likely referring to the American Council
19 for Science and Health.
20      Q.    What do you understand they do?
21      A.    They put out responses for
22 public consumption on various scientific
23 issues relating to public health.
24      Q.    And once the IARC decision came
25 in, you recommended that Monsanto fund money

Page 120

1 to them so that they would write articles
2 saying IARC was wrong about glyphosate.  That
3 was part of the IARC strategy, right?
4      MR. CALHOUN:  Objection to the
5 form of the question.  Lacks
6 foundation.  Misstates the record.
7      THE WITNESS:  No, you've
8 mischaracterized that.
9      We support and had supported
10 ACSH on and off over the years with
11 various grants.  What I believe I
12 proposed that we do at the time was to
13 provide them the scientific literature
14 so that they can create whatever
15 documents and responses they choose to
16 create.
17      (Goldstein Exhibit 22 marked
18 for identification.)
19 QUESTIONS BY MR. MILLER:
20      Q.    All right.  We're going to mark
21 this as Exhibit 24 to your deposition.  I'm
22 sorry, Exhibit 22.
23      It's an e-mail that you send in
24 February 2015 I want to ask you about.
25      All right, sir.  So this is an

Page 121

1 e-mail from you on February 26, 2015, right,
2 sir?
3      A.    Correct.
4      Q.    To other employees at Monsanto,
5 right?
6      A.    To my leadership in the
7 regulatory and scientific affairs group, yes.
8      Q.    Okay.  Regarding ACSH, right?
9      A.    That is correct.
10      Q.    And what does that stand for
11 again?
12      A.    The American Council on Science
13 and Health, I believe.
14      Q.    And they were working with you
15 to respond to IARC if IARC came out with a
16 decision Monsanto didn't like, right?
17      MR. CALHOUN:  Objection to the
18 form of the question.  Lacks
19 foundation.  Mischaracterizes the
20 record.
21      THE WITNESS:  They were working
22 with us only in the sense that I had
23 raised this issue with Gil Ross, who
24 was at ACSH, and asked him if they
25 would be interested in receiving

Confidential - Pursuant to Protective Order

Page 122

1    information regarding IARC so that
2    they can prepare to respond.
3         So we don't decide whether they
4    respond. If they do respond, we do
5    not generate that content, and they're
6    quite adamant about those parameters.
7         So, you know, my point here
8    really was a plea for funding. I
9    wanted to keep our funding to ACSH. I
10   believe that they do a lot of good
11   work. We don't dictate what they
12   respond to, and we don't dictate what
13   they say.
14   QUESTIONS BY MR. MILLER:
15   Q.    Let's see what you said in
16   February of 2015.
17        What you stated, sir, were,
18   quote, "They are working with us to respond,
19   if needed, to IARC." True?
20   A.    That is correct, it is what I
21   had said previously. I had contacted Gil,
22   knowing that the IARC decision was coming,
23   and offered to provide him a complete set of
24   information around the glyphosate and cancer
25   issues.

Page 123

1    Q.    He wanted you to feed him
2    information, right?
3         MR. CALHOUN: Objection to the
4    form of the question.
5         THE WITNESS: I raised the
6    issue with him and offered to provide
7    the scientific information to ACSH.
8    QUESTIONS BY MR. MILLER:
9    Q.    And you stated about whether or
10   not the financial reward would be there with
11   ACSH for Monsanto, quote, "While I would love
12   to have more friends and more choices, we
13   don't have a lot of supporters and can't
14   afford to lose the few we have."
15        Did I read that correctly?
16        MR. CALHOUN: Objection to the
17        form of the question to the extent
18        that you larded up the beginning
19        question with something that you
20        didn't read, so I object to the form
21        of the question.
22   QUESTIONS BY MR. MILLER:
23   Q.    You can answer.
24   A.    Well, as I stated earlier, this
25   is an argument for continued funding. I was

Page 124

1    essentially making the case internally at
2    that point in time in our budget cycle that
3    we needed to support ACSH.
4    Q.    You go on to say, quote, "I am
5    well aware of the challenges with ACSH and
6    know Eric has valid concerns, so I can assure
7    you I am not all starry-eyed about ACSH.
8    They have plenty of warts."
9         What are some of their warts?
10   A.    Well, if you look back at them
11   historically, some of their positions on
12   tobacco, some of their positions on lead, are
13   not positions that I would agree with. So,
14   you know, this is an organization that I
15   think at least in the recent past has done
16   good quality, science-based work, and I felt
17   it was useful for us to continue to support
18   them.
19   Q.    Let's go a couple pages back,
20   if we could, sir, to page 9478.
21        This is an e-mail from you to
22   Tracey about the glyphosate IARC assessment,
23   right, sir?
24   A.    Yes.
25   Q.    This was about eight hours

Page 125

1    before the one we just read, right?
2    A.    Yes.
3    Q.    Okay. "Per my discussion with
4    John, we had some money set aside for IARC."
5    What's that mean?
6    A.    I had a budget line in the
7    proposed budget to continue to support ACSH
8    in relation to IARC.
9    Q.    Right.
10        So you thought that you should
11   go ahead and make that contribution to ACSH,
12   right?
13   A.    That is correct.
14   Q.    All right. These are the same
15   people that helped defend the tobacco
16   companies and the same people that helped
17   defend the lead companies, right?
18        MR. CALHOUN: Objection to the
19        form of the question.
20        THE WITNESS: They had taken
21        positions in the past on some of those
22        issues that I do not fully agree with,
23        that is correct.
24   QUESTIONS BY MR. MILLER:
25   Q.    Yes, sir.

Confidential - Pursuant to Protective Order

1 And let's go to the next page,
2 page 9479. This, I believe, is a response
3 from ACSH to your -- to you. I want to back
4 up and make sure I get it accurate.
5 It's an e-mail from Gilbert
6 Ross at ACSH, right?
7 A. Yes.
8 Q. And to you, right, sir?
9 A. That is correct.
10 Q. Regarding glyphosate and the
11 IARC assessment, right?
12 A. Yes.
13 Q. Okay. Let's see what he has to
14 say.
15 So to put this in context, this
16 is February 2015, after the first time Lee
17 Thompson {sic} reached out to Monsanto and
18 before the second time that Lee Thompson
19 {sic} reached out, right?
20 MR. CALHOUN: Objection to the
21 form of the question.
22 THE WITNESS: Sorry, I -- I
23 believe you made a misstatement there.
24 QUESTIONS BY MR. MILLER:
25 Q. Well, I certainly don't mean

1 to. Please correct me.
2 A. You said Lee Thompson. I don't
3 believe that is who you're attempting to
4 refer to. If it is, I don't know who you're
5 talking about.
6 Q. All right. Lee Johnson. I
7 said Lee Thompson, excuse me. I apologize.
8 Let me restate my question. All right, sir?
9 That would be February 2015
10 after the first time Lee Thompson {sic}
11 reached out to Monsanto and before the second
12 time Lee Thompson {sic} reached out?
13 MR. CALHOUN: You said Lee
14 Thompson again. You're talking about
15 the wrong client name.
16 MR. MILLER: I am brain
17 damaged. We're going to start all
18 over. It must be so frustrating.
19 Just work with me, people. I'm going
20 to take a deep breath.
21 QUESTIONS BY MR. MILLER:
22 Q. You're Daniel Goldstein?
23 A. Yes.
24 Q. I'm Mike Miller. All right.
25 Let's try again.

1 Here's the question: Now we're
2 looking at this document dated February 2015
3 as Exhibit 22, right?
4 A. Yes.
5 Q. Okay. And I want to make sure
6 I get it right. Mr. Johnson, Lee Johnson,
7 reached out to Monsanto in 2014 before this
8 document one time, right? We talked about
9 it?
10 A. Yes, that is correct.
11 Q. And then reached out through
12 the Missouri Poison Control Center one time
13 shortly after this time frame, right?
14 A. Yes.
15 Q. All right. Thank you, sir.
16 And so let's go back then to
17 what Gilbert Ross from ACSH had to say to you
18 in February of 2015.
19 "This situation, however,
20 further illustrates why Monsanto's ongoing
21 support of ACSH is critical, both for
22 Monsanto and ACSH."
23 Did I read that correctly?
24 A. You did, but you've taken it
25 out of the context with the remainder of the

1 paragraph where he talks about providing
2 information that will help them get further
3 up to speed on this topic.
4 So, again, this reflects my
5 providing them with information that they
6 would need to do a scientific assessment on a
7 complex issue.
8 Q. And in fact, you were able to
9 persuade your bosses to provide that ongoing
10 support to ACSH and they, in fact, did write
11 scientific pieces about the IARC decision of
12 glyphosate, right?
13 A. That is correct, yes.
14 Q. One of your key jobs at
15 Monsanto was to neutralize the impact of the
16 IARC decision, right, Dr. Goldstein?
17 MR. CALHOUN: Objection to the
18 form of the question.
19 THE WITNESS: I don't think
20 that's a fair characterization of what
21 I did.
22 (Goldstein Exhibit 23 marked
23 for identification.)
24 QUESTIONS BY MR. MILLER:
25 Q. Let's look at the documents.

Confidential - Pursuant to Protective Order

Page 130

1    We've marked this as
2 Exhibit 23, a copy for you, sir, and a copy
3 for counsel and an extra copy.
4    All right. Are you ready, sir?
5    A.    Just give me one more moment
6 just to look through the center portion of
7 the document.
8    Q.    Yes, sir.
9    A.    Go ahead.
10   Q.    All right. Thank you, sir.
11   Okay. Now we're looking now at
12 an e-mail sent from Kelly Clauss, a Monsanto
13 employee, right?
14   A.    Yes.
15   Q.    In February of 2015, right?
16   A.    Yes.
17   Q.    Where she copies many Monsanto
18 employees, including you, right?
19   A.    The number of people on here, I
20 am included, yes.
21   Q.    Including Donna Farmer as well,
22 I see, right?
23   A.    Correct.
24   Q.    Okay. The importance of this
25 is high, right?

Page 131

1    A.    Yes.
2    Q.    And it's regarding IARC
3 outreach, and attached is an IARC plan,
4 right?
5    A.    That is correct.
6    Q.    And that plan that's attached
7 incorporates feedback from three people,
8 including you, Dan Goldstein, right?
9    A.    Yes.
10   Q.    Okay. Let's take a look at the
11 plan. One thing you say in your plan is that
12 IARC is a World Health Organization. That's
13 what it's part of, right?
14   A.    Yes, but let's be clear on who
15 is saying this. I did not write this plan.
16 This is -- so you said "you." I did not
17 write this plan. I commented on it.
18   Q.    Right.
19   You read it over and
20 incorporated feedback into the plan, right?
21   A.    Well, someone else incorporated
22 the feedback, but I did at some point comment
23 on this, yes.
24   Q.    Well, just to be clear, it says
25 on the front page that it incorporated

Page 132

1 feedback from Daniel Goldstein, right? And
2 that's true, isn't it?
3    A.    Yes.
4    Q.    Okay.
5    A.    What I'm saying is I didn't do
6 the incorporation. Someone else incorporated
7 the feedback into the plan.
8    Q.    Okay. And going to the
9 Bates-stamped page 63854. In this plan it
10 shows that IARC, International Agency for
11 Research on Cancer, is a World Health
12 Organization. It's part of it, right?
13   A.    It is part of the WHO, yes.
14   Q.    It says here, "The
15 International Agency for Research on Cancer,
16 IARC, is a specialized cancer agency of the
17 World Health Organization," right?
18   MR. CALHOUN: Objection to the
19 form of the question.
20   Are you asking him whether you
21 read that correctly or whether he
22 agrees with it?
23   Objection to form.
24 QUESTIONS BY MR. MILLER:
25   Q.    Did I read it correctly?

Page 133

1    A.    You read it correctly. IARC,
2 in fact, is one of a number of groups within
3 World Health Organization that do work in the
4 area of cancer.
5    Q.    In this draft plan it says, "We
6 should assume and prepare for the outcome of
7 2B rating, possible human carcinogen; a 2A
8 rating, probable human carcinogen, is
9 possible but less likely."
10   Did I read that correctly?
11   A.    Yes, you did.
12   Q.    And in fact, what you got two
13 weeks later was a probable human carcinogen
14 rating, right?
15   A.    That is correct.
16   Q.    Yes, sir.
17   A.    I don't believe it was
18 supported by the science, which is reflected
19 in these statements.
20   Q.    And your job -- let's go to
21 page 63856 -- was to neutralize the impact of
22 the decision. Dan Jenkins.
23   Do you see that?
24   MR. CALHOUN: Objection to the
25 form of the question to the extent

Confidential - Pursuant to Protective Order

Page 134

1  that you're suggesting this relates to
2  Mr. Goldstein -- Dr. Goldstein. I'm
3  sorry.
4      MR. MILLER: You're right, Dan
5  Jenkins is not Dan Goldstein. I'm
6  having a time with names.
7  QUESTIONS BY MR. MILLER:
8      Q.    Who is Dan Jenkins?
9      A.    Dan Jenkins is -- was at that
10  time in our Washington office.
11      Q.    So Washington, DC, office of
12  Monsanto, and his job was to help neutralize
13  impact of decision?
14      A.    I can't speak to what his
15  specific role was in this. I didn't draft
16  the plan, but that is what the document says.
17      Q.    Well, that's what Monsanto's
18  been trying to do ever since, isn't it,
19  neutralize the decision?
20      MR. CALHOUN: Objection to the
21  form of the question. Argumentative.
22      THE WITNESS: We've been trying
23  to drive good science into the
24  conversation. Remember that IARC is
25  in stark disagreement with every

Page 135

1  regulatory agency around the world.
2      MR. MILLER: Strike that as
3  nonresponsive.
4  QUESTIONS BY MR. MILLER:
5      Q.    So going to page 3858, as part
6  of this plan, attachment A, post-IARC
7  Monsanto is going to, quote, "orchestrate
8  outcry with IARC decision."
9      That was the plan, right?
10      A.    I'm sorry, you said --
11      MR. CALHOUN: Objection to the
12  form of the question.
13      THE WITNESS: -- 3858?
14  QUESTIONS BY MR. MILLER:
15      Q.    Yes, sir.
16      Attachment A, which is -- so we
17  know what -- this is on that same exhibit.
18  Attachment A, Preparedness and Engagement
19  Plan For IARC, Carcinogen Rating of
20  Glyphosate. "Post-IARC, Monsanto is going to
21  orchestrate an outcry with the IARC
22  decision," right?
23      MR. CALHOUN: Objection to the
24  form of the question.
25      Are you asking whether you read

Page 136

1  the document correctly or whether he
2  agrees with that?
3      Again, your question is vague,
4  so I object to the form.
5      THE WITNESS: That is what the
6  document says. I can't speak to any
7  of the specifics. This is a planning
8  document from public affairs, and
9  although I commented on it, I don't
10  know specifically what they mean by
11  this.
12  QUESTIONS BY MR. MILLER:
13      Q.    One of your jobs, right after
14  IARC concluded that glyphosate was a probable
15  human carcinogen, was to draft op-eds and try
16  to get people to sign them and send them to
17  newspapers, right?
18      MR. CALHOUN: Objection to the
19  form of the question.
20      THE WITNESS: I was generally
21  involved in the scientific response to
22  IARC, and that was one of the roles
23  that I played.
24  QUESTIONS BY MR. MILLER:
25      Q.    And you wrote five potential

Page 137

1  op-eds, right?
2      A.    I did, yes.
3      Q.    Did you have any luck getting
4  people to submit them under their name?
5      MR. CALHOUN: Objection to the
6  form of the question.
7      THE WITNESS: The op-eds that I
8  wrote were intended to be draft
9  material to assist those experts. A
10  number of them did put them in op-eds,
11  but to the best of my knowledge, the
12  portions that I wrote were not used.
13  QUESTIONS BY MR. MILLER:
14      Q.    So you write op-eds and then
15  other people use their name to put them in
16  the media outlets; is that how it worked?
17      MR. CALHOUN: Objection to the
18  form of the question. Also, objection
19  to the extent that this was covered in
20  a prior deposition and your colleague,
21  Mr. Litzenburg, told Judge Karnow that
22  he would not -- that this deposition
23  would not cover ground already covered
24  in the prior deposition.
25

Page 138

1  QUESTIONS BY MR. MILLER:
2      Q.    You can answer.
3      A.    I'm sorry, I've forgotten the
4  question.  Could you read that back?  I
5  apologize.
6          (Court Reporter read back
7      question.)
8          MR. CALHOUN:  Same objections.
9          THE WITNESS:  So I draft
10  materials to give scientific experts
11  outside of Monsanto an idea of what
12  kind of content we believe is
13  appropriate for these, pointing out
14  scientific documents that may be
15  relevant.
16          It's their responsibility to
17  determine what they wish to say and
18  how they wish to say it, and they need
19  to be responsible for their own
20  content.
21          And I believe, if I recall that
22  document correctly, that that is
23  stated in -- not perhaps in those
24  precise words -- within that document.
25

Page 139

1  QUESTIONS BY MR. MILLER:
2      Q.    There is a division within
3  Monsanto called the Environment Safety and
4  Health Division?
5      A.    Yes, there is.  It's a
6  department.
7      Q.    Yes, sir, a department.
8          ESH I guess it's referred to?
9      A.    Correct.
10      Q.    And there is an ESH manual?
11      A.    There is an online resource
12  that is referred to by that name, yes.
13      Q.    And the ESH manual relies on
14  IARC determinations to determine carcinogenic
15  hazards?
16          MR. CALHOUN:  Objection to the
17      form of the question.
18          THE WITNESS:  The global ES&H
19      manual doesn't make any determinations
20      of hazard.  It sets out general
21      aspirations and guidelines and
22      principles that apply globally if
23      we're talking about the same document.
24  QUESTIONS BY MR. MILLER:
25      Q.    Will you agree to produce the

Page 140

1  ESH manual to the plaintiffs in this
2  litigation?
3          MR. CALHOUN:  Objection.
4      That's a question to be directed to us
5      as the attorneys.  We have made our
6      objections in response to the document
7      request that was issued belatedly.
8      It's not a decision for Dr. Goldstein
9      to make because he is not the
10      custodian of that document.
11          (Goldstein Exhibit 24 marked
12      for identification.)
13  QUESTIONS BY MR. MILLER:
14      Q.    Let's look at Exhibit 24.
15  Exhibit 24, an e-mail chain produced by
16  Monsanto.
17          All right, sir?
18      A.    Go ahead.
19      Q.    In this e-mail which was sent
20  to you by John Vicini.
21          Who is he?
22      A.    At that time he was my boss.
23      Q.    Okay.  This is about a week or
24  two after the IARC decision, right, March 25,
25  2015?

Page 141

1      A.    Yes.
2          MR. CALHOUN:  Objection to the
3      form of the question.
4  QUESTIONS BY MR. MILLER:
5      Q.    And it says, "ESH" --
6          That's the environmental --
7  what's the name of it again?
8      A.    Environmental safety and
9  health.
10      Q.    -- "medical conference outcome.
11  I spoke with Annemieke" --
12          Am I pronouncing that?
13      A.    Annemieke.
14      Q.    Annemieke.
15          And who is Annemieke?
16      A.    Annemieke De Wilde is the head
17  of occupational medicine.
18      Q.    And where is she located?
19      A.    In St. Louis.
20      Q.    What's her last name?
21      A.    De Wilde, D-e, W-i-l-d-e.
22      Q.    And says, "She is in alignment
23  that we should not concede a cancer hazard.
24  Some of the ESH folks seemed to be inclined
25  to go with a message that IARC has identified

Confidential - Pursuant to Protective Order

Page 142

1 a hazard, but dose is low in the plants and
2 thus no significant risk was present."
3       John writes on, "I have
4 emphasized the need to hold firm on the,
5 quote, 'no cancer hazard,' end quote,
6 position as per the new press release."
7       First off, did I read that
8 correctly?
9       A.   Yes, but I believe that that is
10 correspondence from me, not from John Vicini.
11 There's another header in there.  It's not as
12 obvious as the first one.
13       Q.   I'm sorry, you're absolutely
14 right.  I appreciate your clarification.
15       All right.  So that was from
16 you.  And let me ask you about that
17 paragraph.
18       Who are the ESH folks that
19 wanted to go with a message that IARC has
20 identified a hazard?
21       A.   I don't remember the specific
22 individuals.  At the time, we had
23 considerable conversation about the need to
24 communicate with our employees, and
25 communication to employees would fall within

Page 143

1 the scope of our environmental safety and
2 health group.  So this is something that I
3 would work in collaboration with them on.
4       And there were two different
5 approaches, and remember that many of these
6 approaches are coming from industrial hygiene
7 people who don't understand or know of the
8 underlying data.
9       So there was a debate as to
10 whether we should acknowledge that Roundup
11 may cause cancer but that a dose response
12 assessment, a risk assessment, was not done
13 by IARC and our doses were low, or that we
14 should remain with what I believe is the
15 correct assessment, which is glyphosate is
16 unlikely to cause cancer, that the IARC
17 classification is incorrect, and that
18 independent of exposure levels, which, by the
19 way, are very low anyway, that there is no
20 risk of cancer to our employees.
21       (Goldstein Exhibit 25 marked
22       for identification.)
23 QUESTIONS BY MR. MILLER:
24       Q.   I want to show you what we've
25 marked as Exhibit 25, a series of e-mails

Page 144

1 concerning carcinogens in April of 2016.
2       Review it and I have a question
3 or two.
4       A.   Yes, go ahead.
5       Q.   Yes, sir.
6       This is an e-mail from you in
7 April of 2016; is that right, sir?
8       A.   Yes.
9       Q.   All right.  Who is Erin
10 Costello?
11       A.   She is in regulatory affairs,
12 and she's involved in chemical regulation.
13       Q.   And so this is a little over a
14 year after the IARC ruling -- or decision,
15 and she writes you at the bottom of the page.
16 It says, "Dan, St. Louis ESH is rewriting our
17 chemical safety audit procedure which
18 includes reviewing carcinogens."
19       My first question to you is:
20 What is a chemical safety audit procedure?
21       A.   So this would be an audit on
22 new incoming chemicals for our facilities.
23 They're not necessarily products; they could
24 chemicals for research, for instance.  But
25 when someone submits a request to bring a new

Page 145

1 chemical on site, whatever they're doing with
2 it, there is a process that is site-specific
3 for evaluating that new chemical.
4       Q.   And that would be conducted by
5 the ESH team?
6       A.   In general, yes, or they can
7 ask for assistance if they need it from other
8 experts within the company, but generally
9 they're able to conduct that themselves.
10       Q.   You write back to her and you
11 state in pertinent part, "I am not sure we
12 can necessarily take this position given OSHA
13 right-to-know regulations that require that
14 we list IARC carcinogenicity on data sheets."
15       Did I read that correctly?
16       A.   That is correct.  That is
17 written into the regulations in reduction --
18 excuse me, in reference to production of
19 material safety data sheets.
20       So she's asking basically for
21 our audit procedure, should we limit that to
22 other sources of information.
23       And what I'm saying here is,
24 given the current federal law requiring that
25 we list IARC on our material safety data

Confidential - Pursuant to Protective Order

Page 146

1 sheet, I don't believe it is advisable to do
2 that. We need to be aware of that. We need
3 to consider it appropriately.
4          And prior to this, we had
5 updated our material safety data sheets to
6 note the IARC classification but also noting
7 that we did not believe that classification
8 was justified.
9     Q.    But I want to finish reading
10 that paragraph, which I think speaks to that
11 point.
12          Quote, "We are altering our
13 current glyphosate SDS" --
14          Safety data sheet, right?
15    A.    Yes.
16    Q.    -- "if I understand correctly
17 to state that IARC classifies glyphosate as a
18 2A probable human carcinogen, but that we do
19 not concur with this assessment," right?
20    A.    Correct, that's exactly what I
21 was saying. In fact, I believe as of this
22 timing that had already occurred. I can't
23 say it happened simultaneously on every SDS.
24 We have a lot of them that need to be
25 updated.

Page 147

1          (Goldstein Exhibit 26 marked
2      for identification.)
3 QUESTIONS BY MR. MILLER:
4    Q.    Exhibit 26 is a California
5 publicly available document. A copy here for
6 you and counsel.
7          You've seen this before,
8 haven't you, sir?
9    A.    I don't believe I've seen this
10 specific document. I'm certainly aware of
11 the consideration of glyphosate under
12 Prop 65.
13    Q.    So "Glyphosate Listed Effective
14 July 7, 2017, as Known to State of California
15 to Cause Cancer."
16          Right?
17          MR. CALHOUN: Objection to the
18      form of the question.
19          Are you asking him whether you
20      read the document correctly or whether
21      he agrees with that or something else?
22          Objection to form.
23 QUESTIONS BY MR. MILLER:
24    Q.    You can answer.
25          Let's be clear. Did I read

Page 148

1 that correctly?
2    A.    You did, yes.
3    Q.    And that's true, that's what
4 happened, that's what California did, isn't
5 it?
6          MR. CALHOUN: Objection to the
7      form of the question.
8          THE WITNESS: I don't know the
9      full legal status of that conversation
10      at this point in time, so I can't give
11      you a current status.
12          I do know that an injunction
13      was issued in regards to the Prop 65
14      listing issue in California yesterday.
15      But I'm not a lawyer, so I can't offer
16      you much more than that.
17 QUESTIONS BY MR. MILLER:
18    Q.    This document states that in
19 summary -- excuse me, I want to read earlier.
20          "Monsanto's challenge was
21 unsuccessful in the trial court."
22          Do you see that?
23    A.    Yes.
24    Q.    To be clear, they reference the
25 International Agency for Research on Cancer

Page 149

1 indicates the following chemicals are also
2 relevant: glyphosate-isopropylamine salt, if
3 I pronounced that correctly?
4    A.    Yes, you did.
5    Q.    Okay. These are various forms
6 of glyphosate; is that -- is that what
7 they're referencing?
8    A.    That is correct, although the
9 trimesium form is no longer marketed.
10    Q.    I see.
11          This would have been listed in
12 2015 but for Monsanto's challenge, right?
13          MR. CALHOUN: Objection to the
14      form of the question. Asking for a
15      legal conclusion.
16          He already said he's not a
17      lawyer. It's an improper question for
18      this witness.
19          THE WITNESS: So Proposition 65
20      is very directive about listing when
21      IARC has made a classification. This
22      is an interesting situation in that
23      IARC has made a classification which
24      the US EPA as well as California's
25      OEHHA disagrees with and which other

Page 150

1  global agencies around the world
2  disagree with.
3      And the basis of our
4  conversation, litigation, around this
5  issue at least, in part, our belief
6  that IARC is incorrect.
7      MR. MILLER:  I have no further
8  questions at this time subject to the
9  motions practice that will be
10  initiated by each party concerning
11  documents that have not been produced.
12      MR. CALHOUN:  Okay.  We're
13  going to have some questions.  I
14  propose that we take a break for lunch
15  and then come back.
16      MR. MILLER:  How long?
17      MR. CALHOUN:  45 minutes.
18      MR. MILLER:  45 minutes it is.
19  Have a good lunch.
20      VIDEOGRAPHER:  We're going off
21  the record at 12:07 p.m.
22   (Off the record at 12:07 p.m.)
23      VIDEOGRAPHER:  We are back on
24  the record at 1:02 p.m.
25      CROSS-EXAMINATION

Page 151

1  QUESTIONS BY MR. CALHOUN:
2      Q.    Good afternoon, Dr. Goldstein.
3          As you know, my name is Martin
4  Calhoun, and I represent Monsanto Company in
5  this case.
6          Are you employed at Monsanto?
7      A.    Yes, I am.
8      Q.    And what is your current job
9  title at Monsanto?
10      A.    I am a distinguished science
11  fellow and lead for medical sciences and
12  outreach.
13      Q.    And what year did you start
14  your employment at Monsanto?
15      A.    1998.
16      Q.    And I just want to go briefly
17  over your background.
18          Where and when were you born,
19  Dr. Goldstein?
20      A.    I was born outside Chicago.  I
21  was born in Aurora, Illinois, 1955.
22      Q.    And where did you go to college
23  for your undergraduate education?
24      A.    Undergraduate, University of
25  Wisconsin at Madison.

Page 152

1      Q.    And did you graduate from the
2  University of Wisconsin?
3      A.    I did.  I majored in molecular
4  biology in December of '76.
5      Q.    Did you then go to medical
6  school?
7      A.    I did.
8      Q.    Where did you go to medical
9  school?
10      A.    Johns Hopkins Medical School in
11  Baltimore.
12      Q.    And did you graduate from
13  medical school?
14      A.    I did.
15      Q.    And when was that?
16      A.    That would have been 1981.
17      Q.    And after graduating from
18  medical school, did you do a medical
19  residency?
20      A.    I did.  I did a pediatrics
21  residency also at Johns Hopkins.
22      Q.    And after that residency, did
23  you pursue studies in toxicology and
24  pharmacology?
25      A.    I did.  I did a fellowship at

Page 153

1  University of Toronto at The Hospital for
2  Sick Children in Toronto, Canada.
3      Q.    And was that in both toxicology
4  and pharmacology?
5      A.    Yes, it was two separate
6  certifications, but I did both.
7      Q.    And did you eventually become a
8  board certified medical toxicologist?
9      A.    Yes, I did.
10      Q.    And can you just tell us in
11  simple terms, Dr. Goldstein, what is a
12  medical toxicologist?
13      A.    So a medical toxicologist
14  specializes in the diagnosis and treatment of
15  poisoning in humans.  So it's unlike the
16  Ph.D. toxicologists who are oftentimes doing
17  rodent studies and risk assessments, the
18  focus of clinical toxicology or medical
19  toxicology is assessment and treatment of
20  patients.
21      Q.    And after you finished your
22  education, did you work as a medical
23  toxicologist treating patients?
24      A.    I did.  Yes, I was in Denver
25  for about 12 years doing a mixture of

Confidential - Pursuant to Protective Order

Page 154

1  critical care toxicology in the intensive
2  care unit, outpatient toxicology at the
3  hospital, as well as an office practice in
4  occupational and environmental medicine.
5      Q.    And have you held various
6  titles and held -- had various
7  responsibilities while working at Monsanto
8  for approximately 20 years?
9      A.    I've had various titles over
10  the years and had responsibility in a wide
11  variety of different product areas.
12      Q.    Now, Dr. Goldstein, do you
13  consider yourself a scientist?
14      A.    I do, yes.
15      Q.    And have you worked with other
16  scientists at Monsanto during the 20 years
17  approximately that you've been at Monsanto?
18      A.    Yes, quite regularly.
19      Q.    And over the years, have other
20  departments and employees at Monsanto looked
21  to you for advice and insights about various
22  toxicology issues?
23      A.    Yes.
24      Q.    And is that how it works at
25  Monsanto, that there's cooperation and

Page 155

1  collaboration among employees and
2  departments?
3      A.    We're a very open company, so
4  we tend to address issues by networking with
5  individuals that may have knowledge or
6  resources that are useful.
7      Q.    And in your experience, what
8  has been the role of science at Monsanto over
9  the years?
10      A.    It's fundamentally a
11  science-driven company.  Product development
12  is almost entirely driven by science,
13  especially new science.  Product safety
14  assessment, of course, is also very much a
15  scientific process.
16      Q.    And, Dr. Goldstein, in the
17  deposition today we've heard a lot of
18  questions and answers about glyphosate and
19  glyphosate-based herbicides.
20          Have you worked on various
21  glyphosate issues, including human health and
22  safety, throughout the approximately 20 years
23  that you've been at Monsanto?
24      A.    Yes, I have.
25      Q.    As part of your

Page 156

1  responsibilities working at Monsanto, have
2  you become generally familiar with how
3  Monsanto developed and evaluated the safety
4  of glyphosate-based herbicides?
5      A.    Yes, I have.
6      Q.    And about how long have various
7  kinds of Monsanto glyphosate-based herbicides
8  been available in this country?
9      A.    They were first marketed in the
10  US, I believe it was, 1974.
11      Q.    And has Monsanto sold
12  glyphosate to farmers or consumers as a
13  standalone product?
14      A.    No.  It is sold to end users as
15  a formulated product.
16      Q.    And do those formulated
17  products that have glyphosate in them, do
18  they have various brand names?
19      A.    They do, yes.
20      Q.    And was Roundup the first and
21  most commonly used brand name for Monsanto's
22  glyphosate-based herbicides?
23      A.    Yes.
24      Q.    And please tell the jury in
25  simple terms what is typically in most of

Page 157

1  Monsanto's glyphosate-based herbicides.
2      A.    They're pretty simple
3  formulations.  They have glyphosate, they
4  have water, and they have a surfactant, a
5  detergent, in them as well.  And then there's
6  very small concentrations of some minor
7  formulating ingredients in some products.
8  Some of them have a little bit of food
9  coloring to add a little bit of color to the
10  product and products in them to keep them
11  from foaming up when you add water.
12      Q.    And what is a surfactant in
13  simple terms, Dr. Goldstein?
14      A.    So a surfactant is really just
15  a soap or detergent.  It's a type of molecule
16  that allows fat and water to sort of come
17  together.  And humans use them mostly in the
18  household environment for cleaning things,
19  for removing greases and oils or for cleaning
20  your hands.
21      Q.    And why would a surfactant be
22  in a glyphosate-based herbicide?
23      A.    So surfactants in herbicides
24  mostly are used to help deliver the herbicide
25  into the plant because plants have a waxy

Page 158

1  cuticle, a coating, and so if you try and
2  apply something, it just sort of beads up on
3  the surface.  So we add a surfactant that
4  then allows the herbicide to be effective in
5  a much, much lower concentration.
6      Q.   So in essence, does the
7  surfactant make the herbicide work better?
8      A.   It does, yes.
9      Q.   And are surfactants used for
10 products other than Monsanto herbicides?
11     A.   Yes.
12     Q.   Can you give us a couple of
13 examples, please?
14     A.   So they're generally present in
15 herbicides from Monsanto or other sources,
16 but they're common in liquid soaps, shampoos,
17 conditioners, laundry detergents, dishwashing
18 detergents.  So they're an exposure that
19 human beings regularly have in the context of
20 their daily life.
21     Q.   And has Monsanto manufactured
22 and sold various different kinds of
23 glyphosate-based herbicides over the years?
24     A.   We have, yes.
25     Q.   And why are there so many

Page 159

1  different formulated products that have
2  glyphosate in them?
3      A.   There are different products,
4  partly for different markets, partly for
5  different uses on different types of plants
6  or in different types of environments.
7      Q.   Now, do glyphosate-based
8  herbicides protect agricultural crops,
9  flowers and other kind of desirable plants?
10     A.   Yes, they do.  They eliminate
11 weeds that would compete with the desirable
12 vegetation, and so it does protect them in
13 that indirect way.
14     Q.   And do glyphosate-based
15 herbicides work well to control and eliminate
16 weeds?
17     A.   Yes, they do.
18     Q.   Are glyphosate-based herbicides
19 widely used for agricultural purposes in this
20 country and all over the world?
21     A.   I believe glyphosate is the
22 highest volume used herbicide in the world
23 and in the US.
24     Q.   Now, in the course of your work
25 at Monsanto, Dr. Goldstein, have you reviewed

Page 160

1  numerous scientific studies involving
2  glyphosate and glyphosate-based herbicides?
3      A.   Yes, I have.
4      Q.   Is there a federal government
5  agency that evaluates the safety of
6  herbicides and decides whether herbicides can
7  be sold in the United States?
8      A.   Yes, that would be the
9  Environmental Protection Agency, or EPA.
10     Q.   And during your employment at
11 Monsanto have you become generally familiar
12 with the EPA's regulatory review and
13 evaluation of glyphosate and glyphosate-based
14 herbicides?
15     A.   Yes, I have.
16     Q.   Was Monsanto required to obtain
17 approval from the EPA before Monsanto was
18 allowed to sell any glyphosate-based
19 herbicides in this country?
20     A.   Yes, that's a regulatory
21 requirement.
22     Q.   And from 1974 to the present
23 day has Monsanto had EPA approval to sell
24 glyphosate-based herbicides in the United
25 States?

Page 161

1      A.   Yes.
2      Q.   Over the years has the EPA
3  considered a large volume of data and
4  scientific studies to evaluate the safety of
5  glyphosate and glyphosate-based herbicides?
6      A.   Yes.
7          MR. MILLER:  Objection to the
8  form.  Leading.
9          THE WITNESS:  Yes, they have.
10 QUESTIONS BY MR. CALHOUN:
11     Q.   Let me rephrase the question.
12          Can you characterize for us the
13 volume of data and scientific studies that
14 EPA has considered or has not considered with
15 respect to evaluating the safety of
16 glyphosate and glyphosate-based herbicides?
17     A.   So EPA has at its disposal not
18 only data from Monsanto but data from other
19 manufacturers.  They get an extensive variety
20 of information regarding safety, including
21 animal studies of both short-term and
22 long-term toxicity.
23          So they also then follow on an
24 ongoing basis the medical literature, so
25 they're aware of the epidemiology studies and

Confidential - Pursuant to Protective Order

Page 162

1 other human information related to glyphosate
2 products.
3     Q.    And would you say that EPA has
4 considered a large volume of data or a small
5 volume of data with respect to the safety of
6 glyphosate and glyphosate-based herbicides?
7     A.    Well, glyphosate is pretty
8 unique because there were at least six
9 different companies that registered products
10 and did safety studies.  So relative to other
11 products, EPA has a very large amount of
12 information around glyphosate, perhaps more
13 than any other marketed herbicide or
14 pesticide in the world.
15     Q.    Now, for glyphosate-based
16 herbicides, has the EPA considered only data
17 and scientific studies submitted to it by
18 Monsanto?
19     A.    No, they actually have all the
20 data from all the manufacturers, and that is
21 consolidated.  And since Monsanto went off
22 patent globally in about 2000, all of the
23 companies work together, and there is a joint
24 re-registration that includes all of the
25 data.

Page 163

1     Q.    And I think you said Monsanto
2 went off patent.
3         Did you mean to say that
4 Roundup went off patent?
5     A.    Excuse me, yes, Roundup,
6 Roundup went off patent in about 2000.
7     Q.    Now, as part of the regulatory
8 approval process, does the EPA also evaluate
9 what kinds of warnings and other statements
10 should be provided on the labeling that
11 accompanies an herbicide product?
12         MR. MILLER:  Objection.
13     Leading.
14 QUESTIONS BY MR. CALHOUN:
15     Q.    You can answer.
16     A.    They do.  And in fact, EPA has
17 final authority over label content.
18     Q.    And let me just rephrase the
19 question, Dr. Goldstein.
20         What, if anything, does the EPA
21 do with respect to evaluating what kinds of
22 warnings and other statements should be
23 provided on the labeling that accompanies an
24 herbicide product?
25     A.    EPA actually specifies label

Page 164

1 content and has final authority over what
2 goes on the label.  They have pretty clear
3 guidance documents on product labeling, but
4 if they feel that something needs additional
5 labeling beyond the guideline, they're free
6 to put whatever labeling they believe is
7 appropriate on a product.
8     Q.    Has the EPA ever required
9 Monsanto to provide any sort of warning that
10 glyphosate-based herbicides are carcinogenic
11 or cause or create a risk of cancer?
12         MR. MILLER:  Objection.
13     Leading.
14 QUESTIONS BY MR. CALHOUN:
15     Q.    You can answer.
16     A.    No.
17     Q.    Now, you've testified earlier
18 today about the IARC monograph regarding
19 glyphosate.
20         Do you recall some of those
21 questions?
22     A.    Yes.
23     Q.    Let's discuss that a little
24 bit, including IARC's assessment that
25 glyphosate is a probable carcinogen.

Page 165

1         Do you recall evaluating that
2 IARC monograph?
3     A.    I do.
4     Q.    And what is your evaluation of
5 IARC's glyphosate assessment regarding
6 whether it is based on sound science?
7     A.    It's a poor quality assessment.
8 It's based on a limited review of the science
9 relative to regulatory agencies, and I don't
10 believe that the science supports their
11 conclusions.
12         And it's not just me.  The same
13 conclusion has been reached by regulatory
14 agencies around the world.
15         MR. MILLER:  Object to answer.
16     Move to strike.  Nonresponsive.
17 QUESTIONS BY MR. CALHOUN:
18     Q.    In your assessment, is IARC's
19 glyphosate assessment sound science,
20 Dr. Goldstein?
21     A.    No.
22     Q.    Can you give us a few examples
23 of why you think IARC's assessment of
24 glyphosate is flawed?
25     A.    They look at only a subset of

Page 166

1 the available information.  They
2 cherry-picked the data that they wanted to
3 focus on rather than looking at the broader
4 weight of the evidence.  They completely
5 failed to take into account any consideration
6 of exposure.
7        And so I think overall, just a
8 poorly done and incomplete assessment
9 relative to the regulatory agencies.
10    Q.    And when you're referring to
11 exposure, are you referring to real world
12 exposures to glyphosate?
13    A.    Yes.  They did not take into
14 account real world exposure data.
15    Q.    So from a scientific
16 perspective, do you and Monsanto agree with
17 IARC's conclusions about glyphosate?
18    A.    No, we do not.
19    Q.    Now, did the EPA respond to
20 IARC's glyphosate monograph in some of the
21 EPA's own subsequent assessments with respect
22 to glyphosate?
23    A.    Yes, they did.
24        MR. MILLER:  Objection.
25 Leading.

Page 167

1 QUESTIONS BY MR. CALHOUN:
2    Q.    And what was the EPA's
3 conclusion regarding whether glyphosate is or
4 is not likely to be carcinogenic to humans?
5    A.    So EPA has been clear that they
6 do not believe that glyphosate poses a risk
7 of cancer.
8    Q.    And so did the EPA disagree
9 with IARC's assessment of glyphosate?
10    A.    Yes, they did.
11    Q.    Now, can you tell the jury
12 whether EPA considered more data or less data
13 than IARC when the EPA concluded that
14 glyphosate is not likely to be carcinogenic
15 to humans?
16    A.    More data.  In fact, far more
17 data because they considered data on
18 environmental exposures.  But they also
19 considered much more of the available animal
20 data and had available to them the raw
21 experimental data from those toxicology
22 studies as well.
23    Q.    Did the EPA consider real world
24 exposures to glyphosate?
25        MR. MILLER:  Objection.

Page 168

1 Leading.
2        THE WITNESS:  They considered
3 them in two ways:  They did an
4 exposure assessment of glyphosate
5 based on modeling and based on
6 measured residues, but they're also
7 looking at the epidemiology data,
8 including the Agricultural Health
9 Study, which looks directly at human
10 health effects of formulated
11 glyphosate products.
12 QUESTIONS BY MR. CALHOUN:
13    Q.    And when you're referring to
14 the Agricultural Health Study, which version
15 of that study in terms of when that study was
16 published are you referring to?
17    A.    Well, there are many
18 publications.  It's a very large study from
19 the National Cancer Institute, but I'm
20 referring specifically to the recent
21 Andreotti publication, which is just a few
22 months old.
23    Q.    Now, have scientific regulatory
24 agencies and governments in Europe and other
25 parts of the world addressed the IARC's

Page 169

1 assessment that glyphosate is a probable
2 carcinogen?
3    A.    Yes, quite thoroughly, and in
4 most cases went back and took another look at
5 the issue following the IARC recommendation.
6    Q.    And what did those scientific
7 regulatory agencies and governments in Europe
8 and throughout the world conclude about
9 IARC's assessment?
10    A.    They all agree with EPA, that
11 glyphosate is unlikely to pose a cancer
12 hazard.
13        MR. MILLER:  Objection to the
14 form of the question and answer.  It's
15 nonresponsive and hearsay.
16 QUESTIONS BY MR. CALHOUN:
17    Q.    All right.  Let me show you
18 what was marked previously as Exhibit 21.
19 First page says, "Recognition and Management
20 of Pesticide Poisonings."
21        Do you recall plaintiff's
22 counsel asking you a series of questions
23 about Exhibit 21, Dr. Goldstein?
24    A.    Yes.
25    Q.    Can you go to the second page

Confidential - Pursuant to Protective Order

Page 170

1 of Exhibit 21, please?
2    A.   If I can find my reading
3 glasses, I'll be able to see it.
4        There, I have it.  Sorry.
5        Yes.
6    Q.   Now, do you recall that
7 plaintiff's counsel put part of this second
8 page of Exhibit 21 up on the screen and
9 highlighted various parts of it?
10    A.   Yes.
11    Q.   I'd like to read to you the
12 last sentence of this Exhibit 21, the second
13 page, which was not on the screen.  Quote,
14 "The information in this publication does not
15 in any way replace or supersede the
16 restrictions, precautions, directions or
17 other information on the pesticide label or
18 any other regulatory requirements, nor does
19 it necessarily reflect the position of the
20 EPA," end quote.
21        Did I read that correctly?
22    A.   You did, yes.
23    Q.   So what does that tell you,
24 Dr. Goldstein, about whether this document,
25 this excerpt that is marked as Exhibit 21,

Page 171

1 whether this is an official EPA document or
2 not?
3    A.   It is not an official EPA
4 document, and in particular, there's not an
5 official EPA registration or approval
6 document for any pesticide or herbicide.
7    Q.   Let's switch to a different
8 topic, Dr. Goldstein.
9        Do you recall that you were
10 asked some questions earlier today by
11 plaintiff's counsel about a California
12 regulatory agency's assertion that glyphosate
13 is required to be listed under Proposition 65
14 as a chemical that can cause cancer?
15    A.   Yes.
16    Q.   Now, was that 2015 decision
17 based on the California agency's own
18 scientific evaluation of glyphosate?
19        MR. MILLER:  Objection.
20 Leading.
21        THE WITNESS:  No, it was not.
22 QUESTIONS BY MR. CALHOUN:
23    Q.   What was that decision based
24 on?
25    A.   Well, it really wasn't a

Page 172

1 decision at all.  The way the law behind
2 Proposition 65 reads, as I understand it,
3 requires that a chemical be classified under
4 Proposition 65 if IARC determines that it is
5 a carcinogen.  So it's an administrative
6 process, not a decision.
7        If you look at the regulatory
8 agency's evaluation in California, they
9 decided that glyphosate was unlikely to pose
10 a risk of cancer.
11        MR. MILLER:  Move to strike the
12 answer.
13 QUESTIONS BY MR. CALHOUN:
14    Q.   And did that same California
15 regulatory agency that made a 2015
16 bureaucratic decision based on the IARC
17 monograph, did that same California
18 regulatory agency previously do a scientific
19 assessment of glyphosate in 2007?
20    A.   Yes, they did.
21    Q.   And what was the conclusion of
22 that 2007 assessment?
23    A.   That glyphosate was unlikely to
24 present a risk of cancer.
25        (Goldstein Exhibit 27 marked

Page 173

1    for identification.)
2 QUESTIONS BY MR. CALHOUN:
3    Q.   All right.  Let me hand you
4 what I'm marking as Exhibit 27.
5        A copy for you, Counsel.
6        Now, Dr. Goldstein, I've marked
7 what is Exhibit 27 a study called, quote,
8 "Glyphosate Use and Cancer Incidence in the
9 Agricultural Health Study," end quote.
10        Did I read that correctly?
11    A.   You did, yes.
12    Q.   And have you seen this study
13 before?
14    A.   I have.
15    Q.   Is this a study that you
16 referred to shortly -- in prior testimony
17 that you referred to it as the Agricultural
18 Health Study?
19    A.   Yes, it is.
20    Q.   And if you go to the top
21 right-hand corner of Exhibit 27, do you see
22 it states there when this study was first
23 published?
24    A.   Yes.
25    Q.   And what does that say?

Page 174

1    A.    It was first published online
2 November 9, 2017, then went to press in 2018.
3    Q.    And who is the first author on
4 this study?
5    A.    That is the Andreotti
6 publication.
7    Q.    All right.  So the first author
8 is Gabriella Andreotti; is that right?
9    A.    That's correct.
10    Q.    And do you see on the first
11 page it says "affiliations of authors"?
12    A.    Yes.
13    Q.    Are any of the authors that
14 were involved in the study, do any of them
15 work at Monsanto?
16    A.    No.
17    Q.    Are these authors all at
18 various government agencies?
19    A.    They're either at government
20 agencies or they're in academic institutions.
21 There's actually a mixture here.  Some of
22 them have left the program and gone to
23 academic institutions but continue to work
24 with the Ag Health Study.
25    Q.    To your knowledge, did Monsanto

Page 175

1 have anything to do with this study that's
2 been marked as Exhibit 17 {sic} in terms of
3 funding or other support for the study?
4    A.    No.
5    Q.    Now, if you go to the
6 conclusions in the abstract, I'd like to read
7 that into the record and then I'll ask you
8 some questions about it.
9        Conclusions:  Quote, "In this
10 large prospective cohort study, no
11 association was apparent between glyphosate
12 and any solid tumors or lymphoid malignancies
13 overall, including NHL and its subtypes," end
14 quote.
15        Did I read that correctly?
16    A.    You did.
17    Q.    And what does NHL stand for in
18 that sentence?
19    A.    Non-Hodgkin's lymphoma.
20    Q.    So what does this tell you,
21 Dr. Goldstein, about the issue of whether
22 glyphosate or glyphosate-based herbicides
23 cause non-Hodgkin's lymphoma?
24    A.    Well, this is very important
25 information because it's human information.

Page 176

1 It relates to formulated products and comes
2 from the largest and most comprehensive
3 prospective study that's ever been done in
4 farmers and applicators and their spouses.
5        They found no relationship
6 between glyphosate exposure and non-Hodgkin's
7 lymphoma in this publication.
8        (Goldstein Exhibit 28 marked
9        for identification.)
10 QUESTIONS BY MR. CALHOUN:
11    Q.    I'm going to hand you what I'm
12 marking as Exhibit 28.
13        You can put that exhibit aside
14 for now, Dr. Goldstein.
15        I have a copy for counsel.
16        Okay.  Dr. Goldstein, I've
17 handed you what has been marked as
18 Exhibit 28, and at the top it says, quote,
19 "Testimony of Anna B. Lowit, Science Advisor,
20 Office of Pesticide Programs, US
21 Environmental Protection Agency, before the
22 House Committee on Science, Space, and
23 Technology, February 6, 2018," end quote.
24        Did I read that correctly?
25    A.    You did, yes.

Page 177

1    Q.    All right.  So that is just a
2 few weeks ago, correct?
3    A.    That is correct.
4    Q.    And were you generally aware
5 that Anna Lowit from EPA had provided
6 testimony before this House committee on
7 glyphosate issues?
8    A.    Yes.
9    Q.    Do you know Anna Lowit?
10    A.    Yes, I do.
11    Q.    How do you know her?
12    A.    I've interacted with her a
13 number of times in conversations around the
14 use of epidemiology in risk assessment
15 processes at EPA.
16    Q.    And is she a Ph.D. scientist?
17    A.    She is, yes.
18    Q.    And on the first page of
19 Exhibit 28, second sentence or third
20 sentence, I guess, it says, quote, "I serve
21 as the science advisor in the Office of
22 Pesticide Programs of the US Environmental
23 Protection Agency," end quote.
24        Did I read that correctly?
25    A.    Yes.

Page 178

1    Q.    And is that consistent with
2  your understanding as to who Dr. Lowit is?
3    A.    Yes.
4    Q.    All right.  If you can turn
5  your attention to page 7 of Exhibit 28, about
6  two-thirds of the way down, I'm going to read
7  into the record something, then I'll ask you
8  about it.
9         It says, quote, "Based on the
10  comprehensive analysis of all available data
11  and reviews, the EPA concludes that
12  glyphosate is, quote, 'not likely to be
13  carcinogenic to humans,'" end quote.
14        Did I read that correctly?
15    A.    Yes.
16    Q.    And is that consistent with
17  your understanding of what EPA's current
18  position is with respect to the question of
19  whether glyphosate causes cancer?
20    A.    Yes.
21    Q.    And so to your knowledge, is
22  this formal testimony that has been given by
23  the EPA to a House congressional committee in
24  Washington, DC?
25    A.    Yes.

Page 179

1    Q.    Now, you were shown various
2  abstracts and studies earlier in this
3  deposition by plaintiff's counsel.
4         Do you recall those series of
5  questions generally, Dr. Goldstein?
6    A.    Yes.
7    Q.    Now, were any of those studies
8  sound science regarding the issue of whether
9  glyphosate or glyphosate-based herbicides
10  cause cancer?
11    A.    Taken collectively, no, they're
12  not.
13    Q.    And how about individually,
14  were any of them sound science in your view
15  and Monsanto's view on the issue of whether
16  glyphosate or glyphosate-based herbicides
17  cause cancer?
18    A.    No.
19    Q.    Now, has the EPA been aware of
20  the various studies that plaintiff's counsel
21  showed you earlier today in this deposition?
22    A.    Yes, definitely.
23    Q.    And did any of those studies
24  change the EPA's conclusion that glyphosate
25  is not likely to be carcinogenic to humans?

Page 180

1    A.    Evidently not.  I mean, the
2  most recent information we have suggests that
3  they're standing firmly behind that
4  conclusion.
5    Q.    And did any of those studies
6  that plaintiff's counsel showed you earlier
7  today change your conclusions and Monsanto's
8  conclusions that glyphosate and
9  glyphosate-based herbicides don't cause
10  cancer?
11    A.    No.
12        MR. CALHOUN:  Those are all of
13    the questions that I have at this
14    time, subject to any further questions
15    by Mr. Miller.
16        MR. MILLER:  I won't be long.
17    I need to set this back up.
18        VIDEOGRAPHER:  Off the record?
19        MR. MILLER:  Sure, whatever it
20    takes.
21        VIDEOGRAPHER:  Okay.  We're
22    going off the record at 1:29 p.m.
23     (Off the record at 1:29 p.m.)
24        VIDEOGRAPHER:  We are back on
25    the record at 1:31 p.m.

Page 181

1        REDIRECT EXAMINATION
2  QUESTIONS BY MR. MILLER:
3    Q.    Dr. Goldstein, good afternoon.
4    A.    Good afternoon.
5    Q.    How many, approximately,
6  employees are there at Monsanto?
7    A.    Total?  Right now I believe
8  it's about 22,000 globally.
9    Q.    And as for the person that
10  actually transmits information to the EPA, of
11  those 22,000 people, how many people are the
12  ones that are allowed to interface directly
13  with EPA?
14        MR. CALHOUN:  Objection to the
15    form of the question.
16        THE WITNESS:  I can't give you
17    a specific number.  Each product or
18    product category will normally have a
19    regulatory lead within Monsanto, and
20    so there are multiple employees that
21    have interactions with the regulatory
22    agencies, not just EPA, but USDA and
23    FDA as well, depending upon the
24    product.
25

Confidential - Pursuant to Protective Order

Page 182

1  QUESTIONS BY MR. MILLER:
2      Q.    Sure.
3          Whether Monsanto has withheld
4  negative scientific information from the EPA
5  as the EPA attempts to do its job with
6  Roundup, you wouldn't know of all the
7  negative possible information that's been
8  done, or can you sit here and say, we've
9  absolutely, all 22,000 of us, never withheld
10 information from the EPA?
11         MR. CALHOUN:  Objection to the
12 form of the question.  Vague.
13 Ambiguous.
14         THE WITNESS:  I obviously can't
15 speculate as to things that may have
16 occurred.  EPA specifies what it needs
17 and wants around a regulatory
18 submission.  They can ask for
19 additional information.
20         There are reporting
21 requirements and obligations around
22 both incidence and data, and we make
23 every effort to make certain that we
24 abide by those regulations.
25

Page 183

1  QUESTIONS BY MR. MILLER:
2      Q.    Do you know who Dr. James Parry
3  is?  Was?  I believe he's died now.
4      A.    I have heard the name.  I
5  believe he was involved in genotoxicity
6  issues, but I know very -- well, I know
7  nothing else about him.
8      Q.    Okay.  So you don't know
9  whether he prepared a report that said it was
10 potential that Roundup caused cancer?
11         MR. CALHOUN:  Objection to the
12 form of the question.
13 QUESTIONS BY MR. MILLER:
14     Q.    You weren't involved in any way
15 with any reports from Dr. Parry?
16     A.    No, I was not.
17         MR. CALHOUN:  Same objection.
18 QUESTIONS BY MR. MILLER:
19     Q.    So if Dr. Parry wrote a report
20 for Monsanto that said whatever, whether or
21 not Dr. Parry's report was sent to the EPA is
22 simply something Dr. Goldstein doesn't know
23 anything about one way or the other?
24     A.    I don't know whether it was
25 reported or whether, in fact, it would have

Page 184

1  been reportable.  I just don't know.
2      Q.    I understand.
3          Do you know what the TNO study
4  is?
5          MR. CALHOUN:  Objection to the
6  form of the question.
7          THE WITNESS:  I'm not sure I
8  know which study precisely you're
9  referring to.  I would have had
10 interactions with TNO as a contract
11 laboratory on various things over the
12 years.
13 QUESTIONS BY MR. MILLER:
14     Q.    And that's not what I'm
15 referring to.  I'm referring to a study of
16 dermal absorption of Roundup that was done in
17 2002 and canceled during the study.
18         Are you familiar at all with
19 that concept?
20         MR. CALHOUN:  Objection to the
21 form of the question.  Misstates the
22 record.
23         THE WITNESS:  Yes, I have some
24 familiarity with the issue.  I was not
25 directly involved in the issue with

Page 185

1  TNO, but I have some familiarity with
2  it.
3  QUESTIONS BY MR. MILLER:
4      Q.    Can you tell this jury whether
5  or not you were involved in any decision to
6  not present the TNO study to the EPA?
7          MR. CALHOUN:  Objection to the
8  form of the question.
9          THE WITNESS:  No, I had no
10 involvement in that conversation.
11 QUESTIONS BY MR. MILLER:
12     Q.    Let's go to the issue of your
13 disagreement with IARC.
14         I'm going to mark as Exhibit 29
15 the first -- well, before we get to the
16 disagreement with IARC, which we'll get to,
17 you yourself have made decisions to not send
18 negative information that Monsanto has to the
19 EPA, haven't you, Dr. Goldstein?
20         MR. CALHOUN:  Objection to the
21 form of the question.
22         THE WITNESS:  I don't know what
23 you mean by "negative information."
24 But, you know, the EPA has criteria
25 for what it wants to have reported and

Confidential - Pursuant to Protective Order

Page 186

1   what it does not want to have
2   reported, and I am involved in some of
3   those decisions related to human
4   health issues.
5   QUESTIONS BY MR. MILLER:
6       Q.   Well, you remember in 2015 a
7   former employee of Monsanto communicated with
8   the company that he had non-Hodgkin's
9   lymphoma, and he had been working with
10  Roundup and he wanted to let you guys know
11  about it, and you decided not to report it to
12  the EPA?
13          Do you remember that,
14  Dr. Goldstein?
15          MR. CALHOUN:  Objection to the
16  form of the question.  Lacks
17  foundation.
18          THE WITNESS:  I've had
19  conversations with or communication
20  around a number of employees, so I'm
21  not sure which one you might be
22  referring to.
23          Was this in Europe?
24          (Goldstein Exhibit 29 marked
25  for identification.)

Page 187

1   QUESTIONS BY MR. MILLER:
2       Q.   Let me show you what we're
3   going to mark as Exhibit 29 to your
4   deposition, and it's a series of e-mails that
5   were produced to us by Monsanto.
6          Sir, here's a copy for you and
7   a copy for counsel.
8          All right, sir?
9       A.   Go ahead.
10      Q.   Yes, sir.
11          This is Exhibit 29, and it's a
12  series of e-mails between various employees
13  at Monsanto including you, Daniel Goldstein;
14  right, sir?
15      A.   Yes, that's correct.
16      Q.   It's regarding annual adverse
17  effects reporting notifications, right?
18      A.   Yes.
19      Q.   And if we could go, please, to
20  Bate-stamped page 82367, you see here is a
21  notification to all Monsanto employees that
22  the United States Environmental Protection
23  Agency and other international regulatory
24  agencies require reporting of this
25  information under certain circumstances.

Page 188

1          That is talking about adverse
2   events, right?
3       A.   Yes.
4       Q.   All right.  "If you become
5   aware of information which suggests a
6   conclusion of adverse events {sic} or
7   substantial risk, you must immediately
8   forward that information to the adverse
9   effects reporting committee as instructed
10  below.  The information may originate inside
11  or outside the United States."
12          Have I read that correctly?
13          MR. CALHOUN:  Objection to the
14  form of the question.  You didn't read
15  it correctly.
16          THE WITNESS:  If there was a
17  misreading, I missed it.  So I...
18  QUESTIONS BY MR. MILLER:
19      Q.   So let's look now at page 83 --
20  I'm sorry, 82366, and see what the series of
21  e-mails becomes about here.
22          A gentleman named Randall
23  Barker, on November 24, 2014, writes to Jean
24  Edwards who is a Monsanto employee, right?
25      A.   Yes.

Page 189

1       Q.   "Jean, I've been diagnosed with
2   hairy cells leukemia."  Let me stop right
3   there.
4          That's a form of non-Hodgkin's
5   lymphoma, isn't it?
6       A.   Yes, it is.
7       Q.   "You may or may not remember
8   that I had irregular blood counts before I
9   retired.  I don't know if this diagnosis is
10  related to working around all the chemicals
11  that I may have been exposed to at
12  Muscatine."
13          Did I read that correctly?
14      A.   Muscatine but, yes.
15      Q.   Excuse me.
16          And Muscatine is a Monsanto
17  plant?
18      A.   Yes.
19      Q.   So this gentleman writes he's
20  got non-Hodgkin's lymphoma, and he's writing
21  to Monsanto about it.
22          And let's go then to where you
23  weigh in on this at page 82365.
24          If you'll look December 3,
25  2014, at 12:52 in the afternoon, Daniel

Page 190

1  Goldstein write, quote, "This is not
2  reportable, in my opinion, because he did not
3  make an allegation of relatedness but rather
4  asked a question."
5      Did I read that correctly?
6  A.   You did, yes.
7  Q.   So this never got reported?
8  A.   So there's two reasons why this
9  would not be a reportable under FIFRA
10 6(a)(2).  The one is that it is a question
11 rather than an allegation.  But actually
12 looking back at it, more specifically, EPA
13 reporting requires that you have a connection
14 to a specific EPA registered product, and
15 nowhere does he make that allegation in this
16 document.
17     He is asking whether he may
18 have this cancer as a result of exposure to
19 all the various chemicals he worked with at
20 Muscatine, which is a very, very large number
21 of different materials.
22     So this information as it comes
23 in would not be reportable.
24 Q.   Muscatine has glyphosate as one
25 of the products that it produces, true?

Page 191

1  A.   One of many products that it
2  produces.
3  Q.   So here we have a gentleman
4  that worked around glyphosate, had abnormal
5  blood counts while working around glyphosate,
6  reports he has non-Hodgkin's lymphoma, and
7  you, sir, the medical safety officer, decide
8  not to report it?
9      MR. CALHOUN:  Objection to the
10     form of the question.  Assumes facts
11     not in evidence.  Misstates the
12     record.
13     THE WITNESS:  This does not
14     meet the basic reporting requirements
15     under FIFRA 6(a)(2) for required
16     reporting.  There is no allegation of
17     relatedness to a specific registered
18     pesticide product.
19 QUESTIONS BY MR. MILLER:
20 Q.   So until a blue collar guy who
21 works at the factory can figure out that it's
22 related, it doesn't have to be reported; is
23 that what I understand?
24     MR. CALHOUN:  Objection to the
25     form of the question.  Argumentative.

Page 192

1      THE WITNESS:  It says --
2      MR. CALHOUN:  Lacks foundation.
3      THE WITNESS:  It says right
4      here.  I'm not suggesting we ignore
5      it; I'm not suggesting we fail to
6      respond to the employee.
7      Currently, as worded, this
8      would not trigger a 6(a)(2) report.
9      It is not reportable because I do not
10     have a specific registered product to
11     link this report to.
12 QUESTIONS BY MR. MILLER:
13 Q.   Sir, and nobody got back to
14 Randall Baker {sic} and say, "Hey, there's
15 been epidemiological studies showing an
16 association.  You might want to mention this
17 to your physician in hopes of getting the
18 best possible treatment"?
19     MR. CALHOUN:  Objection to the
20     form of the question.  Misstates the
21     record.  Lacks foundation.  Also not
22     relevant to Mr. Johnson's case.
23     THE WITNESS:  So two things:
24     One is that as far as his treatment
25     goes, there's no information that we

Page 193

1  would provide him that would make any
2  difference in his treatment.  The
3  cause of a cancer doesn't determine
4  how it's treated.  So your proposition
5  that this would have in some way
6  changed his management is clearly
7  incorrect.
8      But secondly, I believe that
9  there was ongoing communications with
10 this patient, and so, you know, this
11 issue was discussed with the employee
12 and it was resolved.
13     And I don't think that all of
14 the communications around this is
15 necessarily reflected in this e-mail.
16 There were telephone conversations as
17 well around this individual.
18     So he was responded to and
19 provided with information, but this is
20 not reportable under FIFRA 6(a)(2).
21 QUESTIONS BY MR. MILLER:
22 Q.   You say there were phone
23 conversations.
24     Did you talk to Mr. Randall
25 Baker {sic}?

Page 194

1    A.    I don't recall talking to him
2  directly.  I may have.  I believe I spoke
3  with the occupational nurse, Jean Edwards,
4  and that she did the primary communication.
5  She had known this individual for many years.
6  Jean has been a nurse there -- well, for
7  longer that I've been at Monsanto.
8    Q.    Did she call Mr. Baker {sic}
9  and tell him that there's been an association
10 with non-Hodgkin's lymphoma and exposure to
11 glyphosate and you might want to consider
12 that?
13       MR. CALHOUN:  Objection to the
14    form of the question.
15       THE WITNESS:  I don't know the
16    exact content of that conversation.
17 QUESTIONS BY MR. MILLER:
18    Q.    Well, let's go back to the
19 issue of whether it should have been
20 reportable, and let's go down to page 82364,
21 the next page, where on the bottom of the
22 page Annemieke De Wilde -- and what was her
23 title again there at Monsanto?
24    A.    She's head of occupational
25 medicine.

Page 195

1    Q.    She writes to you and says, "I
2  agree that this is not an allegation.  In
3  previous lives, the company has kept this on
4  file."
5       What does she mean by that,
6  "previous lives"?
7       MR. CALHOUN:  Objection to the
8    form of the question.
9       THE WITNESS:  Yeah, I have no
10    idea what she is referring to there.
11       And we have occupational
12    physicals that were done over time for
13    various reasons depending on someone's
14    job classification, but she's confused
15    completely around the reporting issues
16    because this is a registered pesticide
17    substance and it wouldn't fall under
18    TSCA 8(c), it would fall under FIFRA
19    6(a)(2).
20 QUESTIONS BY MR. MILLER:
21    Q.    Here's what she says on
22 December 3, 2014, at 1:09 in the afternoon.
23 She says, "If similar, quote, 'stories
24 surface,' the combination of stories may make
25 it an allegation subject to TSCA 8(c)."

Page 196

1       That's what she says, right?
2    A.    That's what she says, but,
3  number one, I'm not aware of any similar
4  stories, as she puts it in quotes, that
5  appeared in the Muscatine facility, but she's
6  also incorrect about the TSCA 8(c).
7    Q.    Well, this is in December
8  of 2014.  That's one month after you received
9  a call from Lee Johnson about his story which
10 seems awful similar, doesn't it?
11       MR. CALHOUN:  Objection to the
12    form of the question.  Misstates the
13    evidence.
14       THE WITNESS:  So...
15       MR. CALHOUN:  Lacks foundation.
16    Do you remember what the
17    question is, Dr. Goldstein?
18       THE WITNESS:  Yes.
19       So, yes, your timing is
20    correct.  You know, they are different
21    tumor diagnoses and, in fact,
22    Mr. Johnson's information was reported
23    to US EPA.
24 QUESTIONS BY MR. MILLER:
25    Q.    When was that?

Page 197

1    A.    I know for certain it was
2  reported in March of 2015.  Whether it was
3  reported earlier or not, I do not know.
4    Q.    March of 2015.
5       And how was it reported?
6    A.    It went in as a FIFRA 6(a)(2)
7  report.  We had looked earlier -- I don't
8  remember the exhibit number -- at the Poison
9  Control Center document that reflected his
10 case, and that would have been a part of the
11 6(a)(2) notification to EPA.
12    Q.    Moving on with Randall Barker's
13 complaint, you go on to say to Anna a few
14 hours later on page 82359, "I agree with the
15 Adverse Effects Committee, there is no FIFRA
16 6(a)(2) report needed for glyphosate or other
17 active ingredients at this time.  With no
18 clear allegation or specific association, I
19 do not believe there is a TSCA 8(e) report
20 issue either."
21       So not reportable under either
22 code according to Dr. Goldstein, right?
23       MR. CALHOUN:  Objection to the
24    form of the question.
25       THE WITNESS:  Yes, that is

Page 198

1  correct.
2  QUESTIONS BY MR. MILLER:
3      Q.    Fair to say that Monsanto knows
4  a lot more about this chemical and the
5  complaints thereto than EPA if you're not
6  sending these documents to the EPA, right?
7          MR. CALHOUN:  Objection to the
8      form of the question.  Lacks
9      foundation.  Misstates the evidence.
10         THE WITNESS:  Sir, there's no
11     utility here for EPA whatsoever.
12     There's no allegation of relationship
13     to any specific agent.  There's
14     nothing they can do with this if it
15     was submitted.
16  QUESTIONS BY MR. MILLER:
17     Q.    No one could have called him
18  back and asked him if he was exposed to
19  Roundup and how?  That couldn't have been
20  done?
21         MR. CALHOUN:  Objection.  Seeks
22     speculation.
23         THE WITNESS:  We know he was
24     exposed to Roundup, and we know he was
25     exposed to a wide variety of other

Page 199

1      products and chemicals within that
2      facility.  But without a specific
3      relationship to an EPA product number
4      or active ingredient, it's not
5      reportable and the office would do
6      nothing about it.
7          (Goldstein Exhibit 30 marked
8      for identification.)
9  QUESTIONS BY MR. MILLER:
10     Q.    Let's look at your
11  disagreements with IARC.  And we've marked
12  the first publication of IARC in the Lancet
13  as Exhibit 30.  I want to go over that with
14  you.
15         Here's a copy, sir.
16         Seen this before?
17     A.    Yes, I have.
18     Q.    Lancet, that's a peer-reviewed
19  journal, right?
20     A.    It is in general a
21  peer-reviewed journal.  It is also the
22  official organ of record for IARC, so it
23  publishes IARC decisions and documents
24  without peer review.
25     Q.    Now, so the jury understands,

Page 200

1  carcinogenicity means what, sir?
2      A.    Ability to cause cancer.
3      Q.    And one of the chemicals they
4  looked at was glyphosate, right?
5      A.    Yes.
6      Q.    "In March 2015, 17 experts,
7  right, from 11 countries" --
8          Did I read that correctly?
9      A.    Yes.
10     Q.    -- "met at the International
11  Agency for Research on Cancer, IARC, to
12  assess the carcinogenicity of" -- several
13  products.
14         The one we're interested in is
15  glyphosate, right?
16     A.    Yes.
17         MR. CALHOUN:  Objection to the
18     form of the question to the extent
19     that you aren't reading it.  You were
20     just recharacterizing it or
21     summarizing it.
22  QUESTIONS BY MR. MILLER:
23     Q.    What these 17 experts from 11
24  countries -- by the way, do you know these
25  people are volunteers, they don't even get

Page 201

1  paid?  Are you aware of that?
2          MR. CALHOUN:  Objection to the
3      form of the question.  They get paid
4      by plaintiff's counsel in various
5      litigation related to these products.
6          MR. MILLER:  That's a lot of
7      fun.  Now let's go back to work.
8  QUESTIONS BY MR. MILLER:
9      Q.    Are you aware that the IARC
10  experts are volunteers and do not get paid?
11         MR. CALHOUN:  Objection to the
12     form of the question.
13         THE WITNESS:  I don't --
14         MR. CALHOUN:  We know that
15     Dr. Portier was paid.
16         THE WITNESS:  I do not know the
17     arrangements on payments for these
18     individuals.  I know that those that
19     come from governmental regulatory
20     agencies don't get any additional
21     payment.
22         And I know that Dr. Portier,
23     who was an invited special expert for
24     this process, had no significant
25     previous experience with glyphosate

Confidential - Pursuant to Protective Order

Page 202

1  and was paid $160,000 by plaintiff's
2  attorneys within six days after the
3  meeting.  So some of them get paid.
4       MR. MILLER:  Move to strike as
5  nonresponsive.
6       MR. CALHOUN:  I thought that
7  was very responsive, but I guess we'll
8  just have to agree to disagree.
9  QUESTIONS BY MR. MILLER:
10      Q.   And Monsanto was allowed to
11 send an invited observer to the IARC, right?
12      MR. CALHOUN:  Objection to the
13  form of the question.
14      THE WITNESS:  There was an
15  industry observer, yes.
16 QUESTIONS BY MR. MILLER:
17      Q.   Monsanto paid for him to go to
18 the IARC meeting; you know that?
19      A.   I don't know any of the
20 arrangements for payment, whether he was
21 reimbursed for his time, whether travel was
22 covered.  I had no involvement with that
23 conversation.
24      Q.   Seems rather convenient you
25 know what Dr. Portier gets paid and you don't

Page 203

1  know what your own expert gets paid?
2       MR. CALHOUN:  Objection to the
3  form of the question.  It was not
4  Dr. Goldstein's own expert, so that
5  misstates the record.
6  QUESTIONS BY MR. MILLER:
7       Q.   You want to answer now?
8       A.   There was an industry
9  representative that was there.  I was not
10 involved in making any of the arrangements
11 related to it, so I do not know what the
12 payment arrangements, if any, were.
13      Q.   You say "industry
14 representative."  Monsanto representative.
15      Are you aware he was listed as
16 a representative of Monsanto at the meeting,
17 sir?
18      MR. CALHOUN:  Objection to the
19  form of the question.
20      THE WITNESS:  I don't know how
21  he was listed.  I don't believe it was
22  a Monsanto permanent employee, but I
23  don't know anything about the listing.
24 QUESTIONS BY MR. MILLER:
25      Q.   And you've mentioned

Page 204

1  Dr. Portier.  The truth of the matter is,
2  Dr. Portier was not a voting member of the
3  IARC panel.  Are you aware of that?
4       MR. CALHOUN:  Objection to the
5  form of the question.  Misstates the
6  record regarding Dr. Portier's
7  extensive influence on the IARC
8  monograph process for glyphosate.
9  QUESTIONS BY MR. MILLER:
10      Q.   You can answer now.
11      A.   My understanding is that the
12 invited special expert does not vote.
13      Q.   So the 17 invited experts from
14 around the world who did vote, you know they
15 voted unanimously, right?
16      MR. CALHOUN:  Objection to the
17  form of the question.
18      THE WITNESS:  There was a
19  consensus.  I don't know the precise
20  voting process.
21 QUESTIONS BY MR. MILLER:
22      Q.   Let's look at what they said.
23 Looking now at the bottom of the page, of the
24 second page, sir.
25      "Case-control studies of

Page 205

1  occupational exposure" -- stop right there.
2       Case-control studies are the
3  kind of studies like the Hardell study that
4  we talked about earlier; can we agree on that
5  much?
6       A.   Yes.
7       Q.   Okay.  Occupational exposure
8  means what?
9       A.   So in this context, primarily
10 applicators, not manufacturers.
11      Q.   All right, sir.
12      Okay.  Case-control studies of
13 occupational exposure in the United States of
14 America, Canada and Sweden reported what,
15 sir?
16      A.   Are you asking me to read the
17 document?
18      Q.   Yes, please.
19      A.   "Reported increased risks for
20 non-Hodgkin's lymphoma that persisted after
21 adjustment for other pesticides."
22      It goes on to say that the Ag
23 Health Study cohort did not see a
24 significantly increased risk.
25      Q.   Right, sir.

Confidential - Pursuant to Protective Order

Page 206

1    Also tells us, these 17 experts
2 from 11 countries, that a "glyphosate
3 formulation promoted skin tumors in an
4 initiation promotion study in mice."
5    Did I read that correctly?
6    MR. CALHOUN:  Objection to the
7 form of the question.
8    THE WITNESS:  So, yes, you read
9 that correctly.  It's not a relevant
10 test system, but that is stated here.
11 QUESTIONS BY MR. MILLER:
12    Q.   And these 17 experts from 11
13 countries go on to tell us that "glyphosate
14 has been detected in the blood and urine of
15 agricultural workers," indicating what, sir?
16    A.   Indicating absorption.
17    Q.   They go on to tell us that
18 "glyphosate and glyphosate formulations
19 induced DNA and chromosomal damage in mammals
20 and in human and in -- and animal cells in
21 vitro."
22    Did I read that correctly?
23    A.   You did.  There are very large
24 amounts of data that have been reviewed by
25 Kier and others regarding genotoxicity, and

Page 207

1 this does not reflect the weight of the
2 evidence.
3    And as far as I know, the human
4 study that was cited was repeated later and
5 was not replicable.
6    Q.   "Glyphosate and glyphosate
7 formulations and AMPA" --
8    What is AMPA?
9    A.   Yeah, aminomethylphosphonic
10 acid, which is a breakdown product of
11 glyphosate.
12    Q.   Yes, sir.
13    A.   It's also found in detergents,
14 so it enters the environment from several
15 sources.
16    Q.   "Glyphosate, glyphosate
17 formulations and AMPA-induced oxidative
18 stress in rodents and in vitro."
19    Can you tell us what oxidative
20 stress is?
21    MR. CALHOUN:  Objection to the
22 form of the question.
23    THE WITNESS:  It's an
24 interesting question.  Oxidative
25 stress refers to a variety of

Page 208

1 processes that happen in a cell as a
2 result of increased reactivity of
3 certain chemicals.
4    The relationship between
5 oxidative stress and cancer is
6 unclear, and in a number of these
7 studies the test systems involve
8 direction -- direct injection of this
9 material into the peritoneal cavity,
10 which is a completely irrelevant mode
11 of exposure.
12 QUESTIONS BY MR. MILLER:
13    Q.   Well, to these 17 experts from
14 11 countries, their ultimate conclusion was,
15 quote, "the working group classified
16 glyphosate as" what, sir?
17    MR. CALHOUN:  Objection to the
18 form of the question.
19    Make it clear that you're just
20 reading the document, Dr. Goldstein.
21    THE WITNESS:  The document
22 says, "Working group classified
23 glyphosate as probably carcinogenic to
24 humans, parentheses, group 2A, close
25 parenthesis."

Page 209

1 QUESTIONS BY MR. MILLER:
2    Q.   "We declare no competing
3 interest."
4    Do you see that, sir?
5    A.   Yes.
6    Q.   Well, let me start out here.
7    After IARC reached the
8 conclusions that we've just read, it's fair
9 to say that Monsanto disagreed?
10    A.   Yes, we did disagree.  So did
11 many other people.
12    Q.   And it's fair to say that you
13 made your disagreement very public?
14    A.   I think that's a fair
15 assessment, yes.
16    Q.   And in fact, 100 scientists
17 from around the world came to the defense of
18 IARC after Monsanto made their public
19 disagreement with IARC, and you're aware of
20 that, aren't you?
21    MR. CALHOUN:  Objection to the
22 form of the question.
23    THE WITNESS:  I'm aware of that
24 publication, yes.
25    (Goldstein Exhibits 31 and 32

Confidential - Pursuant to Protective Order

Page 210

1    marked for identification.)
2    QUESTIONS BY MR. MILLER:
3        Q.    Let's take a look at it.  What
4    I got here is a cover e-mail that you were
5    copied on concerning that, and we've marked
6    that as 31.  Here, sir.  And 32, we've marked
7    the actual letter from a hundred scientists.
8    And I have a copy of that for you.
9        This was shortly after IARC
10   said that Roundup was a probable cause of
11   cancer.  This is an e-mail from Clare Thorp
12   to you and -- well, I guess only you.  It
13   looks like Daniel Goldstein, right?
14       MR. CALHOUN:  Objection to the
15   form of the question.  Misstates the
16   record.
17       THE WITNESS:  No, it isn't just
18   to me.
19   QUESTIONS BY MR. MILLER:
20       Q.    Okay.  From Clare Thorp?
21       A.    Yes.
22       Q.    And it's on St. Patrick's Day,
23   right?
24       A.    It's on?
25       Q.    March 17th.

Page 211

1        A.    Oh, yes, I'm sorry.  I just
2    didn't hear what you said.
3        Q.    To me it's St. Patrick's Day.
4        A.    Oh, sorry, yes.
5        Q.    All right.  Fair enough.
6        All right.  So how she
7    describes this letter from 100 scientists is
8    "a long-winded defense of the IARC monograph,
9    co-authored by Blair and signed off by
10   approximately 100 former IARC panelists."
11       Do you see that?
12       MR. CALHOUN:  Objection to the
13   form of the question.
14       Are you asking whether you read
15   it correctly, or are you asking him to
16   comment on it?
17       The question is unclear, so I
18   object to form.
19   QUESTIONS BY MR. MILLER:
20       Q.    Dr. Goldstein, am I reading
21   this correctly in this e-mail from Clare
22   Thorp on St. Patrick's Day to you, Daniel
23   Goldstein, quote, "Please also see this
24   long-winded defense of the IARC monographs
25   co-authored by Blair and signed off on by

Page 212

1    approximately 100 former IARC panelists"?
2        Did I read that correctly?
3        A.    You did, yeah.
4        Q.    Let's take a look at the actual
5    letter from these 100 scientists who were
6    defending IARC.
7        Have you seen this before, sir?
8        A.    I am aware of it.  I have never
9    reviewed it in detail.
10       Q.    Look with me at page 27419.  It
11   lists the affiliation of these 100 people who
12   are defending IARC.  And I don't want to go
13   every one of them, but you got the National
14   Cancer Institute in Bethesda, Maryland.
15       You see that, sir, page 2?
16       A.    Yes.
17       Q.    The Imperial College in London,
18   right, sir?
19       A.    Yes.
20       Q.    Norway Centre for Research in
21   Environmental Epidemiology.  Are they listed,
22   sir?
23       A.    Yes.
24       MR. CALHOUN:  Objection to the
25   form of the question.  It's not

Page 213

1    Norway.
2    QUESTIONS BY MR. MILLER:
3        Q.    Harvard School of Public
4    Health, is that listed, sir?
5        A.    Yes.  These are institutional
6    affiliations.  I don't know what the
7    expertise of these various individuals is,
8    and I haven't taken the time to investigate
9    them all.
10       Q.    Go to page 3.  We'll see Duke
11   University Medical School listed, sir?
12       A.    Yes.
13       Q.    Berkeley, California Berkeley?
14       Do you see that listed, sir?
15       A.    Yes.
16       Q.    Going to page 4, and I'm not
17   going to go over all of them, but the German
18   Cancer Research Center.
19       Do you see that, sir?
20       MR. CALHOUN:  Objection to the
21   form of the question.
22       THE WITNESS:  Yes, I do see
23   that.
24   QUESTIONS BY MR. MILLER:
25       Q.    All right.  So let's see what

Page 214

1 these 100 scientists have to say in part,
2 sir.
3          Let's go to page 10. "The
4 authors of this paper are scientists from
5 various disciplines relevant to the
6 identification hazard" -- I'm sorry.
7          "The authors of this paper are
8 scientists from various disciplines relevant
9 to the identification and hazard evaluation
10 of human carcinogens."
11          Did I read that correctly?
12     A.    Oh, here you are.
13     Q.    Yes, sir.
14     A.    Yes, you did read it correctly.
15     Q.    And these 100 scientists go on
16 to say, "We have examined here criticisms of
17 the IARC classification process to determine
18 the validity of these concerns. We review
19 the history of IARC evaluations and describe
20 how the IARC evaluations are performed."
21          Did I read that correctly?
22     A.    You did.
23     Q.    And the first sentence of their
24 discussion is, quote, "We conclude that these
25 recent criticisms are unconvincing."

Page 215

1          Did I read that correctly?
2     A.    That's what the document says,
3 yes.
4          MR. CALHOUN: Objection to your
5     just having -- just reading stuff into
6     the record. The document speaks for
7     itself.
8 QUESTIONS BY MR. MILLER:
9     Q.    Let's go to page 13, sir.
10          Sir, were you aware, and I'm
11 quoting at page 13, that "IARC is funded by
12 the governments of 24 countries that have
13 decided to become members, in addition to
14 competitive grants from funding agencies"?
15          Are you aware of that
16 information?
17     A.    I think that's changed
18 significantly at various points in time, but
19 it is funded by a variety of different
20 funding mechanisms from different
21 governments.
22     Q.    Yes, sir.
23          And you're aware, or if you'll
24 agree, that, quote, "The IARC monograph
25 program is mainly funded by the United States

Page 216

1 National Cancer Institute through a renewable
2 grant subject to the peer review of the
3 program."
4          Are you aware of that, sir?
5     A.    Yes, that's just -- yeah, that
6 is what the document in fact says, but that
7 was the subject of the recent congressional
8 hearing that Anna Lowit testified at, and
9 we'll see how much longer that situation
10 pertains.
11     Q.    I think that's a great point.
12 That hearing was put on by Lamar Smith,
13 right?
14          MR. CALHOUN: Objection to the
15     form of the question.
16 QUESTIONS BY MR. MILLER:
17     Q.    Who is a congressman who was
18 the chair of that subcommittee?
19     A.    I believe that's correct.
20     Q.    And the truth is that Monsanto
21 is a funder of Lamar Smith's campaigns,
22 right, sir?
23     A.    I do not know.
24     Q.    Wouldn't that be important to
25 know?

Page 217

1          MR. CALHOUN: Objection to the
2     form of the question.
3          THE WITNESS: I just said I do
4     not know.
5 QUESTIONS BY MR. MILLER:
6     Q.    What these 100 scientists go on
7 to tell us is, at the bottom of page 13,
8 "Carcinogenic hazard identification refers to
9 an assessment of whether an agent causes
10 cancer."
11          That's what these folks do,
12 isn't it?
13          MR. CALHOUN: Objection to the
14     form of the question.
15          THE WITNESS: Yeah, that's a
16     definition of what hazard
17     identification is. It's perhaps what
18     they set out to do.
19          I would argue in the case of
20     glyphosate they did it very poorly.
21 QUESTIONS BY MR. MILLER:
22     Q.    26 -- and we're almost done
23 here. Appreciate your patience, sir.
24     A.    Page 26?
25     Q.    Yes, sir.

Confidential - Pursuant to Protective Order

Page 218

1    Bottom paragraph. "The working
2  group members do not receive any fee for
3  their work" --
4    That's true, isn't it, sir?
5    MR. CALHOUN:  Objection to the
6  form of the question.
7    THE WITNESS:  I don't factually
8  know myself whether it is true or not.
9  That is what the document states.
10 QUESTIONS BY MR. MILLER:
11   Q.   Yeah.
12   And to complete the sentence,
13 "but are paid travel expenses, and there is
14 some prestige associated with service on an
15 IARC monograph."
16   A.   Yeah, my understanding was,
17 yes, that for some of the representatives
18 travel expenses are covered.
19   Whether there is prestige
20 associated with it also remains to be seen.
21   Q.   And last page and we're done
22 with this.  Page 27, the conclusions.
23   These 100 scientists say,
24 quote, "We are concerned, however, that the
25 criticism expressed by a vocal minority

Page 219

1  regarding evaluations of the few agents may
2  promote the denigration of a process that has
3  served the public and public health well for
4  many decades for reasons which are not
5  supported by data."
6    Did I read that correctly?
7    A.   Well, you read it correctly,
8  but I would point out that that vocal
9  minority at this point includes the German
10 BfR, EFSA, the US EPA, the Canadian
11 regulatory agencies, the Japanese, Australia,
12 New Zealand, Argentina and Brazil, to name a
13 few.
14   So their characterization of
15 this as a vocal minority as it relates to
16 glyphosate is a gross mischaracterization.
17   Q.   They go on to say, quote, "The
18 long list of scientists who are coauthors of
19 this paper attest to the strong support that
20 IARC has in the scientific community."
21   That's true, isn't it, sir?
22   MR. CALHOUN:  Objection to the
23 form of the question.
24   THE WITNESS:  I have a
25 numerator here of something on the

Page 220

1  order of a hundred scientists.  I
2  don't know how many scientists there
3  are total in the scientific community,
4  but I will tell you that a hundred of
5  them certainly is not a broad
6  scientific consensus and that other
7  scientists, particularly scientists in
8  regulatory agencies that have spent
9  years on this issue, disagree entirely
10 as it relates to glyphosate.
11   MR. MILLER:  I have no further
12 questions.  Thank you for your time.
13   MR. CALHOUN:  Let's off the
14 record for a moment.  We may be done,
15 but I just want to go off the record
16 and I'll let you know.
17   VIDEOGRAPHER:  We're going off
18 the record at 2:15 p.m.
19   (Off the record at 2:15 p.m.)
20   VIDEOGRAPHER:  We are back on
21 the record at 2:21 p.m.
22   MR. CALHOUN:  We have no
23 further questions for this witness.
24 Thank you for your time,
25 Dr. Goldstein.  And we reserve the

Page 221

1  right to read and sign.
2    MR. MILLER:  Have a nice day
3  and thank you for your time, sir.
4    THE WITNESS:  Thank you.
5    VIDEOGRAPHER:  The time now is
6  2:21 p.m.  This concludes the
7  deposition and we're going off the
8  record.
9  (Deposition concluded at 2:21 p.m.)
10   – – – – – – –

Confidential - Pursuant to Protective Order

Page 222

CERTIFICATE

1
2
3          I, CARRIE A. CAMPBELL, Registered
Diplomate Reporter, Certified Realtime
4   Reporter and Certified Shorthand Reporter, do
hereby certify that prior to the commencement
5   of the examination, Daniel A. Goldstein, M.D.
was duly sworn by me to testify to the truth,
6   the whole truth and nothing but the truth.
7          I DO FURTHER CERTIFY that the
foregoing is a verbatim transcript of the
8   testimony as taken stenographically by and
before me at the time, place and on the date
9   hereinbefore set forth, to the best of my
ability.
10
11          I DO FURTHER CERTIFY that I am
neither a relative nor employee nor attorney
12   nor counsel of any of the parties to this
action, and that I am neither a relative nor
13   employee of such attorney or counsel, and
that I am not financially interested in the
14   action.
15
16
17   _____
        CARRIE A. CAMPBELL,
18       NCRA Registered Diplomate Reporter
        Certified Realtime Reporter
19       California Certified Shorthand
        Reporter #13921
20       Missouri Certified Court Reporter #859
        Illinois Certified Shorthand Reporter
21       #084-004229
        Texas Certified Shorthand Reporter #9328
22       Kansas Certified Court Reporter #1715
        Notary Public
23       Dated:  March 5, 2018
24
25

Page 223

INSTRUCTIONS TO WITNESS

1
2
3          Please read your deposition over
4   carefully and make any necessary corrections.
5   You should state the reason in the
6   appropriate space on the errata sheet for any
7   corrections that are made.
8          After doing so, please sign the
9   errata sheet and date it.  You are signing
10   same subject to the changes you have noted on
11   the errata sheet, which will be attached to
12   your deposition.
13          It is imperative that you return
14   the original errata sheet to the deposing
15   attorney within thirty (30) days of receipt
16   of the deposition transcript by you.  If you
17   fail to do so, the deposition transcript may
18   be deemed to be accurate and may be used in
19   court.
20
21
22
23
24
25

Page 224

ACKNOWLEDGMENT OF DEPONENT

1
2
3
4          I,_____, do
hereby certify that I have read the foregoing
5   pages and that the same is a correct
transcription of the answers given by me to
6   the questions therein propounded, except for
the corrections or changes in form or
7   substance, if any, noted in the attached
Errata Sheet.
8
9
10
11
12   _____
        Daniel A. Goldstein, M.D.         DATE
13
14
15   Subscribed and sworn to before me this
16   _____ day of _____, 20 _____.
17   My commission expires: _____
18
19   Notary Public
20
21
22
23
24
25

Page 225

1          _ _ _ _ _ _ _
                ERRATA
2          _ _ _ _ _ _ _
3   PAGE  LINE  CHANGE/REASON
4   _____  ____  _____
5   _____  ____  _____
6   _____  ____  _____
7   _____  ____  _____
8   _____  ____  _____
9   _____  ____  _____
10   _____  ____  _____
11   _____  ____  _____
12   _____  ____  _____
13   _____  ____  _____
14   _____  ____  _____
15   _____  ____  _____
16   _____  ____  _____
17   _____  ____  _____
18   _____  ____  _____
19   _____  ____  _____
20   _____  ____  _____
21   _____  ____  _____
22   _____  ____  _____
23   _____  ____  _____
24   _____  ____  _____
25   _____  ____  _____

Confidential - Pursuant to Protective Order

Page 226

1        – – – – – – –
         LAWYER'S NOTES
2        – – – – – – –
3  PAGE  LINE
4  ____  ____  _____
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10 ____  ____  _____
11 ____  ____  _____
12 ____  ____  _____
13 ____  ____  _____
14 ____  ____  _____
15 ____  ____  _____
16 ____  ____  _____
17 ____  ____  _____
18 ____  ____  _____
19 ____  ____  _____
20 ____  ____  _____
21 ____  ____  _____
22 ____  ____  _____
23 ____  ____  _____
24 ____  ____  _____
25