# EXHIBIT 63

Confidential - Subject to Protective Order

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3    ----------------------------x

 4    IN RE: ROUNDUP PRODUCTS      ) MDL No. 2741

 5    LIABILITY LITIGATION         )

 6                                 ) Case No.

 7    _____) 16-md-02741-VC

 8    THIS DOCUMENT RELATES TO ALL  )

 9    CASES                        )

10    _____)

11

12       CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

13

14     VIDEOTAPED DEPOSITION OF MARK A. MARTENS, Ph.D.

15                  WASHINGTON, D.C.

16                FRIDAY, APRIL 7, 2017

17                    9:23 A.M.

18

19

20

21

22

23

24

25    Reported by: Leslie A. Todd
```

Confidential - Subject to Protective Order

1     Deposition of MARK A. MARTENS, Ph.D., held at the

2     offices of:

3

4

5          HOLLINGSWORTH, LLP

6          1350 I Street, N.W.

7          Suite 1000

8          Washington, DC 20005

9          (202) 898-5800

10

11

12

13

14     Pursuant to notice, before Leslie Anne Todd, Court

15     Reporter and Notary Public in and for the District of

16     Columbia, who officiated in administering the oath to

17     the witness.

18

19

20

21

22

23

24

25

Confidential - Subject to Protective Order

```
 1                A P P E A R A N C E S

 2

 3   ON BEHALF OF PLAINTIFFS:

 4        AIMEE H. WAGSTAFF, ESQUIRE
              ███████████@ahw-law.com
 5        ANDRUS WAGSTAFF

 6        7171 W. Alaska Drive

 7        Lakewood, Colorado 80226

 8        (866) ████████

 9              -and-

10        ROBIN L. GREENWALD, ESQUIRE
              ██████████@weitzlux.com
11        PEARL ROBERTSON, ESQUIRE (telephonically)
              ██████████@weitzlux.com
12        RINA EISENBERG, ESQUIRE (telephonically)
              ██████████@weitzlux.com
13        WEITZ & LUXENBERG, PC

14        700 Broadway, 5th Floor

15        New York, New York 10003

16        (212) ████████

17

18   ON BEHALF OF MONSANTO COMPANY:

19        KIRBY T. GRIFFIS, ESQUIRE
              ███████@hollingsworthllp.com
20        ELYSE A. SHIMADA, ESQUIRE
              ███████@hollingsworthllp.com
21        HOLLINGSWORTH, LLP

22        1350 I Street, N.W., Suite 1000

23        Washington, DC 20005

24        (202) ████████

25
```

Confidential - Subject to Protective Order

```
 1    APPEARANCES (Continued):

 2    ALSO PRESENT:

 3         RAY MOORE (Videographer)

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Confidential - Subject to Protective Order

1                 C O N T E N T S

2    EXAMINATION OF MARK A. MARTENS, Ph.D.        PAGE

3       By Ms. Wagstaff                       10, 235

4       By Mr. Griffis                           187

5

6

7                 E X H I B I T S

8

9    MARTENS DEPOSITION EXHIBITS                 PAGE

10   No. 9-1   Curriculum Vitae of Mark A. Martens     12

11   No. 9-2   E-mail string re Actions from 12/17

12             Meeting on Mutagenicity, Bates

13             MONGLY06486896 to 06486898         34

14   No. 9-3   E-mail string re Draft of Minutes -

15             1/15 Meeting, Bates MONGLY01312109

16             to 01312108                        42

17   No. 9-4   Monsanto Telefax Transmittal Sheet,

18             and attached documents, Bates

19             MONGLY01312093 to 01312104         53

20   No. 9-5   E-mail re Meeting Minutes 2/25,

21             Bates MONGLY06486905 to 06486908   55

22   No. 9-6   E-mail string re Comments on Parry

23             Write-up, Bates MONGLY00878595 to

24             00878597                           85

25

Confidential - Subject to Protective Order

```
 1              E X H I B I T S

 2

 3   MARTENS DEPOSITION EXHIBITS                    PAGE

 4   No. 9-7   E-mail string re Comments on Parry

 5             Write-up, Bates MONGLY00878115 to

 6             00878116                             92

 7   No. 9-8   Evaluation of the potential

 8             Genotoxicity of Glyphosate,

 9             Glyphosate mixtures and component

10             surfactants, by James M. Parry,

11             Bates MONGLY01314233 to 01314283     96

12   No. 9-9   E-mail string re Parry report,

13             Bates MONGLY03734971                 120

14   No. 9-10  Genotoxic Potential of Glyphosate

15             Formulations: Mode-of-Action

16             Investigations, MONGLY02413658 to

17             02413664                             133

18   No. 9-11  E-mail re Revised Mark Martens

19             Fellow Nomination Letter, Bates

20             MONGLY00905604 to 00905606           139

21   No. 9-12  Surfactant Toxicology, Mark A.

22             Martens, Toxicology, Europe/Africa,

23             Bates MONGLY06253165                 169

24   No. 9-13  Catalog of Produced Metadata Detail  169

25
```

Confidential - Subject to Protective Order

1                    E X H I B I T S

2

3    MARTENS DEPOSITION EXHIBITS                          PAGE

4    No. 9-14  E-mail re JMPR Summaries, Bates

5              MONGLY00893429                              184

6    No. 9-15  Report by Stout and Ruecker, Bates

7              MONGLY00893439 to 00893443                  186

8    No. 9-16  Report by Hogan and Lankas, Bates

9              MONGLY00893430 to 00893432                  186

10   No. 9-17  Report by Knezivich and Hogan,

11             Bates MONGLY00893433 to 00893436            186

12   No. 9-18  E-mail string re Meeting Prof Parry

13             15 Feb 2001, MONGLY02626553 to

14             02626554                                    219

15

16

17

18

19

20

21

22

23

24

25

Confidential - Subject to Protective Order

```
 1              P R O C E E D I N G S

 2              -------------------

 3        THE VIDEOGRAPHER:  We are now on the

 4  record.  My name is Ray Moore.  I am a videographer

 5  for Golkow Technologies.  Today's date is April 7,

 6  2017, and the time is 9:23 a.m.

 7        This video deposition is being held in

 8  Washington, D.C., In the Matter Regarding Roundup

 9  Products Liability Litigation for the United States

10  District Court, Northern District of California, Case

11  No. 16-MD-02741-VC.  The deponent is Mark Martens.

12        Counsel will -- counsel will be noted on

13  the stenographic record.  The court reporter is

14  Leslie Todd, and will now swear in the witness.

15  WHEREUPON,

16        MARK A. MARTENS, Ph.D.,

17  called as a witness, and having been first duly sworn,

18  was examined and testified as follows:

19        MS. WAGSTAFF:  All right.  Before we get

20  started, I would like to read a statement into the

21  record.

22        On November 14th, 2016, this Court

23  entered Pretrial Order Number 2, which bifurcated

24  discovery in this MDL to prioritize general causation

25  discovery.  This deposition is being taken pursuant
```

Confidential - Subject to Protective Order

1    to the limitations of that order and the limitations

2    of the Federal Rules of Civil Procedure.

3              This means that the questioning will be

4    focused on general causation, and not on early

5    knowledge, general liability, punitive damages,

6    specific causation, Monsanto sales and marketing,

7    regulatory and labeling, except to the extent those

8    topics or a portion of those subjects relate to

9    general causation.

10             Further, Monsanto has not completed

11   document production in this MDL, and hundreds, if not

12   thousands, of privilege challenges remain unresolved

13   and are not yet known due to the truncated time frame

14   of these depositions.

15             Finally, a number of the custodial files

16   in this phase of discovery is limited, and therefore

17   plaintiffs might learn more about today's

18   witnesses -- witness from files not produced in his

19   custodial file that is pertinent even to general

20   causation and the other topics as well.  Thus,

21   plaintiffs reserve the right to continue this

22   deposition as additional documents are produced

23   through document production or through privilege log

24   challenges.

25             Plaintiffs also expressly reserve the

Confidential - Subject to Protective Order

```
1    right to conduct a deposition of this same deponent

2    on topics or -- or documents not limited by the MDL

3    bifurcation Order Number 2 or the Federal Rules of

4    Civil Procedure.

5              MR. GRIFFIS:  And we don't necessarily

6    agree with those characterizations or positions.  We

7    will oppose any attempt to reopen the deposition and

8    will consider it closed permanently after today.

9              In addition, under Docket Number 64,

10   paragraph 8, of the confidentiality protective order

11   that's been entered in this case, we designate

12   this -- this deposition and all its contents as

13   confidential, and direct the court reporter and

14   videographer to maintain it as such.

15             MS. WAGSTAFF:  Understood.

16                  DIRECT EXAMINATION

17   BY MS. WAGSTAFF:

18        Q    Dr. Mart- -- can you please state your

19   name for the record.

20        A    Mark Martens.

21        Q    Okay.  And you're a doctor; is that

22   correct?

23        A    I'm a Ph.D. in pharmaceutical sciences

24   and toxicology.

25        Q    Okay.  Would you prefer I call
```

Confidential - Subject to Protective Order

1    you Dr. Martens or Mr. Martens?

2         A    Whatever you like.

3         Q    Which would you prefer?

4         A    Oh, you can call me Mr. Martens.  That's

5    fine with me.

6         Q    Okay.  So, Mr. Martens, have you had your

7    deposition taken before?

8         A    No.

9         Q    No.  Okay.

10        So I have handed you an exhibit, and it

11   is up on the screen to your right.  I've given your

12   counsel an exhibit.  And I will be talking to you and

13   asking you about documents.

14        A    Okay.

15        Q    I -- I'm sure your counsel has asked you

16   or given you some direction on how this procedure

17   will go.  You can take a break whenever you want to

18   take a break.  But all I ask is that if there's a

19   question pending that you finish it before you take a

20   break; is that fair?

21        A    Yes.

22        Q    Okay.  And I noticed on your CV that your

23   mother tongue, as you -- as you call it, is not

24   English; is that correct?

25        A    Yes, that is correct.

Confidential - Subject to Protective Order

```
 1           Q     Okay.  But it doesn't appear that you

 2     have any trouble understanding English, correct?

 3           A     No, that's correct.

 4           Q     Okay.  If there is anything that I ask

 5     you today that is sort of lost in translation or that

 6     you don't understand, as English is your second

 7     language, will you let me know?

 8           A     I will let you know.

 9           Q     Okay.  And if you don't let me know, is

10     it fair to -- to assume that you understood my

11     question?

12           A     Yes.

13                 MR. GRIFFIS:  Objection.  If he doesn't

14     know that he doesn't understand, he won't -- he won't

15     know to tell you.

16                 (Martens Exhibit No. 9-1 was marked

17                 for identification.)

18     BY MS. WAGSTAFF:

19           Q     Okay.  So what I've given you is marked

20     as Exhibit 9-1 is your CV.  Is that an accurate

21     version of your CV?

22           A     Yes, it is.

23           Q     Okay.  And it looks like -- if we can

24     just walk through a little bit of your CV, and how do

25     you -- you make this a little bit -- okay.
```

Confidential - Subject to Protective Order

1            So it looks like you have some -- some

2    areas of expertise; is that correct?

3        A    That is correct.

4        Q    Okay.  And what are your areas of

5    expertise?

6        A    My areas of expertise throughout my

7    career are, you know, toxicology in all its forms.

8    That means as well experimental, regulatory, as

9    evaluative toxicology.

10       Q    Okay.  And it looks like you had marked

11   down "experimental toxicology, regulatory

12   toxicology" -- I missed one -- "hazard and risk

13   assessment, and preclinical development" as your past

14   and current fields of expertise, correct?

15       A    Yes.  I can add that when I was at the

16   university, I was also involved in forensic

17   toxicology.

18       Q    Okay.  So an update to this would be that

19   you're also an expert in forensic toxicology?

20       A    Yes.

21       Q    Okay.  Excellent.

22            And it looks like -- like you mentioned

23   you've gotten your Ph.D. in the school of pharmacy in

24   1976; is that correct?

25       A    Yes.

Confidential - Subject to Protective Order

1        Q    And a rough math is around 40 years ago,

2   right?

3        A    Right.

4        Q    And so you --

5        A    Yep, 45 years ago, yeah.

6        Q    45 years ago?

7        A    Yes.

8        Q    And so it looks like your first degree in

9   pharmacy or toxicology was in 1972, and that is

10  roughly 45 years ago.  So you've been in the field of

11  toxicology for almost -- for between four and five

12  decades; is that correct?

13       A    Right.  Yes.

14       Q    Okay.  And right now, if you move to the

15  next page, it looks like your current position is a

16  consultant in preclinical development and toxicology;

17  is that correct?

18       A    That is correct.

19       Q    Okay.  So can you tell the jury a little

20  bit about what -- what your -- what that means, your

21  current job right now.

22       A    That means that as an independent

23  consultant, I'm asked as well by pharmaceutical

24  companies, chemical companies and agrochemical

25  companies to -- to provide them support in

Confidential - Subject to Protective Order

```
 1    interpreting and in analyzing toxicology studies.
 2         Q    Okay.  So -- and you've been doing that
 3    consulting job for roughly six years; is that
 4    correct?
 5         A    It's --
 6         Q    Almost seven?
 7         A    -- almost seven years.
 8         Q    Okay.  And is -- is Monsanto one of the
 9    companies that has hired you as a consultant in that
10    past seven years?
11         A    Yes.
12         Q    Okay.  And Monsanto has paid you for that
13    consulting position over the last seven years?
14         A    Yes.
15         Q    Okay.
16         A    It's actually the last five years,
17    because I was actually contacted by Monsanto in 2011
18    for a first contact.
19         Q    Okay.  So, just so we're on the same
20    page --
21         A    Mm-hmm.
22         Q    -- in 2011, Monsanto contacted you --
23         A    Mm-hmm.
24         Q    -- to consult for them; is that --
25         A    Right.
```

Confidential - Subject to Protective Order

```
 1        Q    -- correct?

 2             And what -- what sort of consulting job

 3   were you contacted for in 2011?

 4        A    That was actually for the analysis of

 5   mechanistic studies on another compound than

 6   glyphosate for Monsanto.

 7        Q    Okay.  And have you done consulting work

 8   for Monsanto since 2011 on glyphosate?

 9        A    Only the last year.

10        Q    Okay.  So, yes, you have?

11        A    Yes, I have.

12        Q    And then your -- your CV is very

13   extensive.  It goes on to --

14             MS. WAGSTAFF:  Is there any way we can

15   get this more in focus?  Maybe if we --

16             THE VIDEOGRAPHER:  There's the autofocus

17   button right there in the middle.

18             MS. WAGSTAFF:  Okay, that's fine.  Maybe

19   my eyes are just out of focus.  Is this in focus for

20   you guys?

21             MS. GREENWALD:  Not really.  Maybe it's

22   the angle.  I don't know.

23             MS. WAGSTAFF:  Okay.  Well, we'll just

24   proceed.

25   BY MS. WAGSTAFF:
```

Confidential - Subject to Protective Order

1          Q    So it goes on, your -- your CV goes on to

2    talk about your current and previous positions.  And

3    if you go through it, it says here that -- and this

4    is on page 3 of your CV, it says that you were

5    promoted to a Monsanto Science Fellow in 2002; is

6    that correct?

7          A    That's correct.

8          Q    And can you tell the jury what that --

9    what a Monsanto Science Fellow means?

10         A    A Monsanto Science Fellow is a

11   distinguished degree as a scientist in the Monsanto

12   organization.

13         Q    Okay.  So it's a distinguished scientist

14   within Monsanto, you were promoted to that?

15         A    Yes.  Right.

16         Q    Okay.  And is that a position within

17   Monsanto?

18         A    That is not a position.  That is a kind

19   of a degree which should be considered as a parallel

20   type of career path next to the managerial career

21   path and which is reserved for people who are

22   continuously involved in scientific projects and

23   scientific research.

24         Q    So when you were promoted to a Monsanto

25   Science Fellow in 2002, were you a current Monsanto

Confidential - Subject to Protective Order

1   employee at that time?

2       A    Yes.

3       Q    Okay.  So is -- are the Monsanto Science

4   Fellow promotions just for Monsanto employees?

5       A    That is just -- well, that is a system

6   that exists in every chemical, agrochemical and

7   pharmaceutical industry which allows career paths for

8   people who want to stick to scientific career paths.

9       Q    Okay.  You were a toxicology director in

10  Europe and Africa for Monsanto starting in 1992 and

11  ending in 2004; is that correct?

12      A    Actually, I started with Monsanto in

13  1989.

14      Q    Okay.

15      A    And then I was hired as a manager of

16  toxicology, and then afterwards I was promoted and I

17  graduate to director of toxicology, Europe and

18  Africa, yeah.

19      Q    Okay.  So that's a good clarification.

20  You began working for Monsanto in 1989?

21      A    Yes.

22      Q    And when did you quit working for

23  Monsanto?

24      A    At the end of 2003.

25      Q    Okay.  So then between 2003 and when they

Confidential - Subject to Protective Order

1    hired you to be a consultant in 2011, did you do any

2    work with Monsanto?

3         A    No.

4         Q    Okay.  And then it looks like, just kind

5    of going through your -- your CV a little bit, you

6    lived in the United States for a period of time; is

7    that correct?

8         A    Yes.

9         Q    Okay.  And you were actually, it looks

10   like, a professor or assistant professor at the -- at

11   St. Louis University in St. Louis, correct?

12        A    Yes.

13        Q    Okay.  And that's where Monsanto's

14   headquarters are, correct?

15        A    Yes.

16        Q    Okay.  And you were teaching toxicology

17   to college students.

18        A    No, no, not college students.

19        Q    Okay.

20        A    I was teaching toxicology to medical

21   postgraduates, and those were two branches that was

22   experimental and occupational and forensic

23   toxicology.

24        Q    Okay.  And you were also living in --

25   during that same period of time that you were

Confidential - Subject to Protective Order

1    teaching, you were a manager of product toxicology

2    and corporate toxicology at the Monsanto

3    headquarters, correct?

4         A    Yes.

5         Q    And then you go on to list a few other of

6    your toxicology positions, but the bottom line is

7    that you have been working in toxicology for 45

8    years, and there would be few people that wouldn't

9    consider you an expert in toxicology; is that

10   correct?

11             MR. GRIFFIS:  Objection to form.

12             THE WITNESS:  Yes.

13   BY MS. WAGSTAFF:

14        Q    Okay.  And just for the rest of the

15   deposition, unless your counsel tells you not to

16   answer --

17        A    Mm-hmm.

18        Q    -- you can answer.  Just you can give him

19   a moment to object and then you can answer.

20             And then if you look at -- you also

21   have -- let's make sure I'm on the right page.

22             On page 5 of your CV, you also have a lot

23   of experience with international and national

24   organizations.  Then you list a couple of pages of

25   those, the EU Commission and Council, the OECD

Confidential - Subject to Protective Order

1    chemicals group.  You go on to list -- list a bunch,

2    right?

3              On the next page, you have experience

4    with IARC, right?

5         A    (The witness nods.)

6         Q    You have experience with the European

7    Council for the chemical industry, if you go down

8    there.

9              You also have experience on the next page

10   with the European Crop Protection Association where

11   it looks like you were participating as a

12   representative of Monsanto, correct?

13        A    Yes, correct.

14        Q    So sometimes you engage with regulatory

15   or international associations on behalf of Monsanto;

16   is that correct?

17        A    Yes.

18        Q    Okay.  And you list -- you go through and

19   there's ten organizations that you list, so you have

20   experience with international organizations, correct?

21        A    That's correct.

22        Q    The bulk of your work has occurred in

23   Europe, correct?

24        A    Yes.

25        Q    And where do you currently live?

Confidential - Subject to Protective Order

1        A    I live in --

2             UNIDENTIFIED WOMAN ON PHONE:  Hello?

3             MS. WAGSTAFF:  Hey, who's who just joined

4    the call?

5             UNIDENTIFIED WOMAN ON PHONE:  This is the

6    Monsanto depo in St. Louis.  I think that they have a

7    mixup.

8             MS. WAGSTAFF:  Okay.  So we are -- we are

9    mid -- mid-depo here, so if you guys want to get a

10   new call-in number, that would be great.

11            UNIDENTIFIED WOMAN ON PHONE:  All right.

12   Goodbye.

13            MS. WAGSTAFF:  Goodbye.

14            That's the Acquavella depo.

15   BY MS. WAGSTAFF:

16        Q    All right.  So -- okay.  Okay.  So you --

17   where do you currently live?

18        A    I live in Lubbeek, which is a community

19   next to Leuven in Belgium.

20        Q    Okay.  And so while you have done work in

21   the United States, the bulk of your work has occurred

22   in -- in Europe, and specifically in Belgium; is that

23   correct?

24        A    When I was living in the United States, I

25   actually have two responsibilities.  The first year I

Confidential - Subject to Protective Order

1    was mainly working for the chemical company, because

2    at that time Monsanto was also a chemical -- mostly a

3    chemical company, where I was in charge of resolving

4    issues in manufacturing and in occupational health.

5            The second part I had more

6    responsibility.  I was at the World Park with

7    responsibility for industrial chemicals, but at the

8    same time I was in charge also for European defense

9    of agrochemicals in Europe.

10       Q    Okay.  And you lived in the United States

11   for two years; is that correct?

12       A    Two years, yes.

13       Q    And then back to Belgium, correct?

14       A    Yes.

15       Q    Okay.  And was that a transfer within

16   Monsanto that sent you back to Belgium?

17       A    That -- that was just, you know, a

18   residency, let's say, for two years, and, of course,

19   I agreed with Monsanto to return after two years.

20       Q    Okay.  So you also lecture on toxicology

21   and related sciences, correct?

22       A    Yes.

23       Q    And I counted up really quickly that you

24   have lectured at about seven institutes or

25   universities.  Does that sound correct?

Confidential - Subject to Protective Order

```
 1          A    That sounds correct, yeah.

 2          Q    You also have authored a book or

 3   coauthored a book -- actually, it looks like four

 4   books.  Is that -- or is that all just one book?

 5          A    No, it's one book.

 6          Q    Okay.  So you've authored -- coauthored a

 7   book on -- is that on toxicology as well?

 8          A    This is on preclinical development of --

 9   and toxicology is a part of preclinical development.

10          Q    Okay.  And you also hold patents.

11          A    Yes.

12          Q    Is that correct?

13               And then very impressively you speak four

14   languages as well, correct?

15          A    Yes.

16          Q    Okay.  So you can put that aside.

17               And we are going to talk a little bit

18   about toxicology today, and specifically about

19   glyphosate and Roundup.  And so before we get into

20   the documents and before we get into your role and

21   why you're being deposed, I just want to make sure

22   we're on the same page and maybe have you educate me

23   on a few things, okay?

24               What is oxidative stress?

25          A    Oxidative stress is a state of a cell
```

Confidential - Subject to Protective Order

1   where there is a production of free oxygen radicals,

2   which are inclined actually to damage several

3   molecules in the cell of which DNA.

4        Q    Okay.  And how long has the scientific

5   community known about oxidative stress?

6        A    I think that from 1990, '92, there was

7   science developing in that direction as a possible

8   mechanism of carcinogenicity.

9        Q    Okay.  So just we're on the same page,

10  you're saying since the early '90s that --

11       A    Yeah, early '90s it started to begin

12  practice as best possible, and then in certain

13  academia, they already, you know, had some knowledge

14  in that regard.  So it's -- you know, it's a steady

15  increase of scientific knowledge in that field.

16       Q    Okay.  So in the early 1990s, it's fair

17  to say that the scientific community was aware that

18  oxidative stress could increase -- could -- could

19  lead to an increased risk of cancer; is that correct?

20       A    That was in the beginning, and, you know,

21  there was more and more information that these were

22  possible mechanisms for carcinogenicity, yes.

23       Q    Sure.  And what is the mechanism of how

24  oxidative stress can increase the risk of cancer?

25            MR. GRIFFIS:  Objection.  No foundation

Confidential - Subject to Protective Order

1   for expertise on carcinogenicity, and this is not an

2   expert deposition.

3            MS. WAGSTAFF:  Can you repeat the

4   question?

5            THE WITNESS:  I -- I can answer it.

6   BY MS. WAGSTAFF:

7       Q    Oh, okay.  Yeah, answer.

8       A    I -- I heard it the first time.  I

9   understood the question.

10      Q    Okay.

11      A    No, the -- one of the mechanisms that

12  could lead to cancer is actually the oxidation of

13  DNA, ultimately leading to mutation and --

14           THE REPORTER:  Excuse me.  Can I get you

15  to -- can we go off the record for just one second?

16           MS. WAGSTAFF:  Sure.

17           THE VIDEOGRAPHER:  The time is now 9:41

18  a.m.  We're going off the record.

19           (Pause in the proceedings.)

20           THE VIDEOGRAPHER:  The time is now

21  9:43 a.m.  We are back on the record.

22  BY MS. WAGSTAFF:

23      Q    All right, Mr. Martens, although you did

24  explain the answer, we had to go off the record for a

25  moment before it could get recorded down.  So if I

1      could please ask you to repeat.

2              Do you remember the question?

3      A    Yes.

4      Q    Okay.  If I could ask you to please

5      repeat your answer so the court reporter can -- can

6      transcribe it, that would be great.

7      A    Right.  So oxidative stress is a state of

8      the cell where there is a production of free oxygen

9      radicals.  Now, free oxygen radicals are a very

10     reactive species, molecular species, and they bind to

11     the oxidized molecules in the cell of which DNA.  So

12     oxidation of DNA and there is oxidation of the

13     nucleotides in the DNA can lead, after cell division,

14     to mutation, which can be a permanent change in the

15     gene, and a permanent change in the gene can also

16     make changes in gene transcription, which can lead to

17     phenotypic change of the cell leading to cancer.

18     Q    Excellent.  Thank you.

19              One other question I -- I have for you is

20     the -- the concept of hazard assessment versus risk

21     assessment.  Are you familiar with those two terms?

22     A    Absolutely.

23     Q    Probably more familiar than me, I'm sure.

24              And -- and they're different assessments,

25     correct?

Confidential - Subject to Protective Order

1        A     Yes.

2        Q     Okay.  And is it fair to say that a

3    hazard assessment is considering whether an effect

4    can happen under any circumstance; is that fair?

5        A     That's fair.

6        Q     Okay.  And is it fair to say that a risk

7    assessment is considering under what specific

8    circumstance that effect will happen.

9        A     Yes.

10       Q     Okay.  I just wanted to make sure I had

11   those -- those straight in my head before we started

12   going.

13             The first topic we're going to get into

14   is, do you know Dr. James -- the late Dr. James

15   Parry?

16       A     Yes.

17       Q     Did he go by Jim Parry or James?

18       A     That was Jim.

19       Q     Jim?  Okay.

20       A     Yeah.

21       Q     Dr. Jim Parry.  And were you friends with

22   him?

23       A     Oh, we knew each other from scientific

24   congresses.  Friends is a little bit too close.

25       Q     Okay.  You were professional

Confidential - Subject to Protective Order

1   acquaintances?

2       A    Yes.  Put it that way.

3       Q    And what was -- was Dr. Parry a

4   toxicologist?

5       A    He was a toxicologist specializing in

6   genetic toxicology.

7       Q    Okay.  And was he an expert in his field?

8       A    Yes.

9       Q    Okay.  He was a good scientist, correct?

10      A    He was a good scientist, yes.

11      Q    Okay.  And are you -- he has since passed

12  away.  Has --

13      A    Mm-hmm.

14      Q    -- has -- am I correct?

15      A    Yes.

16      Q    I believe sometime in around 2010, '11.

17      A    I don't remember.

18      Q    It's been a few years.

19      A    But, yes, he's passed away when I was not

20  anymore with Monsanto.  So...

21      Q    Okay.  And Dr. Parry was living in Europe

22  as well, correct?

23      A    Yes.

24      Q    Okay.  And I believe he -- do you know

25  what country he was living in?

Confidential - Subject to Protective Order

```
 1          A    In the U.K. in Swansea.

 2          Q    Okay.  So he was living in England.

 3   Okay.

 4               And are you familiar with -- I'm going to

 5   go back a little bit in time.  I know the documents

 6   that you have reviewed to prepare for this

 7   deposition, your attorneys have sent us a list of

 8   those documents.  So while this is a long way back in

 9   time, I know that you have recently reviewed some of

10   these documents.  Hopefully that will help jog your

11   memory a little bit.

12               Are you familiar with the Bolognesi paper

13   from 1997?

14          A    Yes.

15          Q    Okay.  Am I pronouncing that right?

16          A    Bolognesi.

17          Q    Bolo -- okay.  Bolognesi.  The American

18   way I'm pronouncing it.

19          A    That's okay.

20          Q    Okay.  Are you familiar with the Peluso

21   paper --

22          A    Yes.

23          Q    -- from 1998?

24          A    Yes.

25          Q    Okay.  And are you familiar with the two
```

Confidential - Subject to Protective Order

```
 1   Dr. Lioi papers from -- both from 1998?

 2        A    Yes, I recall that these have been in our

 3   -- are considered, but I -- I didn't actually look at

 4   the papers themselves recently.

 5        Q    Okay.  But you're familiar with all four

 6   of those papers --

 7        A    Yes.  I know about them, yes.

 8        Q    Okay.  And I've got a copy of them here

 9   too, which I can have you look at if I get into too

10   specific details, which I -- I'm not going to go toe

11   to toe with you on toxicology.

12        A    All right.

13        Q    But if you feel you need to look at them,

14   you can certainly ask me for a copy, okay?  Is that

15   fair?

16        A    Yeah.

17        Q    Okay.  So all four of these papers deal

18   with the genotoxicity of glyphosate and/or Roundup,

19   correct?

20        A    Correct, yes.

21        Q    Okay.  And you put ourselves -- if we

22   transport back to the 1999 time period right before

23   the turn of the century, all four of those papers

24   came out, correct?

25        A    Yes.
```

Confidential - Subject to Protective Order

1          Q    They were all 1997 to 1999, correct?

2          A    Yeah, yeah.

3          Q    Okay.  And these papers weren't good for

4     the genotox profile of glyphosate and Roundup,

5     correct?

6               MR. GRIFFIS:  Objection to form.

7               THE WITNESS:  I will phrase it this way:

8     They were not in concordance with the existing

9     results on genotoxicity with -- on glyphosate.

10    BY MS. WAGSTAFF:

11         Q    Okay.  Fair enough.

12              And Monsanto thought that these papers

13    created problems for them, correct?

14         A    Well, problems, I wouldn't phrase it that

15    way.  That these papers actually elicited new results

16    which needed to be critically addressed.

17         Q    Okay.  And Monsanto was worried about the

18    results from these papers and the effect it would

19    have on the Roundup business, correct?

20         A    That is correct.

21              MR. GRIFFIS:  I object to questioning

22    about what Monsanto was thinking.  This witness is

23    not a corporate representative.  He hasn't been put

24    forward in that role.  He's here to testify about

25    himself and what he did.

Confidential - Subject to Protective Order

1   BY MS. WAGSTAFF:

2        Q    Correct?

3        A    Yeah.

4        Q    Okay.  And in fact, the Italian

5   government was also worried when those papers came

6   out, correct?

7        A    That seems to be correct, yeah.

8        Q    Okay.  And so in fact, to address these

9   concerns, Monsanto came to you, correct?

10       A    No, no, I discovered those papers as well

11   as a toxicologist in Europe.  So...

12       Q    Okay.  Excellent.

13            So did you go to Monsanto with these

14   papers or did Monsanto come to you, or do you not

15   recall because it's been so long?

16       A    Well, I don't recall that detail, but --

17   but we both were aware at the same time that these

18   papers had been published and these needed attention.

19       Q    Okay.  Excellent.

20            I'm going to hand you what's been -- what

21   we are going to mark as -- I guess this will be

22   Exhibit 2.  No, not Exhibit 2.  I need 5.

23            MS. WAGSTAFF:  Can you peel this sticker

24   off.  Okay.  We'll put the sticker on in just a

25   minute.

Confidential - Subject to Protective Order

```
 1                 (Martens Exhibit No. 9-2 was marked

 2                 for identification.)

 3    BY MS. WAGSTAFF:

 4         Q    And when I hand you e-mails,

 5    Mr. Martens, feel free to take all the time you need

 6    to read them, and if we need to go off the record to

 7    give you more time, we certainly can.  Okay?  I'm not

 8    trying to rush you through any documents.

 9         A    Okay.  Can I read them now?

10         Q    Sure.

11         A    Yeah.  (Peruses document.)

12         Q    Just tell me when you're ready.

13         A    Thank you.

14                 (Peruses document.)

15         Q    Are you ready?

16         A    No, I'm still reading.

17         Q    We're going to walk pretty slowly through

18    this document, so --

19         A    Okay.  (Peruses document.)

20         Q    All right.  So the way that e-mails work

21    is the -- they're sort of cascades, meaning that

22    replies are on top of each other, correct?

23         A    Yes, I was looking backwards, yeah.

24         Q    Yeah, looking backwards.  So to read the

25    true conversation, you have to start at the back of
```

Confidential - Subject to Protective Order

1    the document, correct?

2         A    Yes.  Yes.

3         Q    Okay.  So you are following me on that.

4              So this is a -- these are what the

5    e-mails from the 19 -- late 1990s look like when

6    they're printed out.  The first e-mail was from Donna

7    Farmer, and it was written on December 27th, 1998,

8    which is two days -- two or three days after

9    Christmas back in 1998.

10             And who is Donna Farmer?

11        A    Dr. Farmer is a product toxicologist

12   located in St. Louis at that time.

13        Q    Okay.  And she still is employed with

14   Monsanto, correct?

15        A    I believe so, yes.

16        Q    And at this time was Dr. Farmer your

17   boss?

18        A    No.

19        Q    No.  Was Dr. Farmer on the same sort of

20   level as you within the hierarchy of Monsanto?

21        A    At about the same level at that time,

22   yes.

23        Q    Okay.  And did you and Dr. Farmer work a

24   lot together at this point?

25        A    We had for this type of project

```
 1   communications.

 2        Q    Okay.  And did you and Dr. Farmer get

 3   along?

 4        A    Yeah.

 5        Q    Okay.  So this looks like Dr. Farmer was

 6   talking about a meeting that y'all had had on

 7   December 17th on mutagenicity; is that correct?

 8        A    That is correct, yes.

 9        Q    And the reason why I think that you were

10   at this meeting is that you write back to her two

11   days later, is that -- or -- yeah, two days later; is

12   that correct?  If you look above.

13        A    Yeah, it seems to be correct, yes.

14        Q    You can also follow me on that screen

15   right there while I'm highlighting if you -- if

16   that's easier.

17        A    Oh, yeah.  Okay.

18        Q    So you had a meeting on December 17th of

19   1998, and ten days later she writes an e-mail to

20   y'all, probably slowed down with the holidays, of

21   course, and about what had happened on December 17th.

22             And so she has action items from --

23   "Action items from the meeting, from today's call."

24   So it looks like she had written that simultaneously,

25   and then just circulates that later.
```

Confidential - Subject to Protective Order

1              So MON 35050, what is that?

2        A     That is a formulation that has been used

3    by Peluso and Bolognesi for their test system.

4        Q     Okay.  So would it be fair to call those

5    the Italian papers?  Are they both from Italy?

6        A     It would be fair to call it the Italian

7    formulation.

8        Q     Okay.  The Italian formulation.  Okay.

9              I was talking about the Bolognesi and the

10   Peluso papers, we could lump them together as Italian

11   papers, so I don't have to keep saying --

12       A     Yeah.  Yeah.  Yeah.

13       Q     Okay.  So this is the -- this is the

14   formulation that was used in the Italian papers,

15   correct?

16       A     Yes, correct.

17       Q     Okay.  So you guys are now knowing about

18   this, this is in late 1998, and you are talking about

19   doing tests on formulation blanks of the Italian

20   formulation, correct?

21       A     Yes.  That was the idea, yeah.

22       Q     Okay.  And if you turn to the next page,

23   and if you go down, we talk about -- this is where

24   Dr. Parry is first talked about.

25       A     Mm-hmm.

Confidential - Subject to Protective Order

1          Q    You have other topics, as you can see, as

2     the jury can see, that they had talked about, but in

3     relative part, it says that:  "Agreed that an

4     external global network of genotox experts need to be

5     developed."

6               Do you see that?

7          A    Yes.

8          Q    Okay.  "As EU has an immediate" --

9     something there -- "as EU has an immediate need and

10    is critical area now, it was agreed that Mark

11    Martens" --

12              That's you, correct?

13         A    Yes.

14         Q    -- "would contact Dr. Parry next week to

15    discuss with him his participation in the support of

16    glyphosate -- glyphosate-based formulations, genotox

17    issues."  Correct?

18         A    Correct.

19         Q    And that's because you're an expert in

20    toxicology, right?

21         A    Yes.

22         Q    And Dr. Parry is an expert in genotox --

23    toxicology, correct?

24         A    Yes.

25         Q    So you two would make the perfect pair to

Confidential - Subject to Protective Order

1   work on this issue, correct?

2       A    That's correct.

3       Q    Okay.  Then it goes on later to say:

4   "For North America, Gary Williams will be here in

5   early February as part of the Cantox project."

6            Okay.  Who is Gary Williams?  Do you know

7   him?

8       A    Yes, I know Gary Williams.  He is an

9   authority in the United States on the mechanisms of

10  carcinogenicity and genotoxicity.

11      Q    Okay.  And is he a Monsanto employee?

12      A    No.

13      Q    Do you know, to your knowledge, has he

14  ever been a Monsanto employee?

15      A    No.  Never.

16      Q    He never has or you don't know?

17      A    He never has to my knowledge, no.

18      Q    Okay.  And then it says:  "Larry Kier

19  will -- as" -- as, I think it means to say has --

20  "graciously agreed to join in those discussions."

21            And who is Larry Kier?

22      A    Dr. Larry Kier was the head of the

23  laboratory of genotoxicology of the Environmental

24  Health Laboratory of Monsanto in St. Louis.  So he

25  was the head genotoxicology expert within the

Confidential - Subject to Protective Order

```
 1    organization.

 2         Q    Okay.  And he is a Monsanto employee?

 3         A    He is a Monsanto employee.

 4         Q    Or at least at some point a Monsanto --

 5         A    Yes.

 6         Q    -- a long-term Monsanto employee?

 7         A    Yes.

 8         Q    Okay.  And do you know what the Cantox

 9    project is that -- that is referenced here?

10         A    I've got a vague -- well, Cantox rings a

11    bell, but I don't recall exactly what it was at the

12    time, but I was explained that it -- you know, it

13    developed into another organization, Intertek.  It's

14    some kind of a Canadian consultancy organization.

15         Q    Okay.  So then these dots indicate we're

16    moving on to the next topic.  Number 2 is:

17    "Unfortunately, our time ran out, but Larry, Bill and

18    Donna stayed a little while longer and discussed the

19    Lioi papers."

20              And we've discussed those already,

21    correct?

22         A    What do you mean "discussed"?

23         Q    Well, we -- we've mentioned those already

24    this morning, right?

25         A    Oh, yes.  Yes.  Exactly, yes.
```

Confidential - Subject to Protective Order

```
 1          Q    Okay.  And Dr. Farmer goes on to say
 2     that:  "It is a real concern that these papers may
 3     create an even bigger problem for us than the Peluso
 4     papers.  Therefore, we do something quickly."
 5               Is that correct?
 6          A    I suppose it's correct.
 7          Q    Okay.
 8               MR. GRIFFIS:  Object to the reading.  It
 9     was not quite right.
10     BY MS. WAGSTAFF:
11          Q    Okay.  Well, I definitely want to get it
12     right.  It's a real -- so Dr. Farmer writes:  "It's a
13     real concern that these papers," meaning the Lioi
14     papers, "may create an even bigger problem for us
15     than the Peluso paper.  Therefore, we do some things
16     quickly."
17               MR. GRIFFIS:  Things, right?
18               THE WITNESS:  That is the opinion of
19     Dr. Donna Farmer.
20     BY MS. WAGSTAFF:
21          Q    Okay.  And did you have any -- did you
22     disagree with that opinion?
23          A    I didn't agree completely actually.
24          Q    Okay.  Did you agree that the Peluso
25     paper created a problem for Monsanto?
```

Confidential - Subject to Protective Order

 1        A    I agreed that the Peluso was a new type

 2   of finding and needed to be addressed.

 3        Q    Okay.  And so one of the ways that --

 4   that Monsanto was deciding to address it was to have

 5   a letter sent from Monsanto Italy or Brussels saying

 6   that the -- the data doesn't agree with other data.

 7        A    Mm-hmm.

 8        Q    Therefore, we are interested in

 9   investigating and we would like samples of what they

10   tested.

11             So one of the ways that Monsanto was

12   going to deal with that was to write a letter to the

13   author, request a sample and retest it; is that

14   correct?

15             MR. GRIFFIS:  Objection to form.  It

16   mischaracterizes the document, which says

17   "recommendations."

18             THE WITNESS:  I can only take notice of

19   what is on the memo.

20   BY MS. WAGSTAFF:

21        Q    Okay, that's fair.

22             All right.  So we can -- we're done with

23   that document.

24             (Martens Exhibit No. 9-3 was marked

25             for identification.)

Confidential - Subject to Protective Order

```
 1   BY MS. WAGSTAFF:

 2        Q    I'm going to hand you what will be marked

 3   as Exhibit 3.

 4             MS. WAGSTAFF:  There is your copy, Robin.

 5             THE WITNESS:  May I take my time to read

 6   it?  It's quite a lot of material.

 7   BY MS. WAGSTAFF:

 8        Q    Sure.  I'm going to walk you through it

 9   just like I did the last one, so you --

10        A    Oh, okay.

11        Q    So if you look at -- again, this is an

12   e-mail, and it starts -- oh.

13             MR. GRIFFIS:  Were you done looking at

14   it, Dr. Martens?

15             THE WITNESS:  I would like to look at it

16   first, you know, just -- just to try to recall what

17   happened.  Is that fine?

18   BY MS. WAGSTAFF:

19        Q    Yeah.  So should I be calling you

20   Dr. Martens?  He just called you Dr. Martens.  I

21   don't want to be disrespectful.

22        A    You are not disrespectful --

23        Q    Okay.

24        A    -- when calling me mister.

25        Q    I did ask you.
```

Confidential - Subject to Protective Order

```
 1        A    Not at all.

 2             MR. GRIFFIS:  All these -- all these

 3   other toxicologists, though, like Dr. Farmer --

 4             MS. WAGSTAFF:  I know.  I asked him,

 5   though.

 6             MR. GRIFFIS:  -- Dr. Farmer, Dr. Parry,

 7   they have the same qualifications as he does.

 8             MS. WAGSTAFF:  But you -- I asked him

 9   flat out what he would prefer, and he said

10   Mr. Martens.  It's on video --

11             MR. GRIFFIS:  Because he's polite.

12             MS. WAGSTAFF:  And it's not polite to

13   ask?

14             MR. GRIFFIS:  It's polite not to thrust

15   your degree forward and insist on being called

16   doctor, but it's polite to call him doctor anyway.

17   You can do what you want.

18             Do you have a complete document?  My copy

19   doesn't have any pages after 108, and it looks like

20   the e-mail --

21             MS. WAGSTAFF:  No, because if you look at

22   it, these were produced improperly.  They -- you can

23   look at the Bates, they're out of order, and we had

24   to scramble to put those two together, and we don't

25   know where the last page is.  I have even on my
```

Confidential - Subject to Protective Order

 1   notes, is there another page, to request it from you

 2   guys, but this is how it was produced.

 3           MR. GRIFFIS:  Well, I object to the

 4   document as incomplete.

 5           THE WITNESS:  (Peruses document.)

 6   BY MS. WAGSTAFF:

 7       Q   All right.  Ready?

 8           So if you look again at this e-mail

 9   exhibit, again it's a cascade, and it looks like we

10   are about a month later after the last e-mail that we

11   looked at.  We are now -- Dr. Farmer is now writing

12   an e-mail on January 27th, '99, and the last one was

13   December 27th, so we're exactly a month later.

14           And she's talking about minutes from a

15   meeting on 1/15; is that correct?

16       A   Yes.

17       Q   Okay.  And you were in fact in attendance

18   in that meeting.

19       A   Yes.

20       Q   Correct?  Okay.

21           So she's talking about -- Dr. Farmer is

22   talking about what will -- the notes from that

23   meeting.  Okay?

24           And so if you look at number 1, she is

25   talking about:  "Donna will ask Bill Graham for

```
 1    clarification" -- Donna being Dr. Farmer, correct?

 2         A    Yes.

 3         Q    -- "on what exactly the official request

 4    was by the Italian government."

 5              And we've already talked about that,

 6    correct?

 7         A    Yes.

 8         Q    Okay.  The Italian government wanted some

 9    follow-up done on the Italian papers, correct?

10         A    Yes.

11         Q    Okay.  And number 2 was that:  "Donna" --

12    again being Dr. Farmer -- "will discuss the

13    mutagenicity issue with Kerry Preete and Mike Stern."

14              Number 3 was:  "The group recommended

15    testing the full formulations."  Correct?

16         A    That's what it says, yes.

17         Q    Okay.  And what does the "full

18    formulations" mean?

19         A    The full formulation is actually the

20    active ingredient together with the co-formulants.

21         Q    Okay.  So Roundup?

22         A    For example, yes.

23         Q    Okay.  Instead of testing just glyphosate

24    or just the surfactants, the "full formulation" means

25    the finished product of Roundup.
```

Confidential - Subject to Protective Order

1        A     Yes.

2        Q     Correct?  Okay.

3              And then we -- we scroll down here a

4    little bit more, and we talk about:  "One of the full

5    formulations discussed was MON 35050, which we had

6    already determined was the product used in the Peluso

7    and Bolognesi papers," which we've called the Italian

8    formula.

9        A     Mm-hmm.

10       Q     "The team was to develop a positive press

11   release."  Correct?

12       A     That's what it says.

13       Q     Okay.  And then we get to the next page,

14   where we will spend a little bit of time.  We had

15   touched before about Dr. Parry.  This group again,

16   which if I can go back to here, in attendance was

17   Donna Farmer, which we talked about Dr. Farmer

18   earlier, Bill Heydens.

19             Can you tell me who Bill Heydens is?

20       A     Dr. Bill Heydens was my colleague in the

21   United States, mostly responsible in the beginning

22   for glyphosate, and then after also other products.

23   He's a toxicologist.

24       Q     Okay.  And we -- you told me Donna Farmer

25   was a toxicologist in the United States, and you told

Confidential - Subject to Protective Order

1    me that Larry Kier was a toxicologist in the United

2    States.

3           A    Yes.

4           Q    And then that's you.  And then Alan

5    Wilson, can you tell me who Alan Wilson is?

6           A    Alan Wilson was the -- the toxicologist

7    working at the Environmental Health Laboratory

8    responsible for biochemical mechanisms and mechanisms

9    of toxicity.

10          Q    Okay.  So Alan Wilson was located where?

11          A    He was located at the Environmental

12   Health Laboratory in St. Louis.

13          Q    Okay.  And was Alan Wilson a Monsanto

14   employee?

15          A    Yes.

16          Q    Okay.  So this is a Monsanto meeting,

17   correct?

18          A    Yes.

19          Q    Okay.  With all toxicologists.

20          A    Mm-hmm.

21          Q    And everyone at that meeting is located

22   in the United States except for you, correct?

23          A    Yes.

24          Q    Okay.  Now, if we go back to this -- so

25   we're talking about the external global networks of

Confidential - Subject to Protective Order

1    genotox experts at this meeting, and when talking

2    about the EU, which is -- you know, what's the EU?

3         A    The European Union.

4         Q    Okay.  So that would fall under your

5    purview, correct?

6         A    Yes.

7         Q    Okay.  We already talked about that

8    Dr. Parry is a recognized genotox expert, right?

9         A    Yes.

10        Q    Okay.  What is not known is how he views

11   some of the nonstandard endpoints.  Correct?

12        A    Yes.

13        Q    Okay.  And those nonstandard endpoints

14   are the endpoints that were evaluated in the Rank

15   article and the Bolognesi article, correct?

16        A    Yes.

17        Q    Okay.  So your group of Monsanto

18   toxicologists were saying that, although Dr. Parry is

19   an expert in genotox toxicology, we don't know what

20   his views are on this paper, correct?

21             MR. GRIFFIS:  Object to the

22   characterization of the e-mail.

23             You may answer.

24             THE WITNESS:  Well, we want to know his

25   opinion on these papers.

Confidential - Subject to Protective Order

1    BY MS. WAGSTAFF:

2        Q    Yeah, you were just saying --

3        A    Yeah.

4        Q    -- you don't know -- he is an expert, but

5    we don't know what his opinions are, correct?

6        A    Yes.

7        Q    Okay.  And so to figure out his opinions,

8    and it says, Before we ask him, meaning Dr. Parry, to

9    get more deeply involved, which is reviewing all the

10   literature, data, or to represent you as a

11   consultant, you wanted to ask Dr. Parry to review a

12   subset of the articles, correct?

13       A    Right.

14       Q    Once again, everyone turns to you, right?

15       A    Mm-hmm.

16       Q    Okay.  So it was proposed that Mark

17   Martens, that's you, would contact Dr. Parry and ask

18   him for a written review of the articles by Rank,

19   Bolognesi, Peluso and Lioi, correct?

20       A    Correct.

21       Q    And I had failed to mention earlier the

22   Rank article, but are you familiar with that article?

23       A    Very vaguely.

24       Q    Okay.  At one point you were?

25       A    Mm-hmm.

Confidential - Subject to Protective Order

```
 1        Q    And then based on his --

 2             MR. GRIFFIS:  Excuse me a moment.  I -- I

 3    believe that several times you've just nodded --

 4             MS. WAGSTAFF:  Oh, sorry.

 5             MR. GRIFFIS:  -- In response to a

 6    question as you did just now.  Would you please say

 7    "yes" or "no" so that we have both the transcript and

 8    the video correct on those things.

 9             THE WITNESS:  Could you then reformulate

10    the question?

11             MR. GRIFFIS:  I think you meant to say

12    "yes," and it's a --

13    BY MS. WAGSTAFF:

14        Q    It's an unnatural way of communicating --

15        A    Oh, okay.  Yeah, okay.

16        Q    -- because you have to actually --

17        A    I'm sorry.  Yes.

18        Q    -- audibly respond.

19             So -- all right.  And then -- so just to

20    recap where we are so far, the group of Monsanto

21    toxicologists decided that you would contact

22    Dr. Parry, and because you don't know his opinion on

23    these four papers, you would give him these four

24    papers and you would ask him for a critique of those

25    four papers, correct?
```

Confidential - Subject to Protective Order

```
 1        A     Yes.

 2        Q     Okay.  And then based on his critique of

 3   the genotox papers, your group would decide whether

 4   or not you would expand his role, correct?

 5        A     Yes.

 6        Q     Okay.  Okay.  Once again, y'all are

 7   talking about the Lioi papers, the two Lioi papers,

 8   and once again, Dr. Farmer says that the Lioi papers

 9   may present an even bigger problem because the

10   studies are with glyphosate and are on a more

11   standard endpoints, correct?

12        A     Yes.

13        Q     Okay.

14        A     But the -- I interpreted the Lioi paper

15   and came to the conclusion it's a very low quality

16   paper.

17        Q     Okay.  Sure.  And we'll get to that.

18        A     Right.  Okay.

19        Q     We will -- I'll get your opinion on that,

20   and if -- if I fail to, your attorney can follow up

21   and ask you about that.

22        A     Mm-hmm.  Yes.

23        Q     But as of right now, we're sitting here

24   in January of -- of '99, this group of Monsanto

25   toxicologists are once again stating that because
```

Confidential - Subject to Protective Order

1    it's a standard -- has more standard endpoints, the

2    Lioi presents an even bigger problem for Monsanto; is

3    that correct?

4        A    That is correct.

5        Q    Okay.  If we then move on to the

6    beginning, because, remember, we've got to go

7    backwards on this.

8             MS. WAGSTAFF:  Yeah.  Okay.  Okay.  Let's

9    see here.  These are out of order, so they're

10   confusing me a little bit.

11            (Martens Exhibit No. 9-4 was marked

12            for identification.)

13            MS. WAGSTAFF:  No, I got it.  I want 110.

14   BY MS. WAGSTAFF:

15       Q    Okay.  So in response to Dr. Farmer

16   writing these notes, you respond, correct?

17       A    That's what I see, yes.

18       Q    Okay.  And you state, among other things,

19   that you reviewed her notes of the minutes and you're

20   in agreement with the discussions that you all had,

21   correct?

22       A    Can I read this first, please?

23       Q    Sure can.

24       A    (Peruses document.)

25       Q    All right.  So while -- while you --

Confidential - Subject to Protective Order

1    while you may not remember if those meet -- if that's

2    exactly how the meeting happened now sitting here in

3    2017 --

4         A    Mm-hmm.

5         Q    -- one day later you responded to the

6    group and you said, I agree, right?

7              MR. GRIFFIS:  Objection.

8              MS. WAGSTAFF:  Okay.

9              THE WITNESS:  Yeah.

10             MR. GRIFFIS:  That's not what it says.

11   BY MS. WAGSTAFF:

12        Q    It said that you were in agreement with

13   the discussion that you had in St. Louis, correct?

14             MR. GRIFFIS:  Objection.  Same objection.

15   It's not what it says.

16             THE WITNESS:  Yeah, it was reflecting the

17   meeting.

18   BY MS. WAGSTAFF:

19        Q    Yeah, okay.  And then you also told the

20   group that in the meantime you contacted Dr. Parry,

21   and a letter of authorization with his papers -- with

22   the papers is underway to him, correct?

23        A    Mm-hmm.  Yes, that is what it says.

24        Q    Okay.  So you were acting on the

25   decisions that had been made at that meeting,

Confidential - Subject to Protective Order

1    correct?

2         A    Yes.

3         Q    Okay.  Oh, and it said that -- I forgot

4    an important part -- it said a report is expected by

5    mid-February.

6              So we're now sitting here in January

7    of -- of -- 28th, and so you're telling the group

8    that Dr. Parry will have his report within a few

9    weeks, correct?

10        A    That's what it says, yes.

11        Q    Okay.  Here is this.

12             (Martens Exhibit No. 9-5 was marked

13             for identification.)

14   BY MS. WAGSTAFF:

15        Q    So let's look at Dr. Parry's report.

16             MS. WAGSTAFF:  Did I give you a copy?

17   BY MS. WAGSTAFF:

18        Q    With respect to the last exhibit, just

19   administratively, they were -- the document was

20   produced in a funky manner.  So the Bates for the

21   document are MONGLY0131209, followed by

22   MONGLY01312110, followed by MONGLY01312107, followed

23   by MONGLY01312108.

24             MR. GRIFFIS:  And I noted my objection

25   that 2108 is not the last page of this thread, and we

Confidential - Subject to Protective Order

 1   don't have a complete --

 2              MS. WAGSTAFF:  Sure.

 3              MR. GRIFFIS:  -- one as Exhibit 3.

 4              Before you go on to the questioning, I

 5   want to make an objection to the procedure of

 6   creating a videotape with highlighted documents from

 7   the ELMO with you highlighting particular passages to

 8   draw it to the witness's attention.  That's not

 9   necessarily the way the court would allow you to

10   proceed at trial, and we don't agree that the

11   creation of a video in that manner will predispose

12   how it should be handled at trial, and we reserve the

13   right to make any objections.

14              MS. WAGSTAFF:  Okay.

15              MR. GRIFFIS:  It's fine to proceed that

16   way today --

17              MS. WAGSTAFF:  Yeah.  Sure.

18              MR. GRIFFIS:  -- but we're not -- we're

19   not agreeing that that is an appropriate thing to

20   show to the jury in that way.

21              MS. WAGSTAFF:  Okay.  And I do request

22   that you produce the rest of that e-mail if you -- if

23   you have it, Exhibit 2.

24   BY MS. WAGSTAFF:

25         Q    All right.  So --

Confidential - Subject to Protective Order

```
 1              MR. GRIFFIS:  Three, I believe.

 2              MS. WAGSTAFF:  Exhibit 3.

 3  BY MS. WAGSTAFF:

 4       Q    So moving on to Exhibit 4.  So this is

 5  Dr. Parry's report critique of the --

 6              MS. WAGSTAFF:  I need the one with the

 7  exhibit number on it.

 8              Did I give you the one with the exhibit

 9  number on it?  No?

10              (Counsel conferring.)

11  BY MS. WAGSTAFF:

12       Q    All right.  So, here we are two weeks

13  later, and this is a fax sent on February 15th --

14  because in Europe you put the month and date opposite

15  of us, correct?

16       A    Yes.

17       Q    -- 1999, and it's a fax from you, from

18  Dr. Mark Martens, and the subject is "Dr. Parry's

19  Report," correct?

20       A    Correct.

21       Q    And you are sending it to Alan Wilson,

22  Donna Farmer and Bill Heydens, correct?

23       A    Correct.

24       Q    So you're sending it to everyone that was

25  at that meeting a few weeks earlier.
```

Confidential - Subject to Protective Order

1        A    Yes.

2        Q    Correct?

3             And you say:  "Dear Alan, Donna and Bill:

4   Please find herewith Professor Parry's evaluation of

5   the four papers."  Correct?

6        A    Yes.

7        Q    And what were those four papers?

8        A    That was the Lioi paper, the Peluso

9   paper, the Bolognesi and the Rank paper.

10       Q    Okay.  And you said you sent him on

11  genotoxicity of glyphosate and Roundup, correct?

12       A    Yes.

13       Q    Okay.  And you're asking for comments and

14  guidance on what to do next, correct?

15       A    Yes.

16       Q    And then you signed it, "Best regards,

17  Mark," and that's your signature, right?

18       A    That is correct.

19       Q    Okay.  And so the next page of this

20  document appears to be a cover sheet from Dr. Parry

21  to you.  Correct?

22       A    Yes.

23       Q    Okay.  Professor James M. Parry.  Where

24  was he a professor?

25       A    At Swansea university in the U.K.

Confidential - Subject to Protective Order

```
1        Q    Okay.  And he wrote you this on
2   February 11th, 1999, to Dr. Martens, correct?
3        A    Yes.
4        Q    The toxicology director of Monsanto
5   Europe.  He's telling you -- what is he telling you
6   in this paper?  Or in this cover sheet?
7        A    Should I read it?  Is that what you want
8   me to do or --
9        Q    Well, never mind.  Strike that.
10            So if you turn the page -- strike that
11  question.
12            If you turn the page, next is -- appears
13  to be Dr. Parry's CV, correct?
14       A    Yes.
15       Q    Okay.  And do you have any reason to
16  think that this is not accurate, his CV?
17       A    No.
18            MR. GRIFFIS:  Objection.  Foundation.
19  BY MS. WAGSTAFF:
20       Q    And then if you go to page -- if you look
21  at the very bottom over here, Doctor, you see that
22  there are Bates numbers, and I'm going to reference
23  just the last two numbers.
24       A    Oh, yes.
25       Q    They say MONGLY.
```

Confidential - Subject to Protective Order

```
 1        A    Right.

 2        Q    Just so that we're on the same page.  So

 3   if you go to the page that ends with 97.  Are you

 4   there?

 5        A    Yes.

 6        Q    Okay.  This appears to be the beginning

 7   of Dr. Parry's report.  Correct?

 8        A    Yes, correct.

 9        Q    Okay.  And he goes through the papers

10   that Monsanto asked him to review, correct?

11        A    Yes.

12        Q    Okay.  And the first one is the Rank,

13   et al., paper and that was in 1993, right?

14        A    Right.

15        Q    Okay.  And this is a Roundup mixture that

16   was tested, correct?

17        A    Yes.

18        Q    Okay.  And the conclusion that Dr. Parry

19   found was that:  "In vitro evidence of genotoxic

20   effect for Roundup mixtures inadequate in vivo

21   studies."

22             So tell me what "in vitro" means.

23             MR. GRIFFIS:  Objection to the predicate

24   which misstates the paper.

25             THE WITNESS:  I will explain to you
```

Confidential - Subject to Protective Order

1    in vitro.

2    BY MS. WAGSTAFF:

3         Q    Sure.

4         A    Yeah.

5         Q    Please.

6         A    In vitro testing occurs normally with

7    cells or bacteria or tissues in culture.  So that

8    means literally in vitro, you know, either in petri

9    dishes or in culture dishes.

10        Q    Okay.  And that's an accepted method of

11   conducting studies, correct?

12        A    Yes.

13        Q    Okay.  In toxicology that's very

14   accepted?

15        A    Yes.

16        Q    Okay.  And so Dr. Parry's conclusion was:

17   "In vitro evidence of genotoxic effect for Roundup

18   mixture," right?

19             MR. GRIFFIS:  Same --

20             THE WITNESS:  That's --

21             MR. GRIFFIS:  Excuse me.  Same objection,

22   mischaracterizes the document.

23   BY MS. WAGSTAFF:

24        Q    That was the conclusion that Dr. Parry

25   came to?

Confidential - Subject to Protective Order

1        A    That was his conclusion, yes.  Mm-hmm.

2        Q    Okay.  And then next we looked at the --

3   one of the Italian papers, which is Bolognesi, and

4   that was from a couple of years later in 1997, right?

5        A    Yes.

6        Q    Okay.  Then if you turn to the next page,

7   which is ending with 98, we get to his conclusions

8   on -- Dr. Parry's conclusions on the Bolognesi paper.

9   Okay.

10            And he also found a positive response

11  in vitro SCE -- should that be SEC?  No, no, SCE --

12  let me start that over.

13            And his conclusions were Dr. Parry found

14  a positive response in vitro SCE for both compounds.

15            And the both compounds being glyphosate

16  and Roundup, correct?

17            MR. GRIFFIS:  Objection to the predicate

18  in the question.

19            You may answer.

20            THE WITNESS:  Yes.

21  BY MS. WAGSTAFF:

22       Q    Okay.  So in -- in the Bolognesi test,

23  the authors were studying both glyphosate and

24  Roundup, correct?

25       A    That's correct.

Confidential - Subject to Protective Order

1      Q    Okay.  So when Dr. Parry is talking in

2   his conclusions about, quote, both compounds, he's

3   referencing glyphosate and Roundup, correct?

4      A    Yes.

5      Q    Okay.  So Dr. Parry -- Dr. Parry

6   concluded that there was a positive response in vitro

7   SCE for both glyphosate and Roundup, correct?

8      A    That's what it says.

9           MR. GRIFFIS:  Objection to form,

10  incomplete question.

11          MS. WAGSTAFF:  Are you done?

12          MR. GRIFFIS:  With regard to this --

13  yeah -- with regard to this study.  Carry on.

14  BY MS. WAGSTAFF:

15     Q    And SCE is another marker looking at the

16  structure of genetic material, correct?

17     A    That is sister chromatid exchanges.

18     Q    Okay.  And it --

19     A    This is an indicator top of test of which

20  the biological mechanism is unknown and with some

21  kind of experimental endpoint which was not accepted

22  by regulatory authorities for assessment of

23  genotoxicity.

24     Q    Okay.  And he found -- Dr. Parry found

25  that the response was ten times lower concentration

Confidential - Subject to Protective Order

```
 1   for Roundup mixture, correct?

 2           MR. GRIFFIS:  Objection to form,

 3   "Dr. Parry found."

 4           MS. WAGSTAFF:  That's a good -- that's a

 5   good objection.  Let me -- let me rephrase that.

 6   BY MS. WAGSTAFF:

 7       Q   Dr. Parry concluded that the response was

 8   at ten times lower concentration for Roundup mixture,

 9   correct?

10       A   That's what he said, yes.

11       Q   Okay.  Dr. Parry also found that both

12   glyphosate and Roundup mixture produced an increase

13   in DNA strand breaks in the mouse liver and kidney,

14   correct?

15           MR. GRIFFIS:  Objection to form,

16   "Dr. Parry found."

17           MS. WAGSTAFF:  Geez, I need to quit doing

18   that.  Sorry.  Strike that.  Doctor --

19           MR. GRIFFIS:  To be clear, you're just

20   making it sound like he performed --

21           MS. WAGSTAFF:  I know, I know.  I just --

22           MR. GRIFFIS:  -- experiments rather than

23   evaluated.

24           MS. WAGSTAFF:  Yeah, I'm trying to

25   correct it based on your objection because I think
```

Confidential - Subject to Protective Order

1    it's a fair objection.  So...

2    BY MS. WAGSTAFF:

3        Q    Dr. Parry concluded that both glyphosate

4    and Roundup mixture produced an increase in DNA

5    strand breaks in mouse liver and kidney, correct?

6        A    That's what he says, yes.

7        Q    Okay.  And next he found that glyphosate

8    increased 8-OHdG in mouse liver, which is a marker of

9    oxidative stress, correct?

10       A    Yes.

11       Q    Okay.  And then he found that the Roundup

12   mixture increased O dash -- or 8-OHdG in mouse liver

13   and kidney, correct?

14       A    Yes.

15            MR. GRIFFIS:  Objection to form --

16   BY MS. WAGSTAFF:

17       Q    So he found --

18            MR. GRIFFIS:  -- what Dr. Parry found.

19   BY MS. WAGSTAFF:

20       Q    So he concluded oxidative stress --

21   Dr. Parry concluded oxidative stress with respect to

22   glyphosate and with respect to Roundup, correct?

23       A    Yes, that was what he concluded, yes.

24       Q    Okay.  And this was in 1999, correct?

25       A    Yes.

Confidential - Subject to Protective Order

1          Q    Okay.  Next we're moving to the Peluso

2     paper, which was one of the Italian papers we

3     discussed, and we talk about the conclusion that

4     Dr. Parry found for the Peluso paper.  And that is

5     that Roundup mixture produced an increase in DNA

6     adducts in the mouse liver and kidney, correct?

7          A    Yes, that was what he concluded.

8          Q    Okay.  And then let's move over to --

9          A    May I -- may I say --

10         Q    Sure.

11         A    -- something?

12              He also concluded that there was no

13    increase in the production of DNA adducts in the

14    presence of glyphosate.

15         Q    Sure.

16         A    And that's important.

17         Q    That's fair.  Okay.  Sure.

18              So -- so what you're saying is that he --

19    he determined that with glyphosate there wasn't, but

20    with Roundup mixture there was?

21         A    Yes.

22         Q    Okay.  Fair enough.

23              Next if we turn to the Lioi 1998 paper,

24    and if you turn the page to 00 and you look at

25    conclusions there, it looks that Dr. Parry found --

Confidential - Subject to Protective Order

1    or Dr. Parry concluded that there was an increase in

2    the chromatid aberrations of SCE following glyphosate

3    exposure, correct?

4         A    That is what he concluded, yes.

5         Q    Okay.  Now if you turn to 01, we're

6    talking about his conclusions still, and he found --

7    Dr. Parry found sister chromatid exchanges induced in

8    human lymphocytes by both glyphosate and Roundup

9    mixture, correct?

10        A    That's what he found -- that's what he

11   concluded, yes.

12        Q    That's what he concluded, yeah.

13             And he also concluded that the Roundup

14   mixture produced a positive result at a lower

15   concentration, correct?

16        A    That is what he concluded, yes.

17        Q    So Dr. Parry concluded that the Roundup

18   mixture and the glyphosate alone would often produce

19   different results, correct?

20        A    That indeed, yes.

21        Q    Okay.  And this was back in 1999 that

22   this was concluded, correct?

23        A    Yes.

24        Q    Okay.  So if you go to page 02, you look

25   at his in vivo studies.  Do you see that?

Confidential - Subject to Protective Order

 1        A    Yes, I see that.

 2        Q    Okay.  And why don't you tell the jury

 3   what "in vivo" means.

 4             MR. GRIFFIS:  Excuse me.  I didn't get in

 5   before you moved on.

 6             MS. WAGSTAFF:  Okay.  Sorry.

 7             MR. GRIFFIS:  Objection to "his in vivo

 8   studies."

 9   BY MS. WAGSTAFF:

10        Q    All right.  Let's start this all over

11   again then.  You get to -- if you look at page 02,

12   you look at the section titled "In vivo studies,"

13   correct?

14        A    That's correct, yes.

15        Q    And would you tell the jury, please, what

16   "in vivo" means.

17        A     In vivo means that an experiment is

18   carried out in live animals.

19        Q    Okay.

20        A     In whole organisms.

21        Q    Okay.  And in vivo is an accepted method

22   of testing in toxicology, correct?

23        A    Yes.

24        Q    Okay.  So this appears to be Dr. Parry's

25   conclusions about the in vivo studies, correct?

Confidential - Subject to Protective Order

1          A     That is correct, yes.

2          Q     So if we are looking at his -- at

3     Dr. Parry's conclusions about in vivo studies, he

4     states:  "Both glyphosate and Roundup mixture

5     produced positive results in the mouse bone marrow

6     micronucleus assay," and then he cites a study that

7     he has pulled that conclusion from, correct?

8          A     That's the Bolognesi study.

9          Q     Yep.

10         A     Mm-hmm.

11         Q     Then he -- if you go down to the next

12    paragraph, it says:  "The data of Bolognesi indicate

13    that glyphosate is a probable in vivo genotoxin."

14    Correct?

15         A     That is his conclusion.

16         Q     Correct.  This is Dr. Parry's conclusion.

17         A     Yes.

18         Q     So Dr. Parry's conclusion in 1999 is that

19    the data of the Bolognesi indicate that glyphosate is

20    a probable in vivo genotoxin, correct?

21         A     What he wanted -- meant to -- what he

22    meant to say is a potential.

23         Q     Well, he didn't say "potential," did he?

24         A     No, no.  Well, but that's a question of

25    wording; just to make sure that people understand it

Confidential - Subject to Protective Order

1    right, that is a potential genotoxin.

2         Q    All right.  Well, we'll never know if

3    that's what he meant or not because he is not around

4    to tell us that --

5         A    Exactly, mm-hmm.

6         Q    -- and he -- he was -- scientists are

7    precise, correct?

8         A    He was a scientist, yes.

9         Q    And scientists -- when you're a

10   scientist, you need to be precise with your words,

11   correct?

12        A    Well, not in evaluative words.  There may

13   be a different choice of words, but yeah.

14        Q    Okay.  But Dr. Parry chose not to put in

15   the word "potential," correct?

16        A    He may have chosen as well "potential."

17        Q    Did you take out the word "potential"?

18        A    No.

19        Q    This is the form that the -- this is the

20   form that it came in --

21        A    Oh, yeah.

22        Q    -- and he did not put "potential," did

23   he?

24        A    No, no.  He put the words as he put it.

25        Q    Okay.

Confidential - Subject to Protective Order

1        A    So we cannot change it.

2        Q    Right.  So I object to you suggesting

3   what he meant to say.

4             MR. GRIFFIS:  I object to the focus on

5   that sentence when he says something different on the

6   next page.

7             MS. WAGSTAFF:  Counsel, you can follow up

8   directly however you want.  You will have your time

9   with this witness.

10  BY MS. WAGSTAFF:

11       Q    All right.  So just for a clean record,

12  Dr. Parry concluded that the data, Bolognesi,

13  indicate that glyphosate is a probable in vitro --

14  in -- let me start over.

15            The data of Bolognesi indicate that

16  glyphosate is a probable in vivo genotoxin, correct?

17       A    That's what he said.

18       Q    Okay.  And we've already discussed that

19  Dr. Parry was a expert toxicologist with an expertise

20  in genotoxicology, right?

21       A    That is right.

22       Q    And Monsanto selected this expert to

23  evaluate this paper, correct?

24       A    Correct.

25       Q    Okay.  Next page, if you go to 03, it

Confidential - Subject to Protective Order

1   says:  "The overall" -- are you there?

2        A     Yeah.

3        Q     Okay.  "The overall data provided by the

4   four publications produce evidence to support a model

5   that glyphosate is capable of producing genotoxicity,

6   both in vivo and in vitro, by a mechanism based upon

7   the production of oxidative damage."

8              Is that Dr. Parry's conclusion in 1999?

9        A     Yes.

10       Q     That was given to Monsanto, correct?

11       A     Yes.

12       Q     Okay.  And the question raised by these

13  studies are that the -- this is what Dr. Parry is

14  telling you and some of your toxicology expert

15  colleagues, correct?

16       A     Mm-hmm.

17       Q     Is that the role of components of mixture

18  which leads to high levels of activity of Roundup, he

19  is questioning the genotoxic activity observed due to

20  oxidative damage, correct?  And the genotoxic -- and

21  can that activity be reduced by anti -- antioxidants,

22  correct?

23       A     Yes.

24       Q     So his recommendations and questions were

25  kind of similar to what you said earlier was that

Confidential - Subject to Protective Order

1   these studies raised new questions that needed to be

2   studied, correct?

3        A    Yes, that's correct.

4        Q    So you were in agreement with Dr. Parry

5   that that's sort of what needed to happen, correct?

6        A    Right.  Can I point --

7             MR. GRIFFIS:  Objection to form, vague.

8             MS. WAGSTAFF:  Sure.

9             THE WITNESS:  Can I point to a sentence

10  which is important --

11  BY MS. WAGSTAFF:

12       Q    Sure.

13       A    -- which you didn't mention?

14       Q    Sure.

15       A    That he said -- you know, after you

16  mentioned the sentence:  "Based upon production of

17  oxidative damage" --

18       Q    Yeah.

19       A    -- he said, "If confirmed."

20       Q    Mm-hmm.

21       A    So that means that he has a hypothetical

22  conclusion and he was seeking confirmation.

23       Q    Sure.  Yeah, that's fair.

24       A    That's important.

25       Q    Doctor, that's fair, because -- and

1    that's confirmed when it says raised -- questions

2    raised by the study --

3         A    Mm-hmm.  Right.

4         Q    -- he is saying that there is more

5    questions and more tests that need to be done, which

6    is what you had said when we started --

7         A    Yes.

8         Q    -- talking about this, correct?

9         A    That's correct.

10        Q    So you were in agreement with Dr. Parry?

11        A    Yes.  In that sense, yes.

12        Q    Okay.  All right.  And in fact, if you

13   turn to 04, which is the next page, this paper is

14   signed by Dr. Parry.

15             And actually, B, Dr. Parry recommends

16   that there be tests to determine if -- he recommends

17   that there is an assessment of the individual

18   components of Roundup mixture to determine whether

19   there is any components which act synergistically to

20   increase the potential genotoxicity of glyphosate.

21             So let's unpack that sentence a little

22   bit since you're an expert in toxicology.  Can you

23   explain to me what it means when components act

24   synergistically?

25        A    When components act -- this is a

Confidential - Subject to Protective Order

1    hypothesis --

2         Q    Yeah, yeah.

3         A    -- put forward by Dr. Parry.

4         Q    I just want to know what synergistic --

5         A    Yes.  That means that one component is

6    over -- inclined to strengthen the toxicological

7    effect of another component of the synergism.

8         Q    Okay.  So if I understand this correctly,

9    synergist -- so when components act synergistically

10   to increase the potential genotoxicity of another

11   one, it means that while component A might not be

12   genotoxic and component B might not be genotoxic,

13   together they might be genotoxic.

14        A    That's not right.

15        Q    Okay.  Explain it to me.

16        A    What synergism -- what he wanted to say

17   with synergism is that in terms of genotoxicity, one

18   of those components should have a genotoxic mechanism

19   of action, and the other component may actually

20   strengthen that geno- -- that potential genotoxic

21   action.  When both components are not genotoxic and

22   you put them together, you don't have genotoxicity.

23        Q    And I'm asking -- we're talking

24   hypothetically still.  I'm not asking you what

25   Dr. Parry meant because we can all read the same

Confidential - Subject to Protective Order

1    words on the paper.  I'm saying --

2         A    Well, I give you an example --

3         Q    Okay.

4         A    -- just to clarify.

5              A synergistic effect may be, for example,

6    if a co-formulant produces an inflammatory process,

7    that inflammatory process produces free oxygen

8    radicals.  If there is a slight synergism with the

9    other component, then you may have some kind of a

10   combined effect that may be more prominent than the

11   effects caused separately.

12        Q    Okay.  That makes sense.

13             And so Dr. Parry is suggesting an

14   assessment of the individual components of the

15   Roundup mixture, which you have already told me are

16   the active ingredient, which is glyphosate and some

17   surfactants, correct?

18        A    Yes, that's correct.

19        Q    Okay.  So he's -- he's saying assess

20   those components to see if they act synergistically

21   when they are together, correct?

22        A    Right.  Yes.

23        Q    All right.  And -- and this is a -- these

24   are all conclusions and recommendations that were

25   sent to Monsanto toxicologists in February of 1999,

Confidential - Subject to Protective Order

```
 1   correct?

 2        A    Yes.

 3        Q    Okay.

 4             MS. WAGSTAFF:  Do we want to take a

 5   break?  We've been going --

 6             MR. GRIFFIS:  We do, when you are --

 7             MS. WAGSTAFF:  Okay.  Yeah, yeah, I'm

 8   done with this --

 9             THE WITNESS:  Can I -- can I -- can I

10   just say something?

11   BY MS. WAGSTAFF:

12        Q    There is no question on the table.  He

13   can follow up with you if you want.

14        A    No, no, for you.

15        Q    Okay.  All right.

16        A    There is something that is very important

17   to mention --

18        Q    Uh-huh.

19        A    -- also in -- in the report of Dr. Parry

20   is that he also lists the flaws of the studies that

21   they've been published.  So --

22        Q    Sure.

23        A    Okay.  So it's important you are aware of

24   this.

25        Q    Yeah, and I -- just to give you a
```

Confidential - Subject to Protective Order

1    little -- we're going there.

2         A    Okay.  Very good.

3              THE VIDEOGRAPHER:  The time is now

4    10:38 a.m.  We're going off the record.

5              (Recess.)

6              THE VIDEOGRAPHER:  The time is now

7    11:00 a.m.  We're back on the record.

8              MR. GRIFFIS:  And just for the time

9    record, we saved some -- we saved five minutes of

10   tape by having Dr. Heydens do some reading, but it's

11   five minutes of additional time on the deposition,

12   the time he spent reading.

13             MS. WAGSTAFF:  All right.

14             MR. GRIFFIS:  10:55 to 11:00.

15             MS. WAGSTAFF:  Thank you for that

16   clarification.

17   BY MS. WAGSTAFF:

18        Q    So we are just back from a break, and you

19   had a chance to refresh yourself or whatever, but

20   you're ready to go again?

21        A    Yes.

22        Q    Okay.  Excellent.

23             So before we were -- we broke we were

24   talking about Dr. Parry's report from February of

25   1999, correct?

Confidential - Subject to Protective Order

1        A     Correct.

2        Q     And it -- it was February 15th of 1999,

3    and so here what I have marked as Exhibit 5 is an

4    e-mail from Dr. Donna Farmer.  If you look at the

5    page that starts with 06 is the e-mail cascade.  And

6    it is -- although it is written on April 19th, Donna

7    Farmer states that these are the meeting minutes from

8    February 25th, correct?

9        A     Yes.

10       Q     Okay.  So this is actually a meeting that

11   occurred ten days after Dr. Parry had -- and you had

12   circulated the Parry report, correct?

13       A     Correct.

14       Q     So very close in time.

15             So if you then look back to the front

16   page where you had responded, and if you look at the

17   very top, you respond and you say:  "Donna," which is

18   Dr. Farmer, "thanks for this.  It accurately reflects

19   the situation."  Correct?

20       A     Yes.

21       Q     Okay.  So now let's go back to see what

22   Dr. Farmer accurately reflected.

23             So if we look to page 07, she talks about

24   different updates, but if we go to the page that

25   talks about global experts, we're now talking about

Confidential - Subject to Protective Order

1    the Parry report that we just discussed, right?

2         A    Yes.

3         Q    So you guys have now had this report for

4    about ten days, and you are meeting to discuss the

5    next step, correct?

6         A    Yes.

7         Q    Okay.  And Dr. Farmer reiterates to you

8    all that:  "Dr. Parry concluded on his evaluation of

9    the four articles that glyphosate is capable of

10   producing genotoxicity, both in vivo and in vitro, by

11   a mechanize -- by a mechanism based upon the

12   production of oxidative damage."  Correct?

13        A    That's correct.

14        Q    Okay.  And we had talked about that

15   before.  And that evaluation was based on material

16   that you all had provided Dr. Parry, correct?

17        A    Yes.

18        Q    Okay.  And was Dr. Farmer and was the

19   group of people that met happy with Dr. Parry's

20   report?

21             MR. GRIFFIS:  Objection to form.

22             THE WITNESS:  No.

23   BY MS. WAGSTAFF:

24        Q    Okay.  All right.  Fair enough.

25             So, Dr. Farmer continues to write:  "In

Confidential - Subject to Protective Order

1    order to move Dr. Parry from his position, we will

2    need to provide him with the additional information

3    as well as asking him to critically evaluate the

4    quality of all the data, including the open

5    literature studies."

6              So you all are meeting and you're trying

7    to figure out how to change Dr. Parry's opinion,

8    correct?

9         A    I wouldn't phrase it in that way.  It is

10   actually to provide Dr. Parry with all the reports on

11   genotoxicity testing on Roundup and on glyphosate

12   that existed at that time so that he could be able to

13   see the context, and he could put his interpretation

14   into context with the existing regulatory database on

15   the genotoxic characteristics or not of glyphosate

16   and Roundup.

17        Q    And change his -- change his opinion,

18   right?

19        A    And he might actually acquire more

20   insight of the -- these results in relation to all

21   the data that have been produced and were accepted by

22   the regulatory authorities.

23        Q    Right.  But if Monsanto had been happy

24   with his report, they wouldn't have tried to move

25   Dr. Parry from his position, correct?

Confidential - Subject to Protective Order

```
 1              MR. GRIFFIS:  Objection.  Speculation.

 2              THE WITNESS:  That's speculation.

 3              MS. WAGSTAFF:  Okay.  I would ask that

 4     there is no more speaking objections, Counsel.  He's

 5     just demonstrated to -- to me and the court that he

 6     is listening to your objections and taking testimony

 7     from your objections, and that's improper.

 8              MR. GRIFFIS:  I will continue to make

 9     proper objections as I have throughout the

10     deposition.

11              MS. WAGSTAFF:  Yeah, you have, I agree

12     with that, but when the -- the witness agrees with

13     your -- with your objection, that's improper.

14     BY MS. WAGSTAFF:

15          Q    All right.  So moving on, Dr. Farmer

16     continues to say:  "As a follow-up, Mark will contact

17     Dr. Parry, discuss with him the existence of

18     additional data, and ask him to evaluate the full

19     package."

20              Mark is you, correct?

21          A    Yes.

22          Q    Mark is Dr. Mark Martens.  Okay.

23              "Mark will also explore his interests,"

24     meaning Dr. Parry's interests, parentheses, "if we

25     can turn his opinion around, in being a spokesperson
```

Confidential - Subject to Protective Order

1    for us on these types of issues."  Correct?

2         A    That's correct.

3         Q    Okay.  So, Dr. Martens, you were tasked

4    with following up with Dr. Parry and getting him

5    additional data to see if you could turn his opinion

6    around, correct?

7         A    I will rephrase that.  It was actually

8    providing, you know, supplementary data so that he

9    could put that in his findings into a context of the

10   existing data.

11        Q    Right.  And turn his opinion around,

12   correct?  It's the words that Donna Farmer used, not

13   me.

14        A    These are the words of Donna Farmer.

15        Q    Okay.  Excellent.

16             And then this group discussed again the

17   Lioi papers, and -- we don't need to -- to harp on

18   that again.  So that is two weeks -- or that is ten

19   days after the report comes out.

20             So moving on to the next -- you can put

21   that aside.

22             (Pause in the proceedings.)

23             MS. WAGSTAFF:  I'm actually saving time

24   by cutting some of these out.

25             MR. GRIFFIS:  Thank you.

Confidential - Subject to Protective Order

```
 1   BY MS. WAGSTAFF:

 2        Q    Dr. Martens, you're not an

 3   epidemiologist, correct?

 4        A    That's correct.

 5        Q    And you would defer conclusions on

 6   epidemiology to expert epidemiologists, correct?

 7        A    Yes.

 8        Q    Do you have an opinion on what it means

 9   for a chemical to be endocrine disrupting?

10        A    Yes.

11        Q    Okay.  Can you share that with me?

12        A    These are chemicals when administered to

13   animals or which people can be exposed that have an

14   influence on the functioning of the hormonal system.

15        Q    Okay.  And do you believe that glyphosate

16   is an endocrine disrupter?

17        A    No.

18        Q    Do you believe that the formulation

19   Roundup is an endocrine disrupter?

20        A    No.

21        Q    Is that an area within your expertise or

22   would you leave that to -- to a scientist with more

23   expertise in that area?

24        A    That is one of my areas of expertise.

25        Q    Okay.  All right.  Let's move to the next
```

Confidential - Subject to Protective Order

```
1    one, which is 6.

2              MS. WAGSTAFF:  This is going to be marked

3    as Exhibit 6.

4              MR. GRIFFIS:  Thank you.

5              THE WITNESS:  Thank you.

6              (Martens Exhibit No. 9-6 was marked

7              for identification.)

8              THE WITNESS:  (Peruses document.)

9    BY MS. WAGSTAFF:

10        Q    Okay?

11        A    Yes.

12        Q    Okay.  So were you aware that the

13   toxicologists that were in the United States thought

14   that you did not do a good job with Dr. Parry?

15        A    No.

16             MR. GRIFFIS:  Objection to form.

17   BY MS. WAGSTAFF:

18        Q    Okay.  Were you aware that they no longer

19   wanted you to be the one interacting with Dr. Parry

20   after his report came out?

21        A    No.

22             MR. GRIFFIS:  Objection to form.

23   BY MS. WAGSTAFF:

24        Q    Okay.  So who is doctor -- or I'm going

25   to strike that.  I don't know if he is a doctor.
```

Confidential - Subject to Protective Order

1          Who is Stephen Wratten?

2     A    Stephen Wratten was a -- a product

3  registration manager in the United States.

4     Q    Okay.

5     A    In charge of glyphosate.

6     Q    Okay.  And so Steve Wratten writes an

7  e-mail on October 31st, 1999, which is a few months

8  after Dr. Parry had given you his report, correct?

9     A    Yes.

10    Q    And he writes an e-mail, and it's called

11  "Comments on Parry write-up," and he writes the

12  e-mail to you, to Donna Farmer, to Dr. Larry Kier,

13  who we talked about.

14    A    Mm-hmm.

15    Q    We talked about Will -- Bill Heydens, and

16  then who's -- who's William Graham?

17    A    Graham, William, is -- was the -- the

18  glyphosate product registration manager for Europe,

19  Africa.

20    Q    Okay.  So is Steve Wratten a doctor?

21    A    What do you mean by doctor?

22    Q    Is he -- what are -- I mean, is he a

23  toxicologist or --

24    A    No, he's an agronomist.

25    Q    Okay.  So would it be appropriate to call

Confidential - Subject to Protective Order

```
 1    him Dr. Wratten?

 2         A    I honestly don't know whether he is a

 3    doctor.

 4         Q    Okay.  Well, we'll err on the side of

 5    saying that he is.

 6              So Dr. Wratten writes to Mark, that's

 7    you, and Donna, which is Dr. Farmer, and says --

 8    talking about comments on the Parry write-up:  "I was

 9    somewhat disappointed in the Parry report."

10              Do you see that?

11         A    Yes.

12         Q    Okay.  And Dr. Wratten says:  "Not

13    particularly with his conclusions but just the way

14    that they're presented."  Correct?

15         A    Yes, I see that.

16         Q    Okay.  And then he goes on to provide --

17    one, two, three, four, five, six, seven, eight --

18    eight suggestions on how he can improve his report;

19    is that correct?

20         A    Well, these were comments.  I see them as

21    comments.

22         Q    Yeah, I'm sorry.  What did I -- that's --

23    I didn't mean -- these -- yeah, so he writes eight --

24    you don't see them as comments, or you do?

25         A    I see them as comments, yes, yes.
```

Confidential - Subject to Protective Order

1        Q    Oh, yeah, yeah.

2             Okay.  So -- so Dr. Wratten writes that

3   he's not particularly disappointed in the conclusions

4   but just the way they're presented, and he gives

5   eight comments on how to improve the Parry report,

6   correct?

7        A    To some extent, yes.

8        Q    Okay.  And then at the very end, Steve

9   Wratten writes, and still talking about the Parry

10  report:  "I do not see that he has stuck his neck out

11  at anything at all controversial, and therefore there

12  is little value in the write-up as written that could

13  be useful.  Hope it didn't cost much."

14             Meaning the Parry report, correct?

15             "Perhaps this is too harsh, and I don't

16  know what your proposal to him was, but I would --

17  but I guess I would expect more than this of a

18  professor."  Correct?

19        A    That's what he said, yes.

20        Q    Okay.  And did that upset you receiving

21  that e-mail?

22        A    Not really.

23        Q    No.

24        A    Because I was also a little bit

25  disappointed about the form of the report.

Confidential - Subject to Protective Order

1          Q    Okay.  So he also asks you and Dr. Farmer

2    if Dr. Parry has ever worked with industry before on

3    this sort of project, correct?

4          A    That -- that's what we can read, yes.

5          Q    Okay.  And so he sends this to -- Donna

6    Farmer then forwards the e-mail to Alan Wilson.

7          A    Yes, that's what I see.

8          Q    You told us earlier who Alan Wilson was,

9    correct?

10         A    Yes.  Correct, yes.

11         Q    Okay.  And Alan Wilson writes back to

12   Dr. Farmer and says:  "Two options:  We work closely

13   with Parry, someone other than Mark, or we get

14   someone else."

15              So basically take Mark off the job or we

16   use someone other than Dr. Parry, correct?

17         A    That's what I read.

18         Q    Right.  So they were disappointed with

19   the work that you had done with Dr. Parry, correct?

20              MR. GRIFFIS:  Objection to having him

21   speculate about other people's thoughts.

22              THE WITNESS:  I have no comment on this.

23   BY MS. WAGSTAFF:

24         Q    Okay.  And so then Donna Farmer responds

25   to Alan Wilson's suggestions and says:  "One option:

Confidential - Subject to Protective Order

```
 1    I agree we need someone else to interfere --
 2    interface with Parry."
 3              Meaning she agrees that -- that you
 4    should be off the job.  Correct?
 5              MR. GRIFFIS:  Same objection as
 6    previously.
 7              THE WITNESS:  That is what appears from
 8    that.
 9    BY MS. WAGSTAFF:
10       Q    Okay.  "Right now the only person I think
11    that can dig us out of this genotox hole is the good
12    Dr. Kier."
13              And that's Dr. Larry Kier?
14       A    Yes.
15       Q    And that's the Monsanto -- long-term
16    Monsanto toxicologist, right?
17       A    Yes.  Yes.  Genotoxicologist.
18       Q    Genotoxicologist, yep.
19              And Dr. Farmer goes on to say that she's
20    concerned about leaving the report out there as the
21    final project with his final impressions, correct?
22       A    That's what I read.
23       Q    Okay.  So she doesn't -- it looks like
24    she doesn't want to just ignore the project, she
25    wants to make sure it gets cleaned up so it's not the
```

Confidential - Subject to Protective Order

1   final project, right?

2        A    That's what I read.

3        Q    Okay.

4             MR. GRIFFIS:  I need to interpose an

5   objection about this document to the extent that

6   you're suggesting that we're talking about what you

7   marked as Exhibit 4, because the references don't

8   match up.

9             MS. WAGSTAFF:  What's Exhibit 4?

10            MR. GRIFFIS:  The February report of

11  Dr. Parry.

12            MS. WAGSTAFF:  Oh, okay.

13  BY MS. WAGSTAFF:

14       Q    All right.  And then Alan writes back to

15  Donna, Dr. Farmer, and says:  "If Larry has the time,

16  that would be great, but we need to be careful we

17  don't get into another Cantox situation that could

18  take some word -- take some time wordsmithing and

19  reaching consensus."

20            Do you know what that means?

21       A    I have no idea.

22       Q    And then says:  "Maybe you should invite

23  Parry to St. Louis to get him more familiarized with

24  the complete database."  Correct?

25       A    That's what I read.

Confidential - Subject to Protective Order

```
1          Q    So it looks like you're being cut out of

2   this, correct?

3               MR. GRIFFIS:  Objection to the

4   characterization.

5   BY MS. WAGSTAFF:

6          Q    Two -- two -- two toxicologists from the

7   United States have said that you should be pulled off

8   the project, and then they're inviting the European

9   expert to St. Louis and not inviting you, are they?

10              MR. GRIFFIS:  Objection.  That's not what

11  the document says.

12              THE WITNESS:  That is a possibility.

13  BY MS. WAGSTAFF:

14         Q    Were you invited to St. Louis for that

15  meeting?

16         A    I don't know where the meeting took

17  place.

18         Q    Okay.

19              (Martens Exhibit No. 9-7 was marked

20              for identification.)

21  BY MS. WAGSTAFF:

22         Q    All right.  And then our next exhibit

23  will be Exhibit 7.

24              This is the same e-mail that Dr. Wratten

25  wrote to you and Donna that we were just looking at,
```

Confidential - Subject to Protective Order

1    to you and Dr. Farmer, and you have interplaced your

2    responses in italics.

3            Are you following that?  You say:  "See

4    further my comments in the text below in italics."

5       A    Can I read this?

6       Q    Sure can.

7            MR. GRIFFIS:  I have the same objection

8    to this document as to the last as it is being used

9    in that it's not referring to the same report that

10   was marked as Exhibit 4, and your questioning is kind

11   of suggesting that it is.

12           THE WITNESS:  (Peruses document.)

13   BY MS. WAGSTAFF:

14      Q    All right, Doctor, how many reports

15   did --

16      A    Can I finish reading, please?

17      Q    Sure.

18      A    (Peruses document.)

19      Q    All right.  How many --

20      A    Yes.

21      Q    How many reports did Dr. Parry write for

22   Monsanto?

23      A    I think he wrote -- there was three

24   reports.

25      Q    Okay.

Confidential - Subject to Protective Order

1        A      Yeah.  And the first report was only

2    evaluating the four publications that I had sent to

3    him that had problematic results.

4              And then afterwards I learned ^ Check to

5    put everything into a nice context and to see whether

6    there is concordance in results with other toxicology

7    tests.  I sent him a whole battery of -- of test

8    reports which have been as well, you know, produced

9    upon commission by Monsanto but also from some other

10   companies, to allow him to put it into context.  So

11   he evaluated all these reports, and there is in the

12   report.

13             And there is a third notice that he

14   produced as well as a follow-up of that report on the

15   evaluation of all the toxicology studies in

16   combination.

17        Q     Okay.  So right here when you're saying

18   that this was -- "he received," meaning Dr. Parry,

19   "received all reports we produced and those we

20   obtained and all scientific papers," you're talking

21   about that first report, or are you talking about a

22   different report?

23        A     We received all reports produced and

24   those -- these are all -- well, these were all the

25   reports that were existing before consultation with

Confidential - Subject to Protective Order

1   Dr. Parry.  So the regulatory reports ^ Check .

2        Q    Okay.  So you received this e-mail from

3   Dr. Wratten on September 1st of 1999 where he's

4   talking about how he is disappointed not in the

5   conclusions but in the way they were presented,

6   correct?

7        A    Mm-hmm.

8        Q    And you write back some remarks to

9   Dr. Wratten within his e-mail, correct?

10       A    Yes.

11       Q    Okay.  And the bottom line is you say to

12  him, you say to Dr. Wratten:  "Please don't be too

13  negative.  It is clear he will need some help to

14  produce a definitive report without twisting his

15  arms.  Don't forget that his opinion is well

16  respected, and I am sure he didn't have the time to

17  write it all down as should have been the case;

18  therefore, the need to meet with him."  Correct?

19       A    Yes.

20       Q    So you still believed in Dr. Parry and

21  this was your work in generating this report,

22  correct?

23       A    Yes.

24       Q    Okay.  And --

25            MR. GRIFFIS:  Object to "your work in

Confidential - Subject to Protective Order

1   generating this report" as vague.

2   BY MS. WAGSTAFF:

3        Q    Okay.  And then you look at the response

4   that you wrote to the entire group where you say

5   that:  "We can now determine for ourselves how such

6   report should look like and give him directions for a

7   rewrite."

8             So you were going to go to Dr. Parry and

9   give him directions for a rewrite of his report,

10  correct?

11       A    Yep.

12       Q    Okay.

13       A    These were directions for the form of the

14  report, not of the content of the report.

15            MS. WAGSTAFF:  Strike as nonresponsive.

16            MR. GRIFFIS:  He was completely --

17  BY MS. WAGSTAFF:

18       Q    And in fact --

19            MR. GRIFFIS:  -- responsive.

20  BY MS. WAGSTAFF:

21       Q    And in fact, the second report that

22  you're talking about was written shortly thereafter

23  in September of 1999.

24            (Martens Exhibit No. 9-8 was marked

25            for identification.)

Confidential - Subject to Protective Order

```
 1   BY MS. WAGSTAFF:

 2        Q    And I am going to walk you through this.

 3   This is a report by Dr. James M. Parry, correct?

 4        A    Yes.

 5        Q    This is the same Parry that wrote the

 6   February 1999 report.

 7        A    Yes.

 8        Q    Correct?

 9             And this is the "Evaluation of the

10   potential genotoxicity of glyphosate, glyphosate

11   mixtures in component surfactants," correct?

12        A    Yes.

13        Q    So it's the same subject matter area,

14   right?

15        A    Yes.

16        Q    And this is the area you have previously

17   testified that Dr. Parry is an expert, right?

18        A    Yes.

19        Q    Okay.  And you had mentioned a few

20   moments ago that you gave Dr. Parry a host of

21   information to review, and it looks like this table

22   is what -- the information you gave him, correct?

23        A    Correct.

24        Q    So on -- on the page ending in 233,

25   Tables 1 through 14, are all of the information you
```

Confidential - Subject to Protective Order

1    provided him to rewrite his report, correct?

2        A    Yes.

3            MR. GRIFFIS:  Objection to form, "to

4    rewrite his report."

5    BY MS. WAGSTAFF:

6        Q    So I'm going to do what I did sort of

7    before with the bottom of the pages, and I'll tell

8    you to flip to a certain page that --

9        A    Mm-hmm.

10       Q    -- that ends -- we're going to go to the

11   one that ends 37, 237, please.  Where it says that:

12   "The evaluation is that these studies provide some

13   evidence that glyphosate may be capable of inducing

14   oxidative damage under both in vitro and in vivo

15   conditions."

16           That was his evaluation, correct?

17           MR. GRIFFIS:  Objection as vague with

18   regard to what "these studies" means.  No context.

19   BY MS. WAGSTAFF:

20       Q    Correct?

21       A    That is what's in the report.  Yes.

22       Q    Okay.  And we already discussed what

23   he -- you sent him to evaluate, correct?

24       A    Mm-hmm.

25       Q    Okay.  And this is consistent with his

Confidential - Subject to Protective Order

1    February of 1999 conclusion, correct?

2          A    The -- the conclusion evaluation he

3    formulated on page 237, pertains to the chapter in

4    "Miscellaneous Endpoints."

5          Q    Okay.  Miscellaneous -- okay.

6          A    And miscellaneous endpoints are endpoints

7    that have been pursued by groups, you know, in

8    academia that have been -- actually undertaken

9    experimental tests in all of the mechanism of

10   actions.  These were endpoints that were not pursued

11   in the official regulatory studies that were done at

12   Monsanto at that time.

13         Q    Okay.  So --

14         A    It's not a general evaluation.  It's only

15   pertaining to miscellaneous endpoints.

16         Q    Okay.  That's a great clarification, and

17   thank you for doing that.

18              And so you provided Dr. Parry additional

19   studies from what you previously provided him,

20   correct?

21         A    Yes.

22         Q    And that evaluation of that additional

23   information was consistent with the conclusion he

24   drew from the previous material you gave him,

25   correct?

Confidential - Subject to Protective Order

1            MR. GRIFFIS:  Excuse me.  Objection to

2    "additional information" to the extent you're talking

3    about this evaluation on 237.  It's the same studies

4    as before.

5            THE WITNESS:  The evaluation that he made

6    and formulated on page 237 is a evaluation pertaining

7    to what we call genotoxicological endpoints that have

8    been pursued in the publications that are sent to him

9    as being problematic papers.

10   BY MS. WAGSTAFF:

11        Q    Okay.  So that was my original question,

12   which I thought I said this is the same conclusion

13   that he had made previously, and you said, no, it was

14   different.

15        A    I --

16        Q    But my question is, is this the same

17   conclusion -- that I had asked five minutes ago, is

18   this the same conclusion that he made in his February

19   of '99 paper?

20        A    Yes.

21            MR. GRIFFIS:  Objection.  Misrepresents

22   his prior testimony.

23   BY MS. WAGSTAFF:

24        Q    And then if you go to page end -- or

25   page 40, please, where it says his evaluation is

Confidential - Subject to Protective Order

1    that:  "These studies provide evidence that Roundup

2    mixture produces DNA lesions in vivo, probably due to

3    the production of oxidative damage."

4              That was his evaluation, correct?

5              MR. GRIFFIS:  Objection.  Vague as to

6    "these studies."

7              THE WITNESS:  Yes.

8    BY MS. WAGSTAFF:

9         Q    Okay.  Then let's go to the "Overall

10   Conclusions."  Do you see that on page 42?

11        A    Can I make a remark?

12        Q    No.  Your counsel can make a remark with

13   you later.  Going to page --

14        A    No, no, a comment that would help you

15   now.

16        Q    No, that's okay.

17             Page 42, "Overall Conclusions."

18             MR. GRIFFIS:  I object to him not being

19   permitted to clarify --

20             MS. WAGSTAFF:  There's no --

21             MR. GRIFFIS:  -- his answers.

22             MS. WAGSTAFF:  -- question on the table.

23             MR. GRIFFIS:  If he wishes to clarify an

24   answer, then he's absolutely allowed to do that.

25             MS. WAGSTAFF:  Counsel --

Confidential - Subject to Protective Order

1          MR. GRIFFIS:  Doctor, would you like to

2   clarify an answer that you gave?

3          THE WITNESS:  Yes.  Yeah.

4          MR. GRIFFIS:  Please do so.

5          THE WITNESS:  It's very important to

6   mention that there are some miscellaneous endpoints

7   which gave some, you know, results of concern have

8   been obtained in vivo via routes of administration

9   which are improper for toxicological testing for

10  glyphosate -- exposure scenarios of glyphosate.

11         This all pertains to results that have

12  been obtained after intraperitoneal injection, which

13  actually produces a specific pathology that otherwise

14  would have never be possible, you know, in normal

15  exposure circumstances to either glyphosate or

16  Roundup.

17  BY MS. WAGSTAFF:

18      Q    Okay.  Thank you.

19         And the intraperitoneal injection is an

20  acceptable route of exposure for a health hazard

21  assessment, correct?

22         MR. GRIFFIS:  Objection.  Overbroad.

23         THE WITNESS:  No.

24  BY MS. WAGSTAFF:

25      Q    It's not.  It's not accepted within the

Confidential - Subject to Protective Order

1    field of toxicology as a -- a relevant route of

2    exposure for health hazard assessment?  Is that what

3    you're telling me?

4              MR. GRIFFIS:  Objection.  Overbroad.

5              Go ahead, Doctor.

6              THE WITNESS:  This is not a relevant

7    route of exposure.  This can be used in order to

8    produce some results to explore potential effects

9    that can be produced during that route of exposure,

10   but that route of exposure is absolutely

11   inappropriate for the hazard and risk assessment of

12   pesticides.

13   BY MS. WAGSTAFF:

14       Q    Okay.  All right.  So overall

15   conclusions -- "Overall Conclusions," let's look at

16   it, page 42.

17              What does class -- clastogen -- genetic

18   mean?

19       A    Clasto --

20       Q    Number 2.

21       A    Clastogenicity means chromosomal

22   breakage.

23       Q    Okay.  So once again, it's talking about

24   mutation, right?

25       A    We like to talk about gene mutations and

Confidential - Subject to Protective Order

1   chromosomal breakage, and these all resort under the

2   term "genotoxicology."

3        Q    Okay.  So the overall conclusions, when

4   you've given Dr. Parry more information, is there is

5   published in vitro evidence that glyphosate is

6   clastogenetic and capable of inducing sister

7   chromatid exchange in both human and bovine

8   lymphocytes, and then he cites papers, correct?

9        A    Correct.

10       Q    And if you move on to the next page, page

11  number 11, and this is consistent with some

12  conclusions that he had six months earlier when he

13  talks about glyphosate-induced G6PD activity in both

14  bovine and human lymphocytes, and he cites a paper;

15  the production of 8-OHdG in mouse liver, cites a

16  paper; both observations indicate that glyphosate may

17  be capable of inducing a prooxidant state leading to

18  the formation of oxidative damage lesion.

19            Correct?

20       A    That's a correct --

21            MR. GRIFFIS:  If the question is did you

22  read that correctly, then I object to the predicate

23  about consistency with what he said before.

24  BY MS. WAGSTAFF:

25       Q    The next conclusion was that a -- of

1    Dr. Parry was that:  "A Roundup mixture containing

2    glyphosate was shown to produce 8-OHdG in both the

3    liver and kidney of the mice (Bolognesi).  These

4    observations indicate the Roundup mixture is capable

5    of inducing oxidative damage in vivo."

6              Is that correct?

7       A    That's what he wrote is correct, yes.

8       Q    Okay.  And this is -- that's consistent

9    with what he found in the February '99 report that

10   he --

11      A    Yes.

12      Q    Okay.  Next on 14, glyphosate-induced

13   single-strand breaks in vivo in the liver and kidney,

14   and he cited those reports, correct?

15      A    Yes.

16      Q    Next, he tells Monsanto that the Roundup

17   mixture produced single-strand breaks in vivo in the

18   liver and kidneys of mice, correct?

19      A    Correct.

20      Q    Okay.  And next, he tells -- Dr. Parry

21   tells Monsanto that glyphosate mixture but not

22   glyphosate produced an increase in uncharacterized

23   DNA adducts in vivo in the liver and kidneys of mice,

24   correct?

25      A    That's correct.

Confidential - Subject to Protective Order

```
1          Q    All right.  So Dr. Parry is telling

2    Monsanto that there are differences between

3    glyphosate alone and a glyphosate mixture, correct?

4          A    That's what he --

5          Q    Okay.

6          A    That's what he said generally.

7          Q    And if you go to --

8          A    Interesting.

9          Q    If you go to the next page, "Specific

10   evaluation of the genotoxicity of glyphosate."

11         A    Yes.

12         Q    Dr. Parry states:  "I conclude that

13   glyphosate is a potential clastogenic in vitro."

14   Correct?

15         A    That's what he said.

16              MR. GRIFFIS:  Objection.  Incomplete

17   sentence.

18   BY MS. WAGSTAFF:

19         Q    And he based that conclusion on the study

20   of Lioi, correct?

21         A    On the study of Lioi?

22         Q    I was trying to fix the objection.

23              So we can start -- the sentence says:

24   "On the basis of the study of Lioi, I conclude that

25   glyphosate is a potential clastogenic in vitro."
```

Confidential - Subject to Protective Order

```
 1   Correct?

 2        A    That's what he says, yes.

 3        Q    Okay.  And then he goes on to say that

 4   the Bolognesi study indicates that it may also be

 5   clastogenic in vivo, correct?

 6        A    It may be, yes.  The way he --

 7        Q    Correct.

 8        A    Yeah.

 9        Q    So he concludes that it is in vitro and

10   that it may be in vivo, correct?

11        A    It's hypothetical in vivo.  Yeah.

12        Q    Correct.

13             And then he goes on the -- so that was

14   the genotoxicity of glyphosate.  Now he's looking at

15   the geno -- specific evaluation of the genotoxicity

16   of glyphosate mixtures, correct?

17        A    Mm-hmm.

18        Q    Okay.  And he says:  "The studies of

19   Bolognesi suggests that glyphosate mixtures may be

20   capable of inducing oxidative damage in vivo."

21   Correct?

22        A    Yes, that's what he says.

23        Q    Okay.

24        A    But he is very careful in his wording.

25   He said "may be," okay?  So...
```

Confidential - Subject to Protective Order

```
1          Q    Correct.  Well, earlier you had said his
2     wordings was wrong, but now you're saying he's
3     careful in his wordings?
4          A    Well, he says "may be."
5          Q    Okay.
6          A    Because he's -- you know, he's pushing
7     towards confirmation.
8          Q    Sure.
9          A    And that is what has been followed up.
10         Q    So he's -- he's specific with his words,
11    you're saying?  He's careful with what he writes,
12    correct?
13         A    Well, I -- what I read is that he said,
14    Okay, we observed that in the Bolognesi study.
15         Q    Mm-hmm.
16         A    And, yeah, we need some confirmation to
17    make sure if that is really happening.
18         Q    Sure.
19         A    Yeah.
20         Q    Exactly.
21         A    Yeah.
22         Q    So he was just putting Monsanto on notice
23    that this may be happening, correct?
24         A    Yes.
25         Q    Okay.  And did the next -- if you -- you
```

Confidential - Subject to Protective Order

1   go on to his report, he talks about the publications

2   that he utilized.  We're not going to get into those.

3        A    Mm-hmm.

4        Q    Then he puts all of his figures and

5   tables, so we're going to skip to -- let me tell you

6   what we're going to skip to.  We're going to skip to

7   page 64.

8            MR. GRIFFIS:  Excuse me one moment before

9   you ask a question here.

10           Doctor, your voice is getting a little

11  low when you're answering the questions.

12  You're speaking low, so --

13           THE WITNESS:  I apologize.  I will --

14           MR. GRIFFIS:  There is a videotape and

15  the court reporter, so --

16           THE WITNESS:  Okay.

17           MR. GRIFFIS:  So just --

18           THE WITNESS:  Yeah, I'll pay attention to

19  that.

20           MR. GRIFFIS:  Thank you.

21           THE WITNESS:  I will raise my voice.

22  BY MS. WAGSTAFF:

23       Q    Okay.  So this number 64 -- I guess I

24  don't need to yell.

25           This number 64 --

Confidential - Subject to Protective Order

```
 1              MR. GRIFFIS:  Yours isn't low.

 2              MS. WAGSTAFF:  I'm fine.

 3              THE WITNESS:  You're fine.

 4  BY MS. WAGSTAFF:

 5       Q    Is -- is this the third report that you

 6  were talking about?

 7       A    Yes.

 8       Q    Okay.  So this came after the first two,

 9  correct?

10       A    That -- that's what I understand, yes.

11       Q    Okay.  And this is the same Dr. Parry

12  that you were -- that we've been talking about all

13  day, correct?

14       A    Yes, correct.

15       Q    Okay.  And do you know what the genesis

16  of this report was, why he created this?

17       A    I don't recall it.

18       Q    Okay.  But he created this at -- at

19  Monsanto's request, correct?

20       A    That is a possibility.  I don't recall.

21       Q    Okay.  And is there any chance that this

22  was linked to the second report?

23       A    Yes.

24       Q    Okay.  It was produced as sort of what I

25  viewed as like an appendix to the second report, but
```

Confidential - Subject to Protective Order

1   you're saying that's a possibility or it could be its

2   own report.  You just don't know?

3        A    I don't know.

4        Q    Okay.  So it's either an appendix to the

5   second report or it's its own --

6        A    Yes.

7        Q    Okay.  And so in this report --

8             MR. GRIFFIS:  Wait.  I'm sorry.  By the

9   "second report," you mean --

10            MS. WAGSTAFF:  I mean the --

11            MR. GRIFFIS:  -- what he identified as

12   the third -- Exhibit 8?

13            MS. WAGSTAFF:  Yeah.

14            MR. GRIFFIS:  Okay.  The second one we've

15   talked about today, possibly the third.

16            MS. WAGSTAFF:  Yeah, so -- that's a good

17   cleanup.

18   BY MS. WAGSTAFF:

19        Q    I have been talking about the February

20   1999 report as when you gave him four articles --

21        A    For the four articles, yes.

22        Q    -- was his first report, correct?

23        A    Yes.

24        Q    And the one we just walked through --

25        A    The big one is --

Confidential - Subject to Protective Order

```
 1        Q     -- is his second report?

 2        A     -- second, yes.

 3        Q     And then this one is either an annex to

 4   his second report or it's a third report?

 5        A     Yes.

 6        Q     You're just not sure.

 7        A     Yes.

 8        Q     Okay.  So in this report, which is

 9   starting -- it's part of Exhibit 8 because that's how

10   we've been considering it.  If we -- and it starts at

11   page MONGLY01314264.  Dr. Parry talks about key

12   issues concerning the potential genotoxicity of

13   glyphosate, glyphosate formulations in surfactants.

14             That is very similar to the title of

15   report 2, which is "Evaluation of potential

16   genotoxicity of glyphosate, glyphosate mixtures in

17   component surfactants."

18             And then this says "Recommendations for

19   Future Work," correct?

20        A     Yes.

21             MR. GRIFFIS:  I just want to object to

22   the labeling as report 2 and 3 as if that's the

23   sequence.  I don't think that has been established.

24   BY MS. WAGSTAFF:

25        Q     Okay.  So it appears to me that this is
```

Confidential - Subject to Protective Order

1    recommendations for future work based off of his

2    analysis in the second report.  Would that make

3    sense?

4         A    That makes sense, yes.

5         Q    Okay.  So key questions, and these are

6    key questions that he is posing to Monsanto that

7    still remain after his analyses, correct?

8         A    Yes.

9         Q    Okay.  So he's wanting to know if

10   glyphosate is an in vitro clastogen, if it's an

11   in vivo clastogen, if glyphosate is -- if that is

12   true, what is the mechanism of action?  And does it

13   lead to other types of genotoxicity activity in vivo

14   such as point mutation induction?  Does glyphosate

15   produce oxidative damage?  Can we explain the

16   reported genotoxic effects of glyphosate on the basis

17   of the induction of oxidative damage?

18             Why don't you read the last three so the

19   jury doesn't have to just listen to my voice,

20   starting with 6.  You can read it out loud.

21        A    Okay.  So if glyphosate is an in vivo

22   genotoxin, is its mechanism of action thresholded?

23        Q    Okay.  Number 7.

24        A    "Threshold," it wants to say that you

25   need to have a certain concentration in tissue before

Confidential - Subject to Protective Order

1    that activity takes place.

2         Q    Mm-hmm.

3         A    "Under what conditions of exposure are

4    the antioxidant defenses of the cell overwhelmed?"

5         Q    Okay.

6         A    That is part of the thresholding.

7              "Are there difference -- differences in

8    the genotoxic activities of glyphosate and glyphosate

9    formulations?"

10        Q    So he's -- he's been telling you in the

11   last two reports that different things happen when he

12   tests glyphosate or glyphosate formulations, right?

13        A    Yes.

14             MR. GRIFFIS:  Objection to "he tests."

15   BY MS. WAGSTAFF:

16        Q    And then the last one.

17        A    "Do any of the surfactants contribute to

18   the reported genotoxicity of glyphosate

19   formulations?"

20        Q    Okay.  So he's saying we need to figure

21   out what the surfactants add to the equation,

22   correct?

23        A    Yes.

24        Q    Okay.  So he also then gives you --

25   Monsanto some actions that he recommended, correct?

Confidential - Subject to Protective Order

1        A    Yes.

2        Q    Okay.  And one of those is to do

3   comprehensive testing on glyphosate formulations,

4   correct?

5        A    Yes.

6        Q    Okay.  He says that -- that "Monsanto

7   should evaluate the induction of oxidative damage

8   in vivo and determine the influence of antioxidant

9   status of the animals."  Correct?

10       A    Correct.

11       Q    He also says:  "Evaluate -- on the

12   assumption that the reported in vitro positive

13   clastogenic data for glyphosate is due to oxidative

14   damage, determine the influence of antioxidants."

15            Okay.  So that's similar to the next one.

16   "Evaluate the clastogenic activity of glyphosate in

17   the presence and absence of a variety of antioxidant

18   activities."  Correct?

19       A    That's what I read, yes.

20       Q    Okay.  And he goes on and gives you --

21   actually, if you turn to the next page, he gives

22   you -- let's see, my alphabet -- nine recommendations

23   that -- that Monsanto should -- actions that Monsanto

24   should take to answer those questions, correct?

25       A    That was his intention, yes.

Confidential - Subject to Protective Order

```
1          Q    Okay.  And those --

2              MR. GRIFFIS:  Excuse me.  Objection.  Two

3    of those are non-recommendations.

4              MS. WAGSTAFF:  Okay.

5              MR. GRIFFIS:  G and H.

6    BY MS. WAGSTAFF:

7          Q    So he gives you a handful of

8    recommendations of actions to take to answer those

9    questions, correct?

10         A    Well, there are a couple of points

11   whereby he does not recommend something.

12         Q    Okay.

13         A    Yeah.

14         Q    So that's I think what your counsel was

15   just saying is that -- so let's make this a little

16   bit cleaner.

17              Dr. Parry gave a list of eight questions

18   that were left unanswered, correct?

19         A    That he would like to see answered, yes.

20         Q    Okay.  And as a scientist, you would have

21   liked to see those answered as well, correct?

22         A    These were genuine questions, yes.

23         Q    Yeah.  Good questions, right?

24         A    These were good questions, yes.

25         Q    Okay.  And he provided with a list of
```

Confidential - Subject to Protective Order

1  actions that Monsanto could take to answer those

2  questions, correct?

3      A    Yes.

4      Q    Okay.  And we've gone over a few of

5  those.

6          So then Dr. Parry says at the very end of

7  his recommendations:  "My overall view is that if

8  there is -- my overall view is that if the reported

9  genotoxicity of glyphosate and glyphosate

10  formulations can be shown to be due to the production

11  of oxidative damage, then a case could be made that

12  any genetic damage would be threshold."

13          Did I read that correctly?

14      A    You read it, yes.

15      Q    Okay.  "Such genetic damage would only be

16  biologically relevant under conditions of compromised

17  anti -- antioxidant status.  If such an oxidative

18  damage mechanism is proved, then it may be necessary

19  to consider the possibility of the susceptible groups

20  within the human population."

21          Did I read that correctly?

22      A    You read that correctly, yes.

23      Q    Okay.  So there is an expert telling

24  Monsanto in 1999 to do tests that may affect the

25  human population, correct?

Confidential - Subject to Protective Order

1            MR. GRIFFIS:  Objection.

2    Mischaracterizes the document.

3            THE WITNESS:  This is a little bit an

4    expanded conclusion.  You know, he is more or less

5    asking himself the question.  If that might be true,

6    then there may be susceptible groups in a population

7    that might be more susceptible in producing an

8    effect.  But he forgets to say those effects have

9    been, you know, obtained through intraperitoneal

10   injection, whereas the human exposure is not via

11   intraperitoneal injection.  And that's a very

12   important nuance.

13   BY MS. WAGSTAFF:

14       Q    So I don't -- how do you know he forgot

15   to say that?

16       A    I don't know why he didn't point it out.

17   That's why --

18       Q    But he didn't point it out, did he?

19       A    Intra -- well, that is limited to

20   intraperitoneal injection.  Not sufficiently --

21       Q    So you may -- you may not agree with

22   what Dr. Parry wrote, but I'm not asking you to

23   rewrite his report.

24            I'm asking you in 1999, Dr. Parry wrote

25   to Monsanto and -- and did an analysis, gave

Confidential - Subject to Protective Order

1    questions unanswered, right?

2         A    Yes.

3         Q    Proposed actions that could be taken,

4    right?

5         A    Yes.

6         Q    And then stated that the over -- his

7    overall view is that these tests and answers need to

8    be taken, right?

9         A    Yes.

10        Q    And then you need to figure out what --

11   what group within the human population may be

12   affected, correct?

13             MR. GRIFFIS:  Objection.  It doesn't say

14   that.

15             THE WITNESS:  That -- that is what he

16   said.

17             MS. WAGSTAFF:  Okay.

18             THE WITNESS:  But I don't agree with what

19   he said because --

20   BY MS. WAGSTAFF:

21        Q    That's -- you can -- that's fine if you

22   don't agree with what he said.  I'm just -- that's

23   what he told Monsanto, correct?

24        A    That's what he told Monsanto, yes.

25        Q    Okay.  All right.  I have -- we're done

Confidential - Subject to Protective Order

```
 1   with this report.

 2        A     Okay.

 3              MS. WAGSTAFF:  Could we go off the record

 4   for one second?  I just need to --

 5              THE VIDEOGRAPHER:  The time is now

 6   11:50 a.m.  We're going off the record.

 7              (Recess.)

 8              (Martens Exhibit No. 9-9 was marked

 9              for identification.)

10              THE VIDEOGRAPHER:  The time is now

11   12:02 p.m.  We're back on the record.

12              MR. GRIFFIS:  I'm sorry.  What time did

13   you say?

14              MS. WAGSTAFF:  We're not going to take

15   anywhere near seven hours.

16              THE VIDEOGRAPHER:  12:02 p.m.

17   BY MS. WAGSTAFF:

18        Q     Are you ready to begin again, Doctor?

19        A     Yes.

20        Q     Okay.  So we had been talking about the

21   Parry reports before the break.

22        A     Mm-hmm.

23        Q     Do you remember the kind of -- what we

24   were talking about or do I need to refresh?

25        A     No, no, I remember.
```

Confidential - Subject to Protective Order

```
 1          Q    Okay.  Excellent.

 2               And so that -- that second Parry report,

 3   which was the longer one, was sent to you sometime

 4   around September of 1999.  And you had sent it to

 5   Larry Kier, Dr. Donna Farmer, and Bill Heydens around

 6   that time, correct?

 7          A    Correct.

 8               MR. GRIFFIS:  Just one moment.  I just

 9   want to object -- object again to "second report."  I

10   believe it's actually --

11               MS. WAGSTAFF:  You can have a standing

12   objection to that.

13               MR. GRIFFIS:  -- the third.

14               MS. WAGSTAFF:  You can do that.

15   BY MS. WAGSTAFF:

16          Q    So you write to Larry and Donna -- which

17   would be Larry Kier and Donna Farmer, correct?

18          A    Correct.

19          Q    -- on September 16, 1999:  "I would like

20   to get some feedback to Jim Parry on his report."

21   Correct?

22          A    Correct.

23          Q    "I sent you my comments but didn't get a

24   reaction.  Can I get your opinion and then have a

25   discussion on what -- on the action to take?"
```

Confidential - Subject to Protective Order

1    Correct?

2         A    Correct, yes.

3         Q    So you're asking these folks for their

4    opinions so you can get some feedback to Dr. Parry,

5    correct?

6         A    That was the intention, yes.

7         Q    Okay.  And you cc'd Dr. Bill Heydens on

8    that e-mail, right?

9         A    Yeah, that's what I see.

10        Q    Yeah.  Okay.

11             MS. WAGSTAFF:  Let me see the other one.

12   This one is like leaking.  It's behind your computer.

13             MS. GREENWALD:  It's on the other line.

14             MS. WAGSTAFF:  Okay, that's fine.

15   BY MS. WAGSTAFF:

16        Q    And so even though the e-mail was

17   directed to Larry and Donna, Bill Heydens goes ahead

18   and responds, correct?

19        A    That is what I see, yes.

20        Q    "Mark, all" -- and Mark is you,

21   Dr. Martens, correct?

22        A    That's correct, yes.

23        Q    Okay.  He lets you know that he has read

24   the report and he agrees with the comments, right?

25        A    Yes.

Confidential - Subject to Protective Order

1      Q    And there are various things that can be

2    done to improve the report.  So, again, they're not

3    completely happy with the report, correct?

4      A    Yes.

5      Q    Okay.  And then he says:  "Let's step

6    back and look at what we're really trying to achieve

7    here."  Right?

8      A    That's in the -- in the mail, yes.

9      Q    Okay.  He states that:  "Monsanto wants

10   to find/develop someone who is comfortable with the

11   genotox profile of glyphosate/Roundup and who can be

12   influential with regulators and scientific outreach

13   operations when genotox issues arise."  Correct?

14     A    That's what I read, yes.

15     Q    And that's what Monsanto was looking for,

16   right?

17         MR. GRIFFIS:  Objection.  He's not here

18   as a representative of Monsanto to talk about what

19   Monsanto wanted.

20         You may answer if you can.

21         THE WITNESS:  That is what Bill Heydens

22   wrote in his memo.

23   BY MS. WAGSTAFF:

24     Q    Okay.  And Bill Heydens is a toxicologist

25   in the United States, correct?

Confidential - Subject to Protective Order

```
1         A    Yes.

2         Q    For Monsanto, correct?

3         A    Yes.

4         Q    Okay.  Dr. Heydens goes on to say:  "My

5    read is that Parry is not currently such a person,

6    and it would take quite some time and" money sign,

7    money sign, money sign, slash, "studies to get him

8    there."  Correct?

9         A    That's what I read, yes.

10        Q    Okay.  "We simply aren't going to do the

11   studies that Parry suggests, period."  Correct?

12        A    That's what he said in the memo, yes.

13        Q    Okay.  Then he directs the e-mail to you

14   specifically.  "Mark, do you think Parry can become a

15   strong advocate without doing this work?"  Parry,

16   question mark.  Then he says:  "If not, we should

17   seriously," underlined, italicized, bolded, "start

18   looking for one or more other individuals to work

19   with."  Correct?

20        A    That's what I read, yes.

21        Q    Okay.  Then he goes on to say:  "We have

22   not made much progress and are currently very

23   vulnerable in this area."  Correct?

24        A    That's what I read.

25        Q    Okay.  And "this area" means the
```

Confidential - Subject to Protective Order

```
 1    genotoxicity of glyphosate/Roundup, correct?

 2         A    That is correct.

 3         Q    "We have to fix that" -- "that" being the

 4    vulnerability -- "but only if we make this a high

 5    priority now."  Correct?

 6         A    That's what I read.

 7         Q    Okay.  So -- and that is in September of

 8    1999, correct?

 9         A    Yes.  That seems correct, yeah.

10         Q    You can put that...

11              Did you have any independent

12    conversations with Dr. Heydens as to why he did not

13    want to do the studies Parry suggested?

14         A    I don't recall.

15         Q    You may have or you may not have, you

16    just don't recall?

17         A    I may have, yes.  Yeah.

18         Q    Did Dr. Parry ever offer to do the

19    studies he was suggesting?

20         A    He had the intention to do some work,

21    yes.

22         Q    When you say "he had the intention to do

23    some work" --

24         A    That's what he was suggesting.

25         Q    Okay.
```

Confidential - Subject to Protective Order

```
 1        A     Yeah.

 2        Q     So he -- Dr. Parry -- I just want to make

 3   sure that we're not using words differently.

 4              So when you say Dr. Parry had the

 5   intention to do the work he suggested, what do you

 6   mean -- do you mean that he wanted to do the work he

 7   suggested?

 8        A     Well, in his laboratory -- it's a typical

 9   academic laboratory, he's a professor of the

10   department with Ph.D. students -- and he was

11   exploring the mechanism of oxidative stress and

12   oxidative damage, and he had some ideas about Ph.D.

13   work to do in that direction.

14        Q     Okay.  So he had some ideas.

15        A     Yeah, some --

16        Q     And did he complete those ideas?

17        A     Not -- not for the glyphosate.

18        Q     Okay.  And Dr. Parry was not a Monsanto

19   employee, correct?

20        A     That's correct.

21        Q     He was never employed by Monsanto,

22   correct?

23        A     Never.

24        Q     So he's an independent scientist from

25   Monsanto, correct?
```

Confidential - Subject to Protective Order

```
1        A    Yes.

2        Q    Okay.  And did Dr. Parry ever ask for

3   financial support from Monsanto to complete the

4   studies that he had recommended?

5        A    Not that I recall.

6        Q    Okay.  Did Dr. Parry ever request some

7   samples to complete the studies that he had -- from

8   Monsanto to complete the studies that he had

9   suggested?

10       A    Not that I recall.  Not for glyphosate.

11       Q    Okay.  If Dr. Parry had suggested and

12  requested samples to complete the studies that he had

13  suggested, do you agree Monsanto should have provided

14  those samples?

15            MR. GRIFFIS:  Objection.  Hypothetical.

16            THE WITNESS:  I can answer?

17            MS. WAGSTAFF:  Yes.

18            MR. GRIFFIS:  Yes.

19            THE WITNESS:  We were reluctant to place

20  studies in the laboratory of Dr. Parry for a variety

21  of reasons.  In the first place, since the results of

22  the studies would be used for regulatory reasons, we

23  would have preferred to have those studies carried

24  out in a laboratory which is accredited for good

25  laboratory practices, and his department was not.
```

Confidential - Subject to Protective Order

```
 1                Plus that if he would engage and we
 2    engaged on supplementary -- additional testing to
 3    prove whether or not there was oxidative stress, we
 4    were looking into much more parameters than just
 5    genotoxic parameters, like, you know, organ weights,
 6    like gross pathology, like histopathology, and his
 7    department was not equipped to do these type of
 8    assays.
 9                And that is more or less -- that's why we
10    were reluctant to place those studies in his
11    laboratory, but we were very open to listen to him
12    and to follow suggestions.
13    BY MS. WAGSTAFF:
14         Q    Okay.  So you were reluctant to give
15    the -- to let Dr. Parry do the studies.  Is that --
16         A    Yes.
17         Q    -- a good summary of what you just said?
18         A    That's a good summary, yes.
19         Q    Okay.  So who did the studies?
20         A    The studies -- you know, finally, we
21    started to do the studies.
22         Q    Uh-huh.
23         A    I had contacts with Professor Parry to
24    give suggestions and do some exchange in the design
25    of the studies.  But the studies finally have been
```

Confidential - Subject to Protective Order

1    carried out at the Environmental Health Laboratory of

2    Monsanto in St. Louis, which is a GLP-accredited

3    laboratory.

4         Q    Okay.  So of all of the -- the scientists

5    in the world, these studies ended up being done in

6    St. Louis by Monsanto scientists, correct?

7         A    Yes.

8         Q    Okay.  And what -- were the studies

9    published?

10        A    The studies -- as soon as the study

11   results were available, we first shared the study

12   results with Professor Parry.  We went actually to

13   visit him and give a whole presentation of the study

14   results, and discuss all the ins and outs of the

15   study results.  And -- and we can talk later of what

16   his opinion was on the study results.

17             But the study results had been in the

18   first place presented in the open as opposed to on

19   the Society of Toxicology meeting in San Francisco in

20   2001.

21        Q    Okay.  And who at Monsanto did those

22   studies?

23        A    These studies were conducted by a couple

24   of scientists in the Environmental Health Laboratory

25   under the leadership of Dr. Larry Kier and Kathy

Confidential - Subject to Protective Order

1    Holz, and, you know, Alan Wilson, and I myself had

2    also a big say in the design and conduct of the

3    studies.

4         Q    Okay.  And you said that that study

5    was -- when -- when did that study occur?

6         A    That must have been -- well, I don't

7    recall exactly, but it was in 2000s that these

8    studies must have been conducted.

9         Q    And you left in 2003, right?

10        A    Yes.

11        Q    Okay.  So you're -- you're saying that

12   the studies that Dr. Parry conducted -- or suggested

13   were conducted by Monsanto at Monsanto's headquarters

14   between 2000 -- well, here we are in -- we were in

15   September of two -- or in April of 2000, and they

16   haven't been done, so they were conducted probably

17   in -- you're saying 2000 or 2001?

18        A    They were conducted somewhere in the

19   second half of 2000.  The results were ready -- were

20   ready very early 2001.

21        Q    Okay.  And what journals were the results

22   published in?

23        A    The results were not published in a

24   journal.  They were published as the proceedings in

25   the Society of Toxicology as a -- it was a poster

Confidential - Subject to Protective Order

1    presentation at the Society of Toxicology, official

2    journal, you know, for the -- as an abstract for the

3    proceedings of the SOT meeting in San Francisco in

4    2001.

5         Q    Okay.  So what was the -- who presented

6    the poster?

7         A    I was at that meeting -- well, there were

8    several of the authors.  Well, the way how the poster

9    is presented, there's actually posters posted, then,

10   you know, there's some -- always scientists go to the

11   poster -- actually, you know, is present at the

12   poster to respond to questions that people may have

13   on the poster.  So I was part of them, but also I

14   believe also Bill Heydens, et cetera, several others,

15   yeah.

16        Q    So this was not -- these results were not

17   peer reviewed, correct?

18        A    These results were peer reviewed in the

19   process -- it's not a peer reviewed for publication,

20   but they were peer reviewed in the process of the

21   submission of abstracts to the Society of Toxicology

22   of the United States.

23        Q    Okay.  So was this -- were these results

24   submitted to a journal?

25        A    These results were later submitted to a

Confidential - Subject to Protective Order

1    journal and published.

2         Q    So these results were -- have been

3    published?

4         A    Yes.

5         Q    Okay.  I thought you just told me a few

6    minutes ago that they were not published.

7         A    No, no, I didn't say that.

8         Q    Okay.

9         A    In the first place they were represented

10   as a poster, but later they were published.

11        Q    Okay.  And where was it published?

12        A    What do you mean, what journal?

13        Q    Mm-hmm.

14        A    Let's see.  There's the Journal of

15   Agricultural Chemicals, et cetera.  I don't recall

16   exactly, but they've been published in 2008.

17        Q    So are you talking about the paper by

18   Heydens, Healy, Hotz, Kier, you, Wilson and Donna

19   Farmer called "Genotoxic potential of glyphosate

20   formulations:  Mode-of-action investigations"?

21        A    Yes.

22        Q    Okay.  So just so we're all on the same

23   page, if you want to -- we can just mark this.  We're

24   not going to talk about it now, but just for -- just

25   for sakeness of a complete record, is this the -- is

Confidential - Subject to Protective Order

1    this the study that Monsanto conducted in response to

2    Dr. Parry's questions and --

3        A    Yes.

4        Q    -- suggestions?

5        A    Yes.

6        Q    Okay.  And so let's mark that as

7    Exhibit 10.

8             (Martens Exhibit No. 9-10 was marked

9             for identification.)

10   BY MS. WAGSTAFF:

11       Q    And you can put that aside.  We're not

12   going to necessarily talk about that right now.

13            But it's your belief and testimony that

14   all of Dr. Parry's questions were answered by that

15   study?

16       A    Let me put it this way:  That Dr. Parry

17   had a whole list of recommendations.

18       Q    Mm-hmm.

19       A    And what happened is actually one of the

20   most important recommendations, and he repeated that

21   all the time is, could you repeat the study of

22   Bolognesi, as -- you know, as best as possible, and

23   produce a couple of endpoints, which he addressed

24   like, for example, oxidative stress or oxidative DNA

25   damage.

Confidential - Subject to Protective Order

1          And then we started to do the study and

2    the plan was actually to present the study results to

3    Dr. Parry and then to see what can happen next.

4          MS. WAGSTAFF:  All right.  So strike as

5    nonresponsive.

6    BY MS. WAGSTAFF:

7      Q    My question was, is it your testimony

8    that that study that's marked as Exhibit 10 done by

9    the Monsanto toxicologists answers all of Dr. Parry's

10   questions?

11         MR. GRIFFIS:  Dr. Martens has answered

12   that question.

13         THE WITNESS:  Yes.  I did.

14   BY MS. WAGSTAFF:

15     Q    Okay.  So if we want to look to the

16   answers for all of Dr. Parry's questions, we can find

17   them all in that report; is that correct?

18         MR. GRIFFIS:  Objection.

19   Mischaracterizes what he just testified to.

20         THE WITNESS:  The -- Dr. Parry had a

21   whole list of recommendations, right.

22   BY MS. WAGSTAFF:

23     Q    Correct.

24     A    And the whole list, the most important --

25   we took the most important type of, you know,

Confidential - Subject to Protective Order

1   questions.  These were recommendations in regard

2   to -- to repeat the results -- to confirm the results

3   that had been found by Peluso and by Bolognesi, and

4   actually address a couple of questions in terms of

5   oxidative damage.

6           MS. WAGSTAFF:  I think it's No. 8.

7   BY MS. WAGSTAFF:

8       Q    Okay.  I just want to be clear --

9       A    Mm-hmm.

10      Q    -- because I'm not going to get the

11  opportunity to ask you questions on this again.  So

12  I'm sorry if it seems --

13          MS. WAGSTAFF:  I think it's 8.  Yeah,

14  that one.

15  BY MS. WAGSTAFF:

16      Q    We're going back to Exhibit 8 really

17  quick, and I just want to talk about -- in this

18  Exhibit 8, we went through these in detail --

19      A    Mm-hmm.

20      Q    -- Dr. Parry listed eight questions.

21  Correct?

22      A    Yes.

23      Q    And is it your testimony that the answers

24  to each of these questions can be found within your

25  2008 article that is entitled "Genotox potential of

Confidential - Subject to Protective Order

1    glyphosate formulations:  Mode-of-action

2    investigations"?

3          A    Mm-hmm.

4          Q    Okay.

5          A    Just to make clear, we produced a lot of

6    new toxicological evidence, and then the plan was to

7    go to Dr. Parry and see whether, you know, all of his

8    questions still were -- he was satisfied or not.  And

9    it was the -- the subject, the topic of the meeting

10   we organized together, we talked to Dr. Parry and to

11   listen to him whether he was satisfied with all the

12   results or whether he would have, you know, other or

13   new recommendations or some of the recommendations

14   that were in here.

15         Q    Okay.

16               MS. WAGSTAFF:  So let's take a ten-minute

17   break -- or let's break for lunch.  I forgot we

18   hadn't eaten lunch.

19               MR. GRIFFIS:  Okay.

20               THE VIDEOGRAPHER:  The time is now

21   12:20 p.m.  We're going off the record.

22               (Lunch recess.)

23               THE VIDEOGRAPHER:  The time is now

24   1:08 p.m.  We're back on the record.

25   BY MS. WAGSTAFF:

Confidential - Subject to Protective Order

```
 1          Q    Good afternoon, Dr. Martens.  Are you

 2   ready to begin?

 3          A    Yes, I am ready.

 4          Q    Okay.  So we're going to shift away from

 5   the Parry report a little bit, which is what we've

 6   been spending the morning talking on, and talk about

 7   a few others things.

 8               I actually don't have much more for you,

 9   you'll be happy to know.  But we're going to shift a

10   little bit.

11               Can you tell me who Rashmi Nair is?  Do

12   you know who that is?

13          A    Yes, I know Rashmi Nair, yes.

14          Q    Yeah.  Who's -- who's Rashmi Nair?  Am I

15   pronouncing it right?

16          A    Yes, yes.  It's an Indian name.  Rashmi

17   Nair was a colleague of mine at Monsanto.

18          Q    And did Rashmi live with you in Belgium

19   or was Rashmi in the United States or somewhere else?

20          A    Rashmi lived in the United States, yes.

21   Yes.

22          Q    Okay.  And worked as a toxicologist for

23   Monsanto?

24          A    Yes.

25          Q    In -- from St. Louis?
```

Confidential - Subject to Protective Order

```
 1          A     In St. Louis, yes.

 2          Q     Okay.  And is Rashmi a girl -- I mean a

 3   woman or a man?

 4          A     He's a -- a woman.  Sorry.  Woman.

 5          Q     A woman.  Okay.

 6                And who is Jerry Hjelle?  Do you know who

 7   that is, Jerry Hjelle?

 8          A     Ah, Jerry Hjelle.

 9          Q     Hjelle.  The silent H gets me every time.

10          A     Jerry Hjelle, yes.  It's a Norwegian

11   name.

12          Q     Okay.  Jerry Hjelle is -- who is Jerry

13   Hjelle?

14          A     Jerry Hjelle was the head of, you know,

15   regulatory in St. Louis.

16          Q     Okay.  So Jerry Hjelle was also an

17   employee for Monsanto and was in charge of worldwide

18   regulatory affairs.  Does that sound right?

19          A     Yes.  Yeah, that's correct.

20          Q     Okay.  And so at the beginning of your

21   deposition, we talked about how you were promoted to

22   a Monsanto fellow.

23          A     Yes.

24          Q     Correct?

25          A     Yes.
```

Confidential - Subject to Protective Order

1              (Martens Exhibit No. 9-11 was marked

2              for identification.)

3    BY MS. WAGSTAFF:

4         Q    And what I've just handed you that has

5    been marked as Exhibit 11, and this is an e-mail from

6    Dr. Bill Heydens, who we've talked about, to -- can I

7    see that?  Oh, never mind --

8              THE VIDEOGRAPHER:  The time is now 1:11

9    p.m.  We're going off the record.

10             (Pause in the proceedings.)

11             THE VIDEOGRAPHER:  The time is now

12   1:11 p.m.  We're back on the record.

13   BY MS. WAGSTAFF:

14        Q    All right.  So -- sorry, my microphone

15   was too low and the videographer couldn't hear me.

16             So what I've marked as Exhibit 11 is an

17   e-mail that Dr. Bill Heydens sends to Rashmi Nair,

18   who is there both working in the Monsanto St. Louis

19   office, and it is a nomination letter.

20             And if you move to the next page, it

21   looks as though this is a nomination for you to be

22   a -- in the fellow program written by Dr. Hjelle.

23        A    Yes.  Hjelle.

24        Q    Hjelle.  I knew that was not right the

25   minute I said it.  Dr. Jerry Hjelle.  Sorry, no -- no

Confidential - Subject to Protective Order

```
 1    disrespect, of course.

 2              And so this was considered an honor to be

 3    a Monsanto fellow.

 4         A    Yes.

 5         Q    Okay.  And do you know how many Monsanto

 6    fellows are promoted -- or how many Monsanto

 7    employees are promoted to a Monsanto fellow each

 8    year, roughly?  If you don't know, that's fine.

 9         A    Well, I don't know, but what I know is

10    that I was the only one in Europe.

11         Q    Oh, wow.  Well, that's a pretty great

12    honor.

13         A    Yes.  Well...

14         Q    So when you -- so this e-mail was

15    written -- let's see -- in September -- or, I'm

16    sorry, November 13th of 2001.

17         A    Mm-hmm.

18         Q    And we -- we read earlier that in 2002,

19    on your CV, you were promoted to a Monsanto fellow.

20    So this appears to be one of the nominations that --

21    that one of your colleagues sent to help you get

22    promoted, right?

23         A    Right.

24         Q    Because you were -- this is late of 2001

25    and you were -- you were promoted the following year.
```

Confidential - Subject to Protective Order

```
 1              What -- what accompanies a promotion to a
 2    Monsanto fellow?
 3         A    It's kind of an honor.  It's a title.
 4    It's a recognition.  But I don't recall whether I got
 5    a raise.  But it's a recognition, yeah.
 6         Q    It's a recognition --
 7         A    A scientific, you know, distinguishing --
 8    for distinguished scientific service.
 9         Q    Okay.  And it's a way of telling you
10    you've done a good job, right?
11         A    Yeah.
12         Q    Or you're doing a good job?
13         A    Yes.
14         Q    Okay.  So -- so I would presume that
15    people needed to write recommendations on your
16    behalf, which is why we have this letter from
17    Dr. Hjelle.  Correct?
18         A    Yes.
19         Q    Okay.  So if you look at this letter,
20    it -- I hope talking about your strengths doesn't
21    embarrass you because that's all this letter talks
22    about, but it talks about how -- this letter is about
23    you, correct?
24         A    Yes.
25         Q    Okay.  So it gives you great pleasure to
```

Confidential - Subject to Protective Order

1    nominate Dr. Mark Martens -- that's you -- for the

2    appointment of the position of Monsanto fellow.

3    That's what we've been talking about, correct?

4           You've been with Monsanto at that time

5    for 12 years.

6    A    Mm-hmm.

7    Q    Does that sound correct?

8    A    Yes.

9    Q    Okay.  And during that time you have

10   developed and sustained technical expertise in

11   various areas of toxicology, most notably metabolism,

12   genotoxicity and carcinogenicity.

13          And those two at the end are the ones

14   that we've been talking about most today, right?

15   A    Yes.

16   Q    So they're recognizing you for being an

17   expert in this area.

18          It says that you have established

19   yourself as a highly knowledgeable and credible

20   scientist outside of Monsanto as well.

21          I assume you don't disagree with that.

22   A    I don't disagree.

23   Q    It says that you had internal leadership

24   and external influence that makes you valuable and

25   effective to support Monsanto's entire profile of

Confidential - Subject to Protective Order

```
 1    products in Europe -- in the Europe/Africa region.

 2            And that would include the Roundup and

 3    glyphosate products, right?

 4       A    Yes.

 5       Q    Okay.  It talks a little bit more about

 6    your accomplishments.  I'm trying to make this a

 7    little bit bigger.

 8            And then it talks about some of the

 9    specific things that you have done early in your

10    career at Monsanto.  If you go down to the third

11    paragraph.

12            It said that your efforts were

13    instrumental in defending butyl benzyl phthalate.

14       A    Phthalate.

15       Q    Phthalate.  BBP; is that correct?

16       A    Yes.

17       Q    Do you remember that experience in your

18    career?

19       A    I worked on BBP, yes.

20       Q    Yeah.  Okay.  And so your colleague is

21    saying that your efforts were instrumental in

22    defending BBP, which was a key Monsanto chemical

23    company product.

24            So it was -- BBP was a key chemical for

25    Monsanto, right?
```

Confidential - Subject to Protective Order

1        A     Yes.

2        Q     And apparently a well-known European

3   researcher published data showing test -- testicular

4   effects in rats at ultra low dose levels; is that

5   right?

6        A     Yes.

7        Q     Okay.  And that probably was problematic

8   for Monsanto, right?

9        A     Yes.

10       Q     Okay.  And so you were called in to work

11  closely with experts outside of Monsanto, and you led

12  the effort to design, implement and conduct a

13  research program to assess the significance of the

14  published work.

15           So, what I read that to mean is you were

16  called in to find experts and reassess all of the

17  data --

18       A     Yes.

19       Q     -- related to BBP.

20       A     Yes.

21       Q     And you were successful in doing that

22  from Monsanto's eyes, correct?

23       A     Yes.

24       Q     Okay.  And your reanalysis of the data

25  actually contradicted the reported findings and

Confidential - Subject to Protective Order

1  caused the independent researcher to retract his

2  publication, right?

3       A    Yes.

4       Q    Okay.  And -- and as a result, Monsanto

5  was able to continue the sale of BBP, correct?

6       A    Yes.

7       Q    So that's kind of similar to what you

8  were called in to do with Dr. Parry, right?

9            MR. GRIFFIS:  Objection to form.

10            THE WITNESS:  I -- I wouldn't necessarily

11  agree with that.

12  BY MS. WAGSTAFF:

13       Q    Okay.  So you were called in to -- to

14  sort of fix some bad data, right?

15            MR. GRIFFIS:  Objection to form,

16  misrepresents the record.

17            THE WITNESS:  I -- I don't accept the

18  word "fix."

19  BY MS. WAGSTAFF:

20       Q    Okay.  Fair enough.

21            Let's talk more about what -- what

22  Dr. Hjelle says about you.

23            You have -- you were instrumental in

24  convincing a key European expert that reports of

25  genotoxicity with Roundup actually represent effects

Confidential - Subject to Protective Order

1    secondary to cytotoxicity, rather than a primary

2    genotoxic response.

3              And that was Dr. Parry, right?

4    A    Yes.

5    Q    That's what we've been talking about all

6    morning.

7              It says that you were also influential or

8    effective in reversing the strong negative regulatory

9    position toward MON 13900 in France.

10             What's -- what's MON 13900?

11   A    I think it was a grow regulating

12   compound, but I honestly don't recall the detail of

13   that.

14   Q    Okay.  And then it says that you have

15   been successful in alleviating concerns over

16   genotoxicity and carcinogenicity, and that's really

17   what your role was with -- with engaging in Parry,

18   right?

19   A    My role in engaging with Parry was to

20   find -- to receive a second opinion and to get

21   Professor Parry to further elucidate, you know, the

22   real significance of those findings by doing

23   supplementary additional testing.

24   Q    Okay.  And -- and Dr. Parry's report did

25   not alleviate the concerns over genotoxicity or

Confidential - Subject to Protective Order

1    carcinogen -- carcinogenicity, right?

2        A    Well, what happens is that on the basis

3    of the recommendations of Dr. Parry, we initiated a

4    stepwise research program, and shared those data with

5    Dr. Parry and discussed those results with Dr. Parry

6    so that he could reassess his position on the basis

7    of those new data.

8        Q    Okay.  But his reports on their face

9    didn't alleviate the concerns over the genotoxicity,

10   right?

11       A    Are you talking about report 1 or

12   report 2?

13       Q    All of them.

14       A    All of them.  The -- the reports that we

15   have been talking about from Dr. Parry were actually

16   an evaluation on -- of the -- the papers of -- you

17   know, that we discussed in the beginning, plus the

18   regulatory genotoxicology work.

19       Q    Okay.  So my questions were -- my

20   question was, Dr. Parry's report did not alleviate

21   the concerns over -- over the genotoxicity and

22   carcinogenicity, correct?

23       A    Dr. Parry's report actually expressed a

24   concern with recommendations that we used to produce

25   new toxicological data in concert with Dr. Parry,

Confidential - Subject to Protective Order

1    that we then shared with Dr. Parry to come to a new

2    conclusion on the basis of those data.

3         Q    Okay.  And did -- did you share -- did

4    you share Dr. Parry's reports, either of them,

5    report 1 or report 2, with anybody?

6         A    No, because it was a consultancy with

7    Dr. Parry, which actually -- with the intention to

8    lead us to the production of new data which would

9    help us to gain insight in the type of data that were

10   produced by Bolognesi and Peluso.

11        Q    Okay.  And you've agreed earlier that

12   the questions raised by Dr. Parry were good

13   questions.

14        A    Yes, mm-hmm.

15        Q    Okay.  And they would -- why not share

16   those with other scientists around the world?

17        A    No, because this was a preliminary --

18   preliminary evaluation which led to an hypotical --

19   hypothetical evaluation of assessment of Roundup and

20   glyphosate by Dr. Parry, and we needed actually to

21   first confirm whether or not his hypothesis was

22   value -- was valid.

23        Q    Okay.  So let me just make sure I

24   understand what happened.  Okay?

25        A    Mm-hmm.

Confidential - Subject to Protective Order

```
1          Q     You engaged -- Monsanto engages Dr. Parry

2    to assess some studies that have occurred, correct?

3          A     Right.

4          Q     Okay.  And those studies raised some

5    valid concerns about the safety profile of glyphosate

6    and Roundup, right?

7          A     Yes.

8          Q     And at that point Monsanto wasn't sure

9    what -- Monsanto agreed Dr. Parry was an expert in

10   the area, right?

11         A     Yes.

12         Q     But they weren't sure what Dr. Parry's

13   opinions of these studies would be, correct?

14         A     That is why we asked his opinion.

15         Q     Yeah.  Of course.  Why else would you ask

16   his opinion, right?

17         A     Yeah.

18         Q     So you asked him an opinion and he writes

19   a report, and the report is not well received by

20   Monsanto toxicologists.

21         A     Well, the conclusions were well received.

22         Q     Okay.

23         A     The form of the report was not well

24   received.

25         Q     Okay.  The conclusions were well
```

Confidential - Subject to Protective Order

```
1    received --

2         A    Mm-hmm.

3         Q    -- and eventually Dr. Parry is given more

4    information.

5         A    Yes.

6         Q    And he writes another report with very

7    similar conclusions.  We've walked through each of

8    the reports, correct?

9         A    Mm-hmm.

10             MR. GRIFFIS:  Objection to the --

11   BY MS. WAGSTAFF:

12        Q    And --

13             MR. GRIFFIS:  -- representation of the

14   record on similar conclusions.  I don't think it

15   shows that.

16   BY MS. WAGSTAFF:

17        Q    Okay.  And at this point, these -- the

18   questions that are raised are serious questions.

19   Good questions, genuine scientific questions.

20        A    I would say genuine questions, yeah.

21        Q    Yeah.  But it's your opinion that these

22   questions should not be shared with anyone else.

23        A    It was the intention to use those

24   questions and to use the recommendation to initiate

25   further research to address them in a corrective way
```

Confidential - Subject to Protective Order

1    and to see where exactly that we -- both parties

2    could understand what's actually going on, and

3    whether we have an initiation of oxidative damage and

4    whether possible genotoxicity was secondary to the

5    initiation of oxidative damage.

6         Q    Okay.  And I assume by the same token,

7    you never shared -- Monsanto never shared the Parry

8    reports with any regulatory agency.

9         A    That was not -- that was internal, you

10   know, expert to our company, you know, information,

11   and exchange of views, which had as the only

12   objective to inspire Monsanto to do some

13   supplementary research and to better understand the

14   effects that have been published by Peluso and

15   Bolognesi.

16             MS. WAGSTAFF:  Okay.  Strike as

17   nonresponsive.

18   BY MS. WAGSTAFF:

19        Q    My question was, I assume by the same

20   token that Monsanto never shared the Parry report

21   with any regulatory agencies, correct?

22        A    That's correct.

23             MR. GRIFFIS:  The answer was responsive.

24             THE WITNESS:  Yeah.

25   BY MS. WAGSTAFF:

Confidential - Subject to Protective Order

```
1        Q    Is that correct?

2        A    That's correct, yeah.

3        Q    Okay.

4             MR. GRIFFIS:  Excuse me, Doctor, the line

5    of sight from the camera to your mouth has your hands

6    in front of it right now.

7    BY MS. WAGSTAFF:

8        Q    Okay.  And in fact, Monsanto engaged

9    Dr. Parry in a secrecy agreement, right?

10       A    In a confidentiality agreement.

11       Q    Well, the words that you used were

12   secrecy agreement, correct?

13       A    Sometimes these words are used on the

14   document itself.  In fact, it's a confidentiality

15   agreement.

16       Q    Okay.  It's -- it's -- but it was a

17   secrecy agreement making Dr. Parry contractually

18   agree not to share the results with anyone, correct?

19            MR. GRIFFIS:  Object to form.

20            THE WITNESS:  Let me rephrase.  A

21   confidentiality agreement is signed between an

22   external expert and a company in the case that a

23   company have -- is willing to share confidential data

24   with the expert, and that is general practice.

25   BY MS. WAGSTAFF:
```

Confidential - Subject to Protective Order

```
1          Q    Okay.  Well, let me -- let me just ask a

2     little bit about that, if you don't mind.

3          A    Yeah.

4          Q    What is the -- Monsanto gave to Dr. Parry

5     four articles that were in the public domain,

6     correct?

7          A    That -- that is not the issue of a

8     confidentiality agreement.  Monsanto provided to

9     Dr. Parry --

10         Q    Mm-hmm.

11         A     -- all its proprietary rights studies,

12    the regulatory studies, which are the property of

13    Monsanto, and it was within that context that the

14    confidentiality agreement was needed.

15         Q    Okay.  And if we go back to Exhibit 5, it

16    shows that you received from Professor Parry the

17    signed secrecy agreement, right?

18         A    Yes.

19         Q    Which means that you're asking Dr. --

20    Professor Parry, Dr. Parry, to keep this work secret,

21    right?

22              MR. GRIFFIS:  Objection.  Miss --

23    BY MS. WAGSTAFF:

24         Q    And by its own words, that's what a

25    secrecy agreement means.
```

Confidential - Subject to Protective Order

```
 1              MR. GRIFFIS:  Objection.  You're adding

 2   your own ideas of the clauses of the contract.  Show

 3   it to him if you have it.

 4              THE WITNESS:  The -- when -- you know,

 5   I'm a consultant myself.

 6   BY MS. WAGSTAFF:

 7        Q    Mm-hmm.

 8        A    If I'm asked by a company to provide

 9   advice --

10        Q    Mm-hmm.

11        A    -- on documents which are the property of

12   that company --

13        Q    Mm-hmm.

14        A    -- then always a confidentiality

15   agreement is signed, and this was exactly the same

16   situation.

17        Q    Sure.  And these aren't my words.  These

18   are your words, right?

19        A    Yeah.

20        Q    Okay.  And you said you received from

21   Professor Parry a signed secrecy agreement, right?

22        A    Right.

23        Q    Okay.  And Monsanto could share that

24   information if they wanted to, correct?

25        A    What do you mean by "information"?
```

Confidential - Subject to Protective Order

1    Q    Well, whatever you're -- whatever you're

2    asking Dr. Parry to keep secret from everybody else,

3    Monsanto could share that information, correct?

4    A    What the confidentiality agreement is

5    about is there to make sure that Dr. Parry doesn't

6    share the documents that are proprietary right

7    documents of Monsanto, shared with third parties.

8    Q    Okay.  So was it your understanding then

9    that Dr. Parry could share his analysis and report

10   with other people?

11   A    Yes.

12   Q    Okay.  So it's -- you don't believe that

13   that analysis or report is contained within the

14   secrecy agreement.

15   A    That was not why a secrecy agreement is

16   normally signed for.

17   Q    Okay.  And do you think that that report

18   should be kept secret?

19   A    It's an evaluation.

20   Q    Mm-hmm.

21   A    That wasn't an open question.  That was

22   never in question.  We asked him for an advice, he

23   provided the advice, and then we worked on that

24   advice.

25   Q    Okay.  So it's your -- I just want to

Confidential - Subject to Protective Order

1    make sure we're talking about the same thing.

2         A    Mm-hmm.

3         Q    You do not -- it's not your opinion that

4    his reports should remain secret, right?

5              MR. GRIFFIS:  Objection.  If you're

6    talking about now with regard to litigation and a

7    legal designation of confidentiality, he's not

8    qualified to answer that question, and I direct him

9    not to.

10             MS. WAGSTAFF:  Okay.

11             MR. GRIFFIS:  If you're talking about

12   something back in 1999, he can try to answer if he

13   can.

14             MS. WAGSTAFF:  I'm talking about the fact

15   that he wrote to his colleagues that, I have received

16   a signed secrecy agreement from Professor Parry, and

17   I'm asking questions about that, and I believe I'm

18   entitled to.

19   BY MS. WAGSTAFF:

20        Q    I get what you're saying.  I know you're

21   not a lawyer.  I'm not asking you to relieve a

22   confidential designation.

23             I'm asking you why would the results

24   or -- and/or his analysis need to be subject to a

25   secrecy agreement?

Confidential - Subject to Protective Order

1             MR. GRIFFIS:  Objection.  He didn't say

2     that his results or analysis were subject --

3             MS. WAGSTAFF:  And that's why I'm asking.

4             THE WITNESS:  Yep.  A secrecy or a

5     confidentiality agreement is always signed when an

6     external expert works together with a company, and

7     that company provides the external expert with data

8     which are confidential and have proprietary rights.

9     BY MS. WAGSTAFF:

10        Q    Okay.  And I -- and I understand that,

11     and let me just make myself clear.

12             I believe I understand your testimony to

13     be that he signed a secrecy agreement because

14     Monsanto gave him secret documents.

15        A    No secret documents.  Confidential

16     documents.

17        Q    Okay.  So he signed a secrecy agreement

18     because Monsanto gave him confidential documents,

19     correct?

20        A    That is correct.

21        Q    And from those confidential documents,

22     he -- Dr. Parry created a report.

23        A    Mm-hmm.

24        Q    Or an analysis, an evaluation.

25        A    Yes.

Confidential - Subject to Protective Order

```
 1        Q    Correct?

 2             I'm wondering is it your opinion that

 3   that evaluation report list of conclusions, the ones

 4   that we've gone through, at the time -- I'm not

 5   talking about now -- I'm talking about at the time,

 6   were those considered to be confidential and subject

 7   to the secrecy agreement as well?

 8             MR. GRIFFIS:  To the extent that this

 9   calls for a legal opinion from him about the effect

10   of the confidentiality agreement, I object.

11             If you have an opinion yourself as a

12   scientist, not as a lawyer, go ahead.

13             THE WITNESS:  Yeah, a confidentiality

14   agreement is always signed between a company and

15   external experts when internal data are exchanged.

16   BY MS. WAGSTAFF:

17        Q    Right.  And so --

18        A    There is no intent -- this is a standard

19   procedure.

20        Q    Right.  And what I'm asking is why -- why

21   weren't his results shared more broadly?

22        A    Well, because we were awaiting the

23   results that we would be producing in order to

24   respond to his recommendations and his concerns.

25        Q    Okay.  So I am understanding it correctly
```

Confidential - Subject to Protective Order

1    that no one at Monsanto shared the Parry papers with

2    anyone?

3             MR. GRIFFIS:  Objection.  No foundation

4    that he would know.

5             THE WITNESS:  What do you mean "with

6    anyone"?  Outside Monsanto?

7    BY MS. WAGSTAFF:

8        Q    Correct.

9        A    Well, you know, as far as the whole

10   research project was not terminated, there was no

11   reason to start sharing those evaluations and data

12   with other party.

13       Q    Okay.  So the answer is, no, it was

14   not -- the information was not shared outside of

15   Monsanto?

16       A    No, it was not shared outside of

17   Monsanto.

18       Q    What is the Glyphosate Task Force?

19       A    The Glyphosate Task Force is -- is a

20   European task force, and I presume there is a similar

21   type of task force in the United States, that more or

22   less -- well, it assembles all the glyphosate, all

23   the companies that bring glyphosate to the market in

24   Europe, and a part of the European Crop Protection

25   Association.

Confidential - Subject to Protective Order

1        Q    Okay.  And is -- does it have members?

2        A    Yes.

3        Q    Okay.  And is Monsanto a member of the

4   Glyphosate Task Force?

5        A    Yes.

6        Q    Okay.  Is it a company or a corporation?

7        A    It is a working group that resides under

8   the European Crop Protection Association, which is a

9   European association of crop protection products

10  produced.

11       Q    So when you were an employee of Monsanto,

12  did the Glyphosate Task Force exist?

13       A    Not under that name.

14       Q    Under what name did it exist?

15       A    I don't recall that.

16       Q    Were you Monsanto's representative on the

17  task force?

18            MR. GRIFFIS:  Objection as to time.  It's

19  vague.

20            THE WITNESS:  I don't recall that.

21  BY MS. WAGSTAFF:

22       Q    Okay.  Have you done work with the

23  Glyphosate Task Force recently?

24       A    Yes.

25       Q    In what capacity?

Confidential - Subject to Protective Order

 1          A     I represented the Glyphosate Task Force

 2     at the meetings of the European Union, at the

 3     European Chemicals Agency for the classification of

 4     glyphosate.

 5          Q     Okay.  And this was recently, correct?

 6          A     Yes.

 7          Q     And because we are bifurcated in

 8     discovery here, I'm not going to get into the

 9     regulatory role that you played in that, and if and

10     when we -- we want to get into that, we'll revisit

11     these issues.

12                But any other thing that -- did you

13     get -- well, strike that.

14                Did you get paid for your work with the

15     Glyphosate Task Force that you just mentioned

16     recently?

17          A     As a consultant, yes.

18          Q     Okay.  And does the task force itself pay

19     you for that work?

20          A     Ultimately the task force pays me for the

21     services provided.

22          Q     Okay.  And you mentioned at the beginning

23     of this deposition that as recently as 2011 Monsanto

24     hired you as a consultant for a product, not

25     glyphosate, right?

Confidential - Subject to Protective Order

1        A    Well, that was the first product I got to

2    evaluate for -- within my consultancy agreement with

3    Monsanto, yes.

4        Q    Okay.  And then I believe you

5    mentioned -- and I'm not trying to trip you up, so

6    correct me if I'm wrong -- but that Monsanto retained

7    you to do consultancy work on glyphosate as recently

8    as one or two years ago?

9        A    One year ago, yes.

10       Q    Okay.  And what's that consulting work

11   that you're doing for Monsanto with respect to

12   glyphosate within the last year and a half or --

13       A    That was all in relation to the European

14   classification and resubmission of glyphosate in

15   Europe.

16       Q    Okay.  So you were a consultant for the

17   Glyphosate Task Force and also for Monsanto.

18       A    Well, you know, I was -- within the

19   contract that I had with Monsanto, I got sanctioned

20   as a representative of Glyphosate Task Force.

21       Q    Okay.  So it was Monsanto who paid you

22   for that work on the Glyphosate Task Force.

23       A    And back charged to the Glyphosate Task

24   Force.

25       Q    Okay.  And roughly how much did you get

Confidential - Subject to Protective Order

```
 1   paid for that?

 2        A     Over what period of time?

 3        Q     Just the glyphosate consultancy in the

 4   last --

 5        A     In the last eight months or --

 6        Q     No, since -- I believe you said they

 7   hired you around a year, year and a half ago.  I

 8   don't care about the work you did for other products.

 9   I'm just talking about glyphosate.

10        A     Right.  Well, I was under contract with

11   Monsanto, so I was actually open for any type of

12   advice they wanted to get from me.

13        Q     Okay.

14        A     So on any kind of products of Monsanto,

15   but I was asked for the first time actually to get

16   engaged in the evaluation of glyphosate for

17   classification in European Union.  So we are in the

18   beginning of summertime of last year.

19        Q     Okay.

20        A     Yeah.

21        Q     So how much money do you believe that you

22   were paid for that consultancy work?

23        A     You want to have that in dollars or

24   Euros?

25        Q     Whichever is easy -- easier for you.
```

Confidential - Subject to Protective Order

```
 1          A     Oh, it must have been something like

 2    60,000 Euros.

 3          Q     60,000 Euros --

 4          A     Yes.

 5          Q     -- is that what you said?  Okay.

 6                And that was over a period of -- you said

 7    since last summer, and right now it's --

 8          A     Eight months, something like --

 9          Q     Eight months.  Okay.

10          A     Eight or nine months.

11          Q     And you had a successful result --

12          A     Yes.

13          Q     -- from that consultancy work for your

14    people?

15                And does your consultancy agreement state

16    that you cannot work for Monsanto competitors?

17          A     No.

18          Q     No.  There's no clause that says you can

19    only consult for Monsanto?

20          A     There is no exclusivity clause.

21          Q     That's what I was looking for.  Okay.

22          A     Yeah.

23                MS. WAGSTAFF:  Can you give me your

24    document.

25                Oh, yeah, we'll take a two-minute break,
```

Confidential - Subject to Protective Order

```
 1    and I think we're close to being finished.

 2              THE VIDEOGRAPHER:  The time is now

 3    1:36 p.m.  We're going off the record.

 4              (Recess.)

 5              THE VIDEOGRAPHER:  The time is now

 6    1:49 p.m.  We're back on the record.

 7    BY MS. WAGSTAFF:

 8         Q    Good afternoon.  Are you ready to

 9    continue?

10         A    Yes, I'm ready.

11         Q    Okay.  We have talked throughout the day

12    about reports that Dr. Parry has written, correct?

13         A    Yes.

14         Q    And each of those reports had certain

15    analyses or -- or evaluations or conclusions

16    contained within them, correct?

17         A    Yes.

18         Q    Did Dr. Parry ever write to you a

19    retraction of those conclusions, evaluations or

20    analyses?

21         A    I don't recall that.

22         Q    Did Dr. Parry ever write a version of a

23    report where his evaluations or conclusions were

24    inconsistent with the ones -- the evaluations and

25    conclusions we looked at today?
```

Confidential - Subject to Protective Order

```
 1        A     I don't recall such a report.

 2        Q     Okay.  So -- okay.  Did -- did you ever

 3   receive any written confirmation from Dr. Parry that

 4   Monsanto has satisfied the questions that he posed

 5   that we went over today?

 6        A     That was written in a meeting report that

 7   was sent out by Richard Garnett.

 8        Q     Right.  And I understand Richard Garnett,

 9   a Monsanto employee, wrote that.

10        A     Yes.

11        Q     And I've seen that e-mail.

12        A     Yes.

13        Q     I'm asking if there was ever any written

14   confirmation from Dr. Parry himself.  Obviously what

15   Richard Garnett said would be, you know, hearsay.

16              So I'm wondering is there any written

17   confirmation from Dr. Parry that his questions have

18   been answered in any way?

19        A     The conclude --

20              MR. GRIFFIS:  I object to the comment

21   about hearsay.

22              But go ahead.

23              THE WITNESS:  The conclusions that were

24   written down by -- the conclusions of the meeting

25   that were written down by Richard Garnett or the
```

Confidential - Subject to Protective Order

1    conclusions that were reached together with Dr. Parry

2    in his meeting were genuinely reflecting the

3    conclusions that we all together reached at that

4    meeting.

5    BY MS. WAGSTAFF:

6        Q    Okay.  So my question was, did you ever

7    receive written confirmation from Dr. Parry that his

8    questions had been answered, and it sounds like, no,

9    you didn't.

10       A    No, we didn't, but I had a continued

11   relationship with Dr. Parry afterwards as well.

12       Q    Sure.  But you never received written

13   confirmation from him, correct?

14       A    Not that I recall.

15       Q    Okay.  Excellent.

16            So moving on to a slightly different

17   tone, you were involved in a lot of the surfactant

18   studies, correct?

19       A    To some extent, yes.

20       Q    Okay.  So we've been provided documents

21   that came from a custodial file from you.  You

22   probably know that.  And you produced documents

23   after -- to us since after you left Monsanto.  You're

24   aware of that.

25       A    I just -- I don't understand what you

Confidential - Subject to Protective Order

1    mean to say.

2        Q    Your lawyers worked with you to gather

3    documents that were responsive to a subpoena that we

4    issued, and you -- and they went through a process of

5    determining which ones were relevant, and they gave

6    to us documents that they found -- and this isn't

7    supposed to be a trick question, but that they found

8    on your computer or somewhere that were responsive to

9    our documents -- I mean to our subpoena.

10           MR. GRIFFIS:  I mean we --

11   BY MS. WAGSTAFF:

12       Q    Yeah.  You left in 2003, and we have

13   documents after that, but you can go ahead.

14           MR. GRIFFIS:  And let me -- let me help

15   because I don't think he knows.

16           MS. WAGSTAFF:  Okay.

17           MR. GRIFFIS:  He wasn't involved in the

18   document production effort.

19           MS. WAGSTAFF:  Okay.

20           MR. GRIFFIS:  It wasn't a subpoena.

21   There was a notice of deposition.  And we sent

22   documents in an e-mail about that subject to you and

23   others explaining what we did, and filed a response

24   to the notice of deposition.

25           MS. WAGSTAFF:  Okay.

Confidential - Subject to Protective Order

1            MR. GRIFFIS:  He hasn't seen those

2    documents or that e-mail, so the deposition response

3    he wasn't involved.

4    BY MS. WAGSTAFF:

5        Q    So this was just a precursor to tell you

6    that along with those documents we would get

7    something called metadata.  It doesn't matter that

8    you know what this is.  I'm just marking it as an

9    exhibit because this was a PowerPoint.  That was the

10   whole point of that.

11       A    Mm-hmm.

12           MS. WAGSTAFF:  Do you want to give --

13   so --

14           MR. GRIFFIS:  This is for Dr. Martens?

15           MS. WAGSTAFF:  Yeah, and this is what

16   we're going to label Exhibit 12 and --

17           (Martens Exhibit Nos. 9-12 and 9-13

18            were marked for identification.)

19   BY MS. WAGSTAFF:

20       Q    And, Dr. Martens, certain documents that

21   are produced to us in a process that the lawyers do.

22   There's no date on them, so they have -- they have

23   this little chart, okay?  And this chart comes up and

24   it has what's called metadata, which just kind of

25   gives you information that's encrypted sort of in

Confidential - Subject to Protective Order

1    electronic documents.

2              And so this metadata relates to this.  So

3    the metadata in Exhibit 13 relates to the metadata in

4    exhibit -- I mean relates to what was produced in

5    Exhibit 12, and you can link them up by title being

6    "Surfactant Toxicology," author is Martens.  At the

7    bottom it looks like the date created was May 3rd,

8    2010.  Okay.  Just for completeness of the record.

9              MR. GRIFFIS:  Just a moment.  Are you

10   marking this as an exhibit?

11             MS. WAGSTAFF:  I just thought you would

12   want it --

13             MR. GRIFFIS:  Yes.

14             MS. WAGSTAFF:  -- just for like

15   completeness.

16             MR. GRIFFIS:  And let me -- I don't -- I

17   don't know if this will matter, but let me state for

18   the record --

19             MS. WAGSTAFF:  Okay.

20             MR. GRIFFIS:  -- that my understanding of

21   metadata is that it can be altered by many things,

22   such as being looked at and so on, and things like

23   "date last modified" might have no relationship to

24   what any of the authors actually did.  It could be --

25             MS. WAGSTAFF:  Sure.

Confidential - Subject to Protective Order

```
 1              MR. GRIFFIS:  -- a file archiving system
 2    that created the data.  It may be a totally
 3    irrelevant observation, but --
 4              MS. WAGSTAFF:  Yeah.  So --
 5              MR. GRIFFIS:  -- I just put that on the
 6    record.
 7              MS. WAGSTAFF:  Yeah, no problem.
 8              MR. GRIFFIS:  Okay.
 9              MS. WAGSTAFF:  And Robin just told me
10    that we were -- have been required to produce the
11    metadata as an exhibit, so that's why we're doing it
12    again.  But -- okay.
13              So you've got date created, 5/10 or
14    May 3rd, 2010, and then as your counsel just said,
15    the date last modified is 5/3/2010, and this was
16    found in Richard Garnett's custodial file.
17              So we will just go from there.  Your
18    objection is on the record.
19    BY MS. WAGSTAFF:
20         Q    So this appears to be a PowerPoint that
21    you've created.  Do you remember this PowerPoint?
22         A    I -- I recall the images when I see them
23    now, yes.
24         Q    Okay.  And so do you recall that --
25    that -- and it looks like we wrote --
```

Confidential - Subject to Protective Order

1              MS. WAGSTAFF:  Did we handwrite the Bates

2    number on there?  It looks like we wrote -- handwrote

3    the initial Bates number on there.

4    BY MS. WAGSTAFF:

5         Q    So do you remember making this

6    PowerPoint?

7         A    Yes, yes.  I remember the -- some of the

8    pictures, yes.

9         Q    All right.  And so when you made this,

10   you were not an employee of Monsanto, correct?

11        A    I was an employ -- employee of Monsanto

12   at the time when I made this presentation.

13        Q    Oh, you were.  Okay.

14        A    Yeah.

15        Q    So you made this presentation before

16   2003?

17        A    Yes.

18        Q    Okay.  And -- and what did you make this

19   presentation for?

20        A    That presentation was given at the

21   occasion of an internal technology meeting of

22   Monsanto Europe.

23        Q    Okay.  And so just help me understand,

24   who was the audience that you were presenting to?

25        A    It was all European Monsanto technology

Confidential - Subject to Protective Order

1   researchers.

2       Q    Okay.  And do you remember why you gave

3   this presentation?

4       A    This presentation -- well, Monsanto

5   Europe organizes on a regular basis scientific

6   meetings to educate their personnel and to put them

7   aware of new findings in -- in science that is of

8   application to the agricultural products of Monsanto.

9   And at the tech days 2001, which were organized in

10  Brussels, the theme was surfactants.

11      Q    Okay.  At the what days?  I just didn't

12  hear what you said.

13      A    Well, there was internal technology

14  meeting days were called the tech days.

15      Q    Oh, tech days.  Okay.  Got it.

16           So tech days 2001 was in Brussels --

17      A    Yes.

18      Q    -- and the theme was surfactants.

19      A    Yes.

20      Q    And this was your presentation at that.

21      A    Right.

22      Q    You remember that?

23      A    Right.

24      Q    Okay.  And so you put this data together

25  at that point, right?

Confidential - Subject to Protective Order

1          A     Right.

2          Q     Okay.  And this isn't a PowerPoint

3     someone else made and gave to you, correct?

4          A     No, no, this is my PowerPoint.

5          Q     You made it, this is your thoughts?

6          A     Yes.

7          Q     Okay.  And have you had a moment to look

8     through it?

9          A     Well, I'm able to recognize it, yes.

10         Q     Okay.  So, unfortunately, there aren't

11    names -- or page numbers on it, but I will kind of

12    guide you by picture.  Okay?

13         A     Okay.

14         Q     Okay.  If you go to the thing that says

15    "Surfactant Technology, Specific Toxicity Cases."

16    It's kind of far back, and then it will be easy from

17    there.  It looks like this (indicating).

18         A     Yes.

19         Q     Okay.

20         A     I have it.

21         Q     And these are all slides from your

22    PowerPoint, right?

23               So it looks like you were educating your

24    audience about the toxicology of surfactants, right?

25         A     Yes.

Confidential - Subject to Protective Order

```
 1          Q    Okay.  And you were -- in doing so --

 2    actually let me go -- go back one page.

 3               In doing so, you noted the Peluso case,

 4    right?

 5          A    Yes.  One -- well, the results of our

 6    additional research were available at that time, and

 7    one of the initiatives was actually to inform

 8    personnel -- technology personnel in Monsanto about

 9    the results.

10          Q    Mm-hmm.

11          A    And also at the same time in parallel, we

12    were preparing the poster for the Society of

13    Toxicology meeting in San Francisco.

14          Q    Yeah, and so I will --

15               MS. WAGSTAFF:  I'm going to strike that

16    as nonresponsive.

17    BY MS. WAGSTAFF:

18          Q    My question was, in educating these

19    folks, you noted the Peluso case, right?

20          A    Yes.

21          Q    Okay.  And you talk about the Peluso case

22    and you talk about MON 35050, which is what we've

23    been talking about all morning, the Italian

24    formulation, right?

25          A    Yes.
```

Confidential - Subject to Protective Order

```
 1          Q    And that's the -- MON 35050 is also the

 2    formulation used in the Peluso and the -- the --

 3          A    Bolognesi.

 4          Q    -- Bolognesi paper.

 5          A    Yes.

 6          Q    Right?

 7          A    Yes.

 8          Q    Okay.  And it says:  "The in vivo

 9    genotoxicity finding was cause of concern to

10    regulatory authorities."

11               Correct?

12          A    Yes.

13          Q    Okay.  So now these are your thoughts

14    that the genotoxicity finding in vivo was of concern,

15    correct?

16          A    Yes.

17          Q    Okay.  And this is -- then you're --

18    you're going on to educate these people who are

19    listening to your presentation about the toxicity of

20    surfactants, and you said:  "To better understand the

21    significance, Monsanto undertook research to examine

22    the role of intraperitoneal versus oral, DMSO olive

23    oil versus saline, and then the Italian formulation

24    with and without glyphosate."  Right?

25          A    Yes, exactly.
```

Confidential - Subject to Protective Order

1        Q    So I just want to make sure that I

2   understand what additional research Monsanto

3   undertook.  Was that the 2008 article that we've been

4   talking about?

5        A    Yes.

6        Q    And was there any other research Monsanto

7   undertook?

8        A    No.  That was that research.

9        Q    Okay.  And do you remember about what

10  month this presentation occurred in 2001?

11       A    That must have been very early 2001.

12       Q    Okay.  We could probably find it on the

13  internet or something.  I mean it was called the

14  tech -- what was it called again, the tech?

15       A    Tech days, but I don't think that you

16  could find it like this under -- that was an internal

17  name that -- that we used for Monsanto technology

18  meetings.

19       Q    Okay.  So January or February or March,

20  sometime like that?

21       A    Something like that.

22       Q    Okay.  And so your -- the -- the results

23  from your new study weren't finalized at this point;

24  is that correct?

25       A    I think they were known by that time,

Confidential - Subject to Protective Order

1    yes.

2         Q    Okay.  So do you include them in this

3    PowerPoint?

4         A    Let me have a look.  (Peruses document.)

5              Yeah, the conclusions of that study were

6    mentioned on a slide.

7         Q    Okay.  Can you point me -- can you tell

8    me which slide?  What is --

9         A    They are not numbered, but I --

10        Q    What's the top of the slide say?

11        A    The top is "Surfactant toxicology.

12   Specific toxicity cases:  DNA adducts.  Conclusions

13   of the MON 35050 case."

14        Q    Okay.  So this is -- these are your

15   conclusions --

16        A    Mm-hmm.

17        Q    -- from the MON 35050 case.

18             So the MON 350 case is your 2008 study,

19   correct?

20        A    Yes.

21        Q    Okay.  And just so we're clear, this is

22   the -- this is the 2008 study that Bill Heydens is

23   the lead coauthor, right?

24        A    Mm-hmm.

25        Q    And it's called "Genotoxic Potential of

Confidential - Subject to Protective Order

```
1    Glyphosate Formulations:  Mode-of-Action

2    Investigations," correct?

3         A    Yes, correct.

4              MR. GRIFFIS:  Excuse me.  Vague and

5    ambiguous to the extent that the 2008 study suggests

6    it was done then rather than published then.

7              MS. WAGSTAFF:  Okay.  And that's a good

8    question.

9    BY MS. WAGSTAFF:

10        Q    If this was done in 2001, previous to --

11   to this research, why did it take seven years to

12   publish it in a journal?

13        A    Well, we were very fast in actually

14   bringing it into the open because we communicated the

15   results via a poster on the -- at the Society of

16   Toxicology meeting in San Francisco.  So those

17   results were in the open and were actually shared

18   with the outside world for discussion.

19              To turn all those results into a

20   publication, that calls for a lot of work, and while

21   that has been done after I left Monsanto in 2003.

22        Q    Okay.  So you will admit that sometimes

23   when results are finished, it would take a while to

24   get them in the public journal?

25        A    Yeah, most of the time that is the case.
```

Confidential - Subject to Protective Order

```
 1              MR. GRIFFIS:  Object to form, "admit."

 2   BY MS. WAGSTAFF:

 3       Q    And do you know if these -- this data was

 4   denied by any journal for publication?

 5       A    I don't recall it because I was not

 6   anymore with Monsanto.

 7       Q    Okay.  So when you left Monsanto in 2003,

 8   the results of this MON 35050 case study were not

 9   published, correct?

10              MR. GRIFFIS:  Objection.  Inconsistent

11   with prior testimony that they were published as a

12   poster.

13              THE WITNESS:  Exactly, yeah.

14   BY MS. WAGSTAFF:

15       Q    Excuse me?

16       A    They were already put into the open via

17   our poster presentation.

18       Q    Okay.  And so this MON 35050 case study,

19   when you left Monsanto in 2013 was not in --

20   published in a journal, correct?

21       A    That is correct, yes.

22       Q    Okay.  So the version that we have

23   labeled as Exhibit 10, I believe -- or, sorry, 8 --

24              MS. GREENWALD:  No, I'm sorry.  You know

25   what -- 10.
```

Confidential - Subject to Protective Order

```
 1   BY MS. WAGSTAFF:

 2        Q    10, did you help in finalizing that

 3   report?

 4        A    The manuscripts were sent to me for, you

 5   know, reading and for commenting and et cetera, yes.

 6        Q    Okay.  So even though you weren't a

 7   Monsanto --

 8        A    No.

 9        Q    -- employee, you stayed involved in the

10   publication of this journal, correct?

11        A    Yes, yes.

12        Q    Okay.  So wouldn't you know if it was

13   submitted to a journal and denied?

14        A    I -- I don't recall anything of this.

15        Q    Okay.  You don't recall or you know that

16   it wasn't?

17        A    I don't recall.  No.

18        Q    Okay.  Would it be normal for someone to

19   submit a journal article without letting the authors

20   know?

21        A    I was informed about the publication.

22        Q    Okay.

23        A    Yes.

24        Q    So you don't know -- you have no

25   recollection of why it took seven years to go from
```

Confidential - Subject to Protective Order

 1    raw data to journal publication?

 2            MR. GRIFFIS:  Objection.  Misrepresents

 3    his testimony on the subject.

 4            THE WITNESS:  Well, since it already was

 5    put into the open and since it was submitted -- all

 6    the results were also submitted to regulatory

 7    authorities, like the German authorities, yes, the

 8    next step is to actually publish, you know, those

 9    results.

10            And normally in industry there is very

11    little time to write full publications, but -- and

12    that's why sometimes it takes a little bit more time

13    than expected, but the results were actually

14    submitted to the institutes, like the regulatory

15    authorities in Germany, who were asking for it.

16    BY MS. WAGSTAFF:

17        Q    Okay.  So you don't -- that's -- you

18    think that that time frame is not abnormal, the

19    seven-year period between raw data and getting it

20    published, that's not -- that's not an abnormally

21    long time period for you?

22        A    No, it's not --

23            MR. GRIFFIS:  Objection to form as to

24    "getting it published."  He's testified multiple

25    times that it was published as a poster.

Confidential - Subject to Protective Order

```
 1              THE WITNESS:  It was already published,
 2   but it's not abnormal to produce a full --
 3              MS. WAGSTAFF:  Please quit testifying,
 4   Counsel.  I mean he's repeating exactly what you say.
 5   You can object to form.
 6              MR. GRIFFIS:  I'm correcting
 7   misrepresentations in your questions.
 8              THE WITNESS:  It's not abnormal.  It
 9   takes a lot of work, yes.
10   BY MS. WAGSTAFF:
11        Q    Okay.  We will move on from that.
12              MR. GRIFFIS:  By the way, if we're going
13   to talk about 10, I don't have a copy of it.  You
14   marked and gave him one, but I don't have one.
15              MS. WAGSTAFF:  I'm not talking about it
16   anymore, I don't think.
17              MR. GRIFFIS:  Okay.
18   BY MS. WAGSTAFF:
19        Q    Well, I will ask one question about your
20   study, that is the 2008 study.  Was that a risk
21   assessment?
22        A    It was meant to be a mechanistic study,
23   if I may say so.
24        Q    So is that a risk assessment?
25        A    No.
```

Confidential - Subject to Protective Order

```
 1        Q    Okay.  All right.

 2             (Martens Exhibit No. 9-14 was marked

 3             for identification.)

 4   BY MS. WAGSTAFF:

 5        Q    So in 2003, and I believe you were still

 6   a Monsanto employee at this time, just because of the

 7   way that the e-mail reads, you were asked to

 8   summarize Monsanto long-term studies.

 9             And this is an e-mail that you have

10   written back to Bill Heydens and Donna Farmer and

11   Richard Garnett talking about those summaries,

12   correct?

13        A    That's correct, yes.

14        Q    And you say:  "Here are the summaries for

15   the Monsanto long-term studies," and then it looks

16   like there is a file attached, a file attached, a

17   file attached, a file attached.

18        A    Mm-hmm.

19        Q    Right?

20        A    Yeah.

21        Q    And you write:  "Here are the summaries."

22   So why were you asked to provide summaries of the

23   Monsanto long-term studies?

24        A    Well, as a toxicologist in Europe, you

25   know, sometimes I collaborate with the team in
```

Confidential - Subject to Protective Order

1    St. Louis to make those summaries, yes.

2        Q    Okay.  So it was -- there wasn't anything

3    abnormal about why you were asked to write those

4    summaries?

5        A    No, absolutely not.

6        Q    Okay.  And I'm not going to ask you any

7    questions about these summaries other than just to

8    confirm that these were summaries that you wrote.

9    Okay?

10           And -- okay.  So --

11           MS. WAGSTAFF:  Do you want to give me

12   each one?

13           MS. GREENWALD:  Yes, this is 16 and this

14   is 17.

15           MS. WAGSTAFF:  Okay.  So these are the

16   three that -- and I will give you a copy, Counsel, in

17   just one second.

18   BY MS. WAGSTAFF:

19       Q    I just want to know if these were in fact

20   the summaries of you --

21           MS. WAGSTAFF:  And these are the -- I'm

22   not going to write on them.  Those are the copies

23   that need to go with the record.

24           MR. GRIFFIS:  It's three of the four?

25           MS. WAGSTAFF:  Yeah.  I don't know what

Confidential - Subject to Protective Order

1    the fourth one is --

2              (Martens Exhibit Nos. 9-15, 9-16

3              and 9-17 were marked for

4              identification.)

5              THE WITNESS:  I don't recall, but

6    apparently, yes, these may be the summaries, yeah.

7    BY MS. WAGSTAFF:

8        Q    Okay.  I mean, is there any reason that

9    that doesn't look like one of your summaries, the

10   format and that type of thing?

11       A    Yeah, it looks like these are the type of

12   summaries that we -- we make in the carcinogenicity

13   studies, yeah.

14       Q    Okay.  Excellent.

15             MS. WAGSTAFF:  You can hand those back

16   then.  This is 14.  It's -- 14 is the e-mail, 15, 16

17   and 17.  If you care about the numbering, 15 is the

18   Stout --

19             MR. GRIFFIS:  I thought 13 was the

20   e-mail.

21             MS. WAGSTAFF:  What's 13?

22             MS. GREENWALD:  13 is the metadata.

23             MS. WAGSTAFF:  Metadata.

24             MR. GRIFFIS:  All right.

25             MS. WAGSTAFF:  14 is the e-mail, 15 is

Confidential - Subject to Protective Order

1    Stout, 16 is Hogan and Lankas, and 17 is Knezevich.

2            MR. GRIFFIS:  Okay.

3    BY MS. WAGSTAFF:

4        Q    Well, have I been fair to you today?

5        A    I think so, yes.

6        Q    Okay.  Excellent.

7            MS. WAGSTAFF:  So thank you very much.

8            I pass the witness, and reserve any

9    rebuttal questions in case you have some.

10           MR. GRIFFIS:  I have a few.  Let's take a

11   break.

12           MS. WAGSTAFF:  And we'll swap seats?

13           MR. GRIFFIS:  Yes.

14           THE VIDEOGRAPHER:  The time is now

15   2:12 p.m.  We're going off the record.

16           (Recess.)

17           THE VIDEOGRAPHER:  The time is now

18   2:28 p.m.  We are back on the record.

19                   CROSS-EXAMINATION

20   BY MR. GRIFFIS:

21       Q    Good afternoon, Dr. Martens.  My name is

22   Kirby Griffis, and I'll be asking you some questions

23   now.

24           You are a toxicologist, correct, sir?

25       A    Yes, sir.

Confidential - Subject to Protective Order

```
 1        Q     Would you please tell the jury what a

 2   toxicologist is.

 3        A     A toxicologist is a scientist who studies

 4   the effects of chemical substances on the health of

 5   animals and men.

 6        Q     And you have a Ph.D. in toxicology?

 7        A     Yes.

 8        Q     Did you start your career as what is

 9   called a forensic toxicologist?

10        A     Yes, I did.

11        Q     Would you please explain to the jury what

12   a forensic toxicologist is.

13        A     A forensic toxicologist is a scientist

14   who actually, you know, designs and applies methods

15   of analysis to determine the concentration of toxic

16   substances in body fluids and tissues of people and

17   of victims in order to establish a causal

18   relationship between a crime and, for example, the --

19   the death of the victim.

20        Q     Okay.  And that was a little bit of a

21   technical explanation.

22              You're one of the scientists that works

23   for police departments or detectives --

24        A     Yes.

25        Q     -- to investigate poisons and other --
```

Confidential - Subject to Protective Order

```
 1          A    Right.

 2          Q    -- substances that might have hurt

 3    someone in a crime?

 4          A    Yes.

 5          Q    Is that a -- is that a good explanation?

 6          A    That is a good explanation, yes.

 7          Q    Did you do a residency with Scotland Yard

 8    in England?

 9          A    Yes, I did.

10          Q    And tell us in a sentence or two what you

11    did there.

12          A    During my residency at Scotland Yard,

13    which is the Metropolitan Police Laboratories in

14    London, I spent time in acquiring knowledge and

15    refining my knowledge in terms of the analysis of

16    toxic substances in body fluids and tissues.

17          Q    After your forensic toxicology work as a

18    student and as a resident at Scotland Yard, what did

19    you go on to do next in your career?

20          A    After my Ph.D., I joined the

21    pharmaceutical industry.

22          Q    Well, what company did you join?

23          A    Continental Pharma in Brussels.

24          Q    And what was your job duty with

25    Continental Pharmaceuticals in Brussels?
```

Confidential - Subject to Protective Order

1      A    I was the head of the department of mass

2   spectometry, pharmacokinetics and metabolism.

3      Q    You said "pharmacokinetics."  What is

4   pharmacokinetics?

5      A    Pharmacokinetics is the study of the

6   behavior of chemical substances in the human body.

7      Q    How the chemicals move through the body?

8      A    And how they are excreted from the body

9   as well.

10     Q    And you said "metabolism."  What is that?

11     A    The metabolism is a series of chemical

12  reactions that take place in the liver and which lead

13  to breakdown products, which are -- can be either

14  toxic, nontoxic, and which are excreted through the

15  kidneys from the body.

16     Q    You also mentioned mass spectrometry, and

17  that's a tool that's used to assess chemicals, right?

18     A    That's a tool that is used to identify

19  and characterize and quantify chemicals that, you

20  know, are present in body fluids and tissues.

21     Q    What did you do after your work at

22  Continental Pharma?

23     A    After Continental Pharma, I joined the

24  Belgium authorities as a specialist in clinical

25  biochemistry first, as an inspector, and then

Confidential - Subject to Protective Order

1    afterwards I joined the toxicologists, where I became

2    head of the toxicology department, and actually

3    founded the toxicology department at the National

4    Institutes of Health.

5         Q    And when you say the "Belgian

6    authorities," that's the same as the National

7    Institutes of Health?

8         A    Well, Belgium is a small country, so we

9    don't have a separate institute like National

10   Institutes of Health, but I worked -- at the time it

11   was called the Institute of Hygiene and Epidemiology,

12   which was actually the scientific research institute

13   of the Ministry of Health.

14        Q    Now, sir, as you said, in the United

15   States we have a whole agency called the National

16   Institutes of Health that does scientific research,

17   and we also have the Environmental Protection Agency

18   which regulates pesticides.

19             In Belgium, does the same organization do

20   both of those things?

21        A    In Belgium, it's a collaboration between

22   the Ministry and the Scientific Institute for Public

23   Health.

24        Q    And that's where you worked, right?

25        A    Yes.

Confidential - Subject to Protective Order

1       Q     How long were you a regulator in Belgium?

2       A     Ten years.

3       Q     And what -- what was your role there?

4    What did you do at the institute?

5       A     I was the head of the department of

6    toxicology, and in that function I was the primary

7    advisor of the Minister of Health of Belgium.  And at

8    the same time I had to represent my country at the

9    meetings of the European Union, the commission of the

10   European Union, at OECD, and at other international

11   meetings like, for example, IPCS.

12      Q     Were you involved in inspections of

13   companies and approval of their products?

14      A     That was also --

15      Q     Or disapproval of their products?

16      A     Yes, that was indeed the case.

17      Q     After your work as a regulator in Belgium

18   for 10 years, what did you do next?

19      A     I joined Monsanto in Brussels.

20      Q     What were your responsibilities at

21   Monsanto, broadly speaking?

22      A     At the time when I joined Monsanto,

23   Monsanto had a very large chemical division next to

24   the agrochemical division and the food division, and

25   I was responsible for the whole portfolio of Monsanto

Confidential - Subject to Protective Order

1    products for all these sectors in Europe and Africa.

2         Q    And it was a Europe -- it was a regional

3    responsibility for Europe, Africa and the Middle

4    East?

5         A    Yes.

6         Q    And you know you haven't been a Monsanto

7    employee since 2003, but you testified that you've

8    done some recent contract work in the last year; is

9    that right?

10        A    Yes, that's right.

11        Q    On glyphosate?

12        A    On glyphosate, yes.

13        Q    So we'll get to that.

14             Now, over your 45-year career as a

15   toxicologist, how many different substances have you

16   worked with toxicologically speaking?

17        A    I've seen the toxicology profiles of at

18   least 1,000 products.

19        Q    And out of the at least thousand products

20   that you have worked with as a toxicologist, how does

21   glyphosate compare regarding -- with regard to

22   toxicity?

23        A    Of all the compounds I assist during my

24   whole career, glyphosate is certainly one of the

25   least toxic I've ever seen.

Confidential - Subject to Protective Order

```
1          Q    How does it compare, for example, to

2    table salt?

3          A    It's less toxic than table salt after

4    single dosing and after repeated dosing.

5          Q    Now, what do toxicologists call the body

6    of studies, the group of studies and scientific data

7    regarding a particular substance like glyphosate?

8          A    As a toxicology dossier.

9          Q    Okay.  So the dossier.

10               How large is the toxicology dossier on

11   glyphosate?

12         A    The toxicology dossier of glyphosate is

13   actually the largest I've ever seen in my whole

14   career.

15         Q    Now, when glypho -- glyphosate is used,

16   of course, to kill weeds, right?

17         A    Yes.

18         Q    How does it do that?  What does it do to

19   weeds that makes them die?

20         A    It inhibits specifically an enzyme that

21   is responsible for the production of an amino acid,

22   which is very essential for the survival of the

23   plant.  When that enzyme is blocked, then the plant

24   actually starves to death.

25         Q    So that the jury will understand, it is
```

Confidential - Subject to Protective Order

1   through chemicals like enzymes that cells and

2   therefore plants and people and animals carry out all

3   their functions, correct?

4       A     Yes.

5       Q     The enzyme that glyphosate blocks in

6   plants, does that exist in humans?

7       A     No, it does not exist in humans and it

8   does not exist in all mammals.

9       Q     So cats and dogs and cows and other

10  mammals don't have that enzyme --

11      A     No.

12      Q     -- and neither do humans?

13      A     No.

14      Q     Is it possible for glyphosate to harm

15  humans or cats and dogs and cows and other mammals

16  through the same way that it harms weeds?

17      A     No, that's not possible.

18      Q     I want to talk for a minute about the

19  issue of exposure.  Would you please explain to the

20  jury why toxicologists care about exposure.

21      A     Actually, the compound is toxic when the

22  dose is high enough to exert a toxic action.  So

23  there are chemicals with a low potential of toxicity

24  and a high potential of toxicity.  The chemicals with

25  a low potential of toxicity need much higher doses to

Confidential - Subject to Protective Order

1    cause illness in man; whereas, the chemicals with a

2    high potential for toxicity only need very lower

3    doses and even very minor doses to cause illness in

4    man.

5         Q    Could you give the jury an example of the

6    importance of exposure to toxicology with, say,

7    vodka?

8              MS. WAGSTAFF:  Objection.  Hypothetical.

9    BY MR. GRIFFIS:

10        Q    Go ahead.

11        A    Yeah.  Well, for example, if you take the

12   example of vodka, vodka consists for something like

13   almost 50 percent volume percent of alcohol.  Alcohol

14   actually is a toxic substance when it's swallowed and

15   when it's given at sufficiently high concentrations.

16   So what is the importance with route of

17   administration?  For example, you drink, let's say, a

18   gallon of vodka.  I'm just hypothesizing.  Well, you

19   certainly get into a coma, but if you would spill

20   that same amount on your skin, you certainly will not

21   get the coma.  You, you know, would get a little bit

22   drowsy because there is still a little bit of

23   quantity that will be absorbed, but that will be much

24   lesser than compared to the amount that is absorbed

25   from the gastrointestinal tract after swallowing.

Confidential - Subject to Protective Order

```
1          Q    Okay.  So you've talked about two

2    different things, the dose and the route of

3    administration, right?

4          A    Right.

5          Q    So on the issue of a dose, you said if

6    you drink a whole gallon of vodka, that would be bad,

7    you might go into a coma or something --

8          A    You may die.

9          Q    -- like that.  You may die.

10         A    Yes.

11         Q    And if you drank one drop of vodka, what

12   would the effect be?  The same?

13         A    The effect would certainly not be the

14   same.  So you can easy for your lifetime drink two

15   little quantities of vodka per day without having any

16   liver disease.

17         Q    And -- or coma or death or --

18         A    Certainly not coma or certainly not CNS

19   depression, no.

20         Q    And if you took a daily dose of two

21   glasses of vodka and just poured it over your arm,

22   that would have virtually no effect as well, right --

23         A    Yeah.

24         Q    -- because it's a different route of

25   administration?
```

Confidential - Subject to Protective Order

1          A     Yes, exactly.

2          Q     Now I would like to turn to glyphosate

3     with those concepts in mind.

4                In the real world, what is the level of

5     exposure that humans have to glyphosate?

6          A     The level of exposure is very low, and it

7     has been demonstrated in a farm family study where

8     glyphosate exposure in farmers has been monitored by

9     analyzing glyphosate in urine, and from that project,

10    which has been, you know, carried out on at least

11    50 -- something like 50 farms -- farmers and their

12    families, we could assess that the quantity that has

13    been absorbed after one day of using glyphosate and

14    applying glyphosate on surfaces as high as 400 acres

15    per day, that the quantity that is absorbed that day

16    is actually about even more than 10 million times

17    lower than the quantities that in one day we had to

18    use in animals in order to, you know, to assess

19    possibly carcinogenicity.

20         Q     So there's a study that was performed

21    called the Farm Family Exposure Study.

22         A     Yes.

23         Q     Is that right?

24         A     That's the right title.

25         Q     It was done in farmers and -- and people

Confidential - Subject to Protective Order

1    who -- people who are applying it on crops.

2         A    Yes.

3         Q    So they would be spraying it on up to 400

4    acres --

5         A    Right.

6         Q    -- over the course of a day.

7              And was everyone in the -- did everyone

8    in the study have any glyphosate in their body?

9         A    Well, of all the -- the farmers and their

10   family members that have been screened, 40 percent --

11   in 40 percent of them glyphosate could not be

12   detected in their urine.

13        Q    And in the ones where glyphosate could be

14   detected, it was how much lower than in your

15   toxicology studies in animals?

16        A    At about 10 million times lower.

17        Q    Now, in the real world -- I want to talk

18   about the real world ways that people might be

19   exposed to glyphosate.  So let's talk about inhaling

20   it first.  Inhaling or breathing it in.

21             Is that a way that people can be exposed

22   to glyphosate, by breathing glyphosate fumes?

23        A    Glyphosate fumes don't exist.

24        Q    Okay.  Now, everyone's familiar with

25   spilling some gasoline or spilling perfume and

Confidential - Subject to Protective Order

1    immediately smelling it.

2         A    Right.

3         Q    Does that mean that they are breathing

4    fumes when they smell it?

5         A    Yes, exactly.

6         Q    But that doesn't apply to glyphosate?

7         A    Glyphosate is not volatile.

8         Q    Okay.  So does that mean that there are

9    not molecules to breathe in from a spill of

10   glyphosate?

11        A    That's not possible.

12        Q    Is it -- is it possible in any way to

13   inhale or breathe in glyphosate?

14        A    The only possibility by which you can be

15   exposed via the inhalation route is by inhaling a

16   spray of, you know, Roundup dilution during

17   application.

18        Q    So if you're spraying it and droplets are

19   still falling and haven't landed on the ground yet,

20   you could breathe some in.

21        A    If they have landed on the ground, there

22   is no way you are exposed.  Whilst you were walking

23   through a cloud of the spray of glyphosate of Roundup

24   dilution, there's a possibility you can inhale some

25   of it.

Confidential - Subject to Protective Order

```
1          Q     And how much would the exposure be in

2    that circumstance?

3          A     Studies have been carried out to assess

4    that, and it appears to be negligible.

5          Q     Are people exposed to glyphosate by

6    eating it or drinking it, if they don't deliberately

7    drink down a bottle of glyphosate for some reason?

8          A     There is a possibility of an exposure to

9    extremely low concentrations when there are some

10   residues in food.

11         Q     Residues in food.  And what is the size

12   of that exposure?

13         A     That is extremely low.

14         Q     What about people getting it on their

15   skin, is that a possible route of exposure to

16   glyphosate?

17         A     That is a possible route of exposure,

18   yes.

19         Q     And I've been saying glyphosate, but all

20   these things are true of Roundup too; is that fair?

21         A     Well, we should consider Roundup because

22   that's the only form through which people are exposed

23   to glyphosate.

24         Q     The things I've been saying are true

25   of -- and you've been saying are true of glyphosate
```

Confidential - Subject to Protective Order

```
 1   and --

 2              MS. WAGSTAFF:  Objection.

 3   BY MR. GRIFFIS:

 4        Q    -- Roundup, right?

 5        A    Right.

 6        Q    Okay.  And the study that you talked

 7   about earlier, the Farm Family Exposure Study, that

 8   would have essentially been looking at dermal

 9   exposure, exposure to the skin?

10        A    Yes.  That is what it was, yes.

11        Q    Is it known how much glyphosate gets into

12   the body if it's placed directly on the skin of a

13   person?

14        A    Yes.

15        Q    How much?

16        A    That varies between 2 and 3 percent

17   depending on the type of formulation.

18              MS. WAGSTAFF:  Object to foundation.

19   BY MR. GRIFFIS:

20        Q    And we're talking about with the

21   surfactant, correct, in roundup?

22        A    With the surfactant.  Yes, yes.

23   Glyphosate, another form is a salt, the

24   isopropylamine salt, in -- you know, together with

25   the surfactant co-formulants.
```

Confidential - Subject to Protective Order

```
 1          Q    Now, sir, you've mentioned a couple of

 2    times today that in the animal studies -- and when we

 3    talk about toxicology studies, there are two major

 4    kinds, in vitro which are done in petri dishes on the

 5    laboratory bench, and there are in vivo ones which

 6    are done in live animals, right?

 7          A    Correct.

 8          Q    So when we talk about the animal studies,

 9    the animals are given glyphosate by an oral dose,

10    they're fed the glyphosate or the Roundup.

11          A    Right.

12          Q    Or it's injected intraperitoneally, which

13    means into their belly cavity, right?

14          A    Yes.

15          Q    Now, humans never get glyphosate either

16    one of those ways in anything like those doses.  So

17    why are the toxicology studies done that way?  Please

18    explain that to the jury.

19          A    The long-term carcinogenicity studies are

20    done via the oral route in order to maximize the

21    concentrations of glyphosate in the bloodstream --

22          Q    Could --

23          A    -- in the body.

24          Q    Could you get enough glyphosate into the

25    bloodstream of rats or mice or other animals to do
```

Confidential - Subject to Protective Order

1    long-term carcinogenicity studies via dermal

2    exposure?

3         A    That would be at least ten times less.

4         Q    The exposure would be at least ten times

5    less?

6         A    Yes, blood concentrations.

7         Q    And the dose -- how do the doses that are

8    given to the animals in the long-term carcinogenicity

9    studies compare to doses that humans are exposed to?

10        A    Well, in simple terms, if you calculate

11   back from the doses that have been given to -- to

12   rats, for example, then you come up with a -- yeah, a

13   full beer glass of glyphosate every day.

14        Q    So for a human to be dosed the same way

15   at the same level as the rats and mice in the

16   long-term cancer studies, they would have to drink a

17   full beer glass of glyphosate per day?

18        A    Every day of their life.

19        Q    Do -- has Monsanto done studies on

20   whether glyphosate can cause cancer?

21        A    Yes.

22        Q    What -- what are those studies?

23        A    There are three studies.  It concerns two

24   rat studies and one mouse study.

25        Q    And do those studies show that glyphosate

Confidential - Subject to Protective Order

 1   can cause cancer?

 2        A    Glyphosate didn't cause -- the conclusion

 3   was that glyphosate didn't cause cancer.

 4        Q    Now, you said that Monsanto -- we've just

 5   been talking about long-term cariogenicity studies,

 6   cancer studies of glyphosate.

 7        A    Right.

 8        Q    Not of Roundup.

 9             Has Monsanto done long-term cariogenicity

10   studies of Roundup?

11        A    These type of studies were not carried

12   out because they are scientifically of no added value

13   for a very simple reason:  If you administer Roundup

14   to, you know, experimental animals for their

15   lifetime, they actually will die from the surfactant

16   before they ever have the occasion to develop cancer.

17        Q    Now, surfactant is kind of like soap,

18   right?

19        A    Yes.

20        Q    And if you --

21             MS. WAGSTAFF:  Objection to the

22   characterization of that.

23   BY MR. GRIFFIS:

24        Q    If you feed an animal large amounts of

25   surfactant, which is -- the surfactants are in -- I

1    said surfactants are like soap, and I got an

2    objection, so I would like to make that clear.

3              Surfactants are in dishwashing liquid.

4    A    Yes.

5    Q    They're in bar soap.

6    A    Yes.

7    Q    They're in shampoo.

8    A    Yes.

9    Q    They're in the soaps that we use to wash

10   our clothes and our houses?

11   A    Pharmaceutical preparations.

12   Q    Pharmaceutical, the pills that we take?

13   A    Yes.

14   Q    They're in substances that we use to

15   spray on the walls of our house to clean it?

16   A    Yes.

17   Q    And those surfactants are, like soaps,

18   those are soap surfactants and they're similar to the

19   surfactants that are in Roundup, right?

20   A    Soap is a very general term, but it, you

21   know, boils down actually to have a molecular

22   structure, which are, you know, called in chemistry

23   surfactants.

24   Q    And what happens to an animal or a person

25   if they drink, consume surfactants at the levels that

Confidential - Subject to Protective Order

1    you would have to give in a long-term carcinogenicity

2    study?

3         A    As surfactants have the characteristic to

4    be irritating to mucous membranes, so if you drink --

5    if you are, from a gastrointestinal point of view,

6    are exposed to high concentrations of surfactants,

7    you actually produce a chronic irritation of the

8    mucous membranes of the gastrointestinal tract, and

9    that causes an imbalance of electrolyte exchange, and

10   the result is that, you know, there will be a lot of

11   water extracted from the bloodstream into the

12   gastrointestinal tract.  Thereby, you will have a

13   thickening of the blood, which can actually end up

14   into a hypothalamic shock, and of which animals can

15   die.

16        Q    So tell me if this is fair.  You were

17   using some technical terms there.  Is it -- is it

18   fair to say that it would be -- you would get sick

19   from the effects of drinking what's the equivalent of

20   a large amount of soap every day, and that would

21   cause severe illness or death long before any cancer

22   effects could be observed?

23        A    Absolutely.

24             MS. WAGSTAFF:  Objection.  Misstates

25   testimony.

1    BY MR. GRIFFIS:

2         Q    Now, the jury has heard that a lot of the

3    studies on glyphosate, including glyphosate cancer

4    studies, were performed by Monsanto, for example, at

5    the Environmental Health Lab in St. Louis.

6              How do regulators know that they can

7    trust studies done by industry labs like the

8    Environmental Health Lab at St. Louis?

9              MS. WAGSTAFF:  Objection.  Calls for

10   speculation.  He's not an environmental regulator.

11   BY MR. GRIFFIS:

12        Q    Go ahead, sir.

13        A    The -- the laboratories for toxicology

14   studies are carried out for regulatory purposes.

15   They need to be accredited for good laboratory

16   practices.  That means they will have to follow

17   extremely stringent procedures of quality control to

18   make sure that processes are followed, to make sure

19   that at all levels of data production, these data are

20   controllable and can be checked by the authorities.

21        Q    Now, you said "good laboratory

22   practices."

23        A    Mm-hmm.

24        Q    Is that your term?

25        A    No, that's the official term which has

Confidential - Subject to Protective Order

1    been at the highest level possible applied at OECD

2    where at the first time the "good laboratory

3    practices" have been defined.

4         Q    Is one of the chapters in your book on

5    good laboratory practices?

6         A    Yes.

7         Q    Did you implement good laboratory

8    practices in Belgium?

9         A    Yes.

10        Q    And have you done good laboratory

11   practices inspections?

12        A    Yes.

13        Q    Have you done one at a pharmaceutical

14   company?

15        A    Yes, I have done the laboratory of

16   Johnson & Johnson in Beerse, Belgium.

17        Q    How many days was that -- days long was

18   that inspection?

19        A    That's almost a week inspection with two

20   people.

21        Q    How do regulators know that industry labs

22   that are following good laboratory practices aren't

23   just cooking the data and making stuff up or telling

24   lies to the regulators?

25             MS. WAGSTAFF:  Object to form.

Confidential - Subject to Protective Order

```
 1                THE WITNESS:  The -- the regulatory

 2    authorities organize on a regular basis inspections.

 3    And also when the study reports are submitted to the

 4    regulatory authorities, they should contain all the

 5    inspection reports of the internal quality assurance

 6    unit of the laboratory, which is an independent unit

 7    in the laboratory reporting to a completely

 8    independent management from the laboratory, and

 9    making sure that all the procedures are in place and

10    that all the inspections are documented.

11    BY MR. GRIFFIS:

12         Q    So the -- they're the -- in the

13    laboratory there will be the scientists who are

14    performing the experiments.

15         A    Yes.

16         Q    And there will be an independent group of

17    people who watch the scientists and make sure they do

18    everything correctly.

19         A    Well, they watch the procedures followed

20    by the scientists.

21         Q    And they report to separate managements,

22    correct?

23         A    Yes.

24         Q    Why -- how do we know that the people who

25    are watching the scientists and watching the
```

Confidential - Subject to Protective Order

1    procedures are following the rules?

2              MS. WAGSTAFF:  Object to form.

3              THE WITNESS:  There is -- the quality

4    assurance unit within the toxicology laboratory

5    reporting to outside toxicology laboratory needs to

6    actually to accept on a regular basis inspections

7    from the authorities, and when the inspection reports

8    are acceptable, they acquire what is called a GLP

9    accreditation.  And they need to have the GLP

10   accreditation at regular renewals of that in order to

11   stay in function.  And when the laboratory has a

12   quality assurance unit or in its role no

13   accreditation, this laboratory has no possibility to

14   submit its test results to the authorities, they will

15   be refused.

16   BY MR. GRIFFIS:

17        Q    So if Monsanto or another company lost

18   its accreditation because it didn't follow the rules,

19   they would be out of business as far as doing

20   research; is that right?

21        A    Abso- -- absolutely.

22        Q    And the regulators also come in and

23   perform inspections of the lab and the -- the

24   independent auditing unit --

25        A    Yeah.

Confidential - Subject to Protective Order

1        Q       -- for the lab as well, right?

2        A       Yes.  On a regular basis.

3        Q       I would like to turn to the issue of

4    Dr. Parry.

5                When you reached out to Dr. Parry in

6    1999, you sent him four of the studies that existed

7    at the time on the subject of genotoxicity, correct?

8        A       Yes.

9        Q       And there were other studies that you

10   didn't send him at the time, right?

11       A       Well, the study -- well, there were the

12   studies -- the regulatory studies which have been

13   produced by Monsanto, they were not sent in the first

14   place to Dr. Parry for evaluation because they've

15   been evaluated by the authorities and who came to the

16   conclusion that glyphosate was not genotoxic.

17       Q       You -- you sent him four particular

18   studies --

19       A       Right.

20       Q       -- that had recently come out that

21   were -- that had suggestions by the conclusions of

22   the authors about possible genotoxicity associated

23   with glyphosate, right?

24       A       Yes.

25       Q       And when he did his initial evaluation,

Confidential - Subject to Protective Order

1    as you testified earlier, he hadn't yet looked at the

2    Monsanto studies and the regulatory studies, right?

3         A    Right.

4              MS. WAGSTAFF:  Objection --

5    BY MR. GRIFFIS:

6         Q    And the --

7              MR. GRIFFIS:  Sorry?

8              MS. WAGSTAFF:  I said objection, leading.

9    BY MR. GRIFFIS:

10        Q    The regulatory studies, they would all

11   have been done under good laboratory practices,

12   rules?

13        A    Yes.

14        Q    His eval- -- his initial evaluation,

15   which is Exhibit 4 -- do you have your copy of

16   Exhibit 4, sir?

17             What I'm putting up on the screen is from

18   Exhibit 4, Bates number ending 103.

19             And during Ms. Wagstaff's examination,

20   she highlighted and asked you about the first

21   sentence in that first full paragraph on the page,

22   sir, saying:  "The overall data provided by the four

23   publications" --

24             I'm sorry, are you there yet?

25        A    Almost.

Confidential - Subject to Protective Order

```
 1        Q     Okay.

 2        A     Yes, I'm there.

 3        Q     I'll just read it.

 4              "The overall data provided by the four

 5    publications provide evidence to support a model that

 6    glyphosate is capable of producing genotoxicity, both

 7    in vivo and in vitro, by a mechanism based upon the

 8    production of oxidative damage?"

 9              And you talked about that earlier.  I

10    would like to go on and talk about the rest of that

11    paragraph right now, sir.

12              It says:  "If confirmed, such a mechanism

13    of genetic damage would be expected to be produced at

14    high concentrations of the herbicide and would be

15    relevant only when the antioxidant protective

16    mechanisms of the cell are overwhelmed."

17              Did I read that right?

18        A     Yes.

19        Q     Now, you mentioned during your

20    examination earlier that he -- he said if it's

21    confirmed.

22        A     Yes.

23        Q     That he was putting forth a hypothesis.

24              And -- but what I would like you to do

25    now is explain to the jury what is meant by:  You
```

Confidential - Subject to Protective Order

1    would expect if there is such a mechanism, if such a

2    mechanism exists and such a mechanism is confirmed,

3    then it would be expected to be produced at high

4    concentrations and would be relevant only when the

5    antioxidant protective mechanisms of the cell are

6    overwhelmed.

7          A    Yes.

8          Q    That's a dose statement, correct?

9          A    Yes.  Yes, correct.

10         Q    Could you explain what he means by the

11   antioxidant protective mechanisms of the cell being

12   overwhelmed by high doses of pesticide?

13         A    Right.

14              MS. WAGSTAFF:  Object to form.

15              THE WITNESS:  The cell disposes of a

16   whole series of molecules which are of a kind to

17   neutralize free oxygen radicals.  One of those

18   molecules is, for example, glutathione, and that is

19   actually a mechanism of the cell to protect itself

20   against oxidative damage.

21              Now, you can be exposed to a chemical

22   producing oxidative free radicals, but as long as

23   those free radicals -- oxygen free radicals are

24   neutralized by these molecules, nothing is happening

25   because the cell is fully protected.

Confidential - Subject to Protective Order

1            So only when the stock of those

2    protective molecules is consumed, then there will be

3    free oxygen radicals that will not anymore be

4    neutralized, and they start actually reacting with

5    constituents of the cell of which DNA.

6    BY MR. GRIFFIS:

7        Q    So you can have a different outcome with

8    regard to what happens with oxidative damage at low

9    doses versus very high concentrated doses; is that

10   right?

11       A    That is right.

12       Q    Is that what you found when you actually

13   did studies of animals and gave them very high doses

14   orally and intraperitoneally?

15       A    Yes.

16       Q    Now, Dr. Parry made some recommendations

17   for possible steps that Monsanto could take in his --

18   in his various proposals to you, correct?

19       A    Yes.

20       Q    What did Monsanto do with those

21   recommendations?  What work did it carry out in

22   response?

23       A    We developed a program in order -- in a

24   stepwise program, and the first step of that program

25   was, upon request and which we fully accepted, a

Confidential - Subject to Protective Order

1    repeat of the Bolognesi study.  That then we found

2    deficiencies with the Bolognesi study.  The Bolognesi

3    study was carried out on three animals at only one

4    dose level.  Monsanto carried out, you know, this

5    assay on ten animals and on two dose levels, and even

6    investigating the possible influence of the vehicle

7    for intraperitoneal injection on the outcome of the

8    study.

9              On top of that, Monsanto added more

10   elements to the protocol to investigate the nature

11   and the severity of the cytotoxicity that is produced

12   after intraperitoneal injection to try to understand

13   the relationship between cytotoxicity, oxidative

14   stress and mutagenicity or oxidative damage of DNA.

15             So all these parameters have been

16   measured in this protocol.

17        Q    And these were done in the GLP certified

18   lab in St. Louis --

19        A    Yes.

20        Q    -- is that right?

21        A    Yep.

22        Q    Now, you mentioned that you more than

23   tripled the size of the study, going from three

24   animals to ten animals; that you evaluated not just

25   one dose but multiple doses; that you evaluated more

Confidential - Subject to Protective Order

1   than one substance.

2          A    Yes.

3          Q    And -- I'm sorry.  What other -- what

4   other modifications and improvements did you make to

5   the Bolognesi study?

6          A    The improvements that were made was, for

7   example, also the selection of the indicator for

8   oxidative stress.  It was the NADP, nicotinaminde

9   adenine, oxidative stress transcription.  It's a

10  complicated term.  But it was at that time the most

11  recent methodology in order -- in a very sensitive

12  and specific way to identify oxidative stress.

13         Q    You used a better way to measure

14  oxidative stress?

15         A    Yes.

16              MS. WAGSTAFF:  Objection.  Leading.

17  BY MR. GRIFFIS:

18         Q    Now, you mentioned -- you talked earlier

19  about how once these results came out, they were

20  provided to the authorities and they were part of a

21  poster presentation in San Francisco; is that right?

22         A    Yes, that's right.

23         Q    And when something is published as a

24  poster presentation, is it available to the general

25  scientific community to see and review?

Confidential - Subject to Protective Order

1        A    Yes.  Exactly.

2        Q    And the same results were also published

3   in 2008 in a paper that you were a coauthor on?

4        A    Yes.

5        Q    I would like to get back to Dr. Parry,

6   though.  When the results came out, you said that you

7   went and showed him first actually before the poster

8   presentation.  Is that right?

9        A    Not only to share the data with him, but

10  also to discuss with him what could be the further

11  steps in order to -- to completely satisfy his

12  questions.

13            (Martens Exhibit No. 9-18 was marked

14            for identification.)

15            MR. GRIFFIS:  I don't know what happened

16  to 17.  I guess we're on 18.

17            MS. WAGSTAFF:  Okay.  I don't know.

18            MS. GREENWALD:  15, 16, 17, I believe.

19            MR. GRIFFIS:  It doesn't matter.

20            THE WITNESS:  Thank you.

21  BY MR. GRIFFIS:

22        Q    I have marked as Exhibit 18 a

23  February 19th, 2001 e-mail from Bill Heydens to

24  Larry Kier, and you're copied on some of the rest of

25  the thread.

Confidential - Subject to Protective Order

1              Go ahead and take a look at that, sir,

2     and tell me when you're ready?

3          A    (Peruses document.)

4              Yes, I'm ready.

5          Q    Okay.  Now, on the first page of

6     Exhibit 17, this is an e-mail from Bill Heydens to

7     Larry Kier and others dated February 19th, 2001, and

8     we see that you were on the thread just a little bit

9     earlier.  Correct?  Sir, you were on this e-mail

10    thread in the preceding e-mail?

11         A    Yes, I --

12         Q    Is that marked on the screen?

13         A    Yeah.

14         Q    And on the second page of the two pages

15    of this exhibit is an e-mail from Richard Garnett

16    dated February 16th, 2001, to you and to Donna

17    Farmer, Bill Heydens and Bill Graham, reporting on

18    your meeting with Dr. Parry, correct?

19         A    Yes.

20         Q    It says:  "The overall tone of the

21    meeting was positive after a negative start because

22    Professor Parry found the tone of the Williams, et

23    al., Cantox paper to be very dismissive of other

24    researchers' work and overdefensive in its attitude."

25              And you recall that he was not very

1    pleased at the beginning of the meeting; is that

2    right?

3        A    That is right.

4        Q    Then "The presentation of the results of

5    the MON 35050 study changed the mood because it

6    clarified certain effects found in the Bolognesi and

7    Peluso papers."  Correct?

8        A    That's correct.

9        Q    And the MON 35050 study is the one that

10   we were just talking about --

11       A    Right.

12       Q    -- that you performed improving on those

13   earlier studies; is that right?

14       A    That is correct.

15       Q    And tell us how it was that the

16   presentation of that information changed Dr. Parry's

17   mood.

18       A    I gave a presentation, so with an

19   extensive overview of all the data, all this

20   research, and, you know, to -- to show Dr. Parry

21   that, you know, when repeating with sufficient number

22   of animals, with defined endpoints, and also with

23   advanced techniques to establish cytotoxicity, like,

24   for example, blood biochemistry from the animals, of

25   the blood from the animals, and the histopathology of

Confidential - Subject to Protective Order

1    the tissues of the liver and the kidney, that we

2    could show that, you know, when intraperitoneal doses

3    of 600 up to 900 milligrams per kilogram are injected

4    in the intraperitoneal cavity, that they produce, you

5    know, tissue damage and inflammatory lesions on the

6    liver and in the kidney.

7              And that from a histopathological view,

8    we could -- you know, after sections of these organs

9    show that indeed there was a damage which was

10   characterized as necrosis and inflammatory lesions.

11   Now, this type of lesions when they are demonstrated

12   are of a kind to produce also oxidative damage.  So

13   we looked into oxidative damage and felt that indeed

14   there was a slight degree of oxidative damage with

15   the new technique that we used.

16             At the same time we investigated the

17   tissues for the presence of oxidized DNA, and we

18   couldn't find any oxidized DNA.  That means there

19   wasn't oxidative damage.  There was cytotoxicity, but

20   there was no demonstrable quantity of oxidized DNA,

21   which means that, you know, the cytotoxicity shown at

22   that moment was not sufficiently high enough to

23   oxidize the DNA.

24             But at the same time it's very important

25   to mention that the doses that have been injected

Confidential - Subject to Protective Order

1    intraperitoneally in those animals, that these

2    actually were higher than the LD50.  That means that

3    these were higher than the lethal dose for producing

4    50 percent mortality.  Only the animals didn't die

5    because they were killed at 24 hours after

6    administration.

7         Q    So these --

8              MS. WAGSTAFF:  Hang on.  I had an

9    objection.  I didn't want to interrupt you, but I

10   object to your question that you are using this

11   document to indeed prove that the information in fact

12   changed Dr. Parry's mood and/or mind when he has

13   testified earlier that there's no written

14   confirmation of the same, and this is from a third

15   party that is not here.

16             But go ahead.

17   BY MR. GRIFFIS:

18        Q    The -- so at the beer-glass-a-day level

19   of exposure in the experiment that you performed,

20   MON 35050, there was oxidative stress observed, but

21   not the next step in the process to cancer which

22   would be oxidative damage to DNA; is that correct?

23        A    What is correct is that there was

24   cytotoxicity and oxidative damage of the

25   intraperitoneal injection.  When we administered the

Confidential - Subject to Protective Order

1   same doses orally to the animals, there was no

2   toxicity whatsoever.

3          Q    Okay.  So the beer glass a day didn't --

4   didn't cause any cytotoxicity?

5          A    No.

6          Q    You had to actually inject the stuff --

7          A    To produce it.

8          Q    -- to produce this -- this effect of --

9          A    Yeah, that's right.

10         Q    Okay.  Since our -- I'm reading again

11  from Exhibit 18.  "Since our previous discussions

12  with him, Professor Parry had begun to comprehend the

13  complexity and range of glyphosate formulations.  We

14  clarified this by reviewing the brands, formulations

15  and surfactants used in Europe and the rest of the

16  world.  Then reviewed the mutagenicity studies

17  available for the surfactants used in glyphosate

18  formulations.  We demonstrated with work undertaken

19  since the previous discussion that structurally

20  related surfactants, etheramines, do not directly

21  cause genotoxicity."

22              And that was an accurate description of

23  the meeting, correct?

24         A    Yeah.  Yes.

25         Q    Now, let's -- I want to go to results.

Confidential - Subject to Protective Order

1    These were the results of the meeting with Professor

2    Parry, correct?

3         A    Yes.

4         Q    "Acceptance that glyphosate is not

5    genotoxic."

6              And that is acceptance by whom, sir?

7         A    By -- by Professor Parry.

8         Q    "Broad agreement that genotoxic results

9    in some studies with surfactants arose due to

10   oxidative damage rather than direct genotoxicity."

11             Now, when you -- when -- when Richard

12   Garnett said:  "Broad agreement that genotoxic

13   results in some studies was due to oxidative damage

14   rather than direct genotoxicity," what studies did he

15   mean by the "some studies"?

16             MS. WAGSTAFF:  Objection.  Speculation.

17   He doesn't know what Garnett meant.

18             THE WITNESS:  Well, I was at the meeting,

19   so I know what it is about.  It was the studies with

20   intraperitoneal injection.

21   BY MR. GRIFFIS:

22        Q    "Recognition of the difference of

23   toxicity between the intraperitoneal and oral

24   routes" -- and you've been explaining that to us,

25   right, the difference between the injection into the

Confidential - Subject to Protective Order

 1   belly and drinking?

 2        A    Drinking, yes.

 3        Q    Drinking.

 4             -- "and that only oral, dermal and

 5   inhalation route are taken into consideration for

 6   classification in the EU."  Correct?

 7        A    Yes.

 8        Q    And why is it that only oral, dermal and

 9   inhalation routes are taken into consideration for

10   classification of substances -- of the toxicity of

11   substances in the EU?

12        A    Well, these are the only acceptable

13   routes of exposure, you know, when, you know, people

14   get into contact with hazardous chemicals.

15        Q    Is it because humans don't get chemicals

16   injected directly into their belly?

17        A    Of course not.

18        Q    "Acceptance of the low quality of the" --

19   how do you pronounce that, sir?

20        A    Lioi.

21        Q    Lioi.

22             "Acceptance of the low quality of the

23   Lioi, et al., study."

24             Who was accepting the low quality of the

25   Lioi study?

Confidential - Subject to Protective Order

```
 1        A    Yes.  And the internal contradictions of

 2   that study.

 3        Q    Who was it that was accepting the low

 4   quality of the Lioi study?

 5             MS. WAGSTAFF:  Objection to form.

 6             THE WITNESS:  Professor Parry.

 7   BY MR. GRIFFIS:

 8        Q    "Professor Parry accepted the argument

 9   that no repeat dose study should be necessary on the

10   basis of the NTP data."  Correct?

11        A    Yes.

12             MS. WAGSTAFF:  Objection.  That's not

13   what the document says.

14   BY MR. GRIFFIS:

15        Q    And he accepted that you as industry, you

16   couldn't test other people's surfactants, right?

17        A    Yes.

18        Q    You explained that to him?

19        A    Right.

20        Q    And Dr. Parry no longer requested any

21   studies on the final formulation; is that right?

22             MS. WAGSTAFF:  Object to form.

23             THE WITNESS:  Yes.

24   BY MR. GRIFFIS:

25        Q    So did -- the results of this meeting
```

Confidential - Subject to Protective Order

1   that you attended with Professor Parry and Richard

2   Garnett, did Professor Parry change his view of what

3   he thought Monsanto should do next?

4       A    Yes.  But he asked for one supplementary,

5   one additional study.

6       Q    And that was -- show us where that is on

7   this page, please.

8       A    That is the fourth dash.

9       Q    "Complete the" -- this is under

10  "Actions," "Complete the MON 35050 study with

11  intraperitoneal injection of the MON 35035

12  formulation minus glyphosate."  Correct?

13      A    Yes.

14      Q    And did you do that?

15      A    Yes.  And there was no difference.

16      Q    Why was it that Dr. Parry's lab didn't

17  perform the MON 35050 study, sir?

18      A    The major reason is because he runs a

19  non-GLP accredited laboratory, and he didn't have the

20  capability in doing histopathology studies.

21      Q    He didn't have the capability, why?

22      A    Because he's not a histopathologist.  So

23  you need expertise of histopathologist plus a

24  completely equipped laboratory to prepare the tissue

25  samples for microscopic examination.

Confidential - Subject to Protective Order

1        Q     Now, how does the -- how do academic

2   labs -- and by "academic labs," I mean labs like

3   Professor Parry's labs by people who are not in the

4   industry that are not under the GLP certifications --

5   compare to GLP certified labs in terms of the

6   reliability that the results were generated in an

7   appropriate scientifically rigorous fashion?

8              MS. WAGSTAFF:  Objection.  Calls for a

9   hypothetical and speculation with respect to

10  Dr. Parry's lab.

11             THE WITNESS:  In my experience with

12  academic laboratory, and that includes Professor

13  Parry's laboratory, there is no rigorous process

14  control to make sure that all the data produced are

15  controllable by third parties.

16  BY MR. GRIFFIS:

17       Q     To be fair, they might be good.

18       A     They might be good scientifically.

19       Q     But they might not be good.

20       A     But they may not have followed the

21  process, and there is always the possibility for

22  transcription errors, for documentation in the

23  case there are deviations from study protocol.

24       Q     And the procedures that exist in GLP labs

25  to make sure that the data is good, those procedures

Confidential - Subject to Protective Order

1    don't normally exist in academic labs; is that fair?

2         A    No.  That's fair.

3         Q    Sir, has any national or multinational

4    regulator, like the European Union, the EPA, et

5    cetera, concluded that glyphosate causes cancer

6    based on the studies that we've been talking about

7    today?

8         A    In the European Union, the European

9    Chemical Agency, and the European Food Safety

10   Authority reviewed all the studies on genotoxicity

11   and carcinogenicity of glyphosate, and they came to

12   the conclusion that glyphosate is not genotoxic and

13   is not a carcinogen.

14        Q    And so those are two separate things,

15   genotoxic and carcinogenic; is that right?

16        A    Right.  That's right.

17        Q    And what is the distinction between the

18   two in a few sentences?

19        A    The genotoxicity is about actually the

20   damage that chemicals can do to the gnome, to the

21   genetic material or to the structure of the genetic

22   material.

23        Q    So something could be genotoxic but not

24   cause cancer; is that right?

25        A    That may be the case, but if it is a

Confidential - Subject to Protective Order

1    substance that is really genuinely genotoxic, you

2    know, there may be mechanisms leading to cancer.  But

3    if a substance is not genotoxic, there is still a

4    possibility in producing cancer through other

5    mechanisms than genotoxicity.

6         Q    Yes --

7         A    Right.

8         Q    Okay.  So they -- they concluded both no

9    genotoxicity and no carcinogenicity --

10        A    Correct.

11        Q    -- correct?

12        A    Yes.

13        Q    And you were -- you were a regulator for

14   10 years in --

15        A    Yes.

16        Q    -- in Belgium.

17             In your experience, do regulators -- in

18   your experience not just as a regulator in Belgium

19   but also as someone who has interacted with

20   regulators very recently, do regulators just take the

21   company's word for it that their products are safe?

22        A    No.

23             MS. WAGSTAFF:  Object to form and it's

24   outside the scope.

25             THE WITNESS:  No.

Confidential - Subject to Protective Order

1   BY MR. GRIFFIS:

2       Q    What do they do?

3       A    When the pesticide producer wants to put

4   a pesticide onto the marketplace, he has to produce a

5   safety package, which is a whole toxicological

6   dossier, and he has to produce that according to, you

7   know, internationally agreed test guidelines and

8   according to good laboratory practices.  All the data

9   that are produced in that context have to be

10  submitted to the authorities, and the authorities

11  actually analyze the data from scratch, and they come

12  to their own conclusions.

13      Q    Do the authorities have experts in

14  toxicology and other areas that enable them to

15  actually evaluate the data?

16      A    They have experts in toxicology, and if

17  they do need experts that are specialized in specific

18  subparts of toxicology, they have the possibility to

19  engage in academic toxicology experts to help them in

20  their assessments.

21      Q    You just spent a significant part of the

22  last year focusing on all of the toxicology evidence

23  about whether glyphosate can cause cancer; is that

24  right?

25      A    Right.

Confidential - Subject to Protective Order

 1        Q     You testified about that earlier.

 2              And was it just Monsanto's data and the

 3     public -- publicly available published data that you

 4     looked at?

 5              MS. WAGSTAFF:  Objection to the -- the

 6     record, the prior record as to what he testified.

 7              THE WITNESS:  No.  Monsanto produced

 8     three carcinogenicity studies, but the total number

 9     of regulatory carcinogenicity studies was 12

10     carcinogenicity studies, because of the -- a lot of

11     the carcinogenicity studies have been produced by

12     other agrochemicals companies putting glyphosate into

13     the marketplace.

14     BY MR. GRIFFIS:

15        Q     And did you see all of those studies?

16        A     Yes.

17        Q     How many genotoxicity studies did you

18     focus on as part of your analysis?

19        A     In total, it was about 80 genotoxicity

20     studies.

21        Q     That's eight zero?

22        A     Eight zero.

23        Q     Did those -- did the regulators in Europe

24     that you were interacting with look at the Bolognesi

25     study and the other studies that you initially sent

Confidential - Subject to Protective Order

1    to Dr. Parry in 1999?

2         A    Yes.

3         Q    That was among the body of studies that

4    they considered in reaching their conclusions?

5         A    It was the body of published literature

6    which also taken into consideration in the

7    assessment.

8         Q    And what was their conclusion?

9         A    Their conclusion is that the overall

10   weight of evidence and analysis indicated that

11   glyphosate was not genotoxic.  And that conclusion

12   was reached at the European chemical -- the agency in

13   unanimity of all member states.

14        Q    How many member states were involved?

15        A    28.

16             MR. GRIFFIS:  Thank you, sir.  I have no

17   more questions.

18             MS. WAGSTAFF:  I just have a few

19   minutes -- yeah, I probably only -- we can go off the

20   record.

21             THE VIDEOGRAPHER:  The time is now

22   3:18 p.m.  We're going off the record.

23             (Recess.)

24             THE VIDEOGRAPHER:  The time is now

25   3:39 p.m.  We're back on the record.

Confidential - Subject to Protective Order

```
 1                    REDIRECT EXAMINATION

 2   BY MS. WAGSTAFF:

 3        Q    Good afternoon, Dr. Martens.  I am here

 4   to ask just some follow-up questions.  And so as a

 5   result, my questions may bounce around a little as I

 6   tried to just write down notes when your attorney was

 7   asking you questions.

 8             Fair?

 9        A    That's fair.

10        Q    Okay.  So when we discuss dosage, that's

11   relating to the risk assessment, correct?

12        A    Yes.

13        Q    Okay.  And there's no bright line on

14   dosage -- what dosage will cause an effect in a

15   person, correct?

16        A    Let me give you a little bit in a more

17   precise explanation is, when you study the effects of

18   a chemical and function of dose, that is a -- what is

19   called the dose-effect relationship establishment.

20   Okay?

21        Q    Mm-hmm.

22        A    From a dose-effect relationship

23   establishment, you derive from animal studies the

24   safe dose.  That means the highest dose at which you

25   don't see any effect.  And that dose, when that is
```

Confidential - Subject to Protective Order

1    confronted with the level of exposure in reality, in

2    real life, that is risk assessment.

3         Q    Okay.  Fair enough.

4              But my question was there's no bright

5    line, correct?  Meaning using your example of the

6    vodka from earlier, and you were saying if someone

7    drank, I think you said, a gallon or a pint or a cup

8    or whatever you said, they would be in a coma.  I

9    think was your example.

10        A    Yeah.

11        Q    That's not true of every person.

12        A    Well, for a gallon, I think it will be

13   true for every person.

14        Q    But, I mean, does someone -- if I drank a

15   pint of vodka and you drank a pint of vodka, you will

16   admit that we could have different results on our

17   body?

18        A    Yes.

19        Q    Okay.  And, in fact, it is very common in

20   toxicology to use high dose testing in animals,

21   correct?

22        A    Yes.

23        Q    And, in fact, it is more common than not

24   to use high dose testing in animals, correct?

25        A    Yes.

Confidential - Subject to Protective Order

1          Q    Okay.  And there's a good reason for

2    that, right?

3          A    Yes.

4          Q    Okay.  And what's the reason?

5          A    The reason is that for testing in

6    animals, we are obliged by international, you know,

7    test guidelines to dose up until we have very clear

8    signals of toxicity.  And then we select doses, and

9    the lowest dose is the dose at which we don't expect

10   to see toxicity, and there is an intermediate dose.

11   And that is -- the reason for that is actually to

12   establish a dose-effect relationship.

13         Q    Okay.  And also if the normal incidence

14   of some effect is, let's say, one in a thousand or

15   one in 5,000, that means that if you -- it would take

16   a thousand or 5,000 animals to show that one time,

17   and tests don't use that many animals, do they?

18         A    They -- well, there is a compromise that

19   you -- you will have to achieve, and the compromise

20   for long-term carcinogenicity test is that you use 50

21   to 60 animals per sex per dose level.

22         Q    Exactly.  So if you're only using 50 or

23   60 animals per sex per dose, you need to really use a

24   high dose analysis, correct?

25         A    Well, you need to actually to -- to dose

1    up, up to the maximum tolerated dose, to make sure if

2    the compound is carcinogenic, you won't miss it.

3         Q    Correct.  And so when your attorney was

4    asking you all about the dosage that was used in

5    these studies that you analyzed, they were following

6    standards and practices that scientists use all over

7    the world, correct?

8         A    Yes.

9         Q    They weren't doing anything abnormal,

10   correct?

11        A    No.

12        Q    They were following the same practices

13   that scientists follow all over that give us results

14   that we -- that are accepted all over the world,

15   correct?

16        A    Yes, insofar they follow the

17   international accepted test guidelines.

18        Q    Exactly.  Okay.  Have you ever read the

19   EPA's guidelines for carcinogenic risk assessment?

20        A    That has certainly been the case when I

21   go before a joint pharmaceutical industry.

22        Q    Okay.  Have you read the guidelines for

23   the carcinogenic risk assessment since you left

24   Monsanto in 2003?

25        A    Well, when -- when I left Monsanto, I

Confidential - Subject to Protective Order

1    joined the pharmaceutical industry, and then you have

2    the guidelines of the United States Food and Drug

3    Administration and not EPA.

4        Q    Okay.  So my question is not about the

5    Food and Drug Administration.  Does the Food and Drug

6    Administration monitor glyphosate or Roundup?

7        A    No.

8        Q    Okay.  So I'm not asking about --

9        A    Oh, wait a minute.

10       Q    -- the Food and Drug Administration.

11       A    When it concerns the food, they have

12   certain responsibility for residues in food.

13       Q    Okay.  Fair enough.

14            I'm asking if you have read the 2005

15   Guidelines for Carcinogen Risk Assessment promulgated

16   by the EPA?

17       A    I don't recall, but it may have been the

18   case, yes.

19       Q    Okay.  You will agree that animal testing

20   is very expensive.

21       A    Absolutely.

22       Q    Do you know the EPA's analysis or

23   position on what a, quote, unsafe chemical is?

24       A    I don't recall that specific test, no.

25   Or that specific text.

Confidential - Subject to Protective Order

```
 1        Q    Okay.  But in your preparation for this

 2   deposition, you didn't go back and make yourself

 3   familiar with the EPA's --

 4        A    Well, I'm -- I'm a professional in the

 5   field, so I don't have to make myself anymore

 6   familiar with the way on how these tests should be

 7   conducted.

 8        Q    Sure.  I'm just wondering because you

 9   work and practice and most of the -- the stuff that

10   you do regulatory-wise is in Europe, correct?

11        A    Yes.

12        Q    You -- what portion of your practice do

13   you interact with the EPA and its guidelines?

14        A    Almost zero.

15        Q    Almost zero?

16        A    Yes.

17        Q    So you may not be familiar with the EPA's

18   definition of what an "unsafe chemical" is, correct?

19        A    I must have been aware of this before I

20   joined the pharmaceutical company.  So sometime ago,

21   yes.

22        Q    Yeah, I mean, so I asked you if you've

23   refamiliarized with it, and your response was you

24   wouldn't have to because that's your job.

25        A    Yeah.
```

Confidential - Subject to Protective Order

```
 1          Q    And so we've established that's not
 2    necessarily your job to interact with the EPA,
 3    correct?
 4          A    Yes.
 5          Q    Yes, correct?
 6          A    Can you rephrase?
 7          Q    No, that's okay.
 8               The four studies that we've been talking
 9    about in the Parry report, the original Parry
10    report --
11          A    Yes.
12          Q    -- do you remember from earlier this
13    morning?
14          A    Yes.
15          Q    They were the Lioi -- how do you
16    pronounce that one again?
17          A    Lioi.
18          Q    Lioi.  The two Lioi papers.
19          A    No, one Lioi paper.
20          Q    One Lioi paper, the Rank --
21          A    Yes.
22          Q    -- the Bolognesi and the Peluso, right?
23          A    Yes.
24          Q    Were those studies conducted in labs that
25    were following good laboratory practices?
```

Confidential - Subject to Protective Order

1          A     No.

2          Q     No.  And how do you know that?

3          A     Because these were academic labs which

4    were not accredited for GLP; otherwise, that would

5    have been -- appeared in their publications.

6          Q     Okay.  So it's impossible for an academic

7    lab to be following GLP; is that your testimony?

8          A     If they want to, they can do it, but they

9    need an accreditation.  And from that accreditation,

10   you actually need to -- to install a quality

11   assurance unit with a very well and highly trained

12   staff to do this, and it's a very expensive

13   undertaking.

14         Q     Okay.  And so do you have any specific

15   reason with any of those four labs or any of those

16   authors on those tests to think that they weren't --

17   that they were not in accordance with GLP?

18         A     They were certainly not in accordance

19   with GLP.

20         Q     Okay.  And what are your reasons for

21   that?

22         A     Because they are very small labs which --

23   which are not GLP operating labs.

24         Q     Okay.  And -- and your counsel said even

25   if a lab wasn't GLP operating, it could still be a

Confidential - Subject to Protective Order

1   good lab.  Correct?

2        A    Yes.

3        Q    Okay.  Just because something's not GLP

4   doesn't mean it's a bad lab, right?

5        A    It doesn't mean it's bad science.

6        Q    Okay.  And just because something is a

7   GLP lab doesn't mean it's good science, right?

8        A    That's right.

9        Q    So the GLP is just sort of a shortcut

10  like a marriage is a shortcut to a commitment, right?

11       A    No, no, no.  The GLP is for what I would

12  call a process control.

13            MR. GRIFFIS:  I must have an objection to

14  that, but I don't know what it is.

15            MS. WAGSTAFF:  I mean married people can

16  be uncommitted and unmarried people can be committed,

17  but that's totally irrelevant, yeah.  But --

18            THE WITNESS:  GLP is a process control

19  part, and has nothing to do with the science.  It's

20  all to do with data control, data access, data

21  quality assurance.

22  BY MS. WAGSTAFF:

23       Q    Okay.

24       A    And there is a science part, and the

25  science part is taken care of in accordance with the

Confidential - Subject to Protective Order

1    internationally agreed test guidelines.

2        Q    Okay.  So I think we're on the same page

3    now that GLP labs can have good or bad science --

4        A    Mm-hmm.

5        Q    -- and non-GLP labs can have good or bad

6    science.

7        A    Yes.

8        Q    Okay.  It really depends on the

9    scientists.

10       A    It depends on the scientists and the

11   structure of the laboratory.

12       Q    Okay.  Gotcha.

13            And when was this GLP accreditation

14   process created?

15       A    It was created in the -- the end of the

16   '70s, beginning of the '80s.

17       Q    Okay.

18       A    Yeah, because it took a long time to

19   implement it in all laboratories, yeah.

20       Q    And when did Monsanto become GLP

21   accredited?

22       A    That I don't recall.

23       Q    Is it -- I assume, and correct me if I'm

24   wrong, but every laboratory has to be GLP accredited.

25       A    Every laboratory that produces data,

Confidential - Subject to Protective Order

1   safety data that have to be submitted for regulatory

2   reasons needs to be GLP accredited.

3        Q    Okay.  So if it's not safety data or if

4   it's not submitted to a regulatory agency, they don't

5   need GLP accreditation.

6        A    Not always, but once a laboratory is

7   actually running according to GLP accreditation, then

8   you will have the structures in place that apply GLP

9   accreditation, even if it's not required.

10       Q    Okay.  And Monsanto was using labs during

11  a registration process that was GLP accredited called

12  IBT, right?

13            MR. GRIFFIS:  Objection.  Foundation.

14            THE WITNESS:  IB --

15  BY MS. WAGSTAFF:

16       Q    Do you know IBT labs?

17       A    I don't recall.

18       Q    Okay.  And you don't recall if IBT was

19  accredit -- GLP accredited or not?

20       A    I don't recall now.

21       Q    Do you recall that Monsanto relied on

22  them to generate data for their -- a reregistration

23  and that turned out to have a criminal investigation

24  that was fraudulent and people went to jail?  Do you

25  remember that?

Confidential - Subject to Protective Order

1          MR. GRIFFIS:  Objection.  No foundation,

2   misrepresents the record.

3          THE WITNESS:  I don't recall any of that.

4   BY MS. WAGSTAFF:

5      Q    So you're not involved in all of the --

6   the glyphosate reregistration processes over here in

7   the United States.

8      A    No.  It's Europe.

9      Q    Okay.  Now, you testified earlier that

10  Monsanto has done three long-term cancer studies --

11     A    Yes.

12     Q    -- involving glyphosate; is that right?

13     A    Yes.

14     Q    I believe you testified that two were rat

15  studies and one was a mouse study.

16     A    Yes.

17     Q    Is that right?

18          Who conducted those studies?

19     A    There was -- I've got to recall -- the

20  Knezevich and Hogan study was done by a contract

21  laboratory.  The Stout and Ruecker study was done at

22  Monsanto.  Yes.

23     Q    Okay.  So that's two studies.  What about

24  the third?

25     A    The third I believe is the Lankas study,

Confidential - Subject to Protective Order

1  and I will have to check that out where it was

2  conducted.  Yeah, I've got to check that out.

3      Q    Okay.  So when you say Monsanto did three

4  studies, you mean they funded three studies?

5      A    They commissioned three studies, either

6  in their laboratory or in contract laboratories.

7      Q    Okay.  And are those studies in published

8  literature?

9      A    No.

10     Q    No.  So they're private --

11     A    Well, they've been summarized in reviews,

12  like, for example, the Williams review.

13     Q    Okay.  Which is a Monsanto commissioned

14  review as well.

15     A    It's commissioned to an organization that

16  took care of the selection and the recruitment of

17  scientists to do that review.

18     Q    Yeah.  So Monsanto did studies and then

19  hired someone to review the studies that they

20  conducted, right?

21     A    Yeah.  In order to publish it.  Yeah.

22     Q    Okay.  But other than using Monsanto to

23  do the studies and then Monsanto to review the

24  studies, no one independently has peer reviewed those

25  studies, correct?

Confidential - Subject to Protective Order

```
 1              MR. GRIFFIS:  Objection to the form,

 2    misrepresents the testimony.

 3              THE WITNESS:  These studies have been

 4    peer reviewed by the authorities.

 5    BY MS. WAGSTAFF:

 6         Q    What authorities?

 7         A    Well, the authorities over all in the

 8    world.

 9         Q    Okay.  So does the EPA have all of these

10    studies?

11         A    Yes.

12         Q    And does anyone other than the regulatory

13    people have these studies?

14         A    The full study package?

15         Q    Yeah.

16         A    No.  Regulatory studies are only to be

17    submitted to the regulatory authorities.

18         Q    Okay.  And these other -- and then I

19    think you testified that there were eight other

20    studies.

21         A    Yes, in total there are 12 carcinogenic

22    studies.

23         Q    Okay.  So then I guess that would be nine

24    other studies, right?

25         A    Yes.
```

Confidential - Subject to Protective Order

1         Q    And who created those studies?

2         A    These studies have been commissioned by

3    other companies that put glyphosate into the

4    marketplace.

5         Q    Okay.  And where would we find those

6    studies?

7         A    The best way and how to get insight in

8    those studies is actually to read the paper of Greim,

9    et al., where the results of those studies are

10   summarized.

11        Q    What if we wanted to actually see the

12   studies and not a summary of studies that was bought

13   by industry?

14             MR. GRIFFIS:  Objection to form.  The

15   summary was not bought by industry.

16             THE WITNESS:  The studies, which are

17   proprietary right to the companies, are only

18   accessible to the authorities, the three studies.

19   BY MS. WAGSTAFF:

20        Q    Okay.  So there are -- there are 12

21   studies that assess the carcinogenicity of glyphosate

22   that's -- that's not available for the public to

23   review or access; is that correct?

24        A    That's not entirely correct, because the

25   analysis, the evaluation, and the complete

Confidential - Subject to Protective Order

1    description of the studies have been published by

2    Greim, et al.

3            Q    Who is Gramadon (phonetic)?

4            A    No, Greim, et al.

5            Q    Oh.  Who's --

6            A    Greim and coworkers.

7            Q    Who's Greim, et al.?  Sorry, I just

8    didn't hear you.

9            A    Yeah, Greim.  Helmoud Greim.

10           Q    Okay.  Who is he?

11           A    He is a cancer specialist, a German

12   cancer specialist.

13           Q    Okay.  And who does he work for?

14           A    He's got -- well, he used to work

15   normally for government.  He was the head of the MAC

16   Commission in Germany, who was responsible for the

17   environmental exposure levels for carcinogens.

18           Q    Okay.  And who paid for that study?

19           A    All the companies that produced the

20   studies contributed to the -- this project.

21           Q    Okay.  So the companies get together and

22   they do these studies where no one gets the results

23   or the data, and then they pay someone to summarize

24   all their studies --

25           A    Yes.

Confidential - Subject to Protective Order

```
 1        Q    -- but they don't give anyone the actual

 2   studies.

 3             MR. GRIFFIS:  Objection.

 4   BY MS. WAGSTAFF:

 5        Q    Is that correct?

 6             MR. GRIFFIS:  Argumentative and

 7   misrepresents the record.  He testified that every

 8   bit of the data was given to multiple regulators

 9   worldwide.

10   BY MS. WAGSTAFF:

11        Q    Is that correct?

12        A    The -- under a confidentiality agreement,

13   these studies must have been provided to Dr. Greim.

14        Q    Okay.  So I could not -- could not find

15   those studies anywhere.

16        A    If you would be a toxicologist and you

17   would be under contract with a company, then you

18   would gain access to those studies.

19        Q    Okay.  So I need to be employed by one of

20   those companies and sign a confidentiality agreement

21   to get access to these 12 cancer studies; is that

22   correct?

23        A    Wait a minute.  You're going a little bit

24   too fast.  If you would be an independent consultant,

25   like I am --
```

Confidential - Subject to Protective Order

1         Q      Mm-hmm.

2         A      -- and I have been granted access to all

3    these studies for my -- my work in the European

4    Union, I signed confidentiality agreements with every

5    one of all those committees to gain full access to

6    these studies.

7         Q      Okay.  And how long did you work for

8    Monsanto?  How many years?

9         A      It was about 15 years.

10        Q      And you -- you view yourself as an

11   independent consultant?

12        A      Yes.

13        Q      Okay.  So the Farm Family Exposure Study

14   that you've been talking about, who funded that

15   study?

16        A      That was a Monsanto designed study.

17        Q      So Monsanto paid for that study to occur?

18        A      And Monsanto executed the study, yeah.

19        Q      Okay.  So other than for Monsanto, any

20   other company, have you ever interacted with the EPA,

21   the United States EPA?

22        A      No.

23        Q      So the only time you've interacted with

24   the EPA is in your role as a Monsanto employee?

25        A      Yes.  And it was only for one substance,

Confidential - Subject to Protective Order

```
 1    I believe.

 2         Q    And what substance was that?

 3         A    Acetochlor.

 4         Q    Okay.  Are you aware that in New York

 5    state there was a lawsuit over Monsanto's statement

 6    that glyphosate is less toxic than table salt?

 7              MR. GRIFFIS:  Objection.  Foundation.

 8    BY MS. WAGSTAFF:

 9         Q    And that in that lawsuit Monsanto was

10    required to take that out of their advertising.  Are

11    you aware of that?

12         A    I'm not aware of that.

13         Q    You testified that in the Farm Family

14    Exposure, which is Monsanto's paid-for study, that

15    only 40 -- that 40 percent did not have glyphosate in

16    their urine.  Was that your testimony?

17         A    Yes.

18         Q    Okay.  Are you aware of a project that

19    was started in the United States that measures urine

20    in the American population, and it was started in

21    2015 at University of California San Francisco?

22         A    I don't recall that.

23         Q    No.  Would you be -- would you be

24    surprised to learn that 93 percent of those tested

25    had glyphosate in their urine?
```

Confidential - Subject to Protective Order

```
 1              MR. GRIFFIS:  Objection.  Foundation.

 2              THE WITNESS:  I -- I cannot comment

 3    because I didn't see the paper, so I cannot evaluate

 4    it.

 5    BY MS. WAGSTAFF:

 6         Q    And is it your testimony as you sit here

 7    today that POEA is like soap?

 8         A    It's a detergent.

 9         Q    So is it your testimony that POEA is like

10    soap?

11         A    Well, soap is a detergent.  It acts like

12    soap --

13         Q    Yeah.

14         A    -- and soap is a very general name for

15    detergent.

16         Q    Okay.  So is it your testimony that POEA

17    is like soap?

18              MR. GRIFFIS:  Objection.  Asked and

19    answered three times.

20              THE WITNESS:  It's a detergent.

21    BY MS. WAGSTAFF:

22         Q    So, yes, it is your testimony that POEA

23    is like soap?

24         A    It's like soap --

25         Q    Yeah.
```

Confidential - Subject to Protective Order

```
 1        A    -- and the right definition is

 2   "surfactant."

 3        Q    Okay.  And why was POEA banned in

 4   Germany?

 5             MR. GRIFFIS:  Objection.  Foundation.

 6   BY MS. WAGSTAFF:

 7        Q    Why would they -- why would they ban a

 8   soap?

 9        A    I'm -- I got no idea.

10        Q    Okay.  You don't have any insider

11   knowledge as someone who is in Europe monitoring this

12   for -- for Monsanto why POEA was banned in Germany?

13             MR. GRIFFIS:  Objection.  No foundation

14   for monitoring --

15             THE WITNESS:  I'm a consultant.  I'm not

16   a Monsanto employee.

17             MR. GRIFFIS:  Excuse me.  No foundation

18   for monitoring this for Monsanto and argumentative.

19             You can answer.

20   BY MS. WAGSTAFF:

21        Q    Was POEA banned in Germany?

22        A    I don't know.

23        Q    You have no knowledge of whether POEA has

24   been banned in Germany?

25        A    Well, I've been asked the last six months
```

Confidential - Subject to Protective Order

1    by Monsanto to dive into the database of POEA, of

2    POET, the tallowamine.  So I'm not aware of the

3    regulatory stages of POEA in countries in the world.

4              I'm not a toxicologist involved in this.

5    Let's not forget that, you know, for a very long

6    period of time I've not been involved with Monsanto,

7    so I don't know what happened in the meantime.

8         Q    Okay.  So you just mentioned a new

9    project you are working on for Monsanto that you

10   didn't mention before, and that is that you are now

11   diving into the profile of POEA.

12        A    Yes.

13             MR. GRIFFIS:  Objection to form.

14   BY MS. WAGSTAFF:

15        Q    Okay.  Anything else you're doing for

16   Monsanto right now?

17        A    Apart from glyphosate we just finished,

18   no.

19        Q    Okay.  And what's your charge -- what

20   have they tasked you with specifically for looking at

21   POEA?

22        A    What do you mean, an hourly rate?

23        Q    No.  What are you -- what is your

24   direct -- what is your directive?  What have they

25   told you to do?

Confidential - Subject to Protective Order

```
 1        A    What they told me to do is actually to --

 2   to look in all the toxicology of POEA and do a risk

 3   assessment in foods and on the field with farmers.

 4        Q    Okay.  And in doing so -- and you've been

 5   working on this for six months, you said?

 6        A    No.  I think -- well, it goes on and off.

 7   I think I started on this somewhere in November of

 8   last year.

 9        Q    Okay.  So four months --

10        A    Yes.

11        Q    -- you've been doing this?

12        A    But not continuously, just --

13        Q    Okay.  And you've never come across the

14   fact that -- that POEA has been banned in any

15   countries?

16        A    I didn't --

17             MR. GRIFFIS:  Asked and answered,

18   argumentative.

19             THE WITNESS:  I didn't check the

20   regulatory status.  I was only checking the

21   toxicology data.

22   BY MS. WAGSTAFF:

23        Q    Okay.  And why has POEA been withdrawn

24   from the United States?

25        A    I have no --
```

Confidential - Subject to Protective Order

```
 1              MR. GRIFFIS:  Objection.  Foundation.

 2              THE WITNESS:  I don't know.

 3   BY MS. WAGSTAFF:

 4        Q    Isn't it -- I'll strike that.

 5              MS. WAGSTAFF:  Oh, I think we're done.

 6   Do you have any more questions?

 7              MR. GRIFFIS:  I don't.

 8              MS. WAGSTAFF:  I think we're done.  Thank

 9   you.

10              THE VIDEOGRAPHER:  I, Ray Moore, the

11   videographer, certify the accuracy and trueness of

12   this video recording.

13              This concludes the deposition.  Going off

14   the record at 4:01 p.m.

15              (Whereupon, at 4:01 p.m. the

16              deposition of MARK A. MARTENS,

17              Ph.D., was concluded.)

18

19

20

21

22

23

24

25
```

Confidential - Subject to Protective Order

```
 1              -  -  -  -  -  -

               E R R A T A

 2              -  -  -  -  -  -

 3

 4    PAGE  LINE  CHANGE

 5    _____ _____ _____

 6       REASON: _____

 7    _____ _____ _____

 8       REASON: _____

 9    _____ _____ _____

10       REASON: _____

11    _____ _____ _____

12       REASON: _____

13    _____ _____ _____

14       REASON: _____

15    _____ _____ _____

16       REASON: _____

17    _____ _____ _____

18       REASON: _____

19    _____ _____ _____

20       REASON: _____

21    _____ _____ _____

22       REASON: _____

23    _____ _____ _____

24       REASON: _____

25
```

Confidential - Subject to Protective Order

```
 1
 2            ACKNOWLEDGMENT OF DEPONENT
 3
 4            I,_____, do
 5    hereby certify that I have read the
 6    foregoing pages, and that the same is
 7    a correct transcription of the answers
 8    given by me to the questions therein
 9    propounded, except for the corrections or
10    changes in form or substance, if any,
11    noted in the attached Errata Sheet.
12
13
14    _____
15    MARK A. MARTENS, Ph.D.            DATE
16
17
18    Subscribed and sworn
      to before me this
19    _____ day of _____, 20_____.
20    My commission expires:_____
21

      _____
22    Notary Public
23
24
25
```

Confidential - Subject to Protective Order

```
 1              CERTIFICATE OF NOTARY PUBLIC

 2

 3      I, LESLIE ANNE TODD, the officer before whom the

 4   foregoing deposition was taken, do hereby certify

 5   that the witness whose testimony appears in the

 6   foregoing deposition was duly sworn by me in

 7   stenotype and thereafter reduced to typewriting under

 8   my direction; that said deposition is a true record of

 9   the testimony given by said witness; that I am neither

10   counsel for, related to, nor employed by and the

11   parties to the action in which this deposition was

12   taken; and, further, that I am not a relative or

13   employee of any counsel or attorney employed by the

14   parties hereto, nor financially or otherwise

15   interested in the outcome of this action.

16

17      LESLIE ANNE TODD

18      Notary Public in and for the

19      District of Columbia

20   My commission expires:

21   November 14, 2017

22

23

24

25
```