Volume 3

Pages 299 - 540

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

EDWARD HARDEMAN,                    )
                                    )
            Plaintiff,              )
                                    )
   VS.                              )       **NO. C 16-00525 VC**
                                    )
MONSANTO COMPANY,                   )
                                    )
            Defendant.              )
_____   )


                        San Francisco, California
                        Monday, February 25, 2019

                  **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                        ANDRUS WAGSTAFF PC
                        7171 W. Alaska Drive
                        Lakewood, Colorado  80226
                BY:     **AIMEE H. WAGSTAFF, ATTORNEY AT LAW**
                        **DAVID J. WOOL, ATTORNEY AT LAW**

                        MOORE LAW GROUP
                        1473 South 4th Street
                        Louisville, Kentucky  40208
                BY:     **JENNIFER MOORE, ATTORNEY AT LAW**


            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Marla F. Knox, RPR, CRR
              Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporters

```
1    APPEARANCES:   (CONTINUED)

2    For Plaintiff:

3                         AUDET & PARTNERS LLP
                          711 Van Ness Avenue - Suite 500
4                         San Francisco, California  94102
                    BY:  MARK E. BURTON, ATTORNEY AT LAW
5
     For Defendant:
6
                          WILKINSON  WALSH ESKOVITZ LLP
7                         2001 M Street, NW - 10th Floor
                          Washington, D.C.  20036
8                   BY:  BRIAN L. STEKLOFF, ATTORNEY AT LAW
                         RAKESH N. KILARU, ATTORNEY AT LAW
9                        TAMARRA MATTHEWS JOHNSON, ATTORNEY AT LAW
                         JULIE RUBENSTEIN, ATTORNEY AT LAW
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

**I N D E X**

2

Monday, February 25, 2019 - Volume 3

3
                                                          **PAGE**   **VOL.**

4    Opening Statement by Ms. Wagstaff                      318      3
     Opening Statement by Mr. Stekloff                      371      3
5

6
     **PLAINTIFF'S WITNESSES**                             **PAGE**   **VOL.**
7
     **RITZ, DR. BEATE**
8     (SWORN)                                               406      3
     Direct Examination by Ms. Wagstaff                     407      3
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

 1   **<u>Monday - February 25, 2019</u>**                    <u>     .m.</u>

 2                    **<u>P R O C E E D I N G S</u>**

 3                        **---oOo---**

 4        **THE CLERK:**  Calling Case Number 16-CV-00521, Hardeman

 5   versus Monsanto Company, et al.

 6        Counsel, please step forward and state your appearances

 7   for the record.

 8        **MS. WAGSTAFF:**  Good morning, Your Honor.  Aimee

 9   Wagstaff on behalf of Mr. Hardeman, and along with me is

10   Ms. Jennifer Moore.

11        **MR. STEKLOFF:**  Good morning, Your Honor.  Brian

12   Stekloff on behalf of Monsanto.  Along with me are Tamarra

13   Matthews Johnson, Rakesh Kilaru and Julie Rubenstein.

14        **THE COURT:**  Good morning.

15        Okay.  What do we need to talk about this morning?

16        **MR. KILARU:**  Your Honor, we had two pretty quick

17   issues just related to the opening.

18        **THE COURT:**  Okay.

19        **MR. KILARU:**  The parties exchanged opening exhibits

20   over the weekend, and there is one exhibit that the Plaintiffs

21   put on their list that we had some concerns about.  There are

22   two actually.  It is two sets of requests for admissions, one

23   from the Johnson trial and then one from this case.

24        **THE COURT:**  Okay.

25        **MR. KILARU:**  So we would object to any use of the

1   Johnson admissions to this trial, both because there is already

2   a ruling that other litigation can't be mentioned, I believe,

3   and then also because the admissions for that case were for

4   that case only.  But the actual admission is an admission --

5   let me pull it up to have the exact words.  In this case it is

6   a request for admission that Monsanto has never warned any

7   consumer that exposure to GBS is associated with non-Hodgkin's

8   lymphoma.  We think that getting into the issue of what we have

9   warned about is a Phase Two issue and not a causation issue.

10          THE COURT:  Certainly is.

11          MS. MOORE:  Your Honor, we have no intention of

12   mentioning the Johnson trial during opening or at any other

13   point during this trial.  The slide, which is a party admission

14   or request for admission, is not mentioning the Johnson trial.

15   It is important that Your Honor knows that.

16       The second thing is we have an agreement that all

17   discovery, regardless of where it comes from, is fair game in

18   this case.  The issue about whether this is Phase One or

19   Phase Two is that our concern is the jurors are coming in here

20   with certain assumptions, and we heard through jury selection

21   that some of the assumptions was did Mr. Hardeman use the

22   product correctly; did he use it as was warned.

23          THE COURT:  Did he describe the request for admission

24   in the response accurately?

25          MS. MOORE:  That's correct, Your Honor.

PROCEEDINGS

1          THE COURT:  It is not admissible in Phase One,

2    clearly.

3          MS. MOORE:  Thank you, Your Honor.

4          THE COURT:  Not even close.

5          MS. MOORE:  Thank you, Your Honor.

6          THE COURT:  Anything else?

7          MS. MOORE:  Your Honor, one issue and it relates to

8    Dr. Ritz who is our first witness today.  It came about during

9    Dr. Portier's cross-examination last week that there was a

10   series of questions asked by Monsanto's counsel that were

11   definitely geared towards case specific opinion; and as a

12   matter of the bifurcation of this matter, the Court is aware

13   that Dr. Portier was disclosed as a general causation expert

14   only.  And so these questions were, did you review

15   Mr. Hardeman's medical records; do you know that he has

16   hepatitis; did you know that he had that.  It was a series of

17   questions intended to impeach Dr. Portier's credibility to show

18   the jury he doesn't know anything about this particular case.

19   And that, you know, is improper, Your Honor.  And our concern

20   is that this is the same thing they are going to attempt to do

21   with Dr. Ritz on cross; and we would like a ruling in advance

22   so those questions aren't asked of Dr. Ritz.

23          THE COURT:  Why isn't it easy for a witness to deal

24   with that simply by saying, Well, I wasn't asked to opine on

25   whether Mr. Hardeman's NHL was caused by Roundup?  I'm only

1  giving an opinion on whether it is capable of causing cancer

2  generally?

3       MS. MOORE:  Well, for us, for lawyers and judges, we

4  would understand that.  My concern is that the jury doesn't --

5  will not understand that that is a byproduct of the bifurcation

6  of this matter and that Dr. Ritz was solely disclosed as a

7  general causation expert, not a case specific expert.  There is

8  no doubt that they are going to use that to their advantage.

9  Even though they asked for the bifurcation of this case, they

10  are now going to try to use that to their advantage to say she

11  doesn't know anything about Mr. Hardeman to discredit

12  everything she is trying to say about general causation.

13       THE COURT:  Saying she doesn't know anything about

14  Mr. Hardeman doesn't discredit her opinion on general causation

15  if she is capable of accurately describing what her opinion on

16  general causation is.

17       MS. MOORE:  Well, she is, Your Honor.

18       THE COURT:  So obviously if, you know, presumably

19  after her direct, it should be not necessary for Monsanto to

20  establish the point that you are describing because Dr. Ritz

21  will already have established it in her direct; but if Monsanto

22  wants to ask a couple questions to hit that point home, I

23  don't -- I don't see what the big deal is.

24       MS. MOORE:  Well, our position is it would go beyond

25  the scope of direct.

PROCEEDINGS

1          **THE COURT:**  At some point I will shut it down if it

2    goes on for too long; but I don't think -- I don't think I can

3    make a ruling in advance that that sort of questioning is

4    inappropriate because it depends on how the direct comes in.

5          **MS. MOORE:**  Okay.

6          **THE COURT:**  And if there is any implication, she has

7    an opinion of Hardeman, then, of course, it would be

8    appropriate on cross; and a couple questions on it might be

9    appropriate on that topic.  Might be appropriate on cross

10   regardless.  Those questions and answers would do nothing to

11   discredit Dr. Ritz.

12         **MS. MOORE:**  Okay.  Thank you, Your Honor.

13         And so we will take that up, you know, on direct.  She is

14   not going to be talking about Mr. Hardeman in particular.

15         Going back to, Your Honor, about the instruction about the

16   RFA, at the appropriate time, can we have a curative

17   instruction that the jury is not to consider warnings in

18   Phase One?

19         **THE COURT:**  The jury is not to consider warnings?

20         **MS. MOORE:**  Well, the whole issue is, you know, was

21   whether Mr. Hardeman using the product, that is our concern,

22   that the jury is going to come in here with assumptions

23   about --

24         **THE COURT:**  What does that have to do with whether it

25   caused his cancer?  The first phase, as we have been discussing

**PROCEEDINGS**

 1  for the last couple months, is whether it caused his cancer.

 2      **MS. MOORE:**  Right.  I understand that, Your Honor.

 3  Our concern is that the jury is going to come in here with

 4  assumptions, which is something that Your Honor pointed out in

 5  your MIL ruling in Pretrial Order Number 81, that you had this

 6  concern with regard to general assumptions that the jury may

 7  make, that would allow Monsanto -- I believe, this was in

 8  response to Motion --

 9      **THE COURT:**  What is the assumption that you think the

10  jury is going to make that you want cured by an instruction

11  about warnings?

12      **MS. MOORE:**  That the label said to wear gloves or a

13  mask --

14      **THE COURT:**  But what does that --

15      **MS. MOORE:**  -- or pants.

16      **THE COURT:**  But what does that have to do with whether

17  that caused cancer?  I don't understand.

18      **MS. MOORE:**  Because they can say, Well, if he had been

19  wearing gloves or a mask or a hazmat suit or pants or

20  closed-toe shoes, then he wouldn't have gotten cancer.

21      **THE COURT:**  Yeah, but he still got it from the

22  Roundup.  I mean, if your argument is to be believed, he still

23  got it from the Roundup; and it doesn't matter at Phase One

24  whether he was wearing gloves or not.

25      **MS. MOORE:**  The only thing there is -- the warning

**PROCEEDINGS**

 1   never says you have to do that.  The warning is completely

 2   silent.

 3        THE COURT:  But they are not going to hear any

 4   evidence of a warning or lack of a warning at Phase One, so why

 5   does it matter?

 6        MS. MOORE:  Well, it matters because they may come in

 7   here with an erroneous assumption that you do have to wear

 8   those things.

 9        THE COURT:  But I don't understand why that is -- why

10   that is relevant to whether his cancer was caused by Roundup or

11   something else.

12        MS. MOORE:  I understand, Your Honor.

13        THE COURT:  Anyway, you can -- before the close of

14   Phase One, you can request instructions based on -- based on

15   how the evidence comes in at trial.  But certainly I'm not

16   going to give them something like that during Phase One, and I

17   would be shocked if it were appropriate to give them an

18   instruction like that at the close of Phase One before their

19   deliberations.

20        MS. MOORE:  That's fair.  Thank you, Your Honor, for

21   allowing us to re-visit it.

22        MR. KILARU:  We have one thing about the deposition

23   ruling that my colleague will address.

24        MS. RUBENSTEIN:  Good morning, Your Honor.  Julie

25   Rubenstein on behalf of Monsanto.  Sorry about that.

PROCEEDINGS

 1          We were hoping that Your Honor would reconsider a couple

 2   of rulings from the treating depositions.  I think -- I don't

 3   need to take them all up right now.  One of them may

 4   potentially be relevant to openings.

 5          THE COURT:  Go ahead.

 6          MS. RUBENSTEIN:  Do you have transcripts with you?  It

 7   not, I will hand you one.

 8          THE COURT:  I don't.

 9          MS. RUBENSTEIN:  This one has to do with the

10   deposition of Dr. Ye.

11          THE COURT:  Okay.  Remind me.  It might be fresh in my

12   mind.  Tell me about it.

13          MS. RUBENSTEIN:  Dr. Ye is Mr. Hardeman's treating

14   oncologist.

15          THE COURT:  Right.  But remind me of the --

16          MS. RUBENSTEIN:  And, Your Honor, the part that I

17   wanted to raise with you was that page 143, there is a section

18   of testimony beginning actually at the bottom of 142 that you

19   did allow in regarding the cause of non-Hodgkin's lymphoma

20   generally.

21          THE COURT:  If I remember correctly, I allowed in up

22   to line 2, and then I said line 3 and 4 is not admissible.

23          MS. RUBENSTEIN:  That's right, Your Honor.  We would

24   respectfully ask that you reconsider that ruling.  I presume

25   that you sustained the objection as to those two lines on the

1   basis of the objection here that it calls for expert testimony,

2   and we believe that this is really just percipient witness

3   testimony about his treatment, diagnosis and opinion --

4           **THE COURT:**  I understand --

5           **MS. RUBENSTEIN:**  -- of Mr. Hardeman.

6           **THE COURT:**  -- but I think from the remainder of the

7   testimony that I allowed in, it is fairly clear, that A, the

8   oncologist didn't inquire into the cause of Mr. Hardeman's NHL;

9   and B, the oncologist is not offering any opinion on the cause

10  of Mr. Hardeman's NHL.

11          **MS. RUBENSTEIN:**  That's right, Your Honor.

12          **THE COURT:**  I don't understand.  I thought that you

13  have to draw lines when you are going through this kind of

14  testimony.  And I thought, you know, that is sufficient to

15  avoid -- I mean, I thought the general principle -- one of the

16  general principles that I applied when I was going through this

17  testimony is we want to make sure the jury is not under a

18  misimpression that the doctors whose -- who are being called by

19  the Plaintiff believe that his -- that his cancer was caused by

20  Roundup; right?

21          And so I allowed enough of that testimony in to establish

22  that none of these doctors inquired into whether his cancer was

23  caused by Roundup and none of the doctors is offering an

24  opinion on whether his cancer was caused by Roundup.  But, you

25  know, to -- I don't understand, I guess -- maybe it wouldn't be

1    a huge deal to let that in; but in light of the fact that the

2    testimony being allowed in establishes that, I don't really

3    understand why it is important to get that in.

4         The other thing about that question and answer is that the

5    way the question was asked, it sort of goes beyond the issue of

6    whether the doctor looked into it or whether the doctor has an

7    opinion.  The question and answer could leave the impression

8    that the doctor believes that there is no known cause of the

9    cancer as opposed to not having an opinion about whether there

10   is a cause to the cancer.  So I think that question and answer

11   is misleading a little bit.

12        **MS. RUBENSTEIN:**  Well, Your Honor, I think that -- I

13   think you might have hit the nail on the head.  I think this

14   testimony is different from the testimony about not having an

15   opinion in the sense that the doctor says, "I cannot attribute

16   a cause to this" --

17        **THE COURT:**  I understand --

18        **MS. RUBENSTEIN:**  -- "this cancer," and we think it is

19   relevant.

20        **THE COURT:**  I understand your argument.  I'm not going

21   to reconsider that ruling.

22        Was there another one?

23        **MS. RUBENSTEIN:**  Well, there was a few more; but none

24   of the others are relevant for openings, so I don't know if

25   Your Honor would prefer to take them up at a different time

**PROCEEDINGS**

 1  before the testimony is played.  I don't want to waste the

 2  Court's time now.

 3      **THE COURT:**  If you want to knock them out now -- I

 4  mean, we have a few minutes if you want to knock them out now.

 5      Let me do this first.  The only other thing I wanted to

 6  talk to you-all about is the depo designations.  When am I

 7  going to get the other depo designations so that I can review

 8  them and not be -- and not be forced to review them at the 11th

 9  hour?

10      **MS. MOORE:**  Your Honor, we are diligently working on

11  that, both sides.  We had meet-and-confers on Saturday and

12  Sunday, and several e-mails last night, even after midnight

13  between us.  My understanding is we are finalizing Dr. Ross and

14  Dr. Reeves to be filed this morning with the Court, and we can

15  hand over hard copies of that, those transcripts similar to how

16  it was done with Dr. Turley.  And then we are also finalizing

17  Dr. Goldstein's corporate representative deposition and

18  Dr. Blair.  So there should be four that should be ready to go

19  this morning that we can discuss this afternoon.

20      I understand Your Honor needs time to look at it.  There

21  might be some global issues that we can address after the jury

22  is excused today that will give us guidance on many of the

23  issues that are still left.  We have narrowed it done pretty

24  substantially.

25      **MS. RUBENSTEIN:**  Your Honor, I would just flag that

 1   Monsanto does object to the admission of some of the testimony

 2   that Ms. Moore just mentioned, and that will be noted in the

 3   pleading that gets filed.

 4          THE COURT:  Okay.  So do you want to knock out a

 5   couple of these other issues?

 6          MS. RUBENSTEIN:  Sure.  I would be happy to.

 7       So the other one I have is also in Dr. Ye's transcript on

 8   page 132, lines 2 to 13.

 9          THE COURT:  Okay.

10          MS. RUBENSTEIN:  Sort of the same argument as before,

11   Your Honor, we believe that this is all based on his care,

12   treatment and opinion about Mr. Hardeman from having been his

13   treating doctor.

14          THE COURT:  I understand that.  The age -- the concept

15   of age being a risk factor is a controversial concept, and I

16   think that the problem with bringing this doctor's testimony in

17   on that topic is that it is not clear whether the doctor is

18   using that sort of in more of colloquial terms or more precise

19   terms, precise scientific terms.  And you didn't get into with

20   this -- nobody got into it with this doctor, who is not serving

21   as an expert witness, what it means to call age a risk factor

22   and how that might be different from calling hepatitis C a risk

23   factor or Roundup a risk factor.  And so I think it is

24   potentially misleading to have it here, and I'm not

25   reconsidering that ruling.

PROCEEDINGS

```
 1          MS. RUBENSTEIN:  Thank you, Your Honor.

 2      The next one I have is, I believe, in the deposition of

 3  Dr. Turk, so I can hand that to you as well.

 4          THE COURT:  Sure.  Should I hand this one back down?

 5  I am trying to avoid --

 6          MS. RUBENSTEIN:  Sure.  I can certainly take that one

 7  back.

 8          THE COURT:  -- accumulating too much paperwork up

 9  here.

10          MS. RUBENSTEIN:  And this one, Your Honor, is Dr. Turk

11  at page 119 to 120.

12          THE COURT:  Okay.

13          MS. RUBENSTEIN:  And this is testimony, Your Honor,

14  about --

15          THE COURT:  Hold on.  Let me --

16          MS. RUBENSTEIN:  Absolutely.  Lines -- page 119, line

17  17 through page 120, line 9.

18      (Whereupon, a brief pause was had.)

19          THE COURT:  Okay.

20          MS. RUBENSTEIN:  This testimony is specific enough to

21  Mr. Hardeman in the sense that it is talking directly about

22  Dr. Turk's medical records and whether --

23          THE COURT:  Dr. Turk made it clear earlier that it

24  wouldn't have been Dr. Turk's role to get into whether his NHL

25  was caused by Roundup.
```

1      **MS. RUBENSTEIN:**  Well, we think it is significant that

2   the discussion was never even had that Mr. Hardeman never

3   asked --

4      **THE COURT:**  If I recall correctly, there was -- I

5   allowed some testimony about that in from --

6      **MS. MOORE:**  You did, Your Honor.

7      **THE COURT:**  -- from Dr. Ye, the oncologist.  It is not

8   coming in from this doctor.  I'm not reconsidering this ruling.

9      **MS. RUBENSTEIN:**  Thank you, Your Honor.

10     I have one last one.  This is from Dr. Turley, so I will

11  hand that up.

12     **MS. RUBENSTEIN:**  This is very similar, Your Honor.

13  Page 41, lines 3 to 6.

14     **THE COURT:**  For the same reason, I'm not reconsidering

15  that ruling.

16     **MS. RUBENSTEIN:**  Okay.  Thank you very much,

17  Your Honor.

18     **MS. MOORE:**  We don't have anything else, Your Honor,

19  for this morning.

20     **THE COURT:**  Great.  We will be back here at 8:30 sharp

21  to bring back the jury.

22     I have one more item.  I apologize.  Just to preview it

23  for you, so the juror who we talked about --

24     **MS. MOORE:**  Yes.

25     **THE COURT:**  -- the other day, I spoke with his

 1   employer.  And here is the situation, and what I told him is

 2   that we will talk to him about it after the trial day today.

 3            **MS. MOORE:**  Okay.

 4            **THE COURT:**  The situation is that he regularly works

 5   five shifts -- Wednesday, Thursday, Friday, Saturday and

 6   Sunday.  He, of course, could continue working Saturday and

 7   Sunday and could continue working Thursday.  He is going to

 8   lose Wednesday and Friday.

 9       I spoke with the employer about paying him anyway.

10   Unfortunately his employment is covered by a collective

11   bargaining agreement, and it would likely be illegal for Kaiser

12   to pay him for his jury service for those two days and -- and

13   he -- so, you know, he is concerned.

14       I spoke with the employer about it on Friday, and I spoke

15   with him about it this morning.  He continues to be very

16   concerned given that his wife's hours were cut on the day of

17   jury selection; that he is not going to be able to serve.  So I

18   didn't -- I didn't tell him one way or another how it was going

19   to come out, but I said that we would keep him afterwards today

20   and talk to him further and that I would permit the lawyers, if

21   they wanted to, to ask him questions and then I may have some

22   additional questions for him.  Okay?

23            **MS. MOORE:**  Thank you, Your Honor.

24            **THE COURT:**  That will happen when we are done.  See

25   you in a few minutes.

1        **MS. MOORE:**  Thank you.

2        **THE CLERK:**  Court is in recess.

3     (Whereupon, a short break was had.)

4     (Proceedings were heard in the presence of the jury:)

5        **THE COURT:**  Good morning.  Good morning, everybody.

6  As I mentioned last time, we are expecting this trial to last

7  four to five weeks.  We understand that that is a significant

8  investment of your time, so we are doing a number of things to

9  make sure that we are going to run this thing as efficiently as

10  possible and not waste any of your time.  One of those things,

11  by the way, is that I'm imposing time limits on both sides and

12  they will be on a clock throughout the trial.

13       Another thing is we will be conducting the trial in

14  phases, which means that we will be calling on you to

15  deliberate on certain questions as we progress.  In the first

16  phase, you will be asked to determine simply whether

17  Mr. Hardeman can prove that his use of Roundup caused his

18  non-Hodgkin's lymphoma.  The medical causation question is what

19  the lawyers' opening statements will be about at this point,

20  and we will be hearing from witnesses on that subject as we

21  begin the trial.

22       Later, in subsequent phases, we will be addressing

23  different issues, different aspects of Mr. Hardeman's claims as

24  the trial progresses.  And the lawyers will be able to speak to

25  you on those different topics as we move forward, but right now

 1   the first question is the medical causation question; and we

 2   will begin with the lawyers' opening statements.

 3       Ms. Wagstaff.

 4                      **OPENING STATEMENT**

 5       **MS. WAGSTAFF:**  May it please the Court, Counsel,

 6   ladies and gentlemen of the jury, good morning.

 7       Before I introduce myself, I want to take a moment to

 8   thank you guys.  We live in a country where we are allowed to

 9   have a jury by our peers, and it is a wonderful thing that we

10   have; but what comes along with that is the burden of coming

11   here for a month for you guys.  We know it is a big investment

12   on your time.  We know it is an investment by you, for your

13   families, for your jobs, for your animals, your dogs, for

14   everyone.

15       So for that, I thank you.  I thank you on behalf of my

16   team and my client and on behalf of Monsanto.  So thank you.

17       My name is Aimee Wagstaff, and I represent Mr. Hardeman in

18   his case against Monsanto.  You had an opportunity to meet my

19   colleague Jennifer Moore last week, and we have the honor and

20   privilege of representing the Hardemans.

21       You also met Ed Hardeman last week.  I would like to take

22   a moment to introduce you to his wife, Mary Hardeman, who was

23   unable to make it last week.

24       Mary and Ed met back in 1975.  They met here in the Bay

25   area.  They met at a graduation party, and pretty soon after Ed

1   asked her out on their first date and they went -- it was on

2   New Year's Eve, wasn't it?  And they went out on New Year's

3   Eve, and the surprise was that Ed brought his entire family on

4   that first date; and pretty soon thereafter they knew they were

5   going to be together for the rest of their lives.  So they got

6   married in 1979, and they have been together ever since; and

7   she really has been the rock for Ed throughout this entire

8   process.

9          So let me tell you their story.  On Christmas Day in

10  2015 -- '14 -- I'm sorry, Christmas Day 2014, Ed wakes up and

11  he finds a lump on his throat.  He is getting ready to go down

12  to Daly City where his niece and nephew live.  His sister had

13  recently passed away, and it was really important for him to

14  spend the holiday with his niece and nephew.

15         So he wakes up and he sees this lump on his throat, and he

16  is shaving his face and he calls Mary in and says, "What is

17  this lump?  What is going on?"

18         She says, "I don't know.  I don't know what it is.  Let's

19  go to" --

20             THE COURT:  Ms. Wagstaff, can we limit the opening

21  statement to the topic that Phase One is about, as we have

22  discussed.

23             MS. WAGSTAFF:  Sure.

24             THE COURT:  Thank you.

25             MS. WAGSTAFF:  So Mr. Hardeman goes to the doctor the

1   next day, and he looks for his treating physician who is not

2   there.  He is on vacation because it is December 26th.

3       So he goes in and he meets with the treating physician,

4   the on-call doctor, who tells him to just monitor it.  You will

5   hear -- you will hear Mr. Hardeman tell you that he didn't want

6   to wait; that he knew something was going on.  So he comes back

7   to Kaiser where he is treated.  The Hardemans live up in Santa

8   Rosa, just north of here.  So he goes back after his family

9   physician comes back from the holiday.  And on the first visit

10  Dr. Turk sends him down to the ENT, which is the ear, nose and

11  throat doctor.  So he goes into the ENT doctor and he starts

12  getting needles drawn; starts getting needles poked in there;

13  biopsies taken.  They want to pull out tissue.  They want to

14  figure out what is going on in his neck.  Blood is drawn.

15      He has to wait for the results.

16      Finally, the results come back and the tissue is dead.  So

17  he has to go back in and get drawn again, get needles poked

18  back into his neck again.

19          **THE COURT:**  Can we have a sidebar, please?

20      (The following proceedings were heard at the sidebar:)

21          **MS. WAGSTAFF:**  I will move on.

22          **THE COURT:**  I'm going to make you sit down and not

23  allow you to give an opening statement if you don't get there

24  and there very quickly to the issues that are relevant to Phase

25  One.

1              **MS. WAGSTAFF:**  Okay.

2         (The following proceedings were heard in open court:)

3              **MS. WAGSTAFF:**  Eventually Mr. Hardeman is diagnosed

4    with cancer on Valentine's Day 2015.  He is diagnosed by

5    Dr. Ye, his treating oncologist from Kaiser, up in Santa Rosa.

6    Ad Dr. Ye diagnoses Mr. Hardeman with Stage 3 non-Hodgkin's

7    lymphoma.  He diagnoses him with a subtype of non-Hodgkin's

8    lymphoma called diffuse large B-cell lymphoma. But you will

9    hear testimony it is a very aggressive form of non-Hodgkin's

10   lymphoma.

11             So we are here today to look at the whole puzzle.  This

12   case, and your job is to put all of the pieces together and

13   figure out what caused Mr. Hardeman's cancer.  You heard the

14   judge tell you a few moments ago that this trial is going to be

15   in phases, and the first phase is going to be what caused

16   Mr. Hardeman's cancer.

17             And so myself and Mrs. Moore are going to give you pieces

18   to that puzzle over the next few weeks.  What we ask of you is

19   that you put all those pieces together to help figure out what

20   causes -- what caused his lymphoma.

21             Now, there is no dispute that Mr. Hardeman has been

22   diagnosed with non-Hodgkin's lymphoma, just to be clear.  So I

23   have put out a map, and I want to tell you what is going to

24   happen for the next few weeks.  If I was in your shoes, I would

25   want to know what is going to be going on.

1    So, first, we have Phase One.  And as the judge just told

2  you, you guys will have one question to answer:  Was

3  Mr. Hardeman's exposure to Roundup a substantial factor in

4  causing his non-Hodgkin's lymphoma?

5            **MR. STEKLOFF:**  Your Honor.

6            **THE COURT:**  We will get to Phase Two when we get to

7  Phase Two.  You can take down that slide.

8            **MS. WAGSTAFF:**  I moved on.

9    We are going to go -- I'm going to tell you what is going

10  to happen in Phase One.  First, we have opening statements,

11  which I'm doing.  Then Monsanto's lawyer will go right after

12  me, and Mr. Hardeman is going to put on his case.

13    We are going to bring in witnesses.  We are going to show

14  you documents, and we are going to give you other pieces of

15  evidence.  What I'm saying right now is not evidence.  I'm just

16  sort of explaining what we are going to show you.

17    Then Monsanto is going to come up, and they are going to

18  present to you witnesses; give you evidence and give you other

19  testimony.

20    Then we are going to come up and we are going to do

21  closing arguments.  And I'm going to stand up, just like I am

22  right now, and I'm going to argue what you have just heard.

23  And Monsanto's lawyer will do the same thing.

24    And then you guys will decide whether or not

25  Mr. Hardeman's exposure to Roundup caused his non-Hodgkin's

 1   lymphoma.

 2       Now, throughout the course of the next few weeks, we are

 3   going to bring you some witnesses.  We are going to bring you

 4   witnesses from Monsanto, both current and former employees.

 5   Now, this trial is happening in San Francisco, and these people

 6   don't live in San Francisco, so we can't force them to come

 7   here.  So what we have done over the past couple of years is we

 8   have taken depositions of Monsanto employees.  And we can't

 9   force them to come here, like I just said, so we will play them

10   to you --

11           MR. STEKLOFF:  Your Honor, may we approach?

12           THE COURT:  I know what your objection is going to be.

13   It is overruled.

14           MS. WAGSTAFF:  So we will play them for you via

15   deposition.  So you will see them on the monitors right in

16   front of you.  We intend to bring you deposition testimony from

17   Dr. William Reeves, Dr. Daniel Goldstein, Dr. Donna Farmer and

18   Dr. David Saltmiras.  And those are all either current or

19   former Monsanto employees.

20       Now, as the trial goes along, we may add a few other

21   employees or we may take one of those depositions down.  Those

22   are who we intend to bring.

23       But here is what I'm going to talk to you about today.

24   There is three real phases of my opening statement I want to go

25   over with you today.  The first one is what is Roundup; right.

 1    We all probably know that Roundup is a weed killer sold by

 2    Monsanto, but maybe we don't know what Roundup is.

 3         Next, I'm going to talk to you about can Roundup cause

 4    cancer.  Is it possible?  Is it within the realm of the

 5    universe that Roundup can cause cancer?  And then I'm going to

 6    talk to you about whether or not Roundup caused Mr. Hardeman's

 7    cancer, different questions.

 8         Once I walk you down those three, I am going to sit down,

 9    and Mr. Stekloff will talk to you about Monsanto.

10         So Roundup.  You are going to hear testimony from

11    Mr. Hardeman, probably next week, about his Roundup use; and

12    you are going to hear that Mr. Hardeman started spraying

13    Roundup in 1986.  You are going to hear he sprayed Roundup

14    through and including 2011, 2012, somewhere around that time.

15    You are going to hear that he used two products -- two main

16    products over the course of that 26, 27 years.  You are going

17    to hear that he used Roundup Concentrate and Roundup

18    Concentrate Plus.

19         You are going to hear him testify about how he has really

20    only lived in two houses during that period of time, and he is

21    a creature of habit; and he would go to the same stores and buy

22    the product.  It was called Yard Bird at the time -- he was

23    living just north of Santa Rosa -- and you are going to hear

24    him talk about how he bought these products because they came

25    in a concentrate form so he thought it would last longer.  You

OPENING STATEMENT / WAGSTAFF

1  are going to hear him describe how he had a two-gallon pump and

2  how he would put concentrate in the pump, dilute it with water,

3  and then walk around and spray.  He is going to testify to you

4  and tell you-all about his exposure activities.

5       So what is Roundup?  Roundup is actually not that

6  complicated of a product.  This is maybe a new word for you

7  guys, but you are going to hear it a lot over the next month:

8  Glyphosate.

9       There's four main ingredients in Roundup, and you are

10 going to hear testimony about this.  Glyphosate is the active

11 ingredient.  It is what actually goes in and kills the weed.

12 There is no dispute about that glyphosate is the active

13 ingredient in Roundup.  And you are going to hear testimony

14 that the other ingredients -- they have a surfactant, all

15 right, and they have a surfactant in there which actually you

16 will hear testimony helps sort of reduce the surface tension of

17 the glyphosate and sort of adhere it to the plant.

18      So if you can picture taking a glass of water, we will

19 just say, and pouring it on a plant, it will all just fall off;

20 right?  You will hear testimony that the surfactant actually

21 helps bind the glyphosate to the plant.

22      And then you are going to hear testimony that water is in

23 Roundup, and then you are going to hear testimony that there

24 are other contaminants, other sort of byproducts in Roundup.

25 So those four main ingredients.

1          And I showed you a picture how there are two different

2     products Mr. Hardeman used, and those four main ingredients,

3     the ratios that -- the ratios of those ingredients are what

4     makes the different products different.  One may have more

5     water; one may have more glyphosate.  You get the picture.

6          So the important takeaway and the first piece of this

7     puzzle that we need -- and the first piece of information that

8     you guys need to understand is that glyphosate and Roundup are

9     not the same.

10         You are going to hear testimony that the combination of

11    glyphosate, with all of those other ingredients, the surfactant

12    is actually more toxic than glyphosate alone.  You are going to

13    hear testimony to that effect.  You are going to hear evidence

14    to that effect.

15         So you need to remember that when people are talking about

16    glyphosate, they are not necessarily talking about Roundup.  So

17    the first piece is to remember and put those two pieces

18    together.  That is the first piece of the puzzle, scientific

19    puzzle.  Now -- we have talked about what is Roundup.

20         Now I want to talk about can Roundup cause cancer.  Now,

21    this discussion is going to walk us through three main pillars

22    of science.  There is three main things that you need to

23    consider as pieces to the second question.  You are going to

24    hear testimony that you can't look at these pieces in

25    isolation.  You are going to hear testimony that you can't

 1  consider the epidemiology studies alone.  You are going to hear

 2  you can't consider the animal studies alone, and you are going

 3  to hear testimony that you can't consider the cell data studies

 4  alone.

 5      The testimony you are going to hear is going to tell you

 6  you need to look at all three of those pieces together to get a

 7  full picture of whether or not Roundup causes cancer.

 8      I'm not going to be the one to teach you that.  We are

 9  going to bring in witnesses.  This is Dr. Ritz.  Dr. Ritz is

10  actually probably going to testify this afternoon.  Depending

11  on how long I take and how long Mr. Stekloff takes, Dr. Ritz, I

12  anticipate, will either talk to you guys either right before

13  lunch or right after lunch.  And Dr. Ritz is a professor at the

14  University of California, Los Angeles at UCLA.  She is a

15  medical doctor and a Ph.D. in epidemiology.

16      Dr. Ritz will explain to you what epidemiology is.  It is

17  a big word.  She will tell you for the concept of studying

18  human populations.  She is going to tell you that really what

19  epidemiology does is it looks at this group of people and

20  compares them to that group of people to see which one has a

21  higher risk of getting a disease.  There is a lot of fancy

22  lingo she is going to use, and she will explain it all to you.

23  But that's basically the core, she will tell you.

24      We brought in a professor because we wanted her to be able

25  to teach to you guys.  She also happens to be the president of

 1  the International Society of Environmental Epidemiology, the

 2  current president.  She is going to tell you that there is a

 3  difference between environmental epidemiology and good

 4  old-fashioned epidemiology.  She is going to tell you that

 5  environmental epidemiologists consider pesticides in human

 6  populations.  That is what environmental epidemiologists do.

 7  She is going to tell you that.

 8      I met with her last night, and she actually told me that

 9  she is --

10          THE COURT:  That's -- that is not appropriate.

11          MS. WAGSTAFF:  All right.

12  Next we are going to bring in Dr. Portier.  Dr. Portier

13  has his Ph.D. in biostatistics.  Dr. Portier was supposed to

14  testify live; but for reasons outside of our control, he

15  couldn't be here.  So last week my colleague flew to Melbourne,

16  Australia and videotaped him.  We thought it was that important

17  to bring you his testimony, that you guys will see him by video

18  probably later this week or early next week, depending on how

19  fast we can get the video cut.

20      So you are going to hear from Dr. Portier, and you are

21  going to learn that Dr. Portier was the former associate

22  director of the National Toxicology Program.  And you will hear

23  that Dr. Portier basically has had his fingerprint on most of

24  the policies and guidelines of the United States Toxicology

25  Board.  You are going to hear that from him.  So we brought him

 1   in.  And Dr. Portier is going to testify to you-all about the

 2   animal studies.  Dr. Portier is also going to testify to

 3   you-all about the cell studies, the data studies.

 4        Next, we are going to bring in Dr. Weisenburger.

 5   Dr. Weisenburger is a clinician pathologist down in the

 6   Los Angeles area, and he works at the City of Hope, which is a

 7   world renowned cancer center.  And you are going to learn that

 8   Dr. Portier (sic) has dedicated his life's work to determining

 9   the cause of people's cancer.  He is a researcher.  He is an

10   author.  You are going to hear from him he has published over

11   434 peer-reviewed -- pieces of literature.  That is 434

12   articles where his colleagues have reviewed his work and

13   published it, and you are going to hear from him on what he

14   thinks is going on with this literature.

15        Dr. Weisenburger is also the author of some of the

16   literature we are going to show you.  So you are going to hear

17   firsthand from one of the people who was involved in the

18   scientific literature.

19        All right.  So let's go back to the pillars of cancer

20   science.  Let's first talk about the epidemiology.

21        All right.  This case is about Mr. Hardeman's cancer.  Can

22   Roundup cause cancer?  The cancer we are specifically talking

23   about in this case is non-Hodgkin's lymphoma.  Now, you are

24   going to hear testimony that cancer is actually a rare disease.

25   You are going to hear testimony that non-Hodgkin's lymphoma is

 1   a blood cancer.  It starts in the blood and it stays in the

 2   blood.  So the epidemiology we are going to consider in this

 3   case is going to relate to non-Hodgkin's lymphoma.  We are

 4   going to -- there is epidemiology about probably everything you

 5   could possibly want epidemiology about, but we are going to

 6   limit it to non-Hodgkin's lymphoma and glyphosate.

 7        So what we are going to do is Dr. Ritz and I are going to

 8   walk you through this chart in great detail, and that blank

 9   white study -- or that blank white column right there, by the

10   time Dr. Ritz gets off the stand, we will have filled in all of

11   those charts, and you will know a lot about each one of those

12   studies.  And what you will learn -- what I will show you, and

13   I will just explain to you to orient you -- Dr. Ritz will

14   explain to you where it says study in parentheses, this first

15   one where it says *Hardell, et al.* 1999, that is the lead

16   author of a -- of a scientific literature, of a journal

17   article, and then the 1999 means the year that it was

18   published.  So this chart is depicting nine pieces of

19   literature, and we will walk through each one.

20        And what this shows, when you are finished and what

21   Dr. Ritz is going to explain to you, looking at this first one,

22   the *Hardell*, you are going to see that there is an increased

23   risk of non-Hodgkin's lymphoma after exposure to glyphosate.

24   But there is a thing called "statistical significance," which

25   you will learn a lot about, and it is a way of determining

1   whether or not the result happened by chance.

2        So this result wasn't statistically significant, so you

3   will learn in the third row -- these are actually

4   chronological.  So you will see in the third row *Hardell* pops

5   up again three years later.  You will learn that the authors in

6   *Hardell* added cases to their study.  They almost did sort of a

7   Phase Two of their study.  And Dr. Ritz will tell you that that

8   added power to the study and that took chance further out of

9   the picture.  Dr. Ritz will tell you that.  And they reached

10  statistical significance in *Hardell*.  And Dr. Ritz will explain

11  to you why the *Hardell* example is a great example of why you

12  can't ignore cases that aren't statistically significant.

13  Dr. Ritz will explain that to you.

14        I'm going to go back to the *McDuffie* case that is

15  sandwiched between the two *Hardell* cases.  Dr. Ritz will

16  explain a concept to you called dose response.  Dose response

17  is sort of what it sounds like, but Dr. Ritz will tell you that

18  dose response means the more dose or the more exposure you

19  have, the more risk you have.

20        So the *McDuffie* study was a Canadian study, and actually

21  the *McDuffie* author looked at eight providences in Canada;

22  gathered a lot of people and looked at dose response as part of

23  the analysis.  They also looked at never-ever analysis, which

24  you will learn about later.  But one of the things that

25  *McDuffie* looked at was they considered, Dr. Ritz will tell you,

1    they considered does the risk increase with the amount of dose

2    that you get?  And they used a two-day limit.  And they said if

3    you are exposed to glyphosate more than two days a year, does

4    your risk go up for people that are exposed to glyphosate less

5    than two days a year?  *McDuffie* found the answer to be yes, it

6    does.  So she is going to explain to you the importance of dose

7    response.

8         And then next we get to *De Roos* 2003.  I'm skipping back

9    over the *Hardell*, the second piece of that block, and Dr. Ritz

10   is going to explain to you the importance of *De Roos* 2003.

11   What Dr. Ritz is going to tell you is you are going to learn a

12   lot about something called confounders.  And Dr. Ritz is going

13   to explain it far better to you than me.  That's why we brought

14   in a professor from UCLA.  She is going to explain to you when

15   you need to consider confounders and when you don't.  Dr. Ritz

16   is going to tell you that.

17        The important thing about *De Roos* is she is going to tell

18   you that the *De Roos* authors actually adjusted for 47

19   confounders, and she is going to explain to you that that makes

20   their findings even more important.  And guess what?  We are

21   also going to bring Dr. Weisenburger who was an author on

22   *De Roos* 2003 to talk about that study as well.

23        Then we go down to *Eriksson*, which is the next study.

24   *Eriksson* also did a dose response calculation.  *Eriksson* looked

25   at ten lifetime days versus less than ten lifetime days, and

1   Dr. Ritz is going to tell you that the *Eriksson* study also

2   found a dose response.  She is going to tell you that the

3   *Eriksson* study found that the more you are exposed to

4   glyphosate, Roundup -- I'm sorry, Roundup, the epidemiology

5   studies are Roundup exposure -- so the more you are exposed to

6   Roundup, your risk increases.  That's what the *Eriksson* study

7   found.

8       Then she is going to walk you through the rest of them.

9   The *Orsi* case was a case -- and she will explain to you why

10  that study found the results they did -- they used patients in

11  hospitals.  So their controls were already people who were

12  sick.  She will explain to you why that is important.  She will

13  explain to you the significance of the effect on the study.

14      The next one is the *North American Pooled Project*, which

15  Dr. Weisenburger is also an author on.  Dr. Weisenburger will

16  talk to you about that study as well.  You can see in the

17  parentheses that the *North American Pooled Project*, if you go

18  to the second row, it actually just pooled two of the earlier

19  studies, *McDuffie* and *De Roos*.  So what that study did was it

20  combined those two findings.  She will explain to you what that

21  means.

22      Then finally the last two studies are a part of what is

23  called *The Agricultural Health Study*.  We are going to spend a

24  lot of time with Dr. Ritz talking about *The Agricultural Health*

25  *Study*.  What you need to know is that *The Agricultural Health*

1   *Study*, what Dr. Ritz will tell you, began in the 1970s, 1980s,

2   and it really started getting going in the 1990s.  And she is

3   going to talk to you about that, a study -- it studied I think

4   50 pesticides.  And they enrolled people in 1993.  And she was

5   actually an external adviser for the -- what we call the AHS,

6   she was actually an external adviser for the AHS.

7        Over the years different people have published literature

8   from collecting data from that study.  So you have this study

9   going on, and Dr. Ritz is going to tell you over the time

10  people have pulled out literature.  What you see here is

11  *De Roos* in 2005 -- the same *De Roos* we were talking about

12  before -- actually wrote a study and published a study about

13  the data from the AHS.  And then actually last year Andreotti

14  in 2018 published some more data about the AHS.

15       That is sort of the scope of the epidemiology that you-all

16  are going to learn about.

17       We talked a little bit about dose response, and Dr. Ritz

18  will talk a little bit about this; that the dose makes poison;

19  that the dose matters.  Dr. Ritz is going to tell you how much

20  exposure you have makes a difference, and she is going to tell

21  you why.

22       You are going to become familiar with the forest plots --

23  sorry -- plot summaries.  So all of those studies that I just

24  talked to you about can be categorized into a dose response

25  study or a never-ever study, and Dr. Ritz will tell you what

1    the differences are.

2        I will tell you very briefly what she will say.  She will

3    tell you that the dose response studies will do what we just

4    talked about.  They will consider how much exposure you have.

5    The never-ever studies will say "Have you ever been exposed to

6    Roundup?"  The answer is yes or no.  If the answer is yes, you

7    are analyzed in this category, without any regard to whether or

8    not you have been exposed one day or a thousand days.  If you

9    have been exposed, you are in the yes.  You are in the ever

10   category.  If you haven't, you are in the never category.

11       And Dr. Ritz will tell you the pros and cons of both.  I

12   will be fair, there are pros and cons to both analyses, and she

13   will tell them to you, and she will explain to you the effect

14   that those analyses will have on the study results.

15       So what this is is this is a plot summary -- see that blue

16   line right in the middle, that is one.  That represents the

17   number one.  And what Dr. Ritz will show you is that everything

18   on the right, all of the black squares on the right show a

19   positive association between exposure to Roundup and

20   non-Hodgkin's lymphoma.

21       One thing we haven't talked about yet, which Dr. Ritz will

22   talk to you about, is meta-analysis, yet another type of

23   epidemiology.  And what meta-analysis does, as Dr. Ritz will

24   tell you, is it takes different studies and it combines them

25   into one.  So it is an effort to make a study more powerful and

1   combine them into one, and Dr. Ritz will talk to you about

2   those.

3       So here are some of the ones that we talked about earlier.

4   Those ones with the red squares around them are the ones that

5   actually have statistical significance.

6       We have talked about the *McDuffie* dose response and how

7   they have looked at over two days, and they found there was a

8   212 percent increased risk if you were exposed to Roundup over

9   two days a year.  This was in 2001.

10      In 2008 *Eriksson* came out.  They found that if you are

11  exposed to Roundup more than ten days, you have a 202 percent

12  chance -- I'm sorry -- you have a 236 percent chance if you are

13  exposed to more than ten days in your life.  236 percent

14  chance.

15          THE COURT:  Can we have another sidebar, please?

16      (The following proceedings were heard at the sidebar:)

17          THE COURT:  Did you read my ruling from yesterday?

18          MS. WAGSTAFF:  Yeah.

19          THE COURT:  So it is a difficult -- it is a difficult

20  line to dance because it is appropriate to say what the studies

21  said, but it is -- but there are certain conclusions that you

22  cannot draw from those studies, and that is the line that

23  Dr. Ritz is going to need to dance.

24          MS. WAGSTAFF:  She will.

25          THE COURT:  That is the line that you have crossed in

 1   your opening statement.  So you cannot say that -- you cannot

 2   say that one can conclude from these studies that you have

 3   X percent risk if you use more than Y percent.  You can say

 4   what the numbers were, but you can't say you can draw a

 5   conclusion from those numbers, and that's the line that you

 6   have crossed.  So that's the line you need to continue to be

 7   aware of for the remainder of your opening statement, and that

 8   is the line that Dr. Ritz must be very aware of when she

 9   testifies.

10        MS. MOORE:  Your Honor, can we ask for clarification?

11   I appreciate the distinction.  We want to make sure we are

12   doing it right.  So the key is we can't say you can draw that

13   conclusion; is that the key?

14        THE COURT:  Yes.  What the numbers from the study

15   were, but you can't say that one can draw that conclusion from

16   the numbers.

17        MS. WAGSTAFF:  I didn't think I crossed that line.

18        THE COURT:  You definitely crossed that line.

19        MR. STEKLOFF:  I think we are probably past those

20   slides, and I think there is a good chance it probably went

21   over people's heads, hopefully.

22        THE COURT:  Yeah.

23        MR. STEKLOFF:  I think it is okay to say there was a

24   percentage above ten days; this was the odds ratio; but then it

25   is the second step of also trying to say the percentage

 1   increase.  I think that crosses a line as well because that is

 2   giving too much credence to the increased risk from an

 3   unadjusted number.

 4        THE COURT:  I think that's what I was trying to

 5   articulate.  It may be that we need to discuss this in more

 6   detail on a break.

 7        MS. WAGSTAFF:  I'm not going to touch it much more.  I

 8   have heard what you said.

 9        THE COURT:  Okay.

10        MS. WAGSTAFF:  If I have a slide, I will zip past it.

11        THE COURT:  Thank you.

12     (The following proceedings were heard in open court:)

13        THE COURT:  I was going to remind the jury, there is

14   an instruction I will give you a number of times during this

15   trial.  I actually already gave it to you on Friday -- or on

16   Wednesday, which is the instruction about what is evidence and

17   what is not evidence.  Lawyer argument is not evidence.  What

18   the lawyers say during opening statements and closing arguments

19   and when they are asking questions of witnesses, that is not

20   evidence.  The purpose of opening statements is solely to give

21   a preview of what the evidence will show and the purpose of

22   closing arguments is to argue about what the evidence shows.

23        And you should keep in mind the very limited role of the

24   lawyers in this process as we go forward and to remember that

25   what a lawyer says during opening statements does not

1    constitute evidence in the case.

2            MS. WAGSTAFF:   All right.   Sorry for that

3    interruption.

4            We had talked a little bit about *The Agricultural Health*

5    *Study*, and Dr. Ritz will probably touch on this tomorrow at

6    some point.   What Dr. Ritz is going to tell you is that this

7    was a cohort study, which means that they gathered a lot of

8    people -- I believe the number was around 50,000, 56,000 people

9    that they gathered -- and she will tell you that these people

10   were in North Carolina and Iowa, and that the study found no

11   association for general non-Hodgkin's lymphoma.

12           And as we just discussed, she is going to tell you that

13   there is two relevant papers that have come out from *The*

14   *Agricultural Health Study* -- *De Roos*, 2005, which is not to be

15   confused with *De Roos* 2003; it is kind of confusing because it

16   is the same person -- and Andreotti 2018.

17           And Dr. Ritz is going to talk to you about this study.

18   She is going to tell you that this study, while good

19   intentioned, has some general flaws to the entire study and

20   then she is going to tell you some specific flaws that are

21   specifically related to glyphosate.

22           She is going to tell you that this study looked at 50

23   chemicals and that they put quantity over quality.   She is

24   going to tell you that it is almost as if they were trying to

25   do too much.

1     She is going to explain that in the middle of their

2  enrollment process, which was 1993 to 1997, she is going to

3  explain that there was a spike in the use of Roundup.  She is

4  going to show you evidence that shows that.  You will see for

5  yourself.  And she is going to show you that the way that they

6  classified people in the beginning of the enrollment in 1993

7  and 1994 became an improper classification because of the

8  glyphosate spike.  She is going to explain all of this to you.

9  And that when they went back to try to call the people,

10  37 percent of the people disappeared.  She is going to explain

11  all of this to you.

12     She is going to explain that the 37 percent of people who

13  disappeared, they used a technique called imputation, which

14  means they used guesses and they looked at the people who did

15  respond; and they imputed data to the people who didn't

16  respond.  And she will testify that that is actually not a bad

17  method.  She will testify that imputation actually sometimes is

18  okay, but what she is also going to tell you is that it is not

19  okay when you have this many people, 37 percent of 50,000; and

20  it is also not okay when it is layered on top of an exposure

21  misclassification due to the glyphosate spike.

22     So we are going to talk about these results this afternoon

23  or tomorrow morning with Dr. Ritz.  And the last thing she will

24  tell you -- maybe not the last thing she will tell you -- but

25  at some point she will tell you that the test results within

1   the AHS studies actually suggest that Roundup protects people

2   from cancer.  And that if taken on their face, she will tell

3   you the significance, to her what that means.

4        A couple of weeks ago -- today is the 25th, so 20 days

5   ago -- a new article came out.  This is one of those

6   meta-analyses that I was telling you about.  And this

7   meta-analysis is sort of a unique thing, and Dr. Ritz will

8   explain it to you far better than I will, but this was a

9   meta-analysis that looked at the high dose glyphosate users.

10  So it is kind of, she will tell you, the first time someone has

11  taken all of those high-use people and put them in the same

12  study.  Dr. Ritz will talk to you about this study.

13       This was three weeks old and what these people found --

14  and they looked, as you will see in accordance with evidence

15  from the experimental animal and mechanistic studies -- and

16  mechanistic studies is what I'm calling cell data studies.  So

17  mechanistic and cell data are the same concept.  So in

18  accordance with the experimental animal and mechanistic study,

19  our current meta-analysis of human epidemiological studies

20  suggests a compelling link between exposure to glyphosate-based

21  herbicides and an increased risk for NHL.  And she will tell

22  you, and I think it is pretty undisputed, that Roundup is a

23  glyphosate-based herbicide.

24       So that's our second piece of the puzzle is the

25  epidemiology.  Epidemiology, sometimes I get tied up in my

1    tongue, so I call it epi.  Epi is sort of the slang term.  Epi

2    right here is the epidemiology.  It is another piece of the

3    puzzle that we have to look at.

4        And so let's consider what happens before we even get to

5    the human studies -- before we even look at what happens in

6    human populations, let's look at the animal studies.

7        We have just walked you through the epidemiology and now

8    we are going to look at toxicology, rodent studies.  In rodent

9    studies they usually test with mice and with rats, and there

10   are particular strains of both mice and rats that are used and

11   have been determined to be best to be used for animal testing.

12   And we are going to have Dr. Portier talk to you about the

13   animal testing.  And what Dr. Portier will tell you is that we

14   used this information to determine if it is biologically

15   plausible to cause tumor in mammals, in these rats and mice.

16       So we are using these studies, and we are -- we are

17   putting glyphosate in these animals to see if it causes tumors

18   and is it possible; and he will testify to you the significance

19   of finding tumors in animals and how that applies to humans.

20   He will explain that to you.

21       So I'm going to walk you through how the basic animal

22   study works.  So usually you have groups of mice -- and it is

23   the same for mice and rats.  There is no real distinction.  So

24   we will say there are usually 50 -- there are 50 male mice and

25   50 female mice, and they are put into four categories.  So you

 1    usually have 400 mice in a study.  And you give -- on the left
 2    you have your control groups.  All right.  Just to be clear,
 3    all of these toxicology -- toxicology means animal studies.
 4    They are sort of used interchangeably.  So all of these animal
 5    studies involve glyphosate, the active ingredient except for
 6    one, the *George* study.  We will talk about that one separately.
 7        So you have the control group, and so you have the control
 8    group who is fed no glyphosate.  The other three groups are fed
 9    glyphosate.  Dr. Portier is going to tell you that the high
10    dose is given the maximum -- maximum-tolerated dose, the MTD,
11    and he is going to tell you how important it is to give these
12    animals the maximum-tolerated dose.  And he is going to tell
13    you there is a specific reason, and he is going to give you
14    that reason when he testifies.
15        And he is going to tell you how you determine the
16    maximum-tolerated dose, and he is going to tell you the effect
17    on the study if the highest group does not reach MTD.  He is
18    going to tell you-all of that.  It is a high dose.
19        And then the low dose and the median dose are given a
20    percentage of the maximum-tolerated dose.  So on the left you
21    have no glyphosate.  On the right you have got the
22    maximum-tolerated dose.  And then you have got fractions of
23    that.
24        So the mice are looked and checked for tumors at six weeks
25    old, and Dr. Portier is going to tell you that the lifespan of

1   the rat and a mouse is two years equivalent to our life.  So

2   when you have a two-year-old mouse or rat, he is going to

3   equate that to someone in their 60s, 70 years old.  That is why

4   they use rats and mice.

5        Dr. Portier is going to tell you that a two-year rat or

6   mouse study is considered a long-term study.  So at the end of

7   two years, they check for tumors in these animals, and they

8   circle -- this is just sort of a demonstrative, but they will

9   count the tumors; right?  So here it looks like there are four

10  on the high dose; three in the medium dose; two in the low

11  dose, and one in the control.  They will count the tumor in all

12  of those groups.  And then they will chart them, and they will

13  see if there is a dose response.  They will see if -- if the

14  people who get more glyphosate, there are more tumors, and they

15  will draw conclusions from that; and Dr. Portier will tell you

16  what conclusions are drawn from that.

17       Dr. Portier will tell you that the important thing about

18  animal studies to look for is if there is a significant

19  increase in tumors.  He will tell you if there is a lot more

20  tumors in the high dose, in the controlled dose, or the low

21  dose, that is important.  And he will tell you why that is

22  important, and he will tell you what that means.

23       He will also tell you that replication is important.  That

24  if the same tumor is found in different studies conducted in

25  different laboratories between two strains of mice, between

 1    different sexes, male and female, or between a mouse and a rat,

 2    that if you see the same tumor popping up, that's really

 3    important.  He will explain that to you.

 4        Dose response, I just showed you a graphic on that.

 5    Dr. Portier will explain that if that arrow shows a dose

 6    response, that is important and he will explain the

 7    significance of that.

 8        I mentioned across species.  If you see a rare tumor in a

 9    mouse and in a rat, that's important.  Dr. Portier will tell

10    you that finding rare tumors at all is important.

11        So let's look at actually the studies involved in this

12    case.  The studies involved in this case -- let me orient you a

13    little bit about this chart, and Dr. Portier will do the

14    same -- but if you look across the top row, there is five

15    columns, okay.  And each column -- the first one says *Knezevich*

16    *& Hogan* 1983.  The second one says *Atkinson* 1993, following

17    across to the right.  Those are animal studies.  Those are

18    separate animal studies.  And if you follow the column down, it

19    will tell you the tumors that those authors found in the

20    studies, and Dr. Portier will explain to you the significance

21    of that.

22        So, for example, in *Knezevich & Hogan*, which was done in

23    1983, Dr. Portier will tell you that the authors found a kidney

24    carcinoma or adenoma and a spleen composite lymphosarcoma.  He

25    will explain to you what those are and what that means, and he

 1  will explain to you why it is important and why it is

 2  significant to him in his opinion that kidney sarcomas or

 3  adenomas are found in three different studies.

 4       He will explain to you that the first four studies are CD1

 5  mice.  And the last study, the *Kumar* study is a Swiss albino

 6  mouse.  Different strains.  And he will explain to you why that

 7  is important.  He will tell you that Monsanto conducted the

 8  first study, and other companies conducted the last four

 9  studies; and he will explain to you why that is important in

10  his opinion.

11       He will explain to you the importance that a lymphoma is

12  found in every mouse study.  He will explain to you that a

13  spleen -- I can't believe I have to say this word twice to you

14  guys -- composite lymphosarcoma is actually a lymphoma, and he

15  will explain to you that means there is a lymphoma finding in

16  every mouse study.

17       I want to tell you a little story about the *Knezevich &*

18  *Hogan*.  *Knezevich & Hogan* story in 1983.  *Knezevich & Hogan* in

19  1983 found a kidney carcinoma or adenoma.

20       A couple of weeks ago -- actually on January 23rd, so

21  almost one month ago, we deposed Monsanto.  They produced

22  Dr. Reeves to talk about this study.

23            **THE COURT:**  Hold on.

24            **MR. STEKLOFF:**  May we approach?

25            **THE COURT:**  Okay.

1          (The following proceedings were heard at the sidebar:)

2          **MR. STEKLOFF:**  So I think this is -- this is fair game

3     as an overall subject matter, and I also don't know where she

4     is going with Mr. Reeves -- Dr. Reeves' testimony, and I'm not

5     saying that is off limits.  I'm concerned.  We are working on a

6     stipulation.  I think later today we are going to have to have

7     an argument in front of Your Honor about whether -- how we are

8     going to be able to tell the story.  Already there is reference

9     to an internal document about the tumor that we don't think

10    should come in at the bottom of this slide, and so I'm

11    concerned about the slide that is being used now and also how

12    far into the story we get into opening given that Your Honor

13    has not -- has not fully -- you have given us guidance --

14    hasn't fully weighed in on how much of the story comes in and

15    the level of details that come in.

16         We have proposed a stipulation to the Plaintiffs.  They

17    don't agree with the stipulation.  I think that much more

18    evidence should come in, but I'm worried about that happening

19    in opening given that we don't have any final rulings from

20    Your Honor.

21         **THE COURT:**  I don't have the slide in front of me

22    right now.  I don't know what I can do about this other than

23    listen and if you make an objection --

24         **MS. WAGSTAFF:**  I will tell you what we are going to

25    do.  The rulings that Your Honor has given is that we are

1   allowed to tell the *Knezevich & Hogan* story.  We just can't

2   refer to it as a magic tumor, and we have no intention of

3   doing.

4           **THE COURT:**  I thought I said you could refer to it as

5   a magic tumor?

6           **MS. WAGSTAFF:**  You said not in opening.  So I have no

7   intention of doing that.  You denied the motion to keep it out,

8   or you granted our motion to bring it in.  I'm not quite sure

9   how that happened.

10          **THE COURT:**  Well, anyway, this does not seem like

11  something we should be having a sidebar about right now.  You

12  can't call a sidebar every time you are worried something bad

13  is going to happen.  If you need to make an objection make, the

14  objection.

15          **MR. STEKLOFF:**  Thank you, Your Honor.

16          (The following proceedings were heard in open court:)

17          **MS. WAGSTAFF:**  All right.  Back to where we were.

18      So I want to talk to you about the *Knezevich & Hogan*

19  studies and findings that were made in 1993.  I have circled

20  this particular tumor because I want to talk and tell you a

21  story about this particular tumor.

22      In 1985 Monsanto submitted the *Knezevich & Hogan* study to

23  the EPA as support to get glyphosate approved, and the study

24  showed that there was a 0-0-1-3 tumor finding.  What that means

25  is zero in the control group, zero in the low group.  They

1  found one tumor in the median group and three tumors in the

2  high group.  That's how -- that's what those numbers mean,

3  0-0-1-3.

4       And around that time you will hear testimony, and you will

5  see documents that show, that the EPA made a unanimous decision

6  in 1985 to classify glyphosate as a Category 3 oncogene.  You

7  will hear testimony and you will see documents that Monsanto

8  thought this was a bad thing for glyphosate.

9       And Monsanto, you will see testimony where they say, short

10 of a new study or finding tumors in control groups, what can we

11 do to get this thing off Category 3.

12           MR. STEKLOFF:  Objection, under --

13           THE COURT:  Overruled.

14           MS. WAGSTAFF:  Monsanto said short of a new study or

15 finding tumors in the control group, what can we do to get this

16 thing off Category C; this thing called glyphosate.

17      The EPA responds to them:  A prudent person would reject

18 the Monsanto assumption that glyphosate dosing has no effect on

19 kidney tumor production.

20      Another way of saying this is that if glyphosate were

21 truly unrelated to kidney production, we would expect to see

22 four or more tumors in less than one out of a hundred

23 experiments of the type sponsored by Monsanto.  Thus,

24 glyphosate is suspect.

25      EPA further said, We disagree with the registrants

1   position -- the registrant being Monsanto.  The EPA says:  We

2   disagree with Monsanto's position.  The registrant wishes to

3   avoid false positives while those concerned with the public

4   health wish to avoid false negatives.  Hence, for this reason

5   alone, Monsanto's argument is unacceptable.  Viewpoint is a key

6   issue.  Our viewpoint is one of protecting the public health

7   when we see suspicious data.  It is not our job to protect

8   registrants from false positives.  We sympathize with the

9   registrant's problem, but they will have to demonstrate that

10  this positive result is false.

11      So the EPA tells Monsanto they will have to demonstrate

12  that the 0-0-1-3 is false.  It is actually not related to the

13  glyphosate.  So you will hear testimony from Mr. Reeves --

14  Dr. Reeves -- I'm sorry.  You will hear testimony to prove it

15  wasn't false -- or to prove it was false they hired

16  Dr. Kuschner.

17      You will see that Monsanto says, Senior management at EPA

18  is reviewing a proposal to classify glyphosate as a Class 3

19  possible human carcinogen because of kidney adenomas in male

20  mice.  Remember, I circled that, kidney adenoma.

21      Dr. Marvin Kuschner will review the kidney sections and

22  present his evaluation of them to EPA in an effort to persuade

23  the agency that the observed tumors are not related to

24  glyphosate.

25      So you will see Monsanto hired Dr. Kuschner to persuade

1   the agency that the tumors were not related to glyphosate on

2   April 3rd, 1985.  You will see documents saying that.  The

3   problem is you will also see documents that Dr. Kuschner didn't

4   receive the slides until 11 days later, April 14th.

5        The story goes on and Dr. Reeves will tell you that

6   Dr. Kuschner reviewed the slides and actually found a tumor in

7   the control group.  And you will hear testimony that Monsanto

8   submitted Dr. Kuschner's study, the EPA, and the EPA declined

9   the results.  The EPA said that is not good enough.

10       You will hear testimony that the EPA then created a group

11  of pathologists and they re-cut the slides so they actually

12  went back to the animal, and you will hear testimony that they

13  re-cut the slides.  And the independent EPA people didn't find

14  a tumor in the control group when they re-cut the slides.

15       So you will hear testimony that the EPA in 1985 then goes

16  back to Monsanto and says, Redo the study.  Redo the study.

17       Monsanto refuses to redo the study, and you will hear

18  testimony about their language and how opposed they are to the

19  study.  You can decide for yourself why you think Monsanto

20  didn't redo the study, but the important thing when you are

21  thinking about why Monsanto didn't redo the study is

22  Dr. Portier will show you -- remember I told you *Knezevich &*

23  *Hogan* was the only study done by Monsanto -- the four tumor

24  studies, the four studies -- mice studies that followed, the

25  only four that have happened since then, found a lymphoma.  So

 1   you can decide when you hear the evidence why Monsanto didn't

 2   redo that study.

 3        You will hear testimony by Mr. Hardeman that right around

 4   this time he began spraying Roundup.

 5        Next we are going to talk about the *George* study.  The

 6   *George* is slightly different.  It is still a mouse study, but

 7   it has a little twist; and the twist is this -- and you will

 8   hear testimony from Dr. Portier that the *George* study is

 9   different for two main reasons.

10        The first reason is that it used Roundup, not glyphosate.

11   So remember I told you one study used Roundup.  Dr. Portier

12   will tell you that the *George* study done in 2010 used Roundup.

13   The other studies we have been talking about, you will hear

14   testimony that they fed the glyphosate to those animals.

15        In the *George* study they actually shaved the mice and they

16   rubbed Roundup on their body, and you will hear Dr. Portier

17   tell you why that is important and the significance of that --

18   of rubbing the Roundup on someone's body.

19        You will hear Dr. Portier tell you that 40 percent of the

20   mice that had Roundup rubbed on their skin got tumors.  Zero in

21   the control group got tumors.  You will hear Dr. Portier tell

22   you that.  The study was -- did an additional step that the

23   other mice studies didn't do, and Dr. Portier will explain it

24   to you.

25        Dr. Portier will explain to you the concept of being an

1    initiator or a promoter.  And so this study looked at whether

2    Roundup was a promoter.  And Dr. Portier will tell you what

3    that means.  What he will tell you is that some chemicals can

4    initiate the cancer process, and some chemicals can promote the

5    cancer process that is already going on.  And so Dr. Portier

6    will explain to you how both of those relate to the *George*

7    study, and Dr. Portier will tell you that the *George* study is

8    evidence that Roundup -- I have glyphosate on here, but it is

9    actually Roundup -- is both an initiator and a promoter.  And

10   Dr. Portier will explain to you why that is important.

11          Next, we have the rat studies.  So there is a little bit

12   more robust group of rat studies, and it is organized the same

13   way.  *Lankas* is the first study and then *Stout and Ruecker* in

14   1990.  What is important here is that Monsanto conducted -- you

15   will hear testimony from Dr. Portier.  Monsanto conducted the

16   first two studies, the *Lankas* study and the *Stout and Ruecker*

17   study, and other people conducted the other studies.  The first

18   studies are Sprague Dawley rats.  The last three are Wistar

19   rats.  The only thing that is important about that is two

20   strains of rats were used, and Dr. Portier will explain the

21   significance of that.

22          I should go back.  Dr. Portier will tell you that this

23   *Suresh* study from 1996; that there was a 40-some percentage of

24   tumors found in the control group when the -- historically

25   those control groups of Wistar rats usually had around a

1   3 percent.  So Dr. Portier will explain to you that -- that the

2   control group in that study was possibly contaminated and so

3   the results of that study can't really be useful.  Dr. Portier

4   will tell you that, but he wanted to put that in.

5        And Dr. Portier will use these slides, these tumor charts.

6   So Dr. Portier will tell you that here is this kidney carcinoma

7   or adenoma that we saw in the mice study.  He will tell you

8   that is actually a really rare tumor.  He will tell you that

9   this is really important and significant when you see it in

10  rats and you see it in mice.

11       We have replication across strains here.  The first ones

12  to the left are Sprague Dawley, and then the wood one is a

13  Wistar rat.

14       So Dr. Portier will tell you that we have checked off all

15  of the animal study boxes, and that's the animal studies.

16  Dr. Portier will tell you that there is significant evidence to

17  conclude that exposure to glyphosate causes tumors in animals,

18  and there is significant data to conclude that Roundup on your

19  skin is a cancer promoter.  So that's the animal piece of the

20  puzzle.

21       We have one more piece of the puzzle we need to look at,

22  and that is the cellular data.  The cellular data really gets

23  at the heart of how does this happen, how is it possible that

24  this actually causes damage.  That is what the cellular data

25  looks at.  And Dr. Portier is actually going to be the expert

1   who talks to you about that as well.  And Dr. Portier is going

2   to tell you that there are ten, I think -- maybe 11 --

3   different possible ways that something can cause damage in a

4   cell, and he is going to tell you that two of those ways keep

5   showing up in the literature.

6        Dr. Portier is going to tell you that with exposure to

7   both Roundup and glyphosate evidence of genotoxicity and

8   oxidative stress keep showing up.

9        So we talked earlier that the epidemiology is Roundup

10  exposure; right?  We talked earlier that the animal studies is

11  pretty much glyphosate exposure, except for the *George* study,

12  which is Roundup.  And here in the cellular data you are going

13  to learn that there actually is both.  We have cellular data

14  that relates to glyphosate, and we have cellular data that

15  relates to Roundup.

16       Dr. Portier will tell you that the field -- the body of

17  the cellular data is huge, and he will tell you that it

18  includes data related to humans.  He will tell you that it

19  relates to data related to mammals, like monkeys; and he will

20  tell you that it relates -- there is data as it relates to

21  non-mammals, living things, bacteria, fish.  And each of those

22  three categories, there is cellular data with the effect of

23  glyphosate and/or Roundup and its effect on cells both in

24  vitro, which means in sort of a petri dish, and in vivo.  So

25  there is a whole bunch of different combinations available

1    Dr. Portier will tell you from the cellular data.

2         And Dr. Portier, in a way far better than me, will walk

3    you through how a normal cell turns to cancer, and he will tell

4    you that the important thing is that somewhere along the way,

5    DNA damage or cell damage happens.  And he will show you that a

6    chemical exposure -- there are several different ways along

7    that pathway that the damage can happen.

8         Dr. Portier will explain to you where the genotoxicity can

9    happen, where the oxidative stress can happen.  This is the --

10   this is what I just explained to you, that there are -- there

11   is a robust body of cellular data study.  And if you look at

12   this DNA that we all learned about when we were young kids,

13   there is different ways that the DNA can be damaged.

14        Dr. Portier will tell you about a single strand break.  He

15   will tell you that the DNA can get mismatched; that the base

16   can be damaged.  He will tell you that you can have a double

17   strand break.  He will talk about intrastrand cross-links and

18   interstrand cross-links.  Dr. Portier will walk you through all

19   the ways in which exposure to Roundup or exposure to glyphosate

20   has been studied, and he will give you his opinion on whether

21   or not it is genotoxic.

22        Now, Dr. Portier will walk pretty quickly -- he

23   actually -- his testimony is sort of weird.  His testimony was

24   actually taken last week in Australia, so I actually know what

25   he is going to say.  He is going to walk through this chart

1    and, he is going to put pluses or minuses where he thinks there

2    has been genotoxicity found, where he thinks in these studies

3    in his opinion he is going to explain to you where those

4    studies show that exposure to Roundup and/or glyphosate has a

5    genotoxic effect.

6          And then he is going to talk about the recent studies.

7    These are the studies that have happened in the last two years.

8    Dr. Portier will walk you through all of those.

9          And because it is so robust, we have asked Dr. Portier to

10   focus on the human data.  Remember I mentioned there are all

11   these bacterial and non-human mammal data and all of that?  He

12   has pretty much focused his opinion on the human data.

13         So this slide is the oxidative stress data.  He is going

14   to walk you through all of that.  What I have done is I have

15   summarized it, and you will see pluses where Dr. Portier will

16   tell you that there is a positive association.

17         So I have walked you through all of the three pillars of

18   cancer science.  And your question, remember, we told you, was,

19   is:  Does exposure to Roundup cause cancer.  I have walked you

20   through what you are going to hear about the epidemiology, and

21   I have walked you through what you are going to hear about the

22   animal studies; and I have walked you through what you are

23   going to hear about the cellular studies, and you are going to

24   remember that Roundup and glyphosate are not the same things.

25   And that is the final piece of your puzzle to decide whether

**OPENING STATEMENT / WAGSTAFF**

1   exposure to Roundup causes cancer.

2       There is one other thing I want to tell you about before

3   we get to whether or not exposure to Roundup caused

4   Mr. Hardeman's cancer.  There is this entity called the

5   International Agency Research on Cancer, which we lovingly

6   refer to as IARC.  IARC is a -- an arm of the World Health

7   Organization.

8       And you are going to hear that Dr. Portier actually has

9   experience with IARC.  Dr. Ritz has experience with IARC.  And

10  what you are going to hear is you are going to hear that in

11  2014 and into the beginning of 2015 IARC reviewed glyphosate.

12  What IARC did was they brought 17 people from around the whole

13  world, not just Americans, people from all over the world, and

14  they convened in Leon, France.  And prior to showing up, you

15  will hear testimony that they spent about six months or so

16  reviewing the literature, and these aren't people who -- let me

17  move back.

18      These are people who are invited there because they are

19  experts in their field.  So you have them reviewing the

20  literature, leading experts on cancer, and they went to Leon,

21  France in March of 2015, so almost four years ago.  People from

22  the EPA were there.  There was someone there from the

23  California EPA.  Monsanto actually sent an observer.  You will

24  hear evidence that actually Monsanto participated a little bit

25  in the process.

1           They had a week-long meeting in France.  And they weren't

2   just looking at glyphosate; they were looking at a couple other

3   chemicals as well, and they categorized the evidence in similar

4   buckets than we did.  They didn't have all the data that our

5   experts have here.  They had a limitation of using

6   peer-reviewed literature that our experts don't have, but they

7   considered the evidence as well.

8           They actually had a fourth group called exposure, but I

9   don't think -- anyway, so epidemiology, IARC determined was

10  limited.  And IARC is an international entity that doesn't

11  sometimes use the same language that you or I would use when we

12  are talking to people or that you or I would sort of give

13  significance to.  So I wanted to read to you what IARC's

14  definition of "limited" is.

15          According to IARC, limited evidence means that a positive

16  association --

17          **THE COURT:**  Ms. Wagstaff, you are getting into more

18  detail on what the IARC investigated than you are going to be

19  allowed to present at Phase One, so I will ask you to move on.

20          **MS. WAGSTAFF:**  Okay.  Thank you, Your Honor.

21          So what the IARC concluded was they unanimously decided to

22  list glyphosate as a Class 2 carcinogen, which means that they

23  unanimously decided after looking at the literature that it was

24  a probable human carcinogen.

25          So one month ago, we deposed Dr. Reeves who was a Monsanto

1    representative, and Monsanto told us that there is no evidence

2    that glyphosate or glyphosate-based formulations caused cancer.

3    That is what Monsanto told us a month ago, and that's why we

4    are here today.

5            So I want to talk to you a little bit about the EPA, just

6    touch on it briefly.  The EPA does not look at Roundup.  You're

7    going to hear testimony that the EPA only looks at glyphosate.

8            You're going to hear testimony that the EPA actually

9    doesn't test anything --

10           **MR. STEKLOFF:**  Objection, Your Honor.

11           **THE COURT:**  Sustained.  Why don't you move on from the

12   EPA.

13           **MS. WAGSTAFF:**  All right.

14           So can Roundup cause cancer?  So let's look at whether or

15   not Mr. Hardeman's exposure to Roundup caused his cancer.

16           You're going to hear from three of Mr. Hardeman's --

17           **THE COURT:**  I wonder if -- since you're changing

18   topics, I wonder if this is a good time to take a brief morning

19   break.  It's five minutes to 10:00.  Why don't we resume at

20   five minutes after 10:00.  We'll take a morning break.

21           (Proceedings were heard out of the presence of the jury:)

22           **THE COURT:**  Okay.  Ms. Wagstaff, you have crossed the

23   line so many times in your opening statement, it's obvious that

24   it's deliberate.  The last time -- the most recent time was

25   when you were talking about the EPA and you were referring to

1   the EPA being vulnerable to political pressure.  Totally

2   inappropriate.  Totally inconsistent with everything we've

3   discussed over the past several months.

4        So I'm going to give you one final warning.  One final

5   warning.  If you cross the line one more time in your opening

6   statement with respect to Phase I, if you bring in material

7   during your opening statement that is inadmissible during

8   Phase I, your opening statement will be over.  I will tell you

9   to sit down and I will tell you that your opening statement is

10  over, and I will do it in front of the jury.

11       Do you understand?

12            **MS. WAGSTAFF:**  Yes, Your Honor.

13            **THE COURT:**  Okay.  Last chance.  Last warning.

14                    (Recess taken at 10:00 a.m.)

15                 (Proceedings resumed at 10:10 a.m.)

16       (Proceedings were heard out of the presence of the jury:)

17            **THE COURT:**  Okay.  Very briefly, I have just filed an

18  order.  It's an Order to Show Cause why Ms. Wagstaff should not

19  be sanctioned for deliberately crossing the line during her

20  opening statement a number of times.

21       That deliberate crossing of the line is not only reflected

22  in what Ms. Wagstaff said but in the slides that she and her

23  team prepared for the opening statement.

24       So Ms. Wagstaff will be required to respond in writing by

25  8:00 p.m. tonight why she should not be sanctioned for crossing

PROCEEDINGS

 1   the line and will have a further opportunity to be heard on it

 2   after that.

 3       For now, I guess my question is:  Should I ban the

 4   plaintiffs from using their slides for the remainder of the

 5   opening statement given what we've seen so far?  I've already

 6   warned Ms. Wagstaff that if she crosses the line one more time,

 7   she will be required to sit down and her opening statement will

 8   be over.

 9       The question is:  Should I save Ms. Wagstaff from herself

10   by barring her from the further use of slides during her

11   opening statement, which I suspect contain a number of

12   inappropriate things?  Thoughts?

13           **MR. STEKLOFF:**  Yes, Your Honor, I have two thoughts.

14   First, we would ask that you preclude Ms. Wagstaff from using

15   slides in the rest of her presentation given what we've seen.

16       I would also ask for a curative instruction specifically

17   on the issue of the Knezevich study.  And what I would like to

18   raise there is two issues.

19       First, Your Honor required us to submit the exhibits that

20   we would be referencing in opening and both parties e-mailed

21   chambers with our exhibits.  None of the exhibits about that

22   study were contained in plaintiff's e-mail to the Court.  So we

23   had no notice and Your Honor had no notice, and I think the

24   exact purpose of that was so that any issues could be raised

25   ahead of time rather than in the middle of opening.

1          Second --

2              **THE COURT:**  I understand your request.  I'm not going

3     to give an instruction specifically about that, but I will give

4     a more specific curative instruction that a number of

5     statements that Ms. Wagstaff has made will not be coming into

6     evidence and the Court should -- and the jury should disregard

7     it.

8              **MR. STEKLOFF:**  Thank you, Your Honor.

9              **MS. WAGSTAFF:**  And, Your Honor, if I may, because I

10    seem to have got you quite upset.

11         I have listened to Dr. Portier's testimony.

12             **THE COURT:**  It's not about being upset.  It's about

13    running an orderly trial.

14             **MS. WAGSTAFF:**  I --

15             **THE COURT:**  And, as I said, you've completely

16    disregarded the limitations that were set upon you.

17             **MS. WAGSTAFF:**  I understand that, and I would just

18    like an opportunity to say something if you would please

19    indulge me.

20             **THE COURT:**  Only if it relates to how your opening

21    statement is going to go.

22             **MS. WAGSTAFF:**  It does relate to my opening statement.

23             **THE COURT:**  Okay.  Go ahead.

24             **MS. WAGSTAFF:**  Thank you.

25         Dr. Portier was asked questions that specifically said

1    "Obama's EPA."  That's the way the questions were phrased.

2          **THE COURT:**  Okay.  Is this about your opening

3    statement going forward or what has already happened?

4          **MS. WAGSTAFF:**  What has already happened.

5          **THE COURT:**  Okay.  We'll talk about what's already

6    happened later.

7          **MS. WAGSTAFF:**  All right.

8          **THE COURT:**  You'll have an opportunity to be heard

9    about that.

10         **MS. WAGSTAFF:**  Okay.  Thank you.

11         THE COURT:  Okay.

12         **MS. WAGSTAFF:**  I think I can use my slides --

13         THE COURT:  Okay.

14         **MS. WAGSTAFF:**  -- and listen to your advice.

15         THE COURT:  It's your risk.

16         **MS. WAGSTAFF:**  I understand.

17         **THE COURT:**  You're the one bearing the risk.

18         **MS. WAGSTAFF:**  I understand, Your Honor.

19         **THE COURT:**  If I see a single inappropriate thing on

20   those slides, I'm shutting you down --

21         **MS. WAGSTAFF:**  Okay.  Thank you, Your Honor.

22         **THE COURT:**  -- and your opening statement is done.

23   Okay.  Bring in the jury.

24         (Proceedings were heard in the presence of the jury:)

25         **THE COURT:**  Okay.  Welcome back.

1        Ladies and gentlemen of the jury, let me remind you once

2    again of my instruction that statements by lawyers are not

3    evidence.  Sometimes, as has occurred today, lawyers will make

4    statements about things that are not -- will not actually come

5    into evidence, and so it's important that you take with a grain

6    of salt what both lawyers on both sides tell you during opening

7    statement about what the evidence will show.

8        What matters is the evidence that actually comes in in the

9    courtroom, not what the lawyers tell you it will be.

10        So with that, Ms. Wagstaff, you can resume.

11        **MS. WAGSTAFF:**  Thank you, Your Honor.

12        All right.  Now we are to the point in my opening

13    statement where we talk about whether or not Mr. Hardeman's

14    Roundup exposure caused his cancer.

15        And so you will hear testimony from three of

16    Mr. Hardeman's treating physicians.  These are three Kaiser

17    doctors who work up in the Santa Rosa area, and you will hear

18    testimony from them by videotape deposition that occurred last

19    year, and you will hear testimony related to his diagnosis of

20    non-Hodgkin's lymphoma.

21        Next you will hear from Mr. Hardeman himself about his

22    exposure to Roundup.  He will walk you through his 26 years of

23    Roundup exposure, and he will tell you how often he sprayed,

24    how much he sprayed, what he wore when he sprayed, and he will

25    explain to you his exposure.

 1          Now, what this is here, Mr. Hardeman will tell you that he
 2     started spraying Roundup around 1986; and that he lived in a
 3     town with Mary called Gualala, and they lived there for a few
 4     years and that's where he began spraying Roundup.  He'll
 5     testify to that.
 6          Around 1988, you'll hear from Mr. Hardeman that he and
 7     Mary bought this property.  And this is a plot map, and this is
 8     a plot map in yellow of his property.  And Mr. Hardeman will
 9     testify to his spraying habits on this property.  It's a
10     56-acre property where he lived from roughly 1988 to roughly
11     2012.
12          And you'll see these blue dots that will become more
13     apparent when Mr. Hardeman testifies and this yellow sort of
14     dash.  And he'll explain where his house was on this property
15     and he'll explain where the hiking trails were.
16          And he'll explain where exactly on the property he
17     sprayed.  And he'll explain to you that there was a serious
18     problem with poison oak on his property.  He'll even tell you
19     that there were poison oak festivals in the Santa Rosa
20     community during the '80s and '90s because the poison oak was
21     so bad.  And, in fact, he'll tell you that he had to go to the
22     doctor's office sometimes because his poison oak got so bad.
23          Now, he's not going to come in here and tell you that he
24     sprayed every inch of this 56-acre property, but he's going to
25     walk you through exactly where he sprayed and when he sprayed

1   it, and he's going to tell you that most of his spraying was

2   done on the hiking trails in and around his home so that he and

3   Mary could enjoy weekend hikes.

4       And he'll tell you that when he bought the property, he

5   got it for a real deal because the previous owner had not

6   maintained the land.  And he'll tell you that he didn't hire a

7   crew to come and fix the land; that he did it himself, and it

8   was a real source of pride for him.  He'll tell you that.

9       And he'll tell you that when you came on the property,

10  which is gated all the way around, that when you came on the

11  property, he'll explain to you that there was a driveway that

12  led up to his house.  And he'll explain to you that he used to

13  walk -- he'll explain to you that the driveway had sort of a

14  cliff cutout almost, and that he used to walk with that

15  2-gallon sprayer I was telling you about before and spray the

16  side of the cliff and spray the side of the cliff, and he'll

17  tell you that.

18      And he'll tell you that sometimes around his house he used

19  to spray poison oak that was coming off of eaves of his house,

20  and he'll testify that sometimes he remembers feeling the

21  Roundup on his face.

22      And he'll testify that in 2015 on Valentine's Day he was

23  told that he had aggressive Stage 3 cancer.

24      And so a doctor is going to come in, an expert witness is

25  going to come in, and do what's known as a differential

1    diagnosis for Mr. Hardeman.  And so what that doctor will do,

2    is that doctor will put all of the known risk factors for NHL

3    in the left-hand column.  This includes age, sex, and race,

4    family history, pesticide use, obesity, viral infections,

5    bacterial infections, and so on and so forth.

6        And then that doctor will sit here on this witness stand

7    and he will walk you through every single factor, and he will

8    tell you why he doesn't think age caused Mr. Hardeman's

9    lymphoma.  He will tell you why he doesn't think the fact that

10   he's a man caused it, the fact that he's white.  He'll tell you

11   that there's no family history that would cause it -- cause him

12   to have non-Hodgkin's lymphoma.

13       And then there are certain factors that require a little

14   bit more attention.  We'll get to those in a minute.  Those are

15   Roundup.  Roundup is a pesticide.  Obesity.  Hepatitis C and

16   hepatitis B, those are viral infections.

17       And then he'll continue going through this list, and then

18   he will tell you that he spent more time considering the

19   literature we've discussed today, considering Mr. Hardeman's

20   specific use of Roundup, how much he used it, how frequently he

21   used it, the duration of time he used it.  This doctor

22   considered all of those things.

23       And he also did the same with obesity.  This doctor will

24   tell you he considered Mr. Hardeman's weight.  He considered

25   Mr. Hardeman's body mass index, and he considered whether that

 1    caused Mr. Hardeman's non-Hodgkin's lymphoma.

 2         And the remaining two are viral infections.  This doctor

 3    will tell you that Mr. Hardeman at one time had an antibody for

 4    hepatitis B.  This doctor will further tell you that there's

 5    been no positive diagnosis of hepatitis B in Mr. Hardeman's

 6    medical history, but he considered hepatitis B because he had

 7    the positive antibody, which means at some point Mr. Hardeman

 8    was probably exposed to the hepatitis B virus.  And he will

 9    tell you how he's able to rule out hepatitis B.

10         This doctor will also talk to you about hepatitis C, and

11    Mr. Hardeman will talk to you about his hepatitis C that he

12    had.  Mr. Hardeman will tell you that he was probably exposed

13    to hepatitis C in the late '60s.  Mr. Hardeman will tell you

14    that it was probably around 1966 that he was exposed to

15    hepatitis C.

16         What the medical records and the evidence will show you

17    and what Mr. Hardeman will tell you is that in 2005 he was

18    diagnosed with active hepatitis C.  In 2006, you will hear

19    testimony and you will see the records that Mr. Hardeman was

20    cured of his hepatitis C.

21         And you will hear from Mr. Hardeman that from 2006 through

22    today, he's never had a positive finding of hepatitis C in his

23    blood test, and he's had plenty of blood tests since then.

24    Hepatitis C, they test it by something called a viral load, and

25    you'll hear Mr. Hardeman tell you he's never had an elevated

1    viral load since 2006.

2          So you'll hear our expert tell you that his hepatitis C

3    was cured.  And, in fact, Mr. Hardeman believed it to be cured

4    as of 2006.

5          You'll hear our expert tell you that if any remaining

6    hepatitis C had lingered in his body undetected, you'll hear

7    that it would have reared its head during chemotherapy.  You'll

8    hear testimony that the chemotherapy suppressed his immune

9    system so bad that any lingering viral infections or virus

10   would have shown up, and you'll see evidence and testimony that

11   it didn't.  You'll see testimony that Mr. Hardeman went through

12   his chemotherapy in 2015, nine years after being cured of

13   hep C, and there was no hep C incident.

14         And you'll hear that those are the reasons why our expert

15   was able to conclude that Roundup was a substantial factor in

16   causing Mr. Hardeman's hepatitis C.  And you'll hear that those

17   are the reasons that they were able to conclude that those

18   other three were not substantial factors.

19         So I just wanted to include a couple of pictures that you

20   will see related to his property.  You can tell these are kind

21   of old photos.

22         And so at the end of the day or at the end of the Phase I,

23   not the end of the day, the end of Phase I, we've given you all

24   the pieces of the puzzle that we think you need to make your

25   decision.

OPENING STATEMENT / STEKLOFF

1          You guys have paid great attention to me.  I can tell that

2     you've been paying a lot of attention for the last hour and a

3     half, and I really thank you for that.  I thank you for your

4     attention and Mr. Hardeman thanks you for your attention.

5     Thank you.

6               **THE COURT:**  Okay.  Mr. Stekloff.

7               **MR. STEKLOFF:**  Thank you, Your Honor.

8          Can I just have a moment to move a few things around?

9               **THE COURT:**  Sure.

10                   (Pause in proceedings.)

11              **MR. STEKLOFF:**  May I proceed, Your Honor?

12              **THE COURT:**  You may.

13                        **OPENING STATEMENT**

14              **MR. STEKLOFF:**  Good morning, everyone.

15              **ALL:**  Good morning.

16              **MR. STEKLOFF:**  You have heard that you are here to

17    answer this question:  Did Roundup cause Mr. Hardeman's cancer,

18    his non-Hodgkin's lymphoma?  That is the question that you are

19    being asked in this phase to answer.

20          And so for the next few weeks, Tamarra, Rakesh, and I,

21    we're going to give you the evidence that you need to answer

22    this question, the testimony that you need to hear, the

23    exhibits that you need to see.  We're not going to waste your

24    time and we're not going to talk about other issues that don't

25    matter to this question because this is the question that is

1    part of Phase I, which is what we're discussing right now.

2        So that's also what I'm going to talk to you about this

3    morning, what is the evidence that you are going to hear over

4    the next few weeks to answer this question.  And the answer to

5    this question is no, Roundup did not cause Mr. Hardeman's

6    non-Hodgkin's lymphoma.

7        So where I want to start is actually there are some areas

8    in this case that are not in dispute, things that I don't think

9    you will hear us fighting about when you hear from the various

10   experts that both sides are going to bring you.

11       The first is that non-Hodgkin's lymphoma, that's NHL, is a

12   common cancer.  That doesn't mean it's a common disease but

13   among cancer, it is a common cancer.  You're going to hear that

14   over 70,000 people every single year just here in the

15   United States are diagnosed with non-Hodgkin's lymphoma.

16       And what you're also going to hear is that for those

17   70,000 people per year, the cause of their non-Hodgkin's

18   lymphoma when they go to their doctors and hospitals around the

19   country is unknown.  Doctors don't tell them and cannot tell

20   them what caused their cancer.

21       You're going to hear different percentages, but I think

22   everyone will agree, whether it's 70 percent or over

23   90 percent, people out in society outside of this courtroom

24   when they are unfortunately diagnosed with non-Hodgkin's

25   lymphoma, they don't know what caused their cancer.

 1          And to be clear, the other percentage, the 10 to

 2    30 percent, they're not told that Roundup or glyphosate is what

 3    caused their cancer.  They're told other things caused their

 4    cancer, whether it's specific genetic issues that they had or

 5    whether it's specific viral diseases.  Like, there's something

 6    called Epstein-Barr disease or hepatitis.  They are told in

 7    some circumstances about those types of things that caused

 8    their cancer, but most people are not told at all and no one is

 9    told Roundup.

10          The other thing is that of those over 70,000 people per

11    year who unfortunately are diagnosed with non-Hodgkin's

12    lymphoma, most of them have never used Roundup in their entire

13    life.

14          People unfortunately, like other cancers, are diagnosed

15    with this type of cancer, non-Hodgkin's lymphoma, every single

16    day and we don't know why.  Doctors don't know why.

17    Oncologists, which are the doctors that treat cancer;

18    pathologists, which are the doctors that diagnose cancer when

19    they look at a tumor on a slide, they do not know what causes

20    cancer.

21          And the last thing that is not in dispute is that there is

22    no test that a doctor can run in a hospital to tell a patient

23    whether or not his or her cancer was caused by Roundup.

24    There's nothing that a doctor can do to look on a microscope

25    and look at the tumor or any other test -- MRI, CAT scan,

1    anything you can think of -- there is no test to say "I'm

2    looking at this individual's cancer and I'm telling you this

3    cancer had something to do with Roundup."  It doesn't exist,

4    and there is no dispute about that.

5        So what is non-Hodgkin's lymphoma?  Because, again, that's

6    the type of cancer that Mr. Hardeman was diagnosed with in

7    2015.  It is a cancer of the immune system.  So the cancer will

8    occur at certain cells in your blood, and then it may show up

9    in different ways.  So I think you saw one of the pictures was

10   in Mr. Hardeman's case he had a tumor on his neck, and that's

11   what led him to go to the hospital and seek a diagnosis, and

12   that's when they diagnosed in 2015 his non-Hodgkin's lymphoma.

13       I've already told you that there are 70,000 -- over

14   70,000, I think it's closer to 75,000, new cases per year here

15   in the United States alone.  There are also 60 different

16   subtypes of non-Hodgkin's lymphoma.  So doctors get even more

17   specific about which type of -- whether it's a certain type of

18   cell or other issues, which subtype of non-Hodgkin's lymphoma

19   people have who are diagnosed with it.

20       And so I mentioned this thing called DLBCL.  It stands for

21   diffuse large B-cell lymphoma.  That is the specific type of

22   non-Hodgkin's lymphoma that Mr. Hardeman had, and that is the

23   most common type of non-Hodgkin's lymphoma overall.

24       Now, you're going to hear from three different categories

25   of doctors who are going to talk to you about Mr. Hardeman.

 1  There are going to be other doctors that come in during trial.

 2  You heard a lot about Dr. Ritz and Dr. Portier, but these are

 3  the doctors who are going to talk to you specifically about

 4  Mr. Hardeman.

 5       The plaintiffs, I believe, are going to bring two experts.

 6  They didn't say during opening, but I believe and we'll see,

 7  that they are going to bring you a Dr. Weisenburger and a

 8  Dr. Nabhan.  Dr. Weisenburger is a pathologist.  Dr. Nabhan is

 9  an oncologist.  So he's someone who treats cancer patients.  He

10  stopped treating patients two years ago and is still

11  practicing -- dealing with medical issues, but he is a trained

12  oncologist.

13       You're also going to hear from three of Mr. Hardeman's

14  doctors who treated him during the course of the events we're

15  dealing with here.  You're going to hear from Dr. Ye.  Dr. Ye

16  was the doctor who took care of Mr. Hardeman starting in 2015

17  when he was diagnosed with non-Hodgkin's lymphoma and is still

18  taking care of him today.

19       You're going to hear from Dr. Turk, who's his general

20  practitioner; and Dr. Turley, who is his, I will simplify it,

21  ear, nose, and throat doctor, who actually took the biopsy of

22  that tumor that we saw on Mr. Hardeman's neck and that helped

23  diagnose his non-Hodgkin's lymphoma.

24       And then we also are going to bring you experts who are

25  going to talk to you about Mr. Hardeman.  We're going to bring

1    you Dr. Levine, who's an oncologist and a hematologist.  A

2    hematologist is a doctor who specializes in blood disorders.

3    And then we're going to bring you Dr. Arber, who's a

4    pathologist.

5        And I'll talk to you more about them later, but right now

6    I just wanted to explain the three categories of doctors that

7    you are going to hear from during this trial about Mr. Hardeman

8    specifically.

9        And of those doctors, who tells patients outside of this

10   courtroom that Roundup causes cancer?  None of them.  Not a

11   single one.  Not the plaintiff's experts, Dr. Weisenburger or

12   Dr. Nabhan; not Mr. Hardeman's doctors; and not the experts

13   that we will also bring.  They do not tell patients outside of

14   this courtroom that Roundup causes cancer.  They've never told

15   that to a single patient.  None of them in all three

16   categories.

17       So I want to talk to you a little bit more about

18   Mr. Hardeman because, again, the question you have to answer

19   is:  Did Roundup cause Mr. Hardeman's non-Hodgkin's lymphoma?

20       Mr. Hardeman today, I believe, is 70 years old.  I've

21   talked to you about the fact that in 2015 he was diagnosed with

22   non-Hodgkin's lymphoma when he was 66.  And we're going to talk

23   about these risk factors that he had for non-Hodgkin's

24   lymphoma, and I want to explain to you what a risk factor is.

25       A risk factor is something that increases your chance of

 1  developing a condition.  And so all of these things --

 2  hepatitis C, hepatitis B, the age 66 at which he was diagnosed,

 3  and his weight or his body mass index -- increase his chances

 4  of developing non-Hodgkin's lymphoma in 2015.

 5       And then today, and this is fortunate and I think everyone

 6  will agree on this -- first of all, everyone agrees that it is

 7  tragic that he was diagnosed with non-Hodgkin's lymphoma in

 8  2015.  He has been in remission for almost a four-year period

 9  that we are at today, and it's very fortunate that it hasn't

10  come back.

11       Mr. Hardeman's non-Hodgkin's lymphoma.  The doctors that

12  you are going to hear from, his cancer doctors, they don't say

13  that Roundup causes cancer.  They don't say that Roundup caused

14  his cancer.  And you will not see a reference to Roundup or

15  that active ingredient glyphosate in a single medical record.

16  We've had access to all of Mr. Hardeman's medical records, both

17  sides.  There's not a single reference to Roundup or glyphosate

18  in any of his medical records.

19       So I want to focus for a moment on Dr. Ye because, again,

20  Dr. Ye is the oncologist.  He is the person who was responsible

21  for taking care of Mr. Hardeman when he was diagnosed with

22  non-Hodgkin's lymphoma in 2015.  He also is an oncologist and a

23  hematologist.  So he not only treats patients for cancer, but

24  he has a background in diseases that involve blood disorders.

25       He was educated and trained at excellent schools, New York

1    University School of Medicine.

2         He had a fellowship, so he had further medical education,

3    at something called the National Institutes of Health.  That's

4    the elite governmental organization that focuses on medical

5    issues in our country.

6         He treats over 50 cancer patients a week.  He's treated

7    hundreds or thousands of patients with non-Hodgkin's lymphoma,

8    and he still treats Mr. Hardeman today.  He is still his doctor

9    today, and you will see his testimony on video and hear what he

10   had to say about his care and treatment of Mr. Hardeman.

11        And I'm going to show you some of his testimony that you

12   will see.  And I want to be clear, this testimony, we go and

13   take a deposition.  It's a normal part of a legal process.

14   There's a court reporter there and the witnesses are under

15   oath, and you'll see several of those depositions.  But his

16   deposition took place at the end of October last year.  So this

17   is recent testimony that he gave about the questions you have

18   to answer in this case.  And he was asked (reading):

19            "As part of your care and treatment of your patients,

20        if you could determine the cause of their cancer, you

21        would want to do so; right?"

22        And his answer was "Yes."

23        So doctors, of course, who are treating patients outside

24   of this courtroom in the real world, if they can learn what

25   caused a patient's cancer, they want to know because that is

 1   going to help them with their patients.  That's going to

 2   improve their ability to help their patients, and that's what

 3   Dr. Ye testified to and you will see that on his video.

 4        We also asked him (reading):

 5             "And you've never determined -- tried to determine

 6        whether any of them" -- that's any of his patients --

 7        "were exposed to glyphosate; correct?"

 8        His answer was "No, I don't."

 9        So he doesn't even ask his patients about whether they

10   used Roundup or whether they used any sort of glyphosate

11   product if it was different than Roundup.

12        And, finally, we asked him about his medical records and

13   we asked (reading):

14             "Now, we looked at a number of medical records

15        regarding your care and treatment of Mr. Hardeman.  And we

16        can agree that nowhere did you ever write down glyphosate

17        or Roundup in his medical records; correct?"

18        And his answer was "I don't believe I would have."

19        And that's because he never told -- he has never told

20   Mr. Hardeman that his cancer was caused by Roundup.

21        Now, you heard a little bit about hepatitis C at the end

22   there.  Do you remember that list of known risk factors that we

23   just discussed?  So one of them was hepatitis C, and I want to

24   talk to you about what hepatitis C is and then show you some of

25   the medical records from Mr. Hardeman's medical history about

 1   hepatitis C.

 2        Hepatitis C is a viral infection.  It can lead to liver

 3   cirrhosis.  So some of you may or may not have heard of liver

 4   cirrhosis, but that's basically a scarring of your liver.  And

 5   having hepatitis C alone, if you have it for long enough, if

 6   you have it for decades, it can actually lead to liver

 7   cirrhosis in your body, but you have to have it for a long time

 8   for that to happen.

 9        It can cause genetic mutations, genetic mutations that can

10   lead to cancer, and it is a known cause of non-Hodgkin's

11   lymphoma.

12        So in 2005 you heard that Mr. Hardeman went and was

13   diagnosed with active hepatitis C.  And this is one of his

14   medical records.  This is the doctor that was treating him for

15   that, for the hepatitis C, Dr. Ruffner-Statzer; and during that

16   consultation, she noted that he had a history of hepatitis

17   dating back to 1966.

18            **MS. WAGSTAFF:**  Objection, Your Honor.

19            **THE COURT:**  Take down the slide.

20            **MS. WAGSTAFF:**  Can we take the slide down?

21            **MR. STEKLOFF:**  Yes.

22            **THE COURT:**  You can't use that slide.

23            **MS. WAGSTAFF:**  I believe that violates --

24            **MR. STEKLOFF:**  Okay.

25        That's not the only medical record that talks about

1    Mr. Hardeman's chronic hepatitis C, that he had hepatitis C for

2    a very long period of time.  And so these are other medical

3    records that are in his file that all reference chronic

4    hepatitis C over time.

5         I don't believe there will be any dispute, there shouldn't

6    be any dispute, that Mr. Hardeman was exposed to hepatitis C in

7    the 1960s and that he had active hepatitis C for a long period

8    of time.

9         And part of the reason that we -- why we know he had

10   hepatitis C active in his body for a long period of time is

11   that he did, in fact, unfortunately, have cirrhosis of the

12   liver.

13        So you can also see, this is one of his medical records,

14   that he developed cirrhosis of the liver; that hepatitis C,

15   that hepatitis C, that virus in his body, caused scarring in

16   his liver to be diagnosed with cirrhosis.

17        And so we asked Dr. Weisenburger (reading):

18             "Is it your opinion that the cirrhosis of his

19        liver" -- this is Mr. Hardeman's liver -- "was a result of

20        his hepatitis C infection?"

21        And his answer was "Yes."

22        So you don't have to take it from me.  You don't have to

23   take it from the medical records.  Their expert agrees that

24   hepatitis C led to cirrhosis of the liver in Mr. Hardeman, and

25   what that tells you is it was in his body and it was impacting

 1    him for a long period of time.

 2        And this is just a timeline that sort of summarizes

 3    Mr. Hardeman's hepatitis C, including his treatment for

 4    hepatitis C.  So you can see he was exposed to hepatitis C in

 5    the 1960s.

 6        You'll actually here that in 1989 there's a record where

 7    he had elevated liver enzymes, and that shows again the

 8    hepatitis C is doing something to his body.  It's causing

 9    enzymes in his liver to be elevated when he tests for them.

10        In 2005, that's when his hepatitis C was identified by his

11    doctors on an ultrasound.  He then had treatment for his

12    hepatitis C for about almost two years, a little less than two

13    years, and it ended in November of 2006.

14        And then the hepatitis C, while it hasn't shown up on

15    blood tests since then -- so I think we heard the word "cured."

16    Hepatitis C is actually, you're going to hear, a little bit

17    like chicken pox.  You can have it cured but it never quite

18    goes away.  If you really, really dug, it's there.  So his

19    diagnosis of non-Hodgkin's lymphoma took place in 2015.

20        Now, what did plaintiff's experts -- again, these are

21    plaintiff's experts -- say about hepatitis C as a risk factor?

22    We asked Dr. Weisenburger (reading):

23            "You agree" --

24            **THE COURT:**  Hold on.  I don't think it's appropriate.

25    Take down that slide.

 1          **MR. STEKLOFF:**  Yes, Your Honor.

 2          **THE COURT:**  It's not appropriate to be showing

 3   deposition testimony to the jurors that may not come in.  The

 4   experts will be testifying live so what you asked them in your

 5   deposition is not relevant right now.

 6          **MR. STEKLOFF:**  Okay.

 7          **THE COURT:**  So exclude any references to prior

 8   deposition testimony by experts.

 9          **MR. STEKLOFF:**  Okay, Your Honor.  Thank you.

10       You will hear, I think there will be no dispute, from

11   their experts that hepatitis C is a risk factor for

12   non-Hodgkin's lymphoma, and I also believe that you will hear

13   that they will admit that hepatitis C causes genetic mutations.

14       So those two points should be no dispute about.

15   Hepatitis C, especially if you have it for a long time, it's a

16   risk factor that increases your chances for non-Hodgkin's

17   lymphoma, and it is something that in your body causes genetic

18   mutations.

19       So is hepatitis C a risk factor for Mr. Hardeman?  The

20   answer to that question is yes.  Now, plaintiff's experts, when

21   they do this differential diagnosis, they're going to say "You

22   shouldn't pay attention to that."  But it is an accepted risk

23   factor for Mr. Hardeman for his non-Hodgkin's lymphoma.

24       Now, you also heard that Mr. Hardeman had hepatitis B.

25   Hepatitis B is a different version of hepatitis, and it's

 1   unclear exactly how long he had it.  I think it will be clear

 2   that he was exposed to it again in the 1960s.  Hepatitis B,

 3   your body can treat itself.  You don't have to go through

 4   treatment at a hospital, but hepatitis B also is a known risk

 5   factor for non-Hodgkin's lymphoma.

 6        I think even their experts will agree, I think when they

 7   come on the stand and they're questioned, that hepatitis B is a

 8   risk factor that in some instances can double your risk of

 9   developing non-Hodgkin's lymphoma.

10        So, again, it has to be something that's considered as

11   something that increased Mr. Hardeman's chances of developing

12   non-Hodgkin's lymphoma given that he had this condition; and we

13   know he had this condition because his medical records talk

14   about the fact that his body now has developed an antibody,

15   something to protect against hepatitis B from becoming active.

16        So is hepatitis B a risk factor for Mr. Hardeman's

17   non-Hodgkin's lymphoma?  The answer is yes.

18        Now, you're also going to hear -- actually you just saw, I

19   think, in this chart -- that the plaintiffs listed known risk

20   factors, and two of those risk factors were age and weight or

21   body mass index.  And so you're going to hear that if you are

22   over 60, it increases your risk of developing non-Hodgkin's

23   lymphoma.  As you get older, unfortunately you are more likely

24   to develop this type of cancer.

25        You're also going to hear that if your body mass index is

 1   higher than it should be, that that increases your chance of

 2   developing non-Hodgkin's lymphoma.

 3        So, again, not just our experts but their experts are

 4   going to agree, first of all, that those are risk factors; and,

 5   second of all, that they were risk factors for Mr. Hardeman.

 6        Now, again, they're going to dismiss them.  They're going

 7   to tell you that you don't need to pay attention to that

 8   because at the end of the day, the only thing you should care

 9   about is Roundup.

10        **MS. WAGSTAFF:**  Objection.  This is getting into

11   argument.

12        **THE COURT:**  Sustained.

13        **MR. STEKLOFF:**  I'll move on, but the evidence will

14   show that hepatitis C, hepatitis B, age, and body mass index

15   were all risk factors for Mr. Hardeman.

16        Now, I told you we are going to bring you two experts in

17   this case to talk to you specifically about Mr. Hardeman and

18   about whether or not -- and help you answer that question:  Did

19   Roundup cause Mr. Hardeman's cancer?

20        One of the experts we're going to bring in I mentioned is

21   Dr. Levine.  Dr. Levine previously practiced at Keck Medical

22   Center at U.S.C. in Los Angeles, University of Southern

23   California, and today practices at City of Hope also in

24   Los Angeles, which I think you heard actually during

25   plaintiff's opening, we will agree, is an elite worldwide

1  recognized cancer center in this country.  She actually was

2  recently, although she now has moved on, the chief medical

3  officer at City of Hope for nine years.  During that time

4  period, she was actually Dr. Weisenburger's supervisor.  He

5  reported to her.

6       She has published over 325 peer-reviewed articles,

7  including on issues relating to hepatitis C and many issues

8  relating to non-Hodgkin's lymphoma.

9       Before that, she chaired the hematology practice at the

10 University of Southern California, and she maintains a practice

11 today treating patients with non-Hodgkin's lymphoma.  For

12 decades, she has been treating patients with non-Hodgkin's

13 lymphoma, including today.

14      Dr. Arber is the chair of pathology at the University of

15 Chicago.  Before that, he was at Stanford as a pathologist.

16 He's also authored over 300 publications, including

17 publications on non-Hodgkin's lymphoma.  He's been recognized

18 with awards.

19      And what they are going to come in and tell you is that

20 Roundup did not cause Mr. Hardeman's non-Hodgkin's lymphoma.

21 And what Dr. Levine is going to tell you is that if she had to

22 say what the most likely cause of Mr. Hardeman's non-Hodgkin's

23 lymphoma was, she would say hepatitis C, she would say that

24 hepatitis C that he was exposed to for decades that led to

25 cirrhosis of his liver that is a known cause of non-Hodgkin's

 1   lymphoma.

 2        So I want to talk for a moment about Mr. Hardeman's

 3   Roundup use.  You heard a little bit about it I think toward

 4   the end of the plaintiff's presentation.

 5        He used Roundup around his home.  He had, I think, two

 6   different properties where he used it.  He would take the

 7   concentrate that you heard of and mix it in water, and then I

 8   think the evidence will show that he would use a handheld

 9   container, like the one that's sort of at the bottom left of

10   this picture, and he would mostly spot spray.  So he would take

11   something that would reach out, he would look for weeds on his

12   property that needed to be killed, and he would try to reach

13   the spot sprayer and spray those.

14        And he stopped using Roundup in about -- in either late

15   2011 or early 2012.  He's not quite sure.  And that is three

16   years or so before he developed his non-Hodgkin's lymphoma.

17        So you also heard a little bit about Roundup, but what

18   does Roundup do?  Roundup -- and you heard about glyphosate,

19   which is the active ingredient -- glyphosate targets a specific

20   enzyme in plants that is essential for their growth.  So plants

21   need to produce amino acids or proteins to grow, and glyphosate

22   actually targets those proteins and kills them off.

23        But two things that Roundup does not do is it does not

24   enter the groundwater, so water that's contained in soil, and

25   it does not stay in soil.  So you're not going to hear too much

1   about this, but these are some of the basic points about how

2   Roundup works.

3       Glyphosate, which is, again, the active ingredient that's

4   been in Roundup, has been studied for decades.  Roundup itself

5   has been on the market for over 40 years.  There have been 800

6   scientific studies about Roundup.  Now, to be clear, not all of

7   those studies are dealing with cancer, but there have been 800

8   scientific studies overall.  And over 70,000 people have been

9   studied to have been exposed or have used Roundup and then were

10  evaluated for different issues.

11      When I present to you during this trial, when Tamarra and

12  Rakesh present to you, we are going to focus on the human data.

13  The human -- I think it was one of the puzzle pieces, the human

14  epidemiology.

15      And this is a publication by Dr. Portier.  You heard a lot

16  about Dr. Portier who's the expert that's going to talk to you

17  about the animal studies and the cell studies, but he was part

18  of an international group that authored this publication that

19  talked about chemical assessments.  And in that publication,

20  what these scientists that were part of that group said is that

21  (reading):

22          "In the evaluation of human health risks, sound human

23      data, whenever available, are preferred to animal data.

24      Animal and in vitro studies provide support and are used

25      mainly to supply evidence missing from human studies."

 1        So what is that telling you?  If you want to know whether

 2   a chemical or a product --

 3             MS. WAGSTAFF:  Objection.  This is argument.

 4             THE COURT:  Overruled.

 5             MR. STEKLOFF:  If you want to know whether a chemical

 6   or a product is affecting humans, the evidence will show you

 7   should look at the human data because that is the best data to

 8   answer the question.

 9        And part of the reason is because in those animal studies

10   that you saw, what they do is they feed the animals with as

11   much glyphosate as possible.  So I think you heard about the

12   maximum tolerable dose, something like that.  I mean, just to

13   be clear, what they do for these rats and mice are they give

14   them as much glyphosate as they can possibly eat, and it is

15   thousands and thousands times higher than a human could ever be

16   exposed to in his or her lifetime.

17        And so that's why of all of those puzzle pieces, it's the

18   human data, it's the epidemiology that helps you answer the

19   question you need to answer.

20        So you saw a chart in opening of some of the studies that

21   I think Dr. Ritz is going to walk through when she comes into

22   the courtroom, and I want to talk to you about what the

23   evidence will show about those studies because I believe that

24   the plaintiff's evidence will be focused on four studies, and I

25   want to walk through you what these numbers mean.

```
 1        The blue chart here is how many people were in the study.

 2   So you can see, you know, it ranges between 3,417 people in the

 3   study in one of the studies and down to 1,656 in the second

 4   study there.  But the yellow line shows you how many of those

 5   people were using glyphosate or were using Roundup, and those

 6   numbers are much lower.

 7        Because a lot of these studies date back to the 1970s and

 8   the 1980s, while they were published later, the dates are

 9   later, they were studying people in those earlier time periods.

10   And in those earlier time periods, Roundup wasn't used that

11   much so they were using -- they're all farmers, or most of them

12   are farmers, and they're using other pesticides.  And what the

13   numbers here show is the number of Roundup or glyphosate users

14   in the studies that the plaintiffs are going to focus you on

15   are very small:  184, 16, 97, and 47.

16        Now, you're going to hear evidence about this concept of

17   adjustment for other pesticides so I want to talk to you about

18   what that means.

19        I think the evidence will show that everyone agrees that

20   in these studies, it is best to do something called adjusting

21   for other pesticides.  If you have used multiple pesticides but

22   you want to find out if there's a relationship between Roundup

23   or glyphosate and cancer, you need to try to isolate Roundup or

24   glyphosate.  You can't let the other pesticides play a role in

25   your evaluation.
```

1          And there are statistical ways that epidemiologists, that

2    people who do this try to address that issue and try to run

3    statistical calculations to make these adjustments.

4          But what this shows is that when they did this in the

5    studies, in these small studies that the plaintiffs are focused

6    on, when they adjusted for other pesticides, it shows that

7    there is no increased risk between glyphosate or Roundup and

8    non-Hodgkin's lymphoma.

9          In the first study, the McDuffie study, they didn't even

10   do the adjustments.  So the people there were exposed to

11   multiple pesticides while they were farming, and no adjustments

12   were made.

13         In the second study, Hardell, when they did the

14   adjustments, there was no increased risk for non-Hodgkin's

15   lymphoma.

16         In the third study, De Roos 2003, they did an adjustment

17   for pesticides but when they tried to adjust even further

18   because of the importance of this issue, that further

19   adjustment, the most adjusted number, showed no increased risk

20   for non-Hodgkin's lymphoma.

21         And the same is true in the Eriksson study.  When they

22   adjusted for pesticides, there was no increased risk for

23   non-Hodgkin's lymphoma.

24         So, again, these are the four studies that the plaintiffs

25   are going to focus on.  What is the study that the evidence

1   will show demonstrates that non-Hodgkin's lymphoma [sic] does

2   not cause cancer and did not cause Mr. Hardeman's cancer?  It's

3   that study that was referenced called the Agricultural Health

4   Study.

5       And the Agricultural Health Study had over 54,000 people

6   in it.  Of those 54,000 people, 45,000, almost 45,000, used

7   Roundup or used a glyphosate product.  The numbers, the

8   evidence will show, pale in comparison to the other studies.

9       So what is the Agricultural Health Study?  Well, this is

10  actually the website of the Agricultural Health Study that you

11  could go to today.  To be clear, you cannot actually go to that

12  website because Judge Chhabria, His Honor, has made very clear

13  about that; but anyone could go to this website today at

14  aghealth.nih.gov, and they could look at the study and they

15  could get various information about the study.

16      You can see here there's a column for about the study,

17  information for study participants.  They talk about their

18  scientific collaboration.  They report their news and their

19  findings.  They have contact information.

20      And at the bottom of the page you can see some of the

21  organizations that are involved in this study.  The National

22  Institutes of Health, which I talked about before, is the

23  governmental organization focused on medical issues in this

24  country.  There's actually a specific part of the National

25  Institutes of Health known as the National Cancer Institute

 1   that is specifically involved in this study.

 2        There's the National Institutes of Occupational Safety

 3   Hazards.  There's the EPA, and you can see usa.gov.  There are

 4   also academic universities, like the University of Iowa, that

 5   are involved in running this study.

 6        You can go into the website, as I mentioned, and get more

 7   information.  So on that study updates page, you can see even

 8   in 2018 they talk about their 25th anniversary edition, who is

 9   the Agricultural Health Study research team, the past 25 years,

10   key findings from the study, and looking to the future because

11   they continue, given the importance of agricultural health

12   issues, to continue -- they continue to study these issues.

13        And so what is the Agricultural Health Study?  Again, it's

14   supported by the National Cancer Institute.  Their goal -- one

15   of their goals, and this is their language, is they want to

16   identify and quantify cancer risks among men and women as well

17   as whites and minorities associated with direct exposure to

18   pesticides and to other agricultural agents.

19        And it's important to note that Monsanto or any other

20   industry company has nothing to do with this study.  They are

21   not funding this study.  This is an independent study run by

22   the government and these various organizations.

23        And so what's the process that the Agricultural Health

24   Study went through to help study these issues and help

25   understand for people who are being exposed to pesticides what

1  they might see?

2      Well, first of all, the scientists who ran the

3  Agricultural Health Study used two detailed questionnaires at

4  different times to collect information from the over 50,000

5  people who signed up to be a part of this study.

6      The questionnaires included questions like which

7  pesticides they were using, how many years and how many days

8  they had used pesticides, how they sprayed the pesticides,

9  whether they wore any protective gear.  This was all so they

10  could learn as much as they could about the people in the study

11  and how they were using pesticides.

12      And what the evidence will show is that the people in this

13  study who were using pesticides used pesticides more than

14  anyone who's using Roundup or other pesticides around their

15  yard.

16      Farmers who are using it are using it in different ways.

17  Some of them might be using tractor-trailers, but some of them

18  might be applying it directly.  They're mixing it.  They're

19  using it in their own yards.  There were also professional

20  workers outside of farming who were using this, but these were

21  people who were using it regularly all the time in different

22  ways.

23      And they followed these participants since the mid-1990s

24  and have collected that data over time so they can answer the

25  question again in part whether there are cancer risks among

1   those people.

2        In terms of answering the cancer question, they have gone

3   to independent state registries.  If you're diagnosed with

4   cancer, that information is collected by states by law in a

5   database.  So there's no question that they were going to

6   identify people who are part of this study and see if they had

7   cancer.  They weren't going to miss that information.

8        Who were the Agricultural Health Study participants?  In

9   other words, who were the people being studied?  I've talked a

10  little bit about that.  They used pesticides on farms, at work,

11  and around their home.

12       Their average pesticide use at the time that they signed

13  up in the 1990s was already 15 years.  And then since then,

14  they've collected another 20 years of data.  So these people

15  that are in this study, the almost 45,000 people who used

16  Roundup, have been using pesticides, including Roundup, for

17  over 30, close to 40 years.

18       And, like I told you, of the 50 or so thousand people who

19  signed up, nearly 45,000 used a glyphosate product, including

20  Roundup.

21       The authors and the people involved in this study at the

22  National Institute of Health and the other organizations have

23  collected this 40 years' of data and have issued over 250

24  published studies based on the work that they have done.  This

25  has been a massive exercise designed to give us the best

1    answers about pesticides, including Roundup.

2         And you're going to hear that the plaintiff's experts

3    actually -- just to be clear, you saw it this morning, the

4    evidence will show they're going to come in here and they're

5    going to criticize the Agricultural Health Study; but at the

6    same time they can't deny, first of all, that they respect the

7    National Cancer Institute, Dr. Weisenburger will tell you that;

8    and, second of all, you heard Dr. Ritz was an adviser to the

9    Agricultural Health Study.  So for years she was involved in

10   that study.  She has called it a beautiful study.  She didn't

11   have criticisms that were public of that study while she was an

12   adviser to it.  Then she became an expert for plaintiff's

13   counsel.  Now she will come into this courtroom and tell you

14   that that study is not the study that should help you answer

15   the question, but she only started criticizing the Agricultural

16   Health Study after she became an expert in this litigation.

17        So what are the results of the Agricultural Health Study?

18   You heard about De Roos.  Remember there was a lot of talk in

19   the plaintiff's opening about De Roos.  There is a study called

20   De Roos 2003.  I've talked about that.  De Roos is one of the

21   authors who was involved in this Agricultural Health Study and

22   in 2005, Dr. De Roos and other authors tried to answer the

23   question:  Let's take the people in the Agricultural Health

24   Study, the 45,000 people and see if there is an association

25   between their use of Roundup and non-Hodgkin's lymphoma.  And

this is what they said in a published article in the

environmental health perspectives, they said (reading):

         "There was no association between glyphosate exposure

     and all cancer incidence or most of the specific cancer

     subtypes we evaluated, including non-Hodgkin's lymphoma,

     whether the exposure metric was ever used, cumulative

     exposure days, or intensity-weighted cumulative exposure

     days."

     And what that means is no matter how they measured it,

there was no association between Roundup exposure and

non-Hodgkin's lymphoma among those 45,000 people.

     But they didn't stop there in 2005.  In 2018 the authors

of the Agricultural Health Study, the scientists involved in

this study, looked at the question again.  And this is their

conclusion in 2018 about the Agricultural Health Study.  They

said (reading):

         "No association was apparent between glyphosate and

     any solid tumors or lymphoid malignancies overall,

     including non-Hodgkin's lymphoma and its subtypes."

     The evidence shows that the most significant largest study

with the most power demonstrates that there's no association

between non-Hodgkin's lymphoma and Roundup use or glyphosate

use.

     So the authors, the evidence will show, of the

Agricultural Health Study, they did another thing.  They said,

1   "Let's try to take the 45,000 people that are part of this

2   study and then get -- and then try to look at 45,000 people who

3   are like them that have similar age, similar gender, similar

4   race, similar characteristics, but aren't using Roundup like

5   the other people."

6        What percentage of those people, just sort of regular

7   people in the United States, would develop non-Hodgkin's

8   lymphoma?  Because, unfortunately, people develop non-Hodgkin's

9   lymphoma every day.  And the answer that they came to was

10  1.07 percent.  So 1 percent of people in the U.S. population

11  who have the similar characteristics to the 45,000 people would

12  develop non-Hodgkin's lymphoma.

13       Now, what is the evidence going to show?  You're here and

14  you're hearing that Roundup causes non-Hodgkin's lymphoma.

15  What is the evidence going to show about the 45,000 people who

16  are using Roundup all the time?  What is the rate of their

17  non-Hodgkin's lymphoma?  Because you would expect it would be

18  much, much, much higher if Roundup is causing non-Hodgkin's

19  lymphoma.

20       The Agricultural Health Study shows that the rate was

21  almost exactly the same, less -- basically 1 percent; 1 percent

22  of people in society who weren't using Roundup all the time

23  developed non-Hodgkin's lymphoma and of the 45,000 people who

24  were using Roundup all the time for decades, 1 percent

25  developed non-Hodgkin's lymphoma.

 1          The other thing that this data tells you that the

 2    Agricultural Health Study people published is that 99 percent,

 3    99 percent of those 45,000 people who were using Roundup all

 4    the time in every possible way did not develop non-Hodgkin's

 5    lymphoma.  And that's part of the reason that they concluded

 6    that there's no association between the two, between Roundup

 7    use and non-Hodgkin's lymphoma.

 8          Now, what is the data also going to show, separate data?

 9    So this is not part of the Agricultural Health Study, but this

10    data is also going to come into evidence during the trial.

11    This is a chart of Roundup use over time and it shows you that,

12    just like you heard in plaintiff's opening, in the '90s, that's

13    when Roundup use really started to increase in the

14    United States.

15          So you can see here, you know, starting around 1995 and

16    then continuing into the 2000s and if you look at the data up

17    until 2014 -- you know, it hasn't changed, but that's the most

18    recent data we have -- that's Roundup use.

19          So what would you expect?  What would you expect the

20    evidence to show about non-Hodgkin's lymphoma rates if it's so

21    associated with Roundup as you're hearing?

22          Well, what the evidence is going to show you is that the

23    rates of non-Hodgkin's lymphoma in our country have remained

24    steady.  They have -- I mean, there's little, little variances

25    but essentially they have stayed steady over time, and that

OPENING STATEMENT / STEKLOFF

1  includes the concept of the fact that it takes time for people

2  to develop cancer.

3      If in the 1990s Roundup use skyrocketed, you would see if

4  the plaintiff's theory is true, then the evidence would show

5  you that the rates of non-Hodgkin's lymphoma were increasing,

6  but that is not what the evidence will show.  That's the data

7  that helps you answer the question.

8      So you heard a little bit about this group called IARC,

9  which was that international agency in France that came

10  together.  And I don't want to talk about that for a long time,

11  but I do want to touch it briefly.

12      And what I want to say is that you will hear no evidence

13  that IARC in their classification of glyphosate has had any

14  impact on doctors like Dr. Ye who are treating patients here in

15  the United States.  There will be no evidence that the IARC

16  classification has changed the way that he is treating his

17  patients who have non-Hodgkin's lymphoma every day.

18      Now, you're going to be instructed by the judge, and his

19  exact wording is what will control, that you shouldn't be

20  substituting your, I think this came up in jury selection, you

21  shouldn't be substituting your judgment for any other group.

22      But it is true that the EPA has disagreed with IARC.  So

23  the EPA first approved Roundup in 1975.  It determined that it

24  wasn't carcinogenic, that it didn't cause cancer.  It has

25  reaffirmed that before IARC; and then since IARC, the IARC

 1   decision came out in 2015, the EPA has reaffirmed its view that

 2   the evidence is not sufficient to show that glyphosate is

 3   carcinogenic multiple times.

 4        And it's not just the United States EPA that you're going

 5   to hear about, which has done that across Administrations.

 6   You're also going to hear some evidence about Europe and the

 7   fact that Europe since the IARC decision since 2015 has also

 8   reaffirmed that Roundup is not carcinogenic and is not causing

 9   cancer.

10        **MS. WAGSTAFF:**  Objection, Your Honor.  Sidebar.

11        **THE COURT:**  Overruled.

12        **MR. STEKLOFF:**  So I want to go back to what happens,

13   again, outside of this courtroom.  What is the evidence going

14   to show you cancer doctors, doctors like Dr. Ye and Dr. Levine,

15   other doctors who are treating patients every single day with

16   non-Hodgkin's lymphoma, what impact, if any, does Roundup have

17   on their care and treatment of patients?

18        And this is what the evidence will show.  They don't ask

19   their patients about Roundup.  They don't test for Roundup use

20   in any way.  They don't warn their patients about Roundup.  And

21   they don't say that Roundup causes cancer.

22        And what I want to talk to you for a moment about are

23   Dr. Nabhan and Dr. Weisenburger, the plaintiff's two experts.

24   Because to be clear, they are going to come into this courtroom

25   and they are going to tell you that Roundup caused

1   Mr. Hardeman's cancer.

2        But they also practice outside of this courtroom.  They

3   deal with patients.  They deal with other oncologists.  They

4   deal with pathologists, other pathologists.  They deal with

5   Tumor Boards or other medical doctors.  I mean, you saw that at

6   City of Hope Dr. Weisenburger was the chief of pathology.  So

7   he is meeting with doctors all across that hospital.  They

8   teach medical students.

9        What the evidence is going to show you is that Dr. Nabhan

10  and Dr. Weisenburger have never told a fellow oncologist or

11  pathologist that Roundup causes cancer.  They've never taught a

12  medical student that Roundup causes cancer.  They've never gone

13  to a conference of doctors and presented their views that

14  Roundup causes cancer.  And they have never told a single

15  patient that they have treated, hundreds and thousands of

16  patients, that Roundup caused his or her cancer.  That is what

17  the evidence will show outside of the courtroom.

18       Again, and this sums it up, they've never told a patient,

19  they've never told a colleague, they've never taught a medical

20  student, and they've never presented at a conference.

21       So, again, what is the question that you have to answer?

22  Has Mr. Hardeman proved the question did Roundup cause

23  Mr. Hardeman's cancer?  And what is the evidence that tells you

24  that the answer to this question is no?

25       First, it's the data.  I've blown it up here, but these

1  are two pieces of data.  What was the rate if you took the

2  45,000 people in the Agricultural Health Study and just found

3  other people that were like them in society?  1 percent.  What

4  was the rate in the Agricultural Health Study?  1 percent.  And

5  99 percent of those 45,000 people did not develop non-Hodgkin's

6  lymphoma who were part of that study using Roundup.

7       And the same data that I just discussed about the use of

8  Roundup over time and what the rates of non-Hodgkin's lymphoma

9  are over time.

10      Next, both Dr. Weisenburger and Dr. Nabhan are going to

11  tell you the evidence will show that Mr. Hardeman could have

12  developed the exact same non-Hodgkin's lymphoma had he never

13  used Roundup.  So he could have had the exact same medical

14  history.  Everything could have been the same, and he could

15  have never touched Roundup in his entire life; and

16  unfortunately in 2015 he could have developed this exact

17  non-Hodgkin's lymphoma.  The evidence will show you that.

18      And then finally, what does Dr. Ye say?  Dr. Ye is the

19  independent oncologist who treats Mr. Hardeman for his cancer

20  to this day.  His testimony will show you that he would

21  determine the cause of cancer in his patients if possible.  He

22  does not ask his patients about their Roundup use.  He has

23  never told a patient that Roundup caused his or her cancer, and

24  he did not tell Mr. Hardeman that Roundup caused his or her

25  cancer.

 1        So when you have to go back and deliberate in a few weeks

 2   after you hear all of the evidence and see the witnesses, the

 3   answer to that question "Did Roundup cause Mr. Hardeman's

 4   cancer?" will be no.  I thank you very much for your attention.

 5   It has already been a long morning.  But as I said, we are just

 6   going to present the evidence that we need.

 7        Thank you very much for your time and attention.

 8        **THE COURT:**  Thank you.  We will take a five-minute

 9   break while we get ready for the first witness.

10        (Jury exited)

11        **THE COURT:**  I have a number of items I will want to

12   talk to you all about eventually, maybe over the lunch break,

13   but in preparing for Dr. Ritz a couple quick things.  One is

14   that I assume nobody is challenging the qualifications of the

15   other side's experts, correct?

16        **MR. STEKLOFF:**  That's correct, Your Honor.

17        **MS. WAGSTAFF:**  Your Honor, I believe we have

18   challenged the qualifications of Dr. Arber in a pending Daubert

19   motion in some of his motions.

20        **THE COURT:**  Okay.

21        **MS. WAGSTAFF:**  Not necessarily on his main or

22   pathology opinion, but he gave some sort of peripheral opinions

23   that I believe are still --

24        **THE COURT:**  I'm sorry.  I didn't recall that.  I will

25   go back and look at that.

1        But for any expert whose qualifications aren't being

2   challenged by the other side -- obviously do what you need to

3   do to establish to the jury that they are qualified -- but you

4   don't need to ask me to qualify them as an expert, and you

5   don't need to go through as much rigmarole as you might

6   otherwise do with an expert if the other side were challenging

7   the expert's qualifications.

8        Does that make sense?

9        **MS. WAGSTAFF:**  Okay.  That's helpful.  Thank you.

10       **THE COURT:**  And then just a reminder, you don't need

11  to ask to approach the witness -- I mean, you will because you

12  are in the habit of doing it; but you don't need to ask to

13  approach the witness.

14       And let me see if there is anything else.

15       We should talk about Dr. Ritz's testimony about dose

16  response, but my sense is that that is not going to be

17  necessary to do before the lunch break or is it?

18       **MS. WAGSTAFF:**  Your Honor, what time are you planning

19  on taking a lunch break?

20       **THE COURT:**  Around 11:45 or 12:00.

21       **MS. WAGSTAFF:**  No.  That will not be -- I can talk to

22  her about that at lunch.

23       **THE COURT:**  Okay.  So what we will do is right at the

24  beginning of the lunch break, we can talk about the dose

25  response.  You-all can decide -- and it may make sense for

1    Dr. Ritz to be in the courtroom for that discussion for the

2    boundaries to be established properly -- but I will let you-all

3    think about that.

4        But in the meantime, why don't you go ahead and we will

5    call the jury back in.  We can get Dr. Ritz in and get her on

6    the stand and get the jury in.

7            **MS. WAGSTAFF:**  I need to run to the restroom.

8            **THE COURT:**  We will take two minutes, and then we will

9    be back.

10       (Whereupon, a short break was had.)

11           **THE COURT:**  The other thing is you can have your

12   witness on the stand when we come in to bring in the jury.

13       (Jury entered.)

14           **THE COURT:**  Okay.  The Plaintiff can call his first

15   witness.

16           **MS. WAGSTAFF:**  Your Honor, the Plaintiff calls

17   Dr. Ritz to the stand.  I just saw her in the hallway, so --

18                          **DR. BEATE RITZ**,

19   called as a witness for the Plaintiff, having been duly sworn,

20   testified as follows:

21           **THE CLERK:**  For the record please state your first and

22   last name and spell both of them.

23           **THE WITNESS:**  My name is Beate Ritz, B-E-A-T-E

24   R-I-T-Z.

25           **THE CLERK:**  Thank you.

<u>DIRECT EXAMINATION</u>

**BY MS. WAGSTAFF**

Q.   Good morning, Doctor -- good afternoon, Dr. Ritz.

A.   Hi, Aimee.

Q.   How are you doing?

A.   I'm good.

Q.   Okay.  Have you ever testified in front of a jury before?

A.   No.

Q.   Okay.  So why don't you tell the jury a little bit about yourself?

A.   So my name is Beate.  That is a German name but I'm American.  I have lived here since 1989.  I got a medical degree from the University of Hamburg.  And as a doctor, I was extremely frustrated not to be able to prevent diseases and just having to treat them.  So I decided I want to go into public health, and the best schools of public health were in the U.S.  And I came to California because I -- there was a really good school at UCLA.  That was in 1989.  And I have been there ever since.

     So I went through the program at UCLA; and when I came here, I was already interested in occupational and environmental health.  And while I was at UCLA, I started on a big worker health study in the nuclear industry; and when I graduated, UCLA wanted to hire me.  So they actually hired me in 1995, and they hired me in an organization within the

1    university that is called the Center for Occupational and

2    Environmental Health, and that is actually a really interesting

3    institute because it was formed by legislative demand in 1980

4    because there was an incident in a little -- in a company

5    called Oxy Chemical in Lathrop, California, not far from here,

6    where workers realized they couldn't have children.  And what

7    the company produced was a pesticide.  It was a fumigant that

8    was mostly exported to other continents for treatment of fruits

9    and vegetables, pineapples and bananas and other things.

10        And so when these workers then demanded an investigation

11   of what was happening to them, there weren't any doctors who

12   could actually do this research.  And what happened is that the

13   California legislature was so upset that among all the doctors

14   in the UC system nobody knew how to do a study, they demanded

15   that Centers for Occupational and Environmental Health would be

16   formed, and that these centers should be having doctors,

17   researchers and people who could go out in the community when

18   something like this happens.

19        So my position is actually one of ten at UCLA where we are

20   tasked to do exactly that; to do research that improves the

21   environment and improves the working conditions of people in

22   California.  And that is what I really have been trying to do

23   for the last 20 years since I was hired -- more than 20 years

24   now.

25   Q.   Excellent.  And you are a medical doctor, you just said --

**RITZ - DIRECT / WAGSTAFF**

1   **A.**   Yes.

2   **Q.**   -- but you are also an epidemiologist, right?

3   **A.**   Correct.

4   **Q.**   So please explain to the ladies and gentlemen of the jury

5   what epidemiology is and what you do as an epidemiologist.

6   **A.**   Right.  So in that discipline, epidemiology, it is part of

7   public health, and actually I would consider it the basic

8   science of public health; and that is because we are

9   studying -- we, as researchers, are actually studying what

10   causes disease.

11       So in a sense what I'm interested in is finding out does a

12   work environment with certain exposures to the workers cause

13   that disease that I'm seeing among the workers.  If, for

14   example, somebody lives in a very polluted neighborhood, we

15   would be investigating whether the air, the water, the soil

16   contamination is responsible for the disease.  The way we do it

17   is not like a doctor who diagnoses a disease and mostly treats

18   patients and has some suspicion of what could cause the

19   disease.  We are also tasked with finding out what does cause

20   the disease.

21       That is not easy, right, because you have many, many

22   different things you breathe, you drink, you get contaminated

23   with when you work in your garden or which workers use when

24   they are in their jobs; right?  But we have to figure out what

25   is it that is toxic and that is actual linked to this disease.

1    And the only way to really do this would be to turn back the
2    clock, to use a time machine.

3        So when we see the people who are sick, right, everything
4    has already happened.  What we want to know is if we go back in
5    time and take away that one exposure that caused their disease,
6    would they not have gotten sick, and that's what I call the
7    time machine.  And that's how we think about it.

8        You know, people get sick.  Lots of things happen
9    throughout their lifetime until they get sick, but what was it
10   that I would have to go back and take out that would prevent
11   them from being sick.  And, of course, you know, we know
12   Hollywood and they have movies in which we can turn back the
13   time and, you know, try it, do an experiment.  Take out this
14   and see what happens.  But in real life, that's not possible.

15       So what do we do?  We are looking for people who live a
16   similar life, who have a similar job, who live in the same
17   neighborhoods, and then we are trying to figure out, okay, what
18   is different among those who actually got the disease, and
19   those who are still healthy and they are the same age.  They
20   are the same sex.  They are the same socioeconomic status,
21   income.  Maybe they are even workers at the same company.  But
22   what is it that distinguishes that worker from this so that
23   that worker got the disease and this one didn't; right?

24       And so we are comparing groups of people who we hope are
25   most similar to each other except for the one exposure that we

1   are interested in.  And then we come to a conclusion that, yes,

2   the rate of disease among the exposed, the workers who had this

3   one exposure, is higher than the rate of disease among the

4   people who didn't have the exposure.  And that is what we call

5   the rate ratio, and odds ratio, risk ratio, meaning the number

6   of people exposed is -- and who got sick is larger than the

7   number of people who weren't exposed and did not get sick.  And

8   those numbers are usually above 1.  When we see these numbers

9   above 1, we know there is more happening among the exposed that

10  should not have happened had they been unexposed, had we kept

11  that exposure away from them.

12      It sounds easy, but it is really difficult to find the

13  right comparison and to do these studies right.  And this is

14  what I teach at UCLA to my students.  I just right now teach it

15  three times a week.  So tomorrow my TA is in charge.  And -- I

16  hope they do a good job -- and it is not easy.  The students

17  struggle with these concepts, and I really feel for you that

18  you have to sit through this.  So bear with me.

19      It is not easy, but what we are trying to do is really

20  compare two groups because we don't have the time machine to go

21  back and take each exposure out and then see whether the person

22  would still get sick.  Rather, we are looking at groups of

23  people, comparing them.

24  **Q.**  All right.  Thank you, Dr. Ritz.

25      Will you explain to the jury what environmental

1    epidemiology is and if there is a difference between

2    environmental epidemiology and epidemiology, just general

3    epidemiology.  Can you explain if there is a difference?

4    **A.**    Right.  So environmental and occupational epidemiology,

5    because the highest exposures we ever have are actually mostly

6    in occupational environments, so workers have always been our

7    canaries in the coal mine, so to say, for most exposures that

8    we are trying to figure out, are they health relevant.  Do they

9    cause disease; right?  We like to go back to workers because

10   they are the ones at the front line of everything.

11        So environmental and occupational epidemiologists, my

12   specialty, really are the experts in trying to figure out what

13   exposures are, how large they are, how we can measure them, how

14   we can measure them over a very long time period, and then link

15   that to any disease that people might want to figure out.  So

16   we are not the specialists in one disease or the other;

17   although, all of us have their favorites, right, cancer,

18   neurodegenerative diseases, child diseases.

19        But we generally are the people who are figuring out the

20   exposure and how much of it do you need, how long do you need

21   to be exposed, when do you need to be exposed.  For example, do

22   you already have to be exposed in childhood?  Is it bad when

23   pregnant women are exposed or is it especially bad that you are

24   exposed when you are elderly because you don't have the

25   defenses anymore?  All of these things is what environmental

1    and occupational epidemiologists do.

2    **Q.**    All right.  Are you familiar with the International

3    Society of Environmental Epidemiology, otherwise known as ISEE?

4    **A.**    In fact, I'm the president.

5    **Q.**    Okay.  So you are --

6    **A.**    Yes.

7    **Q.**    -- familiar with it.

8          Will you tell the ladies and gentlemen of the jury what

9    ISEE is, what it stands for and what your role is there?

10   **A.**    So this is an international society of professionals.  It

11   is called the International Society of Environmental

12   Epidemiology where people like me come together, and we come

13   together every year for an annual conference; and in between we

14   have many working groups where we are figuring issues out among

15   colleagues.  And it is thousands of people like me, all over

16   the world, who get together to discuss issues of our science,

17   and we are very critical of each other; and we are critical for

18   a good reason because we try to figure out the best science.

19         And really, this is where our students come.  I love the

20   society because it has a lot of young people, and we are

21   training our students to be able to go there.  We are

22   encouraging them to present their research and to be challenged

23   because, you know, in order to find the truth, we have to

24   challenge each other and we have to learn to stand up to being

25   challenged, to defend our position, and to be truthful and do

**RITZ - DIRECT / WAGSTAFF**

1 the best studies we can.

2 **Q.** All right.  So are you familiar with the epidemiologist

3 that Monsanto has designated in this case?

4 **A.** Yes, I am.

5 **Q.** Dr. Mucci and Dr. Rider; correct?

6 **A.** Right.

7 **Q.** Are either Dr. Mucci or Dr. Rider an environmental

8 epidemiologist?

9 **A.** No, they are not.

10 **Q.** And what is the significance of that with respect to an

11 opinion that they would give in this case?

12 **A.** Dr. --

13   **MS. MATTHEWS:**  Objection.

14   **THE COURT:**  There is an objection.

15   **MS. MATTHEWS:**  Objection to collateral use of --

16   **THE COURT:**  Overruled.

17 **BY MS. WAGSTAFF**

18 **Q.** You can answer.

19 **A.** Okay.  So these are two young colleagues who are

20 specialists in a different field.  It sounds like epidemiology

21 that should encompass every epidemiologic study or every study

22 of human health, right.  But we have branches, and the branch

23 that Dr. Mucci and Rider are specialists for are molecular

24 epidemiology.  That is a very technical term, but what they

25 mostly know to do is to test cells and to test genetic factors

**RITZ - DIRECT / WAGSTAFF**

1    that contribute to disease, to cancer.

2        And they also have -- so it is much more a -- it is much

3    more detailed in terms of the technology, but they have no

4    training or no specialty in going out into the field, which I

5    do, and asking people about their work or their environmental

6    exposures.  It is really hard to capture environmental and

7    occupational exposures over a lifetime and, therefore, we are a

8    specialty.  And that's not what these two do.  They have never

9    done that.

10   **Q.**   All right.  Have you ever, yourself, developed an exposure

11   assessment model?

12   **A.**   Absolutely, yes.  That's my job.

13   **Q.**   Okay.  So can you tell the ladies and gentlemen of the

14   jury what an exposure assessment model is and maybe describe

15   one that sort of exemplifies what you have created.

16   **A.**   Right.  So as a student, I had it easy.  I worked with

17   workers in the nuclear industry, and the nuclear industry, as

18   much as we can say, "Oh, my God, they are exposing workers to

19   radiation," they very early on were regulated quite well and

20   the workers actually had to wear badges.  So every day they

21   would go into the facility.  They would put on their badge, and

22   that badge would read -- you would be able to read off that

23   badge how much exposure in radiation dose they got; right?

24       So my job was really easy as an occupational

25   epidemiologist.  I could just, you know, collect all these

1    badge readings, and then reconstruct what the dose of the

2    worker was throughout the time they worked at the facility; and

3    I could easily find out, okay, this worker had a low dose.

4    This worker had none.  This worker had a high dose.

5         And what I told you before, I then compared the high dose

6    to the medium dose to the low dose, and we looked for leukemias

7    and for other cancers, right; worried that workers exposed

8    would have had these diseases.  And, lo and behold, we found

9    that.  That was my easy job in terms of exposure assessment.

10        When I graduated, I thought I would do something a little

11   more challenging.  Guess what?  Pesticides are really

12   challenging to figure out.  So one of the first things I did

13   when I was a junior professor was to say, Well, we have an

14   agricultural state.  We don't look like it when we are in San

15   Francisco or LA, but go to the Central Valley, right?  So I

16   actually set up most of my research in the Central Valley

17   because I believed there -- the Central Valley is where people

18   are exposed occupationally and environmentally to more toxins

19   than anybody else.  Okay.

20        **THE COURT:**  One moment, Doctor.

21        **MS. MATTHEWS:**  Objection.  Relevance at this point,

22   Your Honor.

23        **THE COURT:**  Overruled.

24        **THE WITNESS:**  So -- and I know that these pesticides

25   are being used for a good purpose.  I'm not saying any of the

 1    farmers are doing this because they -- they intend to harm

 2    someone.  The opposite.  They want to put food on your table;

 3    right?  They want to -- they want to give you fruits and

 4    vegetables and nuts that we all like to eat and think it is

 5    nutritious, and we should eat them; but they also need to

 6    defend themselves against pests, insecticides, fungi that rot

 7    the oranges, et cetera.

 8         So I know from my perspective that the Central Valley is

 9    really a big experimentation hub for pesticide exposure in

10    humans, and it is for workers and it is for residents.

11         So the exposure models that I built was actually based on

12    something very unique in California, and California should be

13    proud of it.  In 1974 the legislature decided yes, we are using

14    a lot of pesticides; but we better make sure where they are

15    used, who uses them, when they are used and how much is used.

16    And they created, by state law, something called The Pesticide

17    Use Reporting System so that applicators, farmers, professional

18    pesticide applicators, they actually have to report all of this

19    to the State every month or every year; and that goes into a

20    big database.  And that database, when I became a junior

21    professor, hadn't ever been really used for human health

22    studies, and I said here is something I can do.  I love

23    numbers.  I love big numbers and I love modeling.  I love

24    workers, the environment, and I want to do this.  Give me the

25    data, and I want to figure out whether these pesticides

1   actually are doing something they shouldn't, including harming

2   individuals who live and work with them; right?  And how we can

3   hopefully figure out to prevent that, because that's in the end

4   all I want to do.  I want to prevent this from happening;

5   right?

6        So what we did is we downloaded these databases, and then

7   students over years worked on mapping them.  So we now have an

8   electronic database where we can say what has been applied on

9   what field, at what time, in what amount, for the whole of

10  California.  We started with three small counties -- Tulare,

11  Fresno and Kern County -- and we developed this mapping system

12  so that we can now say every worker, every individual who lives

13  there, we can tell who was sprayed around their homes, what was

14  sprayed around the workplaces; and we can summarize the amount

15  of pesticide in -- and the amount of pesticide and the timing

16  of when it was applied in the Central Valley, and I have done

17  many, many studies on that.

18  **Q.**   Excellent.  Thank you.

19       How about for -- your work on the California Air Resources

20  Board panel, can you tell the jury a little bit about your work

21  on that?

22  **A.**   Yes.  So about six, seven, eight years ago I was appointed

23  to the Air Toxics board.  That is not so surprising because I'm

24  one of very few professionals in the state of California who is

25  tasked with preventing occupational and environmental exposure

1   and figuring out what they do.

2       So we have an agency in California called the OEHHA, the

3   Office of Environmental Health & Hazard Assessment, and they

4   are tasked by the State of California to keep your air clean

5   and to prevent you from breathing toxic contaminants.

6   Pesticides are some of these toxic contaminants, air toxic

7   contaminants.  These are people who work in a bureaucracy.

8   They are scientists at OEHHA, and they are trying to figure out

9   what different chemicals do and whether or not they should

10  actually be considered an air toxic.  So when they do this --

11  that is their job.  But at the end of their evaluation, when it

12  comes to, okay, this is an air toxic and here are all the

13  arguments why it is, a lot of times animal studies, cell

14  studies and some human studies.  And then they -- they need an

15  expert panel -- and I'm one of those experts -- who then

16  evaluates that report before they are allowed to go to standard

17  setting because we want to make sure that what they are

18  actually doing is scientifically valid.

19      And they are -- they are bringing all the science together

20  and evaluating what is out there, but they are not doing the

21  science.  So the people who are just bringing it together and

22  evaluating and setting standards to protect the public, they

23  are not -- they are not ever the ones who are doing the

24  science, and so the link is you need a scientist like me who

25  goes out there and actually collects all this information and

1   then puts it together and does a study to see whether what

2   their summary says is actually accurate and whether they

3   truthfully represented what is in those studies and whether the

4   conclusions that they come up with, I or my panel would agree

5   with.  So I'm appointed to that.

6   **Q.**   All right.  Who appoints you to that?

7   **A.**   The Governor.

8   **Q.**   The Governor of California?

9   **A.**   Yeah.

10  **Q.**   Okay.  Have you done any work with the National Academy of

11  Science or the Institute of Medicine?

12  **A.**   Absolutely.

13  **Q.**   Could you tell the jury a little bit about your work with

14  those entities and maybe explain what they are as well.

15  **A.**   Right.  So the National Academy of Science is actually

16  quite old.  That is a federal agency -- not agency.  It is a

17  not-for-profit organization, but it was mandated by the federal

18  government -- actually by Abraham Lincoln in '63 -- 1863, as an

19  independent body that gives the government scientific advice

20  when they need it.  So it -- and this body has been functioning

21  ever since and giving scientific advice.

22       And some of the advice that I was asked to give -- and

23  have been sitting on five or six of these panels since 2000,

24  ever since I wasn't as junior anymore -- so what I was asked

25  was mostly to come in for the Veterans Administration and

**RITZ - DIRECT / WAGSTAFF**

1    evaluate the science on Gulf War Syndrome and all the Gulf

2    War-related disorders from air pollution, from pesticides, et

3    cetera.   And I think I have been sitting on at least three of

4    those.

5        And more recently, on a bigger panel that was called Risk

6    Assessment and Guidelines for Risk Assessment in the nation.

7    **Q.**   Okay.   And did you receive an award recently?

8    **A.**   Yes.

9    **Q.**   Can you tell the ladies and gentlemen of the jury what

10   award you received?

11   **A.**   Yes.   So I was very surprised in January when I got an

12   e-mail from one of my students and then a cake that said "Top

13   1 percent," and I was What is this?   It turns out that there is

14   an online machine learning tool and company that actually

15   figures out how often as a scientist you are cited -- your work

16   is cited worldwide, and then they are naming the scientists who

17   are among the top 1 percent in the world whose science is being

18   cited by other scientists, and I made the list.

19   **Q.**   Congratulations.

20       So let's move onto journals and medical journals.   Can you

21   explain to the ladies and gentlemen of the jury, what a medical

22   journal is and how it comes -- well, why don't we start with

23   what a medical journal is.

24   **A.**   So A medical journal is the main instrument of

25   communication between scientists.   Once you have done a study,

1   you have to write it up; right.  And you write up why you did

2   it, how you did it, what you found; and then you discuss what

3   it means; right.  And the journals that publish these articles,

4   they are really giving us an outlet to give this information

5   that we are collecting and putting together to the public.

6        And as a journal, they have the duty to make sure that

7   what we have been doing at UCLA, at Berkeley, wherever, is

8   actually not junk; right.  It is actually truthful, good

9   science.  And so what they do is they ask peers -- these are

10  other scientists -- hopefully experts, hopefully in the field

11  that you are working at -- to read these articles and to think

12  about -- the articles have to have enough information so that

13  your peer, the person who also does these kind of studies,

14  knows what you have been doing; can follow why you have been

15  doing it, and what you have been doing and evaluate whether

16  what you are saying about what you did is enough that you can

17  come up with the conclusion that you made in your -- in your

18  study.  And none of these peers are ever paid to do this.  This

19  is voluntary work.  It is a lot work.  It is hard work, but it

20  is what keeps us honest as scientists; right?

21       If there wasn't somebody -- and they are judges in a way

22  because if we cannot satisfy our peers or other experts with

23  what is in these papers is actually the truth in some way, as

24  long as they can follow what I did, then the paper -- they can

25  recommend the paper not to be published.  They recommend a lot

1    of changes.  When they don't understand something, I have had

2    papers where I had to write more explanations than the paper

3    was long to the peer reviewers, and I had to do it multiple

4    times until they finally understood why what I was saying was

5    actually okay.  And then the editors evaluate all of that and

6    say, okay, now, that the peer reviewers are satisfied, maybe I

7    still have a problem with this; and they come back to you and

8    have that problem.  And in the end they decide whether you

9    answered all the questions and if what you are actually

10   producing in this paper is truthful and valuable and valid.

11   **Q.**   All right.  And have you ever been a peer reviewer

12   yourself?

13   **A.**   Absolutely.  I do it all the time.

14   **Q.**   Okay.  And you mentioned an editor who is above the

15   peer-review process.  Have you ever participated on an

16   editorial board?

17   **A.**   Yes.  I was an associate editor.

18   **Q.**   Okay.  Were you an associate editor for a medical journal?

19   **A.**   For an epidemiology journal.

20   **Q.**   Okay.

21   **A.**   So that's -- epidemiology is my profession.  So --

22   **Q.**   So have you served on the -- what journals have you served

23   on the editorial board of?

24   **A.**   Epidemiology and I do -- I also -- one on current opinion

25   in environmental health, which pretty much reviews bigger areas

1    of environmental and occupational studies.  I stay away from

2    editorial boards because there is only so much time in a day,

3    and I'm already president of my society.  I teach.  I do

4    research.  And, you know, I travel a lot.  And I -- I try to do

5    what I do as well as I can, and I would feel not having enough

6    time to be on yet another editorial board.  So currently I am

7    not.

8    Q.   All right.  And aside from being a peer reviewer and on

9    editorial boards, have you, yourself, been published and had

10   your papers go through this peer-review process?

11   A.   Absolutely.  I wouldn't be at the University of California

12   anymore if I wouldn't be publishing and publishing a lot.  We

13   are evaluated every -- all -- every two or three years for what

14   we are publishing and producing.  It is called productivity.

15   So actually mine was pretty good.  I now have about 270 papers

16   that are peer reviewed in the literature that came out since

17   1995.

18   Q.   All right.  And are those 270 peer-reviewed literature

19   articles that you wrote, are they on epidemiology?

20   A.   They are on the epidemiology of different diseases

21   including cancers and mostly environmental and occupational

22   causes.

23   Q.   All right.  Do those articles that you had peer reviewed

24   that you wrote, do they consider your exposure models and your

25   exposure methods?  Do those -- are those included within the

1  articles?

2  **A.**   Absolutely.  It is actually what I'm known for.

3  **Q.**   Okay.  Were you asked by the State of California to advise

4  on pesticides?

5  **A.**   Within my Air Toxics board appointment, pesticides come

6  up.  So last year chlorpyrifos, which is a very commonly known

7  used insecticide -- actually it was the most used indoor

8  insecticide we had in California until it was banned from

9  indoor use.  It is still being applied in the fields.  That has

10  been evaluated by that board last year.

11  **Q.**   All right.  Excellent.

12       **MS. WAGSTAFF:**  Your Honor, this may be a great time to

13  break for lunch.

14       **THE COURT:**  Okay.  Sounds good.  Why don't we take a

15  slightly longer break than usual today so you-all can find your

16  way around the building and stuff.  I noticed that the clock

17  is -- this clock is five minutes slow.  Why don't we plan on

18  coming back here at 12:45; not 12:45 by that clock, but 12:45

19  by your iPhone, which will be about 12:40 by this clock.

20       Remember my admonition by the way.  I'm going to sound

21  like a broken record on this stuff, but it is very important,

22  critical that you not talk about the case with anybody or

23  amongst yourselves; that you not conduct any sort of research

24  or anything like that about the case or anybody involved in it.

25  And no Google searches, not even for a term that was used in

1    the case.  You shouldn't do any kind of research at all.

2        If anybody tries to talk to you about the case, you should

3    let us know immediately.

4        With that, have a good lunch.  We will see you back here

5    at 12:45 by your iPhones.

6        (Jurors exit.)

7            THE COURT:  Dr. Ritz, sit tight for just a second.

8    Should we talk about the Dr. Ritz -- the issue of dose response

9    now with Dr. Ritz here or how would you like to proceed on

10   that?

11           MS. WAGSTAFF:  That works.  I also want to make sure

12   that we are all on the same page with respect to medical

13   literature as well just so I don't get on even thinner ice with

14   you.

15           THE COURT:  Okay.  So on the issue of dose response --

16   first of all, by the way speaking of thin ice, can I have a

17   copy of both of the slides for both sides' openings?  Do

18   you-all have that handy?  Can you hand up a copy of your

19   slides?

20           MS. WAGSTAFF:  I don't have it printed out --

21           THE COURT:  That's not -- that can't be true.

22           MS. WAGSTAFF:  Well, the version -- I pulled slides

23   out based on what you talked with Ms. Moore about, so --

24           THE COURT:  I will take that.

25           MS. WAGSTAFF:  -- this isn't what I used.

 1          **THE COURT:**  Okay.  That's fine.  That is your full

 2   version that you were planning on using?  That's fine.  I will

 3   take that.

 4          **MS. WAGSTAFF:**  Well, I feel this will be held against

 5   me.

 6          **THE COURT:**  That's okay.  I will take that.

 7          **MS. MOORE:**  Your Honor, we can have a clean version.

 8          **THE COURT:**  No.  That's okay.  I will take that one.

 9          **MS. WAGSTAFF:**  I have notes in here, so can I take

10   those out?

11          **THE COURT:**  On slides?

12          **MS. WAGSTAFF:**  No.  These are --

13          **THE COURT:**  Yeah, take out your notes.  Sure.  Thank

14   you.

15          **MS. WAGSTAFF:**  Can I just review it one more time?

16      (Whereupon, a brief pause was had.)

17          **MS. WAGSTAFF:**  And I ran out of color ink halfway

18   through printing it.

19          **THE COURT:**  That's fine.

20          **MS. WAGSTAFF:**  This copy that I'm handing you includes

21   the RFA that we had talked about before, so obviously that

22   wasn't shown to the jury.

23      Also I took out an *Eriksson/McDuffie* slide when you get to

24   the specific causation portion that I didn't show to the jury.

25          **THE COURT:**  Okay.

1          **MS. WAGSTAFF:**  And in my exposure slide, there is a

2     bullet point in what I just handed you that discusses warnings

3     and whether or not Mr. Hardeman followed those warnings and

4     labels, which I took out as well.  I deleted based on your

5     conversation with Ms. Moore prior to my openings statement as

6     well.

7          **THE COURT:**  Okay.  I will ask by the way, Kristen, if

8     you can contact GSA and ask them to fix that clock.  Get it

9     tied to the iPhone.

10         Okay.  There was just -- while it is on my mind before I

11    forget, there was a photo of Mr. Hardeman and his family that

12    you described as a photo that was designed to show the jury the

13    property.  It was not designed to show the jury the property.

14    It was designed to show Mr. Hardeman's family.

15         So that's -- I'm not allowing that photo to come in in

16    Phase One.

17         Okay.  Now, let's just talk about the dose response issue

18    for Dr. Ritz and any other -- anything else you want to talk

19    about with respect to the articles, and I have a couple other

20    items; but I will put those off for now.

21         **MS. WAGSTAFF:**  It is my understanding from talking

22    with Monsanto's attorneys that we have an agreement that we

23    will publish medical journals and articles to the jury but not

24    send them back into evidence; is that --

25         **THE COURT:**  That's what you-all told me.

1           **MS. WAGSTAFF:**  Okay.

2           **THE COURT:**  And that I agreed to quite a while ago,

3    yeah.

4           **MS. WAGSTAFF:**  Just before I did it, I wanted to make

5    sure we were all on the same page.

6           **MR. STEKLOFF:**  No issue there, Your Honor.

7           **THE COURT:**  Okay.  So on the issue of dose response,

8    this is one -- I mean, I -- as I said, there are a number of

9    places where the Plaintiff -- or Ms. Wagstaff crossed the line

10   in opening statements, and it seems pretty clear that it was

11   intentional.

12          On the dose response issue, as I mentioned at sidebar, I'm

13   not sure I would put that in -- put the dose response issue in

14   that category because I think that is actually quite a

15   challenging issue, right, based on my rulings.  And what I

16   ruled was -- that Dr. Ritz's testimony from -- from the general

17   causation phase, at least as I recall it, was that there is a

18   dose response -- that the literature shows a dose response.

19   And what I recall from Dr. Ritz's testimony is that she didn't

20   get behind any particular numbers.  She didn't say if you use

21   Roundup more than ten times in your life, your -- your risk of

22   getting NHL will double.  I don't recall you saying anything

23   like that.

24          **THE WITNESS:**  No, I didn't.

25          **THE COURT:**  So what I meant to convey -- what I

 1   intended to convey in the specific causation order that I

 2   issued yesterday is that that testimony -- that general

 3   testimony that Dr. Ritz gave is permissible, and that she can

 4   use *McDuffie* and *Eriksson* to make the general point that there

 5   is evidence of a dose response.

 6       But then when you get to the specific causation phase and

 7   you have people like Dr. Nabhan and Dr. Weisenburger testifying

 8   that they -- you can reach some sort of quantitative conclusion

 9   based on those studies, that's not permissible.  That crosses

10   over into the area of junk science.

11       So that's the basic parameter that has been established

12   not just for Dr. Nabhan and Dr. Weisenburger, but all of the

13   experts.

14       And so the question is:  Are there any concerns about, you

15   know, types of testimony that would be close to the line that

16   we should resolve now?  It seems to me, as I said, I believe

17   that the line was crossed during the opening statements.  It is

18   not as clear that that was intentional as some of the other

19   stuff, but I -- it seems pretty clear that the line was crossed

20   during opening statements.  So perhaps we have to have a

21   further discussion sort of defining that line.

22           MR. KILARU:  Yeah, I think the slides did cause

23   concern in light of the rulings, Your Honor, because I believe

24   there were three slides, though I know one was sort of clicked

25   through in the earlier rulings; that showed that there is an

1    over 200 percent increase risk from the slides.  I think one

2    was 236; one was 212, and I forget the third exactly -- 210,

3    I'm told -- that is the exact type of testimony that we think

4    crosses the line that was set forth in your order where you

5    said that no one really can testify if someone uses Roundup

6    more than two days or ten days, their risk of developing NHL

7    doubles.  And I'm not really sure if there is any space between

8    those two things.

9         **THE COURT:**  Well, but the reason it is a tricky issue

10   I think, is that there are numbers that emanate from the

11   *McDuffie* and *Eriksson* studies.  And, I mean, we could have a

12   discussion about this.  My intention when -- from the -- when I

13   wrote what I wrote in the specific causation order was not

14   necessarily to preclude the Plaintiffs from eliciting testimony

15   about the numbers that emanate from *McDuffie* and *Eriksson*.  It

16   is just that they could not provide -- they could not offer on

17   opinion that those numbers stand for this sort of quantitative

18   proposition.

19        Again, that is a tricky line.  I mean, maybe the answer is

20   that the numbers shouldn't come in at all; but my -- but what I

21   was -- what I was envisioning when I wrote that is that the

22   experts -- they can say what the numbers stand for.  The

23   qualification has to be made about, you know, the fact that

24   these are unadjusted numbers and also the overall numbers of

25   the subjects in the studies are very low.

1          But -- and with those qualifications, you can say that,

2     you know, they are -- they are somewhat probative -- they are

3     probative of dose response without drawing any quantitative

4     conclusions.  That is tricky.

5          I mean does that -- do you understand what I'm saying?

6               THE WITNESS:  Absolutely.  Absolutely.

7               THE COURT:  So what -- how are you with that, I guess

8     I will ask.

9               MR. KILARU:  I guess I would say we do have a concern

10    with the numbers -- not all the numbers, but *McDuffie* and

11    *Eriksson* being showed.  I think these issues are all tied

12    together.  As I think you said in the order, the numbers are

13    unadjusted.  So if you present unadjusted numbers, whether you

14    describe them as a doubling of the risk or just show what they

15    say --

16              THE COURT:  I never said either at general causation

17    or the specific causation stage that unadjusted numbers are

18    inadmissible.  Now, I think there is probably a decent argument

19    for that.

20              MR. KILARU:  Yeah.

21              THE COURT:  But I ruled -- I didn't rule that they are

22    inadmissible.  What I ruled is that they -- they can't be

23    relied upon to -- for -- by an expert to predict the -- how

24    much somebody like Mr. Hardeman has an increased risk if he

25    used glyphosate, a particular amount more than ten lifetime

1   days.

2       So I'm not prepared at this point to preclude an expert

3   from testifying to the numbers themselves.  It is a bit of a

4   tricky line, I think.  And, you know, it is one that everybody

5   is going to have to be paying attention to during trial, but I

6   do think -- just to make clear for the record, right -- the

7   stuff that was in the slide is not appropriate.  That is -- of

8   course, that was not an expert opinion --

9           MR. KILARU:  Right.

10          THE COURT:  -- that Ms. Wagstaff was describing.  That

11  was her own interpretation of the numbers, and that is not

12  appropriate.  And it is not appropriate for an expert to offer

13  an opinion reflecting the content of those slides.

14          MR. KILARU:  I do agree that it is a somewhat gray

15  area, as you said.  I mean, the slides are clearly on one side.

16  Maybe the numbers -- you know our position on the numbers, at

17  least as I just articulated.  Unadjusted numbers shouldn't be

18  admitted because they are unreliable, where we think it is

19  embodied in the order.

20      Where I think we might have some concerns about the

21  testimony is if you start to get into -- it is a hypothetical,

22  but what is the risk ratio in this piece?  It is above 2.  What

23  does 2 mean?  Well, it means the risk is doubled.  They are

24  basically presenting the exact same thing just without a

25  percentage number.  That's where I think the line would

```
 1    probably be crossed as well.
 2         THE COURT:  I'm not sure -- we could probably go
 3    through 20 hypothetical questions and answers --
 4         MR. KILARU:  Right.
 5         THE COURT:  -- and I can issue rulings in advance.
 6    Then there will be a 21st question asked and answered.  I don't
 7    think it is worth trying to do that in advance.
 8         What I will say, however, is that there is a possibility
 9    that, you know, a specific instruction regarding the use of
10    unadjusted numbers could be given to the jury.  And I think the
11    chances of that happening increase the more the Plaintiffs
12    elicit testimony about the unadjusted numbers, and the more the
13    Plaintiffs attempt to get the jury to draw quantitative
14    conclusions about the unadjusted numbers.
15         So we will have to just kind of see how the evidence comes
16    in, but it may be that a limiting instruction of some sort is
17    appropriate.
18         MR. KILARU:  That may make sense, Your Honor.  I just
19    wanted you to know a general gist of how we are thinking about
20    this.  I know there are many, many variables; but it sounds
21    like it might make sense to see how it comes in, and we would
22    be happy to prepare an instruction if we think a line has been
23    crossed.
24         THE COURT:  Okay.
25         Anything from you, Ms. Wagstaff?
```

1          **MS. WAGSTAFF:**  No, Your Honor.

2          **THE COURT:**  Dr. Ritz, does that -- are you comfortable

3    with that?

4          **THE WITNESS:**  Yes.

5          **THE COURT:**  Okay.  Great.  So let me see.  Was there

6    anything else I wanted to discuss with you right now?

7        Oh, what is the status of the stipulation -- there are a

8    bunch of potential stipulations floating around out there.

9    What is the status of the stipulation regarding expert

10   compensation?

11         **MR. KILARU:**  I think we are willing to agree to what

12   Your Honor proposed.  We might propose to switch the word "a

13   lot" for "substantial," but I think we are on the margins at

14   that point.

15         **MS. WAGSTAFF:**  We actually haven't really discussed it

16   with each other.

17         **THE COURT:**  There was some indication -- some

18   e-mail --

19         **MR. KILARU:**  We both said we were --

20         **THE COURT:**  There was some e-mail from someone on your

21   team --

22         **MS. WAGSTAFF:**  I told you in the hearing that we were

23   okay, as long as the wording wasn't that they were each paid a

24   lot of money.

25         **THE COURT:**  Okay.  So -- but we have an expert on the

1    stand now.  So why have we not figured that out, figured out

2    what -- how -- the extent to which people are going to be

3    questioned on their compensation?

4         MS. WAGSTAFF:  I'm not going to question her on her

5    compensation, so it wasn't really a priority to me.

6         THE COURT:  You need to -- you need to figure out

7    by -- how long do you think Dr. Ritz's direct will take?

8         MS. WAGSTAFF:  Okay.  Apparently in Australia they

9    told Mr. Wisner they would give us a copy.  We can figure this

10   out probably in five minutes.

11        THE COURT:  Why don't you do that?

12        MS. WAGSTAFF:  Okay.

13        THE COURT:  Good.  We will see you-all at the actual

14   time of 12:40.  Thank you.

15      You can step down.

16        THE WITNESS:  Thank you.

17        THE COURT:  And you can have -- I think I said this

18   before, but you-all should have your witnesses on the stand

19   when the -- when we are ready to bring the jury in so we don't

20   waste that extra time bringing the witness in when the jury is

21   already sitting there.

22        MS. MOORE:  Thank you, Your Honor.

23        THE CLERK:  Court is in recess.

24           (Luncheon recess was taken at 12:10 p.m.)

25

 1    **Afternoon Session**                          **12:48 p.m.**

 2         (Proceedings were heard out of presence of the jury:)

 3         **MR. STEKLOFF:**  Your Honor, I just want you to -- for

 4    it to be clear.  I have no problem with you having it, but the

 5    PowerPoint that I handed you included an appendix of slides

 6    that I did not use.  I'm just hoping that Plaintiffs' counsel

 7    doesn't see them, but it doesn't bother me one way or the other

 8    if you have them.

 9         **THE COURT:**  I look forward to reading them.

10         **MR. STEKLOFF:**  Second, Your Honor, I think we have

11    reached a stipulation on the expert compensation, which would

12    be to take your language but substitute "significant" for "a

13    lot," but then add the phrase based on customary -- normal and

14    customary rates.  So that -- which would apply to both sides.

15         **THE COURT:**  That's great.  So are you going to want me

16    at some point to read that stipulation to the jury?

17         **MR. STEKLOFF:**  I think it -- my view is that it would

18    make more sense for you to read it since it applies equally to

19    both sides as opposed to having one side read it --

20         **THE COURT:**  Okay.  So at whatever point you get that

21    stipulation to me and you file it, I will just read it -- I

22    will probably read it to the jury at the beginning of

23    tomorrow's testimony.

24         **MS. MOORE:**  That is helpful, Your Honor.  We will get

25    that.  We will send that over to them, and I think we have got

1    that done.

2            **THE COURT:**  Great.  One other thing I wanted to raise

3    with you now, even though it is not immediately relevant, is

4    that I -- you know, you were showing slides of deposition

5    testimony of the Plaintiff's experts.  I understand your theory

6    behind that.  My -- your theory being that the Plaintiff's

7    experts, when they were having their depositions taken, were

8    agents of the Plaintiff and, therefore, their deposition

9    testimony is admissible under Rule 80 -- 801(d)(2).

10          I do not believe that there is any binding Ninth Circuit

11   case law on that issue, whether an expert when their deposition

12   is being taken is acting as a -- as an agent of the party.

13   I believe that the -- that -- I believe that an expert is

14   not -- should not be deemed to act as an agent -- be acting as

15   an agent of the party during deposition testimony.

16          I think there is also a strong argument that they

17   shouldn't be deemed as acting as an agent of the party during

18   trial testimony, but regardless, I think there is a distinction

19   between the two, and so that's why I shut you down on that.  If

20   you can point me to some binding authority that says to the

21   contrary and you want to cross-examine experts using their

22   deposition testimony, you can try to point me to that

23   authority.

24          I will also say I think it is a Rule 403 issue,

25   particularly in a case like this.  I think that the trial --

1    there is a real risk of the trial becoming much more jumbled

2    and confusing if we use as a starting point the expert's

3    deposition testimony rather than the testimony the expert has

4    given at trial.

5        So I believe that for the experts, both because of my

6    interpretation of Rule 801(d)(2) and because of Rule 403,

7    I believe the way it should go is that you use an expert's

8    deposition testimony the same way you use any other witness'

9    testimony, which means you bring it in to impeach them and not

10   use it as part of your affirmative case or affirmatively as the

11   basis for your cross-examination.  Like I said, if you want to

12   try to point me to some authority that is to the contrary, I'm

13   happy for you to consider that.  But as of now, that is my

14   ruling.

15       MR. STEKLOFF:  And I understand your ruling and don't

16   need to go look for authority, I think with the witnesses --

17   I'm fine using it, if necessary, as impeachment if they don't

18   agree to it.

19       THE COURT:  And on the issue of impeachment, I always

20   assume that lawyers know how to use prior deposition testimony

21   for impeachment purposes, and 90 percent of the time I find

22   myself having -- in the middle of trial having to teach the

23   lawyers how to use prior deposition testimony for impeachment

24   purposes, to my surprise.

25       So if you wish to impeach a witness with deposition

1    testimony, whether it is an expert or some other witness, you

2    have to have a transcript of the deposition ready to hand up to

3    me.  You do not immediately start asking them questions about

4    their deposition testimony or the content of their deposition

5    testimony.

6        You simply say, "Your Honor, I would like permission to

7    read pages 17, line 6 through 18, line 10," and then pause.

8    You give it to me.  Give me the deposition testimony.  I look

9    at it.  Opposing counsel has an opportunity to object or to

10   request that for completeness in addition you read page 27,

11   line 32 through 36.

12       And then I will rule on whether you can read the proposed

13   deposition testimony and whether you must also read for

14   completeness the deposition testimony that the opposing side

15   has identified.  Then you can read it, and then if you want --

16   although most good lawyers don't -- if you want, you can ask

17   further questions of the witness about whether their prior --

18   how their prior deposition testimony squares with their current

19   testimony.

20       But in any event, that is the process for impeaching

21   witnesses with prior deposition testimony.

22           MS. MOORE:  Thank you.  Your Honor, understood.

23           MR. STEKLOFF:  While we are on the subject, just for

24   20 seconds, what is your rule during trial about contact with

25   expert witnesses in the middle of testimony, either once they

RITZ - DIRECT / WAGSTAFF

```
 1  have been passed for cross or before or after?
 2          THE COURT:  If you-all have sort of a stipulation
 3  about that, about how -- not a stipulation but agreement about
 4  how that should go, that's fine.  Otherwise, I'm happy to hear
 5  discussion of it.
 6          MR. STEKLOFF:  Okay.
 7          MS. MOORE:  We have not discussed it, Your Honor.
 8          THE COURT:  Okay.
 9          MS. WAGSTAFF:  Thank you, Your Honor.
10          THE COURT:  Okay.  Are we ready to call the jury back
11  in?
12          MS. WAGSTAFF:  We have just agreed on an objection,
13  you will be happy to know.  Let me just let my tech person know
14  something I want to redact.  If you can just indulge me for
15  just a second.
16          THE COURT:  Okay.  How long will that take?  Can we
17  start bringing the jury in?
18          MS. WAGSTAFF:  Yes.
19      (Proceedings were heard in the presence of the jury:)
20          THE COURT:  Welcome back.  You can resume with
21  Dr. Ritz.
22  BY MS. WAGSTAFF
23  Q.  Good afternoon, Dr. Ritz.
24  A.  Good afternoon.
25  Q.  I hope you had some time to get some food.
```

1        So we spent the morning with you -- do you need any water?

2   A.   It's fine.

3   Q.   Okay.  We spent the morning with you going over your

4   qualifications and talking about your journal publications and

5   sort of describing what a medical literature is.  So before we

6   get into the nuts and bolts of your actual decision, I would

7   like to say prior to coming to trial today, explain to the

8   jury -- ladies and gentlemen of the jury, what you reviewed in

9   forming your opinion in this case.

10  A.   Right.  So I did what I usually do.  When I have to form

11  an opinion, I go to the literature.  I read what is there.

12  Peer-reviewed literature, the papers that we will talk about,

13  but I usually also go a little broader than the epidemiology

14  literature, which is where I'm the expert.

15       I also like to read something about animal studies because

16  I'm a medical doctor.  I'm a scientist.  I work with people who

17  do animal studies, so I want to know what our little furry

18  friends tell us, right, because we test on them a lot of

19  things; and I also try to form an opinion whether there is a

20  biological way that actually all of this could happen.  And

21  that's what we call mechanistic data or toxicologic data; that

22  is it actually possible, is there enough getting into the body,

23  what is the body doing with the chemical, where does it end up,

24  what organ does it damage.  So I have done all of that.

25       And then, of course, I also read the reports by the EPA,

**RITZ - DIRECT / WAGSTAFF**

1   the Environmental Protection Agency.  I read the reports by the

2   International Agency on Research of Cancer and all of those

3   also formed opinions, but really my -- my -- I have to say I

4   like to form my own opinion.  So I really have to go and make

5   myself comfortable with what is out there to form that opinion,

6   and that's what I did.  I did everything so I'm comfortable

7   with my opinion as a scientist.

8   **Q.**  All right.  I didn't mean to cut you off.

9   **A.**  Sorry.

10  **Q.**  So based on your review of the epidemiological literature,

11  the animal literature and the cell data studies and your

12  experience in education as an environmental epidemiologist,

13  have you formed an opinion within a reasonable degree of

14  medical certainty whether or not Roundup is capable of causing

15  NHL?

16  **A.**  Yes, I do.

17  **Q.**  And what -- can you tell the ladies and gentlemen of the

18  jury what opinion it is that you hold?

19  **A.**  Well, I absolutely think that Roundup is capable of

20  causing NHL in humans in the way it has been used.

21  **Q.**  All right.  Excellent.

22      So now, I would like to get actually to the nuts and bolts

23  of your opinion.  So please tell the ladies and gentlemen of

24  the jury what a risk factor is.

25  **A.**  So a risk factor --

**RITZ - DIRECT / WAGSTAFF**

1  **Q.**   Risk ratio, sorry.

2  **A.**   Risk ratio, good.

3        These risk ratios, you will see a lot of, and my students

4  hate them too.  But they are making our lives easier because

5  once you understand what they are saying, it is actually -- it

6  gives you a very good idea of what is going on in a study, and

7  it is what I tried to explain this morning, where you have the

8  group of people that was exposed to something, and then you are

9  seeing who comes down with cancer and what is the number among

10 everybody exposed, how many come down with a cancer?  That is a

11 ratio, but not yet a risk ratio.  That is a risk -- a ratio

12 measure.

13       Let's say ten out of a thousand workers come down with

14 that disease, and then you have another thousand workers you

15 also look at, and they have not been exposed to this chemical.

16 And among them you count five, right, five cases.  So you have

17 ten over a thousand, and then divided by five over a thousand.

18 So that's ten over five, gives you two.  That is a risk ratio.

19 Basically that's all we do.

20       In studies where it is an odds ratio, it is a little more

21 complicated because we are starting with cases and then we are

22 starting with non-cases, and then we look how much exposure was

23 the cases and how much exposure was there non-cases and was

24 there more exposure; but it is the same kind of ratio.

25       So in the end, these ratios tell us, yes, the cases were

1  more exposed than the non-cases, or among the non-exposed --

2  among the exposed, there is more cancer than in the exposed.

3  Since it is a ratio measure, you can tell 10 over 5 is 2.

4  That's bigger than one.  If the number of cases will be the

5  same, you would get 10 over 10.  That's a 1.

6       So when we talk about null effects, it is actually not

7  null because it is a ratio.  It has to be 1.  So we are always

8  very concerned about that number being greater than 1 because

9  it indicates there are more cases in the exposed than the

10 unexposed.  Okay.

11      If that ratio measure goes below 1, do you now have an

12 intuition of what happens?  What happens is you have less

13 people among the exposed than the unexposed; right?  That is

14 the only way how that ratio can go below 1.

15      That means what you are giving these people is actually

16 helpful.  It protects them from cancer because the ones who

17 didn't get it have more.  So when we see an estimate -- we call

18 it an estimate -- fall below 1, then we think it is protected.

19 So if we have a toxin we are evaluating, then we have to be

20 worried about is that really true?  Can that be, that a toxin

21 prevents cancer; right?

22      And that's constantly the kind of question that you have

23 to carry around when you see all these estimates, these ratios

24 above 1.  Then all of them tell you, okay, there is a greater

25 risk.  If they all kind of fall around the 1, then maybe there

1    is a random fluctuation, but generally that is no effect;

2    right?  But if they all fall or most of them fall below the 1,

3    then there is protection.

4        If you really don't think that agent can protect you,

5    something must be wrong with what you are doing.  Maybe you

6    have been miscoding; right?  That is the first thing I ask my

7    students.  Did you code this right?  Did you reverse the

8    exposure, the coding for exposure that you call the

9    exposed/unexposed, and the other way around?  It happens.

10   Believe me it happens.  This is how we evaluate in these

11   scientific studies what causes cancer, what causes disease,

12   underexposure compared to not being exposed.

13   **Q.**   All right.  And is there a significant risk ratio?

14   **A.**   Yeah.  There is a principle in statistical science that is

15   called significance testing or significance of an estimate.  So

16   these risk ratios I just described, they are called estimates.

17   And as I told you, you can have all these estimates on one

18   side, on the other side; right?  You can also have them

19   fluctuate around the null, which is one.  And when they start

20   fluctuating around, that gives you a hint, hmm, one study is

21   above; one is below.  What is wrong?

22       And what often is wrong is the study was so small that

23   adding one case or subtracting another from one of the other

24   group makes these ratios flip.

25       So in essence significance helps us evaluate how much

 1   random fluctuation is there between -- when I come up with

 2   these estimates.  When I calculate this ratio, how much would

 3   there be randomness that generated this one estimate, and how

 4   certain can I be that that estimate is really what -- what I

 5   should take for the truth, or maybe that estimate should be

 6   closer to the 1 or further away from the 1.  But it is random

 7   because, you know, something happened that I didn't find one

 8   case.  Something happened that somebody miscoded an exposure.

 9   And these things happen.  We are all human.  We are all doing

10   real-world studies in real human beings, so mistakes happen;

11   right?  Random mistakes is what we are trying to guard

12   ourselves against by saying absolutely.  This is a 20 percent

13   or a twofold risk increase.  No.  We are putting these bounds

14   around it and saying in this range the estimate must be.

15   Q.   Okay.  And is statistical significance the only way to

16   consider whether or not chance played a role in the risk ratio?

17   A.   Actually, it is absolutely not the only way; and it is

18   probably the worst way you can look at it because the

19   statistical significance testing just asks you does -- can

20   chance be completely eliminated or not, according to the rule

21   that I set up, which is usually a 5 percent of the testing

22   rule, and that's an arbitrary rule.

23        And it is also a rule that may or may not help you because

24   you are not trying to make a decision whether there is a yes/no

25   answer in one study.  What you are trying to figure out is what

1    is the information in my study telling me overall.  So -- and

2    there is a lot more information and data that significance

3    testing would ever allow you to use.  So I like to tell my

4    students we need to use all the information we have.

5    Significance testing is out.  We are looking at all of the

6    data.  We are looking at what is called a confidence interval.

7          So that confidence interval --

8    Q.   Let me stop you right there because I would like you to

9    turn to page -- binder 892, which -- I should have a binder for

10   you.

11   A.   892?

12   Q.   Can you please tell us -- it is double sided.  It is two

13   pages.  If you can please tell us what this is and whether or

14   not it would be helpful in explaining your opinion on

15   confidence intervals to the jury.

16          THE COURT:  Here it is.  It is out of order.

17          MS. WAGSTAFF:  It is out of order.

18          THE COURT:  It is after 903.

19   A.   Which one are we looking at?

20   BY MS. WAGSTAFF

21   Q.   892.  If you can please tell the Court what those --

22   A.   These?

23   Q.   Yeah, just what those are.  And if it would be helpful for

24   you to show those to the jury to explain your opinion.

25   A.   Yes.  This is just a visual representation of what I just

**RITZ - DIRECT / WAGSTAFF**

 1  waved my hands --

 2          **THE COURT:**  I think Ms. Wagstaff will publish that to

 3  the jury, so --

 4          **THE WITNESS:**  Yes.

 5          **THE COURT:**  -- you don't need to hold that up to them.

 6  You can just describe it.

 7          **THE WITNESS:**  Okay.

 8          **MS. WAGSTAFF:**  Permission to publish, Your Honor.

 9          **MS. MATTHEWS:**  No objection.

10          **THE COURT:**  All right.  Go ahead.

11  **BY MS. WAGSTAFF**

12  **Q.**  Let's start with the first page -- who is controlling

13  this -- thank you.

14  **A.**  So this is a simple graphic.  You see my red line is what

15  we call a null effect, the 1; right?  The number of cases in

16  the exposed is exactly the same as the number of cases in the

17  unexposed, and this shows 1.  That is the one line.

18          And then you conduct a study and you find well, my

19  relative risk is actually 1.5.  You say 1.5 is above 1, so

20  there is a 50 percent increase in cases.  So instead of 10 in

21  the unexposed, I have 15 in the exposed.  That's how I get my

22  1.5.  15 divided by 10; right?  I get the 1.5.  Okay.  I know

23  now there is a 50 percent increase in cancer risk.

24          Well, not so fast because we also know that a small study

25  might find this 15 over 10; but if I had had a bigger study,

1   and I could have looked at 150 exposed over -- or found 150

2   exposed cases over 100 unexposed, then actually I would be more

3   certain that there is a 50 percent increase.  And if I had

4   1,500 and a thousand, I would be even more certain.

5        So with every increase in my numbers of exposed cases over

6   unexposed, my confidence increases that I have the right

7   estimate, right; that it is not just one case that flip-flopped

8   where I made a mistake, where somebody entered the wrong data.

9   So in order for us to visualize what my data came from, that

10   1.5, whether it is 15 over 10 or 1,500 over a thousand, right,

11   we are putting these confidence intervals around the 1 --

12   around the estimate.

13        So this represents how much information we have in the

14   study to rule out random error and nothing else, only random

15   error.  Making a mistake randomly, not systematically.

16   Randomly.

17        So what it shows is that most of my information tells me

18   it should be a 1.5, but you see that this little bell curve

19   there -- that is the density of information, how much

20   information I have -- it goes -- that lower ends goes across

21   the 1.  So there is a slight chance that actually the true

22   estimate -- if I would repeat the study over and over again --

23   would be below 1; but there is only a 2.5 percent chance that

24   that would ever happen, okay.

25        However, if I asked my students is this a statistically

1  significant result, well, in 97.5 percent of the time if I

2  repeated this, I would get an estimate above 1, but in

3  2.5 percent of the time I wouldn't.  So statistically speaking

4  it is not significant although most of the information tells me

5  there should be an effect, but my study wasn't big enough.

6  Sorry.

7       So according to the rules of statistical significance

8  testing, I'm not allowed to say it is statistically

9  significant.  That doesn't mean it is not medically

10 significant.  It is significant in any other ways.  It is just

11 not statistically significant according to those rules.

12      So what represents what I said much better are these

13 whiskers.  You have the dot in the middle, and you have the

14 whiskers, and you can see how far these whiskers go out and

15 whether they cross the red line.  And if they cross the red

16 line, you now know it is not statistically significant; but it

17 doesn't mean there is no effect.  That's all.

18 **Q.**   All right.  Have you taught this concept of using

19 confidence intervals to help you rule out chance to your

20 students at UCLA?

21 **A.**   Absolutely.

22 **Q.**   If you can turn to binder Number 908 -- and I -- is this

23 a -- is this a chart that came out of peer-reviewed literature?

24 **A.**   The chart -- the chart -- I made up the slide, but the

25 chart on it comes from the peer-reviewed literature, yes.

1    **Q.**    Okay.  And the -- if you will turn to page -- to binder

2    Number 912, which is the Stang article?

3    **A.**    Right.

4    **Q.**    Is this is the article where this chart came from?

5    **A.**    Yes.

6    **Q.**    Is this an accurate representation of that article in this

7    chart?

8    **A.**    Yes.

9    **Q.**    And will using this chart help you explain your opinion to

10   the jury?

11   **A.**    Yes.

12          **MS. WAGSTAFF:**  Permission to publish to the jury.

13          **MS. MATTHEWS:**  No objection.

14   **BY MS. WAGSTAFF**

15   **Q.**    If I could ask, will it help for you to come down and

16   write on this board?

17   **A.**    Probably, yeah.

18          **MS. WAGSTAFF:**  Permission, Your Honor.

19          **THE COURT:**  Yes.

20       Dr. Ritz, make sure to speak up because the court reporter

21   needs to get your voice.

22          **THE WITNESS:**  So this is actually a slide I have used

23   in my classroom a few weeks ago.  I really apologize to you

24   that I spring this on you without all the other stuff that

25   comes before.

1          When I show it to my students, it is a slide show so this

2     doesn't appear yet.  All they see is this side of the slide,

3     and the title which says "The Ongoing Tyranny of Statistical

4     Significance Testing in Biomedical Research," and it is

5     published by colleagues that I know quite well including

6     Charlie Poole, who is a very well-respected methodologist and

7     has been writing about this his whole career.

8          So what they are trying to say is we should not just use

9     one tool.  When we have a nail, you know, we need a hammer, but

10    we can also -- there are many kinds of hammers and many kinds

11    of tools, and statistical significance testing is just one who

12    wants to encourage students to do more, right, to be better, to

13    involve all the information that we can gain into their

14    decision-making.

15         So if I -- when I show this to my students, I show them

16    this slide first and you see here it says -- my line isn't in

17    red, but that should be the red line; right?  Then we have this

18    dot.  That is my point estimate.  It says incidence break

19    ratio.  It is a ratio measure.  It is twofold, meaning we had

20    10 over 5 subjects in the exposed over the unexposed that came

21    down with the disease.  That's what that says.  I have my 2

22    here.

23         Then I have told you we have a confidence interval.  How

24    confident am I that this is a twofold increase and not just

25    random because, you know, I miscounted, make mistakes,

1   whatever.  So here is my confidence interval.  It goes from .9

2   to 4.2.  That is pretty wide; right?  And that's reflected in

3   here.  And most important for the people who love statistical

4   significance testing, it crosses the magic line of 1.

5       It doesn't cross it too much.  It ends up here, given that

6   it could go all the way to null; right?  But it goes from .9 to

7   4.2.  And I could say, Well, it might be a twofold risk

8   increase, but there is uncertainty.  There is random error, and

9   I can truly not tell whether that study should be taken

10  serious; right?  Maybe it was just too small and too much

11  random error.  They didn't measure well enough.  That is

12  another way of getting random error.  They didn't measure

13  right.  They didn't measure the exposure right or the disease

14  right and everything.  So there was a mistake.

15      I would stay at this and then say -- in most studies when

16  I write papers, I would say, This is an indication that

17  possibly something is wrong, but now I have to achieve --

18  actually go to work.  I need a larger study or I need other

19  studies to convince myself there is something; I'm not right.

20  Then I'm showing this.

21      This says prior studies.  I didn't have to go out there

22  and do more studies.  All I had to do was actually read the

23  literature, which I tell my students before you say, I'm going

24  to go get something for the next study, go and read the

25  literature.

1      So this person now read the literature and found studies

2   that actually assessed the same association, pesticides and

3   NHL, smoking and lung cancer, whatever it is; right?  And these

4   are all the prior studies, and they came up with different

5   estimates.  Not one of them really came up with exactly the

6   same point estimate.

7      So their risk ratio is from this largest one, probably 3.2

8   to down there, very close to 1; right?  And if you had only

9   done this study, I would have said there is nothing.  If you

10  had only done this study, everybody would have agreed this is

11  statistically significant because this is above 1.  This is a

12  big effect.  It is almost fourfold; right?  Haha, there is

13  something there.

14     Do you see now how you have to put things in context?  You

15  now have one, two, three, four, five, six, seven, eight, nine

16  studies; and then you have your little study here with the 2.

17  And now you are doing something in your head already that

18  people, scientists, have to do.  They have to go beyond what

19  they can do themselves and put it in the context of the

20  literature and what we already know.

21     And when I show this to my student and say, Do you believe

22  this twofold now more or less?  I think all these dots are

23  above 1.  There are some studies that don't have enough

24  information to say it is statistically significant.  It is this

25  study, this study, this study.  These do, but then overall,

1  look at the pattern; right?  It is all above 1.

2      So, overall, if I were to put all of this information

3  together -- and that's what we call a meta-analysis or a pooled

4  analysis -- I pool all the information of these studies -- and

5  then I probably would get a nice estimate somewhere in between

6  all of these, and that estimate would be fairly close to 2, and

7  that prior knowledge -- we call this prior knowledge from what

8  has already been done in the literature, et cetera -- would

9  then give me a idea of how to interpret this estimate.  And I

10  would not go and say, Oh, you know, we see something but there

11  is probably nothing because it is not statistically

12  significant.

13      No.  I would say, My little study here confirms what other

14  studies have shown, and actually adds to the amount of

15  information we now have out there, right?

16      We now have a lot more information than any one of these

17  studies could have given me.  I would not have been certain

18  with this study or with this study or with this study.  What we

19  do is we put them all together and say in the context of all of

20  what we have done, Do I believe that estimate is above 1 and it

21  is not just chance that did it.

22  BY MS. WAGSTAFF

23  Q.  Thank you.  You can have a seat.

24      Dr. Ritz, can you explain to the ladies and gentlemen of

25  the jury, please, a difference between a never-ever analysis

 1   and a dose response analysis, to include the strengths and

 2   weaknesses of both, please?

 3   **A.**    Right.  So when I do my exposure assessment, which is

 4   what -- you know, the most important part of my work, we want

 5   to know not only have you ever used this agent, but we want to

 6   know when have you used it, how much have you used it, for how

 7   many years have you used it, how have you used it, did you

 8   protect yourself while you have been using it, did you spill

 9   the stuff on you, were you given bathroom access like the

10   workers in the Central Valley to wash the stuff off if you

11   spilled it?  What happened; right?

12        And all of that information then goes into how much I

13   think that person actually got exposed.  And if you don't do

14   that, you would be doing something like you ask a smoker, Are

15   you a smoker?  And he says, Yes and that's it.  He is a smoker.

16        But you could also say, Well, how many cigarettes have you

17   ever smoked?  And the answer could be, You know, when I went

18   into the military, I tried it for a month, and, you know, it

19   didn't become me and then I stopped.  But the question, Have

20   you ever smoked, would have been yes.  So you classify somebody

21   who smoked -- tried smoking for a month as a smoker.

22        And then you have your neighbor who you have seen smoking

23   every single day on the balcony.

24             **THE COURT:**  Dr. Ritz, there is an objection.

25             **MS. MATTHEWS:**  Objection based on prior rules.

1              **THE COURT:**  Overruled.

2              **THE WITNESS:**  So you have your neighbor and you ask

3    him the same question, Have you ever smoked?  And he said,

4    Yeah, and you leave it at that and you call him a smoker.

5         Then you ask yet another person whether or not they ever

6    smoked.  You would not know whether that person has stopped

7    smoking when they were pregnant, smoked maybe one cigarette a

8    day, or tried to keep it within five cigarettes a day, or has

9    actually a three-pack habit that he sustained for 40 years;

10   right?  It is that simple.

11        So when you say never-ever, you are saying a smoker is a

12   smoker is a smoker no matter what they answer to how much, how

13   often, how long have you done this.  So dose response

14   actually -- my colleagues who do -- who did the early smoking

15   studies were really smarter the way they did it.  They asked

16   all these questions.

17        They didn't just say, Well, are you a smoker or not?  They

18   asked all the questions I just told you.  And then they said,

19   How can we summarize this?  And they came up with something

20   called "pack years."

21        So they asked people, How many packs a day do you smoke?

22   And then, How many years have you smoked?  And then they

23   multiply that and you get a pack year.  So you have a lifetime

24   pack year exposure, and then they look at, Okay.  If I have 5

25   pack years, 10 pack years, 20 pack years, 40 pack years, what

1    is the risk of lung cancer?

2         And the general rule is that if you see that the risk

3    increases with dose -- and what I just told you, the pack years

4    are considered a dose -- then you believe that there is

5    probably a higher chance that what you are seeing is not

6    random, is not just, you know, some mistake, because with dose

7    comes the poison; right?  The more you get, the more -- the

8    higher your risk is that you actually come down with the

9    disease.  And that's what we call a dose response.  And

10   whenever we can, we actually do that.

11        Whenever we have the information, we are trying to tease

12   out what is the dose.  And when we can't do that, we at least

13   are trying to figure out who is the most highly exposed, and

14   who is just an occasional user who maybe I should call

15   unexposed or treat like the people who never touched a

16   cigarette, right, because they are closer to them than to the

17   people who used a lot.

18   **BY MS. WAGSTAFF**

19   **Q.**   All right.  Thank you.

20        If you can turn to Exhibit Tab 904, please, in your

21   binder.  Tell me when you are there.

22   **A.**   Yes.

23   **Q.**   Dr. Ritz, did you participate in making this chart?

24   **A.**   Yes.

25   **Q.**   All right.  Dr. Ritz, is this a chart that summarizes some

1  of the epidemiological literature that you reviewed in forming

2  your opinion in this case?

3  **A.**   Yes, it does.

4  **Q.**   Dr. Ritz, would it be helpful for you to show the jury

5  this demonstrative in expressing your opinion to them?

6  **A.**   Yes.

7           **MS. WAGSTAFF:**   Permission to publish.

8           **MS. MATTHEWS:**   No objection.

9           **THE COURT:**   Go ahead.

10          **MS. WAGSTAFF:**   I actually have a demonstrative,

11  Your Honor.   May I publish the demonstrative?

12          **THE COURT:**   Of course.   You mean it is the replication

13  of this?

14          **MS. WAGSTAFF:**   It is a complete replication.   However,

15  I'm going to write on this one.

16  **BY MS. WAGSTAFF**

17  **Q.**   Dr. Ritz, could you please explain to the ladies and

18  gentlemen of the jury the categories of -- just orient them to

19  this chart to include what the names in parentheses are, what

20  the type means, the size and the exposed cases, if you can

21  orient them, please.

22  **A.**   Yes.   So this is a complicated chart that will give us a

23  little bit of an inside overview of the human data from what we

24  call the epidemiologic studies -- so those are the studies that

25  I do -- have provided to us.   And under study you see where the

1    study was done, like in Sweden or in Canada; who conducted the

2    study.  That is in brackets.  You see *Hardell* et al.  That is

3    the name of the first author, and the et al. tells you there is

4    more than one author.  You know, there is usually a list.  And

5    then the year the study was published.

6         Then under Type you see what kind of study design we call

7    that was used, and there are mainly two study designs.  One is

8    where it start from the cases, and I select non-cases from the

9    population; and I ask them all these questions about exposure.

10   So we are going from somebody who is diagnosed backwards in

11   time asking about exposures, and we are doing that also for

12   people who didn't get the disease; and then we compare what the

13   exposures were in those who did and didn't get the disease in

14   order to find that bad actor, right, whatever gave up group of

15   people, that group of people who became cases, the disease.  So

16   that is called a case control study, and that's what is listed

17   mostly on there.

18        And we also call them population based.  That means they

19   are -- every case that occurred in a whole geographic area.

20   So, for example, in all of Sweden or in providences of Sweden

21   or in Canada.  And then the size -- under Size you see the

22   number of cases they identified.  So in this case, it would all

23   be NHL cases; right?

24        And then under -- the next number refers to the controls.

25   So we have control subjects meaning the people who did not get

1    the disease.

2         And then we have Findings and you see nothing.  There is

3    nothing there yet.  So we will walk you through what the

4    findings are.

5         And what is also important in all of these studies is not

6    only how many cases do we have, but how many exposed cases do

7    we have; so how many people actually had the exposure that we

8    are interested in identifying, in this case glyphosate or

9    glyphosate-based compounds.

10   **Q.**   All right.  And I think you mentioned that this table of

11   literature refers to epidemiological literature that has

12   Roundup and non-Hodgkin's lymphoma; is that right?

13   **A.**   Right.

14   **Q.**   All right.

15   **A.**   Uh-huh.

16   **Q.**   So I probably should have put this on there, but let's

17   just make that clear.

18        Okay.  So let's just walk through each of these briefly.

19   If you could turn to Binder Number 443.

20        And, Mr. Wolfe, if you could pull up the Hardell 1993,

21   443, please.

22        And, Dr. Ritz, if you could tell the jury, please give a

23   little bit of context and background about the Hardell case.

24   **A.**   Right.  So here we have that Swedish study by two authors,

25   Lennart Hardell and Mikael Eriksson, who used the resources of

1   the Swedish Public Health System, which includes a Cancer

2   Registry, to identify cases of non-Hodgkin's lymphoma in

3   Northern Sweden.

4        And Northern Sweden is very woodsy and they are using in

5   forestry and in agriculture herbicides, and one of the

6   herbicides was a Roundup-like product.

7        And what they did is they identified all of these

8   non-Hodgkin's lymphomas.  As soon as they're diagnosed, they

9   get into that registry, and that's like the California Cancer

10  Registry, only the Swedes had it for longer.

11       And so for a certain amount of years in the end '80s,

12  early '90s, he identified these 400 cases; and then since in

13  Sweden they also have a population register, meaning every

14  resident is registered in the system, they can randomly select

15  from that registry noncases of the same age, the same sex, who

16  live in the same province, and that's what they did.

17       And then they went out and asked them all these questions

18  about:  Who are you?  What have you done in your life?  You

19  know, what kind of jobs did you have?  What kind of chemicals

20  did you use?

21       And this is -- Northern Sweden is very rural.  If you know

22  Sweden, the major cities it's Stockholm and then in the south,

23  so this is really rural Sweden.

24  **Q.**   Okay.  And, Mr. Wolfe, if you could pull up Table 1 and

25  please highlight the row related to glyphosate.

1        And, Dr. Ritz, just to confirm, you relied on all of these

2    studies in forming your opinion; correct?

3    **A.**    Yes.

4    **Q.**    Okay.  So let's just go through the findings.  And if you

5    could please just tell me the risk ratio and the confidence

6    interval, please.

7    **A.**    So here we have a table that looks at the herbicide use,

8    the insecticide, and fungicide use, but for us of interest it's

9    glyphosate.  So we can highlight glyphosate and we get the

10   number of exposed cases and controls, and we get -- and then,

11   you know, we go through our mass here and we get our

12   odds ratio/risk ratio of 2.3.  So that's like that ratio

13   measure that gives you 2.3.

14       But as I told you, don't take that at face value.  You

15   want to know more.  You want to know these whiskers; right?

16   How wide are they?  Is this just random?  Especially since it's

17   only four exposed cases.

18       So your intuition probably tells you it should be wide,

19   you're right.  It's wide.  It's .42 -- and now I can't read it.

20   9.9?

21   **Q.**    .4 to what?

22   **A.**    I think it's 9.9, but I can't read it really well.  Let me

23   go to this.

24       (Witness examines document.)  Oh, boy.  It's as bad in

25   here.  I think it's 9.9.

1   Q.   Okay.  We'll put 9.9 question mark.

2        All right.  And the jury heard a little bit about adjusted

3   and unadjusted risk factors in the opening statements.

4   A.   Right.

5   Q.   And so I'd like you to please explain if these numbers --

6   if this 2.3 risk ratio was adjusted or unadjusted and what that

7   means, and then I'll ask you to tell the significance of that

8   on your opinion.

9   A.   Yes.  So so far all we have done is worry about random

10  error, but there's something that actually is just as bad and

11  that's called systematic error.  So -- and it is what the word

12  says.  It has a system to it, meaning it draws that estimate to

13  one or the other side.  It's systematically overestimating or

14  underestimating.

15       And the way that works is it generates a bias, and we have

16  factors that may generate these biases and we need to concern

17  ourselves with this bias.

18       This morning I told you we can't go back in time.

19  Instead, what we're doing is trying to find a group of people

20  who is as similar to the people who are exposed except for the

21  exposure.  Right?

22       But we have to check whether that's actually the case or

23  were they actually dissimilar in terms of other things.

24  "Dissimilar" meaning are they all older than the people who

25  were exposed?  Am I comparing women to men?  And there might be

1    a difference in disease risk in women and men.  Are they of

2    different races, of different ethnicities and, therefore, they

3    have a different chance of getting sick?  Right?  Or have they

4    done different jobs that also expose them to something else?

5        So what we're most worried about are usually these

6    factors, like, sex and race and ethnicity; and in Sweden they

7    didn't have to worry about ethnicity.  In the northern Swedish

8    parts, they are all pretty white so they didn't worry about

9    that; but they definitely matched, which means made the

10   comparison group as similar as they could in terms of sex and

11   age.

12       So that is actually adjusted for.  "Adjustment" means

13   nothing but making similar and making sure that the comparison

14   group is actually similar to the group that you want to say

15   something about, which are the people who have the exposure.

16   Right?

17       So that estimate we call unadjusted but only unadjusted

18   for having used a different type of pesticide.  Okay?  They are

19   adjusted for other risk factors, such as sex and age.  But

20   let's call it unadjusted.

21   **Q.**   Okay.  And, Dr. Ritz, I had my tech guy pull up the

22   cleaner copy of this, and would you agree or would you have any

23   reason to disagree that the outer boundaries are 13?

24           **MS. MATTHEWS JOHNSON:**  Objection.

25           **THE COURT:**  Sustained.

1          **MS. WAGSTAFF:**  Okay.  All right.

2   **Q.**   Well, we'll just leave your 9.9 then.

3   **A.**   I didn't bring my glasses.

4   **Q.**   Okay.  So you said this was unadjusted.  Is this the

5   only --

6          **THE COURT:**  So you can disregard that prior question

7   because I sustained the objection, Dr. Ritz.

8   **BY MS. WAGSTAFF:**

9   **Q.**   Yeah.  Right.  That means -- okay.

10  **A.**   (Witness examines document.)  Yeah, I can't see it.

11  **Q.**   Okay.

12         **THE COURT:**  That's okay.  I sustained the objection so

13  you can disregard the question.  Wait for the next one.

14         **THE WITNESS:**  Yes.  Okay.

15  **BY MS. WAGSTAFF:**

16  **Q.**   So is this the only data that you were able to pull out of

17  the Hardell 1999 study?

18  **A.**   No.  Actually they did go ahead and said:  Well, you know,

19  we don't have many exposed -- glyphosate-exposed cases and they

20  did that also for other pesticides but, you know, since people

21  are using multiple pesticides, and in 1999 when this was

22  published we aren't really sure which pesticide might be

23  causing the cancer so we should probably make sure that the

24  un -- what we call unexposed group is really comparable also

25  with respect to having not other types of exposure.

1       So the people you call exposed to glyphosate and compare

2  them to those not exposed to glyphosate, could it be that

3  everybody who was not exposed to glyphosate is actually using

4  2,4-D?  And if they are, could 2,4-D then have given them the

5  cancer?

6       And that would mean I wouldn't see anything; right?  I

7  wouldn't see an effect because I'm now comparing exposed to

8  exposed only it's two different pesticides; right?

9       And we're worried about that.  We're also worried about

10 something like, okay, I call these people exposed to glyphosate

11 but maybe they also were exposed to 2,4-D, and I compare them

12 to the unexposed and they were all really unexposed.  Neither

13 2,4-D nor glyphosate; right?

14      So my 2.3 risk ratio there tells me not just something

15 about glyphosate, it tells me something about glyphosate and

16 2,4-D because these people were co-exposed.  They had all the

17 exposures; right?  So I shouldn't be saying it's glyphosate.

18 It could be glyphosate and 2,4-D or 2,4-D.  I just can't say;

19 right?

20      So in order to come up with an opinion about that, I'm now

21 adjusting for other pesticides, meaning I'm generating a

22 statistical model where I put the information about whether or

23 not these people also used other pesticides into that model,

24 and that's what we are calling adjusting.  Okay?

25      And when they adjust it, and they tell you that in the

1    text on page 1357, they generated an odds ratio of 5.8 with a

2    confidence interval of .6 to 54.  You can see how our

3    confidence interval completely exploded; right?  It's much

4    wider now.  That's what we expect.  Unfortunately, that's what

5    happens.  The more factors you are trying to take into account

6    in your modeling, the more you are widening the possible random

7    error; the possibility that, you know, something went wrong and

8    estimates might be not as stable.  We call it not as stable.

9         But what you also see here, that adjusting for other

10   pesticides, that estimate went from 2.3 to 5.8.  That's an

11   element sixfold risk increase.  But I would not tell you to

12   take this study serious and say glyphosate will cause a sixfold

13   increase in NHL because of that large confidence interval and

14   the small number of cases they were able to use.

15   Q.   And, Dr. Ritz, what does this "NR" mean?

16   A.   That means that they didn't tell me in the text where they

17   told me what the odds ratio is how many cases were in that

18   analysis that were exposed, but I presume that they had all

19   four cases in there.

20   Q.   Okay.  And you just gave the jury a description of what a

21   confounder is and described how to adjust for a confounder.

22   A.   Right.

23   Q.   How do you know if something is a confounder that you

24   should adjust for?

25   A.   Right.  So at the very beginning of the game when we're

1    trying to figure out what is what and what causes cancer and

2    what doesn't -- so find the bad actor; right? -- unless you

3    think everything causes cancer -- we don't think that -- you

4    actually have a very hard time identifying whether or not you

5    should believe the estimate 2.3 or the estimate 5.8.

6        And the reason for that is that this systematic bias where

7    the estimate is drawn to one side or the other side of the

8    null, the 1, has rules to it, and the rules are that factor

9    that is a systematically biasing factor actually has to be a

10    risk factor for the outcome, has to be a risk factor for NHL.

11        If I don't know whether pesticides are a risk factor for

12    NHL, how would I know that?  Right?  So what we are doing is

13    playing these games putting adjusting and not adjusting and

14    saying, "Hmm, what's happening if I do?"  But honestly that's

15    playing a game.  What you really want to know is:  Is this

16    other pesticide a *bone fide* carcinogen?  Then I worry about it.

17        I know that age is a risk factor for the outcome.  I know

18    that when I look at lung cancer, smoking is a risk factor for

19    the outcome.  In a lung cancer study, I want to adjust for

20    smoking; right?  It's a risk factor for the outcome.

21        But here very little is known about these insecticides and

22    pesticides.  We are in 1999.  Not many studies have been done.

23    Almost none; right?  So we're just guessing.  We are guessing,

24    "Oh, maybe I should put 2,4-D in the model.  Oh, maybe I should

25    put Dicamba in the model.  Oh, maybe I should put creosote in

1    the model."  Right?

2        But we don't really know whether that's a good idea or not

3    because we have no determination that that agent that I'm also

4    throwing into my model should be thrown in because I may

5    actually generate bias instead of taking it out.

6        And so between the 2.3 and the 5.8, I don't know which is

7    the truth, I really don't, because we at this point in time of

8    Hardell, if it's not a risk factor for NHL, it should have been

9    kept out of the model.  That's what I know; right?

10   Q.   All right.  And is this the end of the Hardell story?

11   A.   No.  They actually realized that they did not have enough

12   data to say anything about most of the pesticides they were

13   interested in, though they said, "Well, let's do a little bit

14   of what I explained to you before, do a better job and do a

15   better -- a larger study."  So they were actually able to add

16   cases and also noncases, controls, into their study; and they

17   then published those results in 2002, I guess.  Right?  I lost

18   my --

19   Q.   And, Dr. Ritz, can I hand you this copy?  I just want to

20   go back to the previous study.  It's a more legible copy.

21       I can show counsel if you'd like to take a look at this.

22   I'm just going to show her a more legible copy.

23       You were saying that you had a hard time with the 9.9

24   so --

25   A.   Oh, yes.  Let me see.

RITZ - DIRECT / WAGSTAFF

1   **Q.**   -- the outer bound.

2   **A.**   It was actually 13.

3   **Q.**   13.  Okay.

4   **A.**   Yeah.

5   **Q.**   So maybe on a break I'll change that 9.9 to a 13.

6   **A.**   Yes.

7   **Q.**   I was starting to smudge it a bit.

8        All right.  So if you could publish, please, Mr. Wolfe,

9   the Hardell 2002, which is Binder Number 499; and if you could

10  pull up, Mr. Wolfe, Table 1, please.

11       And, Dr. Ritz, if you could explain the second part of

12  Hardell to the jury, please.

13  **A.**   So this is the same group of authors.  They were a little

14  disappointed that their study wasn't more informative.  They

15  added cases and they added controls, and by doing so they are

16  increasing their statistical power; right?  So they now have

17  more cases; and not only do they have more cases, but they also

18  have more exposed cases.  So they're pretty much in this case

19  doubling the number of exposed cases to eight.

20  **Q.**   Okay.  And let's talk about what the Hardell-2 found.  If

21  you could look at Table 1.

22       Yes, Mr. Wolfe, if you could highlight the glyphosate.

23       And please explain to the jury what the Hardell-2 found.

24  **A.**   So here we now have eight glyphosate-exposed cases.  That

25  risk ratio is 3.04.  So right between those two estimates I

1  showed you before, right between 2.3 and 5.8, and look the

2  magic.  I did what I said we need to do to make something

3  statistically significant; right?  It happened.  So our

4  confidence interval is now 1.08 to 8.52.

5  **Q.**  Okay.  And are these numbers adjusted or unadjusted for

6  other pesticides?

7  **A.**  They're not adjusted for other pesticides.

8  **Q.**  Okay.  And did Hardell-2 give us any other data?

9  **A.**  So the first thing I want to say here, this is a trick

10  where you would say -- where people who only use statistical

11  testing would say the first study is a null study, meaning

12  there's no significance in glyphosate causing NHL.  All we have

13  done is add cases and controls in the second study, and we get

14  exactly the same -- a similar effect size, 3 instead of 2.3 or

15  5.8; but because those whiskers shortened -- right? -- they

16  pulled in, they pulled across the 1, which is even more

17  important, they now can claim we have a statistically

18  significant result for glyphosate causing NHL.

19      I think both studies tell the same story.  It's just that

20  in the first study you couldn't completely rule out random

21  error.  Okay?

22  **Q.**  All right.  If you could pull up Table 7, please,

23  Mr. Wolfe.

24      And we're introducing yet another set of terms here, the

25  univariate and the multivariate.  Can you please explain to the

1  jury what those mean?

2  **A.**   So that's just a different term for saying I'm adjusting.

3  Univariate means I only have one pesticide in the model; multi,

4  multiple, I have multiple pesticides in the model.  So the

5  multivariate model actually throws then these other pesticides

6  that people may have been exposed to into the model.  So it's

7  an adjusted estimate.

8  **Q.**   All right.  And can you tell me what the adjusted numbers

9  were, please, for Hardell-2?

10  **A.**   They are 1.85 with a confidence interval of .55 to 6.2 and

11  that's adjusted.

12  **Q.**   Okay.  And was there another set of numbers from Hardell

13  or --

14  **A.**   No.  That's pretty much it.

15  **Q.**   Okay.

16  **A.**   So what happened here -- different from the first Hardell,

17  we're actually throwing in other pesticides -- increased my

18  estimate to 5.8.  Now throwing in other pesticides,

19  co-exposures to other pesticides reduced my estimate from 3 to

20  1.85.

21      However, when you look at the pattern of all the

22  estimates, it tells you there's an 85 percent to sixfold

23  increase in risk depending on what estimate you want to

24  believe.  However, you can see that the 1.85 now, the whiskers,

25  are broader again and they're crossing the 1.

**RITZ - DIRECT / WAGSTAFF**

1          So, again, our adjusted estimate has added random error.

2   It doesn't tell you about bias.  It just tells you there's more

3   random error.  And as I told you, that happens every time you

4   throw another variable into a model.  You're generating more

5   random error so these whiskers go out again.  And in this case

6   they crossed the 1; right?

7          So somebody who believes in statistical testing would say,

8   "Ha, you adjusted for other pesticides, you have a null result.

9   There's nothing there."

10         Well, if you look at the effect estimate, it's 1.85.

11  That's pretty impressive still.  That's 85 percent risk

12  increase.  And in the context of everything I know about this

13  study, that's not the same as saying the estimate is 1; right?

14  **Q.**   Okay.  Let's go back, then.  Let's skip back up to

15  McDuffie.

16         So is this the end of the Hardell story?

17  **A.**   Yes.

18  **Q.**   Okay.  So let's go back to McDuffie.

19         And, Mr. Wolfe, if you could please publish the McDuffie

20  study, which is Binder Number 447.  And if you could please

21  pull up Table 2.

22         **THE COURT:**  Before we go to McDuffie, I think maybe

23  this would be the time to take a five-minute afternoon break.

24         **MS. WAGSTAFF:**  Sure.

25         **THE WITNESS:**  Thank you.

1            THE COURT:  Why don't we break for about five minutes.

2   We'll resume at what is, according to that clock -- did it get

3   switched?  Did it get fixed?

4            THE CLERK:  Not yet.

5            THE COURT:  So five minutes to -- we'll resume at five

6   minutes to 2:00 --

7            MS. WAGSTAFF:  Great.

8            THE COURT:  -- which I think on your clock is --

9            MS. WAGSTAFF:  I'm not leaving.

10           THE COURT:  -- ten minutes to 2:00 or 2:00.  I can't

11  remember.  Ten minutes to 2:00.  No.  2:00.  We'll resume at

12  2:00 according to your phones, and we will get that clock fixed

13  by tomorrow.

14       (Proceedings were heard out of the presence of the jury:)

15           THE COURT:  I'm totally confused about what time it is

16  but, anyway, I'll see you in five minutes.

17           MS. WAGSTAFF:  Okay.  Thank you, Your Honor.

18           THE CLERK:  Court is in recess.

19                    (Recess taken at 1:51 p.m.)

20               (Proceedings resumed at 1:59 p.m.)

21       (Proceedings were heard in the presence of the jury:)

22           THE COURT:  Okay.  You can resume.

23  BY MS. WAGSTAFF:

24  Q.   All right.  Dr. Ritz, pursuant to my questions about --

25  oh, wow.  This is a little -- sorry for turning my back on you

 1   when I'm writing.  This is a little harder than I thought, but

 2   I was going to change the 9.9 --

 3           THE CLERK:  Hold on.  Stop.  Timeout.  We're missing

 4   somebody.

 5           THE COURT:  We're missing a juror.

 6           MS. WAGSTAFF:  Good catch.  I'll just keep erasing.

 7                   (Pause in proceedings.)

 8           THE COURT:  I'm pretty confident that was my fault.

 9   Sorry about that.

10       Okay.  You can resume.

11   BY MS. WAGSTAFF:

12   Q.   All right.  Dr. Ritz, prior to our break, I had showed you

13   a new copy or a cleaner copy of the Hardell, and you had

14   realized that it was actually 13 instead of 9.9.

15   A.   Correct.

16   Q.   So I did my best to erase that, and I'm going to fill it

17   in with 13.  And that was unadjusted; correct?

18   A.   (Nods head.)

19   Q.   Okay.  I just wanted to have accurate numbers on there.

20       All right.  So now if we could turn to the McDuffie study.

21   A.   Yeah.  So McDuffie, Helene.

22           MS. WAGSTAFF:  Can we publish that, please, Ms. Melen?

23           THE CLERK:  Yes.

24           MS. WAGSTAFF:  Mr. Wolfe?

25       All right.  And if we could pull up Table 2.

1  Q.   Okay.  Doctor, sorry.

2  A.   Yeah.  So this is a Canadian study, and it's conducted by

3  the Agricultural Medicine Center of Saskatchewan together with

4  the Canadian National Cancer Institute.  So these folks were

5  interested, as we are, in finding out whether in agriculture

6  the exposures such as pesticides that may be causing cancer.

7       So they do the same thing as our Swedish colleagues did.

8  They used the Canadian Cancer Registry, and they pull out --

9  how many?  I can't see it now -- 500 and -- no.  How many

10 cases?  515?  I don't have my slide up.

11 Q.   Dr. Ritz, this chart is Number 903 in your binder.  If you

12 want to pull that out so you can --

13 A.   Yes, that's good.

14 Q.   As you're flipping the cases, that may help.  If you just

15 unclip your binder and pull out 904.

16 A.   Oh, yes.

17      So in Canada we have now 517 cases assembled in the same

18 way as the Swedes did, but they have 1500 control subjects,

19 meaning people who don't have NHL.  So all 517 cases have NHL.

20      And they were drawn from actually six provinces in Canada,

21 and they were mostly agricultural provinces.  They didn't want

22 the big metropolitan centers, and most of these people turned

23 out to be -- almost half of them turned out to be farmers all

24 been living on farms.  So we have a heavily farming population

25 again just like in Sweden where we had Northern Sweden, which

**RITZ - DIRECT / WAGSTAFF**

1    was mostly farming.

2         And they also conducted what's called a population-based

3    study because not only could they find the cancer cases in the

4    registry, they could also then go to population registries in

5    Canada and identify people of the same age and the same

6    provinces, the same sex, and then approach them and say, "Would

7    you mind being part of a cancer study?"  That's how they do it.

8    And 1506 were enrolled and gave them that information.

9    **Q.**   Okay.  So there were two types of analyses done in

10   McDuffie; right?

11   **A.**   Uh-huh.

12   **Q.**   Okay.  Let's talk about the one that yielded 51

13   non-Hodgkin's lymphoma cases.  Can you tell us -- can you tell

14   the jury, please, the results from that study and what that

15   was?

16   **A.**   Right.  So we have Table Number 2 here and they are

17   showing us all of the results that they got for asking about

18   different herbicides, and one of the herbicides they asked

19   about was actually glyphosate and in brackets they say it's

20   Roundup, and there are 51 exposed subjects.  So many more than

21   we had in Sweden.  Meaning in Canada that use was much more

22   widespread.

23        And they compare it to the number of people -- the percent

24   of people among the controls, and you can see that their

25   relative risk odds ratio that you see under -- is it being

1   highlighted now? -- the A one and the B one is 1.26 and 1.2 and

2   we're using the 1.2 because that's the one that has more

3   adjustments.  Meaning the first one was just adjusted for age

4   and sex and province of residence, and then the second one they

5   also put a lot of medical risk factors and family risk factors

6   into the model.

7        So they're co-adjusting for family risk factors and

8   medical risk factors such as different viral infections,

9   et cetera, but they're not co-adjusting for pesticides.  Right?

10  They're just doing one pesticide at a time here.  That's why we

11  still call this unadjusted.

12       And in this case the estimate is 1.2, which tells us

13  20 percent increase of NHL among those who were exposed to

14  glyphosate.  And our whiskers, we draw them out in this

15  confidence interval, they go across the 1; right?  Not

16  statistically significant.  They go from .83 to 1.74.  So we

17  have something on the right side of the null, but we don't have

18  a significant result.

19  **Q.**    Okay.  And then McDuffie broke that 51 down into two

20  groups.

21  **A.**    Right.

22  **Q.**    And, Mr. Wolfe, if you could turn to Table 8.

23       And, Dr. Ritz, if you could explain to the jury what's

24  going on in Table 8 and the significance of the data?

25  **A.**    Right.  So we talked about dose-response before and

1   calling somebody who smoked for one month in his lifetime a

2   smoker or calling somebody who smoked for 40 years, three packs

3   a day, a smoker, and calling them the same, a smoker; right?

4   And maybe that's not the right thing to do.

5       So in this questionnaire data that they collected, they

6   did a similar thing.  They said, "Well, have you ever used

7   these pesticides?  Yes or no."  And then they went on and said,

8   "Well, if you have used it, how many hours a day have you used

9   it and how many days have you used it per year?"  And --

10          MS. MATTHEWS JOHNSON:  I apologize.  I just have one

11  objection for the record.  I'm not sure the witness said --

12          THE REPORTER:  I'm sorry.  I can't hear you,

13  Ms. Matthews Johnson.

14          MS. WAGSTAFF:  She said we talked about dose.

15          THE WITNESS:  Response.

16          MS. WAGSTAFF:  Yeah, response.

17          THE WITNESS:  Did I say --

18          THE COURT:  Overruled.

19  BY MS. WAGSTAFF:

20  Q.   Keep going.  Sorry.

21  A.   So basically what they're saying here is:  Well, we have

22  several categories of people in my study.  Some people who

23  clearly never touched glyphosate.  Let's call them unexposed.

24      But now we have a group of people who said, "Yeah, I used

25  glyphosate."  But when we then went and asked them how much did

1    you use; how many hours a day; you know, did you use multiple

2    days a year; then we actually have people who report, "Ah, I

3    used it for one day or maybe two days last summer, but never

4    again."  And then people who said, "Yeah, I used it three days

5    for the last 10 days -- years or 30 days for the last 10

6    years," and we are calling them all the same glyphosate

7    exposed.  That's that estimate 1.2, every glyphosate exposed.

8    Okay?

9         And so they're splitting it up and they're splitting it up

10   in a way where, you know, nobody knows.  With smoking we know,

11   okay, maybe five cigarettes a day starts being a problem.

12   Maybe one isn't.  But here we know nothing.

13        So we only have statistical tools, and they use a

14   statistical tool saying, "Well, let's have -- let's form

15   subgroups," but we need to still have people exposed in the

16   subgroups or else, you know, we can't estimate anything when

17   nobody's exposed, when nobody's in that group.

18        So what they did is they called people that said, "Yes, I

19   used, but used no more than one or two days per year," and

20   called them low exposed or whatever they called them, more than

21   zero and less than or equal to two days per year.  And then

22   they estimated just in that subgroup, and that was a subgroup

23   of 28 exposed NHL cases, and we have a 1.0 and the confidence

24   interval is .63 to 1.57.

25   Q.   1.57?

**RITZ - DIRECT / WAGSTAFF**

1    **A.**    Yes.

2    **Q.**    All right.

3    **A.**    Okay.  And so clearly in the group of people who have very

4    little exposure on that measure, meaning one or two days a

5    year, that's it.  There's no effect.  We are hitting the 1.

6    That's so unusual, we should send them a card.  I've rarely

7    ever seen that.  So it's 1.  No risk increase.

8         But now -- now look what happens when you're going to the

9    people who used it more than two days a year, which could be

10   anywhere between 3 days, 10 days, 100 days.

11   **Q.**    And so, Dr. Ritz, these two estimates for the one to two

12   days and over two days are also unadjusted for --

13   **A.**    For other pesticides, yes.

14   **Q.**    So I want to be clear on that.

15   **A.**    So we haven't done that.

16   **Q.**    All right.  So please give us the data for over two days a

17   year.

18   **A.**    That's a 2.12.

19   **Q.**    2.12.

20   **A.**    Right.  And the confidence interval is 1.20 to 3.73.

21   Still unadjusted for other pesticides, but it's adjusted for

22   what I told you, which is age, sex, province, and medical risk

23   factors.  That's already a lot.

24   **Q.**    All right.  And is this finding statistically significant?

25   **A.**    You guys would know now; right?  It is because the

 1   lower -- the lower number is above 1 --

 2   **Q.**   Okay.

 3   **A.**   -- of that confidence interval.  So this is clearly

 4   statistically significant, but I don't care about that.  What I

 5   care about is the pattern I see.

 6       The pattern I see is, yeah, there's no risk increase if

 7   you use glyphosate for a day or two; but look at what happens

 8   when you're using it regularly, more than two days a year.

 9   That's where all of the risk is, and it's more than twofold and

10   it's statistically significant but still unadjusted for other

11   pesticides.

12   **Q.**   Okay.  Let's move on to the next case.

13       And, Mr. Wolfe, if you could pull up De Roos 2003, which

14   is 451 in your binder.  And if you could go to Table 3, please.

15       And, Dr. Ritz, if you could tell the jury a little bit

16   about De Roos 2003.

17   **A.**   Right.  So this is really a beautifully done study by a

18   colleague who at the time was at the National Cancer Institute

19   of the U.S., and actually I think four of the co-authors,

20   including Dr. Blair and Cantor and Zahm, they all were at the

21   National Cancer Institute; and this study is a compilation, a

22   pooling of other studies, of three previous studies done in the

23   U.S.

24       Because we kind of tricked you here a little bit.  We

25   started with the Swedish study, but actually the earliest

1  studies ever done on pesticides and cancer were in the U.S.,

2  and they were done by these colleagues and they were small

3  studies, small.  And remember the problem with small.  Random

4  error.  You can't really say much.  So all of them had maybe we

5  see something but maybe we can't really base our decisions on

6  those.

7       So by the time they had the third study done, this

8  young -- this young epidemiologist came along, Anneclaire

9  De Roos, said, "Ah, I have this beautiful data sitting out

10 there on the computer.  Why don't we pool it?  Why don't we try

11 to actually bring all this data together; and once we have

12 brought it together see what it tells us?  And that's what she

13 did.

14      So she used data from Nebraska, Kansas, Minnesota, and

15 Iowa.  And guess why they did the studies there?  Rural; right?

16 Lots of rural communities, farming communities, again lots of

17 pesticide use.

18 Q.   All right.  So why don't you tell the jury, please, what

19 De Roos 2003 found about the glyphosate that's in Table 3?

20 A.   Right.  And so in this pooled study, they listed every

21 pesticide that was ever looked at in one of the three studies

22 of the four states, and in that Table 3 they published a result

23 on glyphosate that's based on 36 exposed cases and 61 exposed

24 controls, and that ratio measure that we always talk about is

25 2.1 with a confidence interval of 1.1 to 4.0.  And that's

1   exactly the same ratio measure we've been looking at all the

2   time here.

3        And here we are actually allowed to call it adjusted.  We

4   can say A.  And not because it's adjusted for sex, age, and

5   state and maybe some other factors, but because it's also

6   adjusted for all the other pesticides, and those are 47.  Okay?

7   It's co-adjusted for every other pesticide.

8        And you can tell what happened here -- you can't tell

9   because I didn't give you the original studies where they took

10  all the data from, but in the original studies the confidence

11  interval whiskers would have been really wide and included the

12  1; right?  Because we weren't sure it was random error.

13       Here where she has a lot more cases, she has 650 cases and

14  almost 2,000 controls, she was able to do this beautiful

15  analysis where she threw everything and the kitchen sink, we

16  call that, into the model and the effect for glyphosate on NHL

17  did not go away.  It's 2.1 and we would call it statistically

18  significant.

19  **Q.**   Okay.  So if you could turn to -- if you could pull up

20  actually the same study.

21       It looks like we have a new analysis in this case, which

22  is the hierarchical regression versus the logistical

23  regression.  So we have two sets of data from this case.

24  **A.**   Right.

25  **Q.**   Was this the logistical regression?

**RITZ - DIRECT / WAGSTAFF**

**A.**   Yes.   And the logistical regression is the same modeling that was done in the other studies.

**Q.**   So the logistical regression is what we have been talking about.   We just have never mentioned it by name.

**A.**   Right.

**Q.**   Can you tell the jury what the hierarchical regression is?

**A.**   Hierarchical regression?   I told you this was a young, very ambitious researcher who came to the NCI with a lot of abilities in analysis, and she had just learned this great new tool hierarchical regression.   And what that allows her to do is actually use contextual information and add it to her data.

Meaning I can now say, well, if I presume -- I'm testing 47 chemicals here.   I throw them all in one model.   I let the model tell me whether there's an increased risk for any one of them, but I had not made a hypothesis that one or the other should be causing NHL.

But I do know something about NHL because in the meantime, this is in 2003, there are actually all these other studies and there is an EPA evaluation, but there's not -- nothing else I think from IARC yet, but we have a little bit more of a sense which of these chemicals should actually be bad actors.

And she said, "Well, let me use what we know."   Right? And how did she do that?   She gave weights to these estimates that are in this table.   And so the weight she gave to glyphosate was a downweighing of the evidence because no

1   previous studies and no evaluation had called it carcinogen.

2       So in 2003, glyphosate was not considered a carcinogen so

3   she said, "My prior knowledge, what I believe because of

4   science and what we know now in 2003, glyphosate shouldn't be a

5   carcinogen.  So my estimate of 2.1 may be an overestimate."

6   Right?  "I'm actually calling something a carcinogen I

7   shouldn't be calling a carcinogen, so I'm downweighing this."

8   And then she comes up with the hierarchical estimate of 1.6.

9   **Q.**   Okay.  And what's the confidence interval for that

10  regression?

11  **A.**   .9 to 2.8.

12  **Q.**   Okay.  And I just want to -- and this was adjusted or

13  unadjusted?

14  **A.**   Adjusted.

15  **Q.**   Okay.  For the same 47 chemicals?

16  **A.**   That's what the hierarchical regression does, yeah.

17  **Q.**   Oh, okay.

18      And so you told -- you just told the jury that there were

19  assumptions made in the hierarchical regression.

20  **A.**   Right.

21  **Q.**   And those assumptions were based on previous

22  determinations, and I think you mentioned EPA and IARC.

23  **A.**   Right.  And IARC hadn't made one.

24  **Q.**   Okay.  And has -- if IARC has ruled on a chemical within

25  that model, what effect does that have on this analysis?

1  **A.**    So the weight she gave the 2.1 was .3, meaning there's

2  only 30 percent chance that this is really true.  If she would

3  use the IARC evaluation from 2015, according to what she said

4  in this assessment --

5              **MS. MATTHEWS JOHNSON:**  Objection, Your Honor.

6              **THE COURT:**  Overruled.

7              **THE WITNESS:**  -- in this weighing --

8              **THE COURT:**  Overruled.

9      You can answer.

10             **THE WITNESS:**  Sorry.

11     -- it would have been either a .9 or a .8.  So meaning

12  that 2.1 would have been pretty much 2.1 because what she's

13  doing is she's saying, "I want to correct.  I want to correct

14  my data-driven estimate with what I believe and know from

15  everything else in the world we know so far.  So if it hasn't

16  been classified as a carcinogen, then I'm not as certain that

17  really the 2.1 is true and I should downweigh that and not

18  alarm people."

19      That's why we do this.  We are very careful as scientists.

20  We want -- we don't want to cry Wolfe.  Nobody will believe us

21  anymore; right?

22      So what she did here is she downweighed her own data with

23  a weight that draws it closer to the 1 saying "Ah, we may have

24  overestimated."  And that weight was .3 and it was based on the

25  knowledge of 2003.

1  BY MS. WAGSTAFF:

2  Q.  Okay.  So in 2003, IARC, you're telling the jury, has not

3  ruled on the glyphosate chemical at that point?

4  A.  No.

5  Q.  Today has IARC ruled on the glyphosate chemical?

6       MS. MATTHEWS JOHNSON:  Objection.  Cumulative.

7       THE COURT:  Overruled.

8       THE WITNESS:  Yes.

9  BY MS. WAGSTAFF:

10  Q.  And what was IARC's ruling on glyphosate?

11  A.  It's a 2A probable carcinogen.

12  Q.  Okay.  And in your opinion, based on your knowledge and

13  experience of environmental epidemiology, redoing -- should

14  this number be redone based on the fact that IARC has now ruled

15  on glyphosate?

16  A.  Absolutely, because the weight should change and that

17  estimate would change.

18  Q.  Okay.  And does this -- when you redid it, would it drive

19  the risk ratio up or down?

20  A.  It would go towards the 2.1.  Be almost 2.1, maybe 2.

21  Q.  Okay.  And so you just mentioned the word "carcinogen."

22  Can you tell the ladies and gentlemen of the jury what a

23  carcinogen is?

24  A.  Well, the definition for "carcinogen" is an agent that can

25  cause cancer, and actually the IARC classification was based on

```
 1   NHL for glyphosate.
 2           MS. WAGSTAFF:  Okay.  And as far as timing,
 3   Your Honor, I know that you're mindful of the jury's time, it
 4   might be good if I could just get through three more studies
 5   and finish and then finish up in the morning.  I don't know
 6   what your schedule --
 7           THE COURT:  Well, keep going.  We'll see how things
 8   are going.
 9           MS. WAGSTAFF:  Okay.  Excellent.
10   Q.  All right.  Let's talk about the next study, which is
11   Eriksson, which is on page 4 -- or Binder 452.
12       If you could pull that up, Mr. Wolfe, and turn to Table 2,
13   please.
14       All right.  Dr. Ritz, if you could tell the ladies and
15   gentlemen of the jury, please, about the Eriksson study.
16   A.  So this is another Swedish study, but it's done much later
17   than the first study, and it's done in other parts of Sweden.
18   They are now also including more of Southern Sweden.
19       And otherwise they're doing exactly the same kind of
20   study.  It's a case control study, but they're now more
21   conscientious about having to actually assemble a lot of cases
22   so it's almost a thousand cases, 910, and as many controls and
23   they're going out there again in the same way asking people
24   about their work exposures.
25   Q.  Okay.  And if you look at Table 2, please, and if you
```

**RITZ - DIRECT / WAGSTAFF**

1  highlight glyphosate, can you explain to the jury, please, what

2  those three rows tell you and give me data to write on the

3  board?

4  **A.**   Right.   So they learned their lesson they need a lot of

5  cases in order to look at exposures, and you can see that

6  instead of 4 and 8, they now have 29 exposed cases.   And in

7  those -- with those 29 exposed cases and 18 exposed controls,

8  they estimate a relative risk of 2.02 and the confidence

9  interval is 1.10 to 3.71.

10       So this is a new study, new cases that arrived later in

11  time.   More of them were exposed, which makes a lot of sense

12  because glyphosate use increased.   Right?   So we now have

13  actually a lot more data to base our opinion on, and we see

14  again a twofold risk increase and we would call this

15  statistically significant because it excludes the 1; right?

16  It's on that side of the 1, 1.1.

17  **Q.**   Okay.   And was this data adjusted or unadjusted?

18  **A.**   It's unadjusted for other pesticides but adjusted for age,

19  sex, and year of diagnosis and enrollment.

20  **Q.**   So we're going to call it unadjusted because we're just

21  worried about pesticides.

22  **A.**   Right.

23  **Q.**   And so is there any other data that you found relevant

24  with respect to this study?

25  **A.**   Yes.   So they must have read the McDuffie study and said,

1    "Well, what they can do, we can do.  So let's actually now

2    distinguish between occasional users and regular users" --

3    right? -- "people who use it a lot."

4        And in their data that was a 10-day difference.  Before we

5    had a one- to two-day, more than two days.  Here they said --

6    and, I mean, it makes sense -- right? -- because we're now

7    using more glyphosate, and so more people used for more days.

8    And here it's below and above 10 days, and that splits their

9    exposed group nicely into two, which is, again, a nice

10   statistical property, that's what we want, and we're getting

11   now risk ratios of 1.69.

12   Q.   Is this for the zero to 10 days?

13   A.   Yes.

14   Q.   Okay.  1.69?

15   A.   Right.

16   Q.   Okay.

17   A.   And the next one is -- oh, the confidence interval is .7

18   to 4.07.  So I don't have --

19   Q.   .7 to what?

20   A.   .7 to 4.07.

21   Q.   Okay.

22   A.   And I don't have yet the statistical power to say this is

23   significant, but it's definitely above 1, the point estimate,

24   1.69.  And then we have the one that's more than 10 days and we

25   have a 2.36 with a confidence interval of 1.04 to 5.37.

1  Q.   Okay.  And, Dr. Ritz, these are all unadjusted numbers;

2  correct?

3  A.   Yes.

4  Q.   And so is this a dose analysis just like the McDuffie

5  study?

6  A.   That's what they are attempting to do here.  They are

7  trying to say there are unexposed people, there are people who

8  are occasional users and exposed, and they're the ones who are

9  using a lot.

10      And as you can see, the risk is different if you're using

11  a little bit, maybe 69 percent risk increase but we can't say.

12  The confidence interval is wide; right?  But definitely the

13  ones using more than 10 days, they are more than twofold risk

14  increased.

15  Q.   Okay.  And so if you could actually, Mr. Wolfe, turn to

16  Table 7.

17      And here it looks like the Eriksson scientists also did a

18  multivariate and a univariate analysis, and I want you to

19  explain to the jury why that's not actually a new concept.

20  A.   Right.  So this is -- I think we had that before, that we

21  had a univariate and a multivariate.  Univariate again says,

22  "You know, I'm testing one factor, one pesticide at a time."

23  Multi, "We have multiple pesticides we are testing."  So we are

24  co-adjusting for other use.  We are making these comparison

25  groups more similar in terms of all the other pesticides.  We

1    only are interested in them being glyphosate differently

2    exposed.

3        And in that -- and that multivariate adjusted estimate is

4    1.51 with a confidence interval of .77 to 2.94.

5    **Q.**   All right.  And is it fair to say that is an adjusted

6    analysis?

7    **A.**   Yes.

8    **Q.**   Okay.

9    **A.**   But, remember, that's an analysis of ever/never.  We are

10   not looking at people who have more than 10 days versus less

11   than 10 days.  This is everybody's called a user.

12   **Q.**   Okay.  And, actually, Mr. Wolfe, if you could pull back to

13   page 1659 and to the top of -- right above Table 2.

14       And, Dr. Ritz, if you could turn your binder to page 1659

15   and tell us what that area of the study means to you.

16   **A.**   So -- so these authors also do something differently that

17   is a good way of looking at your data from a different

18   perspective to gain even more information about whether it

19   matters when you were exposed and not just whether you were

20   exposed and how much you were exposed.

21       And these analyses we call latency analysis.  So what --

22   basically what they're doing here is saying, "Okay.  It's not

23   only important whether you were one day or 10 days exposed or

24   more, but when those 10 days were.  Are those 10 days per year

25   or whatever they were" -- right? -- "or they were within the

1   last 10 years before you got diagnosed with NHL or was that

2   actually before?"

3       And that's what they're estimating here.  They're saying,

4   "Let's just look at the time 10 years or more prior to

5   diagnosis or within that 10-year period until you were

6   diagnosed and see what we see there."

7   **Q.**   Okay.  And what did the scientists see when they did that

8   analysis?

9   **A.**   They saw that with a latency of more than 10 years -- so

10  the exposure didn't happen in the last 10 years right before

11  you were diagnosed but 10 years earlier -- that odds ratio was

12  2.26.

13  **Q.**   2.26.  Okay.  I'm going to have to write it a little

14  differently because I'm running out of room.

15  **A.**   Right.  And the confidence interval is 1.16 to 4.40.

16  **Q.**   4.40?

17  **A.**   Yes.  So, again, it means if you were exposed 10 days or

18  more in the past, then your risk is more than twofold, and in

19  this case statistically significant.

20  **Q.**   I think you meant to say 10 years.

21  **A.**   More than 10 years in the past.

22  **Q.**   Okay.  I just wanted to make sure there was --

23  **A.**   Yes.  Not in the last 10 years prior to diagnosis but even

24  earlier.

25  **Q.**   Okay.  Let's look at the next case, Doctor, which is Orsi.

1  **A.**    Uh-huh.

2  **Q.**    I don't have the binder number written down for some

3  reason.

4  **A.**    I got it.

5  **Q.**    It's Binder Number --

6  **A.**    898.

7  **Q.**    -- 898.

8         And if you could tell the jury, please, a little bit about

9  this study.

10  **A.**    So now we're going to France and we know that French

11  people like wine, and they have a lot of cheese and agriculture

12  and they have the same problems we have here.  They're using

13  pesticides and insecticides to save their crops -- right? --

14  and herbicides to get rid of weeds and they have cancer.

15         They don't have, I think, a National Cancer registry, at

16  least they're not using it here.  What they're doing is they go

17  to hospitals and they now go to hospitals within big cities,

18  the biggest cities in France, including Bordeaux, which is a

19  wine region, and Lyon, which is another wine region, and some

20  others, and they are -- everybody who comes in with NHL, they

21  try to enroll in their study, take blood, and ask them what

22  their occupation was and what kind of pesticides they used.

23         But we need the control group; right?  So we need people

24  who didn't have NHL and then we want to compare:  Well, is what

25  the people with NHL did different from those who didn't --

1    right? -- didn't get it?

2         And so they go to other parts of the hospital and enroll

3    other patients and say, "Well, you don't have NHL, you have

4    something else and different diseases.  Tell me what you are.

5    And, you know, were you a farmer?  Have you used a pesticide?"

6         And that's what we call a hospital-based case control

7    study.  It's not what we've seen before where we went into

8    the -- from the population register we selected people.  And

9    the American study also they actually went into the population

10   and asked people to participate.  This is simply patients.

11   Anybody who comes to the hospital and doesn't have NHL is now

12   allowed to enroll as a control subject.  They have other

13   diseases.

14        So the question we have when we do these kind of studies

15   is:  Is that a good comparison group?  Because if the pesticide

16   may have also caused these other diseases, what do I do?  I

17   generate a bias.  We call that a selection bias because if the

18   pesticide brings you to the hospital, then you cannot determine

19   whether NHL was, you know, more -- people with NHL were more

20   exposed than those who didn't get it because the others just

21   got something else.  Right?  I'm not saying that that happened,

22   but we're worried about this when we do these kind of studies,

23   and that's why we call them hospital-based.

24        And that's actually the type of study that has given the

25   study design a slightly bad name because we never know whether

1    the other patients really are a good comparison group.  And

2    it's also a smaller study so we have 244 cases and 560 -- 56

3    controls, but you know now they are not really healthy people

4    from the population.  They're people who came to the hospital

5    for other diseases.

6    Q.    Okay.  And can you tell me the data that this hospital

7    study found?

8    A.    So they looked at lots and lots of pesticides, and they

9    also looked at subgroups of non-Hodgkin's lymphoma; but for all

10   cases, the 244 non-Hodgkin's lymphoma, they had 12 exposed

11   cases and for them they estimated a relative risk of 1 with a

12   confidence interval of 0.5 to 2.2 and it was not adjusted for

13   other pesticides.

14   Q.    Okay.  Great.

15         And what table did you get that data out of?

16   A.    Three.

17   Q.    Okay.  So if we could turn to Table 4, please.

18         Can you explain how the data in Table 4 is different than

19   the data in Table 3?

20   A.    Yes.  So these are people who are starting with the

21   hospital, and at the hospital they have pathologists and these

22   pathologists can tell you we have -- you know, maybe or not --

23   that non-Hodgkin's lymphoma has different subtypes, and so they

24   said, "Well, let's at least look at some major subtypes and see

25   whether these subtypes actually have increases or not."

1        And so here they're giving you an estimate for diffuse

2   large-cell lymphoma follicular and then for chronic lymphocytic

3   leukemia and hairy-cell leukemia.

4   Q.   Okay.  So let's turn to the next one.

5        THE COURT:  Before we do that, how much time do you

6   have on the next one?  I'm thinking this might be a good time

7   to wrap up for the day.

8        MS. WAGSTAFF:  I think that if I could get through the

9   North American Pooled Project, maybe five or so minutes, that

10  leaves the AHS for tomorrow.  That's a good break.

11       THE COURT:  Okay.

12  BY MS. WAGSTAFF:

13  Q.   All right.  If we could turn to, in your binder, 899 and

14  900.

15  A.   Yes.

16  Q.   Before we publish anything, why don't you tell the jury

17  what the North American Pooled Project is.

18  A.   Yeah.  So this is not a new study at all.  This is

19  actually an effort that unfortunately has never been published

20  yet, but yet another effort to bring more data together so we

21  can do more fancy things with the data; right?

22       And so what data do we have?  We have now all of the North

23  American data from these case control studies in Kansas,

24  Nebraska, Minnesota, and Iowa and we are adding the six

25  provinces of Canada to it.  So we now have a huge dataset of

1    all those cases in the rural North American states plus the

2    Canadian states.  Not new data, just looking at the same data

3    with different tools.

4    **Q.**   Okay.  And let me just jump back up to De Roos real quick.

5    Was Dr. Weisenburger an author of De Roos 2003?

6    **A.**   Let me see, which tab is it?

7    **Q.**   451.

8    **A.**   I should know that.

9          (Witness examines document.)  Yes, he was.

10   **Q.**   Okay.  And is Dr. Weisenburger also an author of the North

11   American Pooled Project, if you know?

12   **A.**   (Witness examines document.)  There's no name on there.

13   Oh, wait.  He's not -- yeah.  He's on the second slide set from

14   Brazil.

15   **Q.**   Okay.  So why don't we go to -- explain what these two

16   documents are, 899 and 900, please.

17   **A.**   So these are now not published results.  They are slide

18   decks, and we prepare them to go to conferences, show results,

19   and discuss them with colleagues, and that's what these are.

20   **Q.**   Okay.  And these aren't numbered unfortunately, so,

21   Mr. Wolfe, if you could turn to the 12th page of Exhibit 899.

22   Yep, that's it.

23        Dr. Ritz, could you tell the ladies and gentlemen of the

24   jury, please, what this data is and the significance of this

25   data, please?

**RITZ - DIRECT / WAGSTAFF**

1  A.   Right.  So, again, we are pooling.  Now we are pooling

2  across the McDuffie Canadian study and the De Roos American

3  studies, and you can see that we are really increasing the

4  number of cases that reported glyphosate use to 113.  That's a

5  really nice number, big number.

6  Q.   Okay.  And so what data was found?

7  A.   So in this analysis, they are presenting a relative risk

8  of 1.22 with a confidence interval of .91 to 1.63.

9  Q.   Okay.  And is this adjusted or unadjusted?

10  A.   This is actually adjusted and it's adjusted for 2,4-D use,

11  Dicamba use, and malathion use.  So three different pesticides

12  have been entered into the model.

13  Q.   And if you could please turn to page 14, Mr. Wolfe.

14  A.   Yeah.

15  Q.   And this is some additional data that the North American

16  Pooled Project found about glyphosate handling NHL risks;

17  right?

18  A.   Right.

19  Q.   And is this a dosing analysis?

20  A.   This is the same analysis we already have discussed with

21  McDuffie where they said "Let's distinguish between the people

22  who use very little, one day or two, and the people who use

23  more than two days."  It's the same analysis but it's more

24  data.  It's not just Canadian data.  It's the American data as

25  well.

1    **Q.**   Okay.  So that would mean that this is also a dosing

2    analysis?

3    **A.**   Yes.

4    **Q.**   Okay.  And can you tell us the data that this dosing

5    analysis from the North American Pooled Project gives us?

6    **A.**   So the zero to -- more than zero and less equals two is

7    .83, and the confidence interval is 0.51 and 1.34.

8    **Q.**   All right.  Let me write that down.  So for zero to two

9    days --

10   **A.**   Yeah.

11   **Q.**   -- it's .83?

12   **A.**   Uh-huh.

13   **Q.**   With a confidence interval of -- can you read that again?

14   **A.**   0.51 --

15   **Q.**   Okay.

16   **A.**   -- to 1.34.  So essentially there's no effect.  When

17   you're only -- when you're an occasional user, one or two days,

18   no effect.  We've seen that before; right?  But this --

19          **THE COURT:**  Sorry to interrupt, Dr. Ritz.

20       Ms. Wagstaff, you didn't ask for this to be published in

21   front of the jury.  Did you want this?

22          **MS. WAGSTAFF:**  Oh, yes.  Please, can this be published

23   in front of the jury?

24       Thank you, Your Honor.

25   **Q.**   Okay.  And so this is -- is this adjusted as well?

RITZ - DIRECT / WAGSTAFF

1   A.    Yes.

2   Q.    Okay.

3   A.    So the only difference is we have more data, we're doing

4   the same analysis, and now we are also putting these other

5   three pesticides into the model saying we are co-adjusting.  We

6   are -- we are taking care of potential bias because people were

7   also exposed to these other pesticides.

8   Q.    Okay.  And so when you did over two days --

9   A.    Right.

10  Q.    -- what were the numbers?

11  A.    1.98, so almost 2.

12  Q.    1.98.  Okay.

13  A.    Uh-huh.  And a confidence interval of 1.16 to 3.4.

14  Q.    3.4?

15  A.    Uh-huh.

16  Q.    Okay.  And was that adjusted or unadjusted?

17  A.    That was adjusted.

18  Q.    Okay.  And so this is a statistically significant adjusted

19  dose analysis --

20  A.    Correct.

21  Q.    -- is that correct?

22        Okay.  Now, if you move two over, it looks like the same

23  analysis was done for DLBCL?

24  A.    Yes, and this is actually one reason why they probably are

25  trying to do this pooling of data, throwing them all together,

1  because now they have enough cases to also look at subtypes of

2  non-Hodgkin's lymphoma.  So they don't have to call all

3  lymphomas the same.  They can actually look at different types.

4  And there's this type called DLBCL in the third column there.

5  **Q.**   Can you tell the jury what, if you know, what "DLBCL"

6  means?

7  **A.**   Diffuse lymphocytic B-cell lymphoma.

8  **Q.**   Okay.  So DLBCL?

9  **A.**   CL.

10 **Q.**   Okay.  And they did two analyses for DLBCL; correct?

11 **A.**   In the same way that we had for overall.

12 **Q.**   Okay.  So I'll just put this data on the other side and

13 use this.

14       For the zero to two days, what was the data for DLBCL?

15 **A.**   Again, we see a .77 with a confidence interval of .37 to

16 1.58, meaning there's nothing or, if anything, it's protective,

17 which we don't believe.  But, you know, there's no effect if

18 you're an occasional user.

19 **Q.**   Okay.  And what about for the people who were in the

20 high-dose group?

21 **A.**   That odds ratio is 2.49 with a confidence interval of 1.23

22 to 5.04.

23 **Q.**   5.04, okay.

24       And are these adjusted numbers as well for DLBCL?

25 **A.**   Yes.

RITZ - DIRECT / WAGSTAFF

```
 1   Q.    Okay.

 2   A.    For three different pesticides.

 3   Q.    Okay.  So I just want to square off these as being

 4   adjusted dose and statistically significant; right?

 5   A.    Correct.

 6   Q.    Okay.

 7   A.    They actually give you a P for trend.  That's a trend test

 8   for dose.

 9         MS. WAGSTAFF:  Okay.  Excellent.

10   Your Honor, this would be a good time to stop for the day.

11         THE COURT:  Sure.  That would be great.

12   Okay.  Ladies and gentlemen of the jury, we're done with

13   day one.  Thank you for being so attentive.

14   And I'll remind you once again, because of how important

15   it is, don't go home and talk to anybody about this trial or

16   how it's going or what you're learning.  Don't do any

17   independent research on your own.  Don't look up any terms on

18   the Internet or anything like that.

19   And stay away from any media reports on the case.  And if

20   you accidentally come across a media report, please turn away

21   immediately and don't pay attention to it.

22   If you've been exposed to any information that you should

23   not have been exposed to or if you have reason to believe that

24   somebody else on the jury has been exposed to information they

25   should not have been exposed to, please let us know as soon as
```

 1   you can.

 2        And with that, we will see you tomorrow.

 3        And, Mr. Pungyan, I'll be with you in a few minutes back

 4   there to discuss your issue.

 5        (Proceedings were heard out of the presence of the jury:)

 6        **THE COURT:**  Okay.  Thank you, Dr. Ritz.  You're free

 7   to step down.

 8        **THE WITNESS:**  Thank you.

 9        **THE CLERK:**  Please be seated.

10        **THE COURT:**  So is there anything you-all want to talk

11   about before I go back and chat with Mr. Pungyan briefly and

12   then bring him out?

13        **MS. WAGSTAFF:**  Your Honor, may I take a picture of

14   this just since we're going to leave it in the courtroom?

15        **THE COURT:**  Good idea.

16        **MR. KILARU:**  Can we do the same, Your Honor?

17        **THE COURT:**  Sure.

18        **MS. MOORE:**  Not before you talk to the jury.

19        **THE COURT:**  Okay.

20        **MS. WAGSTAFF:**  I do have one housekeeping item.

21        **THE COURT:**  Okay.

22        **MS. WAGSTAFF:**  This is Exhibit Number 914.  We updated

23   these graphs recently to include that new study that came out,

24   and there was a mistake in the one that I gave you.

25        **MR. STEKLOFF:**  We have it.

 1          MS. MATTHEWS JOHNSON:  We have ours.

 2          THE COURT:  Okay.

 3          MS. WAGSTAFF:  So if you want to just rip out the 914

 4   you have and put that in there, that will be great.

 5          MS. MOORE:  Your Honor, we can hole punch it too.

 6          MS. WAGSTAFF:  I'm sorry.

 7          THE COURT:  No worries.

 8          MS. MOORE:  Thank you.

 9          MS. WAGSTAFF:  It just had a dot where there should be

10   a square and a square where there should be a dot.

11          THE COURT:  Very important distinction.

12      Okay.

13          THE CLERK:  I'll give that back to you.

14          MS. WAGSTAFF:  Thank you.

15          THE COURT:  Okay.  Do you want to talk about ground

16   rules for conversations with experts during their testimony?

17          MR. STEKLOFF:  I think our view, Your Honor, is that

18   once a witness is passed for cross-examination, then the

19   witness should not be -- I would have no problem, for example,

20   them trying to refine and make their examination of Dr. Ritz

21   more efficient now; but once a witness is passed, I think that

22   it runs into issues.

23          THE COURT:  Sounds good.

24          MS. WAGSTAFF:  We're okay with that.

25          THE COURT:  Okay.  That will be the rule then.

 1          **MR. STEKLOFF:**  And I think the only issue we have to

 2    raise is really just what -- it is unclear to us which

 3    witnesses plaintiffs planned on presenting.  I suspected

 4    deposition testimony, but it is unclear to us how they're

 5    filling the next day.

 6          **THE COURT:**  Aren't we supposed to know that by now?

 7          **MS. MOORE:**  Yes, Your Honor, and we did e-mail them

 8    about that.  We notified them that tomorrow we will be

 9    finishing up with Dr. Ritz, and then our plan is to go right

10    into video deposition and that would be Dr. Portier.

11          There was a little bit of discussion --

12          **THE COURT:**  Well, wait a minute.  There's a little bit

13    of a problem there.

14          **MS. MOORE:**  I know and that's what I was going to get

15    to.  We have teed up Dr. Portier and also Dr. Reeves, and we've

16    had meet and confers about that.  So depending on the Court's

17    orders, we have the tech people working on getting both of

18    those depositions ready and that way they can take out whatever

19    the Court says excluded, and we'll be ready to roll.  So it

20    will be video depositions following Dr. Ritz.

21          **THE COURT:**  Well, except that I have not yet received

22    evidentiary objections to any aspects of Portier's testimony

23    that you want to designate, or Reeves for that matter, so I

24    think you need to be ready with something else --

25          **MS. MOORE:**  Yes, Your Honor.  I understand.

1        **THE COURT:**  -- in case you haven't gotten that to me

2   in time for me to rule on the objections.

3        **MS. MOORE:**  I understand, Your Honor.  And so to kind

4   of back up and let you know what's happened with that, so of

5   course you know Dr. Portier was taken last week.  We have

6   expedited everything as much as we can with the teams coming

7   from Australia.

8        We sent --

9        **THE COURT:**  I understand it's hard and I'm sure you've

10  run into problems along the way.  All I'm saying is that you

11  cannot count on beginning Dr. Portier's testimony tomorrow and

12  you cannot count on beginning Dr. Reeves' testimony tomorrow

13  because you have not yet given to me the objections to the

14  designated testimony for those two individuals and, therefore,

15  I cannot rule on the objections.

16       So you have to be ready with something else, whether it's

17  the three treating physicians or Dr. Weisenburger or whoever.

18  You need to be ready with another witness in case that hasn't

19  been teed up on time.

20       **MS. MOORE:**  I understand, Your Honor, absolutely.  No

21  question about that.

22       **THE COURT:**  And just to be very clear, it's coming out

23  of your time if you're not ready with something else.

24       **MS. MOORE:**  I understand that, Your Honor.  I will not

25  let that happen.

1          Going back to Dr. Portier, we notified the defense that

2   our plan is to present his direct testimony for Phase I on

3   Tuesday, and we asked them if they would be withdrawing any of

4   their objections that were made contemporaneously.  They've

5   gotten back to us.  I believe I have an e-mail from today on

6   that.

7          So we are now -- we'll be prepared, if the Court would

8   entertain us, to hear some arguments about that.  I think some

9   of it is kind of some broad issues.  If we could get guidance

10  from the Court, we'll be able to meet and confer and narrow

11  that down so we can try to start Dr. Portier tomorrow after

12  Dr. Ritz is off the stand.

13         So we have done that.  It's not been filed with the Court,

14  but there's been meet and confer on that.

15         With respect to Dr. Reeves, I understand it has been filed

16  now with the Court and we do have copies of the transcript that

17  we'll be able to hand to Your Honor.  And, again, it's also

18  some big global pictures that we can kind of talk about that

19  will help us know whether or not either side will continue to

20  maintain certain objections.

21             THE COURT:  So you have the hard copies of Reeves

22  and -- is it Reeves you have?

23             MS. MOORE:  Dr. Reeves is what we have, yes,

24  Your Honor.

25             THE COURT:  And this is the hard copy of the

**PROCEEDINGS**

 1   deposition transcript with the objections interposed?

 2          MS. MOORE:  That's correct, Your Honor.  So we have

 3   copies of that and we've been -- that's after several meet and

 4   confers about Dr. Reeves.

 5          THE COURT:  So what do you want me to do?  Do you want

 6   to have argument about that now or --

 7          MS. WAGSTAFF:  I've got five copies so --

 8          THE COURT:  I think we probably need one or two.

 9   Maybe two.

10          MS. WAGSTAFF:  It's a two-day deposition.  So,

11   Your Honor, here's --

12          MS. MOORE:  Your Honor, so we're -- we had discussed

13   with defense, and I don't know if you wanted to address the

14   juror issue first because I don't want to have him wait, but we

15   were prepared to, if the Court would entertain us, discuss

16   Dr. Reeves, Dr. Blair, and Ross and Dr. Goldstein, as well as

17   Dr. Portier.  And some of this can go fairly quickly because

18   once we get an idea from the Court, it's -- there's an

19   objection as to whether we can even play Dr. Blair, Ross, and

20   Dr. Goldstein in Phase I at all.

21          THE COURT:  I assumed there might be.

22          MS. MOORE:  So I think, you know, if we get insight

23   from Your Honor on that, then that's going to take away a lot

24   of the issues that we may have with those depositions.  So I

25   don't think that's going to take that long.

1      **THE COURT:**  Okay.  I'm happy to have a discussion with

2  you in the abstract if that will help, but I don't know if I'm

3  going to be able to rule on the abstract.  I might need to

4  actually read the testimony and the objections --

5      **MS. MOORE:**  I understand, Your Honor.

6      **THE COURT:**  -- and spend a little more time thinking

7  about it.

8      **MS. MOORE:**  For example, on Dr. Goldstein, this is

9  his --

10      **THE COURT:**  Well, like I said, I'm happy to have an

11  abstract discussion with you after we deal with the juror

12  issue.

13      **MS. MOORE:**  Okay.

14      **THE COURT:**  But why don't you give me five minutes,

15  I'll go back and chat with him briefly, and then likely we'll

16  bring him out.

17      **MS. MOORE:**  Okay.

18      **THE COURT:**  By the way, let me ask you this:

19  Assuming -- I passed on certain basic information to you about

20  his situation this morning.  Is either side going to want to

21  ask him further questions about that?

22      **MS. MOORE:**  I don't believe so, Your Honor.  I mean,

23  it sounds like he has an economic hardship similar to what

24  we've -- what you excused other jurors on.

25      **THE COURT:**  And so what's -- do both sides agree that

1   I should excuse him based on what I've described to you?

2         **MS. MOORE:**  That's our position, Your Honor.

3         **MR. STEKLOFF:**  I think, Your Honor, it's just worth

4   following up, and I do not need to ask any questions.  I would

5   be happy for you to follow-up with him; and if the economic

6   hardship still presents, I would defer to your judgment on

7   that.  I don't need to talk to him about that.

8         **THE COURT:**  Okay.

9         **MR. STEKLOFF:**  But I think it is worth following up

10  with him to explain the conversation that you had and just make

11  sure there are no issues.

12        **THE COURT:**  Okay.  Sounds good.

13        **MS. MOORE:**  All right.  Thank you, Your Honor.

14        **THE CLERK:**  Court is in recess.

15               (Recess taken at 2:54 p.m.)

16            (Proceedings resumed at 2:57 p.m.)

17      (Proceedings were heard out of the presence of the jury:)

18        **THE COURT:**  Okay.  We are back on the record.

19      Mr. Pungyan, I'm going to repeat for the record what I've

20  already discussed with you back there.  So the first thing is

21  that you expressed concern to us that on the day of jury

22  selection, your wife was informed that her hours were being

23  cut.  And you initially thought it would be okay to serve on

24  the jury but after you learned that your wife's hours had been

25  cut, that was a real problem for you and your family because

 1  her hours are cut and your hours would be cut because typically

 2  you work Friday -- sorry -- Wednesday, Thursday, Friday,

 3  Saturday, Sunday at Kaiser.

 4      So when I heard of this concern, I got on the phone with

 5  the Kaiser general counsel's office, and I said, "Is there

 6  anything you can do for this guy given the situation?  Can you

 7  pay him for, you know, five -- during the time he's on the jury

 8  can, you pay him five days a week as he's been working even

 9  though he wouldn't be working Wednesday, Thursday, Friday?"

10      And the response I got was that if there was anything in

11  our power to do it, we would; but his employment is governed by

12  a collective bargaining agreement, so it would actually be

13  illegal for us to compensate him for the jury service.

14      So that while we can -- while we can guarantee that he

15  would work a shift on Thursday -- in addition to his regular

16  Saturday and Sunday shift -- we can't unfortunately do anything

17  more than that.  And so I relayed that to you this morning, and

18  you expressed the concern to me that that would -- just working

19  on Thursdays in addition to Saturday and Sunday would be

20  inadequate based on the fact that your wife's hours were cut at

21  her job.  Have I accurately described our conversation and your

22  feeling about it?

23          JUROR PUNGYAN:  Yes, Your Honor.

24          THE COURT:  So is it your feeling that given the

25  situation that I have just described, which was not your fault

**PROCEEDINGS**

 1   as unanticipated, of course, that it would be an economic

 2   hardship for you to serve on the jury?

 3           **JUROR PUNGYAN:**  Yes, Your Honor.

 4       **THE COURT:**  Does anybody wish to ask Mr. Pungyan any

 5   questions?

 6           **MS. MOORE:**  No, Your Honor.

 7           **MR. STEKLOFF:**  No.

 8       **THE COURT:**  I will go ahead and have you go back to

 9   the jury room.  Sit tight and wait for a report.  We will be

10   with you in a few minutes.  Thank you very much.

11       (Juror Pungyan exited.)

12           **THE COURT:**  Is there anything else anyone wants to say

13   about Mr. Pungyan?

14           **MS. MOORE:**  No, Your Honor.

15       **THE COURT:**  I was not anticipating losing one of our

16   nine jurors on the first day of trial.  It is no fault of his

17   own, and I'm very appreciative for him being willing to serve

18   during selection on Wednesday even though it would have already

19   been financially difficult for him, and I think it's an

20   unexpected development for him means I think we will have to

21   excuse him.  So I will be excusing him.  Let me go back there

22   real quick and let him know, and I will call you back in just a

23   minute.

24               (Recess taken at 3:00 p.m.)

25               (Proceedings resumed at 3:02 p.m.)

1      (Proceedings were heard out of presence of the jury:)

2      **THE COURT:**  So for the record, I just went back and I

3   told Mr. Pungyan that all the restrictions still apply to him

4   in terms of talking about the case until after the case is

5   over.  So he's under a court order now that he's not to speak

6   with any members of the media or anybody else about the case or

7   what's happened thus far.

8      Okay.  So what do you-all want to talk about?

9      **MS. MOORE:**  Your Honor, on an abstract issue, probably

10  the -- as soon as I say the easiest, it probably will not be

11  the easiest, but the easiest one, we want -- the plaintiff

12  wants to play a very short -- thank you -- a very short

13  deposition of Dr. Goldstein who was designated as Monsanto's

14  corporate representative.  And this deposition what we

15  designated I think is around 12 or 13 minutes, Your Honor.  And

16  it concerns the 1997 Dr. Acquavella memo.

17      And as the Court will recall, that was one of the issues

18  that we brought to the Court's attention after the phased trial

19  decision came down, and it's Plaintiffs' *Motion in Limine*

20  Number 14, Your Honor, and Pretrial Order 81.

21      And it's our understanding that the Court is permitting us

22  to introduce during Phase I Dr. Acquavella's July 22nd, 1997,

23  memo criticizing the AHS for the purpose of impeaching any

24  Monsanto expert to rely on it.

25      Your Honor, it's our position that instead of having to

 1  wait until their case-in-chief to impeach an expert, we would

 2  like to go ahead and play that deposition since it's a

 3  corporate rep; and clearly from the opening this morning, we

 4  know that the AHS is central to their defense in this case, and

 5  that's why we would like to go ahead and play it in Phase I.

 6      MR. KILARU:  Your Honor, we think it would make -- how

 7  we understood the ruling was that they could confront the

 8  experts who talk about the AHS with the Acquavella memo and ask

 9  questions about it as opposed to having in their case-in-chief

10  affirmative testimony played from a witness about what that

11  study says.

12      THE COURT:  Well, what's the difference at this point?

13  I mean, I think, you know, your argument on that point was well

14  taken, you know, in the abstract; but thinking about it

15  practically now and after, you know, listening to the opening

16  statement and knowing just how much Monsanto is going to be

17  relying on AHS, what's the difference?

18      MR. KILARU:  Well, I guess just in terms of it being

19  an impeachment issue, you know, there's not really an actual

20  evidentiary statement from anyone about the AHS.  As we were

21  told repeatedly I think is correct, the arguments in the

22  openings are not evidence.

23      THE COURT:  I guess I'm asking you, as a practical

24  matter, what's the difference?

25      MR. KILARU:  It's more a question of whether we get to

**PROCEEDINGS**

1  present our position on it first versus the plaintiffs coming

2  in with it, which is how I think an impeachment would typically

3  work.  Ultimately I recognize that sort of the point will come

4  in at some point, but I do think to the extent it's an

5  impeachment, the ordering does matter somewhat.

6      **THE COURT:**  Well, I think, you know, given the need

7  to -- I mean, it's either going to come -- that testimony is

8  either going to come in now or it's going to come in a little

9  bit later; and I think, you know, in terms of ordering the

10  trial and given the contents of the opening statement -- it's

11  true that an opening statement is not evidence, but something a

12  lawyer says in opening statement can open the door to evidence

13  coming in that might not have come in before.

14      I think -- I just think it, A, it doesn't matter, it

15  really doesn't matter when this evidence comes in; and, B,

16  given the opening statement, I think it would be fine for the

17  plaintiffs to bring that in now.

18      So that's fine.  You can play that.

19      **MS. MOORE:**  Thank you, Your Honor.

20      And we'll have that ready.  And, again, I understand the

21  notice rules and so if there's an objection, we can deal with

22  that.

23      **THE COURT:**  Say again.

24      **MS. MOORE:**  I understand the notice rules as far as

25  when we have to tell them about depositions.  In light of, you

**PROCEEDINGS**

1    know, the Portier rulings that we need to get from Your Honor,

2    the Goldstein one, which is very short, we can work that out.

3    It's already cut so I would like to go ahead and tell them that

4    that would be our backup deposition tomorrow to be played to

5    try to keep things moving along.

6            **THE COURT:**  Okay.

7            **MS. MOORE:**  Okay.  Thank you, Your Honor.

8        And then the other issue, the other depositions, if I

9    could, Your Honor, do those in conjunction, and that is

10   Dr. Aaron Blair and Dr. Matthew Ross, and --

11           **THE COURT:**  Was Ross another member of the IARC?

12           **MS. MOORE:**  Yes, Your Honor, he was.

13           **THE COURT:**  Okay.

14           **MS. MOORE:**  And the Ross deposition is very short.  I

15   don't have the exact time.  It's less than -- now with the

16   designation, it's less than an hour, Your Honor.

17       But both of these, it's our position, and this relates

18   to --

19           **THE COURT:**  I mean, let me just say one thing just to

20   make it clear.  You keep referencing the breadth or the

21   brevity, I should say, of the excerpts.  You know, you have

22   overall time limits and how you use your time is up to you.  So

23   given that you have overall time limits, I'm less concerned

24   with the length or brevity of the excerpts and far more

25   concerned with whether they fit within Phase I or not.

1      **MS. MOORE:**  And that's fair, Your Honor.  I probably

2   just have this chess clock running in my head so that's why I

3   keep saying it.  So I apologize.

4      This relates to, Your Honor, your order, Pretrial Order

5   Number 81.  It's Monsanto's *Motion in Limine* Number 1.  And as

6   you'll recall, it's our understanding from the ruling in the

7   second paragraph that, Your Honor, you ruled that witnesses,

8   which would be Dr. Blair and Dr. Ross, who participated in IARC

9   may testify that they were a member of the IARC committee, may

10   further explain how that membership supports their credibility,

11   but must limit their scientific testimony to their own

12   independent conclusions.

13      **THE COURT:**  What are you reading from?

14      **MS. MOORE:**  Your order, Your Honor.

15      **MR. KILARU:**  MIL Pretrial 81.

16      **MS. MOORE:**  It's 81, Pretrial Order 81.

17      **THE COURT:**  Let me go back there.

18                  (Pause in proceedings.)

19      **THE COURT:**  Okay.  But when I said that, I was

20   referring to expert witnesses who you were calling.

21      **MS. MOORE:**  Yes, Your Honor.

22      **THE COURT:**  Okay.

23      **MS. MOORE:**  And we designated Dr. Blair and Dr. Ross

24   both as nonretained expert witnesses when we did our expert

25   disclosures in November of last year in accordance with the

 1    Court's pretrial order.

 2            **THE COURT:**  Okay.

 3            **MS. MOORE:**  And so the reason we've teed this up this

 4    afternoon is that we had meet and confers with Monsanto.  I

 5    think it's their position we shouldn't be allowed to play any

 6    part of Dr. Blair and Dr. Ross, even any of it in Phase I.  Our

 7    position is that we should and we went ahead and did a meet and

 8    confer.  They didn't waive their objection, Your Honor, to

 9    playing it in the entirety, but we went ahead and did a meet

10    and confer.  So those depositions have been narrowed down

11    substantially based on that meet and confer.

12            **THE COURT:**  I don't think I'm in a position right now

13    to rule on whether Blair and Ross can testify at Phase I.  I

14    would think that I would want to look at the content of the

15    testimony.

16            **MS. MOORE:**  That's fine, Your Honor.  And I can

17    hand -- I think -- Your Honor, I think you already have the

18    color transcripts with the designations, counters, and

19    objections for Dr. Blair.  I also have a copy, Your Honor, of

20    Dr. Ross that I can hand to you.

21            **MR. KILARU:**  Your Honor, I'm not actually sure that's

22    accurate.  I don't think -- I'm not accusing anyone of

23    anything.  I think the only ones that have been filed thus far

24    with Your Honor are Reeves and Ross.  I do not believe that

25    Blair has been filed or submitted.

1          **MS. MOORE:**  Your Honor, if it has not been filed yet,

2     it's been agreed upon by the parties, and so it may just not

3     have gotten filed, but we did hand you a copy of the transcript

4     that the parties have reached an agreement that that is the

5     designations and the objections that we'll need rulings on.

6          **THE COURT:**  I think all I have in front of me right

7     now is Reeves.

8          **MS. MOORE:**  Oh.  I apologize, Your Honor.

9          **THE COURT:**  So I don't know what you filed.

10          **MS. MOORE:**  Oh, sorry.  Sorry.  I misspoke,

11     Your Honor.  I'm sorry.  That's Dr. Reeves.

12          **THE COURT:**  So this is Dr. Reeves' testimony that is,

13     like, ready for me to review for objections?

14          **MS. MOORE:**  Yes, Your Honor.  Yes, Your Honor.  And

15     that's filed.  And then I'm handing you now Dr. Ross.

16        I apologize, Your Honor.

17          **THE COURT:**  Okay.

18          **MS. MOORE:**  And I have a copy for counsel too.  And

19     this is the color transcript.  My understanding is Dr. Ross is

20     filed and that this is the color transcript that would contain

21     the designations and the objections.  And as you can tell,

22     Your Honor, it's not that many pages on Dr. Ross.

23          **THE COURT:**  Okay.  All right.

24          **MS. MOORE:**  And I will come back, Your Honor, on the

25     issue.  My understanding is Dr. Blair we have reached an

 1  agreement as to what transcript we should present to you for

 2  decision, and I will find out if that's filed.  I thought it

 3  was so I apologize if I misspoke.

 4          **THE COURT:**  Okay.  But if it's going to be filed, do

 5  you have a hard copy there of what is going to be filed?

 6          **MS. MOORE:**  I'm being told I do not right now --

 7          **THE COURT:**  Okay.

 8          **MS. MOORE:**  -- but I will try to get that, Your Honor.

 9          **THE COURT:**  Okay.  And Monsanto's position, I gather,

10  is that I should draw a distinction between Blair and Ross on

11  the one hand and Portier and Jameson on the other hand in terms

12  of whether any testimony should be allowed from them on the

13  IARC and their participation in the conference?

14          **MR. KILARU:**  Yes, Your Honor.  Could I briefly explain

15  that a little bit?

16          **THE COURT:**  Yes.

17          **MR. KILARU:**  Just as a technical disclosure matter,

18  both Blair and Ross we acknowledge were disclosed back in

19  November as nontestifying experts, but on the witness list that

20  was filed a couple nights ago they were listed as Monograph 112

21  participants and I think that accurately reflects what their

22  testimony is.

23      They do not have independent scientific conclusions.  What

24  the deposition testimony is is them essentially repeating the

25  conclusions of IARC, and that I think would be not what was

PROCEEDINGS

 1   envisioned by the *motion in limine* ruling.  I think that would

 2   go beyond the rule that we intended for IARC to have.

 3        **THE COURT:**  Okay.  I understand.  I understand the

 4   landscape I think, and I'll just look at the testimony.

 5        **MS. MOORE:**  Thank you, Your Honor.

 6     The only other issue --

 7        **MR. KILARU:**  Sorry.  Just one housekeeping thing to go

 8   back on Goldstein.

 9     I'm sure we can get a transcript on file if you want to

10   review it.  There were a few other more minor objections that I

11   don't know if -- because you haven't seen, you haven't had a

12   chance to rule on.  I don't think they will take long, but I

13   just want to flag that I don't think we're sort of camera ready

14   on Goldstein just yet even though I acknowledge your ruling on

15   the broader issue.

16        **MS. MOORE:**  Your Honor, we will have the color

17   transcript delivered for Dr. Goldstein and Dr. Blair this

18   afternoon so you will have that in hand.

19     And then the only other point I wanted to bring to

20   Your Honor's attention is that with respect to Dr. Blair, he

21   also was a co-author of the De Roos 2003 and he also was an

22   author in the AHS as well.  So that was part of the other

23   reason that he was testifying.

24        **THE COURT:**  It seems to me that a lot of -- it's going

25   to depend largely on what the testimony is.

 1          **MS. MOORE:**  Your Honor, and we tried to narrow that,

 2    and we -- you'll see in Dr. Blair more so than Dr. Ross, but in

 3    Dr. Blair the first part of his testimony is his background,

 4    his credentials.  As you'll recall, he was the head of the work

 5    group for IARC so he has pretty lengthy credentials.  We tried

 6    to narrow that down.

 7          And then we went into that he participated in IARC; the

 8    conclusion that we very briefly talk about that he reviewed --

 9    you know, he was part of the epidemiology subgroup, and that he

10    very briefly he reviewed the studies.  He doesn't go into

11    detail like Dr. Ritz has done today because that would be

12    cumulative so we have just highlighted that.

13          You know, I'd be fine, you know, if we wanted to cut that

14    out.  We suggested that.  The defense has objected to us having

15    him answer questions that he reviewed McDuffie, Eriksson, and

16    De Roos in his discussions about reaching his conclusion to

17    vote for the IARC monograph, but then they did not object when

18    it came to the discussion about the AHS.

19          And so our position is if we're going to talk about

20    epidemiology studies and allow Dr. Blair to say "Here's the

21    ones that we reviewed in reaching our conclusion and our vote,"

22    that it should be all of them and not piecemeal.  And so I

23    think that's the main issue there.

24          But, again, it's -- it doesn't get into the weeds of the

25    studies because that's what Dr. Ritz is here to do.

```
 1            THE COURT:  Okay.  I'll look at it.

 2            MS. MOORE:  Okay.  Thank you, Your Honor.

 3            THE COURT:  Anything else you-all want to discuss?

 4            MR. KILARU:  There are a couple.

 5            THE COURT:  So let me just emphasize, given what has

 6    been given to me --

 7            MS. MOORE:  I know, Your Honor.

 8            THE COURT:  -- and given what you're anticipating

 9    giving to me later, it seems unlikely that I'm going to be able

10    to get to Dr. Portier's testimony, which has not even yet been

11    given to me.  So you need to assume that you're not calling

12    Dr. Portier tomorrow.

13            MS. MOORE:  I understand, Your Honor.  And if it would

14    be helpful to the Court, our position would be, from a priority

15    standpoint, Dr. Goldstein and then Dr. Blair and Ross, which

16    you should have this afternoon Dr. Blair, Your Honor.

17        You know, the Reeves, again, there's some big global

18    issues there that, you know, we have that cut so it is ready to

19    go.  I mean, you know, I guess it depends, Your Honor, I don't

20    know what your schedule is.  And I apologize, Your Honor.

21    We've done our best to try to get those to you as quickly as we

22    can.  But, you know, if you'd rather tackle a bigger one, then

23    Dr. Reeves would be the way to start.

24            MR. KILARU:  Your Honor, I don't know your calendar

25    right now and I wouldn't presume to keep you.  There are a
```

1    couple big issues that I think would knock out pretty big parts

2    of Reeves that we can talk about, but only if it's helpful to

3    you.

4           **THE COURT:**  We can try.  Like I said, I'm not sure

5    I'll be able to do it in the abstract but, sure.

6           **MR. KILARU:**  Okay.  So if I could give just one

7    example, and it's an issue that actually came up earlier.  It

8    is this whole issue of the Knezevich and Hogan study and what

9    evidence should come in and should not.

10          As you know, you issued a *motion in limine* ruling that we

11   should continue to confer about what do we think should come

12   in, and we did do that over the weekend and what we had offered

13   to the plaintiffs was -- excuse me -- a stipulation, which is

14   the following:  Which is to introduce the studies, which I

15   think we've always thought both the initial review and the

16   later review could come in; and a stipulation that during

17   the -- for this case, that during the process of obtaining EPA

18   approval of glyphosate, Monsanto hired Dr. Kuschner to review

19   the tumor slides from the Knezevich and Hogan study based on

20   concerns about the regulatory consequences of that study.

21          I think that pretty closely mirrors what we had discussed

22   when we had the argument over the sort of pick three pieces of

23   evidence a while ago.

24          That's where we are.  The plaintiffs disagree with that

25   and don't want to accept that, which we understand.

PROCEEDINGS

1    But just to give you sort of a concrete example of what

2  the alternative is that's been proposed, there's 100 pages of

3  testimony in Reeves or 100-page range in Reeves, which probably

4  I would say 50 to 60 pages has been designated, and it is

5  literally all of the memos, including the Lyle Gingrich memo

6  that you mentioned in your order, other internal documents.

7  And those are some of the documents we didn't get before

8  opening but were shown in the opening today.  So quotes from

9  that exact memo, quotes from other people, the EPA's responses,

10 and so on.

11    And I thought one of the purposes of the discussion was to

12 try to streamline what evidence would come in and come to an

13 advance agreement of that, and we submit that our proposal is a

14 better one for moving forward on that as opposed to really

15 extensive discussions through Reeves and also based on what's

16 been seen already.

17    **THE COURT:**  Well, my preliminary reaction to your

18 proposal is that it's too restrictive, and so I don't -- you

19 know, I don't really know -- I'm trying to go to the slide.

20    I mean, let me just say that I think the slide -- given

21 the procedural posture, given the fact that this was -- you

22 know, this was still being worked out as to what could come in

23 and what could not come in, the slide was clearly

24 inappropriate; right?  I mean, that -- so that's -- you know, I

25 mean -- and, by the way, this is not the first time this has

```
 1    happened with the plaintiffs where a dispute was teed up and

 2    they didn't wait for the dispute to be resolved before they

 3    acted; right?  And so all of that will be taken into account in

 4    connection with the Order to Show Cause whether Ms. Wagstaff

 5    should be sanctioned.

 6         And my tentative inclination right now, by the way, is to

 7    sanction Ms. Wagstaff $1,000 for these transgressions.  I'm

 8    also wondering -- I will think about whether to issue an Order

 9    to Show Cause why the entire team should not be sanctioned

10    since presumably the entire team was responsible for those

11    slides and for that opening; but I'll consider that later, and

12    Ms. Wagstaff will have an opportunity to file something tonight

13    by 8:00 o'clock and will have an opportunity to be further

14    heard on the matter before I make my final decision.

15         MS. MOORE:  Your Honor, when would you entertain

16    argument on the show cause?

17         THE COURT:  What?

18         MS. MOORE:  When will you entertain argument on the

19    show cause?

20         THE COURT:  I'm not sure yet.

21         MS. MOORE:  Okay.  Thank you.

22         THE COURT:  We'll have to find a time.  Maybe tomorrow

23    afternoon.  Maybe Wednesday afternoon.

24         MS. MOORE:  Okay.

25         MR. KILARU:  I think it would be, through my memory,
```

1   about two thirds of the way through towards the end of the

2   animal section is I believe where it came up.

3        **THE COURT:**  Okay.  But I want to flip to the slide,

4   nonetheless, because, you know, the question is -- you know, as

5   I've said, this concept can come in but it's going to be

6   limited.  So the question is how to limit it.  I think the way

7   you are proposing my gut reaction is that that's too limited.

8   My guess is that the 50 pages of deposition testimony that they

9   want to designate is not limited enough.  I don't know.  It's

10  just a guess.

11       This quote "Short of a new study or finding tumors in

12  control groups, what can we do to get this thing off Group C,"

13  where was that from again?

14       **MR. KILARU:**  It's from the Gingrich memo, Your Honor.

15       **THE COURT:**  It's from the memo we still had not

16  decided if it was going to be admissible?

17       **MR. KILARU:**  Yeah.

18       **THE COURT:**  Okay.  And then what about this

19  February 1985 quote?

20       **MR. KILARU:**  I don't have it in front of me so I -- I

21  think you have the only copy.

22       **THE COURT:**  From EPA, "A prudent person would reject

23  the Monsanto assumption"?

24       **MR. KILARU:**  So that, I'm not sure exactly which

25  discussion, but it is one of the -- we did discuss many

**PROCEEDINGS**

```
 1   internal -- not internal documents but EPA documents at the
 2   point, and I think -- I don't know if -- just on that, I think
 3   one concern that we have is if -- and we understand
 4   Your Honor's ruling on this, EPA like IARC is supposed to be
 5   limited during the trial -- if we have a lot of EPA documents
 6   coming in from the 1980s that suggest doubt about glyphosate,
 7   it does seem to present a little bit of a --
 8          THE COURT:  No, I mean, I think -- I mean, one of the
 9   big questions that was running through my mind is that as
10   Ms. Wagstaff was presenting this, is has she completely
11   forgotten the forest from the trees because the plaintiffs
12   moved to exclude a variety of EPA documents.
13          MR. KILARU:  Right.
14          THE COURT:  And to then get up in the opening
15   statement and start quoting a bunch of EPA documents where it
16   was clear that they were probably not going to be admissible
17   and we hadn't even decided whether that memo -- it was still up
18   in the air whether that internal Monsanto memo was going to be
19   admissible, I mean, in addition to being, you know,
20   intentionally violative of my ruling on the *motion in limine* on
21   the mouse studies, it's, I mean, incredibly dumb.  You know, I
22   can't believe that she would have risked opening the door to
23   all of the EPA studies, all the EPA documents, that they wanted
24   to exclude and that I ruled are excludable.
25          MR. KILARU:  Right.
```

1          **THE COURT:**  So, you know, there's an issue of

2   misconduct here but there's also an issue of just, you know,

3   are the plaintiffs so intent on committing misconduct, that

4   they're not realizing that they're opening the door to bad

5   evidence against them.  So those are the issues that I'm going

6   to need to think about.  But again I'm not sure I can give you

7   an abstract ruling.

8          **MR. KILARU:**  That's fine, Your Honor.  I do think

9   that's helpful because one of our concerns is that one aspect

10  of the EPA story doesn't come in and maybe the later aspects

11  that we've got come out.

12         **THE COURT:**  I think they may have opened the door in

13  their opening statement.  I think they may have opened the door

14  to the later EPA documents.  I think that's a real possibility.

15         **MS. MOORE:**  And, Your Honor, if I can address two

16  things quickly; that with respect to the EPA, what we moved to

17  exclude were two documents in particular.  And the discussion

18  that you're referencing --

19         **THE COURT:**  Oh, I know.  I know what you moved to

20  exclude.

21         **MS. MOORE:**  Okay.

22         **THE COURT:**  And it was totally improper to be quoting

23  those EPA documents in the opening statement, and the whole

24  point was that -- the whole point of Monsanto's argument for

25  why those EPA documents that you moved to exclude should come

1    in were that they need to tell the whole picture because the

2    plaintiffs are trying to tell a misleading picture about the

3    EPA.

4         And so now that the plaintiffs have painted part of that

5    picture in their opening statement, it may very well be that

6    they've opened the door to those later EPA documents, and

7    that's something that I will need to consider in addition to

8    sanctioning Ms. Wagstaff for.

9         **MS. MOORE:**  And, Your Honor, we'll address that in the

10   response then.  Thank you.

11        **MR. KILARU:**  Other than that, Your Honor, I don't know

12   that we need to necessarily back and forth, though I'm

13   obviously happy to do whatever is convenient.

14        I thought I could just tell you what the other set of

15   objections are in broad brush that we made in case that helps.

16        **THE COURT:**  Okay.

17        **MR. KILARU:**  So just in categories.  One is the --

18        **THE COURT:**  You're talking about the Reeves testimony?

19        **MR. KILARU:**  In Reeves, yes.  So one is Knezevich,

20   which we just discussed.

21        A second is testimony sort of asking for Monsanto's

22   official position on other pieces of science and about the

23   general science around Roundup, which we think is more a

24   Phase II issue than Phase I issue.

25        A second category -- and just so you have it, there's some

1   examples of that on pages 29 and 30 and 182, just so you know

2   where the categories are that I'm talking about.

3        Second would be sort of failure-to-test arguments, that

4   certain tests weren't run.  Our position would be that that's

5   at most a Phase II issue without proof of what the studies

6   would show.  And there's examples of that at pages 32 to 35,

7   65, 519 to 22.  So, for example, questions about "You didn't

8   run this kind of test," I think our position would be that

9   absent proof of what that test would have showed, that doesn't

10  push the causation inquiry one way or another.

11       Third, there are a bunch of discussions of internal

12  e-mails among Farmer and Acquavella and Heydens and others

13  about reactions to studies.  And I know we talked about the AHS

14  '97 memo but there were also some other *motion in limine*

15  rulings about other internal reactions to studies.  So, for

16  example, there was a Farmer e-mail about the McDuffie abstract

17  and whether something was in it or out of it; and there's a lot

18  of e-mails of that nature that I think they're proposing to

19  introduce and try to discuss with Mr. Reeves.  So that's just

20  another category of those.

21       I actually think that's it in terms of broad-brush

22  categories.

23            THE COURT:  Okay.  Anything else?

24            MS. MOORE:  I don't think so, Your Honor.  We've set

25  forth our position in the transcript and as to why that

1    information should come in.  It's not getting in to -- we went

2    back and removed anything dealing with ghostwriting.  Of

3    course, unless they open the door later.  But this is about the

4    actual scientific studies, and so that's what we narrowed down

5    Dr. Reeves' testimony.

6             THE COURT:  Okay.

7             MS. MOORE:  Okay.

8             MR. KILARU:  Just one, sorry, Your Honor, last

9    housekeeping matter.

10            THE COURT:  Sure.

11            MR. KILARU:  On the exhibit disclosures, and this

12   might be something that could have helped with this morning,

13   but our understanding is that the exhibits that are to be

14   disclosed are basically anything that's marked with an exhibit

15   in the case.  So if something is marked as, say, Exhibit 904

16   and they intend to use that on an examination, or we do as well

17   and we would comply, that that should be disclosed as opposed

18   to if an exhibit is being shown sort of for pure demonstrative

19   purposes.  I don't think that would fall outside the rule.

20            THE COURT:  Yes, that's correct.

21            MR. KILARU:  Okay.  Thank you.

22            MS. MOORE:  And, Your Honor, the clarification, the

23   reason that he is raising this is that we reached an agreement

24   last week that demonstratives itself do not need to be on the

25   exhibit list.

**PROCEEDINGS**

1       When we first did the exhibit list, we --

2       **THE COURT:**  Disclose to them any documents,

3   demonstratives, or anything that you intend to use.

4       And, by the way, on that note, I'm going to require both

5   sides to disclose their closing argument slides to me in

6   advance.  So you're going to have to get your closing argument

7   slides done in advance because I'm going to review them in

8   advance.

9       **MS. MOORE:**  Okay.  But not to each other; correct?

10       **THE COURT:**  I mean, part of me wonders if you now

11   should be disclosing to each other, but I'd be fine just

12   reviewing them myself.

13       **MS. MOORE:**  Okay.  Thank you, Your Honor.

14       And just to clarify, I mean, because here's what kind of

15   happens with demonstratives, as the Court I'm sure is aware, is

16   that those are works in progress; and right now our rule is

17   that we have to exchange exhibits, which we've been doing, 48

18   hours in advance for a witness.  And, you know, typically

19   you're preparing with the expert the day before, and so we

20   would just ask that if it's demonstratives, that we would do

21   that the night before instead of 48 hours in advance.

22       **THE COURT:**  Any problem with that?

23       **MR. KILARU:**  I think we're all on the same page.  So

24   just to give two examples that are in the courtroom.  The

25   charts up here, you know, I think those to me, I don't know

**PROCEEDINGS**

 1   that those would need to be disclosed because they are sort of

 2   demonstratives.

 3        I guess my concern is that maybe an exhibit, like, say,

 4   I'm just going to use a random number, Exhibit 904, if they're

 5   going to use that, whether as a demonstrative or not, I think

 6   we should know that that's part of what they're going to be

 7   presenting so we have an opportunity to cross-examine and

 8   vice versa.  That's, I think -- that's the point I was trying

 9   to impress.

10        **THE COURT:**  So you're saying you don't want

11   demonstratives that are not identified as exhibits to be

12   disclosed?

13        **MR. KILARU:**  I'd probably phrase it the other way,

14   which is if an exhibit -- if something on the exhibit list is

15   going to be used with the witness in any capacity, we think

16   that that should be disclosed.

17        **THE COURT:**  Yeah.  That sounds fine.

18        **MS. MOORE:**  And what we had done is we were disclosing

19   to them what's on the exhibit list that's going to be entered

20   into evidence.  If we were just publishing --

21        **THE COURT:**  Anything you're going to use.

22        **MS. MOORE:**  Okay.  All right.  But we can do the

23   demonstratives the night before instead of 48 hours?

24        **THE COURT:**  Sure.

25        **MS. MOORE:**  Okay.

PROCEEDINGS

1          THE COURT:  That's fine.

2          MS. MOORE:  Thank you, Your Honor.  I appreciate that.

3          THE COURT:  Okay.

4          MR. KILARU:  Thank you.

5          THE CLERK:  Court is adjourned.

6          MS. MOORE:  Your Honor, I apologize.  We had a

7  request -- I'm so sorry.

8      We had a request about bringing in an extra TV screen to

9  show the documents for Dr. Portier's deposition because of the

10 way it was filmed in Australia.  We need to have one additional

11 screen.  I just want to make sure we had your permission to do

12 that.

13         THE CLERK:  I e-mailed you about this earlier today --

14         MS. MOORE:  I'm sorry.  I haven't checked my e-mail.

15 Sorry.

16         THE CLERK:  -- and there was a proposed order.

17     I e-mailed the whole group that was on there and it was

18 due by 1:00 p.m. today a proposed order so he could review it,

19 and that way they could get it in the building.

20         MS. MOORE:  I apologize, Ms. Melen.  Because I had

21 been in court all day --

22         THE COURT:  It doesn't sound like Portier is coming on

23 tomorrow anyway so hopefully you can find the right time to get

24 it done.

25         THE CLERK:  Okay.  We'll chat about a bunch of stuff

PROCEEDINGS

```
 1   anyway.
 2              MS. MOORE:   Thank you.
 3              (Proceedings adjourned at 3:31 p.m.)
 4                      ---oOo---
 5
 6
 7                 CERTIFICATE OF REPORTERS
 8         I certify that the foregoing is a correct transcript
 9   from the record of proceedings in the above-entitled matter.
10
11   DATE:   Monday, February 25, 2019
12
13
14
15   _____
16        Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
               U.S. Court Reporter
17
18
19   _____
20        Marla F. Knox, RPR, CRR
               U.S. Court Reporter
21
22
23
24
25
```