**Volume 5**

**Pages 784 - 846**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

EDWARD HARDEMAN,          )
                            )   **NO. C 16-00525 VC**
        Plaintiff,    )
                            )   **PAGES 788 - 795**
                            )     **PAGE 834**
                            )  **FILED UNDER SEAL**
  VS.                    )**BY ORDER OF THE COURT AND BOUND**
                            )     **SEPARATELY**
MONSANTO COMPANY,        )
                            )
        Defendant.    )
_____)

San Francisco, California
Wednesday, February 27, 2019

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

          ANDRUS WAGSTAFF PC
          7171 W. Alaska Drive
          Lakewood, Colorado  80226
     BY:  **AIMEE H. WAGSTAFF, ATTORNEY AT LAW**
         **DAVID J. WOOL, ATTORNEY AT LAW**

          MOORE LAW GROUP
          1473 South 4th Street
          Louisville, Kentucky  40208
     BY:  **JENNIFER MOORE, ATTORNEY AT LAW**

     **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Marla F. Knox, RPR, CRR
             Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
             Official Reporters

```
1    APPEARANCES:  (CONTINUED)

2    For Plaintiff:

3                        BAUM HEDLUND ARISTEI GOLDMAN PC
                         12100 Wilshire Blvd. - Suite 950
4                        Los Angeles, California  90025
                    BY:  ROBERT BRENT WISNER, ATTORNEY AT LAW
5
     For Defendant:
6
                         WILKINSON  WALSH ESKOVITZ LLP
7                        2001 M Street, NW - 10th Floor
                         Washington, D.C.  20036
8                   BY:  BRIAN L. STEKLOFF, ATTORNEY AT LAW
                         RAKESH N. KILARU, ATTORNEY AT LAW
9                        TAMARRA MATTHEWS JOHNSON, ATTORNEY AT LAW
                         JULIE RUBENSTEIN, ATTORNEY AT LAW
10                       CALI COPE-KASTEN, ATTORNEY AT LAW

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    **I N D E X**

2    Wednesday, February 27, 2019 - Volume 5

3    **PLAINTIFF'S WITNESSES**                    **PAGE**   **VOL.**

4    **PORTIER, CHRISTOPHER**
     By Video Testimony (not reported)             799     5
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    <u>**Wednesday - February 27, 2019**</u>                    <u>**8:18 a.m.**</u>

2                    <u>**P R O C E E D I N G S**</u>

3                        **---oOo---**

4        (Proceedings were heard out of presence of the jury:)

5            **THE COURT:**  Hi, everybody.  I heard you have a couple

6    of items for me.  But before we get to those, I know the last

7    couple of days have been -- have had a lot of high drama.

8    Unfortunately, I have one more item of drama related to a juror

9    that I need to discuss with you at sidebar.

10       (Pages 788 through 795 were placed under seal by Order of

11   the Court and bound separately.)

1        (The following proceedings were heard at the sidebar:)

2        **MR. STEKLOFF:**  This part does not need to be sealed.

3   We are not objecting to what the expectation is -- and it is

4   the video that is ready that -- the Portier direct is now what

5   is going to be played.  I just want to make sure because some

6   of your rulings were tentative.

7        **THE COURT:**  Yeah.

8        **MR. STEKLOFF:**  You haven't seen day 2.

9        **THE COURT:**  If that's what they want to put on right

10  now, then, you know, as always happens in trial, the question

11  will be Did this direct testimony open the door to, you know,

12  cross-examination on something that might not originally have

13  come in.

14       **MR. STEKLOFF:**  Okay.  I'm comfortable with that.  We

15  do not want to waste time.

16       **THE COURT:**  How long is the direct?

17       **MS. MOORE:**  It is 3 hours and 41 minutes.

18       **THE COURT:**  Oh, my God.

19       **MR. KILARU:**  This is the first part of it.

20       **MS. WAGSTAFF:**  That's because it is --

21       **MR. STEKLOFF:**  More that you will see in the day 2.

22       **MS. MOORE:**  It is less than --

23       **THE COURT:**  I'm glad Brad will be part of this trial

24  after all.

25       **MS. MOORE:**  I'm sure he is too, Your Honor.

1          **THE COURT:**  Thank you.

2          (The following proceedings were heard in open court:)

3          (Proceedings were heard in the presence of the jury:)

4          **THE COURT:**  Welcome back, everybody.  We are prepared

5     to begin this morning.

6          And Ms. Wagstaff or Ms. Moore, do you want to call your

7     next witness?

8          **MS. MOORE:**  Thank you, Your Honor.  Plaintiff's call

9     Dr. Chris Portier.  And this will all be by video deposition

10    by -- and it was taken by our colleague Mr. Brent Wisner and

11    so -- Your Honor, as far as the deposition instruction that you

12    gave yesterday, I don't know if we need to redo that or if

13    that's --

14         **THE COURT:**  No.  I think that's okay.  I'm sure they

15    remember.

16         **MS. MOORE:**  Thank you, Your Honor.

17         **MR. STEKLOFF:**  Your Honor, we might move chairs

18    around.

19         **THE COURT:**  Feel free.

20         **MS. MOORE:**  And, Your Honor, because of the length of

21    the direct examination, at what point, if you just want to let

22    us know, that we should take a break, Mr. Wool then can stop

23    the video and we will take a break; but I will leave it up to

24    the Court's discretion.

25         **THE COURT:**  Will do.

1    **MS. MOORE:**  Thank you.

2           **(Video was played but not reported.)**

3                    **(Video stopped.)**

4    **THE COURT:**  Next sensible point to pause, let's take a

5    five-minute break.

6    **MR. WISNER:**  There is a section right at the end of

7    the Wood study that is perfect.  I will let them know.

8    **THE COURT:**  Great.  Thanks.

9           **(Video was played but not reported.)**

10   **THE COURT:**  Why don't we take a short morning break.

11   We will take a couple of breaks this morning to make sure

12   everybody remains alert.  We will resume at ten minutes to the

13   hour.

14   (Proceedings were heard out of presence of the jury:)

15   **THE COURT:**  I want to make a brief comment to the

16   gallery before everybody leaves.  I mentioned this yesterday,

17   but I want to mention it again in case somebody is here who

18   wasn't here yesterday.  I want to remind everybody that jurors

19   are walking around in this building, particularly during the

20   lunch hour and occasionally during the breaks.  Everybody who

21   is watching this trial, particularly news media, need to be

22   very careful what they say about the case when they are walking

23   around in the building or when they are in the elevators.  It

24   is very important that a juror not overhear anything that

25   anybody says.  So one of the measures I'm going to take to

1   minimize the risk of a juror inadvertently hearing something is

2   that I'm going to require anybody in the gallery to remain in

3   the gallery five minutes after the jury leaves for its lunch

4   break so that the jury can head down in the elevator and get to

5   the cafeteria or get to wherever they are going and minimize

6   the risk that they are sharing an elevator with somebody in the

7   gallery who might make the very big mistake of talking about

8   the case in front of people who they don't know.  So that will

9   be the rule, and I just want to remind everybody that you

10  are -- you are all under orders to not speak about the case in

11  the building in a way that you can be overheard.  We will be

12  back in a few minutes.

13                  (Recess taken at 9:47 a.m.)

14                  (Proceedings resumed at 9:54 a.m.)

15      (Proceedings were heard out of presence of the jury:)

16          THE COURT:  I have one quick question before we bring

17  the jury back in.  I think you-all said this morning that there

18  is like three and a half hours of Portier testimony cut; is

19  that right?

20          MS. WAGSTAFF:  Yeah, I believe it is like 3 hours, 45

21  minutes, something like that.

22          THE COURT:  The idea -- what is the plan after that?

23  I got the rest of the Portier testimony late last night, and I

24  haven't looked at it yet.  So what is -- what is your plan for

25  me in terms of when I should look at that and what is your plan

1   for when the current cut of the Portier deposition is done?

2        **MS. WAGSTAFF:**  Our plan would be that we play -- I

3   think there is a little bit left of the direct so what we have

4   today is day 1.

5        **THE COURT:**  Okay.

6        **MS. WAGSTAFF:**  His testimony was three days, and it

7   was day -- but it was short days -- day 2 Mr. Wisner finished

8   the direct and Monsanto finished their cross.

9        **THE COURT:**  Okay.

10        **MS. WAGSTAFF:**  So that would complete sort of the

11   package and day 3 was what both parties consider to be either

12   rebuttal or Phase Two testimony.  So our request to you would

13   be that if you could -- if you had time to look at and rule on

14   the first two objections.

15        **THE COURT:**  The first two objections in what?

16        **MS. WAGSTAFF:**  I will pass to Mr. Wisner.

17        **MR. WISNER:**  If you can rule on the first two

18   objections to get us through the completion of direct over

19   lunch -- just two objections -- then we can finish the direct

20   today.  That will take us four hours.

21        **THE COURT:**  Do you have any other testimony you want

22   to play if we have a little extra time, one of the treating

23   doctors or something like that?

24        **MS. WAGSTAFF:**  We could play one of the treating

25   doctors.  I would presume you-all would want to do your cross

**PROCEEDINGS**

 1   before we play anyone else.

 2        **MR. STEKLOFF:**  Can I think about it?

 3        **THE COURT:**  Yeah.  I mean, I will tell you that I

 4   don't think -- I think it is more important to use our time

 5   wisely; and I don't think there is any problem with taking that

 6   out of order, particularly if it is a short clip from a

 7   treating doctor or something like that; get that out of the

 8   way.

 9        **MR. WISNER:**  I think we have that ready to go, so I

10   will talk to Jennifer and she will --

11        **MS. WAGSTAFF:**  She is right behind you.

12        **THE COURT:**  Remember, there were a couple changes that

13   were made to, I think, the oncologist testimony.

14        **MR. STEKLOFF:**  We are working through -- well, first

15   of all the age as a risk factor but also --

16        **THE COURT:**  -- the remission issue?

17        **MR. STEKLOFF:**  Yes, and I will say we have flagged --

18   I don't know their position yet -- that we also think -- given

19   that remission is coming up, we also think chemotherapy

20   testimony should come out.  There is some chemotherapy

21   testimony that talks about hepatitis C and hepatitis B testing,

22   and we tried to leave that in.

23        **THE COURT:**  I don't really recall anyone laying it on

24   thick on the chemo testimony.

25        **MS. MOORE:**  They don't, Your Honor.

1          THE COURT:  If you want to re-raise that with me,

2     that's fine.

3          MR. STEKLOFF:  There are short portions.  I don't know

4     that I would describe it as laying on thick.  It clearly goes

5     more to pain and suffering than causation for sure.

6          THE COURT:  Okay.

7          MR. STEKLOFF:  We have tried to be limited in pulling

8     that out.

9          THE COURT:  Okay.

10          MR. STEKLOFF:  I have one issue on Dr. Portier.

11          MS. MOORE:  Before you go there, we did get revised

12     transcripts late last night -- I'm looking at those -- on the

13     doctors.  We are trying to work those issues out.  I want to

14     make sure we have an opportunity to do that if there is any

15     issue we need to raise with the Court.  I'm on that.

16          THE COURT:  Okay.

17          MR. STEKLOFF:  Our view -- in planning purposes our

18     view -- subject to them weighing in -- is in Dr. Turley, who

19     was the ENT, which I think is 15 to 20 minutes.

20          MS. MOORE:  19 minutes.

21          MR. STEKLOFF:  There was nothing that needed to be

22     changed, and so that might be a good example of something that

23     could be played today.

24          THE COURT:  Okay.

25          MR. STEKLOFF:  Dr. Portier -- I mean, I think we are

1    now at the time -- maybe not this second -- where we have to

2    decide this opening the door issue.  I think he is the

3    witness -- if the door has been opened through a combination of

4    Plaintiff's opening -- I think maybe some of the testimony we

5    heard today, and I will specifically flag the bottom of page 44

6    where he talked about why he does this, his 36 years evaluating

7    animal and human cancer data.  Then he went on to say that is

8    sort of the primary thing my career has been aimed at, and I

9    feel that having looked at the way that these agencies -- this

10   is after he was shown the union letter, he is also talking

11   extensively about EPA there looked at the particular pesticide.

12   They have missed all the rules that are in place that they

13   should have followed in doing the evaluation.

14        THE COURT:  Do I recall correctly that I flagged that

15   as an especially tentative ruling?  There was one that I

16   flagged as extra tentative.

17        MR. WISNER:  No.  That was related to the EFSA letter

18   on showing the authors.  That's what I understood.

19        THE COURT:  Okay.  But let me -- and I don't remember

20   as I sit here, let me ask you this more practical question -- I

21   mean, I understand what you are saying; but should we really be

22   talking about this now with the jury waiting to come back in?

23        MR. STEKLOFF:  We can push it.  I guess my point is

24   there might be things we need to pull out from Phase Two that

25   we think now have opened the door.  I just want to be planning.

1          **THE COURT:**  It seems like maybe lunch hour is the best

2     time to talk about that.

3          **MS. MOORE:**  I think that goes both ways, Your Honor.

4     I think we will be prepared to talk about what should come in

5     too.

6          **THE COURT:**  Okay.  Bring in the jury.

7          (Proceedings were heard in the presence of the jury:)

8          **THE COURT:**  You can resume.

9          **(Video was played but not reported.)**

10         **THE COURT:**  Before we do that, why don't we take

11    another five-minute break.  We will resume at a quarter to.

12       (Proceedings were heard out of presence of the jury:)

13         **THE COURT:**  The reason I called a slightly premature

14    break is that it seems to me -- I mean, I don't have

15    Dr. Portier's deposition -- designations in front of me.  It

16    seems to me that some of the testimony that has come in is

17    inconsistent with my rulings on the designations on the

18    objections, so I'm trying to figure out what is going on.  The

19    issue in particular is that that I have noticed a couple of

20    times the reference to the EPA guidelines and I -- you know,

21    I'm looking back at my ruling, and I know that there was an

22    objection that was made at page 80 to a bunch of Portier

23    testimony; and I said that it was sustained to the extent that

24    it was couched in the EPA guidelines, but you can use the

25    testimony without if you remove references to the EPA

1  guidelines.  I'm not sure if that particular testimony that I

2  ruled on was the testimony that I heard referencing the EPA

3  guidelines or if that was some other testimony referencing the

4  EPA guidelines that Monsanto had not objected to or at least an

5  objection was not noted from Monsanto in the document that was

6  delivered to me.  But it seems like we may have a little bit of

7  an issue with the way the testimony has been cut.

8          MR. WISNER:  Sure.  I can walk you through exactly

9  what happened.  The portion that the Court sustained was

10  removed, and I actually met and conferred with counsel last

11  night, and we agreed on how it would be played.

12      The other references to EPA guidelines, Monsanto never

13  objected to and, in fact, last night they actually were

14  e-mailing me about different portions that referenced EPA

15  guidelines asking me to remove them.  I said sure, sure, sure.

16  We agreed to remove all of them.  We also gave them a copy of

17  the video which they sent us an e-mail about at 2:30 last night

18  saying change this, change that.  Otherwise, it is fine.

19      We weren't trying to do anything.  We followed the Court's

20  order a hundred percent, and I didn't know they were in there

21  to be honest.  I wasn't looking at that.  Monsanto didn't

22  object.  We followed the Court's order completely and we were

23  up pretty late last night working on it.

24          THE COURT:  The issue is whatever the document that

25  was delivered to me containing Portier's testimony had a

1   list -- had flagged -- the objections were flagged, and you are

2   saying the portions of the testimony that came in referencing

3   the IARC guidelines were -- there was no objection in the

4   document that was given to me?

5          MR. WISNER:  That's correct.  Now, notwithstanding

6   that, in light of your ruling on page 80, Monsanto flagged

7   other portions where EPA guidelines were discussed and asked us

8   to remove them last night; and we agreed to.  The ones that got

9   through are ones that Monsanto didn't flag for us, and we

10  weren't -- I mean, I didn't go through it and anticipate

11  objections that Monsanto might make in light of your rulings

12  and flag it to their attention.  I mean, that's -- I didn't

13  have -- I mean, I just didn't do that.  So these were -- to the

14  extent that these are being played, it is being done with the

15  consent of Monsanto having reviewed the transcripts and the

16  video itself.

17         MR. STEKLOFF:  I think consent is a strong word.  I

18  wasn't part of the process, I will concede, Your Honor, but I

19  have noticed like Your Honor several references to EPA

20  guidelines.  I have already when -- when it started, it perked

21  my ears up.  I flagged another one that looks like it is coming

22  up -- or at least a different variation -- so when you are

23  trying to answer that bigger question, there are things like in

24  the EPA evaluation you would like to see in talking about some

25  of the tumor that he is going to be describing.  So I will

1    concede that I do not know exactly what was flagged for them or

2    not last night.  I am concerned about the testimony.  I

3    think -- I think it does play into whether the door has been

4    opened given that the direct has come in this way with other

5    things as well.

6          THE COURT:  Well, there will -- there is always --

7    given the direct has come in -- I mean, you don't -- there is

8    no obligation to object to testimony coming in.  You may decide

9    not to object to certain testimony coming in because you want

10   the door to be opened, right.  So I think in that respect we

11   treat this testimony like any other testimony; and if Monsanto

12   didn't specifically flag these aspects of the testimony, and

13   object to them -- you know, I, of course, didn't read the

14   entire testimony.  I only went through the objections and ruled

15   on the objections and, you know -- I think this testimony

16   should continued to be played as it has been cut.  But the

17   question whether these references to the EPA guidelines opens

18   the door to anything is a separate question.  I think we will

19   treat that question as we would any other testimony that came

20   in on direct.  Of course, we don't need to discuss that now;

21   but we will need to discuss that soon I assume.

22         MR. WISNER:  Sure.  I think our concern is that, you

23   know, a lot of the stuff that was removed talking about the

24   EPA, we did in light of the Court's ruling.

25         THE COURT:  Right, and if it -- if that were to open

1    the door to something that wouldn't otherwise come in, then

2    presumably you would be able to re-designate some of that

3    testimony on redirect.

4         **MR. WISNER:**  Precisely.  And that's exactly what I'm

5    concerned about.  If they want to do that, we can go down that

6    hole.  I would also say, Your Honor, I think from a substantive

7    perspective, I think there has been no testimony from

8    Dr. Portier that the EPA was wrong or that they didn't apply

9    their guidelines, which I thought was the heart and soul of the

10   issue.

11        **THE COURT:**  I think -- in other words, what you are

12   saying is in the grand scheme of his testimony these occasional

13   references to the EPA guidelines are relatively minor.  I think

14   I probably agree with you about that.  We can have a discussion

15   later about the extent to which it opened the door and what it

16   may have opened the door to.

17        **MR. WISNER:**  Sure.

18        **THE COURT:**  All right.  Sounds good.  Does anybody --

19   should we just call the jury back in or do you want to take a

20   couple minutes?

21        **MS. WAGSTAFF:**  We can call the jury back in.

22        **THE COURT:**  Although they might not be quite ready.  I

23   told them five minutes; right.  Why don't we take two more

24   minutes.

25        **MS. MOORE:**  Thank you, Your Honor.

PROCEEDINGS

```
1          THE CLERK:  Court is in recess.

2               (Recess taken at 10:45 a.m.)

3               (Proceedings resumed at 10:50 a.m.)

4      (Proceedings were heard out of the presence of the jury:)

5          THE COURT:  Okay.  Go ahead and bring the jury back

6   in.

7      (Proceedings were heard in the presence of the jury:)

8          THE CLERK:  Please be seated.

9          THE COURT:  Okay.  Welcome back.  You can resume.

10          (Video was played but not reported.)

11          THE COURT:  Okay.  Good time for a break?

12      MS. MOORE:  Yes.

13          THE COURT:  All right.  Thank you.

14   So we will go ahead and take our lunch break.  I'll remind

15   everybody a couple of things.

16      Do not talk to one another about the case.  Don't talk to

17   anybody else about the case.  And, you know, try, to the extent

18   possible, when you're walking around the building and whatnot,

19   to keep away from people who you think might be talking about

20   the case.

21      So with that, we'll resume at 12:30 and have a good lunch.

22      (Proceedings were heard out of the presence of the jury:)

23          THE COURT:  Okay.  And some people in the courtroom

24   right now may not have been in the courtroom when I said this,

25   but there will be a rule in this trial that everybody who's in
```

1    the courtroom at the start of the lunch break has to stay in

2    the courtroom for five minutes while we give the jurors a

3    chance to use the elevator, get downstairs, just to minimize

4    the chances of any juror overhearing something inadvertently.

5         So why don't we use these five minutes to talk.  I forgot

6    to bring the Portier testimony out with me so one thing we

7    could do, I could run back and get it real quick and we could

8    talk through those two additional objections you wanted me to

9    rule on real quick.

10        **MR. STEKLOFF:**  Sure.  My colleague is going to handle

11   the two additional objections.

12        On the issue I raised before, Your Honor, I sort of

13   conferred over the break about opening the door.  I want to

14   reflag testimony that is at the bottom of page 44 and page 45.

15        **THE COURT:**  Well, let me go grab his testimony.

16        **MR. STEKLOFF:**  No problem.

17        **THE COURT:**  Oh, okay.  Jordan's getting it.

18                   (Pause in proceedings.)

19        **THE COURT:**  I was also curious where we were on the

20   magic tumor, the evidence that was going to come in on that.  I

21   thought the way we left it is that you-all were working out

22   sort of a way to deal with that consistent with my ruling.

23        **MS. MOORE:**  Yes, Your Honor.  We haven't finished that

24   yet.

25        **THE COURT:**  Okay.

PROCEEDINGS

 1          **MR. WISNER:**  It won't come up in Dr. Portier's

 2    testimony.

 3          **THE COURT:**  I was going to say -- that was going to be

 4    my next question.  Would it come up in Reeves?  Is that where

 5    it would come up?

 6          **MR. WISNER:**  Yes, primarily.  It does -- we did cover

 7    it in the rebuttal for Dr. Portier.  So if it's opened up, we

 8    might designate that for later; but as of right now, for what

 9    we have before the Court, it's not in.

10          **THE COURT:**  Okay.

11          **MR. STEKLOFF:**  Day one or day two, Your Honor?

12          **THE COURT:**  Oh, yeah, I have day one.  So we can talk

13    about the issue.

14          **MR. STEKLOFF:**  Right.

15       So all I want to flag for Your Honor -- and to be clear,

16    because Mr. Wisner asked, I'm not saying this should not have

17    been played, I am just saying that at the bottom of page 44 and

18    the top of page 45 --

19          **THE COURT:**  Okay.

20          **MR. STEKLOFF:**  -- there was a question, "Why are you

21    doing it then?"  This was after Mr. Wisner had walked through

22    the -- in part walked through that letter that he sent to the

23    European authorities and then flagged -- this is where you --

24    I'm now saying prior to page 44 is right when you said you had

25    your tentative ruling that was very tentative, and that's where

 1   the De Roos issue came up.

 2        And then he's asked, "Why are you doing it then?"  And

 3   part of that answer says -- you know, he goes on to say, "That

 4   is sort of the primary thing my career has been aimed at."  And

 5   the part that I think opens the door in part is "and I feel

 6   that having looked at the way these agencies looked at this

 7   particular pesticide" -- so he's talking particularly about

 8   Roundup -- "it missed all the rules that are in place that they

 9   should have followed in doing the evaluation."

10        Now, I will flag that the remedy we are asking for is

11   actually not to sort of bring in a bunch of things that the

12   parties examined Dr. Portier on in what we consider Phase II.

13   So I think the --

14        THE COURT:  One question I have about this.  So I

15   sustained the objection to this portion of the testimony that

16   was played to the jury today.

17        MR. WISNER:  So, Your Honor, let me clarify exactly

18   what occurred because I think there's some confusion because

19   Mr. Stekloff wasn't involved.

20        They originally objected to that entire question and

21   answer, and then yesterday morning before I brought to the

22   Court the objections, they actually withdrew their objections

23   up until starting on page 45, line 2 through 5.

24        THE COURT:  Right.  But I -- didn't that -- and I

25   sustained the objection to that and I thought that came in.  I

 1   thought I heard that.

 2          **MR. WISNER:**  No.

 3          **THE COURT:**  No?

 4          **MR. WISNER:**  We cut out the last paragraph.

 5          **THE COURT:**  Okay.  Okay.

 6          **MR. STEKLOFF:**  Yeah, I don't think lines 2 through 5

 7   were played to the jury.  I would agree with that, Your Honor.

 8          **THE COURT:**  Okay.

 9          **MR. STEKLOFF:**  But the remedy we're asking for is

10   actually just that -- we are not going to change what we are

11   seeking to admit, which was submitted last night in the

12   cross-examination that occurred on the second day of

13   Dr. Portier's examination in Australia.  I think -- we -- I was

14   not there, but --

15          **THE COURT:**  We got -- so I'm guessing that we got --

16   it was filed last night at, like, 11:00 o'clock but we have not

17   received a hard copy of that yet is my understanding.

18          **MR. WISNER:**  It's right here.

19          **THE COURT:**  Okay.

20          **MR. STEKLOFF:**  And I will hand that up.

21       We think everything in that, to be clear, was, of course,

22   already in line with your guidance that we received in the

23   *motions in limine* both on that European authorities could come

24   in through their response to Dr. Portier's letter.

25       I also recall -- or it's my understanding that the parties

PROCEEDINGS

1    made a call to you from Australia talking about EPA response to

2    Dr. Portier.  You gave some guidance on you could ask a few

3    questions but don't go too far.

4        So I think that has been designated by us on day two.  I

5    think the plaintiffs have maintained objections to that, and we

6    just think that -- I think, as you go through that portion,

7    this -- what I'm flagging for you on page 44 and 45, in

8    addition to what was said in opening, and maybe to a lesser

9    extent the various references we've now heard to the EPA

10   Guidelines can factor into how you rule on the objections.

11            THE COURT:  Okay.

12            MR. STEKLOFF:  But we're not trying to --

13            THE COURT:  But the upshot of what you're saying is

14   that my general ruling applies, which in your view my pretrial

15   ruling applies about this, which is that the Plaintiffs' *Motion

16   in Limine* Number 4 to exclude decisions by foreign regulators

17   is granted for Phase I subject to the limited exception that

18   Monsanto may briefly cross-examine Dr. Portier on his efforts

19   to convince European regulators to ban Roundup in a way that

20   reveals that his efforts have thus far been unsuccessful.

21            MR. STEKLOFF:  Yes.  And what I would say --

22            THE COURT:  I don't know that that means -- I mean,

23   you made reference to documents from the European regulators

24   coming in.  I don't know that that means that documents from

25   the European regulators are going to be able to come in.  I

 1   will, however, take a look at the testimony that you've

 2   designated.  And same concept for EPA.

 3          **MR. STEKLOFF:**  And I'm fine with that, but what I

 4   would say, Your Honor, is now Dr. Portier's letter, just as an

 5   example, was shown to the jury.

 6          **THE COURT:**  Okay.

 7          **MR. STEKLOFF:**  It was highlighted.  It was --

 8          **THE COURT:**  And that was not -- was that a subject of

 9   objection?  Did you object to that?

10          **MR. STEKLOFF:**  No, we didn't object to that, but I

11   think that that is relevant to whether the European response to

12   that specific letter, that it was -- brought out the number of

13   scientists who signed onto the letter.  It was brought out that

14   Dr. De Roos was part of it.  It was brought out that --

15          **THE COURT:**  Yeah.

16          **MR. STEKLOFF:**  -- I believe it was a Dr. Lynch,

17   although I might get the name wrong --

18          **MR. WISNER:**  That's correct.

19          **MR. STEKLOFF:**  -- was also part of it.  And that is

20   all relevant to whether we can, therefore, show the documents

21   that we showed Dr. Portier in response.

22        But, again, that was -- what was done at the deposition is

23   still consistent with the ruling -- the *motion in limine* ruling

24   that you just read.

25          **THE COURT:**  Okay.

1      **MR. WISNER:**  Your Honor, two very quick comments

2   simply because I think this is a really important fact.

3      You're going to be looking at the objections when you read

4   through this.  Our objection to the testimony that they're

5   offering about the documents doesn't include an objection to

6   the first part where they go "They disagreed with you; right?"

7   And he goes "Yes."

8      Our objection is when they then take the document and they

9   read portions of it and ask Dr. Portier, "Did I read that

10  correctly?"  And if you read our objection, we make it clear

11  that we don't object to that they disagree, but we think this

12  crosses the line that the Court drew.

13      **THE COURT:**  I understand.

14      **MR. WISNER:**  Okay.

15      **THE COURT:**  And it may be affected by the presentation

16  during direct of the paper that Dr. Portier and his hundred

17  and -- how many colleagues?

18      **MR. WISNER:**  95 or 96.

19      **THE COURT:**  -- submitted to the regulators, but I'll

20  take a look at that.

21      **MR. WISNER:**  Fair enough.

22      I also think there's a procedural point here and, you

23  know, we have the luxury of being able to spend many hours

24  going through these documents, this testimony, and making

25  objections; and if they didn't make an objection, I believe

 1   their right for a remedy is waived by procedure.

 2        THE COURT:  Why?  I mean, again, you can make a choice

 3   not to object to something when it's coming in because you

 4   would prefer that it come in and that it open the door to

 5   something else; right?

 6        MR. WISNER:  I don't believe that -- if they thought

 7   it was a violation of a *motion in limine*, which they're now

 8   saying it was, they have to say something; and if they don't,

 9   they waive that argument on appeal and at trial.  And they

10   didn't object.  In fact, they withdrew the objection after they

11   made it.  I mean, that seems particularly disingenuous if

12   they're trying to sneak a backdoor in.

13        THE COURT:  I'm not really sure I understand that

14   because I, you know, remember the last trial I did as a lawyer,

15   it was a police case, and the plaintiff's lawyer -- there was a

16   *motion in limine* and the plaintiff's lawyer brought in some

17   evidence that was contrary to the *motion in limine*, and we had

18   a little debate amongst ourselves at counsel table, and we

19   decided not to object because it opened the door to some great

20   evidence for us.

21        MR. WISNER:  Sure.

22        THE COURT:  So why is this not the same thing?

23        MR. WISNER:  Because that's different than what

24   happened here.  So what happened in trial is a different story.

25   You have an immediate ruling from the Court.  You have an

1  immediate opportunity to reflect problems that you think might

2  exist or you have a right to open that door.

3     In the deposition we sat for many hours and we removed

4  testimony because they said that violated the *motion in limine*;

5  right?  And we agreed.  That's through this meet-and-confer

6  process.

7     And then they say, "Okay.  This one's fine."  So

8  assumption is they don't think it's opening a door; and if

9  they're saying, "Oh, it did now," I mean, that's -- I mean,

10  come on.

11         THE COURT:  I get that point.

12         MR. WISNER:  Okay.  So that's all I'm concerned about.

13         THE COURT:  I think I understand everybody's views on

14  that, and I'll look at it with an eye towards that.

15     But were there a couple of -- on day two there are a

16  couple of quick rulings that you want?  Can I do them right

17  now?

18         MR. WISNER:  Yeah.

19         THE COURT:  Can we do them together?

20         MR. WISNER:  I think that would be great, Your Honor.

21         MR. STEKLOFF:  Yeah.  Your Honor, I'm just going to

22  introduce my colleague Cali Cope-Kasten, who I don't think has

23  appeared yet before Your Honor, but she is going to argue these

24  objections.

25         THE COURT:  Great.  Hello.

PROCEEDINGS

1      **MS. COPE-KASTEN:**  Good morning, Your Honor.

2      **THE COURT:**  So what page should I go to?

3      **MS. COPE-KASTEN:**  The first page is 283, line 21,

4  through 284, line 22.

5      **THE COURT:**  Okay.  Let me read it.

6                  (Pause in proceedings.)

7      **THE COURT:**  Okay.  So I understand your objection on

8  this but, you know, pursuant to the framework that we have

9  developed on this yesterday -- and I'm increasingly convinced

10  the more I think about it that it's the correct framework --

11  this would come in; that is to say, you know, experts can

12  testify, as experts do, about particular studies and the

13  numbers emanating from particular studies in the context of

14  general causation; but in the context of specific causation, I

15  think that all of the experts should be limited to -- again,

16  unless the door is opened -- all of the experts should be

17  limited to saying that there's a dose-response and refer back

18  to the general causation opinions for that.

19      So I would overrule this objection.

20      What's the next one?

21      **MS. COPE-KASTEN:**  Page 288, line 22, through page 289,

22  line 19.

23                  (Pause in proceedings.)

24      **THE COURT:**  I mean, did you have -- let me just make

25  sure.  On the last one, do you have some other objection that I

 1    didn't anticipate in my comments?

 2          MS. COPE-KASTEN:  The objection would be to leading,

 3    Your Honor.  In this case, for example, the number for the

 4    McDuffie study has not been given, and so the objection would

 5    be to Mr. Wisner saying at line 24, "So in McDuffie we have

 6    between zero and two days per year and the risk ratio is 1.

 7    What does that mean?"

 8       Obviously we don't have a concern about "what does that

 9    mean" with respect to leading, but just the lawyer testimony

10    about what the McDuffie study shows we believe is

11    inappropriate.

12          THE COURT:  Okay.  I understand that.  That's

13    overruled.

14       And then the next one you said was on page?

15          MS. COPE-KASTEN:  Page 288, line 22.

16          THE COURT:  Okay.

17                      (Pause in proceedings.)

18          THE COURT:  Okay.  And the objection here is just that

19    it's a leading question?

20          MS. COPE-KASTEN:  Correct, Your Honor.

21          THE COURT:  Okay.

22          MR. WISNER:  And, Your Honor, in the context we're

23    looking at a diagram that shows what I'm saying.  So it's not

24    like I'm just making stuff up.

25                      (Pause in proceedings.)

PROCEEDINGS

1          MS. COPE-KASTEN:  Your Honor, regardless of whether

2     there is a diagram being shown, for him to ask in this

3     particular way that it's NHL that keeps popping up, not some

4     other type of cancer, he's clearly directing the witness to

5     give a particular answer about the subtype that we're talking

6     about here, and that's what the issue is with respect to

7     leading.

8          THE COURT:  Is there a description that I can

9     reference here to that diagram?

10         MR. WISNER:  It's the plot summary, Your Honor, the

11    never/ever plot summary.

12         THE COURT:  Okay.

13         MR. WISNER:  I don't know.  Was that used with

14    Dr. Ritz?  I wasn't here.

15         MS. MOORE:  Yes.

16         MR. WISNER:  Then it's essentially that exact one.

17         THE COURT:  Okay.  Now let me look at the question

18    again.

19                    (Pause in proceedings.)

20         MS. COPE-KASTEN:  In other words, it's not apparent

21    from the face of the plot summary itself that we are, in fact,

22    talking about NHL.  So it's not that that's something that the

23    jury can obviously visually see by looking at the exhibit.

24         THE COURT:  And then just can you remind me?  So what

25    is he talking about here when he says "But there are other case

**PROCEEDINGS**

1    control studies here that looked at various other -- the

2    endpoints and other diseases for glyphosate and really saw

3    nothing"?

4          **MR. WISNER:**  Sure.  There's been plenty of

5    epidemiological studies that have looked at other types of

6    cancer.

7          **THE COURT:**  But which -- so which ones?  Of the ones

8    we've been looking at, which ones?

9          **MR. WISNER:**  Oh, gosh.  They're in his report and

10   they're discussed very briefly in sort of tangential

11   references, but it's not something we discussed because it's

12   not about NHL so we haven't spent time talking about them with

13   the Court in *Daubert*, for example.

14         **THE COURT:**  I see.  So these studies that he's talking

15   about are studies that are not on the plot.

16         **MR. WISNER:**  That's correct.

17         **THE COURT:**  But he's answering your question that way.

18         **MR. WISNER:**  That's correct.  And then --

19         **THE COURT:**  Is there any testimony anywhere about --

20   anywhere else about the other glyphosate studies that have

21   asked about other diseases?

22         **MR. WISNER:**  Well, it comes up in the specificity

23   prong of the *Bradford Hill* analysis and that there's two types

24   of specificity.

25         **THE COURT:**  Right.  But Dr. Ritz didn't testify about

1    that at all.

2         MR. WISNER:  Oh.  Portier went on at length about

3    specificity in *Bradford Hill*.

4         THE COURT:  And he talks about the fact that there's

5    these other studies of glyphosate that inquire into other

6    diseases and they come out?

7         MR. WISNER:  Not at length, but he says that the

8    studies don't show other cancers.  They're just showing NHL,

9    and that's a specificity point.

10        THE COURT:  Okay.  I understand that objection.  It's

11   overruled.

12       So the rest of it, it looks --

13        MR. WISNER:  It's mostly cross, Your Honor.

14        THE COURT:  Is there nothing else on -- so --

15        MR. WISNER:  For his direct, there's no more

16   objections.

17        THE COURT:  But I'm looking through this testimony and

18   I'm not seeing any actual objections flagged on this document.

19        MR. WISNER:  So that takes -- well, I'll let defense

20   counsel explain.

21        MS. COPE-KASTEN:  Your Honor, we had a discussion

22   yesterday about attempting to get these to the Court as quickly

23   as possible.  In talking with our tech folks about what it

24   would involve to actually have the objections printed, they

25   said "We can't get it to the Court tonight with those in here."

**PROCEEDINGS**

 1   And so we have what we submitted to the Court of this

 2   objections chart.  And if Your Honor does not have a copy, I

 3   can hand you up one.

 4       **THE COURT:**  I may or may not, but why don't you hand

 5   me up one.

 6       **MR. WISNER:**  Your Honor, if you would like, we could

 7   take your copy and just put stickers on all the objections.

 8   Would that be helpful?

 9       **THE COURT:**  Let me see the chart.  I mean, part of it

10   is some of the charts you have been giving me have been

11   basically unreadable, but it's probably -- this is not a big

12   deal.  This seems like a readable chart.

13       So if there's something blank, if there's no objection and

14   no response, it just means that that particular testimony has

15   been designated but there's no objection to it?

16       **MR. WISNER:**  Exactly.

17       **MS. COPE-KASTEN:**  That's correct, Your Honor.

18       **THE COURT:**  Okay.  I can work with that.

19       **MS. COPE-KASTEN:**  And in the transcript that you'll

20   look at, anything that's highlighted in red corresponds to

21   something that has been objected to.  So if you see something

22   that's in red, that would be an indication to look at the chart

23   for that page and line and see what the objection is.

24       **THE COURT:**  Okay.

25       **MS. COPE-KASTEN:**  So you have the same color scheme in

**PROCEEDINGS**

 1  terms of the highlighting that you had with the other

 2  transcripts.

 3          THE COURT:  Oh.  So I can just flip through the

 4  transcript --

 5          MS. COPE-KASTEN:  And just look for red.

 6          THE COURT:  -- and don't stop until I get to red?

 7          MS. COPE-KASTEN:  Exactly.

 8          THE COURT:  All right.  That's easy.  That, I can do.

 9      Okay.  So anything else to discuss before we take our --

10          MR. STEKLOFF:  Can we quickly approach sidebar?

11          THE COURT:  Yes.

12          MS. MOORE:  Your Honor, before we do that, I do have

13  one issue on the Turley deposition transcript that I want to

14  raise with the Court --

15          THE COURT:  Sure.

16          MS. MOORE:  -- just so we'll have this ready to go in

17  case we don't have the cross ready to go.

18          THE COURT:  Okay.

19          MS. MOORE:  And this goes back to, Your Honor, your

20  rulings on -- oh.  Sorry.

21          MR. STEKLOFF:  I'm just trying to see.

22          MS. MOORE:  No, that's fine.  It's fine.  It's fine.

23  You can look.  I don't care.

24      Your Honor, this goes back to there was a line of

25  questioning by the defense about causation with respect to

**PROCEEDINGS**

1   Dr. Turley's testimony, and on page 18, lines 23 through 25,

2   Dr. Turley is asked (reading):

3           "Do you ever try to determine the cause of somebody's

4       NHL?"

5       And his answer was "No."

6           **THE COURT:**  Right.

7           **MS. MOORE:**  And that's in, but if you go over to

8   page 32, lines 2 through 4, even though he's already said his

9   job is not to determine cause, he's the ENT, he's asked

10  (reading):

11          "Do you have any opinion on the cause of

12      Mr. Hardeman's NHL?"

13      And he answers, "No."

14      And then it continues by saying (reading):

15          "Do you have an opinion on any factors that may have

16      contributed to Mr. Hardeman contracting NHL?"

17      The answer is "No."

18      And then later it says (reading):

19          "And so in Mr. Hardeman's case, there's no way you

20      would have been able to determine the cause of his NHL

21      within the scope of your practice?"

22      Page 39 (reading):

23          "Not in mine, and I'm not -- I'd have to defer to the

24      oncologist, the medical oncologist, if they think there's

25      something they can, you know, determine because, again,

1        that's outside of what I do."

2        And then at the very end on page 40 --

3            THE COURT:  And that was allowed in as well?

4            MS. MOORE:  That was all allowed in.

5            THE COURT:  Right.

6            MS. MOORE:  And then at the very end defense asked

7    (reading):

8            "And you've never" -- this is page 40 -- "you've

9        never asked Mr. Hardeman in your interaction with him

10       whether he'd ever been exposed to Roundup; correct?

11           "I don't recall ever asking that.

12           "It wouldn't have been relevant to your care and

13       treatment of Mr. Hardeman; right?

14           "That's not something I routinely ask, no."

15       Our concern, the reason we had objected to this to begin

16   with is that, one, Dr. Turley is not an expert.  He clearly

17   states that his job is not to determine cause.

18           THE COURT:  And my recollection is that I allowed

19   testimony from Dr. Ye on that topic; right?

20           MS. MOORE:  That's correct.  And so I think this is

21   cumulative, Your Honor, and a waste of time.  We're trying

22   to -- but, more importantly, he's not an expert.  He

23   specifically states he doesn't ever determine cause, and then

24   there's a series of questions about whether he can say what

25   caused Mr. Hardeman's NHL.  I don't think there's foundation

1   for him to be able to express that type of opinion.

2          **THE COURT:**  So what are you asking to be excluded that

3   I previously allowed in?

4          **MS. MOORE:**  We would ask that each of those questions

5   regarding causation.  So page 18:23 through 25, and then --

6   well, and then 19:1 through 19:10, which is the follow-up about

7   "Have you heard of Roundup?  Have you ever done research on

8   your own?"  And then continuing page 20, line 1; page 20,

9   lines 2 through 6; page 20:9 through 11; page 20, lines 13

10  through 16.

11         **THE COURT:**  So the first passage that you read to me,

12  you're not asking for that to be excluded and that's on page

13  what?  Or are you?

14         **MS. MOORE:**  Well, I would, Your Honor, if everything

15  else is excluded.  What I'm saying is it starts with page 18,

16  lines 23 through 25, is the question (reading):

17              "Do you ever try to determine the cause of somebody's

18         NHL?"

19         And his answer is "No."

20         **THE COURT:**  Right.  It seems to me that that plus just

21  maybe some additional testimony to clarify that he is not

22  offering -- he doesn't have an opinion one way or another as to

23  Mr. Hardeman's cancer --

24         **MS. MOORE:**  That's fine.  If you start -- just to be

25  clear, Your Honor, if you start at 18:23 with that question,

1   the next section is 19:1 through 10 where he's asked about "Do

2   you know about Roundup?  Do you know about glyphosate?"  He

3   basically says, "I've heard of Roundup."  And then "Have you

4   ever done any research?"  He says, "No."  Those are all fine to

5   set that foundation.  That's fine.

6       But then when you get over to page -- it's toward the

7   end -- then when you get over to page 32, lines 2 through 4,

8   that's where they're asking him specific questions on

9   Mr. Hardeman and the cause of Mr. Hardeman's NHL.

10      And so we would ask that page 32, lines 2 through 4;

11  page 32, lines 7 through 10; and page 39, lines 9 through 17;

12  and page 40, lines 21 through 41:2, be removed based on the

13  fact he does not determine cause.

14      **THE COURT:**  Okay.  I gather that 31 -- I don't have it

15  in front of me, but 31:2-4, I assume that's a question:  You

16  don't have an opinion on whether Hardeman has got his -- how

17  Hardeman got his NHL?

18      **MS. MOORE:**  Yeah.  Page 32, lines 2 through 4, states

19  (reading):

20          "Do you have any opinion on the cause of

21      Mr. Hardeman's NHL?"

22      And the answer is "No."

23      **THE COURT:**  Okay.  That's fine.  As I previously

24  ruled, that's admissible.

25      **MS. MOORE:**  I'm sorry.  That is admissible?

1          THE COURT:  Is admissible.

2          MS. MOORE:  Okay.

3          THE COURT:  What's 32, 7 through 10, again?

4          MS. MOORE:  (reading)

5             "Do you have any opinion on any factors that may have

6      contributed to Mr. Hardeman contracting NHL?"

7      And his answer is "No."

8          THE COURT:  I think that probably can come out.  What

9  are the next two?

10         MS. MOORE:  Page 39, lines 9 through 17 (reading):

11            "And so in Mr. Hardeman's case, there is no way you

12     would have been able to determine the cause of his NHL

13     within the scope of your practice; right?"

14     He says:  "Not in mine."

15         THE COURT:  I would think you would want that in --

16         MS. MOORE:  Yeah.

17         THE COURT:  -- but I think if you want that out, I

18  think that probably makes sense.

19         MS. MOORE:  Okay.  We'll consider that.

20     And then the last --

21         THE COURT:  You're still having a chance to respond,

22  but I would think that 32 -- the one on 32, it might be okay to

23  take that out.  The one on 39, if you want it out, it might be

24  okay to take that out; and then 40 -- thank you -- 40 --

25  page 40.

**PROCEEDINGS**

1          **MS. MOORE:**  Yes, Your Honor.  Those are the questions

2     "And you never asked Mr. Hardeman" -- it's line 21, Your Honor.

3          **THE COURT:**  Sorry.  Which -- is this Turk or Turley?

4          **MS. MOORE:**  Turley.

5          **THE COURT:**  Which page?

6          **MS. MOORE:**  Page 40, line 21.

7          **THE COURT:**  I mean, again, I sort of think it may help

8     you, but probably given the testimony that I allowed in for Ye,

9     I think it would probably be fine to take that out.

10         So, anyway, my tentative view is it might be okay to take

11    out the one on 32, 39, and 40.

12         What's Monsanto's response?

13         **MR. STEKLOFF:**  If I can make one response, then

14    Ms. Rubenstein will follow-up, Your Honor.

15         Part of my concern is that you ruled -- my recollection is

16    you ruled on these designations prior to opening, and so in

17    opening I made statements about what the jury would hear from

18    the doctors based on what you ruled, and I did make statements

19    that were across Dr. Turk, Dr. Turley, and Dr. Ye.  I focused

20    mostly on Dr. Ye, but I did talk about Dr. Turk and Turley.

21         And now to take out, you know, what we view as things that

22    Dr. Turley said that we believe were relevant to his care and

23    treatment of Mr. Hardeman I think would be prejudicial to my

24    opening.

25         I also think, I mean, to the extent the argument is

 1  cumulative, this is a 15-minute clip, we are talking about

 2  15-second clips.

 3          THE COURT:  And I think that on reflection, I mean,

 4  because he does such a good job in his answers of stating that

 5  that's outside the scope of what he would do, I think it's not

 6  problematic for these to come in.

 7          MS. MOORE:  My --

 8          THE COURT:  So my prior ruling stands.

 9          MS. MOORE:  Okay.  And my only concern, Your Honor, is

10  that the references he made to his opening statement,

11  Mr. Stekloff, is that my concern is in closing that he'll argue

12  that, you know, Dr. Turley could not determine the cause of

13  Mr. Hardeman's NHL to argue idiopathic, and I don't think

14  that's the foundation.

15          THE COURT:  Well, if he does that, then that will be a

16  misstatement of the evidence --

17          MS. MOORE:  Okay.

18          THE COURT:  -- and I suspect you will be able to do a

19  great job of pointing that out.  First of all, I suspect he

20  will not misstate the evidence; but if he does, I suspect you

21  will do a very good job of pointing it out on rebuttal.

22          MS. MOORE:  Okay.  Thank you, Your Honor.

23          MR. STEKLOFF:  Your Honor, maybe after lunch, so

24  everyone can eat, is it possible to just go sidebar very

25  quickly before the jury comes in?  I just have one quick

**PROCEEDINGS**

1    question for Your Honor.

2          **THE COURT:**  You said after lunch but before the jury

3    comes in?

4          **MR. STEKLOFF:**  Yes.

5          **THE COURT:**  Okay.

6          **MR. STEKLOFF:**  Thank you, Your Honor.

7              (Luncheon recess taken at 12:13 p.m.)

8    **Afternoon Session**                              **12:37 p.m.**

9        (Proceedings were heard out of presence of the jury:)

10       (Page 834 was placed under seal by Order of the Court and

11   bound separately:)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**PROCEEDINGS**

 1          (Proceedings were heard in the presence of the jury:)

 2          **THE COURT:**   Okay.   You can resume with Dr. Portier

 3   from Australia.

 4          **MS. MOORE:**   Thank you, Your Honor.

 5                         **(Video resumed.)**

 6                         **(Video stopped.)**

 7          **MR. WISNER:**   Time for a break, Your Honor.

 8          **THE COURT:**   Why don't we take our afternoon break.   We

 9   will take ten minutes and resume at ten after 2:00.

10                    (Recess taken at 1:40 p.m.)

11                 (Proceedings resumed at 1:52 p.m.)

12          (Proceedings were heard out of presence of the jury:)

13          **THE COURT:**   Before we bring in the jury, I want to

14   make a quick statement to Ms. Wagstaff.

15          I was reflecting on the OSC hearing last night, and I

16   wanted to clarify one thing.   I gave a list of reasons why I

17   thought your conduct was intentional, and one of those reasons

18   was that you seemed to have prepared yourself in advance for --

19   that you would get a hard time for violating the pretrial

20   rulings.   In explaining that, I used the word "steely," and I

21   want to make clear what I meant by that.

22          I was using steely as an adjective for steeling yourself,

23   which is to make yourself ready for something difficult and

24   unpleasant.   My point was that I perceived no surprise on your

25   part; and since lawyers typically seem surprised when they are

1  accused of violating pretrial rulings, that was relevant to me

2  on the issue of intent.  But "steely" has another meaning as

3  well, which is far more negative.  And I want to assure you

4  that that's not the meaning that I was using nor was I

5  suggesting anything about your general character traits.

6      So I know you continue to disagree with my ruling and my

7  findings about intent, but I wanted to make that point very

8  clear.

9          MS. WAGSTAFF:  Thank you, Your Honor.

10         THE COURT:  All right.  Bring in the jury.

11     (Proceedings were heard in the presence of the jury:)

12         THE COURT:  We are getting to the end of the movie for

13 today.

14     You can resume.

15         MS. MOORE:  Yes, Your Honor.  Thank you.

16                      **(Video resumed.)**

17                      **(Video stopped.)**

18         MR. WISNER:  We are moving onto the second day,

19 Your Honor.

20         THE COURT:  Okay.

21         **(Video was played but not reported.)**

22         THE COURT:  I think it is probably a good time to wrap

23 up and move to our day off.  So remember, we don't have trial

24 tomorrow, right?  Today is Wednesday, right?

25         MS. MOORE:  Yes, it is.

1      THE COURT:  So no trial tomorrow.  You have the day

2 off tomorrow, so it is especially important that you remember

3 all of the admonitions about not doing any research or talking

4 about the case, including to one another.

5      We will see you on Friday morning, and we will bring you

6 in here at 8:30 sharp.  Thank you for being so attentive

7 throughout the course of the day.

8      (Proceedings were heard out of presence of the jury:)

9      THE COURT:  So I assume that Friday will be the

10 remainder of Portier's testimony.

11      MS. MOORE:  That's correct, Your Honor.

12      THE COURT:  And then how long is that anticipated to

13 be?

14      MS. MOORE:  I think it depends somewhat on your

15 rulings with respect to cross, Your Honor, so I don't have a

16 time period on that.

17      THE COURT:  Who will come after Dr. Portier on Friday?

18      MS. MOORE:  That will be Dr. Reeves.

19      THE COURT:  Okay.

20      MS. MOORE:  The corporate representative.

21      THE COURT:  So that is the deposition designation

22 transcript that I keep sending back to you because it hasn't

23 been properly prepared for my review.

24      MS. MOORE:  I understand that, Your Honor.  We are

25 prepared to address that today.  I think both sides have

1    discussed that, and we have tried to work something out on

2    that.

3        One housekeeping matter, though, before, we move on to

4    that.  For the exhibits for Dr. Portier, do you want me to go

5    ahead and move into evidence now the exhibits that have been

6    shown so far or wait until the end of the deposition or what

7    would be your preference for that?

8        THE COURT:  Well, especially since Kristen is not

9    here, I think it would be a good idea not to do it now.

10       Here she comes.

11       What is your preference between moving into evidence the

12   Portier exhibits that have been used so far right now or just

13   waiting until the end of his testimony?

14       MS. MOORE:  I mean, I have the list.

15       THE CLERK:  Doesn't matter to me.

16       MS. MOORE:  Plaintiffs will move into evidence --

17       THE COURT:  Is there a stipulation as to which

18   exhibits can be admitted?

19       MR. STEKLOFF:  No, Your Honor.  I think we might need

20   to talk about it, especially since there were a lot of

21   demonstratives.  Let's just use the last one as an example.

22       MS. MOORE:  I'm not moving for that one.

23       MR. STEKLOFF:  Okay.  Without going through them --

24   hopefully we will move towards a stipulation -- hopefully we

25   will know which ones since there were so many demonstrative

 1   ones used.

 2          **MS. MOORE:**  That's fine, Your Honor.

 3          **THE CLERK:**  Will you just file that stipulation on the

 4   docket then, or is that something you want to put on the record

 5   tomorrow morning -- on Friday?

 6          **MR. STEKLOFF:**  Either way.  I think it just depends on

 7   what we agree to.  Whatever you prefer.  If you would like

 8   us -- I think we can agree to file it on the docket.  We can do

 9   that or we can just tell you on Friday.

10          **THE CLERK:**  Since I'm not here Friday, it might be

11   better to have it on the docket.

12          **MR. STEKLOFF:**  Okay.  We can do that.

13          **MS. MOORE:**  Okay.  And Mr. Wool is going to talk about

14   Dr. Reeves.

15          **THE COURT:**  Okay.

16          **MR. WOOL:**  With respect to cleaning up the transcript,

17   I think that is something that is sort of different.

18       What I wanted to address was reconsidering Your Honor's

19   ruling on whether or not Dr. Reeves is going to be permitted to

20   testify about the scientific evidence and kind of get

21   Monsanto's view of that.  And while we respect Your Honor's

22   ruling, I think that what Plaintiffs would contend is that

23   really any expert testimony evaluating the scientific evidence

24   is relevant and should come in to Phase One, and Dr. Reeves was

25   designated by Monsanto as its corporate representative for a

 1  30(b)(6) deposition on the specific topic of whether or not

 2  Roundup causes non-Hodgkin's lymphoma.  And so --

 3       THE COURT:  Yeah, but not designated -- I mean, that's

 4  like -- that is sort of analogous to saying Mr. Hardeman is

 5  going to get up and testify about whether Roundup -- I mean,

 6  they are a company.  They have the product.  They have studied

 7  it -- probably failed to study it as much as they should -- but

 8  the point is they are a party.  They are not an expert witness.

 9       MR. WOOL:  Well, I think there is a very meaningful

10  distinction, and I think it's a matter of black letter law for

11  our failure-to-warn claim.  Monsanto is held to the standard of

12  an expert in the field.

13       THE COURT:  You already stepped in it by talking about

14  your failure-to-warn claim because we are talking about

15  Phase One testimony.

16       MR. WOOL:  Right.  But if we are going to say that --

17  that Dr. Reeves is not competent to testify as an expert for

18  Phase One, then I think that that sort of carries over to

19  Phase Two.

20       THE COURT:  I don't think so.  For Phase Two it is the

21  position they took, the bad job they did at being objective

22  with respect to glyphosate, and, you know, the lack of effort

23  they made and the attempts they made to influence regulators.

24       MR. WOOL:  I understand but, I guess, if I understood

25  Your Honor a moment ago -- and perhaps I didn't -- I think the

1  distinction Your Honor was drawing is that Mr. Hardeman is a

2  lay witness, and Dr. Reeves is testifying on behalf of

3  Monsanto.  And so I think our argument is that because Monsanto

4  has an affirmative duty to stay abreast of the relevant and

5  scientific developments and is held to the standard of an

6  expert, that there is a distinction there; and that distinction

7  doesn't just disappear at Phase One and Two.

8      If he is an expert for the purposes of Phase Two, then

9  that should carry over from Phase One.  And if Your Honor is --

10      **THE COURT:**  I don't think he is an expert for purposes

11  of Phase Two.  I thinks he is a party representative for

12  purposes of Phase Two, and he can talk about the company's

13  state of the knowledge and what the company did and failed to

14  do and its -- you know, the fact that it -- you know, whatever,

15  all that stuff that I'm going through right now.  It seems like

16  you can talk about it in Phase Two.

17      **MR. WOOL:**  Right.  But I guess if he doesn't have the

18  requisite expertise and he doesn't already have that knowledge

19  which would permit him to testify in Phase One, then for

20  Phase Two -- then I think if Monsanto is going to take that

21  position that he doesn't have that expertise, then I think --

22  if we get to Phase Two, right, and this is all academic, you

23  know, because that theoretically could not happen -- but if we

24  get to Phase Two and then they kind of stand by this argument

25  here, then I feel like they should be estopped from saying that

**PROCEEDINGS**

1   he did keep abreast of -- that Monsanto did keep abreast of --

2         **THE COURT:**  I don't agree.  It seems like -- so far

3   from what I can tell, it seems like pretty good testimony for

4   you on the issue of Monsanto's -- whether Monsanto has been

5   objective about all of this, and that seems relevant to

6   Phase Two, but it doesn't seem relevant to Phase One.

7         **MR. WOOL:**  Well, I think the testimony we would only

8   want to admit would be his specific commentary just about the

9   scientific evidence.

10        **THE COURT:**  I understand your argument.  My ruling

11  stands.

12        **MR. WOOL:**  Okay.  Thank you, Your Honor.

13        **THE COURT:**  Anything else to discuss right now?

14        **MR. KILARU:**  No.  I think just on that, I think in

15  process we will work out what gets resubmitted in light of your

16  rulings.  I think the mouse study issue, the *Knezevich & Hogan*,

17  might be one of the things that gets teed up here in the

18  context of this designation.

19        **THE COURT:**  Of course.  Plus you preserved your

20  objection, and Monsanto argues that none of this is relevant

21  for Phase Two either.  And I have rejected that, and they have

22  preserved -- or they have argued that some of it is irrelevant

23  for Phase Two, and they have preserved their objection on that.

24  But that's my ruling.

25        **MR. WOOL:**  Okay.

 1          **THE COURT:**  You don't need to submit a transcript

 2   which repeats all the objections that I have just rejected or

 3   all the designations that I just rejected.

 4          **MR. WOOL:**  Understood, Your Honor.  I think that's why

 5   just wanted to sort of bring this up this afternoon just so

 6   that when we do submit the transcript, that it is not a waste

 7   of your time and, you know, we understand what your rulings are

 8   going to be.

 9          **THE COURT:**  Great.  Okay.

10      So Portier and then Blair after that.  And then what's

11   the -- that will presumably take us through Friday?

12          **MS. MOORE:**  Dr. Reeves, Your Honor.

13          **THE COURT:**  Sorry, Reeves.

14          **MS. MOORE:**  That's okay.  That's all right.

15      Yes, that will take us through Friday.

16          **THE COURT:**  Quite a reaction from the other side.

17          **MS. MOORE:**  I was like -- and my reaction was like,

18   Okay, we will be glad to play Dr. Blair on Friday, Your Honor.

19          That would be the plan.  I think the way I calculated it,

20   that should take us through Friday afternoon.  And then as far

21   as the next depositions, I mean, Dr. Blair would be one.

22          **THE COURT:**  Don't budget -- budget somewhere between

23   zero and very little time for Dr. Blair.

24          **MS. MOORE:**  Maybe 10 minutes?

25          **THE COURT:**  Somewhere between zero and very little

 1   time.  I'm going to look at it one more time today before I

 2   issue my ruling.

 3           **MS. MOORE:**  And I would say with respect to Dr. Blair,

 4   Your Honor, is that the beginning of it, it is a few pages of

 5   his background and his credentials.  We did leave the

 6   designation.  You know, he was the head of the work group,

 7   which I think is fair to leave that and that he was part of the

 8   epidemiological subgroup.  And then there is a section there --

 9   and I don't have the page references -- but you will be able to

10   see it because it goes in this order, Your Honor, where they

11   ask about the epi studies that they considered, and I

12   understand that might be a little more controversial.

13        But at least at a minimum, we would like his credentials

14   -- the fact that he was the head of the work group, that he was

15   in the subgroup, what the conclusion was that, and that he was

16   an author of the AHS and that the AHS 2018 publication did not

17   change his opinion as a member of the IARC group; that is his

18   personal opinion.  He was designated as a non-retained expert.

19   So those -- those are kind of the points that I think you will

20   be able to see.  It is not terribly much on designation.  But I

21   think you will be able to see that flow in there.  I would

22   agree with some of that would not be relevant to Phase One

23   based on the Court's rulings.

24           **MR. KILARU:**  Your Honor, just on that.  I think --

25           **THE COURT:**  The only thing I need you to respond on is

1  the concept -- and I haven't gone to this part of the

2  deposition testimony yet -- or if I did, I'm not remembering it

3  well -- the idea that his view would not be changed by the AHS.

4          **MR. KILARU:**  Yes, Your Honor.

5      I think we first have a concern that he actually hasn't

6  been -- isn't sort of a fairly characterized expert witness

7  whose views on the 2018 AHS are relevant.

8          And, second, I think individual members of IARC's position

9  on that I think would get us a little too far afield into what

10  IARC thought and what their view of the science is, as opposed

11  what the other studies says.  And other experts have already

12  criticized -- we heard criticism of the 2018 study.  So I think

13  introducing a new witness mostly just for his background, being

14  part of IARC, and then to voice that is a little too much

15  IARC-focused and it seems like it might not be --

16          **THE COURT:**  Okay.  I will consider those points and

17  review it.

18      One final comment.

19          **MS. MOORE:**  Thank you, Your Honor.

20      The only difference with Dr. Blair is that he wasn't

21  co-author of the AHS, and I think that is a distinction.  He

22  can testify based on 701 from his personal observations.

23      Thank you, Your Honor.

24          **THE COURT:**  Got it.  Thank you.

25          **MR. KILARU:**  Thanks, Your Honor.

1          **THE CLERK:**  Court is adjourned.

2                (Proceedings adjourned at 2:28 p.m.)

3                          ---oOo---

4

5

6                  **CERTIFICATE OF REPORTERS**

7          I certify that the foregoing is a correct transcript

8     from the record of proceedings in the above-entitled matter.

9

10    DATE:   Wednesday, February 27, 2019

11

12

13

14    _____

15         Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                   U.S. Court Reporter

16

17

18    _____

19           Marla F. Knox, RPR, CRR
                  U.S. Court Reporter

20

21

22

23

24

25