Volume 6

Pages 847 - 918

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

EDWARD HARDEMAN,                    )
                                    )   NO. C 16-00525 VC
            Plaintiff,              )
                                    )   PAGES 891 - 892
                                    )   FILED UNDER SEAL
   VS.                              )BY ORDER OF THE COURT AND BOUND
                                    )        SEPARATELY
MONSANTO COMPANY,                   )
                                    )
            Defendant.              )
_____    )


                        San Francisco, California
                        Friday, March 1, 2019


                **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                    ANDRUS WAGSTAFF PC
                    7171 W. Alaska Drive
                    Lakewood, Colorado  80226
                BY: **AIMEE H. WAGSTAFF, ATTORNEY AT LAW**
                    **DAVID J. WOOL, ATTORNEY AT LAW**

                    MOORE LAW GROUP
                    1473 South 4th Street
                    Louisville, Kentucky  40208
                BY: **JENNIFER MOORE, ATTORNEY AT LAW**


            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Marla F. Knox, RPR, CRR
              Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporters

1    **APPEARANCES**:   (CONTINUED)

2    For Plaintiff:

3                         BAUM HEDLUND ARISTEI GOLDMAN PC
                          12100 Wilshire Blvd. - Suite 950
4                         Los Angeles, California  90025
                     BY:  **ROBERT BRENT WISNER, ATTORNEY AT LAW**
5
     For Defendant:
6
                          WILKINSON  WALSH ESKOVITZ LLP
7                         2001 M Street, NW - 10th Floor
                          Washington, D.C.  20036
8                    BY:  **BRIAN L. STEKLOFF, ATTORNEY AT LAW**
                          **RAKESH N. KILARU, ATTORNEY AT LAW**
9                         **TAMARRA MATTHEWS JOHNSON, ATTORNEY AT LAW**
                          **JULIE RUBENSTEIN, ATTORNEY AT LAW**
10                        **CALI COPE-KASTEN, ATTORNEY AT LAW**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          I N D E X

 2     Friday, March 1, 2019 - Volume 6

 3     PLAINTIFF'S WITNESSES                         PAGE   VOL.

 4     PORTIER, CHRISTOPHER
       By Video Testimony (not reported)            858    6
 5
       TURK, ROGER
 6     By Video Testimony (not reported)            871    6

 7     TURLEY, RICHARD
       By Video Testimony (not reported)            888    6
 8
       YE, JEFFREY
 9     By Video Testimony (not reported)            890    6

10                        E X H I B I T S

11     TRIAL EXHIBITS                        IDEN   EVID   VOL.

12       28                                         889    6

13       29                                         889    6

14       30                                         889    6

15       31                                         889    6

16       32                                         889    6

17       39                                         915    6

18       40                                         915    6

19       44                                         915    6

20       45                                         915    6

21       46                                         915    6

22       47                                         915    6

23       50                                         915    6

24       52                                         915    6

25
```

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 54 | | 915 | 6 |
| 55 | | 915 | 6 |
| 57 | | 915 | 6 |
| 59 | | 915 | 6 |
| 60 | | 915 | 6 |
| 66 | | 888 | 6 |
| 67 | | 888 | 6 |
| 68 | | 888 | 6 |

| 1 | **Friday - March 1, 2019**                               **8:19 a.m.** |

 1   **Friday - March 1, 2019**                               **8:19 a.m.**

 2                          **P R O C E E D I N G S**

 3                              ---oOo---

 4        (Proceedings were heard out of presence of the jury:)

 5             **THE COURT:**  No need to call the case.  We all know why

 6   we are here.

 7        You-all said you had a couple things to talk to me about.

 8             **MR. STEKLOFF:**  Actually, I think we resolved the main

 9   thing we thought we might be discussing, which is the Dr. Ye

10   deposition.  I do think it might be worth -- now might be a

11   good time, since we are heading into the weekend, to give you

12   an update on whether -- we have collectively discussed where we

13   think things are heading next week.

14             **THE COURT:**  Okay.

15             **MR. STEKLOFF:**  The Plaintiffs told us yesterday that

16   they are not calling Dr. Nabhan.

17             **THE COURT:**  Okay.

18             **MS. MOORE:**  For Phase One.

19             **MR. STEKLOFF:**  For Phase One, yes.  So in addition to

20   the depositions that you are aware of, I think there are two

21   remaining live witnesses, Mr. Hardeman and Dr. Weisenburger.

22   And I think based on that, both of us -- both sides anticipate

23   that the Plaintiffs will rest some time on Tuesday.  I don't

24   think -- we don't think it will be first thing in the morning,

25   but --

**PROCEEDINGS**

```
 1          THE COURT:  Okay.  Wait.  So there is -- so that means
 2   Shustov is not coming either?
 3          MS. MOORE:  That's correct, Your Honor.  We had told
 4   them that last week.  I apologize.
 5          THE COURT:  I probably heard that but forgot it.  So
 6   Hardeman and Weisenburger plus the doctors, the treating
 7   doctors.
 8          MS. MOORE:  Yes.
 9          THE COURT:  Plus the remainder of Portier.  How much
10   is left in Portier?
11          MS. MOORE:  It is a little over two hours, Your Honor.
12          THE COURT:  And then Reeves.
13          MS. MOORE:  Reeves will depend on the Court's rulings.
14          THE COURT:  Right.  And so that would be it -- and
15   Farmer.
16          MS. MOORE:  Dr. Farmer, yes, Your Honor.  That's very
17   short.  It's less than 20 minutes right now.
18          THE COURT:  Okay.  And that -- and that would be it
19   for the Plaintiffs?
20          MS. MOORE:  That's correct, Your Honor.
21          THE COURT:  For Phase One.  And then on Reeves, I will
22   just let you know, my guess is that Reeves is not going to
23   happen today because I want to have a discussion about some of
24   the -- some of the designations about Reeves at lunchtime.  I
25   will issue an order before we come out, hopefully at 8:25. I
```

1  can leave; issue the order on Reeves before we start the trial

2  day.

3          MS. MOORE:  Okay.

4          THE COURT:  And we can have a discussion about it at

5  lunch.  You should plan on not putting Reeves on today, I

6  think.  The other thing I can do is I can look at Farmer while

7  I'm on the bench here.

8          MS. MOORE:  That would be really helpful, Your Honor.

9          THE COURT:  And maybe you can get Farmer teed up and

10  the treating doctors.

11          MS. MOORE:  The treating doctors are ready to go,

12  except there is one issue.  And I don't think -- on Dr. Turk --

13  so, Your Honor, there was one issue.  It was a counter-counter

14  that I believe the defense is not objecting to as putting back

15  in.  It was taken out because it was right after an objection

16  that you sustained.

17          THE COURT:  Okay.

18          MS. MOORE:  So it is on page 127, lines 16 through 20.

19  It is dealing with --

20          THE COURT:  Which doctor is this?

21          MS. MOORE:  Dr. Turk, the primary care physician.  It

22  is dealing with the basal cell carcinoma, and our counter to

23  the testimony that is in there about basal cell carcinoma; and

24  I don't think there is an objection from the defense.

25          MR. STEKLOFF:  We don't object, Your Honor.

1          **THE COURT:**  Okay.  That's fine.

2          **MS. MOORE:**  All three of the doctors' depositions are

3    cut and ready to go.

4          **THE COURT:**  How much time will those take?

5          **MS. MOORE:**  Dr. Turk is approximately 38 minutes;

6    Dr. Turley is approximately 19 minutes, and I think Dr. Ye is a

7    little over an hour.

8          **THE COURT:**  Okay.  So between -- it sounds like -- so

9    we have -- we have the doctors.  We have the remainder of

10   Portier.

11         **MS. MOORE:**  And Dr. Farmer.

12         **THE COURT:**  And we can get Farmer ready and that

13   should be pretty good for today.

14         **MS. MOORE:**  I think that's right, Your Honor.

15         **THE COURT:**  Okay.  And then Hardeman, Weisenburger and

16   Reeves next week.

17         **MS. MOORE:**  That's correct.

18         **THE COURT:**  Okay.  Great.

19         **MR. STEKLOFF:**  So with that, I have been very

20   transparent with Plaintiff's counsel about which experts we are

21   calling.  None of -- we are calling -- I mean, we might remove

22   some of these, but our current intention, depending on how the

23   rest of the case plays out, is to call Dr. Arber, Dr. Levine

24   and Dr. Mucci.  None of them, because of either clinical care

25   or conferences, I believe, are available on Tuesday.

1          So if the Plaintiff's rest before -- and we have a lot of

2     time, but I also don't want to waste the jury's time.  It is

3     going to be extremely difficult, if not impossible.  We are

4     pushing all of them -- when we learned this last night about

5     Dr. Nabhan -- to see if anything can shift.  I think Tuesday is

6     going to be very, very difficult based on their prior

7     obligations to call a witness.

8          On Wednesday, I know that at least one of them can be

9     here.  I think the question is what the other two are seeing if

10    they can move things, and I don't have a current update because

11    of -- again, either clinical care or conferences that they are

12    involved in.  So there is a possibility --

13          THE COURT:  Let me -- there is a possibility that we

14    will have some dead time on Tuesday, is what you are going to

15    say?

16          MS. MOORE:  We don't think very much, Your Honor.

17          THE COURT:  I don't think so.  I mean, Weisenburger,

18    he is still offering a general causation and a specific

19    causation opinion?

20          MS. MOORE:  Correct.

21          THE COURT:  I doubt we are going to have any dead time

22    on Tuesday.

23          MS. MOORE:  I don't think so either.  Obviously some

24    of it depends on their cross-examination.  If anything, maybe

25    we finish a few minutes before 2:00, but I don't think we are

PROCEEDINGS

1  going to have a lot of time there.

2          THE COURT:  That's okay.  I understand.

3          MR. STEKLOFF:  On Wednesday we may have, if we can

4  only get one of the three, a little dead time.  We would then

5  be prepared to have the other two here on Friday.  And then

6  that -- whether they might roll over a little bit into Monday,

7  but I don't think very far.

8          THE COURT:  Well, I don't know.  I mean, I

9  understand -- so are any of those people local, Arber or

10  Levine, Mucci?

11         MR. STEKLOFF:  No.  Well, Dr. Levine is in LA.  She is

12  at City of Hope.  Dr. Arber is in Chicago.  Dr. Mucci is in

13  Boston.

14         THE COURT:  Who are you planning on calling on

15  Wednesday?

16         MR. STEKLOFF:  Dr. Arber can get here on Tuesday

17  night, and I believe has bought a ticket so that he can be our

18  first witness on Wednesday.

19         THE COURT:  You might need to have Levine ready to go

20  on Wednesday also, just so we are not wasting too much time.

21         MR. STEKLOFF:  I'm seeing, based on her schedule.

22         THE COURT:  I don't -- I don't -- you know, I don't

23  think that we should be having any dead time on Wednesday.  I

24  understand what you are saying about Tuesday.

25         MR. STEKLOFF:  Understood, Your Honor.

1          THE COURT:  Okay.

2          MS. MOORE:  Your Honor, if I could just remind the

3     Court briefly, I think we still have a pending Daubert on

4     Dr. Arber's qualifications.

5          THE COURT:  Yes, I know.

6          MS. MOORE:  Okay.

7          THE COURT:  Okay.  So let me go put that order out,

8     and then I will be back in in a couple minutes and we can

9     start.

10         MS. MOORE:  Okay.  Thank you, Your Honor.

11                (Recess taken at 8:26 a.m.)

12              (Proceedings resumed at 8:35 a.m.)

13        (Proceedings were heard out of presence of the jury:)

14         THE COURT:  You can go ahead and bring in the jury.

15        (Proceedings were heard in the presence of the jury:)

16         THE COURT:  Good morning, everyone.  Welcome back.  We

17     have Part 2 of the Portier movie for you today and then some

18     other video deposition testimony.  And then I think it is

19     Monday we are returning to live testimony, right?

20         MS. WAGSTAFF:  Yes, Your Honor.

21         MS. MOORE:  That's correct, Your Honor.

22         THE COURT:  So you can go ahead and proceed with

23     Dr. Portier's testimony.

24         MS. MOORE:  Thank you, Your Honor.  We may need to

25     switch the input.

 1         **(Video was played but not reported.)**

 2         MS. MOORE:  Your Honor, may we have a sidebar?

 3         (The following proceedings were heard at the sidebar:)

 4         MS. MOORE:  The document came up, and it said that

 5   there was a misunderstanding; that no one agrees with the

 6   misunderstanding, and that was part of our objection that you

 7   sustained.  They didn't play the testimony, but they showed the

 8   document from EFSA on that.

 9         MR. STEKLOFF:  Okay.

10         MR. WISNER:  That portion of the misunderstanding was

11   specifically sustained as excluded, and then you showed the

12   exact portion of the letter and left it up there so you can

13   read it.

14         MS. MOORE:  I read it.

15         MR. STEKLOFF:  Is it up right now?

16         MR. WISNER:  It is down right now.  I did it

17   afterwards but it was -- I mean, exactly --

18         MS. MOORE:  The whole thing was up, and then he called

19   out the first sentence; but the whole thing was up for enough

20   time that you could read the entire paragraph.  I did it and

21   actually took notes on it.

22         MR. WISNER:  I was surprised to see it as well.

23   That's why I came up.

24         THE COURT:  Okay.  So I mean whether there needs to be

25   anything curative, we can deal with later, right.  Now the task

1    is to -- if there was something where I sustained an objection

2    and it was -- it is up there, the task is to make sure it is

3    off before we resume with the jury, and then we can deal with

4    curing it later.

5              MS. MOORE:  Okay.  Thank you, Your Honor.

6              MR. WISNER:  I wanted to make our objection noted.

7              THE COURT:  Can you do that?  Is it possible to do

8    that quickly to make sure that part is skipped over?

9              MR. WISNER:  It already passed.

10             MR. STEKLOFF:  Just so I understand, the document was

11   up.  We called out a different portion, but you are saying it

12   was possible they can read other parts?

13             MS. MOORE:  The entire document was pulled up before

14   you called out -- you could read the entire paragraph.  It was

15   pulled up.  It is the document that is still up.  I don't know

16   if that's going to change again.

17             MR. WISNER:  I think we are fine moving forward.  I

18   just wanted to let you know immediately because I don't want to

19   waive any objections.

20             THE COURT:  You think we have passed it?

21             MR. WISNER:  We have.

22             THE COURT:  And we are fine going forward.

23             MR. WISNER:  We are.

24             THE COURT:  That's fine.  And then -- you know, if you

25   need to put a stop to some of the testimony -- video testimony,

**PROCEEDINGS**

1   that's fine; but it is also fine if you -- you know, if

2   something gets through quickly and it's -- there is not enough

3   time to put a stop to it, you can always bring it up later and

4   preserve your objection.

5          **MS. MOORE:**  Thank you, Your Honor.

6       (The following proceedings were heard in open court:)

7          **MR. STEKLOFF:**  May we resume, Your Honor?

8          **THE COURT:**  You may resume.

9                **(Video was played but not reported.)**

10          **MR. STEKLOFF:**  I think this is a good time for a

11   break.

12          **THE COURT:**  That sounds fine.  Why don't we take about

13   a five-minute break.

14       (Proceedings were heard out of presence of the jury:)

15          **THE COURT:**  I want to think about it a little more,

16   but I will give you my tentative views on Farmer testimony

17   right now.

18       First let me say, that this applies to the Farmer

19   testimony.  It applies to the Reeves testimony, and it applies

20   really to all of the deposition testimony and the Portier

21   testimony.  A number of times Monsanto made the objection

22   irrelevant to Phase One and I want -- I sustained -- I have

23   sustained a number of those objections, but I want to make

24   clear that in many of those instances I disagree with

25   Monsanto's literal objection, irrelevant.  I think that in many

1    of the instances it is tangentially relevant to Phase One, but

2    it should be excluded under Rule 403.  So every time I have

3    sustained that objection, everybody should know that it is

4    either under 401 or 403 that I'm sustaining that objection.

5         With respect to Farmer, looking first at the document, the

6    e-mail, my starting point -- and kind of the philosophy I

7    applied in going through the testimony is that the -- really

8    the only thing that can come in from this e-mail is the

9    paragraph that begins, Many groups have been highly critical of

10   the study.  There may be some other benign paragraph in the

11   e-mail that would be used to help identify what she is talking

12   about, the AHS; but that's really the only paragraph that I

13   think -- substantive paragraph -- that is admissible.  So with

14   that philosophy in mind, on page 8, the -- that designation I

15   think can come in.

16        On page 18, the first half can come in.  The second half

17   beginning at line 9 cannot.  On page 56 it can come in.  Page

18   222 out, and the one that starts at page 223 out.  Page 278 in.

19   Page 284 both of them out, both of the designations out, the

20   ones that start at page 284.  287 out.  But the one that starts

21   at the very bottom of 287 and goes over to 288, 289, that is in

22   until page 289, line 19 and the stuff that follows that -- that

23   line and the stuff that follows it is out until page 290, line

24   16.  So starting at line 16 on page 290, it comes back in.  And

25   then you get to line 9 on page 291.  That is out and then the

1    remainder of the Plaintiff's designations are out.

2        And then page 550 -- these are Monsanto's designations I

3    think -- page 550 in.  Page 551 in.  And the idea here is just

4    enough to establish who she is but not to get into her

5    credentials extensively.  So the one on 552 is out.  The one on

6    553 is out.  581 both designations out.  666 out.  667 out.

7    And I believe that's it.

8        So as I said, that is tentative.  I'm going to spend a

9    little more time looking at it to make sure I think I have got

10   it right this morning, but it is not that tentative.  I feel

11   fairly confident about it.  So if you want to start cutting

12   video accordingly, you can do that.

13       And then the only other comment I want to make about that

14   is I believe that I allowed some Reeves testimony in about this

15   as well, and the fact that it is coming in through Farmer makes

16   me want to go back and re-visit whether the testimony from

17   Reeves is cumulative and should come out, okay?  So I will do

18   that as well.  So that's where we stand on those issues.  Why

19   don't we resume at quarter till.

20           **MS. MOORE:**  Thank you Your Honor.

21           **MR. STEKLOFF:**  Thank you Your Honor.

22                (Recess taken at 9:40 a.m.)

23                (Proceedings resumed at 9:47 a.m.)

24        (Proceedings were heard out of presence of the jury:)

25           **THE COURT:**  One additional very quick comment on the

 1   Farmer testimony.  It struck me that because of my ruling there

 2   may be -- because of how I ruled on it, there may be some other

 3   aspects of the Farmer testimony that you want to bring in to

 4   make the parts of the testimony that I allowed in more clear.

 5   Does that make sense?

 6           MR. WISNER:  Yeah.

 7           THE COURT:  I may have created some sort of artificial

 8   line that you want to fix which you can do.

 9           MS. MOORE:  Thank you, Your Honor.

10           THE COURT:  Go ahead and bring them in.

11       (Proceedings were heard in the presence of the jury:)

12           THE COURT:  Thank you.  We can resume the Portier

13   testimony.

14               **(Video was played but not reported.)**

15                     **(Video stopped.)**

16           MR. WOLFE:  Can we switch over?

17           THE COURT:  Why don't we take another five-minute

18   break right now, and we'll aim to resume at quarter till.

19       (Proceedings were heard out of the presence of the jury:)

20           THE COURT:  Okay.  So you -- everyone can be seated.

21   You're always free to be seated as soon as the jury leaves.

22       So about how much more is there for Portier?

23           MR. WOLFE:  We have 28 minutes total for both sides.

24           THE COURT:  Okay.  And then after that, you can be

25   ready to go to one of the treating physicians?

PROCEEDINGS

```
1              MS. MOORE:  Yes, Your Honor.

2              THE COURT:  Okay.  Because I assume we will get into

3    that before lunch.

4              MS. MOORE:  Right.  And then we'll have to stop

5    because it's about 38 minutes.

6              THE COURT:  For all of the treating physicians?

7              MS. MOORE:  No.  Just the first one.

8              THE COURT:  Okay.  And then -- so let me -- so for now

9    let me give you a couple comments on Reeves.  I went back

10   through Reeves after having gone through Farmer this morning,

11   and a couple quick comments.

12        Pages 152 to 159, I said overruled as to the objections to

13   those designations.  I will change that now -- I'm happy to

14   hear argument about it whenever we discuss it, but I will

15   change that now to sustaining the objections until page 154,

16   line 5, and overruling as to the remainder in that section --

17   in that range of pages 152 to 159.

18        Does that make sense what I said?  So previously it was

19   overruled as to the designations on 152 to 159, and now what

20   I'm saying is that for that range, sustained until 154, line 5,

21   overruled as to the remainder in that range.

22        Then on page -- for page 164, I just wrote it wrong in my

23   ruling.  As you can see from the parenthetical, what I meant to

24   say is sustained as to both, but the speculation objection is

25   overruled.  So it's admissible in Phase II.  And I meant
```

 1  sustained, and I feel even more strongly about that after

 2  seeing what's coming in from Farmer.

 3      So those were the two things I wanted to say about the

 4  Reeves testimony as to where we stand right now on the Reeves

 5  testimony.

 6      So with that, let's take a break.

 7          **MS. MOORE:**  Your Honor, as to Portier --

 8          **THE COURT:**  Sure.

 9          **MS. MOORE:**  -- this is to address what we talked about

10  at sidebar, the Court had previously sustained our objection to

11  Monsanto playing 583:8 to 584:11; and our suggestion --

12          **THE COURT:**  Well, what I said was I was busy reading

13  the Farmer deposition so I didn't know what it was, but it

14  sounded like both sides agreed that whatever document was

15  flashed onto the screen shouldn't have been flashed onto the

16  screen.

17          **MS. MOORE:**  That's correct.  And when I say

18  "sustained," Your Honor, I meant in the rulings not today.  I'm

19  sorry.  The prior ruling.

20          **THE COURT:**  Okay.

21          **MS. MOORE:**  I'm sorry, Your Honor, to clarify.

22      So our suggestion as a remedy to them showing what was

23  excluded on the screen is for us to be able to play back a

24  short testimony, and we can submit that to the other side and

25  we can try to work that out on the break.

 1          MS. COPE-KASTEN:  We're happy to talk with Ms. Moore

 2   about that, Your Honor.

 3          THE COURT:  Okay.  So the idea is you would talk to

 4   them about it over lunch or something?

 5          MS. MOORE:  We might be able to just talk about it

 6   quickly in the next couple minutes because Portier is going to

 7   be wrapped up.

 8          THE COURT:  Okay.  Why don't you do that.  We'll

 9   resume in about five minutes.  I'll be back out in about five

10   minutes.

11          MS. MOORE:  Okay.  Thank you, Your Honor.

12                  (Recess taken at 10:44 a.m.)

13                  (Proceedings resumed at 10:55 a.m.)

14       (Proceedings were heard out of the presence of the jury:)

15          THE COURT:  Okay.  Anything that needs argument?

16          MR. WISNER:  Yeah, Your Honor.

17       So the issue was -- can we have it on the screen? --

18   during his testimony --

19          MR. STEKLOFF:  I think you'll need the defense

20   control.

21          THE COURT:  Theresa, can you switch the --

22          MR. WISNER:  Sorry.

23                  (Pause in proceedings.)

24          MR. WISNER:  So there was testimony --

25          THE COURT:  And then, Theresa, you can tell the jurors

```
 1   it will be a couple more minutes.  Thanks.
 2        MR. WISNER:  The testimony that they designated was
 3   when they read this second sentence into the record while
 4   cross-examining him (reading):
 5            "The arguments expressed in the open letter reflect a
 6        misunderstanding of the evidence used for the EFSA
 7        evaluation."
 8        THE COURT:  Yes.
 9        MR. WISNER:  You sustained that and it's out.
10        When they played the video, they showed this on the screen
11   for a sufficient amount of time for everyone to read those
12   sentences.  And so while they didn't read it into the record,
13   they did present it to the jury, I mean, long enough that we
14   were able to physically write the whole sentence down --
15        THE COURT:  Okay.
16        MR. WISNER:  -- by hand.
17        So, as a remedy to that, we have proposed playing a
18   portion that was previously excluded --
19        THE COURT:  Okay.
20        MR. WISNER:  -- and it is the question, if Your Honor
21   remembers -- I don't know, you've been reviewing a lot of
22   testimony -- but the one where I asked "Did it take you a lot
23   of time?"  And he goes "Yes."  And I said, "Well, then why did
24   you do it?"  And he goes on for about a page explaining why he
25   sent these letters and did what he did.
```

1        That portion was excluded for grounds -- you know, for

2   whatever reason, but it was excluded, and I think that that

3   would help rebut any prejudice created by showing that

4   sentence.

5                    (Pause in proceedings.)

6            **MR. WISNER:**  And in that answer, he explains why he

7   thought they were doing it wrong.  You know what I mean?  It's

8   not just that.

9            **THE COURT:**  So this was shown but not read -- this was

10  shown during Portier's testimony, and Portier's testimony

11  was -- had I ruled that the first sentence could come in and --

12           **MR. WISNER:**  That's right.

13           **THE COURT:**  -- the second sentence could not come in?

14           **MR. WISNER:**  That's right.  And they read the first

15  sentence.

16           **MR. STEKLOFF:**  Also to be clear, Your Honor, maybe if

17  you could watch the next few seconds of the video, what happens

18  is that the first sentence is called out and highlighted, and

19  then there is testimony about that first sentence.

20       So that the full paragraph is shown but no questions are

21  asked about the language, and then there is specific testimony

22  that is asked about the first sentence with this up and

23  highlighted.

24           **THE COURT:**  Okay.  I think that the likelihood of that

25  affecting the jury is very -- is exceedingly low.  I mean,

**PORTIER - VIDEO TESTIMONY**

1    almost impossible under the circumstances.

2        I will say, though, why don't you play the video back to

3    me just so I can watch it in realtime.

4                **(Video was played but not reported.)**

5            **THE COURT:**  Can you play it one more time for me?

6                **(Video was played but not reported.)**

7            **THE COURT:**  Fine.

8        So after watching that, I change my view.  I think that it

9    was on there and it was in front of the jury long enough to

10   have an impact.

11       So I don't remember -- I have a general memory of the

12   passage that you're talking about, and I think that that is

13   okay to play to the jury to respond to this; but if you want me

14   to look at the specific text again, you can hand it up to me.

15   I don't have Portier's testimony with me.

16           **MR. WISNER:**  If you're going to let it in, I don't

17   need you to read it.  It's really their discretion.

18           **MR. STEKLOFF:**  Well, I guess the only question I have,

19   Your Honor, is --

20           **THE COURT:**  My general recollection is that he said,

21   "The reason I did this, the reason I spent so much time on this

22   is because I thought they were doing it wrong; and I was

23   actually involved in sort of creating the standards, and I

24   think it's a big deal that they did it wrong," or something

25   along those lines.

1            **MR. WISNER:**  That's a pretty good paraphrase.

2            **THE COURT:**  I think if my memory of that is accurate,

3    I think that that is appropriate under the circumstances to

4    allow in.

5            **MR. STEKLOFF:**  Understanding your position, I will not

6    argue against it.

7            **THE COURT:**  Okay.  You can put that in.

8            **MS. MOORE:**  Thank you, Your Honor.

9            **THE COURT:**  And you can bring in the jury.

10           **MS. MOORE:**  He may need just one minute to do that.

11       You got it?

12           **MR. WISNER:**  We're good.

13           **MS. MOORE:**  We're good?

14       Never mind.  Thank you.

15           **THE COURT:**  You knew how I was going to rule on that,

16   didn't you?

17       (Proceedings were heard in the presence of the jury:)

18           **THE COURT:**  Okay.  Welcome back.

19       You can resume with wrapping up Dr. Portier's testimony.

20           **MS. MOORE:**  Your Honor, we may need to switch the

21   monitor.

22           **THE COURT:**  Oh.  Go ahead.

23           **MS. MOORE:**  Thank you.

24           **MR. WOLFE:**  Thank you.

25               **(Video was played but not reported.)**

PROCEEDINGS

1         **MR. STEKLOFF:**  Your Honor, can we switch back?

2              **(Video was played but not reported.)**

3         **THE COURT:**  All done with Dr. Portier.

4         **MS. MOORE:**  Your Honor, we would move into evidence

5    Exhibits 875, 876, 877, 878, 882 and 883.

6         **THE COURT:**  Any objection?

7         **MR. STEKLOFF:**  Yes, Your Honor.  I think we can

8    discuss it later, though.

9         **THE COURT:**  Okay.  We will do that.

10        **MS. MOORE:**  Okay.

11        **THE COURT:**  Do you want to go ahead and present your

12   next witness?

13        **MS. MOORE:**  Yes, Your Honor.  The Plaintiff calls

14   Dr. Turk.

15        **THE COURT:**  Okay.  Go ahead and play Dr. Turk.

16        **MS. MOORE:**  Thank you.

17             **(Video was played but not reported.)**

18        **MS. MOORE:**  Your Honor, this is a good time for a

19   break.

20        **THE COURT:**  Why don't we return at 12:30.  Remember

21   all my admonitions about staying away from people in the

22   building, not communicating amongst yourselves about the case;

23   not talking to anybody else; not doing any research.  Thank you

24   very much.

25        (Proceedings were heard outside the presence of the jury:)

**PROCEEDINGS**

1      **THE COURT:**  Here is what I would propose.  I would

2  prepose if we talk about -- if there is anything to discuss

3  about Farmer or anybody has any clarification questions or

4  burning issues they want to raise about Farmer, that we do that

5  now.  And I would suggest that we put off Reeves, and that

6  maybe we discuss -- your plan is to call Reeves first thing --

7  excuse me -- Weisenburger first thing Monday morning; is that

8  correct?

9      **MS. MOORE:**  It depends on -- we would like to maybe

10  play Reeves and then call Dr. Weisenburger.

11      **THE COURT:**  Well, we will have to see if that's going

12  to work.

13      **MS. MOORE:**  I understand.

14      **THE COURT:**  Depending on whether we are able to get

15  through Reeves.

16      **MS. WAGSTAFF:**  And we are also juggling Mr. Hardeman

17  as well.  He may be slipped in somewhere.

18      **THE COURT:**  Okay.

19      **MS. WAGSTAFF:**  Your Honor, I have something I would

20  like to discuss with respect to Dr. Portier --

21      **THE COURT:**  Okay.

22      **MS. WAGSTAFF:**  -- if that's okay with you.  I have a

23  hard copy of his cross, run receipt.  I just tagged where I'm

24  going to be.

25      **THE COURT:**  Okay.

1          **MS. WAGSTAFF:**  With respect to the motion in limine --

2    I don't know if you want to pull up your motion in limine order

3    81.

4          **THE COURT:**  I'm happy to.  I may need to go in and

5    grab it.  I have it on my iPad, oh wait.  Sorry.  I forgot.

6    There is too much stuff up here.  Just give me one second.

7          (A brief pause was had.)

8          **THE COURT:**  Okay.

9          **MS. WAGSTAFF:**  So on your last page when you are

10   discussing Plaintiffs' motions in limine, I point you to

11   paragraph 15 where Plaintiffs had moved to introduce

12   Dr. Parry's evaluation and tell the jury about Dr. Parry's --

13   Dr. Parry's story.

14         **THE COURT:**  Right.

15         **MS. WAGSTAFF:**  And you said at the last sentence, that

16   "If Monsanto presents expert testimony on the genotoxicity of

17   glyphosate or otherwise opens the door through

18   cross-examination on, for example, the EPA's conclusions about

19   the genotoxicity of glyphosate, this evaluation could become

20   admissible on redirect."

21         **THE COURT:**  Okay.

22         **MS. WAGSTAFF:**  I point you to the cross-examination,

23   and I also -- before we move off of motion in limine 81, I

24   would like to look at your ruling with respect to Plaintiffs'

25   motion in limine number 4 when we talk about -- we were -- we

 1  requested exclusion of foreign regulators.

 2          **THE COURT:**  Right.

 3          **MS. WAGSTAFF:**  You stated, "It was granted with a

 4  limited exception that Monsanto may briefly cross-examine

 5  Dr. Portier on his efforts to convince European regulators to

 6  ban Roundup parentheticals in a way that reveal his efforts

 7  have thus far been unsuccessful."

 8      You go onto say, "This limited exception is inappropriate

 9  to allow Monsanto to probe Dr." --

10          **THE COURT:**  Wait.  Just to make sure the record is

11  clear.  "This limited exception is appropriate to allow" --

12          **MS. WAGSTAFF:**  Sorry.

13          **THE COURT:**  -- "Monsanto."

14          **MS. WAGSTAFF:**  That was probably a very -- I didn't

15  mean to do that.

16      -- "is appropriate to allow Monsanto to probe Dr. --

17  Dr. Portier's objectivity and to allow Monsanto to counter any

18  erroneous assumption by jurors that glyphosate is banned in

19  Europe."

20          **THE COURT:**  Right.

21          **MS. WAGSTAFF:**  So if you combine those two motions in

22  limine together -- and I point you to the cross-examination,

23  which I have flagged; and they cross-examine Dr. Portier on

24  pages 431 to 484 of the actual depo sites, which is on the

25  left, if you see; and what I flag for you is where they

 1  actually -- on page 457, they are actually using EFSA's

 2  conclusion, which we think is a clear opening the door because

 3  they have already previously in the cross established what you

 4  said in your limited -- the limited way that they could use the

 5  foreign regulatory.  And right here they are now using EFSA's

 6  actual conclusion to cross the genotox.  We think that they go

 7  on on pages 459 with the Bolognesi --

 8         THE COURT:  Hold on.  Give me a quick second to absorb

 9  this.

10      (A brief pause was had.)

11         THE COURT:  Okay.

12         MS. WAGSTAFF:  So we believe that their use of foreign

13  regulatory documents went beyond --

14         THE COURT:  Sorry, were you going to point me to some

15  other --

16         MS. WAGSTAFF:  Yeah.  We also -- 459, if you continue

17  on where they start questioning him about -- starting on line 9

18  on the next page where they start questioning him about the

19  Bolognesi and the actual --

20         THE COURT:  Yes.

21         MS. WAGSTAFF:  And it continues on actually through to

22  page 461 where they actually get in and they say "So the

23  jury" -- 461, line 14, they say, "And just so the jury

24  understands what we are talking about, this was a study that

25  looked at aerial spraying that was being done in South America

1   to try to eradicate crops relevant to the illegal drug

2   institute, correct."

3       And then they go on and they start challenging the genotox

4   opinions, which we think further opens the door.  That's what

5   it says.

6       And then we think that they continue on on page 462,

7   line 16 through 463, line 1, where they say -- they continue to

8   question and challenge the micronuclei testing, which is what

9   shows about the DNA damage.

10      And continuing on all the way through the Bradford-Hill

11  analysis where they say at the bottom of page 463 -- and they

12  cross-examine Dr. Portier on the Bradford-Hill guidelines to

13  assign causality to increase the frequency of BNMN observed in

14  our study, which if you continue reading is micronuclei damage.

15      This is a clear cross-examination on the genotoxicity,

16  which we believe under your motion in limine opens the door to

17  allow us to present the Dr. Parry story to the jury.  And we

18  would like to present to you through Dr. Martens, who is a

19  employee of Monsanto, and we would give you deposition cuts

20  over the weekend or on Monday morning.

21          **THE COURT:**  Okay.  I'm happy to consider it.  It

22  sounds like something that doesn't need to be decided now, and

23  I can read this testimony more carefully and consider the

24  proposed testimony you are giving from Dr. Martens more

25  carefully before I rule.  Do you want to respond briefly now?

1          **MR. KILARU:**  Yes, Your Honor.  We oppose that.  I

2     don't think -- we understood -- in particular the colloquy we

3     had about Parry, we understood that any cross-examination on

4     the topic of genotoxicity would open the door to Parry.

5          **THE COURT:**  I don't think it does categorically.  It's

6     a question of what came out --

7          **MR. KILARU:**  And I believe that what was done here was

8     asking him about the Bolognesi study, which is one of the

9     studies that Dr. Parry asked.  And I think if you remember at

10    the very end of the cross, Mr. Wisner actually asked, Did

11    Mr. Schmidt contest the results of any of the positive findings

12    that you put here as to genotoxicity.

13         The witness said, No, we didn't go back into that.

14         So I think our cross-examination on genotoxicity was very

15    narrow.  It was intended to comply with that ruling and not

16    open the door to Parry.

17         **THE COURT:**  Potentially the bigger issue is -- and,

18    again, I need to read this more carefully -- but it seems to me

19    the bigger issue is the first point Ms. Wagstaff made, which is

20    that you put in testimony or evidence about -- was it the

21    European regulators?

22         **MS. WAGSTAFF:**  EFSA.

23         **THE CLERK:**  EFSA's conclusion about the genotoxicity

24    of glyphosate, and the point was -- the motion -- I mean, the

25    ruling on motion in limine Number 15 said that you open the

1    door if you present, for example, evidence on the EPA's

2    conclusions about the genotoxicity of glyphosate.  So it seems

3    to me that you did bring in material that potentially opened

4    the door to Dr. Parry's second evaluation.  And then the

5    question is, so -- the question is how significant was that bit

6    of testimony that you brought in and is the remedy to strike it

7    or is the remedy to allow, you know, the Parry report in which

8    they -- which then may, of course, permit Monsanto to bring in

9    more stuff on genotoxicity, and maybe that's the appropriate

10   solution.

11        MR. KILARU:  We will think about that as well,

12   Your Honor.  I think my gut instinct right here is that we

13   think that none of this should be in, so we would prefer to

14   strike the testimony.  I can assure you we wouldn't argue about

15   it in closing.

16        THE COURT:  I'm guessing that's what you would prefer.

17   The question is whether or not that is the appropriate --

18        MR. KILARU:  Right.  The reason I would say that is

19   among the reasons, I think it was a pretty small snippet of

20   testimony about EFSA in the grand scheme of things; and the

21   testimony about Parry would be somewhat extensive about the

22   back and forth and involve company documents and things like

23   that.

24        THE COURT:  And then presumably Monsanto may wish to

25   bring in more evidence to rebut that.

1          **MR. KILARU:**  Right.

2          **THE COURT:**  But maybe that's fine, because it's not as

3     if, you know, the genotoxicity stuff is -- in contrast to, you

4     know, the IARC process, the EPA process.  I mean, the

5     genotoxicity science is, of course, highly relevant to

6     Phase One.  So that, I think, is the issue.

7          And -- do you all want to -- I mean, I don't like to make

8     people do briefing in the middle of trial; but maybe it would

9     be worth each of you filing a short brief, and part of it would

10    be, you know, explaining -- the Plaintiffs explaining with more

11    specificity what evidence they want to bring in relating to

12    Parry's evaluation, you know, sort of describing it; and then

13    Monsanto explaining with specificity what evidence it would

14    want to bring in if the Parry evaluation came in.

15         **MS. WAGSTAFF:**  So, Your Honor, I propose it might be

16    best if you actually see our proposed depo cuts instead of just

17    categories of testimony.  And I actually took the Dr. Martens

18    depo, so I can cut that with someone on Monsanto and have it to

19    you -- I don't want to speak for them -- but this weekend

20    sometime.

21         **THE COURT:**  Okay.

22         **MS. WAGSTAFF:**  And also it was our understanding if

23    you look at the testimony on page 472, starting with line 22,

24    where it says, "It's not the purpose of genotoxicity assays to

25    establish that glyphosate causes NHL," that that would be sort

1    of the cross-examination the Court was proposing.  And that

2    when you put in your motion in limine an example of opening the

3    door with, you know, regulatory conclusions, that that is

4    exactly what Monsanto did.  And so --

5         THE COURT:  I think it is more an issue of -- that

6    is -- that -- I think I disagree with you about that because

7    that cross-examination is about what -- what is the importance

8    in the grand scheme of things of the genotoxicity studies, not

9    whether anybody's particular conclusion about genotoxicity was

10   right or wrong; whereas, the quote from the European regulators

11   is more -- goes more to who is right or wrong about

12   genotoxicity.

13        MS. WAGSTAFF:  Right.  I think we are saying the same

14   thing.  I'm agreeing with you.

15        THE COURT:  Oh, okay.  All right.

16        MS. WAGSTAFF:  So perhaps we can agree to get the

17   judge cuts proposed cuts on Dr. Martens by Sunday at noon?

18        MR. KILARU:  We can try to make that work.  We haven't

19   seen any of this yet, but we are happy to work to make this

20   happen.

21        THE COURT:  Sure.  That sounds fine.

22      Do you want to talk about Farmer?

23        MR. KILARU:  Farmer, I don't think --

24        MR. STEKLOFF:  I think both sides agree to accept your

25   rulings.  No argument.

1           THE CLERK:  Okay.

2           MR. WISNER:  We have worked it out.  We added a few

3    extra things we agreed on.

4           THE COURT:  To clarify the testimony, okay.  Good.

5       So then I think what I would propose is that we -- I mean,

6    I will defer to you-all.  I mean, we can talk about -- I don't

7    have too much more time after the trial day although that may

8    depend.  So how much more testimony do we have prepared for

9    today, including Farmer?

10          MS. MOORE:  Your Honor, how much did we play of

11   Dr. Turk's?  We have about 20 minutes of Dr. Turley and an hour

12   of Dr. Ye.

13          MS. WAGSTAFF:  We have 25 of Turk left.

14          MS. MOORE:  Okay.  So we have about probably two hours

15   and 16 minutes left of testimony left to be played today.

16          THE COURT:  Okay.  Good.

17          MS. MOORE:  Should get us right where we need to be, I

18   think.

19          THE COURT:  Yeah, I think so.  So we could talk about

20   the Reeves' testimony now if you wanted to.  We could talk

21   about it briefly -- briefly after the jury leaves for the day,

22   but I do not have that much time after the jury leaves for the

23   day or we could talk about it Monday morning.

24          MS. MOORE:  Your Honor, it is whenever you prefer.  I

25   mean, it's your lunch hour, so -- I mean, we are prepared to

 1  talk about it now or we can wait until after today.

 2      **MR. KILARU:**  Likewise.

 3      **THE COURT:**  Why don't we spend, 10, 15 minutes talking

 4  about it right now.  Maybe 10 minutes, because I want everybody

 5  to have a break for lunch.

 6      **MS. MOORE:**  That would be nice.  Thank you.

 7      **THE COURT:**  Spend 10 minutes and we will resume after

 8  the trial day if we need to.

 9      **MS. MOORE:**  That's good.  Thank you, Your Honor.  I

10  will turn it over.

11      **THE COURT:**  Okay.  So who is most unhappy with this

12  ruling?

13      **MR. KILARU:**  That's a good question, Your Honor.  I

14  mean, I know the *Knezevich & Hogan* --

15      **THE COURT:**  The goal is always to make both of you

16  unhappy.

17      **MR. KILARU:**  I guess we should probably say both of

18  us.

19      I think from our side the main issue is talking about the

20  mouse study.  I suspect the Plaintiffs may have some other

21  objections to other aspects of the rules as well, so we can

22  start on either side of that.

23      **THE COURT:**  Okay.  Why don't we -- why don't you tell

24  me what is wrong with what I have done with respect to the

25  mouse study?

1          **MR. KILARU:**  Sure, Your Honor.  I think we have a

2    proposal we can make to maybe go a little further than what we

3    have offered earlier.  I think the broader point I would make

4    is one of the reasons we haven't come forward with something

5    initial yet is we kind of wanted to see how the evidence would

6    come in on this study.  And as it has come in.  It is unclear

7    to us that we need to get into the back-and-forth about one

8    tumor versus zero tumors in the control group through this

9    deposition.  Dr. Portier was asked about the kidney tumors in

10   the *Knezevich & Hogan* study.  And he said what he said, which,

11   I believe, was that there was a trend in the study; and he

12   talked about that piece of the study.  We did cross-examine on

13   that.

14         The cross-examination that we did on *Knezevich & Hogan* was

15   about the malignant lymphoma data.  You may remember the

16   statistical significance discussion.  It was not about the

17   kidney tumor data.  We don't really intend to get into that any

18   further, so I don't think there will be -- there won't be any

19   witness testimony from us saying actually there was one tumor

20   in the control group, nor do I think that in closing we would

21   intend to argue, at least in Phase One -- we acknowledge this

22   is more of a Phase Two issue -- but in Phase One I don't think

23   we come in and say dismiss *Knezevich & Hogan* because there

24   actually was a tumor in the control group.

25         So under the circumstances, we continue to think they

1   shouldn't be admitted at all; but I really question now whether

2   however much there is -- 50 pages or whatever the case is --

3   should come in.  It is almost sort of -- I don't mean this with

4   the intent, the component that comes with it, but it's also an

5   issue about whether there was a tumor or not.  For purposes of

6   Phase One we are not really disputing --

7           THE COURT:  The upshot is -- the upshot is you -- for

8   purposes of Phase One, you are not contesting the absence of a

9   tumor in the control group in that -- for that study.

10          MR. KILARU:  Right.  For Phase One, I think as the

11  proofs come in, we are not going to go any further than what

12  has already been heard.

13          THE COURT:  Okay.

14          MR. WOOL:  Your Honor, and you just heard this,

15  Monsanto impeaches Portier with the EPA's CARC decision, which

16  is in part predicated on this finding of the tumor in the

17  control group.  So the jury is probably now wondering, Well,

18  why does Dr. Portier have a different conclusion than EPA does

19  as to this data.

20     And so we think that even though they might not contest

21  the tumor in the control group, they have nonetheless sort of

22  opened the door to this and made this an issue by contrasting

23  Dr. Portier's testimony with the CARC report.

24          MR. KILARU:  That, Your Honor, I don't know that

25  anything -- I don't know that in any way the jury would connect

1    the discussion in the CARC report to a mouse tumor back in

2    1983.  The fact of EPA approval since then is what it is, and I

3    think it has been admitted.  But as to what the EPA thought

4    about this study before it really concluded back in 1985 or '86

5    that it should approve it, that I think is really far afield

6    what the jury has heard about the EPA or about this study.

7           THE COURT:  I mean, the thing about it is we have had

8    so much that has happened since 1985, right; and we have had

9    these epidemiology studies.  We have had the IARC

10   classification.  You know, we have had -- we have had Portier

11   trying to convince the EPA to do something.  We have had

12   Portier trying to convince the European regulators to do

13   something.

14        And I suppose if this case were about the state of affairs

15   in 1987 or something like that, there might be a stronger

16   argument that Monsanto's shenanigans with the mouse study are

17   relevant, even if Monsanto had not challenged Dr. Portier on

18   the absence of a tumor in the control group because presumably

19   the background assumption would be that that -- that animal

20   study from 1985 was much more relevant to the EPA's

21   consideration or the European regulators' consideration than it

22   would be in 2018 or 2016 or 2015.

23        So I wonder if, given how long ago this was and given how

24   much science that has come out since then and given that

25   Monsanto is not contesting Dr. Portier on the absence of a

1  tumor in the control group for the study, I wonder if it -- if

2  that makes it -- that makes it a lot more unduly prejudicial

3  than probative.  And I hadn't thought -- the thing I hadn't

4  thought about was the possibility that Monsanto was not going

5  to challenge Portier on the absence of a tumor in the control

6  group.

7          MR. WOOL:  Right.  And we hadn't thought that they

8  were going to do that either.  I think we actually proposed a

9  stipulation to say there was no tumor in the control group.

10        And I think there is also a second point here, and you

11  heard about this from Monsanto in opening, which is that the

12  doctors never connected Mr. Hardeman's NHL to Roundup, right?

13  And that sort of goes to what happened with the EPA in the late

14  '80s and early '90s with respect to this tumor.  You know, I

15  think that they would reasonably have been expected to hear a

16  lot more about glyphosate potentially being carcinogenic had

17  all of this not happened in the 1980s.

18          MR. KILARU:  Well, I --

19          THE COURT:  But you are presuming that if -- so what

20  you are saying is had the tumor not been found in the control

21  group, the doctors would have known that -- would have looked

22  at glyphosate as a potential risk factor for Mr. Hardeman?

23          MR. WOOL:  Well, we think it is certainly possible.

24          THE COURT:  It seems pretty speculative, doesn't it?

25          MR. WOOL:  I mean, I think there is some speculation

```
 1   there, and we would concede that.  But I think you would have

 2   to say that the EPA's categorization from 1985 would have stood

 3   for longer; and that sort of goes directly to, you know, the

 4   doctor sort of connecting this.

 5              THE COURT:  Okay.

 6              MR. WOOL:  Which was a point of emphasis for them

 7   during opening.

 8              THE COURT:  It certainly was.  I grant you that.

 9       So let's -- let's resume this discussion about the magic

10   tumor later, maybe at the end of the trial day.

11       Is there anything you want to articulate -- any separate

12   beefs that you had with my rulings on Reeves?  I guess I said

13   that argument was -- well, you know what, let's give everybody

14   a lunch break.  Let's resume this discussion after the end of

15   the trial day.  All right?

16              MR. WOOL:  Yes.

17              MR. KILARU:  Thanks, Your Honor.

18              (Luncheon recess was taken at 12:07 p.m.)

19   AFTERNOON SESSION                                    12:32 p.m.

20       (Proceedings were heard in the presence of the jury:)

21              THE COURT:  Welcome back.  You can resume the

22   testimony.

23              MS. MOORE:  Thank you, Your Honor.

24                  (Video was played but not reported.)

25              THE COURT:  Next witness?
```

PROCEEDINGS

1          **MS. MOORE:**  Our next witness is Dr. Richard Turley,

2     Your Honor.

3          **THE CLERK:**  Okay.

4          **MS. MOORE:**  Your Honor, before I do that, just

5     housekeeping, we would move to admit into evidence, Exhibit 66,

6     67 and 68.

7          **MR. STEKLOFF:**  When I find out what they are, I can

8     tell you whether there is an objection.

9          (A brief pause was had.)

10          **MR. STEKLOFF:**  Your Honor, we have no objection.  We

11     might also later list some of the medical records that were

12     discussed but --

13          **THE COURT:**  That's fine.  Those will be admitted for

14     now.

15          (Trial Exhibits 66, 67, and 68 received in evidence)

16          **MS. MOORE:**  Thank you, Your Honor.  Dr. Turley will be

17     next.

18               **(Video was played but not reported.)**

19          **THE COURT:**  Why don't we take our afternoon break.  We

20     will resume at 1:30.

21          (Proceedings were heard out of presence of the jury:)

22          **THE COURT:**  How long did you say Dr. Ye's testimony

23     is?  I can't remember.

24          **MS. MOORE:**  It is an hour, Your Honor.  And Dr. Farmer

25     is five minutes.

PROCEEDINGS

1     **THE COURT:**  Dr. Farmer is down to five minutes?

2     **MS. MOORE:**  Yes.  I think we can play both of them.

3     **THE COURT:**  Okay.  That's fine.

4     So we will resume at 1:30, and you can play both of those,

5  and we will be done for the day.

6     **MS. MOORE:**  Great.  Thank you so much.

7     When we come back on the record, do you want me to move to

8  admit the exhibits?  Do you want to do that before the jury

9  comes back in?

10     **THE COURT:**  You want to do it right now?

11     **MS. MOORE:**  That would be great.

12     Plaintiff would then move to admit into evidence Trial

13  Exhibits 27 [sic], 29, 30, 31 and 32.

14     **MR. STEKLOFF:**  We have no objection to any -- the

15  specific pages of any medical records coming in.  We will

16  clarify, I think we have one composite medical record exhibit.

17  I will work with counsel to identify the specific records we

18  identified in our examination so we can move those in as well.

19     **THE COURT:**  All right.  Those are admitted.

20     **MS. MOORE:**  Thank you, Your Honor.

21    (Trial Exhibits 28, 29, 30, 31, and 32 received in

22    evidence)

23             (Recess taken at 1:22 p.m.)

24          (Proceedings resumed at 1:31 p.m.)

25    (Proceedings were heard out of the presence of the jury:)

1          **THE COURT:**  You can go ahead and bring in the jury.

2      (Proceedings were heard in the presence of the jury:)

3          **THE COURT:**  Okay.  You can resume.

4          **MS. MOORE:**  Thank you, Your Honor.

5      Plaintiffs call as our next witness Dr. Jeffrey Ye, and

6  this will also be by video.

7          **THE COURT:**  Okay.

8          **MS. MOORE:**  Thank you.

9              **(Video was played but not reported.)**

10         **THE COURT:**  Why don't we take another five-minute

11  break.  Folks, you can stand up, stretch, grab some coffee if

12  you need to back there, and we'll resume at five after the

13  hour.

14     (Proceedings were heard out of the presence of the jury:)

15         **THE COURT:**  Can I have a brief sidebar with the

16  lawyers?

17     **(Pages 891 through 892 were placed under seal by Order of**

18  **the Court and bound separately.)**

19

20

21

22

23

24

25

1      **(The following proceedings were heard in open court:)**

2          **THE COURT:**  Okay.  I'll be back in a minute.

3              (Recess taken at 2:05 p.m.)

4              (Proceedings resumed at 2:09 p.m.)

5      (Proceedings were heard out of the presence of the jury:)

6          **THE COURT:**  The jury seems pretty anxious to go.  They

7  had told Kristen a couple of days ago that if at all possible,

8  they don't want to be kept past 2:30 because traffic gets bad.

9  So we're just going to do -- we'll just finish with Dr. Ye, and

10 then I'm going to let them go for today.  Sorry about that.

11         **MS. MOORE:**  Okay.  Thank you.

12             (Pause in proceedings.)

13         **MS. MOORE:**  Well, Your Honor, it's 30 minutes for Ye.

14 So do you want to --

15         **THE COURT:**  That's fine.

16         **MS. MOORE:**  Is that okay?

17         **THE COURT:**  Yeah.  I prepared them for the possibility

18 we'll stay little late, but I don't also want to do Farmer.

19         **MS. MOORE:**  I understand.

20         **THE COURT:**  Yeah.

21     (Proceedings were heard in the presence of the jury:)

22         **THE COURT:**  Okay.  You can resume.

23         **MS. MOORE:**  Thank you, Your Honor.

24         **(Video was played but not reported.)**

25             **(Video stopped.)**

1          **THE COURT:**  Okay.  Is that it?

2          **MS. WAGSTAFF:**  That it's it.

3          **MS. MOORE:**  Thank you, Your Honor.

4          **THE COURT:**  Okay, great.

5      Thank you for staying a little bit late.  We were able to

6  get through the testimony of Dr. Ye.

7      This marks the end of our first week.  I will let you

8  know, of course, as I told you at the beginning, scheduling is

9  a little bit unpredictable, but it does appear that we are

10  somewhat ahead of schedule so far just to let you know.

11      And so please, you know, the weekend is coming so I know

12  that you've heard all this many times from me, but it's

13  particularly important for me to remind you on a Friday

14  afternoon when you're going to be gone for two days that you

15  need to be very careful not to talk about the case with

16  anybody.  You need to be very careful not to expose yourself to

17  any media reports about the case, and you need to be careful

18  not -- you certainly need to ensure that you don't do any

19  independent research looking up terms or anything like that at

20  all.

21      And if it comes to your attention that -- if you've been

22  exposed to some information, you should let us know right away,

23  Kristen or myself.  And if it comes to your attention that

24  anybody else has been exposed inappropriately to some

25  information, you should let us know that.

1        So with that, have a nice weekend.  We'll see you

2    bright-eyed and bushy-tailed on Monday.  Thank you.

3        (Proceedings were heard out of the presence of the jury:)

4        **THE COURT:**  Okay.  Why don't -- you know, my rule

5    about lunchtime and people staying in the courtroom for five

6    minutes -- first of all, again everybody is free to sit down.

7    You don't have to remain standing once the jury has left.

8        My rule about sequestering the courtroom for five minutes

9    at the beginning of the lunch hour will also apply to the end

10   of the trial day so that the jurors can have five minutes to

11   take off before people in the courtroom leave.  And usually, of

12   course, I keep talking anyway so people stay.

13       So on that note, one brief comment on leading questions.

14   I thought it was appropriate to tolerate a good number of

15   leading questions in the examination of the doctors given that

16   their testimony didn't really involve any facts that are

17   significantly in dispute, but I will remind both sides that

18   when the experts come to testify next week, I will not allow

19   those kinds of leading questions other than to, you know, set

20   up -- if you want to use leading questions to be efficient

21   about establishing their qualifications and stuff, that's fine;

22   but for the substantive opinions, that is not appropriate.

23       Let's see...  Oh, very quickly, Dr. Arber.  I went back

24   and looked at the -- saw that there's this kind of lingering

25   objection to Dr. Arber even after the ruling that I issued on

**PROCEEDINGS**

1    the plaintiff's -- on the defendant's specific causation

2    experts.  I don't think that objection is well taken, but let

3    me just make sure I understand it.

4        So Arber is going to offer basically two opinions, as I

5    understand it.  One is that the plaintiff's specific causation

6    experts didn't do a good job on hep C; is that right?

7            MR. KILARU:  Yes.  More or less, Your Honor.  I think

8    the primary focus of his examination is what he found on the

9    pathology slides, the hepatitis C.

10           THE COURT:  That's what I was going to ask about, what

11   he found on the pathology slides and that they did a bad job

12   into looking into hep C; is that right?

13           MR. KILARU:  Yes.

14           THE COURT:  On the pathology slides, I guess, my

15   question is:  Is there anything in dispute that necessitates

16   his testimony?  Because it seems like everybody agrees that

17   there is nothing about NHL that would allow you to identify

18   from an examination -- from a pathological perspective --

19   identify the cause of the cancer.  And it seems like everybody

20   is in agreement based on how the evidence has come in so far

21   that whether it is caused by Roundup or hep C or some unknown

22   cause, there is no marker to the NHL.  So why is that testimony

23   necessary at this point?

24           MR. KILARU:  Well, for a couple of reasons,

25   Your Honor.  I think the Plaintiff, as we all know, has the

 1    burden of proving that the NHL was caused by Roundup.  So I

 2    think having a pathologist come in and look at the slides and

 3    identify there is nothing about Mr. Hardeman's particular

 4    cancer --

 5          THE COURT:  But isn't that just a ruse?  I mean, if

 6    everybody agrees that no pathologist on the planet can go and

 7    look at those slides and identify the cause of his cancer, then

 8    why is it necessary to bring in an expert who says, I went and

 9    looked at the slides and there is nothing about them that

10    indicates that Mr. Hardeman's cancer was caused by Roundup?

11          MR. KILARU:  It goes to the other point, Your Honor,

12    which is it is not true that a pathologist can never look at a

13    slide and say, I can't determine the cause of this person's NHL

14    or testify to that.  There are certain causes of NHL that would

15    be reflected in the pathology, and they will further testify

16    that there are certain aspects of Mr. Hardeman's pathology that

17    are more consistent with other causes besides Roundup.

18          THE COURT:  What is that testimony?  What is that

19    opinion?

20          MS. MOORE:  That is undisclosed to us, Your Honor.

21          MR. KILARU:  I don't think that's the case, your

22    Honor.  In his report he talks about the specific genetic

23    mutations that were found in Mr. Hardeman's pathology, and we

24    have disclosed literature that shows whether some of those gene

25    markers are more consistent with hepatitis C or more consistent

1   with Roundup.

2       **THE COURT:**  I'm pulling up his expert report right

3   now.  And by the way, if I surprised you with this line of

4   questioning and you want to --

5       **MR. KILARU:**  No, that's fine, Your Honor.  I think the

6   only thing I would add is the Plaintiffs are also calling a

7   pathologist, Dr. Weisenburger.  And I think it is important for

8   us to be able to call our own pathologist to the extent their

9   pathologist is saying that Roundup is a cause, that is valid in

10  the field of pathology.

11      **THE COURT:**  It begs the question whether there is any

12  dispute on the issue that the expert is being called to testify

13  about.  And I understand, of course, he can testify -- first of

14  all, he is qualified to testify about both of these things.  So

15  to the extent the Plaintiffs are objecting that he is not

16  qualified to testify about one of these things, that objection

17  is overruled.

18      But in looking at it, I -- I found myself scratching my

19  head about why it is necessary -- why it would be helpful to

20  the jury or relevant for Archer -- sorry -- Arber to testify

21  about this -- the pathology.  So where -- can you show me where

22  in his report that that issue is raised?

23      **MR. KILARU:**  Sure, Your Honor.  I don't have the

24  report in front of me, but I believe on -- I think it is either

25  the second page.  It would be one of the left-facing pages.

1        **THE COURT:**  Seared into your brain?

2        **MR. KILARU:**  Very much so.

3     He talks about the specific findings on the pathology in

4   Mr. Hardeman's case.  He talks about FISH tests that were done.

5   He talks about -- there are a lot of numbers and letters there,

6   the KI67 that was talked about here.  Then he talks about FISH

7   test and DCL6 and DCL2 and a MIC mutation, and those various

8   things.

9        **MS. MOORE:**  I think he is referring to paragraph 18,

10  Your Honor.  And we wondered the same thing because we were

11  told last week by defense counsel that they wanted the

12  pathology slides to bring into court to show to the jury, and

13  it's a little bit puzzling because everyone has agreed that NHL

14  is not disputed in this case, and the doctors have testified

15  that you can't tell from the pathology a cause of NHL.  So I

16  think under 401 --

17       **THE COURT:**  Let me just interrupt and ask you this:

18  Can you tell from the -- does anybody contend that you can tell

19  from the pathology whether it was caused by hep C or hep B?

20       **MR. KILARU:**  There is -- I believe there is a debate

21  about that, Your Honor.  I think there is literature suggesting

22  that there are certain -- there are certain genetic mutations

23  that are more associated with hepatitis C or at least

24  correlated with hepatitis C.  Those same things are not

25  correlated --

PROCEEDINGS

1          THE COURT:  Does he offer an opinion --

2          MR. KILARU:  He is planning to.

3          THE COURT:  -- that the pathology is -- well, the

4     question is:  Has he disclosed an opinion that the pathology

5     suggests that it was caused by hep C?

6          MR. KILARU:  We believe he has, Your Honor.  I think

7     the background here is useful.  He talks about the pathology.

8     On the next page of the report he talks about how he doesn't

9     believe the experts have sufficiently ruled out hepatitis C.

10        Now, the Plaintiffs have not deposed him and learned the

11    further basis of those conclusions; but I think on the four

12    corners of the report, he said that he doesn't think that they

13    had really ruled out hepatitis C -- including Dr. Weisenburger

14    who is a pathologist -- and on the previous slide, he talks

15    about -- I have it with me now -- what the markers and the

16    other genetic mutations are that he found in the tumor based on

17    his review of the slides.

18        MS. MOORE:  Your Honor, we are talking about two

19    different things, though.  Genetic mutations versus a viral

20    infection, which is what hepatitis C and B are.  And there is

21    absolutely no evidence or no testimony or no disclosed opinion

22    that says that hepatitis C can be determined as a cause of

23    someone's NHL from looking at the pathology.  We don't think it

24    is relevant.

25        THE COURT:  I certainly don't recall ever seeing

1    that -- I don't recall that being suggested by Mr. Stekloff in

2    his opening statement.  I don't recall that being suggested by

3    any lawyer during cross-examination of any specific causation

4    expert in this case.  I may not -- I may simply may not be

5    remembering.

6           MR. KILARU:  Yes, Your Honor.  Actually when

7    Ms. Matthews Johnson cross-examined Dr. Weisenburger during the

8    Daubert hearing, she specifically asked questions about whether

9    the DCL6 mutation is associated with hepatitis C.  She also

10   asked Dr. Weisenburger whether Mr. Hardeman had that mutation,

11   and she presented him with literature, the Tarone article,

12   showing that that mutation is associated with hepatitis C as

13   well.  We have done this before.

14        In opening what Mr. Stekloff said, I believe, is that the

15   experts will say that hepatitis C is the most likely cause, and

16   that's what Dr. Arber's testimony and I think and Dr. Levine's

17   testimony is designed --

18           THE COURT:  Right.  And I understand that they

19   testified that it is the most likely cause.  The question is

20   whether there is any dispute that has properly been teed up

21   about whether you can determine that from the pathology or that

22   you can discern that it is more likely or less likely based on

23   the pathology.

24           MR. KILARU:  And I think in his initial report and in

25   his supplemental report where he looked at the actual slides

1   and continued to say Nothing about this allows me to attribute

2   to Roundup, and his continued conclusion that hepatitis C --

3   and the experts, including their pathologists, have not

4   appropriately ruled out Roundup -- excuse me -- have not

5   appropriately ruled out hepatitis C, we are there.  And I think

6   Plaintiffs could have deposed him to ask him the further bases

7   for those opinion; they chose not to.

8        So I don't think that given the report -- I think it is

9   fairly within the four corners of the reports.  And I think

10  Plaintiffs could have asked him if they wanted to about whether

11  he had more specific opinion.  They chose not to do so in this

12  case.

13       **MS. MOORE:**  Your Honor, under Rule 26 for expert

14  disclosure opinion, we are not required to take a deposition of

15  an expert.  The purpose of Rule 26 is to prevent unfair

16  surprise at trial.  And so we have to rely on the disclosed

17  opinion in the report, and he did two reports.  And I'm looking

18  at his supplemental report and he specifically states in his --

19       **THE COURT:**  Can I -- I want to say one thing to you.

20       Be careful the standard you are seeking to impose on

21  disclosure of opinion in expert reports.

22       **MS. MOORE:**  I understand, Your Honor.

23       **THE COURT:**  Because the standard is going to apply to

24  both sides, and I have a pretty strong suspicion that it is

25  going to hurt the Plaintiffs a lot more than it is going to

1   hurt Monsanto if you apply very stringent standards to that.

2        **MS. MOORE:**   I appreciate what you are saying,

3   Your Honor.   But I do think when you are talking about a

4   conclusion that a pathology can tell us the cause of

5   Mr. Hardeman's NHL, that is not getting to the weeds of his

6   report.   That is the summary of his opinion.   And nowhere in

7   either of those reports does he say that the pathology slides

8   tell me that his NHL is caused from a genetic mutation.   And

9   that's different than saying, Okay -- I'm not saying you have

10   got to lay out every single word in your report.   That would

11   not be -- that is not realistic for anyone to do, either side.

12   But the conclusion of your opinion should be set forth in your

13   report.

14        **THE COURT:**   But if there is -- so if he says something

15   along the lines of -- and, you know, I will go back and read

16   his report obviously, and I will go back and -- this is

17   something that just popped in my mind based on the way the

18   evidence has come in at trial, right.   But it might also be

19   useful to go back and read your briefs about Dr. Archer [sic]

20   with this in mind to see what Monsanto said about the opinions

21   that Archer [sic] was going to offer; but it seems to me --

22   what I was going to say is that it seems to me if Archer [sic]

23   said something to the effect of, you know, they didn't even --

24   you know, they didn't even look at the pathology or they didn't

25   give adequate consideration to pathology, that would be enough,

1    I would think.

2          So I would -- you know, it sort of depends on -- depends

3    partly on what kind of standard the Plaintiffs want to apply to

4    disclosure of opinion in expert reports, and it depends on what

5    has been said about this up until now.

6          **MR. KILARU:**  Can I just be very clear on exactly what

7    his testimony we anticipate will be?  It is not quite as

8    described.  He is not going to say, as we anticipate, that

9    Mr. Hardeman's NHL was caused by a particular genetic mutation.

10   That is not the nature of the testimony.

11         **THE COURT:**  Right.

12         **MR. KILARU:**  What he would say is, I have looked at

13   the pathology.  Here is what I have found from that pathology.

14   I have found certain genetic abnormalities that are present in

15   his tumor that are also present in some other tumors.  He is

16   going to say, I have looked at literature; and I haven't seen

17   anything in literature on Roundup that would suggest those

18   mutations have anything to do with it, those translocations and

19   so on.  But I have looked at literature on hepatitis C, and I

20   have seen -- as Dr. Weisenburger admitted during the Daubert

21   hearing -- that some of those mutations or translocations are

22   associated with hepatitis C.  To me that makes it more likely

23   that hepatitis C is a cause, and it also makes me think that

24   the experts on the Plaintiffs have inappropriately ruled out

25   Roundup as a cause, including Dr. Weisenburger.  It is

1  different than just saying it was caused by a particular thing.

2      THE COURT:  Well, the point about -- I haven't seen

3  those -- I haven't seen those mutations associated in the

4  literature with Roundup.  I mean, is there literature on -- so

5  what is the literature that he relies on to support the point

6  that Roundup does not cause those mutations?

7      MR. KILARU:  Well, I think his point is the absence of

8  any literature.  I mean, there is no literature on that.  And I

9  think part of our case is that there is, in fact, no published

10  literature on a lot of those things.  If there were literature,

11  he would have looked at it; but there is no comparable

12  literature with relation to Roundup.  We don't want him to get

13  into -- pursuant with your orders -- on general causation

14  evidence.  I think his point is, I can look to that literature

15  about hepatitis C, and I can tell you that there are

16  associations between those two things.  There is not something

17  on the Roundup side similar to that.

18      MS. MOORE:  Your Honor, that crosses the line to the

19  general causation opinion, and Dr. Arber was not disclosed as a

20  general causation expert and did not go through Daubert on that

21  opinion.

22      THE COURT:  Well, no.  I mean, I think you may have a

23  strong argument that he shouldn't be allowed to testify on this

24  point, but I don't think it is because it crosses the line into

25  a general causation opinion.  I don't see that.

**PROCEEDINGS**

1       It is just -- I mean, to me it's -- you know, as I

2  understood what -- coming into this discussion, as I understood

3  what he was going to testify to on the issue of pathology, it

4  seemed like it was not a matter in dispute and, therefore, it

5  was not useful to have an expert come and testify.

6       Now -- so now they are saying that he is going to offer an

7  opinion that is somewhat different from the one that I was

8  assuming.  If he were to offer that opinion, it may be helpful;

9  but then there may be a question about whether this was

10 adequately disclosed.  And, again, as I said a couple times

11 now, raises questions about what -- you know, what standard we

12 should apply to that given the very lenient standard I have

13 applied to the Plaintiffs going all the way back to the general

14 causation phase about their experts and what was disclosed in

15 their reports.

16      So you want to just leave me to think about that or does

17 anybody want to file anything that will help provide a better

18 explanation of what?

19      **MS. MOORE:**  If we can re-visit that on Monday after

20 testimony, Your Honor, and we will -- we will discuss whether

21 we want to file a brief.  We would let the defense know if we

22 were to plan to file something before Monday afternoon, but I

23 would like the opportunity to go back through and now that we

24 have a better understanding based on what counsel said as to

25 why they wanted to use the pathology slides, then we will look

 1  back over both of his reports.

 2          **THE COURT:**  Okay.

 3          **MS. MOORE:**  Thank you, Your Honor.

 4          **MR. STEKLOFF:**  Your Honor --

 5          **THE COURT:**  You-all can be heard about it.  This won't

 6  be the last opportunity to be heard about it.

 7          **MS. MOORE:**  Thank you, Your Honor.

 8          **THE COURT:**  If you want to say something briefly.

 9          **MR. KILARU:**

10          **MR. STEKLOFF:**  Just briefly, Your Honor.

11      On the more basic point, the opinion you thought he was

12  going to offer coming in, without the additional context that

13  Mr. Kilaru added, I think we have to step back.

14  Dr. Weisenburger is now going to be their only specific

15  causation expert.  He is a pathologist.  He is using a

16  differential diagnosis that you have allowed to survive, but I

17  think it is weak.

18      I think the notion that we shouldn't be allowed to call

19  our own pathologist to then talk about what pathologists do in

20  the context of Mr. Hardeman and then criticize the fact that

21  their only specific causation expert, Dr. Weisenburger, is

22  doing something that pathologists don't do --

23          **THE COURT:**  Well, what if you cross-examine him and he

24  says, Yeah, you know, there is -- you know, there is -- you

25  cannot look at the pathology and establish any link between the

 1   particular NHL and Roundup?  I mean, I don't remember what, if

 2   anything, he has said about that in the past --

 3        **MR. STEKLOFF:**  I think --

 4        **THE COURT:**  -- but I'm sort of assuming that that's

 5   what he is going to say based on the way the evidence has come

 6   in so far.

 7        **MR. STEKLOFF:**  Right -- I don't think he will say

 8   that -- but then he is going to take it a further step to say,

 9   Nonetheless, as a pathologist, because he is technically -- all

10   based on his background as a pathologist.  I know he has been

11   involved in epidemiology studies, but he has always made -- he

12   has been a pathologist in those studies.

13        **MS. MOORE:**  Hematologist.

14        **MR. STEKLOFF:**  Even if he says that, I think that it

15   is still relevant to our defense to have a pathologist come in

16   and say that is not what pathologists do.  This is what

17   pathologists do; and outside of this courtroom, not only can

18   you not use a pathology test, but pathologists don't use

19   differential diagnosis.  And I don't agree with the specific

20   causation methodology that Dr. Weisenburger has used including

21   because of the way he has ruled out hep C.  And that is all in

22   his report, and I think that --

23        **THE COURT:**  Including because of the way he has ruled

24   out hep C, I mean, I think that's fair game.  It is just a

25   question of, you know, the -- how does that link back to the

1   pathology?

2           MR. STEKLOFF:  But the --

3           THE COURT:  That's the question I am -- I have.  You

4   started off this discussion by saying even assuming the -- my

5   description of what he would testify to were accurate, that

6   would be important for you.  And I understand the point about

7   hep C being important for you; but if -- if he is merely going

8   to be testifying that, I looked at the slides and the slides

9   didn't show any connection to Roundup, right, there was no

10  indication in the slides that there was a connection to

11  Roundup, that, I think, is a totally noncontroversial

12  proposition at this point.  So that's the part I'm having

13  trouble getting.

14          MR. STEKLOFF:  And I agree that it should be

15  noncontroversial.  I also think it is relevant to educate the

16  jury about the way that patients are treated outside of this

17  courtroom when they have non-Hodgkin's lymphoma; and that when

18  they look specifically at Mr. Hardeman, there is nothing unique

19  about his non-Hodgkin's lymphoma or his diffuse large B-cell

20  lymphoma, and understanding the pathology if we use --

21          THE COURT:  Well, I think you may have established

22  that already through the testimony of the treating physicians,

23  you know, so -- you know, I think this discussion can probably

24  benefit from my being more educated about the ins and outs of

25  Archer's -- is it Archer?

1        **MR. KILARU:**  Arber.

2        **THE COURT:**  -- Arber's report and, you know, perhaps

3   the literature he cites and stuff.  But I just want to raise

4   that because I had this hey-wait-a-minute moment when I looked

5   back at Arber's proposed testimony.

6        **MR. STEKLOFF:**  And I understand that, but I mean, I

7   think from Dr. Weisenburger we will hear from the third witness

8   about the epidemiology and the -- and their -- I'm sure we will

9   hear the Bradford-Hill criteria.  They have chosen to use their

10  time like that.  If we choose to use 20 to 30 minutes of our

11  time to provide some background about Mr. Hardeman's

12  non-Hodgkin's lymphoma from a pathologist, I think that --

13       **THE COURT:**  That may --

14       **MR. STEKLOFF:**  -- is fair game.

15       **THE COURT:**  Maybe that's fair.  Anyway, we can talk

16  more about that.  And maybe Dr. Weisenburger's testimony will

17  elucidate this somewhat.

18    So what do we have happening on Monday morning?

19       **MS. MOORE:**  On Monday morning, Your Honor, we will --

20  at some point Monday we will play Dr. Farmer, since we didn't

21  get to her today, and then we will also be calling

22  Dr. Weisenburger on Monday.

23       **THE COURT:**  Okay.

24       **MS. MOORE:**  And we will also be calling Mr. Hardeman

25  on Monday.

1          **THE COURT:**  Okay.  So you -- it sounds like what you

2   are saying is you are not -- I was sort of anticipating

3   Weisenburger would take at least a full day.  You are not

4   anticipating that?

5          **MS. MOORE:**  I think he will probably carry over,

6   Your Honor, to Tuesday.  I haven't decided because I thought we

7   would get to Farmer today.  I haven't decided the order for

8   Monday, but we will do that and we will notify --

9          **THE COURT:**  Sorry.

10          **MS. MOORE:**  I had a couple of housekeeping matters

11   really quick.

12          **THE COURT:**  The one thing I was going to say about

13   that is that what that means is we can probably put off further

14   discussion of Reeves until Monday --

15          **MS. MOORE:**  That's fine, Your Honor.

16          **THE COURT:**  -- which I would prefer to do, if

17   possible.

18          **MS. MOORE:**  That's fine, Your Honor.  We can do Reeves

19   on Monday.

20          And then the other housekeeping matter, Your Honor, is

21   that earlier when I entered into evidence the Dr. Turley

22   exhibits, I started with 27 and it should have been 28.  So I

23   apologize.  I told the Defense counsel -- 27 was a CV, and it

24   should not have been entered.  So I will replace 27 with 28.

25          And then we still have before the Court, we moved to enter

**PROCEEDINGS**

1   into evidence the exhibits during Dr. Portier's testimony, and

2   I believe that defense was going to look at that.

3          THE COURT:  Oh, yeah, okay.  So is there any objection

4   to the admission of any of the exhibits?

5          MR. STEKLOFF:  No, not to any of the exhibits used

6   during the treater depositions.

7          THE COURT:  No, no.  We are talking about Portier now.

8          MR. STEKLOFF:  Yes.  During Portier the exhibits,

9   Your Honor, that they want to use are all demonstratives.  So

10  they were demonstratives that were used by Mr. Wisner during

11  his examination of Dr. Portier.  Our position is -- and this

12  goes both ways, to be clear -- that demonstratives should be

13  demonstratives and shouldn't be submitted back to the jury.  So

14  we do object on that ground.

15         MS. MOORE:  Your Honor, the difference on these is

16  that these are actually summaries by Dr. Portier.  As you

17  recall, what they are is the mouse and the rat study and the

18  in vitro --

19         THE COURT:  But they are demonstratives that he

20  prepared to assist the jury in understanding his opinion?

21         MS. MOORE:  Well, Your Honor, I think summaries under

22  Rule 1006, under Rules of Evidence 1006, it is summaries to

23  prove the content.  Instead of going through every single

24  one --

25         THE COURT:  But under that rule a summary can't come

**PROCEEDINGS**

1   in unless the evidence is coming in, and he is providing

2   summaries of studies that are not coming into evidence.  So

3   that rule doesn't apply.

4          **MS. MOORE:**  Okay.

5          **THE COURT:**  So those will not be admitted.

6      Anything else to discuss today?

7          **MS. MOORE:**  And, Your Honor, then we would also move

8   to enter into evidence the exhibits from Dr. Ye, and that is

9   Trial Exhibits 39, 40, 44, 45, 46, 47, 50, 52, 54, 55, 57, 59,

10  and 60.

11         **THE COURT:**  Any objection to those?

12         **MR. STEKLOFF:**  No, Your Honor.

13         **THE COURT:**  Those are admitted.

14         **MS. MOORE:**  Thank you, Your Honor.

15     (Trial Exhibits 39, 40, 44, 45, 46, 47, 50, 52, 54,

16       55, 57, 59, and 60 received in evidence)

17         **MR. STEKLOFF:**  I just want to make one statement,

18  which is that -- I don't want to hold us here any longer.

19  Mr. Kilaru was prepared to offer alternatives or have further

20  discussion about Dr. Reeves.  So I don't want is us over the

21  weekend to have to submit something from one of the company

22  witnesses, Dr. Martens, by noon on Sunday.  I think we have --

23  this is --

24         **THE COURT:**  Sorry, you lost me.

25         **MR. STEKLOFF:**  On the Parry issue.

PROCEEDINGS

1          **THE COURT:**  On the Parry issue.

2          **MR. STEKLOFF:**  I think that we -- our position is that

3     we have -- and we could discuss it now, but I think maybe it

4     could wait until Monday.  I think we have other things that we

5     think should be discussed in terms of this opening the door

6     issue.  And so I don't know if you want to see something from

7     Dr. Martens, but we have either a curative instruction that we

8     would offer -- we don't think the door has been opened to

9     Parry.  We will start there.  But putting that aside, even if

10    we did, we have steps that we think should be taken or

11    considered before Dr. Martens --

12         **THE COURT:**  You're going to designate -- my

13    recollection of this discussion is that they were going to

14    designate -- they were going to propose some depo designations

15    to deal with that?

16         **MS. WAGSTAFF:**  Yes, Your Honor, Dr. Martens.  And we

17    were going to get you our proposal by Sunday at noon.

18         **THE COURT:**  Okay.

19         **MS. WAGSTAFF:**  And --

20         **MR. STEKLOFF:**  I guess what I'm saying is without

21    being able to argue it now -- unless we just do competing

22    submissions -- we would propose, first of all, that none of

23    this comes in.  Second, that there be a curative instruction

24    that we have read.  And third, that even based on your order,

25    you suggested that if the door is open, it should be handled on

1  redirect of the expert; and there are portions of Dr. Portier

2  where he was asked about this.  I think the parties did it in

3  Phase Two.  So we would think if we are going to go down a

4  hierarchy here, that would come next; and that the last

5  resort -- if, for some reason, those three steps were

6  insufficient -- only then would you have to go to Dr. Martens.

7           THE COURT:  So how can we -- without discussing it

8  further now, how can we tee up that issue for decision in a way

9  that is not going to be too unduly disruptive for you-all?

10          MS. WAGSTAFF:  So Dr. Martens was actually played at

11 the Johnson trial.  So it is not like re-cutting it will take

12 that much time or effort.

13          THE COURT:  Okay.  But the -- my only question I have

14 got right now is how do we tee this issue up?

15          MS. WAGSTAFF:  Right.  So we could submit to you, as

16 proposed earlier, deposition designations proposals on Sunday.

17          THE COURT:  Okay.

18          MS. WAGSTAFF:  We can have someone bring you a hard

19 copy somewhere, or we could file them on ECF or whatever

20 Your Honor likes.

21          THE COURT:  I assume they are short.

22          MS. WAGSTAFF:  I think in total the Johnson one played

23 was around an hour.

24          MS. MOORE:  I think it was a little longer than that.

25          MS. WAGSTAFF:  I'm thinking about half of that.

1          **MS. MOORE:**  We have already -- Your Honor, we have

2    already submitted Dr. Martens, but it would have to be narrowed

3    down.  That was one of the ones that was filed I think on

4    February 19th.  And so what we are going to do is streamline

5    that to show what we think should come in now, given that the

6    door was open in our opinion.  And so we can just streamline

7    that and then give that to you on Sunday.

8          **THE COURT:**  Okay.  But it seems like it would come in

9    on -- would it come in on rebuttal regardless?  I mean, I don't

10   know.  I guess, it doesn't really --

11         **MS. WAGSTAFF:**  Well, I mean if it's --

12         **THE COURT:**  The point is if -- I don't know.  I mean,

13   I think probably the best solution at this point is you can --

14   if you are talking about half an hour of new deposition

15   testimony to respond to that, that sort of causes me to raise

16   my eyebrows.  But you can submit what you want on Sunday and we

17   can talk about it on Monday.

18         **MR. STEKLOFF:**  I think we might submit, Your Honor,

19   then, a proposed curative instruction that would hopefully

20   avoid any -- we think because no deposition testimony on this

21   is necessary or as an alternative, we might look back at the

22   Portier deposition.

23         **THE COURT:**  And propose some testimony there, that

24   would be helpful.  So why don't you both submit that by Sunday.

25         And then let me see.  Is there anything else that would be

1  helpful to just briefly discuss right now?  Let me flip through

2  my papers.

3       (A brief pause was had.)

4       **THE COURT:**  Just the other thing I wanted to mention

5  on the Reeves issue, on the -- and in particular the magic

6  mouse tumor is -- I'm saying that just in jest.  I'm not taking

7  the position that it is a magic mouse tumor.  It is just an

8  easy way to remember it.

9       But I have been pondering the argument that you made that

10 it shouldn't come in at all now, and I disagree with that

11 argument.  So I still think that this issue is relevant to the

12 trial.  I think it is quite likely that it would be reasonable

13 for the Plaintiffs to respond to the assertion that the doctors

14 didn't know anything about Roundup with -- in thinking about

15 fast forwarding to closing argument, I think it would probably

16 be appropriate for them to respond in part with the -- with the

17 magic mouse tumor.

18      And I think that it is -- it remains relevant because as

19 stated in the -- in limine ruling, it -- you know, the line

20 that we are trying to draw is to the extent Monsanto was trying

21 to influence regulators or influence public opinion, that's

22 Phase Two stuff.  But to the extent Monsanto was actually

23 involved in moving the needle on the science, that is relevant

24 to Phase One; and this seems to me to clearly fall on that side

25 of the line.  So I think it comes in.

1      So the real challenge for you is to -- you know, if you

2  have a real problem with the way my ruling on -- my tentative

3  ruling on Reeves, the real challenge for you to is to propose a

4  sort of narrower, less incendiary way of getting that in.

5            **MR. KILARU:**  Okay.

6            **THE COURT:**  With that, we will see you-all on Monday.

7            **MS. MOORE:**  Thanks, Your Honor.

8            (Proceedings adjourned at 3:13 p.m.)

9                        ---oOo---

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    **CERTIFICATE OF REPORTERS**

4              I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Friday, March 1, 2019

8

9

10

11    _____

12              Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                      U.S. Court Reporter

13

14

15    _____

16              Marla F. Knox, RPR, CRR
                    U.S. Court Reporter

17

18

19

20

21

22

23

24

25