**Volume 8**

**Pages 1003 - 1201**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

EDWARD HARDEMAN,                    )
                                    )
            Plaintiff,              )
                                    )
  VS.                               )        **NO. C 16-00525 VC**
                                    )
MONSANTO COMPANY,                   )
                                    )
            Defendant.              )
_____    )


                          San Francisco, California
                          Tuesday, March 5, 2019

                   **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                          ANDRUS WAGSTAFF PC
                          7171 W. Alaska Drive
                          Lakewood, Colorado  80226
                     BY:  **AIMEE H. WAGSTAFF, ATTORNEY AT LAW**
                          **DAVID J. WOOL, ATTORNEY AT LAW**

                          MOORE LAW GROUP
                          1473 South 4th Street
                          Louisville, Kentucky  40208
                     BY:  **JENNIFER MOORE, ATTORNEY AT LAW**


            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Marla F. Knox, RPR, CRR
              Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporters

```
 1  APPEARANCES:   (CONTINUED)

 2  For Defendant:

 3                      WILKINSON  WALSH ESKOVITZ LLP
                        2001 M Street, NW - 10th Floor
 4                      Washington, D.C.  20036
                   BY:  BRIAN L. STEKLOFF, ATTORNEY AT LAW
 5                      RAKESH N. KILARU, ATTORNEY AT LAW
                        TAMARRA MATTHEWS JOHNSON, ATTORNEY AT LAW
 6                      JULIE RUBENSTEIN, ATTORNEY AT LAW
                        CALI COPE-KASTEN, ATTORNEY AT LAW

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**I N D E X**

Tuesday, March 5, 2019 - Volume 8

| PLAINTIFF'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **PORTIER, CHRISTOPHER** | | |
| By Video Testimony (not reported) | 1007 | 8 |
| **HARDEMAN, EDWIN** | | |
| (SWORN) | 1007 | 8 |
| Direct Examination by Ms. Moore | 1008 | 8 |
| **WEISENBURGER, DENNIS** | | |
| (SWORN) | 1048 | 8 |
| Direct Examination by Ms. Moore | 1048 | 8 |

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 23 | | 1025 | 8 |
| 25 | | 1026 | 8 |
| 938 | 1179 | | 8 |
| 940 | | 1030 | 8 |
| 940 | | 1173 | 8 |
| 941 | | 1030 | 8 |
| 942 | | 1030 | 8 |
| 943 | | 1030 | 8 |
| 944 | | 1030 | 8 |
| 945 | | 1030 | 8 |
| 946 | | 1029 | 8 |
| 949 | 1174 | | 8 |

PROCEEDINGS

| | |
|---|---|
| 1 | **Tuesday - March 5, 2019**                              **8:28 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---oOo--- |
| 4 | (Proceedings were heard out of presence of the jury:) |
| 5 | **THE COURT:**  Good morning, everybody.  We lost our |
| 6 | third juror.  She -- turned out that she had the flu.  It was |
| 7 | not food poisoning.  So we are down to six.  And we are ready |
| 8 | to call in the jury. |
| 9 | Does anybody else -- does anybody have anything to discuss |
| 10 | briefly? |
| 11 | **MR. STEKLOFF:**  No, Your Honor.No Your Honor. |
| 12 | **MS. WAGSTAFF:**  No, Your Honor. |
| 13 | **THE COURT:**  Okay.  Go ahead and bring them in. |
| 14 | Mr. Hardeman is coming on first? |
| 15 | **MS. WAGSTAFF:**  Actually, we are going to play the clip |
| 16 | of Dr. Portier. |
| 17 | **THE COURT:**  Oh, yeah, okay. |
| 18 | **MS. WAGSTAFF:**  It is about four minutes. |
| 19 | Your Honor, we may move to have Exhibit 168 entered.  Can |
| 20 | we reserve to do that outside the presence of the jury because |
| 21 | there may be some -- |
| 22 | **THE COURT:**  Which exhibit is that? |
| 23 | **MS. WAGSTAFF:**  It's the Parry report.  You said we can |
| 24 | discuss it later.  I just didn't want to have attorney argument |
| 25 | in front of the jury. |

PROCEEDINGS

```
 1            THE COURT:  I think we decided that wasn't going to be

 2    admitted, but we can certainly discuss it.

 3            MS. WAGSTAFF:  Okay.

 4        (Proceedings were heard in the presence of the jury:)

 5            THE COURT:  Good morning, everyone.  I see your group

 6    has gotten a little bit smaller.  Thank you for being here, and

 7    we are ready to resume today.

 8        The Plaintiffs are going to play an additional clip of the

 9    testimony from Dr. Portier's testimony in Australia.  That is

10    the first thing that is going to happen today.

11            MS. WAGSTAFF:  The Plaintiff calls Dr. Portier, and it

12    is only about four to five minutes.

13            THE COURT:  Okay.  Plaintiffs want to call their next

14    witness.

15            MS. MOORE:  Yes, Your Honor.  The Plaintiffs call

16    Edwin Hardeman.

17                        EDWIN HARDEMAN,

18    called as a witness for the Plaintiff, having been duly sworn,

19    testified as follows:

20            THE CLERK:  For the record, please state your full and

21    last name and spell both of them.

22            THE WITNESS:  My first name is Edwin.  And my last

23    name is Hardeman.  That is E-D-W-I-N, and the last name is

24    Hardeman, H-A-R-D-E-M-A-N.

25            THE CLERK:  Thank you.
```

HARDEMAN - DIRECT / MOORE

1    **THE WITNESS:**  You are welcome.

2                    **DIRECT EXAMINATION**

3    **BY MS. MOORE**

4    **Q.**   Good morning, Mr. Hardeman.

5    **A.**   Good morning.

6    **Q.**   Have you ever testified in court before?

7    **A.**   No, I haven't.  I'm a little nervous, I must admit.  This

8    is my first experience so please bear with me.

9    **Q.**   We will get through it.  I'm going to ask you some

10   questions this morning about your use of Roundup, and I want to

11   start at the very beginning.

12       How did you learn about Roundup?

13   **A.**   Well, we first became aware of Roundup when we moved to

14   the Mendocino coast and purchased a property in the town called

15   Gualala.  We wanted to move closer to my brother who lives up

16   on the coast.  So after visiting the area for several months,

17   we decided to move up there.

18   **Q.**   Did you say Gualala?

19   **A.**   Yeah, G-U-A-L-A-L-A.  It is on the Mendocino coast.  The

20   house needed some work, and there was a lot of outside work to

21   do also.  We decided that we wanted to start on the outside so

22   we were trying to figure out how to deal with the weeds and the

23   other growth that was on the property.  Looked in the local

24   paper, the Coast Observer, to see if there was anybody in there

25   to help us; and we found a worker in there and we called him up

1    and he came out.  And he had this device with him, and he

2    started spraying the weeds.  So we asked him what he was using.

3    He said it was Roundup.

4        So after that, we figured, Well, maybe we can do this

5    ourself.  We are kind of do-it-yourselfers.  We found out where

6    we can purchase it.  And got the pump-up sprayer and what we

7    would need to apply it, and we were on our way.

8    Q.   And what year was that?

9    A.   It had to be -- we moved up there in 1985.  So I'm

10   thinking it was 1986 when we really started getting into

11   applying the Roundup.

12   Q.   So 1986 is the first time -- well, first of all, did you

13   use Roundup yourself?

14   A.   Yes.

15   Q.   So when was the very first time you used Roundup?

16   A.   Well, I used it in -- I would say it was 19 -- either late

17   1985 or early 1986 to my recollection I started spraying it.

18   Q.   And where would you buy the Roundup that you would use

19   back -- let's stay in 1986 -- but where do you remember buying

20   that?

21   A.   Well, we looked around locally to see if we could purchase

22   it, and there is a hardware store up there in town.  It is

23   possible we bought it there or one of our trips into Santa

24   Rosa, which is a couple hours away, where we were doing our

25   shopping up in -- you know, of food and supplies for the house,

1   one of the hardware stores in Santa Rosa.  It would be Yard

2   Birds, which was a home improvement store, or Friedman's is

3   kind of a ranch supply hardware store in Santa Rosa.

4   **Q.**   And so were you able to buy that right off the shelf at

5   Yard Birds or Friedman's?

6   **A.**   Yes.

7   **Q.**   You keep saying "we."  When you say "we," who are you

8   talking about?

9   **A.**   I'm sorry.  I mean my lovely wife, Mary, who is sitting

10  there.  Together we would do this.

11  **Q.**   Okay.  Do you know what type of Roundup that you would buy

12  back in 1986?

13  **A.**   Well, we -- we bought this concentrate so we could dilute

14  it with water and get more yield out of it.  Roundup

15  Concentrate.

16  **Q.**   And so why did you -- why did you pick the Roundup

17  Concentrate versus Roundup?

18  **A.**   Well, because you could get more yield.  You could mix it

19  and, you know, get more volume or yield out of the product; and

20  it was less expensive that way.

21  **Q.**   And who would actually mix the Roundup?

22  **A.**   I mixed it.

23  **Q.**   And can you tell the ladies and gentlemen of the jury how

24  you would mix the Roundup?

25  **A.**   Yeah, so -- in a measuring -- I would get my pump-up

1    sprayer and remove the plunger off of the top of it.  Pour the

2    Roundup into a measuring cup.  I mean, 4 to 6 ounces per

3    gallon, and I would pour it into the opening.  And then I would

4    start to put water into it with a hose slowly until it got to

5    the first gallon indicator on the spraying device.  And then I

6    would put the next 4 or 5 -- 4 or 6 ounces in there and apply

7    the rest of the water slowly.  Sometimes it foams out over the

8    top and you can get it on you.

9    **Q.**   And so when you say "4 to 6 ounces," that is 4 to 6 ounces

10   of what, Mr. Hardeman?

11   **A.**   Of Roundup, 4 to 6 ounces of Roundup.

12   **Q.**   And so in the device you are using, that is two gallons?

13   **A.**   Two-gallon sprayer is what I would use, yes, that is the

14   capacity.

15   **Q.**   So that would be, what, 8 to 12 ounces of Roundup in the

16   sprayer itself?

17   **A.**   Approximately, yes.

18   **Q.**   And did you use Roundup at your home in Gualala?

19   **A.**   Yes, I did.

20   **Q.**   And can you tell the ladies and gentlemen of the jury

21   where you would spray the Roundup at your home?

22   **A.**   Yes.  We had, you know, a driveway road access off of

23   Iverson Road.  It was approximately 400 feet.  It is a gravel

24   driveway.  And also the -- when you got to the house area, we

25   expanded the parking area.  That was another 200 --

1    approximately 200 feet.

2        So after we -- we had that graded and it was looking nice,

3    and the gravel was put down.  The weeds started popping up

4    after the winter so I would have to spray that whole -- that

5    whole driveway to kind of keep it nice and often into the field

6    areas around the house, around the detached garage, into --

7    they had a little -- small little kind of recreation pond, and

8    it would spray around the pond and into the rest of the

9    property where it needed.

10   **Q.**   And how often would you spray Roundup at the Gualala

11   property?

12   **A.**   I would walk that probably, once a month, you know, I

13   would do that.

14   **Q.**   And how long did you live at this property up on the

15   Mendocino coast?

16   **A.**   We would live there approximately -- I think we moved from

17   there in 1988.  So about three, three and a half years we lived

18   there.

19   **Q.**   So from 1986 when you started using Roundup until you

20   moved in -- what was it -- 1988?

21   **A.**   Yes.

22   **Q.**   So from 1986 to 1988 how often did you use Roundup?

23   **A.**   Well, I would probably do -- use it once a month, you

24   know, from May -- I would start in May after the winter is

25   finished when the weather is nice and temperatures come up,

**HARDEMAN - DIRECT / MOORE**

1  like it gets warmer.  I would go through the summer and into

2  the early fall, you know, once a month, or September or

3  October.

4  **Q.**   And then you moved in 1988.  Tell the jury where you moved

5  to.

6  **A.**   Well, we -- after living on the coast for three years, we

7  found that -- it was a -- the work was a little -- it wasn't

8  consistent employment and work was a little hard to find, so --

9  and we felt it was a little bit too remote for us.  So we

10  decided to -- we liked the Santa Rosa and Sonoma County area.

11  So we started looking there and found another country property

12  that was -- needed some work and we could get a good deal on

13  it.  So we moved to Forestville, which is right on the West

14  Side Road out by the Russian River in the West County.  Moved

15  there in -- I think it was October of 1988.

16  **Q.**   How old would you have been then?

17  **A.**   I'm sorry.

18  **Q.**   How old would you have been then?

19  **A.**   39, going on 40.

20  **Q.**   And when you moved to the West Side Road property, did you

21  use Roundup there?

22  **A.**   Yes.  There was a large piece of property, 56-acre

23  property.  It -- the terrain wasn't mild.  It was steep, and it

24  had beautiful, beautiful views.  Needed a lot of work.  There

25  was a lot of overgrowth, and it was run as an exotic animal

1    preserve when we found it; but it was in disrepair.  And a lot

2    of the improvements that were there were rundown, so we came on

3    the scene.  We bought it.  We negotiated a good deal and moved

4    in October of '88 and started initiating our plans to bring it

5    back to a level that, you know, we wanted to see it at.

6    **Q.**  Let me --

7          **MS. MOORE:**  And, Your Honor, if I can grab the

8    binders, I apologize.  I didn't do that at the beginning.  May

9    I, Your Honor?

10         **THE COURT:**  Sure.

11   **BY MS. MOORE**

12   **Q.**  Mr. Hardeman, if you could, turn to -- you will see in the

13   binder there are tabs on the side.  If you can turn to tab 23,

14   please.

15   **A.**  23, okay.

16   **Q.**  And I'm going to ask you, do you recognize this document?

17   **A.**  Yes.

18   **Q.**  Okay.  And what -- can you tell the jury -- and we will

19   show the jury in a second -- but what is this document you are

20   looking at?

21   **A.**  This is a reduced version of an original plot plan for the

22   West Side Road property, 11995 West Side Road.  It has got some

23   surveyor marks there, monuments along the side.

24   **Q.**  Is this -- hold on one second.  We will get to this.  Is

25   this plot map a fair and accurate description of your West Side

```
1   Road property?

2   A.   Yes.

3          MS. MOORE:  Your Honor, may I have permission to

4   publish this to the jury?

5          THE COURT:  Any objection?

6          MS. MATTHEWS JOHNSON:  No objection.

7          THE COURT:  Go ahead.

8          MS. MOORE:  Thank you.

9   BY MS. MOORE

10  Q.   Mr. Hardeman, I want you to explain to the jury a little

11  bit more about what we are looking at.  Would it be helpful for

12  you to come down and use a blow-up to do so?

13  A.   Sure.

14         MS. MOORE:  Okay.  Your Honor, would that be okay?

15         THE COURT:  Sure.

16  BY MS. MOORE

17  Q.   Mr. Hardeman, I'm going to have you come on down, and we

18  will put this right here.  Have you stand right here.

19         MS. MOORE:  Your Honor, I'm sorry.  I know you can't

20  see it.  It is exactly what is on --

21         THE COURT:  What exhibit is it?

22         MS. MOORE:  It is Exhibit 23.  It is the exact same

23  thing.  I'm sorry.

24         THE COURT:  That's fine.

25  \\\
```

**HARDEMAN - DIRECT / MOORE**

1  **BY MS. MOORE**

2  **Q.**   We are kind of in tight quarters.  Is that all right?

3      Okay.  If you could -- Mr. Hardeman, if you could explain

4  to the jury what it is that we are looking at in Exhibit 23.

5  **A.**   Yes.  This is -- the yellow, the part that is outlined in

6  yellow, is the property line.  And this is the -- what is the

7  West Side Road.  This is the entrance to the property.  There

8  is an easement here across these two properties here.

9  **Q.**   What is this Parcel 2 here?

10 **A.**   Parcel 2 is between the two houses there.  There was a

11 house here that was built in 2000.  So before that house was

12 built I was -- I had to use the --

13          **COURT REPORTER:**  I can't hear him.  I'm sorry.

14 **BY MS. MOORE**

15 **Q.**   She is having a hard time hearing you.  We are going to

16 move this, figure out the best way to put it.  I'm going to

17 move it back here, so that way she can -- the sound is not

18 blocked.

19      Just try to speak up if you can, Mr. Hardeman, so the

20 court reporter can hear you.  Thank you.

21 **A.**   All right.

22 **Q.**   So what is Parcel 2?  Is that part of your property?

23 **A.**   No.  That's not part of our property.  This is a property

24 that accommodates two other houses.  Actually, it is split in

25 two now, two -- I think it is two 5-acre pieces below us.

1  Q.   So where is your house at the West Side property?

2  A.   Now, our house is represented right here.   So it is

3  about -- from the time we entered this off of the West Side

4  Road, you come up the driveway, it's about 5 -- 4 or 500 feet,

5  and there is a large parking lot here.   There is a detached

6  garage about 80 feet from the house, and it's a water tank

7  behind it.

8  Q.   I'm going to have you -- because I think she is having a

9  hard time hearing you.   I'm going to have you stand here so you

10  can project your voice towards her.   I think it might be a

11  little bit better.   There we go.

12  A.   Okay.   So to recap, this is the West Side Road.   And you

13  come up the driveway to our house, there is a big parking lot

14  there; a lower parking lot and an upper parking lot.   This is

15  the south side, the east side.   You would continue up the

16  road -- it continues on up to the back -- the road takes you up

17  to the back of the property.   And there are some off-shoots, a

18  couple hiking trails and service -- there is 22,000 gallons of

19  water storage.   This is a concrete tank, which I would spray

20  and take care of the various poison oak growth, Scotch broom

21  and weeds and other things that were growing.

22  Q.   Let me ask you this:   What is Scotch broom?

23  A.   It's a plant that -- it has a little yellow flower on it,

24  and it grows up wild and up through the road in the back.   And

25  unfortunately, you know, it accommodates ticks which hang onto

HARDEMAN - DIRECT / MOORE

1  it and so on and so forth.  So you can get them on -- I wanted

2  to keep that under control.

3  **Q.**   You mentioned poison oak.  Was there poison oak on the

4  West Side property?

5  **A.**   Yes, there was prolific poison oak.  It was well known in

6  the '80s and '90s.  They even have a poison oak festival.  It

7  was kind of a novelty little thing, but yeah.

8  **Q.**   A poison oak festival?

9  **A.**   Yeah, a poison oak festival.  We used to have that.  They

10  discontinued that.

11       But, yeah, anyway, there was a lot of poison oak

12  throughout the property.  And I first encountered it when I

13  started the project to clean up on the property.  There was a

14  lot of debris there.  It was thrown over the side of the

15  downslope part of the property.  And I went to retrieve it so I

16  could recycle it and get it out of there and clean it up.  But

17  when I was down there cutting brush and whatever, I -- when I

18  came back up, I had poison oak all over my body.  I had to go

19  to a doctor twice and get a shot of Benadryl to clear it all

20  up.

21       Plus my dogs were bringing it back in their paws.  And the

22  oil, you know, you can't see it.  You don't know you are in it

23  until you get it on you.  You can contaminate yourself.  Your

24  tools get contaminated.  Anyway, I just started off on this

25  mission to go after it.

1  **Q.**  And what is the size of this property that you and your

2  wife own?

3  **A.**  This was 56 acres.  And it's a little less than three

4  quarters of a mile long.  And it's got beautiful, beautiful

5  views and hiking trails and things that we --

6  **Q.**  I'm sorry, Mr. Hardeman.

7  **A.**  Yes.

8  **Q.**  Explain to the jury, when we are looking at this, it looks

9  flat.  What was the terrain like?  If you could just walk them

10  through the property briefly as to how it looked when you-all

11  lived there.

12  **A.**  Yeah.  It's a mild to steep terrain.  So it would start

13  to -- you know, an incline upwards.  And it had some nice flat

14  spots that you could enjoy in various spots of the property.

15  The -- all the water system and everything in the back here is

16  all on a gentle slope.

17  **Q.**  Did you have your own water system?

18  **A.**  Yeah.  It was on a spring fed, a natural mountain spring.

19  It was all gravity fed down to the house.  The water was -- we

20  had -- it is all based upon water storage.  There is, like,

21  22,000 gallons of water.  The largest being a 15,000-gallon

22  tank.  In the spring is -- we have a spring box up here, which

23  takes the water from a short little fall off of a rock and

24  collects it, and then distributes it to these other tanks.  And

25  the spring itself, the source of the spring, is further up.  So

1    I would -- I would hike up in here to make sure all this was

2    running right because you had to constantly keep an eye on it.

3    If there is an interruption, you could lose your water.

4    **Q.**    And then what you have got here, it says elevation 1302.

5    What does that mean?

6    **A.**    That is the highest.  That is Black Mountain.  So it would

7    rise up to 1302 feet elevation, and go down 900 feet down the

8    other side of the property.  But I don't -- I wouldn't go up

9    there very often.

10   **Q.**    Okay.  And you mentioned hiking trails?

11   **A.**    Uh-huh.

12   **Q.**    Where is the hiking trails on the property?

13   **A.**    Well, the hiking trails are a little closer in.  So there

14   is -- as you walk up to the back of the property here, past the

15   house and you start going into this area up here by the tanks,

16   there was a trail that went off down to the creek, which we

17   opened up and -- so we could utilize that.  And we wanted to

18   keep that spring.  There is also other areas where you could

19   hike up into, more gentle sloped areas.  And up -- what is

20   called the roundabout where you could turn around.  And then up

21   into -- there is a little more steeper areas where you could

22   hike up into the beautiful redwoods that had a combination of

23   second growth redwood trees, several species of oaks and

24   madrones, pepperwood trees, very beautiful.  The view -- and of

25   course, the views were pretty fantastic so --

**HARDEMAN - DIRECT / MOORE**

1  **Q.**  Now, were these hiking trails there when you and Mary

2  bought the property?

3  **A.**  They were -- they were in place, yes.  They were -- they

4  were just overgrown.  And this is an original, you know, road

5  there.  And then there was some -- you know, some trails there.

6  We opened up some ourselves, but --

7  **Q.**  And how would you re-open the hiking trails?  Tell us the

8  process.

9  **A.**  Well, this one I used -- someone had a loader.  I had them

10  originally take that and open it, and then I maintained it.

11  The other one I had a chainsaw, a small chainsaw, and go up and

12  start -- I had to go up and process wood.  We had four

13  fireplaces.  That was our main heat.

14  **Q.**  And so how would you maintain the hiking trails once you

15  had got it cleared out?

16  **A.**  Well, I would maintain it; go in there and I would look

17  for poison oak, which would grow up in the foot -- the footpath

18  there.  So I would go up with my sprayer and spray that.  Other

19  things that -- excuse me -- weeds and whatever I felt needed to

20  be sprayed.  And the road -- this roadway coming up to the

21  back, I needed to access that.  You could drive up here with

22  four wheels.  I used to drive it with my four-wheel truck.

23  **Q.**  When you say "spray," what are you spraying?

24  **A.**  I'm spraying a lot of poison oak.

25  **Q.**  What are you using -- what is in the sprayer?

**HARDEMAN - DIRECT / MOORE**

1    **A.**    Oh, Roundup.  Roundup was in the sprayer, yes.

2    **Q.**    Okay.

3    **A.**    Sorry, I didn't know what your terms --

4    **Q.**    That's okay.

5        And just before I have you sit down, Mr. Hardeman, can you

6    show the jury on the plot map where -- first of all, did you

7    use Roundup on this property?

8    **A.**    Oh, yes.

9    **Q.**    Okay.  And when was the first time you used Roundup on

10   this property, on the West Side property?

11   **A.**    Well, probably I would think starting clearing that right

12   away.  So after I got that poison oak experience and needed a

13   shot, you know, I just started -- it had to be, what, late 1989

14   to where I started setting aside some time for plans and

15   maintenance to go after this stuff.

16   **Q.**    And how long did you, Mr. Hardeman, own this property?

17   **A.**    Probably 25 years.

18   **Q.**    And during those 25 years that you-all owned this

19   property -- would you like some water?

20   **A.**    Thank you.

21   **Q.**    Here.

22       During this 25 years that you and Mrs. Hardeman owned this

23   property, how many of those years did you use Roundup on the

24   property?

25   **A.**    I used it every year, so 25 years.  It was a regular part

1    of my maintenance to -- when I went to take care of other

2    things and, you know, the water system, which was important to

3    keep that running, or process firewood, I would always, you

4    know, put the Roundup in the container and go up and climb up

5    in that area and start applying it to where I thought it needed

6    it.

7    **Q.**   And now are you saying to the jury that you sprayed

8    Roundup on all 56 of these acres?

9    **A.**   No, not practical.

10   **Q.**   So where -- that is not practical?

11   **A.**   No.

12   **Q.**   So where in particular did you spray Roundup during your

13   maintenance each year of those 25 years?

14   **A.**   Well, I would say that in relationship to the map, I

15   would -- it would be all the way up in here -- in this area.

16   **Q.**   And what is that area, Mr. Hardeman?

17   **A.**   Well, what we have here is -- this is the concrete a ton

18   GREE tank and then past that is the clearing 2,500-gallon

19   plastic tank.  I sprayed all around there.  Plumbing, all

20   around this tank here, coming up here, the trails coming up to

21   the spring box.  I went to the spring box and made sure that

22   that was free of poison oak.  And then maybe up to about -- it

23   could have been right about up until the roundabout, and then

24   up through the water course with the piping.  I'm up to about

25   past here.

1      So yeah, it is not quite half -- somewhere in here.

2   **Q.**   Mr. Hardeman, I'm going to have you go ahead and take a

3   seat back on the witness stand.

4      You testified that -- that you would spray every year as

5   part of your annual maintenance program.  How often during a

6   year would you spray Roundup?

7   **A.**   Well, I would start in May when the temperature was right

8   and the winter was over with; and I would spray into the

9   summer; spray into September, October.  And then I would stop

10  in November more than likely.

11  **Q.**   And when you were spraying Roundup on any particular day,

12  approximately how long would you be spraying it for?

13  **A.**   I would say three to four hours, probably my spraying

14  time.

15  **Q.**   Is it fair to say because we are talking, you know,

16  I guess between the Gualala property and the West Side

17  property, how many years do you believe that you used Roundup?

18  **A.**   Oh, I would have to say probably 28 -- between 28 and 30

19  years, I suppose.

20  **Q.**   And during that time, is it fair to say sometimes you

21  would spray some days longer, some days shorter?

22  **A.**   Yes.  I would definitely spray longer some days than

23  others, I would think, yes.

24  **Q.**   You testified that you used Roundup Concentrate at the

25  Gualala property.  What type of Roundup did you use at the West

1   Side property for those 25 years?

2   **A.**   It was a concentrate Roundup product you could mix with

3   water.

4   **Q.**   And what type of device would you use to spray at the West

5   Side property?

6   **A.**   It's a pump-up sprayer.

7   **Q.**   Would it -- would it be -- I'm going to show you -- if you

8   could turn in your binder, Mr. Hardeman, to tab 25.

9          **MS. MOORE:**  Ms. Melen reminded me, before we move onto

10  that, Your Honor, we would move to admit into evidence

11  Exhibit 23.

12         **THE COURT:**  Any objection?

13         **MS. MATTHEWS JOHNSON:**  No objection.

14         **THE COURT:**  Admitted.

15     (Trial Exhibit 23 received in evidence)

16         **MS. MOORE:**  Thank you, Your Honor.

17  **Q.**   And what is -- do you recognize Exhibit 25, Mr. Hardeman?

18  **A.**   Yes.

19  **Q.**   And what is that?

20  **A.**   That is a typical pump-up sprayer that you would buy at

21  one of the local hardware stores.

22         **MS. MOORE:**  Your Honor, permission to publish to the

23  jury.

24         **THE COURT:**  Any objection?

25         **MS. MATTHEWS JOHNSON:**  No objection.

1      THE COURT:  Go ahead.

2  BY MS. MOORE

3  Q.   And is this a fair and accurate depiction, Mr. Hardeman,

4  of the type of pump-up sprayer you used to spray Roundup during

5  those 26, 28 years?

6  A.   Yes, this is.

7      MS. MOORE:  Your Honor, we would move to admit this

8  photo as Exhibit 25.

9      THE COURT:  Any objection?

10      MS. MATTHEWS JOHNSON:  No objection.

11      THE COURT:  Admitted.

12      (Trial Exhibit 25 received in evidence)

13  BY MS. MOORE

14  Q.   Would it be helpful, Mr. Hardeman, for you to demonstrate

15  with a sprayer, a brand-new sprayer, how you would actually

16  apply Roundup on your property?

17  A.   Yes.

18      MS. MOORE:  Your Honor, if he can come off the bench.

19      THE COURT:  Sure.

20      MS. MOORE:  Thank you.

21  Q.   Mr. Hardeman, if you could, if you could explain to the

22  ladies and gentlemen of the jury what this is.

23  A.   This is a two-gallon pump-up sprayer, typical that you can

24  buy at Home Depot or any hardware store, different versions of

25  them.  This happens to be a Flow Master.

1   Q.   I'm going to ask you to speak up just a little bit so she

2   can hear you.

3   A.   Yeah.  It has a plunger where you remove it, and you put

4   in your Roundup and your water, and you bring it up to your

5   two-gallon level mark.  And then you put the plunger back in

6   and put pressure -- build up pressure in it.

7        This is your wand that you use to -- that you have your

8   pressure in it.  You have interchangeable nozzles so you can

9   put a fan spray nozzle on it to get a wider spray or you can

10  use a direct shot.

11  Q.   Which type of nozzle would you use on your pump?

12  A.   I use a fan sprayer.  That is my preference, to give me a

13  wide swath.  So if you are going and spraying on the ground,

14  you can get -- you can cover more ground with it.  I had a

15  different kind of sprayer for a more direct targeting.  Use my

16  hand sprayer, typical one you use in the household.

17  Q.   When you say "hand sprayer," do you mean like a bottle

18  about this size?

19  A.   Yes.  Yes, a little hand sprayer that I would take the

20  Roundup out of it and use a funnel and put it into the hand

21  sprayer.  And I could take the hand sprayer out, and I could

22  target the poison oak if I was up on a platform where it was in

23  close proximity to me.  Then I could, you know, spray it,

24  either mist it or spray it directly, just turning the nozzle

25  and adjusting it.

**HARDEMAN - DIRECT / MOORE**

1   **Q.**   If you could demonstrate to the ladies and gentlemen of

2   the jury, how would you actually -- how would you spray with

3   using the pump?

4   **A.**   Well, if I was walking down my road down from the house,

5   you know, the poison oak was up on the embankments; and it

6   would come up, grow and sort of lean up over the road.  So I

7   would spray it like this; go along -- or on the embankments,

8   spray it on the embankments or down on the gravel part where

9   the weeds and grass and other things are.

10  **Q.**   Thank you, Mr. Hardeman.  Take a seat back up on the

11  witness stand.

12          **MS. MOORE:**   Your Honor, if I can put this on the ELMO.

13          **THE COURT:**   What is it?

14          **MS. MOORE:**   It is the picture of what we just showed.

15          **THE COURT:**   Okay.

16          **MS. MOORE:**   Thank you.

17  **Q.**   And do you recognize this document, Mr. Hardeman?

18  **A.**   Yes.

19  **Q.**   Okay.  Is this the sample sprayer we just showed to the

20  jury?

21  **A.**   Yes.

22          **MS. MOORE:**   Your Honor, we would move to enter this

23  into evidence as Exhibit 946.

24          **MS. MATTHEWS JOHNSON:**   The picture, no objection.

25          **THE COURT:**   Okay.  Admitted.

1         (Trial Exhibit 946 received in evidence)

2    BY MS. MOORE

3    Q.   Mr. Hardeman, just so the jury has an understanding, I

4    want to show you, if you could flip in your binder to

5    Exhibit 936.  And in the interest of time, there is a series of

6    photos from 930 to 936.  Do you see those in your binder?

7    A.   Yes.  Uh-huh.

8    Q.   Do you recognize these photographs marked as Exhibits 930

9    to 936?

10   A.   Yes, I do.

11   Q.   And what are these photos depicting?

12   A.   Oh, these are photographs -- let's see.  This is page 930.

13   So this is the driveway going up to the gravel road driveway.

14   These are the drainage ditches on the side that I would

15   maintain.

16   Q.   So are these photographs from the West Side property?

17   A.   Yes.

18   Q.   Okay.  And are these fair and accurate depictions of the

19   areas of where you would spray on the West Side property?

20   A.   Yes.

21        MS. MOORE:  Your Honor, we would move to publish these

22   to the jury.

23        MS. MATTHEWS JOHNSON:  No objection.

24        THE COURT:  Go ahead.

25        MS. MOORE:  Then we would also move to enter them into

```
1    evidence as well.
2              MS. MATTHEWS JOHNSON:  No objection.
3              THE COURT:  Admitted.
4         (Trial Exhibits 940 through 945 received in evidence)
5    BY MS. MOORE
6    Q.   We will start, Mr. Hardeman, with 936.  Mr. Hardeman, what
7    are we looking here at Exhibit 936?
8    A.   Go back to it here, that is the entrance -- as you turn
9    off of the West Side Road -- as I showed on the map -- and you
10   would make a left turn, this is the beginning of the driveway
11   here to access the house and the areas I would spray.  I would
12   spray down in here.  A lot of this is overgrown now.
13        Right on the other side of that address sign in front of
14   the -- on the front West Side Road frontage is our mailboxes.
15   So there is a lot of growth there and poison oak up in there.
16   And also directly across the street from the mailboxes was a
17   little turnout that we used to just kind of park our car off
18   the road to walk across and get our mail.
19   Q.   Why would you -- why would -- would you spray in that
20   area?
21   A.   I would spray that because that was our parking, little
22   parking space.  We all utilized that to, you know, walk up and
23   get your mail.  I would drive up to the house.  When you get
24   out on the passenger side, there is poison oak on that side, on
25   the riverside.  I would want to, you know, keep that, you know,
```

1  poison oak-free so if somebody got out, they weren't stepping

2  in it and so on and so forth.

3  **Q.**   And then let's turn to -- sorry -- let's turn to 930, if

4  we can publish.

5  **A.**   930.

6  **Q.**   And what is this area of the property?  Sorry, you have to

7  go backwards in the binder.

8  **A.**   930 is a little further up from the first picture on 936

9  going into the -- well, the gravel part of the road.  And I

10 would, you know, spray into these -- up on the embankments.  If

11 you look further up the road, you will see there is a lot of

12 growth coming off that embankment.  There is poison oak up on

13 the hillside just past that on the tree.

14 **Q.**   And then let's go to 931.  Where is this on the property?

15 What are we looking at here?

16 **A.**   That is my detached garage.  It is about 80 feet from the

17 house.  And what I did -- there was poison oak coming off of

18 that embankment and going on top of the roof.  So we built that

19 garage, and I wanted to get up and clean those gutters -- those

20 rain gutters clean.  So I built a plank system.  It is a very

21 tight space there.  I built this plank that I could attach to

22 the fence, and stand up on it, and I would stand up on it.  And

23 when I got up on it, I could clean the gutters out.  It would

24 be about chest high.  Then I would turn around with my hand

25 sprayer and try to spray the poison -- the poison oak.  And

1  that's when sometimes I would spray it with some close

2  proximity to it.  And, you know, you could see it in the

3  sunlight.  It would, like, atomize and I had a sense I breathed

4  something in, like you may have a steamer or something, you

5  know.  Anyway, that's what that is.  So that is an area I

6  maintained.

7  **Q.**  Now, can you actually see poison oak in this picture 931?

8  **A.**  I'm sorry?

9  **Q.**  Can you actually see poison oak in 931, the picture we are

10  looking at?

11  **A.**  I don't understand your question.

12  **Q.**  Can you see any poison oak in the picture?

13  **A.**  On the other side of that -- this is a fig tree here on

14  the front.  On the other side of this -- my plank would be on

15  the other side of this.  And, you know, you can see -- you can

16  see, if you look through it -- I can see it there, you know.  A

17  lot of times you have -- you know, when it loses its leaves,

18  you know, it goes into a -- like a stick form.  Still the root

19  system is still there.

20  **Q.**  Let's pull up 932.  Mr. Hardeman, this may be a different

21  view of 931.  What is this?

22  **A.**  Yes, that's just another angle of the garage.  You can see

23  the roof -- yeah, the roof is on the east side, and there is

24  the embankment.  And that's where I had the plank.  And you can

25  see -- you can see, you know, on the other side of that.  I can

1    see the growth that I would spray, poison oak.  It is starting

2    to grow on top of the roof.

3    **Q.**   Did you and Mrs. Hardeman ever hire anyone to help you

4    take care of this property?

5    **A.**   No.  I did it myself.

6    **Q.**   Why did you do it yourself?

7    **A.**   We were do-it-yourselfers.  We -- it is something we could

8    do.  And I enjoyed doing it, and, you know, hiking and taking

9    care of it.  I wanted to make sure that I was going to get

10   everything up to my own personal standard which, you know --

11   **Q.**   Let's go to picture 933 -- Exhibit 933.

12        Mr. Hardeman, if you want, you can look on the screen

13   there in front of you.  What is this that we are looking at in

14   933?

15   **A.**   That is between the garage up to the concrete tank.  That

16   is an area we could go off into.  It is a gentle slope.  I

17   would go up in there to process firewood.  You can see some

18   pieces, remnants of someone cutting wood down there.  Also when

19   you walk up in there, there is also -- there is poison oak that

20   pops up and grows in different spots.  I would spray up in

21   there.

22   **Q.**   Mr. Hardeman, I was just told that you can actually put

23   your finger on the screen if you want.

24   **A.**   Yes.

25   **Q.**   And it will -- is that right?

1    **A.**    Okay.  Yes.  So I would walk up in there and, you know,

2    get whatever firewood I could, and cut it up and bring it down.

3    At the same time I would spray any -- you know, any poison oak

4    or anything that may inhibit me from doing that.

5    **Q.**    Let's go to 934.

6    **A.**    Okay.

7    **Q.**    What are we looking at in this picture, Exhibit 934?

8    **A.**    This is the concrete water system that -- it is a

9    15,000-gallon tank.  You can see that there is remnants of

10   poison oak popping up in the driveway there.  It is there, and

11   along the -- I would -- as you look up that road up there, that

12   goes up another -- you know, several hundred feet to that

13   roundabout, yeah, up to the top there; and that's kind of where

14   that road ends.  But off to the left there is that other tank,

15   the other blue dot on there, it is a 2,500-gallon tank.  So I

16   would go up there and there was poison oak growing up around

17   the plumbing.  It was important to keep the plumbing -- because

18   it would go up there, and you had shut off valves and whatever,

19   and I didn't want to get it on my hands.  There was a lot of

20   stuff growing up in there.

21        And then as you go up to the roundabout, that's when I

22   would have to go up and service the spring box and go up -- I

23   would hike up in there and spray where I felt it was necessary.

24   This tank here, I would spray around this tank, the side, the

25   back, you know, so that -- because it was cut against a

1   hillside on the other side and growth comes up on top.

2       So it is all part of the maintenance routine that I did on

3   a monthly basis.

4   **Q.**   And then Exhibit 935, can you tell the ladies and

5   gentlemen of the jury what this is?

6   **A.**   Yeah, this is the -- you know, the plumbing coming off of

7   that tank, that's the shut-off valve.  There were two shut-off

8   valves.  You can see the poison oak around the valve, and

9   that's what I'm talking about there.  It -- there is -- so I

10  would come in there and try to, you know, maintain that as best

11  to keep it free of this type of stuff.  And, yeah, that comes

12  out of the front of the tank going down the road, that

13  particular valve.

14  **Q.**   During these 26, 28 years that you used Roundup at your

15  two properties, Mr. Hardeman, did you ever get Roundup on your

16  skin?

17  **A.**   Oh, yes, quite a few times.  I described the sense that I

18  breathe something in.  Also a couple of times when it was

19  foaming out the top when you are mixing it, it could get on

20  your hands.

21  **Q.**   When you say "foaming up at the top" --

22  **A.**   You know, when you are filling it up with water, sometimes

23  you put too much in.  It foams up the top of the canister.  You

24  have to put the plunger in it, and it drives the foam out.

25  When you handle it, you can get it on your fingers and hands

HARDEMAN - DIRECT / MOORE

1    and whatever.

2    **Q.**   What about when you use the hand sprayer?

3    **A.**   On the hand sprayer, sometimes that would drip and leak;

4    and, of course, when I was spraying the poison oak, I had a

5    ladder on the east side of my house outside the kitchen against

6    the cyclone fencing, and the poison oak was coming over the

7    cyclone fence.  I would try to get creative and get up there so

8    I could spray it, you know, more the same height.  I would use

9    a hand sprayer.  And that -- you know, sometimes you could

10   see -- be spraying it and an afternoon wind would come up.  You

11   get winds there.  And you get a little blow back, and it would

12   blow back up on you is some of the experiences I had with it

13   coming in contact with my skin or breathing it in.

14   **Q.**   Do you still use Roundup?

15   **A.**   No.

16   **Q.**   When was the last time you used Roundup?

17   **A.**   Had to be 2012, right before we put the house on the

18   market.  Summer I would think.  Yeah, maybe somewhere around

19   there.

20   **Q.**   I want to switch gears and ask you a few questions before

21   I sit down.

22   **A.**   Uh-huh.

23   **Q.**   Have you ever worked with any pesticides other than

24   Roundup?

25   **A.**   No.

1   **Q.**   Did you ever work in chemicals or the chemical industry?

2   **A.**   No.

3   **Q.**   The jury, Mr. Hardeman, has heard that you had

4   hepatitis C?

5   **A.**   Yes.

6   **Q.**   Can you tell them when you were diagnosed with

7   hepatitis C?

8   **A.**   2005, to the best of my recollection.

9   **Q.**   And the jury heard from your doctors, Dr. Turk and Dr. Ye,

10  last week, and that you received treatment for hepatitis C.

11  **A.**   Yes.

12  **Q.**   Can you tell the jury when you received that treatment?

13  **A.**   In 2005.

14  **Q.**   Did that treatment go into 2006?

15  **A.**   It finished in 2006.

16  **Q.**   And what is your understanding of how that treatment went

17  for the hepatitis?

18  **A.**   I was cured.

19  **Q.**   And has your -- to your understanding, has the hepatitis C

20  virus ever come back since you were cured in 2006?

21  **A.**   No, never.

22  **Q.**   Now, how do you know that, Mr. Hardeman?

23  **A.**   Because I get a blood test every year and they check that.

24  I get a complete blood count, and they check for viral load;

25  and it is all clear.

1   Q.   The jury also heard that you had been diagnosed with

2   cirrhosis of the liver; is that right?

3   A.   Yes.

4   Q.   And what is your understanding of the condition of your

5   liver now?

6   A.   It is in great condition.  I mean, I was in my doctor's

7   office looking at the CT scan from the lymphoma, and we went

8   down and you can go down inside the body and look and see the

9   liver.  It looks great.  It is really smooth.

10       And I said, Okay.  Yeah, I -- pretty happy with that.

11  Q.   Have you ever been diagnosed with active hepatitis B?

12  A.   No.

13  Q.   Now, the jury heard that you had a couple instances of

14  some skin cancer, some sun spots.  Can you tell the jury about

15  that?

16  A.   Well, sun damage years and years ago.  I mean, the outside

17  of my calf I had a thing called a basal cell.  It is a little

18  round mark, raspberry-colored thing.  And then I --

19  Q.   Where was that, Mr. Hardeman?

20  A.   It was on my left calf.  And it was a little -- like the

21  size of a dime or nickel on the side of my calf, outside of my

22  calf.

23  Q.   When did you have that sun spot?

24  A.   2001 -- well, I think I have had that -- I don't know if

25  it was a birthmark.  May have been.  It was around for many,

1  many, many years.  Didn't pay much attention to it.

2  **Q.**   And did you have treatment for that sun spot on your calf?

3  **A.**   I went in and they removed it.  It was outpatient.  I went

4  in and they took it out, and I went home and that was the end

5  of it.

6  **Q.**   And the last 18 years, since 2001, have you ever had any

7  problems with that spot on your leg?

8  **A.**   No, never had any problems with it.

9  **Q.**   And then any other sun spots or sun damage?

10  **A.**   Well, yes, last August I had -- when going in for routine

11  checkups with Dr. Turk, I always have him check me out with my

12  skin and everything.  They always check the sun damage and look

13  at freckles.  So he found something up on my shoulder.  We have

14  been looking at for quite a while, and he took a picture of it.

15  He sent it up to dermatology, and they did a biopsy and it came

16  back as an in situ, which is zero stage kind of a skin cancer.

17  And -- but went in for the surgery and took it out.  And I was

18  home that afternoon.  There was follow-up.  There was

19  nothing --

20  **Q.**   And that was in August of 2018?

21  **A.**   Yes, last year.

22  **Q.**   And that was after you had already been diagnosed with

23  non-Hodgkin's lymphoma?

24  **A.**   Yes.

25  **Q.**   Okay.  Were either of these sun spots malignant?

1    **A.**    I'm sorry.  Can you repeat --

2    **Q.**    Were either of those malignant?

3    **A.**    No, no, they were not malignant.

4    **Q.**    Mr. Hardeman, the jury has heard that you have been

5    diagnosed with non-Hodgkin's lymphoma.  When did you get that

6    diagnosis?

7    **A.**    Well, official diagnosis was in, I think, in February of

8    2014 -- '15, '15, yes.

9    **Q.**    When did you first notice that something was wrong?

10   **A.**    Oh, well, it was on Christmas morning in 2014.  I was

11   getting ready to go to my sister's.  My sister just passed away

12   so I wanted to support my family down there and was looking in

13   the mirror.  We're getting ready to travel down to the South

14   Bay.

15        I was looking in the mirror, and I said, Mary, look at

16   this.  I have this gigantic thing sticking out of my neck on

17   this side.  I said, What the heck is that?

18        And so what I did was I continued on.  And then the next

19   day I immediately called up Kaiser Permanente.  And there was

20   an on-call physician there.

21        He said, Well, why don't you just observe it for the next

22   30 days.  It could be a swollen lymph node.  Okay.  My doctor

23   was on vacation.

24        So as soon as he come back, I started emailing him and

25   saying, It is not going away.  There is something going on

 1    here.

 2         He said, Come on in.  Let's look at it.

 3         So I went in.  And he made an appointment with the head

 4    and neck surgeon, Dr. Turley, to look at it.  And he did a

 5    biopsy, two biopsies actually, and a needle biopsy, which is

 6    inconclusive.  And then so he had to bring me back, and he did

 7    what -- I guess they take out a whole live sample.  Waited.

 8    Waited and waited.  And anxiety until it came back.  And then

 9    it was -- he gave me the diagnosis.

10    Q.   And so you noticed it -- was it that Christmas 2014?

11    A.   The --

12    Q.   When you noticed the swollen lymph node, that was

13    Christmas 2014?

14    A.   It was 2014, yes.

15    Q.   And I don't want to get into the details of this right

16    now.

17    A.   Okay.

18    Q.   But did you go through chemotherapy?

19    A.   Yes, I did.

20    Q.   And I'm sorry, Mr. Hardeman.  So when you went through

21    chemotherapy, did -- is it your understanding, do you know

22    whether the hepatitis B came back?

23    A.   No, none of that ever -- no, that didn't come back.

24    Q.   What about the hepatitis C, did it come back?

25    A.   No.

1  **Q.**   And how do you know that?

2  **A.**   Because my doctor, Dr. Ye, my oncologist, monitored it.

3  You know, in between the six rounds of chemo, which were a

4  thing called the nadir.  You have 21 days between treatments.

5  So you go for 10 days.  You are going completely downhill,

6  fighting all the side effects from the chemo.  And during that

7  period in order to -- I would say "qualify" for the next round,

8  you have to go in and get a blood test because your white blood

9  cells have to be up to a certain level so you can take the next

10  round.  And so along with the white blood cell test, he was

11  testing for hepatitis C viral load.

12  **Q.**   And since 2006 when you were cured of hep C, has the

13  hep C -- hepatitis C ever come back to your knowledge?

14  **A.**   No, never.

15       **MS. MOORE:**  Those are all the questions I have,

16  Mr. Hardeman.  Thank you for your time this morning.

17       **THE COURT:**  Any cross?

18       **MS. MATTHEWS JOHNSON:**  Thank you, Your Honor.

19  We have no questions, sir.

20       **THE COURT:**  Okay.  You are done.  Go ahead and step

21  down.

22       This is probably a good time to take a short morning

23  break.  So why don't we resume at about 35 after the hour.

24  Thank you.

25       (Proceedings were heard out of presence of the jury:)

```
1            THE COURT:  Is Dr. Weisenburger next?

2            MS. MOORE:  Yes.  Yes, Your Honor.  Would you like him

3    to come in so we can have that discussion with him?

4            THE COURT:  Yeah, why don't we resume in two minutes?

5    We will take a couple minutes.  Then I will come back out and

6    we will talk to Dr. Weisenburger before we --

7            MS. MOORE:  Thank you.  I would appreciate that.

8                    (Recess taken at 9:28 a.m.)

9                 (Proceedings resumed at 9:33 a.m.)

10       (Proceedings were heard out of the presence of the jury:)

11           THE COURT:  Hello, Dr. Weisenburger.

12           THE WITNESS:  Good morning.

13           THE COURT:  So why don't -- I think what it would be

14   worth doing, why don't we do it this way.  Who's doing the

15   direct examination of Dr. Weisenburger?

16           MS. MOORE:  I am, Your Honor.

17           THE COURT:  Do you want -- just to make sure we're on

18   the same page, why don't you articulate to me your

19   understanding of my ruling that limits Dr. Weisenburger's

20   testimony about dose-response?

21           MS. MOORE:  Okay.  I will come to the microphone.

22           THE COURT:  If you want me to do it, that's fine --

23           MS. MOORE:  No.

24           THE COURT:  -- but I thought it would be useful to

25   make sure that you understand and that Dr. Weisenburger
```

1  understands.

2        **MS. MOORE:**   My understanding, Dr. Weisenburger will

3  testify that in his opinion there is a dose-response; that the

4  more you use Roundup, the greater the risk of developing

5  non-Hodgkin's lymphoma.  And that, in a nutshell, is how he's

6  going to testify about dose-response.

7        And with respect to probably where you're coming from on

8  McDuffie and Eriksson, he is going to explain the Epi, not in

9  any detail like Dr. Ritz, but the Epi studies do show that that

10  dose-response, it increases and I think they used more than 2

11  days or more than 10 days.  So he is going to reference that,

12  but --

13        **THE COURT:**   In connection with his general causation

14  opinion?

15        **MS. MOORE:**   That's correct, Your Honor.  That's

16  correct, Your Honor.

17        With respect to his case-specific opinion, it's that in

18  his opinion, Mr. Hardeman falls within a high-risk category

19  based on his significant exposure over those 26 or so years,

20  and that was the reason why -- one of the reasons why he ruled

21  in Roundup as a result of his general causation opinion as

22  well.  But he's not going to quantify the number.  He's not

23  going to quantify it.

24        **THE COURT:**   In other words, he's not permitted to

25  quantify the risk factor for Mr. Hardeman based on the McDuffie

 1    and Eriksson studies.

 2         **MS. MOORE:**  Right.  He's going to use the McDuffie and

 3    Eriksson studies to show there's a dose-response and to show

 4    how they base that dose-response on that; and then he's going

 5    to say, "In my opinion, based on the significant exposure of

 6    Mr. Hardeman over those years, that he would fall into a

 7    high-risk category so he would have an increased risk of

 8    developing non-Hodgkin's lymphoma."

 9         **THE COURT:**  Okay.  But the McDuffie study and the

10    numbers emanating from the McDuffie study and the Eriksson

11    study come in during the general causation --

12         **MS. MOORE:**  That's correct.

13         **THE COURT:**  -- opinion, and they do not -- they're not

14    used -- other than sort of the general comment that there's a

15    dose-response, they're not used -- they're not linked

16    specifically to Mr. Hardeman.

17         **MS. MOORE:**  That's correct, Your Honor.

18         **THE COURT:**  Okay.  Dr. Weisenburger, do you understand

19    those ground rules?

20         **DR. WEISENBURGER:**  Yes, Your Honor.

21         **THE COURT:**  Okay.

22         **MS. MOORE:**  Okay.

23         **MR. STEKLOFF:**  Can I just raise a separate issue,

24    Your Honor, which is to clarify in part based on yesterday, the

25    IARC question?

PROCEEDINGS

 1          THE COURT:  Thank you.

 2          MR. STEKLOFF:  Depending on how you rule on that, I

 3     think you've now heard from Dr. Ritz and Dr. Portier the IARC

 4     classification so I'm not sure we need to -- I understand that

 5     Dr. Weisenburger can say that Dr. Blair was part of the Working

 6     Group from earlier; but other than that, I don't think IARC

 7     needs to play a role in his testimony.

 8          THE COURT:  Other than the fact of the classification,

 9     he can repeat that.  It's been repeated enough times sort of

10     where EPA stands on this and where the European regulators

11     stand on this.  So he can reference the fact of the IARC

12     classification and, you know, who Dr. Blair is, but that's it.

13          MR. STEKLOFF:  Okay.

14          THE COURT:  And then I did go back and think about

15     your point about the IARC's conclusion regarding genotoxicity,

16     and I agree with your point.  I believe that the Portier

17     testimony is sufficient to address the issue that we discussed

18     yesterday, and so there will not be testimony permitted on the

19     IARC's specific conclusions about genotoxicity.

20          MS. MOORE:  And just to clarify, Your Honor, to make

21     sure I understand, Dr. Weisenburger is prepared, as he did

22     during *Daubert*, with his general causation opinion to say that

23     he reviewed the genotox literature and that in his opinion,

24     Roundup is genotoxic, which is separate and apart from --

25          THE COURT:  Of course, that's fine.

PROCEEDINGS

1    **MS. MOORE:**  Okay.  Okay.  Thank you, Your Honor.

2    **THE COURT:**  It's just that Dr. Weisenburger -- just to

3    make clear, just to make sure Dr. Weisenburger is clear, it's

4    just that he cannot testify about -- he can testify about the

5    fact of the IARC classification but can't go into any of IARC's

6    specific conclusions regarding genotoxicity, epidemiology,

7    toxicology.

8    That's -- we're not -- the point is we're not going down

9    the road of having a fight about whose analysis is better

10   between the IARC and the EPA.  We're going to have a fight

11   about whose analysis is better, Dr. Weisenburger's or

12   Dr. Mucci's.  That's what this trial is about.  Okay?

13   **MS. MOORE:**  All right.  Thank you, Your Honor.

14   **THE COURT:**  All right.  So, Dr. Weisenburger, you can

15   come on up.

16   And you can bring in the jury.

17   **MS. MOORE:**  Your Honor, I'm going to distribute

18   binders here.

19   **THE COURT:**  Okay.

20   (Proceedings were heard in the presence of the jury:)

21   **THE COURT:**  Okay.  You can resume.

22   **MS. MOORE:**  Thank you, Your Honor.

23   Plaintiffs call Dr. Dennis Weisenburger.

24   **THE CLERK:**  Dr. Weisenburger, can you stand, please?

25   I need to swear you in.

WEISENBURGER - DIRECT / MOORE

1       **<u>DENNIS WEISENBURGER</u>,**

2    called as a witness for the Plaintiff, having been duly sworn,

3    testified as follows:

4            **THE WITNESS:**  I do.

5            **THE CLERK:**  Thank you.  Please be seated.

6        And for the record, please state your first and last name,

7    and spell both of them.

8            **THE WITNESS:**  My first name is Dennis, D-E-N-N-I-S.

9    My last name is Weisenburger, W-E-I-S-E-N-B-U-R-G-E-R.

10           **THE CLERK:**  Thank you.

11                      **<u>DIRECT EXAMINATION</u>**

12   BY MS. MOORE:

13   **Q.**   Good morning, Dr. Weisenburger.

14   **A.**   Good morning.

15   **Q.**   Can you introduce yourself to the jury and tell them a

16   little bit about what you do?

17   **A.**   Yes.  I'm a pathologist and I have special training in

18   diseases of the blood and the bone marrow and the lymph nodes

19   of which non-Hodgkin's lymphoma is one of the diseases that I

20   deal with every day.

21       And over the last 40 or so years, that's been the main

22   topic of my research at the University of Nebraska Medical

23   Center where I worked for 28 years and now at the City of Hope

24   Medical Center in the L.A. area.

25   **Q.**   What is pathology?

WEISENBURGER - DIRECT / MOORE

1  **A.**    Pathology is the study of disease.  Pathologists, one of

2  their roles is to try to understand what causes disease, what

3  are the mechanisms that are used to cause disease by organisms

4  or chemicals; and then a big role that we have in the hospital

5  is we are the ones who run the clinical laboratories, that do

6  all the testing on specimens, blood, urine, fluids and tissue

7  biopsies.  And so we're in the background helping the doctors

8  make the proper diagnosis.

9  **Q.**   You mentioned biopsy, and the jury has heard that

10 Mr. Hardeman had a couple of different biopsies.  Can you

11 explain to the jury what a biopsy is?

12 **A.**    Yes.  So a biopsy is just taking a piece of tissue from

13 the patient.  Mr. Hardeman had two biopsies.  One was a needle

14 aspiration where they just sucked some of the tissue out of the

15 tumor, and it was all dead tissue so they couldn't really make

16 a diagnosis.

17      And so then they went and did what's called a needle

18 biopsy where they took a needle and put it into the tumor and

19 pulled out a needle core of tissue.  And then they process the

20 tissue, make slides from the tissue so they can actually look

21 at what the tumor looks like, and that's what pathologists do.

22 **Q.**   When you say "needle core," what does that mean?

23 **A.**    Well, it's -- you know, like if you stuck a needle in an

24 apple and you pulled the needle back out, you would have a very

25 thin core of the apple.  It's the same principle.

WEISENBURGER - DIRECT / MOORE

1   Q.   And you said you're a pathologist.  Are you a

2   hematopathologist?  I never can get that right.  I know I'm not

3   saying it right.

4   A.   Yeah.  So I have special -- I spent two additional years

5   of training learning about hematopathology, which, as I said,

6   was diseases of the blood and the bone marrow and the immune

7   system.  So that's an area that I'm specialized in in pathology

8   in terms of my research and my everyday work.

9   Q.   And what is hematopathology?

10  A.   Well, as I said, it's really the study and diagnosis of

11  diseases that arise in the blood or the bone marrow or the

12  immune system; like the lymph nodes, for example.

13  Q.   You mentioned that your focus is non-Hodgkin's lymphoma.

14  How did you end up focusing on non-Hodgkin's lymphoma,

15  Dr. Weisenburger?

16  A.   Well, when I finished my training in hematopathology, I

17  went looking for a job and I eventually ended up at the

18  University of Nebraska where I ended up working for 28 years.

19  And I went there to interview.  People told me that there was a

20  high rate of lymphoma in Nebraska.  So that really peaked my

21  curiosity.

22       And so in the end, I decided to go to Nebraska and work as

23  a hematopathologist, but I was also interested in trying to

24  understand why would there be a high rate of lymphoma in

25  Nebraska.  And so that's how I started my research, my

1    epidemiology research, into lymphoma.

2    **Q.**   So let's back up, then, a little bit before we get into

3    your actual research and explain to the ladies and gentlemen of

4    the jury what your educational background is and your medical

5    training.

6    **A.**   Yes.  So I got my medical degree from the University of

7    Minnesota in Minneapolis, and then I did a one-year medical

8    internship in internal medicine at the Ohio State University in

9    Columbus.

10        And then I decided to shift gears and do a year of

11   pathology just to take a break from the tough internship, and I

12   went to the University of Iowa in Iowa City.  And I just fell

13   in love with pathology, and so I just stayed at Iowa and

14   finished my training in pathology.  I didn't go back to

15   internal medicine like I'd originally planned.

16        And then there I got a real interest, because of some of

17   my teachers and professors, an interest in hematopathology.

18   And so after I finished my residency, I took a fellowship at

19   the City of Hope actually where there was a famous

20   hematopathologist at that time and spent two and a half years

21   there learning hematopathology.

22   **Q.**   What is the City of Hope?

23   **A.**   The City of Hope is a freestanding comprehensive cancer

24   center in Duarte, California, which is actually a suburb of

25   Los Angeles.  So it's one of the 50 or so comprehensive cancer

**WEISENBURGER - DIRECT / MOORE**

1  centers that are recognized by the National Cancer Institute

2  for doing important work in research and treatment of cancer.

3  **Q.**   What is the National Cancer Institute?

4  **A.**   Well, that's the -- that's the federal government agency

5  that oversees cancer research in the United States.  They do

6  their own research, but they also fund research all across the

7  United States, mostly at universities and academic medical

8  centers like City of Hope.

9  **Q.**  So would you consider the City of Hope to be a national

10  major research center for the study and treatment of cancers,

11  including non-Hodgkin's lymphoma?

12  **A.**   Yes.

13  **Q.**   And are you Board certified?

14  **A.**   Yes.  I'm Board certified in both anatomic and clinical

15  pathology.

16  **Q.**   If you could, based on your 40 years of studying the

17  causes of non-Hodgkin's lymphoma, explain to the jury what is

18  non-Hodgkin's lymphoma?

19  **A.**   So non-Hodgkin's lymphoma is a kind of cancer that

20  develops from cells of the immune system -- okay? -- the system

21  that protects us from infections and protects us from cancer.

22  There are these cells in the immune system that protect us.

23  Okay?  And they're cells called B cells -- just the letter B,

24  B cells -- and those cells produce what we call antibodies or

25  proteins that circulate in the blood and in the tissues and

WEISENBURGER - DIRECT / MOORE

1    protect us from infections and other things.

2        And then there's another type of cell called the T cell,

3    which can react to a foreign material by mobilizing other cells

4    to kill that material or actually killing that material itself.

5    So it could kill bacteria or viruses or cancer cells.

6        And then there are a variety of other cells of the immune

7    system, but those are the two main types.

8    Q.   Is non-Hodgkin's lymphoma common among the general

9    population of people in the United States?

10   A.   Well, it's relatively common.  It's I think the sixth or

11   seventh most common cause of cancer in adults.  In the men it's

12   number six, and I think in women it's number seven.  And there

13   are about a little over 70,000 cases a year in the

14   United States.  So it's relatively -- it's a relatively common

15   cancer.

16   Q.   But is cancer common among the general population?

17   A.   Yes, cancer is common among the general population.

18   Q.   And then are there -- the jury has heard there's different

19   subtypes of non-Hodgkin's lymphoma.

20   A.   Yes.  So there are non-Hodgkin's lymphomas that arise from

21   the B cells that we talked about, as well as the T cells, and

22   there are actually 60 or more different specific types of

23   non-Hodgkin's lymphoma.  So it's a complicated classification

24   but we often talk about what type of lymphoma is it, what type

25   of non-Hodgkin's lymphoma; and today we're going to talk about

**WEISENBURGER - DIRECT / MOORE**

1    one of the common types called diffuse large B-cell lymphoma.

2    **Q.**    And where are you working now?

3    **A.**    Well, I was the chairman of the department at City of Hope

4    for six years, and then last fall after I had my 70th birthday,

5    I decided I didn't want to work so hard and do all that

6    administration so I went back to being just a diagnostic

7    pathologist continuing my teaching of fellows and doing my

8    research, as well as doing diagnostic work.

9    **Q.**    So you gave up the administrative part?

10   **A.**    Yeah.

11   **Q.**    Do you miss that?

12   **A.**    No.

13   **Q.**    All right.  And prior to coming to the City of Hope, is

14   that when you were at the University of Nebraska Medical

15   Center?

16   **A.**    Yes.

17   **Q.**    And did you also teach when you were at the University of

18   Nebraska Medical Center?

19   **A.**    Yes.  I actually taught more because we had medical

20   students, we had residents, and we had fellows, and so there

21   was a lot more teaching and lecturing there at the University

22   of Nebraska.

23   **Q.**    And I saw on your curriculum vitae, Dr. Weisenburger, that

24   you also had listed the Beckman Research Institute at the City

25   of Hope.  Can you tell the ladies and gentlemen of the jury

 1   what that is?

 2   **A.**   Well, the Beckman Research Institute is more of a basic

 3   science institute.  That's where most of the researchers are

 4   that are looking into what causes cancer and how cancer

 5   develops.  So it's sort of the more basic research part of the

 6   City of Hope, and I'm a member of that group because of the

 7   research that I do.

 8   **Q.**   And are you still doing research into the causes of

 9   non-Hodgkin's lymphoma?

10   **A.**   Yes.

11   **Q.**   When you were in Nebraska, I saw on your curriculum vitae

12   that you also were listed as the chief pathologist for the

13   Nebraska Lymphoma Study Group; is that right?

14   **A.**   Yes.

15   **Q.**   Tell the ladies and gentlemen of the jury what that was.

16   **A.**   Well, there's a group of people at Nebraska who were very

17   interested in lymphoma, particularly non-Hodgkin's lymphoma,

18   and there are clinicians who take care of patients,

19   pathologists like myself, as well as researchers; and so we

20   formed a research group and we organized the eastern part of

21   Nebraska, all the community hospitals, into a group that would

22   provide us with material from all the patients in eastern

23   Nebraska.  So we had lots of biopsies and material to do the

24   research on.

25         And so this is a group that's been ongoing for over 40

WEISENBURGER - DIRECT / MOORE

1  years, that's been very productive, and one of the things that

2  Nebraska is famous for is its research into lymphoma.

3  Q.   I saw on your curriculum vitae also reference to something

4  called InterLymph.  Can you tell the ladies and gentlemen of

5  the jury what InterLymph is?

6  A.   Yes.  When I first came to University of Nebraska, as I

7  told you, I was interested in trying to figure out why there's

8  an increased -- increase in non-Hodgkin's lymphoma or lymphomas

9  in general in Nebraska so I got interested in epidemiology.

10  And as part of that, I actually organized a large epidemiologic

11  case-control study of non-Hodgkin's lymphoma in Nebraska and

12  learned epidemiology kind of by doing it.  And so that was one

13  of the important research projects that I carried out in my

14  career.

15     The InterLymph is a group of people like me who are

16  epidemiologists, pathologists, biologists, and clinicians who

17  are working together as a team to do research into what causes

18  non-Hodgkin's lymphoma and the other lymphomas.

19  Q.   And are you a founding member of InterLymph?

20  A.   Yes, I am.

21  Q.   And why did InterLymph actually come into existence?

22  A.   Well, back in the 1980s, epidemiologists noticed that

23  there was a rapid increase in the incidence of non-Hodgkin's

24  lymphoma which was unexplained, and so they called a meeting at

25  the National Cancer Institute and they invited people from

WEISENBURGER - DIRECT / MOORE

1    around the country and around the world to come to that

2    meeting, it was an all-day meeting, to sort of discuss what

3    could the cause be for this rapid increase in non-Hodgkin's

4    lymphoma.  Because from about 1970 to 1990, there was a rapid

5    increase and we didn't understand why.

6        And so out of that meeting that was held, the InterLymph

7    group grew out of that meeting as an organization to do

8    research and try to address that question among other

9    questions.

10   Q.   And is InterLymph still active today?

11   A.   It is, yes.  It still -- we meet once a year and sometimes

12   we meet at other meetings to talk about our research and design

13   new studies.  So it's a large group of about 40 or 50

14   researchers who are together working to try to understand

15   better what causes lymphoma.

16   Q.   And are you still active with InterLymph?

17   A.   I am, yes.

18   Q.   What is the Eppley Institute for Research in Cancer and

19   Allied Disease?

20   A.   So that's the basic science institute at the University of

21   Nebraska that does basic research.  That's where most of the

22   Ph.D. researchers are that are researching what causes cancer

23   and how cancer develops.  And so I was a member of that group

24   also because of my research in lymphoma.

25   Q.   And I also saw that you listed the Center for

1  Environmental Health and Toxicology.  What is that?

2  **A.**   So that was a center at the University of Nebraska that

3  was mainly focused on diseases that were caused by the

4  environment.  So in Nebraska, of course, it's an agricultural

5  state so they were looking at asthma in farmers and we were

6  looking at cancer in farmers, including non-Hodgkin's lymphoma,

7  but there were a variety of things we were looking at mainly

8  regarding agriculture because that's, you know, the main --

9  that's the main occupation there in Nebraska.

10  **Q.**   So you mentioned "environmental."  The jury has heard the

11  term "environmental health."  What does that mean?

12  **A.**   Well, it's just what is the effect of environment on the

13  health of people.  You know, in some places, big cities, they

14  look at air pollution.  In some places, like Nebraska, we were

15  concerned about pesticide contamination and fertilizer

16  contamination of water, groundwater, lakes and rivers, and

17  underground water.  We were also interested in the use of

18  pesticides by farmers.

19  **Q.**   And how long have you been studying whether pesticides

20  cause cancer?

21  **A.**   Well, since -- almost since I was -- I started at the

22  University of Nebraska in the mid-1980s because when I got

23  there, I started sort of asking questions what could be causing

24  this increase in Nebraska.

25  **Q.**   And, Dr. Weisenburger, is Roundup a pesticide?

1  **A.**   Yes, Roundup is a pesticide.  It's specifically a

2  herbicide, which is a chemical that kills weeds.  It kills

3  plants actually, and we want to put it on weeds because we

4  don't like weeds, but if you put it on other plants, it will

5  kill other plants too.

6  **Q.**   I also saw that you listed that you had the National

7  Cancer Institute Peer Review Group.  What was that?

8  **A.**   So I was invited to be on a panel of researchers and

9  clinicians who -- to look at the research program and the

10  future plans of the National Cancer Institute with regard to

11  these hematologic cancers, and so I was an invited guest.  We

12  spent a day and a half together going over all the things the

13  National Cancer Institute was doing in lymphoma and other

14  diseases and trying to advise them about what we thought they

15  should do in the future.

16  **Q.**   And what is the Cancer and Leukemia Study Group B?

17  **A.**   Yeah, so that's a large cooperative group of universities

18  and hospitals that are doing clinical studies of patients.  So

19  patients with a certain disease, they may test a new drug or a

20  new drug combination in those patients.

21      And I was involved in that group because someone has to

22  review the biopsies and the pathology and make sure the

23  diagnosis is correct, and so that was my role in that group.

24  **Q.**   Have you published about non-Hodgkin's lymphoma?

25  **A.**   Yes.  That's been the major area that I've done most of my

**WEISENBURGER - DIRECT / MOORE**

1    publication in, in that disease.

2    **Q.**    How many publications have you authored or co-authored

3    over your career?

4    **A.**    Well over 400 publications published in peer-reviewed

5    journals, yes.  So it's -- you know, as an academic person,

6    that's what we're expected to do.

7    **Q.**    How many of those 400 publications involved looking at the

8    causes of non-Hodgkin's lymphoma?

9    **A.**    Well, that's a tough question.  A lot of them looked -- a

10   lot of them were looking at the cause of non-Hodgkin's

11   lymphoma; but I think the major ones, what you're asking me is,

12   you know, with regard to epidemiology studies, we did over

13   50 -- we wrote over 50 papers on epidemiology and the research

14   that we did at Nebraska and the research we've done in the

15   InterLymph group to try to understand the causes of

16   non-Hodgkin's lymphoma.

17   **Q.**    Have you published on the causes of non-Hodgkin's lymphoma

18   including studies of pesticides?

19   **A.**    Yes, especially the studies that we did in Nebraska

20   focused a lot on farming and farming practices and pesticide

21   use.

22   **Q.**    In addition to actually authoring -- writing publications,

23   have you also served on editorial boards and participated in

24   peer review?

25   **A.**    Yes.  So I've been on a number of editorial boards for

WEISENBURGER - DIRECT / MOORE

1    pathology journals and lymphoma journals, and I've been a peer

2    reviewer for papers for many years.

3    **Q.**   Well, Dr. Weisenburger, you've referenced a couple times

4    your work in Nebraska, and if you could tell the ladies and

5    gentlemen of the jury a little bit more about what that work

6    entailed when you first got to Nebraska and noticed this

7    increase in non-Hodgkin's lymphoma.

8    **A.**   Yes.  So, you know, how does one start?  So I was -- you

9    know, I was a new young hematopathologist trying to figure out

10   how do I tackle this approach.  So one of the things I did

11   first, I realized there was some databases.  So the Nebraska

12   Department of Health had a database on a cancer registry, and I

13   could look and see how many cancers occurred in each year in

14   the different counties of Nebraska.  So I made some maps in

15   eastern Nebraska and I found out which were the counties that

16   had high -- a high rate of non-Hodgkin lymphoma, Hodgkin

17   lymphoma, leukemia, and other diseases like that.

18        And then I made some maps looking -- based on data

19   published by the University of Nebraska on, you know, what were

20   the counties where there was high pesticide use, herbicide use,

21   insecticide use, fertilizer use, and corn production to try to

22   see if I could correlate the counties with the high rates of

23   lymphoma with counties that seemed to have very intense

24   agriculture.  And, in fact, there was a correlation, and that

25   got me very interested in pursuing research.

WEISENBURGER - DIRECT / MOORE

1     And then about that time, a publication came out about an

2     epidemiologic study from Kansas, and it showed that certain

3     pesticides increase the risk for non-Hodgkin's lymphoma.  So I

4     got really excited about that, and I called up these

5     researchers at the National Cancer Institute, who I didn't

6     know, I called them up out of the cold and I said, "Look, you

7     guys" -- it was Dr. Blair and his group -- I said, "Look, you

8     guys, you need to come to Nebraska and do an epidemiology

9     study."

10     And they said, "Well, we'd like to, but we don't have any

11     money to come to Nebraska."  They said, "If you raise the

12     money, we'll come and help you do it."

13     So I did.  I wrote grants and I raised the money to do the

14     study; and then because we didn't have any epidemiologists at

15     Nebraska at that time, they came to Nebraska, helped us

16     organize the study, designed the questionnaire, trained our

17     interviewers, did the quality control, and actually then

18     analyzed the data for us when the study was over.

19     So I had a partnership with these people at the National

20     Cancer Institute, and that's how we did the first study of

21     lymphoma and other diseases like that at Nebraska, the

22     so-called Nebraska study, which you'll hear about.

23     **Q.**  So you said "they came."  So tell the ladies and gentlemen

24     of the jury who actually came from Kansas to Nebraska to help

25     you.

1    **A.**    Well, Aaron Blair came, one of his bright young students

2    Sheila Zahm came, and a number of other researchers came over

3    the three or so years that it took us to do the study.  And I

4    also went to the National Cancer Institute and met with them.

5    **Q.**    And who is Dr. Aaron Blair?

6    **A.**    So Dr. Aaron Blair is a very well-known epidemiologist who

7    was the head of the occupational epidemiology branch at the

8    National Cancer Institute.  So his role there was to study what

9    causes diseases by different occupations, and he was originally

10   from Kansas so he was very interested in what causes cancer in

11   farmers and had designed that Kansas study that I told you

12   about.

13       So his team actually were an expert team with regard to

14   trying to study cancer in different occupations, particularly

15   farming.

16   **Q.**    And, Dr. Weisenburger, I'm going to have you -- probably a

17   blast from the past here, but look at 1569 in your binder.

18   **A.**    (Witness examines document.)

19   **Q.**    It's probably at the very back.

20   **A.**    (Witness examines document.)  Yes.  This is a paper I

21   wrote early on when I was at Nebraska just describing some of

22   the findings and hypothesis that I had.  So I don't know if you

23   have it, but --

24   **Q.**    Now, hold on.  Do you -- so is this a publication that you

25   authored, Dr. Weisenburger?

WEISENBURGER - DIRECT / MOORE

1    A.    Yes.

2    Q.    And what year was that?

3    A.    Oh, 1985.

4    Q.    Okay.

5          MS. MOORE:  Your Honor, permission to publish to the

6    jury.

7          MR. STEKLOFF:  No objection.

8          THE COURT:  Go ahead.

9    BY MS. MOORE:

10   Q.    And is this your publication, Dr. Weisenburger?

11   A.    Yes.

12   Q.    Okay.  And if you flip over to page 3, are these the maps

13   you were referencing to the jury?

14   A.    Yes.

15   Q.    Okay.

16   A.    This is my crude attempt to learn something about what was

17   causing lymphoma in Nebraska.

18   Q.    Okay.  And this became the Nebraska story?

19   A.    This was the start of the story, yeah.

20   Q.    So what is the Nebraska story?

21   A.    Well, the Nebraska story is that we did -- based on this

22   research, I convinced the people at the National Cancer

23   Institute to come and help me do a large epidemiologic

24   case-control study of non-Hodgkin's lymphoma and Hodgkin

25   lymphoma and other related diseases.  And out of that study

**WEISENBURGER - DIRECT / MOORE**

1  came a lot of publications that I think were very important,

2  some about pesticide use, others about a variety of other

3  things that might cause non-Hodgkin's lymphoma.

4  **Q.**   And what in particular were you looking at as to what was

5  the cause of non-Hodgkin's lymphoma?

6  **A.**   Well, we were, of course, mainly interested -- we were

7  mainly interested in pesticides, but we also looked at other

8  things that might cause non-Hodgkin's lymphoma.  So we asked

9  questions about family history.  We asked questions about

10  chemical use.

11       We asked questions about hair dye use because there was

12  this idea that hair dyes could cause lymphoma.  And, in fact,

13  what we -- and one of the unique things about our study was

14  that I insisted that we include women in our study.  Okay?

15  Because all the other studies, the Kansas study, were just men.

16  **Q.**   Why is that?

17  **A.**   Well, they thought that men would be the ones who would be

18  the most exposed to pesticides, but I knew that women in rural

19  communities work on the farm.  They do -- sometimes they work

20  just like a man.  They drive the tractor, they do all those

21  things.  So I insisted that we include women in our study.  So

22  it was about half men and half women.  And --

23  **Q.**   Did you get some pushback about including women?

24  **A.**   I did initially but since I was paying for the study, I

25  got to say that.  Okay?

1     And one of the things we found actually is that in women,

2   the use of dark permanent hair dyes increased the risk of

3   non-Hodgkin's lymphoma.  So that was a really important

4   finding.  And as a result --

5   **Q.**   Is that still the case today?  Just asking.

6   **A.**   No.  Well, what happened after we published and other

7   people published this, the hair dye industry decided to take a

8   lot of the bad chemicals out of the hair dyes, and so later

9   studies in the 1990s didn't find that finding anymore because

10  people were using safe hair dyes.  So it was one of the good

11  things that happened as a result of the Nebraska study.

12  **Q.**   On behalf of all women over the age of 40, we thank you

13  for that.

14     Okay.  And then is the Nebraska story -- I mean, we saw

15  Exhibit 1569, one of your publications, Dr. Weisenburger; but

16  this entire Nebraska story, has it been published?

17  **A.**   Yes.  I haven't counted how many papers, but there are at

18  least probably a dozen papers just on the Nebraska study and

19  what the findings were.

20     And then as you'll hear, some of the Nebraska data was

21  combined with other studies as well to do more powerful kinds

22  of research.

23  **Q.**   Is that what was published by De Roos in 2003?

24  **A.**   Yes.  So -- yes, De Roos is one of the studies that was

25  carried out by Aaron Blair and his team at the National Cancer

1   Institute.  They did the Kansas study and then they did a study

2   in Iowa and Minnesota, and then they came to Nebraska and did

3   the Nebraska study.  And so all three of those studies in those

4   four states the data was combined together in that De Roos

5   paper from 2003.

6   **Q.**  Well, let's get into your opinions in this case,

7   Dr. Weisenburger.  And I want to show you Exhibit 880.

8        **MS. MOORE:**  And permission to publish.  It's the stool

9   (indicating).

10       **THE COURT:**  Go ahead.

11  **BY MS. MOORE:**

12  **Q.**  And the jury has seen this when Dr. Portier testified last

13  week, and if you could just kind of explain to the jury when

14  you're studying the causes of non-Hodgkin's lymphoma, what do

15  you look to to determine whether an agent like Roundup causes

16  cancer?

17  **A.**  Well, you want to look at all the literature on the

18  chemical that you're interested in.  So there are various

19  different studies that tell you different things.  So obviously

20  I wanted to look at the epidemiology data because that's the

21  data that would tell you does the chemical, in this case

22  Roundup, cause cancer -- some kinds of cancer in people.  Okay?

23       And so I looked at the epidemiologic data, and then there

24  were also animal studies where they gave glyphosate or Roundup

25  to animals in studies to see if those chemicals could cause the

1   cancer in animals.  So I looked at the studies -- the animal

2   studies to see what they said.

3        And then there were a lot of studies that looked at

4   mechanisms of disease:  Does Roundup cause DNA damage?  Is it

5   genotoxic?  Does it cause other kinds of abnormalities in cells

6   that might lead to cancer?  And so I looked at all of the

7   literature on the mechanisms of how Roundup and glyphosate

8   could cause cancer.

9        So I looked at a wide body of data spanning animal studies

10  to human studies and everything in between.

11       **MS. MOORE:**  Ms. Melen, could I have the Elmo, please?

12  Thank you.

13  **Q.**   And, Dr. Weisenburger, explain to the jury why you looked

14  at all three of these areas of science to form your opinion in

15  this case.

16  **A.**   Well, because I think you need to look at all the data.

17  So, for example, if you just look at the epidemiology data, it

18  might not be convincing.  And if you look at the animal studies

19  by themselves, they may or may not be convincing.  And if you

20  look at the mechanistic studies, again, depending on what you

21  look at, you know, it may not be convincing.

22       So the way you do a general causation analysis is you want

23  to look at all the information, analyze it, weigh it, and try

24  to put -- put it together into a conclusion that's based on all

25  the information rather than just pieces of the information.

1    Q.   And so, Dr. Weisenburger, if someone came into the

2    courtroom and told the ladies and gentlemen of the jury, "I

3    only looked at epidemiology and I decided that Roundup causes

4    or does not cause cancer," as someone who has been studying the

5    causes of non-Hodgkin's lymphoma for over 40 years, what would

6    you say to that?

7            MR. STEKLOFF:   Objection, Your Honor.

8            THE COURT:   Overruled.

9            THE WITNESS:   Well, I would say that that was really

10   inadequate in the sense that you should look at everything.

11   You shouldn't just look at one piece of the puzzle because

12   there are lots of important pieces of information, as you'll

13   see today, besides the epidemiology studies.

14   BY MS. MOORE:

15   Q.   So you want to look at all three?

16   A.   Yes, and that's what I did.

17   Q.   And, Dr. Weisenburger, after reviewing the literature for

18   all three of these areas of science -- the epidemiology, the

19   animal, and the mechanistic studies -- and weighing the

20   evidence, based on your 40 years of studying the causes of

21   non-Hodgkin's lymphoma, have you formed an opinion whether

22   Roundup can cause cancer?

23   A.   Yes, I have.  And my opinion is that, you know, to the

24   best of medical certainty, I believe that Roundup is a

25   substantial cause of cancer in people who are exposed to it in

**WEISENBURGER - DIRECT / MOORE**

 1   the workplace or in the environment.

 2   **Q.**   Well, what is Roundup itself?  You mentioned earlier that

 3   it's a pesticide and an herbicide, but what is Roundup?  The

 4   jury has heard about glyphosate, glyphosate-based formulations,

 5   and Roundup.  Can you distinguish those for us?

 6   **A.**   Yeah.  So Roundup is one of many glyphosate-based

 7   formulations.  So it's thought that the active ingredient that

 8   actually kills the weeds is the glyphosate, but it's diluted in

 9   a liquid, probably water, and then there are other chemicals

10   added to it to make it more potent.  So there -- one of the

11   chemicals that's added is a type of surfactant that allows --

12   **Q.**   What's a surfactant?

13   **A.**   Surfactant is just a chemical that allows a fluid to

14   spread evenly over a surface.  Okay?  But the surfactants that

15   they used not only did that, but they also helped bind the

16   glyphosate to the leaves or to the plants and helped the

17   glyphosate penetrate through the walls of the plants into the

18   actual plant cells.  Okay?

19        So glyphosate is the active chemical for these

20   formulations, and different companies use different types of

21   formulations but glyphosate is the basic chemical in all those

22   formulations.

23   **Q.**   And Roundup is a glyphosate-based formulation; is that

24   right?

25   **A.**   Yes.

1   Q.    Well, how is one, then, exposed to Roundup?

2   A.    Well, so the main way that I think in most cases the way

3   people are exposed is when they use it to try to kill weeds or

4   plants.   Okay?   So in farming, farmers would be exposed to it

5   because they use it -- large amounts of it on corn and soybeans

6   and other crops.

7        And people also use it for home use.   So you can buy it in

8   smaller bottles and use it to spray it on the weeds in your

9   yard or to kill weeds in your garden.   And, of course, you can

10  be exposed to it by getting the chemical on your skin of your

11  hands or your arms or, you know, you can even get it on other

12  parts of your body, like your face if it's windy and it blows

13  back on you.

14       You can expose -- get exposed if you get it on your

15  clothes and you don't change your clothes that day or -- you

16  know, farmers sometimes wear the same clothes more than one day

17  because they wear it until it's dirty.   Right?   So they may be

18  wearing clothes that already have pesticide in the fabric.

19       So those are the ways you get exposed to the pesticide.

20  Mainly it's skin contact.

21  Q.    And what happens when you're exposed to Roundup over and

22  over again and it comes into contact with your skin?

23           MR. STEKLOFF:  Objection, Your Honor.

24           THE COURT:  Quick sidebar.

25       (The following proceedings were heard at the sidebar:)

1    **THE COURT:**  So I'm prepared to sustain the objection

2    because I'm virtually certain that this goes beyond his report,

3    but I wanted to give you a chance to identify something that I

4    might have missed.

5         **MS. MOORE:**  Sure.  On page 3 of his report,

6    Your Honor --

7         **THE COURT:**  You're talking about the general causation

8    one?

9         **MS. MOORE:**  The general causation report, Your Honor.

10   And this is under the background.  He starts about the

11   second sentence and he says they're mainly used with a

12   surfactant which helps glyphosate penetrate plant cells, and

13   then he continues on to talk about what the common surfactant

14   in Roundup is.

15   He says that GBF was found to be more genotoxic in animal

16   studies alone.  He goes on to explain about how, in that next

17   sentence, that it's mainly if they're exposed to GBF mainly by

18   skin and inhalation exposures.  Then he goes on to talk about

19   exposure through the urine.

20   So I do think that's in the Roundup general causation

21   opinion to be able to explain what happens when it does

22   penetrate, and that will tie into his testimony about

23   genotoxicity.

24        **THE COURT:**  Okay.  I'll allow it.

25        **MS. MOORE:**  Thank you, Your Honor.

1        (The following proceedings were heard in open court:)

2   BY MS. MOORE:

3   Q.   So let me go back to my question then.   What happens when

4   you are -- when an individual is exposed over and over again to

5   Roundup on their skin?

6   A.   So when you get Roundup on your skin, just like the

7   Roundup will penetrate the plant cells, it will penetrate the

8   cells of the skin and it will get into the tissues and it will

9   then get into the lymph system and into the blood, and

10  eventually it goes through the kidneys and it gets excreted out

11  in the urine.   Okay?

12       But during that time, it's in the tissues, it's in the

13  lymph, and it's in the blood, and so the tissues, all those

14  tissues do get exposed to glyphosate as it's going through the

15  body and out through the urine.

16  Q.   When you say "in the lymph," what does that mean?

17  A.   Well, we think about blood as being what circulates in our

18  bodies, but in the tissues, the blood circulates but also other

19  fluids without blood cells circulate and that's called the

20  lymph.   Okay?

21       So, you know, I don't know how it is for you, but if I sit

22  a long time, my feet swell.   Okay?   And why are my feet

23  swelling?   Well, it's the fluid coming out of the blood and

24  getting into the tissue and making my feet swell.   And so if I

25  get up and walk or run, that fluid will get mobilized and it

WEISENBURGER - DIRECT / MOORE

1  will get back into the circulatory system.

2      So the lymph is the circulatory system in the tissues that

3  moves fluids around, but it's separate from the blood system

4  although it's connected to the blood system.   It empties into

5  the blood system.

6  **Q.**   So when Roundup penetrates the skin, it gets into the

7  lymph system as well as the blood system?

8  **A.**   Yes.

9  **Q.**   Well, let's look at the first leg of the stool, the

10  epidemiology.   And the jury heard from Dr. Ritz last week, and

11  I am not going to go through all those studies in detail, but I

12  do want to focus on a couple of the studies that you're listed

13  as the author, Dr. Weisenburger.

14      And the first one is -- it's Exhibit 451.

15          **MS. MOORE:**   Permission to publish.   De Roos 2003.

16          **MR. STEKLOFF:**   No objection, Your Honor.

17          **THE COURT:**   Go ahead.

18  **BY MS. MOORE:**

19  **Q.**   And, Dr. Weisenburger, can you tell the ladies and

20  gentlemen of the jury what this publication is?

21  **A.**   So this is the pooled study of De Roos 2003.   This is the

22  study where they pooled the data from the case-control studies

23  done in Kansas, Iowa and Minnesota and Nebraska, and they put

24  the data altogether into one study.   They were able to do that

25  because the studies had very similar designs, very similar

1    questionnaires because they were all designed by Aaron Blair

2    and his team at the National Cancer Institute.

3         And so the purpose of this is to have a much larger study

4    where you can have more statistical power to detect significant

5    differences in people so, for example, who are exposed to one

6    chemical or another chemical.

7         And the other thing about a bigger study like this is you

8    can also do adjustments for confounding.  And "confounding"

9    means that if you're exposed to more than one chemical, how do

10   you know which of those chemicals is actually causing the

11   disease; right?  So farmers use more than one chemical.  They

12   sometimes use -- they don't use a lot of chemicals but they

13   usually use the same chemicals every year and they may use two,

14   three, four different kinds of pesticides.  Okay?

15        So a big study like this has the statistical power to

16   actually adjust for the use of the other pesticides so you can

17   focus on each of the pesticides individually and have a pretty

18   good idea of whether it increases the risk or it doesn't, and

19   that's what they were able to do in this De Roos study.

20   **Q.**   And that was published back 16 years ago or so in 2003?

21   **A.**   Yes.

22   **Q.**   Okay.  And the data that they were pooling, what period of

23   time was that collected?

24   **A.**   Well, the cancer study started in 1979, and they accrued

25   cases till 1981.

1  Q.   And, Dr. Weisenburger, I'm going to have Mr. Wolfe zoom

2  out -- zoom back in -- sorry -- and then go down to the methods

3  on page 1.

4       If you could bring that out.  Thank you.

5  A.   So there are three case-control studies.  Here they're

6  talking about Nebraska.  So Nebraska was the last case-control

7  study to be done in this group, and so we accrued cases from

8  1983 to 1986.  Okay?

9  Q.   That's the Nebraska story?

10 A.   That's the Nebraska study, yep.  Yes.

11      And then Iowa and Minnesota -- if we can go to the next

12 page -- Iowa and Minnesota was done just before the Nebraska

13 study.  So here you can see for Iowa the cases were accrued

14 from 1981 to 1983, and for Minnesota from 1980 to 1982, and

15 then the last study was the Kansas study from 1979 to '81.  So

16 it was basically cases were accrued from 1979 through 1983 in

17 those three different studies.

18 Q.   I'm going to show you a slide, Dr. Weisenburger.

19      MS. MOORE:  Ms. Melen, if I could have the Elmo,

20 please.

21 Q.   And this was shown to the -- I'm sorry.

22      This was shown to the jury during cross-examination of

23 Dr. Ritz --

24 A.   Okay.

25 Q.   -- by Monsanto's attorney, and you see at the bottom it's

1   talking about Iowa, Minnesota, Kansas and Nebraska from De Roos

2   2003.  Do you see that?

3   **A.**   Yes.

4   **Q.**   Okay.  As someone who is a co-author on the De Roos 2003

5   study, what is your opinion about the information contained on

6   this slide?

7   **A.**   Well, there's a mistake.  So in Kansas it says 1976 to

8   1982 and it was actually 1979 through 1981.  So there's a

9   mistake there.

10  **Q.**   Are the dates of collection important, Dr. Weisenburger?

11  **A.**   Well, the dates are -- the dates are important because

12  glyphosate came on the market as a formulation in 1975, and so

13  one of the questions I think that has been raised was:  Was

14  there enough time -- was there enough latency, was there enough

15  time to develop lymphoma from the time glyphosate came on the

16  market until the time these studies were started and stopped?

17  Okay?  Because it takes time sometimes to develop cancer.  It

18  doesn't happen -- it usually doesn't happen quickly.

19  **Q.**   And I'm going to stop you right there because you

20  mentioned the term "latency," and the jury has heard a little

21  bit about that.  But have you published a paper about latency?

22  **A.**   Yeah.  So when they had that meeting at the National

23  Cancer Institute to try to understand what was causing the

24  increase in non-Hodgkin's lymphoma, I was asked to talk about

25  the pathology and I also was asked to talk about the latency.

 1   And so I wrote this paper and drew some curves to sort of

 2   illustrate the principles of latency.

 3   **Q.**   And, Dr. Weisenburger, I'll ask you to turn to 1570 in

 4   your binder.

 5          **MS. MOORE:**  And permission to publish, Your Honor.

 6          **MR. STEKLOFF:**  No objection, Your Honor.

 7          **THE COURT:**  Go ahead.

 8   **BY MS. MOORE:**

 9   **Q.**   And is this, Dr. Weisenburger, a publication you authored

10   back in 1992, "The Pathological Classification of Non-Hodgkin's

11   Lymphoma for Epidemiological Studies"?

12   **A.**   Yes.

13   **Q.**   And would it be helpful for you to use your bell curve,

14   and we will -- Mr. Wolfe, if you could flip over to page 6,

15   please, of the publication.

16       Would it be helpful if you could use the bell curve to

17   explain the concept of latency?

18   **A.**   Yes.  So --

19   **Q.**   And I have a blowup.

20   **A.**   Okay.

21          **MS. MOORE:**  Your Honor, permission for him to come

22   down.

23          **THE COURT:**  Sure.

24   **BY MS. MOORE:**

25   **Q.**   Okay.  And, Dr. Weisenburger, I'm going to have you come

1    right over here so the court reporter can also hear you.

2    **A.**   I'll speak up.

3    **Q.**   And if you can explain to the ladies and gentlemen of the

4    jury what we're looking at here.

5    **A.**   So this is -- there's two latency curves here.  Okay?  And

6    by latency we mean how long does it take -- from the first

7    exposure to a chemical or an agent, how long does it take to

8    actually get the disease.  Okay?  And for cancer, it's usually

9    years -- okay? -- Because it requires a lot of exposure and

10   genetic damage to develop into a cancer.

11       So I drew two different curves.  One is kind of based on

12   my knowledge of the literature on solvent exposure.  So

13   solvents like benzine and paint thinners and those kind of

14   things can cause non-Hodgkin's lymphoma.  There was a nice

15   literature on that, and what it said is that on average it

16   takes about 20 to 25 years to develop non-Hodgkin's lymphoma.

17   Okay?

18       So what that means is about half of the cases of

19   non-Hodgkin's lymphoma develop in the first 20 years or

20   25 years, and the other half more or less develop later.  Okay?

21   So the curve can go anywhere from two years for the first cases

22   all the way out to 30 or maybe even 40 years.

23       So when we talk about latency, we usually talk about the

24   median latency, what is the average time it takes to get a

25   cancer.  And so this curve is a curve for what I would consider

1  repeated low-dose chronic exposure over many years, like a

2  mechanic would get or a machinist who is using a lot of

3  solvents.  Okay?

4  **Q.**  And is that curve B?  Is that what you're referring to?

5  **A.**  The curve B, yeah, the lower curve that goes out a long

6  time.  Okay?  Because with low-dose exposures to agents,

7  usually it takes a longer period of time.

8      The other curve shows what the curve might look like if

9  you had very high exposures to a very toxic or carcinogenic

10  agent.  Okay?  And in that case you would expect -- because

11  it's high dose and it's very toxic, you would expect to see the

12  cancers come up much earlier, the peak or the median would be

13  much earlier, and then they would trail off a little bit like

14  this (indicating) with a bit of a longer tail.

15      So I think for glyphosate it's more likely that it has a

16  curve like this B curve, like we saw for solvents, where it

17  takes a fairly long time to develop the cancers and one has to

18  wait a long time to see all the cancers, probably out to 30 or

19  40 years.

20      So in the De Roos study, we would be looking at cancer

21  that developed in the first part of this curve.  Okay?  The

22  latency is short, but we know that there are people who get

23  cancer early and there are people who get cancer later; right?

24      And so --

25  **Q.**  Meaning from their first exposure?

1   **A.**   Meaning from their first exposure.

2       So, you know, there are people who get cancer early, like

3   at two years, three years, four years, five, ten years after

4   exposure.  Okay?  And that's this part of the latency curve

5   (indicating).

6       But you have to wait a long time to see all the cases.  So

7   the cases in the De Roos study would have been on the early

8   part of this curve, and I think that the De Roos study is a

9   valid study because of that.

10  **Q.**   And, Dr. Weisenburger, what's the conclusions that were

11  drawn, then, from the De Roos study in 2003?

12  **A.**   Well, the De Roos study looked at a lot of pesticides, and

13  one of the conclusions or one of the findings was that

14  glyphosate gave an increased risk for non-Hodgkin's lymphoma of

15  about twofold increased risk.

16      And the nice thing about the De Roos study is they could

17  do this adjustment for confounding by other pesticides.  So

18  they could really focus more on glyphosate, what is the real

19  odds ratio for glyphosate; and it was statistically significant

20  even after all the adjustments for the use of other pesticides.

21  **Q.**   Thank you, Dr. Weisenburger.  Why don't you take a seat

22  back.  I'll pull this down.

23          **THE COURT:**  Is now a good time to take a break and

24  make sure our feet don't start swelling?

25          **MS. MOORE:**  Yes, Your Honor, it is.

1          **THE COURT:**  Okay.  Why don't we take a break.  We'll

2    resume at quarter to 11:00.

3          **MS. MOORE:**  Thank you, Your Honor.

4       (Proceedings were heard out of the presence of the jury:)

5          **THE COURT:**  Be back at quarter till.

6          **MS. MOORE:**  Thank you, Your Honor.

7                  (Recess taken at 10:34 a.m.)

8              (Proceedings resumed at 10:47 a.m.)

9       (Proceedings were heard out of presence of the jury:)

10         **THE COURT:**  Just before I forget, on Friday, we will

11   end the trial day at 1:00 o'clock and not take a lunch break.

12   So we will maybe have one extra short break, and I think we

13   will be able to get in almost the amount of time that we are

14   anticipating; but that's how the schedule will go on Friday.

15         **MS. MOORE:**  Okay.  Thank you, Your Honor.

16         **MR. STEKLOFF:**  We might raise -- Your Honor, we should

17   not do it now, just where we are on all witnesses at the lunch

18   break because of flights.  And so we want to see how far we get

19   and then we can discuss it, if that's okay.

20         **THE COURT:**  Okay.  Go ahead and bring the jury back

21   in.

22      (Proceedings were heard in the presence of the jury:)

23         **THE COURT:**  You can resume.

24         **MS. MOORE:**  Thank you, Your Honor.

25   \\\

1  BY MS. MOORE

2  **Q.**   Dr. Weisenburger, I want to go back to the *De Roos* 2003

3  article.  I just have a couple final questions on that before

4  we move on.  If you could -- if we could publish that, if we

5  can turn over to page 7.

6  **A.**   What number is that?

7  **Q.**   It's 451.  And it is up on the screen too,

8  Dr. Weisenburger.

9  **A.**   Okay.

10  **Q.**   I want to draw your attention on page 7, that's the

11  paragraph.  It starts the very last sentence there.  And,

12  Dr. Weisenburger, this last sentence that we have highlighted,

13  if you could, it says:  These few suggestive findings provide

14  some impetus for further investigation into the potential

15  health effects of glyphosate, even though one review concluded

16  that the active ingredient is noncarcinogenic and nongenotoxic.

17       First of all, what does it mean to say "noncarcinogenic"?

18  **A.**   Well, that means a chemical does not cause cancer, either

19  in people or in animals.

20  **Q.**   And then it says nongenotoxic.  What does that mean?

21  **A.**   It means that the chemical doesn't damage the DNA or the

22  chromosomes that govern the cell.

23  **Q.**   And for glyphosate, based on your review of the literature

24  and your study of the causes of NHL in the last 40 years, do

25  you agree with where it says this one review concluded that the

1    active ingredient, meaning glyphosate, is noncarcinogenic and

2    nongenotoxic?

3    **A.**   That review was written some time ago, and it was a review

4    that was written by -- it was sponsored by industry.  You know,

5    today we know a lot more about Roundup and glyphosate.  My

6    conclusion was that from my review of the literature, the old

7    and the new literature, that glyphosate is both genotoxic and

8    carcinogenic.

9    **Q.**   So it has got a footnote there, footnote 50, and if we

10   could flip over to page 9 of the *De Roos* study.  And, Mr. --

11           **MS. MOORE:**  Thank you, Mr. Wolfe, great.

12   **BY MS. MOORE**

13   **Q.**   We will highlight footnote 50.  It is citing to an article

14   by a G.M. Williams from 2000.  Are you familiar with this

15   publication?

16           **MR. STEKLOFF:**  Objection, Your Honor.  May we

17   approach?

18           **THE COURT:**  Sure.

19      (The following proceedings were heard at the sidebar:)

20           **MR. STEKLOFF:**  Your Honor, I think this is wading into

21   Phase Two territory.  The *De Roos* authors chose to cite

22   whatever it is they chose to cite.  I don't think it is

23   appropriate to now try to put -- bring into the Phase One

24   portion that this article, which is already cited industry

25   supported, was funded by Monsanto and Monsanto authors

 1    involved.  That was disclosed in the article.  I mean, I think

 2    there are separate Phase Two allegations about ghostwriting.

 3    We don't think --

 4         **MS. MOORE:**  I can probably cut it off.  I'm not going

 5    to go any further.  I wanted to point out what the footnote

 6    was.  I was asking him, is this the one sponsored by the

 7    industry, and move on.

 8         **MR. STEKLOFF:**  I think that, Your Honor, we heard it

 9    was sponsored by the industry.

10         **THE COURT:**  I think that's enough.  We have already

11    heard that.

12         **MS. MOORE:**  Great.  Thank you.

13         (Sidebar ended.)

14         (The following proceedings were heard in open court:)

15    **BY MS. MOORE**

16    **Q.**    And, Dr. Weisenburger, the *De Roos* 2003 study, what is the

17    significance of it today, 16 years later?

18    **A.**    Well, it is still a very important study because it was a

19    large pooled study that looked at a large number of different

20    pesticides, including glyphosate and Roundup.  And the

21    importance for today, here, is that even after adjusting for

22    the use of the chemicals, there was an over twofold increase in

23    risk associated with glyphosate that was statistically

24    significant.  And -- so that's an important finding.

25    **Q.**    And for the epidemiological studies like *De Roos*, are we

1    looking at glyphosate itself or are we looking at the

2    formulation like Roundup?

3    A.    Formulations like Roundup, yes.

4    Q.    And so when you say it is an over twofold risk for

5    developing non-Hodgkin's lymphoma, what -- what is an over

6    twofold risk?

7    A.    Well, that means that people who were exposed to Roundup

8    were twice as likely to develop non-Hodgkin's lymphoma as

9    people who weren't exposed to Roundup.

10          MR. STEKLOFF:  Objection.  I move to strike.

11          THE COURT:  Overruled.

12   BY MS. MOORE

13   Q.    And, now, did you rely upon other case control studies in

14   forming your opinion in this case?

15   A.    Yes.  There were six case control studies.

16          MS. MOORE:  Your Honor, if I can have him come down.

17   I have shown this to counsel for defense already.

18          THE COURT:  Okay.

19   BY MS. MOORE

20   Q.    Dr. Weisenburger, we blew up the six studies.  And is this

21   a chart that you created?

22   A.    Right.  This is the table from my report on general

23   causation.

24   Q.    And I will tell you, Dr. Weisenburger, that Dr. Ritz went

25   through each of these studies, so I'm just going to ask you if

WEISENBURGER - DIRECT / MOORE

1   you can summarize for the ladies and gentlemen of the jury what

2   about these six studies -- let me move it up a little bit.  It

3   is kind of small -- what about these six studies did you rely

4   upon in forming your opinion as to whether Roundup causes

5   cancer -- causes non-Hodgkin's lymphoma in humans?

6   **A.**   So the important findings from the studies are that five

7   of the six studies, with the exception of *Orsi*, showed an

8   increased risk for non-Hodgkin's lymphoma, a two to threefold

9   increased risk.

10  **Q.**   Which ones are those?

11  **A.**   It's one, two, three, four and six.  So five out of the

12  six studies showed an increased risk.  Here you see threefold

13  risk.  Here you see a twofold risk.  I bolded the statistically

14  significant increased risk so that they stand out a little bit.

15  **Q.**   And so why did you bold the statistically significant

16  ones?

17  **A.**   Well, because I think that one can have more reliance on

18  the numbers if they are statistically significant, okay.  There

19  is less chance for random error, okay.

20  **Q.**   If the numbers are not statistically significant, do you

21  ignore those numbers?

22  **A.**   No.  You look at all the numbers because you can gain

23  information from looking at the numbers and how the numbers

24  trend and how the numbers change.  So you also look at the

25  numbers that are not statistically significant but still

perhaps increased.

So here is the *De Roos* study with the increased risk at 2.1.  And it is statistically significant, okay.  And it was adjusted for other pesticides.  There are two other studies that were also adjusted for other pesticides to rule out this issue.

One was the *Hardell* study.  It is a small study with only eight exposed people.  The risk there was a threefold increased risk.  And when they adjusted for the use of other pesticides, the risk went down to 1.85, almost a twofold increased risk. So the risk decreased, which is what you would suspect if there are other chemicals causing non-Hodgkin's lymphoma, right?  The risk would decrease, but it didn't go down to 1.  It is still almost a twofold risk, even though it is not statistically significant.  So we would consider that in evaluation of that study.

And the same thing happened when they did adjustments in the *Eriksson* study where the risk went from about 2 down to 1.5.  It was statistically significant, but then it became -- it was no longer significant.  It was elevated, but it was no longer significant.  So again, you see the risk going down, but not going down to 1.  There is still a 50 percent increased risk there, okay.

The other really important thing about -- about these studies is that a couple of the studies were able to look at

WEISENBURGER - DIRECT / MOORE

1   dose response.  In other words, by dose response what I mean is

2   if people were exposed to the chemical for longer or more

3   intense exposure, you would expect if there was a dose

4   response, the people with the low dose would have a low risk

5   and the people with the higher dose would have a higher risk,

6   right.  It makes sense.  So there were two studies that did

7   that -- they had the ability to do that.  One was the *McDuffie*

8   study, and what they found was that if people were exposed two

9   days or less per year, they made it by definition 1, okay.  It

10  is 1.

11  **Q.**   What does that mean?

12  **A.**   It means that they didn't really have an increased risk,

13  okay.  But if they were exposed more than two days per year,

14  the risk increased to over 2, and it was statistically

15  significant.

16       So this is a dose response.  You have people who -- they

17  have low exposure.  The risk is not increased.  If they have a

18  high exposure, the risk is increased.  And this 1.2 is really

19  an average of these two numbers, okay.

20       They did the same thing in the *Eriksson* study.  They

21  divided their cases and controls into those that had less

22  than -- ten days or less cumulative exposure, and those that

23  had more than ten days of exposure, and the same thing

24  happened; that there was an increased risk here.  It was not

25  statistically significant for those who had less exposure, but

 1    it was over twofold increased risk for those who had more than

 2    ten days of exposure to Roundup.  And it was statistically

 3    significant.  And dose response is really important because it

 4    is confirmatory evidence that that chemical is actually having

 5    an effect.

 6        Let's see what else is important.  The two studies that

 7    weren't statistically significant are really the small studies,

 8    and don't have much power to find statistically significant

 9    increases.

10        MS. MOORE:  Mr. Wolfe, if you can go back to 451, *De*

11    *Roos* 2003, and if you can turn to page 5, table 3.

12    BY MS. MOORE

13    Q.   I'm going to ask you, Dr. Weisenburger, you have got

14    *De Roos* 2003 on your chart here; and you testified a few

15    minutes ago there was an over twofold risk, increased risk.  Is

16    that this 2.1 number?

17    A.   Yes.

18    Q.   Okay.  And when you look at the table, it shows on *De Roos*

19    the 2.1.  It is under the column Logistics Regression.  What

20    does that mean?

21    A.   So logistics regression is the statistical method that

22    they used to adjust for the other pesticides and to deal with

23    this issue of confounding, okay.  So it is a statistical

24    method.  They also used another statistical method called

25    hierarchical regression, and when they did that, the risks --

1    the risks were lower.  So the risk went to -- if I can write

2    this here -- 1.6, and the confidence intervals were like this

3    0.9 to 2.8.

4        So when they use this hierarchical regression method,

5    which is a more conservative method, the risk decreased but it

6    didn't go to 1.  It went down to 1.6, so the risk was still

7    increased.  It just --

8    Q.   So what is the significance that it didn't -- when you use

9    a conservative methodology that it didn't go to 1?

10   A.   Well, that -- it looks like there is still an increased

11   risk of about 60 percent, even when you use a very -- a more

12   conservative method to do your adjustment.

13   Q.   Thank you, Dr. Weisenburger.  I will have you take a seat

14   on the stand.

15       In addition to the *De Roos* 2003 epidemiological study, did

16   you -- have you also participated in another pooled project?

17   A.   Yes.  Another pooled project, a more recent project, was a

18   project called the NAPP study, which stands for North American

19   Pooled Project.  And in the NAPP study, the cases -- we used

20   the cases from *De Roos* from the three North American case

21   control studies, and we used the cases from *McDuffie*, which was

22   the Canadian -- across Canada case control study.  So they

23   pooled the data from *De Roos* and from *McDuffie* to get, again,

24   more cases so we could have more power to detect significant

25   differences.  And it also allowed us to -- in that much larger

WEISENBURGER - DIRECT / MOORE

1   group -- do adjustments for confounding due to use of other

2   pesticides.

3   **Q.**   When you say it allowed you because you had a larger

4   group, can you explain why that is?

5   **A.**   It is hard to do adjustments when you have a small number

6   of cases, because if you do the adjustments, everything goes

7   away.  So you have to have larger numbers to have the

8   statistical power to detect differences.  So if you have large

9   numbers, you can detect small differences.  If you have small

10  numbers, at best you can detect large differences; but often

11  you can't even detect differences.  So the idea was to pool all

12  the data together into one bigger study where you had more

13  statistical power to -- to look at the data and also you could

14  do the adjustment for confounding of use of other pesticides.

15  So that's what we did in the NAPP study.

16  **Q.**   And the NAPP study, is that currently published?

17  **A.**   It is currently submitted to a journal; has been reviewed;

18  been sent back for revisions.  So we are hoping it will be

19  published in the next month or two, but it has not actually

20  been published yet in a journal.  We are close.

21  **Q.**   What is an abstract?

22  **A.**   So an abstract is a summary of the research.  Often one

23  writes abstracts when you want to present your research at a

24  meeting of scientists.  And so the NAPP study has been -- the

25  data from that study has been presented at three different

1  international meetings over the last few years.  And for each

2  of those meetings, in order to get it accepted for

3  presentation, you have to write a summary of your research and

4  your findings and your conclusions.  And that's called an

5  abstract.

6  Q.   Are abstracts peer reviewed?

7  A.   Yes, they are.  For meetings like this, they are peer

8  reviewed.  And, you know, they select the ones they think are

9  the most relevant or the most important or the best.

10  Q.   And for the NAPP abstract, it's been reviewed by your

11  peers and approved for the authors, then to present on the data

12  from the NAPP; is that correct?

13          MR. STEKLOFF:  Objection.  Leading.

14          THE COURT:  Sustained.

15  BY MS. MOORE

16  Q.   Has the --

17          THE COURT:  When I sustain an objection, that means

18  you don't answer.

19          THE WITNESS:  I see.  Thank you.

20          MS. MOORE:  I will rephrase it.

21  Q.   Dr. Weisenburger, can you explain to the jury what it

22  means that the abstract of the NAPP has been peer reviewed?

23  A.   So before the meeting happens -- a few months before the

24  meeting happens they put on an invitation to submit your

25  research if you want to present it at the meeting.  So what you

WEISENBURGER - DIRECT / MOORE

1   do is you write an abstract.  You send it into the organization

2   that is sponsoring the meeting, and then they find experts who

3   will review a stack of abstracts and rank them -- score them.

4   And then usually the abstracts with the best scores are the

5   ones that get presented at the meeting.  The results from the

6   NAPP study were presented at three different international

7   meetings over the last few years.

8   Q.   And who attends these international meetings?

9   A.   Some of the meetings are mainly epidemiologists.  Other

10  meetings are a mixture of epidemiologists and cancer

11  researchers and sometimes clinicians.  It depends on who

12  sponsors the meeting.

13  Q.   And, Dr. Weisenburger, I'm going to ask you to explain the

14  results from the NAPP, and would it be helpful to you to use a

15  blowup to do so?

16  A.   Sure.

17  Q.   And did you pull out one of the charts from the

18  presentation to do so?

19  A.   Yes.

20  Q.   Okay.

21       MS. MOORE:   Your Honor, Dr. Weisenburger, can you come

22  on down.  I'm not going to have you go through the entire

23  presentation because I think the jury would not want to sit for

24  that, but I do want to pull up this chart from the presentation

25  and --

1          **THE COURT:**  I take it there is no objection to this?

2          **MS. MOORE:**  Your Honor, I should have said on a break

3     we went through all the blowups, and my understanding is there

4     is no objection to any of those.

5          **THE COURT:**  Okay.

6          **MR. STEKLOFF:**  That's correct, Your Honor.

7          **MS. MOORE:**  I'm sorry, Your Honor.  I should have told

8     you that.

9          **THE WITNESS:**  So as I said, in the NAPP study, we

10    pooled the data from *De Roos*, the three North American studies

11    and across Canada study, and then did similar analyses like in

12    the other papers.  And one of the important findings from the

13    NAPP study was the analysis of dose response.  And like in

14    *McDuffie* -- and this is the data for overall -- all of

15    non-Hodgkin's lymphoma.  So if you look at the number of days

16    per year that it was handled, these are the people who didn't

17    use glyphosate.  By definition their risk is 1.

18         Here you have people who used it two or less days per

19    year, and here you have people who used it more than two days

20    per year.  And what you can see is that for non-Hodgkin's

21    lymphoma as a whole, there wasn't an increased risk for use

22    less than two days or less per year.  It is about --

23    approximately 1.  It is a little less than 1.

24         But if you look at those who used it more than two days

25    per year, the risk was almost -- almost a twofold increase.  It

WEISENBURGER - DIRECT / MOORE

1  was statistically significant.  And you can see that this is a

2  trend analysis, a value for trend analysis.  And it shows that

3  there is a dose response here that is statistically

4  significant.

5  **BY MS. MOORE:**

6  **Q.**   And the overall, who falls in the overall category?

7  **A.**   That is all non-Hodgkin's lymphoma.

8  **Q.**   Okay.  And with all -- overall with non-Hodgkin's

9  lymphoma, you still saw the dose response?

10  **A.**   Yes.

11  **Q.**   Okay.  And what is a p-trend?

12  **A.**   P-trend just -- it tells you that this number is

13  significantly smaller than this number, and the risk is

14  increasing with increasing dosage.  So it is a way to do a

15  statistical analysis of is this number really significantly

16  different than this number.

17  **Q.**   Okay.  And then you also have a column here for DLBCL.

18  What does that stand for?

19  **A.**   So that is diffuse large B-cell lymphoma.  So one of the

20  other advantages of pooling all the cases together in the NAPP

21  study is you can look at actual subtypes of non-Hodgkin's

22  lymphoma.  Remember, we said there were a lot of subtypes.

23  Well, this is the standard.  It stands for follicular lymphoma.

24  This is diffuse large B-cell lymphoma.  This is small

25  lymphoblastic lymphoma.  They are the three most common types

1    of non-Hodgkin's lymphoma.  And then they group all the other

2    ones together in sort of an enterogenous category.

3         If you focus on the diffuse large B-cell lymphoma, which

4    is the disease that Mr. Hardeman has, again you see for low

5    dose exposure the risk is not increased.  But for higher dose

6    exposure, you have almost a 2.5 times increase in risk for

7    non-Hodgkin's lymphoma, using it greater than two days per

8    year.  And, again, the trend analysis is statistically

9    significant with the p-value of .02.

10        So this study shows that there are significant increases

11   in non-Hodgkin's lymphoma as a group as well as for diffuse

12   large B-cell lymphoma as one of the -- really the most common

13   subtype of non-Hodgkin's lymphoma in North America.

14   **Q.**   So the results of the NAPP study, how does that factor

15   into your opinion in this case as to whether Roundup -- whether

16   Roundup increases one's risk of developing non-Hodgkin's

17   lymphoma?

18   **A.**   Well, because you see an increase that is statistically

19   significant with increased dose.  You can see a dose response.

20   You see it for all the different subtypes.  Although, for the

21   other subtypes, the diffuse large B-cell lymphoma, it is not

22   statistically significant, probably because of small numbers.

23   But for diffuse large B-cell lymphoma, you see this dose

24   response.

25        The other thing that is important about NAPP is in NAPP

WEISENBURGER - DIRECT / MOORE

1    they were able to adjust for a whole bunch of other things that

2    could be confounders, okay.  So they adjusted for age and sex

3    and state or providence, whether there was a history of genetic

4    cancer in first-degree relatives which increases risk, whether

5    it was a proxy respondent rather than the individual case.

6    Q.    A proxy respondent, meaning --

7    A.    It would be a wife of a man who died of non-Hodgkin's

8    lymphoma or the husband of a woman who died of non-Hodgkin's

9    lymphoma.

10         Use of protective equipment because that decreases risk.

11   And then most importantly they adjusted for three pesticides --

12   three herbicides -- 2, 4-D, dicamba, and malathion -- actually

13   these are insecticides.  So they adjusted for other pesticides

14   that are known to cause non-Hodgkin's lymphoma, and the use was

15   correlated with the use of glyphosates.  So these are the

16   important chemicals to adjust for so that we know we are

17   looking mainly at the effect of glyphosate and not at the

18   effect of 2,4-D or dicamba or malathion.

19         So these numbers are all adjusted to rule out confounders.

20   And it is the most powerful study of the case control studies

21   that does that, okay.

22   Q.    All right.  Thank you, Dr. Weisenburger.  I will have you

23   go ahead and take a seat.

24         The jury has heard testimony also about the Agricultural

25   Health Study.  Are you familiar with that?

1    **A.**    Yes.  I also reviewed both the early paper on the

2    Agricultural Health Study as well as the recent one, which was

3    published last year.

4    **Q.**    And did you consider the publication -- the two

5    publications from the AHS in forming your opinions in this

6    case?

7    **A.**    Yes, I did.

8    **Q.**    And what is -- and how did these two publications from AHS

9    factor into your opinion in this case?

10   **A.**    Well, I considered them because I think the Agricultural

11   Health Study is an important study of -- but it -- its results

12   don't agree with the case control studies.  It didn't really

13   show an increased risk for non-Hodgkin's lymphoma.

14   **Q.**    Is the AHS study a different type of study than the six

15   case control studies that you have highlighted for the jury?

16   **A.**    Yes.  So the -- so the Agricultural Health Study is what

17   we call a cohort study.  So I don't know whether Dr. Ritz

18   explained that.

19   **Q.**    She did, but if you want -- if it is important for you

20   just to briefly --

21   **A.**    What they did in the Agricultural Health Study is they

22   took licensed pesticide applicators -- so they were mainly

23   farmers but also commercial applicators -- and they identified

24   this group because they all had to take an exam to -- to

25   have -- to use certain restricted pesticides.  So they were

1    either farmers or pesticide applicators from either Iowa or

2    North Carolina, I believe.  And they were able to collect a

3    large number, I think about 50,000 farmers and pesticide

4    applicators.

5         And the idea was we are going to gather data on them at

6    the time of the start of the study, and then we are going to

7    follow them for 10, 20, 30 or more years and see which ones get

8    non-Hodgkin's lymphoma; and they also looked at lots of other

9    cancers.  Non-Hodgkin's lymphoma is just one.  And then see

10   over time who gets the non-Hodgkin's lymphoma, and then see if

11   you can relate back to their exposures to the different

12   chemicals to try to figure out which of the chemicals were

13   causing the non-Hodgkin's lymphoma.

14        So that was the design of the cohort study.  It is a

15   different design than the case control study.

16   Q.   And in what way?

17   A.   Well, in that -- in the cohort study you gather -- in the

18   case control study you just gather your information at one

19   point, and you are kind of looking backwards at what were the

20   exposures before you got the non-Hodgkin's lymphoma, and you

21   are comparing the exposures in the cases with lymphoma to those

22   who didn't have lymphoma.  So that's your cases in your

23   controls.

24        In the cohort study you are starting with a whole group of

25   people who don't have cancer, okay.  So you kind of eliminate

 1   all those people who have had cancer, and you just pick people

 2   who don't have cancer and haven't had cancer, okay.  So it is

 3   kind of a -- it is a group that you can follow that doesn't

 4   have cancer, and then you see who is going to get the cancer

 5   over a long period of time.

 6        So you gather data.  At the initial registration you ask

 7   them -- you know, just like in the case control study, you ask

 8   them what did you use, how long did you use it, how many years

 9   did you use it, how many days per year did you use it, et

10   cetera.  And then once you have that baseline data, then the

11   idea is that every few years you recontact them and you get new

12   information.  Now what are you using, how are you using it, did

13   you stop using this, did you start using that, how much are you

14   using.  And you can calculate.  You can see what happens over

15   time, okay.  So it's a prospective study.

16        So that's the design of the Agricultural Health Study.

17   **Q.**   So when determining your opinion in this case, how much --

18   well, what weight did you give to the Agricultural Health

19   Study?

20   **A.**   Well, I didn't give it a lot of weight.  I weighted it

21   probably like I weighted each of the case control studies.  And

22   the reason I didn't give it a lot of weight, because there are

23   some real significant issues and problems with the Agricultural

24   Health Study, particularly with regard to Roundup, okay,

25   because of how they did the study and how Roundup increased

**WEISENBURGER - DIRECT / MOORE**

1  dramatically during the middle of the first phase of the study.

2  **Q.**   That was in and around 1996?

3  **A.**   Yes.

4  **Q.**   And what about the fact that Roundup sales increased in

5  the '90s -- do you believe -- how did that impact the AHS?

6  **A.**   Well, right at the end of the registration period when

7  they were getting the initial information from the applicators,

8  the genetically modified crops started being marketed by

9  Monsanto.  And so farmers liked using these new seeds because

10  they could plant the crop and then use the pesticide to get rid

11  of the weeds.

12       **MR. STEKLOFF:**  Objection --

13       **THE COURT:**  Hold on a second.  There has been an

14  objection, but it is overruled.

15       You can continue.

16       **THE WITNESS:**  So anyway, it became very popular among

17  farmers to use these genetically modified plants, corn and

18  soybean and others, and then use glyphosate or Roundup to treat

19  because they could -- they didn't have to worry about filling

20  the corn or the soybeans because they were resistant.  They

21  just killed the weeds.  So it wasn't -- I think it was a

22  scientific breakthrough.

23       But this markedly increased use took off right at the

24  latter part of the registration period, and then continued to

25  go for years and years, okay, to go up.  And I think you see --

1    you have seen the diagram of that earlier in the case.

2        So -- and then they did their first follow-up interview --

3    or follow-up questionnaire.  So about five years later after

4    the initial registration and gathering the first set of data,

5    they contacted all of the people -- all the applicators, and

6    they asked them, Well, what is -- what has happened in between?

7        But one of the problems is they didn't ask for each year

8    in between.  They just asked for the last year that they

9    farmed.  So they didn't get data on all of the -- all the

10   information that they should have gotten.

11       And then the other really big problem with this study is

12   that only 63 percent of the applicators responded to the

13   questionnaire.  So there was a large proportion of the

14   applicators who didn't respond to the second questionnaire,

15   okay.  So they had no data on what happened to them in terms of

16   their pesticide use and other things after that initial

17   registration.

18       So to have a really good, successful cohort study, it is

19   really dependent on getting good information at the different

20   periods as you follow the people because of the changes --

21   their pesticide use changes.  They use new pesticides.  They

22   stop using pesticides.  They start using some pesticides more,

23   like glyphosate.  And so you have to gather all that data,

24   okay, to really make sense of what happens in the end.

25   \\\

WEISENBURGER - DIRECT / MOORE

1    BY MS. MOORE:

2    **Q.**   And if you aren't able to gather all the data, then what

3    happens?

4    **A.**   Well, you misclassify people.  So, for example, if

5    somebody at the start of the study didn't use Roundup and then,

6    say, in 1996 they say, Well, this is great stuff.  I'm going to

7    start using the Roundup, but they don't answer the follow-up

8    questionnaire, you wouldn't know that they started using

9    Roundup.  And so when you use the data from the initial

10   questionnaire, they would be one of your non-users but, in

11   fact, they were using it, okay.

12       The same thing happens if they were using it -- say they

13   were using it in small amounts, okay.  And then suddenly

14   decided, Well, I'm going to treat my corn with glyphosate and

15   I'm going to use these new seeds, okay.  So they go from a low

16   user to a high user.  But if you don't gather the information

17   about what happened, you think they were a low user when they

18   were really a high user, okay.

19       So there was a lot of this exposure misclassification that

20   occurred in the people who didn't fill out the second

21   questionnaire.  And then they also had -- they had no real

22   information on the people who did fill out the second

23   questionnaire for all the years between the initial

24   registration and the last year of farming, okay.  So there was

25   a lot of information that was missing, okay.

WEISENBURGER - DIRECT / MOORE

1    So this is a bad thing for a cohort study because you

2    could say, Well, I'm just going to analyze the data for the

3    people who filled out the first questionnaire and who filled

4    out the follow-up questionnaire.  I'm going to note all those

5    people who didn't do the follow-up questionnaire, all right.

6    But what happens then is you have a selection bias because the

7    people who filled out the questionnaire the second time may be

8    very different from the people who didn't fill it out, okay.

9    And, in fact, this was true in this study.

10    So the alternative was to do this imputation, and probably

11    Dr. Ritz told you about that.  What they did is they -- based

12    on the characteristics of the group that didn't fill out the

13    questionnaire the second time, and the people who did fill out

14    the questionnaire the second time, they tried to guesstimate --

15    basically guesstimate what the first group who didn't fill out

16    the questionnaire would actually have done.  So they attributed

17    to them some use, okay, or no use.  And they had to do that

18    also for the people who filled out the second questionnaire

19    because they didn't have use data for 6 to 12 years.

20    So there is a potential here for -- a significant

21    potential for what we call exposure misclassification, okay.

22    It was what we called nondifferential; that it could go either

23    direction, okay.  And when that happens, the power of the study

24    is markedly decreased because you have got a lot of noise, and

25    it becomes much more difficult to detect a true increased risk

 1    because of all of the misclassification of the cases.  And this

 2    is the major problem with the Agricultural Health Study.

 3        So I didn't -- I evaluated it.  I considered it.  But I

 4    didn't give it any more weight than any one of the case control

 5    studies.

 6    Q.   And, Dr. Weisenburger, if someone only looked at the AHS

 7    study, the publication AHS study, and did not look at the case

 8    control studies, what would you say about that?

 9    A.   Well, it's not valid because you should look at all the

10    epidemiologic data.  And, I mean, if you take a superficial

11    look at the Agricultural Health Study with regard to Roundup,

12    you might think there is no increased risk.  But if you really

13    understand what happened in this study, you can say, Well, you

14    know, maybe this is -- this study is a false-negative.  Maybe

15    there really was a risk there, but because of the fact that

16    people didn't fill out the follow-up questionnaire and didn't

17    gather all the data on the people who did, maybe this study

18    isn't as informative as it could have been.

19    Q.   And I want to switch gears now, and the jury has heard

20    about something called meta-analysis.  Did you review

21    meta-analysis in forming your opinion in this case?

22    A.   Yes.  So there were a number of meta-analyses that were

23    done, including the five case control studies that didn't

24    include the Cocco study because it was a small study, so

25    including the five case control studies that we talked about

WEISENBURGER - DIRECT / MOORE

1    already as well as the Agricultural Health Study.

2    **Q.**   Let's turn to one of the first ones, and it's 1102.

3             **MS. MOORE:**  Permission to publish.

4             **MR. STEKLOFF:**  No objection, Your Honor.

5             **THE COURT:**  Go ahead.

6    **BY MS. MOORE**

7    **Q.**   Are you familiar with the Chang publication from 2016?

8    **A.**   Yes.  So this is an industry-sponsored review of

9    glyphosate exposure, and --

10   **Q.**   Dr. Weisenburger, if I can stop you for a second.  What do

11   you mean when you say "industry sponsored"?

12   **A.**   Well, these people were hired by industry to write this

13   paper, okay.

14   **Q.**   And I think if we turn to page 24, there is a disclosure

15   as to the funding.  And who funded the -- oh, I'm sorry.  Who

16   is listed under the funding section of the Chang meta-analysis?

17   **A.**   Monsanto.

18   **Q.**   And what is Chang -- what conclusions did you draw from

19   Chang?

20   **A.**   Well, Chang did a very detailed analysis that -- Chang and

21   Delzell are both epidemiologists.  They did a detailed

22   analysis.  They came to a different conclusion than I did, than

23   the IARC did, with regard to the case control studies, and

24   they --

25             **MR. STEKLOFF:**  Objection, Your Honor.

1          **THE WITNESS:** -- put a lot of reliance --

2          **THE COURT:** Hold on. There is an objection.

3      Basis?

4          **MR. STEKLOFF:** Motion in limine Number 1 from the --

5          **THE COURT:** Overruled.

6  **BY MS. MOORE**

7  **Q.** You can go ahead.

8  **A.** So they did a meta-analysis including the -- and including

9  the first AHS study, the one by *De Roos*, okay. And they found

10 an increased odds ratio of 1.3 that was statistically

11 significant. So taking all of the data from the case control

12 studies and the AHS -- the AHS, the cohort study, they still

13 found an increased risk of 30 percent that was statistically

14 significant.

15     The IARC did the same thing and had the same finding,

16 okay. And the first case -- and the first meta-analysis had a

17 slightly higher finding, but they didn't do all the adjustments

18 that IARC and Chang and Delzell did. So all of the --

19 **Q.** Which -- sorry, Dr. Weisenburger. Which is the first

20 meta-analysis that you are referring to?

21 **A.** By Schinasi.

22 **Q.** Schinasi. Okay.

23     And you also mentioned that IARC did a meta-analysis, and

24 what was the overall conclusion from IARC with respect to

25 glyphosate?

1   **A.**   Well, the overall conclusion was that it is a probable

2   carcinogen.  They gave it a rank of 2A.  So we say it is

3   probably carcinogenic in humans.

4        The IARC finding was the same as the Chang and Delzell

5   finding because they did the analysis the same way.

6   **Q.**   And then if we -- there was -- I think you mentioned there

7   was a fourth meta-analysis.  And which one is that?

8   **A.**   So there was recently a meta-analysis that was done by

9   some researchers from the University of Washington.  Zhang is

10  the first author.

11           **MS. MOORE:**   If we could -- I would ask if we could

12  publish 554.

13           **MR. STEKLOFF:**  No objection, Your Honor.

14           **THE COURT:**  Go ahead.

15           **THE WITNESS:**  What is the number?

16           **MS. MOORE:**  554.

17           **THE WITNESS:**  Okay.

18  **BY MS. MOORE**

19  **Q.**   Is this the Zhang meta-analysis?

20  **A.**   Yes, it is.

21  **Q.**   And you said recent.  When did the Zhang meta-analysis,

22  when did it come out for publication?

23  **A.**   Well, it -- it is -- it was just accepted for publication.

24  So it hasn't actually been published, but they put the paper

25  online so people could read it actually before it is published

1    in the journal.  So this is the online version of the paper.

2    **Q.**   And it looks like it is a month old today; right?

3    **A.**   Yes.

4    **Q.**   And in the -- and did you rely on the Zhang meta-analysis

5    in forming your opinions in this case?

6    **A.**   No, I didn't because it just came out so I only saw it a

7    couple -- three weeks ag.  But it --

8    **Q.**   Have you reviewed it since then?

9    **A.**   Yes, I reviewed it, and it supports all the other

10   information that I reviewed that -- and we will look at the

11   findings.

12   **Q.**   Do you want to look at the findings in the tables,

13   Dr. Weisenburger?

14   **A.**   Yes.  So I think we can go to table 5, it is --

15        **MS. MOORE:**  Page 3, Mr. Wolfe.

16        **THE WITNESS:**  -- gives you the -- sort of the meat of

17   the paper.  And so this is a new meta-analysis, but it is

18   different than the other ones that were done in the sense that

19   it includes the updated AHS, the 2015 AHS.  It includes the

20   updated AHS; although, they did look also at the 2005 AHS, like

21   the other meta-analysis.

22        But what they did is they focused on the people who had

23   high exposure, okay.  The other meta-analysis just looked at

24   ever-never.  So they included everybody who was exposed, low

25   exposed and high exposed.  This study focused on the people who

1    seemed to have the most exposure.  So if you look at the first

2    column to the left, it says highest cumulative exposure.

3    **BY MS. MOORE**

4    **Q.**   Then below that, Dr. Weisenburger, I think you said 2015

5    earlier.  There's two publications out of the AHS, 2005 and

6    2018; is that right?

7    **A.**   So they did the analysis for the data in both, but I think

8    we should focus on the 2018 because that is the most recent

9    data.  So they tried to take the data on the higher exposed

10   people in all of the studies, the case control studies, as well

11   as the AHS 2018.

12       And if you look across you can see the odds ratio is 1.41,

13   and it is statistically significant using a method called fixed

14   effects.  And they used another statistical method to also look

15   at it called random effects, and again they saw an increased

16   risk.  It was a little bit higher, and it was statistically

17   significant.

18       And the data was not too much different between the two

19   AHS studies.  You can see that the next line is the 2005 AHS,

20   it is also pretty much the same.  And that is for highest

21   cumulative exposure.  So these would be the people who had high

22   intensity or frequent use, okay.

23       And then they did another analysis where they looked at

24   the longest exposure, so people who had many days of exposure,

25   looking at long exposure.  And, again, they looked at the 2018

1    and the 2005 AHS.  And, again, the numbers are very similar to

2    what they saw above; that there was a 40 to 50, almost

3    60 percent increase in non-Hodgkin's lymphoma.  And on -- all

4    the numbers are statistically significant here, okay.

5         So I think that's all I want to talk about on this table.

6    We should go to the next table because I think it is also

7    informative, table 6.  And let's focus on where it says other

8    pesticides, adjusted, unadjusted, yes.

9         So what they did here is they -- where they could, they

10   adjusted for the use of other pesticides to get around and to

11   mitigate this issue of confounding the use of multiple

12   pesticides.  And if you look at the unadjusted odds ratio using

13   2005 AHS, there is about a 70 percent increase, okay.  It is

14   statistically significant.  But when you adjust it, the odds

15   ratio goes down.  And that makes sense, because now they are

16   taking away the effects of the other pesticides that could have

17   caused non-Hodgkin's lymphoma, and they are focusing just on

18   Roundup.

19        And, again, the numbers are about the same as what we saw

20   before.  It is 1.46, so a 46 percent increase risk of

21   non-Hodgkin's lymphoma.  Again, it is statistically

22   significant.

23        So I think this is really important data because it looks

24   at -- it is a meta-analysis.  It looks at data a little bit

25   differently.  It focuses on the people who have high exposure.

**WEISENBURGER - DIRECT / MOORE**

 1  And it uses the new data from the Agricultural Health Study.

 2  And it also attempts to do adjustment based on pesticide use.

 3  So I think it is an important, very informative study.

 4  **Q.**   And does the Zhang study, did it look at -- it is a

 5  meta-analysis of epidemiology.  But did it look at the other

 6  legs of the stool?

 7  **A.**   So, yeah, they did an interesting thing in this paper.  So

 8  they didn't just publish the meta-analysis.  They also looked

 9  at the other two legs of the stool.

10      So they looked at the animal studies, just as I did.  They

11  looked at the mechanistic studies, just as I did.  And they

12  came to the same conclusion that I did, in that they felt that

13  all of this data when put together makes a very compelling

14  argument that glyphosate and Roundup cause non-Hodgkin's

15  lymphoma in people.  And so the study I think is a very

16  informative, very important study.

17  **Q.**   And let's look -- are you familiar with the conclusion

18  from the Zhang meta-analysis?

19      Let's go to page 2.  And at the end there,

20  Dr. Weisenburger, do you agree with the conclusion from the

21  Zhang meta-analysis that Overall in accordance with evidence

22  from experimental animal and mechanistic studies, our current

23  meta-analysis of human epidemiological studies suggests a

24  compelling link between exposures to glyphosate-based

25  herbicides, which is Roundup, right, and increased risk for

**WEISENBURGER - DIRECT / MOORE**

1  NHL?

2  **A.**   I agree with it.  I would even make a stronger statement

3  and say that it is a compelling argument.

4  **Q.**   Let's move to the second leg of the stool, and that's the

5  animal studies.  Did -- and they heard from Dr. Portier last

6  week for a couple of days, and I want to just ask you:  Did you

7  consider the animal studies?

8  **A.**   I did.

9  **Q.**   Okay.  And what about the animal studies -- we are not

10  going to go through each one of them.  What about the animal

11  studies was important in reaching your opinion in this case?

12  **A.**   Well, the animal studies were important because there were

13  a number of studies that showed that feeding the -- either mice

14  or rats glyphosate in their feed, or Roundup, increased the

15  risk for tumors.  I think I counted 13 studies that I wrote in

16  my report.  And in mice, for example, the chemical Roundup --

17  glyphosate actually caused the mice to get some rare tumors

18  that they don't usually get, kidney tumors, okay, both benign

19  and malignant tumors.

20  **Q.**   When you say "benign and malignant," what is the

21  difference there?

22  **A.**   Well, there ware benign tumors that grow, that don't

23  spread and kill the animal or the human; but they are often

24  part of the stage of developing a malignant tumor.  So you

25  might develop first a benign tumor like a colon polyp, and then

**WEISENBURGER - DIRECT / MOORE**

1  you are at increased risk for developing colon carcinoma.

2  That's why they take out the colon polyps.

3     So the animals would develop benign tumors and sometimes

4  malignant tumors.  Some of the animals got rare tumors that

5  they usually don't get.  Interestingly in a number of mice

6  studies -- actually, four out of the six studies of mice --

7  glyphosate caused an increase in non-Hodgkin's lymphoma, the

8  same cancer that we were seeing in the epidemiology studies.

9  **Q.**   What is the significance of that?

10 **A.**   Well, it is an interesting result because often you don't

11 see that in animal studies; that the chemical causes the same

12 tumors in the animal and in the human.  But it is an

13 interesting finding that I think gives some initial weight to

14 my conclusion.

15 **Q.**   So what conclusion then can you draw from the animal

16 studies?

17 **A.**   Well, I think the animal studies show that glyphosate --

18 glyphosate is carcinogenic in animals, in mice and in rats.  It

19 causes benign and malignant tumors at excess -- in excess

20 numbers in these animals.

21 **Q.**   You mentioned during the -- your testimony about the

22 epidemiological studies, dose response.

23 **A.**   Yes.

24 **Q.**   And is that something that you can look for in animal

25 studies?

**WEISENBURGER - DIRECT / MOORE**

1  **A.**   Yes.  So you have a group of animals that are your control

2  animals that don't get the agent of interest.  And then you

3  have low dose, usually three or four doses:  Low dose,

4  intermediate dose, and high dose.

5       For high dose you try to give them a dose that they can

6  tolerate that won't make them ill, okay.  And usually what you

7  see in the animal studies is a dose response.  And in a number

8  of the studies, they did see a dose response.  In some of the

9  studies they just saw the tumors in the animals that got the

10  highest dose, okay, but that's what you would expect.

11  **Q.**   Then the third leg of the stool -- is there anything else

12  you want to say about animal studies, Dr. Weisenburger?

13  **A.**   No.

14  **Q.**   Okay.  And then the third leg of the stool, the

15  mechanistic data, did you also review the literature regarding

16  mechanistic data?

17  **A.**   I did.  I did.  So this is mainly information on the

18  genotoxicity of glyphosate or Roundup; that is, you know, if

19  you take cells or you treat animals with these chemicals, do

20  they -- can you find evidence of DNA damage?  And, of course,

21  like all cancers, non-Hodgkin's lymphoma is a genetic disease.

22  So genetic abnormalities occur in non-Hodgkin's lymphoma that

23  actually are the -- are in the end what causes the disease.

24       So if you can show that the chemical is genotoxic in

25  animals or in cultures of human cells, then this is just

1    another important piece of information.  So I looked at the

2    genotoxicity studies, and I also looked at the number of

3    studies that looked at other effects of either Roundup or

4    glyphosate in terms of does it affect other functions, like

5    does it change how cells respond in culture and grow, or -- so

6    I looked at a whole variety of things, including does the

7    chemical cause oxidative stress because oxidative stress is

8    another way that you can damage the DNA.

9         So by oxidative stress what I mean is that if you get a

10   chemical, it causes a stress in the cells, okay.  And one of

11   the things that happens when the cells are stressed is they

12   produce these things called oxygen radicals.  And the oxygen

13   radicals can damage the DNA.  So it is sort of an indirect

14   method for a chemical to damage the DNA.  And glyphosate was

15   found in many of these studies to cause oxidative stress and to

16   produce these free radicals, and to -- it was also genotoxic.

17   **Q.**   So let's look at a few of the studies that you relied

18   upon, and I will have you turn to -- in your binder, it is 916.

19        **MS. MOORE:**  Permission to publish?

20        **THE COURT:**  Can I just ask, Ms. Moore, what are you --

21   about how much more time do you have?  Should we break for

22   lunch now or press ahead a few more minutes?

23        **MS. MOORE:**  I will leave that up to the jury.  But if

24   I can get through the mechanistic, I can definitely do that in

25   probably ten minutes.

1          **THE COURT:**  Okay.  Why don't we go ahead and do that

2     and then we will take our lunch break.

3          **MS. MOORE:**  Great.

4     Permission to publish.

5          **MR. STEKLOFF:**  No objection, Your Honor.

6          **MS. MOORE:**  916.

7     **Q.**   And, Dr. Weisenburger, tell the ladies and gentlemen of

8     the jury what is this publication.

9     **A.**   So this is a publication that looked at a variety of

10    different pesticides and evaluated what was their potential to

11    induce what we call double-strand breaks.  These are breaks in

12    chromosomes that cause the chromosomes to rearrange, okay.  And

13    that is a common finding in non-Hodgkin's lymphoma.  So they

14    looked at lymphocytes, human lymphocytes, the cells that are

15    the precursor cells for non-Hodgkin's lymphoma.  They put

16    normal human lymphocytes from healthy donors in cultures and

17    then they treated those cells with glyphosate.

18    **Q.**   So you have got a petri dish in a lab, and they are

19    putting the glyphosate in the petri dish?  Is it glyphosate or

20    Roundup in this instance?

21    **A.**   I think this one is glyphosate.

22    **Q.**   Okay.  All right.  And did you rely on the conclusions of

23    this publication in forming your opinion in this case?

24    **A.**   I did, because what they showed was an increase in

25    double-strand breaks when the cells were treated with

1    glyphosate, and they showed a dose response that if they

2    gave -- if they put more glyphosate into the cultures, there

3    were more double-strand breaks, okay.

4    **Q.**   And if we could, go to -- Dr. Weisenburger, in forming

5    your opinions, did you then take that data and put it on a

6    chart?

7    **A.**   I did.  It was part of my presentation to the judge at the

8    Daubert hearing.

9            **MR. STEKLOFF:**  No objection, Your Honor.

10           **THE COURT:**  Okay.

11           **THE WITNESS:**  So this just shows the data from this

12   study, and what it shows is that glyphosate induces these

13   double-strand breaks in the chromosomes of cultured human

14   lymphocytes, even at low doses.

15       So what you see in this table is the data for glyphosate.

16   And if you look across where it says zero under dose, those are

17   cells that didn't -- they didn't put any glyphosate into the

18   cultures.  So you get a fairly low level of DNA damage.

19       At the bottom there is another compound called etoposide.

20   Etoposide is the chemotherapy agent which they gave at a high

21   dose just to show that they could cause damage in the cell.  So

22   that is what you call your positive control, and the negative

23   control is no glyphosate in the cultures.

24       Then they increased the doses in micromolar doses, .4,

25   2.0, 10.0 and then high dose of 50.  And what you see, if you

 1   look at the next column under Mean percent cells, is you see

 2   the increase in DNA damage in double-strand breaks going from

 3   .33 with no exposure to a fivefold increase, 1.67.  And then to

 4   a number -- another four or fivefold increase to 9.33 with a

 5   higher dose.  So you see a dose response here.

 6        As you give higher doses, it actually begins to go down,

 7   and that's because in this case the glyphosate was toxic to the

 8   cells and so the cells just die and you don't see as much.  But

 9   if you look at the first three rows, you can see the dose

10   response.  And so -- and to the right you see the p-value,

11   which is statistically significant.

12        So what the study shows is that glyphosate can cause DNA

13   damage.  It is genotoxic.  It causes double-strand breaks.  In

14   human lymphocytes the same cells that develop -- the normal

15   cells that become malignant in non-Hodgkin's lymphoma.

16   **BY MS. MOORE:**

17   **Q.**   And, Dr. Weisenburger, what is the significance that

18   glyphosate can cause DNA damage in the human lymphocyte cells

19   in the petri dish?

20   **A.**   Well, as I said, it shows that it is genotoxic.  And it

21   actually causes DNA in the normal cells that -- when they

22   become malignant, they are called non-Hodgkin's lymphoma.  So

23   these are the same cells that we are talking about in the

24   non-Hodgkin's lymphoma, same kinds of cells.

25   **Q.**   All right.  Let's go to 562.

```
 1            MS. MOORE:  Permission to publish?

 2            MR. STEKLOFF:  No objection, Your Honor.

 3            THE COURT:  Go ahead.

 4   BY MS. MOORE

 5   Q.   And what publication is this, Dr. Weisenburger?

 6   A.   So this is another publication that did a number of

 7   different kinds of tests to determine whether glyphosate was

 8   genotoxic or not.  And they also -- they looked at glyphosate

 9   and they also looked at Roundup.  So they were evaluating both

10   formulation and the -- the formulation and the active compound.

11   Q.   And this is from 1997; is that right?

12   A.   Yes, it is.

13   Q.   If we could --

14            MS. MOORE:  Mr. Wolfe, if you could go over to

15   page 1960 and figure 3.

16   BY MS. MOORE

17   Q.   And, Dr. Weisenburger, if you could explain to the jury

18   what we are seeing in figure 3 -- and do you want to pull up

19   one or two of the bar graphs?

20   A.   Pull them both up.  That would be all right.

21        So this is a test called sister chromatid exchange.  They

22   did a different kind of a test to look for DNA damage called

23   sister chromatid exchange.  Again, these are human lymphocytes

24   from normal donors.  And on the top scale they used glyphosate.

25   Q.   I think you can touch the screen and show --
```

WEISENBURGER - DIRECT / MOORE

1   **A.**   There it is.

2       So along the bottom you can see the dosages.  The C is

3   your control, no glyphosate in the cultures.  And then they use

4   low doses, .33 milligrams per mL; 1, 3, 4 and 6 milligrams per

5   mL.  So they used increasing doses.  And what you see is a dose

6   response.  And the last three columns, because they have the

7   little asterisks on top, are statistically significantly higher

8   than the control.

9       So what you are seeing here is if you put just glyphosate

10  into the cultures with the lymphocytes, you see increased

11  sister chromatid exchanges, which is an indicator of DNA damage

12  and genotoxicity.

13      And then the lower scale is Roundup.  And here you see the

14  same effect.  You have the control and when you use very small

15  amounts of Roundup, .01 milligrams per mL, and .33 grams per

16  mL, you can see you get statistically significant increases in

17  the sister chromatid exchange, and it is very similar to what

18  you see for glyphosate.  But the interesting thing is that you

19  have got to use 3 milligrams per mL to get this effect where

20  you see the fourth column with the asterisk.

21      See if I can show it here.  Hang on.  This is not working

22  so well.

23  **Q.**   Which one did you want highlighted?  And we can have

24  Mr. Wolfe do that for you.

25  **A.**   The fourth one on the top.

**WEISENBURGER - DIRECT / MOORE**

1   Q.    Okay.

2   A.    That one, yeah.  If you look down here, you see the same

3   effect with Roundup; but you have to use ten times more

4   glyphosate than Roundup to get the same effect.  So what this

5   shows you is that Roundup is much more genotoxic in human

6   lymphocytes than glyphosate is.

7   Q.    So the top -- the top graph is putting glyphosate in the

8   petri dish?

9   A.    Right.  And if you just look at the 3 milligrams per mL,

10  you can see that the sister chromatid exchange per cell is

11  about 5.  And then you go down to the lower one, they are using

12  one-tenth of the dose of glyphosate in Roundup, and they get

13  the same effect, telling you that Roundup in this study is ten

14  times more genotoxic than glyphosate, okay.  And that's been

15  shown in many other kinds of studies; that Roundup seems to be

16  more toxic than glyphosate.  But here you see the genotoxicity.

17  Q.    So the formulation is ten times more toxic?

18  A.    Yes.

19  Q.    All right.  Then the last one, Dr. Weisenburger, 560 --

20  did you want to say anything else about this study, I'm sorry?

21  A.    No.

22  Q.    563.

23          MS. MOORE:  Permission to publish.

24          MR. STEKLOFF:  No objection.

25          THE COURT:  Go ahead.

WEISENBURGER - DIRECT / MOORE

1  **BY MS. MOORE:**

2  **Q.**    And what is this publication here?

3  **A.**    So this is another study looking at peripheral blood

4  mononuclear cells, which includes lymphocytes.  And, again,

5  they are looking at Roundup.  And they are looking at

6  glyphosate and they are looking at a different test for DNA

7  damage called the common test.  But it's another way to look at

8  DNA damage in cells, including mononuclear cells in the blood

9  and lymphocytes.

10  **Q.**    And are there some graphs you wanted to point out in this

11  publication?

12  **A.**    Yes.

13        **MS. MOORE:**  Can we turn to page 515, please.  One

14  more.  Thank you.

15        **THE WITNESS:**  This one.  So let's just focus on the

16  second graph first, if we could.

17        So this is a graph like I showed you before.  On the lower

18  axis you see concentrations of glyphosate in micromolar

19  concentrations.  And on the other scale you see DNA damage,

20  okay.  And so what you see is at low doses of glyphosate, you

21  don't see much in the way of DNA damage.  The dark bar consists

22  of two types:  Single-strand breaks, and the white bar is

23  double-strand breaks.

24        But as you increase the dose there, you see -- if you look

25  across at 250, you can see that the combination of

1    single-strand and double-strand breaks, which is the black bar,

2    is statistically increased.  If you can continue to increase

3    the dosage of glyphosate to 1,000 micrograms per mole, you see

4    a statistically significant increase in combination of single-

5    and double-strand breaks, and the bar for double-strand breaks,

6    which is the smaller white bar to the right is also

7    statistically significant.  So, again, it is another example of

8    seeing a dose response and seeing genotoxicity in peripheral

9    blood mononuclear cells that is significant.

10   **BY MS. MOORE:**

11   **Q.**   And then the glyphosate.

12   **A.**   This is glyphosate.  So let's look at Roundup --

13            **MS. MOORE:**  So A, please.

14            **THE WITNESS:**  -- which is the top one.  And for

15   Roundup, you see the same thing basically, except that, again,

16   the doses of Roundup are much smaller than the doses for

17   glyphosate.  So if we just look at the last column, you see

18   both the single- and double-strand breaks as well as the

19   double-strand breaks are statistically significantly increased.

20   There are only 10 micromolar concentration.  And you remember

21   the glyphosate one was 1,000 micromolar.  So in this study the

22   Roundup is 100 times more toxic than the glyphosate.

23       So when you do studies of just glyphosate, you might not

24   find much in the way of effects.  But if you do the studies on

25   Roundup, you are much more likely to find genotoxic effects.

1    And that's what these recent studies did.

2        So those are just three examples of recent -- old and

3    recent genotoxic studies that show that glyphosate, and

4    particularly Roundup, are genotoxic in cells.  I showed you

5    data for lymphocytes because I think to me that is the most

6    important data because those are the cells that eventually

7    would become non-Hodgkin's lymphoma.

8        **MS. MOORE:**  Your Honor, I'm going over my time, so I'm

9    going to stop right there.

10       **THE COURT:**  Okay.  Very good.  Why don't we break for

11   lunch.

12       Remember all the admonitions about not talking about the

13   case and not exposing yourself to other information about it.

14   We will resume at 12:45.  Thank you.

15       (Proceedings were heard out of presence of the jury:)

16       **THE COURT:**  Remember, everybody has to stay in the

17   room for five minutes so we can give the jury a chance to get

18   out and use the elevators and stuff.

19       I had one thought that I was just pondering.  We don't

20   need to discuss it now, but I just wanted to plant the thought.

21   You know, as I'm watching all this expert testimony and seeing

22   all these excerpts from studies being pulled up, you know, I'm

23   anticipating jurors wanting to bring the studies back with them

24   in the jury room.  I understand the problem with doing that.

25       But one thing I was curious about is would there -- would

**PROCEEDINGS**

```
 1   there be any problem with sending back just the excerpts, just
 2   the portions that are published to the jury?  That is something
 3   I would like you-all to ponder and get back to me on because
 4   I'm anticipating that that -- you know, that -- to me for
 5   the -- putting myself in the shoes of the jury, getting at
 6   least that, would be a lot more satisfying, potentially, it
 7   seems to me, than getting -- than being told you can't have
 8   anything at all.  So think about that.
 9            MS. MOORE:  Thank you, Your Honor.
10            MR. STEKLOFF:  Your Honor, can I just raise timing for
11   our witnesses quickly?
12            THE COURT:  Sure.
13            MR. STEKLOFF:  So because of the delay yesterday, we
14   told Plaintiff's counsel that we would be calling Dr. Mucci
15   first tomorrow.  So Dr. Mucci will be here tomorrow.
16            THE COURT:  Okay.
17            MR. STEKLOFF:  My sense of where we are right now --
18   and Dr. Weisenburger may not be happy to hear this -- and I
19   will make every effort to be efficient -- that he might not
20   finish today.
21        So if we go a little bit with Dr. Weisenburger tomorrow,
22   plus I think there is an hour of deposition testimony between
23   Dr. Reeves and Dr. Farmer -- I think it is almost exactly an
24   hour -- 55 minutes and we have Dr. Mucci.
25        I'm sort of asking for permission that Dr. Arber does not
```

1    need to get on a plane tonight.  He can get on a plane

2    obviously to be here for Friday.  Our plan would then be to

3    fill the time with Dr. Mucci tomorrow; see if we even finish

4    her, and then continue with either Dr. Mucci on Friday or

5    Dr. Arber followed by Dr. Levine.

6          **THE COURT:**  So you would have Arber and Levine ready

7    on Friday?

8          **MR. STEKLOFF:**  They are both ready -- but Dr. Arber

9    just needs to know if he needs to get on a plane today under

10   what I think is an unlikely possibility that he will get called

11   tomorrow.

12         **THE COURT:**  Somebody just walked out of the courtroom.

13         **THE CLERK:**  Yeah.

14         **THE COURT:**  So I don't know -- does anybody know who

15   that was?

16         **MS. MOORE:**  I didn't see, Your Honor.

17         **THE COURT:**  All right.  I remember who she is.  So,

18   Kristen, I'm going to ask you -- I will point her out to you,

19   and I will ask you to speak with her if you see her again in

20   the courtroom.

21         **THE CLERK:**  Okay.

22         **THE COURT:**  Disregarded my orders by leaving the

23   courtroom.

24      Okay.  So I mean, let's talk about it again at the end of

25   the day.  As I sit here right now, that sounds like it's okay;

 1   but, you know, again, you are running a risk.  I mean, if there

 2   is a significant amount of time -- if we end at 2:10 or

 3   something like that, fine, no big deal; but if you leave us

 4   with a significant amount of dead time, it's going to come out

 5   of your time.

 6         MR. STEKLOFF:  Well, we have a lot of time.  I would

 7   rather be efficient and not waste the jury's time.  I

 8   understand that risk.  It is just the question of

 9   Dr. Arber's -- we are trying to be as flexible as we can,

10   understanding that the jury takes priority for Dr. Arber as

11   well.

12         THE COURT:  Okay.  Great, thank you.  Sorry.  I should

13   have told you you could step down.

14         THE WITNESS:  That's okay.  I kind of like it up here.

15         THE CLERK:  Court is in recess.

16         (Luncheon recess was taken at 12:04 p.m.)

17   **AFTERNOON SESSION**                                **12:45 p.m.**

18      (Proceedings were heard in the presence of the jury:)

19         THE COURT:  All right.  We are back.  You can resume.

20         MS. MOORE:  Thank you, Your Honor.

21   BY MS. MOORE

22   Q.   Good afternoon, Dr. Weisenburger.

23   A.   Good afternoon.

24   Q.   When we broke for lunch, we were talking about

25   genotoxicity; and my question for you is:  You spent time

WEISENBURGER - DIRECT / MOORE

1  showing the jury these studies about what happens to the

2  lymphocyte cells from humans in petri dishes, but what about

3  the real world?  How do we know Roundup is genotoxic out in the

4  real world?

5  **A.**   Yeah, so there are two studies done in South America that

6  I think are informative to answer that question.

7  **Q.**   If you want to turn to -- it looks like Exhibit 1438 in

8  your binder.

9          **MS. MOORE:**  And permission to publish.

10         **MR. STEKLOFF:**  No objection, Your Honor.

11         **THE COURT:**  Okay.

12 **BY MS. MOORE**

13 **Q.**   Is this one of the studies that you are referencing,

14 Dr. Weisenburger?

15 **A.**   Yes, this is a --

16 **Q.**   Can you --

17 **A.**   -- a study of actual people in Ecuador who were exposed to

18 large doses of Roundup herbicide sprayed from airplanes to

19 eradicate cocaine plants.

20 **Q.**   And what were the findings from this study?

21 **A.**   Well, this was a relatively small study.  These were

22 rural -- rural inhabitants, farmers living right on the border

23 of Ecuador and Colombia.  And they didn't use pesticides in any

24 of their farm work.  And Colombia was spraying for these

25 cocaine -- these cocaine plants trying to eradicate cocaine,

 1   using Roundup -- a more -- a stronger formulation of Roundup.

 2   And they actually did three days of intensive exposure right on

 3   the border, so these people got exposed multiple times.  The

 4   stuff drifted on over to their homes, and they were exposed.

 5   And then they -- after that three days of intense spraying,

 6   there were sporadic spraying for the next three weeks, so they

 7   were exposed over a period of months multiple times to high

 8   doses of Roundup that was sprayed from these airplanes.

 9          MS. MOORE:  And if we could, Mr. Wolfe, if we can go

10   to the abstract on page 1.

11   BY MS. MOORE

12   Q.   The last sentence in the abstract.  Dr. Weisenburger, so

13   what was the results -- what did the results show these authors

14   in this particular study?

15   A.   Well, what the results showed is that the formulation of

16   Roundup that was used during aerial spraying had genotoxic

17   effects on the peripheral blood cells from these -- of these

18   people who lived in -- and were sprayed inadvertently.

19   Q.   And I will show you -- I think that you extracted this

20   data --

21          MS. MOORE:  If we can go to your PowerPoint slide on

22   that.

23          MR. STEKLOFF:  No objection, Your Honor.

24          MS. MOORE:  Thank you.

25   \\\

WEISENBURGER - DIRECT / MOORE

1    BY MS. MOORE

2    Q.    What do we see here, Dr. Weisenburger?

3    A.    So this is just the summary of the data.  These

4    individuals used the comet assay, one of the same assays that

5    was used in the genotox studies I told you about before.

6    Q.    You say "assay."  What is that?

7    A.    A test.

8    Q.    A test?

9    A.    Yeah, a test.

10          So here you can see there were two populations.  There was

11   an unexposed population of similar people who lived far away,

12   80 kilometers away from where the border between the two

13   countries where the Roundup was sprayed.  So you have an

14   unexposed group.  And then you have the exposed group who were

15   exposed to this intensive spraying for three days followed by

16   three weeks of intermittent spraying.

17          And what they did is they drew blood on these people who

18   were exposed.  It was 28 people over -- somewhere between two

19   weeks and two months after they were exposed.  And they did

20   this comet assay to look for DNA damage, or in this case it's

21   called DNA migration.  But what it really means is it is a

22   measurement of DNA damage.  You can see that in the unexposed

23   the number was 25.94.

24   Q.    And what does that mean?

25   A.    Well, that is just sort of the baseline abnormalities that

 1   they saw in their so-called normal controls.  And then the

 2   results increased to 35.5 in the people who were exposed.  And

 3   this is, as you can see from the p-value, highly statistically

 4   significant.

 5        So what this shows is that when innocent bystanders are

 6   sprayed with Roundup at high -- high concentrations, the --

 7   some of these people actually got sick from the pesticide,

 8   okay.  They were ill.  And so they had very high doses that

 9   actually made some of them ill.

10        When you look at their lymphocytes, you can see evidence

11   of genotoxic damage.  So that -- this is sort of a real-world

12   kind of animal study where you are giving the animals high

13   doses.

14   Q.  But in this case it is actually human beings?

15   A.  Yes.

16   Q.  Okay.  And the next one, if you can turn to 1066.

17        **MS. MOORE:**  Permission to publish.

18        **MR. STEKLOFF:**  No objection.

19        **THE COURT:**  Go ahead.

20   BY MS. MOORE

21   Q.  And this is another study, Dr. Weisenburger.  Did you

22   review this and rely on it in forming your opinion in this

23   case?

24   A.  Yes, I did.

25        So this is the other study.  This one was actually done in

 1    Colombia.  And, again, we are looking at basically agricultural

 2    workers.  This study -- it was interesting -- they used

 3    couples.  So they husband -- they had 30 couples in each group,

 4    and they looked at exposure then, in both men and women, some

 5    of which were agricultural workers, and they were actually

 6    working in the fields.

 7         **MS. MOORE:**  And if we could, Mr. Wolfe, if you would

 8    go over to 991 and pull up the graph at the bottom.

 9    **BY MS. MOORE**

10    **Q.**    What were the results of this, Dr. Weisenburger?

11    **A.**    Yeah.  So this is kind of a complicated slide.  Let me

12    walk you through it.  So the first bar on the far left labeled

13    underneath Santa Marta, this was a region in Colombia where

14    they do organic farming for coffee.  So there are no pesticides

15    being used at all, okay.  So this is your negative control,

16    okay.  This is results on people who were not exposed to

17    pesticides at all.

18         The second group, Boyaca, is an area where they used

19    pesticides but they sprayed them, like Mr. Hardeman would have,

20    they sprayed them from tanks, manually walking along and

21    spraying the pesticides.  And they used a variety of

22    pesticides.  So this is sort of like your positive control,

23    okay, in the sense that they did two measurements one month

24    apart, and they found pretty much the same findings; that there

25    was a significant increase in damage to cells.

WEISENBURGER - DIRECT / MOORE

1        In this assay they are looking at what is called

2   binucleated micronuclei -- cells with binucleated micronuclei.

3   And there was this significant increase compared to the

4   control, but it was due just to the spraying of multiple

5   pesticides manually, okay.  They probably were exposed to

6   glyphosate, but -- among many other pesticides that they used,

7   okay.

8        And then there are the three other regions -- Putumayo,

9   Narino and Valle -- and in these three areas they were spraying

10  the glyphosate, the Roundup, aerially just like in the other

11  studies.  So they were trying to get rid of the cocaine plants

12  in Colombia by spraying -- by spraying the Roundup from

13  airplanes, okay.  And they sprayed in these three regions.

14       And so what you see here is the first bar on each of these

15  last three was the test drawn just before the spraying, okay.

16  **Q.**  So this bar, the one that is not filled in, is that the

17  one you are referring to?

18  **A.**  The one right there, yeah.  So that would be the first

19  bar.  So that is sort of the control for that person or that

20  group of people because this is what the DNA damage was in

21  these three groups before the aerial spraying of glyphosate.

22  So you can see they all have increased DNA damage probably

23  because they were using other pesticides, okay, in spraying

24  other pesticides.

25       So then there was this intense spraying of glyphosate from

1  the air and --

2  **Q.**   Is it glyphosate, Dr. Weisenburger?

3  **A.**   It was Roundup, yeah.  Roundup from the air.

4      And then they did the second measurement, which is the

5  middle bar, within five days after the aerial spraying of

6  Roundup, okay.  And what you can see in each area is there is

7  an increase in the DNA damage in each of the three groups, and

8  it is statistically significant.  So there was -- after --

9  shortly after the Roundup spraying, there was a statistically

10  significant increase in all three of these groups after

11  spraying, okay.

12  **Q.**   What is the increase of?

13  **A.**   It is an increase in binucleated micronuclei, which are --

14  it is a test to determine genotoxicity.  Again, this was done

15  in human lymphocytes, okay.

16  **Q.**   What does this tell us if there was an increase five days

17  after spraying Roundup?

18  **A.**   It tells you there was an increase in genotoxic damage to

19  the lymphocytes from the people in these three regions that was

20  associated with the aerial spraying of Roundup.

21      And then the third bar, the dark bar, was drawn four

22  months later.  And what you can see is that in the first group

23  it stays up.  In the second and third groups, it goes back down

24  a little bit.  And so I don't know what to make of this.  It

25  seems like the genotoxic damage persisted in Putumayo, maybe

WEISENBURGER - DIRECT / MOORE

1  related to the use of other pesticides.  But in the other two

2  regions it went back down closer to what their baseline was.

3      So the meaning of this study is that it is a real-world

4  scenario in which agricultural workers and their spouses were

5  exposed to aerial spraying of Roundup, and you can see a

6  correlation, an increase in genotoxic damage to the human

7  lymphocytes related directly to that spraying of Roundup.  So

8  you can see genotoxic effects in experimental situations where

9  you are looking at lymphocytes in a culture dish, and you can

10 see the same effects in real human beings exposed to high

11 amounts of Roundup.

12 **Q.**  And have you formed an opinion based on your review of the

13 animal studies, the human lymphocyte studies in the petri dish,

14 and then the real-world exposures to Roundup as to whether

15 Roundup is genotoxic?

16 **A.**  Yeah.  I think there is no question that Roundup is

17 genotoxic because there are multiple positive studies now in

18 different systems.  I'm just showing you a few of the examples,

19 but there are multiple studies.  There were at least 11 studies

20 in human lymphocytes that showed genotoxicity.  There were

21 studies in other human systems as well where they saw

22 genotoxicity.  So I don't think there is any question that

23 Roundup is genotoxic.

24 **Q.**  And, Dr. Weisenburger, after your review of the

25 epidemiology -- back to our three legs -- the epidemiology, the

1  animal studies, and the mechanistic data, did you perform what

2  the jury has heard of as a Bradford-Hill analysis?

3  **A.**   Yes, I did.  So I weighed all of that evidence and used

4  the criteria that were proposed by Bradford-Hill to do a

5  general causation analysis.

6  **Q.**   And just briefly, remind the jury, who is Bradford Hill?

7  **A.**   So Bradford Hill was an English epidemiologist who was a

8  very influential -- quite a long time ago.  He was involved a

9  lot in analysis of smoking causing long cancer, okay.  But he

10  wrote these -- these eight criteria or guidelines to use in

11  trying to determine whether a chemical or other agent can cause

12  non-Hodgkin's lymphoma.

13  **Q.**   So let's go through those criteria briefly.  And what I

14  want you to focus on, because the jury has heard what the

15  criteria is, I want you to focus on what your analysis of each

16  of the criteria is, what your conclusions were in forming your

17  opinion?

18       **MS. MOORE:**  And, Ms. Melen, can I have the ELMO,

19  please.  Thank you.

20  **BY MS. MOORE**

21  **Q.**   Let's start with the first one, which is the temporal

22  relationship.

23  **A.**   All right.  Temporal relationship, so what that means --

24  it is very straightforward.  What that means is that you have

25  to be exposed to the agent or chemical -- in this case,

WEISENBURGER - DIRECT / MOORE

1    Roundup -- before you get the disease to conclude that Roundup

2    may have caused the disease.  So you just have to be exposed to

3    the agent before you get the disease which, of course, was the

4    case in the case control studies, in the animal studies.

5    **Q.**    So do we meet -- in your opinion is the temporal

6    relationship criteria met in this case?

7    **A.**    Yes, yes.

8    **Q.**    Okay.  The next one, strength of association.

9    **A.**    So the strength of association means if you look at the

10   odds ratios, do you see -- what is the strength of the

11   association, what is the odds ratio?  Is it high and is it

12   statistically significant?  And what we saw in the case control

13   studies, in five of the six, the studies were positive with

14   odds ratio greater than 2, and they were statistically

15   significant.  So I think the strength of the association is

16   seen there as well as in the meta-analysis, where you also saw

17   increased risks that were statistically significant.

18   **Q.**    So should I write "yes" there?

19   **A.**    Yes.

20   **Q.**    And then the next one is dose response relationship.

21   **A.**    So as we talked about, if something -- if there is an

22   agent that causes cancer, usually the more agent you are

23   exposed to, the higher your risk for the cancer.  And so we saw

24   in two of the case control studies that the risk of

25   non-Hodgkin's lymphoma when -- was increased when there was

1   more days that the people were exposed, either per year or

2   total days.  So that shows a dose response relationship.

3        And we saw the same thing in the Zhang meta-analysis

4   where, when they looked at the high dose, the people who were

5   exposed to higher doses or more exposure, they had a -- they

6   had a higher risk ratio than those that were just ever-never.

7   Then you saw it also in the NAPP study where there was a very

8   nice demonstration of dose response for non-Hodgkin's lymphoma

9   overall and for diffuse large B-cell lymphoma.

10       So dose response is a really important criteria.  If you

11  see dose response, it gives you some assurance that that

12  chemical is actually causing the disease.

13  **Q.**   Should I write "yes" on that?

14  **A.**   Yes.

15  **Q.**   Then the next criteria is replication of results.  Did you

16  see replication?

17  **A.**   Yeah.  So what that means is you want to -- you don't want

18  to just evaluate one study, okay.  You want to see the same

19  results or similar results in multiple studies.  So with regard

20  to the epidemiology studies, we saw it in five of the six

21  studies, okay.  In fact, the AHS study was an outlier compared

22  to the other studies.  And you want to see it -- the studies

23  done in -- by different researchers in different countries and

24  at different times.

25       So, you know, I think that there is a consistent

 1  replication of results in the epidemiology studies and in the

 2  animal studies, too, because in many of the -- the tumors were

 3  replicated in other studies.

 4  Q.   And so do we have replication of results?

 5  A.   Yes.

 6  Q.   And then biological plausibility.

 7  A.   So what this means is, you know, based on what we know

 8  scientifically, does it all make sense?  Is it plausible?  Does

 9  it sound like it makes sense?

10       And I think what I have told you today is that there is

11  definitely a biologic plausibility.  We know that Roundup is

12  genotoxic in lymphocyte cultures, in other tests.  We know that

13  it causes genotoxic damage in humans who are highly exposed

14  like the studies in South America.  We know that it causes

15  tumors in animals, including non-Hodgkin's lymphoma.  And

16  finally, the epidemiology studies point towards non-Hodgkin's

17  lymphoma as well.

18       So you have got a coherence of results that make it very

19  plausible that -- that Roundup causes non-Hodgkin's lymphoma.

20  Q.   So is biological plausibility met?

21  A.   Yes.

22  Q.   The next one is alternative explanations.

23  A.   So when you look at epidemiology studies, you always want

24  to think, Well, could there be another explanation for the

25  results, okay.  So some of the things that have been proposed

WEISENBURGER - DIRECT / MOORE

1    are things like selection bias or recall bias or confounding

2    due to the use of other pesticides.  And so, you know, we

3    should talk a little bit about that.

4         You know, these studies were designed by very experienced

5    epidemiologists who knew how to do case control studies.  So

6    the idea that there would be some selection bias in the

7    cases -- the controls I don't think is plausible, okay?

8         The issue of recall bias I think is important -- do you

9    know what recall bias is?  That is when you have cases and

10   controls -- the cases have the disease, and the idea is that

11   because they have the disease, they are asking themselves, How

12   could I have gotten this disease?  What could have caused my

13   disease?  And so the idea is maybe they would remember the

14   pesticides better than the people who didn't get the disease

15   but who used the pesticides.

16        But, in fact, we looked at that in our study in Nebraska,

17   and if you look at the frequency of the various pesticides that

18   were recalled by the cases and by the controls, there was

19   really no difference.  The cases didn't recall more pesticide

20   use or a higher number of pesticides than the controls did.  So

21   it is unlikely to be a recall bias.  But even a more important

22   argument is recall bias would be a systematic error, okay.

23        So you should see it in the case control studies of other

24   cancers, and we have -- we have lots of case control studies of

25   other cancers with Roundup, other hematological malignancies

1    like Hodgkin's lymphoma, myeloma, leukemia, and other solid

2    tumors.  And there was no evidence of increased risk in any of

3    those other studies.  The only studies that are positive are

4    the studies of non-Hodgkin's lymphoma.

5         So recall bias couldn't possibly be the explanation for

6    the increased risks in the non-Hodgkin's lymphoma studies

7    because it should have caused the same kind of effect in the

8    other studies and it didn't, okay.

9         Yeah, so I think that's all I want to say about that.

10   **Q.**  So were you able to --

11   **A.**  Oh, and then confounding.  The other one was confounding,

12   I forgot.  So that is also an important one to consider, you

13   know.  Are we mistaking one pesticide, causing it and blaming

14   the other pesticide?

15        So that's why we do the adjustments like we did in three

16   of the case control studies we talked about, and -- in the NAPP

17   study and in the Zhang meta-analysis.  All of those showed that

18   when you make adjustments for the use of other pesticides, the

19   odds ratio sometimes go down, but they don't go to 1.  In some

20   of the studies they remain statistically significant like *De*

21   *Roos* and Zhang and NAPP; whereas in other studies they go down

22   and they become nonsignificant.  But it is still important to

23   look at all of that data?

24        So it can't be confounding.  It can't be recall bias.  It

25   can't be selection bias.  So we have no other explanation for

**WEISENBURGER - DIRECT / MOORE**

1  why the case control studies would be positive.  And I have

2  given some reasons why I think the AHS is probably a

3  false-negative, okay, because there are lots of problems and

4  issues with that study.

5  **Q.**  So in your opinion is alternative explanations met?

6  **A.**  There are no alternative explanations, so I would say yes.

7  **Q.**  And then disease specificity.

8  **A.**  So this is interesting.  So as I mentioned to you, there

9  have been lots of case control studies of other kinds of

10  cancers, and they have all been negative.  So the only studies

11  that have been positive are the studies of non-Hodgkin's

12  lymphoma.  So I think that exposures to glyphosate and Roundup

13  are very specific for this one cancer, non-Hodgkin's lymphoma.

14  So there is disease specificity here.

15  **Q.**  And then the last one is coherence.  Have we met

16  coherence?

17  **A.**  Coherence just means does all the data fit together, and

18  does it fit with what we know about the use of other

19  pesticides.  And, of course, there are other pesticides that

20  cause non-Hodgkin's lymphoma in the same way that Roundup does.

21  They are genotoxic and they cause oxidative stress and DNA

22  damage.  And so what we are learning about glyphosate fits with

23  what we know about other pesticides and other chemicals that

24  cause cancer.

25  **Q.**  So that is met?

**WEISENBURGER - DIRECT / MOORE**

1   **A.**   So that's met.

2   **Q.**   And, Dr. Weisenburger, I'm just going to write on the top

3   here your name so we will not forget that this was yours, and

4   forgive my handwriting.  I'm going to mark this for

5   identification purposes only as Exhibit 948.

6        So taking into consideration all the criteria of

7   Bradford-Hill and your review of the epidemiology, the animal

8   studies, the mechanistic data, what then is your opinion within

9   a reasonable degree of medical certainty now that we have gone

10  through all the literature and your 40 years of experience in

11  looking at the causes of NHL, what is your opinion regarding

12  Roundup?

13  **A.**   So my opinion is that I agree with -- that after looking

14  at all this information, my conclusion is that based on all

15  this data, that Roundup can cause non-Hodgkin's lymphoma in

16  people who were exposed to it occupationally or exposed to high

17  doses inadvertently.

18  **Q.**   And you said "occupationally."  And I want to make sure.

19  So is it only in people who are using Roundup in the workplace?

20  **A.**   No.  Just like Mr. Hardeman.  I mean, he used it

21  frequently and had high exposures, and so I would include him

22  in that group.  It may not have been his occupation, but he

23  spent a lot of time doing it.

24  **Q.**   Is it fair to say that it's more about the amount of

25  exposure than it is the occupation?

1              MR. STEKLOFF:  Objection.  Leading.

2              THE COURT:  Sustained.

3    BY MS. MOORE

4    Q.   What is a more important factor in determining whether --

5    what is a more important factor when you are looking at an

6    exposure of an individual?

7    A.   Well, I think when you look at the exposure of an

8    individual, you want to really understand how much exposure he

9    or she had.  So you want to get an idea of what their dose was

10   over time, were they exposed for many years, how often did they

11   use it, did they wear protective clothing, et cetera, to get an

12   idea of what their actual exposure was.

13   Q.   Dr. Weisenburger, in your opinion does Roundup cause

14   tumors in mammals?

15   A.   Yes.

16   Q.   In your opinion does Roundup cause malignant lymphomas in

17   mice?

18   A.   Yes.

19   Q.   Does Roundup cause genetic damage in human lymphocytes?

20   A.   Yes.

21   Q.   Does Roundup cause oxidative stress in human cells?

22   A.   Yes.

23   Q.   Does Roundup cause DNA damage in people who are highly

24   exposed to Roundup?

25   A.   Yes.

WEISENBURGER - DIRECT / MOORE

1  Q.   And in your opinion does Roundup cause non-Hodgkin's

2  lymphoma in humans at real-world exposures?

3  A.   Yes.

4  Q.   Now, over your 40 years of studying non-Hodgkin's

5  lymphoma, have you seen an increase or a decrease in the number

6  of cases of non-Hodgkin's lymphoma?

7  A.   Well, over the last 50 years, the incidence of

8  non-Hodgkin's lymphoma has increased.  In fact, there was a

9  rather remarkable increase between 1970 and about 1990.  And as

10  I told you, that was -- that increase was what got people

11  together to think about what could be causing this increase,

12  okay.

13  Q.   And in your opinion what was causing that market increase

14  from 1970 to 1990?

15  A.   Well, we don't have all the answers.  We know that during

16  that period of time is when the AIDS epidemic began, and people

17  with HIV/AIDS have a more -- remarkably increased risk for

18  non-Hodgkin's lymphoma.  So we know some of that steep curve

19  was probably due to AIDS.

20       Probably some of it was better diagnosis by pathologists,

21  and probably some of it was due to other causes, which we don't

22  really know what they are.  It could be due to increased use of

23  pesticides or solvents or petrochemicals, or it could have been

24  an increase in infections, for example.  But we don't really

25  know, other than HIV, what caused that increase -- that

1   increase over time.

2   **Q.**   And I'm going to show you --

3           **MS. MOORE:**  If I could publish on the ELMO, what is

4   called -- it is trends and incidence rates -- let me zoom in on

5   this.

6   **BY MS. MOORE**

7   **Q.**   Trends and incidence rates.  It says 1975 to 2015.  Can

8   you explain to the ladies and gentlemen of the jury what this

9   graph shows?

10  **A.**   Well, first of all --

11          **MS. MOORE:**  I'm sorry, hold on.  May I have this

12  published?

13          **MR. STEKLOFF:**  No objection, Your Honor.

14          **THE COURT:**  I saw the silent non-objection.

15          **MS. MOORE:**  Sorry.

16          **THE WITNESS:**  So the top curve shows the incidence

17  rate in men, and the lower curve shows the incidence rate in

18  women.  And non-Hodgkin's lymphoma, just like many other

19  cancers, is higher in men than women.

20  **BY MS. MOORE**

21  **Q.**   So this yellow line here, that's --

22  **A.**   That's men.

23  **Q.**   -- men?

24          And this line here?

25  **A.**   Is women, yes.

**WEISENBURGER - DIRECT / MOORE**

1      And you can see -- the far left is 1970, and you can see

2    how --

3    **Q.**   I think it -- hold on.  Let me zoom in.

4    **A.**   -- how it goes up.

5    **Q.**   I think -- I don't mean to interrupt you,

6    Dr. Weisenburger.  I think it is 1975.

7    **A.**   1975, okay.

8    **Q.**   Up to 2015.

9    **A.**   Yes.

10      So you can see how it goes up in both men and women, a

11   little more steeply in men than women.  Between 19 -- it

12   actually started in 1970, but -- so between 1970 and probably

13   1990 or 1995 you see a more steep curve.  And then it begins to

14   kind of level off after that, and it is pretty stable.  For men

15   it creeps up a little bit, and for women it is pretty stable.

16      So this early part of the curve where you see it

17   increasing, at what would be kind of a worrisome rate,

18   eventually leveled off and it is not increasing nearly as

19   rapidly as it did during that early period.

20   **Q.**   It looks like from 1975 the rate for men, it went from --

21   what is that -- 13 up to 1995 -- is it almost doubled then?

22   **A.**   It is almost doubled, yes.

23   **Q.**   Okay.  And I want to show you a slide, Dr. Weisenburger,

24   and this was shown to the jury during opening by Monsanto's

25   attorney.  Okay.

WEISENBURGER - DIRECT / MOORE

1      And from this slide -- well, first of all, what is this

2   slide?  What, if anything, does this slide tell you?

3   **A.**   Well, it shows -- it is a drawing on a somewhat different

4   scale, but it shows you in the brown -- brown line, it shows

5   you that the number of cases of NHL, which is on the left side,

6   and the number of cases per hundred thousand persons, which is

7   the incidence, both of those are going up, again, between 1974

8   and about 1990, and then it begins to level off.  So this is a

9   combined curve for both men and women, okay.

10     And then what the blue curve shows is that glyphosate was

11  introduced in 1974, and it was -- increasing -- was used

12  increasingly up until about 1995 or 1994 when the use began to

13  go up dramatically due to the use of the genetically modified

14  crops, like corn and soybeans.

15     So what you can see is there has been a marked increase in

16  the use of glyphosate over the 20 or 30 years or so there;

17  whereas the rate of non-Hodgkin's lymphoma has gone up not very

18  much, okay.  So, you know, it is sort of misleading to say,

19  Look how the glyphosate has gone up and yet the rate of

20  non-Hodgkin's lymphoma hasn't gone up and that's because the

21  rate of non-Hodgkin's lymphoma is due to a whole variety of

22  things.

23     So think about it.  If glyphosate caused an increased

24  number of non-Hodgkin's lymphoma cases, but we learned how to

25  treat the HIV infection, HIV/AIDS, and now we -- they don't get

WEISENBURGER - DIRECT / MOORE

1  nearly as many lymphomas as they did before, glyphosate could

2  cause an increase in non-Hodgkin's lymphoma; treatment of HIV

3  infection could cause a decrease in non-Hodgkin's lymphoma, and

4  the curve wouldn't change very much at all, right, because you

5  have got some things increasing risk and some things decreasing

6  risk.

7  Q.   Let me back up and ask you -- because you referenced HIV

8  and AIDS as an example -- is HIV -- someone who is HIV, are

9  they at an increased risk for developing non-Hodgkin's

10 lymphoma?

11 A.   Yes.  Back in the '70s and '80s it was a markedly

12 increased risk.  And then when we found drugs to treat it, the

13 incidence of non-Hodgkin's lymphoma went down dramatically in

14 people with HIV/AIDS.

15 Q.   So on this slide that was shown by Monsanto's attorney in

16 opening, the title of it is "Glyphosate use increased, NHL did

17 not," can we draw any kind of conclusions about Roundup and the

18 correlation between Roundup causing an increase in

19 non-Hodgkin's lymphoma from this graph?

20 A.   I would say no.  I think it is actually a rather

21 misleading graph that can't let you conclude anything.

22 Q.   It doesn't show a dose response, does it?

23 A.   No.

24       MR. STEKLOFF:  Objection.  Leading.

25       THE COURT:  Sustained.  That answer will be stricken.

1   BY MS. MOORE

2   Q.   Dr. Weisenburger, does it -- does this graph give you any

3   information as far as the impact of Roundup on the journal of

4   population?

5   A.   It doesn't.

6   Q.   Let's switch gears then, and I want to focus on

7   Mr. Hardeman.  Have you had an opportunity to review documents

8   and form an opinion as to whether Roundup was a substantial

9   factor in causing Mr. Hardeman's diagnosis of non-Hodgkin's

10  lymphoma?

11  A.   Yes.  So I reviewed the medical records.  I reviewed the

12  doctors' depositions.  I reviewed the deposition of

13  Mr. Hardeman and his wife.  I reviewed the pesticide fact sheet

14  for Mr. Hardeman.  And I actually talked to Mr. Hardeman on the

15  phone for about an hour to get -- to answer my questions and to

16  get a better idea of what happened to him and what kind of

17  exposures he really had to Roundup.

18  Q.   And based upon that review of depositions and the medical

19  records of Mr. Hardeman, your interview with Mr. Hardeman, have

20  you -- what is your opinion as to whether Roundup was a

21  substantial factor in causing Mr. Hardeman's non-Hodgkin's

22  lymphoma?

23  A.   Well, I think after talking to Mr. Hardeman, he had really

24  quite high exposures to Roundup over many years.  You know, he

25  used Roundup for 26 years before getting non-Hodgkin's

1  lymphoma, and 23 of those years he was using it for the -- for

2  the six months of spring and summer, he was using it twice a

3  month, for two to four hours every time, and spraying up to

4  20 gallons at one -- at one time in one day.  And he did

5  that -- and then -- then during the winter months, he would

6  spray once a month using, you know, lesser amounts.

7          MR. STEKLOFF:  Your Honor, I object to hearsay.

8          THE COURT:  Overruled.

9          THE WITNESS:  And so, you know, I did some crude

10  calculations of how many days he was -- how many days during

11  those 26 years he used Roundup based -- I used information from

12  his deposition.  So he was exposed to Roundup over 300 times

13  during those 26 years.  And he used -- my calculation -- he

14  used around 5,900 gallons of Roundup in those 26 years.

15      So, you know, he had high exposure to Roundup.  He didn't

16  wear any protective equipment, didn't wear gloves, didn't wear

17  a mask.  He wore short-sleeved shirts.  He didn't take any real

18  precautions at all when he sprayed it, so he got it on his

19  hands.  He got it on his arms.  He got it on his face.  And

20  when he was mixing it, he would sometimes even get it on his

21  hands while he was mixing it.

22      So, you know, when you add it all together, he had -- he

23  was -- he had a high exposure to Roundup over many years.

24  BY MS. MOORE

25  Q.   And based upon that -- your determination that

1    Mr. Hardeman fit into the category of high exposure, what was

2    your conclusion as to the cause of his non-Hodgkin's lymphoma?

3    **A.**    Well, my conclusion after weighing all the evidence -- and

4    we will talk about the differential diagnosis or differential

5    etiology -- but after going through all of the -- this

6    methodology, I came to the conclusion that Roundup was the

7    substantial contributing cause for him with regard to his

8    development of non-Hodgkin's lymphoma.

9    **Q.**    But, Dr. Weisenburger, the jury heard testimony last week

10   from Mr. Hardeman's treating physicians, Dr. Ye, his

11   oncologist.  And you have reviewed that deposition?

12   **A.**    Yes.

13   **Q.**    Okay.  And the jury heard that Dr. Ye had -- did not form

14   an opinion as to the cause of Mr. Hardeman's non-Hodgkin's

15   lymphoma.  Did that surprise you when you read that?

16   **A.**    No, because once the patient --

17         **MR. STEKLOFF:**  Your Honor.

18         **THE COURT:**  Overruled.

19         **THE WITNESS:**  So because once the patient has the

20   disease, unless the cause is obvious, the oncologist is more

21   concerned with treating the disease than he is trying to figure

22   out what caused the disease.  So it's not uncommon for

23   physicians not to ask questions or to try to figure out what

24   caused the disease unless it's obvious.

25   \\\

WEISENBURGER - DIRECT / MOORE

1   BY MS. MOORE

2   **Q.**   Now, you mentioned a differential.  And so what is a

3   differential?

4   **A.**   So the methodology for doing this is the same methodology

5   we use when we are diagnosing and treating patients in the

6   hospital or the clinic.  If the patient has a disease, you want

7   to think about what are all of the potential causes and risk

8   factors for that disease, and you want to go through the list

9   and try to eliminate the things that are not applicable to the

10  patient and to -- and then to just evaluate the things that may

11  be causes and hopefully come to a conclusion that one or

12  sometimes more than one thing are the cause.

13       So you want to go through the list of all the known causes

14  and try to eliminate the ones that don't apply to the case, and

15  then what you are left with are potential causes.  Then you

16  have to weigh them and see, well, which is the most important

17  of these potential causes, or you can rule some of them out.

18  **Q.**   Did you go through that process with respect to

19  Mr. Hardeman?

20  **A.**   Yes, I did.

21       **MS. MOORE:**  And, Your Honor, with your permission if I

22  can ask the witness to come off the stand and use the blowup.

23       **THE COURT:**  Sure.

24  BY MS. MOORE

25  **Q.**   Dr. Weisenburger, if you want to come this way.

1    Did you put together -- did you put together a list that

2  you used in your differential?

3  **A.**   Yes, I did.

4  **Q.**   And is this your list?

5  **A.**   Yes.

6  **Q.**   And on the left-hand column there -- if you need a pen, I

7  have one.

8    In the left-hand column, you have Known risk factors for

9  NHL.  Can you explain to the jury how you came up with what is

10  in the left-hand column?

11  **A.**   Well, these are all of the known and published risk

12  factors for non-Hodgkin's lymphoma.  So I made this list,

13  and -- with Mr. Hardeman, and I went through them by reading

14  his medical records and reading his doctors' depositions and

15  talking to him.  I went through this list and tried to rule in

16  or rule out some of these causes, okay.

17      **MS. MOORE:**   Before you do that, may I publish this to

18  the jury, too, Your Honor, on the screen?

19      **THE COURT:**   Any objection?

20      **MR. STEKLOFF:**   No, Your Honor.

21      **MS. MOORE:**   Thank you.

22  **BY MS. MOORE**

23  **Q.**   Go ahead.

24  **A.**   Okay.  So age is a known risk factor for non-Hodgkin's

25  lymphoma; that is, as you get older, your risk for

1   non-Hodgkin's lymphoma increases.  It is true of many cancers,

2   okay.  There are some cancers that are more common in children,

3   but for most cancers the risk increases as people get older.

4        And sex, I showed you that non-Hodgkin's lymphoma is more

5   common in men than women; probably 20 to 30 percent more

6   common.  And we don't really understand why that is.

7        And then race also.  Caucasians have a higher risk than

8   blacks or Hispanics, and they have a higher risk than Asians.

9   So, you know, Mr. Hardeman was 65, I think, when he got his

10  non-Hodgkin's lymphoma.  He was a male.  And he was Caucasian.

11  So he fit into this category, but I don't consider any of these

12  causative risk factors.  Did his age cause his non-Hodgkin's

13  lymphoma?  That doesn't really make sense.

14  **Q.**  When you say "causative risk factor," what does that mean?

15  **A.**  Well, it means that it is a factor that actually caused

16  the lymphoma, okay.  So I don't believe that age causes

17  lymphoma or sex causes lymphoma or race causes lymphoma.  Those

18  are risk factors, but they are not causative risk factors.

19  **Q.**  So in other words with respect to age, simply because you

20  are at an older age, does that mean you are going to get --

21  does that mean age itself is going to cause you to get

22  non-Hodgkin's lymphoma?

23  **A.**  No.

24  **Q.**  The same thing with sex and race, just because you are a

25  man that doesn't mean you are going to -- cause you to get

1    non-Hodgkin's lymphoma?

2    **A.**    No.   We can't say Mr. Hardeman got non-Hodgkin's lymphoma

3    because he is a man.   That doesn't make sense, right.   So they

4    are risk factors.   They tell you something about the disease,

5    but they don't really tell you what caused the disease.   So I

6    eliminated these three as causative risk factors.   And the

7    other thing is you have no control over that, right.   You have

8    no control over that.

9        So the next thing I thought about was family history of

10   malignancies because we do know if you have a family history of

11   a hematologic cancer, like non-Hodgkin's lymphoma or Hodgkin's

12   lymphoma or leukemia or myeloma, we know that those people have

13   a two-time increased risk for non-Hodgkin's lymphoma, okay.

14       But in Mr. Hardeman's case he didn't have any family

15   history of any of these cancers.   So he probably didn't have

16   any genetic predisposition to getting this.

17   **Q.**    Let me -- before you do that, I want to ask you:   You have

18   "hematologic malignancy."   What is that?

19   **A.**    Well, those are the family of diseases that we are talking

20   about:   Non-Hodgkin's lymphoma, Hodgkin's lymphoma, myeloma,

21   leukemia, things that hematologists are diagnosing.   And it is

22   a family history.   It is usually first-degree relatives.   So it

23   is father, mother, brother, sister, and children.   Those are

24   the things that you look at to get this increased risk.   So he

25   didn't have any family history, okay.

WEISENBURGER - DIRECT / MOORE

1    **Q.**    So you ruled that out?

2    **A.**    So I ruled that out.

3    **Q.**    Okay.

4    **A.**    Pesticide use --

5    **Q.**    Before you go there, I just want to ask you -- because the

6    jury heard some testimony about Mr. Hardeman having a couple of

7    sun spots, basal cell carcinoma on his leg, and melanoma last

8    year on his shoulder -- I don't see that you have skin cancer

9    up here.  Can you explain to the jury why you didn't put that

10   on here?

11   **A.**    Well, because it is not really a causative risk factor.

12   And Mr. Hardeman had one basal cell carcinoma.  It is a very

13   common tumor, okay.  Melanomas are also fairly common.

14        So -- and neither basal cell carcinoma or melanomas are

15   causes of non-Hodgkin's lymphoma.  It is -- they are usually

16   due to the sun damage, okay, ultraviolet light damage to the

17   skin.  And we know that people who get a lot of sun exposure

18   have a lower risk of non-Hodgkin's lymphoma, not a higher risk.

19   So I don't see that -- how that fits in at all.  It is -- it

20   doesn't -- I didn't -- I didn't add it into my differential,

21   no.

22   **Q.**    Go ahead with the next thing you put on your risk factor

23   list.

24   **A.**    So the next thing was pesticide use.  And, of course, as

25   we talked about, he had high exposures to Roundup for many

1    years.  I asked about other pesticides because we know there

2    are other pesticides that cause non-Hodgkin's lymphoma, and he

3    didn't use any of those other pesticides.  In fact, the only

4    thing he ever used was he would occasionally, maybe once a

5    year, spray for ants in the house, okay, buying something off

6    the shelf.

7         So the only -- the only pesticide that he used in any

8    amount was Roundup, okay.  So I think we have to put Roundup

9    over here -- excuse my writing -- over there --

10   **Q.**   You are a doctor.

11   **A.**   -- as a possible risk factor for his non-Hodgkin's

12   lymphoma, okay.

13   **Q.**   Let me stop you there because you moved Roundup over to

14   this column right now, does that mean you have already

15   determined that it is the cause?

16   **A.**   No.  We have to go through these other -- the rest of the

17   list here to see if there were other important risk factors.

18   **Q.**   Okay.  All right.  The next one?

19   **A.**   So we know that obesity is sort of a weak risk factor for

20   non-Hodgkin's lymphoma.  Mr. Hardeman wasn't obese, but he is a

21   bit overweight, okay.  His average weight was about 190 pounds,

22   and I think his height was only -- I can't even remember.  But

23   the calculation of his body mass index was in the overweight

24   category, not in the obese category.  But even overweight

25   people can have an increased risk of non-Hodgkin's lymphoma.

WEISENBURGER - DIRECT / MOORE

 1  But it is a small risk.  It is not a big risk.

 2      So, you know, we probably have to include obesity.  His

 3  risk would have been maybe 1.3, maybe a 30 percent, increased

 4  risk.  We will put obesity there, really meaning overweight.

 5  **Q.**  Okay.  Did you want to write "overweight"?

 6  **A.**  No.  It's okay.

 7  **Q.**  Then the next one?

 8  **A.**  The next one is viral infections.  And there are a number

 9  of viral infections that actually cause non-Hodgkin's lymphoma.

10  One of the best known ones is Epstein-Barr virus.  It is the

11  same one that causes infectious mononucleosis, but it also

12  causes non-Hodgkin's lymphoma in some people, okay.  But he

13  didn't have any evidence of that in his biopsy or even in his

14  blood testing.

15      And then there is some other less common viruses that also

16  cause non-Hodgkin's lymphoma, but there are two viral

17  infections that do cause non-Hodgkin's lymphoma.  One is

18  hepatitis C virus infection and one is hepatitis B virus

19  infection; and he did have a history of both of those viral

20  infections, okay.  So we have to put both of those over here in

21  the column and evaluate whether they could be the cause of his

22  non-Hodgkin's lymphoma, okay.  So we will say hepatitis C and

23  hepatitis B.

24  **Q.**  Okay.  And then you want to finish off the list then?

25  **A.**  And then bacterial infections.  There are some bacterial

 1    infections that can cause non-Hodgkin's lymphoma.  The most

 2    common one is non-Hodgkin's lymphoma of the stomach related to

 3    a bacteria, but he didn't have any evidence of bacterial

 4    infections that would fit into that category.  So I excluded

 5    that one.

 6         People who have immune deficiency have an increased risk

 7    of non-Hodgkin's lymphoma.  So we were talking about people

 8    with HIV/AIDS, for example.  That is a good example.  They have

 9    a very dramatic knockout of their immune system, and then they

10    get infections and they can get lymphoma, okay.  And people who

11    have organ transplants, for example, they are put on drugs that

12    could decrease their immunity and then they can get

13    non-Hodgkin's lymphoma.  But he didn't have any history of any

14    of that kind of severe immunodeficiency.  So I crossed that one

15    out.

16         And then immunosuppression.  So if you give certain drugs

17    or chemotherapy, you can knock the immune system down and

18    increase the risk for non-Hodgkin's lymphoma; but he really

19    didn't have any history of immunosuppression by drugs or other

20    things, so I crossed that one out.

21         Another thing that can cause non-Hodgkin's lymphoma is

22    autoimmune diseases.  So diseases like rheumatoid arthritis,

23    for example, diseases like systemic Lupus or celiac disease,

24    et cetera.  There are a variety of autoimmune diseases where

25    the immune system is altered and the body reacts against

1    itself, and people with those diseases can have an increased

2    risk for non-Hodgkin's lymphoma.

3    **Q.**    And based on your review of Mr. Hardeman's medical

4    records, did he have any type of autoimmune disease?

5    **A.**    He didn't so I crossed that one out.

6          And then chronic inflammation is a known cause.  So people

7    who have some kind -- the most recent one actually that I think

8    is the best example is we now know that women who have breast

9    implants have an increased risk for non-Hodgkin's lymphoma.

10   And why is that?  Well, they have chronic inflammation

11   associated with that breast implant, and a small percentage of

12   women actually get non-Hodgkin's lymphoma that comes out of

13   that chronic inflammation.

14         And there's some other examples that are -- you know, that

15   I could give you, but he didn't have any evidence that he had

16   some kind of chronic inflammation going on in his body so I

17   crossed that one out.

18         And then the last one is solvent use.  We talked a little

19   bit about that earlier.  So people who use solvents,

20   particularly people who use a lot of solvents in their work,

21   like painters or machinists, people who are using solvents to

22   clean their brushes or clean their equipment or their machines

23   have an increased risk of non-Hodgkin's lymphoma; but he didn't

24   have any history of solvent use, and so we crossed out that one

25   as well.

**WEISENBURGER - DIRECT / MOORE**

1      So what we're left with is Roundup and obesity and

2  hepatitis C and possibly hepatitis B as the possible causes for

3  his non-Hodgkin's lymphoma.

4  **Q.**   So once you've eliminated these other risk factors and now

5  you've looked at, for Mr. Hardeman in particular, these four,

6  what's the next step in your process?

7  **A.**   So the next step is to take a hard look at each of these

8  and decide whether they're strong risk factors or weak risk

9  factors or maybe not even risk factors at all depending on the

10  history of what happens with the viral infections.

11  **Q.**   Okay.  So which one do you want to start with, then, and

12  explain to the jury what your process was next?

13  **A.**   Well, I think we should start with the hepatitis B and

14  hepatitis C and talk about those because those are -- those

15  could also be substantial risk factors.  Okay?

16  **Q.**   And in Mr. Hardeman's case, let's start with hepatitis C,

17  when you were looking to see whether it is a substantial

18  factor, what did you look at?

19  **A.**   So I had to go back and do a lot of research on

20  hepatitis B and hepatitis C to really understand who's at risk

21  and what is the risk -- okay? -- and what I found was that

22  people who have chronic active hepatitis, they have the virus

23  causing the disease in their liver, those are the people who

24  are at risk for developing non-Hodgkin's lymphoma.  So in some

25  ways they have chronic inflammation that's causing liver damage

**WEISENBURGER - DIRECT / MOORE**

1   and eventually cirrhosis.  Okay?

2       And when Mr. Hardeman was found to have hepatitis, first

3   of all, he was found to have cirrhosis; and then they looked to

4   see what could cause the cirrhosis, and they said, "Oh, my

5   gosh.  He's got hepatitis C -- hepatitis."  So you have to look

6   at the whole story here and try to figure it out.

7       But what the literature says is that you have to have

8   chronic active hepatitis to be at risk for non-Hodgkin's

9   lymphoma.

10  **Q.**   So did Mr. Hardeman at one point in time have chronic

11  active hepatitis C?

12  **A.**   Yes, he must have because he had cirrhosis in 2005 when

13  the cirrhosis was discovered; and then they did the test for

14  hepatitis B and hepatitis C, and they found that he had an

15  active infection of hepatitis C.  He had lots of viral

16  particles in his blood, and they tested him also for

17  hepatitis B, and he was found to be immune to hepatitis B.

18      So he didn't have an active infection of hepatitis B.

19  Because of his prior infection, he became immune to

20  hepatitis B, and so he was immune to that virus.

21  **Q.**   Well, that's what I wanted to ask you.  You say he was

22  immune to hepatitis B and you've got it over in this column.

23  What does immune to hepatitis B mean?

24  **A.**   Well, it means that he developed immunity.  So, for

25  example, if you get a vaccine to -- you know, when you're

1    little, you got vaccinated; right?  And after they vaccinated

2    you with, let's say, the polio -- attenuated polio virus, you

3    developed immune response to that polio virus and it protects

4    you from getting polio; right?

5         Well, the same thing happens with hepatitis B.  If you get

6    hepatitis B, you might be sick for a while but then your body

7    develops immunity, gets rid of the hepatitis B, and you have an

8    immunity and you're protected from hepatitis B in the future.

9    Okay?

10   **Q.**   Is that what happened with Mr. Hardeman?

11   **A.**   And that's what happened with Mr. Hardeman.  He didn't

12   have any evidence of hepatitis through the hepatitis B.  He was

13   immune to hepatitis B virus.

14   **Q.**   And then -- and when do you know that he was -- at what

15   point in time, based on your review of the records, do we know

16   that he was immune to hepatitis B?

17   **A.**   Well, they did the test in 2005.  At the time they were

18   working him up for his cirrhosis, they did tests for

19   hepatitis B and hepatitis C; and they thought because he had

20   active hepatitis through the hepatitis C, that that was the

21   main cause of his cirrhosis.

22   **Q.**   All right.  So you keep mentioning "active."  Can you

23   explain to the jury a little bit more?  What does it mean to

24   have active hepatitis?

25   **A.**   So active hepatitis means you have inflammation in the

**WEISENBURGER - DIRECT / MOORE**

1    liver.  The virus is infecting the liver cells.  It's

2    destroying the liver cells and eventually the liver gets

3    scarred from all the inflammation and death of liver cells and

4    you end up with cirrhosis, just scarring of the liver.  Okay?

5    And that's what he had in 2005, not a severe case but, you

6    know, it definitely was there.

7    **Q.**    Is liver damage an expected outcome with someone who has

8    hepatitis C?

9    **A.**    Yes.

10   **Q.**    And based on your review of the literature,

11   Dr. Weisenburger, people who have active hepatitis C, what

12   percentage of those people go on to develop non-Hodgkin's

13   lymphoma?

14   **A.**    It's actually quite a low percentage.  It's less than

15   1 percent.  Probably less than a half a percent.  The data is

16   not very -- there's not very good data on exactly what

17   percentage it is but it's low.  It's much lower than liver

18   cancer as a result of hepatitis and cirrhosis.  It's probably

19   10 times less common than liver cancer.

20   **Q.**    So what does that mean for Mr. Hardeman?  What would you

21   expect -- given that he had active hepatitis C, what would you

22   expect that to develop in to --

23   **A.**    Well, I think --

24   **Q.**    -- based on those stats?

25   **A.**    -- I think, you know, when we look back at his history, he

WEISENBURGER - DIRECT / MOORE

1  thought he probably contracted the hepatitis C and hepatitis B

2  sometime in the 1960s.  So he probably had the infection to

3  hepatitis C since that time.  So he had it probably for almost

4  40 years causing chronic hepatitis.  Not making him very sick

5  because he never really went to the doctor saying "I'm sick";

6  but by the time he did get to the doctor in 2005, he was found

7  to have scarring of the liver and cirrhosis and some hepatitis

8  as well.  There was evidence of liver damage from blood tests.

9        So, you know, he probably had the hepatitis C for about 40

10 years -- 39, 40 years.  He probably had the hepatitis B at

11 sometime during that same time frame but became immune to it

12 and, you know, kept that infection in check.

13 Q.  So in the time period that you're talking about the active

14 hepatitis C, what time period is that?

15 A.  For Mr. Hardeman?

16 Q.  For Mr. Hardeman.

17 A.  It was about 39 years.

18 Q.  So from what year to what year?

19 A.  Probably 1996 to 2005, something like that.  So 39, 40

20 years.

21 Q.  Well, you said "1996," so --

22 A.  Let's see...

23 Q.  Now I've got you in a math problem here.

24 A.  1966.  1966 to 2005.  I'm sorry.

25 Q.  That's okay.  That's okay.

1      And so during the time that Mr. Hardeman likely had active

2   hepatitis C for those 39 years or so, did he get non-Hodgkin's

3   lymphoma?

4   **A.**    No.  So that's when he would have been at risk for getting

5   non-Hodgkin's lymphoma, and he didn't get non-Hodgkin's

6   lymphoma and luckily he didn't get liver cancer either --

7   okay? -- which are the two cancers he would have been at high

8   risk for.

9   **Q.**    All right.  So based on your review, then, what happened

10   after he found out in 2005 that he had hepatitis C?

11   **A.**    Well, by that time we have had fairly good treatments for

12   hepatitis C so he was given a course of antiviral therapy,

13   which included two drugs -- one called Interferon, another

14   called Ribavirin -- and he was given a course of that treatment

15   over a period of about 46 weeks.  Okay?

16      And what happened to him was that within 12 weeks, his

17   viral DNA in the blood, which is the way they made that, his

18   viral DNA in the blood went away -- okay? -- and he no longer

19   had evidence of the viral infection, but they continued to

20   treat for up to 46 weeks because you know that you have to

21   continue to treat for a long time afterwards to get rid of

22   hepatitis C so that's what they did.

23   **Q.**    Okay.

24   **A.**    And during that period of treatment, once his viral

25   testing in the blood became negative at 12 weeks, it stayed

 1    negative through the whole treatment right out to the end of

 2    the treatment.

 3    **Q.**   And I think we have -- and, Dr. Weisenburger, is that

 4    based on your review of his test results?

 5    **A.**   Yes.

 6    **Q.**   Okay.  And I think we have a summary of his test results,

 7    and I'm going to slide behind you and put that up on the board.

 8    **A.**   Take this off?

 9    **Q.**   It's fine.  We're going to leave it there.

10         And this is a summary of the test results.

11              **MS. MOORE:**  May we publish that to the jury,

12    Your Honor, please?

13              **THE COURT:**  Sure.

14              **THE WITNESS:**  So this just shows you the chronology of

15    his hepatitis C.  So in 2005, January 2005, the test was found

16    to be positive.  Okay?  And so at that point he was treated

17    with this antiviral therapy to try to cure him of the

18    hepatitis C.  Okay?  And, in fact, within just 12 weeks, his

19    viral RNA in the blood became negative.  Okay?

20         And then he was treated for, I think, 46 weeks and he

21    stayed negative through that time.  At the end of the

22    treatment, he was still negative.  And then they monitored him

23    for over five years, and he stayed negative for the whole time.

24    Okay?

25    \\\

WEISENBURGER - DIRECT / MOORE

1   BY MS. MOORE:

2   Q.   What's the significance of once he started antiviral

3   treatment for hepatitis C that he stayed negative during

4   treatment and then after treatment?

5   A.   Well, you would consider him to have a rapid response

6   because he quickly became negative, and then you would consider

7   him to have what we call the sustained virologic response

8   because he stayed negative for six months and then for five or

9   six years thereafter.  Okay?

10       So most people who treat hepatitis C would say that he was

11  cured of his hepatitis -- okay? -- in terms -- because his

12  liver function tests became normal and the virus disappeared

13  from the blood.  Okay?

14  Q.   And are these factors that were important for you in

15  determining whether to rule in or rule out hepatitis C as a

16  cause?

17  A.   Well, they were because I realized that when he got his

18  non-Hodgkin's lymphoma, he had already been free of the virus

19  for nine years.  Okay?  He'd been cured of the virus for nine

20  years.

21       And so part of the research I did was to say:  Well, okay.

22  We know that people who have active hepatitis C have an

23  increased risk for non-Hodgkin's lymphoma, probably two- to

24  threefold increased risk; but what about people who are treated

25  with antivirals, have a sustained virologic response, and are

WEISENBURGER - DIRECT / MOORE

 1  cured of the virus?  Do those people -- are they still at

 2  increased risk for hepatitis C causing non-Hodgkin's lymphoma?

 3      So that was the question I had to answer.

 4  **Q.**  Okay.  And so I want to make sure.  So the first factor

 5  you said was a rapid response; is that right?

 6  **A.**  Right.  He had a rapid response in that he cleared the

 7  virus within the first 12 weeks.

 8  **Q.**  So I'm going to say within 12 weeks; is that right?

 9  **A.**  Yes.

10  **Q.**  Okay.  And then you said he was cured of hepatitis C?

11  **A.**  Yes.  So after you stay negative for six months during

12  the -- six months after the therapy is completed, then you're

13  considered cured, and he did meet that criteria.  So he was

14  considered by his doctors at Kaiser to be cured of the

15  hepatitis C, and they stopped -- then they stopped the

16  antiviral treatment after the first 46 weeks.

17          **THE COURT:**  Can I interrupt for a minute?  I think now

18  would be a good time for a five-minute break.

19          **MS. MOORE:**  Thank you, Your Honor.

20          **THE COURT:**  Why don't we go ahead and take a break.

21  Be back at 2:00 o'clock.

22          **THE CLERK:**  All rise.

23      (Proceedings were heard out of the presence of the jury:)

24          **THE CLERK:**  Please be seated.

25          **THE COURT:**  All right.  Back in a few minutes.

1          **MS. MOORE:**  All right.  Thank you, Your Honor.

2                          (Recess taken at 1:56 p.m.)

3                   (Proceedings resumed at 2:01 p.m.)

4      (Proceedings were heard out of the presence of the jury:)

5          **THE COURT:**  Okay.  You can bring the jury back in.

6          **MS. MOORE:**  Thank you, Your Honor.

7      (Proceedings were heard in the presence of the jury:)

8          **THE COURT:**  Okay.  You can resume.

9          **MS. MOORE:**  And, Your Honor, before I get right back

10     into the questioning, a couple of housekeeping matters that

11     Ms. Melen asked about.

12         And that is the summary of Mr. Hardeman's test results for

13     hepatitis C viral load that we have up on the easel is

14     Exhibit 940, and we would move to enter that into evidence as

15     Exhibit 940.

16         **THE COURT:**  Any objection?

17         **MR. STEKLOFF:**  No objection, Your Honor.

18         **THE COURT:**  It will be admitted.

19     (Trial Exhibit 940 received in evidence)

20         **MS. MOORE:**  Thank you, Your Honor.

21         And then I also had shown this trend in incidence rates,

22     and I did not mark it for identification, and we would mark it

23     as identification 949, "Trends and Incidence Rates 1975 to

24     2015."

25         I apologize for that, Your Honor.

1        (Trial Exhibit 949 marked for identification)

2    **BY MS. MOORE:**

3    **Q.**    Now, Dr. Weisenburger, let's go back to where we were, and

4    you were on this summary that we marked as Exhibit 940, and we

5    were getting back to the point where you said he had been

6    considered cured of hep C.  And then what was the next step in

7    your process?

8    **A.**    Right.  So he was cured of hep C and he remained viral --

9    virus negative for nine years up until his diagnosis of

10   non-Hodgkin's lymphoma in early 2015.  Okay?

11       And --

12   **Q.**    Well, hold on.  You said "up until."  Was he still

13   considered cured when he was diagnosed with non-Hodgkin's

14   lymphoma?

15   **A.**    Yes.  So he was tested at that time -- you can see the

16   test right here -- and he was still negative.  Okay?  So at the

17   time he was diagnosed with non-Hodgkin's lymphoma, his viral

18   test in the blood was still negative so he was still considered

19   to be cured.  Okay?

20       And I don't know if I told you this, but he was found to

21   be immune at the time of the diagnosis for hepatitis C.  So he

22   wasn't thought to have an active infection.

23   **Q.**    Let me interrupt.  You said hepatitis C.

24   **A.**    Hepatitis B.  Hepatitis B.

25       So they retested him for hepatitis B here.  He continued

WEISENBURGER - DIRECT / MOORE

1  to be immune.  Okay?  There was no evidence of a viral

2  infection due to hepatitis B or hepatitis C at the time of his

3  non-Hodgkin's lymphoma.

4  **Q.**  So can I say "immune hepatitis B" here?

5  **A.**  Right.

6  **Q.**  If I can spell it.

7      Okay.  Is that right?

8  **A.**  So one of the things that the clinicians worry about is

9  when you treat people for non-Hodgkin's lymphoma and they have

10  had a past infection for hepatitis C or hepatitis B, they

11  sometimes have small amounts of that virus still in their

12  body -- okay? -- but the immune system is holding it in check.

13      So he could have some virus in the liver.  He could maybe

14  even have some virus in B cells.  Okay?  But it's at a very low

15  level, what we call latent -- present in the latent state, and

16  it's held in check by the immune system.

17      But because they knew he had this history of hepatitis C

18  and hepatitis B, they decided they should monitor him because

19  when you give the chemotherapy, you cause immunosuppression and

20  the viruses can reactivate and cause hepatitis.  Okay?  And

21  they don't want that to happen when he's getting his

22  chemotherapy.  Okay?

23  **Q.**  So let me stop you right there.  What is

24  immunosuppression?

25  **A.**  So immunosuppression is what we talked about earlier where

WEISENBURGER - DIRECT / MOORE

1   we give drugs that knock the immune system out and increase the

2   risk for infection.  And because he had these two viral

3   infections before and he might have some of that virus still in

4   his body at a very low level, they decided, first of all, to

5   give him antiviral drug for his hepatitis B -- okay? -- because

6   there was a drug they could give him to make sure that if he

7   had some hepatitis B still in his system, that it wouldn't

8   reactivate during the chemotherapy.

9        And for hepatitis C there isn't a drug that you can give

10  to prevent it so what they did is they just carefully monitored

11  it every few weeks to make sure that he didn't reactivate his

12  hepatitis C because if he did, they would have to give him the

13  antiviral therapy like they did back in 2005.

14  Q.   So right here where you have this shaded, is this the test

15  they did to check him to see if the hepatitis C or B came back

16  while undergoing chemo?

17  A.   While undergoing chemo and -- yeah, while undergoing

18  chemo.  So he went under chemo for about six or eight -- about

19  six weeks.  So during that period of time, they -- six months.

20  So during that period of time, they were checking him every few

21  weeks for his hepatitis C infection.  And they were also doing

22  a test for his hepatitis B infection to make sure he didn't

23  reactivate that; but because he was on antivirals for that, it

24  was pretty unlikely that that would happen.  But they monitored

25  both of those infections, those possible infections.

WEISENBURGER - DIRECT / MOORE

1  Q.  So with respect to the hepatitis C, there was no drug they

2  could give him to make sure that didn't come back; right?

3  A.  Right.

4  Q.  Okay.  So during the time he was undergoing chemotherapy

5  when his system was weak, did the hepatitis C come back?

6  A.  It didn't.

7  Q.  And what is the significance of that?

8  A.  Well, what that would tell you is that he didn't have it

9  in his system at all or his immunity didn't get knocked down so

10  low that the virus would come back.  So we don't really know,

11  but what we do know is that he didn't develop an active

12  hepatitis infection even when he was getting the

13  immunosuppressive drugs for the lymphoma.  Okay?

14  Q.  All right.

15  A.  And the same is true for the hepatitis B infection as

16  well.

17  Q.  Let me take this down and let's go back.

18      So going back to your process to eliminate -- or, I'm

19  sorry -- going back to your process to consider hepatitis B

20  and C with respect to the non-Hodgkin's lymphoma, what did you

21  do next?

22  A.  Well, so I did some research and I read about hepatitis B

23  and hepatitis C, and the main question was:  If you -- if you

24  have a cure -- if you're cured of your hepatitis C, do you

25  still have an increased risk for non-Hodgkin's lymphoma?

**WEISENBURGER - DIRECT / MOORE**

1    And, in fact, the answer is no, which makes sense because

2   the virus is what's causing the infection.  And so if you get

3   rid of the virus and you no longer have an active infection,

4   then you wouldn't get the lymphoma from the virus because the

5   virus is gone.  Okay?

6       And the same is true -- and the same is true for

7   hepatitis B.  So I wanted to know:  Well, are people who are

8   immune to hepatitis B, are they still at increased risk for

9   non-Hodgkin's lymphoma?  And the answer for that was no too.

10      So if you're -- if you're cured of hepatitis C or if

11  you're immune to hepatitis B, you no longer have an increased

12  risk for non-Hodgkin's lymphoma -- okay? -- because you're

13  cured of the virus.  And even if there's small amounts of

14  either B or C in your body, they're in a latent state held in

15  check by the immune system; and the literature shows that when

16  that occurs, there's no increased risk for non-Hodgkin's

17  lymphoma with either hepatitis B or hepatitis C.

18      And I'm going to show you some -- some -- actually some --

19  **Q.**   Do you want to do that now?

20  **A.**   -- some data from the literature to convince you of that.

21  Okay?

22  **Q.**   Okay.  All right.  Go ahead.  You can go back to the

23  stand.  Thank you.

24      Let's go to the Gianelli graph.  It's actually -- don't

25  kill me, Dr. Weisenburger, but I think you're going to have to

WEISENBURGER - DIRECT / MOORE

1   come off the stand because this is a blow-up.  I'm sorry.

2   **A.**   Oh.

3   **Q.**   You're going to get your exercise.

4        Someone's got my stuff out of order.  Oh, here we go.

5            **MS. MOORE:**  Counsel, this is Gianelli.

6            **MR. STEKLOFF:**  No objection.

7            **MS. MOORE:**  And we'll mark this for identification

8   purposes as 938.

9        (Trial Exhibit 938 marked for identification)

10  **BY MS. MOORE:**

11  **Q.**   And, Dr. Weisenburger, can you explain to the jury what

12  this chart is that we're looking at?

13       And if I could, Your Honor, may I publish this to the

14  jury?

15           **THE COURT:**  Sure.

16           **THE WITNESS:**  So this is from one of the studies of

17  hepatitis C and it shows what happens when patients have a

18  complete virologic response like Mr. Hardeman had to the

19  antiviral therapy for hepatitis C.  Okay?

20       So here he has the infection, and -- I'm trying to see

21  what -- the black box is one of the liver function tests called

22  the ALC; and, of course, his liver function tests are

23  remarkably abnormal and elevated at the time of the diagnosis

24  of hepatitis.  Now, Mr. Hardeman's weren't quite this high, but

25  his tests were also elevated, his liver function tests.

1    And this shows the viral load.  Okay?  This diamond again

2    is very high, about here 5 million copies of viral RNA in

3    his -- per mil.  Okay?

4    **BY MS. MOORE:**

5    **Q.**   And what does viral load represent?

6    **A.**   So viral load just tells you how much virus you have

7    circulating in your blood.  Okay?  And Mr. Hardeman had about,

8    I think, 2 million copies but still a significant number.

9        So --

10   **Q.**   And this graph here, the Gianelli graph, this is from an

11   actual patient?

12   **A.**   This is an actual patient that was treated with antiviral

13   therapy in that paper.  Okay?

14   **Q.**   Go ahead.

15   **A.**   Yeah.  So it shows you.  So you can see when you give the

16   antiviral therapy, what happens.  You get a dramatic decrease

17   in the liver enzymes and they come back to normal.  Okay?  And

18   they stay normal over here (indicating) over a two-month --

19   over a two-year period.

20       And the same thing happens.  There's a dramatic decrease

21   in the viral RNA in the blood and it goes down to zero --

22   okay? -- which is exactly what happened to Mr. Hardeman, and

23   then it stayed negative over the 24 months.

24       So Mr. Hardeman was very much like this patient who was

25   treated in the paper.  And here you see the viral RNA test.

1    It's initially positive and then it becomes negative over time.

2    Okay?

3         So this is what --

4    **Q.**   And is that --

5    **A.**   -- this is what would have happened to Mr. Hardeman.

6    Okay?

7    **Q.**   And so if we go back to our Exhibit 940, Dr. Weisenburger,

8    here --

9    **A.**   Here's the positive (indicating) and then --

10   **Q.**   So that's before the treatment?

11   **A.**   Yep.  And then here are all the negatives (indicating).

12   **Q.**   And that's after the treatment?

13   **A.**   After the treatment, yes.

14        And so this is the kind of response that Mr. Hardeman had

15   to the treatment for his hepatitis C infection.

16   **Q.**   So what does this tell us?

17   **A.**   Well, what this tells us is that once you treat these

18   patients with antiviral therapy and they have a sustained

19   virologic response, their liver disease stabilizes and it

20   doesn't get worse, and there's little or no continued damage to

21   the liver and the virus is completely gone from the blood and

22   is no longer causing disease.  Okay?

23        And, in fact, what I'm going to show you is once you get

24   to this state of sustained virologic response, you no longer

25   have an increased risk for non-Hodgkin's lymphoma -- okay? --

1   which was what the state Mr. Hardeman was in for nine years

2   before he got the non-Hodgkin's lymphoma.

3        So it's very unlikely, it's almost impossible that the

4   hepatitis C could have caused his non-Hodgkin's lymphoma

5   because he was cured of the hepatitis C nine years before he

6   got the non-Hodgkin's lymphoma.

7   **Q.**   Okay.  If you want to go back to the stand, and I think

8   there's some other literature.

9   **A.**   Right.

10  **Q.**   And I'll direct you to -- this is Tab 1531 in your binder.

11           **MS. MOORE:**  And permission to publish, please.

12           **MR. STEKLOFF:**  No objection, Your Honor.

13           **THE COURT:**  Go ahead.

14           **THE WITNESS:**  So this is some data on hepatitis B and

15  hepatitis C viral infection and the risk of non-Hodgkin's

16  lymphoma.  It was a case-control study from Italy and, I mean,

17  what the study showed is that if you have chronic active viral

18  infection with either hepatitis B or hepatitis C, you are at

19  about a two- to threefold increase risk of non-Hodgkin's

20  lymphoma.

21       But as I'll show you, if you have a history of past

22  infection and you no longer have the infection, then the risk

23  goes away.

24       So let's -- there's a table in this paper that I want to

25  show you.  Can we hone in on table -- this table?  Yeah.

WEISENBURGER - DIRECT / MOORE

1   So basically this -- the top half -- this doesn't really

2   show very well.  It shows hepatitis C.  So she's got the bar

3   where it says "HCV."  That's hepatitis C.  So we're going to

4   talk about hepatitis C first.  Okay?

5       So if you -- and this is -- it's done in a case-control

6   format.  So you have an odds ratio -- you have the cases, you

7   have the controls, and then you have the odds ratio on the far

8   right.  Okay?

9       So the first category of people are the people who have

10  immunity to hepatitis C virus.  Okay?  And they have the

11  antibody but they don't have the viral infection.  Okay?

12      No, these are the people who never -- I'm sorry.  These

13  are the people who don't have the antibody.  So they have never

14  been exposed to hepatitis C.  So this is your control group.

15  Okay?  And they have a risk ratio of 1.

16      If you look at the ones that have the antibody to

17  hepatitis C, then you see the risk goes up to over twofold like

18  I told you.  So if you have had an -- if you have a history of

19  an infection with hepatitis C, you have an over twofold

20  increased risk.

21      But then if we divide that into --

22  **BY MS. MOORE:**

23  **Q.**  Dr. Weisenburger, can I stop you for a second?

24      So the first row where it says anti-HCV, anti-

25  hepatitis C --

**WEISENBURGER - DIRECT / MOORE**

1   **A.**   Then it says negative.   There's a little negative there.

2   **Q.**   Oh.   There you go.

3   **A.**   You can't see it.

4   **Q.**   Off the V.

5         Okay.   Sorry the copy is bad.

6   **A.**   Yeah.

7   **Q.**   So the anti-HCV negative there, those are people who do

8   not have hepatitis C?

9   **A.**   They never had hepatitis C --

10  **Q.**   Okay.

11  **A.**   -- right.

12  **Q.**   So that's a control group?

13  **A.**   That's sort of your --

14  **Q.**   Like a control group?

15  **A.**   -- control group, right.

16  **Q.**   Okay.   And then the next row are people who do have

17  hepatitis C?

18  **A.**   They have antibody to hepatitis C.   So we know that they

19  either have an active infection or they have had the infection

20  in the past.   We don't really know which of those is, and

21  that's why you have to test for the hepatitis C RNA, which is

22  the next line.   Okay?

23       And so if you test -- so you take these people that have

24  the antibody and you say, "Okay.   Do they have active infection

25  or not?"

**WEISENBURGER - DIRECT / MOORE**

1    So you measure the hepatitis C virus in the blood; and if

2    it's negative, look across.  There's no increased risk for

3    non-Hodgkin's lymphoma.  The number is essentially 1.  Okay?

4    Just like the people who never had it.

5        But if you look at the next line, people who have the

6    virus in their blood, those are the ones who are at increased

7    risk for non-Hodgkin's lymphoma.

8        So this makes the point that I told you that you have to

9    have chronic active viral hepatitis at the time you're

10   diagnosed with non-Hodgkin's lymphoma -- okay? -- to give you

11   an increased risk for non-Hodgkin's lymphoma.

12       If you're immune to it, like the column above where they

13   have the antibody but they don't have the virus, then you're

14   immune to it.  Okay?

15   **Q.**   So in Mr. Hardeman's case, when he's cured of hepatitis C

16   in 2006 and diagnosed with non-Hodgkin's lymphoma in 2015, what

17   conclusions can you draw from this table here?

18   **A.**   Well, from this table if you have -- if you don't -- if

19   you have the antibody, which he did, and you don't have the

20   virus, then you're actually on the line between the two yellow

21   lines where you have an odds ratio of .98, which is

22   essentially 1, which is the same for your people who never had

23   a hepatitis C infection.  Okay?

24       So just the fact that you had an infection in the past

25   does not put you at any increased risk for non-Hodgkin's

**WEISENBURGER - DIRECT / MOORE**

1    lymphoma.  It's only if you have an active infection that's

2    ongoing right up until the time you get non-Hodgkin's lymphoma,

3    which he didn't have.

4    **Q.**   Okay.

5    **A.**   So let's go to the bottom half of that table because it

6    also then talks about hepatitis B, you know.  So this is the

7    same format, and there are three different tests here.  Let's

8    go across the first row.  Okay?

9        So it's hepatitis surface antigen negative.  Hepatitis --

10   so that's the antigen, that's the actual virus, the measure of

11   the virus in the blood.

12   **Q.**   What's an antigen?

13   **A.**   It's the -- it's part of the coat -- the coat of the

14   virus.  It's a protein that's part of the coat of the virus,

15   and you can measure it.  And so it tells you the virus is there

16   because you're finding the protein of the virus.

17       So in that first group, which is your control group, we

18   have -- you can't really see it very well unfortunately, but

19   it's hepatitis surface antigen negative and antibody surface

20   negative and antibody core protein negative.  So these are

21   people who have never had hepatitis B.  Okay?  They have no

22   evidence of infection.  They have no evidence of immunity.

23   Okay?

24   **Q.**   Just like the line from the hepatitis C, the first line?

25   **A.**   Right.  So the odds ratio for them is 1.  They're your

**WEISENBURGER - DIRECT / MOORE**

1  control group again.  Okay?

2      Now, the next group is a group that has hepatitis surface

3  antigen negative, does not have the surface antibody, but has

4  the core antibody.  Okay?  And that's what Mr. Hardeman had.

5  When they tested him, he was negative for the surface antigen,

6  he was negative for the surface antibody, and he was positive

7  for the core antibody showing that he had immunity.

8      And if you go across, you can see that the odds ratio is

9  less than 1.  So there's no increased risk for people who have

10  immunity to hepatitis C virus, which is what he had at the time

11  he was diagnosed with lymphoma.

12      If you go to the next one, again, it's hepatitis -- I

13  mean, I can't read it because I have to pull up --

14  **Q.**  Do you want the actual study?

15  **A.**  I want the actual study because I can't read the --

16  **Q.**  Sorry.  If you turn in your binder to 1531 and it's

17  page 4.

18  **A.**  (Witness examines document.)  All right.  That's not much

19  better.

20      (Witness examines document.)  I don't have my copy.

21      (Witness examines document.)  Yeah, so the second row,

22  unfortunately, is -- the antigen is negative but both

23  antibodies are positive.  So he's immune.  Okay?

24      So he was actually this -- the third one -- the third one

25  is the antigen negative, the surface antibody positive, and the

**WEISENBURGER - DIRECT / MOORE**

 1  core antibody negative.  And, again, there's no increased risk.

 2  Okay?  So he's immune.

 3      The fourth one is again the antigen is negative, the

 4  surface antibody is negative, and the core antibody is

 5  positive.  And that's what Mr. Hardeman had.  I'm sorry.  It

 6  was this fourth one.

 7      So he didn't have any evidence of active viral infection,

 8  and he had at least the anti-core antibody saying that he was

 9  immune.  And, again, you can see the risk ratio is 1.1.  It's

10  very close to 1 and it's not significant.  So he would not have

11  been at increased risk for non-Hodgkin's lymphoma based on

12  this.

13      And then the last one is people who have -- are surface

14  antigen positive.  That indicates that they have active viral

15  infection.  And if you look across, those are the people --

16  that's the only group that has an increased risk of

17  non-Hodgkin's lymphoma of about twofold increased risk.  Okay?

18  **Q.**  And does Mr. Hardeman fall in that last list?

19  **A.**  No, he doesn't.  He falls in the one above it.

20  **Q.**  Okay.

21  **A.**  Okay.  So basically this is data that shows you if you're

22  immune to hepatitis C and you're immune to hepatitis B, you're

23  not at increased risk for non-Hodgkin's lymphoma.  It's only

24  when you have the active viral infection that you're at

25  increased risk.

WEISENBURGER - DIRECT / MOORE

1   **Q.**   Okay.  All right.  So then were there other studies that

2   you relied on in forming your opinion regarding the

3   hepatitis C?

4   **A.**   So I just want to show you some examples of some of the

5   studies that prove what I just told you.

6   **Q.**   All right.  Let's go to I think it's Tab 1291.

7          **MS. MOORE:**  Permission to publish.

8          **MR. STEKLOFF:**  No objection, Your Honor.

9          **THE COURT:**  Go ahead.

10          **THE WITNESS:**  So this is a study from Japan in which

11   they had a large number of people with hepatitis C, many of

12   which were untreated and some of which were treated.  And of

13   those that were treated, there was a group that had a sustained

14   virologic response just like Mr. Hardeman, and there was a

15   group that didn't have a sustained virologic response.  They

16   had a response but it wasn't a complete response.  Okay?

17      And so let's look at the curve.

18          **MS. MOORE:**  Page 1039, please.

19          **THE WITNESS:**  And read the title too.  It says

20   "Viral" -- go back to the title.  It's important to read the

21   title actually because it tells you what the study shows.  So

22   "Viral elimination" -- they're talking about hepatitis C --

23   "reduces the incidence of malignant lymphoma in patients with

24   hepatitis C."

25      Okay.  Let's look at the curve.

1          **MR. WOLFE:**  Sorry.  Which table was it?

2          **MS. MOORE:**  1039, Figure 3.  It's the top half.

3      There you go.

4          **THE WITNESS:**  So let's look at the figure.  So what

5   this shows you is the time, a period of 5, 10, and 15 years

6   along the bottom of the curve; and on this upper side on the

7   other axis you see the incidence rate of non-Hodgkin's

8   lymphoma.  Okay?

9          Yes.  And what you can see is that the people with

10  persistent infection over time had an increasing incidence of

11  non-Hodgkin's lymphoma.  So these are the people who were never

12  treated and had chronic persistent infection, chronic active

13  viral infection, and the people who were treated but who didn't

14  have a sustained virologic response.  Okay?  So you can see

15  that they over time are at increased risk for non-Hodgkin's

16  lymphoma.

17         But if you look at the patients who had a sustained

18  virologic response like Mr. Hardeman, it goes right along the

19  base.  There weren't any cases of non-Hodgkin's lymphoma, not

20  one case in 15 years.

21         And actually if you go out to 20 years, there was only one

22  case and it was a T cell lymphoma, which was probably unrelated

23  to the virus at all.

24         So in this study, it's very dramatic, there's a

25  statistic -- a marked statistically significant difference in

WEISENBURGER - DIRECT / MOORE

1  these curves showing that people who have a sustained virologic

2  response don't have any increased risk for non-Hodgkin's

3  lymphoma.

4  BY MS. MOORE:

5  Q.   So let me ask you two things from that.  When you keep

6  saying SVR, the sustained virologic response, when we go back

7  to Exhibit 940 and we have marked here from February 23rd,

8  2006, all the way down to June 7th, 2015, and it's written

9  "Negative," what does that signify with respect to the

10  sustained virologic response for Mr. Hardeman?

11  A.   Well, what it tells you is that once he attained a

12  sustained virologic response, he was no longer at increased

13  risk for non-Hodgkin's lymphoma.

14  Q.   So this negative is he no longer has a sustained -- he has

15  a sustained virologic response; correct?

16  A.   Yeah.  So he's one year out there.  So he -- you know,

17  after six months of negatives, you consider it a sustained

18  virologic response.  And obviously he stayed in remission

19  during that whole nine-year period.

20  Q.   And then the second thing is you said that there was one

21  person, I think about at the 20-year marker, that had the

22  infection and it was the T cell.

23  A.   Right.  So it was probably a background case, not related

24  at all to the non-Hodgkin's lymphoma because patients with

25  hepatitis B and hepatitis C, they get B-cell lymphomas.  They

WEISENBURGER - DIRECT / MOORE

1    don't get T-cell lymphomas.

2    **Q.**    Okay.  So that's not relevant then?

3    **A.**    It's not relevant, no.

4    **Q.**    Okay.  All right.

5         Anything else from this graph that you relied on in

6    forming your opinions in this case?

7    **A.**    No.

8    **Q.**    Okay.  Let's go to 917.

9              **MS. MOORE:**  And permission to publish, please.

10             **MR. STEKLOFF:**  No objection, Your Honor.

11             **THE COURT:**  Go ahead.

12             **THE WITNESS:**  So this is another study that looked at

13   the frequency of liver cancer and non-Hodgkin's lymphoma in

14   patients with hepatitis C virus infection, and it's a cohort

15   study from Denmark.  Okay?

16        And I'm just going to show you the data for non-Hodgkin's

17   lymphoma here.

18             **MS. MOORE:**  So let's go -- Mr. Wolfe, if we could turn

19   to page 2314 and the graph in the lower right corner for

20   non-Hodgkin's lymphoma, please.

21             **THE WITNESS:**  So, again, this is a similar graph as I

22   showed you before.  Time is on the bottom part of the curve, it

23   goes out 10 years, and the cumulative incidence is on the other

24   part of the curve.

25        And what you see here, if you look at the dashed line,

WEISENBURGER - DIRECT / MOORE

1    which is the second line from the top -- can you show that?

2    The small dashes?

3        Right there.  Yeah.

4        That's the line for people who have a history of

5    hepatitis C infection.  They have a positive antibody.  Okay?

6    So they either have active infection or they have a history of

7    past infection.  Okay?

8        But like we did on the table, we can split that into two

9    groups -- right? -- the ones that have the active viral

10   infection, that have the RNA in the blood, and that's actually

11   the dark curve above, the solid curve.  Okay?  So they're the

12   ones who have a high infection.

13       And, in fact, the people who have immunity to hepatitis C

14   are the very low curve made up of the dots.  Okay?  So -- and

15   then the large dashes are the expected rate of non-Hodgkin's

16   lymphoma in the population.

17       So you can see that there's no difference in the curve --

18   the incidence curve for people who never had hepatitis C

19   compared to the lower dotted curve of people who are immune to

20   hepatitis C.

21   BY MS. MOORE:

22   Q.   So what does --

23   A.   It's only the people who have active infection who have an

24   increased risk.

25   Q.   So what does that mean with respect to Mr. Hardeman?

 1   **A.**   Well, it means that his risk for non-Hodgkin's lymphoma

 2   was no different than anybody else's who never had hepatitis C.

 3   **Q.**   Okay.  And then those long dashes on this graph, that's

 4   the incident rate of people who have hepatitis?

 5   **A.**   Who never had hepatitis.

 6   **Q.**   Who never had hepatitis.

 7   **A.**   So that's sort of your background rate in the general

 8   population.  Okay?

 9   **Q.**   So once you're treated for hepatitis and you're cured,

10   then you go back to where you were as if anyone in the general

11   population?

12   **A.**   Yeah.  So it's the line of dots, which is pretty much

13   similar to the large dashes.  Those two are identical curves.

14   They look a little different, but statistically they're the

15   same.

16   **Q.**   All right.  And so what percentage, then, would you put on

17   someone who at one point in time had active hepatitis C, then

18   became cured of hepatitis C, stayed in the sustained virologic

19   response?  What is the percentage risk that they might have to

20   develop non-Hodgkin's lymphoma?

21   **A.**   There wouldn't be any increased risk.

22   **Q.**   Okay.  All right.  Let's turn to 918.

23           **MS. MOORE:**  And permission to publish.

24           **THE COURT:**  Before we go there, let me ask you.  How

25   much longer do you think you have with your direct of

WEISENBURGER - DIRECT / MOORE

 1   Dr. Weisenburger?

 2          **MS. MOORE:**  I would say probably 15, 20 minutes.

 3          **THE COURT:**  Okay.  In light of that, I think we should

 4   break -- we should end for the day before you finish with

 5   Dr. Weisenburger, but do you want to finish on the topic maybe

 6   of hep C and then we'll wrap up for the day?

 7          **MS. MOORE:**  I would leave that up to the jury,

 8   Your Honor.  It doesn't matter.

 9          **THE COURT:**  Why don't you go ahead.

10          **MS. MOORE:**  Okay.

11          **THE COURT:**  It seems like you're almost done with

12   hep C.

13          **MS. MOORE:**  I am.

14      Okay.  So let's go to 918.  And permission to publish.

15          **MR. STEKLOFF:**  No objection, Your Honor.

16          **THE COURT:**  Go ahead.

17   BY MS. MOORE:

18   **Q.**  And what does this study tell us, Dr. Weisenburger?

19   **A.**  So this is another study that looks at antiviral therapy

20   and the risk of non-Hodgkin's lymphoma with hepatitis C

21   infection.  It's a recent study from China, and it also makes

22   the point that I made before if we can look at the diagram.

23   **Q.**  Well, let's look.  The title of it is early antiviral

24   therapy reduces risk of lymphoma in patients with chronic

25   hep C; is that right?

1    **A.**    Right.

2    **Q.**    Okay.  So let's go to page 336, and I think it's the

3    diagram for non-Hodgkin's lymphoma, the B diagram, please.

4    **A.**    So this is another similar curve like I've shown you with

5    the years on the lower scale and the incidence of NHL on the

6    other scale.  And what you see for people who have untreated

7    hepatitis C virus, they have the dotted line, which is the

8    increasing incidence over time.  Okay?

9        The small dotted line are people who never had hepatitis C

10   viral infection.  Okay?

11       And then the other -- the solid line just above that are

12   the people who got a full course of Interferon and antiviral

13   therapy, and again you can see that the curve pretty much

14   matches the unexposed curve.  Okay?

15       Probably it begins to stray a little bit because some of

16   those just had a partial response; but, in fact, if you get

17   treated, your risk of non-Hodgkin's lymphoma is the same as the

18   general population.  It's not increased.

19       So it shows you the same -- in three different studies

20   I've sort of shown you the same thing, and there are actually

21   another five studies out there that I'm not even going to show

22   you, but there are eight studies that make this point very --

23   very well.

24   **Q.**    And this -- Dr. Weisenburger, these studies and these

25   graphs you've been showing to the jury, is this based on real

WEISENBURGER - DIRECT / MOORE

1    data of real people?

2    **A.**    Yes.   It's real data of real people who had hepatitis C

3    infection and were treated with antivirals just like

4    Mr. Hardeman.

5    **Q.**    It's not hypothetical about what might happen if you have

6    antiviral therapy following a diagnosis of hepatitis C?

7    **A.**    No, this is real data.

8              **MR. STEKLOFF:**  Objection.

9              **THE COURT:**  Sustained.

10             **MS. MOORE:**  Okay.

11             **THE COURT:**  The answer will be stricken.

12   **BY MS. MOORE:**

13   **Q.**    Dr. Weisenburger, is this information, the data that

14   you've been showing in these last three studies --

15   Exhibits 1291, 917, and 918 -- is that based on real data or a

16   hypothetical situation?

17             **MR. STEKLOFF:**  Objection.

18             **THE WITNESS:**  It's real data and real patients.

19             **THE COURT:**  Sustained -- I mean, overruled.   Sorry.

20   **BY MS. MOORE:**

21   **Q.**    And, Dr. Weisenburger, if hepatitis C was really causing

22   non-Hodgkin's lymphoma after someone is cured, would you see it

23   in the literature in the data?

24   **A.**    Well, you should see it because there's lots of data on

25   large numbers of patients, and the data is very consistent

 1  across all eight studies that there's no increased risk for

 2  non-Hodgkin's lymphoma for people who are cured or people who

 3  become immune spontaneously.  If you don't have active

 4  infection, you're not at increased risk.

 5  **Q.**   Okay.  And if you turn to 1302 in your binder.

 6          **MS. MOORE:**  Permission to publish.

 7          **MR. STEKLOFF:**  No objection, Your Honor.

 8          **THE COURT:**  Go ahead.

 9  **BY MS. MOORE:**

10  **Q.**   And what is this publication, Dr. Weisenburger?

11  **A.**   Well, this is another study which shows similar findings,

12  but this study shows them for hepatitis B.  So the story is the

13  same for hepatitis B, that if you don't have a chronic active

14  viral infection at the time you get non-Hodgkin's lymphoma,

15  then the hepatitis B is not the cause.

16          **MS. MOORE:**  And let's go to the second page, please,

17  Mr. Wolfe.

18          **THE WITNESS:**  Now, let's hone in just on the top two

19  diagrams.

20          Yeah.  So this is now we're talking about hepatitis B,

21  okay?  So remember we said that if you have the hepatitis B

22  surface antigen, which is the first one on the top diagram

23  there, and you look across this bar graph, it's like the four

24  spots that Dr. Ritz showed you, you can see there's an

25  increased risk of 1.82 for non-Hodgkin's lymphoma with active

WEISENBURGER - DIRECT / MOORE

1    hepatitis B infection.

2         But then if you go down to the next one, it says

3    anti-hepatitis C.  So this person has the antibody, the

4    hepatitis C, like Mr. Hardeman did, and you can see the risk is

5    basically at 1.  There's no increased risk.  Okay?

6         And the same is true if you have the antibody to the

7    surface antigen.  The risk is close to 1.  It's not elevated.

8    They're immune -- these -- the lower two items are immune, and

9    they have no increased risk of non-Hodgkin's lymphoma

10   associated with hepatitis B infection.

11        And I won't belabor the point, but the curves -- the data

12   is the same for diffuse large B-cell lymphoma here.  You have

13   an increased risk of over twofold with hepatitis -- with active

14   hepatitis infection with hepatitis surface antigen; but if you

15   have the antibodies, the risk is around 1 or less.

16        So both for hepatitis C and hepatitis B, if you're immune

17   or you're cured, you don't have an increased risk of

18   non-Hodgkin's lymphoma, and that's why I crossed out

19   hepatitis C and hepatitis B as substantial risk factors for

20   Mr. Hardeman -- okay? -- on my differential list.

21   **BY MS. MOORE:**

22   **Q.**   Dr. Weisenburger, I'm going to have you, before we adjourn

23   for the day, come down off the stand and we're going to put up

24   the differential again.

25        **THE COURT:**  Why don't we do that tomorrow morning?

1        **MS. MOORE:**  Do it tomorrow morning?  Okay.  Great.

2    Thank you.

3        **THE COURT:**  Okay.  So we're wrapping up for today.

4    We'll resume again at 8:30 sharp tomorrow.  And as I mentioned

5    to you back there this morning, even though we lost yesterday,

6    we're still a little bit ahead of schedule so that's the good

7    news.  We look forward to seeing all six of you at 8:30 sharp

8    tomorrow.

9       Thank you.

10      (Proceedings were heard out of the presence of the jury:)

11       **THE COURT:**  And, Dr. Weisenburger, you're free to step

12   down.

13       **THE WITNESS:**  Thank you.

14       **THE COURT:**  Everybody, remember, nobody leaves the

15   courtroom for five minutes to give the jurors a chance to use

16   the elevators.  So nobody is allowed to leave the courtroom

17   until they hear from either me or Kristen.

18      Okay.  Anything else to discuss?

19       **MS. MOORE:**  I don't think so, Your Honor.

20       **MR. STEKLOFF:**  No, Your Honor.

21       **THE COURT:**  I mean, it seems pretty clear that you're

22   not going to need to have Dr. Arber here tomorrow; right?  I

23   mean, we're going to have -- you're going -- how long do you

24   anticipate your cross of Dr. Weisenburger to be?

25       **MR. STEKLOFF:**  It might be a couple hours.

**PROCEEDINGS**

 1          THE COURT:  And then we have another hour of video

 2  testimony.

 3          MS. MOORE:  Yes, Your Honor.

 4          THE COURT:  And then you'll put on Dr. Mucci, and she

 5  likely will not finish tomorrow.

 6          MR. STEKLOFF:  I agree, Your Honor.

 7          THE COURT:  Okay.  That's fine.

 8      Okay.  Anything else from anyone?

 9          MS. MOORE:  I don't think so, Your Honor.

10          THE COURT:  Okay.

11          MS. MOORE:  Thank you.

12          THE COURT:  Sounds good.  So everybody sit tight in

13  the courtroom for a couple more minutes, and you'll hear from

14  Kristen when you are permitted to leave.

15              (Proceedings adjourned at 2:42 p.m.)

16                    ---oOo---

17

18

19

20

21

22

23

24

25

1

2

3                    **CERTIFICATE OF REPORTERS**

4            I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Tuesday, March 5, 2019

8

9

10

11    _____

12            Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                     U.S. Court Reporter

13

14

15    _____

16             Marla F. Knox, RPR, CRR
                     U.S. Court Reporter

17

18

19

20

21

22

23

24

25