**Volume 11**

**Pages 1564 - 1911**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

EDWARD HARDEMAN,                        )
                                        )
            Plaintiff,                  )
                                        )
  VS.                                   )      **NO. C 16-00525 VC**
                                        )
MONSANTO COMPANY,                       )
                                        )
            Defendant.                  )
_____ )

                          San Francisco, California
                          Monday, March 11, 2019

                    **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                    ANDRUS WAGSTAFF PC
                    7171 W. Alaska Drive
                    Lakewood, Colorado  80226
              BY:   **AIMEE H. WAGSTAFF, ATTORNEY AT LAW**
                    **DAVID J. WOOL, ATTORNEY AT LAW**

                    MOORE LAW GROUP
                    1473 South 4th Street
                    Louisville, Kentucky  40208
              BY:   **JENNIFER MOORE, ATTORNEY AT LAW**


            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Marla F. Knox, RPR, CRR
              Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporters

1    **APPEARANCES**:   (CONTINUED)

2    For Defendant:

3                           WILKINSON   WALSH ESKOVITZ LLP
                            2001 M Street, NW - 10th Floor
4                           Washington, D.C.  20036
                    BY:   **BRIAN L. STEKLOFF, ATTORNEY AT LAW**
5                          **RAKESH N. KILARU, ATTORNEY AT LAW**
                           **TAMARRA MATTHEWS JOHNSON, ATTORNEY AT LAW**
6                          **JULIE RUBENSTEIN, ATTORNEY AT LAW**
                           **CALI COPE-KASTEN, ATTORNEY AT LAW**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

## **I N D E X**

2 Monday, March 11, 2019 - Volume 11

3 **DEFENDANT'S WITNESSES**                                    **PAGE**   **VOL.**

4 **LEVINE, ALEXANDRA (RECALLED)**
(PREVIOUSLY SWORN)                                         1578    11
5 Direct Examination resumed by Mr. Stekloff              1578    11
Cross-Examination by Ms. Moore                             1639    11
6 Redirect Examination by Mr. Stekloff                     1735    11
Recross-Examination by Ms. Moore                          1761    11

7

8 **ARBER, DANIEL**
(SWORN)                                                    1762    11
Direct Examination by Mr. Kilaru                          1763    11

9

## **E X H I B I T S**

10

**TRIAL EXHIBITS**                                **IDEN**   **EVID**   **VOL.**

11
   38                                                      1574    11
12
   41                                                      1574    11
13
   42                                                      1574    11
14
   43                                                      1574    11
15
   505                                                     1574    11
16
   506                                                     1574    11
17
   508                                                     1574    11
18
   509                                                     1574    11
19
   510                                                     1574    11
20
   511                                                     1574    11
21
   512                                                     1574    11
22
   514                                                     1574    11
23
   515                                                     1574    11

24

25

1

### I N D E X

2

### E X H I B I T S

3

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 1023 | | 1574 | 11 |
| 1178 | | 1574 | 11 |
| 1687 | 1784 | | 11 |
| 1688 | 1785 | | 11 |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1    __Monday - March 11, 2019__                    __8:06 a.m.__

2                    P R O C E E D I N G S

3                        ---oOo---

4       (Proceedings were heard out of presence of the jury:)

5       **THE COURT:**  Good morning.  What do we need to talk

6    about?

7       **MS. WAGSTAFF:**  Good morning, Your Honor.

8       **MS. MOORE:**  Your Honor, I just wanted to have a point

9    of clarification before Dr. Levine takes the stand, given some

10   of the issues on Friday with Dr. Mucci.  And I wanted to make

11   sure that she understands that she is not here to give general

12   causation opinions; and she is not here to give opinions about

13   the animal studies, mechanistic data, and that any opinion she

14   has on epidemiology is solely based on what Dr. Mucci has

15   already testified to.  I want to make sure when I ask my

16   questions, it doesn't elicit other testimony, like what

17   happened on Friday.

18      **THE COURT:**  Well, yeah, I mean, we had a pretrial

19   ruling about that.  We, of course, also had a -- not a pretrial

20   ruling, but pre-testimony ruling about that with Dr. Levine.

21   And, of course, we did with Dr. Mucci too.

22      You know, I don't know what -- is there anything I can say

23   other than what I said in the ruling that I issued last week?

24      **MS. MOORE:**  I understand, Your Honor.  I didn't know

25   if she was in the courtroom, if it could just be reminded to

PROCEEDINGS

1  her before she took the stand today.

2       MR. STEKLOFF:  I think she is in the hall, and I'm

3  happy to have her come in.  I'm not -- I don't think one way or

4  the other she had any opinions in her report -- she knows not

5  to speak about general causation.  I don't think she had

6  opinions about animal studies or the cell studies, and I think

7  that she knows not -- that she is here to rely on Dr. Mucci.

8  I'm going to bring that out affirmatively on my direct with a

9  yes-or-no question.  She is going to explain that she reviewed

10 her trial testimony; that she is relying on that, and that --

11      THE COURT:  Mucci's trial testimony?

12      MR. STEKLOFF:  Yes, Dr. Mucci's trial testimony.  And

13 so, look, if the wrong question is asked -- I'm not re-visiting

14 Dr. Mucci.  But if the wrong question is asked, Dr. Levine is

15 going -- will -- you know, if a question asks her about her

16 general causation views, she has general causation views about

17 the epidemiology; but she knows not to speak about that

18 otherwise.

19      THE COURT:  Okay.

20      MR. STEKLOFF:  I will reaffirm that with her now.

21      THE COURT:  Just reaffirm that with her now.

22      MS. MOORE:  Thank you, Your Honor.

23      THE COURT:  Anything else?

24      MS. MOORE:  I think the same applies to Dr. Arber too.

25      MR. STEKLOFF:  I don't believe -- he knows as well and

**PROCEEDINGS**

1    he -- even less so did not sort of have opinions about the

2    epidemiology, to the best of my recollection, in his report.

3    So he is very -- he is here to talk about his report.

4              **THE COURT:**  Okay.  Anything else from either of you?

5              **MS. MOORE:**  No.  Thank you, Your Honor.

6              **THE COURT:**  One quick thing that I wanted to mention.

7          You know, I -- I will tell you that I find this causation

8    issue very difficult.  I find it very confusing.  It seems like

9    California law -- and the law of many states -- is quite

10   confused about how to instruct juries on medical causation.

11         And, you know, last night -- you know, I was trying to

12   identify -- you know, I gave -- I put out my tentative

13   instruction, I made clear there were two alternative

14   instructions -- both of them were very tentative -- and it is

15   something that requires further discussion this afternoon.

16         I was -- last night I was reading the cases, and I was

17   trying to figure out, well, what is Monsanto's best case for

18   this because it seems like they are a little bit behind the

19   eight-ball on this causation question.  And I guess I thought,

20   you know, it was hard to -- I couldn't find any case directly

21   on point involving a situation where there is, you know, one --

22   directly on point in Monsanto's favor, at least involving a

23   situation where, you know, there are two -- there are two risk

24   factors being argued about.  And one side says this risk factor

25   caused it, and the other side says that risk factor caused it.

**PROCEEDINGS**

 1    And in that situation, you don't give some sort of

 2  multiple causation instruction.  And in that instruction -- and

 3  in that situation you do give the but-for sentence.  I think

 4  maybe Vecchione is their best case, even though it doesn't seem

 5  exactly on point.

 6    So I just wanted to make sure that both sides are prepared

 7  to discuss the Vecchione case this afternoon.  And also just if

 8  you think there is some case out there that involves this

 9  precise scenario that I'm missing, tell me about it.

10    And, again, it is a situation where the Plaintiff is

11  saying, This risk factor caused my cancer; and the Defendant is

12  saying, No, this other risk factor caused my cancer.  And, you

13  know, both risk factors are present.  At least there is

14  substantial evidence that both risk factors are present in the

15  case.  You know, what is your -- what is your case law for the

16  proposition that in that scenario you don't give a multiple

17  causation instruction, and in that scenario you do give that

18  but-for sentence.

19    So that's what I want to discuss -- I want to make sure we

20  focus on this afternoon.

21        **MR. KILARU:**  Sure.

22        **MS. MOORE:**  Your Honor, one case I would direct the

23  Court's attention to -- it is a California State case.  I don't

24  know how to pronounce it.  The first name is Logacz versus

25  Limansky, and the cite --

**PROCEEDINGS**

1          **THE COURT:**  Remind me the name of it.

2          **MS. MOORE:**  L-O-G-A-C-Z versus Limansky.  And,

3     Your Honor, if you want, I can hand you this copy.  It is not

4     marked on.

5          **THE COURT:**  No.  That's fine.

6          **MS. MOORE:**  That is a California Court of Appeals

7     case.

8          **THE COURT:**  What is the citation?

9          **MS. MOORE:**  That's what I'm trying to find.

10         **MR. KILARU:**  71 Cal. App. 4, 1149, Your Honor.

11         **MS. MOORE:**  There you go.

12     And it is the situation where the Plaintiff offers -- it

13     is a medical malpractice case.  Plaintiff offers one theory of

14     causation, and the defense offers a different theory; and they

15     said it was concurrent causes.

16         **THE COURT:**  Well, I mean, again, we can get into it

17     more this afternoon; but it seems like there is either no

18     testimony or barely any testimony of concurrent dependent

19     causation, right?  The only -- it seems like the only evidence

20     you have is of independent causation.  There has been no

21     testimony that hep C worked with Roundup to cause cancer.

22         So that is one of the difficulties of this case is that

23     the model instruction seems targeted primarily at a situation

24     where two things combined together to cause somebody's cancer.

25     And at least as it relates to hep C, there has been no

 1   testimony provided, no evidence provided that the two things

 2   combined together to cause Mr. Hardeman's NHL.

 3       So that is one of the things that we have a problem with

 4   is that even if we were to give some sort of multiple causation

 5   instruction, it seems like it might be quite problematic to

 6   give the one that is -- that is provided in the model set.  So

 7   that's what --

 8           **MS. MOORE:**  One --

 9           **THE COURT:**  -- one of the things we need to discuss

10   this afternoon.

11           **MS. MOORE:**  Thank you, Your Honor.

12           **MR. STEKLOFF:**  While we have the record open, can I

13   clarify a few exhibit issues?

14           **THE COURT:**  Yeah.

15           **MR. STEKLOFF:**  So last week after the depositions of

16   Dr. Ye and Dr. Turk, we moved in TX38, TX41, TX42, TX43 and

17   then TX1023, the following pages:  109 through 110, 113 through

18   115, 282 through 283, 381 through 382, 797 through 798, 841

19   through 861, and 1562 through 1564.

20       Ms. Moore appropriately wanted to take time to review

21   those.  She confirmed over the weekend -- that there was no

22   objection to those being admitted.

23           **MS. MOORE:**  That's correct.

24           **MR. STEKLOFF:**  Then I just want to clarify, after the

25   Reeves' deposition, I had mentioned Exhibit 95 because that was

1   the deposition exhibit that was referenced.  It is actually

2   TX1178.  So we would move in TX1178 I think with no objection.

3        **MS. WAGSTAFF:**  No objection.

4        (Trial Exhibits 38, 41, 42 43, 1023 and 1178 received

5         in evidence)

6        **THE CLERK:**  So get rid of 95?

7        **MR. STEKLOFF:**  Get rid of 95.  That was the wrong

8   number.  I apologize.

9        And then Ms. Wagstaff moved in a series of exhibits after

10  the Reeves' deposition as well, and we have reviewed those and

11  I have no objection to those coming in.

12       **MS. MOORE:**  Those are Exhibits 505, 506, 508, 509,

13  510, 511, 512, 514 and 515.

14       **THE COURT:**  Okay.

15       (Trial Exhibits 505, 506, 508, 509, 510, 511, 512, 514

16        and 515 received in evidence)

17       **MR. STEKLOFF:**  And, Your Honor, Dr. Levine is now in

18  the courtroom.  So I will say it publicly with you here and her

19  here that Dr. Levine understands she is not to opine on general

20  causation or the epidemiology.  She is here to rely on

21  Dr. Mucci's testimony for that, and she will be offering

22  opinions about Mr. Hardeman specifically and specific

23  causation.  And she knows that that is the case, both on direct

24  and cross, unless on cross she is directly asked about general

25  causation.  And I will even tell her that before on cross if

PROCEEDINGS

1   she thinks there is something, maybe she should pause and look

2   to Your Honor to get permission to say anything about general

3   causation because she is not here for that purpose today.

4           THE COURT:  Let the record reflect that she is nodding

5   her head vigorously in response to all of those comments.

6           MR. STEKLOFF:  Thank you.

7           THE COURT:  Okay.  I thought I had one other thing for

8   you-all.  Let me think.  I was just going to ask:  In terms

9   of -- is there anything more you can tell me about scheduling,

10  how long you think the various witnesses are going to take, how

11  long you anticipate for closing arguments, things like that?

12          MR. STEKLOFF:  Yes, Your Honor.  On behalf of Monsanto

13  I think we have approximately 45 minutes left this morning with

14  Dr. Levine on direct.  I don't know how long the cross will be.

15  I think that Dr. Arber is 45 minutes or less on direct.  So our

16  expectation, depending on the cross, is that we would actually

17  finish early today.  We will be resting after Dr. Arber.

18      And then in terms of closing, I will say -- I would like

19  it to be an hour, but probably give or take 10 or 15 minutes on

20  either side.  So I think -- if I go over an hour and 15

21  minutes, I won't be happy with myself.  So I think that's what

22  I would anticipate.

23          THE COURT:  Okay.

24          MS. WAGSTAFF:  And Plaintiff anticipates an hour to an

25  hour and a half in closing as well tomorrow.

PROCEEDINGS

 1          **THE COURT:**  Do you -- is there anything you can tell
 2   me about cross-examination of these two witnesses?  I know it
 3   is hard to predict.
 4          **MS. MOORE:**  That's true, Your Honor.  I don't think
 5   Dr. Arber will be very long at all.  I think it would be less
 6   than half an hour.  And then on Dr. Levine, it is just going to
 7   depend on what she says about hepatitis C, but I would suspect
 8   it would be under an hour.
 9          **MS. WAGSTAFF:**  So, Your Honor, on scheduling --
10          **THE COURT:**  I guess I should have told you to be
11   prepared to close today, but I will not make you do that.
12          **MS. WAGSTAFF:**  Your Honor, on scheduling for
13   Phase Two, we are trying to get our live witnesses here.  There
14   are still some pending motions on the witnesses.
15          **THE COURT:**  Uh-huh.
16          **MS. WAGSTAFF:**  Specifically Dr. Benbrook.  Do you know
17   when we will expect a ruling on that?
18          **THE COURT:**  I will bump it up to the top.
19          **MS. WAGSTAFF:**  Okay.  Thank you.
20          **THE COURT:**  And, in fact, given that we are ending
21   early today, it seems likely I will be able to deal with it
22   today.  And it is something that I have looked at before; but
23   as I sit here, I don't remember what the issue is.
24       So I think that what we will -- so it looks pretty clear
25   that we will be done -- by the way, are you calling any

PROCEEDINGS

 1  witnesses in rebuttal?

 2       **MS. WAGSTAFF:**  We are figuring that out right now; and

 3  if we do, it is going to be something really small by video.

 4       **THE COURT:**  Okay.  So it sounds like the evidence will

 5  be done with the Phase One evidence today for sure, and --

 6  which means we will instruct them and proceed with closing

 7  arguments tomorrow morning, first thing, at 8:30.  And then --

 8  which means you should be ready to do your openings for

 9  Phase Two first thing Wednesday morning.

10       **MR. STEKLOFF:**  Do you instruct the jury before or

11  after closing arguments?

12       **THE COURT:**  I instruct them before.

13       **MR. STEKLOFF:**  And then do you have a -- a deadline

14  and a process through which you would like us to provide you

15  our closing argument slides?

16       **THE COURT:**  Slides?  Why don't we say 7:00 a.m. on

17  Tuesday morning -- yeah, Tuesday morning.

18       **MS. WAGSTAFF:**  Your Honor, do you allow rebuttal?

19       **THE COURT:**  Tomorrow morning.

20       **MR. STEKLOFF:**  I assume those are via e-mail to your

21  chambers, without the other side?

22       **THE COURT:**  That's correct.  And any rebuttal slides

23  you might use, you have to send those as well.

24       **MS. WAGSTAFF:**  Rebuttal for my opening, you are

25  talking about?

1        **THE COURT:**  For closing.

2        **MS. WAGSTAFF:**  For closing, yes.

3        **THE COURT:**  Yes.

4        **MS. WAGSTAFF:**  Thank you.

5        **THE COURT:**  As then I said, this afternoon when we

6   discuss jury instructions, we can also discuss any concerns

7   that the other side has about -- and it is something that

8   counsel might raise at closing -- that would not be

9   appropriate, and we can try to pre-adjudicate some of those

10  questions.  Okay.

11       **MR. STEKLOFF:**  Thank you.

12       **THE COURT:**  See you at 8:30.

13       **THE CLERK:**  Court is in recess.

14            (Recess taken at 8:21 a.m.)

15          (Proceedings resumed at 8:42 a.m.)

16       **THE COURT:**  Go ahead and bring in the jury.

17     (Proceedings were heard in the presence of the jury:)

18       **THE CLERK:**  Please be seated.

19       **THE COURT:**  Good morning, everybody.  Hope you had a

20  nice weekend.  We are ready to resume with Dr. Levine.

21                  <u>**ALEXANDRA LEVINE**</u>,

22  called as a witness for the Defendant, having been previously

23  duly sworn, testified further as follows:

24            <u>**DIRECT EXAMINATION**</u>  **(resumed)**

25  \\\

LEVINE - DIRECT / STEKLOFF

1    BY MR. STEKLOFF

2    **Q.**   Good morning, Dr. Levine.

3    **A.**   Good morning.

4    **Q.**   Let's see -- okay.  So when we left off on Friday, we were

5    walking through a little bit of your background, and I think we

6    had finished talking about this slide about your research

7    experience, correct?

8    **A.**   Yes.

9    **Q.**   So on the next slide -- you had told the jury on Friday

10   that you have published over 300 peer-reviewed articles, and I

11   think we had -- on this slide you have published on lymphomas,

12   including lymphomas caused by HIV, something called HTLV1 and

13   hepatitis C, correct?

14   **A.**   That is correct.

15   **Q.**   And just -- can you explain for the jury what some of the

16   journals are on this slide?  And, first of all, are these

17   journals in which you have published?

18   **A.**   These are some of the journals in which I have published.

19   On the top row are more general medicine articles.  They are

20   for people who are doctors who are engaged in all different

21   kinds of specialties.  The examples on the bottom are specialty

22   journals.  These would be read specifically by people who are

23   hematologists or hematologists/oncologists or oncologists.  So

24   I have written in general medicine journals, some of the best

25   ones, and also in specialty journals.

LEVINE - DIRECT / STEKLOFF

1  Q.   Are these -- you mentioned "best ones."  Are these some of

2  the most read journals either in general medicine on the top,

3  the *New England Journal of Medicine*, *Annals of Internal*

4  *Medicine*, and the *Journal of the American Medical Association*?

5  A.   Yes.  They are rated by something called impact factor,

6  and these are extremely high impact factor journals.

7  Q.   And then with respect to the journals on the bottom, *Blood*

8  and *Journal of Clinical Oncology*, are those, within the world

9  of oncology and hematology, similarly high-impact journals?

10 A.   Yes, they are.

11 Q.   And have you -- apart from having published some of your

12 research, have you -- the jury has heard about this from other

13 witnesses -- have you also served as an editor on journals?

14 A.   Yes, I have.

15 Q.   And have you also served as a peer reviewer reviewing

16 articles that are submitted to be published?

17 A.   Yes.  That is one of the responsibilities of doctors who

18 work in academic medicine to review those articles, and I

19 review perhaps one a week, maybe one every other week.

20 Q.   And so you are still continuing to do that?

21 A.   Yes.

22 Q.   And, again, these are just -- you have published in and

23 edited and peer reviewed in other journals other than these

24 five.  We just wanted to use this as some examples?

25 A.   That's correct.

LEVINE - DIRECT / STEKLOFF

 1  Q.   Now, have you also, in your 40-year career, received

 2  various honors and awards?

 3  A.   Yes.

 4  Q.   And did we highlight some of those on this slide?

 5  A.   Yes.

 6  Q.   And it says here when you were at the Keck School of

 7  Medicine at USC, you received the Outstanding Clinical

 8  Professor Award, I think, six different times.  Can you just

 9  explain why that was -- if it was, why that was meaningful for

10  you?

11  A.   I love to teach, and it is important to me to teach.  When

12  I do, I spend a lot of time doing it.  They made a rule at a

13  certain point that it can only be received every other year or

14  every fifth year.  So I received a few more but they were not

15  valid.

16  Q.   And then I see that you also received in 1994 something

17  called the University of Southern California Presidential

18  Medallion.  Can you explain briefly to the jury what that was?

19  A.   Yes.  That is an award given by the president of the

20  university to somebody who has gone outside of the university,

21  if you will, to bring honor back to the school.

22  Q.   And are we going to talk about some of the ways in which

23  you -- in which you did that?

24  A.   Yes.

25  Q.   And then I see here that you were a member and chair of

1  research committee, the Presidential Advisory Council on

2  HIV/AIDS and were appointed by President Bill Clinton.  Again,

3  just briefly can you explain to the jury what your role was

4  there?

5  **A.**   My role first was to recommend to the President the state

6  of the AIDS epidemic, what the biggest issues and problems

7  were, what we needed to spend money on, how we needed to

8  research particular areas.

9     We spoke about his "bully pulpit."  Sometimes the

10  President can do things just by saying something, and we wanted

11  to make sure that this was important to him and that he did use

12  his "bully pulpit" to be able to educate the United States and

13  to help us to end the epidemic.

14  **Q.**   And then lastly I see here that in March 2019 the

15  University of Texas, the MD Anderson Cancer Center -- just to

16  pause there, is that another -- like City of Hope --

17  well-regarded, elite cancer center in the United States?

18  **A.**   Yes, both the City of Hope, where I work now, and MD

19  Anderson are comprehensive cancer centers funded by the

20  National Cancer Institute to take care of patients; to teach

21  and also to do research and bring the field forward.

22  **Q.**   And it says here you are being recognized as the Margaret

23  Kripke Legend Award for promotion of women in cancer medicine

24  and cancer science.  Can you just explain to the jury, again,

25  why that is meaningful to you?

1  **A.**   It is meaningful to me because it is a mentoring award.

2  When I first started medical school, I was one of 12 women.

3  Now maybe half of the people in medical school are women.  The

4  field has changed, and it was important to me to make sure that

5  my fellow women were included in this field of medicine and

6  research, so it felt good for me to get that award.

7  **Q.**   And you mentioned some of -- how you were honored at USC.

8  Have you done international public health consulting across the

9  world specifically regarding HIV and AIDS?

10 **A.**   Yes, I have.  So --

11 **Q.**   Without going through every single year and every single

12 country, can you just describe generally when you have

13 consulted for other countries what the work entailed?

14 **A.**   The work entailed, first of all, meeting with the Public

15 Health Department, the people in charge of the Public Health

16 Department; ascertaining what they believed their needs were.

17 I would always do research beforehand to look at the status of

18 the AIDS epidemic in that particular country.  I primarily

19 assessed the situation in each of these countries with the

20 Public Health Department.

21      My next step was to educate.  I was -- I was taken to

22 Mongolia even to educate the doctors there, the people there,

23 the nurses there.  So I educated a good deal.

24      And then I helped to propose policies that might be useful

25 in the countries for trying to diminish the AIDS epidemic in

LEVINE - DIRECT / STEKLOFF

1    those countries.

2    **Q.**   Now, did we prepare a slide just to explain to the jury

3    what we are going to walk through next?

4    **A.**   Yes.

5    **Q.**   And so are the three things that we are going to cover

6    next:  First of all, what is non-Hodgkin's lymphoma; second,

7    did Roundup cause Mr. Hardeman's non-Hodgkin's lymphoma; and

8    third, what are Mr. Hardeman's risk factors for non-Hodgkin's

9    lymphoma?

10   **A.**   Yes, that's what I would want to discuss.

11   **Q.**   And so did we prepare some slides so you could explain to

12   the jury first what cancer is and how cancer develops?

13   **A.**   Yes, and these are the slides.

14   **Q.**   Okay.  So using this slide, can you please explain to the

15   jury what cancer is?

16   **A.**   Yes.  Just to start at the beginning, the cells in our

17   body are beautifully controlled in terms of when they grow and

18   when they stop growing.  One example to talk about it is, for

19   example, if you get a cut on your skin.  And if you do, all of

20   a sudden the cells on both sides of the cut get a message that,

21   Oh, there is a defect there.  I better grow and fill in that

22   cut.  And they do.  And the cut heals and that's the end of

23   your injury.

24       The cells don't keep growing and growing so that you have

25   a whole mound of cells every time you cut yourself.  So as soon

1    as the cells know to grow, they do.  And as soon as one cell

2    touched another, as they are healing that wound, they know how

3    to stop.

4        And all of that tremendous regulation, specific

5    regulation, control like that, comes from the DNA.  And the DNA

6    is shown on the right side of the slide.  The DNA is your

7    genetic material.

8        Half of the DNA comes from your mother; the other half of

9    the DNA comes from your father.  And all -- everything about

10   you in a sense comes -- starts with that DNA.  Things that are

11   as easy as the color of your hair or the color of your eyes or

12   how tall you are going to be, that kind of thing.  And also it

13   has complicated as how does a cell know how to grow, how to

14   stop, how to live, how to die.

15       So that is the normal situation with cells and how their

16   growth is controlled.

17   **Q.**   And then what -- can you explain using this slide what a

18   cancer cell is?

19   **A.**   Yes.  I will start on the DNA here on the right side.

20   Cancer ultimately is caused by an accident, an error of some

21   sort, on the DNA.  And that error says to the cell, Divide,

22   divide, divide, forever and never stop.

23       Now, that accident or error, we call that a mutation.  And

24   there are things that are commonly known.  Radiation can cause

25   those kinds of accidents or errors.  Tobacco can cause that

LEVINE - DIRECT / STEKLOFF

1    kind of error.  We will talk about it perhaps.  But when that

2    error occurs in forming cancer, if that accident occurs in a

3    stomach cell, then the stomach cell divides over and over and

4    over and you get stomach cancer.  If that happens in a lung

5    cell, the lung cell will divide over and over without control,

6    and that's lung cancer.  If that happens in a B lymphocyte, one

7    of the cells of the immune system, then that B lymphocyte is

8    going to grow over and over and won't know how to stop.

9    Q.  And so what does this slide -- as compared to the slide

10   that shows one cancer cell, what does this slide with numerous

11   cancer cells demonstrate?

12   A.  What it is trying to show is that as these cells are

13   growing at a certain point, the person, the patient knows it.

14   There is a lump.  There is a big lymph gland someplace, or a

15   lump in the stomach, in the belly.  Or a lump in the chest

16   X-ray, which you can't see; but it is seen as a mass, as a lump

17   on a chest X-ray, for example.  The other consequence is

18   that -- let's just say that this occurred in a liver.  It takes

19   up space in that liver so that the normal liver cells don't

20   have room to be functioning anymore.

21       So the liver won't work and the person can get in trouble

22   with liver failure.  If this occurs in bone marrow, crowds

23   up -- that is the factory where all the blood cells are made.

24   If that whole factory is filled with the cancer cells, there is

25   no room for the normal cells to be made; and the person gets

LEVINE - DIRECT / STEKLOFF

 1   anemic and gets in trouble with low white blood cells and low

 2   platelets.  So that's what happens.

 3   **Q.**   Again, so the next slide says cancer requires two defects.

 4   So can you explain what this slide is -- how it is that cancer

 5   requires two defects?

 6   **A.**   Yes.  I think this is an interesting area, and something

 7   that is being used very aggressively now as we develop new

 8   treatments.  In any event, this starts -- the cancer starts, as

 9   I said, with the mutation or the error, the accident in the

10   DNA.  But that should be seen by our defense system, our immune

11   system, as foreign.

12        So our defense system, for example, is supposed to see a

13   germ, a foreign germ; know that it is foreign and kill it so

14   that we don't die of that infection.  Well, it turns out that

15   an abnormal cell with that defect in the DNA, that is foreign

16   to us also.  That is not the same cell as me anymore, and the

17   immune system should be able to see that cell as foreign and

18   knock it down.

19        And so what we have learned is that the two defects that

20   require actual clinical cancer to develop, number one, the

21   defect; number two, some failure of the immune system, some

22   weakness of the immune system so that it can't recognize that

23   cancer cell as foreign and destroy it.

24   **Q.**   And so just to be clear, on the left that is showing what

25   you referred to as a mutation that leads to a cancer cell; is

LEVINE - DIRECT / STEKLOFF

1    that right?

2    **A.**   Correct.

3    **Q.**   And then on the right there are two sort of ribbons or

4    pretzels, and they look like they are attacking the cancer

5    cell; is that correct?

6    **A.**   Yes.  I was trying to draw an antibody molecule; but, yes,

7    that was an attempt to show the immune system recognizing that

8    cancer cell and killing it directly.

9    **Q.**   And so for cancer to occur, those antibodies shouldn't be

10   working; is that right?  Or wouldn't be working?

11   **A.**   For cancer to occur, it is more complicated than that.

12   There will be some weakness perhaps in the antibodies, but also

13   T-cells are many different components of the immune system.  So

14   many different aspects are not working properly.

15   **Q.**   And what happens to all of us as we age with respect to

16   our immune system and our ability to fight cancer cells, if

17   they exist?

18   **A.**   Yes.  As we age, our immune systems weaken.  And that is

19   just a part of normal aging.  Most cancers that we have of all

20   kinds occur in people who are older.  And one of the reasons

21   for that is simply the immune system, the defense system, has

22   weakened in an older person.

23   **Q.**   Now, did you also want to discuss with the jury -- they

24   have heard about the concept of latency and how long it can

25   take for cancer to develop.  Is that something you wanted to

LEVINE - DIRECT / STEKLOFF

1  discuss with the jury?

2  **A.**   Yes, I would.

3        **MR. STEKLOFF:**   Your Honor, may Dr. Levine step down to

4  use the board?

5        **THE COURT:**   Sure.

6  **BY MR. STEKLOFF**

7  **Q.**   Just make sure that you face Ms. Knox, if possible.   It is

8  hard for her --

9  **A.**   So this is my attempt to show what happens when cancer

10  first begins.   And on this side of the curve, along

11  horizontally here, we have time going on.   And on the vertical

12  axis here, we have number of cancer cells.   And this is any

13  kind of cancer.

14        So the accident that I was talking about -- excuse me --

15  is right here.   That's where the accident, error, occurs.   What

16  happens during that time then is potentially a long time where

17  the cancer cell maybe is growing a little bit, but the immune

18  system is also keeping it in check -- keeping it in check.   In

19  time if the immune system is weaker and the cancer is the

20  winner, let's say, in time the amount of cancer in the body,

21  quote, pops above the line of being diagnosed.

22        What I mean is this:   All of this time here we can't find

23  that tumor no matter how hard we look, nor does the patient

24  have any symptom of any sort.   So the patient would come into

25  me, right now here, and say -- when it is below the level of

1    detectability, and say to me, I think I have cancer.  You

2    should take out every single organ in my whole body and find

3    it.  Obviously I wouldn't, but if I did that, we couldn't find

4    it.  It is completely hidden to the doctor no matter how hard

5    we look and to the patient as well.

6        When it pops above that line, a certain number of cancer

7    cells are required for anything clinically to be diagnosable;

8    to the patient or to the doctor.  When the patient comes in

9    here, yes.  The patient comes in because there is a big lump

10   someplace or some other symptom.  Comes to the doctor.  The

11   doctor does a CAT scan, a biopsy, blood test and can diagnose

12   it.

13       One way to think about this long period that might be more

14   familiar to you relates to smoking, tobacco.  And so as an

15   example here, what I'm trying to teach is that this is not

16   unusual in any sense at all for this initial accident to take

17   decades, a long, long time, before it ever pops above the line

18   of the diagnosability.

19       So one of the guidelines in the United States right now

20   for doctors such as myself, who take care of cancer patients --

21   there are new guidelines related to an attempt to cure and

22   diagnose lung cancer early in people who have smoked for a

23   long, long time.  If you can diagnose lung cancer very early

24   when it is just one little mass on the chest X-ray, that's

25   curable.  You can cut it out.  That's easy.  Nothing is easy,

1   but it is curable.

2        If you diagnose it late, when it has already spread into

3   other areas of the body, that is a whole different ball game.

4        So the goal was if we in the United States could figure

5   out how to find an early lung cancer among chronic smokers,

6   that would really help everyone.  Many studies were done.  And

7   the guideline is as follows:  In people who have smoked

8   cigarettes for 35 years or more and now stopped, and they

9   stopped smoking for up to 15 years -- so they stopped smoking

10  14 years ago, 13 years ago, 10 years ago -- what we do now --

11  what we are asked to do now is to get CAT scans of the lungs

12  each year to find these isolated, these simple little lung

13  cancers.  And it has worked.  We have picked up about

14  20 percent of individuals who would -- if we had not done that

15  early screening, who would have come in much later and not been

16  cured.

17       In other words, they were smoking.  They were exposed to

18  something that caused accidents.  They had 35 years to -- or

19  more -- you know, to be exposed to those accidents, but they

20  stopped smoking 15 years ago or 14 years ago.  They are still

21  at risk.  They are at risk for developing lung cancer.  They

22  had it here.  We couldn't find it.  If you do those early CAT

23  scans, you can catch it right above the line as opposed to

24  catching it when the tumor cells are so high that you can't

25  cure it anymore.

LEVINE - DIRECT / STEKLOFF

1       Obviously that is a tremendous advantage to the patients,

2   to be cured, and it is a tremendous advantage to the United

3   States as well.  So Medicare, as an example, pays for this.  It

4   is going to be much cheaper for all of us if we simply do this.

5       **MS. MOORE:**  Your Honor, I would just ask that she not

6   get into that level of detail on Medicare.

7       **THE COURT:**  Overruled.

8   **BY MR. STEKLOFF**

9   **Q.**   Dr. Levine, are we going to talk later about hepatitis C

10  as it related to Mr. Hardeman?

11  **A.**   Yes, we are.

12  **Q.**   And just briefly using this board, would it be helpful to

13  talk about how latency -- that latency concept with respect to

14  hepatitis C?

15  **A.**   Yes.  It is really true of all the different cancers, and

16  it is certainly true of hepatitis C-related cancers.  Accident

17  occurs down here.  Takes years and years and years and

18  eventually -- eventually, that cancer may be seen.

19  **Q.**   Okay.  Thank you.  You can take your seat.

20      Now, as the jury knows, we are here to talk about --

21  specifically about non-Hodgkin's lymphoma, correct?

22  **A.**   Correct.

23  **Q.**   And then even more specifically, Mr. Hardeman had diffuse

24  large B-cell lymphoma, correct?

25  **A.**   That's correct.

LEVINE - DIRECT / STEKLOFF

1   Q.   And so can you just briefly, using this slide, explain to

2   the jury what non-Hodgkin's lymphoma is?

3   A.   Yes.  Non-Hodgkin's lymphoma basically is a cancer of the

4   immune system.  So that is going to be difficult right off the

5   bat.  These lymphomas can come from either B lymphocytes, which

6   make antibodies to kill germs, or from T lymphocytes, which

7   directly can kill germs.  I think it is exceedingly important

8   to understand that if I say non-Hodgkin's lymphoma, that is not

9   one disease.  There are at least 60 different types of

10  non-Hodgkin's lymphoma, and these are different diseases.  They

11  are potentially caused by different things.  They are treated

12  in a different way.  The clinical illnesses that we see are

13  different.  The prognosis, how somebody will do with treatment,

14  are different.  So non-Hodgkin's lymphoma is a big name, and

15  under it are very, very different discrete specific subtypes.

16       Lymphoma -- these lymphocytes, normally are developed in

17  the lymph glands.  They start to grow, as I demonstrated.  And,

18  again, this usually begins in the lymph glands; but those cells

19  normally have to travel all over the body because they are

20  looking for germs or foreign things.  And the lymphoma cells,

21  the malignant cells, will also travel all over the body just

22  because that's what those lymphocytes do.  So they travel.

23  Q.   And in terms of non-Hodgkin's lymphoma here in the United

24  States, can you just walk the jury through some of the

25  statistics provided here?

1    **A.**    Yes.   There are about 75,000 people diagnosed with

2    lymphoma in the United States each year.   So about 1 in 47

3    people will get this.   The most common type of non-Hodgkin's

4    lymphoma is the type that Mr. Hardeman had, and that is diffuse

5    large B-cell lymphoma.   About 30 to 35 percent of them are

6    diffuse large B-cell lymphoma.

7    **Q.**    So, Dr. Levine, before we walk through your opinions about

8    Mr. Hardeman -- and I want to explain to the jury what it is --

9    some of the materials that you reviewed in forming those

10   opinions.   Okay?

11   **A.**    Sure.

12   **Q.**    First of all, did you review all of Mr. Hardeman's

13   available medical records?

14   **A.**    I did.

15   **Q.**    Did you also review Mr. Hardeman's deposition testimony?

16   **A.**    I did.

17   **Q.**    And then the jury has heard from three of Mr. Hardeman's

18   treating physicians:   Dr. Ye, Dr. Turk and Dr. Turley.   Did you

19   review their testimony?

20   **A.**    Yes, I did.

21   **Q.**    And are all of the opinions that you are going to offer

22   here today, and have already offered, to a reasonable degree of

23   medical certainty?

24   **A.**    They absolutely are.   Physicians, doctors are different

25   maybe.   It has to be reasonable.   There -- you know, people's

1   lives are depending on us, and what we know and how we look at

2   things and how carefully we look at things.  So when I say that

3   this is my opinion, it is based on data which is extensive and

4   which I'm going to use to actually take care of people who need

5   to be treated well and who need to live.

6   Q.   And so are you going to tell the jury anything today that

7   you -- are you going to tell the jury exactly what you would

8   tell a patient if you were treating a patient?

9   A.   Yes, I already have.  I always draw that picture.  I

10  always do.  And that's exactly what I will do here.

11  Q.   And are you going to tell the jury exactly what you would

12  go tell any doctor at City of Hope, an oncologist, a

13  pathologist or any other specialty?

14  A.   Certainly.

15  Q.   So did you review -- Dr. Weisenburger testified last week.

16  Did you review his testimony that he gave to the jury?

17  A.   Yes, I did.

18  Q.   And specifically did you review the testimony he gave

19  about what he calls his differential method?

20  A.   Yes, I did.

21  Q.   Have you, in your 40-plus-year career as an oncologist,

22  ever used that method to determine the cause of a patient's

23  non-Hodgkin's lymphoma?

24  A.   No.  A differential diagnosis is used to figure out what

25  the diagnosis is.  Patient comes with all kinds of different

1   symptoms, and we get lab tests, other kinds of tests, and

2   finally determine what is the actual illness, what is the

3   diagnosis.  But I have never used a differential diagnosis to

4   try to figure out the cause of a certain tumor.

5   Q.   So what Dr. Weisenburger did with the chart -- where he

6   listed the risk factors and crossed them off -- have you ever

7   done that for a non-Hodgkin's lymphoma patient to determine the

8   cause -- the cause of his or her cancer?

9   A.   No.

10  Q.   Have you heard of someone else at City of Hope or at USC,

11  another oncologist, who has used that method to determine the

12  cause of a patient's non-Hodgkin's lymphoma?

13          MS. MOORE:  Objection, Your Honor.  Hearsay.

14          THE COURT:  Overruled.

15          THE WITNESS:  No, I have not.

16  BY MR. STEKLOFF

17  Q.   And so do you think that what Dr. Weisenburger presented,

18  his differential method, was a scientifically valid method to

19  determine the cause of Mr. Hardeman's non-Hodgkin's lymphoma?

20  A.   I do not.

21  Q.   Now, you are here today specifically -- other than the

22  background information that you provided -- but going forward,

23  you are here to talk specifically about Mr. Hardeman, correct?

24  A.   Correct.

25  Q.   Have you reviewed the epidemiological literature that the

LEVINE - DIRECT / STEKLOFF

 1   jury has heard about regarding glyphosate or Roundup and

 2   non-Hodgkin's lymphoma?

 3   **A.**   Yes.

 4   **Q.**   Have you also reviewed Dr. Mucci's testimony that she gave

 5   on Friday to the jury?

 6   **A.**   Yes, I did.

 7   **Q.**   Are you relying -- for a discussion of that

 8   epidemiological literature, are you relying on Dr. Mucci's

 9   explanation to the jury so that you can focus here today on

10   Mr. Hardeman?

11   **A.**   Yes, I am.

12   **Q.**   And is Dr. Mucci's analysis that she provided to the jury

13   consistent with your own professional and clinical experience

14   as a practicing oncologist?

15   **A.**   Yes, it is.  She was careful in her evaluations.  She is

16   an epidemiologist; whereas I am not.

17         **MS. MOORE:**  Objection.

18      I'm sorry, Dr. Levine.

19      Objection, Your Honor.  It goes beyond the scope.

20         **THE COURT:**  You can briefly finish your answer.

21         **THE WITNESS:**  What was the question?

22   **BY MR. STEKLOFF**

23   **Q.**   The question was:  Is Dr. Mucci's analysis consistent with

24   your own professional and clinical experience?

25   **A.**   Yes, it is.

LEVINE - DIRECT / STEKLOFF

1   Q.   What, if any, role -- now let's focus on your clinical

2   practice.  What, if any, role does Roundup play in -- Roundup

3   or glyphosate play in your clinical experience, taking care of

4   patients with non-Hodgkin's lymphoma?

5   A.   No role at all.

6   Q.   Now, let's talk about Mr. Hardeman specifically.  Okay?

7   A.   Yes.

8   Q.   Do you believe that Roundup or glyphosate caused

9   Mr. Hardeman's non-Hodgkin's lymphoma?

10  A.   I do not believe that Roundup or glyphosate caused his

11  lymphoma.

12  Q.   And the jury has heard this phrase -- and will hear this

13  phrase -- "substantial contributing factor."  Do you believe

14  Roundup or glyphosate was a substantial contributing factor to

15  Mr. Hardeman's non-Hodgkin's lymphoma?

16  A.   No, I do not believe that Roundup or glyphosate was a

17  substantial contributing factor to Mr. Hardeman's lymphoma.

18  Q.   And we are going to talk more in a moment about -- the

19  jury has also heard the phrase "idiopathic."  Are you familiar

20  with that phrase?

21  A.   Yes, I am.

22  Q.   We will talk more about that in a moment.  But for now

23  what I want to ask you is in offering his opinion to the jury,

24  do you think that Dr. Weisenburger appropriately considered the

25  possibility that Mr. Hardeman's non-Hodgkin's lymphoma was

LEVINE - DIRECT / STEKLOFF

 1   idiopathic?

 2   **A.**   No, I do not.  There is nothing specific either under the

 3   microscope or clinically or history in terms of the development

 4   of the lymphoma that would indicate that this was anything

 5   other than, in his parlance, idiopathic.  That is not my view.

 6   But he can't -- he did not distinguish the concept that

 7   idiopathic is seen in great numbers, great percentages of

 8   patients who have diffuse large B-cell lymphoma.  We never know

 9   what the cause is.  And if you can't determine Roundup versus

10   idiopathic under the microscope or any other specific way, you

11   have to consider idiopathic is a real possibility as far as the

12   cause, i.e., we just don't know.

13   **Q.**   Now, we are also going to talk more about hepatitis C and

14   hepatitis B.  But in offering his opinions, do you think that

15   Dr. Weisenburger appropriately considered the possibility that

16   Mr. Hardeman's non-Hodgkin's lymphoma was caused by hepatitis B

17   or hepatitis C?

18   **A.**   No, I do not think he was correct when he said that

19   neither hepatitis C or B had anything to do with Mr. Hardeman's

20   lymphoma.

21   **Q.**   What, in your opinion, was the most likely cause of

22   Mr. Hardeman's non-Hodgkin's lymphoma?

23   **A.**   I believe without question that the most likely cause of

24   his lymphoma was chronic infection by hepatitis C; 39 years of

25   active infection by hepatitis C, allowing a real opportunity

LEVINE - DIRECT / STEKLOFF

1   for an accident to occur.  It could have occurred on day one of

2   the infection.  It could have occurred on day one of year 39 of

3   the infection.  For 39 years he was infected with a virus which

4   has been shown to cause diffuse large B-cell lymphoma.

5   **Q.**   And what in your opinion is the second most likely cause

6   of Mr. Hardeman's non-Hodgkin's lymphoma?

7   **A.**   I think the second most likely cause is hepatitis B.  We

8   don't know a lot -- I don't know a lot of the detail about his

9   hepatitis B infection.  I know that he has been infected in the

10  past with hepatitis B, based upon the very specific blood tests

11  that were done.  I believe Dr. Weisenburger said he was immune.

12  What that means is he has been infected in the past with

13  hepatitis B.  Hepatitis B also causes accidents in that DNA.

14  Hepatitis B could be a cause, but I just don't know enough

15  about his hepatitis B from the records to be able to say that

16  that is the primary cause.  So I believe that the primary

17  cause, or most significant factor, was hepatitis C, followed by

18  hepatitis B.  Either could have done this.

19  **Q.**   Now, in your opinion is it also possible that

20  Mr. Hardeman's non-Hodgkin's lymphoma was idiopathic?

21  **A.**   Yes, it is also possible that it was idiopathic.  You

22  can't really tell under the microscope.  It is conceivable that

23  it was about 70 -- the literature is a bit different here, but

24  between 70 and 90 percent of cases of diffuse large B-cell

25  lymphoma are such that we don't know the reason.  So it is

1  possible that it is just idiopathic.  We don't know.

2  **Q.**   Now, there has been testimony about oncologists who want

3  to know the cause of their patients' non-Hodgkin's lymphoma.

4  And my question for you is:  If you, Dr. Levine, could know the

5  cause of every one of your patients' non-Hodgkin's lymphoma,

6  would you want to know?

7  **A.**   I would absolutely want to know.

8  **Q.**   And why is that?

9  **A.**   Oh, all kinds of reasons.  First of all, if I knew the

10  exact cause of a given case, I might be able to treat that

11  patient a little bit differently than I would be treating

12  somebody else.  If somebody had been, for example, infected by

13  hepatitis C or hepatitis B, I would need to know that, even if

14  they didn't have a lymphoma.  So what I mean by that is

15  hepatitis C -- if somebody is going to go on chemotherapy, I

16  would want to be very, very careful because of hepatitis C

17  hidden in the body someplace that might reactivate itself.  I

18  would want to know about that.

19      If the patient had been infected by hepatitis B in the

20  past, as Mr. Hardeman, and that patient was then going to get

21  chemotherapy, I also would worry -- just as Dr. Ye did -- that

22  the hepatitis B might reactivate itself and because he knew at

23  some level that hepatitis B could be hidden in the body, he

24  chose to use a medicine.  He gave Mr. Hardeman lamivudine, a

25  drug, to try to suppress hepatitis B.

1    Even though he said that Mr. Hardeman was, quote, cured of

2  his hepatitis C, that was a -- that was based on a blood test,

3  which isn't sensitive to show hepatitis C very low in the body.

4  And he knew that too.  So we both are saying the exact same

5  thing, but he is acting in the way that I would.  I'm very

6  respectful of him.

7    In other words, he spoke to Mr. Hardeman very carefully.

8  And said to Mr. Hardeman, We have some extra issues in your

9  case.  One is you have chronic hepatitis C infection, a history

10  of that.  I'm going to have to watch you more carefully than

11  usual to make sure that the chemo will be safe related to your

12  hepatitis C.  He wouldn't have said that if he believed that

13  Mr. Hardeman was honestly cured; that there was not one last

14  little HCV.

15        **MS. MOORE:**  Sorry, Dr. Levine.

16    Objection, Your Honor.  Speculation.  Hearsay.

17        **THE COURT:**  That last sentence will be stricken.

18        **THE WITNESS:**  He gave Mr. Hardeman a medicine, a

19  medicine that potentially has side effects.  So every time we

20  give a medicine, that's a big deal.  You are thinking about the

21  potential risks and the potential benefits of that medicine.

22  He gave lamivudine to Mr. Hardeman who had a history of

23  hepatitis B, who was, quote, cured of hepatitis B; but he gave

24  that medicine, knowing he gave that medicine.

25  \\\

LEVINE - DIRECT / STEKLOFF

1   BY MR. STEKLOFF

2   Q.   Now, understanding your opinion that Roundup did not cause

3   Mr. Hardeman's non-Hodgkin's lymphoma or contribute to his

4   non-Hodgkin's lymphoma, let's say you could know that Roundup

5   caused one of your patient's non-Hodgkin's lymphoma.  Would you

6   want to know that?

7   A.   Oh, sure, I would.

8   Q.   Okay.  Now, if Mr. Hardeman had been your patient; and

9   based on your review of the medical records, would you have

10  ever told him that Roundup or glyphosate caused his

11  non-Hodgkin's lymphoma?

12  A.   No, I don't believe it does.

13  Q.   Now, let's turn back to the idiopathic.  And let's discuss

14  that a little more for the jury.

15       What does it mean for a cancer or non-Hodgkin's lymphoma

16  to be idiopathic?

17  A.   It means that we don't know the cause.  We are able to

18  diagnose this under the microscope and so forth, but we don't

19  know why it occurred.  We don't know what caused that accident.

20  Q.   And I think you mentioned a moment ago that the literature

21  differs, but I think -- just to get this -- did you say between

22  70 percent and 90 percent of non-Hodgkin's lymphomas are

23  considered idiopathic?

24  A.   That's correct.  The majority without question are

25  idiopathic.  And the literatures are somewhat diffuse in that

1  regard.  Some of the papers say as low as 70 percent.  Some say

2  as high as 90 percent.

3  **Q.**  And is that -- the 70 to 90 percent, does that also apply

4  to specifically diffuse large B-cell lymphoma?

5  **A.**  Yes, that applies to diffuse large B-cell lymphoma.

6  **Q.**  What about in your practice, what percentage of -- not

7  that you have done a scientific assessment -- but an estimate,

8  what approximate percentage of your patients are idiopathic in

9  your opinion?

10 **A.**  I have not counted this up, but my belief is that my

11 patients are more likely to have lymphomas -- non-Hodgkin's

12 lymphomas with known cause, specifically HIV or hepatitis C or

13 hepatitis B or HTLV1.  My area of expertise is lymphomas caused

14 by infectious organisms caused by germs.

15      So other doctors refer patients to me from locally or

16 around the country or even around the world.  So my belief is

17 that my practice is a bit different and more heavily weighted

18 towards organism, germ-related causes for the patients'

19 lymphoma.

20 **Q.**  And you mentioned that includes HIV?

21 **A.**  Yes, it does.

22 **Q.**  Does that include hepatitis C or hepatitis B?

23 **A.**  It includes HIV, hepatitis C, hepatitis B, yes.

24 **Q.**  Now, you said a moment ago, I believe, that it is possible

25 that Mr. Hardeman's non-Hodgkin's lymphoma was idiopathic and

1  that you don't think Dr. Weisenburger fairly considered that.

2  Can you explain to the jury why it is possible that

3  Mr. Hardeman's non-Hodgkin's lymphoma was idiopathic?

4  **A.**   It is possible because in his particular case we have not

5  looked at his B lymphocytes or his liver cells to know that he

6  has hepatitis C there.   On the other hand, we do know that it

7  was present for all of those years, the 35 years.

8       The other side of the coin, looking at the tissue alone,

9  just the plain biopsy, you really can't tell.   There is nothing

10  that distinguishes the hepatitis C diffuse large B-cell

11  lymphoma from an idiopathic case.

12  **Q.**   So you mentioned hepatitis C.   So let's now talk about

13  hepatitis C.   The jury has heard a lot about hepatitis C, but

14  can you just briefly explain what hepatitis C is?

15  **A.**   Hepatitis C is -- it is an RNA virus.   One of the

16  interesting things about it is that our immune systems are

17  normally not very good at suppressing it.   So when somebody is

18  infected by hepatitis C, about 15 percent of the time, 1-5, the

19  patient's immune system can clear it.   And it is, quote, cured.

20       However, 85 percent of the time our immune systems cannot

21  cure it, and the patient then develops -- as Mr. Hardeman

22  did -- chronic infection by hepatitis C going on for years and

23  decades.   Well, with that chronic infection, the cells that are

24  most involved are B lymphocytes and also liver cells.   The

25  virus gets into liver cells and it also gets into B

1    lymphocytes.

2        The presence of hepatitis C in the liver causes a whole

3    reaction.  It gets inflamed.  All of these immune cells are in

4    there trying to knock it off.  As it gets inflamed, eventually

5    the liver becomes scarred from all of that chronic infection

6    and chronic inflammation.  Big amounts of scar tissue come down

7    on the liver, crowding out the regular liver cells so that they

8    cannot work anymore, and the patient goes into what we call

9    liver failure.  So one outcome is liver cirrhosis, and it is an

10   outcome of chronic -- of long-term infection by hepatitis C.

11       The hepatitis C can also cause those accidents that I was

12   talking about.  Hepatitis C can cause direct mutations in the

13   cells in which it lives.  And that includes B lymphocytes and

14   liver cells.  So hepatitis C is now a proven cause of liver

15   cancer, but in our case here, a proven cause of non-Hodgkin's

16   lymphoma and specifically diffuse large B-cell lymphoma.

17   **Q.**  Mr. Hardeman had diffuse large B-cell lymphoma.  Is

18   hepatitis C a proven cause of diffuse large B-cell lymphoma?

19   **A.**  Yes, it is.

20   **Q.**  Now, did you also -- based on your review of the medical

21   records, did you want to highlight a few of the medical

22   records -- Mr. Hardeman's medical records for the jury?

23   **A.**  Certainly.

24   **Q.**  So this is Exhibit 1023 at page 114, and it is dated

25   January 28th, 2005.

1   　　　Dr. Levine, what does this record show?

2   **A.**   This record shows that Mr. Hardeman was, in fact, infected

3   by hepatitis C.  There are various subtypes of the virus.  His

4   subtype was called genotype 2B.  The amount of virus in his

5   blood in January of 2005 was quite high.  It was 732,000 copies

6   for every drop of blood.

7   **Q.**   So is this, in this January 2005 timeframe, when

8   Mr. Hardeman's hepatitis C was first identified by his doctors

9   at Kaiser?

10  **A.**   This is when it was first identified, yes.

11  **Q.**   Okay.  Now, you also have this record from Dr. Turk dated

12  January 25, 2005.  And what did you want to highlight for the

13  jury here?

14  **A.**   The highlight here is that this hepatitis C could not have

15  been a recent infection.  For the patient to have had actual

16  cirrhosis of the liver, that would have taken years.  And that

17  meant to me that this was a chronic infection, just as it meant

18  to his doctor.

19  **Q.**   So the jury has heard that Mr. Hardeman was first

20  exposed -- likely first exposed to hepatitis C in approximately

21  1966.  Is that your understanding as well?

22  **A.**   Yes, it is.

23  **Q.**   So between 1966 and 2005, that is 39 years, correct?

24  **A.**   Yes.

25  **Q.**   And what does the fact that Mr. Hardeman developed

**LEVINE - DIRECT / STEKLOFF**

1  cirrhosis of the liver during that 39-year period tell you

2  about how long the hepatitis C was active in him?

3  **A.**   The apparent exposure was in the 1960s.  The first proof

4  that he had the hepatitis C was in 2005, 39 years later, and it

5  was chronic.  He already had cirrhosis.  And that says that

6  from the time of his exposure to the time of first diagnosis

7  was a very, very long time, similar to what I would have

8  expected actually.

9  **Q.**   And do you recall also that Dr. Weisenburger testified

10  about this -- there was a record in the 1980s where

11  Mr. Hardeman had increased liver enzymes?

12  **A.**   Yes, I saw that as well.  It was 1989, I believe.  And so

13  there were increased liver enzymes which would have been

14  consistent with active hepatitis C infection, at that time as

15  well.

16  **Q.**   Okay.  And you mentioned that it takes years for cirrhosis

17  of the liver to develop from hepatitis C.  Can you give -- does

18  it take -- what is the sort of minimum amount based on the

19  literature that it appears to take?

20  **A.**   People will be different depending on the immune system

21  and so forth.  But this is long.  It is at least a decade.  It

22  is not years or months.  It is a decade or decades.

23  **Q.**   And so is it your opinion that Mr. Hardeman's cirrhosis

24  was caused by his hepatitis C?

25  **A.**   Yes, I believe that is true.  It is conceivable that

1   hepatitis B was involved as well, but I don't know enough about

2   his hepatitis B to be able to say that definitively.

3   **Q.**   Does that tell you that most likely Mr. Hardeman had

4   active hepatitis C for at least ten years during that 39-year

5   period?

6   **A.**   At least ten years, and this would be consistent with

7   other reports in the literature.  I believe he had active

8   infection for a good 39 years, a long, long time.

9   **Q.**   And did you also -- you mentioned how hepatitis C can

10  impact someone's body.  Did you also prepare a board to walk

11  the jury through that?

12  **A.**   Sure.

13          **MR. STEKLOFF:**  Your Honor, may Dr. Levine step down

14  one more time?

15          **THE COURT:**  Okay.

16  **BY MR. STEKLOFF**

17  **Q.**   Dr. Levine, can you please walk the jury through what we

18  are seeing here, and please speak up.

19  **A.**   So this is just repeating what I said before so that you

20  can get a visual image of it.  When somebody is infected with

21  hepatitis C, the minority, about 15 percent, can actually fully

22  recover.  The immune system can handle that and get rid of the

23  virus.

24          The vast majority, 85 percent of people, develop what we

25  were talking about:  Chronic infection with that hepatitis C

1   that they cannot clear.

2        And there are two outcomes there.  One is the patient just

3   has chronic hepatitis:  Yellow eyes, sick, liver enzymes

4   elevated, liver not well, so to speak.  So chronic hepatitis,

5   fatigue, tired, and so forth.

6        The other outcome, more severe, is cirrhosis, scarring,

7   chronic inflammation of the liver, scarring out at the liver,

8   and eventually end-stage liver disease.  In other words, dying

9   of liver disease.  So that is one outcome of chronic HCV

10  infection.

11       The other outcome of chronic HCV infection is cancer.  One

12  of those cancers, the more common, is liver cancer directly

13  caused by long-term infection by HCV.  It causes accidents in

14  the liver.  It causes mutations in B lymphocytes because the

15  hepatitis B also lives and gets into B lymphocytes; causes

16  accidents in the B lymphocyte, and that may result in

17  non-Hodgkin's lymphoma, specifically diffuse large B-cell

18  lymphoma.  So these are the usual outcomes of chronic

19  hepatitis C infection.

20  Q.   And where, based on your opinions, is it most likely that

21  Mr. Hardeman fits in these various outcomes?

22  A.   I think he -- I know he has cirrhosis.  So I know that

23  part of it.  I know he has lymphoma.  I believe he is here.  He

24  is cirrhosis with lymphoma.

25  Q.   Thank you, Dr. Levine.

1      Dr. Levine, did you also prepare a slide to explain -- to

2  visually explain to the jury how hepatitis C causes

3  non-Hodgkin's lymphoma?

4  **A.**   Yes, I did.

5  **Q.**   Okay.  So using this slide, what I'm hoping you can do is

6  actually start on the right side of the chart that says

7  marginal zone and explain what is happening there with

8  hepatitis C.

9  **A.**   First, I said a while ago that there were more than 60

10 different types of lymphoma; and they are caused by different

11 things and different mechanisms, and this is going to be an

12 example of that, and an important one in this situation.

13      So what we see on top is a B lymphocyte, and it turns out

14 that the B lymphocyte has a -- I am going to call it a

15 receptor.  I will call it now a lock, a receptor, a molecule, a

16 little structure on its surface.

17      This in orange is hepatitis C.  And it turns out that

18 hepatitis C has a molecule on its surface which fits exactly

19 into the receptor on the B cell.  One could think of it as a

20 lock and a key.  All of medicine, all of biology works that

21 way.  It has to be a perfect fit.

22      So what happens is the hepatitis C is the key.  The B

23 lymphocyte is the lock.  If hepatitis C is in the environment,

24 the key goes right into the lock.  It attaches itself right

25 away to the B lymphocyte, and it causes that B lymphocyte to

LEVINE - DIRECT / STEKLOFF

1   divide over and over and over and over again, so that there is

2   a, quote, tumor, a mass, a lump of those cells.

3        This one is directly driven by hepatitis C.  It needs

4   the -- I'm going to say -- call the hepatitis C the foot on the

5   gas pedal of these B cells, making them grow, making them

6   divide over and over.  In this example, if you remove the

7   hepatitis C here, if you remove the hepatitis C, you are taking

8   your foot off of the gas pedal.  You are taking the key out of

9   the lock, and the whole thing can go away.  And it does.  And

10  that's what they are talking about when treatment for marginal

11  zone lymphoma takes that tumor away 75 percent of the time.

12  That's marginal zone lymphoma.  And that is the mechanism in

13  which it works.

14  Q.   Let me stop you there.  Did Mr. Hardeman have marginal

15  zone lymphoma?

16  A.   No, he did not.

17  Q.   And the jury has heard about the antiviral therapy that

18  Mr. Hardeman received between 2005 and 2006.  You are familiar

19  with that, correct?

20  A.   I am.

21  Q.   And does that therapy reduce the likelihood of marginal

22  zone lymphoma?

23  A.   Absolutely will reduce the likelihood of marginal zone

24  lymphoma.

25  Q.   And is that because, as you said, the hepatitis C is

1   attached to the B cells and has to be there?

2   **A.**   Yes.

3   **Q.**   Now, explain -- now, let's talk about the left side.

4   First of all, I see DLBCL -- diffuse large B-cell lymphoma --

5   at the bottom.  Is this the way in which you -- it is your

6   opinion that hepatitis C may or would have caused

7   Mr. Hardeman's non-Hodgkin's lymphoma?

8   **A.**   Yes, it is.

9   **Q.**   So can you explain that left side of the diagram, please.

10  **A.**   Hepatitis C can directly cause accidents, mutations in the

11  DNA.  Mr. Hardeman had mutations in his DNA.  Once that

12  accident is there, the virus doesn't have to be there anymore

13  at all.  We call that a hit-and-run kind of a mechanism.  It is

14  what I was trying to explain when I was talking about tobacco.

15       So, again, people who stop smoking 15 years ago are still

16  at risk for lung cancer.  The accident has happened.  Doesn't

17  matter that they aren't smoking anymore.  The accident happened

18  15 years ago, four years ago, whatever it is.  This kind of

19  error is what really causes the diffuse large B-cell lymphoma,

20  and this is what Mr. Hardeman had.

21       In this particular case, if you get rid of hepatitis C

22  entirely, it doesn't matter.  The accident is there.  If you

23  get rid of smoking entirely, doesn't matter.  The accident is

24  there.

25  **Q.**   And so when we heard about this antiviral therapy and

1   Mr. Hardeman's sustained virological response, he didn't have

2   the positive hepatitis C test between 2006 and 2018.  Does --

3   did the -- would the antiviral therapy have cured an accident

4   that took place through this hit-and-run mechanism?

5   **A.**   No.  The presence or absence of hepatitis C in the blood

6   or the body would have no effect.  This accident, it wouldn't

7   matter.  Once the accident was there, it was there.  His immune

8   system would work with it well or not, but the accident is

9   there.  Doesn't need the hepatitis C anymore.

10  **Q.**   Now, is there peer-reviewed literature?  Are there

11  articles that discuss exactly what you are showing on the left

12  side here, this direct accident in the DNA or the hit-and-run?

13  **A.**   Absolutely.

14       **MR. STEKLOFF:**  Your Honor, I would like to publish two

15  of those articles.  The first is Exhibit 1448.

16       **MS. MOORE:**  No objection, Your Honor.

17       **MR. STEKLOFF:**  So I think we are going to pull that

18  up.  Mr. Holtzen is going to help me.

19  **BY MR. STEKLOFF**

20  **Q.**   So, Dr. Levine, is this an article titled Hepatitis C

21  Associated B-cell non-Hodgkin's Lymphomas, Epidemiology,

22  Molecular Signature and Clinical Management?

23  **A.**   Yes, it is.

24  **Q.**   And are we talking here, in your opinion, about a

25  hepatitis C associated B cell non-Hodgkin's lymphoma in

LEVINE - DIRECT / STEKLOFF

1    Mr. Hardeman?

2    **A.**    Yes, we are.

3    **Q.**    And if we can find the date at the bottom, is this article

4    from 2013 in the *Journal of Hepatology*?

5    **A.**    Yes, it is.

6    **Q.**    Is hepatology -- hepatologists the people who treat

7    hepatitis C?

8    **A.**    Yes.

9    **Q.**    And so if we turn to this first -- let me find the exact

10   spot -- on the first page, I believe, there is a section that

11   says -- that talks about B-cell non-Hodgkin's lymphomas.  Here,

12   does this explain right at the introduction in that second

13   sentence:  B-NHL subtypes most frequently associated with

14   hepatitis C virus are marginal zone lymphoma and diffuse large

15   B-cell lymphoma?

16   **A.**    Correct, just what I was explaining before.

17   **Q.**    Right.  Is that consistent with what you just explained?

18   **A.**    Absolutely.

19   **Q.**    And then if we turn to page 172, do the authors of this

20   article walk through the mechanisms through which hepatitis C

21   can cause B-cell lymphomas?

22   **A.**    Yes, they do.

23   **Q.**    If we can pull that up, please.

24          They talk about three general theories have emerged to

25   understand the HCV-induced transformation process.  Do you see

LEVINE - DIRECT / STEKLOFF

1    that?

2    **A.**    Yes, I do.

3    **Q.**    The third says, Permanent B-cell damage, for example,

4    mutation of tumor suppressor genes caused by transiently

5    intracellular virus, the so-called hit-and-run theory.  Do you

6    see that?

7    **A.**    Yes, I do.

8    **Q.**    And so can you please explain to the jury what the authors

9    are referring to there?

10   **A.**    What they are saying is that HCV is capable of causing

11   accidents or mutations within that -- the cell in which it

12   lives, i.e., B lymphocyte in this case -- it will cause the

13   accident, and that the mutation at that point, it leaves or can

14   leave but the accident is still there.

15       The only thing that I would differ a bit on this last

16   statement is he is talking about a certain kind of tumor

17   suppressor genes.  In fact, we have found that these mutations

18   can occur all over.  It doesn't have to be just in those genes.

19   **Q.**    And now, if we turn to page 173, do they also include a

20   diagram, the third diagram that explains this hit-and-run

21   theory?

22   **A.**    Yes, they did.

23   **Q.**    And I don't need you to walk through, but does this show,

24   consistent with what you explained to the jury, that the

25   hepatitis C can cause the DNA damage, hit-and-run, and then

LEVINE - DIRECT / STEKLOFF

1  leave the cell but leave that DNA damage behind?

2  **A.**   That's exactly what it shows; drawing much more nicely

3  than my own, but there it is.

4  **Q.**   Okay.  So if we can please turn to -- did you -- in fact,

5  were you part of a group that published on this as well?

6  **A.**   Yes, I was.

7         **MR. STEKLOFF:**  Can we please publish Exhibit 1343,

8  Your Honor?

9         **MS. MOORE:**  No objection.

10         **THE COURT:**  Go ahead.

11  **BY MR. STEKLOFF**

12  **Q.**   We see here that this article is called Hepatitis C Virus

13  Induces a Mutator Phenotype, Enhanced Mutations of

14  Immunoglobulin and Proto-oncogenes, correct?

15  **A.**   That's correct.

16  **Q.**   And Dr. Machida is the lead author, but do we see there

17  that you are also part of the authors who published this

18  article?

19  **A.**   Yes.

20  **Q.**   And this is dated March 23, 2004; is that correct?

21  **A.**   Correct.

22  **Q.**   And if we look at the summary of what you and your

23  colleagues published, did it explain -- well, let's just read

24  this for the jury.  It says -- would you like to read it?

25  **A.**   Sure.

LEVINE - DIRECT / STEKLOFF

1   Q.   Okay.

2   A.   We demonstrated here that acute and chronic HCV infection

3   caused a five to tenfold increase imputation frequency in

4   immunoglobulin heavy chain, BCL6, p53, and Beta-catenin genes

5   of in vitro HCV-infected B-cell lines and HCV-associated

6   peripheral blood mononuclear cells, lymphomas and HCCs.

7        So we looked at cell lines.  We looked at living human

8   living peripheral blood B-cells.  We looked at human lymphomas,

9   and we looked at human hepatic cancer cells, hepatocellular

10  cancer cells.

11  Q.   And then if we look at the bottom of this same paragraph,

12  did you and your colleagues explain the following:  These

13  results indicate that hepatitis C virus induces a mutator

14  phenotype and may transform cells by a hit-and-run mechanism.

15  This finding provides a mechanism of oncogenesis for an RNA

16  virus?

17  A.   Yes, that's what it says; and that's what the data

18  indicates, both then and subsequent to that.

19  Q.   Can you just explain -- you have talked about it, but can

20  you just explain to the jury what that -- what those two

21  sentences mean?

22  A.   It basically means that HCV is unusual and difficult in

23  the sense that it has the ability to get into our DNA and cause

24  all kinds of accidents, not any one specific.  Some are more

25  common.  Some are less common.  But it can cause accidents all

1    over the place in our DNA.  It is a very difficult virus.

2    **Q.**    Now, are there other articles that also explain this

3    hit-and-run mechanism?

4    **A.**    Yes, there are.

5    **Q.**    We chose just one that you were involved in and then one

6    that you weren't involved in; is that fair?

7    **A.**    Yes.  I think it is important to note that the field

8    always moves forward.  You're always learning more.  So the

9    first publication was in 2004, but that has consistently been

10   shown.  This is now very commonly understood by oncologists

11   such as myself.

12   **Q.**    Now, Dr. Levine, have you also -- if we can switch back to

13   the PowerPoint.

14       Have you also been involved in research regarding the

15   latency or how long it takes for lymphoma to develop from

16   hepatitis C?

17   **A.**    Yes, I have.

18   **Q.**    And so -- actually we have one more study, I'm sorry,

19   which is Exhibit 1598.

20            **MR. STEKLOFF:**  If I can publish that to the jury,

21   Your Honor.

22            **MS. MOORE:**  No objection.

23            **THE COURT:**  Go ahead.

24   **BY MR. STEKLOFF**

25   **Q.**    And we see here the title of this article is Hepatitis C

1    Virus Infections in Patients with B-cell non-Hodgkin's

2    Lymphoma; is that correct?

3    **A.**    Yes.

4    **Q.**    And, again, with Mr. Hardeman we are talking about a

5    B-cell non-Hodgkin's lymphoma; correct?

6    **A.**    Correct.

7    **Q.**    This is by Dr. Zuckerman.  And then I think we see that

8    you were also part of this research in 1997, correct?

9    **A.**    Right.

10   **Q.**    And can you briefly explain to the jury how you,

11   Dr. Zuckerman and the other doctors conducted this study, not

12   with too much detail, but what you did?

13   **A.**    We were interested in the potential relationship between

14   hepatitis C and B-cell lymphomas because in our large group of

15   patients with lymphoma at the county hospital in L.A., we were

16   seeing quite a few patients who were infected by hep C.

17        We, therefore, did a study and looked at about 120 of our

18   patients who had B-cell lymphoma from the county, we looked at

19   about 150 patients who had other kinds of cancers of the blood

20   system but not B-cell lymphoma, and then we looked at about 130

21   patients from our same clinics who had no cancer at all but

22   they were patients at the county hospital.

23        We did hepatitis C antibody tests on all of them and HCV

24   RNA.  We looked at the RNA, the active virus in the blood, of

25   all of them.  And it turned out that the patients with B-cell

1   lymphoma were highly more likely -- 22 percent of them had been

2   infected with hepatitis C versus only about 5 percent of the

3   other two groups.  This was highly significant and was our

4   first little hint that perhaps hepatitis C was related in some

5   sense to the development of B-cell lymphoma.

6       We went back to the patients who were hepatitis C

7   infected, asked when they might have been infected or when they

8   might have been exposed by hepatitis C, and it turned out that

9   the average, the median time, between the exposure to

10  hepatitis C and the B-cell lymphoma was 15 years.  Again, long

11  time.  But the range went up to 30 -- 35 or 36 years.  So,

12  again, hepatitis C has a long latent period as it eventually

13  develops into B-cell lymphoma.

14  Q.  And so just to call out a couple portions of the article.

15  First, did you explain at page 423 what you just said where it

16  talks about risk factors for hepatitis C infection?

17  A.  Risks --

18  Q.  Yes.  So it says (reading):

19      "Risk factors for hepatitis C virus infection were

20      present in 15 patients (60 percent) with B-cell lymphoma

21      and occurred a median of 15 years before diagnosis of

22      lymphoma."

23      Correct?

24  A.  Correct.

25  Q.  And then if we go to the next portion of the results

**LEVINE - DIRECT / STEKLOFF**

1   section that we wanted to call out.

2       Did you explain -- you and your colleagues explain the

3   period during which patients were at risk for percutaneous

4   exposure to HCV preceded the diagnosis of B-cell lymphoma by a

5   median of 15 years, range 5 to 35 years?

6   **A.**   Correct.

7   **Q.**   And if we can take that down.

8       With respect to Mr. Hardeman and that 5- to 35-year range

9   with a median of 15, what does that tell -- what would you like

10  to tell the jury about that?

11  **A.**   I think that Mr. Hardeman's case was quite common.  That's

12  exactly what we expect, a very, very long latent period during

13  which the accident, the cell with the mutation in it is

14  starting to divide and the person's immune system is trying to

15  keep it in check; but at a certain point, perhaps when the

16  immune system weakens a little bit because the person is older,

17  at a certain point it shifts and the immune system weakens, the

18  lymphoma is allowed to express itself, to divide and divide, it

19  pops above the line, and the patient is diagnosed with a

20  clinical lymphoma.  So I think that his case is quite

21  consistent with the usual situation in that regard.

22  **Q.**   When you say "usual," usual with respect to a hepatitis C

23  diffuse large B-cell lymphoma?

24  **A.**   Consistent with the fact that it's very -- it's expected

25  that the time between infection by hepatitis C and the

1    development of B-cell lymphoma will be decade or decades long.

2    **Q.**   Now, you mentioned earlier that you've reviewed Dr. Ye's

3    testimony; correct?

4    **A.**   That's correct.

5    **Q.**   And are you aware that Dr. Ye said Mr. Hardeman was cured

6    in 2006 of his hepatitis C?

7    **A.**   Yes, he said that.

8    **Q.**   Okay.  And so I think you touched on this briefly but

9    since we're talking about hepatitis C, is Dr. Ye's use of the

10   word "cured" consistent or inconsistent with your opinions?

11   **A.**   I think we're both saying the same thing.  I'm very

12   respectful of Dr. Ye.  He did a beautiful job and he treated

13   Mr. Hardeman beautifully.  He used the word "cure," but in some

14   way he knew -- I'm sorry.

15       He used the word "cure."  He gave the patient some very

16   specific information.  He said to the patient --

17          **MS. MOORE:**  Objection, Your Honor.

18       I'm sorry, Dr. Levine.

19       Again, speculation and hearsay.

20          **THE COURT:**  Overruled.

21   **BY MR. STEKLOFF:**

22   **Q.**   You can continue.

23   **A.**   There is specific data in the literature in Mr. Hardeman's

24   records in which Dr. Ye discusses what he discussed with

25   Mr. Hardeman related to his lymphoma.  He says that he

1    discussed with Mr. Hardeman the fact that he had chronic

2    infection by hepatitis C and, therefore, he was going to have

3    to watch him very carefully as it relates to his liver tests.

4         He also told Mr. Hardeman that he had been infected by

5    hepatitis B and because of that, he wanted to avoid the

6    reactivation of hepatitis B using a drug called lamivudine.

7    This would be done simply because use of chemotherapy itself

8    will weaken the immune system; and if there is virus, germs,

9    hidden occult inside cells, inside a liver cell or inside a

10   B-cell, the use of chemotherapy will decrease the immune system

11   of the patient and allow the hepatitis B to reactivate itself,

12   to show itself again as hepatitis and allow the hepatitis C

13   virus to get active again and show itself as real hepatitis.

14        He was very specific in discussing that with Mr. Hardeman,

15   and he wrote it into his note that he had discussed that.  So

16   his action indicated that he wanted to prevent --

17             **MS. MOORE:**  Objection.  Objection, Your Honor.

18             **THE WITNESS:**  -- reactivation.

19             **MS. MOORE:**  Dr. Levine, I'm sorry.

20        It calls for speculation.

21             **THE COURT:**  Overruled.

22   **BY MR. STEKLOFF:**

23   **Q.**   And, Dr. Levine, we'll come back through some slides, but

24   you mentioned a medical record.  Is this the medical record,

25   1023 at page 940, that you are referencing?

LEVINE - DIRECT / STEKLOFF

1    **A.**    Yes.

2    **Q.**    And so it says at the top (reading):

3              "We specific" --

4         This is Dr. Ye's record from February 19th, 2015; correct.

5    **A.**    Correct.

6    **Q.**    And it says (reading):

7              "We specifically discussed two additional concerns in

8         his case."

9         This is what Dr. Ye was saying he discussed with

10   Mr. Hardeman; correct?

11   **A.**    Correct.

12   **Q.**    And the first involved the impact of hepatitis C

13   cirrhosis; correct?

14   **A.**    Correct.

15   **Q.**    But then explain just -- you just explained it, but just

16   tell the jury what this says in the second bullet and how

17   that's consistent with what you just explained.

18   **A.**    So he says that he discussed these concerns with

19   Mr. Hardeman, hepatitis B and C reactivation from rituximab.

20   Some of the drugs -- one of the drugs that we will use to treat

21   Mr. Hardeman is rituximab, and that definitely weakens the

22   immune system; and so he's saying to Mr. Hardeman that because

23   of the chemotherapy that we are going to start, the hepatitis B

24   could reactivate itself and the hepatitis C hidden could

25   reactivate itself.

1    He says (reading):

2            "We will monitor both diseases through the treatment.

3        I recommend prophylactic lamivudine 150 grams daily."

4        What that means is lamivudine is a drug to try to keep the

5    hepatitis B from reactivating itself, and he starts that drug

6    in Mr. Hardeman.

7    **Q.**   And if Dr. Weisenburger last week suggested to the jury

8    that after that antiviral therapy hepatitis B and hepatitis C

9    had been completely eliminated from Mr. Hardeman's bloodstream,

10   do you agree with that?

11   **A.**   I do not agree with it and I don't believe -- I did not

12   agree with it at all.

13          **MR. STEKLOFF:**   And I'm sorry.  This may have not been

14   published.  So may I published this to the jury if it wasn't

15   published?

16          **MS. MOORE:**   No objection, Your Honor.

17          **THE COURT:**   Go ahead.

18   **BY MR. STEKLOFF:**

19   **Q.**   Okay.  So sorry about that.

20       We don't need to belabor this record.  Do you see here

21   where it says, "We specifically discussed two additional

22   concerns in his case," and then you were reading from that

23   bottom bullet (reading):

24          "Hepatitis Bc reactivation from rituximab.  Will

25       monitor both diseases through the treatment.   I

1            recommended prophylactic lamivudine, 150 milligrams once

2            daily."

3    A.    That's what he said, and he discussed it with the patient.

4            MR. STEKLOFF:  And, Your Honor, I would move into --

5    move for the admission of page 940 and then the two other prior

6    medical records also, page 114 and 192, of Mr. Hardeman's

7    medical records.

8            MS. MOORE:  Objection, Your Honor, just with the

9    admission through an expert.  I think she can testify that she

10   relied it, but admission into evidence is not proper.  I'd like

11   a sidebar on that later.

12           THE COURT:  Sure.

13           MS. MOORE:  Thank you.

14           MR. STEKLOFF:  Okay.

15   Q.    Now, Dr. Levine, the jury -- I just want to talk -- since

16   you've been talking about this antiviral therapy, the jury

17   heard, and I think it's not in dispute, that Mr. Hardeman did

18   not have a positive hepatitis C test after 2006; correct?

19   A.    That is correct.

20   Q.    He had something called a sustained virological response

21   between 2006 and 2015; correct?

22   A.    Correct.

23   Q.    Does that in any way change your opinions about the role

24   hepatitis C most likely played in Mr. Hardeman's non-Hodgkin's

25   lymphoma?

LEVINE - DIRECT / STEKLOFF

1  **A.**   No, for two reasons.  First, if he had had that active

2  hepatitis C for one year or for 39 years, at any one moment he

3  would have had the opportunity for an error.  He did have a

4  mutation in his cell and, therefore, he didn't need the virus

5  anymore.  It was already -- the event had already occurred.

6  That would be one concept -- or fact.

7       The other fact is that sustained virologic remission

8  basically means that we cannot find evidence of the virus in

9  the blood using the standard techniques that we have, and that

10  is defined starting at six months after the end of

11  antiretroviral -- I'm sorry -- antiviral therapy.

12       We -- on the other hand, we do know -- ask me again.  I'm

13  sorry.  I lost my train.

14  **Q.**   You were explaining there were two reasons why --

15  **A.**   Oh.

16  **Q.**   -- his sustained virological response doesn't change your

17  opinions.

18  **A.**   Right.  The other fact is that sustained virologic

19  response means that we don't see the virus in the blood using

20  our standard techniques, but there are many studies published

21  in the peer-reviewed literature that show very carefully that

22  even though the virus is not visible by our techniques in the

23  blood, if one does very careful ultrasensitive studies in the

24  blood, you can often find it.  If you look at the liver cells,

25  it is there.  If you look at the B lymphocytes, it is there.

1      And that's now called occult infection.  It's there at a

2   lower level.  It's a real clinical benefit.  No question, if

3   you reduce the amount of HCV, the patient feels better.  It's

4   something that we should do, no question; but if that accident

5   has already happened, it doesn't really matter whether the

6   virus is still there or not.

7   **Q.**   And so, Doctor, we're not going to walk through them, but

8   Dr. Weisenburger showed the jury last week a series of articles

9   that he used -- that he -- it was his opinion, based on those

10  articles, that Mr. Hardeman would have had little to no risk

11  for diffuse large B-cell lymphoma because of the sustained

12  virological response.  Do you recall reviewing that testimony?

13  **A.**   I do.

14  **Q.**   Have you reviewed all those articles?

15  **A.**   I have.

16  **Q.**   And do any of those articles change the opinions that you

17  have offered here today about the possible role of hepatitis C

18  in Mr. Hardeman's cancer?

19  **A.**   They do not alter my opinion at all.  The accident had

20  39 years to occur.

21  **Q.**   Okay.  So let's turn now --

22       **THE COURT:**  Maybe now would be a good time for our

23  morning break?

24       **MR. STEKLOFF:**  I think that's perfect, Your Honor.  I

25  think I have ten minutes left, but I think this is a good time.

1          **THE COURT:**  Okay.  Sounds good.

2      Why don't we take our morning break.  We'll be back in at

3  about 10 after the hour.  Thank you.

4          **THE CLERK:**  All rise.

5      (Proceedings were heard out of the presence of the jury:)

6          **THE COURT:**  Thank you.  You can step down, Dr. Levine.

7          **THE WITNESS:**  Thank you.

8          **THE CLERK:**  Please be seated.

9          **THE COURT:**  Be back in about ten minutes.

10                     (Recess taken at 9:59 a.m.)

11                  (Proceedings resumed at 10:14 a.m.)

12          **THE COURT:**  Okay.  Go ahead and bring them in.

13      (Proceedings were heard in the presence of the jury:)

14          **THE CLERK:**  Please be seated.

15          **THE COURT:**  Okay.  You can resume.

16          **MR. STEKLOFF:**  Thank you, Your Honor.

17  **Q.**  Good morning, Dr. Levine.

18  **A.**  Good morning.

19  **Q.**  And so when we finished off, we were going to turn to

20  hepatitis B.  And can you just briefly explain to the jury what

21  hepatitis B is?

22  **A.**  Yes.  Hepatitis B is actually an entirely different virus.

23  It is a DNA virus.  It also infects B lymphocytes and liver

24  cells.

25      The interesting thing about hepatitis B, one of them, is

1    that it's very different than C in the fact that most people

2    who get hepatitis B, the immune system can clear it and it's

3    the minority that will go on with chronic hepatitis.  So it's

4    just the opposite in terms of chronic infection as far as the

5    percentage of people with chronic infection.  Very, very common

6    in hepatitis C, not that common in hepatitis B.

7         But it certainly can lead to liver cirrhosis over time.

8    Hepatitis B can cause the same kinds of accidents or genetic

9    errors, mutations, in the DNA just as I was saying about

10   hepatitis C; and hepatitis B has also been proven to be a cause

11   of non-Hodgkin's lymphoma and specifically diffuse large B-cell

12   lymphoma.

13   Q.   And so this is a medical record, again, from Dr. Ye dated

14   February 19th, 2015.  And what does this medical record show?

15   A.   It shows that he has been infected with hepatitis B in the

16   past.  So he does not have active hepatitis B surface antigen

17   is what it's called, and that would be a sign of active

18   infection.  Just like in hep C, the RNA would be a sign of

19   active.  Here he does not have evidence of active hepatitis B

20   infection, but he has had it in the past because he has

21   antibody to what is called hepatitis B core.  So he has been

22   infected in the past.

23        MR. STEKLOFF:  And, Your Honor, I would move for the

24   admission of this exhibit as well, Exhibit 1023 at page 940.

25        MS. MOORE:  Your Honor, same objection.

1          **THE COURT:**  Okay.  We'll discuss it at sidebar.

2     **BY MR. STEKLOFF:**

3     **Q.**   Now, Dr. Levine, we've heard that Mr. Hardeman was, again,

4     most likely exposed to hepatitis B in 1966 as well; correct?

5     **A.**   Correct.

6     **Q.**   Now, are you able, based on the fact that he had this

7     positive test for the antibody in 2015, to tell how long he had

8     active hepatitis B?

9     **A.**   No, I can't tell how long he might have had active

10    hepatitis B.

11    **Q.**   So as compared to hepatitis C, is that why you are -- you

12    said it was the second-most likely cause instead of the most

13    likely cause?

14    **A.**   Yes.  I felt the most likely was hepatitis C.  He had

15    active infection for 39 whole years.  I just don't have enough

16    information from the medical records to know the duration of

17    what might have happened with the hepatitis B, and that's why I

18    put it second on my list.

19    **Q.**   And here we can see in this medical record from Dr. Ye

20    that when he was tested in 2015, Mr. Hardeman was positive for

21    this hepatitis B core antibody; correct?

22    **A.**   That is correct.

23    **Q.**   And is there literature that discusses the risk of

24    developing B-cell lymphoma if you are positive for that core

25    antibody?

LEVINE - DIRECT / STEKLOFF

1   **A.**   Yes, there is.

2   **Q.**   And so -- well, this record we have discussed before;

3   correct?

4   **A.**   Yes, we have.

5   **Q.**   So then we'll move past that.

6        Is the Wang paper from 2007 one of the articles that

7   discusses that increased risk associated with being positive

8   for that core antibody?

9   **A.**   Yes.  He's looking at patients with B-cell lymphoma, and

10  on the bottom in yellow they have antibody to hepatitis C to

11  the core portion of the hepatitis B virus, and that is the same

12  status as Mr. Hardeman.

13  **Q.**   And just to be clear so we're not confusing hepatitis C or

14  hepatitis B, this article is about hepatitis B; correct?

15  **A.**   This is B and "c" here means core.  So this is the core

16  part of the hepatitis B virus.  And the antibody positive means

17  that that patient was infected with hepatitis B at sometime in

18  the past, and this particular highlighted area shows that

19  people who developed B-cell lymphoma were statistically more

20  likely to be positive for that hepatitis B core component.

21  **Q.**   And this is Table 4.  If we look at Table 5, does the

22  highlighted portion also apply to the tests for hepatitis B

23  that Mr. Hardeman had?

24  **A.**   Yes.  So the anti -- he did not have an antibody to

25  hepatitis B surface.  He did have antibody to core, and that

1   is -- if he had -- if he had antibody to surface, that would

2   mean he had been vaccinated.  Here he had real infection.  He

3   had infection --

4   Q.   And so --

5   A.   -- in the past.

6   Q.   -- at the bottom here there's a quote from the article

7   that says (reading):

8        "The same subgroup showed a significantly higher rate

9        of positive anti-hepatitis B core status and negative

10       anti-hepatitis B surface status compared with the control

11       group (31 percent versus 17 percent)."

12       Statistically significant, correct?

13   A.   Correct.

14   Q.   So how does this article and the increased risk associated

15   with it -- can you explain how that impacts your opinions about

16   the role hepatitis B may have played?

17   A.   It says to me that it is certainly possible that

18   Mr. Hardeman's B-cell lymphoma and diffuse large B-cell

19   lymphoma was associated with hepatitis B, but I have no further

20   information about how long he might have been infected or

21   whether he might have been chronically infected.

22   Q.   And to be clear, are there other studies about hepatitis B

23   that show no or little increased risk if you have this positive

24   core antibody?

25   A.   Yes, there are studies that show the opposite as well.

LEVINE - DIRECT / STEKLOFF

1  Q.   And did you consider that in forming your opinions?

2  A.   I did.  And, again, that was why I chose to put this as a

3  second possibility, not as the first possibility.

4  Q.   But with respect to both hepatitis C and hepatitis B,

5  based on everything that you have now told the jury, do you

6  think that Dr. Weisenburger appropriately ruled out, what he

7  claimed he ruled out, those possible causes of Mr. Hardeman's

8  cancer?

9  A.   I don't believe that he ruled out those causes at all.

10  The data is very, very strong in my own mind that those are the

11  significant factors in this case.

12  Q.   Okay.  So I just briefly want to touch on two other things

13  about Mr. Hardeman the jury has heard about.  The first is that

14  when he was diagnosed with his non-Hodgkin's lymphoma in 2015,

15  he was 66 years old; is that right?

16  A.   Yes.

17  Q.   Explain to the jury how, if at all, that impacts your

18  opinions.

19  A.   Older age is a risk factor for many, many kinds of cancer,

20  including lymphoma; and as I said earlier, one of the reasons

21  would be the weakening of the immune system as one ages.

22       Risk factor doesn't mean a causative factor.  Getting old

23  doesn't cause cancer.  It's simply associated with it.  We see

24  patients with cancer who are older as opposed to young people.

25  Q.   But if Mr. Hardeman had any of these DNA mutations from

LEVINE - DIRECT / STEKLOFF

1  hepatitis C or hepatitis B, what would have happened to his

2  immune system to fight those off as he became older?

3  **A.**   As he became older and his defense or immune system got

4  weaker just because of age, he would be less and less able to

5  keep that mutation in check, to keep that beginning of

6  malignancy in check.   He did not get the lymphoma when he was

7  20 or 30 or 40.   He got it when he was 66.   His immune system

8  would have been weakened at that time just by his age.

9  **Q.**   The jury has also heard a little bit about -- from

10  Dr. Weisenburger about Mr. Hardeman's weight.   Do you recall

11  that?

12  **A.**   Yes, I do.

13  **Q.**   And what, if any, role does Mr. Hardeman's weight play

14  into your opinions?

15  **A.**   Very little.   I certainly understand that extreme obesity

16  is associated with diffuse large B-cell lymphoma.   Obesity in

17  young people has been associated with eventual development of

18  diffuse large B-cell lymphoma.

19      I don't, again, believe that obesity causes cancer, but

20  the fat cells release all kinds of chemicals and the chemicals

21  from the fat cells can act as growth factors for some of these

22  kinds of cancers.   So there may be an indirect cause, but the

23  relationship -- certainly there is a relationship.   I looked at

24  it.   I did not take it as a major significant factor at all.

25  **Q.**   And is that based on your review of Mr. Hardeman's weight

LEVINE - DIRECT / STEKLOFF

1  in the medical records?

2  **A.**   That's based on several things.   Number one, his weight in

3  the medical records.   He was not exceedingly obese; i.e., a BMI

4  of 40 or greater.   And also because he was not ever really

5  grossly obese.   It was something that I looked at, but with the

6  other factors that were so prominent, this had very little

7  meaning to me in terms of his lymphoma.

8  **Q.**   Now, did you prepare a slide that summarizes your opinions

9  for the jury?

10  **A.**   Yes, I did.

11  **Q.**   And can you please walk through -- you've discussed all

12  this, but can you please walk through your summary of your

13  opinions that you've offered today?

14  **A.**   Certainly.

15       First, the cause of most diffuse large B-cell lymphoma is

16  unknown, it's iatrogenic, and we can't tell -- or idiopathic.

17  I'm sorry.   Idiopathic.   We can't tell whether a given case

18  under the microscope is caused by hepatitis C or Roundup or

19  anything.   You can't tell, and so that always has to be

20  considered if you're looking at the potential cause of diffuse

21  large B-cell lymphoma in somebody.

22       My second point is that there is no medical evidence that

23  Roundup or glyphosate caused or contributed to Mr. Hardeman's

24  non-Hodgkin's lymphoma, specifically diffuse large B-cell

25  lymphoma.

1        My third conclusion or summary is that hepatitis C, an

2   active infection for 39 years before it was treated, was the

3   most likely cause or contributing factor to Mr. Hardeman's

4   diffuse large B-cell lymphoma.  The virus is capable of causing

5   mutations in the DNA.  Mr. Hardeman had DNA changes, mutations.

6   The long period between his infection and finally treating it

7   is very much consistent with what we know in the literature.

8        Once he had that mutation, it didn't matter at all if his

9   virus had been completely eradicated or not.  The error was

10  there.

11       I also believe that the hepatitis B was the most likely

12  secondary factor simply because it's been shown to do that.  It

13  also can cause mutations in the DNA of B cells, B lymphocytes,

14  just like hepatitis C.  I don't know how long Mr. Hardeman had

15  active hepatitis B and, therefore, because I did not have more

16  information, I left that as my secondary significant cause for

17  this lymphoma.

18  **Q.**  And you've described before what you mean by reasonable

19  degree of medical certainty.  Are all these opinions offered to

20  a reasonable degree of medical certainty?

21  **A.**  Yes, they are.  As a clinical physician, I can't be swayed

22  by a little thing here or a little thing there.  I need real

23  data, and patients depend upon me to know real data and to have

24  judged it carefully and to have discussed it with many

25  colleagues and thought about it for a long time because the

1    treatment that I'm going to do depends on these kinds of

2    things.

3          I don't take that lightly.  I don't take that lightly in

4    any sense at all.  So when I say that this is the most

5    significant factor, it's based on my opinions as a physician,

6    as a clinician doing what I would do to take care of that

7    patient as Dr. Ye did.

8    Q.   And if Mr. Hardeman had been your patient and had asked

9    you about any of these topics, would you have told him exactly

10   what you told the jury today?

11   A.   Absolutely.

12          MR. STEKLOFF:  Your Honor, I pass the witness.

13          THE COURT:  Okay.  Any cross-examination?

14          MS. MOORE:  Yes, Your Honor.

15                        **CROSS-EXAMINATION**

16   BY MS. MOORE:

17   Q.   Good morning, Dr. Levine.

18   A.   Good morning.

19   Q.   Let me get all my things up here.  And I've got some more

20   binders to have in front of you.

21   A.   Okay.

22          MS. WAGSTAFF:  May I approach?

23          THE COURT:  Of course.

24                        (Pause in proceedings.)

25   \\\

BY MS. MOORE:

Q.   Dr. Levine, I want to start off with just some general
questions about you were asked several things about your
practice as an oncologist.  And when you're practicing as an
oncologist, do you agree that when you're trying to determine
the cause of cancer, that it would be important for you to
consider all of the data before reaching a conclusion?

A.   Without any question at all.

Q.   And would you agree that it would be improper to ignore
data when you're trying to determine the cause of someone's
cancer?

A.   I agree.

Q.   And do you agree that sometimes there's more than one
cause of someone's cancer?

A.   As in Mr. Hardeman, hepatitis C and possibly B.

Q.   In fact, I heard you tell the jury today that in your
opinion, both hepatitis C and hepatitis B were causes of
Mr. Hardeman's non-Hodgkin's lymphoma; is that correct?

A.   I said that my primary belief was that hepatitis C was the
primary significant contributing factor to his lymphoma.
Hepatitis B could have been a secondary factor.

Q.   Now, in this case when you were reaching your conclusion
about the cause of Mr. Hardeman's non-Hodgkin's lymphoma, is it
true that you're not here to give any opinions about the animal
studies that looked at Roundup and glyphosate?

1   **A.**   Correct.

2   **Q.**   And you're not here to give any opinions regarding the

3   mechanistic data or, as the jury has heard, the cell studies

4   regarding Roundup and glyphosate?

5   **A.**   That is correct.

6   **Q.**   And you're not here to give an opinion as to whether

7   Roundup is genotoxic; correct?

8   **A.**   That is correct.

9   **Q.**   And for the epidemiology, you are relying solely on

10  Dr. Mucci's testimony from last Friday that I understand you've

11  read; is that correct?

12  **A.**   I have read it and I rely on it.  I thought it was well

13  done.

14  **Q.**   And you understood that Dr. Mucci's testimony was that

15  there was zero evidence that Roundup was a risk factor for

16  Mr. Hardeman?

17       **MR. STEKLOFF:**   Object to form.  Misstates the

18  testimony.

19       **THE COURT:**   You can answer it.  Go ahead.

20       **THE WITNESS:**   Ask it again, please.

21  **BY MS. MOORE:**

22  **Q.**   Sure.  Based on Dr. Mucci -- did you understand

23  Dr. Mucci's testimony to be that there is zero or no evidence

24  that Roundup causes non-Hodgkin's lymphoma?

25  **A.**   I believe that's true.

**LEVINE - CROSS / MOORE**

1  Q.   And as such, you aren't giving any opinions to this jury

2  as to Mr. Hardeman's exposure to Roundup?

3  A.   I am not.

4  Q.   And your opinion as to what caused Mr. Hardeman's

5  non-Hodgkin's lymphoma would be the same whether Mr. Hardeman

6  used Roundup for 1 day or 26 years; correct?

7  A.   Absolutely.  I don't believe it caused lymphoma.  It

8  doesn't matter if it's 1 day or 10 days.

9  Q.   And the same would be true whether he used 1 gallon of

10  Roundup or almost 6,000 gallons?  It wouldn't matter to you?

11  A.   It doesn't matter to me.

12  Q.   And, Dr. Levine, you didn't perform what the jury has

13  heard is the Bradford-Hill analysis; is that correct?

14  A.   I did not perform that analysis.

15  Q.   Dr. Levine, in your experience, you understand that

16  pesticide use or exposure to pesticides is considered to be a

17  known risk factor for non-Hodgkin's lymphoma; is that correct?

18  A.   It's much too broad a statement.  I can't answer that

19  question properly.

20  Q.   Well, you're familiar with pesticides; right?

21  A.   Somewhat.

22  Q.   Okay.  And that's fair.  Let me back up.

23       I notice from your curriculum vitae that your specialty as

24  an oncologist is really focused in on HIV; is that fair?

25  A.   HIV and other organisms.  Basically it is a lymphoma as my

LEVINE - CROSS / MOORE

```
 1  specialty.
 2  Q.   And your specialty has not been lymphoma that's caused by
 3  pesticides; is that fair?
 4  A.   That is not my specialty.
 5  Q.   When you have a patient come into your office that has
 6  non-Hodgkin's lymphoma, do you ask them about their pesticide
 7  use?
 8  A.   I do not.
 9  Q.   Is it possible that all those cases that you referred to
10  earlier that you said, well, the cause is idiopathic or
11  unknown, that it actually could be from pesticide use, but you
12  don't know because you don't ask?
13  A.   That's a total assumption.  I can't answer that question.
14  I don't know.
15  Q.   But without asking your patient about their pesticide use,
16  aren't you assuming that the cause is unknown?
17  A.   No.
18  Q.   Now, let's go back to pesticide use.  Are you familiar
19  that certain pesticides are known to be risk factors for
20  non-Hodgkin's lymphoma?
21  A.   Pesticides?  Be specific.  I really can't answer that.
22  Q.   Okay.  Are you familiar with the American Cancer Society?
23  A.   In general.
24  Q.   And is the American Cancer Society an organization that
25  you turn to in your work as an oncologist?
```

1   **A.**   For what purpose?

2   **Q.**   Well, the research that the American Cancer Society has

3   performed?

4   **A.**   They don't perform research.

5   **Q.**   For the information that the American Cancer Society

6   gathers?

7   **A.**   Occasionally.

8   **Q.**   And, in fact, in this case you relied upon information

9   from the American Cancer Society discussing non-Hodgkin's

10   lymphoma; correct?

11   **A.**   I did.

12   **Q.**   In fact, you listed that as your number one resource on

13   your materials list that you considered in forming your

14   opinions in this case; correct?

15   **A.**   No, that is not correct.

16   **Q.**   Do you recall, Dr. Levine, providing a list of the

17   materials that you reviewed in forming your opinions as to what

18   caused Mr. Hardeman's NHL?

19   **A.**   I do.

20   **Q.**   Okay.

21        **MS. MOORE:**   And, Ms. Melen, can I have the Elmo,

22   please?

23   **Q.**   Do you recall whether you listed the American Cancer

24   Society as one of those resources?

25   **A.**   I'm sure I did.

```
 1   Q.    Okay.  And would it be helpful if I showed you that

 2   materials list?

 3   A.    Please do.

 4   Q.    Okay.  I'll put that --

 5         MS. MOORE:  May I publish?  I apologize.

 6         MR. STEKLOFF:  No objection.

 7         THE COURT:  Go ahead.

 8         MS. MOORE:  Thank you.

 9   Q.    Okay.  And, Dr. Levine, do you see that the number one

10   listing you have there in the literature that you -- materials

11   you considered list for Hardeman is the American Cancer

12   Society?

13   A.    That is because this is an alphabetic list here.  American

14   and we go As, Bs, Cs.  It's not the first in my priority.  It

15   is alphabetized.

16   Q.    And I'm not saying it was number one that you relied on.

17   I'm just saying it's on your list; right?

18   A.    It's on my list definitely.

19   Q.    Thank you.

20         And are you aware, then, that the American Cancer Society

21   provides a list, then, of non-Hodgkin's lymphoma risk factors?

22         MR. STEKLOFF:  Objection.  Hearsay, Your Honor.

23         THE COURT:  Overruled.

24         THE WITNESS:  Yes.

25   \\\
```

1  BY MS. MOORE:

2  Q.   And you talked about a couple of those.  You mentioned a

3  few minutes ago age and I know you mentioned infections, but

4  you didn't talk about on your direct exam pesticide exposure;

5  is that right?

6  A.   That is correct.

7  Q.   Okay.  And do you recall whether the American Cancer

8  Society considers exposure to certain chemicals as a risk

9  factor for non-Hodgkin's lymphoma?

10  A.   I do recall that, yes.

11  Q.   Okay.  And do you recall that the American Cancer Society

12  considers that chemicals, such as benzine and certain

13  herbicides and insecticides, weed and insect-killing substances

14  may be linked to an increased risk of non-Hodgkin's lymphoma?

15  A.   Certain of these subjects may, yes.

16  Q.   But in determining Mr. Hardeman's non-Hodgkin's lymphoma,

17  you didn't consider any pesticide use; correct?

18          MR. STEKLOFF:  Object.  Form.  I mean, objection.

19  Misstates the testimony.

20          THE COURT:  Overruled.

21      You can answer it if you --

22          THE WITNESS:  Ask the question again, please.

23  BY MS. MOORE:

24  Q.   Sure.  In Mr. Hardeman's case, you didn't consider any

25  pesticide use or exposure to Mr. Hardeman in determining his

1  cause of non-Hodgkin's lymphoma; correct?

2  **A.**   I did not.

3  **Q.**   Okay.  Now, you talked about some of the risk factors for

4  Mr. Hardeman, and I just want to make sure I understand.  Risk

5  factor is not the same as cause; is that correct.

6  **A.**   That is correct.

7  **Q.**   In other words, just because you have a risk factor, that

8  doesn't mean that the risk factor will actually lead to the

9  development of non-Hodgkin's lymphoma; correct?

10 **A.**   It means that the risk factor is associated with an

11 outcome but is not causing the outcome.

12 **Q.**   Okay.  Let me --

13         **MS. MOORE:**  Your Honor, I'm going to bring the flip

14 chart up.

15      Oh.  And I'm sorry, Ms. Melen.  I don't need the Elmo for

16 this.

17      Let's see if I can get it up there in this maze.

18      Okay.  And I just want -- and, Mr. Stekloff, I apologize.

19         **MR. STEKLOFF:**  It's okay.

20 **BY MS. MOORE:**

21 **Q.**   And can you see that, Dr. Levine?

22 **A.**   Yes, I can.

23 **Q.**   Now the question is whether you will be able to read my

24 handwriting.

25      So I'm going to write "Hardeman Risk Factors for NHL."

**LEVINE - CROSS / MOORE**

1  And let's work backwards from what you just testified about.

2  You mentioned age; is that right?

3  **A.**   Correct.

4  **Q.**   Okay.  And you mentioned weight; is that right?

5  **A.**   I did.

6  **Q.**   And then you mentioned hepatitis B?

7  **A.**   I did.

8  **Q.**   And you mentioned hepatitis C; is that right?

9  **A.**   Correct.

10  **Q.**   Did I leave anything off?

11  **A.**   Idiopathic.

12  **Q.**   So idiopathic, that just means that we don't know what the

13  cause is; is that right?

14  **A.**   That's correct.

15  **Q.**   And your testimony today is that in your opinion, you know

16  what the cause is; right?

17  **A.**   I can't exclude that this was idiopathic.  If I have to

18  say what is the most significant contributing factor here, it

19  is clearly long-term hepatitis C active infection, but I can't

20  exclude idiopathic.

21  **Q.**   Okay.  So you want me to write "idiopathic" down here?

22  **A.**   I do.

23  **Q.**   So in your opinion, any of these three could be a cause;

24  is that right?

25  **A.**   Yes.

**LEVINE - CROSS / MOORE**

1  Q.   Okay.

2  A.   Well, I don't know that idiopathic is a cause but, yes.

3  Q.   All right.  Exactly.  By definition it's unknown; right?

4  A.   Correct.

5  Q.   All right.  And would it be fair to say from your

6  testimony that you ruled out age as a cause in Mr. Hardeman's

7  non-Hodgkin's lymphoma?

8  A.   Age was not a cause.

9  Q.   So can I just scratch through that?

10  A.   Sure.  Well, actually, I would put a little -- not a

11  scratch-out because it allowed his immune system to be lowered

12  or weakened.

13  Q.   Okay.  But the fact of his age in itself did not cause his

14  non-Hodgkin's lymphoma?

15  A.   Absolutely true, correct.

16  Q.   All right.  And I believe Dr. Weisenburger testified, and

17  I heard you say it this morning, about something called

18  causative risk factors.  And age is not a causative risk

19  factor; right?

20  A.   Correct.

21  Q.   Okay.  And that's what Dr. Weisenburger also testified,

22  that age is not a causative risk factor, and you agree with him

23  about that?

24  A.   Yes, I do.

25  Q.   Okay.  So can I write "not causative"?

LEVINE - CROSS / MOORE

1  **A.**   Fine.

2  **Q.**   And I'm just going to do "RF" for risk factor.  Okay?

3  **A.**   Okay.

4  **Q.**   All right.  And then you also mentioned weight, and I

5  think what you said was you gave it very little; is that right?

6  **A.**   I considered it but did not think this was a significant

7  factor in Mr. Hardeman's lymphoma.

8  **Q.**   In fact, isn't it true you don't -- you agree with

9  Dr. Weisenburger, weight was not -- well, let me back up.

10      Do you agree that weight is not a causative risk factor in

11  this case?

12  **A.**   I agree.

13  **Q.**   All right.  I'm going to mark through that.  I know you'd

14  rather have an asterisk, but artist's difference; right?  But

15  can I write "not causative risk factor" here (indicating)?

16  **A.**   Correct.

17  **Q.**   Okay.  And so that really leaves on your board hepatitis B

18  and hepatitis C.  I'm not going to -- we're going to talk about

19  idiopathic separate since it's not a cause; is that fair?

20  **A.**   Yes.  It depends on what the question will be but, yes, go

21  ahead.

22  **Q.**   Okay.  And then you're aware that Dr. Weisenburger, he

23  went through a similar process where he looked at, okay, what's

24  all the known risk factors for non-Hodgkin's lymphoma and then

25  what applies to Mr. Hardeman.  And that's what you did here; is

1  that right?

2  **A.**    In a sense.

3  **Q.**    And I know that you were asked a question about

4  differential and that that was the method that Dr. Weisenburger

5  did.  Isn't that essentially, Dr. Levine, looking at the known

6  risk factors and figuring out what applies to Mr. Hardeman's

7  case?

8  **A.**    The nomenclature that's being used is not normally used.

9  A differential diagnosis is not used to define the etiology of

10 a disease, and that's not really what I use to define the

11 etiology of a disease, the cause of a disease.

12 **Q.**    Okay.  And that's fair because in medicine when you hear

13 the term "differential diagnosis," it's to figure out let's put

14 up every possible diagnosis on the board when someone comes in.

15 Let's say someone comes in with chest pain, and I know you're

16 not a cardiologist, but let's say someone comes in with chest

17 pain.  You're going to put up every possible cause of that

18 chest pain and you're going to rule out the most

19 life-threatening first and work your way down to figure out is

20 it really a heart attack; is that fair?

21 **A.**    If I'm trying to do a diagnosis, if I'm getting a

22 diagnosis, that's what I do.

23 **Q.**    Okay.  And that's what in the medicine world we call

24 differential diagnosis?

25 **A.**    That's correct.

**LEVINE - CROSS / MOORE**

1   Q.   And then in the legal world what you did was you went

2   through a process to figure out the cause of Mr. Hardeman's

3   NHL, and you did that by figuring out what are the known risk

4   factors that apply to Mr. Hardeman and which in your opinion

5   was the cause; is that fair?

6   A.   I went through my knowledge base of the various causes of

7   non-Hodgkin's lymphoma.  There was very strong evidence of a

8   chronic infection by hepatitis C.  That was a major fact when I

9   was reading that case.  It struck me in a big way.

10  Q.   Okay.  And my question really is about your methodology.

11  A.   Uh-huh.

12  Q.   And is it fair to say that you went through and you

13  thought, okay, here are the risk factors in your opinion that

14  apply to Mr. Hardeman, and then you decided which ones of those

15  was a cause of the NHL?  Is that fair?

16  A.   I looked at all of the factors that he had been exposed to

17  in his life and realized which ones were most significant in a

18  clinical sense, as Dr. Ye did as well.

19  Q.   Okay.  And as Dr. Weisenburger did; correct?

20  A.   I can't answer that.  He wasn't doing a diagnosis.  I

21  don't know.

22  Q.   Well, this is not a diagnosis; correct?  The diagnosis in

23  this case is undisputed; right?

24  A.   I think so.

25  Q.   Okay.

1    **A.**    Diffuse large B-cell.

2    **Q.**    Right.  Everyone agrees that Mr. Hardeman has diffuse

3    large B-cell lymphoma; right?

4    **A.**    Correct.

5    **Q.**    So we don't have to do a differential on the diagnosis;

6    right?

7    **A.**    I did.

8    **Q.**    Well, and you agree with the Kaiser doctors?

9    **A.**    I do.

10   **Q.**    Okay.  So what we're trying to figure out is what the

11   cause is.  And I understand you don't like the nomenclature

12   that Dr. Weisenburger used on differential, but the process is

13   what you went through was to look at what risk factors apply to

14   Mr. Hardeman and then which of those was most likely the cause?

15   **A.**    I don't know the process by which Dr. Weisenburger made

16   his decision.  I can't answer that.  I don't know that.

17   **Q.**    Okay.  Well, I'll tell you that last week the jury heard

18   from Dr. Weisenburger, and he testified that the risk factors

19   that apply to Mr. Hardeman, he talked about age and weight.

20   And you-all are in agreement age is not a causative risk

21   factor; right?

22   **A.**    Yes.

23   **Q.**    And then he talked about weight, and he agreed with you.

24   He didn't think it was the cause in this case.  He thought it

25   was a minor risk factor.

1  A.   Correct.

2  Q.   Okay.  And he also had hepatitis B and hepatitis C.  The

3  only thing he had up on his board that you don't is -- and I'm

4  going -- I've run out of space, but I'm going to write it

5  down -- well, I'm going to write it right here (indicating).  I

6  think it will fit.

7       He had Roundup.  And he had Roundup, which is a pesticide;

8  right?

9  A.   I thought it was an herbicide.

10  Q.   Do you know that herbicides are a type of pesticide?

11  A.   No.

12  Q.   And so he had Roundup.  So you-all had the same risk

13  factors that apply to Mr. Hardeman, except you didn't put

14  Roundup; is that right?

15  A.   I did not put Roundup.

16  Q.   Okay.  And, Dr. Levine, you're here today to testify as an

17  expert witness for Monsanto; correct?

18  A.   Correct.

19  Q.   Okay.  And you understand that Roundup is Monsanto's

20  product?

21  A.   Correct.

22  Q.   And Monsanto is paying you to be here for your time?

23  A.   Correct.

24  Q.   All right.  So let's go into your opinions on hepatitis C.

25  And I'm going to flip over.

1           And this was actually shown to the jury last week when

2     Dr. Weisenburger was on the stand, and I just want to make sure

3     that you agree with this.  Because you reviewed Mr. Hardeman's

4     medical records?

5     **A.**   Yes, I did.

6     **Q.**   Okay.  And you agree that Mr. Hardeman, he went through

7     what's been called antiviral therapy for his hepatitis C; is

8     that right?

9     **A.**   That is correct, Interferon and Ribavirin.

10    **Q.**   And that he had a rapid response?  In other words, within

11    12 weeks of getting that treatment, his viral load went to

12    negative; is that correct?

13    **A.**   Yes, similar to others.

14    **Q.**   Okay.  And so can I just check off that you agree with

15    that?

16    **A.**   I agree.

17    **Q.**   And then -- and I'm just going to write your name here.

18    I'll say "Dr. Levine."

19          Okay.  And then do you agree that his doctors declared

20    Mr. Hardeman cured of his hep C in 2006?

21    **A.**   I believe that we are discussing a matter of words.

22    Dr. Ye said that he was cured, but he treated him for

23    hepatitis B.  He took him to risk by giving him a drug that

24    potentially has side effects, and he gave him that drug because

25    deep down he was very concerned.  He gave him the drug to

1    prevent reactivation of hepatitis B.  That's what his note said

2    and that's what he told Mr. Hardeman.  I don't -- I would not

3    give a drug to a person if I did not believe they needed that

4    drug.

5    **Q.**   Okay.  And, Dr. Levine, several times in your testimony

6    today you've been talking about what you believe Dr. Ye did and

7    why he did it.  Have you ever spoken to Dr. Ye?

8    **A.**   I've never spoken to him.  I read his words in the chart.

9    His words in the chart said he was concerned about hepatitis C

10   and he was concerned about hepatitis B.  That's what he said

11   and that's what he told the patient and that's how he managed

12   and treated the patient.

13   **Q.**   Okay.  Well, let's actually look at the words.

14          **MS. MOORE:**   And, Ms. Melen, can I have the Elmo again,

15   please?

16   **Q.**   Because you testified earlier this morning that -- and I

17   wrote this down.  Let me find it real quick.

18                    (Pause in proceedings.)

19   **BY MS. MOORE:**

20   **Q.**   You said that when Dr. Ye first saw Mr. Hardeman, they had

21   a conversation, and this was about him undergoing chemotherapy

22   for his non-Hodgkin's lymphoma.  Do you recall that?

23   **A.**   I do.

24   **Q.**   Okay.  And you said that Dr. Ye was going to start the

25   hepatitis B prophylactic.  And that means he gave him a drug to

LEVINE - CROSS / MOORE

1  make sure the hepatitis B didn't come back; isn't that right?

2  **A.**   If he had no hepatitis B in his body, it could not come

3  back.

4  **Q.**   And, in fact, it did not come back; isn't that true?

5  **A.**   That is correct.  He got the drug.

6  **Q.**   All right.  And then -- now, he did not give him any drug

7  for hepatitis C; right?

8  **A.**   That is correct.

9  **Q.**   Okay.  And when you go through chemotherapy, you agree

10  that that weakens your immune system?

11  **A.**   Correct.

12  **Q.**   And so your body is less likely to be able to fight off

13  infection on its own; is that right?

14  **A.**   That is correct.

15  **Q.**   Okay.  And Dr. Ye knew that Mr. Hardeman had a history of

16  hepatitis C?

17  **A.**   Correct.

18  **Q.**   And so he monitored to see during chemotherapy if, in

19  fact, when he had a weakened immune system if the hepatitis C

20  would come back; is that right?

21  **A.**   He monitored it, yes.

22  **Q.**   And we know from his records that the hepatitis C never

23  came back.  It was never reactivated during chemotherapy;

24  correct?

25  **A.**   Correct.

1    Q.   So --

2    A.   That is the expectation.

3    Q.   I'm sorry.  Go ahead.

4    A.   That's the expectation.

5    Q.   Okay.  And, in fact, the expectation was met --

6    A.   No.

7    Q.   -- that hep C did not come back?

8    A.   No.  You misunderstood me.

9    Q.   Oh.  I'm sorry.

10   A.   We've actually published on this.  Hepatitis -- we looked

11   at patients with non-Hodgkin's lymphoma who are hepatitis C

12   positive, and it turned out that only one patient out of 33 had

13   real reactivation of the hepatitis C, 45 percent of those

14   patients had no reactivation of hepatitis C at all and they

15   were all known to be HCV RNA positive.  So, no, it is not

16   uniform that patients with hepatitis C will reactivate on

17   chemotherapy.

18   Q.   But Mr. Hardeman was not HCV RNA positive.

19   A.   He was HCV -- he was HCV RNA negative in the blood.  That

20   doesn't mean that he was HCV cured in the body.

21   Q.   Okay.  And, Dr. Levine, when you say it doesn't mean he

22   was HCV cured in the body, that's not based on any kind of

23   tests or any evidence in this case; is that correct?

24   A.   It is based on data in the medical literature where

25   patients with HCV infection in the past with SVR, sustained

 1  virologic response, are then tested by looking at their

 2  B lymphocytes and looking at their liver cells and looking at

 3  their blood in more sensitive tests, and those patients have

 4  been shown.  But it doesn't really matter.  All he needed was

 5  one hepatitis C one time to give him the mutation.

 6  **Q.**  Okay.  And what you were just talking about is a

 7  hypothetical situation.  That's not what the data or the

 8  evidence in this case shows with respect to Mr. Hardeman.

 9  **A.**  I don't know what you mean.  It shows that he did not

10  reactivate.  I was saying that doesn't mean that he doesn't

11  have hepatitis C in his body.

12  **Q.**  Okay.  You agree that from 2006 to the present, he has not

13  had active hepatitis C; correct?

14  **A.**  Not in the blood by these standard tests, correct.

15  **Q.**  And when you say "HCV cured in the body," that's based on

16  speculation in Mr. Hardeman's case; correct?

17  **A.**  It's based on data in the literature.  Those fancy special

18  sophisticated tests, research tests, were not done in

19  Mr. Hardeman nor would I expect them to be done.

20  **Q.**  Okay.  That's not something you do in your practice as an

21  oncologist; correct?

22  **A.**  No.  Dr. Ye --

23  **Q.**  That's something -- I'm sorry.  Go ahead.

24  **A.**  Sorry.  No.

25  **Q.**  That's something that's done in a laboratory when people

1    are doing research?

2    **A.**   It's something that's done in a laboratory when people are

3    trying to find the truth of a situation.

4    **Q.**   Okay.  But in this case -- and I just want to focus on the

5    facts of this case -- the facts of this case is that as of

6    2006, Mr. Hardeman no longer had active hepatitis C in his

7    blood; correct?

8    **A.**   He did not.  He didn't need it to get the lymphoma.

9    **Q.**   Okay.  I understand that.  I just want to go through the

10   facts.  I understand what your opinion is.

11       So as of 2006, you agree that Mr. Hardeman no longer had

12   active hepatitis C in his blood?

13   **A.**   Yes, using standard tests.

14   **Q.**   Okay.  And what you're talking about in the literature are

15   some highly sensitive tests that, even in your practice as an

16   oncologist, you wouldn't order; correct?

17   **A.**   They're not done for clinical tests.  They're done to find

18   the truth of a given situation.

19   **Q.**   And so as you sit here in this courtroom today, when you

20   say he may have hepatitis C in his body, you don't actually

21   know that?

22   **A.**   That's absolutely true.

23   **Q.**   All right.  So do you agree, then, that when he underwent

24   chemotherapy, that the hepatitis did not come back?

25   **A.**   It did not reactivate during chemo.  That has been

 1   described well in the past.

 2   **Q.**   Should I put in parentheses "reactivate" here then?

 3   **A.**   Yes.

 4   **Q.**   Okay.  And then doing that, can I check off that you agree

 5   with that?

 6   **A.**   Yes.

 7   **Q.**   All right.  And do you agree, then, that he was cured of

 8   the hep C in 2006?

 9   **A.**   I don't know if he was cured of it.  I know he was

10   infected by hepatitis.  Are you talking about B or C?  I'm

11   sorry.

12   **Q.**   C.

13   **A.**   Okay.  Repeat the question.  I'm sorry.

14   **Q.**   Sure.  Sure.

15       Do you agree that in 2006, he was declared cured of

16   hepatitis C?

17   **A.**   His doctors used the word "cured."  I don't agree that I

18   believe he was.

19   **Q.**   So you disagree with his doctors at Kaiser?

20   **A.**   They used the word "cure."  They treated him despite the

21   fact that they used the word "cure."  So in a functional way,

22   they were concerned about his hepatitis C and they were

23   concerned about his hepatitis B.

24   **Q.**   Okay.  Well, hold on.  When you say they treated him

25   despite him being cured, that's actually not accurate; right?

1    I mean, they never -- when you say "they," are you talking

2    about Dr. Ye?

3    **A.**   Yes.

4    **Q.**   Dr. Ye didn't provide any treatment for hepatitis C;

5    correct?

6    **A.**   He provided follow-up and careful follow-up of his liver

7    function studies during the chemotherapy.

8    **Q.**   And, in fact, those liver function studies -- and this is

9    actually what I wanted to show you.  And this is -- actually, I

10   think I might be able to do this.

11          **MS. MOORE:**  Mr. Wolfe, can you pull up Exhibit 45,

12   please?

13       Okay.  And this is from --

14       I'm sorry, Your Honor.  It's already in evidence.

15       So any objection to publishing?

16          **MR. STEKLOFF:**  No, Your Honor.

17          **MS. MOORE:**  Okay.  I apologize, Your Honor.

18       If we could -- if you could highlight the date here,

19   Mr. Wolfe, at the top right corner.

20   **Q.**   And do you need a copy, Dr. Levine?  It's on your screen.

21   **A.**   No.  I have it.

22   **Q.**   Okay.  Good.

23       So this is from February 19th, 2015.  And this is a visit

24   that Mr. Hardeman had with Dr. Ye; is that correct?

25   **A.**   Correct.

1  **Q.**   Okay.  And if we could turn to the next page and,

2  Mr. Wolfe, if you could highlight --

3      Dr. Levine, do you see where it says "Liver cirrhosis

4  documented by sonogram" and then "Liver reserve excellent"?

5  **A.**   Yes.

6  **Q.**   And this is around the time of Mr. Hardeman's diagnosis of

7  non-Hodgkin's lymphoma?

8  **A.**   That's correct.

9  **Q.**   Okay.  And this was actually the same office visit that

10  you highlighted on your direct, and I just wanted to point out

11  I didn't recall you highlighting that his liver reserve was

12  excellent around the time of his diagnosis.

13  **A.**   Yes, it is.  It's fine.

14  **Q.**   Okay.  And that's an important fact; correct?

15  **A.**   Well, he has cirrhosis and he's making it through.  He's

16  not -- his liver is not end-stage liver disease.  He has

17  cirrhosis of the liver.  He's maintaining his liver enzymes and

18  his function, but he has cirrhosis.  That's a sign of chronic

19  disease there in the liver.

20  **Q.**   But his treating physician said that his liver reserve was

21  excellent.

22  **A.**   Yes.  It was important for the chemo.

23  **Q.**   Okay.  And this is the office visit that you stated that

24  Dr. Ye talked about that the hepatitis C, I think you used the

25  words, "hidden cells could reactivate."  And I just wanted to

LEVINE - CROSS / MOORE

```
 1   point out --
 2           MS. MOORE:  If we could go to the top paragraph, and
 3   if you could call that out, Mr. Wolfe, please.
 4   Q.   Okay.  And, Dr. Levine, I didn't see Dr. Ye say on here
 5   anywhere about hidden cells, hidden hep C cells.  I just want
 6   to make sure I understood your testimony.
 7           Are you saying that Dr. Ye thought there were hidden
 8   hepatitis C cells?
 9   A.   No.  I am saying, and certainly not by this statement, I
10   am saying that Dr. Ye in a practical sense -- even though he
11   said the patient was cured, in a practical sense he was -- he
12   said he's looking at his liver.  He's following his liver
13   function in time.  He's looking at his history of hepatitis B;
14   he's treating that.
15           So I'm saying in a functional way, what he did, he did
16   something to look at hepatitis C potentially reactivating and
17   he did something to make sure that -- or to try to assure that
18   the hepatitis B would not reactivate.
19   Q.   And this is the office note that you had Monsanto's
20   counsel pull out in your direct exam; correct?
21           MR. STEKLOFF:  Objection, Your Honor.  This isn't the
22   portion that was pointed out.
23   BY MS. MOORE:
24   Q.   One of them?
25           THE COURT:  Sustained.
```

1    BY MS. MOORE:

2    Q.    Did you have defense counsel pull out February 19th, 2015?

3    A.    Yes.   That was where the Dr. Ye discussed hepatitis B and

4    hepatitis C with Mr. Hardeman.

5    Q.    Okay.   And in this paragraph -- and then I'm going to have

6    you look at the whole office note from February 19th, 2015 --

7    does Dr. Ye mention at all that hepatitis C is hidden in

8    Mr. Hardeman's body?

9    A.    No.   There would be no reason for him to do that and he

10   did not.

11   Q.    Okay.   And that's because there's actually no evidence, no

12   facts that tell us that there was hidden hepatitis C cells;

13   correct?

14   A.    That's correct.   He's just going to take care and be very

15   careful because of it.

16   Q.    And when you say "be very careful," that meant getting

17   blood tests while he was undergoing chemotherapy; correct?

18   A.    Yes, and concern about his blood counts and so forth.

19   Q.    Okay.   And, in fact, the whole time he was going through

20   chemotherapy -- and the jury will recall this blowup from last

21   week -- now, this is really a test of my -- I got it.

22         MS. WAGSTAFF:   Here.

23         MS. MOORE:   I got it.

24   Q.    Okay.   And this is Exhibit 940 and, Dr. Levine, I'm going

25   to turn this.   The test is not over.

1          Okay.  All right.  Can you see that, Dr. Levine?

2     **A.**    Yes, I can.

3     **Q.**    And you're familiar with this?  Have you been shown this

4     by counsel for Monsanto?

5     **A.**    Yes.

6     **Q.**    Okay.  And down here where it's shaded in gray, this is a

7     summary, first of all, of Mr. Hardeman's test results for his

8     hepatitis C viral load?

9     **A.**    Correct.

10    **Q.**    And you've looked at all those test results; correct?

11    **A.**    I did.

12    **Q.**    And you agree that in January 2005, he tested positive,

13    meaning that he had active hepatitis C in his blood and serum;

14    is that correct?

15    **A.**    That was correct.

16    **Q.**    Okay.  And then he went through the antiviral therapy to

17    get rid of the hepatitis C; correct?

18    **A.**    Correct.

19    **Q.**    And within the 12 weeks that we talked about, the rapid

20    response, they did another test and he was negative?

21    **A.**    Yes.

22    **Q.**    So those levels -- and I think you showed this -- let's

23    see...  Those levels dropped from --

24         **MS. MOORE:**  Ms. Melen, can I have the Elmo?  This time

25    I'm actually going to use it.

1    This is (indicating).

2         MR. STEKLOFF:  Sure.

3         MS. MOORE:  Okay.

4         MR. STEKLOFF:  No objection, Your Honor.

5    BY MS. MOORE:

6    Q.   And I'll just show the jury.  This is January 14th, 2005.

7    Do you see that on your screen, Dr. Levine?

8    A.   I do.

9    Q.   Okay.  And that's the same date we have up on the top of

10   the chart?

11   A.   Correct.

12   Q.   Okay.  And if we look at -- this is the hepatitis C RNA

13   test results.  Do you see that?

14   A.   Yes.

15   Q.   And so January 14th it's the 731,784 number; is that

16   right?

17   A.   Correct.

18   Q.   And so if we go -- and so that meant his levels were

19   elevated?

20   A.   Yes.

21   Q.   He had active hepatitis C?

22   A.   Yes, he did.

23   Q.   Okay.  And so if we go to the next date --

24        MS. MOORE:  Counsel?

25        MR. STEKLOFF:  No objection.

1          **MS. MOORE:**  Okay.

2    **Q.**   -- the February 23rd, 2006, date -- and you see that right

3    here (indicating) -- and here's the RNA.  And so by

4    January 23rd, 2006, within 12 weeks of treatment starting, they

5    noted that his RNA level was negative; right?

6    **A.**   Exactly.  Yes.

7    **Q.**   So it went (snap) right back down?

8    **A.**   Yes.

9    **Q.**   And that's a good thing?

10   **A.**   It's a very good thing.

11   **Q.**   Okay.  And the whole time he was going through

12   chemotherapy, which is what we shaded in gray -- that's the

13   time period; is that right?

14   **A.**   Correct.

15   **Q.**   -- the levels still stayed negative; correct?

16   **A.**   That is correct.

17   **Q.**   And that meant he still didn't have hepatitis C in his

18   blood?

19   **A.**   He did not.

20   **Q.**   Okay.  So from February 23rd, 2006, 2007, 2008, 2009,

21   2011, and then once he got diagnosed with NHL, they started

22   checking it again, it was all negative?

23   **A.**   That's true, uh-huh.

24          **THE COURT:**  Ms. Moore, roughly how long do you have

25   left?

1          **MS. MOORE:**  That's dangerous, Your Honor.  Probably

2     20, 25 minutes.

3          **THE COURT:**  Okay.  Why don't we take another

4     five-minute break.  We'll resume at 15 minutes after 11:00.

5          (Proceedings were heard out of the presence of the jury:)

6          **THE COURT:**  You can go ahead and step down.

7          And so based on that, it looks like what we can do is

8     finish up with Dr. Levine and then take our lunch break and do

9     Dr. Arber after lunch.

10         Okay.

11         **MS. MOORE:**  That sounds great.

12         **MR. STEKLOFF:**  Your Honor, I'll probably ask for a

13    sidebar before I start my redirect.

14         **THE COURT:**  That's fine.

15         And one thing.  On the admissibility of these medical

16    records, I mean, assuming that the particular records that were

17    being asked about on direct were properly authenticated by the

18    treating physicians, it's not clear why there would be a

19    problem admitting them.  I mean, I'm happy to hear further

20    discussion about that.

21         I mean, the question would be:  Once they're properly

22    authenticated, is there anything wrong with admitting them

23    through an expert at a minimum for the limited purpose of

24    allowing the expert to explain the basis of their testimony?

25    I'm not sure there would be, but we can have further --

1          **MS. MOORE:**  And my position is I don't think they were

2    properly authenticated.  Those were not pages that came in

3    through the doctors' depositions.

4          **THE COURT:**  And if that's the case, that may be a real

5    problem with admitting them.

6          **MS. MOORE:**  Yes.

7          **THE COURT:**  But you didn't object to publishing them

8    to the jury.

9          **MS. MOORE:**  Absolutely, because I do think an expert

10   can testify as to what they relied on, Your Honor, but whether

11   it gets admitted into evidence is a different question.  And I

12   don't think she can authenticate the records because that's

13   based on hearsay, and that would be admitted for the truth of

14   what's in those records and that would be what's improper.

15         **THE COURT:**  Well, I might have thought the distinction

16   was between admitting them for a limited purpose and not

17   admitting them at all.  I mean, in other words, I think you

18   might have been able to object to publishing them to the jury

19   as well if they were not properly authenticated through one of

20   the physicians.

21         **MS. MOORE:**  I see.

22         **THE COURT:**  But once you didn't object to that, then

23   it seems to me the real distinction is not between publishing

24   and admitting but between admitting for a limited purpose and

25   admitting for the truth.  I'm not sure.  I'm just floating my

1    thoughts with you here.

2         **MS. MOORE:**  I understand.  It's probably a distinction

3    without a difference to the jury, though.  I mean, they're not

4    going to understand that, oh, this is for the truth, this is

5    not.  That's a legal distinction.

6         **THE COURT:**  So I'm just floating my sort of reaction

7    to this issue that came up.  I'm not making a ruling.

8         **MS. MOORE:**  I understand.  Okay.  I'll think about

9    that, Your Honor.

10        **MR. STEKLOFF:**  If I can just say, Your Honor, I mean,

11   we have affidavits from the custodian of records from Kaiser

12   authenticating all of the medical records, and I think the

13   doctors were asked about medical records.  Just because a

14   specific page was not shown does not change the authentication.

15   Then there is a hearsay exception to medical records.

16        **THE COURT:**  Right.

17        **MR. STEKLOFF:**  So I think we have --

18        **THE COURT:**  That's why I think, like, the biggest deal

19   is whether they have been properly authenticated for purpose of

20   admission, and they're supposed to be authenticated in front of

21   the jury unless the parties stipulated to authentication.  So,

22   anyway, that's the issue to discuss at a later time I would

23   think.

24        **MR. STEKLOFF:**  I thought we had agreed that there were

25   no questions about the authenticity of all of the medical

PROCEEDINGS

```
 1    records, and we do have affidavits from the custodian of the

 2    medical records.

 3              THE COURT:  Okay.

 4              MS. MOORE:  And, Your Honor --

 5              MR. STEKLOFF:  I don't think it's the biggest deal in

 6    the world whether these records go back or not, but...

 7              THE COURT:  Yeah.

 8              MS. MOORE:  And, Your Honor, just a reminder to

 9    Dr. Levine that she cannot speak to counsel on the break

10    because she's under her cross.

11              THE COURT:  Well, she can speak to them but not about

12    her testimony.

13              MS. MOORE:  Okay.  That's fair, Your Honor.

14              THE COURT:  All right.

15              MS. MOORE:  Thank you.

16              THE CLERK:  Court is in recess.

17                    (Recess taken at 11:12 a.m.)

18                 (Proceedings resumed at 11:19 a.m.)

19        (Proceedings were heard out of presence of the jury:)

20              THE COURT:  What I'm tentatively considering doing now

21    is having the -- finishing up on the cross, and then whatever

22    you want to talk, discuss at sidebar, maybe we will actually do

23    that over the lunch break and have Dr. Levine come back after

24    lunch for redirect.  It kind of depends on, you know, the

25    length of the discussion that we need to have about it.
```

1        **MR. STEKLOFF:**  It might be quick.

2        **THE COURT:**  Okay.  Well, we will have a quick sidebar

3   after the cross, and then we will see how it goes.

4        **MR. STEKLOFF:**  Absolutely, Your Honor.  Thus far, I

5   would say the redirect is less than five minutes.

6      (Proceedings were heard in the presence of the jury:)

7        **THE COURT:**  Okay.  You can continue.

8        **MS. MOORE:**  Thank you, Your Honor.

9   **BY MS. MOORE**

10  **Q.**   Okay.  Dr. Levine, right before the break, we were talking

11  about hepatitis C; and I just want to make sure I said this

12  correctly because we are talking about hepatitis B sometimes

13  and hepatitis C sometimes.

14  **A.**   Right.

15  **Q.**   So let's make sure we are on the same page.  So in 2006

16  when he underwent antiviral therapy for hepatitis C, he had a

17  rapid response within 12 weeks; correct?

18  **A.**   Correct.

19  **Q.**   Okay.  And that his doctors declared him cured of

20  hepatitis C in 2006, correct?

21  **A.**   Correct.

22  **Q.**   Okay.  And then his doctors determined that he was immune

23  for hepatitis B in 2005; is that right?

24  **A.**   That was the word they used.

25  **Q.**   And then when he underwent chemotherapy, the hepatitis,

LEVINE - CROSS / MOORE

1   either the B or the C, did not reactivate?

2   **A.**   That's true.

3   **Q.**   I'm just going to put B and C here; is that fair?

4   **A.**   Yes.

5   **Q.**   Okay.  Great.  Now, you talked some about -- actually, I'm

6   going to use your chart, if that's okay?

7   **A.**   Sure.

8   **Q.**   I think that would be helpful.  I understood your

9   testimony to be that he had an acute hepatitis C infection.

10  That means you have active virus?

11  **A.**   Correct.

12  **Q.**   And we know that Mr. Hardeman hasn't had active virus

13  since 2006, correct?

14  **A.**   That's true.

15  **Q.**   And you are saying some people have active virus and

16  nothing happens and they are fine?

17  **A.**   The minority, correct, 15 percent.

18  **Q.**   And in -- some people may have active virus, and they may

19  have it a long time; and they may not even know they have it,

20  right?

21  **A.**   Absolutely, just like Mr. Hardeman.

22  **Q.**   I think you said Mr. Hardeman had active hepatitis C for

23  something like 39 years?

24  **A.**   That's correct.

25  **Q.**   And just to be clear, those 39 years, he didn't know he

1  had hepatitis C?

2  **A.**   That's a very common situation.

3  **Q.**   And then you drew an arrow that if you have moderate, it

4  goes to chronic hepatitis.  And if you have severe, it goes to

5  cirrhosis, right?

6  **A.**   Correct.

7  **Q.**   Okay.  And we know Mr. Hardeman had cirrhosis?

8  **A.**   We do.

9  **Q.**   Okay.  And then you went down to cancer from there.  Now,

10  Mr. Hardeman does not have liver cancer, correct?

11  **A.**   He is still being evaluated for that routinely by his

12  doctors.  They get ultrasounds of his liver and

13  alpha-fetoprotein.  They are always going to be monitoring him

14  for liver cancer.

15  **Q.**   That is preventative, right?  You just want to make sure

16  that he doesn't have liver cancer because that's a risk, right?

17  **A.**   It's not preventative.  They are looking for an early

18  diagnosis, just like with the lung cancer and smoking.  They

19  are looking for something early that might be curable that they

20  know he is still at risk.

21  **Q.**   And to be clear he does not have liver cancer?

22  **A.**   No, he does not.

23  **Q.**   And they never found any signs to say that he has liver

24  cancer?

25  **A.**   No.  Thank goodness they haven't.

LEVINE - CROSS / MOORE

1  Q.   And are you familiar with what's called -- I think it is

2  ALT serum?

3  A.   ALT is one of the enzymes that is present in liver cells.

4  Q.   Okay.  And Mr. Hardeman's ALT enzyme has been normal for

5  the last 13 or so years, correct?

6  A.   Yes, it has.

7  Q.   Okay.  And that's a good thing, right?

8  A.   It's a very good thing for him.

9  Q.   And then you got end-stage liver disease.  Now, that's not

10  Mr. Hardeman, right?

11  A.   No, that isn't.  He is on the left arrow there, a cancer

12  arrow.

13  Q.   Okay.  And so just to be clear, this diagram is not

14  Mr. Hardeman.  It is just an example that you put together in

15  general; is that fair?

16  A.   Yes, it is the general outcome of patients with HCV

17  infection.

18  Q.   Okay.  Now, you have got NHL under cirrhosis -- and I want

19  to be really clear about this -- Dr. Levine, cirrhosis does not

20  cause non-Hodgkin's lymphoma?

21  A.   That's absolutely correct.

22  Q.   Okay.

23  A.   It's a sign of chronic infection of the liver.

24  Q.   Okay.  So isn't it misleading, though, to put

25  non-Hodgkin's lymphoma right below cirrhosis?

 1   **A.**   Well --

 2          **MR. STEKLOFF:**  Objection, Your Honor.

 3          **THE COURT:**  Overruled.

 4          **THE WITNESS:**  I put two basic outcomes.  One for

 5   chronic infection by HCV, and the cirrhosis -- which is meant

 6   to mean that is how I know he has chronic infection by HCV --

 7   and there are two outcomes of that.  One is end-stage liver

 8   disease -- which luckily for Mr. Hardeman he did not have --

 9   and the other was the development of cancer many years later.

10   He is still being worked up and evaluated to make sure that

11   they can catch liver cancer early if it happens, and he did

12   develop non-Hodgkin's lymphoma.

13   **BY MS. MOORE**

14   **Q.**   Well, what I heard you -- when you were down here with the

15   diagram, you pointed to cirrhosis; and then you went down to

16   the arrow to non-Hodgkin's lymphoma and you said cirrhosis with

17   lymphoma.  That's not accurate, is it?

18   **A.**   If I said that, I'm sorry.  Because I don't mean to imply

19   that cirrhosis causes non-Hodgkin's lymphoma.  What I meant was

20   cirrhosis is a sign of chronic HCV infection.  And once one

21   has -- that is an objective kind of thing.  And once you have

22   chronic infection and cirrhosis proving that, there are two

23   outcomes.  One is cancer; one is end-stage, dying of liver

24   disease.

25   **Q.**   Okay.  So really this diagram here, we have cirrhosis and

**LEVINE - CROSS / MOORE**

1    the arrows pointing down.  NHL shouldn't be there, right?

2    **A.**    I disagree.  Cancer is an outcome with chronic hepatitis C

3    infection as proven by the fact that he has cirrhosis, and

4    there are two cancers that had been associated with hepatitis C

5    at this point.  One is liver cancer, and one is non-Hodgkin's

6    lymphoma.

7    **Q.**    I understand that, Dr. Levine.  But cirrhosis does not

8    cause non-Hodgkin's lymphoma?

9    **A.**    No.  Chronic infection by hepatitis C causes non-Hodgkin's

10   lymphoma.

11   **Q.**    But you didn't have -- I'm sure you have had experience

12   with this -- that you can have people who have chronic

13   hepatitis C infection and they never get non-Hodgkin's

14   lymphoma, correct?

15   **A.**    Certainly.

16   **Q.**    Okay.  Now you talked about these hit-and-run cells.

17   **A.**    Hit-and-run virus.

18   **Q.**    Sorry.  Virus.  Hit-and-run virus.

19        I want to talk actually just about hepatitis B first,

20   okay?

21   **A.**    Sure.

22   **Q.**    Do you agree that hepatitis B -- that the virus actually

23   infects the cell?  In other words, the virus enters the cell?

24   **A.**    Yes, it does.

25   **Q.**    Okay.  And by entering the cell, that's what actually

1  leads to the development of lymphoma cells or can lead to the

2  development of lymphoma cells?

3  **A.**   If the hepatitis B enters the cell, it can cause mutations

4  in the DNA; and the mutations in the DNA of that cell may lead

5  to non-Hodgkin's lymphoma.

6  **Q.**   Okay.

7  **A.**   Or liver cancer for that matter.

8  **Q.**   And were you saying that those hit-and-run cells are in

9  hep B or hep C?

10 **A.**   Both.  Both.

11 **Q.**   And what is your evidence that there is something called a

12 hit-and-run cell for hepatitis B?

13 **A.**   There are data to suggest that hepatitis B does get into

14 the B-cell; does cause mutations in the B-cell.  This field is

15 younger in a sense and more difficult because most patients

16 with hepatitis B infection clear that infection.  So you are

17 looking at the minority.

18      On the other hand, we know by the scientific literature

19 that hepatitis B infects B lymphocytes.  It infects liver

20 cells.  It causes mutations in those cells associated with

21 development of lymphoma.

22 **Q.**   Okay.  And in this case Mr. Hardeman's body, his immune

23 system, actually kept the hepatitis B at bay, the virus; and

24 that's why his doctor said he was immune in 2005.

25 **A.**   It did keep it at bay.  I don't know for how long.

**LEVINE - CROSS / MOORE**

1  **Q.**   Okay.  So you were about to tell me what evidence you have

2  to support your theory that there is hit-and-run cells for

3  hepatitis B.

4  **A.**   The data really -- the hit-and-run mechanism has not been

5  published for hepatitis B.  What has been published is

6  hepatitis B gets into the cell, causes mutations, and at that

7  point conceptually it would be the same.  Whether it is there

8  or not, the mutation is there.

9  **Q.**   So you don't have any evidence to support your theory as

10 to this hit-and-run of hepatitis B cells?

11 **A.**   I can't say that.  I can say that for hepatitis C

12 certainly.

13 **Q.**   Okay.  And we are going to get to hepatitis C in just a

14 little bit.

15 **A.**   Okay.

16 **Q.**   So do you agree, though, that for hepatitis B, when

17 someone like Mr. Hardeman's body can fight off the hepatitis B

18 virus and is immune to hepatitis B -- I mean, he actually was

19 vaccinated, right?

20 **A.**   I'm not aware that he was vaccinated, and his blood tests

21 are not consistent with having been vaccinated.  His blood

22 tests are consistent with having had an infection by that

23 hepatitis B and his immune system clearing.

24 **Q.**   You didn't see in the records the vaccination back in

25 2005?

1   **A.**   No, I did not.

2        And if he did have a vaccination in 2005, it didn't take

3   because the sign of vaccination of hepatitis B is antibody to

4   the surface antigen of hepatitis B.  His surface antigen

5   antibody negative core, antibody positive; that is the

6   signature of a past infection.

7   **Q.**   Well, and we actually don't know if Mr. Hardeman had a

8   past infection of hepatitis B, correct?

9   **A.**   I disagree.  The blood tests that were done are

10  consistent, fully consistent.  That is the definition of a past

11  infection.  He was exposed.  Exposed means it got into his

12  body.  His body saw it.  His body responded to it.

13  **Q.**   And his body could have responded right then, correct?

14  **A.**   I don't know.  That's what I was saying.  I have no idea

15  when his body responded to it.

16  **Q.**   Okay.  And you don't know if the hepatitis B, in fact, did

17  any type of damage to his B-cells?

18  **A.**   I don't know that.

19  **Q.**   Okay.  So on hepatitis B, do you agree then, that for

20  Mr. Hardeman, that once he went through the antiviral therapy

21  and he had been declared immune, that he had no more risk -- no

22  more increased risk for developing non-Hodgkin's lymphoma from

23  the hepatitis B?

24  **A.**   Let me say a few things.  He never got anti-retroviral

25  therapy for hepatitis B.  On the other hand, there is

1    literature to suggest that if somebody has positive antibody to

2    hepatitis B core without surface, they are at increased risk of

3    developing non-Hodgkin's lymphoma and diffuse large B-cell.

4    **Q.**    And what is your evidence to support that theory?

5    **A.**    It's one of your -- can I take a moment to find this?

6    **Q.**    Absolutely.

7          (A brief pause was had.)

8    **BY MS. MOORE**

9    **Q.**    Are you in my binder, Dr. Levine?

10   **A.**    Maybe I'm not.  Let me see here.

11   **Q.**    The white one?  Yes.

12   **A.**    Maybe it is in my binder.

13   **Q.**    Do you know the name of the author?

14   **A.**    Not off the top -- just one second.

15          **MS. MOORE:**  Okay.

16          (A brief pause was had.)

17          **THE WITNESS:**  I'm sorry I'm taking so much time.

18          **MS. MOORE:**  That's okay.

19          (A brief pause was had.)

20          **MR. STEKLOFF:**  Your Honor, because there are multiple

21   binders, it might help if she looks at the other binder.

22          **THE WITNESS:**  Pardon me?

23          **MR. STEKLOFF:**  It might help if you looked at the

24   other binder that we looked at this morning, Dr. Levine.

25          **THE WITNESS:**  Okay.

1           (A brief pause was had.)

2           **THE WITNESS:**  Okay.  So it is tab 1555 on the

3    Defendant's piece here.  What we see --

4           **THE COURT:**  The black binder then?

5           **THE WITNESS:**  It is the black binder, yeah, 1555 and

6    table --

7    **BY MS. MOORE**

8    **Q.**   That's the Wang article?

9    **A.**   That is Wang -- Feng Wang.

10   **Q.**   Let's pull that up.

11          **MS. MOORE:**  Mr. Wolfe, can you pull up Exhibit 1555,

12   please.

13          May I publish please, Your Honor?

14          **THE COURT:**  Sure.

15   **BY MS. MOORE**

16   **Q.**   And is this the article that you believe supports your

17   opinion that for hepatitis B there are hit-and-run cells?

18   **A.**   No.  The question was -- well, ask the question again, if

19   you don't mind.

20          **THE COURT:**  Would you like to have the question read

21   back?

22          **THE WITNESS:**  Please.

23          (Record was read as requested.)

24          **THE WITNESS:**  I said I disagreed.  And the data is an

25   article by Wang and colleagues that is in the exhibit.  And if

1    we can look at table 4 --

2              MS. MOORE:  So if we can go, Mr. Wolfe, it is

3    page 1363, let's pull up table 4.

4              THE WITNESS:  And so Mr. Hardeman is antibody

5    positive, anti-hepatitis B virus C positive.  Anti-HBC

6    positive.

7    BY MS. MOORE

8    Q.   I'm sorry, Dr. Levine.  If I can stop you right there for

9    a second.  So where it says anti-HBC, that is the core antibody

10   for hepatitis B; is that correct?

11   A.   Yes.  So it is the antibody for the core protein of

12   hepatitis B, indicating that this patient would have been

13   infected by hepatitis B in the past --

14   Q.   Okay.

15   A.   -- for sometime.

16   Q.   Now, isn't it true that that group of patients that are

17   positive core antibody for hepatitis B, that would include

18   patients who are positive antigen and negative antigen?

19   A.   Yes.

20   Q.   Okay.  And let's make sure that we are using the same

21   terminology, Dr. Levine.  So when someone has hepatitis antigen

22   positive, that means they have active virus?

23   A.   Yes.

24   Q.   Okay.  And so when someone is negative hepatitis B

25   antigen, that means they don't have active virus?

LEVINE - CROSS / MOORE

1  **A.**   That's true.

2  **Q.**   Okay.  And so this group here for the core antibody

3  positive that we have highlighted here includes both people who

4  have active and not active hepatitis?

5  **A.**   It may.  Doesn't really say that.  What it is really

6  looking at is those patients who are pure hepatitis C antibody

7  positive, but if we go to table 5.

8  **Q.**   Hepatitis B?

9  **A.**   B, sorry.

10  **Q.**   Sorry.  And let me stay right on table 4 for just a

11  moment.  Okay?

12  **A.**   Sure.

13  **Q.**   On that, would you agree that if someone is positive

14  hepatitis B antigen, that would increase their odds ratio?

15  **A.**   Oh, yes.

16  **Q.**   And if someone is negative antigen hepatitis B, it would

17  decrease their odds ratio?

18  **A.**   Perhaps.

19  **Q.**   Okay.  And so this figure here, the 1.8 odds ratio, you

20  pointed out on direct with Monsanto's attorney, that actually

21  is misleading because it contains people who no longer have

22  active virus and people who have active virus?

23  **A.**   Yes, but it includes people who have had inactive virus as

24  well.

25  **Q.**   Right.  And so we don't know what the odds ratio would be

1    if you take out the people who have active virus and core

2    antibody, correct?

3    **A.**    Yes, but there is further clarification on the next table.

4    **Q.**    Okay.  Well, let's go to table 5 then.  Which line did you

5    want to highlight there?

6    **A.**    The last one.  In other words, no antibody to surface

7    antigen, and positive antibody to core.  And that's what

8    Mr. Hardeman had.

9    **Q.**    Right.  But that doesn't tell us the number of those

10   patients -- well, it tells us 130 patients -- I didn't mean to

11   touch that, I apologize -- but it doesn't give us the data as

12   to whether an antibody -- core antibody for hepatitis B

13   increases the risk?

14   **A.**    It tells us -- this is the line that defines the serology,

15   that defines the answers, the results of Mr. Hardeman's

16   hepatitis B evaluation.  So he had no antibody to the surface.

17   He had antibody to the core.  If he had had a vaccine, if he

18   had been vaccinated, he would have had antibody to the surface

19   and no antibody to the core.

20        So his serology, his blood tests, shows that he has had

21   hepatitis B infection in the past.  And this particular table

22   looks at 130 patients with non-Hodgkin's lymphoma in whom that

23   profile was met in the control group, far less -- and this was

24   highly statistically significant.

25        So people who have been exposed to hepatitis B in the past

**LEVINE - CROSS / MOORE**

1    and have cleared it, are still at risk for B-cell lymphoma, and

2    that would be consistent with a hit-and-go kind of a process.

3    **Q.**   But that's not what this article is saying.  This article

4    doesn't talk about hit and run.

5    **A.**   No.  I'm just saying that this is -- in other words, there

6    is no active virus there, and yet there is an increased risk of

7    B-cell lymphoma, and those are the -- that is the serology.

8    That is the blood test of Mr. Hardeman.

9    **Q.**   Okay.  But you would agree, though, that the rate actually

10   was higher in the control group?

11   **A.**   I don't agree that.  This was statistically highly

12   significant.  Highly significant.

13   **Q.**   So when we look at the table 5, it tells us that the rate

14   was higher in the group with B-cell NHL than the control group?

15   **A.**   Yes.

16   **Q.**   Okay.

17   **A.**   There were 31 out of 130 -- 31 lymphomas out of 130

18   lymphomas that had that profile versus 17 out of 208 in the

19   control.  So there were far more -- statistically more patients

20   with this particular serology, these blood tests, who did

21   develop B-cell lymphoma as opposed to the controls.

22   **Q.**   Okay.  Let's look at what the actual text and what the

23   authors have concluded.

24         **MS. MOORE:**  If we go on the same page, Mr. Wolfe.

25   \\\

1  BY MS. MOORE

2  **Q.**   Dr. Levine, it is at the very bottom of the discussion

3  section on that page, in the second column, starting with

4  Conversely.  There you go.

5  **A.**   Okay.

6  **Q.**   Do you see where it says Conversely, the combination of

7  positive anti-hepatitis B -- I guess that is core -- the core

8  antibody, correct?

9  **A.**   Yes, correct.

10  **Q.**   And negative surface antigen, correct?

11  **A.**   Negative antibody for surface antigen.

12  **Q.**   I'm sorry, negative antibody for surface antigen, which

13  signifies occult HBC, hepatitis B, infection was higher in the

14  control group than in the study group.

15      Now, that is an incorrect statement based on what we saw

16  in the table or the table is incorrect and the text is right.

17      Do you know which one it is?

18  **A.**   I cannot say other than to say the last sentence:  Thus it

19  is reasonable to postulate -- postulate that patients with

20  B-cell lymphoma may have higher prevalence of chronic or occult

21  HBV infection and a lower clearance of the virus.

22  **Q.**   Okay.

23  **A.**   So since that sentence goes with the table, I'm going to

24  believe the table.

25  **Q.**   Okay.  But there is a contradiction between -- within the

**LEVINE - CROSS / MOORE**

 1  study, this publication, correct?

 2  **A.**   Let me read the sentence before better.

 3       Yes, so it is confusing.

 4  **Q.**   Okay.  And then that last sentence, you emphasized the

 5  word "postulate."  And that's really another way of saying this

 6  is a hypothesis, correct?

 7  **A.**   There are data.  So they have statistically significant

 8  data, and they are being very careful with it, which is the

 9  right thing to do.  And they are saying it is reasonable to

10  postulate that patients with chronic or occult HBV infection

11  and a lower clearance of the virus may be -- may be at

12  increased risk -- or patients with B-cell lymphoma may have a

13  higher prevalence of chronic or occult.  And that was what was

14  interesting to me.  Occult HBV infection.

15  **Q.**   Right.  And, Dr. Levine, you said they were being careful,

16  but we just pointed out at least one contradiction in the

17  publication, correct?

18  **A.**   Perhaps, uh-huh.

19  **Q.**   Okay.  And then when it is reasonable to postulate, that

20  means they have a theory.  They have a hypothesis.  This is not

21  based on any real data, correct?

22  **A.**   No, I disagree.  They have data -- statistically

23  significant data showing what they said, that they are being

24  conservative about it.  And I think that is an appropriate kind

25  of thing to do in a clinical sense.  So they have -- they have

1   a finding, which is a pretty interesting finding, that even

2   occult HBV infection may be related to development of B-cell

3   lymphoma.

4          **MS. MOORE:**  And we can take that down.

5   **BY MS. MOORE**

6   **Q.**   Dr. Levine, what we are really talking about is a

7   hypothetical.  That is not the evidence with respect to

8   Mr. Hardeman, correct?

9   **A.**   I can't say that.  The table showed his exact blood test

10  results, and the table showed that with people with those exact

11  blood test results may, in fact, develop B-cell lymphoma.  He

12  did.

13         And I say I have no idea how long he had the active

14  hepatitis B infection.  I know that he had infection.  And

15  knowing that he had infection, occult now, and that's what

16  Dr. Ye was treating, he gave him lamivudine; gave him a drug to

17  treat somebody who has hepatitis B on board.  And what he is

18  trying to do is prevent reactivation there.  So he had

19  occult -- he was believed, in a very practical way by the way

20  he was treated, he was believed to have "occult hidden

21  hepatitis B infection."

22  **Q.**   Dr. Levine, none of Mr. Hardeman's treating physicians

23  have diagnosed him with occult hepatitis B?

24  **A.**   No.  They just treated him for it.

25  **Q.**   Well, now, Dr. Levine, isn't it fair that what Dr. Ye did

**LEVINE - CROSS / MOORE**

1  was give him a prophylactic, which was to make sure -- because

2  he had at one point a history of hepatitis B at least a decade

3  before his non-Hodgkin's lymphoma diagnosis, he gave him that

4  prophylactic to make sure when he was weakened that hepatitis B

5  did not reactivate; isn't that true?

6  **A.**  Hepatitis B could not reactivate if it wasn't there.  It

7  can only reactivate if it is there.

8  **Q.**  Exactly.  It can't reactivate if it is not there.  And lo

9  and behold, it did not reactivate, correct?

10  **A.**  He gave him a drug so that it would not reactivate, and it

11  did not.

12  **Q.**  And even after he stopped -- first of all, he stopped

13  giving the drug, correct?

14  **A.**  Correct.

15  **Q.**  Even after he stopped giving the drug, it did not --

16  hepatitis B did not reactivate?

17  **A.**  That's true.

18  **Q.**  So you can't sit here and tell this jury that, in fact,

19  Mr. Hardeman had occult hepatitis B infection?

20  **A.**  He was treated in a sense for that.  I can't prove that he

21  had it.

22  **Q.**  Okay.  All right.  Let's switch over to hepatitis C and --

23  first of all, was there any other evidence you had on your

24  theory about the occult hepatitis B, other than that Wang

25  article?

LEVINE - CROSS / MOORE

1  A.    I don't have to discuss it now, no, it's all right.

2  Q.    Okay.  Are you sure?

3  A.    That's fine.

4  Q.    Okay.  All right.  Let's go over to hepatitis C then.  Do

5  you agree that once Mr. Hardeman reached the sustained

6  virologic response, which we keep calling SVR -- you are

7  familiar with SVR?

8  A.    Yes, I am.

9  Q.    Okay.  And SVR means the active virus is no longer in the

10  serum, the blood, correct?

11  A.    Using the techniques, the standard techniques that we

12  have, correct.

13  Q.    And that -- do you agree, then, that after Mr. Hardeman

14  reached SVR back in 2006 that all the -- if any abnormal cells

15  existed in his body from the hepatitis C, they would have been

16  killed off?

17  A.    Say that again.  I don't believe I agree with that.

18  Q.    I will rephrase.  Sometimes lawyers ask bad questions,

19  sometimes.

20       In 2006 after Mr. Hardeman reached SVR, sustained

21  virologic response, meaning he no longer had active virus in

22  his blood --

23  A.    Yes.

24  Q.    -- do you agree then that his risk of non-Hodgkin's

25  lymphoma was no longer there?

**LEVINE - CROSS / MOORE**

1   **A.**   I disagree.

2   **Q.**   With respect to hepatitis C?

3   **A.**   I disagree.  He had active infection for 39 years.  He

4   could have easily had a mutation at any time during the 39

5   years.  And once that mutation was there, it did not matter

6   whether he had a live virus in his blood or not.  It didn't

7   matter.

8   **Q.**   And, Dr. Levine, to be fair that is your theory, correct?

9   **A.**   It is not my theory.  We know that.  We know that.

10  **Q.**   Well, let's make sure we are talking about the same thing.

11  So for those 39 years that he likely had active virus, he did

12  not get non-Hodgkin's lymphoma when he had active virus,

13  correct?

14  **A.**   No.  That's when he got the mutation.

15  **Q.**   Hold on.  It's correct that he did not get non-Hodgkin's

16  lymphoma when he actually had active hepatitis C?

17  **A.**   He did not get it then.

18  **Q.**   Okay.  And in your theory is that he got a genetic

19  mutation sometime within those 39 years?

20  **A.**   Yes.

21  **Q.**   Okay.  Wouldn't you agree, though, that when he underwent

22  antiviral therapy in December 2005 to November 2006, that the

23  antiviral therapy would have wiped out -- would have eliminated

24  those genetic mutations?

25  **A.**   No.  It would have -- it would have gotten rid of anything

1  related to disease in marginal zone lymphoma, but not in

2  diffuse large B-cell, which is what he had.

3  **Q.**   So you are saying that the antiviral therapy would have

4  wiped out the genetic mutations that would lead to one cancer

5  but not the other?

6  **A.**   Yes, in a sense, uh-huh.  That is what is described in the

7  literature.

8  **Q.**   Okay.  And in what literature is it that you are relying

9  on to say that antiviral therapy only eliminates the bad cells

10 that cause one kind of cancer but not the bad cells that

11 actually is the same kind of cancer Mr. Hardeman has?

12 **A.**   There are different kinds of mutations that hepatitis C

13 can cause.  There are papers in the literature talking about an

14 abnormality called translocation chromosome 14;18.  That

15 particular translocation or chromosome abnormality has been

16 reported in marginal zone lymphoma.  It is reported in mixed

17 cryoglobulinemia, which is another hepatitis C-related illness.

18 And translocation 14;18 in the blood has also been described in

19 normal healthy individuals.

20     There are various studies that have shown that use of

21 interferon and ribavirin can eradicate -- can kill those cells

22 with 14;18 translocation.  But that's not what Mr. Hardeman

23 had.

24 **Q.**   Well, let's back up.  So what -- my question to you was:

25 What evidence do you have that once Mr. Hardeman underwent

 1   antiviral therapy and he was declared cured, he was SVR, what

 2   evidence do you have to support your theory that the genetic

 3   mutations were not wiped out?

 4   **A.**   He had a genetic mutation in his lymphoma cells.  He had

 5   it.  We saw it.  It is in his lymphoma cells.

 6   **Q.**   You would expect to see genetic mutations in lymphoma

 7   cells of patients who have diffuse large B-cell lymphoma?

 8   **A.**   Absolutely.

 9   **Q.**   And that is a nonspecific finding?

10   **A.**   It can be, certainly.

11   **Q.**   Okay.  All right.  So what literature supports your

12   theory?

13   **A.**   Which theory?

14   **Q.**   That antiviral therapy does not eliminate all of the

15   abnormal cells caused by hepatitis C?

16   **A.**   That antiviral therapy does not eliminate?  Mr. Hardeman

17   had antiviral therapy.  It did not eliminate his risk for

18   developing B-cell lymphoma.

19   **Q.**   Okay.  Let's look at the actual data.  If you can turn --

20          **MS. MOORE:**  Permission to publish 1531, please?

21          **MR. STEKLOFF:**  No objection, Your Honor.

22          **THE COURT:**  Go ahead.

23   **BY MS. MOORE:**

24   **Q.**   Dr. Levine, are you familiar with this publication by

25   Taborelli?

PROCEEDINGS

1   **A.**   Yes, I am.

2   **Q.**   And it actually covers hepatitis B and C.  It says

3   Hepatitis B and C Viruses and Risk of Non-Hodgkin's Lymphoma:

4   A case control study in Italy.

5       And the jury saw this article last week with

6   Dr. Weisenburger, and I wanted to direct your attention --

7           **THE COURT:**  Ms. Moore, I'm sorry.  I apologize for

8   interrupting, but I just noticed that it is a couple minutes

9   before noon.  It seems like this is going on a little more than

10  anticipated --

11          **MS. MOORE:**  I apologize, Your Honor.

12          **THE COURT:**  -- which is perfectly fine, but it seems

13  like now might be a time to take a lunch break.

14          **MS. MOORE:**  Okay.  Thank you, Your Honor.

15          **THE COURT:**  So why don't we take a lunch break until

16  12:45.  Please remember all my commands about not talking about

17  the case or exposing yourself to any information about it.  And

18  we will see you in about 45 minutes.

19      Thank you.

20      (Proceedings were heard out of presence of the jury:)

21          **THE COURT:**  You can go ahead and step down.  You said

22  you were going to want to speak with me at sidebar.

23      Do you want to deal with this now?  I mean, I assume you

24  are going to make some argument about opening the door.  Why

25  don't we just have the discussion now?

1          MR. STEKLOFF:  I'm fine with that.

2          THE COURT:  Dr. Levine, I would suggest -- actually, I

3    think it would be helpful if you stay for this discussion so

4    that it would help you understand the parameters of the

5    testimony you would be allowed to provide going forward.

6          THE WITNESS:  Sure.

7          MR. STEKLOFF:  Now I might have two issues.  But the

8    first issue I wanted to raise is that I think Ms. Moore on the

9    prior chart made the suggestion, clearly implied to the jury,

10   that somehow Dr. Levine just simply ignored Roundup.  And that

11   in listing the risk factors, she did an incomplete analysis

12   because she didn't consider Roundup.  She didn't consider

13   pesticides.  She didn't consider herbicides.  And, in fact,

14   wrote down Roundup in between the other risk factors that she

15   did consider.  I think that opens the door to the fact that,

16   because we know Dr. Levine did consider Roundup -- and I think

17   we can do this safely without going into the AHS and the

18   details of the studies by proposing -- asking four yes-no

19   questions that I think now are necessary to deal with this

20   misimpression that has been made.  I think I should be able to

21   ask Dr. Levine, Did you review all of the available published

22   epidemiology regarding Roundup or glyphosate and non-Hodgkin's

23   lymphoma?  Based on that review -- I assume she would say yes

24   to that.  Based on that review --

25         MS. MOORE:  Well, Your Honor, now he is telling

PROCEEDINGS

 1    Dr. Levine how to answer his questions too.

 2         THE WITNESS:  It is yes.

 3         THE COURT:  Let's lighten up a little bit.

 4         MS. MOORE:  I know.

 5         MR. STEKLOFF:  Based on that review, in your opinion

 6    is Roundup or glyphosate a cause of non-Hodgkin's lymphoma?

 7         THE WITNESS:  No.

 8         MS. MOORE:  Now she is answering his question.

 9         THE WITNESS:  I don't know what I'm supposed to do.

10         THE COURT:  I don't need you to answer.

11         MS. MOORE:  Your Honor, I mean --

12         THE COURT:  It is obvious what your answer is going to

13    be, but right now we are talking --

14         MS. MOORE:  I mean, he is basically practicing his

15    redirect with the expert witness standing --

16         THE COURT:  Okay.  So would you prefer that she be out

17    of the room?  Because the point of her being in the room is to

18    make sure that she understands the parameters, but I would be

19    perfectly -- if you prefer her to be out of the room, that's

20    fine.

21         I mean, the whole thing seems a little silly to me because

22    we all know what her answers are to these questions, but if you

23    prefer her to be out of the room and want to increase the risk

24    that she is going to not be able to clearly follow the

25    parameters that we establish, we can do it that way.

 1          MS. MOORE:  I understand, Your Honor.  I'm just

 2    lodging my objection.

 3          THE COURT:  Okay.  But you know what her answers are

 4    to these questions.  We all know what her answers are, right?

 5    You have deposed her about them.

 6          MS. MOORE:  We have not taken her deposition,

 7    Your Honor, but yes.

 8          MR. STEKLOFF:  That was their choice.

 9          MS. MOORE:  What was the second question?  I'm sorry.

10          MR. STEKLOFF:  Based on that review --

11          THE COURT:  Hold on a second.  Do you want her out of

12    the room?

13          MS. MOORE:  No.  She can stay.  I just ask her not to

14    answer the question.

15          THE COURT:  Okay.

16          MR. STEKLOFF:  Based on your review -- based on that

17    review, in your opinion is Roundup or glyphosate a cause of

18    non-Hodgkin's lymphoma?  Did you provide that opinion in your

19    expert report?  And is that why you did not consider Roundup a

20    potential cause of Mr. Hardeman's non-Hodgkin's lymphoma?

21          THE COURT:  Any objection?

22          MS. MOORE:  Yes, Your Honor.

23          THE COURT:  What could the objection be in light of

24    what you did on that chart?

25          MS. MOORE:  Well, I'm not done with my cross, too,

**PROCEEDINGS**

 1   Your Honor.

 2       She said on direct that she did not consider Roundup

 3   because Mucci said it was not a risk factor.  That's what

 4   she -- and I don't know if that was direct or cross.  I

 5   apologize, Your Honor.

 6       And so she has already testified that she relied on

 7   Dr. Mucci's opinion in this case that there is no evidence that

 8   Roundup is a risk factor -- or causes cancer.  So for her now

 9   to go back and be able to say, Well, actually not only did I

10   look at Mucci but these studies, I did not open the door for

11   her to go beyond that.  I very clearly asked her, You did not

12   list a risk -- Roundup as a risk factor.  And that's what

13   she -- she did not do that.  She did not put in her report, she

14   did not say, This is a risk factor for non-Hodgkin's lymphoma.

15   She actually -- her opinion is it is not a risk factor for

16   non-Hodgkin's lymphoma because that's what Dr. Mucci tells her.

17   That's what has been the testimony.  I did not open the door

18   beyond that.

19           THE COURT:  Okay.  That -- your request to answer

20   those questions -- ask those questions is granted.

21           MR. STEKLOFF:  Thank you, Your Honor.

22           THE COURT:  You can't answer the questions; you can

23   only ask them.

24           MR. STEKLOFF:  And I will let Dr. Levine know she

25   should use one word to answer these questions.

 1          And, then, Your Honor, I also think now that she has

 2    opened the door to BCL6.  I understand that BCL6 doesn't only

 3    occur in patients with hepatitis C.  She directly asked

 4    Dr. Levine what data she has.

 5          And we know from the studies that we showed earlier, the

 6    study that showed the hit-and-run, direct hit-and-run

 7    mechanism, that BCL6 in that article -- in that drawing that we

 8    blew up, that -- and I think consistent with your order I

 9    didn't draw any attention to it -- but we know that BCL6 in the

10    literature is associated with that direct hit-and-run

11    mechanism.  She has now asked what data there is.  We know that

12    Mr. Hardeman had a significant number of BCL6 mutations, and I

13    think it is fair game on redirect now.

14          **MS. MOORE:**  Your Honor -- go ahead.

15          **THE COURT:**  And let me give you -- I'm happy to hear

16    argument from them about this, and it may be something that I

17    want to think about a little bit more over the lunch break and

18    talk about it a little more before we resume.

19          But I guess my gut reaction is that given the way that

20    cross-examination proceeded, you are -- you may well be right

21    that the door was opened to that because I think the

22    cross-examination created a little bit of a misleading

23    impression about what Dr. Levine is basing her statements on,

24    but it would have to be -- if, in fact, that is what I

25    conclude -- and I will hear from them, and I will think more

1    about it over the lunch break -- but if, in fact, that is what

2    I conclude, the important thing -- and this is why I wanted

3    Dr. Levine to be here for this discussion -- the important

4    thing is that it all has to be done, I think, to avoid a 403

5    problem.  It all has -- in order to avoid a problem of

6    misleading the jury about the significance of -- the BCL6?

7        **MR. STEKLOFF:**  Yes, Your Honor.

8        **THE COURT:**  -- mutation.  It has to be done with sort

9    of a clear statement that you cannot discern from the BCL6

10   mutation in the pathology what the cause of the cancer is.

11   Does that make sense?

12       **MR. STEKLOFF:**  Yes.  And I agree with that,

13   Your Honor.  I'm happy to bring that out myself.  And then

14   obviously Ms. Moore can follow up on that.  But I think that --

15   I mean, she can speak for herself, but that is consistent with

16   Dr. Levine's opinions.  So I agree with that.

17       **THE COURT:**  Okay.

18       **MS. MOORE:**  My response, Your Honor, is that when she

19   provides testimony, I have to be able to ask her what is the

20   basis for your testimony.  And so I'm not trying to open the

21   door to anything, but I do have the right to say she lodged

22   this theory.

23       **THE COURT:**  You absolutely have the right to ask her

24   questions about what is the basis for her opinion.  But if you

25   ask the questions in a way that leave sort of a misimpression

1  about what her opinion is based on and what it is not based on,

2  then you open the door.

3      In other words, because of Rule 403 -- and because of the

4  rules about expert disclosure -- I said this type of testimony

5  that we are talking about now is out.  It would not be fair for

6  Monsanto to elicit this type of testimony from their expert in

7  light of her report and in light of 403 and in light of the

8  misimpression that it creates.

9      But, of course, as with every witness, even if testimony

10 is excluded before they take the stand, the door can be opened

11 to it on cross-examination.  And I think -- so -- it seems to

12 me that you did open the door to it on cross-examination.  I

13 still have some concerns about the risk of this creating a

14 misleading impression, which is why I made the statement that

15 it has to be absolutely clear that you cannot tell from the

16 pathology -- you cannot tell from the BCL6 damage what the

17 NHL -- how the NHL was caused.  That does not -- that doesn't

18 tell you anything.

19     But it also potentially allows Dr. Levine to clear up sort

20 of a misimpression about the lack of evidence that she has or

21 to correct the suggestion that the evidence is actually

22 inconsistent with what she is saying.

23         **MS. MOORE:**  Your Honor, I would like to go back and

24 look at the testimony.  My understanding is that she was

25 talking about her theory with respect to hepatitis B.  And I

 1  asked her What is your basis -- what data -- where in the

 2  literature --

 3          THE COURT:  You are talking about hepatitis C now, or

 4  B?

 5          MS. MOORE:  I thought it was B, Your Honor.

 6          THE COURT:  He is talking about hepatitis C.

 7          MR. STEKLOFF:  Yes, Your Honor.

 8          MS. MOORE:  Okay.  Well, it was the same --

 9          THE COURT:  You are talking about what you just asked

10  right at the very end.

11          MS. MOORE:  I'm sorry, Your Honor.

12      So I think -- you know, when she lodges -- when she says

13  her testimony, which I can't control what she says, my

14  follow-up is, then, Where does it say that?

15      And I will go back.  I would like to have an opportunity

16  to look back through that and make sure that -- first of all,

17  she is not a pathologist.

18          THE COURT:  Well, your question at the end was What

19  evidence -- something to the effect of what evidence do you

20  have that once -- first of all, you asked a number of questions

21  about -- you are not talking about the evidence in this case,

22  right?  You are not talking about the evidence with respect to

23  Mr. Hardeman, right?

24      So even with respect to that, there is an argument that

25  that opened the door.  Then you say, Well, what evidence do you

1   have that once he was declared cured it didn't eliminate the

2   abnormal cells?

3        How did that question not open the door to this?

4        **MS. MOORE:**  Well, if you back up, Your Honor, in 156 I

5   said, In what literature is it that you were relying on to say

6   antiviral therapy --

7        **THE COURT:**  But that's not the question I'm referring

8   to.

9        **MS. MOORE:**  Okay.  I'm sorry.

10       **THE COURT:**  I'm referring to the question where you

11  said, What evidence do you have that once he was declared

12  cured, it didn't eliminate the abnormal cells?

13       And, again, you asked a number of questions about the

14  evidence in this case, the evidence as it relates to

15  Mr. Hardeman which created an impression, and I'm -- it's not

16  that it is an inappropriate line of questioning -- let me make

17  clear.  It is just that it is a line of questioning that, then,

18  opens the door.  It is a choice that you make to pursue that

19  line of questioning.

20       **MS. MOORE:**  Well, and also, Your Honor, I mean, when

21  she lodges a theory, I can't just let it drop.  And they know

22  what the evidence has been excluded.  I mean, I'm in a catch-22

23  in that sense.

24       **THE COURT:**  I think you put her in catch-22 -- my

25  sense -- like I said, I want to think about it more over the

1   break.  But my sense is that you put her in a catch-22 by

2   asking her that type of question.

3        **MS. MOORE:**  Well, if you look at 157, what I said was:

4   What evidence do you have to support your theory that the

5   genetic mutations were not wiped out?  And that was a follow-up

6   when we were going through the literature, and she said:  He

7   had a genetic mutation in his lymphoma cells.  He had it.  We

8   saw it.  It was in his lymphoma cells.

9        And I said, You would expect to see genetic mutations in

10  lymphoma cells of patients who have diffuse large B-cell

11  lymphomas?

12       And she says, Absolutely.

13       And I said, And that's an nonspecific finding?

14       It can be, certainly.

15       **THE COURT:**  Right.

16       **MS. MOORE:**  So tell me --

17       **THE COURT:**  So one point --

18       **MS. MOORE:**  It is not misleading.

19       **THE COURT:**  One point that that testimony has already

20  come out.

21       **MS. MOORE:**  That's right.

22       **THE COURT:**  The only testimony that he wants to pursue

23  has already come out naturally as a result of your

24  cross-examination.  So, again, I think that's another reason

25  why it's fair game on direct -- as long as it continues to be

PROCEEDINGS

1  clear -- what you made clear during cross-examination -- which

2  is that it is a nonspecific finding.  That is the important

3  thing.

4        **MS. MOORE:**  It is, Your Honor.  And I just want to

5  make sure that there's not going to be any questions as to

6  causation with respect to a BCL6 translocation on a pathology

7  slide to her.  That's really the crux of it.  And -- because I

8  don't know how else I can ask her questions about what her

9  opinions are without saying what did you rely on.  So, I mean,

10  I'm in a real catch-22 there.  But she did clearly state --

11        **THE COURT:**  It sounds like we are all in agreement.

12        **MS. MOORE:**  Well --

13        **THE COURT:**  She is not offering -- she wouldn't offer,

14  even in response to your questions, and she didn't offer --

15        **MS. MOORE:**  That's right.

16        **THE COURT:**  -- in response to your questions on

17  cross-examination that you can draw any causation conclusion

18  from the slides.

19        **MS. MOORE:**  That's correct, Your Honor.  And her

20  report doesn't say that either.

21        **THE COURT:**  Right.  Right.

22        **MS. MOORE:**  Okay.

23        **THE COURT:**  So to the extent that that's all you are

24  worried about, I think, you know, it is probably okay.  You

25  know, again, as long as that point is made clear because I

1  think if that point is not made clear or if the witness were to

2  be sort of equivocal about that point, it could potentially be

3  a 403 issue.  And, again, it could be an issue that -- where,

4  you know, they are testifying to something that is contrary to

5  what is in their report.

6         MS. MOORE:  Right.  And that is my concern.  I would

7  like the opportunity just to think about it.

8         THE COURT:  Yeah, we will all think about it during

9  the lunch break.  And why don't we resume at 40 after the hour.

10  Okay.

11         MS. MOORE:  Thank you, Your Honor.

12         THE CLERK:  Court is in recess.

13         (Luncheon recess was taken at 12:14 p.m.)

14  **AFTERNOON SESSION**                                    **12:44 p.m.**

15     (Proceedings were heard out of presence of the jury:)

16         THE COURT:  Any further discussion on this?

17         MS. MOORE:  No, Your Honor.

18         MR. STEKLOFF:  Nothing from me, Your Honor.

19         THE COURT:  Okay.  Good.  So the tentative ruling that

20  I articulated before we left for lunch stands.

21         MR. STEKLOFF:  Okay.

22         THE COURT:  And Dr. Levine can testify about that, as

23  long as she makes clear that the pathology is not specific.

24         MR. STEKLOFF:  I will make very clear that that is a

25  nonspecific finding and that she cannot, from that finding, say

 1  that the cause was hepatitis C.

 2          **THE COURT:**  Okay.  Sounds good.  Now, I told the jury

 3  12:45.  They might not be quite ready.  Let them take their

 4  time if they need to.

 5          (A brief pause was had.)

 6          (Proceedings were heard in the presence of the jury:)

 7          **THE COURT:**  Okay.  Ms. Moore, you can resume.

 8          **MS. MOORE:**  Thank you, Your Honor.

 9  **BY MS. MOORE**

10  **Q.**  Dr. Levine, we -- you have used the term "occult cells,"

11  and I just want to make sure that we define that for the jury.

12          Is what you are saying that in Mr. Hardeman's case when he

13  went through the antiviral therapy for the hepatitis C; that

14  the purpose of that is to kill off the infected cells, right?

15  **A.**  The purpose is to decrease the amount of virus in the body

16  so that the patient obtains a clinical benefit; feels better.

17  **Q.**  In other words, kill off the infected cells?

18  **A.**  Yes.

19  **Q.**  Okay.  And in your theory is that some of those infected

20  cells stayed behind or hid from the therapy; is that fair?

21  **A.**  Yes, there is a name for that, occult hepatitis C

22  infection.

23  **Q.**  Okay.  So when we are talking about occult cells, that

24  means some cells that remained in the body -- possibly remained

25  in the body and after antiviral therapy.  And then the question

LEVINE - CROSS / MOORE

1  is what does that even mean, right?

2  **A.**   It means it's not cured.

3  **Q.**   Okay.

4  **A.**   It means you are living with the virus.  That's what it

5  means.

6  **Q.**   Okay.  Well, let's back up.  I mean, we have already gone

7  through this, so I'm not going to rehash this, but his doctors

8  declared him cured?

9  **A.**   The doctors said he was cured, but then he treated him so

10  that he would not reactivate hepatitis B.  And he watched him

11  carefully so he would not reactivate his hepatitis C.

12  **Q.**   Okay.  I want to -- my questions right now are only going

13  to be about hepatitis C.

14  **A.**   Okay.

15  **Q.**   I think we have exhausted hepatitis B.  All right?

16  **A.**   Yes.

17  **Q.**   So we are going to focus just on hepatitis C.  And it

18  is -- you agreed with me earlier, I just want to make sure this

19  is true -- that his doctors declared him cured of hepatitis C

20  in 2006?

21  **A.**   That's what they said.

22  **Q.**   Okay.  And you are saying that there were some cells that

23  may have been left behind after that antiviral therapy, right?

24  **A.**    I'm saying that the literature supports the fact that

25  there are often cells left behind even when the patient has

1    been in SVR for prolonged periods.

2    **Q.**   And SVR meaning no active virus in the blood?

3    **A.**   As it can be detected by standard techniques.

4    **Q.**   Okay.  And let's look at the literature -- I think what we

5    are going to look at -- before we go there, in this case, for

6    Mr. Hardeman, this is your hypothetical -- this is your theory

7    that there were some cells left behind, but you don't actually

8    know if that happened?

9    **A.**   Yes, based on the scientific literature, I expect that

10   there are cells left behind.  I cannot prove that in

11   Mr. Hardeman.

12   **Q.**   And the jury heard from Dr. Weisenburger last week, and he

13   said that even if there were some cells left behind, they

14   weren't causing any problems because the immune system was

15   keeping them in check.

16       In other words, Dr. Levine, Mr. Hardeman's risk of

17   non-Hodgkin's lymphoma or hepatitis C went away after he went

18   through antiviral therapy?

19           **MR. STEKLOFF:**  Objection.  Misstates

20   Dr. Weisenburger's testimony.

21           **THE COURT:**  Sustained.

22       Why don't you re-ask your question.

23           **MS. MOORE:**  Okay.  That's fine, Your Honor.

24   **BY MS. MOORE**

25   **Q.**   Dr. Levine, when Mr. Hardeman went through antiviral

**LEVINE - CROSS / MOORE**

```
 1   therapy in 2006 -- and even if there were some cells that were
 2   left behind -- his risk of developing non-Hodgkin's lymphoma
 3   from hepatitis C went away, right?
 4   A.   I disagree.
 5   Q.   Let's look at the literature.  So let's turn to -- do you
 6   have the white binder in front of you?
 7   A.   Yes, I do.
 8   Q.   Tab 1531.
 9          MS. MOORE:  Permission to publish?
10          MR. STEKLOFF:  No objection, Your Honor.
11          THE COURT:  Go ahead.
12   BY MS. MOORE
13   Q.   And this is the Taborelli study that the jury saw last
14   week with Dr. Weisenburger, and it is titled Hepatitis B and C
15   Viruses and Risk of non-Hodgkin's Lymphoma:  A Case Control
16   Study in Italy.  We were about to talk about this right before
17   the break.  And you are familiar with this study?
18   A.   Yes, I am.
19   Q.   Okay.  And so if we can turn over to page 4 of this study.
20          MS. MOORE:  And if we can go to table 2, Mr. Wolfe,
21   please.
22       Let's talk about hepatitis C, HCV, that first half of the
23   table.
24       Great.  Thank you.
25   \\\
```

1    BY MS. MOORE

2    Q.    Okay.  Dr. Levine, do you agree that Mr. Hardeman would

3    fall under -- and I know it is kind of hard -- you are looking

4    at the actual paper, too, but you will see there is anti-HCV,

5    so that negative.  There is a little negative sign next to

6    it -- and that means negative antibody for hepatitis C,

7    correct?

8    A.    Correct.

9    Q.    And then the next one is positive antibody for

10   hepatitis C?

11   A.    Correct.

12   Q.    And then the next category within that is a negative RNA

13   for hepatitis C, correct?

14   A.    Correct.

15   Q.    And that's Mr. Hardeman?

16   A.    That is Mr. Hardeman's status at the time that his

17   diagnosis of lymphoma was made, yes.

18   Q.    Okay.  And so I want to stop right there because if you go

19   over and you see the odds ratio in the last column, .98 -- do

20   you see that, Dr. Levine?

21   A.    Yes, I do.

22   Q.    Okay.  And what that tells us is that after Mr. Hardeman

23   completed his antiviral therapy and his RNA went to negative

24   for hep C, he no longer was at an increased risk for

25   non-Hodgkin's lymphoma from hepatitis C; isn't that what that

LEVINE - CROSS / MOORE

1    tells us?

2    **A.**   Yes, statistically the patient would be less likely to

3    develop lymphoma with a negative RNA.

4    **Q.**   Okay.  Let's go to Exhibit 1413, and this is the -- it is

5    in that same binder -- and it is the Nieters study.  And the

6    jury heard from Dr. Weisenburger last week.  He showed -- he

7    talked about the Nieters study.

8            **THE CLERK:**  Is this to publish?

9            **MS. MOORE:**  May I have permission to publish?  Thank

10   you.

11           **MR. STEKLOFF:**  No objection, Your Honor.

12           **THE COURT:**  Go ahead.

13   BY MS. MOORE

14   **Q.**   Are you familiar with this study?

15   **A.**   Yes, I am.

16   **Q.**   Okay.  And do you agree that when a patient -- and this

17   study showed that only patients with active hepatitis C ended

18   up getting non-Hodgkin's lymphoma?

19   **A.**   No, I disagree.

20   **Q.**   Okay.  Well, do you agree that you can't just look at

21   whether an antibody is present to determine that?

22   **A.**   Table 4 indicates that people who are anti-HCV positive --

23   in other words, antibody positive, or HCV RNA positive have an

24   increased risk of diffuse large B-cell lymphoma.

25   **Q.**   Right.  And that is not Mr. Hardeman, correct?

1   **A.**   No.  He is -- that is Mr. Hardeman.  He is anti-HCV

2   positive.  This says anti-HIV positive or HCV RNA positive.  He

3   is anti-HCV positive.  So he is on that chart.

4   **Q.**   But he is RNA negative.  So you are including the

5   definition that does not define RNA negative and RNA positive?

6   **A.**   Well, you are referring to a paper in which that was done.

7   It is either HIV positive antibody or HCV RNA positive.  That's

8   what it says.

9   **Q.**   Dr. Levine, I think you said HIV.  Did you mean hep C?

10  **A.**   I'm sorry.  I do that a lot.  Forgive me.  HCV.

11  **Q.**   Okay.  All right.  But, Doctor -- I mean, Mr. Hardeman was

12  not RNA positive?

13  **A.**   Correct.  He was RNA negative.

14  **Q.**   Okay.  So let's go to 1291.

15          **MS. MOORE:**  Permission to publish?

16          **MR. STEKLOFF:**  No objection, Your Honor.

17          **THE COURT:**  Go ahead.

18          **THE WITNESS:**  Forgive me.  I don't seem to have -- I

19  have 1271 and then I have 1302.  Oh, here it is.  Here it is.

20  I'm sorry.  Yes.

21  **BY MS. MOORE**

22  **Q.**   Okay.  And, Dr. Levine, this is the study by Kawamura.  It

23  is viral elimination reduces incidence of malignant lymphoma in

24  patients with hepatitis C?

25  **A.**   Yes.

**LEVINE - CROSS / MOORE**

1   **Q.**   And are you familiar with this publication?

2   **A.**   Yes, I am.

3   **Q.**   Let's turn over then to page 1039.  It's the figure 3 on

4   1039?

5   **A.**   Correct.

6   **Q.**   And the jury saw this with Dr. Weisenburger last week.

7   And this shows on this chart -- and this is following patients

8   at over 15 years; is that right?

9   **A.**   Not really.  The median follow-up on the patients with

10   treatment was 14 -- I'm sorry, without treatment with

11   persistent infection was 14 years.  The follow-up with patients

12   with treatment was only 4.5 years.  So I disagree that the

13   overall follow-up was 15 years.  It was not.  It was very

14   different.  Much, much longer in those who had not been

15   treated.

16   **Q.**   Okay.  Let's look at what the chart says.

17   **A.**   Okay.

18   **Q.**   And the line that is going up, the broken line that is

19   going up, those are people who still have active hepatitis C,

20   correct?

21   **A.**   Correct.

22   **Q.**   And then in the people who are sustained virological

23   response, like Mr. Hardeman, after they have gone through that

24   treatment and declared SVR are back at baseline.  They are at

25   zero percent, correct?

LEVINE - CROSS / MOORE

1  A.   They are.

2  Q.   Okay.  All right.  So that means that the therapy works,

3  and that would include people who have possibly occult cells?

4  A.   If you follow them long enough.  You need to follow them

5  long enough.

6  Q.   The jury will see what that chart says there, 15 years.

7       So let's go to the next one.  Omland.  It is 917 in your

8  binder.

9           MS. MOORE:   Permission to publish?

10          MR. STEKLOFF:   No objection, Your Honor.

11          THE COURT:   Go ahead.

12  BY MS. MOORE

13  Q.   Dr. Levine, are you familiar with this publication from

14  2012 Liver Cancer and NHL in Hepatitis C Virus

15  Infected-Patients Results from the Danvir cohort study?

16  A.   Yes, I am.

17  Q.   Okay.  Let's go over then to page 2314.  And it is the

18  bottom right bracket.

19          MS. MOORE:   If we can pull that up, Mr. Wolfe, please,

20  the non-Hodgkin's lymphoma one.

21      Thank you.

22  BY MS. MOORE

23  Q.   And, Dr. Levine, on this graph, does this also show as

24  from the data that once someone becomes RNA negative, that the

25  risk of developing non-Hodgkin's lymphoma goes back to zero?

```
 1   A.    Yes.  And this -- yes, and this certainly would include

 2   the marginals on lymphomas as well.  This is nonspecific,

 3   non-Hodgkin's lymphoma.

 4   Q.    And it would include those people that even after

 5   antiviral therapy may have had some occult cells still in their

 6   body?

 7   A.    Possibly.

 8   Q.    Okay.  All right.

 9         MS. MOORE:  Let's go to the next publication -- and

10   these are all publications the jury saw last week with

11   Dr. Weisenburger.  And that is 918.  It is the very next study

12   in your binder.

13         Permission to publish?

14         MR. STEKLOFF:  No objection, Your Honor.

15         THE COURT:  Go ahead.

16   BY MS. MOORE:

17   Q.    This is the Su study, and it is just from last November.

18   Do you see that, Dr. Levine?

19   A.    I do.

20   Q.    And it's Early Antiviral Therapy Reduces the Risk of

21   Lymphoma in Patients with Chronic hep C Infection.

22         Are you familiar with this study?

23   A.    Yes, I am.

24   Q.    Okay.  And let's look over at the graph here -- and it is

25   on page 336.  And it is figure 2B for non-Hodgkin's lymphoma.
```

1          Do you see that?

2     **A.**     Yes, I do.

3     **Q.**     Okay.  And this is really telling us the same thing, the

4     Omland study -- the one right before it -- told us, that for

5     those who go through the antiviral therapy and receive

6     treatment and go to SVR, that their risk of developing

7     non-Hodgkin's lymphoma from hep C goes down to zero; is that

8     right?

9     **A.**     No, I disagree.  Because as you can tell from the title,

10    what he is really saying is that early antiviral therapy is

11    associated with a decreased risk.  Mr. Hardeman had active

12    disease for 39 years.  So I don't think this speaks to his case

13    particularly.

14    **Q.**     Okay.  Well, during those 39 years, Mr. Hardeman didn't

15    have any problems from the hepatitis, correct?

16    **A.**     His body did.  He was developing cirrhosis of the liver,

17    but he had no symptoms.  And that is very common.  That is why

18    it is such a difficult issue clinically.

19    **Q.**     And you agree that once he was diagnosed with hepatitis C

20    in 2005; that he got the proper treatment and was declared

21    cured?

22    **A.**     He got the proper treatment, and the doctors declared him

23    "cured."

24    **Q.**     And this chart here shows us at the bottom -- the bottom

25    axis goes out eight years.  Do you see that?

1   **A.**   I do.

2   **Q.**   Okay.  And when Mr. Hardeman was diagnosed with

3   non-Hodgkin's lymphoma, it had been almost a decade since he

4   had been declared cured of his hep C; isn't that correct?

5   **A.**   Yes.  It forgets the first part of his illness where he

6   was not treated for 39 years, but you are correct.

7   **Q.**   Well, it is important also, Dr. Levine, not to forget that

8   when you say "39 years," right, that what happened in the

9   middle of that was that he had treatment and he was cured and

10   that the infected cells were killed off, right?  It is

11   important not to forget that too?

12   **A.**   You say that he got treatment in the middle of that, no,

13   he was --

14   **Q.**   No, no, I'm sorry, Dr. Levine.  I didn't mean to imply in

15   the middle.  He went 39 years.  Then he got treatment.

16   **A.**   Yes.

17   **Q.**   So it is important to recognize that fact, that he got

18   treatment.  And the purpose of that is to kill off the infected

19   cells.

20   **A.**   To kill off the virus, the virus.

21   **Q.**   Okay.  Well, and the virus is what -- what infects the

22   cells, right?

23   **A.**   Yes.

24   **Q.**   Okay.  All right.  So let's go back to our graph then on

25   the Su article and -- okay.  What this shows us, if you are

 1   treated and -- up there at the top you see the IFN.  That is

 2   the interferon, right?

 3   **A.**   Correct.

 4   **Q.**   And so if you are treated with interferon, like

 5   Mr. Hardeman -- and I think he had two different drugs, right,

 6   for his hepatitis C?

 7   **A.**   Yes, he did.

 8   **Q.**   Okay.  And that once you are treated, you no longer have

 9   the risk of non-Hodgkin's lymphoma, correct?

10   **A.**   I don't interpret this chart in the same way, but that's

11   fine.  That's fine.

12   **Q.**   Okay.  All right.  And then let me show you -- this is

13   from a Giannelli article.  Are you familiar with the Giannelli

14   study?

15   **A.**   I am, but would appreciate knowing which tab it was.

16   **Q.**   Sure.  Hold on one second and let me grab this.

17        This was shown to the jury last week.  Let me tell you

18   what number it is.  Just a second.

19        (Whereupon, a brief pause was had.)

20             **THE WITNESS:**  I see it.  952.

21   BY MS. MOORE

22   **Q.**   Did you find it, Dr. Levine?

23   **A.**   952.

24   **Q.**   Yes, 952.  Thank you.

25             **MS. MOORE:**  Permission to publish?

1        **MR. STEKLOFF:**  No objection, Your Honor.

2        **THE COURT:**  Go ahead.

3   **BY MS. MOORE**

4   **Q.**   Okay.  This was a publication that Dr. Weisenburger also

5   showed the jury, and we actually have a blowup from it.  This

6   is the blowup, Dr. Levine, that the jury saw last week.  And

7   you are familiar with this?

8   **A.**   Yes.

9   **Q.**   Okay.  And what this -- do you agree what this shows us is

10  that after antiviral therapy in someone who has hepatitis C,

11  that you see a dramatic drop, and that their liver enzymes

12  become normal, like Mr. Hardeman?

13  **A.**   Yes.

14  **Q.**   And that their RNA, that virus in the blood, also goes to

15  normal, correct?

16  **A.**   Correct.

17  **Q.**   And so what Dr. Weisenburger testified to is that this is

18  a good example of what happened to Mr. Hardeman's case.  He

19  started out with an elevated -- elevated enzymes and elevated

20  RNA, and then within 12 weeks he dropped down dramatically to

21  baseline.  Do you agree with that?

22  **A.**   That part of the chart is correct, but these patients did

23  not have lymphoma that were being described in this particular

24  study.

25  **Q.**   Right.  This is showing what happens when you actually go

LEVINE - CROSS / MOORE

1   through antiviral therapy for hepatitis C, correct?

2   **A.**   Yes, correct.

3   **Q.**   And this is what happened to Mr. Hardeman?

4   **A.**   Correct.

5   **Q.**   And the jury was also shown a blowup -- are you familiar

6   with the Zuckerman article -- I know there is two.  Let me tell

7   you which one.  This is the later one.  I think you were asked

8   some questions on your direct examination today regarding the

9   older Zuckerman article; is that right?

10  **A.**   I'm not sure.

11  **Q.**   Okay.  Well, let's turn to 1599 in your binder.

12         **MS. MOORE:**  Permission to publish?

13         **MR. STEKLOFF:**  No objection, Your Honor.

14         **THE COURT:**  Go ahead.

15  **BY MS. MOORE**

16  **Q.**   Are you familiar with this publication by Zuckerman in

17  2001?

18  **A.**   Yes, I am.

19  **Q.**   Okay.  And this is also talking about the effect of

20  antiviral therapy with --

21  **A.**   Correct.

22  **Q.**   -- someone with chronic hep C?

23  **A.**   Correct.

24  **Q.**   Okay.  I'm going to pull up the chart.  That was

25  table 3 -- I have got the blowup here.  The jury will remember

1    that this was also shown by Dr. Weisenburger last week.

2         And, Dr. Levine, can you see that?

3    A.   Yeah, I can.

4    Q.   Okay.  I don't know if the jury can see it.  If not, you

5    can look on your paper too.  I'm sorry.

6    A.   I will just look on my paper.  It's all right.

7    Q.   Sorry.  And what this says is that for those patients who

8    had a virologic response -- which is Mr. Hardeman, correct?

9    A.   Correct.

10   Q.   All right.

11        -- that it actually indicates that -- let me slide through

12   here -- it actually shows that they no longer have an increased

13   risk for non-Hodgkin's lymphoma, correct?

14   A.   Well, that really doesn't say that.  It just shows the

15   effect on a specific translocation, 14;18.  Whether there was a

16   response to 14;18.

17   Q.   And there was?

18   A.   There was.  So of the treated group there were a total of

19   15.  Seven of them remained translocation 14;18 positive, and

20   six of them, there was a loss of that translocation 14;18.

21   Q.   So you would agree with me that the literature shows that

22   once someone obtains sustained virologic response, that their

23   risk of developing non-Hodgkin's lymphoma from the hepatitis C

24   goes away?

25   A.   No, I do not.  This translocation 14;18 is not a common

1  translation in diffuse large B-cell lymphoma, and this

2  doesn't say anything about the lymphoma going away.

3  **Q.**   Okay.  Let me back up.  I was asking it more generally,

4  Dr. Levine.  I apologize.

5           **MS. MOORE:**  We can take it down.  Thank you.

6  **BY MS. MOORE**

7  **Q.**   Going through these articles -- the Taborelli, Nieters,

8  Omland, Su, Kawamura -- you agree that the data from those

9  articles tells us that once a patient with hepatitis C --

10  active hepatitis C goes through antiviral therapy and obtains a

11  sustained virologic response, in other words the active virus

12  it is out of their blood, that the risk for developing

13  non-Hodgkin's lymphoma from hepatitis C goes away?

14  **A.**   I can't answer it for non-Hodgkin's lymphoma in general.

15  For marginal zone lymphoma what you say is absolutely true.

16  For diffuse large B-cell lymphoma caused by a given mutation,

17  it is not dependent upon active HCV in the blood to get that

18  tumor.  It may already have occurred.

19  **Q.**   Those articles don't say that, do they?

20  **A.**   Don't say what?

21  **Q.**   They don't say that it doesn't apply to DLBCL?

22  **A.**   It talks about non-Hodgkin's lymphoma.  And one of the

23  things that I was saying at the beginning is the importance of

24  knowing that non-Hodgkin's lymphoma is a big word and has over

25  60 different diseases in them, caused by different things,

 1  different illnesses, different clinical illness, different

 2  treatment, different prognosis.

 3  **Q.**   Okay.  Well, let's look at one that shows us DLBCL -- and

 4  this is in the context of hepatitis B -- and I know I said we

 5  were done with that, but I just want to show this really

 6  quickly.  And that is 1302, Dr. Levine.

 7          **MS. MOORE:**  Permission to publish?

 8          **MR. STEKLOFF:**  No objection, Your Honor.

 9          **THE COURT:**  Go ahead.

10  **BY MS. MOORE**

11  **Q.**   This is the Klein/Stern publication that Dr. Weisenburger

12  showed the jury last week.  If we could go to page 3, and you

13  see on page 3 it almost looks like forest plots.  Do you see

14  that, Dr. Levine?

15  **A.**   Yes, I do.

16          **MS. MOORE:**  One more page, Mr. Wolfe.  Thank you.

17  **BY MS. MOORE**

18  **Q.**   Okay.  And you have --

19          **MS. MOORE:**  Well, actually I will have you go back.

20  Thank you.

21  **BY MS. MOORE**

22  **Q.**   If we go at the very top of that forest plot, that is

23  overall non-Hodgkin's lymphoma.

24  **A.**   Yes.

25  **Q.**   Right?

LEVINE - CROSS / MOORE

1   **A.**   Yes.

2   **Q.**   And then they break it down to the next one, which is

3   DLBCL.  Do you see that?

4   **A.**   Yes, I do.

5   **Q.**   And so the odds ratio there with 1.  Someone who has --

6   like Mr. Hardeman goes back to baseline.  Do you see that?

7   **A.**   I do.

8   **Q.**   Okay.  Then if we go to the next page, please, they also

9   break it down between overall NHL and DLBCL.  Do you see that?

10  **A.**   I do.

11  **Q.**   Okay.  And they break it down -- that first one is OBI.

12  Do you see that?

13  **A.**   Yes, I do.

14  **Q.**   And that stands for what you have been calling occult

15  B-cell infection, right?

16  **A.**   Occult hepatitis B infection, correct.

17  **Q.**   Okay.  And on this chart it shows that if you are

18  naturally immune, that you do not have an increased risk of

19  developing DLBCL from hep B, correct?

20  **A.**   Correct.

21  **Q.**   And it also tells us that if you are immune via vaccine

22  that you no longer have a risk of developing DLBCL from

23  hepatitis B, correct?

24  **A.**   Yes.  And it also shows that if you have a lack of an

25  immune response, you will have an increased risk of diffuse

1   large B-cell lymphoma.  An immune -- the import of this article

2   is the importance of the immune system in defining how somebody

3   will do with hepatitis B in terms of lymphoma.

4   **Q.**   Right.  And that is important because in Mr. Hardeman's

5   case he never got active hepatitis B after 2005?

6   **A.**   He was also ten years younger then.

7   **Q.**   Right.  But ten years later he still didn't have it,

8   right?

9   **A.**   You are correct.

10   **Q.**   Even under your theory that as you get older, your system

11   is weakened.

12   **A.**   Yes.

13   **Q.**   Even when his system is older, he still didn't get it,

14   right?

15   **A.**   He still didn't get lymphoma.

16   **Q.**   He still didn't get the hepatitis B back?

17   **A.**   This is talking -- this graph talks about the risk factors

18   for developing the lymphoma, and it just says that if you don't

19   have a good immune system, you are more likely to get the

20   lymphoma.  It doesn't say that you are more likely to get

21   hepatitis B reactivated.  That's not what it is looking at.

22   **Q.**   Right.  It is showing us that your risk of developing

23   DLBCL from hepatitis B no longer is increased when you are

24   immune, either by vaccine or naturally, correct?

25   **A.**   Yes, it does.

LEVINE - CROSS / MOORE

1   Q.   Okay.  All right.  We are almost done, Dr. Levine.

2        I wanted to go back to our risk factors chart, and I

3   wanted to focus on Roundup.  We have talked now about

4   hepatitis B and hepatitis C and Roundup -- and I should put on

5   here this was from Weisenburger, right?

6   A.   I don't know.

7   Q.   Well, you read Dr. Weisenburger's testimony, right?

8   A.   Yes, but do you mean that chart is from him?  I'm not

9   sure.

10  Q.   No.  I apologize.  Let me clarify.

11       That when we are talking about risk factors for

12  Mr. Hardeman, Dr. Weisenburger testified that he would include

13  Roundup?

14  A.   Yes, he did.

15  Q.   Okay.  And I understand your testimony is that you would

16  not include Roundup.

17  A.   That's true.

18  Q.   Okay.  So I was just clarifying that this was

19  Dr. Weisenburger only.  Age, weight, hep B and hep C,

20  Dr. Weisenburger; and you both said those should be on the list

21  of risk factors, right?

22  A.   I don't know his list.  I would agree.

23  Q.   Okay.  All right.  So let's focus on Roundup for just a

24  few minutes.

25       You agree, Dr. Levine, that when you are trying to

LEVINE - CROSS / MOORE

```
1    determine the cause, that you want to consider all the risk
2    factors?
3    A.   Correct.
4    Q.   Okay.  And in this situation you did not consider Roundup
5    as a risk factor, right?
6    A.   Correct.
7    Q.   And if the jury finds that Roundup is a risk factor for
8    non-Hodgkin's lymphoma, your list of risk factors would be
9    incomplete?
10   A.   I have a list on mine which is idiopathic, and the
11   idiopathic is something I cannot exclude no matter what.
12   Q.   Right.  But your list does not include Roundup, so it
13   would be incomplete, correct?
14   A.   If the jury said that the Roundup was the cause and my
15   list did not have it, then my list would be incomplete as it
16   related to what the jury said, yes.
17   Q.   So you brought up idiopathic, and I just want to touch on
18   that.  Are you saying to this jury that Mr. Hardeman's
19   non-Hodgkin's lymphoma was caused by hepatitis B and
20   hepatitis C or are you saying that it is idiopathic; meaning
21   you don't know?
22   A.   I'm saying that the most significant contributory cause is
23   hepatitis C because of those 39 years where a mutation could
24   have occurred.  I think the secondary significant cause could
25   be hepatitis B although I don't have enough information about
```

**LEVINE - CROSS / MOORE**

1    Mr. Hardeman's hepatitis B infection, per se, to make that

2    Number 1.

3        And Number 3, under no circumstance can I exclude

4    idiopathic.  You can't tell the difference under the

5    microscope.  So the most likely cause, C; second most likely

6    cause, B; idiopathic, I cannot exclude.  It could easily be

7    idiopathic.  That is the most common of all of these in diffuse

8    large B-cell.

9    **Q.**   So should I -- let me make sure I have got this right.

10       So for hepatitis B and C, it is your opinion those are

11   most likely causes?

12   **A.**   Hepatitis C is the most likely cause.  Hepatitis B is the

13   second most likely cause.

14   **Q.**   Okay.  Can I just say here most likely causes then?

15   **A.**   Okay.

16   **Q.**   Is that okay?

17   **A.**   Sure.

18   **Q.**   Okay.  And that idiopathic -- what did you say on that?

19   **A.**   I said I can't exclude idiopathic in anything that has

20   been shown as far as his pathology, lab tests, biopsy.

21   **Q.**   Okay.  And that is because there is no test or marker that

22   tells us that Roundup causes non-Hodgkin's lymphoma; is that

23   right?

24   **A.**   That's true.

25   **Q.**   You spoke a lot about smoking cigarettes -- smoking

1  causing lung cancer earlier.  Do you recall that?

2  **A.**    Yes.

3  **Q.**    And just like with Roundup, do you agree that there is no

4  test or marker that we can use for smoking to say this person's

5  lung cancer was caused by cigarette smoking?

6  **A.**    There are certain characteristics of smoking of

7  tobacco-related lung cancer that are quite unique, and I'm not

8  sure that that is true, what you just said.

9  **Q.**    Well, you agree that smoking causes lung cancer?

10  **A.**    Some kinds of lung cancer, not all.

11  **Q.**    And that -- you agree that when you are trying to

12  determine the cause of someone's lung cancer, that you have to

13  consider how much they smoked?

14       **MR. STEKLOFF:**  Your Honor, I'm objecting under motions

15  in limine.

16       **THE COURT:**  Sustained.

17       **MS. MOORE:**  Your Honor, can we have a sidebar?

18       **THE COURT:**  Sure.

19     (The following proceedings were heard at the sidebar:)

20       **MS. MOORE:**  I just didn't want to say it in front of

21  the jury, Your Honor -- that motion in limine he is referring

22  to was about comparing Monsanto to the tobacco industry.

23  That's not what I'm trying to do.  She, on direct, testified,

24  went through on her graph that smoking causes lung cancer.  She

25  explained all that.

1      I have the opportunity -- and I think it is only fair --

2  to explain that there is no difference.  That's not comparing

3  Monsanto to the tobacco industry.  That's what the motion in

4  limine is.  Smoking doesn't have a marker that you can see from

5  the pathology that causes lung cancer, neither does Roundup.

6  She can still conclude that smoking causes --

7          THE COURT:  She already testified that smoking does

8  have a marker.

9          MS. MOORE:  I would like to be able to follow up on

10  that.

11          THE COURT:  It doesn't sound like what you were

12  asking.  The objection is sustained.

13      (Proceedings were heard in the presence of the jury:)

14  BY MS. MOORE

15  Q.   Dr. Levine, is there any kind of -- can you tell from the

16  pathology whether someone smoked cigarettes when you are trying

17  to determine the cause of someone's lung cancer?

18          MR. STEKLOFF:  Objection, Your Honor.

19          THE COURT:  Sustained.

20  BY MS. MOORE

21  Q.   Do you agree that when you are trying to determine the

22  cause of someone's cancer, that you have to consider all of the

23  evidence.  You can't just say, Well, if there is no test, we

24  don't know?

25  A.   I guess I'm not sure what you are saying.  Repeat it

LEVINE - CROSS / MOORE

1    again.  Sorry.

2    **Q.**   No problem.  No problem.

3        When -- I just want to focus on idiopathic.

4    **A.**   Okay.

5    **Q.**   Okay.  If you know the cause -- or you have a likely cause

6    of someone's cancer, it wouldn't be right to say it is

7    idiopathic; is that correct?

8    **A.**   If you know what the cause is, it is not right to say

9    idiopathic, but at a certain point you can't -- there is

10   nothing in that idiopathic category that allows you to exclude

11   it.  You can't exclude it.

12   **Q.**   But you would only say something is idiopathic when you

13   don't know the cause, right?

14   **A.**   Yes.

15   **Q.**   Okay.  And in this case it is your opinion that the cause

16   is either hepatitis B or hepatitis C?

17   **A.**   And --

18           **MR. STEKLOFF:**  Objection, Your Honor.  This misstates

19   her testimony.

20           **THE COURT:**  Sustained.

21   **BY MS. MOORE**

22   **Q.**   Your opinion is that the most likely causes are

23   hepatitis B and hepatitis C, correct?

24   **A.**   In my opinion the most likely contributing factor here is

25   hepatitis C.  The second most likely is hepatitis B.  But I

LEVINE - REDIRECT / STEKLOFF

1  can't exclude that this could be idiopathic because under the

2  microscope I can't tell.

3  **Q.**   We have made some references today to Dr. Weisenburger.

4  And you know Dr. Weisenburger, right?

5  **A.**   I do.

6  **Q.**   Okay.  And do you consider him to be a good doctor?

7  **A.**   He is a good pathologist.  He is an excellent pathologist.

8  I hired him.

9         **MS. MOORE:**  Okay.  I have no more questions.  Thank

10 you, Dr. Levine.

11        **THE WITNESS:**  Thank you.

12        **THE COURT:**  Any redirect?

13        **MR. STEKLOFF:**  Yes, Your Honor.  May I please have the

14 ELMO?

15                  <u>REDIRECT EXAMINATION</u>

16 **BY MR. STEKLOFF**

17 **Q.**   Dr. Levine, good afternoon.

18 **A.**   Good afternoon.

19 **Q.**   First of all, I had asked you this on direct -- but just

20 to clarify -- did you review Dr. Weisenburger's testimony about

21 all of the hepatitis C studies you were just walked through?

22 **A.**   Yes, I did.

23 **Q.**   And did you, in fact, also review those studies?

24 **A.**   Yes, I did.

25 **Q.**   Did any of them change the opinions you have been offering

LEVINE - REDIRECT / STEKLOFF

1   to the jury today?

2   **A.**   No, not at all.

3   **Q.**   Okay.  So as fast as humanly possible, I just want to

4   briefly touch on the studies.  Okay?  I'm going to go in

5   reverse order.

6        This is Exhibit 1599, the Zuckerman study.  Do you see

7   that?

8   **A.**   I do.

9   **Q.**   Do you see in the title it says, The effect of antiviral

10  therapy on 14;18 translocation and immunoglobulin gene

11  rearrangement in patients with chronic hepatitis C virus

12  infection?

13  **A.**   I do.

14  **Q.**   Does that have anything to do with Mr. Hardeman and

15  diffuse large B-cell lymphoma?

16  **A.**   Not at all.

17  **Q.**   So did this article change your opinion in any way?

18  **A.**   Not at all.  Has nothing to do with the case under

19  consideration today.

20  **Q.**   Okay.  Let's look at the next one, Giannelli.  The title

21  is:  Effect of antiviral treatment in patients with chronic HCV

22  infection and T-(14;18) translocation.  Do you see that?

23  **A.**   Yes, I do.

24  **Q.**   Does that translocation have anything to do with

25  Mr. Hardeman and diffuse large B-cell lymphoma?

LEVINE - REDIRECT / STEKLOFF

1    A.    No.  This was not a translocation that he had.  These

2    patients did not have lymphoma.  He has diffuse large B-cell

3    lymphoma.  This doesn't speak to him at all.

4    Q.    Did this change your opinions in any way?

5    A.    No, not at all.

6    Q.    Let's look at the next article, the Su article.  The title

7    is:  Early antiviral therapy reduces the risk of lymphoma in

8    patients with chronic hepatitis C infection.

9          Do you see that?

10   A.    I do.

11   Q.    And what -- we have heard that Mr. Hardeman was exposed to

12   hepatitis C in 1966, correct?

13   A.    Yes.

14   Q.    And that he had antiviral therapy starting in 2005,

15   correct?

16   A.    Correct.

17   Q.    So did he have early antiviral therapy?

18   A.    No, he did not.  He had 39 years of active HCV infection,

19   which would have allowed mutations to occur.

20   Q.    Did this study change your opinions in any way?

21   A.    Not at all.

22   Q.    Let's look at the next one, the Omland study.  Do you

23   recall seeing this study from Dr. Omland and others?

24   A.    I do.

25   Q.    Do you recall being shown one of the graphs here on this

LEVINE - REDIRECT / STEKLOFF

1  table?

2  **A.**    Yes.

3       Could you show me the tab number on that one?

4  **Q.**    Of course.  This is tab 917.

5       Dr. Levine, tell me when you are ready.

6  **A.**    Not quite yet.  Just one moment.

7  **Q.**    Okay.  No problem.

8       (Whereupon, a brief pause was had.)

9          **THE WITNESS:**  Yes, I'm ready.

10  **BY MR. STEKLOFF**

11  **Q.**    You were shown this table here about non-Hodgkin's

12  lymphoma, correct?

13  **A.**    Yes.

14  **Q.**    Okay.  I want to show you the next page.  And what it says

15  here, the author said, Similarly, no models were fitted for

16  non-Hodgkin's lymphoma as only five cases occurred in the HCV

17  RNA positive patients and no cases occurred in HCV RNA negative

18  patients.  The results of Gray's test -- that is a statistical

19  test about significance, right?

20  **A.**    Yes.

21  **Q.**    -- of the difference in the cumulative incidence of NHL

22  between the two HCV patient groups shown in figure 1 gave a

23  p-value of .09, indicating that our findings could be due to

24  chance.

25       Do you see that?

**LEVINE - REDIRECT / STEKLOFF**

1  **A.**   That's the point.   These numbers were not significant

2  statistically.   They were not valid statistically.   As a

3  clinician, you can't deal with information of that sort.   He

4  says These findings could be due to chance alone.   And I'm

5  going to have to believe that as a clinician.

6  **Q.**   So did this article change your opinions in any way?

7  **A.**   No, it did not.

8  **Q.**   Let's look at the next one, the Nieters article.   Do you

9  recall being shown this article and being shown the title?

10  **A.**   Yes.

11  **Q.**   And then you said that you wanted to look at table 4.   Do

12  you recall that?

13  **A.**   Yes.

14  **Q.**   So let's show table 4.   And on table 4 I think you were

15  referring to this column here, anti-HCV or HCV RNA positive,

16  correct?

17  **A.**   Correct.

18  **Q.**   So did that group include people who -- some people who

19  had the antibody but not the active virus?

20  **A.**   Absolutely.   That's what it says.

21  **Q.**   Or there were some people in that group who did, in fact,

22  have the active virus, correct?

23  **A.**   Correct.

24  **Q.**   But nonetheless in that group there was an odds ratio of

25  2.19 that was statistically significant, correct?

```
 1   A.    Correct.

 2              MS. MOORE:  Objection.  Leading, Your Honor.

 3              THE COURT:  Sustained.

 4   BY MR. STEKLOFF

 5   Q.    What was the odds ratio, and was it statistically

 6   significant?

 7   A.    The odds ratio was 2.19.  It crossed over 1.  In other

 8   words, this is statistically significant.  There was an

 9   increase, a statistical increase, of specific diffuse large

10   B-cell lymphoma among people who had antibody to HCV.

11   Q.    And so did this article change the opinions that you've

12   offered to the jury?

13   A.    No, it did not.

14   Q.    Let's look at the next one, Kawamura.  And do you recall

15   being shown this study?

16   A.    Yes.

17   Q.    And then you were shown a table with 15 years.  Do you

18   recall that?

19   A.    I do.

20   Q.    And one of the things that you talked about was how long

21   the groups were followed.  Do you recall that?

22   A.    Yes.

23   Q.    Okay.  So let's look at that.

24         In this study did the authors write that the observation

25   period was significantly shorter in the Interferon group than
```

**LEVINE - REDIRECT / STEKLOFF**

1  in the non-Interferon group, median 4.5 versus 14 years?

2  **A.**   Yes.   The average time in that study for patients with

3  lymphoma to develop lymphoma was 6.1 years, but the average

4  follow-up was only 4.5; and as I showed early, it takes years

5  and years for this to occur.   Four and a half years is not --

6  it's not a fair comparison.

7       One group is followed 14 years.   You're going to see a lot

8  of truth in there.   One group is followed -- the treated group

9  followed only four years.   Not enough time to see what the real

10  answer might be.

11  **Q.**   Okay.   So did this article change your opinion in any way?

12  **A.**   No, it didn't.

13  **Q.**   And then let's look at the last one, the Taborelli study,

14  the first one you were shown.   Do you recall being shown this?

15  **A.**   I do.

16  **Q.**   And do you recall being shown this table that Mr. Hardeman

17  would have fit in this group?   HCV, he had the core antibody,

18  he was anti-HCV positive but HCV RNA negative?

19  **A.**   Correct.

20  **Q.**   And do you see that there were 14 cases in the

21  non-Hodgkin's lymphoma group and 27 cases in the control group?

22  **A.**   Yes, I do.

23  **Q.**   And how does that impact your -- whether -- well, first of

24  all, does this study change your opinions in any way?

25  **A.**   It does not because the numbers are just too small.   You

**LEVINE - REDIRECT / STEKLOFF**

1   need real numbers to see small results, and those are just too

2   small.  Fourteen cases of lymphoma, you can't make a firm

3   conclusion on that.

4   **Q.**   Okay.  So you were asked a lot of questions about these

5   studies.  Overall, in any way do you think these studies

6   demonstrate that Mr. Hardeman's non-Hodgkin's lymphoma may not

7   have been caused by hepatitis C?

8   **A.**   None of them disprove the fact that this lymphoma could

9   easily have been caused by hepatitis C during the 39 years of

10  active infection.

11  **Q.**   Okay.  Now, I want to go to a different -- a slightly

12  different topic, it's related, and show you just a few of

13  Mr. Hardeman's medical records.  Okay?

14  **A.**   Okay.

15  **Q.**   Now, you were asked questions, a lot of questions, about

16  his antiviral treatment and whether he was cured.  Do you

17  recall that?

18  **A.**   Yes.

19  **Q.**   Okay.

20  **A.**   Yes.

21  **Q.**   And I think you referenced discussions that you relied

22  upon in the medical records between Dr. Ye and Mr. Hardeman;

23  correct?

24  **A.**   Yes, I did.

25  **Q.**   And do you remember being shown this exhibit from

LEVINE - REDIRECT / STEKLOFF

1  February 19th, 2015, from Dr. Ye?

2  **A.**   Yes.

3  **Q.**   And I think we showed this on direct, but on cross were

4  you able to discuss again, when you were being asked these

5  questions, this section here on the back page where Dr. Ye

6  wrote (reading):

7            "We specifically discussed two additional concerns in

8        his case, and then one of those concerns was hepatitis B

9        and hepatitis C reactivation from rituximab" --

10       That was the medicine to treat his hepatitis B; correct?

11 **A.**   Correct.

12 **Q.**   (reading)

13       -- "and then will monitor both diseases through the

14       treatment."

15       Correct?

16 **A.**   Correct.

17 **Q.**   And so what does -- why did this -- or how did this impact

18 your opinions about whether there may have still been some

19 lingering hepatitis B or C in Mr. Hardeman's blood?

20 **A.**   For all practical purposes, Dr. Ye believed that he had to

21 be worried about the possibility of latent quiet virus, both

22 hepatitis C and hepatitis B.

23       He said that the patient was cured, but that's not what he

24 did.  And what he did was specifically, which I'm most

25 respectful for, specifically talked to the patient about his

 1    concerns.  And his first concern was that there may be

 2    reactivation of hepatitis C or B.  You can't reactivate a germ

 3    unless the germ is in you.  You can get a new infection maybe,

 4    but you can't reactivate it unless it's there.

 5        And so he's implying here -- I won't say that.

 6        And so he is worried about the fact that there may be

 7    latent quiet hepatitis B or C, and he has to be careful about

 8    that.  And so he's going to monitor the diseases carefully

 9    looking at the liver enzymes and so forth, and he's also going

10    to treat the patient for hepatitis B so that it won't, quote,

11    "reactivate."  It's not a matter of -- well, so that it won't

12    reactivate.

13        So, you know, the doctor uses a word "cure."  On the other

14    hand, what he's doing here is saying, "I've got to be really

15    careful here.  There is such a thing as occult hepatitis B."

16            MS. MOORE:  Objection, Your Honor.

17            THE WITNESS:  Okay.

18            MS. MOORE:  I'm sorry, Dr. Levine.

19            THE COURT:  Overruled.

20            THE WITNESS:  You're right.

21    BY MR. STEKLOFF:

22    Q.   It was overruled, so you can --

23    A.   Yes -- oh.  So he's acting on the knowledge that he has to

24    be concerned about those long-term viral infections that may be

25    occult and that may be reactivated because of the chemo --

SIDEBAR

1   because of the immune weakening due to the chemo.

2   **Q.**   Now, you told us earlier that you reviewed Dr. Ye's

3   testimony; correct?

4   **A.**   I did.

5   **Q.**   I mean, based on this, do you have any disagreement with

6   what Dr. Ye said about this in his testimony?

7   **A.**   No.  I'm very respectful of him.  He did a very nice job.

8   **Q.**   Okay.  Do you recall also being asked questions on

9   cross-examination about whether Mr. Hardeman was vaccinated for

10  hepatitis B?

11  **A.**   Yes.

12  **Q.**   And so I'd like to show you a record.  This is

13  Exhibit 1023 at page 860.

14          **MS. MOORE:**  No objection.

15      Well, Your Honor, can we have a sidebar?

16          **THE COURT:**  Sure.

17      **(The following proceedings were heard at the sidebar:)**

18          **MS. MOORE:**  Your Honor, I want to clarify my

19  objection.  So I'm not going -- I'm objecting to it being

20  published for the reason that we talked about in the brief.  I

21  object to it being published because it's not been

22  authenticated by any of the doctors.  It's not in evidence and

23  so it should not be published, and she cannot authenticate it

24  because it's hearsay.

25                    (Pause in proceedings.)

1          THE COURT:  Okay.

2          MR. STEKLOFF:  I'm happy to bring you an affidavit

3    from a medical -- a custodian of records from Kaiser that we

4    have that you can take notice of that this is authenticated,

5    self-authenticated, under -- I don't know the exact rule but

6    the rule in the 900s.

7          I don't think there's any issue that these medical records

8    are authentic.  The doctors brought their files and looked on

9    the computer during the deposition about the medical records,

10   all three -- all three doctors.  I think Ms. Wagstaff and I

11   were there for at least two of them.

12         And there's just no dispute that this is --

13         THE COURT:  What is this responding to?  I couldn't

14   tell from the highlights.

15         MR. STEKLOFF:  So for there to be immunity from a

16   vaccine for hepatitis B, there's a different antibody, the

17   surface antibody; that antibody, if you were immune from the

18   vaccine, would be positive.  Mr. Hardeman's test was negative.

19   So I just want to clarify, given the implication on cross that

20   he may have been vaccinated, that either he wasn't vaccinated

21   or if he was, it didn't stick because he -- because that's what

22   this test shows.

23         MS. MOORE:  So, Your Honor, first of all, she already

24   testified to that on cross; and, second, he can do that without

25   publishing this record.  An affidavit of someone I don't have

1    an opportunity to cross-examine is not proper.  They have not

2    authenticated.  They want to dump all the medical records, and

3    that's not proper.

4         **THE COURT:**  I'll let you go ahead and ask about this

5    without publishing it to the jury.

6         **MS. MOORE:**  Thank you, Your Honor.

7         **MR. STEKLOFF:**  Okay.

8      **(The following proceedings were heard in open court:)**

9    BY MR. STEKLOFF:

10   **Q.**   Dr. Levine, do you recall being asked questions about

11   whether Mr. Hardeman had been vaccinated for hepatitis B?

12   **A.**   Yes.

13   **Q.**   And what is the -- so we've heard about the core antibody;

14   correct?

15   **A.**   Correct.

16   **Q.**   Is there something called the surface antibody?

17   **A.**   Yes.

18   **Q.**   And what is that?

19   **A.**   The surface antibody is what the hepatitis B vaccine is

20   generated against.  So that's the surface of the virus that

21   attaches to the liver cell and so forth, and the vaccine

22   specifically takes that and puts a phony hepatitis B surface

23   antigen.  It puts a phony protein into the vaccine, and your

24   body sees that dead piece of surface hepatitis B and makes an

25   antibody to it because it's seen as foreign.

LEVINE - REDIRECT / STEKLOFF

1    And so in a patient who's vaccinated, the only abnormality
2  on the blood test is antibody to the surface antigen; but if
3  there's antibody to the core, that means that virus actually --
4  the virus actually got into that patient.  Mr. Hardeman had
5  core antibody, which meant he had been infected.  He did not
6  have surface antigen positive so he -- maybe he was vaccinated,
7  I don't know, but if he was, it didn't take because if it had
8  been a good vaccine result, he would have had antibody to the
9  surface, and he didn't.  And so his blood test was fully what
10 we expect with somebody who has had hepatitis B infection in
11 the past.
12 Q.  And so have you seen medical records that corroborate that
13 he did not have that surface antibody that he would have had
14 had he been effectively vaccinated?
15 A.  Yes.
16 Q.  Okay.  I just want to make a quick timeline.
17     MR. STEKLOFF:  Ms. Moore, do you mind if I use one of
18 your pieces of paper, a clean piece of paper?
19     MS. MOORE:  Sure.
20     MR. STEKLOFF:  We can rip it off afterwards.
21     MS. MOORE:  Sure.  That's fine.
22     MR. STEKLOFF:  I'm happy to do it.
23 Q.  Okay.  So we have 1966, the first exposure to hepatitis C;
24 correct?
25 A.  By history, yes.

LEVINE - REDIRECT / STEKLOFF

1   Q.   Okay.  And then we have 39 years until it's identified in

2   2005; correct?

3   A.   Correct.

4   Q.   Then he receives the antiviral treatment into 2006;

5   correct?

6   A.   Correct.

7   Q.   And his diagnosis of non-Hodgkin's lymphoma is in 2015;

8   correct?

9   A.   Correct.

10       MS. MOORE:   Your Honor, objection.  These are all

11   leading questions.

12       THE COURT:   I'll let you just draw your thing, and

13   then stop asking leading questions.

14       MR. STEKLOFF:   Yes, Your Honor.

15   Q.   Okay.  I want you to assume -- let's put aside this entire

16   debate about whether he had occult or hidden hepatitis C or

17   hepatitis B during this time period.  Okay?  Let's assume that

18   he had no hepatitis B and no hepatitis C, absolutely none.

19   Okay?

20   A.   Yes.

21   Q.   Okay.  Does that change your opinion in any way about the

22   most likely cause of his non-Hodgkin's lymphoma?

23   A.   No, it does not.  Diffuse large B-cell lymphoma, the

24   defect is a mutation.  He had 39 years of active hepatitis C

25   that would have allowed a mutation to occur.  He did have a

**LEVINE - REDIRECT / STEKLOFF**

1  mutation in his lymphoma.  It doesn't matter if he had no

2  hepatitis C or hepatitis B after 2005.  He had it for 39 years.

3  **Q.**   Okay.  So this entire debate that we just heard for an

4  hour about whether he had some cells of hepatitis B or

5  hepatitis C from after 2005 and 2006, it doesn't matter at all?

6  **A.**   It would have mattered if he had marginal zone lymphoma,

7  but he doesn't.  He has diffuse large B-cell and so, no, it

8  doesn't matter at all.

9  **Q.**   Okay.  And you were asked on direct, I asked you --

10  sorry -- or you were asked on cross if there was evidence or

11  data about this; correct?

12  **A.**   Evidence and data about?

13  **Q.**   About your -- about what they called your theory of the 39

14  years.

15  **A.**   Well, there are all kinds of experiments in the scientific

16  literature that have been shown -- mutations, the hepatitis C

17  has been able -- has been shown to be consistent, has what's

18  called a mutator phenotype that can just cause all these

19  mutations in our own DNA.

20  **Q.**   And did we show two of those articles on direct?

21  **A.**   Yes, we did.

22  **Q.**   Okay.  So let's look at this one again.  This is the

23  Machida article, and you are one of the authors; correct?

24  **A.**   Yes.

25  **Q.**   And in this article you and your authors wrote (reading):

LEVINE - REDIRECT / STEKLOFF

1              "We demonstrated here that acute and chronic

2        hepatitis C infection caused a 5- to 10-fold increase in

3        mutation frequency in Ig heavy chain, BCL-6, p53, and

4        beta-catenin genes of *in vitro* HCV-infected B cell lines

5        and HCV-associated peripheral blood mononuclear cells,

6        lymphomas, and HCCs."

7        Correct?

8   A.   Yes.

9   Q.   And how does that, what you demonstrated in this study,

10  relate to diffuse large B-cell lymphoma?

11  A.   These are mutations which are often seen in diffuse large

12  B-cell lymphoma and mutations which Mr. Hardeman had.

13  Q.   Okay.  So let's pause for a moment there.  I want to come

14  back to that.

15       Are we going to talk for a moment about the BCL-6

16  mutation?

17  A.   Yes.

18  Q.   Okay.  In Mr. Hardeman?

19  A.   Yes.  His pathology report showed a BCL-6 mutation.

20  Q.   Okay.  And also did you and your colleagues write

21  (reading):

22              "These results indicate that HCV induces a mutator

23        phenotype and may transform cells by a hit-and-run

24        mechanism.  This finding provides a mechanism of

25        oncogenesis for an RNA virus"?

LEVINE - REDIRECT / STEKLOFF

1  A.   Yes.

2  Q.   And the hit-and-run mechanism, was that what you described

3  this morning for the jury?

4  A.   That's exactly what I described.

5  Q.   And that relates to diffuse large B-cell lymphoma?

6  A.   That relates to diffuse large B-cell lymphoma, which is

7  Mr. Hardeman's lymphoma.

8  Q.   And you and your colleagues, what was the date of this

9  article that you published?

10  A.   2004.

11  Q.   Okay.  Let's look at the next article we showed.  Do you

12  recall discussing this article this morning by

13  Dr. Peveling-Oberhag and others?

14  A.   Yes, I do.

15  Q.   And did we show in part this chart here?

16  A.   Yes.

17  Q.   Okay.  Does this actually show three different possible

18  mechanisms through which hepatitis C can cause different forms

19  of non-Hodgkin's lymphoma?

20  A.   Yes.

21  Q.   So let's talk first about this top one.  Can you explain

22  what that shows to the jury?

23  A.   Yes.  That shows what I was showing on my own little chart

24  there, that certain kinds of tumors, marginal zone lymphoma,

25  requires the presence of active, living, activated, active HCV

**LEVINE - REDIRECT / STEKLOFF**

1    in order for that tumor to develop and to continue.  And so

2    it -- the virus attaches to the lock -- the key attaches to the

3    lock on the B-cell and the -- what happens is ongoing growth,

4    division of those B cells.  And if you take away the virus by

5    SVR, as an example, if you decrease it or take it away, that

6    whole thing is going to stop.

7         But --

8    Q.   You can go to the second one where the HCV looks like it's

9    entering the B-cell lymphoma.

10   A.   Okay.  This is more complicated, but basically the virus

11   gets in, causes all kinds of abnormalities based upon what its

12   proteins can do.  It can cause problems directly into the DNA

13   by the virus itself or it can do indirectly with other -- other

14   kinds of mechanisms.

15   Q.   And of these first two, is that what you have told the

16   jury occurred in Mr. Hardeman's case?

17   A.   No.  No.  That's not with Mr. Hardeman.

18   Q.   Okay.  So let's look now at the last one.  Is this the one

19   that you explained to the jury this morning would apply to

20   Mr. Hardeman's diffuse large B-cell lymphoma?

21   A.   Yes.  He had 39 years for one of those mutations to occur,

22   and at that point it doesn't really matter what happens to the

23   HCV.  The mutation is there and time will tell whether that

24   will be a true cancer or not.  In his case, it was.

25   Q.   In fact, here it shows the HCV entering the cell, but does

**LEVINE - REDIRECT / STEKLOFF**

1  it also then show the HCV exiting the cell?

2  **A.**   Yes.   We've shown that B-cell lymphoma cells, diffuse

3  large B-cell lymphomas, for example, can be, quote,

4  "productively infected" by HCV.   In other words, the HCV gets

5  into the cell, the HIV [sic] actually divides in that lymphoma

6  cell.   The HCV that comes out of that lymphoma cell, if you put

7  it into a test tube with normal B lymphocytes or liver cells

8  that have not been infected, that HCV virus from the lymphoma

9  cell will infect that new cell with hepatitis C.

10      So we have shown, and others have as well, that HCV can

11  infect the cell, can cause mutations in the cell, can divide in

12  the cell, leave the cell, and go and find -- infect some other

13  cells in the body.

14  **Q.**   And with this explanation, does the antiviral therapy cure

15  or eliminate that mutation?

16  **A.**   No.   It won't do anything to that mutation.

17  **Q.**   Okay.   And I see here again this mutation BCL-6.   Is that

18  what we just looked at in your article?

19  **A.**   Yes.

20  **Q.**   And also to be clear, was this article in 2013?

21  **A.**   Yes.

22  **Q.**   Okay.   So have you reviewed Mr. Hardeman's pathology

23  report?

24  **A.**   Yes, I have.

25  **Q.**   And what, if anything, did that report say about whether

**PROCEEDINGS**

1   Mr. Hardeman had BCL-6 mutations?

2   **A.**   He did have a mutation of BCL-6.

3   **Q.**   Now, just to be clear, are you telling the jury that

4   because he had a BCL-6 mutation, you are certain that it was

5   the hepatitis C that caused his non-Hodgkin's lymphoma?

6           **MS. MOORE:**   Your Honor, objection.

7           **THE COURT:**   Overruled.

8           **MS. MOORE:**   Leading.

9           **THE COURT:**   Overruled.

10          **MS. MOORE:**   It goes beyond the scope of her testimony.

11          **THE COURT:**   Let's have a sidebar.

12          **MS. MOORE:**   Thank you.

13          **THE COURT:**   Actually, it's probably a good time for

14  our afternoon break.   Why don't we take about five minutes.

15  We'll plan on resuming at five minutes to 2:00.

16      (Proceedings were heard out of the presence of the jury:)

17          **THE COURT:**   Okay.   You're free to step down if you

18  like, but it may be worth you listening to this.

19      I guess I wanted to pause because I don't understand the

20  objection.   They are clearing up -- they're clarifying the very

21  thing that you wanted to make sure was clarified, and you

22  objected to that question, which seems to me runs the risk of

23  leaving a misimpression about BCL-6, precisely the

24  misimpression that you didn't want to leave, yet you're

25  objecting to the question.

**PROCEEDINGS**

1   So because this may be somewhat important, I wanted to

2   just make sure I understand the nature of your objection to

3   that question.

4        **MS. MOORE:**  That's fine, Your Honor.  And I guess what

5   I heard -- and if I misheard, I apologize -- but what I had

6   heard is that he was asking her about cause.

7        **THE COURT:**  About what?

8        **MS. MOORE:**  About cause.

9        **THE COURT:**  He was clarifying -- he was asking a

10  question that was designed to clarify that you cannot tell from

11  the pathology that hep C is the cause.  So I don't understand

12  your objection.

13       **MS. MOORE:**  He says (reading):

14        "Just to be clear, are you telling the jury that

15     because he had a BCL-6 mutation, you are certain that it

16     was the hep C that caused his non-Hodgkin's lymphoma?"

17     That's why I objected.

18       **THE COURT:**  Right, but she's going to say "no" to that

19  question.

20       **MS. MOORE:**  I mean, I thought the way he would ask the

21  question, Your Honor, and this was my concern, was that it

22  would be "You cannot tell from the BCL-6 mutation whether it

23  causes..."  And I think the way he asked it, that's what I was

24  concerned about.  It made it sound like --

25       **THE COURT:**  Now I understand.  So that is a fair

 1 | point.  That is a fair point.

 2 |     MR. STEKLOFF:  Yes.  I was intending to elicit a "no"

 3 | to my question.

 4 |     THE COURT:  Right.  But even --

 5 |     MR. STEKLOFF:  I'm happy to reask it.

 6 |     MS. MOORE:  It implies that there is.

 7 |     THE COURT:  Yes.

 8 |     MR. STEKLOFF:  Okay.

 9 |     THE COURT:  But even with a "no," the way you asked

10 | the question is actually not right.  I mean, because you

11 | said -- you said "Does the pathology make you certain that the

12 | hep C caused the non-Hodgkin's lymphoma?"  Even if the answer

13 | to that is "no," it leaves a misimpression that more likely

14 | than not -- the pathology makes you think more likely than not

15 | that it caused -- that the hep C caused the non-Hodgkin's

16 | lymphoma.  So that actually is -- which is why I wanted to take

17 | a timeout --

18 |     MS. MOORE:  Thank you, Your Honor.

19 |     THE COURT:  -- because I know this is important.  So

20 | you didn't ask the question fairly, I think.

21 |     MR. STEKLOFF:  And I want to ask the right question.

22 | So what I would propose is:  Dr. Levine, you cannot tell from

23 | that BCL-6 mutation that hepatitis C was the cause of

24 | Mr. Hardeman's non-Hodgkin's lymphoma?

25 |     MS. MOORE:  And, Your Honor, I would ask that there be

PROCEEDINGS

 1   a curative instruction that that question and answer -- that

 2   question be struck.

 3          THE COURT:  Well, I'll just -- I'll sustain the

 4   objection.  When the jury comes back, I'll say "The previous

 5   question was sustained.  Do you want to resume?"

 6          MS. MOORE:  Okay.  Thank you, Your Honor.

 7          THE COURT:  Okay.

 8          THE WITNESS:  Can I ask something?

 9          THE COURT:  Sure.

10          THE WITNESS:  Could he ask -- I mean, just to get to

11   the truth of this, could he ask:  Is the BCL-6 mutation

12   specific to hepatitis C?  My answer is no.  Doesn't that

13   clarify it?

14          MS. MOORE:  Yeah.

15          THE COURT:  I mean, either the way he proposed it or

16   the way you just proposed it, either one of those I think is

17   appropriate.

18          MR. STEKLOFF:  Okay.

19          THE COURT:  Okay.  Anything else?

20          MS. MOORE:  No, Your Honor.

21          THE COURT:  All right.

22          MS. MOORE:  What time are we supposed to be back?

23          THE COURT:  Let's take, you know, about five minutes.

24          MS. MOORE:  Okay.  Thank you.

25                   (Recess taken at 1:54 p.m.)

```
 1                    (Proceedings resumed at 2:00 p.m.)

 2          (Proceedings were heard out of the presence of the jury:)

 3               THE COURT:  Okay.  Bring them in.

 4          (Proceedings were heard in the presence of the jury:)

 5               THE COURT:  Okay.  You can resume.

 6          And I believe there was an objection pending before the

 7     break.  That objection is sustained.  You can resume.

 8               MR. STEKLOFF:  Thank you, Your Honor.

 9     Q.   Good afternoon again, Dr. Levine.  Just a few more

10     questions.

11          So I just want to follow-up on that BCL-6 mutation that

12     you were just talking about.

13     A.   Yes.

14     Q.   And is that BCL-6 mutation specific to hepatitis C?

15     A.   No, it is not.

16     Q.   It can occur outside the presence of hepatitis C?

17     A.   It can occur in idiopathic cases, as well it can occur

18     outside of hepatitis C, but it clearly is seen in diffuse large

19     B-cell lymphoma.

20     Q.   Okay.  So I want to shift topics on the last topic I want

21     to cover.  And do you recall being asked and having this chart

22     created --

23     A.   Yes.

24     Q.   -- and then being asked questions about the fact that you

25     didn't put Roundup on the chart?  Do you recall that?
```

1    **A.**    I do recall that.

2    **Q.**    Okay.  First of all, going back to this morning, have you

3    ever used Dr. Weisenburger's differential method to determine

4    the cause of one of your patient's non-Hodgkin's lymphoma?

5    **A.**    No, I haven't.

6    **Q.**    And now let's talk about Roundup.  Did you review all of

7    the published epidemiology regarding Roundup or glyphosate and

8    non-Hodgkin's lymphoma?

9    **A.**    Yes, I did.

10   **Q.**    And based on that review, in your opinion is Roundup or

11   glyphosate a cause of non-Hodgkin's lymphoma?

12   **A.**    No.

13   **Q.**    Did you provide that opinion in the expert report that you

14   prepared for this case?

15   **A.**    Yes, I did.

16   **Q.**    And based on that opinion, is that why you didn't include

17   Roundup as a potential risk factor for Mr. Hardeman?

18   **A.**    Exactly.

19   **Q.**    And these opinions that you're offering about Roundup and

20   the fact that you don't believe it is not -- you don't believe

21   it is a cause of non-Hodgkin's lymphoma, do you offer that

22   opinion to the same reasonable degree of medical certainty that

23   you discussed earlier?

24   **A.**    Could you ask that again?

25   **Q.**    Sure.

LEVINE - RECROSS / MOORE

1    You just told us that you don't believe Roundup is

2  associated with non-Hodgkin's lymphoma; correct?

3  A.    Correct.

4  Q.    Do you offer that opinion just like all the other ones

5  that you've offered to a reasonable degree of medical

6  certainty?

7  A.    Absolutely.  To patients, to doctors if it comes up, yes.

8        **MR. STEKLOFF:**  Okay.  I have no further questions,

9  Your Honor.

10       **THE COURT:**  Okay.

11       **MS. MOORE:**  Your Honor, just a couple of questions.

12       **THE COURT:**  Sure.

13                    <u>**RECROSS-EXAMINATION**</u>

14  BY MS. MOORE:

15  Q.    Dr. Levine, I just want to clear something up.  You were

16  asked some questions about a BCL-6 mutation.

17  A.    Yes.

18  Q.    Do you recall that?  Is the BCL-6 mutation specific to

19  hepatitis C?

20  A.    It is not specific to hepatitis C.  It is very commonly

21  seen in diffuse large B-cell lymphoma.

22  Q.    In fact, it's one of the most common translocations -- I'm

23  sorry -- most common mutations that you see in DLBCL?

24  A.    Absolutely true, and he had it.

25  Q.    Okay.  And so, in other words, you could have a person

1    who's diagnosed with diffuse large B-cell lymphoma and have the

2    BCL-6 on their pathology and they may not have hepatitis C?

3    **A.**   Yes.   That's why I cannot exclude idiopathic.

4           **MS. MOORE:**   Okay.   Thank you.   Those are all my

5    questions.

6           **THE COURT:**   Okay.   You can step down.

7           **THE WITNESS:**   Thank you very much.

8           **THE COURT:**   Thank you.

9                        (Witness excused.)

10           **THE COURT:**   And do you wish to call your next witness?

11           **MR. KILARU:**   Yes, Your Honor.   We call Dr. Daniel

12    Arber, and need to set up briefly.

13           **THE COURT:**   Sure.

14           **MR. KILARU:**   Thanks.

15                        (Pause in proceedings.)

16           **MR. KILARU:**   Your Honor, may I pass these up?

17           **THE COURT:**   Thank you.

18                        (Pause in proceedings.)

19           **THE CLERK:**   Please remain standing and raise your

20    right hand.

21                        **DANIEL ARBER**,

22    called as a witness for the Defendant, having been duly sworn,

23    testified as follows:

24           **THE WITNESS:**   Yes.

25           **THE CLERK:**   Thank you.   Please be seated.

ARBER - DIRECT / KILARU

```
 1        And for the record, please state your first and last name
 2   and spell both of them.
 3             THE WITNESS:  Daniel, D-A-N-I-E-L, Arber, A-R-B-E-R.
 4             THE CLERK:  Thank you.
 5             MR. KILARU:  Doctor, can I trade binders with you?
 6   There's one back there I'll grab too if that's okay.  Thank
 7   you.
 8                    (Pause in proceedings.)
 9             MR. KILARU:  Your Honor, we have some slides that
10   we've shown to opposing counsel.  There's no objection, so we'd
11   ask to publish those as well?
12             THE COURT:  Sure.
13                    DIRECT EXAMINATION
14   BY MR. KILARU:
15   Q.   Good afternoon.
16   A.   Hi.
17   Q.   Could you please introduce yourself to the jury and tell
18   them a little bit about yourself?
19   A.   My name is Daniel Arber.  I'm a pathologist at the
20   University of Chicago.
21   Q.   And the jury has heard a little bit about this before, but
22   could you tell them in your own words what pathology is?
23   A.   Sure.  Pathology in the broadest sense is the study of
24   disease.  As a medical specialty, we oversee the running of the
25   laboratories and also any type of tissue biopsy.  So any
```

ARBER - DIRECT / KILARU

1  patient that has a biopsy specimen comes and is reviewed and

2  interpreted by a pathologist, and any type of blood test or

3  urine test or any type of other test that runs through the labs

4  is overseen by a pathologist.

5  Q.  And, Doctor, in your experience as a pathologist, have you

6  ever diagnosed a patient with non-Hodgkin's lymphoma?

7  A.  Yes.  I frequently diagnose non-Hodgkin's lymphoma.

8  Q.  Do you have a sense of how many times you've done that?

9  A.  Oh, thousands of times.

10  Q.  Let's start by talking a little bit about your background

11  before we get to your opinions in this case.

12  A.  Okay.

13  Q.  Where did you grow up?

14  A.  I grew up in Texas outside of Houston.

15  Q.  And we heard that you're a doctor.  What made you decide

16  you wanted to go to medical school?

17  A.  Well, my father was an engineer and I actually was very

18  good at math, and I struggled more with science but it was more

19  challenging so I thought I would try that.  And I really

20  enjoyed medicine, so that's what I chose.

21  Q.  We'll start with this slide here.  Could you tell the jury

22  where you went to medical school?

23  A.  I went to medical school at the University of Texas Health

24  Science Center in San Antonio, Texas.

25  Q.  And did you decide when you were there that you wanted to

ARBER - DIRECT / KILARU

1    become a pathologist?

2    **A.**   I was thinking about it, but I really couldn't decide so I

3    went ahead and did a clinical internship for a year to help

4    give me more time.

5    **Q.**   And where did you do that internship?

6    **A.**   I did that in Monroe, Louisiana, at one of the charity

7    hospitals.

8    **Q.**   Doctor, what did you do during that year at the charity

9    hospital?

10   **A.**   It was called a rotating internship.  So I'd spend months

11   doing internal medicine, surgery, pediatrics, obstetrics, and

12   emergency medicine.

13   **Q.**   Were you spending that time treating patients?

14   **A.**   Yes.  It was 100 percent taking care of patients.

15   **Q.**   And, Doctor, what about that internship made you want to

16   go into the field of pathology?

17   **A.**   Well, I really enjoyed clinical medicine and dealing with

18   patients, but I found that the most interesting patients always

19   had a biopsy or some exotic test, and that you got a really

20   good concentration of very interesting and challenging cases in

21   that -- in the pathology area so I decided to do a residency in

22   that.

23   **Q.**   And could you tell the jury how pathology helps with

24   diagnosing and treating patients?

25   **A.**   Sure.  So we oversee all laboratory tests, which are

ARBER - DIRECT / KILARU

1  really critical for making a diagnosis, but particularly we

2  interpret all of the biopsy specimens.  And so we interpret

3  things as infections or even make diagnoses of cancer and

4  classify them so that the treating physician knows exactly what

5  the diagnosis is, what the prognosis is, so they can determine

6  the appropriate therapy.

7  Q.   And, Doctor, did you pursue training in pathology after

8  you finished that internship?

9  A.   Yes.

10  Q.   Let's go to that.  What kind of training did you get?

11  A.   So I did a residency that was combined in anatomic

12  pathology and clinical pathology at the Scott & White Clinic,

13  where anatomic pathology covers the more tissue biopsy and

14  clinical pathology more the blood and lab test work.

15  Q.   And did you find that the clinical work you'd done before

16  was helpful in your further training as a pathologist?

17  A.   Yes.  It's very helpful.  Most pathologists these days

18  don't do clinical training, but it does help us understand what

19  the need is.  When someone does a biopsy, we understand, I

20  think, better what -- what questions are being asked when they

21  submit a specimen.

22  Q.   And, Doctor, after you finished your residency, what was

23  the next step in your career?

24  A.   So I moved to the City of Hope and did a fellowship in

25  hematopathology for two years.

ARBER - DIRECT / KILARU

1  **Q.**   Doctor, what is hematopathology?

2  **A.**   So it's pathology of the hematopoietic system.  So it's

3  looking at diseases or abnormalities of blood, bone marrow, and

4  lymph nodes.

5  **Q.**   Does that include conditions like lymphoma and

6  non-Hodgkin's lymphoma?

7  **A.**   Yes, it does.

8  **Q.**   And, Doctor, we've heard a fair bit about the City of Hope

9  over the last few days.  Do you know Dr. Levine and

10  Dr. Weisenburger?

11  **A.**   I do.  I did not overlap with them at City of Hope, but I

12  do know them.

13  **Q.**   Okay.  Doctor, when you were finished with your training,

14  did you get any Board certifications in the field of pathology?

15  **A.**   Yes.  I'm Board certified in anatomic pathology, clinical

16  pathology, and hematology, which in pathology terms is

17  hematopathology.

18  **Q.**   And could you tell the jury, what does it mean to be Board

19  certified?  Why get that credential?

20  **A.**   Well, first of all, to be Board certified, you have to do

21  an accredited training program and then you have to pass a

22  fairly rigorous examination to be Board certified, and many

23  institutions now require Board certification to be able to have

24  privileges to practice in that hospital.

25  **Q.**   And, Doctor, as we can see on the slide, it says you have

ARBER - DIRECT / KILARU

1  three Board certifications.  Why did you pursue three different

2  Board certifications?

3  A.  Well, the anatomic pathology and clinical pathology are

4  ones that help cover all aspects of pathology; and then if you

5  really want to practice a subspecialty and there's Board

6  certification available, then generally you now get certified

7  in that, and I wanted to practice hematopathology.

8  Q.  Now, Doctor, where did you start your career after your

9  training was complete?

10  A.  I went back to the Scott & White Clinic where I'd done my

11  residency and was on the faculty there for a year and a half.

12  Q.  And where did you go after that?

13  A.  Then I went back to the City of Hope for a staff

14  pathologist position for eight years.

15  Q.  And, Doctor, why did you decide to leave the City of Hope

16  after eight years?

17  A.  Well, City of Hope is really an outstanding institution,

18  but it was a small place and it was a small department of

19  pathology, and I was already the director of hematopathology

20  there.  And Stanford offered me a full professor position, and

21  I thought it was just a better opportunity where I'd see more

22  variety of cases and have, I think, opportunity to teach

23  medical students and be involved with residents training, which

24  I couldn't do at City of Hope.

25  Q.  Well, let's talk about your time at Stanford.  How did

1  your career progress once you got there?

2  **A.**   Well, I was hired as a professor to run the hematology

3  laboratories, which is where the basic blood tests like CBCs

4  are done; and over time I was asked to run all the

5  laboratories, including the anatomic pathology area, and

6  eventually made the vice chair for clinical services.

7  **Q.**   Now, Doctor, I can see on the slide that it says you're

8  the Ronald F. -- you were the Ronald F. Dorfman Professor in

9  Hematopathology.  What does it mean that you had that position?

10 **A.**   So once you're a full professor, you really can't get

11 promoted again so to honor some faculty, you get named

12 professorships.  Dr. Dorfman was a very well-known

13 hematopathologist at Stanford, and so I was very fortunate to

14 get the named professorship in his honor.

15 **Q.**   And was that professorship different from some of the

16 other endowed professorships on campus?

17 **A.**   Yes.  Most named professorships are named after the person

18 who donated the money, not someone that practices medicine.  So

19 it's a real honor to get one that is named after someone in

20 your field.

21 **Q.**   And you also said that you were the vice chair for

22 clinical services.  What did that mean?

23 **A.**   So it had a number of responsibilities.  I held the

24 license for all the laboratories, which is a regulation that a

25 physician has to hold all licenses for laboratories with

ARBER - DIRECT / KILARU

hospitals.  And I also oversaw all the clinical faculty in the

department, which were about 50 or so faculty members.

Q.   And, Doctor, did you continue to teach while you were at

Stanford?

A.   Yes.  I taught medical students, residents, and fellows.

Q.   And I see there's some teaching awards listed on this

slide.  Could you tell the jury a little bit about those?

A.   So I received the Stanford School of Medicine Teaching

Excellence Award, which -- for two years in a row, and that's

awarded by the medical students at Stanford.  And then the

Clinical Pathology Senior Faculty Teaching Award is an award

they give each year.  The residents in pathology give that one.

Q.   Well, Doctor, why did you decide in 2016 to leave Stanford

and go back east to Chicago?

A.   Well, I really enjoyed working at Stanford, it's a

beautiful place and an excellent department, but I was offered

a chair position at University of Chicago, which is also an

excellent university, and it gave me a chance to not just be

over the clinical aspects of the department but the research

and education aspects of the department.  So I thought I would

take that opportunity.

Q.   Before we move on, I forgot to ask one thing, which is,

did you continue to treat patients and diagnose patients

throughout your time at Stanford?

A.   Yes.  Through my whole career, I have rotated on the

**ARBER - DIRECT / KILARU**

1  hematopathology service and diagnosed patients on that service.

2  **Q.**   Well, turning, then, to Chicago, what are your

3  responsibilities as the chair of the Pathology Department?

4  **A.**   Well, there are a number of administrative

5  responsibilities.  I also oversee all the clinical aspects of

6  the department like I did at Stanford, but now I'm over the

7  basic science research component and the education component of

8  the department.

9  **Q.**   And do you still teach at Chicago?

10  **A.**   Yes.

11  **Q.**   How often?

12  **A.**   I teach medical -- I teach a couple of medical student

13  classes, but I mainly teach residents and fellows now.

14  **Q.**   And, Doctor, you said a moment ago that you've treated and

15  diagnosed patients throughout your career.  Now, at Chicago

16  are -- the patients that you treat and diagnose, are they just

17  patients who come to the hospital in the Chicago system?

18  **A.**   No, it's not just those.  I do rotate on the regular

19  hematopathology service, which are patients at the University

20  of Chicago, and I also get consultation cases from -- mostly

21  from pathologists across the country.

22  **Q.**   And do you have any knowledge of how those cases end up

23  getting referred to you?

24  **A.**   Well, some are from people that have attended lectures

25  that I've given or read a book chapter or a paper that I've

ARBER - DIRECT / KILARU

1  written on the topic that they're struggling with, and they'll

2  send the case to me to help them with the diagnosis.

3  **Q.**  And do they tend to send you the easy cases or the hard

4  cases?

5  **A.**  They only send the hard cases because pathologists are

6  well trained, and so they -- it's usually something where they

7  have a -- they've gotten to a point that they can't really make

8  a decision about a diagnosis so they send it.

9  **Q.**  Now, Doctor, a few minutes ago you mentioned something

10  called basic science research, and I think we heard last week

11  that that's the type of research that Dr. Weisenburger does as

12  well.  Could you tell the jury what that is?

13  **A.**  So as the name implies, it goes -- it's more science

14  based.  It's not as much as patient-based research, so it

15  includes animal studies, transferring genes to animals to see

16  what happens, looking at cell cultures to see what happens in a

17  petri dish, and that's opposed to more translational research

18  that often is more clinical and directly patient related.

19  **Q.**  Well, what type of research do you do?

20  **A.**  Mine is almost entirely clinical and translational, where

21  I -- my focus is on the diagnosis of hematopoietic tumors and

22  determining prognosis based on features that a pathologist will

23  see often under the microscope or doing other testing.

24  **Q.**  Does your work typically draw from actual patients who are

25  undergoing treatment?

1   **A.**   Yes.  It's almost -- it's all patient sample testing, yes.

2   **Q.**   Well, let's talk a little bit about some of your research.

3   How much have you published within the field of pathology?

4   **A.**   I have about 230 peer-reviewed papers, I have nine books,

5   and I have just under 80 book chapters I've written.

6   **Q.**   And have you served as a reviewer for other people's

7   articles?

8   **A.**   Oh, yes.

9   **Q.**   And, Doctor, are there any publications that you're

10  particularly proud of?

11  **A.**   Well, I did a lot of work with the World Health

12  Organization.  So the World Health Organization or WHO writes

13  the classifications of diseases, and so in 2008 and 2016 were

14  the last two editions for hematopoietic tumors, and I wrote

15  many of the chapters for those books and was very actively

16  involved in the 2016 version.

17      That also resulted in a publication in the journal *Blood*

18  that summarized the classification.  And both of those actually

19  had papers that summarized the classification that were I think

20  probably my top publications.

21  **Q.**   And do you have a sense of whether those two publications

22  are used by doctors in practice?

23  **A.**   I have a good sense of that.  They've been cited thousands

24  of times so that means that when other people are writing

25  papers on topics, they use that as a reference.  And so those

1  papers are very highly referenced because the WHO

2  classification is pretty much universally accepted.

3  **Q.**   Well, Doctor, let's spend a few minutes to talk about the

4  work that you did in this case in connection with Mr. Hardeman.

5  **A.**   Okay.

6  **Q.**   What questions were you trying to answer once you became

7  involved?

8  **A.**   So I was asked to look at his medical records and his

9  pathology material to determine -- confirm the diagnosis and to

10  see if I had any -- if I saw any features that may suggest the

11  cause of his lymphoma.

12  **Q.**   And what materials in particular did you review when you

13  were forming your opinions?

14  **A.**   I did look at Mr. Hardeman's medical record.  I received

15  the pathology slides from a number of different specimens and

16  reviewed those.

17  **Q.**   And, Doctor, what do you mean when you say you looked at

18  the pathology slides?

19  **A.**   So whenever you have a biopsy, the tissue is processed and

20  slides are cut from it, and I received those original slides as

21  well as the additional ancillary studies that were done to help

22  come to the diagnosis.

23  **Q.**   So did you have an opportunity to look at Mr. Hardeman's

24  actual tumor?

25  **A.**   Yes.

**ARBER - DIRECT / KILARU**

1  **Q.**   And, Doctor, what other materials did you review?  Did you

2  have a chance to look at medical records, anything like that?

3  **A.**   Yes.  I had all of his medical records.

4  **Q.**   And did you have a chance to review any testimony from

5  either his doctors or Mr. Hardeman himself?

6  **A.**   Yes.  I reviewed his -- Mr. Hardeman's deposition and

7  depositions from his treating physicians.

8  **Q.**   Now, Doctor, when you looked at those -- could you tell

9  the jury when it was that you looked at those pathology slides

10 you mentioned earlier?

11 **A.**   Well, I think it was in late November, early December.

12 **Q.**   Okay.  Well, did you also have a chance in forming your

13 opinions to look at the reports and conclusions from

14 Dr. Weisenburger?

15 **A.**   Yes.  I have reviewed those.

16 **Q.**   And do you know when he had a chance to look at the

17 pathology slides?

18 **A.**   From his testimony, I believe it was a couple of weeks

19 ago.

20 **Q.**   And you anticipated my next question, which was, did you

21 have a chance to look at the testimony that he provided to the

22 jury last week?

23 **A.**   Yes.

24 **Q.**   Okay.  Let's spend a minute talking about non-Hodgkin's

25 lymphoma in particular and use your training in pathology to

**ARBER - DIRECT / KILARU**

1    maybe illuminate that a little bit.

2    **A.**    Okay.

3    **Q.**    I'll get to that in a second.

4        Doctor, what is lymphoma?

5    **A.**    So lymphoma in the broadest sense is essentially cancer of

6    lymphocytes, and lymphocytes are a subset of the white blood

7    cells you have circulating in your body, and they -- and you

8    can break down lymphoma into two broad groups:  One is

9    Hodgkin's disease, which is now called Hodgkin's lymphoma, and

10   the other is non-Hodgkin's lymphoma.  And those were separated

11   because we originally thought they were two completely

12   different diseases that were unrelated.  Now we know they're

13   both lymphomas arising from lymphocytes.

14       Non-Hodgkin's lymphoma is broken further down into B-cell

15   and T-cell types, and there are just dozens of subtypes of

16   non-Hodgkin's lymphoma.

17   **Q.**    And, Doctor, did you bring some slides to help explain the

18   lymphatic system to the jury?

19   **A.**    Yes.

20   **Q.**    Let's start with the first one of those.  What are we

21   looking at here, Doctor?

22   **A.**    So this is a sketch of a human, and the green dots

23   represent lymph nodes throughout the body.  So lymph nodes are

24   the site where lymphocytes can reside.  They circulate in blood

25   but they also reside in lymph nodes.  And these are the areas

**ARBER - DIRECT / KILARU**

1  of your body if you get an infection, you feel a lump where it

2  swells, that's a swollen lymph node.

3      And the lymphatic system parallels the blood vessel -- the

4  blood system in that it has little tubes or lymphatics that

5  connect these lymph nodes.  Blood doesn't pass through those

6  but lymphocytes do, and they circulate throughout the body and

7  also will get into the blood and circulate.

8  **Q.**   Doctor, you've mentioned the lymphocytes a few times.  Do

9  you have a slide to help explain what those are?

10  **A.**   Yes.

11  **Q.**   Let's go to that.  Can you walk the jury through what

12  we're seeing on the screen here?

13  **A.**   Sure.  There's two main categories of lymphocytes.

14  There's T cells and there's B cells.  And T cells are the most

15  common in both your blood and in your tissues, and these are

16  cells that are less targeted.  So the whole purpose of

17  lymphocytes -- well, the main purpose is to help fight off when

18  you have an infection or any type of foreign thing enters your

19  body.

20      T lymphocytes are a little less specific.  They're already

21  honed and can attack different infections or antigens and help

22  kill them, but they're not specific to whatever that infection

23  is.

24      B cells are a lot less numerous in your body but, as I

25  mentioned, I think the majority of lymphomas are of B-cell

ARBER - DIRECT / KILARU

1  lineage.  These cells also fight off viruses and bacteria and

2  other foreign things in your body, but it takes a little longer

3  for them to respond because they become very specialized

4  against the antigen or infection that you have.

5  **Q.**  Now, what happens in these cells when someone gets

6  lymphoma?

7  **A.**  Well, I'm going to focus mainly on the B cells because

8  that's, I think, relevant here and that's the vast majority of

9  lymphomas.

10      So the B cells, as they're becoming specialized against an

11  antigen, they reshuffle their DNA.  And so every cell in your

12  body has the same DNA, but the DNA gets shuffled to be specific

13  for that cell type.  And these cells reshuffle their DNA to

14  make proteins that are directed against the antigen that they

15  are trying to kill, and then they survive and multiply and then

16  go out and kill it all over your body.  And that's when you get

17  immunity is when that happens.

18      So that takes a number of days.  So if you get a cold, it

19  takes a number of days before your B cells can get activated

20  and start fighting back, and then it takes a few more days to

21  kill the virus or not get down to a point where you get over

22  your cold.

23      But if you got that exact virus again, they'd be ready

24  very quickly and fight it off quickly.  You may not even

25  realize you're sick.

ARBER - DIRECT / KILARU

Q.   Well, what happens -- what goes wrong in the case of a
patient who has lymphoma?

A.   Well, this reshuffling process that makes the B cells very
specific just by its nature will result in abnormal
reshuffling, which can lead to a lymphoma.  The vast majority
of times that reshuffling results in a cell that just dies off;
but on rare events, it will have a genetic defect that can go
on and lead to lymphoma.  It doesn't always and you can detect
genetic events associated with lymphoma in normal people if you
look really, really hard, and presumably those cells just die
off, but every once in a while one of them starts dividing and
years later you develop lymphoma.

Q.   Well, you mentioned years.  How long does it take for
cancer to develop from one of those mutated cells to something
that you can actually diagnose?

A.   Well, it certainly varies.  Some cancers are more
aggressive than others, but you have to remember you're
starting with a single cell.  That genetic event occurs in one
cell, and by the time you have detectable lymphoma in your
body, you have millions of cells.  So it takes truly years in
most patients to get to the point from that one cell to the
time that you have clinical lymphoma.

Q.   And we've heard that Mr. Hardeman had a specific type of
NHL called diffuse large B-cell lymphoma.  Could you explain to
the jury what that looks like under the microscope?

1   **A.**   Okay.  So diffuse large B-cell lymphoma is the most common

2   lymphoma, and the name really describes it.

3        So when we look under the microscope, we are trained to

4   know what a normal lymph node looks like.  It has a pattern

5   that is very typical.  In diffuse large B-cell lymphoma, that

6   pattern is gone and there's a diffuse proliferation of cells

7   instead of nodules that we would expect in a normal lymph node.

8   So that's the diffuse part.

9        The cells are large so we realize they're bigger than

10  normal looking under the microscope, and then we do studies to

11  tell they're B cells.  We can't tell by looking at the cells

12  whether they're B cells or T cells because they look the same

13  under the microscope on a routine slide.  So if it's diffuse

14  and they're large and they're B cells, that's diffuse large

15  B-cell lymphoma.

16  **Q.**   Well, Doctor, what causes -- I think we're done with the

17  slides.

18       What causes diffuse large B-cell lymphoma to develop?

19  **A.**   Well, in -- the vast majority of cases are idiopathic,

20  meaning we don't know the cause.  There are subsets of cases

21  that do have known causes.  The most common are related to

22  immunodeficiency.  So patients that have HIV are at risk for --

23  very high risk for getting lymphoma, patients who have had

24  organ transplants or are taking drugs that make them

25  immunodeficient will have a much higher risk for lymphoma, and

**ARBER - DIRECT / KILARU**

1    then certain infectious agents increase your risk for lymphoma,

2    both viral and bacterial.

3    **Q.**    How often is it that you're able to determine a specific

4    cause for a patient's DLBCL?

5    **A.**    From the pathologist's perspective of looking at the

6    slides, only about 10 percent of the time can we determine a

7    cause of the lymphoma.

8    **Q.**    So what happens in the other 90 percent of cases?

9    **A.**    Most are just generally considered to be idiopathic.

10   **Q.**    Well, we've also heard a few times about this concept

11   called a risk factor.  Within the field of pathology, what does

12   that phrase mean to you?

13   **A.**    So there are certain things that put you at a little bit

14   higher risk of getting lymphoma or, you know, just a number of

15   diseases.  There are risk factors for just about all diseases.

16   Some of them are things like age and sex and even race can be

17   risk factors for getting certain diseases because we know some

18   races have disease more commonly than others, but none of them

19   really are specifically defining of the disease.

20   **Q.**    Well, in those 90 percent of cases, are there risk factors

21   present?

22   **A.**    Yes.

23   **Q.**    Well, if there's risk factors present, why aren't you able

24   to determine the cause of the patient's lymphoma?

25   **A.**    Well, they're usually minor risk factors in that they're

**ARBER - DIRECT / KILARU**

1  increasing the risk by maybe 20 percent, something like that.

2  That doesn't mean that's the cause of their disease.  So one of

3  the risk factors in non-Hodgkin's lymphoma is being a male, but

4  not all males get non-Hodgkin's lymphoma just because of their

5  sex.  There are other things going on that can cause you to

6  have disease.

7      And we're constantly looking for -- looking at the biology

8  of lymphoma and all diseases to try to understand more about

9  them; and if you went in automatically and assigned a risk

10  factor as the cause of a disease, you don't have the

11  opportunity to really discover the real cause if you can find

12  it.

13      There's certainly you can have inherited causes of disease

14  that may actually be spontaneous where this is the first

15  patient that has it.  If you assigned a risk factor of age or

16  sex as the cause, then their other children may not be able to

17  be screened.

18  **Q.**  I think we're coming close to the end of our time today,

19  but I'd like to just talk, if I could, briefly about

20  methodology, yours and Dr. Weisenburger's.

21  **A.**  Okay.

22  **Q.**  Could you walk the jury through the method that you used

23  in reaching your conclusions in this case?

24  **A.**  So I reviewed the medical record because clinical

25  information is very important for making a diagnosis.  We don't

**ARBER - DIRECT / KILARU**

1   as pathologists make it just blindly by looking at the slides.

2        Then I reviewed the slides.  There's what's called a

3   hematoxylin and eosin stain slide, and that is kind of the type

4   of stain we do for every type of tissue that we get, and that's

5   the starting point for doing an evaluation as a pathologist.

6   And then we look at additional stains, which are usually

7   immunohistochemical studies, which help us.

8        So I looked at the H and E section, which was suggestive

9   of a diffuse large B-cell lymphoma, but I mentioned I can't

10  tell if it's a B-cell or not by just looking at the microscope.

11  So there were a number of other stains that were done by the

12  pathologist that confirmed that the large cells were B cells

13  and confirmed that diagnosis.

14       And then there were a variety of other tests that were

15  done that were stains, as well as genetic tests, to determine

16  the prognosis -- prognostic risk group in Mr. Hardeman.

17  **Q.**   And what did you conclude from looking at those materials?

18  **A.**   That the -- I agreed with the diagnosis of a diffuse large

19  B-cell lymphoma.

20  **Q.**   And were you able to determine the cause of Mr. Hardeman's

21  NHL?

22  **A.**   No.  Looking at the slide, it's not possible to determine

23  the cause.  There were not features of a immunodeficiency-

24  associated lymphoma.  Epstein-Barr viral studies were

25  performed, which is one cause, and they were negative.  So I

ARBER - DIRECT / KILARU

1   was not able to determine a cause looking at the slides.

2          MR. KILARU:  Your Honor, at this point I'd ask

3   permission to publish a slide that was shown during opening

4   statements from plaintiff's opening.  It's not marked so it

5   would be, I guess, Exhibit 1687 is I think the number we're at.

6          (Trial Exhibit 1687 marked for identification)

7             THE COURT:  Do you have a copy for me, and have you --

8             MR. KILARU:  I will get a copy of it, yes.

9             MS. MOORE:  Your Honor, it's the differential blowup

10  that we used.

11            THE COURT:  Oh.  That's fine.

12            MR. KILARU:  Is that okay?

13            THE COURT:  I think so.  Let's make sure there's no

14  objection from them.

15       Any objection?

16            MS. MOORE:  Oh, no, Your Honor.  I apologize.

17            THE COURT:  Thank you.

18       Go ahead.

19            MR. KILARU:  And, Ms. Melen, can I have the Elmo,

20  please.

21  Q.   Now, Doctor, you said earlier that you had a chance to

22  review the testimony that Dr. Weisenburger provided to the

23  jury?

24  A.   Yes.

25  Q.   And are you familiar with a chart sort of like this that

 1    was used during his testimony?

 2    **A.**   Well, from his testimony, this sounds familiar, yes.

 3    **Q.**   So I think what we're looking at is a chart that lists

 4    some risk factors for NHL and then has fields for whether they

 5    were Mr. Hardeman's risk factors and a substantial factor.  Is

 6    that what you're seeing as well?

 7    **A.**   Yes.

 8    **Q.**   Doctor, have you ever used a slide or a chart like this in

 9    diagnosing a patient?

10    **A.**   No.

11    **Q.**   Have you ever seen any of the doctors you've worked with

12    over the course of your career use a method like this?

13    **A.**   No.

14    **Q.**   I think what followed, then, was Dr. Weisenburger going

15    through this chart and filling it out.

16         **MR. KILARU:**  And if I can publish just a later slide.

17         **MS. MOORE:**  Your Honor, no objection but just to

18    clarify, this is from opening.  This is not what

19    Dr. Weisenburger did.

20         **MR. KILARU:**  Sure.  It's from the opening.

21         **THE COURT:**  That's fine.

22         **MR. KILARU:**  So I'm putting up what we'll mark as 16,

23    I think, 88 for identification.

24         (Trial Exhibit 1688 marked for identification)

25    \\\

ARBER - DIRECT / KILARU

1   BY MR. KILARU:

2   Q.   Doctor, as you can see on the screen, there's sort of a

3   list -- some risk factors crossed off and then there's a

4   conclusion on the right -- or there's a marking on the right

5   that Roundup was a substantial factor in Mr. Hardeman's NHL.

6   Is that what you're seeing as well?

7   A.   Yes.

8   Q.   And is it your understanding that this is basically the

9   methodology that Dr. Weisenburger used in this case?

10  A.   Yes.

11  Q.   Doctor, have you ever used that methodology in diagnosing

12  a patient within your career as a pathologist?

13  A.   No.

14  Q.   Have you ever seen anyone else you work with use this kind

15  of methodology?

16  A.   No.

17  Q.   And do you believe as someone who's been practicing in

18  pathology for -- how long is it now?

19  A.   26 years.

20  Q.   -- 26 years, do you believe that this is a valid way of

21  identifying the cause of a patient's NHL as a pathologist?

22  A.   No, I don't.

23  Q.   Why do you say that?

24  A.   Well, it lists a number of risk factors.  It ignores some

25  of them like age, sex, and race, all are risk factors; but it's

1  not -- first of all, you can't just make a list of risk factors

2  and then just mark them off and diagnose with what's left on

3  the list because idiopathic is the most common thing here.

4      And if you assign a risk factor as the cause of the

5  disease even if it's a weak risk factor, you again lose the

6  opportunity to discover future risk factors that may be very

7  important for the patient.

8      And if you look at this, things like obesity and viral

9  infections have risk factors of about 1.2, 1.3; and even if you

10  accepted pesticide use, it had some more risk factor.  So why

11  would you choose one over the other?  These are all relatively

12  weak even if you accept pesticide use as a risk factor.

13  Q.   And, Doctor, just going through this, if you crossed off

14  risk factors that you didn't think applied, would you

15  automatically be able to determine that whatever is left was

16  the thing that caused someone's NHL?

17  A.   No.

18  Q.   And do you think that Dr. Weisenburger's methodology gives

19  adequate consideration to the possibility that Mr. Hardeman's

20  cancer was just idiopathic, that we can't determine the cause?

21  A.   No.  Using this methodology, you could never get to

22  idiopathic I don't think.

23       MR. KILARU:  Your Honor, I'm happy to keep going,

24  but --

25       THE COURT:  No.  It sounds like this would be a good

**ARBER - DIRECT / KILARU**

1   time to break for the day.

2        So, ladies and gentlemen of the jury, let me just give you

3   a quick minute -- let me give you a quick update on where we

4   are.

5        As I mentioned at the beginning of this trial, from time

6   to time we'll be asking you to deliberate in the middle of the

7   trial on specific questions, and we're getting to the point

8   where we're going to ask you to do that on Phase I, this issue

9   of medical causation that we've been dealing with here.

10       So what I expect in terms of timing -- sorry to make you

11  sit here and listen to this -- but what I expect in terms of

12  timing is that tomorrow morning we will wrap up with Dr. Arber,

13  and then we will go to closing arguments from the lawyers on

14  the Phase I portion of the case and you will begin your

15  deliberations.

16       What that means in terms of scheduling and terms of timing

17  is as follows:

18       As you know, I usually get you out of here at right around

19  2:30, give or take; but when you -- I want you to start

20  thinking about this now -- when you begin deliberating, and

21  you'll almost certainly begin deliberating tomorrow -- okay? --

22  when you are deliberating, you can collectively make the

23  decision to stay through the close of business; right?  You can

24  stay past 2:30 if you wish to continue your deliberation.

25       So you might even want to have a little bit of a chat

 1   about that now when you go back there to see if you're

 2   interested in going past 2:30 tomorrow.

 3        And then if deliberations go on to Thursday, you are

 4   also -- you can also come in and continue your deliberations on

 5   Thursday even though that isn't a normal trial day for us.

 6        So I wanted to plant those thoughts in your head right

 7   now, but you can plan on hearing closing arguments from the

 8   lawyers tomorrow and almost certainly begin your deliberations

 9   tomorrow.

10        With that, remember all my admonitions, and we will see

11   you tomorrow morning.  Please try to be here right at -- please

12   try to be in the building well before 8:30 so that we can start

13   right at 8:30 sharp.  Thank you.

14        **THE CLERK:**  All rise.

15   (Proceedings were heard out of the presence of the jury:)

16        **THE COURT:**  Okay.  You can step down, Dr. Arber.

17        Okay.  So why don't we get back together at 3:00 o'clock

18   and talk about jury instructions and closing arguments and

19   anything else that you-all need to talk about.  Okay?

20        **MS. MOORE:**  Thank you, Your Honor.

21        **MR. STEKLOFF:**  Thank you, Your Honor.

22        **THE CLERK:**  Court is in recess.

23                    (Recess taken at 2:38 p.m.)

24                (Proceedings resumed at 3:01 p.m.)

25        (Proceedings were heard out of presence of the jury:)

PROCEEDINGS

```
 1          THE COURT:  Okay.  So let me ask first on the jury
 2    instructions, are there any objections to any of the
 3    instructions other than causation?
 4          MR. KILARU:  Your Honor, we had one suggestion and
 5    then one additional instruction that we thought should be
 6    given.
 7          THE COURT:  Okay.
 8          MR. KILARU:  So the suggestion is on Instruction
 9    Number 9 -- this is the regulatory agencies one.
10          THE COURT:  Okay.
11          MR. KILARU:  We have two proposals.  I think first,
12    given that I think the evidence on both of these fronts has
13    been appropriately limited in how it comes in, our concern is
14    actually saying "other health organizations" may be a little
15    too vague in terms of making clear that what we are talking
16    about here is IARC.  So we proposed to change that to,
17    regulatory agencies and IARC have reached conclusions about,
18    because those are the bodies that we have focused on and the
19    bodies we are talking about when we get to this instruction.
20          THE COURT:  Yeah, I mean -- there was a mention of the
21    American Cancer Society today, for example.  Any objection to
22    that?
23          MS. MOORE:  Yes, Your Honor.  We wouldn't want to
24    single out IARC versus EFSA or EPA or anything else.  I mean,
25    we shouldn't just be singling out IARC as one that they
```

 1   shouldn't reach a conclusion about.

 2        THE COURT:  Okay.

 3        MR. KILARU:  Just on that, Your Honor, I think our

 4   point is that I think it is pretty clear that EFSA, EPA and

 5   Health Canada are regulatory agencies.  It is not as obvious

 6   that IARC fits into this, based on what the jury has heard,

 7   this category of other health organizations.

 8        THE COURT:  But the bottom line is when they --

 9   whether we word it you are proposing or the way I'm proposing,

10   they are going to know not to defer to IARC.  They are going to

11   know not to defer to EPA.  They are going to know not to defer

12   to EFSA.

13        MR. KILARU:  The concern is it is not clear that they

14   will with respect to IARC.  It is not obvious that this

15   instruction is applying to that.  I think the concern is it

16   could lead to the opposite, which is the jury thinks disregard

17   the regulators; but then there is this thing called IARC which

18   is part of the World Health Organization and we can take that

19   for what it is.

20        THE COURT:  Okay.  So I assume you might even say --

21   you might even propose EPA, EFSA and IARC have reached their

22   own conclusions.  You shouldn't substitute their judgment for

23   yours.

24        MR. KILARU:  I think that would be fine as well.

25        MR. STEKLOFF:  I have another concern, Your Honor,

 1  which is as phrased "other health organizations," I mean, I

 2  don't think this would happen, but it is possible they could

 3  think, say, the National Cancer Institute is another "health

 4  organization."  And we have been talking about the National

 5  Cancer Institute so much in the context of AHS.  And so I think

 6  without being specific, it is potentially problematic.

 7       We have no objection to specifying the regulatory agencies

 8  if that is a concern.  But I think the phrase "other health

 9  organizations" is too ambiguous for the jury, given -- and I

10  would specifically flag the National Cancer Society.

11            THE COURT:  What would be wrong with saying the

12  Environmental Protection Agency, the EFSA, whatever that stands

13  for and the IARC have reached conclusions about glyphosate?

14            MS. MOORE:  Your Honor, I don't think it is necessary.

15  I mean, we could go on and on with defining what this means and

16  what it entails.  I mean, I think the Court is going to be very

17  clear in your instructions to the jury that they are not to

18  substitute these conclusions for their own that they draw from

19  the evidence.  So I don't think we need to actually identify

20  one versus the other or all or go through the transcript and

21  try to figure out to make sure we have listed everything.

22            THE COURT:  Okay.

23            MS. MOORE:  I think the instruction is sufficient as

24  it is.

25            THE COURT:  I think you could also -- it should

1    probably say You have heard testimony that, and then whatever

2    phrasing we would use.  I think it would be fine to say you

3    have heard testimony that EPA, EFSA and IARC have reached

4    conclusions about glyphosate.

5           **MR. KILARU:**  That would be fine with us, Your Honor.

6           **THE COURT:**  Okay.  I think that is probably the most

7    appropriate way to do it.

8           **MS. MOORE:**  So how, Your Honor, would you be changing

9    that then?

10          **THE COURT:**  You have heard testimony that EPA, EFSA

11   and IARC -- and we will put the -- we will put the full names,

12   then in parentheses the acronyms, have reached conclusions

13   about glyphosate.

14          **MS. MOORE:**  Okay.  So you would just replace

15   "regulatory agencies and other health organizations" with that?

16          **THE COURT:**  Yeah.

17          **MR. KILARU:**  I think there might be one more,

18   Your Honor.  We can scrub to make sure we are not missing any,

19   but I think ECHA was discussed during --

20          **THE COURT:**  What is that?

21          **MR. KILARU:**  I don't know which acronym it stands for,

22   but I know they were talked about in the context.  The European

23   Chemical Health Association, I believe.  It came up in the

24   Portier deposition.

25          **THE COURT:**  Well, what is that?  Is that a regulatory

 1   agency.

 2          **MR. KILARU:**  Yes, it is.

 3          **MS. MOORE:**  Your Honor, again, this highlights the

 4   problem here.  I think that if the Court is going to give an

 5   instruction to this effect, which I believe that initially we

 6   objected to that, when we first saw the original jury

 7   instructions, that I don't think it is necessary to keep going

 8   through a litany of these.  I think what you have here would be

 9   sufficient.

10          **MR. KILARU:**  I think it is four things total based on

11   our review of Dr. Portier's testimony.  I don't know that it is

12   an unduly long list.  I think there are concerns as

13   Mr. Stekloff contributed with both the just the phrase "health

14   organizations."

15          **MS. MOORE:**  It is going to cause jury confusion, Your

16   Honor.  Because then what are they supposed to give weight to?

17   What are they not supposed to give weight to?

18          **THE COURT:**  Well, they are not supposed to give weight

19   to the EPA or EFSA or ECHA or IARC.  And they are supposed to

20   give weight to the AHS if they decide that it is worth giving

21   weight to.

22          **MS. MOORE:**  Right.  And, again, I think what they are

23   getting at is they are going to say in closing the AHS is part

24   of a governmental study, and so they are going to use this

25   instruction in their favor in that sense.

PROCEEDINGS

1    **MR. KILARU:**  I don't think we are going to tie

2  anything we say about AHS to this instruction, Your Honor.  I

3  think this instruction relates to the way in which we present

4  evidence of what the regulators do and what IARC did.

5        **THE COURT:**  Okay.  I think it would be appropriate to

6  list those four, and that is as of now, unless I tell you

7  otherwise, tonight that's what I will do.

8     You said you had one other thing other than causation?

9        **MR. KILARU:**  Yes, Your Honor.  There is, I think, a

10  pretty standard -- actually just on this instruction one other

11  suggestion.  I think this is less important but just wanted to

12  suggest it.  In your original instruction there was much more

13  text about IARC and risk versus hazard, and I think we agreed

14  that that doesn't need to happen given the testimony, but it

15  could be appropriate to include something like The question you

16  must answer here is different from the question those

17  organizations have considered, something like that.

18        **THE COURT:**  I think -- I -- I understand that

19  suggestion, but I think actually in light of this instruction

20  and in light of the limited way that that evidence has come in,

21  that's not necessary.  And I would want to refrain from saying

22  something that would further confuse the jury.

23        **MR. KILARU:**  Okay.

24     The other instruction, Your Honor, is that there is -- I

25  think pretty standard -- there is a California -- there is a

1    CACI version 104, and there's a Ninth Circuit model 4.1, just

2    an instruction about how corporations are entitled to the same

3    treatment as individuals.  4.1, the language is: All parties

4    are equal before the law and a corporation is entitled to the

5    same, fair and conscientious consideration by you as any party.

6        The 104 California instruction is a little bit longer.  I

7    but think those are pretty standard in cases involving a

8    corporate defendant and we ask that --

9            **THE COURT:**  Any objection?

10           **MS. MOORE:**  Yes, Your Honor.  With respect to

11   causation, I don't think that's necessary.  If we are talking

12   about liability of the company, I think that that would come

13   into play.

14           **MR. KILARU:**  It's still relevant given that we are

15   presenting evidence as to causation, and they are a

16   corporation.

17           **THE COURT:**  The question is whether this corporation's

18   product causes cancer and caused Mr. Hardeman's cancer.  I

19   mean, can you -- I understand the point you made.

20       Can you think of anything -- how -- can you imagine it

21   would create any problems giving this instruction?

22           **MS. MOORE:**  Well, it may create jury confusion,

23   Your Honor, with respect to the issue about just causation.  I

24   mean, I don't think it creates jury confusion when you are

25   talking about a liability instruction.  But in this situation

1   when we have limited it to one question that they are answering

2   on the verdict form, I don't think it makes sense to do that in

3   this case.

4        THE COURT:  I'm just pulling up the Ninth Circuit now,

5   the instruction.

6        MR. KILARU:  I think I might have said this, but it is

7   4.1, Your Honor.

8        THE COURT:  Okay.  I'm pulling these up on the Ninth

9   Circuit website, and it gives you a WordPerfect version.

10       MR. KILARU:  I saw that.  I had to find it elsewhere.

11  I haven't used that in a while.

12       (Whereupon, a brief pause was had.)

13       THE COURT:  Yeah, I think this is fine.  This is

14  appropriate to give now, so we will add that.

15       MR. KILARU:  That was all from us other than

16  causation, Your Honor.

17       THE COURT:  Okay.  Anything else from the Plaintiffs,

18  putting aside causation for the moment?

19       MS. MOORE:  Your Honor, I think the only thing was I

20  didn't know if we were going to have an instruction about the

21  video depositions and giving them the same weight as someone

22  who was a live witness here.  I know you have the What is

23  evidence, Instruction Number 2, and it says the sworn testimony

24  of any witness.  I think under the model instructions there is

25  something about video depositions.  And so I would have to go

1   back and pull that.  And I can get that for, Your Honor, too.

2        THE COURT:  Well, I have given that to them during

3   trial.  I have no problem with kind of repeating it as I give

4   them the instruction about what is evidence.

5        MS. MOORE:  Okay.  Thank you, Your Honor.

6        THE COURT:  We should -- so what I can do is just in

7   that Instruction Number 2, What is evidence, I will just say

8   the sworn testimony of any witness.  And as I instructed you

9   before, insofar as possible you should consider deposition

10  testimony presented to you in court in lieu of live testimony

11  in the same way as if a witness had been present to testify.

12       MS. MOORE:  That's fine, Your Honor.  There is a model

13  instruction.  It is 2.4.  I just found.

14       THE COURT:  I just read from it.

15       MS. MOORE:  Okay.  That's fine.

16     I think the only remaining issue, Your Honor, would be the

17  causation instruction.

18       THE COURT:  Okay.

19     All right.  On the causation instruction -- oh, I did want

20  to flag one more thing, just to make sure you noticed it.  On

21  the credibility instruction, Number 5, Credibility of

22  witnesses, I just wanted to make sure that you noticed that I

23  removed a portion of that instruction from the model on the

24  theory that it didn't seem particularly pertinent to this phase

25  of the trial.  It was the part of the model instruction that

**PROCEEDINGS**

 1   talks about how, you know, if you think somebody is lying about

 2   one thing you can disbelieve their entire testimony, if you

 3   want to; or if you think they are lying about one thing, you

 4   can still believe other parts of their testimony, if you want

 5   to.

 6        There -- there is a whole -- there is a kind of a series

 7   of clunky paragraphs on that topic in this model instruction

 8   that I thought I would propose to eliminate, at least for this

 9   phase.  I don't have superstrong feelings about it, but I just

10   wanted to make sure I flagged for you that I, in fact,

11   eliminated those paragraphs.

12        **MS. MOORE:**  Okay.  Thank you, Your Honor.  I have

13   pulled that up.  I don't have any objection to your removing

14   those two paragraphs.

15        **MR. KILARU:**  I think we would be inclined to leave it

16   in, but don't feel strongly about it, Your Honor.  I recognize

17   it is a fair amount of text.  I do feel that witnesses on both

18   sides have probably been impeached in one way or another.  It

19   is fair for the jury to consider that as they go to evaluate

20   the testimony.

21        **THE COURT:**  Well, my plan walking in was if one side

22   objected and wanted this -- that language in, I would put it

23   back in, even in my view it is not necessary.  It is from the

24   model.  I don't want to unwittingly deprive somebody of an

25   argument that they might want to make in closing.

 1              **MR. KILARU:**  We would prefer you to leave it in,

 2    Your Honor.

 3              **THE COURT:**  Okay.  Now, on causation.  Here's -- let

 4    me try and capture my struggle for you.

 5        On the one hand you have all this language from all these

 6    cases that talk about how a multiple causation instruction is

 7    going to be very rare, right.  And you say normally you give

 8    the but-for sentence and you don't give the multiple causation

 9    instruction.  It is going to be a very rare situation where you

10    do that, okay.

11        And my concern is that if -- if you are giving it in every

12    case where there are competing risk factors and one side says

13    Risk Factor A caused the medical condition, the cancer, and the

14    other side says Risk Factor B caused the cancer, and then you

15    must give the multiple causation instruction, all of a sudden

16    you are bringing in -- I would think anyway -- a significant

17    percentage of cases where medical causation is at issue.

18        And so something about that makes me feel uncomfortable,

19    all right.  And it makes me wonder, Well, maybe the way that

20    this rule should be interpreted is that you give the multiple

21    causation instruction only in a situation where we know that

22    two things contributed to the harm.

23        And in a situation where we know that two things

24    contributed to the harm, we have to make sure that the jury

25    understands that just because one thing contributed to the

 1    harm, that doesn't necessarily mean that you conclude that the

 2    other thing wasn't a substantial factor.

 3        So two fires are started at the same time and they both

 4    combine to burn down the barn, right.  Or they both combine

 5    into one fire and then the barn is burned down.  Even if one

 6    fire hadn't started, the other fire would have burned down the

 7    barn.  And therefore both --

 8        So I suppose that might be a way to interpret the rules'

 9    application narrowly.  In a way that comports with the general

10    statements that the Courts seem to intone that, you know, this

11    is going to be a rare instruction.

12        On the other hand, it strikes me as potentially misleading

13    to the jury to not have a multiple causation instruction in

14    this case and to have the but-for sentence.  I assume that

15    Monsanto would agree -- let's change the facts of this case a

16    little bit, okay.

17        Hypothetical:  I assume Monsanto would agree that if

18    somebody was negligently responsible for causing Mr. Hardeman's

19    hep C in the '60s, that Mr. Hardeman could sue them for causing

20    his non-Hodgkin's lymphoma, right?  Putting aside any statute

21    of limitations issue or whatever, right.  But you would agree

22    that he could sue the person who caused his hep C and --

23    assuming it was negligent -- and prevail on the causation

24    question in a jury trial, right?

25        **MR. KILARU:**  Right.  I think we think the standard

1  there would be but-for as well, but I think he could bring that

2  suit, yes.

3          THE COURT:  He could bring that suit, and he could

4  establish that hep C was a substantial factor in causing his

5  NHL.

6          MR. KILARU:  Yes.  I think if his theory were

7  different than here, which is that it was not hepatitis C.  But

8  I think sort of following what I understand --

9          THE COURT:  Right.  So you have, in fact, presented

10 evidence from which a jury could conclude that his NHL was

11 caused by hep C, right?

12         Or let me put it a little bit more precisely.  You have

13 presented evidence from which a jury could conclude that hep C

14 was a substantial factor in causing his NHL.

15         MR. KILARU:  Yes.  And not Roundup.

16         THE COURT:  Yes, you have also presented substantial

17 evidence that it was not Roundup.

18         So a jury could conclude that based on the evidence that

19 you have presented in this case.  But if the jury concludes

20 that, it doesn't automatically preclude the jury from

21 concluding that Roundup was a substantial factor, I would

22 think.

23         MR. KILARU:  I think that is not correct in this case,

24 Your Honor, at least based on the way the evidence has come in.

25 And that's ultimately what I think our bottom line argument on

PROCEEDINGS

1    this point, because this isn't a case where anyone has said

2    that the hepatitis C could have been caused by both or that at

3    the same time these things were --

4         THE COURT:  Meaning that the NHL could have been

5    caused by --

6         MR. KILARU:  I get it now.  There is one NHL, and

7    their expert, Dr. Weisenburger, has said, and I think we have

8    seen the charts and so on, it was Roundup and it was not

9    something else.  And our position is basically it wasn't

10   Roundup, and we have presented hepatitis C as an alternative.

11        But I don't think there is any basis in the record for the

12   jury to say, Well, based on what I have heard, if I believe it

13   was Roundup, I could still believe -- or if I believe it was

14   hepatitis C, I could still believe it was Roundup.  Because

15   they have been represented with binary alternatives, one or the

16   other.  I don't think in that.

17        THE COURT:  Right.

18        MR. KILARU:  -- in that circumstances --

19        THE COURT:  I suppose you would add that they could

20   have, if they wished, presented expert opinions which said,

21   number one, I believe that the NHL was caused by Roundup and

22   that Roundup was the only substantial factor.  But my secondary

23   opinion -- second best choice to use Dr. Levine's concept --

24        MR. KILARU:  Right.

25        THE COURT:  -- is that at a minimum, the Roundup and

1  the hep C combined to cause his NHL.

2        And by the way, there would have been -- had they chosen

3  to present such evidence, I assume there would have been

4  scientific support for it.  I mean, you disagree that there is

5  scientific support for the idea that Roundup causes NHL, but

6  assuming for the moment that, you know, the jury is allowed to

7  present that.  If you have two things that cause cancer, I

8  presume what it means, based on the testimony that has all come

9  in here over the last few days, is that the more -- the more

10 risk factors that are operating on this person, the more

11 genetic mutation and the more likely cancer is to result,

12 right?

13       And so they could have presumably presented that

14 alternative opinion, and they didn't.  And having not presented

15 expert testimony in support of that theory, they should not get

16 the benefit of the instruction.  That's your argument.

17            **MR. KILARU:**  Essentially --

18            **MS. MOORE:**  Your Honor.

19            **MR. KILARU:**  Essentially, yes, Your Honor.  I think if

20 they try to present that type of sort of combined or, I guess,

21 sort of synergistic cause theory, I don't think this is really

22 germane to your point, I would just say we might have

23 scientific and other validity challenges to that methodology.

24       And sort of taking that away, because I think that might

25 be an issue that comes up later in other issues, for now I

PROCEEDINGS

1    think that is essentially our argument that all we have is A or

2    not A.  And I think in a situation where you have A or not A,

3    there is really no -- we think no basis in California law from

4    departing from I think the general rule, which I think is

5    pretty clear, the general rule that we are in a but-for

6    situation.

7           THE COURT:  But -- but I guess the issue that I'm

8    struggling with is that you seem to be saying that the jury

9    must either -- sort of buy the Plaintiff's experts' theory or

10   the defense experts' theory.  Why can't they buy both?

11          MR. KILARU:  Because there has been no evidence that

12   will allow them to buy both.  The one side's view of the world

13   was that it was Roundup and not hepatitis C.  Dr. Weisenburger

14   crossed it off and said it has nothing to do with my opinion.

15   He was the only case-specific opinion they offered.  And

16   certainly no one from our side has said that Roundup and

17   hepatitis C can work together and you can still have Roundup as

18   the cause if hepatitis C were present.  I mean, ultimately we

19   have said -- as you know, our main position is that it wasn't

20   Roundup, and that's what we sort of focused on and that's what

21   I think the emphasis will be in closing.

22          I think we are entitled to present other things so that

23   the jury has other things to consider so we are not just saying

24   it wasn't Roundup.  But I don't think that means we are putting

25   in the juror's mind or presenting some valid scientific

```
 1    evidence that the two things can work together.  And that's
 2    what the jury would have to think for this -- it was both view.
 3    I don't think there is any evidence of that.
 4         THE COURT:  What if the jury -- what if the thought --
 5    you know what, I believe Roundup causes -- I have listened to
 6    the testimony, and I believe that Roundup causes NHL, general
 7    causation.  I buy the Plaintiff's argument on general
 8    causation.  And, you know, I view -- and I think there is a
 9    good argument that Roundup caused Mr. Hardeman's cancer, but
10    there is a really strong argument that hep C caused -- was
11    going to cause his cancer anyway.  Let's just say he would have
12    gotten it anyway from hep C.  He had active hep C for 39 years
13    after all.
14         So I believe that hep C is the strongest -- was the
15    strongest risk factor, and so I'm going to say that his cancer
16    was caused by hep C.
17         But they still -- I guess the way -- I guess you can see
18    that I'm struggling with this too.  I guess the way to put the
19    question to you is, is there a risk that if you include the
20    but-for sentence that the jury will say -- will think, oh, what
21    this but-for sentence means is that if I think he would have
22    gotten it from hep C anyway, then even if I think he got it
23    from Roundup, I should find for Monsanto.  That's my concern.
24         MR. KILARU:  I don't think based on the way you
25    phrased Option Number 2, Your Honor.  Because I think the last
```

 1  sentence you put in there captures that point.  But to me the

 2  really important point that we need to sort of shelter against

 3  the other side is the risk that the jury says could have been

 4  either, so therefore -- and I don't know which it was, but it

 5  could have been either, therefore, the Plaintiff wins.  That's

 6  why I think the but-for requirement is so essential.

 7      If I can just -- on the point you made about what if the

 8  juror -- this sort of hypothetical juror who thinks maybe it

 9  was possible that Roundup was in the mix, but I think

10  hepatitis C was, you know, overwhelmingly the substantial

11  factor here.  I think if the juror --

12          **THE COURT:**  Well, my hypo is a little different.  It

13  was my fault because I sort of -- it was pretty convoluted in

14  the way I tried to present it.

15          **MR. KILARU:**  That's fine.

16          **THE COURT:**  My hypo is -- okay.  So let's go to the

17  actual language of the proposed instruction.  Okay?

18          **MR. KILARU:**  Okay.

19          **THE COURT:**  Let's look at this sentence that says

20  Conduct is not a substantial factor in causing harm if the same

21  harm would have occurred without that conduct.  Okay.

22      The thing I'm worried about here is what if the jury says,

23  Well, I think the Roundup caused his cancer, but it would

24  have -- he would have eventually got the cancer anyway from

25  hep C.

1    **MR. KILARU:**  I don't think that's what we are arguing,

2    Your Honor, so I don't think that's really a concern about the

3    way the case has come forward.  The way we have presented the

4    case to the jury -- and I think the way both sides have

5    presented the case to the jury -- is that the substantial

6    factor is either one thing or the other.  And Dr. Weisenburger

7    actually used the term "substantial contributing cause" in his

8    testimony, and he said what that is in this case is Roundup.

9    It is nothing else.

10    **THE COURT:**  That's what makes this -- this case kind

11    of weird, right?  I mean, I would think usually you would have

12    an alternative expert opinion that says, you know, even if you

13    don't think it is the sole cause, the two things combine.

14    I believe, the two things combine to --

15    **MS. MOORE:**  And, Your Honor, for two things.  One, on

16    that sentence that the Court has pointed out that you are

17    worried about conduct is not a substantial factor in causing

18    harm, the same harm would have occurred without the conduct,

19    that is the but-for test.  And that has been repudiated under

20    California law for these kind of cases.

21    And I will just say that Dr. Weisenburger listed the risk

22    factors and included hepatitis C.  There is no question that a

23    juror -- and we can -- we will argue our position; they will

24    argue their position.  But the evidence is that

25    Dr. Weisenburger considered hepatitis C as a risk factor, just

1    like Dr. Levine did.  Dr. Levine says it is the most likely

2    cause.  Dr. Weisenburger says Roundup is the most likely cause.

3    But he also testified that he couldn't just eliminate

4    hepatitis C completely.

5         So absolutely a juror could say, you know what, I think it

6    is Roundup; also could be hepatitis C.  And but if they read

7    this sentence, they are going to find -- they would find for

8    Monsanto, if they are thinking that, Well, if it is also hep C

9    then I can't find for the Plaintiff.  But they also might have

10   said, We met our burden of proof.  I think it creates jury

11   confusion, and this is the case --

12        **THE COURT:**  I mean, the problem -- I will say on the

13   issue of jury confusion, I mean, one of the problems with --

14   when you are looking at Option 2 now, and we are looking at the

15   second paragraph, and one of the problems is that the -- the

16   first sentence and the second sentence seems somewhat at odds

17   with one another, right.  And that is a concern that I have

18   with that paragraph.  I'm just not 100 percent sure what the

19   solution is.

20        **MS. MOORE:**  Well, I think the solution is Option 1,

21   Your Honor.  Option 1 is very clear.  I mean, the first

22   paragraph -- the first paragraph of both, I believe, are

23   identical.  But the second paragraph for Option 1 is the one

24   that I think prevents jury confusion in this case.  California,

25   for product cases like this, is a substantial factor state.

1      **THE COURT:**  Well, can I ask you -- what do you think

2   is your best case for the argument for giving this instruction?

3      **MS. MOORE:**  Option 1, Your Honor.  Is that what you

4   are talking about?

5      **THE COURT:**  Either one.

6      **MS. MOORE:**  Well, I mean, in this case you have

7   multiple causes that are being presented to the jury.  And in

8   the case I pointed out, Your Honor, this morning, the Logacz

9   versus Limansky case, that is what happened in that case.

10  There was a defense expert who presented a causation theory and

11  a Plaintiff's expert that presented a causation theory.  And

12  the trial court did not offer the concurring causation

13  instruction and the Court of Appeals reversed on -- and said it

14  was reversible error not to do so in that case.

15      So in this situation the jury could absolutely find that

16  Roundup and hep C both contributed to his non-Hodgkin's

17  lymphoma, and they can still find for the Plaintiff because

18  Roundup was part of that.

19      **THE COURT:**  Well, you are using the word

20  "contributed."

21      **MS. MOORE:**  Okay.  Well, substantial factor.  I'm

22  sorry, Your Honor.

23      **THE COURT:**  Because -- I mean, that's important, I

24  think, because what you seem to be suggesting there is that the

25  jury find that even if one of them on their own didn't --

1  wouldn't have caused the cancer, they both combined to cause

2  the cancer.  And I don't think there was anything close to

3  testimony suggesting that, right?

4      **MS. MOORE:**  I mean, no.  Well, Dr. Portier

5  testified -- you will recall the George study, Your Honor, from

6  2010.  And Dr. Portier talked about Roundup is also a promoter

7  not just an initiator.  That was the mouse study where they put

8  Roundup on the skin of the mice.

9      And what they found in that study was that not only was

10 Roundup an initiator of the cancer cells, but it is also a

11 promoter of the cancer cells.  So we absolutely have evidence

12 before the jury that if they believe what Dr. Levine said

13 today, which is that the -- I think her word was "accident" --

14 happened somewhere in the 39-year period where the genetic

15 mutation formed, there is absolutely proof in the case that

16 Roundup could have been a promoter of that genetic mutation

17 that had been caused --

18      **THE COURT:**  But did Dr. Portier actual offer that

19 opinion?  Because I don't think -- I mean, he was talking about

20 it in the context of this one study.  But did he ever actually

21 offer an opinion that said, Number 1, I believe that Roundup

22 caused the NHL; but Number 2, even if you believe that hep C

23 caused the NHL, I believe that Roundup or hep C sort of caused

24 an initial genetic mutation that set off a chain reaction,

25 I believe that Roundup contributed to that chain reaction and,

1    therefore, resulted in Mr. Hardeman getting cancer?

2        I don't remember any testimony to that effect.

3        **MS. MOORE:**  I don't think -- well, I don't think he

4    said to that direct of a point, Your Honor.  But I don't think

5    he has to.  What he offered to the jury was evidence that

6    Roundup has been proven by the science to be an initiator and a

7    promoter.  And so that gives us the ability to make that

8    argument in closing arguments that Roundup -- if you believe

9    what the defense says.  I'm not saying that that's what we say.

10       But if you believe what the defense says, that Dr. Levine

11   says that he had this genetic mutation and it did not -- caused

12   by hep C, and it didn't go away with therapy, it stayed in his

13   testimony.  But he is also at the same time being exposed to

14   Roundup.  And we know from Dr. Portier's testimony that Roundup

15   is also a promoter of precancer and cancer.

16       And so absolutely we can make that argument in closing and

17   present that to the jury.  And so I do think in that situation

18   that it is only right that Option 1 be given versus Option 2.

19       **THE COURT:**  But you -- I mean, it seems a little

20   strange.  I mean, I understand the concept of taking little

21   snippets from different fact witnesses' testimony and then

22   putting together a theory for what happened.  But the purpose

23   of expert testimony is to get them up on the stand offering an

24   opinion.  And you seem to be saying, Even if you disagree with

25   Dr. Portier's opinion, you can take this little snippet from

1   his opinion that -- where he commented on a mouse study.

2   And -- the George study was a mouse study, right?

3         **MS. MOORE:**  Right.

4         **THE COURT:**  -- and, you know, you can use that to

5   conclude that even if the Defendants are right that hep C

6   caused the genetic mutation that led to the NHL, that -- that

7   the Roundup accelerated that process, isn't that the kind of

8   thing that you need expert testimony to support?

9         **MS. MOORE:**  Well, I think we have expert testimony

10  that Roundup is a promoter.  That is clear, and it is

11  undisputed in this case.  As you will recall, they have not

12  brought in one witness to dispute the animal studies in this

13  case.

14     And so that is the evidence undisputed.

15        **THE COURT:**  Where is his -- can you show me where his

16  testimony is?

17        **MR. KILARU:**  Your Honor, while that is happening, can

18  I make a broader point about the George study; is that okay?

19        **THE COURT:**  Sure.

20        **MR. KILARU:**  So I think the most fundamental point

21  here is that Dr. Portier wasn't a case-specific expert.  He was

22  by definition a general causation expert.  And in the context

23  of his testimony, he mentioned that there's this mouse study

24  that says if you paint one chemical on a mouse's skin and then

25  you paint another chemical, it can promote tumor activity.

 1          That has nothing to do and was not in any way tied to

 2    hepatitis C.  It has nothing to do with the conditions that

 3    Mr. Hardeman had.  And I know we're not getting into what

 4    regulators say, even IARC thinks the George study is not

 5    particularly credible and I think discredited it and didn't

 6    rely on it in its monograph.

 7          That's sort of more of a side point.  I think they also

 8    called Dr. Weisenburger; and if they had this belief that the

 9    George study -- I mean, Dr. Weisenburger opined on all the

10    science, including general causation.  If they had a belief

11    that there was some validity to this theory that George shows

12    that somehow Roundup promotes hepatitis C activity, you would

13    think they would ask him something about that or even talk

14    about the George study at all, but that didn't happen.  So I

15    don't think that can be a basis for justifying a jury

16    instruction.

17          THE COURT:  And I'm happy to hear what Portier's

18    testimony said, but I think that you have to be right,

19    particularly given that Portier was just a general causation

20    expert, that they actually -- I mean, this is a discussion

21    about the jury instructions, but it's also a discussion about

22    what can be argued to the jury and what cannot.  And it seems

23    to me -- I don't see how they could argue to the jury that the

24    Roundup accelerated the process by which hep C gave

25    Mr. Hardeman cancer.

1    **MR. KILARU:**  And I think Dr. Weisenburger's testimony,

2    I mean, I have some cites here, but he said on redirect, in

3    talking about hepatitis C (reading):

4        "I don't believe it was a cause and I don't believe

5        hepatitis B was a cause either for the same or similar

6        reasons."

7    And they were talking about it.  And then later, the last

8    question of the direct was (reading):

9        "What was the substantial factor in causing

10       Mr. Hardeman's non-Hodgkin's lymphoma?"

11   And the answer was not Roundup plus hepatitis C, Roundup

12   promoting hepatitis C.  It was:  It was the Roundup exposure,

13   period.

14       **MS. MOORE:**  Your Honor, I apologize.  We're looking

15   for the right report because it's not in the trial transcript.

16   Sorry.

17       **THE COURT:**  That's okay.  Wait.  What's not in the

18   trial transcript?

19       **MS. MOORE:**  You know, when we had the trial

20   transcripts, it doesn't include what was said in the

21   depositions, and so I have my trial transcript so I can't --

22   I've got to find the Portier run report.

23       **THE COURT:**  The Portier what report?

24       **MS. MOORE:**  What was actually played from

25   Dr. Portier's deposition because the transcript, of course,

1  that Jo Ann takes down, she's not taking down the deposition

2  testimony itself.

3        THE COURT:  Right.  Right.  Right.  Right.

4        MS. MOORE:  So I have the transcript of the trial but

5  not that.

6        THE COURT:  And we can circle back to that, but why

7  isn't Mr. Kilaru right that, you know, he was a general

8  causation expert?  He didn't testify about the interaction

9  between hep C and Roundup at all, much less the interaction

10  between hep C and Roundup as it relates to Mr. Hardeman.

11        MS. MOORE:  And I didn't say he did.

12        THE COURT:  How can you use that -- how can that

13  testimony be the basis for arguing that even if you disagree

14  with us that, you know, Roundup was the initial cause of the

15  cancer, you could find for us by concluding that Roundup

16  accelerated the development of the cancer?

17        MS. MOORE:  Because that's what the George study says.

18  The George study says Roundup is an initiator and a promotor.

19  That's what they showed in the George study.  That's what

20  Dr. Portier testified to; and that's about, you know, a

21  promotor as to genetic mutations in the cells.  It doesn't have

22  to be specific to hepatitis C, and I wasn't trying to imply

23  that he was because he did not do case-specific opinions.

24        THE COURT:  Okay.

25        MS. MOORE:  But regardless of -- regardless of that,

1    Your Honor, I mean --

2            **THE COURT:**  Okay.  So let's assume for the purposes of

3    this discussion, and you can point me to the Portier testimony

4    if you want, but let's assume for the purposes of this

5    discussion that I conclude that it would not be appropriate for

6    you to make that argument to the jury because there was not

7    expert testimony to support that argument.  Okay?

8            **MS. MOORE:**  Okay.

9            **THE COURT:**  So what can you argue to the jury and why

10   is this instruction needed to allow you to do it?  I mean,

11   obviously your primary argument to the jury is going to be

12   Roundup causes cancer.

13           **MS. MOORE:**  Right.

14           **THE COURT:**  Hep C didn't.

15           **MS. MOORE:**  Right.

16           **THE COURT:**  Okay.  Now, you are hoping to present an

17   alternative argument to the jury, and we need to talk about --

18   we need to figure out whether there's a basis in the evidence

19   for you to make that alternative argument to the jury; and then

20   if so, what should the instruction be.

21           **MS. MOORE:**  Sure.

22           **THE COURT:**  So what is the alternative argument here?

23           **MS. MOORE:**  The alternative argument is:  You could

24   believe both Dr. Weisenburger and Dr. Levine.  You could

25   believe that if you look at all the risk factors that apply to

PROCEEDINGS

 1   Mr. Hardeman, which they both agree that hepatitis C is a risk

 2   factor that applies, you could believe that Dr. Levine is

 3   correct that hepatitis C is a likely cause.  You could also

 4   believe that Dr. Weisenburger is correct that Roundup is a

 5   likely cause.  They're not mutually exclusive in that sense.

 6        I mean, obviously our number one argument is what the

 7   Court said.  Roundup caused his non-Hodgkin's lymphoma.  That's

 8   our case; right?

 9        But if you believe what the defendant says, which is what

10   happened in the Limansky case, if you believe what the

11   defendant says, that their expert says -- who said "I didn't

12   even consider Roundup in her analysis," but if you agree with

13   her that hep C was the most likely cause, you can also agree

14   with Dr. Weisenburger, and that's why we need this instruction,

15   Your Honor.

16             MR. KILARU:  Your Honor, can I respond on that?

17             THE COURT:  Sure.

18             MR. KILARU:  I think that -- I think what was just

19   described as an argument does not apt this case, and I think

20   it's actually a pretty critical distinction from the case that

21   counsel's mentioned.  This -- I'm not going to try to pronounce

22   it.  I would guess it's *Logacz*, but I don't know if that's

23   correct.

24        On page 157 of that decision --

25             THE COURT:  Wait.  Hold on.  Let me pull it up.

```
 1          MR. KILARU:  Sure.

 2          THE COURT:  Give me one second.

 3          MS. MOORE:  Which decision?

 4          MR. KILARU:  Logacz.

 5          THE COURT:  Sorry.  Wrong folder.  Hold on a second.

 6                      (Pause in proceedings.)

 7          THE COURT:  Here we go.

 8          MR. KILARU:  I don't know if you have the Westlaw

 9    version or the published version.

10          THE COURT:  Hold on a second.

11          MR. KILARU:  Sure.

12                      (Pause in proceedings.)

13          MR. KILARU:  I have a copy if Your Honor would like,

14    but I'm guessing --

15          THE COURT:  Yeah.  Why don't you hand it up to me.

16          MR. KILARU:  Sure.

17          THE COURT:  It's 71 Cal.App. 4th 1149?

18          MR. KILARU:  '49.

19          THE COURT:  Right.  I read this last night, but now I

20    need to refresh my memory on it again.

21          MR. KILARU:  So I think if you look at page 6 of what

22    I just handed you, Your Honor, there's a section marked "2.

23    The Trial Court" -- it starts "The Trial Court erroneously

24    refused to give plaintiff's requested instruction."

25          THE COURT:  Yeah.
```

1     **MR. KILARU:**  Okay.  So the last sentence of that

2  paragraph is I think the key distinction with this case.  It

3  says (reading):

4          "For purposes of this appeal, plaintiffs concede that

5      these other factors" -- which are the ones that the

6      defendants said was the cause -- "may have contributed to

7      Cynthia's death, but that the negligence of the doctor" --

8      which the jury found was also a cause -- "thus, the

9      principle of concurrent causation was and is a critical

10     part of plaintiff's case."

11     So I think that puts this more in the bucket of the two

12  fires case where everyone's sort of acknowledging that there

13  are two things going on.  And I think the point in those cases

14  of saying multiple causation not but for is that it would

15  allow -- it reveals basically a deficiency in the but-for test

16  because both people could say it was the other person.

17     But I think the proof here, not to torture an analogy, but

18  the proof here is actually if you had one side saying there was

19  a fire that burned down the house and another side saying there

20  was a stove in the house that ignited, and everyone would --

21  and I think the testimony here is that both of those things did

22  not happen, it was one or the other -- and in that

23  circumstance, Your Honor, I don't think it would make sense to

24  say the jury can believe both because a jury would have to

25  believe either it was the stove or it was the fire.

**PROCEEDINGS**

 1        And I think that's the case here given what

 2    Dr. Weisenburger said.  He said it was not hepatitis C.  It was

 3    Roundup.  And Dr. Levine, and I think Dr. Arber will say too,

 4    it was not Roundup.

 5        So I think in those circumstances saying the jury could

 6    believe both is a little like saying the jury could believe two

 7    witnesses who say the exact opposite things on a point of fact.

 8    I don't think you would give an instruction about concurrent

 9    cause if that was the factual scenario we were talking about.

10        **THE COURT:**  What -- okay.  Let's say the jury believes

11    that hep C would have caused Hardeman's NHL alone.  Okay?

12        **MR. KILARU:**  Okay.

13        **THE COURT:**  But let's say that the jury also believed

14    that Roundup was a substantial factor in causing his NHL.  In

15    other words, let's say they buy the idea -- buy Levine's

16    testimony and they buy Weisenburger's testimony.  I mean, why

17    couldn't the jury believe both of those things?

18        **MR. KILARU:**  Because I think no one has -- our defense

19    has not been even if it was the Roundup, he wouldn't have

20    gotten it anyway.  Our defense has been in every argument we

21    have made with the experts and throughout the case has been it

22    was not Roundup; and so I don't think the jury can have, based

23    on the proof they have been presented, those two ideas in their

24    head.

25        I mean, they're going to be told they have to evaluate the

 1    credibility of the witnesses, but here you literally do have

 2    sort of competing views of what happened.  So I don't think

 3    based on the proof in this case the jury could come to that

 4    view.

 5        It would be different perhaps if one of the experts had

 6    said, "You know, maybe these were both in the mix," or if

 7    Dr. Weisenburger said something like, "I can't rule out

 8    hepatitis C," or, "I think hepatitis C may be in the mix but

 9    Roundup is clearly more likely."  Then I think you could see a

10    world in which a jury could say, "Well, Monsanto might be right

11    that hepatitis C was the more likely cause, but I agree with

12    Dr. Weisenburger that Roundup was the cause."

13        But here that is just not what we have.

14            MS. MOORE:  But --

15            MR. KILARU:  We have two very different views of the

16    world that have been presented.  I think in terms of how we

17    plan to argue it, that would be the case as well.

18            THE COURT:  Why didn't you present testimony from an

19    expert that in the alternative, you know, the two could have

20    combined to cause his NHL?

21            MS. MOORE:  Well, Your Honor, if I could direct the

22    Court's attention to Dr. Weisenburger's testimony, and this is

23    on page 1313 of the transcript, and he was asked a series of

24    questions about hepatitis C and he was asked (reading):

25            "Hepatitis C just like hepatitis B can cause genetic

 1          mutations; right?"

 2      And he says, "Yes."  And then the question was (reading):

 3          "It can cause genetic mutations that ultimately lead

 4      to the development of NHL; right?"

 5      And he said, "Yes."  And then the question was (reading):

 6          "And so it is possible you can't rule out that in

 7      Mr. Hardeman specifically during that 39- or 40-year

 8      period he had genetic mutations that were caused by his

 9      active hepatitis C; correct?"

10      And his answer was, "Certainly possible."

11      And then the question was (reading):

12          "And so it's certainly possible that the hepatitis C

13      caused genetic mutations in Mr. Hardeman in the 1960s;

14      correct?"

15      And he says, "It is possible."  And then they go on to say

16  the '70s, the '80s, the '80s, and so on.

17      **THE COURT:**  Yeah, but he never offered expert

18  testimony either that -- I mean, he could have -- what he did

19  testify is, yeah, it's certainly possible but it's very, very

20  unlikely.  That was his testimony.  "My opinion is that Roundup

21  caused the cancer and that hep C didn't.  It was exceedingly

22  unlikely that hep C caused the cancer."  That was

23  Weisenburger's testimony.

24      It seems like he could have said one of a couple things.

25  He could have said, "Look, even if you consider hep C to be a

1    substantial factor, even if there's evidence to support a

2    conclusion that hep C is a substantial factor, I believe

3    Roundup was also independently a substantial factor and here's

4    why.  In other words, here's why I believe even if the jury

5    concluded that hep C participated in causing his cancer, he

6    would have gotten the cancer even if he had not -- from the

7    Roundup even if he had not had hep C."  And there's -- he could

8    have testified to that.

9         Or he could have said, "Even if you don't believe that

10   Roundup didn't cause the cancer on its own, I have -- my

11   secondary opinion is that Roundup and hep C combined to cause

12   the cancer."

13        And he didn't do either of those things, and now you're

14   saying you want to argue one of those two things to the jury.

15        **MS. MOORE:**  Well, what I'm saying is that there is

16   testimony by Dr. Weisenburger, which is what Dr. Levine was

17   testifying to today, that there was a genetic mutation.  He

18   agrees with Dr. Levine that it's possible that you could have a

19   genetic mutation.

20        She also testified that she couldn't say with certainty

21   that there was a genetic mutation.  That's her theory.  There's

22   no actual data or proof with Mr. Hardeman in particular that

23   there's a genetic mutation that still survived the treatment.

24   Okay?

25        And they both are saying that.  The jury heard both of

**PROCEEDINGS**

1    them say that.  So there's -- the jury absolutely could say,

2    "Okay.  There's a genetic mutation.  They both said that.  It's

3    caused by hepatitis C.  She says that's what caused the

4    non-Hodgkin's lymphoma.  He says it's the Roundup.  They both

5    could be right."  And that's what happened in the *Limansky*

6    case.

7         **MR. KILARU:**  But, Your Honor, I think what followed

8    that testimony -- so, yes, Mr. Stekloff asked those questions

9    of Dr. Weisenburger and got him to admit they were mutations,

10   but what followed is Dr. Weisenburger -- or maybe it preceded

11   it, I'm not sure -- but Dr. Weisenburger then said the

12   antiviral treatment killed all of those cells.

13        I mean, that was the purpose of -- that was what I think

14   counsel was trying to with Dr. Levine on cross today.  I mean,

15   that's why Dr. Weisenburger did this whole bit about how

16   sustained virological response -- "bit" is not the right word.

17   I shouldn't have said that, I suppose, but why he talked at

18   length about why sustained virological response eliminates

19   mutations in the cells.

20        He didn't just say "It will reduce your risk to cancer."

21   He said, "It reduces your risk" -- he says, "If you never had

22   hepatitis C at all."  He talked about how all of the cells that

23   would be affected would be killed, and Dr. Levine disagreed

24   with that today with -- the same articles that Dr. Weisenburger

25   talked about were presented to Dr. Levine, and that was the

 1   argument that was being presented to her when she was being

 2   cross-examined.

 3       So I don't think that the testimony that counsel pointed

 4   to gets them to being able to say it was both because what

 5   followed was Dr. Weisenburger saying "That theory doesn't

 6   work."

 7       **MS. MOORE:**  Your Honor, the bottom line is under

 8   California state law, which applies in this case, the but-for

 9   causation has been repudiated in favor of substantial factor

10   for sometime now.  I mean, the case is going back over 20

11   years.

12       **THE COURT:**  There's a -- that's not correct.  I mean,

13   the model instruction includes a but-for sentence, and then it

14   says "In a case where there are" -- and then the law says --

15   "In a case where there are independent concurrent causes, you

16   dispense with the but-for sentence and you give a multiple

17   causation instruction"; right?

18       **MS. MOORE:**  But, Your Honor, the jury could absolutely

19   find that these are not independent concurrent -- I guess

20   concurrent, that's redundant, isn't it?  They could absolutely

21   find that these causes are not independent.  They could hear

22   the evidence and say --

23       **THE COURT:**  Say the causes combined to cause the

24   cancer?  I mean, I just -- I don't think -- I mean, without

25   having elicited an expert opinion about that, I don't see how

 1    you can argue that to the jury.

 2         **MS. MOORE:**  But it's not that one party has to make

 3    that argument, Your Honor.  In the *Limansky* case, what the

 4    Court of Appeals looked at was that there was the plaintiff's

 5    expert who made one -- had one opinion and there was the

 6    defense expert who made another opinion; and they said because

 7    of those multiple causes that were presented to the jury, it

 8    was reversible error not to give the multiple causation

 9    instruction.

10         **MR. KILARU:**  Respectfully, Your Honor, I don't think

11    that's what the case says.  It says that when you have what I

12    think the jury instruction -- the note to 430 envisions, which

13    is concurrent independent causes, multiple forces operating at

14    the same time and independently -- actually, I'm not even sure

15    that qualifies in *Logacz* because I think in that case it's

16    referring to independent causes.

17         **THE COURT:**  But here's the thing.  I'm looking at

18    *Logacz* and, I mean, I think the key -- you know, I'm going to

19    go back and I'm going to read this decision more carefully

20    during a break and we'll continue this conversation at some

21    point; but, you know, what that case says is for purposes of

22    this appeal, the plaintiffs concede that these factors may have

23    contributed to Cynthia's death, not that they conceded at

24    trial; right?

25         **MR. KILARU:**  Right, but I think --

1      THE COURT:  And so it sounds like, from the way the

2  court is describing this at least, is that you had one side

3  saying "These factors contributed" and you have the other side

4  saying "These factors contributed."

5      MR. KILARU:  Right, but I think on the next page it

6  clarifies that actually.

7      THE COURT:  Okay.

8      MR. KILARU:  So I think on page 7, if you look at

9  the -- I guess the paragraph with the bold 7.

10     THE COURT:  Okay.

11     MR. KILARU:  It says (reading):

12      "Just as in *Hugh v. Candoli*, even if Dr. Limansky

13      established that, as a matter of law, that any one or all

14      of these factors was a cause of Cynthia's death, his

15      negligence could also have been a cause of her death

16      acting in combination with them.  Multiple or concurring

17      causes of death do not preclude recovery."

18     THE COURT:  Right.

19     MR. KILARU:  And on that theory the court said you

20  needed to give the multiple causes instruction because the jury

21  could have concluded that multiple things were happening at the

22  same time and working together.

23     THE COURT:  Right.

24     MR. KILARU:  But that is not what we have here, and so

25  I think --

1          **THE COURT:**  And that gets back to my point -- I mean,

2   I tend to agree with you that that's not what we have here.  I

3   think we probably could have had that here.  I think the

4   plaintiffs probably could have presented an expert opinion to

5   that effect.  I don't know.  I'm not the scientist here; but,

6   you know, sort of the understanding I've developed over the

7   course of this case that they probably could have presented

8   such an opinion, but they didn't present that expert opinion.

9          And so, you know, it seems like they probably would be

10  precluded from arguing that the two things combine to cause

11  Mr. Hardeman's NHL.

12         But what about -- I mean, it still doesn't quite answer

13  the concern that I have, the primary concern that I have, which

14  is that if they would have thought -- if they thought that he

15  would have gotten it anyway from the hep C, then that is sort

16  of end of the inquiry for them where it shouldn't be because

17  they should still be asking whether Roundup was a substantial

18  factor in causing his cancer.

19         **MR. KILARU:**  I do think that making that the focus of

20  the inquiry is a little concerning given that the plaintiffs

21  ultimately have the burden of proving that it was Roundup, and

22  we do not have the burden of proving that it was hepatitis C.

23         **THE COURT:**  Correct.

24         **MR. KILARU:**  I think to the extent you have that

25  concern, I mean, I think our top-line position would be that

1  the instruction that should be given is actually the version --

2  is version two minus the last sentence; but I do think that the

3  last sentence gets, I believe, to the point that you're making.

4       But I think that it's important to have that but-for

5  language in there under California law because it is a but-for

6  state except in the circumstance where you have these sort of

7  multiple causes working together.

8       And I would point out -- I don't know if Your Honor has

9  this case, and I can give you a copy of it -- I'm not

10  necessarily saying that if you had this type of opinion offered

11  by an expert, you know, it would automatically justify a

12  multiple causes instruction.  But there's this case *Cooper*.

13  It's 239 Cal.App. 4th 555, and it's a case about the multiple

14  causes instruction.  And I think in that case what the expert

15  did --

16          **THE COURT:**  Sorry.  What was the --

17          **MR. KILARU:**  Sorry.  It's 239 Cal.App. 4th 555.

18          **THE COURT:**  *Cooper versus*?

19          **MR. KILARU:**  *Takeda Pharmaceuticals*.  I think it's

20  been cited in the design briefs as well so it covers a lot of

21  issues.

22          **THE COURT:**  Okay.

23          **MR. KILARU:**  But in that case the doctor -- the court

24  found that a multiple causation -- or didn't say that there was

25  error in giving a multiple causes instruction because the

 1   expert didn't rule out a different risk factor.  So the

 2   plaintiff was saying it was negligence, I believe, or design

 3   defect, and the defense was saying that smoking somehow played

 4   a role into the cause.

 5       And the plaintiff's expert said, "I'm not ruling out

 6   smoking.  I just think that the design -- the negligence was a

 7   greater factor."  And that is not what we have here.

 8       So, again, not necessarily committing to what I think

 9   should happen in that situation, but here you don't even have

10   that.  I mean, that might be a situation where something like

11   what Your Honor is concerned about would be a substantial

12   concern; but I think in this case, based on the way it's been

13   presented and the way it's been argued, there really is no

14   evidentiary basis for the plaintiffs to say that you can

15   believe two experts when the two experts said the opposite of

16   each other and sort of defined their methodology in opposition

17   to each other and where the plaintiffs' expert expressly ruled

18   out and said it was impossible for that to have been a cause

19   because anything -- the theory that we offer for how that could

20   have happened was completely eradicated by this treatment.

21       MS. MOORE:  Your Honor, on the *Limansky* case, it

22   wasn't that anyone offered the testimony that both experts,

23   both the plaintiff and defense experts, could be right.  It was

24   that the Court of Appeals -- and this is in that same paragraph

25   that was just read by Monsanto's counsel -- it says that

1  (reading):

2        "Even if Dr. *Limansky* establishes as a matter of law

3     that any one or all of these factors were a cause of

4     Cynthia's death" -- and those are what the defense

5     raised -- "his negligence" -- what the plaintiff raised --

6     "could also have been a cause of her death acting in

7     combination with them."

8        The plaintiff didn't say they acted in combination with

9  the defense.  The defense didn't say they acted in combination

10 with the plaintiff.  That's what the court is putting that the

11 jury could make that conclusion when they weighed the evidence

12 of the case.  That's why we think that option one is correct

13 under California law.

14        **MR. KILARU:**  Obviously I don't have the record in that

15 case, Your Honor, but I'd be surprised if Dr. Limansky had said

16 that it was impossible for the other side's theory to be

17 correct and conclusively ruled it out, which I think is what we

18 have here.

19        **THE COURT:**  Well, neither expert said it was

20 impossible.  Well, scratch that.  Weisenburger did not say it's

21 impossible that it was hep C.

22        **MR. KILARU:**  Well, I believe --

23        **MS. MOORE:**  Correct.

24        **MR. KILARU:**  -- he was impeached on that point; but I

25 think we when we presented the theory -- I mean, it's exact

 1 | thing that was read earlier -- he said it is not the

 2 | substantial factor.

 3 |      **THE COURT:**  Yeah.

 4 |      **MR. KILARU:**  And when he was presented with the theory

 5 | of how it could have happened, he said that was false because

 6 | the cells would have been eliminated.  He offered that

 7 | testimony several times.

 8 |      **THE COURT:**  So -- hold on one second.  I'm just

 9 | looking at your brief.

10 |      **MR. KILARU:**  Yes, Your Honor.  I think this morning

11 | you had asked about cases.  We do have some we can point you

12 | to, but I'll wait for that.

13 |      **THE COURT:**  Okay.  Just give me a second.

14 |      **MR. KILARU:**  Sure.

15 |          (Pause in proceedings.)

16 |      **THE COURT:**  See, I'm looking -- I'm on your brief at

17 | page 4.

18 |      **MR. KILARU:**  Okay.

19 |      **THE COURT:**  And this is part of what has me a little

20 | bit tied up in knots.  I mean, you're talking about the *Xavier*

21 | court; right?  And you're saying the court in *Xavier* declined

22 | to apply the concurrent independent cause exception in a case

23 | involving allegations that the defendant's product caused an

24 | increased risk of lung cancer because apart from defendant's

25 | alleged misconduct, no other independent event or circumstance

 1   was alleged to be a sufficient cause of this harm.

 2        Here there is another independent event or circumstance

 3   that the defendant alleges is sufficient to cause this harm;

 4   namely, hep C.  Right?

 5             **MR. KILARU:**  Yeah.  So I think -- I'm sorry.

 6             **THE COURT:**  And then you go on and you talk about

 7   how -- you know, you said courts -- you cite *Mays* and you say

 8   declining to find concurrent independent causes -- declining to

 9   find concurrent independent causes because the plaintiff

10   alleged that harm was brought about by a combination of a

11   doctor and a surgeon's negligence.

12        I guess what I'm saying to you here is that it seems like

13   the plaintiffs have not presented evidence that it was caused

14   by a combination of the doctor and the surgeon's negligence.

15   They haven't presented any expert opinion that it was the

16   combination of hep C and Roundup; right?

17             **MR. KILARU:**  Yes.

18             **THE COURT:**  I know they disagree with that, but I

19   think that's correct.  But there has been -- Monsanto has

20   presented evidence of an independent event or circumstance that

21   it alleges is sufficient to cause the harm.

22        And so in that circumstance why wouldn't we say that even

23   if Monsanto is right, that it's sufficient to cause -- that

24   hep C was sufficient to cause the harm, you don't automatically

25   find in favor of Monsanto based on that?  You have to ask

 1   whether Roundup was also a substantial factor.

 2        **MR. KILARU:**  Because I think it goes back to the first

 3   point you raised, and I think there's another case that I think

 4   is very helpful on that point, but it goes back to the first

 5   point you raised because essentially what that means is that

 6   whenever the defense doesn't just say it wasn't Roundup and

 7   points to something else, that but-for causation is out of the

 8   picture, and I think that that would eliminate but-for

 9   causation in way too many cases.

10        **THE COURT:**  That's the problem.

11        **MR. KILARU:**  And so I think *Vecchione*, and I know

12   Your Honor mentioned potentially some concerns with the case,

13   but I think that's one of the cases that really directly

14   addresses this point.  Because in that case -- and I have a

15   copy if Your Honor would like.

16        **THE COURT:**  No, I have it.

17        **MR. KILARU:**  In that case, if you look at -- I have

18   the Westlaw version, so I guess it would be page 5, but if

19   you're looking at asterisked pages it would be page 359.

20        **THE COURT:**  Wait.  Hold on.

21        **MR. KILARU:**  Sure.

22                        (Pause in proceedings.)

23        **THE COURT:**  Hold on.

24      (Whereupon, a brief pause was had.)

25        **MR. KILARU:**  So there is a paragraph that says -- I

**PROCEEDINGS**

 1   think this starts to get at the concern -- The but-for rule,

 2   along the rule of finding causation in this state, serves to

 3   well to define what is legal causation but fails in the type of

 4   situation where several causes concur to bring about an event,

 5   and either one of them operating alone could have been

 6   sufficient to cause the results.

 7        But then at the end of that paragraph it points out why

 8   that case is different.  Here there was substantial dispute

 9   between the parties, but each contends there was a single cause

10   for the death.  Either the prenatal distress resulting in DIC

11   was the cause of death -- I think that was the Plaintiff's

12   position -- excuse me, that was the Defense's position -- or

13   the over-heparinization brought it about.  That was the

14   Plaintiff's position.

15        And I think this is the next line.  I don't even think

16   this is the case here, but I think this is an important line.

17        The Plaintiff expert specifically put the cause as

18   over-heparinization and ruled out DIC as a cause, though he was

19   willing to admit DIC could have been present.

20        And the Court says the Defendant's experts on the other

21   hand contended the cause was DIC and there was no heparin

22   overdose.  Under these circumstances the but-for clause is not

23   improper.  And I think because in that circumstance you have

24   two completing causes that are being alleged, and it is really

25   not that different if the defense says it just wasn't the thing

PROCEEDINGS

 1   you are saying was the cause.

 2        **THE COURT:**  But the problem is there -- I think the

 3   problem with that case is it was disputed whether there was

 4   over-heparinization, right, which is an overdose of the drug,

 5   as I understand.

 6        **MR. KILARU:**  Yeah, it is a blood thinner, but yes.

 7        **THE COURT:**  And so it was disputed whether there

 8   was -- this was an overdose of the drug; is that right?

 9        **MR. KILARU:**  Yes.

10        **THE COURT:**  Okay.  And there was a dispute about

11   whether there was an overdose of the drug.  There wouldn't have

12   been a dispute -- if there had been an overdose of the drug,

13   there would not have been a dispute that it was a cause of the

14   harm, right?

15        **MR. KILARU:**  I'm not sure -- at least based on this

16   paragraph, I'm not sure, Your Honor, because I think here the

17   Court is saying the two sides just presented different theories

18   of causation.  I think that is the key point.

19        One side it was over-heparinization.  The other side may

20   have disputed that, but they said -- it seems like they said

21   almost regardless, there was this other thing that caused it,

22   and for that reason it wasn't the over-heparinization.  And

23   that I think was the closest analogy to what we have here.  I

24   think it is much closer to -- what we have here is much closer

25   to this.

1    **THE COURT:**  So you think Vecchione is your best case

2  for the proposition that the instructions -- the multiple

3  causation instruction is not appropriate here?

4    **MR. KILARU:**  I point to three things, Your Honor.

5  That would be one of them.  I think the instruction itself -- I

6  don't mean to be circular here -- but I think the notes on the

7  instruction itself say that you apply -- that but-for is

8  well-acknowledged in California, and the circumstance in which

9  you don't apply but-for causation -- or one of the

10 circumstances in which you wouldn't give that supplemental

11 instruction is where you have multiple forces operating at the

12 same time and independently.  I don't think that's what we have

13 here based on the proof we have, and there are cases that sort

14 of cite that point; but I don't think they illuminate it beyond

15 what is in the instruction.

16    **THE COURT:**  But -- and that -- I mean, I get your -- I

17 get the point about Vecchione, but multiple forces operating

18 independently, I mean, we do have evidence in the case of

19 multiple forces operating.

20    **MR. KILARU:**  Right, but I think --

21    **THE COURT:**  And we don't have evidence of them

22 operating in combination.

23    **MR. KILARU:**  Right.

24    **THE COURT:**  Right?

25    **MR. KILARU:**  Yes.

1      **THE COURT:**  But we have evidence that of one force --

2  that one force caused the cancer.  And we have evidence that

3  another force the cancer.

4      **MR. KILARU:**  I think --

5      **THE COURT:**  The jury has to consider all of that

6  evidence together.

7      **MR. KILARU:**  And I think they are not -- this is where

8  it gets a little semantic, but I think the difference is they

9  are not operating based on the proof at the same time.  One

10  group is -- we are saying it was the hepatitis C.  They are

11  saying it was the Roundup.  No one is saying the two things

12  were sort of colliding with each other.

13      **THE COURT:**  Right.

14      **MR. KILARU:**  I think the situation where it is more

15  analogous what you are talking about would be, say, in an

16  asbestos case where there are five products at issue, and each

17  Defendant is saying, Well, I mean, there are five products.

18  You can't say it was mine because there were other products at

19  issue; multiple factors operating at the same time

20  concurrently.

21      But I think it is different from a case like this one

22  where there are two things that are being argued that no one is

23  saying they operated at the same time.  We are saying -- you

24  know, they are saying it was Roundup.  We are not saying it was

25  Roundup; we are saying it was something else.

1          **MS. MOORE:**  That was the Limansky case, Your Honor.

2   And that case --

3          **THE COURT:**  Wait.  Wait.  Hold on.  You said you had

4   three things that you wanted to make sure we focused on.

5          **MR. KILARU:**  Yes.

6          **THE COURT:**  One was Vecchione.  The other was the

7   notes on the instruction.

8          **MR. KILARU:**  Yes.  And the last was is a case

9   called -- it's an unpublished case so I recognize it has less

10  value for that reason -- but it is a case called *Hudson V Lenz*,

11  and the cite is 2004 Westlaw, 823 492.  And in that case there

12  is a discussion of, I think, the concerns that we are talking

13  about here, which is -- I will just read a paragraph, if I

14  could at the end.  This is on page star 10.  If you have the

15  Westlaw version, it would be on page 8 at the bottom.

16      Were a concurring cause instruction required -- and

17  I guess I should go back a little bit.

18      We are aware of no California authorities holding that the

19  jury must be instructed on concurring causes in a medical

20  malpractice case involving only one actor in a contention by

21  the physician that the disease was the sole cause of

22  Plaintiff's damage.

23      So there was a disease and there was negligent sort of

24  alleged.

25      And the Court continues:  We do not agree that such a

1   broad application of BAJI 377 -- which I think is the

2   predecessor to what we are talking about here -- to medical

3   malpractice action is appropriate.  Were a concurring cause

4   instruction required in such instance, it would be necessary in

5   virtually every case in which the Plaintiff claimed that the

6   medical negligence caused the injury or death, while the

7   defense asserted that the damage was the result of a natural

8   disease process.

9        So I think it is the essential same point as in the

10  Vecchione case.  And we have cited other cases that make this

11  point generally about how, I think, this exception should not

12  swallow the but-for rule.  So those are the points we

13  emphasize.

14       THE COURT:  Okay.  And then can you think of any other

15  way, you know, before I turn to you and your -- the primary

16  authorities you want me to focus on -- the question, again, is

17  if the jury thinks the evidence was really strong for both.

18       MR. KILARU:  Right.

19       THE COURT:  Really strong for both.  And, you know, is

20  there any language that we could use that would make sure that

21  the jury doesn't just call it a day once they have concluded

22  that the evidence was really strong for hep C?

23       MR. KILARU:  I think --

24       THE COURT:  They have to continue to engage in an

25  inquiry about Roundup.  That's the basic concern.

1      **MR. KILARU:**  I think the language you have at the end

2  of two gets to that point, but I guess I would say one broader

3  point, which is that I think based on the way the evidence has

4  come in in this case, if the jury believed that the evidence

5  was strong on both sides, we should win because in this case we

6  have said it was one thing.  They have said it was another

7  thing.  They have the burden of proof.

8      So if the jury can't decide between two alternate

9  competing causes that have been proffered that are both strong,

10  that's actually a reason that we should win.

11      **THE COURT:**  But what you are saying is that -- so you

12  are saying that the second sentence of -- sorry, the second

13  sentence of the second paragraph --

14      **MR. KILARU:**  Yes.

15      **THE COURT:**  -- of the second option --

16      **MR. KILARU:**  Yes, twos all around.

17      **THE COURT:**  -- sort of gets at this concern.  So what

18  if it said -- what if it said, Generally, conduct is not a

19  substantial factor in causing harm if the same harm would have

20  occurred without that conduct.  However, if you conclude that

21  Mr. Hardeman has proven that his exposure to Roundup was

22  sufficient on its own to cause his NHL, then you should find

23  for Mr. Hardeman, even if you believe that other risk factors

24  were also sufficient to cause NHL on their own.

25      **MR. KILARU:**  I know we are talking about one word, but

PROCEEDINGS

1  I think we would oppose that, Your Honor, because I think first

2  it would suggest that but-for standard -- which I think should

3  ordinarily apply -- maybe shouldn't apply in this case.

4       **THE COURT:**  But isn't that the law, that generally the

5  but-for standard does apply?

6       **MR. KILARU:**  Right, but I think -- sorry.

7       **THE COURT:**  Except in a situation where you have two

8  independent forces that could each on their own have caused the

9  cancer.

10      **MR. KILARU:**  Yes.  So I think the answer to that is

11  actually -- I think that would be our top-line position; that

12  you actually shouldn't have the second sentence at all because

13  unless you are in -- the second -- you know, twos all the way

14  down -- the second sentence of the second paragraph, because

15  unless you have that type of situation, but-for is the rule.

16      So I understood this second sentence to be Your Honor

17  trying to address that concept.  And I think if we had to put

18  our positions in order, I think based on what I said earlier

19  and based on the proof, I think the instruction should be

20  Number 2; and I think it should end without that conduct,

21  because here there have been two competing things offered.  And

22  if the jury is sort of equipoised between those two, that means

23  the Plaintiff has not met their burden.

24      But I think that to the extent Your Honor believes some

25  extra language is necessary, I don't think the solution would

1    be to dilute and suggest that but-for doesn't apply.  And I

2    think it might be to add additional language, but my concern is

3    that generally to suggest that we are actually farther away

4    from the baseline but-for cause situation.  I think we are

5    there.

6         THE COURT:  But -- so what would be an alternative

7    that would -- because the problem with the way I have written

8    it, I think, is that Sentence 1 and Sentence 2 seem to be at

9    odds with one another.

10         MR. KILARU:  I understand that, Your Honor.  But I

11    think in some ways the problem with that is the way the

12    evidence has come in in this case because I think what 2 is

13    grappling at is this possibility that the jury could think they

14    were both, and if they are both, then, you know, that doesn't

15    necessarily mean we are off the hook or I suppose it gets maybe

16    at the point that if they think he would have gotten it as a

17    result of hepatitis C, no matter what, they are not going to

18    consider Roundup.

19         But I think that here, really the jury has been given two

20    competing options.  It is A or B.  And so I think the first

21    sentence is all that is needed.  I think this might have been

22    the initial proposal, but I understand that you continued to

23    think about it.  But I think it is A or B based on the

24    evidence, based on the testimony of Dr. Weisenburger.  So I

25    don't think any additional language is necessary.  I think this

 1  probably comes close to getting it at that point, but I don't

 2  think that point is live in this case.

 3          THE COURT:  Let me ask you one other quick question

 4  here.  Hold on.

 5      (A brief pause was had.)

 6          THE COURT:  Okay.  So let me -- I mean, you know, I

 7  wonder if we are dancing on the head of a pin here -- but what

 8  if it said Conduct is not a substantial factor in causing harm

 9  if the same harm would have occurred without that conduct.

10  Okay?  That first sentence.

11      And then what if it then said, With respect to Roundup and

12  hep C, however, if you conclude that either would have caused

13  Hardeman's NHL alone -- if you conclude by a preponderance of

14  the evidence that either would have caused Hardeman's NHL

15  alone, you must find for Hardeman because there can be more

16  than one substantial factor in causing someone's disease.

17          MR. KILARU:  Your Honor, I think that they have -- did

18  you say would have or could have?

19          THE COURT:  Would have.

20          MR. KILARU:  I think -- I don't think -- I'm not sure

21  that that works, Your Honor, for I think the same reasons that

22  we have been talking about here because the jury has been told

23  it is either A or B.  And I think if they think it could be

24  either A or B, the Plaintiff shouldn't win in that circumstance

25  because the Plaintiff has to prove in this case based on the

1    proof that it was Roundup.

2        I mean, what this instruction does is basically tell the

3    jury, if you can't decide between two risk factors -- I think

4    the concern is it basically tells the jury, If you think there

5    is strong evidence on both sides, then Mr. Hardeman wins.  And

6    I don't think that's the way the burden of proof operates in

7    this case especially given that they have been giving sort of

8    competing views of the --

9        MS. MOORE:  But that is ignoring the first paragraph,

10   Your Honor, which is Mr. Hardeman must prove by a preponderance

11   of the evidence that Roundup was a substantial factor in

12   causing his non-Hodgkin's lymphoma.  They still have to show --

13   they still have to find that Roundup was a substantial factor.

14       I mean, again, I just want to be very clear.  Our position

15   is Option 1 is the correct position under California law, but I

16   don't think what Monsanto's attorney just argued right then is

17   accurate because that is taken care of in paragraph 1.

18       THE COURT:  Okay.  So what I want to hear from you now

19   is do you have any other argument -- I mean, as of now where we

20   are is that the Plaintiffs are -- may not argue to the jury

21   that the two things combined to cause the cancer because there

22   is not an expert opinion to support that, and there is not

23   really even any scientific evidence to support that.

24       And so Task Number 1 for you is to talk me out of that.

25       MS. MOORE:  Okay.

1    **THE COURT:**  And then task Number 2 is to get back to

2  this instruction and figure out if we -- if we can have -- if

3  we should be having some concurrent independent cause-type

4  instruction, as opposed to a concurrent independent cause,

5  which is what you are now arguing.

6    **MS. MOORE:**  I understand, Your Honor.

7    As to the first question, I do have Dr. Portier's

8  testimony pulled up now.  This appears on line -- I'm sorry,

9  page 156, and it is lines -- let's see -- starting at line 18,

10  and it goes on through page 157.

11    Dr. Portier was asked about the George study in particular

12  and said:  Is that consistent with what you are seeing in the

13  rodent data for glyphosate?  And he says, Partially.  Obviously

14  it is addressing the question of promotion, which means that

15  you already have these initiated cells.  Living can cause

16  mutations to occur.  And so it is conceivable that glyphosate,

17  all of these tumor findings we are seeing here are glyphosate

18  promoting out already effects.

19    And he continues on --

20    **THE COURT:**  That was his testimony?

21    **MS. MOORE:**  This is Dr. Portier's testimony.

22    **THE COURT:**  It is conceivable?

23    **MS. MOORE:**  Yes.

24    **THE COURT:**  Okay.

25    **MS. MOORE:**  And then he continues on, Your Honor.  I

```
 1    can keep going if you want me to, but -- he says:  Promoting
 2    out already effects.  He goes, I don't think it is likely, but
 3    it is conceivable that's the case.  The initiation promotion
 4    study is simply showing you that one system --
 5            THE COURT:  Wait.  You said -- wait.  Sorry.  Could
 6    you read that one more time?
 7            MS. MOORE:  Sure.  He goes, I don't think it is likely
 8    but it is conceivable that's the case.
 9            THE COURT:  What is conceivable that that's the case?
10    Can you refer back to the testimony that he is saying is not
11    likely but conceivable?
12            MS. MOORE:  Yes.  That is the initiation -- the
13    question of promotion, Your Honor.
14            THE COURT:  Okay.
15            MS. MOORE:  The very first part of his answer is it is
16    addressing the question of promotion.
17            THE COURT:  So he is saying he doesn't think it is
18    likely that it is promoting?
19            MS. MOORE:  He says it is conceivable that's the case,
20    and he continues.  He says:  The initiation promotion study --
21            THE COURT:  Wait, wait.  You just skipped over
22    something.  It is -- okay.  Read it again.
23            MS. MOORE:  Sure.  Okay.  I will start at the very
24    beginning, Your Honor.
25            THE COURT:  Yeah.
```

1       **MS. MOORE:**  Okay.  Let me back up.

2       This is the very beginning of his answer, and it starts at

3    156, line 23.  Partially.

4       Let me read the question because I think that's part --

5    156, 18:  Well, then let me ask you this question.  The George

6    study, this positive finding there, what is that consistent

7    with what you are seeing in the rodent data for glyphosate?

8       And the answer is:  Partially.  Obviously it is addressing

9    the question of promotion, which means that you already have

10   these initiated cells.  Living -- I don't know why it says

11   living here -- living can cause mutations to occur.  And so it

12   is conceivable that glyphosate, all of these tumor findings we

13   are seeing here are glyphosate promoting out already effects.

14   I don't think it's likely but it is conceivable that's the

15   case.

16      And then he continues:  The initiation promotion study is

17   simply showing you that in one system, the skin, glyphosate has

18   this ability to promote out cancer.  That is all it really

19   means.

20      So --

21          **THE COURT:**  So there is no expert testimony that would

22   support an argument -- I mean, if that's all you have --

23          **MS. MOORE:**  No, I don't, Your Honor.

24          **THE COURT:**  Okay.

25          **MS. MOORE:**  If you continue on to page 157 at line 16,

**PROCEEDINGS**

1    he is asked:  Does it have any influence -- meaning it, the

2    George study -- have any influence on whether or not it could

3    promote a mutation to lead to cancer?

4         And Dr. Portier's answer is:  It certainly increases the

5    chances.  That might be the case because now you have evidence

6    to suggest glyphosate can do that.  But I would want to see a

7    lot more evidence before I would go there and start thinking

8    about that.  There are initiation promotion studies you can do,

9    and he continues on for a while about initiation promotion

10   studies.

11        **THE COURT:**  Okay.  So what you just read me is sort of

12   the opposite of evidence to support the argument that you are

13   proposing to make.  I mean, it's an expert who is not willing

14   to offer any sort of opinion remotely close to the argument

15   that you are proposing to make, putting -- even putting aside

16   the fact that it was just general causation testimony and not

17   specific causation and not related to hep C at all.

18        So if that's your evidence to support your argument that

19   Roundup and hep C combined to cause his cancer, you cannot make

20   that argument at closing.

21        **MS. MOORE:**  I understand, Your Honor.  I would just

22   reserve because that was on the fly, me just searching quickly

23   on the iPad to find those two references.  I would want to go

24   back and look at Dr. Portier's testimony.

25        **THE COURT:**  That's fine.  But the ruling now is that

 1   you cannot make that argument.  So as you are preparing your

 2   closing argument tonight, you cannot make that argument.

 3        **MS. MOORE:**  I understand, Your Honor.

 4      Let me go back to the jury instruction issue I think

 5   regardless of the George study and Dr. Portier's testimony on

 6   that, that California law is very clear that this is a

 7   substantial factor, and that the but-for does not apply here.

 8   And that's why I cited the Limansky case, Your Honor.

 9        And I would just point out that in that case what happened

10   at the trial level is that the jury found -- and this was a

11   medical malpractice case --

12        **THE COURT:**  Is this something -- are you citing to the

13   Court of Appeals' opinion in this case?

14        **MS. MOORE:**  Yes, Your Honor.

15        **THE COURT:**  Okay.  So where are you describing from?

16        **MS. MOORE:**  Well, Your Honor, this is at the very

17   beginning the summary of that, and it's -- the first paragraph

18   it starts with This is a medical malpractice case.

19        **THE COURT:**  Okay.

20        **MS. MOORE:**  Okay.  And if you go -- it is the

21   second-to-the-last sentence in that paragraph.  It says:

22   Following a trial during which the trial Court refused to give

23   a jury instruction on concurrent causation, the jury found that

24   while Dr. Limansky was indeed negligent in his care of Cynthia,

25   such negligence was not a cause of her death.

1    That is the exact worry that we have in this case,

2  Your Honor, that you have pointed out.  And that is the jury

3  could absolutely say, you know what, Roundup causes cancer.

4  Roundup cause was a substantial factor in Mr. Hardeman's, but

5  also we think hepatitis C was a substantial factor based on the

6  testimony presented by the Defendant.

7          **THE COURT:**  And he would have gotten -- he would have

8  gotten cancer from hep C even if Roundup had not been involved.

9          **MS. MOORE:**  That's right.  That's right.

10    And that's exactly what happened here.  It is the same

11  analogy, Your Honor.  And what the Court of Appeals said, if

12  you go onto the next paragraph -- because we conclude in

13  that -- in this case, in which causation was the most critical

14  contested issue -- and here, Your Honor, it is the only issue

15  in Phase One -- and in which there was substantial evidence of

16  multiple causes of Cynthia's death, the trial court improperly

17  instructed the jury with respect to concurrent causation, and

18  because such error was clearly prejudicial, we reversed and

19  remand for a new trial.

20          **THE COURT:**  And that language -- I mean, I was sort of

21  floating to the side of how to limit this concept and limit it

22  only to situations where everybody agrees that the two things

23  caused it, or the two things were operated to cause it, but

24  this -- this language -- and we never know how careful the

25  Courts are being with their language -- but this is -- this

```
 1    sentence -- this paragraph stands for the proposition that when
 2    there is substantial evidence to support both.  And so it
 3    does -- I will say that it does seem like if that is the
 4    rule -- if the rule is that when there is substantial evidence
 5    to support two separate causes, you don't give the but-for
 6    instruction and you give the multiple -- you give some
 7    version --
 8              MS. MOORE:  Exactly.
 9              THE COURT:  -- version of independent causation, that
10    does seem to be the exception that swallows the rule in some --
11    to some degree, which is a matter of concern.  But that is what
12    the Court seems to be thinking.
13         Although, one of the things I want to do I want to take a
14    break --
15              MS. MOORE:  Sure.
16              THE COURT:  -- and I want to go back and look at all
17    of the things that you tell me I should really focus on.  And
18    so is there anything else other than this case that you want me
19    to really focus on?
20              MS. MOORE:  I just wanted to point out in this
21    particular case -- and this was something, Your Honor, that you
22    highlighted, too, when you go to Section -- it is Number 2, if
23    you flip over, you will see the head note -- it is not a head
24    note.  Sorry.  It says Number 2, the trial Court irrevocably
25    refused to give the Plaintiff's requested instruction on
```

 1  concurrent causation.

 2      Do you see that?

 3          THE COURT:  I'm sorry.  Are you in the standard of --

 4  are you in the same case?

 5          MS. MOORE:  Yes, I am, Your Honor.  It is after the

 6  standard of review.  So if you go down, you see where it says

 7  Number 2, The trial court erroneously --

 8          THE COURT:  Oh, yeah.  Okay.

 9          MS. MOORE:  And that beginning paragraph there, this

10  was what, you know, they really -- they honed in on.  And they

11  said one of the critical issues we resolved by the jury was

12  causation, which, again, this is the only issue here.  So it is

13  extremely critical to the Plaintiff, and it would be

14  prejudicial not to have this multiple causation instruction.

15      And so they listed out initially four different arguments

16  that the Defendant made, that the doctor made in the

17  malpractice case.

18      Here we heard from Dr. Levine today.  She said that --

19  first -- she said first the primary cause in her opinion was

20  hep C.  The secondary cause was hep B.  So she gave multiple

21  causes on the stand today.

22      Then it continues and it says, as the Court pointed out,

23  for purposes of this appeal, Plaintiffs concede that these

24  factors may have contributed to Cynthia's death.

25      Again, what our position is, Your Honor, it doesn't have

**PROCEEDINGS**

 1    to all come from the Plaintiff.  It's what is the evidence that

 2    is being presented to the jury.  And when they go back to that

 3    jury room, the evidence that they have heard in the case is

 4    that Roundup can cause cancer, and that Roundup is a

 5    substantial factor in causing Mr. Hardeman's cancer.  And they

 6    have also heard today, hepatitis C and hepatitis B were likely

 7    causes of his NHL.

 8         And so to make it one or the other puts the Plaintiff

 9    behind the eight-ball, and it is very prejudicial to us.  And

10    that's why the multiple causation instructions should apply.

11         **THE COURT:**  Okay.  So anything else you want me to

12    really focus on when I go back for a break right now?

13         **MS. MOORE:**  No, Your Honor.

14         **THE COURT:**  Okay.  So what I want to do is -- I

15    think -- I mean, obviously you are going to want to get an

16    answer from me soon on this question so you can start working

17    on your closings.  So what I would propose to do, if you don't

18    mind, is take like a half an hour break, go back and really

19    focus on these things that you want to make sure that I focus

20    on.  And then I will come back, I will ask you -- if I have

21    additional questions, I will ask you.  And otherwise I will

22    just let you know what the answer is.

23         **MR. KILARU:**  Your Honor, before you go, not on the

24    law, but just one suggestion and one -- just on a point you had

25    raised earlier.

 1          THE COURT:  Sure.

 2          MR. KILARU:  So one suggestion I think on Option 2,

 3   which you already have, would be to insert before -- so I guess

 4   in the second paragraph of Option 2, after the but-for

 5   sentence, one proposal would be to insert something like You

 6   have heard evidence about risk factors other than Roundup.  And

 7   then say If you conclude that, which I think sort of grounds in

 8   this idea that there are a couple risk factors potentially

 9   circulating around here.  That is just a suggestion.

10          I don't know if Your Honor is still considering this, but

11   just one point on the language you had proposed earlier

12   about -- you said something like, I believe, with respect to

13   Roundup and hepatitis C, If you conclude that either would have

14   caused Mr. Hardeman, I think one concern we have about that

15   phrasing is that if they conclude that hepatitis C would have

16   technically, one of the either, they found that that caused

17   Mr. Hardeman's NHL, and the instruction would tell them to find

18   for Mr. Hardeman in that circumstance.  So I think at a

19   minimum, I don't think that phrasing would work for that

20   reason.

21          THE COURT:  I think I understand that, but what I will

22   do is I will come out and give you a chance to pour over

23   language before we --

24          MR. KILARU:  Sure.

25          MS. MOORE:  That would be great, Your Honor.

```
 1          And the only thing I would add to that is when he refers
 2    to risk factors, the testimony in the case is that -- and
 3    Dr. Levine admitted this today -- a risk factor is not the same
 4    as saying the cause, so I would have some concern there.  I
 5    don't think when you are talking about multiple causation
 6    instruction you could then just say "risk factors."
 7          THE COURT:  Well, I mean, that's what -- I think
 8    that's actually a good point.  And it may argue for -- if we go
 9    with some version similar to Option 2, what that might mean is
10    that at the bottom there where I say Then you should find for
11    Mr. Hardeman, even if you believe that other risk factors were
12    also sufficient, it should just say other factors were also
13    sufficient probably, so as to avoid that confusion.
14          MS. MOORE:  I don't know if I would agree to just the
15    word factor, Your Honor, when we are talking about causation,
16    but --
17          THE COURT:  You are saying it should be if you believe
18    that other causes for --
19          MS. MOORE:  Causes, yes.  Because risk factor is not
20    the same as a cause.
21          THE COURT:  But factor is -- the center piece of the
22    instruction is factor, substantial factor.
23          MS. MOORE:  Let me look at 431, Your Honor.
24          I mean, 431 says Cannot avoid responsibility just because
25    some other person, condition or event was also a substantial
```

1  factor in causing the Plaintiff's harm.

2       THE COURT:  Yeah.  But the problem with that language

3  is that it's -- it's -- that seems to contemplate the type of

4  argument that you haven't made in this case, which is that they

5  combine to -- that's why I'm trying to find something that is

6  more specific to the argument that you can potentially make,

7  subject to my pouring over this material during the break,

8  which is that they are sort of independent causes.

9       I mean, that's -- it seems to me the only thing you have

10  potentially left yourself room to do is make that type of

11  argument, not make the argument that they have combined to

12  cause his cancer.

13       MS. MOORE:  And I believe that is the Limansky case,

14  Your Honor.

15       MR. KILARU:  Thanks, Your Honor.

16       THE COURT:  Okay.  Why don't we plan on coming back at

17  5:00.

18              (Recess taken at 4:32 p.m.)

19              (Proceedings resumed at 5:28 p.m.)

20     (Proceedings were heard out of the presence of the jury:)

21       THE COURT:  I see it's warmed up in here a little bit.

22  Yeah, our air and heat goes off at 5:00 o'clock.  That's

23  ridiculous.

24       Okay.  So I think option one is off the table for all the

25  reasons we discussed.  I think it's not appropriate to give an

 1   instruction that would allow them to -- that would allow the

 2   jury to conclude that the cause -- in the two things combined

 3   to cause the cancer in light of the way the evidence has come

 4   in, and the plaintiffs can't argue that.

 5          However, I wanted to give you one more chance to respond

 6   to one thing, but I am pretty strongly inclined to give option

 7   two with a couple of tweaks.  One is to add the word

 8   "generally" as I suggested before.  The second tweak would be

 9   to delete "risk" in the bottom line.  So it would just say

10   "other factors were also sufficient to cause his NHL."  And

11   then I would add "on their own" to that.

12          So it would read (reading):

13              "Generally, conduct is not a substantial factor in

14          causing harm if the same harm would have occurred without

15          that conduct.  However, if you conclude that Mr. Hardeman

16          has proven that his exposure to Roundup was sufficient on

17          its own to cause his NHL, then you should find for

18          Mr. Hardeman even if you believe that other factors were

19          also sufficient to cause his NHL on their own."

20          And I think probably the thing that came pretty close to

21   solidifying this for me was looking back at the illustration in

22   the restatement that came up -- it was cited in a couple of the

23   cases that you cited, so I'm looking at page -- I'm looking at

24   page 379, Section 27 -- right? -- subsection (e), "Alternative

25   Causes."

1        MR. KILARU:  Sorry.  Can you -- 379?

2        THE COURT:  Sorry.

3        MR. KILARU:  No, it's fine.

4        THE COURT:  Page 379.

5        MR. KILARU:  Okay.

6        THE COURT:  And it's the section on -- it's the

7   chapter on factual cause, Section 27; right?  And then

8   subsection (e) talks about alternative causes.  Feel free to

9   pull it up if you want.

10        MR. KILARU:  Yeah.

11        THE COURT:  Yeah, take your time.

12                  (Pause in proceedings.)

13        MR. KILARU:  Is it the second or the third,

14   Your Honor?

15        THE COURT:  The second illustration.

16        MR. KILARU:  Okay.

17        THE COURT:  Oh, which restatement?

18        MR. KILARU:  Yeah.

19        MS. MOORE:  The second, I think.

20        MR. KILARU:  I think you might have cited both, but I

21   could be wrong about that.

22        THE COURT:  Good question.  Let me -- hold on one

23   second.

24                  (Pause in proceedings.)

25        THE COURT:  I'm pretty sure this is the third --

1      MR. KILARU:  Okay.

2      THE COURT:  -- but let me just stare at it for a

3 second here.

4                    (Pause in proceedings.)

5      THE COURT:  Yeah, I'm, like, 99 percent sure it's the

6 third.

7      MR. KILARU:  Is this the causal sets piece?

8      THE COURT:  No.

9      MR. KILARU:  Okay.  Oh, sorry.  I was looking at 26.

10                    (Pause in proceedings.)

11      MS. MOORE:  It's the third, Your Honor.

12      THE COURT:  So there is -- so the subsection right

13 after it, subsection (f), is the paragraph about causal sets.

14      MR. KILARU:  Okay.  Got it.

15      THE COURT:  But then subsection (e) is about

16 alternative causes, which is I think the situation we're facing

17 here; right?  And there's Illustration Number 2, and -- did you

18 find it?

19      MR. KILARU:  I don't have it.  We're trying to pull it

20 up.

21      THE COURT:  Take your time.  Take your time.

22      MR. KILARU:  Okay.

23                    (Pause in proceedings.)

24      MR. KILARU:  Your Honor, we'll keep looking, but I

25 don't want to keep you and everyone here.

1          THE COURT:  Well, let me read it to you.

2          MR. KILARU:  Yeah, that would be totally fine.

3          THE COURT:  So subsection (e), it's titled

4    "Alternative Causes."

5          MR. KILARU:  Okay.

6          THE COURT:  And it says that (reading):

7             "In some cases, a defendant may contend that the acts

8       of another were the cause of the plaintiff's harm and,

9       thus, the defendant's conduct, tortious conduct, was not a

10      cause of the plaintiff's harm."  Okay?  "Whether that

11      claim implicates the rule in this section depends on

12      whether the other forces" -- here's I think some key

13      language -- "depends on whether the other forces were

14      operating and sufficient to cause the harm

15      contemporaneously with the defendant's tortious conduct."

16      Okay?

17         MR. KILARU:  Uh-huh.

18         THE COURT:  So whether the other forces were operating

19   and sufficient to cause the harm contemporaneously with the

20   defendant's tortious conduct.  So as applied here, that would

21   mean the defendant's tortious conduct, or allegedly tortious

22   conduct, is inflicting Roundup upon Mr. Hardeman; right?  And

23   the -- but the other force that may have been operating and may

24   have been sufficient to cause the harm was the hepatitis C.

25   Okay?

1        **MR. KILARU:**  Uh-huh.

2        **THE COURT:**  And in that sort of situation, the idea is

3   that you instruct the jury on that, you instruct the jury on

4   the alternative independent causes.  And the example that's

5   given is, you know, there's -- you know, an infant born with a

6   birth defect and the question is whether the company's drug

7   caused the birth defect or whether a genetic condition caused

8   the birth defect.  And one side presents sufficient evidence

9   that the drug caused the birth defect and the other side

10  presents sufficient evidence that the genetic condition caused

11  the birth defect; right?  And so the illustration goes on to

12  say (reading):

13          "The fact finder must determine if the drug, absent

14      the genetic condition, would have caused the birth defect.

15      The fact finder must also determine if absent the drug,

16      the genetic condition would have caused the birth defect.

17      If the fact finder determines that either the drug or the

18      genetic condition would have, in the absence of the other,

19      caused the birth defect at the same time, then each is a

20      factual cause pursuant to this section."

21      So, you know, that is -- it seems to me that although the

22  law overall is very muddled in this area, I think the courts

23  are confused and the California courts have not offered a

24  terribly definitive statement on this question.  The California

25  courts do look to the restatement, and it seems to me that the

 1   restatement -- that example provided in the restatement kind of

 2   highlights why I have this concern about this case and why this

 3   type of instruction may well be appropriate in this case.

 4        So that's kind of my tentative view at this point.  I want

 5   to give you one more chance to address that.

 6            MR. KILARU:  Sure.  And I understand the concern based

 7   on what's here, Your Honor.  I guess I would draw attention to

 8   the last sentence of that --

 9            THE COURT:  Yes.

10            MR. KILARU:  -- which is (reading):

11             "If the fact finder determines that either the drug

12         or the genetic condition played no role in the birth

13         defect, then the other's causal status is determined under

14         but-for."

15            THE COURT:  But we don't -- yes.  So I agree with

16   that.

17            MR. KILARU:  And what I would say on that is as

18   follows:

19        I know that much of the evidence has focused on the sort

20   of the clash between Roundup and hepatitis C, and I know that

21   that has been really what the experts have talked about more

22   than anything else, but I think we've heard Dr. Levine testify

23   today that in 90 percent of the cases you can't determine a

24   cause.  I suspect Dr. -- I actually think Dr. Arber testified

25   to the same thing as well.

```
 1         So I think the concern about saying that both things are
 2    in the mix is that if the jury concludes both are in the mix
 3    but ultimately because I can't determine what it is, I think
 4    this is a situation where it was neither, this is one of those
 5    idiopathic cases where you can't determine the cause, this
 6    would still instruct that they should find us liable, and
 7    that's why I think but-for has to be the answer here.  It's not
 8    just because there's A versus B.  There's also this possibility
 9    that all the experts have discussed about there not being a
10    cause at all or at least the cause being unknown, and that is
11    part of our defense.
12         THE COURT:  But the instruction doesn't say that.  I
13    mean, the -- I think idiopathic -- most of the evidence I think
14    established that idiopathic is not actually a factor; right?
15         MR. KILARU:  Right.
16         THE COURT:  It's if you can't identify the factor,
17    then it's idiopathic; right?
18         MR. KILARU:  Right.  Then I think that would put you
19    in the last sentence; right?
20         THE COURT:  What?
21         MR. KILARU:  I'm sorry.  I didn't mean to cut you off.
22         THE COURT:  No.  I think you were making the same
23    point I was making.  Go ahead.
24         MR. KILARU:  Okay.  I was going to say I think that
25    would put you in the last sentence of this paragraph where I
```

1   think it says but-for would apply.

2       **THE COURT:**  But why -- I don't understand.  I'm not

3   sure I -- I'm not sure I understand what you're saying.  What

4   is wrong -- in light of what I've said, in light of the fact

5   that the fact finder needs to make a determination about, you

6   know, whether it was this or that or whether they both

7   independently could have done it, what's wrong with (reading):

8            "Generally conduct is not a substantial factor in

9        causing harm if the same harm would have occurred without

10        that conduct; however, if you conclude that Mr. Hardeman

11        has proven that his exposure to Roundup was sufficient on

12        its own to cause his NHL, then you should find for

13        Mr. Hardeman even if you believe that other factors were

14        also sufficient to cause his NHL on their own" or "also

15        sufficient on their own to cause his NHL"?

16       I mean, what about that precludes the jury from saying it

17   was idiopathic and, therefore, I'm concluding that Hardeman has

18   not proven that Roundup caused his cancer?

19       **MR. KILARU:**  Because I think it sort of frames for the

20   jury that, you know, you have two different potential causes,

21   and I know that is what a lot of the discussion has talked

22   about; and I think what that might do -- the danger of that

23   language that I perceive is that if the jury -- if the jury

24   says it's either A or B and I know for sure it was one of them,

25   then I think that language is helpful.  But if the jury thinks

```
 1   it's A or B and, you know, I kind of agree with our doctors and
 2   I can't figure out whether it's A or B and so it shouldn't be
 3   either, I don't know that this language leaves open the
 4   possibility for that juror to still say "Even though I think
 5   Roundup could have been sufficient in the abstract, because I
 6   can't determine which of the two it is because I think it's
 7   more likely to be neither," I think this might still lead them
 8   to say Roundup was the cause in that circumstance.
 9        MS. MOORE:  Your Honor, I don't think that's what it
10   says, though.  It says has -- we still have to prove that his
11   exposure to Roundup was sufficient on its own.
12        THE COURT:  I mean, don't -- let me -- let's back up
13   from the issue of idiopathy --
14        MS. MOORE:  Idiopathic.
15        THE COURT:  Idiopathy?
16        MS. MOORE:  Idiopathy.
17        THE COURT:  -- for just a quick second, and let me ask
18   you this question.
19        This example that I just read to you -- okay? -- birth
20   defect or genetic abnormality, don't you think the instruction
21   that I'm proposing here would be appropriate for that
22   situation?
23        MR. KILARU:  If they were just the two things, yes, I
24   think that that's what this is getting at, if there's option A
25   or option B and there's nothing else in the mix.
```

1          THE COURT:  Okay.

2          MR. KILARU:  This is what I think this is sort of

3   envisioning.  It's either A or B is I think the example that's

4   being offered here.

5          THE COURT:  But if there were -- if it was A, B, or C,

6   why wouldn't --

7          MR. KILARU:  It's not as much the C point, Your Honor.

8   It's in this example, one side is saying it was absolutely -- I

9   think as I understand the example, one side is saying it was

10  absolutely A --

11         THE COURT:  Right.

12         MR. KILARU:  -- and the other side is saying it was

13  absolutely B.

14         THE COURT:  Right.

15         MR. KILARU:  And so in that circumstance you sort of

16  evaluate A versus B.

17         THE COURT:  Right.

18         MR. KILARU:  I guess the point I'm making is I don't

19  think our argument is just going to be it was hepatitis C.  I

20  think we're entitled to argue it wasn't Roundup and the cause

21  may just be unknown.

22         THE COURT:  Right.

23         MR. KILARU:  And I don't think that the way -- I think

24  the concern with this example is it doesn't account for those

25  possibilities.  This example is a situation where the only

1  thing we were coming in and saying is it was hepatitis C.

2  **THE COURT:**  I don't -- I guess I'm not seeing that

3  because -- I mean, I would certainly be open to tweaking the

4  language to address that concern, but I guess I'm not seeing

5  that concern because what you're saying is -- you know, again,

6  you've got the first paragraph, which says "To win, he has to

7  prove by a preponderance of the evidence that Roundup was a

8  substantial factor."

9  **MR. KILARU:**  Could I offer a suggestion that I think

10  may get at this?

11  **THE COURT:**  Yes.

12  **MR. KILARU:**  Okay.  What if we added to the end "If

13  you find that Roundup was not sufficient on its own to cause

14  his NHL, then you must find for Monsanto."

15  **THE COURT:**  Well, that statement does not seem

16  objectionable in any way.  It's just a question of whether it

17  is repetitive of what's already in the instructions.

18  **MS. MOORE:**  Your Honor, I think it's repetitive from

19  the first sentence in that paragraph.

20  **MR. KILARU:**  Well, I think that's the -- oh, sorry.

21  Go ahead.

22  **MS. MOORE:**  Yeah, I just was going to say, Your Honor,

23  I understand --

24  **THE COURT:**  I'm sorry.  I think I see.  Let me keep

25  this train of thought.

1        **MS. MOORE:**  Okay.

2        **THE COURT:**  I think I see what you're saying.  So

3   generally it's not a substantial factor in causing harm if the

4   same harm would have occurred without that conduct; however, if

5   you conclude that Mr. Hardeman has proven that his exposure to

6   Roundup was sufficient on its own to cause NHL, then you should

7   find for Hardeman even if you believe that other factors were

8   also sufficient to cause his NHL on their own.  And then you're

9   saying there should be a sentence that says, "However, if you

10  conclude that it was not sufficient on its own, you must find

11  for Monsanto."

12       **MR. KILARU:**  Yes.

13       **MS. MOORE:**  And, Your Honor, now we've gone way past

14  what the model instruction is, and I understand the Court's

15  ruling on option one versus option two and I don't want to

16  revisit that.  I do want to make sure it's very clear that our

17  position is that -- the plaintiff's position is it should be

18  option one.  We're objecting to option two in its entirety.

19  But --

20       **THE COURT:**  Wait a minute.  When you say you're

21  objecting to option two in its entirety, you're not saying that

22  I should just give the standard 430 with the but-for sentence;

23  right?

24       **MS. MOORE:**  That's correct.

25       **THE COURT:**  You're saying so surely you would prefer

**PROCEEDINGS**

1  option two to the standard instruction with the but-for

2  sentence; right?

3          **MS. MOORE:**  Right.   The but-for sentence meaning the

4  conduct is not a substantial factor?

5          **MR. KILARU:**  The bracketed language.

6          **THE COURT:**  Yes.

7          **MS. MOORE:**  That's the sentence that we're objecting

8  to, Your Honor (reading):

9              "The conduct is not a substantial factor in causing

10     harm if the same harm would have occurred without that

11     conduct."

12         **THE COURT:**  Right.

13         **MS. MOORE:**  That's what we're objecting to.

14         **THE COURT:**  And what I've proposed to add is

15  "generally" to that.

16         **MS. MOORE:**  And I understand the Court's ruling.   I

17  just want to note that objection.

18         **THE COURT:**  Sure.

19         **MS. MOORE:**  But then to go and to add an additional

20  sentence and another "however," I think that's going to create

21  a lot of jury confusion, Your Honor, because they're going to

22  read this first sentence, the but-for sentence, the conduct,

23  and then you've got "however," and I think the way you've

24  tweaked it explains that -- again, we've objected to it but I

25  understand what you've done here -- but I don't think we then

PROCEEDINGS

```
 1   continue on by adding additional language.  I think that's

 2   where it's going to get really confusing.

 3        MR. KILARU:  Your Honor, could I propose on that, I

 4   don't think this will address the objection, but just dropping

 5   the howevers?  I mean, I think if you drop the howevers, you

 6   have a general statement qualified by the word "generally" and

 7   then sort of instructions on how to apply that in two

 8   circumstances that could be present during deliberations.

 9        THE COURT:  And your concern is that it does -- you

10   know, it sort of covers one specific scenario --

11        MR. KILARU:  Right.

12        THE COURT:  -- which is you find it's either

13   sufficient on its own.

14        MR. KILARU:  Right.

15        THE COURT:  But it sort of hasn't targeted the other

16   scenario, which is you find that Roundup is not sufficient on

17   its own.

18        MR. KILARU:  Yeah.

19        THE COURT:  I get that concern.  So here's what the

20   ruling is going to be.  I'll go back -- I'm going to go back

21   and do some wordsmithing, and if anybody -- you know, and I'll

22   file something tonight; and if anybody wants to file an

23   additional concern about the wordsmithing that hasn't already

24   been raised here --

25        MS. MOORE:  Okay.
```

 1          **THE COURT:**  -- I mean, you've preserved your

 2    objections --

 3          **MS. MOORE:**  Thank you, Your Honor.

 4          **THE COURT:**  -- but if you have an additional

 5    wordsmithing concern and you want to file something on that,

 6    you're free to do so.

 7       But the instruction that I will put out, I suppose -- you

 8    know, I will put it out soon.  I will do it -- put it out soon;

 9    and I suppose that while I'm drafting it, I reserve the right

10    to change my mind again.

11       But what I'm going to do, what I'm 99 percent sure I'm

12    going to do is provide option two as I read it to you all just

13    a second ago, including the word "generally" and all that, and

14    then add the concept that Mr. Kilaru was suggesting, and that

15    that will be the causation instruction.

16          **MR. STEKLOFF:**  And can --

17          **MS. MOORE:**  And, Your Honor, I'm sorry.  So we would

18    just ask that if you're doing that, that you keep that first

19    "however" as you read it to us.

20          **THE COURT:**  Okay.  And I'll wordsmith it --

21          **MS. MOORE:**  Okay.

22          **THE COURT:**  I'll wordsmith it to make sure it's not --

23    it doesn't create undue confusion.  I mean, I understand your

24    point that it seems like a "however" is appropriate there, but

25    I'll do some word submitting on it.

1        **MS. MOORE:**  Right.  I think the "however" following

2   the first sentence is appropriate.  I'm not so sure that saying

3   "however" the second time is -- I think it's going to raise

4   confusion.

5        **THE COURT:**  I think the point is that it seems

6   appropriate to call out both concepts, and that's what I will

7   do, and I'll do some wordsmithing to make that work.

8        **MS. MOORE:**  Okay.  We'll look at that.  Thank you,

9   Your Honor.

10       **MR. STEKLOFF:**  And on the current sentence, without

11  the one that we've just proposed adding, can I -- you read this

12  both ways where you put "other factors were also sufficient," I

13  think the "on their own" should come after "sufficient" because

14  it's consistent with the prior line.

15       **THE COURT:**  Yeah.

16       **MS. MOORE:**  That's fine, Your Honor.

17       **THE COURT:**  Okay.

18       All right.  So that's jury instructions.

19       And then we've covered a major issue in terms of what can

20  be argued and what cannot be argued, and that is, just to

21  repeat, the plaintiffs are not permitted to argue that the

22  two -- that two -- that any combination of factors combined to

23  give Mr. Hardeman his cancer.  So that's one ground rule for

24  closing arguments, no combination arguments.

25       **MS. WAGSTAFF:**  May I go next, Your Honor?

1      **THE COURT:**  You may, although can I raise one more

2  that's on my mind just before I forget it?

3      **MS. WAGSTAFF:**  Sure.

4      **THE COURT:**  This is an issue that I had not focused on

5  until we got to -- until Dr. Mucci's testimony, but Dr. Ritz

6  testified that the numbers in the De Roos 2003 study would have

7  changed if the IARC had classified glyphosate as a probable

8  carcinogen; and if I remember correctly, she testified that the

9  weight that would have been assigned to glyphosate in the

10 De Roos analysis would have been .8 or .9.

11     That was completely made up.  That was -- as far as I can

12 tell, that was completely junk science; and had I sort of

13 understood the lack of basis for that testimony, I would have

14 excluded it.

15     But after sort of looking carefully at the De Roos study

16 and the explanation of the values that were assigned and how

17 they -- how different values were assigned to different

18 substances or pesticides, I don't see how that it was remotely

19 appropriate for Dr. Ritz to testify to that.  And so my

20 tentative view is that, you know, you can't mention that in

21 closing argument.

22     **MS. WAGSTAFF:**  And I wasn't going to mention that,

23 Your Honor.

24     **THE COURT:**  Okay.

25     **MS. WAGSTAFF:**  I will -- I will -- if I intend to talk

1    about the hierarchical or logistical, it will be for a

2    different reason than that, than Dr. Ritz's testimony.

3           **THE COURT:**  Okay.  So just to be clear, Dr. Ritz's

4    testimony about how the hierarchical regression would have come

5    out if glyphosate had been classified a probable carcinogen by

6    the IARC is off limits.  Everybody understand that?

7           **MR. STEKLOFF:**  I certainly wasn't planning on raising

8    that.

9           **MS. WAGSTAFF:**  Yeah.  I mean, I think the testimony

10   that it would change based on an IARC classification should be

11   allowed, but I don't think that -- I mean, that's right there

12   in the objective language of the --

13          **THE COURT:**  I don't think so.  I think -- I mean,

14   maybe -- I think the problem that you have there is that

15   Dr. Ritz offered, like, a junk opinion on that topic, and so

16   basically you don't have any evidence on that topic.

17          **MS. WAGSTAFF:**  Well, I have Dr. Mucci, who I asked

18   about it and I showed on the screen.  And here's the thing with

19   that study, is that, you know, it's a doubling of the risk

20   fully adjusted study.  And so Dr. Mucci is discounting that by

21   saying you look at the hierarchical; right?

22          **THE COURT:**  Uh-huh.

23          **MS. WAGSTAFF:**  She's saying don't look at the

24   logistical and the hierarchical isn't a doubling.

25          **THE COURT:**  Right.

1    **MS. WAGSTAFF:**  And so what she's doing is she's

2    drawing these thresholds and say "Look at this."  And when I

3    asked her about it and I said, "Well, this number was based on

4    this weighted thing," and I walked her through it and I said,

5    "It was given a .3 because of the time that this was done in

6    2003 or earlier, whenever they did it, IARC hadn't ruled on

7    it."  And she said correct.  And I said they've ruled on it

8    now.  And she said correct.

9    And when I pushed her, she said she wouldn't know how it

10   would change, but I think I can elicit that at least the

11   circumstances have changed.  She admitted that that .3 was a

12   weighting and so, therefore, her discounting of that study was

13   improper --

14           **THE COURT:**  Well, I --

15           **MS. WAGSTAFF:**  -- or at least highlight it to the

16   jury.

17           **THE COURT:**  You know, I mean, maybe it's a question of

18   line drawing because you have no competent testimony that it

19   should have been anything other than .3.  I mean, that's the

20   problem.  So, you know, I suppose you have evidence that

21   glyphosate -- if the De Roos analysis were done again,

22   glyphosate would not have fit any of the categories in that

23   key; right?  That's the only evidence you have, is that

24   glyphosate no longer fits into any of the categories in

25   De Roos' key.

1          MS. WAGSTAFF:  So it would be different.  I have --

2          THE COURT:  It might be different.

3          MS. WAGSTAFF:  Uh-huh.

4          THE COURT:  I mean, I -- you know --

5          MR. STEKLOFF:  It might be lower.

6          THE COURT:  Well --

7          MS. WAGSTAFF:  I mean, I have --

8          THE COURT:  -- I don't see how it would be lower.

9          MS. WAGSTAFF:  Right.  I mean, I have other things

10   that were testified about it.

11          THE COURT:  It might be the same.

12          MS. WAGSTAFF:  But I will not bring up Ritz when

13   talking about that study.

14          THE COURT:  Well, I mean, I suppose it would be

15   fair -- I mean, I think you have a point that you could say,

16   "Look, Mucci wasn't even willing -- you know, she's" --

17          MS. WAGSTAFF:  Yeah.

18          THE COURT:  -- "focusing on this hierarchical and

19   she's not even willing to acknowledge that it should have

20   changed somehow, somehow, because of -- you know, because of

21   the classification."  Maybe that is fair game.

22          MS. WAGSTAFF:  And that's all I was going to do with

23   it, and then I was going to say some other points related to

24   why I think the hierarchical is better or not related to Ritz

25   or anyone, one of them being that the actual author herself

1    chose to put the logistical numbers in her '05 paper when

2    describing the '03 paper.  I think that's fine.

3        And the second one is that Dr. Weisenburger came here and

4    testified that the logistical numbers were perfectly fine and

5    good to use.

6        So those three sort of things put together is what I would

7    testify about that.

8        **THE COURT:**  What would be wrong with saying, you know,

9    she -- you know, that she didn't -- Mucci was unwilling to

10   acknowledge that this might have changed?

11       **MR. STEKLOFF:**  I don't -- well, I think that's

12   actually not her testimony.  So that might be what's wrong is I

13   think she said, "It would have changed.  I can't tell you where

14   it falls."

15       **MS. WAGSTAFF:**  That's fine.

16       **THE COURT:**  Well, I don't think she said it would have

17   changed.  I think she said "I have no idea" because now based

18   on the situation, glyphosate is not in any of these categories.

19       **MR. STEKLOFF:**  Well, that's fair.  But as Your Honor

20   just said, it could have stayed at .3.  None of us know.  So I

21   think that her testimony -- I think to portray her testimony as

22   somehow being disingenuous or inaccurate is wrong.

23       **THE COURT:**  Fair enough.  But what would be wrong with

24   saying:  Look, she relied on this hierarchical but the

25   hierarchical was based on -- was conducted at a time when, you

1  know, this was a .3 because glyphosate had not been classified

2  by either agency and now it's been classified by IARC as a

3  probable carcinogen; and so, you know, the number that she is

4  focusing on is less reliable now than -- you know, what's wrong

5  with that?

6      **MR. STEKLOFF:**  Because I don't think that that's

7  factually accurate.  I think this is sort of where I've had to

8  draw some lines, say, about BCL-6.  I think you would have to

9  say "But the EPA has determined also that it's not carcinogenic

10  and so no one -- as Dr. Mucci said, no one knows where it would

11  be.  I think if you completed the story like that, it would not

12  be objectionable.  If you only tell half the story, I don't

13  think that that's fine.

14      **THE COURT:**  Well, I mean, lawyers only tell half the

15  story in closing --

16      **MS. WAGSTAFF:**  He can argue all he wants.

17      **THE COURT:**  -- argument all the time.

18      **MS. WAGSTAFF:**  I think I can --

19      **THE COURT:**  The point is you can't rely on admissible

20  evidence and you can't be misleading about the evidence.

21      **MR. STEKLOFF:**  But it's different in this circumstance

22  where had Dr. Ritz not said anything, I agree that she could

23  tell half the story.  We are in a different circumstance here

24  because of what Your Honor has identified about Dr. Ritz, and

25  it's that --

**PROCEEDINGS**

1      **THE COURT:**  Well, you could move to strike that

2   testimony.

3      **MS. WAGSTAFF:**  And did you even object to it?

4      **MS. MATTHEWS JOHNSON:**  Yes, I objected to the

5   question.

6      **MS. WAGSTAFF:**  All right.

7      **MR. STEKLOFF:**  So I think that the problem of

8   telling -- I agree, lawyers tell half the story.  Then it would

9   be my job to get up and tell the other half, but that's

10  different here where it draws attention potentially to

11  something that -- it sort of -- this problem is created because

12  of what you just called junk science.

13      **THE COURT:**  Well, I mean, you could move to strike

14  Ritz's testimony now.  You could move to strike it in the event

15  that she makes a misstatement -- you know, sort of brings it up

16  in her closing.  You know, I don't know.  But I think that what

17  she is -- the sort of basic thing that she is proposing, which

18  is, you know, the calculation changes, you know, it --

19      **MR. STEKLOFF:**  Potentially.

20      **THE COURT:**  -- potentially changes.

21      **MS. WAGSTAFF:**  And the reason to know how is even more

22  strong for my argument.

23      **THE COURT:**  Well, I'm not sure how that's the case

24  but, in any event, that's for you to argue, I suppose.

25      But I think, you know, there can be no direct or indirect

PROCEEDINGS

```
 1    reference to Ritz's testimony about that; and, you know, it's
 2    appropriate to say that, you know, that glyphosate doesn't fit
 3    into any of these keys anymore.
 4            MS. WAGSTAFF:  I mean, I would propose --
 5            THE COURT:  You established that in Mucci's cross.
 6    That's fine.
 7            MS. WAGSTAFF:  Okay.
 8            THE COURT:  Okay.  And what else?
 9            MS. WAGSTAFF:  So just to be clear, though, I can say
10    that when this was done, there was no IARC ruling.  Now there's
11    an IARC ruling so it no longer fits in there, and that's what I
12    can say about Mucci's testimony?
13            THE COURT:  I think that's right.
14            MS. WAGSTAFF:  Okay.  Something that I would propose
15    is in their opening slides they had failure to warn slides
16    about the doctors.  I think that if -- one of their slides said
17    that none of the doctors warned or do warn about it, and I
18    think that that's inappropriate for closing.  I think that --
19            THE COURT:  You mean the stuff about just that the
20    doctors never told them --
21            MS. WAGSTAFF:  Yeah.
22            THE COURT:  -- never discussed with Hardeman the fact
23    that glyphosate was a risk factor?
24            MS. WAGSTAFF:  Well, I think their slide actually said
25    something something warned.  I can show it to you.
```

 1          **THE COURT:**  I should have brought my slides up.   I

 2   don't have them with me.

 3          **MS. WAGSTAFF:**  I think it says specifically -- it was

 4   attached to something we filed.  Is this it?  No, this isn't

 5   it.  Just one second.

 6                    (Pause in proceedings.)

 7          **MS. WAGSTAFF:**  Do you have it in front of you?

 8          **MR. STEKLOFF:**  It's changed a little, but it's that

 9   one.

10          **MS. WAGSTAFF:**  No.  There was actual the word "warn."

11          **THE COURT:**  By the way, we need to talk about the

12   medical records issue; right?

13          **MR. STEKLOFF:**  I agree.

14                    (Pause in proceedings.)

15          **MS. WAGSTAFF:**  Yeah.  Do the doctors -- there's

16   this -- there's this?  It says "Do the cancer doctors," the

17   first one is "Ask about Roundup," "Test for Roundup," "Warn

18   about Roundup"; and I don't think that that's appropriate to be

19   making argument on whether or not the doctors warn about

20   Roundup.

21          **MR. STEKLOFF:**  I'm not making that argument so I don't

22   need to -- we don't -- I don't think it needs -- I will not

23   make that argument.

24          **THE COURT:**  Okay.  If you're not going to make the

25   argument, therefore, you're not allowed to make the argument.

 1          MR. STEKLOFF:  That's fine.  I'm not making that

 2   argument.

 3          THE COURT:  No talk about doctors warning about

 4   Roundup.

 5          MR. STEKLOFF:  Okay.

 6          MS. WAGSTAFF:  One question I would ask.  Dr. Mucci

 7   gave some testimony elicited on direct about the PPEs, and when

 8   she was talking about questionnaires and she kind of went a

 9   little bit further than the questionnaire and she started

10   talking about how the thought is that when you wear PPEs, you

11   get less exposure, and she kind of went on and so on and so

12   forth.

13       And I've got that pulled if you want it, but I just wanted

14   to know if that was going to be one of the arguments, we would

15   want a curative instruction that he used the product pursuant

16   to the label.

17          MR. STEKLOFF:  I'm not arguing that.

18          MS. WAGSTAFF:  Okay.

19          THE COURT:  Okay.

20          MR. STEKLOFF:  I had a few if Ms. Wagstaff was

21   finished.

22          MS. WAGSTAFF:  Yeah.  We may ask for a curative

23   instruction on that tomorrow if we go back and reread

24   Dr. Mucci's testimony, but we'll bring that up tomorrow.

25          THE COURT:  Okay.  I'll give you my reaction to that

1    now is that Dr. Ritz and Dr. Mucci both engaged in speculation

2    about what was going on in people's minds when they were

3    filling out this questionnaire, including Dr. Ritz speculating

4    about personal protective equipment.

5        So, you know, I didn't see anything that sort of crossed

6    the line into raising concerns about whether Hardeman used it

7    as intended, but this topic of using personal protective

8    equipment and how the farmers responded to the questionnaire

9    about that was very much introduced initially by Dr. Ritz in

10   her speculation about what they were thinking and what they

11   were not thinking when they responded to the questionnaire.

12       **MS. WAGSTAFF:**  So we'll go back and look at that and

13   raise it again tomorrow if we think we need to.

14       **THE COURT:**  Okay.

15       **MR. STEKLOFF:**  I should clarify now -- someone said

16   this to me -- on the question of warn, I do think it's relevant

17   that if the oncologists knew that Roundup was a cause, they

18   would tell their patients.  I think I can argue that they

19   should stop using Roundup, and I don't want that to be confused

20   with warn.

21       **THE COURT:**  Right.

22       **MS. WAGSTAFF:**  So, then, I think if he's going to make

23   that argument, I think that we have a party stipulation that

24   we've already stipulated -- we have an RFA that says Monsanto

25   never warned that Roundup could cause cancer.  And so if

1   they're going to say their doctors, if they had known, they

2   would have warned, and, oh, look, they didn't warn, then I

3   think that one of the reasons we could say is because Monsanto

4   never warned them.

5          THE COURT:  But that begs the question of whether it

6   causes cancer.

7          MS. WAGSTAFF:  Right.  So I'm saying that it all --

8   none of it should come in.  I think that it's a complete

9   distraction to what we're doing tomorrow.

10         THE COURT:  Yeah, I understand.  I think it's

11  relevant; and, as I've said, I mean, part of why I allowed the

12  stuff in about the mouse study from 1932 or whenever it was

13  was, you know, that --

14         MS. WAGSTAFF:  It's 1985.

15         THE COURT:  I know, sorry.

16     -- it had some relevance, you know, to this issue.  But it

17  is permissible for them to argue in closing the testimony about

18  doctors not warning -- not telling their patients to stop using

19  Roundup.

20         MR. STEKLOFF:  Your Honor, if I can go through my --

21         THE COURT:  It is not permissible to say that Monsanto

22  didn't warn its people -- warn the public and its customers

23  that Roundup causes cancer.

24         MR. STEKLOFF:  Your Honor, I just have a brief list.

25  First, I don't think either of us should say anything about

PROCEEDINGS

```
 1   Phase II.  I don't think Phase II -- I'm basing this on the
 2   opening.  I don't think Phase II should come into play.  There
 3   should be no talk about what might happen based on their
 4   verdict.
 5        THE COURT:  Yeah.  And I will tell them tomorrow that,
 6   you know, they'll be ready to present arguments to you on
 7   Phase II when you're done; and then I agree, neither of you
 8   should say a word about Phase II either directly or by
 9   implication.
10        MR. STEKLOFF:  Okay.  My second, Your Honor, is, this
11   is also based on the opening, there was a slide that had
12   company employees and a big question mark that said "live," and
13   I think any argument that we did not present a company witness
14   is inappropriate.  It's shifting the burden, and I don't think
15   that that would be appropriate.
16        MS. WAGSTAFF:  I mean, I think that's argument and it
17   goes to sort of the strategy of defending this case.  And I
18   think we absolutely, in every case I've ever been involved in,
19   have been able to argue that, that they didn't bring anyone to
20   testify live for you.  I think that's completely appropriate in
21   closing argument.
22        THE COURT:  But Donna Farmer doesn't even work there
23   anymore; right?
24        MS. WAGSTAFF:  She does work there.
25        THE COURT:  Oh, she does work there.
```

1          **MS. WAGSTAFF:**  So does Bill Reeves.  So does

2    Goldstein.  So does almost every person we brought on video.

3          **THE COURT:**  Do you-all have case law on this because

4    my sort of gut is there's nothing wrong with what she did in

5    opening on that.  You know, that's not one of the things I

6    called her out on.

7          You know, Monsanto could bring these people to testify

8    live and they didn't, and they can't force them to come and

9    take the stand.  What's wrong with briefly mentioning that?

10         **MR. STEKLOFF:**  Well, I think it's in any circumstance,

11   even in a nonbifurcated trial, burden shifting because we don't

12   have the burden to bring someone.  So I think there's case law

13   on that, but we will have to go find it.

14         But in this circumstance in a phased trial where we are

15   talking about causation, I'm not -- I mean, what this person

16   could have said where Your Honor has ruled that they can't --

17   that they're only fact witnesses, they can't present expert

18   testimony, for example, about the extreme dosing and animal

19   studies and other things in Phase -- maybe we revisit this if

20   there's a Phase II; and at the end of Phase II, maybe you say

21   it's appropriate there if we don't bring a company witness.

22   But I'm not even sure -- I mean, I'm not sure how we could have

23   even cabined a company witness' testimony here, and so I think

24   in this trial where we are right now, it's inappropriate and it

25   should not happen tomorrow.

1    **MS. WAGSTAFF:** And, Your Honor, I think that they

2    absolutely could have brought company witnesses. And as you

3    know from listening to the trial, one of our themes is sort of

4    looking at the whole picture of evidence, and they didn't

5    produce anyone on toxicology and anyone on mechanism, and I

6    intend to point that out to the jury, whether it's by expert or

7    corporate witness. And they could have brought somebody to

8    talk about this information. Donna Farmer could have come and

9    talked about -- and talked about the animal studies. She

10    absolutely could have.

11    **THE COURT:** Well, I don't know. That begs the

12    question whether she was an expert and would have qualified as

13    an expert to do so.

14    But my ruling as of now on the issue of live witnesses is

15    that I think if you briefly mention it in the way that you did

16    in your opening statement, I think that's fine. That's my

17    sense is that I understand that there's a 403 argument, but I

18    think it's fine. If you have case law to the contrary, go

19    ahead and submit it and I'm happy to look at it and, you know,

20    let you know tomorrow morning.

21    **MR. STEKLOFF:** Okay. On Dr. Levine, I think it would

22    be inappropriate to argue anything about her general causation

23    opinions or general causation methodology. I think based on

24    the door opening, I was able to ask a few questions, but I

25    don't think it would be appropriate, for example, to compare,

PROCEEDINGS

```
 1   like, the amount of time Dr. Weisenburger spent talking about
 2   general causation with the amount of time Dr. Levine spent on
 3   general causation.
 4           THE COURT:  Certainly not.
 5           MR. STEKLOFF:  Okay.
 6           MS. WAGSTAFF:  So just so we're clear on what I intend
 7   to do, because I had planned closing before today, I wasn't
 8   even considering Levine a general causation witness.  So I'm
 9   kind of still operating under that assumption because she
10   testified earlier that all of her general causation opinions
11   were coming through Mucci, which I don't think opened the door
12   changed.
13       I think you let him ask those questions about epidemiology
14   just based on some things that Ms. Moore had asked her.  I
15   don't think that you were -- your ruling was, "Oh, now, you're
16   a general causation witness," and that's why we didn't follow
17   up with a bunch of cross on epidemiology.  And, furthermore,
18   she didn't testify, even when you did open the door, that she
19   reviewed any animal data or mechanistic data.  So that's sort
20   of where I am on that.
21           THE COURT:  Right.  But what does that -- I mean --
22           MS. WAGSTAFF:  So I'm not going to --
23           THE COURT:  I mean, I was a little vague about what
24   you were intending to say about her on closing.
25           MS. WAGSTAFF:  So when I talk about -- you know,
```

1    obviously there's two sort of sections in closing; right?

2    There's general causation and specific causation.  So when I

3    talk about general causation and the testimony that Monsanto

4    brought, I was just going to use Dr. Mucci.

5              THE COURT:  Right.

6              MS. WAGSTAFF:  And I wasn't even going to move her

7    into the classification of general causation because it wasn't

8    my understanding that you were then letting her be a general

9    causation witness.  My understanding was you were just letting

10   her say "Yeah, I've read the epidemiology" based on some

11   questions Ms. Moore asked her, but you weren't saying, "Yeah,

12   and so now you're a general causation expert."  Because, as you

13   know, we hadn't put her epidemiology opinion through the test.

14             THE COURT:  I mean, I don't have a beef with anything

15   that you just said --

16             MS. WAGSTAFF:  Okay.

17             THE COURT:  -- but I also think it would be

18   appropriate -- you tell me, do you have a beef with anything

19   she just said?

20             MR. STEKLOFF:  No.  I think we're going to the same

21   place, which is that I can still argue that Dr. Levine did

22   offer an opinion that Roundup generally does not --

23             THE COURT:  Well, I mean, offer an opinion?  I don't

24   know.  I think that you can say that she -- I think you can say

25   what she said.

 1          MR. STEKLOFF:  Sure.  Okay.

 2          THE COURT:  I don't think you can say she offered an

 3   opinion because she didn't actually offer an opinion in the way

 4   that we understand that term --

 5          MR. STEKLOFF:  Okay.

 6          THE COURT:  -- right?

 7          MR. STEKLOFF:  I can use the phrase "Based on her

 8   review of the literature does not think," you know, or

 9   something.

10          THE COURT:  Yeah, she agrees with Dr. Mucci as she

11   testified.  She's reviewed the letter and the literature and

12   she agrees with Dr. Mucci.

13          MR. STEKLOFF:  I think in redirect she was able to go

14   a little bit further, which was to say that independent --

15          THE COURT:  She has reviewed the literature.

16          MR. STEKLOFF:  And independently does not think, not

17   just based on Dr. Mucci, she does not think Roundup causes or

18   is associated with non-Hodgkin's lymphoma.

19          THE COURT:  I mean, I think it is fine to mention the

20   testimony she gave.  It was testimony.  It was admissible.  It

21   was allowed in, but to sort of dress it up as an opinion,

22   right, we have this instruction on experts offering opinions.

23   And I don't think it will -- it would be fair to say that she

24   offered a general causation opinion.  She offered a specific

25   causation opinion and in response to questions on

PROCEEDINGS

1   cross-examination or whatever, she offered an opinion on

2   specific causation.

3        **MR. STEKLOFF:**  I don't think she did.  I think if I

4   can reference the testimony that she offered on redirect -- and

5   I will not characterize it as an opinion -- then I'm fine with

6   that.

7        **THE COURT:**  Yeah.  Again, it will be the kind of thing

8   where if you go overboard with it, I will need to cut you off.

9        **MR. STEKLOFF:**  No problem.

10       **THE COURT:**  Okay.

11       **MR. STEKLOFF:**  And then the last one --

12       **MS. WAGSTAFF:**  Before we leave that topic --

13       **THE COURT:**  So --

14       **MS. WAGSTAFF:**  -- I intend to do the reverse and argue

15   that she didn't offer a general causation opinion, because --

16       **THE COURT:**  Well, I think that would be a real problem

17   because she didn't -- you know --

18       **MS. WAGSTAFF:**  Or at least if she did, it is only on

19   the epidemiology.

20       **THE COURT:**  Well, I think it would be fine for you to

21   say she reviewed the epidemiology, but she didn't tell you that

22   she reviewed the animal studies and the cell studies.  I think

23   that's fine.

24       And for the record, your opponent is nodding yes to that.

25       **MS. WAGSTAFF:**  Yeah.  And so taking it one step

1    further, though, if you put together all of her testimony, what

2    Dr. Levine actually said was she is relying on Dr. Mucci's

3    analysis of the epidemiology.  She said that at the beginning

4    of the testimony.  I think I can tell the jury that.

5         And then later Mr. Stekloff said, Have you reviewed the

6    epidemiology?

7         She said, Yes.

8         He didn't say, Did you do your own analysis and, you know,

9    all of that kind of stuff.

10        So I will go back tonight and reread it, and I will make

11   sure I say everything that sort of fits together; but I think

12   her earlier testimony that she is relying on Dr. Mucci's

13   analysis of the epidemiology is sort of the way that her

14   testimony came in.

15        **THE COURT:**  Well, she relies on it.  She agrees with

16   it, and she has done her independent review of the

17   epidemiology.  I think it is fair game to say she didn't -- she

18   is not basing -- you know, she is not basing her opinion on

19   animal studies or anything like that.  That's certainly fair

20   game.

21        **MS. WAGSTAFF:**  All right.  Well, I thought we just

22   agreed that she wasn't giving a general causation opinion?

23        **THE COURT:**  Yes.

24        **MS. WAGSTAFF:**  Okay.

25        **THE COURT:**  That's correct.

1    **MS. WAGSTAFF:**  Okay.

2    **MR. STEKLOFF:**  I think --

3    **THE COURT:**  Where am I confused?  It sounds like --

4    **MS. WAGSTAFF:**  It gets confusing.

5    **MR. STEKLOFF:**  I don't think that Ms. Wagstaff should

6    be able to argue that she doesn't -- didn't give a general

7    causation opinion.  I similarly don't think I should be able to

8    say she did give a general causation opinion.  I think we

9    should both rely on what her testimony was in its totality, and

10   that includes the redirect, which is that she did her own

11   independent review of the epidemiology and based on that

12   review, she does not think that glyphosate or Roundup is

13   caused -- is the cause of non-Hodgkin's lymphoma.  That's where

14   we are now based on the cross-examination.  And I think

15   anything that characterizes it as something other than that is

16   inaccurate.

17   **MS. WAGSTAFF:**  The jury doesn't know what general

18   causation is.  So, I mean, I will just argue what her testimony

19   is.

20   **THE COURT:**  That makes me a little bit nervous, but --

21   you know, I'm not sure how much we can pre-adjudicate this.  I

22   think -- all I'm saying is I think it would be inappropriate to

23   say, Look, she got up there and said that she believes -- she

24   reviewed the literature and she believes it is not a risk

25   factor, but she never gave you any explanation why.  That would

1   be totally inappropriate because -- because she was capable of

2   giving an explanation why.  She just didn't because that's how

3   the pretrial rulings went down.

4           MS. WAGSTAFF:  Okay.

5           THE COURT:  Does that make sense?

6           MS. WAGSTAFF:  Yeah.

7           THE COURT:  Okay.

8           MR. STEKLOFF:  Doubling of the risk specific to

9   Mr. Hardeman, I think that's off limits in terms of dose

10   response.  Again, it is not off limits --

11           THE COURT:  In terms of dose response, yes.

12           MR. STEKLOFF:  Yes.

13           THE COURT:  Yeah.

14           MS. WAGSTAFF:  Well, hang on.  Let me just make sure I

15   understand.

16       In the specific causation when we are saying -- when we

17   are talking about Mr. Hardeman, I'm not to say Because he used

18   it more than two days or ten days, his risk is doubled.

19           THE COURT:  That's correct.

20           MS. WAGSTAFF:  Okay.  Yeah, I wasn't going to do that.

21           THE COURT:  The experts were precluded from

22   testifying --

23           MS. WAGSTAFF:  When I talk about the cases, and I'm

24   describing dose response, I can put up there the 2.1, which is

25   a 210 percent increase risk.

 1              THE COURT:  I mean --

 2         MS. WAGSTAFF:  Talking about the general causation.

 3         THE COURT:  General causation, yes.

 4         MS. WAGSTAFF:  I'm going to do general causation, and

 5    then I am going to do specific causation.  So I can actually

 6    use those numbers in my general causation?

 7         THE COURT:  Yes.

 8         MS. WAGSTAFF:  Okay.

 9         MR. STEKLOFF:  Then we have two others, and maybe this

10    is sort of just a gray area.  But I'm not saying she can't --

11    of course, she can state what the IARC classification was, and

12    maybe a little bit more, but I think, you know, veering into

13    where we were in opening, in terms of the 18 scientists and

14    France and all of that, I don't think that that -- I think

15    consistent with how you ruled in opening, that we shouldn't

16    cross that territory in closing.

17         THE COURT:  Well, I mean, you know, we have an

18    instruction that you are not supposed to substitute -- you are

19    not to substitute the EPA's judgment for your own or the IARC's

20    judgment for your own.  So it seems that it would follow from

21    that, that, you know, you don't cite IARC or EPA in support of

22    your conclusion that it does or does not cause cancer.  Right?

23         MR. STEKLOFF:  Yes.

24         THE COURT:  So you agree that you should not be citing

25    the EPA or the European regulators in support of your argument

1   that it does not cause cancer?

2        **MR. STEKLOFF:**  I think I can cite the EPA and the

3   European regulators in response, for example, to Dr. Portier's

4   opinions, because that's how it came in.  And otherwise I'm

5   fine if neither of us can -- need to -- can -- follow the

6   instruction and not say that they should somehow substitute

7   their judgment for IARC or the regulators.

8        **THE COURT:**  I mean, the fact that they have reached

9   their conclusion, that has come in.

10        **MR. STEKLOFF:**  Yeah.

11        **THE COURT:**  You know, I don't -- I don't -- the

12   question is whether there needs to be, like, a hard-fast gag

13   rule about it or whether, you know, it -- whether it can be

14   mentioned as part of the discussion of the evidence that came

15   in, you know, subject to the limitations that we have already

16   discussed.

17        **MS. WAGSTAFF:**  Obviously I have an objection with

18   Monsanto talking about the EPA and foreign regulatory decisions

19   and me not being able to talk about IARC.  There is sort of a

20   theme that they are developing with their witnesses that there

21   is no evidence, no evidence across the board, no evidence, no

22   evidence.

23        So I think me being able to at least mention IARC -- I

24   have it in one slide.  It is very diluted down.  You are going

25   to see it at 7:00 o'clock in the morning.  I can take it out if

1   you don't like it, but I think you will be fine with what I

2   have.

3           THE COURT:  Okay.  But it is not just what is in the

4   slides.  It is what you say when you put up the slides.

5           MS. WAGSTAFF:  Yeah, I understand that.  I can

6   practice in front of you tonight.

7           THE COURT:  Well, I'm comfortable just sort of dealing

8   with IARC and EPA the way we have dealt with it thus far.  I

9   mean, in terms of the evidence coming in, it worked out fairly

10  well.  The message should be quite clear about -- about closing

11  argument in light of what happened in opening statements.

12      So, you know, I'm comfortable leaving it that way, but if

13  either side wants to sort of delineate further grounds rules,

14  I'm happy to try that too.

15          MS. WAGSTAFF:  Well, I don't think we presented too

16  much evidence pumping up IARC too much.  I wouldn't be

17  surprised if all the jurors don't even know what IARC is.

18          THE COURT:  Well, they will after they get this

19  instruction.

20          MR. STEKLOFF:  The last is just -- it's fine.  Okay.

21  I won't even press the other one.

22      I have a different question about closing, which is -- I

23  know there are no time limits, but I do think that having some

24  time limit for the rebuttal closing is appropriate because

25  otherwise --

 1          THE COURT:  Yeah.

 2          MR. STEKLOFF:  Normally there are some time limits

 3    over closings overall, and a certain part can be apportioned

 4    for rebuttal.  So I'm hoping there is some guidance of how much

 5    time can be used for that.

 6          THE COURT:  Well, usually what I do is like a quarter

 7    of the time you spent on your initial closing, you can spend on

 8    your rebuttal.

 9          MR. STEKLOFF:  I would be fine with that.

10          THE COURT:  Any problem with that?

11          MS. WAGSTAFF:  No.

12          THE COURT:  Okay.  So if it is an hour in your initial

13    closing argument, it is 15 minutes on rebuttal.

14          MR. STEKLOFF:  And then the last question I have,

15    Your Honor, is earlier it was referenced to potential rebuttal

16    testimony.  I don't think in the time remaining -- 20 minutes

17    or so on Dr. Arber -- is going to change the universe of our

18    evidence very much.  So I think we should know now if the

19    Plaintiffs are going to argue that there is some sort of

20    rebuttal evidence so we can address if before tomorrow morning.

21          THE COURT:  That's fine.

22          MS. WAGSTAFF:  Well, they have asked me a couple of

23    times about this, and now they are asking in front of you so

24    I guess I should answer.

25          We have some testimony from Dr. Portier on the third

 1    day -- remember he was in Australia.  He did direct, cross, and

 2    then the third day was all rebuttal.  So we have a couple of

 3    sections highlighted out.  That is not very much.  It is

 4    probably less than ten minutes.  And we were working on that

 5    today as Dr. Levine was testifying.

 6        And so I would like the opportunity to talk to my

 7    cocounsel who has been quite busy all day, and I can get to

 8    them the cites that we are talking about later tonight.  I just

 9    don't have it finalized right now, so I don't -- I mean --

10            THE COURT:  Okay.

11            MS. WAGSTAFF:  -- I wasn't prepared to do that.

12            THE COURT:  By 8:00 p.m. tonight.

13            MS. WAGSTAFF:  Okay.  That much time, wow.

14            MR. STEKLOFF:  And other than, I think, addressing the

15    medical records, the authentication issue, I don't have

16    anything else, Your Honor.

17            THE COURT:  Well, then, let's talk about that.

18            MR. KILARU:  I think there is a relatively

19    straightforward answer to that, Your Honor, which is 902(11) --

20    FRE 902(11), talks about certifying domestic records of a

21    regularly conducted activity.

22            THE COURT:  902 what?

23            MR. KILARU:  902(11), Your Honor.

24        It says, The original or a copy of the domestic record

25    that meets the requirements of the Business Records Rule

 1    803(6), as shown by a certification by a custodian or another

 2    qualified person that complies with the statute or rule.

 3        And we have -- I think we submitted --

 4        **THE COURT:**  What is the a definition of a domestic

 5    record?

 6        **MR. KILARU:**  I believe -- I think it would probably

 7    come back up to 803(a)(6) perhaps.  I guess it wouldn't go back

 8    to 803(a)(6), but --

 9        **MS. MOORE:**  Your Honor, I'm going to -- I don't think

10    medical records come in under this subsection, but I need to

11    double-check.

12        **THE COURT:**  Well, it's not that they come in.  It is

13    about authentication.

14        **MR. KILARU:**  I think it would count.  We can look into

15    this domestic records question.  I think this is several

16    arguments we have in favor of letting it come in.

17        We have affidavits from the custodians of medical records

18    at Kaiser, and on both of these affidavits -- I can provide

19    Your Honor a copy if you like -- they have a box checked that

20    says, The person certifying that the records were prepared by

21    the personnel of the hospital staff, physicians or persons

22    acting under the control of, either in the ordinary course of

23    business at or near the time of the act, commission or event.

24        **THE COURT:**  Okay.

25        **MR. KILARU:**  So I think that should get us over the

1    authentication hurdle.

2              THE COURT:  Okay.

3              MR. KILARU:  Independently, in Rule 901, I believe it

4    is 901(b)(4) -- there is authority for permitting

5    authentication if the appearance, content, substance, internal

6    patterns or other distinctive characteristics of the item,

7    taken together with all the other circumstances, satisfy

8    authenticity.

9              THE COURT:  Okay.

10             MR. KILARU:  I think, as Mr. Stekloff pointed out,

11   these records were discussed on the screen with the medical

12   providers, and so I think there shouldn't be that much debate

13   about that.

14             THE COURT:  Okay.

15             MR. KILARU:  And there is a case, Tate -- actually it

16   involves Kaiser, of all providers -- but *Tate v Kaiser*.  It is

17   at 2014 Westlaw 176, 625.  It basically talks about both of

18   these provisions, but sort of puts them together and says even

19   if it technically doesn't meet either one, it is close enough.

20   It is a California case.  I believe it is from the Northern

21   District, but I'm not 100 percent sure which district in

22   California.  I think given the circumstances, given how many of

23   these medical records have come in --

24             THE COURT:  Can you give me the cite again.

25             MR. KILARU:  Sure.  2014 Westlaw, 176, 625, I'm pretty

 1   sure.

 2          THE COURT:  Okay.

 3          MR. KILARU:  We have looked through the notes on 902,

 4   and I don't think there is further definition of domestic

 5   records other than to sort of contrast them with foreign

 6   records, which I think this clearly isn't.

 7          THE COURT:  Okay.

 8          MR. KILARU:  So I think that we believe that that

 9   should take care of the authentication issue, and at that point

10   we think they can be admitted to the expert.

11          THE COURT:  Okay.

12          MS. MOORE:  Well, Your Honor, there is still the issue

13   of hearsay.  Under FRE 703, hearsay is permitted; but that's

14   only to explain that the expert relied upon it.  It is not to

15   be admitted for the truth of what is asserted.

16          And so we would ask for an instruction if the Court was

17   going to allow -- first of all, I don't think it is proper

18   under 902 for them to dump these medical records that they

19   weren't able to get in under the doctor's depositions.  And

20   they were there at the doctors' depositions.  They had an

21   opportunity to cross-examine all the doctors.  They have

22   submitted exhibits at the trial for those doctors.  These are

23   additional records that they didn't get in with the doctors,

24   and now they are trying to get them in through an expert.  And

25   I don't think that's proper.  I don't think that is proper

1   authentication.

2        And so we would ask that if the Court was inclined to

3   allow that to come into evidence, that it not -- that there be

4   an instruction -- I mean, I actually need to see what the

5   exhibits are because I don't recall at this point at 6:30 at

6   night, Your Honor, which ones that we are talking about.

7        THE COURT:  I think it was actually relatively

8   inconsequential, but not to say --

9        MS. MOORE:  Yeah, I know.  I don't want to spend -- I

10  don't want to waste the Court's time.

11       THE COURT:  No.  I'm not saying you can't object to

12  it.

13       MS. MOORE:  If we could -- if you can let me look at

14  it tonight and I can let the defense know.

15       THE COURT:  Well, I mean, the time for looking at the

16  exhibits I think has passed.  The question is whether they are

17  admissible under these circumstances, whether they are -- they

18  have been adequately authenticated in the way that Mr. Kilaru

19  has described, and whether -- and whether they can come in

20  through the experts if they have been adequately authenticated.

21  That's really the question.

22       So do you have anything else to say about that?

23       MS. MOORE:  Yeah, Your Honor.  The only other thing is

24  I did object to this when they sent me their exhibit list.  And

25  I said that it was improper under hearsay.  And I was told, and

1    I was trying to pull that up -- that they were not going to

2    admit them into evidence, and so I wasn't prepared for that.

3        I want to try to see if I can -- as you can imagine, we

4    have a lot of e-mails back and forth -- but that was my

5    understanding, Your Honor.

6        **MR. KILARU:**  I don't believe -- I'm not sure.  I don't

7    believe we agreed to that just on the hearsay point.  I think

8    if it is authenticated under 902 as a business record, it can

9    come in as a business record.  I also think it fits in the

10   medical exception statement, 803(4).  I think the

11   authentication objection, it is pretty clear, was not made --

12       **THE COURT:**  The medical exception statement, was it --

13   none of those records are reflected as statement by

14   Mr. Hardeman to his treaters, did it?

15       **MR. KILARU:**  I don't -- well, I think it goes both

16   ways in those records.

17       **THE COURT:**  I don't think so.  I think that

18   statement -- that exception for a statement to a medical

19   provider only goes to a statement by the person who is seeking

20   treatment.  I don't think it's from the doctors to the patient.

21       **MR. KILARU:**  My understanding is different,

22   Your Honor, because I think it is about statements made for

23   medical diagnosis of treatment.  And I think the rationale that

24   you have for that rule is that neither side has sort of an

25   incentive to lie in that circumstance.  We think it applies

 1   just as well to the doctor's side to the patient's side.   I

 2   don't think there is anything in the rule that limits it to the

 3   declarant being the patient as opposed to the doctor.   I also

 4   think --

 5          **THE COURT:**  There is nothing in the text of the rule,

 6   but I think there is quite of a bit of case law.

 7          **MR. KILARU:**  We can look at that as well.   I also

 8   think the 803(a)(6) point resolves it as well.

 9          **THE COURT:**  Okay.   I will go back and look at that a

10   little bit more, and I will issue a ruling.

11       What were the exhibit numbers?   Does anybody remember?

12          **MR. KILARU:**  I can get those.

13       (Whereupon, a brief pause was had.)

14          **MS. RUBENSTEIN:**  It was Trial Exhibit 1023 at

15   pages 940 and 192.

16       The other -- the other two that were referenced today are

17   actually already in evidence.

18          **THE COURT:**  So it was just that one exhibit and those

19   two pages?

20          **MS. RUBENSTEIN:**  That's right.   We have the medical

21   records.

22          **THE COURT:**  Pages 940 and what?

23          **MS. RUBENSTEIN:**  940 and 192, Your Honor.

24          **THE COURT:**  Okay.

25          **MS. MOORE:**  Do you have a copy?

 1        **MS. RUBENSTEIN:**  Yep.

 2        **THE COURT:**  In light of the fact that it is down to

 3   one exhibit, you want to just glance at it and make sure you

 4   really care?

 5        **MS. MOORE:**  I can, Your Honor.

 6        **MR. KILARU:**  Your Honor, do you want these affidavits

 7   or --

 8        **THE COURT:**  Sure.

 9      (Whereupon, a brief pause was had.)

10        **MS. MOORE:**  Your Honor, I do want to look at this

11   because it looks like something has been redacted off of this.

12      (A brief pause was had.)

13        **MR. KILARU:**  I want to make an unrelated issue that I

14   don't think should take up too much time.

15      But we did make our -- Mr. Stekloff made our directed

16   verdict motion the other day.  I think, whether it is today or

17   tomorrow morning, I think it would probably behoove us to put

18   some reasons on the record.  I don't want to take too much with

19   that, so we can either do that now or later, whatever you

20   prefer.  We can do it tomorrow morning very quickly.

21        **THE COURT:**  Before closings?

22        **MR. KILARU:**  Yeah.  I mean, I think given how much

23   time we spent talking about the jury instructions --

24        **THE COURT:**  Okay.  We can do that before closings if

25   that's necessary, yeah.

 1          MS. WAGSTAFF:  And then, Your Honor --

 2          THE COURT:  Sorry.

 3          MS. WAGSTAFF:  I was going to ask just one follow-up

 4    question.

 5       The case will probably go to the jury after lunch.  If

 6    they choose to go home at 2:30, there is a chance they won't

 7    have a verdict.  If they do not have a verdict tomorrow, we

 8    would do openings on Friday?

 9          THE COURT:  Not necessarily.

10          MS. WAGSTAFF:  Okay.

11          THE COURT:  If they come back with a yes verdict in

12    the morning on Wednesday, I will expect you to be ready with

13    your opening statements.

14          MS. WAGSTAFF:  And you would only do it if there was

15    enough time for both parties to do opening or --

16          THE COURT:  Not necessarily.

17          MS. WAGSTAFF:  Okay.

18          THE COURT:  And you should -- I mean, I think you

19    should anticipate that they will go past 2:30.  The juries

20    almost always seem to do that.  Even when I tell them they have

21    the option to do that, they almost always do, so.

22          MS. MOORE:  Your Honor, on the two pages they just

23    handed me, the one that is marked 1023, page 192, it contains

24    some references that the Court has excluded under a motion in

25    limine, and that has not been redacted.  So I would object to

1    this.  This is about eczema, and it's been excluded.

2        In fact, they stipulated to that being excluded at trial,

3    so I'm not sure of the purpose of getting in page 192,

4    especially as it is unredacted.

5        Then on page 940, this is one page and it is cut off of a

6    particular office visit.  Oh, I see.  This is a different

7    version.  Okay.

8        Your Honor, again, I don't think it should come in because

9    it is hearsay and it shouldn't be authenticated with an expert.

10   So that is my objection.  I have noted it for the record.

11           **THE COURT:**  Okay.

12           **MS. MOORE:**  But I do object to 1023, page 192 for --

13   because it is excluded under the MIL order.

14           **THE COURT:**  If you think there is something that needs

15   to be redacted, I --

16           **MR. KILARU:**  I'm almost certain that this is not the

17   page that we intended.  We will figure out which one it is.  I

18   think it is one of the ones that was shown to the jury during

19   Mr. Stekloff's direct, so we will figure out what that is.

20           **THE COURT:**  All right.  I will look at that and either

21   issue something tonight or we will straighten it out tomorrow.

22   So I'm planning on being in very early tomorrow to look at

23   slides.  So the slides have to be transmitted to us by

24   7:00 a.m. tomorrow.

25           **MS. MOORE:**  Okay.  Thank you, Your Honor.

PROCEEDINGS

1          MR. KILARU:  Thank you.

2               (Proceedings adjourned at 6:38 p.m.)

3                    ---oOo---

4

5               __CERTIFICATE OF REPORTERS__

6          I certify that the foregoing is a correct transcript

7     from the record of proceedings in the above-entitled matter.

8

9     DATE:   Monday, March 11, 2019

10

11

12

13     _____

14          Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                U.S. Court Reporter
15

16

17     _____

18          Marla F. Knox, RPR, CRR
                U.S. Court Reporter
19

20

21

22

23

24

25