Volume 13

Pages 2101 - 2142

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

EDWARD HARDEMAN,                    )
                                    )
            Plaintiff,              )
                                    )
  VS.                               )      NO. C 16-00525 VC
                                    )
MONSANTO COMPANY,                   )
                                    )
            Defendant.              )
_____ )

                              San Francisco, California
                              Thursday, March 14, 2019

                    **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                    ANDRUS WAGSTAFF PC
                    7171 W. Alaska Drive
                    Lakewood, Colorado  80226
                BY: **AIMEE H. WAGSTAFF, ATTORNEY AT LAW**
                    **DAVID J. WOOL, ATTORNEY AT LAW**

                    MOORE LAW GROUP
                    1473 South 4th Street
                    Louisville, Kentucky  40208
                BY: **JENNIFER MOORE, ATTORNEY AT LAW**


          (APPEARANCES CONTINUED ON FOLLOWING PAGE)


REPORTED BY:  Marla F. Knox, RPR, CRR
              Official Reporter

```
1   **APPEARANCES**:   (CONTINUED)

2   For Defendant:

3                       WILKINSON  WALSH ESKOVITZ LLP
                        2001 M Street, NW - 10th Floor
4                       Washington, D.C.  20036
                BY:   **BRIAN L. STEKLOFF, ATTORNEY AT LAW**
5                     **RAKESH N. KILARU, ATTORNEY AT LAW**
                      **TAMARRA MATTHEWS JOHNSON, ATTORNEY AT LAW**
6                     **JULIE RUBENSTEIN, ATTORNEY AT LAW**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | **Thursday - March 14, 1995**                    **12:35 p.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---oOo--- |
| 4 | (Proceedings were heard out of presence of the jury:) |
| 5 | **THE CLERK:**  Calling Civil Matter 16-525, Hardeman v. |
| 6 | Monsanto, et al. |
| 7 | If parties could please come forward and state their |
| 8 | appearances for the record. |
| 9 | **THE COURT:**  Don't worry about it.  We all know who |
| 10 | each other is at this point. |
| 11 | Okay.  So let me -- let me write a list of things that we |
| 12 | need to discuss.  So we have Benbrook.  We have the design |
| 13 | defect issue.  We have the Seralini study.  I feel like I'm |
| 14 | missing one thing.  No? |
| 15 | **MS. MOORE:**  I don't think so, Your Honor.  The only |
| 16 | other thing -- and this can probably come in with the Seralini |
| 17 | studies.  We wanted to ask for some clarification on the |
| 18 | post-use corporate conduct rulings from yesterday, but I think |
| 19 | that can come up when we are talking about Seralini as well. |
| 20 | **THE COURT:**  Okay.  Post-use corporate conduct rulings |
| 21 | from yesterday.  Oh, on the motion in limine. |
| 22 | **MS. MOORE:**  Yes, Your Honor. |
| 23 | **THE COURT:**  All right.  So Benbrook I think is easy. |
| 24 | I don't need to hear any further argument on it. |
| 25 | The three -- the -- the first three items that -- that you |

1    propose to have Benbrook testify about, I do not think are

2    properly the subject of expert testimony.  They are a factual

3    narrative.  The information that you say you want to get out of

4    Benbrook, you should be able to or should have been able in

5    deposition -- been able to get that information out of fact

6    witnesses.  So Benbrook will not be allowed to testify on those

7    three topics.

8         I also think it is highly unlikely that Benbrook is

9    qualified to testify on those three topics, but I don't think

10   it matters because I don't think they are the subject of expert

11   testimony.

12        The fourth topic it seems would be the proper subject of

13   expert testimony, but I don't see how Benbrook is qualified as

14   an expert on that topic.  So I want to -- if you want to kind

15   of point me to something in his qualifications that I might

16   have missed, you know, feel free to do that.  But that's really

17   the only thing that I would want to discuss about Benbrook.

18        **MS. WAGSTAFF:**  All right.  May I confer with my

19   cocounsel for just one minute?

20        **THE COURT:**  Of course.

21        (A brief pause was had.)

22        **MS. WAGSTAFF:**  All right.  In light of Your Honor's

23   comments, and to avoid spending much more time on this,

24   Plaintiffs will withdraw Dr. Benbrook.

25        **THE COURT:**  Okay.  So that means that Mills is not

PROCEEDINGS

1   coming either, right?

2           **MS. WAGSTAFF:**  That means Welsh.

3           **THE COURT:**  Sorry, Welsh.

4           **MR. KILARU:**  That's right, Your Honor.

5           **THE COURT:**  Okay.  Now, let's go to the design defect

6   issue.  I -- come on up.

7       So Monsanto filed this brief in which they say that you

8   don't really have a design defect theory -- sort of

9   anticipating that you actually do have a design defect

10  theory -- but why don't you go ahead and articulate it to me

11  now.

12          **MR. WOOL:**  All right.  So if you look at Monsanto's

13  letter brief, they really limit this argument to glyphosate as

14  a chemical.  And I think there is already enough evidence in

15  the record for the jury to reasonably infer that it is the

16  combination of glyphosate and surfactants that creates the --

17          **THE COURT:**  So your argument is going to be as it

18  relates to the design defect theory?

19          **MR. WOOL:**  Yes.

20          **THE COURT:**  Your argument is going to be that this

21  product as it is constituted -- this product, Roundup, as it is

22  constituted, as it is formulated, is dangerous; and Monsanto

23  could have figured out a way to formulate it so that it would

24  be less dangerous.

25          **MR. WOOL:**  Well, I think that is one potential theory.

**PROCEEDINGS**

1    I think that Monsanto's argument with respect to the

2    possibility of California banning Roundup outright is another

3    theory that Plaintiffs intend to proceed under.

4         THE COURT:  Is that a -- if the argument is that the

5    product simply shouldn't be there, is that really a design

6    defect argument?

7              MR. WOOL:  I think that the argument --

8         THE COURT:  Doesn't sound like it --

9         MR. WOOL:  So I think that the argument wouldn't

10   necessarily be that the product shouldn't be in existence at

11   all, but I think it would be that it shouldn't be in existence

12   as it pertains to residential uses, like the ones that

13   Mr. Hardeman used.  That it is certainly -- you know, setting

14   aside the uses that Your Honor limited, I think in response to

15   Plaintiff's MIL Number 3, which are the agricultural uses which

16   we think aren't relevant here; that this product is completely

17   unreasonable for, you know, your ordinary consumer like

18   Mr. Hardeman.

19        THE COURT:  Is that a design defect theory?  I mean,

20   that is -- I mean, the argument is -- the argument does not

21   appear to be -- on that theory, the argument does not appear to

22   be that it was designed improperly; the argument appears to be

23   that it was marketed improperly or sold to the wrong people.

24        MR. WOOL:  Well, I think that would still fall under

25   the ambit of design defect because this is one of the uses of

1   the product is -- it is sort of sold and intended to be used

2   for, and that it would be used for killing poison oak in

3   Mr. Hardeman's case.  And I believe that is still under the

4   ambit of a design defect.

5        **THE COURT:**  So what -- so what -- do you have case law

6   for the proposition that you can pursue a design defect claim

7   based on who the product is sold to as opposed to the way the

8   product is actually designed?

9        **MR. WOOL:**  Well, I think not only who it is sold to,

10   but more about -- more sort of along the lines of what the

11   product is sold for, which I guess it's not that big of a

12   distinction, but --

13        **THE COURT:**  Let's assume -- let's assume for the sake

14   of discussion that you don't have any argument or evidence that

15   Roundup should have been formulated differently; and had it

16   been formulated differently, it could have been sold to people

17   like Mr. Hardeman, okay, because I don't think you are -- I

18   don't actually think you are arguing that, are you?

19        **MR. WOOL:**  That it should have been -- so if I

20   understand Your Honor's hypothetical, it's that -- for the

21   purposes of this question, it is that --

22        **THE COURT:**  Do you plan to argue to the jury that

23   Roundup could have been sold to people like Mr. Hardeman if it

24   had been formulated differently?

25        **MR. WOOL:**  No, that's not Plaintiff's claim.

PROCEEDINGS

```
1              THE COURT:  Okay.  So what you plan to argue is that
2    it shouldn't have -- maybe it should have been sold to farmers.
3    Maybe it should have been under a sort of a -- it should have
4    been regulated more heavily by the EPA, and maybe it could have
5    been sold to farmers.  We are not here, Jury, to decide whether
6    it could have been sold to farmers or not; but it is a product
7    that is too dangerous to have been sold to ordinary consumers
8    who use it in their yard, right?
9              MR. WOOL:  Right.
10             THE COURT:  Regardless of the type of warning,
11   regardless of whether you are telling people to wear protective
12   equipment, it's too dangerous to be sold to ordinary consumers
13   who use it in their backyards.
14             MR. WOOL:  Right.
15             THE COURT:  That's what you plan to argue to the jury?
16             MR. WOOL:  Yes.
17             THE COURT:  On your design defect theory?
18             MR. WOOL:  Yes.
19             THE COURT:  Okay.  And then so -- I guess the question
20   is:  Do you have any case law for the proposition that that
21   is -- that that argument fits within a design defect claim?
22             MR. WOOL:  Well, I think I could find some,
23   Your Honor.  From my --
24             THE COURT:  I understand they just filed this brief.
25             MR. WOOL:  Right.  My recollection of Bates was this
```

 1   was the argument that was more or less rejected by the Supreme

 2   Court.  In essence, any design defect claim falls back into a

 3   claim that necessarily impeaches the label and turns into a

 4   failure-to-warn claim, but --

 5           THE COURT:  And by the way, I mean, we should make

 6   clear here that Monsanto probably should have moved for summary

 7   judgment on this issue.  It's -- the brief that it filed is

 8   like -- the letter that it filed is like a summary judgment

 9   motion basically.

10           MR. WOOL:  Right.

11           THE COURT:  And so there is a question of timeliness.

12   And it may be more of an issue that you can present your theory

13   to the jury and then Monsanto can make a motion for a directed

14   verdict on that question or something.  But it also seems like

15   given, you know, how much time you have left on your clock, you

16   might want to be thinking proactively about whether you really

17   want to be presenting this to the jury, if, at the end of the

18   day, you don't have a legal basis for the theory, right?

19           MR. WOOL:  Understood, Your Honor.  And to be clear, I

20   do think that we have a legal basis to argue that Roundup as

21   formulated to consumers like Mr. Hardeman is unreasonably

22   dangerous and it shouldn't be on the market.  And I can --

23   I believe -- I don't want to state unequivocally, but I believe

24   I can get Your Honor some case law on that topic; and we can

25   file a response to Monsanto's letter brief by whatever time

**PROCEEDINGS**

 1   Your Honor wants this evening.

 2        **THE COURT:**  Okay.  If you -- so let's assume -- so I

 3   would like you to file a brief on that question.  And, you

 4   know, I think it would be better for you to file it -- you need

 5   to have your opening statements prepared.  So I think it would

 6   be better for you to file it sooner rather than later.

 7        Why don't you file it by 5:00 o'clock today?

 8        **MR. WOOL:**  That works for Plaintiffs.

 9        **THE COURT:**  Get on your phone and start texting your

10   colleagues.  So let's assume you get over that hurdle.

11        **MR. WOOL:**  Right.

12        **THE COURT:**  Let's say the theory you are articulating

13   now that you want to present to the jury is properly a design

14   defect theory.  Then I guess my next question to you is:  Why

15   shouldn't Monsanto be able to make its risk-benefit analysis

16   argument, subject to one very, very important limitation, okay?

17   Somewhere between 95 and 99 percent of what Monsanto put in its

18   brief about what the thing that it wants to argue, I think,

19   would not be permissible, right?

20        **MR. WOOL:**  Right.

21        **THE COURT:**  Because they want to say, you know,

22   Monsanto feeds the world.  Monsanto has revolutionized the

23   agricultural industry.  Monsanto has made things great for

24   farmers.  None of that, it seems to me, is relevant to your

25   design defect theory.

**PROCEEDINGS**

1    So I think Monsanto would be limited to arguing -- if it

2  wants to get up in front of the jury and argue it with a

3  straight face -- it can say, Look, this is so good -- this

4  product is so good at helping people kill poison oak in their

5  backyard that it doesn't matter that it gives people

6  non-Hodgkin's lymphoma, right?

7        MR. WOOL:  Right.

8        THE COURT:  So whether they want to argue that or not,

9  I don't know, but if they want to argue that, why -- why

10  shouldn't they be allowed to?

11        MR. WOOL:  Well, that sort of presupposes that the

12  risk-benefit test applies rather than the consumer expectations

13  test.

14        THE COURT:  Well, why shouldn't it?

15        MR. WOOL:  Well, Plaintiffs have the right under

16  California law to proceed under the consumer expectations test,

17  under factors like this where, you know, Roundup's danger is

18  sort of -- kind of common to everybody who would use Roundup

19  for the purposes that Mr. Hardeman used it for, and that it

20  exceeds the consumers' expectations of what a normal kind of

21  regular --

22        THE COURT:  Well, I think this discussion kind of

23  highlights that this is really a failure-to-warn case.  It is

24  not really a design defect case, but I guess -- I don't

25  understand -- so some people are going to -- assuming the jury

1    comes back for you, the assumption we are operating under for

2    the second phase of the trial is that some people are going to

3    get NHL for -- from their Roundup use and some people are not.

4        And why can't Monsanto argue, if it wishes, that the risk

5    of some people getting NHL from ordinary Roundup use in their

6    backyards is -- is vastly outweighed by the ability of this

7    product to eliminate the scourge of poison oak that is plaguing

8    our nation's backyards all across the country?

9        MR. WOOL:  If Plaintiff elected to proceed only under

10   that theory, only under the risk-benefit theory, then that

11   would be Monsanto's argument.  And, you know, I think we have

12   the option of proceeding under one or both theories.  But as we

13   laid out in our brief, under these circumstances, the consumer

14   expectations test rather than the risk-benefit test is

15   applicable because we are not talking --

16       THE COURT:  Your argument is that it is always the

17   Plaintiff's choice what theory --

18       MR. WOOL:  No, we are not saying it is always the

19   Plaintiff's choice.  In this case the consumer expectations

20   test is applicable.

21       THE COURT:  Is it ever the Plaintiff's choice?

22       MR. WOOL:  I think the Plaintiff can choose to proceed

23   under the risk-benefit test if it --

24       THE COURT:  I mean, why?  I mean, so if you have a --

25   there is a defect in a car and, you know, it's going to -- and

1    the defect, you know, is going to -- or the alleged defect is

2    going to result in, you know, killing one person but saving ten

3    people, who would otherwise have died, are you telling me that

4    the Plaintiff in a case like that can say, We refuse to proceed

5    under the risk-benefit theory?

6          MR. WOOL:  No, no.  I think -- this is sort of the

7    hypothetical that Monsanto lays out in the beginning portion of

8    their brief on this issue with airbags, right.  And I think the

9    way they laid it out is if an airbag deploys, kind of as it

10   would normally be used in a normal circumstance in a wreck,

11   and -- sorry -- strike that.

12       If it deploys under abnormal circumstances, you know,

13   going 2 miles per hour over a speed bump, that that is a

14   consumer expectations issue.  If it deploys in a wreck injuring

15   somebody, and there are certain -- kind of individualized

16   circumstances involved, then that is a risk-benefit question.

17         THE COURT:  Okay.

18         MR. WOOL:  So I think that it sort of turns on whether

19   or not the harm is unique to the Plaintiff, which in this case

20   it is not.  I think obviously there are thousands and thousands

21   of people who are alleging they developed non-Hodgkin's

22   lymphoma from Roundup.

23         THE COURT:  Well, maybe the better way to say it is

24   the risk is not unique to the Plaintiff.

25         MR. WOOL:  Correct.

1          **THE COURT:**  Okay.  I understand your argument.

2       I guess the first question I want to ask you is:  You are

3    not going to be allowed -- if you proceed under the

4    risk-benefit theory, or -- I guess the way to put that is if

5    the jury is going to be given that instruction, you are not

6    going to be permitted to make all your feed-the-world

7    arguments.

8       So what -- can you articulate to me -- and to be more

9    specific and precise in what I'm saying, you are not going to

10   be able to make any of the arguments about benefits as they

11   relate to farming.  You are limited to making arguments about

12   the benefits that Roundup confers for people who are using

13   Roundup in their yards to kill weeds.

14      So what -- can you articulate for me the risk-benefit

15   argument that you will make to the jury under that instruction?

16         **MR. KILARU:**  If we are in that world -- and I think as

17   Your Honor has recognized or at least questioned, we don't

18   think we should be for the reasons set out in our paper.

19         **THE COURT:**  And what you mean by that is:  You don't

20   believe that the failure to -- sorry.  You don't believe that

21   the design defect claim should go to the jury at all?

22         **MR. KILARU:**  Correct.

23         **THE COURT:**  Okay.

24         **MR. KILARU:**  I think saying a product should be taken

25   off the market is not a valid design defect claim and also

**PROCEEDINGS**

 1    raises pretty serious preemption --

 2         **THE COURT:**  Right.  As you know, I disagree with you

 3    on the preemption question.  So putting that aside, you are

 4    just saying that the law says that that is not a valid design

 5    defect theory?

 6         **MR. KILARU:**  That's right.  I do think -- not to

 7    re-visit preemption, I would just say if it is a

 8    ban-the-product argument, I do think that there is a preemption

 9    case for that that is a little -- I think even does not fall

10    necessarily within what Your Honor has already ruled on.

11         **THE COURT:**  You mean there would be a distinction

12    between a causative action where a jury reaches a verdict that

13    has the practical --

14         **MR. KILARU:**  Yes.

15         **THE COURT:**  -- consequence of banning the product --

16         **MR. KILARU:**  Yes.

17         **THE COURT:**  -- as opposed to a state regulator

18    deciding to ban the product?

19         **MR. KILARU:**  Right.

20         **THE COURT:**  I get that.

21         **MR. KILARU:**  So on the --

22         **THE COURT:**  What case is that?  What case is that?

23         **MR. KILARU:**  I will get it for you, Your Honor.  I

24    don't have it off the top of my head.

25         **THE COURT:**  Okay.

1      **MR. KILARU:**  Can we file that by 5:00?

2      **THE COURT:**  Sure.

3      **MR. KILARU:**  Thank you.

4      **THE COURT:**  And any other case on this topic.  But if

5  you have any cases now that stand for the proposition that

6  this -- that this is not -- that this theory that they have

7  articulated is not actually a design defect theory, I'm --

8  sooner than 5:00.

9      **MR. KILARU:**  On that, Your Honor, I think it is the

10  cases we cited in our letter; that it is not a valid theory,

11  both with a chemical and sort of a product, you can't sort of

12  say design something differently when your argument is just

13  actually don't produce it at all.  Those are the two cases we

14  have in the first paragraph.

15      **THE COURT:**  Okay.  And then what about -- and I

16  haven't read those cases yet.  I only read the briefs so far.

17  But what about the fact that you didn't -- at least if I recall

18  correctly, you did not make this argument at summary judgment?

19      Again, I will say that as a practical matter, if you are

20  right, you know, it seems like we should decide the question

21  now so we can save everybody some time and save the Plaintiffs

22  some of their precious time.  But if they, you know, if they --

23  let's say they insist on presenting this theory to the jury,

24  even if the law makes clear that I'm going to have to grant a

25  motion for a directed verdict at the end of the trial, what --

**PROCEEDINGS**

1    what is your argument for why it would be appropriate for me to

2    take that claim away at this stage in the litigation?

3         **MR. KILARU:**  I think it would be that if we ultimately

4    think the claim isn't going to go to the jury, it doesn't make

5    sense for it to go to the jury in the first instance.  I don't

6    think, as Your Honor knows, it would make sense to instruct the

7    jury on a claim that isn't legally valid, and so in the jury

8    instructions context we would address it.

9         **THE COURT:**  But the normal rules are that you are

10   supposed to raise these arguments on summary judgment.  I think

11   in some circumstances Courts have discretion to consider these

12   kinds of issues at the sort of -- in the limine stage, but I

13   haven't gone back to refresh myself on what those circumstances

14   are.  I mean, what is -- what is your argument for why I should

15   do that, other than we would be wasting the jury's time and it

16   is obvious that this is not a design defect claim; and we

17   should have raised this at summary judgment but we didn't, but

18   we are raising it now in the interest of efficiency?  I mean,

19   do you have any other argument or authority for the proposition

20   I could go ahead and grant what is effectively a summary

21   judgment motion now?

22        **MR. KILARU:**  I think beyond your inherent authority to

23   do so, no, Your Honor.  But I do think that time savings and

24   also the fact that because of the phasing, we have this sort of

25   break in the trial, now would be an appropriate time to do it.

```
 1           THE COURT:  Okay.  Anything else you want to say on
 2    the design defect issue?
 3           MR. WOOL:  Yes.  Two issues that I was reminded of by
 4    my colleagues.
 5        One is with respect to the alternative design argument.  I
 6    think Plaintiffs would still have some evidence that if we
 7    elected to could proceed under a theory that the Roundup
 8    formulations in the United States -- particularly those with
 9    tallow amine surfactants -- are more dangerous than, say,
10    European formulations where, you know, the regulators take a
11    more --
12           THE COURT:  Where is that evidence?
13           MR. WOOL:  It is in a couple of e-mails.  We can file
14    that with our brief this evening.
15        Just sort of some internal back-and-forth Monsanto e-mails
16    with respect to, you know, the genotoxicity of the American
17    surfactants and -- in comparison to those that are used in
18    Europe.
19           THE COURT:  Okay.
20           MR. WOOL:  And I guess the second point that I just
21    wanted to raise is if Plaintiffs could file their letter brief
22    at 5:30, just to be able to incorporate and address the case
23    law that Monsanto intends to bring up, if that's -- turns out
24    to be relevant.
25           THE COURT:  That's fine.  You can even do it at 6:00.
```

 1          **MR. KILARU:**  Can I just make a point on that?

 2          **THE COURT:**  Sure.  On the genotox stuff?

 3          **MR. KILARU:**  Yeah.  We had the same understanding as

 4   Your Honor.  I don't know if this was your understanding or you

 5   were just asking a question.  But we have the understanding

 6   that there is no evidence of a different product formulation

 7   that would be safer.  We also don't believe they have any

 8   expert testimony to support that argument, so I don't think

 9   company e-mails alone would be the basis for allowing that

10   theory to go to a jury if there is not someone who can say as a

11   scientific matter, and Your Honor has already ruled the company

12   witnesses are not experts.

13          **THE COURT:**  But as a categorical matter, I don't know

14   if that's true.  If there is a company -- if there is an e-mail

15   from Donna Farmer that says, you know, the formulation that we

16   are allowed to use in Europe is far less genotoxic than the

17   formulation we are allowed to use in the United States, why

18   wouldn't that -- why couldn't they pursue their theory on that

19   e-mail?

20          **MR. KILARU:**  I think this -- well, two things.

21       One, I think this sort of falls into the discussion of why

22   risk-benefit makes more sense, which is that when you are

23   talking about alternative designs, it is a somewhat complex

24   scientific inquiry; and we think they should have to have an

25   expert or someone other than a statement in an e-mail to

**PROCEEDINGS**

1   establish to the jury why that product would be less genotoxic,

2   if that is indeed true or what the circumstances would be in

3   which it is less genotoxic and so on.  I don't think this

4   theory has really been something that we have heard about

5   before now.

6       I guess, related to that, if there are these e-mails, I

7   think, we would appreciate then a chance to respond to them

8   because I think we wouldn't need to respond to the broader

9   argument, other than to cite our cases; but if there now is

10  this theory -- that I thought had been taken off the table --

11  then I think we would need an opportunity to respond without

12  knowing what those e-mails are.

13       **THE COURT:**  Yeah.  I mean, you know, I don't know what

14  to do because we may -- hey, we may not have opening statements

15  tomorrow.  It may wait until Monday or they may not come at

16  all, who knows.

17       But -- it seems at least quite possible that there will be

18  opening statements tomorrow.  And, you know, I haven't -- you

19  know, so today is Thursday.  Opening statements are likely to

20  happen tomorrow.

21       I haven't been given enough to decide this question.  I

22  haven't been given the evidence that the Plaintiffs would use

23  in support of this theory that you are now saying you want to

24  articulate, where previously you were saying you didn't want to

25  articulate that theory.  I haven't been given any cases to

**PROCEEDINGS**

1  support your argument that your theory that you earlier said

2  you wanted to articulate is a design defect theory.  So I

3  really don't know -- I really don't know what to do at this

4  point.

5       MR. WOOL:  Well, you know, I think with respect to

6  this being sort of a brand-new theory, I think my point was

7  that the evidence is there, that we could -- that if Your Honor

8  kind of bought Monsanto's argument hook, line and sinker, that

9  there is still some evidence --

10      THE COURT:  Your use of the words "hook, line and

11 sinker" make it suggest -- suggest that I'm being duped by

12 Monsanto.

13      MR. WOOL:  That's not what I meant to imply,

14 Your Honor.

15      THE COURT:  I mean, they are the ones who gave me case

16 law.  You haven't.

17      MR. WOOL:  Well, I think that with respect to this

18 argument, this was sort of raised in the letter brief for the

19 first time, and that was -- I think at 8:00 this morning.

20      THE COURT:  Okay.  I think -- I mean I would suggest

21 that you go back and think about, what is -- let me ask you

22 this:  What does proceeding on the design defect theory get you

23 that you don't get from your other claims?

24      MR. WOOL:  Well, I think as a practical matter, there

25 is some insulation from an appellate argument as to the, you

**PROCEEDINGS**

 1   know, whether a failure-to-warn claim was preempted.  And I

 2   think that is sort of from the --

 3          THE COURT:  Is there a scenario where the design

 4   defect claim wouldn't be preempted and the failure-to-warn

 5   claim would be preempted?

 6          MR. WOOL:  Well, I don't think either claim is

 7   preempted for the purposes of appellate argument.  I think that

 8   the argument is certainly stronger in the Bates that the design

 9   defect claim is not ever going to be --

10          THE COURT:  Under current law, yeah.

11          MR. WOOL:  Right, under current law.

12      And in terms of what else it gets us, you know, I probably

13   would want to consult with my colleagues.

14          THE COURT:  Is there some extra damages you get from

15   design defect?

16          MR. WOOL:  No, no, no.

17          THE COURT:  So I don't -- I guess I'm left a little

18   bit scratching my head at why you seem to be trying to fit this

19   square peg into this round hole.

20      But let me go back to you, Mr. Kilaru, briefly on the

21   design defect issue and the risk-benefit issue.  So what -- can

22   you articulate what -- assuming the design defect claim is

23   allowed to go forward and you are -- and the jury is given the

24   risk-benefit instruction, what is the argument that -- what is

25   the risk-benefit analysis that you are going to provide to the

1    jury?

2              MR. KILARU:  Well, I think --

3              THE COURT:  And who is going to provide it?

4              MR. KILARU:  So I think we -- for example, Mr. Reeves

5    has already provided in Phase One evidence of the benefits of

6    Roundup for home users.  That evidence has already been played

7    to the jury.  So I think we would have the right to emphasize

8    that again, and that would go to this question.

9         We did think Dr. Weisenburger's testimony opened the door

10   to some of the agricultural benefits.  I understand Your Honor

11   disagrees with that, so I think we will not go down the road.

12        But I think testimony that is similar to what Reeves

13   provided -- and other witnesses -- would also be appropriate.

14   And what he provided to the jury in the main was testimony

15   about how Roundup is absorbed by the soil, whether it leaches

16   into ground water.  I don't know if we played this yet, but I

17   do think its broad applicability to a variety of weeds would be

18   appropriate.  That is relevant to home users as well.  I think

19   the lone toxicity --

20             THE COURT:  I agree with that.

21             MR. KILARU:  Those are the types of arguments that we

22   would be inclined to present in Phase One.  I don't think --

23             THE COURT:  So you will argue that -- you know, Yes,

24   you find that, yes, there is a risk of NHL with Roundup use,

25   but we are telling you that -- we are telling the jury that the

1    risk of developing NHL from Roundup use is outweighed by the

2    benefits that Roundup confers on people who use it in their

3    backyards.

4         MR. KILARU:  I would add something to that,

5    Your Honor, which is to the extent their arguing is that

6    Roundup shouldn't be on the market at all, we would be able --

7    I think we should be entitled -- I think we would be allowed to

8    point out that those benefits come with Roundup and maybe don't

9    come with other pesticides or herbicides, which is why we

10   believe that the benefits outweigh the risks.

11        Now, there is a separate warning piece that I think would

12   go onto the product -- the possibility of the product staying

13   on the marketplace with a warning, which I don't think we are

14   obviously contesting as a substantive matter.  We are not

15   contesting the validity of that theory beyond what we already

16   raised.  But as a design theory, I do think that would be

17   appropriate for us to present.

18        THE COURT:  Okay.  I think I understand that.

19        So procedurally, how -- what are we going to do in terms

20   of you-all finally providing the information that I need to

21   figure this issue out?

22        MR. WOOL:  I think we just --

23        THE COURT:  See, I think you need to go first because

24   you need -- the first thing you need to do is you need to -- I

25   would urge you to go back and think about whether you really

1  want to continue pursuing this claim, and so you can think

2  about that.  You can think about what your design defect theory

3  actually is.  And to the extent your design defect theory is

4  that it could have been formulated differently, where is your

5  evidence for that?  Show us the evidence of that.  And, you

6  know, give us any case that you think is -- supports pursuing

7  either design defect theory, right.

8      I mean, the one about how it's too dangerous and so it

9  never should have been marketed and sold to home users at all,

10  and the other -- you know, the other theory that you have just

11  talked about.  I mean, what is your case law to support your

12  ability to proceed on those theories under a design defect

13  claim.

14      I think you should be the one to file that first.

15          **MR. WOOL:**  Right.

16          **THE COURT:**  And so why don't you go ahead and file

17  that at 5:00, and then Monsanto can respond with to anything at

18  6:00.

19          **MR. KILARU:**  Sure.

20          **MR. WOOL:**  Okay.

21          **THE COURT:**  All right.  Okay.

22      Finally, the Seralini study -- let me pull up that brief.

23      So if I recall correctly, my ruling on the Seralini study

24  from the pretrial motion in limine was that it's -- it's not

25  relevant to Phase One or it should be excluded under 403 at a

**PROCEEDINGS**

 1   minimum in Phase One.

 2           **MS. MOORE:**  That's correct, Your Honor.

 3           **THE COURT:**  I think I may have also said that it

 4   should be excluded under 403 in Phase Two.

 5           **MS. MOORE:**  You did, Your Honor.

 6           **THE COURT:**  And then I said in any event, its post-use

 7   conduct.

 8           **MS. MOORE:**  That's correct, Your Honor.

 9           **THE COURT:**  It should be excluded for that reason as

10   well.

11       So which aspect of that ruling are you asking me to

12   reconsider, that it is 40 -- that it should be excluded under

13   403 under Phase Two, and that it has to be excluded because it

14   was post-use conduct?

15           **MS. MOORE:**  Both, Your Honor.

16           **THE COURT:**  Okay.  And what -- and so I guess after

17   reading your brief, I wasn't -- I guess I wasn't -- in

18   particular on the post-use conduct issue, I was left scratching

19   my head.  It is not to say I agree with you on the 403, but I

20   kind of understood your argument at least.  I didn't really

21   understand why, given the ruling on post-use conduct, this

22   should come in.

23           **MS. MOORE:**  Your Honor, to that point there are

24   internal e-mails at Monsanto going back as early as 2004.  And

25   I can send that to Your Honor.  It is September 8th, 2004.  It

**PROCEEDINGS**

 1   is an e-mail from Donna Farmer to --

 2            **THE COURT:**  You included it on your brief, right?

 3            **MS. MOORE:**  Right -- to a series of people -- well,

 4   this is actually a different one, Your Honor.  And it goes

 5   directly to the issue of post-use corporate conduct.  And she

 6   reads -- she writes:  Good points and your approach makes

 7   sense.  Not good news that Bell and Seralini labs are in

 8   contact.  Similar types of research and downstream extreme

 9   conclusions.

10       And she goes on from there.  And she says:  I am sure this

11   is not the last we have heard from these groups unfortunately.

12       This is something that Monsanto over the years -- well

13   within the time period that Mr. Hardeman was using Roundup,

14   knew that Dr. Seralini was looking into glyphosate and Roundup.

15   And so we don't believe that the post-use corporate conduct

16   even applies with respect to the Seralini study because they

17   have mounted an effort going back several years in order to

18   undermine Dr. Seralini and to discredit any science or

19   scientific conclusions that you may draw from Dr. Seralini.  So

20   that is one point on that.

21            **THE COURT:**  Well, but if there is evidence that they

22   are gearing up to attack the authors of a study or something

23   like that, and the study ended up not coming out until later --

24   until after Mr. Hardeman start-- stopped using Roundup, I would

25   think that that evidence of gearing up to attack somebody would

PROCEEDINGS

1    be admissible in Phase Two, but I -- you know, I'm still not

2    sure why -- you know, there -- at least let me put it this way:

3    There could still be 403 issues with any such evidence, but

4    under my ruling about post-use conduct, I would think that --

5    you know, it wouldn't violate that rule, that ruling to include

6    evidence of Monsanto gearing up to attack somebody who was in

7    the process of conducting a study or something like that, as

8    was the case with the AHS e-mails or memos, right.

9        But why then would it be appropriate to include evidence

10   of Monsanto, in fact, going forward and attacking those people

11   after -- after the summer of 2012.

12       **MS. MOORE:**  Well, I think there is two reasons,

13   Your Honor.  First from a liability perspective, we have the

14   failure-to-test claim.  And Defendant has admitted they never

15   conducted a long-term study regarding the carcinogenicity of

16   Roundup, and Seralini is a long-term carcinogenicity study on

17   Roundup.

18       **THE COURT:**  Well, I thought -- you are kind of moving

19   the goal post on me, because what you just -- you just -- a

20   second ago you were making an argument about how this was

21   relevant to attacking this evidence, this -- the evidence of

22   the Seralini study post-2012 was relevant to your charge that

23   Monsanto attacks everybody who -- and now -- so I asked you a

24   question about why.  And now you are changing and you are

25   saying that this is -- this is relevant to the ability of

**PROCEEDINGS**

```
 1  Monsanto to conduct a long-term rat study.

 2           MS. MOORE:  Your Honor, I'm --

 3           THE COURT:  Do you have any other arguments you want

 4  to make about --

 5           MS. MOORE:  Yes, Your Honor.  I was saying there are

 6  two points.  That is the first point with respect to liability

 7  claim.  And then the second point is punitive damages,

 8  Your Honor.  As the Court is well aware, on a punitive damage

 9  claim, I believe your PTO 101 set forth that we had presented

10  sufficient evidence to show the jury evidence regarding

11  punitive damages.  And with respect to that --

12           THE COURT:  Yeah, you quoted that like maybe three

13  times in your five-page brief.

14           MS. MOORE:  Well, Your Honor --

15           THE COURT:  We are going to make a drinking game in

16  chambers about how many times you quote that sentence.

17           MS. MOORE:  I would probably not recommend that,

18  Your Honor, especially during the day.

19       Your Honor, this goes directly to that.  And not to make

20  light of it, but in your order, Your Honor, in PTO 101, I mean,

21  you write that, There is strong evidence from which a jury can

22  conclude Monsanto does not particularly care whether its

23  product was, in fact, giving people cancer, focusing instead on

24  manipulating public opinion and undermining anyone who raises

25  genuine and legitimate concerns about the issue.
```

1          **THE COURT:**  So do you want to hand me a beer now?

2          **MS. MOORE:**  I don't have that with me, Your Honor.

3        So -- but that goes directly to the heart of the Seralini

4    study, Your Honor.  That is exactly what they did here.  They

5    hired the editor of the journal.  Put him on contract --

6          **THE COURT:**  I understand that it's relevant to the --

7    to your theory of Monsanto attacking everybody who comes out a

8    different way, but the problem is that it is post-use conduct.

9    And I just haven't got a response from you about -- I think

10   there are other problems with the Seralini study, and I think

11   there are real questions about the people on the opposite side

12   from Monsanto on the Seralini study that may make all of this

13   403 anyway.  I think it is probably excludable under 403

14   anyway.  But even aside from that, it is post-use conduct.  So

15   I don't get it.

16         **MS. MOORE:**  But the purpose of punitive damages,

17   Your Honor, is to punish the wrongdoer for the conduct of --

18         **THE COURT:**  We have been through that argument.  I

19   don't want a motion for reconsideration on that issue.  We have

20   decided that already.

21         **MS. MOORE:**  It is to show that it is still going on.

22   This pattern of conduct is still going on, so they need to stop

23   that conduct.  And that is what the purpose of punitive damages

24   is.  So I do think it is relevant for the jury to hear that

25   they continue to display this conduct.  They displayed it

1   during the time Mr. Hardeman used the product, and they

2   continue to do it today.  And I think that is relevant for the

3   jury to hear that type of evidence.

4       THE COURT:  Okay.  I disagree with you.  I have

5   already ruled on the issue.  So the Seralini study is out.

6       I do think it would be fine -- I do think that if you

7   described that 2004 e-mail accurately from Farmer, and the way

8   you described it, it sounded like it was Monsanto gearing up to

9   attack somebody --

10      MS. MOORE:  Right.

11      THE COURT:  -- I think that probably would be

12  admissible in Phase Two.

13      MS. MOORE:  Okay.  Okay.  All right.  Thank you,

14  Your Honor.

15      THE COURT:  So let's see.  Is there anything else to

16  talk about?

17      MR. KILARU:  I don't think so, Your Honor.

18      THE COURT:  Okay.  And so let's talk about scheduling.

19  I still have not started going through the depositions.  So the

20  Plaintiffs are going to have to focus on live witnesses in the

21  first part of their case on Phase Two.

22      So what is -- what have you done in terms of figuring out

23  the order of witnesses?

24      MS. WAGSTAFF:  So assuming -- it is a little difficult

25  not knowing when we are going to start.  We were going to bring

**PROCEEDINGS**

 1   Benbrook first, and we have just withdrawn him.  So in the last

 2   five minutes we have made some executive decisions.

 3       If we have to focus on live witnesses, we will see if we

 4   can bring Dr. Nabhan first or Mr. Hardeman, I guess.  I would

 5   probably need to caucus with my co-counsel a little bit since

 6   everything has changed.

 7           THE COURT:  Okay.

 8           MS. WAGSTAFF:  If we are able to -- if a verdict

 9   doesn't come back until after lunch tomorrow, meaning that

10   opening would not happen until Monday, perhaps we would have

11   more time to at least narrow a few of the first depositions.  I

12   think Dr. Martens would be -- well, we gave you our list.

13       We are also working on a Mills' stipulation.  I don't know

14   how far we are on that.  But in concept, we are sort of working

15   on that.

16       But if we can do Dr. Martens and Dr. Reeves, I think we

17   could probably get some of those done by Monday, depending on

18   when Your Honor -- we can come in tomorrow and work on those as

19   well while we wait for a verdict.

20           THE COURT:  Well, okay.  So Nabhan and Hardeman, then,

21   would be the only two -- and then Mrs. Hardeman.

22           MS. MOORE:  Mrs. Hardeman.

23           THE COURT:  Okay.  So you have to be ready to call

24   those three witnesses at the beginning of your case.  If we

25   have any of these deposition transcripts ready, then you can

 1   sub them in, but you have to -- are those the three live

 2   witnesses?

 3          MS. WAGSTAFF:  Yeah, because if we do Dr. Mills by

 4   stipulation, then he obviously won't be a witness and we have

 5   withdrawn Benbrook.  So those are our three live witnesses.

 6          THE COURT:  Okay.  So there is Martens, Reeves --

 7          MS. WAGSTAFF:  Farmer.

 8          THE COURT:  Farmer.

 9          MS. WAGSTAFF:  Dr. Heydens and Koch, K-O-C-H.

10          THE COURT:  No relation?

11          MS. WAGSTAFF:  I'm not sure.

12          THE COURT:  So -- and the priorities for you are

13   Martens and Reeves?

14          MS. WAGSTAFF:  Yes.

15          THE COURT:  In terms of my review?

16          MS. WAGSTAFF:  Yes, Your Honor.

17          THE COURT:  And if you're --

18          MS. WAGSTAFF:  And then probably Heydens and Farmer

19   and Koch fifth.

20          THE COURT:  Okay.

21          MR. STEKLOFF:  Can I just say, Your Honor, with

22   respect to all of those, while I have not personally reviewed

23   them, I'm told that more than half involve -- more than half of

24   each of those designations probably involves post-2012 conduct.

25   So if we are -- take Reeves, for example.  There are copious

1  amounts of designations that relate to post-2012 conduct, so I

2  defer to Your Honor whether the Plaintiffs should have an

3  obligation to go through and actually cut their designations.

4  We have objected to all of that, but it has been a process.

5       THE COURT:  I mean, I'm not going to go through -- I'm

6  not going to take hours to go through deposition testimony,

7  most of which has already been excluded pursuant to my pretrial

8  rulings --

9       MR. STEKLOFF:  We would agree.  So we would defer to

10  Your Honor how we should proceed.  But that -- I mean, it is

11  clear that of the, I think, 18 hours that they have designated

12  of depositions, I would guesstimate half relates to post-2012

13  conduct, if not -- and so --

14       MS. WAGSTAFF:  I'm --

15       MR. STEKLOFF:  -- we have timed that they have

16  designated 18 hours.  We have not timed how much of that is

17  post-2012, but it is a lot.

18       THE COURT:  And there is, of course, an additional

19  problem with the fact that they have designated 18 hours of

20  deposition testimony, which is that they only have 7 and a half

21  hours of trial time left.

22       MS. WAGSTAFF:  I'm well aware and I agree.

23       THE COURT:  Okay.  What --

24       MS. WAGSTAFF:  So, Your Honor, on that note, I believe

25  Dr. Martens is almost entirely on the Parry issue, which is

1    clearly within the scope of Phase Two.  So we wanted to focus

2    on that one first.  I think that is pretty --

3            THE COURT:  Okay.

4            MS. WAGSTAFF:  -- relevant, and then Ms. Moore

5    would --

6            THE COURT:  Sounds like you from what -- from the way

7    Mr. Stekloff has described it, it sounds like you are going to

8    need to resubmit Reeves and do a much more careful job of

9    comporting with the pretrial rulings.

10           MS. MOORE:  Your Honor, we will go back and look at

11   Dr. Reeves this afternoon.

12       I will just raise for the Court's attention, with respect

13   to IARC and the amount of money that Monsanto spent on trying

14   to debunk IARC, we do think that is relevant for post-use

15   corporate conduct.  In Phase One they made arguments, you know,

16   we had the IARC conclusion.  It has already been heard by the

17   jury.  They argued EPA.  There was this kind of, you know, a

18   little bit of an IARC and EPA.  It wasn't a huge theme of the

19   first phase because of Your Honor's rulings, but that is

20   already out there that they disagree with the IARC conclusion

21   pretty heavily.  And so we think being able to show that they

22   spent $17 million to try to debunk IARC is relevant.

23           THE COURT:  As I said earlier, I'm not going to

24   reconsider my ruling on post-use conduct.

25           MS. MOORE:  Well, I had to try, Your Honor, on that

 1   one.  All right.  Thank you, Your Honor.  We will go back and

 2   look at Dr. Reeves this afternoon and let you know.

 3       But that does bring up a good point.  And Plaintiff -- we

 4   have tried very efficiently throughout Phase One to keep our

 5   time running quickly, smoothly, and efficiently.  I don't think

 6   we, you know, wasted the jury's time at any point.  We were

 7   even ahead of schedule at times.

 8       And so we would respectfully request that the Court give

 9   us additional hours so we can put on our case of liability and

10   damages.  Right now we are at seven hours and 24 minutes.  With

11   another set of opening, another closing, that is virtually

12   impossible for us to meet our burden of proof for Phase Two,

13   which would give us about four hours to put on three live

14   witnesses and do depositions.  So we would ask --

15       THE COURT:  Let me ask the Defendants.  What witnesses

16   are you planning on putting on in Phase Two?

17       MR. STEKLOFF:  We may call no witnesses, Your Honor.

18   We had reserved -- we had told Plaintiffs that we might call

19   Dr. Reeves live, but I don't know -- I wouldn't put it in the

20   likely category.  And then we had also thought about calling

21   Dr. Alkhateeb, but I think based on your ruling today, how that

22   plays out that plays out, he is highly unlikely.  So I think we

23   will not -- my expectation --

24       THE COURT:  Because he's -- I can't remember.  Is

25   he -- is his testimony about all the farming benefits to

PROCEEDINGS

1   Roundup?

2       MR. STEKLOFF:  He is a weed scientist.  So he can talk

3   about benefits in all aspects in part.  He certainly would be

4   able to talk about farming benefits.  He could also talk about

5   poison oak benefits, for example.

6       THE COURT:  Okay.  So is that to say that this

7   discussion -- I mean, it seems to me that perhaps the

8   Plaintiffs need to go back and think about whether they really

9   actually have a design defect theory that they wish to pursue,

10  but it sounds like maybe Monsanto also needs to go back and

11  think about whether it wants to present a risk-benefit analysis

12  in light of the fact that I have ruled that it can't present

13  the farming stuff.

14      MR. STEKLOFF:  Understood.  I mean, I think that we

15  could get in some of the risk-benefit analysis through

16  Dr. Reeves' deposition even.

17      THE COURT:  Yeah.

18      MR. STEKLOFF:  So I don't know that we would have to

19  call Dr. Alkhateeb to address that topic.

20      THE COURT:  Got it.  Okay.

21      MR. STEKLOFF:  But I agree that even if they pursue a

22  design defect claim, how heavily we push the risk-benefit

23  claim, if allowed to, is a trial strategy that we will

24  re-visit.

25      THE COURT:  Okay.  So are you saying your only

**PROCEEDINGS**

 1  possible two witnesses are going to be -- obviously you are

 2  going to be designating -- you are going to be

 3  counter-designating some of the witnesses that the Plaintiffs

 4  are calling by video --

 5          **MS. MOORE:**  And they have done that, Your Honor.

 6          **THE COURT:**  -- but -- so Dr. Reeves and Alkhateeb are

 7  your possible live witnesses?

 8          **MR. STEKLOFF:**  I'm just confirming, but yes, we have

 9  no other possible witnesses.  But I don't think, to be clear,

10  that the fact that we have been efficient and may not have a

11  long --

12          **THE COURT:**  I understand.

13          **MR. STEKLOFF:**  -- presentation should mean they should

14  get extra time.

15          **THE COURT:**  I think that's fair.  But I also want to

16  be a little practical about it, right?  I mean, you have 18 and

17  a half hours left on your clock.  It sounds like there is,

18  given what you just said, there is no chance that you are going

19  to come close to using those 18 and a half hours.

20          **MR. STEKLOFF:**  Absolutely.

21          **THE COURT:**  And I think that on its own probably, you

22  know, is not a reason to give the Plaintiffs extra time, but

23  I guess I'm thinking about -- I'm thinking about a couple other

24  things.

25      Another argument against giving the Plaintiffs extra time

**PROCEEDINGS**

1  is I think we did waste quite a bit of time during Phase One

2  because of all the attempts that the Plaintiffs made to bring

3  Phase Two evidence into Phase One and all the sidebars and all

4  the delays that resulted from that, discussions outside the

5  presence of the jury.  So that's -- that's one argument against

6  giving the Plaintiffs a little more time.

7      The argument for it, I suppose, is that -- and this is

8  something that I was thinking about during Phase One -- is

9  that -- I think the Plaintiffs probably needed more time to put

10  on their case in Phase One because having -- going first and

11  having the burden of proof, you know, they put up these experts

12  and the experts have to explain, you know, the Bradford-Hill

13  criteria and what is epidemiology and, you know, what is

14  toxicology, and what is genotoxicity and, you know, how do you

15  do -- what is the difference between a case control study and a

16  cohort study, and what are -- you know, what are the -- you

17  know, even in areas where the -- both sides agree that there

18  are certain benefits to case control studies and certain

19  benefits to cohort studies, the -- you know, it is the

20  Plaintiff's experts that had to take the time to explain that.

21  So I think that -- that could be a justification for giving the

22  Plaintiffs a little bit more time in the second phase.

23      **MS. MOORE:**  And also defining, Your Honor, adjusted

24  versus unadjusted, confounding.  I mean, there was a lot of

25  terms the jury would never have heard of.  And so it did take

PROCEEDINGS

 1    time.  I think we were efficient with asking the experts those

 2    questions.

 3         And we do have the burden of proof.  And, frankly, we had

 4    to make sure we put all the evidence up so we can get to

 5    Phase Two.  And we are still waiting to know whether we get to

 6    Phase Two.  So we had to put all that evidence in.

 7         I would just ask the Court, respectfully, if you would

 8    consider giving us additional time so then we can meet our

 9    burden in Phase Two.  There is no way we can meet our burden

10    with only four hours of testimony.

11         **THE COURT:**  Well, I don't know if I agree with that.

12    First of all, you have seven and a half hours; you don't have

13    four hours.

14         **MS. MOORE:**  But that includes opening and closing.

15         **THE COURT:**  It is your choice how much to spend on

16    opening and closing.

17         **MS. MOORE:**  Well, Your Honor.  I mean, we have to --

18    even if we did an hour each, which I think is very reasonable

19    in a case like this of this magnitude, I mean, that puts us

20    down to five hours.

21         **MR. STEKLOFF:**  Can I just weigh in a little bit on the

22    efficiency?  Just as --

23         **THE COURT:**  Sure.

24         **MR. STEKLOFF:**  -- Your Honor considers this.

25         First, I think they gave close to a two-hour opening.  I

**PROCEEDINGS**

 1  don't know if that was necessary.

 2      Second, Dr. Ritz.  I understand that there was some basic

 3  background, but I think some of that could have been covered

 4  more efficiently.

 5      Third, they covered those topics, including the

 6  epidemiology, the same epidemiology studies, and the

 7  Bradford-Hill criteria with three different witnesses:  Ritz,

 8  Portier, Weisenburger.

 9          **THE COURT:**  They have the right to do that, though.

10          **MR. STEKLOFF:**  I understand, but there is a question

11  of whether -- if the question is efficiency, there is a

12  question -- I think that that all goes to their efficiency.

13      And finally, I think it's not just that we wasted time on

14  sidebars and things outside the presence of the jury, but also

15  you had to dock time for what happened on Tuesday.  And then to

16  now give them more time in sort of -- would -- I mean, I

17  understand that that was docked.  But then you are sort of

18  giving them that back plus more.

19      So I just think that when you look at -- whether

20  Dr. Weisenburger is the third witness that had to deal with

21  Bradford-Hill criteria and a five-hour examination when they

22  had already heard direct examination when they already heard

23  from Ritz and Portier, I think there are questions about

24  efficiency.  Whether Mr. Hardeman had to spend 30 minutes of

25  his hour showing every picture on his property to show the

**PROCEEDINGS**

1   poison oak.

2       I just think there are a lot of things that -- whether or

3   not they had the burden, whether or not they had to explain a

4   lot of concepts, you know, they probably could have saved a few

5   hours is what I would say.  So I just think that has to be part

6   of the calculus of whether they should --

7           **THE COURT:**  I think all of that is fair.

8       I will give it a little bit of thought.  I will let

9   you-all know tomorrow.

10          **MS. MOORE:**  Okay, Your Honor.  Thank you.

11          **THE COURT:**  But keep your opening statements short,

12  just in case.

13          **MS. MOORE:**  Your Honor, we just want the opportunity

14  to present our case.  Thank you.

15          **THE CLERK:**  Court is in recess.

16              (Proceedings adjourned at 1:30 p.m.)

17                      ---oOo---

18

19

20

21

22

23

24

25

1

2

3                    **CERTIFICATE OF REPORTERS**

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Thursday, March 14, 2019

8

9

10

11    _____

12         Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                    U.S. Court Reporter

13

14

15    _____

16         Marla F. Knox, RPR, CRR
                U.S. Court Reporter

17

18

19

20

21

22

23

24

25