**Volume 17**

**Pages 2196 - 2304**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

EDWARD HARDEMAN,               )
                               )
          Plaintiff,           )
                               )
  VS.                          )    **NO. C 16-00525 VC**
                               )    <u>**PHASE II**</u>
MONSANTO COMPANY,              )
                               )
          Defendant.           )
_____)

San Francisco, California
Wednesday, March 20, 2019

<u>**TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES**</u>:

For Plaintiff:
                    ANDRUS WAGSTAFF PC
                    7171 W. Alaska Drive
                    Lakewood, Colorado  80226
               BY:  **AIMEE H. WAGSTAFF, ATTORNEY AT LAW**
                    **DAVID J. WOOL, ATTORNEY AT LAW**

                    MOORE LAW GROUP
                    1473 South 4th Street
                    Louisville, Kentucky  40208
               BY:  **JENNIFER MOORE, ATTORNEY AT LAW**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Marla F. Knox, RPR, CRR
              Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporters

```
 1   APPEARANCES:  (CONTINUED)

 2   For Defendant:

 3                        WILKINSON  WALSH ESKOVITZ LLP
                          2001 M Street, NW - 10th Floor
 4                        Washington, D.C.  20036
                     BY:  BRIAN L. STEKLOFF, ATTORNEY AT LAW
 5                        RAKESH N. KILARU, ATTORNEY AT LAW
                          TAMARRA MATTHEWS JOHNSON, ATTORNEY AT LAW
 6                        JULIE RUBENSTEIN, ATTORNEY AT LAW

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          **I N D E X**

2     Wednesday, March 20, 2019 - Volume 17

3                                                      **PAGE**   **VOL.**

4     Opening Statement by Ms. Wagstaff             2217   17
      Opening Statement by Mr. Stekloff             2235   17

5     **PLAINTIFF'S WITNESSES**                        **PAGE**   **VOL.**

6

      **MARTENS, MARK**
7     By Video Testimony (not reported)             2260   17

8     **REEVES, WILLIAM**
      By Video Testimony (not reported)             2271   17
9
      **FARMER, DONNA**
10    By Video Testimony (not reported)             2275   17

11                    **E X H I B I T S**

12    **TRIAL EXHIBITS**                        **IDEN**  **EVID**  **VOL.**

13      86                                              2274   17

14      89                                              2274   17

15      155                                             2271   17

16      156                                             2271   17

17      157                                             2271   17

18      158                                             2271   17

19      159                                             2271   17

20      160                                             2271   17

21      161                                             2271   17

22      208                                             2271   17

23      220                                             2274   17

24      249                                             2274   17

25

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 250 | | 2274 | 17 |
| 251 | | 2274 | 17 |
| 254 | | 2274 | 17 |
| 413 | | 2274 | 17 |
| 443 | | 2274 | 17 |
| 448 | | 2274 | 17 |
| 449 | | 2274 | 17 |
| 450 | | 2274 | 17 |
| 451 | | 2274 | 17 |
| 452 | | 2274 | 17 |
| 453 | | 2274 | 17 |
| 495 | | 2274 | 17 |
| 499 | | 2274 | 17 |
| 503 | | 2274 | 17 |
| 516 | | 2274 | 17 |

PROCEEDINGS

| 1 | <u>**Wednesday - March 20, 2019**</u>                              <u>**8:13 a.m.**</u> |

1   <u>**Wednesday - March 20, 2019**</u>                    <u>**8:13 a.m.**</u>

2                        <u>**P R O C E E D I N G S**</u>

3                            **---oOo---**

4        (Proceedings were heard out of presence of the jury:)

5            **THE COURT:**  Okay.  Good morning.  I have a couple

6   small items to discuss, but do you-all have anything?

7            **MS. MOORE:**  Just a couple things, Your Honor.

8            **THE COURT:**  Go ahead.

9            **MS. MOORE:**  One is, Your Honor, as you recall in your

10  pretrial order regarding Dr. Mills, we did come up with a

11  stipulation of the numbers that Dr. Mills would testify

12  about --

13           **THE COURT:**  Okay.

14           **MS. MOORE:**  -- that I believe were undisputed.  We

15  provided that to the Defense, and there is some disagreement on

16  the stip.  I have a copy for Your Honor.

17           **THE COURT:**  Okay.

18           **MS. MOORE:**  It is the same thing.

19           **THE COURT:**  If there is some disagreement on the stip,

20  then it is not a stip, I guess.

21           **MS. MOORE:**  I understand, Your Honor.  I guess, my

22  understanding is that Monsanto will agree to Number 2 as far as

23  the net worth and the cash on hand, but they will not stipulate

24  to the other eight items.  And so our position was that we

25  would then have to bring Dr. Mills in because these are numbers

PROCEEDINGS

```
1   from Dr. Mills -- and it is not disputed by anyone -- so we
2   were hoping that we could enter into a stip so we could avoid
3   taking the time to call him to the stand.
4           THE COURT:  Well, you may need to call him, but let me
5   look at these numbers again.
6       I don't -- I mean, what is the problem with these numbers?
7           MS. RUBENSTEIN:  Well, Your Honor, we think that -- we
8   agree as far as the numbers that have come straight out of
9   Monsanto's financial documents; that those are the numbers.  We
10  do not agree that all of them are probative of the company's
11  ability to pay.  So we are not willing to enter into a
12  stipulation regarding any numbers other than net worth and cash
13  on hand.  And in addition --
14          THE COURT:  So just Number 2?
15          MS. RUBENSTEIN:  That is right.
16          THE COURT:  Okay.
17          MS. RUBENSTEIN:  And in addition, if Mr. Mills were to
18  testify, we don't think many of these numbers are admissible
19  through him either.  In particular Number 1, but -- I mean, I
20  can go through the list and explain them all.
21      With respect to Number 1, Your Honor previously ruled
22  that, you know, evidence related to Bayer was only admissible
23  as necessary to explain Monsanto's financial condition and the
24  Bayer acquisition cost is not at all relevant to Monsanto's
25  financial position.
```

**PROCEEDINGS**

1    Monsanto is a separate legal entity wholly unsubsidiary.

2    Bayer isn't a Defendant.  And the amount of money that Bayer

3    paid shareholders for the prior company really is not probative

4    of Monsanto's financial condition.

5         THE COURT:  How much you buy a company for is not

6    probative of the company's worth?

7         MS. RUBENSTEIN:  So what is probative of the company's

8    worth is the numbers reported in the company's financials.  The

9    number, 63 billion, the Plaintiffs want because it is

10   prejudicial because it is a big number, and they want all of

11   these numbers --

12        THE COURT:  It is because Bayer thought that that's

13   how much the corporation was worth.

14        MS. RUBENSTEIN:  But the net worth is stated in

15   Monsanto's documents.

16        THE COURT:  Okay.  I understand your argument.  I

17   mean, I don't -- so the -- I mean, I think maybe we could cut

18   off this discussion in the following way:  If -- if Monsanto

19   doesn't want to stipulate to some of these numbers that are

20   appropriate to come in, then the answer is that the Plaintiffs

21   can get it in, either through Dr. Mills -- if it is appropriate

22   to get it in through Dr. Mills -- or through some other

23   evidence if it is not appropriate to get it in through

24   Dr. Mills.

25        So we can go through all of these items and kind of decide

1    what is admissible and what is not admissible.  I don't know if
2    we need -- we should be doing that now or later, but I don't --
3    I don't understand at all the argument that Item Number 1 is
4    not admissible.

5         **MS. MOORE:**  I don't either, Your Honor.  And it is the
6    same for Item Number 9, which is the payout to Hugh Grant, the
7    former CEO of 32 million; that was part of the acquisition
8    also.  The rest of these numbers come from their financial
9    statements, their 10Q or their 10K.  And then the two --

10        **THE COURT:**  I mean, why wouldn't -- sorry to interrupt
11   you -- but why -- just take Number 8, for example.  Why -- it
12   seems to me that Number 8 is potentially relevant to a couple
13   of different things, right?  I mean, it may be relevant to
14   Monsanto's ability to pay, but it seems even more relevant to
15   the issue of what was knowable -- both liability and punitive
16   damages, whether Monsanto's conduct was extreme and outrageous.

17        **MS. RUBENSTEIN:**  But, Your Honor, an important thing
18   to understand is that Mr. Mills is only offering an opinion on
19   punitive damages.  He offers absolutely no opinion on
20   liability.  He stated that in his deposition.  It is not
21   anywhere in his report.  And, in fact, his report doesn't get
22   into what these numbers even mean.  He just puts them on a
23   slide.

24        **THE COURT:**  I understand.  But why isn't it relevant
25   to -- why isn't it relevant to punitive damages that -- well, I

PROCEEDINGS

```
1   mean, why can't they argue, Look at all the money Monsanto has
2   been willing to spend on advertising and it's not willing to,
3   you know, conduct any sort of objective inquiry into the safety
4   of its product.  It is not willing to spend any money
5   conducting any sort of objective inquiry --
6           MS. RUBENSTEIN:  Plaintiffs might make that argument,
7   but not through Mr. Mills.
8           THE COURT:  But why can't they use this number, and
9   why can't they get in -- the point of my ruling for Mills was,
10  yes, it is appropriate to have an expert pull out -- pull out
11  these numbers from the financials and provide them to the jury.
12  So that is my ruling about Mills.
13          MS. RUBENSTEIN:  Understood.
14          THE COURT:  So I don't understand what the problem
15  is -- so Mills can come testify about this number if it is
16  relevant to the trial, okay?
17      Now, I'm talking about Number 8 as an example.
18          MS. MOORE:  And Number 7 -- I'm sorry, Your Honor.
19  Number 7 is very similar --
20          THE COURT:  Right.
21          MS. MOORE:  -- to the point of Number 8.
22          THE COURT:  Right.  So I have already ruled he can
23  come testify about those numbers.  So then the question is:
24  Are these numbers relevant to punitive damages?  Are these
25  numbers relevant to the argument that Monsanto's conduct with
```

1  respect to glyphosate and the safety of glyphosate is extreme

2  and outrageous?  And I don't understand why they are not

3  relevant.  I don't understand how -- I can't even understand

4  the argument that they are not relevant.

5          MS. RUBENSTEIN:  Well -- and it may go back to your

6  ruling on Mr. Mills, but I don't see how these numbers are at

7  all probative of the company's ability to pay.

8          THE COURT:  Like I said, these numbers, looking at

9  Number 7 and 8, are probative of the company's -- of the

10  outrageousness of the company's conduct.  It may be that --

11  that they are not probative of the company's ability to pay

12  although they seem somewhat probative of that as well.

13          MS. RUBENSTEIN:  So I guess I'm stuck on how Mr. Mills

14  is the proper mouthpiece for these numbers because he --

15          THE COURT:  Because my ruling about Mr. Mills is that

16  you can have an expert pull out the numbers from the financials

17  to provide them to the jury so that the jury doesn't have to

18  sift through all the gobbledygook in the financials.  That is

19  my ruling about Mr. Mills.

20          MS. RUBENSTEIN:  I understand.  And, you know, Your

21  Honor, the case law -- and I would be happy to hand you up a

22  few cases -- although there is no one metric to decide a

23  company's financial position --

24          THE COURT:  But, again, I think you keep sidestepping

25  the main point here, which is -- again, at least as to Number 7

1    and Number 8 and -- you know, possibly Number 9 as well -- that

2    the -- you know, it is not about -- it is not as much about the

3    company's ability to pay as it is about the company's conduct

4    with respect to the safety of its product.

5         Look at all these things that the company is spending

6    extreme amounts of money on, and it's not willing to lift a

7    finger to conduct any sort of objective inquiry about the

8    safety of its product.  That, I assume, is their argument.  And

9    I don't understand why these numbers are not relevant to that.

10        **MS. RUBENSTEIN:**  I think, Your Honor, in the case law

11   the point of introducing financial condition evidence is to

12   show -- is to show the company's wealth.

13        **THE COURT:**  Do you have any case that says that the

14   amount of money a company spends on something else is not

15   relevant to judge the company's mindset with respect to the

16   thing that it is not spending money on?

17        **MS. RUBENSTEIN:**  I don't have any case specifically

18   suggesting that, but I do have cases saying that typically the

19   number used to determine a company's financial condition is net

20   worth.

21        **THE COURT:**  Right.  And I understand that, and you are

22   focused exclusively on the net worth issue.  And I'm explaining

23   to you that I think that these numbers are relevant for a

24   different issue.

25        **MS. MOORE:**  And the same, Your Honor, would be true of

1  Number 6; that Monsanto chose to pay out almost a billion

2  dollars in cash dividends, 948 million.  And then Number 9 that

3  we talked about; that they chose to pay their former CEO, one

4  person, over $32 million.  So we think that 6, 7, 8 and 9 are

5  probative to show how the company is choosing to spend their

6  money versus testing their product.

7              THE COURT:  Okay.  Remind me what you have in the

8  slides.  You have Number 2 in the slides, right?

9              MS. MOORE:  Yes, Your Honor.  Actually, I can hand it

10  to you.  We have a chart.

11              THE COURT:  Is this in the slides?

12              MS. MOORE:  This is in the slide.

13              MS. WAGSTAFF:  The second-to-last page.

14              THE COURT:  I mean, this is my point exactly, right,

15  is that this slide shows that -- what this is probative of is

16  not Monsanto's -- not so much Monsanto's ability to pay --

17  although it might be somewhat probative of that -- it is

18  probative of Monsanto's mindset with respect to this product.

19              MS. RUBENSTEIN:  Well, the last thing I will add, Your

20  Honor, is that all these numbers come from 2018 -- 2017 and

21  2018 financial statements, and that is obviously post-use.

22      So if the -- if Plaintiff's argument is that, you know,

23  for instance, dividends paid in 2017 is somehow relevant to

24  Monsanto's mindset in 2017, we have already decided that

25  Monsanto's mindset and conduct post-use is not relevant.  So I

PROCEEDINGS

```
 1   think --
 2          THE COURT:  That's a good point, yeah.  That's a good
 3   point.
 4          MS. MOORE:  But, Your Honor, it goes back to Monsanto
 5   continues this mantra of There is no evidence that the product
 6   causes cancer, that they don't need to test, that they have
 7   never spent any money on epidemiology.  This just shows how
 8   much money they actually have that they could spend on testing
 9   and epidemiology studies.
10          MS. RUBENSTEIN:  Even if Ms. Moore's representations
11   are true, I don't see why those -- why that mindset in 2017 and
12   2018 is at all relevant to this trial.
13          THE COURT:  Yeah.  So that is a good point, and I
14   hadn't thought about that.
15       So here is what the ruling is going to be for now -- I
16   mean, one thing you may need to do is go back and figure out if
17   you can put in numbers from -- put in figures from, you know,
18   2012.  But as of now, I believe that the -- on the -- on the
19   issue of showing Monsanto's ability to pay, the Item Number 2
20   is certainly admissible; and Item Number 1, I believe, is
21   admissible.
22          MS. MOORE:  Okay.
23          THE COURT:  So I believe that that -- I believe that
24   those two items are admissible.  So for now you can use those
25   in your opening statement.
```

1          **MS. MOORE:**  Thank you, Your Honor.

2          **THE COURT:**  You can't use the other numbers in your

3     opening statement until we have a little more -- and can't use

4     those at trial.  And I think everybody needs to take a little

5     more time to sort that out.

6          **MS. MOORE:**  That's fine, Your Honor.  We can look at

7     that.

8          **THE COURT:**  It may be there is nothing in the record

9     on the 2012 numbers, and so it may be that you can't use them.

10    But in any event, we can have a further discussion about

11    that --

12         **MS. MOORE:**  That's fine.

13         **THE COURT:**  -- offline.  But for the opening

14    statements, that's the -- you are limited to those two numbers.

15         **MS. MOORE:**  That's fine, Your Honor.  I understand.

16    We will go back and look at that.

17       I would ask that the Court allow us to include Number 9

18    which is about the acquisition as well.

19         **THE COURT:**  No.

20         **MS. MOORE:**  Okay.

21         **MS. RUBENSTEIN:**  Your Honor, just two more things, and

22    then we can move on from this topic.

23       Number 4, Average sales of Roundup per year, this is

24    not -- this is not a number that Mr. Mills includes in his

25    report.  And, in fact, he testified in his deposition that he

1   has no idea what percentage of any of the numbers in his report

2   are attributable to Roundup.

3          **THE COURT:**  Okay.  But is there any -- is there a

4   dispute about that?  I assume there is some evidence about that

5   in the record.

6          **MS. MOORE:**  Mr. Grant, the former CEO, testified in

7   his deposition on page 26 that it was about $2 billion a year

8   in Roundup sales.

9          **THE COURT:**  Okay.  Well, and that -- you know, so

10  maybe you need to get that in through Grant.

11         **MS. MOORE:**  We designated that, Your Honor.  They have

12  objected to it.

13         **THE COURT:**  Okay.  All right.  So that's the --

14  anything else on this issue?

15         **MS. MOORE:**  I don't think so, Your Honor.  We will go

16  back and re-visit those other points.

17        And then just to recap -- and we don't have to do this

18  necessarily before opening -- but on the Request For

19  Admissions, I went back and we extracted the ones that we would

20  like to use at this point in Phase Two.  I highlighted what we

21  would read directly, which is the question and then their

22  admission.  And I provided a copy of that to Defense counsel.

23  I have a copy for the Court as well.

24         **THE COURT:**  Okay.  Any -- is there any discussion to

25  be had on this?

1          **MR. STEKLOFF:**  Your Honor, we -- I -- there is

2    discussion because I haven't had a chance to meet and confer

3    with Ms. Moore about this yet, but you can see -- at least in

4    the responses -- that they have only highlighted the words

5    "admit," except in Request Number 5 and 7 on the third page of

6    this document.

7          I will also note that we -- when we received this last

8    night, we went and checked and this document is incomplete in

9    the sense that to several of the responses, portions of

10   Monsanto's response have been -- have been taken out of this

11   document without --

12          **THE COURT:**  Even though I didn't --

13          **MS. MOORE:**  That is not intentional.

14          **THE COURT:**  Even though I didn't strike those

15   portions?

16          **MR. STEKLOFF:**  Yes.

17          **THE COURT:**  Okay.

18          **MR. STEKLOFF:**  So I think that we have a -- I mean, it

19   is our position, Your Honor -- and I'm happy to go through this

20   with Ms. Moore and try to agree on language -- but that the

21   full statements need to be read, including the full statements

22   as, you know, pursuant to Your Honor's rulings but what the

23   full admission was.

24          So that doesn't mean in every -- we may be able to go

25   through this and take out in some instances Monsanto otherwise

PROCEEDINGS

1   denies this request, for example, but this is very incomplete.

2   So I let Ms. Moore know that we didn't think in opening --

3   pursuant to what we discussed yesterday, I think based on the

4   slides that Ms. Wagstaff planned on using -- the approximately

5   four slides -- I'm fine with that in opening, but I don't think

6   these should be read to the jury today until we have had a

7   further chance to --

8        MS. MOORE:  We can meet and confer on a break.  I

9   think we are fine on opening statements.  But we can meet and

10  confer and make sure we are on the same page as to what can be

11  read.

12       MR. STEKLOFF:  But as a general rule, I think the rule

13  should be that they have to read the admission as provided and

14  then to the extent they challenged part of our admission --

15       THE COURT:  Well, why doesn't -- why can't the

16  admissions come in as an exhibit, and each side can emphasize

17  whatever aspects of the admissions they want to emphasize?

18       MS. MOORE:  I do think we have the right to read that

19  into the record, Your Honor.  But we can meet and confer on

20  that.

21       THE COURT:  If you read it in the record -- if you are

22  going to stand up and read it in the record, then you read the

23  whole thing.

24       MS. MOORE:  All of their objections, Your Honor?

25       THE COURT:  Whatever it is that you agree --

1    MS. MOORE:  Okay.

2       THE COURT:  I mean, I'm quite sure, as we discussed

3  last time, the sort of general boilerplate objections aren't

4  going to be read.

5       MS. MOORE:  Right.

6       THE COURT:  But you might want to read those because

7  it always makes a defendant look -- or a party look bad when

8  they include those boilerplate objections.

9       MS. MOORE:  Okay.  We can confer on that, Your Honor.

10  Thank you.

11       THE COURT:  Okay.  So a couple things.  I still need

12  to go back and flip through some of the new opening slides that

13  were given to me.  So I will go do that very quickly right now.

14       On the issue of time, the Plaintiff's requested more time.

15  I'm somewhat reluctant at this point to give the Plaintiff's

16  more time because I have been going through the deposition

17  designations and the -- what has been designated is very

18  repetitive.  It is your choice how to use your time.  But a lot

19  of that stuff -- I'm not excluding it as cumulative under

20  Rule 403, but a lot of that stuff is very repetitive; and so

21  I'm quite reluctant to give you more time, given the way you

22  are proposing to use it.  I'm happy to hear further discussion

23  about that later.

24       MS. MOORE:  Thank you, Your Honor.

25       THE COURT:  And sort of take a look at how the

```
 1   evidence is coming in and how efficiently the jury's time is
 2   being used or how inefficiently the jury's time is being used.
 3   But as of this time you should continue to plan on having the
 4   amount of time that you were originally given.
 5           MS. MOORE:  I understand, Your Honor.  I will say that
 6   we heeded your advice in the Martens pretrial order.  We went
 7   back and we cut some more out of Martens.  I'm not sure how
 8   much that reduced it by.  And that's our plan with all the
 9   depositions, as we are continuing to streamline it, because
10   obviously we want to be efficient with the jury's time; and we
11   also want to get our evidence in.
12           THE COURT:  Okay.
13           MS. MOORE:  So we will --
14           THE COURT:  You know, the designations you are
15   emailing them to us, but you need to file them on the docket
16   also.
17           MS. MOORE:  We will do so.
18           THE COURT:  And then I believe that -- I just
19   completed Farmer, but --
20           MS. MOORE:  I saw that.
21           THE COURT:  -- I believe you-all filed some new Farmer
22   designations late last night.
23           MS. MOORE:  I think the Defense did.
24           THE COURT:  So you need to -- if you can please submit
25   whichever -- I don't think you made clear in your filings what
```

1   is new and what is not new.  So if you can just file something

2   that makes clear what I need to still review.  Does that make

3   sense?

4       MR. STEKLOFF:  We can provide you a color-coded copy

5   of that.

6       THE COURT:  All right.  So I will be back in five

7   minutes.

8       MS. WAGSTAFF:  One note for you as you go through

9   this, on the Heydens' 2015 e-mail we discussed yesterday, the

10  version you have doesn't have the IARC parenthetical, but I

11  have whited that out, just so when you look at --

12      THE COURT:  Okay.  Thank you.

13      THE CLERK:  Court is in recess.

14              (Recess taken at 8:32 a.m.)

15          (Proceedings resumed at 8:37 a.m.)

16  (Proceedings were heard out of presence of the jury:)

17      THE COURT:  One other brief comment.  I mean, from

18  looking at the slides -- I don't know if you are planning on

19  using them all, but this seems like a two-hour opening

20  statement.  You know, that is something that we will -- the

21  length of the opening statement and the length of the previous

22  closing argument and the length of the initial opening

23  statement, all of those things, will be taken into account when

24  deciding whether -- whether additional time should be given.

25      So anyway, with that, Kristen, go ahead and bring in the

1   jury.  And feel free to get set up if you want.

2         MS. WAGSTAFF:  I need to get my -- I was waiting from

3   edits from you, so I need to give it to my PowerPoint tech.  It

4   will just take me a moment.

5         (A brief pause was had.)

6         (Proceedings were heard in the presence of the jury:)

7         THE COURT:  Okay.  Welcome back, everyone.

8         As I mentioned to you yesterday afternoon, we will begin

9   Phase Two of the trial.  And Phase Two is the final phase of

10  the trial.  We are pretty much on schedule.  We may need to do

11  a little bit of tweaking to our schedule to make sure that

12  we -- that we kind of stick to the plan that we outlined at the

13  beginning of trial, but we are pretty much on schedule.

14        All of the same instructions that I read to you at the

15  beginning of trial and gave to you at the end of trial about

16  what is evidence, burden of proof, how to think about witness

17  credibility, all of those things continue to apply.  You will

18  get another written copy set of all the instructions, including

19  those ones, when you begin your deliberations on Phase Two.

20        But for now, we will simply proceed with opening

21  statements from the lawyers on Phase Two, and then we will go

22  to receiving additional evidence.

23        And, again, the topic of Phase Two is, is Monsanto liable

24  for the -- for Mr. Hardeman's injury, and that is something

25  that Monsanto denies.  And then the question is if Monsanto is

1  liable for Mr. Hardeman's injury, what should the damages be,

2  if any.  And that will be -- that will be for your

3  consideration as well.  So all of that will be considered

4  together in Phase Two.

5       And we are ready to proceed with opening statements.

6                        **OPENING STATEMENT**

7       MS. WAGSTAFF:  Good morning.  So I know this has been

8  a long two weeks, and on behalf of Mr. Hardeman and my entire

9  team, we thank you very much for the time and effort you spent

10 during Phase One.

11      So we are here today to talk about the beginning of

12 Phase Two, and I will tell you that Phase Two will be similar

13 in structure to Phase One.  You will hear opening statement

14 from myself.  You will hear opening statement from Monsanto.

15 You will hear evidence from Plaintiff.  You will hear evidence

16 from Monsanto.  Closing argument.  And then you-all will

17 deliberate again.

18      I would like to remember why we are here.  In Phase One we

19 heard a lot about the science, a lot about Monsanto's --

20 whether or not Roundup was carcinogenic, but don't forget we

21 are here today now in Phase Two to talk about Mr. Hardeman and

22 the fact that Mr. Hardeman got cancer from Monsanto's product.

23      So the questions in Phase Two are pretty simple:  What did

24 Monsanto know and when?  How did Monsanto influence the science

25 over the last 40 years?  Did Monsanto fail to warn Mr. Hardeman

OPENING STATEMENT / WAGSTAFF

1    of the dangers?  Was Roundup as safe as expected?  What are

2    Mr. Hardeman's damages?  And should Monsanto be punished?

3         What Monsanto did not do over the last 40 years -- you

4    have heard a lot about the three pillars of science.  You have

5    heard about epidemiology.  You have heard about the mechanistic

6    data, and you have heard about the animal studies.  To this day

7    Monsanto has never done an epidemiology study.

8         With respect to animal studies, you heard a little bit

9    about the *Knezevich & Hogan* study.  And I will touch on that

10   briefly today, but they have vehemently refused to repeat that

11   study.  And they have admitted that they have never, to this

12   day, conducted any long-term rodent carcinogenicity test on the

13   formulated product Roundup.

14        You heard a little bit about the *Parry* study with respect

15   to the mechanistic data.  They have never completed the

16   recommendations that Mr. Parry recommended that they do in

17   1999.  And they have admitted that they have never conducted an

18   in vivo human genotox studies or in vivo oxidative stress

19   studies with respect to genotoxicity.  And you are going to

20   hear a lot of evidence over the next week about how Monsanto

21   has influenced and manipulated the science through its

22   relationships with regulatory officials and through

23   ghostwriting.

24        We are going to bring you some of Monsanto's current and

25   former decision makers.  We are bringing you high-level

OPENING STATEMENT / WAGSTAFF

1    employees that are going to help tell the story.

2        Once again, just like in Phase One, we don't have subpoena

3    power to bring anyone here, so you are going to hear mostly by

4    video testimony from their employees.  You are going to hear

5    from their former CEO, Hugh Grant.  You are going to hear a lot

6    from Dr. Heydens, who is in charge of product safety.  You are

7    going to hear from Mark Martens, who is a toxicologist;

8    Dr. William Reeves, who is a designated spokesman for Monsanto.

9    You are going to hear a lot from Donna Farmer, who was their

10   head toxicologist; and David Saltmiras.

11       I don't know if Monsanto is going to bring anyone live,

12   but these are the people we are going to bring to you.

13       This is a slide from my closing last week, talking about

14   how -- you remember Dr. Weisenburger told you last week that a

15   study showed that Roundup is a hundred times more toxic than

16   glyphosate.  You learned glyphosate is not the same thing as

17   Roundup.  And Monsanto knew this.

18       In 1999 Donna Farmer, who was one of their head

19   toxicologists -- she is a decision maker at Monsanto -- wrote

20   in an e-mail, I will not support doing any studies on

21   glyphosate formulations or other surfactant ingredients at this

22   time with the limited information we have on this situation.

23       You are going to learn that this was almost 20 years after

24   the product has been on the market.

25       You are going to hear testimony that she actually stated

OPENING STATEMENT / WAGSTAFF

in 2003 -- which now we are getting close to 30 years after it
has been on the market -- You cannot say that Roundup is not a
carcinogen.  We have not done the necessary testing on the
formulations to make that statement.  One of Monsanto's
decision makers in 2003.  It is about 15 years after
Mr. Hardeman started spraying the product.

This is a slide from my closing too.  You remember how
much he used, and he used it for 26 years.  You heard his
testimony twice.  So you know that he started using it in May
and stopped in November, three to four hours every time.

Monsanto has admitted that it never warned any customer
that Roundup could cause cancer.  To this day, it has never
warned any customer that Roundup could cause cancer.

You are going to hear testimony again from Mr. Hardeman.
He is going to take the stand again.  You are going to hear
testimony from his wife, Mary.  And you are going to hear
Mr. Hardeman say that he read the label; and if it had warned
of cancer, he would not have used it.  He would not have used
it.

You are going to hear testimony on Roundup's design.  And
you are going to hear that the approval of Roundup with the EPA
was based on one study, back in the late '70s, one study.  And
you are going to hear that that study was tested by a
laboratory called Industrial Bio-Test Laboratories, which we
call IBT Labs.  And you are going to hear that in the late '70s

OPENING STATEMENT / WAGSTAFF

1    Monsanto learned that the results were invalid, and that IBT

2    asked them to redo those results.  Monsanto re-did those

3    results, and this was -- this was their -- IBT's letter.  There

4    are serious deficiencies in IBT tests conducted to support the

5    registration of numerous pesticides.

6         Monsanto agrees to redo the one study that Roundup's

7    registration was built on.  And this was the *Knezevich & Hogan*

8    study.  You remember this from Phase One.  This was the study

9    in 1983, right around the time Mr. Hardeman started spraying,

10   right.  He started spraying in 1986.  Monsanto knows that their

11   registration is based on an invalid study.  So they redo it.

12   They learn dose related.  They hear that in 1983, dose

13   response.

14        This is when, as you will recall, Monsanto's employees

15   stated, Short of a new study or finding tumors in the control

16   groups, what can we do to get this thing off of Category C?

17   You remember that from Phase One.

18        And so you remember they hired a man, Dr. Kuschner, who

19   changed the result by finding a magic tumor.  You remember that

20   from Phase One.  And you see what it does with the study

21   results.  And it makes it no longer highly significant.  This

22   is the one study that they are redoing that was invalid before.

23        So they turn that into the EPA.  You remember that the EPA

24   doesn't agree with them and asks them to redo it.  The EPA

25   re-cuts the slides.  Doesn't find the magic tumor that

OPENING STATEMENT / WAGSTAFF

1   Dr. Kuschner found.  Monsanto vehemently argues for the lack of

2   justification for a repeat mouse study.  Monsanto refuses, you

3   will hear, to redo the mouse study, the one study that this

4   registration was built on.

5        This is Monsanto's representative last month admitting

6   they never did that rat study again.  This is actually in

7   January, so two months ago.

8        And why?  Look at every mouse study that has happened

9   since the *Knezevich & Hogan* study.  The *Knezevich & Hogan* study

10  on the left is the study that the EPA was asking Monsanto to

11  redo.  Every mouse study that has been repeated since that time

12  has found a malignant lymphoma, the same type of cancer that

13  Mr. Hardeman has.

14       Monsanto has admitted that it has never conducted a

15  long-term carcinogenicity study on any surfactant used in

16  Roundup.

17       Monsanto admits it has never conducted a long-term animal

18  carcinogenicity study on Roundup, the formulated product, never

19  to this day.

20       And Monsanto admits that it did not conduct any further

21  long-term carcinogenicity animal studies on glyphosate since

22  1991.

23       Monsanto further admits there is no law prohibiting them

24  from doing that.  They get up here and they say the EPA

25  requires -- doesn't require it.  They admitted there is no law

 1   prohibiting them from testing their product.

 2        And their response January 23rd, 2019 -- almost 60 days

 3   ago -- We have not done that study because we have never had

 4   any information in front of us indicating we would need to do

 5   that study.  That is their position 60 days ago:  Never had any

 6   information in front of us indicating we would need to do that

 7   study.

 8        You remember Dr. James Parry.  You remember that Monsanto

 9   hired Dr. Parry -- moving onto the genotox.  You remember

10   Monsanto hired Dr. Parry in 1999 to analyze the genotox

11   studies.  And you remember that Monsanto -- that Dr. Parry came

12   back that there was strong evidence that glyphosate may be

13   genotoxic.  That's what he told Monsanto in 1999.

14        Prior to hiring Dr. Parry, Monsanto internally was unsure

15   if he was the right guy.  You will hear evidence that says,

16   Well, Dr. Parry is a recognized genotox expert.  What is not

17   known is how he views some of the nonstandard endpoints.

18        So what they were going to do -- and what the evidence

19   will show -- is that they gave Dr. Parry a subset of documents.

20   And based on what he found, based on his critique of the

21   genotox papers, a decision would then be made as to expanding

22   or terminating his involvement.  It was Monsanto's choice.  And

23   then they brought up a guy -- talking to a guy named Dr. Gary

24   Williams -- footnote that Williams for a minute -- back in

25   1999.

OPENING STATEMENT / WAGSTAFF

1     Meanwhile, while they are talking about getting Dr. Parry

2  to review some genotox papers, meanwhile in the same e-mail,

3  they are developing a "positive" press release -- positive

4  being in quotes -- talking about Several genotoxicity studies

5  have been conducted on glyphosate, the surfactants in

6  glyphosate formulations and other closely related surfactants.

7     Skip forward a sentence:  None of these studies have shown

8  any adverse findings.  Based on all of these results, we are

9  confident that glyphosate-herbicide products are not genotoxic

10 and, therefore, do not present immunogenic or carcinogenic risk

11 to human and animals.

12    This press release is being drafted at the exact same time

13 they are asking a guy to review these articles for them, a guy

14 who comes back and tells them that glyphosate is genotoxic.

15    So Dr. Parry submitted his first report in 1999, February

16 of 1999.  And he determined that glyphosate was both -- was

17 capable of being both genotoxic in vivo and in vitro through

18 oxidative damage.  And you will learn that that didn't make it

19 into the press release.

20    Then they decide that they want to give Dr. Parry more

21 information to change his mind; to move him from his position.

22 So they say in order to move Dr. Parry from his position, we

23 need to provide him with more information.  So they give him

24 more information.  And you will learn that depending on his --

25 how he comes out, they might want to use him as a spokesperson.

1    They are confident they can change his position.

2         However, in the second paper Dr. Parry concludes that

3    glyphosate is a potential clastogenic in vitro, and that means

4    it is an agent that can induce mutation by disrupting or

5    damaging chromosomes.  So he didn't change his position.  This

6    was in August of 1999.

7         And Monsanto's reaction -- these are some of the decision

8    makers up top -- Dr. Bill Heydens and Dr. Donna Farmer:  We

9    simply aren't going to do the studies that Parry suggests.

10        And might I back up for one moment.  Dr. Parry suggested

11   eight or nine studies that should be done on both Roundup and

12   glyphosate.

13        Shortly thereafter, within a few weeks, you have

14   Dr. Heydens and Dr. Farmer e-mailing.  Let's take a step back

15   and look what we are really trying to achieve here.  This is

16   September of -- September 16th of 1999.  We want to find and

17   develop someone who is comfortable with the genotox profile of

18   glyphosate and Roundup, and who can be influential with

19   regulators and scientific outreach operations when genotox

20   issues arise.  My read is that Parry is not currently such a

21   person, and it would take quite sometime and money sign, money

22   sign, money sign/studies to get him there.  We simply aren't

23   going to do the studies that Parry suggests.

24        Mark, do you think that Parry can become a strong advocate

25   without doing this work Parry.  If not, we should seriously --

OPENING STATEMENT / WAGSTAFF

1  underlined, italic, bolded -- start looking for one or more

2  other individuals to work with.  Even if we think we can

3  eventually bring Parry around closer to where we need him, we

4  should be currently looking for a second back up genotox

5  supporter.  We have not made much progress, and we are

6  currently very vulnerable in this area.

7         September of 1999.  Simply not going to do the studies

8  Parry suggests after admitting they are vulnerable in that

9  area.

10        You are going to hear from Dr. Larry Kier who is -- who

11  was a Monsanto employee, is now a consultant.  We are going to

12  bring him by video deposition.

13        Monsanto admits that it has no record of submitting either

14  of Dr. Parry's reports to the EPA.

15        So now I told you to footnote that portion about Williams.

16  So in that same e-mail where they are talking about bringing

17  Dr. Parry on Dr. Gary Williams is mentioned.  And so what

18  happens?  Instead of doing the 1999 studies that Dr. Parry

19  suggests, you are going to learn that what happens is that

20  Monsanto starts to ghostwrite an article, the Williams paper.

21  This is in late '99 -- late 1999.

22        And what ghostwriting is -- you will learn, is

23  ghostwriting is when a company writes a favorable publication

24  and pays a prestigious author to put their name on it.  So

25  instead of doing the studies and the testing that Dr. Parry

1   suggested, you are going to hear evidence that Dr. Bill

2   Heydens, one of Monsanto's decision makers, ghostwrote what we

3   now call the *Williams* 2000 article.  It was published -- it was

4   received December 6, 1999, but it was actually published in

5   2000, so it is called the *Williams* 2000 article.

6        And there is internal e-mails that you will see because we

7   are going to bring Dr. Heydens by video deposition.  You will

8   see where Dr. Heydens is writing to Dr. Farmer saying, And

9   don't you think that I would actually leave the final editing

10  to him unsupervised?

11       And you are going to hear the story of how that was

12  ghostwritten.  And if you don't believe us, you will see that

13  in a few years later, recently, when discussing a different

14  project, Dr. Heydens suggests a less expensive, more palatable

15  approach might be to involve experts only for the areas of

16  contention; epidemiology and possibly MOA, which is Mechanism

17  Of Action.  And we ghostwrite the exposure tox and genotox

18  sections.

19       Fast forward, We would be keeping the cost down by doing

20  the writing and they would just edit and sign their names, so

21  to speak.  Recall this is how we handled Williams, Kroes and

22  Munro 2000.  The Williams article, *Williams* 2000, I was just

23  mentioning.

24       This is e-mails right around the time Williams came out.

25  And they are discussing that the *Williams* 2000 article, the

OPENING STATEMENT / WAGSTAFF

1    article that they ghostwrote, is the most exhaustive and

2    detailed scientific assessment ever written on glyphosate.  It

3    was due to the perseverance, hard work and dedication of the

4    following group of folks.  They deserve significant credit for

5    their stewardship result here since the human health

6    publication on Roundup herbicide and its companion publication

7    will undoubtedly be regarded as the, in quotes, reference on

8    Roundup and glyphosate safety.  Our plan is to now utilize it

9    both in the defense of Roundup and in our ability to

10   competitively differentiate ourselves from generics.

11        You will notice the publication itself refers specifically

12   to the brand of Roundup.  Then it talks about how this was put

13   together through infinite edits and reviews.

14        The e-mail goes on -- that you will see -- it says:  Both

15   documents meant to be utilized by the next tier of third-party

16   scientists for continued Roundup FTO, Freedom To Operate.

17        You will hear evidence that this was a paper designed to

18   defend Monsanto's right to sell Roundup.

19        You will hear that it goes on:  Now, the hard work by the

20   public affairs begins in utilizing these reference documents to

21   the fullest.

22        This is where the public affairs group -- the public

23   affairs strategy begins to kick in globally.  They are

24   referencing the Williams.  This is Hugh Grant, the former CEO

25   of Monsanto.  He was the CEO of Monsanto until Bayer bought

OPENING STATEMENT / WAGSTAFF

1    Monsanto last summer.  And he says:  This is very good work.

2    Well done to the team.  Please keep me in the loop as you will

3    build the PR info to go with it.  Thanks again, Hugh.

4         He ratifies the ghostwriting.

5         You will see later -- this is Dr. David Saltmiras, who is

6    a toxicologist.  He is giving a presentation ten years later in

7    2010.  He is talking about the *Williams* 2000, and he is saying

8    it is an invaluable asset.  It allows Monsanto to respond to

9    agencies, scientific affairs rebuttals, regulator reviews.

10        When he talks more about the *Williams* 2000 article, he

11   says *Williams et al.* 2000 has served us well in toxicology over

12   the last decade.

13        And why is that important?  You guys heard about some of

14   the epidemiology articles.  You heard about *De Roos* 2003.  It

15   was one of the articles that Dr. Weisenburger published.  Why

16   ghostwriting is important, you heard us ask Dr. Weisenburger

17   about this.  When they were talking about -- when a new article

18   is built and they build in the previous scientific studies, we

19   asked him about this.  This was in the *De Roos* 2003 article.

20        Few suggestive findings, some impetus for further

21   investigation into the potential health effects of glyphosate,

22   even though one review concluded that the active ingredient is

23   noncarcinogenic and non-genotoxic.  Footnote 50.

24        Well, if you look at Footnote 50, it is the *Williams*

25   article.  So these articles get all intertwined in the science.

1    You will learn that the ghostwriting has had a systematic

2    effect.  You will learn also that Monsanto has a pattern of

3    ghostwriting.

4         You are going to hear from Donna Farmer.  We asked her

5    questions about her role in the Mink 2008 epidemiology review.

6    She is going to tell you she just offered suggested evidence.

7    And you are going to see that she added statements such as It

8    concluded that glyphosate is unlikely to pose a carcinogenic

9    risk to humans.

10        You are going to hear that the original authors didn't

11   have that.  Donna Farmer from Monsanto adds that into the

12   article in 2008, and she cites the *Williams* 2000 article.  You

13   are going to hear also that Donna Farmer adds Glyphosate is

14   widely considered by regulatory authorities and scientific

15   bodies to have no carcinogenic potential.  You are going to

16   hear she added that in.  And her name is nowhere on the paper.

17   She is not a listed author.

18        And then you are going to hear a few years later, with the

19   Journal of Toxicology and Environmental Health, the lead

20   author, Amy Williams, called Donna Farmer's contribution

21   significant.  But we have drafts where she is redlined out as

22   an author, and her name isn't on the final paper.  You are

23   going to hear this testimony from Donna Farmer.

24        And then you remember the *McDuffie* paper.  This was in

25   2001.  And this was a statistically significant doubling of the

1  risk paper that showed a dose response.  This was an important

2  paper for a company that makes this important.

3      You are going to hear that Monsanto decision makers are

4  happy that the *McDuffie* paper is harder to find.  When you have

5  a paper online, you are going to hear -- and I think

6  Dr. Weisenburger talked about it -- there is an abstract that

7  comes out.  So people search in the abstract.

8      This is an e-mail chain for Dr. John Acquavella -- who was

9  Monsanto's one and only ever epidemiologist -- and Donna

10  Farmer.  This was back when the *McDuffie* article comes out.

11  Dr. Acquavella says, The *McDuffie* article appeared in the

12  November issue of the Journal of Cancer Epidemiology Biomarkers

13  and Prevention.  Unlike the abstract presented at the

14  International Society for Environmental Epidemiology meeting in

15  August of 1999, glyphosate is no longer mentioned as a risk

16  factor in the abstract.  I will have to get the article and see

17  what it says in the small print.

18      Donna Farmer, I don't know yet what it says in the small

19  print, in quotes; but the fact that glyphosate is no longer

20  mentioned in the abstract is a huge step forward.  It removes

21  it from being picked up by abstract searches.

22      They didn't want people to find these results.  Yes, they

23  were still available if you dug around, but they were harder to

24  find and Monsanto was happy.  This was about the *McDuffie*

25  abstract.

 1        Then you will hear a few months later where she is --

 2   Dr. Heydens is saying So if I understand the situation

 3   correctly, even though reference to glyphosate wasn't removed

 4   entirely, there was a substantial reduction in emphasis,

 5   including but not limited to removal in the abstract.

 6        Right.  It's a good result but not everything we wanted.

 7   The invalid result could be cited as a second glyphosate NHL

 8   finding.  However, it will not be picked up by most of the

 9   usual suspects because it is not mentioned in the abstract.

10   And Monsanto was happy about that.  This was a finding of a

11   doubling of the risk dose response.

12        You remember the *Hardell* studies.  They were done in 1999

13   and then again in 2002 when they added people to them.  You

14   will remember I just -- I put down here that the first *Hardell*

15   study found a doubling of the risk, and five times the risk.

16   The second one in 2002 found a statistically significant

17   tripling of the risk.  You remember that?

18        So when *De Roos* 2003 came out, you will learn that instead

19   of testing the product, Monsanto said, I'm afraid the *De Roos*

20   2003 could add more fuel to the fire for *Hardell*.  You will

21   learn that Monsanto knew that there was a fire swelling from

22   the *Hardell* results.  And instead of testing, you will hear

23   that We are assembling a panel of experts to work on this.

24        Now we will get to epidemiology, which you heard in

25   Phase One from Monsanto's lawyers; that Monsanto believes

1  epidemiology is enough.  You will see that Monsanto has never

2  conducted an epidemiology study to this day.  Despite all the

3  money they have made on Roundup over the years, Monsanto has

4  admitted, as we stand here in 2019, it has never conducted an

5  epidemiology study to study the association between Roundup and

6  NHL.

7      And why is that?  Because two months ago Monsanto, through

8  its designated spokesman, told Mr. Hardeman that there is no

9  evidence that glyphosate or glyphosate-based formulations cause

10 cancer under the conditions that he was exposed to.

11     So when I sit down and Monsanto's lawyers get up, you are

12 going to hear a lot about EPA, EPA, EPA.  It was approved by

13 the EPA.  It was on the market because the EPA allowed it.

14     But I just want you to remember a few things you will

15 learn from the evidence we will present to you.  The original

16 EPA was built on an invalid study which was never repeated.

17 The EPA does not test anything.  The EPA does not test Roundup.

18 The EPA does not test glyphosate.  The EPA relies solely on

19 information provided by the corporations.

20     You are going to learn that Monsanto had a cozy

21 relationship with a couple of people, long-term EPA employees.

22 You are going to hear testimony about that.  You are also going

23 to hear that the EPA did not follow its own guidelines.  You

24 are going to hear testimony about that as well.

25     So I want to bring it back to Mr. Hardeman as we close --

1    and you are going to hear how the cancer has affected his life

2    every day.  You are going to hear him testify how he wakes up

3    every single morning wondering if this lump is back.  You are

4    going to hear the stress and anxiety that it causes on him and

5    his family.

6         And we are going to bring in Dr. Nabhan, who is a

7    board-certified oncologist, who is going to testify about the

8    medical condition of Mr. Hardeman.  We are probably going to

9    bring him on Friday.  You will hear from him on Friday.

10        And then if you decide that damages should be awarded,

11   there are two different kinds of damages.  There are

12   compensatory damages, which are meant to compensate

13   Mr. Hardeman.  And within compensatory damages you will have

14   economic damages which the parties have stipulated to -- makes

15   it easy for you -- are just over $200,000 for Mr. Hardeman, his

16   medical bills.

17        And then you guys will decide, if you determine it is

18   appropriate, the noneconomic damages.  And we will give you

19   evidence and present testimony to help you make that decision

20   and use the categories that you will consider.

21        And next you will decide whether or not Monsanto should be

22   punished.  And this last slide went by really fast -- okay.

23   Good it stopped.  But what it says right there is Monsanto's

24   current net worth -- I'm sorry, Bayer Corporation acquired

25   Monsanto last summer for $63 billion.  That's what it was

 1   bought for last year.  The net worth, when it purchased it, was

 2   6 -- was $7.8 billion.  And the cash on hand was $2.4 billion

 3   last summer.  And then it was purchased for $63 billion.

 4       So you are allowed to take all of that information into

 5   consideration when you think about punitive damages and

 6   punishing Monsanto for its conduct.  And I know you will take

 7   Phase Two just as seriously as you took Phase One, and I really

 8   appreciate you from the bottom of all of our hearts.

 9       Thank you very much.

10       **THE COURT:**  Okay.  It's possible that we are having a

11   little difficulty with the screens and putting up slides, so

12   why don't you go ahead and proceed.  But if there are technical

13   difficulties, we will take a quick break.

14       **MR. STEKLOFF:**  Thank you, Your Honor.

15                   **OPENING STATEMENT**

16       **MR. STEKLOFF:**  Good morning, everyone.

17       As we move into Phase Two, what I would suggest is that

18   you demand that both sides present to you the full story.  So

19   you have heard the phrase "there is two sides to every story."

20   And you shouldn't ignore how stories complete themselves, what

21   happens along the way.  You should demand all of the evidence,

22   and even just now you had cherrypicked evidence.  You had

23   pieces of stories.  You had pieces of e-mails that did not tell

24   you the full story about what has happened.

25       The question that you have to answer in Phase Two boils

1   down to this:  Based on the science at the time, did Monsanto

2   act responsibly in not including a warning about NHL on

3   Roundup?  There is no dispute that there is no warning about

4   NHL on Roundup, and we are focused here on the time period 1986

5   to 2012.  That will be familiar to you.  That's the time period

6   when Mr. Hardeman used Roundup.  And you have to judge whether

7   or not Monsanto acted responsibly during that time period based

8   on the science, based on what it did, based on what it knew,

9   and also based on what the rest of the world was saying about

10  Roundup during that time period.

11      And so you heard at the end that part of Phase Two will be

12  about Mr. Hardeman and what Mr. Hardeman suffered.  And what I

13  really want to make clear is that that's not in dispute.  That

14  is not what we are going to be focusing your attention on on

15  behalf of Monsanto in Phase Two.

16      You will recall he used Roundup between 1986 and 2012.

17  You will hear that while he was unfortunately diagnosed with

18  non-Hodgkin's lymphoma in 2015, he went through chemotherapy

19  and has been in remission since July 2015.  And you will see

20  some testimony again from Dr. Ye, his treating oncologist --

21  who is still his treating oncologist today -- who will say he

22  is optimistic about Mr. Hardeman's future.

23      But we are not going to stand up here and tell you that

24  chemotherapy is not awful; that being diagnosed with

25  non-Hodgkin's lymphoma is not awful.  Of course, those things

OPENING STATEMENT / STEKLOFF

1   are awful; and that is not what Phase Two is about.  I just
2   want to make that clear right now.
3       So what this case is about, again, is what the science at
4   the time told the world and told Monsanto about Roundup and
5   whether Roundup -- whether Monsanto acted responsibly.
6       Monsanto -- Roundup you will recall entered the market in
7   1975.  And you are going to hear me this morning talk about the
8   EPA and other regulators because it is relevant to Phase Two.
9   It has been approved multiple times -- up through 2012, the
10  time period we are focusing on -- by the EPA, by regulators
11  around the world who have looked at the science.  They have
12  looked at all the science and some of the science you have
13  looked at, but they have looked at more; and they have made a
14  determination about Roundup, whether it should be sold and
15  whether it needs a warning about non-Hodgkin's lymphoma.
16      And it is the most studied herbicide in the world by
17  Monsanto, who ran its own tests; by other manufacturers, who
18  use glyphosate and make their own products; by independent
19  scientists who conducted some of the studies you heard in
20  Phase One.  This is the most studied herbicide in the world,
21  and regulators around the world repeatedly since 2012 have said
22  that it should be sold and it can be sold without a warning
23  about non-Hodgkin's lymphoma.
24      Now I want to make clear Monsanto is not hiding behind the
25  EPA.  Monsanto takes responsibility for its product.  Monsanto

OPENING STATEMENT / STEKLOFF

 1    takes responsibility for its label, but what you heard this
 2    morning suggested that Monsanto has done no tests, almost,
 3    about Roundup.  You saw all these slides about certain in
 4    particular tests that have not occurred, but I want to make
 5    clear Monsanto has conducted decades of testing on glyphosate
 6    and on Roundup.
 7         It has run multiple types of tests, something called --
 8    you are going to hear of this from Dr. Farmer -- acute
 9    toxicology, genotoxicity, which you heard -- those are the
10    cells studies that you heard about in Phase One.  It has run
11    its own genotoxicity studies.  It has done its own animal
12    studies.  It has tested glyphosate by itself.  It has tested
13    the surfactants.  It wasn't even required to do that by the
14    EPA, and it still tested them nonetheless.  And it has tested
15    the formulated product, so the combination of glyphosate and
16    surfactants as it is used in Roundup by people whether they
17    spraying on their yard or otherwise.  It has tested all of
18    those things, and those tests have been submitted to the EPA
19    and other regulators.
20         So when you heard this morning all these tests that
21    weren't run, the full story is that there were numerous
22    tests -- dozens and dozens and dozens of tests of Roundup --
23    surfactants, glyphosate and the formulated product.  And you
24    are going to see when Dr. Farmer testifies that she even
25    collected some of that evidence.

 1          And, Ms. Melen, may I briefly have the ELMO, please?

 2          So these are two of the exhibits you will see.  And to be

 3     clear, these are not the only tests that Monsanto conducted.

 4     But Dr. Farmer put together a compilation of studies that have

 5     been done.  These are genotoxicity studies by Monsanto on the

 6     formulated products.  All of these were done by Monsanto on

 7     that combination product, the glyphosate with the surfactants,

 8     to see if it is genotoxic.

 9          And you can see here years are listed -- and they are

10     small, but you will have this back with you -- 1992, 1992,

11     1998, 1999, 1999.  It goes on and on, pages of this.  More

12     studies in the '90s.  Studies into the 2000s, 2006, 2008.  They

13     didn't stop studying Roundup.  They didn't stop studying the

14     formulation.  2008, 2008, 2009, and it goes into 2010, 2011,

15     2012, the time period that we're --

16          **MS. WAGSTAFF:**  Your Honor, can we have a sidebar?

17          **THE COURT:**  Sure.

18          (The following proceedings were heard at the sidebar:)

19          **MS. WAGSTAFF:**  Your Honor, this testimony and this

20     exhibit was designated last night.  It hasn't been ruled on.

21     And we have strenuously objected to its use.  It was an

22     affirmative designation through one of their depositions on a

23     counter that we think far exceeds the scope of anything we have

24     designated.  We think Donna Farmer is an unavailable witness.

25     And it has not been ruled on by Your Honor, and it is on our

```
 1   objection --
 2           THE COURT:  So this is part of the Farmer testimony
 3   that was designated -- the additional designation from last
 4   night?
 5           MS. MOORE:  That's my understanding.  It was part of
 6   their affirmative designations -- designations from last night.
 7           MR. STEKLOFF:  It's my understanding that it was
 8   previously designated.  And I will also say -- and this is not
 9   to hold the Court responsible -- but I did make in the e-mail
10   that I sent to the Court, I let the Court know that I would be
11   using these two documents.  I want Counsel to know that I
12   wasn't trying to do something that the Court was unaware of.
13           THE COURT:  Yes, and I didn't --
14           MR. STEKLOFF:  I don't know why this would be
15   inadmissible either.  They are attacking --
16           THE COURT:  I'm going to allow you to use this in
17   opening statements.  I will remind the jury that what lawyers
18   say is not evidence, but I'm going to allow you to use this.
19           MS. WAGSTAFF:  I know you didn't mean to; but when you
20   were talking, you said that the regulations have been approved
21   many times since 2012.  I'm sure it was just a --
22           MR. STEKLOFF:  I'm trying --
23           MS. WAGSTAFF:  -- slip, if you can be more careful.
24           THE COURT:  I caught that too.  I'm not going to rule
25   that that opens the door to anything.  It was clear it was a
```

1    slip of the tongue.

2            **MR. STEKLOFF:**  I didn't know I did that.  I apologize.

3            **MS. WAGSTAFF:**  I tried to get his attention.

4        **MS. MOORE:**  Your Honor, you will give that curative

5    though about lawyers' statements to the jury?

6            **THE COURT:**  Yeah.

7        **MS. MOORE:**  Thank you.

8        (The following proceedings were heard in open court:)

9            **THE COURT:**  Okay.  So that objection is overruled, but

10   I will remind the jury that statements -- you have heard this

11   many times -- but statements by lawyers are not evidence, and

12   the -- what the lawyers say in their opening statements and

13   their closing arguments are designed to help you understand the

14   evidence, but it is the actual evidence that comes in that

15   matters and your interpretation of that evidence.

16       You can proceed.

17           **MR. STEKLOFF:**  So returning to this chart.

18   I showed you the dates.  It goes from 1992, continues here

19   through 2009.  There were additional studies of genotoxicity

20   conducted by Monsanto on the formulated product during this

21   entire time period.  They didn't stop testing.  They tested

22   during this entire time period, from the '90s through 2012.

23       And then in this chart that I expect that you will receive

24   in evidence they -- Dr. Farmer, who is going to testify to you

25   about this, listed the specific title, the specific tests that

1    they ran.  She listed the organism that was tested, the assay

2    that was used -- that is the type of test they are doing when

3    they put the cells -- when they are testing these cells in a

4    petri dish -- she described the product.

5        So you can see here 31 percent glyphosate because, again,

6    this was the formulated product; 40 percent glyphosate;

7    72 percent glyphosate assay equivalent.  These are all

8    formulations using glyphosate and surfactants to see if it is

9    genotoxic.

10       And you can see the results of the tests that Monsanto ran

11   and Monsanto provided to EPA.  Negative.  Negative.  Negative.

12   Negative.  And you will have this -- these results.  It goes

13   negative all the way through, all the way through in Monsanto's

14   tests conducted by scientists, toxicologists and scientists.

15   The results were not genotoxic.  And it wasn't just genotoxic

16   studies on the formulation.

17       Again, there is this suggestion that Monsanto is somehow

18   failing in its tests.  Here is a chart that Dr. Farmer put

19   together of genotoxicity studies on just the surfactants

20   because even this morning you were shown a slide that somehow

21   the surfactants make it a hundred times more dangerous,

22   remember, from Dr. Weisenburger.  Well, here are all the tests

23   that Monsanto ran just on surfactants to see if surfactants

24   were genotoxic, and they were not required to do that by the

25   EPA.  They were required to run genotoxic tests on glyphosate,

1  and those occurred as well; but they ran tests on surfactants

2  to see if they were genotoxic.  And it is the same thing in

3  this chart.

4      It has the years, 1981 through the '90s into the 2000s, up

5  through 2009.  It lists the title of the study, the test

6  organism, the assay and the results.  Negative.  And you can

7  see again -- you can look at these test results on the

8  surfactants that Monsanto ran, and they are negative.

9      And, again, there were animal tests run by Monsanto.

10  There were mice tests, rat tests, different lengths.  There

11  were tests run on glyphosate.  So Monsanto did take

12  responsibility for testing the product; did provide the results

13  to the EPA and other regulators around the world, and did take

14  responsibility for the safety of glyphosate.

15      So what was the result?  When the EPA looked at those

16  tests, when the EPA looked at other tests, what did the EPA do

17  or not do between 1975 and 2012?  It didn't suspend the

18  product.  It has the power to do that.  It didn't remove the

19  product from the market.  It has the power to do that.  And it

20  did not require a warning about non-Hodgkin's lymphoma or

21  cancer.  The EPA, you will hear, has the power to do all of

22  these things.  They did not do it.  This is across multiple

23  administrations.  This is from 1975 to 2012.

24      And who works at the EPA?  Is it just -- is it just people

25  who are sitting behind a desk who are paper pushers?

1    Absolutely not.  The people who were involved in this

2    evaluation of Roundup and glyphosate for decades included

3    toxicologists, chemists, pathologists, epidemiologists,

4    biologists, and other scientific experts who understand these

5    issues and care about safety.

6        And you don't have to take it from my slide.  This is a

7    1993 review that you will see that shows all of the different

8    divisions of the EPA in 1993 that conducted this glyphosate

9    reregistration eligibility team.  They had a special review and

10   reregistration division.  They had a health effects division, a

11   biological and economic analysis division and a pesticides and

12   toxic substances division.  And all of these types of doctors,

13   all of these types of experts work across these different

14   divisions within the EPA to analyze the data and analyze the

15   science.

16       And this is some of the evidence that they were looking

17   at, how the product was being used, the regulatory and labeling

18   history, rat studies, mice -- mouse studies, the exact

19   animal -- types of animal studies that you heard about in

20   Phase One -- and you will hear more about in Phase Two --

21   genotoxicity studies, the exact types of studies you heard

22   about in Phase One, and you will hear more about in

23   Phase Two -- other issues including residential exposure.  So

24   how much exposure people who are using this in -- at their

25   residences are getting.  They considered all of this in

1    evaluating the safety of Roundup and the safety of glyphosate

2    in deciding how to act on it.

3        And this is a summary of their process in 1993, right in

4    the middle, seven years after Mr. Hardeman started using

5    Roundup.  In their final decision they say they have completed

6    their reregistration eligibility decision on the pesticide

7    active ingredient glyphosate.  And they conclude -- they

8    explain the RED -- that is the Reregistration Eligibility

9    Decision -- is the agency's evaluation of the glyphosate

10   database, its conclusions regarding human and environmental

11   risks associated with the current product uses and its

12   decisions and conditions under which uses and products will be

13   eligible for reregistration.  And this is what they

14   concluded -- this is what that group of scientists concluded in

15   1993 -- the agency has classified glyphosate as a Group E

16   carcinogen, signifies evidence of non-carcinogenicity in

17   humans.

18       So, again, Monsanto takes responsibility, but Monsanto

19   also interacted with the EPA, and this is what the EPA said to

20   Monsanto:  We don't believe that Roundup or glyphosate is

21   carcinogenic.  We are not requiring you to take any steps.

22       And Monsanto's actions were consistent with what the EPA

23   said, but also consistent with what the science showed at that

24   time.

25       1998, the EPA looked again at the science.  The EPA didn't

 1    stop.  They didn't stop in 1975.  They didn't stop in 1993.

 2    They looked at it again in 1998.  You can see that they

 3    specifically were looking at that time at carcinogenicity

 4    studies in rats and in mice.  And once again, they confirmed

 5    that this was a Group E pesticide; no evidence for

 6    carcinogenicity in two acceptable species.

 7         It is not just the EPA.  It is Europe and other

 8    international organizations around the world.  Here is what

 9    Europe said in 2002, 16 years after Mr. Hardeman started using

10    Roundup.  They looked at the long-term toxicity and

11    carcinogenicity of Roundup.  They said -- at the bottom you can

12    see -- No evidence of carcinogenicity for glyphosate or

13    something called glyphosate trimesium.  No evidence of

14    carcinogenicity.

15         Those are European regulators.  Again, scientists,

16    toxicologists, epidemiologists who are looking at the science

17    to see if glyphosate is carcinogenic.

18         And it is not just regulators.  It is not just government

19    bodies, regulators.  It is also other groups of scientists.  So

20    you can see here in 2004, the world -- part of the World Health

21    Organization and part of the United Nations, The Food and

22    Agricultural Organization of the United Nations, had a joint

23    meeting to evaluate pesticide residues including glyphosate

24    residues.

25         And so they were looking at residues in food, but they

1  were focused on -- based on all of the science -- again, animal

2  studies, cell studies or genotoxicity studies, is glyphosate

3  carcinogenic.  And this is their conclusion:  The Meeting

4  concluded that glyphosate is unlikely to be genotoxic in view

5  of the absence of carcinogenic potential in animals and the

6  lack of genotoxicity in standard tests.  The Meeting concluded

7  that glyphosate is unlikely to pose a carcinogenic risk to

8  humans.

9      Those are scientists from the World Health Organization,

10  scientists from the United Nations in 2004.  And Monsanto --

11  all of these findings, of course, are being shared with

12  Monsanto during this timeframe.

13      So what did the regulators say between 1986 and 2012, the

14  time period you are being asked to focus on in Phase Two?  The

15  EPA, during that time period, did not say that Roundup caused

16  his non-Hodgkin's lymphoma and no international regulator said

17  Roundup causes non-Hodgkin's lymphoma.

18      So what did we hear this morning?  What did we hear?  We

19  heard pieces of evidence, pieces of stories to try to convince

20  you that Monsanto hid the truth or denied the truth or did

21  something wrong.  But, again, consider all of the evidence as

22  you listen through the evidence in Phase Two.

23      You heard about this mouse study in Phase One.  And it

24  came up again today with this tumor.  Remember the tumor that

25  they said was zero-one-one-three and the line changes?  I think

1    we saw the line go up and down multiple times this morning.

2    But you weren't told, once again, how the story played out.

3        So you will recall from Phase One, Monsanto submitted a

4    mouse study to the EPA in the 1980s.  And the EPA panel that

5    looked at that study, the *Knezevich* study, at first thought

6    that they were going to give a Group C classification.  EPA

7    asked for more information, and Monsanto went out and hired an

8    independent consultant, Dr. Kuschner.  You heard this evidence.

9        The EPA then -- and Dr. Kuschner found a tumor in that

10   control group.  The EPA looked at the evidence.  The EPA asked

11   for another study to be conducted.  And what did the EPA say in

12   the end based on the *Knezevich* study and other studies that it

13   was looking at?  It said glyphosate is not carcinogenic in

14   1991.

15       Here is the study that occurred in 1990 -- the study that

16   Monsanto conducted after that control group tumor was found in

17   the 1980s -- and you can see -- this is the study.  It is an

18   unpublished study prepared by Monsanto.  It discusses what the

19   study was:  A chronic feeding carcinogenicity study was

20   conducted using certain rats fed diets containing glyphosate

21   for two years.  The agency concluded that these adenomas -- so

22   there were certain tumors, adenomas that were found -- were not

23   treatment related and glyphosate was not considered to be

24   carcinogenic in this study.

25       So based on this study, what does the EPA say in 1991?

1    Glyphosate should be classified as a Group E, evidence of
2    non-carcinogenicity for humans, based on lack of convincing
3    carcinogenicity evidence in adequate studies in two animal
4    species.  The EPA said the studies that were conducted were
5    adequate; said that the studies showed that glyphosate was not
6    carcinogenic.
7         So part of what you heard this morning, just to go back,
8    was, Well, Monsanto admits it has never conducted a two-year
9    study of the formulated product in mice or in rats, a long-term
10   two-year study.  Well, you are going to hear why that happened
11   because you will recall from Phase One these animals are fed.
12   They are fed large amounts of whatever is being tested.
13        And so in the formulated product, you have glyphosate and
14   the surfactants.  And the surfactants are like a soapy dish
15   like -- a soapy hand dish liquid-type substance.  If you feed
16   that to rats or mice for two years, they are -- even in 30-day
17   studies what Monsanto was seeing was that it was eating away at
18   the rats and the mice, their gastrointestinal lining.  You are
19   going to hear Dr. Farmer explain that.  And so they determined,
20   along with the EPA, for two years you can't feed them soap.
21   You are not going to get real results.  The rats likely aren't
22   even going to survive.
23        So when you hear all of these things about, well, one type
24   of study wasn't done; one type of study wasn't done, remember
25   all of the different types of study that Monsanto conducted,

1    both genotoxicity and animal studies; and that the EPA took

2    that data; reviewed it and made determinations like this in

3    1991.  Group E evidence of non-carcinogenicity for humans.

4         Ms. Melen, may I have the ELMO, please, one more time?

5    Thank you.

6         Here is another document that you were shown briefly in

7    opening this morning.  You heard a lot about Dr. Farmer this

8    morning.  So you were shown this e-mail, and you were shown

9    this sentence at the bottom of this e-mail:  For example, you

10   cannot say that Roundup is not a carcinogen.  We have not done

11   the necessary testing on the formulation to make that

12   statement.

13        But what I want to show you is what Donna Farmer was doing

14   in this e-mail, what she was doing as a responsible scientist.

15   So let me give you some context for this full e-mail; again,

16   the full evidence.

17        This is an e-mail from Donna Farmer to a series of

18   Monsanto employees dated Saturday, November 22, 2003, 4:46.

19   And these employees are coming to Donna Farmer with some

20   potential Q and As of questions that are being asked by

21   Roundup.

22        And what does Donna Farmer say?  First of all, she

23   explains:  Your Q and A was forwarded to Kathy Carr and me for

24   review.  I'm the toxicologist responsible for glyphosate and

25   glyphosate-based products worldwide, and Kathy provides

OPENING STATEMENT / STEKLOFF

1    ecotoxicology support for glyphosate globally as well as

2    manages the information resources for glyphosate.

3         So she is explaining that she is reviewing this Q and A to

4    make sure that it is accurate.

5         She says:  As explanation for some of our edits, in many

6    parts of the world, there is no such formulation being sold

7    called Roundup.  In addition, in the U.S., we have some lawn

8    and garden products with the Roundup name on them, but they

9    contain other active ingredients in addition to glyphosate; and

10   they may have different properties from glyphosate.  That is

11   why we were using the phrase "Roundup herbicides" or "Roundup

12   agricultural herbicides."  When possible, it is preferable to

13   use the name of the product that is actually being used and the

14   data that supports that particular formulation.

15        That is what you would want from a responsible scientist,

16   to say We want accurate information and use the data that is

17   tied to that specific product.

18        Then she says:  The terms "glyphosate" and "Roundup"

19   cannot be used interchangeably.

20        And you know why.  Glyphosate is the molecule, but -- in

21   Roundup it is combined with surfactants and water and other

22   things, right.  So you can't just say glyphosate and Roundup

23   are the same if you are a scientist.

24        She says:  Nor can you use Roundup for all

25   glyphosate-based herbicides anymore.

OPENING STATEMENT / STEKLOFF

1    So then she goes on to say:  For example, you cannot say

2    that Roundup is not a carcinogen.  We have not done the

3    necessary testing on the formulation to make that statement.

4    The testing on the formulations are not anywhere near the level

5    of the active ingredient.

6        So let's pause there.  What she is saying is We have

7    tested the formulation, but not as much as just glyphosate by

8    itself.  So if you are going to make statements, you need to be

9    careful.  You need to make statements about glyphosate if

10   that's what the data supports.  You can't just say that it

11   applies automatically to the formulated product of Roundup.

12       Again, this is exactly what you would expect and demand

13   from a responsible scientist, is to be accurate about what

14   testing has occurred in a Q and A.

15       So she goes on to say:  We can make that statement about

16   glyphosate -- because of all the testing that has been done on

17   glyphosate -- and can infer that there is no reason to believe

18   that Roundup would cause cancer.

19       Imagine if the evidence showed the opposite.  Imagine if

20   she said Based on our glyphosate testing, you can say whatever

21   you want about Roundup.  I'm quite confident that would have

22   been the focus of the opening statement today, saying that we

23   were irresponsible and taking data from glyphosate and applying

24   it in a way it shouldn't have been.

25       But what is actually happening here is a responsible

1    scientist, a toxicologist at Monsanto, telling people who might

2    not have this information about the science what the science is

3    and what it shows.

4         And so don't let cherrypicked statements out of documents

5    be used during this trial.  Demand that the full context be

6    given.

7         This is another document you were -- that was discussed

8    during opening.  It was this *Williams* article from 2000.

9    Remember the *Williams* article?  They showed you it was cited in

10   other journal articles.  They talked about e-mails about

11   Williams.  They didn't show you the full part of Williams.

12        So what is important is that if Monsanto has a role in a

13   study, that role should be disclosed so that anyone who is

14   looking at the study can say, Okay.  Maybe I trust Monsanto,

15   maybe I don't.  Maybe I put value on this study, maybe I don't.

16   Everyone can make their own determination about how much they

17   value a study.

18        Well, this is the acknowledgment section from the *Williams*

19   article in 2000.  And the authors of the *Williams* article --

20   and you are going to hear testimony about this *Williams*

21   article -- specifically acknowledge that Monsanto played a role

22   in the study.  You weren't shown this.  This is what the

23   article itself says in the acknowledgment section so that

24   people can read this and know Monsanto's role.

25        It says:  Second, we thank the toxicologists and other

**OPENING STATEMENT / STEKLOFF**

1    scientists at Monsanto who made significant contributions to

2    the development of exposure assessments and through many other

3    discussions.

4         They talk about being given complete access to the

5    toxicological information at the labs at Monsanto in St. Louis.

6    So you know they are working at St. Louis to collect their

7    data.

8         And then it says, Key personnel at Monsanto who provided

9    scientific support -- and it includes a number of people --

10   including Dr. Heydens -- who you are going to hear from --

11   Dr. Farmer -- who you are going to hear from -- and Dr. Carr;

12   and others.

13        Again, what is the full evidence?

14        And this happened with the Parry study as well.  So you

15   heard about this Parry.  You heard about Dr. Parry in Phase I.

16   You heard about it this morning.  You're going to hear more

17   about it in Phase II.  But what happened with Dr. Parry?

18        You will recall that Dr. Parry was given four of the

19   genotoxicity studies, and he had raised concerns about the

20   genotoxicity and recommended a series of further tests.  That

21   evidence was presented to you in Phase I.

22        What you didn't hear and what you didn't hear discussed

23   this morning was that Monsanto did conduct further tests.

24   Monsanto shared the results of those tests with Dr. Parry,

25   Monsanto published test results, and Dr. Parry in the end

1    agreed that those tests did not show genotoxicity.  They did

2    not show genotoxicity.

3         And you might recall that from Dr. Portier, the

4    plaintiff's expert, when he was questioned in Australia, he was

5    asked about those recommendations that Dr. Parry made.  There's

6    a series of eight recommendations that were made, and this was

7    his testimony about those recommendations.  He was asked

8    (reading):

9         "Q.  Have you reviewed these various recommendations, sir?

10        "A.  Yes, I have."

11   These are the Parry recommendations that he made to

12   Monsanto, Dr. Parry made to Monsanto.  (reading)

13        "Q.  And just to be clear, has Monsanto, to the best of

14        your knowledge, or anybody done all of these

15        recommendations."

16   And he said (reading):

17        "With the exception of point I, I think somebody has

18        done something on most of the rest of these."

19        And so it is true that Monsanto itself did not do all

20   these recommendations, but it did run further tests, it did

21   publish the results of those tests, it did provide them to

22   Dr. Parry, and Dr. Parry in the end said "I don't think this

23   shows genotoxicity."  That is the full story about Dr. Parry

24   that you will hear in Phase II.

25        And while we're on the topic of Dr. Portier, you will

1    recall -- you're going to hear briefly from Dr. Portier, again

2    from his testimony that was recorded in Australia, that he, in

3    this time period that we are focused on, during part of that

4    time period, he was at the National Toxicology Program.  He was

5    working there to find causes of cancer.  And from that period,

6    based on the science at the time, 1986 to 2012, he never said

7    Roundup caused cancer.  He never said Roundup caused

8    non-Hodgkin's lymphoma.

9          So during this period up to 2012, who said glyphosate

10   caused cancer by 2012 that were groups of scientists, whether

11   regulators, whether Dr. Portier, or whether they were other

12   health organizations like the World Health Organization?  No

13   one.  No one said that based on all of the science, not just

14   the science that you saw in Phase I but all of the science that

15   was available to them.  The science -- the tests that were sent

16   to the EPA and other regulators by Monsanto, the tests that

17   were done by other manufacturers of glyphosate-based

18   herbicides, the independent tests, the animal tests, the

19   genotoxicity tests, the epidemiology, no regulator or health

20   organization by 2012 said that glyphosate caused cancer.

21         So in the end, that is the time period that you need to

22   focus on in Phase II.  You will be instructed by the Court at

23   the end of the phase, but we are focusing here in Phase II on

24   Mr. Hardeman's use because you heard the question is:  Did

25   Mr. Hardeman's injury that you found, is Monsanto responsible

```
 1   for it?
 2        So Mr. Hardeman used Roundup from 1986 to 2012.  During
 3   that time period, no organization, health organization, no the
 4   EPA, and no other international regulator required a warning on
 5   the label.  No health organization or regulator said Roundup
 6   causes cancer.
 7        And Monsanto was responsible.  Monsanto acted responsibly;
 8   and while you may not believe -- or you may not -- this is not
 9   a popularity contest.  In the end, it's not a popularity
10   contest where you're going to say "Do you love Monsanto?  Do
11   you like Monsanto?"  But what the evidence will show is that
12   Monsanto, consistent with the science, consistent with how the
13   science was being viewed around the rest of the world did act
14   responsibly and should not be found liable in Phase II.
15        Thank you.
16        THE COURT:  Okay.  Thank you.
17        Now is a good time for a morning break, and it reminds me
18   there's one little scheduling glitch for today that I forgot to
19   tell you.
20        We're going to need to have an early lunch break today
21   because of something that I need to deal with at 11:00 o'clock.
22   So the lunch break will go from 11:00 to 12:00 today, and we
23   may go a little bit past 2:30 today in an effort to sort of
24   make sure that we remain on schedule.  So I wanted to let
25   you-all know that about today.
```

**PROCEEDINGS**

 1        For now we'll take a short break.  We'll resume at five

 2   minutes to 10:00.

 3        Thank you.

 4        (Proceedings were heard out of the presence of the jury:)

 5            **THE COURT:**  Okay.  Thank you for the closing

 6   arguments.  We'll be back in a few minutes.

 7        Who's the first witness?

 8            **MS. WAGSTAFF:**  Dr. Martens.

 9            **THE COURT:**  Dr. Martens, okay.

10                    (Recess taken at 9:48 a.m.)

11                (Proceedings resumed at 10:00 a.m.)

12        (Proceedings were heard out of the presence of the jury:)

13            **THE COURT:**  Okay.  Go ahead and bring them in.

14            **MS. MOORE:**  Your Honor, I'm sorry, really quick.  We

15   have -- the parties have met and conferred, and there is a

16   brief section of the Reeves deposition that we added some

17   designations Mr. Wool can speak to.  It won't take but a

18   minute.

19            **THE COURT:**  Okay.

20            **MR. WOOL:**  These were the designations we added

21   briefly last night we submitted to the Court.  It's really just

22   the same issue throughout the entirety of the designation, just

23   sort of with respect to what information is going to be allowed

24   to come in with respect to Monsanto's relationship with EPA.

25        And so we just -- it doesn't need to happen right now, but

**PROCEEDINGS**

1    we just wanted to tee that up because we were planning on

2    playing Reeves this afternoon.

3        So I can provide Your Honor with the transcripts right

4    here and, you know, during the lunch hour, or something like

5    that, I think it would be pretty easy to get a ruling.

6            **THE COURT:**  Okay.  So there were some additional

7    Reeves designations that were submitted last night?

8            **MR. WOOL:**  Correct.

9            **THE COURT:**  Okay.

10           **MR. WOOL:**  Sort of pursuant to the colloquy with the

11   Court earlier in the day.

12           **THE COURT:**  Okay.  And these are them?

13           **MR. WOOL:**  That's correct.

14           **THE COURT:**  That's it?

15           **MR. WOOL:**  Yes.  And that includes Monsanto's at the

16   bottom, although those are probably less objectionable and --

17           **MR. STEKLOFF:**  I think what you will see, based on the

18   colloquy that we had yesterday morning, Your Honor, they've

19   added in 2015 testimony about Jess Rowland, which we object to.

20       And then we also made some slightly -- you know, small

21   number of new affirmative designations, which I think are, like

22   Mr. Wool said, less controversial.

23       Once we have that, they can play the Reeves video.

24           **THE COURT:**  Okay.  I'll try to look at it while this

25   testimony is playing right now.

MARTENS - VIDEO TESTIMONY

1          **MR. WOOL:**  Thank you, Your Honor.

2          **MS. MOORE:**  Thank you, Your Honor.

3          **THE COURT:**  Okay.

4          **MS. WAGSTAFF:**  Your Honor, I don't know if you have a

5    hard stop of 11:00 a.m., but this deposition is one hour and

6    eight minutes.

7          **THE COURT:**  I do have a hard stop.

8          **MS. WAGSTAFF:**  Okay.  So we'll just finish it after.

9          **THE COURT:**  Finish it at five minutes till.

10         **MS. WAGSTAFF:**  Okay.  Finish it at five minutes till,

11   and then we'll just finish it after lunch.

12         **THE COURT:**  Fine.

13         **MS. MOORE:**  Thank you.

14         **THE COURT:**  Or thereabouts, give or take a couple of

15   minutes.

16      (Proceedings were heard in the presence of the jury:)

17         **THE COURT:**  Okay.  The plaintiff can call its first

18   witness.

19         **MS. MOORE:**  Thank you, Your Honor.  The plaintiffs

20   call Dr. Mark Martens from Monsanto.

21         **THE COURT:**  Okay.  Go ahead.

22             **(Video was played but not reported.)**

23         **THE COURT:**  Okay.  Thank you.  That sounds like a good

24   time to take a break.

25      So we'll go on our lunch hour early.  As I said, I

PROCEEDINGS

1    apologize for having to tweak the schedule for you today.  We

2    will resume -- we'll bring you back in here at noon sharp.

3        And please remember all of my admonitions and be careful

4    not to -- you need to prevent yourself from overhearing

5    anything in the building and things like that, and we'll see

6    you at noon sharp.

7        Thank you.

8        (Proceedings were heard out of the presence of the jury:)

9        **THE COURT:**  Okay.  And I'll remind everybody in the

10   courtroom that the rule still applies that you have to wait

11   five minutes.  Nobody can leave the courtroom for five minutes

12   at the lunch break or at the end of the trial day to give the

13   jurors a chance to use the elevator and whatnot.

14       What I will propose is that you-all come back at 11:45,

15   and we can talk a little bit more about this Rowland business.

16       My gut reaction is that a lot of this should not come in

17   under Rule 403, and perhaps none of it should come in; but it

18   seems like it's at least worth having a discussion about, you

19   know, the paragraph in Exhibit 90, which starts "Also Jess

20   called to ask for a contact name at ATSDR."  It seemed like

21   that one paragraph, you know, potentially could come in

22   without, you know, sort of opening the door to too much or

23   creating too many problems.

24       And then possibly the stuff about Rowland retiring if it's

25   sort of sanitized from any discussion of IARC and whatnot.

**PROCEEDINGS**

1         And then the -- and then Exhibit 92 possibly, but I want

2     to hear a little more about -- I don't know -- I don't know who

3     Jack Housinger exactly is.

4         Part of it depends, I suppose, on how long Rowland and

5     Housinger were in EPA and whether there's any evidence of any

6     kind of relationship between Monsanto and Rowland and Housinger

7     pre-2012 and what kind of influence they exercised pre-2012.

8         I mean, those are some of the questions to ponder, but

9     I'll be back at 11:45 to hear more from you on that.

10        **MS. MOORE:**  Okay.  Thank you, Your Honor.

11        **MR. STEKLOFF:**  Thank you, Your Honor.

12    Can I just flag, I don't need to argue --

13        **THE COURT:**  Oh.  And I didn't get the text exchange.

14    Nobody handed me up the text exchange.

15        **MR. STEKLOFF:**  We'll try to locate that.

16        **THE COURT:**  Okay.

17        **MR. STEKLOFF:**  Can I just hand you one thing?  We'd

18    like to seek reconsideration of one exhibit that you admitted

19    in the Farmer testimony, and so I pulled out that exhibit and

20    the relevant testimony.

21        **THE COURT:**  Okay.

22        **MS. WAGSTAFF:**  Do you have a copy of the relevant

23    testimony?

24        **MR. STEKLOFF:**  I'll get it for you.

25        **THE COURT:**  All right.  Thank you.

PROCEEDINGS

```
 1              (Luncheon recess taken at 10:59 a.m.)

 2   Afternoon Session                          11:53 a.m.

 3         (Proceedings were heard out of the presence of the jury:)

 4         THE COURT:  Okay.  First, on this Donna Farmer thing,

 5   now that I'm seeing what the document is about, it strikes me

 6   that this should not come in.

 7         I will say that this is a consequence of objecting to

 8   everything.  I mean, it appears -- you know, from going through

 9   the deposition designations, it appears that Monsanto has

10   decided to object to virtually all the evidence that's coming

11   in on the grounds that -- on 403 grounds, on the grounds that

12   it's unfairly prejudicial.

13         I mean, most of the objections, frankly, are ridiculous.

14   So it becomes hard going through all of the deposition

15   testimony to focus on any one thing when you just get the same

16   403, 403 objection to everything.

17         Yes, this evidence is prejudicial to Monsanto in the sense

18   that it is damaging, but it's not excludable -- for the most

19   part, it's not excludable under 403.

20         So, you know, I don't know if it's too late to go back and

21   try to be a little more judicious with your objections or if

22   you just want me to keep going through what you've sent me, but

23   either way, this is a good example of -- this is a consequence

24   of the blanket objections that Monsanto has made.

25         So, anyway, but, I mean, this document definitely is not
```

PROCEEDINGS

```
 1  admissible.

 2          MS. MOORE:  Your Honor, we would just ask that we be

 3  allowed to redact, then, parts of it because I think the first

 4  line on page 1, bullet 1, "Funny you should say that, Donna

 5  Farmer.  Glyphosate talks and I have been playing whack-a-mole

 6  for years and calling it just that.  We were joking about it

 7  yesterday," and I think that that is relevant.  I mean, it's

 8  the way that they perceive this is a game and it's not a game,

 9  and that's referring to glyphosate toxicology with Donna

10  Farmer.

11          THE COURT:  I understand your argument, but this

12  document is excluded under Rule 403 and, frankly, probably 401

13  as well, and the accompanying testimony is excluded as well.

14      So, then, that brings us back to the stuff that you-all

15  gave me this morning.

16      Let me ask, first, how long is Dr. Reeves' testimony?

17          MS. MOORE:  It's a little under two hours, Your Honor.

18          THE COURT:  Okay.

19          MS. MOORE:  That's both sides, Your Honor.

20          THE COURT:  Right.  And then Farmer is after Reeves;

21  is that the plan?

22          MS. MOORE:  Yes, Your Honor.

23          THE COURT:  Okay.  So Farmer will be ready to go after

24  this bit is removed.  And how long is Farmer?

25          MS. MOORE:  It's almost 3 hours?
```

1          **UNIDENTIFIED SPEAKER:**  3:15.

2       **MS. MOORE:**  3:15 with both sides, Your Honor.

3       **THE COURT:**  Okay.  As I've said a couple times now,

4 there's a lot of cumulative stuff in there, but it's your

5 choice.

6     Okay.  So let's talk about Rowland, then, for a few

7 minutes.  It sounds like we could potentially resolve Rowland a

8 little bit later, but -- so I guess -- let me -- you know, as I

9 said, just looking at this first e-mail, Exhibit 90, you know,

10 the only possible thing that would come in I think would be

11 that paragraph.  I think it's questionable whether it should

12 come in, but why don't you tell me why you think that one

13 paragraph at least shouldn't come in.

14       **MR. KILARU:**  Is that the paragraph, Your Honor, on the

15 second page that starts with --

16       **THE COURT:**  Yes.  "Jess called to ask..." yeah.

17       **MR. KILARU:**  I think it shouldn't come in because it's

18 here talking about a 2015 review that may or may not have

19 happened.

20       **THE COURT:**  Right.

21       **MR. KILARU:**  I mean, it's Monsanto's communication --

22 first of all, it's hearsay because it's relaying a conversation

23 that Rowland had with the person in the e-mail.

24       **THE COURT:**  Well, but it's not -- it wouldn't be --

25 it's not offered for its truth.

 1          **MR. KILARU:**  I think that would be, then, further --

 2    fair enough, but I think that would further diminish its value

 3    in terms of how probative it is because if it's not offered for

 4    the truth, then presumably it's coming in for some kind of

 5    state-of-mind-type reason.

 6          **THE COURT:**  It would be coming in to show that

 7    Monsanto has a guy in the EPA at a high level.

 8          **MR. KILARU:**  But as of -- this is about 2015,

 9    Your Honor.  And just going back in time a little bit, because

10    you asked this question before, there actually isn't any

11    evidence of any connection between Monsanto and Jess Rowland

12    before these documents and this e-mail.

13      As you may recall --

14          **THE COURT:**  Other than this e-mail and these

15    documents.

16          **MR. KILARU:**  Other than this e-mail.

17          **THE COURT:**  Because these documents suggest a

18    preexisting relationship with Jess Rowland; right?

19          **MR. KILARU:**  I suppose.  I mean, how far back it goes

20    is very unknown.  Whether it began before 2015 is, I think,

21    completely unclear from the documents.

22      And when Mr. Rowland was deposed, as you may recall, the

23    EPA permitted him to be deposed only on 2014 and going forward

24    so that is actually all the evidence we have in this case of

25    Rowland's involvement.  And I don't think taking this paragraph

1   out of the context and perhaps suggesting that it might be

2   about something before 2012 when it's clearly not would be

3   appropriate.

4           THE COURT:  EPA permitted him only to testify about

5   2014-2015?

6           MR. KILARU:  Yeah.  I have a copy of the authorization

7   for the subpoena but basically because he was still at the

8   agency -- excuse me -- he had left the agency, but because it

9   was about matters within the scope of his employment, the

10  agency has to authorize him to the extent he's allowed to talk

11  about it.  So the only evidence of Jess Rowland in this case is

12  from 2014 and on.

13          THE COURT:  What was his position in 2015 at this

14  time?

15          MR. KILARU:  I don't remember his exact position.

16          THE COURT:  Was it --

17          MR. KILARU:  Actually, I may have it here.

18          THE COURT:  I want to know what his position was, how

19  long he held it.  Did he hold the same position, you know,

20  pre-2012?

21          MR. KILARU:  I believe he was the deputy division

22  director.  He had previously worked as the co-chair of the

23  Cancer Assessment Review Committee.  How far back he had worked

24  at EPA, I am not certain.

25          MR. WOOL:  He started at EPA in 1990.

PROCEEDINGS

1        **THE COURT:**  But I'm curious what jobs he held.  How

2    long did he hold this deputy director job?

3        **MR. WOOL:**  I think it was several years.  I don't have

4    it.

5        **THE COURT:**  All right.  So it sounds like we're not

6    quite ready yet -- nobody's quite ready yet to have a full

7    discussion about this to the point where a decision can be made

8    whether this is allowable.

9        **MR. KILARU:**  Your Honor, if I could just on that,

10   though, I mean, I think what we are -- the portion of the

11   e-mail that I believe we're discussing right now is, by

12   definition, about 2015.  I mean, that is what he is talking

13   about.  He's talking about a review in 2015.

14       **THE COURT:**  Right.  And, again, the idea would be that

15   you can only consider this to the extent it's relevant to

16   Monsanto's pre-2012 conduct, but it seems like it is on some

17   level relevant to Monsanto's -- potentially relevant to

18   Monsanto's pre-2012 conduct because it shows a preexisting

19   relationship, cozy relationship, with a high-level EPA

20   official.

21       And the question --

22       **MR. KILARU:**  And I think -- sorry, Your Honor.

23       **THE COURT:**  No.  And so, you know, it's potentially

24   relevant.  Then the question is:  How relevant and is its

25   relevance, you know, outweighed by the unfairly prejudicial

1    effect it would have?  That, I think, is probably the question.

2        MR. KILARU:  And I think just on that, Your Honor,

3    what I'd say is, I think consistent with the discussion a few

4    days ago, if there's evidence of Mr. Rowland having involvement

5    with Monsanto during the time period we're talking about, that

6    might be one thing.

7        THE COURT:  But if it's --

8        MR. KILARU:  And if there's post-2015 evidence --

9        THE COURT:  But they didn't let him -- they didn't let

10   the plaintiffs take his deposition on --

11       MR. KILARU:  Well, that may be, Your Honor, but we

12   can't sort of pretend evidence exists if it doesn't.  I mean,

13   we have the evidence we have, and the evidence --

14       THE COURT:  You might expect that there would be

15   documentary evidence.  You know, we've got e-mails talking

16   about "Jess Rowland is getting ready to retire and maybe he can

17   be a good asset for us."  We've got e-mails talking about

18   conversations they're having with Jess Rowland, which could be

19   interpreted as Rowland assisting -- kind of assisting Monsanto

20   in moving things a certain direction.

21       You might expect there to be documentary evidence from

22   pre-2015 on that if, in fact, they were engaging in those kinds

23   of communications with Rowland at that time.

24       MR. KILARU:  And my point is, Your Honor, I don't

25   think there is any evidence of that in our record.  If it may

1    exist out there in the world, that might be another matter for

2    a future case --

3            THE COURT:  Okay.

4        MR. KILARU:  -- but for here, we have what we have.

5        And when what Mr. Rowland is talking about is his conduct

6    in 2015 in relation to approvals that were being discussed in

7    2015, then, first of all, we think that is post-use; and,

8    second of all, we think if they're going to introduce evidence

9    of what Mr. Rowland was talking about in EPA in 2015, we should

10   have the right to complete the story with what then followed

11   from that.  And I think we've been keeping that evidence out so

12   far, and so I think that should probably continue.

13           THE COURT:  So here's what I would suggest.  So it's

14   not going to come in now because I want to have a fuller

15   discussion about it, and we can talk at the end of the trial

16   day, perhaps today, further about it or tomorrow morning or

17   something.

18       So you could play Reeves now without that or you could

19   play Farmer since Farmer's ready to go.  It's up to you.  But

20   either way, we're going to bring the jury back in now.

21           MR. KILARU:  Thanks, Your Honor.

22           MR. WOOL:  May I make one brief point, Your Honor?

23           THE COURT:  No.

24           MR. WOOL:  Fair enough.

25           THE COURT:  Because the jury has been waiting.

REEVES - VIDEO TESTIMONY

```
1        (Proceedings were heard in the presence of the jury:)

2            THE COURT:  Welcome back, everyone.  You can resume

3   with Dr. Martens.

4            MS. MOORE:  Thank you, Your Honor.

5                  (Video was played but not reported.)

6            MS. MOORE:  Your Honor, plaintiffs move to enter into

7   evidence Trial Exhibits 155, 156, 157, 158, 159, 160, 161, and

8   208.

9            THE COURT:  Any objection?

10           MR. STEKLOFF:  I'll need to just double -- confirm

11  that, but no objection.

12           THE COURT:  Okay.  So they'll be admitted

13  provisionally subject to your confirmation.

14       (Trial Exhibits 155 through 161 and 208 received in

15        evidence)

16           MS. MOORE:  Thank you, Your Honor.

17           THE COURT:  And go ahead and call your next witness.

18           MS. MOORE:  Thank you, Your Honor.

19       We call Monsanto's designated corporate representative,

20  Dr. William Reeves.

21           THE COURT:  Go ahead.

22                  (Video was played but not reported.)

23           THE COURT:  Okay.  Why don't we take a short break.

24  We'll resume at quarter after the hour.

25           (Proceedings were heard out of the presence of the jury:)
```

PROCEEDINGS

```
1         THE COURT:  Okay.  Be back in a few minutes.

2                 (Recess taken at 1:08 p.m.)

3              (Proceedings resumed at 1:18 p.m.)

4         MS. MOORE:  Your Honor, it looks like we'll have time

5  to play -- start Dr. Farmer.  I do want to note that we

6  objected to the entirety of the defense's affirmative

7  designations of Dr. Farmer because she's not unavailable to

8  them.  So it may be something we need to bring up.

9         THE COURT:  I saw that objection.

10        MS. MOORE:  Okay.

11        THE COURT:  Yes.

12        MS. MOORE:  As the Court --

13        THE COURT:  And I allowed that in.  And I've got the

14 final ones right here.  I was going to look at the final ones.

15        MS. MOORE:  Because they've got about two hours' worth

16 of affirmative designations, and we think it's cumulative of

17 Dr. Reeves.  That part of Dr. Farmer happened like two days

18 after Dr. Reeves, and it's clear they didn't like the way

19 Dr. Reeves came in so they tried to use Dr. Farmer to clear

20 that up.

21     So that's the basis of our objection.  She's not an

22 unavailable witness to them so they need to bring her live if

23 they want to get that testimony from her.

24        THE COURT:  You know, the answer may be that somebody

25 other than Farmer may need to be next, if we have an ongoing
```

**REEVES - VIDEO TESTIMONY**

```
 1  dispute about Farmer.  That will be up to you.
 2          MS. MOORE:  Okay.
 3          THE COURT:  I mean, I -- anyway, we can talk about it.
 4          MS. MOORE:  We can at least play the first part.
 5          MR. STEKLOFF:  I don't think it is a valid dispute, so
 6  I don't know how much time to spend on it.
 7          MS. WAGSTAFF:  Your Honor, we can start Farmer.  Our
 8  affirmatives will get us through today.
 9          THE COURT:  Right.  Okay.
10          MS. MOORE:  We have one hour left in Reeves, Mr. Wolfe
11  just told me.  So that will take us to 2:20.
12          THE COURT:  We will take a break after that.
13          MS. MOORE:  Sounds good, Your Honor.
14      (Pause in proceedings)
15      (Proceedings were heard in the presence of the jury:)
16          THE COURT:  Welcome back.  You can resume.
17          MS. MOORE:  Thank you, Your Honor.
18              (Video was played but not reported.)
19          THE COURT:  Why don't we take another short afternoon
20  break.  We will resume in about five minutes.  Thank you.
21                  (Recess taken at 2:01 p.m.)
22              (Proceedings resumed at 2:08 p.m.)
23      (Proceedings were heard in the presence of the jury:)
24          THE COURT:  Okay.  You can resume.
25              (Video was played but not reported.)
```

```
 1              THE COURT:  Is that it?

 2              MS. MOORE:  Yes, Your Honor.

 3              THE COURT:  All right.  Why don't you call -- start

 4   your next witness.

 5              MS. MOORE:  Your Honor, we do have some exhibits that

 6   we want to move into evidence.

 7              THE COURT:  Go ahead.

 8              MS. MOORE:  Can we go ahead and do this for the

 9   record?  Trial Exhibit 86, 89, 220, 249, 250, 251, 254, 413,

10   443, 448, 449, 450, 451, 452, 453, 495.

11              THE CLERK:  Hold on.

12              MS. MOORE:  Sorry, Kristen.

13              THE CLERK:  453.

14              MS. MOORE:  495, 499, 503, and 516.

15              THE COURT:  Mr. Stekloff, do you have all those seared

16   into your brain?

17              MR. STEKLOFF:  I actually have a chart, and it almost

18   matches.  So we will just double-check.  I can say now we have

19   no objection to any of the Martens exhibits.

20              THE COURT:  Okay.  They will be provisionally admitted

21   subject to your confirming there are no objections.

22         (Trial Exhibits 86, 89, 220, 249, 250, 251, 254, 413,

23            443, 448, 449, 450, 451, 452, 453, 495, 499, 503 and

24            516 received in evidence)

25              MR. STEKLOFF:  Then, Your Honor, I need to move in
```

1    from Martens Exhibit 154 and then from Reeves Exhibit 1005,

2    1178, which was admitted in Phase One, and then a portion of

3    1697 that I will show Plaintiff's counsel.

4         **MS. MOORE:**  Your Honor, I need to look at those.  It

5    wasn't on my list, and I will get back to you.  I did not list

6    515.  It was admitted in Phase One.  It is in evidence.  I

7    didn't think I needed to readmit it.

8         **THE COURT:**  That's right.

9         **MS. MOORE:**  Thank you, Your Honor.

10        **THE COURT:**  As long as it is the same stuff.  Get a

11   start on your next witness.

12        **MS. MOORE:**  The Plaintiffs call Dr. Donna Farmer from

13   Monsanto.

14              **(Video was played but not reported.)**

15        **THE COURT:**  Sidebar.

16     (The following proceedings were heard at the sidebar:)

17        **THE COURT:**  What came in was not a particularly big

18   deal, but I just wanted to make sure that you properly cut out

19   the whack-a-mole stuff.

20        **MS. MOORE:**  It was, Your Honor.  It has all been taken

21   out.

22        **MS. WAGSTAFF:**  I didn't even know it was in there.

23        **THE COURT:**  Okay.  That's fine.

24        **MS. MOORE:**  Thanks, Your Honor.

25     (Proceedings were heard in the presence of the jury:)

1      **MS. WAGSTAFF:**  May we continue, Your Honor?

2      **THE COURT:**  You may.

3          **(Video was played but not reported.)**

4      **THE COURT:**  Breaking point, okay.  All right.  Ladies

5  and gentlemen, that will be it for today.  We will resume on

6  Friday -- as you discussed back there with Kristen, we will

7  begin at 8:00 a.m. on Friday to kind of make sure we are on

8  track to finish as we discussed.  So we will see -- I will be

9  requiring the lawyers to be here at 7:30 a.m. on Friday.  I

10  will be here at 7:30 a.m.  You should be ready to come in at

11  8:00 a.m. on Friday.  So thank you very much.  Remember all of

12  my admonitions about your conduct, and we will see you Friday

13  morning.  Thank you.

14      (Proceedings were heard out of presence of the jury:)

15      **THE COURT:**  A reminder to everyone in the courtroom,

16  you are a prisoner here for about five minutes while we give

17  the jury a chance to take off.  In the meantime, feel free to

18  have a seat.  Why don't we finish some of our conversations

19  that we have been having today.

20      Regarding Farmer, there were these few other designations

21  that were given to me.  Those seemed fine.  The objections to

22  those are overruled, but there was -- I believe there is some

23  other issue about Farmer.  Oh, it was from the opening.

24  Something about the chart that was being used during the

25  opening statement.  So what's that about?

1     **MS. MOORE:**  Yes, Your Honor.  That was a summary

2  prepared by the lawyers and Dr. Farmer.  Our objection to it is

3  that it was using her as an expert witness.  She's not an

4  expert witness in this case.  She's a witness that's available

5  to Monsanto.  We don't believe she falls within the

6  unavailable.  That's why we objected to the entirety of their

7  affirmative designations, which I think are about two hours now

8  based on what they designated last night.

9     I think it's cumulative of Dr. Reeves also.  Most of this

10  has already come in through Dr. Reeves.  I just think they

11  think it sounds better to them under Dr. Farmer.

12     But the main point is that under Rule 32, she's an

13  unavailable witness to us as the adverse party but she is an

14  available witness to them.  So they do need to bring her live.

15     As the Court will recall last week, they actually said

16  they were going to bring Dr. Reeves live.

17     So these people are available to them.  They are choosing

18  not to so that means that their depositions cannot be played in

19  lieu of live testimony.

20     **MR. STEKLOFF:**  There was a lot there.  I won't respond

21  to the cumulative argument based on what we're seeing from the

22  other side.

23     Rule 32(a)(4)(B) allows us to play the deposition

24  testimony of Dr. Farmer, and I'm not sure what the objections

25  are to those two exhibits but those were raised.  You

PROCEEDINGS

1   overruled -- they actually have already been overruled.  I

2   think they're appropriate summary documents.

3           THE COURT:  Okay.  So all those objections are

4   overruled.  Those summary documents can come in or be used, and

5   those additional designations that you made are admissible.

6   Those objections are overruled.

7       So are we done on Dr. Farmer?

8           MS. MOORE:  I think so, Your Honor.

9           THE COURT:  Okay.

10          MS. MOORE:  Sorry.  Go ahead.

11          THE COURT:  Let me look at my notes.  So what else do

12  we kind of have hanging out there?

13          MS. MOORE:  Your Honor, for Friday we are planning to

14  call Mr. and Mrs. Hardeman and Dr. Nabhan.  I don't think we

15  have any outstanding issues with any of those three live

16  witnesses.

17      With respect to depositions, we'll obviously be continuing

18  Dr. Farmer's deposition, which I'm not sure how much more time

19  we have on that, but it's probably at least two hours.

20          MR. WOLFE:  2:40.

21          MS. MOORE:  2:40.  So that's going to take up a lot of

22  the day on Friday, and then --

23          THE COURT:  So let me slow you down a little bit.

24          MS. MOORE:  Okay.

25          THE COURT:  So Mr. Hardeman and Mrs. Hardeman, how

PROCEEDINGS

1   long do you plan to have them testify roughly?

2          MS. MOORE:  Both of them should be on and off the

3   stand in total less than an hour, Your Honor.

4          THE COURT:  And as you sit here now, do you have any

5   estimate about how much, if any, cross you have for them?

6          MR. STEKLOFF:  30 minutes or less total.

7          THE COURT:  Okay.  And then what about Dr. Nabhan?

8          MS. MOORE:  From our perspective, Your Honor, he would

9   be on and off the stand for direct in less than an hour.

10         THE COURT:  And any estimate from you as you sit here

11  now?

12         MR. STEKLOFF:  I mean, I find it hard to believe that

13  we need to hear for an hour about how chemotherapy is hard to

14  go through but, I mean, it depends what he says.  So if that's

15  really what he's going to talk about for an hour, I would say

16  10 minutes or less.

17         MS. MOORE:  I said less than an hour, Your Honor.  I

18  suspect he'll be 30 minutes.  I'm just not trying to box myself

19  in.

20         THE COURT:  And so is it just about how hard it is to

21  go through chemotherapy or is there also, like, prognosis

22  testimony?

23         MS. MOORE:  It's prognosis, Your Honor, and his

24  damages.  He did a thorough summary.  We're not going to

25  belabor this.

PROCEEDINGS

1     We're not actually even playing the depositions of Dr. Ye

2 and Dr. Turk because we think that would be cumulative.  So,

3 actually, I need to tell you don't even look at those.  Those

4 designations were turned in to you, so we're not going to play

5 those so you can take that off your list of things to do.

6          **THE COURT:**  Take off Ye and Turk?

7          **MS. MOORE:**  Yes.

8          **MR. STEKLOFF:**  We may end up, then, playing that.

9 Then I think they will be affirmatives for us, and I think they

10 can appropriately counter.

11     But we'll have to, then, I think maybe work together to go

12 back through those.  It also probably depends on what

13 Dr. Nabhan says.  If Dr. Nabhan is consistent with Dr. Ye, we

14 might not need it; but if he contradicts him, then we might

15 need to play Dr. Ye.

16          **THE COURT:**  Okay.

17     All right.  And then you said Dr. Farmer -- you anticipate

18 how much more of her testimony?

19          **MS. MOORE:**  2:40.

20          **MR. WOLFE:**  2:30 to 2:40, Your Honor.

21          **MS. MOORE:**  Two and a half hours at least, Your Honor.

22          **THE COURT:**  So that potentially might be all for

23 Friday.

24          **MS. MOORE:**  Right.

25          **THE COURT:**  Obviously you can be ready with more

 1   deposition testimony or whatever if you need it.

 2       And so then after that what's left?

 3       **MS. MOORE:**  Well, Your Honor, what we're going to do

 4   is tonight we're going to go back through Dr. Heydens'

 5   deposition.  We've already cut over an hour from him.

 6       We have been heeding your advice on this, Your Honor.

 7   We're trying to streamline things.  So we're going to try to do

 8   another swing at Dr. Heydens and see if we can cut some more

 9   out of that.

10       **THE COURT:**  You're saying the deposition that I just

11   finished going through this afternoon, you're going to go back

12   and cut it?

13       **MS. MOORE:**  Well, we cut an hour and a half already

14   from what you reviewed.

15       **THE COURT:**  I cut it for you.

16       **MS. MOORE:**  Oh, you did?  Okay.

17       **THE COURT:**  Because you put in a lot of, like,

18   obviously inadmissible testimony.  And, again, I mean, it's a

19   little frustrating because, you know, you designated testimony

20   from Heydens that is clearly contrary to my pretrial rulings,

21   and so I had to sit there and go through all this testimony

22   that is obviously inadmissible based on my pretrial rulings.

23       So, you know, you're --

24       **MS. MOORE:**  Well, that was not our intent, Your Honor,

25   and I'm not sure what you're referring to, but we'll look at

PROCEEDINGS

1    the order that you're issuing on that.

2        The other ones would be --

3            **THE COURT:**  Pages 14 through 175.

4            **MS. MOORE:**  Okay.

5            **THE COURT:**  But I'll issue an order on that.

6            **MS. MOORE:**  Okay.  Thank you, Your Honor.  I mean, I

7    don't know what those are.

8            **THE COURT:**  So, in any event, you want to play some

9    testimony from Dr. Heydens.

10           **MS. MOORE:**  Right, Your Honor.

11       And then Saltmiras, which is about I think five and a half

12   minutes.

13           **THE COURT:**  What's the name again?  Sorry?

14           **MS. MOORE:**  David Saltmiras and you have that,

15   Your Honor.

16           **THE COURT:**  Okay.

17           **MS. MOORE:**  And then you also have Larry Kier.

18           **THE COURT:**  Okay.  And that I haven't looked at yet.

19           **MS. MOORE:**  And I don't think that one's very long

20   either, Your Honor.

21       And then we're going to take -- have you looked at

22   Hugh Grant, the former --

23           **THE COURT:**  No.

24           **MS. MOORE:**  Okay.  We're going to take another swing

25   at him tonight and see if I can cut that.  It's about 44

1    minutes so I'm going to see if I can cut that some more, and

2    then we can send the Court an e-mail if we do de-designate and

3    we can send you an updated transcript.  I'll just tell you that

4    off the top of my head.

5            THE COURT:  Okay.  And then who -- is that it or --

6    are those all the witnesses?

7            MS. MOORE:  No, Your Honor.  We may need to call

8    Dr. Mills based on the conversation we had this morning.  We

9    can go back and look at the 2012 numbers, some of which are

10   even more -- even larger than the 2017.  So I was going to talk

11   to them and see if they really want to go there or not.

12        And then we also have Murphy, Gould, and Guard.  Those are

13   not that long.

14           THE COURT:  Murphy, Gould, and?

15           MS. MOORE:  Guard.

16           THE COURT:  Okay.

17           MS. MOORE:  Gould and Guard are with Monsanto.  Murphy

18   is with CropLife, the trade association.  And so we're going to

19   look at all of those again tonight and see if we can streamline

20   them even more.

21           THE COURT:  Okay.  So here's what I'm going to require

22   you to do.  Given the fact that, you know, I'm getting all

23   these depo designations that are clearly inadmissible, I'm

24   going to require you by Friday, by Friday morning at 8:00 a.m.,

25   to file -- to submit something new on Saltmiras, on any of the

**PROCEEDINGS**

```
1    other witnesses whose depo testimony you want to put in.  So
2    Saltmiras, Kier, Grant, Murphy, Gould, Guard.  I want you to go
3    through a careful review --
4           MS. MOORE:  Okay.
5           THE COURT:  -- of that testimony, and then either tell
6    me, "No, the stuff we gave you is what we need you to review,"
7    or resubmit a streamlined version --
8           MS. MOORE:  Okay.
9           THE COURT:  -- of the testimony --
10          MS. MOORE:  That's no problem, Your Honor.
11          THE COURT:  -- for me to review --
12          MS. MOORE:  That's no problem.
13          THE COURT:  -- and then I can do that over the
14   weekend.
15      Heydens or Heydens, however you pronounce his name, you'll
16   get that from me this afternoon because I went through it.
17          MS. MOORE:  Okay.  Great.
18          THE COURT:  So is that all the witnesses that you're
19   hoping to call?
20          MS. MOORE:  I'm not -- I think so, Your Honor, but I'm
21   not absolutely sure because I was just prepared to talk about
22   what was going to happen on Friday, but I'll look at all that
23   tonight and we can send in an e-mail.  When we notify you about
24   whether there's streamlining of these other depositions, we'll
25   note if there's anything else there too.
```

1          **THE COURT:**  Okay.  And, then, so where do we stand

2    with Monsanto in terms of what it plans to do?

3          **MR. STEKLOFF:**  Well, I think it in part depends,

4    Your Honor, on which depositions they choose to play and which

5    they don't, potentially using Dr. Ye as an example.  There may

6    be depositions that we play, I think very short clips.  I'm

7    looking here.  We have 6 minutes and 15 seconds of Dr. Ye that

8    we affirmatively designated.

9          And so I think -- and then we have reserved the right to

10   call Dr. Reeves, although I think it's unlikely.  And so I

11   think we will not have a lot of witness testimony, either

12   through video or otherwise, in our case.

13         Can I just comment, Your Honor?  By my calculations, after

14   the Farmer deposition is completed, the plaintiffs will have

15   approximately very close to four and a half hours.  I mean, I'm

16   just doing the math on the witnesses that they just stated.

17   That is almost five hours of testimony, understanding you're

18   going to cut it, of video.  Then they have said they're going

19   to call both of the Hardemans.  That's an hour.  They said

20   they're going to call Dr. Nabhan.  We're getting close to six

21   hours.  And I assume that Ms. Wagstaff would like to give a

22   closing argument.

23         So I'm just -- I mean --

24         **MS. MOORE:**  And, Your Honor --

25         **MR. STEKLOFF:**  -- this has not been efficient.  I

1   mean, even today we saw documents shown to Dr. Reeves and

2   Dr. Farmer, the same documents about the same epidemiology

3   we've heard about now for over two weeks.  And so I think that

4   we need to -- they need to be forced to streamline their case

5   and when they hit their -- when they hit zero, it's zero.

6          MS. MOORE:  And, Your Honor, this is the conclusion of

7   the very first day of Phase II.  We did the opening in

8   approximately 30 minutes this morning.  We have really cut

9   things, but to put on liability and damages in a case like

10  this, I mean, we do need more than, you know, a handful of

11  hours.

12         And we will go back and look at these other depositions.

13  The other one I forgot to mention, Your Honor, was Koch, too,

14  K-O-C-H.

15         THE COURT:  Oh, right.

16         MS. MOORE:  And so we will do that, Your Honor.  We

17  were trying to be as efficient as we can, but we also have to

18  put on our case.

19         As far as closing, I would like the opportunity to be able

20  to present a closing argument, so I do want to reserve time for

21  that as well.  I think that's only fair for the plaintiff, and

22  we do have the burden of proof.

23         THE COURT:  And let me just tell you, if you want

24  to -- yeah, no, scratch that.

25         So I want to be clear what is required of you on Friday

PROCEEDINGS

1    morning.

2          **MS. MOORE:**  Okay.

3          **THE COURT:**  And what is required of you on Friday

4    morning is to file a letter, or something like that, which

5    identifies each witness that you plan to call, an estimate of

6    the amount of time involved --

7          **MS. MOORE:**  Okay.

8          **THE COURT:**  -- and then you should -- for the video

9    witnesses, you should indicate whether you are going to be

10   submitting revised designations that are more consistent with

11   my pretrial rulings or whether I should review the designations

12   that you have already submitted.

13         **MS. MOORE:**  Okay.  I understand, Your Honor.

14         **THE COURT:**  Okay.

15         **MS. MOORE:**  Okay.  That sounds good, Your Honor.  We

16   will do that.

17         **THE COURT:**  Okay.

18         **MS. MOORE:**  And in the meantime we'll meet and confer

19   with defense on the financial issue if there is anything else

20   that they would agree to, so we can avoid taking the time to

21   call Mr. Mills to read out numbers basically.

22         **THE COURT:**  Yes, and perhaps we need to be talking

23   more about that issue now as well, and then two other things I

24   can think of that we might want to talk about right now are

25   that issue and then just the EPA officials issue.

1      **MS. MOORE:**  Oh, okay.  That's fine, Your Honor.

2          So the financial -- if I can just grab my notes really

3  quick.

4      **THE COURT:**  Sure.

5      **MS. MOORE:**  -- and then the RFA too.

6      **THE COURT:**  And, by the way, if people are sick of us,

7  they're free to leave now.

8      **MS. WAGSTAFF:**  Me too?

9                      (Pause in proceedings.)

10     **MS. MOORE:**  Actually, I don't know where it is right

11 now, Your Honor.  I don't want to take your time, but I know it

12 off the top of my head.

13     **THE COURT:**  Know what?  Sorry.

14     **MS. MOORE:**  The financials, if you wanted to go back

15 through that.

16     **THE COURT:**  Oh, you're talking about the 2012 thing?

17     **MS. MOORE:**  Right.

18     **THE COURT:**  Okay.  So the idea is that, if I recall

19 where we left this -- where we left off is that -- let me pull

20 it up here -- where we left off is that most or all of these

21 types of numbers could come in --

22     **MS. MOORE:**  Right.

23     **THE COURT:**  -- except perhaps number 9, since that

24 happened just, like, last year or something; right?

25     **MS. MOORE:**  And our position on number 9, Your Honor,

PROCEEDINGS

 1    is that's part of the acquisition from Bayer and that they paid

 2    one individual over $32 million as part of his retirement.  It

 3    goes back to how they're choosing to spend their money.

 4        THE COURT:  Okay.  And I understand that, but I think

 5    the problem is that it is -- you know, on the issue of current

 6    net worth, cash on hand, how much Bayer paid to acquire

 7    Monsanto, I think all of that stuff is relevant and

 8    appropriately included in the presentation to the jury on the

 9    issue of ability to pay for punitive damages.

10        The rest of the stuff I think is conceptually admissible

11    because it's relevant to -- not to the issue of ability to pay

12    but to the issue of whether Monsanto's conduct was

13    reprehensible; right?

14        MS. MOORE:  Right.

15        THE COURT:  But on the issue of whether Monsanto's

16    conduct was reprehensible, as I've ruled, the focus needs to be

17    on the time period where Monsanto's conduct injured

18    Mr. Hardeman.  And so, you know, I think that except for items

19    1 and 2 on your list, on your proposed stipulation here --

20        MS. MOORE:  Right.

21        THE COURT:  -- except for your items 1 and 2, it has

22    to be limited to stuff from 2012 or earlier.

23        MS. MOORE:  And so what I think we can do, Your Honor,

24    before Friday is we will -- Dr. Mills will pull those numbers.

25    I mean, they're from the public financial documents.

PROCEEDINGS

```
 1            THE COURT:  Well, then there's going to be an issue
 2    about whether you disclosed it or whether it's on the exhibit
 3    list, all that sort of stuff; right?  And I don't know the
 4    answer to any of those questions.
 5            MS. MOORE:  Well, I think --
 6            MR. STEKLOFF:  The answer is no.  I mean, I think
 7    they're saying that they need Dr. Mills to go pull that this
 8    week, which by definition means that he didn't pull it
 9    previously and disclose it.
10            MS. MOORE:  Your Honor, I'd like to have the
11    opportunity to look at that and then report back to the Court
12    on that, and we'll also meet and confer with defendant about it
13    too.
14            THE COURT:  That's fine.
15            MS. MOORE:  Because, like I said, some of the numbers
16    I saw were actually larger than what we have in the proposed
17    stip, so --
18            THE COURT:  So that's fine.
19            MS. MOORE:  Okay.  Thank you.
20            THE COURT:  But as it stands now, items 1 and 2 can
21    come in.
22            MS. MOORE:  Right.
23            THE COURT:  The rest of these items cannot, the items
24    that you've listed on your proposed stip --
25            MS. MOORE:  I understand.
```

1          **THE COURT:**  -- because of the timing.

2       And item 9 can't come in at all.  I mean, that's something

3    that can't be cured, in other words.  There's an issue of

4    whether you could cure the other items by changing the date,

5    and there may need to be an argument about that.

6          **MS. MOORE:**  Okay.  I understand, Your Honor.

7          **MR. STEKLOFF:**  And can I just raise, Your Honor, even

8    to your point -- your ruling that the other items other than

9    1 and 2 somehow could go to reprehensibility, I think that even

10   if you take the 2012 numbers -- I don't know what they are,

11   they haven't been disclosed --

12         **THE COURT:**  I'm sure they're pretty high.

13         **MR. STEKLOFF:**  Sure, let's assume that.

14      -- the fact that Monsanto paid cash dividends does not --

15   I don't know how that could go to, just as an example,

16   reprehensibility.  I mean, the fact that they conducted

17   research and development, and we're not focusing here solely on

18   glyphosate or Roundup, I'm not sure that that goes to

19   reprehensibility.

20      I think they can make an argument based on --

21         **THE COURT:**  Well, it may not be super-strong evidence

22   but it does seem relevant.  I mean, why is it not -- why isn't

23   it not relevant -- why isn't it not appropriate for -- assuming

24   they've disclosed the evidence and it's properly on the exhibit

25   list and all that kind of stuff, why is it not appropriate for

PROCEEDINGS

1   the plaintiff to say, "Look at all of these gazillions of

2   dollars that Monsanto is spending on all of these different

3   things and not a dime of it was directed to conducting an

4   objective inquiry into whether its product was causing cancer"?

5       MR. STEKLOFF:  Well, I think if the jury is told that

6   Monsanto had $2.4 billion cash on hand, then that argument can

7   easily be made without these other areas, which even if they

8   have some minimal probative value, I really think are designed

9   to inflame the passions of the jury and would be excludable

10  under 403.  So that's --

11      THE COURT:  I mean, take I think their best one is

12  probably the advertising figure; right?

13      MS. MOORE:  Uh-huh.

14      THE COURT:  Look at -- I mean, the theme from this

15  phase is that, you know, that Monsanto is seeking to manipulate

16  public opinion and the opinion of the scientific community and

17  the regulators and all that and, here, look at all this money

18  they spend on advertising and they don't spend any money

19  objectively researching their product.

20      MR. STEKLOFF:  I think that there are a number of

21  tests so they did spend money objectively researching their

22  product.

23      THE COURT:  No, I'm not expressing my own opinion on

24  that.  I'm saying why isn't it legitimate for them to argue

25  that.

1          **MR. STEKLOFF:**  Well, part of the problem is that --

2    well, and maybe this is a circle, but since it wasn't

3    disclosed, I can't tell you what the number was that they spent

4    on tests in that same time period because it wasn't disclosed

5    in Dr. Mills' report.  We weren't able to cross-examine him

6    with those types of things, and so we're sort of running into

7    this problem where I think there would be very appropriate

8    responses to that.

9          You know, the research and development number that they

10   have in their stipulation is not broken down but it may involve

11   testing.  I wasn't able to -- or we weren't able to question

12   Dr. Mills about that.

13         And so I think picking numbers that they think are

14   favorable to inflame the jury without both the disclosure and,

15   I think, the other relevant information that we would have

16   disclosed causes a problem, and I think that's why -- I mean,

17   in my experience we have stipulated in other litigations to net

18   worth and cash on hand for this purpose.

19         I think that a lot of arguments can be made about what

20   Monsanto could have done with $2.4 billion cash on hand.  We

21   have now heard, both in opening and I think we'll see it again

22   when the RFAs are read, that certain tests we admit weren't

23   done, an epidemiology test wasn't done.  They can certainly

24   argue that you could have spent whatever portion of the

25   $2.4 billion to create the best epidemiology study ever.

1        And I just think we're running down a path where we have

2    notice issues and 403 issues.

3            THE COURT:  And your argument is sort of those two,

4    you've got the notice issues and then you've got, you know, the

5    fact that they can already use, you know, item 1 and item 2 to

6    make the arguments they want to make and how much more do they

7    really need, particularly given the fact that we have the

8    notice issues.

9            MR. STEKLOFF:  Yes.

10           THE COURT:  That's your argument and I get that, and

11   that may be right.  It may not be right.  I'll give you a

12   chance --

13           MS. MOORE:  Thank you, Your Honor.

14           THE COURT:  -- to look at it --

15           MS. MOORE:  And we'll work on it.

16           THE COURT:  -- and we'll talk about it on Friday, I

17   guess.

18           MS. MOORE:  Very good.

19           THE COURT:  But I guess let me ask you this, just as a

20   practical matter.  I mean, I believe, and I've stated -- I

21   think I said this pretrial in the *motions in limine* -- that the

22   Bayer acquisition or Bayer acquisition of Monsanto can come in.

23           MS. MOORE:  That's right.

24           THE COURT:  So the question is if it's -- if the

25   plaintiffs are limited to number 1 and number 2, are they going

1    to need to call Dr. Mills in to testify to number 1?

2         MR. STEKLOFF:  We will not require Dr. Mills to come

3    in, and we will try to save them some precious minutes on

4    number 1 and number 2.

5         I think if some of the other ones do come in, and this is

6    not to create a problem, even given testimony he gave about

7    similar metrics with the 2018 numbers, we would want to

8    cross-examine him I think on some of those other metrics.

9         THE COURT:  Okay.

10        MR. STEKLOFF:  But I had told Ms. Moore that we would

11   stipulate to number 2.  We were going to challenge number 1,

12   but Your Honor has deemed it admissible, but we will stipulate

13   to that as well.

14        THE COURT:  Preserving any objection you have, of

15   course, to it.

16        MR. STEKLOFF:  Yes.  Yes.

17        THE COURT:  That's fine if you want to --

18        MS. MOORE:  We can add some language in the stip to

19   that effect if they want to.  We can work that out, Your Honor.

20        I don't think that we have anything else.  I think the

21   RFAs, Mr. Stekloff and I just need to meet and confer about

22   that.  We'll try to do that after court today so we can get

23   back to you on Friday regarding the RFA issue.

24        THE COURT:  Okay.

25        MR. STEKLOFF:  And then Mr. Kilaru is going to handle

```
 1   if there's anything else about --
 2        THE COURT:  The -- so I guess -- so the remaining
 3   issue is the EPA officials?
 4        MR. KILARU:  Yes.
 5        THE COURT:  And I guess -- I don't remember exactly
 6   where we left off on that this morning, but I think I was
 7   saying that -- I was kind of pressing you on, you know, what
 8   would be the problem with admitting, you know, just this
 9   paragraph on ATSDR, and then it's sort of stripped of all the
10   IARC stuff.  It's not taking us down the IARC road, but it's
11   arguably relevant because Monsanto is in kind of cozy
12   communication with this senior EPA official, who has been there
13   for decades.  Why is that not relevant?
14        MR. KILARU:  So Your Honor had also asked two factual
15   questions, which I think bear on the answer to that.
16        THE COURT:  Okay.
17        MR. KILARU:  So one of them is about Mr. Rowland's
18   role at the EPA, and so he was -- we're pulling this from his
19   deposition so I'm not 100 percent sure this is the right
20   timeline, but I think it's close enough based on what he
21   said -- he was the deputy director, which was the position he
22   had at this time, going back to 2010 or 2011, and he had worked
23   at the EPA going back to 1990 in various different divisions
24   and various sections.
25        I can break --
```

1          **THE COURT:**  He was Deputy director of what?

2          **MR. KILARU:**  Of the Health and -- HED, which --

3          **MR. WOOL:**  Health Effects Division.

4          **MR. KILARU:**  Health Effects Division.

5          **THE COURT:**  Going back to 2010?

6          **MR. KILARU:**  Yes.  And he worked on basically these

7  CARCs, the C-A-R-Cs, which are designed to evaluate specific

8  chemicals.  The EPA did a CARC assessment.  Mr. Rowland

9  presided over one.  He was the chair of the committee that was

10 released I believe in 2015-2016.

11         **THE COURT:**  And what did he do before 2010?  Do you

12 know?

13         **MR. KILARU:**  He was -- yes.  He was a senior scientist

14 at the EPA in 2009.  He was the chair of a CARC.  I'm not sure

15 if it was one or if there are multiple ones.

16     And then before that, he worked as a branch chief at EPA

17 in various different branches going back to 1998.

18     And then before that, he was, I think, a staff member at

19 the EPA going back to 1990.

20         **THE COURT:**  Okay.

21         **MR. KILARU:**  The other thing we looked at is -- very

22 closely is, through the depositions and the documents, whether

23 there's anything to suggest that whatever relationship may be

24 revealed by this e-mail predates 2012, and there is no evidence

25 of that.  I mean, I don't believe the plaintiffs have

**PROCEEDINGS**

1    identified any and we're not aware of any.

2        And so I think in response to the question you started

3    with, Your Honor, first, I don't think that that -- taking this

4    one paragraph out of context about ATSDR, I think there are

5    concerns about that from a sort of telling the jury what's

6    actually going on because there's talk about killing something

7    in 2015 that, you know, we actually haven't heard from

8    Mr. Rowland on.  This is someone relaying what Rowland said.

9    The jury won't know what that is.  They'll just know that it

10   happened in 2015 so they can kind of only consider it from the

11   perspective of 2015.

12       And because there's no evidence to show --

13           THE COURT:  And what did happen?  There was -- the FDA

14   was looking at the issue?

15           MR. KILARU:  Yeah.  There's a separate agency ATSDR

16   that was thinking about looking at glyphosate.

17           THE COURT:  And ATSDR, is that something within the

18   FDA or --

19           MR. KILARU:  I think it's within HHS, Your Honor.

20           THE COURT:  Okay.

21           MR. KILARU:  Yeah, which FDA also is, but I don't

22   think it's under the FDA umbrella.

23           THE COURT:  Okay.

24           MR. KILARU:  So they were thinking about looking at

25   it.  They ultimately chose not to.  The reasons why I think are

1    not in the record here, and --

2              THE COURT:  Well, some of them are; right?  I mean --

3              MR. KILARU:  Well, there's speculation about why, yes,

4    but I don't think the actual official reason why or any

5    official statement from the agency about what they did is in

6    the record.

7         And we know there's speculation about why they did what

8    they did, but ultimately they didn't do it; and EPA then

9    released some more assessments of glyphosate, which, you know,

10   we haven't talked about but they did do.

11        So I think the concern is taking this paragraph out of

12   context, the jury won't know what it's about.  What it is about

13   we all know is 2015 conduct, and there is in fact nothing in

14   the record to tie this 2015 conduct to something that dates

15   before 2012.

16        It's not, like, for example, one of the examples we talked

17   about last week -- I think it was the redacted e-mail -- where

18   they're saying, "Oh, back in 2000 we did this thing."

19   Obviously you know our position on that, but that at least ties

20   it back to 2012.

21        Here there is no way on this e-mail or with other evidence

22   to say that anything was going on before 2012.  And just in

23   point of fact, in his deposition Rowland said he barely knows

24   anyone at Monsanto.  I mean, he said that under oath.

25             THE COURT:  That doesn't mean anything to me but, I

1   mean, you know, what you're saying is there could -- there

2   might have been -- you might have expected something like "Jess

3   Rowland has been -- you know, has communicated with us

4   forthrightly for the last decade" or, you know, some indication

5   in the documents somewhere that he had an ongoing relationship

6   with Monsanto.

7          **MR. KILARU:**  If it was, in fact, yes.

8          **THE COURT:**  Okay.  What about this other person?  We

9   haven't talked about this other person yet.  Jack Housinger.

10  Who's Jack Housinger?

11         **MR. KILARU:**  I believe he was Mr. Rowland's supervisor

12  at EPA for some time.  The information on his employment and

13  tenure at EPA is a little harder to discern because he wasn't

14  deposed, and so I think figuring out how long he was there,

15  when he was there, I don't have the answer to that.

16         I think this e-mail is about a communication in 2015

17  regarding what was going on at ATSDR and agencies communicating

18  with each other about not sort of putting out conflicting

19  reviews at the same time perhaps; but I don't believe there's

20  any evidence as to Housinger that goes back -- I mean, Mr. Wool

21  can tell me if I'm wrong -- but I don't believe there's any

22  evidence that goes back before 2012 and I think other than this

23  e-mail, I'm not aware of any communications between -- I'm not

24  aware of many significant communications that would suggest a

25  preexisting relationship that goes back past 2012.

PROCEEDINGS

```
 1            THE COURT:  Okay.

 2            MR. WOOL:  And I don't think that we would contend

 3     that, you know, we have a trove of e-mails or documents that

 4     establish a pre-2012 relationship.  I think that these are

 5     relevant because I think, as of this morning, it's fairly

 6     evident that Monsanto intends to rely heavily on EPA, its

 7     decisions that emphasize that the decisions span 40 years,

 8     which the jury can do the math and figure that that postdates

 9     Mr. Hardeman's use.

10            And I think the cat is also out of the bag in the sense

11     that the jury knows that Roundup is still on the market.  And

12     so they're probably wondering, "Well, why is that?"  And if you

13     accept Monsanto's slides from this morning and their argument

14     where they ask who is EPA, who are these scientists, the

15     implication is obviously that they're independent.

16            And so this sort of goes directly to how much stock the

17     jury should put in EPA's decisions, how much stock they should

18     put into the 40-year relationship.

19            And then we also know from the Reeves testimony that there

20     are kind of communications with EPA going back to the 1980s.

21            And so this taken together suggests that --

22            THE COURT:  Well, and that is in.

23            MR. WOOL:  Right, that is in.  But this taken together

24     suggests that that is kind of the way business works rather

25     than an isolated instance that happened in 1985.  And so, you
```

**PROCEEDINGS**

1    know, that's really what we would want to introduce that for.

2            **THE COURT:**  Yeah, I understand the arguments, and I do

3    think -- I will tell you that I do think that these are

4    relevant even if you look at the punitive damages issue the way

5    I'm looking at it, which is you need to look at the conduct

6    that harmed Mr. Hardeman.  I do think that these are relevant

7    because they help you kind of establish your point that you're

8    trying to make that Monsanto has captured the EPA or whatever.

9        So I understand that.  I really think it's a 403 question,

10   and I'll give it some thought and I'll let you-all know either

11   in an order tomorrow or verbally on Friday.

12           **MR. WOOL:**  All right.  And if Your Honor would like

13   some briefing on that or something along those lines --

14           **MR. KILARU:**  Your Honor, can I just make one point

15   about the opening?

16           **THE COURT:**  I don't think that's necessary.  Sorry.

17           **MR. KILARU:**  One point about the opening.  We actually

18   didn't get into the 40-year issue.  I don't believe that was in

19   our slides.  I actually think our slides -- I know there was

20   one comment that we addressed at sidebar, but in our slides we

21   ended at 2012.

22           **THE COURT:**  Yes.

23           **MR. KILARU:**  That's where we focused on it.

24           **THE COURT:**  Absolutely.

25           **MR. KILARU:**  And I do think if we're going to talk

1   about the 40 years and go down this path, then there is a lot

2   of evidence past that about what EPA did that I think -- and

3   what other people have done that I think might be relevant.

4           THE COURT:  Even after Jess Rowland left.

5       Is what's his name still there?

6           MR. KILARU:  I don't know if he's still there or not,

7   but --

8           THE COURT:  Jack Housinger?

9           MR. KILARU:  I'm not sure he's there or not still.  I

10  know Rowland is not there.  He's been retired for several

11  years.

12      But the point I was trying to make is that I think getting

13  into purely post-2015 evidence that can't be tied to pre-2012

14  with any reliable evidence in the case, if we're doing that, I

15  think then there's another part of the story that we've not

16  been telling and I think consistent with your rulings have not

17  told but I think should come in.

18      And what I think the better course would be is just to not

19  have it come in at all because, as Mr. Wool has pointed out,

20  they did designate some testimony today about communications

21  before 2012 and we did not really contest those.  And to the

22  extent 40 years came up, I believe it came up in designated

23  testimony asked of Mr. Reeves.

24          THE COURT:  Okay.

25          MR. KILARU:  We've been trying to stay on the right

PROCEEDINGS

```
 1   side of that.

 2        THE COURT:  I understand the arguments.  I'll give it

 3   a little more thought and let you know.

 4        Is there anything else that we need to be discussing this

 5   afternoon?

 6             MS. MOORE:  I don't think so, Your Honor.

 7             THE COURT:  Okay.

 8             MR. KILARU:  Thanks, Your Honor.

 9             THE COURT:  All right.  Thank you.

10                  (Proceedings adjourned at 3:33 p.m.)

11                          ---oOo---

12                  CERTIFICATE OF REPORTERS

13        I certify that the foregoing is a correct transcript

14   from the record of proceedings in the above-entitled matter.

15   DATE:   Wednesday, March 20, 2019

16

17

18   _____

19        Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                U.S. Court Reporter
20

21

22   _____

23        Marla F. Knox, RPR, CRR
                U.S. Court Reporter
24

25
```