**Volume 18**

**Pages 2305 - 2459**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

EDWARD HARDEMAN,               )
                               )
            Plaintiff,         )
                               )
  VS.                          )     **NO. C 16-00525 VC**
                               )
MONSANTO COMPANY,              )
                               )
            Defendant.         )
_____)


                          San Francisco, California
                          Friday, March 22, 2019

                **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                     ANDRUS WAGSTAFF PC
                     7171 W. Alaska Drive
                     Lakewood, Colorado  80226
               BY:   **AIMEE H. WAGSTAFF, ATTORNEY AT LAW**
                     **DAVID J. WOOL, ATTORNEY AT LAW**

                     MOORE LAW GROUP
                     1473 South 4th Street
                     Louisville, Kentucky  40208
               BY:   **JENNIFER MOORE, ATTORNEY AT LAW**


            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Marla F. Knox, RPR, CRR
              Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporters

 1    **APPEARANCES**:   (CONTINUED)

 2    For Defendant:

 3                          WILKINSON  WALSH ESKOVITZ LLP
                          2001 M Street, NW - 10th Floor
 4                          Washington, D.C.  20036
                    BY:   **BRIAN L. STEKLOFF, ATTORNEY AT LAW**
 5                          **RAKESH N. KILARU, ATTORNEY AT LAW**
                          **TAMARRA MATTHEWS JOHNSON, ATTORNEY AT LAW**
 6                          **JULIE RUBENSTEIN, ATTORNEY AT LAW**

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                 **I N D E X**

2   Friday, March 22, 2019 - Volume 18

3   **PLAINTIFF'S WITNESSES**                               **PAGE**  **VOL.**

4   **FARMER, DONNA**
    By Video Testimony Resumed (not reported)   2334  18
5

    **NABHAN, CHADI**
6   (SWORN)                                      2344  18
    Direct Examination by Ms. Wagstaff      2345  18
7

    **HARDEMAN, EDWIN**
8   (SWORN)                                      2385  18
    Direct Examination by Ms. Moore         2386  18
9   Cross-Examination by Mr. Stekloff       2409  18
    Redirect Examination by Ms. Moore      2423  18
10

    **HARDEMAN, MARY**
11   (SWORN)                                      2430  18
    Direct Examination by Ms. Moore         2430  18

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | <u>**Friday - March 22, 2019**</u>                                   <u>**7:34 a.m.**</u> |
| 2 | **P R O C E E D I N G S** |
| 3 | ---oOo--- |
| 4 | (Proceedings were heard out of the presence of the jury:) |
| 5 | **THE COURT:**  Okay.  Good morning. |
| 6 | **ALL:**  Good morning, Your Honor. |
| 7 | **THE COURT:**  What do we need to discuss this morning? |
| 8 | **MS. MOORE:**  Your Honor, we need to discuss, and we can |
| 9 | do it -- I'd like to do it, if we can now, the RFA issue. |
| 10 | **THE COURT:**  Okay. |
| 11 | **MS. MOORE:**  And Mr. Stekloff just a few minutes ago |
| 12 | showed me what they would like to read, which includes some |
| 13 | otherwise denial language that we would object to.  I think |
| 14 | there's one that we have agreement on and other ones. |
| 15 | I don't have a copy of what he wants to read, but the |
| 16 | first one is that RFAs "Admit that Monsanto has never submitted |
| 17 | the scientific reviews authored by Dr. Parry to the EPA."  And |
| 18 | the answer "Monsanto admits," but they want to include all this |
| 19 | language after that as well, and we would just object to that. |
| 20 | **MR. STEKLOFF:**  I only have one copy because I didn't |
| 21 | think this would be controversial.  I'm happy to hand you what |
| 22 | I highlighted to show Ms. Moore, and then you can look.  I |
| 23 | think it may be the easiest way is for you to look through the |
| 24 | admissions and see if you think I have overhighlighted. |
| 25 | **THE COURT:**  Okay. |

1          **MR. STEKLOFF:**  So I only have one copy, but I'm happy

2    for you to do it.   I think she's referring to the biggest --

3    the bigger packet right now, Your Honor.  That has the largest

4    number of admissions at issue.

5          **THE COURT:**  This one (indicating)?  Okay.

6          **MR. STEKLOFF:**  The thicker one.

7          **THE COURT:**  Okay.  So which request number is this?

8          **MS. MOORE:**  This is Request Number 1, Your Honor.

9          **THE COURT:**  Okay.

10               (Pause in proceedings.)

11          **MS. MOORE:**  And we have agreement.  Obviously we're

12   going to read the entire request to the jury so there's no

13   dispute about that.  It's just whether the language that

14   follows "Monsanto admits" is required to be read.

15               (Pause in proceedings.)

16          **THE COURT:**  Okay.

17          **MR. STEKLOFF:**  I mean, I think that we're allowed to

18   put context around our admissions.  I think everything I've

19   highlighted is appropriate context.

20       Again, there were discovery disputes about our admissions.

21   Your Honor struck some language.  The language that remains I

22   think is appropriate, and I think it is common practice to read

23   the full admission with whatever language there is to put it in

24   context.

25          **THE COURT:**  Okay.  Where's the next one?  Number 4?

 1              **MS. MOORE:**  Your Honor, the next one -- and, I'm

 2     sorry, I don't have a copy -- it's Request for Admission

 3     Number 4 --

 4              **THE COURT:**  Okay.

 5              **MS. MOORE:**  -- but that is a -- that is the set that's

 6     in the MDL.  And, I'm sorry, Your Honor, I don't have what you

 7     have in front of you.

 8              **THE COURT:**  "Admit that Monsanto has not conducted a

 9     long-term chronic animal" --

10              **MS. MOORE:**  Yes, Your Honor.  Yes.  And we would just

11     ask that it say "Monsanto admits."  I mean, I wouldn't -- I

12     would be fine with "Monsanto admits that" --

13              **THE COURT:**  Well, let me --

14              **MS. MOORE:**  Okay.

15              **THE COURT:**  Sorry.  Let me just read it.

16              **MS. MOORE:**  Sure.

17                         (Pause in proceedings.)

18              **THE COURT:**  And then Number 5 is in dispute as well;

19     is that right?

20              **MS. MOORE:**  Yes.  And, Your Honor, I apologize.  I

21     just saw these.  So on Request Number 4, I just confirmed with

22     Mr. Stekloff, we're fine with it if it just says "Monsanto

23     admits it has not identified any 12-month or longer animal

24     chronic toxicity studies it has conducted on glyphosate since

25     1991," and it ends right there.  We would be fine with that.

1      **MR. STEKLOFF:**  Just to clarify, I think the document

2  Ms. Moore is working off of does not include all of the

3  language that's in the actual admissions.  So I don't --

4  without having it in front of me, your document that you

5  prepared with what you wanted read did not include all of our

6  language.  So you might be reading something -- I'm trying to

7  help you -- you might be reading something that is not -- there

8  might be something --

9      **MS. MOORE:**  I understand, but this is from the actual

10  RFAs.  I double-checked it myself.

11      **THE COURT:**  Okay.  So which language are you objecting

12  to in Number 4?

13      **MS. MOORE:**  We would just have it to be "Monsanto

14  admits it has not identified any 12-month or longer animal

15  chronic toxicity studies it has conducted on glyphosate since

16  1991."

17      **THE COURT:**  And so the language that you don't want is

18  what?

19      **MS. MOORE:**  "Monsanto admits."  I don't think that

20  they're asking for "after reasonable inquiry into the

21  information."

22      **THE COURT:**  What's the language that you're objecting

23  to that comes after --

24      **MS. MOORE:**  "Monsanto otherwise denies this request."

25      **THE COURT:**  Okay.  Yeah, you haven't included all the

1    language in it.  You don't have in front of you the full

2    responses to the request for admission.

3         **MS. MOORE:**  I'm looking at the amended response to the

4    request.

5         **THE COURT:**  So there are two things -- three things I

6    think.  Number one is that, you know, this was adjudicated --

7    this was supposed to have been adjudicated pretrial; and this

8    issue came up pretrial, and I issued a ruling.

9         Number two is you don't even have Monsanto's full

10   responses in front of you so you're not prepared to discuss

11   this.

12        And, number three, so far what I've read is going to be

13   allowed.

14        So I'm going to continue reading them and most likely it's

15   all going to be allowed given the procedural posture in which

16   this is coming up.

17        **MS. MOORE:**  Your Honor, if I could, I'm reading from

18   the amended version.  I don't know what you have in front of

19   you.  I asked Mr. Stekloff yesterday to provide me the language

20   he wanted read.  He showed it to me right before Your Honor

21   came into the courtroom and did not provide me with a copy, so

22   I'm sorry I don't have that.

23        **THE COURT:**  Do you want to talk about this later when

24   you've had a chance to sort of get it all together?

25        **MS. MOORE:**  Your Honor, we can do it on a break,

PROCEEDINGS

1   that's fine, if they can provide me a copy so I can work

2   from --

3          **THE COURT:**  Yes, but you need to have -- if you wanted

4   to tee up an argument about this, you needed to have the full

5   request for admission and responses.

6          **MS. MOORE:**  I have that, Your Honor, and it's from the

7   amended request.  I don't know if they're reading from the

8   amended request, Your Honor.

9          **THE COURT:**  Okay.

10         **MS. MOORE:**  And so I don't have what you have in front

11  of you because they didn't provide me a copy of it.

12         **THE COURT:**  I'm going to hand this back, but I'm going

13  to tell you that based upon what I've read so far and based on

14  the procedural posture in which this is coming up, I'm very

15  likely to simply allow these to go to the jury as highlighted

16  by Mr. Stekloff.  I mean, I haven't looked at all of them.  I

17  just looked at the first few --

18         **MS. MOORE:**  I understand, Your Honor.

19         **THE COURT:**  -- but they seemed fine; and given the

20  procedural posture, that's what's going to happen.

21         **MS. MOORE:**  I don't want to take the Court's time,

22  Your Honor.  I will look at it, if he can provide me a copy,

23  and then we will see if there's any issues that we still have.

24         The other thing I would just let the Court know, to

25  follow-up on our conversation from Wednesday, we did provide a

1   revised stipulation yesterday to the defendants regarding

2   Monsanto's finances based on your Court's rulings, and we're

3   just waiting on them to give us the approval on that.  So I

4   think we have -- hopefully that's going to be resolved.

5        And then there were the issue about Rowland, which

6   Mr. Wool is going to handle, Your Honor.

7            THE COURT:  Sorry?  The issue about what?

8            MS. MOORE:  Jess Rowland that we talked about

9   yesterday, so I'm going to hand that over for him to handle.

10           THE COURT:  Okay.

11           MS. MOORE:  Thank you, Your Honor.

12           MR. STEKLOFF:  Your Honor, I have two issues.  Rowland

13  is good to go next, and then I have just two brief issues,

14  Your Honor.

15           THE COURT:  Okay.

16           MR. WOOL:  So Your Honor's ruling basically excluded

17  Rowland under 403.  We would want to admit the Rowland evidence

18  as evidence of habit under Rule 406, and the reason we want to

19  admit that is because, as I mentioned before, EPA approval and

20  regulatory approval is really Monsanto's central defense.

21       I think I mentioned that the cat was sort of out of the

22  bag, and then Mr. Kilaru corrected me with respect to

23  Monsanto's opening slides for Phase II.  But in Phase I, Slide

24  Number 46 did mention regulatory approval for 40 years and

25  specifically mentioned regulatory approval after IARC.  And the

 1   e-mail that we would seek to admit is, you know, right around

 2   that time period, right before IARC actually.

 3          **THE COURT:**  So let me -- if you could just try to

 4   articulate -- I mean, I explained in my ruling that the

 5   evidence of those exchanges are not coming in for the theory

 6   that you have thus far articulated.  They're not coming in --

 7   and I wasn't inviting you to invoke some other rule to get the

 8   evidence in under the same theory of relevance.

 9          What I was saying is that on the theory of relevance that

10   you've articulated, it's not coming in under 403.  Even if

11   there were some other rule that would allow it in under the

12   theory of relevance that you've articulated, it's not coming in

13   under 403.

14          So the task for you is to try to articulate some other

15   theory of relevance.  So you seem to be articulating the same

16   theory of relevance that you've been articulating the whole

17   time and which I have said is not going to allow those

18   exchanges to come in.  So do you have some other theory of

19   relevance you want to try to articulate?

20          **MR. WOOL:**  Well, the theory would be, Your Honor, that

21   what you see in the e-mail exchanges is that Monsanto is

22   working with regulatory agencies to, in part, get other

23   regulatory agencies to avoid investigations.  You know, I think

24   that apart from the get-a-medal stuff, you know, to show the

25   jury that what they presume to be an arm's length decision

```
 1   between EPA and Monsanto is, in fact, one in which there is
 2   sort of a closer relationship than, you know --
 3        THE COURT:  And so what issue in the trial -- if you
 4   could articulate to me, what issue in the trial does that go
 5   to?
 6        MR. WOOL:  Well, that goes to Monsanto's
 7   failure-to-warn argument, their defense to failure to warn,
 8   that "We just did the tests that the regulators asked us to
 9   do."
10        Because, you see, Monsanto was actually taking a hand in
11   making sure that those tests aren't required of them and that
12   some reviews, particularly in this case the ASTDR review,
13   doesn't take place at all.
14        And so, you know, I think that that shows that, you know,
15   like I said, the relationship is cozier than you would think
16   and what Monsanto is really doing here is sort of using EPA as
17   sort of a sword and a shield in saying "EPA has approved this.
18   They didn't tell us to do these tests," but they're saying --
19   but the argument at the same time is you can't lift back the
20   curtain and see what EPA is actually doing and what the
21   relationship actually is.
22        And so without the evidence of the back and forth between
23   Monsanto, the cozy relationship, the, you know, "we all know
24   Jess" type of stuff, it's sort of impossible for the jury to
25   get a fair and accurate assessment as to what does EPA approval
```

PROCEEDINGS

1    mean, and what --

2        THE COURT:  So you're saying -- I mean, your argument

3    thus far is that it's relevant to punitive damages, but it

4    sounds like now what you're saying is that it's relevant to the

5    liability, it's relevant to the failure-to-warn issue because

6    Monsanto is arguing that this was not knowable at -- the

7    dangers of Roundup were not knowable at the time --

8        MR. WOOL:  Correct.

9        THE COURT:  -- and the reason we know that the dangers

10   of Roundup were not knowable at the time is that the EPA and

11   all its fancy scientists concluded that Roundup was not

12   dangerous.  However, what you need to know, jury -- this was

13   your response -- what you need to know, jury, is that the EPA

14   is not trustworthy because look at the kinds of relationships

15   that Monsanto had cultivated with high-level EPA officials.

16       MR. WOOL:  Exactly.  And, you know, I don't even know

17   if it would go so far as to say it's untrustworthy.  It's just

18   that it is not at arm's length.  It's not free of Monsanto's

19   influence and that Monsanto is in particular asking EPA to stop

20   other regulatory agencies from doing things.

21       And you heard during opening, and I think you are almost

22   certainly going to hear during closing, Monsanto did what the

23   regulators asked them to do, and that's their failure-to-warn

24   defense.

25       THE COURT:  And your argument is that the regulators

 1    did what Monsanto asked them to do.

 2         **MR. WOOL:**  Yes, exactly.  And I think without lifting

 3    back the curtain and seeing that, you know, you would think

 4    that EPA is just acting on its own, regulators are acting on

 5    their own with, you know, maybe some studies or something going

 6    back and forth from Monsanto but certainly not, "Hey, if you

 7    can get rid of this for us, if you can stop this for us," you

 8    know, that sort of thing.

 9         **THE COURT:**  If it did come in on that theory, I

10    assume, again, there would need to be -- potentially would need

11    to be some sort of limiting instruction.

12         **MR. WOOL:**  And we would be fine with that.  I think we

13    would say this only comes in to the extent it informs your

14    appraisal of EPA and what the EPA decision means.

15         But because this is really the central theme of their

16    defense, I think that it has to come in to kind of, you know,

17    shed some light onto, you know, what this EPA decision actually

18    means and what -- at least with respect to the United States --

19    certain regulatory decisions mean.

20         **THE COURT:**  Okay.  Why is that not a better theory of

21    relevance for the Rowland exchange?  I'm not -- I'm less sure

22    about -- what's the other person's name?  Housinger or

23    something?

24         **MR. WOOL:**  Housinger.

25         And I think we would agree there's less evidence that we

1   would want to get in for Housinger.

2        **THE COURT:**  Okay.  So why is that not a better theory

3   of relevance for Rowland than the one they've been articulating

4   thus far?

5        **MR. KILARU:**  Because it runs into the same basic

6   problem, which is we've asked multiple times, and I think

7   they've had multiple opportunities, to provide some evidence

8   that anything that they're talking about now was happening

9   before 2012, and there is no evidence of that.

10       There's no evidence that ATSDR wanted to start looking at

11  this.  There's no evidence that they intended to look at this.

12  There's no evidence that Monsanto stopped them from looking at

13  this.  There's no evidence that before 2012 Monsanto had any

14  relationship with Rowland or any relation with Rowland that

15  goes to the ATSDR relationship.

16       I mean, they're now arguing that there's some kind of

17  failure to test by ATSDR.  It's not clear to me whether they

18  could do tests.

19       **THE COURT:**  Well, I don't know if they're arguing -- I

20  don't think that's why they want to get it in.  They want to

21  get it in because they want to respond to the argument that

22  you've made, and it really is your primary, if not your

23  exclusive argument, as far as I can tell so far, that how can

24  you conclude that we were supposed to know this when the EPA

25  approved us over and over and over again.

PROCEEDINGS

1      And then you have this e-mail exchange with Rowland, which

2  I think can easily be interpreted to mean that Rowland is not

3  to be trusted -- right? -- that you can't -- you can't rely on

4  anything that Rowland says.  That's not the only

5  interpretation, but that is a reasonable interpretation.

6      And so that's -- and Rowland was -- and it's not like

7  Rowland was some random EPA official; right?  Rowland was --

8  was it the deputy director of -- what was the unit called?

9          MR. KILARU:  The Health Effects Division.

10         THE COURT:  -- the Health Effects Division of EPA.

11 They were involved precisely in this issue.  There were

12 communications between Monsanto and him about this issue and

13 about his -- between Monsanto and his supervisor about this

14 issue.

15     I mean, again, you know, to the extent that you're arguing

16 it's not relevant, I don't agree with that.  I mean, it goes to

17 the question of whether EPA's decisions can be fully trusted;

18 or to put it another way, it goes to the question of whether

19 the EPA has been objective about this issue.

20         MR. KILARU:  And, Your Honor, first of all, we don't

21 think that it does because of the post-use ruling.  I mean, if

22 they had some evidence to tie what they're saying was going on

23 in 2015 to before, that might be one thing, but they don't.

24     We also think that because of that, there's a substantial

25 403 concern that the jury is going to think that because they

1  see this e-mail in 2015, something was happening before.

2  There's no evidence of that, and they can't tie it up.

3       THE COURT:  Well, that's a concern, and I guess the

4  question is whether it's a 403 concern because I think that's a

5  permissible inference to draw from --

6       MR. KILARU:  And my submission, Your Honor, is that it

7  is an excludable 403 concern because there isn't anything to

8  tie it to what was going on beforehand and a limiting

9  instruction doesn't cure the prejudice.

10      And I would also just add that if we are now going to

11  inject Rowland's role into the trial and argue that because

12  Rowland in 2015 said something that apparently casts light on

13  everything that was happening before, we should then be allowed

14  to present evidence of what the EPA did after Rowland left and

15  that up to today, including 2016 and 2017, they've approved it.

16      Now, we haven't gone down that road because I think we had

17  this, I think clear, post-use ruling in place, but I don't

18  think that they could say post-2015 --

19      THE COURT:  Well, maybe that's right, that you should

20  be -- maybe that's right that if the Rowland stuff comes in,

21  you should be allowed to present evidence of what the EPA did

22  afterward.  But, of course, then that would open the door to, I

23  think, you know, Monsanto's attacks on IARC probably.

24      MR. KILARU:  Well, I'm not sure why it would open the

25  door to attacks on IARC if everything that was being offered to

1   discuss is Monsanto's interactions with the EPA.

2       I mean, first, I don't think they should get to open their

3   own door by introducing evidence of Rowland; and then when we

4   respond to that --

5           THE COURT:  Well, it's not really them opening their

6   own door.  It's the door being opened by Monsanto's defense

7   that, you know, "the EPA has always let us do this."

8       And I guess why don't -- I mean, why isn't -- if this

9   e-mail did come in and if the evidence of the exchange with

10  Rowland did come in, why wouldn't it be sufficient for Monsanto

11  to say, "Look, they've given you this exchange from 2015, but

12  there's no indication of any improper influence during the time

13  that Mr. Hardeman was exposed"?

14      And then they can respond, "Well, this shows their -- you

15  know, this shows how the EPA was operating with Monsanto."

16          MR. KILARU:  Because, again, Your Honor, I think --

17          THE COURT:  And you can say, "Look at all of these

18  other independent scientists that EPA had, you know, from 1975

19  to 2012 looking at the issue."

20          MR. KILARU:  Because it comes back to the central

21  question is:  Can they prove this is what was going on at EPA?

22  And they can't prove that this was going on at EPA before 2012,

23  other than evidence they've already introduced before 2012 on

24  which they're making that argument.  I mean, they've introduced

25  some evidence through Reeves.  They have the Knezevich and

1    Hogan evidence that they've introduced and they intend to

2    emphasize again.

3         But I think putting in purely post-2015 evidence that

4    cannot in any way be tied to preuse 2012 evidence for the sake

5    of proving what was going on then, is not relevant to what was

6    going on before 2012 and is substantially more prejudicial than

7    probative.

8         And I think the argument you've mentioned is one that we

9    would make if it comes in, but I don't think it cures the

10   concern that comes from admitting what is, on its face and

11   through the evidentiary record they have developed, purely

12   post-use conduct as evidence of what was happening before.

13            **THE COURT:**  Okay.  Do you want to quickly have the

14   last word?

15            **MR. WOOL:**  Yes.  So very quickly, under 406, I don't

16   think it matters it was post use or not with respect to the

17   evidence that it is their habit of, you know, how they react to

18   these sorts of -- you know, any sort of potentially adverse

19   regulatory decision.

20        With respect to the post-use conduct --

21            **THE COURT:**  I mean, it's kind of one item.  I mean, I

22   guess you could say that it combines with --

23            **MR. WOOL:**  Right, it combines with the other and so

24   the jury can infer.

25            **THE COURT:**  Right.

1        **MR. WOOL:**  With respect to the post-use conduct,

2   again, they specifically mention that EPA came to this decision

3   after IARC; and so, you know, I think that they've put this

4   directly at issue, you know, before the jury as to, you know,

5   why would the EPA conclude this, et cetera.

6        And so I don't think that this is something where we've

7   opened the door.  EPA -- I mean, the jury has seen a slide that

8   says EPA approved this after IARC.  You know, this is right

9   during that time period.

10        And, third, with respect to did Rowland actually have an

11   impact on whether or not ASTDR did a study, if you look at the

12   e-mail, the exchange is, "Well, you know, I don't even think

13   Jess can do this."  And here we are, I think four years later,

14   and ASTDR still hasn't happened so...

15        **THE COURT:**  Well, that requires a tremendous amount of

16   speculation.  I mean, I think you've kind of introduced an

17   issue that, you know, kind of hurts your argument because it

18   sort of shows just how speculative your theory is about why

19   that ASTDR didn't go forward.

20        **MR. WOOL:**  Well, I don't know that we would

21   necessarily argue that during closing, but I think that

22   Monsanto raised in its argument that, you know, there's very

23   limited evidence that this actually had an impact.

24        **THE COURT:**  Okay.  So I understand the arguments.

25   I'll think about it a little bit more.  I do think at a minimum

 1    you've articulated a better theory of relevance than you had

 2    thus far.

 3         And, by the way, I'll just mention briefly for you-all to

 4    chew on, I spent some time working on jury instructions last

 5    night and it does seem -- Monsanto proposed an instruction on

 6    the EPA, which is most definitely not going to be given, but it

 7    did, you know, make me think that perhaps there should be some

 8    sort of additional instruction on EPA and the European

 9    regulators and IARC as that issue relates to Phase II.

10         And, you know, it may say something along the lines of:

11    You know, you've been told that these entities -- you know, you

12    should not substitute the judgment of these entities for your

13    own, and that continues to be true; but, you know, the

14    decisions of those entities are relevant to the failure-to-warn

15    issue, to the issue of whether, you know, Monsanto knew or

16    could have known or should have known, or whatever the language

17    is, about the dangers of Roundup.

18         The other thing I'll comment on is that, you know, the

19    wording of the instructions is going to assume the conclusion

20    that the jury reached in Phase I.  So, you know, there's a lot

21    of language in your proposed jury instructions where you sort

22    of leave open the question whether, you know, Roundup harmed

23    Mr. Hardeman, but those instructions are going -- the wording

24    is going to change to presume the truth of the conclusion that

25    the jury already reached about that.

 1          So, anyway, you-all can chew on that a little bit, but

 2    were there -- sorry.

 3          MR. KILARU:  Can I make one brief jury instructions

 4    point?

 5          THE COURT:  Yes.

 6          MR. KILARU:  As you may have seen, we submitted a

 7    design defect instruction on risk-benefit because that was a

 8    theory we thought appropriate.

 9          THE COURT:  Right.

10          MR. KILARU:  I understand Your Honor's ruling.  Is it

11    okay if we over the weekend we submit something on what we

12    think consumer expectations will look like if that goes to the

13    jury?

14          THE COURT:  Sure.

15          MR. KILARU:  We will be filing a motion on whether

16    that should go to the jury.

17          THE COURT:  Sure.

18          MR. KILARU:  Thank you.

19          THE COURT:  Did you say there was some other small --

20    a couple other small things?

21          MS. WAGSTAFF:  Your Honor, I have something very

22    small.

23          THE COURT:  Okay.

24          MS. WAGSTAFF:  We spent a significant portion of time

25    going over deposition designations last night, as you can tell

PROCEEDINGS

1   from our 4:00 a.m. filing.  One thing that became clear in

2   looking at the objections and the responses to the objections,

3   they have in almost every single one of their corporate

4   witnesses asked a line of questions to that witness "Do you

5   personally use Roundup?"

6        So Donna Farmer, who's coming up, we went back up and

7   revisited, and in about 30 minutes they are going to get into

8   their affirmative designations, which is about two hours, and

9   they have a line of questions where they ask her if she uses

10  it, if she wears special equipment.

11            THE COURT:  Yeah, I know.  I reviewed the testimony.

12            MS. WAGSTAFF:  Yeah.  And so --

13            THE COURT:  And I gave it thought, and I guess I don't

14  understand.  I mean, there are serious credibility issues here,

15  and you've put in -- you know, you've introduced the topic of

16  whether anything that these people say about the safety of

17  Roundup can be believed.  Why isn't that not relevant?

18            MS. WAGSTAFF:  Sure.  So this is when it came to our

19  attention last night why they were putting this in there.  In

20  their responses to the objections, they say (reading):

21            "The witness' personal use of Roundup is relevant to

22       plaintiff's failure-to-warn claim as it establishes that a

23       risk of cancer was not and is not known to the company."

24        And we don't think that that is an appropriate use and

25  establishes that fact at all.  They go on and they ask her if

PROCEEDINGS

 1    her husband is a medical doctor and if he's warned, if she

 2    recommended Roundup to anybody.

 3            THE COURT:  But isn't it -- but your whole --

 4    basically your whole case is that these people are a bunch of

 5    liars and they don't care whether the product causes cancer.

 6    And, you know, on the issue of their credibility, isn't it

 7    relevant that they, you know, use Roundup?

 8            MS. WAGSTAFF:  Well --

 9            THE COURT:  Just on the issue of their credibility

10    given that you have attacked their credibility.

11            MS. WAGSTAFF:  I mean, I just think that if

12    Mr. Stekloff, or whomever is delivering closing argument, comes

13    in and says the fact that every single one of their corporate

14    witnesses uses Roundup establishes that they didn't know it was

15    harmful, I don't think that's an appropriate argument.  We will

16    deal with it and we will handle it if you allow it in.

17            THE COURT:  Well, we can talk about whether that's an

18    appropriate argument, but the reason I allowed that testimony

19    in and the reason I'm continuing to allow it in is I think it's

20    relevant for them to respond to your attacks on their

21    credibility.

22            MS. WAGSTAFF:  Okay.  Thank you, Your Honor.

23            THE COURT:  Was there anything else that needs to be

24    discussed this morning?

25            MR. STEKLOFF:  I don't think so, Your Honor.

PROCEEDINGS

```
1          Before you review one of the depositions, I think the name

2     is Doreen --

3          MS. WAGSTAFF:  Manchester.

4          MR. STEKLOFF:  -- Manchester, who's a 30(b)(6) person

5     for an organization called CropLife America, I just wanted to

6     address that; but if you're going to wait for that one, we

7     don't have to do it now.

8          THE COURT:  Okay.  And then what am I supposed to

9     look -- so for Heydens, are there anymore affirmative

10    designations for the plaintiffs that I need to look at that I

11    haven't looked at, or is it just Monsanto's counterdesignations

12    that I need to look at?

13         MS. MOORE:  On Bill Heydens in particular?

14         THE COURT:  Yes.

15         MS. MOORE:  You received the updated Excel sheet I

16    think from defense counsel yesterday, Your Honor.

17         MS. RUBENSTEIN:  Yes.

18         MR. STEKLOFF:  It's just the counters I think,

19    Your Honor.  You've ruled on all of plaintiff's designations.

20         THE COURT:  So it's nine -- there are nine counters

21    that you have.

22         MS. MOORE:  Yes, Your Honor.

23         MS. RUBENSTEIN:  And, Your Honor, I have a full

24    colored transcript if you want it.  I know you already have a

25    transcript for Dr. Heydens so I don't know if you want the
```

 1   extra paper, but I'm happy to hand it up.

 2        **THE COURT:**  No, I'd rather not.

 3        **MS. RUBENSTEIN:**  I don't blame you.

 4        **MS. MOORE:**  Just a small tree.

 5        **THE COURT:**  I'll grab it from my office.

 6        **MS. MOORE:**  And, Your Honor, just on that topic, you

 7   received our letter brief early this morning.  You can see that

 8   we went through, spent an extensive amount of time streamlining

 9   these depositions.  I do go -- I have three hard copy

10   transcripts here and we'll be bringing the rest of them to you.

11   So please disregard -- everything is listed in the letter brief

12   as to what we would need rulings on, what the parties need

13   rulings on, for the depositions.

14        **THE COURT:**  Okay.  You're talking about this letter?

15        **MS. MOORE:**  Yes.  Yes, Your Honor.

16        **THE COURT:**  Okay.  So that's -- okay.  So I should get

17   the transcripts that I already have --

18        **MS. MOORE:**  If you want to bring them to us, we can

19   recycle them, whatever you want to do.

20        **THE COURT:**  -- put them next to this letter, but this

21   letter doesn't have listings of what you still want in and what

22   you don't want in.

23        **MS. MOORE:**  So, Your Honor, so here's the way we did

24   it just so there won't be any confusion, is the first -- where

25   it says "First," those are the witnesses we're not playing at

 1   all now.

 2             THE COURT:  Okay.

 3             MS. MOORE:  Okay.  So if you have any depositions of

 4   those people, please do not spend any time.  We're not going to

 5   play those individuals, and I think that's -- one, two, three,

 6   four, five, if I can, seven, eight, nine -- it looks like it's

 7   nine people that we have completely eliminated their

 8   depositions.  Okay?

 9             THE COURT:  Okay.

10             MS. MOORE:  Then the next one where the chart is,

11   those are the depositions that remain to be played; and then,

12   of course, Mr. Heydens we just talked about that.  All right?

13      The other ones we have gone ahead and we have redone the

14   transcripts so you would only be seeing the new designations.

15             THE COURT:  Okay.

16             MS. MOORE:  And so I have three of those right now --

17             THE COURT:  Got it.

18             MS. MOORE:  -- and we're going to bring the other ones

19   to you.

20             THE COURT:  Okay.  So why don't you hand me those.

21   And then do you have also --

22             MS. MOORE:  That way you don't have to do a comparison

23   and stuff.

24             THE COURT:  And does it have the objections on here or

25   is that --

PROCEEDINGS

```
 1              MS. MOORE:  It does not.  I have the Excel sheets
 2     printed for every single one.
 3              THE COURT:  Okay.
 4              MS. MOORE:  So I can hand that to you.
 5              THE COURT:  Okay.  For every one of the three that
 6     you've handed up or for all of them?
 7              MS. MOORE:  This is for every one on that chart,
 8     Your Honor.
 9              THE COURT:  Okay.
10              MS. MOORE:  And the defense and the plaintiffs, we've
11     both gone back and forth.  Everyone has reviewed this.  It
12     contains everyone's objections.
13          I'm sorry the print is small, Your Honor.  And so it
14     should have the name of the individual in the top left corner.
15              THE COURT:  Oh, here it is.  Okay.  I see.
16          All right.  I can deal with this.
17              MS. MOORE:  Okay.  And I think that's it.  So you
18     should have everything.  And we'll bring the other transcripts
19     to you on a break, and that way you'll have everything that
20     needs to be reviewed.
21              THE COURT:  Okay.
22              MS. MOORE:  Thank you.
23              THE COURT:  And then you're continuing with Farmer
24     right now; is that right?
25              MS. MOORE:  Yes, Your Honor.
```

1          **THE COURT:**  Okay.

2          **MS. WAGSTAFF:**  And, Your Honor, we have one just note

3    on Farmer.  These charts that Mr. Stekloff showed in his

4    opening --

5          **THE COURT:**  Yes.

6          **MS. WAGSTAFF:**  -- they are going to be exhibits.  One

7    of them contains about three pages of post-2012 studies.  So we

8    will object to that going back to the jury; but as far as being

9    displayed right now, we're okay with it because it's our

10   understanding only the front page --

11         **THE COURT:**  Well, the problem is you argued at

12   opening.  Monsanto has never to this day conducted X study,

13   Monsanto has never to this day conducted Y study.  So I think

14   those are admissible.

15         **MS. WAGSTAFF:**  Sure, and we'll bring that up later.

16         **THE COURT:**  Okay.

17     All right.  So we'll resume in about -- let's plan on

18   resuming about 10 after the -- or bring in the jury at 10 after

19   the hour.

20         **MS. MOORE:**  Thank you, Your Honor.

21               (Recess taken at 8:05 a.m.)

22             (Proceedings resumed at 8:13 a.m.)

23      (Proceedings were heard out of the presence of the jury:)

24         **THE COURT:**  All right.  Go ahead and bring them in.

25      (Proceedings were heard in the presence of the jury:)

1        **THE COURT:**  Okay.  Welcome back, everyone.

2        We will resume with the testimony of Dr. Farmer.

3            **(Video was played but not reported.)**

4        **THE COURT:**  We will take our first morning break.  We

5    will break for about five or ten minutes and resume then.

6    Thank you.

7        (Proceedings were heard out of presence of the jury:)

8        **THE COURT:**  Okay.  I went through the Heydens or the

9    Heydens counter-designations.  The objections to those are all

10   overruled.  So you can play those.  So that is it for Heydens,

11   right?

12       And I will turn to the remaining ones, and we will see you

13   in a few minutes.

14       **MS. WAGSTAFF:**  Your Honor, just for planning purposes,

15   I believe, there is around an hour and a half left of this; and

16   then we will bring in Dr. Nabhan.

17       **THE COURT:**  Okay.  So probably we can play the rest of

18   it.  Although if it seems like it is really starting to drone

19   on, I might take another break.  But why don't we plan on

20   playing the rest of it and then take another break and then

21   bring in Dr. Nabhan.

22       **MS. WAGSTAFF:**  Okay.

23       **THE COURT:**  We will resume at 9:30.

24              (Recess taken at 9:21 a.m.)

25            (Proceedings resumed at 9:33 a.m.)

1     (Proceedings were heard out of presence of the jury:)

2         **THE COURT:**  Just one very brief thing I forgot to

3    mention, I was also on the bench reading our prior stuff on the

4    Requests For Admission.  It seems like -- I can't tell for

5    sure, but it seems like Monsanto is now trying to get in

6    something that I had previously stricken.

7         **MR. STEKLOFF:**  We -- we clarified it.  I think there

8    was some confusion on my end over what was in my --

9         **THE COURT:**  Okay.

10        **MR. STEKLOFF:**  I think it is actually all resolved

11   except Ms. Moore has one thing.

12        **THE COURT:**  Okay.  Well, let's talk about that later.

13        **MS. MOORE:**  Great.  Thank you, Your Honor.

14    We wanted to read these after Dr. Farmer, so we can do

15   that at sidebar.  We've agreed on everything, except for one.

16        **THE COURT:**  If you read it, it will be after the next

17   break we take.

18        **MS. MOORE:**  That's fine.  Thank you, Your Honor.

19    (Proceedings were heard in the presence of the jury:)

20        **THE COURT:**  Okay.  You can resume.

21          **(Video was played but not reported.)**

22        **THE COURT:**  Why don't we take another morning break.

23   We will resume right at 11:00 o'clock.  Thank you.

24    (Proceedings were heard out of presence of the jury:)

25        **THE COURT:**  I did think it was starting to drone on a

1   little bit.  I thought it would be in everybody's interest

2   before we cut it off -- about how much time do we have left in

3   the video?

4           **MR. WOLFE:**  About 12 minutes.

5           **THE COURT:**  By the way, I just want to say before I

6   forget, the tech work that you folks have done in this trial

7   has been outstanding.  So I really appreciate it, and I want to

8   make sure you know that.

9           **MS. WAGSTAFF:**  He has been working a lot of late

10  nights.

11          **THE COURT:**  I'm quite sure.

12      Okay.  So let's chat briefly.  When am I going to -- you

13  are free to sit down.

14      When am I going to get Portier's testimony, revised

15  designations?  I'm particularly interested in looking at that

16  because I have a sense that it might help me sort of complete

17  the picture on this Rowland dispute that we are talking about.

18  I would like to --

19          **MS. MOORE:**  Your Honor, my understanding is that the

20  transcripts have been printed; and they are going to be brought

21  down.  So we have all the transcripts including Portier.

22          **MR. STEKLOFF:**  We have been, I think, very careful in

23  our designations not to cross the 2012 threshold, which, of

24  course, we think we should allowed to do if we -- if

25  Mr. Rowland's e-mails come in.

 1          **THE COURT:**  I understand.  I mean, but -- you know,

 2  you keep talking about this 2012 threshold, and the ruling was

 3  not that nothing can come in from post-2012.  The ruling is

 4  just that Monsanto's post-use conduct can't come in on punitive

 5  damages, right?  So that's the line that you are talking about?

 6          **MR. STEKLOFF:**  Yes, Your Honor.  And I would be happy

 7  to introduce the EPA and foreign regulators around the world,

 8  their decisions that postdate 2012.

 9          **THE COURT:**  Right.

10          **MR. STEKLOFF:**  If that's fair game.  I mean, we have

11  not designated that; but if you are saying now I can do that,

12  we would love to go back and do that.

13          **THE COURT:**  Well, I mean, all I'm saying is that the

14  ruling was that it was about Monsanto's post-use conduct.

15          **MR. STEKLOFF:**  Well, I think your order also, I think,

16  then -- this is off the top of my head -- in the rulings about

17  the regulatory conduct, I think that there were similar --

18  there were similar limitations.

19          **THE COURT:**  Well, I mean, there are limitations in the

20  sense that -- that stuff that happened post-2012 is much less

21  likely to speak to Monsanto's mindset with respect to whether

22  it should have known pre-2012 whether Roundup was dangerous,

23  but the focus of the ruling is Monsanto's post-use conduct,

24  right?

25          **MR. STEKLOFF:**  Yeah.  I mean, you had said in -- with

1    respect to Plaintiff's Motion in Limine Number 5, EPA will

2    generally be admissible subject, of course, to specific

3    evidentiary objections relating to particular pieces of

4    evidence, again, as long as it occurred before the Plaintiff's

5    stopped using Roundup.

6         I would make two points now.  First of all, I think there

7    is the argument based even on -- just on opening that

8    Plaintiffs have opened the door by making what you referred to

9    this morning with all of these statements about what Monsanto

10   has not done up until today.  And I think that to the extent

11   that that is something that they continue to pursue, we should

12   be allowed to say, Yes, and the regulatory bodies around the

13   world, including the EPA, also have not required us to make

14   changes.  I want to put a flag onto that.

15        I also think if the Rowland issues come in, I think that

16   is even more reason why we should be allowed to show what

17   happened after Rowland left the EPA.

18        **THE COURT:**  No, I understand that.  I understand that

19   argument.  I just wanted to make sure I could see the Portier

20   testimony over the lunch hour because I think that will help to

21   complete the evidentiary picture.

22        **MR. STEKLOFF:**  Understood.  And I'm just flagging that

23   we have drawn a line even with Dr. Portier --

24        **THE COURT:**  Got it.

25        **MR. STEKLOFF:**  -- pre-2012.  To be clear, if you tell

 1  us that we can go past that, putting aside Mr. Rowland, we

 2  would like to do that.  So I think we would seek guidance on

 3  that as well.

 4       **THE COURT:**  Okay.  And then how long do you anticipate

 5  Nabhan's testimony being?

 6       **MS. WAGSTAFF:**  Probably 30 minutes.  And based on our

 7  Phase One discussions and Mr. Stekloff's representations to me

 8  that they are not challenging Dr. Nabhan's credentials and

 9  qualifications, I'm not going to tender him as an expert or

10  offer him as an expert unless I'm told otherwise.

11       **MR. STEKLOFF:**  No objection, Your Honor.

12       **THE COURT:**  That's fine.

13    So what is he going to testify about then, the

14  difficult --

15       **MS. WAGSTAFF:**  His treatment and prognosis, his

16  chemotherapy, the side effects of chemotherapy and his

17  prognosis.

18       **THE COURT:**  Prognosis.

19       **MS. WAGSTAFF:**  Yeah.  And it may not even go 30

20  minutes.

21       **THE COURT:**  Okay.  And the admissions, did you say

22  that we have got that straightened out?

23       **MR. STEKLOFF:**  I think there is one sentence that --

24  in one of the admissions.

25       **THE COURT:**  Okay.

 1          **MS. MOORE:**   Your Honor, this is Request For Admission

 2    Number 7.   And the way it reads is:   Admit that Monsanto has

 3    never conducted a long-term animal carcinogenicity study on any

 4    surfactant using a glyphosate-formulated product.

 5          And we agree that this should be read:   Monsanto admits

 6    that it has never conducted a 12-month or longer term animal

 7    carcinogenicity study on any surfactants used in

 8    glyphosate-based products.

 9          The Defendant -- and I think that is responsive to the

10    request.

11          The Defendant would also like to read the next sentence --

12    which we don't think is responsive -- to the extent the phrase

13    long-term animal carcinogenicity study is intended to apply to

14    studies involving rodents exposed to surfactants for up to four

15    weeks, Monsanto denies this request.

16          And I think it is pretty clear, long-term studies are 12

17    months or longer.   In fact, Dr. Farmer testified about 18 to 24

18    months.   So I just don't think that second sentence has any

19    applicability to the actual request itself.

20          **MR. STEKLOFF:**   I think they can make that argument,

21    but I think that this -- was allowed to be part of the

22    response.   And so I think we have now heard -- I mean, I don't

23    think -- I think the parties' positions on this long-term study

24    on surfactant are pretty clear.   We have just heard testimony

25    from Dr. Farmer about why Monsanto did not conduct that study

1   and didn't think it was a feasible study and didn't think it

2   was a necessary study.  So I think reading that sentence

3   doesn't really cause controversy.  So we would ask that it be

4   read.

5          THE COURT:  I think it's a fairly close question.  I

6   can understand the Plaintiff's argument, but I also think it is

7   a relatively inconsequential question, and including it is

8   consistent with the -- my ruling when we had to deal with this

9   issue pretrial.  So that will be allowed in.

10         MS. MOORE:  Thank you, Your Honor.

11         THE COURT:  That resolves the admissions?

12         MS. MOORE:  Yes, Your Honor, it does.

13      And then I do have the transcripts too.

14         THE COURT:  Okay.

15         MS. MOORE:  And I was going to pull out -- and Portier

16  is right on top.  So I pulled out the Portier, and then the

17  rest of them are here as well, Your Honor.

18         THE COURT:  So that's all the rest of them?

19         MS. MOORE:  I believe so, Your Honor.

20         THE COURT:  Okay.

21         MR. STEKLOFF:  I want to be able to read that one

22  CropLife America -- not now, Your Honor -- before you review

23  that transcript, just sort of a macro issue associated with --

24         THE COURT:  Say that one more time.

25         MR. STEKLOFF:  There is a CropLife America 30(b)6

PROCEEDINGS

1  witness, and I would just like to raise a macro issue before

2  you review that transcript.  But now probably doesn't need to

3  be the time.

4          **THE COURT:**  Very good.

5          **MS. MOORE:**  That is Doreen Manchester, Your Honor,

6  just so you know.

7          **THE COURT:**  Okay.  Great.  We will resume at 11:00 or

8  a minute or two after.

9          **MS. MOORE:**  Thank you, Your Honor.

10                    (Recess taken at 10:58 a.m.)

11                 (Proceedings resumed at 11:05 a.m.)

12        (Proceedings were heard in the presence of the jury:)

13          **THE COURT:**  Okay.  You can go ahead and finish up the

14  Farmer testimony.

15                **(Video was played but not reported.)**

16          **THE COURT:**  Would you like to call your next witness?

17          **MS. MOORE:**  We have something we would like to read

18  into the record, Request For Admissions.

19          **THE COURT:**  Go ahead.

20          **MS. MOORE:**  Thank you, Your Honor.

21          **THE COURT:**  And let me just say -- before you read

22  them in, I will just tell the jury.

23          **MS. MOORE:**  Thank you, Your Honor.

24          **THE COURT:**  So you have heard that we had deposition

25  testimony that took place before this trial started, and it

1   comes in at trial.  There are also other exchanges with

2   information that occur between the parties during the process

3   leading up to the trial, and sometimes that information is

4   simply admitted into the trial to make the trial more efficient

5   and to avoid having to call particular witnesses.

6        In this particular case, the Plaintiffs -- the Plaintiffs

7   submitted to Monsanto a number of requests -- that are called

8   Requests For Admission -- asking Monsanto to admit whether

9   certain things did happen or did not happen.  Monsanto provided

10  responses, and Ms. Moore is going to read some of those

11  requests and responses to you now.

12        **MS. MOORE:**  Thank you, Your Honor.

13        This is Plaintiff's Request for Admission Number 31:

14  Admit that Monsanto has never conducted an epidemiological

15  study to study the association between glyphosate-containing

16  formulations and non-Hodgkin's lymphoma.

17        Defendant's response:  Admitted.

18        Plaintiff's Request Number 4:  Admit that Monsanto has not

19  conducted a long-term animal carcinogenicity study on

20  glyphosate since 1991.

21        Monsanto's response:  Monsanto admits that it has not

22  identified any 12-month or longer animal chronic toxicity

23  studies that it has conducted on glyphosate since 1991.

24        Plaintiff's Request Number 5:  Admit that Monsanto has

25  never conducted a long-term animal carcinogenicity study on any

 1  glyphosate formulation.

 2      Monsanto's response:  Monsanto admits that it has not

 3  conducted a long-term animal carcinogenicity study on any

 4  formulated pesticide product.

 5      Request for Admission Number 6:  Admit that Monsanto is

 6  not precluded by any applicable law, regulation, or ordinance

 7  from conducting a long-term animal carcinogenicity study on a

 8  glyphosate formulation.

 9      Monsanto's response:  Admitted.

10      Request Number 7:  Admit that Monsanto has never conducted

11  a long-term animal carcinogenicity study on any surfactant used

12  in a glyphosate-formulated product.

13      Monsanto's response:  Monsanto admits that it has never

14  conducted a 12-month or longer term animal carcinogenicity

15  study on any surfactants used in glyphosate-based products.  To

16  the extent the phrase long-term animal carcinogenicity study is

17  intended to apply to studies involving rodents exposed to

18  surfactants for up to four weeks, Monsanto denies this request.

19      Thank you, Your Honor.

20          THE COURT:  Thank you.  You can call your next

21  witness.

22          MS. WAGSTAFF:  Mr. Hardeman calls Dr. Nabhan.

23                  CHADI NABHAN,

24  called as a witness for the Plaintiff, having been duly sworn,

25  testified as follows:

1    **THE CLERK:**  State your full name for the record.

2    **THE WITNESS:**  Chadi Nabhan, C-H-A-D-I, N-A-B-H-A-N.

3    **MS. WAGSTAFF:**  May I proceed?

4    **THE COURT:**  You may.

5    <u>**DIRECT EXAMINATION**</u>

6    BY MS. WAGSTAFF

7    **Q.**  Good morning, Dr. Nabhan.  Thanks for being here with us

8    today.

9    **A.**  Good morning.

10   **Q.**  Can you please tell the ladies and gentlemen of the jury a

11   little bit about yourself?

12   **A.**  Sure.  My name is Chadi Nabhan.  I'm a hematologist and

13   medical oncologist.  I have about 18 years of clinical

14   experience, essentially seeing patients with lymphoid

15   malignancies, all kinds of lymphomas.

16   I'm Board certified in hematology, oncology and internal

17   medicine.  And I practiced at a large community center as well

18   as University of Chicago, which was -- which is one of 41 NCI

19   designated cancer centers.  In my role I did clinical research

20   in lymphoma patients, essentially doing clinical trials for

21   patients diagnosed with lymphomas, all kinds of lymphomas.  And

22   then towards the last couple of years at the University of

23   Chicago, I became more interested in understanding other

24   aspects of care delivery to patients.

25   I think we can all agree that it takes more than just

1    seeing a patient, diagnosing a patient and prescribing the

2    therapy to take care of patients.   There are many aspects of

3    care delivery to patients.

4       Because of this, I went back to business school, and I got

5    an MBA in healthcare management.   And I currently am a Chief

6    Medical Officer at a healthcare company that essentially sits

7    in the middle between manufacturers of oncology drugs,

8    oncologists that prescribe these oncology drugs; and I work

9    with all the stakeholders that are involved in patient care to

10   better understand what can be done to assure patients receive

11   the proper therapy at the right time.

12   **Q.**   All right.   And let's tell the ladies and gentlemen a

13   little bit about your medical education.   Where did you get

14   your medical degree and when?

15   **A.**   Sure.   So I'm originally from Syria.   I was born in Syria,

16   so I did my medical school there.   I came to the States '91,

17   '92.   I spent two years at Mass General Hospital at Harvard

18   Medical School doing basic research.   I was very interested in

19   understanding what happens in the lab in terms of basic

20   research on the molecular level.

21      After that I moved to Chicago where I did my residency at

22   Loyola University.   I took one year off, and I did primary care

23   in underserved indigent area in the Chicago area on the south

24   side.   Then I went to do my fellowship in hematology and

25   oncology, at Northwestern University Feinberg School of

NABHAN - DIRECT / WAGSTAFF

1    Medicine.  As I told you, I -- in my practice experience span

2    between the University of Chicago and Advocate Healthcare.

3    **Q.**    And during your fellowship, you were actually the chief

4    fellow, right?

5    **A.**    Yes.  Yes, and I was awarded -- I was awarded a research

6    grant to do research -- in my research during fellowship, I

7    worked in a lab as well as in the clinic; and I did a lot of

8    research on lymphoma cell lines and myeloma cell lines at the

9    time.  So I have always been fascinated in understanding what

10   happens in the lab as well as what happens in the clinic, and I

11   think understanding both allows clinicians to better just

12   recognize the research effort that leads to developing drugs

13   that help patients with cancer.

14        And, in fact, in my current role, I'm very interested in

15   knowing what are the new therapies, but not necessarily how

16   they work.  More importantly, these new therapies -- what it

17   takes to lead patients to receive the right treatment because

18   if payers don't pay for treatment, then patients can't get it.

19   So our opinion is that patients need to show, payers need to

20   look at and oncologists need to demonstrate.

21        In my current research, I do a lot of patient reported

22   outcome studies.  So, as you know, the symptoms that are voiced

23   by patients have demonstrated actually -- they are more

24   impactful in delivering care versus just a simple review of

25   systems when the doctor just asks the patient how you feel and

1  so forth.

2      I do a lot of health economics research as well, which,

3  again, looks at the comparative effectiveness between

4  therapies, mainly in lymphoid malignancies.

5  **Q.**  All right.  And I think you mentioned to the jury that you

6  live in Chicago, Illinois.  Are you licensed to practice

7  medicine in California?

8  **A.**  Yes.  So I'm actually licensed in five states:  Illinois,

9  Wisconsin, Indiana, Florida and California.  And as I told you,

10  I have -- I'm Board certified in hematology, medical oncology

11  and internal medicine.  I hope this answers the question.

12  **Q.**  Yes.  And so you mentioned earlier that you were -- you

13  had a clinical practice for, I think you said, 20 years -- or

14  18, 20 years.  Can you -- did you see patients during that

15  time?  Can you explain to the jury what that means?

16  **A.**  Yeah.  So, you know, my role had some administrative

17  responsibilities as well as clinical care and research and

18  teaching fellows and medical students.  So in the -- on the

19  clinical aspect, basically I was seeing patients with all kinds

20  of lymphomas, so not one type of lymphoma, all lymphoid

21  malignancies.  And as you probably know, there are many types

22  of lymphomas out there, so I actually saw all kinds of lymphoma

23  patients.  And I saw hundreds of patients of lymphoma, probably

24  over a thousand during my clinical practice.

25      In my role as well, I was a director of the operations at

1   the Cancer Center of the University of Chicago looking at more

2   throughput, what it takes to deliver the proper care, reducing

3   wait times, labs, all the things that impact patient care.  I'm

4   very interested in that aspect of care delivery.  It is very,

5   very important.

6        And teaching fellows and students as well as residents, so

7   oftentimes in clinic you are joined by a fellow or a resident.

8   They learn from you as to what actually -- how you diagnose a

9   patient, what type of therapy you prescribe to a patient, what

10  are the side effects that goes with the particular regimen, how

11  do you manage these side effects to make sure the patients go

12  through the treatment as seemingly as possible.  It is never

13  easy.  Chemotherapy is horrific when it is given to patients,

14  but we do our best as physicians to try to minimize the side

15  effects.  Sometimes we are successful, and unfortunately

16  oftentimes we are not; but we try to do our best.

17       And the other role, of course, is clinical research, as I

18  told you.  And in that I designed clinical trials.  I wrote

19  clinical trials.  I published clinical trials.  I have over 300

20  peer-reviewed papers, abstracts or book chapters; over

21  80 percent, 85 percent of these are on lymphomas and lymphoid

22  malignancies.

23       I continue to publish in that field as well, even after I

24  have left actual clinical practice because, in my current role,

25  I'm doing more administration and research as opposed to seeing

1  patients in clinic.

2  **Q.**   All right.  And in terms of your clinical care and

3  practice that you just discussed with the jury, did you

4  specialize in a particular type of cancer?

5  **A.**   Lymphomas, but all kinds of lymphomas.  There are some --

6  there are some oncologists that see one type of lymphoma.  So

7  there are oncologists around the country that might see only

8  T-cell lymphomas or B-cell lymphomas.  In my practice I have

9  seen all kinds of lymphomas, non-Hodgkin's and Hodgkin's, and

10  in the Hodgkin's, T-cell and B-cell.  I had a small practice,

11  about 10 percent of prostate cancer.  I did see some -- very,

12  very minor practice in prostate cancer; 85 to 90 percent of

13  that was in lymphoma.

14       You know, oftentimes this happens by virtue of whom

15  mentors you.  When I was a fellow and I worked in the lab, the

16  director of the cancer center was working on lymphoma and

17  myeloma.  And, you know, you end up modeling -- you model

18  around the role model that you actually follow, and you try to

19  do your best to fulfill what your mentor wants you to be.  So I

20  worked in his lab, and I became very interested in lymphoma.

21  Part of my interest was the variety.  There are so many types

22  of lymphomas, and trying to understand each type is

23  challenging; but it is also rewarding.

24  **Q.**   And the jury has heard previously that Mr. Hardeman, who

25  you are here to testify about today, has been diagnosed with

1   diffuse large B-cell lymphoma, a subtype of non-Hodgkin's

2   lymphoma.  And was your specialty when you were a clinician,

3   did that include treating patients with DLBCL?

4   **A.**   Yes.  I mean, of course.

5   **Q.**   Okay.  And so what did you do to prepare for your opinion

6   today?

7   **A.**   So I reviewed thousands of pages of medical records that

8   were provided to me, and that included everything that

9   Mr. Hardeman went through from even prior to his diagnosis of

10  non-Hodgkin's lymphoma or DLBCL.  I had the opportunity to meet

11  Mr. Hardeman in the Chicago area where we talked for an hour,

12  hour and a half, about his history, about what he went through,

13  about the regimen he received, the side effects, et cetera.

14  And I examined him briefly, and I got the opportunity to

15  understand his journey as he went through the cancer therapy.

16       I also had the opportunity to read his -- Mr. Hardeman and

17  Mrs. Hardeman's deposition when they were deposed, along with

18  the depositions of the treating physicians that cared for

19  Mr. Hardeman, his oncologist, his primary care physician and

20  the surgeon who did the biopsy.

21       Of course, I relied on my own experience in seeing many

22  patients with non-Hodgkin's lymphoma and DLBCL.  I have

23  published a lot on DLBCL.  So I utilized my clinical expertise

24  in the area and my understanding of the field.

25  **Q.**   All right.  And the jury has heard there are several

1   different types -- subtypes of non-Hodgkin's lymphoma.  Based

2   on your medical training and experience, is there anything

3   unique about DLBCL, which is the subtype Mr. Hardeman has?

4   **A.**   You know, the best way to explain non-Hodgkin's lymphoma

5   to folks who don't necessarily see lymphoma patients every day

6   is just to think of non-Hodgkin's lymphoma as two very broad

7   and big categories.  The first category is the aggressive type

8   of non-Hodgkin's lymphoma, and the second type is the indolent,

9   maybe not so aggressive.

10      The difference is that in the aggressive type of

11  non-Hodgkin's lymphoma, the disease is fatal if it is not

12  treated timely, appropriately, effectively and with the proper

13  therapy.

14      In the indolent type of non-Hodgkin's lymphoma, sometimes

15  you can wait.  There are some patients who may not need right

16  away treatment.  They can wait a little bit, and they may get

17  treatment down the road and so forth.

18      What Mr. Hardeman had was DLBCL, which is a very

19  aggressive type of non-Hodgkin's lymphoma.  So it is in the

20  category of aggressive non-Hodgkin's lymphoma.  And what that

21  means, that if you don't treat that disease properly and

22  timely, patients will die.  So you don't really have the luxury

23  of deciding whether I can wait or not.  You just have to treat.

24  What is also important about the DLBCL, you don't have a lot of

25  treatment choices that you can sit down and say, Well, I'm

 1   going to select Treatment A versus B versus C.

 2       Over 70 to 80 percent of patients with DLBCL will require

 3   this type of therapy that Mr. Hardeman received, which is the

 4   R-CHOP.  There are some patients with DLBCL who can get other

 5   therapies, but for the most part there are not a lot of choices

 6   in how you treat this disease.

 7       So you have an aggressive non-Hodgkin's lymphoma that is

 8   fatal if it is not treated appropriately and timely.  And the

 9   treatment choice pretty much has to be R-CHOP in about 70 to

10   80 percent of patients.

11   Q.   All right.  Now, you have mentioned R-CHOP a few times.

12   Can you please explain to the ladies and gentlemen of the jury

13   what R-CHOP is and explain how it applies to Mr. Hardeman's

14   treatment.

15   A.   The standard of care for the majority of patients with

16   DLBCL is R-CHOP.  So whether us oncologists have very

17   short-term memory, we don't want to remember the entire

18   regimen; and so we just try to put letters on the names or

19   not -- that is a different story -- but R-CHOP, each letter

20   signifies a particular drug that is being delivered to the

21   patient.

22       So the R stands for a drug called Rituxan, which is given

23   intravenously.  It is an antibody that is usually delivered

24   intravenously, and it is given over a few hours.  And the

25   Rituxan affects specifically the lymphoma cells.  So it targets

1    a particular protein that is expressed on the lymphoma cells so

2    it doesn't necessarily kill the non-lymphoma cells.

3         Now, the Rituxan measures -- I can go through the side

4    effects if you want me to or I can just through the regimen

5    first.

6         That's what the R stands for.

7         The CHOP is not targeted, so it is very different than the

8    R.  It doesn't necessarily go into the actual lymphoma cell.

9    The CHOP is chemotherapy that doesn't necessarily differentiate

10   the lymphoma cells from the non-lymphoma cells.  It is not

11   smart enough, and that's why certain side effects occur with

12   the CHOP.

13        The C stands for a drug called Cytoxan, C-Y-T-O-X-A-N, and

14   the H essentially stands for a drug called Adriamycin.

15   **Q.**   Let me spell that again.  So can you spell the R again?

16   **A.**   R stands for Rituxan, R-I-T-U-X-A-N.

17   **Q.**   Okay.

18   **A.**   And that is the antibody that is directed specifically to

19   the cancer cells, and it is given intravenously over a couple

20   hours.

21   **Q.**   Okay.

22   **A.**   The C essentially stands for Cytoxan, C-Y-T-O-X-A-N.  And

23   that's in the category of what we call alkylating therapy.  So

24   these -- the Cytoxan damages the DNA of the normal cells.  So

25   it calls -- as you probably heard in previous testimony --

 1   something called genotoxicity because it does affect

 2   chromosomes and it affects DNA of the normal cells.  It doesn't

 3   target the lymphoma cells like Rituxan does.

 4        The H is Adriamycin, specifically -- A-D-R-I-A --

 5   **Q.**   A?

 6   **A.**   -D-R-I-A --

 7   **Q.**   Uh-huh.

 8   **A.**   -M-Y-C-I-N.

 9        And that's in the category of chemotherapy is classified

10   under what we call anthracyclines or antibiotics essentially.

11   And that also affects the DNA.  It also damages the DNA of the

12   normal cells.  Remember, these are not smart drugs like the

13   Rituxan that goes after the cancer cell.  It could damage the

14   DNA.  It could cause a lot of breakage in the DNA and of the

15   chromosomes, but also causes cardiac side effects.  So it could

16   have some heart side effects.

17   **Q.**   Did you say cardiac?

18   **A.**   Cardiac, some heart side effects, and essentially heart

19   failure where patients could suffer from when they get the

20   Adriamycin.

21        The O stands for oncogene or vincristine.  I would say --

22   vincristine, V-I-N-C-R-I-S-T-I-N-E.  And that's -- that causes

23   some tingling and numbness in the fingers and toes, or what we

24   call neuropathy.  So that is the major side effect of

25   vincristine.

1    And you see that a little bit more common in folks who are

2    a little more older because sometimes you have nerve damage

3    because of age and so forth.  So occasionally that sense of

4    neuropathy could actually be problematic.  And for some

5    patients I have seen or cared for, it could cause pain as

6    opposed to just tingling and numbness.

7    Then you have the P, which stands for prednisone.  And I

8    think everybody, hopefully, is familiar with prednisone.  The

9    issue with the prednisone with the CHOP regimen is it is given

10   at high doses; 100 milligrams a day for five days.

11   Prednisone, P-R-E-D-N-I-S-O-N-E.  And that's usually given

12   at pretty high doses, 100 milligrams a day for five days.  It

13   is repeated every three weeks, and sometimes you don't actually

14   start the prednisone right away.  You may have to taper it a

15   little bit depending on how patients do.  And I think it goes

16   without saying, prednisone can cause swelling to patients,

17   puffiness, weight gain; could increase blood sugars

18   significantly.  And when people receive a lot of prednisone for

19   a long period of time, they can have bone thinning down the

20   road as they age as well because it does cause some bone damage

21   down the road.  So that's what prednisone does.

22   **Q.**   Okay.  And how is R-CHOP administered?

23   **A.**   So all of them are given intravenously, except the

24   prednisone usually are oral pills that patients take by mouth.

25   **Q.**   And how many -- and Mr. Hardeman had R-CHOP, you

1    testified?

2    **A.**    Yes.  So, again, just to say the type of disease that

3    Mr. Hardeman had is treated with R-CHOP in close to 80 percent

4    of patients.  And, in fact, many folks would argue over

5    90 percent should get that regimen.  So you don't have a lot of

6    choices when you are dealing with this type of lymphoma.  It

7    will be fatal if you don't treat it right away.  So R-CHOP is

8    what Mr. Hardeman received, and he received a total of six

9    cycles.  I'm more than happy to go over what I learned from the

10   medical records regarding his medical experience.

11   **Q.**    Yes, please.  Based on your meeting with Mr. Hardeman,

12   your examination of him and your review of the medical records,

13   can you explain to the ladies and gentlemen of the jury how

14   R-CHOP affected him?

15   **A.**    So I think just to -- it is very important to know that

16   nobody would ever want to get chemotherapy unless they have to.

17   I mean, if anybody has experienced either a family member or

18   somebody that they cared for that they received chemotherapy,

19   they will understand that there is no chemotherapy that is

20   easy, and this chemotherapy is not a walk in the park.  I would

21   argue no chemotherapy is a walk in the park.  But the degree of

22   tolerance vary between patients and it depends on the patient

23   himself or herself, as well as on the therapies and the drugs

24   that we deliver.

25        So from my understanding, you know, when Mr. Hardeman

NABHAN - DIRECT / WAGSTAFF

1  first received the chemotherapy, he did experience a lot of

2  nausea and vomiting with the regimen.  And, in fact, when

3  reviewing the medical records, it was very clear that he had to

4  call several times to figure out a regimen that will control

5  his symptoms, and eventually the oncologist was able to control

6  the vomiting.  He still had issues with nausea, and they

7  figured out a regimen that at least pulled him through the

8  vomiting piece; but he still experienced some of the nausea.

9       Are we going to go through all of them?  You know, the

10  fatigue is something that is very common.  Anybody who gets

11  chemotherapy will be tired and fatigued.  But, again, the

12  degree of fatigue differs between patients.  So when I met

13  Mr. Hardeman -- oftentimes my general question is, Are there

14  certain things you were able to do before that you couldn't do

15  after?  That is usually my typical question when I ask patients

16  because you never know what the baseline is of somebody, but

17  most patients are able to tell you, Well, two months ago I was

18  able to walk a couple of miles.  I was able to drive.  I

19  usually don't take naps in the afternoon.  Now I take a nap in

20  the afternoon every afternoon for a couple of hours.

21       You have to have some trick questions to give you an idea

22  about the level of fatigue because sometimes if I ask everybody

23  in this courtroom Are you tired, we will get a unanimous

24  answer.  Everybody is tired.  So that's why I try to understand

25  he did experience a lot of fatigue when he went through the

1  chemotherapy.

2      Alopecia or the loss of hair is something you expect with

3  this regimen.  Not all chemotherapies cause alopecia or hair

4  loss, but this one does, specifically because of the Cytoxan

5  and the Adriamycin.

6  **Q.**  Before we move on to the fourth one, in your review of the

7  medical records and speaking with Mr. Hardeman, was he given

8  any additional medication for nausea and vomiting?

9  **A.**  Yes.  Yes, he was -- you know, the oncologist did give him

10 other medications for the nausea and vomiting, and it didn't

11 resolve the vomiting.  He still had some degree of nausea.

12     It is also interesting -- just to give you an idea -- so

13 prednisone as a medication that we often -- as part of the

14 chemotherapy, is actually an antiemetic.  So it is used as an

15 antinausea vomiting.  So when you look at many of the

16 chemotherapy regimens that we actually use, we give

17 dexamethasone, which is a form of steroid, before we administer

18 the chemotherapy.  And what the dexamethasone does, it is

19 supposed to suppress the sense of nausea and vomiting.

20     So when somebody still has that sense of nausea and degree

21 of vomiting that he experienced in the beginning, despite

22 getting the prednisone, it's just his degree is a little bit

23 more than -- than you would expect or you want to see normally,

24 but eventually the vomiting was controlled by his oncologist.

25 **Q.**  Now, the hair loss, how long was Mr. Hardeman's hair loss?

**A.**   I don't remember exactly the length, but what I can tell

you is that with this regimen, 100 percent -- I mean, I have

never seen -- 99.9 percent of patients will lose their hair,

men or women.  Oftentimes you will see that after the second

cycle of chemotherapy.

So in the first round you start seeing the hair thinning;

and then after the second round, you actually start having the

loss of hair.  And it is actually a painful experience, not

just from emotional standpoint when you just see the clumps of

hair that are in the bathroom or in your bathtub or on your

pillow or in the bedroom, but it sometimes causes pain when the

hair is lost.

It stays -- most patients will stay without hair until

they finish with the chemotherapy.  The hair eventually grows

back, and it starts growing back several weeks after the last

chemotherapy; and it takes about four to six months before it

comes back.

Frankly, with all of the patients I have seen, I have

always told them, the hair will eventually come back.  But what

I don't know is, A, what color your hair will be when it comes

back and the texture of your hair.  So some patients actually,

they have straight hair and it comes back curly; and they could

be gray and it comes back dark and visa versa.  I have seen it

all.  And it is very important to prepare patients just

emotionally for the idea that the hair loss is going to happen;

1   but also when it comes back, it may be a little bit different

2   than what you experience.  So managing the expectations is very

3   critical.

4        As part of the chemotherapy regimen -- because the

5   chemotherapy not always smart and it doesn't always attack only

6   the lymphoma cells -- it attacks normal cells -- patients could

7   drop their counts.  What I mean by drop their counts, the white

8   blood cell counts could go down.

9        So in our body the white cells are these cells that fight

10  infections.  So essentially all of us in this room have white

11  cells; and if they are functioning properly, they should be

12  able to attack the pathogens, the bacteria, whatever our body

13  might be faced with.  When you give chemotherapy, these white

14  cells could go down -- could be suppressed.

15       Now, there are different types of white cells, but the

16  ones that usually fight infections are called neutrophils.

17  These are the ones that essentially fight infections, and

18  chemotherapy brings down the white cells and brings down the

19  neutrophils.  The degree by which the chemotherapy could bring

20  down the white cells and neutrophils vary based on the

21  chemotherapy regimen that we use as expected.  And with this

22  one, most patients will have drop in the white cells and in the

23  neutrophils, but what that means is it exposes them to the

24  possibility of developing infections because now they have no

25  defense mechanisms against what they have.

1      And if you have ever been sometimes in airports or you see

2   people walking -- they sometimes walk with a mask around their

3   face and the reason for that is because they don't get exposed

4   to the germs that other people around them may have.

5      So when I talk to patients, I tell them, you know, just

6   stay away from crowds.  If you have a grandson or daughter or

7   somebody that you -- you don't hug them.  And right now when --

8   if they have a cold or they are sneezing or coughing, just

9   exercise judgment.  At the same time you don't want to live in

10  a bubble.

11     So Mr. Hardeman did drop his white cells.  After the

12  second cycle, I believe his white cells went down.  And in

13  order for physicians to combat the drop of the white cells, the

14  good news is we have some tools right now to help patients to

15  prevent the white cells from staying down for a long time.  I

16  mean, they are going to go down; but we try to minimize the

17  duration of how low the white cells will be.

18     And the way we do that is by giving shots under the skin.

19  These shots are called Neupogen, N-E-U-P-O-G-E-N.  So these are

20  growth factors.  What these shots do is they stimulate the bone

21  marrow.

22     You know, all of our cells, by the way, are produced in

23  the bone marrow.  So the bone marrow is the core of the bone.

24  Inside the core of the bone, think of it as the factory that

25  produces all of the cells that circulate in your blood.

1      So the bone marrow is the factory.  It produces white

2   cells, red cells and platelets; and these circulate in your

3   blood.  The white cells are the ones -- all of them go down

4   with the chemotherapy, but we worry about the white cells the

5   most because people then are exposed to possible infections and

6   you can -- you know, just walk around anywhere; and you will

7   see a lot of possible germs and infections.

8      So to combat this, physicians and oncologists try to give

9   these shots to bring the white cells up faster.  And they've

10  actually revolutionized the way we are able to care for

11  patients because you just can imagine 20 years ago where this

12  thing did not exist.  So patients could go without white cells

13  for 20, 30 days, and there was a lot of problems, as you can

14  imagine.

15     The only -- there are several side effects of this

16  Neupogen shots, and what I have counseled my patients about

17  always is bone pain.  Bone pain is the major side effect of

18  these shots, just by virtue of the way they work because they

19  work on getting the bone marrow to stimulate the production of

20  the white cells, just common sense.  But I always told my

21  patients, You are going to get bone pain.  It is just the

22  degree of bone pain is very variable.

23     I have had patients who have just, you know, low-grade

24  bone pain, which is not a problem.  And I have had patients who

25  have severe bone pain where they have to go to the emergency

1  room because you get pain, you don't know where it is coming

2  from.

3      Most of the bone pain happens in the rib cage, lower back

4  and pelvic area.  The reason it happens in these locations is

5  because these are the areas where the bone marrow is usually

6  producing all of the white cells.  In fact, when patients get a

7  bone marrow biopsy, we do it from the hip bone because that's

8  where there is a lot of marrow.

9      That's why oftentimes when patients have bone pain because

10 of the Neupogen, it happens in the hips and the pelvic area,

11 and sometimes in the rib cage.  And as a physician when you are

12 getting a phone call at midnight sometimes, I'm having chest

13 pain, you have to make a decision, Is this really chest pain

14 that could be cardiac or is it from the shot that you just got

15 yesterday or the day before.  Sometimes it is not easy, and you

16 end up saying, I really can't tell you, you have to go to the

17 emergency room.  Or sometimes the pain is so severe that you

18 actually have to go to the emergency room.

19     So the majority of patients who receive these shots will

20 get bone pain.  The severity of the bone pain varies.  And

21 Mr. Hardeman is in the minority of patients, in my opinion,

22 that experience severe bone pain.  That is not what you would

23 commonly see, but he did have severe bone pain; and I believe

24 he had a lot of communication with his physician about the bone

25 pain that he experienced.

1   **Q.**   So you testified that Mr. Hardeman had a Neupogen shot

2   after the second R-CHOP treatment.   Did he only have one

3   Neupogen shot?

4   **A.**   No.   So the Neupogen shot are not usually given once.   It

5   is usually multiple days.   And initially he received a lower

6   dose.   It is usually the two doses that we give with Neupogen,

7   either 300 micrograms or 480.   And initially I believe he got

8   the Neupogen for only three days; and then after that, they had

9   to increase the dose of the Neupogen and increase the frequency

10  that he got for seven days at the higher dose.   And part of

11  that is because it looks like he needed that much of the

12  Neupogen to make sure his counts stay up.

13       Now, interestingly, he also had a dose reduction in the

14  R-CHOP.   So as patients go through the treatment with the

15  chemotherapy, if the physician believes that you are not

16  tolerating the treatment to the degree that you think you

17  should tolerate the therapy, you might have to reduce the dose.

18       Now, just to explain to you, the doses of chemotherapy is

19  usually based today -- in 2019, which I think might change in

20  2025 -- but for today is based on the body weight and the body

21  height.   So what I would get would be different than what

22  Mr. Hardeman gets because I have a different height and weight

23  than he does.   So that's how the chemotherapy is delivered.

24       So if the chemotherapy causes more side effects than you

25  believe as the oncologist you might be able to tolerate, then

1  you reduce the dose because you want to try to tailor things to

2  the -- to the extent that you believe your patient can

3  tolerate.

4      Mr. Hardeman did have a dose reduction of the chemotherapy

5  that he was receiving.  I'm just not remembering if it was

6  after the third cycle or fourth cycle, but I'm 100 percent

7  certain that he did have a dose reduction of the chemotherapy

8  because of the side effects that he encountered.

9  **Q.**  All right.  And, Dr. Nabhan, does R-CHOP ever cause chemo

10 brain?

11 **A.**  You know, that's a tough question to answer because chemo

12 brain in general is always in my experience a diagnosis of

13 exclusion.  And what chemo brain is is just simply a fact that

14 you may have a little bit of forgetfulness, maybe confusion at

15 times, maybe not able to remember certain things.  And there

16 are some reports that you could see that more in patients who

17 are receiving chemotherapy -- not necessarily just R-CHOP --

18 any type of chemotherapy could cause that, you know, the type

19 of confusion, maybe the type of a little bit of forgetfulness

20 and so forth.

21     I think it is a challenging diagnosis for an oncologist to

22 know sometimes how much of this is really from the chemotherapy

23 versus -- I don't know, I forgot where I put my keys yesterday

24 because I simply forgot where I put my keys -- which, by the

25 way, happens a lot in my household -- but the point is

NABHAN - DIRECT / WAGSTAFF

 1   sometimes it is very difficult.  So I think -- I hope you

 2   appreciate the challenge in deciding how much of this is chemo

 3   brain or not.

 4        So I oftentimes rely on the caregiver and either the wife

 5   or the friend or whoever is caring for the patient to give some

 6   clues as to whether this is something, a change in pattern.

 7   You know, you turn your head and you talk to the caregiver or

 8   the person who is with the patient in the room, and you say, Is

 9   this really a change from what you have noticed over the past

10   20 years or did he always forget how to get to the grocery

11   store?

12        I mean it's always -- it is challenging.  So the short

13   answer to this is, you know, chemotherapy is a problem.  It

14   causes a lot of side effects.  Chemo brain is one of them.  I

15   think it is a difficult thing to diagnose by us oncologists.  I

16   tend to believe it is a diagnosis of exclusion.  I do often

17   just tell patients and families that this could happen, but you

18   know your loved one more than anybody else.  If you see any

19   change in pattern and behavior, please let me know and let's

20   talk about it.  So I have had patients who have had R-CHOP and

21   never had chemo brain or anything like that, and I had patients

22   who did.  So you can't regionalize that.

23   Q.  All right.  And do --

24        THE COURT:  Ms. Wagstaff, can I interrupt and just ask

25   you roughly how long you think you have left?  I'm trying to

1  decide whether to take a lunch break now or --

2        MS. WAGSTAFF:  Ten minutes.  But we can take one now

3  because he will probably be crossed after lunch.

4        THE COURT:  Why don't we go ahead and just do the ten

5  minutes, and then take our lunch break and we will go to 1:00

6  for lunch.

7  BY MS. WAGSTAFF

8  Q.   All right.  Dr. Nabhan, in your experience, do patients

9  who go through R-CHOP suffer from weight loss or loss of

10 appetite?

11 A.   They do suffer from loss of appetite.  Weight loss is an

12 interesting question because, remember, the prednisone can

13 cause puffiness and sometimes weight gain, despite the fact

14 that the patients may lose the appetite and they may not

15 necessarily want to eat.  So they may have some weight gain

16 because of the puffiness and the swelling, which is not really

17 a welcome weight gain, despite the loss of appetite.

18       So I have seen the spectrum.  Some people may lose weight

19 just because of the appetite, despite the swelling, because the

20 loss of appetite and the lack of desire to eat might be so

21 profound that it overcomes the swelling you see and the

22 puffiness of the prednisone.  And I have seen some weight gain

23 from the prednisone despite the loss of appetite.

24 Q.   So would it be fair to say weight fluctuates --

25 A.   It does fluctuate.  I'm trying to explain as to why

1    because you have the prednisone that causes some swelling and

2    puffiness.  And the taste buds usually -- the chemotherapy

3    affects the taste buds.  So oftentimes you don't necessarily

4    like to eat what you used to eat.  And my trick for patients

5    used to be always, even if you never liked salty foods, maybe

6    try to put a little bit of salt or pepper; try to put some

7    ketchup or mustard.  Just try -- or barbecue sauce.  Just try

8    various things because maybe things will taste a little bit

9    better for you.  But the weight is very difficult because you

10   have the prednisone and the appetite.

11   **Q.**   All right.  And can you tell the ladies and gentlemen of

12   the jury what is happening with Mr. Hardeman's non-Hodgkin's

13   lymphoma today?

14   **A.**   Well, the good news is that he does not currently have

15   evidence of DLBCL or non-Hodgkin's lymphoma.  So Mr. Hardeman

16   is currently in remission, which is very good news.  And it

17   demonstrates a good prognosis -- very good prognosis for his

18   current disease.

19       It is my understanding that he is going to have a scan, a

20   CAT scan, at some point in the next month or so.  I have not

21   seen that.  The last CAT scan that he had done did not show any

22   evidence of recurrence.  So today he doesn't have any evidence

23   of DLBCL.

24   **Q.**   All right.  And what is your opinion on his future

25   prognosis?

A.   Well, his prognosis from the DLBCL is very good.  It is my opinion that it is extremely unlikely that his DLBCL is going to recur or return because it's close to four years; and a lot of times when you hit the five-year mark, it is really even better.  So I believe the prognosis for his DLBCL, which is the disease that he was diagnosed with, is good.  It is extremely unlikely in my opinion that this will recur.

I do believe that it is very important that Mr. Hardeman is watched and monitored and followed up because there are certain toxicities that occur from the chemotherapy that he received that are important to recognize and identify by his oncologist, and he is at increased risk of other types of lymphomas.

His original lymphoma is unlikely to recur, but many patients who develop one type of lymphoma, they could get another type of lymphoma.  So that's why he should be monitored.

And there is also the increased risk of other types of cancers -- not necessarily the DLBCL -- such as acute leukemia and myelodysplasia.  From the chemotherapy that he received, which, like I told you, it does affect the DNA -- causes some DNA damage and DNA problems, he could be -- he is at increased risk of developing other types of cancer, specifically acute leukemia and myelodysplasia.  And that's why really all patients with non-Hodgkin's lymphoma, DLBCL specifically, are

1    followed lifelong.

2        So in my practice I have seen patients like Mr. Hardeman

3    twice a year -- about two times a year, every six months, where

4    we do physical exam, blood work.  We talk about what is going

5    on.  And make a decision if imaging is needed, not needed, and

6    make any determination as to what else needs to be done.  But

7    the follow-up is really lifelong to make sure that no other

8    types of side effects or toxicities emerge down the road.

9    **Q.**   So I tried to summarize what you said.  Mr. Hardeman is at

10   an increased risk of other cancers from DNA damage from

11   chemotherapy.  Is that a fair representation of what you said?

12   **A.**   Yes.

13   **Q.**   Okay.  And that is because what you testified to earlier

14   was that because the CHOP attacks normal cells; is that fair?

15   **A.**   Right.  Many chemo -- I mean, pretty much any chemotherapy

16   that is not targeted attacks normal cells.  And CHOP -- short

17   of the Rituxan -- does attack normal cells, causes DNA damage.

18   So he is at increased risk compared to the general population

19   as to developing other types of cancers.

20   **Q.**   All right.  And you testified that it is unlikely that his

21   DLBCL will return given that he is in remission, but it is not

22   impossible; is that fair?

23   **A.**   My practice was all lymphoma -- so I have seen it all.  I

24   mean, it's really extremely unlikely that this will -- the

25   DLBCL will recur.

1          Have I seen that in my practice?  I have.

2          But you have to realize that my practice was skewed

3     because I have seen all kinds of lymphomas, even the esoteric

4     type of lymphomas that you see once or twice in a lifetime, as

5     well as the rare situations.  So the odds are DLBCL that

6     Mr. Hardeman has is not going to recur, which is very good news

7     for him.  But this does not mean it is impossible.

8     **Q.**    All right.  And based on your opinion and as part of your

9     prognosis opinion you are giving the jury, do you believe that

10    Mr. Hardeman will need to be followed by -- for the rest of his

11    life for his DLBCL by a medical professional?

12    **A.**    He needs to be followed for the rest of his life for the

13    possibility of emerging problems from the treatment that he

14    received for DLBCL as well as other things that might emerge

15    from prior therapies.

16         So, again, the National Comprehensive Cancer Network

17    recommendations would say that patients with DLBCL need to be

18    followed lifelong.  Some people would say once a year after

19    five years is sufficient.

20         In my practice I did twice a year.  Part of the reason I

21    also want to do that is because sometimes new information come

22    up with -- about diseases and so forth, and I want to make sure

23    I continue to educate patients.

24         So after five years, some physicians will see patients

25    once a year.  Some will see them twice a year.  But it is

1   recommended that patients are followed lifelong for their

2   disease.

3   **Q.**   All right.   Thank you, Dr. Nabhan.

4      Are the opinions you gave today given to a reasonable

5   degree of medical certainty?

6   **A.**   Yes.

7         **MS. WAGSTAFF:**   Thank you.   Pass the witness.

8         **THE COURT:**   Okay.   Is there going to be any cross

9   after lunch?

10        **MS. MATTHEWS JOHNSON:**   We have no questions, Doctor.

11        **THE COURT:**   Okay.   Great.

12     Well, in that case we will go ahead and take our lunch

13   break.   You-all are done with Dr. Nabhan.   So we will take our

14   lunch break.   We will resume at 1:00 o'clock.   Please remember

15   all my admonitions.   Thank you.

16     (Proceedings were heard out of presence of the jury:)

17        **THE COURT:**   Okay.   So reminder to everybody in the

18   courtroom that everybody is required to remain in the courtroom

19   for five minutes while the jury uses the elevators and all

20   that.   And why don't we -- why don't we return at about ten

21   minutes to 1:00, and I'm going to go -- I'm going to sit over

22   lunch and look through the Portier testimony.   Give some more

23   thought to the Rowland issue, and I will give you a final

24   answer on the Rowland issue after lunch.

25        **MS. WAGSTAFF:**   Thank you, Your Honor.

1          **THE COURT:**  Okay.

2          **MR. STEKLOFF:**  Thank you.

3          (Luncheon recess was taken at 12:09 p.m.)

4     **<u>Afternoon Session</u>**                              **<u>12:53 p.m.</u>**

5        (Proceedings were heard out of the presence of the jury:)

6          **THE COURT:**  Okay.  Regarding the Rowland exchange, I

7     think it's a close question, but I think that the risk of

8     sending us off into an even less relevant series of

9     speculations and the potential prejudicial effect without

10    offering fuller explanation is too great so I'm going to

11    exclude it under Rule 403.

12        I have a question about the Portier testimony, which I've

13    been through and most of which is admissible, but in particular

14    I had -- I was a little confused about a couple of the

15    plaintiff's objections to a couple of the counterdesignations.

16        So give me a second to pull those up.  I shouldn't say

17    counterdesignations.  I should say Monsanto's affirmative

18    designations.

19                      (Pause in proceedings.)

20          **THE COURT:**  Okay.  So all of this stuff about EPA,

21    there's -- well, let me first get to the stuff about IARC.

22        I'm trying to find the testimony from Dr. Portier when

23    he's asked, I think it's on page 847 -- let me see...

24                      (Pause in proceedings.)

25          **THE COURT:**  The exchange I'm thinking of is the

1  exchange where Portier is asked by Monsanto's counsel:  Isn't

2  it true that before the IARC made its classification, nobody

3  really thought that glyphosate caused cancer?  I'm

4  paraphrasing, but it was something like that.  Do you-all

5  remember where that is?

6        **MR. STEKLOFF:**  I just saw it, Your Honor.  I think

7  it's at -- I think it's earlier.  It's -- there's a reference

8  to IARC on page 821, and then I think what you are talking

9  about is at 822:22 through 823:3.

10        **THE COURT:**  Yeah.

11                   (Pause in proceedings.)

12        **THE COURT:**  Okay.  So, yeah.  So the question -- so,

13  for example, on the bottom of 822, it says (reading):

14          "I think that what you have testified, but tell me if

15      you agree with this, is in the case of glyphosate, no one

16      really thought it was carcinogenic until after the IARC

17      review; is that accurate?"

18      And Dr. Portier responds (reading):

19          "I would say that's probably accurate."

20      And, you know, I don't know what he meant when he said

21  "nobody."  I assume he was referring to the various other

22  agencies like the EPA, but I guess the question is -- so you've

23  objected to that, I believe.

24        **MR. WOOL:**  Correct.

25        **THE COURT:**  And your objection is foundation, 403,

1  calls for speculation.  So what -- I mean, so I understand the

2  foundation and the calls for speculation objections, but what's

3  the 403 objection to that?

4       **MR. WOOL:**  Well, it would be prejudicial because it

5  gives the impression that there is a kind of scientific

6  consensus out there when in reality it's really just a bunch of

7  scientists haven't taken up the question necessarily.

8       **THE COURT:**  But what's prejudicial is your expert's

9  response to the question.  I mean --

10      **MR. WOOL:**  Well, but the question --

11      **THE COURT:**  If he had said "no," you wouldn't -- if he

12  would have said "That's not accurate," you wouldn't be

13  referring to it as prejudicial.  It's only because your expert

14  gave an answer that you don't like.

15      **MR. WOOL:**  Well, I think that the question and the

16  answer even necessarily kind of invites, you know, a conclusion

17  that I don't know that his answer intended to provide.

18      And, you know, when you read the answer along with the

19  question, you know, sitting here right now, I don't know that

20  Monsanto could even say what he means by, you know, nobody was

21  saying that glyphosate was carcinogenic.

22      **THE COURT:**  Well, I assume that it's, you know, in the

23  context of this discussion of, you know, the EPA regulating

24  glyphosate, and so I assume he's kind of referring to the EPA

25  and other government agencies --

PROCEEDINGS

1          MR. WOOL:  Well, I think --

2          THE COURT:  -- in the United States.

3          MR. WOOL:  -- the problem is the question is not did

4    any regulatory agency classify glyphosate as being

5    carcinogenic, and the question sort of asks about the sort of

6    it could be inferred as the general scientific consensus as

7    though there was sort of, you know, a bedrock opinion out there

8    when there was not.

9          THE COURT:  Well, why isn't the response to this that

10   you can just say, "Hey, look, you know" -- I don't know if

11   you've adduced evidence of this yet, and I don't know -- I

12   don't know -- it's not clear to me that you plan to, but

13   assuming there's evidence to support it, why couldn't you say

14   that, you know, the IARC's conclusion was based on all this

15   stuff from all these studies that previously existed, and that

16   those authors concluded that there was an association between

17   glyphosate and cancer?

18          MR. WOOL:  Well, I think, first, we kind of tried to

19   limit, you know, the IARC evidence; but, you know, sort of --

20          THE COURT:  But why?  Why did you try to limit the

21   IARC evidence?

22          MR. WOOL:  Well, I think --

23          THE COURT:  I mean, I just went back and read my

24   *motion in limine* rulings, and one of the things I made clear is

25   that, you know, the IARC evidence could be revisited at

 1   Phase II, but you haven't -- I mean, you know, there's never

 2   been a ruling that says that anything anybody did post-2012 is

 3   inadmissible.

 4           MR. WOOL:  Right.

 5           THE COURT:  There's only been a ruling that Monsanto's

 6   post-2012 conduct is inadmissible -- right? -- and that we have

 7   to inquire into, you know, what Monsanto knew or could have

 8   known at the time that Mr. Hardeman was using Roundup.

 9        So, you know, I don't know.  I guess I'm a little confused

10   by your objection to that.  It seems like you have a good

11   response to that.  I'm not sure you put in evidence that could

12   adequately respond to that; but to the extent you're suggesting

13   it's because of some -- because of the pretrial rulings, tell

14   me what I'm missing.  I mean, I don't think anything in those

15   rulings precluded you from doing that if you wanted to.

16           MR. WOOL:  I haven't looked at the ruling just now,

17   but sort of generally I think there was sort of a practical

18   consideration, which was that to kind of go into the whole IARC

19   story is just going to kind of take the jury down a sideshow

20   and waste some time when they already know what the decision

21   is.

22           THE COURT:  Okay.

23           MR. WOOL:  And so that was sort of the consideration.

24   I mean, if we are permitted to kind of get into the IARC story,

25   I mean, perhaps we could come up with a very concise

1  designation from Portier or somebody else that would address

2  this in, say, five minutes or less.

3      **THE COURT:**  Well, I'm just trying to understand what

4  your objection is to this passage.

5      **MR. WOOL:**  Right.

6      **THE COURT:**  I understand it's probably not a good

7  passage for you because it's your expert making this statement,

8  but I guess I'm -- you made reference to the fact that, you

9  know, the evidence on IARC is limited, but I think that's

10 largely a product in Phase II of your decision to put in the

11 evidence that you've put in.

12     **MR. WOOL:**  Right.  Well, like I said before, I think

13 it is mostly prejudicial to the extent that it's vague and

14 invites the jury to speculate about, you know, what it is when

15 he says that nobody's come to this conclusion or consensus.

16     **THE COURT:**  Okay.  I mean, I assume that you could

17 have also asked him to explain what he meant by that and

18 offered testimony about that; right?

19     **MR. WOOL:**  Yes.  I was not in Australia with

20 Mr. Wisner, but he could have.

21     **THE COURT:**  I mean, the collective "you."

22     **MR. WOOL:**  Yes.

23     **THE COURT:**  Okay.

24     All right.  Okay.  I understand that.  I don't need to

25 hear argument from you on that.  I think I'll go back and take

PROCEEDINGS

 1    one more run through the Portier testimony, and then I'll issue

 2    an order on that.  There are a couple things -- at least a

 3    couple things that need to be excluded, but for the most part

 4    it's going to come in.

 5         MR. STEKLOFF:  I do think, not relating to this or to

 6    Mr. Rowland, Your Honor, if it's okay, maybe by Sunday at noon

 7    we would like -- I think now, given we're -- based on the

 8    comments you gave before lunch in the context of Mr. Rowland

 9    but then also what we heard from plaintiff's counsel in opening

10    and the reading of the RFAs, which don't have a time limitation

11    on them, we do think that some limited evidence of post-2012

12    regulatory approvals is admissible.  So I think by Sunday by

13    noon we will probably propose limited portions of Dr. Portier

14    to address that issue.

15         THE COURT:  Well, I mean, let's -- the jury already

16    knows from Phase I; right?  I mean, you can use your Phase I

17    evidence for Phase II, and I have a draft instruction to the

18    jury on that that, you know, you can consider all the Phase I

19    evidence, you know, and you'll have a chance to look at it.

20         By the way, I will file the jury instructions on Sunday,

21    and you-all should be prepared to have the charging conference

22    on Monday afternoon after the trial day.

23         MS. MOORE:  Okay.

24         THE COURT:  But, you know, the jury already knows that

25    the EPA hasn't done anything to require a warning or to ban

PROCEEDINGS

```
 1    glyphosate.  The jury knows what the IARC has done.  The jury
 2    knows, I think, through the Portier testimony where Europe is
 3    on the matter.  So I think it's going to be a question of how
 4    much more is necessary in light of the evidence that's already
 5    come in on that.
 6        MR. STEKLOFF:  And I'm happy -- that's a fair point.
 7    I'm happy to factor that in now knowing I can affirmatively use
 8    the 2016 evidence that was admitted through Dr. Portier in
 9    Phase I.  That might change the parameters a little bit.
10        I'm not sure --
11        THE COURT:  And, again, there will be a limiting
12    instruction, which I'm drafting, that, you know, makes clear
13    what the jury can use the post-2012 stuff for and what it
14    can't.
15        MR. STEKLOFF:  Right.  And I guess the only thing I
16    would say, and I need to go back and look at the testimony, it
17    might not even be Dr. Portier.  It might be Dr. Farmer, for
18    example.  I'm not sure the jury has heard, even based on what
19    the evidence was with Dr. Portier about 2016, which was limited
20    to the European response and then EPA was sort of thrown in
21    without a document in 2016 as a direct response to
22    Dr. Portier's letters, I'm not sure the jury has heard that up
23    until today, you know, March 2019, or whenever the depositions
24    were taken, that no regulatory body in the world, including the
25    EPA or otherwise, has taken an action to find carcinogenicity
```

1  or require some sort of warning on the label.  I don't think

2  that that evidence has come in even through what was admitted

3  through Dr. Portier.

4       THE COURT:  I think it came pretty close to that, but

5  obviously I haven't sifted through the transcripts.

6       MR. STEKLOFF:  We'll go back and look and factor it

7  into anything we may submit.  We will submit it Sunday by noon

8  if we think there are limited designations that we think should

9  come in based on the discussions we've been having.

10       MS. MOORE:  And, Your Honor, obviously we'd object to

11  further evidence of that.  I think that was covered in Phase I.

12  If they're going to start talking about what's happening in

13  2016 with regulatory agencies, then I think that does open the

14  door for that they spent $17 million trying to debunk one of

15  the organizations.  I think that's fair.

16       So we're starting to try to expand things now.  We have

17  been very diligent about keeping, you know, in line with your

18  order about IARC outcry; but I do think if they start going

19  down that path, then their response, if they're going to stand

20  up here and say "No regulatory agency, no one in the world says

21  this" when we know IARC does and that what they did in response

22  to IARC is --

23       THE COURT:  Yeah.  I mean, my only comment right now

24  is I think this might be very much dancing on -- you know,

25  dancing on the head of a pin because the jury knows from the

 1   evidence that has come in, the jury knows that the IARC, a

 2   respected international scientific body, has concluded that

 3   it's a possible carcinogen and that the EPA and the European

 4   regulators have concluded that it's not.

 5          MS. MOORE:  Right.

 6          THE COURT:  I mean, the jury already knows that.

 7          MS. MOORE:  That's correct.

 8          THE COURT:  And so it does -- so it's not clear to me

 9   how -- you know, this discussion that we're having, it seems

10   like you-all might be assuming that the jury doesn't know that,

11   and so, you know, I don't know.  Anyway.

12          MR. STEKLOFF:  I think a little more for me was not

13   what they know or remember from Phase I, but in part what we

14   could argue; and now I think I hear what we can argue so we'll

15   go back, I mean, of course, within all rules set forth and

16   whatever the final instructions are, but I think now hearing

17   this conversation is enlightening and helpful and we'll factor

18   it in.

19          THE COURT:  Okay.

20          MS. MOORE:  Your Honor, before I bring the jury in,

21   Mr. Stekloff and I discussed, we have several exhibits from

22   Dr. Farmer's deposition that I want to move into evidence.  I

23   think Ms. Melen wanted us to discuss that on Monday, but I

24   wanted to put it on the record that we do have a long list of

25   exhibits with Dr. Farmer, and I think they do as well, and I

PROCEEDINGS

```
 1   just want to preserve the right to enter that into evidence.
 2         THE COURT:  That's fine.  And are there going to be
 3   any objections to either one or you need -- you're not sure
 4   yet?
 5         MR. STEKLOFF:  I think we need to meet and confer.  I
 6   think if we can set aside even just ten minutes on the record
 7   sometime on Monday to address this, there are pending things
 8   even from Reeves.
 9         THE COURT:  Okay.
10         MS. MOORE:  It won't take very long, but just to get
11   the record clear on the exhibits I think from Martens, Reeves,
12   and Farmer, that would be great, and we can do that on Monday.
13         MR. STEKLOFF:  Agreed, Your Honor.
14         THE COURT:  Okay.
15         MS. MOORE:  And then, Your Honor, before we call our
16   next witness, we have one more RFA to read to the jury.
17         THE COURT:  Okay.  Sounds good.
18      And who's the next witness going to be?
19         MS. MOORE:  Mr. Hardeman.
20         THE COURT:  Okay.  Very good.
21      You can go ahead and bring them in.
22      And either at the next break or after we're done, let's
23   have a talk about time.
24         MS. MOORE:  Okay.  Great.  Thank you, Your Honor.
25         (Proceedings were heard in the presence of the jury:)
```

 1       **THE COURT:**  All right.  Welcome back.  Sorry we kept

 2  you a little bit longer than anticipated back there, but we're

 3  ready to resume.

 4       I understand you have one more admission to read, and then

 5  you'll proceed with your next witness.

 6       **MS. MOORE:**  Yes, Your Honor.  Thank you very much.

 7       This is Plaintiff's Request for Admission Number 13.  It

 8  is:

 9       Admit that Monsanto has never warned any consumers that

10  glyphosate-containing products can cause non-Hodgkin's

11  lymphoma.

12       Monsanto's response:  Admitted.  Monsanto denies that its

13  glyphosate-containing products can cause non-Hodgkin's

14  lymphoma.

15       Your Honor, the plaintiff at this time calls Mr. Hardeman

16  to the stand.

17       **THE COURT:**  All right.

18       **THE CLERK:**  I'll just ask you to stand there and raise

19  your right hand.

20                          **EDWIN HARDEMAN**,

21  called as a witness for the Plaintiff, having been duly sworn,

22  testified as follows:

23       **THE WITNESS:**  I do.

24       **THE CLERK:**  Please have a seat.  Get comfortable.

25       I'd ask you to state your name and spell your last name

1    for the record.

2            **THE WITNESS:**  Yes.  My first name is Edwin, E-D-W-I-N,

3    and my last name is Hardeman, H-A-R-D-E-M-A-N.

4                        **DIRECT EXAMINATION**

5    **BY MS. MOORE:**

6    **Q.**   Good afternoon, Mr. Hardeman.

7    **A.**   Good morning, Ms. Moore.  Good morning, jury.

8    **Q.**   And the jury has heard from you I guess it's been a couple

9    weeks now ago, and I just wanted to kind of start off this

10   afternoon with tell the jury where you're from, where you grew

11   up.

12   **A.**   Yes.  I grew up actually in San Francisco and attended

13   some of the local Catholic schools and Catholic high schools

14   and public schools.

15   **Q.**   Great.

16       I want to go back to when you bought Roundup, and we're

17   not going to go through your usage of Roundup.  They've heard

18   that.  But I want to ask you, when you bought Roundup during

19   those 26 or so years, tell the jury just simply why did you buy

20   Roundup.

21   **A.**   To kill weeds and other growth on my properties.

22   **Q.**   And when you bought Roundup, Mr. Hardeman, did you expect

23   that you would get cancer from using Roundup?

24   **A.**   No, I never did.

25   **Q.**   And at any point during those 26 years or so of using

1    Roundup, did you think that by using Roundup, it would be

2    dangerous?

3    **A.**   No.  I thought it was safe.

4    **Q.**   Why did you think it was safe?

5    **A.**   You buy it right off the shelf, going to one of the local

6    hardware stores and buy it.

7    **Q.**   Did you read the label before you bought it the first

8    time?

9    **A.**   Absolutely.  I read it and I had to familiarize myself

10   with the instructions in how to -- what the mixing ratios were.

11   **Q.**   Now, you said "absolutely."  You sounded pretty certain

12   about that.  Tell the jury why you are certain that you read

13   the label before you bought it the first time.

14   **A.**   Because I looked at the bottle.  It had a little acetate

15   data sheet on it, you peel it back, and you read how to -- how

16   to mix it, how much to put in per gallon of water.

17   **Q.**   Did you follow all of the instructions on the label?

18   **A.**   Yes, I did.

19   **Q.**   And did you read the label again throughout those 26 or so

20   years that you used Roundup?

21   **A.**   Yeah, I read it off and on several times.

22   **Q.**   At any point when you read the label during those 26 or so

23   years, did you see anything on the label or anything on the

24   bottle of Roundup about using Roundup could cause cancer?

25   **A.**   No.  No, I didn't.

1   Q.   Did you ever read on the label on the bottle of Roundup in

2   those 26 or so years any warning that using Roundup could cause

3   cancer?

4   A.   No.  I never saw anything like that.

5   Q.   Now, Mr. Hardeman, if the label on the bottle of Roundup

6   at any point in time when you were using it had a warning on it

7   that if you use Roundup, it could cause cancer, tell the ladies

8   and gentlemen of the jury what you would have done.

9   A.   I wouldn't -- I wouldn't have used it.  I wouldn't have

10  bought it.  I'd let the weeds grow.

11  Q.   Now, the jury heard about your properties and how you had

12  this poison oak problem; right?

13  A.   Yeah.

14  Q.   Okay.  So didn't you need to get rid of the poison oak?

15  A.   I did, but I didn't want to get cancer doing it.

16  Q.   So if Monsanto had warned on its bottle or its label that

17  using Roundup could cause cancer, what would you have done?

18  A.   I wouldn't have used it.

19  Q.   When did you file this lawsuit?

20  A.   I believe it was in February of 2016.

21  Q.   I want to switch gears a little bit, and I want to talk

22  about the last few years with you having non-Hodgkin's

23  lymphoma.

24       And the jury heard about when you discovered the swollen

25  lymph node on Christmas morning.  And what year was that?

1   **A.**   That was Christmas morning 2014.

2   **Q.**   Okay.  And can you tell the jury a little bit about what

3   that following month was like once you woke up Christmas

4   morning 2014?

5   **A.**   Well, I was very concerned about it, and I immediately

6   decided to go to Kaiser the next day, December 26.  And I spoke

7   with the on-call physician and he looked at it and he said,

8   "You know, it could be a swollen lymph node."  So he suggested

9   that I wait for 30 days.

10      My family practitioner was on vacation so I just went

11   about my business and decided to wait.  Then my doctor,

12   Dr. Turk, came back in January, early January.  So I e-mailed

13   him and said, "You know, I was in.  I'm very concerned about

14   this.  What should I do?"  And he said, "You know, why don't

15   you just give it some more time."

16      So I waited until January 28th, and I made an appointment

17   and went in to see him, and he -- immediately he scheduled a

18   blood test for me that morning, and then he sent me to

19   Dr. Turley's office.  He's a head-and-neck surgeon.  So I went

20   to see him in the afternoon, and he took out a big needle and

21   did a needle biopsy I guess they call it.  And we had to wait

22   for the results.

23   **Q.**   And let me stop you there.

24      So in this month of January when you're monitoring the

25   swollen lymph node, tell the ladies and gentlemen of the jury

1  what you were thinking, what that time period was like for you.

2  A.   I was -- I didn't know what to think immediately.   I was

3  hoping it was going to be a swollen lymph node.   I never

4  thought it would be cancer, and -- but a little voice inside of

5  me was, "You know, it's not going down.   This is kind of odd."

6       So I -- you know, I went ahead and, as I said, contacted

7  Dr. Turk and we got a needle biopsy.   And then he e-mailed me

8  on January 31st, and said he'd just got an e-mail from

9  Dr. Turley and that the biopsy was inconclusive.   It was

10  necrotic and the cells were dead.   So he scheduled a --

11  Dr. Turley scheduled a CAT scan because he wanted to look at it

12  before he was going to take an open biopsy and take a tissue

13  sample.

14       So I went in on February 3rd and got the CAT scan.   The

15  next day I met with Dr. Turley, and he did the tissue biopsy.

16  The core biopsy they call it I think.

17  Q.   And so why did you have to have a CAT scan before the

18  second biopsy?

19  A.   Because he wanted to -- he wanted to look at the lump that

20  was sticking out of the side of my neck to make sure that when

21  he went in for the core biopsy, he wasn't going to hit some

22  nerves or something else or cause some other problem, so he

23  could target the area that he could get the sample from.

24  Q.   And then did you have a second biopsy by Dr. Turley?

25  A.   Yes, I did.

**HARDEMAN - DIRECT / MOORE**

1  **Q.**   Okay.  And then tell the ladies and gentlemen of the jury

2  what that process was like and how long you had to wait to get

3  those results.

4  **A.**   Well, we -- that was agonizing, and we had to wait.  It

5  was very slow.  And I e-mailed him and asked him, "Hey, how's

6  it going?  Do you have any results yet?"

7       And it wasn't until February 14th, that he -- it was on a

8  Saturday, and the phone rang and my wife Mary was with me, we

9  put it on the speakerphone, and Dr. Turley said, "I'm sorry to

10  inform you that you have cancer."  And we were both shocked.  I

11  mean, just, like, "What?"  I couldn't believe this.  Cancer.

12       And he went on to describe to me what it was, and it was a

13  non-Hodgkin's lymphoma.  He gave me the subtype, and he sent me

14  a link to a lymphoma site so I could educate myself on the

15  cancer.

16       And he said, "I'm going to -- I'm going to refer you to

17  the Oncology Department, Dr. Ye, and he will set up an

18  appointment for you to come in and he will discuss what he's

19  going to do from here."

20       So I --

21  **Q.**   And let me stop you right there.

22  **A.**   Sure.

23  **Q.**   Did you know what non-Hodgkin's lymphoma was --

24  **A.**   No.

25  **Q.**   -- in February 2015?

1   **A.**   No.  I never -- no.  I didn't, no.

2   **Q.**   And you said that Dr. Turley was going to set you up an

3   appointment with Dr. Ye.  How soon after you got that call on

4   February 14th did that happen?

5   **A.**   Well, I -- I believe I -- you know, things continued to

6   happen in February.  I met with Dr. Ye I think it was on -- he

7   wanted to schedule a PET scan for me so that they could

8   evaluate the extent of the cancer.

9         And so I went in for that, and then he took some -- he

10  scheduled some blood tests so I took those.  I met with him on

11  February 23rd, and my wife and I met with him in his office at

12  Kaiser, and he said, "It looks -- you know, looking at the PET

13  scan, you have a Stage 3.  You have the non-Hodgkin's lymphoma

14  on both sides of your diagram."  So I had it in my abdomen on

15  both sides and sticking out in my neck.

16  **Q.**   When he told you you had Stage 3 cancer, what did you

17  think?

18  **A.**   I was, like, I'm just -- I'm just -- you know, I'm in a

19  daze.  You know, just one thing after the other.  I can't -- I

20  can't believe this is happening to me, you know.

21        So he says, "Well, I'm going to schedule -- we're going

22  to" -- he talked about the chemotherapy, what kind of

23  chemotherapy I was going to get and the R-CHOP and explained a

24  little bit about it.

25        And he said, "I'm going to have to do a bone marrow biopsy

1    to make sure it didn't get into your bloodstream."  And so we

2    did that that day.  You lay on your stomach, and he went into

3    my hip and took out -- got the sample that he needed and he was

4    going to send that out.

5        Then the next day he explained the process of what was

6    going to happen.  And then he took me to the chemo lab, you

7    know, which was --

8    Q.   Had you ever been to a chemo lab before?

9    A.   No.  No.  I'd never seen one before, no.

10   Q.   Can you tell the jury what the chemo lab was like?

11   A.   Well, it's a -- it's located in Kaiser.  It's not far from

12   the Oncology Department where his office was, and they have a

13   workstation for the nurses and then all these chairs are lined

14   up, you know, for all the patients.  There's 10 or 15 chairs.

15   And they, you know, administer -- put the patients in there,

16   and they administer the different medications and drugs and,

17   you know, put them on those pulleys and hook them up to an IV.

18       And they try to create an atmosphere that you can be

19   comfortable, and they have a fish tank so you can watch, you

20   know, the fish and try not to think about this.

21       But it -- they're wonderful people and make you feel like

22   you're part of a family, you know.  So that was the good part

23   about it.

24   Q.   The jury heard this morning from Dr. Nabhan that you had

25   treatment, you had chemotherapy.

1   **A.**   Yes.

2   **Q.**   And he called it R-CHOP.  Are you familiar with that?

3   **A.**   Yes.

4   **Q.**   Okay.

5   **A.**   That was the chemo I had.

6   **Q.**   And so tell the jury a little bit about what your

7   understanding of how the chemo, the R-CHOP, was working and how

8   often did you have to go through that?

9   **A.**   Well, it consisted of some oral medication, which was the

10  prednisone, 100 milligrams; and --

11  **Q.**   Does that mean you had to take a pill of prednisone?

12  **A.**   Yeah.  You take that prior to your appointment.  The

13  chemotherapy was always administered on a Tuesday, and they

14  were 21 days apart.  I had an appointment with Dr. Ye every

15  Monday before the treatment so he could sign off and make sure

16  that you -- you know, you were physically able to go through

17  the next treatment.

18      So we started off with that and -- excuse me -- and I got

19  my first chemo treatment on February 24th and started my

20  appointment at 11:30 but it was delayed, so that was agonizing,

21  another hour and didn't get in there until 12:00, 12:30,

22  1:00 o'clock in the afternoon and then we were in there until

23  7:00 o'clock at night.

24      And I was just -- at that point I just wanted to get home,

25  you know.  So my wife and I, she took me to the car and we, you

HARDEMAN - DIRECT / MOORE

1  know, proceeded to get home.

2  **Q.**   And, Mr. Hardeman --

3  **A.**   Yes.

4  **Q.**   -- that first chemotherapy treatment, you said that you

5  received treatment from somewhere between 12:30 and 1:00 and

6  7:00 o'clock that night.  So tell the ladies and gentlemen of

7  the jury, so when you're receiving treatment, what's the setup?

8  What are you getting?  What's that process like?

9  **A.**   Well, they set you up initially with the IV and get you

10  hooked up.  I didn't want a port.  I decided to do the IV.  And

11  then they, you know, take a bag of liquid, it's a big bag

12  that's clear, and they show it to you and then they -- and then

13  they have another nurse come over and check it, hang it up on

14  the thing.

15        They hook it up to your IV, and start the drip.  So it's a

16  drip at a certain rate.  It's hooked up to a machine with an

17  alarm.  So when the alarm goes off, that means there's bubbles

18  in it, and then they have to come over and, you know, so

19  they're sort of constantly trying to get it going again.

20        So you're there and there's -- I think there was three or

21  four bags of this chemical, but medication.

22  **Q.**   And you said you -- so you got the call from Dr. Turley on

23  the 14th of February.  You start treatment on the 24th.

24  **A.**   Yes.

25  **Q.**   What's your understanding of why you went into treatment

1   10 days after you got the call?

2   **A.**   Oh, because this is very aggressive lymphoma.  They had,

3   you know -- you know, we had to get some treatment on it right

4   away, start right away.  There was no delaying anymore, and

5   they -- you know, they knew I had Stage 3 and my condition, so

6   it's time to, you know, to initiate the -- administer the

7   chemotherapy, and that's why we started.

8   **Q.**   Now, you said that it was 21 days apart.  Can you explain

9   to the jury what your understanding of why it was -- each round

10  was about 21 days apart?

11  **A.**   Yes.  Well, they have a thing called the nadir, which is

12  after you finish your treatment, you're deteriorating and

13  you're going to go downhill and every day you get a little

14  worse.  You have nausea.  And with me I had a thing which

15  Dr. Nabhan explained was chemo brain where I couldn't handle

16  the motion in the car or television set or noise.

17  **Q.**   Mr. Hardeman, I'm just going to kind of write up when you

18  say your problems.  So one you said nausea?

19  **A.**   Yeah, a lot of nausea.

20  **Q.**   And how -- did I spell that right?

21       And describe that to the jury.

22  **A.**   Well, an example of that, after the first -- the first

23  dose of chemo, the next day I got up and had to go get an

24  electrocardiogram because they want to check your heart out.

25  So we proceeded down to Kaiser.  My wife drove me down there.

1  And we always keep a bucket in the car in case, you know, you

2  have to use it, and --

3  **Q.**   Did you do that before chemo?

4  **A.**   Well, after the chemo.  After the chemo, I put the bucket

5  in the car.

6       And on the way back from the electrocardiogram, I started

7  vomiting violently, you know, three or four times.  I

8  contacted -- e-mailed my doctors and asked them, "You know,

9  what's going on here?  Any of this nausea medication is not

10 working.  I probably threw it up."

11      And he said, "Well, I'm going to try to get you some other

12 type that you can put under your tongue."  And that's when I

13 said, "Well, I'll have to send my wife down there.  I can't --

14 you know, I can't handle motion right now either."

15      So it was a real struggle, a real challenge to try to get

16 comfortable, you know.

17 **Q.**   What do you mean so you couldn't handle motion?

18 **A.**   It's -- it's a thing that I -- it's going through your

19 brain where you -- moving, anything that's moving in your

20 direction in front of you, whether you're in a car or in your

21 house trying to watch a little television, I couldn't even

22 watch television.  I couldn't stand the TV going in and out,

23 you know.

24 **Q.**   And so did they switch up your medication for nausea?

25 **A.**   Yes.  He gave me a different type of nausea medication,

HARDEMAN - DIRECT / MOORE

1    one you put under your tongue, you know.

2    **Q.**   And then you mentioned chemo brain, and the jury heard a

3    little bit about that from Dr. Nabhan.  What do you mean when

4    you say "chemo brain"?

5    **A.**   It was a term that I think I picked up from my chemo nurse

6    because I had talked to him about it, and he said, "It's

7    probably chemo brain."

8        So it was an experience where I -- the motion that was

9    happening, you know, whether I was in a car or even at home

10   trying to sit and relax, it was just I -- it's kind of -- it's

11   difficult to explain unless you're going through it; but it's a

12   thing where you can't sit and comfortably watch, whether it's

13   television, or you didn't want anybody around you.  It's -- you

14   know, it's a comfort thing.

15   **Q.**   All right.  So let's go back to that first treatment then.

16   How did you do after that treatment?  How did you do that night

17   and the next day?

18   **A.**   Oh, it -- well, that night I just wanted to go home.  I

19   couldn't -- I couldn't eat.  You know, you eat sparsely, a

20   little -- peck at a little bit of food here and there and then,

21   you know, I could never finish.  My wife tried to prepare some

22   nice meals, but I couldn't eat them.

23       And --

24   **Q.**   Did you have loss of appetite?

25   **A.**   Yeah, I had loss of appetite.

1   **Q.**   Okay.

2   **A.**   Then I got up the next morning and I was all puffed up.

3   My face was swollen and hands.  She didn't even recognize me.

4   **Q.**   And that was in your face and hands swelled?

5   **A.**   Face, my whole body was puffed up.  I gained 10 pounds.  I

6   stopped by the chemo lab and had them weigh me again because I

7   couldn't believe that, you know, I was so puffed up.  And that

8   was when I was going down to get the electrocardiogram.

9   **Q.**   And then this 21 days, why did you have to wait 21 days

10  for the second round?

11  **A.**   Well, because, you know, as I said you're going downhill

12  and you're getting worse every day, and you're hoping that, you

13  know, when you get to the bottom of this, on this 10th day

14  you're going to start feeling a little better and that's the

15  whole idea.  You look forward to that one little -- that part.

16      You know, so you have to go in and take a blood test too

17  to see if your white blood cell count is going to come up to a

18  point where you can take the next round of chemo.

19      So on the second round I had was on March 17th, and then I

20  was having problems with white blood cell count after that one.

21  It really whacked me.

22  **Q.**   And the jury heard from Dr. Nabhan on that.  So was it

23  that your white blood cells, your count dropped?

24  **A.**   Yeah.  Yeah.  It really dropped really, really low, and

25  Dr. Ye was very concerned about it.

HARDEMAN - DIRECT / MOORE

1  **Q.**   And so what happened then?

2  **A.**   Well, you know, we continued to monitor.  I think it was

3  on the third round, I think he started me on this Neupogen

4  shots.  And first it was five and it was a lower dose, and then

5  he increased -- increased the dose and extended them to seven

6  days.  So I was getting one every day after the chemo to build

7  up my white blood cell count so I could qualify for the next

8  round of chemo.

9  **Q.**   And Dr. Nabhan talked about some patients experience bone

10  pain --

11  **A.**   Oh, yeah.

12  **Q.**   -- from the Neupogen shots.

13  **A.**   Oh, yeah.

14  **Q.**   Did that happen to you?

15  **A.**   Oh, yeah.  Yeah, that happened to me.  I was -- yeah,

16  after I was sitting there on the bed, and this almost like

17  electric shock comes right -- right up your legs and into your

18  ribs and you sort of jump right out of the bed.  I didn't know

19  what was happening to me, and I couldn't sit still.  And Mary

20  says -- my wife Mary said, "Come over and sit in the recliner."

21       So I had to sleep in the recliner all night to try to

22  control it, and it just was resonating right up through my

23  ribcage.  It was pretty frightening, and I didn't quite know

24  what it was.

25       I was e-mailing my doctors again, and they said -- I

1   e-mailed the chemo -- the chemo nurse, and she said, "Well, try

2   taking an ibuprofen."  I started taking those to see if I could

3   take the edge off it a little bit and see if I could control it

4   by maybe getting in a comfortable position that I'm not, you

5   know, inducing it to start in again.

6   Q.   How often would you experience bone pain?

7   A.   Just about every round after I started taking the Neupogen

8   shots -- started those Neupogen shots, I had to take those all

9   through the rest of the four or five treatments that I had

10  left.

11  Q.   And then how often were you getting the Neupogen shots

12  after the chemo treatment?

13  A.   I would start on them right away.  The very next day after

14  the chemo treatment, I would start the seven days of shots.

15  Q.   And so then did you have bone pain on each of those seven

16  days that you got the Neupogen shot?

17  A.   I was able -- I tried to control it as best I could.  You

18  know, I'd try to take -- you know, I tried to -- you know, I

19  didn't want to experience that so I took the ibuprofen, and I

20  tried to -- when I felt it coming on, I tried to maybe get into

21  a position to, you know, quell it down a little bit.  And

22  that's how I kind of managed it.

23  Q.   What do you mean when you felt it coming on?

24  A.   Well, you could feel it.  You start to feel -- you get the

25  sensation, you know, that it's kind of like waves that

1    resonates through your ribcage and your legs.

2    **Q.**   Dr. Nabhan mentioned that some patients undergo -- or

3    experience hair loss, Mr. Hardeman.

4    **A.**   Yes.

5    **Q.**   Did you experience hair loss?

6    **A.**   Yeah.  After the second round, hair started coming out in

7    chunks.  You know, I figured I was -- they told me I was going

8    to lose my hair, and I just didn't know when so I started, you

9    know, just pulling it out.  You just pull right at your head,

10   big chunks of it, you know.

11       And, you know, I figured -- huh?  I'm sorry?

12   **Q.**   Go ahead.

13   **A.**   And I figured, well, I'm just going to have -- I'm just

14   going to have to deal with it, you know, and so I prepared

15   myself for it mentally.

16   **Q.**   How did you do that?

17   **A.**   Well, I started, you know, thinking of cancer as my enemy

18   and started getting a military mind-set.  I got my -- I got a

19   hat with my old divisional patch on it and the unit crest, and

20   I tried to develop a mind-set to -- frame of mind to deal with

21   all these side effects that it was causing, and that's how I

22   mentally prepared myself.  That was my personal thing.

23   **Q.**   Did you serve in the military?

24   **A.**   Yes, I did.

25   **Q.**   When did you serve?

1   **A.**   1970 to '73 in the United States Army.

2   **Q.**   Dr. Nabhan also mentioned about fatigue.  Did you have any

3   kind of fatigue or loss of strength?

4   **A.**   Oh, incredible amount of fatigue and loss of strength,

5   yeah.  You're always fatigued.  Always tired, always fighting

6   that and fighting, you know, the constant nausea, the mental

7   anguish, the anxiety, you know, trying to understand what's

8   happening to you, how to deal with it, how to get past it.  You

9   know, and you have to go on to the next round.

10       My doctor, Dr. Ye had to reduce -- as Dr. Nabhan said, he

11   had to reduce my chemotherapy dose.

12   **Q.**   Why was that?

13   **A.**   Well, because I was having such a violent reaction to it.

14   You know, it was -- he didn't think I was going to make it.

15   You know, if we continued on with that strength, he didn't

16   think I could take it, and I didn't think I could either

17   really.  It was just...  It was -- it was pretty challenging.

18   **Q.**   And did Dr. Ye have to reduce the dosage for the

19   chemotherapy?

20   **A.**   Yes, he did.

21   **Q.**   What were the last couple of rounds of chemotherapy like

22   for you?

23   **A.**   Well, I kind of looked at it, like, after the third round

24   I said to myself, "You know, I'm halfway there.  If I can just,

25   you know, get past the fourth, the fifth, and sixth."  So I

 1    looked at each one as kind of a benchmark.  I've only got --

 2    after the fourth, I've only got two; and you look forward to

 3    the bottom of the nadir, and then you start you're going to

 4    have this moment where you're going to feel good.  So you've

 5    got some moments where you're going to start feeling good, and

 6    you have to prepare yourself to know you're going to have to go

 7    through this again within a short period of time and it's going

 8    to start all over again.

 9         And, you know, it gets -- you know, that idea is you have

10    to force yourself to do it and make sure you're physically up

11    to it because if you don't do it, just it's going to kill you

12    this cancer.

13    Q.   Did you complete all six rounds of chemotherapy?

14    A.   I'm sorry?

15    Q.   Did you complete all six rounds of chemotherapy?

16    A.   Yes, I did.

17    Q.   You mentioned loss of strength.  Can you tell the ladies

18    and gentlemen of the jury how that manifested for you?

19    A.   Yes.  The Neupogen shots, I mean, I tried to walk as best

20    I can and help myself by just doing a little exercise by

21    walking down the street.  My wife and I would go for walks, but

22    the Neupogen shots did something to -- or maybe it was the

23    chemo, I don't know -- but my whole lower extremity, I didn't

24    have the body strength to walk very well, and it was like

25    somebody was holding me back by the back of my shirt, and I

1    just didn't have that power to move my body forward.

2        And I talked to my -- I e-mailed my doctors about that and

3    telling them what I was experiencing, and they said to, you

4    know, just try to walk.  You know, keep -- you know, keep doing

5    it if you can.  Get some exercise.  That went on for about a

6    year.  I was wondering if I was ever going to be -- you know,

7    going to be able to walk properly again.

8    Q.   So you had that loss of strength about a year?

9    A.   Yes, uh-huh.

10   Q.   And, Mr. Hardeman, we've covered -- have we covered the

11   physical injuries or side effects that you had from the chemo?

12   A.   Uh-huh.

13   Q.   I don't know if you can see this.  I tried to write it

14   down as you were testifying.  I'm sorry.  I just want to make

15   sure I covered it.

16       So we had the nausea, the chemo brain, vomiting, loss of

17   appetite, the facial and hand swelling, the white blood count

18   drop, bone pain, hair loss, fatigue, loss of strength.  Is

19   that -- is there anything else that, I'm not saying that there

20   should be, but that you would want to list up here for the jury

21   to understand?

22   A.   Well, it's -- I mean, there is, you know, the personal

23   effect it was having on my wife Mary also, and I was trying

24   to -- you know, that was putting a lot of pressure on me too.

25   I know she was trying to do the best she could with it, and it

1  was kind of affecting me a little bit because she's not used to

2  seeing me like this.  But, yeah, that had a kind of effect on

3  me mentally, but she --

4  **Q.**   Let's switch over, then, to you mentioned mental anguish

5  and anxiety.

6  **A.**   Yes.

7  **Q.**   And, you know, the jury heard that, you know, the good

8  news that your doctor is telling you that you're in remission;

9  right?

10 **A.**   Yes.

11 **Q.**   Okay.  And I wanted to ask you and give you an opportunity

12 to explain to the jury.  What does remission mean to you?

13 **A.**   To me the remission was just kind of an island that I

14 could -- a safe place that I could -- I could go and be rest

15 assured that I just had the CAT scan, you know, it was clear so

16 I've got some time I don't have to worry about the chemo -- the

17 chemo -- worry about the non-Hodgkin's lymphoma coming back

18 because I had the clear CAT scan.

19    That would go on for, you know, several months until I was

20 getting more anxiety because I had to go -- wondering if it's

21 coming back.  And, you know, I'm e-mailing my doctors, "When am

22 I supposed to get my next cat scan?  When am I supposed to get

23 my blood test?"

24    And worrying about the lumps maybe.  You know, I'm feeling

25 my body and seeing -- I'm wondering if they're coming back.

**HARDEMAN - DIRECT / MOORE**

 1  And I would look forward to the next CAT scan to give me that

 2  assurance.  That is just an area that I could feel safe at for

 3  a temporary period of time.  So it's temporary.

 4  **Q.**   And you heard Dr. Nabhan testify that it's -- I think he

 5  used the words extremely unlikely that your cancer is going to

 6  come back.  Even hearing that, what in your mind do you hear?

 7  **A.**   Well, there's always that fear that it can come back.

 8  That's the unknown.  I don't know if it's going to come back.

 9  You know, there's no guarantee that it won't come back.

10  **Q.**   And are you still having to get repeat scans?

11  **A.**   Yes.  I have another one next month.

12  **Q.**   And tell the ladies and gentlemen of the jury, so what's

13  it like leading up to the time period where you have to go back

14  and get that repeat scan?

15  **A.**   Well, there's a certain amount of anxiety associated with

16  it because, you know, you're thinking to yourself you want it

17  to be -- you want it to be clear.  You know, you're hoping that

18  the further you get out, maybe the higher chance it's going to

19  be that, you know, you're going to have a good CAT scan, a

20  good -- you know, good result, but you don't know, you know.

21  There's no guarantee.

22  **Q.**   And how do you find out what the results are of the repeat

23  scans?

24  **A.**   Dr. Ye will e-mail me the results of it and we'll talk a

25  little bit about it, where I'm at.

1   Q.   And so from that time when you get that repeat scan till

2   you get that e-mail, what's going through your mind?

3   A.   I'm hoping and praying that it's going -- it's going to be

4   a good report.  That's what I'm hoping, yeah.

5   Q.   Do you think that that anxiety will ever go away?

6   A.   I don't -- I don't believe it will.  I think it's always

7   going to be there.  There's always -- you know, there's no

8   guarantee.  Like I said, it could come back and you're

9   always -- you're thinking about it, you know.

10  Q.   Do you think cancer, Mr. Hardeman, has changed you?

11  A.   Absolutely, uh-huh.  Yes, absolutely.

12  Q.   In what way?

13  A.   Well, I mean, I look at it, you know, as an experience

14  that only people that have had cancer, you know, can kind of

15  share.  And, you know, you have this sense of camaraderie when

16  you look at, you know, each of you both kind of went through it

17  and are in remission or, you know, that you survived it.  Yeah.

18  Q.   Before I have you sit down, I want to ask you just a

19  handful of questions about Roundup really quick.

20  A.   Uh-huh.

21  Q.   When you started using Roundup in 1986, when you started

22  using Roundup and bought it off the shelf, did you expect that

23  Monsanto would have had valid studies to support that Roundup

24  was a safe product?

25  A.   You know, I never thought about that, no.  I mean, I -- I

1   thought it was safe.  I thought the product was safe, you know.

2   **Q.**   Would you have expected Monsanto to make sure their

3   product was safe before they put it on the market?

4   **A.**   Absolutely.

5   **Q.**   If you had been told back in 1986 that there were no valid

6   studies to support the safety of Roundup, would you have

7   sprayed Roundup?

8   **A.**   No.  No.

9           **MS. MOORE:**  Okay.  Thank you, Mr. Hardeman.

10       Your Honor, we would ask that the Court take judicial

11   notice of the life tables.

12          **THE COURT:**  Any objection?

13          **MR. STEKLOFF:**  I think I just need to look at that,

14   Your Honor.  That hasn't been discussed before.

15          **MS. MOORE:**  It's Trial Exhibit 26.

16          **THE COURT:**  Okay.

17          **MS. MOORE:**  So we can do that.

18          **THE COURT:**  Any cross-examination?

19          **MR. STEKLOFF:**  I do have just a brief examination,

20   Your Honor.

21          **THE COURT:**  Go ahead.

22                      **CROSS-EXAMINATION**

23   BY MR. STEKLOFF:

24   **Q.**   Good afternoon, Mr. Hardeman.

25   **A.**   Good afternoon, Mr. Stekloff.

HARDEMAN - CROSS / STEKLOFF

1   Q.   First, I just want you to know I'm just asking questions

2   about 1986 to 2012, the time period when you were using

3   Roundup.  Okay?

4   A.   Okay.

5   Q.   And as I said on Wednesday and I'll say it now, I have no

6   questions -- understanding how difficult it was for you to even

7   discuss this today and to go through your diagnosis and

8   chemotherapy, I have no questions about any of that.  Okay?

9   A.   Thank you.

10  Q.   Just to remind the jury about that period of 1986 to 2012,

11  I just want to talk briefly about where you lived.  Okay?

12  A.   Sure.  Okay.

13  Q.   So in 1986, that's when you lived at the -- I hope I get

14  this right -- Gualala property?

15  A.   Yes, that's correct.

16  Q.   And then in 1988, that's when you moved to the 56-acre

17  property that we heard about?

18  A.   That's when we bought, yes, the Westside Road property,

19  yes.

20  Q.   Right.  So we've been calling that the Westside property;

21  right?

22  A.   Yes.

23  Q.   And that was in 1988?

24  A.   Yes.

25  Q.   Okay.  And so when you were being asked questions by

HARDEMAN - CROSS / STEKLOFF

1  Ms. Moore, at the beginning one of the questions that you were

2  asked is how often you read the Roundup label.  Do you remember

3  that?

4  **A.**  Yes.

5  **Q.**  Okay.  And I think, I tried to write down, you said before

6  you -- you read the label before you bought Roundup the first

7  time; correct?

8  **A.**  That's correct.

9  **Q.**  And that was so you could understand how to mix it, for

10  example; right?

11  **A.**  Yes.

12  **Q.**  And then I think you said you read it off and on several

13  times after that; right?

14  **A.**  Yes.  Yes, something like that.  Yes, several times --

15  **Q.**  Okay.  But isn't it --

16  **A.**  -- over the years.

17  **Q.**  Mr. Hardeman, isn't it the case that, to the best of your

18  recollection, you read the label at most twice; once when you

19  first bought it in 1986 and then maybe a second time when you

20  moved to the Westside property in 1988?

21  **A.**  Well, I read the label off and on over the years.  I just

22  don't know how many times I read it.  I don't know what years I

23  read it.  You know, I mean, it's -- I looked at it and, you

24  know, would go through it and read it, glance through it.

25  **Q.**  Right.  And I guess my question, just to be clear, isn't

 1   it your recollection that at most you read it twice; once in

 2   1986 when you first bought Roundup and then maybe once when you

 3   moved to the Westside property in 1988?

 4   **A.**   It's possible.  I don't remember exactly how many times I

 5   read the label.  It may have been a couple of times.  It may

 6   have been three.  It may have been four.  I really -- I don't

 7   know.

 8   **Q.**   Okay.

 9   **A.**   I'd have to remember reading it again.

10          **MR. STEKLOFF:**  Your Honor, I'd like to show

11   Mr. Hardeman some of his deposition testimony if that's okay.

12          **THE COURT:**  Okay.  Do you have a copy for me too?

13          **MR. STEKLOFF:**  I do, Your Honor.

14                 (Pause in proceedings.)

15          **MR. STEKLOFF:**  May I approach, Your Honor?

16          **THE COURT:**  Sure.

17                 (Pause in proceedings.)

18          **THE WITNESS:**  Okay.  Thank you.

19          **THE COURT:**  Thank you.

20          **MR. STEKLOFF:**  And, Mr. Hardeman, just so you know

21   where you are, if you turn to the second tab, it has a

22   transcript from your deposition.

23       And, Your Honor, I would like to read page 194:6 through

24   195:12.

25          **THE COURT:**  Okay.  Give me a second.  Give opposing

 1  counsel a second to look at it.

 2              (Pause in proceedings.)

 3          **THE COURT:**  Can you give me the page and line numbers

 4  again?

 5          **MR. STEKLOFF:**  Sure, Your Honor.  It is 194:6 through

 6  195:12.

 7          **THE COURT:**  Okay.

 8          **MR. STEKLOFF:**  And then for completeness, I would

 9  also -- this is long, but 196:19 through 198:7 is also on this

10  topic.

11          **THE COURT:**  To 198:7 you said?

12          **MR. STEKLOFF:**  Yes, Your Honor.

13          **THE COURT:**  Any objection to this being read?

14          **MS. MOORE:**  No, Your Honor, as long as for

15  completeness he also reads on page 294 from line 10 to line 18.

16              (Pause in proceedings.)

17          **THE COURT:**  You can deal with it -- you can bring that

18  in on redirect if you like.

19          **MS. MOORE:**  Okay.  Thank you, Your Honor.

20          **THE COURT:**  Go ahead.  So you don't have to read that

21  also, but you can read what you've proposed.

22          **MR. STEKLOFF:**  Okay.  And then I might have one more

23  thing to read after that on redirect.

24  **Q.**   So, Mr. Hardeman, are you with me on page 194?

25  **A.**   Yes.

HARDEMAN - CROSS / STEKLOFF

1   Q.   Okay.  And so I'm just going to read -- this is a little

2   bit long, but I'm just going to read some of the testimony that

3   you gave at your deposition, and I'll try to read it slowly and

4   just ask you if I read it correctly.  Okay?

5   A.   Okay.

6   Q.   So you were asked (reading):

7        "Q.  And did you read the warning label on the Roundup

8        product?"

9        And your answer was (reading):

10       "A.  Well, it was a little data -- plastic clear acetate

11       data sheet attached to it.  That's -- you know, you read

12       it.  And all I remember was -- and when I initially read

13       this, because I didn't reread it again, you know, because

14       I already -- because I was already just familiar with it,

15       and that was -- in those days it was, like, don't spray,

16       you know, 24 hours before it's going to rain and, you

17       know, don't spray things that you don't want, you know, to

18       get contaminated with the Roundup and get your -- get your

19       pet -- keep your pets out of the area for 24 hours.

20           "That's -- that's all I think -- that's all I

21       remember about it, yeah.  But, yeah, I think that's --

22       that's all I can recall.  Those are the things.

23           "And then of course, yeah, it did say it works best

24       up at a certain temperature, like, I don't know what it

25       was, 65.  I thought it was 65.  I like -- I like to spray

1    when it's hot, you know, or 65 when it's warmer, yeah."

2    And then you were asked another question (reading):

3    "Q.  So the -- so the label advises you to spray it when

4    it was warmer outside.  You think it said 65; correct?"

5    And your answer was (reading):

6    "A.  I don't know -- I -- I believe at one time when I --

7    and didn't -- every time I bought a thing of Roundup I

8    didn't read.  I don't know if they updated it or not.  I

9    mean, when I originally got the -- you know, the product

10   in the -- in the earlier, I may have read it once.  So I

11   didn't -- so I knew it so I didn't need to reread it

12   again.  So I don't know."

13   And then if you turn, Mr. Hardeman, to page 196 -- well,

14   first of all, did I read that correctly?

15   A.   I'm sorry?

16   Q.   Did I read all that correctly?

17   A.   Yes.  I'm on page 196.

18   Q.   Okay.  What I read so far, I just want to make sure I read

19   that correctly.  Were you following with me?  Did I read all of

20   it correctly?

21   A.   Yes, that's what's on the deposition.  That's what you

22   quoted.

23   Q.   Okay.  And so then on page 196, if you go to line 19 --

24   A.   Uh-huh.

25   Q.   -- it continued and you were asked (reading):

HARDEMAN - CROSS / STEKLOFF

1    "Q.  So you read the label the first time in 1986, but you

2    didn't read it after that?"

3    And your answer was (reading):

4    "A.  I may have looked at it again in Westside.  I

5    quickly -- I don't know.  I, you know -- I -- I know, I --

6    it's possible I looked at it again in Westside, you know,

7    after that time.

8    "Q.  So you would have looked at it, so just so --

9    "A.  Maybe one other time.  I mean, it's -- it's been --

10   there's no need for me to keep looking at it again.  You

11   know -- you know, you're whatever and you know the

12   conditions and the whatever you need to spray it under,

13   and I was familiar with that and that's how I, you know,

14   used it.

15   "Q.  So you would have looked at it the first time you

16   bought it in 1986 and then you would have reviewed it

17   again shortly after moving to Westside in 1988; is that

18   accurate?"

19   Your answer (reading):

20   "A.  I don't know when I -- I looked at it again in

21   Westside Road, I can't recall that, but I'm thinking maybe

22   I did once look -- looked at it again.  I, you know --

23   "Q.  Do you know what decade you looked at it again?

24   "A.  What decade?  Well, no, I can't be sure.  I don't

25   know if it was -- well, we were only there in '88 so there

HARDEMAN - CROSS / STEKLOFF

1    was only two years left.  You're into the '90s.  So I --

2    I'm guessing.  I don't know if it was the '90s or if it

3    was the next decade, turn of the century.  I -- I -- I

4    really can't be specific, and I just know that I possibly

5    looked at it again, but I don't have a complete -- like,

6    it was 19, you know, '95 I looked at it again.  I -- I --

7    I don't know that, you know.  I can't really answer that."

8    Did I read that correctly?

9    A.   Yeah.

10   Q.   Okay.  So, Mr. Hardeman, I want to -- well, actually

11   later --

12          MR. STEKLOFF:  Can I actually go ahead?

13          THE COURT:  You are referring to the deposition

14   testimony that Ms. Moore wanted you to read?

15          MR. STEKLOFF:  Yes.

16          THE COURT:  You are going to read that in as well?

17          MR. STEKLOFF:  Yeah, I would like to cover that.

18          THE COURT:  Sure.

19   BY MR. STEKLOFF

20   Q.   So later in your deposition, just like here, your

21   attorneys were able to ask you questions; is that -- is that --

22   do you remember that?

23   A.   Yeah.

24   Q.   In other words the Monsanto attorneys went first, and then

25   your attorneys -- Ms. Wagstaff, was able to ask you questions

1    at your deposition.  Do you remember that?

2    **A.**   I remember -- yes, I do remember.  It was a long

3    deposition, so long, but I do -- several hours, yeah.  I do

4    remember that, yes.

5    **Q.**   Okay.  So if you turn to page 305, and this is now --

6    sorry, not 305 -- 294.  And I'm going to read to you line 10 on

7    page 294.

8    **A.**   284?

9    **Q.**   And you can see --

10            **THE COURT:**  294.

11           **THE WITNESS:**  Oh, 294, okay.

12           **MR. STEKLOFF:**  Where did you want me to stop?

13           **MS. MOORE:**  295, 15.

14   **BY MR. STEKLOFF**

15   **Q.**   Are you on page 294, Mr. Hardeman?

16   **A.**   Yes, I am.

17   **Q.**   Okay.  So Ms. Wagstaff at the deposition asked you the

18   following:

19       Question:  And you testified I believe that you read the

20   Roundup label in the mid-'80s and then maybe one more time

21   while you were at the Forest -- Forest Villa property; is that

22   correct?

23       Answer:  Yes.

24       Question:  Okay.  Is -- is that accurate testimony?

25       Answer:  No.  I have read it more than -- more than those

 1   times.  Three or four times I would say during the -- maybe

 2   several times.

 3        Question:  So -- so why did you testify that you had only

 4   read it two times?

 5        Answer:  Couldn't -- couldn't quite reflect.  I mean, I

 6   was looking at it different because I was looking at it in

 7   terms of how I spray it and forgot that I had looked at, reread

 8   some of those data sheets on the -- on the containers, and --

 9        Question:  So is it fair to say that you viewed the

10   labels, the Roundup label, when you first bought the product

11   and then periodically throughout the use, your use of the

12   product, is it fair to say that you reviewed the label when you

13   first bought the product and then periodically throughout your

14   use?

15        Answer:  Yes.

16        Did I read that correctly?

17   **A.**   Yes.

18   **Q.**   Okay.  And then I just want to show you one more portion

19   of your deposition.  If you go to page 305.

20        **MR. STEKLOFF:**  Your Honor, I would like to read 305,

21   line 20 through 306, 4.

22        **THE COURT:**  Any objection?

23        **MS. MOORE:**  No, Your Honor.  Other than it -- I would

24   ask that for completeness it be continued until line 19.

25        **THE COURT:**  Again, you can bring that up on redirect,

1    if you want.

2            **MS. MOORE:**   Okay.   Thank you, Your Honor.

3    **BY MR. STEKLOFF**

4    **Q.**   Okay.   So, Mr. Hardeman, are you on page 305?

5    **A.**   Okay.   I'm on page 305.

6    **Q.**   And this is -- again, this was Monsanto asking you

7    questions, and I'm going to start on line 20.   And the question

8    was:   Mr. Hardeman, one last question, between the time that

9    you offered the testimony that you had reviewed the label

10   twice --

11           And you said uh-huh.

12           And then Question:   -- and the time where you offered

13   testimony that you had reviewed the label initially and then

14   periodically thereafter, did you have discussions with your

15   counsel?

16           And your answer was:   Yes.

17           Correct?

18   **A.**   That's my answer.

19   **Q.**   Okay.   So, Mr. Hardeman, I now want to turn to a different

20   topic -- and you can put the binder to the side -- just one

21   last topic.   Again, I really just want to focus on 1986 to 2012

22   when you were at the two properties we have heard about.

23           When you were at those properties, I think you told us you

24   were a do-it-yourselfer; is that right?

25   **A.**   That's correct.

HARDEMAN - CROSS / STEKLOFF

1  Q.   So did you ever use -- did you ever have bugs where you

2  had to use bug spray, for example?

3  A.   Bug spray?

4  Q.   Like for ants?

5  A.   Ants -- I used those -- I said I think I testified I used

6  those little ant cup things or there was maybe some stuff in

7  the can or something.  I don't remember what I said, whatever

8  was in there.

9  Q.   Right.

10  A.   It is in the deposition, I think.

11  Q.   And I'm not asking about the deposition, but sometimes --

12  and I know this was a long time ago.  But sometimes you would

13  use ant spray if they were coming in a window or something,

14  right?

15  A.   Yeah.  I think I testified to that, yeah.

16  Q.   Okay.  And so do you know if the ant spray that you were

17  using had any sort of cancer warning on it?

18  A.   I don't remember anything like that, no.

19  Q.   Okay.

20  A.   Cancer warning, I mean, it may have been a non-toxic kind.

21  I know I used a green type of ant spray that you spray on a

22  wall.  I don't think it was toxic ant spray.

23  Q.   But you just don't remember?

24  A.   I don't remember what it was.  I mean, I maybe used it

25  once or twice.  I mean, it was --

HARDEMAN - CROSS / STEKLOFF

```
 1   Q.    Okay.  What about wasps or hornets or any other bugs?  Did
 2   you ever use any spray to get rid of those on the West Side
 3   property?
 4   A.    On the West Side property, maybe I might have -- it is
 5   possible.  I mean, the stuff in the can you buy at a hardware
 6   store?
 7   Q.    Yeah.
 8   A.    Possibly.  I don't know.  I don't recall.  I might have.
 9   I did have some wasps.
10   Q.    And if you used that type of can, do you remember if that
11   had a cancer warning on it?
12   A.    No, I don't remember.  It may have.  I mean, I haven't --
13   you know, used any of that in a long time.  I just don't --
14   wouldn't recall that.
15   Q.    Did you at the -- at either property ever do any painting
16   where you had to paint walls or paint --
17   A.    Latex paint, yeah.
18   Q.    And do you know if any of that -- if any of the paint had
19   any cancer warnings on the paint cans?
20   A.    I know it is water based.  I don't know.
21   Q.    What about motor oil?  Have you used motor oil to change
22   your -- the oil in your car or any -- motor oil --
23   A.    No, I take it into a shop and they do it.  I don't do it.
24   Q.    Okay.  And what about gasoline, not --
25   A.    Gasoline?
```

ED HARDEMAN - REDIRECT / MS. MOORE

1   Q.   -- not -- not filling up your car, but, you know, filling

2   up a lawn mower, filling up any other sort of equipment at the

3   56-acre home, did you use gasoline for anything?

4   A.   I had a lawn mower.  I mean, you know, I might have -- put

5   gasoline in it.  You know, you want to run it.  It wasn't

6   electric, so.

7   Q.   And do you know if the gasoline had a cancer warning on

8   it?

9   A.   Gasoline had a cancer warning on it?  Well, it may have

10  had one at the pump, you know, when you go to -- yeah, probably

11  at the pump when you go to put gasoline in your can.  I'm sure

12  there was -- you know, like you do every day when you put gas

13  in your car, there is probably a warning on the gas pump.

14  Q.   Okay.  Mr. Hardeman, thank you very much.

15       MR. STEKLOFF:  I have no further questions.

16                    REDIRECT EXAMINATION

17  BY MS. MOORE:

18  Q.   Mr. Hardeman, you were asked several questions about your

19  deposition and --

20       THE COURT:  On that topic that you are wanting to

21  bring up, you can just ask him the question.  You don't need to

22  go back to the deposition.  It is kind of a slightly different

23  topic.  You are free to ask --

24       MS. MOORE:  I understand.  I'm not going there right

25  now though.  Thank you, Your Honor.

ED HARDEMAN - REDIRECT / MS. MOORE

```
 1          Can I have the ELMO, please?
 2   BY MS. MOORE
 3   Q.   Mr. Hardeman, do you recall when your deposition started
 4   that day?  If you don't know the time, you can actually -- if
 5   it would help you to refresh your recollection --
 6          MS. MOORE:  May I publish this front page?
 7          MR. STEKLOFF:  No objection, Your Honor.
 8   BY MS. MOORE
 9   Q.   And this is the cover page to your deposition.  And do you
10   see here, Mr. Hardeman --
11   A.   Yes.
12   Q.   -- your deposition started at 9:16 a.m.?
13   A.   Yes.
14   Q.   And it was held at the Vintners Inn; is that right?
15   A.   That's correct.
16   Q.   Do you remember what that room was like that day?
17   A.   How long it was?
18   Q.   No, what that room at the hotel was like that day.
19   A.   It was small, a small little conference room.
20   Q.   Any windows?
21   A.   Pardon?
22   Q.   Were there any windows?
23   A.   No.  There was no windows, no.
24   Q.   Okay.  And then I will show you at the end of your
25   deposition -- let me flip over here --
```

 1            **MS. MOORE:**  Permission to publish the last -- the
 2  time.
 3            **MR. STEKLOFF:**  No objection.
 4  **BY MS. MOORE**
 5  **Q.**   And here it shows you it went off the record at 5:08 p.m.
 6  Does that sound right to you?
 7  **A.**   Yeah.  It was a long day.  That's it.
 8  **Q.**   And so Monsanto's attorneys -- the deposition that they
 9  requested of you, what was it, about eight hours long that day
10  in that hotel room?
11  **A.**   Yes.  I was exhausted by the end of it.  The same
12  questions over and over again and different times, and, you
13  know, it was really getting frustrating.  They always wanted a
14  different answer, you know --
15  **Q.**   And then after your deposition concluded at 5:08, what
16  happened next?
17  **A.**   Well, then they wanted my wife -- they were going -- my
18  wife was exhausted.  She was up next.
19  **Q.**   So her deposition started that evening?
20  **A.**   Yes.
21            **MR. STEKLOFF:**  Your Honor.  May we approach?
22            **THE COURT:**  Sure.
23       (The following proceedings were heard at the sidebar:)
24            **THE COURT:**  This is -- I understand why you didn't
25  want to object in front of the jury, but this is not

 1    appropriate.

 2         MR. STEKLOFF:  Yeah.  And now also bringing in

 3    Mrs. Hardeman.  That was by agreement when they requested that

 4    they fit these depositions in.  I think we need an instruction

 5    that there was nothing improper done in taking these

 6    depositions, both in terms of the length or the --

 7         MS. MOORE:  Your Honor, our position is that they are

 8    trying to attack his credibility by reading different points

 9    of --

10         THE COURT:  None of that has to do with

11    Mrs. Hardeman's deposition.  And none of it has to do with them

12    asking annoying questions at depositions.  So it is not so much

13    your questions that were inappropriate, except for the one

14    about Mrs. Hardeman's deposition.  It is his answers.  And so

15    I'm going to order you to move on.

16         MS. MOORE:  I will move on.

17         THE COURT:  I'm going to order the jury to disregard

18    those last questions and answers about the length of his

19    deposition.

20         MS. MOORE:  But, Your Honor, I think that --

21         THE COURT:  The contents of his deposition.

22         MS. MOORE:  The length of his deposition is absolutely

23    relevant.

24         THE COURT:  That's fine, okay.

25         MS. MOORE:  Thank you, Your Honor.

1          **MR. STEKLOFF:**  I think we actually need a more -- I

2     would request a more affirmative instruction that there was

3     nothing wrong with the length.  There was nothing improper

4     about either the length of the deposition or the scheduling of

5     the deposition because that impression has now been left.  They

6     can argue it was a long day, so somehow maybe his answers were

7     confused, that's fine.  But I think now there is a suggestion

8     that somehow we did something wrong by taking -- giving him

9     breaks.  And I think taking less than a seven-hour deposition

10    with breaks, which were allowed under the rules --

11         **THE COURT:**  I will tell them they are not allowed to

12    consider anything about any of the questions or answers about

13    his deposition other than the fact that it went from 9:00 to

14    5:00.

15         **MR. STEKLOFF:**  Okay.

16         **MS. MOORE:**  Okay.

17     (The following proceedings were heard in open court:)

18         **THE COURT:**  Okay.  So, ladies and gentlemen of the

19    jury, the objection is sustained.  And several of the last

20    questions and answers will be stricken.

21     It is appropriate for you to consider the fact that the

22    deposition went from 9:00 a.m. to 5:00 p.m.  It is not

23    appropriate for you to consider anything else about the

24    deposition or how it was conducted.  And so I will instruct you

25    to disregard all of that testimony, and that testimony will be

```
 1    stricken.
 2            MR. STEKLOFF:  Can we just clarify -- I apologize,
 3    Your Honor -- they don't -- they can still --
 4            MS. MOORE:  Your Honor.
 5            MS. WAGSTAFF:  Wait.  Sidebar.
 6            THE COURT:  I think it's okay.
 7            MR. STEKLOFF:  The content of the examination I gave
 8    is not part of -- when you say not to -- that they shouldn't
 9    consider anything else in the deposition --
10            THE COURT:  Yes.
11            MR. STEKLOFF:  -- it is not the content of what was --
12            THE COURT:  Yes, thank you for clarifying it.
13        So I don't mean to say that you should disregard all of
14    the questions and answers about his answers in the deposition.
15    What I mean to say is just those last couple of questions about
16    the manner in which the deposition was conducted, that is not
17    appropriate for you to consider.  That is not appropriate
18    testimony.  So that will be stricken.
19            MS. MOORE:  Thank you, Your Honor.
20    BY MS. MOORE
21    Q.   And, Mr. Hardeman, before I have you sit down, I just want
22    to be clear, because I think there is a lot of confusion now on
23    this.  But did you read the label on the Roundup bottle before
24    you bought it in 1986?
25    A.   Absolutely.
```

1  **Q.**   And over the years of using Roundup, did you read the

2  label again?

3  **A.**   Yes.

4  **Q.**   And, at any point, during the time that you used Roundup,

5  did you expect that it would cause you to have cancer?

6  **A.**   No.

7  **Q.**   And if Monsanto at any point in those 26 years had warned

8  on the bottle and the label that using Roundup could cause

9  non-Hodgkin's lymphoma, what would you have done?

10  **A.**   I wouldn't have used it.

11         **MS. MOORE:**  That's all the questions I have.  Thank

12  you, Your Honor.

13         **THE COURT:**  Any recross?

14         **MR. STEKLOFF:**  No thanks, Your Honor.

15         **THE COURT:**  You can step down, Mr. Hardeman.  Why

16  don't we let the jury go off for a break before you step down.

17     Why don't we take a five-minute break.  We will resume at

18  about 20 minutes after the hour.  Thank you.

19                    (Recess taken at 2:13 p.m.)

20               (Proceedings resumed at 2:23 p.m.)

21         **MS. MOORE:**  Your Honor, we have the joint stipulation

22  regarding his medical expenses that we would like read into the

23  record.  It is a joint stip.

24         **MR. STEKLOFF:**  No objection, Your Honor.

25         **THE COURT:**  Read it in unless somebody prefers that I

```
 1    do it.

 2            MR. STEKLOFF:  No, that's fine.

 3            MS. MOORE:  That's fine.

 4            THE COURT:  Okay.

 5        (Proceedings were heard in the presence of the jury:)

 6            THE COURT:  Next witness.

 7            MS. MOORE:  Mary Hardeman, Your Honor.

 8                          MARY HARDEMAN,

 9    called as a witness for the Plaintiff, having been duly sworn,

10    testified as follows:

11            THE CLERK:  I ask you to speak directly into the

12    microphone.  You can adjust it if you need to.  And then I will

13    ask you to state your name and spell your last name for the

14    record.

15            THE WITNESS:  Mary Hardeman.  And what else do you

16    want?

17            THE CLERK:  Spell your last name, please.

18            THE WITNESS:  H-A-R-D-E-M-A-N.

19                        DIRECT EXAMINATION

20    BY MS. MOORE

21    Q.   Good afternoon, Mrs. Hardeman.

22    A.   Good afternoon.  Can you hear me?

23    Q.   I can hear you fine.  And if I can't, I will make sure

24    that we let you know.

25    A.   All right.
```

HARDEMAN - DIRECT / MOORE

Q.   Can you introduce yourself to the jury by telling them who you are?

A.   I am Mary O'Flaherty Hardeman, and --

Q.   I'm going to move this up just a little bit towards you.

A.   Okay.

Q.   Is that better?

A.   I hope so.

Q.   Okay.  Great.  I heard that O'Flaherty with an accent.  Can you tell the ladies and gentlemen where you are from?

A.   I was born in a very small town in County Galway, Ireland called Loughrhea.

Q.   How long have you been in the United States?

A.   I emigrated in '61.  It's a long time.

Q.   And are you married to Ed Hardeman?

A.   Yes, I am.

Q.   And how long have you two been married?

A.   Well, we have been together 46 years and married 40.

Q.   And do you have any children?

A.   We have one.  I have a biological son that Ed adopted when we got married.

Q.   Ms. Hardeman, the jury has heard from Dr. Nabhan and from your husband today about the chemotherapy and the impact that it had on him.  I would just like for you to explain to the jury as his wife of the last 40 years, what stands out to you the most about Ed having cancer and having to go through

HARDEMAN - DIRECT / MOORE

1   chemotherapy?

2   **A.**   It was awful.  I mean, it -- I know that morning that we

3   got that awful news after waiting for weeks, you know, for the

4   result and getting it that morning.  The only word I heard was

5   cancer, nothing else went into my mind but just that word.  And

6   you start thinking about Oh, my God, you know.  You know, he is

7   the love of my life and I could lose him, you know.

8        And you -- it's hard for me to describe how awful that

9   whole day was, but you start thinking about what are we going

10  to do, you know, what is the next step and what is the step

11  after that, and go forward.  And I can't remember -- it is a

12  blur, some of it, to me, that first probably week of it, you

13  know.

14       And Ed has always been -- my husband -- he has always been

15  the strong person in our -- for me, and I felt then that it was

16  like a role reversal.  I had to be strong for him, and I hadn't

17  never done that kind of -- he -- he -- I -- I'm tongue tied

18  right now on that.

19  **Q.**   That's okay.  Let me ask you about -- Ed talked about how

20  you drove to chemotherapy for him?

21  **A.**   Oh, yeah.

22  **Q.**   Tell the ladies and gentlemen of the jury, what was that

23  first day of chemotherapy -- what did you observe of Ed that

24  first day of chemotherapy?

25  **A.**   Well, we both got up and we got in the car.  I had to

1    drive.  Ed couldn't drive then.  And we drove down to Kaiser.

2    And it was -- both scared to death, you know.  You didn't know

3    what to expect.  And we went in and -- to the -- into the

4    office there, and they got a little delayed; and I just kind of

5    wanted to get in and get it done and get it over with, just

6    to -- but didn't happen that way.  I think they got a little

7    behind in the chemo ward.

8         And the nurse came out and -- very, very nice woman.  And

9    she apologized for the thing being delayed.  And she said --

10   came in after about an hour and she said, Well, we are ready

11   for you.  You know, and, of course, both of us went into the

12   chemo ward.  And you are scared to death.

13   Q.   Were you able to sit with your husband while he --

14   A.   I sat beside him.  They had -- they had these -- like

15   recliners is the best way to describe it.  And on the side was

16   a chair, and that's where I sat, on the chair beside him.  And

17   they -- I guess -- got him all prepped and they brought over

18   these different bags of -- plastic bags of drugs, I guess, is

19   what it is, and started prepping him.  And I guess he has tried

20   to console me and I'm trying to console him, and it's -- the

21   first time, you know, and it's --

22   Q.   How did your husband seem to you?

23   A.   Well, he was very different than I have known him.  He

24   was -- he was scared.  I could tell that, you know.  And, of

25   course, the words kept ringing in our head what Dr. Ye had told

1    him in the -- when he went in to first see Dr. Ye, and he told

2    him the kind of cancer that he had.  We didn't know -- we had

3    never heard of that type of cancer before.  And he -- he then

4    told him -- I guess after he looked at his -- he had taken a

5    scan of his body, and they could tell where the cancers were,

6    and he told him he was in stage 3.  And, of course, he could

7    see that Ed was pretty scared and I was scared, you know.

8        And he -- he then told him, which kind of drove it home to

9    us.  He said, you know, Ed, if you don't seek this treatment,

10   he said it is going to kill you.  And that kind of puts it home

11   to you that you have got to do everything you can to combat

12   this.

13       And the first day -- well, we were there for many hours.

14   We didn't get home until like about 7:00 o'clock that night.

15   And it was really all a blur, the whole day, you know.  We both

16   got home.  We were both exhausted.  And he -- he went right to

17   bed, and I went to bed.  I was totally wiped out.  And he -- I

18   remember next morning when he got up, I almost didn't recognize

19   him.

20   Q.   Why is that, Mrs. Hardeman?

21   A.   His whole face was blown up.  And his body, he was very

22   bloated, you know.  We didn't know what it was.  And, of

23   course, we had to get back, then, the next morning to Kaiser

24   because they had to take -- oh, God.  It was -- I forget --

25   they had to do -- was it a heart scan or something?  I can't

1   remember exactly.

2       And, of course, I have to drive because of -- and even

3   driving -- and thank God, it wasn't -- you know, we didn't live

4   too far from Kaiser, whereas if we stayed out in West Side we

5   would have had to a long drive every day.  So that was a good

6   thing, you know.  We were much closer in, and we -- I'm trying

7   to think.

8   Q.   Well, let me ask you this, Mrs. Hardeman, what type of

9   problems or issues did you observe that your husband was going

10  through while he had the chemotherapy?

11  A.   Oh, my gosh, he was -- a lot of nausea, a lot of anxiety.

12  It's like he was a different person.  He was --

13  Q.   What do you mean by that?

14  A.   Well, he was -- I mean, usually before I could have the

15  television on and have a little noise around.  You would be

16  cooking or, you know, doing whatever.  I couldn't have any of

17  that on because the TV, any movement of anything made him ill.

18  So you learned to live with it and --

19  Q.   And did he get ill at times?

20  A.   Oh, yeah, yeah.  He was -- it was the nausea, I think,

21  that was the worse.  And I knew he had to eat, so I would

22  make -- I would make these dishes that he would normally like,

23  but light ones, you know.  And, of course, half of it never got

24  eaten, you know.  He just couldn't eat.  So it didn't -- then I

25  decided to just do, like, chicken soup.  And I made a ginger

 1    tea, lots of ginger.  He didn't really like it, but I told him

 2    he had to get it in him, you know, and ginger ale and stuff

 3    like that, you know.

 4    Q.   Mr. Hardeman testified that you-all would bring, I think,

 5    a bucket in the car?

 6    A.   Oh, yeah.

 7    Q.   What was that?

 8    A.   Well, the first time -- no, it was -- I can't remember

 9    first or second, whichever time -- I'm driving down to Kaiser,

10    and just the movement of the car, he yells at me.  He says

11    Mary, pull over please.  Pull over quick.  And he -- I'm sorry

12    to say it right on the side of the road he threw up.

13         So after that, I decided I'm putting a bucket in the car.

14    And so we took -- I had the bucket in there.  And so at least

15    we didn't have to do that.  And I would just tell him to use

16    the bucket, you know.

17    Q.   And then how -- did you ever observe your husband in what

18    you thought was pain?

19    A.   Oh, yeah, yeah, yeah.

20    Q.   Can you tell the jury about that?

21    A.   Yeah.  It was -- it had to be after the second -- it had

22    to be after the second round of chemo.  It had to be at least

23    that when he was getting the shots to, I guess, increase his

24    white blood cell count.  And I remember him literally screaming

25    one night.

1        And I said, What's the matter?

2        And he said, Oh, my God.  It's like -- it's like -- I

3    didn't know what it was -- he said, It's like electric shock

4    going up through his body.

5        And I tried to get him into bed and he couldn't lie down.

6    He could not -- what am I going to do, you know.  So I told him

7    to come up into the living room and get on the recliner,

8    because, you know, the recliner, you can get in different

9    positions.  And covered him with a blanker.  And I was tired

10   too.  I had to lie down and go get some sleep because the next

11   morning we had to get up and go back there.  And we --

12   Q.   So what did you do when you got him into the recliner?

13   A.   I got him into the recliner, and I turned on -- we have

14   Xfinity, so I turned on the TV, but they have like that -- oh,

15   they have nice -- like landscapes on it, you know, and very

16   soft music.  And I turned that on.  And so there was no

17   movement, you know.  It was just -- and I gave him -- I can't

18   remember what -- I went to bed.  I was just wiped out.  And got

19   up after a couple of hours, and I came in and he was finally

20   sleeping in the recliner.  And that's how it was for the rest

21   of, you know --

22   Q.   And did he continue to sleep in the recliner during chemo?

23   A.   No, no, he -- that would only happen during -- when he

24   would get these bone pains, I guess, would be the best way to

25   describe it.

1   Q.   The jury heard about something called "chemo brain."  Are

2   you familiar with that?

3   A.   Well, I have heard it.  I have heard of it, yeah.

4   Q.   What is it -- what does it mean to you and --

5   A.   Well, he would forget a lot of things.  He would -- oh, it

6   is hard to describe.  He would, like -- you would be talking to

7   him, and it's like he wasn't interested in what you were

8   saying.  It's like he -- that, to me, was what it was like with

9   him.  It is hard for me to --

10  Q.   How was his patience?

11  A.   Oh, his patience wasn't there, no, no.  And usually he is

12  a very patient person, you know.  But -- no, his patience went

13  out the window, you know.  And that's when I had to start

14  getting some patience of my own because normally I was the one

15  who would get impatient and, you know -- but we worked it out,

16  you know.

17  Q.   The jury heard that Mr. Hardeman has to have a repeat scan

18  I think next month; is that right?

19  A.   That's correct, yeah, yeah.

20  Q.   Can you tell the jury how he does right before these

21  repeat scans?

22  A.   Yeah.  He is -- well, we are both -- we are both, because

23  it is coming up to going in for the scan -- well, going for the

24  scan is not bad.  You know, you go in for the scan.  It is the

25  waiting afterwards to find out what the result is, and you are

1   always hoping for a good result.  You pray for it, and so

2   far -- I think he has had, what, three -- three years of --

3   this will be the fourth -- yeah, so far it has been good, you

4   know.

5        The one thing, too, that -- with him, what he felt

6   terrible about, and I didn't want him to feel terrible about,

7   was in 2015 it was going to be my brother's 75th birthday.  My

8   family live in Ireland, and I wanted to go there real bad for

9   that to be with them.  And so did Ed.

10       He felt terrible we had to cancel the whole thing.  And --

11  but thank God, the next year when he got a clear scan we did

12  go.  And I did get to see all of the family and all of their

13  kids and grandkids, and it was lovely, you know.  It was really

14  lovely.

15  Q.   You mentioned anxiety?

16  A.   Yeah.

17  Q.   And feeling anxious.  Can you tell the jury about what you

18  have observed of your husband feeling anxious or having that

19  anxiety?

20  A.   Yeah.  It's -- you are anxious -- you are always anxious

21  to know that you have got a clear -- a clearance from the

22  doctor and from these scans, because it gives you more time to

23  enjoy your life, you know.

24  Q.   Do you think, based on what you have observed of your

25  husband, that that anxiety of the cancer will ever go away?

1    **A.**   Realistically, no.  No, I don't think so.  No.

2    **Q.**   Why not, Mrs. Hardeman?

3    **A.**   Well, cancer is something.  It is pretty tenacious, and

4    you always -- you are always thinking, God, if I think I'm fine

5    and it is all gone and everything, I'm scared that, Oh, my God

6    I will hex it and it will come back, you know.  But I know it's

7    not a great answer, but that's -- that's how I feel, you know.

8    And I wish to God that he had never got that damn disease,

9    ever, you know.

10   **Q.**   Do you think that the non-Hodgkin's lymphoma has changed

11   your husband?

12   **A.**   Oh, yeah, yeah.  It has changed us.  You know, yeah, I

13   think so.

14   **Q.**   In what ways, Mrs. Hardeman?

15   **A.**   It's the -- the outlook on life, it is different.  You

16   know, you look upon life a little differently after you have

17   gone through that.  It's -- oh, it's -- you didn't think about

18   things that you think about after you have had that.  It's --

19   it's hard for me to describe it.

20   **Q.**   Do you -- do you think of him as being in remission?

21   **A.**   Well, he is in remission.  He is in remission after we get

22   a good CAT scan.  That, to me, is the time when you say, Oh,

23   God, we will do things.  We will go places.  We will, you know,

24   and -- but then the next year starts coming back around again,

25   and you start thinking, I hope it doesn't come back.  And I

1  fervently hope it does not, you know.

2      I love my husband very much and want him to be around.  I

3  want to be around because I'm a little older than him, so I

4  don't know how that is going to work out, but, you know --

5  **Q.**  Do you think your husband worries that he is not going to

6  be around?

7  **A.**  Well, I know he did for a while there, yeah.  Yeah, he

8  did.

9          **MS. MOORE:**  Thank you, Mrs. Hardeman.

10         **THE WITNESS:**  Thank you.

11         **THE COURT:**  Any cross-examination?

12         **MR. STEKLOFF:**  No, Your Honor.  Thank you.

13         **THE COURT:**  Okay.  Thank you.

14     I think this is probably a good time to call it a day.

15     Mrs. Hardeman, why don't you go ahead and step down and --

16  we will give you a second.

17     And I just want to talk to you a little bit about

18  scheduling.  We are very much in the home stretch now.  Take

19  your vitamins over the weekend.  Why don't we plan on starting

20  on Monday at 8:00 a.m. as we did today.  I can't make any

21  promises, but it looks like the way it is going, we will

22  probably conclude Phase Two, which is the final phase, on

23  Tuesday.

24     It looks like you will probably hear closing arguments on

25  Tuesday, and I will instruct you on Tuesday and you may even be

 1   able to begin your deliberations on Tuesday.  So I can't

 2   guarantee that.  Don't be mad at me if it ends up being

 3   Wednesday, but I think that's the direction we are going in

 4   right now.  So just wanted you-all to know that.

 5       Please remember all the rules about not doing any research

 6   or talking to people or -- and make sure to avert your eyes

 7   from any media reports or anything like that.  And with that, I

 8   hope you-all have a good weekend, and we will see you Monday

 9   morning; and we will bring you in at 8:00.  Thank you.

10       (Proceedings were heard out of presence of the jury:)

11       **THE COURT:**  People can be seated, but please remember

12   you have to stay in the courtroom for five minutes to give the

13   jury a chance to escape.

14       And with that -- first of all, let's talk about time.

15       **MS. MOORE:**  Okay.

16       **THE COURT:**  Because I'm looking at the clock right

17   now, and it looks like the Plaintiff has about two hours and 20

18   minutes left on the clock.  You know, I guess it also looks

19   like, for the witnesses that you propose calling, you are

20   proposing calling more than -- putting on more than two hours

21   and 20 minutes worth of additional testimony, which would leave

22   you zero time for closing arguments, right?

23       **MS. MOORE:**  Yes, Your Honor.  That's accurate.  As you

24   can tell, we provided you with a chart this morning.  We really

25   did narrow down the time.  I think it is -- I think it's

PROCEEDINGS

 1   around --

 2          MS. WAGSTAFF:  I think we have about three hours and

 3   ten minutes of designated time left.

 4          THE COURT:  For the Plaintiffs?

 5          MS. WAGSTAFF:  Correct.  That's what I -- give or

 6   take.

 7          MS. MOORE:  That seems -- okay.  I haven't added it up

 8   Your Honor.  It is on that chart.  I think we can play --

 9          THE COURT:  Well, let me ask you this.

10          MS. MOORE:  Okay.

11          THE COURT:  What I was sort of entertaining is perhaps

12   reluctantly giving you another hour so that you can get your

13   closing in, but -- and I -- you know, we have had discussions

14   along the way about the arguments in favor of giving you more

15   time and the arguments against giving you more time.  I think

16   they are all strong arguments, but I guess what I would want to

17   hear before -- before adding an hour to your clock, looking at

18   the witnesses that you have left, what are you proposing to get

19   in from those witnesses that is not cumulative, right?  Because

20   obviously at this point anything about ghostwriting is

21   cumulative.  I'm not saying you can't use your time that way if

22   you want to.  It's your time, but, you know, anything -- it

23   seems to me that anything about ghostwriting is cumulative.

24   Anything about the *McDuffie* abstract at this point is

25   cumulative.

PROCEEDINGS

1          **MS. MOORE:**  There isn't any designations, I believe,

2    on the *McDuffie* abstract, Your Honor.   I do think that

3    Mr. Heydens, there is -- we cut him from three hours and 32

4    minutes.   I do think there is ghostwriting in there.

5          And then Mr. Azevedo, Mr. Grant, the former CEO,

6    Mr. Guard, those are all with respect to damages, which we have

7    not played anything on damages yet.   And then I believe that

8    Mr. Kier is also ghostwriting, which we could probably take

9    another swing at that as well, if we need to.

10          **THE COURT:**  Who?

11          **MS. MOORE:**  Larry Kier.

12          **THE COURT:**  Okay.

13          **MS. MOORE:**  And then the rest of these, Your Honor,

14    with the exception of Dr. Portier, which I know you are

15    familiar with his testimony, but the rest of these are -- it's

16    damages with the exception of -- it's less than five minutes,

17    Dr. Saltmiras, that is on ghostwriting.

18          **THE COURT:**  When you say damages, what do you mean by

19    that?

20          **MS. MOORE:**  Punitive.

21          **THE COURT:**  Like punitive damages?

22          **MS. MOORE:**  Yes, Your Honor.

23          **THE COURT:**  Does it relate to the amount of punitive

24    damages or whether the conduct was sufficiently reprehensible

25    for punitive damages?

1        **MS. MOORE:**  Both, Your Honor.  More so showing a

2    pattern for compensability.  It also goes to what they knew,

3    when they knew it and really their actions over those 40 years

4    to support our claim for punitive damages.

5        **MS. WAGSTAFF:**  It hovers around three hours.  I just

6    did it on the fly.

7        **THE COURT:**  What is remaining -- what you have

8    remaining hovers around three hours?

9        **MS. MOORE:**  Right.

10        **THE COURT:**  What the Defendant has remaining hovers

11    around, what?

12        **MS. WAGSTAFF:**  I did their time this morning, so don't

13    hold me to this, but I had timed them around four hours and 20

14    minutes, which included their Farmer time, which I think was --

15        **MS. MOORE:**  Two hours or something.

16        **MR. STEKLOFF:**  I think we are around two, two and a

17    half hours of our counters and affirmatives.

18        **THE COURT:**  Okay.  And you were saying you may wish to

19    try -- to attempt to designate something else from Portier?

20        **MR. STEKLOFF:**  If we do, it would be from Portier or

21    Dr. Farmer.  And we would keep it brief.

22        **THE COURT:**  Okay.  So --

23        **MS. MOORE:**  So what we would ask, Your Honor, is that

24    we be able to play the remaining depositions.  We really have

25    worked hard over the last two days to narrow it down.  I think

 1   you can tell from the times and stuff too.  And we would like

 2   to play these remaining depositions.  And then I would like

 3   time for a closing argument.

 4           THE COURT:  Well, that's why I was saying -- I mean,

 5   it sounds like there is -- there is still a fair bit of

 6   cumulative information that you are proposing to put on.  And,

 7   you know, like I said, you are entitled to do that, but it

 8   affects whether, you know, to take -- you know, it affects the

 9   decision whether to take more of the jury's precious time than

10   we had planned.

11           And so I guess what I would say to you right now is I

12   would be inclined to add an hour to your clock, and that -- you

13   know, it struck me that the opening statement, which was, as

14   Monsanto's was, much more like a closing argument -- was very

15   efficient.  And you did it in, what, like --

16           MS. WAGSTAFF:  Thirty-two minutes.

17           THE COURT:  Thirty-two minutes.  It was very -- I

18   don't think you need to use that whole hour for your closing,

19   it seems.

20           MS. MOORE:  Well, I do have to cover damages, Your

21   Honor, in closing.

22           THE COURT:  Right.  That's true.

23           So my -- you know, I will add another hour to your clock,

24   and I think it's going to be on you to kind of comb through and

25   remove whatever is, you know, either excessively cumulative or

 1   not important enough to include in your case.

 2       **MS. MOORE:**  Your Honor, we would just request if we

 3   could have two hours.  I'm not trying to push my luck, Your

 4   Honor, but I do think that, you know, the amount of time we

 5   have spent streamlining it, I mean, it's -- it's several people

 6   with hours and hours, and we have been very judicious about

 7   that.  If we can have another hour, that would set us on the

 8   right course.  It would allow us to get our evidence in on

 9   damages.  And I think we would still be on schedule to close

10   Tuesday or Wednesday, Your Honor.

11       **THE COURT:**  Okay.  Well --

12       **MS. MOORE:**  Especially in a case this size.  I have to

13   cover 40 years in closing argument, Your Honor.  I just want to

14   make sure that I have sufficient time to do that.

15       **THE COURT:**  Okay.  So I -- I mean, I may reconsider it

16   after reviewing all of this testimony over the weekend.

17       **MS. MOORE:**  I would appreciate it that, Your Honor.

18       **THE COURT:**  But I'm very doubtful that I will give you

19   more than an hour given how much cumulative testimony has come

20   in already and given all the other issues we have already

21   discussed regarding the use of the jury's time and whatnot.

22       **MS. MOORE:**  I understand.  We are 20 hours below where

23   they were in Johnson, I will just say.

24       **THE COURT:**  Is that right?

25       **MS. MOORE:**  Yes, we are.

**PROCEEDINGS**

1          **THE COURT:**  It sounds like it may have not been a very

2    efficient trial.

3          **MR. STEKLOFF:**  I don't think our efficiency in this

4    trial should be held against us.

5          **THE COURT:**  How much time did you use in this case,

6    compared to Johnson?

7          **MR. STEKLOFF:**  I don't know compared to Johnson.  I

8    think coming in today we had over 14 hours.

9          **THE COURT:**  Yeah.

10          **MS. MOORE:**  But they don't have the burden.

11          **THE COURT:**  We discussed all those issues.

12          **MS. MOORE:**  Absolutely.  I don't want to rehash it,

13    Your Honor.

14          **THE COURT:**  Given all the issues we discussed, I think

15    it would be fair to add an hour.  But at some point it does

16    become unfair both to the jury and to the opposing side to just

17    keep giving you more time.  So I highly doubt I'm going to give

18    you more time than that.

19          **MS. MOORE:**  We would appreciate the consideration,

20    Your Honor.

21          **THE COURT:**  And I will review all the remaining

22    testimony over the weekend.  And we will go from there.

23          I want to -- it looks like you have something, but I

24    wanted to make sure before I forget to make at least one

25    comment about jury instructions.  I want to make sure that

1   you -- so on the issue -- well, let me just back up on the

2   issue of timing.

3        So assuming we have given you another hour, so that puts

4   you at about three hours and 20 minutes.  Assuming that that is

5   how it is going to be, which is very likely, I think what that

6   means is that we would -- we would begin at 8:00 a.m. on

7   Monday.  We would probably either finish the presentation of

8   the evidence on Monday or come very, very close to doing so.

9   And then you could -- the closings could be on Tuesday morning,

10  and the jury could begin deliberating by lunchtime potentially.

11       MS. MOORE:  Okay.  Great.  We can plan on that for

12  now, Your Honor.

13       THE COURT:  Okay.

14       MS. MOORE:  You did raise something on the jury

15  instructions, and I wanted to ask you, because we really

16  struggled with how to do that.  And in both the failure to warn

17  and the defective design claims, there is that line that, you

18  know, whether it was the failure to warn was a substantial

19  factor, and I didn't know if that's what you were getting at

20  this morning.

21       THE COURT:  I'm dealing with that.  And I will put out

22  a -- my version of the instructions on Sunday.

23       MS. MOORE:  Great.

24       THE COURT:  But the way basically that I'm dealing

25  with it for you-all to -- in case you-all want to start

 1   thinking about it, is to just -- let me see.  Do I have them --

 2   I think I have them in front of me.

 3         MS. WAGSTAFF:  Your Honor, I assume Monday when we do

 4   our charging conference, we can have a conversation like in

 5   Phase One where we discuss sort of the scope of some of the

 6   closing arguments that we anticipate.

 7         THE COURT:  Absolutely.

 8         MS. WAGSTAFF:  Okay.

 9         THE COURT:  So let me just -- I'm pulling up the

10   models, just to give you an example.

11         MS. MOORE:  Okay.

12         THE COURT:  But -- so this is -- what I'm working on

13   is still very much in draft form.

14         MS. MOORE:  I understand.

15         THE COURT:  I did it late last night, so I don't know

16   if this is going to stay this way.  But so take strict

17   liability design defect, for example, right.

18         MS. MOORE:  Yes.

19         THE COURT:  The -- the element that Mr. Hardeman was

20   harmed, I mean that was decided in Phase One already.

21         MS. MOORE:  Right.

22         THE COURT:  So my proposal is to take that out.  And

23   to say things along the lines of --

24         MS. MOORE:  And you will see in our version, Your

25   Honor, we moved that up to the top to say -- and the language

**PROCEEDINGS**

 1   can work its way out.  We said, In Phase One you found that

 2   Mr. Hardeman was harmed by Roundup.  They don't need to find

 3   that again.  So I agree with you in how we play with that

 4   language.

 5           **THE COURT:**  Yeah.  But just generally -- I'm having a

 6   hard time coming up with an example right now, but it's

 7   generally the -- the concept that is embodied in the

 8   instructions that I'm working on is, Was the failure to warn a

 9   substantial factor in the harm that Roundup caused

10   Mr. Hardeman?  You know, something like that, something along

11   those lines.

12           **MS. MOORE:**  I see what you are saying, okay.

13           **THE COURT:**  So, in other words, we have already

14   established that Roundup caused the harm to Mr. Hardeman; but

15   what we haven't established is that the -- that Monsanto is

16   legally responsible for the harm that Roundup caused to

17   Mr. Hardeman --

18           **MS. MOORE:**  Right.

19           **THE COURT:**  -- because Monsanto, you know, knew or

20   should have known that the product was dangerous.

21           **MS. MOORE:**  Right.

22           **THE COURT:**  That's the sort of conceptual point --

23           **MS. MOORE:**  I understand.

24           **THE COURT:**  -- that the instructions will embody.

25           **MR. STEKLOFF:**  That makes sense conceptually.

PROCEEDINGS

1    **THE COURT:**  And then the other thing I was just going

2  to plant in your brain now is that, you know, you have got the

3  strict liability failure to warn and you have got the negligent

4  failure to warn.

5    **MS. MOORE:**  Right.

6    **THE COURT:**  I think what you need to do is scratch

7  your head and ask yourself, How could the jury rationally

8  conclude in Mr. Hardeman's favor on one and not the other.

9    **MS. MOORE:**  Right.  And I know we --

10    **THE COURT:**  If you can't think of a way that they can

11  do that, then I think the only thing you are doing by

12  submitting both of those claims to the jury is inviting

13  inconsistent verdicts.

14    **MS. MOORE:**  I understand.

15    **THE COURT:**  Which could, I suppose, get both of them

16  tossed under Trayhill and other cases that --

17    **MS. MOORE:**  Can we think about it?  We have talked

18  about it.  We have tossed it around.  And it is kind of an

19  academic exercise too.  And let us think about that a little

20  bit more today.

21    And would it be okay with you if we sent you an e-mail, to

22  the Court e-mail tomorrow?

23    **THE COURT:**  You don't even have to do that.

24    **MS. MOORE:**  I just don't want you to waste your time

25  on a certain instruction.

 1          **THE COURT:**  No, no.  It's fine.  We will give you a

 2     draft of the instructions.

 3          **MS. MOORE:**  Okay.

 4          **THE COURT:**  But, you know, I really question whether,

 5     you know -- I mean, there are two issues.  One is is it

 6     appropriate to give both under the way the evidence has come

 7     in.  And even if -- even if I don't have the authority to pull

 8     one of them, you know, you need to think about whether it is a

 9     mistake for you to be submitting both of them to the jury.

10          **MS. MOORE:**  I understand, Your Honor.

11          **THE COURT:**  So let me think.  Was there anything else

12     I wanted to get you thinking about?

13          I mentioned earlier that I'm working on a sort of

14     massively revised version of Monsanto's proposed instruction

15     about the EPA.

16          **MS. MOORE:**  Yes.

17          **THE COURT:**  And the idea -- so just think about it.

18     We don't need to discuss it now.  But start giving thought to

19     it.  The gist of what I drafted last night, which may be

20     different than what you get on Sunday -- was, you know, that --

21     you know, as we told you before, you are not supposed to

22     allow -- you know, substitute the judgment of EPA, IARC, the

23     European regulators for your own judgment.  That is still the

24     case.

25          But, you know, the -- but the actions of those entities

**PROCEEDINGS**

1   are appropriate for you to consider in assessing, you know,

2   whether Monsanto knew or should have known between whatever

3   date and pre-2012 Roundup was a cancer risk, something along

4   those lines.

5        **MS. MOORE:**  Okay.  And I think the only thing is on

6   Monday we will deal with the exhibits from the last three

7   depositions, Your Honor.  And then I will start with the joint

8   stip.  I know the jury wanted to go home today so I didn't go

9   there, but we will start with the joint stip on the medical

10  bills.  And then Mr. Stekloff said he would look over the

11  judicial notice issue on life tables, and we can bring that up

12  on Monday morning too.

13       **THE COURT:**  Okay.

14       **MS. MOORE:**  And then we went and filed the joint stip

15  on the financials, so that has been filed with the Court.

16       **THE COURT:**  Okay.

17       **MR. STEKLOFF:**  Just we are preserving our objection,

18  but we did stip to it.

19       **THE COURT:**  Got it.

20       **MR. KILARU:**  Can I ask one jury instruction-related

21  question?

22       **THE COURT:**  Yes.

23       **MR. KILARU:**  We had talked earlier about consumers'

24  expectations proposal from us.

25       **THE COURT:**  Yes.

1          **MR. KILARU:**  I know you wanted to get these out on

2     Sunday.  Is there a time?  Tomorrow morning, is that okay?

3          **THE COURT:**  Sure.

4          **MR. KILARU:**  Okay.  Great.  Thanks.

5          **THE COURT:**  It can even be tomorrow afternoon

6     probably.

7          **MR. KILARU:**  Oh, great.

8          **THE COURT:**  And then there is an issue of -- there is

9     an instruction in there about mitigating evidence as it relates

10    to damages.  Maybe it is punitive damages.  I can't recall.

11         **MR. STEKLOFF:**  Do you know which --

12         **THE COURT:**  It is in the model.  I can't remember

13    which side proposed it.  I thought it was in your proposal.

14         **MS. MOORE:**  It would have been you-all.

15         **MR. STEKLOFF:**  That makes more sense.

16         **THE COURT:**  But I had a question about whether any

17    evidence such as -- any mitigating evidence has come in with

18    respect to punitive damages.  I don't really know what would be

19    categorized.

20         **MR. KILARU:**  It is in the -- it is a subset of the

21    punitive damages.

22         **THE COURT:**  Right, right, right.

23       So, anyway, I found myself scratching my head, wondering

24    whether that has any relevance in this case.  But you don't

25    have to answer now.  Just start giving that some thought.

1        MR. KILARU:  Okay.

2        THE COURT:  I think those are kind of the -- and then

3    we need to figure out what the right limiting instruction is

4    for, you know, post-use conduct.  And I'm working on that.  And

5    I'm hopeful you-all are thinking more carefully about that, and

6    will be -- you will see what I put out on Sunday and we will

7    discuss it on Monday.

8        MS. MOORE:  Okay.  Sounds good.  Thank you, Your

9    Honor.

10       THE COURT:  Anything else for now?

11       MR. STEKLOFF:  Just briefly -- and I don't think we

12   need to argue this.  I just thought -- so one of the

13   depositions that you have before you is Doreen Manchester.

14       THE COURT:  Oh, yeah.

15       MR. STEKLOFF:  Who is 30(b)6 for CropLife America.  I

16   think that it is -- the testimony is hard to follow without the

17   exhibits, so I wanted Your Honor to have the exhibits.

18       THE COURT:  Okay.

19       MR. STEKLOFF:  My understanding of what is happening

20   here is that -- and these documents are -- well, one is 2016.

21   But one is 2009.  And in 2009 there is testimony -- this is

22   really the -- other than maybe a little bit of background

23   information, I think all the Plaintiffs have designated in this

24   deposition about a FOIA request that CropLife America makes of

25   the National Cancer Institute related to the Agricultural --

 1          **THE COURT:**  Can you -- I apologize.  Can you hold on

 2   one second?  I just realized I was supposed to be somewhere at

 3   3:00.  So I just want to e-mail them and tell them I'm not

 4   there, in case they don't know.

 5          (Pause in proceedings)

 6          **THE COURT:**  Okay.  Sorry.

 7          **MR. STEKLOFF:**  So in the e-mail you will see a

 8   discussion about a FOIA request that CropLife America made of

 9   the NCI relating to the Agricultural Health Study.  This is

10   after *De Roos* 2005.  And in that -- and then there are e-mails

11   where Dr. Goldstein for Monsanto is included in the e-mails in

12   which they are talking about the FOIA submission that NCI sent

13   back to them, whether it was sufficient, whether they need to

14   get lawyers involved to follow up.  And so the only -- I just

15   wanted you to have the e-mails.

16          The other back -- I don't think that that should be

17   relevant.  I think it is a lot of speculation about -- it

18   really has nothing to do with Phase Two.  I think it requires a

19   lot of speculation.

20          The other point I wanted to make was that I think it

21   really ties to a multiple myeloma finding that was in some of

22   the earlier AHS publications.  And then later using the data

23   that they received from NCI, there is follow-up on whether

24   there is an association between multiple myeloma and various

25   products including glyphosate.  So, I mean, I think if you have

1    the e-mails, it will give you context; and I think it will save

2    Plaintiffs 12 precious minutes of time, if they don't have to

3    play the Manchester --

4            **MS. MOORE:**  Is it okay if the Hardemans, can they

5    leave now?

6            **THE COURT:**  Of course.

7            **MS. WAGSTAFF:**  Your Honor, I appreciate the invitation

8    not to play.  I just wanted to remind you that the post-conduct

9    order, as I remember it, doesn't relate to literature that they

10   relied on, which clearly they relied on the AHS data.  And so

11   what this e-mail actually is is CropLife America is the trade

12   association.  Monsanto is the main member.

13       Monsanto's dues are based on how much Roundup they sell.

14   So the more Roundup they sell, the more money CropLife makes.

15   That is all in the designations.

16       In 2005, right after the first AHS paper comes out, they

17   FOIA for the information.  And they won't get it.  And so

18   Monsanto's employee actually says, Stick a loaded lawyer at

19   them.  And then they say something else and he says, Sue the

20   bastards.

21       So we think it goes completely towards their punitive

22   damage and their mindset and sort of what the company was

23   saying when they couldn't get the information they wanted.  And

24   then now they come in here and say this is sort of the best

25   data ever.  So I think you will learn it when you read the

 1    e-mail, but it's a little more color than the way Mr. Stekloff

 2    just described it.

 3         THE COURT:  Okay.  I will take a look.  Thank you.

 4         Okay.  Let me see.  Is there anything else that we should

 5    be discussing right now?

 6         MR. STEKLOFF:  I don't think so, Your Honor.  There is

 7    one Reeves exhibit that we think should be admitted.  Actually,

 8    I think based on the discussion we have had today about

 9    post-2012 regulatory, I want to go back and look.  We had

10    redacted it substantially because a lot of it touched on

11    post-2012 regulatory issues.  I think now some of that may be

12    admissible.  So I will coordinate with Ms. Wagstaff over the

13    weekend on what we think should be redacted and what shouldn't,

14    and we will present it to Your Honor on Monday.

15         THE COURT:  All right.  Sounds good.

16         So we will see you Monday morning.  Be here by 7:30 so we

17    can discuss anything we need to discuss.

18         MS. MOORE:  Thank you, Your Honor.

19         MS. MATTHEWS JOHNSON:  Thank you.

20              (Proceedings adjourned at 3:12 p.m.)

21                        ---oOo---

22

23

24

25

**CERTIFICATE OF REPORTERS**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Friday, March 22, 2019

_____
Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
U.S. Court Reporter


_____
Marla F. Knox, RPR, CRR
U.S. Court Reporter