Volume 19

Pages 2460 - 2682

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

EDWARD HARDEMAN,                    )
                                    )
            Plaintiff,              )
                                    )
  VS.                               )     NO. C 16-00525 VC
                                    )
MONSANTO COMPANY,                   )
                                    )
            Defendant.              )
_____)

                        San Francisco, California
                        Monday, March 25, 2019

                **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                        ANDRUS WAGSTAFF PC
                        7171 W. Alaska Drive
                        Lakewood, Colorado  80226
                   BY:  **AIMEE H. WAGSTAFF, ATTORNEY AT LAW**
                        **DAVID J. WOOL, ATTORNEY AT LAW**

                        MOORE LAW GROUP
                        1473 South 4th Street
                        Louisville, Kentucky  40208
                   BY:  **JENNIFER MOORE, ATTORNEY AT LAW**


            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Marla F. Knox, RPR, CRR
              Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporters

1   **APPEARANCES**:   (CONTINUED)

2   For Defendant:

3                        WILKINSON  WALSH ESKOVITZ LLP
                         2001 M Street, NW - 10th Floor
4                        Washington, D.C.  20036
                BY:   **BRIAN L. STEKLOFF, ATTORNEY AT LAW**
5                     **RAKESH N. KILARU, ATTORNEY AT LAW**
                      **TAMARRA MATTHEWS JOHNSON, ATTORNEY AT LAW**
6                     **JULIE RUBENSTEIN, ATTORNEY AT LAW**
                      **CALI COPE-KASTEN, ATTORNEY AT LAW**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**I N D E X**

Monday, March 25, 2019 - Volume 19

| PLAINTIFF'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **WILLIAMS, HEYDENS**<br>By Videotape Deposition (not reported) | 2485 | 19 |
| **PORTIER, CHRISTOPHER**<br>By Video Testimony (not reported) | 2490 | 19 |
| **KIER, LARRY**<br>By Video Testimony (not reported) | 2490 | 19 |
| **MURPHY, SAMUEL**<br>By Video Testimony (not reported) | 2491 | 19 |
| **KOCH, MICHAEL**<br>By Video Testimony (not reported) | 2519 | 19 |
| **GRANT, HUGH**<br>By Video Testimony (not reported) | 2520 | 19 |
| **GUARD, JAMES**<br>By Video Testimony (not reported) | 2524 | 19 |

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 86 | | 2529 | 19 |
| 89 | | 2529 | 19 |
| 147 | | 2489 | 19 |
| 154 | | 2528 | 19 |
| 155 | | 2527 | 19 |
| 156 | | 2527 | 19 |
| 157 | | 2527 | 19 |
| 158 | | 2527 | 19 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 159 | | 2527 | 19 |
| 160 | | 2491 | 19 |
| 160 | | 2527 | 19 |
| 161 | | 2527 | 19 |
| 208 | | 2527 | 19 |
| 220 | | 2529 | 19 |
| 245 | | 2519 | 19 |
| 249 | | 2529 | 19 |
| 250 | | 2529 | 19 |
| 251 | | 2529 | 19 |
| 254 | | 2529 | 19 |
| 254 | | 2535 | 19 |
| 312 | | 2486 | 19 |
| 314 | | 2535 | 19 |
| 315 | | 2486 | 19 |
| 317 | | 2486 | 19 |
| 322 | | 2486 | 19 |
| 323 | | 2486 | 19 |
| 388 | | 2490 | 19 |
| 416 | | 2489 | 19 |
| 426 | | 2519 | 19 |

1

## **I N D E X**

2

### **E X H I B I T S**

3

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 429 | | 2535 | 19 |
| 435 | | 2535 | 19 |
| 442 | | 2535 | 19 |
| 443 | | 2529 | 19 |
| 444 | | 2535 | 19 |
| 448 | | 2529 | 19 |
| 448 | | 2535 | 19 |
| 449 | | 2529 | 19 |
| 449 | | 2535 | 19 |
| 450 | | 2529 | 19 |
| 453 | | 2529 | 19 |
| 461 | | 2535 | 19 |
| 462 | | 2535 | 19 |
| 463 | | 2535 | 19 |
| 464 | | 2535 | 19 |
| 466 | | 2535 | 19 |
| 467 | | 2535 | 19 |
| 468 | | 2535 | 19 |
| 481 | | 2489 | 19 |
| 503 | | 2529 | 19 |
| 515 | | 2529 | 19 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 516 | | 2529 | 19 |
| 686 | | 2490 | 19 |
| 710 | | 2489 | 19 |
| 711 | | 2489 | 19 |
| 788 | | 2555 | 19 |
| 791 | | 2554 | 19 |

PROCEEDINGS

| | |
|---|---|
| 1 | **Monday - March 25, 2019**                            **7:37 a.m.** |
| 2 |                       P R O C E E D I N G S |
| 3 |                          ---000--- |
| 4 | (Proceedings were heard out of presence of the jury:) |
| 5 | THE COURT:  Okay.  What do we need to talk about?  I |
| 6 | think there may have been one or two little issues hanging from |
| 7 | the depo designations last night. |
| 8 | MR. WOOL:  The Kier and Kirkland Saltmiras is probably |
| 9 | the easiest to tee off, and that is one issue that was floating |
| 10 | off of the depositions. |
| 11 | THE COURT:  That was the -- that was the issue of |
| 12 | whether that 2013 Kier and Kirkland article was an example of |
| 13 | Monsanto ghostwriting? |
| 14 | MR. WOOL:  Correct. |
| 15 | THE COURT:  Okay. |
| 16 | MR. WOOL:  So -- |
| 17 | THE COURT:  I will tell you my understanding of the |
| 18 | evidence from what you submitted to me is that Saltmiras and |
| 19 | the folks at Monsanto were always anticipating that he was |
| 20 | going to be listed as a coauthor of that article, and then |
| 21 | Kirkland said No, it would not be appropriate to have you |
| 22 | listed as a coauthor of the article, notwithstanding the fact |
| 23 | that you did make some contributions to it. |
| 24 | MR. WOOL:  Well, as a factual matter, before that, the |
| 25 | glyphosate task force said no to Saltmiras being listed as an |

1    author.  But I think -- kind of separate and apart from whether

2    this fits into the box of ghostwriting -- this is an example of

3    Monsanto going out and having David Saltmiras write the

4    article.  They anticipated having him as an author and then

5    paying to have David Kirkland's name slapped on the paper.

6        And the evidence is uncontroverted that from both David

7    Saltmiras and Larry Kier that David Saltmiras is not qualified

8    to be an author on this paper.  And so whether Monsanto sort of

9    took the final step in ghostwriting this, they were sort of

10   complicit in this conspiracy, if you will, to have the article

11   published with knowing that it was pretty much written by David

12   Saltmiras and given the appearance that David Kirkland was

13   actually the author to kind of lend credibility to that.

14        **THE COURT:**  Okay.  So the theories that this is --

15   this is not necessarily an example of ghostwriting, it is an

16   example of having -- paying a scientist to slap his name on an

17   article that he didn't really have significant involvement in

18   creating.

19        **MR. WOOL:**  Right.

20        **THE COURT:**  And so what -- you want to point me to the

21   evidence of that that you have -- you have designated some

22   testimony.  Can you show me where the -- where the testimony is

23   that you have designated that supports that proposition?

24        **MR. WOOL:**  Yes.  Hold on one second, and I can tell

25   you exactly where it is.

PROCEEDINGS

1       (Pause in proceedings)

2           MR. WOOL:  So if you go to page 180, line 5 of Kier --

3   sorry, of the Kier --

4           THE COURT:  Hold on a second.  What page?

5           MR. WOOL:  180.

6           THE COURT:  Okay.  Hold on.

7       All right.

8           MR. WOOL:  You will see at line 5 that they were

9   talking about the price really of adding David Kirkland onto

10  the project.  And at this point in time, you know, they are

11  estimating he is going to spend fewer than ten days working on

12  it.  You know, when David Saltmiras was -- pretty much had a

13  section of the manuscript ready to go, was already drafted back

14  in 2011.  And here we are kind of late or mid-2012 at this

15  point.

16          THE COURT:  Okay.

17          MR. WOOL:  And you can see --

18          THE COURT:  But this says he is putting -- this says

19  that Monsanto is planning on paying Kirkland to have him be a

20  coauthor of the article.  And he says that his efforts will be

21  less than ten days.

22          MR. WOOL:  Right.

23          THE COURT:  So it doesn't exactly say that they are

24  paying him to slap his name on the article.  I mean, they are

25  paying him to be involved in the production of the article, it

PROCEEDINGS

 1   sounds like.

 2        MR. WOOL:  Well, at this point in time the evidence

 3   shows that the article is pretty much substantially complete.

 4   And then the evidence that follows this shows that, you know,

 5   that by the time David Kirkland even kind of conducts his

 6   initial review, it is being -- the article is being circulated

 7   to glyphosate task force members.

 8        So, you know, we also have drafts of the articles.  You

 9   can -- the jury would be able to compare or, you know, well,

10   I guess, we don't want to send the articles back to the jury --

11   but the articles kind of before David Kirkland becomes involved

12   and after is virtually identical.  The overarching themes are

13   already there.

14        THE COURT:  Okay.  So the idea is that this is an

15   example of kind of paying scientists to -- significant amounts

16   of money, it looks like, to put their name to articles that

17   Monsanto is producing.

18        MR. WOOL:  Correct.  And producing by people who are

19   not even qualified, who are admittedly not qualified to --

20        THE COURT:  And if it came in, the idea would be that

21   it would be impermissible to argue or imply that this is an

22   example of ghostwriting because it's not.  And there is no

23   evidence that it is.  But that it is an example of Monsanto

24   paying scientists to put their name on stuff that is favorable

25   to Monsanto.

1    **MR. WOOL:**  Right.  Just a general pattern of sort of

2   polluting the scientific literature by giving the appearance

3   that certain people are authoring articles, where, in reality,

4   it is Monsanto's employees.

5    **MR. STEKLOFF:**  Good morning, Your Honor.

6    I think there is a little more history here.  I think what

7   happened is that the article was drafted -- started in late

8   2011.  Then in the summer of 2012 they decided to expand the

9   genotoxicity data that they are looking at.  So they expand to

10  all of the data even from other manufacturers of glyphosate

11  products.  And that's the point at which Kirkland is added.

12   So there had already been work.  Saltmiras -- there had

13  already been submissions in which Saltmiras was going to be an

14  author, but because Saltmiras couldn't look at proprietary data

15  from other manufacturers, Kirkland is -- well, Kirkland is part

16  of that process.  He's independent.  Saltmiras can't look at

17  it.

18   Obviously, whatever the scope of Kirkland's involvement

19  was, he felt very strongly that he was an active participant in

20  this manuscript along with Dr. Kier, and he insists that Dr. --

21  that Saltmiras not be included on the publication.  So I

22  think -- you know, they are trying to argue that it is evidence

23  of ghostwriting because --

24    **THE COURT:**  Right.  As I said, it is not evidence of

25  ghostwriting; but -- but it seems that it is evidence of

 1    Monsanto paying significant amounts of money to, you know,

 2    ostensibly independent scientists to put their -- to publish

 3    papers.  And why isn't that in itself relevant?

 4            MR. STEKLOFF:  Because I think that the only way it

 5    would be relevant is if you are arguing that they weren't

 6    truly -- if you are arguing ghostwriting.  In other words, I

 7    don't think -- I think that what we are hearing is Monsanto was

 8    engaging scientists to not really be involved in literature

 9    they were publishing when, in fact, in this case we know

10    Kirkland was involved with the literature that he was

11    publishing.  And then, in fact, even though Kier and Kirkland

12    decided -- and Saltmiras eventually, you know, agreed to their

13    request not to be an author -- there is also an acknowledgment

14    in the article of Saltmiras' role and Monsanto's role in it.

15        And so I think this is sort of -- to me -- a backdoor way

16    of trying to argue ghostwriting even if they couldn't say this

17    is a perfectly, you know, a square box in a square peg,

18    evidence of ghostwriting.

19        Kirkland was involved.  Kirkland did work.  Kirkland took

20    pride in that work.  And Kirkland said we want this work.  We

21    don't want Monsanto -- that Saltmiras to be an author --

22            THE COURT:  Okay.  Briefly last --

23            MR. WOOL:  Yes.  The critical point here that

24    Mr. Stekloff played out is that there was another draft that

25    was going on before this, before they kind of delved into the

1    proprietary studies.  And in that draft David Saltmiras was

2    listed as a coauthor.  He had pretty much written the entire

3    thing.

4        And as I pointed out, the testimony is uncontroverted from

5    David Saltmiras that he was not -- it wouldn't have been

6    appropriate for him to be listed as an author on any of those

7    publications.  And Larry Kier likewise states that Saltmiras is

8    not a genotox expert.  He is not qualified to author these

9    things.

10       And so kind of regardless of the intellectual origins of

11   this, the result is pretty clear, which is that even though

12   David Saltmiras is not a genotox expert and wrote most of it,

13   he is not listed as an author; and this is a study that

14   Monsanto paid for.

15           **THE COURT:**  Okay.  I think just -- that last comment

16   just highlighted why it would be unfairly prejudicial.  So I am

17   excluding it under Rule 403.  So that's out.

18       Is there anything else to discuss?

19           **MR. STEKLOFF:**  On Saltmiras, Your Honor, now, I think

20   the way -- based on your rulings -- his depo stands, I think it

21   is a little misleading.  So I just want to highlight one issue

22   with it.

23       The Plaintiff's affirmatives are very short.  They are two

24   minutes and nine seconds.  But at line -- page 68, Saltmiras is

25   asked, Well, tell us the different ways --

PROCEEDINGS

1          **THE COURT:**  Hold on.  Let me go to it.

2          **MR. STEKLOFF:**  Sorry, Your Honor.  68, line 11.

3          **THE COURT:**  Okay.

4          **MR. STEKLOFF:**  And do -- there is that back-and-forth

5     starting at 68, line 11 through 68, 25.

6          **THE COURT:**  Yes.

7          **MR. STEKLOFF:**  That then leads -- excuse me, Your

8     Honor -- that then leads into a discussion of the Grime paper

9     because that's what he is talking about.

10         **THE COURT:**  Okay.

11         **MR. STEKLOFF:**  And his explanation of the Grime paper,

12    the way it is cut, it then skips ahead to 88 and talks about

13    other papers that he has been involved in; but I don't think it

14    is pure -- it is not ghostwriting allegations.  It is beyond

15    that.

16        So I think as cut, given your ruling on the Grime paper,

17    to leave in that Q and A at page 68 would be misleading and

18    therefore sort of suggests that maybe Saltmiras isn't necessary

19    as a witness.

20         **MR. WOOL:**  And, Your Honor, this is -- we think this

21    is a party --

22        (Pause in proceedings)

23         **THE COURT:**  Yeah, I mean, I thought that what I -- if

24    I recall correctly, what I -- the order I issued last night

25    said that, you know, that -- in the ruling on the Kier

PROCEEDINGS

1    designations, I said the stuff about Kier and Kirkland 2013 is

2    not coming in.  And, oh, by the way, that stuff is not coming

3    in from Saltmiras' testimony either.

4         Isn't that what I ruled last night?

5              **MR. WOOL:**  Yes.  I think this is a little bit more of

6    a general statement about his activities.

7              **THE COURT:**  But, you know --

8              **MR. STEKLOFF:**  I'm happy to hand you, Your Honor,

9    page 69, which is the next --

10             **THE COURT:**  No.  I have it.  I have it right here.

11        It just -- I mean, it says -- the first question is, Have

12   you ever ghostwritten.

13        And he says, Yes.

14        And he says -- then the question is, Tell us the different

15   ways you have done it.

16        And then he says, Well, one thing I can think of is Grime.

17             And, again, the point here is that he wanted to be an

18   author.  He tried to be an author.  Monsanto tried to make him

19   an author, and the author would not let him be listed.

20             **MR. STEKLOFF:**  Well, Grime is different.  But Grime is

21   2015.  So you separately excluded Grime.

22             **THE COURT:**  Oh.

23             **MR. STEKLOFF:**  Not Kier and Kirkland.  This is on Kier

24   and Kirkland.

25             **THE COURT:**  Sorry.

1        **MR. STEKLOFF:**  Grime was excluded as part of 2015.

2        **THE COURT:**  Okay.  So he says that I have -- that one

3   example I can think of is Grime and Grime was 2015.

4      Okay.  So what are you saying should be excluded?

5        **MR. STEKLOFF:**  Well, I'm saying if 2015 is excluded --

6   and that's his example where he says yes -- then I don't think

7   the testimony on page 68, which is what I think is what they

8   really want in from this, is admissible.

9        **THE COURT:**  Well, is there any evidence that he

10  ghostwrote anything else?  I can't remember now.

11       **MR. STEKLOFF:**  I don't believe so.  And I think that

12  that's part of the -- I mean, we have the Kier and Kirkland

13  issue.  And then I think that's part of the problem here is

14  that if you look at the way this cuts now, it's then on

15  page 88, transitions to situations where he was managing

16  articles but not listed as a coauthor.  But I don't think they

17  are ghostwriting allegations.

18      So this as now played -- where it is clear from the

19  context of the deposition -- when he gives the answer on 68, he

20  is talking about Grime, suggests that he ghostwrote -- I think

21  it says at page 89, nine publications --

22       **THE COURT:**  Well, I think -- I think the stuff on 68

23  and 69 has to be cut, but you are not arguing that the stuff on

24  88 and 89 has to be cut?

25       **MR. STEKLOFF:**  No.  It's 68 -- I think 68 has to be

 1   cut.  And then if they want to play 88 and 89, I'm fine with

 2   that.

 3          MR. WOOL:  I don't want to belabor the point, but I

 4   think the statements on 68 kind of go back to these issues that

 5   we were just discussing where he says he has ghostwritten.

 6       And if you look at the testimony on page 88, he says, I

 7   didn't make technical contributions to those manuscripts; and

 8   it wouldn't -- it wouldn't be appropriate for me to be listed

 9   as a coauthor of any of these papers.

10       He doesn't say the authors said, I shouldn't be on

11   there --

12          THE COURT:  Okay.  But I think the important thing

13   is -- do you have any evidence that he ghostwrote anything or

14   arguably ghostwrote anything pre-2012?

15          MR. WOOL:  The Kier and Kirkland article would be the

16   only example.

17          THE COURT:  Okay.  So that testimony from 68 is

18   excluded then.

19          MR. WOOL:  Okay.  And I think there is one more sort

20   of issue with respect to Kier, which is in that section there

21   is a 2015 article, which is a review article on the Bolognesi

22   Paz-y-Mino test studies.  And the testimony concerns a comment

23   by Dr. Kier, that he is concerned that those articles are

24   expressed in terms -- they are too absolute; that they will

25   expose him to personal liability.  And we want that admitted to

1   show Monsanto's knowledge at the time that the articles came

2   out; that they presented a risk of genotoxicity.

3         THE COURT:  Can you show me where that testimony is?

4         MR. WOOL:  So that's back to Kier.  And that's on

5   page 223.  So it is starting on line --

6      (Pause in proceedings)

7         THE COURT:  What does this have to do with the

8   Bolognesi study?

9         MR. WOOL:  So he wrote a review article on the

10  Bolognesi study.  And in the process of getting it peer

11  reviewed, he -- somebody else writes the summary; and he makes

12  the statement that this is expressed in terms that are too

13  absolute such that it would expose him to personal liability.

14  And so this is evidence we would want to introduce to refute

15  Monsanto's central premise that there was no evidence across

16  the board and, therefore, no reason to --

17        THE COURT:  Okay.  I understand the argument.  This

18  is -- remains excluded --

19        MR. WOOL:  Okay.

20        THE COURT:  -- per my ruling yesterday.

21     Okay.  Anything else?

22        MR. STEKLOFF:  I had two quick issues, Your Honor.

23     One is -- and I have copies of the e-mail.  In the Koch

24  deposition, there is an e-mail that you might recall about

25  whether a long-term animal study should be conducted; and there

PROCEEDINGS

 1  is a mention of the significant financial investment of

 2  $1.5 million.  I wanted to hand that e-mail to Your Honor just

 3  to provide --

 4          THE COURT:  Okay.

 5          MR. STEKLOFF:  -- additional context.  This is Trial

 6  Exhibit 519.  And you can see if you look at the -- after "Hi

 7  all" at the top of the e-mail --

 8          THE COURT:  Yes.

 9          MR. STEKLOFF:  -- that this is about GM products, so

10  it is about genetically modified products.  That is the context

11  in which they are discussing this.  It is also --

12          THE COURT:  Just to be clear, you are asking me to

13  reconsider a ruling from the Koch deposition last night?

14          MR. STEKLOFF:  Yes, Your Honor.

15          THE COURT:  Where is it?  Where is the testimony?

16          MR. STEKLOFF:  That, I will have to have someone pull,

17  which -- I apologize.  I don't have it right in front of me.

18          THE COURT:  That's okay.  We can also do this one at a

19  break.

20          MR. STEKLOFF:  I'm fine with that, Your Honor.

21          THE COURT:  Why don't we do that.

22          MR. STEKLOFF:  Okay.  And then the last question we

23  have, Your Honor, is we -- depending on the basis for your

24  ruling on excluding the second designations that we proposed

25  with respect to Dr. Portier --

PROCEEDINGS

1          THE COURT:  Yes.

2          MR. STEKLOFF:  -- we were -- we weren't sure what the

3   ruling was, and so it may have been in part because it was

4   being elicited through Dr. Portier and his personal knowledge.

5          THE COURT:  No, no.  So let me -- I will give you at

6   least a little bit of explanation for now.  I thought it would

7   be useful to do a written ruling on this one, both for purposes

8   of this trial and also for purposes of future trials.  And I

9   will preview it now, which is that basically what has happened

10  in this case is that each side really wants -- wants in the

11  post-2012 evidence that is good for it and is trying to

12  exclude, under 403 and other grounds, the post-2012 evidence

13  that is bad for it.  Right?

14       So you have both sides trying to exclude each other's

15  post-2012 evidence.  Basically all of that evidence has been

16  subject to a motion to exclude.  And I decided to grant

17  Monsanto's motion to exclude evidence of post-2012 conduct

18  because of the concern that it would be used by the jury to

19  punish Monsanto for conduct that didn't harm Mr. Hardeman.

20       So once you honor that ruling, the domino effect of it is

21  that a lot of the other post-2012 evidence cannot come in even

22  if it might otherwise have come in.

23       So, for example, in a vacuum it might have been

24  appropriate for Monsanto to present evidence that the EPA and

25  all of its experts took a hard look at the glyphosate issue --

 1   again, after the IARC made its decision and continued to

 2   conclude that there shouldn't be a warning label and it

 3   shouldn't be banned and it is not carcinogenic and all that --

 4   however, if you brought that in, then, of course, what would

 5   have to come in is Monsanto's efforts to discredit and

 6   undermine the IARC.

 7        So that's just one example of the domino effect of

 8   Monsanto's appropriate request, I think, to keep out -- subject

 9   to the limited exceptions that we have discussed so far and

10   that we will discuss a little more this afternoon -- to keep

11   out evidence of the post-2012 conduct.

12        So now, I suppose, you know, if Monsanto had wanted to

13   kind of re-visit that and say, Well, okay, the Jess Rowland --

14   we -- we decided that we want the Jess Rowland stuff to come

15   in, and we have decided that we want the millions of dollars

16   that we spent attacking IARC to come in because we really want

17   the EPA's post-IARC conclusions to come in, that might have

18   been fine.

19        But the whole point was to honor the original ruling about

20   post-use conduct, and so that's kind of what is driving all of

21   this.  So it's not -- so the ruling about the Portier stuff is

22   not a Portier-specific ruling.  It's a ruling that -- that, you

23   know, that this is one of the dominoes that you prevented from

24   falling by -- through -- by your motion to exclude post-use

25   conduct.

PROCEEDINGS

1          MR. STEKLOFF:  Thank you, Your Honor.  That's helpful

2    because we were wondering if we should try to designate Farmer

3    or Reeves on some of this post-use regulatory actions.

4          THE COURT:  I mean, I suppose theoretically you still

5    could; but it would bring in the Rowland stuff, and it would

6    bring in, you know, the attacks on IARC and all that.

7          MR. STEKLOFF:  Understood.

8          THE COURT:  And probably all this ghostwriting stuff

9    that we were talking about right now.

10         MR. STEKLOFF:  No.  I understand that, and I don't

11   think we intend on doing that.  But I do think, then, maybe --

12   I'm sure we will have this discussion later -- it might touch

13   on -- you even, in our letter, saw the door-opening argument

14   that has been made by Plaintiff's arguments, both in opening

15   and through the evidence --

16         THE COURT:  Yeah.

17         MR. STEKLOFF:  -- through the RFAs.  At a minimum, we

18   obviously think that that was a basis for the regulatory

19   conduct to come in regardless, but even if not, it might touch

20   on what they can argue in closing because --

21         THE COURT:  Yeah, we can talk a little bit about that.

22         MR. STEKLOFF:  Just starting with the assumptions of

23   what we all think the jury knows -- I think without us being

24   able to have the evidence, I don't know what the jury knows.

25   So that is part of my concern, but we can discuss that later.

PROCEEDINGS

1          THE COURT:  All right.  Sounds good.

2          MS. MOORE:  Your Honor, some housekeeping matters

3    that -- as you recall on Friday, we wanted to read into

4    evidence the joint stipulation regarding Mr. Hardeman's medical

5    expenses.

6          THE COURT:  Okay.

7          MS. MOORE:  So I have that, Your Honor, if you would

8    like a copy of it.  I don't know if that's something you would

9    read or you want us to read.

10         THE COURT:  Whatever you prefer.  I don't care.

11         MS. MOORE:  It doesn't matter to me.

12         THE COURT:  Okay.  Why don't I --

13         MS. MOORE:  I think you have --

14         THE COURT:  I think I have read -- I think there have

15   been a couple other stipulations I have read.

16         MS. WAGSTAFF:  There is writing on the back of that

17   piece of paper.

18         THE COURT:  I won't look at it.

19         MS. MOORE:  I don't know what it is.  Okay.

20     And then also the life expectancy table, and I saw your

21   note in the jury instructions, Your Honor.  And that was -- I

22   don't know if you have had an opportunity to look at that, but

23   that paper came from the Social Security --

24         MR. STEKLOFF:  We want to argue that as part of the

25   charge conference.  I think -- I don't know if that is -- if

1   it's going to be read to the jury, it can be read in the

2   instructions.  I do think we have some questions about whether

3   that should be read to the jury given the evidence we have

4   heard of noneconomic damages, but I think that can wait until

5   the charge conference.

6          THE COURT:  In other words, I can take judicial notice

7   of it at the charge conference and include it in the

8   instructions if it is appropriate to include in the

9   instructions?

10         MR. STEKLOFF:  Correct.

11         MS. MOORE:  The issue, Your Honor, is by that point we

12  have already closed our case.  And so it is our position that

13  you would actually take judicial notice of it during our case

14  in chief and instruct the jury that his life expectancy is

15  14.3 --

16         THE COURT:  Well, do you want to discuss that issue?

17  And I haven't looked into -- I don't know what your dispute is

18  about that.  I have been under the impression that there was

19  agreement about that.  But we can discuss that, say, at the

20  lunch break or morning break.

21         MS. MOORE:  That's fine.  I just don't want to close

22  the case without that issue.

23      And then the last one -- and we can do this -- well, there

24  are a couple of other stips, but we can do this on a break.

25         THE COURT:  Okay.  Do you want me to read this

PROCEEDINGS

1   stipulation first thing?

2         MS. MOORE:  That would be great.  Thank you, Your

3   Honor.

4         THE COURT:  And then who is the first witness?

5         MS. MOORE:  It will be Dr. Heydens.

6         THE COURT:  Okay.  Good.  Why don't we -- let's resume

7   in five minutes.

8         MS. MOORE:  Okay.  Thank you.

9         THE CLERK:  Court is in recess.

10                (Recess taken at 8:02 a.m.)

11              (Proceedings resumed at 8:08 a.m.)

12         THE COURT:  Go ahead and bring in the jury.

13      (Proceedings were heard in the presence of the jury:)

14         THE COURT:  Okay.  Welcome back, everyone.

15      We are -- in a moment we can proceed to the next witness.

16      First, I want to read you a stipulation.  I think you may

17   recall from the previous phase that from time to time the

18   lawyers agree to certain facts to avoid needing to have

19   witnesses come up and testify about them to make the process

20   more efficient, and this is a stipulation that the parties have

21   reached about medical expenses.  So I will read that

22   stipulation to you now.  And you are to consider this

23   stipulation to be a fact that has been proven.

24      The parties, Edwin Hardeman and Monsanto Company, by

25   counsel stipulate that Edwin Hardeman's medical expenses

```
 1   incurred for treatment of non-Hodgkin's lymphoma total

 2   $200,967.10.  The parties further stipulate that the

 3   $200,967.10 of medical expenses for Mr. Hardeman's treatment of

 4   non-Hodgkin's lymphoma from December 26th, 2014 through

 5   June 20th, 2018 were medically reasonable and medically

 6   necessary.

 7        So with that, the Plaintiff can call his next witness.

 8        MS. WAGSTAFF:  Good morning, Your Honor.

 9        Ladies and gentlemen of the jury, Mr. Hardeman calls

10   Dr. William Heydens, a Monsanto employee.  And the video is one

11   hour and seven minutes.

12        THE COURT:  All right.

13             (Video was played but not reported.)

14        THE COURT:  Okay.  Probably a good time for a morning

15   break.  Why don't we take five minutes and resume at 25 after

16   the hour.  Thank you.

17     (Proceedings were heard out of presence of the jury:)

18        THE COURT:  Okay.  So what is next?

19        MS. WAGSTAFF:  Your Honor, before we move onto the

20   next deposition, Plaintiff's would move into evidence Trial

21   Exhibits 312 --

22        THE CLERK:  Hold on.  Wait for me.

23        MS. WAGSTAFF:  Sorry.  Plaintiff's would move into

24   evidence Trial Exhibits 312, 315, 317, 322 and 323.

25        MR. STEKLOFF:  No objection.
```

PROCEEDINGS

```
 1        (Trial Exhibits 312, 315, 317, 322 and 323 received in

 2         evidence)

 3             MR. STEKLOFF:  And we would move in, Your Honor, 147,

 4    416, 481, 710 and 711.

 5             MS. WAGSTAFF:  Your Honor, we need to take a look at

 6    those.  I think 416 is the Williams' article; is that correct?

 7             MR. STEKLOFF:  Yeah, this might come up more broadly

 8    in the context of Phase Two when we discuss other exhibits,

 9    understanding that it's peer-reviewed literature under the

10    learning treatise.  I think for Phase Two where there are --

11    where there is evidence that goes to Monsanto's conduct, I

12    think that it comes in -- we think that it should go back to

13    the jury for a different purpose.  So this -- we might have

14    this discussion later about a series of articles.  I think it

15    is different than the learning treatise exception in Phase One

16    where I think the purpose behind that exception is so that

17    jurors aren't trying to understand the science themselves and,

18    you know, delve into things about expert testimony.  I think

19    here it is different.

20             THE COURT:  God forbid they would try to understand

21    the science themselves.

22             MR. STEKLOFF:  They should, of course, but based on

23    the expert testimony.

24             THE COURT:  Yeah, we can have a discussion about that

25    later.  I mean, the question would be whether there is a need
```

PROCEEDINGS

```
1   for anything in that paper to go to the jury other than what
2   has been shown to the jury through the testimony.  And, you
3   know, if there is anything in that paper that sort of helps you
4   refute the allegations about Monsanto's conduct that you
5   haven't already put in front of the jury by way of testimony
6   and by way of publication, I assume that would be the question
7   to discuss.  And I think we probably should discuss it later.
8       MS. WAGSTAFF:  And that's our position as well, and
9   that is sort of the agreement we have had throughout both
10  phases with peer-reviewed literature.
11      If we could reserve our opinion on those exhibits that you
12  moved to enter in, and we can let you know later when we talk
13  about the Farmer and Martens' exhibits.
14      MR. STEKLOFF:  Yeah, of course.
15      We can talk about this later.  I think even using Heydens
16  2008, which is part of completing the Parry story, I think the
17  full article itself -- we didn't show every portion of the
18  article -- demonstrates the -- arguably we would argue the
19  thoroughness through which Monsanto studied the issue and then
20  reported its issue in a published article available for
21  everyone to review.  I think the jury would be able to -- be
22  able to see that to determine Monsanto's reasonableness in
23  Phase Two, I think it goes to a different point than --
24      THE COURT:  I understand -- I understand the argument.
25  So we can discuss that maybe at the lunch break.
```

**PROCEEDINGS**

```
 1        And then anything else to discuss right now?

 2           MR. STEKLOFF:  I will just flag, Your Honor, I don't

 3    even think -- I don't need further argument on it, but with the

 4    Koch exhibit that I handed you --

 5           THE COURT:  Oh, yeah.

 6           MR. STEKLOFF:  -- which is Trial Exhibit 519, that is

 7    discussed on pages 212 through 220 of the Koch deposition.

 8    That's where the designations take place.

 9           THE COURT:  Okay.  I will go back and take another

10    look at that probably at the next break, or actually maybe I

11    will bring the Koch -- yeah, I will bring the Koch transcript

12    up here and look at it while the stuff is playing.

13        So what is next -- what are the next witnesses?

14           MS. MOORE:  We are going to call Dr. Portier next,

15    Your Honor, because we have to make some changes to the Kier

16    testimony, and so Mr. Wolfe needs just a few minutes.

17           THE COURT:  Portier, how long will that be?

18           MS. WAGSTAFF:  Portier is 29 minutes, Your Honor.  And

19    then we will play Kier which, I believe, is 49.

20           THE COURT:  Okay.

21           MS. WAGSTAFF:  We are going to be taking out a lot

22    from your ruling this morning, so it will probably be --

23           MS. MOORE:  Probably more like 30 minutes.

24           MS. WAGSTAFF:  -- 20 or 30 minutes.  And Mr. Wolfe is

25    doing that right now.  And then who we have left is Murphy, who
```

1    is 7 minutes; Grant, who is 21 minutes.

2          THE COURT:  Maybe do those three -- Portier, Kier and

3    Murphy -- and then we will take another break probably.

4          MS. WAGSTAFF:  Sure.  That will work.

5          THE COURT:  All right.

6          MS. MOORE:  Thank you, Your Honor.

7          THE CLERK:  Court is in recess.

8                    (Recess taken at 9:25 a.m.)

9                    (Proceedings resumed at 9:34 a.m.)

10      (Proceedings were heard out of the presence of the jury:)

11          THE COURT:  All right.  Go ahead and bring them in.

12          MS. WAGSTAFF:  Your Honor, before we bring them in,

13    just one housekeeping thing.

14      I had moved -- plaintiff had moved some exhibits into

15    evidence.  There was no objection from Monsanto, but the Court

16    never so moved so --

17          THE COURT:  Oh, I'm sorry.  They're admitted.

18          MS. WAGSTAFF:  Okay.  Thank you.

19          THE COURT:  Sorry about that.

20      (Trial Exhibits 147, 416, 481, 710, and 711 received

21       in evidence)

22          THE COURT:  Go ahead.

23      (Proceedings were heard in the presence of the jury:)

24          THE COURT:  Okay.  You can resume.

25          MS. WAGSTAFF:  All right.  Mr. Hardeman calls

 1  Dr. Christopher Portier, and the deposition is going to run

 2  29 minutes.

 3              **(Video was played but not reported.)**

 4          **THE COURT:**  Next witness.

 5          **MS. WAGSTAFF:**  Your Honor, plaintiffs would move into

 6  evidence Trial Exhibit 388 and Trial Exhibit 504.

 7          **MR. STEKLOFF:**  I think we need to discuss 504, but no

 8  objection to 388.

 9          **THE COURT:**  Okay.  That's admitted.

10      (Trial Exhibit 388 received in evidence)

11          **MS. WAGSTAFF:**  All right.  Plaintiff calls next

12  witness a Monsanto employee -- or former employee Larry Kier,

13  and the deposition is 17 minutes.

14              **(Video was played but not reported.)**

15          **MS. WAGSTAFF:**  Your Honor, Mr. Hardeman would move

16  Trial Exhibit 686 into evidence.

17          **MR. STEKLOFF:**  No objection, Your Honor.

18          **THE COURT:**  Admitted.

19      (Trial Exhibit 686 received in evidence)

20          **MS. WAGSTAFF:**  And, Your Honor, Trial Exhibit 160,

21  which we have proffered previously with Martens, but I'm not

22  sure that's actually been moved into evidence yet.

23          **MR. STEKLOFF:**  I think it was moved in through

24  Dr. Martens, but we have no objection.

25          **THE COURT:**  Okay.  Admitted.

1          MS. WAGSTAFF:  Okay.  Thank you.

2      (Trial Exhibit 160 received in evidence)

3          THE COURT:  Do you want to call your next witness?

4          MS. WAGSTAFF:  Sure.  Mr. Hardeman calls Monsanto

5    employee Sam Murphy, and the video is 7 minutes.

6          THE COURT:  And we'll take another break after that

7    one.

8              **(Video was played but not reported.)**

9          MS. WAGSTAFF:  Your Honor, Mr. Hardeman would move

10   Trial Exhibit Number 768 into evidence.

11         MR. STEKLOFF:  Another one for discussion later,

12   Your Honor.

13         THE COURT:  Okay.

14      All right.  Why don't we take another short break.  We'll

15   resume in about five minutes.

16      (Proceedings were heard out of the presence of the jury:)

17         THE COURT:  Okay.  So who's next?

18         MS. MOORE:  Dr. Koch -- or, I'm sorry, Mr. Koch.

19         MS. WAGSTAFF:  Your Honor, we have about a little less

20   than an hour of total testimony left.  We have Dr. Koch, which

21   is 17 minutes.

22         THE COURT:  So you're going to do your closing today?

23   I'm just kidding.

24         MS. WAGSTAFF:  You would never do that to us.  We know

25   that.

 1          **THE COURT:**  You said -- okay.

 2          **MS. WAGSTAFF:**  We have Koch, who's 17 minutes; we have

 3   Hugh Grant, who's 21 minutes; and we have James Guard, who is

 4   17 minutes.  So about 40 or so minutes.  A little less than 40

 5   minutes.

 6          **THE COURT:**  I feel like there's somebody missing.

 7          **MS. WAGSTAFF:**  Saltmiras and we chose not to play him

 8   based on Your Honor's rulings.

 9          **THE COURT:**  Rulings.  Okay.

10      All right.  And so that's -- and at this point is Monsanto

11   planning on calling anyone?

12          **MR. STEKLOFF:**  I have one issue to raise so that --

13   but other than that, no.  I mean, so basically I think that --

14   and I'm going to hand the Court a letter that, based on

15   Dr. Portier's testimony about the EPA and whether it follows

16   its own guidelines, that we should be entitled to play -- I

17   understand I'm revisiting an issue that we discussed this

18   morning -- a very brief segment introducing a December 21st,

19   2018, letter from the EPA from the director of the Office of

20   Pesticide Programs to Australia.

21      We would not be seeking to introduce the Health Canada

22   information that we put in our letter yesterday, but I think

23   now Dr. Portier, based on what was played, has gone even

24   further than what we put in our letter yesterday attacking the

25   EPA for not following its guidelines and saying that he thinks

1    that they are -- I don't -- I highlighted the testimony, but I

2    think his testimony was that they have let down the American

3    public.

4        And if you look at this letter, I think it demonstrates

5    the EPA's own words in which it followed its own process,

6    followed its own guidelines.  I think this is necessary to

7    rebut that testimony.

8        THE COURT:  And so this would be part -- this would be

9    evidence that you would present in your case?

10       MR. STEKLOFF:  Yes.  And I couldn't raise it in the

11   middle of the Portier testimony, but this would be the only

12   evidence that we would raise in our case.

13       THE COURT:  Okay.

14       MR. STEKLOFF:  We are not planning on playing any

15   other evidence.

16       THE COURT:  Okay.  Why don't we talk about that at

17   lunch.  I mean, my gut reaction to that is -- well, maybe we

18   should talk about it before lunch because if it doesn't come in

19   or even if it does come in, we could play it before lunch and

20   then let the jury go home; right?

21       MR. STEKLOFF:  I think it would be five minutes,

22   Your Honor.  Our total -- I haven't counted, but our total

23   designations as of yesterday that we submitted were 10 minutes,

24   but that had some Health Canada stuff in it.  So if this letter

25   comes in, it's less than 10 minutes for sure.

1    **THE COURT:**  Kristen, why don't you go tell the jurors

2   that we may take another five, ten minutes right now but that

3   we are going to let them go today at about noon.

4        **THE CLERK:**  Okay.

5        **THE COURT:**  We're going to let them go for the day at

6   about noon.

7        **MS. MOORE:**  Your Honor, before we do that, I just want

8   to say we received these counters -- or these designations at

9   3:00 o'clock in the morning, and so we have not done our

10  counters.

11       **THE COURT:**  Wait a minute.  Hold on.  Can we -- can we

12  just --

13       **MR. STEKLOFF:**  This is different.

14       **MS. MOORE:**  Oh, this is different?  Okay.

15       **THE COURT:**  Is there anything wrong with Kristen

16  telling the jury --

17       **MS. MOORE:**  I don't think so, Your Honor.  The only

18  thing is if that's allowed to be played, we may need to do

19  rebuttal, and so I just want to make sure --

20       **THE COURT:**  Okay.

21       **MS. MOORE:**  -- we put that in there.

22       **THE COURT:**  Yes, you can go ahead and let them know

23  that.

24                    (Pause in proceedings.)

25       **THE COURT:**  So before we turn to that, I want to go

PROCEEDINGS

```
 1    back to the portion of the Koch testimony that you raised with
 2    me this morning.
 3              MR. STEKLOFF:  Yes.
 4              THE COURT:  I sustained that testimony that you
 5    raised.
 6              MR. STEKLOFF:  I don't -- I'm being told no,
 7    Your Honor, by both sides.
 8              MS. MOORE:  I don't think so, Your Honor.
 9              THE COURT:  Maybe I misread that.
10         So we're talking about the pages -- you flagged pages 212
11    to 220 for me of the Koch depo?
12              MR. STEKLOFF:  Yes, Your Honor.
13              THE COURT:  I sustained the objections to those.
14              MS. MOORE:  Your Honor, there's a section -- I don't
15    think they objected to all of that.
16              THE COURT:  Oh, I see.  Well --
17              MS. MOORE:  So what we did is when you did those group
18    ones, we went through and we removed wherever the objection was
19    that was sustained.  The rest of the testimony would have
20    stayed.
21              THE COURT:  Okay.
22              MS. MOORE:  Let me get my --
23              THE COURT:  But I don't remember where exactly the
24    objections are, but I sustained all the objections to testimony
25    that appeared between pages 212 and 219, line 22.
```

1          **MR. STEKLOFF:**  I see that as well, Your Honor.   I

2     don't know what was submitted in our objections when it was

3     submitted to the Court.

4          **MS. MOORE:**  Here.  I have it, Your Honor.

5                    (Pause in proceedings.)

6          **MS. MOORE:**  So on page 212, Your Honor, it looks like

7     212, 1 through 5, is not objected to.  This is really small.

8          **MS. WAGSTAFF:**  I've got it a little larger.

9          **MS. MOORE:**  Sorry.  Go ahead.

10         **MS. WAGSTAFF:**  212, 1 through 5, was not objected to.

11    216, 7 to 15, was not objected to.

12         **THE COURT:**  Okay.  Wait.  So -- right.

13         And it may be that that's fine to come in even if -- I

14    mean, I guess I don't know what's going on here because I was

15    handed this exhibit -- right? -- this e-mail exchange, and

16    there's a lot of dialogue about this e-mail exchange; and I

17    think I sustained all the objections -- I think I sustained the

18    objection to the e-mail exchange and to all the dialogue about

19    the e-mail exchange.

20         **MR. STEKLOFF:**  I think what happened, Your Honor, we

21    objected to the e-mail, and then I think there are sections

22    where parts of the e-mail are read where maybe we didn't have

23    objections; but I think we objected to the e-mail itself and

24    then should have -- I mean, I think we objected to parts of the

25    testimony about the e-mail and not others.  But I think if the

1   e-mail is out, there should be no testimony about the e-mail;

2   and what was just read on pages 212, 216, is referring to the

3   e-mail and using the e-mail as context for the questions.

4          **MS. MOORE:**  It actually doesn't, Your Honor.

5          **THE COURT:**  Well, I mean, that exchange itself -- I

6   mean, what I'm going to say is you didn't object to that

7   exchange and, therefore, that exchange is coming in.  It

8   doesn't -- that exchange does not specifically refer to or call

9   out that e-mail.

10         **MR. STEKLOFF:**  Okay.

11         **THE COURT:**  So that's coming in.

12     So you're saying that the remainder of the testimony on

13   212, 213, 214, I sustained the objections to that testimony;

14   right?

15         **MS. MOORE:**  And that's been taken out, Your Honor.

16         **THE COURT:**  And that's been taken out.

17         **MR. STEKLOFF:**  And then there's testimony on 216,

18   Your Honor, lines 7 through 15, where we didn't -- my

19   understanding is while we objected to the exhibit, did not

20   include a separate objection to the testimony; but that is

21   reading the --

22         **THE COURT:**  And that should not come in because the

23   exhibit is not coming in.

24         **MR. STEKLOFF:**  Okay.

25         **MS. MOORE:**  Right, Your Honor.  And the reason it

 1   wasn't taken out, 7 through 15, is they did not object to it.

 2        **THE COURT:**  Right.  Right.

 3      And both sides, you know, had little, you know, kind of

 4   typos in their objections here and there, and that's fine.

 5   This is obviously a typo to not include this, so that's fine.

 6      So that's on page 216.  Yeah, I mean, basically all

 7   testimony that is about this e-mail and makes clear that it's

 8   about this e-mail should be excluded.

 9      So is there anything else?

10        **MR. STEKLOFF:**  Well, I think it continues.  So 216,

11   7 through 15; 216, 18 through 20; and then 218:9 through 219:8,

12   where, again, questions are being asked about the e-mail.

13        **THE COURT:**  Yeah, but, again, I thought I sustained

14   all those objections.

15        **MS. MOORE:**  Again, Your Honor, they didn't object to

16   that.

17        **THE COURT:**  Okay.

18        **MS. WAGSTAFF:**  We were working off the Excel

19   spreadsheet.

20        **MR. STEKLOFF:**  So I think basically through 220,

21   line 1, that there are designations by plaintiffs that all

22   refer to the e-mail, and they should all be struck except what

23   Your Honor just said on page 212.

24      And then at 221, line 22, it continues on a separate

25   subject, that is fine.

1        **MS. MOORE:**  Your Honor, we -- you know,

2  notwithstanding the fact they didn't object, we understand your

3  ruling.  So we will take out 216, 7 through 15; 216, 18 through

4  20; and 218:9 through 219:8; but the question and answer at

5  219:24 through 221 is not tied to the e-mail, and so we would

6  ask that stay.  And they did not object to that originally.

7        **THE COURT:**  219 what?

8        **MS. MOORE:**  24 to 221.  The question is (reading):

9        "When there's not a scientific need, that would be a

10     bad precedent?

11        "Yes."

12        **THE COURT:**  Yeah, but it's all in the context of this.

13        **MS. MOORE:**  Okay.

14        **THE COURT:**  I think that would be prejudicial to

15  include that little snippet that was about the e-mail and not

16  have the jury know what it's about.

17        **MS. MOORE:**  That's fine.  I understand, Your Honor.

18     Then we'll pick up at 221:22.  Okay.

19        **THE COURT:**  So are we clear on that?

20        **MS. MOORE:**  Yes, Your Honor.

21        **MR. STEKLOFF:**  Yes, Your Honor.  Thank you.

22        **THE COURT:**  Okay.  So that's the Koch testimony.

23     And then there's an issue of Portier?

24        **MR. STEKLOFF:**  Yes, Your Honor.  Can I hand up,

25  please --

PROCEEDINGS

```
 1              THE COURT:  Sure.

 2              MR. STEKLOFF:  -- Trial Exhibit 1330, which is the

 3     letter?  And I've given Ms. Moore a copy.

 4              THE COURT:  Right.  So let's go back and recap what

 5     came in through Portier in Phase I.  Okay?

 6              MR. STEKLOFF:  Yes, Your Honor.

 7              THE COURT:  My recollection, and you have to correct

 8     me if I'm wrong, I didn't go back and look at the transcript,

 9     but my recollection is that what came in through Portier in

10     Phase I is that he was trying to persuade the European

11     regulators to -- and I think this was post-IARC, if I remember

12     correctly --

13              MS. MOORE:  It was.

14              THE COURT:  -- that he was trying to persuade the

15     European regulators to change their mind on glyphosate and he

16     was trying to persuade the EPA to change its mind on

17     glyphosate, and they both rejected him.  Am I misremembering

18     that?

19              MR. STEKLOFF:  You are remembering that correctly.  I

20     think -- and just to give a little context, I think with

21     Europe, the document was displayed.  With EPA, there was no --

22     to the best of my recollection, there was no document

23     displayed.  There was a Q&A about the fact that he also tried

24     to persuade EPA post-IARC, and they rejected that.

25              THE COURT:  And they rejected it.
```

 1            **MR. STEKLOFF:**  I'm pretty certain on that.  I'm not --

 2            **THE COURT:**  Okay.

 3            **MR. STEKLOFF:**  I did not show -- I remember in my

 4    closing of Phase I, I showed portions of the Europe documents.

 5    I don't think there was -- I did not show the EPA document.

 6            **THE COURT:**  So what that means, and this is sort of

 7    before we get to this letter, I mean, what that means is as the

 8    state of the evidence is now -- right? -- you are -- the

 9    plaintiffs can argue to the jury that glyphosate is still on

10    the market, there's still no warning, and Monsanto still hasn't

11    done the studies that we think Monsanto should do; right?

12        Monsanto can argue that, you know, as you learned from the

13    testimony that Dr. Portier gave, you know, he took a run at

14    them and -- he took a run at the EPA even as recently as last

15    year or whatever, and they rejected his position.

16            **MR. STEKLOFF:**  It was 2016.

17            **THE COURT:**  Okay.  And so those things can come in.

18    The fact of the IARC classification can be used.

19        I don't think -- I mean, part of me was expecting the

20    plaintiffs to establish in Phase II that all of the IARC stuff

21    was based on pre-2012 studies.  I don't believe that evidence

22    came in, but I may be misremembering that.  That will be

23    something we can discuss later this afternoon.

24        Okay.  So that's sort of the state I think of what can be

25    argued to the jury with respect to post-2012 more or less.  I

1   may be forgetting something.

2       Now you're saying that you want -- because Dr. Portier has

3   said that he disagrees with the EPA -- which, of course, he

4   said in Phase I also -- and because he has said that the EPA

5   has let down the American public, you should be able to put in

6   the EPA's analysis as reflected in this letter to some

7   regulators in Australia; is that the argument?

8           MR. STEKLOFF:   Yeah.   I mean, I think the argument

9   ties back to what we argued yesterday and that in combination

10  with what we heard today.

11      So the plaintiffs are undoubtedly in closing going to

12  argue that:   To this day, nothing has ever happened.   To this

13  day, Monsanto should have put a warning on.   To this day, they

14  haven't run tests.   You need to send a message.   You need to

15  send them -- if they're not going to do the right thing on the

16  label, you need to punish them financially.

17      I mean, I think we're all going --

18          THE COURT:   And you can respond "To this day the EPA

19  has not" -- I think, I mean, you're nodding your head.

20          MS. MOORE:   That's in evidence.

21          THE COURT:   -- that "To this day, you know, the EPA

22  has not changed its mind about glyphosate."

23          MR. STEKLOFF:   But that's in evidence through

24  omission, and I guess that's --

25          THE COURT:   Through what?

1          **MR. STEKLOFF:**  Through omission.  In other words, they

2    would have presented evidence if the EPA had done something

3    different to this day, but I don't think that there is

4    affirmative evidence that I can show that the EPA -- how

5    seriously they have taken this question and how seriously they

6    stand by their guidelines, how seriously they stand by their

7    review of glyphosate; and that even until December 2018, they

8    say that glyphosate is not carcinogenic.

9          And that's the problem I have is I can't argue it by

10   omission because I can say, "Of course, if the EPA would have

11   done something different, you would have seen it"; but to say

12   that there's one Q&A or, you know, short Q&A where they

13   disagreed with Dr. Portier.

14         So it's not even that they've done this broad

15   comprehensive review that has nothing to do with Dr. Portier

16   and some letter that he sent them.  That is what's

17   demonstrated, I think, here, and it's different.

18         And so I think I'm at a huge disadvantage to sort of argue

19   this point "By omission you haven't heard evidence so we can

20   all -- we all know that the EPA hasn't done anything."  I think

21   it is necessary for me to be able to establish, based on what

22   we know the plaintiffs will argue, the process through which

23   the EPA has gone.

24         And I think if you look at this letter, it describes the

25   process generally.  The first page starts with "U.S. EPA's

1   process for reviewing and reassessing the safety of

2   pesticides."  It isn't even tied to sort of post-use process.

3   It's their general process relating to FIFRA, transparency, and

4   independence policies, data collection, scientific approaches

5   used to assess evidence.

6        And then they go specifically to their glyphosate review

7   that was done.  They say they took it even more seriously after

8   IARC, which I think we're also going to hear something from the

9   plaintiffs, but that --

10           THE COURT:  Well, wait.  What?

11           MR. STEKLOFF:  -- their review was independent.

12           THE COURT:  What do you think we're going to hear from

13   the plaintiffs?  I mean, I'm not sure --

14           MR. STEKLOFF:  That IARC got it right, and that -- I

15   think this argument that you're saying -- whether the evidence

16   has come in or not, we might need to discuss it later -- that

17   Monsanto should have done what IARC did, and we know IARC got

18   it right and Monsanto didn't do that.

19        Now, the EPA is saying, "Well, we've looked" -- I mean,

20   this isn't a big part of the letter, but "We've looked -- we

21   took IARC seriously and we did our own review, and it is

22   comprehensive and we stand by the determination."

23        And so I think I need this affirmative evidence to be able

24   to paint a fair picture; and I don't think this letter, to the

25   points we were discussing this morning, then goes back to

 1    Jess Rowland and other things.  It talks --

 2            **MS. MOORE:**  But it does, Your Honor.

 3            **MR. STEKLOFF:**  It talks about the process --

 4            **THE COURT:**  Don't interrupt.

 5            **MR. STEKLOFF:**  It talks about the process both

 6    pre-2012 and post-2012, but it gives me something to be on even

 7    standing.  I don't think right now by omission I'm on even

 8    standing.

 9            **THE COURT:**  Well, except, you know, I guess there are

10    two concepts; right?  And I want to kind of disentangle two

11    concepts that you have sort of brought into this discussion.

12            One is the concept of, you know, needing to respond to,

13    you know -- well, let me put it another way.

14            One is that you want to make the point that to this day,

15    the EPA has not changed its mind.  The other point that you

16    want to make is that in not changing its mind, the EPA has

17    taken the matter very seriously and conducted a rigorous

18    analysis and all that; right?

19            On the first point, I get it; right?  I understand, and I

20    think that it -- you know, if there -- I thought the evidence

21    came in that Portier took another run at the EPA after the

22    IARC, and that the EPA said, "We disagree with you."  I thought

23    that came in pretty clearly so I think you -- I think that

24    evidence put you in a position to say, "You know, to this day

25    the EPA hasn't changed its mind."

PROCEEDINGS

1      I mean, I know it wasn't quite "to this day," but I think

2   colloquially speaking, you know, given the context of this

3   case, it is.

4      If that didn't adequately come in, the concept that to

5   this day, the EPA has not changed its mind, I think it may be

6   appropriate for you to get that in, and I do not take the

7   plaintiffs to be arguing that you shouldn't be able to get in

8   the basic point that to this day the EPA has not changed its

9   mind.

10      But when you get to the question of whether you should be

11   able to present to the jury sort of how seriously the EPA has

12   taken this and how serious and thorough their analysis has

13   been, I agree with you that you're entitled to present that to

14   the jury.  I don't think anybody ever thought that you weren't

15   entitled to present that to the jury.

16      The question is:  What does it open the door to?  And I

17   believe that if you, for the reasons that we discussed this

18   morning, if you present to the jury -- if you want to start

19   putting in evidence about how serious the EPA's analysis was

20   post-IARC and all of that, then the plaintiffs have the right

21   to come back with all of the stuff we talked about this

22   morning, which is Rowland, which is the efforts to sort of

23   discredit the IARC and all of that.

24      So I think that's sort of always been the choice for you,

25   and I certainly understand why you would want to make the

1  choice that you've made thus far; but I do not think it would

2  be appropriate to put in this letter in an effort to show how

3  thorough and objective or whatever -- transparent, whatever you

4  want to call it -- the EPA's analysis was post-IARC.

5      But if there's something that you want to get in through

6  Portier that makes more clear than has already been made that

7  the EPA stands by, you know, the position that it's held over

8  the last four decades or whatever, I think that's fine, and I

9  don't take the plaintiffs to be objecting to that issue.

10      **MS. MOORE:**  I mean, we would have to see the

11  testimony, Your Honor, obviously.

12      And, I mean, to your point, what you said this morning

13  about being a domino effect, in this letter that they want to

14  admit, 1330, on page 4, it talks about following an IARC

15  decision regarding glyphosate.  It's at the very bottom of

16  page 4, Your Honor (reading):

17          "The EPA Office of Pesticide Programs" -- the OPP --

18      "Cancer Assessment Review Committee" -- CARC, which is

19      what Jess Rowland was in charge of -- "conducted an

20      independent review."

21      And so, I mean, I do think what you were saying this

22  morning, it's a domino effect.  If they want to put something

23  like this in, we have to put rebuttal about Rowland and the

24  relationship.

25      **THE COURT:**  Yeah, I mean that's my view.  So if you

 1   want to propose -- and that continues to be my ruling.  So if

 2   you want to propose something, you know, to get in on the small

 3   point, you know, to the extent that it's necessary, to the

 4   extent that it's not already in there, you know, you can

 5   certainly do that.

 6        MR. STEKLOFF:  Well, one suggestion I might have,

 7   Your Honor, is that there might be a way to redact this.  I

 8   mean, we could take out the references to IARC.  If you look at

 9   the first three pages, three and a half pages, it talks about

10   the process generally up until glyphosate's review.

11        And then I think you could have, for example, the first

12   page -- the first paragraph of glyphosate's review talks about

13   all the different arms, disciplines within EPA that are part of

14   the review; you could redact the next one, two, three, four

15   paragraphs; and then you could go to (reading):

16        "EPA is confident in its conclusion that glyphosate

17        is not likely to be carcinogenic to humans.  EPA's

18        conclusion is consistent with other countries and

19        regulatory authorities," and then list those.

20        And I think that -- I would have to look at the last

21   couple of paragraphs, but I actually think that would solve the

22   problem, is just literally playing the testimony where this

23   Portier document is introduced, and he does -- and then not

24   reading any portion about IARC and then allowing me to then

25   argue from it.

 1       And I think that that satisfies, I think, both elements

 2  without opening -- based on -- first of all, based on what

 3  Dr. Portier testified in the plaintiff's affirmative testimony

 4  that we just heard now and addresses this concern about opening

 5  the door further to other Monsanto post-use conduct.

 6       **THE COURT:**  I mean, I'm at a little bit of a

 7  disadvantage because I haven't read this letter before, and

 8  I -- you know, so I don't have a good sense of what it is that

 9  you're proposing should come in from it and what shouldn't, and

10  then I also don't have in front of me the Portier testimony

11  that would relate to the portions --

12                 (Sound coming from gallery.)

13       **UNIDENTIFIED SPEAKER:**  I'm really sorry.

14       **THE COURT:**  -- that would relate to the portions of

15  the letter that you think should come in.

16       **MS. MOORE:**  And our position, Your Honor, would be

17  that you can't piecemeal this letter.  You have to go back and

18  look at the process; and what CARC did is that this is

19  following IARC, and so here it is the EPA is now reviewing

20  everything after the IARC decision comes out.

21       And so to say, "Well, we can solve this by just taking out

22  references to IARC," that misses the point of why EPA was

23  actually doing the review in 2000 -- from 2016 to 2018.

24       And so, again, it's -- you know, they're the ones that

25  didn't want this information in to begin with.  Now they want

 1   to bring it in.  And if they do, that's, you know, one thing;

 2   but if they do, then we have to be able to show what was

 3   happening in order to have a full and complete picture for the

 4   jury.

 5          THE COURT:  I mean, there must be -- again, to the

 6   extent it hasn't already come in, there must be some snippet of

 7   Portier testimony that can be played that kind of establishes

 8   that the EPA, you know, continues to take this view to this

 9   day.

10          MR. STEKLOFF:  I mean, I think -- I mean, hindsight is

11   20/20, but I think it was this letter because this letter was

12   December 21st, 2018.

13          And I understand the -- I understand what is being said,

14   but I think if you -- if we walk through this letter, and --

15   you know, if we all read this letter, if you take out, again,

16   the entire middle of the section about glyphosate's review, the

17   rest of it is entirely neutral about the EPA's process, that

18   it's not tied to anything post-2012.  It is the EPA's general

19   process under FIFRA and the laws that the EPA is held

20   accountable for in reviewing pesticides.  It talks about their

21   data collection process and other things.  That continues up

22   through page 4, and --

23          THE COURT:  Isn't there also a hearsay issue with

24   this?  I mean, I suppose I could take judicial notice of a

25   document like this.  I'm not sure.  But it still wouldn't come

 1    in for its truth; right?  And what would you be putting it in

 2    for?

 3              MR. STEKLOFF:  Well, I think it's -- I mean, I don't

 4    know that I have a red ribbon copy of it, but I think it's a

 5    public record.  So I think that this is not hearsay.  It's a

 6    public record.  The director of the Office of Pesticides

 7    Program on behalf of the EPA is writing to the Australians --

 8    to Australia's equivalent of the EPA.  That's within his

 9    duties, it is an official government action.  I don't think

10    there's any dispute about the authenticity of this letter, and

11    so I don't think it's hearsay.

12         And I think that it should come in for the truth about the

13    EPA's process, and I think that it should come in for the truth

14    about the EPA's conclusion to this day by stating that it's not

15    carcinogenic.

16         Because I agree if we were in a post-2012 notice issue, it

17    might go to mitigation, which I think we'll discuss later in

18    the context of punitives, but I think this would come in for

19    its truth.

20              MS. MOORE:  You just can't separate, Your Honor, what

21    we were talking about this morning that if something like this

22    comes in, this letter, 1330, when it's talking about -- whether

23    it's talking about in the letter or not CARC, which, of course,

24    the letter is talking about CARC, is that you can't separate

25    the entire genesis for why the EPA reopened its cancer review

1    of glyphosate, and what was going on behind the scenes with

2    Monsanto and EPA and with Monsanto spending $17 million to

3    debunk IARC at the same time the EPA is going through its

4    review process.

5        They can't have it both ways.  They can't say, "Oh, look,

6    we're going to hide behind the EPA," and say "Well, here's

7    their conclusion" without being able to show the jury

8    everything they were doing.

9            THE COURT:  Yeah.  I mean, I basically -- I think you

10   and I agree on this issue.  I guess the question -- I'm just

11   kind of glancing through the letter, but what about the first

12   paragraph and on page 5 the one paragraph which says "EPA is

13   confident in its conclusion"?

14          MS. MOORE:  I'm sorry, Your Honor.  "EPA is

15   confident"?

16          THE COURT:  Yeah.  Just the first paragraph of the

17   letter and then page 5, the one paragraph that says "EPA" -- it

18   starts "The EPA is confident in its conclusion."

19          MS. MOORE:  And that one sentence, not going into the

20   foreign regulatories?

21          THE COURT:  Well, I mean, I guess I -- we've already

22   established through Portier that the Europeans disagree with

23   him.

24          MS. MOORE:  And our position would be that taking

25   these two snippets out, it's cumulative because it's already in

1    evidence from the questioning of Portier from both Phase I and

2    Phase II; and so to highlight this and single it out I think

3    would be prejudicial to the plaintiffs, especially with us not

4    being able to give the entire story.

5            THE COURT:   Just the first sentence?  Just the first

6    sentence of the paragraph, "EPA is confident in its conclusion

7    that glyphosate is not likely to be carcinogenic to humans"?

8        I mean, the other thing is there may be some testimony

9    from Portier, you know, about this that doesn't -- and the

10   letter doesn't need to go in, but Portier concedes that the EPA

11   continues to take the position.

12           MS. MOORE:   And I think that's already, you know, in

13   evidence, Your Honor.  I mean, that was in Phase I when they

14   went back and asked questions of Dr. Portier on cross about

15   that.

16       But this statement made at this time went in with respect

17   to the climate of what was going on following IARC.  So it just

18   can't be separated out.  It's not giving us the opportunity to

19   paint the full picture.

20           MR. STEKLOFF:   I have a couple comments.  One, I think

21   the problem is Dr. Portier fought this general notion at his

22   deposition.  So he was asked (reading):

23           "Do you recall that after you submitted those public

24       comments, the EPA came to the judgment that for cancer

25       descriptors, the available date and weight of evidence

1    clearly do not support the descriptors?"

2    It goes on (reading):

3        "And do you recall that?

4        "No."

5    Then we tried to show him a 2017 EPA document.  He

6    wouldn't really agree with that.

7    And so I do think this document, consistent with what you

8    just proposed, is necessary.  I mean, the -- I feel, again, to

9    be able to have to respond to a cumulative argument --

10    **THE COURT:**  No, no.  You don't have to respond to a

11    cumulative argument.

12    **MR. STEKLOFF:**  So I think this even shows that there

13    will be some pushback on exactly what the EPA has done up to

14    this day; and absent -- arguing by omission is not -- I

15    actually should be able to argue affirmative, and I think the

16    solution you just proposed is a good one.  We would accept

17    that.

18    In just allowing Dr. Portier -- I mean, they could -- we

19    don't even have to play Dr. Portier.  They could stipulate that

20    this document was sent on December 21st, 2018, and we could

21    redact everything except the two paragraphs you said, and then

22    I can argue from it.  But I think we need the evidence.

23    **THE COURT:**  Or the first paragraph and the first

24    sentence from that paragraph.

25    **MR. STEKLOFF:**  But I think that the second sentence --

 1   I mean, now this is a different issue.  I think that the second

 2   sentence goes to the extent your instructions instruct the jury

 3   that post-2012 regulatory conduct or regulatory conduct from

 4   other countries can be considered in considering, you know,

 5   whether Monsanto acted reasonably based on what was known and

 6   knowable -- and I'm sort of paraphrasing -- that it is relevant

 7   to Monsanto's state of mind, that all these other regulatory

 8   bodies around the world, both up till 2012 but then also up

 9   through today, for the same reasons that the EPA is relevant up

10   to today, that all these other bodies.  And so I think that

11   having that full paragraph in is appropriate.

12        MS. MOORE:  And, again, Your Honor, we cannot separate

13   the date and what led up to them writing this, the EPA writing

14   this, in December of 2018.  I mean, it's taken out of context.

15        And they have the absolute right if they want to call a

16   witness.  They could do that, but they're trying to, like,

17   piecemeal our expert's testimony in order to get this letter

18   in.  And now --

19        THE COURT:  Well, I don't know about piecemeal.  I

20   mean, you can obviously -- it may be that you can -- you know,

21   you can counterdesignate something or you can bring something

22   in on rebuttal.

23        So I don't -- I mean, I guess what I would propose is that

24   we bring the jury back in and we play the remaining testimony

25   for them, and then you-all -- what do we have left?  Remind me

 1   what we have left.

 2          MS. MOORE:  Your Honor, we have --

 3          THE COURT:  Koch, Grant, and Guard; right?

 4          MS. MOORE:  Yes, Your Honor.

 5          THE COURT:  Why don't we start playing that for them.

 6   You-all can scramble a little bit to give me a little bit more

 7   of a concrete proposal --

 8          MS. MOORE:  That's fine.

 9          THE COURT:  -- for what testimony would be played from

10   Portier.  I sort of pretty strongly lean toward just the first

11   sentence, not a statement from the EPA about what other

12   regulatory authorities believe.  I mean, the consideration of

13   this issue is very much in flux and so to say that the EPA can

14   speak for other regulatory agencies around the world on an

15   issue that's very much in flux I don't think is appropriate.

16       But why don't you kind of -- you know, why don't you

17   figure out a more concrete proposal for getting in the basic

18   concept of where the EPA stood as of December 2018 and some

19   specific proposal about the Portier testimony that would come

20   in on it or how you would get it in; and why don't you start

21   thinking about what, if any, you would counterdesignate for

22   that basic proposition.

23          MS. MOORE:  I understand.

24          THE COURT:  And then we'll take a break after the

25   remaining testimony.

PROCEEDINGS

```
 1            MS. MOORE:  That's fine, Your Honor.

 2        And then the only other --

 3            THE COURT:  You could even just do that, like, at the

 4     beginning of the day tomorrow if we need to.

 5            MS. MOORE:  We could, Your Honor.

 6        The other thing is that we did file last night a letter

 7     brief -- I don't know if you've had an opportunity, probably

 8     not yet -- but --

 9            THE COURT:  No, I read them.

10            MS. MOORE:  -- on Seralini.

11            THE COURT:  Yeah.

12            MS. MOORE:  And as you'll recall from our discussion

13     before was that you said --

14            THE COURT:  I read your letter, I understand your

15     argument, and I'm not reconsidering any of the evidence about

16     Seralini.

17            MS. MOORE:  Okay.  Thank you, Your Honor.  I did find

18     stuff in 2009 so that's why I brought it back to your

19     attention.

20        So, okay.

21            THE COURT:  Okay.

22            MS. WAGSTAFF:  Your Honor, we would like for

23     Your Honor to read a stipulation between a couple of the --

24            MS. MOORE:  We can do that.

25            MS. WAGSTAFF:  -- depositions.
```

1    **THE COURT:**  Is that about the damages?

2    **MS. MOORE:**  Yeah, the damages.

3    **THE COURT:**  Net worth and stuff?

4    **MS. MOORE:**  It will be before Grant.

5    **THE COURT:**  Before Grant.

6    **MS. WAGSTAFF:**  I will cue you, Your Honor.

7    **THE COURT:**  Yeah, you can cue me.

8    Do you-all want to take a two-minute break before we --

9    **MS. MOORE:**  That would be great, Your Honor.  Thank

10   you.  I appreciate it.

11   **THE COURT:**  Okay.

12                (Recess taken at 11:06 a.m.)

13            (Proceedings resumed at 11:11 a.m.)

14   (Proceedings were heard out of the presence of the jury:)

15   **THE COURT:**  So before we bring in the jury, the only

16   other thing I want to say is the plaintiffs should also look

17   for testimony from Portier that already established the point

18   that he wants to establish again because that may have some

19   relevance to our discussion.

20   Go ahead and bring in the jury.

21   (Proceedings were heard in the presence of the jury:)

22   **THE COURT:**  Okay.  Welcome back.

23   So I think Kristen mentioned to you we're a little bit

24   ahead of schedule, so what we're going to do is go for about

25   another 50 minutes to an hour today and then that's going to be

1    it for today.

2        And as I indicated to you last week, tomorrow morning we

3    will have closing arguments for Phase II.  There may be a

4    little more -- it's not quite clear yet, there may be a little

5    more evidence that comes in tomorrow morning, maybe not; but,

6    in any event, we'll have closing arguments tomorrow morning,

7    and you'll be able to begin your deliberations for the second

8    and final phase of the case at some point tomorrow.

9        So with that, do you want to call your next witness?

10        **MS. WAGSTAFF:**  Sure.  Mr. Hardeman calls Monsanto

11    employee Michael Koch, and his video is just over 15 minutes.

12              **(Video was played but not reported.)**

13        **MS. WAGSTAFF:**  Your Honor, Mr. Hardeman moves into

14    evidence Trial Exhibit 426 and Trial Exhibit 245.

15        **MR. STEKLOFF:**  Preserving our prior objections, no

16    objection now, Your Honor.

17        **THE COURT:**  Okay.

18        (Trial Exhibits 245 and 426 received in evidence)

19        **MS. WAGSTAFF:**  And, Your Honor, I would request that

20    you please read the stip into evidence.

21        **THE COURT:**  Okay.  Sounds good.

22        We have another stipulation from the parties.  This one

23    relates to the issue of punitive damages.  I'll read it to you

24    now.

25        The parties, Edwin Hardeman and Monsanto Company, by

1    counsel stipulate the following regarding Monsanto's finances:

2         1.   Bayer Corporation acquired Monsanto in June 2018 for

3    $63 billion.

4         2.   Prior to Bayer's acquisition, Monsanto's net worth was

5    $7.8 billion with $2.4 billion cash on hand.

6         You can call your next witness.

7              MS. WAGSTAFF:   Thank you.   Mr. Hardeman calls

8    Hugh Grant, Monsanto's former CEO.   The video is 21 minutes.

9                **(Video was played but not reported.)**

10             MR. WOLFE:   Sorry, Your Honor.   I just have to

11   restart.

12             THE COURT:   No worries.

13               **(Video was played but not reported.)**

14                     (Pause in proceedings.)

15             THE COURT:   Do you-all want to take a -- shall we take

16   a quick break?

17             MR. WOLFE:   Yes, Your Honor.

18             THE COURT:   All right.   Why don't we take a quick

19   break just for a couple minutes just to deal with the technical

20   issue.

21                   (Recess taken at 11:39 a.m.)

22                   (Proceedings resumed at 11:40 a.m.)

23        (Proceedings were heard out of the presence of the jury:)

24             MR. STEKLOFF:   Your Honor, I think there was some

25   confusion about what should be played or not, but everything

 1  that's been played is fine and I think we're ready to proceed

 2  again.

 3         **MR. WOLFE:**  If I could just have one minute.

 4         **THE COURT:**  Take your time.

 5               (Pause in proceedings.)

 6         **MS. MOORE:**  Your Honor, while we're waiting on that,

 7  we did have an opportunity to look at their designations and

 8  counter; and I think as the jury just heard from Dr. Koch, I

 9  think the issue has been resolved already and there's no need

10  to play Dr. Portier again.

11      Dr. Koch just went through and he was -- I don't know if

12  it's Koch or Koch.  I keep saying it both ways.

13         **THE COURT:**  No, I heard all that too and some came in

14  from Grant as well.

15         **MS. MOORE:**  From Grant as well.

16         **THE COURT:**  But, you know, I'm not going to sustain an

17  objection just on the ground that it's cumulative for all the

18  reasons we've discussed.

19         **MS. MOORE:**  Well, it's not just that it's cumulative,

20  Your Honor.  His argument was the jury hasn't heard this and he

21  wants to be able to play another piece of testimony where it's

22  actually been heard.  I mean, I understand that's cumulative,

23  but --

24         **THE COURT:**  And, you know, all of this is undisputed.

25         **MS. MOORE:**  That's right.

1      **THE COURT:**  I mean, the stuff that the Monsanto

2  witnesses are now saying, it's undisputed that the EPA has

3  given its sign-off and these other regulators; but if they want

4  to do something more on that in their case, I think it would be

5  very unfair for me to prevent them from doing so simply because

6  it's cumulative given all the cumulative testimony --

7      **MS. MOORE:**  I understand.

8      **THE COURT:**  -- I've allowed in on the plaintiff's

9  side.

10     **MS. MOORE:**  I understand, Your Honor.  And then we

11  would have a counter to that as well, and we have that ready.

12     **THE COURT:**  I haven't even seen the proposal for what

13  they're going to play.

14     But what I would propose to do -- since the jury is not

15  here, what I would propose to do is let's get done with the

16  plaintiff's case -- okay? -- and then we'll talk about -- we

17  have to talk about jury instructions.

18     **MS. MOORE:**  Right.

19     **THE COURT:**  We have to talk about the verdict form.

20  We have to talk about closing arguments, and we'll also at that

21  point talk about what it is precisely that Monsanto wants to

22  bring in --

23     **MS. MOORE:**  Okay.

24     **THE COURT:**  -- and what your objection would be to it.

25     **MS. MOORE:**  Okay.

**PROCEEDINGS**

1      THE COURT:  And then if it comes in, it will come in

2  tomorrow morning.

3      MR. STEKLOFF:  That's fine, Your Honor, and we're

4  putting together a short clip report so you can see exactly

5  what we're proposing.

6      THE COURT:  Okay.

7      MS. WAGSTAFF:  And, Your Honor, we will point you to

8  where in Phase I Dr. Portier was asked about the EPA.

9      THE COURT:  Well, point it to me --

10      MS. WAGSTAFF:  Now or later?

11      THE COURT:  Point me to it later this afternoon.

12      MS. WAGSTAFF:  Okay.

13      THE COURT:  So that we can -- are you ready?

14      MR. WOLFE:  Yes, sir.  Thank you.

15      THE COURT:  Okay.  Go ahead and bring them in.

16    (Proceedings were heard in the presence of the jury:)

17      THE CLERK:  Please be seated.

18      THE COURT:  Okay.  Thank you.  Sorry about the glitch.

19    You can continue.

20          **(Video was played but not reported.)**

21      THE COURT:  Okay.  One more witness, is that right,

22  for today?

23      MS. WAGSTAFF:  Yes, Your Honor.  Mr. Hardeman calls

24  Monsanto employee James Guard.  The video is 16 minutes and 55

25  seconds.

```
 1            THE COURT:  All right.  And that will be it for today.

 2              (Video was played but not reported.)

 3            THE COURT:  Okay.

 4            MS. WAGSTAFF:  Your Honor, Mr. Hardeman, if I may --

 5            THE COURT:  Go ahead.

 6            MS. WAGSTAFF:  -- moves into evidence Trial Exhibits

 7     788 and 791.

 8            MR. STEKLOFF:  And we just want to confirm with

 9     counsel a few things overall.

10            THE COURT:  That's one of the many things that we will

11     all be working on this afternoon.  We don't want to keep you

12     here while we are doing that.  So, as I said, there may be a

13     little bit of evidence that -- additional evidence that comes

14     in tomorrow or we may go straight to closings, but either way

15     you will hear closing arguments tomorrow and be able to begin

16     your deliberations.

17            So why don't we -- why don't we plan to start at

18     8:30 tomorrow.  Plan to start at 8:30.  So be ready to come in

19     here at 8:30 sharp.  And remember all the restrictions that

20     have been imposed on your conduct between now and then, and we

21     will see you tomorrow morning.

22            Thank you.

23            (Proceedings were heard out of presence of the jury:)

24            THE COURT:  Okay.  Everybody remember that you are --

25     everybody is required to stay here for five minutes before
```

PROCEEDINGS

 1   leaving the courtroom to allow the jurors to escape.

 2       Why don't we -- but after you-all stay here for five

 3   minutes, why don't you then leave and then go have lunch.  And

 4   why don't we come back at 1:30 to discuss exhibits, jury

 5   instructions, verdict form, this Portier issue, and anything

 6   else that we need to discuss.

 7           MS. MOORE:  Thank you, Your Honor.

 8           MS. WAGSTAFF:  Your Honor, I think I have -- I printed

 9   out -- and I have a copy for you as well.

10           MR. STEKLOFF:  Yep.

11           MS. WAGSTAFF:  This is from the run report that was

12   actually played from Dr. Portier.  And in it it talks a little

13   bit about the European stuff and then the EPA.

14           THE COURT:  This is from Phase One?

15           MS. WAGSTAFF:  Phase One, yep.

16           THE COURT:  Okay.

17           MR. STEKLOFF:  Your Honor, just a few logistics.

18   First, I have -- this does not have the counters that were

19   included in the letter submitted yesterday from Dr. Portier.

20   Here is the three minutes that we would propose playing

21   regarding the issues we have been discussing today.

22           THE COURT:  Okay.

23           MR. STEKLOFF:  And then while the record is open, I

24   failed to move in and to admit two exhibits from what was

25   already played from Dr. Portier.  I'm happy to discuss them

 1   over the break with counsel.  But they were 1179 and 1668, and

 2   I will make sure Ms. Melen has those when she returns as well.

 3          THE COURT:  Okay.

 4          MR. STEKLOFF:  And then to the extent the Plaintiff is

 5   formally resting, we obviously make a motion that has been --

 6          THE COURT:  I don't think they have formally rested

 7   yet.  I thought we would leave that open until tomorrow

 8   morning, just in case anything we discuss today changes the

 9   equation.

10          MS. WAGSTAFF:  Yes.  We would like that, Your Honor.

11          MR. STEKLOFF:  Thank you, Your Honor.

12          MS. WAGSTAFF:  We will see you at 1:30.

13          THE COURT:  Yeah, 1:30.

14          THE CLERK:  Court is in recess.

15          (Luncheon recess was taken at 12:21 p.m.)

16   **AFTERNOON SESSION**                                    **1:33 p.m.**

17      (Proceedings were heard out of presence of the jury:)

18          THE COURT:  Okay.  What do you want to do first,

19   exhibits or have you taken care of exhibits?

20          MS. MOORE:  Exhibits will be fine, Your Honor.

21          MR. STEKLOFF:  I was going to ask if we could do jury

22   instructions, verdict form, and directed verdict motions last

23   because I may -- with your permission -- seek to excuse myself

24   to go work on closings.  Mr. Kilaru and Ms. Matthews Johnson

25   are here.  I was hoping we could deal with exhibits, the

```
1    Portier testimony -- to the extent we need to discuss it
2    further -- and then I guess what is on or off limits for
3    closing arguments.
4              THE COURT:  Okay.
5              MR. STEKLOFF:  So from my perspective it does not need
6    to be a long discussion.
7              THE COURT:  Okay.
8              MS. MOORE:  So we are starting with exhibits?
9              MR. STEKLOFF:  Yes, we can start with exhibits.
10             MS. MOORE:  All right.  Your Honor, I think we have
11   agreement on the Martens exhibits.  So we had moved
12   provisionally -- we had moved to enter into evidence 155, 156,
13   157, 158, 159, 160, 161 and 208, and we would ask that those be
14   entered into evidence now.
15             MR. STEKLOFF:  No objection to any of those, Your
16   Honor.
17             THE COURT:  Those are admitted.
18        (Trial Exhibits 155 through 161 and 208 received in
19         evidence)
20             MS. MOORE:  And then --
21             MR. STEKLOFF:  Then with respect to --
22             MS. MOORE:  Martens.
23             MR. STEKLOFF:  -- Monsanto and Martens, we had
24   Exhibit 154.
25             MS. MOORE:  And that's it.
```

 1           MR. STEKLOFF:  And that's it.  And I believe there is

 2  no objection.

 3           MS. MOORE:  That's correct.

 4           THE COURT:  Okay.  That's admitted.

 5       (Trial Exhibit 154 received in evidence)

 6           MS. MOORE:  And then for Reeves, we had

 7  provisionally -- we had moved to admit into evidence -- it's

 8  all the ones listed on 320.  Do you want me to list them out,

 9  Kristen?

10           THE CLERK:  It's okay.  I can get them.

11           MS. MOORE:  So we would move those to be entered into

12  evidence now.  I can list it:  86, 89, 220, 249, 250, 251, 254,

13  413, 443, 448, 449, 450, 451, 452, 453, 495, 499, 503, 515 and

14  516.  And we would ask those be entered into evidence at this

15  time.

16           MR. STEKLOFF:  So did you move 413?

17           MS. MOORE:  I did.

18           MR. STEKLOFF:  So 413 may depend, Your Honor, on how

19  we are going to handle learned treatises in general.

20           MS. MOORE:  Sorry.  That was not supposed to go.  I

21  withdraw 413.

22           MR. STEKLOFF:  Okay.

23           MS. MOORE:  And --

24           MR. STEKLOFF:  And 451 and 452?

25           MS. MOORE:  Yes, sorry, about that.

PROCEEDINGS

1      **THE CLERK:**  So those are withdrawn?

2      **MS. MOORE:**  Yes.

3      **MR. STEKLOFF:**  And did you move in 495 and 499?

4      **MS. MOORE:**  Yes.  I agree that 495 and 499 do not go.

5      **MR. STEKLOFF:**  Okay.

6      **MS. MOORE:**  Sorry.  I was reading off a different

7  list.

8      **MR. STEKLOFF:**  So with all of that, I have no

9  objection to the remaining exhibits on that list.

10     **THE COURT:**  Okay.  Those are admitted.

11        (Trial Exhibits 86, 89, 220, 249, 250, 251, 254, 443,

12          448, 449, 450, 453, 503, 515 and 516 received in

13          evidence)

14     **MS. MOORE:**  Thank you, Your Honor.

15     **MR. STEKLOFF:**  Then with respect to Monsanto on

16  Reeves, Your Honor, this is maybe a time to tee up the argument

17  I made about some learned treatises earlier.  So we move into

18  evidence Exhibit 241 and 1697 -- so -- and I think there are

19  objections to both, Your Honor.

20        I will start with 241, which, again, probably applies more

21  broadly.  That specifically was the Farm Family Exposure Study;

22  and I think that -- similar to the argument I made earlier in

23  Phase Two -- it is really coming in for Monsanto's state of

24  mind and it goes to their conduct and their reasonableness

25  overall.

 1        So I think that those studies -- so we are not just

 2   talking about the Farm Family Exposure Study but, for example,

 3   the Heydens 2008 study where they did some of the follow-up

 4   tests recommended by Dr. Parry, the Williams study, for

 5   example, where there are ghostwriting allegations; and the

 6   acknowledgment section has been displayed to the jury.

 7        I just think that the jury now can view those for a

 8   different purpose.  They have already determined causation.

 9   They wouldn't be viewing these to gauge whether or not Roundup

10   is capable of causing cancer.  They would be viewing it to

11   determine whether or not Monsanto in publishing these studies,

12   in doing the tests that they have done, with their being

13   criticized for not doing a lot of tests has acted reasonably.

14   And so for that purpose in Phase Two I think -- and here we are

15   talking about specifically the Farm Family Exposure Study --

16   that is our position.

17        **THE COURT:**  So did I just hear you argue that we want

18   the ghostwritten article to go to the jury because it helps

19   show that Monsanto acted reasonably?

20        **MR. STEKLOFF:**  Well, I think -- with respect to that

21   one, Your Honor, I think that, one, it goes -- that is a

22   different purpose.  But I think it goes to show -- I mean, I

23   will argue that it was not, in fact, ghostwritten; that the

24   acknowledgment section is in there.  Sort of less concerned

25   about that one because I can show the acknowledgment section

PROCEEDINGS

1    regardless.  I think on the studies that Monsanto itself

2    conducted and published, I think that is more directly tied to

3    what Your Honor just stated.

4         THE COURT:  Well, I don't think there is -- I mean,

5    your -- well, let's put aside the Williams paper for a second,

6    okay.  That sort of threw me for a loop.  So let's put that

7    aside and think about the other ones.

8         I mean, you are right that the jury is not going to be

9    called upon to decide the issue of causation.  And so to the

10   extent there is extraneous material or material that wasn't

11   covered in expert testimony or something like that, if the jury

12   were to look at that, it wouldn't be prejudicial from the

13   standpoint of the causation question.

14        But I suppose -- I mean, I suppose it could still be

15   prejudicial from the standpoint of -- or potentially confusing

16   or potentially misleading from the standpoint of the question

17   of whether the cancer risk was knowable.  I suppose it could

18   still have sort of the same -- the same effect in Phase Two on

19   that question.

20        MS. MOORE:  And, Your Honor, our position is -- this

21   is why we objected.  We think it opens -- not necessarily opens

22   the door, but it is a slippery slope because then we can argue

23   that all the published studies that we -- you know, we talked

24   about in Phase One should then go back to the jury because that

25   shows all the knowledge and the facts and the evidence that

PROCEEDINGS

1    were out there pre-2012 that Monsanto knew or should have known

2    that Roundup causes cancer.  And so to cherrypick the one that

3    they wrote which says, It's not cancerous, and send that back

4    to the jury is unfair and prejudicial to the Plaintiff because

5    that's not -- that's not the true story of the knowledge that

6    they would have had pre-2012.

7              THE COURT:  Then I suppose you might also say that you

8    were kind of operating on the assumption that the way we were

9    proceeding in this trial with these studies is that whatever

10   you want to call out from the studies, you call out and it goes

11   before the jury.

12             MS. MOORE:  That's right.

13             THE COURT:  And the study itself doesn't go back into

14   the jury room.

15             MS. MOORE:  That's right.  And that's how we have been

16   operating throughout Phase Two as well.  In fact, I just agreed

17   with Monsanto to withdraw certain objections to Reeves, which

18   were studies.

19             THE COURT:  You mean you agreed with them to withdraw

20   the request to admit certain studies?

21             MS. MOORE:  Right.  I rattled off the exhibits, and I

22   didn't realize that that included some.  So -- and I agree with

23   them that those shouldn't go back.  But I also think that the

24   one that they want, which happened to be written by Monsanto,

25   shouldn't go back either.  I don't think any of them should,

1  just like we had agreed previously.

2        **THE COURT:**  Okay.  I understand.  I think that the --

3  the rule that we have been applying to studies should continue

4  to apply to these ones that we are talking about here.  So I

5  will rule that they are not going to be admitted into evidence.

6        **MR. STEKLOFF:**  Understood, Your Honor.

7        And then the second Reeves exhibit, over which there is a

8  pending objection, is 1697.  So 1697, Your Honor, was a -- was

9  testified by Dr. Reeves as something he put together and is one

10  of the authors.  It is a pamphlet, for lack of a better word,

11  Benefits and Safety of Glyphosate.  It was a much longer

12  document that had a lot of information about the benefits of

13  glyphosate and safety of glyphosate.

14        If I can hand Your Honor a copy, this is what we propose

15  going back to the jury, which is actually just the title page.

16  We redacted the date, which off the top of my head was

17  December 2016.  So that is the bottom left.  For that purpose

18  we redacted it.

19        Then there is one page in that table -- in that document,

20  table 2, that we think should be admitted.

21        **THE COURT:**  So this was called up to the jury, and he

22  testified about this particular chart or table?

23        **MR. STEKLOFF:**  No.  He did not testify about this

24  particular table.

25        **MS. MOORE:**  This was not published to the jury at all,

1   Your Honor.  And we have objected to it, one, coming into

2   evidence and definitely going back to the jury.

3       First of all, it was not on their will-use trial list,

4   which I'm not going to make a big deal about that; but it was

5   not on there.  It was also not shown to the witness during the

6   deposition.  And it is a publication that Monsanto put out in

7   2016.  So it is not within the time period that we have been

8   operating under either.

9       And for those reasons we don't think it should come in,

10  especially not being extracted to this degree.  I mean,

11  there -- this is -- this is showing a table that they have --

12  Monsanto has put together.  It's -- and the underlying

13  information here wouldn't be admissible either.  We haven't

14  been putting in these reports from any of these foreign

15  regulatory agencies.

16          **THE COURT:**  Yeah, I understand.  This is not -- this

17  is not admitted.

18          **MS. MOORE:**  Thank you, Your Honor.

19          **THE COURT:**  That objection is sustained.

20          **MR. STEKLOFF:**  That covers Reeves, Your Honor.

21          **THE COURT:**  Okay.

22          **MS. MOORE:**  And then, Your Honor, we had on Farmer --

23  and it's my understanding there are no objections from the

24  Defendant, but I will read through that list.  It's -- I have

25  to make sure -- it is 429, 435, 442, 444, 448, 449, 254, 314,

 1   461, 462, 463, 464, 466, 467, and 468.  And we have redacted

 2   the one that they have asked to be redacted, 429.

 3        **MR. STEKLOFF:**  I'm doubling-checking.

 4        **THE COURT:**  Take your time.

 5        **MR. STEKLOFF:**  What was the one before 314?

 6        **MS. MOORE:**  254.

 7        **MR. STEKLOFF:**  That is correct, Your Honor.  And just

 8   429 is the document -- is the 2015 e-mail that discussed the

 9   Williams article, but we have agreed on the redactions.  So as

10   redacted -- I mean, obviously pending our previous

11   objections -- we have no further objections.

12        **THE COURT:**  Okay.  Those are admitted.

13        (Trial Exhibits 429, 435, 442, 444, 448, 449, 254,

14         314, 461, 462, 463, 464, 466, 467 and 468 received in

15         evidence)

16        **MS. MOORE:**  Thank you, Your Honor.

17        **MR. STEKLOFF:**  And I think with respect to the

18   Defense, Your Honor, in Dr. Farmer's deposition, we move in 479

19   and -- well, I will just read all the numbers:  479, 480, 481,

20   482, 483, 484, 485, 493, and that is all, and I think all of

21   those are objected to.  So I'm happy to walk through what those

22   were.

23        **THE COURT:**  Okay.

24        **MR. STEKLOFF:**  479 and 480 were the two summary charts

25   that I showed during opening in Phase Two under Federal Rule Of

1   Evidence 1006.  One shows the genotox testing of surfactants.

2   The other shows the genotoxic testing of the formulated

3   products.  So we believe those are admissible.

4          **THE COURT:**  Well, the problem is -- I mean, summaries

5   of evidence usually go to the jury when the actual evidence

6   goes to the jury.  And, you know, we give the jury an

7   instruction -- I thought we talked about this pretrial.

8          **MS. MOORE:**  We talked about it in Phase One, Your

9   Honor.

10         **THE COURT:**  But the jury gets an instruction that says

11  the summary of the evidence is only as good as the underlying

12  evidence so, you know, your memory of the underlying evidence

13  controls or whatever.  So I think that it was appropriate to

14  call out those charts in the same way that the studies have

15  been called out, but I don't think it is appropriate to admit

16  them -- admit those charts and send them back to the jury.

17         **MR. STEKLOFF:**  As long as -- understood.  I can still

18  refer to them --

19         **THE COURT:**  Yes.

20         **MR. STEKLOFF:**  -- on the course of closing.

21      Just while we are on that topic, this one might be a

22  little bit different.  Exhibit 493 was a summary chart that you

23  may recall where there was follow-up to each of Dr. Parry's

24  recommendations.

25      So Dr. Farmer presented a chart for A through I in the

 1   recommendations and would have things that predated Dr. Parry's

 2   first report, and then steps that occurred afterwards, or

 3   sometimes it said N/A if, in Monsanto's view, he had not made a

 4   firm recommendation.  So you may have the same view on it, but

 5   I also think some of that underlying evidence is coming in.  So

 6   I don't know if that one is a little bit different.

 7          THE COURT:  It is a little too abstract for me as I

 8   sit here because I don't remember the chart well enough.

 9          MS. MOORE:  Your Honor, it is basically somewhat of a

10   summary -- thank you.

11      We objected to it for the same reason we objected to the

12   other ones, Your Honor, is that everything on here would not be

13   admissible.  And so for those reasons, we don't think it is a

14   proper summary under 1006.

15          THE COURT:  Well, this is a list of all the different

16   tests and stuff --

17          MS. MOORE:  Yes, Your Honor.

18          THE COURT:  -- that were and were not --

19          MS. MOORE:  Yes.

20          MR. STEKLOFF:  And this was discussed in some detail

21   in Dr. Farmer's designations for Monsanto.

22          MS. MOORE:  It was published.

23          THE COURT:  Same ruling on this one, which is that you

24   can call it out and, you know, sort of use it to remind the

25   jury of Dr. Farmer's testimony.  But it shouldn't go back to

 1   the jury.

 2           MR. STEKLOFF:  Understood.

 3       And then the last category of documents, I think --

 4           MS. MOORE:  You can probably group them together.

 5           MR. STEKLOFF:  Yeah, sort of group them together.  481

 6   and 482, Your Honor, are EPA documents.  So the first, for

 7   example, is the RED document that there has been testimony

 8   about.  And then 483 is I think a -- European document, a

 9   regulatory action.  484 is that World Health Organization 2004

10   review document.  And 485 is a similar version of that.

11       And so I think this is -- we are moving to admit those.

12       And in Phase One there were some EPA documents that came

13   in, for example, related to the -- we can all just call it now

14   the magic tumor, so I think -- we think that these documents

15   should come in, but we are looking for your guidance.

16           THE COURT:  I was sort of assuming when I was

17   reviewing the testimony of -- regarding those documents that

18   they would come in, but, again, I don't have -- it's a little

19   too abstract to me right now.  Can you put them in front of me?

20       Or let me just get a clarification.  Do you object to

21   those documents coming in?

22           MS. MOORE:  We do, Your Honor.  In similar to how the

23   IARC Monograph didn't come into evidence, we believe that -- we

24   understood your ruling that --

25           THE COURT:  You never asked for the IARC Monograph to

1    come in in Phase Two, right?

2         MS. MOORE:  Okay, I understood --

3         THE COURT:  I mean, my ruling was that the IARC stuff

4    would be re-visited after Phase One, and you didn't ask for it

5    to come in so.

6         But anyway -- so strike the similar to the IARC Monograph,

7    but you -- what is your point about these EPA documents?

8         MS. MOORE:  Well, that some of those -- and I don't

9    have --

10        MR. STEKLOFF:  I have them.

11        MS. MOORE:  Oh, great.  Thanks.  Thank you.

12        Kill a couple more trees.  Okay.

13        That these are actually -- some of these are akin to

14   actual studies too.  There is one -- let's see -- here is the

15   RED.  So 481 is the RED, Your Honor.  And, again, if -- it was

16   our understanding that these types of documents would not be

17   coming in and going back to the jury, based on your motions in

18   limine rulings.  And there is also hearsay within the documents

19   too.

20        (Pause in proceedings)

21        MS. MOORE:  And, Your Honor, I think what they wanted

22   from these documents they got from the actual testimony itself.

23   And to send all this back to the jury, one, I don't think it is

24   proper; and, two, I don't think it is necessary.

25        (Pause in proceedings)

1      **THE COURT:**  Yeah, I mean the problem is there is also

2    a lot of extraneous stuff in here.  I think in light of that,

3    in light of the way the parties have been treating these kinds

4    of documents throughout the trial, I think at least the red

5    document should -- should not come in.  But you can -- whatever

6    testimony you elicited about it is appropriate to call out to

7    the jury.

8        I think certainly the same with the European Commission

9    document, which has the additional problem of having been

10   identified as a working document that doesn't necessarily

11   reflect -- represent the views of the Commission services.

12       And let me look at this third one here, Number 482.

13       (Pause in proceedings)

14       **THE COURT:**  Yeah, same thing with this document.  Same

15   ruling.

16       **MR. STEKLOFF:**  Understood.  And I will accept the same

17   ruling on the two WHO documents without handing them up.

18       **THE COURT:**  Okay.  Can I hand this back to you?

19       **MS. MOORE:**  You don't want more documents?

20       Okay.  Your Honor -- do you have anything else on Farmer?

21       **MR. STEKLOFF:**  I do not.

22       **MS. MOORE:**  Your Honor, from today, we had moved on

23   Dr. Heydens' deposition, and I don't believe there is an

24   objection now for 312, 315, 317, 322 and 323, and we just ask

25   for those to be admitted into evidence.

PROCEEDINGS

```
 1          MR. STEKLOFF:  I thought those were --

 2          MS. MOORE:  I'm sorry.  Too many things.  Thank you.

 3     And the Kier one was already admitted, 686.

 4          THE CLERK:  Yes.

 5          MS. MOORE:  And Portier, 388, was admitted.  But they

 6     reserved an objection on 504.

 7          MR. STEKLOFF:  That's correct, Your Honor.

 8     504, Your Honor, I have one copy, is the IBT -- July 1983

 9     OPP document about the IBT.

10          THE COURT:  Right.

11          MR. STEKLOFF:  So if there is a -- now, if there is a

12     goose-gander, I will put this -- you are going to hear me say

13     what is good for one side is good for the other.  There is a

14     lot of extraneous information about the IBT review that goes

15     well beyond Monsanto in this document.

16          THE COURT:  Oh, I don't -- I have little question that

17     that's true.  I mean, I remember the stuff that was called out

18     in the testimony all seemed totally appropriate, but I can't

19     imagine that that document -- I mean, I will look at it, if you

20     want me to; but I can't imagine that there is not a lot of

21     extraneous stuff in that document that shouldn't go to the

22     jury.

23          MR. STEKLOFF:  I would think now the same rule

24     applies.  Anything that was shown during the testimony -- for

25     example, I think it was during Mr. --
```

PROCEEDINGS

```
 1           MS. MOORE:  Dr. Portier.

 2           MR. STEKLOFF:  Either one.  But if they showed

 3   something to a witness from this document, then they could

 4   bring it up.  And I remember, for example, they showed the one

 5   line where the animal study on carcinogenicity --

 6           MS. MOORE:  There is two.

 7           MR. STEKLOFF:  -- was an I, and if they want to make a

 8   slide of that for closing, that's fine.  I don't think the

 9   document should go back.

10           MS. MOORE:  And our position is that this is similar

11   to the documents that came in about the magic tumor from

12   Phase One.  And the issue is that it lists the other

13   pesticides.  We can redact that in those pages.  And so then

14   the only lines that would be highlighted on those pages would

15   be on glyphosate.  We could get rid of that.  That is pretty

16   easy to do.

17           THE COURT:  Well, let me take a look at the document.

18       (Pause in proceedings)

19           THE COURT:  I guess at that point -- if you are

20   redacting 99 percent of the document, or 99 point --

21           MS. MOORE:  Well, the charts.

22           THE COURT:  -- 9 percent of the documents, at what

23   point do you just say -- well, because then -- the problem I

24   think -- and this may be an argument that you wish to adopt

25   when it comes to the letter that went to Mr. Portier -- I mean,
```

 1   to the Australian folks.

 2           MS. MOORE:  Right.

 3           THE COURT:  The problem is when you are redacting

 4   99 percent of the document, then the jury is --

 5           MS. MOORE:  Wondering.

 6           THE COURT:  -- sitting there speculating what else is

 7   in this.  And if you have already established the point through

 8   testimony that you want to establish from this document, then

 9   what's the problem --

10           MS. MOORE:  That's fair, Your Honor.

11           THE COURT:  -- with just calling out that testimony?

12           MS. MOORE:  That's fair.

13           THE COURT:  It is admissible evidence.

14           MS. MOORE:  And then in closing I will call out those

15   lines that we called out here in Dr. Portier.  So that's fine.

16           THE COURT:  Okay.  So the same ruling applies to that

17   document.

18           MS. MOORE:  Yeah.

19           MR. STEKLOFF:  Your Honor, there were two in Heydens,

20   which I didn't have a chance to raise, which were on the

21   Monsanto side:  710, which is a 1990 rat study report.  And

22   then 711, which was the GLP audit of Monsanto's labs in

23   September 1993.

24       The second item -- maybe it falls into these broader EPA

25   documents, but first the 1990 rat study report I think should

```
 1   be admitted, which is Exhibit 710.

 2              MS. MOORE:  And again, Your Honor, that would be the

 3   only rat study that will be going back.

 4              THE COURT:  Well, I was just going to ask -- it's not

 5   clear to me why -- why does this rat study need to be admitted

 6   when no other is admitted?  Which -- what is the 1990 rat

 7   study?

 8              MR. STEKLOFF:  I will concede off the top of my head,

 9   I don't know the difference --

10              MS. WAGSTAFF:  It is that important.

11              MR. STEKLOFF:  -- between that rat study and any other

12   study; but I think we played testimony about it and moved to

13   admit it.  If they wanted to play testimony about any other rat

14   study --

15              THE COURT:  Is this the follow-up to the magic mouse

16   study?

17              MS. RUBENSTEIN:  It is, Your Honor.

18              MS. MOORE:  It is.

19              THE COURT:  Okay.  Same ruling will apply to that.

20              MR. STEKLOFF:  And then just so the record is

21   complete, I understand the ruling ahead of time.  But we had

22   moved in 147, which was the Heydens 2008 article, which was

23   sort of a publication after Parry.  I understand the ruling.

24              THE COURT:  Same ruling.

25              MR. STEKLOFF:  And then 416 was the Williams article.
```

```
 1    I understand the ruling.

 2              THE COURT:  416 was what?

 3              MR. STEKLOFF:  The Williams 2000 article.

 4              THE COURT:  Yeah, same ruling.

 5              MS. MOORE:  481 was excluded.

 6              MR. STEKLOFF:  I think we already excluded that.

 7              MS. MOORE:  Okay.  You good on that?

 8              MR. STEKLOFF:  On Dr. Portier, Your Honor, we moved in

 9    Exhibit 1179, which is a 1998 report from the EPA.  And I

10    understand that you will sustain their anticipated objection to

11    that.

12              THE COURT:  Sustained --

13              MR. STEKLOFF:  Just for the record.

14              THE COURT:  Sustained the anticipated objection.

15              MR. STEKLOFF:  Yes.

16         Jennifer, we are ready.

17              MS. MOORE:  Okay.  Then we had identified an exhibit

18    with Mr. Murphy, 768, but we are withdrawing that.

19              THE COURT:  Okay.

20              MS. MOORE:  And then on Dr. -- Michael Koch, I think

21    those were both already admitted, 426 and 245.  And then the

22    last one --

23              THE COURT:  Hold on.  They are seeming like they are

24    trying to confirm.

25              THE CLERK:  Yes, they were.
```

1          **MS. MOORE:**  Thank you.

2      And then the last one, Your Honor, was Mr. Guard, and we

3   moved to enter into evidence 788 and 791.  And I think

4   Defendants were going to look at those.

5          **MR. STEKLOFF:**  Yeah, we object to those, Your Honor.

6   I'm happy to hand those both up.  These are, to be clear,

7   internal Monsanto documents.  I think the same problem applies.

8   There was specific testimony about specific pages or parts of

9   pages that we don't object to.  Obviously preserving our prior

10  objections.

11     But there's -- both of these documents -- I'm happy to go

12  through them in either order -- have lots of extraneous

13  information.  One of them is a PowerPoint that is focused on

14  GMOs in our view and things happening in Europe and in France,

15  largely around GMOs.  There was not testimony about 95 percent

16  or more of this document.

17     The second one has various financials in it relating to

18  products that aren't even part of this trial.  Admitting it is

19  Roundup products in general, but not Roundup products that

20  Mr. Hardeman has used.

21     Again, to the extent they want to either admit with the

22  99 percent redaction issue or refer to them in closing, we

23  don't object.  But I don't think all the other information in

24  either of these should come in.

25         **MS. MOORE:**  Your Honor, our position on these is that

1  a proper foundation was laid during the deposition of

2  Mr. Guard.  He was actually designated as a corporate

3  representative for Monsanto.  So these documents -- he was

4  examined about both of these documents, and so we believe they

5  are proper to enter into evidence.  And I don't think a proper

6  objection is that they are internal documents or that they

7  refer to their financials.  That information is all relevant

8  for the jury.

9        MR. STEKLOFF:  I'm not objecting that they shouldn't

10  be admitted because they are internal documents or involve

11  financials.  I'm objecting to -- under 401 and 403.

12      And it is sort of the same problem we have with the Reeves

13  document I showed earlier.  I mean, we are not allowed to admit

14  a table -- he also authenticated the document and put in the

15  document, and we weren't allowed to show a table from it, and

16  wasn't discussed and shown in designations before Your Honor.

17  We run into the same problem here where there is lots of

18  extraneous information that has no bearing on what has been

19  discussed in front of the jury.

20        THE COURT:  Well, I mean, the principle you are

21  articulating sounds right.  But I'm just flipping through the

22  presentation to see if it is really true that there is lots of

23  extraneous information because at least at first glance, I

24  mean, it seems like -- it seems like less of the information is

25  extraneous in this presentation.

1     So hold on.  Let me just -- give me a minute to just kind

2     of flip through it.

3          MS. MOORE:  The other thing, while you are doing that,

4     Your Honor, I will just say that 788 is from 2009 and 791 is

5     from 2000.  So these are within the relevant time period as

6     well.

7          MR. STEKLOFF:  Right.  And 788, Your Honor, on the

8     front page I think makes clear that this is an attack on

9     Monsanto relating to GMOs, not on the e-mail but on the third

10    page, I guess, of the document.  And then it -- when it walks

11    through the rest of the attacks on Roundup, it is in the

12    context of GMOs.

13         THE COURT:  Okay.  Let me just -- can I just read it

14    for a sec?

15         MR. STEKLOFF:  Of course.

16       (Pause in proceedings)

17         THE COURT:  Who gave this presentation?

18         MS. MOORE:  Are you looking at 788 or 791, Your Honor?

19         THE COURT:  788.

20         MR. STEKLOFF:  The front page, Your Honor, it is

21    from -- at least the e-mail is from someone named Martin Voss,

22    and there is a series of people it was emailed to, none of whom

23    testified in the case.  It came up because Mr. Guard was a

24    30(b)(6).  He was not -- there is no evidence he was personally

25    involved in this.

PROCEEDINGS

1           **THE COURT:**  Remind me what he testified with respect

2   to this presentation.

3           **MR. STEKLOFF:**  I think he was shown, Your Honor, on

4   the first page -- sorry.  I keep saying the first page.  On the

5   third page it says at the top, Roundup FTO as part of the

6   growth initiatives why.  He was questioned about that middle

7   bullet.  Roundup is key to Monsanto in many aspects.

8       I don't recall if there was other testimony about this

9   document.

10          **MS. MOORE:**  There was.

11          **MR. STEKLOFF:**  But that at a minimum was shown.  There

12  may have been one other section that was shown.

13          **MS. MOORE:**  There was, Your Honor.  He was designated

14  on this topic.  And so given that he was a corporate

15  representative under 30(b)(6), this is a proper topic to be

16  examined on.  And it was authenticated and the proper

17  foundation was laid.  We do believe that given that, the

18  exhibit should be admitted into evidence.

19          **MR. STEKLOFF:**  I don't know if that changes what the

20  jury was shown.  The jury was only shown that one bullet, Your

21  Honor, on page 3 of the document.

22          **MS. MOORE:**  Well, it was more than that, Your Honor;

23  but I don't think you have to go through every single line of a

24  document in order to get a document admitted.

25          **THE COURT:**  No, you don't.  But I'm examining it

 1  mainly to test it against the principle that we have been

 2  applying to these other documents, which is -- I know it is a

 3  different type of document, but if it's -- you know, if it is

 4  the kind of thing where you are pulling one small item out of

 5  the document and eliciting testimony on it, and the rest of the

 6  document is kind of about something different or, you know, far

 7  afield, you know, that's one thing.

 8        **MS. MOORE:**  I don't think --

 9        **THE COURT:**  As I said, it doesn't -- I don't think it

10  immediately seems to me that this document fits that

11  description.  So I'm just trying to flip through it.

12        **MS. MOORE:**  I don't think so, too, Your Honor.  It is

13  about Roundup and the way they are defending Roundup back in

14  2009.

15        **THE COURT:**  But there is a ton of stuff in here that

16  is not, for example -- well, "a ton" may be an overstatement.

17  But there is a lot of stuff in here that is off point.

18        For example, I'm looking at one -- they don't have page

19  numbers, but there is one kind of towards the middle that is

20  talking about farmers and retailers and what we need to do

21  vis-à-vis farmers and retailers.  It says, We need to reassure

22  them on toxicity, ecotoxicity, resistance, usage, regulatory

23  evolutions.

24        So only a portion of that is what this case is about,

25  right?

1     **MS. MOORE:**  Well, maybe.  I mean, it is to farmers and

2  retailers.

3     **THE COURT:**  Well, this is not about ecotoxicity, for

4  example, right?

5     **MS. MOORE:**  Okay.  All right.  That might be fair.

6  But, I mean, they are basically telling one thing internally

7  and a separate thing externally.  And externally they are

8  including retailers where Mr. Hardeman bought this from a

9  retailer.  And they want to provide basic information on

10 Roundup to the retailer and reassure them that there is nothing

11 wrong with the product.  I think that is directly on point.

12     **THE COURT:**  I think -- I'm looking at this, and I'm

13 thinking about -- I'm looking at water detection and GMOs and

14 what is going on in France and ecotoxicity and all that stuff.

15 I think you need to be limited to what the testimony you

16 elicited about this document.

17     **MS. MOORE:**  Well, Your Honor, if we could, we go

18 through -- we could have a meet-and-confer with the Defense

19 this afternoon and see if we can meet out an agreement as to

20 what they believe --

21     **THE COURT:**  I think at this point in the trial, I

22 think that it's -- we are simply going to apply that principle

23 to it.  So you can call out the testimony you elicited on it.

24     **MR. STEKLOFF:**  Then we have the same objection, Your

25 Honor, to -- for 791.  I know, for example --

1          **THE COURT:**  And this came in through?

2          **MS. MOORE:**  From Guard, who is the corporate

3    representative, Your Honor.

4          **THE COURT:**  Okay.

5          **MS. MOORE:**  This is -- this is about financial.

6          **THE COURT:**  Right.

7          **MS. MOORE:**  And I would ask not to be limited -- I

8    mean, obviously I'm not going to bring up a product that is not

9    relevant; but I do think that this presentation, which was put

10   together and then produced in response to a 30(b)(6) notice on

11   financials is relevant and should come into evidence.

12         **THE COURT:**  Well, just because it was produced in

13   response to 30(b)(6) doesn't mean it is admissible.

14         **MS. MOORE:**  Well, that's true, Your Honor.  But the

15   foundation was laid, and it is directly on point as to Roundup

16   sales.

17         **MR. STEKLOFF:**  And just to be clear, Your Honor, they

18   showed, I believe, at the minimum page 4 to the jury, and so --

19   and they elicited testimony about the Roundup sales discussed

20   on that chart.  So I think the same rule would apply.  But I

21   think there is a lot of -- again, there is a lot of products in

22   this that have not been discussed and are not part of this

23   trial and are not products -- specific Roundup products that

24   Mr. Hardeman used.  So I don't know why the rest of this would

25   come in.

PROCEEDINGS

```
1          But -- I mean, again, subject to our prior objections and
2   deposition designations, I have no problem sitting here now to
3   the charts in this document that were shown to the jury during
4   Mr. Guard's testimony.
5          THE COURT:  I mean, this one even more than the one I
6   was just looking at -- which I think was 788 -- has just tons
7   of extraneous stuff in it.
8          MS. MOORE:  What we would ask, Your Honor, is that we
9   be allowed to admit into evidence on 791, the cover page, which
10  is Roundup products line review; and then page 4, which was
11  shown to the jury, which is Roundup dollar sales; and then page
12  8, which is the concentrate, which is what Mr. Hardeman used.
13         THE COURT:  Any objection to that?  I mean, this is a
14  little different from like a report that has a bunch of
15  information jumbled together.  I mean, this is a slide
16  presentation.  If you are just talking about one slide from the
17  presentation that -- about which testimony was elicited, what
18  is the problem with that?
19         MR. STEKLOFF:  Well, I have no objection to the cover
20  page or page 4 going back.  I don't believe page 8 was shown to
21  the jury, and I'm not sure --
22         THE COURT:  What is page 8 again?
23         MS. MOORE:  Page 8 is the concentrate.  And it has the
24  unit sales 1999, and it has the amount -- I can hand that to
25  you, Your Honor, if you want to see it.
```

1        **MR. STEKLOFF:**  It has unit sales and dollar sales for

2   all concentrates in 1999 with a projected growth rate in 2000.

3   We are picking one year out of the 26 years.  I'm not sure why

4   that -- given the other evidence they have that goes to the

5   financial condition for punitive -- why this is necessary.

6        **MS. MOORE:**  I mean, Your Honor, as you recall, we

7   wanted to put into evidence as a stipulation that the sales now

8   are $2 billion a year, and they would not agree to that.  And

9   so we have gone back and, you know, this is clearly the

10  projected growth going out to 2000 on Roundup concentrate,

11  which is what Mr. Hardeman used.  I do think that is relevant

12  and should come into evidence.

13       **THE COURT:**  Okay.  The -- whatever you elicited

14  testimony about from there, you can pull those slides and admit

15  them into evidence.

16       (Trial Exhibit 791 received in evidence)

17       **MS. MOORE:**  Okay.  Thank you, Your Honor.

18       I think that's it on exhibits, Your Honor.

19       **THE COURT:**  Could I ask also on 788, could I just take

20  one more look at that again?

21       **MR. STEKLOFF:**  Yes, Your Honor.

22       **THE COURT:**  If you could, tell me which slides

23  testimony was elicited about.

24       **MS. MOORE:**  Yes, Your Honor.

25       **MR. STEKLOFF:**  I need to confirm, but I think the

1   cover e-mail, and at a minimum, just part of the third page,

2   that middle part that starts, Roundup is key to Monsanto in

3   many aspects.  And then --

4       THE COURT:  Okay.  So on the theory that I just

5   articulated about 791, what would be the problem -- assuming

6   our memory is correct that it was just about the elicited

7   testimony about the cover page and about this one slide.

8       MS. MOORE:  It is more than one, Your Honor.

9       THE COURT:  Of course, there are a number of other

10  slides in this presentation that are totally irrelevant, or

11  largely irrelevant, to this case, but if they elicited

12  testimony about this one slide, why can't that be admitted into

13  evidence?

14      MR. STEKLOFF:  I understand -- I mean, again,

15  preserving our prior objections about all of the testimony

16  about this document.

17      THE COURT:  Yes.

18      MR. STEKLOFF:  I don't object to that.

19      THE COURT:  Okay.  So you can -- so that part of it

20  can be admitted into evidence.

21     (Trial Exhibit 788 received in evidence)

22      MS. MOORE:  We will go back and look at that, Your

23  Honor.

24      THE COURT:  I will give this back to you, Kristen.

25      THE CLERK:  Did we address 1668?

1          MR. STEKLOFF:  1668, let me see if that -- 1668.  We

2    will sustain it and --

3          THE COURT:  Go ahead and make it.

4          MS. MOORE:  Objection.

5          MR. STEKLOFF:  It is a JNPR, one of the WHO reviews

6    prior to 2015 where they said --

7          THE COURT:  Okay.  Same ruling as to that sustained as

8    the other many documents that we have talked about.

9          MR. STEKLOFF:  Yep.

10         MS. MOORE:  I think that's it for exhibits, Your

11   Honor.

12         MR. STEKLOFF:  Yes, we agree, Your Honor.

13         THE COURT:  Okay.  On the Portier thing, my view after

14   looking through the testimony that you-all -- that both of you

15   submitted and looking through the letter a little bit more, I

16   kind of -- I think I foreshadowed my thinking on this in a

17   comment I made earlier, but I think it would just be pretty

18   weird to put in the document when every sentence of it is

19   redacted except for that one.

20       You elicited testimony from Portier about the contents of

21   that sentence, about that very sentence.  I think the testimony

22   he gave about that sentence and about the conclusion can come

23   in.

24         MR. STEKLOFF:  Okay.

25         THE COURT:  But the -- but I don't think under the

 1   circumstances it makes sense under 403 to admit the document.

 2   So just to be very clear what I'm saying:  I think that if you

 3   look at the testimony you gave me, you have got -- the passage

 4   from 854 to 855 can come in.  The passage from 855 to 856,

 5   line 1 can come in.

 6          MR. STEKLOFF:  Okay.

 7          THE COURT:  Then the passage from 862, line 14 to 862,

 8   line 19 can come in.

 9          MR. STEKLOFF:  Understood, Your Honor.

10          THE COURT:  And the rest of it cannot.

11          MS. MOORE:  Then, Your Honor, we will -- we will look

12   at our counters and get those to them this afternoon.  I don't

13   think it will be, you know, even a minute.

14          THE COURT:  Okay.

15          MS. MOORE:  Thank you.

16          MR. STEKLOFF:  Then I realize some of this may -- if I

17   can be excused, I realize --

18          THE COURT:  Of course.

19          MR. STEKLOFF:  -- some of this may change.  But to the

20   extent there needs to be a discussion about sort of the

21   limitations of closing arguments in Phase Two --

22          THE COURT:  You don't want to be involved in that

23   discussion.

24          MR. STEKLOFF:  No.  I'm hoping we can have that now --

25          THE COURT:  Okay.  Sure.

1          MR. STEKLOFF:  -- to the extent -- yes.

2          THE COURT:  I have a couple items, but why don't --

3   does anybody -- do you want to raise any concerns, either side

4   raise any concerns they have about what might be said?

5          MR. STEKLOFF:  No.  I mean, obviously I know this is

6   sort of a fundamental rule on the punitive side.  I think I

7   just want to -- we have discussed various arguments that might

8   be made, both here and earlier in the case, but I think just

9   the golden rule should not be violated.  I know that sort of

10  goes without saying.  I think that would be the one place I

11  would have to pop up, and I'm hoping that doesn't happen.  In

12  terms of trying to put the jurors in the mindset of

13  Mr. Hardeman and the anxiety he experienced related to his

14  diagnosis or future diagnoses, those types of arguments I think

15  should be obviously precluded.

16         THE COURT:  What do you mean by -- when you say

17  putting them -- urging them to go into his mindset, what do you

18  mean?

19         MR. STEKLOFF:  Well, I don't think -- I think they are

20  allowed to --

21         THE COURT:  You are referring to it as the golden

22  rule, which suggests that I should be more familiar than I am,

23  so go ahead.

24         MR. STEKLOFF:  Sure.  So I think that it would be

25  appropriate to ask that Mr. Hardeman be compensated, for

**PROCEEDINGS**

1  example, the anxiety he and Mrs. Hardeman experience every time

2  they go for his -- for his check-ins to make sure he remains in

3  remission or has hadn't any new diagnoses.  I'm sure they are

4  going to argue that.  I'm sure they are going to argue that he

5  is going to have to experience that for many years.  I think

6  that is within the bounds and does not violate any sort of

7  golden rule on noneconomic damages.

8      I think -- the argument I think that would be

9  inappropriate would be to say, you know, almost is to

10  personalize it with the jurors, and say, Imagine if you were in

11  that position or if you had to go through this or if it was

12  your family member or if you and your spouse or significant

13  other were experiencing some of this, that -- you know, that

14  you should somehow factor that into the pain and suffering that

15  the Hardemans are going through, and I think that is barred.

16  So I just want to make sure we don't sort of cross that

17  threshold there.

18          **THE COURT:**  Agreed.

19          **MS. MOORE:**  I'm not going to ask the jury to put

20  themselves in Mr. Hardeman's shoes.

21          **MR. STEKLOFF:**  And then the other argument I think

22  that sort of jumped out was this argument that Your Honor

23  raised earlier about IARC.  I think given the lack of evidence

24  that has come in about the IARC review, while I think they can

25  reference the IARC review, I don't think -- in some context I

 1    don't think it would be appropriate, given how Phase Two has

 2    played out, to say that Monsanto essentially should have known

 3    or done what -- performed what IARC did or it was therefore

 4    known or knowable to Monsanto based on what IARC did prior to

 5    2012 because they haven't elicited that.

 6         THE COURT:  I mean, I think you might be right about

 7    that.  I just don't remember how the evidence came in either

 8    during Phase One or Phase Two on what IARC considered.  I think

 9    in Phase Two basically nothing came in on what IARC considered,

10    right?

11         MR. STEKLOFF:  That's correct.  And I think it was --

12    appropriately so -- limited in Phase One, but I don't think

13    there is the evidence to be able to support any such article --

14         THE COURT:  There was evidence that IARC conducted its

15    own meta-analysis, right?

16         MR. STEKLOFF:  Yes.

17         THE COURT:  And IARC's own meta-analysis consisted of

18    considering, I believe, it came in -- I may be

19    misremembering -- but I believe IARC's own meta-analysis was

20    analysis of the data from the various epidemiological studies

21    that had already been conducted; is that right?

22         MS. MOORE:  I think that's right, Your Honor.  And

23    also under Dr. Portier, he actually testified that IARC

24    considered the same as what Chang did in that meta-analysis,

25    which is the one that Monsanto had funded.  So that all was

1    elicited during Phase One.

2           THE COURT:  So, I mean, it is kind of a -- there is a

3    little bit of a strange disconnect between the evidence you --

4    that came in on what IARC considered and the evidence that you

5    believe the jury should consider, right, because what -- you

6    are saying you ought to not just consider the epidemiology, but

7    the toxicology and the genotox stuff.

8           And, of course, IARC did consider all of that.  But the

9    only evidence that came in in Phase One on what IARC

10   considered -- and this was never -- we never re-visited this in

11   Phase Two -- was the epidemiology data that the jury

12   considered.

13          MS. MOORE:  Right.  And --

14          THE COURT:  So I guess it probably is okay for you to

15   say -- I mean, again, if there is a dispute about this, we

16   should hash it out this afternoon.  We should look at how the

17   evidence came in.  But I'm -- at least based on my memory of

18   it, it probably is okay for you to say, Look, you know, the

19   folks at IARC looked at all the epidemiology stuff that was in

20   existence and that -- and that Dr. Weisenburger testified to

21   you about in Phase One, and the IARC came to its conclusion

22   based in part on that.

23          Of course, the problem is -- as I'm talking, I'm

24   remembering what the big problem is, which is that the IARC

25   concluded that the epidemiological evidence was limited, right?

1   And that -- if I recall correctly, the IARC came to, after

2   significant amount of discussion, sort of a stronger conclusion

3   about the animal toxicity evidence, right?

4        MS. MOORE:   Right.   But we also -- I guess there are

5   two things I would say, Your Honor.   First to that point

6   directly is that, as you will recall, in Phase One, we

7   attempted to designate Dr. Blair and Dr. Ross who actually

8   participated in IARC.   And their testimony is very clear as to

9   what IARC considered and relied on in forming their conclusions

10  in all three of those categories.   So if that is an issue, we

11  would like the opportunity to play, like, seven minutes or so

12  of Dr. Blair or Dr. Ross tomorrow morning.   That would be very

13  brief.

14       But regardless of that, Your Honor, our position is the

15  jury instruction is about what Monsanto knew or should have

16  known during the relevant time period.   And for that purpose,

17  you know, what IARC relied on or did not rely on really doesn't

18  matter.

19       THE COURT:   Okay.

20       MS. MOORE:   I mean, it is more about here is all of

21  the information out here for all these years, and they still

22  say there is nothing.

23       THE COURT:   Okay.

24       MS. MOORE:   So I don't know --

25       THE COURT:   So it sounds like --

1        **MS. MOORE:**  It is not hinging on IARC.

2        **THE COURT:**  It sounds like I was maybe anticipating an

3   argument that you weren't planning on making anyway.

4        **MS. MOORE:**  Which made me nervous, which made me think

5   I missed something.

6        **THE COURT:**  No.  I think that's right.

7        **MS. MOORE:**  That's the instruction.

8        **THE COURT:**  Right.  That here is all this stuff that

9   Dr. Weisenburger told you about and you reached your

10  conclusion --

11       **MS. MOORE:**  And Dr. Ritz and Dr. Portier.

12       **THE COURT:**  If you are capable of reaching that

13  conclusion, why is Monsanto not capable of reaching --

14       **MS. MOORE:**  Right.

15       **THE COURT:**  Fine.  Okay.

16       **MR. STEKLOFF:**  I mean, I don't like the argument, but

17  I have no objection to --

18       **MS. MOORE:**  It is fair.

19       **MR. STEKLOFF:**  -- to making that argument that was

20  just articulated, not tieing it IARC.

21       **THE COURT:**  Okay.  Fair enough.

22       **MS. MOORE:**  We are all on the same page.

23       **THE COURT:**  Okay.  So do you have anything else?

24       **MR. STEKLOFF:**  I have nothing else, Your Honor.

25       **THE COURT:**  What about you?

1        **MS. MOORE:**  The only thing we have, Your Honor, is we

2   submitted a letter brief last night about this.

3        **THE COURT:**  Oh, yeah.

4        **MS. MOORE:**  The motion in limine on there.  And it is

5   really saying, as you recall, the cross-examination, there was

6   some questions about ant spray and wasp spray and gasoline,

7   motor oil; but there wasn't anything -- we would ask for a

8   motion in limine to exclude or preclude any arguments that

9   those had labels that warned about cancer.

10        **THE COURT:**  I don't think that's why they pursued that

11   line of questioning.  I mean, I assume what they intend to

12   argue from that -- and what I assume is appropriate to argue

13   from that -- is that there was this dispute about how seriously

14   Hardeman took the Roundup label, and there was conflicting

15   testimony from Mr. Hardeman about whether he really looked at

16   the label or how much he really looked at the label.  And you,

17   you know -- and you saw that he used these other products that

18   one might be concerned about, and he -- he testified that he

19   never looked at the label or he doesn't think he looked at the

20   label for any of those other products that you might also be

21   considered about.  And that sheds light on his testimony about

22   his reliance on the Roundup label.

23      I mean, I think that -- is that basically what your

24   argument is?

25        **MR. STEKLOFF:**  I couldn't have said it better.

1            MS. MOORE:  And that --

2            THE COURT:  What is wrong with that?

3            MS. MOORE:  That assumes facts that are not in

4    evidence, Your Honor, because those other labels, there is

5    absolutely no evidence whatsoever that they contain any kind of

6    warnings, that they have any warning of cancer.

7            THE COURT:  I mean, jurors are allowed to use their

8    common sense.  And, you know, if you are spraying bug spray

9    inside the house -- or what were the other examples?

10           MS. MOORE:  It was wasps, ants, using motor oil, and I

11   think gasoline for your lawn mower.

12           THE COURT:  Right.

13           MS. MOORE:  And paint.

14           THE COURT:  And paint, right.

15           MS. MOORE:  And paint.

16           THE COURT:  I mean, why can't a jury use their common

17   sense and say, Well, I don't know whether that stuff causes

18   cancer or not, but if Mr. Hardeman really cared about whether

19   the products he was using were dangerous, why didn't he read

20   the labels of those products?

21           MS. MOORE:  I think --

22           THE COURT:  Now, I think his testimony was a little --

23           MS. MOORE:  He didn't say he didn't.

24           THE COURT:  He was a little unequivocal about whether

25   he did, but the point for purposes of our discussion is why is

 1    that not an appropriate argument for Monsanto to make, based on

 2    how the evidence came in?  As long as they don't do anything to

 3    suggest that, in fact, those products do cause cancer.  That

 4    would, of course, be inappropriate; but I didn't take them to

 5    be --

 6            MS. MOORE:  And we weren't sure --

 7            THE COURT:  -- going in that direction.

 8            MS. MOORE:  We weren't sure if they were going there

 9    because from the examination it appeared that they were

10    assuming -- and as the Court is aware under the Ninth Circuit,

11    you have to have expert testimony when you are talking about

12    whether something causes cancer.  And so just to say -- you

13    know, just kind of drop it out there and say, Well, you are

14    using this ant spray and basically implying that that causes

15    cancer too; and you didn't read that label so, you know, come

16    on now -- that's where we have the issue, that they don't need

17    to stand up -- they cannot stand up in closing and say, Well,

18    you know, he says that he would have used it if we put cancer

19    on there.

20            THE COURT:  Well, I thought you were trying to prevent

21    them from arguing this point altogether.

22            MS. MOORE:  No.  I --

23            THE COURT:  I mean, if all you're doing is preventing

24    them from arguing or implying that these products cause --

25            MS. MOORE:  Yes.

 1          **THE COURT:**  -- cancer, that's fine.  I mean, I didn't

 2  take them to be intending to do that, and I'm happy to tell

 3  them that they can't do that because that would not be

 4  appropriate.

 5          **MR. STEKLOFF:**  I was not intending on doing that.

 6          **MS. MOORE:**  Okay.  All right.

 7      I mean, so just to be clear, then, you know, if they want

 8  to make the argument "We don't believe he reads labels," then

 9  that's one thing and, I mean, you know, they can try to attack

10  him on that; but to go to the next step and say "And the reason

11  that's important or what we're implying is, you know, he would

12  have still used it if we had put a cancer label on there,"

13  that's where I have the issue because you still have to have

14  proof that these other products had warnings on them, and

15  there's no evidence at all that these products had warnings.

16          **THE COURT:**  Well --

17          **MR. STEKLOFF:**  That, I think, is a different -- I

18  think I --

19          **THE COURT:**  Yeah.  I don't understand that last point

20  because the point is he's using these products that one might

21  be concerned about, and he's not reading the labels; and so you

22  should not -- you should not take -- I don't know how they

23  would say it, but you shouldn't take seriously when he says, "I

24  read this label and had it said 'cancer,' I wouldn't have used

25  the product," because you, jury, could conclude that he never

1   would have read the label in the first place, that he never did

2   read the label in the first place.

3       **MS. MOORE:**  But what it infers is that the reason they

4   picked out these types of products is that they're inferring

5   that those actually have cancer warnings on them when there's

6   nothing in evidence.

7       **THE COURT:**  No, because those are the kinds of

8   products that you might say, "Hey, maybe I should stop and read

9   the label before I use this product."  That's the point and

10   that's appropriate.

11       **MS. MOORE:**  Okay.  All right.  But there's not going

12   to be argument that they, in fact, did warn of cancer or had

13   any -- or even had any warnings on them.

14       **THE COURT:**  I think you're chasing ghosts at this

15   point.

16       **MS. MOORE:**  Okay.  That's fine.  All right.  I

17   understand, Your Honor.

18    The other thing -- I don't think I had anything else for

19   closing, Your Honor, but we do have that life table issue too

20   that we need to --

21       **THE COURT:**  Okay.  On closing, I just -- I wanted to

22   revisit a couple things.  It sounds like the evidence came in

23   pretty clearly that to this day -- I mean, there's this one

24   phrase that Ms. Wagstaff kept using during opening -- right? --

25   which is "To this day, Monsanto hasn't conducted an

1    epidemiological study, a tox study," whatever, long-term,

2    whatever.  It sounds like people are in agreement that that --

3    kind of like the EPA continues to say it's safe, the IARC, you

4    know, says it's not safe, Monsanto still hasn't done any

5    studies --

6            **MS. MOORE:**  And there's RFAs to that effect too.

7            **THE COURT:**  -- we're sort of in agreement on that

8    point, right, about the state of the evidence?

9            **MR. STEKLOFF:**  Yes, Your Honor.

10           **MS. MOORE:**  I think so.

11           **THE COURT:**  So the only other concern I had was about

12   this issue of post-2012 evidence as it relates to Monsanto's

13   arguments about punitive damages.  You know, it strikes me that

14   the post-2012 evidence has some relevance to whether Monsanto

15   should have known pre-2012 about the risk.

16        So, in other words, well, EPA has been approving -- you

17   know, the whole time between 1974 and 2012, the EPA approved

18   it.  The EPA concluded it was safe.  In fact, they still

19   haven't, you know, banned it.  And so the fact that they still

20   haven't banned it is relevant to whether Monsanto should have

21   known something way back in 2012.  In other words, hey, I

22   didn't even -- you know, it hasn't even happened now, let alone

23   2012; right?

24           **MS. MOORE:**  Yes.  Right.

25           **THE COURT:**  So it strikes me that that -- it's sort of

1  appropriate for the jury to know the current state of affairs,

2  both for that and for the punitive damages issue; but what I

3  think would probably not be appropriate is for -- well, what

4  position do you take -- let me just ask the question.

5      What position do you take about the relevance of the EPA's

6  current conclusions to punitive damages?

7      MR. STEKLOFF:  Our position -- so I think one way in

8  which this will come up is in the section on mitigating

9  circumstances in the punitive damages instruction, and you had

10  asked -- I think may ask momentarily why that should come in.

11      I think that the EPA's current position is mitigating

12  evidence, that even if the jury were to find that between --

13  somehow -- at some point or the entire time period between

14  1986-2012 that Monsanto acted recklessly -- I know that's not

15  the exact phrase -- that the fact that the EPA has still --

16  still takes the position that it does -- mitigates Monsanto's

17  failure to act during that relevant time period 1986 to 2012.

18  So I think -- whether it ties directly to the instruction on

19  mitigating circumstances or not, whether that sentence is read

20  to the jury or not, I think the concept applies.

21      THE COURT:  But the -- I mean, maybe this is a

22  discussion we should have for, you know, later with Mr. Kilaru

23  or whatever, but I don't know.

24      I mean, as I recall the instruction on punitive damages,

25  this concept of mitigation comes in when you're deciding the

 1   amount.  So if the jury has already decided that Monsanto's

 2   conduct was reprehensible such that punitive damages should be

 3   awarded, then is the -- despite the fact that EPA has been

 4   approving it for 50 years or whatever, what -- then does EPA

 5   approval still have relevance to sort of the question whether

 6   there are mitigating circumstances that should affect the

 7   amount of the punitive damages?

 8           MR. STEKLOFF:  I think it does because I think we are

 9   going to hear the argument given the up-to-today language that

10   we just discussed, that part of the reason punitives need to be

11   assessed is to send a message today.  In other words, put aside

12   1986 to 2012, today the only way to send a message to Bayer or

13   Monsanto -- I don't know how they're going to phrase it -- is

14   to give some huge award in punitive damages.

15           And I do think that it's relevant that, I mean, to this

16   day, EPA and every other foreign regulator has said no, and I

17   think that goes to the amount.  It's all part of the calculus

18   to me of what message needs to be sent up to today since I

19   think we're going to hear that phrase a lot.

20           THE COURT:  By the way, I assume everyone agrees it

21   would not be appropriate to say "send a message to the EPA."

22           MR. STEKLOFF:  I agree with that.

23           THE COURT:  You agree with that.

24           MS. MOORE:  I'm not going to say that, Your Honor.

25       If they're trying to argue that the punitive damage amount

 1   should be lowered because the EPA has continued to approve the

 2   product, including, you know, 2017 or 2018, then we absolutely

 3   should have the right on rebuttal to show the relationship with

 4   Jess Rowland.

 5        THE COURT:  Well, I mean, again, we've sort of --

 6   we've struck a balance on what can come in and what can't come

 7   in, and I've precluded them from bringing in all the details

 8   of, you know, how the EPA reached its conclusion after the IARC

 9   and all that stuff, and that's sort of -- that's a balance that

10   we've struck and we've, you know, kind of crossed that bridge

11   at this point.

12        MR. STEKLOFF:  If I can make a suggestion.  I mean,

13   maybe the point is that they shouldn't -- in terms of the

14   amount of damages -- the amount of damages, they shouldn't be

15   allowed to say "up to today" because the amount of damages

16   really has to apply to Mr. Hardeman and it needs to apply to

17   that time period that he was using it, 1986 to 2012.

18        And to be clear, I think the mitigating circumstances

19   sentence can be debated momentarily, but I don't plan on

20   arguing -- I mean, I don't -- while I think that I could argue

21   it, I don't plan on arguing that the amount of punitive

22   damages -- I mean, you're asking just a sort of general

23   question.  I don't need to argue and don't -- I wasn't planning

24   on arguing that the amount of punitive damages should be lower

25   because of the EPA's approval of today.  I think could I

1    hypothetically?  Yes, but I think this is -- we don't need to

2    fight it because I don't need to argue that.

3        But I actually think this raises a separate question,

4    which is whether they should be allowed to argue somehow that

5    the amount of punitive damages should be tied to the conduct

6    today.  It should stop at 2012.  They can argue --

7              THE COURT:  Well, if they can say "You need to put a

8    stop to this" -- right?  I mean, you know, the fact is, and

9    everybody -- and it's in evidence -- right? -- Roundup is still

10   being sold today.  Monsanto continues to disagree with the view

11   that it causes cancer.  Monsanto continues to disagree with the

12   view that there should be a warning.  And if -- you know, and

13   part of punitive damages is to deter future misconduct --

14   right? -- so to deter the kind of misconduct -- alleged

15   misconduct that Monsanto engaged in at the hands of people like

16   Mr. Hardeman up to 2012.

17       So I don't know.  I mean, I -- you know, I'm not sure

18   there's a way -- I'm not sure it would be reasonable to

19   restrict that.

20             MR. STEKLOFF:  I mean, I guess at least on the conduct

21   side, whether Monsanto's behavior constituted the standard for

22   punitive damages, I think that clearly needs to stop at 2012.

23   I don't think in that context the "up to today" arguments

24   should be made because that -- I think that's the whole point

25   of the post-use conduct.

 1          Maybe in the amount.  I think now we're focusing on the

 2     amount of punitive damages, if the jury gets there, that's

 3     different.

 4          But to be clear, I don't need to argue that because -- I

 5     mean, I think I should be allowed to argue a lot about what the

 6     EPA today -- I mean, a lot -- the EPA in response to that

 7     argument about up to today, but I don't know if I'm going to

 8     directly tie it to somehow, therefore, you should give less

 9     money in punitive damages.

10          **MS. MOORE:**  And, Your Honor, as you were saying, I

11     mean, what's in evidence right now before the jury is their

12     request for admissions where they've admitted they haven't

13     tested.  You know, they haven't done the long-term tests.

14     They're not precluded from doing those tests simply because of

15     the EPA.

16          I mean, the EPA is not on trial.  It's Monsanto.  It's

17     Monsanto's duty, not the EPA's duty.  And, in fact, it's not a

18     defense for them to say, "Well, the EPA..."

19          And so the fact that they still haven't tested and they

20     still say there's absolutely no evidence after, you know, the

21     jury has heard all this and the jury has already made a

22     decision on causation, I think that's fair game on closing

23     argument for me to be able to say.

24          **THE COURT:**  "Put a stop to this.  When you're deciding

25     whether to award punitive damages and how much to award" --

1       **MS. MOORE:**  Right.

2       **THE COURT:**  -- "put a stop to it."

3       **MS. MOORE:**  Yeah.

4       **THE COURT:**  I mean, I think that's probably right.

5   I'll think about that a little bit more.

6       **MR. STEKLOFF:**  Just because the jury knows something

7   because the way the trial plays out doesn't mean that that's an

8   appropriate argument.  So --

9       **THE COURT:**  Well, what's inappropriate about it?  I

10  mean, what's --

11      **MR. STEKLOFF:**  Again, put aside the amount.  I think

12  that -- whether or not Monsanto engaged in the type of behavior

13  that necessitates or allows for punitive damages, in other

14  words, whatever question there is, has plaintiff met his burden

15  by clear and convincing evidence that he is entitled to

16  punitive damages -- I don't have the verdict form right in

17  front of me -- that should -- the argument about that question

18  I think, under all of the precedent that you relied on in

19  making the post-use conduct inadmissible, forces them to argue

20  pre-2012 or earlier behavior.

21      **THE COURT:**  Well, but, I mean, again, it's a difficult

22  needle to thread, but what if the facts of this case were

23  different?  What if Mr. Hardeman got NHL in 2012, and then the

24  IARC classification came out in 2016?  And then in 2017

25  Monsanto said, "You know what?  We don't -- you know, we're

1   still not really sure that this causes NHL, but we are going to

2   put a warning on the label because, you know, IARC is a

3   respected scientific body and, you know, we -- you know, the

4   issue is continuing to be studied; and in the meantime, we want

5   to be careful with people's safety and so we're going to put a

6   warning label on here that says 'The IARC has concluded that

7   Roundup is a probable carcinogen.  You know, if you're

8   concerned about this, use protective equipment,'" blah, blah,

9   blah.  Whatever.

10      If this case were in trial right now and Mr. Hardeman were

11  seeking punitive damages and you had done that, surely it would

12  be appropriate for you to say, "When you consider the issue of

13  punitive damages, you should consider the fact that we are

14  now -- you know, after the IARC did its thing, we're now --

15  we've now got this on the label."  Right?

16          **MR. STEKLOFF:**  But I think that it would be --

17          **THE COURT:**  "And when you're deciding the amount of

18  punitive -- they've told you to put a stop to this.  You know,

19  Ms. Moore just got up in front of the jury and said, 'You need

20  to put a stop to this.'  Well, look at what we're doing now.

21  So you should consider that both with respect to whether to

22  award punitive damages and with respect to how much."

23          **MS. MOORE:**  And that's the mitigating.

24          **MR. STEKLOFF:**  Right.  Exactly.  I think it would go

25  to the amount only.  In other words, if the circumstance that

**PROCEEDINGS**

1    you describe happened, they would stand up and say, "We still

2    get to argue for punitive damages.  They should have done

3    everything that they did in 2016," under your hypothetical,

4    "well before 2012 because it was too late for Mr. Hardeman; and

5    everything that they did before 2012 was egregious and terrible

6    and reckless and malice.  And the fact that they did it in

7    2016, well, that's too little too late.  So you need to award

8    punitive damages."

9         Now then they would make an argument about what the

10   damages should be, and I think that we would then be entitled,

11   based on the mitigating circumstances, to say, "Well, really,

12   they want you to send a message?  Look at what's happening now.

13   We already got the message," or whatever.

14        **THE COURT:**  Right.  But by the same token, I mean, if

15   you can say, "Award less in punitive damages because however

16   reprehensible our conduct was in 2012, look what a good citizen

17   we are now in 2017," then surely they can say, "And when you're

18   deciding how much to award in punitive damages, you can

19   consider the fact that this continues to be on the market and

20   there's no label"; right?

21        **MR. STEKLOFF:**  But I think not going back to where we

22   were, I think I was arguing that they should be limited to

23   making that type of argument in the amount argument.  I don't

24   think that the fact -- they shouldn't be allowed to make it as

25   part of the reprehensibility argument.

1          THE COURT:  Oh.  I'm sorry.  I didn't understand that.

2          MR. STEKLOFF:  That, I think needs to stop at 2012.

3          THE COURT:  Yeah.

4          MR. STEKLOFF:  The argument about whether Monsanto

5    acted with malice and oppression and everything else needs to

6    stop at 2012, and it shouldn't tie to, you know, the fact that

7    there's no warning on the label today.

8          THE COURT:  "But when you're considering amount, you

9    know, still to this day they haven't done an epidemiology

10   study.  Still to this day they haven't done, you know, a

11   two-year rat study or whatever it is.  And, you know, still" --

12         MS. MOORE:  And there's no warning.

13         THE COURT:  -- "to this day there's no warning label

14   and they continue to sell the product."  You can say "Still to

15   this day" -- and this goes to the original question that I

16   asked about mitigation -- "Still to this day EPA says we can do

17   this."

18         MR. STEKLOFF:  Right, and everyone else, and they all

19   say that it doesn't cause cancer.  But, yes, I think I can

20   argue that.

21         THE COURT:  Okay.  I get that.  I get that.

22         MS. MOORE:  And just to make sure I understand,

23   Your Honor, so -- but I do think I should be able to argue that

24   it's reckless on their part that from 1975 to 2012 there was

25   all of this information out there and they still say there's no

 1   evidence.  And, in fact, they said that in this courtroom, that

 2   that there's no evidence.

 3        THE COURT:  I think what he's saying, and I think this

 4   is a good point, is when they are determining whether

 5   Mr. Hardeman is eligible for punitive damages, whether

 6   Monsanto's conduct was reprehensible, that is the conduct that

 7   harmed Mr. Hardeman.  That's what -- so you say:  What is the

 8   conduct that was reprehensible?  It has to be the conduct that

 9   harmed Mr. Hardeman.  And so you really are talking about

10   conduct that took place up until 2012, but it does seem like --

11   and this is not a nuance that I had focused on until this

12   discussion --

13        MS. MOORE:  It is definitely a nuance, yeah.

14        THE COURT:  -- I think it's exactly right, that, you

15   know, when you're talking about -- it's when you start talking

16   about the amount of punitive damages that it becomes

17   appropriate to say, you know, that you can take -- and it

18   sounds like you agree with this, that it becomes appropriate to

19   say they're still doing it.

20        MS. MOORE:  Right.

21        THE COURT:  And it becomes appropriate for them to

22   say, "Yeah, the EPA is still letting us do it."

23     Is that basically your point?

24        MR. STEKLOFF:  Yeah.  I mean, Mr. Kilaru is showing me

25   the current draft instructions, which I think talk about

PROCEEDINGS

```
 1   post -- the relevance of post-2012 conduct to punitive damages
 2   generally on page 22 --
 3            THE COURT:  Right.
 4            MR. STEKLOFF:  -- but --
 5            THE COURT:  But that's my current draft, which was
 6   before we had this discussion.
 7            MR. STEKLOFF:  Understood.
 8            THE COURT:  I think the point you're making is a very
 9   good one, that that -- you know, that your EPA stuff is
10   relevant to mitigation.
11            MR. STEKLOFF:  Yes.
12            THE COURT:  The fact that you haven't changed your
13   behavior is relevant to the amount of punitive damages; but on
14   the issue of reprehensibility, is that --
15            MR. STEKLOFF:  Yes.
16            THE COURT:  Do I have that basically right?
17            MR. STEKLOFF:  Yes, Your Honor.  I think that's right.
18   I mean, I -- yes.  Given that "to this day" stuff has come in
19   but also I don't think it's limited to EPA.  I think regulators
20   around the world, both through affirmative evidence, for
21   example Europe, but also by omission, also haven't said that
22   it's carcinogenic or required a warning, I think I can argue
23   that.
24        And so I think that's where we've been now for a couple
25   days and that's where we are.  So this distinction between
```

1    whether or not the conduct qualifies for punitive damages

2    should be limited to 2012.  The amount, I think, that's where

3    we've been and that's where we are.

4         THE COURT:  Well, we'll think about this a little more

5    when we're discussing the actual instructions, but I think it

6    probably makes sense to tweak the language that I inserted

7    about post-use conduct maybe to make that sort of a little more

8    clear.  I mean, we can discuss it further, but --

9         MS. MOORE:  And just two things, Your Honor, and I

10   want to make sure I'm clear on this.  Because my argument is

11   that, you know, during that whole time that Mr. Hardeman was

12   using it, they hadn't done the tests.  They were ignoring all

13   the data and the science out there, and their position is

14   there's no evidence across the board even though you have all

15   that.

16       And it sounds like I can say all that because --

17            THE COURT:  As to the time period leading up to --

18            MS. MOORE:  2012.

19            THE COURT:  -- 2012, yes.

20            MS. MOORE:  Yes.  Yes.

21       I guess where I want to make sure that I understand,

22   because I think it is a very fine nuance, their position at

23   this trial has been there is no evidence.  And so that's what I

24   wanted to argue, is that their position is there's no evidence,

25   and I should be able to do that when I'm talking about the

1  knowledge or should have known up to 2012.  Their position is

2  there's no evidence.  Is that accurate?  I just want to make

3  sure.

4      THE COURT:  I think so.  I mean, I think Monsanto's

5  consistent position from 1974 until today --

6      MS. MOORE:  They've been saying the same thing.

7      THE COURT:  So their position has always been there's

8  no -- you know, there's no evidence, but I think -- you know, I

9  think you need to kind of -- when you're talking about whether

10 the conduct was sufficiently reprehensible to justify an award

11 of punitive damages, you need to limit yourself to the conduct

12 that was engaged in pre-2012.

13     MS. MOORE:  I understand.  And I guess, you know, to

14 be really clear about it, like Dr. Reeves, their corporate

15 representative, he testified, it's a party admission, that

16 their position is there's no evidence across the board, and I

17 think that goes right to the position they were doing up to

18 2012.

19     THE COURT:  Yeah.  I mean, I understand the problem

20 you have because he testified in 2019; right?

21     MS. MOORE:  Right, but that's --

22     THE COURT:  I understand.

23     MS. MOORE:  -- their position.  It's their position in

24 2012.  It's their position today.

25     THE COURT:  Yeah.

1          **MR. STEKLOFF:**  But I don't think -- what I would say

2    is I don't think it's that complicated.  I think she can say --

3    I don't agree with the characterization, but taking their

4    characterization, she can argue there was no -- they think that

5    the science up to 2012 demonstrated that none of that was

6    evidence of carcinogenicity.  There was no evidence up to 2012

7    based on all the science that there was cancer.

8          **MS. MOORE:**  Yeah.  And my point is that came in

9    through Dr. Reeves.  I mean, that's the evidence in the case.

10         **MR. STEKLOFF:**  I mean, the slide was used at opening

11   and I can already imagine --

12         **MS. MOORE:**  I just want to make sure.

13         **THE COURT:**  You have to be able to use that kind of

14   testimony --

15         **MS. MOORE:**  Yes.

16         **THE COURT:**  -- to make your point about the

17   position --

18         **MS. MOORE:**  Exactly.

19         **THE COURT:**  -- that Monsanto -- Monsanto's approach to

20   the evidence up to 2012, I agree with that.

21         **MS. MOORE:**  Yes.

22         **THE COURT:**  But you have to couch it in terms of

23   Monsanto's conduct --

24         **MS. MOORE:**  Up to 2012.

25         **THE COURT:**  -- up to 2012.

1      **MS. MOORE:**  I understand.  And then when I get to

2  talking about "Here's the amount for punitive damages," then I

3  go to, "You know, and they still today, they still think

4  there's no evidence.  Their position is they don't test.  They

5  don't put a warning on."  That's when I can get to that; is

6  that fair?

7      **THE COURT:**  That's --

8      **MS. MOORE:**  Okay.

9      **THE COURT:**  I think that's right.  I mean, like I

10  said, we can talk about it further as we're going through the

11  instructions, but I think that's a nice point that I didn't

12  really focus on when I was preparing the instructions.

13      **MS. MOORE:**  And I appreciate the clarification.

14      The other point I just want to raise really quick is that

15  Mr. Stekloff just raised, he said "omission" and "evidence by

16  omission," and I wasn't -- when you're talking about foreign

17  regulatories, and that raised a concern to me --

18      **THE COURT:**  Me too.

19      **MS. MOORE:**  -- that he's going to stand up here and

20  argue that there are other countries or regulatory agencies

21  that they haven't even heard about that haven't found that.  I

22  don't think that's appropriate.

23      **THE COURT:**  Yeah.  I would not think that it would be

24  appropriate to start talking about what Japan and India do.

25      **MR. STEKLOFF:**  That was unclear.  I think I can argue

1   were there another -- they've heard about Europe.  They've

2   heard about the EPA.  But if there were some other regulator

3   around the world that had come in and said "You need to put a

4   warning on the product if you're going to sell it in our

5   country," they would have presented that.  I think that's a

6   fair argument because they would have presented that.

7           THE COURT:  That's probably right.

8           MR. STEKLOFF:  That's what I meant by it.  It's sort

9   of they have the burden, and they didn't present that evidence

10  because it doesn't exist; and had it -- so I think I can

11  argue -- that's what I meant by "omission."  I'm not going to

12  affirmatively state what Japan or New Zealand or some other

13  entity does.

14          THE COURT:  Okay.

15          MS. MOORE:  Okay.  All right.

16          THE COURT:  So is that all you want to talk about?

17  Shall we maybe take a break and then get to the jury

18  instructions and verdict form and whatever else we need to talk

19  about?

20          MS. MOORE:  That's fine.  If you want to talk about

21  the life table when we talk about the jury instructions.

22          THE COURT:  You want to talk about the life table?

23          MR. STEKLOFF:  Mr. Kilaru was going to handle that.

24          THE COURT:  Okay.  Then why don't we take a break

25  right now --

 1          **MS. MOORE:**  Okay.  That will be great.

 2          **THE COURT:**  -- and then return in ten minutes.

 3          **MS. MOORE:**  Okay.  Sounds good.  Thank you,

 4  Your Honor.

 5          **MR. STEKLOFF:**  And may I be excused, Your Honor?

 6          **THE COURT:**  Of course.

 7          **MR. STEKLOFF:**  Thank you very much.

 8                  (Recess taken at 2:55 p.m.)

 9                  (Proceedings resumed at 3:12 p.m.)

10      (Proceedings were heard out of the presence of the jury:)

11          **THE COURT:**  Okay.  Shall we go through the jury

12  instructions one by one?

13          **MS. WAGSTAFF:**  Your Honor, before we do that --

14          **THE COURT:**  Yeah.

15          **MS. WAGSTAFF:**  -- this might be something we can just

16  quickly do.

17          **THE COURT:**  Yeah.

18          **MS. WAGSTAFF:**  So the Portier cut that you are

19  allowing in --

20          **THE COURT:**  Yeah.

21          **MS. WAGSTAFF:**  -- that was a subset of something that

22  they had filed with you previously.

23          **THE COURT:**  Yes.

24          **MS. WAGSTAFF:**  So we took a subset of our counter --

25          **THE COURT:**  Okay.

PROCEEDINGS

 1              **MS. WAGSTAFF:**   -- which I was going to show to you in

 2      this highlighted -- it's just that highlighted part, and I've

 3      showed it to Monsanto.  And Mr. Stekloff told me they object,

 4      but he's seen that before and that's been sent to you before.

 5              **THE COURT:**  I've seen this before.

 6              **MS. WAGSTAFF:**  That would be in response to the

 7      portion that you were just -- you're going to allow regarding

 8      the EPA and the Australian letter.  Just that designated

 9      highlighted portion at the bottom.  And I can give you the

10      testimony that you're allowing in if it would help you.

11          Ms. Melen, could you hand this to him?

12              **THE CLERK:**  Yes.

13              **MS. WAGSTAFF:**  The three sections that you're allowing

14      in are marked 1, 2, 3 on this.

15              **THE COURT:**  Yes.  And if I recall correctly, one of

16      the objections was that one of these chemicals is Monsanto's.

17              **MR. KILARU:**  Yeah.  I think our objection is that it

18      runs afoul of the MIL on other products.

19              **THE COURT:**  Right.  And what is it?  Dioxins?  Is that

20      what --

21              **MR. KILARU:**  I don't have that in front of me.

22              **MS. WAGSTAFF:**  I think PCBs.

23              **MR. STEKLOFF:**  I think PCB.

24              **THE COURT:**  PCBs?  I mean, does anybody know that PCB

25      is a Monsanto product?

 1          **MR. KILARU:**  I don't know what they know.  We didn't

 2   ask about it.  So if a juror knows, you know, they know.

 3          **MS. WAGSTAFF:**  And our position would be that this is

 4   being introduced, you know, at the request of -- at the

 5   response of something Monsanto is requesting to just show that

 6   the EPA has, you know, gotten it wrong before and that it's

 7   just a list of chemicals.  And I think you're right, that

 8   there's no evidence in the case that PCBs belong to Monsanto.

 9          **THE COURT:**  Let's Google PCBs.

10          **MR. KILARU:**  I think it will show up, Your Honor.

11          **MS. WAGSTAFF:**  Baum Hedlund is going to show up.  Just

12   kidding.

13          **MS. MOORE:**  Brent's face.

14          **MR. KILARU:**  Yeah, I think we may be the only North

15   American producer of PCBs.

16          **MS. WAGSTAFF:**  But regardless of that, that --

17          **THE COURT:**  Oh, I know, but I'm just...

18                      (Pause in proceedings.)

19          **THE COURT:**  Do you have any problem with this

20   testimony other than that?

21          **MR. KILARU:**  I don't think so, Your Honor.  I think

22   that would be the question and answer about other products that

23   we propose to strike.

24          **THE COURT:**  Are all of these Monsanto products?

25          **MR. KILARU:**  I do not know the answer to that.  I

**PROCEEDINGS**

 1   suspect not, but I don't know.

 2        THE COURT:  Do you want to just cut out PCBs and say

 3   dioxins, polyfluorinated compounds?

 4        MS. WAGSTAFF:  PCB is the last one?  I haven't

 5   memorized them.

 6        THE COURT:  No.  It's the middle one.

 7        MS. WAGSTAFF:  If we can, we will, and I'll let you

 8   know if we can't.

 9     I assume that your tech person is going to be doing the

10   cutting.

11        MR. KILARU:  Yeah, we can do that.

12        MS. WAGSTAFF:  So we can try; and then if you send it

13   to us, we'll listen to it and then tomorrow morning if we think

14   it screws it up too much, we'll bring that up to you.

15        MR. KILARU:  And I will find out if there are other

16   products on that list that we make, in which case --

17        THE COURT:  In which case the answer may be too bad.

18        MR. KILARU:  Well...

19        THE COURT:  But we'll see.

20        MS. WAGSTAFF:  Okay.  Thank you, Your Honor.

21     And if I could have those back just because they have

22   handwriting all over them.

23        THE CLERK:  That's one.

24        MS. WAGSTAFF:  Yes.  And there was --

25        THE COURT:  Is there anything else I owe you?  This

1    one?

2         **MS. WAGSTAFF:**  Yeah.

3         All right.  And just for the record, the testimony that

4    you've just allowed is 885:10 to 885:14, 885:17 to 885:19,

5    886:20 to 887:3, and 887:6 to 887:8, with us trying to cut out

6    PCBs from 888:7, if that makes sense.

7         Thank you, Your Honor.

8         **THE COURT:**  Okay.

9         All right.  Jury instructions.  Why don't we just go

10   through them one by one.

11        Any objection to the first instruction?

12        **MR. KILARU:**  Your Honor, if it streamlines, I didn't

13   have anything until Number 11 so --

14        **THE COURT:**  Okay.

15        **MR. KILARU:**  -- everything before that seemed okay.

16                  (Pause in proceedings.)

17        **MS. MOORE:**  Your Honor, we have no objection to the

18   first 10 and Number 11 as well too.

19        **THE COURT:**  Okay.  So Number 11 Monsanto has an

20   objection to?

21        **MR. KILARU:**  Yes, Your Honor.

22        **THE COURT:**  Okay.

23        **MR. KILARU:**  We have a few things.  I mean, first,

24   there's a global objection we have to the jury being instructed

25   on design defects.  I think you saw we filed a motion for

 1  directed verdict earlier today.  I think the --

 2      **THE COURT:**  I have not.

 3      **MR. KILARU:**  Okay.  Well, we did.  I believe I gave a

 4  copy to Ms. Melen.

 5      **THE COURT:**  Okay.

 6      **MR. KILARU:**  So if you need another copy, I'm happy to

 7  give it to you, but I'm sure she has distributed it.

 8      We don't think that their -- I think the only theory of

 9  design defect that remains based on PTO 116 and their response

10  to that is this theory that Roundup should never have been sold

11  to residential users, and I don't think there has been a single

12  piece of evidence on that topic from the plaintiffs in this

13  case.

14      I mean, none of the expert witnesses in Phase I talked

15  about that, a categorical ban on sale; none of the expert

16  witnesses that they could have called that they did not call in

17  Phase II testified that there should be a categorical ban on

18  sale; and I don't think that there's any evidence certainly

19  from the Monsanto employees that they called in part of their

20  case that there should be a categorical ban on sale.

21      So I think we also list some legal deficiencies that I

22  think are arguments that in the main we have raised before when

23  we were briefing, what tests to apply and then also whether the

24  claim is viable as a matter of law, but I think that's kind of

25  the most fundamental objection to this going to the jury at

PROCEEDINGS

1    all.

2         THE COURT:  Yeah.  And, I mean, I think, you know,

3    there's an issue there.  I mean, I guess before I have you

4    respond to that question, could I ask you what is maybe a

5    precursor question, which is I asked you to think about sort of

6    which claims you wanted to continue to present to the jury and

7    which you didn't.  Have you given any thought to that?

8         MS. MOORE:  Where we are on that, Your Honor, is that

9    we would like to move forward with all three of the claims.

10        THE COURT:  Okay.  So design defect, strict liability,

11   failure to warn, and negligence?

12        MS. MOORE:  Correct, Your Honor.

13        THE COURT:  Okay.  And we'll talk, I guess, about

14   strict liability, failure to warn, and negligent failure to

15   warn in a minute; but on design defect, I mean, so what is your

16   design defect argument?  Is it that they -- that this product

17   being sold without a warning constitutes a design defect, or is

18   it that this product should never be sold to people for home

19   use or what?

20        MR. WOOL:  Right.  So it's mostly the first one,

21   Your Honor.  And you sort of highlighted a point that where you

22   have an inherently dangerous product, which is what we allege

23   here, that you can defend that by pointing to an adequate

24   warning, which they don't have here.

25        THE COURT:  Okay.  And that's what happened in the

PROCEEDINGS

 1   *Johnson* case as well; right?

 2          **MS. MOORE:**  That's right.  Yes, it is, Your Honor.

 3   All three of those claims went to the jury in *Johnson*.

 4          **THE COURT:**  And they're basically the same claims.  I

 5   mean, it doesn't seem like there's any meaningful distinction

 6   between any of the three claims that you're presenting to the

 7   jury.  All three of them are this product should have come with

 8   a warning about cancer and it did not.

 9          **MS. MOORE:**  With a twist on design defect also.  I

10   mean, under consumer expectations, it's one that a consumer

11   would ordinarily expect to be safe.

12          **THE COURT:**  Right.

13          **MS. MOORE:**  And I understand that what you're saying

14   it kind of ties to you would expect it to be safe because you

15   can buy it off the shelf and there's no warning on it that

16   tells you anything bad is going to happen to you, but it's a

17   little different but not much on that.

18          **THE COURT:**  Well, can you articulate for me how it is

19   different?  I mean, with the --

20          **MS. MOORE:**  Well, the design defect doesn't say that

21   they had to have a warning on it.  We're saying it's an

22   inherently dangerous product itself and for which, you know,

23   the ordinary consumer would not realize that.

24          **THE COURT:**  But I thought in *Johnson* you argued that

25   the reason it was defective is because it didn't come with a

 1   warning.  Am I misremembering that?

 2        MS. MOORE:  I'm not sure if that's how they argued the

 3   design defect in *Johnson*.  I know they used consumer

 4   expectations.

 5        THE COURT:  So why don't you just tell me what you --

 6   what is your argument to the jury on why this is -- why there

 7   is a design defect in Roundup.  Explain to me what your

 8   argument is.

 9        MS. MOORE:  My consumer expectations expert here.

10        MR. WOOL:  Well, I wouldn't say "expert."

11   Because glyphosate and with a surfactant in a formulation

12   is inherently dangerous.  It cannot be made safe.  That the

13   only option that Monsanto would have in that situation would

14   actually be to provide an adequate warning, which I don't think

15   there's any question here that if we can prove that Roundup

16   caused Mr. Hardeman's cancer and that it's more dangerous than

17   a normal consumer would expect, that because there's not a

18   warning here, that would not be a defense that they could

19   pursue here.

20        THE COURT:  So the reason that this product was

21   defective is because it did not carry a warning?  It sounds

22   like that's what you just said.

23        MR. WOOL:  No.  I wouldn't say that.  I would say that

24   the product is defective because of the way that the molecule

25   kind of interacts with human beings and then causes cancer.

 1   This could be defended by showing that there's a warning, but

 2   it's not defective because there's an absence of a warning, if

 3   that makes sense.

 4         THE COURT:  No, it doesn't make sense because on your

 5   argument, the presence of a warning is not a defense to the

 6   design defect claim it sounds like.

 7         MR. WOOL:  Well, no, no.  In this case --

 8         THE COURT:  I mean, it sounds like what you're

 9   preparing to argue -- and I'm not putting words in your mouth,

10   I'm just trying to understand -- it sounds like what you're

11   preparing to argue is that this product is defective and

12   whether they had included a warning or not, even if they had

13   included a warning, you would be liable -- Monsanto would be

14   liable to Mr. Hardeman.

15         MR. WOOL:  Well, no, there's some facts.  So if they

16   had included a warning, which they didn't do, then that would

17   open up the door to certain affirmative defenses, and then they

18   would be able to defend the design defect claim.

19         THE COURT:  What's the affirmative defense?

20         MR. WOOL:  I think it's Comment j to the Second

21   Restatement.

22         THE COURT:  But, I mean, there's nothing about a

23   warning -- Comment j to the Second Restatement?  What does that

24   say?

25         MR. WOOL:  That says that where you have an inherently

1   dangerous product that can't -- where the danger cannot be

2   designed away, that you can -- that you can avoid liability

3   under a design defect theory by including a warning that is

4   adequate and warns consumers of the dangers inherent in the

5   product.

6        MR. KILARU:  But I think that's if we argue that it's

7   an inherently dangerous product and therefore...  An inherently

8   dangerous product, I believe, is itself an affirmative defense

9   that the defense can bring.

10      So I think the argument that's being made actually has

11  nothing to do with whether this is a valid design defect claim

12  or not.  I think if their claim is that it's defective in

13  design because it doesn't have a warning, that's not a design

14  defect claim.  That's a failure-to-warn claim.

15      There's a reason there's a separate claim for not warning

16  about a product.  I think a design defect claim has to be about

17  whether there's some aspect of the design independent of the

18  warning that means the product shouldn't be sold.

19      And here, if they're arguing that the defect is the

20  failure to warn, I think there's the first problem I just

21  mentioned; but there's also a problem that a couple weeks ago

22  you asked them to articulate what design defect claim they were

23  going to bring and whether it was different from the claim that

24  the product shouldn't be sold at all, and they didn't do that.

25  So now evidence has come in about -- you know, whether or not

 1    evidence has come in about that theory, other theories haven't

 2    been explored.

 3        If the claim is instead you should never sell this product

 4    at all, there is no evidence at all to support that in the

 5    record, no expert testimony, which as you'll see in our motion

 6    we believe is required, but really no testimony at all that

 7    Roundup shouldn't be sold.

 8        **THE COURT:**  But putting aside for the moment -- I

 9    mean, look, you know that I'm going to deny your motion for a

10    directed verdict without prejudice to you reraising the issues

11    posttrial.  Let's talk about what we're going to instruct the

12    jury.

13        Like, I'm telling you, I think this -- I think their

14    design defect claim is defective.  I think there's probably a

15    real problem with it, but there wasn't a motion for summary

16    judgment on it, and I want to -- and we're going to instruct

17    the jury on it and we're going to see what the jury says.  And

18    it may be that this claim should never have been brought and

19    the verdict on that claim might need to be taken away.

20        **MR. KILARU:**  Well, I understand.  Just on that point,

21    Your Honor, I understand that we didn't make the summary

22    judgment motion, but we are entitled to file a motion for

23    judgment of law at any time after the case has been submitted.

24    We have filed it now before the case goes to the jury, and we

25    believe there's a real defect in the evidence and the legal

PROCEEDINGS

1    theory for that claim that shouldn't allow it to go to the

2    jury.

3        **THE COURT:**  I think you might be right but,

4    nonetheless --

5        Can I just ask you one more time to try to explain what

6    your -- how your design defect theory is different from your

7    failure-to-warn theory?

8        **MR. WOOL:**  Well, so, it's more limited in a way.  So

9    the design defect theory is that Roundup as formulated is

10   inherently and unreasonably dangerous, and that is the claim in

11   a nutshell.  And you can --

12       **THE COURT:**  That it shouldn't be on the market?

13       **MR. WOOL:**  Well, I wouldn't say that it shouldn't -- I

14   mean, it doesn't go that far.  Whether --

15       **THE COURT:**  Well, then, what does it mean to say that

16   it's inherently and unreasonably dangerous?

17       **MR. WOOL:**  Well, it means that you can sell your

18   product in an inherently and unreasonably dangerous fashion and

19   be liable for design defect claims; or, as I sort of mentioned

20   before, you can put a warning on the product and that would --

21       **THE COURT:**  It's Restatement Second what?

22       **MR. WOOL:**  Comment j.

23       **THE COURT:**  Restatement Second?

24       **MR. WOOL:**  Second.  I think it's Section 402A,

25   Comment j.

1          **MR. KILARU:**  402?

2          **MR. WOOL:**  Yeah, I think 402A.

3          **THE COURT:**  "The reporters of the" -- I'm reading

4     something -- an article now on the Third Restatement and it

5     says (reading):

6              "The reporters of the Third Restatement referred to

7          the Comment j emphasis on product warnings as unfortunate

8          language which has elicited heavy criticism.  In response

9          to this perceived criticism, the Third" -- I'm just

10         reading this out loud right now.  I don't even know what

11         it says yet.  Okay? -- "the Third Restatement shifts the

12         emphasis away from product warnings and towards safer

13         product design.  The core provision of the Third

14         Restatement, Section 2, states that 'a product is

15         defective when, at the time of sale or distribution, it

16         contains a manufacturing defect, is defective in design,

17         or is defective because of inadequate instructions or

18         warnings."

19     Oh, okay.  It goes on to define each category of strict

20     liability separately (reading):

21             "A product is defective because of inadequate

22         instructions or warnings when the foreseeable risks of

23         harm posed by the product could have been reduced or

24         avoided by the provision of reasonable instructions or

25         warnings by the seller or other distributor or a

1    predecessor," blah, blah, blah.

2        Okay.  So that's -- but -- so it sounds like, just from a

3    quick read of this, and I haven't read their motion yet and

4    I'll do so tonight, but it sounds like from a quick read of

5    this maybe you can present a theory like that, but I still

6    don't understand how the theory is any different from the

7    failure-to-warn theory.

8        It may be that that's fine.  I mean, maybe you're

9    presenting two different theories that are basically

10   indistinguishable in the context of this case, and maybe you're

11   exposing yourself to, you know, potential reversal based on the

12   possibility of inconsistent verdicts; but, you know, I suppose

13   there's nothing inherently wrong with presenting two sort of

14   different legal -- giving them two different legal hooks to

15   hang their -- hang the factual hat on.

16       **MR. WOOL:**  Right.  And I think that we see and

17   understand the potential inconsistencies, you know, between the

18   two theories but have, nonetheless, sort of decided that, you

19   know, that risk is --

20       **THE COURT:**  And why is that?  Why?  Why is that risk

21   worth it?  Why is the risk of inconsistent verdicts -- because

22   it seems like -- again, if you want to try to articulate the

23   difference between your three theories, go ahead and do so; but

24   it seems like all three legal theories that you're presenting

25   to the jury are identical and, therefore, you're running the

 1  risk of inconsistent verdicts.  And so the question is:  Why

 2  are you willing to run that risk?

 3          **MR. WOOL:**  Well --

 4      **MS. MOORE:**  I think it is a little bit different,

 5  Your Honor, because the negligence is based on reasonableness

 6  and strict liability obviously is not.  So there is a

 7  difference there.

 8      And, you know, the evidence as to the reasonableness of

 9  Monsanto's conduct comes into play when you're looking at the

10  negligence failure to warn.  Their reasonableness does not come

11  into play when you're talking about the strict liability either

12  under the design -- under the design defect and also under the

13  failure to warn strict liability.  I mean, it's not about their

14  conduct.  It's about the product itself.

15      And, you know, that's one of the reasons why we wanted to

16  present the negligence claim in addition to the strict

17  liability.

18          **THE COURT:**  Can you articulate for me a theory that

19  the jury could rationally articulate for why -- to hold

20  liable -- hold Monsanto liable under one theory but not one of

21  the others?

22      **MS. MOORE:**  No.  My position to the jury is going to

23  be they should check "yes" for all three.

24          **THE COURT:**  No, I'm not asking you what you're going

25  to tell the jury.  I'm asking you:  Is there a rational way

 1   that the jury could find for you on one of these three claims

 2   but for Monsanto on another of these three claims?

 3         MS. MOORE:  I think that would be highly unlikely,

 4   Your Honor.

 5         THE COURT:  Okay.  So if the jury found for you on one

 6   of these three claims and Monsanto on another of these three

 7   claims, would the verdicts be inconsistent such that the whole

 8   thing would have to be thrown out?

 9         MS. MOORE:  I don't think so, Your Honor.

10         THE COURT:  Why not?

11         MS. MOORE:  I think it depends on which ones they

12   found for.  If --

13         THE COURT:  But you would have to articulate a

14   rationale.

15         MS. MOORE:  Here, for this example, if they found for

16   the plaintiff on strict liability design defect and did not

17   find for the plaintiff on strict liability failure to warn and

18   negligent failure to warn, I don't think that the case would

19   have to be thrown out on that.  So I think that's one.

20         THE COURT:  And why?  Tell me what is the jury --

21   what's the jury's theory for why Monsanto is liable on the

22   design defect claim but not the failure-to-warn claim.

23         MS. MOORE:  Well, you can look at the difference in

24   the language of the instructions.  I mean, under design

25   defect --

1          **THE COURT:**  Well, what's the set of facts that the

2    jury finds that would fit into the design defect claim but not

3    fit into the failure-to-warn claims?

4          **MS. MOORE:**  Because they could say that the product

5    itself is so dangerous and -- that the product itself is so

6    dangerous and there's -- the ordinary consumer would not expect

7    it to be such, and they could find for the plaintiff on the

8    design defect for that.  They don't have to go to the failure

9    to warn part of it.

10         I mean, they can just say, you know, right here that the

11   product is one in which an ordinary consumer can form

12   reasonable minimum safety expectations.  Mr. Hardeman testified

13   that he didn't expect to get cancer from using Roundup for all

14   those years.

15         And then the next one is Roundup used by Mr. Hardeman did

16   not perform as safely as --

17         **THE COURT:**  But he didn't get -- he testified that --

18   I mean, he didn't expect to get cancer from using Roundup

19   because they didn't warn him; right?

20         **MS. MOORE:**  No.  It's two different things.

21         **THE COURT:**  If they had warned him, he wouldn't have

22   used it.

23         **MS. MOORE:**  No.  He said he didn't expect to get

24   cancer from Roundup.

25         **THE COURT:**  Okay.

1          **MS. MOORE:**  And he also testified he didn't expect

2     that Roundup was dangerous.  Those are two separate things from

3     saying "If I had -- if they had warned me it was causing

4     cancer, I wouldn't have used the product."  It's separate.

5          **THE COURT:**  Okay.

6          **MS. MOORE:**  And so when I asked him those questions, I

7     did not tie your expectation and whether you thought it was

8     dangerous to the failure to warn.  Those were separate.

9          **THE COURT:**  Okay.

10         **MS. MOORE:**  And so that's how -- I mean, again, that

11    would be my argument on design defect.

12         **THE COURT:**  So that argument is that even if Monsanto

13    had provided an adequate warning, it would still be liable on

14    the design defect claim; or is your argument only --

15         **MS. MOORE:**  That's going --

16         **THE COURT:**  -- is your argument only that Monsanto is

17    liable on the design defect claim because Monsanto didn't

18    provide a warning?

19         **MS. MOORE:**  What I was articulating was that under the

20    instruction itself, it does not require the jury to make any

21    finding about a warning.  It requires the jury to make a

22    finding that the product is one that an ordinary consumer would

23    form reasonable minimum safety expectations -- in other words,

24    they don't expect to get cancer from using Roundup -- and then

25    the last part of it is it did not perform as safely as you

 1   would expect because he got cancer.

 2        That's all they have to find under consumer expectations.

 3   They don't have to go to the warning.  They have to go to that

 4   next step under the design defect under consumer expectations.

 5   It's what you --

 6        **THE COURT:**  Under what next step?  What is the next

 7   step that they need to take?

 8        **MS. MOORE:**  Well, I think what you were talking about

 9   was failure to warn, was the warning.  And so under consumer

10   expectations, they expect the product to be safe, and it turns

11   out the product was not safe because he got cancer.  And so

12   right there they're liable if we show that, which I think we

13   have shown, and so that's how they can find for us under design

14   defect.

15        Under design -- under strict liability failure to warn,

16   they have to show that there was -- that they failed to

17   adequately warn of the risk of cancer.  Well, they've

18   admitted -- Monsanto admitted they've never warned for the risk

19   of cancer, and so that's what they have to find under strict

20   liability failure to warn.

21        When you get to negligence failure to warn, there's

22   another prong of that, and I'm abbreviating all this, but

23   there's another prong of that and we have to show, we have the

24   burden to show that Monsanto knew or reasonably should have

25   known Roundup was dangerous, and that's that time period we've

1    been talking about from '75 to 2012.  We have to show that they

2    knew or should have known that it was dangerous and that the

3    user would not have realized it, and then they failed to warn.

4         So there's -- you know, I understand, Your Honor, it was

5    very similar, but there are some nuanced differences on that.

6         I understand, Your Honor, it is very similar, but there

7    are some nuance differences on that.  And, you know, I mean,

8    they are going to argue that he didn't read the label.  He

9    would have used, you know, the product anyway.  You know, so

10   that -- I mean, that could be how you could end up with

11   separate ones.  I mean, I think -- I think they are either

12   going to check yes to all three or no to all three.  I don't

13   think there is going to be -- you know, I can't predict.

14        **MR. KILARU:**  Your Honor, can I be heard on a few

15   aspects of that?

16        So, first of all, I don't think that counsel can say

17   because they look at the instruction -- the instruction can

18   only be given if there is a valid theory of liability

19   supporting the instruction.  You can't just say the jury can

20   look at the instruction and find us liable if there is not a

21   theory for why that instruction should be given in the first

22   place.  That is Point Number 1.

23        Point Number 2 is -- I don't have Comment J in front of

24   me, so I'm operating a little bit off of memory -- but I'm

25   pretty sure that the way that comments and other comments talk

1   about things, they use the term "design defect" in two

2   different ways.  One way is to say all three manufacturing

3   defect, failure to warn, and design defect are design defects

4   because they are saying something was wrong with the product.

5       When you are talking about the actual theory of liability

6   for jury instruction purposes, you have to have a valid design

7   defect argument that is not the same as the failure to warn

8   because a design defect isn't a warning.  You would never need

9   to have either failure to warn or design defect liability.

10      THE COURT:  That's why I'm trying to pin them down on

11  what their design defect argument is.

12      MR. KILARU:  And that's why I think this really

13  matters because I think there is a fair amount of indeterminacy

14  about which design defect theory they are pursuing, and that

15  affects whether it approves giving the instruction or not or a

16  legal basis to support giving --

17      THE COURT:  Okay.  Your argument is that if their

18  design defect theory is that it doesn't carry a warning, then

19  it is duplicative of the --

20      MR. KILARU:  It's not just that it is duplicative.  It

21  is not a valid design defect claim.

22      THE COURT:  Okay.  And if their design defect theory

23  is that the product is simply unfit to be sold, then you are

24  saying there was no evidence that it was --

25      MR. KILARU:  There is no evidence from anyone that the

 1   product is unfit to be sold to residential users.

 2        **THE COURT:**  What form does that evidence have to take?

 3        **MR. KILARU:**  I think, as we cite in our brief, it has

 4   to take the form of expert testimony because it involves

 5   basically arguing that a product should be banned from the

 6   market for a class of users.  But I would note that -- I mean,

 7   take the experts out of it for a second and look at the

 8   testimony we have in this case.  In Phase One even their

 9   experts didn't say --

10        **THE COURT:**  What about like the -- I'm sorry to

11   interrupt you.

12        **MR. KILARU:**  That's fine.  Of course, of course.

13        **THE COURT:**  I was just going to ask, what about like

14   in the tobacco cases, right?  Were those design defect cases or

15   were they failure-to-warn cases or both?

16        **MR. KILARU:**  They were both.

17        **THE COURT:**  Okay.  And so the -- is the argument that

18   these are products that are not fit to be on the market?

19        **MR. KILARU:**  No.  So actually I think the tobacco

20   cases -- we cite them in our brief -- they are instructed on

21   two points.  One, the Courts generally apply risk-benefit, not

22   consumer expectations because what they were looking at is

23   there is some aspect of the actual design of the cigarette,

24   whether a filter or, you know, some type -- I don't know the

25   details that well, but we cite these cases in our brief -- some

1    aspect of the actual design of the product that can be changed

2    to solve what they are claiming is a defective design.  And

3    that was the kind of thing that we think might be a valid

4    design defect claim that was not the sort of claim they are

5    supporting here.  I don't believe the --

6         **THE COURT:**  Well, the answer with cigarettes is no.  I

7    mean, there is no way you can design cigarettes.

8         **MR. KILARU:**  Well, I think the argument in some of

9    those cases was that there are arguments you can make; either

10   having the absorption level drop or have less nicotine get into

11   the system or whatever the case may be.  I don't know whether

12   those arguments were successful or not, but those were the

13   types of design defect arguments that I believe are being

14   talked about in the cases we cite.

15       And in those case the Court said, You have to have expert

16   testimony because it is sort of a complicated scientific

17   question and people have to come in and say what aspect of the

18   design should be different -- I think in at least the cases we

19   cite -- they say the experts haven't provided that.

20       But I think to take it back to here if the theory is that

21   you shouldn't have Roundup on the market at all, I don't think

22   there is any evidence of that.  Even in Phase One their experts

23   didn't say -- I mean, Dr. Weisenburger's testimony -- he is the

24   only expert who testified -- is that you need to have exposure

25   to Roundup at some high level to cause cancer.  And he said, I

1   think it was a little bit of I will tell you when I see it.

2   But be that as it may, his argument wasn't, If you buy Roundup

3   and use it one time, you are at risk of cancer.

4        And so for that reason alone, I think there is no

5   testimony that you should take this product off the shelves and

6   not sell it to residential users.  So if that's their theory,

7   there is not evidence to support it.

8        And if the theory is -- this failure-to-warn theory, it is

9   not a legally valid theory.  And I think -- the reason I keep

10  emphasizing this is that certainty needs to exist on the

11  front-end before the claim goes to the jury because -- the

12  instruction is what it is, but I think the jury can read this

13  instruction and absent being told that is the actual theory of

14  liability the Plaintiff is bringing, you could theoretically

15  get a verdict on this that is not supported by any evidence or

16  a valid theory of design defect.

17           **THE COURT:**  Okay.  So let me -- let me try and ask you

18  one more time:  What is the theory of design defect liability

19  that you are going to articulate -- so the purpose of asking

20  this question is so that I can go back and look at their

21  motion.  And they contend that if -- if you are asserting a,

22  quote-unquote, design defect theory that involves failure to

23  have an adequate warning, then it is not a separate theory from

24  your failure-to-warn theory and it shouldn't be given to the

25  jury for that reason.

**PROCEEDINGS**

1        Then they argue that if, in fact, your design defect

2    theory is that regardless of warning, it is not a product that

3    should be on the market for residential users or whatever, then

4    you haven't presented any evidence to support that.

5        Putting aside their argument about -- putting aside

6    whether they are right that one -- you know, that the

7    failure-to-warn design defect theory is not a separate design

8    defect theory, putting aside their argument about whether you

9    presented sufficient evidence about whether it is a product

10   that should be on the market, what is your theory?  Is it the

11   former or the latter?  Is it based on the absence of a warning,

12   or is it -- is it irrespective of the absence of a warning?

13        **MR. WOOL:**  So it's -- this is sort of hard to

14   articulate because what we are contending is that it is

15   inherently dangerous.  It would be able to defend this claim by

16   showing that -- that there was a valid warning, but that is

17   their affirmative duty.  That would be an affirmative defense

18   for them.

19        And so they can defend the claim that Roundup is

20   inherently dangerous and, therefore, defective under California

21   law by saying, We did have an adequate warning, in which case

22   that would eliminate the design defect claim.  But I think that

23   sort of the discussion we are having now is a little bit -- or

24   sort of is getting into shifting the burden a little bit to

25   Plaintiffs because I think that is sort of the distinction here

PROCEEDINGS

1    is that for the design defect claim, you know, we do not have

2    to prove that Roundup contained an adequate warning, where it's

3    inherently dangerous and caused Mr. Hardeman's harm.

4        You know, and that is sort of distinguishable from the

5    failure-to-warn claim.  I don't know if this is making sense.

6    There is a lot of sort of nuance here, but they could -- they

7    can defend the design defect claim by saying that Roundup did

8    have an adequate warning, but on its face without them sort of

9    showing that -- the claim stands.

10       **THE COURT:**  Okay.  I mean, I'm at a little bit of a

11   disadvantage because I haven't read their motion yet; but let's

12   focus on -- let's act on the assumption that this design defect

13   claim is going to the jury, okay.

14       So the claim is going to the jury.  They say they don't

15   have to say anything about warnings in connection with their

16   design defect claim.  All they need to say is that -- that

17   Monsanto manufactured and distributed -- and sold it; that an

18   ordinary consumer can form reasonable, minimum safety

19   expectations about the product, about this type of product; and

20   then it didn't perform safely because it gave him non-Hodgkin's

21   lymphoma.

22       So what -- is there -- well, let's assume they are right

23   about that, that that's all they have to put forward.  Anything

24   wrong with this jury instruction, any sort of specific

25   objection?

1          **MR. KILARU:**  Yes, we do have a few, Your Honor.

2          **THE COURT:**  Talk to me about that.

3          **MR. KILARU:**  They come from disagreeing that those are

4    the only things they have to prove.  This is separate from the

5    argument I just made.

6          **THE COURT:**  Okay.

7          **MR. KILARU:**  So first I think -- and I know this

8    collapses into a little bit about what we just talked about,

9    but I do think it is important.  So in the second sentence

10   there is a statement:  In Phase Two Mr. Hardeman claims that

11   Roundup's design was defective because it didn't perform as

12   safely as an ordinary consumer would expect it to perform.

13        We would argue that instead of using that phrase, there

14   should be an articulation of the theory of design defect

15   liability of which the claim is going to the jury so that the

16   jury is actually finding design defect liability on something

17   that Your Honor has said is a legally viable theory.  So

18   perhaps that would be -- that Roundup should never have been

19   sold to residential users.  I mean, it is perhaps a warning

20   claim.  I mean, it is sort of up to them to decide which of

21   those they want to pursue.  But I think that is important to

22   put that in here so you don't necessarily have an abstract

23   verdict disconnected from a valid theory of what --

24          **THE COURT:**  I had a little bit of an opposite reaction

25   to what you said, which is I would be inclined to cross out the

 1    words "because it did not perform as safely as an ordinary

 2    consumer would have expected it to perform."

 3        In other words, In Phase Two, Mr. Hardeman claims that

 4    Roundup's design was defective, period.  To establish this

 5    claim, Mr. Hardeman must prove all of the following -- and then

 6    we can argue about what he needs to prove and what he doesn't

 7    need to prove, but it actually strikes me that that last line

 8    is kind of somewhat like partially redundant of the elements

 9    and, therefore, probably should not be in there.

10        **MR. KILARU:**  I think it is -- I agree.  It is

11    redundant of the elements, but I don't think that just deleting

12    it is the answer.

13        **THE COURT:**  Okay.

14        **MR. KILARU:**  And -- for the reason I just mentioned.

15    I think the jury -- the proof that the jury is deciding this

16    case on should be tethered to a valid theory of liability.  It

17    shouldn't just be sort of in the abstract, Does Roundup have a

18    defect in design.  So we think that that language, if that is

19    their theory, should be put in here so the jury knows what they

20    should be thinking about in evaluating this question of

21    defective design.

22        And it is, in fact, not true -- this goes to my point

23    raised earlier -- that all they have to prove is that he used

24    the product and suffered an injury that he didn't expect.  I

25    mean, there is case law on this in the CACI instructions.

1          **THE COURT:**  Not that he didn't expect, but that the

2    ordinary consumer --

3          **MR. KILARU:**  Sure, sure, sure.  But I don't think

4    that's all he has to prove.  I think, again, in our motion we

5    cite cases showing that even in a consumer expectations case,

6    you have to prove that there is a defect and that the defect

7    caused the injury.  So that's what we're -- that's what I'm

8    relying on, when I say that the theory of what the defect is

9    should be included in this instruction.

10         **MS. MOORE:**  And, Your Honor --

11         **THE COURT:**  So does that -- does that -- should that

12   be one of the elements or should that be in the sentence that

13   you just flagged?  I mean, if that's -- if that's really -- if

14   it is really true that they have to prove that there was --

15   they have to define the defect, and they have to get the jury

16   to buy into the definition of the defect, it sounds like maybe

17   that is supposed to be an element?

18         **MR. KILARU:**  Well, I think it should be an element.  I

19   think the question is if you want the language of the actual,

20   you know, words -- of the specific elements to track the model

21   instruction, the reason I proposed putting it higher up is

22   because it sort of grounds what the jury is finding on those

23   elements in this broader argument that there is a design

24   defect.  I mean, we had proposed over the weekend --

25         **THE COURT:**  It is 1203, right?

 1            **MR. KILARU:**  Yes, I believe.

 2            **MS. MOORE:**  It is 1203, Your Honor.  And we think our

 3    proposed instruction under 1203, which is the consumer

 4    expectation test, and that is what, Your Honor -- your draft is

 5    also based on with the modification that they had already made

 6    a couple of the findings from Phase One.

 7            **THE COURT:**  Right.

 8            **MS. MOORE:**  I will point out that there is California

 9    case law that is directly on point about this.  And under

10    *Arnold versus Dow Chemical*, which is a California appellate

11    case from 2001, the Court held it is sufficient to allege that

12    a pesticide is toxic and that the consumer didn't expect it to

13    be toxic in order to have a design defect claim.  And that's --

14    you know, we've kind of gone round and round on this --

15            **THE COURT:**  That's right.

16            **MS. MOORE:**  So that's --

17            **THE COURT:**  I forgot about that case, yeah.

18            **MS. MOORE:**  The *Arnold versus Dow Chemical*.  I have

19    the cite if you need it, Your Honor.

20            **THE COURT:**  No.  That's okay.

21        Hold on a second.

22                        (Pause in the proceedings.)

23            **THE COURT:**  Okay.  So your argument, Mr. Kilaru, is

24    that there needs to be an articulation of the detect, and the

25    articulation of the defect needs to be either that it was

 1    just -- it was not a product that should have been sold for

 2    these purposes?  Or that it didn't come with a warning?

 3            **MR. KILARU:**  Those are the theories that have been

 4    articulated.  So those are the theories that I think would come

 5    in here, if one of those indeed --

 6            **THE COURT:**  Okay.  Any other arguments regarding this

 7    instruction?

 8            **MR. KILARU:**  Yes.  Just a couple quick ones, Your

 9    Honor.

10            **THE COURT:**  Yes.

11            **MR. KILARU:**  I think on Number 2, we would propose

12    adding language about what -- what the expectations relate to.

13    And what I mean by that is it's not just reasonable -- we think

14    it should just be reasonable and expectations in general, it

15    should be about the risk of causing NHL based on everyday

16    experience with the product, and that is the expectation that

17    they are talking about here.  And I think that language is

18    important, both as a statement of what the expectation is that

19    we are talking about the consumer and also relevant to the

20    scientific background that the jury is evaluating.

21            **MS. MOORE:**  Your Honor, that would increase our burden

22    because under the model instructions, the language -- which is

23    taken right from the model instructions -- which is ordinary

24    care and can form reasonable minimum safety expectations --

25    does not require that to be specified more than that or to be a

 1   higher burden.

 2        THE COURT:  Okay.

 3        MR. KILARU:  If I can point you to case law on that,

 4   Your Honor, it is cited in 1203 itself in sort of the notes to

 5   that but at least a few bullets down in the sources and

 6   authority, it would be the seventh bullet.  There is a case

 7   called *Pannu* -- and there are other cases -- I think that's the

 8   main one -- where the Court says:  The critical question in

 9   assessing the applicability of the consumer expectation test is

10   not whether the product considered in isolation is beyond the

11   ordinary knowledge of the consumer but whether the product in

12   the context of the facts and circumstances of its failure is

13   one about which ordinary consumers can form minimum safety

14   expectations.  And that's what I think this additional language

15   would go to.

16        THE COURT:  Okay.

17        MS. MOORE:  Your Honor, I did pull up the Johnson jury

18   instructions, and they are exactly the way the Court is

19   proposing with the exception of the harm has already been

20   determined.  But the language is exactly identical.

21        And the claim there was that the defect -- is that it

22   failed to perform according to the expectations of an ordinary

23   consumer.  I mean that's our claim, Your Honor, for defective

24   design.

25        THE COURT:  Okay.  I understand the arguments.  I will

PROCEEDINGS

 1   think about it a little bit.

 2            MS. MOORE:  Thank you, Your Honor.

 3            THE COURT:  More anything else on that instruction?

 4            MR. KILARU:  The last thing, Your Honor.  We had --

 5   just for preservation purposes, I guess, we had two things, I

 6   guess.  One is very -- we know your position on this.  But we

 7   had proposed changing this used or misused and intended or

 8   reasonably foreseeable way language to a language about in

 9   accordance with widespread and commonly recognized practice.  I

10   take it from what is on the page, that Your Honor disagreed

11   with that.

12            THE COURT:  Correct.

13            MR. KILARU:  The last thing I would say is:  I do

14   think that Element 4 of the model should still be included in

15   this instruction.  And that is that Roundup's failure to

16   perform safely was a substantial factor in causing his NHL.

17   And this goes I think to the point that I was trying to make

18   earlier, which is that there is even in this context, there is

19   a difference between medical causation which we understand has

20   been established and legal causation; that what they are saying

21   is the defect in design is what caused his injury as opposed to

22   the mere use itself.  And, again, this ties back to our motion.

23   We cite some cases in there pointing out that mere use alone

24   doesn't establish proximate causation.

25            THE COURT:  Well, I mean, I understand how that point

PROCEEDINGS

1    goes to your argument that this isn't a real design defect

2    claim or this shouldn't go to the jury.  I understand that, but

3    assuming it goes to the jury, what -- I guess I don't -- I

4    mean, given that they already found that Roundup caused his

5    NHL, what -- what would be left for the jury to find with

6    respect to that element?

7          MR. KILARU:  Well, I guess, it goes to -- it does sort

8    of collapse into my earlier argument because they have to find

9    that there was a failure to perform safely that we think

10    relates to the design.

11          THE COURT:  Right.

12          MR. KILARU:  As opposed to just sort of what happened

13    to Mr. Hardeman based on his use.

14          THE COURT:  I get that.  I get that.

15        And -- but I think that simply goes to your argument that

16    this claim should not go to the jury.  I don't think it goes to

17    your argument about how the jury should be instructed if the

18    claim goes to the jury, but I want to make sure.

19          MR. KILARU:  I think it actually -- I think it does

20    because it is a different place for what I said should be -- I

21    think what I'm proposing to add now is sort of a different way

22    of articulating the point that I articulated earlier, that you

23    should put the theory in the instructions -- in the

24    instructions, somewhere in there the jury has to find that the

25    design defect was what caused Mr. Hardeman's injury.

PROCEEDINGS

1        **THE COURT:**  Well, they are going to say that the

2   product fails to perform safely because it causes NHL.  And --

3   I mean, that's -- that's the reason that they say the product

4   does not perform safely.  And the jury has already concluded

5   that it does cause NHL and it caused Mr. Hardeman's NHL.  So

6   I'm just left -- let's put it this way:  If this element were

7   in here, what would you argue to the jury about why this

8   element is not met?

9        **MR. KILARU:**  What is the defect and design that they

10  are claiming injured him?  What is the thing about Roundup they

11  are saying that should -- you know, that it didn't perform

12  safely?

13       **THE COURT:**  It causes NHL.

14       **MR. KILARU:**  I know that's what happened, but I guess

15  my point is what is the aspect of the design of Roundup that

16  did that as opposed to just the product itself.

17       **THE COURT:**  I understand that point, but I don't think

18  that's what the fourth element is about.  I mean, the fourth

19  element is that the product failure to perform safely was a

20  substantial factor in causing the Plaintiff's harm, so --

21       **MR. KILARU:**  I think that ordinarily that language

22  encompasses both legal causation and medical causation.  Here,

23  medical causation has obviously been resolved.  Our argument is

24  that legal causation still has not been taken off the table by

25  the jury's Phase One finding.

**PROCEEDINGS**

 1           **MS. MOORE:**  But that is encompassed then, if you look

 2     at the element before that, Your Honor, they have to know --

 3     they have to find that Roundup is a product by which an

 4     ordinary consumer can perform reasonable and minimal safety

 5     expectations.  And if they say, Okay, you can form reasonable

 6     minimum safety expectations, and then they say next that, It

 7     did not perform safely, I mean, that's it.  I mean, they have

 8     already made the determination that Roundup causes NHL.  And

 9     they are basically wanting to rehash Phase One.

10           **THE COURT:**  Well, let me ask you this:  Your colleague

11     said that it would be appropriate to -- for -- well, said it

12     would be appropriate for them to come back and say, Well, we

13     have a warning.  And so the reason -- you know, the product's

14     failure to perform safely was not the substantial factor.  It

15     was the failure to adhere the warning that was the substantial

16     factor, right?  So I know there is no warning in this case.

17     But --

18           **MS. MOORE:**  Right.

19           **THE COURT:**  -- it sounds like from what your colleague

20     was saying, they could argue that in response to a design

21     defect claim, right?  So why couldn't they argue in response to

22     this claim, you know, the fact that -- well, now, it doesn't --

23     actually, as I'm saying it, it doesn't really make sense.

24           But I guess what I was going to -- I will say it anyway.

25     What if they argued, Look, a warning wouldn't have mattered for

```
 1    Mr. Hardeman because you can't believe him when he says that he
 2    read the label.  He would have used the product anyway.
 3             MS. MOORE:  I mean, they can make --
 4             THE COURT:  The fact that the product is not
 5    performing safely isn't really the substantial factor in
 6    causing his harm.  I don't think that makes any sense.
 7             MS. MOORE:  I don't think either.  And I don't think
 8    that's probably what they are going to argue.  I mean, they are
 9    going to argue that it doesn't cause cancer again, but I
10    mean --
11             THE COURT:  I don't think they are going to argue that
12    one.  I don't think -- that would not be very smart.
13             MS. MOORE:  Maybe.
14       But on this, I just think we are being repetitive, Your
15    Honor.  I think the way that you had it written originally
16    makes the most sense, given the findings from Phase One.  I
17    mean, the -- this is an independent cause of action from the
18    failure-to-warn claim and -- and I think we have set forth the
19    elements in the proposed instructions by the Court.
20             THE COURT:  Okay.  So let's say this element is
21    included, this fourth element, the failure of the product to
22    perform safely.  I mean, again, part of it is that I'm
23    struggling to understand your design defect theory.  But I
24    assume what you would say about the fourth element is that,
25    Yeah, it gave him cancer.  And you already found in Phase One
```

```
1   the fact that this product creates a cancer risk was a

2   substantial factor in him getting cancer.

3            MS. MOORE:  Right.

4            THE COURT:  So would there be any harm in this element

5   being in here?

6            MS. MOORE:  I mean, it is already the law in the case.

7   And I think that's why you have it at the very beginning of the

8   instructions because they don't need to -- if it is the law of

9   the case, you don't need to make a judicial -- a jury finding

10  on that.  They don't need to be weighing the evidence on it.

11           THE COURT:  Okay.  Anything else on this instruction?

12           MR. KILARU:  No, Your Honor.  If it is a

13  warning-related theory, then I do think 4 would do some work.

14  I think that the fact that the product -- our argument could be

15  whether the product had a warning or not wouldn't --

16           THE COURT:  Wouldn't have mattered.

17           MR. KILARU:  -- wouldn't have mattered based on what

18  we know about Mr. --

19           MS. MOORE:  I mean, I will just say -- to wrap this

20  one up -- the defect itself is that consumers don't expect to

21  get cancer from Roundup.  That is the defect, so --

22           THE COURT:  Right.  But that kind of begs the

23  question.

24           MS. MOORE:  Yes, but there is still independent --

25           THE COURT:  It begs the question whether you are
```

1    saying the defect can be cured by a warning or the defect

2    should be cured by it not being on the market in the first

3    place.

4         **MS. MOORE:**  I understand.  The defect itself might be

5    in one instance --

6         **THE COURT:**  There are lots of things that give people

7    cancer that are on the market.

8         **MS. MOORE:**  I understand.  And the failure to warn,

9    may be a predicate for that, but that doesn't mean they are not

10   independent causes of action.

11       On your next instruction, Your Honor --

12        **THE COURT:**  Number 12?

13        **MS. MOORE:**  Yes, Number 12.  We didn't have any

14   objection to that.

15        **THE COURT:**  Okay.

16        **MR. KILARU:**  We had two brief things, Your Honor.

17       One, in the second sentence we think the phrase "potential

18   risk" should be changed to "the risk of NHL."  I think there is

19   case law that potential risks aren't enough and that actually a

20   specific risk --

21        **THE COURT:**  I think that's right.  I think "potential"

22   should come out, and it should say "the risk of NHL," right?

23        **MR. KILARU:**  Yeah, that's our position.

24        **MS. MOORE:**  Which line is that?  I'm sorry.

25        **MR. KILARU:**  Right here.

 1          **MS. MOORE:**  Potential risk.

 2      Can we -- to be consistent, Your Honor -- we have "cancer"

 3  down here.  Can we say "potential risk of cancer."

 4          **THE COURT:**  I think either one is probably fine.

 5          **MR. KILARU:**  Well, I think that actually goes to my

 6  second point, which throughout it should be NHL.

 7          **THE COURT:**  Okay.

 8          **MR. KILARU:**  It should be that Roundup lacks

 9  sufficient warnings of the risk of NHL.  And then I think

10  throughout where it says "cancer," I think substituting "NHL"

11  would be more appropriate, sticking with the nature of the

12  claim of the elements.

13          **THE COURT:**  I think that's probably right.

14          **MS. MOORE:**  That's fine, Your Honor.  Just as long as

15  we are consistent with it.

16          **THE COURT:**  So it would say -- I was also going to

17  propose taking out the first sentence from Instruction

18  Number 12 just because it is repetitive.

19          **MS. MOORE:**  The only thing I would hesitate on that,

20  Your Honor, then I think we would have to have a separate

21  instruction on the finding from Phase One.

22          **THE COURT:**  The first instruction.

23          **MR. KILARU:**  Yes, it is in the first instruction,

24  I believe.  It is "In the first phase of the trial, you

25  determined that Roundup was a substantial factor in causing

 1   Mr. Hardeman's NHL."

 2          THE COURT:  I think if we -- if I ended up taking away

 3   the design defect claim, then we would leave it in there.  But

 4   assuming not, I just think it becomes repetitive.  We have

 5   already said it, like, three times.

 6          MS. MOORE:  I understand what you are saying, Your

 7   Honor.

 8          THE COURT:  So I'm going to take that first sentence

 9   out of Instruction Number 12.

10          MR. KILARU:  Your Honor, just for preservation

11   purposes, the Bates argument I made earlier can we just say

12   that cuts across all three --

13          THE COURT:  Absolutely.

14          MR. KILARU:  -- so I don't have to repeat it.

15          THE COURT:  Absolutely.

16      It would say "In Phase Two Mr. Hardeman also claims that

17   Roundup lacked sufficient warnings of the risk of NHL."

18      Anything else on that?  And then I will -- then in

19   Element 2, I will just say that Roundup's NHL risk --

20          MR. KILARU:  Right.  I think you can just find and

21   replace that all the way down.

22          THE COURT:  Anything else on that instruction?

23          MR. KILARU:  Not from us.

24          MS. MOORE:  One second, Your Honor.

25          (Pause in proceedings)

1          **MS. MOORE:**  I do think that the word "potential" has

2    to be in there, Your Honor.  It is part of the form instruction

3    as well.  So I think it would read "lacks sufficient warnings

4    of potential risk of NHL."

5          **THE COURT:**  I mean, if you want it in there, that's

6    fine.  I don't know why you would ever want it in there when

7    the jury has already found that there is a risk.  I mean, the

8    model instruction presumes that the jury has not found --

9          **MS. MOORE:**  That's a fair point, Your Honor.  That's

10   fine.

11         **THE COURT:**  Okay.

12         **MS. MOORE:**  Then the only other changes to 12 would be

13   where it says "cancer," it would change to "NHL."

14         **THE COURT:**  Yes.

15         **MS. MOORE:**  Okay.  That's fine.

16      (Pause in proceedings)

17         **THE COURT:**  Okay.  Number 13?

18         **MS. MOORE:**  Your Honor, our only objection to this is

19   Subsection 6.

20         **THE COURT:**  Okay.

21         **MS. MOORE:**  I don't think that's required under the

22   model instructions.

23         **MR. KILARU:**  I think it's a way -- if I understand

24   that proposal correctly, Your Honor, it is a way of getting a

25   legal causation versus medical causation.

PROCEEDINGS

```
 1              THE COURT:  Yeah, I'm going back to the
 2   failure-to-warn instruction.  Hold on a second here.  Sorry.
 3   So you are objecting to that in 13 but not 12?
 4              MS. MOORE:  I missed that in 12.  I'm sorry, Your
 5   Honor.
 6              THE COURT:  Okay.
 7              MS. MOORE:  Give me one second, Your Honor.  I'm
 8   sorry.
 9              THE COURT:  Okay.  Remind me which -- where the model
10   instruction is again.
11              MR. KILARU:  It is for strict liability --
12              MS. MOORE:  1205 for strict liability to warn and it
13   is 12 --
14              MR. KILARU:  1222 for negligence.
15              THE COURT:  Okay.
16              MS. MOORE:  Let me just pull that up, Your Honor.
17              MR. KILARU:  Which one were you planning to start
18   with?
19              THE COURT:  Sorry.
20              MR. KILARU:  Just so I'm looking at the right one,
21   which one were you planning to look at?
22              THE COURT:  1205 right now, but I think the point is
23   the same for both, right?
24              MS. MOORE:  It is, Your Honor.
25              THE COURT:  This is just providing a more specific
```

1    causation instruction.  In other words, they have to be

2    instructed the lack of sufficient instructions or warnings was

3    a substantial factor in causing his harm.  Well, we already

4    know that Roundup was a substantial factor in causing his harm.

5    So most of that you have already proved.  The only thing that

6    is left to prove is that he wouldn't have used Roundup if -- if

7    he had been adequately warned.  So it is a way of sort of

8    pairing back what it is that you need to prove to establish

9    that element.  That's why I did it that way.

10          MS. MOORE:  I understand.  And the model rules simply

11   says -- and I understand our case is a little different from

12   that -- but that Defendant's failure to warn was a substantial

13   factor in causing Plaintiff's harm.  And I think when we are --

14   the inclusion that Mr. Kilaru wanted on Instruction Number 11,

15   which was to add that Roundup's failure to perform safely was a

16   substantial factor causing Plaintiff's harm, I think it is a

17   similar argument then on 12 and 13 going back to the model --

18   to the CACI instruction because this is -- I think this changes

19   it a little bit more than necessary, the way it is worded under

20   the Court's proposal.

21          THE COURT:  So you would propose something like -- and

22   I'm not sure -- in the context of this case, I'm not sure what

23   the difference is, but you might propose something like "The

24   failure to warn" -- the Number 6 would be "that the failure to

25   warn about the NHL risk was a substantial factor in causing

1   Hardeman's NHL"?

2         **MS. MOORE:**  I don't think you have to say the NHL

3   twice, Your Honor.  I think the way the model instruction is,

4   is it focuses on the Defendant's conduct, not on the

5   Plaintiff's conduct.  I think that changes -- I think the way

6   you have it written is that it is focused on the Plaintiff

7   versus the Defendant, and the model instruction says it would

8   be Monsanto's failure to warn or instruct was a substantial

9   factor in causing Mr. Hardeman's harm, instead of shifting it

10  over to what Mr. Hardeman should or shouldn't have been doing.

11        **THE COURT:**  So the failure to warn was a substantial

12  factor in causing Hardeman's harm?

13        **MS. MOORE:**  Correct, Your Honor.

14        **THE COURT:**  Hardeman's NHL.

15        **MS. MOORE:**  I think it should actually be harm in that

16  case because that would encompass all of his harm and losses in

17  the case.  It is not just that he got NHL.  I mean, they have

18  already found he got NHL.  This is -- we are now talking about

19  his damages too.  I think "harm," which is the word from the

20  model instruction, is more inclusive of that.

21        **THE COURT:**  But the harm is the cancer.  I mean --

22        **MS. MOORE:**  It is everything that goes with it too.

23        **THE COURT:**  -- the model instruction uses "harm"

24  because we don't know -- they haven't found it yet, right?  Or

25  they are being general about it, right?

PROCEEDINGS

1            **MS. MOORE:**  But they're -- but he is not -- he is

2       entitled to be compensated for his harms, not just that he had

3       NHL.  It is all the harms that go along with that.  And so I

4       think it would be better to leave it with the word "harm"

5       versus limiting it to "NHL."

6            **THE COURT:**  So you think it should be "The failure to

7       warn was a substantial factor in causing Mr. Hardeman's harm"?

8            **MS. MOORE:**  If we are going to continue to have

9       something about substantial factor in there or causation, I

10      think that's the proper way to do it versus saying that

11      Mr. Hardeman would not have used Roundup had Monsanto

12      adequately warned him of the cancer risk.  I think that shifts

13      it.  It shifts the focus from the Defendant to the Plaintiff.

14           And that would apply for 12 and 13.  I apologize, Your

15      Honor.  I missed that on 12.

16           **MR. KILARU:**  Your Honor, I don't think there is a

17      shift in focus because there is still the phrase "had Monsanto

18      adequately warned him," so I think it sort of ends up in the

19      same place.

20           **THE COURT:**  But what is -- what would be wrong with --

21      you know, I don't know how much any of this matters, but what

22      would be wrong with the failure to warn was a substantial

23      factor in causing Mr. Hardeman's NHL?  Or a substantial factor

24      in causing Mr. Hardeman's harm?

25           **MR. KILARU:**  I think it should be the failure to warn

1    about the risk of NHL as opposed to just a failure to warn.

2           THE COURT:  Yeah.

3           MS. MOORE:  That's fine.

4           MR. KILARU:  I don't know if there is a huge

5    difference between the two, but --

6           THE COURT:  Okay.

7           MS. MOORE:  And then that would be the same for 12 and

8    13?

9           THE COURT:  Presumably.  I can't imagine why there

10   would be a difference.

11          MR. KILARU:  Yeah.

12          MS. MOORE:  Okay.

13          THE COURT:  Do you have any comments about the failure

14   to warn about "The risk of NHL was a substantial factor in

15   causing Mr. Hardeman's harm"?  Do you have any --

16          MR. KILARU:  No, as long as we are not -- the argument

17   you articulated here is one that we intend to make.  So I

18   understand -- I don't understand the switch in wording to make

19   the arguments we want to make so --

20          THE COURT:  Okay.

21          MS. MOORE:  Nothing else on that instruction, Your

22   Honor.

23          THE COURT:  When you say "on that instruction"?

24          MS. MOORE:  On 12 or 13.

25          THE COURT:  Okay.  Anything else on 13?

1          **MR. KILARU:**  Couple things on 13, Your Honor.

2      I think the instruction, the model instruction use, I

3   think that's what has been carried over, uses the term that

4   Roundup was dangerous or was likely to be dangerous.  And I

5   think in this case, given the finding in Phase One, that should

6   be substituted, sort of like the previous instruction, with

7   language about NHL as opposed to dangers that haven't been

8   proven and aren't really relevant.

9          **THE COURT:**  I think that makes sense.

10          **MS. MOORE:**  So what would be the language then?

11          **THE COURT:**  So, for example, in Number 2, I think it

12   can be changed to something like, that Monsanto knew or

13   reasonably should have known of Roundup's NHL risk when used or

14   used in a reasonably --

15          **MR. KILARU:**  And you can say that users would not

16   realize the risk of NHL.  It sort of goes down the line.

17          **MS. MOORE:**  I mean, our position was that we want to

18   follow the model instruction, which is what the Court has put

19   in its proposal for Instruction Number 13.

20          **THE COURT:**  Yeah, but I'm saying that they have a good

21   point, that since we already have a jury finding that it caused

22   his NHL, and that this case is all about NHL risk and not about

23   any other dangers that Roundup might have -- might pose, what

24   is wrong with -- why wouldn't we want to change it to make it

25   more specific to the facts of this case?

PROCEEDINGS

1          **MS. MOORE:**  I'm always hesitant, Your Honor, to switch

2    it from what the model instruction says.  That's just my

3    hesitancy on that.  And so I would prefer the language of the

4    model instruction.

5          **THE COURT:**  Okay.  So -- I will change that throughout

6    so that it refers to the NHL risk.

7          **MS. MOORE:**  And, Your Honor, just to follow up on that

8    a little bit, yes, they found that it was a substantial factor

9    in causing Mr. Hardeman's cancer; but, you know, our arguments

10   are that it is genotoxic; that it causes oxidative stress.  I

11   mean, I don't think that limits us in any way.  But I just want

12   to make sure that it is clear that those are our arguments as

13   well.

14         **THE COURT:**  I didn't understand that.  I mean, this

15   case is only about whether Roundup causes NHL.  Are you saying

16   you want to -- you are going to argue that it is dangerous in

17   some other way?

18         **MS. MOORE:**  No.  I'm saying that -- that really goes

19   to the method as to how it causes NHL.  It's fine, Your Honor.

20       I understand the Court's ruling.  Our position is that it

21   should stay as the model instruction, but I understand the

22   Court's ruling.

23         **THE COURT:**  So --

24         **MR. KILARU:**  I think they are just going back to

25   our --

1          **THE COURT:**  Let's go through this instruction.

2          **MR. KILARU:**  Sure.

3          **THE COURT:**  -- and talk precisely about how we will

4     change the language just to make sure we are on the same page.

5          **MR. KILARU:**  So I think --

6          **THE COURT:**  Let's start at the beginning.

7          **MR. KILARU:**  Sorry.

8          **THE COURT:**  So "Hardeman also claims that Monsanto was

9     negligent by not using reasonable care to warn or instruct

10    about Roundup's NHL risk."

11         **MR. KILARU:**  You could also say about whether Roundup

12    could cause NHL.  I think that is a different phrasing.  Either

13    way it is the same point.  That is what we are talking about

14    with the warning.

15         **MS. MOORE:**  And, Your Honor, my concern is that is

16    there any case law to support Monsanto's position that the

17    manufacturer would have to have knowledge of the precise harm

18    versus just saying that the product is dangerous like the model

19    instruction says?

20         **THE COURT:**  Well, I don't know, but in this case there

21    has been no evidence that Monsanto had any indication that the

22    product caused any harm other than NHL.

23         **MS. MOORE:**  Well, part of that too is that there are

24    motions in limine to preclude any argument or references to any

25    other kinds of --

1            THE COURT:  Right.

2            MS. MOORE:  -- harms.

3            THE COURT:  The question now is what evidence came in

4     in this case.  And Mr. Hardeman got NHL.  And this whole case

5     has been about whether it causes NHL.

6            MS. MOORE:  Right.

7            THE COURT:  So --

8            MS. MOORE:  Right.  But now the focus is on Monsanto's

9     knowledge or what they should have known.  And, you know, the

10    language in the instruction does not require it to be a precise

11    harm.  And my question was what case law do they have to

12    support that?

13           THE COURT:  Okay.  If you want to write a brief about

14    that, you can.  We are not going to waste any time on that now.

15           MS. MOORE:  Okay.  Okay.  That's fine.  I mean, I was

16    fine with the way it was written, Your Honor, so --

17           THE COURT:  So "warn or instruct about Roundup's NHL

18    risk" or "about facts that"?

19           MR. KILARU:  I think it would actually end there.  I

20    mean, I think -- I guess you could say about facts that -- I

21    think it actually is just the NHL risk.  I mean, this

22    instruction -- we are -- given the phasing, there is one thing

23    we are talking about here.  I know the jury has made a finding

24    on that, but that should be the thing that the instruction

25    focuses on.  I would end it there.

1          **MS. MOORE:**  It could say "or about facts that made

2   Roundup likely to cause NHL."

3          **THE COURT:**  Could say that.  I would sort of defer

4   to -- I'm not sure that adds anything.  I think it is kind

5   redundant, but I also don't think it matters.  So, I guess, my

6   slight preference would be to just say "Mr. Hardeman also

7   claims that Monsanto was negligent by not using reasonable care

8   to warn or instruct about Roundup's NHL risk," given that the

9   jury has already found that Roundup carries an NHL risk.  Don't

10  you think that makes sense --

11         **MS. MOORE:**  That's fine, Your Honor.

12         **THE COURT:**  -- in this context?  Okay.

13     So to establish this claim, you must prove all the

14  following:  Monsanto manufactured, distributed or sold Roundup.

15     Two, that Roundup -- that Monsanto knew or reasonably

16  should have known that Roundup --

17         **MR. KILARU:**  You could say of Roundup's NHL risk.

18         **THE COURT:**  Of Roundup's NHL risk.

19         **MR. KILARU:**  When used or misused.

20         **THE COURT:**  That sounds good.

21     Does that sound good to you?

22         **MS. MOORE:**  That's fine, Your Honor.

23         **THE COURT:**  Okay.

24     In a reasonably foreseeable manner that Monsanto knew or

25  reasonably should have known that users did not realize that --

1          **MR. KILARU:**  The risk of NHL.

2          **MS. MOORE:**  Risk of NHL.

3          **THE COURT:**  -- risk of NHL.

4      That Monsanto failed to adequately warn of the risk, and I

5   think at that point we can just say "risk."  Everybody knows

6   what we are talking about.

7      That a reasonable manufacturer, distributor or seller

8   under the same or similar circumstances would have warned of

9   the risk.  And that -- and then we will change Number 6 to the

10  language that we are using for the -- in the previous

11  instruction, and that is, and Number 6, the failure to warn

12  about the risk of NHL was a substantial factor in causing

13  Mr. Hardeman's harm.

14         **MS. MOORE:**  Your Honor, Defendant's failure to warn.

15         **THE COURT:**  Okay.  Monsanto's --

16         **MS. MOORE:**  Monsanto's.

17         **THE COURT:**  -- failure to warn.

18         **MS. MOORE:**  Yes.

19         **THE COURT:**  Yeah, that's right.

20      Okay.  Anything else on Number 13?

21         **MS. MOORE:**  No, Your Honor.

22         **MR. KILARU:**  No, Your Honor.

23      Other than we have JMOL, Monsanto's failure to warn, we

24  also have the concern about inconsistent verdicts, which Your

25  Honor has already -- we cited Trejo, was a good example where

1    the Court says strict liability basically subsumes the failure

2    to warn.

3           THE COURT:  Right.  And so I guess the question for me

4    at this point is if -- it seems to me there is potentially a

5    concern about inconsistent verdicts.  But is it -- but the

6    Plaintiff -- like, let's put aside the design defect claim for

7    a second.  Let's talk about the two failure-to-warn claims.

8        I'm operating under the assumption -- and correct me if

9    I'm wrong -- I'm operating under the assumption that if the

10   Plaintiffs want to present these two theories to the jury -- I

11   mean, they are two viable, legal theories -- and if, by doing

12   so, they want to run the risk of inconsistent verdicts, that is

13   their problem.  It is not for me to deal with at the front end;

14   is that correct?  Or do I have some obligation to --

15          MR. KILARU:  I think that's right, Your Honor.  Other

16   than to say, you know, given the time and resources have been

17   expended on the case, we think the Trejo situation is possible.

18   And given the law in that case that the strict liability count

19   basically subsumes the negligent warning claim, I think it

20   would be within your discretion to just say, Let's charge on

21   the one and avoid that.  But I think as a general matter if

22   they want to pursue the two claims, that's their choice to do

23   so, subject to your --

24          THE COURT:  So the idea would be just to charge on the

25   strict liability?

1        **MR. KILARU:**  I believe -- I would have to look back at

2   it.  I believe, in Trejo the Court said that strict

3   liability -- there is no negligent failure to warn that

4   wouldn't be encompassed by the strict liability.  It might be

5   the other way around, but I'm pretty sure it is the strict

6   liability claim because it is about the state of the science

7   generally would subsume the reasonableness.  I can look that up

8   right now actually.

9        (Pause in proceedings)

10       **THE COURT:**  I think it was that -- I think it was the

11  opposite of what you were saying, if I remember correctly.  I

12  think they said that there is no way they could find for the

13  Plaintiff on negligent failure to warn and for the Defendant on

14  strict liability failure to warn.  And so in that respect the

15  verdicts are inconsistent.

16       And I remember thinking, Well, if the jury had found for

17  the Plaintiff on strict liability failure to warn but not

18  negligent failure to warn, that might have been okay.  That

19  might not have been inconsistent.  That's what I remember

20  thinking when I read that case, but it was a few days ago now.

21       **MR. KILARU:**  I think that's right, in terms of the

22  problem.  I'm just looking.  I thought I had seen this morning

23  language that one of the theories sort of encompasses the

24  other, but I can keep looking.

25       **THE COURT:**  I'm guessing, as I sit here now, that it

1    may be that -- if the jury came back for the Plaintiffs on

2    negligence but for the Defendant on strict liability, then we

3    would have a problem.

4            MR. KILARU:  Yes, at a minimum --

5            THE COURT:  And I think the verdict would need to be

6    thrown out then.

7            MR. KILARU:  I think that's exactly -- I believe

8    that's what happened in Trejo.

9            THE COURT:  But if they came back for the Plaintiff on

10   strict liability and for the Defendant on negligence, it's

11   not -- I mean, there may be an argument that those verdicts are

12   inconsistent, but it's not as obvious to me that they are.

13           MR. KILARU:  I would have to think about that a little

14   bit more, Your Honor, because I think embodied in the strict

15   liability is sort of an objective assessment of the state of

16   the science and what a reasonable manufacturer would know.  And

17   so if they are saying we acted reasonably in light of that, I

18   think there would be some inconsistency there as well.

19           THE COURT:  Well, and it -- that the -- for the strict

20   liability, it's that Roundup's NHL risk was known or knowable

21   in light of the scientific and medical knowledge that was

22   generally accepted in the scientific community at the time that

23   Mr. Hardeman was using Roundup.

24       I mean, it's either impossible or almost impossible to

25   imagine how the jury could find for the Plaintiff on that and

 1    not also find for the Plaintiff on Number 2 in the negligence.

 2         MR. KILARU:  Right.  I think in Trejo there is a quote

 3    here, which sort of caught my eye.  It basically says --

 4    talking about an earlier Court decision -- the known or

 5    knowable -- I think is exactly what you just said -- the known

 6    or knowable in light of language in the strict liability

 7    instruction at a minimum encompasses the knowing or has reason

 8    to know negligence instruction.

 9         Under a negligent standard a reasonable manufacturer would

10    not be charged with knowing more than what would come to light

11    from the prevailing scientific and medical knowledge.  I think

12    that is the same scenario.

13         THE COURT:  Right, which is why you could never find

14    for the Plaintiff on the negligence claim while finding for the

15    Defendant --

16         MR. KILARU:  Right.

17         THE COURT:  -- on the strict liability claim, but

18    it's -- what I'm not --

19         MR. KILARU:  I see the point.

20         THE COURT:  -- as clear on is could you -- could you

21    ever rationally find for the Plaintiff on the strict liability

22    but not the negligence.  And -- I think -- I'm sure there are

23    cases where you can.  And so the question is just -- is this a

24    case, given the evidence that has come in --

25         MR. KILARU:  Right.

1        **THE COURT:**  -- would those verdicts be inconsistent on

2   the facts of this case?

3        **MR. KILARU:**  Right.

4        **THE COURT:**  And the answer may be yes.  You know, I'm

5   not as sure though.

6        You know, I mean, I guess, as I sit here right now, you

7   know, unless I had something that sort of definitively, you

8   know, showed me that on the facts of this case, the verdicts

9   would be inconsistent if they came in for the Plaintiff on

10  strict liability and for the Defendant on negligence, I would

11  be pretty reluctant to take -- to be inclined to instruct the

12  jury on -- that on both theories.  I think if I were the

13  Plaintiffs, I would be reluctant to present both theories to

14  the jury because of the risk of an inconsistent verdict.  I am

15  not sure that's the --

16       **MR. KILARU:**  We will -- I will take a look and see if

17  there is anything tonight, but I understand the concern about

18  not charging them both.

19       **THE COURT:**  I don't think that's for me to do at this

20  point is my sense.  I will think a little bit more about it

21  tonight too.  But I think we should operate under -- and I will

22  look at your brief on design defect.

23       And we should all be operating on the assumption that

24  Number 11, 12 and 13 are all going to the jury.

25       **MS. MOORE:**  Right.  And we will also look at their

**PROCEEDINGS**

1    brief, Your Honor.  It came while we have been in court today.

2    We haven't had a chance to look at that too.  Okay.

3         **THE COURT:**  But have you looked at Trejo and given

4    thought to the --

5         **MS. MOORE:**  Yes, and we have had discussions about it,

6    Your Honor.

7         **THE COURT:**  All right.

8       Anything else on Number 13?

9         **MR. KILARU:**  Not from us, Your Honor.

10        **MS. MOORE:**  Your Honor, I have a copy of the *Arnold*

11   *versus Dow*, and I flagged the page.

12        **THE COURT:**  That's okay.

13        **MS. MOORE:**  Okay.  Thanks.

14        **THE COURT:**  Anything else from you on Number 13?

15        **MS. MOORE:**  No, Your Honor.

16        **THE COURT:**  Okay.  Number 14, anything from the

17   Plaintiffs on Number 14?

18        **MS. MOORE:**  Your Honor, our only concern here is --

19   let me find it -- is that obviously they are arguing -- we

20   talked about this a lot yesterday, and I don't want to rehash

21   it.

22        **THE COURT:**  Sorry, I didn't catch that.

23        **MS. MOORE:**  I said we talked about this a lot today,

24   and I don't want to rehash it.  But it is not a defense for

25   them to say the EPA approved the product and, therefore, we do

**PROCEEDINGS**

1   not -- we are not liable.  And so I have some concerns about

2   how we word Instruction Number 14.

3        **THE COURT:**  Well, that's why we say you don't

4   substitute your judgment for that of the -- you don't

5   substitute the agency's judgment for your own.

6        **MS. MOORE:**  And I -- I have no problem with that.  I

7   think where you end that, that remains true in Phase Two.

8        **THE COURT:**  Yes.

9        **MS. MOORE:**  But then you say "however."  And that's

10  where I get a little concerned because you may consider the

11  conclusions of those entities when assessing whether Monsanto

12  is legally responsible.  And I think that will allow them then

13  to argue that, Well, the EPA approved us so we are not

14  responsible.  And that's not correct under the law.  And so I

15  would ask that that sentence take -- come out.

16       **MR. KILARU:**  Well, Your Honor --

17       **THE COURT:**  What if we worded it differently?  I mean,

18  I understand your point.  But what if the wording were changed

19  to say, that, you know, the conclusions of these -- I'm just

20  speaking off the top of my head now -- but the conclusions of

21  these entities, along with all the other evidence, are relevant

22  to considering whether blah, blah, blah, blah.

23       **MS. MOORE:**  That's probably better, Your Honor.  It is

24  just my only concern, that doesn't preclude them -- you know,

25  again, you know, under the law it is not a defense that the EPA

 1   approved the label.  And so that's my concern with that.  I

 2   don't know if we need some type of limiting instruction on

 3   that.

 4            MR. KILARU:  I guess I can say two things, Your Honor.

 5   We are not going to argue we are not liable simply because the

 6   EPA approved the label and approved Roundup.  But I think much

 7   of Phase Two has been litigated on the correct premise that the

 8   EPA's actions and other regulator's actions are probative as to

 9   whether we acted reasonably, which goes to the liability.  So I

10   think that aspect of the instruction, appropriately given the

11   earlier instruction, that you can't just say because EPA

12   decided something you decide the same thing captures where we

13   are.

14            THE COURT:  I like the idea of dialing back the

15   wording a little bit just to make sure that we are not saying

16   anything that suggests to them that they -- you know, that -- I

17   wouldn't want this instruction to be misread as, Well, you are

18   not supposed to substitute the agency's judgment for your own

19   except on the following questions.  I want to make sure that

20   it's not --

21            MR. KILARU:  Yeah, I don't think it does that because

22   it says "may consider."  It doesn't say "shall consider" or

23   "you must consider."

24            MS. MOORE:  But --

25            MR. KILARU:  That would be not that different I think

1  from saying, you know, like all evidence is relevant, but I

2  think that it accurately describes how the jury should -- or

3  can approach this evidence.

4       MS. MOORE:  My concern is the phrase whether Monsanto

5  is legally responsible.  I think that's what can lead them to

6  think, Well, if the EPA has approved it and has reapproved it

7  or that it is registered with the EPA, well, then Monsanto's

8  not responsible.

9       THE COURT:  Yeah.

10      MS. MOORE:  That's the language that I think goes too

11  far.

12      THE COURT:  Yeah, I think -- so I mean, what are

13  the -- what are these conclusions relevant for, right?  They

14  are relevant -- they are relevant to whether the NHL risk was

15  known or knowable, right, between 1974 and 2012?

16      MS. MOORE:  Right.

17      THE COURT:  They are relevant to the -- it sounds like

18  from the discussion we had today, that we are all in

19  agreement -- that they are relevant to the amount of punitive

20  damages.

21      MS. MOORE:  Uh-huh.

22      THE COURT:  I suppose they are also relevant -- the

23  conclusions from pre-2012 are also relevant to punitive damages

24  generally, like eligibility for punitive damages.  And it seems

25  like we all agree that that's what these things are relevant

1    for; is that right?

2         So in other words, the -- you know, the conclusions that

3    these agencies reached pre-2012 and also to a lesser extent

4    post-2012 are relevant to whether the risk was known or

5    knowable; and the conclusions the agencies reached pre-2012 are

6    relevant to eligibility for punitive damages, and the

7    conclusions they reached post-2012 have relevance to

8    eligibility -- I mean, relevance to the amount of punitive

9    damages.

10        So does that -- does that sort of span the issues that --

11             **MS. MOORE:**  I think so, Your Honor.

12             **THE COURT:**  -- this is relevant for?

13        **MR. KILARU:**  Yes.

14             **THE COURT:**  So should we specify that?

15             **MS. MOORE:**  I mean, that might be --

16             **THE COURT:**  Or should we just have a more general

17    statement that is dialed back a little bit from the way it is

18    written now?

19        I mean, my inclination is that we should have a more

20    general statement that -- we shouldn't get into all those

21    specifics, but we should have a more general statement that is

22    dialed back from the way it is written now because your point

23    is well taken about the Monsanto legally responsible for the

24    harm.

25        So what if we just said, However, you make -- however, you

 1  know, the conclusions of those entities, along with the other

 2  evidence you have heard, are relevant to Phase -- to the issues

 3  you are considering in Phase Two, or something like that?

 4          MS. MOORE:  That's fine, Your Honor.  Something like

 5  that.

 6          MR. KILARU:  That's fine, Your Honor.

 7          THE COURT:  All right.  Let me write that down.

 8       However, the conclusions of these entities are relevant --

 9          MS. MOORE:  Were you going to add along with the other

10  evidence?

11          THE COURT:  Oh, yeah.

12       -- are relevant to the issues you are considering in

13  Phase Two.

14          MS. MOORE:  And then that would be the end of that

15  sentence?

16          THE COURT:  I think that's probably better than what I

17  had.

18          MS. MOORE:  Okay.

19          THE COURT:  Does that sound okay?

20          MR. KILARU:  That's fine.

21          THE COURT:  All right.

22       Number 15.

23          MR. KILARU:  Your Honor, just so I understand where

24  you are on this -- just for a preservation standpoint, we

25  would -- we believe that this instruction should also include

 1  legal facts about what the EPA is entitled to do and not do

 2  with respect to pesticides.  I think that is important

 3  information for the jury to consider, and I think it is

 4  probably something that, because it is a legal obligation,

 5  would be best addressed in the form of an instruction.

 6       **THE COURT:**  Understood.

 7     Okay.  Number -- anything else on 14?

 8       **MS. MOORE:**  No, Your Honor.

 9       **THE COURT:**  15?

10       **MR. KILARU:**  We have a couple things, Your Honor.  And

11  this folds into the table issue, so --

12       **THE COURT:**  Oh, yeah, the table.

13       **MR. KILARU:**  -- but we can do that first or last.  It

14  is up to you.

15       **THE COURT:**  I don't care.

16       **MR. KILARU:**  Maybe just going through in order.

17     In paragraph 3, we -- the second sentence says "The

18  parties have stipulated to the amount of economic damages," and

19  the stipulated amount is already included on the verdict form.

20  I think one concern we have with that sentence just as it is

21  and with the number on the form is that putting the number

22  there may suggest to the jury that they need to get to that

23  number.  So we propose putting into this instruction some

24  language about "If you determine that damages should be

25  awarded."

1      THE COURT:  Well, why don't we just -- I think we can

2  take out "and the stipulated amount is already included on the

3  verdict form," and -- but I think it is also fine to say --

4  have some language that says if you -- along the lines of what

5  you just suggested.  "If you conclude that damages should be

6  awarded."

7      MR. KILARU:  Yeah.  I just don't want the jury to

8  think that we are stipulating to entitlement as opposed to an

9  amount.

10      MS. MOORE:  And I understand that point, Your Honor.

11  That's how the instruction starts at the beginning, "if you

12  decide," and so that language is already there, the very first

13  thing they would read.

14      THE COURT:  The issue is, by the way -- I mean, there

15  is no argument that if they find -- if the jury finds that

16  Mr. Hardeman has met his burden of proving the various elements

17  of the design defect and the failure-to-warn claims, there is

18  no argument that he is still not entitled to any damages,

19  right?

20      MR. KILARU:  No.  I think if they check through the

21  form and get to the damages question --

22      THE COURT:  It is going to be at least 200,000,

23  whatever it is.

24      MS. MOORE:  Right.  That's why I don't think it is

25  necessary to add anything else here because we have that

 1    covered at the beginning.

 2        MR. KILARU:  I think our concern comes from, Your

 3    Honor, if the jury has this instruction, but then they see the

 4    verdict form that has one thing and only one thing filled out

 5    already in the damages section, that might lead them to think

 6    they need to get to that part of the form.

 7        I think another option would be to put the amount of the

 8    stipulation in here and not include it on the verdict form.  I

 9    just -- our concern is basically that the amount being on the

10    verdict form is very suggestive that the jury needs to get to

11    that part of the form.  And we want to think of ways to avoid

12    creating that suggestion.

13        THE COURT:  Okay.  Hold on.

14        (Pause in proceedings)

15        THE COURT:  Why don't we just say "The parties have

16    stipulated that if you find liability, the amount of economic

17    damages is," and then put it in there in the instruction?

18        MR. KILARU:  I think that would make more sense, Your

19    Honor.

20        MS. MOORE:  Well, that is not the stipulation, Your

21    Honor.  I mean, I don't want to parse words, but we -- the

22    stipulation is not "if you have found."  The stipulation is

23    that "these are his past medical expenses."

24        MR. KILARU:  I guess you could put the "if you have

25    found" language up front if that helps.  "If you have found

 1   they are entitled, the parties have stipulated to," and then

 2   everything else you said.

 3          **MS. MOORE:**  That would be better, Your Honor.

 4          **THE COURT:**  "If you find liability, the parties have

 5   stipulated that the amount of economic damages is" -- what is

 6   it again?

 7          **MS. MOORE:**  It is 200,000 -- let me get the verdict

 8   form.

 9          **THE COURT:**  There is no other form of economic

10   damages, right?

11          **MS. MOORE:**  That's right, Your Honor.  Well,

12   noneconomic.

13      $200,967.10.

14          **THE COURT:**  Okay.  So it will just say "If you find

15   liability, the parties have stipulated that the amount of

16   economic damages is $200,967.10."

17          **MS. MOORE:**  Okay.

18          **MR. KILARU:**  And, Your Honor, just on that point.

19   There was a portion of our JMOL brief that addressed what I

20   think were initially claimed as past and future medical

21   expenses and past and future lost earnings, and what we had

22   pointed out in the brief is that we didn't think there was any

23   evidence to support those claims.  So if that's the case,

24   then -- that's my point is you don't need to read that part.

25          **MS. MOORE:**  We are not making those claims, Your

1   Honor, so --

2              **THE COURT:**  Okay.  About future -- so is there --

3              **MS. MOORE:**  It is not even -- it wasn't even in our

4   instruction.  It is not in your instruction.

5              **MR. KILARU:**  My point was to save you some time

6   reading the last few pages of our brief -- I guess it is not

7   the last few pages -- but there are pages of our brief that

8   target future medical expenses and past and future loss

9   earnings.  And if they are not seeking those, then I don't

10  think we need to --

11             **MS. MOORE:**  We are not --

12             **THE COURT:**  They are not in the instruction?

13             **MS. MOORE:**  They are not.

14             **MR. KILARU:**  I don't believe so.

15             **THE COURT:**  Anything else on the compensatory damage

16  instruction?

17             **MR. KILARU:**  I think there might just be -- in the

18  interest of candor -- a typo in the next paragraph that says

19  "The amount of damages must include an award for each item of

20  harm."  I think that should be "Monsanto's conduct" not

21  "Mr. Hardeman's conduct."

22             **MS. MOORE:**  Good catch.

23             **THE COURT:**  Okay.  Anything else?

24             **MR. KILARU:**  On the next page, Your Honor, I don't

25  think there has been evidence about future physical pain or

 1   physical impairment.  So we chose to take that out, based on

 2   the testimony of Dr. Nabhan, everything else is supporting --

 3          THE COURT:  So future mental suffering, loss of

 4   enjoyment of life, inconvenience, grief, anxiety?

 5          MR. KILARU:  Yeah.  Those, I think -- I think there is

 6   no basis for the jury to find on those.  Obviously we disagree

 7   with that, but I think the physical pain and physical

 8   impairment, I think Dr. Nabhan testified that he is likely to

 9   be in remission.  That is a good thing for everyone.  So it

10   wouldn't be necessarily --

11          THE COURT:  It is almost impossible that it will come

12   back.

13          MS. MOORE:  He also testified, Your Honor, that he is

14   at increased risk for developing other types of cancer; and

15   there is no evidence to dispute that increased risk.  They

16   didn't bring anyone in here to dispute that evidence.  And so I

17   do think that that language should say that we have presented

18   sufficient evidence to the jury.

19          THE COURT:  That there is evidence -- there is

20   evidence for -- of future physical pain and future physical

21   impairment.

22          MS. MOORE:  Correct, Your Honor.

23          MR. KILARU:  I think the risk would actually fall more

24   into the other categories; that there is the possibility of

25   future cancer, which obviously is not a trivial thing, but that

1    would fall into the sort of mental and emotional distress and

2    loss of enjoyment of life as opposed to actually having some

3    certainty that these things would occur.

4         MS. MOORE:  The standard is not 100 percent certainty,

5    though, for future pain and suffering.  We have shown that he

6    is at an increased risk by expert testimony to develop other

7    types of cancer, and they have not disputed that evidence at

8    all.

9         THE COURT:  But what if there is a 2 percent risk that

10   he will develop some other type of cancer?  I mean, does that

11   mean -- obviously you can recover for that because it's going

12   to cause you anxiety; right?

13        MS. MOORE:  Uh-huh.

14        THE COURT:  But if there's a 2 percent risk that he's

15   going to develop some future ailment, can you recover for the

16   physical pain you will experience for that ailment?

17        MS. MOORE:  It's not about quantifying the chance or

18   the probability of that risk.  His testimony is that he is at

19   an increased risk.  It could be a 1 percent.  It could be a

20   99 percent.  He is at an increased risk because of the harm

21   that was caused by the non-Hodgkin's lymphoma.

22        And so because of that, then I think we have presented

23   sufficient evidence to go to the jury on future physical pain

24   and physical impairment, in addition to all the others that are

25   listed there.  Because if he's --

1      **THE COURT:**  You didn't answer my question.  Let's say

2  that there's a 2 percent risk that he's going to get some other

3  cancer because he had NHL.

4      **MS. MOORE:**  Well, the evidence, though, Your Honor, is

5  that he's at an increased risk and they did not explore and say

6  to him, "Okay.  Is that 1 percent or is that 99 percent?"

7      **THE COURT:**  But neither did you.  You didn't adduce

8  any evidence about --

9      **MS. MOORE:**  We don't have to, Your Honor.

10     **THE COURT:**  Okay.  So what is the percentage of --

11 like, how much more likely does it have to become that he's

12 going to get sick or suffer pain or something before you can

13 have this in?

14     **MS. MOORE:**  Well, I think we have to back up.

15     So his testimony was within a reasonable degree of medical

16 certainty, Mr. Hardeman is at an increased risk for developing

17 these other cancers.  So right there alone is sufficient then

18 to go to the jury on that claim; and --

19     **THE COURT:**  On the claim that he's going to develop --

20 that you should compensate him --

21     **MS. MOORE:**  You should compensate him for that.

22     **THE COURT:**  -- for the pain that he's going to

23 experience from the other cancers he's going to get?

24     **MS. MOORE:**  Right, along with the mental suffering and

25 the anxiety, that he has given that opinion.  Our burden is to

1   show that it's probable.  We have to provide expert testimony

2   on probable.  He testified that it was within a reasonable

3   degree of medical certainty.

4        **MR. KILARU:**  Your Honor, I think the next line is

5   actually the key one, and this is a requirement of damages,

6   that he has to prove that he is reasonably certain to suffer

7   that harm, understanding that it's possible or likely that

8   there's an increased risk; but to answer that question,

9   ultimately they have the burden.

10        **MS. MOORE:**  If you --

11        **MR. KILARU:**  I don't think there's a jury question on

12   whether he's reasonably certain to suffer that harm of future

13   physical pain and physical impairment, not the other things.

14        **THE COURT:**  Okay.  I understand.  I think we have to

15   take out "physical pain and physical impairment."

16        **MS. MOORE:**  And, Your Honor, we would just note our

17   objection to that based on the evidence that's come in.

18        **THE COURT:**  Okay.

19      All right.  What's next?

20        **MR. KILARU:**  Last, Your Honor, I think it's been

21   foreshadowed for the last few days, but we object to the

22   inclusion of the life expectancy tables.

23      So just to explain that, I think it's pretty commonplace

24   in cases involving future economic damages to use life

25   expectancy numbers because, say, it's lost earnings in the

1    future, you calculate how long that's likely to go.

2         But the economic damages are actually a fixed amount here.

3    We just talked about that.  And so all we're talking about at

4    this point, as I understand it, in the future are noneconomic

5    damages.

6              THE COURT:  Okay.

7              MR. KILARU:  And we don't think there's a basis for

8    using an actuarial table of life expectancy to try to come up

9    with a number for noneconomic damages.  I don't -- I think it

10   would inevitably be conjecture to say something like "Pick a

11   random number and then pick it out over the course of the next

12   14 years."

13        That type of argument, you know, we had a case that we

14   found that's called *Bakke versus Union Carbide*, and there were

15   some other problems there; but that case is a 2007 Westlaw

16   4206739, and it basically reversed --

17             THE COURT:  What's that?  Westlaw 420?

18             MR. KILARU:  4206739.

19        And in that case there were a few impermissible arguments

20   made.  There was definitely this Golden Rule argument that you

21   should imagine what you would do over the next 50 -- I don't

22   know what the number was; but they also argued something to the

23   effect of "Take, you know, $500,000 and carry that forward for

24   the rest of his life expectancy.  That's the -- that's the

25   noneconomic loss he's going to have in the future."

1    And that type of argument, we think, isn't permissible and

2    we don't think that the use of the life expectancy table would

3    be appropriate because it would suggest there's some kind of

4    formulaic mathematical way to calculate those damages when, in

5    fact, that's not the case.

6          **MS. MOORE:**  Your Honor, under the actual Ninth -- I'm

7    sorry.  Under the CACI instructions under 3932, the life

8    expectancy, it states that you use those -- it says (reading):

9          "If you decide that the plaintiff has suffered

10         damages that will continue for the rest of his life, you

11         must determine how long he will probably live."

12         That's if you have the instruction, you don't take

13   judicial notice.  But it's about damages.  It does not break it

14   down between noneconomic and economic.

15         I've actually never had this happen in a case.  I've

16   always had the parties agree to the life expectancy table,

17   which we provided to them in January on this.  But, I mean,

18   this is something that the Court can take judicial notice of

19   from the life expectancy tables.  And, I mean, it's very

20   clearly set forth in CACI 3932.

21         **THE COURT:**  Do you have any cases where there were

22   only noneconomic damages being sought going forward and this

23   life expectancy table was given?

24         **MS. MOORE:**  I'd have to go back and look, Your Honor.

25   They do cite to -- in the CACI form instructions, they do cite

1   to *Levy* on pain and suffering, and the cases that they're

2   talking about is that mortality tables are admissible to assist

3   the jury but they -- and it goes on to say that, you know, the

4   life expectancy of the deceased -- well, in that case, that's a

5   deceased so that doesn't matter.

6        In my experience, and I'll go back and look at case law,

7   Your Honor, but in my experience, because I've never had this

8   be a disputed issue, is that you can use life expectancy tables

9   if you can show that there are future damages, and I've never

10  seen it where it's limited solely to economic damages versus

11  noneconomic damages.

12        **THE COURT:**  Okay.  Why don't you take a look and see

13  if you can find any cases --

14        **MS. MOORE:**  That's fine, Your Honor.

15        **THE COURT:**  -- that stand for the proposition that the

16  life expectancy table is appropriate to be given in a situation

17  where the plaintiff is only seeking future noneconomic damages.

18        **MS. MOORE:**  Okay.  We will, Your Honor.  We'll do

19  that.

20        **THE COURT:**  Why don't you file that by 8:00 o'clock.

21  File something on that.  You know, you don't even have to

22  have -- you don't have to have briefing.  You can just file a

23  letter brief.

24        **MS. MOORE:**  Just send you the cases?

25        **THE COURT:**  File a letter identifying the cases.

PROCEEDINGS

1          **MS. MOORE:**  Okay.  We will do that.  Thank you,

2     Your Honor.

3          **THE COURT:**  Assuming it goes in, is 1430 right?  Is

4     that really the life expectancy of a --

5          **MS. MOORE:**  A 70-year-old male?  Yes.

6          **THE COURT:**  I didn't think it was that high.

7          **MS. MOORE:**  Yes, it is.

8          **THE COURT:**  Okay.  Is that right?  14.3?

9          **MS. MOORE:**  Yes.

10         **THE COURT:**  Okay.  Do you agree?

11         **MR. KILARU:**  Yeah, I see it on the table, so...

12         **THE COURT:**  Okay.  Anything else on that instruction?

13         **MS. MOORE:**  No, Your Honor.

14         **MR. KILARU:**  No, Your Honor.

15         **MS. MOORE:**  I'm glad Mr. Hardeman is not here, though.

16         **MR. KILARU:**  It's just average.  It could be a lot

17     higher.

18         **THE COURT:**  Okay.  Nothing else on compensatory

19     damages from either of you?

20         **MS. MOORE:**  No, Your Honor.

21         **MR. KILARU:**  No.

22         **THE COURT:**  All right.  Number 16?

23         **MR. KILARU:**  We had one tweak, Your Honor.

24         **THE COURT:**  Okay.

25         **MR. KILARU:**  The first sentence says that Mr. Hardeman

1  must prove his eligibility for punitive damages by clear and

2  convincing evidence, and our worry about that is just the clear

3  and convincing evidence is actually too limited to certain

4  considerations when, in fact, sort of all of the elements

5  they're going to hear about on the next page about malice and

6  oppression and fraud and managing agent liability, corporate

7  liability --

8        **THE COURT:**  So you want it to say "He must prove

9  punitive damages by clear and convincing evidence"?

10       **MR. KILARU:**  I think that would be more appropriate.

11       **MS. MOORE:**  That's fine, Your Honor.

12       **THE COURT:**  Okay.  And nothing else on 16?

13       **MS. MOORE:**  Not from us, Your Honor.

14       **THE COURT:**  All right.  17?

15       **MR. KILARU:**  We had a couple things, Your Honor.  We

16  can start with the fraud issue that you had raised.

17       **MS. MOORE:**  Your Honor, we're fine with not including

18  fraud.

19       **THE COURT:**  Okay.

20       **MR. KILARU:**  Okay.

21       **THE COURT:**  That was easy.

22       **MR. KILARU:**  If there's no fraud claim, so just to

23  take our things in order, I think number A5 should be pulled

24  out, the trickery or deceit, which I think is relevant to a

25  fraud claim but not to sort of a malice or oppression claim.

PROCEEDINGS

1          **MS. MOORE:**  I'm not aware of the case law on that,

2   Your Honor.  I will note that in the *Johnson* case they did not

3   have the fraud either and they did include the trickery or

4   deceit factor as well.

5          **THE COURT:**  Let me just ask.  Are you planning on

6   arguing that Monsanto acted with trickery or deceit?

7          **MS. MOORE:**  I think they acted with deceit, I do.

8          **THE COURT:**  Okay.

9          **MS. MOORE:**  I think we have evidence in with the

10  Williams ghostwritten article and that's deceitful.  I think

11  that evidence has been presented.

12         **THE COURT:**  All right.  I think it's appropriate to

13  leave that in.

14         **MR. KILARU:**  Okay.

15         **THE COURT:**  What else?

16         **MR. KILARU:**  On the next page, Your Honor -- oh,

17  actually, let me start with -- this is not an objection.  This

18  is just to tee up an issue on the next page.

19     So in 5 -- sorry -- in A -- in B Your Honor used the

20  phrase "is there a reasonable relationship between the amount

21  of punitive damages and Mr. Hardeman's harm or between the

22  amount of punitive damages," so on and so forth, "that Monsanto

23  knew was" -- "potential harm that Monsanto knew was likely to

24  occur."  And we think for the "potential harm" piece that is

25  the appropriate standard, that it has to be potential harm that

1    Monsanto knew was likely to occur.

2        But then on the next page when you started -- the next

3    sentence starts, "A punitive damages award may punish the

4    defendant only for conduct that harmed or potentially could

5    have harmed the plaintiff," I think it would be more

6    appropriate to add in something about the likely to -- the

7    likely harm as opposed to just potential harm.

8        Does that make sense?  So it would read something like "A

9    punitive damages award may punish the defendant only for

10   conduct that harmed the plaintiff or potential harm that was

11   likely to have occurred because of Monsanto's conduct."

12          THE COURT:  "That harmed the plaintiff"?

13          MR. KILARU:  Right, or "potential harm to the

14   plaintiff that would likely to have occurred because of

15   Monsanto's conduct."

16       It just kind of mirrors the language somewhat from the

17   previous page.  And we think the law is a case called *Simon* --

18   it's 113 P.3d 63 -- actually requires for potential harm it

19   would be likely as opposed to just potential in the abstract.

20          THE COURT:  Any objection to that change?

21          MS. MOORE:  I think it just becomes confusing,

22   Your Honor.  I think the way it was written was fine.

23          THE COURT:  So what he's proposed is "A punitive

24   damages award may punish the defendant only for conduct that

25   harmed the plaintiff or for potential harm that was likely to

1    have occurred"?  Is that what you proposed?

2         MR. KILARU:  Yeah.  I'm trying to think of a better

3    way to phrase it than what I just said.  I mean, maybe it would

4    be "conduct that harmed or potentially likely could have harmed

5    the plaintiff."

6         MS. MOORE:  That's just basically the same thing that

7    was already there.

8         THE COURT:  Well, he's trying to insert the word

9    "likely" in.

10        MR. KILARU:  Yeah, that's it.  I think my first

11   phrasing was a much more inelegant way of doing that, but I

12   think that that is an important aspect of the "potential harm"

13   piece.

14        THE COURT:  So do you have any objection to the

15   concept of inserting that "likely" into that sentence?

16        MS. MOORE:  Where would "likely" go?

17        THE COURT:  I don't know exactly.

18        MR. KILARU:  I think you could just say "potentially

19   likely could have harmed" or "potentially likely could have

20   harmed the plaintiff," perhaps.

21        MS. MOORE:  I think "potentially" --

22        THE COURT:  Why not just say -- well, this

23   instruction...

24                         (Pause in proceedings.)

25        THE COURT:  "Punitive damages and potential harm that

PROCEEDINGS

1    Monsanto knew was likely to occur because of its conduct."

2        MR. KILARU:  Yeah, I think the first proposal was just

3    to take that phrase kind of wholesale and put it at the end.  I

4    recognize that makes it a lot longer, but that might avoid the

5    weirdness of "potentially likely could."

6        MS. MOORE:  You could say -- you know, I don't think

7    it's necessary, but you could say "or potentially could have

8    likely harmed."  I mean, this is ridiculous really.

9        MR. KILARU:  I don't think it's that ridiculous.  I

10   think it's pretty important, but I get the wording could be a

11   little ridiculous.

12       MS. MOORE:  I agree that jury instructions are

13   important, but I think the way it was written covered the issue

14   that you're raising.

15       MR. KILARU:  I guess my concern was as it's phrased,

16   is that it takes out the part about how we, Monsanto, had to

17   know that potential harm was likely to occur.  That's sort of

18   the nutshell point of it.

19       THE COURT:  I mean, model instructions are often

20   wrong, especially in California, but what does the model

21   instruction say?  3945, is that what it is?

22       MR. KILARU:  Yeah, this is 3940.  This is not in the

23   model because I think the purpose of this paragraph was

24   something we had proposed inserting to address both the 2012

25   issue and then how you consider post 2012 issues.  So it's not

1    sort of normally -- well, I can tell you what our language was.

2         **MS. MOORE:**  Yeah.  We had ended it with -- our

3    proposal, Your Honor, was after number (c) -- or subsection

4    (c), that you would just say "Punitive damages may not be used

5    to punish Monsanto for the impact of its alleged misconduct on

6    persons other than Mr. Hardeman."  And so we didn't have any of

7    these last three paragraphs in our proposal.

8         **MR. KILARU:**  So that actually is one of my next

9    points, which is I think that should be --

10        **THE COURT:**  That's not included in there.

11        **MR. KILARU:**  I think that should be in there.

12        **THE COURT:**  Right.

13        **MR. KILARU:**  But I don't think that goes to this point

14   about likely -- about potential harm being likely.

15        **THE COURT:**  This was the paragraph -- this was the

16   post-use conduct paragraph.

17        **MR. KILARU:**  Yeah.

18        **THE COURT:**  Okay.  So I think we can simplify this.

19   So what I would propose is simply to cross out --

20        **MS. MOORE:**  The first sentence?

21        **THE COURT:**  -- the first sentence because --

22        **MR. KILARU:**  Oh, I see.  Okay.

23        **THE COURT:**  And then --

24        **MS. MOORE:**  You can just start with "when."

25        **MR. KILARU:**  Yeah.

1              THE COURT:  Then you say "When deciding whether award

2       punitive damages" -- well, so we need to tweak this based on

3       our discussion earlier.

4              MR. KILARU:  Right.

5              THE COURT:  So there are a couple things flying around

6       in the air right now.  One is you want to include an

7       instruction that the jury can't punish Monsanto for harm caused

8       to others --

9              MR. KILARU:  Yes.

10             THE COURT:  -- only to Mr. Hardeman.  That seems

11      appropriate.  It was included in the plaintiff's original

12      proposed instructions.  I believe it's in the model.  I know

13      it's in the Ninth Circuit model.  That seems appropriate.

14          And so we have to work to figure out how to incorporate

15      that, and then tweak this language about 2012 to account for

16      the discussion -- kind of the meeting of the minds that I

17      believe we reached earlier today, which is that in deciding

18      whether the conduct was, you know, sufficiently reprehensible

19      to warrant punitive damages, only the conduct pre-summer 2012

20      can be considered.

21          When you're considering the amount, you know, you can

22      consider -- I think we might just be able to say "You can

23      consider post-summer 2012 conduct" because we've already sort

24      of very carefully limited what evidence came in of post-2012

25      conduct.

 1          MR. KILARU:  Right.

 2          THE COURT:  So now that we've limited what evidence

 3   has come in on post-2012 conduct, I think we can just say that

 4   "you can consider post-2012 conduct in determining the amount."

 5   And what that allows you to do is argue --

 6          MS. MOORE:  Right.

 7          THE COURT:  -- that -- you know, you can make your EPA

 8   argument --

 9          MS. MOORE:  IARC.

10          THE COURT:  -- you can make your IARC, and they still

11   haven't done a study.

12          MS. MOORE:  Or Zhang, or whatever has come out

13   afterwards, and said, "Look, all the stuff keeps coming and

14   they still don't change their behavior."

15          MR. KILARU:  I think a way -- I'm sorry.  Go ahead.

16          MS. MOORE:  I was going to say, the only thing is that

17   where we say "You should only consider Monsanto's conduct up

18   until summer," I think it should be "through the summer"

19   because he did testify that he went through the summer of 2012.

20   So --

21          THE COURT:  Okay.

22          MS. MOORE:  -- just to change that "up until."

23          MR. KILARU:  So, Your Honor, just to put all these

24   threads together, I think this is off the top of my head, but

25   one potential idea would be, "When deciding whether to award

1   punitive damages -- because that's the eligibility point --

2   "you should only consider Monsanto's conduct through summer

3   2012, which is when Mr. Hardeman stopped using Roundup.  Any

4   evidence you may have heard concerning" -- I guess you could

5   just say "conduct post-summer 2012" because I think the EPA

6   pieces may fold into here as well, "can only be considered in

7   determining the amount of punitive damages.

8           THE COURT:  Okay.  So say that again.

9           MR. KILARU:  Sure.

10          THE COURT:  "Any evidence you may have heard regarding

11  conduct"?

12          MR. KILARU:  Yes, "conduct post-summer 2012 can only

13  be considered in determining the amount of punitive damages."

14          THE COURT:  And then you might say "In addition,

15  punitive damages" -- "In addition," and then the sentence --

16          MR. KILARU:  Yeah.  So it's -- actually I looked just

17  now, it's the same in ours and theirs, so I think from either

18  side you could take it, but I believe it's -- I'll just use

19  this --

20          MS. MOORE:  I would add it at the end of the next

21  paragraph, though.  I think that flows a little bit more.

22          THE COURT:  Okay.

23          MR. KILARU:  That's fine.  Yeah.  I think, yeah, both

24  sides I believe had the same language, which is --

25          MS. MOORE:  It's straight from the model.

1          **MR. KILARU:**  Yeah.  "Punitive damages may not be used

2    to punish Monsanto for the impact of its alleged misconduct on

3    persons other than Mr. Hardeman."

4          **THE COURT:**  Okay.

5          **MS. MOORE:**  Yeah.  And I'm fine if he just wants to

6    stick that at the end of that next paragraph, Your Honor.

7          **THE COURT:**  All right.  So the idea -- so let's -- so

8    we go through these various elements A, B, C; and then after

9    that, you have a paragraph that says (reading):

10             "When deciding whether to award punitive damages, you

11          should only consider Monsanto's conduct through summer

12          2012, which is when Hardeman stopped using Roundup.  Any

13          evidence you may have heard regarding conduct post-summer

14          2012, can only be considered in determining the amount of

15          punitive damages."

16    And then you go --

17          **MS. MOORE:**  Can you --

18          **THE COURT:**  Sorry?

19          **MS. MOORE:**  I was just going to say, can you add

20    "Monsanto's" in front of "conduct"?

21          **THE COURT:**  Oh, no.  The idea would be to --

22          **MS. MOORE:**  Oh, any conduct.  Okay.

23          **THE COURT:**  -- take that out because it could be EPA

24    conduct, it could be --

25          **MS. MOORE:**  Okay.  That's fine.

PROCEEDINGS

1      **THE COURT:**  And then -- so the next paragraph, the one

2  that starts "Punitive damages are not intended to compensate

3  Mr. Hardeman," at the end of that paragraph add the sentence

4  about punitive damages only being -- you can't award punitive

5  damages for harm done to other people.

6      **MS. MOORE:**  Right.  That's fine.

7      **THE COURT:**  Is that correct?

8      **MR. KILARU:**  Yep.

9      **MS. MOORE:**  Yes.

10     **THE COURT:**  Should that be a separate paragraph or

11 should it be --

12     **MS. MOORE:**  I think it can go in that one, Your Honor.

13     **MR. KILARU:**  I think it's fine either way.

14     **THE COURT:**  Okay.  Anything else on the punitive

15 damages instruction?

16     **MS. MOORE:**  Your Honor, we would just object to that

17 last paragraph.  We don't think that that's necessary.

18     **THE COURT:**  The one about mitigating evidence?

19     **MS. MOORE:**  Yes.

20     **THE COURT:**  Okay.  And I think based on the discussion

21 we had, that it is appropriate, and so that will stay in.

22     **MR. KILARU:**  I think that was the last thing we had on

23 the instructions, Your Honor.

24     **THE COURT:**  All right.  Anything else from the

25 plaintiff on the instructions?

PROCEEDINGS

1          **MS. MOORE:**  No, Your Honor.

2          **THE COURT:**  Okay.  Verdict form?

3          **MS. MOORE:**  Your Honor, we do not have any changes to

4    the verdict form.

5          **THE COURT:**  Okay.

6          **MR. KILARU:**  So we have --

7          **THE COURT:**  I want to make a note to ourselves to make

8    sure the numbering stays the same.  I think the numbering is

9    going to stay the same, but in terms of cross-referencing the

10   instruction numbers.

11         **MS. MOORE:**  Right.

12         **THE COURT:**  And then you wanted -- in light of the way

13   we've changed the instructions, are you okay with keeping the

14   number in on past economic loss?

15         **MR. KILARU:**  I actually think part of my proposal to

16   put it in the instructions was to take it out of here for the

17   reasons of suggestiveness.  I mean, I think they will use these

18   things side by side.  So if they get to this question on the

19   form, they can go to the instruction; but I think having it on

20   the form we think is a little suggestive that they should get

21   there.

22         **THE COURT:**  What happens if they award $1 million in

23   economic damages?

24         **MR. KILARU:**  I think we stipulated to the amount of

25   economic damages, so it would get reduced to 200,000, whatever

 1    the number is.

 2         **THE COURT:**  Okay.  That's fine.

 3      Any objection?

 4         **MS. MOORE:**  No, Your Honor.

 5         **THE COURT:**  Okay.

 6      All right.  So you're okay with the verdict form?

 7         **MR. KILARU:**  Two things.

 8         **THE COURT:**  Okay.

 9         **MR. KILARU:**  So, first, I sort of gather that

10    Your Honor has ruled on this, but we have proposed something

11    more akin to a special verdict form as opposed to a general

12    verdict form.

13         **THE COURT:**  My general philosophy is unless there's a

14    really strong reason to do special verdicts, I think it's

15    generally preferable to do a general one.  So --

16         **MR. KILARU:**  The only thing -- understanding that,

17    Your Honor, I think -- I just note that we would prefer the

18    special for record purposes; but the one thing I propose is

19    instead of Question 1, there's a sentence and then it says "See

20    Instruction Number 11," that it would be more appropriate to

21    say something like "by establishing the elements in Instruction

22    Number 11" because in order to get the verdict, they need to go

23    through the elements on 11.  It's not just sort of look back at

24    them and determine.

25         **THE COURT:**  I mean, we're saying "See Instruction 11"

1  and it tells them in Instruction 11 that he has the burden of

2  proving these elements.

3       **MR. KILARU:**  Right.  I just -- given that we're not

4  doing a special verdict form, I think it would be appropriate

5  to tell them that they should find the elements in that

6  instruction as opposed to sort of a general reference to the

7  instruction.

8       **THE COURT:**  Okay.  I mean --

9       **MS. MOORE:**  I think that's redundant.

10      **THE COURT:**  I suppose that argument can be made in

11  every case, but I do think it's nice to refer them to the

12  instruction, which is helpful because it will remind them of

13  the burden and all that; but I think that makes the sentences a

14  little too complicated to -- a little too long and a little too

15  complicated.  So I think it's better to leave it the way it is.

16      **MR. KILARU:**  Okay.

17      Second, and my colleague has flagged this for me, but I

18  think in both 2 and 3, just to track the decisions that we made

19  earlier, instead of "potential risks" in 2 and "cancer risk" in

20  3, it should be "the risk of NHL."

21      **THE COURT:**  "Lacks sufficient warnings of the risk of

22  NHL"?

23      **MR. KILARU:**  Yes.

24      **THE COURT:**  "The risk of NHL."

25      **MR. KILARU:**  And then in 3, instead of "cancer risk",

1  Roundup's NHL" --

2           THE COURT:  "NHL risk"?

3           MR. KILARU:  Yes.

4           MS. MOORE:  And, Your Honor, I just want to make sure

5   because the testimony and then their request for admission is

6   warning of cancer, and I don't think they would do this, but I

7   just want to put it out there, that they're not going to stand

8   up and say, "Well, you know, they didn't ask about whether if

9   it had said NHL..."  I mean, NHL is a form of cancer.  We're

10  narrowing it much more than I'd anticipated.

11          THE COURT:  I don't understand what they would --

12          MS. MOORE:  I mean, I thought we would --

13          THE COURT:  What is it you're worried they're going to

14  argue?  Are you worried they're going to get up there and say,

15  "Hey, they never said we had to have an NHL warning, they just

16  said we had to have a cancer warning"?

17          MS. MOORE:  Right.

18          THE COURT:  That would shoot the punitive damages

19  verdict up higher than the *Johnson* verdict.

20          MR. KILARU:  We will not be making that argument to

21  the jury.  I note as an aside, that we have an argument that

22  there's insufficient evidence of what the warning should have

23  been, but that's sort of a legal argument and separate than I

24  think we would argue to the jury.

25          THE COURT:  Okay.  Anything else on the verdict form?

PROCEEDINGS

 1          **MR. KILARU:**  Just one other thing, Your Honor.   On

 2   Question 5, this alludes to again what we were just talking

 3   about.

 4          **THE COURT:**  Yes.

 5          **MR. KILARU:**  It says "entitled to punitive damages

 6   based on Monsanto's conduct during the time."

 7          **THE COURT:**  Yes.

 8          **MR. KILARU:**  We think that needs to be limited to

 9   Mr. Hardeman because it's not sort of general conduct.  It goes

10   to the question of, you know, it has to be tied to conduct that

11   either -- and I don't want to get into the sort of long phrase

12   we had, but it's the conduct that either harmed Mr. Hardeman or

13   is likely to harm Mr. Hardeman, not just conduct generally.

14          **THE COURT:**  Yes.  I'm wondering if we should just say

15   "Did Mr. Hardeman prove by clear and convincing evidence" --

16          **MR. KILARU:**  Oh, I see.

17          **THE COURT:**  What?

18          **MR. KILARU:**  I'm sorry.  I think I envisioned where

19   you were going, but I shouldn't have cut you off.

20          **THE COURT:**  Did he prove by clear and convincing

21   evidence that he was entitled to punitive damages?

22          **MR. KILARU:**  Yes.  That makes sense.

23          **MS. MOORE:**  That's fine, Your Honor.

24          **MR. KILARU:**  That's all.

25          **THE COURT:**  And anything else on this verdict form.

 1          **MR. KILARU:**  That was all from us, Your Honor.

 2          **MS. MOORE:**  No, Your Honor.

 3          **THE COURT:**  Okay.  Anything else to discuss?

 4          **MS. MOORE:**  Your Honor, the only thing is I would ask

 5  how much time we have and if I could have an hour for closing.

 6          **THE COURT:**  You can have an hour for closing.

 7          **MS. MOORE:**  Thank you, Your Honor.

 8          **THE COURT:**  So is that to say an hour -- are you

 9  asking for an hour total?

10          **MS. MOORE:**  I'd like an hour to close and then 15

11  minutes for rebuttal.

12          **THE COURT:**  That's fine.

13          **MS. MOORE:**  Thank you, Your Honor.

14          **THE COURT:**  And I'll inform the jury that that's how

15  much -- how long you're anticipated to take in advance.

16          **MS. MOORE:**  I will be cognizant of that.

17          **THE COURT:**  Oh, yes, slides, closing argument slides.

18  When am I getting those?

19          **MR. KILARU:**  We could -- I think was it 7:00 a.m. last

20  time, Your Honor, the morning of?  We could do that again or --

21  I guess are we starting earlier than 7:00?  No.  I think --

22          **MS. MOORE:**  What time do you want us here tomorrow?

23          **THE COURT:**  We're starting at 8:30, and I guess I

24  should receive the closing argument slides by 7:30.

25          **MS. MOORE:**  Okay.  That's fine, Your Honor.  Thank

1   you.

2        **THE COURT:**  And that way I can review them and

3   hopefully we won't have anything to argue about this time, but

4   that will give you a little time to tweak it.

5        **MS. MOORE:**  Okay.  Sounds good.  Thank you,

6   Your Honor.

7        **THE COURT:**  All right.

8        **MR. KILARU:**  Your Honor, I just got a message on one

9   factual point that goes, I think, two hours ago at this point;

10  but you had asked about the theory of design defect in *Johnson*,

11  and I don't believe, based on what my colleagues are telling

12  me, that in *Johnson* it was argued that Roundup shouldn't be

13  sold to residential users.

14       There was some evidence, we would argue insufficient

15  evidence in that proceeding, but the evidence from Dr. Sawyer

16  that the combination of the particular surfactants used made

17  Roundup more defective than some other version of the product,

18  but I don't believe the sort of "ban the product" argument was

19  made there.

20       **THE COURT:**  Yeah.  I mean, my recollection of -- I

21  remember flipping through it like last week or something and

22  seeing that they argued to the jury in *Johnson* that the reason

23  it was defective is it didn't have a warning.  That's my

24  recollection, but it sounds like -- I mean, I still don't fully

25  understand what they're arguing, but it sounds like they're not

**PROCEEDINGS**

 1   arguing that this time.  They're arguing that it was just

 2   simply dangerous.

 3            **MS. MOORE:**  Are we going back to that?

 4        It's defective in the sense that it's not something that

 5   an ordinary consumer would expect to get cancer from.

 6            **THE COURT:**  Okay.  All right.

 7            **MS. MOORE:**  All right.  Thank you, Your Honor.

 8            **MR. KILARU:**  Thank you, Your Honor.

 9            **MS. MOORE:**  We'll see you in the morning.

10            **MS. MATTHEWS JOHNSON:**  Thank you, Your Honor.

11            **MS. MOORE:**  What time do you want us here?  8:00?

12            **THE COURT:**  I want you here by quarter to 8:00.

13            **MR. KILARU:**  And did you want the slides by 7:00,

14   Your Honor?

15            **THE COURT:**  Slides by 7:30.

16            **MR. KILARU:**  Oh, okay.  I was just going to say...

17                  (Proceedings adjourned at 5:12 p.m.)

18                        ---oOo---

1

2

3                          **CERTIFICATE OF REPORTERS**

4          I certify that the foregoing is a correct transcript

5   from the record of proceedings in the above-entitled matter.

6

7   DATE:   Monday, March 25, 2019

8

9

10

11   _____

12          Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                    U.S. Court Reporter
13

14

15   _____

16            Marla F. Knox, RPR, CRR
                  U.S. Court Reporter
17

18

19

20

21

22

23

24

25