Volume 20

Pages 2683 - 2805

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

EDWARD HARDEMAN,                    )
                                    )
            Plaintiff,              )
                                    )
  VS.                               )      **NO. C 16-00525 VC**
                                    )
MONSANTO COMPANY,                   )
                                    )
            Defendant.              )
_____)


                              San Francisco, California
                              Tuesday, March 26, 2019

                    <u>**TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES**</u>:

For Plaintiff:
                    ANDRUS WAGSTAFF PC
                    7171 W. Alaska Drive
                    Lakewood, Colorado  80226
               BY:  **AIMEE H. WAGSTAFF, ATTORNEY AT LAW**
                    **DAVID J. WOOL, ATTORNEY AT LAW**

                    MOORE LAW GROUP
                    1473 South 4th Street
                    Louisville, Kentucky  40208
               BY:  **JENNIFER MOORE, ATTORNEY AT LAW**



            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Marla F. Knox, RPR, CRR
              Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporters

2684

1   **APPEARANCES**:  (CONTINUED)

2   For Defendant:

3                 WILKINSON  WALSH ESKOVITZ LLP
                     2001 M Street, NW - 10th Floor

4                 Washington, D.C.  20036
             BY:  **BRIAN L. STEKLOFF, ATTORNEY AT LAW**

5                 **RAKESH N. KILARU, ATTORNEY AT LAW**
                 **TAMARRA MATTHEWS JOHNSON, ATTORNEY AT LAW**

6                 **JULIE RUBENSTEIN, ATTORNEY AT LAW**
                 **CALI COPE-KASTEN, ATTORNEY AT LAW**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

<u>**I N D E X**</u>

2

Tuesday, March 26, 2019 - Volume 20

3

|                                          | **PAGE** | **VOL.** |
| ---------------------------------------- | -------- | -------- |
| Plaintiff Rests                          | 2692     | 20       |
| Defendant Rests                          | 2692     | 20       |
| Final Jury Instructions                  | 2692     | 20       |
| Closing Argument by Ms. Moore            | 2706     | 20       |
| Closing Argument by Mr. Stekloff         | 2748     | 20       |
| Rebuttal Argument by Ms. Moore           | 2793     | 20       |

**DEFENDANT'S WITNESSES**          **PAGE**   **VOL.**

**CHRISTOPHER, PORTIER**
By Videotape Deposition (not reported)        2692      20

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
1 | **<u>Tuesday - March 26, 2019</u>**                                    **<u>8:03 a.m.</u>**

2                          **P R O C E E D I N G S**

3                               **---000---**

4        (Proceedings were heard out of presence of the jury:)

5            **THE COURT:**  Good morning.  I have -- on the jury

6    instructions, the two changes that I made from last night in

7    response to your filings from last night were calling it

8    non-Hodgkin's lymphoma in the first instruction.

9            **MS. MOORE:**  Thank you, Your Honor.

10           **THE COURT:**  And second was on the damages instruction,

11   we made both changes that were suggested.  The Plaintiffs

12   suggested a change; Monsanto suggested a change, and we made

13   both of those changes.

14           **MS. MOORE:**  Okay.  Thank you, Your Honor.

15           **THE COURT:**  We kept the amount on the verdict form.  I

16   don't think it is suggestive.  I think the instructions are

17   very clear.  I think it will be very clear from the argument,

18   and I don't want to run the risk of creating any problems with

19   this trial that are -- that we could otherwise avoid.  So those

20   are the changes that were made.

21       The rest of the objections were -- you know, I disagreed

22   with.  So those will be the final instructions.  We will file a

23   final version of the instructions shortly.

24           **MS. MOORE:**  So the verdict form is the same as what we

25   had yesterday?

PROCEEDINGS

1          THE COURT:  There is one minor change to the verdict
2   form?
3          THE CLERK:  Yes.  So the way that it worked out when
4   it was printed, it was two pages.  And then this little
5   instruction at the top of page Number 2 it says "all of the
6   above" if you answered no.  We changed it to "If you answered
7   no to 1 through 3."
8          MS. MOORE:  Oh, that makes sense, yeah.
9          THE COURT:  Okay.  So I have been through the
10  Plaintiff's slides.  I will go through Monsanto's slides
11  shortly.
12     I only had one fairly minor concern about the Plaintiff's
13  slides, and that was the use of the 1.5 billion R&D figure.  I
14  know that testimony came in --
15         MS. MOORE:  It did.
16         THE COURT:  -- on that.  I guess there were two -- two
17  issues.
18     Again, I think these are pretty minor, but one issue is
19  that you -- at a couple -- on a couple different slides you
20  refer to it as a $1.5 billion annual budget, and my vague
21  recollection of the testimony was -- and how it came in was
22  that you were talking about one particular year.  But I -- I
23  may be misremembering that.
24         MS. MOORE:  I don't think so, Your Honor, but I will
25  find that.

PROCEEDINGS

1     **THE COURT:**  But the other question is, you know, we

2  went through and discussed the numbers -- I can't remember

3  where we left our discussion about all the numbers and how they

4  would be used for -- as they relate to punitive damages, and

5  you ended up -- you know, you ended up stipulating to certain

6  numbers.

7     **MS. MOORE:**  Right.

8     **THE COURT:**  You got this $1.5 billion number

9  through -- in through the testimony of -- was it Grant?

10     **MS. MOORE:**  I believe so, Your Honor.

11     **THE COURT:**  And then so the question is having gotten

12  that number in, can you use that number in your punitive

13  damages argument?  Maybe it's -- I think probably it's okay,

14  but I just wanted to make sure that I wasn't misremembering any

15  aspect of our discussion about the numbers from a week or so

16  ago.

17     **MS. MOORE:**  I mean, it's in evidence, Your Honor.  So

18  I would think I could use it.

19     **MR. STEKLOFF:**  I would agree that it is in evidence,

20  Your Honor, but I think one of the issues is that that 1.5

21  research and development goes to a much broader scope of

22  things.  It goes to agricultural science and trying to develop

23  agricultural science and improve agricultural science and

24  products that have nothing to do with Roundup.  Some may and

25  some may not.

1          So I think then to argue where we have been precluded -- I

2     mean, we have been precluded from presenting the agricultural

3     benefits story.  I think to then use that as something to tee

4     off of for punitive damages seems both unnecessary, given the

5     other numbers they have, but also I think a little misleading

6     and an incomplete story because we haven't been able to present

7     why that number is so large, how it is being used, how it is

8     being used appropriately, and how the company is advancing

9     agricultural science.

10          MS. MOORE:  I mean, he can make an argument about

11     that.  I mean, the point is that that is their research and

12     development budget; and then they choose to spend the money

13     however they want, but what we know is they didn't choose to

14     spend it on testing Roundup.  That's where I'm going.

15          THE COURT:  I think it is permissible.  The only

16     question I have is just when you say 1.5 billion annually, is

17     that consistent with how the testimony came in or was he

18     talking about a particular year?

19          MS. MOORE:  I will check that, Your Honor.  I think it

20     was just in general, but I am going to double-check that.

21          THE COURT:  Okay.  So that's all I had.

22       Does anybody else have anything?

23          MS. MOORE:  I think Ms. Wagstaff does, Your Honor.

24     Just a second.

25          MS. WAGSTAFF:  Your Honor, just one small thing.

1          Last night when we were cutting that video for

2    Dr. Portier, we were watching it.  It is about a minute and a

3    half to two minutes.  And it became clear to us, and we would

4    just ask you to reconsider allowing that.  The testimony --

5    basically what happens is they had him -- they ask him if he is

6    aware of a letter.  He says, No, I'm not aware of this letter.

7    They hand him a letter, and then the attorney reads something

8    and says, Did I read that correctly; and that's the end of it.

9          So it is basically an attorney testifying to something

10   that our expert doesn't even know about.  We think it is the

11   wrong way to get this information in.

12          **THE COURT:**  So you want the letter to come in?

13          **MS. WAGSTAFF:**  No, we don't want the letter to come

14   in.  We want them to bring a witness if they want to present

15   testimony on this.

16          **THE COURT:**  Okay.  My ruling stands.

17          **MS. WAGSTAFF:**  Thank you, Your Honor.

18          **THE COURT:**  Okay.  Anything else?

19          **MR. STEKLOFF:**  Not from the Defense.

20          **THE COURT:**  Okay.  So let me go back -- I will go back

21   and review the Monsanto slides.  We will file the final jury

22   instructions, and we will see you out here at 8:30.

23          Nobody had a problem with the way I'm planning on reading

24   the instructions to the jury?

25          **MR. STEKLOFF:**  We did not, Your Honor.

1        **THE COURT:**  Okay.

2        **MS. MOORE:**  That's fine, Your Honor.  Sorry.

3        **THE COURT:**  Okay.

4        **THE CLERK:**  Court is in recess.

5                  (Recess taken at 8:15 a.m.)

6                  (Proceedings resumed at 8:32 a.m.)

7        (Proceedings were heard out of presence of the jury:)

8        **THE COURT:**  Go ahead and bring in the jury.

9    I forgot one very minor thing on your slides.

10        **MR. STEKLOFF:**  Yes, Your Honor.

11        **THE COURT:**  Which is Slide Number -- I think it is

12   Number 27 or it might be 39 -- I can't remember.  I wrote both

13   numbers down, but I only had an issue with one of them.  The

14   EPA letter -- you put a picture of the EPA letter on the slide

15   that is not coming in, so I think the quote is okay but

16   probably not the picture of the EPA letter.  It is a minor

17   thing.

18        **MR. STEKLOFF:**  Oh, in the background?

19        **THE COURT:**  Yeah.

20        **MR. STEKLOFF:**  So we can just delete the page from the

21   background.

22        **THE COURT:**  Yeah.  Sorry about that.

23   Go ahead.  Bring them in.

24        (Proceedings were heard in the presence of the jury:)

25        **THE COURT:**  Okay.  Welcome.  Thank you for arriving on

1   time again.  We are ready to -- we are ready to proceed.

2       Oh, there is going to be a little bit more evidence

3   presented to you, and then we will proceed with the Plaintiff's

4   closing argument.  And then there will be a little break, and

5   then Monsanto's closing argument, and then rebuttal from the

6   Plaintiff and then the case will be yours.

7       So no more witnesses from the Plaintiff; is that correct?

8           **MS. WAGSTAFF:**  Your Honor, Mr. Hardeman rests.

9           **THE COURT:**  Okay.

10          **MR. STEKLOFF:**  We preserve our motion.  And we recall

11  Dr. Portier for a very brief clip.

12          **THE COURT:**  Okay.  Go ahead.

13              **(Video was played but not reported.)**

14          **THE COURT:**  Okay.  Anything further from Monsanto?

15          **MR. STEKLOFF:**  No, Your Honor.  Monsanto rests.

16          **THE COURT:**  Nothing further from the Plaintiff?

17          **MS. WAGSTAFF:**  No rebuttal, Your Honor.

18              <u>**FINAL JURY INSTRUCTIONS**</u>

19          **THE COURT:**  Okay.  So now we are ready for closing

20  arguments.  I will first read you the instructions for

21  Phase Two.  And as with Phase One, you will each have a copy

22  set of these instructions back in the room with you; but I will

23  read them to you to help shed light on the closing arguments

24  that you will hear.

25      In the first phase of the trial you determined that

1   Roundup was a substantial factor in causing Mr. Hardeman's

2   non-Hodgkin's lymphoma.  You are now being asked to determine

3   whether Monsanto is legally responsible for the harm caused to

4   Mr. Hardeman by Roundup; and if so, what damages should be

5   awarded.

6        Specifically, Mr. Hardeman has three substantive claims.

7   He claims, number one, that Roundup's design was defective;

8   number two, that Roundup lacked sufficient warning of potential

9   risks; and number three, that Monsanto was negligent by not

10  using reasonable care to warn about the risks posed by Roundup.

11       Mr. Hardeman has the burden of proving his claims.  And

12  Monsanto denies the claims.

13       It is your duty to find the facts from all the evidence in

14  this case.  You may consider the evidence from both phases in

15  deciding the claims in Phase -- and deciding the facts in

16  Phase Two.  To those facts, you will apply the law as I give it

17  to you.  You must follow the law as I give it to you -- whether

18  you agree with it or not -- and you must not be influenced by

19  any personal likes or dislikes, opinions, prejudices or

20  sympathies.  You will recall that you took an oath to do so.

21       You must follow all of these instructions and not single

22  out some and ignore others.  They are all important.  Please do

23  not read into these instructions or anything that I may say or

24  do or may have said or done as suggesting that I have an

25  opinion regarding the evidence or what your verdict should be.

 1          Now, it is true that all of the instructions are equally
 2   important, but a number of these instructions I have already
 3   read to you once; and you have already considered them and read
 4   them back in the jury room during your deliberations during
 5   Phase One, so I'm not going to read some of these entire
 6   instructions again.  I'm just going to remind you that they are
 7   there, and the full instructions will be there in writing back
 8   in the jury room.

 9          For example, I gave you an instruction about what is
10   evidence.  That will apply -- that still applies, of course in
11   Phase Two.

12          I gave you an instruction about what is not evidence.  The
13   highlight from that instruction is that lawyer statements and
14   questions and arguments are not evidence, and you will have
15   that instruction back there.

16          Direct and circumstantial evidence, I gave you an
17   instruction about that.  You may remember long ago I gave you
18   the example of raining at night, and if you -- how you -- if
19   you actually see it raining or hear it raining, that is direct
20   evidence that it rained at night.  If you see the ground wet
21   when you wake up the next morning, that is circumstantial
22   evidence that it rained.  You will have that instruction.

23          Requests for admission.  Evidence was presented to you in
24   the form of admissions to the truth of certain facts.  These
25   admissions were given in writing before trial in response to

 1  requests that were submitted under established court

 2  procedures.  You must treat these facts as having been proved.

 3       I gave you the instruction, and you will have the

 4  instruction, on fair treatment for corporations and

 5  partnerships.

 6       There is an instruction that applies, again, on

 7  credibility of witnesses.

 8       There is an instruction, again, on expert opinions that

 9  applies.

10       Burden of proof.  I will read that to you again.  So this

11  is the preponderance of the evidence burden of proof that you

12  are familiar with.  With the exception of punitive damages,

13  Mr. Hardeman has -- Mr. Hardeman's burden of proof for all his

14  claims is called a preponderance of the evidence.  When a party

15  has the burden of proving a claim by a preponderance of the

16  evidence, it means you must be persuaded by the evidence that

17  the claim is more probably true than not true.  Mr. Hardeman

18  has a higher burden of proof for his punitive damages claim,

19  which I will discuss with you later.

20       Okay.  Now, onto the three substantive legal claims that

21  Mr. Hardeman is making.  First is the design defect claim.  To

22  establish his design defect claim, Mr. Hardeman must prove all

23  of the following:

24       One, that Monsanto manufactured, distributed or sold

25  Roundup; two, that Roundup in the context of the facts and

circumstances of this particular case is a product about which
an ordinary consumer can form reasonable minimum safety
expectations; three, that the Roundup used by Mr. Hardeman did
not perform as safely as an ordinary consumer would have
expected it to perform when used or misused in an intended or
reasonably foreseeable way; four, that Roundup's failure to
perform safely was a substantial factor in causing
Mr. Hardeman's harm.

Second, failure to warn, strict liability.  Mr. Hardeman
also claims that Roundup lacked sufficient warnings of the risk
of NHL.  To establish this strict liability failure-to-warn
claim, Mr. Hardeman must prove all of the following:  One --
and there are six things -- one, that Monsanto manufactured,
distributed or sold Roundup; two, that Roundup's NHL risk was
known or knowable in light of the scientific and medical
knowledge that was generally accepted in the scientific
community at the time that Mr. Hardeman was using Roundup;
three, the risk of NHL -- that the risk of NHL presented a
substantial danger when Roundup was used or misused in an
intended or reasonably foreseeable way and that is a
substantial danger of NHL; four, that ordinary consumers would
not have recognized the risk of NHL; five, that Monsanto failed
to adequately warn of the risk of NHL; and six, that Monsanto's
failure to warn about the risk of NHL was a substantial factor
in causing Mr. Hardeman's harm.

1    And then third, the negligence claim which also relates to

2   failure to warn.  Mr. Hardeman also claims that Monsanto was

3   negligent by not using reasonable care to warn about Roundup's

4   NHL risk.  To establish this claim, Mr. Hardeman must prove all

5   of the following.  And, again, there are six elements:  One,

6   that Monsanto manufactured, distributed or sold Roundup; two,

7   that Monsanto knew or reasonably should have known that Roundup

8   posed a risk of NHL when used or misused in a reasonably

9   foreseeable manner; three, that Monsanto knew or reasonably

10   should have known that users would not realize the risk of NHL;

11   four, that Monsanto failed to adequately warn of the risk;

12   five, that a reasonable manufacturer, distributor or seller

13   under the same or similar circumstances would have warned of

14   the risk; and six, that Monsanto's failure to warn about the

15   risk of NHL was a substantial factor in causing Mr. Hardeman's

16   harm.

17    You have an instruction about the EPA, European regulators

18   and IARC.  In Phase One you were instructed not to substitute

19   the judgment of the EPA, various European regulatory bodies or

20   the International Agency for Research of Cancer, or IARC, for

21   your own independent assessment of the evidence.  That remains

22   true in Phase Two.  However, the conclusions of these entities

23   are relevant to the issues you are considering in Phase Two.

24    Now, moving onto damages.  There are two types of damages

25   being sought in this case:  Compensatory damages and punitive

 1   damages.  And now I will instruct you on compensatory damages.

 2       If you decide that Monsanto is legally responsible for the

 3   harm Roundup caused Mr. Hardeman, you must decide how much

 4   money will reasonably compensate him for that harm.  This

 5   compensation is called "compensatory damages."

 6       Mr. Hardeman seeks damages from Monsanto under more than

 7   one legal theory.  However, each item of damages may be awarded

 8   only once, regardless of the number of legal theories allowed

 9   and presented to you.  The compensatory damages claimed by

10   Mr. Hardeman for the harm caused by Monsanto fall into two

11   categories called economic damages and noneconomic damages.

12       If you find for Mr. Hardeman, the parties have stipulated

13   that the amount of economic damages is $200,967.10.  You will

14   be asked to determine what amount of noneconomic damages should

15   be awarded.  The amount of damages must include an award for

16   each item of harm that was caused by Monsanto's wrongful

17   conduct, even if the particular harm could not have been

18   anticipated.

19       Mr. Hardeman does not have to prove the exact amount of

20   damages that will provide reasonable compensation for the harm.

21   However, you must not speculate or guess in awarding damages.

22       The following are specific items of noneconomic damages

23   claimed by Mr. Hardeman:  Physical pain, mental suffering, loss

24   of enjoyment of life, physical impairment, inconvenience,

25   grief, anxiety, humiliation and emotional distress.  No fixed

1  standard exists for deciding the amount of these noneconomic

2  damages.   You must use your judgment to decide a reasonable

3  amount based on the evidence and on your common sense.

4      To recover for future mental suffering, loss of enjoyment

5  of life, inconvenience, grief, anxiety, humiliation and

6  emotional distress, Mr. Hardeman must prove that he is

7  reasonably certain to suffer that harm.   For future noneconomic

8  damages, determine the amount in current dollars paid at the

9  time of judgment that will compensate Mr. Hardeman for these

10  future noneconomic damages.

11     So that's compensatory damages, and now we are turning to

12  punitive damages.   As I mentioned, there is a higher standard

13  of proof for punitive damages.   So I will first instruct you on

14  that standard of proof; that is the clear and convincing

15  standard.

16     Mr. Hardeman must prove punitive damages by clear and

17  convincing evidence, which is a higher burden of proof than the

18  preponderance of the evidence standard.   Under the clear and

19  convincing evidence standard, a party attempting to prove a

20  fact must persuade you that it is highly probable that the fact

21  is true.

22     So now punitive damages.   If you decide that Monsanto is

23  legally liable for the harm that Roundup caused Mr. Hardeman,

24  you must then decide whether Monsanto's conduct justifies an

25  award of punitive damages.   The purposes of punitive damages

1   are to punish a wrongdoer for the conduct that harmed the

2   Plaintiff and to discourage similar conduct in the future.  You

3   may award punitive damages against Monsanto only if

4   Mr. Hardeman proves that Monsanto engaged in conduct with

5   malice or oppression.

6        To do this, Mr. Hardeman must prove one of the following

7   by clear and convincing evidence:  One, that the conduct

8   constituting malice or oppression was committed by one or more

9   officers, directors or managing agents of Monsanto who acted on

10  behalf of Monsanto; or two, that the conduct constituting

11  malice or oppression was authorized by one or more officers,

12  directors or managing agents of Monsanto; or three, that one or

13  more officers, directors or managing agents of Monsanto knew of

14  the conduct constituting malice or oppression and adopted or

15  approved that conduct after it occurred.

16       Malice means that Monsanto acted with intent to cause

17  injury or that Monsanto's conduct was despicable and was done

18  with a willful and knowing disregard of the rights or safety of

19  another.

20       A person acts with knowing disregard when he or she is

21  aware of the probable consequences of his or her conduct and

22  deliberately fails to avoid those consequences.

23       Oppression means that Monsanto's conduct was despicable

24  and subjected Mr. Hardeman to cruel and unjust hardship in

25  knowing disregard of his rights.

1    Despicable conduct is conduct that is so vile based or

2   contemptible that it would be looked down on or despised by

3   reasonable people.

4    An employee is a managing agent if he or she exercises

5   substantial independent authority and judgment in his or her

6   corporate decision-making, such that his or her decisions

7   ultimately determine corporate policy.

8    There is no fixed formula for determining the amount of

9   punitive damages.  And you are not required to award any

10  punitive damages.

11   If you decide to award punitive damages, you should

12  consider all of the following factors in determining the

13  amount:  A, how reprehensible was Monsanto's conduct.  In

14  deciding how reprehensible Monsanto's conduct was, you may

15  consider, among other factors, whether the conduct caused

16  physical harm, whether Monsanto disregarded the health or

17  safety of others, whether Mr. Hardeman was financially weak or

18  vulnerable and Monsanto knew that Mr. Hardeman was financially

19  weak or vulnerable and took advantage of him, whether

20  Monsanto's conduct involved a pattern or practice, and whether

21  Monsanto acted with trickery or deceit.

22   B, is there a reasonable relationship between the amount

23  of punitive damages and Mr. Hardeman's harm or between the

24  amount of punitive damages and potential harm to Mr. Hardeman

25  that Monsanto knew was likely to occur because of its conduct.

1    C, in view of Monsanto's financial condition, what amount

2  is necessary to punish it and discourage future wrongful

3  conduct.

4    You may not increase the punitive damage award above the

5  amount that is otherwise appropriate merely because Monsanto

6  has substantial financial resources.

7    When deciding whether to award punitive damages, you

8  should only consider Monsanto's conduct through summer 2012,

9  which is when Mr. Hardeman stopped using Roundup.  However, any

10  evidence you heard -- any evidence you may have heard regarding

11  events that occurred after 2012 can be considered in

12  determining the amount of punitive damages.

13    Punitive damages are not intended to compensate

14  Mr. Hardeman.  If you awarded compensatory damages to

15  Mr. Hardeman, your award will have fully compensated him for

16  any loss, harm or damage that he has incurred or may in the

17  future incur as a result of Monsanto's conduct.

18    Accordingly, you must not include in an award of punitive

19  damages any amount intended as compensation for loss, harm or

20  damage that Mr. Hardeman has incurred or may incur.  In

21  addition, punitive damages may not be used to punish Monsanto

22  for the impact of its alleged misconduct on people other than

23  Mr. Hardeman.

24    In determining the amount of punitive damages, if any, you

25  should take into consideration any mitigating evidence.

1   Mitigating evidence is evidence that may demonstrate that there

2   is no need for punitive damages or that a reduced amount of

3   punitive damages should be imposed against Monsanto.

4        This next instruction I gave you at Phase One, but I will

5   give it to you again.

6        Before you begin your deliberations, elect one member of

7   the jury as your presiding juror.  If you want the past

8   election to control, that's fine too.  The presiding juror will

9   preside over the deliberations and serve as the spokesperson

10  for the jury in court.

11       You must diligently strive to reach agreement with all of

12  the other jurors, if you can do so.  Your verdict must be

13  unanimous.

14       Each of you must decide the case for yourself, but you

15  should do so only after you have considered all of the

16  evidence, discussed it fully with the other jurors and listened

17  to their views.  It is important that you attempt to reach a

18  unanimous verdict, but, of course, only if each of you can do

19  so after having made your own conscientious decision.

20       Do not be unwilling to change your opinion if the

21  discussion persuades you that you should, but do not come to a

22  decision simply because other jurors think it is right or

23  change an honest belief about the weight and effect of the

24  evidence simply to reach a verdict.

25       Conduct of the jury.  I have read you -- given you this

**FINAL JURY INSTRUCTIONS**

1  instruction so many times.  I'm not going to give you the whole

2  instruction again.  But the instruction is in there.  You

3  should read it.  And I will just remind you of the high points,

4  which is that you should not -- cannot be conducting any of

5  your own independent research.  You cannot be communicating

6  with anybody else about the case or the people involved in it.

7  You -- and if -- you cannot expose yourself to any media

8  reports about the case.  And if any of these things happen to

9  you or you believe that any of these things have happened to

10  another juror, you should bring it to the attention of Kristen

11  or me immediately.

12      These instructions are very important, and if these

13  instructions are not followed, it could result in a mistrial

14  that would require the entire process to start over again.

15      The same instruction regarding a transcript -- regarding a

16  transcript of the trial applies.  You won't have a transcript

17  back there.  You can request a read back of certain testimony

18  if you wish.  If you request part of a witness' testimony, I

19  may order that you hear more of it for context.  I may

20  determine that it is not appropriate to have read back.  I will

21  discuss that with the lawyers in advance, but you do have that

22  available to you if you need it.

23      Again, I gave you this instruction last time; but I will

24  give it to you again.  If it becomes necessary during your

25  deliberations to communicate with me, you may send a note

through the courtroom deputy signed by any one or more of you.
No member of the jury should ever attempt to communicate with
me except by a signed note.  I will not communicate with any
member of the jury on anything concerning the case, except in
writing or here in open court.

     If you send out a question, I will consult with the
lawyers before answering it, which may take some time.  You may
continue your deliberations while waiting for the answer to any
question.

     And remember that you are not to tell anyone, including me
or the courtroom deputy, how the jury stands, whether in terms
of vote count or otherwise until after you have reached a
unanimous verdict or been discharged.

     A verdict form has been prepared for you.  After you have
reached a unanimous agreement on a verdict, your presiding
juror should complete the verdict form according to your
deliberations, sign and date it, and advise the courtroom
deputy you are ready to return to the courtroom.

     So those are your instructions.  As I said, a written copy
set will be provided for each of you during your deliberations.

     Now we will begin with closing arguments.  We will start
with the Plaintiff.  And after Ms. Moore gives her closing
argument, we will take a break.  Then we will hear from
Monsanto.  And then we will hear a short rebuttal from the
Plaintiff.  And then it will be time for you to deliberate.

1        So you can proceed, Ms. Moore.

2            **MS. MOORE:**   Thank you, Your Honor.

3                        **<u>CLOSING ARGUMENT</u>**

4        May it please the Court, Counsel, Ladies and Gentlemen of

5    the Jury.  We are here.  A month later we have finally made it

6    to this day, and Mr. Hardeman has asked me to simply say to you

7    Thank you.  Thank you from the bottom of his heart, from

8    Mrs. Hardeman as well for your commitment, your devotion and

9    for your attention over the last month.  We recognize that it

10   is a huge sacrifice on each of your parts, and we thank you for

11   that.

12       Now, this is kind of the hard part as a lawyer because I

13   now have to stand up here and turn the case over to you.  And

14   it is a case that we have worked on for a long time.  You heard

15   Mr. Hardeman say he filed this lawsuit in February 2016.  And

16   we have worked on this case.  We have looked at thousands of

17   documents, and Ms. Wagstaff and I have fought every day to make

18   sure Mr. Hardeman has his day in court, and one of the largest

19   companies in the world, and here we are.  And now we are here

20   on behalf of the entire team to thank you for your service and

21   to say It's in your hands.

22       So let's get started.

23       Phase One, you-all made the decision that Roundup was a

24   substantial factor in causing Mr. Hardeman's non-Hodgkin's

25   lymphoma, and now we are in Phase Two.  After you made that

1   decision in Phase One that Roundup caused his non-Hodgkin's

2   lymphoma, you heard throughout this trial, Phase Two, Monsanto

3   continued to say there is no evidence Roundup causes

4   non-Hodgkin's lymphoma.

5       So when you go back in that jury room -- and the judge

6   just gave you these instructions, and he told you about -- it

7   is the same -- similar instructions that you had before about

8   electing a presiding juror.  And then, same thing as last time,

9   we need each of you -- all six of you -- to reach a decision

10  for Mr. Hardeman.  We have to count on each one of you to vote

11  for Mr. Hardeman.

12      And when you see this verdict form, Ladies and Gentlemen,

13  it is three questions on the front page, three questions.  And

14  what we ask for you to do is check yes, yes, and yes.  Because

15  we believe that we have tipped those scales, not just a little

16  bit -- not that feather -- but that we have tipped those

17  scales.

18      And what I'm going to do now is give you some tools so

19  that when you are back there in that jury room -- just like you

20  spent almost a week before back there -- that you have these

21  tools.  And you know the exhibits because you will have the

22  exhibits again, but there are a lot more exhibits now.

23      And I wanted to point out to you, so when you have

24  someone -- everyone -- you should listen to everyone's opinion,

25  you should hear what everyone has to say, but if there is a

1  disagreement or someone is like, I don't know about this, then

2  you can say, Hold on a second.  Remember, the Judge said we are

3  to follow the law; listen to what the evidence is.  And this is

4  what I want to point out to you.

5      So Phase Two, this is about Monsanto.  It is about their

6  bad conduct since they put Roundup on the market in 1975.  And

7  what the evidence has shown, Ladies and Gentlemen, is that

8  Monsanto knew or should have known the entire time Mr. Hardeman

9  was spraying Roundup that Roundup causes non-Hodgkin's

10 lymphoma.  That's all that evidence that you saw in Phase One

11 and how you-all reached your decision that Roundup causes NHL,

12 they knew all of that.  They knew all of that long, long before

13 Mr. Hardeman stopped spraying Roundup.  They knew it.

14     Another fact.  Monsanto admits -- remember those requests

15 for admissions?  And the Judge pointed out to you that you will

16 see this when you go back there, Instruction Number 6 explains

17 requests for admissions to you -- and that you must treat these

18 facts as having been proved.  And one of those requests for

19 admissions is that Monsanto says -- they admit, they have never

20 warned that Roundup causes cancer.  It's not on the label,

21 Ladies and Gentlemen.

22     Remember what Mr. Hardeman said on the stand is that if

23 they had warned that it causes cancer, he wouldn't have used

24 the product.  We wouldn't be here today if they had taken the

25 time and told the truth and warned that it causes cancer.

 1         And then the last fact that we are going to spend some

 2    time on this morning is that Monsanto acted recklessly and with

 3    conscious disregard for safety.  And that is the exact opposite

 4    of what a company should be doing.

 5         A responsible company -- a responsible company would test

 6    its product.  A responsible company would tell consumers if

 7    they knew that it caused cancer.  And Monsanto didn't do either

 8    of those things.

 9         So what is Monsanto's knowledge?  Now, I know as soon as I

10    put the epidemiology up here, everyone is going to have

11    flashbacks of Phase One.  I'm not going to go through all the

12    epi studies.  But what I do want to show is this is what they

13    knew from 1975, when Roundup went on the market, through 2012.

14    Remember Mr. Hardeman sprayed from 1986 to 2012.

15         So what did they know in that time period?

16         This is undisputable.  This is not about what someone

17    testified in a deposition about, what Monsanto's employees say

18    now.  This is what did they know then.  And that's a really

19    critical difference.

20         When you are back in that jury room, think about what do

21    the documents say?  What do the internal documents say from

22    Monsanto?  Not what they say in a deposition with the comfort

23    of their own attorney, but what did they say back in 1999?

24    What did they say back in 2003?  What did they say back in the

25    1980s that they knew?  That's what I want you to look at is

 1   these documents.

 2       Because, remember, after you made a finding in Phase One

 3   that Roundup causes non-Hodgkin's lymphoma, did you see one

 4   person from Monsanto, other than their attorneys, come here and

 5   say that's not right.  We stand by our product.  Did anyone

 6   come in this courtroom from Monsanto and defend the safety of

 7   Roundup?  No.  They didn't call any single live witness to

 8   stand up here and tell you ladies and gentlemen that you are

 9   wrong and all the science is wrong.

10       So here is the science.

11       Remember *Hardell* 1999, *McDuffie* 2001, *Hardell* 2002, *De*

12   *Roos* 2003, and *Eriksson* 2008.  All of these epi studies all

13   showed an association between Roundup and non-Hodgkin's

14   lymphoma, Roundup and non-Hodgkin's lymphoma.  They knew about

15   every single one of these studies.  And meanwhile, what is

16   happening in that time period?  Mr. Hardeman is spraying

17   Roundup.  All right.  That's the epi.

18       Let's go to the animal.  We heard -- remember Dr. Portier

19   testified in Phase One about the mice and rats?  The first one,

20   *Knezevich & Hogan*, 1983 -- this is before Mr. Hardeman ever

21   started spraying Roundup -- when that study came out originally

22   in 1983, if Monsanto had done the right thing and put a warning

23   on the label, we wouldn't be here.  We wouldn't be here.

24   Instead, they didn't.

25       1993, '97, '99, 2001, 2009.  And they remember the *George*

1    study in 2010.   That *George* study was the one where they

2    actually used Roundup, and they put it on the mice skin.   And

3    what did Dr. Portier tell you yesterday?   Every single one of

4    these mice studies showed malignant lymphomas, just like what

5    Mr. Hardeman has.   This is what they knew -- Monsanto knew

6    about all of these mice studies.

7         Oxidative stress, remember we talked about that in

8    Phase One?   That comes up in 2005, 2009, 2010.   All three of

9    these publications Monsanto knew about.

10        Genotoxicity.   Remember we had all that testimony about

11   Roundup being genotoxic?   First one, 1980 -- again, before

12   Mr. Hardeman started spraying -- 1993, '97, '98, '98.   And

13   those four, Ladies and Gentlemen, is what forms the basis of

14   the *Parry* report that you heard about in Phase Two, but they

15   keep going.

16        Of course, here is the Parry.   And Parry is, of course,

17   the professor they hired to tell them whether it is genotoxic.

18   And when they told him that I think it could be genotoxic, what

19   do they do?   They don't do what he says.   And they don't share

20   it with the EPA.   They don't share it with anyone.

21        Keeps going.   More genotoxic.   2004, 2005, 2007,

22   *Paz-y-Mino*.   You will remember that is the aerial spraying

23   study.

24        2009, the second Bolognesi, which is also the aerial

25   spraying study.

 1          2009 again, 2009 again, 2012.  These are all the genotox

 2     studies all showing Roundup or glyphosate having a genotoxic

 3     effect.  This is everything Monsanto knew from 1975 to 2012.

 4     This is undisputed, Ladies and Gentlemen.  That is what they

 5     knew.

 6          And 1985 they also knew that the EPA categorized

 7     glyphosate as a Class C oncogen, meaning it is capable of

 8     causing cancer.  What did they do in 1985?  We are going to

 9     talk about this.  What they did not do is they didn't take it

10     off the shelf, and they didn't put a warning on it; the year

11     before Mr. Hardeman started spraying.

12          So after hearing all of this and you-all reached your

13     decision in Phase One, what does Monsanto come in here and say

14     to you?  And this is Dr. Reeves who was designated by Monsanto

15     to speak on its behalf on behalf of the company.

16          (Video played.)

17          **MS. MOORE:**  No evidence across the board.  No evidence

18     across the board?  Are you kidding me?  That, Ladies and

19     Gentlemen, is reckless.  That is a reckless thing to say.  And

20     frankly, it is offensive.  It is offensive after you-all made

21     your finding.  It is offensive when you see all the information

22     they had for 60 days ago, in January, for their spokesperson,

23     for their designated representative to come to this court and

24     say, No evidence across the board, it is just flat-out untrue.

25          I'm going to move that slide -- I went ahead and put this

1    up here, which is just so I can keep referring to it, because

2    this is important.  This is the knowledge.

3        So let's look at Monsanto's conscious disregard of all of

4    this information.  First thing, you heard testimony from

5    Dr. Portier yesterday about the IBT scandal.  So 19 -- in the

6    1970s when Monsanto submitted for approval to the EPA, the

7    initial approval to the EPA, it was based on a study conducted

8    by IBT labs.

9        1983 the EPA found that study to be invalid.  So from 1975

10   to 1983, the approval from the carcinogenicity standpoint for

11   glyphosate was based on one study from IBT, a mouse study that

12   was then held to be invalid.  What did the company do when they

13   were told it was invalid?  Let's look at the document.

14       So remember you saw this.  It was called out.  And it says

15   Glyphosate, and then the first column is Oncogenicity and zero.

16   You see down at the bottom, Ladies and Gentlemen, where it says

17   zero equals IBT.  That is the IBT Labs.  It is saying that the

18   oncogenicity study was done by IBT.

19       And then if you look over to the right-hand column, it

20   says Data Column.  And Dr. Portier explained that when the EPA

21   put something like that in, that means they are asking for more

22   data from the company, okay.

23       And then you look at the next sheet -- I will call this

24   out -- this is Glyphosate, Monsanto, the carcinogenicity study.

25   It is a mouse study.  And the "I" Dr. Portier testified to

 1   meant invalid.  So the study where they got the original EPA

 2   approval was determined to be invalid.  And that was a mouse

 3   study.

 4        So there was no valid study from 1975 to 1983, and you are

 5   going to hear in a few minutes -- when Monsanto's attorney

 6   stands up here, you are going to hear a lot about the EPA, a

 7   lot about the EPA.  But I want you to think about let's look at

 8   the history of Monsanto and the EPA.  And we got to go all the

 9   way back to -- gosh, a long time, 1983 -- 35 years ago, 36

10   years ago -- and look at when they determined that the initial

11   study was invalid.  And what did Monsanto do when they found

12   this out that the study was invalid?  They didn't take it off

13   the market and they didn't warn.

14        Now, let's go to what happened in 1983, '85.  So remember

15   that first mouse study was *Knezevich & Hogan*.  And you-all have

16   heard all about this study that I'm going to write up here

17   because these are some trial exhibits that I think are

18   important, and I'm just going to put K&H for that.

19        And 1983 the *Knezevich & Hogan* study was done and they

20   found lymphoma.  1985 the EPA determines that glyphosate is a

21   Class C oncogen.  In accordance with EPA for post-guidelines,

22   the panel has classified glyphosate as a Category C oncogen.

23   That is the finding in 1985.

24        And these are Trial Exhibits 503 and 505.  You will have

25   those in the back with you.

1      And they base that -- that glyphosate was oncogenic, in

2   male mice causing renal tubule adenomas -- adenomas -- I never

3   can say it right -- a rare tumor in a dose-related manner.

4   Remember all the dose response information?  That's what they

5   found.

6      And then what is Monsanto's plan?  What is Monsanto's

7   response when they are told that it is -- it is a Category C

8   oncogen?  A responsible company would first say, Should we take

9   this off the market?  Or should we test it?  Or should we put a

10  warning on it that it is an oncogen?  It is going to cause

11  cancer.  They don't do anything.

12     Here is their response.  Short of a new study or finding

13  tumors in the control group, what can we do to get this thing

14  off of Group C?  That's their response.

15     And this is 506.  And you can see that one for yourself.

16  And so what they are saying is, All right, EPA.  You are saying

17  it is a Class C oncogen now.  I guess the only way we can get

18  it out of there is to find a tumor in the control group.

19     And, lo and behold, what do they do?  Here is first, zero

20  in the control group, zero low, one in the medium, and three in

21  the high.  What do they do?  They hire someone to look at the

22  study again; and lo and behold, they find that magic tumor, the

23  one tumor in the control group.  And why does that matter?

24  Because it changes everything in 1985 to '86.  It is no longer

25  highly significant.

1           Now, the EPA looked at it again.  Other pathologists

2     looked at it again.  The only pathologist who ever said there

3     was a tumor in the control group was the one Monsanto hired.

4           They reviewed -- the EPA reviews the kidney slides and

5     does not find a tumor.  They issue a guidance document, and

6     that's 514.

7           508 and 509, that's where they -- Monsanto sent the slides

8     to Dr. Kuschner.  So you will have all that back there too.

9           So Monsanto's reaction in 1986, the next year, after they

10    told the EPA about this magic tumor, they come back and they

11    say, We agree to repeat a rat study -- now, remember this is

12    about a mouse study -- and we vehemently argue the lack of

13    justification for a repeat mouse study.

14          Ladies and gentlemen, they have never, never repeated that

15    mouse study.  They don't want to repeat that mouse study.  And

16    you have to ask why that is.  When all the other mouse studies

17    show lymphoma, you have to ask why they don't want to do that.

18          So they refuse.

19          And Dr. Reeves testified to it:  And, in fact, Monsanto

20    never re-did the mouse study, did it?

21          His answer:  We conducted a rat study.

22          Question:  So Monsanto in response to the glyphosate, the

23    registration document -- that is the EPA document --

24    specifically said we want a waiver from having to do this mouse

25    study, correct?

1        That's correct.

2        And that's 516.

3        Since that day Monsanto -- to this day Monsanto has not

4    done -- ever done another mouse study with glyphosate, right?

5        Answer:  No, because all the other registrants have for

6    their data package.

7        It is not about the EPA.  It is not about the regulatory

8    agencies.  It is about what Monsanto should be doing.  It is

9    about whether a responsible company would put a product on the

10   market without warning it causes cancer when they know that it

11   does.

12           THE COURT:  Ms. Moore, can we take a brief sidebar?

13           MS. MOORE:  Oh, sure.

14       (The following proceedings were heard at the sidebar:)

15           THE COURT:  Okay.  So there was a little confusion

16   between me and Kristen.  Kristen handed me a note saying that

17   some of the exhibits that you were writing down on the board

18   were not admitted, but what she didn't -- what Kristen didn't

19   realize was that they were admitted in Phase One.

20       I apologize for the interruption, but it's fine.  But

21   Kristen is going to have to prepare the exhibits for -- she was

22   not planning on sending back the Phase One exhibits.  We are

23   going to need to work with her on that.

24           MS. MOORE:  Okay.

25       (The following proceedings were heard in open court:)

1          **MS. MOORE:**  Then there were a couple others I wanted

2    to write up here about this mouse study.  515 and 512 and 516,

3    and then the last one will be 1178.  The reason I put 1178 up

4    there is because 1991 -- and you will hear from the Defense --

5    that's when EPA changed from a Category C, the oncogen, to a

6    Category E, evidence of non-carcinogenicity.  But what is

7    really important about that is what the EPA says -- and you can

8    see this in 1178 -- the EPA says:  This should not be

9    interpreted as a definitive conclusion that glyphosate will

10   not -- will not be a carcinogen under any circumstances.

11         What they are saying is they don't have definitive

12   evidence one way or the other, and that's important.

13         So that's what happened in the '80s.  And Monsanto's

14   response, you know, when the EPA -- when they are coming in

15   here to this courtroom and saying, Ladies and Gentlemen, EPA

16   has approved the product.  When the EPA says you need to repeat

17   a mouse study and first you ask for a waiver, and then second

18   you never do it, it is hard to hang your hat on the EPA.

19         And here is the timeline.  '75 is the initial approval

20   based on an invalid study.  1983, EPA found glyphosate to be a

21   Class C oncogen.  '85, EPA orders Monsanto to redo the mouse

22   study.  '86, Monsanto finds a magic tumor in the control group

23   that nobody else has found.  1986, EPA does not see the magic

24   tumor.  And in 1991 the EPA changes it to Class E.  Monsanto

25   has never redone that mouse study.  That is not what a prudent

1    company should do.

2        Parry, 1999.  So this is following these four studies,

3    Ladies and Gentlemen, that we talked about in Phase One, the

4    genotox studies in the '90s.  And Monsanto knew that there was

5    an issue.  They think it is a problem.  It is actually

6    scientific information being provided to them.

7        And what do they do?  They hire Dr. Parry.  And the first

8    document to look at when they hire Dr. Parry is an internal

9    Monsanto document.  And it is talking about someone getting

10   someone to be supportive of glyphosate.  And that is 155.  And

11   I'm going to write Parry -- I'm trying to group these for

12   you-all, and -- so that is 155.

13       So Monsanto calls Dr. Parry, I'm looking for someone who

14   is going to be in support of glyphosate.  That's what the

15   document says.  And then they ask him to look at those four

16   studies.  He looks at the four studies -- and you saw this --

17   here it is.  Sorry.  Discuss with him his participation in

18   support of glyphosate, glyphosate-based formulation, genotox

19   issues.

20       And what does Dr. Parry come back and say?  You heard from

21   Dr. Portier, because Dr. Parry is no longer with us, that

22   strong evidence that glyphosate may be genotoxic.  That's what

23   they knew in 1999.  This is their own person they hired telling

24   them this.

25       And what is their response to this?  Their reaction is

1  they develop this press release -- and this is 156.  And in

2  this press release they say, Several genotoxicity studies have

3  been conducted on glyphosate, the surfactants in glyphosate

4  formulations and other closely related surfactants.  Studies

5  have also been performed on Roundup herbicide and other

6  glyphosate formulations.

7      None of these studies have shown any adverse findings.

8  That's a flat-out lie.  Remember what the studies showed in

9  Phase One?  This is what they decide to do.  The development of

10  a positive press release.  And then they are asking for

11  comments internally.  Meanwhile, Dr. Parry had found that it is

12  capable of being genotoxic, both in vivo and in vitro.  And

13  here is their response to Dr. Parry.  Let's send out a press

14  release saying there is nothing.

15      When they find out -- I'm going to put 157 and then 158

16  and 159 -- because these -- 158 and 159, you will see these.

17  These are internal e-mails after they got the results from

18  Dr. Parry, and some of the things they said is:  Has he ever

19  worked with industry before?  We may have to help him write all

20  this.  Help to produce the definitive report without twisting

21  his arms.

22      And 158, after they provide more information, what they

23  say is with the hope of, quote, "moving Dr. Parry from his

24  position."  Not finding an objective result.  They want him to

25  be on their side.  They don't want objectivity.  They want to

 1    turn his opinion around.  That's what they wanted in 1999.

 2        So Parry will say it all again.  He looks at more

 3    information and he concludes glyphosate is a potential

 4    clastogenic *in vitro*.  And remember, this is an agent that can

 5    induce mutation by disrupting or damaging the chromosomes.

 6        This is Exhibit 160 that you'll have back there.  And this

 7    is when he comes up with the recommendations, and this is

 8    critical because Donna Farmer's deposition was played the other

 9    day.  Remember Donna Farmer is one of the head toxicologists at

10    Monsanto.  She's been there for a number of years.  She's a

11    spokesperson for the company.  She acts on its behalf.  She's

12    one of the decision-makers there, along with Dr. Heydens who

13    you heard from yesterday.

14        And Monsanto's reaction when they get this back from

15    Dr. Parry, at first it's (reading):

16            "Roundup is currently very vulnerable in genotox."

17        Okay.  So they admit this.  But here is what they say

18    (reading):

19            "We simply aren't going to do the studies Parry

20        suggests."

21        That's 161.  I want you-all to look at that e-mail.  161

22    (reading):

23            "We simply aren't going to do the studies Parry

24        suggests."

25        Now, when Donna Farmer was deposed in January, she went

1   through this chart.  And you're going to hear from Monsanto's

2   attorney, "Oh, well, you know, we did this study.  We did that

3   study."  Here's what she said in 1999 (reading):

4           "We simply aren't going to do the studies."

5       And the rest of the e-mail says, if you look at that

6   (reading):

7           "We want to find" -- this is the second sentence in

8           the second paragraph -- "We want to find and develop

9           someone who is comfortable with the genotox profile of

10          glyphosate/Roundup and who can be influential with

11          regulators" -- that's EPA -- "and scientific outreach

12          operations when genotox issues arise.  My read is that

13          Parry is not currently such a person and it would take

14          quite some time and money" -- several dollar signs --

15          "studies to get him there.  We simply aren't going to do

16          the studies Parry suggests."

17  And then he asks Mark Martens (reading):

18          "Do you think Parry can become a strong advocate

19          without doing this work?  If not, we should seriously

20          start looking for one or more other individuals to work

21          with.  Even if we think we can eventually bring Parry

22          around close to where we need him, we should be partly

23          looking for a second backup genotox supporter."  Again,

24          they don't care what the science actually shows.  "We've

25          not made much progress and are currently very vulnerable

1          in this area."

2          They knew back in 1999 Roundup was genotoxic.  They had

3     the information to make that determination and then chose not

4     to.

5          So what else do they do?  They said "Let's get Dr. Kier."

6     You heard from Dr. Kier yesterday.  He worked at Monsanto a

7     number of years and then he retired and was a consultant.  And

8     then they say (reading):

9               "Right now the only person I can think of to dig us

10          out of this," quote, "genotox hole is the good Dr. Kier."

11         A genotox hole?  There is no mention in any of these

12    e-mails, ladies and gentlemen, about "We've got a problem that

13    our product is not safe.  We need to have discussions about

14    whether it should be on the shelf.  We need to have discussions

15    about telling the public."  Nothing.  There is nothing about

16    that in the documents.  It's all about "How can we get someone

17    on our payroll to put out information that is false, that is

18    wrong, that goes against what the science shows?"

19         Let me go back.  I don't know why that's flashing, but

20    we're going to go away from that.

21         Let me go back.

22              MR. WOLFE:  Hold on a second.

23              MS. MOORE:  Okay.  Thank you.  Are you pushing it too?

24    I'll just stop.

25              MR. WOLFE:  No.

1                       (Pause in proceedings.)

2          **THE COURT:**  If you want to take a five-minute break to

3    get it fixed, that's totally fine.

4                       (Pause in proceedings.)

5          **MS. MOORE:**  Thank you.  Thank you, Mr. Wolfe.

6       Okay.  All right.  I'm going to put down the rest of these

7    numbers.  There was only one more and that was the genotox

8    hole, and that's 208.

9       Okay.  So they bring in Dr. Farmer in this deposition to

10   say all these things about tests.  And I just wanted to remind

11   you-all, I read these requests for admissions into the record,

12   and this was Request for Admission Number 5.  And remember it

13   was that we asked Monsanto before trial (reading):

14          "Admit that Monsanto has never conducted a long-term

15       animal carcinogenicity study on any glyphosate

16       formulation."

17      And they admit that.  They admit that.  That is what is in

18   evidence here.

19      Okay.  Go to the next one.  Okay, great.

20      And then they admit that Monsanto has not conducted a

21   long-term animal carcinogenicity study on glyphosate since

22   1991.  That was a long time ago.  That's actually the year I

23   graduated high school so I know it was a long time ago.  But

24   they admit that.  They haven't done any of those studies on

25   glyphosate.  Now, again, that's not on the formulation.

1     And then they admit that Monsanto has never conducted a

2  long-term animal carcinogenicity study on any surfactant used

3  in a glyphosate-formulated product.  They admit that.  They

4  admit that.

5     And then they admit that Monsanto is not precluded by any

6  applicable law, regulation, or ordinance from conducting a

7  long-term animal carcinogenicity study on a glyphosate

8  formulation.  They admit there is nothing that precludes them

9  from doing it.  They just choose not to do it.

10     So when you hear Monsanto's attorney argue "Well, we've

11  done some tests and everything," well, what are those tests?

12  Those tests, ladies and gentlemen, remember these charts they

13  showed you in Dr. Farmer's testimony in Phase II?  I'm sure

14  they're going to show them to you again in their closing.

15     They didn't show them to you in Phase I when we were

16  trying to decide whether Roundup caused non-Hodgkin's lymphoma.

17  I thought that was interesting.

18     Dr. Farmer said --

19        **MR. STEKLOFF:**  Objection, Your Honor.

20        **THE COURT:**  The objection is overruled, but I will

21  remind the jury again that attorney argument is not evidence

22  and you should be focusing on the evidence that's presented in

23  the case.

24        **MS. MOORE:**  And what's important is this one that is

25  marked as 479, ladies and gentlemen, is titled "Surfactants."

 1   This is genotoxicity studies on surfactants, not on Roundup.

 2   Okay?  So we can put that one to the side.

 3       The other one -- I'll take my little Post-its off -- is on

 4   formulated product.  Remember Dr. Farmer testified about how

 5   there were different tests and one was acute toxicity and that

 6   doesn't tell you about cancer, it talks about irritation of the

 7   skin?  Remember the admissions.  They didn't test on glyphosate

 8   since 1991, and they have never conducted a long-term animal

 9   carcinogenicity study on any glyphosate formulation.

10       Here's what the lawyer and Dr. Farmer put together

11   (indicating).  Formulated products; right?  The admission says

12   they've never done this.  They have this but if you look at it,

13   it's salmonella, salmonella, mouse bone marrow, bacteria.

14       In order to get to human lymphocytes, you have to go all

15   the way over to the last two pages.  It starts here

16   (indicating) goes to here (indicating), October 2016.  Eight

17   months after Mr. Hardeman files a lawsuit do they start testing

18   about human lymphocytes with the formulation.  And, lo and

19   behold, guess what the result is?  Negative.

20       All right.  Backed up.

21       So there is this refusal to test after Dr. Parry tells

22   them they need to test, that he recommends testing.  In fact,

23   Mark Martens -- and this is 686, I'll put "refusal to test."

24   My handwriting is going to get really bad.

25       Okay.  686.  And in that he says (reading):

1              "If somebody came to me and said they wanted to test

2         Roundup, I know how I would react -- with serious

3         concern."

4         "Serious concern."  Again, not about, you know, "We've got

5    a problem here.  We really should be studying our product."

6    No.  It's more about:  How are we going to fend this off?

7         I don't know if they're going to make this argument.  I

8    hope they wouldn't make this argument.  I just want to raise

9    this.  There was nothing, nothing to preclude Monsanto from

10   testing Roundup.  They've never done it, and there was nothing

11   to preclude them from doing it.

12        In fact, this is -- remember Hugh Grant?  He's the -- not

13   the actor -- the former CEO of Monsanto (reading):

14             "Just to be clear, I -- make sure I heard you

15        straight.  Monsanto was spending on the order of one and a

16        half billion dollars" -- $1 billion a year -- "in research

17        and development?"

18        He goes:  "More or less, yeah."

19        And they couldn't do a study on Roundup?  They're spending

20   one and a half billion dollars and they couldn't take the time

21   to study a product that they had on the shelf since 1975?

22   Knowing all of this information is out there, knowing that they

23   had to hire someone in 1999, they couldn't have taken a little

24   bit of that one and a half billion dollars and test it?

25        So what happens after Parry?  The Hardell comes out,

1    Hardell article.  And how do they respond to that?  Remember

2    they say it's an index of concern.  So I'm going to write on

3    the next page -- I think it's 686 -- let's see, let's go to epi

4    just to show you that they knew about all these and how they

5    responded internally.

6         So this is 86, and they say there's an index of concern

7    for glyphosate and future agricultural epidemiological studies.

8         And then this was that -- I don't know if you-all

9    remember -- well, you probably -- I'm sure you do -- in

10   Phase I, remember this exhibit in Phase I (indicating)?  Now

11   you're going to have Exhibit 220.  It's the unredacted version

12   of it.  220.

13        And here's what they say Monsanto said about Hardell in

14   1999 Hardell (reading):

15             "Just the tip of the iceberg for these types of

16        association epi studies."

17        "Just the tip of the iceberg."  They knew.  Don't let them

18   stand up here and try to say that, "We didn't have any reason

19   to believe there was association."  Here's what their internal

20   documents in 1999 say.

21        So what do they do after Parry?  What do they do after

22   Hardell comes out and they know it's the tip of the iceberg and

23   know they're in this genotox hole?  These are their words,

24   ladies and gentlemen, not mine.  They start ghostwriting.  And

25   you heard a lot of testimony about the Williams 2000 article,

1    and I just wanted to point out some of the e-mails.

2        And this is Dr. Heydens' e-mail to Dr. Farmer, and this is

3    back in 1999.  I'm just going to write "ghostwriting" up here

4    (indicating) because I've tried to put all the ghostwriting

5    stories together for you -- or the exhibits, and this one is

6    314.

7        And Heydens, who in his deposition acted like, "Oh, I

8    didn't ghostwrite."  I mean, if you look at the acknowledgment

9    section in Williams, "It says 'Monsanto' in the acknowledgment.

10   So, you know, everybody knew that we were acknowledged."

11   That's not being an author on a paper.

12       And what does he say?  (reading)

13           "And Dougie" -- this is someone -- a grown man named

14       Doug, Douglas -- "thinks I would actually leave the final

15       editing to him unsupervised."

16       That's 314.

17       301.  This is the e-mail 15 years later where Dr. Heydens

18   says (reading):

19           "A less expensive, more palatable approach might be

20       to involve experts only for the areas of contention,

21       epidemiology and possibly MOA, and we ghostwrite" -- "we

22       ghostwrite" -- "the exposure tox and genotox sections."

23       So, you know, all that testimony about "I don't know what

24   ghostwriting is" or "I don't know this definition.  It has many

25   definitions," again, I want you to go back to the documents.

1    301.  It says (reading):

2              "An option would be to add Greim and Kier or Kirkland

3         to have their names on the publication, but we would be

4         keeping the cost down by us doing the writing and they

5         would just edit and sign their names so to speak.  Recall

6         that is how we handled Williams, Kroes, and Munro in

7         2000."

8         He admits it.

9         And here is why this is significant, ladies and gentlemen,

10   and this is 464.  The reason it's significant is that they

11   consider Williams, the publication by independent experts,

12   which again no one knew it was actually Monsanto (reading):

13             "The most exhaustive and detailed scientific

14        assessment ever written on glyphosate," it says, "was due

15        to the perseverance, hard work, and dedication of the

16        following group of folks.  They deserve significant credit

17        for the stewardship result here."

18        It says (reading):

19             "This human health publication of Roundup herbicide

20        and its companion publication," it goes on, "will be

21        undoubtedly regarded as the reference on Roundup and

22        glyphosate safety."

23        That's Monsanto.  That's their plan.  They want Williams

24   to be the reference on Roundup, not any of this other stuff.

25        And they go on, this is still in 464 (reading):

1          "Now the hard work by public affairs" -- so their

2     Communications Department -- "begins in utilizing these

3     reference documents to the fullest.  This is where public

4     affairs strategy begins to kick in globally."

5          "Globally."  They want everyone in the world to know about

6     the Williams article, just not that they wrote the whole thing.

7          And what does their CEO say?  He ratifies it.  He says

8     (reading):

9              "This is very good work.  Well done to the team.

10         Please keep me in the loop as you build the PR info to go

11         with it.  Thanks again."

12         This starts at the top and works its way down at Monsanto.

13    He's ratifying their ghostwriting.

14         And then what does Dr. Saltmiras say?  This is 312.  This

15    is a PowerPoint slide that you're going to have back there with

16    you.  So 312.  He says (reading):

17             "Williams is an invaluable asset."

18         And, look, "Regulator reviews," that's EPA; "FTO," the

19    freedom to operate.  It's all about their freedom to operate,

20    not about safety.

21         And what does Heydens say?  "It's a very important paper."

22    In fact, he said it three times during his testimony.

23         And then Saltmiras, again back to the PowerPoint, he says

24    (reading):

25             "Williams, et al., has served us well in toxicology

1          over the last decade.  We need a stronger arsenal of

2          robust scientific papers to support the safe use of our

3          products as we face the next set of chemistry registration

4          reviews..."

5          They're getting ready for reapproval and they want to get

6     a stronger arsenal together.

7          And here's an example of how Williams served them well.

8     This is the De Roos 2003 publication.  You'll remember this.

9     And in there there was one publication.  Remember?  That

10    De Roos 2003 said "even though one review concluded that the

11    active ingredient is noncarcinogenic and nongenotoxic."  One,

12    and it's Footnote 50.

13         And guess what that one paper was.  Williams.  That's the

14    only one that De Roos found in 2003 that was against all of the

15    other information in the scientific community written by

16    Monsanto.

17         So this is a pattern of ghostwriting by Monsanto.  And

18    this is, again, Dr. Farmer and she's doing another epi review,

19    and she says she offered suggested edits.  She adds (reading):

20         "It was concluded that glyphosate is unlikely to pose

21         a carcinogenic risk to humans."

22         And guess what she cites?  Williams.

23         She adds to the paper (reading):

24         "Glyphosate is widely considered by regulator

25         authorities and scientific bodies to have no carcinogenic

1        potential."

2        And she's not listed on the final paper.

3        Another one, she's redlined out as the author, not listed

4   on the final paper.  This is a pattern at this company of

5   ghostwriting.

6        What else did they do?  McDuffie.  You heard about the

7   McDuffie abstract.  McDuffie had found that in 2001, there was

8   statistically significant doubling of the risk, the

9   dose-response; the more you use, the more likely it is you're

10  going to get non-Hodgkin's lymphoma.

11       And so what did they do?  They set out and they said

12  (reading):

13            "I don't know yet what it says in the small print,

14       but the fact that glyphosate is no longer mentioned in the

15       abstract is a huge step forward.  It removes it from being

16       picked up by the abstract searches."

17       They're celebrating that they got glyphosate out of the

18  abstract.  Remember, that's the summary at the beginning of the

19  publication.  Glyphosate not mentioned in the abstract.

20       And so they say (reading):

21            "I understand the situation correctly, even though

22       reference to glyphosate wasn't removed entirely, there was

23       a substantial reduction in emphasis, including, but not

24       limited to, removal from the abstract."

25       And Dr. Acquavella, their toxicologist, says -- I'm

1    sorry -- their epidemiologist, says (reading):

2            "Right.   It's a good result, but not everything we

3        wanted."  And he put in parentheses, "invalid result."

4        Could be cited as a second glyphosate/NHL finding."  A

5        second one.  They knew it.  This is in 2001.  "However, it

6        will not be picked up by most of the usual suspects

7        because it's not mentioned in the abstract."

8        Let me make sure I've written these down here for you.

9    314.  I'm going to write 461 is another example of

10   ghostwriting.  And 462 is another one.

11       And then you've got 315 is another one that you need to

12   look at.  And then 464 is what Hugh Grant, the CEO, ratified.

13       And then on McDuffie, it is 448.  And I'm going to kind of

14   write a little fast because I've got to move on here.  And

15   that's 448.

16       And when De Roos came out in 2003, they said it added fuel

17   to the Hardell fire.  They knew.  Don't let them tell you

18   there's no evidence across the board.  They knew it.  So look

19   at 254 as well.

20       They said in their admission Monsanto has never conducted

21   an epidemiological study to study the association between

22   glyphosate-containing formulations and NHL.  They admit that.

23       So what's a responsible corporation to do?  This is what

24   Hugh Grant said in his deposition (reading):

25       "Q.  Mr. Grant, did you have a view about whether the

1      company should communicate with the public about the

2      safety of glyphosate?

3          "A.   It's not just should.   I think there's a

4      responsibility for companies like Monsanto.   There's a

5      responsibility to communicate the science, to communicate

6      what the products do when used as advised.   So I don't

7      think that's a should.   I think, frankly, that's a

8      responsibility."

9          He thinks, the CEO thinks, it's a responsibility.   So were

10     they responsible?  Absolutely not.  Exhibit 317, look at this

11     one, ladies and gentlemen.  They write in there (reading):

12          "It's the good 'ol Monsanto way.  Let's hire some

13          more scientists.  Let's pick up our people to talk about

14          and defend Roundup."

15         Let's deceive.  Let's ghostwrite.  Let's manipulate the

16     data, and let's refuse to test and, frankly, let's lie to the

17     public about Roundup causing cancer.

18         So let's look at that document, this very important

19     document.  It is 426.  And I'm just going to write it here and

20     circle it because I would ask all of you to look at it when you

21     go back.  This is an e-mail from Donna Farmer.

22         And 245.  I'm going to start with 245.  So 245 and 426 are

23     e-mails from Donna Farmer.

24         In 245 it says -- 245, it's in response to an article that

25     came out and -- for Monsanto Australia, and they're asking how

1  do we respond to these articles.  And she says (reading):

2        "First, you cannot say that Roundup does not cause

3     cancer.  We have not done carcinogenicity studies with

4     Roundup."

5     She admits that in 1999.

6     And then the very next line, the bullet point for press

7  (reading):

8        "Will Roundup harm my family or me?"

9     Her answer (reading):

10       "Based on the results of short-term and long-term

11    testing, it can be concluded that Roundup poses no danger

12    to human health."

13    What?  She says internally "You can't say it does not

14 cause cancer.  We haven't done the tests."  Externally to the

15 public when they're asked will it harm my family and me, "Well,

16 based on the results of short-term/long-term testing, it can be

17 concluded that Roundup poses no danger."  That's lying to the

18 public, ladies and gentlemen.

19    And, again, 426, she continues on that.  I'm going to run

20 through these.

21    EPA.  You're going to hear about the EPA from the defense.

22 Just remember that that was built on an invalid study, they

23 rely on information provided by Monsanto, and Monsanto had a

24 cozy relationship.  You heard Dr. Reeves testify that "We have

25 conversations with EPA representatives."  (reading)

1         "Q.   You guys shared text messages; correct?

2         "A.   There are instances where EPA officials and Monsanto

3    employees have texted each other."

4    Texting?

5    And then Dr. Portier.  Dr. Portier testified that -- and,

6    remember, he's worked for government for 30 years, and he said

7    that because -- (reading)

8         "Because they've inappropriately applied the science

9         time after time after time to reach that conclusion, it's

10        an inappropriate conclusion for this particular compound,"

11        meaning glyphosate.

12   And he was asked (reading):

13        "When you see something like that, what's your

14        reaction?"

15   And he says (reading):

16        "I feel as if EPA has let down the American public."

17   And then Dr. Kier says, you know, about whether you

18   should -- whether it causes cancer (reading):

19        "I think they wanted to have information sufficient

20        for them and the regulatories."

21   Again, nothing about safety.

22   I'm going to run through this.

23   And, remember, Monsanto has never warned.

24   So let's look at these jury instructions, ladies and

25   gentlemen.  So on the verdict form the first question you have

1    to answer is:  Did Mr. Hardeman prove by a preponderance of the

2    evidence -- the tipping of the scales -- that his claim that

3    Roundup's design was defective?  And we ask that you check

4    "yes."

5        Number 2:  Did Mr. Hardeman prove by a preponderance of

6    the evidence his claim that Roundup lacked sufficient warnings

7    of the risk of NHL?  Again, they admit they didn't warn.  We

8    ask that you check "yes."

9        And then Number 3:  Did Mr. Hardeman prove by a

10   preponderance of the evidence his claim that Monsanto was

11   negligent by not using reasonable care to warn about Roundup

12   NHL risk?  And, again, we ask that you check "yes."

13       We ask that you check "yes" to all three of these.

14       And then you'll turn the page and you will then decide

15   about damages.  And as the judge instructed you, the parties

16   have agreed on the amount of the past medical expenses.  So if

17   you find for Mr. Hardeman, that amount is already written

18   there.  That's the medical expenses that have been charged to

19   Mr. Hardeman.

20       Noneconomic loss.  It's really important that you look at

21   the jury instructions on this.  And let's flip back over to --

22   remember Dr. Nabhan testified and Mr. Hardeman testified about

23   his harms and what this experience of having cancer has been

24   like.

25       And when you look at the compensatory damages instruction,

1  and that is Instruction Number 15, it talks about noneconomic

2  damages; and right below that, at the end of that page, it

3  outlines for you what noneconomic damages are, and that's what

4  I have here on the screen.  It's for that pain, for that bone

5  pain that Mr. Hardeman experienced where they talked about it's

6  like electric waves going through his body.

7       It's the nausea.  You know, when Mary -- Ms. Hardeman

8  said, you know, they had to carry a bucket in the car from all

9  of his vomiting.

10      It's the chemo brain that he went through where he's

11  forgetting things.  The confusion.  His loss of appetite.

12      The swelling.  Remember Mrs. Hardeman said that the next

13  morning she couldn't even recognize him when he got out of bed

14  because he was so swollen?

15      And then his white blood cells, the count dropping and

16  dropping where he had to get daily shots seven days in a row,

17  and that's what caused the bone pain.

18      And then him losing his hair.  The fatigue, the loss of

19  strength.

20      And then remember what Dr. Nabhan said.  In the future,

21  yes, you're going to hear Monsanto's attorney, and it's a great

22  thing, that his last scans have been clear, that he's in

23  remission.

24      But I asked Mr. Hardeman what that meant to him, and he

25  talked about it was a temporary place for him because he has to

1    get repeat scans.  He has one next month, and he has that

2    anxiety coming up before that scan as to whether this is going

3    to be the scan that they come back and say, "Mr. Hardeman, I'm

4    sorry to tell you, but your cancer is back."

5        And he has to live with that.  He has to live with that

6    for the rest of his life because Dr. Nabhan testified that he

7    has an increased risk of other cancers because of the

8    chemotherapy.

9        And, remember, they didn't ask Dr. Nabhan one question.

10   They didn't ask anything about Mr. Hardeman's harms because

11   that's not in dispute, ladies and gentlemen.  The suffering

12   this man has gone through is not in dispute.  The anxiety, the

13   anguish, the emotional distress that he's going to have to face

14   for the rest of his life, that's not in dispute.  The worry

15   about whether he's going to have a repeat scan and they're

16   going to tell him he has cancer, that's not in dispute.

17       So when you look at the instructions, you have to decide,

18   then, on the noneconomic loss; and I will tell you that's

19   something that, you know, people struggle with.  Under the law,

20   it's your job to compensate Mr. Hardeman for these harms, for

21   all of these harms, and for the anxiety and the mental anguish.

22       And he's had that since 2014, and we don't know if he's

23   going to live another 25 years, 20 years, 15 years.  We don't

24   know that, but I would submit to you that the number that you

25   should put on the jury instruction is a million dollars a year

1    for every year that he has suffered in the past for the last

2    almost four years and for the next 15 years.

3        It is up to you-all to decide the amount to put on those

4    lines on the verdict form, but I would submit to you that that

5    is a fair number given what he has gone through, and that would

6    be the past noneconomic loss for the suffering and the future

7    noneconomic loss for the suffering.

8        And then the last thing is on punitive damages.  Now,

9    you'll see in the instructions, ladies and gentlemen, that

10   punitive damages -- you'll see at the very beginning (reading):

11           "The purpose of punitive damages is to punish a

12       wrongdoer for the conduct that harmed the plaintiff and

13       discourage similar conduct in the future."

14       It's not about Mr. Hardeman.  It's not about any kind of

15   thoughts or feelings or harms.  We don't want any sympathy for

16   him about this.  This is about Monsanto.  It is about this

17   company for the last 40 years manipulating the science,

18   manipulating the public opinion.

19       And you look at the documents.  Here it is.  You heard the

20   stipulation.  Monsanto was bought last year for $63 billion by

21   Bayer.  That's what Bayer thought this company was worth last

22   year.  Right before Bayer bought the company, Monsanto had a

23   net worth of $7.8 billion.  They had cash on hand -- cash on

24   hand -- of $2.4 billion.  Cash.

25       And then we talked about a few minutes ago they had

1    1.5 billion in their annual budget for research and

2    development.  Now, how did they spend all that money?  Zero on

3    epidemiology.  Zero on *in vivo* human genotoxicology studies;

4    zero on *in vivo* oxidative stress studies; zero on long-term

5    rodent carcinogenicity studies on Roundup formulation; and

6    zero, absolutely zero dollars spent on warning the public that

7    Roundup causes cancer.  All that money and they don't spend a

8    dime telling the public that Roundup can cause cancer.  That,

9    ladies and gentlemen, is offensive.

10       And Roundup, make no mistake about it, is key to Monsanto.

11   Look at 788.  This is an exhibit that came into evidence

12   yesterday, and Roundup -- this is an internal Monsanto

13   document.  They say (reading):

14           Roundup is key to Monsanto in many aspects.  It's the

15           number one weed killer all over the world.  It's a

16           fantastic brand.  Close to 100 percent awareness amongst

17           farmers around the globe.  It's an outstanding contributor

18           to Monsanto's earnings, and Roundup FTO" -- free to

19           operate -- "needs a champion."

20           "Needs a champion."

21       So let's look at Roundup.  Here's what Roundup has done

22   for Monsanto.  Back in 1996 before that spike in Roundup sales

23   that you heard about, Roundup was bringing in about

24   $130 million a year for Monsanto.  By 2000 after the spike

25   started, it had grown to over $210 million in one year alone.

 1    One year alone the company brought in $210 million on Roundup.

 2         And then you'll remember this slide from Phase I that was

 3    Monsanto's.  Remember what happened after 2000, that the

 4    sales -- the blue line is the sales -- just kept going up.  So

 5    this graph would keep going up.  2000 is 210 million.  When

 6    Mr. Hardeman's still, still spraying Roundup, they're bringing

 7    in $210 million in one year.

 8         So, ladies and gentlemen, when you look at this punitive

 9    damages instruction and you go over -- and it's Instruction

10    17 -- we have to show that Monsanto acted with malice and

11    oppression -- or oppression that their officers -- so

12    Hugh Grant -- their managing agents -- Donna Farmer, Bill

13    Heydens, Mark Martens, Jim Guard -- all these people that

14    you've heard from; and malice, that's kind of an old term, but

15    what it means as defined in the instructions "acting with

16    intent to cause injury or that Monsanto's conduct was

17    despicable and was done with a willful and knowing disregard of

18    the rights or safety of another."

19         When you put a product on the market and from 1975 to 2012

20    when you know that that product causes cancer and you do it

21    anyway and you don't give a consumer like Mr. Hardeman a

22    choice -- they deprived him of any choice to make as to whether

23    to buy this product.  He could have made a choice and he told

24    you his choice.  He wouldn't have bought it if he was warned

25    about cancer.  But when you knowingly do that, that is malice.

1    Oppression means Monsanto's conduct was despicable and

2   subjected Mr. Hardeman to cruel and unjust hardship.  It gave

3   him cancer.  Nothing can be more cruel and unjust than to give

4   someone cancer, and that's what this company did by putting

5   this on the market.

6    So you go through here and then number A, this is on the

7   second part of the instruction:  How reprehensible was

8   Monsanto's conduct?  All you have to remember is what they knew

9   for all of these years, 1975 to 2012, and despite knowing all

10   of that, they still conducted a pattern and practice of deceit

11   over and over again to the American public, to Mr. Hardeman.

12    And then when you're determining the amount, in view of

13   Monsanto's financial condition, those sales from -- oh, thank

14   you -- the $63 billion -- that's fine -- the $63 billion, the

15   7.8 billion, the 2.4 billion, and the 1 and a half billion

16   spent on research and development.  In view of that financial

17   condition, what amount is necessary to punish it -- to punish

18   Monsanto and discourage future wrongful conduct?  That is a

19   decision that you have to make as a jury.

20    All I can tell you is that this company after all of this

21   time, after all of this information, after everyone in the

22   scientific community telling them that Roundup causes cancer,

23   they still come to this courtroom and they tell you there's no

24   evidence across the board.  They still come to this courtroom

25   and they say it doesn't cause cancer.  It's still on the shelf,

 1    ladies and gentlemen.  They're still selling this product.

 2    They're still denying that it causes cancer.

 3         After IARC came out in 2015, the International Agency on

 4    Research and Cancer, and says it's a problem with carcinogens

 5    in humans, what did they do?  They didn't take it off the

 6    shelves.  They didn't warn it caused cancer.  They didn't tell

 7    anyone of their consumers it causes cancer.  They just kept

 8    selling Roundup and kept making money off of it because that is

 9    the bottom line for Monsanto.

10         And so you've got to decide:  Is it a year of their sales

11    of Roundup?  Is it that $210 million?  Is that what's going to

12    send a message to this company?  Is it the fact they have

13    $2.4 billion in cash?  Is that what's going to send a message

14    to this company?  That's for you to decide.

15         But what I can tell you is that if you don't send a

16    message and a loud message, because nothing else over all these

17    years, all the data from the scientific community, IARC telling

18    them it's a probable carcinogenic -- carcinogen, nothing has

19    stopped this company, and that's because the only thing that

20    matters to them is their greed.  The only thing that matters is

21    that bottom line, the profit.  Remember they want this all over

22    the world.

23         And so it's your power, it's your job to say "No more,

24    Monsanto.  No more.  It stops today.  It stops today.  The

25    lying, the ghostwriting, the manipulation, it stops today.  Own

 1    up to it.   Test your product.   Put a warning on it.   Let the

 2    consumer know.   Give the consumer that choice whether to spray

 3    weeds and risk getting cancer."   No ordinary consumer would do

 4    that.

 5        But send that message loud and clear because I guarantee

 6    you, ladies and gentlemen, if you don't send that message loud

 7    and clear to Monsanto, when their team of lawyers leave this

 8    courtroom, they're going to make a phone call to a boardroom in

 9    St. Louis --

10        **THE COURT:**   Okay.   You've gone significantly over your

11    time.

12        **MS. MOORE:**   I'm sorry.

13        **THE COURT:**   So I'm going to ask you to sit down now.

14        **MS. MOORE:**   Okay.   All right.   Thank you, Your Honor.

15        **THE COURT:**   Thank you.

16    Okay.   We'll take a break and we'll be back in about ten

17    minutes.   Why don't we plan on resuming at 20 after the hour.

18    Thank you.

19        **MS. MOORE:**   Thank you, Your Honor.

20        (Proceedings were heard out of the presence of the jury:)

21        **THE COURT:**   Okay.   So given how far over your time you

22    went, we're going to use the timer for rebuttal.

23        **MS. MOORE:**   I am so sorry, Your Honor.

24        **THE COURT:**   That's okay.

25        **MS. MOORE:**   I had no idea.   I don't even have a watch

PROCEEDINGS

```
 1   on.
 2           THE COURT:  Don't worry about it, but we're going to
 3   use the timer for rebuttal.  It will be 15 minutes.
 4           MS. MOORE:  That's fine, Your Honor.
 5           THE COURT:  The buzzer will go off and you'll be asked
 6   to sit down.
 7           MS. MOORE:  It will be helpful, Your Honor.  I just
 8   didn't have any clue so I'm sorry.  Thank you.
 9           THE COURT:  All right.  So we'll resume -- anything to
10   discuss?
11           MR. STEKLOFF:  No, Your Honor.
12           THE COURT:  All right.  We'll resume at 20 after.
13           MS. MOORE:  All right.  Thank you, Your Honor.
14                   (Recess taken at 10:12 a.m.)
15               (Proceedings resumed at 10:27 a.m.)
16       (Proceedings were heard out of the presence of the jury:)
17           THE COURT:  Just real quick, Mr. Stekloff, do you have
18   a rough estimate of how long your closing is?
19           MR. STEKLOFF:  I think --
20           THE COURT:  I'm not going to hold you to it.
21           MR. STEKLOFF:  No, I understand.  I think between an
22   hour and an hour and a half, and I'm hoping it's much closer to
23   an hour.
24           THE COURT:  Okay.  So we'll decide after that whether
25   to take a break before the rebuttal or not.  I think we might
```

1    take a little break.  It just depends how long it goes.

2             MR. STEKLOFF:  Okay.

3             THE COURT:  Okay.  You can bring in the jury.

4        (Proceedings were heard in the presence of the jury:)

5             THE COURT:  Okay.  Mr. Stekloff.

6             MR. STEKLOFF:  Thank you, Your Honor.

7                        **CLOSING ARGUMENT**

8             MR. STEKLOFF:  Counsel, good morning, everyone.

9        As you can probably tell, there weren't too many things

10   that the parties agreed on in the month that you have sat and

11   listened to us; but one thing that I think we agree on and,

12   frankly, everyone in this courtroom agrees on is how attentive

13   and responsible you have been as a jury.  You have listened to

14   all of the evidence.  You have paid attention.  You have paid

15   attention to the videos.  You obviously took Phase I and the

16   deliberation process extremely seriously, and everyone here is

17   grateful for that.

18       And as I turn to the evidence and what the evidence showed

19   in Phase II, I want to walk you through what I have said from

20   the beginning.  We are going to present the full evidence to

21   you.  We're not going to tell half stories.  We're not going to

22   only present part of the story.  We want you to consider all of

23   the evidence that you have heard, particularly in Phase II but,

24   as the Court said, you are allowed to consider the Phase I

25   evidence as we walk through the evidence today.

1      And in Phase II, what I'm going to present to you are the

2   three key questions that I think answer everything you have to

3   answer on that verdict form.  The first question is:  Did

4   Monsanto fail to use reasonable care to warn about the risks of

5   Roundup?

6      You've heard in the instructions today there are three

7   claims.  You'll see all three claims on the verdict form when

8   you have to walk through it, but all three claims ask the same

9   thing.

10     The first is design defect, and what they are saying is

11  that an ordinary consumer who used Roundup like Mr. Hardeman

12  did would not have thought there was cancer associated with it

13  so there should have been a warning.  It is:  Did Monsanto use

14  reasonable care to warn about the risks of Roundup?

15     And the second two are failure to warn.  Did Monsanto use

16  reasonable care to warn about the risks of Roundup?  I mean,

17  the words are a little bit a difference.  One asks you to focus

18  on what was known or knowable at the time.  So did Monsanto act

19  reasonably based on the science?  And the other has the word

20  "reasonably" right in it.  Did Monsanto act reasonably?

21     That is the question that you are here to answer.  That is

22  the evidence I am going to present to you today.  I will then

23  talk about what did the plaintiff prove about the Roundup

24  label, and did the plaintiff prove he is entitled to damages,

25  which only is relevant if you decide that Monsanto acted

 1   unreasonably.  You only get to damages if you first find

 2   liability.

 3        So let's talk about the first question and what the

 4   evidence shows.  You heard evidence about Monsanto's extensive

 5   testing of Roundup.  You heard it from multiple witnesses.

 6   Monsanto has conducted hundreds of tests on glyphosate,

 7   surfactants, and the formulated Roundup product.  Those tests

 8   have occurred over 40 years from before the first approval in

 9   1975 all the way up through today in 2019.

10        And you heard that in conducting their tests, Monsanto

11   followed good laboratory practices, which you heard is a term

12   of art.  It's a term that the EPA uses, that companies use,

13   that scientists use about how tests are being conducted, and

14   you saw that evidence as well.

15        This was a report that the EPA prepared in 1996 where they

16   actually went to Monsanto's laboratory, the Environmental

17   Health Laboratory that you heard about, the EHL, and assessed

18   are they using good laboratory practices, and the answer was

19   yes.

20        You can see here they went to the laboratory, and then

21   they concluded (reading):

22             "The GLP inspection found that the procedures

23        followed by the Monsanto EHL at the time of the inspection

24        were in accord with the FIFRA" -- that's the law that

25        applies here -- "GLP regulations.  The data audits" --

1    So they looked at all of the data in these tests that

2    Monsanto was running -- the genotoxicity tests, the animal

3    studies -- the data found no discrepancies between the raw data

4    and the reports submitted to EPA.

5        And what does that mean?  Because I want to stop there for

6    a minute.  When you run these tests, you produce pages and

7    pages and pages and pages of data with the results from the

8    tests.  Then Monsanto, pursuant to the laws required by the

9    EPA, produces reports.  The EPA checked those reports and found

10   no discrepancies.  What was in the data is what was reported to

11   the EPA.

12       And what is the result of all of this testing that

13   Monsanto conducted for decades?  You heard from Dr. Koch

14   yesterday, and this is part of what he testified.  He said

15   (reading):

16           "I made reference to the regulatory dataset for

17       glyphosate because it's an unusually large dataset.  It

18       has both the Monsanto safety data as well as safety data

19       from other registrants of glyphosate."

20       So this is now the EPA's safety data on glyphosate.

21   Because, remember, you heard that Roundup went off patent and

22   then there were other companies that were manufacturing

23   products using glyphosate.  They had to do their own tests,

24   Monsanto wasn't involved, and they had to submit those tests to

25   the EPA and to other regulators.

 1          He explained this (reading):

 2               "Since glyphosate went off patent, many other

 3          chemical manufacturers have begun manufacturing glyphosate

 4          as well, and they have generated safety data in addition

 5          to what Monsanto has so it has a larger safety dataset

 6          than usual."

 7          He was asked (reading):

 8               "What kind of data is in the regulatory safety data?

 9               "So there's an extensive toxicology database.

10          There's acute, there's repeat dose, there's developmental

11          and reproductive toxicology, there's genotoxicity, there's

12          carcinogenicity, and quite a few other studies.   In

13          addition to human safety studies, there's ecotox studies,

14          residue studies, and just a considerable amount of data."

15          That is the testing that Monsanto was involved in.   That

16     is the reasonableness of Monsanto testing this product over 40

17     years and submitting the data to EPA.

18          And when Monsanto tested the product, they tested the

19     product in many different ways.   They tested glyphosate.   So

20     the active ingredient that you've heard about both in Phase I

21     and Phase II.   They tested the surfactants, that soapy

22     substance that combines with glyphosate to make it stick on

23     plants.   And they tested the formulated product, the

24     combination of the two, glyphosate and surfactants.

25          They did it in multiple ways.   They tested genotoxicity.

1    They tested animal studies.  They tested human exposure.  They

2    did long-term tests.  They did short-term tests.  They

3    performed all the tests required by regulators, and then they

4    conducted additional tests that were not required.

5        I mean, this is quite an allegation to stand up here and

6    say how awful and basically criminal Monsanto's behavior was

7    when they did this level of testing for 40 years beginning in

8    the 1970s and then continuing through today and then turned

9    over all of the data with no discrepancies to EPA.

10       So what did Dr. Farmer testify about the testing?  She was

11   asked (reading):

12           "Give us first an overview of the substances that

13       Monsanto tested over the years as they related to

14       glyphosate and glyphosate products."

15   And she testified to what I just showed you (reading):

16           "So we have done glyphosate, the active -- what we

17       call the active ingredient.  Again, we talked about the

18       next one is the surfactant.  We've done testing on the

19       surfactants."  That's the testing, by the way, that wasn't

20       required but they did it anyway.  "And then when those two

21       are put together in the glyphosate products, the

22       formulation what we call it, we then test the

23       formulation."

24       And what did the testing show?  How did it -- again, you

25   don't have to take it from me.  You heard it from the

1   witnesses.  She was asked (reading):

2         "Now when -- over what period of time have the tests

3     that Monsanto has done -- either in the lab that it owned

4     back in the 1980s and 1990s or third-party labs that

5     you've described -- over what period of time have these

6     tests been done?"

7   And her answer was (reading):

8         "They have been ongoing for all this time, many, many

9     years.

10         "Did it start before you" -- Dr. Farmer -- "arrived

11     at Monsanto in the 1990s?

12         "Yes.

13         "Does it continue today?"  When she was just deposed

14     in 2019.

15         "Yes."

16   And I am going to show you these charts that she helped

17   prepare, so that's one place we do agree.  I want to be clear,

18   these charts are not all the tests that Monsanto ran.  There

19   are -- I could bring in boxes that would fill the gallery with

20   all the data and all the tests that Monsanto ran because, as

21   you've heard, they ran tests on glyphosate.  They ran

22   genotoxicity tests on glyphosate.  They ran animal studies.

23       But Because of these requests for admission where they

24   keep saying they won't test the formulated product, they won't

25   test surfactants, they won't do certain long-term studies,

 1   Dr. Farmer prepared these charts to show all the testing that

 2   occurred in those two areas.

 3        So the first chart that she prepared was a genotoxicity

 4   testing on the formulated product.  You can see that the

 5   testing on this chart started in 1992.  She listed the author

 6   or the study director, the year, the title, the test organism,

 7   the description of the product or test substance, and whether

 8   the result was positive or negative.

 9        And I think one of the things that I heard this morning

10   was that they ran salmonella tests as if that was a bad thing.

11   Well, salmonella test, that's called the AIMS test.  The

12   AIMS test is one of the most fundamental.  It is called the

13   gold standard of genotoxicity tests.

14        So when you heard this morning some allegation that by

15   running the salmonella tests they weren't doing their job, that

16   is the gold standard in the petri dishes for determining

17   whether there's genotoxicity.  And so that chart -- this chart

18   demonstrates how responsible Monsanto was with respect to its

19   testing.

20        And you can see here, this first page shows 1992 to 1999

21   on the formulated product, the combination of glyphosate and

22   surfactants.  Every result was negative.

23        1999 to 1999.  Look how many tests they did in 1999 alone.

24   All negative.

25        1999 to 2008.  All negative.

1    2008 to 2009.  All negative.

2    2010 to 2016.  All negative.

3    More in 2016 all the way up until 2018.  All negative.

4    They ran all these tests.  They didn't stop; they ran the

5    tests.

6    And then she prepared a similar chart on the surfactants.

7    So this was just testing the surfactant.  Again, tests that

8    were not required by the regulators, but they did them anyway

9    to understand the surfactants that were being used in the

10   product.

11   1981 to 2000 on this table with the same information, all

12   negative; and then 2009, negative.

13   Monsanto ran those tests and it learned from them and it

14   shared the results.  It evaluated the results of its tests.  It

15   provided all of the data, the underlying data, and the reports

16   to the regulators.  It continued to conduct new tests.  It

17   didn't stop.  And it published the key studies in peer-reviewed

18   journals.

19   So we're going to talk about some of the allegations that

20   we've heard, like the Parry report.  Well, when they did

21   further tests based on what Dr. Parry asked them to do, they

22   published it in the peer-reviewed journals so that the world

23   could see it and so scientists could see and review what they

24   did in those tests.

25   And you heard from Mr. Grant, the CEO.  So we heard today

1    at the top (reading):

2           "And what did Mr. Grant tell you about the importance

3        of science at Monsanto?  Was getting the science right

4        important to Monsanto during your tenure there?"

5        Remember, he was there for 15 years.

6           "It absolutely was.

7           "Why?

8           "Because it was everything that we stood for, and

9        sound science was the bedrock, it was the platform that we

10       operated on."

11       That is the message that was being sent from the top,

12   sound science.  They did the testing.  Now, that doesn't mean

13   that everyone has to agree, like, in 2015 IARC came out with

14   this decision; but to say that they didn't believe in their

15   science, of course they believed in their science.  They did

16   the tests, they provided it to regulators, they stood behind

17   what they did, and they acted reasonably based on all of the

18   science.

19       You heard about Dr. Farmer.  I think you heard criticisms

20   of Dr. Farmer this morning, but Dr. Farmer in e-mails

21   demonstrated what her intentions were about science.

22       And let me make a comment.  Are there dumb e-mails in this

23   case?  When you have produced millions of pages from years and

24   decades of multiple employees working at a company, are there

25   dumb e-mails?  The answer is yes; but the overall record -- I

mean, they can pick 10 e-mails, or whatever she wrote on the
chart, 20 documents, 30 documents, out of millions of pages and
say that there are some bad language that they don't agree
with.  The overall record demonstrates that this was a company
committed to testing and committed to science.

And she explained, Dr. Farmer, in detail, not only in the
writing but in her testimony, what she meant in this e-mail.
She explained her four-part strategy for the stewardship
program for glyphosate, which included publishing relevant
toxicologic, ecotoxicological and human information, reviewing
the literature regularly for glyphosate findings and respond
when appropriate.

I mean, we heard today somehow that they -- as if Monsanto
is not paying attention to the science, as if they think
there's no science out there.  She is telling you "We are
reviewing the science."  Now, if we disagree, if we think there
are limitations of a study or problems with a study, we're
going to respond when appropriate, but of course they're
reviewing the science and that's part of the reason that they
were doing more testing.

And she said (reading):

"We are going to establish a scientific network of
prestigious scientists in key world areas and provide them
the latest information about glyphosate.  We have epi,
tox, environmental exposure, reproductive development, and

1            clinical toxicological experts.  And then we are going to

2            assess data gaps and fund appropriate research."

3        That means they are identifying data gaps and they are

4    funding research.  That is not ignoring.  That is not deceit.

5    That is not lying.  That is not hiding.  That is a stewardship

6    program based on exactly what the message was from the top from

7    Mr. Grant:  We stood for sound science, which was the bedrock.

8        And let's just talk about what we saw -- we've seen it now

9    throughout this trial.  I think we saw it in Phase I.  We

10   definitely saw it in Phase II.  They played you the testimony

11   this morning from Dr. Reeves where he says "across the board,"

12   but what did he mean by that?

13       Because the allegation is that Monsanto is standing in

14   here saying "There's no science.  There's no science."  That is

15   not what he said.  This is his testimony that they didn't play

16   for you this morning (reading):

17           "It's still Monsanto's position that there's no

18           evidence across the board; right?"

19       That's what the plaintiff's lawyer asked him.  This was

20   his full answer (reading):

21           "Yes, our -- our position is that, when you take all

22           this data into account" -- again, he is considering all of

23           the data, he is not ignoring on behalf of the company the

24           data -- "you have a very large body of evidence saying we

25           fully understand the carcinogenic potential of glyphosate

1      and Roundup-based herbicides, or glyphosate and

2      glyphosate-based herbicides, indicating there is no

3      carcinogenic potential.  There are additional studies that

4      may purport to have findings one way or the other; but

5      when you look at those in particular, they often have some

6      sort of methodological flaw that prevents either a

7      conclusive outcome or a reliable source of or from them

8      being a reliable source of information."

9          Now, again, people can disagree with that, but the

10   accusation that they are not considering the science or saying

11   there is no science, they are considering all the science and

12   they acted reasonably in doing so.

13         More evidence that Monsanto believed in the science.

14   Mr. Grant (reading):

15         "What did you learn about the safety profile of

16      glyphosate and Roundup over the course of your tenure at

17      Monsanto?

18         "Both from the work scientists within the company and

19      from the regulatory agencies around the world, that it was

20      unrivaled in its safety position."

21         And not only did they stand behind the science in their

22   testing, in their review of the science that's out there, which

23   is more than you see on this chart or more than you see, to be

24   clear, even in Phase I -- and we understand your verdict in

25   Phase I -- but there is more science that is out there,

 1   including the science that the EPA reviews from Monsanto, from

 2   other glyphosate manufacturers.

 3       These employees stand behind Roundup, and one of the

 4   reasons you know that is because they use Roundup in their own

 5   yards with their children, with their pets.  They do not think

 6   it causes cancer or they wouldn't be using it in their --

 7   themselves at their homes.

 8       So what does the plaintiff argue?  Well, first of all, the

 9   plaintiff shows you these requests for admission, which you've

10   heard an instruction from the Court.  Yes, when we were asked,

11   we admitted that certain things didn't occur, but let's talk

12   about why those things didn't occur.  Let's put them in

13   context.  Again, what is the full evidence?

14       So the first one is that Monsanto never conducted a

15   long-term animal carcinogenicity study on any glyphosate

16   formulation.  So the formulated product.

17       And the second really goes along with it:  Admit that

18   Monsanto never conducted a long-term animal carcinogenicity

19   study on any surfactant used in a glyphosate-formulated

20   product.

21       So this is -- they are now saying despite all the testing

22   that occurred, they are complaining because we didn't run a

23   two-year test on a certain rat or a certain mouse with the

24   formulated product or a surfactant, but you heard multiple

25   witnesses explain why that didn't happen.

 1          First of all, all of the other animal testing demonstrated
 2     to them that there was no carcinogenicity and that it wasn't
 3     necessary.
 4          But, second of all, it's just basic.  If you feed mice or
 5     rats as much soap as you can, because all of the surfactants,
 6     whether it's in the formulated product or by itself, if you
 7     feed them as much soap as you can for two years, first of all,
 8     they probably can't survive; and even if they do, you can't
 9     read the results.  It's not because it's causing cancer, to be
10     clear.  It's because it's interfering with the mice and the
11     rats, with their systems.
12          And so that is the reason why these studies were never
13     conducted along with all of the other studies that were
14     conducted that showed no carcinogenicity or genotoxicity.
15          Then there is:  Admit that Monsanto has not conducted a
16     long-term animal carcinogenicity study on glyphosate since
17     1991.  Well, Monsanto conducted three studies before 1991.  The
18     EPA reviewed those studies and the EPA has repeatedly -- and
19     I'm going to talk to you about the EPA -- repeatedly found no
20     carcinogenicity time and time and time again.
21          And then what's the last allegation that we heard?  And we
22     heard this morning, "Well, they should spend the money.  They
23     should spend the money."  Admit that Monsanto has never
24     conducted an epidemiological study to study the association
25     between glyphosate-containing formulations and non-Hodgkin's

1  lymphoma.  That is true.

2      But let's just acknowledge what would have happened if

3  Monsanto had conducted such a study, like a 20-year study, like

4  the Agricultural Health Study by the National Cancer Institute.

5  They would stand up here and say anything we did was invalid.

6  They did it this morning.  They showed you articles and how

7  they were cited, like the Williams article, and they say, "It's

8  invalid.  You shouldn't consider it because Monsanto was

9  involved."

10     So what's Monsanto supposed to do?  If we do a study and

11  it shows no carcinogenicity, we're at fault.  We should have

12  done more.  If we don't do a study, we're at fault.

13     Well, that is not a proper allegation about being

14  unreasonable.  Monsanto was reasonable in every single respect

15  in its testing.

16     And what is the evidence about regulators?  Because you

17  heard from Mr. Grant and others that I just showed you that it

18  wasn't -- Monsanto stood behind its science, but Monsanto also

19  learned from what the regulators were saying about all of the

20  science that was out there.

21     From 1975 to 2012 -- and here I'm stopping at 2012 because

22  you've heard 1986 to 2012 is the key time period, that's when

23  Mr. Hardeman was using Roundup -- the EPA who had these powers

24  did not suspend the product, did not remove the product, did

25  not require a warning about non-Hodgkin's lymphoma or cancer.

1    It could have done any of those things and based on the

2    science, the EPA did not do so across multiple administrations.

3    No matter the politics, it did not do so.

4        And when we hear about this IBT allegation, again, the EPA

5    didn't come and say "You need to pull the product."  This IBT,

6    I think we heard it was a -- I forgot the exact word, but some

7    sort of conspiracy today or something.  I mean, Monsanto was

8    one of numerous companies that were defrauded by a third party

9    who was conducting tests; and when Monsanto learned about it,

10   Monsanto ran more tests and those tests showed no

11   carcinogenicity, just like all of the tests that I showed you

12   before.

13       So as of 2012, that important time period, no one in the

14   outside world said glyphosate caused cancer, not a single

15   regulatory body anywhere in the world.  So not just the EPA,

16   but Europe, Canada, Australia, anywhere else.

17       And no health organization.  Not the National Institutes

18   of Health, not even the World Health Organization, no one said,

19   based on that science that's on that chart that you were shown

20   repeatedly this morning, that glyphosate caused cancer or that

21   Roundup caused cancer.

22       And that you are allowed to consider in Phase II because

23   it goes directly to Monsanto's state of mind and whether they

24   acted reasonably based on the science.

25       So who are the world regulators and what did they do when

CLOSING ARGUMENT / STEKLOFF

1    they looked at the science?  And I've listed here some of the

2    world regulators that you've heard about from witnesses,

3    Monsanto witnesses, who reviewed that extensive glyphosate

4    database, all of the testing, and made determinations.  The

5    EPA; EFSA and ECHA, which are the two European organizations;

6    Health Canada in Canada; Australia; Japan.

7         They all had teams of highly qualified experts.  I mean,

8    they're -- let's be clear, you didn't hear from them but there

9    are real doctors and real scientists who care about the safety

10   of the public working at all of these organizations around the

11   world.  They have diverse experience.  So they have

12   epidemiologists.  They have toxicologists.  They have

13   biochemists.  They have everything who are reviewing this data.

14        They examined Monsanto's data; but if -- maybe they say

15   "We don't want Monsanto's data."  Well, they reviewed the data

16   from other manufacturers that Monsanto had nothing to do with.

17   So the non-Monsanto data.  And then they reviewed independent

18   data that had nothing to do with any company that was just run

19   by people who conducted some of the studies that you heard in

20   Phase I.  And from 1975 when the product was first on the

21   market through today, they have consistently said that Roundup

22   or glyphosate is not carcinogenic.

23        Who works at the EPA?  Because you heard this as well, and

24   I just mentioned it.  Toxicologists, chemists, pathologists,

25   epidemiologists, biologists, other scientific experts who are

1    involved in these reviews.  And to be clear, not just at the

2    EPA, but in Europe, in Health Canada, in Australia, in Japan.

3        Here is the 1993 reregistration eligibility team when they

4    were looking at 1975 to make sure in 1993 what the science

5    said, and you can see all the different branches.  It's hard to

6    see because it's little on the left, but it even names all the

7    different doctors who were involved in this review.  You can

8    read it.  Special Review and Reregistration Team, Health

9    Effects Team, Biological and Economic Analysis Division,

10   Pesticides and Toxic Substances Division.

11       These are real scientists who are looking at the safety of

12   glyphosate and telling Monsanto "We have looked at the data and

13   we do not think there is carcinogenicity."

14       So you have seen a series of documents.  I have shown them

15   to you in opening here in Phase Two.  I won't belabor them.

16   But in 1993, in that reregistration eligibility decision, which

17   was sometimes referred to as RED, the Agency classified

18   glyphosate as a Group E carcinogen, non-carcinogenicity to

19   humans.

20       And I say that Monsanto was informed by the reviews.

21   Well, here is the testimony to show that they were reasonable

22   based on the science.  When you say the EPA's reregistration

23   decision helped inform Monsanto's views that glyphosate and

24   glyphosate products did not cause cancer, how did it do that?

25   Explain that.

CLOSING ARGUMENT / STEKLOFF

 1    In here -- and she is talking about the documents I just

 2    showed you.  In here they talk about their decision on the

 3    carcinogenicity evaluation of glyphosate.

 4    And did they have scientists who reviewed the same tests

 5    that Monsanto had performed?

 6    Yes.

 7    Did they come to the conclusion that glyphosate is not

 8    genotoxic?

 9    Yes.

10    Did they -- what else did they conclude with respect to

11    glyphosate as it relates to whether or not it causes cancer?

12    They put it into Group E, which is evidence of

13    non-carcinogenicity.

14    In 1998 the EPA came to the same conclusion.  It was a

15    Group E pesticide, no evidence for carcinogenicity in two

16    acceptable species, which was based on both mice studies and

17    rat studies.  And as I have said, it wasn't just the EPA here

18    in the United States.

19    Europe, no evidence of carcinogenicity.

20    The World Health Organization and a division of the United

21    Nations, glyphosate is unlikely to be genotoxic.  In view of

22    the absence of a carcinogenic potential in animals and the lack

23    of genotoxicity in standard tests, the Meeting concluded that

24    glyphosate is unlikely to pose a carcinogenic risk to humans.

25    This is in 2004, based on all of the science.

 1        And even Dr. Portier had to admit that he, himself -- he

 2   was working at the National Toxicology Program for the United

 3   States government -- he was responsible as a group -- as part

 4   of a group of scientists for finding the causes of cancer.  And

 5   while he was there, before he was a paid Plaintiff's expert, he

 6   never said that Roundup or glyphosate caused cancer.

 7        And he admitted that the same statement would be accurate

 8   as to 2013.  That as of 2013, agencies you know of that have

 9   reviewed glyphosate prior to 2013 -- again, that key period is

10   1986 to 2012 -- their findings were not carcinogenic.

11        Yes.

12        So this is their expert admitting that no agency in the

13   world based on all of the science before 2012 thought Roundup

14   was carcinogenic, and yet the allegation here is that Monsanto

15   was basically involved in criminal behavior for not warning

16   that Roundup cause -- is carcinogenic.

17        Then Dr. Portier, once he was an expert, once IARC came

18   out, he went out and tried to petition organizations --

19   regulators around the world that his opinions, which you heard

20   in Phase One, are right and they are wrong.  But what did they

21   say?  This is from Phase One.  EFSA, the European Food Safety

22   Authority, they reviewed all of his arguments, even more

23   arguments than he made on the video that you saw.

24        They said glyphosate is unlikely to be genotoxic.

25        And then they wrote back and they say EFSA considers that

1    the arguments brought forward in the open letter -- the open

2    letter he wrote to them with all of his concerns -- do not have

3    an impact on the EFSA conclusion on glyphosate.

4         And he testified this was true of the EPA too.  He tried

5    to petition them.  They reviewed all of his criticisms, and

6    they said glyphosate is not carcinogenic.

7         And then you saw this morning, we played for you a

8    two-minute clip of Dr. Portier once again.  But the date here

9    is key.  In December of 2018 -- so, what, three months ago --

10   the EPA once again -- now IARC has occurred.  Now there is a

11   lot of attention on Roundup and glyphosate.  And the EPA is

12   reviewing the science, and this is what the EPA said just three

13   months ago:  EPA is confident in its conclusions that

14   glyphosate is not likely to be carcinogenic to humans.  They

15   are confident in their conclusion.

16        Again, how did the worldwide regulators impact Monsanto,

17   and was Monsanto -- and I said this in opening.  Monsanto takes

18   responsibility.  Monsanto is not hiding behind EPA.  Monsanto

19   is not hiding behind regulators, but it is still relevant what

20   regulators who were also independently looking at the science

21   and have a duty to the public, what are they telling Monsanto.

22        And this is what Mr. Grant told you yesterday.  It is our

23   conclusion that Roundup does not cause cancer.  But more

24   importantly, in the regulatory jurisdictions around the world,

25   in the U.S., in Canada, in Japan, in Europe, with the German

 1   rapporteurs, it has been their conclusion for the last 40

 2   years -- and that's the point I was trying to make earlier --

 3   it's -- this is a conclusion that's validated by scientific

 4   evaluation.

 5        So we are a science-based company, and the regulators are

 6   looking at the science at that time, and that is their

 7   conclusion also.  So what was known and knowable to the company

 8   and to the regulators shows that Monsanto was acting

 9   reasonably.

10        And Monsanto and the regulators were informed by the

11   science.  So I'm not here to re-litigate Phase One.  Again, no

12   one has any questions about how seriously you took Phase One.

13   But at the same time, they are looking at the science time and

14   time and time again.

15        And these two pie charts, to be clear, are not in dispute.

16   This is what the AHS showed.  Maybe AHS in your opinion had

17   flaws, but the AHS showed that the NHL rates -- the rates of

18   non-Hodgkin's lymphoma in people who were -- the 44,000 people

19   who were using glyphosate as compared to just the regular

20   general population, were exactly the same:  1 percent.  And it

21   is data like this that was informing Monsanto, and it was the

22   data like this, along with everything else, that was informing

23   the regulators.

24        So up to today has any evidence been brought to you that a

25   single regulator, anywhere in the world -- maybe you don't like

**CLOSING ARGUMENT / STEKLOFF**

 1   the EPA, but what about Health Canada?  What about Europe?

 2   What about Australia?  What about Japan?  What about anywhere

 3   else in the world?  Has any regulator said glyphosate or

 4   Roundup is carcinogenic?  No.  Because there is no evidence.

 5   The answer to that question is no, no regulator has said that.

 6        Has any regulator in the world said that Roundup should be

 7   sold in their country with a cancer warning?  No.  Nowhere in

 8   the world has that occurred.  And that is what demonstrates the

 9   reasonableness of Monsanto.

10        So this is what you heard was going to occur in opening.

11   In opening we are supposed to present to you what the evidence

12   will show, and the Plaintiff, who has the burden, said this to

13   you -- this is a direct quote from opening -- you are going to

14   learn that Monsanto had a cozy relationship with a couple of

15   people, long-term EPA employees.  You are going to hear

16   testimony about that.

17        You heard no testimony about that.  I think there was a

18   reference this morning to text messages.  There was no evidence

19   whatsoever of a cozy relationship with a couple of long-term

20   employees at the EPA because that evidence is not there.

21        And I talked to you at the outset this morning.  And I

22   hope you know that from Phase One and Phase Two we have

23   presented the full stories for you today.  Sorry, for a month,

24   not just today.

25        But these are the four things that the Plaintiffs continue

1    to rely on -- really the first three.  We will talk about the

2    fourth.  They walked through all of these things today, and now

3    I want to walk through what they presented in this trial and

4    what the rest of the story was.

5         So let's start with the Knezevich tumor, this magic tumor

6    that you supposedly heard about today.  Here is what they

7    presented to you when they presented the evidence.  They told

8    you that Monsanto submitted a mouse study to EPA.  They told

9    you that the EPA panel considered making it a Group C

10   classification.  They told you that the EPA asked for more

11   information.  They told you that Monsanto hired Dr. Kuschner to

12   review the slides.

13        Here is what we had to present to you.  They didn't

14   present this.  We presented it.  EPA held more discussion and

15   held a public meeting.  Monsanto conducted a new study on rats;

16   and based on that study, EPA determined that glyphosate was not

17   carcinogenic.

18        Here is the document -- that they didn't present to you

19   that we had to present to you -- in 1990 that shows that --

20   where the EPA was considering the study that Monsanto conducted

21   using certain types of rats for two years, and the Agency

22   concluded that these adenomas -- so these tumors -- were not

23   treatment related and glyphosate was not considered to be

24   carcinogenic in this study.

25        And here was the EPA's ultimate conclusion in 1991:

1  Glyphosate should be classified as a Group E, evidence of

2  non-carcinogenicity for humans, based on lack of convincing

3  carcinogenicity evidence.  That is the full story about the

4  *Knezevich* study.

5      What about Dr. Parry's recommendations?  Because we heard

6  half the story again today.  This is the story that they

7  presented to you in this trial.  This is the story that they

8  presented to you today.  Dr. Parry reviewed the genotoxicity

9  studies, four genotoxicity studies.  He found possible

10  genotoxicity.  He made recommendations.

11      Well, what is the story that we had to present to you so

12  that you had all of the evidence?  Monsanto, based on

13  Dr. Parry's recommendations, conducted further tests.  Monsanto

14  shared the results with Dr. Parry.  Monsanto published the

15  results of its tests in a peer-reviewed journal.  And Dr. Parry

16  agreed, based on those tests, that Roundup or glyphosate was

17  not carcinogenic.  We had to present that to you.  They had the

18  burden.

19      Here, you will recall this document.  I think they said, I

20  might show you this document.  I'm going to show you this

21  document.  Let's walk through the recommendations that

22  Dr. Parry made and then Dr. Farmer testified what happened in

23  response to each document.

24      I think today they showed you something that said there

25  was a dumb e-mail that said, We are not going to run the tests.

1    Well, guess what?  Despite that e-mail in 1999, they responded

2    to every single one of Dr. Parry's recommendations.  This was A

3    and B, about providing more data.

4        They provided the data, you will recall, that showed --

5    Dr. Farmer showed you this -- all of the tests they provided to

6    Dr. Parry so he could evaluate everything, and you will even

7    recall that Dr. Parry was happy because Monsanto had already

8    started some of the tests, unbeknownst to him, before his

9    recommendations.

10       Here, he recommended evaluating oxidative damage.  They

11   showed him the studies that evaluated oxidative damage.  Here

12   he said to perform an in vivo bone marrow micronuclei assay.

13   They showed him the study where that occurred.

14       In this one, the next one, he made no recommendations.  He

15   raised some issues but there was no recommendation, so there

16   was nothing for them to do.

17       In this one you remember there was testimony about the

18   comet assay, and Dr. Farmer walked you through this.  In

19   response to this recommendation, exactly what they provided to

20   Dr. Parry, including, you will see down here, Heydens and

21   Holtz -- so the third bullet and the fifth bullet and actually

22   the fourth bullet -- those were Monsanto's studies that they

23   conducted and then provided the data about genotoxicity to

24   Dr. Parry.

25       And then this next recommendation, G, he said, I do not

1   recommend any transgenic point mutation assays at this time.

2   There was nothing to do there.

3         H, he didn't recommend any studies of DNA.

4         Adduct induction, there was nothing to do there.

5         And then he wanted to be provided with comprehensive in

6   vitro data on the surfactants, so they gave him the in vitro

7   data and the in vivo data.  That, you can see all showed

8   negative for genotoxicity.

9         And after Dr. Parry looked at Monsanto's responses to all

10  of his recommendations, what did he say?  Well, first of all,

11  here is another promise that was made to you in opening

12  statement by the Plaintiff with the burden.  This is what you

13  were told you would hear in Phase Two.

14        However, in the second paper where Dr. Parry concludes

15  that glyphosate is a potential clastogenic in vitro, and that

16  means it is an agent that can induce mutation by disrupting or

17  damaging chromosomes.  So he didn't change his position.

18        Well, he did change his position because you heard

19  testimony about this document that we presented.  We presented

20  it.

21        In 2001 Dr. Parry accepted that glyphosate is not

22  genotoxic.  And in 2001 he said he no longer required any

23  studies on the final formulation.  That's the full story about

24  Dr. Parry.

25        These are two of the things that we probably heard about,

PROCEEDINGS

1    the mouse study and the Parry -- and the Parry data for 30

2    minutes this morning to argue why not only is Monsanto liable

3    but should be penalized for punitive damages.  They didn't

4    present to you the full story.  We did.

5            THE COURT:  Mr. Stekloff, can I ask -- I want to take

6    a quick break just to make sure -- there is an issue I want to

7    discuss with the parties outside the presence of the jury.  Why

8    don't we take a five-minute break.  We will be back at about 15

9    after the hour.

10        (Proceedings were heard out of presence of the jury:)

11           THE COURT:  So the issue I want to discuss is -- I

12   meant to bring this up after the opening -- after the closing

13   arguments in Phase One and I forgot to.  I want to warn

14   Plaintiff's counsel to be careful not to act -- not to react

15   with theatrical facial expressions in response to arguments

16   that Mr. Stekloff is making.

17           MS. MOORE:  Okay.

18           THE COURT:  That happened a lot during closing

19   arguments in Phase One, and it was not appropriate; and it is

20   not appropriate now.

21           MS. MOORE:  Okay.  I apologize, Your Honor.

22           THE COURT:  Why don't we come back in a couple

23   minutes.  Okay.

24           MS. MOORE:  Thank you, Your Honor.

25           THE CLERK:  Court is in recess.

 1            (Recess taken at 11:11 a.m.)

 2            (Proceedings resumed at 11:15 a.m.)

 3            THE COURT:  Okay.  Bring the jury back in.

 4       (Proceedings were heard in the presence of the jury:)

 5            THE COURT:  Okay.  Sorry about that interruption.

 6       Mr. Stekloff, you can resume.

 7            MR. STEKLOFF:  Thank you, Your Honor.

 8       So we were walking through what we spent, I think, the

 9   majority of this morning on:  The magic tumor, the Knezevich

10   tumor, and then Dr. Parry's recommendations.  But then we also

11   heard about ghostwriting.  So that's what the Plaintiff told

12   you.  Again, half the story.  Well, what was the full story?

13       First of all, in the *Williams* 2000 paper, Monsanto's role

14   was disclosed.  And, again, what is the purpose behind

15   disclosing Monsanto's role or not disclosing it in a paper?  It

16   is so people who are reading the paper can say This is what I

17   think.  I don't really trust it because Monsanto is involved,

18   or maybe I do trust it because Monsanto is involved.  It is

19   their product.

20       But here it makes very clear that the toxicologists and

21   other scientists at Monsanto made significant contributions to

22   the development of exposure assessments and through many other

23   discussions related to the paper.  And then it laid out people,

24   including Dr. Heydens and Dr. Farmer, who were involved in

25   those discussions.

1          Now, there was another paper, the Mink paper, that, again,

2     you were shown.  It was written on the paper.  You should

3     consider this study.  Well, I agree.  Go back and look at the

4     Mink paper.  Go back and look at that exhibit, Exhibit -- well,

5     this is an e-mail, Exhibit 466.  Go back and look at what was

6     done in the Mink paper.

7          First of all, Dr. Farmer testified about this.  The

8     question was:  I don't really want to get into that substance.

9     I just want to validate that you wrote these things.  You wrote

10    that paragraph under the introduction glyphosate acid is

11    typically -- you see that?

12         And her answer was:  Again, I think it's important that we

13    do take the context because Dr. Williams and Dr. DeSesso are

14    not familiar with the constituents of the product, so the minor

15    edits that I did was to help give a little bit of context to

16    the formulated product.

17         And when you look at that paper -- when you look at that

18    exhibit -- papers are laid out.  There is an introduction.

19    Then there is often the methods that the scientists use to

20    conduct whatever study they were conducting.  And then there is

21    a discussion of their results, and then there oftentimes is

22    some sort of conclusion.  That's how papers are typically laid

23    out.

24         Well, if you look at that paper -- and it is a long

25    paper -- after the introduction where she gave the context that

1    she explained, there was no edit from Dr. Farmer to the method

2    section that the scientists choose.  There was no edit to the

3    result section that discussed the results of their study.

4    There were no edits to the author's discussion of the science

5    that they were reporting.

6        She moved words around in the introduction, and she

7    provided context and information for the introduction because,

8    as she said, they don't have all of the context about

9    Roundup-formulated products because they don't -- those

10   scientists who wrote that paper don't work at Monsanto.

11       So what was the last thing -- we actually didn't hear

12   about this morning, but there was a big focus on it at trial.

13   You might remember that there was an e-mail from Dr. Farmer

14   where she -- you can see the e-mail, says:  Here is their

15   bottom line.  How do we combat this?

16       Do you have to love the word combat?  No.  But she

17   provided context for exactly what she meant when she was

18   combating this statement to avoid carcinogenic herbicides in

19   foods by supporting organic agriculture and on lawns by using

20   nontoxic land care strategies that rely on soil health, not

21   toxic herbicides.

22       What you may remember from the trial is that this e-mail

23   where Plaintiffs were presenting their evidence was shown to

24   Dr. Reeves.  And Dr. Reeves was asked:  Do you agree with what

25   characterization here?  What do you think about this word

1   combat?  What do you think about it?

2        Well, what you need to know is that we showed you the

3   testimony from Dr. Farmer about this.  I don't know if it was

4   always clear who was showing you what in the depositions when

5   they were shown consecutively.  They weren't going to show you

6   what Dr. Farmer said about the e-mail she wrote.  We had to

7   play that for you, so you had the full story.

8        And here is what she testified when asked.  They didn't

9   want you to hear this:  Why would you want to combat that

10  sentence?

11       Well, first of all, in relationship to glyphosate, it was

12  not a carcinogen.  And I think that's really important that

13  people understand that herbicides -- dose makes the poison --

14  that's what you heard from Dr. Ritz -- so you have to look at

15  this, that glyphosate was not carcinogenic.  I don't want

16  people to be misled that all these herbicides are carcinogenics

17  and that everything that is used out there is organic is

18  nontoxic.

19       You can agree or disagree with that, but we presented the

20  full story to you about what she meant in this e-mail, and

21  that's what you should demand, is that the full story is given.

22       And here is another example because it happened to him

23  this morning.  This e-mail is taken out of context.  This is in

24  2003.  She writes, For example, you cannot say that Roundup is

25  not a carcinogen.

1        But I showed you this in opening.  This is actually what a

2   responsible scientist does.  She was saying you can't say

3   Roundup is not a carcinogen based on all of the testing.  We

4   can make that statement about glyphosate and can infer that

5   there is no reason to believe that Roundup would cause cancer.

6        This is the full e-mail, not just some snippet that is

7   cherrypicked that is trying to mislead you into Monsanto's

8   behavior or whether they were reasonable.  And I actually want

9   to show you something that happened -- I don't have a slide on

10  it because I didn't expect it to happen, but it happened this

11  morning.

12       Ms. Melen, can I please have the ELMO?

13       This is one of the e-mails that you were shown that was

14  written on the chart that you should consider.  It was an

15  e-mail from Dr. Heydens.  And hopefully you recall this.

16       What I want to show you is The good 'ol Monsanto way of

17  doing things.  Give people --

18       Now, when you were shown this on one of the slides in

19  Plaintiff's closing this morning, just an hour ago, it said the

20  good 'ol Monsanto way of doing things.  It was a little image

21  on the top left of a slide.  Give people, and it had four

22  dollar signs.  That is what you were shown to try to convince

23  you why you should find Monsanto liable.  This is what the

24  e-mail actually says.

25       Monsanto people who are responsible for dissemination and

 1    coordination of scientific information within and outside of

 2    Monsanto.   This was part of his elements of a network plan

 3    include but not are not necessarily limited to by Dr. Heydens,

 4    1999.   They will also play a role in establishing and managing

 5    relationships with outside experts.   Some of these will be

 6    full-time dedicated headcount and some will be part-time.   The

 7    good 'ol Monsanto way of doing things, give people an extra

 8    job.   Not money, an extra job.

 9         Initially Jerry talked about adding four full-time people

10    to Europe for this role and one in St. Louis.   I don't know if

11    this has changed.   It is my understanding that Ariane Redding

12    will have an overall coordination role for Western Europe.

13         I think we heard the word "offensive."   It is offensive to

14    misquote and put on a slide The good 'ol Monsanto way of doing

15    things, give people money, when this is what the document says.

16    That is offensive.

17         Can I please turn back?   Thank you.

18         Monsanto acted reasonably.   Mr. Hardeman used the product

19    from 1986 to 2012, but from 1975 to today the EPA has never

20    required a warning based on all of the science.   Every other

21    regulator in the world from 1975 to today, the same is true.

22    They have not required a warning.   And this is the evidence

23    that answers the questions about whether there was a design

24    defect or whether Monsanto failed to warn.

25         So what is the second question that I want to talk about?

 1   What did Plaintiff prove about the label?  Because, then again,

 2   there is no dispute the Plaintiff has the burden.

 3        What are some of the questions that the Plaintiff never

 4   answered for you in Phase Two?  What did the Roundup label say?

 5   The Roundup label that was on the product that Mr. Hardeman was

 6   using from 1986 to 2012, what did it say?  What should the

 7   label have said?

 8        They are saying there should have been a cancer warning,

 9   but what should it have said?  Because, as you know, the

10   science changes.  The science evolves.  The science is

11   complicated.

12        Again, not challenging in any way the decision you made in

13   Phase One, but that doesn't mean that they can just come in and

14   say there should have been a cancer warning.

15        When should Monsanto have added that warning?  He used it

16   from 1986 to 2012.  They haven't presented any evidence to you

17   about when a warning should have been added.

18        And it was the EPA who was responsible ultimately to say

19   whether something should go into any warning on the Roundup

20   label.  Monsanto is responsible for putting it in, but the EPA

21   has to approve it.  Would the EPA have approved whatever it is,

22   hypothetically, that they say should have gone on the label?

23   They presented no evidence to you on this.  Literally zero.

24   And they brought you no expert to talk about this.

25        They have the burden.

1          And then I just briefly want to talk about whether

2    Mr. Hardeman would have even read a different label if it had

3    taken place because this is what the evidence showed about

4    Mr. Hardeman reading the label.

5          When he first testified in his deposition -- and I had to

6    confront him with this, you might recall -- this is what he

7    said about reading the label under oath:  I don't know -- I --

8    I believe at one time when I -- and didn't every time I bought

9    a thing of Roundup, I didn't read.  I don't know if they

10   updated it or not.  I mean, when I originally got the -- you

11   know, the product in the -- earlier, I may have read it once.

12         So since 1986 he may have read it once.

13         So I didn't -- so I knew it so I didn't need to reread it

14   again at any point after 1986 so I don't know.

15         Now, later in his deposition under oath, he did say this:

16   So you read the label the first time in 1986, but you didn't

17   read it after that?  And your answer was --

18         And he said:  I may have looked at it again in West Side.

19   I -- quickly I don't know.

20         That's 1988 when he moves to that 56-acre property.

21         He says:  I may have looked at it again.  I don't know.

22   It is possible I looked at it again in West Side, you know,

23   after that time.

24         So you would have looked at it, so just so --

25         Maybe one other time.  I mean, it's been -- it's been --

1    there is no need for me to keep looking at it again.  You know,

2    you know, your whatever and -- you know the conditions and the

3    whatever you need to spray it under, and I was familiar with

4    that and that's how I, you know, used it.

5          And in every claim that you have to find the elements, one

6    of the elements is that a different label would have been a

7    factor in Mr. Hardeman developing cancer, and that is directly

8    what this goes to because there is no evidence that he would

9    have read the warning.  Even if one had occurred, even if you

10   think one was necessary, even if you think the company was

11   unreasonable, who knows what it would have said, who knows what

12   it would have been -- when it would have been put on.  They

13   didn't present any evidence of that.  But they also can't get

14   around this testimony from Mr. Hardeman.

15         And I asked Mr. Hardeman about other labels because we

16   heard he used other products that a reasonable person would

17   have maybe wanted to look at the labels and see what they said,

18   and his testimony was he didn't know what the labels said for

19   these other products:  Ant spray, wasp spray, gasoline, paint.

20   That was his testimony.

21         So I want to stop there because if you say no to the first

22   three questions, that they didn't prove that Monsanto was

23   unreasonable, that they didn't prove that Monsanto should have

24   warned based on all of the science, based on what every

25   regulator and what every health agency was saying between 1986

 1   and 2012, and frankly up until today, then you are done.  You

 2   only get to damages if you answer yes to one of those three

 3   questions.

 4        So I want to talk to you briefly about damages because

 5   there are two types of damages.  There are compensatory damages

 6   that you heard about from His Honor during the instructions and

 7   there are punitive damages.

 8        I think I heard today They didn't cross-examine

 9   Dr. Nabhan.  They didn't challenge compensatory damages.

10   That's right, we didn't cross Dr. Nabhan.  I told you in the

11   opening for Phase Two we weren't going to challenge how

12   difficult and unfortunate it was that Mr. Hardeman suffered

13   from non-Hodgkin's lymphoma and what he went through.  I'm not

14   standing here challenging that this morning.

15        We stipulated to the amount of his medical records.  We

16   agreed that his medical costs up through, I think, late 2018

17   when we had the records, were approximately $200,000.  It is in

18   the instructions.  It is on the verdict form.

19        But you only give that if you find that Monsanto acted

20   unreasonable.

21        And one of the instructions that His Honor read to you --

22   one of the first ones -- Instruction Number 1 reads in part:

23   You must follow the law as I give it to you whether you agree

24   with it or not.  And you must not be influenced by any personal

25   likes or dislikes, opinions, prejudices, or sympathies.  You

 1    will recall that you took an oath to do so.

 2         And that's important because all of us feel sympathy for

 3    Mr. Hardeman.  And I told you in opening this is not a

 4    popularity contest.

 5         But you need to make your decision based on the evidence,

 6    based on the full story, based on all of the evidence.  And if

 7    someone in that room says, Look, I feel sympathetic for

 8    Mr. Hardeman and we have a huge company over there, the rest of

 9    you need to say, That's not what we are here to discuss.  We

10    are here to discuss did Mr. Hardeman prove that Monsanto acted

11    unreasonably.  Did they meet their burden to prove that

12    Monsanto should have warned, based on all of the science, based

13    on what they were hearing from the regulators?

14         All of you -- some of you when we were in jury selection,

15    we discussed, could go back and vote -- tell your colleagues,

16    tell your friends you voted for Monsanto.  You don't have to

17    like Monsanto.  You don't have to think that every single thing

18    in every single e-mail was perfectly written.  You can think

19    there were things that were just dumb, but that doesn't mean

20    they have met their burden.

21         And all of you said, when I asked you whether you could

22    vote for Monsanto if they didn't meet their burden, every

23    single one of you -- and I'm grateful for it -- raised your

24    hand and said yes.

25         So let's talk for a moment about punitive damages.

 1    First of all, the standard for punitive damages is higher.

 2  It is not that -- I'm not going to go over the burden thing

 3  again, but they started here regardless.  It is not a feather.

 4  But the standard for punitive damages is not preponderance of

 5  the evidence.  It is clear and convincing.

 6    So there is beyond a reasonable doubt in criminal cases,

 7  clear and convincing -- which is right below it -- and then

 8  preponderance of the evidence, which is what applies to the

 9  claims, except for punitive damages.  And they have to prove

10  punitive damages by clear and convincing evidence, and you will

11  have the definition of that.

12    You will also have the definition of what punitive damages

13  are.  I think you are going to read that there had to be malice

14  and oppression and basically despicable conduct.  So what is

15  it -- and we heard it this morning, based on Parry, based on

16  the magic tumor, based on ghostwriting -- was despicable?  They

17  are -- you heard from ten Monsanto employees.  They said we

18  didn't bring anyone in here.

19    These people all sat and were asked any question that they

20  wanted to ask for days and days and hours and hours upon hours

21  of depositions.  They all came in here and they testified.

22  That testimony by video you can consider the exact same way as

23  a person sitting on -- live.  The Judge has instructed you

24  that.

25    Well, what are they really asking you to believe about the

employees of Monsanto when they ask for punitive damages?  They

are asking you to believe that these people who work in

St. Louis, in their homes, eat breakfast, feed their kids, take

them to school, and then drive to Monsanto and say, You know

what, we are going to engage in a conspiracy to give people

cancer.  We are going to go into Monsanto and cause people to

get cancer.  That's what they are asking you to believe, and

that's outrageous.

     These people believe in the safety of Roundup.  These

people believe in the safety of glyphosate.  These people have

done the testing; provided the data to the regulators, and the

regulators and Monsanto have said that Roundup and glyphosate

are not carcinogenic.  And for them to stand up here and say

the things that they said about these people is offensive.

     These people are highly credentialed.  You heard their

backgrounds.  We had to play that for you too.  We had to play

their education for them.  We had to play where they worked

before.  We had to play how long and how seriously they took

their responsibilities at Monsanto.

     And it is not just -- it is Monsanto that is on trial, but

to really believe punitive damages, to believe what they are

telling you here, you have to believe that every one of these

organizations is also just out there lying about glyphosate and

Roundup.

     The EPA, Health Canada, Australia, Japan, the European

 1    Union, the National Cancer Institute -- when they do the

 2    Agricultural Health Study -- the National Institutes of Health

 3    that supports that Agricultural Health Study, the United

 4    Nations, and the World Health Organization, you have to believe

 5    that all of these people are lying to the public about the

 6    safety and the non-carcinogenicity of Roundup and glyphosate.

 7    And that is just not the case.

 8        Punitive damages, which you shouldn't even get to, but

 9    punitive damages are not warranted here.

10        And how do you know that?  Again, it is the testing.  It

11    is what the company did.  For years and decades of so many

12    different types of testing.  This is the evidence before 2012,

13    which you will look in the instructions is the key period you

14    need to look at.

15        1991, 1993, 1998 EPA, noncarcinogenic, noncarcinogenic, no

16    evidence of non-carcinogenicity.

17        Europe, no evidence of carcinogenicity in 2002.

18        World Health Organization and United Nations in 2004,

19    unlikely to pose a carcinogenic risk to humans.

20        And did it stop there, even after IARC made the

21    determination it made?  No.  You have seen this evidence as

22    well.

23        2016, Europe, unlikely to be genotoxic, does not support a

24    classification of carcinogenicity for glyphosate.

25        December 2018, EPA is confident in its conclusion that

 1   glyphosate is not likely to be carcinogenic to humans.

 2        There is one more instruction that I want to read for you.

 3   And, again, there is no one in this courtroom who doubts how

 4   seriously -- based on the deliberations -- we don't know what

 5   was said back there, but the length and the seriousness of your

 6   deliberations that you took in Phase One.

 7        The Judge informed you, of course you need to listen to

 8   each other.  Do not be unwilling to change your opinion if the

 9   discussion persuades you that you should.  But also this is the

10   law:  Do not come to a decision simply because other jurors

11   think it is right or change an honest belief about the weight

12   and effect of the evidence simply to reach a verdict.

13        We know that when you go back to discuss the evidence, the

14   full story, that is what you will do.  So the last thing I want

15   to talk to you about -- and I thank you.  You have heard a lot

16   from me over the last month -- this is the last you are going

17   to hear from me.

18        As I said before, this is really hard for lawyers not to

19   have the last word, but Ms. Moore gets the last word because

20   they have the burden.  They have the burden to tell you the

21   full story.

22        But what are the things that they want you to ignore?  You

23   should demand answers to these things.

24        They want you to ignore the decades of Monsanto testing on

25   the glyphosate, surfactants, the formulated product, animal

1   studies, genotoxicity studies, human exposure studies.  I mean,

2   again, that is quite a conspiracy to run all of those tests if

3   you are trying to hide something that you believe causes

4   cancer.

5        They want you to ignore that worldwide regulators -- not

6   just the EPA, but every regulator around the world has -- that

7   has looked at this issue has confirmed that Roundup is not

8   carcinogenic, from 1975 through today.

9        They want you to ignore that those same worldwide

10  regulators have not required a warning.

11       They want you to ignore that they presented to you no

12  evidence of when a warning should have been added.

13       They want you to ignore that they didn't bring you an

14  expert on when a warning should have been given or what the

15  warning should have said.  They have the burden.  Their experts

16  didn't talk about these things.  They could have brought you

17  such an expert.

18       And they want you to ignore those Monsanto employees, they

19  are claiming, believe that Roundup causes cancer and are trying

20  to -- and they are trying to give cancer to people, that those

21  same employees believe that but yet use Roundup at their home

22  with their families.  It is not the case.

23       So the fact that you have come to a determination on

24  Phase One does not answer the question on Phase Two.  What all

25  of the evidence shows, when you don't cherrypick evidence, when

 1  you don't mislead about evidence, is that Monsanto was

 2  reasonable.  Monsanto believed in the science.  Monsanto

 3  followed the regulators.  Monsanto took responsibility and did

 4  the testing.  And so those questions to 1, 2 and 3 are no.

 5      So, again, I cannot thank you enough for the attention you

 6  have given and the seriousness you have given.  And so I now

 7  leave it in your hands.

 8      Thank you.

 9          THE COURT:  Okay.  Ms. Moore.

10          MS. MOORE:  Thank you, Your Honor.  Do you mind if I

11  just put my phone on so I will watch my time myself?

12          THE COURT:  Sure.

13          MS. MOORE:  Thank you.

14                    **REBUTTAL ARGUMENT**

15          THE COURT:  You have 15 minutes.

16          MS. MOORE:  Thank you, Your Honor.

17      Ladies and gentlemen, I want to respond to a few things

18  that Mr. Stekloff mentioned, and I want to kind of work

19  backwards.  He spent a lot of time on his closing argument on

20  EPA and the regulatory bodies, and I want to be really clear

21  about this:  EPA's decision is about glyphosate.  Regulatories

22  look at glyphosate, not Roundup, not the formulated product.

23  That is a key difference.

24      We saw in the e-mails -- it is Exhibits 245 and 426 --

25  Donna Farmer says:  We cannot say Roundup -- Roundup -- is not

REBUTTAL ARGUMENT / MOORE

1    a carcinogen.  We have not done the testing.

2        That is what she said in the internal documents.  These

3    are not documents that they turn over to the EPA, just like the

4    *Parry* report.  They didn't give the *Parry* report to the EPA

5    when Parry said that it is genotoxic.

6        She said:  We cannot say it is not a carcinogen.  They

7    haven't done the testing.

8        Now, he talked about there was all these tests, hundreds

9    of tests.  We have to look at what those tests actually were.

10        Those tests, Ladies and Gentlemen -- if I can find my

11    thing here -- those tests Dr. Farmer was asked about them.  Are

12    these acute toxicology tests?  Well, first of all, do they test

13    for cancer?

14        Answer:  No.

15        That's what she said on the stand.

16        Question:  Potential cancer causing of any substance?

17        Answer:  No.

18        They answered the request for admissions.  You saw them.

19    They admitted that they didn't test the formulated product.  So

20    for him to stand up here and say, Oh, there are hundreds of

21    tests, that's not what they admitted to.  That's not what the

22    Defendant admitted to.

23        Now, conspiracy.  I never said the word "conspiracy," and

24    you know that.  But I will say that their behavior since 1975

25    has been reckless, time and time and time again.

 1          Going back to the EPA when it was first approved, you had
 2     the IBT scandal.  When that study was held invalid, they didn't
 3     do the right thing.  They didn't take it off the market.  They
 4     didn't put a warning on it.  When the EPA said it was a Class C
 5     oncogen, what did they -- how did they respond to it?  They
 6     didn't say, Let's warn it is a Class C oncogen.  They said, We
 7     have to find a tumor in the control group.  And, lo and behold,
 8     they did; and that changed the history, their relationship with
 9     the EPA because the EPA changed their categorization after
10     that.
11          Now, this labeling issue, make no mistake about it.  It is
12     the Defendant's responsibility.  It is Monsanto's
13     responsibility on the label.  It is their responsibility to
14     warn that their product causes cancer.  They cannot hide behind
15     the EPA as a shield like they are doing in front of you now.
16          The instructions.  Let's look at the instructions because
17     he made an issue about what would this label even say.  When
18     would this label have gone on the product?  Well, the label
19     should have gone on the product when they first knew or should
20     have known that it caused cancer.  Remember, one of the first
21     studies was 1980.  The first mouse study showing lymphoma was
22     1983, well before Mr. Hardeman ever sprayed.
23          So Mr. Hardeman, I asked him:  If the bottle had said
24     Warning, it causes cancer, would you have bought it?
25          He said:  No.

REBUTTAL ARGUMENT / MOORE

1    So on the instructions -- and you have to kind of look at

2    the instructions and the verdict form together.  The verdict

3    form is what you fill out and then return, but the instruction

4    gives you guidance.  So the first question -- and you remember

5    what we asked is that all six of you -- all six of you -- vote

6    yes to all three questions.

7    Number 1 goes back to Number 11 in the instructions.  All

8    right.  It says it right here for you, but that's strict

9    liability design defect.  And it says very clearly -- and this

10   is why we believe that the answer is yes, Ladies and Gentlemen:

11   To establish its design defect claim, Mr. Hardeman must prove

12   all of the following:  Monsanto manufactured, distributed or

13   sold Roundup.

14   That is not in dispute, okay.  It's their product.  So

15   that's Number 1.

16   Number 2, Roundup, in the context of the facts and

17   circumstances of this particular case, is a product about which

18   an ordinary consumer can form reasonable minimum safety

19   expectations.

20   You can buy it off the shelf at your local hardware store.

21   Your minimum safety expectation is it wouldn't cause cancer.

22   That Roundup used by Mr. Hardeman did not perform as

23   safely as an ordinary consumer would have expected.

24   I asked him:  Did you expect cancer?  Did you think it was

25   dangerous?

1        No.

2        And that Roundup's failure to perform safely was a

3   substantial factor in causing his harm.

4        You already found that Roundup caused his harm, and the

5   fact that it failed to perform safely, and that's in

6   Exhibit 442.  It talks about it is not glyphosate.  It is the

7   actual formulation that does the damage.  The formulation does

8   the damage.  The formulation is Roundup.  And that's why we ask

9   that you check yes to Question Number 1.  It is a defective

10  design.  It does not work as an ordinary consumer would expect

11  it to work.

12       All right.  Number 12, let me take my cheat sheets off

13  here -- Number 12, that goes with Question Number 2 on the

14  verdict form.  And this is about failure to warn.

15       Number 1, Monsanto manufactured, distributed or sold

16  Roundup.

17       That is a yes.

18       Roundup's NHL risk was known or knowable in light of the

19  scientific medical knowledge.

20       Remember that's the blow-up.  The scientific knowledge.

21  It was generally accepted in the scientific community at the

22  time Mr. Hardeman was using it?  From 1975 to 2012?  There is

23  your scientific community.  That's what they knew.

24       And that the risk of NHL presented a substantial danger

25  when it was used in an intended or reasonably foreseeable way.

1    Remember Dr. Reeves testified that they intended people to use

2    it to kill poison oak.  That is exactly how Mr. Hardeman used

3    this product for over 26 years.

4         Ordinary consumers would not have recognized the risk of

5    NHL.  People like Mr. Hardeman, they are not going to know that

6    a weed killer causes cancer.  That is the Defendant's

7    responsibility to tell them, to warn them.

8         And they have admitted, Ladies and Gentlemen, Number 5,

9    Monsanto failed to adequately warn of the risk of NHL.  They

10   admitted they never warned.  And when we talk about punitive

11   damages, to this day, they don't warn.

12        Even after IARC says it is a probable carcinogen in 2015,

13   they didn't change their label.  They do not warn that it

14   causes cancer.  In fact, they have come to this courtroom and

15   they tell you it doesn't.

16        We don't want to disagree with what you say in Phase One,

17   but they do.  They say it doesn't cause cancer.

18        And not one person from Monsanto, not one corporate

19   officer, not one representative of that company came and sat

20   with their attorneys at any point in this trial.  Not one of

21   them came here to defend the safety of Roundup, not one of

22   them.

23        Back to the instruction, failure to warn.  And then it

24   says that that failure to warn was a substantial factor in

25   causing Mr. Hardeman's harm.

 1          I have to watch my clock.  All right.

 2          Number 13, and this goes to the last question -- actually

 3     kind of lines up 1, 11; 1, 12 -- 3, 13.

 4          So that is negligent failure to warn.  And, again, they

 5     have admitted they did not warn.  This is why we think you

 6     should answer yes, because they made the product.  They sold

 7     it.  They knew or reasonably should have known that Roundup

 8     posed a risk of NHL when used or misused in a reasonably

 9     foreseeable manner, and that Monsanto knew or reasonably should

10     have known that users would not realize the risk.  They failed

11     to adequately warn.  And that a reasonable manufacturer under

12     the same or similar circumstances would have warned.

13          Absolutely.  If you know that your product causes cancer,

14     you should tell the public.  You shouldn't do what Donna Farmer

15     says and say, Well, just tell them it doesn't do any damage.

16     That is in her e-mail.  That is despicable.  That is why --

17     that is one of the reasons why punitive damages is warranted in

18     this case because they have never told the public, and they

19     continue to this day to deny it to the public.  But internally,

20     internally, in those internal e-mails -- and he may call them

21     "dumb" only once, but that is what is on the page.  And that is

22     what she said.  And it is not dumb.  It is offensive.  It is

23     offensive for her to say, On the one hand we can't say it is

24     not a carcinogen because we haven't tested it, but on the other

25     hand to say, Tell the public it doesn't do any damage.  That is

1    offensive.

2        And that is why, when you look at this one, Instruction

3    Number 13, Monsanto's failure to warn about the risk of NHL was

4    a substantial factor.

5        And, Ladies and Gentlemen, when you go through these

6    instructions and you turn to that verdict form, that is why we

7    ask you to check yes.  Every single one of you, we need all six

8    of you to check yes for Mr. Hardeman because he has had to sit

9    here and listen to them say, It doesn't cause cancer.  There is

10   no evidence.  There is no evidence.

11       I mean, are you kidding me?  After all this, after

12   everything that has happened since 1975 and everything we have

13   talked about in this trial, that is still their position?

14       Now, I want to talk about this -- the label.  I got to say

15   something about that too.  And he talked about Mr. Hardeman's

16   deposition.  And do you remember that when I came back I asked

17   Mr. Hardeman -- because there were certain pages of his

18   deposition read and there were certain pages not read, and we

19   asked for more pages to be read.  This was an eight-hour

20   deposition.

21       And they are standing here today and saying, Well, when

22   did he read the label?  When did he not read the label?

23       Ladies and Gentlemen, they have already admitted they

24   didn't put a warning on the label.  He testified that he looked

25   at the label.  He read the label.  You know why?  One of the

 1    reasons he looked at the label is because he had to know how to

 2    use the product.  This was concentrate.  Remember, he was

 3    mixing it.  He told you on the stand he absolutely looked at

 4    the label.

 5        Now, they are going to nit-pick him and say, Well, did you

 6    look at in 1988?  Did you look at in 2000?  Did you look at in

 7    2005?  Did you look at it -- I mean, come on.  Mr. Hardeman

 8    testified he read the label.  And they have admitted they

 9    didn't warn him.

10        And they can ask him over and over and over again in an

11    eight-hour deposition Was it one time?  Was it two times?  Was

12    it four times?  But Mr. Hardeman testified he read it.

13        And most importantly he testified if they had put on the

14    label that it causes cancer, that they had warned about that

15    risk, he wouldn't have used it and we wouldn't be here today.

16        Ladies and Gentlemen, I ask that on behalf of Mr. Hardeman

17    that when you go back there and you consider the damages in

18    this case and you consider what he has been through and how it

19    was completely unnecessary if they had just told the public it

20    causes cancer, we ask you to consider that when you make your

21    decision about the damages, about his past suffering, his

22    future suffering, because Mr. Hardeman is going to have to live

23    with this for the rest of his life.

24        This trial will end.  This trial will end.  But

25    Mr. Hardeman's anxiety, his anguish, his worry about if he will

1    get cancer, that will not end.  That will not end for the rest

2    of his life.  And we ask you to compensate him for that.

3         And we ask you to tell this company -- and you send this

4    message loud and clear because they have not heard it from

5    anyone so far -- that you send a message loud and clear that no

6    more.  You have to be responsible.  You have to say, If you are

7    going to put a product on the shelf, you have got to tell

8    people that it causes cancer when you know or should have

9    known.  You have got to warn.  No more business as usual at

10   Monsanto.

11        You need to send that message loud and clear, Ladies and

12   Gentlemen.

13        Thank you, Your Honor.

14            **THE COURT:**  Ms. Moore.

15        Okay.  Ladies and gentlemen of the jury, the case is

16   yours.  We will send you back to the jury room, and you can

17   begin your deliberations.  Thank you very much.

18            (Jury beginning deliberations at 11:56 a.m.)

19        (Proceedings were heard out of presence of the jury:)

20            **THE COURT:**  Okay.  My understanding is that the jury

21   will not be given lunch in the jury room today.  So they may be

22   going down to the cafeteria so I'm going to apply the usual

23   rule right now of requiring everybody to stay in the courtroom.

24   Feel free to take a seat, but please stay in the courtroom for

25   five minutes.

**PROCEEDINGS**

 1          And is there anything to discuss?

 2              **MR. STEKLOFF:**  Not from us, Your Honor.

 3              **THE COURT:**  Okay.

 4              **MS. MOORE:**  I don't think so, Your Honor.

 5              **THE COURT:**  So everybody is a prisoner -- you're all

 6      prisoners for five minutes and stay in the building.

 7              **MS. WAGSTAFF:**  I have a question, Your Honor.

 8              **THE COURT:**  Yes.

 9              **MS. WAGSTAFF:**  What's the -- are the time limits for

10      deliberations the same as in Phase I, they're going to stay

11      till 4:00 p.m. and deliberate and then you've given them the

12      option on Thursday or --

13              **THE COURT:**  Oh, I don't know.  Yeah, it's whatever

14      they --

15              **MS. WAGSTAFF:**  The same as --

16              **THE COURT:**  It's whatever they would want.

17              **MS. WAGSTAFF:**  Okay.

18              **THE COURT:**  So presumably they will be back there

19      discussing that and deciding how long they want to deliberate.

20      If they pass anything along to Kristen, we'll let you know.

21              **MS. WAGSTAFF:**  Okay.

22              **MS. MOORE:**  Thank you, Your Honor.

23              **MS. WAGSTAFF:**  That will be great.  Thank you.

24              **THE COURT:**  But while they're deliberating, stay in

25      the building.

 1          **MS. MOORE:**  Right.  We understand.  Thank you,

 2  Your Honor.

 3          **MR. BRAKE:**  And, Your Honor, I know the last thing

 4  that you want to think about right now is doing this all over

 5  again.

 6          **THE COURT:**  Oh, no.  We decided -- you want a trial

 7  date?

 8          **MR. BRAKE:**  Yes, sir.

 9          **THE COURT:**  We decided -- I mean, I will say that I

10  want to have -- now is not necessarily the time to do it, but I

11  do want to have a conversation with all the parties, including

12  you, about whether after this trial, given that we had, you

13  know, the trial last year and we have the trial going on in

14  Alameda and we've had this trial, I do want all of us to have a

15  discussion about whether the focus should shift to mediation or

16  something like that.

17          **MR. BRAKE:**  Understood.

18          **THE COURT:**  But assuming we go forward with your

19  trial, we came up with a date.  I think it was May 20th; is

20  that right?

21          **MR. BRAKE:**  Well, that's the reason I'm persisting in

22  this, is that I don't really have anything firm on my calendar

23  that I feel --

24          **THE COURT:**  Sorry?

25          **MR. BRAKE:**  I don't have anything on my calendar that

**PROCEEDINGS**

1    I feel comfortable with.

2         **THE COURT:** May 20th.  May 20th.

3         **MR. BRAKE:** May 20th?

4         **THE COURT:** Yes.

5         **MR. BRAKE:** Okay.  So that's going to be subject to

6    further discussion?

7         **THE COURT:** Yeah.  You should operate on the

8    assumption now that you're going to trial on May 20th; but,

9    yeah, I want to have a further discussion with the parties

10   about that after this case is entirely over.

11        **MR. BRAKE:** Great.  Thank you.

12        **THE COURT:** Thank you.

13        **MS. WAGSTAFF:**  Thank you, Your Honor.

14            (Luncheon recess taken at 11:59 a.m.)

15            (Jury left for the day at 3:06 p.m.)

16                     ---oOo---

17

18

19

20

21

22

23

24

25

1

2

## CERTIFICATE OF REPORTERS

    I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.


DATE:   Tuesday, March 26, 2019


_____

Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
U.S. Court Reporter


_____

Marla F. Knox, RPR, CRR
U.S. Court Reporter