Brian K. Brake (pro hac vice)
**THE MILLER FIRM, LLC**
108 Railroad Avenue
Orange, VA 22960
Tel : (540) 672-4224
Fax : (540) 672-3055
Email : bbrake@millerfirmllc.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE:  ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 |
| | Case No. 3:16-md-2741-VC |
| This document relates to: | **DECLARATION OF BRIAN K. BRAKE IN SUPPORT OF PLAINTIFFS' MOTION TO REMAND THE CASE TO THE SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF ALAMEDA, PURSUANT TO 28 U.S.C. §1447(c)** |
| *George Chupa, et al., vs. Monsanto Company, et al., Case No. 3:19-cv-01589-VC* | |

I, Brian K. Brake, declare as follows:

1.      I am an attorney licensed to practice in the Commonwealth of Virginia and admitted pro hac vice in the United States District Court for the Northern District of California in MDL 2741 pursuant to Pretrial Order No. 1.  I am an attorney at the Miller Firm, LLC, counsel of record for Plaintiffs in the above-referenced action.   I make this declaration based on my personal knowledge, and, if called as a witness, I could and would testify competently to these matters.

2.      This action includes individuals who suffer from Non-Hodgkin Lymphoma as the result of exposure to Monsanto product, Roundup.

1

3.    Monsanto Company ("Monsanto") removed Plaintiffs' lawsuit to federal court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446.

4.    Attached hereto as Exhibit 1 is a true and correct copy of the Complaint, *George Chupa, et al., vs. Monsanto, et al.,* (Case No. CGC-18-571983) originally filed in the Superior Court of the State of California, County of San Francisco, on December 10, 2018.

5.    Attached hereto as Exhibit 2 is a true and correct copy of the February 26, 2019 Order: Addition of Cases to JCCP and Transfer of Cases to Alameda County, entered by the Hon. Smith, Roundup JCCP Judge, Alameda County.

6.    Attached hereto as Exhibit 3 is a true and correct copy of Order (1) Denying Motion of Plaintiffs for Consolidation of Case for Trial and (2) on Case Management, entered on January 25, 2019, by the Hon. Winifred Y. Smith, Roundup JCCP judge, Alameda County.

7.    Attached hereto as Exhibit 4 is a true and correct copy of the current Draft version of Plaintiffs' Master Long Form Complaint and Jury Demand to be filed at the JCCP, Alameda County, per Judge Winifred Smith's January 25, 2019 Order.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 24th day of April 2019, at Orange, Virginia.


                    */s Brian K. Brake*
                    Brian K. Brake

2

1

## **CERTIFICATE OF SERVICE**

2

3
I, Curtis Hoke, hereby certify that, on April 24, 2019, I electronically filed the foregoing with the Clerk for the United States District Court for the Northern District of California using the CM/ECF system, which shall send electronic notification to counsel of record.

4

5
/s/ Brian K. Brake
Brian K. Brake

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

DECLARATION OF BRIAN K. BRAKE                                          3:19-cv-012589-VC

Exhibit 1

1   Curtis G. Hoke (SBN 282465)
  **THE MILLER FIRM, LLC**
2   108 Railroad Avenue
  Orange, Virginia 22960
3   Tel: (540) 672-4224
  Fax: (540) 672-3055
4   choke@millerfirmllc.com

5   *Attorneys for Plaintiffs*

6

7         SUPERIOR COURT OF THE STATE OF CALIFORNIA

8            FOR THE COUNTY OF SAN FRANCISCO

9               (UNLIMITED JURISDICTION)

10 GEORGE CHUPA; BILLY L. COLTON and     CASE NO. **CGC - 18 - 571983**
   ROSALIE ANITA COLTON; ROBERT E.
11 GAYLE and SHIRLEY A. GAYLE; JACOB
   PANNELL; JAMES E. PORTER; ROBERT U.     **COMPLAINT FOR DAMAGES AND**
12 RAMIREZ and DOLORES RAMIREZ; DAVID   **DEMAND FOR JURY TRIAL**
   L. ROSS and LINDA ROOT; GEORGE L. RUIZ     1.    Strict Liability – Design Defect
13 and ARACELI RUIZ; PAUL S. USTER and       2.    Strict Liability – Failure to Warn
   DEBRA DONALD; MATTHEW R. VOELKER;     3.    Negligence
14 GEORGE WARREN;  LEONARD WEINBERG     4.    Fraud
   Individually and as Successor-In-Interest on behalf   5.    Breach of Express Warranties
15 of the ESTATE OF JEANNE WEINBERG,       6.    Breach of Implied Warranties
   Deceased; RONALD J. WOYCHAK and DEBRA   7.    Wrongful Death
16 WOYCHAK; WILLIAM G. BRONSTON;        8.    Loss of Consortium
   MARY DENHAM; LISA DIRUSCIO and DOUG   9.    Punitive Damages
17 DIRUSCIO; TOM GREENLY; LAVERN        10.   Survival Action
   LEMUNYN; BURTON J. NIENHUIS and SUE
18 NIENHUIS; PHILIP D. RAYMOND and CINDI   **JURY TRIAL DEMANDED**
   RAYMOND; CYNTHIA ROMEO; SALAM
19 SHABA; LUCILLE SHAW; FRANKLIN HYATT
   and SANDRA HYATT; ALBERT SEADLER,
20

21         Plaintiffs,

22   v.

23 MONSANTO COMPANY, a corporation;
   WILBUR-ELLIS COMPANY, LLC, a
24 corporation; and WILBUR-ELLIS FEED, LLC, a
   corporation; and DOES 1 through 100 inclusive,
25

26        Defendants.

27

28       Plaintiffs, by and through their attorney Curtis G. Hoke of The Miller Firm, LLC allege
  upon information and belief:

                                 1

        COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

---

ENDORSED
FILED
San Francisco County Superior Court

DEC 1 0 2018

CLERK OF THE COURT
BY: _____ NEYL WEBB
                Deputy Clerk

## STATEMENT OF THE CASE

1.      In 1970, Defendant Monsanto Company discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 millions of pounds used annually. That number grew to 185 million pounds by 2007.  As of 2013, glyphosate was the world's most widely used herbicide.

2.      Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

3.      Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

4.      On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

5.      On July 29, 2015, the IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

6.      The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

7.      The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans. Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

8.      Upon information and belief, Wilbur-Ellis Company, LLC and Wilbur-Ellis Feed, LLC were responsible for marketing Roundup and related Monsanto products during the time period in question.

## JURISDICTION AND VENUE

9.      The California Superior Court has jurisdiction over this action pursuant to California Constitution Article VI, Section 10, which grants the Superior Court "original jurisdiction in all causes except those given by statute to other trial courts." The Statutes under which this action is brought do not specify any other basis for jurisdiction.

10.      The California Superior Court has jurisdiction over the Defendants because, based on information and belief, each is a California resident, a corporation and/or entity organized under the laws of the State of California, a foreign corporation or association authorized to do business in California and registered with the California Secretary of State or that has sufficient minimum contacts in California, or otherwise intentionally avails itself of the California market so as to render the exercise of jurisdiction over it by the California courts consistent with traditional notions of fair play and substantial justice.

11.      Venue is proper in this Court pursuant to California Code of Civil Procedure Section 395(a) because some of the Defendants – Wilbur-Ellis Company, LLC and Wilbur-Ellis

Feed, LLC – are residents of San Francisco County.

12.     Furthermore the Defendants have purposefully availed themselves of the benefits and the protections of the laws within the State of California. Monsanto has had sufficient contact such that the exercise of jurisdiction would be consistent with the traditional notions of fair play and substantial justice.

## PARTIES

13.     Plaintiff GEORGE CHUPA is a competent individual over the age of 18, resident and citizen of the State of California, who submits to the jurisdiction of this court and alleges venue in this Court is proper.  As a result of exposure to Roundup in the State of California and Florida from the 1970s to 2018, Plaintiff suffered from severe physical, economic, and emotional injuries resulting from Plaintiff's use of Roundup, including but not limited to non-Hodgkin's lymphoma, diagnosed in 2007.

14.     Plaintiffs BILLY L. COLTON and ROSALIE ANITA COLTON are competent individuals over the age of 18, residents and citizens of the State of California, who submit to the jurisdiction of this court and allege venue in this Court is proper.  As a result of Billy L. Colton's exposure to Roundup in the state of California from approximately 1988 to 2018, he suffered from severe physical, economic, and emotional injuries resulting from Plaintiff's use of Roundup, including but not limited to non-Hodgkin's lymphoma, diagnosed in 2014.  Plaintiffs Billy L. Colton and Rosalie Anita Colton are lawful spouses; Rosalie Anita Colton asserts a loss of consortium claim herein for damages and losses directly and proximately caused by Roundup.

15.     Plaintiffs ROBERT E. GAYLE and SHIRLEY A. GAYLE are competent individuals over the age of 18, residents and citizens of the State of California, who submit to the jurisdiction of this court and allege venue in this Court is proper.  As a result of Robert E. Gayle's exposure to Roundup in the state of California from approximately 1985 to 2018, he suffered from severe physical, economic, and emotional injuries resulting from Plaintiff's use of Roundup, including but not limited to non-Hodgkin's lymphoma, diagnosed in 2010.  Plaintiffs Robert E. Gayle and Shirley A. Gayle are lawful spouses; Shirley A. Gayle asserts a loss of consortium claim herein for damages and losses directly and proximately caused by Roundup.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

16.     Plaintiff JACOB PANNELL is a competent individual over the age of 18, resident and citizen of the State of California, who submits to the jurisdiction of this court and alleges venue in this Court is proper.  As a result of exposure to Roundup in the State of Washington from approximately 1995 to 2014, Plaintiff suffered from severe physical, economic, and emotional injuries resulting from Plaintiff's use of Roundup, including but not limited to non-Hodgkin's lymphoma, diagnosed in 2005 in California.

17.     Plaintiff JAMES E. PORTER is a competent individual over the age of 18, resident and citizen of the State of California, who submits to the jurisdiction of this court and alleges venue in this Court is proper.  As a result of exposure to Roundup in the State of California from approximately 1975 to 1985, Plaintiff suffered from severe physical, economic, and emotional injuries resulting from Plaintiff's use of Roundup, including but not limited to non-Hodgkin's lymphoma, diagnosed in 1995.

18.     Plaintiffs ROBERT U. RAMIREZ and DOLORES RAMIREZ are competent individuals over the age of 18, residents and citizens of the State of California, who submit to the jurisdiction of this court and allege venue in this Court is proper.  As a result of Robert Ramirez's exposure to Roundup in the state of California until 2013, he suffered from severe physical, economic, and emotional injuries resulting from Plaintiff's use of Roundup, including but not limited to non-Hodgkin's lymphoma, diagnosed in 2018.  Plaintiffs Robert Ramirez and Dolores Ramirez are lawful spouses; Dolores Ramirez asserts a loss of consortium claim herein for damages and losses directly and proximately caused by Roundup.

19.     Plaintiffs DAVID L. ROSS and LINDA ROOT are competent individuals over the age of 18, residents and citizens of the State of California, who submit to the jurisdiction of this court and allege venue in this Court is proper.  As a result of David Ross' exposure to Roundup in the state of California from approximately 1990 to 2017, he suffered from severe physical, economic, and emotional injuries resulting from Plaintiff's use of Roundup, including but not limited to non-Hodgkin's lymphoma, diagnosed in 2012.   Plaintiffs David L. Ross and Linda Root are lawful spouses; Linda Root asserts a loss of consortium claim herein for damages and losses directly and proximately caused by Roundup.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

20.    Plaintiffs GEORGE L. RUIZ and ARACELI RUIZ are competent individuals over the age of 18, residents and citizens of the State of California, who submit to the jurisdiction of this court and allege venue in this Court is proper.  As a result of George L. Ruiz's exposure to Roundup in the state of California from approximately 1975 to June, 2018, he suffered from severe physical, economic, and emotional injuries resulting from Plaintiff's use of Roundup, including but not limited to non-Hodgkin's lymphoma, diagnosed in March, 2018.  Plaintiffs George L. Ruiz and Araceli Ruiz are lawful spouses; Araceli Ruiz asserts a loss of consortium claim herein for damages and losses directly and proximately caused by Roundup.

21.    Plaintiffs PAUL S. USTER and DEBRA DONALD are competent individuals over the age of 18, residents and citizens of the State of Hawaii, who submit to the jurisdiction of this court and allege venue in this Court is proper.  As a result of Paul S. Uster's exposure to Roundup in the state of California from approximately 2010 to 2017, he suffered from severe physical, economic, and emotional injuries resulting from Plaintiff's use of Roundup, including but not limited to non-Hodgkin's lymphoma, diagnosed in June, 2017 in California.  Plaintiffs Paul S. Uster and Debra Donald are lawful spouses; Debra Donald asserts a loss of consortium claim herein for damages and losses directly and proximately caused by Roundup.

22.    Plaintiff MATTHEW R. VOELKER is a competent individual over the age of 18, resident and citizen of the State of California, who submits to the jurisdiction of this court and alleges venue in this Court is proper.  As a result of exposure to Roundup in the State of California from approximately 1985 to 2001, Plaintiff suffered from severe physical, economic, and emotional injuries resulting from Plaintiff's use of Roundup, including but not limited to non-Hodgkin's lymphoma, diagnosed in 2012.

23.    Plaintiff GEORGE WARREN is a competent individual over the age of 18, resident and citizen of the State of California, who submits to the jurisdiction of this court and alleges venue in this Court is proper.  As a result of exposure to Roundup in the State of California from the 1970s to 2017, Plaintiff suffered from severe physical, economic, and emotional injuries resulting from Plaintiff's use of Roundup, including but not limited to non-Hodgkin's lymphoma, diagnosed in 2009.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

24.     Plaintiff LEONARD WEINBERG Individually and as Successor-In-Interest on behalf of the ESTATE OF JEANNE WEINBERG, Deceased, is a competent individual over the age of 18, resident and citizen of the State of California, who submits to the jurisdiction of this court and alleges venue in this Court is proper.  Jeanne Weinberg, deceased, used Defendant's Roundup product in California from approximately 1979 to 2016, and suffered from severe physical, economic, and emotional injuries as a result of her use of Roundup, including but not limited to non-Hodgkin's lymphoma, initially diagnosed in 1992.  Jeanne Weinberg's use of Roundup and her resulting diagnosis of non-Hodgkin's lymphoma directly and proximately caused Jeanne Weinberg's death in October, 2017 in California.  Plaintiff Leonard Weinberg was Jeanne Weinberg's lawful spouse and brings this lawsuit, including claims for loss of consortium, individually and as successor-in-interest on behalf of the Estate of Jeanne Weinberg.

25.     Plaintiffs RONALD J. WOYCHAK and DEBRA WOYCHAK are competent individuals over the age of 18, residents and citizens of the State of California, who submit to the jurisdiction of this court and allege venue in this Court is proper.  As a result of Ronald J. Woychak's exposure to Roundup in the state of California from approximately 1978 to 2017, he suffered from severe physical, economic, and emotional injuries resulting from Plaintiff's use of Roundup, including but not limited to non-Hodgkin's lymphoma, diagnosed in 2014.  Plaintiffs Ronald J. Woychak and Debra Woychak are lawful spouses; Debra Woychak asserts a loss of consortium claim herein for damages and losses directly and proximately caused by Roundup.

26.     Plaintiff WILLIAM G. BRONSTON is a competent individual over the age of 18, resident and citizen of the State of California, who submits to the jurisdiction of this court and alleges venue in this Court is proper.  As a result of exposure to Roundup in the State of California from approximately 2000 to 2018, Plaintiff suffered from severe physical, economic, and emotional injuries resulting from Plaintiff's use of Roundup, including but not limited to non-Hodgkin's lymphoma, diagnosed in 2017.

27.     Plaintiff MARY DENHAM is a competent individual over the age of 18, resident and citizen of the State of California, who submits to the jurisdiction of this court and alleges venue in this Court is proper.  As a result of exposure to Roundup in the State of California from

approximately 1975 to 2009, Plaintiff suffered from severe physical, economic, and emotional injuries resulting from Plaintiff's use of Roundup, including but not limited to non-Hodgkin's lymphoma, diagnosed in 1997.

28.    Plaintiffs LISA DIRUSCIO and DOUG DIRUSCIO are competent individuals over the age of 18, residents and citizens of the State of California, who submit to the jurisdiction of this court and allege venue in this Court is proper.  As a result of Lisa DiRuscio's exposure to Roundup in the state of California from approximately 2000 to 2012, she suffered from severe physical, economic, and emotional injuries resulting from Plaintiff's use of Roundup, including but not limited to non-Hodgkin's lymphoma, diagnosed in 2017.  Plaintiffs Lisa DiRuscio and Doug DiRuscio are lawful spouses; Doug DiRuscio asserts a loss of consortium claim herein for damages and losses directly and proximately caused by Roundup.

29.    Plaintiff TOM GREENLY is a competent individual over the age of 18, resident and citizen of the State of California, who submits to the jurisdiction of this court and alleges venue in this Court is proper.  As a result of exposure to Roundup in the State of California from approximately 1998 to 2016, Plaintiff suffered from severe physical, economic, and emotional injuries resulting from Plaintiff's use of Roundup, including but not limited to non-Hodgkin's lymphoma, diagnosed in 2016.

30.    Plaintiff LAVERN LEMUNYN is a competent individual over the age of 18, resident and citizen of the State of California, who submits to the jurisdiction of this court and alleges venue in this Court is proper.  As a result of exposure to Roundup in the State of California from the 1980s to 2000s, Plaintiff suffered from severe physical, economic, and emotional injuries resulting from Plaintiff's use of Roundup, including but not limited to non-Hodgkin's lymphoma, diagnosed in 2018.

31.    Plaintiffs BURTON J. NIENHUIS and SUE NIENHUIS are competent individuals over the age of 18, residents and citizens of the State of California, who submit to the jurisdiction of this court and allege venue in this Court is proper.  As a result of Burton J. Nienhuis' exposure to Roundup in the state of California from 1975, he suffered from severe physical, economic, and emotional injuries resulting from Plaintiff's use of Roundup, including but not limited to non-

1  Hodgkin's lymphoma, diagnosed in 2006.  Plaintiffs Burton J. Nienhuis and Sue Nienhuis are

2  lawful spouses; Sue Nienhuis asserts a loss of consortium claim herein for damages and losses

3  directly and proximately caused by Roundup.

4      32.    Plaintiffs PHILIP D. RAYMOND and CINDI RAYMOND are competent

5  individuals over the age of 18, residents and citizens of the State of California, who submit to the

6  jurisdiction of this court and allege venue in this Court is proper.  As a result of Philip D.

7  Raymond's exposure to Roundup in the state of California from approximately 1986 to 2018, he

8  suffered from severe physical, economic, and emotional injuries resulting from Plaintiff's use of

9  Roundup, including but not limited to non-Hodgkin's lymphoma.  Plaintiffs Philip D. Raymond

10  and Cindi Raymond are lawful spouses; Cindi Raymond asserts a loss of consortium claim herein

11  for damages and losses directly and proximately caused by Roundup.

12      33.    Plaintiff CYNTHIA ROMEO is a competent individual over the age of 18, resident

13  and citizen of the State of California, who submits to the jurisdiction of this court and alleges

14  venue in this Court is proper.  As a result of exposure to Roundup in the State of California from

15  the 1990s to 2010, Plaintiff suffered from severe physical, economic, and emotional injuries

16  resulting from Plaintiff's use of Roundup, including but not limited to non-Hodgkin's lymphoma,

17  diagnosed in June, 2017.

18      34.    Plaintiff SALAM SHABA is a competent individual over the age of 18, resident

19  and citizen of the State of California, who submits to the jurisdiction of this court and alleges

20  venue in this Court is proper.  As a result of exposure to Roundup in the State of California from

21  approximately 2000 to 2010, Plaintiff suffered from severe physical, economic, and emotional

22  injuries resulting from Plaintiff's use of Roundup, including but not limited to non-Hodgkin's

23  lymphoma, diagnosed in 2015.

24      35.    Plaintiff LUCILLE SHAW is a competent individual over the age of 18, resident

25  and citizen of the State of California, who submits to the jurisdiction of this court and alleges

26  venue in this Court is proper.  As a result of exposure to Roundup in the State of California from

27  the late 1990s to 2018, Plaintiff suffered from severe physical, economic, and emotional injuries

28

9

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

resulting from Plaintiff's use of Roundup, including but not limited to non-Hodgkin's lymphoma, diagnosed in 2017.

36.     Plaintiffs FRANKLIN HYATT and SANDRA HYATT are competent individuals over the age of 18, residents and citizens of the State of California, who submit to the jurisdiction of this court and allege venue in this Court is proper.  As a result of Franklin Hyatt's exposure to Roundup in the state of California from approximately 1975 to 2004, he suffered from severe physical, economic, and emotional injuries resulting from Plaintiff's use of Roundup, including but not limited to non-Hodgkin's lymphoma, diagnosed in 2004.  Plaintiffs Franklin Hyatt and Sandra Hyatt are lawful spouses; Sandra Hyatt asserts a loss of consortium claim herein for damages and losses directly and proximately caused by Roundup.

37.     Plaintiff ALBERT SEADLER is a competent individual over the age of 18, resident and citizen of the State of California, who submits to the jurisdiction of this court and alleges venue in this Court is proper.  As a result of exposure to Roundup in the State of California from approximately 1978 to 2018, Plaintiff suffered from severe physical, economic, and emotional injuries resulting from Plaintiff's use of Roundup, including but not limited to non-Hodgkin's lymphoma, diagnosed in 2015.

38.     Plaintiffs are informed and believe and based thereon allege that as a direct and proximate result of Plaintiffs' use of Roundup® and/or other Monsanto glyphosate-containing products ("Roundup"), supplied and/or distributed by Defendants herein, Plaintiffs suffered significant harm, conscious pain and suffering, physical injury and bodily impairment including, but not limited to non-Hodgkin lymphoma and other cancers, other permanent physical deficits, permanent bodily impairment and other injury sequelae. Plaintiffs' injuries required medical intervention to address the adverse physical effects and damage caused by Plaintiffs' use of Roundup® and/or other Monsanto glyphosate-containing products ("Roundup").

39.     As a direct and proximate result of the wrongful conduct, acts, omissions, fraudulent concealments, fraudulent misrepresentations, and fraudulent business practices by Defendants and DOES 1 through 100, inclusive, Plaintiffs used and/or were exposed to Roundup® and were diagnosed with serious health injuries including non-Hodgkin lymphoma and death.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

40.     As a further direct and proximate result of defects in Roundup® and the wrongful conduct, acts, omissions, and fraudulent misrepresentations of Defendants, Plaintiffs suffered severe mental and physical pain and have and will sustain permanent injuries and emotional distress, along with economic loss due to medical expenses and living-related expenses as a result of lifestyle changes.

41.     As a further direct and proximate result of defects in Roundup® and the wrongful conduct, acts, omissions, and fraudulent misrepresentations of Defendants, Plaintiffs required medical intervention in efforts to maintain and/or save Plaintiffs.

42.     Plaintiffs are individuals who suffered damages as a result of injuries resulting from Plaintiffs' use and/or exposure to Roundup® and are authorized to bring an action for the causes of actions alleged herein including, but not limited to, injuries and damages sustained by Plaintiffs resulting from Plaintiffs' use of Roundup®. Said injuries and damages sustained by Plaintiffs were caused or substantially contributed to by the wrongful conduct of Defendants and DOES 1 through 100, inclusive.

43.     The product warnings for Roundup® in effect during the time period Plaintiffs used and/or were exposed to Roundup® were vague, incomplete or otherwise inadequate, both substantively and graphically, to alert consumers to the severe health risks associated with Roundup® use and/or exposure.

44.     The Defendants and DOES 1 through 100, and each of them, inclusive, did not provide adequate warnings to consumers including Plaintiffs and the general public about the increased risk of the serious adverse events described herein.

45.     Had Plaintiffs been adequately warned by the Defendants and DOES 1 through 100, and each of them, inclusive, of the potential life-threatening side effects of Roundup®, Plaintiffs would not have purchased, used, or been exposed to Roundup®.

46.     By reason of the foregoing, Plaintiffs developed serious and dangerous side effects including non-Hodgkin lymphoma and other cancers, related injury sequelae, physical pain and suffering, mental anguish, loss of enjoyment of life, and death. By reason of the foregoing, Plaintiffs suffered economic losses and special damages including, but not limited to, loss of

11

earning and medical expenses. Plaintiffs' general and special damages exceed the jurisdictional limits of this Court.

47.     Plaintiffs have reviewed potential legal claims and causes of action against the Defendants and have intentionally chosen only to pursue claims based on state law. Any reference to any federal agency, regulation or rule is stated solely as background information, and Plaintiffs are not making any claims which raise federal questions. Thus, California state jurisdiction and venue is proper.

**Defendants**

48.     Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri. At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and manufactured Roundup®. Monsanto has regularly transacted and conducted business within the State of California and has derived substantial revenue from goods and products, including Roundup®, used in the State of California and employs sales representatives in the State of California. Monsanto expected or should have expected its acts to have consequences within the State of California because it derived substantial revenue from interstate commerce and invoked the benefits and protection of the State of California's laws.

49.     Defendant Wilbur-Ellis Company LLC is a California limited liability corporation with its headquarters and principal place of business in San Francisco, California. At all times relevant to this complaint, Wilbur-Ellis Company, LLC sold and distributed Monsanto products, including Roundup®, within the State of California.

50.     Defendant Wilbur-Ellis Feed LLC (with Wilbur-Ellis Company LLC, hereinafter "Wilbur-Ellis") is a California limited liability corporation with its headquarters and principal place of business in San Francisco, California. At all times relevant to this complaint, Wilbur-Ellis Feed LLC sold and distributed Monsanto products, including Roundup®, within the State of California. Wilbur-Ellis is a main distributor of Roundup®, and, upon information and belief, distributed Roundup® used by Plaintiffs.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

51.     Plaintiffs are informed and believe, and based thereon allege, that in committing the acts alleged herein, each and every managing agent, agent, representative and/or employee of the Defendants was working within the course and scope of said agency, representation and/or employment with the knowledge, consent, ratification, and authorization of the Defendants and their directors, officers and/or managing agents.

52.     At all relevant times alleged herein, one or more of the corporate Defendants was, and now is, a corporation with its principal place of business in the State of California and, therefore, is a citizen of the State of California.

53.     The true names and/or capacities, whether individual, corporate, partnership, associate, governmental, or otherwise, of Defendant DOES 1 through 100, inclusive, and each of them, are unknown to Plaintiffs at this time, who therefore sue said Defendants by such fictitious names. Plaintiffs are informed and believe, and thereon allege, that each Defendant designated herein as a DOE caused injuries and damages proximately thereby to Plaintiffs as hereinafter alleged; and that each DOE Defendant is liable to the Plaintiffs for the acts and omissions alleged herein below, and the resulting injuries to Plaintiffs, and damages sustained by the Plaintiffs. Plaintiffs will amend this Complaint to allege the true names and capacities of said DOE Defendants when the same are ascertained.

54.     Plaintiffs are informed and believe, and thereon allege, that at all times herein mentioned, each of the named Defendants and each of the DOE Defendants was the agent, servant, employee and/or joint venturer of the other co-Defendants and other DOE Defendants, and each of them, and at all said times, each named Defendant and each DOE Defendant was acting in the full course, scope and authority of said agency, service, employment and/or joint venture.

55.     Plaintiffs are informed and believe and allege that at all times mentioned herein, Defendants and DOES 1 through 100, inclusive, and each of them, were also known as, formerly known as and/or were the successors and/or predecessors in interest/business/product line/or a portion thereof, assigns, a parent, a subsidiary (wholly or partially owned by, or the whole or partial owner), affiliate, partner, co-venturer, merged company, alter egos, agents, equitable trustees and/or fiduciaries of and/or were members in an entity or entities engaged in the funding,

researching, studying, manufacturing, fabricating, designing, developing, labeling, assembling, distributing, supplying, leasing, buying, offering for sale, selling, inspecting, servicing, contracting others for marketing, warranting, rebranding, manufacturing for others, packaging and advertising of Roundup® and/or other Monsanto glyphosate-containing products. Defendants and DOES 1 through 100, inclusive, and each of them, are liable for the acts, omissions and tortious conduct of their successors and/or predecessors in interest/business/product line/or a portion thereof, assigns, parents, subsidiaries, affiliates, partners, co-venturers, merged companies, alter egos, agents, equitable trustees, fiduciaries and/or their alternate entities in that Defendants and DOES 1 through 100, inclusive, and each of them, enjoy the goodwill originally attached to each such alternate entity, acquired the assets or product line (or portion thereof), and in that there has been a virtual destruction of Plaintiffs' remedy against each such alternate entity, and that each such Defendant has the ability to assume the risk spreading role of each such alternate entity.

56.     Plaintiffs are informed and believe, and thereon allege, that at all times herein mentioned, Defendants and DOES 1 through 100, inclusive, and each of them, were and are corporations organized and existing under the laws of the State of California or the laws of some state or foreign jurisdiction; that each of the said Defendants and DOE Defendants were and are authorized to do and are doing business in the State of California and regularly conducted business in California, including in San Francisco County.

57.     Upon information and belief, at all relevant times, Defendants and DOES 1 through 100, and each of them, inclusive, were engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce and into the State of California, including in San Francisco County, either directly or indirectly through third parties or related entities, Roundup® and/or other Monsanto glyphosate-containing products.

58.     At all ®relevant times, Defendants and DOES 1 through 100, inclusive, and each of them, conducted regular and sustained business and engaged in substantial commerce and business activity in the State of California, which included but was not limited to selling, marketing and

distributing Roundup® and/or other Monsanto glyphosate-containing products in the State of California, including San Francisco County.

59.     At all relevant times, Defendants and DOES 1 through 100, inclusive, and each of them, expected or should have expected that their acts would have consequences within the United States of America including the State of California, including San Francisco County, and said Defendants derived and derive substantial revenue therefrom.

## EQUITABLE TOLLING

60.     Plaintiffs have suffered an illness that has a latency period and does not arise until years after exposure. Plaintiffs had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup® and glyphosate until made aware that Plaintiffs' illness, including non-Hodgkin lymphoma could be caused by use and/or exposure to Roundup®. The discovery rule applies, and the statute of limitations was tolled until the day Plaintiffs knew or had reason to know that Plaintiffs' illnesses, including non-Hodgkin lymphoma, were linked to Plaintiffs' use and/or exposure to Roundup®.

61.     Within the time period of any applicable statute of limitations, Plaintiffs could not have discovered through the exercise of reasonable diligence that exposure to Roundup® and glyphosate is injurious to human health.

62.     Plaintiffs did not discover and did not know of facts that would cause a reasonable person to suspect the risk associated with the use of and/or exposure to Roundup® and glyphosate nor would a reasonable and diligent investigation by Plaintiffs have disclosed that Roundup® and glyphosate would cause Plaintiffs' illnesses.

63.     The expiration of any applicable statute of limitations has been equitably tolled by reason of Monsanto's fraudulent misrepresentations and fraudulent concealment and fraudulent conduct. Through affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiffs the true risks associated with use of and/or exposure to Roundup®.

64.     As a result of Defendants' actions, Plaintiffs could not reasonably have known or learned through reasonable diligence that Plaintiffs had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

65.     Defendants are estopped from relying on any statute of limitations because of their concealment of the truth regarding the safety of Roundup®. Defendants had a duty to disclose the true character, quality and nature of Roundup® because this was non-public information over which Defendants continue to have exclusive control. Defendants knew that this information was not available to Plaintiffs, Plaintiffs' medical providers and/or health facilities, yet Defendants failed to disclose the information to the public, including Plaintiffs.

66.     Defendants had the ability to and did spend enormous amounts of money in furtherance of the purposes of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks. Plaintiffs and medical professionals could not have afforded to and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks and were forced to rely on Defendants' representations.

## FACTS

67.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

68.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

69.     For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses.

70.     That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed. Monsanto assured the public that Roundup® was harmless. In

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

### The Discovery of Glyphosate and Development of Roundup®

71.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use; Osborn & Barr joined or took over these misleading marketing efforts in the early 1990s and continued through 2012. Monsanto still markets Roundup® as safe today.

### Registration of Herbicides under Federal Law

72.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all herbicides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a (a).

73.     Because herbicides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to herbicides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c) (5) (D).

74.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus

17

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

requires EPA to make a risk/benefit analysis in determining whether a registration of a product should be granted or allowed so that the product may continue to be sold in commerce.

75.     The EPA registered Roundup® for distribution, sale, and manufacture in the United States including the State of California.

76.     FIFRA generally requires the registrant, Monsanto in the case of Roundup®, to conduct health and safety testing of herbicide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

77.     The evaluation of each herbicide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a herbicide has changed over time. The EPA is now in the process of re-evaluating all herbicide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these herbicides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

78.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment —in relation to the re-registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

### *Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®*

79.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, in 1991 the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E). In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be

interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

80.    On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

81.    In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate herbicide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

82.    In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

83.    Three top executives of IBT were convicted of fraud in 1983.

84.    In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

85.    Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

86.    Multiple studies have been ghostwritten in part and/or published by Monsanto through companies such as Intertek and Exponent, Inc., from 2000 through the present which minimize any safety concerns about the use of glyphosate. The studies are used to convince regulators to allow the sale of Roundup® and customers to use Roundup®. Such studies include, but are not limited to Williams (2000); Williams (2012); Kier & Kirkland (2013); Kier (2015); Bus (2016); Chang (2016); and the Intertek Expert Panel Manuscripts. All of these studies have

been submitted to and relied upon by the public and the EPA in assessing the safety of glyphosate. Through these means, Monsanto has fraudulently represented that independent scientists have concluded that Glyphosate is safe. In fact, Monsanto paid these so-called "independent experts," and Monsanto failed to disclose the significant role Monsanto had in creating the manuscripts produced by the "independent" experts. Further, Monsanto has ghostwritten editorials to advocate for the safety of glyphosate in newspapers and magazines for scientists such as Robert Tarone and Henry Miller. Monsanto has also ghostwritten letters by supposedly independent scientists which have been submitted to regulatory agencies who are reviewing the safety of glyphosate.

87.     Monsanto has also violated federal regulations in holding secret ex parte meetings and conversations with certain EPA employees to collude in a strategy to re-register glyphosate and to quash investigations into the carcinogenicity of glyphosate by other federal agencies such as the Agency for Toxic Substances and Disease Registry. Monsanto's close connection with the EPA arises in part from its offering of lucrative consulting gigs to retiring EPA officials. In March 2015, The Joint Glyphosate Task Force, at Monsanto's behest, issued a press release sharply criticizing IARC, stating that IARC's conclusion was "baffling" and falsely claiming that "IARC did not consider any new or unique research findings when making its decision. It appears that only by deciding to exclude certain available scientific information and by adopting a different approach to interpreting the studies was this possible."

88.     Beginning in 2011, the Federal Institute for Risk Assessment (BfR) in Germany began preparing a study on the safety of glyphosate. Through the Glyphosate Task Force, Defendants were able to co-opt this study, becoming the sole providers of data and ultimately writing the report, which was rubber-stamped by the BfR. The Glyphosate Task Force was solely responsible for preparing and submitting a summary of studies relied upon by the BfR. Defendants have used this self-serving report (which they, in fact, wrote) to falsely proclaim the safety of glyphosate. In October 2015, the Defendants, as members of the Joint Glyphosate Task Force, wrote to the state of California to try to stop California from warning the public about the carcinogenicity of glyphosate, arguing that the IARC classification was mistaken. In January of

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

2016, Monsanto filed a lawsuit to stop California from warning the public about the carcinogenicity of glyphosate.

### *The Importance of Roundup® to Monsanto's Market Dominance Profits*

89.     The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

90.     In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further. By 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide, and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

91.     Through a three-pronged strategy of increased production, decreased prices, and by coupling Roundup Ready® seeds with Roundup® herbicide, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

### *Monsanto has known for decades that it falsely advertises the safety of Roundup®.*

92.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup ® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "**safer than table salt**" and "**practically non-toxic**" to

mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

(a)    Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences...

(b)    And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging or trimming problem.

(c)    Roundup® biodegrades into naturally occurring elements.

(d)    Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

(e)    This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

(f)    You can apply Accord (glyphosate-containing herbicide) with "confidence because it will stay where you put it;" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

(g)    Glyphosate is less toxic to rats than table salt following acute oral ingestion.

(h)    Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture or use it.

(i)    You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

(j)    "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

22

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

93.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

(a)     its glyphosate-containing herbicide products or any component thereof are safe, non-toxic, harmless or free from risk. * * *

(b)     its glyphosate-containing herbicide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable * * *

(c)     its glyphosate-containing herbicide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

* * *

(d)     its glyphosate-containing herbicide products or any component thereof are "good" for the environment or are "known for their environmental characteristics." * * *

(e)     glyphosate-containing herbicide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

(f)     its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

94.     Monsanto did not alter its advertising in the same manner in any state other than New York, and, on information and belief, still has not done so today.

95.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

***Classifications and Assessments of Glyphosate***

96.     The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be

Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

97.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

98.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected, and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed, and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

99.     In assessing a chemical agent, the IARC Working Group reviews the following information:

(a)     human, experimental, and mechanistic data;

(b)     all pertinent epidemiological studies and cancer bioassays; and

(c)     representative mechanistic data.

The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

100.     In March of 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent, that is, glyphosate is probably carcinogenic in humans.

101.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by

the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

102.    The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

103.    Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

104.    Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

105.    The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

106.    The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

107.    The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

108.    In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

109.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

110.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA, oxidative stress, and chromosomal damage in mammals and in human and animal cells in utero.

111.     In addition to DNA damage and oxidative stress, scientists have suggested that Roundup®'s association with various serious health conditions is linked to the effect Roundup® has on the digestive system. Specifically, scientists believe the same mechanism that makes Roundup® toxic to weeds also makes it toxic to the microbes within the human gut and mucous membranes. When humans are exposed to Roundup®, this exposure leads to a chronic inflammatory state in the gut, as well an impaired gut barrier, which can lead to many long-term health effects, including an increased risk of cancer. Monsanto has deliberately refused to conduct tests on this aspect of Roundup®'s mechanism of action.

112.     Many Roundup® products bear a label which either reads: "glyphosate targets an enzyme found in plants but not in people or pets" or "this Roundup formula targets an enzyme in plants but not in people or pets." These statements are false because it has been established that the human body is host to microorganisms which contain the enzyme Monsanto asserts is not found in humans.

113.     Thus, glyphosate targets microbes within the human body which contain the enzyme affected by glyphosate, leading to a variety of adverse health effects. The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

114.     The IARC Working Group also reviewed an Agricultural Health Study consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While

this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

### Other Earlier Findings about Glyphosate's Dangers to Human Health

115.    The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

116.    Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

117.    It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

118.    Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport, storage, and disposal.

119.    In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

### Recent Worldwide Bans on Roundup®/Glyphosate

120.    Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light

of this assessment as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

121.   The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

122.   France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

123.   Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

124.   The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

125.   The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

126.   On information and belief, Wilbur-Ellis was, at all relevant times, engaged in the distribution of Roundup®, Roundup-ready® crops and other glyphosate-containing products from Monsanto to retailers and commercial/agricultural users in California.

127.   Wilbur-Ellis had superior knowledge compared to Roundup® users and consumers, including regarding the carcinogenic properties of the product, yet failed to accompany its sales and or marketing of Roundup® with any warnings or precautions for that grave danger. On

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

information and belief, Wilbur-Ellis was one of the distributors providing Roundup® and other glyphosate-containing products actually used by the Plaintiffs.

## LIMITATION ON ALLEGATIONS

128.   Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

129.   The allegations in this pleading are made pursuant to California law. To the extent California law imposes a duty or obligation on Defendants that exceeds those required by federal law, Plaintiffs do not assert such claims. All claims asserted herein run parallel to federal law, *i.e.*, the Defendants' violations of California law were also violations of federal law. Had Defendants honestly complied with California law, they would also have complied with federal law.

130.   Additionally, Plaintiffs' claims do not seek to enforce federal law. These claims are brought under California law, notwithstanding that such claims run parallel to federal law.

131.   As alleged herein, Defendants violated U.S.C. § 136j and 40 C.F.R. § 156.10(a)(5) by distributing Roundup®, which was misbranded pursuant to 7 U.S.C. § 136(g). Federal law specifically prohibits the distribution of a misbranded herbicide.

## <u>JOINDER</u>

132.   On July 26, 2017, Alameda Superior Court Judge G. Hernandez ordered the severance of multiple plaintiffs in a similar Roundup action.[1] Judge Hernandez held that plaintiffs could not be joined in a bundled complaint because the underlying complaint at issue in that case did not explain how the claims of the five different plaintiffs in that case arose from the same transaction or occurrence or series of transactions or occurrences.

133.   To address Judge Hernandez's July 26 Order, Plaintiffs plead the following transactions, occurrences, or series of transactions or occurrences that give rise to questions of law and fact common to the claims of all Plaintiffs:

   a.   At all relevant times throughout the history of Roundup®'s presence on the market, Defendants have engaged in efforts to manipulate the scientific data on glyphosate via strategies such as ghostwriting scientific publications, subverting safety studies,

---

[1] *Woodbury v. Monsanto, et al.*, RG17855094, Superior Court for the County of Alameda.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

scientific "outreach" to academics, and collusion with regulatory officials. In fact, during the 1990s, independent scientists published new studies concluding that glyphosate-based herbicides were genotoxic and induced oxidative stress. To combat these studies, Monsanto hired Dr. James Parry, a prominent toxicologist at the forefront of genetic toxicological research. Based on published literature and Monsanto's unpublished in-house genotoxicity studies, Dr. Parry provided Monsanto a draft report which concluded that glyphosate was a mutagenic agent and urged Monsanto to further research the formulated product. Monsanto, however, did not conduct further studies, contrary to Dr. Parry's recommendations, and never submitted Dr. Parry's report to the EPA, as it was required to do under 40 CFR 159.158. Recognizing that Dr. Parry's report would not aid Monsanto's messaging that Roundup® was not carcinogenic, the chemical company instead elected to publish a ghostwritten article ostensibly by Gary Williams, concluding that "Roundup herbicide does not pose a health risk to humans,"[2] despite Monsanto's own scientists admitting internally, "[t]he terms glyphosate and Roundup cannot be used interchangeably . . . For example you cannot say that Roundup is not a carcinogen . . . we have not done the necessary testing on the formulation to make that statement."[3] https://www.globalresearch.ca/monsanto-it-aint-glyphosate-its-the-additives/5606670  This series of occurrences and transactions amounted to glyphosate being sold to the public in the State of California without any cancer warning. Because of this cover up, Plaintiffs were left in the dark about the true dangers of Roundup® and, ultimately, as a direct result of this deception, were tricked into purchasing Roundup®. That deception, for each plaintiff, arising out of Monsanto's cover-up, then led to each Plaintiff's NHL. These occurrences are common questions of law and fact to each Plaintiff.

    b.   In 1991, Monsanto successfully pressured the EPA to alter the agency's 1985

---

[2] *Available at*: https://www.ncbi.nlm.nih.gov/pubmed/10854122.

[3] *See* Danny Hakim, *Monsanto Emails Raise Issue of Influencing Research on Roundup Weed Killer* (Aug. 1, 2017) *available at*: https://www.nytimes.com/2017/08/01/business/monsantos-sway-over-research-is-seen-in-disclosed-emails.html

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

classification of glyphosate from *possibly carcinogenic to humans* (group C) to *evidence of non-carcinogenicity in humans* (Group E).  The pressure was done by manufacturing "tumors" in the control groups to help eliminate the statistically significant risks.  Specifically, Monsanto hired an "independent" expert to find these new tumors—indeed, the expert knew he would find them before he even began looking—and then presented this expert's opinions to the EPA.  This caused the EPA to change its classification and that directly caused induced Plaintiffs to purchase Roundup® believing the herbicide posed no risk to human health.  Thus, the same series of transactions and occurrences – Monsanto influencing the EPA's classification of glyphosate – resulted in Plaintiffs' shared injuries and constitute overlapping questions of law and fact.

c.  In 2012, Professor Giles Seralini published a study detailing the adverse health effects associated with Roundup® and Roundup-ready® crops. Monsanto decided to silence Professor Seralini by using the company's close relationship with the journal's editor to get the Seralini study retracted. Monsanto also covertly managed a letter-writing campaign directed at the journal, demanding that the study be retracted. The plan was successful, and Professor Seralini's paper was withdrawn, allowing Monsanto to cover up science that demonstrated the dangers of Roundup® which have caused Plaintiffs' injuries. Such occurrences and transactions are part and parcel of Defendants' general strategy of protecting the bottom line even if it means lying to consumers and putting Plaintiffs' lives at risk. The same question of Defendants' corruption of the science are germane to Plaintiffs' allegations of harm that Plaintiffs would not have sustained but for Roundup® being sold without adequate warnings and other disclosures regarding the product's health risks.

d.  Recently, it was revealed that Monsanto had colluded with EPA official, Mr. Jesudoss Rowland (former Deputy Division Director of the EPA Office of Pesticide Programs) in ensuring that the agency's evaluation of glyphosate would return a

finding of non-carcinogenicity. Part of this effort resulted in publication of the "Report of the Cancer Assessment Review Committee" – co-chaired by Mr. Rowland, which indeed concluded glyphosate is "Not Likely to be Carcinogenic to Humans."[4] Internal emails show Monsanto personnel lauding their close relationship with Mr. Rowland in defending glyphosate as well as Mr. Rowland reportedly informing Monsanto that if he is able to "kill" glyphosate review by another agency, he should be given a medal. The unseemly institutional manipulation exercised by Monsanto has resulted in Plaintiffs being subjected to the risk of cancer given that glyphosate was evaluated by an EPA tainted by collusion with industry. This common series of occurrences and transactions directly pertain to Plaintiffs' claims as their injuries arise from exposure to a product that Plaintiffs were told was safe on the basis of regulatory evaluations.

e.  Monsanto employs a vast network of third-party voices responsible for rebutting studies and research concluding that Roundup® may pose a danger to human health. This network includes prominent academics, scientists, bloggers, journalists, and organizations from other industries. A glaring example of Monsanto's approach to touting the safety of glyphosate can be found in the company's relationship with University of Illinois Professor Bruce Chassy. Documents obtained through FOIA requests and litigation revealed that Mr. Chassy accepted vast sums of money from Monsanto to write favorable articles on glyphosate and rebut criticism, as well as taking part in the letter-writing campaign which sought retraction of Professor Giles Seralini's study.[5] Many of these articles were published in California and influenced the public's understanding about the safety profile for Roundup®. This is yet another series of occurrences and transactions involving Monsanto's unscrupulous conduct in protecting the public image of glyphosate and misleading consumers and regulators. Monsanto's gambit

---

[4] *Available at*: https://assets.documentcloud.org/documents/2835260/GLYPHOSATE-Report-of-the-Cancer-Assessment.pdf
[5] *See, e.g.,* Stacy Malkan, *Monsanto Fingerprints Found All Over Attack on Organic Food* (June 30, 2016), *available at*: https://www.huffingtonpost.com/stacy-malkan/monsanto-fingerprints-fou_b_10757524.html.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1     resulted in Plaintiffs facing the risk of death and continuous to expose millions of

2     consumers across the country to the adverse health effects associated with

3     Roundup®.

4   f.  It has also come to light that Monsanto has a similar relationship with Dr. Henry

5     Miller, fellow of the California-based Stanford University Hoover Institute and

6     former regular contributor to Forbes magazine. In 2015, Mr. Miller, whose opinion

7     pieces champion the use of GM foods and herbicides, published a series of articles

8     in Forbes attacking IARC's classification of glyphosate and discrediting the

9     research of Professor Seralini. Internal Monsanto documents reveal that Mr.

10    Miller's contributions were drafted by Monsanto personnel, which papers Mr.

11    Miller then published under his own name, beneath the guise of impartiality.[6] Such

12    covert poisoning of the well by a California-based researcher acting in concert with

13    Monsanto is exemplary of a series of occurrences and transactions that are directly

14    relevant to the claims of the California Plaintiffs, who allege scientific fraud and

15    deliberate failure to disclose the health risks of Roundup® long known to

16    Defendants. Notably, when Mr. Miller's ghost-authorship was exposed, he was

17    fired from Forbes, and his articles were removed from the Internet.

18   g.  Many Roundup® products bear a label which either reads: "glyphosate targets an

19    enzyme found in plants but not in people or pets" or "this Roundup® formula

20    targets an enzyme in plants but not in people or pets." These statements are false as

21    it has been established that the human body is host to millions of microorganisms

22    which contain the enzyme Monsanto asserts is not found in humans. Thus,

23    glyphosate targets microbes within the human body which contain the enzyme

24    Roundup® is actually targeting, leading to a variety of adverse health

25    complications, including cancer. Through the same series of transactions and

26    occurrences whereby Defendants manufactured, promoted, and distributed

27

28

---

[6] *See* Danny Hakim, *Monsanto Emails Raise Issue of Influencing Research on Roundup Weed Killer* (Aug. 1, 2017) *available at*: https://www.nytimes.com/2017/08/01/business/monsantos-sway-over-research-is-seen-in-disclosed-emails.html

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Roundup® products bearing this false label, Plaintiffs were induced to purchase a carcinogenic product without being informed that Roundup®'s interference with vital bacteria is a precursor to the cancer from which Plaintiffs suffer.

h. Although Defendants promised the New York Attorney General that they will not promote Roundup® with false statements such as "glyphosate is 100 times safer than table salt," these restrictions do not extend to California consumers. Thus, the series of transactions in the form of representations about Roundup®'s safety found by the New York Attorney General to be false and misleading are still being propounded on California consumers by Defendants. Defendants' fallacious advertising contributed to Plaintiffs perceiving Roundup® to be completely safe for human use and sustaining injuries thereof. Plaintiffs would not have purchased Roundup® absent the falsehoods that are still being disseminated in a series of transactions by Defendants.

i. On March 28, 2017, California's Office of Environmental Health Hazard Assessment ("OEHHA") notified the public that glyphosate would be added to the list of chemicals known to the State of California to cause cancer under of California's Proposition 65 ("Prop 65"). This would require Roundup to bear a label informing consumers that the chemical is known as a carcinogen to the State of California. Prop 65 is the statutory mechanism which allows Californians to make an informed choice about whether to expose themselves to carcinogenic chemicals. Monsanto has filed two lawsuits – in federal and state courts – to avoid complying with Prop 65 as well as seeking to outright declare Prop 65 unconstitutional. This is in addition to a cross-industry letter-writing campaign instituted by Monsanto aimed at preventing California from adding glyphosate to the list and labeling Roundup®. The series of occurrences and transactions involving Defendants' concerted efforts aimed at circumventing and precluding the Prop 65 labeling of Roundup® directly robbed consumers, such as Plaintiffs, of the opportunity of making an informed choice about the safety of the herbicide and

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

whether to use it. Indeed, the absence of a Prop 65 warning label has resulted in Defendants being able to continue misleading Plaintiffs about the ostensible safety of Roundup®.

j. The Wilbur-Ellis Defendants also have engaged in transactions with Monsanto in the City of San Francisco, which resulted in it being the sole distributor of Roundup® in the State of California. Every Plaintiffs' purchase of Roundup® arose out of those transactions and agreements with Monsanto. Thus, Plaintiffs are properly joined to prosecute their claims against the Wilbur-Ellis Defendants.

**COUNT I:  STRICT LIABILITY (DESIGN DEFECT)**

**(Against all Defendants)**

134.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

135.    Plaintiffs bring this strict liability claim against Defendants for defective design.

136.    At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendants. At all relevant times, Defendants designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by Plaintiffs, as described herein.

137.     At all relevant times, Defendants' Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, including Plaintiffs.

138.    At all relevant times, Defendants' Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in California and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

139.    Defendants' Roundup® products, as researched, tested, developed, designed,

35

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that, when they left the control of Defendants' manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

140. Defendants' Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that, when they left the hands of Defendants' manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

141. At all relevant times, Defendants knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendants.

142. Therefore, at all relevant times, Defendants' Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendants were defective in design and formulation, in one or more of the following ways:

    a. When placed in the stream of commerce, Defendants' Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

    b. When placed in the stream of commerce, Defendants' Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

    c. When placed in the stream of commerce, Defendants' Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

    d. Defendants did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate;

    e. Exposure to Roundup® and glyphosate-containing products presents a risk of

harmful side effects that outweigh any potential utility stemming from the use of the herbicide;

    f.    Defendants knew or should have known at the time of marketing Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries;

    g.    Defendants did not conduct adequate post-marketing surveillance of its Roundup® products; and

    h.    Defendants could have employed safer alternative designs and formulations.

143.    Plaintiffs were exposed to Defendants' Roundup® products without knowledge of Roundup®'s dangerous characteristics.

144.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Defendants' Roundup® products in an intended or reasonably foreseeable manner without knowledge of Roundup®'s dangerous characteristics.

145.    Plaintiffs could not reasonably have discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure due to the Defendants' suppression of scientific information linking glyphosate to cancer.

146.    The harm caused by Defendants' Roundup® products far outweighed their benefit, rendering Defendants' product dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendants' Roundup® products were and are more dangerous than alternative products, and Defendants could have designed Roundup® products to make them less dangerous. Indeed, at the time Defendants designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

147.    At the time Roundup® products left Defendants' control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendants' herbicides.

148.    Defendants' defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including Plaintiffs herein.

149.    Therefore, as a result of the unreasonably dangerous condition of their Roundup® products, Defendants are strictly liable to Plaintiffs.

150.    The defects in Defendants' Roundup® products were substantial and contributing factors in causing Plaintiffs' injuries, and, but for Defendants' misconduct and omissions, Plaintiffs would not have sustained injuries.

151.    Defendants' conduct, as described above, was reckless. Defendants risked the lives of consumers and users of its products, including Plaintiffs, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, warn or inform the unsuspecting public. Defendants' reckless conduct warrants an award of punitive damages.

152.    As a direct and proximate result of Defendants placing its defective Roundup® products into the stream of commerce, and the resulting injuries, Plaintiffs have sustained pecuniary loss including general damages in a sum which exceeds the jurisdictional minimum of this Court.

153.    As a proximate result of Defendants placing its defective Roundup® products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Plaintiffs have suffered great mental anguish and other personal injury and damages.

154.    As a proximate result of the Defendants placing its defective Roundup® products into the stream of commerce, as alleged herein, Plaintiffs sustained loss of income, loss of earning capacity and/or property damage.

155.    WHEREFORE, Plaintiffs demand judgment against all Defendants for compensatory, treble damages pursuant to California Civil Code Section 3345, and punitive damages in excess of the jurisdictional minimum of this Court, together with interest, costs of suit, attorneys' fees, and all such other relief, as this Court deems proper.

## COUNT II:  STRICT LIABILITY (FAILURE TO WARN)

### (Against all Defendants)

156.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs

as if fully stated herein.

157.   Plaintiffs bring this strict liability claim against Defendants for failure to warn.

158.   At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendants.

159.   Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiffs, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

160.   At all relevant times, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn Plaintiffs of dangers associated with Roundup use and exposure. Defendants, as manufacturer, seller, or distributor of chemical herbicides are held to the knowledge of an expert in the field.

161.   At the time of manufacture, Defendants could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

162.   At all relevant times, Defendants failed and deliberately refused to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of their product and to those who would foreseeably use or be harmed by Defendants' herbicides, including Plaintiffs.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

163.   Despite the fact that Defendants knew or should have known that Roundup® posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of their products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they distributed, supplied or sold the product, and were not known to end users and consumers, such as Plaintiffs.

164.   Defendants knew or should have known that their products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn consumers, *i.e.*, the reasonably foreseeable users, of the risks of exposure to its products. Defendants have wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate and, further, have made false and/or misleading statements concerning the safety of Roundup® products and glyphosate.

165.   At all relevant times, Defendants' Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in California and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

166.   Plaintiffs were exposed to Defendants' Roundup® products without knowledge of their dangerous characteristics.

167.   At all relevant times, Plaintiffs used and/or were exposed to the use of Defendants' Roundup® products while using them for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

168.   Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiffs' exposure. Plaintiffs relied upon the skill, superior knowledge, and judgment of Defendants to know about and disclose serious health risks associated with using Defendants' products.

169.   Defendants knew or should have known that the minimal warnings disseminated with their Roundup® products were inadequate, failed to communicate adequate information on

the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

170. The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiffs to utilize the products safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after they knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

171. This alleged failure to warn is not limited to the information contained on Roundup®'s labeling. The Defendants were able, in accord with federal law, to comply with California law by disclosing the known risks associated with Roundup® through other non-labeling mediums, *i.e.*, promotion, advertisements, public service announcements, and/or public information sources. But the Defendants did not disclose these known risks through any medium.

172. To this day, Defendants have failed to adequately and accurately warn of the risks of cancer associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

173. As a result of their inadequate warnings, Defendants' Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed by Defendants, and used by Plaintiffs.

174. Defendants are liable to Plaintiffs for injuries caused by their negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of their products and the risks associated with the use of or exposure to Roundup® and glyphosate.

175.     Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with their Roundup® products, Plaintiffs could have avoided the risk of developing injuries and could have obtained or used alternative herbicides.

176.     As a direct and proximate result of Defendants placing defective Roundup® products into the stream of commerce, Plaintiffs were injured and have sustained pecuniary loss resulting and general damages in a sum exceeding the jurisdictional minimum of this Court.

177.     As a proximate result of Defendants placing defective Roundup® products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Plaintiffs suffered great mental anguish and other personal injury and damages.

178.     As a proximate result of Defendants placing defective Roundup® products into the stream of commerce, as alleged herein, Plaintiffs sustained loss of income, loss of earning capacity and property damage.

179.     WHEREFORE, Plaintiffs demand judgment against all Defendants for compensatory, treble damages pursuant to California Civil Code Section 3345, and punitive damages in excess of the jurisdictional minimum of this Court, together with interest, costs of suit, attorneys' fees, and all such other relief, as this Court deems proper.

## COUNT III:  NEGLIGENCE

### (Against all Defendants)

180.     Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

181.     Defendants, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiffs.

182.     At all relevant times, Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

183.    At all relevant times, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Defendants' duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

184.    At all relevant times, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and, specifically, the carcinogenic properties of the chemical glyphosate.

185.    Accordingly, at all relevant times, Defendants knew or, in the exercise of reasonable care, should have known that use of or exposure to Roundup® products could cause or be associated with Plaintiffs' injuries, and thus, create a dangerous and unreasonable risk of injury to the users of these products, including Plaintiffs.

186.    Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

187.    As such, Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of  Roundup® products, in that Defendants manufactured and produced defective herbicides containing the chemical glyphosate; knew or had reason to know of the defects inherent in its products; knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects; and failed to prevent or adequately warn of these risks and injuries. Indeed, Defendants deliberately refused to test Roundup® products because they knew that the chemical posed serious health risks to humans.

188.    Defendants were negligent in their promotion of Roundup®, outside of the labeling context, by failing to disclose material risk information as part of their promotion and marketing of Roundup®, including the Internet, television, print advertisements, etc. Nothing prevented

Defendants from being honest in their promotional activities, and, in fact, Defendants had a duty to disclose the truth about the risks associated with Roundup in their promotional efforts, outside of the context of labeling.

189.    Despite their ability and means to investigate, study, and test the products and to provide adequate warnings, Defendants have failed to do so. Indeed, Defendants have wrongfully concealed information and have further made false and/or misleading statements concerning the safety and/or exposure to Roundup and glyphosate.

190.    Defendants' negligence included:

   a.    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® products without thorough and adequate pre- and post-market testing;

   b.    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup;

   c.    Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

   d.    Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup/glyphosate as an herbicide;

   e.    Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

   f.    Failing to provide adequate instructions, guidelines, and safety precautions to those persons Defendants could reasonably foresee would use and be exposed to Roundup® products;

   g.    Failing to disclose to Plaintiffs, users/consumers, and the general public that use of

and exposure to Roundup® presented severe risks of cancer and other grave
illnesses;

h.  Failing to warn Plaintiffs, consumers, and the general public that the product's risk
of harm was unreasonable and that there were safer and effective alternative
herbicides available to Plaintiffs and other consumers;

i.  Systematically suppressing or downplaying contrary evidence about the risks,
incidence, and prevalence of the side effects of Roundup® and glyphosate-
containing products;

j.  Representing that their Roundup® products were safe for their intended use when,
in fact, Defendants knew or should have known the products were not safe for their
intended purpose;

k.  Declining to make or propose any changes to Roundup® products' labeling or
other promotional materials that would alert consumers and the general public of
the risks of Roundup® and glyphosate;

l.  Advertising, marketing, and recommending the use of the Roundup® products,
while concealing and failing to disclose or warn of the dangers known (by
Defendants) to be associated with or caused by the use of or exposure to Roundup®
and glyphosate;

m.  Continuing to disseminate information to its consumers, which indicate or imply
that Defendants' Roundup® products are not unsafe for use in the agricultural and
horticultural industries; and

n.  Continuing the manufacture and sale of their products with the knowledge that the
products were unreasonably unsafe and dangerous.

191.  Defendants knew and/or should have known that it was foreseeable consumers such
as Plaintiffs would suffer injuries as a result of Defendants' failure to exercise ordinary care in the
manufacturing, marketing, labeling, distribution, and sale of Roundup®.

192.  Plaintiffs did not know the nature and extent of the injuries that could result from
the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

193.    Defendants' negligence was the proximate cause of Plaintiff's injuries, *i.e.*, absent Defendants' negligence, Plaintiffs would not have developed cancer.

194.    Defendants' conduct, as described above, was reckless. Defendants regularly risked the lives of consumers and users of their products, including Plaintiffs, with full knowledge of the dangers of their products. Defendants have made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiffs. Defendants' reckless conduct therefore warrants an award of punitive damages.

195.    As a direct and proximate result of Defendants placing defective Roundup® products into the stream of commerce, Plaintiffs were injured and have sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

196.    As a proximate result of Defendants placing defective Roundup® products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Plaintiffs suffered great mental anguish and other personal injury and damages.

197.    As a proximate result of Defendants placing defective Roundup® products into the stream of commerce, as alleged herein, Plaintiffs sustained a loss of income, loss of earning capacity and property damage.

198.    WHEREFORE, Plaintiffs demand judgment against all Defendants for compensatory, treble damages pursuant to California Civil Code Section 3345, and punitive damages in excess of the jurisdictional minimum of this Court, together with interest, costs of suit, attorneys' fees, and all such other relief, as this Court deems proper.

## COUNT IV:  FRAUD

### (Against Monsanto)

199.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

200.    Defendant Monsanto has defrauded the agricultural community in general and Plaintiffs in particular by misrepresenting the true safety of its Roundup® and by failing to disclose known risks of cancer.

201.    Defendant Monsanto misrepresented and/or failed to disclose, *inter alia*, that:

glyphosate and its major metabolite aminomethylphosphonic acid (AMPA) could cause cancer; glyphosate and AMPA are known to be genotoxic in humans and laboratory animals because exposure is known to cause DNA strand breaks (a precursor to cancer); glyphosate and AMPA are known to induce oxidative stress in humans and laboratory animals (a precursor to cancer); glyphosate and AMPA interfere with the aromatic amino acids within the human gut, leading to downstream health conditions including cancer; exposure to glyphosate and AMPA is causally associated with non-Hodgkin lymphoma; and the laboratory tests attesting to the safety of glyphosate were flawed and/or fraudulent.

202.    Due to these misrepresentations and omissions, at all times relevant to this litigation, Defendant's Roundup® was misbranded under 7 U.S.C. § 136(g) and its distribution within California and around the United States was a violation of 7 U.S.C. § 136j and 40 C.F.R. § 156.10(a)(5).

203.    Plaintiffs relied on the Defendant's misrepresentations and/or material omissions regarding the safety of Roundup® and its active ingredient glyphosate in deciding whether to purchase and/or use the product. Plaintiffs did not know nor could they reasonably have known of the misrepresentations and/or material omissions by Defendant concerning Roundup® and its active ingredient glyphosate.

204.    The misrepresentations and/or material omissions that form the basis of this fraud claim are not limited to statements made on the Roundup® labeling, as defined under federal law, but also involve Defendant Monsanto's representations and omissions made as part of its promotion and marketing of Roundup®, including on the Internet, television, in print advertisements, etc. Nothing prevented Defendant Monsanto from disclosing the truth about the risks associated with Roundup® in its promotional efforts outside of the labeling context, using the forms of media and promotion Defendant Monsanto traditionally used to promote the product's efficacy and benefits.

205.    When Defendant Monsanto made the misrepresentations and/or omissions as alleged in this pleading, it did so with the intent of defrauding and deceiving the public in general and the agricultural community and with the intent of inducing the public and agricultural

community to purchase and use Roundup®.

206. Defendant Monsanto made these misrepresentations and/or material omissions with malicious, fraudulent and/or oppressive intent toward Plaintiffs and the public generally. Defendant's conduct was willful, wanton, and/or reckless. Defendant deliberately recommended, manufactured, produced, marketed, sold, distributed, merchandized, packaged, promoted and advertised the dangerous and defective herbicide Roundup®. This constitutes an utter, wanton, and conscious disregard of the rights and safety of a large segment of the public, and by reason thereof, Defendant is liable for reckless, willful, and wanton acts and omissions which evidence a total and conscious disregard for the safety of Plaintiffs and others which proximately caused the injuries as set forth herein.

207. As a proximate result of Defendant Monsanto's fraudulent and deceitful conduct and representations, Plaintiffs have sustained damages and other losses in an amount to be proven at trial.

208. As a proximate result of Defendant Monsanto's fraud, as alleged herein, Plaintiffs sustained a loss of income, loss of earning capacity and property damage, including lost income.

209. WHEREFORE, Plaintiffs demand judgment against all Defendants for compensatory, treble damages pursuant to California Civil Code Section 3345, and punitive damages in excess of the jurisdictional minimum of this Court, together with interest, costs of suit, attorneys' fees, and all such other relief, as this Court deems proper.

## COUNT V:  BREACH OF EXPRESS WARRANTIES
### (Against Monsanto)

210. Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

211. At all relevant times, Defendant Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant Monsanto.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

212.    Defendant Monsanto had a duty to exercise reasonable care in the research, development, design, testing, packaging, manufacture, inspection, labeling, distributing, marketing, promotion, sale, and release of Roundup® products, including a duty to:

  a.  ensure that its products did not cause the user unreasonably dangerous side effects;

  b.  warn of dangerous and potentially fatal side effects; and

  c.  disclose adverse material facts, such as the true risks associated with the use of and exposure to Roundup® and glyphosate-containing products, when making representations to consumers and the general public, including Plaintiffs.

213.    As alleged throughout this pleading, the ability of Defendant Monsanto to properly disclose those risks associated with Roundup® is not limited to representations made on the labeling.

214.    At all relevant times, Defendant Monsanto expressly represented and warranted to the purchasers of its products, by and through statements made by Defendant Monsanto in labels, publications, package inserts, and other written materials intended for consumers and the general public, that Roundup® products were safe to human health and the environment, effective, fit, and proper for their intended use. Defendant Monsanto advertised, labeled, marketed, and promoted Roundup® products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that Roundup® products would conform to the representations.

215.    These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup® and glyphosate. Defendant Monsanto knew and/or should have known that the risks expressly included in Roundup® warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant Monsanto expressly represented that Roundup® products were safe and effective, that they were safe and effective for use by individuals such as the Plaintiffs, and/or that they were safe and effective as agricultural herbicides.

216.    The representations about Roundup®, as set forth herein, contained or constituted

49

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1  affirmations of fact or promises made by the seller to the buyer, which related to the goods and

2  became part of the basis of the bargain, creating an express warranty that the goods would conform

3  to the representations.

4  217.    Defendant Monsanto placed Roundup® products into the stream of commerce for

5  sale and recommended their use to consumers and the public without adequately warning of the

6  true risks of developing the injuries associated with the use of and exposure to Roundup® and its

7  active ingredient glyphosate.

8  218.    Defendant Monsanto breached these warranties because, among other things,

9  Roundup® products were defective, dangerous, and unfit for use, did not contain labels

10  representing the true and adequate nature of the risks associated with their use, and were not

11  merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically,

12  Defendant Monsanto breached the warranties in the following ways:

13  a.    Defendant Monsanto represented through its labeling, advertising, and marketing

14  materials that Roundup® products were safe, and fraudulently withheld and concealed information

15  about the risks of serious injury associated with use of and/or exposure to Roundup® and

16  glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings

17  and labels; and

18  b.    Defendant Monsanto represented that Roundup® products were safe for use and

19  fraudulently concealed information that demonstrated that glyphosate, the active ingredient in

20  Roundup®, had carcinogenic properties, and that Roundup® products, therefore, were not safer

21  than alternatives available on the market.

22  219.    Plaintiffs detrimentally relied on the express warranties and representations of

23  Defendant Monsanto concerning the safety and/or risk profile of Roundup® in making a decision to

24  purchase the product. Plaintiffs reasonably relied upon Defendant Monsanto to disclose known

25  defects, risks, dangers, and side effects of Roundup® and glyphosate. Plaintiffs would not have

26  purchased or used Roundup® had Defendant Monsanto properly disclosed the risks associated with

27  the product, either through advertising, labeling, or any other form of disclosure.

28  220.    Defendant Monsanto had sole access to material facts concerning the nature of the

risks associated with its Roundup® products, as expressly stated within their warnings and labels, and knew that consumers and users such as Plaintiffs could not have reasonably discovered that the risks expressly included in Roundup® warnings and labels were inadequate and inaccurate.

221.    Plaintiffs had no knowledge of the falsity or incompleteness of Defendant Monsanto's statements and representations concerning Roundup.

222.    Plaintiffs used and/or were exposed to Roundup® as researched, developed, designed, tested, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Defendant Monsanto.

223.    Had the warnings, labels, advertisements, or promotional material for Roundup® products accurately and adequately set forth the true risks associated with the use of such products, including Plaintiffs' injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Plaintiffs could have avoided the injuries complained of herein.

224.    As a direct and proximate result of Defendant Monsanto's breach of express warranty, Plaintiffs have sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

225.    As a proximate result of Defendant Monsanto's breach of express warranty, as alleged herein, there was a measurable and significant interval of time during which Plaintiffs suffered great mental anguish and other personal injury and damages.

226.    As a proximate result of Defendant Monsanto's breach of express warranty, as alleged herein, Plaintiffs sustained a loss of income, loss of earning capacity, and property damage.

227.    WHEREFORE, Plaintiffs demand judgment against all Defendants for compensatory, treble damages pursuant to California Civil Code Section 3345, and punitive damages in excess of the jurisdictional minimum of this Court, together with interest, costs of suit, attorneys' fees, and all such other relief, as this Court deems proper.

### COUNT VI:  BREACH OF IMPLIED WARRANTIES

### (Against Monsanto)

228.    Plaintiffs incorporate by reference every allegation set forth in preceding

paragraphs as if fully stated herein.

229.    At all relevant times, Defendant Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which were and are defective and unreasonably dangerous to consumers, including Plaintiffs, thereby placing Roundup® products into the stream of commerce.

230.    Before the time Plaintiffs were exposed to the aforementioned Roundup® products, Defendant Monsanto impliedly warranted to its consumers, including Plaintiffs, that Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as agricultural herbicides.

231.    But Defendant Monsanto failed to disclose that Roundup® has dangerous propensities when used as intended and that use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiffs' injuries.

232.    Plaintiffs were intended beneficiaries of the implied warranties made by Defendant Monsanto to purchasers of its herbicides.

233.    The Roundup® products were expected to reach and did in fact reach consumers and users, including Plaintiffs, without substantial change in the condition in which they were manufactured and sold by Defendant Monsanto.

234.    At all relevant times, Defendant Monsanto was aware that consumers and users of its products, including Plaintiffs, would use Roundup® products as marketed by Defendant Monsanto, which is to say that Plaintiffs were foreseeable users of Roundup®.

235.    Defendant Monsanto intended that Roundup® products be used in the manner in which Plaintiffs, in fact, used them and which Defendant Monsanto impliedly warranted to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

236.    In reliance upon Defendant Monsanto's implied warranty, Plaintiffs used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by Defendant Monsanto.

237.    Plaintiffs could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

238.    Defendant Monsanto breached its implied warranty to Plaintiffs in that Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

239.    The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

240.    As a direct and proximate result of Defendant's breach of implied warranty, Plaintiffs have sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

241.    As a proximate result of the Defendant's breach of implied warranty, as alleged herein, there was a measurable and significant interval of time during which Plaintiffs suffered great mental anguish and other personal injury and damages.

242.    As a proximate result of Defendant's breach of implied warranty, as alleged herein, Plaintiffs sustained a loss of income, loss of earning capacity, and property damage.

243.    WHEREFORE, Plaintiffs demand judgment against all Defendants for compensatory, treble damages pursuant to California Civil Code Section 3345, and punitive damages in excess of the jurisdictional minimum of this Court, together with interest, costs of suit, attorneys' fees, and all such other relief, as this Court deems proper.

## COUNT VII: WRONGFUL DEATH

**(This claim is brought by the above-named plaintiffs individually and as successor(s)-in-interest, surviving heir(s), and/or estate representative of each decedent against all Defendants)**

244.    Plaintiffs repeat and reiterate the allegations previously set forth herein.

245.    Plaintiff is the successor-in-interest, surviving heir, or estate representative of the Decedent, or other person authorized to bring an action for the wrongful death of the Decedent,

who used Defendant's Roundup product and was injured and died as a result.

246.    The injuries and damages of the Plaintiff and Decedent were caused by the wrongful acts, omissions, and fraudulent misrepresentations of Defendants.

247.    As a result of the conduct of Defendants and the ingestion of Defendants' Roundup Product, the Decedent suffered fatal injuries.

248.    As a result of the death of the Decedent, Plaintiff was deprived of love, companionship, comfort, support, affection, society, solace, and moral support of the Decedent.

249.    Plaintiff is entitled to recover economic and non-economic damages against Defendants for the wrongful death directly and legally caused by the defects in Defendants' Roundup product and the negligent conduct, acts, errors, omissions and intentional and negligent misrepresentations of Defendants.

250.    WHEREFORE, Plaintiffs demand judgment against all Defendants for compensatory, treble damages pursuant to California Civil Code Section 3345, and punitive damages in excess of the jurisdictional minimum of this Court, together with interest, costs of suit, attorneys' fees, and all such other relief, as this Court deems proper.

## COUNT VIII: LOSS OF CONSORTIUM

### (This claim is brought by all spouses against all Defendants)

251.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

252.    Plaintiffs were married at the time of injuries alleged above.  Each spouse is entitled to his or her spouse's, care, affection, companionship, services, society, advice, guidance, counsel, and consortium.

253.    As a direct and proximate result of one or more of the wrongful acts or omissions of the Defendants described above, each spouse has been and will be deprived of their spouse's comfort, care, affection, companionship, services, society, advice, guidance, counsel and consortium.

254.    WHEREFORE, Plaintiffs demand judgment against all Defendants for

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

compensatory, treble damages pursuant to California Civil Code Section 3345, and punitive

damages in excess of the jurisdictional minimum of this Court, together with interest, costs of suit,

attorneys' fees, and all such other relief, as this Court deems proper.

## IX. PUNITIVE DAMAGES

### (Against all Defendants)

255.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs
as if fully stated herein.

256.    Defendants' conduct as alleged herein was done with oppression, fraud, and malice.
Defendants were fully aware of the safety risks of Roundup®. Nonetheless, Defendants
deliberately crafted their label, marketing, and promotion to mislead farmers and consumers.

257.    This was not done by accident or through some justifiable negligence. Rather,
Defendants knew that it could turn a profit by convincing the agricultural industry that Roundup
was harmless to humans, and that full disclosure of the true risks of Roundup® would limit the
amount of money Defendants would make selling Roundup® in California. Defendants' objection
was accomplished not only through its misleading labeling, but through a comprehensive scheme of
selective fraudulent research and testing, misleading advertising, and deceptive omissions as more
fully alleged throughout this pleading. Plaintiffs were denied the right to make an informed
decision about whether to purchase, use, or be exposed to an herbicide, knowing the full risks
attendant to that use. Such conduct was done with conscious disregard of Plaintiffs' rights.

258.    There is no indication that Defendants will stop their deceptive and unlawful
marketing practices unless they are punished and deterred. Accordingly, Plaintiffs request punitive
damages against the Defendants for the harms caused to Plaintiffs.

259.    WHEREFORE, Plaintiffs demand judgment against all Defendants for
compensatory, treble damages pursuant to California Civil Code Section 3345, and punitive
damages in excess of the jurisdictional minimum of this Court, together with interest, costs of suit,
attorneys' fees, and all such other relief, as this Court deems proper.

# X. SURVIVAL ACTION

**(This claim is brought by the above-named plaintiffs individually and as successor(s)-in-interest, surviving heir(s), and/or estate representative of each decedent against all Defendants)**

260.    Plaintiffs incorporate by reference all other paragraphs in this Complaint as if set forth fully herein.

261.    As a direct and proximate result of the acts and/or omissions of Defendants as set forth herein, each decedent named in this action used Roundup. Subsequent to such use, Decedent developed non-Hodgkin's lymphoma, suffered substantial pain and suffering, both physical and emotional in nature, and subsequently died.

262.    Plaintiffs, individually and on behalf of all of the next of kin or successors-in-interest of Decedent, is entitled to recover damages as Decedent would have if he or she were living, as a result of acts and/or omissions of Defendants.

263.    Plaintiffs, individually, and on behalf of all of Decedent' next of kin or successors-in-interest is also entitled to recover punitive damages and damages for substantial pain and suffering caused to Decedent from the acts and/or omissions of Defendants as fully set forth herein, including without limitations, punitive damages.

264.    As a direct and proximate result of Defendants' conduct, Plaintiffs and Decedents have been injured and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care and comfort, and economic damages.

265.    WHEREFORE, Plaintiffs demand judgment against all Defendants for compensatory, treble damages pursuant to California Civil Code Section 3345, and punitive

damages in excess of the jurisdictional minimum of this Court, together with interest, costs of suit, attorneys' fees, and all such other relief, as this Court deems proper.

## JURY TRIAL DEMAND

266.    Plaintiffs demand a trial by jury on all of the triable issues within this pleading.

## PRAYER FOR RELIEF

267.    WHEREFORE, Plaintiffs request the Court to enter judgment in Plaintiffs' favor and against the Defendants for:

a.   actual or compensatory damages in such amount to be determined at trial and as provided by applicable law;

b.   exemplary and punitive damages sufficient to punish and deter the Defendants and others from future fraudulent practices;

c.   pre-judgment and post-judgment interest;

d.   costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

e.   any other relief the Court may deem just and proper.

Dated:  December 10, 2018                    **THE MILLER FIRM LLC**


_____
Curtis G. Hoke (SBN: 282465)
**THE MILLER FIRM, LLC**
108 Railroad Ave.
Orange, VA 22960
Telephone: (540) 672-4224
Facsimile: (540) 672-3055
choke@millerfirmllc.com

*Attorneys for Plaintiffs*

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Exhibit 2

E-Served: Feb 25 2019 11:46AM PST Via Case Anywhere



21105579

FILED
ALAMEDA COUNTY

FEB 2 6 2019

CLERK OF THE SUPERIOR COURT
By _____ Deputy

COURTESY COPY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF ALAMEDA

| COORDINATION PROCEEDING SPECIAL TITLE (RULE 3.550) | JCCP NO. 4953 |
|---|---|
| ROUNDUP PRODUCTS CASES | ASSIGNED FOR ALL PURPOSES TO JUDGE WINIFRED Y. SMITH DEPT. 21 |

THIS DOCUMENT RELATES TO:
ALL ACTIONS AND

*Limbach, et al. v. Monsanto Company, et al.,*
Case No.: CGC-18-571668 (S.F. County);

*Abreu, et al. vs. Monsanto Company,* et al.,
Case No. CGC-18-571705 (S.F. County);

*Chupa, et al. vs. Monsanto Company,* et al.,
Case No.: CGC-18-571983 (S.F. County)

[~~PROPOSED~~] ORDER: ADDITION OF *LIMBACH, ABREU,* AND *CHUPA* CASES TO JCCP AND STAY OF CASES

Revised Stipulation Regarding [Proposed] Order filed concurrently herewith

BY FAX

///

///

///

[~~PROPOSED~~] ORDER: ADDITION OF *LIMBACH, ABREU,* AND *CHUPA* CASES TO JCCP

1    For good cause shown, the Court hereby orders as follows:

2    The cases listed below shall be designated as complex and added to JCCP 4953, and the

3    cases shall be stayed in their home jurisdictions pursuant to Rules 3.529(b) and 3.544(d) of the

4    California Rules of Court.

| Case name | Case No. | Court | Filing Date |
|---|---|---|---|
| *Limbach, et al. v. Monsanto Company, et al.* | CGC-18-571668 | San Francisco | 11/29/2018 |
| *Abreu, et al. v. Monsanto Company, et al.* | CGC-18-571705 | San Francisco | 11/30/2018 |
| *Chupa, et al. v. Monsanto Company, et al.* | CGC-18-571983 | San Francisco | 12/10/2018 |

IT IS SO ORDERED.

Date: **February 26**, 2019

HONORABLE WINIFRED Y. SMITH

[PROPOSED] ORDER: ADDITION OF *LIMBACH*, *ABREU*, AND *CHUPA* CASES TO JCCP

Exhibit 3



FILED
ALAMEDA COUNTY

JAN 2 5 2019

CLERK OF THE SUPERIOR COURT
By _____
                              Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

| | |
|---|---|
| IN RE ROUNDUP PRODUCTS CASES | No. JCCP 4953 |
| | *Pilliod v. Monsanto*, RG17-862702 |
| | ORDER (1) DENYING MOTION OF PLAINTIFFS FOR CONSOLIDATION OF CASE FOR TRIAL AND (2) ON CASE MANAGEMENT |
| | DATE  1/25/19 |
| | TIME   10:00 AM |
| | DEPT   21 |

The motion of plaintiffs for court setting bellwether selection process came on for hearing on Friday 1/25/19, in Department 21 of this Court, the Honorable Winifred Y. Smith presiding. Having reviewed the papers and having heard the arguments of counsel, and good cause appearing, IT IS HEREBY ORDERED:  The motion of plaintiffs for court setting bellwether selection process is DENIED WITHOUT PREJUDICE.

///

///

1  MOTION OF PLAINTIFFS FOR COURT SETTING BELLWETHER SELECTION PROCESS

2       The motion of plaintiffs for court setting bellwether selection process is DENIED

3  WITHOUT PREJUDICE.

4       Plaintiffs seek an order that the bellwether trials will each be a multi-plaintiff trial with up

5  to 10 plaintiffs in each trial. The motion is therefore a motion for consolidation under CCP

6
7  1048(a).

8       CCP 1048(a) states: "When actions involving a common question of law or fact are

9  pending before the court, it may order a joint hearing or trial of any or all of the matters in issue

10  in the actions; it may order all the actions consolidated and it may make such orders concerning

11  proceedings therein as may tend to avoid unnecessary cost or delay." In considering a motion to

12  consolidate under CCP 1048(a), the court evaluates whether the cases have common issues and

13  whether undue confusion or prejudice will likely to result from the proposed consolidation.

14  (*Todd-Stenberg v. Dalkon Shield Claimants Trust* (1996) 48 Cal.App.4th 976, 979.)

15
16       All the cases included in the JCCP cases share common issues of fact or law. As a matter

17  of law, however, the "common questions of fact or law" required for creation of a JCCP and

18  inclusion in a JCCP for pre-trial case management purposes (CCP 404, CRC 3.541) is a different

19  standard than the "common question of law or fact" required for consolidation for trial (CCP

20  1048(a)). Although the words are the same, coordination for pre-trial case management purposes

21  is distinctly different from consolidation for trial.

22       The court cannot determine on the present record whether the claims of unidentified

23  plaintiffs have common issues. The court also cannot determine whether the consolidation of the

24  claims of various plaintiffs for trial might have case management and judicial efficiency benefits

25  or whether undue confusion or prejudice would likely to result from consolidation. The court has

26

1   not yet identified which plaintiffs will be in the bellwether trials, set a schedule for the bellwether

2   trials, or determined where the bellwether cases will be set for trial.  (CRC 3.543.)

3          The court is likely to follow the court's currently planned procedure in the *Essure Cases*,

4   JCCP 4887, of (1) identifying bellwether plaintiffs; (3) setting dates for bellwether trials without

5   identifying specific plaintiffs; (3) working up all the bellwether cases for trial; and only then (4)

6   determining which plaintiffs will go to trial in which jurisdiction. Only at or after the final step

7   can the court evaluate the issue of consolidation for trial, and that might be a decision made by a

8   judge in a different county after a case or a few cases are remanded or transferred for trial.  (CRC

9

10  3.542 and 3.543.)

11         When the time comes, the court will exercise its discretion in determining whether to

12  consolidate cases for trial by looking at variables such as common issues of law and fact, the

13  possibility of undue confusion or prejudice, and considerations of judicial efficiency.  Although

14  the Roundup JCCP and the Essure JCCP share certain case management similarities, each JCCP

15  has its own case management, legal, and factual issues.  An order in one JCCP has effect only in

16

17  that JCCP.  Similarly, decisions made by other trial courts in the exercise of their discretion are

18  useful guideposts, but do not compel the court to reach the same conclusions.  (*In re Large*

19  (2007) 41 Cal.4th 538, 553; *Rush v. White* (2017) 13 CalApp.5th 1086, 1098-1099; *Miyamoto v.*

20  *Department of Motor Vehicles* (2009) 176 Cal.App.4th 1210, 1222-1224 [concurring].)

21

22  CASE MANAGEMENT ORDERS

23         The court ORDERS as follows:

24

25  1.  The court ORDERS that effective as of the date of this order each plaintiff must file their

26     own individual complaint except where the facts of the plaintiffs are closely intertwined,

3

as with Alva Pilliod and Alberta Pilliod in *Pilliod v. Monsanto*, RG17-862702. (*Billings v. Monsanto*, RG17-852375, order of 7/14/17; *Woodbury v. Monsanto*, RG17-855094, order of 7/26/17.)

2.  The court ORDERS that for previously filed complaints with more than one plaintiff, that by the earlier of (1) 6/30/19 or (2) 30 days after the date the case is assigned for trial, that all plaintiffs except one per case must be dismissed and the other plaintiffs must file their own individual complaint as in paragraph 1. Any new complaints filed pursuant to this order will relate back to the filing of the initial complaint. This is consistent with the stipulated order of 8/4/17 in *Pilliod v. Monsanto*, RG17-862702.

3.  The court ORDERS that counsel for plaintiffs are to prepare a proposed master complaint and a proposed short form complaint. The short form complaint will incorporate the allegations in the master complaint and set forth the essential facts for each plaintiff. The short form complaint can be fairly cursory given that each plaintiff will be required to provide a Plaintiff's Fact Sheet. (CMO 11 filed 8/28/18.) After the filing of the proposed master complaint, then any plaintiffs filing new complaints are to file the short form complaint.

4.  It is unclear to the court what cases are included in the JCCP and the names of the plaintiffs in each case. The court ORDERS that the parties collectively prepare and maintain a joint spreadsheet of all the cases individual plaintiffs in the JCCP and for each plaintiff: (1) the plaintiff's name, (2) the case name, (3) case jurisdiction and case number, (4) the date of case filing; (5) the geographic focus of the facts in the case for the individual plaintiffs; and (6) whether the case is pending, set for trial, or dismissed. The parties may include additional information in the joint spreadsheet, as it will be an asset

for common use. The court anticipates that a spreadsheet will be useful in keeping track

of the cases.

5. The court ORDERS that each CMC statement include as an appendix the spreadsheet

identified above, or a summary of critical information.  The court anticipates that a

spreadsheet will be useful in identifying which cases are oldest and should be set for trial

first, for alerting other courts that they might have cases sent to them for trial, and for

other matters.

6. Roundup cases can be added to the JCCP using the add-on procedure.  (CRC 3.544.)

7. Roundup cases that are added to the JCCP will be stayed in their home jurisdictions.

(CRC 3.529(b), 3.544(d).)

8. Roundup cases that are added to the JCCP do not need to be transferred from their home

jurisdictions.  (CRC 3.543.)  The court will not enter transfer orders in the future absent a

showing of good cause.

9. The court understands that certain cases have been transferred to Alameda County.  The

court will process those transfers and create Alameda case files, but then the plaintiffs

will need to comply with paragraph 2 above so that each individual plaintiff has his or her

own individual complaint by 6/30/19.

10. The coordination trial judge in the JCCP will manage the common issues.  (CRC 3.541.)

11. The court ORDERS that all motions concerning common issues must be filed in the

JCCP.  For example, the anticipated *Sargon* motion that concerns the JCCP should be

filed in JCCP 4953.

12. After a case has been added to the JCCP, then all filings must be made in the JCCP case.

13. When cases are ready for trial, the coordination trial judge in the JCCP can remand the case out of the JCCP for trial in the home jurisdiction (CRC 3.542) or transfer the case to another jurisdiction for trial (CRC 3.543). That way the specific record at trial will then be developed in a separate case file.

14. The case of *Pilliod v. Monsanto*, RG17-862702, is sufficiently close to trial that motions related to that case should be filed in RG17-862702. For example, the *Sargon* motion concerning *Pilliod* specifically should be filed in the RG17-862702.

15. The court encourages the parties to review the schedule in the JCCP and in *Pilliod* for the next 6-12 months and to propose general case schedules. The court will be interested in setting hearing at 9:00 am on the first Wednesday or Thursday of each month in the JCCP for regular CMCs and for hearing any motions in the JCCP.

16. The court informs counsel that in addition to being coordination trial judge in *In re Roundup Cases*, JCCP 4953, the court has also been appointed coordination trial judge in *In re Essure Cases*, JCCP 4887. Each case has its own case management, legal, and factual issues and an order in one JCCP has effect only in that JCCP. That said, the court encourages counsel in this JCCP to review the court's orders in the other JCCP because they might provide guidance on the court's thinking and help avoid or narrow contested motion practice. For example, counsel may refer to *Essure* CMO 13 filed 12/21/18 regarding case schedule.

Dated: January 25, 2019

Winifred Y. Smith
Judge of the Superior Court

6

Exhibit 4

1

2

## IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF ALAMEDA

3

| | |
|---|---|
| 4  IN RE: COORDINATION PROCEEDING<br>5  SPECIAL TITLE  Rule 3.550 | JCCP No. 4953 |
| 6  **ROUNDUP PRODUCTS CASES**<br>7  This document relates to: | Judge Winifred Smith<br>Department 21 |
| 8  Plaintiff,<br>9 | |
| 10  v. | |
| 11  Monsanto Company; Wilbur-Ellis Company<br>LLC; Wilbur-Ellis Nutrition, LLC;<br>12  Defendants; Chevron Corporation; and<br>DOES 1 through 100 inclusive,<br>13 | Master Long Form Complaint<br>and Jury Demand |
| 14  Defendants | |

15

16        JCCP Plaintiffs, by and through co-lead liaison counsel, submit this Master Long Form

17 Complaint ("Master Complaint") as an administrative device to set forth potential claims that

18 individual Plaintiffs may assert in this litigation against Monsanto Company; Wilbur-Ellis

19 Company LLC; Wilbur-Ellis Nutrition, LLC; Chevron Corporation, Defendants.

20        This Master Complaint does not constitute a waiver or dismissal of any claims asserted in

21 individual actions, and Plaintiffs reserve the right to amend this Master Complaint based upon

22 newly discovered evidence.

23                        ## STATEMENT OF THE CASE

24        1.        In 1970, Defendant Monsanto Company discovered the herbicidal properties of

25 glyphosate and began marketing it in products in 1974 under the brand name Roundup®.

26 Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the

27 growing of crops. By 2001, glyphosate had become the most-used active ingredient in American

28 agriculture with 85–90 millions of pounds used annually. That number grew to 185 million pounds

1

COMPLAINT

by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

2.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

3.     Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

4.     On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

5.     On July 29, 2015, the IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

6.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

7.     The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans. Nevertheless, Monsanto, since it began selling Roundup®, has

2
COMPLAINT

represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

8.     Upon information and belief, Wilbur-Ellis Company, LLC and Wilbur-Ellis Feed, LLC were responsible for marketing Roundup® and related Monsanto products during the time period in question.

9.     Upon information and belief, the Chevron Corporation, operating as "Monsanto Chevron," manufactured, marketed, registered, distributed, and sold Roundup® products and other glyphosate-based formulations, and investigated and prepared storage stability data for submission to the EPA in furtherance of the continued registration of Roundup® products and other glyphosate-based formulations for use by consumers during the time period in question.

## JURISDICTION AND VENUE

10.     The JCCP Court has jurisdiction over this action pursuant to the California Constitution Article VI, Section 10, which grants the Superior Court "original jurisdiction in all causes except those given by statute to other trial courts", the California Code of Civil Procedure §§ 404 *et seq.*, California Rules of Court 3.400 *et seq.*, this Court's January 4, 2018 Order Granting Petition for Coordination and coordinating the actions subject to this JCCP in this Court, and the January 16, 2018 Order from the Chair of the Judicial Council of California assigning the then-presiding judge, the Honorable Ioana Petrou, as coordination trial judge.  The Statutes under which this action is brought do not specify any other basis for jurisdiction.

11.     The California Superior Court has jurisdiction over the Defendants because, based on information and belief, each is a California resident, a corporation and/or entity organized under the laws of the State of California, a foreign corporation or association authorized to do business in California and registered with the California Secretary of State or that has sufficient minimum contacts in California, or principle places of business in California or otherwise intentionally avails itself of the California market so as to render the exercise of jurisdiction over it by the California courts consistent with traditional notions of fair play and substantial justice.

3
COMPLAINT

1       12.     Venue is proper in this Court pursuant to California Rules of Court, Rule 3.530(b),

2  this Court's January 4, 2018 Order Granting the Petition for Coordination, and the January 16,

3  2018 Order from the Chair of the Judicial Council of California assigning the then-presiding

4  judge, the Honorable Ioana Petrou, as coordination trial judge.

5       13.     Furthermore, the Defendants have purposefully availed themselves of the benefits

6  and the protections of the laws within the State of California.  Monsanto has had sufficient contact

7  such that the exercise of jurisdiction would be consistent with the traditional notions of fair play

8  and substantial justice.

9  **PARTIES**

10  **Plaintiffs**

11       14.     Plaintiffs seek relief that is within the jurisdictional limits of this Court.

12       15.     Plaintiffs are informed and believe and based thereon allege that as a direct and

13  proximate result of Plaintiffs' use of Roundup® and/or other Monsanto glyphosate-containing

14  products ("Roundup"), supplied and/or distributed by Defendants herein, Plaintiffs suffered

15  significant harm, conscious pain and suffering, physical injury and bodily impairment including,

16  but not limited to non-Hodgkin lymphoma and other cancers, other permanent physical deficits,

17  permanent bodily impairment and other injury sequelae. Plaintiffs' injuries required medical

18  intervention to address the adverse physical effects and damage caused by Plaintiffs' use of

19  Roundup® and/or other Monsanto glyphosate-containing products ("Roundup").

20       16.     As a direct and proximate result of the wrongful conduct, acts, omissions,

21  fraudulent concealments, fraudulent misrepresentations, and fraudulent business practices by

22  Defendants and DOES 1 through 100, inclusive, Plaintiffs used and/or were exposed to Roundup®

23  and were diagnosed with serious health injuries including non-Hodgkin lymphoma and/or other

24  cancers.

25       17.     As a further direct and proximate result of defects in Roundup® and the wrongful

26  conduct, acts, omissions, and fraudulent misrepresentations of Defendants, Plaintiffs suffered

27  severe mental and physical pain and have and will sustain permanent injuries and emotional

28

4
COMPLAINT

distress, along with economic loss due to medical expenses and living-related expenses as a result of lifestyle changes.

18.     As a further direct and proximate result of defects in Roundup® and the wrongful conduct, acts, omissions, and fraudulent misrepresentations of Defendants, Plaintiffs required medical intervention in efforts to maintain and/or save Plaintiffs.

19.     Plaintiffs are individuals who suffered damages as a result of injuries resulting from Plaintiffs' use and/or exposure to Roundup® and are authorized to bring an action for the causes of actions alleged herein including, but not limited to, injuries and damages sustained by Plaintiffs resulting from Plaintiffs' use of Roundup®. Said injuries and damages sustained by Plaintiffs were caused or substantially contributed to by the wrongful conduct of Defendants and DOES 1 through 100, inclusive.

20.     The product warnings for Roundup® in effect during the time period Plaintiffs used and/or were exposed to Roundup® were vague, incomplete or otherwise inadequate, both substantively and graphically, to alert consumers to the severe health risks associated with Roundup® use and/or exposure.

21.     The Defendants and DOES 1 through 100, and each of them, inclusive, did not provide adequate warnings to consumers including Plaintiffs and the general public about the increased risk of the serious adverse events described herein.

22.     Had Plaintiffs been adequately warned by the Defendants and DOES 1 through 100, and each of them, inclusive, of the potential life-threatening side effects of Roundup®, Plaintiffs would not have purchased, used, or been exposed to Roundup®.

23.     By reason of the foregoing, Plaintiffs developed serious and dangerous side effects including non-Hodgkin lymphoma and other cancers, related injury sequelae, physical pain and suffering, mental anguish, and loss of enjoyment of life. By reason of the foregoing, Plaintiffs suffered economic losses and special damages including, but not limited to, loss of earning and medical expenses.  Plaintiffs' general and special damages exceed the jurisdictional limits of this Court.

24.     Plaintiffs have reviewed potential legal claims and causes of action against the Defendants and have intentionally chosen only to pursue claims based on state law. Any reference to any federal agency, regulation or rule is stated solely as background information, and Plaintiffs are not making any claims which raise federal questions. Thus, California state jurisdiction and venue is proper.

**Defendants**

25.     Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters in St. Louis, Missouri and multiple principal places of business throughout the world, including in St. Louis, Missouri, Oxnard, California, Woodland, California, and, at all relevant times to this complaint, San Ramon, California.  At all relevant times, Monsanto was the entity that discovered the herbicidal properties of glyphosate and manufactured Roundup®. Monsanto has regularly transacted and conducted business within the State of California and has derived substantial revenue from goods and products, including Roundup®, used in the State of California and employs sales representatives in the State of California.  Specifically, Monsanto operated a residential products division known as the Solaris Group of Monsanto Company (hereinafter "Solaris Group"), headquartered in San Ramon, California.  Moreover, upon information and belief, Solaris Group manufactured, registered, distributed, marketed, advertised, and sold Roundup® products to California consumers.  At all relevant times, Monsanto has conducted testing, research, and analyses on its Roundup® and other glyphosate-based formulations within California and manufactured said products in California, utilizing principal laboratories and manufacturing sites throughout the State of California in locations such as San Ramon, Oxnard and Woodland, among others.  Monsanto expected or should have expected its acts to have consequences within the State of California because it derived substantial revenue from interstate commerce and invoked the benefits and protection of the State of California's laws.

26.     Defendant Wilbur-Ellis Company LLC is a California limited liability corporation with its headquarters and principal place of business in San Francisco, California. At all relevant times, Wilbur-Ellis Company, LLC sold and distributed Monsanto products, including Roundup®, within the State of California.

27.     Defendant Wilbur-Ellis Nutrition LLC (with Wilbur-Ellis Company LLC, hereinafter "Wilbur-Ellis") is a California limited liability corporation with its headquarters and principal place of business in San Francisco, California. At all relevant times, Wilbur-Ellis Nutrition LLC sold and distributed Monsanto products, including Roundup®, within the State of California. Wilbur-Ellis is a main distributor of Roundup®, and, upon information and belief, distributed Roundup® used by Plaintiffs.

28.     Defendant Chevron Corporation (hereinafter "Chevron" or "Monsanto Chevron") is a Delaware corporation with its headquarters and principal place of business in Sam Ramon, California.  Chevron, through its Ortho Consumer Products Division, investigated and prepared storage stability data, and conducted other testing, research and analyses, to support the EPA registration of Roundup® and other glyphosate-based formulations intended for the residential consumer market. The research was then submitted to the EPA by Monsanto in furtherance of continued registration of Roundup® products and other glyphosate-based formulations. Under the entity name "Monsanto Chevron,"  Chevron directly contributed to the continued registration of the carcinogenic Roundup® products and other glyphosate-based formulations that were tested, researched, analyzed, manufactured, registered, distributed, marketed and sold in California, aimed at a California consumer market, and purchased and used by Plaintiffs.  Moreover, upon information and belief, and at all relevant times, Chevron manufactured, marketed and distributed glyphosate-based formulations in California.

29.     Plaintiffs are informed and believe, and based thereon allege, that in committing the acts alleged herein, each and every managing agent, agent, representative and/or employee of the Defendants was working within the course and scope of said agency, representation and/or employment with the knowledge, consent, ratification, and authorization of the Defendants and their directors, officers and/or managing agents.

30.     At all relevant times alleged herein, one or more of the corporate Defendants was, and now is, a corporation with its principal place of business in the State of California and, therefore, is a citizen of the State of California.

31.     The true names and/or capacities, whether individual, corporate, partnership, associate, governmental, or otherwise, of Defendant DOES 1 through 100, inclusive, and each of them, are unknown to Plaintiffs at this time, who therefore sue said Defendants by such fictitious names. Plaintiffs are informed and believe, and thereon allege, that each Defendant designated herein as a DOE caused injuries and damages proximately thereby to Plaintiffs as hereinafter alleged; and that each DOE Defendant is liable to the Plaintiffs for the acts and omissions alleged herein below, and the resulting injuries to Plaintiffs, and damages sustained by the Plaintiffs. Plaintiffs will amend this Complaint to allege the true names and capacities of said DOE Defendants when the same are ascertained.

32.     Plaintiffs are informed and believe, and thereon allege, that at all times herein mentioned, each of the named Defendants and each of the DOE Defendants was the agent, servant, employee and/or joint venturer of the other co-Defendants and other DOE Defendants, and each of them, and at all said times, each named Defendant and each DOE Defendant was acting in the full course, scope and authority of said agency, service, employment and/or joint venture.

33.     Plaintiffs are informed and believe and allege that at all times mentioned herein, Defendants and DOES 1 through 100, inclusive, and each of them, were also known as, formerly known as and/or were the successors and/or predecessors in interest/business/product line/or a portion thereof, assigns, a parent, a subsidiary (wholly or partially owned by, or the whole or partial owner), affiliate, partner, co-venturer, merged company, alter egos, agents, equitable trustees and/or fiduciaries of and/or were members in an entity or entities engaged in the funding, researching, studying, manufacturing, fabricating, designing, developing, labeling, assembling, distributing, supplying, leasing, buying, offering for sale, selling, inspecting, servicing, contracting others for marketing, warranting, rebranding, manufacturing for others, packaging and advertising of Roundup® and/or other Monsanto glyphosate-containing products. Defendants and DOES 1 through 100, inclusive, and each of them, are liable for the acts, omissions and tortious conduct of their successors and/or predecessors in interest/business/product line/or a portion thereof, assigns, parents, subsidiaries, affiliates, partners, co-venturers, merged companies, alter egos, agents, equitable trustees, fiduciaries and/or their alternate entities in that Defendants and DOES 1

8
COMPLAINT

1   through 100, inclusive, and each of them, enjoy the goodwill originally attached to each such

2   alternate entity, acquired the assets or product line (or portion thereof), and in that there has been a

3   virtual destruction of Plaintiffs' remedy against each such alternate entity, and that each such

4   Defendant has the ability to assume the risk spreading role of each such alternate entity.

5          34.     Plaintiffs are informed and believe, and thereon allege, that at all times herein

6   mentioned, Defendants and DOES 1 through 100, inclusive, and each of them, were and are

7   corporations organized and existing under the laws of the State of California or the laws of some

8   state or foreign jurisdiction; that each of the said Defendants and DOE Defendants were and are

9   authorized to do and are doing business in the State of California and regularly conducted business

10  in California.

11         35.     Upon information and belief, at all relevant times, Defendants and DOES 1 through

12  100, and each of them, inclusive, were engaged in the business of researching, developing,

13  designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into

14  interstate commerce and into the State of California, including in San Francisco County, either

15  directly or indirectly through third parties or related entities, Roundup® and/or other Monsanto

16  glyphosate-containing products.

17         36.     At all ®relevant times, Defendants and DOES 1 through 100, inclusive, and each of

18  them, conducted regular and sustained business and engaged in substantial commerce and business

19  activity in the State of California, which included but was not limited to selling, marketing and

20  distributing Roundup® and/or other Monsanto glyphosate-containing products in the State of

21  California.

22         37.     At all relevant times, Defendants and DOES 1 through 100, inclusive, and each of

23  them, expected or should have expected that their acts would have consequences within the United

24  States of America including the State of California, and said Defendants derived and derive

25  substantial revenue therefrom.

26                            **EQUITABLE TOLLING**

27         38.     Plaintiffs have suffered an illness that has a latency period and does not arise until

28  years after exposure. Plaintiffs had no way of knowing about the risk of serious illness associated

with the use of and/or exposure to Roundup® and glyphosate until made aware that Plaintiffs'

illness, including non-Hodgkin lymphoma could be caused by use and/or exposure to Roundup®.

The discovery rule applies, and the statute of limitations was tolled until the day Plaintiffs knew or

had reason to know that Plaintiffs' illnesses, including non-Hodgkin lymphoma, were linked to

Plaintiffs' use and/or exposure to Roundup®.

39.     Within the time period of any applicable statute of limitations, Plaintiffs could not

have discovered through the exercise of reasonable diligence that exposure to Roundup® and

glyphosate is injurious to human health.

40.     Plaintiffs did not discover and did not know of facts that would cause a reasonable

person to suspect the risk associated with the use of and/or exposure to Roundup® and glyphosate

nor would a reasonable and diligent investigation by Plaintiffs have disclosed that Roundup® and

glyphosate would cause Plaintiffs' illnesses.

41.     The expiration of any applicable statute of limitations has been equitably tolled by

reason of Monsanto's fraudulent misrepresentations and fraudulent concealment and fraudulent

conduct. Through affirmative misrepresentations and omissions, Defendants actively concealed

from Plaintiffs the true risks associated with use of and/or exposure to Roundup®.

42.     As a result of Defendants' actions, Plaintiffs could not reasonably have known or

learned through reasonable diligence that Plaintiffs had been exposed to the risks alleged herein

and that those risks were the direct and proximate result of Defendants' acts and omissions.

43.     Defendants are estopped from relying on any statute of limitations because of their

concealment of the truth regarding the safety of Roundup®. Defendants had a duty to disclose the

true character, quality and nature of Roundup® because this was non-public information over

which Defendants continue to have exclusive control. Defendants knew that this information was

not available to Plaintiffs, Plaintiffs' medical providers and/or health facilities, yet Defendants

failed to disclose the information to the public, including Plaintiffs.

44.     Defendants had the ability to and did spend enormous amounts of money in

furtherance of the purposes of marketing and promoting a profitable product, notwithstanding the

known or reasonably knowable risks. Plaintiffs and medical professionals could not have afforded

1   to and could not have possibly conducted studies to determine the nature, extent, and identity of

2   related health risks and were forced to rely on Defendants' representations.

3   <u>**FACTS**</u>

4   45.   Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of

5   herbicidal products around the world.

6   46.   Plants treated with glyphosate translocate the systemic herbicide to their roots,

7   shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids

8   necessary for protein synthesis. Treated plants generally die within two to three days. Because

9   plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by

10  milling, baking, or brewing grains.

11  47.   For nearly 40 years, farms across the world have used Roundup® without knowing

12  of the dangers its use poses.

13  48.   That is because when Monsanto first introduced Roundup®, it touted glyphosate as

14  a technological breakthrough: it could kill almost every weed without causing harm either to

15  people or to the environment. Of course, history has shown that not to be true. According to the

16  WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer.

17  Agricultural workers and home users are, once again, victims of corporate greed. Monsanto

18  assured the public that Roundup® was harmless. In order to prove this, Monsanto championed

19  falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged

20  campaign of misinformation to convince government agencies, farmers and the general population

21  that Roundup® was safe.

22  ***The Discovery of Glyphosate and Development of Roundup®***

23  49.   The herbicidal properties of glyphosate were discovered in 1970 by Monsanto

24  chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-

25  1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a

26  "safe" general-purpose herbicide for widespread commercial and consumer use. Monsanto still

27  markets Roundup® as safe today.

28  ***Registration of Herbicides under Federal Law***

50.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all herbicides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a (a).

51.     Because herbicides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to herbicides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c) (5) (D).

52.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration of a product should be granted or allowed so that the product may continue to be sold in commerce.

53.     The EPA registered Roundup® for distribution, sale, and manufacture in the United States including the State of California.  However, the EPA's decision to register Roundup was based on studies on the active chemical, glyphosate, and not the formulated Roundup product which contains a cocktail of other ingredients such as surfactants, adjuvants, and inert compounds, all of which, as discussed in greater detail below, contribute to the health risks associated with Roundup exposure.[1]

---

[1] Surfactants are compounds which contribute to the even and effective spread of glyphosate across the surface of a leaf and increase the rate of penetration through the plant.  It has been shown that surfactants also greatly increase the amount and rate of Roundup® absorbed by human skin.  Moreover, surfactants are known to be individually dangerous to human health, contributing to the carcinogenic properties of Roundup.  Indeed, the surfactant POEA that is used in many U.S. Roundup formulations has been banned in Europe due to its adverse effects on human health.

54.     FIFRA generally requires the registrant, Monsanto in the case of Roundup®, to conduct health and safety testing of herbicide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

55.     The evaluation of each herbicide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of an herbicide has changed over time. The EPA is now in the process of re-evaluating all herbicide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these herbicides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

56.     The EPA completed its review of glyphosate in early 2015, but delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.  On September 12, 2016, the EPA's office of Pesticide Programs released an interim report, titled "Glyphosate Issue Paper: Evaluation of Carcinogenic Potential," ("2016 Issue Paper")  detailing the agency's review of a small portion of the existing literature on Roundup.  The 2016 Issue Paper contains a review of studies submitted to the agency by Monsanto, as well as the general independent scientific literature on glyphosate carcinogenicity.

57.     Immediately following the publication of the 2016 Issue Paper, the FIFRA Scientific Advisory Panel ("SAP") issued a report which reviewed the EPA's 2016 Issue Paper, and the conclusions therein.  The SAP strongly criticized the EPA's conclusions and questioned the scientific approach of the agency, noting that that agency had failed to follow its own guidelines.

### Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®

58.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, in 1991 the EPA

changed its classification to *evidence of non-carcinogenicity in humans* (Group E). In so

classifying glyphosate, however, the EPA made clear that the designation did not mean the

chemical does not cause cancer: "It should be emphasized, however, that designation of an agent

in Group E is based on the available evidence at the time of evaluation and should not be

interpreted as a definitive conclusion that the agent will not be a carcinogen under any

circumstances."

59.    On two occasions, the EPA found that the laboratories hired by Monsanto to test

the toxicity of its Roundup® products for registration purposes committed fraud.

60.    In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA,

hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate herbicide toxicology

studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-

containing products, including nine of the 15 residue studies needed to register Roundup®.

61.    In 1976, the United States Food and Drug Administration ("FDA") performed an

inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw

data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently

audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be

invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was

"hard to believe the scientific integrity of the studies when they said they took specimens of the

uterus from male rabbits."

62.    Three top executives of IBT were convicted of fraud in 1983.

63.    In the second incident of data falsification, Monsanto hired Craven Laboratories in

1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the

owner of Craven Laboratories and three of its employees were indicted, and later convicted, of

fraudulent laboratory practices in the testing of pesticides and herbicides.

64.    Despite the falsity of the tests that underlie its registration, within a few years of its

launch, Monsanto was marketing Roundup® in 115 countries.

65.    Multiple studies have been ghostwritten in part and/or published by Monsanto

through companies such as Intertek and Exponent, Inc., from 2000 through the present which

14

COMPLAINT

minimize any safety concerns about the use of glyphosate. The studies are used to convince regulators to allow the sale of Roundup® and customers to use Roundup®. Such studies include, but are not limited to Williams (2000); Williams (2012); Kier & Kirkland (2013); Kier (2015); Bus (2016); Chang (2016); and the Intertek Expert Panel Manuscripts. All of these studies have been submitted to and relied upon by the public and the EPA in assessing the safety of glyphosate. Through these means, Monsanto has fraudulently represented that independent scientists have concluded that Glyphosate is safe. In fact, Monsanto paid these so-called "independent experts," and Monsanto failed to disclose the significant role Monsanto had in creating the manuscripts produced by the "independent" experts. Further, Monsanto has ghostwritten editorials to advocate for the safety of glyphosate in newspapers and magazines for scientists such as Robert Tarone and Henry Miller. Monsanto has also ghostwritten letters by supposedly independent scientists which have been submitted to regulatory agencies who are reviewing the safety of glyphosate.

66.    Monsanto has also violated federal regulations in holding secret ex parte meetings and conversations with certain EPA employees to collude in a strategy to re-register glyphosate and to quash investigations into the carcinogenicity of glyphosate by other federal agencies such as the Agency for Toxic Substances and Disease Registry. Monsanto's close connection with the EPA arises in part from its offering of lucrative consulting gigs to retiring EPA officials. In March 2015, The Joint Glyphosate Task Force, at Monsanto's behest, issued a press release sharply criticizing IARC, stating that IARC's conclusion was "baffling" and falsely claiming that "IARC did not consider any new or unique research findings when making its decision. It appears that only by deciding to exclude certain available scientific information and by adopting a different approach to interpreting the studies was this possible."

67.    Beginning in 2011, the Federal Institute for Risk Assessment (BfR) in Germany began preparing a study on the safety of glyphosate. Through the Glyphosate Task Force, Defendants were able to co-opt this study, becoming the sole providers of data and ultimately writing the report, which was rubber-stamped by the BfR. The Glyphosate Task Force was solely responsible for preparing and submitting a summary of studies relied upon by the BfR. Defendants have used this self-serving report (which they, in fact, wrote) to falsely proclaim the

15<br>COMPLAINT

1  safety of glyphosate. In October 2015, the Defendants, as members of the Joint Glyphosate Task
2  Force, wrote to the state of California to try to stop California from warning the public about the
3  carcinogenicity of glyphosate, arguing that the IARC classification was mistaken. In January of
4  2016, Monsanto filed a lawsuit to stop California from warning the public about the
5  carcinogenicity of glyphosate.

6  *The Importance of Roundup® to Monsanto's Market Dominance Profits*

7  68.     The success of Roundup® was key to Monsanto's continued reputation and
8  dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's
9  agriculture division was out-performing its chemicals division's operating income, and that gap
10  increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000,
11  Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off
12  impending competition.

13  69.     In response, Monsanto began the development and sale of genetically engineered
14  Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate,
15  farmers can spray Roundup® onto their fields during the growing season without harming the
16  crop. This allowed Monsanto to expand its market for Roundup® even further. By 2000,
17  Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide, and
18  nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured
19  Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that
20  coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

21  70.     Through a three-pronged strategy of increased production, decreased prices, and by
22  coupling Roundup Ready® seeds with Roundup® herbicide, Roundup® became Monsanto's most
23  profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other
24  herbicides by a margin of five to one and accounting for close to half of Monsanto's revenue.
25  Today, glyphosate remains one of the world's largest herbicides by sales volume.

26  *Monsanto has known for decades that it falsely advertises the safety of Roundup®.*

27  71.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against
28  Monsanto based on its false and misleading advertising of Roundup ® products. Specifically, the

lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were **"safer than table salt"** and **"practically non-toxic"** to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

(a)   Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences...

(b)   And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging or trimming problem.

(c)   Roundup® biodegrades into naturally occurring elements.

(d)   Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

(e)   This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

(f)   You can apply Accord (glyphosate-containing herbicide) with "confidence because it will stay where you put it;" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

(g)   Glyphosate is less toxic to rats than table salt following acute oral ingestion.

(h)   Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture or use it.

(i)   You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

(j)     "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

72.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

(a)     its glyphosate-containing herbicide products or any component thereof are safe, non-toxic, harmless or free from risk. * * *

(b)     its glyphosate-containing herbicide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable * * *

(c)     its glyphosate-containing herbicide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

* * *

(d)     its glyphosate-containing herbicide products or any component thereof are "good" for the environment or are "known for their environmental characteristics." * * *

(e)     glyphosate-containing herbicide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

(f)     its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

73.     Monsanto did not alter its advertising in the same manner in any state other than New York, and, on information and belief, still has not done so today.

74.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

***Classifications and Assessments of Glyphosate***

75.     The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has

1  reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known

2  Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be

3  Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one

4  agent to be Probably Not Carcinogenic.

5      76.    The established procedure for IARC Monograph evaluations is described in the

6  IARC Programme's Preamble. Evaluations are performed by panels of international experts,

7  selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

8      77.    One year before the Monograph meeting, the meeting is announced and there is a

9  call both for data and for experts. Eight months before the Monograph meeting, the Working

10  Group membership is selected, and the sections of the Monograph are developed by the Working

11  Group members. One month prior to the Monograph meeting, the call for data is closed, and the

12  various draft sections are distributed among Working Group members for review and comment.

13  Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates

14  the evidence in each category, and completes the overall evaluation. Within two weeks after the

15  Monograph meeting, the summary of the Working Group findings is published in Lancet

16  Oncology, and within a year after the meeting, the final Monograph is finalized and published.

17      78.    In assessing a chemical agent, the IARC Working Group reviews the following

18  information:

19      (a)    human, experimental, and mechanistic data;

20      (b)    all pertinent epidemiological studies and cancer bioassays; and

21      (c)    representative mechanistic data.

22      The studies must be publicly available and have sufficient detail for meaningful review,

23  and reviewers cannot be associated with the underlying study.

24      79.    In March of 2015, IARC reassessed glyphosate. The summary published in *The*

25  *Lancet Oncology* reported that glyphosate is a Group 2A agent, that is, glyphosate is probably

26  carcinogenic in humans.

27      80.    On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For

28  Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11

countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

81.   The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

82.   Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

83.   Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

84.   The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

85.   The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

86.   The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

87.   In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in

male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

88.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

89.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA, oxidative stress, and chromosomal damage in mammals and in human and animal cells in utero.

90.     In addition to DNA damage and oxidative stress, scientists have suggested that Roundup®'s association with various serious health conditions is linked to the effect Roundup® has on the digestive system. Specifically, scientists believe the same mechanism that makes Roundup® toxic to weeds also makes it toxic to the microbes within the human gut and mucous membranes. When humans are exposed to Roundup®, this exposure leads to a chronic inflammatory state in the gut, as well an impaired gut barrier, which can lead to many long-term health effects, including an increased risk of cancer. Monsanto has deliberately refused to conduct tests on this aspect of Roundup®'s mechanism of action.

91.     Many Roundup® products bear a label which either reads: "glyphosate targets an enzyme found in plants but not in people or pets" or "this Roundup formula targets an enzyme in plants but not in people or pets." These statements are false because it has been established that the human body is host to microorganisms which contain the enzyme Monsanto asserts is not found in humans.  Thus, glyphosate targets microbes within the human body which have the enzyme, leading to a variety of adverse health effects.

92.     Thus, glyphosate targets microbes within the human body which contain the enzyme affected by glyphosate, leading to a variety of adverse health effects. The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several

21
COMPLAINT

1    metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and
2    general metabolic disruption.

3         93.    The IARC Working Group also reviewed an Agricultural Health Study consisting
4    of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While
5    this study differed from others in that it was based on a self-administered questionnaire, the results
6    support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia
7    (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

8         ***Other Earlier Findings about Glyphosate's Dangers to Human Health***

9         94.    The EPA has a technical fact sheet, as part of its Drinking Water and Health,
10   National Primary Drinking Water Regulations publication, relating to glyphosate. This technical
11   fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release
12   patterns for glyphosate as follows:

13        ***Release Patterns***

14        95.    Glyphosate is released to the environment in its use as an herbicide for controlling
15   woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These
16   sites may be around water and in wetlands.

17        96.    It may also be released to the environment during its manufacture, formulation,
18   transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical
19   in the Toxics Release Inventory, data on releases during its manufacture and handling are not
20   available.

21        97.    Occupational workers and home gardeners may be exposed to glyphosate by
22   inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by
23   touching soil and plants to which glyphosate was applied. Occupational exposure may also occur
24   during glyphosate's manufacture, transport, storage, and disposal.

25        98.    In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in
26   California, the state with the most comprehensive program for reporting of pesticide-caused
27   illness, glyphosate was the third most commonly-reported cause of pesticide illness among
28   agricultural workers.

*Recent Worldwide Bans on Roundup®/Glyphosate*

99.    Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light of this assessment as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

100.    The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

101.    France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

102.    Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

103.    The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

104.    The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

105.    Wilbur-Ellis was, at all relevant times, engaged in the distribution of Roundup®, Roundup-ready® crops and other glyphosate-containing products from Monsanto to retailers and commercial/agricultural users in California.

106.   Wilbur-Ellis had superior knowledge compared to Roundup® users and consumers, including regarding the carcinogenic properties of the product, yet failed to accompany its sales and or marketing of Roundup® with any warnings or precautions for that grave danger. On information and belief, Wilbur-Ellis was one of the distributors providing Roundup® and other glyphosate-containing products used by Plaintiffs.

107.   Chevron and Monsanto Chevron were, at all relevant times, engaged in the testing, research, and analyses of Roundup and other glyphosate-based formulations, including investigation and preparation of storage stability data for Roundup and other glyphosate-based formulations for submission to the EPA, and were, at all relevant times, involved in the manufacture, registration, marketing, distribution and sale of Roundup®, Roundup-ready® crops and other glyphosate-based formulations to retailers and residential users in California.

108.   Chevron and Monsanto Chevron had superior knowledge compared to Roundup® users and consumers, including regarding the carcinogenic properties of the product, yet failed to accompany its registration, sales, distribution and or marketing of Roundup® and other glyphosate-based formulations with any warnings or precautions for that grave danger. Chevron and Monsanto Chevron participated in the preparation of storage stability and other testing on Roundup® and other glyphosate-containing products which were used by Plaintiffs.

## LIMITATION ON ALLEGATIONS

109.   Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

110.   The allegations in this pleading are made pursuant to California law. To the extent California law imposes a duty or obligation on Defendants that exceeds those required by federal law, Plaintiffs do not assert such claims. All claims asserted herein run parallel to federal law, *i.e.*, the Defendants' violations of California law were also violations of federal law. Had Defendants honestly complied with California law, they would also have complied with federal law.

111.   Additionally, Plaintiffs' claims do not seek to enforce federal law. These claims are brought under California law, notwithstanding that such claims run parallel to federal law.

112.   As alleged herein, Defendants violated U.S.C. § 136j and 40 C.F.R. § 156.10(a)(5)

1  by distributing Roundup®, which was misbranded pursuant to 7 U.S.C. § 136(g). Federal law
2  specifically prohibits the distribution of a misbranded herbicide.

3  ## COUNT I:  STRICT LIABILITY (DESIGN DEFECT)

4      113.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs
5  as if fully stated herein.

6      114.    Plaintiffs bring this strict liability claim against Defendants for defective design.

7      115.    At all relevant times, Defendants' Roundup® products reached the intended
8  consumers, handlers, and users or other persons coming into contact with these products in
9  California and throughout the United States, including Plaintiff, without substantial change in their
10  condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.  At
11  all relevant times, Defendants registered, researched, manufactured, distributed, marketed and sold
12  Roundup® and other glyphosate-based formulations within California and aimed at a California
13  consumer and industrial market. Chevron, in a joint effort with Monsanto, Monsanto Chevron,
14  was involved in the testing, research, analyses of Roundup® and other glyphosate-based
15  formulations, including investigation and preparation of storage stability data and other data
16  submissions to the EPA for the continued registration of Roundup® and other glyphosate-based
17  formulations for use by consumers, including Plaintiff, in California and throughout the United
18  States. The Wilbur-Ellis Defendants were at all relevant times involved in the marketing,
19  distribution, and sale of Roundup® and glyphosate-based formulations marketed and sold in
20  California.

21      116.    At all relevant times, Defendants' Roundup® products were manufactured,
22  designed, and labeled in an unsafe, defective, and inherently dangerous manner that was
23  dangerous for use by or exposure to the public, including Plaintiffs.

24      117.    At all relevant times, Defendants' Roundup® products reached the intended
25  consumers, handlers, and users or other persons coming into contact with these products in
26  California and throughout the United States, including Plaintiffs, without substantial change in
27  their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

28      118.    Defendants' Roundup® products, as researched, tested, developed, designed,

licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that, when they left the control of Defendants' manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

119.   Defendants' Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that, when they left the hands of Defendants' manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

120.   At all relevant times, Defendants knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendants.

121.   Therefore, at all relevant times, Defendants' Roundup® products, as researched, registered, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendants were defective in design and formulation, in one or more of the following ways:

  a.  When placed in the stream of commerce, Defendants' Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

  b.  When placed in the stream of commerce, Defendants' Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

  c.  When placed in the stream of commerce, Defendants' Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

  d.  Defendants did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate;

  e.  Exposure to Roundup® and glyphosate-containing products presents a risk of

harmful side effects that outweigh any potential utility stemming from the use of the herbicide;

   f.  Defendants knew or should have known at the time of marketing Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries;

   g.  Defendants did not conduct adequate post-marketing surveillance of its Roundup® products; and

   h.  Defendants could have employed safer alternative designs and formulations.

122.   Plaintiffs were exposed to Defendants' Roundup® products without knowledge of Roundup®'s dangerous characteristics.

123.   At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Defendants' Roundup® products in an intended or reasonably foreseeable manner without knowledge of Roundup®'s dangerous characteristics.

124.   Plaintiffs could not reasonably have discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure due to the Defendants' suppression of scientific information linking glyphosate to cancer.

125.   The harm caused by Defendants' Roundup® products far outweighed their benefit, rendering Defendants' product dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendants' Roundup® products were and are more dangerous than alternative products, and Defendants could have designed Roundup® products to make them less dangerous. Indeed, at the time Defendants designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

126.   At the time Roundup® products left Defendants' control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendants' herbicides.

127.   Defendants' defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including Plaintiffs herein.

27

COMPLAINT

128.    Therefore, as a result of the unreasonably dangerous condition of their Roundup® products, Defendants are strictly liable to Plaintiffs.

129.    The defects in Defendants' Roundup® products were substantial and contributing factors in causing Plaintiffs' injuries, and, but for Defendants' misconduct and omissions, Plaintiffs would not have sustained injuries.

130.    Defendants' conduct, as described above, was reckless. Defendants risked the lives of consumers and users of its products, including Plaintiffs, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, warn or inform the unsuspecting public. Defendants' reckless conduct warrants an award of punitive damages.

131.    As a direct and proximate result of Defendants placing its defective Roundup® products into the stream of commerce, and the resulting injuries, Plaintiffs have sustained pecuniary loss including general damages in a sum which exceeds the jurisdictional minimum of this Court.

132.    As a proximate result of Defendants placing its defective Roundup® products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Plaintiffs have suffered great mental anguish and other personal injury and damages.

133.    As a proximate result of the Defendants placing its defective Roundup® products into the stream of commerce, as alleged herein, Plaintiffs sustained loss of income, loss of earning capacity and/or property damage.

134.    WHEREFORE, Plaintiffs respectfully request this Court to enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT II:  STRICT LIABILITY (FAILURE TO WARN)

135.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

136.    Plaintiffs bring this strict liability claim against Defendants for failure to warn.

28
COMPLAINT

137.    At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, promoting, and using and applying Roundup® products which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendants.  At all relevant times, Defendants registered, researched, manufactured, distributed, marketed and sold Roundup® and other glyphosate-based formulations within California and aimed at a California consumer and industrial market.  Chevron, in a joint effort with Monsanto, Monsanto Chevron, was involved in the testing, research, analyses of Roundup® and other glyphosate-based formulations, including investigation and preparation of storage stability data and other data submissions to the EPA for the continued registration of Roundup® and other glyphosate-based formulations for use by consumers, including Plaintiff, in California and throughout the United States. The Wilbur-Ellis Defendants were at all relevant times involved in the marketing, distribution, and sale of Roundup® and glyphosate-based formulations marketed and sold in California.

138.    Defendants researched, developed, designed, registered, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiffs, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

139.    At all relevant times, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn Plaintiffs of dangers associated with Roundup use and exposure. Defendants, as manufacturer, seller, or distributor of chemical herbicides are held to the knowledge of an expert in the field.

140.    At the time of manufacture, Defendants could have provided the warnings or

29

COMPLAINT

instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

141. At all relevant times, Defendants failed and deliberately refused to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of their product and to those who would foreseeably use or be harmed by Defendants' herbicides, including Plaintiffs.

142. Despite the fact that Defendants knew or should have known that Roundup® posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of their products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they distributed, supplied or sold the product, and were not known to end users and consumers, such as Plaintiffs.

143. Defendants knew or should have known that their products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn consumers, *i.e.*, the reasonably foreseeable users, of the risks of exposure to its products. Defendants have wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate and, further, have made false and/or misleading statements concerning the safety of Roundup® products and glyphosate.

144. At all relevant times, Defendants' Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in California and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

145. Plaintiffs were exposed to Defendants' Roundup® products without knowledge of their dangerous characteristics.

146. At all relevant times, Plaintiffs used and/or were exposed to the use of Defendants' Roundup® products while using them for their intended or reasonably foreseeable purposes,

1  without knowledge of their dangerous characteristics.

2       147.   Plaintiffs could not have reasonably discovered the defects and risks associated

3  with Roundup® or glyphosate-containing products prior to or at the time of Plaintiffs' exposure.

4  Plaintiffs relied upon the skill, superior knowledge, and judgment of Defendants to know about

5  and disclose serious health risks associated with using Defendants' products.

6       148.   Defendants knew or should have known that the minimal warnings disseminated

7  with their Roundup® products were inadequate, failed to communicate adequate information on

8  the dangers and safe use/exposure, and failed to communicate warnings and instructions that were

9  appropriate and adequate to render the products safe for their ordinary, intended and reasonably

10  foreseeable uses, including agricultural and horticultural applications.

11       149.   The information that Defendants did provide or communicate failed to contain

12  relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiffs

13  to utilize the products safely and with adequate protection. Instead, Defendants disseminated

14  information that was inaccurate, false and misleading, and which failed to communicate accurately

15  or adequately the comparative severity, duration, and extent of the risk of injuries with use of

16  and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its

17  products, even after they knew or should have known of the unreasonable risks from use or

18  exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and

19  promotion, any information or research about the risks and dangers of exposure to Roundup and

20  glyphosate.

21       150.   This alleged failure to warn is not limited to the information contained on

22  Roundup®'s labeling. The Defendants were able, in accord with federal law, to comply with

23  California law by disclosing the known risks associated with Roundup® through other non-

24  labeling mediums, *i.e.*, promotion, advertisements, public service announcements, and/or public

25  information sources. But the Defendants did not disclose these known risks through any medium.

26       151.   To this day, Defendants have failed to adequately and accurately warn of the risks

27  of cancer associated with the use of and exposure to Roundup® and its active ingredient

28  glyphosate.

152.   As a result of their inadequate warnings, Defendants' Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed by Defendants, and used by Plaintiffs.

153.   Defendants are liable to Plaintiffs for injuries caused by their negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of their products and the risks associated with the use of or exposure to Roundup® and glyphosate.

154.   Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with their Roundup® products, Plaintiffs could have avoided the risk of developing injuries and could have obtained or used alternative herbicides.

155.   As a direct and proximate result of Defendants placing defective Roundup® products into the stream of commerce, Plaintiffs were injured and have sustained pecuniary loss resulting and general damages in a sum exceeding the jurisdictional minimum of this Court.

156.   As a proximate result of Defendants placing defective Roundup® products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Plaintiffs suffered great mental anguish and other personal injury and damages.

157.   As a proximate result of Defendants placing defective Roundup® products into the stream of commerce, as alleged herein, Plaintiffs sustained loss of income, loss of earning capacity and property damage.

158.   WHEREFORE, Plaintiffs respectfully request this Court to enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT III:  NEGLIGENCE

159.   Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

160.   Defendants, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.  At all relevant times,

Defendants registered, researched, manufactured, distributed, marketed and sold Roundup® and other glyphosate-based formulations within California and aimed at a California consumer and industrial market. Chevron, in a joint effort with Monsanto, Monsanto Chevron, was involved in the testing, research, analyses of Roundup® and other glyphosate-based formulations, including investigation and preparation of storage stability data and other data submissions to the EPA for the continued registration of Roundup® and other glyphosate-based formulations for use by consumers, including Plaintiff, in California and throughout the United States. The Wilbur-Ellis Defendants were at all relevant times involved in the marketing, distribution, and sale of Roundup® and glyphosate-based formulations marketed and sold in California.

161.   At all relevant times, Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, distribution, and use and application of Roundup products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

162.   At all relevant times, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Defendants' duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

163.   At all relevant times, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and, specifically, the carcinogenic properties of the chemical glyphosate.

164.   Accordingly, at all relevant times, Defendants knew or, in the exercise of reasonable care, should have known that use of or exposure to Roundup® products could cause or be associated with Plaintiffs' injuries, and thus, create a dangerous and unreasonable risk of injury to the users of these products, including Plaintiffs.

165.    Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

166.    As such, Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of Roundup® products, in that Defendants manufactured and produced defective herbicides containing the chemical glyphosate; knew or had reason to know of the defects inherent in its products; knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects; and failed to prevent or adequately warn of these risks and injuries. Indeed, Defendants deliberately refused to test Roundup® products because they knew that the chemical posed serious health risks to humans.

167.    Defendants were negligent in their promotion of Roundup®, outside of the labeling context, by failing to disclose material risk information as part of their promotion and marketing of Roundup®, including the Internet, television, print advertisements, etc. Nothing prevented Defendants from being honest in their promotional activities, and, in fact, Defendants had a duty to disclose the truth about the risks associated with Roundup in their promotional efforts, outside of the context of labeling.

168.    Despite their ability and means to investigate, study, and test the products and to provide adequate warnings, Defendants have failed to do so. Indeed, Defendants have wrongfully concealed information and have further made false and/or misleading statements concerning the safety and/or exposure to Roundup and glyphosate.

169.    Defendants' negligence included:

    a.   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® products without thorough and adequate pre- and post-market testing;

    b.   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or

34

COMPLAINT

intentionally concealing and failing to disclose the results of trials, tests, and
studies of exposure to glyphosate, and, consequently, the risk of serious harm
associated with human use of and exposure to Roundup;

c.  Failing to undertake sufficient studies and conduct necessary tests to determine
whether or not Roundup® products and glyphosate-containing products were safe
for their intended use in agriculture and horticulture;

d.  Failing to use reasonable and prudent care in the design, research, manufacture, and
development of Roundup® products so as to avoid the risk of serious harm
associated with the prevalent use of Roundup/glyphosate as an herbicide;

e.  Failing to design and manufacture Roundup® products so as to ensure they were at
least as safe and effective as other herbicides on the market;

f.  Failing to provide adequate instructions, guidelines, and safety precautions to those
persons Defendants could reasonably foresee would use and be exposed to
Roundup® products;

g.  Failing to disclose to Plaintiffs, users/consumers, and the general public that use of
and exposure to Roundup® presented severe risks of cancer and other grave
illnesses;

h.  Failing to warn Plaintiffs, consumers, and the general public that the product's risk
of harm was unreasonable and that there were safer and effective alternative
herbicides available to Plaintiffs and other consumers;

i.  Systematically suppressing or downplaying contrary evidence about the risks,
incidence, and prevalence of the side effects of Roundup® and glyphosate-
containing products;

j.  Representing that their Roundup® products were safe for their intended use when,
in fact, Defendants knew or should have known the products were not safe for their
intended purpose;

k.  Declining to make or propose any changes to Roundup® products' labeling or
other promotional materials that would alert consumers and the general public of

the risks of Roundup® and glyphosate;

l.  Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known (by Defendants) to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m.  Continuing to disseminate information to its consumers, which indicate or imply that Defendants' Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

n.  Continuing the manufacture and sale of their products with the knowledge that the products were unreasonably unsafe and dangerous.

170.    Defendants knew and/or should have known that it was foreseeable consumers such as Plaintiffs would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

171.    Plaintiffs did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

172.    Defendants' negligence was the proximate cause of Plaintiff's injuries, *i.e.*, absent Defendants' negligence, Plaintiffs would not have developed cancer.

173.    Defendants' conduct, as described above, was reckless. Defendants regularly risked the lives of consumers and users of their products, including Plaintiffs, with full knowledge of the dangers of their products. Defendants have made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiffs. Defendants' reckless conduct therefore warrants an award of punitive damages.

174.    As a direct and proximate result of Defendants placing defective Roundup® products into the stream of commerce, Plaintiffs were injured and have sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

175.    As a proximate result of Defendants placing defective Roundup® products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Plaintiffs suffered great mental anguish and other personal injury and damages.

176.   As a proximate result of Defendants placing defective Roundup® products into the stream of commerce, as alleged herein, Plaintiffs sustained a loss of income, loss of earning capacity and property damage.

177.   WHEREFORE, Plaintiffs respectfully request this Court to enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT IV:  FRAUD
## (MONSANTO)

178.   Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

179.   Defendant Monsanto has defrauded the agricultural community in general and Plaintiffs in particular by misrepresenting the true safety of its Roundup® and by failing to disclose known risks of cancer.

180.   Defendant Monsanto misrepresented and/or failed to disclose, *inter alia*, that: glyphosate and its major metabolite aminomethylphosphonic acid (AMPA) could cause cancer; glyphosate and AMPA are known to be genotoxic in humans and laboratory animals because exposure is known to cause DNA strand breaks (a precursor to cancer); glyphosate and AMPA are known to induce oxidative stress in humans and laboratory animals (a precursor to cancer); glyphosate and AMPA interfere with the aromatic amino acids within the human gut, leading to downstream health conditions including cancer; exposure to glyphosate and AMPA is causally associated with non-Hodgkin lymphoma; and the laboratory tests attesting to the safety of glyphosate were flawed and/or fraudulent.

181.   Due to these misrepresentations and omissions, at all times relevant to this litigation, Defendant's Roundup® was misbranded under 7 U.S.C. § 136(g) and its distribution within California and around the United States was a violation of 7 U.S.C. § 136j and 40 C.F.R. § 156.10(a)(5).

182.   Plaintiffs relied on the Defendant's misrepresentations and/or material omissions regarding the safety of Roundup® and its active ingredient glyphosate in deciding whether to

purchase and/or use the product. Plaintiffs did not know nor could they reasonably have known of the misrepresentations and/or material omissions by Defendant concerning Roundup® and its active ingredient glyphosate.

183.    The misrepresentations and/or material omissions that form the basis of this fraud claim are not limited to statements made on the Roundup® labeling, as defined under federal law, but also involve Defendant Monsanto's representations and omissions made as part of its promotion and marketing of Roundup®, including on the Internet, television, in print advertisements, etc. Nothing prevented Defendant Monsanto from disclosing the truth about the risks associated with Roundup® in its promotional efforts outside of the labeling context, using the forms of media and promotion Defendant Monsanto traditionally used to promote the product's efficacy and benefits.

184.    When Defendant Monsanto made the misrepresentations and/or omissions as alleged in this pleading, it did so with the intent of defrauding and deceiving the public in general and the agricultural community and with the intent of inducing the public and agricultural community to purchase and use Roundup®.

185.    Defendant Monsanto made these misrepresentations and/or material omissions with malicious, fraudulent and/or oppressive intent toward Plaintiffs and the public generally. Defendant's conduct was willful, wanton, and/or reckless. Defendant deliberately recommended, manufactured, produced, marketed, sold, distributed, merchandized, packaged, promoted and advertised the dangerous and defective herbicide Roundup®. This constitutes an utter, wanton, and conscious disregard of the rights and safety of a large segment of the public, and by reason thereof, Defendant is liable for reckless, willful, and wanton acts and omissions which evidence a total and conscious disregard for the safety of Plaintiffs and others which proximately caused the injuries as set forth herein.

186.    As a proximate result of Defendant Monsanto's fraudulent and deceitful conduct and representations, Plaintiffs have sustained damages and other losses in an amount to be proven at trial.

187.    As a proximate result of Defendant Monsanto's fraud, as alleged herein, Plaintiffs

1  sustained a loss of income, loss of earning capacity and property damage, including lost income.

2      188.    WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in

3  Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein

4  incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT V:  BREACH OF EXPRESS WARRANTIES
## (MONSANTO)

7      189.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs

8  as if fully stated herein.

9      190.    At all relevant times, Defendant Monsanto engaged in the business of testing,

10  developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup®

11  products, which are defective and unreasonably dangerous to consumers, including Plaintiffs,

12  thereby placing Roundup® products into the stream of commerce. These actions were under the

13  ultimate control and supervision of Defendant Monsanto.

14      191.    Defendant Monsanto had a duty to exercise reasonable care in the research,

15  development, design, testing, packaging, manufacture, inspection, labeling, distributing,

16  marketing, promotion, sale, and release of Roundup® products, including a duty to:

17          a.  ensure that its products did not cause the user unreasonably dangerous side effects;

18          b.  warn of dangerous and potentially fatal side effects; and

19          c.  disclose adverse material facts, such as the true risks associated with the use of and

20              exposure to Roundup® and glyphosate-containing products, when making

21              representations to consumers and the general public, including Plaintiffs.

22      192.    As alleged throughout this pleading, the ability of Defendant Monsanto to properly

23  disclose those risks associated with Roundup® is not limited to representations made on the

24  labeling.

25      193.    At all relevant times, Defendant Monsanto expressly represented and warranted to

26  the purchasers of its products, by and through statements made by Defendant Monsanto in labels,

27  publications, package inserts, and other written materials intended for consumers and the general

28  public, that Roundup® products were safe to human health and the environment, effective, fit, and

39
COMPLAINT

1  proper for their intended use. Defendant Monsanto advertised, labeled, marketed, and promoted
2  Roundup® products, representing the quality to consumers and the public in such a way as to
3  induce their purchase or use, thereby making an express warranty that Roundup® products would
4  conform to the representations.

5     194. These express representations include incomplete warnings and instructions that
6  purport, but fail, to include the complete array of risks associated with use of and/or exposure to
7  Roundup® and glyphosate. Defendant Monsanto knew and/or should have known that the risks
8  expressly included in Roundup® warnings and labels did not and do not accurately or adequately
9  set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant
10  Monsanto expressly represented that Roundup® products were safe and effective, that they were
11  safe and effective for use by individuals such as the Plaintiffs, and/or that they were safe and
12  effective as agricultural herbicides.

13     195. The representations about Roundup®, as set forth herein, contained or constituted
14  affirmations of fact or promises made by the seller to the buyer, which related to the goods and
15  became part of the basis of the bargain, creating an express warranty that the goods would conform
16  to the representations.

17     196. Defendant Monsanto placed Roundup® products into the stream of commerce for
18  sale and recommended their use to consumers and the public without adequately warning of the
19  true risks of developing the injuries associated with the use of and exposure to Roundup® and its
20  active ingredient glyphosate.

21     197. Defendant Monsanto breached these warranties because, among other things,
22  Roundup® products were defective, dangerous, and unfit for use, did not contain labels
23  representing the true and adequate nature of the risks associated with their use, and were not
24  merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically,
25  Defendant Monsanto breached the warranties in the following ways:

26     a. Defendant Monsanto represented through its labeling, advertising, and marketing
27  materials that Roundup® products were safe, and fraudulently withheld and concealed information
28  about the risks of serious injury associated with use of and/or exposure to Roundup® and

1   glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings
2   and labels; and

3       b.      Defendant Monsanto represented that Roundup® products were safe for use and
4   fraudulently concealed information that demonstrated that glyphosate, the active ingredient in
5   Roundup®, had carcinogenic properties, and that Roundup® products, therefore, were not safer
6   than alternatives available on the market.

7       198.    Plaintiffs detrimentally relied on the express warranties and representations of
8   Defendant Monsanto concerning the safety and/or risk profile of Roundup® in making a decision to
9   purchase the product. Plaintiffs reasonably relied upon Defendant Monsanto to disclose known
10  defects, risks, dangers, and side effects of Roundup® and glyphosate. Plaintiffs would not have
11  purchased or used Roundup® had Defendant Monsanto properly disclosed the risks associated with
12  the product, either through advertising, labeling, or any other form of disclosure.

13      199.    Defendant Monsanto had sole access to material facts concerning the nature of the
14  risks associated with its Roundup® products, as expressly stated within their warnings and labels,
15  and knew that consumers and users such as Plaintiffs could not have reasonably discovered that the
16  risks expressly included in Roundup® warnings and labels were inadequate and inaccurate.

17      200.    Plaintiffs had no knowledge of the falsity or incompleteness of Defendant
18  Monsanto's statements and representations concerning Roundup.

19      201.    Plaintiffs used and/or were exposed to Roundup® as researched, developed,
20  designed, tested, manufactured, inspected, labeled, distributed, packaged, marketed, promoted,
21  sold, or otherwise released into the stream of commerce by Defendant Monsanto.

22      202.    Had the warnings, labels, advertisements, or promotional material for Roundup®
23  products accurately and adequately set forth the true risks associated with the use of such products,
24  including Plaintiffs' injuries, rather than expressly excluding such information and warranting that
25  the products were safe for their intended use, Plaintiffs could have avoided the injuries complained
26  of herein.

27      203.    As a direct and proximate result of Defendant Monsanto's breach of express
28  warranty, Plaintiffs have sustained pecuniary loss and general damages in a sum exceeding the

1  jurisdictional minimum of this Court.

2  204.   As a proximate result of Defendant Monsanto's breach of express warranty, as

3  alleged herein, there was a measurable and significant interval of time during which Plaintiffs

4  suffered great mental anguish and other personal injury and damages.

5  205.   As a proximate result of Defendant Monsanto's breach of express warranty, as

6  alleged herein, Plaintiffs sustained a loss of income, loss of earning capacity, and property damage.

7  206.   WHEREFORE, Plaintiffs respectfully request this Court to enter judgment in

8  Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein

9  incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

10              ## COUNT VI:  BREACH OF IMPLIED WARRANTIES
11                              ## (MONSANTO)

12  207.   Plaintiffs incorporate by reference every allegation set forth in preceding

13  paragraphs as if fully stated herein.

14  208.   At all relevant times, Defendant Monsanto engaged in the business of testing,

15  developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup®

16  products, which were and are defective and unreasonably dangerous to consumers, including

17  Plaintiffs, thereby placing Roundup® products into the stream of commerce.

18  209.   Before the time Plaintiffs were exposed to the aforementioned Roundup® products,

19  Defendant Monsanto impliedly warranted to its consumers, including Plaintiffs, that Roundup®

20  products were of merchantable quality and safe and fit for the use for which they were intended;

21  specifically, as agricultural herbicides.

22  210.   But Defendant Monsanto failed to disclose that Roundup® has dangerous

23  propensities when used as intended and that use of and/or exposure to Roundup® and glyphosate-

24  containing products carries an increased risk of developing severe injuries, including Plaintiffs'

25  injuries.

26  211.   Plaintiffs were intended beneficiaries of the implied warranties made by Defendant

27  Monsanto to purchasers of its herbicides.

28  212.   The Roundup® products were expected to reach and did in fact reach consumers

42

COMPLAINT

1  and users, including Plaintiffs, without substantial change in the condition in which they were

2  manufactured and sold by Defendant Monsanto.

3      213.    At all relevant times, Defendant Monsanto was aware that consumers and users of

4  its products, including Plaintiffs, would use Roundup® products as marketed by Defendant

5  Monsanto, which is to say that Plaintiffs were foreseeable users of Roundup®.

6      214.    Defendant Monsanto intended that Roundup® products be used in the manner in

7  which Plaintiffs, in fact, used them and which Defendant Monsanto impliedly warranted to be of

8  merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately

9  tested or researched.

10      215.    In reliance upon Defendant Monsanto's implied warranty, Plaintiffs used

11  Roundup® as instructed and labeled and in the foreseeable manner intended, recommended,

12  promoted, and marketed by Defendant Monsanto.

13      216.    Plaintiffs could not have reasonably discovered or known of the risks of serious

14  injury associated with Roundup® or glyphosate.

15      217.    Defendant Monsanto breached its implied warranty to Plaintiffs in that Roundup®

16  products were not of merchantable quality, safe, or fit for their intended use, or adequately tested.

17  Roundup® has dangerous propensities when used as intended and can cause serious injuries,

18  including those injuries complained of herein.

19      218.    The harm caused by Defendant's Roundup® products far outweighed their benefit,

20  rendering the products more dangerous than an ordinary consumer or user would expect and more

21  dangerous than alternative products.

22      219.    As a direct and proximate result of Defendant's breach of implied warranty,

23  Plaintiffs have sustained pecuniary loss and general damages in a sum exceeding the jurisdictional

24  minimum of this Court.

25      220.    As a proximate result of the Defendant's breach of implied warranty, as alleged

26  herein, there was a measurable and significant interval of time during which Plaintiffs suffered

27  great mental anguish and other personal injury and damages.

28      221.    As a proximate result of Defendant's breach of implied warranty, as alleged herein,

1  Plaintiffs sustained a loss of income, loss of earning capacity, and property damage.

2      222.    WHEREFORE, Plaintiffs respectfully request this Court to enter judgment in

3  Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein

4  incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

5                **COUNT VII: LOSS OF CONSORTIUM**

6                    **(Against All Defendants)**

7      223.        Plaintiffs incorporate by reference each allegation set forth in preceding

8  paragraphs as if fully stated herein.

9      224.        This cause of action is asserted by the Plaintiff, whose spouse suffered

10  personal injuries as a result of using Roundup®

11      225.        By reason of the injuries sustained by Plaintiff's spouse, the Plaintiff has

12  been and will continue to be deprived of her love, companionship, comfort, care, assistance,

13  protection, affection, society, and moral support, and as a result has sustained general and special

14  damages.

15                **COUNT VIII:  WRONGFUL DEATH**

16                    **(Against All Defendants)**

17      226.        Plaintiff hereby incorporates each of the paragraphs of this Complaint as if

18  fully set forth herein.

19

20      227.        Plaintiff is a surviving heir of Decedent, as identified above, who used

21  Roundup® and was injured and died as a result.

22      228.        The injuries and damages of Decedent were caused by the wrongful acts,

23  omissions, and fraudulent misrepresentations of Defendants.

24      229.        As a result of the conduct of defendants and the Decedent's use of

25  Roundup®, the Decedent suffered fatal injuries.

26      230.        As a result of the death of the Decedent, Plaintiff was deprived of love,

27  companionship, comfort, support, affection, society, solace and moral support of the Decedent.

28

44<br>COMPLAINT

1   231.        Plaintiff is entitled to recover economic and non-economic damages against

2   all Defendants for wrongful death directly and legally caused by the defects in Roundup® and the

3   negligent conduct, acts, errors, omissions and intentional and negligent misrepresentations of

4   Defendants, and each of them.

5                   **COUNT IX: SURVIVAL ACTION**

6                      **(Against All Defendants)**

7   232.        Plaintiff hereby incorporates each of the paragraphs of this Complaint as if

8   fully set forth herein.

9   233.        Decedent incurred special damages in the form of the reasonable value of

10  services rendered for medical care for the injuries that Decedent sustained prior to death, all caused

11  by the Decedent's exposure to Roundup®.  Plaintiff is the personal representative or a successor in

12  interest and authorized to bring this survival action on behalf of the Decedent's Estate pursuant to

13  Code of Civil Procedure § 377.31, et seq.

14  234.        Plaintiff incurred special damages for losses sustained by the Decedent in

15  the form of the reasonable value of services rendered for medical care for the injuries sustained by

16  the Decedent prior to death, lost earnings and other special damages.

17  235.        As a direct and proximate result of the defects in Roundup® and the conduct

18  of Defendants, Plaintiff and Plaintiff's Decedent sustained the damages as set forth above.

19                **EXEMPLARY DAMAGES ALLEGATIONS**

20  236.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs

21  as if fully stated herein.

22  237.    Defendants' conduct as alleged herein was done with oppression, fraud, and malice.

23  Defendants were fully aware of the safety risks of Roundup®. Nonetheless, Defendants

24  deliberately crafted their label, marketing, and promotion to mislead farmers and consumers.

25  238.    This was not done by accident or through some justifiable negligence. Rather,

26  Defendants knew that it could turn a profit by convincing the agricultural industry that Roundup

27  was harmless to humans, and that full disclosure of the true risks of Roundup® would limit the

28

                          45

amount of money Defendants would make selling Roundup® in California. Defendants' objection was accomplished not only through its misleading labeling, but through a comprehensive scheme of selective fraudulent research and testing, misleading advertising, and deceptive omissions as more fully alleged throughout this pleading. Plaintiffs were denied the right to make an informed decision about whether to purchase, use, or be exposed to an herbicide, knowing the full risks attendant to that use. Such conduct was done with conscious disregard of Plaintiffs' rights.

239.    There is no indication that Defendants will stop their deceptive and unlawful marketing practices unless they are punished and deterred. Accordingly, Plaintiffs request punitive damages against the Defendants for the harms caused to Plaintiffs.

## JURY TRIAL DEMAND

240.    Plaintiffs and each of them demand a trial by jury on all of the triable issues within this pleading.

## PRAYER FOR RELIEF

241.    WHEREFORE, each Plaintiff requests the Court to enter judgment in Plaintiff's favor and against the Defendants for:

a.  actual or compensatory damages in such amount to be determined at trial and as provided by applicable law;

b.  exemplary and punitive damages sufficient to punish and deter the Defendants and others from future fraudulent practices;

c.  pre-judgment and post-judgment interest;

d.  costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

e.  any other relief the Court may deem just and proper.

Dated:                                    *Attorneys for Plaintiffs*

COMPLAINT