Pages 1 - 122

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE VINCE CHHABRIA, JUDGE

IN RE ROUNDUP PRODUCTS          )
LIABILITY LITIGATION            )  Case No. 16-md-02741 VC
_____ )
                                   San Francisco, California
                                   Wednesday, May 22, 2019


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                        WEITZ & LUXENBERG, P.C.
                        700 Broadway
                        New York, New York 10003
                   BY:  **ROBIN L. GREENWALD, ESQ.**

                        ANDRUS ANDERSON LLP
                        7171 West Alaska Drive
                        Lakewood, Colorado 80226
                   BY:  **AIMEE WAGSTAFF, ESQ.**

                        BAUM, HEDLUND, ARISTEI, & GOLDMAN, P.C.
                        12100 Wilshire Boulevard, Suite 950
                        Los Angeles, California 90025
                   BY:  **R. BRENT WISNER, ESQ.**
                        **MICHAEL L. BAUM, ESQ.**

                        THE MILLER FIRM LLC
                        108 Railroad Avenue
                        Orange, Virginia  22960
                   BY:  **BRIAN BRAKE, ESQ.**


 (Appearances continued on next page)




Reported By:   Katherine Powell Sullivan, CSR #5812, RMR, CRR
               Official Reporter - U.S. District Court

**APPEARANCES (CONTINUED):**

For Plaintiffs:

                FULMER SILL PLLC
                1101 N. Broadway Avenue, Suite 102
                Oklahoma City, Oklahoma 73103
      BY:  **TARA T. TABATABAIE, ESQ.**

                LAW OFFICES OF TESFAYE TSADIK
                1736 Franklin Street 10th Floor
                Oakland, California 94612
      BY:  **TESFAYE WOLDE TSADIK, ESQ.**

                LUNDY, LUNDY, SOILEAU AND SOUTH, LLP
                501 Broad Street
                Lake Charles, Louisiana 70601
      BY:  **HUNTER WILLIAM LUNDY, ESQ.**
                **RUDIE SOILEAU, ESQ.**

                MOORE LAW GROUP, PLLC
                1473 South 4th Street.
                Louisville, Kentucky 40208
      BY:  **JENNIFER A. MOORE, ESQ.**

                ANDRUS WAGSTAFF, PC
                7171 West Alaska Drive
                Lakewood, Colorado 80226
      BY:  **DAVID J. WOOL, ESQ.**

                BRADY LAW GROUP
                1015 Irwin Street
                San Rafael, California 94901
      BY:  **STEVEN J. BRADY, ESQ.**

                AUDET & PARTNERS, LLP
                711 Van Ness Avenue, Suite 500
                San Francisco, California  94102
      BY:  **MARK BURTON, ESQ.**

                ANDRUS HOOD WAGSTAFF
                1999 Broadway, Suite 4150
                Denver, Colorado 80202
      BY:  **VANCE R. ANDRUS, ESQ.**

(Appearances continued on next page)

**<u>APPEARANCES (CONTINUED):</u>**

For Plaintiffs:

          LOCKRIDGE GRINDAL NAUEN PLLP
          100 Washington Avenue S.
          Minneapolis, Minnesota 55401-2179
    BY:  **YVONNE M. FLAHERTY, ESQ.**

          ANDRUS WAGSTAFF PC
          6315 Ascot Drive
          Oakland, California 94611
    BY:  **KATHRYN M. FORGIE, ESQ.**

For Defendant:

          WILKINSON WALSH ESKOVITZ
          2001 M Street, NW, 10th Floor
          Washington, DC 20036
    BY:  **BRIAN L. STEKLOFF, ESQ.**
        **RAKESH KILARU, ESQ.**

**P R O C E E D I N G S**

**Wednesday, May 22, 2019**                    **10:11 a.m.**

---0O0---

(This transcript applies to the following cases: Ashton
v. Monsanto Company, 18-cv-3959; Moceri v. Monsanto Company,
18-cv-3558; Flynn v. Monsanto Company, 18-cv-6551; Brooks v.
Monsanto Company, 18-cv-7558; Angel v. Monsanto Company,
18-cv-5547; Smith v. Monsanto Company, 17-cv-5547; Applegate v.
Monsanto Company, 18-cv-3363; Boblitz v. Monsanto Company,
18-cv-0993; Beaudet v. Monsanto Company, 17-cv-6902; Berlin v.
Monsanto, Company 18-cv-0815; Ginger v. Monsanto Company,
18-cv-4552; Koehn v. Monsanto Company, 17-cv-5161; Edwards v.
Monsanto Company 17-cv-7365; Ruffin v. Monsanto Company,
18-cv-1085; Wiseman v. Monsanto, Company 18-cv-5495; Giglio v.
Monsanto Company, 18-cv-5658; Baum v. Monsanto Company,
19-cv-1018; Gonzales v. Monsanto Company, 19-cv-1020; Rabbers
v. Monsanto Company, 19-cv-1023; Rivas v. Monsanto Company,
19-cv-1024; Taylor v. Monsanto Company, 19-cv-1030; Kast v.
Monsanto Company, 19-cv-1031; Ataide v. Monsanto Company,
19-cv-1289; Abreu v. Monsanto Company, 19-cv-1587; Chupa v.
Monsanto Company, 19-cv-1589; Archambault v. Monsanto Company,
19-cv-1717; Conyers v. Monsanto Company 19-cv-2001.)

---0O0---

**THE CLERK:**  Calling civil action C16-MD-02741, In Re
Roundup Products Liability Litigation.

1      Counsel, please step forward and state your appearances

2  for the record.

3          **THE COURT:**  And if one of you wants to announce

4  everybody's presence, feel free to do it that way.  Whatever

5  you prefer.

6          **MS. WAGSTAFF:**  All right.  Good morning, Your Honor.

7  Aimee Wagstaff on behalf of the plaintiffs.  Nice to see you

8  again.

9          **THE COURT:**  You too.

10         **MS. GREENWALD:**  I guess I'm going to be the emcee.

11  Robin Greenwald for the plaintiffs.  And then we've got Brian

12  Brake.  Mr. Miller had a problem getting here, so Mr. Brake is

13  sitting in his place.

14      Hunter Lundy, Yvonne Flaherty, and Tara Tabatabaie.  And

15  she is arguing the remand today.

16         **THE COURT:**  Okay.  Great.

17         **MS. GREENWALD:**  And then Tesfaye Tsadik.

18         **THE COURT:**  Hello.

19         **MS. GREENWALD:**  And then is sitting in the back,

20  Michael Baum, Brett Wisner, and then we have a bunch of others.

21  But these are the people who are speaking, Your Honor.

22         **THE COURT:**  Hi, everyone.

23         **MR. STEKLOFF:**  Good morning, Your Honor.  Brian

24  Stekloff and Rakesh Kilaru on behalf of Monsanto.

25         **THE COURT:**  Outnumbered again.  Monsanto is always

```
 1    outnumbered.

 2        Okay.  Let's see.  So let's put together a little list of

 3    things that we should make sure to discuss today, and maybe

 4    roughly in this order.

 5        We have the issue of the appointment of a mediator.  We

 6    have the issue of a bond.  We have the motion -- what is it? --

 7    the ninth amended motion to dismiss.  This is the motion to

 8    dismiss the cases where plaintiffs never submitted a fact

 9    sheet; right?

10            MR. STEKLOFF:  Right.

11            THE COURT:  We have a motion to remand this California

12    case, or these California cases.  And then we have a motion to

13    remand the Missouri case with 108 plaintiffs.

14        And then we have -- we have to discuss the plan for how to

15    get all of these cases back to their home districts eventually

16    for trial.  I'll put out kind of a proposed plan.  And we need

17    to set a trial date in the Stevik case.

18        So that's one, two, three, four, five, six, seven items

19    I've identified.  Anything else we should be discussing?

20            MS. GREENWALD:  Just one additional one, Your Honor,

21    and that is taking preservation testimony of expert witnesses.

22            MS. WAGSTAFF:  And, Your Honor, Aimee Wagstaff.

23        We have noticed by separate motion Mr. Giglio's case.  I

24    know if you wanted to include that in the remand plan.

25            THE COURT:  Yeah, I was thinking of that, Mr. Giglio's
```

1   case as part of the discussion of the remand plan.

2        **MS. WAGSTAFF:**  Okay.

3        **THE COURT:**  And I was also thinking of severance as

4   part of the discussion of the remand plan; you know, that is,

5   severance of any multi-plaintiff cases that are otherwise here

6   properly, where there's not a motion to remand pending or

7   whatever, but that they should be severed and we should figure

8   out when and how to do that.

9        **MS. WAGSTAFF:**  Okay.  I just wanted to note that for

10   you.

11        **THE COURT:**  Anything else?

12        **MR. STEKLOFF:**  Only, so I don't forget, our post trial

13   briefs in Hardeman are due on May 31st.  We were going to seek

14   an extra 10 pages.  I think the plaintiffs agree to that.  And

15   we would agree to them having an extra 10 pages as well.

16        **MS. WAGSTAFF:**  We oppose that they're necessary, the

17   motions, but if he intends to file them, we don't oppose 10

18   extra pages.

19        **THE COURT:**  Okay.  That sounds good.

20     When is the hearing for the post trial motions?

21        **MR. KILARU:**  I don't believe it's been scheduled yet.

22   Ours is due on the 31st, and then I think -- beyond that, I

23   don't think the calendar has been set.

24        **THE COURT:**  Yours is due on the 31st of --

25        **MR. KILARU:**  May.

1          **THE COURT:**  -- May?

2          **MR. KILARU:**  Yes.

3          **THE COURT:**  Okay.  I don't know if a hearing will be

4     necessary for them, but I think we should set a hearing date.

5     And we should -- so the responses to the post trial motions

6     will be due 14 days afterwards, by operation of the rule.  Is

7     that right?

8          **MS. WAGSTAFF:**  Which puts it mid-June, probably.

9          **THE COURT:**  Okay.  I think we should take a crack at

10    setting the date now.

11         **MS. WAGSTAFF:**  Okay.

12         **THE COURT:**  Let's see here.  I think we're looking at

13    the first week of July for that.  And I know that's crunching

14    you a little bit, but because of the law clerk transition, I

15    think it's very important to do that.

16         **MS. WAGSTAFF:**  So the 4th of July holiday is on a

17    Thursday.  I assume the court will be closed that day?

18         **THE COURT:**  I assume so.  I think we should try to do

19    like the 1st or the 2nd or something like that.

20         **MS. WAGSTAFF:**  The 1st or the 2nd of July works for

21    plaintiffs.

22         **MR. STEKLOFF:**  I think the 2nd is preferable for us,

23    but we can make either day work, Your Honor.

24         **MS. MOORE:**  That's fine, Your Honor.  Jennifer Moore.

25         **THE COURT:**  I would like to ask you both to -- if

1  Tuesday is preferable, we could schedule that.  But I would

2  like to ask you both to keep Monday open and keep open the

3  possibility that I'll move it to Monday, because there may be

4  something that prevents me from doing Tuesday.

5      So why don't we schedule it for July 2nd, at 1:30 p.m.

6  Let's say 1:00 p.m.  July, 2nd at 1:00 p.m., with the

7  possibility that it will be moved to Monday.

8          **MS. MOORE:**  Thank you, Your Honor.

9          **MS. WAGSTAFF:**  Thank you, Your Honor.

10          **THE COURT:**  So your reply, I assume, is due seven days

11  after the opposition; is that right?

12          **MR. STEKLOFF:**  I would be -- I don't know, but that

13  sounds right to me, Your Honor.

14          **THE COURT:**  Okay.  Well, regardless, let's say that

15  your -- regardless of what the rules say, let's say that your

16  reply is due seven days after the opposition is filed --

17          **MR. STEKLOFF:**  Okay.

18          **THE COURT:**  -- so that we have enough time to look at

19  it.

20          **MR. STEKLOFF:**  That's no problem, Your Honor.

21          **THE COURT:**  Okay.  Anything else on the -- that should

22  be on the list to discuss today?

23          **MR. STEKLOFF:**  Not from us, Your Honor.

24          **THE COURT:**  Okay.  So why don't we start then with the

25  appointment of a mediator.  Each side submitted three names

```
1    that they were proposing.  Both sides asked -- asked for
2    permission to submit those names confidentially.  I said that
3    that was fine.
4         There was no agreement between the parties.  There was no
5    overlap on the names that were submitted.  As I previously
6    indicated, if the parties were unable to agree on the
7    appointment of a mediator, I would go ahead and appoint one
8    myself.
9         So what I plan to do is appoint Ken Feinberg, who is on
10   neither side's list, so long as he's willing to do it.  And
11   I've had, you know, preliminary discussions with him about
12   that, but he and I agree that he should meet with both sides to
13   make sure that he's comfortable taking on the engagement.
14        And so I've instructed him to meet with both sides and to
15   report back to me in 14 days from today.  So I will require
16   each side to meet with him within that time frame.
17        At this point are you in a position to give me the primary
18   contact person from each side who Feinberg would communicate
19   with?
20             MS. WAGSTAFF:  Yes, Your Honor.  So the primary
21   contacts would be myself, Robin Greenwald, and Mike Miller.
22             THE COURT:  Okay.  And if there's one, who's it going
23   to be?
24             MS. WAGSTAFF:  He can contact me, Your Honor.
25             THE COURT:  Okay.  And what about for Monsanto?
```

```
 1         MR. STEKLOFF:  William Hoffman at Arnold and Porter,

 2   Your Honor.

 3         THE COURT:  Okay.  So that's that.

 4      The second item is that Monsanto would like to post an

 5   appeal bond of $100,334,542.62.  It seemed from the case

 6   management statement that the plaintiffs may be saying that

 7   that is too low.  I do not agree that that is too low.

 8      So that is fine for -- I approve Monsanto's request to

 9   post an appeal bond in that amount and to stay enforcement

10   pending appeal.

11      If you could please submit a proposed order reflecting

12   that.

13         MR. KILARU:  Of course.  Thank you.

14         THE COURT:  Okay.  The motion to dismiss, I'm not sure

15   if there's too much to discuss.  Seems like it's almost an

16   administrative thing at this point, but let me just pull it up.

17      So we have -- just to make sure that I understand it

18   correctly, the motion to dismiss, so we have -- we have --

19   we've had multiple amended motions to dismiss.  So we're at the

20   ninth amended motion to dismiss, I think.

21      Is that the only one that we need to scrutinize?

22         MR. KILARU:  No.  So I believe the ninth and the

23   eighth are the two operative ones right now.  There were

24   basically two sets of motions that were filed at different

25   times, and they've -- those have been the ones that have been
```

1    sort of updated on a seriatim basis.

2          **THE COURT:**  Okay.

3          **MR. KILARU:**  So I think the seventh motion -- I'm

4    sorry, there's so many of them, but the seventh motion was the

5    one, I believe, was scheduled for today.  The ninth is the same

6    as the seventh, it just eliminates two plaintiffs where there

7    had been a stipulation of dismissal.

8          **THE COURT:**  Okay.

9          **MR. KILARU:**  So, otherwise, I think there are however

10   many plaintiffs there are remaining.  And from our perspective,

11   at least, I think it is sort of administrative at this point.

12         **THE COURT:**  Okay.  So what was the seventh is now the

13   ninth?

14         **MR. KILARU:**  Yes.

15         **THE COURT:**  And the eighth is what?

16         **MR. KILARU:**  It's a different group of plaintiffs

17   where the same arguments are being made as to, sort of, the

18   failure to file a PFS.  But I think the timing of what we filed

19   on -- we sort of just updated them on a periodic basis.  So the

20   eighth has a different group of plaintiffs but same arguments.

21         **THE COURT:**  Okay.  And so the -- I mean, there's

22   not -- as far as I can tell, there's not an opposition to this.

23   So what's the -- do you have anything to say about the motions

24   to dismiss?

25         **MR. BRAKE:**  Yes, Your Honor.  Good morning.  Brian

1    Brake for the plaintiffs.

2         What I prepared for was what Your Honor indicated we would

3    be talking about today, which is docket 3233 and docket 3084.

4         And I can tell you the plaintiffs, on those motions to

5    dismiss, which I have some comments about, would like the Court

6    to take action on.

7              THE COURT:  Well, what are -- what were the docket

8    numbers you said?

9              MR. BRAKE:  The first one Your Honor indicated we'd

10   hear today is 3233.

11             THE COURT:  What is that?

12             MR. BRAKE:  It's a motion to dismiss.

13             MR. KILARU:  I think I can clarify, which is that 3233

14   is the fifth motion.  32 -- 3084 is the fourth.  And I believe

15   the clerk had just asked us to consolidate those two into one,

16   so that's the seventh.  So the same people are involved in

17   everything.

18             THE COURT:  Okay.  So are you saying that the -- what

19   is now the ninth amended motion to dismiss, which is docket

20   number 3833, is the one that's effectively teed up for today?

21             MR. KILARU:  Yes.

22             THE COURT:  And are you saying that the eighth amended

23   motion to dismiss, docket number 3831, is not teed up for

24   discussion today?

25             MR. KILARU:  I believe that's right.  We filed it, I

1  think, on Monday.  It's a different group of four plaintiffs.

2          **THE COURT:**  Okay.  All right.  So, effectively, it

3  sounds like, Mr. Brake, you are -- you're here to talk about

4  what is now the ninth amended motion to dismiss, which is

5  docket number 3833.

6          **MR. BRAKE:**  I believe so.  I have -- there are a total

7  of six plaintiffs I'd like to address with the Court that I

8  believe are in that motion.

9          **THE COURT:**  Okay.  Well, hold on a second.

10          **MR. BRAKE:**  Okay.

11          **THE COURT:**  Let me pull it up.

12      So I believe there are ten plaintiffs in that motion?

13          **MR. BRAKE:**  I do not have that here in front of me.

14  I'm operating from the ones in your order.  I can tell you the

15  names of the plaintiffs.

16          **THE COURT:**  Okay.  So what do you have to say about

17  them?

18          **MR. BRAKE:**  What I have to say is, for plaintiff

19  Ronald Brook, in Action 06902, that's a Miller Firm plaintiff

20  client.

21          **THE COURT:**  He's not in this motion.

22          **MR. BRAKE:**  Okay.  Then --

23          **THE COURT:**  Oh, wait, he is.  I missed it.  I missed

24  it.  Sorry.

25          **MR. BRAKE:**  We recently have contacted him after

```
1    multiple attempts in the past have failed to get in contact
2    with him, and we believe we can have a modified or actual
3    Plaintiff Fact Sheet done in 30 days.  So we'd like a 30-day
4    extension on his Plaintiff's Fact Sheet.
5              THE COURT:  Okay.  What's the history of -- I mean,
6    why -- who was representing Ronald Brook?
7              MR. BRAKE:  We represent Ronald Brook, the Miller Firm
8    does.
9              THE COURT:  Okay.
10             MR. BRAKE:  And we've been trying for a long time to
11   get ahold of him.  We only recently, on May 16th, were able to
12   get ahold of him.  And so, based upon that, we are asking the
13   Court to give us 30 days now to complete the Plaintiff's Fact
14   Sheet.
15             THE COURT:  Okay.  What else?
16             MR. BRAKE:  The next one is DeAnna Geller.
17             THE COURT:  Okay.
18             MR. BRAKE:  All I can say in response to the motion to
19   dismiss for her is that we've tried to contact her and have not
20   been able to get ahold of her.
21             THE COURT:  Okay.
22             MR. BRAKE:  And then Mark Hanson, there's a
23   stipulation filed to dismiss him with prejudice.
24             THE COURT:  Who?
25             MR. BRAKE:  Mark Hanson.
```

 1              **THE COURT:**  He's not on this list, and I assume the

 2   reason he's not on this list --

 3              **MR. KILARU:**  Yes, we had agreed to stipulate.  That's

 4   fine.

 5              **MR. BRAKE:**  All right.  And then the next one is Tracy

 6   Magee, M-a-g-e-e.

 7              **THE COURT:**  Same, I assume?

 8              **MR. BRAKE:**  Yeah, we tried to get ahold of her

 9   multiple times and have not been able to.

10              **THE COURT:**  Okay.  She's not on this list though.

11              **MR. KILARU:**  She, I believe, should be on there.

12              **THE COURT:**  She's not listed on -- I might be missing

13   it, but she's not on your ninth motion.

14              **MR. KILARU:**  She was on the seventh, and I don't

15   believe she's filed anything or stipulated, so.

16              **THE COURT:**  So it may have been an oversight not to

17   have her on the ninth?

18              **MR. KILARU:**  It was an oversight.  I apologize for

19   that.

20              **THE COURT:**  That's okay.  She's listed on the caption.

21   It says "This document relates to" and then includes her name,

22   but it doesn't include her -- oh, no, there she is.

23              **MR. KILARU:**  She is there, okay.

24              **THE COURT:**  She's on the first page.

25              **MR. KILARU:**  Yeah.

1          **THE COURT:**  I didn't see that.  Okay.  All right.

2      So what did you want to say about Magee?

3          **MR. BRAKE:**  The only thing I can say is we've tried to

4   contact her without any success after multiple efforts.

5          **THE COURT:**  Okay.

6          **MR. BRAKE:**  And then the next one is Rosalita Castro.

7   A stipulation to dismiss has been filed for her, so she may not

8   be in the motion.

9          **MR. KILARU:**  Wouldn't have her.

10          **THE COURT:**  Okay.

11          **MR. BRAKE:**  And then the last one is John Otts.  I'm

12   not sure if he's in there or not.

13          **THE COURT:**  I don't think so.

14          **MR. KILARU:**  I believe he is.

15          **THE COURT:**  Oh, yes.

16          **MR. KILARU:**  First one on the next page.

17          **MR. BRAKE:**  We would ask the Court not to make a

18   ruling on that motion to dismiss because he is a plaintiff in

19   the Smith versus Monsanto case, which the Court is going to

20   rule on today about remanding and/or transferring.

21      And so I think we should wait to see how Your Honor rules

22   on that before making a disposition as to the motion to dismiss

23   for John Otts.

24          **THE COURT:**  Well, why would that matter?  I mean, if

25   he has not complied with the requirements for submitting a fact

sheet and Monsanto has complied with all the notice

requirements and everything, why shouldn't he be dismissed at

this point?

         **MR. BRAKE:**  Well, if another court is the proper court

to -- for this case to be in -- for the Smith case to be in,

then that would be the court to make the decision.

         **THE COURT:**  Is he one of the ones that -- maybe that's

right.  Is he one of the ones who -- I was going to ask if he

was one of the plaintiffs who used Roundup for residential

purposes only.  But I'm guessing the answer is we don't know.

         **MR. KILARU:**  Well, this is the other one, I believe.

This is the Missouri one, not the California ones where

there's --

         **THE COURT:**  Oh, the Missouri.

         **MR. BRAKE:**  Yeah.

         **THE COURT:**  Oh, okay.  The Missouri one.

    So on that, I think the answer is that, if I remand the

Missouri case, then I should not rule on the request to dismiss

Otts.  If I deny the motion to remand, then I dismiss Otts.

         **MR. BRAKE:**  Yes, sir.

         **MR. KILARU:**  Especially I'm not sure that's quite

right, Your Honor.  I don't know that the same plaintiff can

have the same cause of action pending in two different courts

and not prosecute one and say, well, I have the other one.

         **THE COURT:**  It's not that he has it pending in two

```
 1   different courts; it's that it's here right now because it's

 2   been removed.  And the question is whether I have jurisdiction

 3   over it.  And if I don't have jurisdiction over it, then I send

 4   it back down to -- I send it back to Missouri and -- without

 5   ruling on the merits on anything, including without dismissing

 6   Otts' case.

 7           MR. KILARU:  Right.  But I guess he's also filed a

 8   separate lawsuit here, that's properly here, that he's not

 9   prosecuting.  And I think the disposition of that --

10           THE COURT:  Oh, this is a separate --

11           MR. KILARU:  It's a different case, I believe.  It's

12   not the same case that's here by virtue of Smith.  He's filed

13   as a plaintiff in Smith and then also is a plaintiff here in

14   this action.

15           THE COURT:  I see.  I see.  Oh, okay.  Right.

16       Well, and so if I decide that it's appropriate to remand

17   the Missouri case, I do not have jurisdiction over that

18   duplicative lawsuit, essentially, that he has filed because

19   that lawsuit is properly in state court.  Or I don't know if

20   it's properly in state court, but it should be dealt with in

21   state court.  And then I should dismiss a separate lawsuit that

22   he's filed here, but should it be with prejudice or without

23   prejudice?

24           MR. KILARU:  I would think it should be with prejudice

25   and then the -- because there's a rule -- we've sort of
```

established rules on what happens when you don't file a fact
sheet.  And then, as you say, the effect of that dismissal with
prejudice, if it were to go back to Missouri -- and I think you
know our position is it shouldn't, but if it were to go back to
Missouri, we would have to litigate there what the effects of
the dismissal with prejudice here are.

But he does have a case here that should be dismissed with
prejudice under the rules we've established.

**THE COURT:**  And I assume, Mr. Brake, same comment?
You've been trying to get in touch with him and you've been
unable to?

**MR. BRAKE:**  Yes, sir.

**THE COURT:**  Okay.

**MR. BRAKE:**  And I'm not talking about two phone calls.
I'm talking about letters, phone calls, emails, certified mail,
the whole ball of wax.

**THE COURT:**  Okay.  So with respect to Brook, any
objection to the request for an additional 30 days to file a
fact sheet?

**MR. KILARU:**  Yes, Your Honor, in the sense that I
believe in Brook's case we're sort of several months -- at this
point, well, more than several months past the point at which
PFSs should have been filed.

We've provided the notices.  We have been filing these
motions to dismiss.  So I think there have been a number of

```
 1    instances in which it's been made clear to his lawyers and to

 2    the litigation generally that he really needs to file this

 3    claim.

 4        And I think I, as a general matter, understand the theory

 5    behind getting extensions when they haven't been able to

 6    contact the plaintiff, but if in every instance where we file

 7    these deficiencies, then months later they say we found them, I

 8    mean, I think the process is going to break down.

 9        THE COURT:  Okay.  I'll think about that.

10        My tentative inclination would be to say that all of

11    the -- with the exception of Brook, all of the plaintiffs'

12    cases should be dismissed with prejudice, including Otts, and

13    that I would be tentatively inclined to give Brooks another --

14    is it Brook or Brooks?

15        MR. KILARU:  Brook.

16        MR. BRAKE:  Brook.

17        THE COURT:  -- Brook another 30 days.  I'll think

18    about that a little bit more.

19        MR. BRAKE:  Thank you.

20        MR. KILARU:  Thanks, Your Honor.

21        THE COURT:  Okay.  Let's talk, I guess, about -- let's

22    talk first about the motion to remand the Missouri case,

23    because maybe it's a little -- maybe it's simpler.  I'm not

24    sure.

25        So I will tell you I put out a question last night about
```

```
 1   Section 1332(d)(11)(C).  Did I get that right?
 2           MR. BRAKE:  Yes, sir.
 3           MR. KILARU:  I believe so, yes.
 4           THE COURT:  And so we've spent some time looking at it
 5   since I put out that question.  And I guess my tentative view
 6   of the response to the question that I put out last night is
 7   that the case was transferred by the MDL panel after having
 8   been removed on two grounds.  One was the federal officer
 9   removal ground that I subsequently rejected in another case,
10   and the other was the CAFA ground.  Right?
11           MR. BRAKE:  Yes, sir.
12           THE COURT:  And so I think that the best answer is
13   that it was appropriate for the MDL panel to transfer the case
14   here, notwithstanding Section 1332(d)(11)(C), because there was
15   another basis for removal at the time that was not -- that
16   hadn't been deemed invalid by me yet.
17        So my -- I guess my tentative view is that it was not
18   improperly transferred and, therefore, we should just jump in
19   to whether the case should be remanded based on the arguments
20   that are made in the papers.
21        Before we jump into that, I thought I'd ask if you all had
22   any additional comments on that.
23           MR. KILARU:  On that, I agree with the question of
24   whether it was proper for the transfer to occur.  I think
25   there's two different senses in which it could be remanded.
```

```
 1   One is it could be remanded back to the Eastern District of

 2   Missouri because there's not still a basis for it to be here

 3   other than MDL transfer.

 4       And then the second would be remand back to state court.

 5   I think the latter we oppose.  The former, I think, is actually

 6   the right -- is probably the right course given that you've now

 7   rejected our argument on the federal officer removal.  And so

 8   it's only here to the extent it's here because of CAFA.

 9       THE COURT:  Well, it's only here because of CAFA, but

10   I wonder, though, if that's -- I guess -- I think I may

11   disagree with that.  I think that it probably makes the most

12   sense to interpret this provision, 1332(d)(11)(C), as

13   contemplating the state of affairs at the time the transfer

14   is -- transfer by the MDL panel is being contemplated.

15       So, in other words, I mean, obviously, this is an odd

16   situation.  I don't know how often it would come up, but it

17   seems to me that the question should be whether the transfer

18   was appropriate when it was done, not whether we would go back

19   and do it differently in light of a subsequent ruling that I

20   made on one of the bases for removal.

21       MR. KILARU:  But I think there would still be the

22   questions of whether there's a basis for the case to still be

23   here.  And if the only basis for the case to still be here is

24   the MDL transfer statute, I don't think the premise that -- I

25   take the point that you look at the point in time, but then you
```

1    have to ask why is the case here and does it make sense for it

2    to remain here?

3         And if the only basis is something that's statutorily

4    foreclosed, I would think that would be a basis for saying it

5    actually now has to go back because I rejected that argument.

6         And I think there was a Darvocet case in front of the JPML

7    in -- I think it was in 2013.

8              THE COURT:  Say that again.

9              MR. KILARU:  It's Darvocet, D-a-r-v-o-c-e-t.

10             THE COURT:  Okay.

11             MR. KILARU:  So there's sort of a long history of that

12   case, but the first opinion in that case that I think is

13   relevant is -- it's at 939 F.Supp.2d 1376.  And that addressed

14   the question that you opened the discussion with, which is, if

15   there's two bases for transfer, one is MDL and one is not, is

16   it okay to transfer it?  And they said yes, if there's another

17   basis.

18             THE COURT:  I think the precise way to say it is if

19   there are two bases for removal --

20             MR. KILARU:  Yes, yes.

21             THE COURT:  -- and then the panel is considering

22   transferring, it's appropriate to transfer if one of the bases

23   for removal was something other than CAFA.

24             MR. KILARU:  Yes, that's right.

25        As the case followed on, it turned out, similar to here,

```
1   if I have it correct, that the other grounds for removal, the
2   courts rejected those.  So the only thing left was CAFA as the
3   basis for sending it over.
4        And there was then a question of what to do with the case.
5   And it was briefed, and I believe that there had been some
6   indication from the JPML that the plan was going to be to
7   actually send the case back to the transferor federal court.
8        But the issue then mooted out because, basically, the MDL
9   was winding down, so the Court said we don't really need to
10  address this.  So that, to me, at least suggests it's an open
11  question.
12       I think if you look at what is the basis for the case
13  remaining here, the only basis for it being here is now CAFA.
14  And CAFA would say that it can't be here under the statute you
15  quoted.  So we would think that sending it back to Eastern
16  District of Missouri would be the right course.
17            THE COURT:  So I guess the next question -- maybe
18  that's right.  I guess the next question would be is it --
19  would it -- if that is correct, would it even be appropriate
20  for me to entertain the motion to remand?
21       Or would that be inappropriate and should I, instead, send
22  it to the Missouri federal court to consider the motion to
23  remand?  Or would I have the authority to entertain the motion
24  to remand now?
25            MR. KILARU:  That's a fair question.
```

1          **MR. BRAKE:**  I think the Eastern --

2          **MR. KILARU:**  I think it could be sent back to the

3    Eastern District of Missouri for that reason, as you say,

4    because obviously the case should have been -- there's no

5    longer a basis for the case to be here for transfer purposes.

6    So it would go back to a Missouri federal court to be removed

7    in the first instance.

8          **THE COURT:**  Maybe that it's -- you know, sometimes the

9    rules require us to be inefficient.

10         **MR. KILARU:**  Yeah, yeah.  I think that, from our

11   perspective -- and I expect disagreement on this -- I think the

12   removal question is a pretty straightforward one as to whether

13   this should be in federal court.  So I think there's efficiency

14   in handling it and sending it back, but I understand that there

15   will be disagreement on whether removal was proper at all.

16         **THE COURT:**  Does either side have any objection to my

17   deciding the removal question, given the procedural posture

18   it's in and the possibility that it ought to be transferred

19   back to federal court in Missouri?

20         **MR. BRAKE:**  I don't think so, Your Honor.

21         **MR. KILARU:**  I don't think so either, Your Honor.

22         **THE COURT:**  Okay.  Well, then, let's at least talk

23   about that.  Even if neither side has an objection, there may

24   be a question whether I have the authority to do it.  And

25   that's something we'll have to ponder.

1      So you say that you think it's a pretty straightforward

2   question that it was properly removed.  And the -- your

3   argument, as I understand it, is that we should understand them

4   to have proposed that the 108 plaintiffs be tried jointly,

5   because they didn't say anything clearly to suggest otherwise

6   and that's just been their general MO with respect to these

7   cases?

8        **MR. KILARU:**  I would put it a little more strongly

9   than that, which is that I think the case law suggests that

10  when there's no affirmative indication that the complaint is

11  not being consolidated for some purpose other than trial, you

12  should interpret it to be a consolidated complaint through

13  trial.

14      And I think that every indicia in the complaint is that

15  they intended there to be one trial and one judgment.  I think

16  the request for relief -- and you can see this in the brief,

17  but there's a unified request for a judgment on each claim,

18  there's a unified request for a trial.

19      And so I think the cases we've cited, *Ramirez* and *Visendi*,

20  in both of those cases where there's no indicia in the

21  complaint that they wanted something other than a consolidated

22  trial and there are indicia that they did want a trial, it

23  should be considered appropriate under CAFA.

24        **THE COURT:**  Put aside, for the moment, the parts of

25  the complaint that you've cited that you say suggest that they

1    wanted a joint trial.  I'm not saying that those are

2    unimportant.  I'm just saying put them aside for a moment.

3         It seems strange to me to have a presumption like that,

4    that they intended for the -- or desired for the plaintiffs to

5    have a trial jointly if the rules of the state permit, as a

6    matter of course, people to file complaints jointly with the

7    understanding that the cases will be managed together pretrial

8    but then tried separately.

9         So, you know -- and as I understand it, that is the rule

10   in Missouri.  If I'm wrong about that, you can tell me.  But it

11   seems like the rules in Missouri contemplate, whether it's to,

12   you know, to save plaintiffs the filing fees or whatever, or

13   save plaintiffs the administrative hassle of filing separate

14   lawsuits and then filing motions to relate them or coordinate

15   them or consolidate them or something, that Missouri has this

16   practice of allowing individual plaintiffs to join together and

17   file the same lawsuit against the same defendant even if it's

18   kind of obvious that those cases could never be tried together,

19   and even if it -- just the purpose is to manage the cases

20   pretrial together.

21        **MR. KILARU:**  On that I would say that at the time that

22   this case was filed in St. Louis City it actually was, if not

23   common, acceptable for plaintiffs to file cases that they

24   intended to go all the way through trial.

25        So there was the *Johnson & Johnson* case, which was a City

trial with multiple plaintiffs, and that was filed and actually taken through trial with multiple plaintiffs.

So it's not that St. Louis just has a procedure that allows you to consolidate for pretrial purposes.  At the time the complaint was filed, it was also permissible to take those cases to trial with a number of different plaintiffs at trial.

Now, since then the Missouri Supreme Court has indicated in an opinion in the *Johnson & Johnson* case that that's not an appropriate use of the St. Louis City venue; that you can't have what you have here, which is one St. Louis City plaintiff and 107 -- I think in that case it was 21 -- plaintiffs who have no connection to St. Louis City who are trying to join together for trial.

But I don't think it's as simple as saying --

**THE COURT:**  What about if they had all been St. Louis City plaintiffs?  Would it have been appropriate for them to go to trial together?

**MR. KILARU:**  I think that's an unresolved question, but I think that the basis for saying that there couldn't have been a multi-plaintiff trial of the type that occurred was that there weren't other St. Louis City residents and that there were a bunch of other residents.

So I think that's the lens through which to understand the complaint.  It's not as if the default rule in Missouri is you file and things are consolidated for pretrial purposes and then

1  don't go to trial together.  And I think that's where the way

2  the complaint was pleaded matters.

3       **THE COURT:**  What is the -- I mean, is it basically

4  that you file together and you proceed together, and then you

5  sort out later whether they're going to go to trial together or

6  not?

7       **MR. KILARU:**  I don't know the precise details on when

8  the decision is made as to have the cases go together for

9  trial.  I know that prior to the Johnson -- and this is still a

10 matter of litigation, I should be clear, in St. Louis.

11      There are some -- or at least there were some

12 multi-plaintiff trials involving Roundup that are on the

13 calendar for actual trial, not just for pretrial purposes.  So

14 that may all be revisited as a result of this *Johnson & Johnson*

15 ruling, but there were a bunch of those trials that were

16 proposed.

17      And I think plaintiffs can propose to the Court, and it's

18 up to the Court whether they want to agree with it or not, to

19 actually take cases through trial with a huge group of

20 plaintiffs, again, subject to the subsequent legal

21 developments.

22      So I guess I would say there's not a default that, when

23 you file a complaint like this, it's just going to be

24 consolidated for only pretrial purposes.  And I think that's

25 why, consistent with the cases -- the *Visendi* case from the

1    Ninth Circuit, but also just the complaint itself, you look at
2    the complaint and see, you know, what's the best reading of
3    what's happening here.

4          And given that there's one request for a jury trial and
5    one request for a judgment, and obviously a huge number of
6    plaintiffs, which has its own set of problems, but it is one
7    complaint where I can see why the plaintiffs would see some
8    advantage in trying to bring 108 plaintiffs into the courtroom
9    in a single case.

10          **THE COURT:**  So the upshot of your proposed solution to
11    this is that, if the plaintiffs' lawyers had only included 99
12    plaintiffs in the complaint, this would not be removable as a
13    mass action.  But because they included 108 plaintiffs in the
14    complaint, it is removable as a --

15          **MR. KILARU:**  I wouldn't say that, because there's also
16    case law about, say, three actions are filed on the same day
17    that have 50 plaintiffs each, how do you construe that?

18          And I believe there's some case law that would look at
19    those sort of three 50-plaintiff cases and say you should
20    really view those as one action, and that's how you would get
21    over the hundred number.

22          I do think in this case you have a 108-plaintiff claim
23    that is over the CAFA limit, so you don't have to think about
24    those questions.

25          But I guess what I would say, I don't think the number --

```
 1   the number is obviously very important, and I think when you're
 2   over a hundred you are in CAFA territory.  If you had three
 3   99-plaintiff cases filed on the same day by the same law firm,
 4   you might still find yourself in CAFA territory.
 5            MR. BRAKE:  Well, there has to be a hundred
 6   plaintiffs, but they also have to have a proposal to be tried
 7   jointly, as Your Honor mentioned.  And there's no explicit
 8   request in this complaint that all 108 plaintiffs have their
 9   cases tried jointly.  That's the basis for our motion to remand
10   the case.
11            THE COURT:  Well, but why shouldn't we -- why
12   shouldn't we interpret the complaint as a proposal that they be
13   tried jointly?
14            MR. BRAKE:  Because there's no affirmation or
15   request -- affirmative request in the complaint to say that.
16   So there should not be a presumption where there's no request.
17            THE COURT:  Well, you asked for judgment for the
18   plaintiffs --
19            MR. BRAKE:  True.
20            THE COURT:  -- on each cause of action.
21            MR. BRAKE:  That's true.
22            THE COURT:  There's no indication that you think there
23   should be separate trials.  Right?
24            MR. BRAKE:  That's true.
25            THE COURT:  Okay.  It's also the case that you seem to
```

 1   be asking for joint trials in all of the -- in -- wherever you

 2   can get them, as far as I can tell.  Right?

 3        You have filed a case management statement in this court

 4   in which you have said we should take all the Central District

 5   of California cases and consolidate them together and send them

 6   back to the Central District of California for one trial.

 7        So in light of that, how am I to interpret your complaint

 8   in this Missouri case as not contemplating that the 108

 9   plaintiffs will go to trial jointly?

10        **MR. BRAKE:**  No, I understand your argument or your

11   rationale, Your Honor.  I would say that absent some

12   affirmation or affirmative relief, you should not make that

13   presumption.

14        **THE COURT:**  What if -- okay.

15        I'm going to ask, sort of, a strange question.  How

16   important is this issue?  I know it's important to the 108

17   plaintiffs and to you guys, but how often does this sort of

18   thing really come up?

19        **MR. BRAKE:**  I don't think very often.

20        **THE COURT:**  It seems like a fairly esoteric question.

21        **MR. KILARU:**  I think it's fair to say that it's rare

22   to see a 108-plaintiff complaint, and so I think that that's

23   why the issue doesn't often come up.

24        **THE COURT:**  Part of the problem for me, I mean, I'm

25   not familiar with the rules in Missouri and practices in

```
 1    Missouri, but the idea of filing a 108-plaintiff complaint

 2    seems so preposterous, I mean, you know, unless it's understood

 3    that, you know, the only reason that the 108 plaintiffs are

 4    filing the same lawsuit together is to avoid the, you know,

 5    payment of 108 different filing fees and to avoid the

 6    administrative hassle of filing motions to relate all the cases

 7    to one another for pretrial purposes.

 8         If the purpose of the rule is that, and the purpose of

 9    joining the 108 plaintiffs is that, then it doesn't seem

10    preposterous.  But the idea of filing -- you know, joining 108

11    plaintiffs together for trial seems preposterous.

12         And so I assume you'd agree with that.

13              MR. KILARU:  Well, of course, but if --

14              THE COURT:  So if joining 108 plaintiffs together for

15    trial is preposterous, why should we assume that that's what

16    they were proposing when they filed the complaint?

17              MR. KILARU:  Because I think that there have been --

18    the proposal, at least, that I believe was on the table for the

19    judge there was for 15 to 20 plaintiffs at trial.  But that was

20    after a hearing in which both sides presented their position,

21    where I believe the plaintiffs' position was we should have all

22    multi-plaintiff trials, and our positions was we shouldn't have

23    any multi-plaintiff trials.

24         So, yes, I think it's -- I think that there is no basis

25    for trying 108 plaintiffs together, but I think, as you said,
```

when you take all the indicia we have here of requests for

multi-plaintiff trials across the board, I think it is sort of

an audacious request, but I don't think there's any indication

in the complaint that they intended it for anything other than

a 108-plaintiff trial.

     And you, I think, can understand why, if the plaintiffs

could get that, they would want it, I mean, having 108

plaintiffs alleging the same injury --

          **THE COURT:**  Why anybody would want a 108-plaintiff

trial?  I mean, I wouldn't wish that on my worst enemy.

     (Laughter)

          **MR. KILARU:**  There's just one other piece of this,

too, which is the sort of forum selection aspects of this,

which is, there are a hundred plaintiffs in St. Louis because

at the time you could get a single St. Louis City resident and

bring as many other people as you wanted to into the case.

     Now, I think that might not be the case.  But I think

that's another reason why to get all these plaintiffs in for

trial.

          **THE COURT:**  But if that's true, I'm not sure that is

an issue to be considered in connection with this motion to

remand.  I think that issue is relevant if the case is

remanded.  Then, presumably, you could file a severance motion.

     And then the question would be, if the cases were severed,

could -- you know, could some of them be removed at that point.

 1   I don't know.  It would depend on whether there was diversity

 2   or not, and all that stuff.  Right?

 3         MR. KILARU:  Yeah.  I guess the question for now is --

 4   we have an 108-plaintiff complaint.  And if you look at the

 5   *Visendi* case that we cited, the court looks at a complaint and

 6   they see that the complaint provides -- and I'm quoting from

 7   the opinion here -- plaintiffs and each of them demand a jury

 8   trial, and they allege being victims of a common plan and

 9   scheme, and they -- their initial complaint presented monetary

10   relief claims of 100 or more persons proposed to be tried

11   jointly.

12         That's not what was in the complaint, but that is how the

13   Court understood what the plaintiffs were asking for.  So

14   that's a case in which the Court clearly found that removal was

15   proper.

16         So here I think you have all of that plus the knowledge

17   that there has been a repeated effort to try to get

18   multi-plaintiff claim complaints together.

19         THE COURT:  Do you think that's appropriate to

20   consider?  I mean, in other words, we're conducting an inquiry,

21   basically, into the intent of the lawyers based on conduct that

22   the lawyers have engaged in in other cases.

23         MR. KILARU:  Well, I don't think the rule -- I think

24   the rule that should -- all the rule needs to be is that you

25   look at the complaint and see if, when you have a hundred

1    plaintiffs together, there's some indicia of something other

2    than a request to try jointly, which is presumption when a

3    group of people files a complaint and demands a jury trial, I

4    would think they would want the case to go through to the end.

5         **THE COURT:**  If there is that presumption, I guess I

6    might agree with you.  But that's the issue.  Is there that

7    presumption in Missouri?

8         For example, one of the things I would find interesting --

9    and I don't know if either of you has looked at this, but I

10   would be interested in seeing -- looking at the Missouri

11   practice guides.  What do the Missouri practice guides say

12   about filing complaints?

13        Are there provision -- do the practice guides say, hey,

14   guess what, great news, in Missouri, you know, you can avoid

15   paying separate filing fees and you can avoid the

16   administrative hassle of moving to relate cases for pretrial

17   purposes because you can just join all these plaintiffs

18   together even if you know that they're never going to be tried

19   together.

20        If -- you know, if the practice guides said that, then

21   that would be evidence that, sort of, that's how things are

22   done in Missouri.  And it would be difficult, I think, to apply

23   the presumption that you're proposing to apply.

24        **MR. KILARU:**  I don't --

25        **MR. BRAKE:**  I'm sorry.  What actually happens, Your

Honor, is multi-plaintiff complaints are filed.  Say 99.  And

then what has a practical matter happens in reality is, let's

say, 10 will be picked, or a smaller subgroup, which indicates

an intent not to try all 99, which would kind of be impractical

even if you wanted to.  But that's what happens in the real

world, if that goes to intent.

       **THE COURT:**  I don't know if it goes to intent.  Well,

I mean, maybe it does, but it -- I'm not sure I would quite say

that it goes to intent.

    I would say it goes to -- maybe it's a different way of

saying the same thing, but it goes to what is being proposed

when, you know, a lawsuit is filed that includes 108

plaintiffs.

       **MR. BRAKE:**  Right.

       **MR. KILARU:**  I guess I would say, Your Honor, that if

there's -- we have what we have, which is their complaint.  And

if there's some other indicia they can point to that they

weren't trying to have these cases tried jointly, that would be

one thing.

    But, you know, under the statute you have a complaint in

which the claims of a hundred or more persons are proposed to

be tried jointly.

       **THE COURT:**  Well, I think that begs the question.

Whether they're proposed to be tried jointly depends in part on

what it means to file a 108-person complaint in Missouri.

1      **MR. KILARU:**  Right.  But I think the complaint

2   itself -- I understand there's -- there's -- you could view it

3   as question begging, but there's also a question of what the

4   complaint actually asks for.  And it asks for a jury trial.

5   And I think that looking past what the complaint asks for in

6   the context of removal --

7      **THE COURT:**  Yeah, but that's just like boilerplate

8   stuff; right?  I mean, that's just cut-and-paste.

9      I mean, if we're going to be real about this, I mean,

10  that -- do we really want to be hinging our decision on a

11  cut-and-paste job that somebody makes when they're slapping

12  together a complaint?

13     **MR. KILARU:**  I don't know that this complaint would

14  count as a cut-and-paste job.  I mean, there are allegations

15  about 108 different plaintiffs, and then there are allegations

16  about the common threads that unite their claims, or so it's

17  claimed.

18     But I think -- as a practical matter, I think there are a

19  lot of lawsuits -- at least there were a lot of lawsuits,

20  multi-plaintiff complaints filed in St. Louis City, because of

21  a perception that St. Louis City would be very perceptive to

22  the idea of trials with a large number of plaintiffs.

23     And what you have is, in that context, a 108-plaintiff

24  complaint that's filed, that has more than enough people under

25  CAFA, satisfies all the other requirements.  And the indicia in

the complaint, to the extent there are any, is that there's a

request for a single trial and a single judgment.

And I think, especially in the context of removal, which

you have to measure at a point in time and figure out where the

case should be based on what you have, I think looking at the

complaint is the right thing to do.  And the complaint here, I

think, provides the answer.

THE COURT:  What about the idea that when we're not

sure about our jurisdiction, we should resolve that against

jurisdiction?

MR. KILARU:  I think that that's a presumption that

goes as far as it goes.  But I think when you have a complaint

that, again, at least from our perspective, has 108 plaintiffs

in it and lists the request for a jury trial and a judgment on

each of those claims, I'm not really sure what the doubt is

that there -- especially when it's filed in a jurisdiction

where there's sort of -- at the time was a practice of having

large multi-plaintiff trials.

THE COURT:  But if you agree that the presumption

applies here -- I think it does.  But assuming you agree that

the presumption applies here, why wouldn't I apply that

presumption to remand the case in light of the doubt that's

created by the practices in Missouri?

MR. KILARU:  Because I think the way -- at least based

on the cases we've cited, I think it's not -- this isn't a case

where you sort of use the canon of if there's any doubt.

          THE COURT:  But do you agree that that presumption

against removal jurisdiction applies here?

          MR. KILARU:  I don't know that -- I don't think it

applies here.  I know that that is a general presumption about

removal jurisdiction, but I think the cases we cited in the

CAFA context say look at the complaint, and if it satisfies the

requirements on its face and there's not some indication that

they wanted something other than what the complaint on its face

indicates, that that's a case that should be removed.

          THE COURT:  Anything else you want to say on this?

          MR. BRAKE:  No, sir.

          THE COURT:  Okay.  All right.  I'll think about that a

little more.  I may ask -- I assume, by the way, that we'll

have -- well, I don't know.  I don't know how long we'll go.

     I was going to say we'll probably take a lunch break and

then I may have questions after lunch.  But I don't know how

long this whole thing is going to last.  We'll see.

     Okay.  So the next issue I think we should discuss then is

the motion to remand the California case.

          MR. KILARU:  There are actually 11 of them, Your

Honor.

          THE COURT:  Eleven California cases.  Well --

          MR. KILARU:  Eleven -- they're similar.  They're not

all identical.  They're very similar, but there are 11 motions

```
 1    that raise a similar set of issues.
 2         THE COURT:  But they're all plaintiffs that were in
 3    the same case filed in California, and then Judge Smith ordered
 4    them severed, and we removed them.  Am I right about that?
 5         MR. KILARU:  Yeah.  The only thing I would say is each
 6    of the 11 motions is, itself, a multi-plaintiff case.  So it's
 7    not -- yes, so it's not -- there are 11 motions.  It's not 11
 8    plaintiffs in one case.  It's 11 cases where they range from 8
 9    to 27 plaintiffs, each of which has its own motion.
10         So, for example -- try just to pick one example.  One
11    second.  There's a motion to remand in Gonzales, which is just
12    one of the cases we have.  That case itself features ten
13    plaintiffs.  Then there's another motion in Taylor.  That case
14    features ten, and so on.
15         So it's not as if the ten motions are the ten plaintiffs
16    in one case.  It's ten motions regarding ten cases with large
17    numbers of plaintiffs in each.
18         THE COURT:  Got it.  And I gather that, in each of
19    those cases, there are some plaintiffs who used Roundup for
20    residential purposes and others who used it for industrial
21    purposes or whatever -- however you would characterize that?
22         MR. KILARU:  That's right.
23         THE COURT:  Okay.  And I'm going to rely on you.  If
24    there are any important distinctions among the ten cases that
25    would make a difference, I'm going to rely on you to flag those
```

 1   for me, because I haven't drilled down.

 2        MR. KILARU:  Sure.  I think there are two distinctions

 3   that sort of split the universe, but we can talk about this

 4   when they become relevant.

 5        THE COURT:  Okay.  So here is what -- so I start on

 6   this -- and I think this question, by the way, is much more

 7   important and is apt to come up much more frequently in cases

 8   throughout the country.  You agree?

 9        MR. KILARU:  Yes.

10        THE COURT:  Okay.  And I guess my starting point --

11   and this, I think, is reflected in my ruling on removal before

12   a defendant is served -- is that you have -- you know, these

13   statutory provisions are not very well worded, and you have to

14   interpret the language of the statutes in accordance with, sort

15   of, the purposes of removal jurisdiction.

16        And I guess what I think -- I don't know who's going to

17   like this least.  I think you'll probably like this least, so

18   I'll start with you.

19        I guess what I -- I think the best interpretation of this

20   statute that would be in accordance with the purposes of

21   removal jurisdiction is that when severance has been

22   effectuated, that effectively starts a new action.

23        You know, if you have a lawsuit where ten plaintiffs are

24   joined and they are severed into separate actions, those are

25   new actions and they can be removed.  And the clock starts on

1   removal again once severance has been effectuated.

2        Now, what does it mean to say that severance has been

3   effectuated?  I think that's where it can get a little bit

4   tricky.  In some places severance might be effectuated simply

5   by the judge issuing an order saying these plaintiffs are

6   hereby severed.

7        So maybe due to the, you know, state's idiosyncratic rules

8   that it does not follow from a severance order that plaintiffs

9   actually have to go through the mechanical process of filing

10  separate complaints.

11       In other states -- and this is what Judge -- this is true

12  of Judge Smith's cases, right, in California -- you know, a

13  motion for severance may be granted or the judge may simply

14  sever the cases -- order the cases severed, as occurred in this

15  case.

16       But something else needs to happen before they become

17  separate cases; right?  Judge Smith said everybody has got to

18  file a separate complaint by June 30th, or whatever it was.  I

19  can't remember.

20       But I guess my -- the way I propose to read the statute is

21  that, for purposes of assessing whether a case can be removed,

22  and for purposes of assessing when the clock starts again on

23  removal, it is once the severance has been effectuated.

24       So if a severance is effectuated simply by a court saying

25  these cases are not going to be tried together; these cases are

1   not going to proceed together, it's not necessary for everybody

2   to file a separate complaint, but I'm ordering that the cases

3   effectively be severed or not be tried together, that that is

4   the moment that severance is effectuated, and that's the moment

5   that defendant can remove the case, and that's the moment the

6   clock starts.

7        On the other hand, in a case like -- in the Judge Smith

8   situation, where she has said these cases need to be severed,

9   but we know that something else needs to happen before the

10  severance is effectuated, we wait until the severance is

11  effectuated.  We wait until the complaints get filed separately

12  before the defendant has the ability to remove them and before

13  the clock starts.

14       And so as that would apply -- so, for example, if it were

15  Missouri, and the Court simply said, okay, these cases are --

16  you know, these cases are not going to be tried together,

17  that's the end of the matter.  You don't all have to go through

18  the hassle of filing separate complaints.

19       Then in a situation like that, if there were diversity

20  jurisdiction with respect to one of the plaintiffs, the

21  defendant could remove that immediately.

22       But, here, because severance has not been effectuated,

23  Monsanto's removal of the cases, I think, effectively, are

24  premature.  But once -- and I think that's an important -- I

25  think it's important to conclude that the removal was

premature, because we don't know what the new complaints are going to look like; right?

We don't know whether one individual plaintiff in these cases might name a defendant who would defeat diversity.  We don't know if one of the plaintiffs -- I mean, I think it highly unlikely in this case but, theoretically, in other cases there might be one plaintiff who doesn't meet the amount of controversy, you know.

I mean, again, not -- I'm speaking of other cases.  We know that the amount of controversy in these cases is a billion dollars.  So I think there are a whole host of reasons to say that, you know, if something else needs to happen before the severance is effectuated, removal is premature.

But I do think -- and this is the rule that I would propose to adopt for this case.  And you may disagree with this, but the rule I would propose to adopt for this case is that a defendant can remove once severance is effectuated.  And the clock starts again once severance is effectuated because it's effectively a new action that has been commenced within the meaning of the statute.

So, practically, what that means here is that I would grant your motion to remand, but, you know, once any of the plaintiffs file individual complaints on June 30th, or whenever the deadline is, Monsanto would have the right to remove any cases for which there is diversity jurisdiction.

1          **MS. TABATABAIE:**  Good morning, Your Honor.  Tara

2     Tabatabaie for the plaintiff.

3          Again, I agree with the conclusion in some way.  Maybe not

4     completely.  Of course, in these particular cases, by the time

5     that the plaintiffs dismiss their cases, which they have not

6     done yet because --

7          **THE COURT:**  Do they have to dismiss their cases?

8          **MS. TABATABAIE:**  Yes.

9          **THE COURT:**  Or do they just have to file a separate --

10         **MS. TABATABAIE:**  No, no.  Judge Smith asked the

11    plaintiffs to -- for all plaintiffs, with the exception of the

12    first named plaintiff on each complaint, to dismiss their cases

13    and refile them as individual cases.  So that had not happened

14    when Monsanto removed the cases.

15         And that's actually against the law in the Ninth Circuit

16    that requires the cases be removable when filed and also

17    removable at the time of removal, which means if there -- you

18    know, if removal is based on diversity jurisdiction, there

19    should be -- there should not be complete diversity of

20    jurisdiction when filed and also -- or there should be -- I'm

21    sorry.  There should be complete diversity of jurisdiction as

22    the complaints are filed and also at the time of removal.

23         So at this point, as you mentioned, you know, since the

24    cases have not been effectively severed, when Monsanto removed

25    the cases there was no removability in the case.  And so,

1  again, the removal was -- you know, violates the law in the

2  Ninth Circuit.

3      In regard to the cases we're talking about, for most of

4  them, though, by the time that these cases are -- if they're

5  remanded, are -- are dismissed and refiled as individual cases,

6  then Monsanto would be past the one-year statutory limit on

7  removal.  And that's what, of course, Monsanto is complaining

8  about.

9      But as I'm sure Your Honor is well aware, the requirement

10  of removal, the right to removal is statutory.  And, you know,

11  the removal statute has to be construed very narrowly.

12      **THE COURT:**  Let me make sure I understand.

13      Is there any aspect of my proposed rule that you are

14  taking issue with right now?

15      **MS. TABATABAIE:**  You know, not with regard to these

16  cases.  But at the same time, for future purposes and for what

17  goes into your order, we believe that, you know, severance or

18  dismissal and refiling, based on Judge Smith's case management

19  order, would violate the voluntary/involuntary rule.

20      Because, as the Ninth Circuit has held in *Self versus*

21  *General Motors*, when an action is not removable as filed, it

22  cannot be, you know, turned into -- it can only be --

23      **THE COURT:**  Okay.  So I think I pretty strongly

24  disagree with you about that because this is a situation where

25  the -- you know, as a number of judges have put it, and I think

probably Judge O'Connell put it best in a case out of the
Central District -- I can't remember the name of it -- that in
this instance it's not the plaintiff themselves that has
control over removal jurisdiction.  Right?  It's only the
choice of some separate plaintiff to join them in the
litigation.

     And so it strikes me that the voluntary/involuntary rule
that you're invoking probably does not apply here.  And I think
that it also just seems -- again, stepping back and considering
the purposes of removal jurisdiction, it seems inappropriate.
Right?

     I mean, if you were right, then what that means is that,
you know, anytime plaintiffs' lawyers wanted to avoid removal
jurisdiction, they would simply improperly join.  They could
simply improperly join plaintiffs on a single complaint and
then run the clock out.

     And that happens all the time, right, where multiple
plaintiffs are joined in a single complaint, and they get tied
up in some coordinated proceeding, and more than a year goes by
before everything gets sorted out and the plaintiffs get
separated out as they should have been from the beginning.

     But the plaintiffs' lawyers have avoided removal
jurisdiction.  And that seems contrary to the purposes of the
removal statute.  And I think it's an argument for construing
this language about when an action commences as sort of -- as

1   we are reflecting the notion that when severance is actually

2   effectuated new actions commence.

3          **MS. TABATABAIE:**  I agree, Your Honor.

4         **THE COURT:**  Okay.  And then so I think what that would

5   mean is that when the -- okay.  That's fine.

6     Do you want to discuss any of this?

7         **MR. KILARU:**  Two very quick points.

8     I think what Your Honor said -- if I understand correctly

9   what Your Honor said, it would be that when the new complaints

10  are filed in front of Judge Smith, we would be triggering sort

11  of a new period under 1446(a)(2) -- or (a)(3), I guess, the

12  one-year period, because there's sort of a new action and sort

13  of a new event triggering removal.

14       **THE COURT:**  I mean, it's not obvious, if you're just

15  looking at the language of the statute in the abstract, that

16  that is the right answer.  But I think when you consider it in

17  the context of the purposes of removal jurisdiction, I think it

18  would be too contrary to those purposes to interpret it

19  otherwise.

20       **MR. KILARU:**  That makes sense.  I just understood --

21  or at least I believed I heard counsel to be saying that they

22  would argue that our removals would become untimely if we filed

23  them later.  I just want to make sure that -- I understand Your

24  Honor did not agree with that.

25       **THE COURT:**  What I'm envisioning is that that would

```
 1    not be the case.

 2              MR. KILARU:  All right.

 3              THE COURT:  So that, effectively -- I guess my view is

 4    that, to the extent you're arguing fraudulent joinder, that's

 5    not -- that's not a timely basis for removal.

 6         To the extent you're saying that there was fraudulent

 7    joinder, you could have figured that out when the lawsuits were

 8    filed or shortly after the lawsuits were filed.

 9         So to the extent you're asserting fraudulent joinder as a

10    basis for removal, I don't think that's timely.  However, you

11    know, the act -- I also believe that the act of severing the

12    cases creates new actions that start the clock again on

13    removal.

14         And so once the case -- once the severance is fully

15    effectuated in the state court, you do have the right to remove

16    any case that is -- for which there is diversity jurisdiction.

17    But I don't think -- but I think to the extent you're asserting

18    severance as a basis for removal, that's premature because I

19    don't think a severance has been effectuated.

20              MR. KILARU:  Understood.  I think we may have

21    arguments based on how the new complaints are filed, that there

22    could conceivably be some fraud --

23              THE COURT:  Fraudulent joinder.

24              MR. KILARU:  Those cases which we would make at the

25    appropriate time.  As a legal matter, I think that's fine.  I
```

```
 1   think that, as I understand it, protects our rights to remove.
 2       I would just say as a practical matter we understand the
 3   cases to have been severed.  So in that sense the issue -- we
 4   do have an order from which we could ascertain that the cases
 5   would be removable.  But I think --
 6           THE COURT:  And I understand that.
 7           MR. KILARU:  Yeah.
 8           THE COURT:  What about the point that I made earlier,
 9   that, you know, in a situation where there is no requirement in
10   state court that somebody actually go through the process of
11   filing a new individual complaint, and that the judge's
12   severance order is essentially the end of the matter with
13   regard to severance, and so we know who the individual
14   plaintiff is, we know who the defendant is, we presumably have
15   a sense of the amount in controversy, that's sort of the end of
16   the matter, and so the question whether there is going to be
17   removal jurisdiction on that severed case can be answered right
18   then.
19       But the question can't be answered in a situation where
20   you're making a plaintiff go file a separate complaint, because
21   we don't know yet what's going to be in that separate
22   complaint.
23           MR. KILARU:  Understood, Your Honor.  I think the plan
24   makes sense in terms of we'll see what complaints get filed,
25   and then, as I understand it, we would have the right to remove
```

```
 1   any cases where we either think there's diversity on the face

 2   or we have an argument about some sort of misjoinder.

 3        THE COURT:  And I guess the one thing that concerns

 4   me -- I don't know if you have any thoughts on this or not.

 5   You don't need to, I guess.

 6        You know, the thing that worries me is this feels like a

 7   good solution for this situation, and it feels like the right

 8   solution for this situation.  It feels like a solution that is

 9   consistent with the statute and the purposes of the statute.

10        But I'm wondering if, you know, like I said, this -- in

11   contrast to the last remand motion that we just discussed, this

12   one seems important, and it seems to have implications for many

13   other cases.

14        I'm just wondering if you could step back and think about

15   the rule that I'm proposing, and tell me if you think it makes

16   sense.

17        MR. KILARU:  I think it makes sense.  I think that,

18   practically, as I said, there are reasons that the issue could

19   be addressed now.  But I understand where you're coming from on

20   that.

21        I guess the only thing I'd say is, to the extent this is

22   an approach going forward, I would think -- and I understand

23   this to be what you're saying as well -- that this would only

24   be the case in a situation where you do have what I view as a

25   slightly unique circumstance here where the judge has ordered
```

severance and then told everyone to file new complaints at some

period of time in the future, as opposed to a situation where

there's a severance order and maybe it's a little less clear as

to whether new complaints need to be filed or not.

**THE COURT:**  Yeah.  And, you know, it may be in a

situation like that perhaps it would be incumbent upon the

defendant to seek clarification in state court about, you know,

whether anything else needs to happen to effectuate the

severance.

**MR. KILARU:**  I think we would intend do that.  I guess

the only thing I'd say is, to the extent we didn't get that

clarification, you might find a motion to remand within the

time period sort of protective of that purpose.

**THE COURT:**  I think in this case, in this situation,

it's clear.  But you're talking about in other situations where

it's less clear.

**MR. KILARU:**  Right.  Yes.  Here I understand there to

be a game plan, which is there will be a new complaint filed at

some point in the future, and then we can sort of address the

arguments as we need to when that happens.

**THE COURT:**  I think that's -- well, I don't know.  I'm

not an expert on how things work in the state courts.  But I

always thought that was typically how it worked, that, you

know, the Court grants a motion for severance and requires all

of the plaintiffs to file individual complaints.

1        Do you know anything about that?

2            **MR. KILARU:**  I couldn't comment on state practice

3    generally enough on that.

4            **MS. TABATABAIE:**  May I make a clarification, Your

5    Honor?

6            **THE COURT:**  Yeah.  Mr. Wisner wants to say something

7    to you or to me or somebody.

8            **MR. WISNER:**  Your Honor, Brent Wisner.  I've been --

9    I'm lead counsel for JCCP, and I actually argued with Judge

10   Smith on the severance issue.

11       I don't think, based on interactions with Judge Smith,

12   that the idea for severance was that they would be tried

13   separately or that the idea was that they're individual cases

14   that need to be separated.

15       I think it was largely an administrative point, that she

16   was having a difficult time tracking what cases were up.  I

17   don't think she ever intended her severance order resulting in

18   wholesale removal of cases from the JCCP.

19       And if, in fact, that's where the Court is headed in

20   ruling on the timing issue, I think there's going to be a lot

21   of individual factual issues.

22       For example, a lot of these plaintiffs have been going

23   through discovery.  You know, plaintiff actions have been

24   served.  It's not like they've just been sitting there and no

25   litigation has occurred.

1      So the spirit of the removal statute, that if it's been

2    proceeding for longer than a year in state court, I think, is

3    going to be individualized.  And I don't think we can make a

4    hard rule here in a vacuum that the clock restarts, because I

5    think sometimes it won't.

6        I think there will be instances, for example, where a

7    plaintiff, you know, filed and was there for longer than a

8    year.  Monsanto could have argued fraudulent joinder from the

9    beginning.  They could have moved to sever, and they didn't for

10   a year.  At some point that plaintiff is entitled to the forum

11   that they chose, which is the state court.

12       So I would be remiss in this court issuing a prospective

13   order on the rule, because I think it's really going to be case

14   specific.  And it will largely affect how these cases are

15   repled in state court.

16       You know, will more defendants be brought in?  Will -- you

17   know, I might even have to go to Judge Smith and say, I think

18   this severance order creates serious administrative problems,

19   maybe we don't do it.

20       I mean, this is reality.  This is how this works.  And so

21   I don't think her intention was to restart the clock on these

22   cases.  I think her intention was just to get it

23   administratively --

24          **THE COURT:**  Well, I'm sure her intention was not to

25   restart the removal clock on these cases.  I don't think

 1   anybody assumed that it was.

 2       But what she did is she said, look, all of these cases --

 3   all of these plaintiffs are grouped together in this complaint;

 4   I can't -- I can't make heads or tails of this, I'm ordering

 5   separate lawsuits to be filed.  Right?

 6       I mean, it's a good point.  I hadn't really thought of the

 7   fact that she wasn't -- you know, her basis for doing that was

 8   not so much that they were improperly joined as it was, you

 9   know, sort of to avoid an administrative headache.

10       But how different are those two things, really, because,

11   you know, is there any doubt that they were improperly joined?

12           **MR. WISNER:**  Absolutely.

13           **THE COURT:**  I'm not saying fraudulently joined.  I'm

14   not saying that.  But, you know, I just don't -- again, I don't

15   have a great understanding of this, but I thought that the

16   joinder rules in California were similar if not identical to

17   the ones in federal court.

18       And if so, I mean, if you filed -- and we'll talk about

19   this later.  If you filed a complaint in this court with ten

20   different people who were exposed to Roundup and got NHL, I

21   would sever those in a heartbeat.  I would say those are

22   improperly joined, clearly improperly joined.

23           **MR. WISNER:**  Well, I think you'd have to look at the

24   complaint first; right?  I mean, there could be a situation

25   where ten plaintiffs -- like, for example, here's some factual

1   stuff.

2        For example, the label -- the warning label for Roundup,

3   as we have it today in the lawn and garden context, that label

4   was actually crafted through studies done at UC Davis.  Okay?

5   And so there is a common factual thread -- I mean, I can get

6   into a lot of factual stuff.

7        I know the discovery -- this gets pretty [indiscernible],

8   but there's a way you can allege a common factual basis that

9   would be slightly different than Joe's --

10        **THE COURT:**  I don't understand how it would ever be

11   appropriate, under the federal rules, to try ten or five

12   plaintiffs together in a case like this, because the inquiry

13   about whether it was Roundup that caused their NHL or something

14   else that caused their NHL is going to be so individualized.

15   Totally inappropriate.

16        **MR. WISNER:**  What if ten farm workers working for the

17   same farm for the same period of time, spraying the same

18   product, using it in the same context, with the same protective

19   gear, with the same employer and the same sales representative

20   from Monsanto telling them it's safe enough to drink?  I think

21   now we're getting much closer to a world where a common trial

22   would actually make a lot more sense.

23        And all I'm saying, Your Honor, is I think we should be

24   careful in making blanket future statements because I think it

25   does depend.  Insofar as issuing the remand order in this case,

1    I think you should be careful about saying the clock restarts,

2    because I don't know if that's the case.

3         **THE COURT:**  Didn't Judge Smith -- I mean, maybe I

4    should pull up her order, but I thought that Judge Smith's

5    order contemplated the kind of scenario that you just

6    described.

7         In other words, correct me if I'm misremembering, but I

8    think she said that everybody has to file an individual

9    complaint unless there is some sort of extraordinary

10   circumstances that warrant putting them together as the husband

11   and wife were in the Alameda County case.

12        **MR. WISNER:**  Sure.

13        **THE COURT:**  Didn't she say that?

14        **MR. WISNER:**  Sure.

15        (Unreportable simultaneous colloquy.)

16        **THE COURT:**  So your example that you just gave me, I

17   mean, I assume it would be consistent with Judge Smith's

18   severance orders to file those -- file a case for those ten

19   plaintiffs together.

20        **MR. WISNER:**  Sure.

21        **THE COURT:**  And that you wouldn't be violating her

22   order.

23        **MR. WISNER:**  Sure.

24        **THE COURT:**  I mean, I assume that her severance order

25   was driven by, you know, in large part, a desire for

administrative convenience.  But why isn't that effectively --
why can't we treat it as, you know, a conclusion that these
people are improperly joined, given the fact that she said
everybody has to be severed unless there's -- unless there are
particular facts that justify putting them together?

        MR. WISNER:  I think we really are now in "it depends"
land.

        THE COURT:  Okay.

        MR. WISNER:  And that's all I'm saying, Your Honor.

        THE COURT:  And all you're saying is, if I rule the
way I'm proposing, I should account for that possibility.

        MR. WISNER:  Yeah, and say it's going to depend on the
complaint that gets filed.

        THE COURT:  It doesn't automatically mean that every
plaintiff has to file individually.  That is, you know, the
plaintiffs can file in accordance with her order.  But then the
question is, you know, does each individual -- is each
individual lawsuit subject to removal jurisdiction; right?

        MR. WISNER:  Sure.  And I think in an individual
lawsuit, for example, like there might be a plaintiff who has
gone through significant discovery, medical productions,
subject to motions to compel and protective orders in front of
Judge Smith, or previously Judge Petrou, and, you know, now
they have to sever and refile because Judge Smith decided she
wanted to change the sequence, in that context the clock

resetting seems a bit odd.  Right?

     Whereas, someone who just filed it and it got removed, and
they haven't done anything for over a year in state court -- I
mean, the spirit of the removal statute isn't just a hard line.
And that's all I'm saying, Your Honor.  I think it needs to be
carefully construed --

          **THE COURT:**  I understand what you're saying, but on
the flip side, you know, the plaintiffs' lawyers file a
complaint joining 15 different plaintiffs.  And at least, if
the rules are anything similar to the federal rules, you know,
the joinder is improper.  Not fraudulent but improper.

     And the case gets tied up in this mass -- you know,
massive proceeding, and they don't get around to getting
severed until more than a year later, and that results in the
defendants not being able to remove the individually filed
cases later on, that doesn't make sense either.

          **MR. WISNER:**  Sure.  But, conversely, if they knew
about this improper joinder from day one and could have taken
action a year ago to get that resolved, and didn't, similarly,
it doesn't seem fair that they can say, aha, now it's severed
two years later, after we've engaged in discovery.

          **THE COURT:**  But I've seen a number of cases where
defendants have requested severance early on.  I don't know if
it happened in this case, but the defendants requested
severance early on, and the judge said, I'll get to that later,

1    I've got a bunch of other stuff I've got to deal with, with

2    respect to these cases right now, we'll clean that up at the

3    back end.  Right?

4         **MR. WISNER:**  Sure.  But, again, I think we're --

5    you're right.  I think that's -- that's an interesting --

6    there's all these wonderful hypotheticals.  Again, I think it

7    depends.  That's all I'm saying, Your Honor.

8        If you issue an order saying the clock automatically

9    restarts, I think that that will run roughshod over the

10   individual characters by these individual lawsuits that could

11   be different.

12       So when they remove that case, let's say, or if they

13   attempt to remove it, there may be circumstances about that

14   case where they had the opportunity to seek severance, never

15   did, there's been substantial discovery, and maybe there the

16   clock doesn't restart.

17        **THE COURT:**  And this is something I meant to look at,

18   but I forgot to look at it.

19       Are there cases where a defendant removes within the

20   one-year period but the courts have held that the defendant

21   unduly delayed in removing?

22        **MR. KILARU:**  I don't believe that's the law.

23        **THE COURT:**  Sort of like a hard line?

24        **MR. KILARU:**  Yeah, I don't believe that's the law,

25   which goes to why I would oppose the suggestion that, you know,

just because we didn't move earlier within -- as long as we
moved within the one-year period, I think we have a right to
remove if the appropriate circumstances are checked.

I think in these circumstances there are a lot of
plaintiffs who are only in state court and thus not subject to
removal because they were part of a case that had claims
against the defendant who they individually had no claim
against.

**THE COURT:**  Right.  But what about the problem --
hypothetically, let's say you have a situation where, you know,
ten plaintiffs are joined in a lawsuit.  You know, the case is
tied up in a massive coordinated proceeding.  You know, they
get to the eve of trial, and then all of a sudden the judge
says, oh, by the way, you know, these cases are not going
together; they're going to go one by one, and so I'm
effectively severing.  And then the defendant immediately
removes the cases to federal court on the eve of trial.

I mean, is there a way to -- that's the concern that
Mr. Wisner is effectively expressing.

Do I have that right?

**MR. WISNER:**  Yes, Your Honor.

**THE COURT:**  So is there a way to prevent that?

I mean, if the Court doesn't have the ability to say, not
withstanding the fact that you removed within the one year, you
unjustifiably delayed in removing, what would prevent that sort

1   of harm from occurring?

2       MR. KILARU:  Well, I think we get a year from the

3   order from which it may be first ascertained that the case is

4   one which has been removed.

5       I mean, that's what we have.  We have a year from the

6   point in time at which there's an order or other paper or

7   pleading or whatever the case may be.

8       So I don't know that the scenario you're envisioning,

9   which is I guess -- I guess the scenario would be one of these

10  cases gets to the eve of trial, and then on the eve of trial

11  then the judge says --

12      THE COURT:  That's the scenario.

13      MR. KILARU:  Right.  I don't know that that relates to

14  any of what we're dealing with right now.

15      THE COURT:  No, but because this is an important issue

16  and because --

17      MR. KILARU:  No.  Understood.  If a plaintiff is going

18  to trial in state court and there's complete diversity, and the

19  only reason there hasn't been diversity is because, you know,

20  up until that point the cases have been together, whether

21  proper or not, I would think once it becomes appropriate to

22  sever -- once the cases get severed, I think you would have a

23  right to try to remove the case.

24      Now, in that circumstance a judge could determine that

25  there's so much water under the bridge and there could have

1    been an effort to sever and file earlier and, therefore,

2    there's no basis for doing so.

3         **THE COURT:**  Could a judge do that, I mean, even if

4    it's within the one-year period?  That's the question I guess

5    I'm saying I haven't looked into.

6         **MR. KILARU:**  I would think that if you get that -- I

7    don't know the answer to that off the top of my head.  I think

8    as you get closer to trial a judge's ability to, for example,

9    construe doubt in favor of nonremoval might be a circumstance

10   where that rule would play.

11       I think here the complaints were filed.  You know, there

12   is an order, where a year after the complaint was filed the

13   order is issued, we file within 30 days of that order.  I don't

14   think that that's implicated for any of these cases.

15        **THE COURT:**  It's not for these cases.

16        **MR. KILARU:**  Right.  I understand.

17        **THE COURT:**  I'm thinking about these asbestos cases

18   where, you know, these -- I'm going to try not to use any

19   adjectives.  The defense lawyers in the asbestos cases often

20   wait until the eve of trial and then they file improper

21   removals.

22        **MR. KILARU:**  I guess I would say this:  I think you

23   can expect that, given our general views on multi-plaintiff

24   trials, that if there are multi-plaintiff trials that we

25   believe can be severed, we'll be filing those motions when we

1   think we have the legal ability to do so, including on the

2   grounds that there's' an improper joinder earlier on if we

3   believe --

4        **THE COURT:**  Yeah, I understand.  I'm just trying to

5   figure out what the appropriate rule is sort of generally.

6        **MR. WISNER:**  I would point out, Your Honor, just

7   factually, that actually California rules on joinder are

8   actually much more liberal than federal rules.

9        **THE COURT:**  Is that right?

10       **MR. WISNER:**  Yeah.  And they're interpreted much more

11  liberally.

12       Also, I would point out that Judge Smith specifically

13  contemplated that the --

14       **THE COURT:**  Do you have a cite for that?

15       **MR. WISNER:**  Sure.  It's California Civil Procedure

16  378 through 384.  It's the section on joinder under the

17  California code.  And we actually briefed and litigated this

18  issue quite extensively in the Pilliod case, because they were

19  joined plaintiffs.

20       But I'd also point out, Your Honor, that Judge Smith

21  specifically did not contemplate the statute of limitations,

22  right, restarting or, you know -- because some of these

23  cases --

24       **THE COURT:**  That's none of her business; right?  I

25  mean, you're talking about the removal limitation period?

1          **MR. WISNER:**  No, no, no.  Statute of limitations like

2    for filing a timely claim under California law.  A lot of these

3    plaintiffs that were being severed and refiled would be

4    untimely claims because it's beyond two years from when they

5    should have filed the lawsuits.

6          And for those that --

7          **THE COURT:**  Right.  But I assume that the -- I assume

8    that the -- it seems obvious that the statute of limitations is

9    tolled in that circumstance.  But it also doesn't seem like

10   that answers the question whether, within the meaning of the

11   removal statute, a new action has been commenced.

12         **MR. WISNER:**  Well, why I point to that is it speaks to

13   Judge Smith's intention in the severance.  I don't think the

14   intention was to create new jurisdictional issues or to

15   substantively effect the claims that had been filed.  It was

16   purely an administrative point.

17         And, frankly, as soon as the Court issues an order, I'm

18   going to read it carefully.  I might have to go to Judge Smith

19   next week and say, all right, I think we need to reconsider

20   what we're doing here because this is -- the implication is

21   happening for removal, and I don't know if that was the intent.

22         And I would also point out that she has signaled that

23   there very well may be joint plaintiffs' trials.  The proposed

24   CMC there is to have ten, ten, twenty worked up for trial.  And

25   they may be consolidated for trials in bubbles of ten or sent

 1    back to state court.  She hasn't decided yet.  But she hasn't

 2    suggested there will not be multi-plaintiff trials.

 3        I mean, that's -- that's -- I don't think she --

 4        **THE COURT:**  That's the proposal in your CMC.  That's

 5    not --

 6        **MR. WISNER:**  No, no.  It's hers.  This is an order

 7    that's been issued.  It models the same procedure she's using

 8    in the *Essure* JCCP that she's overseeing as well.  She said

 9    we're using that model.

10        And I believe we're actually in the process of negotiating

11    it, but that's -- I think we've agreed on that premise already.

12    Now, whether or not they will be joined trials or not is

13    something that we're sort of punting on the joint submission.

14    But there's going to be 40 cases worked up at one time, and

15    pretty aggressively.

16        And then she's either going to remand them, consolidate

17    them for trial in Alameda, or maybe consolidate them in Alameda

18    and then remand to state court.

19        **THE COURT:**  I would be very surprised if that's what

20    she was thinking.  I mean, why would she have said -- why would

21    she have said there needs to be a separate complaint unless

22    it's a situation like the -- who are the two people who went to

23    trial?

24        **MR. WISNER:**  The Pilliods.

25        **THE COURT:**  A situation like the Pilliods', it has to

1   be a separate complaint.

2          **MR. WISNER:**  I think she's trying to get a handle --

3   and I think this is what she told us.  She's trying to get a

4   handle on how many actual plaintiffs there are in the case,

5   because that affects how many need to get worked up at a time.

6          Because I think Judge Smith's intention is not -- it's to

7   get these cases done, to get through the JCCP and have us punch

8   through all 4- or 500 of them and get them out.  And that's our

9   viewpoint on it.

10          And so whether they're tried in Alameda or whether they're

11   tried in their home courts, whether there's joined trials, I

12   suspect, frankly, that she has no intention of having 500

13   individual trials.

14          I'm pretty sure there's going to be starting to be

15   joinders as we progressively go down the road and saying, okay,

16   let's do ten at a time, let's do -- and hopefully --

17          (Unreportable simultaneous colloquy.)

18          **THE COURT:**  I can imagine the temptation to do that,

19   but -- sorry, what were you saying?

20          **MR. KILARU:**  I think that -- from my colleagues who

21   are litigating that case and have been at these case management

22   conferences, I think there is nothing close to an affirmative

23   indication from Judge Smith that she is going to be

24   contemplating 10 or 20 or whatever number of plaintiff trials.

25          In fact, the issue of whether the Pilliods would be

 1    jointly tried was something that was briefed extensively.  And

 2    there was actually a tentative ruling saying they shouldn't be

 3    tried jointly, and then -- so she changed her mind on that.

 4        So I think it's way too early to make any kind of

 5    prediction that there would be a multi-plaintiff trial of 10 or

 6    20 or however many plaintiffs in the future.

 7        But, I guess, going back to a point made earlier, if there

 8    is going to be an effort to revisit the severance order after

 9    it's been made, then I think that sort of needs to be backed

10    into whatever Your Honor decides as well.

11        Because if they're going to take the position with Judge

12    Smith that actually the cases aren't severed and so, you know,

13    nothing has restarted, then I don't think we should be out of

14    luck in terms of trying to remove the cases because an order

15    changes afterwards, which is why we sort of understood the

16    order to do the severance, because it says file these

17    complaints separately.

18        **MR. WISNER:**  Just factually, the tentative that he

19    referred to is not by Judge Smith.  It was actually by Judge

20    Petrou.

21        **MR. KILARU:**  Oh, I'm sorry.  Yes, it was by another

22    judge before.  That's correct.

23        **THE COURT:**  Okay.  So here's what I propose we do.

24    We've been going for like an hour and 45 minutes.  Obviously,

25    we have -- I assume it's going to require a fair amount of

discussion, this plan for how to manage the cases.  And we've

got a couple other little things to talk about.  Severance.  I

may have a couple more questions on this remand issue.

     So why don't we take a lunch break and come back at -- why

don't we say 1:00 o'clock, because I have something that I need

to take care of during the lunch break as well.  So why don't

we resume at 1:00 o'clock.  And I assume we'll go for like

another hour or something like that.

          **MR. WISNER:**  Thank you, Your Honor.

          **THE COURT:**  Okay.  Thank you.

                    (Recess taken at 11:43 a.m.)

                    (Proceedings resumed at 1:06 p.m.)

          **THE COURT:**  Okay.  I do want to talk a little bit more

about this remand motion, the California one.

     I was thinking a little bit more about Mr. Wisner's

comments over the lunch break and wondering if it would

actually be more consistent, for the purposes of the rule

statute, to construe it so as to not restart the one-year clock

but to restart the 30-day clock.

     And the 30-day clock would be restarted by, as I said

before, the completion of the severance or the effectuation of

the severance, because until the severance is fully

effectuated, we don't know if the case is going to be

removable.

     So it seems to me that the document that you got from

1   Judge Smith, her order, which I went back and read during the

2   lunch break, does not -- is not a document that actually

3   establishes removability, because we don't yet know what the

4   cases -- what the new complaints that she ordered filed are

5   going to look like.

6       So I think the document that you receive in the litigation

7   that starts the 30-day clock running is the new complaint.  But

8   with respect to the one-year rule, it seems like it's probably

9   a more natural reading of the statute to say that the action

10  has not recommenced -- that the action commenced when it was

11  filed.

12      And in terms of that one-year clock, you know, if the

13  defendant wants to make sure that the severance happens

14  beforehand, they've got to get on top of it.  And sometimes it

15  will work and sometimes it won't work, but it sort of makes it

16  incumbent upon the defendant to try to make that happen in the

17  state court before the year clock runs.

18      **MR. KILARU:**  A couple of reactions.  One, for example,

19  the Gonzalez complaint was filed on March 19, 2018.

20      **THE COURT:**  Okay.

21      **MR. KILARU:**  So if the year doesn't change, it's

22  May 2019 when they refile.

23      **THE COURT:**  Well, when do they refile?

24      **MR. KILARU:**  When they refile, if the year starts

25  again, then I think that -- I guess they would --

1          **THE COURT:**  I'm saying it doesn't start again.  I'm

2    saying I'm kind of -- I think I may be persuaded by

3    Mr. Wisner's point about the one-year period.

4          So, in other words, you're saying the Gonzales complaint

5    is a multi-plaintiff complaint?

6          **MR. KILARU:**  Yes.

7          **THE COURT:**  And it was filed on March 19, 2018?

8          **MR. KILARU:**  Yes.

9          **THE COURT:**  And so what I would say about that is that

10   you -- I think my rule -- this different rule that I'm

11   proposing now would say that your removal -- you can't remove

12   it now because we don't know whether there is jurisdiction over

13   any of those -- we don't know whether there's federal

14   jurisdiction over any of those cases, because they haven't

15   filed their new complaints.

16         And because Judge Smith set a deadline of June 30th, 2019,

17   to file the new complaints, that will be outside the year, and

18   so they will not be removable.

19         And it was incumbent upon -- so any of the complaints that

20   were filed after June 30th, 2018, would still be removable.

21   But the ones that were filed prior to then would not be

22   removable.

23         And had Monsanto wanted to establish federal jurisdiction

24   over those cases, it should have done something to get them

25   severed earlier.

1        And it might not have been able to do so.  It might have

2    been sort of these cases might have been held hostage to the

3    vagaries of the state court system, but that's life.

4        **MR. KILARU:**  Well, respectfully, we disagree with

5    that.  I mean, I think, first of all, it comes back to how you

6    construe her order and what you construe that order to have

7    done.

8        And, yes, it's true that new complaints will be filed on

9    June 30th, but I think the overwhelming presumption in that

10   order is that they will be individual complaints and that it

11   won't be proper to file the same template of complaints that

12   were the reason why we couldn't remove the case earlier.

13       I mean, I think, because the cases got put in -- as you

14   said earlier, because the cases got put in this process where

15   there were eight plaintiffs in Gonzales, for example, who had

16   no basis for being in state court --

17       **THE COURT:**  I understand, but -- you know, so two

18   things.  One, just looking at it strictly from the standpoint

19   of the statutory language, when did this action commence?  I

20   think it's ambiguous.  I think it could probably be interpreted

21   either way.

22       But I think probably the more natural interpretation is

23   that the action commenced on March 19th of 2018, and that it's

24   not a new action commencing on June 30th of 2019.

25       And then I think, again, when you're thinking about the

purposes of the removal statute, which in some ways might be
even more important than the language, given how ambiguous the
language is, you know, I wonder if it's more consistent with
the purposes of the removal statute and with our understanding
of removal to say, you know, it's incumbent on the defendant to
get the case severed within a year so that they can take it to
federal court if they wish.

MR. KILARU:  I guess the reaction to that would be I
think if we're viewing these new complaints as new complaints
that potentially will name new defendants -- and I don't know
if they'll contain other theories or whatever the case may be,
but there's something new that's going to be filed on the 30th.
So that's one thing as to when the action is commencing.

And it's clear that Judge Smith would not be allowing the
complaints, in their existing form, those actions to commence.
So I think that's one reason to think of what's going to happen
on June 30th --

THE COURT:  Well, is that the right way to think of
it?  Or is the right way to think of it that the action
commenced in March of 2018, and she's not allowing them to go
forward in their current form?

MR. KILARU:  Well, I think they're ended in their
current form.  They don't exist in their current form.  There's
new pleadings.  For example, Gonzales, I think, would have to,
presumably, involve ten different complaints filed by ten

1   different plaintiffs.

2        And maybe there'll be other parties named.  I don't know

3   how the complaints will be different, but that action doesn't

4   exist anymore other than in the sort of fictional sense that,

5   until the 30th, it's sort of still on the docket.

6        **THE COURT:**  Well, it doesn't exist any less than when

7   you, you know, dismiss -- you know, there's a 12(b)(6) motion

8   and you dismiss a complaint with leave to amend, and then a new

9   complaint is filed 21 days later.

10       During that 21-day no man's land, you know, in the sense

11  that you're describing, there's no -- there's no complaint that

12  exists, but we still would all understand the action to have

13  begun at the time when the original complaint was filed, even

14  though it was dismissed with leave to amend.

15       **MR. KILARU:**  Right.  But, presumably, in that case you

16  wouldn't have a fundamentally different action that's coming

17  out the other side taking -- going from ten plaintiffs added

18  together, making claims against a variety of defendants, some

19  of whom they wouldn't be able to make claims at --

20       **THE COURT:**  Is it really fair to characterize it as a

21  fundamentally different action?  I mean, it's largely the same

22  action brought by the ten plaintiffs, just in separate

23  lawsuits.

24       **MR. KILARU:**  And I would think against not some of the

25  defendants who were parties to the previous case --

1          **THE COURT:**  Right.

2          **MR. KILARU:**  -- which is sort of the nature of our

3     objection.

4          **THE COURT:**  Right.  But people -- I mean, again, in

5     regular litigation, you know, you file a lawsuit, you name

6     three defendants, you drop a defendant along the way.  That

7     doesn't somehow make it a different action.

8          **MR. KILARU:**  That may be the case if you, the

9     plaintiff, decide to drop that action.

10         But in this case, these complaints were filed.  I think

11    Judge Smith said these are not going forward as they are; file

12    new complaints by June 30th.

13         And so as they are today, the only --

14         **THE COURT:**  Just like you say, under Rule 12(b)(6),

15    this is not going forward as it is.  File a new complaint in 21

16    days.

17         **MR. KILARU:**  I guess we think -- our position is that

18    it's fictional to think of these cases as continuing on in

19    their current form only up until the point at which a new

20    complaint is filed, in which case it's still the same action

21    but we don't have a right to remove it.

22         I mean, I think the judge issued an opinion that says

23    these cases --

24         **THE COURT:**  Well, I'm saying you do have a right to --

25    what I'm proposing -- again, I'm thinking more in terms of what

1   the right rule should be generally, and then let's figure out

2   how it applies to your ten cases that we're talking about.

3        But I think the answer is you do have the right to remove

4   it once the new complaint is filed, unless it's past the year

5   mark.  Right?  That's the point.

6        So even though it's not a new action that's been

7   commenced, even though it's a continuation of the same action,

8   the document that is filed that allows you -- that gives you

9   the right to remove is the new complaint, which establishes

10  that there is removal jurisdiction.  Right?

11       And until then you don't know if there's removal

12  jurisdiction.

13       MR. KILARU:  I guess I'd say right now we have a

14  series of complaints against -- by certain plaintiffs against

15  certain defendants.

16       We know that those complaints have been split up.  And we

17  know against which defendants the individual plaintiffs could

18  plausibly allege a claim, which I think is enough of a basis

19  for these cases to be removed.

20       Because we know that for eight of the defendants in one of

21  the actions, for example, Gonzales, and for four in another and

22  six in another, there's no basis for that case -- we believe

23  there wouldn't be a basis to defeat removing the case to

24  federal court.

25       And I think the one-year bar shouldn't be construed to

1    sort of, on the one hand, allow the sort of action to -- I

2    guess I would say I don't think we can view the June 30th

3    filing as simultaneously not something that retriggers the

4    one-year bar but something that allows removal to be defeated

5    because it is a new case and a new complaint.

6          **THE COURT:**  Why not?  I mean, that happens all the

7    time in removal; right?

8          I mean, in the normal case where the case is not

9    immediately removable, you say, okay, when was the document

10   filed that shows us that there's federal jurisdiction that

11   triggers the 30-day clock for us to remove?

12         And then we have to separately ask, well, did this happen

13   within the one-year period?  And if it didn't happen within the

14   one-year period, tough luck for the defendant; right?  So why

15   shouldn't the same concept apply here?

16         By the way, even in the normal case, there's any number of

17   reasons why it might be tough luck for the defendant; right?

18   The trial judge in state court might take too long to rule on

19   something that, you know, causes there to be jurisdiction.  Or

20   it may take too long to get discovery responses from the

21   plaintiffs' side that establishes the amount in controversy.

22   Or whatever the case may be.

23         But isn't the answer typically tough luck for the

24   defendant then?

25         **MR. KILARU:**  I think the incentive it creates the

1    other way is basically do what happened here.   File a complaint

2    grouping a bunch of people together, including one plaintiff or

3    two or more who have a claim against a California defendant,

4    and then, you know, whether or not we get PFS or whether or

5    not the complaints give us -- in some of these cases the

6    complaints did give us enough of a basis to believe that there

7    was a fraudulent joinder, but in other cases it wasn't until

8    the PFSs were filed.

9        And it sort of creates an incentive to say, let's put

10   these case into a state court proceeding and hope that a year

11   runs before there's some kind of order that launches the filing

12   of a new complaint.

13       I think this event that's coming up, the filing of new

14   complaints, is not something that would typically happen.

15       **THE COURT:**  Well, could you -- you mentioned the PFS.

16   I mean, maybe if the PFS is filed, you know, maybe you should

17   have filed your notice of removal then.   I don't know.

18       **MR. KILARU:**  We had a year to file.   I mean, it says

19   we have a year.   We filed it within the year.

20       **THE COURT:**  Well, no, you have 30 days from the time

21   that something --

22       **MR. KILARU:**  Yeah, the order that gave us -- the order

23   that made clear that there are -- that we can break out these

24   individual plaintiffs, who clearly don't have a claim against

25   Monsanto, was the order that Judge Smith issued.

1          **THE COURT:**  Why wasn't it, the PFS, filed by the

2     individual plaintiffs who showed that they didn't -- if those

3     PFSs showed that they didn't have legitimate claims against the

4     nondiverse defendant, why wasn't it the PFS the document that

5     should have triggered the 30-day clock?

6          **MR. KILARU:**  If a PFS is construed as an other paper,

7     I think that that would be -- I think it's not clear that the

8     PFS would be considered an other paper.

9          I think if the rule going forward is that a PFS would be

10    considered an other paper, then it would be the basis for

11    triggering removal.  And the PFSs are filed in the ordinary

12    course.  I think that would be helpful to avoid this problem

13    coming up in the future.

14         What we have here is sort of a situation where --

15         **THE COURT:**  I think you didn't -- I think the reason

16    you didn't remove on that basis is because you sort of had an

17    understanding that so long as these plaintiffs are jumbled

18    together in the same complaint and, you know, looking at all

19    the defendants and all the plaintiffs, there's not complete

20    diversity, we can't remove it.  And I think that's probably

21    right.

22         But, you know, to the extent that you're saying that the

23    PFSs disclosed that there was some sort of, you know,

24    fraudulent joinder or improper joinder, then the time to -- the

25    time to remove would have been then, I would think.

1      But to the extent you're basing your removal argument on,

2  you know, the order, Judge Smith's order, you know, I guess I

3  still think that the filing of the new complaint that she

4  required is -- you know, is the triggering event, because we

5  don't yet know what that new complaint is going to say.

6      And if you really wanted to be able to remove these cases,

7  you know, maybe you should have filed a motion in the superior

8  court earlier on saying, look, these are -- these things are

9  improperly joined.

10      And if the state court said, no, they're not improperly

11 joined, then again you're out of luck.  I know it's hard.  I

12 feel -- you know, again, I feel a real obligation in this case

13 to think about how it would apply in other cases.

14      **MR. KILARU:**  I guess it just seems an odd rule to me

15 that if the state court incorrectly determines that cases that

16 shouldn't be joined are joined that defeats our right to

17 removal, when it's clear that some of the plaintiffs don't have

18 a valid claim against the defendants that would be jurisdiction

19 and federal jurisdiction.

20      We cite a number of cases in our papers where, you know, a

21 removal was filed and the Court determines when the removal is

22 filed.  Looks at it, there isn't a valid claim against one of

23 the defendants, and so severs -- and so severs that plaintiff

24 off and says the other cases stay in the court.  Which is

25 exactly what I think we're asking for here, because we have an

order that says, effectively, these cases cannot continue as
consolidated.

THE COURT:  Okay.  I'll think about it a little more.

Is there anything anybody wants to add on this side?

MR. WISNER:  I think Your Honor is also sort of --
what is the complaint right now that was removed to this court?
And that one doesn't have proper jurisdiction in this court as
it's written.

So we have to see what the complaint looks like when
they're refiled, and then we'll see, okay, is there a proper
grounds for removal at that point.  And that's, I think,
exactly what you're saying.

THE COURT:  Although, what about in a situation
where -- I know we're going kind of back and forth here.

MR. WISNER:  Sure.

THE COURT:  What about a situation where a state court
says, look, I'm concluding now that these cases are not going
to be tried together, but I'm not going to make you go through
the administrative hassle of filing separate complaints and
paying separate filing fees and all that; I'm just declaring
that, with respect to this complaint, these cases are all going
forward separately?

MR. WISNER:  Well, then I think at that point it's
incumbent upon the defendants to file immediately to sever a
specific case because they believe it needs to be removed to

 1   federal court --

 2          **THE COURT:**  Why would they have to file a motion to

 3   sever in state court first?

 4          **MR. WISNER:**  They have to get not only a motion to

 5   sever, they'd have to sever it and have a new case that's

 6   properly removable brought to the federal court.

 7          And there's mechanisms in state court to do that.  You can

 8   get ex parte motions that get resolved in 24 hours.  I mean,

 9   there's plenty of ways to deal with these issues on an

10   expedient basis.  They didn't do that.

11          And, you know, there was maybe a strategic shift in their

12   decision on how to litigate these cases.  That's fine.  But

13   saying, okay, now we have this order that they're going to be

14   severed at some point in the future and they're going to have

15   to file new cases -- and, you know, frankly, we're thinking

16   about how we're going to plead those new filings.

17          You know, maybe the Wilbur Ellis defendant, that they say

18   is fraudulent joined, isn't fraudulently joined.  I mean, we

19   have allegations that might relate to non-IT&O situations where

20   I think we could properly name them as a defendant even though

21   they didn't distribute that specific Roundup.

22          I think they're things that they've done, that we can

23   prove, and we have the evidence to back it up.  So, you know, I

24   think we -- I think we don't know.

25          I think we have to see what that complaint looks like and

1  see, okay, when that's removed, is there a proper basis for

2  removal?  If it's one year from the commencement of the thing,

3  well, sorry.  If it has properly diverse -- if it's not

4  fraudulently joined, okay.

5      I think we have to look at it when we see it.  I think

6  that's the right approach.

7          MR. KILARU:  And just on the point about whether we

8  have to get a formal order from the state court severing to

9  have a right to remove, I mean, I just think there's no legal

10  support for that.

11      There's a number of cases we've cited in our briefs.  I

12  think the *Martinez* case that we cite, but there are other

13  examples; *Sutton*, *Greene*, *Baycol*.  In a lot of these cases, the

14  severance happens by the federal court after some order by the

15  state court, or it just happens in the context of removal.

16          THE COURT:  But isn't that kind of strange?  I mean, I

17  really -- I guess I kind of question that.  I mean, you have --

18  you have one lawsuit, you know.  And the statute speaks in

19  terms of removing actions; right?

20          MR. KILARU:  Right.

21          THE COURT:  And so you've got an entire lawsuit coming

22  up to federal court even though, if you examine the lawsuit in

23  its entirety, there's no jurisdiction.

24          MR. KILARU:  Well, I think what happens in these

25  cases --

1          **THE COURT:**  We don't remand claims.  You know, we

2     don't remand parts of lawsuits.  We remand lawsuits.

3          **MR. KILARU:**  I think that that actually -- in the

4     sense of claims against multiple defendants or claims against

5     multiple plaintiffs, I think it is often the case that

6     individual pieces of a lawsuit, whether a particular

7     plaintiff's claim against a particular defendant or a

8     particular plaintiff's case, period, gets sent back.  I mean,

9     we have cited examples of that.

10          **THE COURT:**  I think there are examples of that.  I'm

11    just not sure they're right.  I'm not sure -- I'm not sure that

12    the courts correctly thought through that issue.

13          **MR. KILARU:**  I think on that I'd say if we look at a

14    complaint and we believe, based on sort of where things are in

15    litigation, and there's some development that would make a

16    defendant believe that the case has been fraudulently joined

17    and that there's a party that shouldn't be attached on either

18    side of the V, that there are many examples -- and I think this

19    is the right thing to do -- of removing those cases.

20          And the courts then assessing -- the federal courts

21    assessing whether those arguments are valid.  Because,

22    otherwise, you get into the exact problem of, if you constantly

23    have to wait on the state court to issue some kind of

24    definitive ruling to trigger a right to removal, you may never

25    have a right to remove at all.  I think that's what these cases

1   reflect.

2          THE COURT:  What are the cases -- why don't you sort

3   of tally the cases that you want me to go back and look at on

4   that point.

5          MR. KILARU:  Sure.  Let me put together the briefs in

6   the cases so I can give citations.

7        So there's the *Sutton* case, which if I can just grab --

8          THE COURT:  Just give me the names.  I know they're in

9   your papers.  I haven't read all the cases in your papers.

10          MR. KILARU:  I think I have everything in one place

11   though.  Give me one second.

12        There's *Sutton*, which is 251 FRD 500.

13          THE COURT:  I don't need the cites.  Just give me the

14   names.

15          MR. KILARU:  There's a *Greene* case, G-r-e-e-n-e.

16   *Baycol*, B-a-y-c-o-l.  *Morris*, M-o-r-r-i-s.  *Martinez*,

17   M-a-r-t-i-n-e-z.

18          THE COURT:  And those are the cases that stand for the

19   proposition that it's okay to sort of pull up -- pull one

20   lawsuit out of state court where, you know, if you consider the

21   lawsuit in its entirety, there's no jurisdiction, but then kind

22   of separate it out in federal court and send part of it back

23   down to state court?

24          MR. KILARU:  Yeah, so I think *Martinez* and *Baycol* come

25   to mind, but they're a case where a plaintiff filed suit

1    against a group of defendants.  One of those defendants is from

2    the same state as the plaintiff.  The Court concludes that

3    there's no basis for a claim against that defendant, the

4    diversity-defeating defendant, dismisses them, and keeps --

5              (Unreportable simultaneous colloquy.)

6              **THE COURT:**  -- cases?

7              **MR. KILARU:**  -- the case in federal court.

8         I'm not sure.  I guess so, in the sense that they say --

9    so, for example, in *Martinez* the case goes up.  And McKesson,

10   which was the distributor defendant in that case that defeated

11   diversity, files a declaration, I believe -- it was either a

12   declaration or an affidavit -- saying, we don't distribute this

13   product, we've never distributed this product in this state.

14   And on that basis the Court says we're going to deny a motion

15   to remand because McKesson shouldn't be in the case.

16             **THE COURT:**  That's a little different, though, from

17   pulling up a case out of state court, multi-plaintiff case, and

18   then sifting through the case and deciding which plaintiffs can

19   stay in federal court and which plaintiffs should go back to

20   state court.  Because that's effectively what you're asking me

21   to do here; right?

22             **MR. KILARU:**  I think *Baycol* is similar to that then.

23   I think there was a group of plaintiffs, one of whom was in

24   state with the defendant.

25        All the cases go up.  The Court determines that they don't

1   believe that that plaintiff's claims have enough in common with

2   the other plaintiffs, and so they send that one back, I guess,

3   and they --

4           **THE COURT:**  I will certainly read the case, but that

5   sounds wrong to me.  That sounds wrong.  It sounds like that

6   entire case should have been remanded because there was no

7   jurisdiction over the action.

8       But I'll give it a little more thought.  I understand that

9   it's important, not just for the ten motions here but other

10  motions in other Roundup cases as well as other cases.

11          **MR. WISNER:**  Your Honor, on the other side of that,

12  legally, there's actually cases that say you cannot do that.

13  You can't break up the plaintiffs.  And we've cited it in our

14  briefs.

15      The *In Re Pradaxa* case, which is exactly on point, says

16  you cannot -- basically, the argument is you have to use Rule

17  21, right, to sever out the plaintiffs.  But you don't get to

18  get to Rule 21 unless you have jurisdiction.  And so if you

19  don't have jurisdiction, you go back.

20      And there's the *In Re Pradaxa* case.  There's the *Garby*

21  *versus Diamond Kaiser*, Seventh Circuit case they discussed in

22  passing.  And the *Moore v. McKesson Corp.*

23          **THE COURT:**  Okay.

24          **MR. WISNER:**  Thank you, Your Honor.

25          **THE COURT:**  I'll give that a little more thought.

1          So what should we turn to now?  The issue of how to manage

2     all of these cases in the MDL?  Is that next on the list

3     probably?

4               **MS. WAGSTAFF:**  Sure, Your Honor.

5               **MR. STEKLOFF:**  Yes, Your Honor.

6               **THE COURT:**  Okay.  I sort of put out a tentative plan

7     somewhat similar to what you proposed, not exactly what you

8     proposed.  Very different from what you proposed.

9          So what's wrong with my plan?

10              **MR. STEKLOFF:**  Well, I think, Your Honor, what we --

11    you know, and we made this point in our brief, so I don't want

12    to belabor it, but I think, as you know, this is a national

13    litigation.  There are cases filed all around the country.

14         We have three data points now.  Only one federal data

15    point, to be clear, but three data points in California;

16    specifically, in the Bay Area.

17         Even this morning we heard that there will be more data

18    points in the JCCP, in state court in California, either

19    potentially in Alameda or, if it gets remanded, around the

20    state.

21         I think that plaintiffs' counsel has said to Judge Smith

22    that they have at least three more cases where they haven't

23    filed them yet, but they plan on seeking preferential

24    treatment.  So we know there are going to be a number of trials

25    in California.

1          And what our plan sought was to get data points outside of

2    California because I think it's important given that the

3    litigation has been filed all around the country.

4          **THE COURT:**  But California is a pretty diverse state.

5    I mean, if we start with the California cases -- and the

6    reason -- I'll just tell you.  I can't remember if I put this

7    in the order or not, but there are two primary reasons that I

8    propose to start with California.

9          One is that -- what's the plaintiff's name?  Is it --

10         **MR. STEKLOFF:**  Giglio.

11         **THE COURT:**  Giglio?  That plaintiff is in the Southern

12   District of California; is that correct?

13         **MS. WAGSTAFF:**  That's correct, Your Honor.

14         **THE COURT:**  So that was one reason to start with

15   California, is that there's one plaintiff who's dying, who we

16   want to get to trial as soon as we can.

17         The other is just that on some level it would be easiest

18   to adjudicate the summary judgment motions in those cases

19   because we're applying California law, which is what we already

20   did in the first three.  Right?

21         So, you know, but the cases would go to the Southern

22   District of California, to the Central District of California,

23   to the Eastern District of California.  It's a very diverse

24   state.

25         You know, to the extent that you think you might be able

1    to win in other jurisdictions that are less like the Bay Area,

2    you're going to be sent to those jurisdictions within

3    California.

4        So I guess I'm not -- you know, plus, you're going to be

5    doing these trials in Missouri.  Right?  There are these state

6    court trials that are scheduled in the fall in Missouri.  So

7    the data point argument that you make, I don't really find that

8    persuasive.

9            **MR. STEKLOFF:**  But there's other law that applies to

10   other individuals in terms of what the test is for a

11   substantial contributing factor --

12           **THE COURT:**  And we're going to adjudicate those

13   questions on summary judgment here.  Right?

14           **MR. STEKLOFF:**  I understand that, but in terms of

15   trials, just as an example, having different law -- it's not

16   just jury pools.  I understand why that is an issue.  But it's

17   not just jury pools.  It's also the operating law that applies

18   as well.  And so --

19           **THE COURT:**  So what would be your favorite state to go

20   to?

21       (Laughter)

22           **THE COURT:**  What would be -- if we were to pick a

23   first state, what would it be?

24           **MR. STEKLOFF:**  You're putting me on the spot.  On the

25   law, it's typically defendants say Texas or Michigan.  On the

facts here, I would probably pick, you know, where glyphosate

is used heavily in agriculture.

            **THE COURT:**  North Pole?

        **MR. STEKLOFF:**  For all the benefits that it provides,

particularly in agriculture places, where it's used everywhere

and people aren't developing non-Hodgkin's lymphoma, in our

view.

            **THE COURT:**  So isn't that like Missouri?

        **MR. STEKLOFF:**  Well, we will be going to Missouri, but

here we're here to deal with the federal cases.

        And so, look, there were many California cases that were

part of our plan under what we proposed with the first in/first

out.  We weren't saying --

            **THE COURT:**  No, I understand.  I just don't -- from my

standpoint, from the standpoint of managing the MDL, I don't

think -- you know, to the extent there are meaningful

differences in the law of causation in the different states, I

don't think it makes sense to be -- to do the first in/first

out approach because then, with each wave of cases, I'm going

to have to sift through the law of, you know, 20 different

states and try to differentiate.  It's going to be like a

Rubik's Cube.

        **MR. STEKLOFF:**  That's why I think, based on your order

yesterday, an alternative plan would be to include California

but pick a few other states.  And I don't know the magic

1    number, whether it's three or four.  Work those cases up.

2        I mean, both sides agreed -- actually, that wasn't even

3    negotiation.  When they proposed their plan first and sent it

4    to us, they had 50 cases that they expected to be remanded back

5    as part of their plan.  We also independently had approximately

6    50 plaintiffs who would have been remanded back.

7            THE COURT:  So is that to say that there are only 50

8    California cases?

9            MR. STEKLOFF:  No.  I actually wanted to flag that.  I

10   think in their plan there were 16, including Giglio and Stevik.

11   But there may be other California cases filed, for example, in

12   the Eastern District of Missouri, where -- I mean, there are

13   choice-of-law issues, but there may be plaintiffs who used

14   Roundup or were diagnosed with non-Hodgkin's lymphoma in

15   California, but, nonetheless, filed in the Eastern District --

16           THE COURT:  Yeah.  We started looking at that in the

17   last couple of days and came to the conclusion that if a

18   California plaintiff was exposed in California and filed a

19   lawsuit in Missouri, under Missouri choice of law law,

20   California law would apply.

21       And so that's the assumption we're going to operate on

22   unless you present something -- or unless either side presents

23   something to the contrary.

24       So, in other words, if a Californian filed a lawsuit in

25   Missouri, we're going to assume California law applies, so that

```
 1    would be in the California group.

 2            MR. STEKLOFF:  Understood.

 3            THE COURT:  And that would result in -- presumably,

 4    that would result in the case -- that case going back to

 5    Missouri.

 6            MR. STEKLOFF:  I agree with that.

 7            THE COURT:  And maybe there would be some other

 8    California -- are there other states?  No, probably just

 9    Missouri; right?

10            MR. STEKLOFF:  I have not checked since the order came

11    out last night, but I think it's most likely either in

12    California or in Missouri.

13            THE COURT:  Missouri.

14            MR. STEKLOFF:  Yeah.

15            THE COURT:  So in the first wave, we'd be -- under my

16    plan, we would be sending cases back to their home districts in

17    California and perhaps some handful of cases to Missouri for

18    trial.

19            MR. STEKLOFF:  And I guess --

20            THE COURT:  But under California law.

21            MR. STEKLOFF:  You could also have a plaintiff who now

22    lives in Arkansas but used Roundup in California, was diagnosed

23    with non-Hodgkin's lymphoma initially in California, has

24    subsequently moved.  And then you have to look at the --

25            THE COURT:  The problem you identify of the trial
```

1    applying California law remains; right?

2              **MR. STEKLOFF:**  Yes.

3              **THE COURT:**  So that doesn't address the problem that

4    you're concerned with.  So you're saying we would want to

5    add -- like maybe let's do California and one other state.

6    Like pick your best state.

7         I mean, I guess, in theory, I don't have an objection to

8    that, so long as it's manageable.

9              **MR. STEKLOFF:**  And I think we could make it

10   manageable.  I read your order.  I'm not pushing for first

11   in/first out.

12             **THE COURT:**  The key to making it manageable, I have a

13   feeling, is how reasonable is Monsanto going to be in the case

14   management process; right?

15        Because, you know, you could imagine a defendant trying to

16   make unimportant differences between cases seem important and

17   saying, you know, these 50 cases are all very -- you know, here

18   are ten distinctions between each of these cases and the cases

19   you already ruled on.  And, you know, most of those differences

20   are really not meaningful.

21        Or you could kind of play ball in the MDL and say, all

22   right, we concede -- preserving our appellate rights, we

23   concede your prior summary judgment rule applies to these 40

24   cases, but for these five cases we believe that there's

25   something meaningfully different that requires you to

```
 1   adjudicate.
 2        So, you know, I think -- so, in theory, I don't have a
 3   problem with taking a shot at, you know, doing California and
 4   another state.  But if it seems like it's too much, then I
 5   would think we would revert to just looking at California or
 6   just the Southern District of California or something like
 7   that.
 8        MR. STEKLOFF:  And so maybe what I would propose is
 9   that, you know, within a week we make a proposal about another
10   state or another two states.
11        And that will also help you know the number of cases that
12   just -- you know, might not be perfect because we're not -- I
13   don't know that we're able to go through all the Plaintiff Fact
14   Sheets, but generally how many cases are filed in a certain
15   jurisdiction with the expectation that that law applies.  And
16   then --
17        THE COURT:  Presumably, you would want to pick -- I
18   mean, you would want to pick a state where you think the law on
19   causation is different --
20        MR. STEKLOFF:  Correct.
21        THE COURT:  -- is more -- you know, more favorable to
22   defendants.
23        MR. STEKLOFF:  Yes.
24        THE COURT:  And is it really true that there are only
25   around 50 California cases of the 1300 cases that we have?
```

1          **MS. WAGSTAFF:**  So in our proposal we had listed all of
2     them, and there was 16.
3          **THE COURT:**  16?
4          **MS. WAGSTAFF:**  16 actually directly filed into a
5     California district.
6          **THE COURT:**  Oh, I thought there were a lot more than
7     that.
8          **MR. STEKLOFF:**  Their 50 were the whole Ninth Circuit.
9     So when you broke it down, of the California districts it was
10    only 16.
11         **THE COURT:**  Okay.
12         **MS. WAGSTAFF:**  And there are ten in the
13    Central District.
14         **THE COURT:**  Right.  I saw the breakdown within
15    California.
16      So that makes me think that it may well be manageable to
17    do California and one or two other states in the first wave.
18         **MR. STEKLOFF:**  Right.  Because I think that 50 number
19    that both sides independently reached is a realistic number.
20      And I realize we shouldn't do eight states because then
21    the burden it would put on you.  But I think we could
22    accomplish it with -- I don't know whether the magic number is
23    two, three, or four, but I think we go back and look and can
24    make a proposal.
25         **THE COURT:**  Well, the other thing you may want to do

```
 1   is you may want to look at the states and say-- I guess, here's
 2   what I would be inclined to do is, California law and one other
 3   law.  Okay?
 4       So you might say -- you might identify two states where
 5   you say the law in those states is different from California,
 6   but they're identical to one another.  And if the parties
 7   stipulate to that, then I can just -- I don't have to pay
 8   attention to which state the case is coming from.  I can just
 9   read the cases and apply the law.
10       And, you know, maybe we could do -- maybe something like
11   that would work.  But I think maybe -- and particularly if it's
12   only -- if we're only talking about, you know, 16 cases from
13   California and then five cases from some other state or
14   something, that might work.
15           MS. WAGSTAFF:  And so, Your Honor, I would ask that
16   plaintiffs get to propose a state, or we jointly propose a
17   state, or we propose two states.
18       The reason why we proposed California is because we're
19   here.  And Monsanto had refused to wave *Lexecon*, so the Court
20   has spent most of its time --
21           THE COURT:  You refused to wave *Lexecon* too.
22           MS. WAGSTAFF:  Well, we didn't have to.  We had
23   Mr. Hardeman.
24           THE COURT:  I know, but you refused to wave *Lexecon*.
25           MS. WAGSTAFF:  Some plaintiffs have, yes.  But, for
```

1    example, Mr. Giglio has said he will try his case up here.

2            **THE COURT:**  Oh, yeah.  Right.

3            **MS. WAGSTAFF:**  So that's why we went down the

4    California path in the first place.  Right?  And so that's sort

5    of why we agree with you that --

6            **THE COURT:**  I think we're going to let Monsanto pick a

7    state.  Things have been going pretty well for you.

8            **MS. WAGSTAFF:**  All right.

9            **THE COURT:**  Let's give Monsanto a chance.

10       So I think that's fine.  So I assume -- I mean, are the

11   vast majority of these cases from Missouri?

12           **MR. STEKLOFF:**  I think the vast majority of the cases

13   have been filed in Missouri in the federal MDL, but I think

14   that runs into the issue of -- I don't think that necessarily

15   means that Missouri law applies in the vast majority of those

16   cases.

17           **THE COURT:**  Got it.

18           **MR. STEKLOFF:**  And so cases have been filed -- I think

19   we put in our paper over 50 districts around the country, so it

20   really is nationwide.  But I do think if you look at a

21   percentage, there are a large number of cases that have been

22   filed in the Eastern District of Missouri.

23           **THE COURT:**  Okay.  Let's say that we decide that it

24   would be workable to do California and one other state at the

25   same time.  I'm talking about not where the cases are filed but

what law applies.  Right?

     And the goal is to adjudicate summary judgment motions on those cases, figure out which of those cases my prior summary judgment rulings apply to and which cases have significant differences that require further adjudication other than me saying the motion for summary judgment is denied for the reasons stated in my prior ruling.  Right?

     And that's the goal.  Right?  As many cases as we can identify where we say summary judgment is denied for the reasons stated in my prior ruling, the faster we can get those cases out to trial and, hopefully, to a state that, you know, you think might be a little better.  So that's really the goal.

     But perhaps there will need to be some individualized adjudication of some of these summary judgment motions.  So how soon can we do that?  When can we get those adjudicated?

          **MS. WAGSTAFF:**  So I propose that we put a CMO proposal to you within ten days.

          **THE COURT:**  Case management order proposal?

          **MS. WAGSTAFF:**  Yeah.

          **MR. STEKLOFF:**  I think it's worth us meeting and conferring.  I think on the macro issues of state law, whatever other jurisdiction is chosen, we may be able to put those on a different track.

     Obviously, there will be individual issues, as you just mentioned, like statute of limitations, that will require the

1    discovery of the plaintiff or the doctors that may then raise

2    different summary judgment issues.

3        So I just want to differentiate there's sort of the

4    macro -- is this, you know, failure to warn claim valid under

5    California law?  I think that was one of the issues raised in

6    the Hardeman -- before the Hardeman trial, which you denied.

7        But then there are like the Gabayou statute of limitations

8    issue, which require the deposition of Mr. Gabayou and his

9    doctor, for example.  So that's going to be -- I would think

10   either we do it all in one track or potentially on a different

11   track.

12       We can also discuss in our discussions, once we know the

13   number of cases, how long it will take to do discovery of

14   plaintiffs, of the treaters, of family members.  And then

15   obviously there will need to be expert disclosures as well.

16       **THE COURT:**  My view is that -- as I've previously

17   expressed, my view is that getting these cases going and

18   getting the summary judgment motions adjudicated and getting

19   them out for trial is a bigger priority.  And my time is better

20   spent on that than trying another case.

21       And so I want to set an aggressive schedule for making

22   that happen.  So, I mean, what are you thinking in terms of

23   ballpark?

24       **MS. WAGSTAFF:**  So your order just came out last night,

25   but I spoke with the plaintiffs' leadership team and we were

```
 1   thinking if it was just going to be the 16 California cases --

 2   well, actually, taking Stevik out, Daubert sometime around

 3   October.

 4           THE COURT:  Daubert summary judgment in October?

 5           MS. WAGSTAFF:  Yeah.  And with the hope that today you

 6   would order that those cases would be unlocked from the

 7   discovery stay.

 8           THE COURT:  Does that sound about right?

 9           MR. STEKLOFF:  I think we add cases -- I think

10   sometime this year sounds about right.  I don't know if October

11   sounds about right.

12        But, you know, there are a number of depositions that need

13   to happen in every case.  And then you need experts in every

14   case, both general causation experts, which I do not believe

15   should be locked in from something that happened a year and a

16   half ago, and then specific causation experts to assess the

17   depositions, to assess the medical records.

18        We have to collect medical records, which on our side is a

19   time-consuming process.  So I'm not suggesting it should take a

20   year, but, you know, I think this year -- sometime this year,

21   ballpark, makes sense.

22           MS. WAGSTAFF:  And, Your Honor, we could start with

23   the California cases.  And while we're figuring out the second

24   state, we could sort of stagger that maybe 60 days behind or

25   something like that.
```

1          **THE COURT:**  Well, I certainly see no problem in

2     lifting the discovery stay for the California cases right now.

3          **MS. WAGSTAFF:**  Okay.

4          **THE COURT:**  And that could be the 16 California cases

5     and any other cases that both sides agree are governed by

6     California law.  And so then the nice thing about that is then

7     you can go back and look at, well, how many other cases are we

8     talking about?

9          So how many cases -- again, it would still be governed by

10    California law, so it doesn't quite get at your problem.  But,

11    yeah, I mean, I think we can agree on that now, that the

12    discovery stay for those 16 California cases and any other

13    cases governed by California law is lifted now.

14         And you guys should start cranking on those cases and

15    getting them ready for summary judgment and *Daubert*.  Again,

16    it's just the *Daubert* motions that are intertwined with summary

17    judgment that I want to deal with.

18         Did that make sense to you?

19         **MR. STEKLOFF:**  A little more clarification might help

20    in terms of what you were proposing.

21         **THE COURT:**  Right.  Well, for example, I mean, there

22    are a number of other motions to exclude expert testimony in

23    the last trial --

24         **MR. STEKLOFF:**  Uh-huh.

25         **THE COURT:**  -- right? -- where my granting or denying

1    the motion wouldn't have affected summary judgment.  It might

2    have affected how -- you know, it would only have affected what

3    evidence came in at trial.  I think those issues should be left

4    for the trial judges, is my instinct anyway.

5            MS. WAGSTAFF:  So to put a point on it, you're talking

6    about Dr. Sawyer or Dr. Benbrook, those types of experts?

7            THE COURT:  Right.

8            MS. WAGSTAFF:  You do not contemplate us disclosing

9    them at this time?

10           THE COURT:  I mean, we can have a discussion about

11   whether you should be disclosing them.  And we may, in fact --

12   we may want to for Giglio --

13           MS. WAGSTAFF:  Giglio.

14           THE COURT:  Giglio, sorry.  For Giglio, we may want to

15   set a more aggressive schedule that gets it even more ready for

16   trial in San Diego or the Southern District of California.

17       But, generally speaking, I would -- I wasn't referring to

18   disclosure of experts as much as I was adjudication of *Daubert*

19   motions with respect to those experts.

20       Those experts -- I think the trial judge should decide

21   those questions because the trial judge should be in complete

22   charge of how the trial is going to go; you know, whether the

23   trial is going to be bifurcated or not.

24       I'm sure I'll start getting a lot of calls about that from

25   judges around the country at some point, but that should be

1   their decision.

2        And, you know, whether Benbrook can testify or whether

3   somebody can testify about the EPA's, you know, regulatory

4   system, that's for the trial judge to decide, I would think.

5        **MS. WAGSTAFF:**  Understood.

6        **MR. STEKLOFF:**  On that point of bifurcation, my

7   understanding is that when you remand the cases an order goes

8   along with that in which -- within which we would request that

9   you -- you know, I don't think you can order judges to follow

10  bifurcation, but recommend bifurcation based on your experience

11  post Hardeman.

12       And so I'm just putting a pin in that, that when that

13  comes out, which -- whenever it is, I think that we would

14  request that.

15       **THE COURT:**  I mean, if somebody called me and asked

16  me, I would say I think that aside from the misconduct in the

17  opening statement, that bifurcation worked well.  It's a little

18  more challenging for the judge, but I think it's a -- I think,

19  you know, I think it worked well.

20       But whether to put that in a memo or something, I don't

21  know.  I don't know if that's appropriate.

22       **MR. STEKLOFF:**  On the specific causation *Dauberts*,

23  Nabhan or Weisenburger, I just want to preserve -- I understand

24  the sort of operating presumption that Ninth Circuit law will

25  govern -- if you're ruling on those, will govern your decisions

1    there.

2        And we can litigate this later, but I think there are

3    cases that go other ways, as well, as the case is coming.

4            **THE COURT:**  Yes.

5            **MR. STEKLOFF:**  The California case, I understand, but

6    if it's a different --

7            **THE COURT:**  And that's incumbent on you.  I mean, that

8    is my understanding of the law, that Ninth Circuit *Daubert*

9    standard governs regardless of where the case comes from.  So

10   it's incumbent upon you to convince me otherwise, you know, if

11   you think I'm wrong about that.

12       And so the presumption we're operating under, the status

13   quo right now, is that Ninth Circuit law is governing.  So the

14   onus will be on you.

15           **MR. STEKLOFF:**  Yes.  Understood.  And I'm flagging it.

16   It's probably something we'll raise and hopefully convince you,

17   but understanding.  I just wanted to flag that as something.  I

18   don't want to waive that issue, I guess, is my point.

19           **THE COURT:**  Right.  Fair enough.  Yeah.  I was

20   assuming you would raise that.

21       Okay.  So we're thinking -- so just in looking at my

22   calendar, I'm thinking November is the right time to do -- let

23   me ask you this.  I mean, I've been operating on the

24   assumption, but I want to make sure we're on the same page,

25   that no further *Daubert* hearings would be necessary.

1           **MR. STEKLOFF:**  I think we need to see what the reports

2   are and what the methodology is.  I mean, I expect it will be

3   the same, and self-fulfilling from my perspective.

4       So, I mean, I think that's probably right, but I don't

5   want to waive that now if, for example, the methodology is

6   changed or there's a new expert that raises, you know, facts

7   that we haven't seen before that raises new issues.

8           **THE COURT:**  Right.

9           **MR. STEKLOFF:**  So I think a presumption that we don't

10  need the full evidentiary hearings that we've already had, I

11  mean, I don't know if we'll need to discuss these -- not in

12  California but in other jurisdictions, the legal issues about

13  which law applies in terms of which circuit.  I think it's a

14  little premature, but I guess I understand the presumption.

15          **THE COURT:**  Okay.

16          **MS. WAGSTAFF:**  So do you want us to submit a proposed

17  case management order within ten days?

18          **THE COURT:**  Yeah.  I mean, I'm trying to decide

19  whether that makes the most sense or if it makes the most sense

20  to have you back in a week or so to hammer it out.

21          **MS. WAGSTAFF:**  Could we try for a week and then get on

22  a telephone call with you, and we can tell you our progress?

23  And if you want us to come back, we can.

24          **MR. STEKLOFF:**  I think with your guidance of

25  November -- we agree on things every once in awhile, so I

 1   wouldn't be surprised if we can make significant progress.  And

 2   at least, at a minimum, we'll only be able to flag a couple of

 3   disputes for you.

 4        You know, if we were debating totally different time

 5   periods, it would be different, but with that guidance, I think

 6   we might be able to resolve a lot of it.

 7             THE COURT:  Okay.  Why don't we have a -- what's

 8   today?  Wednesday.  I'm looking at my calendar.

 9        Next Wednesday I have a motion to dismiss hearing in my

10   other MDL, Cambridge Analytica MDL.

11        Why do I agree to all these MDLs?

12        (Laughter)

13             THE COURT:  Why don't we have -- do me a favor.

14   Here's what we'll do.  Submit a -- why don't you submit a

15   proposed case management order on the 29th.  Okay?

16        And then we will look at it, and if we want to call you in

17   to talk or talk by phone or whatever, we'll probably set

18   something up for the following week, the week of the 3rd.  It

19   can be by phone.  Telephone is fine, I think.

20             MS. WAGSTAFF:  Okay.

21             MR. STEKLOFF:  When should Monsanto submit this other

22   state --

23             THE COURT:  With that --

24             MR. STEKLOFF:  On the 29th?

25             THE COURT:  On the 29th.

1          **MR. STEKLOFF:**  Okay.

2          **THE COURT:**  And, you know, you can send a letter

3     explaining whatever you want to explain and all that.

4          So should we be setting -- should we also be setting a

5     schedule for like the next wave of cases at this time?  Or

6     should we wait and do that later?

7          **MS. WAGSTAFF:**  Well, I think if we're going to set 50

8     cases, we should wait.

9          **THE COURT:**  Doesn't have to be 50.

10         **MS. WAGSTAFF:**  Or around there, we should probably

11    wait.

12         **MR. STEKLOFF:**  Well, under what you said, we have 16

13    in California.  And Stevik is one of them.  So, really, we have

14    15 that we have to work up.  And Giglio has already started

15    with some of the preservation depositions.  So it's 14 and a

16    half.

17         I think you said pick a state.  I mean, you said five.  So

18    I think we have a little leeway.

19         **THE COURT:**  Yeah.

20         **MR. STEKLOFF:**  So I think maybe a second wave -- I

21    mean, I'm fine with the state-by-state approach where we find

22    some other states.  Seems like a good idea.

23         **THE COURT:**  Why don't you set a schedule for a second

24    wave too.  And why don't you -- why don't you identify -- you

25    know, you each pick a state.  Okay?  Why don't you each pick a

```
1   state.
2       And for the second wave, can you please try to make it
3   just one law?  Try to identify a couple of different states
4   where the law is the same.
5           MS. WAGSTAFF:  We'll try.
6           THE COURT:  Because I think it really -- you know, and
7   if you can't, then just pick one state, because I think it will
8   be much more difficult to rip through these if I'm applying two
9   different sets of law to them.
10          MR. STEKLOFF:  So each side picks one law even if
11  there are multiple states that fall into that law?
12          MS. WAGSTAFF:  He wants us to agree on the law.
13          THE COURT:  Yeah.  I mean, I want -- it may be simpler
14  to just pick -- you know, for the second wave, you pick a
15  state.  And for the third wave, you pick a state.  You take
16  turns picking states.  That might be the easiest way to do it.
17      But I think you should do some research on the law and see
18  if you can group the states based on the law and say that --
19  you know, you can say, hey, you know, New York, New Jersey, and
20  Illinois have the same causation law, we can put all those
21  together.
22          MR. STEKLOFF:  Okay.
23          THE COURT:  That would be the ideal thing.
24      So I guess, you know -- but I think one law per wave.
25  Even if you're setting them on a fairly accelerated schedule,
```

1   more accelerated than if a bunch of states were grouped

2   together, I think that would be preferable.  Have one law per

3   wave.

4        And you can pick the second one.  You can pick the law for

5   the second wave.

6             **MR. STEKLOFF:**  Okay.  Thank you.  When should we

7   submit that?

8             **THE COURT:**  Can you submit it on the 29th also?

9             **MR. STEKLOFF:**  Yeah.

10            **THE COURT:**  Okay.

11            **MS. WAGSTAFF:**  On the 29th, can we also include an

12   individualized proposed CMO for Giglio that's a little more

13   accelerated?

14            **THE COURT:**  Yes.  Yes, please.

15            **MS. WAGSTAFF:**  Okay.

16            **THE COURT:**  Again, I still think that the judge in the

17   Southern District of California should be deciding all pretrial

18   motions that will merely affect how the trial is going to go.

19        But that doesn't mean that you shouldn't do expert reports

20   for those -- you know, you can get it all ready, you know, up

21   to the pretrial conference, basically.

22            **MS. WAGSTAFF:**  Okay.

23            **MR. STEKLOFF:**  And I think that the judge there has to

24   decide the trial setting as well.  So I understand working

25   faster so you can remand it more quickly, but in their papers

1    they keep --

2         **THE COURT:**  I'm not going to be consolidating any

3    cases for trial.  I'm not going to set any cases for trial in

4    other districts.

5         **MR. STEKLOFF:**  Okay.  Thank you.

6         **MS. WAGSTAFF:**  So the judge down there is Judge

7    Moscowitz, in case you were interested.

8         **THE COURT:**  Oh, okay.

9         And then, I guess, related -- somewhat related to this

10   issue of pulling out the Missouri cases, which may have the law

11   of various different states applying to them, is the fact that

12   there are -- I believe in this MDL we have a number of

13   complaints that are multi-plaintiff complaints.

14        I would apply the same standards that Judge Smith applied,

15   which is that all of those should be severed unless there's a

16   situation like --

17        **MS. WAGSTAFF:**  The Pilliods.

18        **THE COURT:**  Like the Pilliods, yeah.  Even the

19   Pilliods, I'm not so sure, to be honest with you.

20        But at a minimum I would require the filing of -- and I'll

21   just go ahead and order this now -- that for all

22   multi-plaintiff cases there needs to be a new complaint filed.

23   It can be some sort of short-form complaint.

24        There was -- there's an MDL where that procedure was

25   followed, where -- I can't remember which one it was as I sit

```
 1    here.  But where the judge said, no, these multi-plaintiff

 2    complaints all have to be severed, but we're going to create

 3    some sort of short-form complaint process for you to use.

 4        So, Jordan, do you remember which case that was off the

 5    top of your head?

 6          LAW CLERK:  *Talc Litigation* case in the District of

 7    New Jersey.

 8          THE COURT:  Yeah.

 9          MS. WAGSTAFF:  So, Your Honor, since we don't have

10    direct filing here, are you anticipating that if a District of

11    Colorado case came here, we would just file short-form

12    complaints directly into the Northern District?

13          THE COURT:  That's what I'm assuming happened in the

14    *Talc* case.  And that's what I was envisioning here.

15          MS. WAGSTAFF:  Okay.

16          THE COURT:  But I forgot to look at the details of how

17    they did that in New Jersey.  But, anyway, that's going to have

18    to happen.

19        I don't -- you know, I don't know how important it is that

20    that happen immediately.  I don't think -- you guys have enough

21    to work on in the next seven days that, you know, you don't

22    necessarily have to worry about that.

23        Why don't we go ahead and schedule another case management

24    call the week of June 3rd.  And that will be on the agenda, is

25    we're going to make a decision in that call about how to get
```

```
 1   all the cases severed, all the multi-plaintiff cases severed.

 2        How about 9:00 a.m. on June 5th?  Not good?

 3            MS. WAGSTAFF:  Your Honor, the 5th is the only day

 4   that's bad for me.

 5            THE COURT:  How about the 4th?

 6            MS. WAGSTAFF:  That works.

 7            THE COURT:  9:00 a.m., June 4th?

 8            MR. STEKLOFF:  Yeah.  I may be unavailable, but I am

 9   quite confident there is someone who can -- you know,

10   Mr. Kilaru and others can handle this.

11            THE COURT:  We can also do the 3rd.  Is the 3rd

12   better?

13            MR. STEKLOFF:  The 3rd is better for me.  I mean, you

14   shouldn't schedule it around me, but I am probably available on

15   the 3rd.

16            THE COURT:  Let's do the 4th if you're unsure about

17   the 3rd also.  Let's do the 4th at 9 o'clock.

18            MR. STEKLOFF:  While your calendar is open -- and I

19   hate to do this -- we will make July 1st or 2nd work, Your

20   Honor, for the Hardeman post trial, but I just wanted to -- I

21   recognize the conflict that I have, and I think I should be a

22   part of that that week.

23        And I'll be here if that's the only time that works, but I

24   just wanted to throw out, looks like the briefing will be

25   finished on the 21st.  So understanding you would need enough
```

1    time to review, Ms. Wagstaff and I discussed the possibility of

2    either June 26th, 27th, or 28th, or July 8th.

3        Ms. Wagstaff has a vacation after July 8th.

4            **THE COURT:**  26th, 27th.  What were the other dates?

5            **MR. STEKLOFF:**  June 26, 27th, or 28th, or July 8th.

6            **THE COURT:**  July 8th is probably not going to work.

7    27th and 28th definitely don't work.  26th probably doesn't

8    work.

9            **MR. STEKLOFF:**  Okay.

10           **THE COURT:**  But we'll look.  So let's keep it where it

11   is, but we'll give it some more thought and see if we can

12   rearrange some things and make it happen either on the 26th or

13   the 8th.

14           **MR. STEKLOFF:**  The 25th or 24th, I think, works as

15   well, but I especially didn't want to stand up and tell you

16   that you had only the weekend to review the papers, with the

17   reply brief coming in on the 21st.  But that whole week, I

18   think, was open for us.

19           **THE COURT:**  Okay.  We'll give it a little thought.

20           **MR. STEKLOFF:**  Thank you, Your Honor.

21           **THE COURT:**  Let's see.  Anything else to discuss?

22           **MS. WAGSTAFF:**  We need a trial date for Ms. Stevik.

23           **THE COURT:**  Oh, yeah.  I was thinking probably

24   February.  February of 2020.

25           **MS. WAGSTAFF:**  Mr. Brake is going to address that.

1      **MR. BRAKE:**  Yes, sir.  We'd like it sooner if

2  possible.  But if that's the earliest that Your Honor is

3  available, then that's what we'll do.

4      **THE COURT:**  Yeah.  Again, it's mainly just because I

5  think that it is -- you know, all of it is a priority.  I

6  understand that all of it is a priority.

7      But I think, from an MDL management standpoint right now,

8  it's a greater priority to get these California cases and cases

9  from one other state out and trial ready.

10      **MR. BRAKE:**  I understand.

11      **THE COURT:**  And so I think -- I believe that -- I

12  discussed this with Kristen yesterday, and I believe that we

13  came down on February 10th.

14      So what I will do is I will go ahead and set the trial

15  date for -- the first day of trial for February 10th, with the

16  understanding that you may hear from us that, you know, it may

17  be February 18th or maybe February 3rd or something.  I may be

18  off by a week or so, but I'm pretty sure it was February 10th.

19      **MR. BRAKE:**  Okay.

20      **THE COURT:**  And then jury selection I think we'll do

21  on February 5th.

22      How many jurors do you want to pick this time?

23      **MR. BRAKE:**  Haven't thought about that.  We need more

24  than -- we need to leave some room, obviously.

25      **THE COURT:**  You all objected to ten last time.  It

1    almost came back to bite you pretty hard, didn't it?

2         All right.  Well, you have some time to ponder that.

3         Let me see if there was anything else I wanted to talk

4    about.

5              **MS. WAGSTAFF:**  Your Honor, we had one more --

6              **MS. GREENWALD:**  One issue.

7              **THE COURT:**  One sec.

8         Were you going to bring up the preservation depos?

9              **MS. GREENWALD:**  Yes.

10             **MS. WAGSTAFF:**  Yes.

11             **THE COURT:**  So my view of that is that obviously that

12   can't be forced upon anybody.  But it does strike me as

13   potentially a good idea to do preservation depos that, you

14   know, if a trial judge approves it and if the parties agree to

15   it, could obviate the need for, you know, individualized

16   testimony in a particular trial.

17        But, like I said, I don't think -- I assume that I can't

18   force that upon either side, and I think it would be

19   inappropriate to, given -- I mean, look, we had that Zang, et

20   al. meta analysis come out, you know, a month before trial last

21   time; right?  And we're going to continue -- and now we've had

22   the EPA put out an analysis since the trial; correct?

23             **MR. STEKLOFF:**  Yes, Your Honor.

24             **THE COURT:**  Did the jury in the Alameda County trial

25   learn about that?

1        **MR. STEKLOFF:**  No.  Monsanto sought to admit it, and

2   Judge Smith, I think, just given the timing, it happened --

3        **THE COURT:**  Like in the middle of trial or something?

4        **MR. STEKLOFF:**  -- did not let the jury hear about it.

5        **THE COURT:**  And, obviously, that stuff -- you know,

6   new stuff will be weaved into people's testimony oftentimes, I

7   would think.

8        But I just -- part of me wonders if, you know, it would be

9   appropriate to have kind of generic preservation testimony just

10  to keep options open for all involved.

11       **MS. GREENWALD:**  I think that's all we're asking, Your

12  Honor.  We're not saying that there should be an admissibility

13  decision now.  We're not saying that it wouldn't be subject to

14  their -- Monsanto's objection at any given trial.

15       And, of course, they can do the same thing.  It's to have

16  it if something comes up that we need it, and we have to make

17  an application to the Court at the time and convince the Court

18  that it can or can't be used.  It would be an individualized

19  decision with each case.

20       And, presumably, we would always rather have someone in

21  person.  It would really only be used if circumstances make it

22  impossible or virtually impossible.

23       **THE COURT:**  And the idea would be that this would be

24  testimony -- I mean, obviously, it would be testimony about

25  general causation.

1           **MS. GREENWALD:**  Only.

2           **THE COURT:**  Only general causation.

3       So you're not trying to put together some sort of specific

4   causation testimony that would be general enough that it would

5   be applicable to multiple plaintiffs or something like that?

6           **MS. GREENWALD:**  No.  Just specifically only to general

7   causation, much like you heard a year -- I don't remember

8   whenever it was, whenever we had our original *Daubert*.

9           **THE COURT:**  What would be wrong with doing that, just

10  to sort of open up options for everybody involved?

11          **MR. STEKLOFF:**  Well, I think there are -- I mean,

12  first of all -- well, I won't start with this.

13      There are unavailability issues which, under the rules --

14  I mean, I understand we are preserving it in a hypothetical of

15  someone becoming unavailable, but I think that's a concern of

16  ours.  Second, I think you flagged that there are -- you know,

17  the science and the regulatory record is evolving, and so that

18  concerns us.

19      I mean, even the Portier deposition that we had from

20  Hardeman, which I saw in their paper, they suggested could be

21  used, I mean, it's outdated already.  And so I think -- I just

22  think it's an endeavor that -- now is not the time.  And I

23  think we are going to all have new -- I mean, we're seeing

24  other experts on both sides that are being disclosed, for

25  example, in the Missouri cases, and I expect here as well, that

1   are covering these general causation issues and other issues.

2       I'm not saying we won't also continue to see some -- you

3   know, I expect we'll see Dr. Portier and others time and time

4   again.  But we just think now is not the time for that.  And it

5   is a huge use of resources when we have, I think, other

6   priorities and other trials coming up.

7       **MS. GREENWALD:**  But it also preserves resources in

8   circumstances where there's back-to-back trials and there's

9   availability issues.

10      I don't think any of us want to do anything that we're not

11  going to use or that will be superfluous.  Some circumstances

12  would be very limited.  It's a benefit to everybody.

13      And, again, the whole argument that Monsanto makes that

14  maybe that particular testimony now isn't fair because there's

15  just been a major study that changes everything, they would

16  make that argument to the trial court and they would probably

17  win.

18      **THE COURT:**  I guess my gut on this is that it may be a

19  good idea, but I wonder if you should all be focused more right

20  now on working up this first wave of cases for summary

21  judgment.  And if we could revisit that, you know, in the fall,

22  kind of after you filed all your summary judgment briefs and

23  *Daubert* briefs and gotten your expert reports done and all that

24  kind of stuff.

25      And maybe kind of the window while I'm considering -- I

1   mean, I know you all have a lot of stuff going on in other

2   cases too, but while I'm considering the summary judgment

3   motions and while you're waiting for me to decide those and

4   waiting for the cases to get remanded and sent back to their

5   home districts and waiting for the trial judges to set trial

6   dates in those cases and decide, maybe that would be the time

7   to do some preservation depositions.

8           **MS. GREENWALD:**  I think that's fair.  We're fine with

9   that.

10          **MR. STEKLOFF:**  Yes.  I mean --

11          **THE COURT:**  You still think --

12          **MR. STEKLOFF:**  That's my instinct, but I am very

13  comfortable with rediscussing it at that time.

14          **THE COURT:**  Okay.

15          **MS. GREENWALD:**  Thank you, Your Honor.

16          **THE COURT:**  So do we have a plan?

17          **MS. GREENWALD:**  We do.

18          **THE COURT:**  Is that it for today?

19          **MR. STEKLOFF:**  Yes.

20          **THE COURT:**  All right.  I'll think about the remand

21  stuff and issue an order.

22          **MS. GREENWALD:**  Thank you.

23          **MR. STEKLOFF:**  Thank you, Your Honor.

24          **THE COURT:**  Thank you.

25          (At 2:15 p.m. the proceedings were adjourned.)

## **CERTIFICATE OF REPORTER**

      I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Friday, May 24, 2019

_____

Katherine Powell Sullivan, CSR #5812, RMR, CRR
U.S. Court Reporter