# Exhibit 2

FILED
San Francisco County Superior Court

OCT 22 2018

CLERK OF THE COURT
BY: _____
          Deputy Clerk

62586236
Oct 22 2018
04:36PM

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO

| | |
|---|---|
| DEWAYNE JOHNSON,<br><br>Plaintiff,<br><br>vs.<br><br>MONSANTO COMPANY,<br><br>Defendant. | Case No. CGC-16-550128<br><br>**ORDER DENYING MONSANTO COMPANY'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT and CONDITIONALLY DENYING MONSANTO'S MOTION FOR NEW TRIAL** |

# BACKGROUND

## I. BRIEF OVERVIEW OF CASE

This case involves the trial of design defect and failure to warn claims asserted by Dewayne Johnson ("Plaintiff") alleging that his exposure to glyphosate and glyphosate-based herbicides ("GBHs") developed by Monsanto Company ("Monsanto") caused him to develop mycosis fungoides ("MF"), a subtype of non-Hodgkin's lymphoma ("NHL").

Plaintiff testified he first began using GBHs, at the earliest, in June 2012. In October 2014, Plaintiff was diagnosed with NHL. Plaintiff stopped using GBHs in approximately January 2016. The parties stipulated to a trial date of June 18, 2018, and trial commenced on that date.

Among other things, this case required the jury to resolve the complex scientific question of whether Plaintiff's exposure to GBHs caused his NHL. Both sides presented expert testimony about the science underlying GBHs. The evidence introduced by Plaintiff's experts focused largely on epidemiology studies and an IARC Monograph published in March 2015, along with various animal and genotoxicity studies. Plaintiff proffered Dr. Portier, a biostatistician; Dr. Neugut, an epidemiologist; Dr. Nabhan, an oncologist; and Dr. Sawyer, a toxicologist, to testify about various aspects of the science underlying GBHs. As discussed below, Dr. Nabhan, who proffered a differential diagnosis opinion, formed the linchpin of Plaintiff's case that his exposure to GBHs caused his cancer.

Monsanto proffered Dr. Mucci, an epidemiologist; Dr. Foster, a toxicologist; Dr. Kuzel, an oncologist; and Dr. al-Khatib, a weed scientist.

Both parties designated the deposition testimony of several factual witnesses, including scientists involved with the evaluation of GBHs' safety and regulatory approval. The evidence showed that Monsanto has produced GBHs in the United States and much of the rest of the world for decades, and that glyphosate has developed one of the largest bodies of scientific data of any substance in the world. Before and after IARC's classification of glyphosate as a "probable" human carcinogen, regulatory and public health agencies worldwide have reviewed and rejected claims about the carcinogenicity of GBHs.

During trial, Monsanto timely moved for nonsuit and a directed verdict, both of which

were denied. The jury concluded its deliberations on August 10, 2018, and found in favor of Plaintiff, awarding economic loss in the amount of $2,253,209.35; noneconomic loss in the amount of $37,000,000.00; and punitive damages in the amount of $250,000,000.00.

Notice of Monsanto's Motion for Judgment Notwithstanding the Verdict (JNOV) and New Trial was timely filed, and the Motions were argued concurrently.

## ANALYSIS

### II. LEGAL STANDARD FOR JNOV

In ruling on a JNOV motion, the trial court may not weigh the evidence or make its own credibility determinations. *King v. State of California* (2015) 242 Cal.App.4th 265, 287. In deference to our strongly held belief in the constitutional right to a jury trial and a policy of judicial economy against disregarding the jury's verdict, the law regarding JNOV motions is very strict. "Conflicts in the evidence are resolved *against* the moving defendant and in favor of the plaintiff; all reasonable inferences to be drawn from the evidence are drawn against the moving defendant and in favor of the plaintiff." *Fountain Valley Chateau Blanc Homeowner's Assn. v. Department of Veterans Affairs* (1998) 67 Cal.App.4th 743, 750. Furthermore, in ruling on a motion for JNOV, a court may not change a prior ruling as to the admissibility of evidence. "[W]e must take the record as we find it. We cannot strike or disregard any evidence favorable to the prevailing party merely because it was erroneously received." *Waller v. Southern California Gas Co.* (1959) 170 Cal.App.2d 747, 757; *Estate of Callahan* (1967) 67 Cal.2d 609, 617.

### III. THERE IS NO LEGAL BASIS TO DISTURB THE JURY'S DETERMINATION THAT PLAINTIFF'S EXPOSURE TO GBHs WAS A SUBSTANTIAL FACTOR IN CAUSING HIS NHL

All of Plaintiff's claims require him to prove by a preponderance of the evidence that his use of GBHs was a "substantial factor" in causing his harm. California law recognizes that such proof is "especially troublesome" in cases alleging cancer as the injury, because "it is frequently difficult to determine the nature and cause of a particular cancerous growth." *Jones v. Ortho Corp.* (1985) 163 Cal.App.3d 396, 403.

Plaintiff's evidence that his NHL was caused by his exposure to GBHs was based on the

testimony of Dr. Nabhan, a former practicing oncologist.[1]  Dr. Nabhan does not dispute that he is unable to identify a cause of NHL in the majority of his patients. Tr. 2990:6-14; 2997-2998. Nonetheless, Dr. Nabhan opined that Mr. Johnson's cancer was not idiopathic and that there was substantial evidence that his NHL was caused by his exposure to GBHs: a "known carcinogen causing non-Hodgkin's lymphoma." Tr. 2997:5-10.

Dr. Nabhan elected to conduct a type of causation analysis known as a differential diagnosis, or differential etiology, in reaching the opinion that GBHs caused Plaintiff's NHL. Differential diagnosis is a process whereby the physician begins by 'ruling in' all possible causes of the plaintiff's illness then 'rules out' the least plausible causes until the most likely cause remains. The final result of a differential diagnosis forms the basis of the physician's conclusion regarding what caused the plaintiff's illness. *Cooper v. Takeda Pharms. Am., Inc.* (2015) 239 Cal. App. 4th 555, 565–66.

In performing his differential diagnosis, Dr. Nabhan explained that because Mr. Johnson was much younger than the average patient who developed the disease this raised a "red flag" that his cancer is not likely to be idiopathic and more likely to be caused by an exposure. Tr. 2842:23-2844:19. Dr. Nabhan considered the known risk factors and causes of NHL including age, race, immunosuppressant therapies, autoimmune diseases, skin conditions, occupation, occupational exposures and viruses. *Id.* at 2842-2852. Dr. Nabhan opined that sun exposure, tobacco, and alcohol are not known causes of NHL and could therefore be excluded. *Id.* at 2852-2853. After conducting his differential diagnosis, Dr. Nabhan concluded that Mr. Johnson's only known risk factors were his race (African American) and exposure to GBHs. Tr. 2853:19-23. Dr. Nabhan therefore concluded that the GBHs were the most substantial contributing factor to Mr. Johnson's NHL. *Id.* at 2853:24-2854:2.

Dr. Nabhan's methodology in this case is similar to the differential diagnosis accepted by the Court of Appeal in *Cooper*. The trial court in *Cooper* granted defendant's JNOV motion because in

---

[1] Plaintiff also presented Dr. Sawyer to discuss Plaintiff's use of GBHs. Dr. Sawyer did not provide an exposure dose, but testified that Plaintiff's days of exposure "puts him approximately in the middle of the human epidemiology studies that show human cancer. He falls in the middle of the exposure categories…." Tr. 3674:25-3675:13.

the Court's view the testimony of the expert oncologist, Dr. Smith, did not establish specific causation between the drug at issue and plaintiff's cancer. In reversing the trial court's JNOV, the Court of Appeal emphasized that "It is not necessary *in the trial of civil cases* that the circumstances shall establish the negligence of the defendant as the proximate cause of injury with such absolute certainty *as to exclude every other conclusion. It is sufficient if there is substantial evidence upon which to reasonably support the judgment.*" *Cooper*, 239 Cal.App.4th at 580. The Court further held that "[b]are conceivability of another possible cause does not defeat a claim: the relevant question is whether there is 'substantial evidence' of an alternative explanation for the disease." *Id.* at 586. Finding that Dr. Smith's opinion met the threshold test for admissibility, the Court of Appeal instructed that the jury was free to accept Dr. Smith's testimony regarding specific causation and that the trial court erred in granting the JNOV. *Id.*

As with Dr. Smith in *Cooper*, Dr. Nabhan did not need to eliminate every other possible cause of Plaintiff's cancer. *Id.* at 580. Because there is no substantial evidence of an alternative explanation for Plaintiff's NHL, the jury here was free to give weight to Dr. Nabhan's testimony that GBHs were a substantial factor in causing the cancer. *Id.* at 586. Dr. Nabhan was cross-examined and the defense presented expert witnesses to criticize the basis of Dr. Nabhan's opinion. "The court does not resolve scientific controversies." *Id.* at 592 (*citing Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal 4th 747, 772). That is a matter for the jury to resolve.

Monsanto also argues that the jury's award of $37 million for past and future noneconomic damages is excessive and unsupported by the evidence. In particular, Monsanto objects to Plaintiff's closing argument that Plaintiff should receive $1 million per year for his entire lifespan (as projected for a healthy person his age by actuary) "because he deserves that money…it doesn't matter if he dies in two years or dies in 20." Tr. 5110:13-18. Monsanto is correct that future damages are limited by a plaintiff's projected remaining lifespan. *See, e.g., Bigler-Engler v. Breg, Inc.*, 7 Cal. App. 5th 276, 305-06 (2016) (reducing damages to level based on plaintiff's life expectancy at trial). In this case, the Court read CACI instructions 3905A and 3932 to the jury which explain that to recover for future noneconomic loss the Plaintiff must prove that he is reasonably certain to suffer that harm. The Court presumes that the jury followed its instructions "and that its verdict reflects the legal limitations

those instructions imposed." *Cassim v. Allstate Insurance Co.* (2004) 33 Cal. 4th 780, 803-804 (quoting *Saari v. Jongordon Corp.* (1992) 5 Cal. App. 4th 797, 808).

For the reasons stated, the Court declines to grant Monsanto's JNOV regarding liability.

## IV. PUNITIVE DAMAGES

As to his punitive damages claim, Plaintiff was required to prove by clear and convincing evidence that an officer, director, or managing agent of Monsanto acted with malice or oppression in the conduct that gave rise to liability. Cal. Civ. Code § 3294(a) (b).

Monsanto argues that there is no clear and convincing evidence of a specific managing agent authorizing or ratifying malicious conduct or engaging in conscious disregard of safety. While Monsanto is correct, Plaintiff is not required to identify a particular managing agent if he can illustrate by clear and convincing inference that the company as a whole acted maliciously. See *Pacific Gas & Electric Co. v. Superior Court* (2018) 24 Cal.App.5th 1150, 1172–73 (holding that corporate malice may be demonstrated by company policy or the actions and knowledge of many corporate employees rather than a specific managing agent). "In most of the cases in which the 'managing agent' issue has resulted in reversal of a punitive damage award, initial liability arises from a particular tortious act of an employee of the corporation. [Citations.] Defendant has cited no case, and our own research has failed to disclose any case, in which a series of corporate actions and decisions, such as the design, production, and marketing of an automobile, has been found inadequate to support an award of punitive damages on the basis that the multitude of employees involved in various aspects of the process were not high enough in the corporate chain of command. When the entire organization is involved in acts that constitute malice, there is no danger a blameless corporation will be punished for bad acts over which it had no control, the primary goal of the 'managing agent' requirement." *Romo v. Ford Motor Co.* (2002) 99 Cal.App.4th 1115, 1140, vacated on other grounds in *Ford Motor Co. v. Romo* (2003) 538 U.S. 1028.[2] The jury could find that the decision by Monsanto to continue marketing GBH's notwithstanding a possible link with NHL constitutes corporate malice for purposes

---

[2] Although this opinion was vacated on due process grounds for excessive punitive damages, its analysis regarding the managing agent requirement has been cited recently by the California Court of Appeal in *Pacific Gas & Electric Co. v. Superior Court* (2018) 24 Cal.App.5th 1150.

of punitive damages. *Grimshaw v. Ford Motor Co.* (1981) 119 Cal. App. 3d 757 at 814, vacated on other grounds in *Kim v. Toyota Motor Corp.* (2018) 6 Cal. 5th 21. Because the managing agent requirement may be satisfied by a "series of corporate actions" advancing a product rather than precise conduct by a high-level official at an identifiable period of time, Monsanto's argument about the lack of evidence of conduct by a managing agent must fail.

Under the punitive damages statute "malice does not require actual intent to harm. [Citation.] Conscious disregard for the safety of another may be sufficient where the defendant is aware of the probable dangerous consequences of his or her conduct and he or she willfully fails to avoid such consequences." *Pfeifer v. John Crane, Inc.* (2013) 220 Cal.App.4th 1270, 1299. Punitive damages have been upheld where a defendant has failed to conduct adequate testing on a product. *West v. Johnson & Johnson Products, Inc.* (1985) 174 Cal.App.3d 831, 869 (affirming award of punitive damages where evidence showed that adequate testing would have revealed an association between tampon use and toxic shock, that the manufacturer's testing was inadequate, and that the manufacturer decided not to do any further testing even when faced with consumer complaints.) Punitive damages have also been upheld where "there was a 'reasonable disagreement' among experts" *Buell–Wilson v. Ford Motor Co.* (2006) 141 Cal.App.4th 525, 559–60, vacated on other grounds in *Ford Motor Co. v. Buell–Wilson* (2007) 550 U.S. 931, 127 S.Ct. 2250[3] (citing *Grimshaw v. Ford Motor Co.* (1981) 119 Cal.App.3d 757, 810). The jury is "entitled to" reject the claims of Defendant's experts in reaching a verdict on punitive damages. *Id.* Thus, the jury could conclude that Monsanto acted with malice by consciously disregarding a probable safety risk of GBHs and continuing to market and sell its product without a warning.

However, as the U.S. Supreme Court held in *State Farm Mut. Auto. Ins. Co. v. Campbell* (2003) 538 U.S. 408, 416–17, punitive damages awards are limited by the Fourteenth Amendment of the U.S. Constitution. Punitive damages found to exceed the ceiling of what due process allows must be reduced. *Id.* at 416. "[A] constitutional reduction . . . is a determination that the law does not

---

[3] Although this opinion was vacated with respect to constitutional limits of punitive damage awards, the California Supreme Court continues to cite this case with respect to the availability of punitive damage awards. *Boeken v. Philip Morris USA, Inc.* (2010) 48 Cal.4th 788, 796.

permit the award." *Gober v. Ralphs Grocery Co.* (2006) 137 Cal.App.4th 204, 214 (quoting *Johansen v. Combustion Engineering, Inc.* (11th Cir. 1999) 170 F.3d 1320, 1331). In other words, without second-guessing the jury's determination, a court has "a mandatory duty to correct an unconstitutionally excessive verdict so that it conforms to the requirements of the due process clause." *Id.*

When evaluating whether the defendant's actions warrant the extent of the punitive damages, courts consider three factors: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the compensatory damages award and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized in comparable cases. *Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1171–72. The third factor is inapplicable here as this is a common law tort action and the parties have not pointed to any statute providing a civil penalty for marketing a dangerous product.

Regarding the second factor, courts establish a ratio of punitive damages to the actual harm determined by compensatory damages. "When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Simon*, 35 Cal.4th 1159, 1182 (quoting 538 U.S. 408, 425). Particularly when the non-economic component of compensatory damages is high, a lower ratio of compensatory to punitive damages may be appropriate because the total compensatory damages themselves serve the deterrent effect of punitive damages. *Id.* at 1189. In this case, the $39,253,209.35 award of compensatory damages, $37,000,000.00 of which is noneconomic, is fairly considered substantial. *See, e.g., Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 718–20 (determining that a largely noneconomic $1,905,000 compensatory damages award was substantial in the context of harassment and employment discrimination); *Walker v. Farmers Insurance Exchange* (2007) 153 Cal.App.4th 965, 974 ($1.5 million in noneconomic damages is substantial); *Jet Source Charter, Inc. v. Doherty* (2007) 148 Cal. App.4th 1, 11("$6.5 million in compensatory damages…was, to say the least, substantial").

Under these circumstances the law mandates that the ratio be reduced to one to one. In *Roby* the California Supreme Court directed a reduction of punitive damages to a one to one ratio with compensatory damages at $1,905,000 because that was the "maximum punitive damages that may be

awarded…in light of the constraints imposed by the federal Constitution." *Roby*, 47 Cal.4th at 799. In a case such as this where there is a punitive element to the compensatory damages award, the law supports only a one to one ratio for punitive damages.

The cases on federal due process constraints on punitive damages also evaluate the first factor, degree of reprehensibility. In this case, the second factor, the permissible ratio between punitive damages and compensatory damages, is dispositive and an evaluation of degree of reprehensibility is not necessary. The compensatory damages award of $39,253,209 is extremely high for a single plaintiff and consists largely of non-economic damages which the due process case law recognizes has a punitive element. If the level of reprehensibility of Monsanto's conduct was high, there would be no constitutional basis to allow a higher ratio since the amount of compensatory damages is high and includes a punitive element. Similarly, if the level of reprehensibility was low, there would be no constitutional basis to further reduce the amount of punitive damages since this Court has not been cited to and could not locate any case holding that federal due process requires reducing a punitive damages award to less than a one to one ratio with compensatory damages. Accordingly, regardless of the level of reprehensibility of Monsanto's conduct, the constitutionally required ratio is one to one.

In enforcing due process limits, the Court does not sit as a replacement for the jury but only as a check on arbitrary awards. The punitive damages award must be constitutionally reduced to the maximum allowed by due process in this case—$39,253,209.35—equal to the amount of compensatory damages awarded by the jury based on its findings of harm to the Plaintiff.

/////

/////

/////

1  V.  **ORDER**

2     For the reasons stated above, Monsanto's Motion for Judgment Notwithstanding the
3  Verdict is denied. If the Plaintiff consents to a remittitur of the award of punitive damages to
4  equal the amount of the compensatory damages award, Monsanto's Motion for New Trial will be
5  denied. Pursuant to CCP § 662.5(a)(2), Plaintiff must indicate his acceptance of the remittitur no
6  later than Friday, December 7, 2018 or it will be deemed rejected and Monsanto's Motion for New
7  Trial will be granted as to punitive damages only.

8     **IT IS SO ORDERED.**

11 Date: 10/22/18

SUZANNE R. BOLANOS
Judge of the Superior Court

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF SAN FRANCISCO
### Department 504

| | |
|---|---|
| DEWAYNE JOHNSON,<br><br>　　　　Plaintiff,<br><br>　vs.<br><br>MONSANTO COMPANY, et al.,<br><br>　　　　Defendants. | Case No.: CGC-16-550128<br><br>**CERTIFICATE OF ELECTRONIC SERVICE** (CCP § 1010.6 & CRC 2.251) |

　　I, R. Michael Diles, a Deputy Clerk of the Superior Court of the County of San Francisco, certify that I am not a party to the within action.

　　On October 22, 2018, I electronically served **ORDER DENYING MONSANTO COMPANY'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT and CONDITIONALLY DENYING MONSANTO'S MOTION FOR NEW TRIAL**, via File & Serve*Xpress* on the recipients designated on the Transaction Receipt located on the File & Serve*Xpress* website.

Dated: October 22, 2018　　　　　　　　　　T. MICHAEL YUEN, Clerk

　　　　　　　　　　　　　　　　　　　　By: _R. Michael Diles_
　　　　　　　　　　　　　　　　　　　　R. Michael Diles, Deputy Clerk

CERTIFICATE OF ELECTRONIC SERVICE