# Exhibit 8

United States
Environmental Protection
Agency

Office of
Pesticides and Toxic Substances
Washington DC 20460

June 1986

Pesticides



&EPA

# Guidance for the Reregistration of Pesticide Products Containing Glyphosate

# as the Active Ingredient



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

TRIAL EXHIBIT 514

Case No. 3:16-cv-0525-VC

Date Entered _____

By _____
Deputy Clerk

GUIDANCE FOR THE REREGISTRATION

OF PESTICIDE PRODUCTS CONTAINING

GLYPHOSATE

AS THE ACTIVE INGREDIENT

CASE NUMBER 0178

ENVIRONMENTAL PROTECTION AGENCY
OFFICE OF PESTICIDE PROGRAMS
WASHINGTON, D.C.  20460

JUNE 1986

# TABLE OF CONTENTS

I.      Introduction ........................................ 1

II.     Chemicals Covered By This Standard ................. 4
        A.    Description of Chemical
        B.    Use Profile

III.    Agency Assessment .................................. 5
        A.    Summary Science Statement
        B.    Toxicology Characteristics
        C.    Physiolofical and Biochemical Behavior
              Characteristics
        D.    Environmental Characteristics
        E.    Ecological Characteristics
        F.    Tolerance Reassessment

IV      Regulatory Position And Rationale .................. 20
        A.    Regulatory Position and Rationale
        B.    Criteria For Registration
        C.    Acceptance Ranges and Limits
        D.    Required Labeling

V.      Products Subject to this Standard .................. 35

VI.     Requirement for Submission of Generic Data ......... 37
        A.    What are Generic Data ?
        B.    Who must submit generic data ?
        C.    What generic data must be submitted ?
        D.    How to comply with DCI requirements
        E.    Procedures for requesting a change in protocol
        F.    Procedures for requesting extensions of time
        G.    Existing stocks provisions upon suspension or
              cancellation

VII.    Requirement for Submission of Product Specific Data . 42

VIII.   Requirement for Submission of Revised Labeling ..... 43

IX.     Instructions for Submission ........................ 44
        A.    Manufacturing use products (sole active)
        B.    Manufacturing use products (multiple active)
        C.    End use products
        D.    Intrastate products
        E.    Addresses

APPENDICES

I.   <u>DATA APPENDICES</u>

    Guide to Tables

    Table A

    Table B

    Table C

II.   <u>LABELING APPENDICES</u>

    Summary of label requirements and table

    40 CFR 162.10 Labeling Requirements

    Physical/Chemical Hazards Labeling Statements

    Storage Instructions

    Pesticide Disposal Instructions

    Container Disposal Instructions

III.   <u>USE INDEX APPENDIX</u>

IV.   <u>BIBLIOGRAPHY APPENDICES</u>

    Guide to Bibliography

    Bibliography

V.   <u>FORMS APPENDICES</u>

EPA Form 8580-1   FIFRA §3(c)(2)(B) Summary Sheet

EPA Form 8580-6   Certification of Attempt to Enter Into an
Agreement with Other Registrants for Development
of Data

EPA Form 8580-   Product Specific Data Report (End-Use Products)

EPA Form 8580-   Formulator's Exemption Statement

ii

# I.  INTRODUCTION

## The Registration Standards Program

EPA has established the Registration Standards program in order to provide an orderly mechanism by which pesticide products containing the same active ingredient can be reviewed and standards set for compliance with FIFRA.  The standards are applicable to reregistration and future applications for registration of products containing the same active ingredient. Each registrant of a product containing an active ingredient subject to this Standard who wishes to continue to sell or distribute that product must bring his product and labeling into compliance with FIFRA, as instructed by this Standard. Pesticides have been grouped into use clusters and will be reviewed on the basis of a ranking scheme giving higher priority to (1) pesticides in clusters used on food and feed crops; and (2) pesticides produced in large volumes.

The Registration Standards program involves a thorough review of the scientific data base underlying a pesticide's registration.  The purpose of the Agency's review is to reassess the potential hazards arising from the currently registered uses of the pesticide; to determine the need for additional data on health and environmental effects; and to determine whether the pesticide meets the "no unreasonable adverse effects" criteria of FIFRA.  In its review EPA identifies:

1.  Studies that are acceptable to support the data requirements for the currently registered uses of the pesticide.

2.  Additional studies necessary to support continued registration.  The additional studies may not have been required when the product was initially registered or may be needed to replace studies that are now considered inadequate.

3.  Labeling revisions needed to ensure that the product is not misbranded and that the labeling is adequate to protect man and the environment.

The detailed scientific review, which is not contained in this document, but is available upon request[1], focuses on the pesticide active ingredient.  The scientific review primarily discusses the Agency's evaluation of and conclusions from available data in its files pertaining to the pesticide

---

[1]The scientific reviews may be purchased from the National Technical Information Service, 5285 Port Royal Road, Springfield Virginia  22161 approximately 90 days after issuance.

1

active ingredient. However, during the review of these data the Agency is also looking for potential hazards that may be associated with the end use products that contain the active ingredient. The Agency will apply the provisions of this Registration Standard to end use products if necessary to protect man and the environment.

EPA's reassessment results in the development of a regulatory position, contained in this Registration Standard, on the pesticide and each of its registered uses. See Section IV - Regulatory Position and Rationale. Based on its regulatory position, the Agency may prescribe a variety of steps to be taken by registrants to maintain their registrations in compliance with FIFRA. These steps may include:

    1.  Submission of data in support of product registration;

    2.  Modification of product labels;

    3.  Modifications to the manufacturing process of the pesticide to reduce the levels of impurities or contaminants;

    4.  Restriction of the use of the pesticide to certified applicators or other specially trained individuals;

    5.  Modification of uses or formulation types; or

    6.  Specification of packaging limitations.

Failure to comply with these requirements may result in the issuance of a Notice of Intent to Cancel or a Notice of Intent to Suspend (in the case of failure to submit data).

In addition, in cases in which hazards to man or the environment are identified, the Agency may initiate a special review of the pesticide in accordance with 40 CFR Part 154 to examine in depth the risks and benefits of use of the pesticide. If the Agency determines that the risks of the pesticide's use outweigh the benefits of use, the Agency may propose additional regulatory actions, such as proposed cancellation of uses of the pesticide which have been determined to cause unreasonable adverse effects on the environment.

2

EPA has authority under the Data Call-In (DCI) provisions of FIFRA sec. 3(c)(2)(B) to require that registrants submit data to answer our questions regarding the chemical, toxicological, and environmental characteristics and fate of a pesticide. This Registration Standard lists the data EPA believes are necessary to resolve our concerns about this pesticide. These data are listed in Section V – Requirement for Submission of Generic Data, and Section VI – Requirement for Submission of Product-Specific data.  Failure to comply with the DCI requirements enumerated in this Registration Standard may result in issuance by EPA of a Notice of Intent to Suspend the affected product registrations.

Registrants are reminded that FIFRA sec. 6(a)(2) requires them to submit factual information concerning possible unreasonable adverse effects of a pesticide at any time that they become aware of such information.  You should notify the Agency of any information, including interim or preliminary results of studies, if those results suggest possible adverse effects on man or the environment.  This requirement continues as long as your products are registered by the Agency.

## II. CHEMICALS COVERED BY THIS STANDARD

### A. Description of Chemicals

The following chemicals are covered by this Registration Standard:

Common name:  isopropylamine salt (IPA) of glyphosate
Chemical name:  isopropylamine salt of N-(phosphonomethyl) glycine
CAS Number:  38641-94-0
OPP Shaughnessy Number:  103601
Empirical Formula:  $C_3H_8NO_5P$
Trade Names:  Roundup; Rodeo, Roundup L&G, Shackle, Shackle C
Description of chemical characteristics: White crystalline solid with a melting point of 200 °C with a bulk density of 1.74.  This chemical is 1 percent soluble in water at 25 °C; insoluble in ethanol, acetone, or benzene.

Common name:  sodium salt of glyphosate
Chemical name:  sodium salt of N-(phosphonomethyl) glycine
CAS Number:  38641-94-0
OPP Shaughnessy Number:  103603
Trade Names:  Polado
Description of chemical characteristics:  White crystalline solid which decomposes at 140 °C with a bulk density of 30 pounds per cubic foot ($lb/ft^3$).  This chemical is soluble in water and insoluble in organic solvents.

### B. Use Profile

Type of pesticide:  IPA salt herbicide
                    Sodium salt – plant growth regulator
Pests controlled:  Grasses, sedges, and broadleaf weeds (annual and perennial)
Registered Uses:  IPA salt (terrestrial food, nonfood crop, and noncrop; aquatic food and noncrop; greenhouse nonfood, domestic outdoor, and forestry); sodium salt (terrestrial food crop).

Predominant Uses:
    IPA salt of glyphosate:  soybeans, cotton, corn, sorghum, wheat, rice, vegetables, citrus fruits, pome fruits, stone fruits, tropical fruits, pastures, and alfalfa.
    Sodium salt of glyphosate:  sugarcane.

Mode of activity:  Inhibition of amino acid synthesis.

4

Formulation Types Registered:  1.04 lb active ingredient (ai)/gal emulsifiable concentrate (EC); 0.42, 3, and 4 lb ai/gal soluble concentrate/liquid (SC/L); 5% and 6.6% ai SC/L; 0.5%, 0.96%, and 1% ai liquid ready to use (RTU); and 0.75% and 0.96% ai pressurized liquid (Prl).

Methods of Application:  Foliarly, in broadcast application, using conventional ground equipment, handheld, recirculating, and shielded sprayers, wiper applicators and aerial application.

## III.  AGENCY ASSESSMENT

### Summary Science Statement

Glyphosate has low acute toxicity (Category III) for acute oral, acute dermal, and primary eye irritation and is in Category IV for primary skin irritation.  It is not teratogenic to rats or rabbits and is not mutagenic. The oncogenic potential is not fully defined at this time.  Repeat oncogenic studies are required in mice and rats.

Glyphosate is no more than slightly toxic to birds, aquatic invertebrates, and fish.  It does pose a risk to some endangered species.

Glyphosate is stable to hydrolysis and strongly adsorbed onto the soil and has a low potential to contaminate ground water.

### Toxicology Characteristics

Acute Toxicity

Acute oral and dermal toxicity data place technical glyphosate in Toxicity Category III.  Primary eye and skin irritation data indicate that technical glyphosate is not a primary skin irritant (Toxicity Category IV), and is only minimally irritating to the eye (Toxicity Category III).  Acute inhalation or dermal sensitization studies have not been submitted and are required.

Chronic Feeding/Oncogenicity Data

Available chronic feeding/oncogenicity data include chronic feeding/oncogenicity studies in mice and rats and a 1-year chronic feeding study in dogs.  A discussion of these studies follows.

5

The chronic feeding/oncogenicity study in mice tested dosages of 1000, 5000, and 30,000 parts per million (ppm). Glyphosate produced an equivocal oncogenic response in the mouse, causing a slight increase in the incidence of renal tubular adenomas (a benign tumor of the kidney) in males at the highest dose tested of 30,000 ppm. The Toxicology Branch Ad Hoc Oncogenicity Committee tentatively classified glyphosate as a "Class C" oncogen. The studies were reexamined by a consulting pathologist, and data were submitted indicating that an additional kidney tumor had been found in control males (no renal tumors were found in controls in the original examination). The Agency then requested that additional kidney sections from the mouse study be prepared and examined. The resultant microslides were examined by a number of pathologists. These examinations revealed no additional tumors, but confirmed the presence of the tumors identified in the original study report. The apparent lesion in the control kidney was not present in any of the additional sections. After examination of the slides, the Agency concluded that this lesion did not "represent a pathophysiologically significant change."

However the apparent oncogenic response was a marginal response at best. The doses tested were quite high, 3 percent of the diet, and there was no corresponding increase in the incidence of preneoplastic changes, such as hyperplasia or dysplasia, in the target tissue. Further, glyphosate is negative in a number of acceptable mutagenicity studies, therefore the compound is not known to be genotoxic.

Because of the equivocal nature of the findings, the Toxicology Ad Hoc Oncogenicity Committee asked the expert assistance of the FIFRA Science Advisory Panel (SAP) in determining the proper Weight-of-the-Evidence classification of the study. After reviewing all the available evidence, the SAP proposed that glyphosate be classified as "Class D," or having "inadequate animal evidence of oncogenicity." The principal reason for this assessment by the SAP was their determination that, after adjusting for the greater survival in the high dose mice compared to concurrent controls, no statistically significant difference existed. The SAP further noted that, although comparison of these findings to historical control incidences yielded a statistically significant result, this finding did not over-ride the lack of significance of comparisons to concurrent controls. The SAP determined that the oncogenic potential of glyphosate could not be determined from existing data and proposed that the study be repeated in order to clarify these equivocal findings.

After consideration of the expert opinion of the SAP, and reconsideration of all relevant data for this compound in particular the statistical assessment provided by the SAP, the Agency agrees that available data are not sufficient to adequately address the question of whether the apparent effects noted in the mouse study are biologically relevant. Therefore, in order to fully address this question, the Agency is requiring that this study be repeated with a larger number of animals in each test group, so that the statistical power of the study is increased.

Other non-neoplastic changes noted in high-dose male mice included centrilobular hypertrophy and necrosis of hepatocytes, chronic interstitial nephritis, and proximal tubule epithelial cell basophilia and hypertrophy in females. The no-observable effect level (NOEL) for non-neoplastic chronic effects was the mid-dose level, 5000 ppm. This study is acceptable as a chronic feeding study.

The lifetime feeding study in rats tested dietary concentrations of glyphosate of 0, 30, 100, and 300 ppm. These concentrations were adjusted during the course of the study so that actual doses of 0, 3, 10, and 31 mg/kg/day in males and 0, 3, 11, and 34 mg/kg/day in female rats were maintained. Thus, the doses tested in the rat chronic study were about 1/100 of those tested in the mouse study. Although no effect of treatment on the incidence of non-neoplastic lesions was noted, a marginal apparent increase in the incidence of interstitial cell tumors of the testes was observed in the rats. Historical controls were used in the Weight-of-the-Evidence analysis to provide an indication of the range of variability in the background spontaneous incidence of any lesion, and were used to supplement the data provided by a concurrent control group. Because of the absence of a dose-dependent effect, the lack of preneoplastic changes, the wide variability in the spontaneous incidence of this tumor, the similarity in incidences between the high dose group and the historical controls, and lack of any evidence of genotoxicity, it was concluded that the observed incidence did not demonstrate an oncogenic response. An independent review of the data raised a question of possible thyroid carcinoma in high-dose females. After a review of the slides by a consulting pathologist, and a reassessment of all relevant data, including the fact that no effect of treatment on tumor latency or the combined incidences of adenoma and carcinoma was apparent, the Agency concluded that the data did not demonstrate a carcinogenic response in the thyroid.

However, in view of the large difference in doses between the rat and mouse studies, the Toxicology Branch Oncogenicity Review Committee speculated that "a toxic, or MTD [Maximally

7

Tolerated Dose], was not reached in [the rat] study," and
that at doses "close to an MTD, tumors might have been induced."
The rat study was rereviewed for evidence that the highest
dose tested was an MTD. No effect of treatment on survival,
body weight gain, clinical pathology, or findings at necropsy
was noted. Therefore, there is no evidence that the highest
dose tested was an MTD. A repeat rat study is required in
which the highest dose tested is an MTD. This study is
acceptable as a chronic feeding study, since an MTD is not
required to satisfy Agency guidelines for chronic toxicity
studies. Since an MTD was apparently not reached in this
study, it does not fulfill the Guideline (§158.135 83-2)
requirement for a rat oncogenicity study.

A 1-year chronic feeding study in dogs tested doses of
0, 20, 100, and 500 mg/kg/day, administered by capsule. The
only effect of treatment was an apparent decrease in the
absolute and relative weights of pituitaries from mid- and
high-dose dogs. Additional data have been requested to
better assess this apparent effect. The tentative NOEL is
20 mg/kg/day pending submission of requested data.

## Subchronic Toxicity Studies

No acceptable rat or dog subchronic feeding studies are
available for technical glyphosate. IBT studies submitted
for both species were invalid.

A 3-month subchronic study in mice tested dietary
concentrations of 0, 5000, 10,000, and 50,000 ppm of
technical glyphosate. A decrease in body weight gain was
noted in high-dose mice; however, no gross or microscopic
changes were observed at necropsy. The study was classified
as Supplementary data because hematology, clinical chemistry,
and urinalysis measurements were not performed.

The 3-month subchronic study in mice does not have to be
repeated because the lifetime chronic feeding study in rats
discussed above fulfills the Guideline requirement (§158.135,
82-1) for a subchronic feeding study in a rodent. A 3-month
subchronic study in dogs is not required because the 1-year
chronic feeding study in dogs discussed above fulfills the
Guideline requirement (§158.135 82-1) for a subchronic feeding
study in a nonrodent.

A 21-day dermal toxicity study in rabbits testing dermal
doses of 100, 1000, and 5000 mg/kg/day for 5 days/week for
3 weeks has been submitted. The only effect noted was slight
edema and erythema of the skin at the high dose (5000 mg/kg/day).
The no observable effect level (NOEL) for these effects was
1000 mg/kg/day. This study is acceptable. No additional
data are required.

8

Teratology and Reproduction Studies

Acceptable teratology and reproduction studies have been submitted. Therefore, no additional data are required for these topics. A discussion of the acceptable data follows.

A teratology study in rats tested levels of 0, 300, 1000, and 3500 mg/kg/day with no evidence of teratology observed in the study. Evidence of developmental toxicity in the form of unossified sternebrae was noted in fetuses from the high dose (3500 mg/kg/day). This dose was also toxic to dams as evidenced by weight gain deficits, altered physical appearance, and mortality during treatment. The fetotoxic and maternal toxic NOEL for this study is 1000 mg/kg/day.

A teratology study in rabbits tested dosage levels of 0, 75, 175, or 350 mg/kg/day with no evidence of teratogenicity observed. The highest dose tested was toxic to does as evidenced by altered physical appearance and mortality. No treatment-related fetal effects were noted. The NOEL for maternal toxicity is 175 mg/kg/day and the NOEL for feto-toxicity is 350 mg/kg/day.

In the three-generation rat reproduction study and addendum, the most significant finding was focal, unilateral, renal tubular dilation in the kidneys of male pups from the $F_{3b}$ generation of high-dose dams (30 mg/kg/day). The NOEL for this effect was 10 mg/kg/day. No effects on fertility or reproductive parameters were noted.

Mutagenicity

Acceptable studies have been submitted to satisfy the Agency's testing requirements for gene mutations, chromosomal aberrations, and primary DNA damage. Glyphosate was negative for gene mutations in Chinese hamster ovary cells in the presence or absence of microsomal activation. Glyphosate was also negative for gene mutations in bacteria, with or without activation. Glyphosate was negative for chromosomal aberrations in the mouse dominant lethal test and in the in vivo cytogenetics assay. No primary DNA effects were seen with glyphosate in the B. subtilis rec assay or in the rat hepatocyte DNA repair assay. No additional mutagenicity data are required.

Neurotoxicity

Even though glyphosate is not an organophosate or carbamate pesticide, a delayed neurotoxicity study was conducted in chickens at Industrial Bio-Test Laboratories. Although no

9

evidence of neurotoxicity was noted in the study, the valida-
tion report for this study noted an absence of raw data for
dose preparation and administration, body weight measurements,
and pathological observations for untreated and positive
control birds.  After evaluation of the study for scientific
content, the study was classified as invalid on the basis of
the extensive gaps in the raw data supporting study findings
and conclusions.

A repeat neurotoxicity study is not required because the
guidelines (§158.135 81-7) require this study only for organo-
phosphate or carbamate pesticides.  Glyphosate is neither an
organophosphate nor a carbamate pesticide, therefore, the
study is not required.

Metabolism

Available metabolism data demonstrate that glyphosate is
rapidly excreted by rats, as > 90 percent of the administered
dose was eliminated within 48 hours of treatment.  In males,
the majority of excretion was via the feces (80%), and about
15 percent of the administered dose was eliminated in the
urine.  In females, about 40 percent of the administered dose
was excreted in the urine, which suggests that female rats
absorbed more glyphosate from the gastrointestinal tract than
did males.

After a single oral or intraperitoneal dose less than 1
percent of the administered dose was retained at 120 hours
after treatment.  In animals fed 1, 10, or 100 ppm of $^{14}$C-
glyphosate for 14 days, a steady-state equilibrium between
intake and excretion of label was reached within about 8
days.  The amount of radioactivity excreted in the urine
declined rapidly after withdrawal of treatment.  By 10 days
after withdrawal, detectable levels of radioactivity were
measured in the urine and feces of only the rats fed 10 or
100 ppm of the test diet.  Only minimal residues of 0.1 ppm
or less remained in the tissues of high-dose rats after 10
days of withdrawal, with no single tissue showing a signifi-
cant difference in the amount of label retained.

The submitted studies are deficient in that data for the
analysis of excreta for the presence of metabolites were not
submitted, and only one to three animals was used in each
experimental group.  The submitted data demonstrated differen-
tial effects on excretion and retention of radioactivity
depending on the molecular location of the radioactive label.
These findings are strong evidence that some metabolism of
glyphosate occurred in rats.

These studies are not adequate to fulfill Guideline requirements (§158.135 85-1), therefore repeat studies are required.

## N-Nitroso-Glyphosate

The Agency has determined that technical glyphosate contains N-nitroso-glyphosate (NNG) as a contaminant at levels of 0.1 ppm or less. The Agency has determined that oncogenicity testing of nitroso contaminants will normally be required only in those cases in which the level of nitroso compounds exceeds 1.0 ppm (see "Pesticide Contaminated with N-nitroso Compounds, proposed policy 45 FR 42854 (June 25, 1980)"). Therefore, although a chronic feeding study in rats was reviewed and found unacceptable, no additional studies are requested at this time.

Acute oral toxicity data for NNG place it in Toxicity Category III. Other acute toxicity data for NNG are not available.

Chronic toxicity studies on NNG in the dog and rat were conducted at IBT. After a raw data audit, both studies were judged to be "supplementary" (not adequate to fulfill guideline requirements). Both studies were then evaluated for scientific acceptability, and the rat study was invalid due to dosing of the control groups with an excessive amount of NaCl which resulted in high mortality of control animals. The dog study remained classified "supplementary" due to the lack of supporting raw data as identified in the raw data audit validation report. The only apparent treatment-related findings in the dog study were an increase in absolute and relative kidney weights and in blood glucose in high-dose (30 mg/kg/day) females. The NOEL for this apparent effect was 10 mg/kg/day.

A 90-day subchronic oral toxicity study with NNG was conducted in the rat. The principal effect of treatment was a dose-related decrease in survival, food consumption, and body weight gain. A NOEL was not established in this study since these effects were noted at the lowest dose tested, 3000 mg/kg/day. The study was classified as "supplementary" data due to inadequate reporting of clinical signs and necropsy data, and inadequate identification of the test material.

A rat metabolism study conducted with NNG demonstrated that NNG is rapidly absorbed and excreted, with the kidneys the preferential route of elimination. These findings are in direct contrast with the results of the metabolism studies with glyphosate, which found that absorption from the gut

was poor and the majority of excretion occurred in the feces
due to unabsorbed radiolabel.  Tissue residues after five
consecutive doses were minimal, as no tissue contained more
than 1.5 ppm of radiolabel.

No acceptable studies for mutagenic or reproductive
effects are available at present for NNG.

Because the amount of N-nitroglyphosate is less than 1.0
ppm no additional toxicology data are required; therefore,
none of the above studies are to be repeated or required.

Plant Metabolite--Aminomethylphosphonic Acid

The Agency has determined that the metabolite aminomethyl-
phosphonic acid (AMPA) is formed on plants in amounts that
can range as high as 28 percent of the total residue on the
plant.  Since the extent of glyphosate metabolism was not
adequately addressed in the rat metabolism study, the possi-
bility exists that the AMPA metabolite could pose a hazard
to humans that was not evaluated by testing the parent com-
pound glyphosate.  If an acceptable rat metabolism study
is submitted which demonstrates significant conversion of
glyphosate to AMPA in animals, additional studies on this
metabolite may be not necessary, since the toxicity of AMPA
will have been assessed by chronic feeding studies with the
parent compound glyphosate.

Acute oral toxicity and primary skin irritation data
place AMPA in Toxicity Category IV.  The primary eye irrita-
tion study demonstrated that AMPA was slightly irritating to
the eye, corresponding to Toxicity Category III.

A 90-day subchronic feeding study was submitted that
demonstrated irritation of the urinary bladder in rats
treated with 1200 mg/kg/day, the lowest effect level (LEL)
in this study.  This irritation was manifested in the form
of hyperplasia of the cells lining the bladder, and was
noted with increased incidence and severity at the highest
dose tested, 4800 mg/kg/day.  Epithelial hyperplasia of the
renal pelvis was also noted in high-dose rats.  The NOEL for
this effect was 400 mg/kg/day, and the study was classified
as Core-Minimum.

A rat metabolism study demonstrated that AMPA is rapidly
excreted as the parent compound.  No evidence for bioaccumula-
tion was noted in this study, which was classified as Supple-
mentary data because the number of animals studied was not
reported, only males were studied, and the effects of a
minimally toxic dose and repeated nontoxic doses on excretion,
metabolism, and accumulation were not assessed.

12

The limited data available for AMPA do not suggest that this compound poses any hazard distinct from that of the parent compound. No studies are available by which to assess potential mutagenic, reproductive, oncogenic, or chronic effects of AMPA. The need for additional testing of this compound will be assessed after the submission of an acceptable rat metabolism study with glyphosate.

## Physiological and Biochemical Behavior Characteristics

Foliarly applied glyphosate is readily absorbed and translocated from treated areas to untreated shoot regions and fruits of grapes, apples, pears, dwarf citrus, and coffee, and to untreated shoots and roots of seedling almond, pecan, and walnut.

The mechanism of pesticidal action for glyphosate is believed to be inhibition of amino acid biosynthesis resulting in a reduction of protein synthesis and inhibition of growth.

The metabolism of glyphosate occurs via N-methylation and ultimately yields N-methylated glycines and phosphonic acids. In plants, degradation of $[^{14}C]$ glyphosate to $^{14}CO_2$ and the suusequent photofixation of respired $^{14}CO_2$ was evidenced by presence of $^{14}C$-residues in control plants housed in close proximity to treated plants. The parent compound and its metabolite AMPA are considered to be the residues of concern in plants. No additional plant metabolism data are required.

In animal feeding studies using nonradiolabeled glyphosate and AMPA in a 3:1 ratio, glyphosate was detected in the liver of poultry, swine, and cattle and the kidney of swine and cattle; AMPA was detected in liver of poultry, swine, and cattle and in the kidney of swine and cattle. Residues of the parent glyphosate and AMPA have also been identified in the tissues, urine, and feces of rats and rabbits. Additional metabolism studies with ruminants and poultry are required.

## Environmental Characteristics

Glyphosate and its degradate aminomethylphosphonic acid are stable to hydrolysis in sterile, buffered water at pH 3, 6, and 9. In three natural waters (pH 4.2, 6.2, and 7.2) glyphosate degraded with half-lives of < 50, 63, and > 35 days, respectively. Addition of sediment to the three natural water systems increased the rate of dissipation of glyphosate from water via sorption to sediment. Glyphosate dissipated in pondwater with a half-life of between 14 and 21 days. In two canal waters, glyphosate was not detected 6 months posttreatment. Glyphosate and aminomethylphosphonic acid dissipation rates and concentrations in treated forest soils

13

are extremely variable ranging from < 0.002 ppm in streamwater
samples to 89 ppm in foliage samples. Based on the available
data that indicate that glyphosate is strongly adsorbed to
the soil, the potential of glyphosate to contaminate ground-
water is expected to be low. Glyphosate has the potential to
contaminate surface waters because of application to aquatic
sites. Glyphosate residues have a low potential to bio-
accumulate in fish or clams.

Only the hydrolysis study is acceptable to fulfill
Guideline requirements. The following data are required to
fully assess the environmental fate of glyphosate: photo-
degradation studies in water, on soil, and in air; aerobic
and anaerobic soil metabolism studies; aerobic and anaerobic
aquatic metabolism studies; adsorption and desorption studies;
laboratory volatility studies; terrestrial, forestry, and
aquatic field dissipation studies; and accumulation studies
on rotational, irrigated crops and fish. Additional data may
be required if requested studies indicate the need for addi-
tional data.

## Exposure

The primary potential for exposure from the soluble
concentrate/liquid (SC/L) formulation is during mixing and
loading where both dermal and ocular exposure via splashing
may occur. Inhalation and dermal exposure may occur during
application of liquid ready to use (RTU) and pressurized
liquid (Prl) formulations. Application from aircraft increases
the potential exposure of humans and nontarget organisms to
glyphosate due to spray drift and volatilization.

The California Department of Food and Agricultural reported
that glyphosate ranked third in the number of illnesses reported
from exposure to pesticides. The majority of these illnesses
were associated with skin and eye irritation during mixing,
loading and application of glyphosate. Although technical
glyphosate has very low toxicity (Toxicity Category III or IV)
the formulated products for agricultural use cause moderate
eye irritation (Toxicity Category II) and some dermal irritation
(Toxicity Category III). To reduce the risk of injury to skin
and eyes from use of glyphosate the Agency is requiring that
"Worker Safety Rules" requiring protective clothing appear on
all formulated products labeled for agricultural or aquatic use.

The end-use products registered for homeowner use are of
very low concentration (0.1 to 10% active ingredient) and
have very low acute toxicity (Category III and IV); therefore
the Agency will not require protective clothing for these
products.

Available acute dermal toxicity data place technical glyphosate and its formulated products for agricultural use in Toxicity Category III. Because of the low toxicity of glyphosate materials as applied, the Agency believes that there is no risk of acute injury to field workers from applications of glyphosate. Therefore reentry data will not be required by the Agency.

Ecological Characteristics

Terrestrial Organisms

Based on an acute oral toxicity of > 2000 mg/kg/day for bobwhite quail, glyphosate is no more than slightly toxic to bobwhite quail on an acute oral basis. Available data indicate that the 8-day dietary toxicity of glyphosate is > 4000 ppm for both mallard ducks and bobwhite quail. Based on the forgoing data, the Agency has determined that glyphosate is no more than slightly toxic to birds. Avian reproduction studies indicate reproductive impairment would not be expected at dietary levels up to 1000 ppm. Glyphosate is relatively nontoxic to honeybees. Available data indicate that the 48-hour acute toxicity to honeybees is > 100 micrograms per bee.

Aquatic Organisms

Based on a 48-hour acute toxicity of 780 ppm for Daphnia magna, technical glyphosate is no more than slightly toxic to aquatic invertebrates. Three tests on warmwater species, one bluegill and two fathead minnow, produced the 96-hour toxicities of 120 ppm, 84 mg/L and 97 mg/L, respectively; two rainbow trout 96-hour toxicities of 86 mg/L and 140 mg/L. These data indicate that glyphosate is no more than slightly toxic to freshwater species.

In addition to the acute studies a fish lifecycle study showed no effects at 25.7 mg/L, the highest level tested, indicating that glyphosate has a maximum acceptable threshold concentration (MATC) greater than 25.7 mg/L. A Daphnia study with MATC between 50 and 96 mg/L reported reduced reproductive capacity, the most sensitive parameter.

A series of studies was performed on marine/estuarine species. A 96-hour toxicity of 281 mg/L was found for grass shrimp. In a study on fiddler crabs, it was determined that 96-hour toxicity is 934 mg/L glyphosate. Both of these studies indicate that glyphosate is no more than slightly toxic. An embryolarvae 48-hour acute toxicity test indicated that glyphosate is no more that moderately toxic.

15

## Plant Protection

No studies were evaluated under this type.

Tier 1 testing is required on a case-by-case basis to support (I) products for which phytotoxicity problems arise and open literature data are not available (II) products that may pose hazards to endangered or threatened species. Since glyphosate has use patterns similar to those chemicals that have jeopardy opinions prepared by Office of Endangered Species (OES), the Agency is assuming that use of glyphosate may also pose hazards to endangered plants. The Agency is requiring that Tier 1 testing be performed with glyphosate. Refer to charts in Appendix I for testing required.

## Endangered Species

In considering the hazard to endangered species the previous consultations with the OES were reviewed. The Endangered Species Act requires all federal agencies to formally consult with OES whenever an action taken by them may affect an endangered species. The consultation provides an opinion which may or may not indicate hazard to an endangered species. An opinion which indicates hazard is a jeopardy opinion. Consultations on crops (alfalfa, apples, barley, corn, cotton, pears, and wheat), rangeland/pastureland, and silvicultural sites has resulted in jeopardy opinions relating to glyphosate. In order to protect the jeopardized species, the Agency will require additional product labeling

The consultation for the crop cluster indicated jeopardy for Solano grass, Houston toad, and the Valley elderberry longhorn beetle. Glyphosate products with crop uses are required to bear the labeling entitled, "Glyphosate Endangered Species Labeling (crop sites)." Refer to Section D of Part IV for label wording.

Silviculture sites were addressed under the forest cluster. The following plant species were identified to be at risk: green pitcher plant, Chapman rhododendron, Florida torreya, hairy rattleweed, persistent trillum, small-whorled pogonia, northern wild monkshood, Furbish lousewort, mountain golden-heather, and Virginia round-leaf birch. Glyphosate products with silvicultural uses are required to bear the labeling entitled "Glyphosate Endangered Species Labeling (Silvicultural Sites)." Refer to Section D of Part IV for label wording.

The OES has indicated jeopardy for the following plants when rangeland/pastureland is treated with herbicides: green pitcher plant, Arizona agave, Nichol's Turk's head cactus, Arizona hedgehog cactus, Brady pincushion cactus, Peebles Navajo cactus, Siler pincushion cactus, Arizona cliffrose, Carex specuicola, Thornber's fishhook cactus, large-flowered

16

fiddleneck, San Benito evening-primrose, salt marsh birds-beak,
San Clemente Island Indian paintbrush, San Clemente Island
larkspur, Eureka dune grass, Solano grass, Antioch Dunes
evening-primrose, San Clemente Island bush-mallow, San Diego
mesa mint, San Clemente Island broom, Raven's manzanita,
Santa Barbara Island liveforever, Pedate checker-mallow,
slender-petaled mustard, Contra Costa wallflower, McDonald's
rockcress, Truckee barberry, Uinta Basin hookless cactus,
Mesa Verde cactus, North Park phacelia, clay-loving wild-
buckwheat, purple-spined hedgehog cactus, knowlton cactus,
spineless hedgehog cactus, Clay phacelia, Hairy rattleweed,
Nehe, Harper's beauty, Miccosukee gooseberry, Gouania
hillebrandii, Stenogyne angustifolia var. angustifolia,
Haplostachys haplostachya var. angustifolia, Ewa Plains'
akoko, Diamond Head schiedea, Liochaeta venosa, caneate
bidens, MacFarlane's four-o'clock, Short's goldenrod, Robbins
cinquefoil, Lee pincushion cactus, Sneed pincushion cactus,
Kuenzler hedgehog cactus, McKittrick pennyroyal, Todsen's
pennyroyal, gypsum wild-buckwheat, Rhizome fleabane, Cirsium
vinaceum, bunched arrowhead, Malheur wire-lettuce, Tennessee
purple coneflower, Ashy dogweed, Tobusch fishhook cactus,
Nellie cory cactus, bunched cory cactus, Lloyd's hedgehog
cactus, black lace cactus, Davis' green pitaya, Lloyd's
mariposa cactus, Johnston's frankenia, Texas poppy-mallow,
Texas snowbells, Novasota ladies'-tresses, Texas wild-rice,
Maguire daisy, Wright fishhook cactus, Rydberg milk-vetch,
Dwarf bear-poppy and Last Chance townsendia.  As a result of
this consultation, glyphosate products with uses for range
and pastureland are required to bear the labeling entitled
"Glyphosate Endangered Species Labeling (Range and Pastureland
Uses)."  Refer to Part D of Section IV for label wording.

Endangered species labeling may be required for aquatic
and noncrop uses when the respective generic consultations
from Office of Endangered Species are available.

The following registered uses of glyphosate have not
been reviewed in the cluster project or in registration
submissions: almond, apricot, artichoke (Jerusalem), asparagus,
avocado, banana, beans, beet greens, beets (red), bermudagrass
(seed crop), broccoli, cabbage, carrot, cauliflower, celery,
cherry, chicory, citrus, coffee, cranberry, filbert, gardens,
grapes, grasses grown for seed, guava, horseradish, kale,
lentils, lettuce, macadamia nuts, mango, mustard greens,
nectarine, okra, onions, papaya, parsnips, peachs, peanuts,
peas, pecans, pineapple, pistachio, plum, potato (irish),
prune, radish, rutabaga, spinach, sugar beets, sugarcane,
sweet potato, tea, turnips, walnut, watercress, and ornamentals.

## Tolerance Reassessment

Tolerances have been established for residues of glyphosate in a variety of raw agricultural commodities, in meat, fat, and meat byproducts (40 CFR 180.364) and in processed food (21 CFR 193.235) and feed (21 CFR 561.253). EPA has evaluated the residue and toxicology data supporting tolerances, and has addressed the following questions:

a. Whether the available data support all currently registered use patterns (including those registered under FIFRA section 24(c) and intrastate uses and methods of application).

b. Whether the existing uses of glyphosate require the establishment of tolerances in animal products because of residues that may transfer to animals from feed items derived from raw agricultural commodities.

c. Whether food additive regulations are necessary because residues in the raw agricultural commodity concentrate in processing.

d. Whether group tolerances could be established in accordance with 40 CFR 180.34(f).

e. Whether, in the absence of tolerances, restrictions on use, grazing, or feeding of treated commodities are necessary.

f. Whether the tolerances are expressed accurately and in current terminology.

The regulatory results of the Agency's review are set out in Section IV A, Regulatory Positions and Rationales.

## Residue Data

The residue data reviewed in support of these tolerances include the following:

a. Data on the nature of the residues in both plants and animals, including identification of major metabolites and degradates of glyphosate. Available data indicate that the major metabolite of glyphosate is aminomethyl-phosphonic acid (AMPA). The established tolerances are based on occurrence of glyphosate and AMPA in plants and animals.

18

b.   Radiolabeled studies on the uptake, translocation, and metabolism of glyphosate in plants which show that the parent compound, glyphosate, and its metabolite, AMPA, are the residues of concern in plants.

c.   Radiolabeled studies on the uptake, translocation, and metabolism of glyphosate in poultry, swine, cattle, rats, and rabbits which show that glyphosate and its metabolite, AMPA, occur in liver of poultry, swine, and cattle and kidney of swine and cattle. These residues have also been identified in the tissues, urine, and feces of rats and rabbits.

d.   Analytical methodology for determining levels of residues of glyphosate in plants, animals, and water.  The available gas liquid chromatography (GLC) method for analysis in milk, eggs, and animal tissues is adequate for data collection and enforce-ment.  Available methods for analysis of residues of glyphosate and its major metabolite, AMPA, in or on plant commodities or water are adequate for data collection.

e.   Storage stability data demonstrating residues of glyphosate.  Available data are sufficient to ascer-tain that residues of glyphosate and its AMPA metabo-lite are stable in or on frozen plant products for up to 7 months.  No data were submitted concerning storage stability of glyphosate in or on animal products (tissue, milk, or eggs) or water.

f.   Data on magnitude and levels of residues of glyphosate in individual raw agricultural commodities, animal products, and processed food and feed items.

## Toxicology Data

The toxicology data considered in support of the tolerances include:  a chronic feeding study in mice with a NOEL of 5000 ppm; a chronic feeding study in rats with a NOEL greater than 31 mg/kg/day; a rat teratology study with a fetotoxic and maternal NOEL of 1000 mg/kg/day and no observed teratogenic effects; a rabbit teratology study with a maternal toxicity NOEL of 175 mg/kg/day, a fetotoxicity NOEL of 350 mg/kg/day and no observed teratogenic effects; a three-generation reproduction study in rats with a NOEL of 10 mg/kg/day; and

several mutagenicity studies, all negative. Refer to the toxicology section above for detailed information on available data and additional requirements.

The acceptable daily intake (ADI) for glyphosate is currently based on the finding of renal tubular dilation in $F_{3b}$ pups in the rat three-generation reproduction study. The NOEL for this effect was 10 mg/kg/day. Using a hundred-fold safety factor, the ADI for glyphosate is 0.1 mg/kg/day, which is equivalent to a maximum permissible intake (MPI) of 6.0 mg/day in a 60-kg individual. Existing tolerances produce a theoretical maximum residue contribution (TMRC) of 1.4238 mg/day from a 1.5 kg diet which occupies 23.73 percent of the ADI.

Tolerances Issued

Refer to 40 CFR 180.364, 21 CFR 193.235, and 21 CFR 561.253 for tolerances established on glyphosate and its metabolite aminomethylphosphonic acid.

Canadian tolerances have been established for residues of glyphosate in or on carrots, sugar beets, lettuce, cabbage, beans, peas, soybeans, citrus, pome fruits, stone fruits, grapes, cereals, grasses, and forage legumes at 0.1 ppm.

No Mexican or Codex tolerances have been established for glyphosate.

IV.   REGULATORY POSITION AND RATIONALE

A.  REGULATORY POSITION AND RATIONALE

1.  None of the risk criteria listed in 40 CFR 154.7 have been exceeded for glyphosate. Therefore, no referral to Special Review is being made at this time. The Agency is requiring a repeat of the mouse and rat oncogenicity studies.

Rationale: A review of the data indicates no risk criteria have been exceeded or met. A review of the mouse oncogenicity study noted a slight increase in the incidence of renal tubular

20

adenomas. Based on reviews by the Toxicology Branch Ad Hoc Oncogenicity Committee and the Science Advisory Panel, the Agency concluded that the mouse study was not adequate to define the oncogenic potential of glyphosate. A review of the rat oncogenicity study determined that a maximum tolerated dose had not been reached; therefore, the rat study was also inadequate to determine oncogenic potential. Refer to Part III - Agency Assessments for detailed discussion of data.

2. The Agency will issue registrations for substantially similar products and will issue significant* new uses on a case-by-case basis.

Rationale: The available data do not clearly demonstrate whether glyphosate is an oncogen. However, even if it is assumed to be an oncogen, the data suggests that it would be relatively weak. Pending completion and review of the required chronic feeding studies the Agency would use the Q* from the existing mouse study and other relevant data in assuming the potential risk from addition of any significant new use.

3. The Agency is not imposing a ground water advisory statement for glyphosate.

Rationale: Available data indicate that glyphosate is strongly adsorbed to the soil; therefore, the potential of glyphosate to contaminate ground water is expected to be low. Refer to the Environmental Characteristics Section of Part III - Agency Assessments for a detailed discussion of available data.

4. The Agency is not imposing any reentry statements nor is it requesting that reentry data be submitted.

Rationale: Available acute dermal toxicity data place technical glyphosate and its formulated products for agricultural use in Toxicity Category III. Based on glyphosate's low acute toxicity and the fact that the major routes of exposure are via splashing during mixing and loading, it is not expected that field workers would be exposed to acutely toxic levels of glyphosate following agricultural treatments. Therefore, reentry data or intervals are not required by the Agency.

5. The Agency is requiring that labeling on all end-use products except those labeled for homeowner use only bear "Worker Safety Rules" requiring protective clothing requirements (face shield or goggles), chemical resistant

*Significant new use is defined in 44 FR 27934, May 11, 1979. In the case of a new food or feed use, the Agency will consider as significant an increase in Theoretical Maximum Residue Contribution of greater than 1 percent.

gloves, chemical resistant apron and chemical resistant shoes, shoe coverings, or boots). Refer to Section D of Part IV for detailed wording.

Rationale: The major routes of exposure are dermal and ocular via splashing during mixing or loading. Exposure to all formulations of glyphosate during application is expected to be dermal. Information from the California Department of Food and Agriculture reported incidents of worker poisonings or illnesses due to skin or eye irritation. Although technical glyphosate has very low toxicity (not irritating), formulations of glyphosate for agricultural use cause moderate eye irritation and some dermal irritation. The "Worker Safety Rules" required will reduce the exposure of workers to formulations of glyphosate. The formulated products labeled for homeowner uses only are of very low concentration and available data show they are not very irritating to either skin or eyes.

6. The Agency is imposing endangered species labeling for crops (alfalfa, apples, barley, cotton, pears, and wheat), rangeland and pastureland, and silvicultural sites. Refer to Section IV D for labeling requirements.

Rationale: Consultations with the Office of Endangered Species resulted in jeopardy opinions for several species (refer to Endangered Species Section of Part III for lists of species). The proposed labeling is intended to reduce the hazard to endangered or threatened species.

7. The Agency is imposing a label restriction prohibiting the rotation of food or feed crops in glyphosate treated soils unless glyphosate is registered for use on those crops. This restriction will be in effect until the requested rotational crop data are submitted and reviewed. Refer to Section IV Part D for exact wording.

Rationale: Rotational crop data are unavailable for glyphosate. Therefore the Agency cannot determine a length of time after treatment of soil with glyphosate that food or feed crops may be planted without exposure to residues of glyphosate. This statement is to ensure that food or feed crops without tolerances are not exposed to residues of glyphosate.

8. The Agency is imposing a label restriction prohibiting the use of glyphosate on rice fields in which crayfish and catfish are included in cultural practice.

Rationale:  Tolerances are not established for residues of glyphosate in crayfish and catfish.  This restriction is to ensure that crayfish and catfish harvested for human food are not exposed to residues of glyphosate.

9.  The Agency is imposing label restrictions prohibiting the use of water containing glyphosate from rice cultivation for irrigation of feed or food crops not appearing on glyphosate labels.

Rationale:  Data are not available to support the use of water containing glyphosate for irrigation purposes on feed or feed crops not appearing on the label.  These restrictions are to ensure that food or feed crops not having tolerances are not exposed to residues of glyphosate.

10.  The Agency will not require additional residue data on the following raw agricultural commodities:  garden beets; carrots; potatoes; rutabagas; sugar beets; sweet potatoes; garden beet tops; chicory tops; sugar beet tops; celery; lettuce; spinach; cauliflower; kale; mustard greens; dried beans; lentils; lima beans; peas (succulent or dried); snap beans; soybeans; bean vines and hay; lentil forage and hay; soybean forage and hay; grapes; barley grain; corn grain (including popcorn), and sweet corn (kernels plus cob with husks removed); oat grain; rice grain; wheat grain; barley forage, hay, and straw; corn forage, silage, and fodder; oat forage, hay, and straw; rice straw; wheat forage, hay, and straw; avocados; bananas (including plantains); cotton; guava; okra; papayas; pineapple; pistachionuts; and watercress.  Additional residue data are not required for the following processed food or feeds:  soybean hulls, almond hulls, barley milled products, oat milled products; and sugarcane molasses.  Additional residue data are not required for the following crop groupings:  legume vegetables; foliage of legumes         ; vegetables group; pome fruits group; treenuts; grass forage; fodder and hay group; and forage and hay of nongrass animal feeds.

Rationale:  The Agency has determined that the available residue data adequately support the established tolerances for these raw agricultural commodities, foods, feeds, and crop groups.

11.  The Agency is requiring that additional residue data and/or information be submitted on the following raw agricul-tural commodities:  parsnips; turnips, turnip greens; onions; cranberries; sorghum grain; asparagus; coffee; mangos; peanuts,

peanut forage, hay, and hulls; and sugarcane. Additional
residue data and/or information are required on the following
processed foods or feeds; potato granules, chips and dried
potatoes; processed commodities of sugar beets (dehydrated
pulp, molasses, and refined sugar); dried citrus pulp; prunes;
processed products of grapes; corn oil (crude and refined);
corn-milled products; processed products of grain and sorghum;
wheat-milled products; alfalfa seed; and processed olives,
and olives. Additional residue data and/or information are
required on the following crop groups: root and tuber vege-
tables; leaves of root and tuber vegetables, bulb vegetables
groups; leafy vegetables (except brassica vegetables group,
brassica leafy vegetables group; fruiting vegetables (except
cucurbits) group; citrus fruits group; small fruits and
berries group; and cereal grains group. Refer to the data
tables in Appendix I for a detailed discussion of types of
data and/or information needed.

Rationale: The Agency has determined that the available
residue data do not adequately support the established
tolerances for these raw agricultural commodities, foods,
feeds and crop groups.

   12. The Agency requires residue data together with a
petition for establishing tolerances, if necessary, for
sugarcane forage and pineapple forage. Alternatively, a
statement may be placed on the label restricting the grazing
or feeding of treated commodities. Each registrant will have
6 months to notify the Agency which alternative it chooses.
Refer to the data tables in Appendix I for details of residue
data required.

Rationale: Review of available data indicates that residue
data are required to determine whether residues are transferred
to animals from feed items. A grazing restriction prevents
the transfer of residues from animals to feed items.

   13. The Agency intends to disapprove the registrations
of the following 24(c) registrations (KS820001, MO820014,
NE820009, NM820001, OK820010, and TX820023. Alternatively,
residue data and petitions for tolerances must be submitted
proposing tolerances on sorghum forage, fodder, and hay
reflecting these uses. Each registrant will have 6 months
to notify the Agency which alternative he chooses. Refer to
the data tables in Appendix I for details of the residue
data required.

Rationale: Available residue data do not support this use
pattern.

14.  The Agency is requiring the following changes in the tolerance listings.

a.  The tolerance for residues in or on root crop vegetables should be deleted and individual tolerances established or proposed for individual members of the root and tuber vegetables crop group.

b.  The tolerance for residues in or on seed and pod vegetables should be deleted and individual tolerances established for members of the former seed and pod vegetables group on which use of glyphosate is registered.

c.  The entry "Nuts" will be amended read "Tree Nuts."

d.  The tolerance for residues in or on leafy vegetables should be deleted and tolerances established for residues in or on individual members of the leafy vegetable crop group.

e.  The existing tolerances for alfalfa, clover, and forage legumes should be deleted and separate tolerances for residues of glyphosate and AMPA of 100 ppm should be established for residues of forage and hay of nongrass animal feeds.

f.  The existing tolerance for residues in or on forage legumes should be deleted and separate tolerances of 0.2 ppm should be established in or on legume vegetables (except soybeans) and the foliage of legume vegetables, except soybean forage and hay.

g.  The established tolerances for forage grasses, grasses, forage, Bahiagrass, bermudagrass, bluegrass, bromegrass, fescue, orchardgrass, ryegrass, timothy and wheat grass should be deleted and a separate tolerance of 100 ppm for residues in or on grass forage and hay must be established.

Rationale:  The crop groupings as listed have been superseded by publication of new crop groupings.  (Refer to 40 CFR 180.34.

15.  The tolerance for cottonseed forage and hay must be cancelled.

Rationale:  These tolerances are inappropriate because cotton hay is not fed to animals; therefore, hay is not considered a raw agricultural commodity of cotton.  Since a grazing restriction prohibits feeding of cotton forage, no residues are transferred to animals from the feed item cotton forage.

25

16.   The food additive tolerances for instant tea from imported dried tea will be raised from 4 ppm to 7 ppm.

Rationale:  The available processing data indicate that residues of glyphosate concentrating in the processed commodity instant tea are 5 to 7 times more than in the processed commodity imported dried tea.  Available data support the established tolerance of 1 ppm on imported dried teas.

17.   The Agency is requiring additional data on crops treated with irrigation water containing residues of glyphosate. Once these data are submitted, the crop groupings presently listed in § 180.364(c) must be deleted and tolerances based on the requested field irrigation tests must be established for glyphosate residues in or on members of the current, appropriate crop groups and all major irrigated crops which are not included in a crop group, such as cottonseed, sugarcane, peanuts, etc.

Rationale:  Available data are not sufficient to determine the magnitude of glyphosate residues in or on crops treated with irrigation water containing residues of glyphosate.

18.   While data gaps are being filled, currently registered manufacturing use products (MPs) and end use products (EPs) containing glyphosate as the sole active ingredient may be sold, distributed, formulated, and used, subject to the terms and conditions specified in this Standard.  Registrants must provide or agree to develop additional data, as specified in the Data Appendices, in order to maintain existing registrations.

Rationale:  Under FIFRA, the Agency may choose not to cancel or withhold registration if data are missing or are inadequate (see FIFRA sec. 3(c)(2)(B) and 3(c)(7).

Issuance of this Standard provides a mechanism for identifying data needs.  These data will be reviewed and evaluated, after which the Agency will determine if additional regulatory changes are necessary.

B.   CRITERIA FOR REGISTRATION

To be registered or reregistered under this Standard, products must contain glyphosate as the sole active ingredient, bear required labeling, and conform to the product composition, acute toxicity limits, and use pattern requirements listed in this section.

26

C.  ACCEPTABLE RANGES AND LIMITS

   1.  Product Composition Standard

        To be registered or reregistered under this Standard,
manufacturing-use products (MP's) must contain glyphosate as
the sole active ingredient.  Each MP formulation proposed for
registration must be fully described with an appropriate
certification of limits, stating maximum and minimum amounts
of the active ingredient and inert ingredients which are
present in products, as well as impurities found at greater
than 0.1 percent.

   2.  Acute Toxicity Limits

        The Agency will consider registration of technical
grade and manufacturing-use products containing glyphosate
provided that the product labeling bears appropriate pre-
cautionary statements for the acute toxicity category in
which each product is placed.

D.  REQUIRED LABELING

   All MPs (and EPs if covered by Standard) must bear
appropriate labeling as specified in 40 CFR 162.10.  Appendix
II contains information on label requirements.  All labeling
changes must appear on all products in channels of trade by
June 30, 1988.

   In addition to the above, the following information must
appear on the labeling:

   1.  Ingredients Statement

        The ingredient statement for MP's must list the active
ingredient as:

             Glyphosate, N-phosphonomethyl glycine

   2.  Precautionary Statements

        Statements for Manufacturing-Use Products

                Do not discharge effluent containing this
                product into lakes, streams, ponds, estuaries,
                oceans, or public waters unless this product
                is specifically identified and addressed in
                an NPDES* permit.  Do not discharge effluent

---

*National Pollution Discharge Elimination System.

containing this product to sewer systems
without previously notifying the sewage
treatment plant authority.  For guidance,
contact your State Water Board or Regional
Office of the EPA.

Statements for End-Use Products

Outdoor Uses

Products not labeled for aquatic use

Do not apply directly to water or wetland
(swamps, bogs, marshes, and potholes).  Do
not contaminate water by cleaning of equipment
or disposal of waste.

Products Labeled for Aquatic Use

Do not contaminate water by cleaning of
equipment or disposal of waste.  Treatment
of aquatic weeds can result in oxygen loss
from decomposition for dead plants.  This
loss can cause fish suffocation.

3.   The following label statements must appear on all
end-use products.

Rotational Crop

Do not use glyphosate on rice fields in
which crayfish and catfish farming are
included in the cultural practice and do not
plant crops other than those with registered
glyphosate uses for food or feed in glyphosate-
treated soil.

Irrigated Crops

Do not use water containing glyphosate
residues from rice cultivation to irrigate
food or feed crops not listed on the glyphosate
label.

4.   The following Worker Safety Rules must appear on end-
use products containing glyphosate except for those labeled
for homeowner use only.

28

Worker Safety Rules

THIS PRODUCT CAUSES EYE IRRITATION AND SKIN IRRITATION

Keep all unprotected persons, children, livestock, and pets away from treated areas or where there is danger of drift.

Do not rub eyes with hands.  If you feel sick in any way, STOP work and get help right away.  See First Aid (Practical Treatment) section.

HANDLE THE CONCENTRATE ONLY WHEN WEARING THE PROTECTIVE CLOTHING AND EQUIPMENT.

Wear goggles or a face shield, chemical-resistant gloves, chemical resistant apron, and chemical-resistant shoes, shoe coverings, or boots.

WEAR THE FOLLOWING PROTECTIVE CLOTHING DURING APPLICATION, EQUIPMENT REPAIR, CLEANING, DISPOSAL OF THE PESTICIDE SPRAY SOLUTION, AND DURING REENTRY TO TREATED AREAS BEFORE THE SPRAY HAS DRIED.

Wear goggles or a face shield, chemical-resistant gloves and chemical-resistant shoes, shoe covers, or boots.  A helmet with visor may be worn during open cockpit aerial application.

During application only from a tractor with a completely enclosed cab or aerially with an enclosed cockpit the above protective clothing is waived.  Chemical-resistant gloves must be available in the cab or cockpit and must be worn while exiting.

IMPORTANT!  Before removing gloves, wash them with soap and water.  Always wash hands, face, and arms with soap and water before smoking, eating, drinking, or toileting.

AFTER WORK, wash protective clothing and protective equipment with soap and water after each use.  Personal clothing worn during use should be laundered separately from household articles.  Clothing or protective equipment heavily contaminated or drenched with glyphosate must be disposed of in accordance with State and local regulations.

HEAVILY CONTAMINATED OR DRENCHED CLOTHING CANNOT BE ADEQUATELY DECONTAMINATED.

29

5.  The following Endangered Species labeling is required for all end-use products labeled for the following use patterns.

Glyphosate products with silviculture uses are required to bear the following labeling:

Glyphosate Endangered Species Labeling
(Silvicultural Sites)

ENDANGERED SPECIES RESTRICTIONS

The use of any pesticide in a manner that may kill or otherwise harm an endangered or threatened species or adversely modify their habitat is a violation of Federal law.  The use of this product is controlled to prevent death or harm to endangered or threatened species that occur in the following counties or elsewhere in their range.

Before using this pesticide in the following counties you must obtain the EPA Forest Herbicide Endangered Species Bulletin (EPA/ES-FOREST).  The use of this pesticide is prohibited in these counties unless specified otherwise in the Bulletin.  The Forest Herbicide Bulletin is available from either your County Agricultural Extension Agent, the Endangered Species Specialist in your State Wildlife Agency Headquarters, or the appropriate Regional Office of either the U.S. Fish and Wildlife Service (FWS) or the U.S. Environmental Protection Agency (EPA) indicated below.  THIS BULLETIN MUST BE REVIEWED PRIOR TO PESTICIDE USE.

Contact FWS or EPA in Atlanta, Georgia

ALABAMA:  counties of Cherokee, DeKalb, Marshall, Jackson, and Etowah

FLORIDA:  counties of Clay, Gadsden, Gulf, Liberty, and Jackson

GEORGIA:  counties of Decatur, Towns, Wayne, Brantley, Rabun, Habersham, and Stephans

NORTH CAROLINA:  counties of Burke, Macon, and Henderson

SOUTH CAROLINA:  Oconee county

<u>Contact FWS in Newton Corner, Massachusetts or EPA in
Philadelphia, Pennsylvania</u>

NEW JERSEY:  Sussex county

PENNSYLVANIA:  counties of Venango and Centre

VIRGINIA:  counties of Smyth, Caroline, and James City

<u>Contact FWS in Newton Corner, Massachusetts or EPA in
Boston, Massachusetts</u>

MAINE:  counties of Arrostook, Cumberland, and Kennebec

MASSACHUSETTS:  counties of Hampshire and Essex

NEW HAMPSHIRE:  counties of Strafford, Belknap,
   Merrimack, Rockingham, and Carroll

RHODE ISLAND:  Providence county

Glyphosate products with uses for rangeland and
pastureland are required to bear the following labeling:

Glyphosate Endangered Species Labeling (Rangeland and
Pasture Uses)

The use of any pesticide in a manner that may kill or
otherwise harm an endangered or threatened species or adversely
modify their habitat is a violation of Federal law.  The use
of this product is controlled to prevent death or harm to
endangered or threatened species that occur in the following
counties or elsewhere in their range.

Before using this pesticide in the following counties
you must obtain and review the EPA Rangeland and Endangered
Species Bulletin (Bulletin EPA/ES-RANGE).  The use of this
pesticide is prohibited in these counties unless specified
otherwise in the Bulletin.  The Rangeland Bulletin is available
from your County Agricultural Extension Agent, the Endangered
Species Specialist in your State Wildlife Agency Headquarters,
or the appropriate Regional Office of the Wildlife Agency
Headquarters or the appropriate Regional Office of the U.S.
Fish and Wildlife Service (FWS) or the U.S. Environmental
Protection Agency (EPA) indicated below.  <u>THIS BULLETIN MUST
BE REVIEWED PRIOR TO PESTICIDE USE</u>.

31

Contact FWS in Portland, Oregon or EPA in San Francisco, California

    CALIFORNIA:  counties of San Benito, Monterey, San Luis Obispo, Fresno, Kings, Kern, Santa Barbara, Ventura, Tulare, San Joaquin, San Diego, Los Angeles, Inyo, Solano, San Francisco, San Bernardino, Contra Costa, Mendocino, and Nevada

    HAWAII:  Island of Maui, District of Lahaina, Island of Hawaii, and Island of Oahu

Contact FWS in Portland, Oregon or EPA in Seattle, Washington

    IDAHO:  Idaho county

    OREGON:  counties of Harney and Wallowa

Contact FWS in Albuquerque, New Mexico or EPA in San Francisco, California

    ARIZONA:  counties of Yavapai, Maricopa, Pinal, Pima, Gila, Navajo, Mohave, and Graham

Contact FWS in Albuquerque, New Mexico or EPA in Dallas, Texas

    NEW MEXICO:  counties of Eddy, Dona Ana, Otero, Chaves, Lincoln, San Juan, Sierra, McKinley, and Catron

    TEXAS:  counties of El Paso, Culberson, Zapata, Bandera, Kerr, Brewster, Terrell, Pecos, Jim Wells, Kelburg, Refugio, Starr, Runnels, Edwards, Real, Kimble, Val Verde, Brazos, and Hays

Contact FWS or EPA in Atlanta, Georgia

    ALABAMA:  counties of Cherokee, De Kalb, Jackson, and Marshall

    FLORIDA:  counties of Franklin, Liberty, and Jefferson
    GEORGIA:  counties of Towns, Wayne, and Brantley

    KENTUCKY:  counties of Nicholas, Fleming, and Robertson

    NORTH CAROLINA:  Henderson county

SOUTH CAROLINA:  counties of McCormick and Greenville

TENNESSEE:  counties of Rutherford, Wilson, and Davidson

Contact FWS or EPA in Boston, Massachusetts

NEW HAMPSHIRE:  Coos county

Contact FWS or EPA in Denver, Colorado

COLORADO:  counties of Delta, Mesa, Montrose, Montezuma, Jackson, Washington, La Plata, and Duray

UTAH:  counties of Washington, San Juan, Duchesne, Summit, Emery, Wayne, Piute, Garfield, Utah, and Sevier

Glyphosate products labeled for use on field crops (corn, cotton, soybeans, sorghum, small grains, alfalfa, and for apples and pears) must bear the following label:     -

[GLYPHOSATE (LABELING INFORMATION FOR FIELD CROP USES: CORN, COTTON, SOYBEANS, SORGHUM, SMALL GRAINS, ALFALFA, AND FOR APPLES AND PEARS)]

ENDANGERED SPECIES RESTRICTIONS

The use of any pesticide in a manner that may kill or otherwise harm an endangered or threatened species or adversely modify their habitat is a violation of Federal law.

The use of this product is controlled to prevent death or harm to endangered or threatened species that occur in the following counties or elsewhere in their range:

| STATE<br>Species<br>(BULLETIN NO.) | County | | |
|---|---|---|---|
| | Corn<br>Cotton<br>Wheat<br>Barley<br>Pears<br>Apples | Soybeans<br>Sorghum | Alfalfa |
| CALIFORNIA<br>  Solano grass<br>    (EPA/ES-85-13) | SOLANO | | |
|   Valley elderberry<br>    longhorn beetle<br>    (EPA/ES-85-08) | MERCED | | |
| TEXAS<br>  Houston toad<br>    (EPA/ES-85-28) | BURELSON<br>BASTROP | HARRIS | |

Before using any pesticide in the above counties you must
obtain the EPA Bulletin specific to your area.  The use of
this pesticide is prohibited in the above-named counties
unless specified otherwise in the Bulletins.  The EPA
Bulletins are available from either your County Agricultural
Extension Agent, the Endangered Species Specialist in
your State Wildlife Agency Headquarters, or the appropriate
Regional Office of the U.S. Fish and Wildlife Service or
the U.S. Environmental Protection Agency.  <u>THIS BULLETIN MUST
BE REVIEWED PRIOR TO PESTICIDE USE</u>.

34

## V.   PRODUCTS SUBJECT TO THIS STANDARD

All products containing one or more of the pesticides identified in Section II.A. are subject to certain requirements for data submission or changes in composition, labeling or packaging of the product.  The applicable requirements depend on whether the product is a manufacturing or end use product and whether the pesticide is the sole active ingredient or one of multiple active ingredients.

Products are subject to this Registration Standard as follows:

A.   Manufacturing use products containing this pesticide as the sole active ingredient are subject to:

1.  The restrictions (if any) upon use, composition, or packaging listed in Section IV, if they pertain to the manufacturing use product.

2.  The data requirements listed in Tables A and B[2]

3.  The labeling requirements specified for manufacturing use products in Section IV.

4.  Administrative requirements (application forms, Confidential Statement of Formula, data compensation provisions) associated with reregistration.

---

[2] Data requirements are listed in the three Tables in Appendix I of this Registration Standard.  The Guide to Tables in that Appendix explains how to read the Tables.

Table A lists generic data requirements applicable to all products containing the pesticide subject to this Registration Standard.  Table B lists product-specific data applicable to manufacturing use products.  The data in Tables A and B need not be submitted by a producer who is eligible for the formulator's exemption for that active ingredient.

Table C lists product-specific data applicable to end use products.  The Agency has decided that, in most cases, it will not require the submission of product-specific data for end use products at this time.  Therefore most Registration Standards do not contain a Table C.   35

B.  Manufacturing use products containing this pesticide
as one of multiple active ingredients are subject to:

> The data requirements listed in Table A.

C.  End use products containing this pesticide as the
sole active ingredient are subject to:

> 1.  The restrictions (if any) upon use, composition, or
> packaging listed in Section IV if they pertain to the
> end use product.
>
> 2.  If eligible for the formulator's exemption[3], the
> data requirements listed in Table C.
>
> 3.  If not eligible for the formulator's exemption, the
> data requirements listed in Table A and the data require-
> ments listed in Table C.
>
> 4.  The labeling requirements specified for end use
> products in Section IV.

D.  End use products containing this pesticide as one of
multiple active ingredients are subject to:

> a.  If not eligible for the formulator's exemption,
> the date requirements listed in Tables A and C.
>
> b.  If eligible for the formulator's exemption, the
> data requirements listed in Table C.

---

[3] If you purchase from another producer and use as the
source of your active ingredient only EPA-registered products,
you are eligible for the formulator's exemption for generic
data concerning that active ingredient (Table A) and product-
specific data for the registered manufacturing use product
you purchase (Table B).

> Two circumstances nullify this exemption:

> 1)  If you change sources of active ingredient to an
> unregistered product, formulate your own active ingredient,
> or acquire your active ingredient from a firm with ownership
> in common with yours, you individually lose the exemption
> and become subject to the data requirements in Table A.

> 2)  If no producer subject to the generic data requirements
> in Table A agrees to submit the required data, all end use
> producers lose the exemption, and become subject to those
> data requirements.

36

## VI.   REQUIREMENT FOR SUBMISSION OF GENERIC DATA

This portion of the Registration Standard is a notice
issued under the authority of FIFRA sec. 3(c)(2)(B).  It
refers to the data listed in Table A, which are required to
be submitted by registrants to maintain in effect the regis-
tration of products containing this active ingredient.[4]

### A.   What are generic data?

Generic data pertain to the properties or effects of a
particular active ingredient.  Such data are relevant to an
evaluation of all products containing that active ingredient
regardless of whether the product contains other ingredients.
(unless the product bears labeling that would make the data
requirement inapplicable).

Generic data may also be data on a "typical formulation"
of a product.  "Typical formulation" testing is often required
for ecological effects studies and applies to all products
having that formulation type.  These are classed as generic
data, and are contained in Table A.

### B.   Who must submit generic data?

All current registrants are responsible for submitting
generic data in response to a data request under FIFRA sec.
3(c)(2)(B) (DCI Notice).  EPA has decided, however, not to
require a registrant who qualifies for the formulator's
exemption (FIFRA sec. 3(c)(2)(D) and § 152.85) to submit
generic data in response to a DCI notice if the registrant
who supplies the active ingredient in his product is complying
with the data request.

If you are not now eligible for a formulator's exemption,
you may qualify for one if you change your source of supply
to a registered source that does not share ownership in
common with your firm.  If you choose to change sources of
supply, the Confidential Statement of Formula must identify
the new source(s) and you must submit a Formulator's Exemption
Statement form.

If you apply for a new registration for products containing
this active ingredient after the issuance of this Registration
Standard, you will be required to submit or cite generic
data relevant to the uses of your product if, at the time

---

[4] Registrations granted after issuance of this Standard
will be conditioned upon submission or citation of the data
listed in this Registration Standard.

the application is submitted, the data have been submitted
to the Agency by current registrants.  If the required data
have not yet been submitted, any new registration will be
conditioned upon the new registrant's submission or citation
of the required data not later than the date upon which
current registrants of similar products are required to provide
such data.  See FIFRA sec. 3(c)(7)(A).  If you thereafter fail
to comply with the condition of that registration to provide
data, the registration may be cancelled (FIFRA sec. 6(e)).

C.  What generic data must be submitted?

     You may determine which generic data you must submit by
consulting Table A.  That table lists the generic data needed
to evaluate current uses of all products containing this
active ingredient, the uses for which such data are required,
and the dates by which the data must be submitted to the
Agency.

D.  How to comply with DCI requirements.

     Within 90 days of your receipt of this Registration
Standard, you must submit to EPA a completed copy of the form
entitled "FIFRA Section 3(c)(2)(B) Summary Sheet" (EPA Form
8580-1, enclosed) for each of your products.  On that form
you must state which of the following six methods you will
use to comply with the DCI requirements:

     1.  You will submit the data, and either--

          (a) Submit the existing data that you believe will
     satisfy the data requirements, or

          (b) State that you will secure the data or have made
     a contract to have any necessary studies completed
     within the applicable time period.

     2.  You have entered into an agreement with one or more
registrants to jointly develop (or share in the cost of
developing) the data, but will not be submitting the data
yourself.  If you use this method, you must state who will
submit the data on which you will rely.  You must also provide
EPA with documentary evidence that an agreement has been
formed which allows you to rely upon the data to be submitted.
Such evidence may be:  (1) your letter offering to join in
an agreement and the other registrant's acceptance of your
offer, (2) a written statement by the parties that an agreement
exists, or (3) a written statement by the person who will be
submitting the data that you may rely upon its submission.
The Agency will also require adequate assurance that the
person whom you state will provide the data is taking appropriate
steps to secure it.  The agreement to produce the data need
not specify all of the terms of the final arrangement between
the parties or a mechanism to resolve the terms.

38

3.  You have attempted to enter into an agreement to
jointly develop data, but no other registrant has accepted
your offer.  You request that EPA not suspend your registration
for non-compliance with the DCI.  EPA has determined that,
as a general policy, it will not suspend the registration of
a product when the registrant has in good faith sought and
continues to seek to enter into a data development/cost
sharing program, but the other registrants developing the
data have refused to accept its offer.  [If your offer is
accepted, you may qualify for Option 2 above by entering
into an agreement to supply the data.]

In order to qualify for this method, you must:

1.  File with EPA a completed "Certification of Attempt
to Enter into an Agreement with other Registrants for Develop-
ment of Data" (EPA Form 8580-6, enclosed).

2.  Provide us with a copy of your offer to the other
registrant and proof of the other registrant's receipt of your
offer (such as a certified mail receipt).  Your offer must,
at a minimum, contain the following language or its equivalent:

> [Your company name] offers to share in the burden of
> producing the data required pursuant to FIFRA sec.
> 3(c)(2)(B) in the [name of active ingredient] Registration
> Standard upon terms to be agreed or failing agreement
> to be bound by binding arbitration as provided by FIFRA
> section 3(c)(2)(B)(iii).

The remainder of your offer may not in any way attempt to
limit this commitment.  If the other registrant to whom your
offer is made does not accept your offer, and if the other
registrant informs us on a DCI Summary Sheet that he will
develop and submit the data required under the DCI, then you
may qualify for this option.  In order for you to avoid
suspension under this method, you may not later withdraw or
limit your offer to share in the burden of developing the
data.  In addition, the other registrant must fulfill its
commitment to develop and submit the data.

4.  You request a waiver of the data requirement.  If
you believe that a data requirement does not (or should not)
apply to your product or its uses, you must provide EPA with
a statement of the reasons why you believe this is so.  Your
statement must address the specific composition or use factors
that lead you to believe that a requirement does not apply.
Since the Agency has carefully considered the composition and
uses of pesticide products in determining that a data require-
ment applies, EPA does not anticipate that many waivers will
be granted.  A request for waiver does not automatically
extend the timeframes for developing required data, and if
your waiver request is denied, your registration may be
suspended if you fail to submit the data.

5.   <u>You request that EPA amend your registration by deleting the uses for which the data are needed.</u>  You are not required to submit data for uses which are no longer on your label.

6.   <u>You request voluntary cancellation of the registration of your product(s) for which the data are needed.</u>

E.   <u>Procedures for requesting a change in testing protocol.</u>

If you will generate the required data and plan to use test procedures which deviate from (or are not specified in) either EPA's Pesticide Assessment Guidelines or the Reports of Expert Groups to the Chemicals Group, Organization for Economic Cooperation and Development (OECD) Chemicals Testing Programme, you must submit for EPA approval the protocols you propose to use.

You should submit your protocols before beginning testing and await EPA approval, because the Agency will not ordinarily accept as sufficient studies using unapproved protocols. A request for protocol approval will not automatically extend the timeframe for submission of the data, nor will extensions generally be given to conduct studies due to submittal of inappropriate protocols.

F.   <u>Procedures for requesting extensions of time.</u>

If you plan to submit the data, and think that you will need more time to generate the data than is allowed by EPA's schedule, you may submit a request for an extension of time. The extension request must be submitted in writing to the Product Manager listed at the end of this section and must be made before the deadline for response.  EPA will view failure to request an extension before the response deadline as a waiver of any future claim that there was insufficient time to submit the data.  While EPA considers your request, you must strive to meet the deadline for submitting the data.

The extension request should state the reasons why you believe that an extension is necessary and the steps you have taken to meet the testing deadline.  Time extensions normally will not be granted due to problems with laboratory capacity or adequacy of funding, since the Agency believes that with proper planning these can be overcome.  Time extensions may be considered when joint data development is planned, or when the Agency must approve a new or modified protocol before the study can be begun.

A request for an extension does not automatically extend the timeframe for submission of the data.  If EPA denies your request for a time extension and you do not submit the data as requested, EPA may begin proceedings to suspend the registrations of your products.

40

G.   Existing stocks provision upon suspension or cancellation.

     EPA will permit continued sale and distribution of existing
stocks of a pesticide product which has been suspended or
cancelled if doing so would be consistent with the purposes
of the Act.  However, the Agency has determined that if a
registration is suspended for failure to respond to a DCI
request under FIFRA sec. 3(c)(2)(B), an existing stocks
provision is not consistent with the Act.  Accordingly, the
Agency does not anticipate granting permission to sell or
distribute existing stocks of suspended product except in
rare circumstances.  If you believe that your product will
be suspended or cancelled and that an existing stocks provision
should be granted, you have the burden of clearly demonstrating
to EPA that granting such permission would be consistent with
the Act.  The following information must be included in any
request for an existing stocks provision:

     1.  Explanation of why an existing stocks provision is
     necessary, including a statement of the quantity of
     existing stocks and your estimate of the time required
     for their sale or distribution; and

     2.  Demonstration that such a provision would be consis-
     tent with the provisions of FIFRA.

## VII. REQUIREMENT FOR SUBMISSION OF PRODUCT-SPECIFIC DATA

Under its DCI authority, EPA has determined that certain product-specific data are required to maintain your registrations in effect.  Product-specific data are derived from testing using a specific formulated product, and, unlike generic data, generally support only the registration of that product. All such data must be submitted by the dates specified in this Registration Standard.

If you have a manufacturing use product, these data are listed in Table B.  If you have an end use product, the data are listed in Table C.  As noted earlier, the Agency has decided that it will not routinely require product-specific data for end use products at this time.  Therefore, Table C may not be contained in this Registration Standard; if there is no Table C, you are not required to submit the data at this time.

In order to comply with the product specific data require- ments, you must follow the same procedures as for generic data. See Section IV.D, E, F, and G.  You should note, however, that product chemistry data are required for every product, and the only acceptable responses are options IV.D.1. (submit data) or IV.D.6.(cancellation of registration).

Failure to comply with the product-specific data require- ments for your products will result in suspension of the product's registration.

42

## VIII.  REQUIREMENT FOR SUBMISSION OF REVISED LABELING

FIFRA requires each product to be labeled with accurate, complete and sufficient instructions and precautions, reflecting the Agency's assessment of the data supporting the product and its uses. General labeling requirements are set out in 40 CFR 162.10 (see Appendix II - LABELING and SUMMARY). In addition, labeling requirements specific to products containing this pesticide are specified in Section IV.D of this Registration Standard. Applications submitted in response to this notice must include draft labeling for Agency review.

If you fail to submit revised labeling as required, which complies with 40 CFR 162.10 and the specific instructions in Section IV.D., EPA may issue a Notice of Intent to Cancel the registration of your product under FIFRA sec. 6(b)(1).

## IX.   INSTRUCTIONS FOR SUBMISSION

A.  Manufacturing Products (MUPs) containing  Glyphosate
as sole active ingredient.

1.  **Within 90 days** from receipt of this document, you
must submit to the Product Manager in the Registration Division
for each product subject to this Registration Standard:

a.  The "FIFRA Section 3(c)(2)(B) Summary Sheet" (EPA
Form 8580-1), with appropriate attachments.[5]

b.  Confidential Statement of Formula (EPA Form 8570-4).

c.  Formulator's Exemption Statement (EPA Form        ).

d.  Product Specific Data Report (EPA Form 8580-4).

e.  Evidence of compliance with data compensation
requirements of FIFRA sec. 3(c)(1)(D).  Refer to 40 CFR
152.80-152.99.

2.  **Within 12 months** from receipt of this document you
must submit to the Product Manager:

a.  Two copies of any required product-specific data
(See Table B or C).

b.  Three copies of draft labeling, including the
container label and any associated supplemental labeling.
Labeling should be either typewritten text on 8-1/2 x 11
inch paper or a mockup of the labeling suitable for
storage in 8-1/2 x 11 files.  The draft label must indicate
the intended colors of the final label, clear indication
of the front panel of the label, and the intended type
sizes of the text.

---

[5] If on the Summary Sheet, you commit to develop the data,
present arguments that a data requirement is not applicable
or should be waived, or submit protocols or modified protocols
for Agency review, you must submit a copy of the Summary
Sheet (and any supporting information) to the Office of
Compliance Monitoring, which will be monitoring the data
generated in response to this notice.  This submission is in
addition to responding to the Product Manager, and should be
submitted to the Office of Compliance Monitoring at the
address given at the end of this section.  (Actual studies
are not to be submitted to the Office of Compliance Monitoring.)

44

3. **Within the times set forth in Table A**, you must submit to the Registration Division all generic data, unless you are eligible for the formulator's exemption. If for any reason any test is delayed or aborted so that the agreed schedule cannot be met, immediately notify the Product Manager and the Office of Compliance Monitoring of the problem, the reasons for the problem, and your proposed course of action.

B. **Manufacturing Use Products containing** Glyphosate in combination with other active ingredients.

1. **Within 90 days** from receipt of this document, you must submit to the Product Manager in the Registration Division:

a. FIFRA sec. 3(c)(2)(B) Summary Sheet, with appropriate attachments[5] (EPA Form 8580-1).

b. Confidential Statement of Formula (EPA Form 8570-4)

c. Formulator's Exemption Statement (EPA Form          ), if applicable.

2. **Within the time frames set forth in Table A**, you must submit to the Registration Division all generic data, unless you are eligible for the formulator's exemption. If for any reason any test is delayed or aborted so that the agreed schedule cannot be met, immediately notify the Product Manager and the Office of Compliance Monitoring of the problem, the reasons for the problem, and your proposed course of action.

C. **End Use Products containing** GLyphosate alone or in or in combination with other active ingredients.

1. **Within 90 days** from receipt of this document, you must submit to the Product Manager in the Registration Division:

a. FIFRA Section 3(c)(2)(B) Summary Sheet, with appropriate attachments[5] (EPA Form 8580-1).

b. Confidential Statement of Formula (EPA Form 8570-4).

c. Formulator's Exemption Statement (EPA Form          ), if applicable.

d. Product Specific Data Report (EPA Form 8580-4), if Table C lists required product-specific data.

2. **Within 12 months** from receipt of this document you must submit to the Product Manager:

a. Two copies of any product-specific data, if required by Table C.

45

b.  Three copies of draft labeling, including the container
label and any associated supplemental labeling.  Labeling should
be either typewritten text on 8-1/2 x 11 inch paper or a mockup
of the labeling suitable for storage in 8-1/2 x 11 files.  The
draft labeling must indicate the intended colors of the final
label, clear indication of the front panel of the label, and
the intended type sizes of the text.  End use product labeling
must comply specifically with the instructions in Section IV
(Regulatory Position and Rationale).

D.  <u>Intrastate Products containing  glyphosate either
    as sole active ingredient or in combination with other
    active ingredients.</u>

These products are being called in for full Federal regis-
tration.  Producers of these products are being sent a letter
instructing them how to submit an application for registration.

E.  <u>Addresses</u>

The required information must be submitted to the following
address:

    Robert J. Taylor (PM-25)
    Registration Division (TS-767C)
    Office of Pesticide Programs
    Environmental Protection Agency
    401 M St., SW
    Washington, D.C.  20460

The address for submissions to the Office of Compliance
Monitoring is:

    Laboratory Data Integrity Program
    Office of Compliance Monitoring (EN-342)
    Environmental Protection Agency
    401 M St., SW
    Washington, D.C. 20460.

46