1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ANDRUS WAGSTAFF, PC**
Aimee H. Wagstaff (SBN 278480)
David J. Wool (SBN 324124)
7171 W. Alaska Drive
Lakewood, CO 80226
Tel: (303) 376-6360
Fax: (303) 376-6361
aimee.wagstaff@andruswagstaff.com

**MOORE LAW GROUP, PLLC**
Jennifer A. Moore (SBN 206779)
1473 S. 4th Street
Louisville, KY 40208
Tel: (502) 717-4080
Fax: (502) 717-4086
jennifer@moorelawgroup.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741<br>Case Number: 3:16-MD-02741-VC |
| | **PLAINTIFF HARDEMAN'S OPPOSITION TO DEFENDANT MONSANTO COMPANY'S MOTIONS FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL** |
| This document relates to:<br><br>*Hardeman vs. Monsanto Co., et al.*, 3:16-cv-0525-VC | |

**TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................................1

II.   LEGAL STANDARD....................................................................................1

III.  ARGUMENT .................................................................................................2

    A.   Plaintiff Presented Sufficient Admissible Scientific Evidence Regarding General and Specific Causation. .............................................................................2

    B.   Plaintiff's Claims are Not Preempted....................................................4

    C.   Plaintiff Presented Sufficient Evidence to Support the Verdict. ....................5

        1.   Plaintiff Presented a Valid Design Defect Claim...............................5

            a.   The Component Parts Defense is Inapplicable. ..............................6

            b.   Plaintiff Presented a Valid Design Defect Theory at Trial. ..............7

            c.   The Court Correctly Applied the Consumer Expectations Test. ...........8

        2.   Plaintiff Presented Sufficient Evidence in Support of His Failure to Warn Claims.............................................................................................8

            a.   The NHL Risks of GBHs Were Known and Knowable by Monsanto Before Mr. Hardeman Started Spraying, and During the Years He Sprayed, Roundup...............................................................9

            b.   *Monroe* is Factually Distinguishable. ........................................11

            c.   Plaintiff Has Presented Sufficient Evidence for a Jury to Conclude that Monsanto was Negligent in Failing to Warn. ..............................12

        3.   Plaintiff Provided Sufficient Evidence on General and Specific Causation. ..........13

        4.   The Jury's Compensatory Damages Award is Proper.............................15

    D.   The Jury's Punitive Damages Award Should Not Be Disturbed. ................17

        1.   The Punitive Damages Award Conforms to California Law. ..................17

        2.   The Punitive Damages Award Was Not Excessive................................18

            a.   Monsanto's Conduct Has Been Highly Reprehensible....................18

            b.   The Ratio Between the Actual or Potential Harm Suffered and the Punitive Damages Award is Constitutionally Sound.......................19

            c.   Difference Between Punitive Damages and Civil Penalties Imposed in Comparable Cases................................................................20

        3.   Monsanto's Financial Condition Supports the Size of the Award. ..........20

        4.   The Risk of Punitive Damages in Other Cases Cannot Be Considered. ............21

    E.   The Jury Instructions and Verdict Forms Were Proper............................22

        1.   The Court did Not Abuse Its Discretion in Crafting the Jury Instructions.............22

2.   The Court's Modifications of CACI 430 Were Proper and Appropriate, and Not an Abuse of Discretion. ...................................................................22

3.   The Design Defect Instruction was Sufficient, and Not an Abuse of Discretion. ...........................................................................................24

4.   The Instructions on Strict Liability and Negligent Failure to Warn Provided the Jury with the Proper Standard for Consideration and Was Not an Abuse of Discretion. .................................................................................24

5.   The Inclusion of Stipulated Damages Neither "Suggested" Other Categories of Damages, Nor Did it Harm Defendants. ...............................................25

F.   The Court Properly Excused Juror No. 4. ..........................................................26

G.   Monsanto Has Not Alleged Any Evidentiary Errors That Support Its Request For Relief And "Policing" Previously-Issued Rulings Is Not A Basis For A New Trial. .................................................................................................27

1.   The Court's Ruling Regarding Pathology Opinions Was Proper...........................27

2.   The Court's Specific Causation Rulings Were Proper. ...................................29

3.   Regulatory Evidence Was Ruled Upon Fairly and Properly.................................29

4.   Plaintiff's Counsel Did Not Violate PTO 85 and Monsanto Was Not Entitled to a Curative Instruction. ...........................................................29

5.   Exclusion Of "Agricultural Benefits" Was Proper.................................30

IV.  CONCLUSION.............................................................................30

1

## <u>TABLE OF AUTHORITIES</u>

2

3

**STATE CASES**

*Anderson v. Owens-Corning Fiberglas Corp.*
53 Cal. 3d 987 (1991) ...................................................................................9, 10, 13

*Arena v. Owens-Corning Fiberglas Corp.*
63 Cal. App. 4th 1178 (1998) ...................................................................................7

*Arnold v. Dow Chem. Co.*
91 Cal. App. 4th 698 (2001) ...............................................................................8, 24

*Barker v. Lull Eng'g Co.*
20 Cal. 3d 413 (1978) ...............................................................................................7

*Bender v. County of Los Angeles*
217 Cal. App. 4th 968 (2013) .................................................................................16

*Boeken v. Philip Morris Inc.*
127 Cal. App. 4th 1640 (2005) ..........................................................18, 19, 20, 21

*Boeken v. Philip Morris USA, Inc.*
48 Cal. 4th 788 (2010) ............................................................................................18

*Buell-Wilson v. Ford Motor Co.*
141 Cal. App. 4th 525 (2006) .........................................................16, 17, 18, 20

*Bullock v. Philip Morris USA, Inc.*
198 Cal. App. 4th 543 (2011) .................................................................................20

*Carlin v. Superior Ct.*
13 Cal. 4th 1104 (1996) ...............................................................................9, 10, 12

*Conte v. Wyeth, Inc.*
168 Cal. App. 4th 89 (2008) ...................................................................................25

*Delos v. Farmers Ins. Group*
93 Cal. App. 3d 642 (1979) .....................................................................................20

*Duarte v. Zachariah*
22 Cal. App. 4th 1652 (1994) .................................................................................17

*Garza v. Asbestos Corp., Ltd.*
161 Cal. App. 4th 651 (2008) ...................................................................................8

*Izell v. Union Carbide Corp.*
231 Cal. App. 4th 962 (2014)...................................................................................21

*Jet Source Charter, Inc. v. Doherty*
148 Cal. App. 4th 1 (2007) .....................................................................................20

*Johnson v. American Standard, Inc.*
43 Cal. 4th 56 (2008) ...........................................................................................9, 12

*Johnson v. Ford Motor Co.*
35 Cal. 4th 1191 (2005) ....................................................................................21, 22

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Johnson v. U.S. Steel Corp.*
240 Cal. App. 4th 22 (2015) ........................................................6, 7, 8, 24

*Karlsson v. Ford Motor Co.*
140 Cal. App. 4th 1202 (2006) ...........................................................18

*Logacz v. Limansky*
71 Cal. App. 4th 1149 (1999). ............................................................23

*Mansur v. Ford Motor Co.*
197 Cal. App. 4th 1365 (2011) .............................................................8

*Modisette v. Apple Inc.*
30 Cal. App. 5th 136 (2018) ...............................................................23

*Morton v. Owens-Corning Fiberglas Corp.*
33 Cal. App. 4th 1529 (1995) ...............................................................8

*Neal v. Farmers Ins. Exch.*
21 Cal. 3d 910 (1978) ........................................................................21

*O'Neil v. Crane Co.*
53 Cal. 4th 335 (2012) .........................................................................6

*Pacific Gas & Elec. Co. v. Superior Ct. (Butte Fire Cases)*
24 Cal. App. 5th 1150 (2018) .........................................................17, 18

*Pfeifer v. John Crane, Inc.*
220 Cal. App. 4th 1270 (2013) ...........................................................18

*Ramirez v. Plough, Inc.*
6 Cal. 4th 539 (1993) ........................................................................13

Roby v. McKesson Corp.
47 Cal. 4th 686 (2010) .......................................................................19

*Romo v. Ford Motor Co.*
99 Cal. App. 4th 1115 (2002) .........................................................17, 21

*Rufo v. Simpson*
86 Cal. App. 4th 573 (2001) ...............................................................16

*Saller v. Crown Cork & Seal Co., Inc.*
187 Cal. App. 4th 1220 (2010) .........................................................8, 24

*Scott v. C.R. Bard, Inc.*
231 Cal. App. 4th 763 (2014) ...............................................................12

*Simon v. San Paolo U.S. Holding Co., Inc.*
35 Cal. 4th 1159 (2005) .................................................................19, 20

*Soule v. General Motors Corp.*
8 Cal. 4th 548 (1994) ..........................................................................6

*Stevens v. Owens-Corning Fiberglas Corp.*
49 Cal. App. 4th 1645 (1996) ...............................................................21

*Trejo v. Johnson & Johnson*
13 Cal. App. 5th 110 (2017) ..................................................................8

*Viner v. Sweet*
    30 Cal. 4th 1232 (2003) ........................................................................................24

*Walker v. Farmers Ins. Exch.*
    153 Cal. App. 4th 965 (2007) ..............................................................................20

*Webb v. Special Elec. Co., Inc.*
    63 Cal. 4th 167 (2016) ...................................................................................5, 6, 9

*Whiteley v. Philip Morris Inc.*
    117 Cal. App. 4th 635 (2004) ................................................................................8

**FEDERAL CASES**

*Apple, Inc. v. Samsung Elecs. Co.*
    67 F. Supp. 3d 1100 (N.D. Cal. 2014) .................................................................30

*Bates v. Dow Agrosciences LLC*
    544 U.S. 431 (2005)..............................................................................................25

*BMW of N. Am., Inc. v. Gore*
    517 U.S. 559 (1996)........................................................................................18, 19

*Boyd v. City and County of San Francisco*, 576 F.3d 938 (9th Cir. 2009) ................................31

*Cotton v. City of Eureka*
    860 F. Supp. 2d 999 (N.D. Cal. 2012) ................................................................15

*Duran v. City of Maywood*
    221 F.3d 1127 (9th Cir. 2000) .............................................................................22

*Duste v. Chevron Prods. Co.*
    Case No. C 08-3980 MEJ, 2012 WL 43756 (N.D. Cal. Jan. 9, 2012)...................2, 15, 29

*E.E.O.C. v. Go Daddy Software, Inc.*
    581 F.3d 951 (9th Cir. 2009) ...............................................................................22

*Escriba v. Foster Poultry Farms, Inc.*
    743 F.3d 1236 (9th Cir. 2014) .............................................................................26

*Fisher v. City of San Jose*
    558 F.3d 1069 (9th Cir. 2009) ...............................................................................2

*Ford Motor Co. v. Buell-Wilson*
    550 U.S. 931 (2007) .............................................................................................18

*Grobelny v. Baxter Healthcare Corp.*
    Case No. 05-cv-4645 (PCS), 2008 WL 2186417 (D.N.J. May 23, 2008) .............12

*Gutierrez ex rel. v. United States.*
    323 F. App'x 493 (9th Cir. 2009) ........................................................................16

*Hardeman v. Monsanto Co.*
    216 F. Supp. 3d 1037 (N.D. Cal. 2016) ...............................................................25

*Harrell v. Taylor*
    Case No. C 00-2516 PJH (PR), 2008 WL 4344582 (N.D. Cal. Sept. 22, 2008) ...................26

*Hemmings v. Tidyman's Inc.*
    285 F.3d 1174 (9th Cir. 2002) ........................................................................27, 29

*Henry v. Lehman Com. Paper, Inc.* (*In re First Alliance Mortg. Co.*)
    471 F.3d 977 (9th Cir. 2006) ...................................................................................16

*Image Tech. Servs. v. Eastman Kodak Co.*
    125 F.3d 1195 (9th Cir. 1997) ...............................................................................27

*In re Exxon Valdez*
    270 F.3d 1215 (9th Cir. 2001) .............................................................................3, 28

*Kanellakopoulos v. Unimerica Life Ins. Co.*
    Case No. 15-CV-04674-BLF, 2019 WL 2029071 (N.D. Cal. May 8, 2019) ..........................2

*Landes Constr. Co., Inc. v. Royal Bank of Can.*
    833 F.2d 1365 (9th Cir. 1987) .............................................................................2, 26

*Little v. City of Richmond*
    Case No. 13-CV-02067-JSC, 2015 WL 3543127 (N.D. Cal. June 5, 2015) ......................1, 2

*Merck Sharp & Dohme Corp. v. Albrecht*
    139 S.Ct. 1668 (May 20, 2019) .................................................................................5

*Molski v. M.J. Cable, Inc.*
    481 F.3d 724 (9th Cir. 2007) ....................................................................................2

*Monroe v. Zimmer U.S. Inc.*
    766 F. Supp. 2d 1012 (E.D. Cal. 2011) ..................................................................9, 12

*Pavao v. Pagay*
    307 F.3d 915 (9th Cir. 2002) ....................................................................................2

*Pavelko v. Breg, Inc.*
    Case No. 09-CV-01461-PAB-KMT, 2011 WL 782664 (D. Colo. Feb. 28, 2011)...............12

*Pooshs v. Philip Morris USA, Inc.*
    904 F. Supp. 2d 1009 (N.D. Cal. 2012) ......................................................................8

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*
    326 F.3d 1333 (11th Cir. 2003) .................................................................................4

*Raynor Bros. v. American Cyanimid Co.*
    695 F.2d 382 (9th Cir. 1982) ..................................................................................17

*Reeves v. Sanderson Plumbing Prods., Inc.*
    530 U.S. 133 (2000).................................................................................................1

*Rivas v. Knight Transp. Inc.*
    Case No. CV 15-05793-DTB, 2017 WL 3453365 (C.D. Cal. Mar. 24, 2017)...................4, 30

*Roy v. Volkswagen of Am., Inc.*
    896 F.2d 1174  (9th Cir. 1990) ...............................................................................14

*Sepulveda v. Robertson*
    Case. No. CV 18-01700 JGB (MAA), 2018 WL 3869609 (C.D. Cal. July 2, 2018) ............26

*Settlegoode v. Portland Pub. Sch.*
    371 F.3d 503 (9th Cir. 2004) ....................................................................................1

*Sherwin-Williams Co. v. JB Collision Servs., Inc.*
    Case No. 16-56566, 2019 WL 1858214 (9th Cir. Apr. 25, 2019) .........................................16

*Silverthorne v. United States*
    400 F.2d 627 (9th Cir. 1968) ...................................................................................26

*State Farm Mut. Auto. Ins. Co. v. Campbell*
    538 U.S. 408 (2003) .......................................................................................18, 19

*United States v. Clevenger*
    733 F.2d 1356 (9th Cir. 1984) .............................................................................28

*United States v. Field*
    625 F.2d 862 (9th Cir. 1980) ...............................................................................26

*United States v. Giese*
    597 F.2d 1170 (9th Cir. 1979) .............................................................................27

*United States v. Duran*
    59 F.3d 938 (9th Cir.1995) ..................................................................................24

*White v. BNSF Ry. Co.*
    726 F. App'x 603 (9th Cir. 2018) .......................................................................22

*White v. Ford Motor Co.*
    312 F.3d 998 (9th Cir. 2002) ...............................................................................22

*White v. Ford Motor Co.*
    335 F.3d 833 (9th Cir. 2003) ...............................................................................22

*Wyeth v. Levine*
    555 U.S. 555 (2009) ...............................................................................................5

*Xavier v. Philip Morris USA Inc.*
    787 F. Supp. 2d 1075 (N.D. Cal. 2011) .............................................................23

**STATE STATUTES**

Cal. Civ. Code § 3294(a) ..........................................................................................17

**FEDERAL STATUTES**

7 U.S.C. § 136a(d) ......................................................................................................4

Fed. R. Civ. Proc. § 50(b) ...........................................................................................1

Federal Insecticide and Rodenticide Act, 7 U.S.C. §§ 136, *et seq.* ("FIFRA") (1947) ...............4

**TREATISES**

Rest. (3d) of Torts: Phys. & Emot. Harm § 27 (2010) .............................................23

Rest. (3d) of Torts: Prod. Liab. § 5 (1998) ................................................................6

Restatement (Third) of Torts .......................................................................................6

Restatement (Second) of Torts § 402a (1965) .........................................................24

**OTHER AUTHORITIES**

David G. Owen, *The Puzzle of Comment J*
    55 Hastings L.J. 1377 (2004) ................................................................................7

## I.   **INTRODUCTION**

Defendant Monsanto Company received a fair trial in this case, before an impartial jury. At the end, the jury determined that Plaintiff Hardeman had presented sufficient evidence to establish: (1) that his use of Roundup had been a substantial factor in causing his Non-Hodgkin's lymphoma ("NHL"); and (2) that Monsanto's design of Roundup, and failure to warn, was responsible for his injuries.  Monsanto also had the benefit of nearly 150 pretrial orders ("PTOs"), providing direction and demonstrating the careful attention paid by this Court.

Acknowledging this, Defendant's Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial, *In Re Roundup Prods. Liab. Litig.,* Case No. 3:16-md-02741-VC ("MDL Dkt." or "Dkt.") Dkt. 3976 ("Motion"), largely regurgitates arguments that have already been considered, and rejected, during this litigation.  Monsanto fails to show how the verdict was contrary to the evidence, or unsupported, or a miscarriage of justice, as it must to obtain a directed verdict or a new trial.  Indeed, with respect to causation, the Motion challenges the admissibility of Plaintiff's experts, rather than if their opinions sufficiently supported the verdict.  And even when challenging the trial proceedings themselves, Defendant fails to demonstrate any prejudice.

As follows, Plaintiff presented more than enough evidence, properly admitted by the Court, to demonstrate Monsanto's liability and support the jury's verdict.  That verdict should be upheld and Defendant's Motion, therefore, denied.

## II.   **LEGAL STANDARD**

"A district court may set aside a jury verdict and grant judgment as a matter of law 'only if, under the governing law, there can be but one reasonable conclusion as to the verdict.'" *Settlegoode v. Portland Pub. Sch*., 371 F.3d 503, 510 (9th Cir. 2004) (citing *inter alia*; Fed. R. Civ. Proc. ("FRCP") 50(b)). "'[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Id.* (citing *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150 (2000)).  "[A] jury's verdict 'must be upheld if it is supported by substantial evidence ... even if it is also possible to draw a contrary conclusion.'" *Little v. City of Richmond*, Case No. 13-CV-02067-JSC, 2015 WL 3543127, at *3 (N.D. Cal. June 5, 2015) (quoting *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir.

2002); citing *Fisher v. City of San Jose*, 558 F.3d 1069, 1074 (9th Cir. 2009)). "A party seeking judgment as a matter of law has a 'very high' standard to meet." *Id.* (citation omitted).

Motions for a new trial face a similarly high standard: "[t]he trial court may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (citation omitted). Courts must give "full respect" to a jury's findings. *Duste v. Chevron Prods. Co.*, Case No. C 08-3980 MEJ, 2012 WL 43756, at *3 (N.D. Cal. Jan. 9, 2012) (*citing Landes Constr. Co., Inc. v. Royal Bank of Can.*, 833 F.2d 1365, 1371-72 (9th Cir. 1987)). "A new trial is only warranted when an erroneous evidentiary ruling 'substantially prejudiced' a party." *Kanellakopoulos v. Unimerica Life Ins. Co.*, Case No. 15-CV-04674-BLF, 2019 WL 2029071, at *2 (N.D. Cal. May 8, 2019) (citation omitted).

## III.   ARGUMENT
### A.   Plaintiff Presented Sufficient Admissible Scientific Evidence Regarding General and Specific Causation.

Defendant has now made the same argument regarding scientific causation evidence ***five*** times.[1]  Each time this Court has rejected Monsanto's arguments.[2]  This time, Defendant begins with two conclusory paragraphs claiming that Plaintiff did not present general causation evidence at trial.  Motion, ¶¶ 1-2.  This is simply untrue: Drs. Portier, Ritz, and Weisenburger all testified that Roundup is capable of causing NHL in humans at real world exposures.[3]  Defendant ignores this testimony altogether, even though the Court has previously considered this evidence,[4] did so again at trial, and properly denied Defendant's Motion for Directed Verdict.[5]

With respect to specific causation, the Court has already addressed Monsanto's contentions regarding the De Roos (2003) and NAPP data.  PTO 45 (Dkt. 1596), p. 54.[6]  Further,

---

[1] Plaintiff hereby adopts and incorporates all prior briefing on this subject, including but not limited to Dkts. 647; 793; 1135; 2479; 2559.

[2] *See* PTO 45 (Dkt. 1596); PTO 85 (Dkt. 2799); PTO 113 (Dkt. 2984); and PTO 134 (Dkt. 3170).

[3] Tr. vol. 9, 1369:1-8 (Weisenburger); vol. 4, 636:14-16 (Ritz); vol. 2, 254:3-8 (Portier).

[4] The Court soundly rejected Defendant's criticisms of Dr. Weisenburger's general causation opinions, during Phase 1 of this trial. *See* PTO 45 (Dkt. 1596), pp. 6, 52, 54, 55.

[5] *See* Order Denying Monsanto's Motion for a Directed Verdict (Dkt. 2984).

[6] *See also*, PTO 45 (Dkt. 1596) pp. 53-54 ("Dr. Weisenburger explained that he elected to include published studies in his expert report, a defensible choice.").

the Court previously noted that "Dr. Weisenburger considered other possible explanations for the observed results," and

> [in] his original report, he addressed whether glyphosate or glyphosate-based formulations like Roundup cause NHL in humans exposed to these chemicals in the workplace or environment. In addressing this question, he considered the epidemiological studies as well as studies he determined showed biological effects at relatively low doses.

*Id.* p. 55-56 (citations omitted).  The Court also rejected the claim that Dr. Weisenburger's methodology was "results-driven."[7]  Tellingly, while Dr. Levine disagreed with some "nomenclature," her testimony established that both she and Dr. Weisenburger employed the same methodology.  Trial Transcript ("Trial Tr."; all "Tr." citations are to the trial transcript, unless otherwise noted) vol. 11, 1650:22-1651:2.  That Drs. Weisenburger and Levine reached different results, despite employing the same methodology, does not warrant a new trial.  *In re Exxon Valdez*, 270 F.3d 1215, 1248 (9th Cir. 2001) ("jurors need not accept the views of one side's expert or the other's, but may make their own reasonable judgment on the evidence, accepting part, all or none of any witness's testimony.").  It is enough that the Court held Dr. Weisenburger's "underlying methodology [to be] sound." *See* PTO 85 (Dkt. 2799).

Finally, Dr. Weisenburger's opinions and methodology were properly disclosed to Defendant prior to trial. *See* PTO 45 (Dkt. 1596), p. 6 ("Before ruling on these motions, the Court held seven days of hearings to assess the testimony of many of these experts."); Daubert Tr. vol. 3, 389-390 (Feb. 11, 2019); *see also* MDL Tr. vol. 1, 209:13-210:10 (Mar. 5, 2018); MDL Tr. vol. 2, 248:1-25 (Mar. 6, 2018) (discussing studies relied upon by Dr. Weisenburger, as well as his deposition testimony); *Id.* at 250 (discussion of studies relied upon).  Monsanto notably fails to cite any instance where it claims Dr. Weisenburger's trial testimony was inconsistent or surprising. In any event Dr. Weisenburger's reports on general and specific causation, supplemental reports, and reliance lists were provided to Defendant in accordance with the Court's pretrial orders, and Dr. Weisenburger testified live at *Daubert* hearings for both general and specific causation where

---

[7] *See* PTO 85 (Dkt. 2799) ("And here, the Court already determined that the plaintiffs offered admissible expert opinions that glyphosate is capable of causing NHL. Thus, Monsanto's primary criticism of the ruling-in process – namely, that the specific causation experts improperly ruled in glyphosate exposure by cherry-picking favorable epidemiological studies – is off-point.").

Defendant cross examined him.  Thus, because his opinions were properly disclosed and

approved by the Court, Monsanto has not suffered any prejudice sufficient to warrant a new trial.

Nor were there any evidentiary errors with respect to Dr. Weisenburger's testimony. *See*

*Rivas v. Knight Transp. Inc*., Case No. CV 15-05793-DTB, 2017 WL 3453365, at *1 (C.D. Cal.

Mar. 24, 2017) ("A new trial is warranted on the basis of an evidentiary error only if the ruling

substantially prejudiced a party.") (citations omitted). Dr. Weisenburger's opinions were

consistent with the opinions he previously offered in his reports and *Daubert* testimony, so

Defendant's unsubstantiated claim that they were "inconsistent" can be disregarded.  *See*

Dkt. 2478.  Likewise, Defendant's contention (again, for the fifth time) that Dr. Weisenburger's

methodology is "invalid" is not the basis for a new trial. *Rivas*, 2017 WL 3453365, at *1.[8]

**B.  Plaintiff's Claims are Not Preempted.**

Monsanto first presents the same argument the Court rejected at the summary judgment

stage: that California's common law requirements conflict with the Federal Insecticide and

Rodenticide Act, 7 U.S.C. §§ 136, *et seq.* ("FIFRA"), section 136a(d).  *See* Motion ¶ 7.  As the

Court held, Plaintiff's claims are not expressly preempted: Monsanto's argument is predicated on

a requirement that is not derived from FIFRA's misbranding provision and "nothing in the statute

suggests that warnings should be limited to those relevant to 'widespread and commonly

recognized uses of a product.'"  PTO 101 (Dkt. 2937); *see also Hardeman* Dkt. 34.[9]  The Court

should not reverse its prior rulings.

Nor does impossibility preemption apply here; the Court correctly recognized that it is

inapplicable because FIFRA expressly permits states to ban the sale of federally approved

pesticides.  PTO 45 (Dkt. No. 1596).  Nevertheless, Monsanto asserts that EPA's Proposed

Interim Registration Review Decision ("PID") for *glyphosate* constitutes "clear evidence" that

---

[8] *See also Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333 (11th Cir. 2003)
("[A]lthough rulings on admissibility under *Daubert* inherently require the trial court to conduct
an exacting analysis of the proffered expert's methodology, it is not the role of the district court to
make ultimate conclusions as to the persuasiveness of the proffered evidence. Moreover, we will
not overturn an evidentiary ruling and order a new trial unless the objecting party has shown a
substantial prejudicial effect from that ruling.") (internal citations omitted).
[9] Plaintiff hereby adopts and incorporates all prior briefing on this subject including Dkt. 2559
and *Hardeman Dkt*. 27.

EPA would have rejected a more stringent warning for Roundup.  But even if the clear evidence standard were applicable to pesticides, Monsanto could not meet its burden.

First, there is no indication in *Wyeth* and its progeny that an agency's decision as to a component part insulates the final product from liability.[10]  In fact, virtually every pharmaceutical case concerning "clear evidence" turns on the evidence and warnings submitted for the product at issue, not component parts.  For example, in *Wyeth* the Supreme Court held that the defendant's evidence did not show that it "supplied the FDA with an evaluation or analysis concerning the *specific* dangers" that otherwise would have merited a warning.  *Wyeth v. Levine*, 555 U.S. 555, 573 (2009) (emphasis added).  Here, neither before nor during trial did Monsanto present evidence that it "attempted to give the kind of warning required by [state law] but was prohibited from doing so," for either Roundup or glyphosate.  *Id.,* at 572, *see also* n. 5.

Second, Monsanto cannot establish the "demanding" clear evidence defense because it cannot show that it "*fully informed* the [EPA] of the justifications for the warning required by state law and that the [EPA], in turn informed [Monsanto] that the [EPA] would not approve a change in [Roundup]'s label to include that warning."  *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S.Ct. 1668, 1672 (May 20, 2019) (emphasis added).  There is nothing in the record to suggest Monsanto fully informed EPA of the justifications for a more stringent warning on Roundup. Rather, the uncontroverted evidence suggests the opposite—that Monsanto *withheld* information from EPA.  *See* Declaration of Jennifer Moore, attached hereto, Exhibit ("Ex.")[11] 26, (Tr. vol. 17, 2198 (Martens deposition testimony; "Martens Dep."), at 151:19-152:2.

### C.  Plaintiff Presented Sufficient Evidence to Support the Verdict.
#### 1.  Plaintiff Presented a Valid Design Defect Claim.

Under California law, "[a] product design may be found defective if 'the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner."  *Webb v. Special Elec. Co., Inc.,* 63 Cal. 4th 167, 180 (2016) (citation omitted).  And where the "*everyday experience* of the product's users permits a conclusion that the product's design violated *minimum* safety assumptions" the product is defective "*regardless*

---

[10] The PID, published after the *Hardeman* verdict, is not part of the trial record in this case.
[11] All subsequent "Ex." citations are to exhibits to the Declaration of Jennifer Moore.

*of expert opinion about the merits of the design*."  *Soule v. General Motors Corp.,* 8 Cal. 4th 548, 567 (1994) (emphasis original).

### a.   The Component Parts Defense is Inapplicable.

Presumably relying upon the component parts doctrine espoused in comment c to section 5 of the RESTATEMENT (THIRD) OF TORTS ("Comment c"), Monsanto argues that "glyphosate is a raw material that cannot by definition be defectively designed."  *See* Motion, ¶ 12.  But this argument misinterprets Plaintiff's claims, the trial evidence trial, and Comment c.[12]

First, Plaintiff presented evidence at trial that Roundup caused his NHL and that Roundup is more dangerous than glyphosate alone.  Tr. vol. 8, 1070:2-25; 1120:17-1126:7; Ex. 1 (Trial Exhibit ("Tr. Ex.") 442).  This is critical because the component parts defense, by its own terms, does not apply to finished products like Roundup.  *See* REST. (3D) OF TORTS: PROD. LIAB. § 5 (1998), comment c; *O'Neil v. Crane Co.,* 53 Cal. 4th 335, 346 (2012) ("The component parts doctrine provides that the manufacturer of a component part is not liable for injuries caused by the finished product into which the component has been incorporated unless the component itself was defective and caused harm.").  Rather, the component parts defense "protects manufacturers and sellers of component parts from liability to users of finished products incorporating their components."  *Webb,* 63 Cal. 4th at 183.  This defense is therefore inapplicable to Plaintiff's design defect claim, which was based upon evidence of an injury caused by a finished product produced by Monsanto.[13]  *See Johnson v. U.S. Steel Corp.,* 240 Cal. App. 4th 22, 33 (2015) ("the seller of a completed product is strictly liable for any defect in the completed product").

Second, Comment c applies to "a ***basic raw material*** such as sand, gravel, or kerosene."  *Webb,* 63 Cal. 4th at 184 (emphasis added) (quoting Comment c).  Glyphosate is not a naturally occurring basic raw material.  Rather, it is a synthesized chemical compound.[14]  And even if

---

[12] Plaintiff hereby incorporates all prior briefing and argument on this subject including, but not limited to, Dkts. 2939, 2995, 3039, *Hardeman* Dkt. 27,

[13] Section 5 is only concerned with limiting liability for component part manufacturers who do not sell finished products because "[i]mposing liability would require the component seller to scrutinize another's product." REST. (3D) OF TORTS: PROD. LIAB. § 5 (1998).

[14] *Webb* expressly considered "only failure to warn, and [] express[ed] no view on design defect liability." 63 Cal. 4th at 184, fn. 8.

Roundup were a basic raw material, sellers of raw materials remain liable for injuries caused by finished products when: (1) the material itself is harmful and unchanged in composition; and (2), the raw material "renders the product into which it is incorporated harmful, contrary to ordinary consumer expectations." *Johnson*, 240 Cal. App. 4th at 38.  Both of these conditions are met in the case of Monsanto's Roundup. *See, e.g.,* Tr. vol. 5, 786 (Portier deposition testimony), Ex. 23 ("Portier Dep."),  at 252:19-253:3 (discussing Roundup's carcinogenicity due to glyphosate and surfactant); Tr. vol. 8, at 1121:17-1123:18 (Roundup is more toxic than glyphosate alone).

### b.  Plaintiff Presented a Valid Design Defect Theory at Trial.

Plaintiff presented evidence that Roundup's design itself—the combination of glyphosate and a surfactant—rendered the product unreasonably dangerous. Monsanto's semantic dispute over the term "defect" misconstrues California products liability law by inventing a requirement that Plaintiff identify a reasonable alternative design.  *See, e.g., Barker v. Lull Eng'g Co*., 20 Cal. 3d 413, 427 (1978) ("the term defect as utilized in the strict liability context is neither self-defining nor susceptible to a single definition applicable in all contexts."); *Johnson*, 240 Cal. App. 4th at 35 ("The term 'design defect' as described in *Barker* [] relates more to a legal conclusion that a product has deviated in some manner from what is reasonably expected, than it does to a description of a specific mechanical shortcoming or flaw.").  California has no requirement that a plaintiff proffer evidence of a safer design under a consumer expectations theory.

Indeed, as Monsanto conceded in its Motion to Dismiss, California law permits design defect claims where products are inherently and unavoidably dangerous.  *See Hardeman v. Monsanto Co*., Case No. 16-cv-00525-VC ("Hardeman Dkt.")[15] Dkt. 18 ("[I]n California, comments j and k address the class of products that carry unavoidable dangers that cannot be designed away.") (quoting David G. Owen, *The Puzzle of Comment J*, 55 Hastings L.J. 1377, 1382 (2004).  If a product is ***inherently and unavoidably*** dangerous, there is not a component that can be altered to make the product safe.[16]  *See* MDL Dkt. 2995.

---

[15] Unless otherwise noted, "Dkt." refers to the MDL docket, *i.e.,* Case No. 3:16-md-02741-VC.
[16] This principle finds considerable support in California courts, which repeatedly hold that raw materials can fail the consumer expectations test.  *See Arena v. Owens-Corning Fiberglas Corp.*, 63 Cal. App. 4th 1178, 1191 (1998) ("raw asbestos is a product that may have a design defect

*Pooshs v. Philip Morris USA, Inc.*, which Monsanto relied upon to support this argument during trial does not stand for a different proposition. 904 F. Supp. 2d 1009 (N.D. Cal. 2012). In *Pooshs,* the court's decision turned upon that fact that the act of smoking itself, as opposed to a defect in cigarettes, caused the plaintiff's injury. *See id.*, at 1025. But here, there is no evidence that ***spraying*** is inherently dangerous, or itself caused Plaintiff's NHL. Rather, the evidence presented at trial demonstrated that exposure to Roundup caused Plaintiff's cancer. *Pooshs* is also distinguishable because it utilized the risk-benefit test, as opposed to the consumer expectations test.[17] *See* PTO 116. This is critical because unlike *Pooshs*, where expert testimony was required, "it is well settled that expert testimony is not relevant in a consumer expectations theory of liability." *Mansur v. Ford Motor Co.*, 197 Cal. App. 4th 1365, 1380 (2011).[18]

### c. The Court Correctly Applied the Consumer Expectations Test.

The consumer expectations test is applicable to design defect products liability claims asserted against pesticide manufactures and distributors, even where expert testimony is required to explain the nature of the alleged defect. *Arnold v. Dow Chem. Co.*, 91 Cal. App. 4th 698, 727 (2001). The Court therefore correctly applied the consumer expectations test at trial.[19]

### 2. Plaintiff Presented Sufficient Evidence in Support of His Failure to Warn Claims.

A plaintiff alleging a failure to warn strict liability cause of action need prove that the defendant either (1) knew of the risks involved at the time of manufacture or distribution, or

---

when it fails to meet the 'commonly accepted minimum safety assumptions of its ordinary consumers.'") (quoting *Morton v. Owens-Corning Fiberglas Corp.,* 33 Cal. App. 4th 1529, 1529, 1535 (1995)); *Garza v. Asbestos Corp., Ltd.*, 161 Cal. App. 4th 651, 659 (2008), *as modified* (Apr. 2, 2008) ("strict liability is not 'restricted to processed products.'"); *Saller v. Crown Cork & Seal Co., Inc.*, 187 Cal. App. 4th 1220, 1236 (2010); *Johnson,* 240 Cal. App. 4th at 32 (2015).
[17] *Whiteley v. Philip Morris Inc.,* (cited by Monsanto in its Rule 50(a) Motion for Judgment as a Matter of Law and for Directed Verdict, Dkt. 3157 ("Rule 50(a) Motion"), likewise turned on the inapplicability of the consumer expectations test. 117 Cal. App. 4th 635, 702 (2004) ("This case was not tried on a 'consumer expectation' theory… but upon a negligent design theory.
[18] The holding in *Pooshs* that "a plaintiff must prove that there ***was*** a design defect, which actually caused [the plaintiff's injury]" and that this proof must be established "through expert testimony" is incorrect. 904 F. Supp. 2d at 1025 (emphasis original). Instead, "[u]nder the consumer expectations test [], expert witnesses may not be used to demonstrate what an ordinary consumer would or should expect." *Trejo v. Johnson & Johnson*, 13 Cal. App. 5th 110, 159 (2017), *review denied* (Oct. 11, 2017)
[19] Plaintiff hereby adopts and incorporates all his prior briefing and argument on this subject, including, but not limited to, Dkt. 2592, Dkt. 2939, Dkt. 2995, and Dkt. 3039.

(2) based on the state of scientific knowledge at the time of manufacture or distribution, should

have known of the risks. *Webb,* 63 Cal. 4th at 180.  "Manufacturers have a duty to warn

consumers about the hazards inherent in their products." *Johnson v. American Standard, Inc.*, 43

Cal. 4th 56, 64 (2008). The California Supreme Court has traditionally imposed strict liability for

failure to warn of either known or ***reasonably scientifically knowable*** risks of a product.

*Anderson v. Owens-Corning Fiberglas Corp.*, 53 Cal. 3d 987, 1000, 1002 (1991) ("[t]he rules of

strict liability require a plaintiff to prove only that the defendant did not adequately warn of a

particular risk that was known or knowable in light of the generally recognized and prevailing

best scientific and medical knowledge available at the time of manufacture and distribution.").

When adjudicating failure to warn under strict liability principles, "the reasonableness of the

defendant's failure to warn is immaterial." *Carlin v. Superior Court*, 13 Cal. 4th 1104, 1112

(1996).

       Even Monsanto's leading case—*Monroe v. Zimmer U.S. Inc.*, 766 F. Supp. 2d 1012 (E.D.

Cal. 2011)—does not support its assertion that Plaintiff was required to prove, via expert

testimony, the precise contents and timing of the warning that should have appeared on the

Roundup label. Rather, California law holds manufacturers strictly liable where they "failed to

give warning of dangers that were known to the scientific community at the time it manufactured

or distributed the product." *Anderson*, 53 Cal. 3d at 1002 ("The rules of strict liability require a

plaintiff to prove only that the defendant did not adequately warn of a particular risk that was

known or knowable in light of the generally recognized and prevailing best scientific and medical

knowledge available at the time of manufacture and distribution.").  Monsanto admits that it never

warned of any cancer risk.  *See* Tr. vol. 18, at 2385:6-14.

       a.  <u>**The NHL Risks of GBHs Were Known and Knowable by Monsanto Before Mr. Hardeman Started Spraying, and During the Years He Sprayed, Roundup.**</u>

The California Supreme Court's

definition of what is "reasonably scientifically knowable" … refers to knowledge
obtainable 'by the application of reasonable, developed human skill and foresight'
[citation] …. The actual knowledge of the individual manufacturer, even if
reasonably prudent, is not the issue …. [T]he manufacturer is held to the

knowledge and skill of an expert in the field; it is *obliged to keep abreast of any scientific discoveries and is presumed to know the results of all such advances*.

*Carlin*, 13 Cal. 4th at 1113, fn. 3 (emphasis added) (quoting *Anderson*, 53 Cal. 3d at 1002, n.13). The evidence presented at trial demonstrated that the data was either known or knowable well during the time Mr. Hardeman used Roundup, as testified to by Plaintiff's experts.

For instance, Plaintiff's experts testified that the various animal bioassays demonstrated that glyphosate is carcinogenic in animals and therefore a probable human carcinogen. *See* Ex. 23 (Portier Dep.), at 98:9-104:4; 119:4-120:10 (explaining significance of kidney tumors); 134:13-135:18 (explaining Glyphosate is animal carcinogen and therefore a probable human carcinogen). This was corroborated through Monsanto's own testimony regarding EPA's 1985 classification of glyphosate as a "Category C" oncogene and Monsanto's knowledge thereof. *See, e.g.,* Tr. vol. 9, 1204 (Reeves deposition testimony), Ex. 24 ("Reeves Dep."), at 218:2-12; 218:15-220:23. Similarly, Plaintiff presented evidence showing that Monsanto knew of Roundup's genotoxicity 20 years ago through the report of Dr. James Parry; Dr. Parry informed Monsanto in the 1999 that Roundup and glyphosate were potentially genotoxic and capable of inducing oxidative stress, a potential cause of cancer. *See, e.g.,* Ex. 26 ("Martens Dep."), at 65:3-23; Ex. 23 (Portier Dep.), at 218:5-219:25; Exs. 2, 3 (Tr. Exs. 157, 160).  Monsanto never disclosed these results to anyone outside the company and did not conduct the studies recommended by Dr. Parry.  Ex. 26 (Martens Dep.) at 151:19-152:2.  Plaintiff's experts further explained what the epidemiological literature signified and the respective dates each study was published. Tr. vol. 3, 467:16-471:18 (discussing Hardell 1999); 471:10-477:19 (discussing Hardell 2002); Ex. 23 (Portier Dep.), at 245:3-247:19. Indeed, Monsanto's own testimony confirmed that epidemiological evidence linking Roundup to NHL was known to Monsanto beginning in 1998.  *See, e.g.,* (Reeves deposition testimony during phase 2) Ex. 25 ("Reeves Dep. 2"), at 38:17-38:20.

Even if the risk of NHL was not known to Monsanto, it was certainly *knowable*.  The trial was rife with evidence of Monsanto intentionally avoiding the very tests that would otherwise reveal an association between Roundup and NHL.  First, in the 1980's Monsanto "vehemently opposed" conducting another mouse study, which would have revealed glyphosate's association with cancer.  Ex. 24 (Reeves Dep.), at 289:20-291:11; Ex. 25 (Reeves Dep. 2), at 297:24-298:4;

300:8-301:1; 308:19-309:16; Ex. 23 (Portier Dep.), at 113:24-114:7 (all mouse studies showed malignant lymphomas). Monsanto's pattern of avoidance continued when it commissioned the Parry report but refused to test the recommended formulations. *See, e.g.,* Tr. vol. 19, 2462 (Kier deposition testimony), Ex. 27, Kier at 146:16-19 (Monsanto did not conduct the tests Parry recommended); *Id.* 156:23-160:4 (Monsanto avoided testing formulations for fear of a "false positive" finding). Internal company emails—acknowledging that Monsanto could not refute Roundup's carcinogenicity because it had not conducted sufficient tests—provided even more evidence at trial that Roundup's carcinogenicity was at a minimum knowable by 2003. *See, e.g.,* Tr. vol. 19, 2462 (Koch deposition testimony), Ex. 28, Koch Dep. at 221:22-222:6; 222:9-222:14; 222:19-223:1; Exs. 4, 5 (Tr. Exs. 426, 245).

The evidence further showed that Roundup's dangers were knowable through epidemiology. Plaintiff's expert testified as to both the enrollment intervals and the dates of the epidemiological studies, demonstrating that such studies began enrollment, and therefore could have been conducted, as early as the late 1970s (*see* Tr. vol. 4, 691:25-693:2) but Monsanto chose not to conduct epidemiological studies. Ex. 25 ("Reeves Dep. 2"), at 66:7-66:19.

Because he is not required to present expert testimony concerning the precise contents of the warning that should have appeared and the precise timing of the warning, Mr. Hardeman's testimony that he would not have used Roundup had Monsanto warned of a cancer risk is sufficient to establish causation. Tr. vol. 18, 2388:5-10. (Plaintiff would not have used Roundup if warned of a cancer risk at ***any*** time during the 26 years he used the product).

### b. *Monroe* **is Factually Distinguishable.**

*Monroe* is factually distinct from the present case. *See* Motion ¶ 22 (citing *Monroe v. Zimmer U.S. Inc.*, 766 F. Supp. 2d 1012 (E.D. Cal. 2011)). First, the defendant in *Monroe* was not actually aware of the published literature plaintiff relied upon: plaintiff argued in her summary judgment response that defendant would have been aware of the relevant literature "***if*** it had performed an adequate search of the medical literature." *See Monroe v. Zimmer U.S. Inc.*, 2:08-cv-02944 (E.D. Cal Nov. 05, 2010), ECF No. 86 at 22 (emphasis added). But in Plaintiff's case, there is no question that Monsanto was actually aware, and therefore on notice, of the

1    literature supporting Plaintiff's failure to warn claims. *See generally*, Ex. 25 (Reeves Dep. 2) And

2    unlike *Monroe*, where the articles "were not sufficiently reliable to support [plaintiff's]

3    foreseeability argument," this Court has already determined that Plaintiff's experts' opinions are

4    reliable.  *Compare Monroe,* 766 F. Supp. 2d at 1034 *with* PTO 45 (1596).

5         Second, in *Monroe,* expert testimony was necessary to connect the scientific literature and

6    defendant's knowledge because "[e]ight out of the nine articles are largely irrelevant, relating

7    primarily to substances other than anesthetics." *Pavelko v. Breg, Inc.,* Case No. 09-CV-01461-

8    PAB-KMT, 2011 WL 782664, at *6 (D. Colo. Feb. 28, 2011) (examining same evidence as

9    *Monroe* court). But in Mr. Hardeman's case, the literature discussed by Plaintiff's experts is

10   plainly relevant and concerned either Roundup or its active ingredient glyphosate.

11        Third, because *Monroe* concerned a medical device, available to consumers only under the

12   supervision of a licensed physician, the manufacturer's duty was much narrower than here, where

13   Roundup was sold directly to Plaintiff. *See, e.g., Grobelny v. Baxter Healthcare Corp.,* Case No.

14   05-cv-4645 (PCS), 2008 WL 2186417, at *2 (D.N.J. May 23, 2008) ("[where a product is] a

15   complex pharmaceutical compound [...] with a complicated warning insert, testimony of a

16   physician would be necessary in order to aid the jury in determining whether the warning was

17   adequate."). Because defendant-manufacturers of prescription drugs and medical devices are

18   typically only required to warn physicians rather than end consumers of the dangers inherent in

19   their products, determining whether those warnings are adequate will almost always be more

20   complex than cases, like this one, involving direct to consumer products. *See Carlin*, 13 Cal. 4th

21   at 1116 ("[I]n the case of prescription drugs, the duty to warn runs to the physician, not to the

22   patient."). Nor is there a duty to warn of risks that are known and obvious to sophisticated users

23   like physicians. *See e.g. Johnson v. American Standard, Inc*., 43 Cal. 4th 56, 65 (2008). For these

24   reasons, it is unsurprising that *Monroe* is rarely cited outside the medical device context.

25              c.   **Plaintiff Has Presented Sufficient Evidence for a Jury to Conclude**
                     **that Monsanto was Negligent in Failing to Warn.**

26        General negligence does not require the applicable standard of care to be established by

27   competent expert testimony.  *Scott v. C.R. Bard, Inc.*, 231 Cal. App. 4th 763, 787 (2014).  Instead,

28   in cases like the present the applicable standard of care is simply "what a reasonably prudent

manufacturer would have known and warned about." *Anderson,* 53 Cal. 3d at 1002. Nothing in this case is so outside common experience of the jury so as to require expert testimony; in fact, expert testimony would be prohibited because it would invade the province of the jury to decide the ultimate issue in the case. *Ramirez v. Plough, Inc.,* 6 Cal. 4th 539, 546 (1993) ("Once the court has formulated the standard [of care], its application to the facts of the case is a task for the trier of fact if reasonable minds might differ"). Because Plaintiff proved that Roundup caused his cancer, the jury did not need expert testimony to come to the conclusion that Defendant's failure to warn of cancer was unreasonable under the circumstances.

### 3.   Plaintiff Provided Sufficient Evidence on General and Specific Causation.

Again, now for the sixth time, Defendant argues that Plaintiff failed to present evidence of general and specific causation. Motion, ¶¶ 25-28. Not only has Plaintiff responded to these arguments many times (incorporated again here), but they have been consistently rejected by this Court. *See, supra, fn.* 1-2. Additionally, Plaintiff presented three experts at trial on general causation—Drs. Portier, Ritz, and Weisenburger—each of whom testified that Roundup causes NHL in humans at real world exposures. *See, supra, fn.* 3. Defendant does not identify any specific issue with these experts' ***trial*** testimony regarding general causation, instead simply declaring that Plaintiff did not meet his burden. *See* Motion ¶ 25.

Regarding specific causation, Defendant focuses on the testimony of Dr. Weisenburger. This ground has been heavily tread, and Plaintiff has addressed Defendant's claims in prior briefing, and (again) above. But Plaintiff must address Defendant's more egregious falsehoods: Monsanto contends that Dr. Weisenburger used an "untested, never-before-used methodology." Motion ¶ 26. But, as the Court has explained,

> plaintiffs' specific causation experts use a 'differential diagnosis' as the basis for their opinion that exposure to glyphosate caused these plaintiffs' NHL . . . The Ninth Circuit has repeatedly approved the use of a differential diagnosis under *Daubert*, provided, of course, that it is applied reliably.

PTO 85 (Dkt. 2799). While Dr. Weisenburger does not perform a differential diagnosis in his role as a ***pathologist***, he has been studying the causes of NHL for over 30 years. *See* Tr. vol. 9, 1221:4-10. Similarly, contrary to Monsanto's assertion (Motion ¶ 26), Dr. Weisenburger ***did***

adequately consider whether Plaintiff's NHL was idiopathic; explaining that it is nonsensical to categorize the cause of NHL as "idiopathic" when there is a substantial risk factor present. *See* Tr. vol. 9, 1218:4-22; *see also* Dkt. 2478, at p. 19.  Monsanto's further allegations that Dr. Weisenburger relied on "inadequate and unreliable epidemiological studies," and that he "failed to reasonably rule out Plaintiff's other causative risk factors," are simply false.  Plaintiff's experts properly considered the totality of evidence in forming their opinions.[20]  The Court agrees. *See, supra, fn*. 6-7.  Similarly, the Court specifically addressed and rejected Monsanto's complaints about Plaintiff's other causative risk factors. *See* PTO 85 fn4 (Dkt. 2799). Monsanto's restatement of their prior complaints is not a basis for a new trial.

As the Court explained in denying Monsanto's motion for summary judgment, "[a]ll three experts noted the plaintiffs' extensive Roundup usage, and further explained – as did the plaintiffs' general causation opinions – that both the McDuffie (2001) and Eriksson (2008) studies showed a dose-response relationship between glyphosate and NHL." PTO 85 (Dkt. 2799), p. 6.  Most importantly, Plaintiff presented sufficient expert testimony that his Roundup exposure was a substantial factor in causing his NHL:

- "[W]hen you look at the potential risk factors for Mr. Hardeman, … [h]e had lots of exposure to Roundup." (Tr. vol. 9, 1212:12-14.)

- "I eliminated [Hepatitis B and C as risk factors] because I don't believe that they could have caused his non-Hodgkin's lymphoma. So then it leaves it between Roundup and obesity, and we know that … people with high exposure to Roundup have a significantly increased risk for non-Hodgkin's lymphoma … The risk with people who are overweight is [] very small." (Tr. vol. 9, 1213:6-17.)

- "[T]he point of what I was showing is that if you have exposure to the chemical in high doses, you get genotoxic damage." (Tr. vol. 9, 1268:23-25.)

Thus, Defendant's attempt to manipulate the application of Dr. Weisenburger's methodology and opinions is not a basis for a new trial.  *See Roy v. Volkswagen of Am., Inc.*, 896 F.2d 1174, 1176 (9th Cir. 1990) ("[T]he court is not justified in granting a new trial merely because it might have come to a different result from that reached by the jury.")  Ultimately, Plaintiffs provided sufficient evidence upon which the jury's verdict is based. *See* Dkt. 2479.

---

[20] Plaintiff hereby incorporates all his prior briefing on this subject, including Dkts. 647, 793, 1135, 2479, and 2559

### 4. The Jury's Compensatory Damages Award is Proper.

As a preliminary matter, Defendant's contentions that Dr. Nabhan's opinions and testimony are speculative are completely without support.  *See* Motion ¶ 29.  First, Dr. Nabhan's testimony was more than sufficient to support the jury's award of noneconomic damages. Dr. Nabhan explained to the jury how Plaintiff was diagnosed with Stage III Diffuse Large B-Cell Lymphoma ("DLBCL") and would die without immediate treatment.  Tr. vol. 18, 2352:18-22. He further described the excruciating treatment regimen, Plaintiff's harms, future treatment, and increased risks.  *Id.*, at 2353:1-10 (discussing aggressiveness of Plaintiff's cancer), 2355:17-2358:10 (discussing chemotherapy side effects), 2366:9-20 (discussion of "chemo brain" and its lasting effects), 2370:14-25 (discussion of increased risk of developing other types of cancers and need for continued medical monitoring), 2371:2-2372:15 (discussing "lifelong" follow-up; "[Plaintiff] needs to be followed for the rest of his life for the possibility of emerging problems from the treatment that he received for DLBCL").  Second, Dr. Nabhan testified to a reasonable degree of medical certainty (Tr. vol. 18, 2373:3-6), and thus his testimony is not "speculative." Third, Defendant chose not to cross-examine Dr. Nabhan. Tr. vol. 18, 2373:10-11.[21]  Finally, Defendant chose not to call any expert to refute Dr. Nabhan's testimony in Phase 2.  In short, Defendant neither challenged nor rebutted Plaintiff's overwhelming evidence of suffering.[22]

As for the amount of the compensatory damage award, Defendant has not presented any evidence that it is excessive in light of what Plaintiff has experienced and continues to endure. Tr. vol. 18, 2410:5-9 (Defense counsel: "I have no questions – understanding how difficult it was for you to even discuss this today and to go through your diagnosis and chemotherapy, I have no questions about any of that."). "Generally, a jury's award of damages is entitled to great deference, and should be upheld unless it is clearly not supported by the evidence or only based

---

[21] Notably, because Defendant chose not to cross-examine Dr. Nabhan or object to his testimony on the record, Defendant has waived any argument as to the substance of Dr. Nabhan's testimony. *See Duste*, 2012 WL 43756, at *2 ("A party cannot raise arguments in its post-trial Rule 50(b) motion that it did not raise beforehand in a Rule 50(a) motion offered during the trial itself."); *Cotton v. City of Eureka*, 860 F. Supp. 2d 999, 1015 (N.D. Cal. 2012) (holding defendants failed to preserve their argument by failing to timely object to introduction of evidence).

[22] Including testimony from Mr. and Ms. Hardeman about Plaintiff's noneconomic damages such as pain, suffering, and continued anxiety. Tr. vol. 18, 2406:11-2407:21; 2438:1-2440:19.

on speculation or guesswork." *Henry v. Lehman Com. Paper, Inc.* (*In re First Alliance Mortg. Co.*), 471 F.3d 977 (9th Cir. 2006) (internal citations omitted); *see also Sherwin-Williams Co. v. JB Collision Servs., Inc.*, Case No. 16-56566, 2019 WL 1858214, at *2 (9th Cir. Apr. 25, 2019) ("The jury was free to place any dollar amount on the noneconomic harm so long as it was not so grossly excessive.") (internal citations omitted). Defendant's cherry-picking of other verdicts does not demonstrate that this jury's verdict is excessive, and does not support its reduction. A finding of an excessive verdict predicated on "what other juries awarded to other plaintiffs for other injuries in other cases based upon different evidence would constitute a serious invasion into the realm of factfinding." *Rufo v. Simpson*, 86 Cal. App. 4th 573, 615-16 (2001). Courts should "revers[e] as excessive only those judgments which the entire record, when viewed most favorably to the judgment, indicates were rendered as the result of passion and prejudice on the part of the jurors." *Id.*, at 616.[23]  California courts emphasize that each case must be resolved on its own facts. *Gutierrez ex rel. v. United States*, 323 F. App'x 493, 494 (9th Cir. 2009).

Moreover, the compensatory damages for Mr. Hardeman are not out of line with verdicts in other cases, even those relied on by Defendant.  *See* Motion ¶ 30 (citing *Buell-Wilson v. Ford Motor Co.*, 141 Cal. App. 4th 525 (2006)).  In *Buell-Wilson*, despite the plaintiffs request for "three to four times the specials" for noneconomic damages, identifying that amount as "fair, just, and reasonable," the jury awarded ***thirteen*** times the amount counsel requested.  *Id*, at 548, 552. The court found that the jury acted out of passion and prejudice because its award far exceeded what the plaintiffs characterized as "fair, just, and reasonable," and reduced the award to "$18 million, within the ratio/range requested by the [plaintiffs'] counsel." *Id.*, at 554.  The court nevertheless noted that noneconomic awards vary greatly from case to case: "[i]njuries are seldom identical and the amount of pain and suffering involved in similar physical injuries varies widely." *Id.*, at 548, 552 ("review of all of these cases shows a range between $1 million and $66 million in compensatory damages awards and substantial differences in the facts of each case.").

---

[23] "A damage award is excessive only if the record, viewed most favorably to the judgment, indicates the award was rendered as the result of passion and prejudice on the part of the jurors." *Bender v. County of Los Angeles*, 217 Cal. App. 4th 968, 981 (2013) (internal citations omitted).

Thus, there is no bright-line test regarding the ratio of economic to noneconomic damages. *Duarte v. Zachariah*, 22 Cal. App. 4th 1652, 1664-65 (1994).  Here, in contrast, the jury here awarded *less* than Plaintiff's counsel suggested were appropriate as noneconomic damages. Tr. vol. 20, 2740:22-2741:2.

Defendant has not identified any facts or evidence to suggest prejudice or passion from the jury that is necessary for overturning a jury's award.  *Buell-Wilson*, 141 Cal. App.4th at 548 ("[courts] should not assume to substitute its appraisal, for that of a jury, of the amount of damages for physical pain and mental suffering" except where "it is based on prejudice or passion rather than sober judgment.").  The evidence presented at trial, and uncontested by Defendant, warrants a substantial compensatory award; the jury agreed and their award should be respected. *Raynor Bros. v. American Cyanimid Co.*, 695 F.2d 382, 385 (9th Cir. 1982) ("jury's verdict should be accepted if it could reasonably have been reached.") (citations omitted).

### D.   The Jury's Punitive Damages Award Should Not Be Disturbed.[24]

The jury was right to award punitive damages in this case, and the amount of the award ($75,000,000), should not be reduced.   As the Court has previously acknowledged, there is strong evidence that "Monsanto does not particularly care whether its product is in fact giving people cancer, focusing instead on manipulating public opinion and undermining anyone who raises genuine and legitimate concerns about the issue."  PTO 101 (Dkt. 2937).

### 1.   The Punitive Damages Award Conforms to California Law.

In order for a jury to award punitive damages, it need only find that the defendant acted with malice, oppression or fraud.  Cal. Civ. Code § 3294(a).  "Conscious disregard for the safety of another may be sufficient where the defendant[25] is aware of the probable dangerous consequences of [its] conduct and [] willfully fails to avoid such consequences."  *Pfeifer v. John*

---

[24] Plaintiff adopts and incorporates all trial testimony and exhibits relevant to punitive damages.
[25] A plaintiff is not required to identify a particular managing agent who acted with malice or oppression if he illustrates that the company, as a whole, acted maliciously.  *See, e.g., Romo v. Ford Motor Co.*, 99 Cal. App. 4th 1115, 1141-46 (2002) ("It is difficult to imagine how corporate malice could be shown in the case of a large corporation except by piecing together knowledge and acts of the corporation's multitude of managing agents."); *accord Pacific Gas & Elec. Co. v. Superior Ct. (Butte Fire Cases)*, 24 Cal. App. 5th 1150, 1172-73 (2018).

*Crane, Inc.,* 220 Cal. App. 4th 1270, 1299 (2013) (internal quotation marks and citation omitted). "Marketing a product that is known to be defective and dangerous to consumers supports an inference of malice for purposes of punitive damages."[26]  *Karlsson v. Ford Motor Co.,* 140 Cal. App. 4th 1202, 1230 (2006).  Even where the risk of harm is relatively slight, and grave injury may only occur to a small fraction of consumers, punitive damages have been upheld due to the gravity of the potential harm resulting from a widely used product.  *See, e.g.*, *Boeken v. Philip Morris Inc.*, 127 Cal. App. 4th 1640, 1689-1703 (2005), *cert. denied* (March 20, 2006).  Nor does "the existence of governmental safety regulations [] bar an award of punitive damages for egregious misconduct that they are ineffective in preventing."  *Pfeifer*, 220 Cal. App. 4th at 1301 (citation omitted).  Punitive damages are appropriate even where "there was a 'reasonable disagreement' among experts" because a "jury is 'entitled to' reject the claims of Defendant's experts in reaching a verdict on punitive damages."  *Buell-Wilson*, 141 Cal. App. 4th at 559-60. [27]

### 2.   The Punitive Damages Award Was Not Excessive.

The Supreme Court has established a three-factor weighing analysis to determine whether an award of punitive damages is constitutionally excessive: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996).

### a.   Monsanto's Conduct Has Been Highly Reprehensible.

"[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct."  *State Farm*, 538 U.S. at 419; *BMW*, 517 U.S. at 575.  To assess reprehensibility, courts consider "whether: the harm caused was physical

---

[26] Certainty of harm is not required: "intentionally marketing a defective product knowing that it ***might*** cause injury and death is 'highly reprehensible.'" *Id.*, at 1690 (emphasis added).
[27] Although vacated with respect to constitutional limits of punitive damage awards in *Ford Motor Co. v. Buell-Wilson*, 550 U.S. 931 (2007), the California Supreme Court continues to cite *Buell-Wilson* regarding availability of punitive damage awards.  *See Boeken v. Philip Morris USA, Inc.*, 48 Cal. 4th 788, 796 (2010).

as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *State Farm*, 538 U.S. at 419.

At trial, Plaintiff offered ample evidence demonstrating that Monsanto's conduct showed a high degree of reprehensibility, from which a reasonable jury could find that Monsanto exhibited conscious and callous disregard of public safety in order to maximize corporate profits.[28] *Boeken*, 127 Cal. App. 4th at 1690.  Notably,

> [t]he very conduct that injured [Plaintiff Hardeman] was directed at all [consumers] in the United States, repeated over many years with knowledge of the risk to human life and health, and is probative of intentional deceit.  The national marketing of a defective product, knowing that ordinary consumers expect it to be less hazardous, knowing that thousands of people will die due [to its use], is probative of a willful and conscious disregard of the danger to human life.

*Id.*, 1694 (citing *State Farm*, 538 U.S. at 423–24).

**b.  The Ratio Between the Actual or Potential Harm Suffered and the Punitive Damages Award is Constitutionally Sound.**

The California Supreme Court has recognized that ratios between the punitive damages award and the plaintiff's compensatory damages significantly greater than 9 or 10 to 1 require justification (by showing, for example, extreme reprehensibility).  *Simon v. San Paolo U.S. Holding Co., Inc.*, 35 Cal. 4th 1159, 1181-82 (2005).  In this case, Monsanto's extreme reprehensibility provides justification for the ratio awarded by the jury (of approximately 14).[29]

Reviewing courts also may consider the relative size of the compensatory award when evaluating the appropriate size of punitive awards, but such an analysis is of little assistance here.  The compensatory award in this case is neither so low as to have no effect on Monsanto's future conduct, nor so high as to say that the jury already punished Monsanto with its compensatory

---

[28] *See* Exs. 1-22 (Tr. Exs. 155-161, 220, 245, 254, 312, 314, 315, 426, 448, 449, 461, 462, 464, 686, 788).

[29] Monsanto's reprehensibility is far worse than the defendant's in *Roby v. McKesson Corp.*, which was determined to fall at the "low end of the range of wrongdoing that can support an award of punitive damages."  47 Cal. 4th 686, 717 (2010).

award.[30] Thus, this factor weighs neither for nor against upholding the punitive damages award in this case. *Compare Delos v. Farmers Ins. Group*, 93 Cal. App. 3d 642, 661 (1979) (compensatory damages only $10,500 in bad faith action) *with Buell-Wilson*, 141 Cal. App. 4th at 531 ($109,606.004 in compensatory damages for injuries suffered in a rollover).

### c. Difference Between Punitive Damages and Civil Penalties Imposed in Comparable Cases.

The California Court of Appeal has acknowledged that this guidepost is of "little help" in determining whether a punitive damages award is constitutionally acceptable. *See Boeken*, 127 Cal. App. 4th at 1698 ("Finding analogous penalty provisions sanctioning frauds leading to wrongful death is a difficult, if not impossible, undertaking."). Moreover, "the precise award in any case [] must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Bullock v. Philip Morris USA, Inc.*, 198 Cal. App. 4th 543, 564 (2011) (quotation omitted); *see also Buell-Wilson*, 141 Cal. App. 4th at 552 ("other cases may give us a point of reference, [but] our decision must be based upon the evidence in this case.").

To the extent that comparing one case to another is necessary, *Bullock* is instructive. At trial, the *Bullock* plaintiff revealed Philip Morris' decades'-long deceit about the dangers of smoking, and in light of the extreme reprehensibility of the defendant's misconduct (as well as its vast scale and profitability, and the defendant's financial condition), the Court of Appeal upheld a punitive damages ratio of 16 to 1. *Id.* at 573. Monsanto's behavior is not unlike Big Tobacco's, and the penalty for such callous disregard of human life should be comparable.

### 3. Monsanto's Financial Condition Supports the Size of the Award.

A defendant's financial condition is an essential factor in fixing an amount sufficient to serve these goals without becoming excessive. *See Simon*, 35 Cal. 4th at 1185. "[T]he function of deterrence ... will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort." *Neal v. Farmers Ins. Exch.*, 21 Cal. 3d 910, 928 (1978).

---

[30] Although Mr. Hardeman is in remission, his NHL could recur, and so the **potential harm** caused by Monsanto's misconduct far exceeds the compensatory award. The physical nature of the harm suffered by Plaintiff makes the bad faith cases Monsanto relies on inapposite. *See Walker v. Farmers Ins. Exch.*, 153 Cal. App. 4th 965, 974-75 (2007) (economic harm only); *Jet Source Charter, Inc. v. Doherty*, 148 Cal. App. 4th 1, 11 (2007) (same).

Bayer paid $63 billion to acquire Monsanto.  Tr. vol. 19, 2519:19-2520:5.  In June 2018, Monsanto's net worth was $7.8 billion and it had $2.4 billion dollars cash on hand.  *Id.*  A punitive damages award of $75 million is thus less than 0.1% of Monsanto's net worth.[31]

Given Monsanto's great wealth, a great sum of money is necessary to effectively deter such corporate misconduct in the future.  *See Boeken*, 127 Cal. App. 4th at 1696 ("California courts have routinely upheld punitive damage awards which amounted to a percentage of net worth from .005 percent. . . and not exceeding 10%.") (citations omitted).  In *Boeken*, where punitive damages were $50 million, the Court of Appeal noted that: "[a] multiplier of 5[32] to 10 percent of net worth may be necessary to deter a very wealthy wrongdoer."  *Id.* at 1701.

### 4.  The Risk of Punitive Damages in Other Cases Cannot Be Considered.

If a defendant wishes to limit the amount of punitive damages based on the fact that it has previously been assessed punitive damages, that evidence must be presented to the jury.  Here, as in *Stevens v. Owens-Corning Fiberglas Corp.*, 49 Cal. App. 4th 1645 (1996), Monsanto made a calculated decision not to present to the jury evidence of the punitive damages award in the *Johnson* trial, and, as such, is precluded from raising the prior award to attack the size of the punitive damages award in this case.  *Id.*, at 1664.[33]

> To consider the defendant's entire course of conduct in setting []a punitive damage award, even in an individual's lawsuit, is not to punish the defendant for its conduct towards others. An enhanced punishment for recidivism does not directly punish the earlier offense; it is,

---

[31] This percentage is in the same range as the percentage-of-worth value of the punitive damages award against the defendant in *Romo*, 99 Cal. App. 4th at 1149.  There, the Court of Appeal upheld a punitive damages award equal to 1.2% of Ford's net worth.  *Id.*  In *Izell v. Union Carbide Corp.*, 231 Cal. App. 4th 962 (2014), the Court of Appeal upheld a punitive damages award equal to .04% of the defendant's net worth of $4.2 billion.

[32] Five percent (5%) of Monsanto's net worth in 2018 would be $390 million.

[33] Monsanto attempts to distinguish *Stevens* by arguing that Monsanto could not have been expected to show the jury the amount of punitive damages imposed in *Johnson* because liability and damages were heard at the same time in this case (unlike in *Stevens*, where liability and damages were bifurcated), Motion at 16, n.1, but *Stevens*' holding—and the rationale behind it— was not tied to bifurcation at all.  Instead, the Court of Appeal stated quite plainly: "[f]or evidence of other awards to have probative value, it must be tested in an adversary setting."  *Id.* at 1664.  Here, Monsanto explicitly informed the trial court that "Monsanto is not seeking a separate trial limited to punitive damages."  *See* Monsanto Company's Motion to Reverse Bifurcate the Group 1 Trials, p. 9:26 (Dkt. 2282).  Bifurcation or not, though, the trial court is prohibited from reducing a punitive damages award based on other awards that were not presented to the jury.

1    rather "a stiffened penalty for the last crime, which is considered to be an aggravated offense
2    because a repetitive one."

*Johnson v. Ford Motor Co.*, 35 Cal. 4th 1191, 1206 (2005) (internal citation omitted).

3              **E.   The Jury Instructions and Verdict Forms Were Proper.[34]**

4                   **1.   The Court did Not Abuse Its Discretion in Crafting the Jury
5                          Instructions.**

6          The district court must formulate a set of jury instructions that fairly and accurately states

7    the law, covers the issues presented, and is not misleading. *Duran v. City of Maywood*, 221 F.3d

8    1127, 1130 (9th Cir. 2000) (per curiam); *see also White v. Ford Motor Co.*, 312 F.3d 998, 1012

9    (9th Cir. 2002), *opinion amended on denial of reh'g*, 335 F.3d 833 (9th Cir. 2003).  Thus, the trial

10   court has broad discretion to craft jury instructions that it believes are appropriate under the

11   circumstances of the case. *White v. BNSF Ry. Co.*, 726 F. App'x 603, 604–05 (9th Cir. 2018)

12   (citing *Fikes v. Cleghorn*, 47 F.3d 1011, 1013 (9th Cir. 1995)).

13         Further, because Monsanto did not challenge the jury instructions in its Rule 50(a)

14   Motion, its attempt to do so here is not only disingenuous, it is disallowed.  *See E.E.O.C. v. Go*

15   *Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) ("[Rule 50(b)] is not a freestanding

16   motion" so party cannot raise arguments in Rule 50(b) motion not raised in Rule 50(a) motion).

17         Monsanto was granted significant briefing and argument—and even input—on the final

18   jury instructions and verdict forms submitted to the jury. *See*, *e.g.*, Tr. vol. 11, 1800:3-1874:18

19   (discussing only "causation" instruction).  But ultimately, after weighing California's model jury

20   instructions, the Parties' arguments, and relevant case law, and submitted instructions and verdict

21   forms to the jury which were proper and therefore should not be disturbed.

22                   **2.   The Court's Modifications of CACI 430 Were Proper and Appropriate,
23                          and Not an Abuse of Discretion.**

24         Like Monsanto did here, "a defendant may contend that the acts of another were the cause

---

25   [34] Plaintiff hereby incorporates all prior briefing, argument, and orders regarding the causation,
26   design defect, strict liability and negligent failure to warn jury instructions, and with respect to
     the verdict form, including but not limited to Hardeman Dkt. 27, PTO 101 (MDL Dkt. 2937),
27   Dkt. 2939), PTO 106 (Dkt. 2959), PTO 107 (Dkt. 2961), Dkt.2995), Dkt. 3001), PTO 137
     (Dkt. 3188), Dkt. 3190, PTO 139 (Dkt. 3194); Tr. vol. 11, 1800:3-1874:18, vol. 13, 2105:7-
28   2113:25, and vol. 19, 2592:13-2682:4-5.

of the plaintiff's harm and thus that defendant's tortious conduct was not a cause of the plaintiff's harm.  [Where] the other forces were operating and sufficient to cause the harm contemporaneously with the defendant's tortious conduct … this Section [titled, 'Alternative Causes'] is applicable."  REST. (3D) OF TORTS: PHYS. & EMOT. HARM § 27(e) (2010); *see also* Tr. vol. 11, 1853:2-9; *Logacz v. Limansky*, 71 Cal. App. 4th 1149, 1152, 1157 (1999).

In fact, the Restatement explicitly acknowledges that an additional "contingent" instruction may be necessary where "the jury [is] first [asked] to determine whether it finds that only one cause was operating, or that both were operating.  Then, alternative instructions must be provided to correspond with the jury's finding."  REST. (3D) OF TORTS: PHYS. & EMOT. HARM § 27 (2010).  Thus, the Court properly presented the standard "but-for" causation instruction—virtually verbatim of CACI 430—with an additional contingent instruction for "if [the jury] believe[d] that two or more NHL-causing factors operated independently on Mr. Hardeman."  *See* Dkt. 2963, at 11.  The Court amended the language to acknowledge the fact that both Roundup and hepatitis C were proffered as causes of Mr. Hardeman's NHL, and although they could have been independent causes, they are not mutually exclusive.  *See* PTO 107, Dkt. 2961.

For this reason, the cases Defendant cites are explicitly inapposite.  *Xavier v. Philip Morris USA Inc.*, for example, does not apply here because, "no [] independent event or circumstance [other than the defendants' misconduct was] alleged to be a sufficient cause of [the plaintiff's] harm."  787 F. Supp. 2d 1075, 1080 (N.D. Cal. 2011).  Likewise, *Modisette v. Apple Inc.*, explicitly acknowledges that defendant's conduct was the only possible cause of the decedent's death.  30 Cal. App. 5th 136, 153 (2018), *reh'g denied* (Jan. 9, 2019), *review denied* (Feb. 27, 2019).  But here, in contrast, when Plaintiff asserted that Roundup caused his NHL, Defendant submitted hepatitis C as an independent cause.  As *Modisette* confirms, "[c]oncurrent independent causes 'are multiple forces operating at the same time and independently, each of which would have been sufficient by itself to bring about the harm.'"  *Id.*, fn. 14 (quoting *Viner v. Sweet*, 30 Cal. 4th 1232, 1240 (2003)).  Because the parties posit that either Roundup *or* hepatitis C could have caused Plaintiff's injuries, the "substantial factor" instruction was proper.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Despite its protestations, Monsanto was allowed significant input in the final jury instruction regarding causation—including by inserting an explicit alternative statement by which the jury **had** to find for Defendant.  *Compare* Tr. vol. 11, 1869:12-15 (Defendants proposal for final sentence of jury instruction) *with* Dkt. 2963, p. 11 (final causation instruction incorporating Defendant's proposal).  Further, the second phase of trial included a separate and additional instruction which not only reiterated that Mr. Hardeman bore the burden of proof, but also specified that he must meet that burden by a preponderance of the evidence.  *See* PTO 139 (Dkt. 3194), p. 12; *see also United States v. Duran*, 59 F.3d 938, 941 (9th Cir.1995) ("'It is not reversible error ... to reject a defendant's proposed instruction … if other instructions, in their entirety, adequately cover that defense theory.'") (citation omitted).

### 3.   The Design Defect Instruction was Sufficient, and Not an Abuse of Discretion.

The consumer expectations test applies here and is applicable when "[t]he purposes, behaviors, and dangers of [the] products are commonly understood by those who ordinarily use them." *Saller,* 187 Cal. App. 4th at 1232. The "consumer expectation test" recognizes that "implicit in a product's presence on the market is a representation that it is fit to do safely the job for which it was intended." *Johnson,* 240 Cal. App. 4th at 32 (internal citations omitted). Succinctly put, "[w]here the product is one of 'common experience,' encountered generally in everyday life, the jury can rely on its own expectations of safety in applying the test." *Id*. at 32.

Plaintiff's design defect theory asserts that Roundup is an inherently dangerous product and its dangerous nature would not be obvious to an ordinary consumer.  *See* Tr. vol. 19, 2682:4-5 ("It's defective in the sense that it's not something that an ordinary consumer would expect to get cancer from."); *see also* REST. (2D) OF TORTS § 402a cmt. j (1965); *Arnold,* 91 Cal. App. 4th at 723, 729 (2001) (finding plaintiff's design defect claim distinct from failure to warn claim, and encompassed multiple theories including defective labeling and that the product was generally unsafe for residential use).

### 4.   The Instructions on Strict Liability and Negligent Failure to Warn Provided the Jury with the Proper Standard for Consideration.

As posed to the jury, the failure to warn instructions asked whether "Roundup's NHL risk was known or knowable in light of the scientific and medical knowledge that was generally

1    accepted in the scientific community at the time that Mr. Hardeman was using Roundup" (for

2    strict liability, *see* Dkt. 3194, at 14), and whether "Monsanto knew or reasonably should have

3    known that Roundup posed a risk of NHL when used or misused in a reasonably foreseeable

4    manner" (for negligent failure to warn, *see id.*, at 15).  Monsanto now claims that these

5    instructions were insufficient, but does not explain how these instructions fell short of

6    Defendant's preferred instruction.  *See* Motion, at ¶ 46.  Indeed, the only differences are that

7    Monsanto prefers to call the risk of NHL "actual risk," and would rather say "when used in

8    accordance with widespread and commonly recognized practice" than "when used or misused in a

9    reasonably foreseeable manner."  Without further explanation, these distinctions are not relevant.

10   Nor, importantly, are they required by *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 447 (2005).

11   *Bates* did not consider jury instructions, or the standard by which failure to warn claims should be

12   assessed; indeed, *Bates* did not even consider California law.

13          "California law [] asks whether a risk is known or knowable (for strict liability) or

14   reasonably should have been known (for negligence)."  PTO 101, Dkt. 2937, at 2 (citing *Conte v.*

15   *Wyeth, Inc.*, 168 Cal. App. 4th 89, 101-02 (2008); *Hardeman v. Monsanto Co.*, 216 F. Supp. 3d

16   1037, 1038 (N.D. Cal. 2016)).  As the Court has explained, "[i]t is difficult to see how there could

17   be no evidence that the risks of glyphosate were 'knowable.'"  *Id.*, at 5-6.

18                    **5.    The Inclusion of Stipulated Damages Neither "Suggested" Other
                             Categories of Damages, Nor Did it Harm Defendants.**

19          Citing neither caselaw nor evidence, Defendant claims that including the accurate and

20   stipulated amount of economic damages influenced the jury.  *See* Motion, ¶ 47.  While Plaintiff

21   did not object to eliminating the stipulated amount from the verdict form (*see* Tr. vol. 19, 2653:8-

22   12) Defendant conceded that it was appropriate to include the amount of stipulated damages in the

23   jury instruction (*see* Monsanto Letter re Jury Instructions, Dkt. 3189, at 4) and indeed the Court

24   adopted the revision to Jury Instruction 15 that Monsanto requested (*see* Instruction No. 15, Dkt.

25   3194).  Defendant does not claim, because it cannot, that printing the stipulated damages on the

26   verdict form "permits only one reasonable conclusion, and that conclusion is contrary to the jury's

27   verdict" (as it must to secure a directed verdict, *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d

28

1236, 1242 (9th Cir. 2014)), nor that it is against the "clear weight of the evidence" (as it must to

claim a right to a new trial, *Landes Const. Co.*, 833 F.2d at 1371).

## F.   <u>The Court Properly Excused Juror No. 4.</u>

The Court did not abuse its discretion in excusing Juror No. 4. *See Silverthorne v. United States*, 400 F.2d 627, 637 (9th Cir. 1968) (explaining appellate courts will not interfere with the court's manner of conducting *voir dire* and questioning jurors "unless there has been a clear abuse of discretion."); *see also United States v. Field*, 625 F.2d 862, 870 (9th Cir. 1980). Importantly, Monsanto's counsel did not object to the excusal of Juror No. 4, but rather in "defer[ence] to Your Honor" merely "request[ed]" that the Court, outside the presence of counsel, ask the juror "whether or not she is unwilling to listen to the evidence and your instructions and participate in deliberations . . . I'm not saying to try to rehabilitate her. . ." *See* Tr. vol. 5, 792:14-21. The Court declined Monsanto's request citing "multiple reports" from other jurors that they were "very uncomfortable" with Juror No. 4's presence and comments[35] because she had "prejudged" the case, "in part based on the views of the lawyers," and that, "nothing would change her mind." *Id.*, at 794:3, 789:16-19; 788:11-13. This juror misconduct risked contamination of the jury, as the Court acknowledged (*id.*, at 794:3-13) and the Court properly rejected Monsanto's request to question the juror *ex parte*; an evidentiary hearing is not mandatory.  *Sepulveda v. Robertson*, Case. No. CV 18-01700 JGB (MAA), 2018 WL 3869609, at *3 (C.D. Cal. July 2, 2018) ("a trial court has flexibility to decide whether to conduct a hearing" based upon the "content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source."); *see also Harrell v. Taylor*, Case No. C 00-2516 PJH (PR), 2008 WL 4344582, at *15 (N.D. Cal. Sept. 22, 2008) ("investigation into juror misconduct is at the discretion of the trial court, to be conducted with or without a hearing.").

Here, the Court conducted an investigation into Juror No. 4's conduct and statements and determined that she had prejudged the case and would likely contaminate the entire jury if not

---

[35] Tr. vol. 5, 789:16:19 (noting courtroom deputy's "perception [] was that the other jurors are very uncomfortable with this person being on the jury and . . . believe she is irresponsible.").

excused.[36]  Monsanto also recognized this concern.  *See* Tr. vol. 5, 792:14-21.  Monsanto now claims that the Court abused its discretion because the Judge did not question the juror *ex parte*, but the Court has considerable discretion and is not required to ask questions requested by counsel. *United States v. Giese*, 597 F.2d 1170 (9th Cir. 1979). Moreover, the evidence overwhelmingly showed that Juror No. 4 could not and would not follow the Court's instructions: multiple jurors reported that Juror No. 4 repeatedly disregarded the Court's instructions on only the second day of trial, had already made up her mind, and likewise blatantly demonstrated her intention to disregard the oath she had taken just the day before.  *See* Tr. vol. 5, 794:3, 789:16-19; 788:11-13.  While the court "must pay due respect for the oath taken by a juror," that is true only in the absence of any stated intention to disregard it. *Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1221 (9th Cir. 1997) (internal citations omitted).

### G.  Monsanto Has Not Alleged Any Evidentiary Errors That Support Its Request For Relief And "Policing" Previously-Issued Rulings Is Not A Basis For A New Trial.

FRCP 61 provides that no error in admitting or excluding evidence constitutes a ground for granting a new trial unless justice requires otherwise. Here, Defendant has not identified any evidentiary errors that support its request for judgment as a matter of law or a new trial.

#### 1.  The Court's Ruling Regarding Pathology Opinions Was Proper.[37]

"We review a district court's admissibility ruling on expert testimony for abuse of discretion. We will not reverse the admissibility ruling unless it is manifestly erroneous." *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1183 (9th Cir. 2002) (citation omitted). There is no evidence in the record, and Defendant has cited none in its Motion, to support a reversal of the Court's ruling admitting Dr. Weisenburger's testimony. The Court ruled on the admissibility of his testimony twice, finding both times that it was admissible under *Daubert*.[38]  Defendant's focus

---

[36] Tr. Trial, vol. 5, 794:5-7, February 27, 2019 ("I don't think it would be appropriate for me to keep her on the jury…there is a significant risk that she would taint the jury [] going forward...").
[37] Plaintiff hereby adopts and incorporates all of his prior briefing on this subject, including but not limited to Dkts. 167; 647; 793; 1135; 2479; 2559.
[38] *See* PTO 85 (Dkt. 2799) ("[T]he Court already determined that the plaintiffs offered admissible expert opinions that glyphosate is capable of causing NHL.").

on Dr. Weisenburger's testimony regarding pathology slides is misplaced. The findings on the

pathology slides have never been in dispute.  All of Mr. Hardeman's treating physicians, the

defense experts, and Plaintiff's experts agree that the pathology slides confirm the diagnosis of

NHL, specifically, DLBCL. *See* Tr. vol. 9, 1217:14-17. Both Drs. Weisenburger and Levine

testified that the pathology does not show the cause of the cancer.  *See id.*, at 1216:10-12

(Weisenburger); vol. 11, 1731:18-24 (Levine).  Further, Dr. Weisenburger's opinion regarding his

"ruling out" of hepatitis C was not based on the pathology slides.[39]

Dr. Weisenburger's testimony regarding hepatitis C was no surprise to Defendant: his

general causation and specific causation reports, supplemental reports, and reliance lists were

provided to Defendant in accordance with the Court's pretrial Orders.  Indeed, Defendant's expert

testified about Dr. Weisenburger's consideration of hepatitis C.  Tr. vol. 11, 1599:13-25, 1600:5-

18, 1605:12-25.  Ultimately, the trial established that Drs. Weisenburger and Levine employed the

same methodology[40]; that the jury chose to believe Dr. Weisenburger's testimony over Dr.

Levine's is not a basis for a new trial.  *In re Exxon Valdez*, 270 F.3d at 1248; *United States v.*

*Clevenger*, 733 F.2d 1356, 1359 (9th Cir. 1984).  Defendant's claim about the jury's "impression"

of Dr. Weisenburger's testimony regarding pathology is nonsensical, and the Zuckerman article

was included in Dr. Weisenburger's reliance list served pretrial, and thus Defendant's contention

that it was not included is false.  Motion ¶ 52.  In any event, Defendant had the opportunity to

cross-examine Dr. Weisenburger, and even listed the Zuckerman article as a trial exhibit, thus

neither was "previously undisclosed."  *Id.*; s*ee* also Tr. vol. 9, 1233:13-20.

Defendant's assertion that excluding Drs. Arber's and Levine's testimony about BCL6

findings on the pathology was prejudicial is not supported by the evidence. *See* PTO 104 (Dkt.

2942) ("Dr. Weisenburger's testimony … only opens the door to a discussion of BCL6 if NHL

---

[39] Dr. Weisenburger's "ruled out" hepatits C because Plaintiff (1) did not develop NHL when he
had active hepatitis C (Tr. vol. 9, 1212:12-24); (2) had a rapid response to antiviral therapy for
hepatitis C (Tr. vol. 8, 1171:5-13); (3) was cured of hepatitis C for over nine years at the time of
diagnosis of NHL (*id.*, at 1171:17-25); and (4) Plaintiff's hepatitis C did not reactivate during
chemotherapy when he was immunosuppressed (Tr. vol. 9, 1367:7-20).
[40] *See* PTO 45 (Dkt. 1596), p. 55-56 (citing to Weisenburger 2, 12).

1   caused by hepatitis C is uniquely associated with BCL6 rearrangements.").  Because Dr. Arber

2   did not opine that BCL6 findings on the pathology showed Hepatitis C as a cause, his testimony

3   was properly excluded.  *Id.*  Likewise, Dr. Levine testified on cross-examination that the BCL6

4   translocation was a nonspecific finding. Tr. col. 11, 1695:4-10.

## 2.   The Court's Specific Causation Rulings Were Proper.

6        Again, Defendant seeks to overturn a ruling on the inadmissibility of expert testimony

7   without any justification. *Hemmings*, 285 F.3d at 1183. This Court twice held that only experts

8   whose opinions were put to the test at Phase 1 would be permitted to present opinions on general

9   causation at trial.  PTO 74 (Dkt. 2682); PTO 81 (Dkt. 2799). Dr. Levine was not identified as a

10  general causation expert in Phase 1, and thus she could not offer new general causation opinions.

11  *See* Dkt. 167.  The Court's rejection of Defendant's attempt to sneak Dr. Levine's general

12  causation opinions into Phase 2—*see* PTO 85 (Dkt. 2799)—is not a basis for a new trial.

## 3.   Regulatory Evidence Was Ruled Upon Fairly and Properly.

14        The Court permitted the parties to testify about both the IARC Monograph conclusion and

15  the EPA's conclusions regarding glyphosate, and both parties were permitted to discuss IARC

16  and the EPA decisions that occurred post-use.  *See* PTO 81 (Dkt. 2775).  At the same time, the

17  Court determined that neither report could be admitted as evidence.  There was no unfair or

18  uneven treatment between the parties, and thus there was no harm to Defendant.  Monsanto was

19  allowed to show the jury the EPA's classification and make arguments regarding the EPA's views

20  on glyphosate.  In fact, Monsanto was permitted to (and did) argue that numerous agencies have

21  concluded that glyphosate is not carcinogenic. *Id.*; *see* Tr. vol. 20, 2768:21-24.

22        As for trial exhibits, Monsanto waived any objections to exhibits 503, 505, 512, 514, and

23  516.  *See* Tr. vol. 11, 1574:7-13 ("I have no objection to those coming in."); vol. 19, 2529:8-9 ("I

24  have no objection to the remaining exhibits on that list."); *see also Duste*, 2012 WL 43756, at *2.

## 4.   Plaintiff's Counsel Did Not Violate PTO 85 and Monsanto Was Not Entitled to a Curative Instruction.

26        Discussing Plaintiff's opening statement, and the alleged violation of PTO 85,

27  Defendant's counsel admitted, "we are probably past those slides, and I think there is a good

28  chance it probably went over people's heads."  Tr. vol. 3, 337:19-21.  Now, Defendant claims

prejudice and requests a new trial on this basis.  Not only would this not justify a new trial, but during trial the Court immediately instructed the jury that "[l]awyer argument is not evidence. What the lawyers say during opening statements and closing arguments, and when they are asking questions of witnesses, that is not evidence." Tr. vol. 3, 338:17-20.

With respect to Dr. Ritz's testimony, everything Defendant cites in its Motion (¶ 62) includes the qualifier the Court required – that these are unadjusted numbers:

> My intention [] in the specific causation order was not necessarily to preclude the Plaintiffs from eliciting testimony about the numbers that emanate from *McDuffie* and *Eriksson*. [T]he experts [] can say what the numbers stand for. The qualification has to be made about [] the fact that these are unadjusted numbers

Tr. vol. 3, 431:9-25; *see also id.*, at 484:10-11 ("it's statistically significant, but still unadjusted for other pesticides."); 492:18 (same); 499:12-13 (same).

Finally, as the Court held, a curative instruction was not necessary regarding Dr. Weisenburger's testimony involving the demonstrative exhibit because Defendant's objection was granted, the objectionable chart was removed mid-testimony, and Dr. Weisenburger "provide[d] the rest of his analysis from the stand verbally." Tr. vol. 9, 1213:6-1214:13.  The trial court has great discretion regarding the necessity of a curative instruction and the absence of a curative instruction where any alleged problematic statement was confined, is not reversible error. *See Apple, Inc. v. Samsung Elecs. Co.*, 67 F. Supp. 3d 1100, 1134-35 (N.D. Cal. 2014).

### 5.   Exclusion Of "Agricultural Benefits" Was Proper.

The trial court has broad discretion in determining whether to admit evidence. *Rivas*, 2017 WL 3453365, at *1.  The Court properly excluded irrelevant evidence under Rule 401 and 403— including Monsanto's "feed the world" argument, *see* PTO 81 (Dkt. 2775)—because it did not tend to make any fact of consequence to determination of the action more or less probable than without the evidence. *See Boyd v. City and County of San Francisco*, 576 F.3d 938 (9th Cir. 2009).

### IV.   CONCLUSION

For the foregoing reasons, Defendant's Motion should be denied.

1

2    Dated: June 14, 2019                ANDRUS WAGSTAFF, PC

3                                        By: /s/ Aimee Wagstaff

4                                        Attorney for Plaintiff

5

6

7    Dated: June 14, 2019                MOORE LAW GROUP, PLLC

8                                        By: /s/ Jennifer Moore

9                                        Attorney for Plaintiff

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 3:16-md-02741-VC        PLAINTIFF'S OPPOSITION TO DEFENDANT'S POST-TRIAL MOTIONS

1

### ECF ATTESTATION

2

Pursuant to Civil L.R. 5-1(i)(3), the filing attorney attests that concurrence regarding the filing of

3

this document has been obtained from the signatories above.

4

5

Date: June 14, 2019                        By: _____*/s/ Leland H. Belew*_____
6                                                     Leland H. Belew

7
                                           Leland H. Belew (SBN 293096)
8                                          leland@andrusanderson.com
                                           Lori E. Andrus (SBN 205816)
9                                          lori@andrusanderson.com
                                           Jennie Lee Anderson (SBN 203586)
10                                         jennie@andrusanderson.com
11                                         **ANDRUS ANDERSON LLP**
                                           155 Montgomery Street, Suite 900
12                                         San Francisco, CA 94104
                                           Telephone:  (415) 986-1400
13                                         Facsimile:  (415) 986-1474

14
                                           *Attorneys for Plaintiff*
15

16

17

18

19

20

21

22

23

24

25

26

27

28