Pages 1 - 74

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

EDWARD HARDEMAN,                )
                               )
            Plaintiff,          )
                               )
   VS.                          )   NO. C 16-00525 VC
                               )
MONSANTO COMPANY,               )
                               )
            Defendant.          )
_____)
                               )
IN RE: ROUNDUP PRODUCTS         )
LIABILITY LITIGATION            )
                               )   NO. 16-md-02741 VC
_____)

San Francisco, California
Tuesday, July 2, 2019

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:
                    ANDRUS WAGSTAFF PC
                    7171 W. Alaska Drive
                    Lakewood, Colorado  80226
              BY:   AIMEE H. WAGSTAFF, ATTORNEY AT LAW
                    DAVID J. WOOL, ATTORNEY AT LAW

                    MOORE LAW GROUP
                    1473 South 4th Street
                    Louisville, Kentucky  40208
              BY:   JENNIFER MOORE, ATTORNEY AT LAW

        (APPEARANCES CONTINUED ON FOLLOWING PAGE)

REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

```
1   APPEARANCES:  (CONTINUED)

2   For Defendant:

3                        WILKINSON WALSH ESKOVITZ LLP
                         2001 M Street, NW - 10th Floor
4                        Washington, D.C.  20036
                    BY:  BRIAN L. STEKLOFF, ATTORNEY AT LAW
5                        RAKESH N. KILARU, ATTORNEY AT LAW
                         TAMARRA MATTHEWS JOHNSON, ATTORNEY AT LAW
6                        JULIE RUBENSTEIN, ATTORNEY AT LAW

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>**Tuesday - July 2, 2019**</u>                                      <u>**2:38 p.m.**</u>

P R O C E E D I N G S

---oOo---

**THE CLERK:**  Calling Case Number 16-cv-00525, Hardeman

versus Monsanto Company, et al., and 16-md-2741, In Re Roundup

Products Liability Litigation.

Counsel, please step forward and state your appearances

for the record.

**MS. WAGSTAFF:**  Good afternoon, Your Honor.  Aimee

Wagstaff on behalf of plaintiffs, and with me is attorney

David Wool and Jennifer Moore.

**MS. MOORE:**  Good afternoon, Your Honor.

**THE COURT:**  Hello.

**MR. STEKLOFF:**  Good afternoon, Your Honor.  Brian

Stekloff, Tamarra Matthews Johnson, Rakesh Kilaru, and Julie

Rubenstein on behalf of Monsanto.

**THE COURT:**  Okay.  There's one quick thing I want to

get out of the way on Juror Number 4 before we talk about

damages.

**MS. WAGSTAFF:**  Do you mind if I just scoot this over a

little so I can see you?

**THE COURT:**  Yes.  Whatever you want.

With respect to Juror Number 4, there was one thing that I

forgot to put on the record at trial about our contact with

her, and I wanted to do that now so as to give you an

1    opportunity to respond to it if you wanted to.

2         As you know, Kristen excused her after the discussion we

3    had about Juror Number 4; and either that day or the day after,

4    there was a message for me from Juror Number 4 and she was

5    calling to ask why she was excused, and so I wanted to do her

6    the courtesy of calling her back.

7         So I called her back and I said, "The reason you were

8    excused is because it was reported by multiple people on the

9    jury that you had announced that you had already decided how

10   the case -- how you were going to vote and that nothing was

11   going to change your mind, and you also expressed some views

12   about the lawyers."

13        And she said, "Oh.  Okay.  Thank you."  And she sounded

14   relieved actually.  She didn't deny that she said any of those

15   things.  And to me, I mean, this is just my perception from her

16   reaction, but to me she sounded relieved that she hadn't been

17   caught doing something else and that she was worried about

18   being caught doing something else.  I mean, again, that was

19   just my perception so you have to take that with a grain of

20   salt.

21        But what is clear is that she did not deny that she had

22   said that to the jurors.  So I wanted to tell you that.  I

23   mean, I'm not sure -- you know, obviously I made the decision

24   before that time to excuse her, and I think I had sufficient

25   information that justified the decision to excuse her.  I also

1    think you probably waived any objection to that.

2        But I did at least want to relay that to you, because I

3    realize that I forgot to do so during trial, and give you an

4    opportunity to respond to it in any way that you like, either

5    at the moment or at the tail end of the hearing when we're done

6    discussing damages.

7        **MR. STEKLOFF:**  I don't think, Your Honor, that it

8    changes our argument understanding that you're not going to

9    grant a new trial on that basis.  I think that we still believe

10   that there should have been a colloquy at the time and that it

11   could have been more fulsome than what was just described; but

12   beyond that, I think we would preserve the issue understanding

13   that the record -- understanding that this has now been added

14   on the record.

15       **THE COURT:**  Okay.  And then -- so I think that pretty

16   much leaves us talking about the damages issues.  I think

17   that's really the only -- that's probably the only thing we

18   need to discuss.

19       I did ask you one follow-up question on preemption.  Let's

20   see how much time we have to get to it.  I'm not sure it's

21   necessary.

22       So on the damages, you know, I just have to say that I

23   think that there is an unfortunate aspect to the law on

24   punitive damages and that is, you know, we have to tell -- we

25   have to ask the jury to find the appropriate amount of punitive

1    damages; and, generally speaking, we're not supposed to tell

2    them that under the due process clause, you know, it can almost

3    never be more than nine times the amount of the compensatory

4    damages and that district judges are required after the trial,

5    if the punitive damages award is higher than that, district

6    judges are required after the trial in almost every instance to

7    reduce the punitive damages award.

8        I think that's an unfortunate thing from the standpoint of

9    juror service, you know, and it's unfortunate that we, you

10   know, in most circumstances have to keep the jury in the dark

11   about that.

12       You know, I understand why.  I think that if -- I think

13   the problem is that if -- you know, if you inform the jury

14   upfront that punitive damages are capped in a way that's tied

15   to compensatory damages, then you run the risk that the

16   Supreme Court is concerned about of, you know, passions driving

17   the compensatory damages award as well as the punitive damages

18   award; right?

19       So I get the -- I understand it, but I find it very

20   uncomfortable.  I don't like it.  I don't like bringing, you

21   know, members of the community into the courtroom and having

22   them preside over a trial and kind of keeping them in the dark

23   about this constitutional limitation on, you know, the amount

24   of punitive damages that they can award.

25       That being said, I think that, you know, it's quite clear

1  that I am required under the Constitution to reduce the

2  punitive damages award and it's just a question of how much,

3  and we can have a discussion about how much; but before we get

4  there, I do want to talk a little bit about the noneconomic

5  damages because I also have a specific concern about

6  noneconomic damages.

7       And the question is this:  As I recall the evidence, and

8  you can correct me if I'm misstating it in any way or if I'm

9  missing anything, but as I recall the evidence, Mr. Hardeman

10 was diagnosed with NHL about five years before trial; right?

11          MS. MOORE:  February 14th, 2015, Your Honor.

12          THE COURT:  So right about five years before trial;

13 right?

14          MS. MOORE:  About four.  Four years, yeah.

15          THE COURT:  Is it four?

16          MS. MOORE:  Yes.

17          THE COURT:  Okay.

18          MS. MOORE:  2015-2019.

19          THE COURT:  All right.  So let's divide the

20 noneconomic damages into past damages and future damages.

21 Okay?  The jury awarded about $3 million in past noneconomic

22 damages; right?

23          MS. MOORE:  Right.

24          THE COURT:  And the jury awarded about $2 million in

25 future economic damages.

1          **MS. MOORE:**  That's correct.

2          **THE COURT:**  So what was the harm that Mr. Hardeman

3    suffered in the past before trial; right?  He suffered a great

4    deal of harm.  He was diagnosed with non-Hodgkin's lymphoma.

5    He didn't know whether he was going to live or die.  He went

6    through this horrible chemotherapy treatment.  He had to go

7    back, you know, every year to get checked and didn't really get

8    a clean bill of health from his doctors, as I recall, until

9    just before trial -- right around the time of trial; right?  He

10   was deemed in remission right around the time of trial.  Okay?

11        So that is a great deal of harm, noneconomic harm, and I

12   don't have any concerns about the jury's conclusion that, you

13   know, Mr. Hardeman should have been compensated around to the

14   tune of roughly $3 million for that past noneconomic harm.

15        And I understand Monsanto's argument that, well, there

16   were only, like -- what was it? -- $200,000 of economic

17   damages?

18          **MS. MOORE:**  That's correct.  That's what we stipulated

19   to, Your Honor.

20          **THE COURT:**  But under circumstances like this where,

21   you know, again, you're diagnosed with cancer, you don't know

22   whether you're going to live or die, you have to go through the

23   horrible chemo treatment, I don't -- I think under these --

24   under the circumstances of this case, that is not problematic

25   under California law.  It's a very loose standard that is

1   applied under California law.

2           **MS. MOORE:**   I would agree with Your Honor, and I would

3   just add I don't think that's a good measure in a cancer case

4   to look at the amount of the medical bills to determine the

5   amount of the past noneconomic damages.

6           And I would just say that, as the Court will recall, the

7   testimony is that when Mr. Hardeman was going through those six

8   rounds of chemotherapy, they actually had to reduce his dosage

9   because Dr. Ye testified he didn't think he was going to make

10  it.

11          So here you have someone who he has to have

12  chemotherapy --

13          **THE COURT:**   I don't recall Dr. Ye testifying he didn't

14  think Mr. Hardeman was going to make it.   My recollection of

15  the testimony was that he, as often happens during

16  chemotherapy, he had to stop because his levels were down and

17  we needed to wait for his levels to come back up.

18          **MS. MOORE:**   It was two different things, Your Honor.

19  His white blood count dropped and so then they had to give him

20  Neupogen shots.   The first dosage and the frequency was not

21  sufficient to get his white blood count back up, and so then

22  they had to increase the dosage of the Neupogen shots and to go

23  to seven days --

24          **THE COURT:**   Okay.   But you said Dr. Ye testified that

25  he didn't think Mr. Hardeman was going to make it.

```
 1            MS. MOORE:  Right.  So what I'm saying, that's two

 2    different things.  So that was the white blood count; and then

 3    the chemotherapy itself, that the dosage they said was too

 4    high, he wasn't able to tolerate it and so he was reduced on

 5    the dosage of the chemotherapy, which of course he needs the

 6    chemotherapy to get rid of the non-Hodgkin's lymphoma.  So

 7    there was a reduction of that because he didn't think he was

 8    going to be able to survive the chemotherapy at the dosage that

 9    he was being administered at that time.

10            THE COURT:  Okay.  So, in any event, I don't have --

11    as I said, I don't have any particular concerns about the award

12    of past noneconomic damages.

13        So it was $3 million for past noneconomic harm and

14    $2 million for future noneconomic harm.  So let's compare the

15    harm that Mr. Hardeman suffered in the five years prior to

16    trial -- or four years prior to trial with the harm that we

17    expect him to suffer in the -- you know, however long he lives.

18        He's in remission.  Dr. Nabhan testified, I don't remember

19    the exact words, but it was essentially he's in the clear;

20    right?  He doesn't have to worry?

21            MS. MOORE:  He said it's extremely unlikely that it

22    would reoccur.

23            MR. STEKLOFF:  And Dr. Ye said the same thing.

24            THE COURT:  And so I'm not saying that there is no

25    suffering, no emotional distress going forward; but, you know,
```

1  is it -- what would be the basis for concluding that the future

2  noneconomic harm is almost as great as the past economic harm?

3      I mean, it seems like the only reasonable conclusion is

4  that the past economic harm is much, much, much greater than

5  the future noneconomic harm and, therefore, the fact that --

6  and it does -- I can't think of a rational justification for

7  the two awards being so close to one another given the

8  disparity in the harm.

9      So I wanted to give you an opportunity to explain how you

10  think, you know, we might justify 2 million for the future

11  noneconomic harm.

12      **MS. MOORE:**  All right.  So on the evidence of

13  noneconomic harm for the future, Your Honor, Dr. Nabhan

14  testified that this is lifelong, that he's going to have to

15  have repeat scans.  Dr. Nabhan said that he would do it -- he

16  would see him twice a year.  He's been seeing -- he was going

17  to the doctor, he testified, right after the trial to get a

18  repeat scan.  He has to get repeat blood work.  And this is for

19  the rest of his life.  That's the testimony.

20      **THE COURT:**  Right.  And, by the way, I want to make

21  very clear, I'm not saying that's a walk in the park.

22      **MS. MOORE:**  Right.

23      **THE COURT:**  I mean, I understand that that is harm.

24  That is very real harm that can be compensated.  I'm only

25  questioning whether it comes close to the kind of noneconomic

1   harm that Mr. Hardeman had already experienced when he thought

2   he was going to die; right?

3        MS. MOORE:  I understand.  And that's why I asked him

4   when he was on the stand:  "What does remission mean to you?

5   You heard Dr. Nabhan testify you were in remission.  What does

6   it mean to you?"

7        And he said to him it means he's in a temporary place and

8   when he gets closer to those repeat scans, that that all goes

9   away and that anxiety comes back and he thinks "Is this the

10  time?  Do I have swollen lymph nodes again?  Is it coming back?

11  Do I have cancer again?"

12       So you can tell someone that has cancer or had cancer and

13  is in remission, "You're fine."  It doesn't mean that's going

14  to -- you know, can go to them and they're going to realize it.

15  I mean, that's what he testified to.

16       THE COURT:  So I agree and I get all that, but it

17  doesn't fully answer the question that I'm asking you, which

18  is -- so far what you've described doesn't seem to come

19  close -- it is real harm but it doesn't seem to come close to

20  the kind of suffering he experienced in the past.

21       MS. MOORE:  So there's additional testimony and

22  evidence in the case too.  So Dr. Nabhan testified that because

23  of the side effects of the chemotherapy -- remember, it was the

24  R-CHOP, the five different drugs that he was administered six

25  times -- that he has DNA damage not only to the lymphoma cells

1   but to the non-lymphoma cells and that because of that, he's at

2   an increased risk of developing other types of cancer.

3       And so, you know, as the Court is aware, under the jury

4   instructions --

5       **THE COURT:**  Was that risk quantified?  I don't recall

6   if that was quantified in any way at trial.  Was it a slight

7   increased risk, a significant risk, anything like that?

8       **MS. MOORE:**  He said "increased risk" and that was

9   undisputed.  As the Court is aware, Monsanto did not challenge

10  any of the noneconomic damages in this case.  They did not call

11  an expert to challenge the noneconomic damages.  They did not

12  refute any of the testimony of Dr. Nabhan.  They didn't

13  cross-examine Dr. Nabhan.  They didn't cross-examine

14  Mr. Hardeman regarding his noneconomic damages and they didn't

15  cross-examine Ms. Hardeman at all.

16      **THE COURT:**  But they're not required to.  I mean, the

17  test at this stage is, you know, did the evidence justify a

18  conclusion that he suffered almost as much -- he is going to

19  suffer almost as much noneconomic harm in the future as he

20  suffered in the past; right?

21      **MS. MOORE:**  Well, if you look at the time period,

22  though, it's not the same because if you have four years of

23  past noneconomic harm and the 3,666,000, you know, and change,

24  versus, you know, he might live another, and as I argued in

25  closing, 15, 20 years -- he's 73.  I know we'll probably get to

```
1    that --

2          THE COURT:  Actually, I don't think you did argue that

3    in closing.  I think you just said, you know, give him -- what

4    did you say?  Give him a million bucks a year for 15 years?

5          MS. MOORE:  I thought -- I'll go back and check, but I

6    thought I said that he could live another 15, 20 years and that

7    I would suggest that you award him $1 million per year.  So

8    four years for past noneconomic and a million dollars -- I'm

9    sorry -- a million dollars for the past four years and a

10   million dollars for 15 years going forward.  They didn't agree

11   with me.  They awarded much less than that, dramatically less

12   than what I asked for.

13         And in closing defense argued, and this is on page 2786 of

14   the transcript (reading):

15         "I told you in opening for Phase II we weren't going

16          to challenge how difficult and unfortunate it was that

17          Mr. Hardeman suffered from NHL and what he went through.

18          I'm not standing here challenging that this morning."

19         I mean --

20         THE COURT:  But that's not relevant to the question

21   I'm asking you.  I'm not talking about what he went through.

22   I'm talking about compensation for what he's likely to go

23   through.

24         MS. MOORE:  Right.  And so if you do the math, over 15

25   years $2 million is $133,000 a year.  I don't think anyone
```

1  would say "Okay.  You can pay me $133,000 a year for the next

2  15 years" knowing that I could get cancer again and die.

3      I mean, it's absolutely -- there's -- first of all --

4          **THE COURT:**  But, again, that begs the question to what

5  extent was the risk quantified; right?  I mean --

6          **MS. MOORE:**  I don't think the risk had to be

7  quantified.

8          **THE COURT:**  -- if there's a slightly increased risk

9  that he could get some other cancer in the future, I don't

10  know.  I mean, everybody has a risk of getting cancer in the

11  future; right?  So, you know, the baseline is not zero risk.

12          **MS. MOORE:**  But he has an increased risk.

13          **THE COURT:**  Right.

14          **MS. MOORE:**  He has an increased risk, I mean, compared

15  to me or you because he had gone through chemotherapy, and

16  that's what Dr. Nabhan testified to and that was --

17          **THE COURT:**  That wasn't quantified in any way?

18          **MS. MOORE:**  It was -- the testimony was that it was

19  increased risk.  I don't think it had to be quantified more

20  than that.

21      But regardless of that, Your Honor, Mr. Hardeman

22  testified, when I asked him what does it mean going forward to

23  him, he said (reading):

24          "I think it's always going to be there.  It could come

25          back and you're always -- you're thinking about it.

1        There's always that fear that it can come back.  There's

2        no guarantee that it won't come back."

3    And I put together in response to the Court's --

4        **THE COURT:**  Let me just ask you, I want to try one

5    more time -- okay? -- and let me ask it to you directly.  Do

6    you think that the harm Mr. Hardeman is going to suffer in the

7    future is anything close to the harm he has suffered in the

8    past?

9        **MS. MOORE:**  From his perspective, no, I don't, because

10   he thinks that the cancer could come back and that he could

11   die.

12       **THE COURT:**  Did you mean to say "yes" in response to

13   that question?

14       **MS. MOORE:**  Yes, I did.  Sorry.  Thank you,

15   Your Honor.

16       **THE COURT:**  So from Mr. Hardeman's perspective, even

17   though he previously thought he had a good chance of dying and

18   went through this horrible chemotherapy, that the harm he

19   suffered in the past is roughly comparable to the harm he's

20   suffering going forward, even though he's been told that he's

21   in remission and that he's essentially in the clear with

22   respect to non-Hodgkin's lymphoma?

23       **MS. MOORE:**  Well, he hasn't been told he's in the

24   clear.  I mean, one thing Dr. Nabhan testified --

25       **THE COURT:**  That's pretty close to what Dr. Nabhan

said.

**MS. MOORE:**  He said it's extremely unlikely and, you know, when you hit the five-year mark, that's a good mark for cancer survivors.

But the testimony in front of the jury was:  What does remission mean to Mr. Hardeman?  And the damages under the instructions is to compensate Mr. Hardeman for that mental anguish, the suffering, and the anxiety, and all of that is spelled out under the California jury instructions.  It's not just pain and suffering.

**THE COURT:**  I just wish there was something else you could say to support the idea that the harm he is suffering in the future is remotely comparable to the harm he's already suffered because, again, I'm not disputing that he's going to suffer harm in the future.  I'm not saying that the jury's conclusion that he is going to suffer harm in the future is illegitimate.  I'm just saying that it doesn't seem -- they don't seem close to me.  The harm that he's already suffered seems much, much greater and, if so, how can we rationalize a damages award that is roughly similar?

**MS. MOORE:**  And I think if we were faced with a situation where the jury came back and awarded the exact same amount for past and future, that would be a different situation, but that's not what we have.  They awarded less than they did -- for future than they did for the past, and that's

1   them recognizing that, sure, he went through six rounds of

2   chemotherapy and that was horrible; and right now what he's

3   dealing with in the future is the mental anguish, the

4   suffering, and the anxiety that every time for every year of

5   his life, the remainder of his life, he has to go and get a

6   repeat scan and then wait for those results and wonder if he's

7   going to get cancer.  And if he gets cancer again, he knows

8   that that is a death sentence.

9        **THE COURT:**  Is he getting scanned for NHL or is he

10  getting scanned for any kind of cancer?  What did the evidence

11  say about that?  Because my recollection, and I could be

12  misremembering, but my recollection is that he gets scanned for

13  NHL every year not that he gets scanned for any kind of cancer?

14       **MS. MOORE:**  Well, he would -- the PET scan, it would

15  be a PET scan to show whether he has cancer.  I mean, and then

16  you would have to do the pathology to determine, but I don't

17  think the evidence went into that great of detail.  I mean,

18  he's getting repeat scans to find out if he has cancer.  I

19  don't think it went into detail as far as what type of cancer.

20       **THE COURT:**  Okay.

21       **MS. MOORE:**  I mean, if you're getting a PET scan and

22  they find something, they're going to call you and tell you you

23  need to come back in and get further testing, you know, whether

24  it's non-Hodgkin's lymphoma or acute leukemia.

25       **THE COURT:**  I don't know.  I don't know how that works

1    and that sort of depends what the evidence said at trial about

2    that; right?

3        Do you have any other evidence that you want to make sure

4    I focus on that would support a $2 million award for future

5    noneconomic harm?

6            MS. MOORE:  I think the fear, the mental anguish, and

7    the worry, the anxiety, which is all compensable under

8    California law, which was what you instructed the jury to

9    consider when they deliberated and made their decision in this

10   case, I think the evidence there, which was unrefuted and

11   undisputed, supports that.

12       And, Your Honor, what I did is I put together cites to the

13   record that talk about the noneconomic damages in response to

14   your question in PTO 152.  If I could hand that to you.

15           THE COURT:  Sure.

16           MS. MOORE:  And then what we're going to do is we

17   actually --

18           THE COURT:  I assume you've given that to the other

19   side as well.

20           MS. MOORE:  Yes.  I just handed them a copy of it,

21   Your Honor.

22       And then what we're doing is we're going to file this --

23   it has been filed, Aimee? -- with actual -- the attachments

24   which will show the transcript and it will be highlighted so

25   you'll see all the evidence on noneconomic damages that was

1    presented to the jury.

2              THE COURT:  Future noneconomic damages?

3              MS. MOORE:  It's past and future.  I did not separate

4    it out.  If you want me to, I'm happy to do that, Your Honor.

5              THE COURT:  Oh, no.  That's okay.

6              MS. MOORE:  But I do think if you look at similar

7    verdicts -- and, of course, we have two similar verdicts, we

8    have the *Johnson* verdict and the *Pilliod* verdict -- in *Pilliod*,

9    Mr. and Mrs. Pilliod, the amounts were much different,

10   Your Honor, but --

11             THE COURT:  I was wondering if you were regretting

12   that you didn't ask for a billion dollars in this case.

13             MS. MOORE:  No comment, Your Honor.

14      On the Pilliods, both Pilliods are in remission.  They're

15   actually older.  Mr. Pilliod is older than Mr. Hardeman, and in

16   those cases the compensatory amount was 18 million and

17   37 million.  Here we have a $5 million total compensatory.

18             THE COURT:  And maybe that will be reduced.

19             MS. MOORE:  Or maybe not.  I mean, again, there's no

20   magic formula on it.  This is a jury that sat through a trial

21   for a month, six people devoted a month of their life and

22   listened to the evidence.  As the Court knows, they took

23   extensive notes.  They deliberated, they took the matter very

24   seriously, and they came back and based on their deliberations,

25   they determined that $2 million was fair and reasonable to

1    compensate Mr. Hardeman for his damages going forward.

2         And I would just say that when you look at four years,

3    and, yes, that was absolutely horrible what he went through

4    having to go through chemotherapy, but then you look at years

5    going into the future because he does not have a reduced life

6    expectancy, there was no testimony his life expectancy is

7    reduced, you look at years going into the future, spread that

8    out $2 million, when you look at the *per diem*, it is not that

9    much given the worry and the anguish and anxiety that he's

10   facing.

11        **THE COURT:**  Okay.  Mr. Stekloff, do you want to

12   address that?

13        **MR. STEKLOFF:**  I agree, Your Honor, with the way that

14   you've characterized the evidence.  Obviously I haven't been

15   able to review the testimony or the exhibits laid out here, but

16   I think what you have set forth as your recollection of the

17   evidence is consistent with what the evidence, in fact, was.

18        Dr. Nabhan, I will just add, that he did not quantify the

19   risk of any other cancer in any way or present any

20   scientific -- I mean, he said it and he said it was a risk but

21   he didn't present any studies or anything along those lines.

22        **THE COURT:**  So what is it that he said?  He said that

23   having gone through chemo, Mr. Hardeman's risk of developing

24   other cancers increases?  Is that what he said?

25        **MR. STEKLOFF:**  I believe that's correct.  And I

1    believe that you actually -- there was -- when the life

2    expectancy issue came up, this was part of the basis for them

3    arguing that that evidence should have been admitted to the

4    jury, and you at that time called what Dr. Nabhan said

5    speculative, which I agree with both then and now, and so he

6    didn't quantify it in any way.

7         THE COURT:  What did I call speculative?  I don't

8    remember.

9         MR. STEKLOFF:  Dr. Nabhan's testimony about the risk

10    of developing a cancer in the future.

11         THE COURT:  Okay.

12         MR. STEKLOFF:  We cite that in our reply brief.  We

13    cite the trial transcript where there was a discussion about

14    this issue in a different context.

15         THE COURT:  Okay.  And then what about the issue of

16    the annual scans?  What do you recall?  Was the evidence that

17    he was getting annual scans to test for NHL or for any cancer?

18    What do you remember about that?

19         MR. STEKLOFF:  I don't believe that it was specified

20    is my recollection sitting here now.  I did not go back before

21    the hearing to check.  I think the purpose is to see if the NHL

22    returns.  I mean, sitting here, from what I know about PET

23    scans, which is just what I know, I don't think it's in the

24    record, is that it might pick up other cancers; but I don't

25    think there was any testimony, which is the question:  What is

1   the evidence that the purpose of those other scans was to

2   assess whether he developed any other cancer?  The purpose of

3   the scans, I think, the best reading of the evidence to my

4   recollection is to see if the NHL returns.

5       And it's not just Dr. Nabhan who testified about this

6   issue of remission at the five-year point or the future

7   prognosis.  It was also Dr. Ye.  There was extensive testimony

8   from Dr. Ye on that same issue, which was introduced in front

9   of the jury.

10      The only other point I want to make on this issue is the

11  standard because counsel is talking about this as sort of, you

12  know, an abuse of discretion of the jury's assessment, and

13  that's not the standard under California law.  Under California

14  law, here I believe the Court has a duty to independently

15  assess the evidence and then substitute its judgment if it

16  feels -- you know, essentially provide your own judgment about

17  the proper compensatory damages, including the future and

18  noneconomic loss.

19      And so it's not -- you know, it's not just was the jury

20  reasonable, and we can all speculate about what the jury

21  thought about past economic damages -- or noneconomic damages,

22  future noneconomic damages.  That's not the standard that is

23  applicable, I think, to the decision you have to make under

24  California law.

25      That's one of the questions I think you asked in your

order, which was:  Is California law different than federal law and would the outcome be different?  I don't know that the outcome would be different, but I certainly think that -- I mean, I would argue under federal law the same thing; but I think under California, it is clear that there isn't sufficient evidence to support a $2 million future noneconomic loss.

THE COURT:  But it -- I mean, so I understand that whether it's under California law or federal law, it's not a situation where I have to view the evidence in a light most favorable to the plaintiff.  I get that.

But there is this -- you know, what the California Code of Civil Procedure says about it is that I'm not supposed to reduce the damages award simply if I would have done it differently; right?  I mean, what it says is that I have to be convinced from the entire record that the jury clearly should have reached a different verdict or decision; right?  That's the standard.

So to the extent you're suggesting that I can simply substitute my own judgment for the jury's, I don't think that's correct.

MR. STEKLOFF:  And I'll cite to a case *Ryan vs. Crown Castle NG Networks, Incorporated*, 6 Cal.App. 5th 775, and that case says (reading):

"For purposes of a motion asserting inadequate or excessive damages, the trial court has not only the power

1          to substitute its judgment for the jury's but the duty to

2          do so."

3          And so --

4               **THE COURT:**  But isn't that -- I mean, I don't know

5     what that means in the abstract, but don't we have to consider

6     language like that, you know, in the context of this language

7     from Section 657 of the Code of Civil Procedure?

8          I mean, I think the problem with California law on this

9     issue is that how you characterize the judge's role, I mean, it

10    really depends on what case you look at and sometimes it

11    depends on what paragraph in a particular case you look at;

12    right?  California law is a mess on that question.  You're

13    nodding your head in agreement.

14               **MR. STEKLOFF:**  I think it's a mess on many of the

15    questions that you posed in your pretrial order.

16               **THE COURT:**  Yes.  But I do think that it would be a

17    mistake to simply say that I can -- you know, if I would

18    disagree with the jury, that if I would have come out

19    differently than the jury on the future noneconomic harm

20    question, then I need to lower the award or give them a choice

21    of accepting a lower award or having a new trial.  I mean, I

22    think that, you know, the standard is higher than that.

23               **MR. STEKLOFF:**  I don't disagree with that.  I don't

24    think it's -- but -- I'm not saying it shouldn't be viewed

25    within the context of what the jury did.  I'm just saying that

```
 1    it's --
 2            THE COURT:  There's a degree of deference that I give
 3    to the jury in this context, I think, in other words.
 4            MS. MOORE:  There is, Your Honor.
 5            MR. STEKLOFF:  I'm not -- I think that you have to
 6    independently assess the evidence.  I don't think you need
 7    to --
 8            THE COURT:  Only if the jury's verdict was clearly
 9    unjustified in light of that evidence do I require that the
10    damages -- that that aspect of the damages award be reduced.
11            MR. STEKLOFF:  That's where I disagree.  I don't
12    think -- that would be giving too much deference under
13    California law.  Clearly unjustified I don't think is the
14    correct standard.
15            THE COURT:  Clearly should have reached a different
16    verdict or decision.
17            MR. STEKLOFF:  I mean, that's the statute but there's
18    case after case that talks about this concept of 13th juror and
19    the Court serving as a 13th juror, and there are appellate
20    decisions where the California Courts of Appeals say that where
21    the judge doesn't -- where the trial judge doesn't exercise an
22    independent assessment of the evidence and I think make a more
23    independent -- I mean, I don't think it has to be you would
24    have given exactly X.  I think it can be considered within the
25    totality of what the jury gave, but I don't think it's that
```

1  deferential to the jury's verdict.  I do not think California

2  law, as it's been laid out in numerous California appellate

3  decisions, is consistent with that level of deference.

4          THE COURT:  On the relationship between this issue

5  we're discussing and the punitive damages award, which comes

6  first?  In other words, do I make a decision about whether the

7  future noneconomic harm number must be reduced first and then

8  set the punitive damages award to that reduced number?  Is that

9  how I'm supposed to do it?

10          MR. STEKLOFF:  I believe so, Your Honor.

11          THE COURT:  Okay.  And do you have cases that

12  exemplify that?

13          MR. STEKLOFF:  I did not -- off the top of my head --

14          THE COURT:  Sorry.  I didn't give you that question

15  ahead.

16          MR. STEKLOFF:  Yeah, I realize -- I read so many

17  cases.  I can check, but off the top of my head I don't have,

18  you know, the cases that necessarily fit squarely in that; but

19  I think how could you give punitive damages to a number that is

20  determined to be improper -- I'm using the phrase loosely --

21  improper or inadequate or excessive under the law?

22      I mean, if the verdict is excessive, you can't then cue a

23  constitutional determination off of that.  It has to be that

24  the constitutional due process procedure applies to what is

25  viewed after a review by the Court as the correct compensatory

1    damages.

2             **THE COURT:**  Okay.

3             **MR. STEKLOFF:**  It just seems inherent.

4             **THE COURT:**  So while we're on the topic -- so moving

5    to the topic of punitive damages, I don't need to hear

6    argument.  I believe that the jury's conclusion that Monsanto

7    deserves punitive damages is supportable and I don't need to

8    hear any argument to the contrary.

9         I believe that this is not a case where Monsanto's conduct

10   was so outrageous that the punitive damages award should not be

11   reduced so I don't need to hear argument to that effect either.

12        It's really just a question -- I mean, I think the

13   punitive damages award has to be reduced under the due process

14   clause to, you know, a single-digit ratio and the question is

15   just what single-digit ratio.

16        So give me sort of your best argument that it should be

17   closer to 1-to-1 than 9-to-1.

18             **MR. STEKLOFF:**  Yes, Your Honor.

19        So I think it's very important to keep in context 2012,

20   which was the post -- that was the cut-off date that was used

21   in the evidence, and as of 2012, view the scientific and

22   regulatory consensus on glyphosate as of 2012.  And I

23   understand now you're saying punitive damages are appropriate.

24   I understand it's clear that the science reached that.

25             **THE COURT:**  Well, what's relevant is the degree of

reprehensibility of Monsanto's conduct and all that, and that's
what you're addressing now.

    **MR. STEKLOFF:**  Correct.  And the degree of
reprehensibility as of 2012.  And I only -- for purposes of
punitive damages, to be clear, based on the evidence, I'm going
to talk about past 2012, but I just want to start with 2012.

    As of 2012, no scientific body had said that glyphosate
had an association with non -- causes cancer.  No regulatory
body had said that.  And that is the key, is that Monsanto,
whether they're going to say they shouldn't have done the magic
tumor and they should have --

    **THE COURT:**  Shouldn't have ghostwritten --

    **MR. STEKLOFF:**  -- they didn't respond well to Perry
and they shouldn't have ghostwritten Williams in 2000,
everything that they did was consistent with the regulatory and
the scientific consensus.

    Now, I understand now the argument is going to be, well,
they influenced that, but I don't think that that's consistent
with what the evidence showed because we know that the EPA, and
here specifically Europe, had all of that evidence and
considered all of it and repeatedly told Monsanto that it could
both sell and manufacture Roundup and glyphosate and that it
didn't require a warning.  And that's also where I think for
your assessment of punitive damages it doesn't end there
because we were allowed, the evidence shows, to argue that that

1    is also true up to today.

2         I mean, there were lots of sort of walls drawn around what

3    we could argue and what we could not, but the evidence was

4    given to the jury based on, for example, what Dr. Portier wrote

5    to EFSA and ECHA and current EPA decisions that even given

6    IARC, even given other science as it developed, that that is

7    the absolute consensus of the world in the regulatory -- you

8    know, I think I was allowed to argue based on the evidence

9    that --

10        **THE COURT:**  It's not the absolute consensus of the

11   world.  What you're saying is that no regulatory body had

12   concluded -- no regulatory body has yet agreed with the IARC --

13        **MR. STEKLOFF:**  Correct.

14        **THE COURT:**  -- or acted on the IARC's conclusions to

15   require a warning label or limit use of Roundup.

16        **MR. STEKLOFF:**  Correct.  And the same with other

17   scientific bodies.  We know there are numerous scientific

18   bodies and no other scientific -- no scientific body other than

19   IARC has come out and said -- you know, I'm not saying in a

20   given study that people haven't said there's an association,

21   but sort of as a scientific body making a determination about

22   the carcinogenicity of glyphosate said "We think glyphosate or

23   Roundup is carcinogenic."

24        And so I think that, then, puts in light every action that

25   Monsanto made.  I'm not going to -- I can stand here and debate

1    every piece of evidence about the magic tumor or Perry or the

2    Williams article, but I think that that overall threshold

3    requires a very low, I mean, we would argue 1-to-1, but very

4    low ratio and I think that that's the strongest evidence there

5    is.

6         I also think the evidence that we saw from, you know, all

7    of these employees, that they used the product.  Now, again, we

8    can question things that they wrote in individual e-mails or

9    phrases that they used; but, again, we're talking about people

10   who use the product, who stand by its safety, and it's very

11   different than other cases.

12        **THE COURT:**  But here's -- I mean, here's the problem I

13   have with that.  I think there was a fair amount of evidence of

14   Monsanto being pretty crass about this issue.  There was a fair

15   amount of evidence of Monsanto not really caring whether its

16   product caused cancer or not, and a fair amount of evidence

17   that the only thing that Monsanto cared about was undermining

18   the people who were raising concerns about whether Roundup

19   caused cancer.

20        Monsanto didn't seem concerned at all with getting at the

21   truth of whether Roundup caused cancer.  And, you know, I might

22   have expected you to put in -- I mean, if there was evidence of

23   Monsanto being conscientious about this issue, if there was

24   evidence about Monsanto being objective about the question, I

25   expect there would have been tons of e-mails reflecting that.

1   E-mails like, "Oh, you know, there's this study coming out that

2   concludes that glyphosate might cause cancer.  Do we need to

3   take another look at this?"  Something like that.  But there

4   was, at least at trial, there was nothing suggesting that

5   anybody at Monsanto viewed this issue objectively or with any

6   amount of caring for human beings.

7        And so, you know, you say that people came up and intoned

8   that they -- people testified that they used the product, but

9   where was the evidence that Monsanto actually cared about

10  getting to the truth of any of this and actually sort of cared

11  about whether, in fact, these concerns being raised about its

12  product might have some validity that needs -- that might have

13  some -- raise some questions that need to be investigated?

14       MR. STEKLOFF:  I think there was substantial evidence

15  that Monsanto cared about the issue and --

16       THE COURT:  Where?  What was it?

17       MR. STEKLOFF:  Donna Farmer's testimony about the

18  extensive testing that had occurred on the product.

19       THE COURT:  What about contemporaneous evidence, like

20  e-mails?  You know, they put in all these bad e-mails --

21  right? -- showing Monsanto executives being, you know, kind of

22  crass about this and not seeming to care about doing anything

23  other than undermining the people who were raising concerns

24  about this.  Where were the e-mails that suggested

25  contemporaneously that Monsanto people wanted to look at the

1    issue objectively?

2           MR. STEKLOFF:  Well, we had the testimony of people

3    that said that.

4           THE COURT:  That wasn't contemporaneous evidence.

5    That was people testifying --

6           MS. MOORE:  That was after the fact.

7           THE COURT:  -- testifying that --

8           MS. MOORE:  Sorry.

9           MR. STEKLOFF:  But I understand that -- I mean,

10   whether -- how the evidence was put into the record through

11   deposition testimony, I think the evidence --

12          THE COURT:  Yes, but the jury had the right to not

13   believe Monsanto's people -- right? -- when they said that they

14   believed that this was safe?

15          MR. STEKLOFF:  Well, off the -- you know, Donna Farmer

16   testified, we had to show this testimony, for example, about

17   being careful about what language to use, about whether it was

18   just glyphosate or whether you could say that Roundup was

19   carcinogenic; and then we introduced evidence of her talking

20   about the stewardship of the product and --

21          THE COURT:  Yeah, but that careful about what language

22   to use, wasn't that their evidence?  I mean, they put that in

23   to show that Monsanto was being crass about all this.  At least

24   that's my recollection.

25          MR. STEKLOFF:  They put that evidence in.  Then they

didn't play her testimony about it.  We played the testimony
about it from her, but I don't think that -- I mean, we can --
it was lawyer argument about whether she was being crass or
not.  I think maybe the jury didn't agree with me, but being
careful about what language to use based on the extensive
testing to be done.

I mean, also there was evidence -- what we know is that
the EPA and all of these regulatory bodies around the world
require extensive testing before they both approve a product
and continually reevaluate a product.  And it's not just
Monsanto's testing, but there was evidence of the fact that
other glyphosate-based herbicides manufactured by other
manufacturers, that evidence is also submitted to the EPA and
to the regulatory bodies.

So these regulatory bodies are considering all of that
evidence.  That is contemporaneous evidence that the company
was meeting its regulatory obligations, which is taking the
question of its safety and carcinogenicity seriously, both
doing the animal studies that are required and doing the cell
studies that are required, doing them over decades, doing them
up into the 2000s, which was presented through Donna Farmer,
and testing every formulation, getting regulatory approval
every single time, and going above and beyond their regulatory
requirements.

I mean, that testing evidence is contemporaneous evidence.

1    It's not a discussion between two Monsanto employees about a

2    particular study, but I think that it all ties back -- and I

3    understand the jury, they weren't supposed to substitute their

4    judgment for the regulatory bodies; but at the end of the day,

5    the fact that every regulatory body, with all of the Monsanto

6    papers and all of these allegations being out there and IARC

7    decisions coming out post-IARC have repeatedly assessed all of

8    the evidence, all of the allegations.  It is all public and

9    it's not just the EPA.  It is every regulatory body that has

10   assessed the issue, whether it's Europe, Health Canada, the

11   letter to Australia from the EPA that was introduced, whether

12   it's considering Dr. Portier's specific, you know, litigation,

13   the same arguments he makes in the courtroom, they are

14   considering those and saying, "No, based on the science,

15   glyphosate is not carcinogenic, that is what the evidence

16   shows," that goes to contemporaneous evidence of what the

17   company did for 40 years to establish that scientific record.

18        And so, you know, I don't think all of a sudden this

19   should be, well, they liked their six e-mails and their ten

20   e-mails and that's all the Court can consider in punitive

21   damages.  I think that this is a unique case in which the

22   regulatory consensus is so different than the basis for this

23   litigation, which is the IARC decision.

24        THE COURT:  You know, I certainly agree that's

25   relevant.  I mean, your points are relevant.  It's just a

1    question of how important they are in the overall mix I think.

2        Let me just ask you a couple other quick questions on the

3    damages stuff.  So is it -- so let's say I conclude that --

4    well, we know that with respect to compensatory damages, if I

5    conclude that the noneconomic future damages award is not

6    supportable, to use a colloquial phrase, I would need to give

7    them the choice of accepting a reduction or having a new trial;

8    correct?

9        MR. STEKLOFF:  I agree with that, Your Honor.

10       THE COURT:  And then so if I believed that that aspect

11   of the award needed to be reduced and then I believed that to

12   comport with the Constitution the punitive damages award needed

13   to be reduced, do I then sort of give them that full figure

14   and -- you know, that final figure and say "You need to either

15   accept this or have a new trial"?  Or do I -- is that the most

16   advisable way to handle this?

17       MR. STEKLOFF:  So -- well, so let me break it down a

18   little bit.  I don't think on the punitive damages question

19   alone you have to offer a new trial.  I think it's a question

20   of federal law and there's case law -- I can cite it if you'd

21   like -- that allows you to just issue a judgment with the ratio

22   and the final number that you determine is correct.

23       THE COURT:  Go ahead.  Cite that.

24       MR. STEKLOFF:  So I would cite *Morgan v. Woessner*,

25   W-O-E-S-S-N-E-R, 997 F.2d 1244.  It's a 1993 Ninth Circuit

1   case.

2       And there's one other case, *Southern Union Company v.*

3   *Irvin*, 563 F.3d 788, 790.

4       I also think actually that's true under California law as

5   well, but I think this is a federal question.  The California

6   case is the *Simon* case that I believe was cited in our brief,

7   Your Honor.

8       Then you asked what's advisable, which I think is a

9   different question.  I think if you --

10      **THE COURT:**  Well, let me -- so part of it involves

11  what's advisable and part of it involves do I have the

12  discretion to do it either way.

13      **MR. STEKLOFF:**  Well, I think what you have the

14  discretion to do is to offer a new trial only on the

15  noneconomic compensatory damages if you choose and then set the

16  ratio off of that.  I think that you have the option to

17  offer -- to give them the choice on the entire thing.

18      I don't think you're required to just issue the judgment.

19  I think either --

20      **THE COURT:**  But I have the discretion to -- the

21  question I'm asking -- I want to make sure we're on the same

22  page, we're communicating -- do I have the discretion to say,

23  "All right.  You know, future noneconomic damages, you know,

24  must be reduced by X and, you know, the punitive damages award

25  must be no greater than X times the adjusted compensatory

1     damages award"?

2         And I'm putting the question to the plaintiffs:  You know,

3     do you want to take that final number or do you want a new

4     trial?  Do I have the discretion to do it that way as opposed

5     to saying -- I mean, maybe as a practical matter there's no

6     difference, but do I have the discretion to do that as opposed

7     to saying "You can have a new trial on the noneconomic damages

8     question only"?

9         MR. STEKLOFF:  I think you could offer them -- I think

10    you have the discretion to do both, either one.  I think you

11    could say "I'm going -- this is what I think are the

12    appropriate noneconomic damages and the appropriate ratio, and

13    you can either have a new trial on both or either and then --

14    or you can accept my number."  I think you also could say "This

15    is what I think the ratio is.  That's not going to change.  You

16    can have a new trial on noneconomic damages or accept my

17    number."

18        THE COURT:  And what do you think the most advisable

19    course is?

20        MR. STEKLOFF:  I think the most advisable course is

21    for them to accept your number because I think there is case

22    law that suggests that --

23        THE COURT:  But that's not quite what I asked.

24        MR. STEKLOFF:  I mean, there's case law that suggests

25    they can't do better than what you say.  So they can only do

1   worse.  So I'm not sure why they wouldn't accept the number

2   that you're giving even though they may not agree with it and

3   they may appeal that, but I'm not sure what a new trial would

4   accomplish for any of us on that.

5        But I think I would offer a -- I think the more certainty,

6   the better.  So I think that if you think the ratio is set,

7   sort of not giving them a choice because it's a maximum

8   constitutionally allowed number is easier.  And so if we need

9   to have a new trial about noneconomic damages, which would be

10  capped at the $2 million, I guess we could come in and do that,

11  but I don't think that that's advisable --

12             **THE COURT:**  So it would be --

13        **MR. STEKLOFF:**  Or, no.  Sorry.  Capped at whatever

14  number you set.

15             **THE COURT:**  Okay.  So that's -- and that's the part I

16  didn't -- I guess maybe we learned about this in law school,

17  but I've never had this issue before.  So it would be capped at

18  the number that I concluded is sort of the maximum number

19  that's supportable by the evidence?

20        **MR. STEKLOFF:**  I believe so, Your Honor.

21             **THE COURT:**  In the previous trial?

22        **MR. STEKLOFF:**  I believe so.  Well, the case,

23  Your Honor, is *Simon v. San Paolo U.S. Holding Company*,

24  35 Cal.4th 1159.  It's a 1995 case.  This is punitive damages

25  and constitutional excessiveness there.  So, you know, the

1    noneconomic damages is a different question about exactly how a

2    new trial would play out.

3              MS. MOORE:  Your Honor, if I could address that point.

4              THE COURT:  Sure.

5              MS. MOORE:  On compensatory damages on the noneconomic

6    future, if the Court were to reduce that -- and I do want to go

7    back to that, I know we went to punitives --

8              THE COURT:  Before we turn back to you, just bookmark

9    that.

10             MS. MOORE:  Sure.

11             THE COURT:  I have one more question for them --

12             MS. MOORE:  Okay.

13             THE COURT:  -- and then I was going to turn to you.

14        The last question I have for you is -- I couldn't quite

15   tell -- do you have any separate argument that even within --

16   you believe that -- first of all, you believe that the punitive

17   damages verdict should be overturned entirely.  I have said

18   that I disagree with you about that.

19        And then you seem to have an argument that, in any event,

20   you know, it should be no more than 1-to-1 or, in other words,

21   you know, no greater than -- the punitive damages award should

22   be no greater than the compensatory damages award.

23        And is it your argument that the Constitution requires

24   that as opposed to, you know, that being required as an

25   evidentiary matter or a discretionary matter on my part?

1          **MR. STEKLOFF:**  I think that was one of the questions
2    you asked, which was this difference between the constitutional
3    argument and the other argument.
4          **THE COURT:**  Yes.
5          **MR. STEKLOFF:**  I think we're arguing under both
6    grounds but in another area where the cases are not entirely
7    clear.  It seems like that second argument, which is that this
8    is grossly excessive under California law, is often subsumed by
9    the constitutional analysis, which I think requires three
10   questions which we laid out in our brief.  It's not just
11   reprehensibility.
12         **THE COURT:**  Right.
13         **MR. STEKLOFF:**  I mean, it also goes to the FIFRA fine
14   that's available and other awards, and so I think that we've
15   laid out that analysis under *State Farm*.  So I just want to put
16   a bookmark there that it's not just the question of
17   reprehensibility, but --
18         **THE COURT:**  But that is the most important question;
19   right?
20         **MR. STEKLOFF:**  Yeah.  I mean, it's the primary
21   question in *State Farm*.
22         **THE COURT:**  Courts have stated that.
23         **MR. STEKLOFF:**  I think it's where the courts focus
24   their attention, but the Supreme Court in *State Farm* made clear
25   that the other factors, which we've laid out in our brief, also

1    must be considered by the Court, and I don't think -- you know,

2    we've addressed the other two factors.  One wasn't responded to

3    at all in the plaintiffs' opposition, which is the FIFRA fine.

4    The other one I think they tried to argue that you can't

5    consider, you know, the concern that Monsanto could be punished

6    through other punitive damages for the same conduct in other

7    cases, but their case we distinguished in our reply brief.  So

8    I just want to make sure we address those other factors.

9              **THE COURT:**  Understood.

10             **MR. STEKLOFF:**  But I think that we are arguing both,

11   that it's grossly excessive as a common law issue under

12   California state law and also the due process constitutional

13   issues.  I think the due process constitutional issues is

14   really where, you know, it subsumes -- in the cases I've seen,

15   it subsumes the other analysis.

16             **THE COURT:**  Okay.  Go ahead.

17             **MS. MOORE:**  Your Honor, if I can go back to the

18   compensatory and then we can go to punitive.

19        So on the compensatory issue, and I want to pick up at the

20   very end where you were asking defense counsel about if you

21   order a new trial, and I just want to be really clear on that.

22   That would be a trial that would be limited to noneconomic

23   damages.  Phase I verdict would stand.  Phase II we would just

24   be coming back to present to the jury evidence regarding

25   noneconomic damages.

```
 1              THE COURT:  And possibly punitive damages.

 2              MS. MOORE:  That's fine.  Okay.

 3          And then with respect to your question --

 4              THE COURT:  I mean, I assume that's right.  I mean, I

 5     haven't actually examined that question, but that's the

 6     assumption I was operating on.

 7              MS. MOORE:  Right.  And then --

 8              THE COURT:  And it sounds like everybody agrees on

 9     that.

10              MS. MOORE:  Right.  I think so.  That was my

11     understanding.

12          And then with respect to --

13              THE COURT:  Mr. Stekloff is nodding his head.

14              MR. STEKLOFF:  I wasn't fully listening to Ms. Moore's

15     argument so I'm sort of --

16              THE COURT:  Well, let me just repeat it.  So the point

17     is that under any scenario, there wouldn't be a new trial on

18     Phase I.  There wouldn't be a new trial on past economic

19     damages or noneconomic damages.  It would just be a new trial

20     on future noneconomic damages and potentially punitive damages.

21              MR. STEKLOFF:  I would love a new trial on Phase I,

22     but I don't think I have any case law to support that argument,

23     Your Honor.

24              THE COURT:  I'm sure you will get an opportunity in

25     another case.
```

1          Go ahead.

2          **MS. MOORE:**  So that was one point.

3          And then he raised an issue about it would be capped at

4     whatever -- if the Court did reduce, and I want to address

5     that, but if the Court did reduce the future noneconomic, it

6     would be capped at that amount.  I don't think that's correct,

7     Your Honor.

8          If we have a new trial on noneconomic damages, then we

9     have the opportunity to present evidence to the jury.  The jury

10    then would consider that evidence and the constitutionality of

11    the due process arguments do not apply for compensatory

12    damages.  So --

13         **THE COURT:**  I mean, that's usually what happens when

14    you have a new trial; right?  You have a new trial and you

15    present the evidence again, and the jury renders a verdict

16    based on that new evidence; but maybe in the remittitur

17    context, you know, you're stuck with -- I don't -- why would

18    anybody ever opt for a new trial?

19         The concept is --

20         **MS. MOORE:**  It doesn't make any sense, yeah.

21         **THE COURT:**  -- you're giving people the choice of a

22    new trial or accept the number; and if you're capping people at

23    the number, why would anybody ever take a new trial?

24         **MR. STEKLOFF:**  I think you're capping them at the

25    2 million.  So I don't think -- so -- because you're saying,

```
 1    I'm making up a number, you say it's -- I'll pick a really low
 2    number, 200,000.  I don't think, then, they can argue for
 3    6 million because there's a Seventh Amendment jury problem
 4    there.  They are, then, if they select a new trial, I think
 5    given the opportunity to try to justify the larger amount; but
 6    where we have a jury decision of $2 million, they don't get to
 7    relitigate that and argue for more.
 8            THE COURT:  I see.
 9            MR. STEKLOFF:  That's different than punitive damages.
10    Where punitive damages you're saying this is the constitutional
11    maximum, then I think the analysis changes.
12            THE COURT:  And so in that scenario, on the punitive
13    damages scenario, again, I mean, there's no reason for a
14    remittitur it seems to me.  I mean, if you're saying that under
15    California law the punitive damages award was excessive, not in
16    a constitutional way but under California law, then maybe it
17    makes sense to say, "You know, either you take this number or
18    you have a new trial where you try to go for the number -- you
19    know, you try to better justify the number that the jury
20    reached in your previous trial."
21        But if you're ruling on a constitutional basis, I mean, it
22    sounds to me like if you're saying, well, this is the
23    constitutional ceiling, why would anybody go have a new trial
24    then; right?
25            MR. STEKLOFF:  I agree.  I don't think in that -- I
```

1   think in that context it's why there are courts that say

2   there's no need to go through the exercise of ordering --

3   giving the plaintiff the option of a new trial and you can just

4   put the judgment in because I agree with you.

5            THE COURT:  Okay.

6            MS. MOORE:  And so that was my point on the

7   compensatory, is that --

8            THE COURT:  And, by the way, do you agree with that,

9   that on the compensatory side of things, if I -- the number he

10  used was $200,000 -- if I said it has to be reduced to $200,000

11  based on the evidence that came in at the last trial, then your

12  choice is to take that number or go for a new trial but at the

13  new trial you wouldn't be able to argue for more than

14  2 million?

15           MS. MOORE:  I disagree with that, Your Honor --

16           THE COURT:  Okay.

17           MS. MOORE:  -- because --

18           THE COURT:  Where's your case law?  Do you have case

19  law to support that?

20           MS. MOORE:  I don't but I'm happy to provide that,

21  Your Honor, because when you start a new trial, then that jury

22  is presented with the evidence.  We're not limited as to what

23  evidence we can present on noneconomic future damages at that

24  point, and then the jury deliberates based on the evidence

25  presented at that trial.  I mean, there's no constitutional

```
 1   argument that says, well, then you're capped at whatever
 2   another jury had determined on evidence in that particular
 3   case.  I mean, that doesn't make any sense to me on that issue.
 4        But regardless of that, we don't think that the future
 5   noneconomic damages should be reduced at all.  If you go back
 6   to the standard that, Your Honor, you were referencing, which
 7   is the 657, it's very clear in 657 that a new trial shall not
 8   be granted upon the ground of excessive damages unless after
 9   weighing the evidence the Court is convinced from the entire
10   record, including reasonable inferences therefrom, that the
11   jury clearly should have reached a different verdict or
12   decision.
13        In California law, the cases have said -- I would
14   reference Bigboy vs. County of San Diego, Your Honor.  This is
15   154 Cal.App.3d 397.  It's a 1984 case, and the quote from the
16   case is (reading):
17           "Judge is not permitted to substitute his judgment for
18       that of the jury on the question of damages unless it
19       appears from the record that the jury verdict was
20       improper."
21        So simply if you disagree with the number of 2 million,
22   you would have -- you know, if you were sitting on the jury,
23   you would have voted for a different number, that's not the
24   same thing.
25           THE COURT:  No, I agree with you.
```

1          **MS. MOORE:**  Okay.

2          **THE COURT:**  You don't need to --

3          **MS. MOORE:**  So from that perspective, our position is

4    there's no basis to reduce the future noneconomic damages.

5          I went back and I pulled Dr. Nabhan's testimony,

6    Your Honor, and this is on page 2370 of the transcript, and

7    it's lines 8 going down to 25 really.  I won't read the whole

8    thing, Your Honor, but I wanted to address the issue about the

9    repeat scans.

10          **THE COURT:**  Could you give me the citation to it one

11    more time?

12          **MS. MOORE:**  Sure.  2370 --

13          **THE COURT:**  Okay.

14          **MS. MOORE:**  -- and then lines 8 through 25.

15          **THE COURT:**  Okay.

16          **MS. MOORE:**  And he starts off and he says (reading):

17          "I do believe that it is very important that

18      Mr. Hardeman is watched and monitored and followed up

19      because there are certain toxicities that occur from the

20      chemotherapy that he received that are important to

21      recognize and identify by his oncologist, and he is at an

22      increased risk of other types of lymphomas."

23      And then he goes on to explain what those are.  He talks

24    about the increased risk some more and he explains how it had

25    affected his DNA.

1          **THE COURT:**  So other types of lymphomas.  Okay.

2          **MS. MOORE:**  Yes.  And then he specifies such as acute

3    leukemia and then myelodysplasia.  I don't know if I'm

4    pronouncing that correctly.

5          But the monitoring, the repeat monitoring, is to pick up

6    those increased risks of other cancer so I wanted to address

7    the Court's question on that.

8          So when you look at that and you see that the future

9    noneconomic is based on the mental anguish, the worry, the

10   anxiety because he's going to have these repeat scans and

11   Mr. Hardeman testified that he knows there's no guarantee, he

12   knows it's going to come back, and then when you look at the

13   metric that I asked the jury to consider when determining the

14   amount of future and past noneconomic damages, that was based

15   on a per year *per diem*.

16         And if you look at that, the past noneconomic is roughly

17   $750,000 per year.  The future is $133,000.  So -- and that's

18   rough numbers, Your Honor.  But that is substantially different

19   and it's going over several years.  So I don't think there's

20   any basis that the jury was clearly wrong.

21         And when you look at the *California Judges Benchbook*,

22   which, I mean, really in this light for compensatory damages,

23   you've got to -- you may not want to do this -- step in the

24   shoes of a California state court judge, the *Judges Benchbook*

25   says that -- let me just read that section to you really

1    quickly, Your Honor (reading):

2            "A judge should not substitute his or her evaluation

3        of the evidence for that of the jury even if the judge

4        would have reached a different conclusion based on an

5        independent evaluation of the evidence.  As long as the

6        verdict is based on a reasonable interpretation of the

7        evidence and it appears the jury understood" --

8        **THE COURT:**  But I keep saying that I agree with you

9    that that's the standard.  So you're arguing against something

10   that you don't need to be arguing.

11       **MS. MOORE:**  Okay.  All right.  I'll move on from that,

12   Your Honor.

13       We would just ask that the Court not reduce the future

14   noneconomic and let the jury's decision on its award stand

15   because we do think that they considered the difference between

16   the past damage and the future damage, especially when you look

17   at that metric when you break it down per year.

18       **THE COURT:**  Okay.  That's a fair point.

19       So punitive damages, do you want to sort of wrap up on

20   that topic?

21       **MS. MOORE:**  Yes, Your Honor.

22       So on punitive damages, on the ratio issue, I mean, we

23   would disagree, Your Honor, that a 15-to-1 ratio like we have

24   in this case is not constitutionally permissible.

25       **THE COURT:**  Okay.  I don't need to hear argument on

1    that.

2            **MS. MOORE:**  I understand.  I would just refer the

3    Court to the *Bullock* decision which we cited in our brief,

4    which was 16-to-1.

5        On the analysis on the evidence of reprehensibility, that

6    what they're referencing is, remember, they knew that

7    glyphosate and Roundup are two different things.  They're not

8    the same thing, and the regulatory bodies only consider

9    glyphosate, not Roundup.

10           **THE COURT:**  That's your argument for punitive

11   damages --

12           **MS. MOORE:**  No, no, no, no.

13           **THE COURT:**  -- for reprehensibility?

14           **MS. MOORE:**  No, no, no.

15           **THE COURT:**  Because the evidence was exceedingly thin

16   on that issue.

17           **MS. MOORE:**  No.  The evidence was there, but that's

18   not the main thing on that.  I mean, if you look at

19   decades-long evidence on what Monsanto knew, what they did,

20   what they didn't do, you go back to the Perry report, for

21   example, they hired Dr. Perry as an independent toxicologist to

22   look at whether Roundup was genotoxic based on the four studies

23   from the 1990s.

24           **THE COURT:**  So I will just -- I'm interrupting you

25   because I remember all that evidence well --

1          **MS. MOORE:**  I understand.  I don't want to --

2          **THE COURT:**  -- and it supports the conclusion that I

3     think I articulated to Mr. Stekloff, which is that, you know,

4     it didn't seem like Monsanto cared about anything other than

5     tamping down any concerns that its product might cause cancer;

6     right?

7          But, on the other hand, you know, your argument and your

8     presentation seems to assume that Monsanto controls the EPA and

9     controls the European regulators, and I don't think the

10    evidence suggested that either and I don't think that's true.

11         And, you know, it may be that Monsanto's machinations had

12    some influence on, you know, the conclusions ultimately reached

13    by the regulators, but I also think that the regulators

14    conducted, you know, their own analysis and reached their own

15    conclusions and essentially said, "You know, you can sell this

16    product."

17         And I feel like that, you know, that is a relevant and

18    maybe a highly relevant consideration on what is the

19    constitutional limit of punitive damages in this case.  You

20    know, it can't simply be thrown aside.

21         And as Mr. Stekloff points out, even after the IARC

22    reached the conclusion that it did, the EPA, you know,

23    continues to take the position that it does and the jury

24    learned that; and, you know, I think that has to be a major

25    factor in the analysis.

1          **MS. MOORE:**  I think the major factor, Your Honor, is

2     what Monsanto knew and what they did over decades of this

3     product being on the market.  And if you look at that -- so

4     look at the --

5          **THE COURT:**  And, as I said, I agree with you that it's

6     highly relevant.  I'm just saying that it's also highly

7     relevant that the regulators said, "You have permission to sell

8     this product."  I mean, how can that not be highly relevant to

9     the degree of reprehensibility?

10         **MS. MOORE:**  Well, it's a matter of what the other

11    evidence shows too.  I mean, the other evidence shows that

12    Monsanto refused to test its product.  I mean, when Dr. Perry

13    came back and said, "This is possible genotoxic," the e-mails,

14    which they did not dispute clearly show that Monsanto refused

15    to test the product, they refused to conduct the tests that

16    Dr. Perry recommended, and they never told the EPA about any of

17    that.  Instead, they went along and they continued to market

18    this product as safe to consumers.  They never warned it caused

19    cancer and they knew that it was genotoxic.

20         I mean, the studies showed that Roundup is 100 times more

21    potent or 10 times more potent, depending on the study you look

22    at, than glyphosate alone, and Monsanto knew that and they

23    didn't tell the consumer that.

24         I think the evidence was overwhelming on what they knew,

25    when they knew it.  And you look at other cancer cases,

1    Your Honor, the *Actos* case, which I'm sure you're familiar

2    with, the *Actos* MDL out of Louisiana --

3                 THE COURT:  I can't keep track of all the MDLs.

4                 MS. MOORE:  I know.  I cannot either, Your Honor.

5         I actually had -- if it's okay, I can pass this decision

6    up to you.

7                 THE COURT:  Sure.

8                 MS. MOORE:  This is the *Actos* decision.

9                 THE COURT:  It's heavy.

10               MS. MOORE:  It is heavy, Your Honor.

11        This is relevant to this discussion, Your Honor, because

12   in *Actos* -- this was the $9 billion verdict.  It was an

13   individual plaintiff.  It's a federal district court case

14   coming out of an MDL.  It's a personal injury claim involving

15   cancer.  And in that case the court does a very thorough and

16   detailed analysis of Supreme Court and federal law on the issue

17   of what is constitutionally permissible under the due process

18   clause of the Fourteenth Amendment.  So I think it's very

19   helpful for our analysis.

20        And in that case the court held that a ratio of 25-to-1

21   was constitutionally permissible given the evidence that Takeda

22   and Lilly, so pharmaceutical companies, were aware of the

23   possibility that *Actos* posed an increase risk of bladder

24   cancer, that Takeda and Lilly chose to move forward and acted

25   to avoid full disclosure of that and other relevant information

1   to the FDA, to refuse to include adequate warnings on the

2   label --

3          THE COURT:  But I think you've already distinguished

4   that case from this one; right?  Because in contrast to

5   apparently that case and in contrast to the tobacco cases, for

6   example, there was no evidence presented to the jury that

7   Monsanto actually had knowledge of the dangers of Roundup that

8   it concealed from anybody.

9          Rather, I mean, it was -- I believe that the way Monsanto

10  conducted itself was reprehensible but, you know, less

11  reprehensible than the tobacco companies if only because we

12  didn't see any evidence that Monsanto actually knew of a danger

13  and concealed that danger from regulators or from the public.

14  Rather, it was Monsanto -- you know, the evidence, as I've said

15  a number of times, I think is very equivocal on whether Roundup

16  actually does cause cancer, and the problem with Monsanto's

17  conduct is that Monsanto didn't seem to really care what the

18  answer was.

19         But it didn't -- there was -- or at least we didn't

20  receive any evidence at trial and we haven't received any

21  evidence in this litigation that Monsanto actively concealed

22  anything from anybody in the way that the tobacco companies

23  did.

24         MS. MOORE:  Well, what they did do was they made a

25  choice not to conduct carcinogenicity tests because they didn't

1    want to know.

2           **THE COURT:**  They were perhaps, you know, grossly

3    reckless but, you know, what the tobacco companies did was

4    criminal.  And, you know, it sounds like from your brief -- I

5    haven't read this case, but it sounds like what the company did

6    in that case was much closer to criminal than in this case.

7    I'm not saying Monsanto's conduct was not reprehensible but

8    it's different.

9           And then, you know -- and so it's not a case where the

10   regulators only approved the product because they were in the

11   pocket of the company and the company, you know, concealed from

12   the regulators information that, you know, the regulators

13   should have seen.  You know, we didn't see evidence at trial of

14   that happening here.

15          **MS. MOORE:**  But what we did see evidence was the

16   company saying one thing internally and another thing

17   externally.  So when you go back to the Dr. Farmer e-mails, the

18   2003, 2009 e-mail that's in evidence, Your Honor, she says in

19   there (reading):

20          "We cannot say Roundup is not a carcinogen.  We have

21      not done the necessary testing."

22          And then right below that she says -- in response to how

23   you deal with the media, she says (reading):

24          "Say Roundup, based on our long-term and short-term

25      testing, poses no danger to you and your family."

1      They say one thing internally and they say another thing

2  externally.  That is concealing the facts from the public, and

3  that is reprehensible and it does warrant a more significant --

4          THE COURT:  A punitive damages award, I agree with you

5  there.

6          MS. MOORE:  Punitive damages, yes.  But under

7  California, and I understand, you know, on the binding

8  precedent, but under California, when you look at that,

9  California law has said that a ratio of 9- or 10-to-1 --

10         THE COURT:  Well, wait a minute.  We're talking about

11  the United States Constitution here.

12         MS. MOORE:  I understand, Your Honor.  I understand.

13  I think this is instructive.  I understand it's not binding on

14  you.

15      But under that is that --

16         THE COURT:  It's not only not binding, I'm not sure

17  how much it matters in the -- what California law requires, I'm

18  not sure how much it matters on the question of what the U.S.

19  Constitution requires.

20         MS. MOORE:  Well, it's looking at *BMW* and *State Farm*

21  *vs*. *Campbell*.  So in that context they said when you look at

22  that -- it's the *Simon* case that he was referencing -- when you

23  look at that, if it's significantly greater than 9- or 10-to-1,

24  it's suspect.  This is not significantly greater than 9- or

25  10-to-1.  We're looking at a 15-to-1 ratio.  And, you know,

1    tobacco --

2          **THE COURT:**  I think the Supreme Court has language

3    that if it's greater than, like, 4-to-1, it's suspect; right?

4    Isn't that what *State Farm* says?

5          **MS. MOORE:**  But not in a personal injury context,

6    Your Honor.

7          **MR. STEKLOFF:**  3- or 4-to-1, Your Honor.

8          **MS. MOORE:**  I mean -- I think it's 4-to-1, Your Honor,

9    but it's not in a personal injury context.  That's why I think

10   the *Actos* case is so illustrative because it's a personal

11   injury case; it's also a cancer case.

12         And when you are disguising from the public cancer, the

13   risk of cancer --

14         **THE COURT:**  But, I mean, the Supreme Court didn't say

15   in noncancer cases, it's constitutionally suspect if it's more

16   than 4-to-1.  The court said -- there were specific facts in

17   *State Farm*, but the court in generally describing the

18   constitutional rule for punitive damages said that it's, as I

19   recall -- I mean, I don't recall the exact language, but I

20   think it said that, you know, a punitive damages award of more

21   than 4-to-1 is going to require some pretty serious scrutiny.

22         **MS. MOORE:**  Well, and you can have the scrutiny,

23   Your Honor, but we believe the evidence shows that when you're

24   dealing with hiding the risk of cancer from your consumer in

25   lieu of making profits -- and, remember, this is a

```
1    billion-dollar company, the jury heard the evidence on that,
2    $63 billion acquisition, the 7.8 billion net worth.  I mean,
3    the punitive damage award is .001 percent of the stipulated net
4    worth amount that was presented to the jury.  I mean, this is
5    not grossly excessive by any stretch of the imagination when
6    you're looking at .001 percent of the stipulated net worth.
7              THE COURT:  Okay.  Anything else on punitive damages?
8              MS. MOORE:  Your Honor, we would just ask that you
9    look at the Actos case and we would ask that you look at the
10   Bullock vs. Philip Morris case.  The BMW case which is, you
11   know, the property damage issue is a much different situation
12   than you have here when you have cancer as the harm.
13        The U.S. Supreme Court has been very clear there's no
14   mathematical bright line between what is constitutionally
15   acceptable and what is not.  There's no rigid benchmarks that a
16   punitive damages award may not surpass.
17        And so that we believe that, you know, when you're looking
18   at 15-to-1 compared to 25-to-1 ratio in Actos, this is
19   constitutionally -- passes constitutional muster and you have
20   to consider the net worth of a company, that's another factor,
21   in this analysis; and given that it's .001 percent of the net
22   worth of Monsanto, we believe that it should stand.
23        And when you look at the --
24             THE COURT:  I assume the net worth of the company has
25   gone down a fair bit in the last few months.
```

1          **MS. MOORE:**  It actually just had some stock -- the

2    shares went up about a week or so ago.

3          **THE COURT:**  You said you have stock.

4          **MS. MOORE:**  No.  Oh, no, no, no, Your Honor.  No.  I

5    said the stock went up a couple weeks ago.  No, I do not have

6    stock in Monsanto, Your Honor.

7       But when you look at it from that standpoint and you look

8    at the *Pilliod*, you know, verdict, Your Honor, which was the

9    ratio was much higher, you know --

10         **THE COURT:**  I really don't think it's appropriate for

11   me to consider the *Pilliod* verdict where the judge hasn't even

12   ruled on posttrial motions yet.

13         **MS. MOORE:**  Well, and I understand that, Your Honor.

14   I would just say that it's --

15         **THE COURT:**  We all know the $2 billion verdict is

16   going to be reduced substantially; right?  I mean, nobody

17   thinks that's going to stand.

18         **MS. MOORE:**  Well, and this is -- I think when you look

19   at what this jury did for a month and these six people who sat

20   in this courtroom -- or in the courtroom down the hall,

21   Your Honor, who deliberated and took extensive notes and took

22   this matter very seriously and gave up a month of their life,

23   when they came back with a $75 million punitive damage, they

24   thought that would send a message to this company because the

25   goals of punitive damage, the purpose of it is to punish the

harmful --

THE COURT:  I don't think you need to go over those basics with me.

MS. MOORE:  And I'm not trying to be -- I mean, I just -- Your Honor, I think right after this verdict, Monsanto came out with a press release and said it has no impact, and the purpose of punitive damages is to --

THE COURT:  But I'm not supposed to consider that in deciding whether to reduce the award.

MS. MOORE:  Well, the purpose of punitive damages is deter wrongful conduct and to punish the wrongdoer.

THE COURT:  I understand your arguments.  Is there any final point you want to make before we wrap up?

MR. STEKLOFF:  I think this is obvious, but in *State Farm* the Supreme Court made clear the wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award at page 427.

I actually just wanted to seize on one thing that Your Honor mentioned as another reason why I think the punitive damages should be 1-to-1 or much closer to 1-to-1, which is the ambiguity over the science because taking even -- I was not involved in *Actos* and don't have that large opinion in front of me but, I mean, where there is I think recognized ambiguity of the science that this Court in this case has recognized in both *Daubert* opinions and at various times throughout the trial,

that also goes to the question of punitive damages and the
conduct of the company.

    In other words, just I don't even think it's appropriate
to be comparing this to tobacco, but there is no -- you know,
there's not the ambiguity of science there.  And so I think
that that is another factor that Your Honor can consider when
assessing the reprehensibility, and so I just wanted to make
that point.

    I don't know if you need me to try to distinguish *Actos*
based on my limited knowledge.  I think Your Honor started to.
I think there were also spoliation allegations there.

        **THE COURT:**  No, I don't need that.

        **MR. STEKLOFF:**  I think there was so much else there
that it's not an appropriate comparison.

        **THE COURT:**  Okay.  Well, I'll give this a little more
thought and then issue a ruling probably on all the issues
probably next week.

    And I guess one last question for you on the preemption
issue.  So I think I understand your argument to be, and I
want --

        **MR. STEKLOFF:**  Is this on the final question?

        **THE COURT:**  Yes.

        **MR. STEKLOFF:**  Mr. Kilaru is going to handle this so
I'm just going to switch.

        **THE COURT:**  All right.  And actually if we could just

```
 1    take a two-minute break --

 2            MR. STEKLOFF:  Sure.

 3            THE COURT:  -- and then come back and talk about that

 4    and there may be a couple other questions.  Why don't we just

 5    take a two-minute break.

 6            MR. STEKLOFF:  And Ms. Wagstaff and I had just some

 7    general coordination stuff to raise.

 8            THE COURT:  Great.

 9            MS. MOORE:  Thank you, Your Honor.

10                    (Recess taken at 3:59 p.m.)

11                    (Proceedings resumed at 4:09 p.m.)

12            THE COURT:  Okay.  I would like -- you know, we were

13    having this discussion about, you know, what a new trial would

14    be capped at, and I would like letter briefs from both sides on

15    this issue by tomorrow close of business, tomorrow 5:00 p.m.

16    Sorry about that.

17         So I want to try to articulate the issue that I want you

18    to address in these letter briefs, and feel free to ask me any

19    questions if you have them.

20         Okay.  So let's just say hypothetically, and these

21    numbers -- these are not numbers that I'm particularly leaning

22    towards or anything like that, but just hypothetically let's

23    say that I conclude that, you know, the highest appropriate

24    number for future noneconomic damages would have been $500,000,

25    and let's just say that I conclude that the highest
```

constitutional ratio for punitive damages is 5-to-1.  I want to
emphasize that that is not a reflection of where I'm leaning.
It's just a hypothetical number that I've sort of pulled out of
the air.

     And let's say that I give the plaintiffs an option of
accepting that or having a new trial.  What does the new trial
look like?  To what extent are the plaintiffs' requests for
future noneconomic damages and punitive damages capped at the
new trial?

     Does that question make sense?

          **MS. MOORE:**  Yes, Your Honor.

          **MR. STEKLOFF:**  And I assume it's how is each one
standing on its own capped.

          **THE COURT:**  Each one standing on its own and how might
they relate to one another.

          **MR. STEKLOFF:**  Okay.

          **MS. MOORE:**  Okay.

          **THE COURT:**  Does that make sense?

          **MS. MOORE:**  Yes, Your Honor.

          **MR. STEKLOFF:**  Yes, Your Honor.

          **THE COURT:**  And if you think I asked the question
imprecisely, you can tell me that in the letter brief tomorrow.

     And then you guys said you had some housekeeping matters,
but first, Mr. Kilaru, do you want to talk briefly about the
FIFRA issue?

1          **MR. KILARU:**  Sure.

2          **THE COURT:**  Really I think I just have one question

3     about it.  You keep making this argument and you keep trying to

4     pull this language from one part of FIFRA and apply it to the

5     other part of FIFRA, and I think your argument stands for the

6     following proposition, and I want you to tell me if I'm correct

7     about that.

8          I think your argument is if the product would not harm

9     people in its widespread use, then even if the product would

10    harm people in some different and foreseeable use, there is no

11    duty to warn under FIFRA.  Is that your argument?

12         So, in other words, the company knows, okay, the

13    widespread use of this product is X and if people use it in

14    that way, it's not going to hurt them; but there's this other

15    foreseeable way in which people sometimes use the product and

16    when people use the product that way, it's going to kill them,

17    but under that scenario, there is no duty to warn people under

18    FIFRA.  The company can just sell the product.

19         **MR. KILARU:**  I think --

20         **THE COURT:**  Is that your argument?

21         **MR. KILARU:**  More or less.  I mean, I think what we

22    would say is that FIFRA sets forth the standards for what a

23    warning is supposed to contain.

24         **THE COURT:**  More or less.  What aspect of it is less

25    than that?

1    **MR. KILARU:**  I think that's right.  I think I would

2    just phrase it from the FIFRA perspective, which I think is the

3    right lens as opposed to from the state law perspective.

4        FIFRA says -- it has a misbranding provision and it

5    involves a -- it requires that a label have directions for use

6    which are necessary for affecting the purpose for which the

7    product is intended, and then it incorporates this misbranding

8    provision that talks about use in accordance with a widespread

9    and commonly recognized practice.

10        And the Supreme Court said in *Bates* that you can't go

11   beyond those requirements and we think that the California law

12   does with the language Your Honor has mentioned about a

13   non -- a reasonably foreseeable misuse.

14       **THE COURT:**  Okay.  And the consequence of that is that

15   if the company -- if a use of its product -- if it's reasonably

16   foreseeable that people will use its product in the way that

17   will kill them, the company does not have a duty under FIFRA to

18   warn about that --

19       **MR. KILARU:**  If --

20       **THE COURT:**  -- because it's not a widespread use.

21       **MR. KILARU:**  If there's a reasonable foreseeable

22   misuse, yes, because that is a requirement that is in addition

23   to and different from FIFRA's requirement.

24       **THE COURT:**  Okay.  All right.

25       What else?  The severance order?  Does anybody have

 1   anything they want to say about the severance order?

 2          MR. KILARU:  We did not have any objections to the

 3   severance order.

 4          MS. WAGSTAFF:  I haven't had a chance to really look

 5   at it and digest it with my team yet, but I can't imagine we'd

 6   have a problem.

 7          THE COURT:  Okay.  What else do you-all want to talk

 8   about?

 9          MS. WAGSTAFF:  So Pretrial Order 150, the wave orders.

10          THE COURT:  I'm sorry, the what?

11          MS. WAGSTAFF:  The wave order, where you entered a

12   Wave I and Wave II.

13          THE COURT:  Oh, yeah.

14          MS. WAGSTAFF:  You put them on the discovery track.

15          THE COURT:  Yes.

16          MS. WAGSTAFF:  There was one case, Goldie Perkins.  It

17   was filed by my law firm on July 29th, 2016.

18          THE COURT:  Is that the husband and wife, the Stevick

19   comparison, or am I missing --

20          MS. WAGSTAFF:  No.

21          THE COURT:  Okay.  Sorry about that.

22          MS. WAGSTAFF:  This is Case Number 3:16-cv-06025.

23          THE COURT:  Can you say that one more time?

24          MS. WAGSTAFF:  3:16-cv-06025.

25          THE COURT:  Okay.

1         **MS. WAGSTAFF:**  We believe that was inadvertently left

2    off the Wave I, and we've conferred with Monsanto and they

3    agree.

4         **THE COURT:**  Okay.

5         **MS. WAGSTAFF:**  Another case that we believe -- if you

6    want to -- there's a case that's actually a class action that

7    we believe should be put on the side and taken out of Wave I.

8         **MR. STEKLOFF:**  That's correct, Your Honor.  I don't

9    have the case number in front of me and I'm happy to find it

10   for Ms. Melen.  The plaintiff's name is Robert Ramirez and that

11   case -- ah, thank you.

12       This is 3:19-cv-02224.  And we've conferred -- and

13   Ms. Wagstaff can verify this -- with Mr. Ramirez and class'

14   counsel and they agree that it should be removed from the wave

15   because it's sort of a unique case.

16        **THE COURT:**  Well, I'm not sure I would necessarily

17   disagree with removing it from the wave; but, I mean, it's

18   obvious that class certification is going to need to be denied

19   for that case so why not just keep it in Wave I and deny class

20   certification and keep it in there?

21        **MR. STEKLOFF:**  I think you'd have to ask plaintiff.  I

22   agree class certification needs to be denied so I think you'd

23   have to ask plaintiffs' counsel if they just accept that

24   outcome.

25        **THE COURT:**  Both of you believe that that should be

1   taken out of Phase I -- I mean, Wave I?

2           **MS. WAGSTAFF:**  Yes, Your Honor.

3           **THE COURT:**  Okay.

4           **MS. WAGSTAFF:**  It was Monsanto's request to plaintiffs

5   to take it out of Wave I.

6           **THE COURT:**  Okay.

7           **MS. WAGSTAFF:**  Secondly, prior to serving expert

8   reports, we need to depose the plaintiffs' treating physicians

9   so their experts can read those depositions.  We've been having

10  a very difficult time getting medical records and getting those

11  set so we were wondering if the Court would be amenable to

12  moving the Phase I deadlines 30 days.  We have conferred with

13  Monsanto.  They're agreeable to it.

14      We have a tentative schedule that we would propose to you.

15  We would want Mr. Giglio to --

16          **THE COURT:**  I don't have the schedule in front of me

17  right now.  And, I mean, the question is -- okay.  Go ahead.

18          **MR. STEKLOFF:**  I think our thought, Your Honor, was

19  that we could submit -- you know, obviously subject to your

20  approval -- a joint proposed calendar both for Phase I and --

21  or Wave I and Wave II.  It essentially moves the expert

22  deadlines back and then the hearings associated with those, the

23  briefing, 30 days in each wave.  And fact discovery we've

24  agreed to move the deadlines back two weeks just because

25  there's a lot of movement right now in trying to schedule all

1  of these depositions.

2      So what I would propose is that we -- I mean, we can do it

3  now, but submit -- we could submit it by tomorrow, I think, an

4  order.

5          **THE COURT:**  Yeah.  Why don't you submit a stipulated

6  request and make sure to justify it because I'm -- you know,

7  give a proper explanation of why this stuff can't be done in

8  the time -- within the deadlines that we previously set because

9  I'm not going to be quick to push back deadlines on these that

10 we just set.  You know, we just set these schedules not so long

11 ago and it's important to move these cases along, and

12 especially Wave I where we have somebody who I don't know what

13 their current condition is but the allegation previously was

14 that they were dying and they needed a trial quickly.

15         **MS. WAGSTAFF:**  And so, Your Honor, that was what I was

16 saying a moment ago, is we would want to exclude Mr. Giglio

17 from that.

18         **THE COURT:**  Okay.

19         **MS. WAGSTAFF:**  He actually has -- we have deposed --

20 he's been deposed.  We've deposed two of his three treating

21 physicians.  We deposed his PCP, we deposed his oncologist, and

22 his last doctor that we've noticed, and Monsanto hasn't noticed

23 anyone, is set for July 11th.  So presumably we will have no

24 problem meeting our deadline, which is August 16th -- or 20th,

25 to get expert reports.

1    So we would ask that Mr. Giglio be carved out and continue

2    with the current Wave I deadlines and that everyone else get

3    pushed 30 days, and we'll put that in our proposal tomorrow.

4          **THE COURT:**  Okay.

5          **MR. STEKLOFF:**  We were going to oppose that.  I mean,

6    part of the problem I think is that --

7          **THE COURT:**  You're going to oppose it as to Giglio?

8          **MR. STEKLOFF:**  Yeah, and not -- and I understand.  I'm

9    not in any way questioning the issues with Mr. Giglio, but we

10   have a hearing set for the *Daubert* issues and the summary

11   judgment issues.  I don't know specifically which experts they

12   will submit as part of that process or what the challenges to

13   those experts might be, but I think it's odd to have one case

14   on a different track as to all the other cases when it's all

15   sort of part of one -- I mean, I know that that hearing is a

16   potential hearing but as part of that process.  So I agree we

17   could finish the expert process.

18         **THE COURT:**  You can go ahead and submit your, you

19   know, joint request and in that joint request you can identify

20   where you disagree and explain why, but submit that also by

21   tomorrow.  It doesn't have to be by 5:00 o'clock.  You can

22   concentrate on your brief if you want, which is more important,

23   but tomorrow submit the stipulation.

24         **MR. STEKLOFF:**  The only other request I'll just flag

25   for Your Honor that we're going to put in it is that where --

1    and Ms. Wagstaff and I have discussed this -- where treater

2    depositions are being set, we're going to ask for you to

3    order -- I don't know the exact language, but for the

4    plaintiffs' counsel to engage in a good faith effort to obtain

5    the medical records from that provider.

6        We have authorizations from all the plaintiffs' counsel in

7    the Wave I cases, but that process can take weeks and some of

8    the depositions are coming up within the next few weeks, and so

9    just to try to -- you know, a plaintiff can go to his or her

10   provider and probably obtain the records more easily.  So we'll

11   probably propose something along those lines.  I don't even

12   know that it will be disputed, but I just want to flag that for

13   Your Honor.

14       MS. WAGSTAFF:  Well, I would say, you know, some of

15   these plaintiffs have cancer, some of them are very sick.  If

16   there's a court order requiring them to go to their doctor to

17   get their records, I don't know if that's --

18       THE COURT:  I mean, usually you don't have to

19   physically go to your doctor to get records.

20       MS. WAGSTAFF:  Right.  There's already an order in the

21   PFS I believe that says we have to give the records to

22   Monsanto.  And as Mr. Stekloff and I were talking before this

23   hearing, we want the records just as much as they want the

24   records, sometimes even more.  We don't want to go into a

25   deposition without the records.  So we are working together on

```
 1    that, and I advised him that if he had a problem with a

 2    particular plaintiff's counsel, to bring it to leadership and

 3    that we would talk to that plaintiff's counsel before taking it

 4    to the Court, but I don't think that the measure of a court

 5    order requiring the plaintiffs to go get them from the doctor

 6    is necessary at this point.

 7              THE COURT:  Okay.  If you want to propose something,

 8    I'll consider it.

 9         Anything else?

10              MS. WAGSTAFF:  I don't think so.

11              MR. STEKLOFF:  No, Your Honor.

12              THE COURT:  Okay.  One last thing that I wanted to ask

13    is that, you know, as you know, I appointed Mr. Feinberg to be

14    the mediator.  He reported back to me that both sides -- he

15    reported back to me that after speaking with both sides, he was

16    comfortable being the mediator.  I don't think there has been a

17    formal order appointing him as the mediator, but he's hereby

18    appointed as the mediator.

19         And I also understand from Mr. Feinberg that both sides

20    have given him permission to communicate with me about the

21    mediation process, but I just wanted to get confirmation from

22    each of you on the record about that.

23              MR. STEKLOFF:  That's correct on behalf of Monsanto,

24    Your Honor.

25              MS. WAGSTAFF:  That's correct.  Yes, on behalf of
```

```
 1  plaintiffs.

 2            THE COURT:  All right.  Very good.  Thank you.

 3            MS. MOORE:  Thank you, Your Honor.

 4            MR. STEKLOFF:  Thank you, Your Honor.

 5                 (Proceedings adjourned at 4:23 p.m.)

 6                          ---oOo---

 7

 8

 9                     CERTIFICATE OF REPORTER

10            I certify that the foregoing is a correct transcript

11  from the record of proceedings in the above-entitled matter.

12

13  DATE:   Wednesday, July 3, 2019

14

15

16

17  _____

18       Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                    U.S. Court Reporter
19

20

21

22

23

24

25
```