# EXHIBIT H

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | Case No. 16-md-02741-VC<br><br>MDL No. 2741 |
| This document relates to:<br><br>*Giglio v. Monsanto, 3:16-cv-05658-VC* | |

**Expert Report**

**Dr. Thomas J. Rosol, DVM, PhD, MBA**

**September 3, 2019**

**Expert Report - Dr. Thomas J. Rosol, DVM, PhD, MBA**

I.    <u>Background, Experience, and Qualifications</u>

I am a professor of veterinary and toxicologic pathology at Ohio University (OU) and diplomate of the American College of Veterinary Pathologists. I received my Bachelors of Science degrees in animal science (1978) and veterinary medicine (1979) as well as my Doctor of Veterinary Medicine degree (1981) from the University of Illinois, Urbana/Champaign. After completing pathology residence training and my PhD in experimental pathobiology at The Ohio State University (1986), I joined the faculty of OSU's Department of Veterinary Biosciences, where I taught and conducted NIH-funded biomedical research on cancer for over three decades. On September 1, 2017, I was recruited to the Heritage College of Osteopathic Medicine as professor and chair of the Department of Biomedical Sciences, which has 45 faculty members that teach and do research in scientific disciplines ranging from evolutionary biology to clinical medicine. I continue to run a research laboratory and train graduate students in cancer research and the use of artificial intelligence to automate the quantitation of histological changes of pathology slides.

I am an expert in toxicologic pathology and teach postgraduate students in the United States, Europe, and Asia.  I regularly make educational presentations for the Society of Toxicologic Pathologists (North America), European Society of Toxicologic Pathologists, and Japanese Society of Toxicologic Pathologists. I have led an international group of toxicological pathologists (INHAND) to define the nomenclature and diagnosis of rat and mouse neoplastic and nonneoplastic lesions (J. Toxicol. Pathol., 2018). The nomenclature is currently being incorporated into the FDA operating procedures for submission of preclinical pathology data by the SEND project. I teach programs in veterinary and toxicologic pathology for the European College of Veterinary Pathology, the Australian Animal Diagnostic Laboratories, Chinese and Japanese trainees in toxicologic pathology, and give update presentations to US regulatory agencies, such as the FDA and EPA. I regularly consult for industry and government on issues related to preclinical toxicologic pathology, especially in relation to carcinogenesis. I have been asked to speak and consult with the FDA on food and chemical safety assessment of potential carcinogens. I have served on EPA special advisory panels for suspected environmental carcinogens and am a member of the EPA Scientific Advisory Board Chemical Assessment Advisory Committee (CAAC). I have consulted with the Cancer Assessment Committee of the FDA Center for Food Safety and Applied Nutrition on the human relevance of rat neoplasms. I served on the 2018 European Society of Toxicologic Pathologist Workshop (12 members) on the 'Adversity (human relevance) of rat thyroid neoplasia in preclinical studies' in Berlin, and am finalizing a white paper on the conclusions. I serve on the independent expert panel (8 international scientists) for the Flavor and Extract Manufacturer's Association to assess the GRAS (generally recognized as safe status) status of chemicals and natural food products and submit reports to the FDA. Consultation activities (over 65 individual issues) for industry (pharmaceutical and chemical companies) have involved

2

deliberations on mode of action, design and interpretation of mechanistic research, human relevance related to toxicologic pathology findings in preclinical toxicity studies, and GRAS opinions (Generally Recognized as Safe for food additives).  I have served on Pathology Working Groups (PWGs) to reach consensus on preclinical pathology findings and deliberate on human relevance of pathology findings in animals.

I have served as dean of the College of Veterinary Medicine and senior associate and interim vice president for research at OSU and on advisory boards or councils to the National Institutes of Health, United States Department of Agriculture, National Academy of Sciences, Environmental Protection Agency, American Veterinary Medical Association, and Morris Animal Foundation. I served for 2 years on the committee to evaluated biomedical research regulations for the National Academy of Sciences.

My laboratory investigates the pathogenesis of cancer-associated hypercalcemia, mechanisms and treatment of bone metastasis, animal models of human cancer, and endocrine-responsive cancers, and has been funded by NIH for 30 years. My recent work has focused on prostate, breast, head and neck cancer, and lymphoma. I have over 300 publications and served as the mentor for 25 PhD students and 25 postdoctoral trainees. I am an elected fellow of the American Association for the Advancement of Science and was recognized by Ohio State University as a Distinguished Scholar, which is one of the university's highest honors.  My curriculum vitae, which more fully sets forth my qualifications, is attached as Attachment A.

I am being compensated for my work in this matter at a rate of $400 per hour. Over the past four years I have provided expert testimony in the Roundup litigation.

## II.     Summary of Opinions

The data from at least 12 rodent carcinogenicity studies, an exceptionally large data set for a chemical, drug, or exposure, shows no carcinogenic effect from glyphosate.  My opinion is based on my review of the underlying study reports and data from 5 mouse studies and 7 rat studies with glyphosate, the relevant scientific literature, and my professional education, training, research, and experience. The weight of evidence from many (>100) genotoxicity studies supports the conclusion that glyphosate and its formulated products are not mutagenic or genotoxic. Unless otherwise stated, all of my opinions expressed in this report are to a reasonable degree of scientific certainty. I reserve the right to supplement or amend this report as additional information comes to my attention or becomes available.  A list of materials I have considered in forming my opinions is attached as Attachment B to this report.

## III.    General Principles Underlying Experimental Pathology and Rodent Carcinogenicity Studies

Preclinical toxicity testing is a rigorous and standardized series of in vivo experiments to determine whether a drug or chemical has toxic or carcinogenic effects in at least two species of animals.  The goal of preclinical toxicity studies is to determine

the toxic effects of chemicals and predict whether any effects seen in animals may have relevance to humans.  The most common species used are mice, rats, dogs and subhuman primates.  The experiments begin with short-term studies of one week, two weeks, and one to three months.  Next, longer studies are conducted for three, six, nine, or twelve months.

Carcinogenicity studies (chronic bioassays) are conducted in both rats and mice for their average lifespan (approximately two years).  Rats and mice often develop spontaneous neoplasia (tumors) as they age, which are considered background findings.  Neoplasia can occur spontaneously or can be induced by chemicals or ionizing radiation.  Neoplasia is the formation of cell proliferations that are considered irreversible.  In other words, they are thought to be independent from normal cellular regulatory processes and will grow continuously for the life of the animal.  Neoplasms (individual tumors) can either be benign or malignant.  Benign neoplasms continue to grow locally, but do not actively invade the organs in which they develop or spread to other organs (metastasize).  Malignant neoplasms can invade locally to the organs in which they develop and into adjacent tissues or organs, and they can metastasize (spread by the vascular system) to other organs.  Metastasis is the most conclusive hallmark of malignancy.  Benign neoplasms can remain benign for the life of the animal or, in some cases, may have the potential to progress to a malignant neoplasm depending on the tumor type.  For example, hemangioma (benign neoplasms of the vascular system) and hemangiosarcoma (malignant neoplasms of the vascular system) are separate entities, and hemangiomas generally do not progress to hemangiosarcomas.

There are also preneoplastic tissue changes or cellular proliferations. Preneoplastic changes include focal hyperplasia, which is a localized proliferation of cells that is still regulated by the body.  If the inciting cause of hyperplasia is removed, the cellular proliferation will regress.  Focal hyperplasia has the potential to progress to benign or malignant neoplasia in some cases.

The incidence of neoplasia (tumors) depends on the genetic strain of rat or mouse and the specific organ (such as the liver, lungs, kidneys, or endocrine glands). Different organs have different background incidences of spontaneous neoplasia.  For example, neoplasms of the thyroid gland are more common in rats compared to mice and lymphomas are more common in mice compared to rats.

The vertebrate animals (rats and mice) used for chronic bioassays are complex biological organisms that share many genetic, biochemical, and functional systems seen in humans. This is why they are invaluable for biomedical research. However, decades of research have revealed important differences between humans and rodents. All research in animals and humans is subject to expected biological variation between individuals. Biological variation is greater in outbred animals and humans. Chronic bioassays typically use inbred rats and mice to reduce interanimal biological variation; however, biological variation is an expected reality for all scientific experiments. Toxicologic pathologists must always take into consideration differences between

species and expected biological variation when interpreting scientific findings and when predicting effects in humans from animal experiments. Results (including the statistical analyses) are interpreted by toxicologists and toxicological pathologists. Toxicological pathologists play a central and critical role in the data interpretation and development of conclusions because they are uniquely qualified in the understanding of disease and systems biology (Cohen and Arnold, 2016).

## A.   Study Design

Typically four groups of animals are used in carcinogenicity studies and include control animals (exposed to the chemical carrier only, such as the normal diet), low-dose, mid-dose, and high-dose groups.  The findings from the short-term studies inform the dose levels that are used in carcinogenicity studies.  Maximum tolerated doses (up to the point of excessive weight loss or death) are used in the high-dose group to make sure that any toxic or carcinogenic effects are discovered.  The maximum tolerated dose is the highest dose you can give to the animals and still expect many of the animals to survive for two years and, in general, not lose greater than 10% of their body weight compared to controls.  The maximum tolerated dose is often many times greater than potential human exposure.  The margin of safety can be mathematically estimated based on the dosage used in the rodent study and the expected exposure in humans. The low and mid doses are carefully selected so that any toxic effects seen in the test animals have an increasing incidence based on dosage or exposure.  This results in a dose-response curve, which is typically a logarithmic increase in incidence with increasing dosage.

The animals are administered the test substance, typically in their food or water or by gavage (stomach tube), every day for the length of the study.  Rat carcinogenicity studies are typically two years, while mouse carcinogenicity studies can range from one year to two years depending on the strain of mouse that is used.  It is important to understand that the natural life span for rats and mice is approximately two years. Accordingly, it is very common and expected for some of the animals to die naturally, for reasons unrelated to the test substance. And just as with people, a third or more of the animals are expected to develop and die from cancer during their lifetime, with that rate increasing with age.  In other words, there is never a "cancer-free" rodent bioassay. Naturally occurring cancer is expected and seen in both control and treatment groups. It is typical for up to half of the animals in all dose groups to die of spontaneous diseases, including cancer, before two years. This is why the group sizes consist of approximately 50 animals.  Instead of focusing on whether there is any sign of neoplasia in any animal, the focus of a carcinogenicity study is to assess whether there is a biologically significant increase in the rate of neoplasia in the treatment groups compared to controls. The control group of animals in the same study is typically the best comparator, however, the expected background incidence as determined by historical controls (animals in prior studies that were not exposed to any test substance) for the age, species, and gender of the rodents can also be helpful in determining biological significance.

Tumor incidence rates can vary significantly by the strain of rodent used and in any study, there will be expected biologic variability. Laboratories maintain data on the range of cancer incidence in carcinogenicity studies for their particular strain (historical control data). Even within the same lab, however, the incidence of cancer in a given strain changes over time. Therefore, historical control data is typically evaluated as an expected incidence range, rather than comparison to a single value, such as the mean. Using the mean incidence of a given tumor type is not an accepted methodology in pathology reviews because it is not very informative. The evaluation of historical control data is not a statistical comparison. Instead, any evaluation examines whether the tumor incidence in a study falls close to or within the historical control range and, if so, that becomes simply another piece of evidence that the tumors may be the result of normal biologic variation. However, it is often useful to look at all historical control data and interpret it based on the number of studies, location, strain of animal, and the time period.

At the end of the study the animals are euthanized and their tissues are examined for any visible or obvious changes. The gross lesions (pathological changes that can be seen by visual observation) are tabulated and compared. Many tissues (approximately 40 under most current guidelines) are then examined microscopically by a veterinary pathologist. In the United States and Europe, veterinary pathologists are certified (board certification) based on successfully completing a minimum of 3 years of mentored apprenticeship and postgraduate education and by examination from the American College of Veterinary Pathologists (ACVP) or European College of Veterinary Pathologists (ECVP). The pathologist examines the structure of tissue under a microscope. All major organs are examined – everything from brain to the endocrine glands. It takes several months to examine all these tissues for each bioassay. Because those animals that live to the end of the study are old animals, the reviewing pathologist expects to see many lesions from natural disease. The review focuses on classifying those lesions (discussed in more detail below) in order to determine whether the number of lesions exceeds those in control animals or the expected background incidence, and evaluating whether those lesions are compound-related. In addition to the animals that are examined at the end of the study (at terminal sacrifice), tissues from animals that die prior to two years of age or are found moribund (close to death) are examined if available and included in the final study calculations. If the animals are not promptly examined after spontaneous death, the tissues may be poorly preserved due to postmortem dissolution (autolysis) and therefore not useful in a pathologic analysis.

### B.      Interpretation of Results

Interpretation of the data gathered during the pathology examination process is an important final step in any carcinogenicity bioassay. The most important structural change to tissue that is investigated in a two-year study is the development of neoplasms. As mentioned previously, neoplasm means either a benign or malignant tumor. Most of the neoplasms seen in chronic studies are benign. Benign neoplasms

are referred to as adenomas, while malignant tumors are referred to as carcinomas or sarcomas. Neoplasia starts with some injury to the DNA of cells in a specific tissue that could be spontaneous or caused by number of factors such as UV light, presence of a chemical in the diet, ionizing radiation (natural cosmic rays or man-made radiation such as diagnostic radiographs), or an error in a protein or gene that occurs as an animal ages. There are many naturally occurring ways to damage the genetic material of a cell. As people and animals age, the mechanisms used to repair DNA damage deteriorate. Notably, the vast majority of genetically damaged cells die or are destroyed by the immune system. This is occurring all the time in our bodies.

Because there are so many ways for spontaneous damage to DNA to occur constantly during life, if an individual animal develops an adenoma or carcinoma, the cause is almost never known. And there are routinely sporadic and spontaneous adenomas and carcinomas in all dose groups. Therefore, when evaluating the findings from a two-year carcinogenicity study, we first look at effect size – how many animals in the treatment groups developed neoplasms compared to the control population or, where appropriate, the historical controls. Large effect sizes are easier to identify. Where tumor numbers are low (such as <10) and effect size is small, the analysis becomes more difficult, as chance variations are both common and expected due to the large number of tissue types examined in the bioassay. It is a common error to over interpret statistical significance or fail to appreciate the variability that can occur in the incidence of uncommon tumors.

Cancer is a continuum, and not a threshold event. If damaged cells are not automatically repaired or removed by the body and the test compound is in fact a carcinogen, we expect to see progression from hyperplasia → adenoma → carcinoma. Therefore, we also look for the presence of preneoplastic lesions, such as focal hyperplasia, and lesion progression.

When interpreting pathologic findings from a rodent study, I ask three important questions: (1) is the effect compound-related; (2) is it biologically relevant; and, (3) is it relevant to humans? A statistically significant P value alone is a very weak indicator of a positive finding. Instead, to put the statistics in perspective and determine whether an effect is compound-related requires toxicologic pathologists to consider a number of factors:

- size/magnitude of effect

- dose response

- precursor lesions (toxicity in short term studies or focal hyperplasia)

- lesion progression (for some types of neoplasms)

- historical controls and their variability

- expectation of a finding based on the scientific literature

- morbidity and survivability

- repeatability

All of the factors must be considered together; satisfaction of one factor does not mean that the effect is compound related.

As mentioned above, because maximum tolerated doses are used in carcinogenicity studies, there is typically a high margin of safety for humans. The margin of safety can be mathematically estimated based on the dosage used in the rodent study and the expected exposure in humans. When there are compound-related effects in a rodent bioassay, the next discussion for the pathologist becomes *is it relevant to humans*. Tumor causation in rodents does not directly equate to the same finding in humans. Many drugs and chemicals on the market have positive findings in rodents but the mechanism is not relevant to humans. However, the results of a negative bioassay are powerful – it is extremely uncommon for something to be missed in a rodent bioassay that is discovered in people.

Plaintiffs' experts' reports focus heavily, if not exclusively, on statistical significance, often using non-standard statistical methods to overstate findings and misrepresent the data. However, statistical significance does not equate to biological significance nor does it determine causality. Statistics provide guidance on acceptance or rejection of null hypotheses and should not be used as a sole criterion for drawing conclusions. Making a conclusion about causality based on statistics alone is not proper methodology for a pathologic evaluation and interpretation. Instead, based on current research on the reliability and reproducibility of data, it is known that conclusions of causality based on p-values of .05 will be incorrect up to 89% of the time, especially for findings that are considered unlikely (Nuzzo, R. Statistical Errors. Nature. 506:150-152, 2016). Therefore, it is inappropriate to infer causality from an exposure or chemical based simply on a statistically significant increase in some tumor type in a given experiment. There is currently a widespread renaissance occurring in the use of statistics to interpret biomedical data (Amrhein et al., 2019a; Amrhein et al., 2019b; Lovell, 2014). It is now accepted that the overreliance on the use of p-values to interpret results and the ambiguous use of the term, 'statistical significance' has led to confusion and extensive misinterpretation of scientific studies (and confusion of journalists and the public). The emphasis is correctly moving away from statistical significance to biological relevance. This requires sound interpretation of data beyond simple conclusions based on p-values alone. The over reliance on p-values is thought to be the basis for the general lack in the reliability and repeatability of many scientific studies. It is expected that this will lead to improved interpretations of scientific investigations and, most importantly, reduced occurrences of overinterpretation of nonbiologically relevant data. Therefore, it is absolutely imperative that the proper methodology for interpreting pathology data requires a much more exhaustive review by pathologists, including consideration of the relevant factors described above.

### C.    Repeatability

The power of science is to repeat experiments.  And true findings are repeatable. Looking at the results of a single study in isolation can lead to misinterpretation of data because of simple chance variation.  Repeated effects across multiple studies dramatically increase the likelihood that those effects are real, meaning they are related to the test compound and not the result of chance or normal biological variability.  As seen in the carcinogenicity studies with glyphosate, not all statistically significant findings in science are real effects.

Because approximately 35-40 tissues or more are evaluated in every animal in a rodent carcinogenicity study, the chance of finding a random increase of neoplasia in an organ at any dose level or in control animals is very high and expected.  In a sense, every carcinogenicity study is actually at least 35-40 different experiments (and actually more since every tissue consists of multiple cell types).  It is important to keep in mind that the mechanisms for inducing different kinds of neoplasms are very different.  It is therefore very unlikely for a carcinogenic substance to induce neoplasia in different tissues in different studies in the same species.

For almost all rodent bioassays, there is general scientific agreement on the findings of suspected or evidence of carcinogenicity in rodents. In some cases there may be pathological findings that necessitate the use of pathology working groups (5 pathologists) to reach consensus on specific findings and interpretations. Suspected carcinogenicity in one study is best evaluated by repeat studies; however, this is usually not practical or available.  For most chemicals used in the United States, we have just two carcinogenicity studies – one mouse and one rat.  With glyphosate we have the unique luxury of *many* repeated carcinogenicity studies and consequently a wealth of data.  Therefore, we are much better equipped to distinguish between false positives and real effects.  It is notable that scientists or scientific organizations that have utilized the validated methods and criteria described above and applied by toxicologic pathologists to assess the glyphosate rodent carcinogenicity bioassay data set have reached the same conclusions regarding the lack of compound-mediated effects.

One of plaintiffs' experts advocates for pooling of tumor incidence data across studies, incorrectly stating that "[t]here is no argument that would support a comparison across studies that is appropriate when pooling is inappropriate."  Repeatability across experiments and pooling data across experiments are distinct concepts.  Pooling across studies is not an acceptable methodology for interpretation of animal carcinogenicity bioassay data.  Each assay is a different experiment, conducted at a different time, with different conditions that were not controlled the same way.  That is true even for studies within the same test lab or using the same strain of animal because, as discussed earlier, there is always some biological variability.  Each study should be assessed and interpreted on its own.

However, the impropriety of pooling data does not limit the ability to compare results across studies.  Reproducibility of similar results in different laboratories has

been a time honored approach to provide supporting evidence that a biological effect is consistent or real.  If the same tumor findings (not just statistics, but also evaluation of biologic relevance determining a true compound-related effect) are not observed in multiple studies that increases confidence in the overall conclusion that there is no compound-related effect.  In other words, there are important differences between studies that induce variability and make pooling improper, but if a real carcinogenic effect is observed in one study, it should also be seen in other studies *despite* those differences.

## IV.    The Many Rodent Carcinogenicity Studies With Glyphosate Show No Evidence of a Carcinogenic Effect

The carcinogenicity data set for glyphosate is exceptionally large.  In October 2016, I visited a public reading room in Brussels, Belgium for 2 days where proprietary data from 12 different rodent carcinogenicity studies with glyphosate was made available for review through the European Commission and the European Glyphosate Task Force.  The extensive data set included the toxicology and pathology reports, tumor incidence data, and other summary and individual animal data for five studies on mice and seven studies on rats. The data was reviewed on a computer. Due to the time and computer technical limitations I focused on reading pathology reports and some of the group animal data. The studies were conducted by and/or on behalf of several different glyphosate manufacturers, including Monsanto.  After reviewing and evaluating these data, I can confidently say that all 12 carcinogenicity studies with glyphosate were conducted in accordance with or in a manner consistent with Good Laboratory Practices (GLP) and/or OECD guidelines, even though they were conducted by different labs, at different times, across different continents.

Outside of the reading room and even if one does not consider the materials I reviewed there, I had access to an enormous amount of data that was sufficient to render all opinions in this report.  For example, I had access to the complete studies conducted by Monsanto.  I also had access to the original data tables from all twelve of the studies upon which my opinions were based. And, in addition to applying knowledge gained throughout my professional career in this field, I accessed a variety of publicly available scientific materials that contained all the data needed to reach my opinions, including historical control data, literature regarding various strains and species of rodents, data contained in various scientific reports by regulatory agencies, and other materials. These materials are reflected on the attached list.

Based on my review of all of the bioassay data, I believe that none of the individual tumor findings [identified by plaintiffs' experts] are meaningful.  Notably, there was no repeatability across the 12 studies.  Instead, tumor incidences reflect the random variability that often occurs in these studies. It is important to note that I have based my conclusions on all of the evidence that can be used to interpret biological significance of a glyphosate-mediated effect on carcinogenesis. It is not appropriate to base biological significance solely on statistical significance. This often leads to misinterpretation of data and errors in conclusions. In addition, statistical P values are

meant to be used as a guide to interpretation of a null hypothesis. It is not the purpose of P values to determine biological significance or cause. ScienceNews reports that P values, "confuse more than they clarify. They are misused, misunderstood, and misrepresented" (https://www.sciencenews.org/blog/context/p-value-ban-small-step-journal-giant-leap-science). Over emphasis of using P values to interpret biological significance has led to the widely recognized problem by which other laboratories have been unable to reproduce or replicate experimental results in a majority of published scientific studies.  Some scientific journals (e.g., *Basic and Applied Social Psychology)* no longer allow the publication of P values due to the potential for misinterpretation and misuse. To interpret biological data, it is most important to examine all of the data in an investigation before interpreting statistical results. Just focusing on statistical results without putting the analyses in perspective of the complete data set often leads to erroneous conclusions.

Plaintiffs' experts extract select tumor incidence data across the 12 glyphosate studies that they claim show a carcinogenic effect; however, what they have extracted is only a small slice of a much larger pie.  I have reviewed and analyzed *all* the incidence data in the glyphosate bioassays.  The overall tumor counts per study are also available in the Greim (2015) publication cited by plaintiffs' experts.

When we look at all the data for glyphosate we see the expected biologic variability in tumor incidence.  It is impossible and improper from a methodological perspective for plaintiffs' experts to reach a reliable conclusion of a carcinogenic effect by cherry picking the tumor incidence data that supports their argument while ignoring the data that goes the other way.  For example, plaintiffs' experts focus on the finding of five hepatocellular adenomas in the high dose group and none in the controls or mid-dose treatment group in the Brammer 2001 rat bioassay.  However, that same study shows the control group had higher rates of other tumors.  Similarly, plaintiffs' experts rely on the finding of renal tumors in male mice in the Knezevich and Hogan 1983 Mouse Study.  Yet they ignore that lung carcinomas in male mice occurred mostly in the controls.

If these data were interpreted in the manner plaintiffs' experts' methodology suggests, one would conclude that glyphosate has a protective effect for certain cancers.  Both outcomes show the fallacy of looking only at isolated lines of data numerically and out of context of the entire study.

The bioassays tested active forms of glyphosate and appropriately did not use formulated products for evaluation of carcinogenicity. It would be wrong to test formulated products in rodent bioassays because the results would be inconclusive and unable to detect whether glyphosate was a carcinogen for the following reasons:

- Rodent bioassays are designed experimentally and mathematically to test for the carcinogenesis of single chemicals and this approach is supported by extensive historical data. The bioassay is not designed for mixtures.

- Use of a formulated glyphosate product would prevent the use of high doses of glyphosate in the bioassay due to the acute toxicity of the surfactants. Surfactants may induce pathology and irritation of the stomach. Rodents are not capable of vomiting, so they are unable to remove gastric irritants. Therefore, only very low doses of formulated products could be used in vivo for both practical and humane reasons. This avoids the purpose of the carcinogenicity bioassay.
- A chronic bioassay with formulated product would primarily test the effect of chronic gastrointestinal irritation by the surfactants. Food intake could be dramatically reduced because of palatability and gastrointestinal irritation. Surfactants have the potential to reduce absorption of glyphosate from the gastrointestinal tract, especially if the animals develop diarrhea.
- Surfactants are not needed for efficient absorption of glyphosate into the body from the gastrointestinal tract.
- Cutaneous application of a formulated product would not be useful because too little glyphosate would be absorbed into the general circulation. The skin serves as an effective barrier to glyphosate absorption. There would be limited dosing of all the major organs, such as the lungs, liver, kidneys, the lymphocytes of the immune system (circulating lymphocytes, lymph nodes, spleen, bone marrow and tissue lymphocytes in the lungs, gastrointestinal tract, dermis, and other organs), and the skin including the epidermis (keratinocytes) and dermis (hair follicles, glands, and supporting connective tissues). Therefore, the carcinogenicity of glyphosate could not be tested by a topical approach in this model.

Representative examples of random tumor incidence data (blue rows are incidences highlighted by plaintiffs' experts):

| Knezevich and Hogan, 1983 Mouse Study (Monsanto) | | | | |
|---|---|---|---|---|
| | control | low | mid | high |
| Kidney adenomas & carcinomas (male) | 1 | 0 | 1 | 3 |
| Lung adenoma (male) | 5 | 9 | 9 | 9 |
| Lung adenoma (female) | 10 | 9 | 10 | 1 |
| Lung carcinoma (male) | 4 | 3 | 2 | 1 |
| Lung carcinoma (female) | 1 | 3 | 4 | 4 |
| Liver carcinoma (male) | 5 | 6 | 6 | 5 |
| Liver carcinoma (female) | 1 | 2 | 1 | 0 |
| Lymphoma & Leukemia (male) | 1 | 4 | 3 | 2 |
| Lymphoma & Leukemia (female) | 1 | 4 | 5 | 1 |

**Atkinson, 1993 Mouse Study (Cheminova)**

|  | control | low | Mid | high |
|---|---|---|---|---|
| Hemangiosarcomas (male) | 0 | 0 | 0 | 4 |
| Granulosa cell tumors | 8 | 3 | 1 | 6 |
| Leydig adenomas | 3 | 0 | 0 | 2 |

**Wood, 2009 Mouse Study (Nufarm)**

|  | control | low | Mid | high |
|---|---|---|---|---|
| Malignant lymphoma (male) | 0 | 1 | 2 | 5 |
| Adrenal adenoma (male) | 3 | 0 | 0 | 3 |
| Lung adenoma (male) | 9 | 7 | 7 | 4 |
| Lung adenoma (female) | 2 | 4 | 2 | 2 |
| Lung carcinoma (male) | 3 | 4 | 5 | 9 |
| Lung carcinoma (female) | 5 | 2 | 2 | 3 |

**Stout and Ruecker, 1990 Rat Study (Monsanto)**

|  | control | low | mid | high |
|---|---|---|---|---|
| Pancreas islet adenoma (male) | 1 | 8 | 5 | 7 |
| Pancreas islet adenoma (female) | 5 | 1 | 4 | 0 |
| Thymic lymphoma | 5 | 3 | 2 | 1 |

**Atkinson, 1993 Rat Study (Cheminova)**

|  | control | low | low-mid | mid | high |
|---|---|---|---|---|---|
| Pheochromocytoma (female) | 5 | 0 | 0 | 1 | 0 |
| Pancreas islet adenoma (male) | 7 | 1 | 2 | 2 | 1 |
| Leydig adenoma | 3 | 1 | 0 | 0 | 0 |

**Brammer, 2001 Rat Study (Syngenta)**

|  | Control | low | mid | high |
|---|---|---|---|---|
| Hepatocellular adenoma (male) | 0 | 2 | 0 | 5 |
| Uterus carcinoma | 2 | 8 | 0 | 2 |
| Hemangioma | 2 | 1 | 0 | 0 |
| Leydig adenoma | 5 | 2 | 2 | 2 |

13

**FIVE STUDIES IN MICE:**

**Knezevich and Hogan, 1983 Mouse Study (Monsanto)**

I have reviewed the primary study data as well as related submissions and correspondence with EPA regarding Monsanto's 1983 mouse study.  In this study, groups of CD-1 mice (50/sex/dose) were fed diets containing glyphosate at doses of 0, 1000, 5000, and 30,000 parts per million (or 0, 161/195, 835/968, 4945/6069 mg/kg/day for males and females respectively) for 24 months.

The original study pathologist reported a low incidence of renal tubule adenomas and carcinomas (combined) in males: 0/49 (control), 0/50 (low dose), 1/50 (mid dose), 3/50 (high dose).  With low tumor numbers like this, it is common to combine adenomas and carcinomas in reporting the data.  Here, the original pathologist reached the scientifically reliable conclusion that the tumors were spurious and unrelated to treatment, which was supported by the lack of pre-neoplastic lesions in the kidneys.  As explained earlier, cancer is not a threshold evident, and a true carcinogen will often induce pre-neoplastic changes that were not seen in this study.

The renal sections from male and female mice in control and treatment groups were subsequently evaluated by an independent pathologist, Dr. Marvin Kuschner, who was the Dean of the School of Medicine and founding Chair of the Department of Pathology, State University of New York (Stoney Brook).  Dr. Kuschner identified an adenoma in a control group male which had not been diagnosed as such in the original pathology report.  The renal findings with the control tumor were 1/49 (control), 0/50 (low dose), 1/50 (mid dose), 3/50 (high dose), which is not statistically significant by pair-wise comparison of treated groups with concurrent controls or by trend test.

Dr. Kuschner also found no compound-related differences in severity; in fact, the largest and most severe tumor was in a mid-dose male.  If the renal tumors were a compound-related effect, the most advanced tumor would have probably been found in the high-dose group.

The slides that were examined by Dr. Kuschner, along with the associated data regarding kidney tumors, were subsequently examined by Dr. Klaus Stemmer, M.D., a pathologist at the Institute of Environmental Medicine, University of Cincinnati Medical Center. He agreed with the opinion of Dr. Kuschner that the kidney tumors were not caused by glyphosate treatment.

At EPA's request, three additional sections were taken from each kidney of all male mice and examined microscopically by the original study pathologist.  No new tumors were found in any of the control or treated animals. These negative findings provide additional support that the tumors were spurious and unrelated to glyphosate administration.

Thereafter, a Pathology Working Group (PWG) blindly reviewed sections of the kidneys, including the additional sections.  It is very common for a PWG to be convened

and confer about slight differences to reach a consensus opinion on diagnosis, significance, and relevance.  In this case, the PWG unanimously concluded that the incidences of renal tubule neoplasms in the study were not treatment related.  The PWG also noted that no treatment-related nephrotoxic lesions were seen in the study, meaning that the lesions seen were not secondary to renal toxicity.  Chronic nephritis, which is common in rodents, is not considered a preneoplastic lesion.  To determine if a lesion results from a renal toxin, it is important to look for other degenerative changes in the kidney, such as degeneration leading to tissue necrosis.  In the absence of those changes, it is likely that the renal tumors were spontaneous and not compound-related.  Additionally, two panelists from the 1986 EPA Scientific Advisory Panel on glyphosate (Drs. Swenberg and Grisham) also looked at the slides and agreed with Dr. Kuschner.  The fact that Dr. Kuschner's findings were reviewed and confirmed by Dr. Stemmer and the PWG is compelling evidence supporting the reliability of those findings and the overall conclusion that there was no carcinogenic effect related to glyphosate treatment in this study.

### Atkinson, 1993 Mouse Study (Cheminova)

I reviewed the primary study data for this investigation, including the pathology report and tumor incidence tables.  Here, groups of CD-1 mice (50/sex/dose) were fed diets containing glyphosate at doses of 0, 100, 300, 1000 parts per million (or 0, 98/102, 297/298, 988/1000 mg/kg/day for males and females respectively) for 104 weeks.

There was a slight increase in hemangiosarcomas in the high-dose male group: 0/47 (control), 0/46 (low-dose), 0/50 (mid-dose), 4/45 (high-dose).  I agree with the study investigators that these tumors were chance effects, unrelated to treatment with glyphosate.  Importantly, there is no dose-response in the incidence of these tumors across dose groups and no consistent findings repeated in the female mice: 0/50 (control), 2/50 (low-dose), 0/50 (mid-dose), 2/50 (high-dose).  True carcinogens (cancer-causing chemicals) usually cause neoplasms in a dose-responsive manner.  This means that an increasing incidence of neoplasms is expected in the four dose groups.  Further, hemangiosarcomas are a common spontaneous tumor in mice and are more common in males than females.  The incidences observed in this study were within historical control numbers from the same laboratory and were not statistically significant by pair-wise comparison of treated groups with concurrent controls.

Plaintiffs' expert (Dr. Jameson) incorrectly claims that as few as two animals per dose group were examined histologically for hemangiosarcomas.  In fact, because the vascular system is in every organ, it is impossible not to look for vascular system tumors in every slide.  In this study's tumor incidence tables, vascular system tumors are combined and presented as a single entity.  The number that Dr. Jameson is focused on is actually the total number of animals in the dose group that had a vascular diagnosis.

**Kumar, 2001 Mouse Study (Feinchemie Schwebda)**

I reviewed the primary study data, including the pathology report and tumor incidence tables for this investigation.  In this study, groups of Swiss albino mice (50/sex/dose) were fed diets containing glyphosate at doses of 0, 100, 1000, 10,000 parts per million (or 0, 14.5/15, 150/151, 1454/1467 mg/kg/day for males and females respectively) for 18 months.

I am aware of two data analyses reported for this study.  One, in the Greim (2015) paper, reports the following data for lymphoma in males: 10/50 (control), 15/50 (low-dose), 16/50 (mid-dose), and 19/50 (high-dose).  A more recent reanalysis of the data reports the following: 12/50 (control), 16/50 (low-dose), 18/50 (mid-dose), and 19/50 (high-dose).  The reanalysis reports that the pair-wise significance reported by the original investigators no longer occurs.

The differences in these analyses do not impact my ultimate opinion that this study does not support any carcinogenic effect of glyphosate.  As an initial matter, lymphomas are the most common spontaneously occurring tumor category in mice.  It is known that mice have a high background incidence of lymphoma.  This can be due to spontaneous genetic mutations, natural genetic susceptibility, and an endogenous retrovirus that is passed from mothers to their offspring via the milk when they suckle. This retrovirus (murine leukemia virus) is common in mice and can cause lymphoma in some mice that are infected at birth when they nurse. This is similar to lymphoma that occurs in a subset of people when they are infected with human T cell lymphotrophic virus-1 (HTLV-1) from their mothers' milk, which occurs in Japan, the Caribbean islands, and Florida. The actual cause of lymphoma is unknown in any individual mouse. However, the endemic retrovirus in mice is an important confounding factor that we must consider when evaluating lymphoma incidences in mice.  As a result, it is challenging to show carcinogenicity that might express as lymphoma in mice.  In other words, because of the high background incidence and high variability of lymphoma, mice are not a good model for identifying a carcinogenic effect in the lymphocytes. Evidence of lymphoma in rats would be stronger evidence of carcinogenicity because they do not have the same high background incidence and they do not have the retrovirus that affects mice (note that the opposite is true for testicular tumors; some rat strains have an extremely high background incidence of testicular tumors, but mice do not). Notably, there is no evidence of lymphoma in the 7 glyphosate studies conducted with rats.

There was lack of a dose response and the incidences were near the normal background variation. These factors support the conclusion that the frequency of lymphoma in this study was incidental. In addition, questions about the health of the colony could have affected the prevalence of lymphoma and increased the background incidence.

**Wood, 2009 Mouse Study (NuFarm)**

I reviewed the primary study data for this investigation, including the pathology report and tumor incidence tables.  Groups of CD-1 mice (51/sex/dose) were fed diets containing glyphosate at doses of 0, 500, 1500, 5000 parts per million (or 0, 71.4/97.9, 234/300, 810/1081 mg/kg/day for males and females respectively) for 18 months.

The study investigators noted several increases in spontaneous tumors in male mice, none of which were considered treatment-related.   For example, there was a statistically significant trend for lung adenocarcinomas in male mice, 5/51 (control), 5/50 (low-dose), 7/51 (mid-dose), 11/51 (high-dose)); however, the incidence of lung adenocarcinomas at the high-dose was not statistically significant when compared to the concurrent controls, there were no treatment-related preneoplastic lesions observed, and there was no evidence of progression from adenomas to carcinomas. Moreover, the lung tumors were not seen in any of the other mouse studies when tested at similar or significantly higher doses for up to two years.  Accordingly, I agree with the study investigators that the tumors observed in this study were unrelated to treatment with glyphosate.  Even plaintiffs' expert Dr. Portier concluded that these tumors were likely "due to chance."  This reinforces the need to look for replication across studies before putting undue weight on a given tumor finding simply because it is marginally statistically significant.

Plaintiffs' experts focus on the statistically significant trend of malignant lymphoma in the males in this study: 0/51 (control), 1/51 (low-dose), 2/51 (mid-size), 5/51 (high-dose).  As discussed above, because the magnitude of the effect here is so low, it is easy to misinterpret the data.  Further, the incidences are within historical controls and there was no effect in the females.  Moreover, for other mechanistic reasons discussed above and based on the wide range of historical data (0-14% generally, 0-12% at the performing lab), we expect a high degree of variability in the background incidence in lymphoma in male mice.

**Sugimoto, 1997 Mouse Study (Arysta Life Sciences)**

I reviewed the primary study data for this investigation, including the pathology report and tumor incidence tables.  Groups of CD-1 mice (50/sex/dose) were fed diets containing glyphosate at doses of 0, 1600, 8000, 40000 parts per million (or 0, 165/153, 838/787, 4348/4116 mg/kg/day for males and females respectively) for 78 weeks. Notably, the highest dose tested in both sexes exceeded (4-fold) the EPA recommended limit dose of 1,000 mg/kg/day.

The tumor incidences in this study are similarly consistent with random, non-compound related effects.  For example, there was a statistically significant trend in hemangiomas in female mice: 0/50 (control), 0/50 (low-dose); 2/50 (mid-dose); 5/50 (high-dose).  Hemangiomas are common benign lesions in mice that are distinct, unrelated neoplasms from hemangiosarcomas, which are cancerous.  Tumor incidence at the high-dose was statistically significant with the raw (unadjusted) p-value as

compared to concurrent controls; however, with an adjustment for multiple comparisons, the high dose tumors were not statistically significant (p=0.055). Accordingly based on all of the data, I do not consider the hemangioma incidences in this study to be representative of a carcinogenic effect because the effect size was small and there was no evidence of repeatability in other mouse bioassays in the same sex. Also, one cannot tell if this is the true incidence because the instances of hemangioma are reported by organ. Tumor incidence is counted per animal, not per lesion. Therefore, it is not appropriate to combine lesions (such as all hemangiomas) occurring across organs to determine the incidence rate, as it is possible the same animal had the same type of lesion in two different organs. To reach a conclusion regarding incidence, individual animal data (data enabling a determination of how many animals had hemangiomas) is necessary. Using lesion counts to compute an incidence rate may be very misleading.

Plaintiffs' experts again focus on the incidence of malignant lymphoma in the males in this study: 2/50 (control), 2/50 (low-dose), 0/50 (mid-size), 6/50 (high-dose). The magnitude of effect here too is very low, there is no dose response, the incidence is within historical controls, and wide variability between groups is expected based on historical control ranges (4-19%). Therefore, there is no glyphosate mediated effect on lymphoma in this study.

## Takahashi, 1999, 78-week bioassay in CD-1 mice (Joint FAO/WHO Meeting on Pesticide Residues, 2016, Part II – Toxicological)

I reviewed an incomplete subset of data from this study that was summarized in the 2016 FAO/WHO report, which was inadequate to perform a thorough evaluation of the investigation. Doses ranged from 0 to 7500-8700 mg/kg/day in the high-dose groups of male and female mice, respectively. Therefore, very high doses of glyphosate were used in this study.

Incidences of lymphoma were 3, 1, 4, and 6/50 in the female mice at doses of 0, 500, 5000, and 50,000 ppm in the diet. It was noted that there was a statistically significant difference in the trend test, but not pairwise comparison for lymphoma in the female mice. After applying the factors discussed above, I concluded that there was not a glyphosate-mediated effect on lymphoma in the female mice. The incidences were within the expected range and there was no evidence of a monotonic dose response. Incidences of lymphoma were not available for the male mice.

There was confusion related to the incidence of renal tumors in the male mice since there were data from the original study and from a resectioning and restaining of the kidneys. The original slides had faded and could not be re-examined by the study pathologist as recommended by the Food Safety Commission of Japan. I concluded that there was no glyphosate-mediated effect on renal tumors, which was in agreement with Takahashi.

**SEVEN STUDIES IN RATS:**

**Atkinson, 1993 Rat Study (Cheminova)**

I reviewed the primary data for this study, including the pathology report and tumor incidence tables.  Groups of Sprague-Dawley rats (50/sex/dose) were fed diets containing glyphosate at doses of 0, 10, 100, 300, and 1000 mg/kg/day for 24 months.

Various tumors were observed in both control and treated groups, however there were no pair-wise statistically significant increased incidences of any tumor type in any treated group.  This fact is also noted by IARC, EPA, and EFSA in their recent respective evaluations of glyphosate.  In fact, the total number of benign and malignant tumors (combined) observed in the control groups was higher than the total number of tumors in the high dose groups:

- Males: 88 (control) v. 73 (high-dose)
- Females: 111 (control) v. 104 (high-dose)

This reflects the random variability that can occur in these types of studies.  Since no glyphosate-mediated effects were found in the high dose animals, not all tissues were evaluated histopathologically for the mid dose groups.  This does not reduce the reliability of the conclusion that there was no carcinogenic effect.

**Brammer, 2001 Rat Study (Syngenta)**

I reviewed the primary study data for this study, including the pathology report and tumor incidence tables.  Groups of Wistar rats (52/sex/dose) were fed diets containing glyphosate at doses of 0, 121/145, 361/437, 1214/1498 mg/kg/day for males and females respectively for 24 months.

A statistically significant trend in hepatocellular (liver) adenomas was observed in the males: 0/52 (control), 2/52 (low-dose), 0/52 (mid-dose), 5/52 (high-dose).  I agree with the study investigators, EPA, and other regulatory authorities that have evaluated this data that the liver tumors were unrelated to treatment with glyphosate.  There was no evidence of preneoplastic lesions, no evidence of progression to carcinomas, and no dose-response.  Further, there was no statistical significance when treated groups were compared to the concurrent controls.

**Stout and Ruecker, 1990 Rat Study (Monsanto)**

I have reviewed the primary study data as well as related submissions and correspondence with EPA regarding Monsanto's 1990 rat study.  In the study, groups of Sprague Dawley rats (60/sex/dose) were fed glyphosate for 24 months at doses of 0, 2000, 8000, 20,000 parts per million (or 0, 89/113, 362/457, 940/1183 mg/kg/day for males and females respectively).

The only statistically significant increase by pair-wise comparison was pancreatic islet adenomas, a relatively common benign tumor, in low-dose males: 1/58 (control), 8/57 (low-dose), 5/60 (mid-dose), and 7/59 (high-dose). There was no statistically significant trend in these tumors. I agree with the study investigators that these tumors were not related to treatment with glyphosate. This conclusion is based on a number of factors. First, the incidences of these adenomas did not occur in a dose-related manner; the only carcinoma occurred in a control group rat, suggesting no progression; the incidences of these tumors in the low and high-dose groups slightly exceeded historical controls at the performing laboratory, however they were consistent with contemporaneous reports from other laboratories; and, there was no corresponding effect observed in the females. Moreover, the exact opposite effect was observed in the females; pancreatic islet cell adenomas occurred 5/48 (control), 1/44 (low-dose), 4/49 (mid dose), 0/47 (high-dose).

Considering these factors together, I conclude that the incidences of pancreatic islet cell adenomas in this study were not related to treatment with glyphosate.

**Suresh, 1996 Rat Study (Feinchemie Schwebda)**

I reviewed the primary study data for this investigation, including the pathology report and tumor incidence tables. Groups of Wistar rats (50/sex/dose) were fed diets containing glyphosate at doses of 0, 100, 1000, 10000 parts per million (or 0, 6.3/8.6, 59.4/88.5, 595/886 mg/kg/day for males and females respectively) for 24 months.

Here, there were no compound related or biologically relevant changes observed in tumor incidences in any treatment group.

**Wood, 2009 Rat Study (Nufarm)**

I reviewed the primary study data for this study, including the pathology report and tumor incidence tables. Groups of Wistar rats (51/sex/dose) were fed diets containing glyphosate at doses of 0, 1500, 5000, 15000 parts per million (or 0, 84/105, 285/349, 1077/1382 mg/kg/day for males and females respectively) for 24 months.

Again, there were no compound related or biologically relevant changes observed in tumor incidences in any treatment group.

**Enemoto, 1997 Rat Study (Arysta Life Sciences)**

I reviewed the primary study data for this investigation, including the pathology report and tumor incidence tables. Groups of Sprague-Dawley rats (50/sex/dose) were fed diets containing glyphosate at doses of 0, 3000, 10000, 30000 parts per million (or 0, 104/115, 354/393, 1127/1247 mg/kg/day for males and females respectively) for 24 months.

Here too, there were no changes in biologically relevant histopathological findings observed in tumor incidences in any treatment group. For example, lung adenomas occurred in the males: 2/50 (control), 3/50 (low-dose), 1/50 (mid-dose), 3/50 (high-dose). These tumor incidences reflect the expected random variability that occurs in carcinogenicity studies.

## Lankas, 1981 Rat Study (Monsanto)

I have reviewed the primary study data as well as related submissions and correspondence with EPA regarding Monsanto's 1981 rat study. In the study, groups of Sprague-Dawley rats (50/sex/dose) were fed diets containing glyphosate at doses of 0, 30, 100, 300 parts per million (or 0, 3/3, 10/11, 31/34 mg/kg/day for males and females respectively) for 26 months. Although the data from this study is considered valid, the maximum tolerated dose was not reached and the study had to be repeated at higher doses (see Stout and Ruecker 1990, above).

A statistically significant trend was reported for testicular interstitial tumors: 0/50 (control), 3/47 (low-dose), 1/49 (mid-dose), 6/44 (high-dose). I consider these tumors unrelated to treatment because they do not show a dose response, the concurrent controls (0/50) appear to be unusually low for this tumor compared to historical controls (3.4%-6.7%), there were no preneoplastic lesions, and this tumor type was not seen in other studies at doses up to 35-fold higher in the same strain of rat.

A statistically significant trend was reported for C-cell carcinomas in female rats: 1/47 (control), 0/49 (low-dose), 2/45 (mid-dose), 6/47 (high-dose). The trend was not statistically significant for C-cell adenomas (5/47 (control), 3/49 (low-dose), 6/45 (mid-dose), 3/47 (high-dose) or combined C-cell adenomas and carcinomas (6/47 (control), 3/49 (low-dose), 8/45 (mid-dose), 9/47 (high-dose). I consider these tumors unrelated to treatment because C-cell neoplasms are relatively common in female rats, a dose response was not apparent, and there was a lack of repeatability in other studies. For example, the incidences of C-cell carcinoma in females rats was 0/60 (control), 0/60 (low-dose), 1/60 (mid-dose), 0/60 (high-dose) in the Stout and Ruecker (1990) study and 0/50 (control), 0/27 (low-dose), 0/29 (mid-dose), 0/29 (mid-dose 2) and 0/49 (high-dose) in the Atkinson et al (1993) study.

## V.    Genotoxicity

### A.    Guiding Principles

The purpose of genotoxicity testing is to identify chemicals that have the potential to cause heritable damage to humans. Genotoxic potential is one step in the evaluation of genotoxic risk, which also takes into account potential exposure and possible mode of action. In addition, the relevance of results should also take into consideration the known or anticipated chemical reactivity, bioavailability, metabolism, toxicokinetics, target tissue exposure, and target organ specificity. The results of genotoxicity tests do

not directly test the carcinogenic potential of a substance; more data in higher level test systems are required.

Each genotoxicity or mutagenicity assay that has acceptable assay conditions is considered within the weight of evidence approach. Data that are OECD (Organization for Economic Cooperation and Development) compliant are prioritized, but data that do not meet that criteria are also considered. The criteria for assay interpretation include quality, sources of artefacts, and adherence to OECD guidelines. Considerations of study quality and inherent limitations of each assay are considered when interpreting the data. A battery of complementary tests are often used in combination with expert judgement to assess the possibility of mutagenicity (alterations in genetic sequence) or other genotoxic effects (DNA breaks, DNA cross-linking, or chromosomal damage). The greater the number of genotoxicity tests performed will result in a greater number of false positive tests, so expert evaluation is required. Typically in vivo tests are used to follow up on equivocal or positive in vitro findings.

For cancer to occur through a genotoxic mechanism, more than DNA damage is required. Instead, there must be permanent damage that is not repaired by the naturally occurring cellular repair mechanisms, the cell must replicate (many damaged cells are naturally eliminated before replication), and the mutation must be transmitted to the new daughter cells.

Some of the widely used genotoxicity tests that have OECD guidelines and focus on whether a mutation or heritable changes are likely to occur are:

- Bacterial reverse mutation test (also named Ames test) (TG 471)

    o Commonly performed in vitro test to measure the mutagenic potential of a chemical.

- In vitro mammalian Cell Gene Mutation (TG 476)

- In vitro mammalian chromosomal aberration test (TG 473)

- Mammalian bone marrow chromosomal aberration test (TG 475)

- Mammalian erythrocyte micronucleus test (TG 474)

- In vitro mammalian cell micronucleus test (TG 487)

The value of the results of each genotoxicity assay within the overall evaluation is determined by the study quality, biological relevance of assay results, and human relevance. Negative results from well-conducted in vivo genotoxicity studies would typically outweigh positive in vitro results, assuming they reflect the same genotoxic mode of action (i.e., mutagenicity or chromosomal damage). Study quality is evaluated by:

- Adherence to OECD guidelines

- Use of Good Laboratory Practices (GLP)

- Justification of concentrations and dose range

- Adequacy of treatment time

- Detailed documentation of the conditions and procedures of tissue processing and collection

- Data presentation, variability, and statistical analysis

- Identification of sources of artefacts including dose justification based on preliminary testing, cytotoxicity, and systemic toxicity (from in vivo toxicity testing). Appropriate substance identification, substance quality (lack of degradation), and lack of interactions between the chemical and test components.

  DNA damage may not be biologically relevant if:

- Assay conditions lead to excessive cytotoxicity

  - Cytotoxicity can be induced by the test substance or changes in osmolality or pH. Cells capable of cell division are required for the assays.

- There is inconsistency in the dose-response pattern.

- There is high data variability in outcome (Variability in outcome is often a concern with the Comet assay, which only measures DNA damage and does not evaluate the potential for DNA repair or mutation. The assay is also subject to a high number of false positives.)

- There is absence of a DNA repair system. Cell lines should be tested to confirm functional DNA repair systems are present.

- There are inherent assay performance limitations. Assays vary in their sensitivity and specificity and these data may not be available. Ames assays have few false positives (26%). False positives are more common in in vitro assays using mammalian cells (50-70%) (Kirkland et al., 2005; Kirkland et al., 2007).

When appropriately conducted genotoxicity studies are interpreted as positive, human relevance should be determined by evaluating the mode of action. Genotoxic modes of action include mutagenicity, clastogenicity and aneugenicity, and may be either direct acting or non-direct acting.

The determination of potential genotoxicity should be completed using a weight of evidence approach. In some cases, there may be inadequate, high quality, data to form a conclusion on the genotoxicity of a chemical. In such cases, other forms of data can help with the uncertainty. Such information includes the mode of action of the chemical, results of carcinogenicity or rodent bioassays, toxicokinetic studies, evidence from structurally related chemicals, predictions from structure-activity relationships, and reliable data from nonstandard tests (such as DNA adducts). However, as discussed below, there is more than an adequate amount of data to conclude glyphosate and glyphosate formulations are not mutagenic or genotoxic. Regulatory agencies worldwide have reached that conclusion as well after evaluating this data set.

**B.    Genotoxicity Analysis of Glyphosate, Formulations, & Surfactants**

The tabular data from the EPA revised glyphosate issue paper (December 12, 2017) and certain published and unpublished assay data were used in a weight of evidence approach to develop an opinion on the genotoxicity of glyphosate chemical and formulations.

Data for over eighty in vitro, high quality, bacterial mutagenicity assays (Ames assays) conducted at various laboratories with or without metabolic activation were negative for mutagenicity for glyphosate, surfactants, and glyphosate formulations.  One Ames assay reported equivocal results at concentration that approached cytotoxicity. Further, four in vitro, high quality, mammalian gene mutation assays with mouse lymphoma cells (L5178Y TK+ cells +/- S9 activation) (n=3) or Chinese hamster ovary (CHO) cells were negative for mutagenicity for glyphosate. This amount of negative mutation data has significant scientific weight.

The weight of the evidence in the other study types described above also supports a conclusion that glyphosate and glyphosate formulations are not genotoxic. The guideline-compliant, high quality studies overwhelmingly showed no genotoxic effect from glyphosate or glyphosate formulations. To the extent some authors reported a genotoxic result in a specific study, faults such as those discussed above were identified and the studies were considered but assigned little or no weight. For example:

- Out of eight in vitro mammalian chromosomal aberration tests on glyphosate reviewed only two reported "positive" results.  Both came from the Lioi laboratory (1998). In vitro mammalian chromosomal aberration tests have a high incidence of false positive results in general. There was a lack of replication across the eight studies, which supports the conclusion that the Lioi studies were outliers or false positives.  This is also supported by the fact that the concentrations used (>/= 8.5 $\mu$M in one study and 7-170 $\mu$M) were excessive and cytotoxic.  Therefore, any genetic damage seen cannot be attributed to the test materials directly.

- One test for micronuclei induction in mammalian cells with human buccal carcinoma cells (TR146) had increased micronuclei at 0.09 and 0.12 mM

at 20 minutes of exposure (Koller et al., 2012). The TR146 cells were not characterized for this assay, there was a short exposure time, and there was apoptosis and necrosis in the carcinoma cells. These flaws prevent assessing any weight to this study.

- Seven of nine in vivo mammalian erythrocyte micronucleus assays on glyphosate using intraperitoneal injection were negative. The two positive assays in this category used concentrations greater than the LD50 for glyphosate (130 mg/kg).

It is inappropriate to place weight on studies that, even if otherwise valid, do not answer the question being asked in any investigation. As discussed above, the Comet assay has a high false positive rate. Although some Comet assays report findings of genotoxicity with glyphosate or glyphosate formulations, the assay is both not designed to answer the question of mutation and the studies were often conducted at cytotoxic concentrations.  For example, Wozniak et al., (2018) reported that glyphosate and Roundup formulation (360 Plus) induced DNA damage using human peripheral blood mononuclear cells (PBMCs); however, the effects observed were at cytotoxic concentrations. Data in the same study at lower concentrations showed no effect from the glyphosate formulation.

The surfactants used in glyphosate formulations are also considered non-genotoxic and non-mutagenic and have been approved for use by EPA.

The weight of evidence indicates that glyphosate and glyphosate formulations are not mutagenic or genotoxic using standard assays and proper test methodologies.

## VI.   Skin Carcinogenesis of Commercial Formulation of Glyphosate (George et al, 2009)

George et al (2009) reported that a commercial formulation of glyphosate was not a complete carcinogen or a tumor initiator in a 2-stage model of mouse skin carcinogenesis. It was reported that the commercial glyphosate product was a weak promoter for benign cutaneous papillomas (warts) when used with the carcinogen DMBA when compared to TPA. Progression to malignancy (squamous cell carcinoma) was not reported, and, in fact, the authors conducted no histopathological assessment on any of the tissues. Without histopathology, it is impossible to determine whether gross observations indeed reflect any evidence of cancer or tumor progression. And, importantly, although the authors call this an "animal carcinogenicity bioassay" and describe their paper as assessing "glyphosate-induced carcinogenicity," they did not even look for carcinogenicity, which requires histology sections and interpretation by a pathologist.

There were other important deficiencies in the investigation. The manuscript did not describe how the commercial product was used or diluted and what application volume was used. The amount of surface area of the application was not described.

The commercial product had 41% (410 μg/uL) glyphosate. The dose of glyphosate applied to the skin was 25 mg/kg body weight. This would require less than 2 μL of the commercial product for a 30 gm mouse for each application. The commercial glyphosate was diluted in 50% ethanol (100 proof) and the DMBA and TBA were diluted in 50% acetone. Therefore, different carriers were used for the different experimental groups including the two groups with the reported occurrence of papillomas. The authors did not explain what the dilution of the test substances were and what the final volumes were that were applied to the skin of the mice. In addition, the area of skin exposure for each application was not described. The area of exposure and consistency between applications should have been documented. For example, what method was used to have consistency in the application site for each mouse? The distribution of suspected benign papillomas compared to the actual sites of chemical application were also not described. The control animals were completely untreated and no vehicle was used. The investigation did not use a range of doses of glyphosate. This would have been necessary to reveal a dose response curve, which would be necessary to support interpretation of the data. No other formulations or chemicals were used. This would have been necessary to demonstrate specificity of the results. It is most likely the results represent a nonspecific effect.

Tumor promotion is a process that occurs <u>after</u> irreversible genetic damage (initiation) and often involves an increase in cell proliferation. Cell proliferation of keratinocytes (skin cells) can be induced my many different types of physical (itching) or nonspecific chemical irritation. Many chemicals, including concentrated 50% ethanol, upon repeated exposure to nonhaired skin could induce irritation.

Therefore, this investigation demonstrated that formulated glyphosate at a single concentration diluted in 50% ethanol was not shown to be a cutaneous carcinogen or tumor initiator after repeated administration onto the clipped skin of mice. It offers no meaningful insight into carcinogenicity. However, robust data demonstrating a lack of carcinogenicity in rodent bioassays is available and resolves this question in the negative.

## VII.    <u>Conclusion</u>

There is an exceptionally large carcinogenicity data set for glyphosate.  Based on my review of the underlying study reports and data from the 5 mouse studies and 7 rat studies, I believe that glyphosate does not have a carcinogenic effect in any of the individual studies.  Importantly, there was no reproducibility of biologically significant effects across the 12 studies.  Plaintiffs' experts rely heavily on select tumor incidences that are statistically significant or "marginally significant" under one or more statistical tests; however, statistical significance does *not* equate to biological significance nor does it determine causality.  It is my opinion that the individual tumor incidences identified by plaintiffs' experts reflect the random variability that often occurs in these studies. Further, it is my opinion that weight of the large amount of genotoxicity data available does not support a conclusion that glyphosate, glyphosate-based

formulations, or surfactants are genotoxic or mutagenic. In addition, although I am not an epidemiologist by training, it is notable that the largest and most adjusted epidemiology studies reach a similar conclusion and find no association between exposure to glyphosate-based formulations and human non-Hodgkin's lymphoma. Andreotti et al (2018) (the only prospective cohort study, which also adjusted for other exposures, and considered intensity/duration of use) and Pahwa et al (2019) (which pooled case-control study data from the U.S. and Canada, controlled for confounders, and examined various aspects of use as well) support this conclusion.


_Thomas J. Rosol_                              September 03, 2019

**Thomas J. Rosol, DVM, PhD, MBA**            **Date**