# EXHIBIT 1

*Environmental Health & Safety Services*



THE COHEN GROUP

October 25, 2019
Project No. 19145

Mr. John M. Kalas, Esq.
Hollingsworth LLP
1350 I St NW
Washington, DC 20005

RE:   In Re: Roundup Prods. Liab. Litig.
        U.S. District Court for the Northern District of California
        Case No. 16-MD-2741

        Jaime Alvarez Calderon v Monsanto Company
        Civil No.: 3:16-md-2741vc

Dear Mr. Kalas:

Thank you for the opportunity to provide my expert opinions in connection with the above referenced matter. This summary of opinions is in response to your request for my review of the relevant exposure and industrial hygiene data and case-specific information and summarizes my opinions concerning Mr. Jaime Alvarez Calderon's alleged exposure to Glyphosate from his use of Roundup® branded herbicides. The following opinions are based on my review and/or consideration of the materials listed in Attachment A and based upon my site visit to Mr. Alvarez's home on September 9, 2019 as well as on my training and expertise. A copy of my current CV is attached in Attachment C. A statement of my compensation is listed below. Attachment D is a list of cases in which I have testified in trial or deposition for the past four years. As new information becomes available, I reserve the right to alter or supplement these opinions.

My opinions are stated to a reasonable degree of professional and/or scientific certainty, and are based on my professional education, training and more than 40 years of experience, as well as my knowledge and review of the pertinent scientific literature and materials customarily relied upon and generally accepted by experts in the fields of industrial hygiene and occupational safety, my knowledge and review of applicable industry standards and practices, and the particular facts of this case.

Three Waters Park Drive
Suite 226
San Mateo
California 94403
Tel 650 349.9737
Fax 650 349.3378
www.thecohengroup.com

Page 2 - J. Kalas, Esq., Hollingsworth LLP

**Background and Qualifications**

My qualifications, background and publications are summarized in the attached Curriculum Vitae (CV) which can be found in Attachment C. Briefly, I have been engaged in the field of occupational health and safety for over 40 years. I have a Bachelor of Science degree (BS) from Oakland University at Rochester, Michigan (1972) and a Masters of Public Health degree (MPH) from the University of Michigan at Ann Arbor, Michigan (1974).

I am certified by the American Board of Industrial Hygiene in the Comprehensive Practice of Industrial Hygiene and have been so continuously since 1980 (last re-certified in 2018). In 2008, I was awarded the Fellow Award by the American Industrial Hygiene Association (AIHA) for my contribution to the practice of Industrial Hygiene. I have been a member of AIHA since 1973 and have served in leadership positions on several of their technical committees including Hygienic Guides and Construction Safety. I have also held several leadership positions with the Northern California Section of the AIHA, including President during 1984-1985. I am a diplomate of the Academy of Industrial Hygiene. I also serve as a Board member on the California Industrial Hygiene Council (CIHC) and have done so since 2006. I serve on the Cal/OSHA Advisory Committee as a Science Member. I have served as a committee member on several Cal/OSHA Technical Advisory Committees, including hazard communication, minimum ventilation, asbestos, Title 8 reform, sensitizing substances, and others.

I have authored or co-authored three books and more than two dozen papers on industrial hygiene and exposure to hazardous substances in occupational settings, and I have presented numerous technical papers at professional conferences. I have personally reviewed and conducted hundreds of assessments for various potentially hazardous substances, including pesticides. The categories of environmental stresses I am routinely asked to evaluate include chemical, biologic, physical, and ergonomic. I evaluate these stresses on the basis of observation using my experience and training, and with the aid of quantitative and qualitative measurement techniques.

Currently, I am the President and a Senior Occupational Health and Safety Consultant of The Cohen Group, an occupational health and safety consulting firm I founded in 1980. Prior to The Cohen Group, I was employed by the Aluminum Company of America, Stanford Research Institute (now called SRI International), Intel Corporation, and Hewlett Packard Company (H-P). At H-P, I was the Manager of Corporate Industrial Hygiene and Director of the Environmental Laboratory, an AIHA-accredited laboratory. I was the Corporate Industrial Hygienist and Assistant Manager of Corporate Health and Safety for Intel Corporation. At SRI, I was an industrial hygienist and project manager where I conducted applied research, primarily for the National Institute for Occupational Safety and Health (NIOSH). Much of my research efforts for NIOSH involved characterization of exposures to chlorinated hydrocarbons and engineering control studies. While employed at Alcoa, my work involved both industrial hygiene and environmental issues primarily at domestic smelting operations.

Page 3 - J. Kalas, Esq., Hollingsworth LLP

**Summary of Information on Mr. Alvarez's Exposure to Roundup®-branded Products and Other Relevant Products**

Based on the sworn testimony of Mr. Alvarez (through a translator) and other case-specific materials, I was able to obtain the following information concerning Mr. Alvarez's alleged exposure to glyphosate, the manner in which he used Roundup®-branded products, and other relevant data pertinent to my exposure assessment.

- Mr. Alvarez was born September 21, 1954 in Mexico City, Mexico. He moved to the United States, specifically California in 1979.
- Mr. Alvarez worked as a landscaper at Sutter Home Vineyard from 1986 to the present. Previously, he had worked at a restaurant in California for 3 to 4 years. He then moved to Idaho to pick potatoes. He stayed in Idaho for one year, and then moved back to California to work at the same restaurant for "a few months." No information was available regarding whether Mr. Alvarez worked near chemicals associated with NHL at his other workplaces.
- In 2014, Mr. Alvarez was diagnosed with Non-Hodgkins Lymphoma (NHL). He testified that he smoked for approximately 15 years until he quit in 2002.
- Mr. Alvarez testified that he began to use Roundup in 1986 and used the product until 2017 (31 years), solely at Sutter Home Vineyard. He used Roundup "to control weeds around the buildings, aggregate, and fence perimeter." [PFS, p. 9]
- Mr. Alvarez stated that he did not use Roundup or any pesticides at his home. [Pg. 37, 58] He testified that he used Roundup Pro [Concentrate], which he mixed [Pg. 38, L24-25] and which involved shaking the Roundup with the water [Pg. 56, L5], though his Plaintiff Fact Sheet states that he also used Roundup-Ready-to-Use Weed & Grass Killer III. When questioned about his use of this product he stated he "only" used the Concentrate. [Pg 39, L10] He says that he recalls spilling the solution while mixing Roundup but stated he "washed it off like it said." [Pg. 73, L20-21] He says he used the product every 2 days during the spring months. [Pg. 40, L. 8] The Plaintiff Fact Sheet states the he used the product less frequently in the summer and fall months, and considerably less frequently in the winter months. He testified that on days he sprayed he would try to spray the product for half a day, unless it was windy. [Pg. 58]
- Mr. Alvarez testified that he would mix 5 oz of solution with 3 gallons of water. He further stated that the mixture would last "45 minutes, something like that" and that in a typical day when he used Roundup, he would make up the mixture 3 or 4 times a day. [Pg 13]
- Mr. Alvarez testified that he typically would try to avoid spraying Roundup on windy days. [Pg. 58, L8-9] He would spot spray the Sutter Home property for one-half of a day for weeds. [Pg. 14 L10] He used the "mist" setting on the sprayer to spray along fence lines [Pg 56, L10-17] He testified that there were times when spraying with mist setting it would blow back on him and he would always wash it off. When asked if there were

- times that he would keep working after the solution got on him, he stated, "No. I went to wash it off and keep working." [Pg. 73, L13] There were times when he mixed Roundup and it would spill on him, but again he stated he washed it off. [Pg. 73, L20-21]
- Mr. Alvarez testified that he always used a three-gallon backpack sprayer and a hand sprayer occasionally. [Pg. 40-41] He would adjust the nozzle, calibrate the sprayer, and clean it with water after spraying. [Pg. 56-57] He testified the Roundup spray would go three feet. [Pg. 58, L1-3]
- Mr. Alvarez stated that he wore rubber gloves, either a short or long-sleeved shirt, jeans, and rubber boots. [Pg. 41- 42]
- He claims the backpack sprayer broke on two times and soaked his entire back, as well as his head and neck. On those occasions, he went to the bathroom and washed his face. [Pg. 42-43] He attributes these soaking events to his co-workers loosening the hose attached to the backpack sprayer. [Pg. 44]
- He testified that he was never trained or licensed as a pesticide applicator. [Pg. 39 L16-21] He also stated that because he could not read English, he never read the Roundup label, but based the use (mixing) of the product on instructions he received from the individual who sold him the product. [Pg.40, L 15-21].

**Opinions**

1. ***Based on Mr. Alvarez's sworn testimony concerning his work with Roundup, it is my professional Industrial Hygiene opinion that his exposure to Glyphosate would be well within acceptable limits of exposure, if he was exposed at all.***

Mr. Alvarez testified that he began spraying Roundup in 1986 and continued through 2017. He stated that we would spray at the various Sutter Home properties, roughly every two days during the spring. The Plaintiff Fact Sheet stated that Mr. Alvarez would spray less often in summer and fall, and considerably less often in the winter. He further stated that the mixture would last 45 minutes, and that in a typical day when he used Roundup, he would make up the mixture 3 or 4 times a day. He also stated he would spray for a half of a day.

Mr. Alvarez stated the he only used Roundup Concentrate that he would mix, but the Plaintiff Fact Sheet states that he also used pre-mixed Roundup. He answered that he never read the label and was not a licensed pesticide applicator. He would spray with either a backpack sprayer or a hand sprayer. When mixing and applying Roundup, he stated that he would wear jeans, rubber boots, rubber gloves, and either a short- or a long-sleeved shirt. He testified that when he got Roundup on his back after the back pack sprayer broke, he went to a bathroom and washed his face.

In an attempt to determine Mr. Alvarez's dermally absorbed dose of Glyphosate, I made very conservative estimates of exposure which are shown in my calculations [See Attachment B].

Page 5 - J. Kalas, Esq., Hollingsworth LLP

The basis for these calculations is the American Industrial Hygiene Association publication on mathematically estimating occupational exposure to chemicals, specifically Chapter 13 which details dermal exposure modeling.[1]  The values used for the calculations were Mr. Alvarez's testimony and the information obtained from the scientific literature.  Furthermore, when there were unknowns, conservative estimates were made.  These values are described below.

Although Mr. Alvarez testified that he would mix 5 oz of solution with 3 gallons of water, the proper mixture is 6 oz of solution with 1 gallon of water.  For my calculations, I will assume Mr. Alvarez misspoke and used the proper mixture.

A dermal absorbed dose rate was calculated based on Mr. Alvarez's average daily usage rate, which is referred to as an "event".  The basis for this calculation is the calculated average time of spraying per day based on Mr. Alvarez's testimony.

The scientific literature reports the flux (or dermal permeability) for Glyphosate to be between 0.01 to 0.059 ug/cm2/hr (when adjusted for the same units of measure).  For this calculation, I used a peer-reviewed reported flux for Glyphosate in the literature [Neilsen 2009].

Although Mr. Alvarez did not provide the frequency with which he may have had some of the spray solution land on his skin during his work spraying, it is clear from his testimony that the application was from a back-pack sprayer with a wand which was presumably pointed downward to the specific area where the spray solution was to be applied.  Even if some misting occurred, it is more likely than not that the spray would land on the front of the leg below the knee and possibly on the foot.  The calculation assumes that his legs (front and back and thighs) would be the skin surface receiving some of the misting.  This more than doubles the surface area of just the lower leg skin surface.  Since my calculations are extremely conservative and account for ongoing spraying, my calculations more than account for the two instances reported by Mr. Alvarez in which co-workers loosened the hose on the back-pack sprayer, causing him to become wet on his back and the back of his neck and then to go to a bathroom to wash the material off.

Concerning exposure to the legs, Mr. Alvarez stated that he wore long pants.  Oltmanns 2016 evaluated the effectiveness of personal protective equipment against dermal exposure.  He cited the Fenske study evaluating lindane in a dust formulation and found the cotton workpants to offer a 91.4% exposure reduction.  Oltmanns also cited the Driver and Ross study of pesticide handlers wearing single layer clothing including long pants and found for mixers/loaders, flaggers, applicators an exposure reduction of approximately 90%.  He cites an exposure reduction of 91.31% from the use of backpack sprayer when the above stated clothing is worn

---

[1] Keil, CB, ed., et. al., ***Mathematical Models for Estimating Occupational Exposure to Chemicals, 2nd Edition***, American Industrial Hygiene Association, Fairfax, VA, 2009

Page 6 - J. Kalas, Esq., Hollingsworth LLP

(see Table 5.21). For my calculation of exposure, I assumed only a 50% reduction, an extraordinarily conservative estimate based on the scientific literature.

Mr. Alvarez's weight is approximately 65 kg.  Based on these above conservative values, as shown in my calculations, the dermal absorbed dose of Glyphosate Mr. Alvarez's experienced on a spraying day in the Spring was 0.006 mg/kg/day.  As stated in the Plaintiff Fact Sheet, spraying was less in the Summer and Fall months and "considerably less" in the Winter.  Therefore, the above-stated dose for a spraying event would be the maximum exposure.  Based on the assumption that Mr. Alvarez sprayed 2hr/day once a week, his daily dose was calculated to be 0.003 mg/kg/day.  Unquestionably, Mr. Alvarez's exposure from spraying for nine months of the year would be substantially less than his springtime spraying.

EPA chronic reference dose (RfD) for Glyphosate is 1.75 mg/kg/day which is "an estimate of the quantity of chemical that a person could be exposed every day for the rest of their life with no appreciable risk of adverse health effects."  The EU Acceptable Operator Exposure Limit is 0.1 mg/kg.  These dose limits are orders of magnitude above the conservative estimates of exposure.  For example, the calculated average daily dermal absorbed dose is over 800 times lower than the EPA Reference Dose and over 45 times below the EU limit.

The State of California through the Office of Environmental Health Hazard Assessment (OEHHA) pursuant to California's Proposition 65 has established a No Significant Risk Level (NSRL) for Glyphosate.  The NSRL for glyphosate has been set at 1.1 mg/day.  This regulatory limit is also orders of magnitude above my conservatively calculated dermal dose for Mr. Alvarez.

It is my professional Industrial Hygiene opinion that Mr. Alvarez's exposure to Glyphosate is well within governmental established acceptable limits of exposure, if he was exposed at all.  This is based on extremely conservative dermal dose estimates.  Based on these calculations, Mr. Alvarez's daily dermal dose to Glyphosate from his use of Roundup is well within a lifetime acceptable dose where ill effects would not be expected.

During my site inspection, I found several large potted plants and numerous birds in Mr. Alvarez's yard.  It is unknown what products are used, if any, to maintain these large potted plants and birds.  Furthermore, I reserve the right to supplement or amend this report upon any site inspection of any other properties at which Mr. Alvarez used glyphosate-based herbicides.

   2. ***Regulatory agencies worldwide have determined there is no carcinogenic risk from exposure to Glyphosate-Based Herbicides. IARC concluded that Glyphosate was a "probable" carcinogen, a term that IARC defines as "limited" evidence.***

Multiple regulatory agencies have reviewed the potential carcinogenicity of Glyphosate and only one has concluded that Glyphosate is a "probable carcinogen".  The International Agency for Research on Cancer ("IARC") concluded Glyphosate was a probable carcinogen based on limited evidence in humans.  [See IARC 2015].  The IARC preamble notes that calling a

Page 7 - J. Kalas, Esq., Hollingsworth LLP

substance a carcinogen under IARC's process does not quantitate the risk of cancer to people from exposure to that substance, which may be minimal. The preamble draws the distinction between "hazard" and "risk" by stating, "the Monographs assess the strength of evidence that an agent is a cancer hazard. The distinction between hazard and risk is fundamental." Therefore, IARC is clear that they did not measure the risk of the probable cancer hazard to humans but stated that the substance is a probable carcinogen hazard based on limited evidence. [See IARC Preamble 2019]

Regulatory and scientific agencies from the U.S., Canada, Germany, the E.U., Australia, New Zealand, Japan, and the United Nations have all found Glyphosate exposure from the use of Glyphosate-based herbicides not to represent a carcinogenic risk. The proceedings of many of these agencies span many years were subject to comment and/or peer-review, and were conducted openly. EPA stated that their most recent "cancer evaluation is more robust than IARC's evaluation. IARC's evaluation only considers data that have been published or accepted for publication in the openly available literature. As a result, IARC only considered a subset of the studies...". [See EPA Interim Decision 2019]. Additionally, these agencies had access to unpublished data submitted pursuant to regulatory requirements which was not considered by IARC. It is therefore my professional opinion that unlike the aforementioned regulatory agencies, IARC did not consider all of the available scientific literature and did not quantitate the risk from exposure. Therefore it is my professional opinion IARC's conclusion is different than many of the other scientific agencies from around the world.

3. ***The main route of exposure to Glyphosate via use of Glyphosate-Based Herbicides is dermal. Published and unpublished data indicate dermal absorption of Glyphosate is Low. The presence of surfactants does not appear to affect dermal absorption.***

Industrial Hygienists consider all routes of exposure at the workplace when characterizing exposure to a chemical or biologic agent. Glyphosate is not volatile and field studies of applicators of Glyphosate-based herbicides have shown that inhalation exposures to Glyphosate are minimal. [See Jauhinien 1991, Edmiston 1995]. IARC states "monitoring [for Glyphosate] in air is not a useful way of determining exposure in workers since most exposure occurs via the dermal route." Ingestion would be an inadvertent route of exposure. The main route of exposure from use of Glyphosate-based herbicides, subject to work practices, appears to be dermal. ATSDR states that "dermal contact appears to be the major route of exposure to Glyphosate for people involved in its application." [See ATSDR 2019, IARC 2015].
Glyphosate is a hydrophilic compound. The skin acts like a barrier to such compounds. Studies using human skin samples demonstrate that dermal penetration of Glyphosate is "very low." Once dermally absorbed, the literature indicates that Glyphosate remains largely unchanged within the body, is quickly excreted in urine, and does not bioaccumulate.

Multiple studies have examined the dermal absorption of Glyphosate and Glyphosate-based herbicides [See e.g. Franz 1983, Nielsen 2009, Smith 2014]. Formulated Glyphosate-based herbicides may contain surfactants such as polyoxyethene tallow amine (POEA) as one example.

Page 8 - J. Kalas, Esq., Hollingsworth LLP

It is my professional Industrial Hygiene opinion that the most relevant of these studies to the human experience have used human skin *in vitro*, though there have also been studies using animal models. Many of the more recent studies have stated that the test methodology used have been conducted according to OECD guidelines, an internationally recognized protocol for the testing of chemicals on excised skin.

The rate and percentage of absorption do not appear to be affected by the presence of surfactants in formulations. Multiple studies indicate that the percentage of Glyphosate dermally absorbed is affected by diluting the mixture. The presence of surfactants does not appear to significantly affect absorption. For example, Franz 1983 shows that as the study transitioned from Glyphosate, to a concentrated form of Roundup®, to a Roundup® spray mix, the percent of Glyphosate absorbed increased each time even as the absolute amount of Glyphosate absorbed declined. That's despite the fact that the amount of surfactant in each formulation went from none to a high level to a much lower level. Franz states, "absorption of Glyphosate was lowest from the Roundup Spray Mix and this was in keeping with the much lower concentration of Glyphosate in the Spray Mix formulation. It should be noted however, that on a relative basis the percent absorption was actually greater from the Spray Mix formulation than from the other two. This phenomenon has been observed before with other topically applied materials and is related to the size of the applied dose. As the dose increases….the percent absorption falls off." Clearly, the presence of the surfactants used in Glyphosate-based herbicides does not affect absorption. Franz concludes that Glyphosate absorption through human skin was 0.03 to 0.15% and that greater than 92% of the unabsorbed Glyphosate remained on the skin surface where it was "readily removed" by a water wash. Other studies show similar results [See Ward 2010, Smith 2014-2015, and Davies, 2015].

The small percentage of Glyphosate which is absorbed appears to quickly leave the body, largely unmetabolized as mentioned above [ATSDR 2019]. Glyphosate has been found to have a short half-life in the body. Laboratory studies have shown the majority of an intravenous dose of Glyphosate administered to monkeys has been eliminated unmetabolized within twenty-four hours. [Wester 1991; Maibach 1983]. The National Institute of Environmental Health Sciences National Toxicology Program (NTP) reported that rats administered intravenous doses of

Glyphosate found that 98% of the Glyphosate was excreted in urine during the first twenty-four hour period. [NTP 1992]. Following a seven day excretion period, Wester examined the bodies of the topical skin treatment test subjects and determined that "there was no residual doses in tissues or skin." [Wester 1991]. In humans, biomonitoring studies show similar results. Peak urinary excretion comes as soon as 3 hours after task completion and, by 24 hours later, urinary concentration has fallen to background or near-background levels. [Connolly 2018].

All studies performed on human skin suggest very low dermal absorption. Industrial Hygienists commonly determine the extent of dermal absorption by a measure of flux value, which is the rate of absorption through the skin, and the percent absorbed. Franz 1983 and Nielsen 2009 have

Page 9 - J. Kalas, Esq., Hollingsworth LLP

reported the flux between 0.01 to 0.059 [as shown and converted to same units] ug/cm2/hr for Glyphosate. No study using human skin indicates a percent of absorption greater than 2.2% [Wester 1991] and most are below 1% [Franz 1983, Smith 2014, Ward 2010]. These results are as expected for a hydrophilic compound like Glyphosate.

4. ***Biomonitoring and passive dosimetry studies confirm that dermal absorption of Glyphosate from the use of Glyphosate-Based Herbicides is low and within regulatory limits of exposure.***

In addition to dermal absorption studies, there are biomonitoring and passive dosimetry studies that assess exposure and dose of Glyphosate in individuals applying Glyphosate-based herbicides in a variety of exposure scenarios. These studies are very useful in assessing home and workplace exposures including the quantity of Glyphosate that may land on the skin of individuals during product usage and potentially absorb. The dose reported in these studies can then be compared to toxicological and regulatory levels.

Overall, Glyphosate absorption has been recorded to range from 0.000013 mg/kg/day to 0.00456 mg/kg/day in biomonitoring studies. [See Bleeke 2007, Abdelghani 1995, as reported in Solomon 2016]. In a 70 kg (approximately 150 pounds) individual, that would calculate to a systemic daily dose of 0.00091 - 0.319 mg of Glyphosate a day, as follows:

$$\frac{0.000013 mg}{\frac{kg}{day}} \times 70 kg = 0.00091 \ mg/day$$

$$\frac{0.00456 \ mg}{\frac{kg}{day}} \times 70 kg = 0.319 \ mg/day$$

Passive dosimetry studies (studies that use gauze pads applied to the skin or clothing, or cassettes placed in the breathing zone to capture airborne Glyphosate) reported doses approximately an order of magnitude above and below the recorded biomonitoring doses described above. That said, doses recorded by passive dosimetry remain low. [See Lavy 1992, Edmiston 1995].

Compared to regulatory and toxicological levels, absorbed doses of Glyphosate are extremely low. Acquavella 2004 reports a maximum exposure dose of 0.004 mg/kg in a farmer-applicator, a dose significantly higher than any other exposure reported in this or other studies. Interestingly, that applicator was observed by the study authors to have skin contact with Glyphosate while not wearing gloves and was also observed to smoke cigarettes while handling Glyphosate (potential for incidental exposure by ingestion). [Acquavella 2004 at Figure 1]. The dose of 0.004 mg/kg is 437.5 times lower than the EPA RfD of 1.75 mg/kg, and 25 times lower than the EU Acceptable Operator Exposure Limit of 0.1 mg/kg. [See Tarazona 2017].

Page 10 - J. Kalas, Esq., Hollingsworth LLP

Therefore, it is my professional Industrial Hygiene opinion that the literature reports levels well within acceptable exposure levels based on biomonitoring and passive dosimetry. Dermal absorption, the primary route of exposure for Glyphosate, is very low and well below levels that would be considered of increased risk of ill health.

> 5. *It is my professional Industrial Hygiene opinion that epidemiology studies of environmental health illnesses are stronger when they account for the extent of exposure to the alleged stressor. Epidemiologic studies that control for potential confounders as well are stronger than studies that do not. Such studies that consider exposures and confounding factors confirm the findings of many government regulators that there is no increased risk of NHL from the use of Glyphosate.*

In a recognized Industrial Hygiene text by DiNardi[2], it states that "in occupational epidemiologic studies, one test for concluding the existence of cause and effect is the presence of an exposure-response relationship." [See DeNardi, pp 6-7, 1997] DiNardi further states "confounding is a type of bias that [may] adversely affect the understanding of an exposure/disease relationship." [DiNardi pg 98] Thus, the need for exposure data and the need to control for confounding variables is important for determining risk of disease. Without consideration for dose and other causal factors, a study may report an association between a stressor and outcome, without recognizing a study bias. Unfortunately, the link to illnesses as reported in epidemiologic studies generally does not consider such variables within the studied cohort. Meta-analyses or pooled analyses that do not account for these issues also are subject to the same criticism.

Some epidemiological studies reported in the regulatory documents compare the rate of lymphoma in individuals who "ever" used Glyphosate against those who "never" used Glyphosate. Those studies do not have empirical exposure data to evaluate exposure levels. For this report, I have reviewed epidemiological studies on Glyphosate with a focus on individual studies that take the extent of exposure into account.

Some studies [e.g. Eriksson 2008, McDuffie 2001, Andreotti 2018] used data on yearly or lifetime days of use to evaluate dose. One can also see these studies referenced in the meta-analyses [e.g., Pahwa 2019, Zhang 2019]. Days of use without considering the extent of exposure provides some information, but is still a crude measure of dose. For example, McDuffie appears to have combined an individual who was exposed to Glyphosate-based herbicides three times a year with someone who was exposed to Glyphosate 300 times a year. Assuming those two individuals used Glyphosate-based herbicides in the same manner, the dose to the latter would be a 100 times greater than the former. On the other hand, if someone who

---

[2] DiNardi, SR, ed, *The Occupational Environment – Its Evaluation and Control,* American Industrial Hygiene Association, Fairfax, VA, 1997

Page 11 - J. Kalas, Esq., Hollingsworth LLP

only used Glyphosate herbicides one day a year with extremely large quantities as opposed to someone who used it 3 days a year at a lower quantity, the one day user may very well have had a larger exposure. Additionally the McDuffie and Errikson studies do not control for confounding variables that may influence outcome, eg family history of cancer.

Andreotti 2018, using a peer-reviewed methodology as reported in the Dosemeci 2002 and Coble 2011 studies, applied an intensity-weighted dose metric to its evaluation of the relationship between Glyphosate-based herbicide exposure and NHL. This metric considered the use of personal protective equipment (PPE) worn by applicators, which is an important variable to consider as one evaluates intensity of exposure. They also identified method of application. Though not a "real-time" dose assessment like biomonitoring, recording the use of PPE as one variable to characterize exposure, it is an important step in understanding whether any dose-response relationship exists between Glyphosate-based herbicides and cancer. Additionally, Andreotti controlled for other potential confounders. The results from Andreotti 2018, a relative risk below 1.0 for each exposure group were reported, suggesting that there is no relationship between Glyphosate-based herbicides and NHL. Because the Andreotti study considers dose metrics and because it controls for potential confounding factors, it is my professional Industrial Hygiene opinion that it is a stronger study than studies like the McDuffie or Eriksson studies for several reasons such as the Andreotti study is an extremely large cohort study, consisting of 54,251 pesticide applicators, rather than a case control study with a limited population. Apart from being the largest cohort study I reviewed, the researchers considered, exposure by frequency of use, method of application and use of personal protective equipment as well as considered for other pesticide use.

**Statement of Compensation**

Joel Cohen's hourly rate for consultation is $350.

Please contact me if you have any further questions.

Very truly yours,

*[signature]*

Joel M. Cohen, MPH, CIH, FAIHA
The Cohen Group

Attachment A:   Materials Considered List of Joel Cohen, MPH, CIH, FAIHA
Attachment B:   Dose Calculations
Attachment C:   Curriculum Vitae of Joel Cohen, MPH, CIH, FAIHA
Attachment D:   Joel M Cohen 4-Year Trial and Deposition Testimony

# ATTACHMENT B

# DOSE CALCULATIONS

**Based on the testimony of Mr. Alvarez:**

Used Roundup Concentrate
Mix 1 cap/gal.  Each cap is 6 oz  18% is active ingredient.
Density of glyphosate in solution is 1.19 lb/gal

Usage:
Every 2 days in Spring (assumed to be March through May)
"Less often in Summer and Fall" (assumed 1 day/week for June through November)
"considerably less in Winter" (assumed no spraying)

Spray time in Spring is 4 hours/ day, 3-4 refills of 3 gallon backpack or 9 to 12 gallons
Spray time in Summer and Fall is assumed to be 1 day/week

Based on the above assumptions, Mr. Alvarez's average yearly usage of the Roundup would be as follows:

$$\frac{3 \; days \; in \; Spring}{week} \times \frac{4 \; hr}{day} \times \frac{4.3 \; weeks}{month} \times 3 \; month = 154.8 \; hrs \; spraying \; in \; Spring$$

$$\frac{12 \; gals}{4 \; hours} \times 154.8 \; hrs = 464.4 \; total \; gallons \; for \; Spring \; Spraying$$

$$\frac{1 \; day \; in \; Summer\&fall}{week} \times \frac{2 \; hr}{day} \times \frac{4.3 \; weeks}{month} \times 6 \; months = 51.6 \; hrs \; spraying \; in \; Summer\&Fall$$

$$\frac{3 \; gal}{4 \; hours} \times 51.6 \; hrs = 38.7 \; total \; gallons \; for \; Summer\&Fall \; spraying$$

No spraying in Winter months

Total spraying for year: $464.4 + 38.7 = 503.1 \; gallons \frac{sprayed}{year}$ or $1.38 \; \frac{gallons}{day}$ annualized

$$\frac{1.19 \; lb \; Glyphosate}{1 \; gal \; of \; Concentate} \times \frac{1 \; gal}{3.78 \; liters} \times \frac{453.4 \; gm}{1 \; lb} = \frac{142.8 gm \; Glyphosate}{1 \; liter \; of \; Concentrate}$$

$$\frac{1.19 \; lb \; Glyphosate}{1 \; gal \; of \; Concentrate} \times \frac{1 \; gal}{128 \; oz} = \frac{0.00929 \; lb \; Glyphosate}{oz \; of \; Concentrate}$$

$$\frac{0.00929 \; lb \; Glyphosate}{oz \; of \; Concentrate} \times \frac{6 \; oz \; Concentrate}{gal \; of \; Spray \; Solution} = \frac{0.558 \; lb \; Glyphosate}{gal \; of \; Spray \; Solution}$$

$$\frac{0.558 \; lb \; Glyphosate}{gal \; of \; Spray \; Solution} \times \frac{1.38 \; gal \; Spray \; Solution}{Day} \times \frac{453.4 \; gm}{1 \; lb} = \frac{349.1 \; gm \; Glyphosate}{day}$$

$$\frac{0.558 \; lb \; Glyphosate}{gal \; of \; Spray \; Solution} \times \frac{453.4 \; gm}{lb} \times \frac{gal}{3.78 \; liter} \times \frac{liter}{1000 \; cm3} \times \frac{1000 mg}{gm} = \frac{6.69 mg}{cm3}$$

Per: Keil, CB, et. al., *Mathematical Models for Estimating Occupational Exposure to Chemicals*, AIHA, Chapter 13

**Dermal absorbed dose rate per event**, as follows:

Event is 4 hrs/day per testimony in Spring
Flux is 5.9 x 10-6 ug/cm2/hr per Nielson 2009 (range is 0.01 to 0.059 in literature)
Surface area exposed skin is 0.505 m2 or ~5000cm2 (assuming front and back of legs are exposed) see AIHA Table 13.2
PPE is 50% per Oltmanns 2016 (long pants worn)
Weight of Mr. Alvarez is 65Kg (assumed for calculations)

$$\frac{5.9 \; x \; 10^{-6} cm/hr \; \times 6.69 \; mg/cm3 \; \times 5000 cm2 \times \; 4hr/day}{65 \; Kg} \times 0.5 = 0.006 \; mg/kg/day$$

Again using 2 hrs/day for Summer and Fall spraying, Mr. Alvarez's event dose would be:

$$\frac{5.9 \; x \; 10^{-6} cm/hr \; \times 6.69 \; mg/cm3 \; \times 5000 cm2 \times \; 2hr/day}{65 \; Kg} \times 0.5 = 0.003 \; mg/kg/day$$

**Average daily dermal absorbed dose:**

Note:  Assuming Mr. Alvarez worked 5 days/week

$$\left[0.006 \frac{mg}{kg}/day \; \times \frac{5 \; days}{week} \times \frac{4.3 \; week}{month} \times \frac{3 \; month}{year}\right] +$$

$$\left[0.003 \frac{mg}{kg}/day \times \frac{5 \; days}{week} \times \frac{4.3 \; week}{month} \times \frac{6 \; month}{year}\right] \times \; \frac{year}{365 \; days} = 0.0021 \; mg/kg/day$$