UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 |
| | Case No. 3:16-md-02741-VC |
| THIS DOCUMENT RELATES TO: | **DECLARATION OF MARTIN CALHOUN IN SUPPORT OF DEFENDANT MONSANTO COMPANY'S OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION TO REMAND AND FOR ATTORNEY FEES AND COSTS** |
| *Victor Berliant, et al. v. Monsanto Co., et al.*, Case No. 3:19-cv-07189-VC | |

I, Martin Calhoun, declare:

1.      I am over the age of eighteen.  I make the statements set forth herein based on my personal knowledge.  If I were called to testify, I could and would be competent to testify under oath.

2.      I am a partner at Hollingsworth LLP.  I am one of the attorneys representing defendant Monsanto Company ("Monsanto") in the above-captioned lawsuit.  I submit this declaration in support of Monsanto's Opposition to Plaintiffs' Emergency Motion to Remand and for Fees and Costs.

3.      Attached hereto as Exhibit 1 is a true and correct copy of excerpts of IARC Glyphosate Monograph.

4.      Attached hereto as Exhibit 2 is a true and correct copy of excerpts of the 2/21/2019 Transcript of Christopher Portier *Hardeman* Testimony.

5.      Attached hereto as Exhibit 3 is a true and correct copy of excerpts of the 3/11/2019 *Hardeman* Trial Transcript.

6.      Attached hereto as Exhibit 4 is a true and correct copy of excerpts of the 4/30/2019 Transcript of William Sawyer *Cazier* Deposition Testimony.


I declare under penalty of perjury that the foregoing is true and correct.


Executed in Washington, DC on November 18, 2019


Martin C. Calhoun

*Attorney for Defendant Monsanto Company*

# Exhibit 1

# GLYPHOSATE

## 1. Exposure Data

## 1.1 Identification of the agent

### 1.1.1 Nomenclature

*Chem. Abstr. Serv. Reg. No.:* 1071-83-6 (acid); also relevant:
38641-94-0 (glyphosate-isopropylamine salt)
40465-66-5 (monoammonium salt)
69254-40-6 (diammonium salt)
34494-03-6 (glyphosate-sodium)
81591-81-3 (glyphosate-trimesium)

*Chem. Abstr. Serv. Name: N*-(phosphono-methyl)glycine

*Preferred IUPAC Name*: *N*-(phosphono-methyl)glycine

*Synonyms:* Gliphosate; glyphosate; glyphosate hydrochloride; glyphosate [calcium, copper (2+), dilithium, disodium, magnesium, monoammonium, monopotassium, monosodium, sodium, or zinc] salt

*Trade names:* Glyphosate products have been sold worldwide under numerous trade names, including: Abundit Extra; Credit; Xtreme; Glifonox; Glyphogan; Ground-Up; Rodeo; Roundup; Touchdown; Tragli; Wipe Out; Yerbimat (Farm Chemicals International, 2015).

### 1.1.2 Structural and molecular formulae and relative molecular mass



Molecular formula: $C_3H_8NO_5P$
Relative molecular mass: 169.07
Additional information on chemical structure is also available in the PubChem Compound database (NCBI, 2015).

### 1.1.3 Chemical and physical properties of the pure substance

*Description:* Glyphosate acid is a colourless, odourless, crystalline solid. It is formulated as a salt consisting of the deprotonated acid of glyphosate and a cation (isopropylamine, ammonium, or sodium), with more than one salt in some formulations.

*Solubility:* The acid is of medium solubility at 11.6 g/L in water (at 25 °C) and insoluble in common organic solvents such as acetone, ethanol, and xylene; the alkali-metal and

**Table 3.1 (continued)**

| Species, strain (sex) Duration Reference | Dosing regimen, Animals/group at start | For each target organ: incidence (%) and/or multiplicity of tumours | Significance | Comments |
|---|---|---|---|---|
| Mouse, Swiss (M) 32 wk George et al. (2010) | Initiation–promotion study Skin application of glyphosate-based formulation (glyphosate, 41%; POEA, ~15%) (referred to as "glyphosate") dissolved in 50% ethanol; DMBA dissolved in 50% ethanol, and TPA dissolved in 50% acetone, used in the groups described below 20 M/group | Skin tumours [called "papillomas" by the authors, following gross examination only] | | Short duration of treatment, no solvent controls, and lack of any histopathological evaluation Age at start; NR (mice weighed 12–15 g bw) [The Working Group concluded this was an inadequate study for the evaluation of glyphosate] |
| | Group I: untreated control (no treatment) | Group I: 0/20 | | |
| | Group II: glyphosate only: 25 mg/kg bw topically, 3 × /wk, for 32 wk | Group II: 0/20 | | |
| | Group III: single topical application of DMBA, 52 μg/mouse, followed 1 wk later by TPA, 5 μg/mouse, 3 × /wk, for 32 wk | Group III: 20/20*, 7.8 ± 1.1 | *P < 0.05 vs groups VI and VII | |
| | Group IV: single topical application of glyphosate, 25 mg/kg bw, followed 1 wk later by TPA, 5 μg/mouse, 3 × /wk, for 32 wk | Group I: 0/20 | | |
| | Group V: 3 × /wk topical application of glyphosate, 25 mg/kg bw, for 3 wk, followed 1 wk later by TPA, 5 μg/mouse, 3 × /wk, for 32 wk | Group V: 0/20 | | |
| | Group VI: single topical application of DMBA, 52 μg/mouse | Group VI: 0/20 | | |
| | Group VII: topical application of TPA, 5 μg/mouse, 3 × /wk, for 32 wk | Group VII: 0/20 | | |
| | Group VIII: single topical application of DMBA, 52 μg/mouse, followed 1 wk later by topical treatment with glyphosate, 25 mg/kg bw, 3 × /wk, for 32 wk | Group VIII: 8/20*, 2.8 ± 0.9 | *P < 0.05 vs group VI | |

bw, body weight; DMBA, 7,12-dimethylbenz[a]anthracene; EPA, United States Environmental Protection Agency; F, female; M, male; mo, month; NR, not reported; NS, not significant; POEA, polyethoxylated tallowamine; PWG, pathology working group; TPA, 12-O-tetradecanoyl-phorbol-13-acetate; vs, versus; wk, weeks; yr, year

### 3.1.2 Initiation–promotion

Groups of 20 male Swiss mice [age at start not reported; body weight, 12–15 g] were given a glyphosate-based formulation (glyphosate, 41%; polyethoxylated tallowamine, ~15%) (referred to as glyphosate in the article) that was dissolved in 50% ethanol and applied onto the shaved back skin (George et al., 2010). Treatment groups were identified as follows:

- Group I – untreated control;
- Group II – glyphosate only (25 mg/kg bw), applied topically three times per week for 32 weeks;
- Group III – single topical application of dimethylbenz[a]anthracene (DMBA; in ethanol; 52 µg/mouse), followed 1 week later by 12-O-tetradecanoylphorbol-13-acetate (TPA; in acetone; 5 µg/mouse), applied topically three times per week for 32 weeks;
- Group IV – single topical application of glyphosate (25 mg/kg bw) followed 1 week later by TPA (in acetone; 5 µg/mouse), applied topically three times per week for 32 weeks;
- Group V – glyphosate (25 mg/kg bw) applied topically three times per week for 3 weeks (total of nine applications), followed 1 week later by TPA (in acetone; 5 µg/mouse), applied topically three times per week for 32 weeks;
- Group VI – single topical application of DMBA (in ethanol; 52 µg/mouse);
- Group VII –TPA (in acetone; 5 µg/mouse), applied topically three times per week for 32 weeks; and
- Group VIII –single topical application of DMBA (in ethanol; 52 µg/mouse), followed 1 week later by glyphosate (25 mg/kg bw), applied topically three times per week for 32 weeks.

All mice were killed at 32 weeks. Skin tumours were observed only in group III (positive control, DMBA + TPA, 20/20) and group VIII (DMBA + glyphosate, 8/20; P < 0.05 versus group VI [DMBA only, 0/20]). No microscopic examination was conducted and tumours were observed "as a minute wart like growth [that the authors called squamous cell papillomas], which progressed during the course of experiment." [The glyphosate formulation tested appeared to be a tumour promoter in this study. The design of the study was poor, with short duration of treatment, no solvent controls, small number of animals, and lack of histopathological examination. The Working Group concluded that this was an inadequate study for the evaluation of glyphosate.]

### 3.1.3 Review articles

Greim et al. (2015) have published a review article containing information on five long-term bioassay feeding studies in mice. Of these studies, one had been submitted for review to the EPA (EPA, 1985a, b, 1986, 1991a), and one to the JMPR (JMPR, 2006); these studies are discussed in Section 3.1.1. The review article reported on an additional three long-term bioassay studies in mice that had not been previously available in the open literature, but had been submitted to various organizations for registration purposes. The review article provided a brief summary of each study and referred to an online data supplement containing the original data on tumour incidence from study reports. The three additional long-term bioassay studies in mice are summarized below. [The Working Group was unable to evaluate these studies, which are not included in Table 3.1 and Section 5.3, because the information provided in the review article and its supplement was insufficient (e.g. information was lacking on statistical methods, choice of doses, body-weight gain, survival data, details of histopathological examination, and/or stability of dosed feed mixture).]

In the first study (identified as Study 12, 1997a), groups of 50 male and 50 female CD-1

# Exhibit 2

Confidential - Pursuant to Protective Order

```
 1            UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF CALIFORNIA
 2

 3   IN RE: ROUNDUP           )
     PRODUCTS LIABILITY       )   MDL No. 2741
 4   LITIGATION               )
     _____ )   Case No.
 5   THIS DOCUMENT RELATES     )   16-md-02741-VC
     TO ALL CASES              )
 6

 7           THURSDAY, FEBRUARY 21, 2019
 8   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
 9                    - - -
10           Videotaped deposition of
11   Christopher J. Portier, Ph.D., held at the
12   Crowne Plaza Melbourne, 1-5 Spencer Street,
13   Melbourne, Australia, commencing at
14   8:10 a.m., on the above date, before Carrie
15   A. Campbell, Registered Diplomate Reporter,
16   Certified Realtime Reporter, Illinois,
17   California & Texas Certified Shorthand
18   Reporter, Missouri & Kansas Certified Court
19   Reporter.
20                    - - -
21

             GOLKOW LITIGATION SERVICES
22        877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
23

24

25
```

Confidential - Pursuant to Protective Order

```
 1              A P P E A R A N C E S :
 2
        BAUM HEDLUND ARISTEI & GOLDMAN, P.C.
 3      BY:  R. BRENT WISNER, ESQUIRE
               rbwisner@baumhedlund.com
 4      12100 Wilshire Boulevard, Suite 950
        Los Angeles, California 90025
 5      (310) 207-3233
 6      and
 7      BY:  MICHAEL L. BAUM, ESQUIRE
               (VIA TELECONFERENCE)
 8          mbaum@baumhedlund.com
        12100 Wilshire Boulevard, Suite 950
 9      Los Angeles, California 90025
        (310) 207-3233
10
11      WEITZ & LUXENBERG, P.C.
        BY:  ROBIN L. GREENWALD, ESQUIRE
12          rgreenwald@weitzlux.com
        700 Broadway
13      New York, New York 10003
        (212) 558-5547
14
15      ANDRUS WAGSTAFF, PC
        BY:  AIMEE H. WAGSTAFF, ESQUIRE
16          aimee.wagstaff@andruswagstaff.com
            DAVID J. WOOL, ESQUIRE
17          david.wool@andruswagstaff.com
               (VIA TELECONFERENCE)
18      7171 West Alaska Drive
        Lakewood, Colorado  80226
19      (303) 376-6360
20
        LUNDY, LUNDY, SOILEAU & SOUTH, LLP
21      BY:  BERNARD THEUNISSEN, ESQUIRE
               btheunissen@lundylawllp.com
22             (VIA TELECONFERENCE)
        501 Broad Street
23      Lake Charles, Louisiana 70601
        (337) 439-0707
24      Counsel for Plaintiffs
25
```

Confidential - Pursuant to Protective Order

```
 1      COVINGTON & BURLING LLP
        BY:  PAUL W. SCHMIDT, ESQUIRE
 2           pschmidt@cov.com
             MICHAEL X. IMBROSCIO, ESQUIRE
 3           mimbroscio@cov.com
        850 Tenth Street, NW
 4      Washington, D.C. 20001-4956
        (202) 662-5694
 5
 6      WILKINSON WALSH + ESKOVITZ
        BY:  CALI COPE-KASTEN, ESQUIRE
 7           ccope-kasten@wilkinsonwalsh.com
        2001 M Street, NW, 10th Floor
 8      Washington, DC 20036
        (202) 847-4000
 9
10      HOLLINGSWORTH LLP
        BY:  JOHN M. KALAS, ESQUIRE
11           jkalas@hollingsworthllp.com
        1350 I Street, N.W.
12      Washington, D.C. 20005
        (202) 898-5800
13      Counsel for Defendant Monsanto
14
15    ALSO PRESENT:
        BRIAN BEAM, Baum Hedlund
16      JIM SOTO
17
      V I D E O G R A P H E R S:
18      DAN LAWLOR & VINCENT ROSICA,
        Golkow Litigation Services
19
                        - - -
20
21
22
23
24
25
```

Confidential - Pursuant to Protective Order

1                           INDEX

2                                                 PAGE

3    APPEARANCES.................................   2

4   EXAMINATIONS

5      BY MR. WISNER.............................   6

6

7

8    CERTIFICATE................................255

9   ACKNOWLEDGMENT OF DEPONENT..................257

10    ERRATA....................................258

11    LAWYER'S NOTES............................259

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Confidential - Pursuant to Protective Order

```
 1                    VIDEOGRAPHER:  We are now on

 2         the record.  My name is Dan Lawlor,

 3         I'm the videographer with Golkow

 4         Litigation Services.

 5                    Today's date is February 21,

 6         2019, and the time is 8:10 a.m.

 7                    This video deposition is being

 8         held in Melbourne, Australia, in the

 9         matter of MDL Roundup, Hardeman versus

10         Monsanto.

11                    The deponent is Dr. Christopher

12         Portier.

13                    Counsel will be noted on the

14         stenographic record.

15                    The court reporter is Carrie

16         Campbell and will now swear in the

17         witness.

18

19          CHRISTOPHER J. PORTIER, Ph.D.,

20     of lawful age, having been first duly sworn

21     to tell the truth, the whole truth and

22     nothing but the truth, deposes and says on

23     behalf of the Plaintiffs, as follows:

24

25
```

Confidential - Pursuant to Protective Order

1        Leading.

2   QUESTIONS BY MR. WISNER:

3        Q.     What, if anything, does this

4   indicate to you as a scientist?

5        A.     In terms of the relationship to

6   the skin painting study that was done, it

7   would be far too speculative for me to go

8   there.

9        Q.     Okay.

10       A.     In one case they're papillomas.

11   These are skin keratoacanthomas.  They're

12   different mouse strains.  The other study is

13   very tailored for -- the initiation/promotion

14   study is very tailored for a very fixed

15   result.

16            It would be too speculative for

17   me to say they're related in any way.

18       Q.     Okay.  Well, then let me ask

19   you this question.  The George study, this

20   positive finding there, what -- what -- is

21   that consistent with what you're seeing in

22   the rodent data for glyphosate?

23       A.     Partially.  Obviously it's --

24   it's addressing the question of promotion,

25   which means that you already have these

Confidential - Pursuant to Protective Order

1    initiated cells.  Living can cause mutations

2    to occur.  And so it's conceivable that

3    glyphosate, all of these tumor findings we

4    are seeing here, are glyphosate promoting out

5    already effects.  I don't think it's likely,

6    but it's conceivable that's the case.

7              The initiation/promotion study

8    is simply showing you that in one system, the

9    skin, glyphosate has this ability to promote

10   out cancer.  That's all it really means.

11        Q.    Well, let's -- hypothetically

12   speaking, let's say an individual has a

13   mutated cell caused by, like you said, life,

14   or like a viral infection or something.  Does

15   the George study -- I don't know.  You tell

16   me.  Does it have any influence on whether or

17   not it could promote a mutation to lead to

18   cancer?

19        A.    It certainly increases the

20   chances that that might be the case because

21   now you have evidence to suggest glyphosate

22   can do that -- this.  But I'd want to see a

23   lot more evidence before I'd go there and

24   start thinking about that.

25              There are initiation/promotion

Confidential - Pursuant to Protective Order

1    studies you can do in the liver.  There are

2    initiation/promotion studies you can do in

3    the brain.  I'd like to see a little more

4    work along those lines.

5              And then looking at the other

6    mechanistic evidence, I'd have to conclude

7    that even though it wasn't an initiator in

8    the skin, I'd want to look more closely at

9    why it didn't come out as an initiator in the

10   skin because theoretically it probably should

11   have.

12       Q.    Okay.  You mentioned that you'd

13   like to see more initiation and promotion

14   studies in other sort of organs.

15             Have any of those been done?

16       A.    Not that I'm aware of.  I would

17   have hopefully picked them up in my search of

18   the literature, and I haven't seen any.

19       Q.    Okay.  All right.  So going

20   back to our causation stool here, we spent

21   some time on animal studies.  And we talked

22   about the initiation and promotion study, and

23   that kind of got us into this next section,

24   which is the mechanism studies.

25             What do you mean by mechanism?

Confidential - Pursuant to Protective Order

```
 1                     CERTIFICATE

 2

 3          I, CARRIE A. CAMPBELL, Registered
     Diplomate Reporter, Certified Realtime
 4   Reporter and Certified Shorthand Reporter, do
     hereby certify that prior to the commencement
 5   of the examination, Christopher J. Portier,
     Ph.D., was duly sworn by me to testify to the
 6   truth, the whole truth and nothing but the
     truth.

 7

            I DO FURTHER CERTIFY that the
 8   foregoing is a verbatim transcript of the
     testimony as taken stenographically by and
 9   before me at the time, place and on the date
     hereinbefore set forth, to the best of my
10   ability.

11          I DO FURTHER CERTIFY that I am
     neither a relative nor employee nor attorney
12   nor counsel of any of the parties to this
     action, and that I am neither a relative nor
13   employee of such attorney or counsel, and
     that I am not financially interested in the
14   action.

15

17          _____
            CARRIE A. CAMPBELL,
18          NCRA Registered Diplomate Reporter
            Certified Realtime Reporter
19          California Certified Shorthand
            Reporter #13921
20          Missouri Certified Court Reporter #859
            Illinois Certified Shorthand Reporter
21          #084-004229
            Texas Certified Shorthand Reporter #9328
22          Kansas Certified Court Reporter #1715
            Notary Public

23
            Dated:  February 22, 2019
24

25
```

Exhibit 3

Volume 11

Pages 1564 - 1911

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

EDWARD HARDEMAN,                )
                                )
          Plaintiff,            )
                                )
  VS.                           )      NO. C 16-00525 VC
                                )
MONSANTO COMPANY,               )
                                )
          Defendant.            )
_____)


                          San Francisco, California
                          Monday, March 11, 2019

                     **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                    ANDRUS WAGSTAFF PC
                    7171 W. Alaska Drive
                    Lakewood, Colorado  80226
                BY: **AIMEE H. WAGSTAFF, ATTORNEY AT LAW**
                    **DAVID J. WOOL, ATTORNEY AT LAW**

                    MOORE LAW GROUP
                    1473 South 4th Street
                    Louisville, Kentucky  40208
                BY: **JENNIFER MOORE, ATTORNEY AT LAW**


            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Marla F. Knox, RPR, CRR
              Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporters

1    wouldn't have caused the cancer, they both combined to cause

2    the cancer.  And I don't think there was anything close to

3    testimony suggesting that, right?

4        **MS. MOORE:**  I mean, no.  Well, Dr. Portier

5    testified -- you will recall the George study, Your Honor, from

6    2010.  And Dr. Portier talked about Roundup is also a promoter

7    not just an initiator.  That was the mouse study where they put

8    Roundup on the skin of the mice.

9        And what they found in that study was that not only was

10   Roundup an initiator of the cancer cells, but it is also a

11   promoter of the cancer cells.  So we absolutely have evidence

12   before the jury that if they believe what Dr. Levine said

13   today, which is that the -- I think her word was "accident" --

14   happened somewhere in the 39-year period where the genetic

15   mutation formed, there is absolutely proof in the case that

16   Roundup could have been a promoter of that genetic mutation

17   that had been caused --

18       **THE COURT:**  But did Dr. Portier actual offer that

19   opinion?  Because I don't think -- I mean, he was talking about

20   it in the context of this one study.  But did he ever actually

21   offer an opinion that said, Number 1, I believe that Roundup

22   caused the NHL; but Number 2, even if you believe that hep C

23   caused the NHL, I believe that Roundup or hep C sort of caused

24   an initial genetic mutation that set off a chain reaction,

25   I believe that Roundup contributed to that chain reaction and,

PROCEEDINGS

1    therefore, resulted in Mr. Hardeman getting cancer?

2        I don't remember any testimony to that effect.

3        **MS. MOORE:**  I don't think -- well, I don't think he

4    said to that direct of a point, Your Honor.  But I don't think

5    he has to.  What he offered to the jury was evidence that

6    Roundup has been proven by the science to be an initiator and a

7    promoter.  And so that gives us the ability to make that

8    argument in closing arguments that Roundup -- if you believe

9    what the defense says.  I'm not saying that that's what we say.

10        But if you believe what the defense says, that Dr. Levine

11   says that he had this genetic mutation and it did not -- caused

12   by hep C, and it didn't go away with therapy, it stayed in his

13   testimony.  But he is also at the same time being exposed to

14   Roundup.  And we know from Dr. Portier's testimony that Roundup

15   is also a promoter of precancer and cancer.

16        And so absolutely we can make that argument in closing and

17   present that to the jury.  And so I do think in that situation

18   that it is only right that Option 1 be given versus Option 2.

19        **THE COURT:**  But you -- I mean, it seems a little

20   strange.  I mean, I understand the concept of taking little

21   snippets from different fact witnesses' testimony and then

22   putting together a theory for what happened.  But the purpose

23   of expert testimony is to get them up on the stand offering an

24   opinion.  And you seem to be saying, Even if you disagree with

25   Dr. Portier's opinion, you can take this little snippet from

1   his opinion that -- where he commented on a mouse study.

2   And -- the George study was a mouse study, right?

3        **MS. MOORE:**  Right.

4        **THE COURT:**  -- and, you know, you can use that to

5   conclude that even if the Defendants are right that hep C

6   caused the genetic mutation that led to the NHL, that -- that

7   the Roundup accelerated that process, isn't that the kind of

8   thing that you need expert testimony to support?

9        **MS. MOORE:**  Well, I think we have expert testimony

10  that Roundup is a promoter.  That is clear, and it is

11  undisputed in this case.  As you will recall, they have not

12  brought in one witness to dispute the animal studies in this

13  case.

14      And so that is the evidence undisputed.

15       **THE COURT:**  Where is his -- can you show me where his

16  testimony is?

17       **MR. KILARU:**  Your Honor, while that is happening, can

18  I make a broader point about the George study; is that okay?

19       **THE COURT:**  Sure.

20       **MR. KILARU:**  So I think the most fundamental point

21  here is that Dr. Portier wasn't a case-specific expert.  He was

22  by definition a general causation expert.  And in the context

23  of his testimony, he mentioned that there's this mouse study

24  that says if you paint one chemical on a mouse's skin and then

25  you paint another chemical, it can promote tumor activity.

1    That has nothing to do and was not in any way tied to

2   hepatitis C.  It has nothing to do with the conditions that

3   Mr. Hardeman had.  And I know we're not getting into what

4   regulators say, even IARC thinks the George study is not

5   particularly credible and I think discredited it and didn't

6   rely on it in its monograph.

7    That's sort of more of a side point.  I think they also

8   called Dr. Weisenburger; and if they had this belief that the

9   George study -- I mean, Dr. Weisenburger opined on all the

10  science, including general causation.  If they had a belief

11  that there was some validity to this theory that George shows

12  that somehow Roundup promotes hepatitis C activity, you would

13  think they would ask him something about that or even talk

14  about the George study at all, but that didn't happen.  So I

15  don't think that can be a basis for justifying a jury

16  instruction.

17   **THE COURT:**  And I'm happy to hear what Portier's

18  testimony said, but I think that you have to be right,

19  particularly given that Portier was just a general causation

20  expert, that they actually -- I mean, this is a discussion

21  about the jury instructions, but it's also a discussion about

22  what can be argued to the jury and what cannot.  And it seems

23  to me -- I don't see how they could argue to the jury that the

24  Roundup accelerated the process by which hep C gave

25  Mr. Hardeman cancer.

1    **THE COURT:**  And then task Number 2 is to get back to

2    this instruction and figure out if we -- if we can have -- if

3    we should be having some concurrent independent cause-type

4    instruction, as opposed to a concurrent independent cause,

5    which is what you are now arguing.

6    **MS. MOORE:**  I understand, Your Honor.

7    As to the first question, I do have Dr. Portier's

8    testimony pulled up now.  This appears on line -- I'm sorry,

9    page 156, and it is lines -- let's see -- starting at line 18,

10   and it goes on through page 157.

11   Dr. Portier was asked about the George study in particular

12   and said:  Is that consistent with what you are seeing in the

13   rodent data for glyphosate?  And he says, Partially.  Obviously

14   it is addressing the question of promotion, which means that

15   you already have these initiated cells.  Living can cause

16   mutations to occur.  And so it is conceivable that glyphosate,

17   all of these tumor findings we are seeing here are glyphosate

18   promoting out already effects.

19   And he continues on --

20   **THE COURT:**  That was his testimony?

21   **MS. MOORE:**  This is Dr. Portier's testimony.

22   **THE COURT:**  It is conceivable?

23   **MS. MOORE:**  Yes.

24   **THE COURT:**  Okay.

25   **MS. MOORE:**  And then he continues on, Your Honor.  I

PROCEEDINGS

```
1   can keep going if you want me to, but -- he says:  Promoting

2   out already effects.  He goes, I don't think it is likely, but

3   it is conceivable that's the case.  The initiation promotion

4   study is simply showing you that one system --

5           THE COURT:  Wait.  You said -- wait.  Sorry.  Could

6   you read that one more time?

7           MS. MOORE:  Sure.  He goes, I don't think it is likely

8   but it is conceivable that's the case.

9           THE COURT:  What is conceivable that that's the case?

10  Can you refer back to the testimony that he is saying is not

11  likely but conceivable?

12          MS. MOORE:  Yes.  That is the initiation -- the

13  question of promotion, Your Honor.

14          THE COURT:  Okay.

15          MS. MOORE:  The very first part of his answer is it is

16  addressing the question of promotion.

17          THE COURT:  So he is saying he doesn't think it is

18  likely that it is promoting?

19          MS. MOORE:  He says it is conceivable that's the case,

20  and he continues.  He says:  The initiation promotion study --

21          THE COURT:  Wait, wait.  You just skipped over

22  something.  It is -- okay.  Read it again.

23          MS. MOORE:  Sure.  Okay.  I will start at the very

24  beginning, Your Honor.

25          THE COURT:  Yeah.
```

1            **MS. MOORE:**  Okay.  Let me back up.

2        This is the very beginning of his answer, and it starts at

3    156, line 23.  Partially.

4        Let me read the question because I think that's part --

5    156, 18:  Well, then let me ask you this question.  The George

6    study, this positive finding there, what is that consistent

7    with what you are seeing in the rodent data for glyphosate?

8        And the answer is:  Partially.  Obviously it is addressing

9    the question of promotion, which means that you already have

10   these initiated cells.  Living -- I don't know why it says

11   living here -- living can cause mutations to occur.  And so it

12   is conceivable that glyphosate, all of these tumor findings we

13   are seeing here are glyphosate promoting out already effects.

14   I don't think it's likely but it is conceivable that's the

15   case.

16       And then he continues:  The initiation promotion study is

17   simply showing you that in one system, the skin, glyphosate has

18   this ability to promote out cancer.  That is all it really

19   means.

20       So --

21            **THE COURT:**  So there is no expert testimony that would

22   support an argument -- I mean, if that's all you have --

23            **MS. MOORE:**  No, I don't, Your Honor.

24            **THE COURT:**  Okay.

25            **MS. MOORE:**  If you continue on to page 157 at line 16,

1    he is asked:  Does it have any influence -- meaning it, the

2    George study -- have any influence on whether or not it could

3    promote a mutation to lead to cancer?

4        And Dr. Portier's answer is:  It certainly increases the

5    chances.  That might be the case because now you have evidence

6    to suggest glyphosate can do that.  But I would want to see a

7    lot more evidence before I would go there and start thinking

8    about that.  There are initiation promotion studies you can do,

9    and he continues on for a while about initiation promotion

10   studies.

11       **THE COURT:**  Okay.  So what you just read me is sort of

12   the opposite of evidence to support the argument that you are

13   proposing to make.  I mean, it's an expert who is not willing

14   to offer any sort of opinion remotely close to the argument

15   that you are proposing to make, putting -- even putting aside

16   the fact that it was just general causation testimony and not

17   specific causation and not related to hep C at all.

18       So if that's your evidence to support your argument that

19   Roundup and hep C combined to cause his cancer, you cannot make

20   that argument at closing.

21       **MS. MOORE:**  I understand, Your Honor.  I would just

22   reserve because that was on the fly, me just searching quickly

23   on the iPad to find those two references.  I would want to go

24   back and look at Dr. Portier's testimony.

25       **THE COURT:**  That's fine.  But the ruling now is that

**PROCEEDINGS**

1    you cannot make that argument.  So as you are preparing your

2    closing argument tonight, you cannot make that argument.

3            **MS. MOORE:**  I understand, Your Honor.

4        Let me go back to the jury instruction issue I think

5    regardless of the George study and Dr. Portier's testimony on

6    that, that California law is very clear that this is a

7    substantial factor, and that the but-for does not apply here.

8    And that's why I cited the Limansky case, Your Honor.

9            And I would just point out that in that case what happened

10   at the trial level is that the jury found -- and this was a

11   medical malpractice case --

12           **THE COURT:**  Is this something -- are you citing to the

13   Court of Appeals' opinion in this case?

14           **MS. MOORE:**  Yes, Your Honor.

15           **THE COURT:**  Okay.  So where are you describing from?

16           **MS. MOORE:**  Well, Your Honor, this is at the very

17   beginning the summary of that, and it's -- the first paragraph

18   it starts with This is a medical malpractice case.

19           **THE COURT:**  Okay.

20           **MS. MOORE:**  Okay.  And if you go -- it is the

21   second-to-the-last sentence in that paragraph.  It says:

22   Following a trial during which the trial Court refused to give

23   a jury instruction on concurrent causation, the jury found that

24   while Dr. Limansky was indeed negligent in his care of Cynthia,

25   such negligence was not a cause of her death.

PROCEEDINGS

```
 1            MR. KILARU:  Thank you.

 2                (Proceedings adjourned at 6:38 p.m.)

 3                        ---oOo---

 4

 5              CERTIFICATE OF REPORTERS

 6        I certify that the foregoing is a correct transcript

 7   from the record of proceedings in the above-entitled matter.

 8

 9   DATE:   Monday, March 11, 2019

10

11

12

13   _____

14     Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
          U.S. Court Reporter
15

16

17   _____

18        Marla F. Knox, RPR, CRR
          U.S. Court Reporter
19

20

21

22

23

24

25
```

Exhibit 4

1                MONTANA EIGHTEENTH JUDICIAL DISTRICT COURT
                              GALLATIN COUNTY
2

3

   ROBERT CAZIER and JANE CAZIER,
4
              Plaintiffs,
5
         v.                                 Case No. DC-17-883C
6
   MONSANTO COMPANY, a corporation,
7  and ROCKY MOUNTAIN SUPPLY, INC.,
   a corporation,
8
              Defendants.
9  _____

10        *****  C O N F I D E N T I A L  *****

11        V I D E O   D E P O S I T I O N

12                      o f

13             WILLIAM SAWYER, Ph.D.

14          taken on behalf of Defendants

15

      DATE:         April 30, 2019
16
      TIME:         9:06 a.m. to 2:30 p.m.
17
      PLACE:        2173 Periwinkle Way
18                  Sanibel, Florida  33957

19
      BEFORE:       Dawn A. Hillier, RMR, CRR, CLR
20                  Notary Public - State of
                    Florida, at Large
21
      JOB NO:       240319
22

23

24

25

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
Transcript of William Sawyer, Ph.D.
Conducted on April 30, 2019                    2

```
1    APPEARANCES:

2

3    ATTORNEY FOR PLAINTIFFS

4         AIMEE WAGSTAFF, ESQUIRE
          ANDRUS WAGSTAFF, P.C.
5         7171 W. Alaska Drive
          Lakewood, Colorado  80226
6         303.376.6360

7

8    ATTORNEYS FOR DEFENDANTS

9         JOHN KALAS, ESQUIRE
          MARCHELLO GRAY, ESQUIRE
10        HOLLINGSWORTH LLP
          1350 I Street, NW
11        Washington, DC  20005
          202.898.5800

12

13

14   ALSO PRESENT:

15        LaJuana Pruitt, Videographer

16

17

18

19

20

21

22

23

24

25
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
Transcript of William Sawyer, Ph.D.
Conducted on April 30, 2019                                3

```
1                          INDEX

2                                              PAGE

3  WITNESS - WILLIAM SAWYER, Ph.D.               5
   DIRECT EXAMINATION BY MR. KALAS               5
4  CROSS EXAMINATION BY MS. WAGSTAFF           208
   REDIRECT EXAMINATION BY MR. KALAS           216
5  CERTIFICATE OF OATH                         224
   REPORTER'S CERTIFICATE                      225
6

7                        EXHIBITS

8  Exhibit 139  TCAS, LLC, document              6

9  Exhibit 140  Notice of Deposition            10

10 Exhibit 141  Dr. Sawyer's case list          12

11 Exhibit 142  Dr. Sawyer's curriculum vitae   13

12 Exhibit 143  Table 1                         13

13 Exhibit 144  Dr. Sawyer's billing records    17

14 Exhibit 145  EPA Reregistration Eligibility  75
        Decision, glyphosate
15
   Exhibit 146  Plaintiffs' expert disclosures  87
16
   Exhibit 147  Rebuttal disclosures            87
17
   Exhibit 148  Robert Cazier's deposition of   95
18      December 20, 2018

19 Exhibit 149  Acquavella study                98

20 Exhibit 150  Study by Wester                127

21 Exhibit 151  Guidance Document for the      129
        Conduct of Skin Absorption Studies, OECD
22      Series on Testing and Assessment

23 Exhibit 152  Guidance notes on dermal       135
        absorption
24
   Exhibit 153  Glyphosate use and cancer      148
25      incidence in the agricultural health
        study
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
Transcript of William Sawyer, Ph.D.
Conducted on April 30, 2019                    4

1    Exhibit 154  Risk of cancer among          159

2         firefighters in California, 1988 - 2007

3    Exhibit 155  Leukemia & Lymphoma Society,   169
          Firefighters and Cancer Risk
4
5    Exhibit 156  McDuffie study                 171

6    Exhibit 157  Article by Eriksson, Pesticide 181
          exposure as risk factor for non-Hodgkin
          lymphoma including histopathological
7         subgroup analysis

8    Exhibit 158  MSDS for Bison                 183

9    Exhibit 159  Purchase records               189

10   Exhibit 160  Goldsky MSDS                   190

11   Exhibit 161  MSDS for Mustang Maxx          193
          Insecticide
12
     Exhibit 162  International Journal of       206
13        Epidemiology study by Maria E. Leon

14   Exhibit 163  Article by Jose V. Tarazona,   216
          glyphosate toxicity and carcinogenicity,
15        a review of the scientific basis of the
          European Union assessment and its
16        differences with IARC

17   Exhibit 164  Box of materials (retained)    221

18

19             REPORTER'S KEY TO PUNCTUATION:

20   --  At end of question or answer references

21        interruption.

22   ...  References a trail-off by the speaker.

23        No testimony omitted.

24   "Uh-huh" "Um-hum" References affirmative sound.

25   "Huh-uh" "Um-um"  References negative sound.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
Transcript of William Sawyer, Ph.D.
Conducted on April 30, 2019                    5

| | | |
|---|---|---|
| 1 | THE VIDEOGRAPHER:  Here begins media unit one | 09:05:30 |
| 2 | to the videotaped deposition of William Sawyer, | 09:05:32 |
| 3 | Ph.D., taken in the matter of Robert Cazier versus | 09:05:37 |
| 4 | Monsanto Company to be heard before the 18th | 09:05:41 |
| 5 | Judicial District Court for Gallatin County, | 09:05:44 |
| 6 | Montana, Case No. DC-17-883C.  Today's date is | 09:05:46 |
| 7 | April the 30th, the year 2019.  The time is | 09:05:54 |
| 8 | 9:06 a.m.  Our videographer is LaJuana Pruitt | 09:05:57 |
| 9 | representing Planet Depos.  This video deposition | 09:06:05 |
| 10 | is taking place at 2173 Periwinkle Way in Sanibel, | 09:06:07 |
| 11 | Florida.  Will counsel please introduce themselves, | 09:06:12 |
| 12 | beginning with plaintiff counsel. | 09:06:14 |
| 13 | MS. WAGSTAFF:  Aimee Wagstaff on behalf of | 09:06:16 |
| 14 | plaintiff. | 09:06:18 |
| 15 | MR. KALAS:  John Kalas and Marchello Gray on | 09:06:20 |
| 16 | behalf of Monsanto. | 09:06:23 |
| 17 | THE VIDEOGRAPHER:  And will the court | 09:06:24 |
| 18 | reporter, Dawn Hillier, please swear in the | 09:06:25 |
| 19 | witness. | 09:06:26 |
| 20 | WILLIAM SAWYER, Ph.D., | 09:06:27 |
| 21 | was called as a witness, and having first been duly | 09:06:27 |
| 22 | sworn, was examined and testified as follows: | 09:06:27 |
| 23 | THE WITNESS:  Yes, I do. | 09:06:37 |
| 24 | COURT REPORTER:  Thank you. | 09:06:39 |
| 25 | DIRECT EXAMINATION | 09:06:39 |

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
Transcript of William Sawyer, Ph.D.
Conducted on April 30, 2019                                    145

| | | |
|---|---|---|
| 1 | of whether or not glyphosate can cause cancer in and of | 12:42:20 |
| 2 | itself, in other words, initiate, you're relying on | 12:42:25 |
| 3 | human studies, animal studies, genotoxicity studies, and | 12:42:28 |
| 4 | exposure studies; right? | 12:42:33 |
| 5 |     A     All of the factors of Bradford Hill.  That's | 12:42:34 |
| 6 | correct. | 12:42:36 |
| 7 |     Q     Okay.  And in the case of whether or not | 12:42:37 |
| 8 | glyphosate can promote non-Hodgkin's lymphoma that may | 12:42:39 |
| 9 | be initiated by some other cause, you are not relying on | 12:42:42 |
| 10 | any human studies there.  Instead, you are relying on | 12:42:45 |
| 11 | animal studies, genotoxicity studies, and exposure | 12:42:48 |
| 12 | studies, perhaps? | 12:42:52 |
| 13 |     A     Only with respect to promotion of the | 12:42:54 |
| 14 | malignant process.  Now, claiming that a chemical is a | 12:42:56 |
| 15 | carcinogen without human studies, I'm not doing that. | 12:43:07 |
| 16 |        I'm stating that a promoter is determined | 12:43:11 |
| 17 | using animal studies, animal bioassays. | 12:43:13 |
| 18 |        It's not -- not reasonable or even possible. | 12:43:17 |
| 19 | I can't even think of an example where epidemiologic | 12:43:20 |
| 20 | studies have been run to determine if a chemical's a | 12:43:24 |
| 21 | promoter. | 12:43:27 |
| 22 |     Q     Okay.  Is it -- I think we've talked about | 12:43:27 |
| 23 | this before.  There are lots of carcinogens -- or strike | 12:43:32 |
| 24 | that. | 12:43:36 |
| 25 |        Naphthalene.  We talked about naphthalene | 12:43:37 |

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
Transcript of William Sawyer, Ph.D.
Conducted on April 30, 2019                          224

```
1                          CERTIFICATE OF OATH

2

3    STATE OF FLORIDA  )

4    COUNTY OF LEE )

5

6        I, the undersigned authority, certify that WILLIAM

7    SAWYER, PH.D. personally appeared before me and was duly

8    sworn.

9        WITNESS my hand and official seal this 2nd day of

10   May, 2019.

11

12

13   _____
     DAWN A. HILLIER, RMR, CRR, CLR
14   Notary Public - State of Florida
     My Commission No.:  GG 259309
15   Expires:  12-15-2022

16

17

18

19

20

21

22

23

24

25
```