# EXHIBIT 4



Deposition of
# Stephen E. Petty, P.E., C.I.H., C.S.P.

## Volume I

**Date:** July 9, 2019

**Case:** WALTER WINSTON, et al. v. MONSANTO COMPANY

**No.** 1822-CC0515

**Court Reporter:**  Matthew McKinney, FPR

Paszkiewicz Court Reporting
Phone:  618-307-9320
Toll-Free:  855-595-3577
Fax:  618-855-9513

Page 1

IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
STATE OF MISSOURI


WALTER WINSTON, et al.,

            Plaintiffs,

 vs.                              CASE NO.: 1822-CC0515

MONSANTO COMPANY,

            Defendant.
_____/


VIDEOTAPED DEPOSITION OF
STEPHEN E. PETTY, P.E., C.I.H, C.S.P.

Taken on Behalf of the Defendant, Monsanto Company

VOLUME I



DATE TAKEN:   Tuesday, July 9, 2019

TIME:         9:56 a.m. - 5:01 p.m.

LOCATION:     Regus, Cypress Park West
              6750 North Andrews Avenue
              Suite 200
              Fort Lauderdale, Florida  33309






Examination of the witness taken before:

Matthew McKinney, FPR

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

## Page 2

APPEARANCES OF COUNSEL

On behalf of the Winston Plaintiffs:
    JERRY KRISTAL, Esquire
    Weitz & Luxenberg
    Cherry Hill Office
    220 Lake Drive East
    Suite 210
    Cherry Hill, New Jersey 08002
    (856) 755-1115
    Jkristal@weitzlux.com

    and

    ROBIN L. GREENWALD, Esquire
    Weitz & Luxenberg
    New York Office
    700 Broadway
    New York, New York 10003
    (212) 558-5500
    Rgreenwald@weitzlux.com

On behalf of the Defendant, Monsanto Company:
    ANTHONY N. UPSHAW, Esquire
    and
    MELISSA R. ALVAREZ, Esquire
    McDermott Will & Emery, LLP
    333 Southeast 2nd Avenue
    Suite 4500
    Miami, Florida 33131
    (305) 347-6540
    Aupshaw@mwe.com
    malvarez@mwe.com

Also Present:
    Thomas Olender, Videographer

## Page 3

### INDEX

WITNESS: STEPHEN E. PETTY                          PAGE
Direct Examination by Mr. Upshaw              6
Certificate of Oath                        238
Certificate of Reporter                    239

### INDEX TO EXHIBITS

DEFENDANT'S        DESCRIPTION         PAGE
Exhibit 1  Mr. Petty's CV           10
Exhibit 2  Composite, EES Group invoices    12
Exhibit 3  Letter to Carol Moore from EES Group,   15
    dated 1/26/18, re: Stephen Petty Expert
    Witness Consulting Agreement and Support
    Package

Exhibit 4  Summary of Expert Witness Cases - Stephen  18
    Petty
Exhibit 5  Defendant Monsanto Company's Notice of    41
    Taking Videotaped Deposition of Stephen
    E. Petty, P.E., C.I.H., C.S.P.
Exhibit 6  Stephen E. Petty Roundup Cases Reliance   45
    Materials

Exhibit 7  Factual Summary In Support Of Expert     77
    Opinions
Exhibit 8  Corrections to Factual Summary       78
Exhibit 9  Plaintiffs' Amended Disclosure of Expert  102
    Testimony

## Page 4

### INDEX TO EXHIBITS
(Continued)

DEFENDANT'S        DESCRIPTION        PAGE
Exhibit 10 "Glyphosate use and associations with    115
    non-Hodgkin lymphoma major historical
    sub-types: findings from the North
    American Pooled Project" by Pahwa
    Freeman, et al.
Exhibit 11 "Statement from Health Canada on       118
    Glyphosate"

Exhibit 12 "Proposed Interim Registration Review   121
    Decision, Case Number 0178" dated 4/2019
Exhibit 13 Summary of information drawn from       174
    plaintiff interviews and calculations
    of exposure time
Exhibit 14 Code of Federal Regulations, Part 170   219
        - - -

## Page 5

THE VIDEOGRAPHER:  This is the videotaped deposition of Stephen E. Petty.  Today's date is July 9, 2019.  The time is 9:56 a.m.  This is the case of Walter Winston, et al., plaintiffs, versus Monsanto Company, defendant, case number 1822-CC0515.  This case is pending in the Circuit Court of the City of St. Louis, State of Missouri.

My name is Thomas Olender.  I'm representing Paszkiewicz Court Reporting.  The court reporter is Matt McKinney, also representing Paszkiewicz Court Reporting.  This deposition is taking place at Regus, 6750 North Andrews Avenue, Suite 200, Fort Lauderdale, Florida.

Starting with the noticing counsel, will counsel please identify yourselves and state your appearances for the record?

MR. UPSHAW:  Sure.  Anthony Upshaw and Melissa Alvarez on behalf of the defendant.

MR. KRISTAL:  Jerry Kristal from Weitz & Luxenberg, on behalf of the Winston plaintiffs.

MS. GREENWALD:  Robin Greenwald for the plaintiffs also.

THE VIDEOGRAPHER:  Okay.  Will the court reporter please swear the witness?

2 (Pages 2 to 5)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 6

1    THE REPORTER:  Do you solemnly swear or affirm
2  that the testimony you're about to give in this
3  case will be the truth, the whole truth and nothing
4  but the truth?
5    THE WITNESS:  I do.
6    THE REPORTER:  Thank you.
7      STEPHEN E. PETTY,
8  having been first duly sworn and responding "I do,"
9  testified as follows:
10     DIRECT EXAMINATION
11  BY MR. UPSHAW:
12    Q.  Good morning, Mr. Petty.
13    **A.  Good morning.**
14    Q.  We're going to do our best, over the course of
15  the next three days, to cover as much of this material
16  as we possibly can.  As you know, we've got a number of
17  plaintiffs whom you have opinions about, so if there's
18  areas that we don't get to, then we'll work to get us
19  finished at some other time, but we'll do our best.
20  Okay?
21    **A.  That's up to you guys.**
22    Q.  Okay.  That's fine.
23    MR. KRISTAL:  We will certainly deal with that
24  issue if we have to --
25    MR. UPSHAW:  Sure.

Page 7

1    MR. KRISTAL:  -- whenever we have to.
2    MR. UPSHAW:  I don't remember, but in Missouri
3  I think we have to state that all objections except
4  as to form are preserved until the time of trial.
5  That's how it is in California, but maybe not here.
6  Anything else, Counsel, before we get rolling
7  here?
8    MR. KRISTAL:  Nope.
9    MR. UPSHAW:  Perfect.
10  BY MR. UPSHAW:
11    Q.  Mr. Petty, would you state your full name for
12  our record, please?
13    **A.  Yes.  My name is Stephen, S-t-e-p-h-e-n,**
14  **Petty, P-e-t-t-y.**
15    Q.  Okay.  Can you give me your business address?
16    **A.  There are multiple.  But in Florida, it's 1701**
17  **East Atlantic Boulevard, Suite 5, Pompano Beach, Florida**
18  **33060.**
19    Q.  Is this the first time you have been deposed
20  in the glyphosate litigation?
21    **A.  It is.**
22    Q.  Okay.
23    **A.  Well, yeah, I was sitting ready for one, but**
24  **it got cancelled.  But, yes, it's the first time we're**
25  **moving forward.**

Page 8

1    Q.  Okay.  But this is the first time you've
2  actually had to sit and be deposed for any of the
3  litigation; correct?
4    **A.  Well, I sat, but I didn't get deposed.  But,**
5  **yes, I guess we've finally started.**
6    Q.  All right.  We'll talk a little about that in
7  a minute.  You have been deposed on a number of
8  occasions previously; correct?
9    **A.  I have.**
10    Q.  Those involved benzene; correct?
11    **A.  Amongst others.  I mean, I've been deposed on**
12  **probably a dozen or more different situations.**
13    Q.  And benzene would be one of them; correct?
14    **A.  Correct.**
15    Q.  Oil spills would be another; correct?
16    **A.  I don't know about oil spills.  I've done**
17  **research on oil spills.  It's hard to tell.**
18    Q.  Okay.  Have you testified at trial before?
19    **A.  I have.**
20    Q.  On how many occasions?
21    **A.  I have no idea, but they're listed here on**
22  **this list of cases, if you want to make that an exhibit.**
23    Q.  Counsel, I brought four copies.
24      I'll get to it in a minute, but you've
25  obviously been deposed before; correct?

Page 9

1    **A.  Correct.**
2    Q.  So just so we go quickly over the ground
3  rules, which you know probably as well or better than we
4  do, that if I ask you a question, I assume you
5  understand the question, and if you do not understand
6  the question, please let me know.  Okay?
7    **A.  Okay.**
8    Q.  We can take a break whenever you want, as you
9  well know.  And if there is something in a particular
10  question that you'd like me to rephrase, I'm happy to do
11  so.
12    **A.  Great.**
13    MR. UPSHAW:  Now, we did request some
14  documents, some of which are going to be copied at
15  the break, right, Robin?
16    MS. GREENWALD:  I have five documents.
17  BY MR. UPSHAW:
18    Q.  All right.  And I understand you brought some
19  other documents with you this morning, specifically the
20  invoices that were requested?
21    **A.  I brought five or six sets of documents, yes.**
22  **I think that's one set of them.  If you don't trust my**
23  **secretary, you can see the originals, but I tried to**
24  **make copies.**
25    Q.  I think we're fine with the copies that you've

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 10

1  provided.
2      You've also copied for us the Plaintiffs'
3  Amended Disclosure of Expert Testimony.
4      MS. GREENWALD:  Oh, that was in there by
5  mistake.
6      It doesn't matter.  It makes no difference.
7      MR. UPSHAW:  Oh, okay.
8      THE WITNESS:  Should be the retention
9  agreement, billings, and any notices.
10 BY MR. UPSHAW:
11     Q.  All right.  We'll mark those in a second.
12 I think last night we were also provided a
13 copy of your CV.
14     Did you print that out?
15     A.  I brought four sets as well.
16     MR. UPSHAW:  Did we figure out, Ms. Greenwald,
17 that we have the right version now?
18     Let me do this.  Let me mark this as
19 Exhibit 1.
20     (Defendant's Exhibit 1 marked for
21 identification.)
22     MS. GREENWALD:  The second e-mail that I
23 sent -- the first one came from Nicole Thomas, and
24 that was an older one, and the one I sent you is
25 the updated one, if that helps.

Page 11

1      THE WITNESS:  And I brought you current ones,
2  whatever that means.
3  BY MR. UPSHAW:
4      Q.  Let me hand you what's been marked as
5  Exhibit 1.  I don't know if you need another copy.  Let
6  me just hand you the --
7      A.  I'll hand you these.
8      Q.  -- marked copies.
9      And let me ask you, Mr. Petty:  Is that a copy
10 of your current CV?
11     A.  I don't know.  I know those are.
12     Q.  I'll tell you what.  Why don't you take a
13 look, and we'll figure it out.
14     A.  You want me to read each page, each word?
15     Q.  If you need to, to confirm that that's a copy
16 of your CV, then go right ahead, sir.
17     A.  Okay.  I just thought it would be more
18 convenient to mark the ones that are current.
19     Q.  We're all on the same page.  Just give it a
20 look over, if you would.
21     MR. KRISTAL:  I don't know why we don't just
22 use the one that's current.
23     THE WITNESS:  This will take more time.
24     MR. KRISTAL:  You're not going to mark the
25 current one that he brought with him?  In other

Page 12

1  words, we have a current version --
2      MR. UPSHAW:  I think that is the current one.
3  I don't think there's any change.  I didn't think
4  it would take, you know, any time to flip through
5  the pages.  You can look, but...
6      MR. KRISTAL:  It would just be quicker to mark
7  the one that we know is current, but whatever.
8      THE WITNESS:  I'm just checking the last words
9  on each page.  Those last words seem to be the
10 same, so based on that, I would say they're the
11 same, but I haven't checked every word to make sure
12 they're the same.
13 BY MR. UPSHAW:
14     Q.  Okay.  Okay.  You've provided a copy of the
15 invoices, which we discussed.  I'm going to mark that
16 group of invoices and payments, which are stapled
17 together, as a Composite Exhibit 2.  I'm happy to mark
18 whatever one you want to mark, if that makes it easy.
19     (Defendant's Composite Exhibit 2 marked for
20 identification.)
21     A.  Where did you pull that?
22     Q.  Out of the folder that you handed us that says
23 "copy."
24     A.  Super.  That's correct.  I just want the
25 originals back.  That's all.

Page 13

1      MR. UPSHAW:  All right.  Do we have another
2  copy?  Because I'm going to ask him about these.
3  You know what, you have your own copy; right?
4      MR. KRISTAL:  There should be copies in the
5  folder.
6      MR. UPSHAW:  Oh, perfect.
7      MS. GREENWALD:  Yeah, we brought another one.
8      MR. UPSHAW:  Excellent.
9      THE WITNESS:  Well, that's the originals, I
10 think.
11     MS. GREENWALD:  Huh-uh.
12     THE WITNESS:  Oh, I have the originals.
13     MR. UPSHAW:  There we go.
14     THE WITNESS:  Yeah, yeah, good, so I have one
15 I can look at.  I brought three sets of copies.
16     MS. GREENWALD:  We're good.  That's your extra
17 copy.
18     MR. UPSHAW:  Thank you.
19 BY MR. UPSHAW:
20     Q.  Okay.  Mr. Petty, tell us what we have here in
21 Exhibit 2, if you would, please.
22     A.  You have it marked?
23     Q.  Yes, sir.  I'll hand it to you.
24     A.  It looks to be our invoicing regarding this
25 project as well as copies of payments that we received

4  (Pages 10 to 13)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 14

1  in context with those invoices.
2      Q.  And when you say "with regard to this
3  project," what are you referring to?
4      A.  The Monsanto Roundup project.
5      Q.  Okay.  Are these invoices specifically for
6  your work on the Winston case?
7      A.  It's the lead plaintiff in -- I guess it would
8  be the Winston case, but it's the lead plaintiff in a
9  series of -- my report would -- and work would apply to
10 the other plaintiffs, I guess.
11     Q.  Right.  You've seen the style of this case,
12 have you not, sir?
13     A.  I have.
14     Q.  Okay.  I think you are correct that the case
15 is styled Winston, et al., just so we can use that
16 nomenclature and we don't have to name all 14 or 15
17 plaintiffs now.
18     A.  Sure.  That's all I was trying to comment on.
19     Q.  Yes, sir.  So I'm not clear that we got a
20 direct answer.  So all these invoices are directed at
21 your work on the Winston case, the plaintiffs involved
22 in the Winston case?
23     A.  Yes.
24     Q.  Okay.  Now, there is a point here -- and
25 you'll see where it's tabbed with the yellow sticker at

Page 15

1  the top -- where your invoices were originally sent to
2  Ms. Greenwald and then they change -- or earlier, I
3  didn't look at the dates -- changed to another firm, is
4  that correct, Carol Moore?
5      A.  Right.  I was originally retained by -- if you
6  look at the original retention agreement, I was retained
7  by Levin Papantonio, but I was primarily working with
8  Robin.  And so, at some point, Robin directed us through
9  my office to send the invoices directly to her.
10     Q.  Okay.  Do you have a separate agreement signed
11 with Weitz & Luxenberg?
12     A.  I do not.
13         MR. UPSHAW:  I'll mark that agreement as
14 Exhibit 3, which I think you're familiar with.
15         (Defendant's Exhibit 3 marked for
16 identification.)
17         MR. KRISTAL:  Do you have another copy?
18         MR. UPSHAW:  Yeah, there's one in here.
19         MR. KRISTAL:  Thank you.
20         MS. GREENWALD:  There's one in here.
21         MR. KRISTAL:  In this folder?
22         THE WITNESS:  Yeah, at the back.  Should be at
23 the back.
24         MR. KRISTAL:  I have it.  Thank you.
25 BY MR. UPSHAW:

Page 16

1      Q.  Mr. Petty, this agreement you have that you
2  provided, dated January 26, 2018, it reflects your
3  current rate, sir?
4      A.  Let me check.
5          Yes, it does.
6      Q.  All right.  How many total hours have you
7  billed to date?
8      A.  I have no idea.
9      Q.  Okay.  Is it -- is all the time you've billed
10 reflected in Exhibit 2?
11     A.  We bill on a monthly basis, so as of the end
12 of June, that would be true.  Any time I've spent in
13 July, you wouldn't see yet.
14     Q.  Very well.  Okay.  And do you have an estimate
15 of how much time you expect to spend on the Winston
16 matter between now and the time of trial?
17         MR. KRISTAL:  Depends on how long you take.
18 I'm kidding.
19         MR. UPSHAW:  Well, I'll let the witness answer
20 as well.
21     A.  I don't.  I'm not aware of whether I would
22 spend any additional time, but that would depend on
23 counsel and if there were additional documents or they
24 wanted me to do additional work.
25 BY MR. UPSHAW:

Page 17

1      Q.  Okay.
2      A.  And, obviously, there would be some time
3  associated with prepping and going to trial, if it went
4  to trial.
5      Q.  Do you know when the trial is currently
6  scheduled for this case?
7      A.  I want to say October.
8      Q.  Okay.  And do you have any previous
9  engagements that would prevent you from appearing at
10 trial?
11     A.  No.
12     Q.  Okay.  You served as an expert for Levin
13 Papantonio previously?
14     A.  In one set of cases, I did, yes.
15     Q.  Okay.  What set of cases were those?
16     A.  The so-called DuPont C8 cases.
17     Q.  Right.  How long ago was that?
18     A.  It would be reflected in this list of
19 exhibit -- or cases that I was involved in.  Let me get
20 you the best answer I can get you.
21         I don't know that we marked this as an
22 exhibit.
23         MR. KRISTAL:  We have copies of this.
24         MR. UPSHAW:  Of the case list?
25         MR. KRISTAL:  Yes.

5 (Pages 14 to 17)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 18

1    MR. UPSHAW: Perfect. We'll mark one of
2  those.
3    MR. KRISTAL: Yeah, here's the copies for you
4  folks.
5    THE WITNESS: Counsel, what I'm referring to
6  is on page -- well, it hasn't been marked. Maybe I
7  should be quiet until it's marked.
8    (Defendant's Exhibit 4 marked for
9  identification.)
10 BY MR. UPSHAW:
11   Q. All right. It's now been marked as Exhibit 4,
12 which is a summary of expert witness cases --
13   A. Where I've been disclosed as a testifying
14 expert.
15   Q. All right. So you're referring to what, now?
16   A. These would only be cases where I've been
17 disclosed as a testifying expert. So those that I've
18 been retained on as a consulting expert, I wasn't
19 converted to a testifying expert here nor on cases where
20 I've been disclosed.
21   Q. Okay.
22   A. But moving to Exhibit 4, page 23, to answer
23 your original question, if you look at the second row on
24 page 23, it begins with Mr. Tim O'Brien, and -- are you
25 there?

Page 19

1    Q. Yes, sir. Go ahead.
2    A. And if you move to the third column, if I've
3  ever been deposed or I've testified in trial, it would
4  be listed in the third row -- or the third column, I
5  should say. And you'll see in this case that I was
6  deposed for the C8 cases on March 30th, 2015. I
7  testified in trials something approaching 12 days
8  between 2015 and early 2017. I probably began working
9  on these cases in late '13 or early '14. That would be
10 my best estimate.
11   Q. Okay. And over the course of your career, how
12 many times have you testified at trial, sir, do you
13 know?
14   A. They would all be listed here. So the
15 absolute answer is to go through the document and add
16 them up. But if you ask me to ballpark it, I would say
17 somewhere between 10 and 20 times. Most of them don't
18 go to trial.
19   Q. Okay. All right. Looking at Exhibit 4, these
20 are in reverse chronological order, so if I go to the
21 back, that's your newest cases?
22   A. I don't know if they're in reverse
23 chronological order, but as an engineer, I would say
24 they're in chronological order. I don't want to argue
25 with you, but the most recent ones are at the back.

Page 20

1    Q. That's what we're trying to get to.
2    A. That's the engineer in me.
3    Q. So the last two cases you have here on page
4  29, if I'm reading your chart correctly, you did not
5  provide any testimony, any deposition or trial testimony
6  in either of those two cases; is that correct?
7    A. That would be correct.
8    Q. And according to your work product, which is
9  Exhibit 4, the last time you were deposed was January of
10 2019 in the --
11   A. No. The last time I was deposed is at the top
12 of 28. It was a week ago for two days, a little over a
13 week ago, 6/25 and 6/26.
14   Q. Okay. And that's on your list somewhere?
15   MR. KRISTAL: It's on page 28.
16   A. I'm sorry. It's on the top of page 28, very
17 first trial.
18   Q. Oh, okay. So I see.
19   A. And I was deposed on 6/13, and I was deposed
20 on 6/4. There are some other ones that show up on 27
21 and 28.
22   Q. Got you.
23   A. I should say page 27 and page 28.
24   Q. All right. Now I'm understanding how you have
25 this set up. Okay.

Page 21

1    All right. I'll come back to that in a
2  minute.
3    In the 29-some pages you have of expert work
4  and testimony as a witness or expert, has all that work
5  been for the plaintiff?
6    A. No. There's been two or three cases that are
7  defense. Again, most -- I was retained as a consulting
8  expert on hundreds of cases for the insurance industry,
9  but they typically -- once they get the report, they
10 make a decision on what to do. They don't go further.
11   I would say on -- I wrote a book on how to --
12 on methodologies for disputed claims in the insurance
13 industry -- it's the fundamental textbook -- based on
14 about 5,000 projects. And I would say in the 2- or
15 3,000 projects I've worked on, maybe 10 I would -- maybe
16 10 went to litigation -- what I would call litigation,
17 and I think I was only deposed two times on those 5,000
18 projects.
19   So, typically, what happens on that side is
20 I'm retained as a consulting expert but I'm not
21 converted to a testifying expert. In terms of the ones
22 where I've been converted to a testifying expert, the
23 majority of those have been on the plaintiff's side.
24   Q. So my original question was: Out of the list
25 of testifying experts that you just provided in

6 (Pages 18 to 21)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 22

1    Exhibit 4, the vast majority, if not all of them, have
2    been for plaintiffs; correct?
3        A.  Sure.  I always say I think I'm pretty good; I
4    don't know why you guys don't use me.
5        Q.  Did you bring with you any communications with
6    Plaintiffs' counsel?
7        A.  I did not.
8        Q.  Okay.  Did you have communications --
9        A.  We have -- we have a written policy that's
10   been in place for almost 20 years where we delete all
11   e-mails within 30 days.  So, no, I don't have -- well,
12   the only communications I would have brought would have
13   been the duces tecum, if I pronounced that right, and
14   then -- I think that's it.
15       Q.  Okay.  So when you received documents and
16   materials from Plaintiffs' counsel, you don't maintain
17   the transmittal letter?
18       A.  That question's hard for me to answer because
19   I don't deal with that side of it.  I'm not trying to
20   duck your question.  What happens typically on expert
21   witness projects is that we will receive documents over
22   time, and they get put -- literally labeled as exhibits,
23   my so-called Appendix A, where I have -- we have
24   different versions of the word "exhibit."
25           But in my Appendix A, as they come in, my

Page 23

1    paralegal will enter them 1, 2, 3, et cetera.  For
2    matters of efficiency, et cetera, I typically wouldn't
3    write a report until somebody says, you know, we need a
4    report at a certain date, close of discovery, whatever,
5    and that's when I start to look at materials.  Sometimes
6    retention letters are contained in those lists of
7    exhibits, if they're with the package, but generally
8    not.
9        Q.  So do you --
10       A.  We do retain the -- whatever the materials are
11   that are sent to us, of course.
12       Q.  Understood.  So do you know whether or not,
13   Mr. Perry, when you received materials from Plaintiffs'
14   counsel, whether or not the retention letters are
15   retained?
16       A.  I'm Mr. Petty, by the way.
17       Q.  Did I not say "Mr. Petty"?
18       A.  You said "Mr. Perry."
19       Q.  Sorry.
20       A.  No worries.
21           I've seen them in with the list of exhibits at
22   times.  I don't think there's any intention not to
23   retain them.  I just -- I'm not -- I don't keep track of
24   that side of the equation, to be honest with you.  It's
25   part of the admin side.

Page 24

1        Q.  Okay.  Do you have a way of identifying
2    documents on your exhibit list that have been received
3    from Plaintiffs' counsel versus any other source?
4        A.  In this case, are you -- is that your
5    question?
6        Q.  Yes, sir.
7        A.  Yeah, I could go through them and have a
8    pretty good idea of which ones I received from
9    Plaintiffs' counsel versus those that I had put in
10   myself from my own sources.
11       Q.  Is there any way for me to identify those
12   documents rather than you going through every single one
13   of them?
14       A.  By and large -- well, for instance, the --
15   anything -- well, I shouldn't say anything.  Most of the
16   documents regarding Federal Registers come from me,
17   because 20 years ago we found a source somewhere that
18   had the Federal Registers from 1920 forward and we
19   downloaded them all, and they're in microfiche and
20   they're a pain to look at, but if you need to go find
21   one, you can.
22           So those certainly came from me.  Some of the
23   early MONGLY documents came from me as well because I
24   got them from the Right To Know website before I really
25   got anything from Plaintiffs' counsel.  There was about

Page 25

1    50 of those.  If they're not MONGLY -- if they don't
2    have a MONGLY sort of indication, typically -- and you
3    know what I'm saying by that, don't you, the Bates
4    number?
5        Q.  Let's make that clear.  When you say
6    "MONGLOY" (phonetic) or I say "MONGLY," you mean those
7    documents which have an M-O-N-G-L-Y suffix in the Bates
8    stamp?
9        A.  Yes, yes.  In general, those would have come
10   from Plaintiffs' counsel, not the early ones, but the
11   later ones would have.  And then what I usually will do
12   in the exhibits is, if I don't think the documents are
13   readily available -- the way I always write my
14   reports -- I know you haven't seen them before, but
15   they're always written in the same sort of style.
16           The references are materials that are either
17   textbooks or readily available papers.  And then the
18   exhibits, which is always Appendix A, are either
19   materials provided by counsel or they're documents that
20   I don't think are readily available, that I want to
21   refer to, and I will insert them there as well and make
22   those available to everyone.
23       Q.  When were you first hired to work on
24   glyphosate cases?
25       A.  Well, I think it would be indicated in the

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 26

1    retention agreement, which is our deposition Exhibit 3.
2    It looks like I signed it on February 9th, 2018, so it
3    would have been early -- well, it would have been early
4    February 2018.
5        Q.   Were you contacted by the Levin Papantonio
6    firm in 2017 about these cases?
7        A.   Candidly, I was contacted by a number of
8    attorneys back in '15, and I declined to work on these
9    cases for a while.
10       Q.   Okay.
11       A.   And then -- believe it or not, I'm trying to
12   retire.  I came to Florida to retire, not to work, and
13   it hasn't worked out that way.  But I'm down to a
14   handful of clients that I'll work for, and Levin
15   Papantonio made a strong case that they would really
16   like to retain me on these cases, and so I finally
17   agreed to do so.
18       Q.   When you say you declined to undertake
19   retention on these cases in 2015, can you explain to me
20   what you were referring to?
21       A.   I had other firms contact me to be involved
22   with Roundup, and I declined to participate in them at
23   that time.  I want to say it was in the '13, '14
24   timeframe.
25       Q.   And for what reason did you decline at that

Page 27

1    point?
2        A.   A combination of issues.  One, I was in the
3    middle of the C8 work, which was pretty time consuming.
4    And, secondly, I wanted to be able to do more homework
5    on the dermal side, and they had schedules such that
6    they said that wasn't workable, and I just said okay,
7    that's fine, then I'll pass.
8        In other words, they wanted a report or work
9    within a couple -- within six months, I know that for a
10   fact, and I just said that's not workable for me.
11       Q.   Okay.  Do you recall, after you -- well, did
12   you do any work on these cases before you signed the
13   agreement?
14       A.   If I did, it would be reflected in the
15   invoicing.  If I did, it was minimal.
16       Q.   Okay.  By the time you signed the agreement in
17   2018, you had some familiarity with glyphosate, is that
18   correct, based on what you just told us?
19       A.   I was aware of it because I'm sort of a dermal
20   expert.  That's what I'm known for.  And so I was -- I
21   had -- I realized that the Roundup cases were going to
22   be driven a lot by dermal exposures, so, yeah, I was
23   aware of, at least tangential.  I hadn't spent a lot of
24   time on it.
25       Q.   Did this retention agreement include working

Page 28

1    on the Neal case?
2        A.   I think initially --
3            MR. KRISTAL:  I would just advise you -- I
4    don't know the answer to the question, but if you
5    haven't been disclosed as a testifying expert,
6    then --
7            MR. UPSHAW:  That was the deposition that he
8    sat for and didn't go forward, so he was disclosed.
9            MR. KRISTAL:  In the Neo case, okay.
10           MR. UPSHAW:  Neal.
11           THE WITNESS:  Neal.
12           MR. KRISTAL:  Oh, I'm sorry.  I thought you
13   were talking about a different substance.  I
14   apologize.
15           MR. UPSHAW:  No.
16           MR. KRISTAL:  I thought you said "Neo."
17           MR. UPSHAW:  Oh, no, Neal.
18           MR. KRISTAL:  That's fine.
19           MR. UPSHAW:  He knew what I was talking about,
20   and you jumped right in there.
21           MR. KRISTAL:  I know what you're talking about
22   now that I hear you correctly.
23   BY MR. UPSHAW:
24       Q.   So go ahead, Mr. Petty.
25       A.   I'll let you guys figure it out.

Page 29

1        Q.   Do you need the question asked again, or do
2    you recall?
3        A.   No.
4        Q.   Okay.  Go ahead.
5        A.   I believe that's correct, that initially it
6    was -- the work, the initial work was subtitled Neal, et
7    al, or something like that.
8        Q.   Okay.  And for the case we're on today, the
9    Winston -- I'll say the Winston plaintiffs, did you use
10   some of that same work to develop your factual summary
11   for this matter that you developed in the Neal case?
12       A.   Well, I'm sure you know the answer to that
13   because I disclosed a report a couple days before I was
14   sitting for the last deposition, and so certainly a
15   large portion of the material that I have in my current
16   report was done by that point.
17       Q.   Okay.  And do the invoices -- I just want to
18   make sure.  Does any of the time that you've provided in
19   the invoices that you've provided today reflect work
20   that was done in the Neal matter?
21       A.   Well, certainly the -- I was looking at it
22   more as associated with the Roundup cases in general,
23   because that's the nature of what I was looking at, was
24   warnings and dermal exposure.  So I guess it's -- the
25   initial work was titled "Neal" and I'm not sure how the

8 (Pages 26 to 29)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 30

1 invoices were actually titled, but to me it's been a
2 continuum.
3 Q. I think you have them right there in front of
4 you.
5 A. Yeah. But, I mean, the work that would have
6 been invoiced prior to me sitting initially -- well, I
7 guess I sat, but I wasn't deposed -- would have been a
8 time where the titles of the cases were "Neal, et al.,"
9 but I don't think the invoices make that distinction.
10 Q. Well, on your more current invoices, you state
11 "Winston" specifically, and on the invoices that are
12 somewhat earlier, you just state "Monsanto expert
13 witness support," as far as I can see.
14 A. Well, that's true, but you drew the line in
15 the sand, if you will, with your marker here between the
16 invoices that went to Levin Papantonio and the invoices
17 that went to -- directly to Robin, Weitz & Luxenberg,
18 and all I'm saying is I believe that I -- I believe that
19 I sat in my Ohio offices for a deposition almost exactly
20 a year ago, so I think it was like 7/25 or something
21 like that, so it was a little bit later, but not much.
22 And so I'm just trying to reflect on that. It looks
23 like -- you can't really make that distinction based on
24 the titles on the invoices. That's all I'm telling you.
25 Q. Okay. That's fine.

Page 31

1 A. To me, it was a continuum of work looking at
2 the Monsanto documents with respect to labeling and
3 standard of care.
4 Q. All right.
5 All right. Let's turn to your CV, if we
6 might.
7 A. All right.
8 Q. Now that we've determined painstakingly that
9 this is the appropriate copy, is there anything you need
10 to add to this current CV that I think we have marked as
11 Exhibit 2? I don't have --
12 MR. KRISTAL: It's 1.
13 MR. UPSHAW: Is it 1?
14 MR. KRISTAL: Yeah.
15 THE WITNESS: It's 1.
16 MR. UPSHAW: Okay. Thank you.
17 THE WITNESS: No, I mean, it hasn't -- I'll be
18 honest with you. Getting old and being in my 60s
19 and having worked for 40 years, it hasn't changed
20 much in the last few years.
21 BY MR. UPSHAW:
22 Q. Sure. Okay. Let me run through it real
23 quick. This should be fairly quick and easy.
24 Your educational background, you have a
25 master's in chemical engineering; correct?

Page 32

1 A. And a bachelor's.
2 Q. And a bachelor's. You also have an MBA?
3 A. Correct.
4 Q. And what's the field of study?
5 A. MBA was behavioral marketing.
6 Q. Okay. You're a certified industrial
7 hygienist?
8 A. I am.
9 Q. You're a member of a couple different
10 associations with regard to CIH. What are those?
11 A. Well, I'm a member of the American Board of --
12 I don't know that the CIH is necessarily tied to the
13 organizations, but they're industrial hygiene
14 organizations. I'm a member of the American Board of
15 Industrial Hygiene, I believe, and then American
16 Industrial Hygiene Association and then American
17 Conference of Governmental Industrial Hygienists, ACGIH.
18 It used to be you could only be an associate member.
19 I'm not sure if the government -- they changed the rules
20 a few years back.
21 Q. Okay.
22 A. Guess they wanted more money. I've become a
23 member.
24 Q. You're also a certified safety professional?
25 A. I am.

Page 33

1 Q. What is that?
2 A. It's a -- the short version is you're an OSHA
3 expert.
4 Q. Okay.
5 A. That has some overlap with industrial hygiene
6 as well, but you're a safety expert.
7 Q. Safety expert?
8 A. Right.
9 Q. Okay. I'm unclear on what that means. Safety
10 with regard to what? Occupational safety? Playground
11 safety? I'm not sure what field you're talking about
12 when you say "safety."
13 A. It could be all of the above. I mean, it's --
14 as you know, most of the regulations didn't occur until
15 the 1970 timeframe going forward. Before that, you had
16 industrial -- you either had consensus standards or you
17 had industrial best practice documents, so -- and before
18 that, you just had papers and positions going back to
19 Hamilton around 1900.
20 So you're basically an expert in the history
21 of safety, not just for employers, but for all
22 individuals. The National Safety Council documents go
23 way back to the '50s. They pre-exist, say, OSHA. So,
24 in fact, a lot of the OSHA standards are based on
25 National Safety Council documents. So when I'm doing

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 34

1    work in cases that don't involve an employer, oftentimes
2    I'll refer to National Safety Council documents, because
3    they cover people in stores, they cover people in -- as
4    you say, people in playgrounds.
5         I've actually done an expert case on people in
6    playgrounds in Texas in the last two years, where a
7    child climbed a low fence around a pool and impaled
8    himself through the neck on a spike on the top of the
9    fence because they basically -- the ball had flipped off
10   over the play field, and the play field was higher than
11   the fence. It was only a couple feet off the ground,
12   went into the pool area, and he hopped on the fence and
13   impaled himself. So in that case, I wouldn't be
14   referring to OSHA documents per se; I would be referring
15   to National Safety Council and other non-OSHA safety
16   documents as to standard of care.
17        Q.  What does it take to become a certified safety
18   professional?
19        A.  The requirements for the CICSP and the PE are
20   all similar. In general, they take certain educational
21   background, certain experience, time of experience in
22   certain areas, and then typically they require two exams
23   that you have to pass. Now, because I was a CIH, I
24   didn't have to take the preliminary CSP exam, but I took
25   the second one.

Page 35

1         Q.  Okay. You own a company called EES Group?
2         A.  I own portions of it.
3         Q.  Okay. At some point you sold the Ohio
4    portion?
5         A.  When my son passed away and I had no heir, I
6    sold a lot of operations.
7         Q.  So you own that now with another firm?
8         A.  No. What happened was, as you know, companies
9    are incorporated by state. So the original
10   incorporation for EES Group was in Ohio in 1996. And in
11   roughly 2013, while I still owned Ohio operations, I
12   incorporated the same name in the state of Florida; it
13   was available. I did different DBAs in both places.
14   The Ohio DBA was Engineering and Environmental Services,
15   and the Florida was Engineering and Expert Services.
16   They were all under one umbrella, at least from an
17   accounting standpoint and from an operational
18   standpoint.
19        The intent was to have offices down here when
20   I retired, if I wanted to do some part-time work. After
21   Mark passed away in New York City, my legacy was
22   terminated, so at some point I knew I'd have to let go,
23   and so what I did was I sold the Ohio operations in late
24   2014 to employees. Now, I retained -- the buildings in
25   Cleveland, Columbus and Florida are retained under a

Page 36

1    separate company, corporation, and so I always leased to
2    myself, if you will. I still retain the buildings in
3    Ohio, but I don't retain the operations.
4         Q.  Okay. So you just work now out of the Florida
5    office or both?
6         A.  No. It's more complicated than that. I spend
7    one week a month in Ohio, the third week, and I spend
8    three weeks a month in Florida. Primarily, I was
9    president of a -- until very recently, and now I'm a
10   chairman of the board of the Ohio -- Central Ohio Coin
11   Club, which is about 250 people. It's a
12   hundred-year-old club. And their meetings --
13        Q.  Did you say "Coin Club"?
14        A.  Coin Club. I'm big into numismatics, which is
15   coin collecting. I've been very active in that area.
16   So I go up there for that. I go up to check on the
17   buildings. I still have my home up there. And to be
18   honest with you, the attorneys and the insurance
19   companies take advantage. They know I'm going to be in
20   Ohio the third week, so they don't want to pay travel,
21   which I don't blame them, and it's not unusual that I
22   will do work in Ohio during that third week. And in
23   fact, that's why the last deposition was scheduled for
24   my building in Dublin, Ohio, because I was there that
25   third week.

Page 37

1         Q.  Okay. The purpose of the firm EES Group was
2    to provide expert witness services?
3         A.  No.
4         Q.  What was the purpose of the firm?
5         A.  Well, the purpose of the firm when I first
6    started was to make a living, and by that I mean I
7    literally started the firm with three little kids and a
8    wife who wasn't working, and I had to do whatever I had
9    to do to have people pay me to do that, and I started
10   off doing a lot of environmental permit work, working
11   for schools.
12        Within a couple years, out of left field, came
13   opportunities to work for the insurance industry in
14   disputed claims, and so to this day, EES Group is known
15   primarily for working for the insurance industry. Our
16   biggest clients are insurance clients. We do a thousand
17   projects a year for the insurance industry. We're
18   probably the largest forensics company in Ohio. I know
19   we have the largest one in Ohio. We do a lot of the
20   work in surrounding states. The expert witness work
21   traditionally was maybe 10 or 15 percent of our volume.
22   85 percent of it was forensics engineering and then
23   maybe 5 percent was maybe going out and doing industrial
24   hygiene work.
25        Q.  Okay.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 38

1      A.  I also had an asbestos certificate, so
2  anytime that -- you can't just go sample asbestos.
3  Well, people think they can, but you really have to be
4  qualified by state annually to sample.  And so it wasn't
5  unusual that I was doing building -- the insurance
6  companies would call us and say, Can you go out and
7  sample for asbestos in these buildings?  Either we're
8  going to do demo, we're going to do repairs, whatever.
9  So I would sample asbestos from time to time amongst
10  other things.
11      Q.  All right.  Your CV also includes a list of
12  publications.
13      A.  Yep.  I did a lot of publications early when I
14  was at the national labs.  And then when I went to work
15  for the private industry, they don't publish; they keep
16  everything proprietary.  And then I've published -- we
17  worked about three years on a paper with Mark Nicas on
18  transfer of benzene through the skin from complex
19  solutions.
20      Q.  Which paper is that?
21      A.  It would be the 2011 Petty, Nicas, Boiarski
22  paper.  It's sort of the seminal paper on dermal
23  exposure to benzene.
24      Q.  All right.  Was that your last publication?
25      A.  I don't know.  I think it's the last one

Page 39

1  that's officially been accepted.  The textbook was my
2  last publication, the forensics engineering textbook.
3      Q.  Okay.  That was January 2013?
4      A.  Correct.  And that's being updated.
5      Q.  Which goes to my next question:  Do you have
6  any publications you're currently working on?
7      A.  Yes.  I have one on asbestos exposure and then
8  I have one on -- and will be updating the forensics
9  engineering textbook.  In fact, it's done by CRC Press
10  here in Boca, of all things small.  And we've agreed to
11  update that textbook, second edition.
12      Q.  Your third publication from the top is a
13  publication with Peter Infante and others on "Vinyl
14  Chloride Propellant in Hairspray"?
15      A.  Yeah, I did that as well.
16      Q.  You worked with Mr. Markowitz and Mr. Rosner
17  on that?
18      A.  Yeah, I guess.  They were on the causation
19  side; I was doing the exposure analysis.
20      Q.  Okay.
21      A.  Yeah, the last publication was the textbook.
22      Q.  For your time spent working now, as you said
23  as you approach retirement, is the percentage of your
24  time still 10 to 15 percent expert work and then the
25  rest dealing with other services at EES?

Page 40

1      A.  No.  It's -- since I moved to Florida in the
2  last four years or so, the vast majority of my work is
3  assisting legal cases.  I've done four or five forensics
4  projects, which were problem projects, where they call
5  me up and say, We need you to get involved with this
6  because it's gone south.  And they know because I wrote
7  the textbook for the area and that I'm renowned for
8  calling balls and strikes, whether they like the outcome
9  or not.  And I've never had one where they haven't
10  called me, once I get done with the report, that the
11  case didn't resolve itself.
12      Q.  Okay.  None of your publications, either the
13  ones you're working on that haven't been published yet
14  or the publications that have been accepted, address
15  glyphosate; correct?
16      A.  That's correct.
17      Q.  So on the last page of your CV, you reference
18  classes you taught at Franklin University?
19      A.  Yeah.  I taught for a while.
20      Q.  Okay.  And when was the last time you taught a
21  class?
22      A.  It's been a while.  I think I -- I remember
23  figuring out I worked for about $2 an hour.  So I taught
24  environmental -- environmental and geology classes.
25      Q.  That would have been the earth science class?

Page 41

1      A.  Yeah.
2      Q.  Okay.  According to your CV, the last time you
3  taught was the spring term 2006; is that correct?
4      A.  That sounds right.  It's been a while.
5      Q.  And in either the earth science class or the
6  environmental science class, did you focus on
7  glyphosate?
8      A.  I don't believe so.  We had modules on all the
9  major environmental cases at the time, like Three Mile
10  Island and Love Canal, and I know I worked early on, on
11  the CHRIS database, but I don't think we covered that in
12  my class.
13      Q.  Okay.  All right.  Shift away from your CV and
14  go to the notice of deposition.  There are several
15  copies flying around.  I will mark that as Exhibit 5.
16      Do you have a -- well, I'll hand you this so
17  you have all of it.
18      (Defendant's Exhibit 5 marked for
19  identification.)
20      A.  Yeah, I'll just look at that one so I know
21  which one I'm looking at.
22      This might be the marked copy.  I don't know.
23      MR. UPSHAW:  Do you need one?  I've got a
24  couple flying around.
25      MR. KRISTAL:  Yeah, I'm not sure which is the

11 (Pages 38 to 41)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 42

1    operative one.  Is there a date in the back?
2         THE WITNESS:  This one looks thinner.
3         MR. KRISTAL:  Yeah, I was just going to say
4    it's --
5         THE WITNESS:  It's got a dash 3 in the bottom.
6    I don't know if that means anything.
7         MR. UPSHAW:  Here, this is the operative one.
8         MR. KRISTAL:  Thank you.  It looks like July
9    1st, 2019, on the second page.
10        MR. UPSHAW:  I think that is correct.
11        MR. KRISTAL:  Okay.  Got it.  Thank you.
12   BY MR. UPSHAW:
13        Q.  Okay.  All right.  Have you seen Exhibit 5
14   before?
15        A.  I have.
16        Q.  Okay.
17        MR. KRISTAL:  Just for recordkeeping purposes,
18   I'm not sure why the Andrus Wagstaff firm is
19   noticed on this.  They have nothing to do with this
20   case, the Winston case.
21        MR. UPSHAW:  Okay.  Good to know.  I don't
22   know why they got picked up.
23        MR. KRISTAL:  Yeah, I don't know.
24        MR. UPSHAW:  Okay.
25   BY MR. UPSHAW:

Page 43

1         Q.  Let me go through the request for production
2    here, Mr. Petty, and make sure that we've got all the
3    documents pursuant to the request, all documents --
4    number 1 is all documents provided by you or that you
5    have related to Roundup glyphosate that are not publicly
6    or otherwise available.
7         Have you provided those documents?
8         A.  I believe that I have.  I know that I made a
9    zip drive of them, but I believe that you all requested
10   them from Robin ahead of time.  There's five I think
11   that you're still asking for.
12        Q.  Right.
13        A.  So other than those five, I believe so.
14        Q.  Okay.  Would that include all studies,
15   literature and materials, research files, publications,
16   treatises, testimony, depositions, pleadings, litigation
17   materials, or any other documents that are not publicly
18   or otherwise available that you have reviewed and upon
19   which you rely and/or intend to rely as the basis for
20   your opinions that you intend to offer in the
21   Roundup/glyphosate litigation?
22        A.  Well, subject to getting new materials after
23   this deposition, I mean, I -- my Appendix A is, I
24   believe, trying to be responsive to your item 2.
25        Q.  Okay.  And just -- we're going to get to that

Page 44

1    and we're going to mark your Appendix A, your list of
2    reliance materials I think is what it's titled.
3         A.  Well, that's part of it.  I mean, the reliance
4    materials are broader than that.
5         Q.  Okay.  So we're going to talk about that.  But
6    at some point, somewhere, you have a list of everything
7    you've reviewed.  Like you said, you were trying to
8    answer our item 2 here.
9         Is that one condensed list somewhere?
10        A.  I believe it would be the reliance materials
11   that have been submitted to you folks.
12        Q.  Okay.
13        A.  The list of them.  And that would include both
14   what I call reference materials as well as the
15   Appendix A materials as well as the interviews, which I
16   brought copies of.
17        Q.  All right.  Well, let's do this, and we'll
18   make sure --
19        A.  Sorry.  I'm just trying to make sure I answer
20   your question.
21        Q.  And I appreciate that.  Let's make sure we
22   cover it so that we don't have to ask this question
23   again because you're trying to respond to my request
24   number 2 here.  So let's identify those.
25        Let me mark as Exhibit 6 what we received as

Page 45

1    Stephen E. Petty Roundup Cases Reliance Materials, dated
2    July 1, 2019, and it consists of 47 pages.  I'll hand
3    that to you, and let's see if that is a complete copy.
4         (Defendant's Exhibit 6 marked for
5    identification.)
6         THE WITNESS:  Did you-all want to see this?
7         MR. UPSHAW:  I mean, I can show you this one.
8    It's what I'm going to refer to.
9         THE WITNESS:  So this looks like the list of
10   reliance materials that I forwarded to counsel,
11   which obviously they forwarded to you folks, and it
12   includes some publicly available materials.  I
13   would say that that's -- that's not my entire
14   library of textbooks on industrial hygiene.
15   BY MR. UPSHAW:
16        Q.  Okay.
17        A.  So when item 2 talks about "not publicly
18   available," I tried to include the not publicly
19   available stuff as best as I can in Appendix A.  The
20   comment "or otherwise available," I'm not sure what that
21   means.  That seems like a big grab statement.
22        But I'm here to tell you that I'm not giving
23   you my entire library of -- I've got 15,000 MSDSs.  I'm
24   not providing those.  The MSDSs that I've primarily
25   relied on here, I have referenced and provided, and --

12 (Pages 42 to 45)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 46

1    and I'm not saying that every one of the textbooks that
2    I might refer to in industrial hygiene, whether it be
3    toxicology or epidemiology, in a general sense I've
4    provided here.
5         So -- but my intent has been that the
6    information I'm primarily relying on, to give that to
7    you, if that makes any sense.  But I don't -- given the
8    nature of how this is written, I don't want you to go
9    away thinking that I've given you my entire library of
10   40 years.
11        Q.  Understood.  How did you decide, out of your
12   entire library, your 40-year library, which publications
13   under the heading "Publicly Available Reference
14   Materials" you would include in this document?
15        A.  I've tried to include more recent primarily
16   industrial hygiene-related documents or books or
17   standards.  There are some exceptions.  Like when you go
18   to the "Codes and Standards," there I'm listing some
19   stuff that goes back a ways.
20        Q.  May I interrupt you for a second?  So I'm
21   going to go to each heading you have in this.
22        A.  Oh, are you done --
23        Q.  Yeah, so we're clear on what we're looking at
24   here.  So my question really revolved around this first
25   subheading, which is "Publicly Available Reference

Page 47

1    Materials," and how did you go about selecting those,
2    and then I'll go to the codes next.
3         A.  Well, I'll give you an example.  I'm not
4    including my five or six versions of the Chemical
5    Engineers Handbook from 1953 to god knows when because
6    there's stuff in there that I might rely on.  For
7    instance, Fick's.  Fick is the famous guy from 1855 that
8    came up with Fick's Law, which is used in chemical
9    engineering all the time, which is the driving force of
10   a material through a membrane material, or any material
11   really, is dependent on the concentration difference,
12   and that's the underlying theory behind almost all
13   dermal work.
14        So I'm not giving you the Chemical Engineering
15   Handbook reference to Fick and going to say, okay --
16   now, I'm referencing Fick in my report, but, you know,
17   you can go to almost any transport phenomena -- like I
18   took chemical engineering transport phenomena and mass
19   transfer in undergraduate school, and I think we used a
20   book called "Transport Phenomena" by Bird, Stewart and
21   Lightfoot out of Wisconsin.  And I'm not referencing
22   that textbook, but they talk about Fick.
23        So, you know, it's almost impossible when
24   you've been -- you're old like I am and you're in your
25   60s and you've been around a long time, to put

Page 48

1    everything on there that might fit in this category
2    "otherwise available."  I'm just telling you that the
3    things I've directly relied on are there.  But if I were
4    asked in some sort of Daubert situation where does
5    Fick's law come from, well, I might pull it out of the
6    Chemical Engineering Handbook or any other standard
7    traditional chemical engineering textbooks.  But I'm not
8    going to provide all those for the purposes of this
9    deposition.  I mean, at some point, you've got to cut it
10   off.
11        Q.  Understood, Mr. Perry.  I think you've
12   answered my question --
13        A.  Petty.
14        Q.  Why do I keep calling you Perry?  Sorry.  I
15   apologize for the rest of the time that we're together.
16        A.  That's all right.
17        Q.  And keep correcting me.  I don't mind.
18        A.  At least it's not four letters.  It's at least
19   five.
20        Q.  Mr. Petty -- I must have taken a deposition
21   with a Perry at some point.
22        A.  I'm sorry.  Got to have a little fun here.
23        Q.  Not a problem.  Just trying to -- it was
24   somewhere in your answers how you narrowed what you
25   chose down.

Page 49

1         A.  These are primarily industrial hygiene, more
2    modern references.
3         Q.  Okay.
4         A.  As opposed to all my chemical engineering
5    textbooks.  But --
6         Q.  All right.  Understood.  Now -- oh, sorry.  Go
7    ahead.
8         A.  But the whole concept of mass transfer is a
9    chemical engineering concept that goes way back.
10        Q.  Understood.
11        A.  And I've referenced some epidemiology books
12   here, but not all of them.  So, you know, I've just
13   tried to put enough material there that should give a
14   good understanding of the baseline industrial hygiene
15   stuff, but I certainly did not include all my chemical
16   engineering textbooks, and I've got tons of them.
17        Q.  Understood.  And on page 7, you referenced
18   several EPA documents.  How did you determine which EPA
19   documents you would include on your list of reliance
20   materials versus other EPA documents you may have seen?
21        A.  This had to do with -- there is some analysis
22   by EPA on risk assessment with regards to glyphosate,
23   and there's also some reliance by Monsanto on risk
24   assessment concepts.  Appreciate that -- and it turns
25   out that I'm an expert in both the environmental side as

13 (Pages 46 to 49)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 50

1    well as the health and safety side.  I helped write the
2    State of Ohio risk assessment rules, and I trained all
3    the regulators on risk assessment a long time ago in the
4    1990s.  And I helped -- the stuff that's on the web page
5    to this day is partly what I wrote.
6         So I was an expert -- in fact, I took one of
7    the very first classes on risk assessment, which was
8    based on ASTM 1979.95, I think the 1995 version of the
9    risk assessment standard.  And in like 1997, there was a
10   bunch of Ohio EPA guys, and I was one of the few
11   industry guys.  So -- and I taught the risk assessment
12   folks at the Ohio -- they called it BUSTR, which was
13   Bureau of Underground Storage Tank Regulators, kind of a
14   weird acronym.
15        THE REPORTER:  Could you repeat that?  I'm
16   sorry.
17        THE WITNESS:  BUSTR, B-U-S-T-R.
18        MR. KRISTAL:  Bureau of Underground Storage
19   Tank Regulators.
20        THE WITNESS:  Bureau of Underground Storage
21   Tank Regulators.
22        Because the underground storage tank program
23   in Ohio was delegated to the Department of
24   Commerce, not the Ohio EPA, so another story for
25   another day in how that got split up.  But I then

Page 51

1    taught the regulators not only what risk assessment
2    was but how to use it and then how people cheat on
3    it.
4         So I've spent some time looking at the risk
5    assessments done for glyphosate, just to see what
6    pathways they chose, what pathways they didn't
7    choose, and try to understand that.  And so I
8    included some of the earlier risk assess- -- or
9    environmental stuff mainly because if questions
10   came up on risk assessment, I'd be able to rely on
11   some of those.
12        And then, of course, the other side of it --
13   so, you know, typically people in my profession are
14   talked about as environmental health and safety
15   people, but it's really two different bins.  The
16   environmental side, as you know, is probably the
17   EPA 40 CFR stuff.  And then the health and safety
18   is really the OSHA side primarily; it's the 29 CFR.
19   And then sometimes I get involved in 49 CFR, which
20   is transportation, which is HAZWOPER, which is
21   another -- I used to train on HAZWOPER.  But it
22   turns out that I'm known for being an expert in
23   both dimensions, which is somewhat unusual.
24   Typically, you're either an environmental expert or
25   you're a health and safety expert.

Page 52

1    BY MR. UPSHAW:
2         Q.  So if I understand your answer correctly, you
3    chose these particular EPA documents to list for the
4    purpose of understanding the EPA's risk assessment?
5         A.  Not entirely.  As you see, there are other
6    documents there as well, but some of them were in fact
7    for -- if I had to go back and say what were the basis
8    for some of your opinions on risk assessment, then I
9    would go back to the ASTM 1739-95 or its updates or I
10   would go back to the EPA risk assessment documents.
11        Q.  So, Mr. Petty, why include these nine EPA
12   documents on this --
13        A.  We can go through each of them if you'd like.
14        Q.  We can, which is fine, and I'm happy to.  I'm
15   just trying to figure out, out of -- why these 9 and not
16   10 or 9 others.
17        A.  Oh, I could have included a hundred others.
18        Q.  Or a hundred.  Why just these 9?
19        A.  Because they touch on the areas that I felt I
20   might be asked about, and typically if I have to
21   reference back to materials, these will at least tie me
22   back to documents that I can then reference.
23        Q.  Okay.
24        A.  So the first one's a risk assessment.  The
25   second one is TSCA.  The third one is Exposure Factors

Page 53

1    Handbooks; there are multiple versions of that.  But
2    that's used in risk assessment a lot.  The -- how one
3    samples soils, if you're looking at transport of
4    materials through the environment, included one of
5    those.  Sampling of materials in the air, I included one
6    of those.  Looked at TSCA in terms of AEACAD provisions
7    for letting people know what you know, when.  Exposure
8    Factors Handbook, again, is part of the risk world,
9    same -- both of those.  And then, obviously, this is a
10   pesticide case, and so I've included the Label Review
11   Manual.
12        Q.  Am I correct this is the first pesticide case
13   you've worked on?
14        A.  In litigation.
15        Q.  Okay.  You've worked on others outside of
16   litigation, as a consulting expert?
17        A.  Well, at Patel we -- this takes me way back.
18   I mean, you have some background with the Coast Guard as
19   I understand it, and you're familiar then with the CHRIS
20   database that goes back into the '70s -- or maybe not.
21   I don't know.  But it's the Coast Guard's -- it's called
22   Chemical Hazards Response Information System, I believe.
23        Well, when I first got out of college the
24   first time, one of my first jobs was to populate the
25   CHRIS database, and it has herbicides in it.  Now,

14 (Pages 50 to 53)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 54

1 that's tangential; I appreciate it.  And then the CIH
2 exam has pesticide questions on it.
3     Q.  So a better-worded question:  Is this the
4 first litigation matter you've worked on that deals with
5 pesticides?
6     A.  To my recollection, I believe that's true.
7     Q.  Okay.  Is it also fair to say that you've
8 looked at other EPA documents either from the Office of
9 Pesticide Programs, OPP, or other EPA-related
10 publications since 2017?
11     A.  I think I reference one in there in my report
12 regarding unit exposure factors for pesticides.  I think
13 that there's some reference to that in my report.  I
14 think that's a 2018 document.
15     Q.  Is that the most recent EPA document that
16 you've reviewed?
17     A.  I don't know the answer to that.  I'd have to
18 check my list of exhibits and all of that to answer that
19 question fully.
20     Q.  Your list of exhibits, would that be --
21     A.  Or if it was in the report.
22     Q.  -- what we're getting to here as part of
23 Exhibit 5 -- or 6?
24     A.  Yeah, either that or -- if it's more current,
25 typically what I did in my report is just list the URL.

Page 55

1 Like I know the 2018 unit -- I think that's a 2018
2 document, and it's in my report.  You'll find that I
3 list it as a URL; in other words, a website address.
4     Q.  Okay.  And that would not have been part of
5 the documents you list in Exhibit 6 as exhibits; right?
6     A.  If it came straight from the internet, no, I
7 just list the web page in general.
8     Q.  Okay.  Let me continue through Exhibit 6.
9         The next section would be "Codes and Standards
10 (Not Already in Petty List of Exhibits)."  And that's
11 the section coming up, right, the "Petty List of
12 Exhibits"?
13     A.  Yes.
14     Q.  Okay.  And so how did you determine which
15 codes and standards to list here on July 1, 2019?
16     A.  They're primarily associated with warnings,
17 the history of warnings.  There are some exceptions.
18 Obviously, the respiratory protection standard, some of
19 the OSHA standards are not necessarily that way.  But
20 almost all of these have -- well, the ACGIH
21 documentation, the TLVs and the annual booklets are --
22 really the TLVs and the BEIs from 2001 to 2019, those
23 aren't necessarily tied only to pesticides.
24         The -- nor is the ANSI Z9.1 or the ANSI Z88
25 stuff; that's respiratory.  But certainly the LAPI

Page 56

1 standards, Labeling and Precautionary Information
2 standards from MCA, as well as the ANSI standards
3 Z129.1, as well as the ANSI Z400 are all primarily
4 related to warnings.  And that's a big chunk, if you
5 will, of this material.
6         There are training or warning aspects
7 associated with all these other regulations, but they
8 cover broad areas.  The PPE standard, the respiratory
9 protection standard, the HazCom Standard.  The HazCom
10 Standard has warnings language in it in Sections F and
11 G.  F is labeling and G is MSDSs.  So I guess that's
12 kind of my answer to that.
13     Q.  Okay.  This list also includes a website
14 reference.  It is the third-from-the-last reference,
15 from OSHA.gov.
16     A.  Right.
17     Q.  Is that a URL?  Is that what you were
18 referring to?
19     A.  Sure.
20     Q.  Okay.
21     A.  I don't know if it's called unified reporting
22 language -- whatever.  The URL is HTTP either S or no S,
23 colon, double backslash, whatever.  It's called a URL.
24     Q.  Okay.  Then the next page, which is page 10 of
25 Exhibit 6, is your list of exhibits; correct?

Page 57

1     A.  Correct.
2     Q.  Okay.  And --
3     A.  "Petty List of Exhibits."
4     Q.  "Petty List of Exhibits."
5     A.  So we don't confuse it with deposition list of
6 exhibits.
7     Q.  Okay.  All right.  So correct me if I'm wrong,
8 but this is where you told me that when your office
9 receives some document, it gets put on this list either
10 as 1, 2, 3, 4, or however it comes into your office; is
11 that correct?
12     A.  With the exception if I hand a batch of
13 documents -- at whatever point, say she's up to Exhibit
14 17 and I hand her all these Federal Registers, she's
15 going to label them 18 through whatever, and then the
16 next set of documents that come in will pick up with the
17 next available number.
18     Q.  Okay.  And as I asked before and I told you I
19 would get back to, is there any way on this list -- is
20 there any reference on this list to documents that you
21 have decided to add to this list separate from documents
22 provided by Plaintiffs' counsel?
23     A.  Other than me going through them and telling
24 you, I think that would be the easiest way.  Obviously,
25 things that, in general, that have MONGLY numbers, more

Paszkiewicz Court Reporting
(618) 307-9320  /  Toll-Free (855) 595-3577

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 58

1    than likely came from Plaintiffs' counsel. The other
2    documents --
3        Q.  Well, let me interrupt you.
4        A.  -- would have almost all came from me. There
5    are some exceptions.
6        Q.  That's what I was asking. Because I thought
7    you said earlier there were some MONGLY documents that
8    you obtained on your own; isn't that correct?
9        A.  Yeah, and I think that were then provided
10   later as well, so I ended up getting them two
11   directions. I got them myself and then they were also
12   provided to me. So that's where it gets a little
13   confusing, if that makes any sense.
14       Q.  All right. Well, I need to clarify that
15   confusion to make sure we're not confused. Let's try to
16   do this unfortunately by page, because I want to know
17   what was provided by Plaintiffs' counsel, is my general
18   question.
19       A.  Okay.
20       Q.  So if the easiest way is to run through it,
21   then let's take the opportunity to --
22       A.  We're not going to have an absolute answer to
23   that. You appreciate that?
24       Q.  I understand there may be some that you don't
25   recall where they came from.

Page 59

1        A.  Well, I know one way or the other where they
2    came from; I just don't know which direction.
3        Q.  Okay. So --
4        A.  Either it came from me or they came from
5    outside folks. It's one or the other.
6        Q.  All right.
7        A.  A binary decision.
8        Q.  We've narrowed it down, then.
9            On page 1, can you identify -- I'm sorry -- on
10   the first page of "Petty List of Exhibits," which is
11   page 10, can you identify any documents, 1 through 13,
12   which were provided by Plaintiffs' counsel?
13       MR. KRISTAL:  And just for the record, we're
14   talking about Exhibit 5?
15       MR. UPSHAW:  6.
16       MR. KRISTAL:  I'm sorry. Thank you.
17       THE WITNESS:  Exhibit 6, page 10.
18           I would -- I believe that the first 10 would
19   have been sent to me from Plaintiffs' counsel.
20   BY MR. UPSHAW:
21       Q.  Okay. And you had in your possession Exhibit
22   11, 12 and 13?
23       A.  I would believe so. Because what I did as
24   part of my independent research is, as a member of AIHA,
25   I have access to their documents database I guess is the

Page 60

1    best way to put it, and they have a number of --
2    including American Industrial Hygiene Association
3    journal -- a number of journals, four or five. They
4    give members access to all the articles in those
5    journals, and they're searchable going back into the
6    '50s. So when you see "Journal of Occupational and
7    Environmental Hygiene," I'm almost certain -- and "AIHA
8    journal," I'm almost certain I would have gotten those
9    from doing some search through the AIHA portal.
10       Q.  Okay. Let's go to the next page. Exhibits 14
11   through 37, can you identify for me which of those
12   exhibits were provided by Plaintiffs' counsel?
13       A.  The first four almost certainly I pulled down
14   from the AIHA portal. That's 14 through 17.
15       Q.  Okay.
16       A.  18 through 30 definitely came from the EES
17   libraries of -- this comes from our Federal Register
18   library. I think I spoke about this earlier, that I
19   have them going back to 1920s or '30s, all of them.
20       Q.  Yes, you did.
21       A.  So those certainly would have come from me.
22   I'm not saying independently that counsel wouldn't have
23   sent them, but the way they're designated, they almost
24   certainly would have been my designation. I'm giving
25   dates.

Page 61

1        The '69 minutes comes from me. I know that
2    document. I did get additional minutes from MCA from
3    counsel, but not that particular set -- or not that
4    particular document, anyway.
5        Q.  Are those included in your exhibits somewhere
6    later?
7        A.  I believe so.
8        Q.  Okay.
9        A.  It strikes me the balance of these would have
10   come from me. 38 and 39 -- I'm assuming we're moving to
11   page 12?
12       Q.  Yeah, sir, you can just keep going. I don't
13   have to ask you the same question. You know what we're
14   looking for. So I appreciate you looking for it.
15       A.  Going through these, I know through 46, Davis
16   is definitely a paper that I have from 1929.
17           38 through 46 are definitely documents from
18   me -- or from our files.
19       Q.  Okay.
20       A.  I believe that the documents up through 51
21   would have come from me, but I'm not absolutely certain. I know
22   that 52 would have been provided to me.
23       Q.  So let's go back a second. So you're not
24   absolutely certain. That means it could have come from
25   Plaintiffs' counsel or they could have come from your

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 62

1  library, for 48 through 51?
2      A.  Well, 47 and 48 look like they're documents
3  that I would have pulled from the literature, based on
4  the journals.
5      Q.  And when you --
6      A.  But I'm not 100 percent sure.
7      Q.  Okay.  When you say "pulled from the
8  literature," for an example, item 48, Exhibit 48, this
9  2016 article from Environmental Health, where would you
10  have pulled that from?
11      A.  The internet or AIHA.
12      Q.  Okay.
13      A.  Environmental Health is a standard industrial
14  hygiene journal.
15      Q.  All right.  I think we're at 53, if you want
16  to move forward.
17      A.  Yeah, 53, I'm almost certain that that would
18  have been -- 53 and the exhibits -- typically, when you
19  see -- the way that we do things, if we have a
20  deposition and there are attached exhibits, this is how
21  we designate the attached exhibits to a deposition.  In
22  almost -- in all cases, depositions in this case would
23  have been provided to me.
24      Q.  Okay.
25      A.  So I would say that 53 and its attachments

Page 63

1  that go on for quite a while, actually -- they move all
2  the way to page 14, ending with Exhibit 28.
3      Q.  Okay.
4      A.  54, I would have gotten on my own.
5      Q.  And where would you have found this document
6  from 2008?
7      A.  Either on the -- I think that I purchased it,
8  but I'm not sure -- I either purchased it or I got it
9  online, one of the two.
10      Q.  If you had purchased it, where would you have
11  purchased it from?
12      A.  I don't know.  Internet, Amazon, whatever.
13      Q.  Okay.  And what was the importance of this
14  document as an exhibit, that you would need to purchase
15  it if necessary?
16      A.  Just as part of my collecting information
17  on -- that was available and out there, as part of the
18  process of collecting information.
19      Q.  All right.  55, I think we're on.
20      A.  Yeah.  I'm hesitating because I know 56 and 57
21  are definitely my document -- well, not my documents.
22  They're documents that are from my library.  So I
23  suspect -- since 54 was as well, I suspect 55 was
24  something I found on the internet.
25      Q.  Okay.  Would you have found these on the

Page 64

1  internet before you were hired in the glyphosate
2  litigation or after you were hired?
3      A.  I would think after.
4      Q.  Okay.
5      A.  So where are we at here?
6      Q.  56.
7      MR. KRISTAL:  I think 58.
8      A.  I think we're on 58 because I said 57.  Well,
9  anyway, 57 and 58 are documents that would have come
10  from my library.
11      Q.  Okay.  So you're right.  We talked about 56.
12  We're down to, yeah, 59 now.
13      A.  I think we're at 58.  I don't know -- the
14  reason I hesitate on 58, I think it may have come
15  from -- internally from our own sources, because I know
16  59 did.  I'm pretty sure 59 did.  So I'm a little
17  uncertain about 58.
18      Q.  Okay.
19      A.  That's all I can say.  Up to 65, I'm almost
20  certain that those documents -- it's more likely than
21  not they came from me.  I'm not 100 percent certain.
22      Q.  Okay.  And your description in document 60,
23  "Meetings in Prospect" --
24      A.  Yeah, this would have been associated with the
25  American Industrial Hygiene Association.

Page 65

1      Q.  Okay.
2      A.  Almost certainly.
3      Q.  All right.
4      A.  Because I'm -- a lot of these documents I'm
5  pulling from AIHA portal.  You can kind of tell.
6      The -- this is where it gets a little -- there
7  were approximately 75 documents that had MONGLY numbers
8  that I located on I think it was the Right To Know
9  website -- you probably know that one -- before I got
10  additional material from counsel.  So I'm not saying
11  that they didn't also provide these, but I think I would
12  have independently got the next 75 or so exhibits on my
13  own, and then beyond that, they were either provided
14  again or the documents beyond that.
15      So if I take 75 to, like, 150 or so, I would
16  say that most of those I independently located on the
17  internet.  They may have also been provided by counsel
18  separately.  But the sequence I'm pretty certain of.
19  That was that I did searches of my own libraries; I did
20  searches of the internet; I did searches of the AIHA
21  libraries or their portal.  And then I also had located
22  the Right To Know and downloaded or had my staff
23  download -- I think -- my recollection was around 75
24  documents.
25      Q.  Okay.  And what would have been the importance

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 66

1  of reviewing these e-mails from Monsanto?
2      A.  Well, ultimately my task was to evaluate --
3  ultimately, my task was to form opinions on whether or
4  not Monsanto met the standard of care in their
5  own industry and governmental standards of care for
6  providing unvarnished information and warnings to
7  stakeholders.  And so any internal documents regarding
8  how they're handling information regarding information
9  that might or should have been provided to the public
10  are important as part of that process.
11     Q.  Okay.  So I think we're --
12     A.  So we're somewhere in the 150 range, and don't
13  quote me on 75, but it's on that order.
14         Then beyond that -- I'm just checking.  Beyond
15  that, a vast majority of the documents were provided to
16  me by counsel.  I just want to cross-check the list.
17     Q.  Please do.
18     A.  I'm now on page 22 and 23, and I believe up to
19  that point so far that those were provided to me.
20     Q.  Okay.  While you're reviewing that, I noticed
21  that you number these exhibits in various ways.  I
22  understood your exhibits -- your deposition exhibits.
23     A.  Sure.
24     Q.  But now for, like, 196, you start with A and
25  go through FF.

Page 67

1      A.  Yeah, those would still be the first exhibit
2  to that deposition, 196, the second exhibit, et cetera.
3      Q.  Okay.
4      A.  So it's --
5         MR. KRISTAL:  It may have been marked that way
6  at the time.
7         THE WITNESS:  I don't know if it was just
8  marked that way with how it came in.  I would have
9  to ask my admin why they went from 1 to A.
10  BY MR. UPSHAW:
11     Q.  Yeah, that was kind of why I didn't understand
12  there was a difference, but okay.
13     A.  I suspect it had to do with how they came in,
14  but I don't know.
15     Q.  Okay.  And what's the significance of the P
16  number?  I'll give you an example.  Item 195 has in
17  parentheses "P1.3319."
18     A.  I'm not sure, because it was probably simply
19  on the document and I think my paralegal just wrote it
20  down since it was on the document.
21     Q.  Okay.  Very good.  And one other thing, if I
22  may -- I know I'm interrupting your process here.  197?
23     A.  Sure.
24     Q.  The document after 197 is 197-41.  Do we know
25  why that's marked that way, or am I missing 40 exhibits?

Page 68

1      A.  Where --
2      Q.  On page 22, 197 is the deposition of Timothy
3  Ford, Sr., and then the next document you have listed is
4  197-41, and then you go to 197-A, 197-B, 197-C.
5      A.  I'm sure that's how it came.  It looks to me
6  like somebody provided, during the deposition, a piece
7  of paper and they must have been marked that way.
8      Q.  Okay.
9      A.  We wouldn't make those numbers up.
10     Q.  Right.  I just didn't know whether I was
11  missing 1 through 40 and then we went to A.
12     A.  No, I agree that it looks odd, but I think it
13  was just the way the documents were marked would be
14  my -- we don't have any grand scheme within our
15  organization as to how to mark documents.
16     Q.  All right.
17     A.  We just try to -- we do try to stay with the
18  number that's associated with the deposition so it's
19  clear that the dash -- the dash whatever is an
20  attachment to a deposition.
21     Q.  Okay.  Now, I took you off your task and I'll
22  ask you to return.  I don't recall where you left off.
23     A.  That's right.
24     Q.  But my next question, as you move forward,
25  will be on page 25.

Page 69

1      A.  Okay.  Fire away.
2      Q.  Under 198 on page 25, you have an exhibit
3  labeled 198-01, and there is no description.
4      A.  So that would typically be an attached page
5  labeled that with nothing on it.
6      Q.  Okay.  That's fine.  Just so I know what I'm
7  looking at here.
8      A.  I'm not sure on 26, Exhibit 199.  I may have
9  had that independently.  I'm not certain that it wasn't
10  sent to me, but I -- I've got a lot of Maibach's stuff
11  because he's involved a lot in dermal work.  I've got
12  dozens of papers on dermal exposure, so I'm just not
13  certain about that one.
14     Q.  So that one would be a question mark?
15     A.  Would be.
16     Q.  Okay.
17     A.  The INCHEM -- the others I think were probably
18  provided to me.  The INCHEM almost certainly I found, I
19  would think.
20     Q.  That's 202?
21     A.  Yeah, I would believe that I found that.
22     Q.  Okay.
23     A.  I'm not certain about 203 through 205, whether
24  I got those independently.  I know Wester has been
25  provided as well, but I may have had that as well.

18 (Pages 66 to 69)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 70

```
 1      Q.  Okay.
 2      A.  Pretty certain that the Williams paper was
 3  provided to me.  I would think probably 207 was as well.
 4      208, 209, 210 probably I located because I've
 5  indicated a URL in 208.  So 208 through 212, probably I
 6  found, but I'm not certain.
 7      Q.  Okay.
 8      A.  I believe that the -- up through 215, 11 to
 9  215 probably were provided to me.  The MSDSs, we
10  probably pulled most of those ourselves.  I know later
11  on we were provided some, but I'm pretty sure we would
12  have pulled the MSDSs.
13      Q.  Okay.
14      A.  I would say the balance of these, on this page
15  27, would come from outside -- or from counsel.
16      Q.  Okay.
17      A.  Looks like I would say that the documents on
18  page 28 were provided to me.
19      Q.  All right.
20      A.  I would think the documents on page 29 were
21  provided to me.
22      On page 30, with the exception of documents
23  276 and 277, I'm almost certain those were provided to
24  me.  The other two, I'm uncertain.  I may have pulled
25  those independently.
```

Page 71

```
 1      Q.  Wait.  You said "the other two."
 2      A.  277 and 278 -- or no, I'm sorry.
 3      Q.  So you started with 276.
 4      A.  276 and 277, because they don't have M-O --
 5  MONGLY numbers on them.  I'm not positive about that,
 6  but -- or MONGLY or however we want to say it.
 7      Then moving on to page 31, I believe these
 8  documents were provided to me.
 9      Q.  Okay.
10      A.  I think from 304 to 311 were probably provided
11  to me.  I'm pretty sure that 312, 313, 314 and perhaps
12  315 I got independently.
13      Q.  All right.
14      A.  316 likely came from out -- was provided to
15  me.
16      Uncertain about 317.  Seems like that may have
17  been a journal that I pulled, but I'm not certain.
18      Q.  Okay.
19      A.  318 through 322 would have been provided to
20  me.
21      323 to 325-2 likely were provided to me.
22      The patent to Franz, it may have been provided
23  to me, but I also independently looked it up.
24      MR. KRISTAL:  It's F-r-a-n-z.
25      THE WITNESS:  Franz, yeah.  Mainly because he
```

Page 72

```
 1  spent time at my alma mater, so I was curious about
 2  that, not long after I was there.  So I know I read
 3  his patent.
 4  BY MR. UPSHAW:
 5      Q.  Okay.
 6      A.  And since I was responsible for patents at
 7  Columbia Gas and had nine of my own, I always like to
 8  look them up independently.
 9      Going on down, I would say the balance of
10  these were provided to me, on page 33.
11      Q.  All right.
12      A.  I've got to give a mixed answer on 34.  I
13  think the majority of these were provided to me.  The
14  exception would be 342.  I don't know if I found that
15  independently or it came from counsel.  I'm just not
16  sure.
17      Q.  Okay.
18      A.  Similarly with the OECD guidance, I know that
19  I --
20      Q.  What number was that?
21      A.  Number 347.  I'm sorry.
22      Q.  Okay.
23      A.  I know it exists in some provided documents,
24  but I think I looked it up independently because I was
25  curious what they were saying about dermal, and it's
```

Page 73

```
 1  available online, I'm pretty sure.
 2      There's one other.  358, I believe it was
 3  provided to me, but I'm not certain.
 4      Q.  All right.
 5      A.  360 was definitely a document that I was --
 6  was inhouse.
 7      Same with 361.
 8      Q.  You pulled that, 361?
 9      A.  I'm pretty sure I did.
10      Q.  Okay.
11      A.  Not 100 percent, but I know 360, I did.
12      Q.  All right.
13      A.  I believe that the balance of the documents
14  were provided to me.
15      Q.  Okay.  We have --
16      A.  On that page.
17      MR. UPSHAW:  Okay.  Great.  We have to take a
18  break to switch our video recording.
19      THE VIDEOGRAPHER:  Okay.  This marks the end
20  of video media disc number 1.  The time is 11:40
21  and we're going off the record.
22      (Recess from 11:40 a.m. to 11:51 a.m.)
23      THE VIDEOGRAPHER:  We're back on the video
24  record.  This is the start of video media disc
25  number 2 of the deposition of Stephen Petty.  The
```

19  (Pages 70 to 73)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 74

1  time is 11:51.
2  BY MR. UPSHAW:
3      Q.  Great.  Mr. Petty, we are back on the record
4  and we were reviewing your Exhibit 6.  I think we're on
5  page 36, if I'm correct -- or did we get done with page
6  35?  I think we finished.
7      A.  You tell me.  I don't remember.
8      Q.  Let's start with page 36, Exhibit 377, and
9  continue to move forward, identifying those exhibits
10  listed that were provided by Plaintiffs' counsel.
11      A.  All right.  I'm on page 36 of Exhibit 6, and
12  it would appear to me that the documents on this page
13  were provided to me.
14      Q.  Okay.
15      A.  I believe the documents on page 37 were also
16  provided to me.
17      Q.  Okay.  That would be 393 to 409; correct?
18      A.  Correct.
19          I believe most of these were provided to me.
20  The exception would be two of the last three.  426 and
21  424, I may have gotten independently.  Not certain of
22  that.
23      Q.  Okay.  I'll put question marks by those.
24      A.  I believe the documents on page 39 of this
25  exhibit were provided to me.

Page 75

1      Q.  Very well.
2      A.  I believe these documents were provided to me,
3  but the video, which is Exhibit 461, I independently --
4  the videos that I have as part of my references, I
5  independently found those videos, so that would be my
6  caveat to that one.
7      Q.  So 447 to 460, provided.
8          And then 462 to 469, provided?
9      A.  Certainly, yes, I believe that to be the case.
10      MR. KRISTAL:  461?
11      THE WITNESS:  461 was the One World News --
12  no, wait a second.  I'm not saying that this wasn't
13  provided to me.  I'm just saying that
14  independent -- the videos that I relied on -- I'd
15  have to cross-check the videos that I relied on to
16  see if that's one of the seven.  That's all I'm
17  saying.
18  BY MR. UPSHAW:
19      Q.  So the videos that you relied on, you found
20  them on your own?
21      A.  I did.
22      Q.  And you don't know though whether this is one
23  of them?
24      A.  I'd have to cross-check.  I just don't know
25  off the top of my head.

Page 76

1      I believe the documents on page 41 were
2  provided to me.
3      Q.  Okay.
4      A.  And then the documents from page 42, which are
5  depositions primarily and exhibits from plaintiffs.
6      Q.  I think that's the remainder of them.
7      A.  That's just what I'm checking.
8          I believe the balance of those were provided
9  to me because they were depositions of plaintiffs and
10  there are attached exhibits.
11      Q.  Okay.  All right.  Go back to your deposition
12  notice, and we can finish that up.  You provided --
13  number 3 was a current curriculum vitae, which you've
14  provided.  Number 4 is all billing records, invoices,
15  and as I understand correctly, you've provided those as
16  well; correct?
17      A.  Yeah that was the intent with the admin file.
18  I call it the admin file.
19      Q.  Very good.  Number 5 was a retainer letter.
20  And is that the only retainer letter that you have?
21      A.  It is.
22      Q.  Number 6, your expert report with your
23  opinions in the instant action.
24      A.  Well, the report is not my opinions.  It's a
25  statement of facts, but I assume we'll be asking about

Page 77

1  my opinions in that report at some point.
2      Q.  Okay.  So for now, let's mark your -- I think
3  you've titled it "Factual Summary in Support of Expert
4  Opinions."
5      A.  I made four or five changes to that report,
6  which I can give you the pages that were changed, but do
7  you want to mark --
8      MR. KRISTAL:  They were typos.  They were not
9  substantive changes.
10      THE WITNESS:  They were typos.
11  BY MR. UPSHAW:
12      Q.  All right.  So let me mark your corrected
13  copy, okay, and then we'll go through and just point it
14  out for me.
15      A.  Sure.
16      Q.  That way we'll all be on the same page.
17      A.  Here's one for you.
18      Q.  All right.  You've got one for you that I want
19  to mark?
20      A.  This is the one to mark.
21          (Defendant's Exhibit 7 marked for
22  identification.)
23      Q.  There you go.  That's Exhibit 7.
24          Now, before we --
25      A.  Well, it's -- okay, okay.  I thought you were

20  (Pages 74 to 77)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 78

1   referring to item 7, but it's Exhibit 7.
2       Q.  You are right.  It is not item 7, but it's
3   Exhibit 7.
4       Okay.  In Exhibit 7, you said that you've made
5   a few corrections.  I appreciate that.
6       A.  And I just usually bring the pages marked and
7   I can go through them, and you can make them as an
8   exhibit too, if you want.
9       Q.  That's fine.  If you've got another copy, we
10  can do that.  That's much easier to do.
11      A.  I'll just have them marked, you mark it, and
12  then I'll read it to you, if that's what you want.
13      MR. UPSHAW:  All right.  Let's mark those as
14  Exhibit 8.
15      (Defendant's Exhibit 8 marked for
16  identification.)
17      MR. KRISTAL:  And just so the record is clear,
18  8 are the corrections to what had been previously
19  provided to counsel.
20      7 is with the corrections in them.
21      MR. UPSHAW:  Thank you.  We'll get this
22  stapled so that we don't lose any of the pages and
23  our exhibits are complete, and Exhibit 8 consists
24  of four pages.
25      Okay.

Page 79

1       THE WITNESS:  So would you like me to go over
2   those real quick?
3   BY MR. UPSHAW:
4       Q.  Yeah, real quick, why don't we do that, just
5   so we have everything on the record.
6       A.  All right.  Let me lead you to page 2.
7       Q.  Okay.
8       A.  Page 2, the last paragraph, that one sentence
9   stops at the word "plaintiff" and then there's a new
10  paragraph, and the new paragraph begins with
11  "Mr. Winston" -- or, I mean -- I'm sorry.  Let me stop.
12      The first -- the last paragraph stops with the
13  word "Mr. Winston," and then the new paragraph begins
14  with "Roundup."
15      And I've also brought forward on page 4 --
16      Q.  Wait a minute.  I'm still on page 2.
17      A.  Yeah.
18      Q.  I don't find a sentence that ends with
19  "Mr. Winston."  Are you talking about the last paragraph
20  on the page?
21      A.  Yeah, let me see what's going on.
22      See the last paragraph?
23      Q.  Yes, sir.
24      A.  There's a sentence -- I don't know which
25  version you're looking at.

Page 80

1       Q.  I'm looking at both.
2       A.  Okay.
3       Q.  And they both start with -- the penultimate
4   paragraph says "While this summary is about Roundup
5   generally" --
6       A.  Right.
7       Q.  Okay.
8       A.  That paragraph has now been split into two
9   paragraphs.  Okay?
10      Q.  Okay.
11      A.  But to add to the complexity, there was
12  another sentence dangling out there on page 4 about
13  Mr. Winston, on the one you have, the original you have.
14  And I've simply brought that in together so both
15  sentences about Mr. Winston are in the same place.
16      So there was a sentence on page 4, "Following
17  use of Roundup, Mr. Winston was diagnosed with non" --
18  "NHL."  So I've simply brought that -- I've combined the
19  two sentences for Mr. Winston into one and then split
20  out the last sentence referring to these photographs.
21      Q.  Okay.
22      A.  Now, the -- on page 4, there's a reference on
23  the last paragraph on the copy you have, the figure
24  7-35.
25      Q.  Yes, sir.

Page 81

1       A.  It should be 1-4.
2       Q.  Okay.  So the figure number's been corrected?
3       A.  Correct.
4       Q.  All right.
5       A.  And then page 27 -- everybody there?
6       Q.  I am there on both.
7       A.  Under the title "4.4.4, Rank, et al.," first
8   sentence, last word in the second line, "Bone Morrow"
9   should be "Marrow," M-a-r-r-o, not M-o-r-r-o.  It's a
10  misspelling.
11      And on page 28, under 4.4.5, the title block
12  "Peluso" is misspelled.  It should be P-e-l-u-s-o, not
13  P-u, consistent with the rest of the paragraph.
14      Q.  Okay.
15      A.  We're making progress.
16      Page 73.
17      Q.  No worries.
18      A.  I've drug everybody there so far?
19      Q.  Let me just get there on both.
20      Yes, sir.
21      A.  The paragraph towards the bottom that begins
22  with the word "Finally."
23      Q.  Yes.
24      A.  Where it says "i.e.," it should say -- the
25  word should say "data."  It was misspelled.

21 (Pages 78 to 81)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 82

1    Q. Instead of "date," okay.
2    **A. Instead of "date."**
3        And page 74, the sentence just above 4.5.8
4    that begins with the word "Further," it refers to I
5    think "ICIPM," and it should be "UCIPM."
6    Q. Okay.
7    **A. And that's what I found so far.**
8    Q. Okay. All right. As a side note in
9    Exhibit 7, your factual summary which we'll go over in
10   excruciating detail, you reference several videos which
11   we do not have.
12       MR. KRISTAL: They're all online.
13       THE WITNESS: Well, we provided them --
14       MR. KRISTAL: Oh, yes, yes.
15       THE WITNESS: -- multiple times. I know they
16   were provided for the last sit down.
17       MS. GREENWALD: You mean the commercials?
18       MR. UPSHAW: Whatever it says, I mean,
19   there's --
20       (Simultaneous speaking.)
21       MR. UPSHAW: -- video 1 through 10 I think it
22   is. Sorry.
23       THE WITNESS: I think they're on the zip drive
24   as well.
25       MR. KRISTAL: We have a zip drive here. Do

Page 83

1    you have a USB port so we could pull them up and
2    you could look at them? I'm not sure how else
3    we --
4        MR. UPSHAW: Yeah, we'll figure it out.
5        THE WITNESS: You can transfer them if you
6    want --
7        (Simultaneous speaking.)
8        MR. UPSHAW: -- if you can put it in. I know
9    some of them we can't use if it's not encrypted and
10   all that kind of craziness.
11       MR. KRISTAL: They're all online. It's not
12   a...
13       THE WITNESS: But I think I also cut the
14   sections that were relevant.
15       MR. UPSHAW: Right.
16       THE WITNESS: Where I refer to them as 1
17   through 7, I cut them.
18       MR. UPSHAW: Yeah, I'd prefer to have the
19   actual exhibit versus whatever's in general out
20   there, but I appreciate it.
21       MR. KRISTAL: No, no, I disagree --
22       (Simultaneous speaking.)
23       THE WITNESS: -- I think you looked at the
24   whole nine yards and went to sleep.
25       MR. KRISTAL: I haven't opened this. This is

Page 84

1    my copy. But is it by exhibit number, so if they
2    go to 296, all the videos will be there?
3        THE WITNESS: Yeah. I think the way it reads
4    is -- it's either -- was it 296 or 396 --
5        (Simultaneous speaking.)
6        THE WITNESS: I forget which one it is. But
7    it will say "videos," and it will be a directory.
8        MS. GREENWALD: I also --
9        THE WITNESS: Go ahead. I'm sorry.
10       MS. GREENWALD: No, no. I also sent you those
11   five documents, but I didn't have your e-mail
12   address, so I sent them to you.
13       MS. ALVAREZ: Okay.
14       MR. UPSHAW: All right. And we'll flip
15   them -- we'll do it at lunch. You don't have to do
16   that now. If you don't mind, we can flip over.
17       THE WITNESS: Do you see what I'm referring to
18   yet, or has it come up?
19       MR. UPSHAW: I'm pretty sure you can see it.
20       THE WITNESS: It may still be loading. It's
21   like 14 gigabytes.
22       MS. ALVAREZ: I got an encryption blocker
23   message, so --
24       MR. UPSHAW: Yeah, that's what I was worried
25   about. You know they can't stick in the...

Page 85

1        MR. KRISTAL: I haven't tried to do it either.
2    Oh, you mean --
3        MR. UPSHAW: Yeah, our computers, you can't
4    just stick in a...
5        THE WITNESS: They don't want you to load
6    malicious stuff.
7        MS. ALVAREZ: Right.
8        MR. UPSHAW: Exactly, so we're all protected.
9        THE WITNESS: From yourself?
10       MR. UPSHAW: From ourselves.
11       MR. KRISTAL: I can try on mine and just hand
12   you my laptop if that works.
13       MR. UPSHAW: I'd like that.
14       MR. KRISTAL: We can figure it out.
15       MR. UPSHAW: We'll figure it out. It's not an
16   issue. We're not going to sit here during your
17   deposition and watch the video and have you comment
18   on it. It's just for me to have.
19       THE WITNESS: They're there. That's all I can
20   tell you.
21   BY MR. UPSHAW:
22   Q. All right. Let's keep moving through the
23   deposition notice.
24   **A. Okay.**
25   Q. So item 7, on the deposition notice, is any

22 (Pages 82 to 85)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 86

1  summary or other memoranda, report or document prepared
2  by you, at your direction, in support of your expert
3  report or expert opinion in the instant action.
4        Are there any documents we have not yet
5  identified that would fit this category?
6        A.  Yeah, I think so.  I sent -- well, first of
7  all, we've got the interviews.  Let me go through the
8  list and then you can ask me.
9        Q.  Perfect.
10        A.  The interviews.  I sent a PDF of a spreadsheet
11  that you guys should have somewhere.  I also brought
12  copies of -- which I tend to rely on -- the EPA Title
13  40, Part 170, Worker Protection Standard.  I've referred
14  to it in my report, but I brought a copy of the entire
15  statute.
16        MR. KRISTAL:  And just so we're clear, the
17  report -- there's no report required in Missouri,
18  so we've given you more than you're entitled to.
19  It's the facts upon which Mr. Petty's opinions are
20  going to be based, so it's --
21        MR. UPSHAW:  Correct.
22        MR. KRISTAL:  -- slightly different than a
23  normal report.
24        THE WITNESS:  This was simply an attempt to
25  facilitate the deposition and not looking at 500

Page 87

1        documents and pulling them one at a time.
2  BY MR. UPSHAW:
3        Q.  Okay.  All right.
4        A.  So those are the three items that I can think
5  of right away that we haven't covered.
6        Q.  Okay.  Then the rest of this should be pretty
7  simple.
8        Number 8, any report, memoranda, note or other
9  document prepared by you or at your direction in
10  connection with the instant action or any plaintiff in
11  the instant action, including the following 15
12  plaintiffs, and I think that's the reference to items we
13  have just discussed; correct?
14        A.  I brought four copies each of my interviews
15  with them, yes.
16        Q.  All right.
17        A.  And I think you have them, but I brought them
18  again.
19        Q.  Yes, sir.  And I appreciate that.
20        Number 9 would be a list of all organizations
21  which you have entered into consulting agreements within
22  the past 10 years to the extent that those agreements
23  are not protected from disclosure by attorney work
24  product doctrine.
25        Did you bring any of those?

Page 88

1        A.  With respect to disclosed expert witnesses --
2  or expert witness cases I have worked on, I have brought
3  that as item 4.  To the extent that I haven't been
4  disclosed and to the extent that all of my contracts
5  have a confidentiality provision, I have not provided
6  those.
7        Q.  Okay.  Number 10 would be a copy of all
8  abstracts, articles, draft articles, books, et cetera,
9  which has or part of subject matter NHL, glyphosate,
10  IARC and/or Roundup, that are not publicly or otherwise
11  available.
12        Did you bring anything that fits that
13  category, or is there anything that fits that category?
14        A.  I wrote a chapter in my textbook on indoor
15  environmental quality, which includes IAQ, indoor air
16  quality, and a lot of the stuff associated with
17  ASHRAE 55, which is the comfort standard.  The question
18  is -- and it may refer to IARC, but it's certainly not
19  targeting glyphosate.  But I certainly wrote a chapter
20  on IAQ, which was -- it's called IEQ, indoor
21  environmental quality, which is broader than IAQ, which
22  is indoor air quality.  That would be the only thing
23  that might be relevant, and I did not bring a copy of
24  the textbook, but it's available.  If you want to buy
25  it, it's on Amazon.

Page 89

1        Q.  So the textbook, then your rewrite is
2  available or --
3        A.  No, no, the forensics engineering textbook.
4        Q.  Okay.  Not the one you're redoing.
5        A.  No.  And I've just agreed to start doing it.
6  I haven't started writing that yet.
7        Q.  Which book was that again?  I keep getting
8  them confused.
9        A.  Yeah, it's on my resume on the very first
10  page.
11        MR. KRISTAL:  The CRC?
12        THE WITNESS:  Yeah, it's the first paragraph,
13  in fact, "Forensics Engineering Damage Assessment
14  For Residential and Commercial Structures."  And
15  there's 21 chapters and probably around 14 or 15 is
16  the IEQ chapter.
17  BY MR. UPSHAW:
18        Q.  Okay.  Is that the only chapter that you've
19  written in that book?
20        A.  No.  I wrote either all or parts of probably
21  two-thirds of them.
22        Q.  Next item is item 11 -- well, before I get
23  there, but the book is publicly available; right?
24        A.  Oh, sure.  You can type in my last name and
25  "Forensics Engineering."

23 (Pages 86 to 89)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 90

1    Q.  All right.  So it wouldn't fall into number 10
2  anyway because it's asked for not publicly or otherwise
3  available.
4    A.  Okay.
5    Q.  Number 11 is a copy of all handouts,
6  PowerPoints or other documents used by you at any
7  lecture you have given on non-Hodgkin's lymphoma,
8  glyphosate, IARC, and/or Roundup.
9    A.  It's not relevant.
10    Q.  Okay.  Number 12, all documents or
11  communications regarding glyphosate, non-Hodgkin's
12  lymphoma, Roundup or IARC sent to or received on or
13  after July -- I'm sorry -- January 1, 2013, from any
14  current or former employee or current or former member
15  of IARC -- well, you can read the rest.
16    A.  Yeah, it's not relevant to me.
17    Q.  Okay.  It's not relevant because you have not
18  had any communications with these organizations, or you
19  have and you have discarded those communications?
20    A.  Well, it's not relevant because I haven't had
21  any communications regarding glyphosate or Roundup with
22  these entities.  I mean, I've talked to California
23  OEHHA, but not on glyphosate.
24    Q.  All right.
25    A.  And, obviously, I've worked for the EPA going

Page 91

1  back 40 years, so -- but it's not -- it's only
2  tangentially related to herbicides, which is what I
3  mentioned earlier.  In '79, '80, I worked on the CHRIS
4  database, which included herbicides, but I think it
5  was -- I don't think Roundup was in there at that time.
6  I think Dual was in there, and I forget what the
7  different herbicides were.  But that's available on --
8  well, I don't know if it's available online or not.
9  It's 40 years from now, so you probably have better
10  access to it than I would, coming out of the Coast
11  Guard.
12    Q.  Not anymore.
13       Okay.  Number 13, any device, equipment or
14  other item used by you in connection with your report.
15       Does anything fall in that category?
16    A.  Am I supposed to bring my computer?  I don't
17  understand that.
18    Q.  I don't really know.  If you had something
19  that you thought was appropriate, then you would have
20  brought it; correct?
21    A.  No, not necessarily.  I mean, I've got my
22  phone that I did interviews with.  I got my computer I
23  typed on.  I printed stuff.  I don't understand this
24  question, to be honest with you.
25    Q.  Okay.

Page 92

1    A.  But I certainly didn't bring any device or
2  equipment to this deposition.
3    Q.  All right.
4    A.  Well, I brought my phone, but it's off.
5    Q.  Okay.  Number 14 asks for any notes or
6  recordings of interviews you've had with any of the
7  plaintiffs.
8    A.  I brought my notes from those.  I did not
9  have -- I did not make recordings of the interviews, but
10  I did bring my telephone interview notes.
11    Q.  Okay.
12    A.  Well, and I provided those as well.
13    Q.  Yes, you did.
14       Number 15 would be all photographs,
15  videotapes, and audio logs taken, reviewed, considered,
16  referred to or relied upon in connection with this case
17  that are not publicly or otherwise available or
18  protected by disclosure work product.
19       I think you just said you didn't record any of
20  the interviews with the plaintiffs; correct?
21    A.  Yeah, but I used videos, so I provided those.
22  So I guess in context with this question, that would
23  include videos that I've relied on.  So bottom line is I
24  think I've complied with it to the extent that I needed
25  to.

Page 93

1    Q.  Okay.  Very well.
2       Number 16, all other documents in your paper
3  file or computer files that were considered or relied on
4  in connection with any work done that relates to this
5  case, to the extent those documents are not publicly or
6  otherwise available, and I think we've just gone through
7  your list of exhibits.
8    A.  I think I've tried to do that, yes.
9    Q.  Okay.  And that would include the transcripts
10  of any depositions or trial testimony that you have
11  given -- actually wouldn't.  This is all transcripts or
12  any depositions or trial testimony you have given as an
13  expert witness within the last four years.
14    A.  I have not done that, don't intend to.  I
15  don't even know if I have -- I know I don't have them
16  all.  I don't have any of the trial testimony from -- I
17  might have -- I don't even know if I have the trial
18  testimony from C8.
19    Q.  Did you look for it?
20    A.  I didn't look.  I'm pretty sure I don't have
21  it.  There would be no reason for me to get it.
22    Q.  No, this doesn't ask you to get it.  This asks
23  if you have it in your possession, to provide it.  It's
24  not a requirement for you to go search for it.  But if
25  you have it, that's deposition and/or trial testimony,

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 94

1  we've asked that --
2      A.  Some of them I have; some of them I don't, but
3  I don't intend to provide them.  Some of them I have,
4  some of -- I didn't go look.
5      Q.  Well, is there a reason why you don't intend
6  to provide them when they've been requested pursuant to
7  your notice of deposition?
8      A.  Because I've never had to, ever.
9      Q.  So anything that's new in the whole time that
10 you've been an expert witness, you have determined
11 you're not going to provide, any new request?
12     A.  I mean, I got this like two or three days ago.
13 So no, I don't have the time.  I'm a one-man band.  I
14 don't have time to go back and do all that.
15     Q.  Dr. Petty, you're not a one-man band.
16     A.  I am.
17     Q.  You've got --
18         MR. KRISTAL:  You don't need to argue about
19 it.
20         THE WITNESS:  I am.
21         MR. KRISTAL:  Mr. Petty has said what he said,
22 and you've said what you said.
23         MR. UPSHAW:  Okay.
24         MR. KRISTAL:  We can move on.
25         MR. UPSHAW:  I am moving on.

Page 95

1  BY MR. UPSHAW:
2      Q.  On your agreement, do you not list hourly
3  rates for senior engineer, product engineer,
4  technicians, secretarial, administrative assistant?
5      A.  I do.
6      Q.  Do you have a senior engineer that works with
7  you?
8      A.  No.
9      Q.  Do you have a project engineer that works with
10 you?
11     A.  No.
12     Q.  Do you have a technician that works with you?
13     A.  No.
14     Q.  Do you have a secretary that works with you?
15     A.  I do.
16     Q.  Okay.  Did you ask your secretary to look for
17 item 7 -- anything that would be responsive for item 17?
18     A.  I did not.
19     Q.  Is there any reason you can't ask your
20 secretary today to look for those items?
21     A.  I will defer to counsel.
22         MR. KRISTAL:  Yeah, we'll take this under
23 advisement, and we can talk to you about it after
24 if you'd like.
25         MR. UPSHAW:  Okay.

Page 96

1  BY MR. UPSHAW:
2      Q.  Number 18, any index of transcripts of
3  depositions or trial testimony by you as an expert
4  witness that you have in your possession.  And I think
5  we've marked that already; correct?
6      A.  Is that the list of where I've testified --
7      Q.  Yeah, your case list.
8      A.  Case list in 4.  Yeah, I believe I've tried to
9  provide that.
10     Q.  Okay.  Have you signed any reports,
11 declarations or affidavits as an expert witness within
12 the last four years?
13     A.  Sure.
14     Q.  Okay.  Did you provide any of those?
15     A.  I did not.
16     Q.  Is there a reason you didn't provide any of
17 those?
18     A.  Most of them are confidential to my knowledge.
19 They're confidential under the terms of my agreement
20 that I execute with each firm.  They would have to allow
21 the release of those documents.
22     Q.  Okay.  You're saying the reports that you have
23 signed are confidential?
24     A.  They're part of the agreement that I execute
25 with the firm that any of the materials are confidential

Page 97

1  to that firm.
2      Q.  Okay.  I'll discuss that with counsel.
3         Number 20, any index of signed reports,
4  declarations or affidavits by you, as an expert witness,
5  within the last four years that you have in your
6  possession.
7         Do you have any of those in your possession?
8      A.  Sure.
9      Q.  Okay.  And you're refusing to provide those;
10 correct?
11     A.  I don't know if that's the right answer.  I
12 don't think that I can because every document -- I would
13 have to have permission from the people I work for to
14 release those documents, and I know that for a fact
15 because people have asked for copies of reports from
16 attorneys on other cases, and I've said, "You need to
17 contact them because I can't release them."
18     Q.  Okay.  Do you have any communication between
19 you and Dr. Benbrook?
20     A.  No.
21     Q.  Dr. Jacobsen?
22     A.  No.
23     Q.  Caron Jacobsen?
24     A.  No.
25     Q.  How about any of the other names listed here

25 (Pages 94 to 97)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 98

1    in item 21?
2        A.  Well, I've contacted the plaintiffs because
3    I've interviewed them.
4        Q.  Okay.  How about any of the experts?  And I'll
5    go through the list.  Dr. Lacasse?
6        A.  No.
7        Q.  Any communications with her?
8        A.  No.
9        Q.  Any communications with Dr. Portier?
10       A.  No.
11       Q.  Any communications with Dr. Siegel?
12       A.  Well, not in this case.  He was an expert in
13   C8.
14       Q.  All right.
15       A.  So I knew him from that case.
16       Q.  All right.  Well, this would be regarding
17   glyphosate or glyphosate-based herbicides, Roundup or
18   IARC.
19       A.  Well, I mean, IARC is so broad, I mean...
20           MR. KRISTAL:  Well, it relates to this
21   litigation, not some other litigation.
22           THE WITNESS:  Yeah, I mean, I haven't talked
23   to any of these experts.
24   BY MR. UPSHAW:
25       Q.  So you haven't talked to Dr. Staller or

Page 99

1    Dr. Ritz?
2        A.  No.
3        Q.  Dr. Jameson, Dr. Weisenburger, Dr. Shustov or
4    Dr. Sawyer?
5        A.  No.
6        Q.  You haven't talked to Dr. Sawyer?
7        A.  I have not.
8        Q.  Dr. Nabhan, Mr. Johnson, Mr. Mills or
9    Dr. Blair?
10       A.  No.  I think I've answered your question, but
11   you can go through them all if you like.
12       Q.  That was it.  Actually, I forgot Dr. Ross.
13   Don't want to do that.
14           Okay.  With regard to the interviews of the
15   plaintiffs, how were those set up?
16       A.  It depended.  I think Plaintiffs' counsel in
17   some cases set them up.  In other cases, I called --
18   they set them up, but I called them independently.  They
19   were all just telephone interviews where there was
20   agreement that I would contact them on a certain date
21   and time, and that's what happened.
22       Q.  Okay.  When you said you set them up, was
23   there any e-mail communication, or you would just call
24   them out of the blue?
25       A.  I'm sure there's e-mail communication.  But

Page 100

1    like I said, we don't retain that stuff.
2        Q.  Okay.  So we have and you have provided any
3    and all written materials you have with regard to your
4    interviews of the plaintiffs?
5        A.  I have.
6        Q.  You have --
7        A.  I have four copies of each one.
8        Q.  Okay.  You had no separate handwritten notes
9    or anything that you took during the interviews?
10       A.  If I did, they're -- they were destroyed after
11   I got done finishing writing it up.  That's been my
12   practice for 20 years.
13       Q.  Okay.  Number 22 is all communications,
14   including any attachments, between you and anyone,
15   including any current or former client, regarding the
16   potential carcinogenicity of herbicides, including but
17   limited to glyphosate and/or glyphosate-based herbicides
18   and Roundup that are not publicly or otherwise available
19   and not protected by disclosure.
20           Did you bring any of those communications?
21       A.  I don't have any -- anything documented on
22   communications with any -- I don't have anything
23   responsive to this, I don't think.
24       Q.  Did you look, Mr. Petty?
25       A.  What am I looking for?  I don't know how I'm

Page 101

1    looking for communications.
2        Q.  Well, you would -- I'm not sure how you would
3    look for communications in your office.  I'm not sure
4    how they are kept in your office, sir.
5        A.  Well, what are you referring to as -- I've
6    already told you about e-mails.  We don't keep the
7    e-mails.
8        Q.  That's fine.
9        A.  I don't keep recordings of telephone
10   conversations, so I don't know how I would bring -- I've
11   already said I didn't talk to any of these experts.  I
12   just -- I don't know how to answer this question.
13       Q.  This particular request does not ask you about
14   experts.  It asks you about any communications you've
15   had with current or former clients regarding basically
16   herbicides, including glyphosate or glyphosate-based
17   herbicides.
18       A.  Sure.  The only one I can think of is I've
19   talked to Peter Infante, but it's because we work on
20   cases together all the time, mainly benzene, and I was
21   aware of the fact that he was stricken from the advisory
22   panel.
23       Q.  Okay.
24       A.  So that's it.  He said he was going to testify
25   and he was stricken.  That's all I know.

26 (Pages 98 to 101)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 102

1    Q. And that was a written communication with --
2    **A. No. It was on the phone.**
3    Q. On the phone. Okay.
4         Number 23 would be all documents sent by --
5    sent to you by counsel for plaintiffs since your initial
6    retention in the glyphosate litigation that aren't
7    publicly or otherwise available but not protected by
8    work product doctrine or other protective agreement.
9         And I believe you've provided those, have you
10   not?
11   **A. That was my intent.**
12   Q. Okay.
13   **A. We haven't covered them all yet, but...**
14   Q. No, we have not.
15        Okay. Part of your admin file included your
16   amended expert disclosure. I will mark that as
17   Exhibit 9.
18        Okay. Do you have that in front of you?
19        (Defendant's Exhibit 9 marked for
20   identification.)
21        MR. KRISTAL: Is there a copy in here?
22        MS. GREENWALD: You can take Stephen's because
23   he's going to get that one.
24        THE WITNESS: Yeah, he's going to mark that.
25   I think they're the same.

Page 103

1    BY MR. UPSHAW:
2    Q. Let's make sure they're the same. How about,
3    Mr. Petty, you look through Exhibit 9 and make sure that
4    is the amended disclosure you had in your admin file
5    that was handed to me today.
6    **A. Did it just come out of the copies? Is that**
7    **where it came from?**
8    Q. Right here.
9    **A. Then it would be, yeah.**
10   Q. Okay. You've seen this document before?
11   **A. I have.**
12   Q. And I think you are located on page 7.
13   **A. My pages aren't marked, but I can find my**
14   **name. I think I'm after N.**
15   Q. Yeah, you're at the bottom.
16        Do you know whether you've been disclosed as
17   an expert in any other cases other than Earl Neal, et
18   al., and the Winston plaintiffs case we're here about
19   today?
20   **A. In what regards?**
21   Q. As far as disclosures.
22   **A. I've been disclosed in lots of cases. For**
23   **this Roundup?**
24   Q. For Roundup, yes, sir.
25   **A. That would be the only ones, yes.**

Page 104

1    Q. The only two?
2    **A. Yeah. I guess I look at it as one case, but**
3    **it's multiple plaintiffs, so yes.**
4        MR. KRISTAL: No. It was Neal and Winston.
5        THE WITNESS: Started as Neal, et al., and now
6    it's Winston et al., yes.
7    BY MR. UPSHAW:
8    Q. Right. Two separate cases.
9    **A. Okay.**
10   Q. Okay. Do you know if you've been disclosed in
11   any other cases other than the Winston plaintiffs case
12   and the Neal plaintiffs case?
13   **A. With regards to Roundup?**
14   Q. Yes, sir.
15   **A. No.**
16   Q. So your disclosure, is that an accurate
17   statement of your credentials?
18   **A. Well, I have other credentials as well. You'd**
19   **have to go to my resume. I'm certified in asbestos, for**
20   **example. But the primary certifications, CIH, CSP, and**
21   **PE, those are clearly the ones that are the primary**
22   **certifications. I guess asbestos would be one, but it**
23   **really wasn't relevant in my mind to this case.**
24   Q. Okay. And if you turn the page, the first
25   sentence of that page starts with your name. Does that

Page 105

1    statement accurately state the scope of your expert
2    witness opinion in this action?
3        MR. KRISTAL: Object to the form of the
4    question.
5    **A. I don't know if it's with respect to my -- I**
6    **really didn't quite understand your question, and I**
7    **apologize for that.**
8    Q. Not a problem.
9    **A. I think these are the areas in which I am --**
10   **these are the areas of expertise in which I will base my**
11   **expert opinions.**
12   Q. Okay. You're not a medical doctor; right?
13   **A. I am not.**
14   Q. Okay.
15        MR. KRISTAL: Do you play one on TV?
16        MR. UPSHAW: He gets the chance to ask
17   questions later.
18   BY MR. UPSHAW:
19   Q. And you're not an oncologist?
20   **A. I am not.**
21   Q. You're not going to be providing medical
22   opinions regarding disease or diagnosis; correct?
23   **A. I am -- I am not a medical doctor, so I'm**
24   **precluded from offering specific causation opinions. I**
25   **have been qualified in courts to offer, and on some**

27 (Pages 102 to 105)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 106

1  cases do offer, general causation opinions. In fact,
2  it's part of being a CIH.
3        My intent is not to offer general and specific
4  causation opinions necessarily in these cases, but if I
5  were for some reason asked some general causation
6  opinion that I felt qualified to answer, I might. But
7  that's not my intent.
8     Q. Okay.
9     A. I'm primarily here on warnings and exposure.
10    Q. Warnings and exposure, okay.
11    A. But I'm certainly qualified in the courts.
12 I've been through Daubert motion in federal court on
13 whether or not I'm a general causation expert, and the
14 courts have ruled that I am. And the distinction is I
15 just don't want to preclude myself from other work in
16 offering general causation opinions.
17    Q. Understood. But that's not what you've been
18 asked to provide for the Winston plaintiffs; correct?
19    A. That is correct.
20       MR. KRISTAL: You're talking about medical
21 causation. To the extent warnings relate to other
22 causation issues, obviously those opinions would
23 be --
24       THE WITNESS: Where it gets to be a little
25 difficult on general causation is appreciate, in

Page 107

1  the field of industrial hygiene, what I'm asked to
2  do outside of litigation, over and over again, is
3  people complain about health symptoms, and my job
4  is to take the world of things that might be
5  impacting them and winnow it down to things that
6  are most likely.
7        The absolute diagnosis is the medical doctor
8  takes my report, does an examination of the patient
9  and offers the specific causation opinion. So
10 there's a huge -- the distinction might be that
11 I've certainly been tested and qualified on
12 something like -- I have to know cause and effect.
13 That's 40 percent of the CIH exam, is toxicology,
14 because when we go into the environment and see
15 people, we have to know what might be likely
16 causing their disease.
17       We can't -- we can't diagnose that person
18 specifically. We're precluded from doing that.
19 But we provide input to that process. And I'll
20 give you an example real quickly. Outside of
21 litigation, I was tasked with going to a home with
22 a lady that was complaining of a lot of
23 health-effect problems. She actually was renting
24 the home. The insurance company sent me there.
25 They said test -- "We want you to go there and we

Page 108

1  want you to test for mold."
2        Well, I did the interview of the individual
3  and all her symptoms were gastrointestinal, and
4  mold by and large is associated with respiratory
5  tract diseases. I also did an inspection of the
6  home, and there was raw feces in the basement from
7  a broken pipe. So I called the insurance person.
8  I said, "I want to test for bacteria because
9  bacteria is associated with gastrointestinal
10 diseases."
11       The agent said, "No. We sent you to test for
12 mold."
13       I said, "Wait a second. Pretend I'm a
14 mechanic going in the garage and you bring your car
15 in and smoke's coming out of the engine, and you
16 tell me only work on the brakes." I said, "I'm the
17 expert. I'm telling you it's not the brakes. It's
18 the engine. Now, if you want me to test for mold,
19 I'll do it, but I want to test for bacteria because
20 those are more consistent with her symptoms."
21       And, indeed, when we tested for bacteria, we
22 found the bacterial levels were elevated. Now, can
23 I say that's causing her to be sick? No. But I'm
24 getting close because that report's going to her
25 physician. He's going to make the diagnosis

Page 109

1  because only a medical doctor can do that. But in
2  my world, I have to take the universe of things
3  that might be making somebody feel bad and try to
4  winnow those down. So I have to be a general
5  causation expert to do my job.
6  BY MR. UPSHAW:
7     Q. Okay. But for this case, you're not providing
8  any medical causation opinions; correct?
9     A. I don't believe so. But I'm just saying that
10 if somebody were to ask me general -- say in cross,
11 somebody went far afield and they asked me a general
12 causation opinion of something about general causation,
13 cause and effect, if I thought that I could answer it, I
14 would. But I don't intend to. That's not my goal.
15       I just don't want to preclude myself in this
16 case or in other cases, if I'm asked and I think I can
17 answer it, to do so. I don't intend to. But I
18 certainly don't want to preclude myself in other cases
19 where I am proffered as a general causation expert.
20    Q. Understood. You're not an epidemiologist;
21 correct?
22    A. I would be considered -- I would consider
23 myself an expert in epidemiology. I am not a -- I've
24 been both trained in classroom as well as tested on it
25 as a CIH. I'm not a board-certified epidemiologist, but

28 (Pages 106 to 109)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 110

1    I certainly am an expert in epidemiology as a result of
2    my CIH credentials.
3       Q.  You're not an epidemiologist; correct?
4          MR. KRISTAL:  Asked and answered.
5       A.  I just answered that question.
6       Q.  The question is:  Are you an epidemiologist?
7    Are you a board-certified epidemiologist?
8          MR. KRISTAL:  That's a different question.
9    BY MR. UPSHAW:
10      Q.  We're not going to go back and forth, but go
11   ahead and answer the question.
12      A.  I'm not a board-certified epidemiologist, but
13   I am certainly qualified as an expert in epidemiology.
14      Q.  Have you ever performed an epidemiology study?
15      A.  I don't know if I've actually done an
16   epidemiology study, no.
17      Q.  Okay.  Are you a board-certified toxicologist?
18      A.  It's really the same answer.  I'm not a
19   board-certified toxicologist, but I am certainly a
20   qualified expert in toxicology.  In fact, it's 40
21   percent of the CIH exam, as I mentioned earlier.
22      Q.  So there's some designation as a certified
23   industrial hygienist that makes you a toxicologist?
24      A.  You have to know toxicology in order to do
25   your job.  I just gave you examples of why, when you go

Page 111

1    into the workplace, you have to know cause and effects,
2    and that's toxicology.
3       Q.  I understand you may work with toxicology,
4    Mr. Petty --
5       A.  No, I'm not working with toxicology.  I'm in
6    the real world where people are feeling bad or sick, and
7    I have to try to figure out why.
8       Q.  Sure.  Do you have a degree in toxicology?
9       A.  No.  But I have an education in toxicology.
10      Q.  Okay.  All right.
11         So it's Exhibit 6, let's go back to that a
12   second.
13      A.  Okay.
14      Q.  When did you start creating this reliance
15   material list?
16      A.  In -- well, the -- when did I start?  I'm
17   referring to -- I mean, there's multiple sets of
18   material here; right?
19      Q.  Yeah.  We marked as Exhibit 6 what you've
20   titled --
21      A.  If you want to ask me, for each of these
22   sections, when I started preparing that.
23      Q.  I can do that.  If there are different
24   answers, different responses, I'm happy to do it that
25   way.

Page 112

1       So let's go to Section 1, "Publically
2    Available Reference Materials," which starts on page 2.
3          When did you start compiling that list of
4    materials that's included in this document, for
5    inclusion in this document?
6       A.  Well, that list would have been available from
7    many earlier reports, and then I updated it as part of
8    this particular set of work.  So it may have been
9    updated from 2018 until very recently.
10      Q.  Okay.
11      A.  It's really not quite the same answer,
12   but on -- oh, the standards, similar answer.  I use this
13   or at least elements of this list in many of other
14   cases, and then I tune the list depending on the case
15   that I'm involved in.
16      Q.  And when would you have tuned this list that
17   starts on page 8?
18      A.  It would have been during the entire
19   timeframe, different -- I worked on this project in
20   bursts -- I call it bursts of activity.  And I think
21   there were probably -- I'm not saying there weren't days
22   that I didn't do some limited work on the project, but I
23   would say there were three major phases where I did a
24   block of work, and it would have been during those times
25   that I would have taken a look at this list.

Page 113

1       Q.  Okay.  So you're thinking of three specific
2    occasions when you had a burst for work, as you put it?
3       A.  Yeah, I think there was a time where I -- when
4    I put together the Neal version of this report just
5    before I was deposed back in second quarter of '18, it
6    would have been.
7          MR. KRISTAL:  Going to be deposed.
8          THE WITNESS:  I was going to be deposed,
9    correct.
10         MR. KRISTAL:  Right.
11         THE WITNESS:  Because I think I sat -- I want
12   to say the 25th of July, but it was something -- it
13   was almost exactly a year ago.
14         And then I worked quite a bit on it again in
15   the early part of '19, and then I worked quite a
16   bit again on it in the last month.  So those were
17   the three periods where I recall spending the most
18   time on this report, on this work.
19   BY MR. UPSHAW:
20      Q.  Okay.  And turning to your list of exhibits,
21   the same initial question:  When did you start compiling
22   that list for the Winston report that's dated July 1,
23   2019?
24      A.  It would have started very soon after --
25   again, I don't compile this list.  Just appreciate that.

29 (Pages 110 to 113)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 114

1   My admin people do.
2       Q.  You're right.
3       A.  But they would have started compiling this
4   list as soon as there was initial -- I think we talked
5   about the first -- I want to say the first 10 exhibits
6   came to us right away in early -- well, it would have
7   been probably in February of '18, so that first list of
8   10 would have gone on there early.  Then it's just
9   continuously added to until -- I mean, we were getting
10  deposition testimony in the last three weeks or so.  You
11  know, there's still -- there's still open depositions of
12  some of the plaintiffs.
13      Q.  Okay.
14      A.  So that was added to -- that would be added to
15  as the material came in or I submitted batches to her to
16  add materials that I was adding to this list that
17  weren't readily available.
18      Q.  And is it possible that between now and the
19  time you appear at trial, that you would add additional
20  items to your reliance materials list or your -- I say
21  your exhibit list?
22      A.  It's possible only -- I say "only" because
23  some of the depositions still remain open of some of the
24  plaintiffs.  So to the extent that I was sent additional
25  depositions from the plaintiffs or exhibits from those

Page 115

1   depositions, then yeah.
2       Q.  Other than the plaintiffs' exhibits -- or
3   deposition testimony, which begins at 491, I believe --
4       A.  Okay.
5       Q.  -- do you anticipate adding any other
6   documents to this list?
7       A.  I don't intend to, but I can't preclude the
8   fact that I get sent additional materials.
9       Q.  Okay.  We talked a lot about this list, and I
10  don't want to go back over some of those questions.  But
11  I do want to ask you:
12          Did you consider the North American Pooled
13  Project in deriving your opinions in this case?
14      A.  The North American?
15      Q.  Pooled Project or NAPP.
16      A.  My recollection of that, it was more on the
17  causation side, so not so much.
18      Q.  Okay.  Have you looked at it?  Have you seen
19  it?
20      A.  I'm not sure.  I've looked at a lot of
21  documents.  I'm just not sure.
22      Q.  Let me mark for you, as Exhibit 10, an article
23  by Pahwa Freeman, et al.
24          I don't know if you have one or not.
25          (Defendant's Exhibit 10 marked for

Page 116

1   identification.)
2       MR. KRISTAL:  Thank you.
3   BY MR. UPSHAW:
4       Q.  Have you seen this before, Mr. Petty?
5       A.  I don't know if it was -- I know that this
6   journal was referenced when we went through that list.
7   I just don't know if this was the one, the Scandinavian
8   journal.  I just don't recall.
9       Q.  Okay.  Well, take a second to look at it and
10  just let me know if it looks familiar.
11      A.  My answer remains the same.  I just don't
12  know.  It's mainly a causation paper, so I would have
13  been -- even if I was provided with it, I would have
14  spent less time with it.
15      Q.  Okay.
16      A.  I mean, the objectives are epidemiology.
17      Q.  You've reviewed epidemiology for your opinions
18  in this case, have you not?
19      A.  It's kind of a yes or a no.  There's certainly
20  a lot of documents that are associated with
21  epidemiology.  My focus was different.  My focus was to
22  the extent that information was known, was it provided
23  to the public, government officials, et cetera, as it
24  should have been based on Monsanto's own standard of
25  care, industry standard of care, and governmental

Page 117

1   standard of care.  So.
2           I'm a little -- I'm looking at it a little
3   differently.  I'm not the epidemiology expert, but if
4   there's epidemiology information that was either -- was
5   the -- the totality of the information available, was it
6   provided in a transparent way to those entities, that's
7   why I'm here.  I'm really here on warnings, as opposed
8   to -- I'm not here at all on causation.
9       Q.  Okay.  So --
10      A.  So that's the distinction.
11      Q.  All right.  So now that I understand you
12  correctly, what a particular study, epidemiology study,
13  says or holds, it was not relevant to your opinions for
14  this matter; it was whether or not or how -- it was more
15  on how was that opinion disseminated, used or discussed?
16      A.  Well, I only hesitate because you're saying it
17  wasn't used -- it's the predicate that I'm not
18  necessarily agreeing with.  There are -- I'm using --
19  where I use the epidemiology, I'm using it in context
20  with what was known and how it was presented to affected
21  entities.  And so that --
22          I mean, but I'm not here to discuss individual
23  epidemiology papers as to whether this one's good, this
24  one's bad, this one I agree with, this one I disagree
25  with.  What I'm asking is how transparent was Monsanto

30 (Pages 114 to 117)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 118

1  with what they knew when, to various entities, period,
2  and epidemiology would be a subset of that.
3      Q.  A subset of what they were transparent on or
4  not, is that what you're saying?
5      A.  Yes.
6      Q.  Okay.  So if I ask you if you looked at any of
7  the materials from Health Canada, have you done that in
8  relation to your opinions in this case?
9      A.  I think as part of reading the attached
10 material from some of the depositions of some of the --
11 the first -- some of the depositions of some of the
12 causation experts, for example, would refer to some of
13 these studies, and when they were attached, I would
14 certainly look at them, but it wasn't a focus.
15     Q.  Okay.  So have you seen the 2019 "Statement on
16 Glyphosate from Health Canada"?
17     A.  I don't believe so.
18     Q.  I'll mark that statement as Exhibit 11.  There
19 we go.
20         Have you seen that before, sir?
21         (Defendant's Exhibit 11 marked for
22 identification.)
23     A.  Well, let me look at it first.
24     Q.  Sure.
25     A.  I don't believe I've seen this.

Page 119

1      Q.  Okay.  Are you familiar with the EPA's most
2  recent document, titled "Proposed Interim Decision on
3  Glyphosate"?
4          MR. KRISTAL:  I'm not sure why you're asking
5      questions about this given the scope of what
6      doctor -- I'm sorry -- Mr. Petty has said.  This
7      last document, Health Canada, Exhibit 11, is
8      January 2019, so we don't intend to ask Mr. Petty
9      if Monsanto was or wasn't transparent with
10     information it received in 2019, so --
11 BY MR. UPSHAW:
12     Q.  So let me ask you this, and that may help.
13         Thank you, Jerry.
14         Through what time period do you intend to
15 offer your opinions with regard to transparency?
16     A.  The latest information that I might offer
17 opinions on would be the most recent EPA risk assessment
18 on glyphosate, and I don't know if that's late '18 or
19 early '19.  But if -- you know, if asked about -- for
20 instance, being an expert on risk assessment, I wanted
21 to see what pathways they were considering.
22     Q.  "They" being who?
23     A.  EPA.
24     Q.  Okay.
25     A.  And also being an expert in dermal, I wanted

Page 120

1  to see specifically how they were handling dermal.  And
2  my observation of the -- I think it's a 2018, but I
3  could be wrong, EPA risk assessment was that they
4  assumed there was no cancer pathway and they assumed
5  there was no dermal pathway.  Now, I find that -- I used
6  to always say, when I was training on risk assessment,
7  if you assume away all the pathways, you don't have any
8  risk.
9          So it's not a surprise to me their conclusions
10 that -- and I would quibble greatly with them assuming
11 away the dermal irritation pathway.  I think that is
12 flat-out wrong.  But if you do what they did -- they
13 only looked at the -- I think it's the rabbit acute
14 toxicity on the dermal side.  That was the limitations
15 to their dermal analysis.  So I'm very -- I have a lot
16 of experience at looking at risk assessments and trying
17 to figure out what's in and what's out and whether or
18 not that makes any sense.
19         So from that standpoint, if asked opinions
20 about -- the latest document I can think of looking at
21 was the EPA risk for glyphosate, and I have the
22 criticisms I just offered.  Particularly on the dermal
23 side, I think that that was a mistake.
24     Q.  The last document -- and since you referred
25 to it, I think you're referring to what I'm marking as

Page 121

1  Exhibit 12.  It's from April 2019.
2          Can you look at that and tell me if that's
3  what you're referring to?
4          (Defendant's Exhibit 12 marked for
5  identification.)
6      A.  No, this isn't the document.  This document's
7  too thin.  I was reviewing the document where it
8  actually had all the pathways and their justification
9  for including or excluding.  This is an Interim
10 Registration Review Decision.  This isn't the risk
11 assessment.
12     Q.  Okay.
13     A.  I was looking at the risk assessment and
14 specifically the document that listed all the pathways
15 considered and which ones they included and excluded and
16 the data that was -- these were the pathways it was
17 based on.
18     Q.  Do you recall the year of the document you're
19 referring to?
20     A.  It was either late '18 or early '19.
21     Q.  Do you know whether it's on your exhibit list?
22     A.  I don't.  I looked at it online.
23     Q.  So that would be a document you would rely on,
24 since you refer to it?
25     A.  I would rely -- I mean, only in a secondary

31 (Pages 118 to 121)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 122

1  sense. I don't know that I'm going to be asked
2  questions about the EPA risk assessment. I looked at it
3  tangentially only because I was interested in how EPA
4  was handling dermal. And I spent considerable work
5  looking at the studies that have been done since 1983 by
6  or on behalf of Monsanto in the dermal area, and I was
7  curious how they were going to -- I saw that they had
8  done a risk assessment, a recent one, and I wanted to
9  see how they handled the dermal. I was surprised.
10       And so I -- I'm not here to comment on what
11  EPA does necessarily or doesn't, about their internal
12  matters. I'm more here to look at Monsanto's behavior
13  with respect to warnings. And so that's a different
14  issue. I mean, if I were asked about it, I just wanted
15  to be familiar with what they had done with dermal and
16  risk assessment. That's all. I don't see it as being a
17  primary input to my opinions because my opinions have to
18  do with Monsanto, not the EPA.
19       Q.  And it's your opinion that what the EPA does
20  or doesn't do is not critical to what Monsanto has done
21  or hasn't done with regard to warnings?
22       A.  Well, that has a yes or no answer.
23       Q.  Be my guest.
24       A.  They certainly have responsibility ultimately
25  for labels, but they make it absolutely clear -- and

Page 123

1  it's in my report -- that the fundamental responsibility
2  for the information that they use to make that
3  determination comes from the applicant, and that there's
4  an obligation, a legal obligation, to make sure that
5  that information is transparent and current. So the yes
6  part of the answer is yeah, they have responsibility.
7       The difficulty is -- it's the same thing in
8  warnings. I get asked this question all the time
9  because I've testified on warnings dozens of times.
10  Well, isn't it true the employer has the ultimate
11  responsibility to train and warn the worker? Well, the
12  answer is yes-no. Yes, they do, subject to the fact
13  that they're given the correct information on which to
14  train. So the same sort of analogy holds here; that is,
15  the EPA is clearly saying -- and I'll point out the
16  language in my report. I just want to make sure I have
17  it right. I think it's on 107.
18       On 107 --
19       MR. KRISTAL:  This is Exhibit 7, the factual
20  summary?
21       THE WITNESS:  Yes, I'm sorry. Exhibit 7, the
22  factual summary on page 108.
23  BY MR. UPSHAW:
24       Q.  108.
25       A.  One of the things I did, as part of my

Page 124

1  methodology, is I go back and I found it to be very
2  helpful over the years to read the preambles to all the
3  rules, whether they be, you know, proposals or final
4  rules, because they're sort of the back and forth about
5  what they're thinking; that is, the EPA. And here they
6  make it clear -- this is this carved out, indented
7  section. It says, "Section 6(a)" -- this is coming out
8  of the Federal Register regarding rulemaking since 1975.
9       They're saying, "Section 6(a) of the Act,"
10  that's FIFRA, "and 162.8(d) of these regulations imposes
11  on the registrant the affirmative duty to report any
12  additional factual information, regardless -- regarding
13  adverse effects on man or the environment of the
14  pesticide. EPA interprets report of scientific findings
15  in the general literature as within that duty. The same
16  affirmative duty is imposed upon the applicant for
17  re-registration as well. The burden for establishing
18  the safety of the product is on the applicant at all
19  times."
20       So -- and then they say, "The duty falls on
21  the applicant or registrant because they are in a better
22  position to monitor the literature as regards to a
23  particular pesticide."
24       Q.  What was the sentence you just skipped?
25       A.  The one in between?  The "He must convince"?

Page 125

1       Q.  Who's the "he" you're referring to?
2       A.  The registrant.
3       Q.  Okay.
4       A.  That's my read of it.
5       So it's clear that the EPA is saying they're
6  absolutely dependent on -- they're absolutely dependent
7  on what information's provided to them, and the
8  obligation to provide that information is on the
9  registrant.
10       Q.  And who would be the "administrator" in this
11  paragraph?
12       A.  The "administrator" -- where are you at?
13       Q.  "He must convince the Administrator." "He" is
14  the applicant, and the "administrator" is who --
15       A.  The "administrator" is the Pesticides Program.
16       Q.  OPP?
17       A.  That's my assumption, yeah.
18       Q.  Okay.
19       MR. KRISTAL:  If you're done with this line of
20  questioning --
21       MR. UPSHAW:  I was thinking the exact same
22  thing. If that's the end of your answer, we can
23  take a break for lunch.
24       THE WITNESS:  Sure. So that's the yes and the
25  no aspects of that answer.

32 (Pages 122 to 125)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 126

1     MR. UPSHAW:  Okay.
2     THE VIDEOGRAPHER:  This marks the end of video
3  media disc number 2.  The time is 1307 and we're
4  going off the record.
5     (Recess from 1:06 p.m. to 2:18 p.m.)
6     MR. KRISTAL:  Mr. Petty's also been designated
7  in the Kane, K-a-n-e, case, that happened
8  relatively recently.  He didn't mention that.
9     MR. UPSHAW:  Right, right.
10    MR. KRISTAL:  Kane was the third one.
11    MR. UPSHAW:  I'll ask you the question just so
12  it's on the record.
13    THE WITNESS:  Fair enough.
14    MR. UPSHAW:  That will give you a chance to
15  clarify.
16    THE WITNESS:  Correct the record.
17    THE VIDEOGRAPHER:  We're back on the video
18  record.  This is the start of video media disc
19  number 3 of the deposition of Stephen Petty.  The
20  time is 1420.
21  BY MR. UPSHAW:
22  Q.  Mr. Petty, welcome back from lunch.
23  A.  Thank you.
24  Q.  I understand there may be a correction we need
25  to make.  I asked a question earlier what cases -- what

Page 127

1  glyphosate cases that you have been disclosed in, and I
2  understand that was not a complete answer from earlier.
3  A.  Yes.  There was a third set of cases, the Kane
4  cases, that should have been part of that answer.
5  Q.  I think it's K-a-n-e is how you spell it.  Do
6  you know?
7     MR. KRISTAL:  Yes, that's right.
8  BY MR. UPSHAW:
9  Q.  Okay.  All right.  Anything else that you can
10  think of we need to correct before we move forward?
11  A.  No.  I think we're good.
12  Q.  All right.  Since this is the first time
13  you're being deposed in this litigation, I have some
14  more background questions for you.  Specifically, I want
15  to be clear on your education and go into a little more
16  detail in that regard.
17     Your Bachelor of Science degree was from what
18  university?
19  A.  University of Washington in Seattle.
20  Q.  And what year did you graduate?
21  A.  '79.  That means I'm old.
22     MR. KRISTAL:  Not as old as those of us who
23  graduated college in '71.
24  BY MR. UPSHAW:
25  Q.  And after graduating with your BS -- that was

Page 128

1  in chemical engineering?
2  A.  Correct.
3  Q.  Did you obtain a master's degree?
4  A.  I did.  Well, I went to work right away, and
5  then I went to night school for seven more years.  But
6  the answer is yes, the next degree I got was in chemical
7  engineering, a master's.
8  Q.  Okay.  And that was from the University of
9  Washington as well?
10  A.  Yes.
11  Q.  What year was that?
12  A.  1982.
13  Q.  And then you have obtained other degrees?
14  A.  Yeah.  I have an MBA.
15  Q.  Okay.  That's from the University of Dayton?
16  A.  Yep.  1987, I think.
17  Q.  And in our discussions this morning, you
18  referenced other educational opportunities you took
19  advantage of.
20     Can you explain what you were talking about?
21  A.  You know, there was a course -- a quarter-long
22  course offered at Ohio State.
23  Q.  What did you say?
24  A.  A quarter-long, a quarter class.
25  Q.  Quarter?  Oh, okay.  Got you.

Page 129

1  A.  On risk assessment.  It was sponsored by both
2  Ohio State and the University of Cincinnati, and there
3  were like 15 of us.  I want to say it was in 1997, and
4  it really was on the whole -- risk assessment was kind
5  of just coming along at that point, and mostly it was
6  regulators in the class.  I think there were two of us
7  from the industry.  And it had modules on epidemiology,
8  toxicology, interface with the public, and then just the
9  mechanics of doing risk assessment.
10  Q.  Did you walk away from that quarter-long
11  course with some type of certificate?
12  A.  Yeah, I'm sure I did.  I've still got the -- I
13  think I still have the notebooks from that class.
14  Q.  All right.  Any other formal training in your
15  career?
16  A.  Well, I've taken and have taught the 40-hour
17  HAZWOPER classes.
18  Q.  I'm sorry.  Has -- say that again.
19  A.  HAZWOPER.
20  Q.  HAZWOPER.  Okay.
21  A.  It's the transportation spill response sort of
22  certificate.  In other words, if you have spills of
23  hazardous materials, you have to have people that have
24  been HAZWOPER trained to go out and deal with the
25  spills.

33 (Pages 126 to 129)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 130

1    Q. How would you spell that?
2    A. H-A-Z-W-O-P-P-E-R [sic]. Strange acronym.
3    Q. Okay.
4    A. And then I've had the 40-hour asbestos
5  training, and then every year --
6        THE REPORTER: I apologize. Just one second.
7  I got bit by a mosquito.
8        (Brief interruption.)
9        THE WITNESS: So the other area was I had the
10  40-hour asbestos training, so I'm a hazard
11  evaluation specialist, and I don't know; I can do
12  pretty much everything in asbestos, and then
13  every year I've got to go back for another eight
14  hours. But that certification's for -- asbestos
15  certifications are by state, so in that case I was
16  in Ohio. It allows me to do sampling work in Ohio.
17        I took a variety of courses before I took my
18  PE. I don't know that they're all that relevant.
19  I took a quarter course on statics and dynamics at
20  Columbia Basin Community College. That's all that
21  comes to mind.
22  BY MR. UPSHAW:
23    Q. And in what state did you take your
24  engineering certification? That's PE; right?
25    A. Yeah, it's split, because remember I said

Page 131

1  there's two exams. So the -- but they -- now they call
2  it the FE, is the first exam, fundamental exam. It used
3  to be called EIT, but I guess that's not politically
4  correct anymore. It was engineering training in those
5  days. And I took that in the state of Washington, and
6  then I took my PE exam in the state of Ohio, several
7  years later -- three years later, I think.
8    Q. And when did you become a certified PE?
9    A. 1982, I think. A long time ago.
10    Q. The same year you got your master's?
11    A. I think so, yeah. I'm pretty sure that's
12  right.
13    Q. Okay. Any other training that you have
14  received throughout your career?
15    A. Oh, I took the -- it's hard to remember all
16  this stuff. I took the one-week CIH prep course at the
17  University of Michigan, so they're a pretty well-known
18  school for industrial hygiene, so I took their one-week
19  class to get ready to take the CIH exam.
20    Q. It was like an exam prep?
21    A. Yeah, it was called CIH Prep or something. It
22  actually was -- actually, I took it before I took the
23  IHIT. They call that the industrial hygienist in
24  training, and you had to pass that exam before you could
25  take the CIH exam.

Page 132

1    Q. Okay.
2    A. And then I took -- actually, I took another
3  week class on CSP prep, certified safety professional
4  prep, so -- and then I've had dozens of classes because
5  of all the maintenance requirements for -- the
6  maintenance requirements on all three of these
7  certifications -- actually, the four of the asbestos,
8  are onerous.
9        So I probably spend one to two months a year
10  just taking classes either online or in person to
11  maintain those certificates, and I took a -- I think
12  the -- no. What is the board -- the Certified Safety
13  Professional Board offered a class that was 50 -- 50
14  hours that I took last year on industrial hygiene, so I
15  took that review class.
16    Q. Okay.
17    A. But, I mean, I take probably 100 to 200 hours
18  a year of coursework.
19    Q. To keep your certifications active?
20    A. Yeah.
21    Q. Let's turn now to your employment history, and
22  it's probably easiest if we start with your employment,
23  if any, during -- or, let me ask you this: Were you
24  employed at any time before college?
25    A. Oh, yeah. I started working at eight years

Page 133

1  old.
2    Q. Okay.
3    A. I was a lumberjack. I was felling trees with
4  a chainsaw at eight or nine years old, climbing them.
5    Q. And where were you a lumberjack?
6    A. Cascade Mountains in Washington state.
7        MR. KRISTAL: (Inaudible.)
8        MR. KRISTAL: What?
9        MR. KRISTAL: Sorry. It's an aside. I
10  apologize.
11        THE WITNESS: You wouldn't catch me dead in
12        those trees now but, I used to climb to the very
13        top, top them and send them back over.
14  BY MR. UPSHAW:
15    Q. This work as an 8-year old, were you getting
16  paid for this?
17    A. We would -- mostly we were cutting firewood,
18  so, yeah, I would -- we would cull the wood out of the
19  woods in a wheelbarrow, and then in the fall since we
20  didn't have vehicles, we would go down and people would
21  come and buy firewood for 5 cents apiece. And we did
22  that for 10 years.
23    Q. So from 8 to 18?
24    A. Yeah, yeah -- well, I also did some other
25  things about 17 or so.

34 (Pages 130 to 133)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 134

1  Q.  Okay.  That was just one job.
2     Okay.  So what else did you --
3     A.  17 to 18, I worked at a store called
4  Albertson's --
5     MR. KRISTAL:  You know, is this really part of
6  what we want to spend our time -- I mean, if you're
7  going to be asking for more time, we're going to be
8  opposing it, and this would be perhaps Exhibit 3
9  or 4.
10    MR. UPSHAW:  Well, that's --
11    MR. KRISTAL:  What he was doing at eight years
12 old, cutting trees down?
13    MR. UPSHAW:  I asked if he had any jobs before
14 college.  He started at eight.  I'm just starting
15 where the witness starts.  I'm going where the
16 witness starts.  I'm following the process.  I'm
17 not sure he had too many other jobs between 18 at
18 Albertson's and college.
19 BY MR. UPSHAW:
20    Q.  Did you?
21    A.  I had a few.  I worked at Albertson's.  My
22 job was to clean restrooms and the meat department.
23    Q.  What other jobs did you have?
24    A.  My next job was I was a guard in the Cascade
25 Mountains, guarding equipment with a shotgun so people

Page 135

1  didn't damage it.
2     Q.  And this was all between the ages of 17 and
3  18?
4     A.  No, no, 17 and 18.  And then 19 was the guard
5  job.
6     Q.  Were you in college then?
7     A.  It was one summer, yes.  And then two summers
8  after that, I worked for Weyerhaeuser twice, and they
9  helped put me through school, so I always say I promise
10 to use as much trees and paper as possible to reward
11 them for putting me through school.
12    Q.  What did you do at Weyerhaeuser?
13    A.  There were five of us.  I worked at two
14 different mills.  One was the Longview mill just north
15 of Portland, Oregon, and the other one was the Everett
16 mill, north of Seattle.  And in both cases, they took
17 top 5 percent kids:  There was a girl from Berkeley, a
18 girl from Cal Tech; I was out of Washington; there was a
19 guy from Oregon state.
20    Anyway, our job at Longview was to try to
21 reduce their water consumption from 100 million gallons
22 a day to less, so we did water balances, we did
23 wastewater balances, and came up with schemes to save
24 about 10 million gallons of water a day.
25    Q.  Okay.

Page 136

1     A.  So that was our big thing.  We did a lot of
2  analytical work.
3     Q.  Did you do any work during class time?
4     A.  I did not work during class time.
5     Q.  Okay.  So these were all summer jobs?
6     A.  These were all summer jobs.
7     Q.  All right.  We're to your senior summer, then,
8  I think.
9     A.  I think the senior summer was the last
10 Weyerhaeuser job.
11    Q.  All right.  So after you graduated from
12 college, where did you work?
13    A.  I first started working for Battelle at the
14 Atomic Works in Hanford, Washington.
15    Q.  And what year was that?
16    A.  1979, June of '79.
17    Q.  When did you leave Battelle?
18    A.  Well, I left Hanford in '82, and then -- but I
19 was transferred to corporate in Columbus, Ohio, and I
20 left corporate in Columbus -- I was there 10 years
21 total, ballpark, then I went to Columbia Gas System.
22    Q.  So you transferred to Columbus and that was --
23    A.  '82.
24    Q.  -- '82 to '89?
25    A.  Ballpark -- no, no, no.  That would have

Page 137

1  been -- yes, that's right.  I left -- I would have
2  started Columbia around that timeframe.
3     Q.  And you started at Battelle -- what was the
4  name of the facility?
5     A.  The Hanford Atomic Works where they made the
6  plutonium for the nuclear bombs.
7     Q.  Okay.  So you left Battelle and Columbus in
8  '89, and where did you move to?
9     A.  I went to Columbia Gas System R&D, so
10 technically a place called Marble Cliff, but it's a
11 suburb of Columbus as well.  I was there for about 10
12 years.
13    Q.  So '89 to '99 would be accurate?
14    A.  Ballpark, yeah.
15    Q.  And what did you do with Columbia Gas Systems?
16    A.  My initial assignment was to -- they had
17 patents on a heat pump technology called chemical heat
18 pumps.  The holy grail for the gas industry was to have
19 a cooling load, so they were looking for ways to use gas
20 to make cold.  And I worked on a system called
21 ammonia-sodium thiocyanate, and that's where I got a lot
22 of my patents.  And we proved out that technology in
23 probably the first two or three years I was there, and
24 then I became section manager and then department
25 manager.

35 (Pages 134 to 137)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 138

1  Q.  So were you a researcher then?
2  A.  Yes.
3  Q.  What was your title?
4  A.  Well, in -- okay.  The title at Columbia was
5  senior research engineer, then section manager, then
6  department manager.
7  Q.  These particular employments are not laid out
8  anywhere in your CV, are they?
9  A.  I don't know.  There's a lot not laid out in
10  the CV.  I mean, you work 40 years; it could be 100
11  pages.
12  Q.  I understand.  Just making sure I didn't miss
13  anything.
14  A.  I thought the --
15  You're correct.  It's more by experience and
16  areas than it is by employers, per se.
17  Q.  Understood.  Just wanted to make sure I didn't
18  miss anything.
19  So is Columbia Gas Systems the same as your
20  employment with Columbia Energy?
21  A.  Well, got to make the Cliff Notes version of
22  that.  Columbia Gas System owned nine other
23  corporations.  They owned two production companies:
24  Columbia Gas Gulf, where they produced natural gas and
25  oil; Columbia Appalachia, they had a transmission

Page 139

1  system.  They had six distribution companies.  And then
2  they had an overall corporate entity called System.
3  When I first started working at Columbia Gas,
4  we were part of the system, the overall corporate
5  umbrella.  By the time I left, we were part of Columbia
6  Gas Ohio.
7  Q.  Okay.  When you say in your CV that you were a
8  manager of residential and commercial technology at
9  Columbia Energy, what are you referring to?
10  A.  And it's broader than that.  In all the areas
11  in which Columbia Gas was interested, there were
12  three -- three section managers, one with transmission
13  research, one with supply or production research, and
14  then one with end use.  I was the end use, which meant
15  anything associated with developing products for
16  residential customers, commercial customers.  I also had
17  responsibility at that time for natural gas vehicle or
18  transportation research and also for power generation
19  research, which was to -- there was a lot of work going
20  on at the time to convert coal to gas for emissions.
21  So I had responsibility for all four areas.
22  And by that, what we did was -- I was on about 11
23  national advisory committees, but we funded R&D
24  internally at our own labs; we funded R&D externally,
25  and we also took money that commingled with some of our

Page 140

1  own money internally.  And what came with the section
2  manager position was appointments on nation- -- several
3  prominent national committees.  So we were advising on
4  the spending of $2 billion a year at DOE.
5  So it just came with -- and the other thing
6  was that we were also on committees to review -- there
7  was a group called Gas Research Institute out of Chicago
8  that was sort of a collaborative research entity for the
9  gas industry, and they spent about 200 million a year.
10  And I was on five of the subcommittees for GRI, and we
11  would review programs and decide whether they were going
12  to get further funding or not.
13  Q.  Okay.  Is any of that outlined in your CV?
14  A.  Yeah, to some extent, it is.  When I talk
15  about, on page 6, the bottom part, I had responsibility
16  for all the intellectual property at Columbia Gas
17  System, so I was overseeing about 100 patents a year.  I
18  served on 11 industry advisory committees for GRI,
19  American Gas Association, U.S. DOE, a group called the
20  Gas Utilization Research Forum, a strange acronym, GURF.
21  Q.  And this was while you were with
22  Columbia; right?
23  A.  Yes.
24  Q.  Okay.
25  A.  I ultimately -- after I left Columbia and was

Page 141

1  just starting EES, I was selected by DOE to help with
2  review programs at their national labs, primarily Oak
3  Ridge, Pittsburgh Energy Center.  I had a known capacity
4  to separate wheat from chaff.  What you have in these
5  academic environments is somebody's pursuing research on
6  an idea and they usually don't get it quite done, but
7  they need more money.
8  The question is will it ever get done or not,
9  are they really making progress or not, and so I would
10  go in and spend two or three days on specific programs,
11  hear from people and make recommendations on whether
12  they should get further funding or not.  I also did the
13  same thing for the Pittsburgh Energy Center, which was
14  another national lab.  And that was all a result of all
15  the work I had done on industry advisory bodies at GRI
16  and other places.
17  Q.  Okay.  Going -- I'm sorry.  Go ahead.  Finish.
18  A.  The other part of Columbia that was unique is
19  that, unlike Battelle, where we would invent things and
20  our real goal was just to prove it in the lab, Columbia
21  was quite different.  They really couldn't care less
22  about whether you made it work in a lab.  They wanted to
23  know whether you could make it commercially, which is a
24  much more difficult step, believe it or not, than making
25  it work in a lab.  So as a consequence, I spent -- as a

36 (Pages 138 to 141)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 142

1 manager, I would spend at least one to two days a week
2 visiting major players on commercialization side.  So I
3 knew the personalities and the corporate
4 characteristics of -- if it was refrigeration, I knew --
5 or I mean air conditioning, I knew Trane, Carrier and
6 York people.  If it was appliances, I knew GE Appliance
7 Part in Kentucky.  I knew all the players.
8        If it was vehicles, I knew the Cummings
9 people.  I knew DDC, Detroit Diesel.  I knew John Deere.
10 I knew Ford and Chrysler and GM.  I was visiting these
11 people all the time to see if we could -- the one thing
12 that made us work is I could bring money to the table,
13 which was always important, and so I was collaborating
14 with technology and money to see if we could
15 commercialize either ideas we had generated or the
16 industry had generated, and so I was a commercialization
17 agent, basically.
18    Q.  Commercialization agent.  Okay.
19    A.  My job was to take it from the lab and make
20 sure somebody could actually use the product, that
21 somebody would buy it.
22    Q.  Okay.  And after Columbia Gas Systems, which
23 was -- I assume you left in '99, given what we had said
24 before.  What did you do next?
25    A.  There was a bit of an overlap, because

Page 143

1 Columbia Gas System got Enron'd in the '90s.
2    Q.  What do you mean by that?
3    A.  Where there was consolidation and they had all
4 read MBA 101, which was the way to make money is to fire
5 half the staff.  So our research group went from -- in
6 '96 or so, went from 40 -- no -- 60 to 4 in one day.
7 Average experience was 21 years.  So they kept me.  I
8 was one of the four; it was good and bad.
9        But -- after -- and that's when I started EES.
10 I thought, well, this isn't going to last.  But then we
11 were sort of in a holding pattern where we were cleaning
12 up projects.  And they kept saying, "We're going to
13 bring it back," and I was working directly for corporate
14 people.  Then I realized eventually that that wasn't
15 true.  I was working directly with the people under the
16 CEO, and so at that point I started EES.
17    Q.  At what point was that?
18    A.  I actually incorporated in '99, but I
19 didn't -- or in '96, but I didn't really start doing
20 much.  I mean, it was -- my business started literally
21 in my bedroom.  I didn't move out of the house until
22 2001.  So in '99 I was -- yeah, '98, '99, I was out of
23 Columbia.  I know that I did exactly 10 years at
24 Columbia, within a day or two, and then I started EES.
25 And I also was a little bit chicken to go out on my own,

Page 144

1 so I worked for a year and a half with a company called
2 Lawhon & Associates.  I was brought in to develop their
3 business.  It was an environmental firm.
4    Q.  And how do you spell Lawhon?
5    A.  Lawhon, L-a-w-h-o-n.  And I built their
6 business from 1 to 3 million a year in two years, but
7 the CEO reneged on all 12 written provisions, so I left
8 and said I'll do my own thing.  And at that point, I
9 built EES.
10    Q.  So how long were you with Lawhon & Associates?
11    A.  Lawhon, about two years.  But, I mean, it
12 was -- and I had permission to do so.  I was running EES
13 at the same time.
14    Q.  What years was that at Lawhon?
15    A.  Late '98, '99, to late 2000 or so.  It was at
16 the end of the '90s.
17    Q.  And since starting EES, you've basically
18 worked for yourself?
19    A.  I have, yeah.
20    Q.  Okay.  Okay.  Earlier this morning, you said
21 you worked for the EPA.  When did you work for the EPA?
22    A.  I've worked for them multiple times as a
23 contractor, not as an employee.  I think the very first
24 project I had was -- we had a contract when I was at
25 Battelle for -- I worked mainly nonnuclear, even though

Page 145

1 I was on the nuclear reservation.  Most of the work I
2 did was non-nuke.
3        And one of the first -- this was the -- in
4 '79, this was before Superfund and a lot of that stuff,
5 and we had a contract from EPA Region 10 to identify
6 where corporations were dumping their waste.  And my job
7 was literally calling people.  And fortunately or
8 unfortunately, the people that told me the most ended up
9 being on the NPL priorities list.  So it was not a
10 glamorous job.  It was a telephone job where I was
11 trying to figure out where waste was going and what kind
12 of waste was going where.  And EPA Region 10 I think was
13 Washington, Oregon, Idaho, and Alaska.
14    Q.  So Battelle was contracted and you worked for
15 Battelle?
16    A.  I did, yeah.  And we did a whole bunch of
17 wastewater studies that partially were for them at times
18 as well.
19    Q.  That was a separate --
20    A.  Contract.
21    Q.  -- contract at Battelle?
22    A.  Oh, yeah.  That was the early era of coming up
23 with better wastewater technologies.  Some of the work
24 was for DOE; some of it was for EPA.  And we were
25 looking at -- that's where I had my first real

37 (Pages 142 to 145)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 146

1  experience in using reverse osmosis and membrane
2  technology. I was really early on in that process, and
3  what I was doing was taking all the research membranes
4  from all the industrial companies. I remember ULP San
5  Diego was giving us a lot. And they would give us our
6  experimental membranes, and we would try them against
7  different materials on separations. I was doing
8  separations work. And the deal was that they would give
9  us the experimental membranes and we'd give them the
10 data. And that's what I did for -- partially, for about
11 a year and a half.
12    Q.  Okay.
13    A.  So I became sort of an expert on that, and
14 then the people next to me, I was helping -- because I
15 was a young guy, so I got to do what they told me to do.
16 I was also helping with the bioreactors. We were
17 looking at ways to put high-density biomass in
18 bioreactors to clean up some really nasty wastewater
19 streams.
20    In those days, we thought we were going to
21 make a lot of fuels out of coal and out of shale, and
22 especially in the west where water's scarce, we were
23 trying to figure out how to clean up the wastewaters and
24 reuse them, and so we had a lot of projects to try to do
25 that without killing the systems or ruining the

Page 147

1  separation systems. It was a challenge.
2    Q.  And was that work under a separate contract
3  that Battelle had with --
4    A.  Yeah, Battelle really had -- most of their
5  contracts were with either DOE or EPA.
6    Q.  Have you ever been individually contracted at
7  EPA?
8    A.  EES did work that was related to EPA, Ohio
9  EPA.
10    Q.  Well --
11    A.  So that makes --
12    Q.  -- you're right. And thank you.
13    A.  I mean -- I mean, I owned EES. That's why I'm
14 hesitating.
15    Q.  Yeah, and I should have made it clear that I'm
16 talking about the federal EPA, because we can talk about
17 state EPA in a second.
18    A.  I don't -- you know, I'd have to think about
19 that. I worked on literally dozens of projects at
20 Battelle. We got all the projects nobody else could get
21 answers to. Battelle was the largest research
22 organization in the world. It had 7,000 scientists. To
23 get an interview, you had to be in the top 5 percent.
24 So it was a group that -- but, I mean, we would work
25 on -- I worked on everything from nerve gas to the space

Page 148

1  shuttle, Love Canal -- I'm just trying to --
2    Q.  So my --
3    A.  I just don't recall -- nothing jumps out at me
4  other than that work early on for EPA Region 10.
5    Q.  Okay. You mentioned, and I'll go back and ask
6  you the question: Have you ever been individually
7  contracted to work with a state EPA organization?
8    A.  I don't believe so. As an individual, no.
9    Q.  Okay. What was the work you did with Ohio
10 EPA?
11    A.  It was tied in with the Ohio Facilities
12 Commission, and they had a program called Extreme
13 Environmental Contamination, and I was contracted to --
14 there was a law written that schools that had extreme --
15 that were being contaminated by adjacent properties.
16    Under certain circumstances, usually through
17 risk assessments, you could calculate what the exposure
18 to the students might be depending on how long they were
19 there, and if the levels reached certain levels, then
20 the schools were going to be eligible to either move the
21 school or some sort of remediation. And my job
22 initially was to flesh out that legislation; in other
23 words, write, draft the rules. And then later on, my
24 job was to review the applications that came in as part
25 of the program, to decide whether or not they got a new

Page 149

1  building or not.
2    Q.  And this contract with --
3    A.  I think it was mostly with the School
4  Facilities Commission, but they were a liaison with Ohio
5  EPA.
6    Q.  All right. So the contract was with the
7  School Facilities?
8    A.  Ohio School Facilities Commission. But the
9  OEPA folks were present a lot because it overlapped with
10 their jurisdiction.
11    Q.  And was this an EES contract?
12    A.  It was.
13    Q.  Any state where you've worked directly for
14 their environmental protection department?
15    A.  Other than what I've just described, no, I
16 can't think of any.
17    Q.  Okay. Okay. Anything in your employment that
18 we missed or skipped?
19    A.  The only reason I hesitate is I have submitted
20 a lot of risk assessments that go to the EPA, but I'm
21 usually being contracted by, like, a petroleum company.
22    Does that make any sense?
23    Q.  Sure.
24    A.  So I'm interfacing with the agency, but I'm
25 not contracted to them. So the answer is no, I believe.

38 (Pages 146 to 149)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 150

1  But I've had a lot of interface with the agency.
2      Q.  Okay.  In that regard, have you been
3  contracted -- or rather, has EES been contracted by any
4  responsible parties in any Superfund or other cleanup
5  issues?
6      A.  I did a lot of -- not Superfund that I
7  remember, but we did a lot of -- a lot of permitting
8  work for people to get their permits in order.
9      Does that make any sense?
10      Q.  Sure.  What type of permits?
11      A.  Air, mainly air -- well, they were all over
12  the place.  I did the -- there were air permits,
13  obviously.
14      Q.  Air quality permits?
15      A.  Yeah -- well, air emission permits.
16      Q.  Air emission permits.
17      A.  Including FESOPs, federally enforceable state
18  operating permits.
19      And then they had -- it's called SPCC, School
20  Preventions and Countermeasures plans.  And I did that
21  for the Ohio State University Airport as part of a
22  program where we put in all new fueling facilities,
23  designed the facilities.  We installed them, we
24  permitted them.
25      Q.  And this is in conjunction with some

Page 151

1  underground storage tank work; right?
2      A.  No.  They just needed -- I think -- it
3  wasn't -- they may have had underground storage tanks,
4  but they wanted to move to aboveground storage tanks, so
5  we were just associated with the aboveground storage
6  tank portion of that.
7      Now, the SPCC -- I have to think back on it.
8  The early ones have had to do with -- the SPCC
9  isn't so much underground storage tanks.  It's just
10  spills.  In other words, you have tanks or vehicles, and
11  they spill, how do you control that spill.  So it's a
12  little different than USCs.
13      Q.  Okay.  Ever work on any NPDES or MS4
14  permitting for any organization or municipality?
15      A.  Not that I'm aware of, no.
16      Q.  Do any TMDL work for any organization or
17  municipality?
18      A.  Not that I can recall.
19      Q.  Okay.  Let me turn now to Exhibit 7 and spend
20  some time on that.
21      Okay.  So the totality of Exhibit 7, which is
22  your Factual Summary and Support of Expert Opinions, is
23  dated -- the one I have is dated July 3rd, 2019.  That
24  would be the latest version of this?
25      A.  Subject to the typos we talked about

Page 152

1  morning, yeah.
2      Q.  I think that's the one you handed me.
3      A.  Oh, 7 is the one that you marked as --
4      Q.  Yes, sir.
5      A.  With the corrections.
6      Q.  I marked one of yours with the corrections.
7      A.  I'm not sure which ones got marked, but --
8      MR. KRISTAL:  7 is correct.
9  BY MR. UPSHAW:
10      Q.  This is a corrected version, yeah.
11      A.  Then it is correct.
12      Q.  And it consists of 475 pages?
13      A.  I believe so.
14      Q.  When did you prepare this?
15      A.  I think we talked about that earlier.  I said
16  it was in sort of three bursts.
17      Q.  We talked about some of your other work.  But
18  I didn't know if --
19      A.  That's what I'm talking about.
20      Q.  What we talked about is included in this;
21  right?
22      A.  I'm not saying it was only those three bursts
23  I worked on it, but primarily it was developed on three
24  separate occasions.
25      Q.  Right.  Earlier we were talking about your

Page 153

1  reliance material list when I was asking about how you
2  put that together.
3      A.  Okay.  Well, the same applies for the report,
4  if you will.
5      Q.  Okay.  Did you have assistance in putting this
6  together?
7      A.  Well, my office manager proofed it.
8      Q.  Okay.
9      A.  But that's it.
10      Q.  Who's your office manager?
11      A.  Lexa.  Alexandra, I should say.
12      Q.  Is she in your Florida office or your Ohio
13  office?
14      A.  Both.  She's my wife.
15      Q.  Oh, okay.
16      A.  She's probably in charge of both.
17      Q.  That makes life easy.
18      Okay.  So let me ask:  Does she help put this
19  together, or do you put this together and she just
20  proofreads it?
21      A.  She just proofs it.
22      Q.  And you put this together, I suspect, just on
23  your computer --
24      A.  Microsoft Office, Word, along with using
25  PowerPoint to work some graphics.

39 (Pages 150 to 153)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 154

1    Q.  All right.  Did Plaintiffs' counsel assist you
2  in any way in putting this document together?
3    **A.  I don't believe so, no.**
4    Q.  Okay.  Did you have conversations with them
5  about what should go in this document?
6    **A.  No, I don't think so.  That's all my stuff.**
7    Q.  Okay.  Did you discuss your creation of this
8  document, as it was moving forward, with Plaintiffs'
9  counsel?
10    **A.  Well, I think there was some discussion right**
11  **before my canceled first deposition, because they saw it**
12  **at that point.  They saw it before it went to**
13  **deposition.  And then I think it's been very recently**
14  **that they've seen this, within the last couple of weeks.**
15    Q.  Prior to -- and I think Ms. Greenwald was your
16  counsel for the other deposition; right?
17    **A.  Correct.**
18    Q.  Okay.  So prior to the previous deposition --
19  strike that.
20         How long before that previous deposition had
21  you given this to Ms. Greenwald?
22    **A.  I think probably --**
23    MR. KRISTAL:  Wait.  I object; assumes facts
24  not in evidence.
25  BY MR. UPSHAW:

Page 155

1    Q.  Okay.  You can go ahead.
2    **A.  Yeah, I'm not sure I ever gave it to her.  I**
3  **don't remember e-mailing her a copy of it at all.**
4    Q.  Or mailing it or any other way?
5    **A.  I didn't mail it, no.**
6    Q.  Okay.  Is it your testimony that just before
7  the deposition that was set a year ago, you had not
8  given this document or a similar document in that
9  case --
10    **A.  Might have been a couple, three weeks, but**
11  **yeah, just before.**
12    Q.  Okay.  So a couple, three weeks before the
13  deposition?
14    **A.  Yeah, perhaps they saw it, yeah.  It's been a**
15  **while.**
16    Q.  Perhaps they saw it?
17    **A.  It's been a while.  I've written 10 reports**
18  **since then.**
19    Q.  You've written 10 reports with regard to
20  glyphosate?
21    **A.  No.  With other subjects.  Appreciate I've**
22  **been deposed -- I'm not complaining -- I've been deposed**
23  **oddly six times in six weeks, all 500-page reports.  So**
24  **when you ask me those sorts of questions, sometimes it's**
25  **hard to remember.**

Page 156

1    Q.  Okay.  Well, I do appreciate that.  I'm not
2  really interested in the other cases at the moment.
3    **A.  Good.  I'm just saying that, to remember**
4  **exactly whether it was two weeks or three weeks, I don't**
5  **remember.**
6    Q.  Okay.  Well, if you give me the best answer
7  you can, I'm fine with that.
8    **A.  That's what I'm trying to do.  I know they saw**
9  **it before I was deposed.  That's all I can tell you.**
10    Q.  Very well.  And in seeing it before you were
11  deposed, did they have any comment or editing that you
12  needed to include in this -- or the previous document
13  for the Neal case?
14    **A.  I think that -- the only thing they told me is**
15  **they didn't want it to contain any opinions.  They**
16  **wanted it just to be factual.**
17    MS. GREENWALD:  Our conversations are
18  protected.
19    MR. UPSHAW:  Your conversations aren't really
20  protected that I'm aware of.
21    MR. KRISTAL:  The conversations are protected.
22    MS. GREENWALD:  In this case, they are.
23    MR. KRISTAL:  I think the question was whether
24  there had been any discussion.
25    MR. UPSHAW:  Right, and I think that's all he

Page 157

1  said, was there had been discussion.
2    MR. KRISTAL:  Then it started to get into
3  substance.  We're just doing our jobs.
4    MR. UPSHAW:  We'll move on along.  I got you.
5    THE WITNESS:  Anybody who knows me, I write my
6  own stuff.  Believe me.  I'll give you an example
7  on the insurance side --
8    MR. UPSHAW:  Well --
9    THE WITNESS:  No, no, I want -- because you're
10  suggesting that somehow they have input, and I want
11  to --
12    MR. UPSHAW:  I'm not suggesting anything, Mr.
13  Petty, and --
14    THE WITNESS:  I think you are, and I'd like to
15  finish my answer.
16    MR. UPSHAW:  You're not responsive to any
17  question that I have pending right now.
18    THE WITNESS:  Yes, I am.  You're not going to
19  let me finish my answer?
20    MR. UPSHAW:  Sure, I'll let you finish.  I'm
21  aware of counsel's admonition earlier, but you go
22  right ahead, sir.
23    THE WITNESS:  So I had a reputation on the
24  insurance side, having written many, many projects.
25  There's only one time somebody asked me to change a

40 (Pages 154 to 157)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

| Page 158 | Page 160 |
|---|---|

**Page 158**

1  report, and I said, "Don't go there because I never
2  want to have to say in any deposition anywhere that
3  you've ever influenced me in my work," and that's
4  how I operate.
5      MR. UPSHAW: Okay. Move to strike as
6  nonresponsive.
7  BY MR. UPSHAW:
8      Q. Did you explain, then, to Plaintiffs' counsel,
9  prior to writing this, that you would prepare such a
10  factual summary?
11      A. I was given a scope of work and I prepared a
12  scope of work accordingly.
13      Q. So part of that scope of work was to prepare a
14  factual summary in support of your expert opinions?
15      A. Yes -- well, no, the -- there is no report
16  requirements in Missouri.
17      Q. Okay.
18      A. And I was insistent on having -- to make the
19  deposition go quicker, was I thought it would facilitate
20  the process to have like materials grouped together,
21  rather than bringing in four or five boxes of 500
22  documents and trying to weave through those one at a
23  time as to what my opinions were of each of those
24  documents.
25          So this was a facilitation exercise that I

**Page 159**

1  insisted on having something written that would pool
2  together information I found from the various sources
3  that I had reviewed and sort of -- and attempt to
4  aggregate them in a way that was consistent with my
5  scope of work.
6      Q. Okay. So you prepared this for what audience?
7      A. I prepared it for this -- for defense to do my
8  deposition ultimately, and then if it gets used down the
9  road, so be it.
10      Q. I guess I don't understand. What do you mean,
11  "if it gets used down the road"?
12      A. Well, if it gets used in the trial or
13  whatever. If the material from this gets used in the
14  trial, then so be it. It will be part of the record at
15  that point.
16      Q. Okay. But as you said, this doesn't include
17  any of your opinions; right?
18      A. It does not.
19      Q. And would you consider this Exhibit 7 a
20  reference document for you for this deposition?
21      A. I've already described what it is. It's my --
22  I don't know if I'd use the word "reference." What I
23  would use is I would say that it's an aggregation of
24  information that I found that would be supportive of
25  opinions I would offer in each area so that we don't

**Page 160**

1  have to try to go back and find all those documents in
2  real time.
3      Q. Sure. So you can reference this easier than
4  going through several boxes and trying to come up with a
5  particular document?
6      A. The intent is to have like information that
7  will support my opinions, somewhat aggregated, so that I
8  can then say, okay, I have an opinion on this section
9  that says this and it's based on these documents.
10      Q. Okay. I think we're saying the same thing.
11          When were you done? When did you say, okay,
12  I'm done with my factual summary?
13      A. Last night.
14      Q. Okay.
15      A. I was still looking for typos.
16      Q. All right. When's the last time you added any
17  information? I don't mean looking for typos. That you
18  actually added something to this.
19      A. Well, late last night I changed the pages for
20  the typos.
21      Q. Okay. Other than the typos, when is it that
22  you actually added some information here? I would not
23  consider a typo change an addition of information.
24      A. I don't know exactly, but perhaps in the last
25  week.

**Page 161**

1      Q. Okay. And what is it that came up in the last
2  week that you said I got to add this to my factual
3  summary?
4      A. I had some deposition testimony that came in,
5  for example.
6      Q. And the deposition testimony is referred
7  specifically in here, or it's just added in one of these
8  tables?
9      A. It was -- it was primarily just added in
10  exhibit -- in exhibit A -- or Appendix A.
11      Q. Appendix A, which is the reliance material?
12          MR. KRISTAL: No. The reliance material is an
13  Appendix A -- it virtually duplicates what's
14  already been marked.
15          THE WITNESS: The way my report's always -- at
16  the end of the signature block, there's an area
17  called "References," which is what I call publicly
18  available materials that I'll rely on, and then
19  Appendix A is typically where I'll put the
20  materials that are less readily available or
21  sometimes supplied to me.
22          MR. KRISTAL: It's page 239.
23  BY MR. UPSHAW:
24      Q. So let's walk through, then --
25          MR. KRISTAL: Actually, 231 is the

41 (Pages 158 to 161)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 162

1   reference --
2         MR. UPSHAW:  230 is his signature page?
3         MR. KRISTAL:  Right.
4   BY MR. UPSHAW:
5         Q.  Let's walk through the creation or actually
6   how the document's put together, if we can, Mr. Petty.
7         A.  Okay.
8         Q.  And rather than me try to guide you, I will
9   let you just discuss how you put this together, because
10  when you reference Appendix A, Appendix B, I'll have a
11  better idea of what you're talking about.
12        A.  Sure.  I think on page 2, you have a pretty
13  good idea of what the major topics are that are subjects
14  of chapters or sections of this report:  Roundup history
15  and timeline, properties and characteristics of Roundup,
16  public health and safety and industrial hygiene
17  concepts, review of the dermal studies and the
18  literature that are available, review of FIFRA and
19  FFDCA, review of the Roundup labeling, review of the
20  MSDSs, and then Section 9 is sort of a review of the
21  standard of care touted by Monsanto, industry, and the
22  government.
23        And then appendix -- there's then a reference
24  section, which is the readily available documents.  Then
25  there's Appendix A, which is always the materials that I

Page 163

1   say are less readily available, that I always bring to
2   depositions.  Appendix B in this case, as I said
3   before --
4         Well, we pulled a lot of MSDSs for a lot of
5   Roundup products, and I went through a review of one of
6   those products and what my criticisms are of that
7   product within the report.  This is then an extraction
8   for all these other Roundup products of the information
9   in the MSDSs and I would offer similar criticisms of
10  those MSDSs, but I didn't want to bulk the body of the
11  report up with all these pages, so I put them in
12  Appendix B.
13        Appendix C is a copy of the --
14        Q.  What page would that be?
15        A.  C?  It's on page 443.
16        Q.  Okay.
17        A.  It's a copy of Chapter 12 of the US EPA Label
18  and Review Manual.
19        Q.  The entire manual?
20        A.  Chapter 12 of it.
21        Q.  Chapter 12.
22        A.  Then Appendix D, which begins on page 457, is
23  the CV and case history.  And then Appendix E is my
24  retention agreement, including terms and conditions, for
25  this particular effort.

Page 164

1         Q.  Okay.  And so on page 230, where you sign the
2   factual summary, that would be the, for lack of a better
3   term, working portion of this document?
4         A.  Pretty much, except for you still have all the
5   MSDSs for the other products that technically would be
6   applicable for different plaintiffs.
7         Q.  Okay.
8         A.  Depending on which project -- products they
9   used and my criticisms of what's said in those.
10        Q.  And I was going to refer to that.  So in
11  Appendix B is where you have your particular criticisms,
12  or is that in the body of your report?
13        A.  It's in the body.  What I've done is take one
14  product -- it's table 7.1, beginning on page 113, and
15  then I've done what I call extractions of the warnings
16  information from the MSDSs, and then beginning on page
17  130, for those particular MSDSs, I've then given my --
18  if you will, my criticisms or concerns about those
19  labels.
20        Q.  Okay.  All right.  That lays out a little bit
21  of a road map for us.
22        Does this document describe your methodology
23  in determining exposure?
24        A.  Well, it shows it.
25        Q.  Tell me what the difference is.

Page 165

1         A.  It's the same methodology I used in C8.
2   They're parallel cases, the DuPont C8 cases.
3         Q.  I don't know about the C8 cases.  So when you
4   make reference to "it's the same," you're going to have
5   to educate me on what your overall method is.
6         A.  I was headed there.
7         Q.  Okay.  Okay, good.
8         A.  Then you cut me off.
9         Almost all methodologies are differential
10  diagnosis, whether it be medicine, whether it be auto
11  mechanic.  Is this the problem?  No.  Is this the
12  problem?  No.  Whatever is left is probably what the
13  problem is.  My methodology here, in an overview sense,
14  is to look at what industry and what the government said
15  is required in terms of providing information to the
16  public regarding the hazards of, in this case, a
17  pesticide, and contrasting that to what was actually
18  done.
19        Then the question is:  Did they meet the
20  standard of care for what was required by Monsanto
21  themselves, by industry, or by the government in terms
22  of providing the information on labels as they should
23  have?  So it's a differential diagnosis.  It's a look,
24  it's a review of -- as you'll see, I've pulled all the
25  original Federal Register materials, for example, in

Paszkiewicz Court Reporting
(618) 307-9320  /  Toll-Free (855) 595-3577

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 166

1    FIFRA and FFDCA, read the preambles, et cetera, going
2    forward to see what the intent was of the regulations
3    and what they actually say, and then compare and
4    contrast that to what Monsanto did and determine whether
5    or not they were being fully transparent with both the
6    government as well as the public. So it's simply a
7    compare-and-contrast methodology.
8         Q. So is it a compare-and-contrast methodology or
9    a differential-diagnosis methodology?
10        A. Well, that is by definition what differential
11   diagnosis does. It compares -- it looks at how things
12   should be and how they are and the difference is what is
13   different.
14        Q. Really? So in the differential diagnosis
15   in -- like you said, in auto mechanic, they look at what
16   things should be and what they are, and they decide
17   what's wrong with your engine?
18        A. No. They look at what things are and they
19   look at how they should be, and the difference is what's
20   wrong. I've worked as a mechanic. I don't know if you
21   ever did this.
22        Q. Okay. And that's what you're defining as a
23   differential diagnosis?
24        A. I'll tell you, in forensics engineering, it's
25   the same way. In the textbook I wrote, you look at --

Page 167

1    when you have failure of a building system, you look at
2    how should that have been designed either by code or by
3    best practice, look at how it was built after
4    it's failed, and the difference is probably what caused
5    the failure.
6         Q. Which would be the same as a compare and
7    contrast?
8         A. Well, I think that the word that's typically
9    used in the technical community is a differential
10   diagnosis, but I'm just saying that that process is used
11   in almost all the sciences to compare -- when there's an
12   issue, to compare how it should be versus how it is and
13   see what the differences are, and the differences
14   explain why there's a difference between what exists
15   versus what should exist.
16        Q. And who's determining that there is a
17   difference between what exists and what should exist in
18   the context of the glyphosate litigation that you're
19   providing --
20        A. Well, whoever the expert is in that area. If
21   it's specific causation, it's the medical doctors. If
22   it's warnings, it's experts on warnings, like myself.
23        Q. So you are the one, with regard to warnings,
24   who's decided what to compare and what to contrast; is
25   that correct?

Page 168

1         A. I'm not sure I understand your question,
2    because that's not what I said. What I said is the
3    methodology is to use what Monsanto said they would do
4    with respect to warnings, what the industry says they
5    should do with respect to warnings, and what the
6    government says they should do with respect to warnings,
7    and compare that to what they actually did, based on
8    their own documents and based on these other source
9    documents, and look at the differences.
10        And when we go through this, I think the
11   examples I give based on opinions will make it very
12   clear. So the methodology is a differential diagnosis
13   like it is in forensics engineering, like it is in
14   medicine, like it is in mechanics. It's the same
15   methodology.
16        Q. I'm -- okay. And I'm trying to understand how
17   you're using these terms and these nomenclatures to
18   explain your methodology, and I'm not catching when you
19   say "a differential diagnosis."
20        What are you -- what are you discarding as you
21   go through the different potential causations in a
22   differential diagnosis, when you're looking at warnings?
23        MR. KRISTAL: Object to the form of the
24   question.
25        A. Well, I mean, we'd have to go through -- I've

Page 169

1    got 300 pages of examples. So it's the role of -- my
2    ultimate opinions are based on an evaluation of things
3    like their dermal studies, how were they done, how were
4    they presented, how should they have been presented.
5         Q. And when you look at --
6         A. Based on what industry says, based on what
7    Monsanto says they will do. I'm not throwing out
8    anything. I'm just making that comparison between
9    what's there in documents versus what either Monsanto or
10   other such -- how that information should be conveyed.
11   And I also have a section that talks about -- in terms
12   of that interpretation, I've got an entire chapter
13   dedicated to that issue.
14        Q. Does anywhere in your factual summary define
15   what you mean by "differential diagnosis"?
16        A. Sure. And I was getting to that. That's
17   this -- this is this whole Section 5 on the public
18   health and safety and industrial hygiene concepts.
19        Q. What page are you on, sir?
20        A. 81.
21        Q. 81.
22        A. So that's the underlying basis of the
23   methodology for looking at warnings.
24        Q. And where in Section 5 do you define
25   "differential diagnosis" as you have used it here in

43 (Pages 166 to 169)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 170

1  developing your opinions?
2  **A.  This entire chapter has to do with that.**
3  Q.  Okay.  I understand it may have some linkage
4  to it; it may have to do with it, as you said.  But do
5  you actually define what I mean by "differential
6  diagnosis" is this?
7  **A.  What I say, ultimately, in this document is**
8  **that the public health and industrial hygiene concept**
9  **that we're referring to is to err on the side of public**
10  **health and safety.  So if Monsanto hasn't done that,**
11  **compared with what they say they will do or what**
12  **industry says they should do or what the government says**
13  **they should do on a whole series of issues, then they**
14  **haven't erred on the side of public health and safety.**
15  **That's ultimately the basis for the differential**
16  **diagnosis with respect to warnings.**
17  Q.  Understood, Mr. Petty.  I guess my question
18  was a little more simplistic.  Is there somewhere you
19  provide a definition of how you use that term?
20  I'm hearing you that that's your ultimate
21  basis and I'm understanding that, and we will talk about
22  in detail how you apply your methodology.  I'm just
23  trying to determine --
24  **A.  It's not my methodology.**
25  Q.  Wait a minute.  Let me finish.  Let me finish.

Page 171

1  How you apply your methodology as it comes to the
2  document that you've provided, I'm trying to understand
3  a very simple portion of that; and that is, you've
4  turned us to Section 5.  You said "differential
5  diagnosis" is explained in here.
6  And I'm asking:  Do you define anywhere in the
7  document --
8  **A.  Sure.**
9  Q.  Let me finish the question.
10  MR. KRISTAL:  And let me finish my objection.
11  BY MR. UPSHAW:
12  Q.  And let him finish his objection.
13  Do you define anywhere in the document that
14  when you say "differential diagnosis," this is what
15  you're talking about?
16  MR. KRISTAL:  A, object to the form of the
17  question, including "your methodology."
18  B, the objection is this is a factual summary.
19  It's not an expert report with opinions and
20  methodology.
21  C, it doesn't have to have what you're talking
22  about.
23  MR. UPSHAW:  Well, one, those aren't
24  objections to form, so they're --
25  MR. KRISTAL:  Sure they --

Page 172

1  MR. UPSHAW:  No.  Your objection to form
2  should be an objection to form, not an explanation,
3  unless you're going to let me know how I can fix my
4  question.
5  MR. KRISTAL:  I'm letting you know how to fix
6  your question.  If your question is do you define
7  in the body of this factual summary the term
8  "differential diagnosis," giving a definition, that
9  would be the question I think you're trying to ask.
10  MR. UPSHAW:  Which is what I asked the first
11  time.  And I can have him read it back.
12  MR. KRISTAL:  I'm not so sure that was clear.
13  MR. UPSHAW:  You and I don't have to go back
14  and forth.  That's exactly the question I've been
15  trying to get an answer to.
16  MR. KRISTAL:  No, that's what I thought.  It
17  just seemed to be getting lost in the sauce.  It's
18  a very simple question.
19  Is "differential diagnosis" defined
20  specifically in this summary?
21  THE WITNESS:  Those words are not in this
22  summary.
23  MR. KRISTAL:  Okay.
24  BY MR. UPSHAW:
25  Q.  All right.  Then let's start back at the

Page 173

1  beginning, page number 2.
2  You identified how this particular document
3  works.  And again, if I call it a report, we all
4  understand it's not a report; it's your factual summary.
5  So if I slip, we know it's not a report.
6  **A.  It's not a report of opinions.**
7  MR. KRISTAL:  It's not a typical expert report
8  as we refer to it, which would include opinions and
9  perhaps methodology, such as in federal court.
10  MR. UPSHAW:  That's the difference.  I don't
11  want you to be misled that we're referring to his
12  report, and we know it's not.  It's more for us
13  than it is for him.
14  BY MR. UPSHAW:
15  Q.  And you outline seven areas which you told us
16  about, and the report itself has nine sections which you
17  also refer to; correct, Mr. Petty?
18  **A.  Correct.  Well, it's got some appendices as**
19  **well, but yes.**
20  Q.  Well -- yes.  Okay.  And I want to clarify:
21  Does this entire factual summary lead to the opinions in
22  the two areas that we discussed this morning?  And those
23  were -- oh, shoot, I had it written down.
24  MR. KRISTAL:  Warnings and exposure.
25  BY MR. UPSHAW:

44 (Pages 170 to 173)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 174

1    Q.  Warnings and exposure.
2    A.  The -- to some extent, but the spreadsheet
3  that I've provided based on numbers of days of exposure
4  as well as hours would supplement this as well, plus the
5  individual interviews.
6    Q.  And you know what, we haven't marked that yet,
7  so let's do that now.  And we'll mark that as 13.  And I
8  believe it's 19 pages.
9       And just tell the jury what this is that I've
10  handed you, that we've marked as exhibit 13.
11      (Defendant's Exhibit 13 marked for
12  identification.)
13      MR. KRISTAL:  You mean us, the jury here?
14    A.  What this is, is a copy of calculations that
15  I've made for each of the individuals I interviewed
16  based on interview information.  So it's an attempt --
17  the individual -- the first two tables are summary
18  tables.
19    Q.  Yeah.  You can just broadly explain it to us.
20  We're going to go in detail with this along with your
21  interviews, but I don't like to mark an exhibit and then
22  not explain on the record what we're marking.
23    A.  Okay.  Well, ultimately, it's a summary of
24  information drawn from the interviews and then some
25  calculations to total numbers of events and numbers of

Page 175

1  hours for each individual in terms of exposure to
2  Roundup products.
3    Q.  And just as a general question, does it
4  include any final exposure assessment for each of the
5  individuals, each of the plaintiffs in this case?
6    A.  I have not done a dermal dose analysis, so
7  that -- the question is on the issue of exposure, which
8  is different than dose.
9    Q.  Correct.
10    A.  And from the standpoint of exposure, I guess
11  it does give numbers of days and number of hours.
12    Q.  So would you classify that as an exposure
13  assessment?
14    A.  No.
15    Q.  Did you do an exposure assessment?
16    A.  No, did not do a full exposure assessment.
17  This would be sort of part -- it would be sort of some
18  front-end information.  This would be, if you did an
19  interview and you wanted to start to summarize the
20  information from the interview, this would be what you
21  would do.  But I have not done an exposure or a dermal
22  assessment.
23    Q.  All right.  We'll get back to that.
24    A.  But there are clearly data there that show the
25  input information that would be used, and some of it's

Page 176

1  aggregated, for an exposure assessment.
2    Q.  And did you --
3    A.  For example -- and I apologize.
4    Q.  No, go ahead.  You're not done yet.
5    A.  What's sort of unique about my interviews
6  is that -- well, maybe not unique -- I ask a lot of
7  questions about dermal exposure, like skin area, in
8  terms of skin area wetted, you know, the percent of time
9  wetted by different areas, how far away you would be
10  post-dermal.  Rarely do lawyers ask those questions in
11  depositions.  And I need that information because if I'm
12  going to do a dose, you have to have to do --
13      Typically, what you do in dermal is you do a
14  dose and then you have to back up to an exposure,
15  because a dose is when it penetrates basically through
16  the skin or through the lung membranes into the body,
17  whereas exposure is typically viewed as contaminants
18  outside of the body, either in the air or just above the
19  skin or on the surface of the skin, but it's not where
20  it actually -- when the material actually penetrates the
21  body, then that's viewed as a dose, at least from an
22  industrial hygiene standpoint.
23      Does that make any sense?
24    Q.  Yes, sir.
25    A.  In other words --

Page 177

1    Q.  My question is:  Do you intend to do an
2  exposure analysis for each of these plaintiffs?
3    A.  I -- if I was going to do an analysis, I would
4  do a dose analysis.
5    Q.  All right.  So --
6    A.  And I --
7    Q.  -- let me go back to my-- I'm going to
8  interrupt you and go back to my question because I may
9  have a follow-up question to that, that you may be going
10  to.
11      Do you intend to do an exposure analysis for
12  each or any of these plaintiffs?
13    A.  Not beyond what I've already provided.
14    Q.  Okay.  Do you intend to do a dermal analysis,
15  dermal absorption analysis, for each or any of these
16  plaintiffs?
17    A.  A dose?
18    Q.  Or a dose.
19    A.  I'm just trying to get the terminology
20  correct.
21    Q.  I appreciate that.
22    A.  I do not intend to do a dose analysis at this
23  time.
24    Q.  Okay.  For what purpose did you create Exhibit
25  13?

45 (Pages 174 to 177)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

---

Page 178

1     A.  Simply to summarize all the interview
2  information, to basically take this thickness of
3  material and reduce it to this thickness.  I mean, it's
4  a summary of what came out of -- it's an attempt to
5  summarize all the information that came out of all the
6  interviews.
7     Q.  And do you intend to use that summary of
8  information in any way to provide your opinion?
9     A.  I'm sure I would.
10    Q.  Okay.  Did you need to create that summary for
11 you to use it to provide your opinion, since you did the
12 interviews?
13    A.  Sure.  I would need to know whether or not
14 they got product on their skin, and if so, to what
15 degree and how often, sure, because I'm looking at the
16 dermal warnings.  Because I'm -- this is how I look at
17 it.  I'm stepping back a bit.  My scope was to look at
18 warnings and exposure.  But from the standpoint of where
19 does exposure come from, well, it's clear from Monsanto
20 themselves, not just me, that most of that exposure
21 would come from dermal.
22       So it's natural that I would want to
23 understand what the dermal exposures were for each of
24 these individuals.  And the reason it's important is
25 because I'm looking at the labels and the warnings from

---

Page 179

1  the standpoint -- my biggest opinion's going to be --
2  one of the biggest opinions is going to be that Monsanto
3  should have insisted on the word "warning" being used
4  rather than "caution," because it's clear that Roundup
5  irritates the skin.
6       And the difference between the "caution"
7  word -- or I shouldn't say the "caution" word -- the
8  word "warning" and the word "caution" is dermal
9  protection, and the dermal protection is what prevents
10 the dermal exposure.  So that's why the exposure's of
11 interest to me, to the extent to which they got it on
12 their skin, it wetted their skin, because my opinion's
13 going to be that if they had the proper PPE, that would
14 have greatly lessened their exposure, dermal exposure.
15       And so I'm looking at warnings from the
16 standpoint of how were the deficiencies and warnings, at
17 least in some part, responsible for the exposures that
18 these folks encountered.  And it becomes difficult to
19 separate all those things.  In other words, I need to
20 know from them what PPE -- what clothing PPE they wore
21 when they got stuff on their skin, what products they
22 used, how often they did it.  Because, for example --
23    Q.  Why do you need to know that?
24    A.  Because it's well understood in dermal that
25 repetitive exposures lead to higher exposures and to

---

Page 180

1  damaged skin than single exposures.  So I'm interested
2  in -- and also I'm interested simply in the aggregate of
3  how often and how long did they do this stuff.
4     Q.  So when you tell us that you're going to give
5  an opinion -- your opinions are going to be about
6  warnings and exposure, are you giving some opinion
7  specifically on exposure by itself?
8     A.  I will say that I interviewed these folks and
9  they have these number of hours and events exposed to
10 products as I've summarized here, and then I'll go
11 through, if asked, and they had dermal exposures
12 associated with getting product on their skin, during
13 each of these events, a certain portion of their skin, a
14 certain portion of the time.  I won't do the dose, but I
15 will say they got this product on their skin because
16 it's important, because they didn't have to.
17    Q.  So I guess -- and that's going to be the
18 extent of your opinion with regard to exposure?
19    A.  Well, in terms of taking the data from the
20 interviews forward, I believe so.  But I've written a
21 whole section on analysis of the dermal studies
22 sponsored by Monsanto, and I have criticisms of those
23 and how they were conveyed and how they were utilized in
24 warnings.
25    Q.  That has nothing to do with the plaintiff

---

Page 181

1  interviews and the exposure data that you've collected
2  and summarized; right?
3     A.  It does.
4     Q.  How?
5     A.  Because those numbers would be greatly reduced
6  if they had proper PPE.
7     Q.  Okay.  And I understand that.  But the
8  numbers --
9     A.  You can't separate the two.
10    Q.  So the numbers you come up with, regardless of
11 what the numbers may or may not be, is not important.
12 The important part for you, when you are reviewing this
13 exposure data, is that they had some dermal exposure
14 that you think should have been less because they
15 weren't properly warned?
16    A.  Well, I wouldn't say that.  I mean, I'm going
17 to say that they had hundreds to thousands of exposure
18 events.  I mean, that's different than having one or
19 two.
20    Q.  Okay.
21    A.  I mean, I'm going to respond to the orders of
22 magnitude of their exposure events and times.  And more
23 importantly, I'm going to talk about the stuff that's in
24 the interviews and then summarized here.  I'm going to
25 talk about the percent skin area that was exposed and

---

46 (Pages 178 to 181)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 182

1  for how -- you know, percent time.  Because my biggest
2  criticisms ultimately have to do on the warning side
3  with improper presentation of results, which resulted in
4  improper warnings which then, in my opinion, resulted in
5  an increase in exposure.  And it's not just my opinion.
6  I've outlined in here, going through the actual studies
7  funded by or related to Monsanto, to show the effects --
8  in other words, they've done some analysis here on
9  dermal --
10       Q.  Who's "they"?
11       A.  Well, okay, you want to get to it?
12       Q.  Well, no, you're talking in general.  And
13  we're going to get to this in excruciating detail.  But
14  I just wanted to know, when you said "they," who's
15  "they"?
16       A.  Well, I'll give an example because, I mean,
17  it's only fair, if we're going to do that, to actually
18  give a real example.
19       Q.  Okay.
20       A.  Almost there.
21            And beginning on page 74, I go through an
22  analysis of the UK POEM model results for Roundup.  And
23  I have a series of comments on those.  But more
24  importantly, in the text that's below these tables that
25  come from their modeling results, I actually look at

Page 183

1  what are the impacts of having less dermal protection.
2            Let me give you an example.  On page 77, the
3  assumption if you move -- I'm just pulling one example.
4  If you go down below where it says "exposure during
5  spray application" and it says "penetration" and it says
6  they have gloves, 10 percent of the exposure is a dose
7  for the hands, 5 percent for the trunk and 5 percent for
8  the legs.  Okay.  They're saying that of the available
9  material, only 5, 5 and 10 percent is getting into the
10  body in this model.  And they're saying below that, in
11  that model, the amount of material on a normalized
12  basis, which is a dose, a normalized dose of .585
13  milligram per kilogram body weight per day.
14       Q.  Where is that number?
15       A.  At the very bottom, under "predicted
16  exposure."
17       Q.  Okay.
18       A.  And they're saying it's 293 percent of AOEL,
19  which means basically the European limit is .2 and this
20  is above that by about a factor of 3.
21            But then you'll note down below that -- or on
22  the next page, 78, I say that using -- they used
23  non-conservative assumptions of 10, 5 and 5.  In other
24  words, they're assuming impermeable clothing.  That
25  doesn't include things like jeans and T-shirts.  This is

Page 184

1  real PPE.  And what their -- so what I said is, well,
2  let's just say the most conservative assumption you
3  could make would be to assume that all of that dose gets
4  in, that it gets right to the bare skin and gets in.  No
5  gloves -- I'm not saying that's the case.  I'm just
6  saying, if you want to go to the other extreme.
7       Q.  What do you mean "get in"?  You mean touches
8  the skin?
9       A.  No, no.  What they're assuming is that this
10  exposure amount never gets to the skin.  Only 10 percent
11  of it does because you've got gloves on, and only 5
12  percent gets to the trunk and legs because of some sort
13  of protective clothing.  And I'm saying, well, let's say
14  the person's out there in shorts and they're not wearing
15  gloves, then that exposure all of a sudden isn't on top
16  of clothing or gloves.  It's on the skin itself.  So
17  it's available to be a dose.
18            Does that make sense?
19       Q.  Sure.
20       A.  In that case, where we take their calculations
21  and we just change the numbers from 10, 5 and 5, to 100,
22  that number of .585 that you see before jumps to 7.82 or
23  a factor of 39 times higher.  It's already three times
24  higher than that European limit, and now it's going to
25  go up by another factor, almost 40.  So you can use

Page 185

1  their calculations for Roundup to do some perimetric
2  analysis of, well, what if it's not this scenario?
3       Q.  Understood.  But my question was:  Who is the
4  "they" and who is the "their"?
5       A.  Well, it's whoever -- I'd have to go back --
6       Q.  And here you're saying it's the UK POEM model?
7       A.  Model Roundup exposure results.
8       Q.  So that's the "they"; right?
9       A.  It's the results from this reference, Exhibit
10  459, and it is whoever it is.  We'd have to look up the
11  MONGLY numbers to see exactly who did that study, to
12  answer your question.  I mean, I don't have that right
13  in front of me, but it's easily found.  Whoever the
14  "they" is, is whoever they are.  It's done for Roundup.
15            And so there's -- and then -- and I looked at
16  all three -- what was done in this particular study for
17  Roundup was they looked at three scenarios.  One was
18  where you were in a cab.  A second was where you were
19  wearing a backpack, and the third was where you had some
20  sort of mechanical sprayer; it was a rotating disk.
21       Q.  You're still referring to the UK POEM?
22       A.  Yeah, beginning on page 74 and extending
23  through page 79.
24       Q.  Uh-huh.
25       A.  And you can also look at the -- page 79 starts

47 (Pages 182 to 185)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 186

1   where I do an analysis where it was found that there's
2   dioxane in Roundup POEA surfactant, which is a
3   carcinogen, and Monsanto was trying to convince the EPA
4   that -- and wrote two documents saying, well, it's in
5   there, but it's really not an issue; we're going to do a
6   risk assessment and prove to you that it's not a
7   problem.
8          But what they show as part of that is they're
9   basing everything -- their base model is glyphosate,
10  with the EPA model, and what they're doing is saying,
11  okay, dioxane is some percent of glyphosate.  Say
12  it's -- I don't know what the real number is, but 1
13  percent.  So we'll take 1 percent of those numbers and
14  plug them into these equations and see what it predicts.
15         But what's interesting is, on page 80, you can
16  see the dramatic effects on dose for scenarios where you
17  have gloves and don't have gloves.  You can have factors
18  of 5 just simply on having hand protection.  Appropriate
19  hand protection can drop the dose by a factor of 5.  And
20  by that, I'm talking about 79.5 [sic] versus 19.3
21  in figure 4-29 on page 80.
22         So the reason that I go through a lot of these
23  and I have opinions on every one of these studies is
24  that it's clear that it's important, in order to reduce
25  dermal exposure, to have appropriate protective

Page 187

1   equipment.  And then when I go through and go through
2   the warnings, I'll show that there wasn't
3   recommendations for appropriate exposure protection.  So
4   that's why they kind of dovetail together.  You have to
5   understand how -- what the effects are of dermal in
6   order to make comments on whether or not the warnings
7   were adequate or not.
8       Q.  Okay.  Well, we're going to get back to
9   Exhibit 13 and talk about that more in detail.  I was
10  just trying to --
11      A.  Sure.
12      Q.  -- introduce it for now.
13      A.  And I was just trying to introduce you to some
14  examples.
15          MR. UPSHAW:  I appreciate that.
16          We've been going a while since lunch.  Anybody
17  need a bio break?
18          THE REPORTER:  I would.
19          MR. UPSHAW:  You would want --
20          THE WITNESS:  He's the guy that you need to
21  ask.
22          MS. GREENWALD:  The court reporter's the most
23  important person.
24          MR. UPSHAW:  Exactly.
25          THE WITNESS:  Keep the poor guy working.

Page 188

1           THE VIDEOGRAPHER:  This marks the end of video
2   media disc number 3.  The time is 1546, and we're
3   going off the record.
4           (Recess from 3:46 p.m. to 3:57 p.m.)
5           THE VIDEOGRAPHER:  We're back on the video
6   record.  This is the start of video media disc
7   number 4 in the deposition of Stephen Petty.  The
8   time is 1557.
9   BY MR. UPSHAW:
10      Q.  All right.  We're back from a break.
11          Mr. Petty, are you ready to go?
12      A.  Sure.
13          MR. UPSHAW:  Okay.  Are we clear on the
14  screens?  Everybody okay, Tom?
15          THE VIDEOGRAPHER:  Yeah, you're fine.
16  BY MR. UPSHAW:
17      Q.  Okay.  Going back to Exhibit 7 where we
18  started, for a moment, your Section 2.0 talks about
19  information resources considered.
20      A.  Okay.
21      Q.  Can you tell me, are these documents that
22  you've collected or documents that were provided to you
23  and why you included them in your factual summary?
24  There are three questions there, so I know it's multiple
25  questions.

Page 189

1       A.  Yeah, I think you asked a multiple-question
2   question.  Which part do you want answered first?
3       Q.  The first part.
4       A.  Okay.  Did I collect these?  Yes, I have all
5   of these.
6       Q.  Why did you add this Section 2?
7       A.  This is typically where I just give an
8   overview of materials that I may use, along with
9   defining what's in the appendices, so it's just sort of
10  an introductory chapter.
11      Q.  Okay.  All of these documents that are
12  referred to in Section 2 are included in your
13  Appendix A, which we reviewed as your reliance materials
14  as Exhibit 6; is that correct?
15      A.  I'm not sure that the EPCRA or the RMP is
16  there.
17      Q.  What was the first thing you said?
18      A.  The Community Right-to-Know statute.  Let's
19  see how many bullets down, 1, 2, 3, 4, 5, 6, 7, and 8.
20  I think 8 is in, which is Process Safety Management, but
21  the two additional ones would be the EPCRA and risk
22  management plans under EPA.
23      Q.  Okay.  Those are not in your Appendix A?
24      A.  I don't think so.
25      Q.  Okay.  And why not?

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 190

1    A.  I don't know the answer to that.  It's always
2  difficult for me to answer questions on why I didn't do
3  something I didn't do.
4    Q.  Yeah, it's a mystery, which is why I asked.
5       Would you include them otherwise on your
6  Appendix A of reliance materials, or you didn't use them
7  at all?
8    A.  I would always say, if you ask me on reliance
9  materials, I would include everything here.
10      MR. KRISTAL:  Yeah, it says, "Additional
11  consideration materials are listed as exhibits in
12  Appendix A," so it's not meant to be --
13      THE WITNESS:  Yeah, I'm setting the table here
14  a little bit for the balance of the report.  The
15  main objective here is to let the reader know what
16  is in the appendices.
17  BY MR. UPSHAW:
18    Q.  So I get back to my question of:  Who was the
19  intended reader?
20    A.  What do you mean, who is the intended reader?
21    Q.  Of this document.
22    A.  I assume you folks.
23    Q.  Okay.  So I should rely on your reliance
24  material list at Appendix A, or include these plus your
25  reliance materials list?

Page 191

1    A.  I'm not sure it really matters.  Typically, I
2  would say you should rely on all of them, but I'm not
3  sure that the Community Right -- you know, the standards
4  for Community Right-to-Know and RMP -- RMP is so tied to
5  Process Safety Management, I don't know how you
6  distinguish between the two, other than one's from OSHA
7  and one's from EPA.  I mean, I've trained and I've done
8  these for industry, both of them.
9    Q.  Okay.  Will you have --
10    A.  In many respects, it's because -- the reason I
11  include as many documents as I do is because if I don't
12  include them and for some reason I need to have them at
13  some point in the future, I'll get frozen out in the
14  legal system.  So I err on the side of putting more
15  things in than maybe I may need, but sometimes I don't
16  know.  I've been -- there have been situations in
17  Daubert matters where I wished I would have had more
18  documents listed, and I've learned over the years,
19  better to err on the side of putting more in than less.
20  I mean, that's kind of where it comes from.
21    Q.  All right.  Any documents in Section 2 that
22  are not publicly available?
23    A.  No.  These are all publicly available.
24    Q.  Okay.  On page 18 -- right now, I'm just
25  kind of getting my general feet wet here.  Page 18, you

Page 192

1  refer to the Petty video clips and you refer to it in a
2  number of places.  Those are the clips that we talked
3  about earlier today?
4    A.  They are.  And what I've done is taken
5  screen -- I wouldn't call them screenshots, but I've
6  clipped frames to put in the report.
7       Does that make sense?
8    Q.  It does.  And --
9    A.  I haven't figured out how to embed a video in
10  a paper document.
11    Q.  It will come.
12      MR. KRISTAL:  Frame by frame.
13      THE WITNESS:  That's called storyboard.  You
14  think it's long now.
15  BY MR. UPSHAW:
16    Q.  Do you intend to use this document at trial?
17    A.  I will use -- I will use -- I guess the
18  answer's yes.
19    Q.  So when you walk up to the witness stand,
20  you'll have this with you?
21    A.  No, not necessarily, but I'll certainly use
22  information -- well, I don't know that I will.  It will
23  be up to the attorneys to decide what they want to use
24  out of this.
25    Q.  Let me ask it a different way.  Do you intend

Page 193

1  to have this with you when you walk up to the witness stand
2  at trial?
3    A.  No, I don't intend it.  Generally, my
4  experience at trial is I go up there with water and
5  that's about it.
6       MS. GREENWALD:  We don't even allow that.
7       MR. UPSHAW:  Yeah, I think we'll promise to
8  provide you water.
9  BY MR. UPSHAW:
10    Q.  The clips that are considered the Petty video
11  clips, I think you mentioned earlier you edited them
12  somehow?  They're not the entire commercial?
13    A.  They're not the entire commercial.  But
14  I've -- I've referenced where they come from.
15    Q.  Sure.
16    A.  So if you want the entire one, you just type
17  in that URL.  Like on this page 18, see where it says
18  https, colon, whatever -- it's obviously a YouTube
19  video, so if you type that into your computer, you'll
20  get the entire video.
21    Q.  And I think your counsel's going to provide us
22  your edited versions or she already has.
23    A.  I think they have.  I don't know if your
24  computer's --
25    Q.  I don't know if we've been able to open them

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 194

1    yet, but we'll get there.
2      A.  Your computer seems to be allergic to my disk.
3        MR. KRISTAL: I provided the six UC IPM
4    videos. I have not yet pulled off of the thumb
5    drive the other videos. I'll have to -- I'll get
6    that done. But the other ones I had independent of
7    the thumb drive.
8        MR. UPSHAW: And the ones -- I know we should
9    probably talk offline, but the ones you had
10   independent of the thumb drive are the witness's
11   edited versions of whatever those are?
12       MR. KRISTAL: No. The UC IPM videos are not
13   edited. I think it's more the commercials that
14   were edited.
15       MR. UPSHAW: Wait. Let me ask those as
16   questions rather than us just discussing.
17       MR. KRISTAL: Okay. Sure.
18   BY MR. UPSHAW:
19     Q.  So referencing the Petty video clips, which is
20   how you referenced them, tell me how you are going to
21   produce them and what you have done with those
22   particular clips.
23     A.  I'm producing the portion of the video clip
24   that I think most represents what I'm trying to
25   illustrate. So I've used a commercial video editing

Page 195

1    program to clip frames of those videos, where I've
2    listed what the entire video is, and that's what you
3    have in those video clips.
4      Q.  And counsel referred to another set of videos,
5    IC --
6      A.  There's -- I'm sorry. Go ahead.
7      Q.  Go ahead. The ICMP videos?
8      A.  I think there's some University of California
9    videos, five or six of them -- yeah --
10       MR. KRISTAL: There's six of them.
11       THE WITNESS: Six of them. And those I
12   haven't clipped or done -- I've referenced them at
13   times, but I have not done any editing of those at
14   all.
15       MR. UPSHAW: All right. Thank you. Much
16   better from the witness than the attorneys yapping
17   away.
18       MR. KRISTAL: I thought I was waxing
19   eloquently. Now I find out I'm yapping.
20       MR. UPSHAW: See, it's all in the
21   interpretation.
22   BY MR. UPSHAW:
23     Q.  Okay. And just cleaning up -- oh, let me go
24   back to 13 for a second. I have just a few questions on
25   that.

Page 196

1      A.  13 is what?
2      Q.  Is your spreadsheet on the different
3    plaintiffs' events.
4      A.  Okay. I'm there.
5      Q.  Do you reach some conclusion for each of these
6    plaintiffs with regard to exposure?
7      A.  I do in the sense of total events and total
8    hours.
9      Q.  Okay. And that's the totality of the
10   conclusion with regard to a particular plaintiff?
11     A.  With respect to time variables.
12       Now, with respect to skin areas, you just have
13   to describe that. Each of the -- each of the rows on
14   the first two tables come from data in, ultimately, the
15   interviews but presented in individual tables that
16   follow. And the dermal data, what's sort of unique
17   about my interviews is I'm very consistent in how I ask
18   dermal data. I call them dermal tables. You'll see
19   them in the interviews.
20     Q.  I'm sure I'm going to ask you this again, but
21   I may as well ask it while I have it on the top of my
22   head.
23       Do you follow a script? Do you have a
24   worksheet to follow so that you're consistent between
25   interviews?

Page 197

1      A.  Yes and no. I start with an industrial
2    hygiene interview sheet that I've used for a long time,
3    but I maintain -- I realize that based on what I hear, I
4    may have to deviate from that. Does that make any
5    sense?
6      Q.  Sure.
7      A.  If I hear something that I need to deviate
8    into, then I will do that. But, yes, I start with a
9    baseline set of questions, and they're pretty obvious
10   when you look at the interview. But if you look at even
11   these 15 interviews or 14 now, and you had the
12   opportunity to look at hundreds of others that I've
13   done, you would see very much a consistent pattern.
14     Q.  And you've used the same questionnaire, for
15   lack of a better word, as a basis?
16     A.  As a starting point, but each interview
17   deviates from that, depending on what I've learned.
18     Q.  Have you produced a copy of that
19   questionnaire, your baseline questionnaire that you
20   deviate from?
21     A.  I don't think so. Nobody's asked for it.
22     Q.  I'm asking for it. And we'll talk about that
23   with your counsel, but I think it's part of your
24   documents. But we'll talk about it after we get done
25   today.

50 (Pages 194 to 197)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 198

1      Let me ask this question before we discuss it:
2  You have it at your residence, right, or you can obtain
3  it --
4      A.  I have it at my office.
5      Q.  But you could obtain a copy for us if need be?
6      A.  I could.
7      Q.  Okay.
8      A.  That will be up to counsel.
9      Q.  Yeah, like I said, we'll talk about it, but I
10  just want to make sure that if we decide that you are
11  going to produce it, that you can.
12      Part of what you said about this Exhibit 13 is
13  that this was not my methodology.  Can you explain --
14      A.  Exhibit 13?
15      Q.  Yeah.  We were talking about your methodology
16  and we were talking about how you -- the methodology you
17  use, and we went into some detail about differential
18  diagnosis and compare and contrast, and at one point I
19  said, "This is your methodology," and your response was,
20  "This is not my methodology."
21      A.  I wasn't referring to --
22      MR. KRISTAL:  I think you were talking about
23  Exhibit 7, and you were asking if the
24  definition of --
25      THE WITNESS:  The only reason I'm confused is

Page 199

1  your reference to 13.
2      MR. UPSHAW:  You're right.  I apologize.  I
3  mixed the two up.  And I appreciate that.  Thank
4  you, Counsel.
5      So let me go start that section again because
6  we were talking about your methodology here.
7      THE WITNESS:  This document is a statement of
8  facts.  It's not intended -- if you want to ask me
9  what my methodology is, I will tell you what it is,
10  but -- and I will point out sections that describe
11  elements of that, because it's a document on just
12  trying to put factual information aggregated in
13  similar places.
14  BY MR. UPSHAW:
15      Q.  Okay.
16      A.  And the area in which I talk about the history
17  of warnings is an important part of that methodology.
18  But there isn't -- you know, I'm going to have to
19  describe to you for the methodology, because this isn't
20  a report of opinions.
21      Q.  Correct.  Okay.  So before we do that, which
22  is something I do want to know -- I do want to know if
23  there was any methodology -- going back to 13, which is
24  where I got confused on -- the question I wanted to ask
25  is:

Page 200

1      Do you apply any methodology in the creation
2  of these charts or the separate Roundup exposure chart
3  for each plaintiff, or is this just a factual
4  regurgitation of the information you obtained?
5      A.  Well, these tables are a roll-up of other
6  tables from the interviews, so I have to try to make
7  distinctions between the tables that I have in my
8  interview and where I'm trying to aggregate a lot of
9  information from multiple pages in the interview.
10      The interview itself is set up like the -- I
11  call it the dermal table, but it's got more than just
12  the dermal tables in it.  It is intended to provide
13  information that I would need, should I ever decide to
14  do a dose, because those are the parameters that I would
15  need in order to do a dose evaluation, at least the
16  input parameters, some of the input parameters.
17      Q.  Right.
18      A.  So where does that come from?  Well, I guess
19  it comes from my dermal benzene paper and all the
20  literature that's behind it, which is methodologies for
21  dermal assessments.
22      Q.  Which dermal benzene paper?
23      A.  The one that Petty Nicas and Boiarski wrote in
24  2011.
25      MR. KRISTAL:  It's the last one on the CV or

Page 201

1  the most recent one on the CV.
2      MR. UPSHAW:  Right.
3  BY MR. UPSHAW:
4      Q.  And it's your statement today that the -- you
5  would apply the methodology -- or you did apply the
6  methodology identified in your Petty Nicas paper to
7  these plaintiffs?
8      A.  No, that's not my statement at all.
9      Q.  Okay.  I totally missed it, then.  Tell me
10  where I'm wrong.
11      A.  Regardless of the methodology you pick, in
12  dermal exposure analysis, there's really two approaches.
13  One is to use what we call a flux approach, which is to
14  look at -- flux is basically the amount of material that
15  will pass through your skin per unit area, per unit of
16  time.  So once you know the flux for a given material,
17  you just multiply it by the skin area and the time, and
18  that will give you a dose like milligrams of whatever
19  the material is.  So you have to determine what the flux
20  is.  And you'll see that in some of the work that was
21  done by Franz, for example, presented his data in terms
22  of flux.
23      The other way that data are often presented is
24  the percent that's absorbed, and the EPA models tend to
25  look at percent absorbed as a basis for starting the

51 (Pages 198 to 201)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 202

1    dermal models. So, you know, when you look at
2    methodology, to me the methodology is what equations are
3    you going to use to determine a dermal dose. And what
4    I'm developing here is simply input data to those
5    models. So it's not really a methodology. It's simply
6    if you're going -- if you need time and you need skin
7    area, then you've got to get that either from deposition
8    testimony or from interviews of the individuals
9    involved, or if they're deceased, from -- as we call it,
10   similar exposure groups, can get it from people that
11   would be as representative as you could of the people
12   who are no longer with us of exposure.
13         So what I'm doing here in these interviews is
14   collecting input data. It would be like: What's the
15   methodology for adding two numbers together? Well, the
16   methodology would be the addition operator. But what
17   I'm doing here is getting the values to put into the
18   addition operator. So it's the input data that could be
19   used once I were to select a methodology.
20         But as I've said before, I'm not doing a
21   dermal dose. I'm not -- I could, I guess, but I have no
22   intent to do a dermal dose. There was a time where I
23   didn't think I could, but now I've reviewed enough of
24   this stuff that I'm pretty confident I could. But I've
25   not been asked, and it would just take a lot of time and

Page 203

1    work, and it's been done by others. Frankly, it's been
2    done by Monsanto and others.
3         Q. A dermal dose has been done for these
4    plaintiffs by Monsanto and others?
5         A. Not by the plaintiffs, but it's been done for
6    people doing certain activities, so you would just have
7    to change the input parameters, right.
8         Q. Okay.
9         A. I don't intend to do that, but we just went
10   through one of those models. We can look at different
11   skin areas involved or whatever.
12         Q. All right. When you -- just in general, when
13   you were putting this data together in Exhibit 13, did
14   you rely at all on the deposition testimony of any of
15   these plaintiffs?
16         A. It depended on whether -- if you look at the
17   dates associated with the interviews versus the
18   depositions, I didn't have the ability to invert time,
19   so -- in all cases. Where there was information from
20   depositions available before I interviewed them, yeah, I
21   would consider it. But if it was available afterwards,
22   not necessarily. I mean, the interviews are what they
23   are. I mean, I'm not going to -- you know, that's what
24   they tell me.
25         Q. Correct. And did you go back and determine

Page 204

1    whether or not that information was confirmed in
2    subsequent deposition testimony that you have received
3    and have in your possession?
4         A. By and large the information that I have in
5    here was not asked in the depositions. The skin areas,
6    the skin percent area impacted of each of the areas and
7    the percent time impacted and the post-dermal times,
8    none of those questions were asked. That's been my
9    experience over and over again, that they're just not
10   asked. And for the ones I reviewed, I don't recall a
11   single set of data that compares to what I put together
12   on the dermal side of the equation.
13         Q. Is it your testimony that you've reviewed all
14   of the transcripts for these plaintiffs now that they're
15   in your possession?
16         A. I have not reviewed all of them. I reviewed
17   most of them but not all of them.
18         Q. And in the transcripts that you reviewed, did
19   you check to confirm either the number of events,
20   duration of events, areas of exposure, any of that
21   information?
22         A. I tried to, yes.
23         Q. And did you find any conflicting information
24   of any of the plaintiffs? And, again, we'll go over
25   each one. That's asking you about 14 different people

Page 205

1    in general. I recognize that.
2         A. There's always conflicting data. I mean, you
3    ask somebody about events 20 years ago, and you ask
4    them, six months apart, the same hundreds if not
5    thousands of questions, you're going to see some
6    differences in numbers. I didn't see anything that
7    really was dramatically different. Most of the
8    questions weren't asked.
9         Q. Where you did see conflicting data, how did
10   you rectify that?
11         A. I didn't. It is what it is. The data are
12   what they are.
13         Q. So on those where you saw conflicting data,
14   are there two sets of event calculations, then?
15         MR. KRISTAL: Object to form.
16         A. Why would I do that? Why would I do that? I
17   mean, this is based on the interviews.
18         Q. I understand. If you saw that there were a
19   conflicting number of events in the subsequent
20   deposition testimony. And, again, I know we're talking
21   in the abstract, so bear with me.
22         A. Appreciate, most of those I've only seen in
23   the last month or so, and I've been in five depositions
24   in that time. I haven't had time to go through and do
25   all that analysis, plus the depositions haven't been

52 (Pages 202 to 205)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 206

1    finished.
2        Q.  So for those depositions that have been
3    finished, you just haven't had the time to do this
4    analysis of whether or not the conflicting data would
5    change any of your event --
6        A.  I don't think it would change my --
7        MR. KRISTAL:  Objection --
8        THE WITNESS:  I don't think --
9        MR. UPSHAW:  He wants to object.
10       MR. KRISTAL:  Assumes facts not in evidence.
11       THE WITNESS:  The best way to answer that
12   question is:  It wouldn't change my opinions.  In
13   other words, I don't think it's going to change my
14   opinion that there were thousands -- hundreds if
15   not thousands of events and hundreds if not
16   thousands of hours.
17       Will it change it on the margin somewhat?
18   Yes.  But remember, my primary purpose here isn't
19   to do an exposure or dose analysis.  It's to
20   comment on the effect of not having proper PPE or
21   protection through the warnings, so this is -- it
22   would have very limited effect on my opinions.
23   BY MR. UPSHAW:
24       Q.  Okay.
25       A.  I'm going to get up there and say, I think

Page 207

1    this individual had several hundred or a thousand or
2    whatever exposure events in so many hours.  If it
3    changes at 10 percent, it's not going to change the
4    decimal point.
5        Q.  Understood.  All right.  Have you sent
6    Exhibit 13 to anyone else other than your attorneys --
7    not your attorneys -- other than the attorneys for the
8    plaintiff?
9        A.  I have not.
10       Q.  So in general, when you've talked to -- when
11   you talked to the 14 plaintiffs, they were all telephone
12   interviews; correct?
13       A.  Correct.
14       Q.  Were they by Skype or FaceTime at all?
15       A.  No.
16       Q.  So you don't know what they look like?
17       A.  In general, I don't know what they look like,
18   that's correct.
19       Q.  What do you mean by "in general"?
20       A.  I can't tell you 100 percent that I haven't
21   seen some picture, but I don't believe so, of one of
22   them.
23       Q.  And I think we've talked about this, but let
24   me make sure.  You had no e-mail communication with any
25   of the plaintiffs?

Page 208

1        A.  No.
2        Q.  Was someone else on each of the calls?
3        A.  The interviews say who was on the calls.
4        Q.  Okay.  In front of the interview; right?
5        A.  In the first entry part of the interview form,
6    it says exactly who was on the line.
7        Q.  On each of the interview forms -- and again,
8    I'm talking in general.  We'll get to them specifically.
9    But on each of the interview -- I don't want to call it
10   a form -- outline, summary --
11       A.  Sure.
12       Q.  -- it lists one or a number of attorneys.  Was
13   anyone other than attorneys and yourself present on
14   those phone calls, that you are aware?
15       MR. KRISTAL:  Assuming you're including the
16   plaintiff as well.
17       MR. UPSHAW:  Well, the plaintiff obviously,
18   since it's a phone call with the plaintiff.
19       A.  Well, I think so because, on some of them,
20   they've indicated that maybe a spouse is on or the
21   father was on or whoever I've indicated was present.
22   And then I don't know in some cases whether the person
23   on the legal side was a paralegal or an attorney.  I
24   really don't know.
25   BY MR. UPSHAW:

Page 209

1        Q.  Is it your --
2        A.  But I've indicated the names of who was there.
3    That's all I'm telling you.
4        Q.  Is it your method normally to interview
5    someone with their attorney present?
6        A.  Yeah, I don't have any difficulty with that at
7    all.
8        Q.  Did you review your questionnaire with
9    Plaintiffs' counsel prior to asking the questions to
10   these specific plaintiffs?
11       A.  They may have had a copy of it originally, but
12   I never had any conversations with them before -- I
13   can't recall any conversations with them before the
14   interview.  It's usually are you available at this time,
15   we're available at this time, can we get together on the
16   phone and make the call.  It's usually I'm busy and
17   they're busy.  You know how that goes.
18       Q.  At some point before the interviews started,
19   you informed counsel of the questions you were going to
20   ask; right?
21       A.  No.  I have a general outline that I've talked
22   about before, but the questions that I ask are
23   interview-specific in the sense that it depends on what
24   I learn from them.
25       Q.  Understood.

53 (Pages 206 to 209)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 210

1    A. Because the very first thing I do is go
2 through their job history, so the first thing -- whether
3 they've used the product of interest or not, I want to
4 rule in or out other potential exposures. I want to
5 know something about their smoking history. I want to
6 know a whole bunch of things. As an industrial
7 hygienist, I have that obligation to do all those
8 things.
9    And so, as part of reviewing their work
10 history, their school history, their military history
11 and all that, what will come out of that is information
12 about where they may have used certain products, and
13 that will then drive me to ask more questions about
14 their times at those jobs. That is completely variable
15 depending on what I learn from the individual.
16    Q. Okay. Did you discuss with counsel for these
17 plaintiffs why you were going to ask about this exposure
18 or obtain a -- attempt to obtain this exposure
19 information?
20    A. No. I'm insistent on doing interviews. I've
21 always done them for every forensic project I can do
22 them. It's a standard method industrial hygiene
23 interview. The people that are most likely to know what
24 they did and what happened to them are the people
25 themselves, so I want to know directly from them what

Page 211

1 their experiences were, and specifically, I want to find
2 out what their exposures were to a variety of things,
3 including the target product or chemical of interest,
4 because I have an obligation to try to figure out
5 whether there were alternative explanations as well.
6    Q. For these plaintiffs, did you ask specifically
7 whether or not they were exposed to other pesticides?
8    A. In some cases, that information became -- I
9 asked them about other products. And to the extent that
10 they remembered or was able to provide that information,
11 I listed those.
12    Q. Okay. When you say "other products," my
13 question was other pesticides.
14    A. Well, that includes other pesticides.
15    Q. Okay. So what kind of question was it that
16 you asked with regard to other products? Just products
17 in general? Chemical products? I don't understand.
18    A. Yeah, I would ask what else they used when
19 they were -- did they use any other products for
20 spraying. And you'll see in the interviews, if they
21 provided that information, then I wrote it down.
22    Q. My question, though, is: Was that one of your
23 general questions? If they had that information,
24 obviously you wrote it in your summary. But for every
25 one of these plaintiffs, did you ask, "Did you use any

Page 212

1 other pesticides?"
2    A. I always asked them what they used. I don't
3 know if I asked them exactly that way. But to the
4 extent -- I think I got to that answer. I was
5 definitely interested in knowing. I call balls and
6 strikes.
7    Q. On one or two occasions, you spoke to other
8 individuals to obtain additional exposure or event
9 information. On those occasions where someone else
10 added information, it's always listed on your interview
11 summary?
12    A. Well, you seem to say that I've done that, so
13 can you give me a specific?
14    Q. For --
15    A. Then I'll answer your question.
16    Q. I think it's Kyle Chaplick.
17    Am I right with that? I don't know why I
18 think it's Kyle.
19    MR. KRISTAL: Well, Deion Sanders was the
20 child, so his father was present --
21    THE WITNESS: The only one I remember is
22 Sanders.
23 BY MR. UPSHAW:
24    Q. Maybe it was Deion.
25    A. I only remember Sanders. But Chaplick, I

Page 213

1 don't have anybody else on their side.
2    Q. Yeah, no, Chaplick just came to mind. But
3 you're right. It is Mr. Sanders. You do identify -- I
4 think it was his father.
5    A. I think his mother as well at one point was
6 on. It is whatever it is.
7    Q. Right. I think it's his father and mother.
8    A. His father and mother were on.
9    Q. Got you. Okay.
10    So my question is: If there was someone else
11 on, you would have identified them; right?
12    A. I did.
13    Q. Okay.
14    A. Unless they were -- I never knew they were on,
15 but...
16    Q. Which, interestingly enough, leads me to my
17 next question. Do you know whether anyone else was
18 present with the plaintiff?
19    A. These interviews are long enough that I think
20 I would have heard noises or something in the
21 background. To my knowledge -- there's always
22 introductions as to who's there, and that's why I want
23 to know, so I can write that down and put it on the
24 record.
25    So to my knowledge, I would -- other than

54 (Pages 210 to 213)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 214

1  occasionally hear background noise of somebody in the
2  street or something, I don't know of anybody that was
3  part of the formal part of the interview that I didn't
4  record their names.  I'm not aware of that.
5      Q.  Do you know where the attorney was located?
6  Was the attorney -- were the attorneys or one of the
7  attorneys who were present for these interviews located
8  with the plaintiff?
9      A.  Sometimes yes; sometimes no.
10     Q.  Did you indicate that on your summary sheet,
11 though?
12     A.  No, most of the time not.  The only one that I
13 recall that they were there, and that was the first time
14 with Deion, I think you were with -- I know, with the
15 Sanders interview, that Robin was with them at least
16 once, maybe more.
17     Q.  Yeah, the Sanders interview was over several
18 days, if I recall; correct?
19     A.  The others, I don't think they were there, but
20 I don't know for a fact.
21     Q.  In your -- in your interviews, you indicate
22 how someone was applying Roundup.  Did that matter at
23 all in your event or time analysis?
24     A.  How they were applying Roundup.  For just the
25 specific time calculations, only to the extent that they

Page 215

1  would tell me the time -- well, yes, it had some
2  implication because I was also including the post-dermal
3  application time.  So what they were doing and how long
4  it was till they cleaned up was important, I guess if
5  that answers your question.
6      Q.  It does to an extent.  Let me try to clarify a
7  little bit.
8          Did it matter if someone was applying, as an
9  example, a Roundup product for 20 minutes with an
10 18-inch wand one occasion, and then another occasion
11 they were applying it for a half an hour with a
12 backpack?
13     A.  Well, I mean, obviously it does matter.  But
14 in terms of just doing the roll-ups, if you wanted those
15 details, you'd go to the individual interviews where
16 I've talked about the percent time, if there's a
17 situation where they use multiple ways of applying the
18 pesticide.  The roll-up doesn't account for concentrate
19 versus ready-to-use, nor does it account for the --
20 well, it does in a way account for some of that because
21 you've -- in the subcalculations, I've indicated the
22 post-dermal times as part of the -- when you go down
23 below, you can see the actual calculations.  Now --
24     Q.  Okay.  In your roll-up, as you called it,
25 Exhibit 13?

Page 216

1      A.  Well, it's a roll-up and then a roll-up of a
2  roll-up.  So you've got -- the first two tables are a
3  summary of all the tables that follow.
4      Q.  Right.
5      A.  And the tables that follow are a roll-up of
6  the interviews.  I apologize for using the term twice.
7  But you've got a roll-up for the individual interviews
8  that is showing up as a table for each plaintiff, and
9  then all the plaintiff tables are rolled up in the
10 next two -- at the top two tables for both events and
11 time.
12         So some of that information is included here.
13 Whether they used a backpack or hand sprayer, we'd have
14 to go to the interview to ferret out the differences
15 between those two.  But the final roll-ups here are
16 simply time and events, independent of product or method
17 of application.
18     Q.  And is it important to your opinion, in the
19 way that you're using this exposure information, whether
20 or not there -- the application was by a backpack or a
21 wand or some other type?
22     A.  It would be with respect to when I add in the
23 dermal side of it, because the dermal side of it's in
24 the individual tables.
25     Q.  But, now, when you add in the dermal side,

Page 217

1  does that -- what impact did that have on your general
2  opinion that these plaintiffs would not have been
3  exposed to as much Roundup had Monsanto used the word
4  "warning" instead of "caution," if I said that
5  correctly?
6      A.  Because the different equipment caused
7  different amounts of wetting of the skin, and so there
8  would be -- an application situation that results in
9  more wetted skin would have more of an impact if the PPE
10 wasn't there than if you had an application where there
11 was less wetted skin, so that's why it's important.
12     Q.  But you'd be talking about totally different
13 PPE, wouldn't you?
14     A.  No.  Well, what's the different PPE if you're
15 going to wear gloves that are impermeable or not?
16     Q.  Or Tyvek?
17     A.  Well, Tyvek is not real PPE.  It's level C.
18     Q.  Okay.
19     A.  I'll put you in Tyvek if you want to protect
20 yourself from a carcinogen or something -- or any
21 chemical element I point you at, you don't want to be in
22 Tyvek to protect yourself from those, believe me, but
23 I'll give it to you if you want.  I'll put you in
24 level C.
25     Q.  Move to strike, nonresponsive.

55 (Pages 214 to 217)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 218

1     You are aware --
2     A.  It would be if you were exposed.
3     Q.  Well, it's getting kind of late.  We're
4  getting a little giddy.  I'm happy to finish for the
5  day, and we'll pick this up tomorrow.  I don't want to
6  get us too far off track.
7     A.  Sorry about that.
8     Q.  No problem.  It's rather late.
9     A.  Do you want to get these documents in?
10     MR. UPSHAW:  Yeah, let me mark those, and then
11  we'll just come back in the morning.  I get it.
12     MR. KRISTAL:  Well, we're here to have a
13  deposition.
14     MR. UPSHAW:  I'm here to have a deposition
15  too, but we're getting way afield with --
16     MR. KRISTAL:  I don't think we're getting
17  afield.  He made one comment in seven hours that
18  you think somehow is far afield.
19     MR. UPSHAW:  I'm happy to go forward.
20     MR. KRISTAL:  We should go forward.
21     MR. UPSHAW:  I just don't want us to get too
22  far into --
23     MR. KRISTAL:  We should go forward.
24     MR. UPSHAW:  -- giddiness here, and if you're
25  fine with doing that, I'm fine with going forward.

Page 219

1     THE WITNESS:  Yeah, I'm good with that.
2  BY MR. UPSHAW:
3     Q.  Let's mark those two documents.
4     A.  It's one for you and one for them, I guess.
5     Q.  So it's just one document?
6     A.  You can have that.
7     Q.  No, I mean, it's one we're going to mark?
8     A.  Yeah, I'll give them both to you.  I'm sorry.
9  You can mark them.  That's okay.  I'm sorry.
10     Q.  Yeah, I just want to make sure we're not
11  marking two things.  This is both the same?
12     A.  They're both the same.  I apologize.
13     MR. KRISTAL:  Maybe I missed it.  Did you mark
14  the summaries?
15     MR. UPSHAW:  No, we haven't marked the
16  summaries.
17     MR. KRISTAL:  Okay.  All right.
18     THE WITNESS:  We haven't marked the
19  interviews.  Is that what you're saying?
20     MR. KRISTAL:  Right, that's what I'm talking
21  about.
22  BY MR. UPSHAW:
23     Q.  Okay.  Let's mark this as Exhibit 14.
24     And, Mr. Petty, let's identify that for the
25  record, if you would.

Page 220

1     (Defendant's Exhibit 14 marked for
2  identification.)
3     A.  What it is, is a paper copy of the Worker
4  Protection Standard, Part 170 of FIFRA under Title 40.
5  And I've highlighted the areas that I want to comment
6  on.
7     Q.  On both sides?
8     A.  Yeah.  I went ahead and made it easy for you.
9     Q.  And why have you added this to the documents
10  that you are producing at this deposition?
11     A.  Specifically because -- well, I knew it as an
12  industrial hygienist and a safety professional.  They
13  make it explicit, and that is that in several of the
14  labels, Monsanto says PPE and then it says pants and a
15  long-sleeve shirt.  Those are not PPE by definition, and
16  this document says it explicitly.  So they're
17  misrepresenting, as PPE, shirts and jeans.
18     Q.  Just to be clear, when you say they say
19  misrepresenting, you mean Monsanto?
20     A.  Monsanto.  And, specifically, I can take you
21  to page -- it's in multiple sections of this document.
22  It's well understood within the PPE standards under
23  OSHA.  But if you go to page 22 of this document.
24     Q.  All right.
25     A.  And, specifically, I'm referring to 170.240,

Page 221

1  PPE, personal protective equipment.  And, specifically,
2  I'm referring to line -- item 2, "Long-sleeved shirts,
3  short-sleeved shirts, long pants, short pants, socks,
4  shoes, and other items of work clothing are not
5  considered personal protective equipment for the
6  purposes of this section."
7     So when Monsanto says in their labeling "wear
8  the following PPE," and they say "long pants and a
9  shirt," they're in violation of 170.240.
10     Q.  Okay.  And who enforces Section 170.240?
11     A.  The EPA would.  I mean, they don't really
12  have an enforcement -- well, they do have an enforcement
13  arm, but we all know that, you know, the EPA has limited
14  resources as well.  But this is incumbent on -- Monsanto
15  is representing that shirt -- regular work clothing,
16  pants, jeans, long-sleeved shirts are PPE.  They are
17  not.
18     Q.  And that's your opinion that that's what
19  they're representing?
20     A.  Absolutely.  It's in my report.
21     Q.  Right.  And you're going to show me in your
22  report --
23     A.  I'll show you right now.
24     Q.  Okay.  Let's do that.
25     A.  Might as well get to that.  I show it in two

56 (Pages 218 to 221)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 222

1 places, page 139 --
2        Q. Hold on one second.  I have to mark that
3 exhibit.
4        A. Page 139, it's under the Roundup ProMax.  It
5 says "Personal Protective Equipment," "Applicators and
6 other handlers must wear long-sleeved shirts,
7 long pants, shoes and socks."
8            That is not PPE.
9        Q. Where?  Okay.
10       A. It's highlighted.
11           MR. KRISTAL:  This is a label.
12           THE WITNESS:  This is a label.
13 BY MR. UPSHAW:
14       Q. I was going to explain here what we're talking
15 about.  So on page 138, under Section 7.1.3, you're
16 referring to a 2010 label for Roundup ProMax; is that
17 right?
18       A. Correct.
19       Q. Okay.  And --
20       A. And -- I'm sorry.
21       Q. I was just going to set the groundwork here.
22 And so you've included -- I mean, there's some language
23 here which says, in this 2010 label, figure 7.5 -- and
24 again, I'm paraphrasing -- Monsanto's warnings for
25 dermal skin protection, 7-6, which is I believe the next

Page 223

1 page --
2        A. It's just more of the label.  It's just the
3 rest of the label.
4        Q. Okay.  Do not require any specific chemically
5 resistant items, which is a violation of the EPA's
6 requirements for dermal protection.
7        A. No, that's not what I'm saying.  What I'm
8 saying is they are listing, under the title "PPE" --
9 "PPE" has a very distinct meaning.
10       Q. Okay.
11       A. And you can go back and see the line item
12 above the one I just read you in the 170 code, but you
13 can go to industrial hygiene documents, you can go to
14 OSHA documents; PPE would have you wear chemically
15 protective clothing as is pointed out in the FIFRA
16 standard under work protection rules, simply using
17 long-sleeved shirts and long pants as being
18 representative of PPE is completely incorrect.  So it's
19 misleading the worker.  They're thinking they're getting
20 PPE because that's the title.
21       Q. Which is what you say right under where it
22 says "Figure 7-6," right, "None of the PPE items listed
23 in the label (long-sleeved shirts, long pants, nor shoes
24 plus socks) are a PPE even though they're listed under
25 PPE"?

Page 224

1        A. That's what I'm saying, trying to make it
2 easy.  And the exact same --
3        Q. Let me ask a question, then.  You said "None
4 of the PPE items listed in the label."  So you think
5 there are PPE items?  Because that's what your sentence
6 says.
7        A. I'm saying these specific items, right.  I put
8 them in brackets.
9        Q. Yeah, you just called them "PPE items."  "None
10 of the PPE items listed in the label," those in the
11 brackets, "are PPE"?
12       A. Right, because I'm saying -- I think --
13 hopefully we're saying the same thing.  Monsanto's
14 saying that under their label, the personal protective
15 equipment they're recommending is long-sleeved shirt,
16 long pants, shoes plus socks.  What I'm saying is that
17 is not, by definition, PPE.  That's all I'm saying.
18       Q. And the definition was the document you
19 provided us?
20       A. Well, it's -- PPE for dermal protection is
21 OSHA 1 -- 1910.132, which is the PPE standard, will tell
22 you that information.  But I felt like the most relevant
23 document would be the EPA FIFRA document on worker
24 protection.
25       Q. And in fact, in the label, this is what's

Page 225

1 referred to?
2        A. Yes, at least a portion -- it's referring to
3 170.  I don't know the specific subpart.
4        Q. Isn't this part 170 you just --
5        A. Yes, I'm not disagreeing with you.  I'm saying
6 I don't know about the 240(d) --
7        Q. Oh, okay.  I'm with you.
8        A. I'm not disagreeing with you.  I'm just
9 clarifying.
10       Q. You've got to go even further down?
11 Understood.
12       A. You've got to go down the document to see what
13 they're saying in those subsections, for me to answer
14 further questions.
15       Q. Okay.
16       A. Now, the next --
17       Q. Oops, sorry.  I thought we were done.
18       A. -- page 140 -- 140 is another example for --
19 I'm just using examples, okay.  This report -- nobody
20 ever accused me of writing a short report.  But another
21 example of the same, in my opinion, misrepresentation of
22 FIFRA is the same scenario here, where they're listing
23 as PPE long-sleeved shirts, long pants, protective
24 footwear and socks.  I don't highlight the protective
25 eyewear because that's legit.  That's real PPE.  But

57 (Pages 222 to 225)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 226

1    these other ones are not, and it's because of the 170
2    language that I've cited earlier in my deposition.
3        Q.   Okay.  And this was part of a label that you
4    found on an actual bottle of Monsanto Roundup QuikPro
5    concentrate?
6        A.   I've referenced it.  Below the figure, you'll
7    see it's my Exhibit 186 with that MONGLY.  I try to make
8    it easy for you guys.
9             MR. KRISTAL:  185?
10            MR. UPSHAW:  185.
11            THE WITNESS:  185 with the MONGLY or however
12    you say it.
13            MR. KRISTAL:  Well, it's glyphosate, so I
14    always pronounce it MONGLY, since it's g-l-y.
15            THE WITNESS:  And I want to get it right,
16    eventually.
17            MR. UPSHAW:  I agree with Jerry.
18            THE WITNESS:  Anyway, I'm just saying -- my
19    only point is where I got the material, I always
20    try to reference everything, so not only for you,
21    but for me; I can go back and find it.
22    BY MR. UPSHAW:
23        Q.   I was just making sure that this is not a
24    draft label or a submission label, that it's an actual
25    label.

Page 227

1        A.   Well, you'll see if you go to my page 4 or
2    5 -- 4 or 5, you'll see where they're draft labels
3    because they clearly have markings.  I mean, I have
4    criticisms of this as well.  You'll know if it's a draft
5    because you've got this sort of language around it
6    that's showing -- you know, there's an example where I'd
7    say, yes, that's a draft label.
8        Q.   So we know it's a draft in your factual
9    summary if it's got some language around it?
10       A.   Well, I know that this one is, and it just --
11   it's distinct -- I mean, it's -- you can go back and
12   look at the document, if you have to, where I pulled
13   this from, to realize that that's what's being done
14   here.  This is where they're designing labels.  And the
15   reason I have this here is for other reasons, but you
16   don't -- my understanding is that these are labels that
17   were actually used because they were produced to us as
18   such.
19       Q.   Just as a side note, the example figure 7-7
20   and 7-8, those are the same label?
21       A.   Those are -- well, they're labeling on the
22   same -- they're labeling for the same container.  Does
23   that make any sense?
24       Q.   So one's the front and one's the back of the
25   same container?

Page 228

1        A.   Or something like that, yeah.  You can go back
2    and look at...
3        Q.   Okay.
4        A.   They come from different places, clearly, but
5    they're related to the same products.
6        Q.   Understood.  My question is:  Do you know
7    whether that's the same product, that 7-7 is the front
8    and 7-8 is on the back?
9        A.   I'd have to pull those to be absolutely
10   certain, but I'm pretty sure they are.
11       Q.   Okay.
12       A.   I've got the dates.  They look to be the
13   same Bates number.
14       Q.   They seem like they're the same Bates number,
15   which seems odd to me, but okay.
16       A.   Well, because I think what I did was if you
17   tried to put them all on one page, you couldn't read it.
18   My goal here was to -- I clipped the graphic so that I
19   could blow up this portion so you could see it and also
20   so I could highlight it with an editing tool.
21       Q.   Understood.  Okay.  All right.  I think we've
22   covered why we have Exhibit 14 now.
23            THE REPORTER:  Just to let you guys know, it's
24   10 minutes till 5:00.
25   BY MR. UPSHAW:

Page 229

1        Q.   All right.  Going back to your individual --
2    some general questions with regard to your telephone
3    analysis and issues involving the exposure, on your
4    interview sheets, do you identify what clothing they
5    were wearing at the time of these events?
6        A.   No, not necessarily.  What I'm interested in
7    is the bigger number, whether it's clothing or -- I ask
8    about gloves.  I don't ask about clothing.  I simply ask
9    whether it was clothing or not clothing.  I want to
10   know -- what I'm interested in is what portion of the
11   skin gets wetted, whether they have clothes on or not.
12            Does that make any sense?
13       Q.   No, because I picture somebody out in their
14   underwear spraying, so I think it would matter if they
15   had on clothes or not, but, I mean, you asked for
16   exposed skin --
17       A.   No, no, you're being sort of facetious.  But
18   what I'm saying is whether they have -- let's say
19   whether they don't have pants on or they do have pants
20   on, but they say their lower leg is wetted, 25 percent
21   of their leg, 25 percent of the time.  Whether it's
22   because the leg's bare or because it got through the
23   jeans is not --
24       Q.   Doesn't matter?
25       A.   It doesn't matter to me because what counts is

58 (Pages 226 to 229)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 230

1  the material that wets the skin. That's what's going to
2  provide the dose.
3       Q. Okay. Didn't we talk earlier about the
4  difference in the dermal dose, whether someone had long
5  pants or short pants on?
6       A. No, no, no. We were talking about protective
7  equipment. That was protective -- we did talk about it,
8  you're right, but what we were talking about there is,
9  remember, the word used was "protective," and they were
10  reducing the dose from 100 percent to 5 percent because
11  of protective equipment. That's fine. That's an
12  assumption that the protective equipment will stop 95
13  percent of it from coming through. The 5 percent is
14  assumed that it's coming through and it's going to wet
15  the skin.
16      Q. Okay.
17      A. You see what I'm saying?
18      Q. I do see what you're saying.
19      A. So what I care about is mostly, if I'm
20  interested in dose, I want to cut right to the chase,
21  which is what percent of the time and what percent of
22  the area were different elements of your body wetted by
23  this product.
24      Q. But the amount of the, quote, unquote, wetting
25  would be different if it were long pants or short pants,

Page 231

1  would it not?
2       A. Sure. And you would expect that they would
3  give me higher numbers.
4       Q. Higher numbers how?
5       A. If they didn't have any pants on, you would
6  expect there would be less skin wetted than -- well, it
7  depends on the scenario. If there's a lot of -- they're
8  not changing their clothes and they're spraying a lot of
9  material and those pants are getting soaked, at some
10  point it goes through regardless, right, if they're not
11  PPE. So there's all sorts of scenarios between, you
12  know, they just spray a little bit and it wets the top
13  of the pants and it never gets to the skin.
14      Q. Okay.
15      A. Or you have a scenario where they're not
16  wearing pants, they're wearing shorts, and it gets right
17  to the skin. What I care about is the percent area of
18  the skin that's wetted on -- and, usually, I ask for a
19  range because nobody knows exactly, and then I say a
20  percentage of the time. So it might be that maybe when
21  your legs get wet, maybe one -- the front of one leg
22  gets wet, 25 percent of both legs get wet, but it
23  doesn't happen every time; maybe it only happens one
24  time out of 10. So I want to know both of those
25  responses.

Page 232

1            And that is somewhat -- it's not that the
2  clothing doesn't matter, because it should be reflected
3  in how often and the extent to which the skin is wetted,
4  unless you're in a scenario where there's such long
5  timeframe and such low back or whatever the scenario is
6  where the pants are being wetted, that they're saturated
7  and they're continuing to work.
8            You see what I'm saying?
9       Q. I do see what you're saying. I'm trying to
10  figure out where that's reflected in any of your --
11  either your interviews or your summaries.
12      A. It's ultimately -- I think I've answered that
13  question. What I'm looking for is what is the exposure
14  regardless of -- I can give you other examples. I have
15  all kinds of cases where I have people that say they
16  wear protective gloves, and they'll tell me, "Well, 25
17  percent of the time, my hands are totally wetted."
18            And I say, "Well, how can that be?"
19            And they said, "Well, every time I put my
20  hands down, from my wrists it drips down and gets in
21  them."
22            I said, "Oh, okay."
23            But what I'm still interested in is what
24  portion of the skin sees an exposure because that will
25  result in a dose. If it doesn't get to the skin, it

Page 233

1  won't be a dose.
2       Q. Okay. Do you consider the type of clothing
3  material -- or did you consider the type of clothing
4  material when you are determining those percentages,
5  those dermal exposure percentages, like whether it's
6  denim or cotton or polyester?
7       A. My answer's the same. I'm primarily concerned
8  with what is wetted, not with what they're wearing,
9  unless they're wearing PPE, and I do ask them questions
10  about PPE.
11      Q. And the question you ask about PPE is whether
12  they were wearing gloves or not or a respirator?
13      A. Sure.
14      Q. And that's --
15      A. Well, but during that time, if they wear any
16  other PPE, they'll tell me and I'll write it down. I'm
17  not aware of any of the plaintiffs wearing protective
18  clothing other than perhaps sometimes some gloves. But
19  they're generally wearing work clothes.
20      Q. Right. Even those professionals that we have
21  as plaintiffs, and we're going to get to them
22  individually.
23      A. That's what the label said they could do. I
24  mean, honestly, therein lies one of my big criticisms.
25      Q. Which is what?

59 (Pages 230 to 233)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 234

1      A.  That the labels are misleading.  They're not
2   protective.
3      Q.  Do you take into account, when doing your
4   calculations, the weather conditions on particular event
5   days?
6      A.  Indirectly.  I mean, it's --
7      Q.  How so?
8      A.  Well, because I'm asking them what portions of
9   their body are wetted, how often and how frequently, and
10  that's going to roll all of that in.  Some of them said
11  in the interviews something to the effect that, you
12  know, it would blow back on them and they'd try to get
13  upstream or whatever.  But all I care about is -- what
14  it does is it tends to change the frequency.
15      In other words, if somebody says they get it
16  in their face -- that's the one I hear the most -- it's
17  because somehow or other the wind swirled or got back
18  and the material blew back into their face.  But from a
19  standpoint of exposure or dose, what I care about is
20  what gets wetted.  At the end of the day, it rolls all
21  of that up together, clothing, weather.
22      Q.  Time of day make any difference?
23      A.  Time of day.
24      Q.  And whether it's occupational or residential
25  use, does that make a difference?

Page 235

1      A.  In terms of wetting?  In what sense?
2      Q.  That's what I'm asking.  Does it make a
3   difference to you at all?
4      A.  A difference in what?
5      Q.  Either the event or the amount of exposure
6   that you're concluding.
7      A.  I don't know how to answer that question.  All
8   I can tell you is what I'm looking for on the dermal
9   side is skin areas wetted, what portion of the skin area
10  is wetted and how frequently that happens; that's what
11  I'm interested in because that's the input data you need
12  to run a dermal model.
13      Q.  Okay.  And that's included in the dermal
14  exposure sections of the interviews; right?
15      A.  I don't know if you're looking at one of my
16  interviews.
17      Q.  Yes.
18      A.  That's what I call my dermal page, but there's
19  more than dermal stuff there.  But the last five columns
20  are my traditional dermal questions.
21      Q.  Okay.
22      A.  I've done hundreds of interviews.
23      Q.  I'll ask one more.
24      A.  You're enjoying me so much.
25      Q.  I know.  I'm being cognizant of the time.

Page 236

1      In your dermal exposure chart, does it take
2   into account someone's, like, height and weight?
3      A.  That's -- that's different.  Remember, I said
4   that I didn't do a dose.
5      Q.  Right.
6      A.  But if I were to do the dose, I would have to
7   account for male, female or age, which I would do if I
8   did a dose calculation.  Remember the Exposure Factors
9   Handbook reference maybe from the EPA?
10      Q.  I remember you speaking about it, yes.
11      A.  That's where you go to get the different skin
12  areas depending on age and gender.  For instance -- I
13  didn't do it in this case, but I can tell you I've done
14  it on dozens of benzene cases, for example.  And I will
15  have to use -- where that comes into play is, when I say
16  X percent of the hand area, well, then I have to go and
17  look, is this a male, female, child, whatever, and get
18  the hand area for that individual and then multiply by
19  that percentage.  But I have not done the dose
20  calculation.  But if I were to do it, I would have to
21  account for that.  But it's not -- this is the input
22  data phase.
23      Q.  Again, these are general questions I have
24  about the -- your individual --
25      A.  I'm just trying to bring you along on dermal.

Page 237

1      MR. UPSHAW:  I appreciate that.
2      Our court reporter's slanted eye at me a
3   couple times now, so we'll stop at 5:00 o'clock and
4   we'll resume tomorrow.
5      THE VIDEOGRAPHER:  This marks the end of video
6   media disc number 4.  The time is 1701, and we're
7   going off the record.
8      (Deposition adjourned at 5:01 p.m.)
9          ---
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

60 (Pages 234 to 237)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 238

1           CERTIFICATE OF OATH
2
3    STATE OF FLORIDA )
4    COUNTY OF BROWARD )
5
6
7        I, MATTHEW McKINNEY, Florida Professional
8    Reporter, Notary Public, State of Florida, certify that
9    STEPHEN E. PETTY personally appeared before me on
10   July 9, 2019, and was duly sworn.
11
12       Signed this 15th day of July, 2019.
13
14   _____
15       Matthew McKinney, FPR
     Notary Public, State of Florida
16   Commission No.: GG 099111
     Expires: June 9, 2021
17
18
19
20
21
22
23           Personally Known_____
24       Or Produced Identification___X___
25   Type of Identification Produced___DL.___

Page 240

1           DEPOSITION ERRATA SHEET
2    Our Assignment No.: 12156
3    Case Caption:     Walter Winston, et al.,
4                vs.
5            Monsanto Company.
6
7
8        DECLARATION UNDER PENALTY OF PERJURY
9
10       I declare under penalty of perjury that I have
11   read the entire transcript of my Deposition taken in the
12   captioned matter or the same has been read to me, and
13   the same is true and accurate, save and except for
14   changes and/or corrections, if any, as indicated by me
15   on the DEPOSITION ERRATA SHEET hereof, with the
16   understanding that I offer these changes as if still
17   under oath.
18
19       Signed on the _____ day of _____, 20___.
20
21
22
23   _____
24           STEPHEN E. PETTY
25

Page 239

1           CERTIFICATE OF REPORTER
2
3    STATE OF FLORIDA )
4    COUNTY OF BROWARD )
5
6        I, MATTHEW McKINNEY, Florida Professional
7    Reporter, do hereby certify that I was authorized to and
8    did stenographically report the videotaped deposition of
9    STEPHEN E. PETTY, Volume I, that a review of the
10   transcript was requested, and that the foregoing
11   transcript is a true and complete record of my
12   stenographic notes.
13
14       I FURTHER CERTIFY that I am not a relative,
15   employee, or attorney, or counsel of any of the parties,
16   nor am I a relative or employee of any of the parties'
17   attorney or counsel connected with the action, nor am I
18   financially interested in the action.
19
20       DATED this 15th day of July, 2019.
21
22
23
24
     _____
25       Matthew McKinney, FPR

61 (Pages 238 to 240)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 241

| **A** |
| --- |

**a.m** 1:15 5:3
73:22,22
**ability** 203:18
**able** 27:4 51:10
193:25 211:10
**aboveground**
151:4,5
**absolute** 19:15
58:22 107:7
**absolutely** 61:21
61:24 122:25
125:6,6 221:20
228:9
**absorbed** 201:24
201:25
**absorption**
177:15
**abstract** 205:21
**abstracts** 88:8
**academic** 141:5
**accepted** 39:1
40:14
**access** 59:25
60:4 91:10
**account** 215:18
215:19,20
234:3 236:2,7
236:21
**accounting**
35:17
**accurate** 104:16
137:13 240:13
**accurately** 105:1
**accused** 225:20
**ACGIH** 32:17
55:20
**acronym** 50:14
130:2 140:20
**Act** 124:9
**action** 76:23
86:3 87:10,11
105:2 239:11
239:18

**active** 36:15
132:19
**activities** 203:6
**activity** 112:20
**actual** 83:19
182:6 215:23
226:4,24
**acute** 120:13
**add** 19:15 31:10
57:21 80:11
114:16,19
161:2 189:6
216:22,25
**added** 114:9,14
114:14 160:16
160:18,22
161:7,9 212:10
220:9
**adding** 114:16
115:5 202:15
**addition** 160:23
202:16,18
**additional** 16:22
16:23,24 61:2
65:10 114:19
114:24 115:8
124:12 189:21
190:10 212:8
**address** 7:15
40:14 55:3
84:12
**adequate** 187:7
**adjacent** 148:15
**adjourned** 237:8
**admin** 23:25
67:9 76:17,18
102:15 103:4
114:1
**administrative**
95:4
**administrator**
125:10,12,13
125:14,15
**admonition**

157:21
**advantage** 36:19
128:19
**adverse** 124:13
**advise** 28:3
**advisement**
95:23
**advising** 140:3
**advisory** 101:21
139:23 140:18
141:15
**AEACAD** 53:6
**affidavits** 96:11
97:4
**affirm** 6:1
**affirmative**
124:11,16
**afield** 109:11
218:15,17,18
**age** 236:7,12
**agency** 149:24
150:1
**agent** 108:11
142:17,18
**ages** 135:2
**aggregate** 159:4
180:2 200:8
**aggregated**
160:7 176:1
199:12
**aggregation**
159:23
**ago** 17:17 20:12
20:13 24:17
30:20 50:3
94:12 113:13
131:9 155:7
205:3
**agree** 68:12
117:24 226:17
**agreed** 26:17
39:10 89:5
**agreeing** 117:18
**agreement** 3:14

10:9 15:6,10
15:13 16:1
26:1 27:13,16
27:25 95:2
96:19,24 99:20
102:8 163:24
**agreements**
87:21,22
**ahead** 11:16
19:1 28:24
29:4 43:10
49:7 84:9
110:11 141:17
155:1 157:22
176:4 195:6,7
220:8
**AIHA** 59:24
60:7,9,14
62:11 65:5,20
**air** 53:5 88:15,22
142:5 150:11
150:11,12,14
150:15,16
176:18
**Airport** 150:21
**al** 1:3 4:6 5:4
14:15 29:7
30:8 81:7
103:18 104:5,6
115:23 240:3
**Alaska** 145:13
**Albertson's**
134:4,18,21
**Alexandra**
153:11
**allergic** 194:2
**allow** 96:20
193:6
**allows** 130:16
**alma** 72:1
**alternative**
211:5
**Alvarez** 2:17
5:18 84:13,22

85:7
**Amazon** 63:12
88:25
**amended** 3:23
10:3 102:16
103:4
**American** 4:5
32:11,14,15,16
60:2 64:25
115:12,14
140:19
**ammonia-sodi...**
137:21
**amount** 183:11
184:10 201:14
230:24 235:5
**amounts** 217:7
**analogy** 123:14
**analysis** 39:19
49:21 120:15
175:6 177:2,3
177:4,11,14,15
177:22 180:21
182:8,22 185:2
186:1 201:12
205:25 206:4
206:19 214:23
229:3
**analytical** 136:2
**and/or** 43:19
88:10 90:8
93:25 100:17
240:14
**Andrews** 1:16
5:12
**Andrus** 42:18
**annual** 55:21
**annually** 38:4
**ANSI** 55:24,24
56:2,3
**answer** 14:20
16:19 17:20
18:22 19:15
22:18 28:4

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

29:12 44:8,19
52:2 54:17,18
56:12 58:22
72:12 97:11
101:12 106:6
109:13,17
110:11,18
112:11,12
116:11 122:22
123:6,12
125:22,25
127:2,4 128:6
149:25 156:6
157:15,19
172:15 185:12
190:1,2 206:11
212:4,15
225:13 235:7
**answer's** 192:18
233:7
**answered** 48:12
99:10 110:4,5
189:2 232:12
**answers** 48:24
111:24 147:21
215:5
**Anthony** 2:16
5:17
**anticipate** 115:5
**anybody** 157:5
187:16 213:1
214:2
**anymore** 91:12
131:4
**anytime** 38:2
**anyway** 61:4
64:9 90:2
135:20 226:18
**AOEL** 183:18
**apart** 205:4
**apiece** 133:21
**apologize** 28:14
48:15 105:7
130:6 133:10

176:3 199:2
216:6 219:12
**Appalachia**
138:25
**appear** 74:12
114:19
**appearances** 2:1
5:16
**appeared** 238:9
**appearing** 17:9
**appendices**
173:18 189:9
190:16
**appendix** 22:23
22:25 25:18
43:23 44:1,15
45:19 161:10
161:11,13,19
162:10,10,23
162:25 163:2
163:12,13,22
163:23 164:11
189:13,23
190:6,12,24
**Appliance** 142:6
**appliances**
142:6
**applicable** 164:6
**applicant** 123:3
124:16,18,21
125:14
**application**
183:5 215:3
216:17,20
217:8,10
**applications**
148:24
**Applicators**
222:5
**applies** 153:3
**apply** 14:9
170:22 171:1
200:1 201:5,5
**applying** 214:22

214:24 215:8
215:11,17
**appointments**
140:2
**appreciate** 44:21
49:24 54:1
58:23 61:14
78:5 83:20
87:19 106:25
113:25 155:21
156:1 177:21
187:15 199:3
205:22 237:1
**approach** 39:23
201:13
**approaches**
201:12
**approaching**
19:7
**appropriate**
31:9 91:19
186:18,25
187:3
**approximately**
65:7
**April** 121:1
**area** 34:12 36:15
40:7 122:6
130:9 159:25
161:16 167:20
176:7,8 181:25
199:16 201:15
201:17 202:7
204:6 230:22
231:17 235:9
236:16,18
**areas** 6:18 34:22
52:19 56:8
105:9,10
138:16 139:10
139:21 173:15
173:22 176:9
196:12 203:11
204:5,6,20

220:5 235:9
236:12
**argue** 19:24
94:18
**arm** 221:13
**article** 62:9
115:22
**articles** 60:4
88:8,8
**asbestos** 38:1,2,7
38:9 39:7
104:19,22
130:4,10,12,14
132:7
**ASHRAE** 88:17
**aside** 133:9
**asked** 29:1 48:4
52:20 57:18
90:2 94:1
97:15 106:5,18
107:1 109:11
109:16 110:4
119:19 120:19
122:1,14 123:8
126:25 134:13
157:25 172:10
180:11 189:1
190:4 197:21
202:25 204:5,8
204:10 205:8
211:9,16 212:2
212:3 229:15
**asking** 43:11
58:6 76:25
117:25 119:4
134:7 153:1
171:6 197:22
198:23 204:25
209:9 234:8
235:2
**asks** 92:5 93:22
101:14
**aspects** 56:6
125:25

**assess-** 51:8
**assessment**
49:22,24 50:2
50:3,7,9,11
51:1,10 52:4,8
52:10,24 53:2
89:13 119:17
119:20 120:3,6
121:11,13
122:2,8,16
129:1,4,9
175:4,13,15,16
175:22 176:1
186:6
**assessments**
51:5 120:16
148:17 149:20
200:21
**assignment**
137:16 240:2
**assist** 154:1
**assistance** 153:5
**assistant** 95:4
**assisting** 40:3
**associate** 32:18
**associated** 17:3
29:22 55:16
56:7 64:24
68:18 88:16
108:4,9 116:20
139:15 151:5
180:12 203:17
**Associates** 144:2
144:10
**Association**
32:16 60:2
64:25 140:19
**associations** 4:4
32:10
**assume** 9:4
76:25 120:7
142:23 184:3
190:22
**assumed** 120:4,4

230:14
**assumes** 154:23
206:10
**assuming** 61:10
120:10 183:24
184:9 208:15
**assumption**
125:17 183:3
184:2 230:12
**assumptions**
183:23
**ASTM** 50:8 52:9
**Atlantic** 7:17
**Atomic** 136:14
137:5
**attached** 62:20
62:21 69:4
76:10 118:9,13
**attachment**
68:20
**attachments**
62:25 100:14
**attempt** 86:24
159:3 174:16
178:4 210:18
**attorney** 87:23
208:23 209:5
214:5,6 239:15
239:17
**attorneys** 26:8
36:18 97:16
192:23 195:16
207:6,7,7
208:12,13
214:6,7
**audience** 159:6
**audio** 92:15
**Aupshaw@m...**
2:20
**authorized**
239:7
**auto** 165:10
166:15
**available** 25:13

25:17,20,22
35:13 43:6,18
45:12,18,19,20
46:13,25 48:2
57:17 63:17
73:1 88:11,24
89:2,23 90:3
91:7,8 92:17
93:6 100:18
102:7 112:2,6
114:17 117:5
161:18,20
162:18,24
163:1 183:8
184:17 191:22
191:23 203:20
203:21 209:14
209:15
**Avenue** 1:16
2:18 5:12
**Average** 143:7
**aware** 16:21
27:19,23
101:21 151:15
156:20 157:21
208:14 214:4
218:1 233:17

---

**B**

**B** 162:10 163:2
163:12 164:11
171:18
**B-U-S-T-R**
50:17
**Bachelor** 127:17
**bachelor's** 32:1
32:2
**back** 12:25
15:22,23 19:21
19:25 21:1
26:8 32:20
33:18,23 42:1
46:19 49:9
52:7,9,10,21

52:22 53:17,20
57:19 60:5,19
61:23 73:23
74:3 76:11
91:1 94:14
110:10 111:11
113:5 115:10
124:1,4 126:17
126:22 130:13
133:13 143:13
148:5 151:7
160:1 172:11
172:13,25
175:23 176:14
177:7,8 178:17
185:5 187:8
188:5,10,17
190:18 195:24
199:23 203:25
218:11 223:11
226:21 227:11
227:24 228:1,8
229:1 232:5
234:12,17,18
**background**
31:24 34:21
53:18 127:14
213:21 214:1
**backpack**
185:19 215:12
216:13,20
**backslash** 56:23
**bacteria** 108:8,9
108:19,21
**bacterial** 108:22
**bad** 109:3 111:6
117:24 143:8
**balance** 61:9
70:14 72:9
73:13 76:8
190:14
**balances** 135:22
135:23
**ball** 34:9

**ballpark** 19:16
136:21,25
137:14
**balls** 40:8 212:5
**band** 94:13,15
**bare** 184:4
229:22
**base** 105:10
186:9
**based** 12:10
21:13 27:18
30:23 33:24
50:8 62:3
86:20 116:24
121:17 160:9
168:7,8,11
169:2,6,6
174:3,16 197:3
205:17
**baseline** 49:14
197:9,19
**basement** 108:6
**basically** 33:20
34:9 101:15
142:17 144:17
176:15 178:2
183:19 201:14
**Basin** 130:20
**basing** 186:9
**basis** 16:11
43:19 52:7
169:22 170:15
170:21 183:12
197:15 201:25
**batch** 57:12
**batches** 114:15
**Bates** 25:3,7
228:13,14
**Battelle** 136:13
136:17 137:3,7
141:19 144:25
145:14,15,21
147:3,4,20,21
**Beach** 7:17

**bear** 205:21
**bedroom** 143:21
**began** 19:8
**beginning**
164:14,16
173:1 182:21
185:22
**begins** 18:24
79:10,13 81:21
82:4 115:3
163:22
**behalf** 1:10 2:3
2:15 5:18,20
122:6
**behavior** 122:12
**behavioral** 32:5
**BEIs** 55:22
**believe** 26:11
29:5 30:18,18
32:15 41:8
43:8,9,13,24
44:10 53:22
54:6 59:18,23
61:7,20 66:18
69:21 70:8
71:7 73:2,13
74:15,19,24
75:2,9 76:1,8
96:8 102:9
109:9 115:3
118:17,25
141:24 148:8
149:25 152:13
154:3 157:6
174:8 180:20
207:21 217:22
222:25
**Benbrook** 97:19
**benzene** 8:10,13
38:18,23
101:20 200:19
200:22 236:14
**Berkeley** 135:17
**best** 6:14,19

17:20 19:10 33:17 45:19 60:1 156:6 167:3 206:11
**better** 9:3 91:9 124:21 145:23 162:11 164:2 191:19 195:16 197:15
**better-worded** 54:3
**beyond** 65:13,14 66:14,14 177:13
**big** 36:14 45:21 56:4 136:1 233:24
**bigger** 229:7
**biggest** 37:16 179:1,2 182:1
**bill** 16:11
**billed** 16:7,9
**billing** 76:14
**billings** 10:9
**billion** 140:4
**binary** 59:7
**bins** 51:15
**bio** 187:17
**biomass** 146:17
**bioreactors** 146:16,18
**Bird** 47:20
**bit** 30:21 113:14 113:16 130:7 142:25 143:25 164:20 178:17 190:14 215:7 231:12
**Blair** 99:9
**blame** 36:21
**blew** 234:18
**block** 81:11 112:24 161:16
**blocker** 84:22
**blow** 228:19 234:12
**blue** 99:24
**board** 32:11,14 36:10 132:12 132:13
**board-certified** 109:25 110:7 110:12,17,19
**Boca** 39:10
**bodies** 141:15
**body** 163:10 164:12,13 172:7 176:16 176:18,21 183:10,13 230:22 234:9
**Boiarski** 38:21 200:23
**bombs** 137:6
**Bone** 81:8
**book** 21:11 47:20 89:7,19 89:23
**booklets** 55:21
**books** 46:16 49:11 88:8
**bottle** 226:4
**bottom** 42:5 81:21 92:23 103:15 140:15 183:15
**Boulevard** 7:17
**boxes** 158:21 160:4
**brackets** 224:8 224:11
**brakes** 108:16 108:17
**break** 9:8,15 73:18 125:23 187:17 188:10
**Brief** 130:8
**bring** 22:5 78:6 87:25 88:12,23 91:16 92:1,10 100:20 101:10 108:14 142:12 143:13 163:1 236:25
**bringing** 158:21
**broad** 56:8 98:19
**broader** 44:4 88:21 139:10
**broadly** 174:19
**Broadway** 2:11
**broken** 108:7
**brought** 8:23 9:18,21 10:15 11:1,25 13:7 13:15 22:12 44:16 79:15 80:14,18 86:11 86:14 87:14,17 88:2 91:20 92:4,8 144:2
**BROWARD** 238:4 239:4
**BS** 127:25
**building** 36:24 38:5 149:1 167:1
**buildings** 35:24 36:2,17 38:7
**built** 144:5,9 167:3
**bulk** 163:10
**bullets** 189:19
**bunch** 50:10 145:16 210:6
**burden** 124:17
**Bureau** 50:13,18 50:20
**burst** 113:2
**bursts** 112:20,20 152:16,22
**business** 7:15 143:20 144:3,6
**BUSTR** 50:12 50:17
**busy** 209:16,17
**buy** 88:24 133:21 142:21

**C**

**C** 163:13,15 171:21 217:17 217:24
**C.I.H** 1:9 3:18
**C.S.P** 1:9 3:18
**C8** 17:16 19:6 27:3 93:18 98:13 165:1,2 165:3
**cab** 185:18
**Cal** 135:18
**calculate** 148:17
**calculation** 236:8,20
**calculations** 4:10 174:14,25 184:20 185:1 205:14 214:25 215:23 234:4
**California** 7:5 90:22 195:8
**call** 21:16 38:6 40:4 44:14 76:18 99:23 112:20 131:1 131:23 161:17 164:15 173:3 192:5 196:18 200:11 201:13 202:9 208:9,18 209:16 212:5 235:18
**called** 35:1 40:10 47:20 50:12 53:21 56:21,23 88:20 99:17,18 108:7 131:3,21 134:3 137:10,17,20 139:2 140:7,19 144:1 148:12 150:19 161:17 192:13 215:24 224:9
**calling** 40:8 48:14 145:7
**calls** 208:2,3,14
**Canada** 4:7 118:7,16 119:7
**Canal** 41:10 148:1
**canceled** 154:11
**cancelled** 7:24
**cancer** 120:4
**Candidly** 26:7
**capacity** 141:3
**Caption** 240:3
**captioned** 240:12
**car** 108:14
**carcinogen** 186:3 217:20
**carcinogenicity** 100:16
**care** 31:3 34:16 66:4,5 116:25 116:25 117:1 141:21 162:21 165:20 230:19 231:17 234:13 234:19
**career** 19:11 129:15 131:14
**Carol** 3:13 15:4
**Caron** 97:23
**Carrier** 142:5
**carved** 124:6
**Cascade** 133:6 134:24
**case** 1:5 4:9 5:4

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 245

5:5,6 6:3 14:6
14:8,11,14,21
14:22 17:6,24
19:5 24:4
26:15 28:1,9
29:8,11 34:5
34:13 40:11
42:20,20 53:10
53:12 62:22
75:9 92:16
93:5 96:7,8
98:12,15
103:18 104:2
104:11,12,23
109:7,16
112:14 115:13
116:18 118:8
126:7 130:15
155:9 156:13
156:22 163:2
163:23 165:16
175:5 184:5,20
236:13 240:3
**cases** 3:15,19
8:22 17:14,15
17:16,19 18:12
18:16,19 19:6
19:9,21 20:3,6
21:6,8 25:24
26:6,9,16,19
27:12,21 29:22
30:8 34:1 40:3
41:9 45:1
62:22 88:2
97:16 99:17,17
101:20 103:17
103:22 104:8
104:11 106:1,4
109:16,18
112:14 126:25
127:1,3,4
135:16 156:2
165:2,2,3
203:19 208:22

211:8 232:15
236:14
**catch** 133:11
**catching** 168:18
**category** 48:1
86:5 88:13,13
91:15
**causation** 39:18
105:24 106:1,4
106:5,13,16,21
106:22,25
107:9 109:5,8
109:12,12,19
115:17 116:12
117:8 118:12
167:21
**causations**
168:21
**cause** 107:12
109:13 111:1
**caused** 167:4
217:6
**causing** 107:16
108:23
**caution** 179:4,6
179:7,8 217:4
**caveat** 75:6
**Center** 141:3,13
**Central** 36:10
**cents** 133:21
**CEO** 143:16
144:7
**certain** 23:4
34:20,21,22
60:7,8 61:21
61:24 62:17
64:20,21 65:18
69:9,13,23
70:2,6,23
71:17 73:3
74:21 99:20
148:16,19
180:13,14
203:6 210:12

228:10
**certainly** 6:23
24:22 29:14,21
49:15 55:25
60:13,21,24
65:2 69:18
75:9 88:18,19
92:1 106:11
107:11 109:18
110:1,13,19
116:19 118:14
122:24 192:21
**certificate** 3:5,6
38:1 129:11,22
238:1 239:1
**certificates**
132:11
**certification**
130:24
**certification's**
130:14
**certifications**
104:20,22
130:15 132:7
132:19
**certified** 32:6,24
34:17 104:19
110:22 131:8
132:3,12
**certify** 238:8
239:7,14
**cetera** 23:1,2
67:2 88:8
116:23 166:1
**CFR** 51:17,18
51:19
**chaff** 141:4
**chainsaw** 133:4
**chairman** 36:10
**challenge** 147:1
**chance** 105:16
126:14
**change** 12:3
15:2 157:25

160:23 184:21
203:7 206:5,6
206:12,13,17
207:3 234:14
**changed** 15:3
31:19 32:19
77:6 160:19
**changes** 77:5,9
207:3 240:14
240:16
**changing** 231:8
**Chaplick** 212:16
212:25 213:2
**chapter** 88:14
88:19 89:16,18
163:17,20,21
169:12 170:2
189:10
**chapters** 89:15
162:14
**characteristics**
142:4 162:15
**charge** 153:16
**chart** 20:4 200:2
236:1
**charts** 200:2
**chase** 230:20
**cheat** 51:2
**check** 16:4 36:16
54:18 204:19
**checked** 12:11
**checking** 12:8
66:14 76:7
**chemical** 31:25
47:4,8,14,18
48:6,7 49:4,9
49:15 53:22
128:1,6 137:17
211:3,17
217:21
**chemically**
223:4,14
**Cherry** 2:5,6
**Chicago** 140:7

**chicken** 143:25
**child** 34:7
212:20 236:17
**Chloride** 39:14
**choose** 51:7
**chose** 48:25 51:6
52:3
**CHRIS** 41:11
53:19,25 91:3
**chronological**
19:20,23,24
**Chrysler** 142:10
**chunk** 56:4
**CICSP** 34:19
**CIH** 32:10,12
34:23 54:1
104:20 106:2
107:13 109:25
110:2,21
131:16,19,21
131:25
**Cincinnati**
129:2
**Circuit** 1:1 5:6
**circumstances**
148:16
**cited** 226:2
**City** 1:1 5:7
35:21
**claims** 21:12
37:14
**clarify** 58:14
126:15 173:20
215:6
**clarifying** 225:9
**class** 40:21,25
41:5,6,12
128:24 129:6
129:13 131:19
132:3,13,15
136:3,4
**classes** 40:18,24
50:7 129:17
132:4,10

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

classify 175:12
classroom
  109:24
clean 134:22
  146:18,23
cleaned 215:4
cleaning 143:11
  195:23
cleanup 150:4
clear 14:19 25:5
  46:23 68:19
  78:17 86:16
  122:25 124:6
  125:5 127:15
  147:15 168:12
  172:12 178:19
  179:4 186:24
  188:13 220:18
clearly 104:21
  123:15 175:24
  227:3 228:4
Cleveland 35:25
client 100:15
clients 26:14
  37:16,16
  101:15
Cliff 137:10
  138:21
climb 133:12
climbed 34:7
climbing 133:4
clip 194:23
  195:1
clipped 192:6
  195:12 228:18
clips 192:1,2
  193:10,11
  194:19,22
  195:3
close 23:4
  108:24
clothes 229:11
  229:15 231:8
  233:19

clothing 179:20
  183:24 184:13
  184:16 221:4
  221:15 223:15
  229:4,7,8,9,9
  232:2 233:2,3
  233:18 234:21
club 36:11,12,13
  36:14
coal 139:20
  146:21
Coast 53:18,21
  91:10
code 4:12 167:2
  223:12
codes 46:18 47:2
  55:9,15
cognizant
  235:25
coin 36:10,13,14
  36:15
cold 137:20
collaborating
  142:13
collaborative
  140:8
collect 189:4
collected 181:1
  188:22
collecting 36:15
  63:16,18
  202:14
college 53:23
  127:23 130:20
  132:24 134:14
  134:18 135:6
  136:12
colon 56:23
  193:18
Columbia 72:7
  130:20 136:21
  137:2,9,15
  138:4,19,20,22
  138:24,25

139:3,5,9,11
  140:16,22,25
  141:18,20
  142:22 143:1
  143:23,24
Columbus 35:25
  136:19,20,22
  137:7,11
column 19:2,4
columns 235:19
combination
  27:2
combined 80:18
come 21:1 22:25
  24:16 25:9
  48:5 57:16
  60:21 61:10,21
  61:24,25 64:9
  64:14 70:15
  84:18 103:6
  133:21 160:4
  178:19,21
  181:10 182:25
  192:11 193:14
  196:14 200:18
  210:11 218:11
  228:4
comes 57:10
  60:17 61:1
  123:3 130:21
  171:1 191:20
  200:19 236:15
comfort 88:17
coming 55:11
  91:10 108:15
  124:7 129:5
  145:22 230:13
  230:14
comment 14:18
  45:20 85:17
  122:10 156:11
  206:20 218:17
  220:5
comments

182:23 187:6
Commerce
  50:24
commercial
  89:14 139:8,16
  193:12,13
  194:25
commercializa...
  142:2,16,18
commercialize
  142:15
commercially
  141:23
commercials
  82:17 194:13
commingled
  139:25
Commission
  148:12 149:4,8
  238:16
committees
  139:23 140:3,6
  140:18
communication
  97:18 99:23,25
  102:1 207:24
communicatio...
  22:5,8,12
  90:11,18,19,21
  98:7,9,11
  100:13,20,22
  101:1,3,14
community
  130:20 167:9
  189:18 191:3,4
companies 35:8
  36:19 38:6
  138:23 139:1
  146:4
company 1:6,10
  2:15 5:5 35:1
  36:1 37:18
  107:24 144:1
  149:21 240:5

Company's 3:17
compare 166:3
  167:6,11,12,24
  168:7 198:18
compare-and-...
  166:7,8
compared
  170:11
compares
  166:11 204:11
comparison
  169:8
compile 113:25
compiling 112:3
  113:21 114:3
complain 107:3
complaining
  107:22 155:22
complete 45:3
  78:23 127:2
  239:11
completely
  210:14 223:18
complex 38:18
complexity
  80:11
complicated
  36:6
complied 92:24
Composite 3:12
  12:17,19
computer 91:16
  91:22 93:3
  153:23 193:19
  194:2
computer's
  193:24
computers 85:3
concentrate
  215:18 226:5
concentration
  47:11
concept 49:8,9
  170:8

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 247

concepts 49:24
162:17 169:18
concerned 233:7
concerns 164:18
concluding
235:6
conclusion
196:5,10
conclusions
120:9
condensed 44:9
conditioning
142:5
conditions
163:24 234:4
Conference
32:17
confident
202:24
confidential
96:18,19,23,25
confidentiality
88:5
confirm 11:15
204:19
confirmed 204:1
conflicting
204:23 205:2,9
205:13,19
206:4
confuse 57:5
confused 58:15
89:8 198:25
199:24
confusing 58:13
confusion 58:15
conjunction
150:25
connected
239:17
connection
87:10 91:14
92:16 93:4
consensus 33:16

consequence
141:25
conservative
184:2
consider 109:22
115:12 159:19
160:23 203:21
233:2,3
considerable
122:4
consideration
190:11
considered
92:15 93:3
109:22 121:15
188:19 193:10
221:5
considering
119:21
consistent 81:13
108:20 159:4
196:17,24
197:13
consists 45:2
78:23 152:12
consolidation
143:3
consulting 3:14
18:18 21:7,20
53:16 87:21
consuming 27:3
consumption
135:21
contact 26:21
97:17 99:20
contacted 26:5,7
98:2
contain 156:15
contained 23:6
container
227:22,25
contaminants
176:17
contaminated

148:15
Contamination
148:13
context 14:1
92:22 117:19
167:18
continue 55:8
74:9
Continued 4:1
continuing
232:7
continuously
114:9
continuum 30:2
31:1
contract 144:24
145:5,20,21
147:2 149:2,6
149:11
contracted
145:14 147:6
148:7,13
149:21,25
150:3,3
contractor
144:23
contracts 88:4
147:5
contrast 166:4
167:7,24
198:18
contrasting
165:17
control 151:11
convenient
11:18
conversations
101:10 154:4
156:17,19,21
209:12,13
convert 139:20
converted 18:19
21:21,22
conveyed 169:10

180:23
convince 124:25
125:13 186:3
cooling 137:19
copied 9:14 10:2
copies 8:23 9:24
9:25 11:8 13:4
13:15,25 17:23
18:3 41:15
44:16 86:12
87:14 97:15
100:7 103:6
copy 10:13 11:5
11:9,15 12:14
12:23 13:2,3
13:17 15:17
31:9 41:22
45:3 77:13
78:9 80:23
84:1 86:14
88:7,23 90:5
102:21 155:3
163:13,17
174:14 197:18
198:5 209:11
220:3
corporate
136:19,20
139:2,4 142:3
143:13
corporation
36:1
corporations
138:23 145:6
correct 8:3,8,10
8:13,14,15,25
9:1 12:24
14:14 15:4
20:6,7 22:2
27:18 29:5
31:25 32:3
39:4 40:15,16
41:3 42:10
53:12 56:25

57:1,7,11 58:8
74:5,17,18
76:16 81:3
86:21 87:13
91:20 92:20
96:5 97:10
105:22 106:18
106:19 109:8
109:21 110:3
113:9 123:13
126:16 127:10
128:2 131:4
138:15 152:8
152:11 154:17
167:25 173:17
173:18 175:9
177:20 189:14
199:21 203:25
207:12,13,18
214:18 222:18
corrected 77:12
81:2 152:10
correcting 48:17
correction
126:24
corrections 3:22
78:5,18,20
152:5,6 240:14
correctly 20:4
28:22 52:2
76:15 117:12
217:5
cotton 233:6
Council 33:22
33:25 34:2,15
counsel 2:1 5:14
5:15 7:6 8:23
16:23 18:5
22:6,16 23:14
24:3,9,25
25:10,19 45:10
57:22 58:1,17
59:12,19 60:12
60:22 61:3,25

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

65:10,17 66:16
70:15 72:15
74:10 78:19
95:21 97:2
99:16 102:5
154:1,9,16
158:8 195:4
197:23 198:8
199:4 209:9,19
210:16 239:15
239:17
counsel's 157:21
193:21
Countermeas...
150:20
counts 229:25
COUNTY 238:4
239:4
couple 27:9
29:13 32:9
34:11 37:12
41:24 154:14
155:10,12
237:3
course 6:14
19:11 23:11
51:12 128:21
128:22 129:11
130:19 131:16
courses 130:17
coursework
132:18
court 1:1 5:7,9,9
5:10,24 106:12
173:9 187:22
237:2
courts 105:25
106:11,14
cover 6:15 34:3
34:3 44:22
56:8
covered 41:11
87:5 102:13
228:22

craziness 83:10
CRC 39:9 89:11
create 177:24
178:10
creating 111:14
creation 154:7
162:5 200:1
credentials
104:17,18
110:2
critical 122:20
criticisms
120:22 163:6,9
164:9,11,18
180:22 182:2
227:4 233:24
cross 109:10
cross-check
66:16 75:15,24
CSP 34:24
104:20 132:3
cull 133:18
Cummings
142:8
curious 72:1,25
122:7
current 11:1,10
11:18,22,25
12:1,2,7 16:3
29:15 30:10
31:10 54:24
76:13 90:14,14
100:15 101:15
123:5
currently 17:5
39:6
curriculum
76:13
customers
139:16,16
cut 48:9 83:13
83:17 165:8
230:20
cutting 133:17

134:12
CV 3:11 10:13
11:10,16 31:5
31:10 38:11
40:17 41:2,13
138:8,10 139:7
140:13 163:23
200:25 201:1
Cypress 1:16

_____

**D**

D 163:22
damage 89:13
135:1
damaged 180:1
dangling 80:12
dash 42:5 68:19
68:19
data 81:25
121:16 146:10
175:24 180:19
181:1,13
196:14,16,18
201:21,23
202:4,14,18
203:13 204:11
205:2,9,11,13
206:4 235:11
236:22
database 41:11
53:20,25 59:25
91:4
date 1:14 5:2
16:7 23:4 42:1
82:1,2 99:20
dated 3:13 4:9
16:2 45:1
113:22 151:23
151:23 239:20
dates 15:3 60:25
203:17 228:12
Daubert 48:4
106:12 191:17
Davis 61:15

day 37:14 50:5
50:25 135:22
135:24 143:6
143:24 183:13
218:5 234:20
234:22,23
238:12 239:20
240:19
days 6:15 19:7
20:12 22:11
29:13 94:12
112:21 131:5
141:10 142:1
146:20 174:3
175:11 214:18
234:5
Dayton 128:15
DBA 35:14
DBAs 35:13
DDC 142:9
dead 133:11
deal 6:23 22:19
129:24 146:8
dealing 39:25
deals 54:4
deceased 202:9
decide 46:11
140:11 148:25
166:16 192:23
198:10 200:13
decided 57:21
167:24
decimal 207:4
decision 4:9
21:10 59:7
119:2 121:10
DECLARATI...
240:8
declarations
96:11 97:4
declare 240:10
decline 26:25
declined 26:8,18
26:22

dedicated
169:13
Deere 142:9
defendant 1:7
1:10 2:15 3:17
5:5,18
Defendant's
3:10 4:3 10:20
12:19 15:15
18:8 41:18
45:4 77:21
78:15 102:19
115:25 118:21
121:4 174:11
220:1
defense 21:7
159:7
defer 95:21
deficiencies
179:16
define 169:14,24
170:5 171:6,13
172:6
defined 172:19
defining 166:22
189:9
definitely 60:16
61:16,17 63:21
73:5 212:5
definition
166:10 170:19
172:8 198:24
220:15 224:17
224:18
degree 111:8
127:17 128:3,6
178:15
degrees 128:13
Deion 212:19,24
214:14
delegated 50:23
delete 22:10
demo 38:8
denim 233:6

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 249

**department**
50:23 134:22
137:24 138:6
149:14
**depend** 16:22
**depended** 99:16
203:16
**dependent** 47:11
125:6,6
**depending**
112:14 148:18
164:8 197:17
210:15 236:12
**depends** 16:17
209:23 231:7
**deposed** 7:19 8:2
8:4,7,11,25
19:3,6 20:9,11
20:19,19 21:17
30:7 113:5,7,8
127:13 155:22
155:22 156:9
156:11
**deposition** 1:9
3:17 5:2,11
20:5 26:1 28:7
29:14 30:19
36:23 41:14
43:23 48:9,20
57:5 62:20,21
66:22 67:2
68:2,6,18,20
73:25 76:11
85:17,23,25
86:25 92:2
93:25 94:7
114:10 115:3
126:19 154:11
154:13,16,18
154:20 155:7
155:13 158:2
158:19 159:8
159:20 161:4,6
188:7 202:7

203:14 204:2
205:20 218:13
218:14 220:10
226:2 237:8
239:8 240:1,11
240:15
**depositions**
43:16 62:22
76:5,9 93:10
93:12 96:3
114:11,23,25
115:1 118:10
118:11 163:2
176:11 203:18
203:20 204:5
205:23,25
206:2
**deriving** 115:13
**dermal** 27:5,19
27:22 29:24
38:22 47:13
69:11,12 72:25
119:25 120:1,5
120:11,14,15
120:22 122:4,6
122:9,15
162:17 169:3
175:6,21 176:7
176:13 177:14
177:15 178:16
178:21,23
179:8,9,10,14
179:24 180:11
180:21 181:13
182:9 183:1
186:25 187:5
196:16,18,18
200:11,12,19
200:21,22
201:12 202:1,3
202:21,22
203:3 204:12
216:23,23,25
222:25 223:6

224:20 230:4
233:5 235:8,12
235:13,18,19
235:20 236:1
236:25
**describe** 164:22
196:13 199:10
199:19
**described**
149:15 159:21
**description** 3:10
4:3 64:22 69:3
**designate** 62:21
**designated**
60:23 126:6
**designation**
60:24 110:22
**designed** 150:23
167:2
**designing**
227:14
**destroyed**
100:10
**detail** 82:10
127:16 170:22
174:20 182:13
187:9 198:17
**details** 215:15
**determination**
123:3
**determine** 49:18
55:14 166:4
170:23 201:19
202:3 203:25
**determined** 31:8
94:10
**determining**
164:23 167:16
233:4
**Detroit** 142:9
**develop** 29:10
144:2
**developed** 29:11
152:23

**developing**
139:15 170:1
202:4
**deviate** 197:4,7
197:20
**deviates** 197:17
**device** 91:13
92:1
**diagnose** 107:17
**diagnosed** 80:17
**diagnosis** 105:22
107:7 108:25
165:10,23
166:11,14,23
167:10 168:12
168:19,22
169:15,25
170:6,16 171:5
171:14 172:8
172:19 198:18
**Diego** 146:5
**Diesel** 142:9
**difference** 10:6
47:11 67:12
164:25 166:12
166:19 167:4
167:14,17
173:10 179:6
230:4 234:22
234:25 235:3,4
**differences**
167:13,13
168:9 205:6
216:14
**different** 8:12
22:24 28:13
32:9 35:13
51:15 86:22
91:7 110:8
111:23,24
112:19 116:21
122:13 135:14
141:21 146:7
151:12 164:6

166:13 168:21
175:8 176:9
181:18 192:25
196:2 203:10
204:25 205:7
217:6,7,12,14
228:4 230:22
230:25 236:3
236:11
**differential**
165:9,23
166:10,14,23
167:9 168:12
168:19,22
169:15,25
170:5,15 171:4
171:14 172:8
172:19 198:17
**differential-di...**
166:9
**differently**
117:3
**difficult** 106:25
141:24 179:18
190:2
**difficulty** 123:7
209:6
**dimensions**
51:23
**dioxane** 186:2
186:11
**direct** 3:4 6:10
14:20
**directed** 14:20
15:8
**direction** 59:2
86:2 87:9
**directions** 58:11
**directly** 15:9
30:17 48:3
143:13,15
149:13 210:25
**directory** 84:7
**disagree** 83:21

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 250

117:24
**disagreeing**
225:5,8
**disc** 73:20,24
126:3,18 188:2
188:6 237:6
**discarded** 90:19
**discarding**
168:20
**disclosed** 18:13
18:17,20 28:5
28:8 29:13
88:1,4 103:16
103:22 104:10
127:1
**disclosure** 3:23
10:3 87:23
92:18 100:19
102:16 103:4
104:16
**disclosures**
103:21
**discovery** 23:4
**discuss** 97:2
117:22 154:7
162:9 198:1
210:16
**discussed** 12:15
87:13 117:15
173:22
**discussing**
194:16
**discussion**
154:10 156:24
157:1
**discussions**
128:17
**disease** 105:22
107:16
**diseases** 108:5
108:10
**disk** 185:20
194:2
**disputed** 21:12

37:14
**disseminated**
117:15
**distinct** 223:9
227:11
**distinction** 30:9
30:23 106:14
107:10 117:10
**distinctions**
200:7
**distinguish**
191:6
**distribution**
139:1
**DL** 238:25
**doctor** 105:12
105:23 107:7
109:1 119:6
**doctors** 167:21
**doctrine** 87:24
102:8
**document** 19:15
46:14 54:14,15
55:2 57:9 61:2
61:4 63:5,14
63:21 64:22
67:19,20,24
68:3 73:5 86:1
87:9 97:12
103:10 112:4,5
119:2,7 120:20
120:24 121:6,7
121:14,18,23
154:2,5,8
155:8,8 156:12
159:20 160:5
164:3,22 170:7
171:2,7,13
173:2 190:21
192:10,16
199:7,11 219:5
220:16,21,23
224:18,23,23
225:12 227:12

**document's**
121:6 162:6
**documentation**
55:21
**documented**
100:21
**documents** 9:14
9:16,19,21
16:23 22:15,21
24:2,12,16,23
25:7,12,19
31:2 33:17,22
33:25 34:2,14
34:16 43:3,3,4
43:7,17 46:16
49:18,19,20
52:3,6,10,12
52:22 54:8
55:5 57:13,16
57:20,21 58:2
58:7 59:11,25
61:17,20 62:2
63:21,22 64:9
64:20 65:4,7
65:14,24 66:7
66:15 68:13,15
70:17,20,22
71:8 72:23
73:13 74:12,15
74:24 75:2
76:1,4 84:11
86:4 87:1 90:6
90:10 93:2,5
96:21 97:14
102:4 115:6,21
116:20 158:22
158:24 160:1,9
162:24 168:8,9
169:9 186:4
188:21,22
189:11 191:11
191:18,21
197:24 218:9
219:3 220:9

223:13,14
**DOE** 140:4,19
141:1 145:24
147:5
**doing** 33:25
37:10,23 38:5
39:19 60:9
89:5 107:18
129:9 134:11
143:19 146:3,7
157:3 186:10
202:13,17,20
203:6 210:20
215:3,14
218:25 234:3
**dose** 175:6,8
176:12,14,15
176:21 177:4
177:17,18,22
180:14 183:6
183:12,12
184:3,17
186:16,19
200:14,15
201:18 202:3
202:21,22
203:3 206:19
230:2,4,10,20
232:25 233:1
234:19 236:4,6
236:8,19
**double** 56:23
**dovetail** 187:4
**download** 65:23
**downloaded**
24:19 65:22
**dozen** 8:12
**dozens** 69:12
123:9 132:4
147:19 236:14
**Dr** 94:15 97:19
97:21 98:5,9
98:11,25 99:1
99:3,3,3,4,6,8

99:9,12
**draft** 88:8
148:23 226:24
227:2,4,7,8
**dramatic** 186:16
**dramatically**
205:7
**drawn** 4:10
174:24
**drew** 30:14
**drips** 232:20
**drive** 2:5 43:9
82:23,25 194:5
194:7,10
210:13
**driven** 27:22
**driving** 47:9
**drop** 186:19
**drug** 81:18
**Dual** 91:6
**Dublin** 36:24
**duces** 22:13
**duck** 22:20
**duly** 6:8 238:10
**dumping** 145:6
**duplicates**
161:13
**DuPont** 17:16
165:2
**duration** 204:20
**duty** 124:11,15
124:16,20
**dynamics**
130:19

_____
        **E**
_____
**E** 1:9 3:3,18,19
5:2 6:7 45:1
163:23 238:9
239:9 240:24
**e-mail** 10:22
84:11 99:23,25
207:24
**e-mailing** 155:3

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

**e-mails** 22:11
66:1 101:6,7
**Earl** 103:17
**earlier** 15:2
30:12 51:8
58:7 60:18
91:3 110:21
112:7 126:25
127:2 144:20
152:15,25
157:21 192:3
193:11 226:2
230:3
**early** 19:8,9
24:23 25:10
26:3,3 38:13
41:10 113:15
114:6,8 119:19
121:20 145:22
146:2 148:4
151:8
**earth** 40:25 41:5
**easier** 78:10
160:3
**easiest** 57:24
58:20 132:22
**easily** 185:13
**East** 2:5 7:17
**easy** 12:18 31:23
153:17 220:8
224:2 226:8
**edited** 193:11,22
194:11,13,14
**editing** 156:11
194:25 195:13
228:20
**edition** 39:11
**educate** 165:5
**education** 111:9
127:15
**educational**
31:24 34:20
128:18
**EES** 3:12,13

35:1,10 37:1
37:14 39:25
60:16 141:1
143:9,16,24
144:9,12,17
147:8,13
149:11 150:3
**effect** 107:12
109:13 206:20
206:22 234:11
**effects** 111:1
124:13 182:7
186:16 187:5
**efficiency** 23:2
**effort** 163:25
**eight** 130:13
132:25 133:4
134:11,14
**EIT** 131:3
**either** 20:6
25:16,18 33:16
38:7 40:12
41:5 51:24
54:8,24 56:22
57:9 59:4 63:7
63:8 65:13
84:4 85:1
89:20 117:4
121:20 132:10
142:15 147:5
148:20 167:2
169:9 176:18
202:7 204:19
232:11 235:5
**element** 217:21
**elements** 112:13
199:11 230:22
**elevated** 108:22
**eligible** 148:20
**eloquently**
195:19
**embed** 192:9
**Emery** 2:17
**emission** 150:15

150:16
**emissions**
139:20
**employed**
132:24
**employee** 90:14
144:23 239:15
239:16
**employees** 35:24
**employer** 34:1
123:10
**employers** 33:21
138:16
**employment**
132:21,22
138:20 149:17
**employments**
138:7
**encountered**
179:18
**encrypted** 83:9
**encryption**
84:22
**ended** 58:10
145:8
**ends** 79:18
**Energy** 138:20
139:9 141:3,13
**enforceable**
150:17
**enforcement**
221:12,12
**enforces** 221:10
**engagements**
17:9
**engine** 108:15
108:18 166:17
**engineer** 19:23
20:2 95:3,3,6,9
138:5
**engineering**
31:25 35:14,15
37:22 39:2,9
47:9,14,18

48:6,7 49:4,9
49:16 89:3,13
89:25 128:1,7
130:24 131:4
166:24 168:13
**Engineers** 47:5
**enjoying** 235:24
**Enron'd** 143:1
**enter** 23:1
**entered** 87:21
**entire** 45:13,23
46:9,12 86:14
112:18 163:19
169:12 170:2
173:21 193:12
193:13,16,20
195:2 240:11
**entirely** 52:5
**entities** 90:22
117:6,21 118:1
**entitled** 86:18
**entity** 139:2
140:8
**entry** 208:5
**environment**
53:4 107:14
124:13
**environmental**
35:14 37:10
40:24,24 41:6
41:9 49:25
51:9,14,16,24
60:7 62:9,13
88:15,21 144:3
148:13 149:14
**environments**
141:5
**EPA** 49:18,18,20
49:22 50:10,24
51:17 52:3,10
52:11 54:8,15
86:12 90:25
119:17,23
120:3,21 122:2

122:3,11,18,19
123:15 124:5
124:14 125:5
144:21,21
145:5,12,24
147:5,7,8,9,16
147:17 148:4,7
148:10 149:5
149:20 163:17
186:3,10
189:22 191:7
201:24 221:11
221:13 224:23
236:9
**EPA's** 52:4
119:1 223:5
**EPA-related**
54:9
**EPCRA** 189:15
**epidemiologist**
109:20,25
110:3,6,7,12
**epidemiology**
46:3 49:11
109:23 110:1
110:13,14,16
116:16,17,21
117:3,4,12,19
117:23 118:2
129:7
**equation** 23:24
204:12
**equations**
186:14 202:2
**equipment**
91:13 92:2
134:25 187:1
217:6 221:1,5
222:5 224:15
230:7,11,12
**era** 145:22
**err** 170:9 191:14
191:19

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 252

| | | | | |
|---|---|---|---|---|
| **ERRATA** 240:1 | 224:2 | **exhibit** 3:11,12 | **exhibits** 3:8 4:1 | 93:13 94:10 |
| 240:15 | **exactly** 30:19 | 3:13,15,17,19 | 22:22 23:7,21 | 96:3,11 97:4 |
| **erred** 170:14 | 85:8 113:13 | 3:20,22,23 4:4 | 25:12,18 54:18 | 98:12 102:16 |
| **especially** | 143:23 156:4 | 4:7,8,10,12 | 54:20 55:5,10 | 103:17 105:1 |
| 146:22 | 160:24 172:14 | 8:22 10:19,20 | 55:12 56:25 | 105:11 106:13 |
| **Esquire** 2:4,9,16 | 185:11 187:24 | 11:5 12:17,19 | 57:3,4,6 59:10 | 108:17 109:5 |
| 2:17 | 208:6 212:3 | 13:21 15:14,15 | 60:10,12 61:5 | 109:19,23 |
| **establishing** | 231:19 | 16:10 17:19,22 | 62:18,20,21 | 110:1,13,20 |
| 124:17 | **exam** 34:24 54:2 | 18:8,11,22 | 65:12 66:21,22 | 117:3 119:20 |
| **estimate** 16:14 | 107:13 110:21 | 19:19 20:9 | 66:22 67:25 | 119:25 146:13 |
| 19:10 | 131:2,2,6,19 | 22:1,24 24:2 | 74:9 76:5,10 | 151:22 158:14 |
| **et** 1:3 4:6 5:4 | 131:20,24,25 | 26:1 31:11 | 78:23 93:7 | 167:20 171:19 |
| 14:15 23:1,2 | **examination** | 41:15,18 42:13 | 113:20 114:5 | 173:7 |
| 29:6 30:8 67:2 | 1:23 3:4 6:10 | 44:25 45:4 | 114:25 115:2 | **expertise** 105:10 |
| 81:7 88:8 | 107:8 | 54:23 55:5,8 | 190:11 | **experts** 21:25 |
| 103:17 104:5,6 | **example** 47:3 | 56:25 57:13 | **exist** 167:15,17 | 98:4,23 101:11 |
| 115:23 116:23 | 62:8 67:16 | 59:14,17,21 | **exists** 72:23 | 101:14 118:12 |
| 166:1 240:3 | 104:20 107:20 | 62:8 63:2,14 | 167:14,17 | 167:22 |
| **European** | 118:12 157:6 | 67:1,2 69:2,8 | **expect** 16:15 | **Expires** 238:16 |
| 183:19 184:24 | 161:5 165:25 | 74:4,8,11,25 | 231:2,6 | **explain** 26:19 |
| **evaluate** 66:2 | 176:3 179:22 | 75:3 77:21,23 | **experience** | 128:20 158:8 |
| **evaluation** | 182:16,18 | 78:1,3,4,8,14 | 34:21,21 | 167:14 168:18 |
| 130:11 169:2 | 183:2,3 201:21 | 78:15,23 82:9 | 120:16 138:15 | 174:19,22 |
| 200:15 | 215:9 225:18 | 83:19 84:1 | 143:7 146:1 | 198:13 222:14 |
| **event** 205:14 | 225:21 227:6 | 102:17,19 | 193:4 204:9 | **explained** 171:5 |
| 206:5 212:8 | 227:19 236:14 | 103:3 111:11 | **experiences** | **explanation** |
| 214:23 234:4 | **examples** 110:25 | 111:19 114:21 | 211:1 | 172:2 |
| 235:5 | 168:11 169:1 | 115:22,25 | **experimental** | **explanations** |
| **events** 174:25 | 187:14 225:19 | 118:18,21 | 146:6,9 | 211:5 |
| 180:9,13 | 232:14 | 119:7 121:1,4 | **expert** 3:13,15 | **explicit** 220:13 |
| 181:18,22 | **exams** 34:22 | 121:21 123:19 | 3:20,23 10:3 | **explicitly** 220:16 |
| 196:3,7 204:19 | 131:1 | 123:21 134:8 | 17:12 18:12,14 | **exposed** 180:9 |
| 204:20 205:3 | **Excellent** 13:8 | 151:19,21 | 18:17,18,19 | 181:25 211:7 |
| 205:19 206:15 | **exception** 57:12 | 159:19 161:10 | 21:3,4,8,20,21 | 217:3 218:2 |
| 207:2 216:10 | 70:22 72:14 | 161:10 174:10 | 21:22 22:20 | 229:16 |
| 216:16 229:5 | 74:20 | 174:11,21 | 27:20 28:5 | **exposure** 4:11 |
| **eventually** | **exceptions** 46:17 | 177:24 185:9 | 30:12 33:3,6,7 | 29:24 38:23 |
| 143:14 226:16 | 55:17 58:5 | 187:9 188:17 | 33:20 34:5 | 39:7,19 52:25 |
| **Everett** 135:15 | **excluded** 121:15 | 189:14 198:12 | 35:15 37:2,20 | 53:7 54:12 |
| **everybody** 81:5 | **excluding** 121:9 | 198:14,23 | 39:24 49:25 | 69:12 106:9,10 |
| 81:18 188:14 | **excruciating** | 203:13 207:6 | 50:6 51:22,24 | 148:17 164:23 |
| **evidence** 154:24 | 82:10 182:13 | 215:25 219:23 | 51:25 53:16 | 173:24 174:1,3 |
| 206:10 | **execute** 96:20,24 | 220:1 222:3 | 76:22 77:3 | 175:1,4,7,10 |
| **exact** 125:21 | **exercise** 158:25 | 226:7 228:22 | 86:2,3 88:1,2 | 175:12,15,16 |

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

175:21 176:1,7
176:14,17
177:2,11
178:18,19,20
179:10,14,14
180:6,7,18
181:1,13,13,17
181:22 182:5
183:4,6,16
184:10,15
185:7 186:25
187:3 196:6
200:2 201:12
202:10,12
204:20 206:19
207:2 210:17
210:18 212:8
216:19 229:3
232:13,24
233:5 234:19
235:5,14 236:1
236:8
exposure's
179:10
exposures 27:22
178:23 179:17
179:25,25
180:1,11 210:4
211:2
extending
185:22
extent 87:22
88:3,4 92:24
93:5 106:21
114:24 116:22
140:14 174:2
179:11 180:18
211:9 212:4
214:25 215:6
232:3
externally
139:24
extra 13:16
extraction 163:7

extractions
164:15
extreme 148:12
148:14 184:6
eye 237:2
eyewear 225:25

**F**

F 56:10,11
F-r-a-n-z 71:24
face 234:16,18
FaceTime
207:14
facetious 229:17
facilitate 86:25
158:19
facilitation
158:25
facilities 148:11
149:4,7,8
150:22,23
facility 137:4
fact 27:10 33:24
36:23 39:9
50:6 52:6
89:13 97:14
101:21 106:1
110:20 115:8
123:12 214:20
224:25
factor 183:20
184:23,25
186:19
factors 52:25
53:8 54:12
186:17 236:8
facts 76:25
86:19 154:23
199:8 206:10
factual 3:20,22
29:10 77:3
82:9 123:19,22
124:12 151:22
156:16 158:10

158:14 160:12
161:2 164:2
169:14 171:18
172:7 173:4,21
188:23 199:12
200:3 227:8
failed 167:4
failure 167:1,5
fair 54:7 126:13
182:17
fairly 31:23
fall 90:1 91:15
133:19
falls 124:20
familiar 15:14
53:19 116:10
119:1 122:15
familiarity
27:17
famous 47:7
far 30:13 66:19
81:18 82:7
103:21 109:11
176:9 218:6,18
218:22
father 208:21
212:20 213:4,7
213:8
FE 131:2
February 26:2,4
114:7
feces 108:6
federal 4:12
24:16,18 57:14
60:17 106:12
124:8 147:16
165:25 173:9
federally 150:17
feel 109:3
feeling 111:6
feet 34:11
191:25
felling 133:3
felt 52:19 106:6

224:22
female 236:7,17
fence 34:7,9,11
34:12
ferret 216:14
FESOPs 150:17
FF 66:25
FFDCA 162:19
166:1
Fick 47:7,15,16
47:22
Fick's 47:7,8
48:5
field 32:4 33:11
34:10,10 37:12
107:1
FIFRA 124:10
162:18 166:1
220:4 223:15
224:23 225:22
figure 10:16
11:13 28:25
52:15 80:23
81:2 83:4
85:14,15 111:7
120:17 145:11
146:23 186:21
211:4 222:23
223:22 226:6
227:19 232:10
figured 192:9
figuring 40:23
file 76:17,18
93:3 102:15
103:4
files 43:15 61:18
93:3
final 124:3 175:4
216:15
finally 8:5 26:16
81:22
financially
239:18
find 24:20 55:2

79:18 103:13
120:5 160:1
195:19 204:23
211:1 226:21
findings 4:5
124:14
fine 6:22 9:25
27:7 28:18
30:25 52:14
69:6 78:9
101:8 156:7
188:15 218:25
218:25 230:11
finish 76:12
141:17 157:15
157:19,20
170:25,25
171:9,10,12
218:4
finished 6:19
74:6 206:1,3
finishing 100:11
fire 69:1 143:4
firewood 133:17
133:21
firm 15:3 26:6
35:7 37:1,4,5,7
42:18 96:20,25
97:1 144:3
firms 26:21
first 6:8 7:19,24
8:1 10:23
20:17 25:23
37:5 46:24
50:7 52:24
53:12,23,24,24
54:4 59:10,18
60:13 67:1
79:12 81:7
86:6 89:9,12
104:24 114:5,5
114:7 118:11
118:23 127:12
131:2 136:13

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

137:23 139:3
144:23 145:3
145:25 154:11
172:10 174:17
189:2,3,17
196:14 208:5
210:1,2 214:13
216:2
**fit** 48:1 86:5
**fits** 88:12,13
**five** 9:16,21 40:3
43:10,13 47:4
48:19 60:3
77:5 84:11
135:13 140:10
158:21 195:9
205:23 235:19
**fix** 172:3,5
**flat-out** 120:12
**flesh** 148:22
**flip** 12:4 84:14
84:16
**flipped** 34:9
**Florida** 1:17
2:19 5:13 7:16
7:17 26:12
35:12,15,25
36:4,8 40:1
153:12 238:3,7
238:8,15 239:3
239:6
**flux** 201:13,14
201:16,19,22
**flying** 41:15,24
**focus** 41:6
116:21,21
118:14
**folder** 12:22
13:5 15:21
**folks** 18:4 44:11
45:11 50:12
59:5 149:9
179:18 180:8
190:22

**follow** 196:16,23
196:24 216:3,5
**follow-up** 177:9
**following** 80:16
87:11 134:16
221:8
**follows** 6:9
**footwear** 225:24
**force** 47:9
**Ford** 68:3
142:10
**foregoing**
239:10
**forensic** 210:21
**forensics** 37:18
37:22 39:2,8
40:3 89:3,13
89:25 166:24
168:13
**forget** 84:6 91:6
**forgot** 99:12
**form** 7:4 66:3
105:3 168:23
171:16,24
172:1,2 205:15
208:5,10
**formal** 129:14
214:3
**former** 90:14,14
100:15 101:15
**forms** 208:7
**Fort** 1:17 5:12
**forth** 110:10
124:4 172:14
**fortunately**
145:7
**Forum** 140:20
**forward** 7:25
24:18 28:8
33:15 62:16
68:24 74:9
79:15 127:10
154:8 166:2
180:20 218:19

218:20,23,25
**forwarded**
45:10,11
**found** 24:17
63:5,24,25
69:18,21 70:6
72:14 75:5,19
82:7 108:22
124:1 159:2,24
185:13 186:1
226:4
**four** 8:23 10:15
40:2,3 48:18
60:3,13 77:5
78:24 87:14
93:13 96:12
97:5 100:7
132:7 139:21
143:8 158:21
**FPR** 1:24 238:15
239:25
**frame** 192:12,12
**frames** 192:6
195:1
**Franklin** 40:18
**Frankly** 203:1
**Franz** 71:22,25
201:21
**Freeman** 4:6
115:23
**frequency**
234:14
**frequently** 234:9
235:10
**front** 30:3
102:18 185:13
208:4 227:24
228:7 231:21
**front-end**
175:18
**frozen** 191:13
**fueling** 150:22
**fuels** 146:21
**full** 7:11 175:16

**fully** 54:19 166:5
**fun** 48:22
**fundamental**
21:13 123:1
131:2
**funded** 139:23
139:24 182:7
**funding** 140:12
141:12
**further** 21:10
82:4 140:12
141:12 225:10
225:14 239:14
**future** 191:13

─────────
**G**
─────────
**G** 56:11,11
**g-l-y** 226:14
**gallons** 135:21
135:24
**garage** 108:14
**gas** 72:7 136:21
137:9,15,18,19
138:19,22,24
138:24 139:3,6
139:11,17,20
140:7,9,16,19
140:20 142:22
143:1 147:25
**gastrointestinal**
108:3,9
**GE** 142:6
**gender** 236:12
**general** 25:9
29:22 34:20
46:3 55:7
57:25 58:17
83:19 106:1,3
106:5,13,16,25
109:4,10,11,12
109:19 124:15
175:3 182:12
191:25 203:12
205:1 207:10

207:17,19
208:8 209:21
211:17,23
217:1 229:2
236:23
**generally** 23:7
80:5 193:3
233:19
**generated**
142:15,16
**generation**
139:18
**geology** 40:24
**getting** 31:18
43:22 54:22
58:10 89:7
108:24 114:9
133:15 169:16
172:17 180:12
183:9 191:25
202:17 218:3,4
218:15,16
223:19 231:9
**GG** 238:16
**giddiness** 218:24
**giddy** 218:4
**gigabytes** 84:21
**girl** 135:17,18
**give** 6:2 7:15
11:19 46:6
47:3 49:13
60:4 67:16
72:12 77:6
107:20 126:14
146:5,8,9
156:6 157:6
168:11 175:11
180:4 182:16
182:18 183:2
189:7 201:18
212:13 217:23
219:8 231:3
232:14
**given** 46:7,9

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

86:18 90:7
93:11,12 119:5
123:13 142:23
154:21 155:8
158:11 164:17
201:16
**giving** 45:22
47:14 60:24
146:5 172:8
180:6
**glamorous**
145:10
**gloves** 183:6
184:5,11,15,16
186:17,17
217:15 229:8
232:16 233:12
233:18
**glyphosate** 4:4,7
7:20 25:24
27:17 40:15
41:7 43:5
49:22 51:5
64:1 88:9,19
90:8,11,21,23
98:17 100:17
101:16 102:6
118:16 119:3
119:18 120:21
127:1 155:20
167:18 186:9
186:11 226:13
**glyphosate-ba...**
98:17 100:17
101:16
**GM** 142:10
**go** 9:2 11:16
13:13 19:1,15
19:18,20 21:10
24:7,20 28:8
28:24 29:4
33:22 35:22
36:16,16 38:2
38:6 41:14

43:1 46:8,17
46:21 47:1,2
47:17 49:6
52:7,9,10,13
60:10 61:23
63:1 66:25
68:4 76:11
77:13,23 78:7
79:1 82:9 84:2
84:9 86:7
93:24 94:4,14
98:5 99:11
104:19 107:14
107:25 110:10
110:10,25
111:11 112:1
115:10 118:19
124:1 127:15
129:24 130:13
133:20 141:10
141:17 143:25
148:5 149:20
154:5 155:1
157:21 158:1
158:19 160:1
168:10,21,25
172:13 174:20
176:4 177:7,8
180:10 182:21
183:4 184:6,25
185:5 186:22
187:1,1 188:11
193:4 195:6,7
195:23 199:5
203:25 204:24
205:24 210:1
215:15,22
216:14 218:19
218:20,23
220:23 223:11
223:13,13
225:10,12
226:21 227:1
227:11 228:1

236:11,16
**goal** 109:14
141:20 228:18
**god** 47:5
**goes** 39:5 46:19
49:9 53:20
209:17 231:10
**going** 6:14 9:14
11:24 12:15
13:2 17:3
24:12 27:21
33:15,18 36:19
37:23 38:8,8
42:3 43:25
44:1,5 45:8
46:21 47:15
48:8 57:15,23
58:22 60:5,19
61:12,15 72:9
73:21 79:21
85:16 86:20
90:25 94:11
101:24 102:23
102:24 105:21
107:21 108:14
108:24,25
110:10 113:7,8
122:1,7 126:4
134:7,7,15
139:19 140:11
141:17 143:10
143:12 145:11
145:12 146:20
148:20 157:18
160:4 164:10
165:4 166:1
172:3 174:20
176:12 177:3,7
177:9 179:1,2
179:13 180:4,5
180:17 181:16
181:21,23,24
182:6,13,17
184:24 186:5

187:8,16 188:3
188:17 193:21
194:20 196:20
198:11 199:18
199:23 202:3,6
203:23 205:5
206:13,25
207:3 209:19
210:17 217:15
218:25 219:7
221:21 222:14
222:21 229:1
230:1,14
233:21 234:10
237:7
**good** 6:12,13
13:14,16 22:3
24:8 42:21
49:14 67:21
76:19 117:23
127:11 143:8
156:3 162:13
165:7 219:1
**gotten** 60:8 63:4
74:21
**government**
32:19 116:23
162:22 165:14
165:21 166:6
168:6 170:12
**governmental**
32:17 66:5
116:25
**grab** 45:21
**graduate** 127:20
**graduated**
127:23 136:11
**graduating**
127:25
**grail** 137:18
**grand** 68:14
**graphic** 228:18
**graphics** 153:25
**Great** 9:12

73:17 74:3
**greatly** 120:10
179:14 181:5
**Greenwald** 2:9
5:22,22 9:16
10:4,16,22
13:7,11,16
15:2,20 82:17
84:8,10 102:22
154:15,21
156:17,22
187:22 193:6
**GRI** 140:10,18
141:15
**ground** 9:2
34:11
**groundwork**
222:21
**group** 3:12,13
12:16 35:1,10
37:1,14 140:7
140:19 143:5
147:24
**grouped** 158:20
**groups** 202:10
**guard** 53:18
91:11 134:24
135:4
**Guard's** 53:21
**guarding** 134:25
**guess** 8:5 14:7
14:10 29:24
30:7 32:22
39:18 56:11
59:25 92:22
104:2,22 131:3
159:10 170:17
175:10 180:17
192:17 200:18
202:21 215:4
219:4
**guest** 122:23
**guidance** 72:18
**guide** 162:8

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

**Gulf** 138:24
**GURF** 140:20
**guy** 47:7 135:19
146:15 187:20
187:25
**guys** 6:21 22:4
28:25 50:10,11
86:11 226:8
228:23

**H**

**H-A-Z-W-O-P...**
130:2
**Hairspray** 39:14
**half** 143:5 144:1
146:11 215:11
**Hamilton** 33:19
**hand** 11:4,6,7
13:23 41:16
45:2 57:12,14
85:11 186:18
186:19 216:13
236:16,18
**Handbook** 47:5
47:15 48:6
53:8 236:9
**Handbooks** 53:1
**handed** 12:22
103:5 152:2
174:10
**handful** 26:14
**handled** 122:9
**handlers** 222:6
**handling** 66:8
120:1 122:4
**handouts** 90:5
**hands** 183:7
232:17,20
**handwritten**
100:8
**Hanford** 136:14
136:18 137:5
**happen** 231:23
**happened** 35:8

99:21 126:7
210:24
**happens** 21:19
22:20 231:23
235:10
**happy** 9:10
12:17 52:14
111:24 218:4
218:19
**hard** 8:17 22:18
131:15 155:25
**hazard** 130:10
**hazardous**
129:23
**hazards** 53:22
165:16
**HazCom** 56:9,9
**HAZWOPER**
51:20,21
129:17,19,20
129:24
**head** 75:25
196:22
**headed** 165:6
**heading** 46:13
46:21
**health** 4:7 50:1
51:14,17,25
62:9,13 107:3
118:7,16 119:7
162:16 169:18
170:8,10,14
**health-effect**
107:23
**hear** 28:22
141:11 197:3,7
214:1 234:16
**heard** 213:20
**hearing** 170:20
**heat** 137:17,17
**height** 236:2
**heir** 35:5
**help** 119:12
141:1 153:18

**helped** 50:1,4
135:9
**helpful** 124:2
**helping** 146:14
146:16
**helps** 10:25
**herbicides** 53:25
91:2,4,7 98:17
100:16,17
101:16,17
**hereof** 240:15
**hesitate** 64:14
117:16 149:19
**hesitating** 63:20
147:14
**high-density**
146:17
**higher** 34:10
179:25 184:23
184:24 231:3,4
**highlight** 225:24
228:20
**highlighted**
220:5 222:10
**Hill** 2:5,6
**hired** 25:23 64:1
64:2
**historical** 4:4
**history** 33:20
55:17 132:21
162:14 163:23
199:16 210:2,5
210:10,10,10
**Hold** 222:2
**holding** 143:11
**holds** 117:13
123:14
**holy** 137:18
**home** 36:17
107:21,24
108:6
**homework** 27:4
**honest** 23:24
31:18 36:18

91:24
**honestly** 233:24
**hopefully**
224:13
**hopped** 34:12
**hour** 40:23
215:11
**hourly** 95:2
**hours** 16:6
130:14 132:14
132:17 174:4
175:1,11 180:9
196:8 206:16
207:2 218:17
**house** 143:21
**HTTP** 56:22
**https** 193:18
**huge** 107:10
**Huh-uh** 13:11
**hundred** 52:17
52:18 207:1
**hundred-year...**
36:12
**hundreds** 21:8
181:17 197:12
205:4 206:14
206:15 235:22
**hygiene** 32:13
32:15,16 33:5
37:24 45:14
46:2 49:1,14
60:2,7 62:14
64:25 107:1
131:18 132:14
162:16 169:18
170:8 176:22
197:2 210:22
223:13
**hygiene-related**
46:16
**hygienist** 32:7
110:23 131:23
210:7 220:12
**Hygienists** 32:17

**I**

**i.e** 81:24
**IAQ** 88:15,20,21
**IARC** 88:10,18
90:8,12,15
98:18,19
**IC** 195:5
**ICIPM** 82:5
**ICMP** 195:7
**Idaho** 145:13
**idea** 8:21 16:8
24:8 141:6
162:11,13
**ideas** 142:15
**identification**
10:21 12:20
15:16 18:9
41:19 45:5
77:22 78:16
102:20 116:1
118:22 121:5
174:12 220:2
238:24,25
**identified** 86:5
173:2 201:6
213:11
**identify** 5:15
24:11 44:24
59:9,11 60:11
145:5 213:3
219:24 229:4
**identifying** 24:1
74:9
**IEQ** 88:20 89:16
**IHIT** 131:23
**illustrate** 194:25
**impact** 217:1,9
**impacted** 204:6
204:7
**impacting** 107:5
**impacts** 183:1
**impaled** 34:7,13
**impermeable**
183:24 217:15

implication
215:2
importance
63:13 65:25
important 66:10
142:13 178:24
180:16 181:11
181:12 186:24
187:23 199:17
215:4 216:18
217:11
importantly
181:23 182:24
imposed 124:16
imposes 124:10
impossible 47:23
improper 182:3
182:4
Inaudible 133:7
INCHEM 69:17
69:18
include 27:25
43:14 44:13
45:18 46:14,15
49:15,19 52:11
92:23 93:9
156:12 159:16
173:14 175:4
183:25 190:5,9
190:24 191:11
191:12
included 51:8
52:17 53:4,5
53:10 61:5
91:4 102:15
112:4 121:15
152:20 188:23
189:12 216:12
222:22 235:13
includes 38:11
45:12 56:13
88:15 211:14
including 47:4
60:2 87:11

100:14,15,16
101:16 121:9
150:17 163:24
171:17 208:15
211:3 215:2
inclusion 112:5
incorporated
35:9,12 143:18
incorporation
35:10
incorrect 223:18
increase 182:5
incumbent
221:14
indented 124:6
independent
59:24 75:14
194:6,10
216:16
independently
60:22 65:12,16
69:9,24 70:25
71:12,23 72:8
72:15,24 74:21
75:3,5 99:18
index 3:1,8 4:1
96:2 97:3
indicate 214:10
214:21
indicated 25:25
70:5 208:20,21
209:2 215:21
240:14
indication 25:2
Indirectly 234:6
individual 108:2
117:22 148:8
174:5,17 175:1
196:15 207:1
210:15 215:15
216:7,24 229:1
236:18,24
individually
147:6 148:6

233:22
individuals
33:22 174:15
175:5 178:24
202:8 212:8
indoor 88:14,15
88:20,22
industrial 32:6
32:13,15,16,17
33:5,16,17
37:23 45:14
46:2,16 49:1
49:14 60:2
62:13 64:25
107:1 110:23
131:18,23
132:14 146:4
162:16 169:18
170:8 176:22
197:1 210:6,22
220:12 223:13
industry 21:8,13
37:13,15,17
38:15 50:11
66:5 116:25
129:7 137:18
140:9,18
141:15 142:16
162:21 165:14
165:21 168:4
169:6 170:12
191:8
Infante 39:13
101:19
influenced 158:3
information
4:10 46:6
53:22 56:1
63:16,18 66:6
66:8,8 116:22
117:4,5 119:10
119:16 123:2,5
123:13 124:12
125:8 159:2,24

160:6,17,22,23
163:8 164:16
165:15,22
169:10 174:16
174:24 175:18
175:20,25
176:11 178:2,5
178:8 188:19
192:22 199:12
200:4,9,13
203:19 204:1,4
204:21,23
210:11,19
211:8,10,21,23
212:9,10
216:12,19
224:22
information's
125:7
informed 209:19
inhouse 73:6
initial 29:6,25
102:5 113:21
114:4 137:16
initially 28:2
29:5 30:6
148:22
input 107:19
122:17 157:10
175:25 200:16
200:16 202:4
202:14,18
203:7 235:11
236:21
insert 25:21
insisted 159:1
179:3
insistent 158:18
210:20
inspection 108:5
installed 150:23
instance 24:14
47:7 119:20
236:12

instant 76:23
86:3 87:10,11
Institute 140:7
insurance 21:8
21:12 36:18
37:13,15,16,17
38:5 107:24
108:7 157:7,24
intellectual
140:16
intend 43:19,20
93:14 94:3,5
109:14,17
115:7 119:8,14
177:1,11,14,22
178:7 192:16
192:25 193:3
203:9
intended 190:19
190:20 199:8
200:12
intent 35:19
46:5 76:17
102:11 106:3,7
160:6 166:2
202:22
intention 23:22
interest 179:11
210:3 211:3
interested 122:3
139:11 156:2
180:1,2 212:5
229:6,10
230:20 232:23
235:11 239:18
interesting
186:15
interestingly
213:16
interface 129:8
150:1
interfacing
149:24
Interim 4:8

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 258

119:2 121:9
**internal** 66:7
122:11
**internally** 64:15
139:24 140:1
**internet** 55:6
62:11 63:12,24
64:1 65:17,20
**interpretation**
169:12 195:21
**interprets**
124:14
**interrupt** 46:20
58:3 177:8
**interrupting**
67:22
**interruption**
130:8
**interview** 92:10
108:2 147:23
174:16 175:19
175:20 178:1
197:2,10,16
200:8,9,10
208:4,5,7,9
209:4,14
210:23 212:10
214:3,15,17
216:14 229:4
**interview-spec...**
209:23
**interviewed** 98:3
174:15 180:8
203:20
**interviews** 4:10
44:15 86:7,10
87:14 91:22
92:6,9,20
99:14,19 100:4
100:9 174:5,21
174:24 176:5
178:6,12
180:20 181:1
181:24 196:15

196:17,19,25
197:11 200:6
202:8,13
203:17,22
205:17 207:12
208:3 209:18
210:20 211:20
213:19 214:7
214:21 215:15
216:6,7 219:19
232:11 234:11
235:14,16,22
**introduce**
187:12,13
**introductions**
213:22
**introductory**
189:10
**invent** 141:19
**invert** 203:18
**invoiced** 30:6
**invoices** 3:12
9:20 12:15,16
14:1,5,20 15:1
15:9 29:17,19
30:1,9,10,11
30:16,16,24
76:14
**invoicing** 13:24
27:15
**involve** 34:1
**involved** 8:10
14:21 17:19
26:21 40:5
51:19 69:11
112:15 202:9
203:11
**involving** 229:3
**IPM** 194:3,12
**irritates** 179:5
**irritation** 120:11
**Island** 41:10
**issue** 6:24 85:16
122:14 167:12

169:13 175:7
186:5
**issues** 27:2
106:22 150:5
170:13 229:3
**item** 43:24 44:8
45:17 62:8
67:16 78:1,2
85:25 88:3
89:22,22 91:14
95:17,17 98:1
221:2 223:11
**items** 87:4,12
95:20 114:20
221:4 223:5,22
224:4,5,7,9,10

_____
**J**
**Jacobsen** 97:21
97:23
**Jameson** 99:3
**January** 16:2
20:9 39:3
90:13 119:8
**jeans** 183:25
220:17 221:16
229:23
**Jerry** 2:4 5:19
119:13 226:17
**Jersey** 2:6
**Jkristal@weit...**
2:7
**job** 107:3 109:5
110:25 134:1
134:22,24
135:5,20
136:10 142:19
145:6,10,10
148:21,24
210:2
**jobs** 53:24
134:13,17,23
136:5,6 157:3
210:14

**John** 142:9
**Johnson** 99:8
**journal** 60:3,6,8
62:14 71:17
116:6,8
**journals** 60:3,5
62:4
**July** 1:14 5:3
16:13 42:8
45:2 55:15
90:13 113:12
113:22 151:23
238:10,12
239:20
**jumped** 28:20
**jumps** 148:3
184:22
**June** 16:12
136:16 238:16
**jurisdiction**
149:10
**jury** 174:9,13
**justification**
121:8

_____
**K**
**K-a-n-e** 126:7
127:5
**Kane** 126:7,10
127:3
**keep** 23:23
38:15 48:14,17
61:12 85:22
89:7 101:6,9
132:19 187:25
**Kentucky** 142:7
**kept** 101:4 143:7
143:12
**kidding** 16:18
**kids** 37:7 135:17
**killing** 146:25
**kilogram** 183:13
**kind** 50:13 56:12
65:5 67:11

83:10 116:19
129:4 145:11
187:4 191:20
191:25 211:15
218:3
**kinds** 232:15
**knew** 28:19
35:22 98:15
118:1 142:3,4
142:5,6,7,8,9,9
142:10 213:14
220:11
**know** 6:16 8:16
9:3,6,9 11:5,11
11:11,21 12:4
12:7 13:3 17:5
17:21 19:13,22
22:4 23:3,12
24:24 25:3,14
27:9 28:4,21
29:12 32:12
33:14 35:8
36:19 37:18
38:25 40:6
41:10,20,22
42:6,21,22,23
43:8 47:16,23
49:12 51:13,16
53:7,7,21
54:17 55:1
56:21 58:16
59:1,2 61:1,13
61:15,22 63:12
63:20 64:13,15
65:8,9,22 67:7
67:14,22,24
68:10 69:6,24
70:10 72:2,14
72:18,23 73:11
75:22,24 79:24
82:15 83:8
84:25 91:8,18
93:15,15,17
97:11,14

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

100:25 101:10
101:12,25
103:16 104:10
105:5 107:12
107:15 110:15
110:24 111:1
114:11 115:24
116:5,5,7,10
116:12 119:18
119:19 121:21
122:1 124:3
127:6 128:21
130:11,18
134:5 138:9
141:23 143:23
147:18 152:18
156:8 159:22
160:24 165:3
166:20 172:3,5
173:5,12 174:6
176:8 178:13
179:20,23
182:1,14
186:12 188:24
190:1,15 191:3
191:5,16
192:22 193:23
193:25 194:8
199:18,22,22
201:16 202:1
203:23 205:20
207:16,17
208:22,24
209:17 210:5,6
210:23,25
212:3,17
213:17,23
214:2,5,14,20
221:13,13
225:3,6 227:4
227:6,8,10
228:6,23
229:10 231:12
231:24 234:12

235:7,15,25
**knowing** 212:5
**knowledge**
96:18 213:21
213:25
**known** 27:20
37:14 51:22
116:22 117:20
141:3 238:23
**knows** 47:5
157:5 231:19
**Kristal** 2:4 5:19
5:19 6:23 7:1,8
11:21,24 12:6
13:4 15:17,19
15:21,24 16:17
17:23,25 18:3
20:15 28:3,9
28:12,16,18,21
31:12,14 41:25
42:3,8,11,17
42:23 50:18
59:13,16 64:7
67:5 71:24
75:10 77:8
78:17 82:12,14
82:25 83:11,21
83:25 85:1,11
85:14 86:16,22
89:11 94:18,21
94:24 95:22
98:20 102:21
104:4 105:3,15
106:20 110:4,8
113:7,10 116:2
119:4 123:19
125:19 126:6
126:10 127:7
127:22 133:7,9
134:5,11 152:8
154:23 156:21
156:23 157:2
161:12,22,25
162:3 168:23

171:10,16,25
172:5,12,16,23
173:7,24
174:13 190:10
192:12 194:3
194:12,17
195:10,18
198:22 200:25
205:15 206:7
206:10 208:15
212:19 218:12
218:16,20,23
219:13,17,20
222:11 226:9
226:13
**Kyle** 212:16,18

———————
**L**
———————
**L** 2:9
**L-a-w-h-o-n**
144:5
**lab** 141:14,20,22
141:25 142:19
**label** 53:10
57:15 163:17
222:11,12,16
222:23 223:2,3
223:23 224:4
224:10,14,25
226:3,24,24,25
227:7,20
233:23
**labeled** 22:22
69:3,5
**labeling** 31:2
56:1,11 162:19
221:7 227:21
227:22
**labels** 122:25
164:19 165:22
178:25 220:14
227:2,14,16
234:1
**labs** 38:14

139:24 141:2
**Lacasce** 98:5
**lack** 164:2
197:15
**lady** 107:22
**laid** 138:7,9
**Lake** 2:5
**language** 56:10
56:22 123:16
222:22 226:2
227:5,9
**LAPI** 55:25
**laptop** 85:12
**large** 24:14
29:15 108:4
204:4
**largest** 37:18,19
147:21
**late** 19:9 35:23
119:18 121:20
144:15,15
160:19 218:3,8
**latest** 119:16
120:20 151:24
**Lauderdale** 1:17
5:13
**law** 47:8 48:5
148:14
**Lawhon** 144:2,4
144:5,10,11,14
**lawyers** 176:10
**lays** 164:20
**lead** 14:7,8 79:6
173:21 179:25
**leads** 213:16
**learn** 209:24
210:15
**learned** 191:18
197:17
**leased** 36:1
**leave** 136:17
**lecture** 90:7
**left** 37:12 68:22
136:18,20

137:1,7 139:5
140:25 142:23
144:7 165:12
**leg** 229:20,21
231:21
**leg's** 229:22
**legacy** 35:21
**legal** 40:3 123:4
191:14 208:23
**legislation**
148:22
**legit** 225:25
**legs** 185:8
184:12 231:21
231:22
**lessened** 179:14
**let's** 25:5 31:5
44:17,21,24
45:3 58:15,21
60:10 61:23
74:8 77:2
78:13 85:22
103:2 111:11
112:1 132:21
161:24 162:5
172:25 174:7
184:2,13
189:18 219:3
219:23,24
221:24 229:18
**letter** 3:13 22:17
76:19,20
**letters** 23:6,14
48:18
**letting** 53:7
172:5
**level** 217:17,24
**levels** 108:22
148:19,19
**Levin** 15:7 17:12
26:5,14 30:16
**Lexa** 153:11
**liaison** 149:4
**libraries** 60:17

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

65:19,21
**library** 45:14,23
46:9,12,12
60:18 62:1
63:22 64:10
**lies** 233:24
**life** 153:17
**Lightfoot** 47:21
**limit** 183:19
184:24
**limitations**
120:14
**limited** 100:17
112:22 206:22
221:13
**line** 30:14 81:8
92:23 125:19
208:6 221:2
223:11
**linkage** 170:3
**list** 8:22 17:18
17:24 20:14
21:24 23:21
24:2 38:11
44:1,6,9,13
45:9 49:19
52:3 54:18,20
54:25 55:3,5,7
55:10,11,15
56:13,25 57:3
57:4,5,9,19,20
57:21 59:10
66:16 86:8
87:20 93:7
95:2 96:6,7,8
98:5 111:15
112:3,6,13,14
112:16,25
113:20,22,25
114:4,7,16,20
114:21 115:6,9
116:6 121:21
145:9 153:1
190:24,25

**listed** 8:21 19:4
19:14 68:3
74:10 97:25
121:14 190:11
191:18 195:2
211:11 212:10
223:22,24
224:4,10
**listing** 46:18
223:8 225:22
**lists** 23:6 208:12
**literally** 22:22
37:7 143:20
145:7 147:19
**literature** 43:15
62:3,8 124:15
124:22 162:18
200:20
**litigation** 7:20
8:3 21:16,16
43:16,21 53:14
53:16 54:4
64:2 98:21,21
102:6 107:2,21
127:13 167:18
**little** 8:6 20:12
30:21 37:7
48:22 58:12
64:16 65:6
106:24 117:2,2
127:15 143:25
151:12 164:20
170:18 190:14
215:7 218:4
231:12
**living** 37:6
**LLP** 2:17
**load** 85:5 137:19
**loading** 84:20
**located** 65:8,16
65:21 70:4
103:12 214:5,7
**LOCATION**
1:16

**logs** 92:15
**long** 16:17 17:17
47:25 50:3
72:2 131:9
144:10 148:18
154:20 180:3
192:14 197:2
213:19 215:3
221:3,8 222:7
223:17,23
224:16 225:23
230:4,25 232:4
**long-sleeve**
220:15
**long-sleeved**
221:2,16 222:6
223:17,23
224:15 225:23
**longer** 202:12
**Longview**
135:14,20
**look** 11:13,20
12:5 13:15
15:3,6 18:23
23:5 24:20
41:20 62:2
72:8 83:2
93:19,20 94:4
95:16,20
100:24 101:3
103:3 104:2
112:25 116:9
118:14,23
121:2 122:12
165:14,23
166:15,18,19
166:25 167:1,3
168:9 169:5
178:16,17
182:25 185:10
185:25 197:10
197:10,12
201:14,25
202:1 203:10

203:16 207:16
207:17 227:12
228:2,12
236:17
**looked** 53:6 54:8
71:23 72:24
83:23 115:18
115:20 118:6
120:13 121:22
122:2 185:15
185:17
**looking** 19:19
29:21,23 31:1
41:21 46:23
51:4 53:3
61:14,14 69:7
79:25 80:1
86:25 100:25
101:1 117:2
120:16,20
121:13 122:5
137:19 145:25
146:17 160:15
160:17 168:22
169:23 178:15
178:25 179:15
232:13 235:8
235:15
**looks** 13:24 26:2
30:22 42:2,8
45:9 68:5,12
70:17 116:10
166:11
**lose** 78:22
**lost** 172:17
**lot** 27:22,23
33:24 35:6
37:10,19 38:13
53:2 65:4
69:10,11 88:16
107:22 115:9
115:20 116:20
120:15 136:1
137:21 138:9

139:19 145:4
146:5,21,24
149:9,20 150:1
150:6,7,7
163:4,4 176:6
186:22 200:8
202:25 231:7,8
**lots** 103:22
**Louis** 1:1 5:7
**Love** 41:10
148:1
**low** 34:7 232:5
**lower** 229:20
**lumberjack**
133:3,5
**lunch** 84:15
125:23 126:22
187:16
**lung** 176:16
**Luxenberg** 2:4
2:10 5:20
15:11 30:17
**lymphoma** 4:4
90:7,12

_____

**M**
**M-a-r-r-o** 81:9
**M-O** 71:4
**M-O-N-G-L-Y**
25:7
**M-o-r-r-o** 81:9
**magnitude**
181:22
**Maibach's** 69:10
**mail** 155:5
**mailing** 155:4
**main** 190:15
**maintain** 22:16
132:11 197:3
**maintenance**
132:5,6
**major** 4:4 41:9
112:23 142:2
162:13

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

**majority** 21:23
22:1 40:2
66:15 72:13
**making** 81:15
109:3 138:12
141:9,24 169:8
226:23
**male** 236:7,17
**malicious** 85:6
**malvarez@m...**
2:20
**man** 124:13
**management**
189:20,22
191:5
**manager** 137:24
137:25 138:5,6
139:8 140:2
142:1 153:7,10
**managers**
139:12
**manual** 53:11
163:18,19
**map** 164:21
**Marble** 137:10
**March** 19:6
**margin** 206:17
**mark** 10:11,18
11:18,24 12:6
12:15,17,18
15:13 18:1
35:21 38:17
41:15 44:1,25
68:15 69:14
77:2,7,12,19
77:20 78:11,13
102:16,24
115:22 118:18
174:7,21
218:10 219:3,7
219:9,13,23
222:2
**marked** 10:20
11:4,8 12:19

13:22 15:15
17:21 18:6,7,8
18:11 31:10
41:18,22 45:4
67:5,8,25 68:7
68:13 77:21
78:6,11,15
96:5 102:19
103:13 111:19
115:25 118:21
121:4 152:3,6
152:7 161:14
174:6,10,11
219:15,18
220:1
**marker** 30:15
**marketing** 32:5
**marking** 120:25
174:22 219:11
**markings** 227:3
**Markowitz**
39:16
**marks** 73:19
74:23 126:2
188:1 237:5
**Marrow** 81:9
**mass** 47:18 49:8
**master's** 31:25
128:3,7 131:10
**mater** 72:1
**material** 6:15
29:15 47:10,10
47:10 49:13
56:5 65:10
111:15,18
114:15 118:10
153:1 159:13
161:11,12
176:20 178:3
183:9,11
190:24 201:14
201:16,19
226:19 230:1
231:9 233:3,4

234:18
**materials** 3:19
22:16 23:5,10
23:13 25:16,19
43:15,17,22
44:2,4,10,14
44:15 45:1,10
45:12 46:14
47:1 49:20
52:21 53:4,5
96:25 100:3
112:2,4 114:16
114:20 115:8
118:7 129:23
146:7 158:20
161:18,20
162:25 165:25
189:8,13 190:6
190:9,11,25
**Matt** 5:10
**matter** 10:6
16:16 29:11,20
54:4 88:9
117:14 214:22
215:8,13
229:14,24,25
232:2 240:12
**matters** 23:2
122:12 191:1
191:17
**Matthew** 1:24
238:7,15 239:6
239:25
**MBA** 32:2,5
128:14 143:4
**MCA** 56:2 61:2
**McDermott** 2:17
**McKinney** 1:24
5:10 238:7,15
239:6,25
**mean** 8:11 25:6
30:5 31:17
33:13 37:6
43:23 44:3

45:7 48:9
53:18 79:11
82:17,18 85:2
90:22 91:21
94:12 98:19,19
98:22 111:17
114:9 116:16
117:22 121:25
122:14 132:17
134:6 138:10
142:5 143:2,20
144:11 147:13
147:13,24
159:10 160:17
168:25 169:15
170:5 174:13
178:3 181:16
181:18,21
182:16 184:7,7
185:12 190:20
191:7,20
203:22,23
205:2,17
207:19 215:13
219:7 220:19
221:11 222:22
227:3,11
229:15 233:24
234:6
**meaning** 223:9
**means** 11:2 33:9
42:6 45:21
61:24 127:21
183:19
**meant** 139:14
190:12
**meat** 134:22
**mechanic**
108:14 165:11
166:15,20
**mechanical**
185:20
**mechanics** 129:9
168:14

**media** 73:20,24
126:3,18 188:2
188:6 237:6
**medical** 105:12
105:21,23
106:20 107:7
109:1,8 167:21
**medicine** 165:10
168:14
**meet** 165:19
**meetings** 36:12
64:23
**Melissa** 2:17
5:17
**member** 32:9,11
32:14,18,23
59:24 90:14
**members** 60:4
**membrane**
47:10 146:1
**membranes**
146:3,6,9
176:16
**memoranda**
86:1 87:8
**mention** 126:8
**mentioned** 91:3
110:21 148:5
193:11
**message** 84:23
**met** 66:4
**method** 165:5
209:4 210:22
216:16
**methodologies**
21:12 165:9
200:20
**methodology**
124:1 164:22
165:1,13 166:7
166:8,9 168:3
168:12,15,18
169:23 170:22
170:24 171:1

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

171:17,20
173:9 198:13
198:15,16,19
198:20 199:6,9
199:17,19,23
200:1 201:5,6
201:11 202:2,2
202:5,15,16,19
**Miami** 2:19
**Michigan**
131:17
**microfiche**
24:19
**Microsoft**
153:24
**middle** 27:3
**Mile** 41:9
**military** 210:10
**mill** 135:14,16
**milligram**
183:13
**milligrams**
201:18
**million** 135:21
135:24 140:9
144:6
**mills** 99:8
135:14
**mind** 48:17
84:16 104:23
130:21 213:2
**mine** 85:11
**minimal** 27:15
**minute** 8:7,24
21:2 79:16
170:25
**minutes** 61:1,2
215:9 228:24
**misleading**
223:19 234:1
**misled** 173:11
**misrepresenta...**
225:21
**misrepresenting**

220:17,19
**missed** 149:18
201:9 219:13
**missing** 67:25
68:11
**Missouri** 1:1 5:7
7:2 86:17
158:16
**misspelled** 81:12
81:25
**misspelling**
81:10
**mistake** 10:5
120:23
**mixed** 72:12
199:3
**model** 182:22
183:10,11
185:6,7 186:9
186:10 235:12
**modeling** 182:25
**models** 201:24
202:1,5 203:10
**modern** 49:2
**modules** 41:8
129:7
**mold** 108:1,4,12
108:18
**moment** 156:2
188:18
**money** 32:22
139:25 140:1
141:7 142:12
142:14 143:4
**MONGLOY**
25:6
**MONGLY**
24:23 25:1,2,6
57:25 58:7
65:7 71:5,6
185:11 226:7
226:11,14
**monitor** 124:22
**Monsanto** 1:6

1:10 2:15 3:17
5:5 14:4 30:12
31:2 49:23
66:1,4 117:25
119:9 122:6,18
122:20 162:21
165:20 166:4
168:3 169:7,9
170:10 178:19
179:2 180:22
182:7 186:3
203:2,4 217:3
220:14,19,20
221:7,14 226:4
240:5
**Monsanto's**
116:24 122:12
222:24 224:13
**month** 36:7,8
113:16 205:23
**monthly** 16:11
**months** 27:9
132:9 205:4
**Moore** 3:13 15:4
**morning** 6:12,13
9:19 128:17
144:20 152:1
173:22 218:11
**Morrow** 81:8
**mosquito** 130:7
**mother** 213:5,7
213:8
**motion** 106:12
**Mountains**
133:6 134:25
**move** 19:2 62:16
63:1 68:24
74:9 94:24
127:10 137:8
143:21 148:20
151:4 157:4
158:5 183:3
217:25
**moved** 40:1

**moving** 7:25
18:22 61:10
71:7 85:22
94:25 154:8
**MS4** 151:13
**MSDSs** 45:23,24
56:11 70:9,12
162:20 163:4,9
163:10 164:5
164:16,17
**multiple** 7:16
53:1 82:15
104:3 111:17
144:22 188:24
200:9 215:17
220:21
**multiple-quest...**
189:1
**multiply** 201:17
236:18
**municipality**
151:14,17
**my--** 177:7
**mystery** 190:4

**N**

**N** 2:16 103:14
**Nabhan** 99:8
**name** 5:8 7:11
7:13 14:16
35:12 89:24
103:14 104:25
137:4
**names** 97:25
209:2 214:4
**NAPP** 115:15
**narrowed** 48:24
59:8
**nasty** 146:18
**nation-** 140:2
**national** 33:22
33:25 34:2,15
38:14 139:23
140:3 141:2,14

**natural** 138:24
139:17 178:22
**nature** 29:23
46:8
**Neal** 28:1,10,11
28:17 29:6,11
29:20,25 30:8
103:17 104:4,5
104:12 113:4
156:13
**necessarily**
32:12 55:19,23
91:21 106:4
117:18 122:11
192:21 203:22
229:6
**necessary** 63:15
**neck** 34:8
**need** 11:5,15
23:3 24:20
29:1 31:9 40:5
41:23 58:14
63:14 94:18
97:16 126:24
127:10 141:7
176:11 178:10
178:13 179:19
179:23 187:17
187:20 191:12
191:15 197:7
198:5 200:13
200:15 202:6,6
235:11
**needed** 92:24
151:2 156:12
**Neo** 28:9,16
**nerve** 147:25
**never** 40:9 94:8
158:1 184:10
209:12 213:14
231:13
**new** 2:6,10,11,11
35:21 43:22
79:9,10,13

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

94:9,11 148:25
150:22
newest 19:21
News 75:11
NHL 80:18 88:9
Nicas 38:17,21
200:23 201:6
Nicole 10:23
night 10:12
128:5 160:13
160:19
nine 52:11 72:7
83:24 133:4
138:22 173:16
Nobody's
197:21
noise 214:1
noises 213:20
nomenclature
14:16
nomenclatures
168:17
non 80:17
non-conservat...
183:23
non-Hodgkin
4:4
non-Hodgkin's
90:7,11
non-nuke 145:2
non-OSHA
34:15
nonnuclear
144:25
nonresponsive
158:6 217:25
Nope 7:8
normal 86:23
normalized
183:11,12
normally 209:4
north 1:16 4:5
5:12 115:12,14
135:14,16

Notary 238:8,15
note 82:8 87:8
183:21 227:19
notebooks
129:13
notes 92:5,8,10
100:8 138:21
239:12
notice 3:17
41:14 76:12
85:23,25 94:7
noticed 42:19
66:20
notices 10:9
noticing 5:14
NPDES 151:13
NPL 145:9
nuclear 137:6
145:1
number 4:9 5:5
6:16 8:7 25:4
26:7 43:4
44:24 57:17
60:1,3 66:21
67:16 68:18
72:20,21 73:20
73:25 76:13,14
76:19,22 84:1
87:8,20 88:7
90:1,5,10
91:13 92:5,14
93:2 96:2 97:3
100:13 102:4
126:3,19 173:1
175:11 180:9
183:14 184:22
186:12 188:2,7
192:2 204:19
205:19 208:12
228:13,14
229:7 237:6
number's 81:2
numbers 57:25
65:7 68:9 71:5

174:3,25,25
175:11 181:5,8
181:10,11
184:21 185:11
186:13 202:15
205:6 231:3,4
numismatics
36:14

**O**

o'clock 237:3
O'Brien 18:24
Oak 141:2
oath 3:5 238:1
240:17
object 105:3
154:23 168:23
171:16 205:15
206:9
objection 171:10
171:12,18
172:1,2 206:7
objections 7:3
171:24
objective 190:15
objectives
116:16
obligation 123:4
123:4 125:8
210:7 211:4
observation
120:2
obtain 128:3
198:2,5 210:18
210:18 212:8
obtained 58:8
128:13 200:4
obvious 197:9
obviously 8:25
17:2 45:11
53:9 55:18
57:24 90:25
106:22 150:13
193:18 208:17

211:24 215:13
occasion 215:10
215:10
occasionally
214:1
occasions 8:8,20
113:2 152:24
212:7,9
occupational
33:10 60:6
234:24
occur 33:14
October 17:7
odd 68:12
228:15
oddly 155:23
OECD 72:18
OEHHA 90:23
OEPA 149:9
offer 43:20
105:25 106:1,3
119:15,16
159:25 163:9
240:16
offered 120:22
128:22 132:13
offering 105:24
106:16
offers 107:9
office 2:5,10
15:9 36:5 54:8
57:8,10 101:3
101:4 153:7,10
153:12,13,24
198:4
offices 30:19
35:19
officially 39:1
officials 116:23
offline 194:9
oftentimes 34:1
oh 10:4,7 13:6
13:12 20:18
28:12,17 46:22

49:6 52:17
82:14 85:2
89:24 112:12
128:25 131:15
132:25 145:22
152:3 153:15
173:23 195:23
225:7 232:22
Ohio 30:19 35:3
35:10,11,14,23
36:3,7,10,10
36:20,22,24
37:18,19 50:2
50:10,12,23,24
128:22 129:2
130:16,16
131:6 136:19
139:6 147:8
148:9,11 149:4
149:8 150:21
153:12
oil 8:15,16,17
138:25
okay 5:24 6:20
6:22 7:15,22
8:1,18 9:6,7
10:7 11:17
12:14,14 13:20
14:5,14,24
15:10 16:9,14
17:1,8,12,15
18:21 19:11,19
20:14,18,25
22:8,15 24:1
26:10 27:6,11
27:16 28:9
29:4,8,17
30:25 31:16,22
32:6,21 33:4,9
35:1,3 36:4
37:1,25 39:3
39:20 40:12,20
41:2,13 42:11
42:13,16,21,24

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

43:14,25 44:5
44:12 45:16
47:15 49:3
52:23 53:15
54:7 55:4,8,14
56:13,20,24
57:2,7,18
58:19 59:3,21
60:10,15 61:8
61:19 62:7,12
62:24 63:3,13
63:25 64:4,11
64:18,22 65:1
65:25 66:11,20
67:3,12,15,21
68:8,21 69:1,6
69:16,22 70:1
70:7,13,16
71:9,18 72:5
72:17,22 73:10
73:15,17,19
74:14,17,23
76:3,11 77:2
77:13,25,25
78:4,25 79:7
80:2,7,9,10,21
81:2,14 82:1,6
82:8 84:13
85:24 87:3,6
88:7 89:4,18
90:4,10,17
91:13,25 92:5
92:11 93:1,9
94:23 95:16,25
96:10,14,22
97:2,9,18 98:4
99:14,22 100:2
100:8,13
101:23 102:3
102:12,15,18
103:10 104:9
104:10,24
105:12,14
106:8,10 109:7

110:17 111:10
111:13 112:10
113:1,20
114:13 115:4,9
115:18 116:9
116:15 117:9
118:6,15 119:1
119:24 121:12
125:3,18 126:1
127:9 128:8,15
128:25 129:20
130:3 131:13
132:1,16 133:2
134:1,2 135:25
136:5 137:7
138:4 139:7
140:13,24
141:17 142:18
142:22 144:20
144:20 146:12
148:5,9 149:17
149:17 150:2
151:13,19,21
153:3,5,8,15
153:18 154:4,7
154:18 155:1,6
155:12 156:1,6
158:5,17 159:6
159:16 160:8
160:10,11,14
160:21 161:1
162:7 163:16
164:1,7,20
165:7,7 166:22
168:16 170:3
172:23 173:20
174:23 177:14
177:24 178:10
181:7,20
182:11,19
183:8,17
186:11 187:8
188:13,14,17
188:20 189:4

189:11,23,25
190:23 191:9
191:24 194:17
195:23 196:4,9
198:7 199:15
199:21 201:9
203:8 206:24
208:4 210:16
211:12,15
213:9,13
215:24 217:18
219:9,17,23
221:10,24
222:9,19 223:4
223:10 225:7
225:15,19
226:3 228:3,11
228:15,21
230:3,16
231:14 232:22
233:2 235:13
235:21
**old** 31:18 47:24
127:21,22
133:1,4,15
134:12
**older** 10:24
**Olender** 2:24
5:8
**once** 21:9 40:10
201:16 202:19
214:16
**oncologist**
105:19
**one's** 52:24
117:23,24
191:6,7 227:24
227:24
**one-man** 94:13
94:15
**one-week** 131:16
131:18
**onerous** 132:8
**ones** 11:1,18

19:25 20:20
21:21 24:8
25:10,11 40:13
103:25 104:21
121:15 151:8
152:7 189:21
194:6,8,9
204:10 226:1
**online** 63:9 73:1
82:12 83:11
91:8 121:22
132:10
**Oops** 225:17
**open** 114:11,23
193:25
**opened** 83:25
**operate** 158:4
**operating**
150:18
**operational**
35:17
**operations** 35:6
35:11,23 36:3
**operative** 42:1,7
**operator** 202:16
202:18
**opinion** 86:3
105:2 106:6
107:9 109:12
117:15 122:19
160:8 178:8,11
180:5,6,18
182:4,5 206:14
216:18 217:2
221:18 225:21
**opinion's** 179:1
179:12
**opinions** 3:21
6:17 43:20
52:8 66:3
76:23,24 77:1
77:4 86:19
105:11,22,24
106:1,4,16,22

109:8 115:13
116:17 117:13
118:8 119:15
119:17 120:19
122:17,17
151:22 156:15
158:14,23
159:17,25
160:7 168:11
169:2 170:1
171:19 173:6,8
173:21 179:2
180:5 186:23
199:20 206:12
206:22
**OPP** 54:9
125:16
**opportunities**
37:13 128:18
**opportunity**
58:21 197:12
**opposed** 49:4
117:7
**opposing** 134:8
**order** 19:20,23
19:24 66:13
110:24 150:8
186:24 187:6
200:15
**orders** 181:21
**Oregon** 135:15
135:19 145:13
**organization**
68:15 147:22
148:7 151:14
151:16
**organizations**
32:13,14 87:20
90:18
**original** 15:6
18:23 21:24
35:9 80:13
165:25
**originally** 15:1,5

209:11
**originals** 9:23
  12:25 13:9,12
**OSHA** 33:2,23
  33:24 34:14
  51:18 55:19
  191:6 220:23
  223:14 224:21
**OSHA.gov**
  56:15
**osmosis** 146:1
**outcome** 40:8
**outline** 173:15
  208:10 209:21
**outlined** 140:13
  182:6
**outside** 53:15
  59:5 70:15
  107:2,20
  176:18
**overall** 139:2,4
  165:5
**overlap** 33:5
  142:25
**overlapped**
  149:9
**overseeing**
  140:17
**overview** 165:13
  189:8
**owned** 35:11
  138:22,23
  147:13

**P**

**P** 67:15
**P-e-l-u-s-o** 81:12
**P-e-t-t-y** 7:14
**P-u** 81:13
**P.E** 1:9 3:18
**p.m** 1:15 126:5,5
  188:4,4 237:8
**P1.3319** 67:17
**package** 3:14

23:7
**page** 3:3,10 4:3
  11:14,19 12:9
  18:6,22,24
  20:3,15,16,23
  20:23 40:17
  42:9 49:17
  50:4 55:7
  56:24,24 58:16
  59:9,10,11,17
  60:10 61:11
  63:2 66:18
  68:2,25 69:2,4
  70:14,18,20,22
  71:7 72:10
  73:16 74:5,5,8
  74:11,12,15,24
  76:1,4 77:16
  79:6,8,15,16
  79:20 80:12,16
  80:22 81:5,11
  81:16 82:3
  89:10 103:12
  104:24,25
  112:2,17
  123:22 140:15
  161:22 162:2
  162:12 163:14
  163:15,22
  164:1,14,16
  169:19 173:1
  182:21 183:2
  183:22 185:22
  185:23,25
  186:15,21
  191:24,25
  193:17 220:21
  220:23 222:1,4
  222:15 223:1
  225:18 227:1
  228:17 235:18
**pages** 12:5 21:3
  45:2 77:6 78:6
  78:22,24

103:13 138:11
  152:12 160:19
  163:11 169:1
  174:8 200:9
**Pahwa** 4:5
  115:23
**paid** 133:16
**pain** 24:20
**painstakingly**
  31:8
**panel** 101:22
**pants** 220:14
  221:3,3,8,16
  222:7 223:17
  223:23 224:16
  225:23 229:19
  229:19 230:5,5
  230:25,25
  231:5,9,13,16
  232:6
**Papantonio** 15:7
  17:13 26:5,15
  30:16
**paper** 38:17,20
  38:22,22 61:16
  68:7 70:2 93:2
  116:12 135:10
  192:10 200:19
  200:22 201:6
  220:3
**papers** 25:17
  33:18 69:12
  117:23
**paragraph** 79:8
  79:10,10,12,13
  79:19,22 80:4
  80:8,23 81:13
  81:21 89:12
  125:11
**paragraphs** 80:9
**paralegal** 23:1
  67:19 208:23
**parallel** 165:2
**parameters**

200:14,16,16
  203:7
**paraphrasing**
  222:24
**parentheses**
  67:17
**Park** 1:16
**part** 4:12 23:25
  44:3 53:8
  54:22 55:4
  59:24 63:16,17
  66:10 75:4
  86:13 88:9
  96:24 102:15
  106:2 112:7
  113:15 118:9
  123:6,25 127:4
  134:5 139:4,5
  140:15 141:18
  142:7 148:24
  150:21 158:13
  159:14 175:17
  179:17 181:12
  186:8 189:2,3
  197:23 198:12
  199:17 208:5
  210:9 214:3,3
  215:22 220:4
  225:4 226:3
**part-time** 35:20
**partially** 145:17
  146:10
**participate**
  26:22
**particular** 9:9
  52:3 61:3,4
  101:13 112:8
  117:12 124:23
  138:7 160:5
  163:25 164:11
  164:17 173:2
  185:16 194:22
  196:10 234:4
**Particularly**

120:22
**parties** 150:4
  239:15
**parties'** 239:16
**partly** 50:5
**parts** 89:20
**pass** 27:7 34:23
  131:24 201:15
**passed** 35:5,21
**Paszkiewicz** 5:9
  5:10
**Patel** 53:17
**patent** 71:22
  72:3
**patents** 72:6
  137:17,22
  140:17
**pathway** 120:4,5
  120:11
**pathways** 51:6,6
  119:21 120:7
  121:8,14,16
**patient** 107:8
**pattern** 143:11
  197:13
**pay** 36:20 37:9
**payments** 12:16
  13:25
**PDF** 86:10
**PE** 34:19 104:21
  130:18,24
  131:6,8
**Peluso** 81:12
**penalty** 240:8,10
**pending** 5:6
  157:17
**penetrates**
  176:15,20
**penetration**
  183:5
**penultimate**
  80:3
**people** 34:3,3,4
  34:5 36:11

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 266

37:9 38:3 51:2
51:13,15 53:7
97:13,15 107:3
107:15 111:6
114:1 129:23
133:20 134:25
141:11 142:6,9
142:11 143:14
143:15 145:7,8
146:14 150:8
202:10,11
203:6 204:25
210:23,24
232:15
**percent** 37:21,22
37:23 39:24
62:6 64:21
73:11 107:13
110:21 135:17
147:23 176:8
181:25 182:1
183:6,7,7,9,18
184:10,12
186:11,13,13
201:24,25
204:6,7 207:3
207:20 215:16
229:20,21
230:10,10,13
230:13,21,21
231:17,22
232:17 236:16
**percentage**
39:23 231:20
236:19
**percentages**
233:4,5
**perfect** 7:9 13:6
18:1 86:9
**performed**
110:14
**perimetric** 185:1
**period** 118:1
119:14

**periods** 113:17
**perjury** 240:8
240:10
**permission**
97:13 144:12
**permit** 37:10
**permits** 150:8
150:10,12,14
150:15,16,18
**permitted**
150:24
**permitting**
150:7 151:14
**Perry** 23:13,18
48:11,14,21
**person** 107:17
108:7 132:10
187:23 208:22
**person's** 184:14
**personal** 221:1,5
222:5 224:14
**personalities**
142:3
**personally** 238:9
238:23
**pesticide** 53:10
53:12 54:2,9
124:14,23
165:17 215:18
**pesticides** 54:5
54:12 55:23
125:15 211:7
211:13,14
212:1
**Peter** 39:13
101:19
**petroleum**
149:21
**Petty** 1:9 3:3,13
3:16,18,19 5:2
6:7,12 7:11,14
11:9 13:20
16:1 23:16,17
28:24 38:21

43:2 45:1
48:13,20 52:11
55:10,11 57:3
57:4 59:10
73:25 74:3
94:15,21
100:24 103:3
111:4 116:4
119:6,8 126:19
126:22 157:13
162:6 170:17
173:17 188:7
188:11 192:1
193:10 194:19
200:23 201:6
219:24 238:9
239:9 240:24
**Petty's** 3:11
86:19 126:6
**phase** 236:22
**phases** 112:23
**phenomena**
47:17,18,20
**phone** 91:22
92:4 102:2,3
208:14,18
209:16
**phonetic** 25:6
**photographs**
80:20 92:14
**physician**
108:25
**pick** 57:16
201:11 218:5
**picked** 42:22
**picture** 207:21
229:13
**piece** 68:6
**pipe** 108:7
**Pittsburgh**
141:3,13
**place** 5:11 22:10
80:15 137:10
150:12

**places** 35:13
141:16 192:2
199:13 222:1
228:4
**plaintiff** 4:10
14:7,8 21:5
79:9 87:10
180:25 196:10
200:3 207:8
208:16,17,18
213:18 214:8
216:8,9
**plaintiff's** 3:23
21:23
**plaintiffs** 1:4 2:3
5:4,21,23 6:17
14:10,17,21
22:2 29:9 76:5
76:9 87:12
92:7,20 98:2
99:15 100:4
102:5 103:18
104:3,11,12
106:18 114:12
114:24,25
164:6 175:5
177:2,12,16
196:6 201:7
203:4,5,15
204:14,24
207:11,25
209:10 210:17
211:6,25 217:2
233:17,21
**plaintiffs'** 10:2
22:6,16 23:13
24:3,9,25
25:10 57:22
58:1,17 59:12
59:19 60:12
61:25 74:10
99:16 115:2
154:1,8 158:8
196:3 209:9

**plans** 150:20
189:22
**play** 34:10,10
105:15 236:15
**players** 142:2,7
**Playground**
33:10
**playgrounds**
34:4,6
**pleadings** 43:16
**please** 5:15,25
7:12 9:6 13:21
66:17
**plug** 186:14
**plus** 174:4
190:24 205:25
223:24 224:16
**plutonium** 137:6
**POEA** 186:2
**POEM** 182:22
185:6,21
**point** 14:24 15:8
27:1 29:16
35:3,22 44:6
48:9,21 57:13
66:19 77:1,13
123:15 129:5
143:16,17
144:8 154:12
159:15 191:13
197:16 198:18
199:10 207:4
209:18 213:5
217:21 226:19
231:10
**pointed** 223:15
**policy** 22:9
**politically** 131:3
**polyester** 233:6
**Pompano** 7:17
**pool** 34:7,12
159:1
**Pooled** 4:5
115:12,15

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

poor 187:25
populate 53:24
port 83:1
portal 60:9,14
    65:5,21
Portier 98:9
portion 29:15
    35:4 151:6
    164:3 171:3
    180:13,14
    194:23 225:2
    228:19 229:10
    232:24 235:9
portions 35:2
    234:8
Portland 135:15
position 124:22
    140:2
positions 33:18
positive 71:5
possession 59:21
    93:23 96:4
    97:6,7 204:3
    204:15
possible 27:6
    114:18,22
    135:10
possibly 6:16
post-dermal
    176:10 204:7
    215:2,22
potential 100:16
    168:21 210:4
power 139:18
PowerPoint
    153:25
PowerPoints
    90:6
PPE 56:8 179:13
    179:20,20
    181:6 184:1
    206:20 217:9
    217:13,14,17
    220:14,15,17

220:22 221:1,8
221:16 222:8
223:8,9,14,18
223:20,22,24
223:25 224:4,5
224:9,10,11,17
224:20,21
225:23,25
231:11 233:9
233:10,11,16
practice 33:17
    100:12 167:3
pre-exist 33:23
preambles 124:2
    166:1
Precautionary
    56:1
preclude 106:15
    109:15,18
    115:7
precluded
    105:24 107:18
predicate 117:17
predicted
    183:15
predicts 186:14
prefer 83:18
preliminary
    34:24
prep 131:16,20
    131:21 132:3,4
prepare 152:14
    158:9,13
prepared 86:1
    87:9 158:11
    159:6,7
preparing
    111:22
prepping 17:3
present 2:23
    149:9 208:13
    208:21 209:5
    212:20 213:18
    214:7

presentation
    182:3
presented
    117:20 169:4,4
    196:15 201:21
    201:23
preserved 7:4
president 36:9
Press 39:9
Pretend 108:13
pretty 22:3 24:8
    27:3 64:16
    65:18 70:2,11
    71:11 73:1,9
    84:19 87:6
    93:20 130:12
    131:11,17
    162:12 164:4
    197:9 202:24
    228:10
prevent 17:9
Preventions
    150:20
prevents 179:9
previous 17:8
    154:18,20
    156:12
previously 8:8
    17:13 78:18
primarily 15:7
    36:8 37:15
    45:24 46:6,15
    49:1 51:18
    55:16 56:3
    76:5 106:9
    141:2 152:23
    161:9 233:7
primary 104:20
    104:21 122:17
    206:18
print 10:14
printed 91:23
prior 30:6
    154:15,18

158:9 209:9
priorities 145:9
private 38:15
probably 8:12
    9:3 19:8 37:18
    51:16 65:9
    67:18 69:17
    70:3,4,5,9,10
    71:10 89:15,20
    91:9 112:21
    114:7 132:9,17
    132:22 137:23
    153:16 154:22
    165:12 167:4
    194:9
problem 40:4
    48:23 105:8
    165:11,12,13
    186:7 218:8
problems 107:23
process 63:18
    66:10 67:22
    107:19 134:16
    146:2 158:20
    167:10 189:20
    191:5
produce 194:21
    198:11
produced
    138:24 197:18
    227:17 238:24
    238:25
producing
    194:23 220:10
product 20:8
    87:24 92:18
    95:3 102:8
    124:18 142:20
    163:7 164:14
    178:14 180:12
    180:15 210:3
    211:3 215:9
    216:16 228:7
    230:23

production 43:1
    138:23 139:13
products 139:15
    163:5,6,8
    164:5,8 175:2
    179:21 180:10
    210:12 211:9
    211:12,16,16
    211:17,19
    228:5
profession 51:13
professional
    32:24 34:18
    132:3,13
    220:12 238:7
    239:6
professionals
    233:20
proffered
    109:19
program 50:22
    125:15 148:12
    148:25 150:22
    195:1
programs 54:9
    140:11 141:2
    141:10
progress 81:15
    141:9
project 4:5
    13:25 14:3,4
    95:9 112:19,22
    115:13,15
    144:24 164:8
    210:21
projects 21:14
    21:15,18 22:21
    37:17 40:4,4
    143:12 146:24
    147:19,20
    157:24
ProMax 222:4
    222:16
prominent 140:3

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

promise 135:9 193:7
pronounce 226:14
pronounced 22:13
proofed 153:7
proofreads 153:20
proofs 153:21
Propellant 39:14
proper 179:13 181:6 206:20
properly 181:15
properties 148:15 162:15
property 140:16
proposals 124:3
Proposed 4:8 119:2
proprietary 38:16
Prospect 64:23
protect 217:19 217:22
protected 85:8 87:23 92:18 100:19 102:7 156:18,20,21
protection 55:18 56:9 86:13 149:14 179:9,9 183:1 186:18 186:19 187:3 206:21 220:4 222:25 223:6 223:16 224:20 224:24
protective 102:8 184:13 186:25 221:1,5 222:5 223:15 224:14 225:23,24 230:6,7,9,11

230:12 232:16 233:17 234:2
prove 141:20 186:6
proved 137:22
provide 20:5 37:2 48:8 65:11 93:23 94:3,6,11 96:9 96:14,16 97:9 106:18 107:19 125:8 170:19 178:8,11 193:8 193:21 200:12 211:10 230:2
provided 10:1 10:12 12:14 16:2 21:25 25:19 29:18,19 43:4,7 45:25 46:4 57:22 58:9,12,17 59:12 60:12 61:22 62:23 65:13,17 66:9 66:15,19 68:6 69:18,25 70:3 70:9,11,18,21 70:23 71:8,10 71:14,19,21,22 72:10,13,23 73:3,14 74:10 74:13,16,19,25 75:2,7,8,13 76:2,8,12,14 76:15 78:19 82:13,16 88:5 92:12,21 100:2 102:9 116:13 116:22 117:6 125:7 171:2 174:3 177:13 188:22 194:3 211:21 224:19

providing 45:24 66:6 105:21 109:7 165:15 165:22 167:19
provision 88:5
provisions 53:6 144:7
public 66:9 116:23 129:8 162:16 165:16 166:6 169:17 170:8,9,14 238:8,15
Publically 112:1
publication 38:24 39:2,12 39:13,21
publications 38:12,13 39:6 40:12,14 43:15 46:12 54:10
publicly 43:5,17 45:12,17,18 46:13,25 88:10 89:23 90:2 92:17 93:5 100:18 102:7 161:17 191:22 191:23
publish 38:15
published 38:16 40:13
pull 12:21 48:5 83:1 228:9
pulled 60:13 62:3,7,10 70:10,12,24 71:17 73:8 163:4 165:24 194:4 227:12
pulling 65:5 87:1 183:3
pump 137:17
pumps 137:18

purchase 63:14
purchased 63:7 63:8,10,11
purpose 37:1,4,5 52:4 177:24 206:18
purposes 42:17 48:8 221:6
pursuant 43:3 94:6
pursuing 141:5
put 22:22 24:9 47:25 49:13 57:9 60:1 74:23 83:8 113:2,4 135:9 146:17 150:22 153:2,18,19,22 161:19 162:6,9 163:11 192:6 199:12 202:17 204:11 213:23 217:19,23 224:7 228:17 232:19
putting 135:11 153:5 154:2 191:14,19 203:13

────────────
          Q
qualified 38:4 105:25 106:6 106:11 107:11 110:13,20
quality 88:15,16 88:21,22 150:14
quarter 113:5 128:24,25 130:19
quarter-long 128:21,24 129:10

question 9:4,5,6 9:10 18:23 21:24 22:20 24:5 28:4 29:1 39:5 44:20,22 46:24 48:12 54:3,19 58:18 61:13 68:24 69:14 74:23 88:17 91:24 92:22 99:10 101:12 105:4,6 110:5,6,8,11 113:21 123:8 126:11,25 141:8 148:6 156:23 157:17 165:19 168:1 168:24 170:17 171:9,17 172:4 172:6,6,9,14 172:18 175:3,7 177:1,8,9 185:3,12 189:2 190:18 198:1 199:24 206:12 211:13,15,22 212:15 213:10 213:17 215:5 224:3 228:6 232:13 233:11 235:7
question's 22:18
questioning 125:20
questionnaire 197:14,19,19 209:8
questions 51:9 54:2 105:17 115:10 119:5 122:2 127:14 155:24 176:7 176:10 188:24

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

188:25 190:2
194:16 195:24
197:9 204:8
205:5,8 209:9
209:19,22
210:13 211:23
225:14 229:2
233:9 235:20
236:23
**quibble** 120:10
**quick** 31:23,23
79:2,4
**quicker** 12:6
158:19
**quickly** 9:2
107:20
**quiet** 18:7
**QuikPro** 226:4
**quite** 63:1 105:6
112:11 113:14
113:15 141:6
141:21
**quote** 66:13
230:24

──────── **R** ────────
**R** 2:17
**R&D** 137:9
139:23,24
**rabbit** 120:13
**range** 66:12
231:19
**Rank** 81:7
**Rarely** 176:10
**rate** 16:3
**rates** 95:3
**raw** 108:6
**re-registration**
124:17
**reach** 196:5
**reached** 148:19
**read** 11:14 72:2
78:12 90:15
124:2 125:4

143:4 166:1
172:11 223:12
228:17 240:11
240:12
**reader** 190:15
190:19,20
**readily** 25:13,17
25:20 114:17
161:20 162:24
163:1
**reading** 20:4
118:9
**reads** 84:3
**ready** 7:23
131:19 188:11
**ready-to-use**
215:19
**real** 31:22 79:2,4
107:20 111:6
141:20 145:25
160:2 182:18
184:1 186:12
217:17 225:25
**realize** 197:3
227:13
**realized** 27:21
143:14
**really** 24:24
26:15 30:23
38:3 46:24
47:11 51:15,18
55:22 91:18
104:23 105:6
110:18 112:11
117:7 129:4
134:5 141:9,21
143:19 146:2
146:18 147:4
156:2,19
166:14 186:5
191:1 201:12
202:5 205:7
208:24 221:11
**reason** 26:25

64:14 93:21
94:5 95:19
96:16 106:5
149:19 178:24
186:22 191:10
191:12 198:25
227:15
**reasons** 227:15
**recall** 27:11 29:2
58:25 68:22
113:17 116:8
121:18 148:3
151:18 204:10
209:13 214:13
214:18
**receive** 22:21
**received** 13:25
22:15 23:13
24:2,8 44:25
90:12 119:10
131:14 204:2
**receives** 57:9
**Recess** 73:22
126:5 188:4
**recognize** 205:1
**recollection** 54:6
65:23 115:16
**recommendati...**
141:11 187:3
**recommending**
224:15
**record** 5:16 7:12
59:13 73:21,24
74:3 78:17
79:5 92:19
126:4,12,16,18
159:14 174:22
188:3,6 213:24
214:4 219:25
237:7 239:11
**recording** 73:18
**recordings** 92:6
92:9 101:9
**recordkeeping**

42:17
**records** 76:14
**rectify** 205:10
**redoing** 89:4
**reduce** 135:21
178:3 186:24
**reduced** 181:5
**reducing** 230:10
**refer** 25:21 34:2
45:8 46:2
83:16 88:18
118:12 121:24
164:10 173:8
173:17 192:1,1
**reference** 40:17
44:14 46:13,25
47:15 52:21,22
54:11,13 56:14
56:14 57:20
80:22 82:10
87:12 112:2
159:20,22
160:3 162:1,10
162:23 165:4
185:9 199:1
226:20 236:9
**referenced**
45:25 49:11,17
116:6 128:18
193:14 194:20
195:12 226:6
**references** 25:16
49:2 75:4
161:17
**referencing**
47:16,21
194:19
**referred** 86:13
92:16 120:24
161:6 189:12
195:4 225:1
**referring** 14:3
18:5,15 26:20
34:14,14 56:18

78:1 80:20
84:17 101:5
111:17 120:25
121:3,19 125:1
139:9 170:9
173:11 185:21
198:21 220:25
221:2 222:16
225:2
**refers** 82:4
**reflect** 29:19
30:22
**reflected** 16:10
17:18 27:14
232:2,10
**reflects** 16:2
**refrigeration**
142:4
**refusing** 97:9
**regard** 14:2
32:10 33:10
99:14 100:3
119:15 122:21
127:16 150:2
155:19 167:23
180:18 196:6
196:10 211:16
229:2
**regarding** 13:24
24:16 54:12
66:7,8 90:11
90:21 98:16
100:15 101:15
105:22 124:8
124:12 165:16
**regardless**
124:12 181:10
201:11 231:10
232:14
**regards** 49:22
103:20 104:13
124:22
**Region** 145:5,12
148:4

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Register 60:17
124:8 165:25
Registers 24:16
24:18 57:14
registrant
124:11,21
125:2,9
Registration 4:8
121:10
regular 221:15
regulations 4:12
33:14 56:7
124:10 166:2
regulators 50:3
50:13,19,21
51:1 129:6
regurgitation
200:4
Regus 1:16 5:12
relate 106:21
related 43:5
56:4 91:2
147:8 182:7
228:5
relates 93:4
98:20
relation 118:8
relative 239:14
239:16
relatively 126:8
release 96:21
97:14,17
relevant 83:14
88:23 90:9,16
90:17,20
104:23 117:13
130:18 224:22
reliance 3:19
44:2,3,10 45:1
45:10 49:19,23
111:14 114:20
153:1 161:11
161:12 189:13
190:6,8,23,25

relied 45:25 48:3
75:14,15,19
92:16,23 93:3
rely 43:19,19
47:6 51:10
86:12 121:23
121:25 161:18
190:23 191:2
203:14
relying 46:6
remain 114:23
remainder 76:6
remains 116:11
remediation
148:21
remember 7:2
40:22 74:7
130:25 131:15
146:4 150:7
155:3,25 156:3
156:5 206:18
212:21,25
230:9 236:3,8
236:10
remembered
211:10
reneged 144:7
renowned 40:7
renting 107:23
repairs 38:8
repeat 50:15
repetitive
179:25
rephrase 9:10
report 14:9 21:9
23:3,4 27:8
29:13,16 40:10
47:16 54:11,13
54:21,25 55:2
76:22,24 77:1
77:5 86:1,3,14
86:17,17,23
87:8 91:14
107:8 113:4,18

113:22 123:1
123:16 124:11
124:14 153:3
158:1,15
162:14 163:7
163:11 164:12
171:19 173:3,4
173:5,6,7,12
173:16 190:14
192:6 199:20
221:20,22
225:19,20
239:8
report's 108:24
161:15
reporter 3:6 5:9
5:25 6:1,6
50:15 130:6
187:18 228:23
238:8 239:1,7
reporter's
187:22 237:2
reporting 5:9,11
56:21
reports 25:14
96:10,22 97:3
97:15 112:7
155:17,19,23
representative
202:11 223:18
representing 5:8
5:10 221:15,19
represents
194:24
reputation
157:23
request 9:13
43:1,3 44:23
94:11 101:13
requested 9:20
43:9 94:6
239:10
require 34:22
223:4

required 86:17
165:15,20
requirement
93:24
requirements
34:19 132:5,6
158:16 223:6
research 8:17
43:15 59:24
138:5 139:13
139:13,18,19
140:7,8,20
141:5 143:5
146:3 147:21
researcher
138:1
reservation
145:1
residence 198:2
residential 89:14
139:8,16
234:24
resistant 223:5
resolve 40:11
resources
188:19 221:14
respect 31:2
88:1 105:5
122:13 168:4,5
168:6 170:16
196:11,12
216:22
respects 191:10
respirator
233:12
respiratory
55:18,25 56:8
108:4
respond 44:23
181:21
responding 6:8
response 53:22
129:21 198:19
responses

111:24 231:25
responsibility
122:24 123:1,6
123:11 139:17
139:21 140:15
responsible 72:6
150:4 179:17
responsive 43:24
95:17 100:23
157:16
rest 39:25 48:15
81:13 87:6
90:15 223:3
restrooms
134:22
result 110:1
141:14 232:25
resulted 182:3,4
results 182:3,22
182:25 185:7,9
217:8
resume 89:9
104:19 237:4
retain 23:10,23
26:16 36:2,3
100:1
retained 15:5,6
18:18 21:7,20
23:15 35:24,25
retainer 76:19
76:20
retention 10:8
15:6 23:6,14
26:1,19 27:25
102:6 163:24
retire 26:12,12
retired 35:20
retirement
39:23
return 68:22
reuse 146:24
reverse 19:20,22
146:1
review 4:8 53:10

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 271

| | | | | |
|---|---|---|---|---|
| 121:10 132:15 | 72:11 73:4,12 | 228:21 229:1 | 27:21 29:22 | 170:10,14 |
| 140:6,11 141:2 | 74:11 76:11 | 230:8,20 | 43:5 45:1 | 189:20 191:5 |
| 148:24 162:17 | 77:12,18 78:2 | 231:10,16 | 79:14 80:4,17 | 220:12 |
| 162:18,19,19 | 78:13 79:6 | 233:20 235:14 | 88:10 90:8,12 | **sample** 38:2,4,7 |
| 162:20 163:5 | 80:6 81:4 82:8 | 236:5 | 90:21 91:5 | 38:9 |
| 163:18 165:24 | 83:15 84:14 | **Right-to-Know** | 98:17 100:18 | **samples** 53:3 |
| 209:8 239:9 | 85:7,22 87:3,5 | 189:18 191:4 | 103:23,24 | **sampling** 53:5 |
| **reviewed** 43:18 | 87:16 89:23 | **risk** 49:22,23 | 104:13 162:14 | 130:16 |
| 44:7 54:16 | 90:1,24 92:3 | 50:2,3,7,9,11 | 162:15,19 | **San** 146:4 |
| 92:15 116:17 | 97:11 98:14,16 | 51:1,4,8,10 | 163:5,8 175:2 | **sand** 30:15 |
| 159:3 189:13 | 103:8 104:8 | 52:4,8,10,24 | 179:4 182:22 | **Sanders** 212:19 |
| 202:23 204:10 | 105:12 111:10 | 53:2,8 119:17 | 185:1,7,14,17 | 212:22,25 |
| 204:13,16,16 | 111:18 113:10 | 119:20 120:3,6 | 186:2 200:2 | 213:3 214:15 |
| 204:18 | 114:2,6 117:11 | 120:8,16,21 | 214:22,24 | 214:17 |
| **reviewing** 66:1 | 123:17 126:9,9 | 121:10,13 | 215:9 217:3 | **sat** 8:4 28:8 30:7 |
| 66:20 74:4 | 127:7,9,12 | 122:2,8,16 | 222:4,16 226:4 | 30:19 113:11 |
| 121:7 181:12 | 128:4 129:14 | 129:1,4,9 | **Roundup/glyp...** | **saturated** 232:6 |
| 210:9 | 130:24 131:12 | 148:17 149:20 | 43:21 | **sauce** 172:17 |
| **revolved** 46:24 | 136:7,11 137:1 | 186:6 189:21 | **row** 18:23 19:4 | **save** 135:23 |
| **reward** 135:10 | 140:22 147:12 | **Ritz** 99:1 | **rows** 196:13 | 240:13 |
| **rewrite** 89:1 | 149:6 151:1 | **RMP** 189:15 | **ruining** 146:25 | **saw** 122:7 |
| **Rgreenwald@...** | 152:21,25 | 191:4,4 | **rule** 210:4 | 154:11,12 |
| 2:12 | 154:1,10,16 | **road** 159:9,11 | **ruled** 106:14 | 155:14,16 |
| **Ridge** 141:3 | 156:25 157:17 | 164:21 | **rulemaking** | 156:8 205:13 |
| **right** 8:6 9:15,18 | 157:22 159:17 | **Robin** 2:9 5:22 | 124:8 | 205:18 |
| 10:11,17 11:16 | 160:16 162:3 | 9:15 15:8,8 | **rules** 9:3 32:19 | **Sawyer** 99:4,6 |
| 13:1,3 14:11 | 164:20 172:25 | 30:17 43:10 | 50:2 124:3,4 | **saying** 25:3 |
| 15:5 16:6 | 175:23 177:5 | 214:15 | 148:23 223:16 | 30:18 46:1 |
| 17:17 18:11,15 | 181:2 184:4 | **role** 169:1 | **run** 31:22 58:20 | 60:22 65:10 |
| 19:19 20:24 | 185:8,12 | **roll** 234:10 | 235:12 | 72:25 75:12,13 |
| 21:1 22:13 | 188:10 191:3 | **roll-up** 200:5 | **running** 144:12 | 75:17 96:22 |
| 24:24 28:20 | 191:21,24 | 215:18,24 | | 109:9 112:21 |
| 30:3 31:4,5,7 | 195:15 198:2 | 216:1,1,2,5,7 | **S** | 117:16 118:4 |
| 33:8 38:11,24 | 199:2 200:17 | **roll-ups** 215:14 | **S** 56:22,22 | 123:15 124:9 |
| 41:4,13 42:13 | 201:2 203:7,12 | 216:15 | **S-t-e-p-h-e-n** | 125:5 143:12 |
| 43:12 44:17 | 207:5 208:4 | **rolled** 216:9 | 7:13 | 152:22 156:3 |
| 48:16 49:6 | 209:20 212:17 | **rolling** 7:6 | **safety** 32:24 | 160:10 167:10 |
| 55:5,11 56:16 | 213:3,7,11 | **rolls** 234:20 | 33:6,7,9,10,11 | 183:8,10,18 |
| 57:7 58:14 | 216:4 219:17 | **Rosner** 39:16 | 33:12,21,22,25 | 184:5,6,13 |
| 59:6 62:15 | 219:20 220:24 | **Ross** 99:12 | 34:2,15,15,17 | 185:6 186:4,10 |
| 63:19 64:11 | 221:21,23 | **rotating** 185:20 | 50:1 51:14,17 | 219:19 223:7,8 |
| 65:3,8,22 | 222:17 223:21 | **roughly** 35:11 | 51:25 124:18 | 224:1,7,12,13 |
| 68:10,16,23 | 223:22 224:7 | **Roundup** 3:19 | 132:3,12 | 224:14,16,17 |
| 70:19 71:13 | 224:12 226:15 | 14:4 26:22 | 162:16 169:18 | 225:5,13 |

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

226:18 229:18
230:17,18
232:8,9
**says** 12:22 23:3
80:4 81:24
82:18 117:13
124:7 160:9
168:4,6 169:6
169:7 170:12
170:12 183:4,5
183:5 190:10
193:17 208:6
220:14,14,16
221:7 222:5,23
223:22 224:6
234:15
**Scandinavian**
116:7
**scarce** 146:22
**scenario** 185:2
225:22 231:7
231:15 232:4,5
**scenarios** 185:17
186:16 231:11
**scheduled** 17:6
36:23
**schedules** 27:5
**scheme** 68:14
**schemes** 135:23
**school** 47:19
128:5 131:18
135:9,11
148:21 149:3,7
149:8 150:19
210:10
**schools** 37:11
148:14,20
**science** 40:25
41:5,6 127:17
**sciences** 167:11
**scientific** 124:14
**scientists** 147:22
**scope** 105:1
119:5 158:11

158:12,13
159:5 178:17
**screen** 192:5
**screens** 188:14
**screenshots**
192:5
**script** 196:23
**se** 34:14 138:16
**search** 60:9
93:24
**searchable** 60:5
**searches** 65:19
65:20,20
**Seattle** 127:19
135:16
**second** 10:11,22
18:23 34:25
39:11 42:9
46:20 52:25
61:23 67:2
75:12 81:8
108:13 111:12
113:5 116:9
130:6 147:17
185:18 195:24
222:2
**secondary**
121:25
**secondly** 27:4
**secretarial** 95:4
**secretary** 9:23
95:14,16,20
**section** 55:9,11
112:1 124:7,7
124:9 137:24
138:5 139:12
140:1 160:8
162:20,24
169:11,17,24
171:4 180:21
188:18 189:6
189:12 191:21
199:5 221:6,10
222:15

**sections** 56:10
83:14 111:22
162:14 173:16
199:10 220:21
235:14
**see** 9:23 14:25
16:13 19:5
20:18 30:13
45:3,6 51:5
52:5 60:6
62:19 75:16
79:21,22 84:17
84:19 107:14
119:21 120:1
122:9,16
142:11,14
165:24 166:2
167:13 184:22
185:11 186:14
186:16 189:19
193:17 195:20
196:18 197:13
201:20 205:5,6
205:9 211:20
215:23 223:11
225:12 226:7
227:1,2 228:19
230:17,18
232:8,9
**seeing** 156:10
**seen** 14:11 23:21
25:14 42:13
49:20 103:10
115:18 116:4
118:15,20,25
154:14 205:22
207:21
**sees** 232:24
**select** 202:19
**selected** 141:1
**selecting** 47:1
**seminal** 38:22
**send** 15:9 133:13
**senior** 95:3,6

136:7,9 138:5
**sense** 46:3,7
58:13 120:18
122:1 149:22
150:9 165:13
176:23 184:18
192:7 196:7
197:5 209:23
227:23 229:12
235:1
**sent** 10:23,24
15:1 23:11
59:19 60:23
69:10 84:10,12
86:6,10 90:12
102:4,5 107:24
108:11 114:24
115:8 207:5
**sentence** 79:8,18
79:24 80:12,16
80:20 81:8
82:3 104:25
124:24 224:5
**sentences** 80:15
80:19
**separate** 15:10
36:1 57:21
100:8 104:8
141:4 145:19
147:2 152:24
179:19 181:9
200:2
**separately** 65:18
**separation** 147:1
**separations**
146:7,8
**sequence** 65:18
**series** 14:9
170:13 182:23
**served** 17:12
140:18
**services** 35:14
35:15 37:2
39:25

**set** 9:22 17:14,15
20:25 57:16
61:3 99:15,17
99:18,22 112:8
127:3 155:7
195:4 197:9
200:10 204:11
222:21
**sets** 9:21 10:15
13:15 111:17
205:14
**setting** 190:13
**seven** 75:16
128:5 173:15
218:17
**shale** 146:21
**sheet** 197:2
214:10 240:1
240:15
**sheets** 229:4
**Shift** 41:13
**shirt** 220:15
221:9,15
224:15
**shirts** 220:17
221:2,3,16
222:6 223:17
223:23 225:23
**shoes** 221:4
222:7 223:23
224:16
**shoot** 173:23
**short** 33:2 221:3
225:20 230:5
230:25
**short-sleeved**
221:3
**shorts** 184:14
231:16
**shotgun** 134:25
**show** 20:20 45:7
175:24 182:7
186:8 187:2
221:21,23,25

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

| | | | | |
|---|---|---|---|---|
| **showing** 216:8 | 166:6 178:1 | 229:16 230:1 | 59:9,16 71:2 | **specifically** 9:19 |
| 227:6 | 180:2 186:18 | 230:15 231:6 | 72:21 79:11 | 14:5 30:11 |
| **shows** 164:24 | 202:4,5 216:16 | 231:13,17,18 | 82:22 84:9 | 107:18 120:1 |
| **Shustov** 99:3 | 223:16 229:8 | 232:3,24,25 | 90:13 119:6 | 121:14 127:14 |
| **shuttle** 148:1 | **Simultaneous** | 235:9,9 236:11 | 123:21 129:18 | 161:7 172:20 |
| **sic** 130:2 186:20 | 82:20 83:7,22 | **skipped** 124:24 | 133:9 141:17 | 180:7 208:8 |
| **sick** 108:23 | 84:5 | 149:18 | 195:6 218:7 | 211:1,6 220:11 |
| 111:6 | **single** 24:12 | **Skype** 207:14 | 219:8,9 222:20 | 220:20,25 |
| **side** 21:19,23 | 180:1 204:11 | **slanted** 237:2 | 225:17 | 221:1 |
| 22:19 23:24,25 | **sir** 11:16 13:23 | **sleep** 83:24 | **sort** 25:2,15 | **spell** 127:5 130:1 |
| 27:5 39:19 | 14:12,19 16:3 | **slightly** 86:22 | 27:19 38:22 | 144:4 |
| 49:25 50:1 | 19:1,12 24:6 | **slip** 173:5 | 48:4 123:14 | **spend** 16:15,22 |
| 51:12,16,18 | 61:12 79:23 | **small** 39:10 | 124:4 129:21 | 36:6,7 132:9 |
| 82:8 115:17 | 80:25 81:20 | **smoke's** 108:15 | 140:8 143:11 | 134:6 141:10 |
| 120:14,23 | 87:19 101:4 | **smoking** 210:5 | 146:13 148:21 | 142:1 151:19 |
| 142:2 157:7,24 | 103:24 104:14 | **so-called** 17:16 | 152:16 159:3 | **spending** 113:17 |
| 170:9,14 182:2 | 118:20 152:4 | 22:23 | 162:20 175:17 | 140:4 |
| 191:14,19 | 157:22 169:19 | **soaked** 231:9 | 175:17 176:5 | **spent** 16:12 |
| 204:12 208:23 | 176:24 | **socks** 221:3 | 184:12 185:20 | 27:23 39:22 |
| 213:1 216:23 | **sit** 8:2 82:16 | 222:7 223:24 | 189:9 196:16 | 51:4 72:1 |
| 216:23,25 | 85:16 | 224:16 225:24 | 227:5 229:17 | 116:14 122:4 |
| 227:19 235:9 | **sitting** 7:23 | **soils** 53:3 | **sorts** 155:24 | 140:9 141:25 |
| **sides** 220:7 | 29:14 30:6 | **sold** 35:3,6,23 | 231:11 | **spike** 34:8 |
| **Siegel** 98:11 | **situation** 48:4 | **solemnly** 6:1 | **sounds** 41:4 | **spill** 129:21 |
| **sign** 164:1 | 215:17 217:8 | **solutions** 38:19 | **source** 24:3,17 | 151:11,11 |
| **signature** 161:16 | **situations** 8:12 | **somebody** 23:3 | 168:8 | **spills** 8:15,16,17 |
| 162:2 | 191:16 | 68:6 109:3,10 | **sources** 24:10 | 129:22,25 |
| **signed** 15:10 | **six** 9:21 27:9 | 109:11 142:20 | 64:15 159:2 | 151:10 |
| 26:2 27:12,16 | 47:4 139:1 | 142:21 157:25 | **south** 40:6 | **split** 50:25 80:8 |
| 96:10,23 97:3 | 155:23,23 | 205:3 214:1 | **Southeast** 2:18 | 80:19 130:25 |
| 238:12 240:19 | 194:3 195:9,10 | 229:13 234:15 | **space** 147:25 | **spoke** 60:18 |
| **significance** | 195:11 205:4 | **somebody's** | **SPCC** 150:19 | 212:7 |
| 67:15 | **skin** 38:18 176:7 | 141:5 | 151:7,8 | **sponsored** 129:1 |
| **similar** 34:20 | 176:8,16,19,19 | **someone's** 236:2 | **speaking** 82:20 | 180:22 |
| 112:12 155:8 | 178:14 179:5 | **somewhat** 30:12 | 83:7,22 84:5 | **spouse** 208:20 |
| 163:9 199:13 | 179:12,12,21 | 51:23 160:7 | 236:10 | **spray** 183:5 |
| 202:10 | 180:1,12,13,15 | 206:17 232:1 | **specialist** 130:11 | 231:12 |
| **Similarly** 72:18 | 181:25 184:4,8 | **son** 35:5 | **specific** 105:24 | **sprayer** 185:20 |
| **simple** 87:7 | 184:10,16 | **soon** 113:24 | 106:3 107:9 | 216:13 |
| 171:3 172:18 | 196:12 201:15 | 114:4 | 113:1 141:10 | **spraying** 211:20 |
| **simplistic** | 201:17 202:6 | **sorry** 20:16 | 167:21 209:10 | 229:14 231:8 |
| 170:18 | 203:11 204:5,6 | 23:19 28:12 | 212:13 214:25 | **spreadsheet** |
| **simply** 67:18 | 217:7,9,11 | 44:19 48:14,22 | 223:4 224:7 | 86:10 174:2 |
| 80:14,18 86:24 | 222:25 229:11 | 49:6 50:16 | 225:3 | 196:2 |

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

spring 41:3
Sr 68:3
St 1:1 5:7
staff 65:22 143:5
stakeholders
  66:7
Staller 98:25
stamp 25:8
stand 192:19
  193:1
standard 31:3
  34:16 48:6
  50:9 55:18
  56:8,9,9,10
  62:13 66:4
  86:13 88:17
  116:24,25
  117:1 162:21
  165:20 210:22
  220:4 223:16
  224:21
standards 33:16
  33:24 46:17,18
  55:9,15,19
  56:1,2,2 66:5
  112:12 191:3
  220:22
standpoint
  35:17,18
  120:19 175:10
  176:22 178:18
  179:1,16
  234:19
stapled 12:16
  78:22
start 23:5 66:24
  73:24 74:8
  80:3 89:5
  111:14,16
  112:3 113:21
  126:18 132:22
  143:19 172:25
  175:19 188:6
  197:1,8 199:5

started 8:5 37:6
  37:7,9 71:3
  89:6 104:5
  111:22 113:24
  114:3 132:25
  134:14 136:13
  137:2,3 139:3
  143:9,16,20,24
  157:2 188:18
  209:18
starting 5:14
  134:14 141:1
  144:17 197:16
  201:25
starts 104:25
  112:2,17
  134:15,16
  185:25
state 1:1 5:7,15
  7:3,11 30:10
  30:12 35:9,12
  38:4 50:2
  105:1 128:22
  129:2 130:15
  130:23 131:5,6
  133:6 135:19
  147:17 148:7
  149:13 150:17
  150:21 238:3,8
  238:15 239:3
statement 4:7
  45:21 76:25
  104:17 105:1
  118:15,18
  199:7 201:4,8
states 37:20
statics 130:19
statute 86:15
  189:18
stay 68:17
stenographic
  239:12
stenographica...
  239:8

step 141:24
Stephen 1:9 3:3
  3:13,15,17,19
  5:2 6:7 7:13
  45:1 73:25
  126:19 188:7
  238:9 239:9
  240:24
Stephen's
  102:22
stepping 178:17
Stewart 47:20
stick 84:25 85:4
sticker 14:25
stop 79:11
  230:12 237:3
stops 79:9,12
storage 50:13,18
  50:20,22 151:1
  151:3,4,5,9
store 134:3
stores 34:3
story 50:24
storyboard
  192:13
straight 55:6
strange 130:2
  140:20
streams 146:19
street 214:2
stricken 101:21
  101:25
strike 154:19
  158:5 217:25
strikes 40:8 61:9
  212:6
strong 26:15
Structures 89:14
students 148:18
studies 43:14
  118:13 122:5
  145:17 162:17
  169:3 180:21
  182:6 186:23

study 32:4
  110:14,16
  117:12,12
  185:11,16
stuff 45:19 46:19
  47:6 49:15
  50:4 51:9,17
  55:25 69:10
  85:6 88:16
  91:23 100:1
  131:16 145:4
  154:6 157:6
  179:21 180:3
  181:23 202:24
  235:19
style 14:11 25:15
styled 14:15
sub-types 4:5
subcalculations
  215:21
subcommittees
  140:10
subheading
  46:25
subject 43:22
  88:9 123:12
  151:25
subjects 155:21
  162:13
submission
  226:24
submitted 44:11
  114:15 149:19
subpart 225:3
subsections
  225:13
subsequent
  204:2 205:19
subset 118:2,3
substance 28:13
  157:3
substantive 77:9
subtitled 29:6
suburb 137:11

sudden 184:15
suffix 25:7
suggesting
  157:10,12
Suite 1:17 2:6,18
  5:12 7:17
summaries
  219:14,16
  232:11
summarize
  175:19 178:1,5
summarized
  180:10 181:2
  181:24
summary 3:15
  3:20,22 4:10
  18:12 29:10
  77:3 80:4 82:9
  86:1 123:20,22
  151:22 158:10
  158:14 160:12
  161:3 164:2
  169:14 171:18
  172:7,20,22
  173:4,21
  174:17,23
  178:4,7,10
  188:23 208:10
  211:24 212:11
  214:10 216:3
  227:9
summer 135:7
  136:5,6,7,9
summers 135:7
Super 12:24
Superfund
  145:4 150:4,6
supplement
  174:4
supplied 161:21
supply 139:13
support 3:14,20
  30:13 77:3
  86:2 151:22

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

158:14 160:7
**supportive**
159:24
**supposed** 91:16
**sure** 5:17 6:25
12:11 14:18
22:3 29:12,18
29:25 31:22
32:19 33:11
41:25 42:18
43:2 44:18,19
44:21 45:20
56:19 58:15
62:6 63:8
64:16 66:23
67:18,23 68:5
69:8 70:11
71:11 72:16
73:1,9 77:15
83:2 84:19
89:24 93:20
96:13 97:8
99:25 101:2,3
101:18 103:2,3
111:8 115:20
115:21 118:24
119:4 123:4,16
125:24 129:12
131:11 134:17
138:12,17
142:20 149:23
150:10 152:7
155:2 157:20
160:3 162:12
168:1 169:16
171:8,25
172:12 178:9
178:13,15
184:19 187:11
188:12 189:15
191:1,3 193:15
194:17 196:20
197:6 198:10
207:24 208:11

219:10 226:23
228:10 231:2
233:13
**surface** 176:19
**surfactant** 186:2
**surprise** 120:9
**surprised** 122:9
**surrounding**
37:20
**suspect** 63:23,23
67:13 153:22
**swear** 5:25 6:1
**swirled** 234:17
**switch** 73:18
**sworn** 6:8
238:10
**symptoms** 107:3
108:3,20
**system** 53:22
136:21 137:9
137:20 138:22
139:1,2,4
140:17 143:1
167:1 191:14
**systems** 137:15
138:19 142:22
146:25 147:1

**T**

**T-shirts** 183:25
**tabbed** 14:25
**table** 142:12
164:14 190:13
200:11 216:8
**tables** 161:8
174:17,18
182:24 196:14
196:15,18
200:5,6,7,12
216:2,3,5,9,10
216:24
**take** 9:8 11:12
11:23 12:4
16:17 34:17,20

34:24 36:19
58:21 65:15
73:17 95:22
102:22 107:4
109:2 116:9
125:23 130:23
131:19,25
132:17 142:19
164:13 178:2
184:20 186:13
202:25 220:20
234:3 236:1
**taken** 1:10,14,23
48:20 92:15
112:25 129:16
192:4 240:11
**takes** 53:17
107:8
**talk** 8:6 44:5
47:22 95:23
101:11 140:14
147:16 170:21
181:23,25
187:9 194:9
197:22,24
198:9 199:16
230:3,7
**talked** 51:14
64:11 90:22
98:22,25 99:6
101:19 114:4
115:9 151:25
152:15,17,20
192:2 207:10
207:11,23
209:21 215:16
**talking** 28:13,19
28:21 33:11
59:14 79:19
106:20 128:20
147:16 152:19
152:25 162:11
171:15,21
182:12 186:20

198:15,16,22
199:6 205:20
208:8 217:12
219:20 222:14
230:6,8
**talks** 45:17
169:11 188:18
**tangential** 27:23
54:1
**tangentially**
91:2 122:3
**tank** 50:13,19,21
50:22 151:1,6
**tanks** 151:3,4,9
151:10
**target** 211:3
**targeting** 88:19
**task** 66:2,3
68:21
**tasked** 107:21
**taught** 40:18,19
40:20,23 41:3
50:11 51:1
129:16
**Tech** 135:18
**technical** 167:9
**technically**
137:10 164:5
**technician** 95:12
**technicians** 95:4
**technologies**
145:23
**technology**
137:17,22
139:8 142:14
146:2
**tecum** 22:13
**telephone** 92:10
99:19 101:9
145:10 207:11
229:2
**tell** 8:17 11:12
13:20 45:22
65:5 74:7

85:20 108:16
121:2 156:9
164:25 166:24
174:9 180:4
188:21 194:20
199:9 201:9
203:24 207:20
215:1 224:21
232:16 233:16
235:8 236:13
**telling** 30:24
48:2 57:23
108:17 209:3
**tend** 86:12
201:24
**tends** 234:14
**term** 41:3 164:3
170:19 172:7
216:6
**terminated**
35:22
**terminology**
177:19
**terms** 21:21 53:6
66:4 96:19
163:24 165:15
165:21 168:17
169:11 175:1
176:8 180:19
201:21 215:14
235:1
**test** 107:25
108:1,8,11,18
108:19
**tested** 107:11
108:21 109:24
**testified** 6:9 8:18
19:3,7,12 96:6
123:9
**testify** 101:24
**testifying** 18:13
18:17,19 21:21
21:22,25 28:5
**testimony** 3:23

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 276

6:2 10:3 20:5,5
21:4 43:16
93:10,12,16,18
93:25 96:3
114:10 115:3
155:6 161:4,6
202:8 203:14
204:2,13
205:20
**Texas** 34:6
**text** 182:24
**textbook** 21:13
39:1,2,9,11,21
40:7 47:22
88:14,24 89:1
89:3 166:25
**textbooks** 25:17
45:14 46:1
48:7 49:5,16
**thank** 6:6 13:18
15:19,24 31:16
42:8,11 59:16
78:21 116:2
119:13 126:23
147:12 195:15
199:3
**theory** 47:12
**they'd** 234:12
**thickness** 178:2
178:3
**thin** 121:7
**thing** 67:21
88:22 123:7
125:22 136:1
140:5 141:13
142:11 144:8
156:14 160:10
189:17 210:1,2
224:13
**things** 38:10
39:10 48:3
57:25 62:19
107:4,5 109:2
123:25 133:25

141:19 166:11
166:16,18
169:2 179:19
183:25 191:15
210:6,8 211:2
219:11
**think** 7:3 9:22
9:25 10:12
12:2,3,3 13:10
14:14 15:14
21:17 22:3,14
23:22 25:12,20
25:25 28:2
30:3,9,20
31:10 38:3,25
40:22 41:11
42:10 43:10
44:2 47:19
48:11 50:8
54:11,12,14
55:1 57:24
58:9 60:18
62:15 63:7,19
64:3,7,8,13,14
65:8,11,23
66:11 67:19
68:12 69:17,19
70:3,20 71:10
72:13,24 74:4
74:6 76:6 77:2
82:5,21,23
83:13,23 84:3
86:6 87:4,12
87:17 91:4,5,6
92:19,24 93:6
93:8 96:4
97:12 99:10,16
100:23 101:18
102:25 103:12
103:14 105:9
109:16 112:20
113:3,11 114:4
118:9 120:2,11
120:13,20,23

120:25 123:17
127:5,10,11
128:16 129:6
129:13 131:7,9
131:11 132:11
136:8,9 144:23
145:12 147:18
149:3,16 151:2
151:7 152:2,15
154:6,10,13,15
154:22 156:14
156:23,25
157:14 160:10
162:12 167:8
168:10 172:9
181:14 189:1
189:20,24
192:14 193:7
193:11,21,23
194:13,24
195:8 197:21
197:23 198:22
202:23 206:6,8
206:13,25
207:23 208:19
212:4,16,18
213:4,5,7,19
214:14,19
218:16,18
224:4,12
228:16,21
229:14 232:12
**thinking** 46:9
113:1 124:5
125:21 223:19
**thinner** 42:2
**thiocyanate**
137:21
**third** 19:2,4,4
36:7,20,22,25
39:12 52:25
126:10 127:3
185:19
**third-from-th...**

56:14
**Thomas** 2:24 5:8
10:23
**thought** 11:17
28:12,16 58:6
77:25 91:19
109:13 138:14
143:10 146:20
158:19 172:16
195:18 225:17
**thousand** 37:16
207:1
**thousands**
181:17 205:5
206:14,15,16
**three** 6:15 13:15
21:6 36:8 37:7
38:17 41:9
74:20 87:4
94:12 112:23
113:1,17
114:10 131:7
132:6 137:23
139:12,12
141:10 152:16
152:22,23
155:10,12
156:4 184:23
185:16,17
188:24
**throwing** 169:7
**thumb** 194:4,7
194:10
**tie** 52:21
**tied** 32:12 55:23
148:11 191:4
**till** 215:4 228:24
**Tim** 18:24
**time** 1:15 4:11
5:3 6:19 7:4,19
7:24 8:1 11:23
12:4 16:9,12
16:15,16,22
17:2 20:9,11

22:22 26:23
27:3,16,24
29:18 30:8
34:21 38:9,9
39:22,24 40:20
41:2,9 43:10
47:9,25 48:15
50:3 51:4
53:24 67:6
72:1 73:20
74:1 87:1 91:5
94:9,13,14
99:21 101:20
113:3,18
114:19 116:14
119:14 123:8
126:3,20
127:12 131:9
132:24 134:6,7
136:3,4 139:5
139:17,20
142:11 144:13
151:20 157:25
158:23 160:2
160:16 172:11
176:8 177:23
180:14 182:1
188:2,8 196:11
197:2 201:16
201:17 202:6
202:22,25
203:18 204:7
205:24,24
206:3 209:14
209:15 214:12
214:13,23,25
215:1,3,16
216:11,16
229:5,21
230:21 231:20
231:23,24
232:17,19
233:15 234:22
234:23 235:25

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

237:6
**timeframe** 26:24
  33:15 112:19
  137:2 232:5
**timeline** 162:15
**times** 19:12,17
  21:17 23:22
  82:15 112:24
  123:9 124:19
  144:22 145:17
  155:23 181:22
  184:23,23
  195:13 204:7
  210:14 215:22
  237:3
**Timothy** 68:2
**title** 81:7,11
  86:12 138:3,4
  220:4 223:8,20
**titled** 29:25 30:1
  44:2 77:3
  111:20 119:2
**titles** 30:8,24
**TLVs** 55:21,22
**TMDL** 151:16
**today** 29:8,19
  95:20 103:5,19
  192:3 197:25
  201:4
**Today's** 5:2
**told** 27:18 57:8
  57:18 101:6
  145:8 146:15
  156:14 173:15
**Tom** 188:14
**tomorrow** 218:5
  237:4
**tons** 49:16
**tool** 228:20
**top** 15:1 20:11
  20:16 34:8
  39:12 75:25
  133:13,13
  135:17 147:23

184:15 196:21
  216:10 231:12
**topics** 162:13
**total** 16:6 136:21
  174:25 196:7,7
**totality** 117:5
  151:21 196:9
**totally** 201:9
  217:12 232:17
**touch** 52:19
**touches** 184:7
**touted** 162:21
**toxicity** 120:14
**toxicologist**
  110:17,19,23
**toxicology** 46:3
  107:13 110:20
  110:24 111:2,3
  111:5,8,9
  129:8
**track** 23:23
  218:6
**tract** 108:5
**traditional** 48:7
  235:20
**traditionally**
  37:21
**train** 51:21
  123:11,14
**trained** 50:2
  109:24 129:24
  191:7
**training** 56:6
  120:6 129:14
  130:5,10 131:4
  131:13,24
**Trane** 142:5
**transcript**
  239:10,11
  240:11
**transcripts** 93:9
  93:11 96:2
  204:14,18
**transfer** 38:18

47:19 49:8
  83:5
**transferred**
  136:19,22
**transmission**
  138:25 139:12
**transmittal**
  22:17
**transparency**
  119:15
**transparent**
  117:6,25 118:3
  119:9 123:5
  166:5
**transport** 47:17
  47:18,20 53:3
**transportation**
  51:20 129:21
  139:18
**travel** 36:20
**treatises** 43:16
**trees** 133:3,12
  134:12 135:10
**trial** 7:4 8:18
  16:16 17:3,4,5
  17:10 19:3,12
  19:18 20:5,17
  93:10,12,16,17
  93:25 96:3
  114:19 159:12
  159:14 192:16
  193:2,4
**trials** 19:7
**tried** 9:23 45:18
  46:15 49:13
  85:1 93:8 96:8
  204:22 228:17
**true** 16:12 30:14
  54:6 123:10
  143:15 239:11
  240:13
**trunk** 183:7
  184:12
**trust** 9:22

**truth** 6:3,3,4
**try** 51:7 58:15
  68:17,17 85:11
  109:3 111:7
  135:20 146:6
  146:24 160:1
  162:8 200:6
  211:4 215:6
  226:7,20
  234:12
**trying** 14:18
  20:1 22:19
  26:11 30:22
  43:24 44:7,19
  44:23 48:23
  52:15 120:16
  145:11 146:23
  148:1 156:8
  158:22 160:4
  168:16 170:23
  171:2 172:9,15
  177:19 186:3
  187:10,13
  194:24 199:12
  200:8 224:1
  232:9 236:25
**TSCA** 52:25
  53:6
**Tuesday** 1:14
**tune** 112:14
**tuned** 112:16
**turn** 31:5 104:24
  132:21 151:19
**turned** 171:4
**turning** 113:20
**turns** 49:24
  51:22
**TV** 105:15
**twice** 135:8
  216:6
**two** 20:3,6,12
  21:6,17 34:6
  34:22 51:15
  58:10 63:9

70:24 71:1
  74:20 80:8,19
  94:12 104:1,8
  129:6 131:1
  132:9 135:7,13
  137:23 138:23
  141:10 142:1
  143:24 144:6
  144:11 156:4
  173:22 174:17
  181:9,19 186:4
  189:21 191:6
  196:14 199:3
  201:12 202:15
  205:14 212:7
  216:2,10,10,15
  219:3,11
  221:25
**two-thirds** 89:21
**type** 89:24
  129:11 150:10
  193:16,19
  216:21 233:2,3
  238:25
**typed** 91:23
**typical** 173:7
**typically** 21:9,19
  22:20 23:2
  25:2 34:22
  51:13,24 52:20
  54:25 62:18
  69:4 161:19
  167:8 176:13
  176:17 189:7
  191:1
**typo** 160:23
**typos** 77:8,10
  151:25 160:15
  160:17,20,21
**Tyvek** 217:16,17
  217:19,22

---
**U**
---
**U.S** 140:19

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 278

| | | | | |
|---|---|---|---|---|
| **UC** 194:3,12 | **understood** | 16:19,25 17:24 | 195:15,20,22 | **utilized** 180:23 |
| **UCIPM** 82:5 | 23:12 46:11 | 18:1,10 28:7 | 199:2,14 201:2 | **V** |
| **Uh-huh** 185:24 | 48:11 49:6,10 | 28:10,15,17,19 | 201:3 206:9,23 | **values** 202:17 |
| **UK** 182:22 | 49:17 66:22 | 28:23 31:13,16 | 208:17,25 | **variable** 210:14 |
| 185:6,21 | 106:17 109:20 | 31:21 41:23 | 212:23 218:10 | **variables** 196:11 |
| **ULP** 146:4 | 138:17 170:17 | 42:7,10,12,21 | 218:14,19,21 | **variety** 130:17 |
| **ultimate** 123:10 | 179:24 185:3 | 42:24,25 45:7 | 218:24 219:2 | 211:2 |
| 169:2 170:20 | 207:5 209:25 | 45:15 52:1 | 219:15,22 | **various** 66:21 |
| **ultimately** 66:2 | 220:22 225:11 | 59:15,20 67:10 | 222:13 226:10 | 118:1 159:2 |
| 66:3 122:24 | 228:6,21 | 72:4 73:17 | 226:17,22 | **vast** 22:1 40:2 |
| 140:25 159:8 | **undertake** 26:18 | 74:2 75:18 | 228:25 237:1 | 66:15 |
| 170:7,15 | **underwear** | 77:11 78:13,21 | **upstream** | **vehicle** 139:17 |
| 174:23 182:2 | 229:14 | 79:3 82:18,21 | 234:13 | **vehicles** 133:20 |
| 196:14 232:12 | **unfortunately** | 83:4,8,15,18 | **URL** 54:25 55:3 | 142:8 151:10 |
| **umbrella** 35:16 | 58:16 145:8 | 84:14,19,24 | 56:17,22,23 | **version** 10:17 |
| 139:5 | **unified** 56:21 | 85:3,8,10,13 | 70:5 193:17 | 12:1 33:2 50:8 |
| **uncertain** 64:17 | **unique** 141:18 | 85:15,21 86:21 | **USB** 83:1 | 79:25 113:4 |
| 70:24 71:16 | 176:5,6 196:16 | 87:2 89:17 | **USCs** 151:12 | 138:21 151:24 |
| **unclear** 33:9 | **unit** 54:12 55:1 | 94:23,25 95:1 | **use** 4:4 11:22 | 152:10 |
| **undergraduate** | 201:15,15 | 95:25 96:1 | 14:15 22:4 | **versions** 22:24 |
| 47:19 | **universe** 109:2 | 98:24 103:1 | 29:9 51:2 | 47:4 53:1 |
| **underground** | **university** 40:18 | 104:7 105:16 | 80:17 83:9 | 193:22 194:11 |
| 50:13,18,20,22 | 127:18,19 | 105:18 109:6 | 112:12 117:19 | **versus** 5:4 24:3,9 |
| 151:1,3,9 | 128:8,15 129:2 | 110:9 113:19 | 123:2 135:10 | 49:20 83:19 |
| **underlying** | 131:17 150:21 | 116:3 119:11 | 137:19 139:14 | 167:12,15 |
| 47:12 169:22 | 195:8 | 123:23 125:21 | 139:14 142:20 | 169:9 186:20 |
| **understand** 9:5 | **unquote** 230:24 | 126:1,9,11,14 | 159:22,23 | 203:17 215:19 |
| 9:5,18 51:7 | **unusual** 36:21 | 126:21 127:8 | 168:3 170:19 | **video** 73:18,20 |
| 52:2 53:19 | 38:5 51:23 | 127:24 130:22 | 178:7,11 | 73:23,24 75:3 |
| 58:24 67:11 | **unvarnished** | 133:8,14 | 184:25 189:8 | 82:21 85:17 |
| 76:15 91:17,23 | 66:6 | 134:10,13,19 | 190:6 192:16 | 126:2,17,18 |
| 105:6 111:3 | **update** 39:11 | 152:9 154:25 | 192:17,17,21 | 188:1,5,6 |
| 117:11 126:24 | **updated** 10:25 | 156:19,25 | 192:23 198:17 | 192:1,9 193:10 |
| 127:2 138:12 | 39:4 112:7,9 | 157:4,8,12,16 | 201:13 202:3 | 193:19,20 |
| 159:10 168:1 | **updates** 52:9 | 157:20 158:5,7 | 211:19,25 | 194:19,23,25 |
| 168:16 170:3 | **updating** 39:8 | 161:23 162:2,4 | 215:17 234:25 | 195:2,3 237:5 |
| 171:2 173:4 | **Upshaw** 2:16 3:4 | 171:11,23 | 236:15 | **Videographer** |
| 178:23 181:7 | 5:17,17 6:11 | 172:1,10,13,24 | **usually** 25:11 | 2:24 5:1,24 |
| 187:5 205:18 | 6:25 7:2,9,10 | 173:10,14,25 | 78:6 141:6 | 73:19,23 126:2 |
| 211:17 | 9:13,17 10:7 | 187:15,19,24 | 148:16 149:21 | 126:17 188:1,5 |
| **understanding** | 10:10,16 11:3 | 188:9,13,16 | 209:14,16 | 188:15 237:5 |
| 20:24 49:14 | 12:2,13 13:1,6 | 190:17 192:15 | 231:18 | **videos** 75:4,5,14 |
| 52:4 170:21 | 13:8,13,18,19 | 193:7,9 194:8 | **Utilization** | 75:15,19 82:10 |
| 227:16 240:16 | 15:13,18,25 | 194:15,18 | 140:20 | |

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 279

84:2,7 92:21
92:23 194:4,5
194:12 195:1,4
195:7,9
**videotaped** 1:9
3:17 5:1 239:8
**videotapes** 92:15
**viewed** 176:17
176:21
**Vinyl** 39:13
**violation** 221:9
223:5
**virtually** 161:13
**visiting** 142:2,10
**vitae** 76:13
**volume** 1:11
37:21 239:9
**vs** 1:5 240:4

**W**

**Wagstaff** 42:18
**wait** 71:1 75:12
79:16 108:13
154:23 170:25
194:15
**walk** 129:10
161:24 162:5
192:19 193:1
**Walter** 1:3 5:4
240:3
**wand** 215:10
216:21
**want** 8:22 9:8
11:14 12:18,24
17:7 19:24
25:20 26:23
29:17 36:20
45:6 46:8
58:16 62:15
66:16 71:6
77:7,18 78:8
78:12 83:6
85:5 88:24
99:13 106:15

107:25 108:1,8
108:18,19
109:15,18
111:21 113:11
114:5 115:10
115:11 123:16
127:14 129:3
134:6 156:15
157:9,10 158:2
163:10 173:11
173:20 178:22
182:11 184:6
187:19 189:2
192:23 193:16
198:10 199:8
199:22,22
208:9 210:3,4
210:5,25 211:1
213:22 217:19
217:21,23
218:5,9,21
219:10 220:5
226:15 229:9
230:20 231:24
**wanted** 16:24
27:4,8 32:22
35:20 119:20
119:25 122:8
122:14 138:17
141:22 151:4
156:16 175:19
182:14 199:24
215:14
**wants** 206:9
**warn** 123:11
**warned** 181:15
**warning** 56:6
179:3,8 182:2
217:4
**warnings** 29:24
55:16,17 56:4
56:10 66:6
106:9,10,21
117:7 122:13

122:21 123:8,9
164:15 167:22
167:22,23
168:4,5,6,22
169:23 170:16
173:24 174:1
178:16,18,25
179:15,16
180:6,24 182:4
187:2,6 199:17
206:21 222:24
**Washington**
127:19 128:9
131:5 133:6
135:18 136:14
145:13
**wasn't** 18:18
27:6 30:7 37:8
38:4 69:9
75:12 104:23
117:17 118:14
119:9 143:14
151:3 187:2
198:21 217:10
**waste** 145:6,11
145:12
**wastewater**
135:23 145:17
145:23 146:18
**wastewaters**
146:23
**watch** 85:17
**water** 135:21,22
135:24 193:4,8
**water's** 146:22
**waxing** 195:18
**way** 23:16 24:1
24:11 25:13
26:13 33:23
49:9 53:17
55:19 57:19,24
58:20 59:1
60:1,23 62:19
63:2 67:5,8,25

68:7,13 77:16
84:3 111:25
117:6 143:4
154:2 155:4
159:4 161:15
166:25 178:8
192:25 201:23
206:11 212:3
215:20 216:19
218:15
**ways** 46:19
66:21 137:19
146:17 215:17
**we'll** 6:18,19 8:6
10:11 11:13
18:1 44:17
76:25 77:13,16
78:21 82:9
83:4 84:14,15
85:15 95:22
157:4 174:7
175:23 186:13
193:7 194:1
197:22,24
198:9 204:24
208:8 218:5,11
237:3,4
**we're** 6:14 7:24
9:25 11:19
13:16 20:1
29:8 37:17
38:7,8 43:25
44:1,5 46:23
46:23 48:15
54:22 58:15,22
59:13 61:10,13
62:15 63:19
64:8,12,13
66:11,12 73:21
73:23 74:4
81:15 85:8,16
86:16 103:18
107:18 110:10
126:3,17

127:11 134:7
136:7 143:12
157:3 160:10
170:9 173:11
174:20,22
182:13,17
186:5 187:8
188:2,5,10
205:20 209:15
218:3,12,15,16
219:7,10
222:14 224:13
233:21 237:6
**we've** 6:16 8:5
31:8 39:10
43:2 59:8 86:7
86:18 93:6
94:1 96:5
174:10 187:16
193:25 207:23
228:21
**wear** 217:15
221:7 222:6
223:14 232:16
233:15
**wearing** 184:14
185:19 229:5
231:16,16
233:8,9,12,17
233:19
**weather** 234:4
234:21
**weave** 158:22
**web** 50:4 55:7
**website** 24:24
55:3 56:13
65:9
**week** 20:12,13
36:7,7,20,22
36:25 132:3
142:1 160:25
161:2
**weeks** 36:8
114:10 154:14

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

155:10,12,23
156:4,4
**weight** 183:13
236:2
**weird** 50:14
**Weisenburger**
99:3
**Weitz** 2:4,10
5:20 15:11
30:17
**welcome** 126:22
**well-known**
131:17
**went** 17:3 21:16
30:16,17 34:12
38:14 67:9
68:11 83:24
109:11 116:6
128:4,5 136:21
137:9 143:5,6
154:12 163:5
198:17 203:9
220:8
**weren't** 112:21
114:17 181:15
205:8
**west** 1:16 146:22
**Wester** 69:24
**wet** 191:25
230:14 231:21
231:22,22
**wets** 230:1
231:12
**wetted** 176:8,9
179:12 217:9
217:11 229:11
229:20 230:22
231:6,18 232:3
232:6,17 233:8
234:9,20 235:9
235:10
**wetting** 217:7
230:24 235:1
**Weyerhaeuser**

135:8,12
136:10
**whatever's**
83:19
**wheat** 141:4
**wheelbarrow**
133:19
**When's** 160:16
**wife** 37:8 153:14
**Williams** 70:2
**wind** 234:17
**winnow** 107:5
109:4
**Winston** 1:3 2:3
5:4,20 14:6,8
14:15,21,22
16:15 29:9,9
30:11 42:20
79:11,13,19
80:13,15,17,19
103:18 104:4,6
104:11 106:18
113:22 240:3
**Wisconsin** 47:21
**wished** 191:17
**witness** 1:23 3:3
3:14,15 5:25
6:5 10:8 11:1
11:23 12:8
13:9,12,14
15:22 16:19
18:5,12 21:4
22:21 28:11
30:13 31:15,17
37:2,20 42:2,5
45:6,9 50:17
50:20 59:17
67:7 71:25
75:11 77:10
79:1 82:13,15
82:23 83:5,13
83:16,23 84:3
84:6,9,17,20
85:5,9,19

86:24 88:2
89:12 93:13
94:10,20 96:4
96:11 97:4
98:22 102:24
104:5 105:2
106:24 113:8
113:11 123:21
125:24 126:13
126:16 130:9
133:11 134:15
134:16 157:5,9
157:14,18,23
161:15 172:21
187:20,25
190:13 192:13
192:19 193:1
195:11,16
198:25 199:7
206:8,11
212:21 219:1
219:18 222:12
226:11,15,18
**witness's** 194:10
**witnesses** 88:1
**wood** 133:18
**woods** 133:19
**word** 11:14
12:11 22:24
79:9,13 81:8
81:22,25 82:4
153:24 159:22
167:8 179:3,7
179:7,8,8
197:15 217:3
230:9
**words** 12:1,8,9
27:8 55:3
129:22 148:23
151:10 172:21
176:25 179:19
182:8 183:24
206:13 234:15
**wore** 179:20

**work** 6:18 14:6
14:9,21 16:24
20:8 21:3,4
25:23 26:8,12
26:14 27:3,8
27:12 29:6,6
29:10,19,25
30:5 31:1 34:1
35:20 36:4,22
37:10,13,20,20
37:24 38:14
39:24 40:2
47:13 69:11
87:23 92:18
93:4 97:13
101:19 102:8
106:15 108:16
111:3 112:8,22
112:24 113:2
113:18 122:4
128:4 130:16
133:15 136:2,3
136:4,12
138:10 139:19
141:15,22,25
142:12 144:21
145:1,23 146:8
147:2,8,24
148:4,7,9
150:8 151:1,13
151:16 152:17
153:25 158:3
158:11,12,13
159:5 201:20
203:1 210:9
221:4,15
223:16 232:7
233:19
**workable** 27:10
**worked** 21:15
26:13 31:19
38:17 39:16
40:23 41:10
53:13,15 54:4

88:2 90:25
91:3 112:19
113:14,15
134:3,21 135:8
135:13 137:20
144:1,18,21,22
144:25 145:14
147:19,25
149:13 152:23
166:20
**worker** 86:13
123:11 220:3
223:19 224:23
**working** 15:7
19:8 27:25
37:8,10,15
39:6,22 40:13
111:5 132:25
136:13 139:3
143:13,15
164:3 187:25
**workplace** 111:1
**works** 85:12
95:6,9,12,14
136:14 137:5
173:3
**worksheet**
196:24
**world** 53:8
75:11 107:4
109:2 111:6
147:22
**worried** 84:24
**worries** 23:20
81:17
**wouldn't** 16:13
23:2 34:13
60:22 68:9
90:1 93:11
133:11 181:16
192:5 206:12
217:13
**wrists** 232:20
**write** 23:3 25:13

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

Page 281

50:1 148:23
157:5 213:23
233:16
**writing** 89:6
100:11 158:9
225:20
**written** 22:9
25:15 46:8
89:19 100:3
102:1 144:7
148:14 155:17
155:19 157:24
159:1 173:23
180:20
**wrong** 57:7
120:3,12
166:17,20
201:10
**wrote** 21:11 40:6
50:5 67:19
88:14,19 89:20
166:25 186:4
200:23 211:21
211:24

**X**
**X** 236:16 238:24

**Y**
**yapping** 195:16
195:19
**yards** 83:24
**yeah** 7:23 13:7
13:14,14 15:18
15:22 18:3
24:7 27:22
30:5 31:14
39:15,18,21
40:19 41:1,20
41:25 42:3,23
46:23 54:24
58:9 61:12
62:17 63:20
64:12,24 67:1
67:11 69:21

71:25 76:17
79:4,17,21
83:4,18 84:3
84:24 85:3
86:6 89:9,12
90:16 92:21
95:22 96:7,8
98:22 102:24
103:9,15 104:2
111:19 113:3
115:1 123:6
125:17 128:14
129:12 130:25
131:11,21
132:20,25
133:18,24,24
137:14 140:14
143:22 144:19
145:16,22
147:4,15
150:15 152:1
152:10 155:2
155:11,14,14
174:19 185:22
188:15 189:1
190:4,10,13
193:7 195:9
198:9,15
203:20 209:6
211:18 213:2
214:17 218:10
219:1,8,10
220:8 224:9
228:1
**year** 30:20 37:17
113:13 121:18
127:20 128:11
130:5,13
131:10 132:9
132:14,18
136:15 140:4,9
140:17 144:1,6
146:11 155:7
**years** 22:10

24:17 31:19,20
32:20 34:6
37:12 38:17
40:2 46:10
87:22 91:1,9
93:13 96:12
97:5 100:12
124:2 128:5
131:7,7 132:25
133:4,22
134:11 136:20
137:12,23
138:10 143:7
143:23 144:6
144:11,14
191:18 205:3
**yellow** 14:25
**Yep** 38:13
128:16
**yes-no** 123:12
**York** 2:10,11,11
35:21 142:6
**you-all** 45:6
**young** 146:15
**YouTube**
193:18

**Z**
**Z129.1** 56:3
**Z400** 56:3
**Z88** 55:24
**Z9.1** 55:24
**zip** 43:9 82:23
82:25

**0**
**0178** 4:9
**08002** 2:6
**099111** 238:16

**1**
**1** 3:11 10:19,20
11:5 23:1
31:12,13,15
43:4 45:2

55:15 57:10
59:9,11 67:9
68:11 73:20
82:21 83:16
90:13 112:1
113:22 144:6
186:12,13
189:19 224:21
**1-4** 81:1
**1/26/18** 3:13
**1:06** 126:5
**10** 3:11 4:4
19:17 21:15,16
37:21 39:24
52:16 56:24
59:11,17,18
82:21 87:22
88:7 90:1
114:5,8 115:22
115:25 133:22
135:24 136:20
137:11 143:23
145:5,12 148:4
155:17,19
183:6,9,23
184:10,21
207:3 228:24
231:24
**100** 62:6 64:21
73:11 132:17
135:21 138:10
140:17 184:21
207:20 230:10
**10003** 2:11
**101** 143:4
**102** 3:23
**107** 123:17,18
**108** 123:22,24
**11** 4:7 59:22
70:8 89:22
90:5 118:18,21
119:7 139:22
140:18
**11:40** 73:20,22

**11:51** 73:22 74:1
**113** 164:14
**115** 4:4
**118** 4:7
**12** 3:12 4:8 19:7
59:22 61:1
90:10 121:1,4
144:7 163:17
163:20,21
**121** 4:8
**12156** 240:2
**13** 4:10 19:9
26:23 59:11,22
91:13 174:7,10
174:11 177:25
187:9 195:24
196:1 198:12
198:14 199:1
199:23 203:13
207:6 215:25
**130** 164:17
**1307** 126:3
**138** 222:15
**139** 222:1,4
**14** 4:12 14:16
19:9 26:23
60:10,14 63:2
84:21 89:15
92:5 197:11
204:25 207:11
219:23 220:1
228:22
**140** 225:18,18
**1420** 126:20
**15** 3:13 14:16
26:8 37:21
39:24 87:11
89:15 92:14
129:3 197:11
**15,000** 45:23
**150** 65:15 66:12
**1546** 188:2
**1557** 188:8
**15th** 238:12

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

239:20
**16** 93:2
**162.8(d)** 124:10
**17** 57:14 60:14
  95:17 133:25
  134:3 135:2,4
**170** 4:12 86:13
  220:4 223:12
  225:3,4 226:1
**170.240** 220:25
  221:9,10
**1701** 7:16 237:6
**1739-95** 52:9
**174** 4:10
**18** 3:15 57:15
  60:16 96:2
  113:5 114:7
  119:18 121:20
  133:23 134:3
  134:17 135:3,4
  191:24,25
  193:17
**18-inch** 215:10
**1822-CC0515**
  1:5 5:6
**185** 226:9,10,11
**1855** 47:7
**186** 226:7
**19** 113:15
  119:19 121:20
  135:4 174:8
**19.3** 186:20
**1900** 33:19
**1910.132** 224:21
**1920** 24:18
**1920s** 60:19
**1929** 61:16
**195** 67:16
**1953** 47:5
**196** 66:24 67:2
**197** 67:22,24
  68:2
**197-41** 67:24
  68:4

**197-A** 68:4
**197-B** 68:4
**197-C** 68:4
**1970** 33:15
**1975** 124:8
**1979** 136:16
**1979.95** 50:8
**198** 69:2
**198-01** 69:3
**1982** 128:12
  131:9
**1983** 122:5
**1987** 128:16
**199** 69:8
**1990s** 50:4
**1995** 50:8
**1996** 35:10
**1997** 50:9 129:3
**1st** 42:9

_____
**2**
**2** 3:12 12:17,19
  13:21 16:10
  23:1 31:11
  40:23 43:24
  44:8,24 45:17
  57:10 73:25
  79:6,8,16
  112:2 126:3
  140:4 162:12
  173:1 183:19
  189:6,12,19
  191:21 221:2
**2-** 21:14
**2.0** 188:18
**2:18** 126:5
**20** 19:17 22:10
  24:17 97:3
  100:12 205:3
  215:9 240:19
**200** 1:17 5:12
  132:17 140:9
**2000** 144:15
**2001** 55:22

143:22
**2006** 41:3
**2008** 63:6
**2010** 222:16,23
**2011** 38:21
  200:24
**2013** 35:11 39:3
  90:13
**2014** 35:24
**2015** 19:6,8
  26:19
**2016** 62:9
**2017** 19:8 26:6
  54:10
**2018** 16:2 26:2,4
  27:17 54:14
  55:1,1 112:9
  120:2
**2019** 1:14 5:3
  20:10 42:9
  45:2 55:15,22
  113:23 118:15
  119:8,10 121:1
  151:23 238:10
  238:12 239:20
**202** 69:20
**2021** 238:16
**203** 69:23
**205** 69:23
**207** 70:3
**208** 70:4,5,5
**209** 70:4
**21** 89:15 98:1
  143:7
**210** 2:6 70:4
**212** 2:12 70:5
**215** 70:8,9
**219** 4:12
**22** 66:18 68:2
  100:13 220:23
**220** 2:5
**23** 18:22,24
  66:18 102:4
**230** 162:2 164:1

**231** 161:25
**238** 3:5
**239** 3:6 161:22
**240(d)** 225:6
**25** 68:25 69:2
  229:20,21
  231:22 232:16
**250** 36:11
**25th** 113:12
**26** 16:2 69:8
**27** 20:20,23
  70:15 81:5
**276** 70:23 71:3,4
**277** 70:23 71:2,4
**278** 71:2
**28** 20:12,15,16
  20:21,23 63:2
  70:18 81:11
**29** 20:4 51:18
  70:20
**29-some** 21:3
**293** 183:18
**296** 84:2,4
**2nd** 2:18

_____
**3**
**3** 3:13 15:14,15
  23:1 26:1 42:5
  57:10 76:13
  126:19 134:8
  144:6 183:20
  188:2 189:19
**3,000** 21:15
**3:46** 188:4
**3:57** 188:4
**30** 22:11 60:16
  70:22
**300** 169:1
**304** 71:10
**305** 2:19
**30s** 60:19
**30th** 19:6
**31** 71:7
**311** 71:10

**312** 71:11
**313** 71:11
**314** 71:11
**315** 71:12
**316** 71:14
**317** 71:16
**318** 71:19
**322** 71:19
**323** 71:21
**325-2** 71:21
**33** 72:10
**33060** 7:18
**33131** 2:19
**333** 2:18
**33309** 1:17
**34** 72:12
**342** 72:14
**347** 72:21
**347-6540** 2:19
**35** 74:6
**358** 73:2
**36** 74:5,8,11
**360** 73:5,11
**361** 73:7,8
**37** 60:11 74:15
**377** 74:8
**38** 61:10,17
**39** 61:10 74:24
  184:23
**393** 74:17
**396** 84:4
**3rd** 151:23

_____
**4**
**4** 3:15 18:8,11
  18:22 19:19
  20:9 22:1
  57:10 76:14
  79:15 80:12,16
  80:22 88:3
  96:8 134:9
  143:6 188:7
  189:19 227:1,2
  237:6

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 9, 2019

**4-29** 186:21
**4.4.4** 81:7
**4.4.5** 81:11
**4.5.8** 82:3
**4/2019** 4:9
**40** 31:19 46:10
  51:17 67:25
  68:11 86:13
  91:1,9 107:13
  110:20 138:10
  143:6 184:25
  220:4
**40-hour** 129:16
  130:4,10
**40-year** 46:12
**409** 74:17
**41** 3:17 76:1
**42** 76:4
**424** 74:21
**426** 74:20
**443** 163:15
**447** 75:7
**45** 3:19
**4500** 2:18
**457** 163:22
**459** 185:10
**46** 61:15,17
**460** 75:7
**461** 75:3,10,11
**462** 75:8
**469** 75:8
**47** 45:2 62:2
**475** 152:12
**48** 62:1,2,8,8
**49** 51:19
**491** 115:3

--- **5** ---
**5** 3:17 7:17
  37:23 41:15,18
  42:13 54:23
  59:14 76:19
  133:21 135:17
  147:23 169:17

169:24 171:4
183:7,7,9,9,23
183:23 184:11
184:21,21
186:18,19
189:19 227:2,2
230:10,13
**5,000** 21:14,17
**5:00** 228:24
  237:3
**5:01** 1:15 237:8
**50** 25:1 132:13
  132:13
**500** 86:25
  158:21
**500-page** 155:23
**50s** 33:23 60:6
**51** 61:20 62:1
**52** 61:22
**53** 62:15,17,18
  62:25
**54** 63:4,23
**55** 63:19,23
  88:17
**558-5500** 2:12
**56** 63:20 64:6,11
**57** 63:20 64:8,9
**58** 64:7,8,9,13,14
  64:17
**585** 183:12
  184:22
**59** 64:12,16,16

--- **6** ---
**6** 3:4,19 44:25
  45:4 54:23
  55:5,8 56:25
  59:15,17 74:4
  74:11 76:22
  111:11,19
  140:15 189:14
  189:19
**6(a)** 124:7,9
**6/13** 20:19

**6/25** 20:13
**6/26** 20:13
**6/4** 20:20
**60** 64:22 143:6
**60s** 31:18 47:25
**65** 64:19
**6750** 1:16 5:12
**69** 61:1

--- **7** ---
**7** 3:20 49:17
  77:21,23 78:1
  78:1,2,3,4,20
  82:9 83:17
  85:25 95:17
  103:12 123:19
  123:21 151:19
  151:21 152:3,8
  159:19 188:17
  189:19 198:23
**7-35** 80:24
**7-6** 222:25
  223:22
**7-7** 227:19 228:7
**7-8** 227:20 228:8
**7,000** 147:22
**7.1** 164:14
**7.1.3** 222:15
**7.5** 222:23
**7.82** 184:22
**7/25** 30:20
**700** 2:11
**70s** 53:20
**71** 127:23
**73** 81:16
**74** 82:3 182:21
  185:22
**75** 65:7,12,15,23
  66:13
**755-1115** 2:7
**77** 3:20 183:2
**78** 3:22 183:22
**79** 91:3 127:21
  136:16 145:4

185:23,25
**79.5** 186:20

--- **8** ---
**8** 3:22 78:14,15
  78:18,23 87:8
  112:17 133:23
  189:19,20
**8-year** 133:15
**80** 91:3 186:15
  186:21
**81** 169:20,21
**82** 136:18,23,24
**85** 37:22
**856** 2:7
**89** 136:24 137:8
  137:13

--- **9** ---
**9** 1:14 3:23 5:3
  52:15,16,18
  87:20 102:17
  102:19 103:3
  162:20 238:10
  238:16
**9:56** 1:15 5:3
**90s** 143:1 144:16
**95** 230:12
**96** 143:6,19
**98** 143:22
  144:15
**99** 137:13
  142:23 143:18
  143:22,22
  144:15
**9th** 26:2