**WILKINSON WALSH + ESKOVITZ LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonwalsh.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonwalsh.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel:    202-847-4030
Fax:    202-847-4005

**ARNOLD & PORTER KAYE SCHOLER**
Pamela Yates (CA Bar No. 137440)
(Pamela.Yates@arnoldporter.com)
777 South Figueroa St., 44th Floor
Los Angeles, CA 90017
Tel: 213-243-4178
Fax: 213-243-4199

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843
Fax: 202-682-1639

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel: 202-662-6000

*Attorneys for Defendant*
*MONSANTO COMPANY*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | ) MDL No. 2741 ) ) Case No. 3:16-md-02741-VC |
| *Dickey v. Monsanto Co.*, 3:16-cv-04102-VC | ) |
| *Domina v. Monsanto Co.*, 3:16-cv-05887-VC | ) **MONSANTO COMPANY'S NOTICE OF** |
| *Giglio v. Monsanto Co.*, 3:16-cv-05658-VC | ) **MOTION AND MOTION TO EXCLUDE** |
| *Harris v. Monsanto Co.*, 3:17-cv-03199-VC | ) **TESTIMONY OF DR. WILLIAM R.** ) **SAWYER ON *DAUBERT* GROUNDS** |
| *I. Hernandez v. Monsanto*, 3:16-cv-06025-VC | ) |
| *Janzen v. Monsanto Co.*, 3:19-cv-04103-VC | ) Hearing date: Jan. 29, 2020 |
| *Mendoza v. Monsanto Co.*, 3:19-cv-06046-VC | ) Time: |
| *Perkins v. Monsanto Co.*, 3:16-cv-06025-VC | ) |
| *Pollard v. Monsanto Co.*, 3:19-cv-04100-VC | ) |
| *Russo v. Monsanto Co.*, 3:16-cv-06024-VC | ) |
| *Sanders v. Monsanto Co.*, 3:16-cv-05752-VC | ) |
| *Tanner v. Monsanto Co.*, 3:19-cv-04099-VC | ) |

1   **TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

2   **PLEASE TAKE NOTICE THAT** beginning on January 29, 2020, in Courtroom 4 of the United

3   States District Court, Northern District of California, located at 450 Golden Gate Avenue, San

4   Francisco, CA 94102, or as ordered by the Court, Defendant Monsanto Company ("Monsanto") will

5   present its *Daubert* Motion to Exclude the Testimony of Dr. William R. Sawyer.  Monsanto seeks

6   an order excluding opinion of this witness under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,

7   509 U.S. 579 (1993).

8   DATED:  November 26, 2019

9                                           Respectfully submitted,

10                                          */s/ Brian L. Stekloff*

11                                          Brian L. Stekloff (*pro hac vice*)
                                            (bstekloff@wilkinsonwalsh.com)
12                                          Rakesh Kilaru (*pro hac vice*)
                                            (rkilaru@wilkinsonwalsh.com)
13                                          WILKINSON WALSH + ESKOVITZ LLP
                                            2001 M St. NW
14                                          10th Floor
                                            Washington, DC 20036
15                                          Tel:     202-847-4030
                                            Fax:    202-847-4005
16
17                                          Pamela Yates (CA Bar No. 137440)
                                            (Pamela.Yates@arnoldporter.com)
18                                          ARNOLD & PORTER KAYE SCHOLER
                                            777 South Figueroa St., 44th Floor
19                                          Los Angeles, CA 90017
                                            Tel: 213-243-4178
20                                          Fax: 213-243-4199
21
22                                          Eric G. Lasker (*pro hac vice*)
                                            (elasker@hollingsworthllp.com)
23                                          HOLLINGSWORTH LLP
                                            1350 I St. NW
24                                          Washington, DC 20005
                                            Tel: 202-898-5843
25                                          Fax: 202-682-1639
26
27                                          Michael X. Imbroscio (*pro hac vice*)
                                            (mimbroscio@cov.com)
28                                          COVINGTON & BURLING LLP

One City Center
850 10th St. NW
Washington, DC 20001
Tel: 202-662-6000

*Attorneys for Defendant*
*MONSANTO COMPANY*

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER ON *DAUBERT* GROUNDS

## **INTRODUCTION**

Several Wave 1 Plaintiffs have designated Dr. William Sawyer as an exposure expert to provide testimony regarding their alleged levels of exposure to various Roundup-branded herbicides ("Roundup").  Dr. Sawyer *also* seeks to offer opinions regarding general causation and specific causation.  For the reasons below, Dr. Sawyer's opinions do not meet the *Daubert* admissibility standards and should be excluded.[1]

*First*, Dr. Sawyer's general causation opinion should be excluded because it does not follow any valid or recognizable methodology.  Although his reports (both in these and prior cases) reference the three types of evidence that are used to evaluate causation—epidemiological, animal, and mechanistic—Dr. Sawyer did not actually evaluate these types of evidence in forming his general causation opinion. Instead, Dr. Sawyer conceded that he looked only at the "dose aspects of the epidemiology and whether or not the plaintiff fits in the dose brackets within the epidemiology" and that he did not consider any other aspects of the epidemiology or animal or cell studies for purposes of determining general causation. *See* Stekloff Decl., Ex. 1, Sawyer Deposition in *Giglio* ("Sawyer *Giglio* Dep.") (9/15/2019) at 58:5-16; 169:12-15.

*Second*, Dr. Sawyer likewise did not follow a valid methodology in reaching his so-called "specific causation" opinions.  In nine of the cases—*Dickey, Domina, Harris, I. Hernandez, Janzen, Mendoza, Pollard, Tanner,* and *Sanders*—Dr. Sawyer did not even attempt to calculate the Plaintiffs' exposure doses.  Instead, he relied exclusively on the alleged dose determinations of either Mr. Petty (in *Dickey, Domina, Janzen, Mendoza, Pollard, Tanner,* and *Sanders*) or Dr. Schiff (in *Harris* and *I. Hernandez*).  And in *Russo*, in which Dr. Sawyer did purport to conduct his own

---

[1] Dr. Sawyer was previously disclosed as an expert in this MDL in the *Hardeman, Stevick,* and *Gebeyehou* cases.  Monsanto moved to exclude his testimony in those cases.  *See* Monsanto Company's Notice of Motion and Motion to Exclude Testimony of Dr. William R. Sawyer on *Daubert* Grounds, ECF No. 2418 ("*Hardeman* Motion to Exclude").  Monsanto is mindful of the Court's directive to not re-litigate issues that have previously been decided.  However, because the Court did not rule on Monsanto's previous motion to exclude Dr. Sawyer, it files the instant motion. Monsanto incorporates by reference all arguments made in its prior briefing regarding Dr. Sawyer to the extent applicable.

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER ON *DAUBERT* GROUNDS

dose calculation, Dr. Sawyer admitted that his dose calculations do not support his opinions on specific causation.

Dr. Sawyer then compared the doses allegedly sustained by Plaintiffs to certain exposure thresholds included in cherry-picked epidemiology studies, notwithstanding his lack of training in epidemiology and his admission that he did not actually analyze the epidemiological details of any of the studies from which he plucks individual, exposure-related data points. In fact, he *defers* to others on any analysis, interpretation, and meaning of the epidemiology studies on which he purports to rely. *See* Stekloff Decl., Ex. 1, Sawyer *Giglio* Dep. at 58:8-10 ("I'm not going to handle the epidemiological aspects. I defer that to the medical epidemiologists in this matter."); 64:2-11 (agreeing that he is "not here to talk about general epidemiology opinions" and that he defers the "significance" of certain epidemiology studies to the epidemiologists); Stekloff Decl., Ex. 2 Sawyer Deposition in *Janzen* ("Sawyer *Janzen* Dep.") at 21:13-20. And he did not even attempt to consider—much less reliably analyze and rule out—many other possible causes of Plaintiffs' NHL. Stekloff Decl. Ex. 3, Expert Report of Dr. William R. Sawyer in *Giglio* (August 20, 2019) ("Sawyer *Giglio* Rpt.")[2], at 6; Ex. 1, Sawyer *Giglio* Dep., at 55:18-56:10; 56:17-57:15; 127:25-128:4. Dr. Sawyer's conclusion that Roundup was a "substantial contributing factor to" Plaintiffs' development of NHL is therefore based on nothing more than impermissible *ipse dixit* and is not helpful to the jury.

***Third***, Dr. Sawyer's opinions are based on data that is universally considered to be unreliable. Specifically, Dr. Sawyer's conclusion that the George study demonstrates Roundup is a cancer "promoter" is inconsistent with the conclusions of all scientific panels and regulators that have reviewed it, including both the EPA and IARC. Indeed, IARC concluded that the George study is "inadequate" for the evaluation of glyphosate.

---

[2] Dr. Sawyer submitted largely the same expert report in each of the Wave 1 cases in which he was designated, with the exception of certain plaintiff-specific information included in each report. For clarity and efficiency, unless otherwise noted, Monsanto's citations throughout this brief are to Dr. Sawyer's Report in *Giglio*.

*Fourth*, Dr. Sawyer's opinion that trace chemicals in Roundup caused or contributed to Plaintiffs' cancer is based merely on assertions that those chemicals (at much higher doses) have been associated with cancer.  But there is no scientific evidence of causation linking them to NHL at doses remotely comparable to those at issue here, and Dr. Sawyer does not even calculate the doses of these chemicals to which Plaintiffs were allegedly exposed.  Nor is there any scientific evidence suggesting that exposure to Roundup is a cancer risk because of these trace chemicals.

*Fifth*, Dr. Sawyer seeks to offer opinions regarding Monsanto company documents and regulatory duties, which are clearly beyond his area of expertise and beyond the realm of proper expert testimony.

## BACKGROUND

Plaintiffs have offered Dr. Sawyer, a toxicologist by training, as an expert witness on, among other topics, "the mechanism of absorption of glyphosate-based formulations through the skin and other exposure pathways," "toxicology and animal studies on dermal absorption," "human exposure studies and data relating to glyphosate-based formulations," and "Plaintiff's total exposure to Roundup, including the comparability of Plaintiff's exposure with the exposure data from applicators in studies on glyphosate-based formulations."  *See, e.g.,* Stekloff Decl. Ex. 4, Plaintiff's R. 26 Expert Disclosures in *Giglio*, at 7.  Dr. Sawyer purports to offer opinions on both general and specific causation in eleven Wave 1 cases—*Dickey, Domina, Giglio, Harris, I. Hernandez, Janzen, Mendoza, Pollard, Russo, Tanner*, and *Sanders*.  In *Perkins*, Dr. Sawyer purports to offer only general causation opinions.  Dr. Sawyer also purports to offer an unsupported opinion that Roundup is a cancer promoter, based on the George study, and that various trace chemicals in Roundup contributed to Plaintiffs' development of NHL.  Finally, Dr. Sawyer purports to offer opinions regarding various EPA regulations and Monsanto's corporate state of mind.

General Causation

There are three types of evidence that are used to evaluate whether an agent is capable of causing a particular outcome at human-relevant exposure levels: epidemiological, animal, and mechanistic evidence.  *See In re: Roundup Prods. Liab. Litig.*, 2018 WL 3368534, at *7–17 (N.D.

Cal. July 10, 2018). Epidemiology, which studies the incidence and etiology of disease in human populations, is "central to the general causation inquiry, and where such evidence exists, it must be addressed." *Id.* at 7. Dr. Sawyer, however, has conceded repeatedly that he has not evaluated the merits or "epidemiological aspects" of any of the epidemiology studies, and instead is "deferring" to other experts on that subject. Stekloff Decl. Ex. 1, Sawyer *Giglio* Dep. at 58:8-16; 64:2-11.[3] The general causation portions of Dr. Sawyer's reports instead discuss glyphosate's history; the ingredients in various Roundup formulations; the routes of potential exposure to glyphosate; and various factors purportedly affecting dermal absorption. *See* Stekloff Decl. Ex. 3, Sawyer *Giglio* Rpt. at 59-154. In other words, Dr. Sawyer's "general causation" opinion is just a discussion of the properties of Roundup, not an analysis of whether Roundup generally can cause NHL in humans.

Specific Causation

Dr. Sawyer's reports in eleven Wave 1 cases (*Dickey, Domina, Giglio, Harris, I. Hernandez, Janzen, Mendoza, Pollard, Russo, Tanner*, and *Sanders*) also purport to address specific causation—whether Roundup caused Plaintiffs' cancer specifically—but do so only by purporting to "determine whether the dose in 'exposure days' sustained by [Plaintiffs] was reasonably similar to (and/or in excess of) doses sustained by other glyphosate applicators as documented in the generally-accepted, peer-reviewed glyphosate applicator studies." Stekloff Decl. Ex. 3, Sawyer *Giglio* Rpt. at 159. For most of these Plaintiffs (Dickey, Domina, Janzen, Mendoza, Pollard, Tanner, Sanders, Harris, and I. Hernandez), Dr. Sawyer did not even attempt to calculate the Plaintiffs' alleged doses. Instead, in those cases, Dr. Sawyer relied exclusively on the alleged dose

---

[3] This admission of deference is typical of Dr. Sawyer whenever he has been offered as an expert witness in the Roundup litigation. *See, e.g.*, Stekloff Decl. Ex. 5, Expert Report of Dr. William R. Sawyer in *Pilliod v. Monsanto Co.*, No. RG-17-862702 (Cal. Sup. Ct. Alameda Cnty.) (Jan. 14, 2019) at 117 ("Sawyer *Pilliod* Rpt.") ("I have deferred epidemiological causation opinions to other experts retained in the current matter."); Ex. 6, Tr. of the Dep. of Dr. William R. Sawyer in *Pilliod* ("Sawyer *Pilliod* Dep.") (Feb. 6, 2019) at 40:5-8; 40:18-22; 42:5-12; 77:15-18; 80:3-4; 163:1-2; 176:7-9; 194:21; 203:1-5; 207:2-6; 212:10-12; 213:18-20; 230:3-5; 232:2-8; 233:23-25; 234:24-25; 236:10-21; 252:16-253:10; 260:4-18; Ex. 7, Tr. of the Dep. of Dr. William R. Sawyer in *Stevick v. Monsanto Co.*, No. 3:16-cv-02341 (N.D. Cal. Dec. 20, 2018) ("Sawyer *Stevick* Dep.") at 240:18-23; 241:24-242:15; Ex. 8, Tr. of the Dep. of Dr. William R. Sawyer in *Winston, et al. v. Monsanto Co.*, No. 1822-CC00515 (Mo. Cir. Ct. City of St. Louis) ("Sawyer *Winston* Dep.") at 179:17-22; 190:10-191:15; 197:13-202:20; 218:6-15; 234:11-239:24; 252:4-20.

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER ON *DAUBERT* GROUNDS

1    determinations of either Mr. Petty or Dr. Schiff.  Dr. Sawyer's analysis then consisted of comparing

2    the total number of days on which Plaintiffs allegedly used Roundup to various "exposure day"

3    levels mentioned in certain epidemiological studies.  *Id*. at 41-49.

4          Importantly, Dr. Sawyer's "specific causation" opinion does not attempt to account for

5    (much less rule out) other possible causes of Plaintiffs' NHL.  In other words, unlike other specific

6    causation experts in the litigation, Dr. Sawyer, here, does not even purport to conduct a differential

7    diagnosis.

8          <u>Promotion</u>

9          The George study is a small mouse study in which various combinations of (1) a known

10    carcinogen, (2) a known tumor promotor, (3) Roundup, (4) 2- dimethylbenz[a]anthracene

11    ("DMBA"), and (5) 7, 12-O-tetradecanoyl-phorbol-13-acetate ("TPA") were painted on the skins of

12    the subject animals.  Stekloff Decl. Ex. 9, George, J., et al., *Studies on glyphosate-induced*

13    *carcinogenicity in mouse skin: A proteomic approach*, 73 Journal of Proteomics 951 (2010)

14    ("George 2010") at 953.  While it purports to find that Roundup facilitated the growth of cancer, *id.*,

15    due to multiple flaws in the study design—including that it omitted histopathology (the standard

16    scientific confirmation of cancer)—the George study has been uniformly rejected as evidence of

17    promotion (or carcinogenicity).  *See*, *e.g.*, Stekloff Decl. Ex. 10, EPA Office of Pesticide Programs,

18    *Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* (Dec. 12, 2017) at 70; Ex.

19    11, IARC, *Glyphosate in Some Organophosphate Insecticides and Herbicides: Diazinon,*

20    *Glyphosate, Malathion, Parathion, and Tetrachlorvinphos, Monograph Vol. 112 on the Evaluation*

21    *of Carcinogenic Risks to Humans* (2015) at 32 ("The Working Group concluded this was an

22    inadequate study for the evaluation of glyphosate.").  Monsanto knows of no publication relying on

23    the George study which states Roundup may promote tumors or cancer.

24          Notwithstanding this uniform disapproval of the George study, Dr. Sawyer relies on the

25    study to support his conclusion that Plaintiffs' episodic exposures to Roundup were a "substantial

26    contributing factor to" their "promotion of non-Hodgkin's lymphoma."  Stekloff Decl. Ex. 3,

27    Sawyer *Giglio* Rpt., at 160.  He states that in the George study, "glyphosate was demonstrated to

28

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER ON *DAUBERT* GROUNDS

1  have strong tumor-promoting activity." *Id.* at 68. He further states that the results of the study

2  "suggested that glyphosate has tumor-promoting potential in skin carcinogenesis." *Id.* Critically,

3  however, he does all of this without mentioning that the George study has been rejected by every

4  scientific agency to review it.

5        Trace Chemicals

6        Roundup, like all herbicides, contains certain trace chemicals as byproducts of the

7  manufacturing process. Dr. Sawyer seeks to testify that various trace chemicals in Roundup are

8  carcinogens, and thus caused or contributed to Plaintiffs' NHL. Dr. Sawyer provides no science

9  linking any of the trace chemicals to NHL at any dose remotely approximating the minuscule

10  amounts to which Plaintiffs could have been exposed, and none attributing NHL in people exposed

11  to Roundup to the presence of those trace chemicals. Dr. Sawyer never even calculates a dose of

12  these trace chemicals to which Plaintiffs allegedly were exposed.

13        EPA Regulations and Corporate State of Mind

14        Finally, Dr. Sawyer seeks to offer improper opinion testimony regarding the relevant EPA

15  regulations and Monsanto's corporate state of mind. Dr. Sawyer is unqualified to discuss these

16  topics, which are plainly outside the scope of his expertise.

17                    **LEGAL STANDARD**

18        Under *Daubert* and Federal Rule of Evidence 702, an expert must be qualified in the

19  specific subject area in which he seeks to offer opinions, and his proffered testimony must be both

20  relevant and reliable. *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579,

21  589 (1993). *Daubert* created "exacting standards of reliability," *Weisgram v. Marley Co.*, 528 U.S.

22  440, 455 (2000), which require far "more than subjective belief or unsupported speculation,"

23  *Daubert*, 509 U.S. at 590. *Daubert's* objective "is to make certain that an expert . . . employs in the

24  court room the same level of intellectual rigor that characterizes the practice of an expert in the

25  relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). Thus, "in

26  determining whether proposed expert testimony amounts to good science, [the court] may not

27  ignore the fact that a scientist's normal workplace is the lab or the field, not the courtroom or the

28

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER ON *DAUBERT* GROUNDS

lawyer's office." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (*Daubert II*).

An expert's purported expertise, of course, also must match the subject matter about which he is being proffered to testify.  The fact that Dr. Sawyer may be qualified to give an opinion about a person's level of exposure does not render him qualified to opine about general or specific causation, whether Roundup is a cancer promotor, whether trace chemicals in Roundup can cause NHL, or the relevant EPA regulations and Monsanto's regulatory duties.  *See*, *e.g.*, *White v. Ford Motor Co.*, 312 F.3d 998, 1008-09 (9th Cir. 2002) ("A layman, which is what an expert witness is when testifying outside his area of expertise, ought not to be anointed with ersatz authority as a court-approved expert witness for what is essentially a lay opinion."); *Jenkins v. Arkansas Power & Light Co.*, 140 F.3d 1161, 1165 (8th Cir. 1998) (affirming district court's exclusion of testimony where expert lacked specialized knowledge about specific area in which he offered opinions).  When an expert's field of expertise is not related to the subject at issue, such testimony will not aid the jury and is inadmissible.  *See, e.g., Berry v. Armstrong Rubber Co.*, 989 F.2d 822, 828 (5th Cir. 1993) (affirming exclusion of experts who "stepped outside of their areas of expertise" into an area in which they had no training); *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty.").  And an opinion like Dr. Sawyer's on the George study— which flies in the face of all scientific analysis of that study—must be rejected as not scientifically reliable.  *See*, *e.g.*, *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 862 (9th Cir. 2014) (affirming district court's exclusion of expert after finding expert's testimony to be "inherently unreliable and unsupported by the facts."); *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003) ("Under *Daubert*, any step that renders the analysis unreliable . . . renders the expert's testimony inadmissible.") (internal quotations omitted).

## **ARGUMENT**

### I.      **The Court Should Exclude Dr. Sawyer's General Causation Opinions.**

Dr. Sawyer's general causation opinions are inadmissible because he did not follow any

valid methodology to reach them.  As an initial matter, courts have repeatedly held that an expert may not testify on matters outside his specific subject matter of expertise, *Apple, Inc. v. Samsung Electronics Co., Ltd.*, 2013 WL 5955666, at \*2 (N.D. Cal. Nov. 6, 2013) ("Under Federal Rule of Evidence 702, experts may not make expert conclusions about areas outside their expertise.").[4]  In the context of toxicologists specifically, courts have noted that although "a toxicologist may testify that exposure to a chemical caused a person's symptoms and injuries," there is no "blanket rule that toxicologists are qualified to render an opinion on causation."  *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006).  Dr. Sawyer's reports in these cases do not specify *any* methodology for reaching a general causation opinion.  Moreover, to the extent Dr. Sawyer attempts to apply the Bradford Hill criteria (a method for assessing causation)—which he has purported to apply in other Roundup cases[5]—he has not reliably applied that methodology.

The Bradford Hill criteria can be applied only *after* epidemiology data demonstrates an association.  *See* Stekloff Decl. Ex. 12, Reference Manual on Scientific Evidence at 598–99 ("We emphasize that these guidelines are employed only *after* a study finds an association to determine whether that association reflects a true causal relationship."); *see also* Stekloff Decl. Ex. 13, A. Bradford Hill, *The Environment and Disease: Association or Causation?*, 58 Proc. R. Soc. Med. 295, 295 (1965).  Critically, Dr. Sawyer has admitted that he has not evaluated the epidemiological studies for purposes of determining causation.  *See, e.g.,* Stekloff Decl. Ex. 1, Sawyer *Giglio* Dep. at 58:11-16 (admitting that he has only looked at "the dose aspects of the epidemiology and whether or not the plaintiff fits into the dose brackets within the epidemiology"); *see also* Stekloff Decl. Ex. 8, Sawyer *Winston* Dep. at 252:9-20 (admitting that he is "not the one who is evaluating the body of [epidemiology] literature and weighing each study for its merits and determining whether or not

---

[4] *See also White v. Ford Motor Co.*, 312 F. 3d 998, 1008-09 (9th Cir. 2002) ("A layman, which is what an expert witness is when testifying outside his area of expertise, ought not to be anointed with ersatz authority as a court-approved expert witness for what is essentially a lay opinion.").

[5] *See, e.g.*, Stekloff Decl. Ex. 14, Tr. of the Dep. of Dr. William R. Sawyer in *Johnson v. Monsanto Co.,* No. CGC-16-550128 (Cal. Sup. Ct. S.F. Cnty. Feb. 26, 2018) ("Sawyer *Johnson* Dep.") at 139:2-6, 145:12-15 (testifying that he uses the Bradford Hill criteria in forming causation opinions).

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER ON *DAUBERT* GROUNDS

glyphosate is a carcinogen."). Rather, he defers that analysis and evaluation to other experts in these cases. Stekloff Decl. Ex. 1, Sawyer *Giglio* Dep. at 58:8-10 ("I'm not going to handle the epidemiological aspects. I defer that to the medical epidemiologists in this matter."); 64:2-11 (agreeing that he is "not here to talk about general epidemiology opinions" and that he defers the "significance" of certain epidemiology studies to the epidemiologists). Because Dr. Sawyer has not analyzed the epidemiology evidence for purposes of determining causation, he cannot properly reach any general causation opinion.

Nor can Dr. Sawyer testify about animal or mechanism studies without explaining how such evidence can be properly extrapolated to humans. *See, e.g.*, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 145 (1997) (excluding animal data where expert failed to adequately extrapolate to humans).[6] Here, although Dr. Sawyer describes certain genotoxicity studies in his reports, he admits he did not analyze them and offers no explanation for how the results of those studies can be extrapolated to reach a conclusion that Roundup can cause NHL in humans. Accordingly, any general causation opinion that Dr. Sawyer may attempt to offer would be based entirely on his say-so, and should be excluded.[7]

---

[6] *See also In re Lockheed Litig. Cases*, 23 Cal. Rptr. 3d 762, 780 (2005), *rev. dismissed by* 83 Cal. Rptr. 3d 478 (ruling animal data legally insufficient where expert did not account for dosage or species extrapolation); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1314 (11th Cir. 1999) (plaintiff "failed to adequately establish the link between the animal, retinal, and anti-collagen studies and Allison's complaints of disease"); *Richardson v. Richardson-Merrell, Inc.*, 857 F.2d 823, 830 (D.C. Cir. 1988) (animal studies of "scant utility in drawing conclusions about whether a substance will cause birth defects in humans"); *Soldo v. Sandoz Pharm. Corp.*, 244 F. Supp. 2d 434, 446 (W.D. Pa. 2003) ("This Court observes that studies of laboratory animals are routinely excluded as irrelevant and unreliable when proffered as a basis for medical causation testimony."); *In re Accutane Prod. Liab. Litig.*, 511 F. Supp. 2d 1288, 1294-95 (M.D. Fla. 2007) ("The problem with this approach is also extrapolation—whether one can generalize the findings from the artificial setting of tissues in laboratories to whole human beings.").

[7] Dr. Sawyer also claims that his general causation opinion includes an opinion on the "latency" of NHL. Stekloff Decl. Ex. 3, Sawyer *Giglio* Rpt. at 154-55. His "latency" opinion consists of nothing more than presenting a chart that merely lists latency periods from certain epidemiology studies (which, as noted above, he concedes he has not analyzed). *See id.* Dr. Sawyer's extraction of these latency estimates without further analysis is not a proper expert opinion, would not be helpful to the jury, and should be excluded.

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER ON *DAUBERT* GROUNDS

## II.   The Court Should Exclude Dr. Sawyer's Specific Causation Opinions.

Dr. Sawyer likewise did not use any reliable methodology to reach his specific causation opinions.  Dr. Sawyer did not perform a differential diagnosis in these cases. Nevertheless, he seeks to opine that Roundup was "a substantial contributing factor to" Plaintiffs' development of NHL. *E.g.,* Stekloff Decl. Ex. 3, Sawyer *Giglio* Rpt. at 160.  That opinion should be excluded because Dr. Sawyer has not followed any valid methodology.  *See, e.g.*, *Marmo*, 457 F.3d at 758 (affirming district court's exclusion of toxicologist where toxicologist "interviewed [plaintiff] but did not examine her and did not inquire about other toxic exposures . . . [and] did not exclude confounding factors, which leaves open the possibility of competing causes of the disease and raises questions about the competency of expert testimony.") (internal quotation omitted).

Dr. Sawyer apparently concludes that Roundup can be considered a potential cause for Plaintiffs' NHL based solely on exposure-related data extracted from epidemiology studies which, as explained above, he has not evaluated for purposes of determining causation.  And there is nothing "specific" about such a causation analysis—it would deem Roundup to be a "substantial contributing factor" for *any individual anywhere in the world* who has been exposed to his hypothetical threshold amount of glyphosate.  As if to confirm the point, Dr. Sawyer did not attempt to analyze many of Plaintiffs' other potential risk factors in either his reports or at deposition, claiming instead that he "deferred" such analysis to other experts.  Stekloff Decl. Ex. 3, Sawyer *Giglio* Rpt., at 6; Stekloff Decl. Ex. 1, Sawyer *Giglio* Dep., at 55:18-58:10; Stekloff Decl. Ex. 15, Sawyer Deposition in *I. Hernandez* ("Sawyer *I. Hernandez* Dep.") at 28:11-15.  Dr. Sawyer's results-driven process does not resemble any sort of valid specific causation analysis, and should be excluded under *Daubert* and its progeny.

### A.   Dr. Sawyer's Opinion that Roundup Is a "Substantial Contributing Factor" to Plaintiffs' NHL Is Not the Proper Subject of Toxicology Expert Testimony.

The purported foundation for Dr. Sawyer's "specific causation" opinion is his comparison of the number of days Plaintiffs used Roundup (calculated by some other expert in most of the Wave 1 cases) to thresholds from six epidemiology studies, which, according to him, demonstrate that a

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER ON *DAUBERT* GROUNDS

person with Plaintiffs' exposure, is at increased risk of developing NHL. Stekloff Decl. Ex. 3, Sawyer *Giglio* Rpt. at 7, 41-49; 159. Dr. Sawyer should be prohibited from offering his "specific causation" opinions for multiple reasons.

> 1. Dr. Sawyer's Specific Causation Opinions in *Dickey, Domina, Janzen, Mendoza, Pollard, Tanner, Sanders, Harris*, and *I. Hernandez* Are Not Helpful Because He Did Not Calculate Plaintiffs' Alleged Exposure or Absorption Doses and Instead Relied on Other Experts' Flawed Calculations.

Although disclosed as an exposure and toxicology expert, Dr. Sawyer has abandoned any attempt to calculate Plaintiffs' alleged exposure or absorption doses in a majority of the Wave 1 cases, including *Dickey, Domina, Janzen, Mendoza, Pollard, Tanner, Sanders, Harris,* and *I. Hernandez*. Dr. Sawyer instead relies on exposure dose determinations made by Mr. Petty[8] (in *Dickey, Domina, Janzen, Mendoza, Pollard, Tanner*, and *Sanders*) or Dr. Schiff (in *Harris* and *I. Hernandez*). *See, e.g.,* Stekloff Decl. Ex. 16, Sawyer Deposition in *Dickey* ("Sawyer *Dickey* Dep.") at 24:13-25:16; 51:4-52:2; Stekloff Decl. Ex. 17, Sawyer Deposition in *Domina* ("Sawyer *Domina* Dep.") at 16:24-19:14; 20:15-21:3; Stekloff Decl. Ex. 18, Sawyer Deposition in *Sanders* ("Sawyer *Sanders* Dep.") at 15:2-10; 27:11-19.[9] Neither Mr. Petty nor Dr. Schiff calculated the absorption doses of any of these Plaintiffs; rather Mr. Petty's and Dr. Schiff's analyses were limited solely to determining the number of "exposure hours" each Plaintiff allegedly experienced. *See, e.g.,* Stekloff Decl. Ex. 16, Sawyer *Dickey* Dep. at 24:13-25:16. Dr. Sawyer then took those "exposure hour" calculations and divided each by eight to reflect eight-hour "exposure days," which, as discussed in more detail below, he then compared to several hand-selected epidemiology studies to support his opinions on specific causation.

---

[8] As articulated in more detail in Monsanto's separate motion to exclude the opinions of Mr. Petty, Mr. Petty's opinions on Plaintiffs' alleged exposure should be excluded. Because Dr. Sawyer's specific causation opinions in *Dickey, Domina, Janzen, Mendoza, Pollard, Tanner,* and *Sanders* depend on Mr. Petty's inadmissible exposure opinions, Dr. Sawyer's specific causation opinions are likewise inadmissible.

[9] *See also* Stekloff Decl. Ex. 2, Sawyer *Janzen* Dep. at 15:20-16:2; 28:7-17; 36:4-11; 63:2-22; Stekloff Decl. Ex. 19, Sawyer Deposition in *Pollard* ("Sawyer *Pollard* Dep.") at 24:11-16; 26:10-13; Stekloff Decl. Ex. 20, Sawyer Deposition in *Mendoza* ("Sawyer *Mendoza* Dep.") at 12:3-7; 28:17-29:1; Stekloff Decl. Ex. 21, Sawyer Deposition in *Tanner* ("Sawyer *Tanner* Dep.") at 35:14-21.

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER ON *DAUBERT* GROUNDS

To start, because Dr. Sawyer did not calculate any actual absorption or exposure doses for any of these Plaintiffs and, instead, simply divided by eight the exposure dose determinations of other experts—a calculation the individual members of any jury could accomplish with relative ease—Dr. Sawyer's opinions on dose are not the proper subject of expert testimony and are entirely unhelpful to the jury. *Chesebrough-Pond's, Inc. v. Faberge, Inc.*, 666 F.2d 393, 398 (9th Cir. 1982) (noting that it would be "well within the discretion of the trial judge to exclude" expert opinions that would not be "of any real assistance to the trier of fact."). Moreover, exposure and absorption are not equivalent concepts. As Dr. Sawyer has admitted, Roundup exposure can only be harmful, even under his flawed theory, if it is absorbed into the body. *See* Stekloff Decl. Ex. 17, Sawyer *Domina* Dep. at 34:24-35:3; Stekloff Decl. Ex. 18, Sawyer *Sanders* Dep. at 46:24-47:20. Because Mr. Petty and Dr. Schiff did not determine the amount of Roundup that these Plaintiffs allegedly *absorbed*, their opinions on exposure cannot support Dr. Sawyer's opinions on specific causation.

### 2. Dr. Sawyer's Absorbed Dose Calculations in *Russo* Are Unreliable and Based on an Improper Methodology.

In one case—*Russo*—Dr. Sawyer did perform an absorbed dose calculation using the UK POEM methodology. However, as Dr. Sawyer has admitted, that methodology is not helpful or necessary in determining specific causation. *See* Stekloff Decl. Ex. 17, Sawyer *Domina* Dep. at 18:11-19:14; Stekloff Decl. Ex. 18, Sawyer *Sanders* Dep. at 15:2-6. In fact, Dr. Sawyer conceded that his UK POEM dose calculations cannot be compared to the various exposure thresholds in the human epidemiology studies, which form the basis for his flawed specific causation opinions. *See* Stekloff Decl. Ex. 16, Sawyer *Dickey* Dep. at 25:7-16; Stekloff Decl. Ex. 17, Sawyer *Domina* Dep. at 17:7-19. Dr. Sawyer further admits that the UK Poem model has not been validated in the relevant glyphosate epidemiology studies. Stekloff Decl. Ex. 22, Sawyer Deposition in *Wade* (10/5/2019) ("Sawyer *Wade* Dep.") at 137:16-22; Stekloff Decl. Ex. 23, Sawyer Deposition in *Russo* (10/22/2019) ("Sawyer *Russo* Dep.") at 142:9-23. Thus, Dr. Sawyer should not be permitted to offer a specific causation opinion in Russo based on this dose calculation.

Moreover, to the extent that Dr. Sawyer attempts to offer a dose calculation based on the Prasad study, which involved intraperitoneal injection of glyphosate in rats, that dose calculation also cannot support Dr. Sawyer's opinions on specific causation for multiple reasons.  To start, that opinion was disclosed only in Dr. Sawyer's supplemental report in *Russo*, which was submitted after the deadline for expert disclosures.  Thus, any opinion based on the Prasad study is untimely and should be excluded.  *See* Stekloff Decl. Ex. 23, Sawyer *Russo* Dep. at 8-20.  Moreover, Dr. Sawyer has admitted that the intraperitoneal injection route of exposure used in Prasad is not comparable to any relevant exposure route in humans.  *See* Stekloff Decl. Ex. 22, Sawyer *Wade* Dep. at 45:12-20; 220:17-221:12. Dr. Sawyer further admits that he made errors in the process of performing his exposure calculations based on Prasad.  *Id.* at 317:25-318:22.  Thus, any specific causation opinion based on the Prasad study would be improper.

3. <u>Dr. Sawyer's Comparisons of Plaintiffs' Alleged Exposure Doses to "Exposure Thresholds" in Various Epidemiological Studies Do Not Support His Opinions on Specific Causation.</u>

As discussed above, the foundation for Dr. Sawyer's specific causation opinions in all of these cases is his comparison of Plaintiffs' alleged exposures (which Dr. Sawyer figured using an eight-hour "exposure day") to various exposure-day thresholds included in some of the epidemiology studies on Roundup.  Dr. Sawyer should be prohibited from offering these comparisons under the guise of specific-causation expert testimony for multiple reasons.

**First**, Dr. Sawyer is not qualified to draw conclusions on specific causation from the epidemiology studies.  Dr. Sawyer is not an epidemiologist, does not consider himself an epidemiology expert, and disclaimed any attempt to evaluate or interpret the relevant epidemiology studies for purposes of determining causation, instead relying on or deferring to others' opinions. *See, e.g.*, Stekloff Decl. Ex. 1, Sawyer *Giglio* Dep., at 58:8-10; 64:2-11.

Indeed, he consistently testifies that he defers to epidemiologists on virtually every aspect of the epidemiology studies, from big-picture questions about the sufficiency of human data to show a connection between Roundup and NHL, to other matters such as epidemiological study design, statistical analysis of data, and the validity of epidemiological studies.  *See*, *e.g.*, *id.*; Stekloff Decl.

Ex. 8, Sawyer *Winston* Dep. at 179:17-22; 190:10-191:15; 197:13-202:20; 218:6-15; 234:11-239:24; 252:4-20; Ex. 6, Sawyer *Pilliod* Dep. at 40:5-8; 40:18-22; 42:5-12; 77:15-18; 80:3-4; 163:1-2; 176:7-9; 194:21; 203:1-5; 207:2-6; 212:10-12; 213:18-20; 230:3-5; 232:2-8; 233:23-25; 234:24-25; 236:10-21; 252:16-253:10; 260:4-18.  The Court should not allow Dr. Sawyer to opine on topics that exceed his expertise, which includes extracting alleged thresholds from studies he is not qualified to evaluate.  *See, e.g.*, *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d at 614 ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty.  That would not be responsible science.").

      **Second,** even if Dr. Sawyer were qualified to analyze the epidemiology data on which he based his opinions, that analysis cannot justify his conclusion that Roundup caused *a particular plaintiff's* cancer.  Dr. Sawyer repeatedly confirmed that under his counting-of-days "analysis," the actual amount of Roundup that was allegedly absorbed in each Plaintiffs' body, Plaintiffs' use of any personal protective equipment, and Plaintiffs' efforts to clean Roundup off of their skins after exposure events are all irrelevant.  *See, e.g.,* Stekloff Decl. Ex. 18, Sawyer *Sanders* Dep. 26:24-27:19; Stekloff Decl. Ex 2, Sawyer *Janzen* Dep. 28:7-17; 36:4-11; Stekloff Decl. Ex. 19, Sawyer *Pollard* Dep. 24:11-16; 50:2-25; Stekloff Decl. Ex. 20, Sawyer *Mendoza* Dep. 27:23-29:1  What matters for his analysis is the number of "exposure days" Plaintiffs each allegedly experienced and whether they met certain exposure-day thresholds in his handpicked epidemiology studies.  However, even *general* causation cannot be established with epidemiology alone, as Plaintiffs' experts concede and as this Court has found in this MDL.  *See* Stekloff Decl. Ex. 24, Tr. of Proceedings, Testimony of Dr. Christopher J. Portier, *Pilliod v. Monsanto Co.,* No. RG-170862702 (Cal. Sup. Ct. Alameda Cnty. Apr. 3, 2019) at 1893:3-8 ("Q: And so in terms of the human data we have in this case, you agree that you cannot make a firm statement that Roundup causes NHL from the epidemiology data alone, true? A: Correct.  I can't do it from the epidemiology data alone."); *In re: Roundup*, 2018 WL 3368534, at \*7; *see also* Stekloff Decl. Ex. 12, Reference Manual on Scientific Evidence at 598.  Without question, epidemiology alone cannot establish specific causation.  But that is what Dr. Sawyer has done:  he has concluded that Roundup caused Plaintiffs'

NHL merely because Plaintiffs were exposed to Roundup for a number of days that exceeds the minimal "number-of-days" threshold presented by certain epidemiological data points from studies he has not analyzed.  Moving from general causation to specific causation requires more than just say so—but that is all Dr. Sawyer has provided.[10]

*Third,* most of the epidemiology data on which Dr. Sawyer relies in reaching his conclusions on specific causation is unreliable because it was not adjusted for the use of other pesticides.  Although his reports mention several epidemiology studies, Dr. Sawyer admits that the "three primary studies" on which he relies for his specific causation opinions are McDuffie, Eriksson, and Andreotti.  Stekloff Decl. Ex. 1, Sawyer *Giglio* Dep. at 66:5-10.  But Dr. Sawyer admits that Andreotti "did not find a statistically elevated risk of NHL," (Stekloff Decl. Ex. 3, Sawyer *Giglio* Rpt. at 46), so that study does not support his conclusions on specific causation.  Dr. Sawyer also relies on Eriksson and McDuffie, which he states reported odds ratios of 2.36 and 2.12, respectively, for those with greater than ten days of exposure (in Eriksson) and greater than two days of exposure (in McDuffie).  Stekloff Decl. Ex. 3, Sawyer *Giglio* Rpt. at 45.  However, those studies did not adjust for exposure to other pesticides.  *See* Ex. 1, Sawyer *Giglio* Dep.*,* at 78:13-80:18; *see also In re Roundup Prods., Liab., Lit.*, 390 F. Supp. 3d 1102, 1119–20 (N.D. Cal. 2018).  As this Court has already determined, "[f]ailing to take account of likely confounders by presenting and relying upon only unadjusted (or minimally adjusted) estimates is a serious methodological concern."  *Id.* at 1140.  Dr. Sawyer's reliance on unreliable data from studies that did not adjust for other pesticide use provides another basis for exclusion of his specific causation opinions.

## B.    Dr. Sawyer Did Not Consider Other Potential Causes of Plaintiffs' NHL.

Dr. Sawyer's failure to consider other possible causes of Plaintiffs' NHL confirms that his "specific causation" opinion is not, in fact, a reliable specific causation opinion.  In his reports, Dr. Sawyer specifically notes that his assessment defers the analysis of other potential risk factors for

---

[10] While Dr. Sawyer noted that certain studies allegedly show that Roundup can have a genotoxic effect on human cells, he provides no justification for concluding that Roundup had this kind of effect on Plaintiffs, and no explanation for how any alleged genotoxic effect led to their development of NHL.

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER ON *DAUBERT* GROUNDS

Plaintiffs' NHL—such as cigarette smoking, predisposing medical genetics, and prior medical conditions—to other experts in the case, including the oncologists, pathologists, and medical epidemiologists.  Stekloff Decl. Ex. 3, Sawyer *Giglio* Rpt., at 6; Stekloff Decl. Ex. 23, Sawyer *Russo* Dep. at 28:17-29:7; 32:9-33:3.  When asked whether he considered potential genetic causes of Plaintiffs' NHL, Dr. Sawyer admitted that he deferred that analysis to the oncologist and pathologist.  Stekloff Decl. Ex. 1, Sawyer *Giglio* Dep., at 56:17-57:1; Stekloff Decl. Ex. 23, Sawyer *Russo* Dep. at 28:17-29:7; Stekloff Decl. Ex. 2, Sawyer *Janzen* Dep. at 38:16-23; Stekloff Decl. Ex. 16, Sawyer *Dickey* Dep. at 15:20-23.  When asked whether he had "gone through the process of ruling out random chance as the cause of [Plaintiff]'s NHL," Dr. Sawyer again responded that he "would defer that to our medical epidemiologist." Stekloff Decl. Ex. 1, Sawyer *Giglio* Dep. at 57:2-10.  Dr. Sawyer also admitted that he did not consider certain environmental exposures in assessing the cause of Plaintiffs' NHL. *Id.* at 127:25-128:4. These represent just some of the many examples in these cases (and in other Roundup cases) of Dr. Sawyer's unwillingness to testify about other potential causes of a plaintiff's NHL.  By repeatedly deferring these questions to other experts, Dr. Sawyer relinquished any ability to offer a specific causation opinion.  He cannot properly reach such an opinion without considering Plaintiffs' individual circumstances, such as whether their NHL might be attributable to some factor other than Roundup.  *See, e.g., Marmo*, 457 F.3d at 758 (affirming district court's exclusion of toxicologist where toxicologist "did not exclude confounding factors, which 'leaves open the possibility of competing causes of the disease' and raises questions about the competency of expert testimony.")

In sum, there is nothing "specific" about Dr. Sawyer's specific causation opinion.  His methodology consists of simply counting days of exposure and comparing them to data plucked from epidemiology studies he is not qualified to analyze, with no examination whatsoever of Plaintiffs' unique medical and family history or occupational history and circumstances.  Thus, any specific causation opinion he attempted to offer would be based on nothing more than his say-so, and should be excluded.

**III.    The Court Should Exclude Dr. Sawyer's Opinions Regarding the George Study.**

The George study was a small study that, in relevant part, was designed to determine if glyphosate *initiated* tumors or if it *promoted* tumors generated by a known tumor initiator.   It concluded that glyphosate "*failed* to provoke neoplastic development when tested as tumor initiator or complete carcinogen," but did show "carcinogenic potential" as a tumor promotor.   Stekloff Decl. Ex. 9, George 2010 at 954 (emphasis added).

The George study was evaluated by several major national and international agencies— including the EPA and IARC—and was uniformly found by them to be an inadequate study for scientific purposes:

- Stekloff Decl. Ex. 10, EPA, Office of Pesticide Programs, *Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* (Dec. 12, 2017) at 70 ("A number of studies were judged to be inadequate in protocol, conduct or reporting and were not considered in the analysis of glyphosate . . . An initiation-promotion study (George et al., 2010) in male Swiss mice that tested a commercial formulation of glyphosate (41%) on the skin.   Study deficiencies included small number (20) of animals, tested only males, and lack of histopathological examination.").

- Stekloff Decl. Ex. 11, IARC, *Glyphosate in Some Organophosphate Insecticides and Herbicides: Diazinon, Glyphosate, Malathion, Parathion, and Tetrachlorvinphos, Monograph Vol. 112 on the Evaluation of Carcinogenic Risks to Humans* (2015) at 32 ("Short duration of treatment, no solvent controls, and lack of any histopathological evaluation, Age at start, NR (mice weighed 12–15 g bw) The Working Group concluded **this was an inadequate study for the evaluation of glyphosate.**" (emphasis added)).

- Stekloff Decl. Ex. 25, BAuA, Proposal for Harmonized Classification and Labeling: N (phosphonomethyl)glycine; Glyphosate (ISO), CLH Report for Glyphosate (2016) at 66 ("[George] cannot contribute to a decision on the classification of glyphosate.").[11]

Despite this consensus view rejecting the George study, Dr. Sawyer strays far into the realm of speculation by opining, based solely on that unreliable study, that Plaintiffs' "episodic exposures to Roundup, sustained over a period of 24 years, was a substantial contributing factor to his . . . *promotion* of non-Hodgkin's lymphoma."   Stekloff Decl. Ex. 3, Sawyer *Giglio* Rpt., at 160 (emphasis added).   Moreover, Dr. Sawyer makes an unsupported speculative leap by inferring from a study of chemicals painted on mouse skin that Roundup can promote *NHL* in *humans.   See, e.g.,*

---

[11] The BAuA is Germany's Federal Institute for Occupational Safety and Health.

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER ON *DAUBERT* GROUNDS

*Joiner*, 522 U.S. at 145 (excluding animal data where expert failed to adequately extrapolate to humans).

## IV.     The Court Should Exclude Dr. Sawyer's Opinions Regarding Trace Chemicals.

Roundup contains trace amounts of certain chemicals.   EPA considers these chemical "impurities" to be safe because they are present at extremely low (i.e. "trace") levels.   *See, e.g.*, Stekloff Decl. Ex. 26, EPA, Proposed Interim Registration Review Decision Case No. 0178 (April 2019), at 10 (finding that glyphosate is not likely to be carcinogenic to humans despite noting that "[m]ost pesticide products contain substances in addition to the active ingredient . . . .").[12] There is no scientific evidence of causation linking these trace chemicals to NHL at doses remotely comparable to those at issue here; indeed, Dr. Sawyer does not even calculate the dose of these chemicals to which Plaintiffs were allegedly exposed.  And Dr. Sawyer has pointed to absolutely no scientific evidence suggesting that exposure to Roundup is a cancer risk *because of these trace chemicals.*

Dr. Sawyer nevertheless intends to offer unsupported testimony that such trace levels of these chemicals (assuming they were even present in the particular bottles of Roundup allegedly used by Plaintiff) are carcinogenic *and* that these trace chemicals caused or contributed to Plaintiffs' cancer.  This testimony is designed solely as a sideshow to distract, confuse, and provoke fear in the jury.  At the most recent trial, Dr. Sawyer implied, without any scientific evidence, that trace ingredients in Roundup could kill a person upon opening the Roundup bottle.  Stekloff Decl. Ex. 27, Tr. of Proceedings, Testimony of Dr. William R. Sawyer, *Pilliod v. Monsanto Co.,* No. RG-170862702 (Cal. Sup. Ct. Alameda Cnty. Apr. 11, 2019) at 3131:6-3132:16 ("A: [Ethylene oxide] is

---

[12] *See also* Ex. 28, Tr. of the Dep. of Charles Benbrook, *Hall, et al. v. Monsanto Co.,* No. 1622-CC01071 (Mo. Cir. Ct. St. Louis Cty. May 23, 2018) at 277:20-278:4 ("Q: Whether it's formaldehyde, NNG, dioxane or any other glyphosate-based herbicides, EPA has always determined that those impurities are below specified limits as far as you know, correct?  A: As far as I know, correct.   Q:  Is it your opinion that impurities found in glyphosate-based herbicides at levels below EPA certified limits can cause non-Hodgkin's lymphoma? A: I -- I have no -- no reason to believe that, and I would -- would find that unlikely .  . ."); Ex. 29, Tr. of the Dep. of  Charles Benbrook, *Johnson v. Monsanto Co.,* No. CGC-16-550128 (Cal. Sup. Ct. S.F. Cnty. Feb. 9, 2018) at 560:22-561:7 ("Q: EPA has not determined that the level of impurities in glyphosate formulations is an issue of toxicological concern, right? . . . THE WITNESS: I agree with that. Yes. The answer is yes.").

a sterilization gas.  It kills every type of biological life on earth . . . if I had a little air in the bottle, as one of our jurors has sitting there, that over time that air in the bottle, the ethylene oxide would accumulate in that air space.  Q: . . .  So this actually has Roundup that's been sitting in here for a while.  If I were to open up this cap, what would happen?  A:  There would be ethylene oxide escaping from that head space.").  Dr. Sawyer's unsupported comments on these trace chemicals are entirely speculative, inappropriate, and inadmissible.  *See Guidroz-Brault v. Missouri Pacific R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001) ("Rule 702 requires that expert testimony relate to scientific, technical, or other specialized knowledge, which does not include unsupported speculation and subjective beliefs.").[13]

## V.    The Court Should Exclude Dr. Sawyer's Opinions on Monsanto Company Documents and Regulatory Duties.

Dr. Sawyer also intends to offer inadmissible expert testimony on Monsanto company documents and Monsanto's regulatory duties.  This proffered testimony is beyond Dr. Sawyer's area of expertise and beyond the realm of proper expert testimony.  *See* Sawyer Deposition in *Harris* at 11:1-9 (admitting that he is not a regulatory expert).

Having an expert narrate company documents, under the guise of explaining terminology, is improper expert testimony because it invades the province of the jury.  *See Sanchez v. Boston Sci. Corp.*, No. 2:12-CV-05762, 2014 WL 4851989, at *32 (S.D. W. Va. Sept. 29, 2014) ("The majority of this section of Dr. Slack's report is simply a narrative review of corporate documents, which is not helpful to the jury."); *City of New York v. FedEx Ground Package Sys., Inc.*, No. 13 Civ. 9173 (ER), 2018 WL 2941455, at *4 (S.D.N.Y. Oct. 10, 2018) (excluding expert opinion where expert "relied on the same types of evidence that a jury traditionally relies upon to answer the sort of

---

[13] Furthermore, Dr. Sawyer's opinions regarding trace chemicals will not assist the trier of fact and require exclusion for that reason.  *See Chesebrough-Pond's, Inc. v. Faberge, Inc.*, 666 F.2d 393, 398 (9th Cir. 1982) (noting that it would be "well within the discretion of the trial judge to exclude" expert opinions that would not be "of any real assistance to the trier of fact.").  The jury will not be aided by Dr. Sawyer's comments regarding trace chemicals alleged to be found in Roundup at unspecified quantities because—absent any evidence regarding whether those chemicals are capable of causing NHL (and at what dose)—there is a great danger of the jury being misled at trial by irrelevant testimony and Dr. Sawyer's histrionics.

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER ON *DAUBERT* GROUNDS

questions that a jury traditionally answers."). Moreover, even a properly qualified expert may not opine as to the intent, motive, or state of mind of a corporation or its officers, because that would substitute the expert's judgment for the jury's. *See, e.g., ., Oracle America Inc., et al. v. Hewlett Packard Enterprise Co.*, No. 16-cv-01393-JST, 2018 WL 6511146, at *3 (N.D. Cal. Dec. 11, 2018) ("Courts routinely exclude as impermissible expert testimony as to intent motive, or state of mind" because such testimony "would be merely substituting the expert's judgment for the jury's . . ." (quotations and citations omitted)). Accordingly, Dr. Sawyer should be precluded from offering any opinions related to Monsanto company documents or Monsanto's supposed state of mind.

Relatedly, Dr. Sawyer is not qualified to opine on the ultimate issue of the adequacy of Roundup's EPA-regulated labeling. He has never drafted the labeling for an herbicide. *See* Stekloff Decl. Ex. 6, 2/6/19 Sawyer *Pilliod* Dep. at 337:7-11. He has never been asked by EPA or any other regulator to opine on the contents of a label for an herbicide. *Id.* at 337:22-338. And he has never been invited by EPA to advise on labeling. *Id.* at 338:3-6. He is unqualified to offer any opinions about Monsanto's compliance with EPA regulatory requirements, and accordingly, any such opinions should be excluded. [14]

## **CONCLUSION**

For the reasons set forth above, the Court should grant Monsanto's Motion to Exclude Testimony of Dr. William Sawyer.

---

[14] In other cases, Dr. Sawyer has deferred opinions on these topics to other experts, admitting that they are outside his area of expertise. *See* Stekloff Decl. Ex. 30, Deposition of Dr. Sawyer in *Hall* (8/23/2018) at 76:25-77:4; 82:20-82:25.

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER ON *DAUBERT* GROUNDS

DATED: November 26, 2019

Respectfully submitted,

*/s/ Brian L. Stekloff*

Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonwalsh.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonwalsh.com)
WILKINSON WALSH + ESKOVITZ LLP
2001 M St. NW, 10th Floor
Washington, DC 20036
Tel: 202-847-4030
Fax: 202-847-4005

Pamela Yates (CA Bar No. 137440)
(Pamela.Yates@arnoldporter.com)
ARNOLD & PORTER KAYE SCHOLER
777 South Figueroa St., 44th Floor
Los Angeles, CA 90017
Tel: 213-243-4178
Fax: 213-243-4199

Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
HOLLINGSWORTH LLP
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843
Fax: 202-682-1639

Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
COVINGTON & BURLING LLP
One City Center
850 10th St. NW
Washington, DC 20001
Tel: 202-662-6000

Attorneys for Defendant
MONSANTO COMPANY

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER ON *DAUBERT* GROUNDS

1

**CERTIFICATE OF SERVICE**

2
      I HEREBY CERTIFY that on this 26th day of November, 2019, a copy of the foregoing was

3
filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all

4
appearing parties of record.

5
                                 */s/ Brian L. Stekloff*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER ON *DAUBERT* GROUNDS