# EXHIBIT 17

William R. Sawyer, Ph.D.

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN RE: ROUNDUP PRODUCTS        § MDL No. 2741
LIABILITY LITIGATION           § Case No. 3:16-md-02741-VC
_____ §
                                §
This document relates to:       §
                                §
Domina v. Monsanto Company      §
Case No. 3:16-cv-05887-VC       §
_____ §

                        - - -

            Thursday, November 14, 2019

                        - - -


        Videotaped deposition of WILLIAM R. SAWYER,

    Ph.D., held at South Seas Resort, 5400 Plantation

    Road, Captiva, Florida 33924, commencing at

    11:37 a.m., on the above date, before Susan D.

    Wasilewski, Registered Professional Reporter,

    Certified Realtime Reporter, Certified Realtime

    Captioner, Florida Professional Reporter

                        - - -

            GOLKOW LITIGATION SERVICES

        877.370.3377 ph | 917.591.5672 fax

                deps@golkow.com

William R. Sawyer, Ph.D.

## Page 2

APPEARANCES:

WEITZ & LUXENBERG
BY: JERRY KRISTAL, ESQUIRE
  jkristal@weitzlux.com
220 Lake Drive East, Suite 210
Cherry Hill, New Jersey 08002
Phone: (856) 755-1115
Representing Plaintiffs


NELSON MULLINS RILEY & SCARBOROUGH LLP
BY: ERIC A. PAINE, ESQUIRE
  eric.paine@nelsonmullins.com
1320 Main Street
Columbia, South Carolina 29201
Phone: (803) 255-5518
Representing Defendant Monsanto Company


WILKINSON WALSH & ESKOVITZ
BY: CALI COPE-KASTEN, ESQUIRE
  ccope-kasten@wilkinsonwalsh.com
2001 M Street, NW, 10th Floor
Washington, D.C. 20036
Phone: (856) 755-1115
Representing Defendant Monsanto Company


ALSO PRESENT:
  MATTHEW ALLISON, Videographer

## Page 3

--- 
INDEX
---

Testimony of: WILLIAM R. SAWYER, Ph.D.        Page
  DIRECT EXAMINATION BY MR. PAINE.............  5
  CROSS-EXAMINATION BY MR. KRISTAL............ 59


  E X H I B I T S
  (Attached to transcript)
WILLIAM R. SAWYER, Ph.D. DEPOSITION EXHIBITS    PAGE
Exhibit 1  Monsanto Company's Amended Notice to    5
     Take Oral and Videotaped Deposition
     of Dr. William Sawyer
Exhibit 2  October 9, 2019 Report from        6
     Toxicology Consultants & Assessment
     Specialists, LLC
     Excluding Appendix A - Documents

Exhibit 3  Appendix F - Mr. Larry Domina's      11
     Interviews
Exhibit 4  Appendix G - Exposure Summary       11
     Information and Calculations based on
     Information from Mr. Domina's
     Interviews

Exhibit 5  Herbicide Application Handbook -     37
     Excerpted Pages
     MONGLY07297384, MONGLY07297403
     through 7297405, MONGLY07297407,
     MONGLY07297409, MONGLY07297425 and
     MONGLY07297443

## Page 4

                      - - -
      THE VIDEOGRAPHER:  Good morning.  We are now
on the record.  My name is Matthew Allison.  I am
a videographer for Golkow Litigation Services.
Today's date is November 14th and the time is
11:37 a.m.
      This video deposition is being held in
Captiva, Florida, in the matter of Larry Domina
vs. Monsanto Company, taken in the United States
District Court, Northern District of California.
The deponent is Dr. William R. Sawyer.
      Will all counsel please identify themselves
for the record?
      MR. KRISTAL:  Jerry Kristal, Weitz &
Luxenberg, for Larry Domina.
      MR. PAINE:  I'm Eric Paine with Nelson
Mullins Riley & Scarborough for Monsanto.
      THE VIDEOGRAPHER:  The court reporter is
Susan Wasilewski and will now swear in the
witness.
      THE COURT REPORTER:  Would you raise your
right hand?
      Do you solemnly swear or affirm the
testimony you're about to give will be the truth,
the whole truth, and nothing but the truth?

## Page 5

      THE WITNESS:  Yes.
      THE COURT REPORTER:  Thank you.
      WILLIAM R. SAWYER, Ph.D., called as a
witness by Defendant Monsanto Company, having been
duly sworn, testified as follows:
            DIRECT EXAMINATION
BY MR. PAINE:
   Q.  Good morning, again, Dr. Sawyer.
   A.  Hi.
   Q.  We are proceeding onto the Domina case, the
second of our three depositions today.  Let me
handle the preliminaries first.  I've marked as
Exhibit 1 to your deposition a copy of the notice.
   (Sawyer Exhibit 1 was marked for identification.)
      MR. PAINE:  Jerry, here is a copy for you.
      MR. KRISTAL:  Thank you.
BY MR. PAINE:
   Q.  And you've had an opportunity to look at
that before today's deposition?
   A.  Correct.
   Q.  Okay.  And you know that it requests certain
documents?
   A.  Yes.
   Q.  And have you produced those documents --
   A.  Yes.

2 (Pages 2 to 5)

William R. Sawyer, Ph.D.

Page 6

```
 1        Q.  -- heretofore or brought them with you
 2   today?
 3        A.  I have.
 4        Q.  Okay.  And you told me in the earlier
 5   deposition that the Redweld in front of you was your
 6   file for all three cases we're talking about today,
 7   Dickey, Domina, and Sanders, right?
 8        A.  That's correct.
 9        Q.  And please, as you have, feel free to refer
10   to that at any point.  I'll handle a few other
11   housekeeping things as we get going.
12        (Sawyer Exhibit 2 was marked for identification.)
13   BY MR. PAINE:
14        Q.  I'm handing you what I've marked as
15   Exhibit 2, and I want to be clear about what that
16   is, Doctor.  That is the first -- that is your
17   report for Mr. Domina's case up through page 125,
18   which has your signature on it, right?
19        A.  Yes.
20        Q.  Okay.  And what is truncated from that is
21   the materials considered list, and I apologize for
22   that.  I didn't realize that was missing until I got
23   here, but I understand that you have on your laptop
24   a version of that same report with the materials
25   considered list, right?
```

Page 7

```
 1        A.  That's right.
 2        Q.  And that would be the materials considered
 3   list that was complete as of October 9, when you
 4   signed the report, right?
 5        A.  Correct.
 6        Q.  And we've had some discussions about this in
 7   the earlier case today, but Counsel has supplemented
 8   that materials considered list with some materials
 9   earlier this week, correct?
10        A.  Yes, on Monday, three days ago.
11        Q.  Okay.  All right.  So does that then, the --
12   and I know you're looking at this online -- the
13   materials considered list that runs through page 144
14   of your report that has specifically nine new
15   documents reviewed as of October 9, plus the
16   supplement, represent the materials you considered
17   for the Domina case?
18        A.  Yes.  In fact, the document review list is
19   identical except for this is the -- specifically the
20   Domina plaintiff fact sheet, Domina deposition,
21   Domina medical records, and the Stephen Petty report
22   specific to Domina.  The other documents are exactly
23   the same as the list of documents in the Dickey
24   report.
25        Q.  Okay.  Thank you for clarifying that.
```

Page 8

```
 1        MR. KRISTAL:  Just one other clarification.
 2        MR. PAINE:  Sure.
 3        MR. KRISTAL:  You said that Counsel
 4   supplemented the materials considered list.  We
 5   did so as a go-between between Dr. Sawyer
 6   supplementing it and Counsel.  It's not as if we
 7   independently generated a new list with
 8   additional stuff without direction from
 9   Dr. Sawyer.
10        MR. PAINE:  Sure.
11   BY MR. PAINE:
12        Q.  Now, your original report or the report for
13   Mr. Domina's case was signed and dated on October 9,
14   2019; is that right?
15        A.  Yes.
16        Q.  Okay.  And did you have all of the
17   information you needed to formulate your opinions
18   for Mr. Domina's case at the time you prepared that
19   and signed that report?
20        A.  Yes.
21        Q.  Since that time have you come into
22   possession of or been made aware of any additional
23   information regarding Mr. Domina's case specifically
24   that pertains to your opinions in this case?
25        MR. KRISTAL:  I'm assuming it's the same
```

Page 9

```
 1   definition as the last -- in the Dickey matter?
 2        MR. PAINE:  Yeah.
 3        MR. KRISTAL:  Specific to Mr. Domina.
 4        MR. PAINE:  Yes, exactly.  I'll clarify
 5   that.
 6        MR. KRISTAL:  Like a medical record?
 7        MR. PAINE:  Yeah.
 8   BY MR. PAINE:
 9        Q.  Like medical records, any additional fact
10   sheets, any additional interviews, transcripts,
11   anything like that that you've either seen or been
12   made aware of since you signed your report on
13   October 9?
14        A.  No.
15        Q.  Have you ever spoken with Mr. Domina?
16        A.  No.
17        Q.  Have you ever participated in any
18   conversations as an observer or a listener with
19   Mr. Domina even if you didn't speak with him
20   directly?
21        A.  No.
22        Q.  You've reviewed Mr. Domina's fact sheets?
23        A.  Yes.
24        Q.  And you have reviewed Mr. Domina's medical
25   records, correct?
```

3 (Pages 6 to 9)

William R. Sawyer, Ph.D.

Page 10

1    A. Yes.
2    Q. Similar to the Dickey case, did you review
3  the entirety of the available medical records for
4  Mr. Domina, or to your knowledge were those just
5  certain medical records for Mr. Domina?
6    A. Correct, specific medical records, primarily
7  medical records that included his diagnosis,
8  pathology result, as well as smoking history and any
9  information regarding exposure history to
10 herbicides.
11   Q. And what depositions have you reviewed
12 regarding Mr. Domina's case?
13   A. Just his deposition.
14   Q. Do you have any plans to speak with
15 Mr. Domina before trial?
16   A. Not at this time.
17   Q. Do you have any plans to review additional
18 depositions in this case before trial?
19   A. No.  I'm not aware of any additional
20 depositions of Mr. Domina per se.
21   Q. Sure.  And let me ask a little better
22 question.  Have you -- do you have any plans to
23 review other fact witnesses who have been deposed in
24 Mr. Domina's case, his doctors, family members,
25 friends, anybody like that, to the extent they've

Page 11

1  been deposed?
2    A. Not at this time.
3    Q. Did you rely on Mr. Domina's deposition
4  testimony for your opinions in this case?
5    A. Yes.
6    Q. You also relied on information from
7  Mr. Petty's report for your opinions in this case;
8  is that right?
9    A. Yes.
10   (Sawyer Exhibit 3 was marked for identification.)
11 BY MR. PAINE:
12   Q. Doctor, I'm going to mark and hand you
13 Exhibit 3, which is Appendix F from Mr. Petty's
14 report, and is that -- and ask you if that's some of
15 the materials from Mr. Petty that you relied on for
16 forming your opinions in Mr. Domina's case?
17   A. It is.
18   Q. Okay.
19   (Sawyer Exhibit 4 was marked for identification.)
20 BY MR. PAINE:
21   Q. Now I will mark and hand you as Exhibit 4
22 Mr. Petty's Exhibit G -- I'm sorry, Appendix G from
23 his report from Mr. Domina's case, and let me ask
24 you, is that also something that you relied on for
25 your opinions in this case?

Page 12

1    A. Yes.
2    Q. And I think we've already established this
3  but just so I'm clear, you did not -- you know that
4  Mr. Petty interviewed Mr. Domina, right?
5    A. Yes.
6    Q. And Appendix F represents his summary of the
7  information he obtained from his interviews with
8  Mr. Domina, right?
9    A. That's right.
10   Q. You did not participate in or listen in on
11 that interview, on either session of that interview,
12 did you?
13   A. No.
14   Q. And I take it all of the information you
15 have about what was asked or discussed during
16 Mr. Petty's interviews with Mr. Domina is what is
17 summarized in Appendix F and Appendix G that I've
18 marked as Exhibits 3 and 4; is that right?
19   A. It is.
20   Q. You do not know the precise questions that
21 Mr. Petty asked Mr. Domina, correct?
22   A. No.
23   Q. Sorry.  Not correct or you don't know?
24   A. I know I don't know.
25   Q. Okay.  And similarly, you do not know the

Page 13

1  precise answers that Mr. Domina gave to Mr. Petty's
2  questions, do you?
3    A. No.  No, I don't know.  I just have the
4  summarized responses in the documents issued by
5  Mr. Petty.
6    Q. All right.  And again, I think we've
7  established this.  Mr. Petty has a lengthy generic
8  report or generic sections of his report that are
9  several hundred pages long, but the portions that
10 pertain to Mr. Domina specifically from his report
11 are in Appendices F and G; is that your
12 understanding?
13   A. That's correct.
14   Q. Okay.  In your review of Appendices F and G
15 from Mr. Petty for the Domina case, can you tell if
16 there are additional questions that you would have
17 wanted to ask Mr. Domina that are not either
18 summarized or reflected in either Appendix F or
19 Appendix G?
20   A. No.
21   Q. And to your knowledge, is there any other
22 record or notes or transcripts of Mr. Petty's
23 interviews with Mr. Domina other than what's in
24 Appendices F and G?
25   A. No.

4 (Pages 10 to 13)

William R. Sawyer, Ph.D.

Page 14

1    Q.  Do you know if Mr. Petty reviewed any other
2  materials in Mr. Domina's case, such as his fact
3  sheets, Mr. Domina's deposition, or Mr. Domina's
4  medical records, to formulate his opinions in this
5  case concerning Mr. Domina?
6    A.  I have no evidence of that but I cannot be
7  conclusive.  I would really have to defer you to
8  Mr. Petty.
9    Q.  Now, if you would look through with me
10  Mr. Petty's Appendices F and G, and tell me if
11  anywhere in there Mr. Petty discusses any chemicals
12  other than Roundup formulations to which Mr. Domina
13  may have been exposed?
14    A.  No, not that I recall.  I will double-check
15  but I don't think so.  No.
16    Q.  So it is correct that the only substance
17  that Mr. Petty discusses in his Appendices F and G
18  in Mr. Domina's case is Roundup or Roundup
19  formulations, right?
20    A.  Correct, but I handled that in my report
21  without relying on Mr. Petty's report.
22    Q.  Do you know if Mr. Petty ever took a current
23  or historical chemical inventory for Mr. Domina?
24    A.  I can't answer that.  I do not know.  You'd
25  have to question Mr. Petty regarding that.

Page 15

1    Q.  Now, going to page 5 of your report, you do
2  discuss some additional herbicides that Mr. Domina
3  used in his farming operations.  This is page 5
4  through really page 6.  Is that right?
5    A.  Yes.
6    Q.  And what was your source for the information
7  about those additional herbicides that you've listed
8  there?
9    A.  Deposition of Larry Domina dated July 15th,
10  2019, as well as the plaintiff fact sheet.
11    Q.  But again, you didn't speak with Mr. Domina
12  to take a more fulsome or extensive chemical
13  inventory of the chemicals that he may have used in
14  his farming operations or around his farming
15  operations or in his household, either currently or
16  historically, beyond what's in his deposition; is
17  that right?
18    A.  No.
19      MR. KRISTAL:  Objection.
20    A.  And the reason being the deposition covered
21  the additional herbicide and chemicals rather
22  thoroughly, and it has also been my experience in
23  prior Monsanto depositions that I'm heavily
24  criticized for interviewing individuals who are not
25  under oath, and the fact is he was under oath in

Page 16

1  that deposition and thoroughly questioned and I
2  really didn't see any reason to carry out further
3  questions regarding his use of other pesticide and
4  herbicides.
5    Q.  Now, was Mr. Domina under oath when he spoke
6  with Mr. Petty, to your knowledge?
7    A.  No.  However, Mr. Petty ascertained, by
8  necessity, information that had not been asked in
9  deposition.
10    Q.  What are you referring to there, please?
11    A.  Throughout the two appendices, F and G,
12  there are -- is information that was not contained
13  in the deposition or plaintiff fact sheet.
14    Q.  And can you give me some examples of that,
15  please?
16    A.  Yes.
17    Q.  Okay.
18    A.  Specifically, and probably one of the most
19  important points, is Mr. Petty's questioning in
20  terms of duration of exposure to the skin prior to
21  bathing.
22    Q.  Okay.  Anything else?
23    A.  Many different things, yes.
24    Q.  Okay.  We'll hit those as we go.  You agree
25  that Mr. Petty did not do any dosage calculations in

Page 17

1  terms of absorbed dosage calculations in
2  Mr. Domina's case, correct?
3    A.  Correct, although he did discuss and
4  ascertain the information on the time between
5  exposure and bathing with respect to enhanced dermal
6  absorption over time.
7    Q.  And in your report for Mr. Domina's case,
8  you did not do any dermal absorption dose
9  calculations; is that correct?
10    A.  Yes, because the dose metric studies
11  published in the human epidemiological literature do
12  not use milligram per kilogram body weight dose,
13  but, rather, exposure days on an eight-hour
14  time-weighted average, and I refer specifically to
15  Eriksson 2008 with respect to the eight-hour
16  time-weighted average, Swedish workday, and note
17  that McDuffie may not have used the eight-hour day
18  such that my calculations are underestimated and
19  conservative.
20    Q.  I'm just curious, Dr. Sawyer.  You and I
21  have done a couple depositions together before, and
22  I know in some cases you have done absorbed dose
23  calculations, right?
24    A.  Yes.
25    Q.  And is there a reason for doing it in some

5 (Pages 14 to 17)

Golkow Litigation Services - 1.877.370.DEPS

William R. Sawyer, Ph.D.

Page 18

1    cases and not others?
2        A.   In some cases it's not possible.  For
3    example, in the Russo case, the manner of
4    application involved heavy spraying in a trench-like
5    structure in an attempt to prevent weeds from
6    reemerging under artificial turf grass mats, while
7    on hands and knees spraying in the breathing zone.
8    That is a different application than the POEM model
9    is designed for, therefore, I did not use it in that
10   case.
11        In other cases, such as in Domina and
12   Dickey, the exposure days data was an overwhelmingly
13   large number compared to the thresholds of the
14   study -- studies that calculated the milligram per
15   kilogram dose simply for comparison to the AOEL
16   would have been an unnecessary exercise, and in any
17   case where I have sufficient data to calculate the
18   exposure days value, the calculation of milligram
19   per kilogram per day is not essential because the
20   dose metric studies do not rely on milligram per
21   kilogram per day.
22        Q.   And we kind of touched on this in the Dickey
23   deposition a little while ago.  So I take it where
24   you have calculated based on the evidence sufficient
25   exposure days beyond those with which an increased

Page 19

1    risk is associated in the epidemiologic studies,
2    it's not necessary for you to do a calculated
3    absorbed dose exercise; is that right?
4        MR. KRISTAL:  Object to form.
5        A.   Yes, but it is not necessary in any
6    evaluation where the thresholds of exposure have
7    been exceeded, and in fact, when I say the
8    thresholds, the thresholds in all six of the cited
9    studies in my report, the human studies that
10   actually had dose metric thresholds, when all of
11   those thresholds are exceeded, it's really not a
12   necessary task to calculate a milligram per kilogram
13   per day dose as the only thing that can be done with
14   it is comparing it to an AOEL.
15        Q.   I think you've made this clear but let me
16   just make sure I ask the question to again be very
17   clear.  You didn't visit any of the sites where
18   Mr. Domina says he used Roundup formulations, right?
19        A.   No.
20        Q.   And you didn't inspect any of the equipment
21   that Mr. Domina used to apply Roundup, correct?
22        A.   Correct.
23        MR. KRISTAL:  Objection.
24        Q.   Have you ever spoken with any of
25   Mr. Domina's doctors?

Page 20

1        A.   No.
2        Q.   Have you ever spoken with any other expert
3    witnesses retained by the plaintiff about Mr. Domina
4    specifically?
5        A.   No.
6        Q.   And if you look on page 8 of your report,
7    there is a section talking about scope of exposures,
8    right?
9        A.   Yes.
10        Q.   Okay.  And again, there's a table there,
11   time totals, hours of spraying, which has a low of
12   4970, high of 6340, and midpoint of 5655.  That's
13   directly from Mr. Petty's report; is that right?
14        A.   It is, yes.
15        Q.   Below that, where there is a discussion
16   about Mr. Domina's minimum of 621.3 exposure days,
17   maximum 792.5 exposure days, and mean of 706.9
18   exposure days, was that -- were those your
19   calculations or did those come from Mr. Petty as
20   well?
21        A.   Those are my calculations based upon
22   Mr. Petty's total time calculations in hours.  It's
23   just a conversion to eight-hour time-weighted
24   exposure days.
25        Q.   Gotcha.  So just in simplest terms, you took

Page 21

1    the calculated hours that Mr. Petty came up with and
2    divided by eight to come up with days?
3        A.   Correct.
4        Q.   Okay.
5        A.   And I should point out that the Agricultural
6    Health Study does not use eight-hour time-weighted
7    days but simply any exposure on a given day.
8        Q.   So how does your calculation of Mr. Domina's
9    exposure days here compare to the exposures in the
10   Agricultural Health Study?
11        A.   Mr. Domina's exposures are at the extreme
12   high end of the third tertile and the fourth
13   quartile.
14        Q.   Third tertile and fourth quartile.  And is
15   that -- are those the metrics from the Andreotti
16   paper in 2018, or are you referring to a different
17   AHS publication?
18        A.   Andreotti 2018.
19        Q.   And is that Andreotti's raw exposure days or
20   time-weighted exposure days?
21        A.   The raw exposure days with the upper tertile
22   greater than 108.5 days, and the upper -- I'm sorry.
23   That was the upper quartile at 108.5 exposure days,
24   and the upper tertile of equal or greater than 62
25   days.

6 (Pages 18 to 21)

William R. Sawyer, Ph.D.

Page 22

1    Q.  Thank you for clarifying that.  So going
2  back to pages 5 and 6 of your report, where you talk
3  about the summary of additional herbicides, you've
4  listed -- and I'm not going to run through it, it
5  speaks for itself -- one, two, three -- six ones
6  specifically, right?  The 2,4-D, Callisto, Flexstar,
7  Harness, Halex and Keystone, right?
8    A.  Yes.
9    Q.  And then in the narrative right above that
10  table you mentioned two other -- or two types of
11  broadleaf grass killers, names unknown.  What do you
12  know about those?
13    A.  That in deposition, Larry Domina testified
14  on page 151 to 154 that there were two other
15  products that he couldn't recall the name.
16    Q.  And I take it since he didn't know what
17  those names were, you don't know what the active
18  ingredients or coingredients were for either of
19  those two herbicides?
20    A.  That's correct.
21    Q.  Do you know how often Mr. Domina used those
22  two unknown unnamed broadleaf grass killers?
23    MR. KRISTAL:  Coconspirators.
24    THE WITNESS:  I'm sorry?
25    MR. KRISTAL:  I was making a bad joke.

Page 23

1    THE WITNESS:  I wanted to hear it.
2    MR. KRISTAL:  I said coconspirators, unnamed
3  and unknown.
4    MR. PAINE:  I'm smiling too.  Move to
5  strike, obviously.
6  BY MR. PAINE:
7    Q.  So let me ask the question again.
8    Doctor, do you -- do you have any sense of
9  how often in terms of exposure days Mr. Domina would
10  have used those two unnamed broadleaf grass killers?
11    A.  No.  That information was not available in
12  the deposition.
13    Q.  And similarly, Doctor, did you calculate
14  exposure days for any of the six additional
15  herbicides that are listed for Mr. Domina on pages 5
16  and 6 of your report?
17    A.  In part.
18    Q.  And where would I find that in your report?
19    A.  Halex and Flexstar were
20  glyphosate-containing products that are accounted
21  for in the exposure day analysis.
22    Q.  So did you weight Halex and Flexstar any
23  differently than you weighted Roundup formulation in
24  terms of Mr. Domina's exposure days?
25    A.  No.

Page 24

1    Q.  And did Mr. Petty differentiate between
2  exposure to Flexstar, exposure to Halex, or exposure
3  to Roundup formulations in any way in his report?
4    A.  No.
5    Q.  Do you recall what Mr. Domina said about how
6  often he used Roundup compared to Flexstar compared
7  to Halex at any times or periods during the years
8  that he used those substances in his farming
9  operations?
10    A.  No.
11    Q.  Now, you note on page 7 of your report,
12  right there at the top, these herbicides were only
13  used on an occupational basis and were sprayed using
14  a hand sprayer, a pull-type sprayer with a 60-foot
15  boom, a self-propelled sprayer, a four-wheel sprayer
16  with a hand wand or bean bar sprayer, correct?
17    A.  Yes.
18    Q.  Okay.  And those are the same methods and
19  same equipment that Mr. Domina would have used to
20  apply Roundup formulations, correct?
21    A.  That's my understanding, yes.
22    Q.  So is it fair to assume, Doctor, that
23  Mr. Domina's exposures to these other pesticides,
24  given the same use of the same equipment, would have
25  been similar to his exposure to Roundup --

Page 25

1    MR. KRISTAL:  Objection.
2    Q.  -- for any given occasion when he used those
3  materials?
4    MR. KRISTAL:  Objection, foundation.
5    A.  There could be differences in aerosol
6  droplet, residency time, based upon the form
7  laboratories within each of these agents, such as
8  Keystone which contains propylene glycol, versus
9  2,4-D that did not.  There are -- there could be
10  some chemical differences that affect how long the
11  aerosol droplet in the drift persists, even though
12  it's coming out of the same spray head, but beyond
13  that, no.
14    Q.  So in your report did you make any
15  calculations about the volumes of any of these
16  materials in Table A that Mr. Domina used in his
17  farming operations?
18    MR. KRISTAL:  Objection.
19    A.  No.  My goal was to determine whether or not
20  any of these chemicals that he used were potential
21  probable human carcinogens and whether or not they
22  had the propensity to induce NHL.
23    Q.  And the only ones that you identified in
24  your analysis were those that contained glyphosate,
25  right, in Table A?

7 (Pages 22 to 25)

William R. Sawyer, Ph.D.

Page 26

1   A.  That's correct.
2   Q.  Okay.
3   A.  Yes.
4   Q.  But again, you didn't make any comparisons
5   between the volumes of Flexstar versus Halex versus
6   Roundup formulations Mr. Domina used over time,
7   correct?
8   A.  No.  That would be irrelevant simply because
9   they can't explain or contribute to the onset and
10  development of his NHL.
11  Q.  Sorry.  Explain -- run that one by me again,
12  please.
13  A.  That exercise would have been futile since
14  those other products do not cause NHL.
15  Q.  Okay.  So sorry.  I was asking about
16  Flexstar, which contains glyphosate according to
17  your table, right?
18  A.  Yes.
19  Q.  And Halex GT, which contains glyphosate
20  according to your table, right?
21  A.  Correct.
22  Q.  You didn't compare or make an effort to
23  ascertain the relative volumes or frequency of
24  spraying the Flexstar compared to the Halex compared
25  to Roundup formulations in Mr. Domina's case, did

Page 27

1   you?
2   A.  No.
3       MR. KRISTAL:  Objection.
4   Q.  And, for instance, you don't know the number
5   of days he applied Flexstar or Halex compared to any
6   Roundup formulation, right?
7   A.  That's right.
8   Q.  And I think we've established this, but when
9   you look at Exhibits F and G that Mr. Petty
10  prepared, the only exposure days he calculates refer
11  to Roundup concentrations, right -- or Roundup
12  formulations?  Excuse me.
13  A.  I believe so.  I don't recall any
14  segregation otherwise.
15  Q.  Okay.  So, for instance, if we go to page
16  524, which I think is in Appendix G of Mr. Petty's
17  report -- tell me if I'm wrong about that.  Do you
18  see that?
19  A.  Yes.
20  Q.  Okay.  It's a table that says Pesticide
21  Usage and Exposure Information, Farm - Coleridge,
22  Nebraska, and this is again from Mr. Petty's report,
23  and if you look through there, location/activity,
24  container size/spray can used, everything he lists
25  is for Monsanto Roundup concentrate, correct?

Page 28

1   A.  That's right.
2   Q.  So he didn't account for the Halex or the
3   Flexstar separately, did he?
4       MR. KRISTAL:  Objection; foundation.
5   A.  Not to my knowledge.  As I said, I don't see
6   where he segregated those two.
7   Q.  Did you consult either the labeling or
8   Material Safety Data Sheet or other formulation
9   information for Flexstar and Halex GT in preparing
10  your opinions in this case?
11  A.  I did.
12  Q.  Okay.
13  A.  And I have a footnote to the SDS Flexstar GT
14  right in my report on page 6, I think it is.  Let's
15  see.
16  Q.  You do.
17  A.  Page 6, yes.
18  Q.  You do.  Thank you.  So did Flexstar or
19  Halex use surfactants in their formulations?
20  A.  It's possible.  The problem is they
21  didn't -- they don't disclose all of the proprietary
22  ingredients.
23  Q.  So it would be fair to say that you don't
24  know if either of those products, Flexstar GT or
25  Halex GT, used surfactants, or if they did, what

Page 29

1   those surfactants were?
2   A.  Correct.
3   Q.  Similarly, do you know if the constituents
4   of either Flexstar GT or Halex GT changed over time
5   as far as the particular formulations that
6   Mr. Domina used in his farming operations?
7   A.  I do not know.
8   Q.  So it's fair to say that for Flexstar GT,
9   Halex GT, and for that matter, any of the other
10  substances listed on Table A in your report, you
11  don't have a complete list of all the ingredients
12  for any of those herbicides; is that correct?
13  A.  There -- correct.  There could be
14  proprietary ingredients that I'm not aware of.
15  Q.  Now, you've given testimony in the past
16  about coingredients, and in some cases contaminants,
17  in Roundup formulations, like nitrosamines and
18  formaldehyde, for instance.  Do you recall that?
19  A.  Yeah.  Primarily formaldehyde and ethylene
20  oxide because of the volatility and accumulation in
21  head space.
22  Q.  Okay.  Do you know if any of those
23  substances or similar carcinogens were present in
24  any of the herbicides that you've listed in Table A
25  for your report for Mr. Domina?

8 (Pages 26 to 29)

William R. Sawyer, Ph.D.

Page 30

1      MR. KRISTAL:  Object to form.
2      A.  No.
3      Q.  Have you reviewed any internal company
4   documents for any of the -- from any of the
5   manufacturers of the non-Monsanto products that are
6   listed in Table A of your report in Mr. Domina's
7   case?
8      A.  No.
9      Q.  Do you know if the manufacturers of any of
10  the non-Monsanto products in Table A in your report
11  for Mr. Domina's case conducted any type of
12  carcinogenicity studies on their products, either
13  the active ingredients or their formulated products?
14     A.  No.
15     Q.  Do you know if Mr. Domina read the Roundup
16  label?
17     A.  No, I do not know.
18     Q.  Have you reviewed the individual Roundup
19  labels for the years that Mr. Domina used Roundup
20  formulations?
21     A.  For some of the years I have.
22     Q.  Now, in your report, on page 4 you indicated
23  that Mr. Domina was diagnosed with a grade 2
24  follicular non-Hodgkin lymphoma, slow-growing B-cell
25  type.  Is that your understanding of what he had?

Page 31

1      A.  Yes.
2      Q.  Was there any evidence that you could find
3   of the presence of non-Hodgkin lymphoma in
4   Mr. Domina's bone marrow?
5      A.  I didn't look.  I'd have to refer that to
6   the medical oncologist or a pathologist.
7      Q.  Now, Dr. Sawyer, you've testified in other
8   cases about your personal use of Roundup around your
9   home, right?
10     A.  Yes.
11     Q.  Okay.  And I'm going to botch this a little
12  bit, but if I understood from reading that testimony
13  in the past correctly, that the way you have applied
14  Roundup reduces the amount of Roundup that comes
15  into your -- into contact with your skin to
16  essentially zero exposure or zero dose.  Is that --
17  did I understand that correctly?
18     A.  Yes.
19     Q.  Okay.  And the reason you take precautions,
20  whether they are in the label or additional
21  precautions that you've taken on your own, is to
22  reduce the amount of Roundup that comes into contact
23  with your skin and could therefore be absorbed into
24  your body, correct?
25     A.  Yes.  I have been very -- I don't know if I

Page 32

1   want to use the word fearful, but concerned since --
2   oh, it was either late 1990s or early 2000s when the
3   first few studies came out and there have been -- I
4   remember the hairy cell leukemia study that came out
5   in I think early 2000s, 2000 or 2002, somewhere in
6   there, and I've known that this compound could be
7   carcinogenic and treated it as such.
8      Q.  So based on your personal experience -- and
9   to be clear, there can be exposure to Roundup in the
10  sense of using Roundup which may or may not result
11  in an absorbed dose of Roundup through the skin,
12  correct?
13     MR. KRISTAL:  Objection.
14     A.  Could you clarify that?
15     Q.  Sure.
16     A.  I didn't understand.
17     Q.  Yeah.  I think it just follows from what
18  we've been talking about.  You've been exposed to
19  Roundup in the sense that you've used it yourself,
20  correct?
21     A.  I have, but I take extraordinary measures
22  over the years.  I -- for example, the measuring cup
23  is rinsed with slow water coming out of the hose, so
24  there is no back spray, rinse it five times before I
25  put it away with gloves on.  I handle it as -- as a

Page 33

1   ex-laboratory director, I handle it as I would
2   handle a laboratory carcinogen and, thus, avoid an
3   exposure.
4      Q.  Okay.  And that's what I want to be precise
5   about, is our use of terms here, because you in your
6   report in this case, and others, have calculated
7   exposure days, right?
8      A.  Yes.
9      Q.  Okay.  And those are days where people that
10  you're talking about, Mr. Domina in this case and
11  others in other cases, have been using Roundup,
12  right?
13     A.  Correct.
14     Q.  Those count as exposure days, right?
15     A.  Yes.
16     Q.  Okay.  And my point is that you've had
17  exposure days, correct?
18     A.  Yes, but unlike the general population, I'm
19  a toxicologist.  There aren't -- there aren't many
20  toxicologists in the US, it's kind of an unusual
21  field, and of the applicators, they are not
22  toxicologists.  They would not have the knowledge
23  that I have had in reviewing the literature over the
24  years to have that type of understanding,
25  unfortunately.

9 (Pages 30 to 33)

William R. Sawyer, Ph.D.

Page 34

1    Q.  Well, my question is a little bit different.
2  My question is it's possible to have exposure days
3  to Roundup but, as in your case, to take precautions
4  or to be in circumstances where the Roundup isn't
5  landing or being deposited on the skin and is,
6  therefore, not absorbed into the body, right, such
7  as you've done?
8    A.  Well, no, I think that's incorrect.  The
9  average applicator would not have modified their
10 sprayer and used the precautions that I've used over
11 the years, because they would not have known that
12 they were actually handling a dangerous carcinogen.
13   Q.  Well, again, let's be clear.  The way you
14 have gone about your use of Roundup over the years
15 is you have a number of exposure days, correct?
16   A.  Yes, but they are different exposure days
17 from the rest of the world.
18   Q.  Okay.  And that's my point.  It is possible
19 to have exposure days without systemic absorption of
20 Roundup, correct?
21      MR. KRISTAL:  Object to form.
22   A.  It's possible, but it would be highly
23 unusual.
24   Q.  And you would agree that Roundup exposure is
25 not harmful unless it results in Roundup, or

Page 35

1  specifically glyphosate, being absorbed into the
2  body, right?
3    A.  Yes.
4    Q.  So in that sense, exposure and dose are very
5  different things, aren't they?
6    A.  Yes, but the dose is based upon -- it's been
7  well studied among persons who are dressed with
8  drill coveralls, leather boots, long sleeves, head
9  covering and a face mask, and I direct you to the
10 Machado study, for example, and many other studies
11 in which individuals were less exposed, with short
12 sleeves, without gloves.
13      There is a wealth of study evidence showing
14 the actual dose that occurs among Roundup
15 applicators, and the exposure day analysis in the
16 dose metric studies is a combination of the
17 different variants of applicators.  It's not
18 specific only to those wearing shorts.  It's not
19 specific to only those using the full what we call
20 personal protective gear, PPE.
21      It's 12:30 and I'm suggesting we break for
22 lunch before the next question.
23      MR. PAINE:  Yeah.  Okay.  That's fine.
24   Let's do that.
25      THE VIDEOGRAPHER:  Going off the record at

Page 36

1  12:30 -- I'm sorry, 12:27.
2      (Recess from 12:27 p.m. until 1:33 p.m.)
3  (Ms. Cope-Kasten is present in the conference room.)
4      THE VIDEOGRAPHER:  We are back on the
5  record.  The time is 1:33.
6  BY MR. PAINE:
7    Q.  Welcome back, Dr. Sawyer.
8    A.  Thank you.
9    Q.  All right.  We're making good progress but
10 let me see if I can sort of pick up at a logical
11 place from where we left off.
12      Do you know whether Mr. Domina had an
13 applicator's license for herbicides and pesticides?
14   A.  I do not.
15   Q.  Okay.  Do you have any idea what -- assuming
16 he did, what kind of training he may have received
17 in how to handle or apply pesticides, herbicides,
18 including Roundup, safely and effectively?
19      MR. KRISTAL:  Objection to form.
20   A.  No.  I mean not beyond what the -- you know,
21 what the label states.  Other than the label, no.
22   Q.  So if you were to assume that he had an
23 applicator's license, you haven't had a chance to
24 evaluate, in light of that, whether or not he would
25 have been applying Roundup or other pesticides

Page 37

1  consistent with those programs' requirements in a
2  way that might have minimized the deposition of
3  Roundup or any other chemical on his skin, you
4  haven't evaluated that, right?
5    A.  No.
6      MR. KRISTAL:  Objection.
7    A.  No.  I've only evaluated the -- my
8  familiarity with the various area of label with
9  respect to Roundup products, so I really don't have
10 any information regarding materials beyond the
11 label.
12      I have, of course, reviewed and have relied
13 on Exhibit Number 10 in the Dickey case with respect
14 to the checklist for farmers who use the
15 agricultural herbicide glyphosate products, and I'm
16 familiar with those factors, and as I say, various
17 issues of labels.
18   Q.  Let's see.  I'm going to borrow this for
19 just a moment.  I'm not sure I've got any questions
20 about it right now but --
21      Okay.  Well, now that you've called my
22 attention to that, I'm going to mark this as
23 Exhibit 5 to this deposition for the Domina case.
24   (Sawyer Exhibit 5 was marked for identification.)
25 BY MR. PAINE:

10 (Pages 34 to 37)

William R. Sawyer, Ph.D.

Page 38

1    Q.  And again, this is exactly the same thing we
2  marked as Exhibit 10 to the deposition in
3  Mr. Dickey's case.
4        So let me just ask you a few questions about
5  this again, not having really had a chance to fully
6  evaluate this, but this Herbicide Application
7  Handbook from Monsanto that we've marked as
8  Exhibit 5, and this is -- has Bates number
9  MONGLY07297384 through -- it looks like it's not a
10  complete copy.  It skips around through Bates number
11  MONGLY07297443.
12        This does, for instance, on the page that
13  ends in 403, have what's listed here as an Herbicide
14  Application Checklist, right?
15    A.  Yes.
16    Q.  Okay.  And that says:  The following items
17  should be accessible prior to herbicide handling and
18  application.
19        And it has a number of things, including the
20  MSDS, rubber or synthetic gloves, protective
21  eyeglasses or goggles, rubber boots, activated
22  charcoal, rubber apron, soap, eye wash, clean water
23  for emergency use, and then a wind gauge, right?
24    A.  Yes.
25    Q.  Okay.

Page 39

1    A.  And then on a separate page it shows having
2  10 gallons of water available in the field for use
3  in needed, and other factors.
4    Q.  Okay.  And is it your understanding, Doctor,
5  from reviewing again what I've marked in this case
6  as Exhibit 5, that these are measures or
7  recommendations that were essentially intended to
8  help those applying Roundup and other herbicides to
9  reduce the chance that any of it might be deposited
10  on their skin or come into contact with them in a
11  potentially harmful way?
12        MR. KRISTAL:  Objection to form.
13    A.  Yes.  I agree, but the dichotomy is these
14  warnings are, for the most part, not on the label.
15    Q.  Just my question, though, Doctor, is those
16  things, those recommendations were intended to help
17  people apply the product safely, right?
18        MR. KRISTAL:  Objection.
19    A.  Yes, but not on Mr. Domina's -- I should say
20  the product labels he used, many of these factors
21  are not on Mr. Domina's product labels.
22    Q.  And I think we talked about this earlier,
23  but did you review all of the labels for the years
24  in which Mr. Domina says that he applied Roundup
25  formulations?

Page 40

1    A.  No, but I have reviewed literally dozens of
2  Roundup labels.  As recent as Monday I was -- in
3  fact, some labels are marked into the deposition
4  from Monday that correspond to the years that
5  Mr. Domina used the product.
6    Q.  And whether it's in an Herbicide Application
7  Handbook like we've marked as Exhibit 5, or
8  potentially part of an herbicide or pesticide
9  applicator's training, these are all things that a
10  person could do to sort of minimize their potential
11  dose of any glyphosate or Roundup formulation they
12  may come into contact with as part of the
13  application, right?
14        MR. KRISTAL:  Objection.
15    A.  Yes, but these Monsanto recommendations
16  were -- never made it to the labels.
17    Q.  My point is, Doctor, again, that exposure in
18  the sense of a day of use is not necessarily the
19  same thing as absorbed dose, correct?
20    A.  It's a measure of absorbed dose that
21  correlates with a statistically significant
22  increased rate of NHL.
23    Q.  But that's assuming that the Roundup
24  formulation actually comes into contact with the
25  skin, correct?

Page 41

1    A.  Yes, and that has been demonstrated in
2  numerous studies that I've referenced in the past.
3    Q.  Now, you're not going to come in and tell
4  the jury that you, Bill Sawyer, because of your
5  toxicologist training, are the only person on the
6  planet who has ever successfully used Roundup
7  without actually getting any on your skin, are you?
8    A.  No.
9    Q.  Okay.  So again, it is possible for people
10  to use Roundup formulations in the sense of having
11  an exposure day but in a way and in a method --
12  using methods that don't result in Roundup being
13  deposited on the skin or absorbed through the skin,
14  correct?
15        MR. KRISTAL:  Objection.
16    A.  Right, but the label doesn't provide that
17  information to the user.
18    Q.  Let's go to page 8 of your report, please.
19  There are a series of four bullet points at the top
20  and I would like to call your attention to the third
21  bullet point.  Just let me know when you're there
22  with me.
23    A.  Okay.
24    Q.  Okay.  So page 8 of the Domina report, the
25  third bullet point reads:  When Mr. Domina would

11 (Pages 38 to 41)

William R. Sawyer, Ph.D.

Page 42

1  unplug the boom nozzle, he would often blow it out
2  with his mouth.
3      Did I read that correctly?
4      A.  Yes, you did.
5      Q.  Okay.  And you've underlined the word mouth,
6  right?
7      A.  Yes.
8      Q.  Are you suggesting that he put his mouth
9  directly on the nozzle, or that he got the nozzle
10 close to him and blew it out with his mouth?
11     A.  I'm going to open his deposition to page
12 118.
13     Q.  Okay.  Please do, and tell me when you're
14 there, please.
15     A.  I'm on 118.
16     Q.  Okay.  And so what are you relying on for
17 the statement in your report there that he would
18 unplug the boom nozzle, he would often blow it out
19 with his mouth?
20     A.  Well, I'm on page -- line 8 of page 117.  He
21 stated as an answer to the question:  All right.  So
22 if you had a nozzle plug up, describe the process to
23 unplug it.
24     It would -- you would go back to the boom,
25 unscrew the nozzle and unplug it with whatever was

Page 43

1  plugged.  Either blow it out with your mouth or if
2  it was, if you could tap it out, whatever was in
3  there was hard, you know, it's hard to -- could have
4  been hard telling what it is.
5      So the answer to the question is he stated
6  that he blew it out with your mouth.  He didn't say
7  with his hand, he said your mouth.
8      Q.  Right.  My question was different, though.
9  Can you tell or do you know if he's applying his
10 mouth actually to the nozzle, as in putting his lips
11 on the nozzle, or whether he is blowing on it from a
12 distance?  And I guess the analogy I would draw, is
13 he treating it like a balloon to blow it up, or is
14 he treating it like a birthday cake candle to blow
15 it out, or do you know?
16     A.  I can only -- I can only state what the text
17 says.  I'm a toxicologist.  It's not my role to try
18 to read what's in his mind.  That would be
19 inappropriate.  I would defer your question to
20 Mr. Domina.
21     Q.  So you don't have an opinion and can't tell
22 one way or the other whether there was skin contact
23 on the nozzle when he's blowing this out or whether
24 he's blowing at it from a instance, that's what I
25 understand you're telling me?

Page 44

1      A.  His deposition doesn't specify; however, it
2  does state mouth, which is strongly suggestive that
3  he put his lips on the nozzle, but again, I would
4  defer that to Mr. Domina to answer, not me.
5      Q.  Do you see a little further down there on
6  117 where the question is:  I think you testified
7  earlier you wore gloves about 50 percent of the time
8  when you were using the bean bar.  If you had to
9  unplug the nozzle, did you use gloves all the time,
10 or about how often?
11     Answer:  All the time.
12     Question beginning on 118:  Why the change?
13 Were you starting to use gloves more often?
14     Answer:  Safer.  I knew I was going to get
15 some on my skin then.
16     Did I read all that correctly?
17     A.  Yes.
18     Q.  Okay.  Does it appear that Mr. Domina was
19 taking the precautions that he thought were
20 appropriate to render his handling of those nozzles
21 that he had to unplug in as safe a manner as
22 possible?
23     A.  What is the question?
24     Q.  Just what I asked:  Does it appear that
25 Mr. Domina was taking the precautions that he

Page 45

1  thought were appropriate to render his handling of
2  those nozzles that he had to unplug in as safe a
3  manner as possible?
4      A.  Thank you.  I didn't hear the word "appear."
5  It sounded more like a statement.
6      I can't judge that.  I mean, that's -- he
7  cleaned a nozzle out with his mouth.  Again, I
8  direct you to Mr. Domina.  You're asking me to
9  second-guess what he stated and I am not in a
10 position to do that.  That would be inappropriate.
11     Q.  Let's look at your report at page 7, please.
12 In the middle of the page there is a section that's
13 headed -- titled Type of Roundup Product Used.  Do
14 you see that?
15     A.  Yes.
16     MR. PAINE:  I'm making this worse.
17 BY MR. PAINE:
18     Q.  All right.  The first line there you write:
19 In his deposition Mr. Domina stated he first began
20 farming full-time in 1975.  He used 2.5 gallon
21 Roundup concentrate to spray on Roundup Ready crops.
22     Did I read that correctly?
23     A.  Yes.
24     Q.  Were Roundup Ready crops available in 1975?
25     A.  No.

12 (Pages 42 to 45)

William R. Sawyer, Ph.D.

Page 46

1    Q.  When were Roundup Ready crops first
2   available?
3    A.  I don't recall the date but it certainly was
4   not 1975.  That's -- the product only came out mid
5   '74.
6    Q.  Okay.  So that's an error in your report,
7   that he was using Roundup on Roundup Ready crops in
8   1975?
9    A.  No, it's not an error in my report.  It's
10  what was stated.
11   Q.  Okay.  So what's your assessment about
12  whether that's even possibly true, that is whether
13  Mr. Domina was using Roundup on Roundup Ready crops
14  as early as 1975?
15   A.  That's impossible.  He may have been using
16  Roundup but not on Roundup Ready crops.
17   Q.  Do you know when Mr. Domina first began
18  using Roundup Ready crops?
19   A.  No.
20   Q.  Would you agree that the volume of Roundup
21  applied per acre is less for crops that are not
22  Roundup Ready than those that are Roundup Ready?
23      MR. KRISTAL:  Objection; foundation.
24   A.  I'm not prepared to answer that.
25   Q.  Were you aware that part of Mr. Domina's

Page 47

1   farming operations involved raising livestock?
2    A.  I answered that earlier.  I really don't
3   have much information at all regarding his livestock
4   production.
5    Q.  Okay.  Well, let's look at your report.  On
6   page 4 you said:  He raises 200 beef cows and about
7   2,000 hogs.
8      Do you know what -- over what period of time
9   he raised that livestock?
10   A.  The only information I have was starting in
11  1960, when he started farming, and early on I
12  believe he had cows and hogs.  I can't -- I can't
13  specify the years.  I don't have that information.
14   Q.  Beyond just mentioning that statement that
15  we've read about him raising 200 beef cows and about
16  2,000 hogs, did you give any other consideration to
17  whether his raising of or handling or working with
18  livestock were potential contributing factors to his
19  non-Hodgkin lymphoma?
20   A.  Only that as I stated earlier.  I am
21  familiar with an older study that's been around a
22  while that does show an association anyway with
23  raising of farm animals and lymphoma, but as I also
24  said earlier, that -- and I guess when I say
25  earlier, I mean in the Dickey deposition -- that the

Page 48

1   microbiological aspects regarding potential
2   associations with lymphoma is best handled by the
3   medical oncologist and/or pathologist rather than
4   the toxicologist, as that's truly an infectious
5   process as opposed to a chemical process of
6   carcinogenesis.
7    Q.  Okay.  So with the deference to other
8   disciplines duly noted, I take it, though, that you
9   didn't assess anything to do with Mr. Domina's work
10  with or raising of livestock as a potential cause or
11  contributing factor to his non-Hodgkin lymphoma?
12   A.  I did not.
13   Q.  And you mentioned that you would defer to
14  the medical oncologists and others in the medical
15  field about the microbiological aspects, correct?
16   A.  That's right.
17   Q.  I take it you didn't investigate any
18  chemicals that were used, fumigants, pesticides,
19  insecticides, anything like that, beyond what
20  Mr. Dickey -- I'm sorry, what Mr. Domina described
21  in his deposition as relates to his raising of
22  livestock as part of his farming operations?
23   A.  That's correct.
24   Q.  Do you know when the first non-Hodgkin's
25  lymphoma malignant cell appeared in Mr. Domina's

Page 49

1   body?
2    A.  No.
3    Q.  Do you even know a year when the first
4   malignant non-Hodgkin lymphoma cell appeared in
5   Mr. Domina's body?
6    A.  No.  There is no methodology to make such a
7   determination.
8    Q.  Similarly, there is no methodology to make
9   such a determination as to which particular month
10  the first malignant non-Hodgkin lymphoma cell
11  appeared in Mr. Domina's body, correct?
12   A.  Yes.
13   Q.  Is there any way for you to identify --
14  sorry.  Strike that.
15      Is there any scientifically validated test
16  or method or procedure that you or anyone else could
17  use to identify when the first precursor changes
18  that led to malignancy of Mr. Domina's non-Hodgkin
19  lymphoma first occurred in his body?
20   A.  Yeah, there are diagnostic tests that screen
21  for various precursors of lymphoma and other
22  malignancies, and I would defer those to the medical
23  oncologist.
24   Q.  Were any of those tests for precursor
25  lesions or precursor changes performed in

13 (Pages 46 to 49)

William R. Sawyer, Ph.D.

Page 50

1    Mr. Domina's case?
2       A.  Not that I'm aware of, no, not until after
3    his initial presentation.
4       Q.  And that's the one that led to his diagnosis
5    in 2012, right?
6       A.  Correct.
7       Q.  Okay.  Now, in your report at pages 7
8    through 8 you talk about the -- let me make sure I
9    got that right.  Yeah, pages 7 through 8, under Time
10   Frame of Exposures, you talk about the intervals
11   during given years when Mr. Domina used Roundup
12   formulations on his farm, right?
13      A.  Yes.
14      Q.  And again there you've said, basically, over
15   those periods of time, 1975 to 1984, '84 to '96, and
16   '96 to '02, that he used the Roundup formulations
17   from mid May to September 1 each year; is that
18   correct?
19      A.  Yes, and I'm referencing Stephan Petty's
20   interview work.
21      Q.  Sure.  But the months during which
22   Mr. Domina used Roundup on his farm were from mid
23   May to September 1 each year, right?
24      A.  Yes.
25      Q.  Okay.  And that's what you've accepted as

Page 51

1    correct for purposes of your opinions, right?
2       A.  I've relied on that, yes.
3       Q.  Okay.  And actually, Dr. -- I'm sorry,
4    Mr. Petty's appendicis that we've marked as, I
5    think, Exhibits 3 and 4 to your deposition, if you
6    look at page 524 again from his report, I think
7    that's in Appendix F -- I think that's it.
8       A.  No, that's not it.
9       Q.  I think that's it right there.  It's not in
10   the notice.
11      A.  It's not in the notice.  That would be
12   peculiar.
13      Q.  That would be peculiar.
14      A.  Okay.  Ready.
15      Q.  Okay.  You're with me on page 524?
16      A.  Yes.
17      Q.  And that's Appendix F for Mr. Petty?
18      A.  It is.
19      Q.  All right.  And Mr. Petty there says, in
20   that third column, Time Frame Job, the season is
21   basically mid May to October 1st.  Do you see how
22   he's got through October 1st each year?
23      A.  I do.
24      Q.  Okay.  Do you know whether he or you are
25   right about that exposure interval from mid May to

Page 52

1    either September 1, as you've got in your report, or
2    October 1, as he's got in his report?
3       A.  I would have to defer that question to
4    Mr. Petty, because I see on page 531, which is
5    Appendix G, he listed a midpoint value for months in
6    season, May through October, as five months, and yet
7    in Exhibit F, page 524, he lists mid May to
8    October 1st.  So there is some discrepancy with
9    respect to those two page numbers, 524 and 531, and
10   I can't explain it.
11      Q.  Okay.  Well, let's -- and that's fine.  If
12   you can't explain it, that's fine, but let me make
13   sure we're literally talking about the same things.
14         So you, in your report, have said the
15   interval of use was from mid May to September 1,
16   right?  And that's different than what Mr. Petty
17   has, which is from May to October 1 in his report,
18   right?
19         MR. KRISTAL:  Objection to form.
20      A.  Yes, and it may be in my report it's simply
21   a typo.
22      Q.  Okay.
23      A.  I relied on his actual calculation of total
24   hours, so whether my report states September 1st or
25   October 1st, it's still the same number.

Page 53

1       Q.  Okay.  Well, that's my next question.  So
2    you relied on Mr. Petty who came up with a total
3    time and hours of spraying which he apparently based
4    on an interval from May to October, right?
5          MR. KRISTAL:  Objection.
6       A.  Yes.
7       Q.  Okay.  So if your report is right, that it
8    was actually mid May to September, that would be
9    more like four months rather than five months that
10   Mr. Petty is using, right?
11      A.  Correct, but I relied on his calculation, so
12   whether I made a typographical error with respect to
13   September/October has no effect on the actual
14   quantitative value I used.
15      Q.  Well, let's -- let me see if I can check you
16   on that.  If you're right, that the interval was mid
17   May to September 1, rather than a month more that
18   Mr. Petty used in his calculations, his total time
19   of hours spraying that you've copied here and put
20   into your report on page 8 would be off by a factor
21   of about 20 to 25 percent, right?
22         MR. KRISTAL:  Objection to form.
23      A.  No, because I didn't --
24      Q.  No?
25      A.  I didn't calculate the total hours.  I

14 (Pages 50 to 53)

William R. Sawyer, Ph.D.

Page 54

1    relied on Table -- well, there is no table number,
2    but the table on page 534 of Appendix G from the
3    Petty report, I relied on that value.
4         Q.  Right.  So -- sorry?
5         A.  So whether I made a typographical error on
6    page 8 or not, it would make no difference on a
7    calculation.
8         Q.  Okay.  Again, I want to make sure I
9    understand this.  So I'm not a math major or
10   statistician, but if your report is not a typo, and
11   the interval of use was actually mid May to
12   September that you have on page 8 -- 7 and 8 of your
13   report in the bullet points, okay, that's roughly
14   three-and-a-half months of use per year, right?
15        A.  Right.
16        Q.  Okay.  If that's correct, as opposed to what
17   Mr. Petty has, which is mid May to October, he's
18   included an extra month, correct?
19        A.  No.
20        Q.  Okay.  So you're going to tell the jury that
21   the interval from mid May to September is the same
22   as the interval from mid May to October?
23        A.  No.
24        Q.  Okay.
25        A.  I'm going to tell the jury I relied on the

Page 55

1    calculations and the information from Petty's report
2    and I have made an error and it should have read
3    October 1st, not September 1st, and that error is
4    typographical, has no bearing on the numerical
5    quantitative number of hours that I used directly
6    from the Petty report on page 524 -- or 534.  I'm
7    sorry.
8         Q.  Okay.  So you're assuming that Mr. Petty has
9    it right, that the interval of use is from mid May
10   to October 1, and that you have it wrong from mid
11   May to September 1?
12        A.  Absolutely.
13        Q.  Okay.
14        A.  I said, and I made it very clear throughout
15   this deposition, that I relied on Mr. Petty's
16   calculation.
17        Q.  Okay.  So let me ask you to assume this for
18   me.  Okay?  Let's assume that you got it right, that
19   the interval of use was mid May to September 1, not
20   what Mr. Petty has.  Okay?  So just assume that for
21   purposes of my question.  I'm not asking you to
22   agree, I'm asking you to assume.  Okay?
23            If you assume that, then Mr. Petty's total
24   time and hours, which are based on adding up the
25   months and years of exposure for the interval that

Page 56

1    he used each year, would be an overestimate, right,
2    if you're right and he's got the wrong interval?
3         A.  I clearly don't understand that question.
4    It got a little bit convoluted.
5         Q.  Okay.  Mr. Petty would have overestimated
6    the amount of total hours if he used an interval
7    that was a month longer than you used and it turns
8    out that you're right?
9         A.  But I didn't use one.
10        Q.  Okay.
11        A.  I didn't make any calculation.
12        Q.  You just took his and divided it by eight?
13        A.  Yes.
14        Q.  Okay.  And if his was off, then your
15   division by 8 would be off?
16        A.  That would be off by 20 percent, yeah.
17        Q.  Okay.  See, that was easy.
18            MR. KRISTAL:  When you ask the right
19   question, it becomes very easy.
20            MR. PAINE:  You know, I get around to it
21   eventually.
22            MR. KRISTAL:  For the steno record, that was
23   a joke with some laughter.
24            MR. PAINE:  Stipulated.
25        BY MR. PAINE:

Page 57

1         Q.  So whether Mr. Petty is right or you are
2    right, the majority of the year, in any given year
3    that Mr. Domina was using glyphosate, was spent not
4    using glyphosate, right?  And that's a bad question.
5    I'll stipulate that was a bad question.
6            If he's using it from mid May to September
7    or mid May to October, the majority of any given
8    year was spent not using glyphosate formulations in
9    Mr. Domina's case, right?
10        A.  Agree.
11            MR. KRISTAL:  We'll stipulate 3 and 4 is
12   less than 6.
13            MR. PAINE:  Or 12.
14            MR. KRISTAL:  Well, you said majority.
15        BY MR. PAINE:
16        Q.  Can you say to a reasonable degree of
17   scientific certainty that any amount of glyphosate
18   from Roundup was present in Mr. Domina's body when
19   the first malignant non-Hodgkin lymphoma cell
20   appeared in his system?
21            MR. KRISTAL:  Object to form.
22        A.  No.
23        Q.  Is there any objective fact, test result,
24   imaging study, pathologic slide or stain, medical
25   record whatsoever that you can point me to that

15 (Pages 54 to 57)

William R. Sawyer, Ph.D.

Page 58

1  would indicate to you that Mr. Domina's NHL was at a
2  more advanced stage or is associated with a worse
3  prognosis because of his use of Roundup products
4  than if he had not used Roundup products?
5      MR. KRISTAL: Object to form.
6      A.  I can't, but I would defer that to also an
7  opinion from the pathologist and medical oncologist,
8  but from a toxicological standpoint, no.
9      MR. PAINE: Let's go off the record for a
10  second.  I may be done but I'd like to consult
11  with Ms. Cope-Kasten for just a moment.
12      THE VIDEOGRAPHER: We're going off the
13  record at 2:09.
14      (Recess from 2:09 p.m. until 2:11 p.m.)
15      THE VIDEOGRAPHER: We're back on the record.
16  The time is 2:11.
17      MR. PAINE: Dr. Sawyer, thank you for your
18  time.  We have one more deposition after this
19  but -- and we'll come back on for that, but at
20  the moment I'm done with my questions for
21  Mr. Domina.
22      MR. KRISTAL: I have --
23      MR. PAINE: I'll pass the witness and may
24  have some follow-ups after that, but if not, I
25  wanted to thank you for answering my questions

Page 59

1  and being patient with me in this deposition too.
2      MR. KRISTAL: It'll be two minutes.
3              CROSS-EXAMINATION
4  BY MR. KRISTAL:
5      Q.  On page 7 of your report you note that
6  Mr. Domina has said that he was told my a Monsanto
7  salesman or person that, quote, it's so safe you
8  could drink it, end quote.
9          Do you see that quote there?
10      A.  Yeah.
11      Q.  Would it be unusual for someone who is told
12  that to put his mouth on a nozzle and blow out
13  Roundup?
14      MR. PAINE: Objection.
15      A.  It would be consistent.
16      Q.  Okay.  With respect to Mr. Petty and
17  October 1st or September 1st, I think you said it
18  was off by about -- if he is wrong and it's
19  September 1st, it would be off -- his calculation
20  would be off by about 20 percent, thereabouts?
21      A.  Yes.
22      Q.  Okay.  Let's assume, to be super
23  conservative, his estimate is off by 50 percent.
24  How many hours total was his mid range that you used
25  to calculate days?

Page 60

1      A.  Well, 5655 hours.
2      Q.  Excuse me?
3      A.  5,655 hours.
4      Q.  Right.  And you calculated the mid range to
5  be seven -- how many days, 700 --
6      A.  Mid range, 706.9 exposure days.
7      Q.  Okay.  So if he was off by 50 percent, half
8  of 706 is 353?
9      A.  Yes, which is about 35 times above the
10  maximal threshold value in the human epidemiologic
11  studies with dose metrics --
12      Q.  Okay.
13      A.  -- of greater than 10 days.
14      Q.  And let's assume he was 90 percent off.  So
15  we would deduct 540 days or thereabouts, right?
16      A.  At 90 percent off, you'd be down to about 70
17  days.
18      Q.  Okay.  And how does 70 days compare to the
19  epidemiological studies that use days as a metric in
20  terms of relative risk?
21      A.  It's still about seven times above the
22  maximal threshold.
23      Q.  Okay.  You were -- and this is the last
24  question or two.  You were asked about whether or
25  not there was glyphosate in Mr. Domina's body when

Page 61

1  the first malignant cell appeared.  Do you have to
2  have the chemical in the body when the first
3  malignant cell appears to render an opinion that
4  that substance contributed to the development of the
5  cancer?
6      MR. PAINE: Objection; form.
7      A.  No.  There's no methodology to support that
8  at all.  That's a self-proclaimed methodology, if it
9  exists.
10      Q.  So the damage to Mr. Domina's DNA that
11  ultimately led to a malignant cell forming, do we
12  know -- can anybody tell exactly when that initial
13  DNA damage occurred?
14      A.  No.
15      MR. KRISTAL: That's all I have.
16      MR. PAINE: We're good.
17      THE VIDEOGRAPHER: This concludes the
18  deposition.  The time is 2:15.
19      (Whereupon, the deposition concluded at
20  2:15 p.m.)
21
22
23
24
25

16 (Pages 58 to 61)

William R. Sawyer, Ph.D.

## Page 62

```
 1            CERTIFICATE
 2         I, SUSAN D. WASILEWSKI, Registered
 3    Professional Reporter, Certified Realtime Reporter,
 4    Certified Realtime Captioner, and Florida
 5    Professional Reporter, do hereby certify that,
 6    pursuant to notice, the deposition of WILLIAM R.
 7    SAWYER, Ph.D., was duly taken on Thursday,
 8    November 14, 2019, at 11:37 a.m. before me.
 9         The said WILLIAM R. SAWYER, Ph.D., was duly
10    sworn by me according to law to tell the truth, the
11    whole truth and nothing but the truth and thereupon
12    did testify as set forth in the above transcript of
13    testimony.  The testimony was taken down
14    stenographically by me.  I do further certify that
15    the above deposition is full, complete, and a true
16    record of all the testimony given by the said
17    witness, and that a review of the transcript was
18    requested.
19
20    _____
21    Susan D. Wasilewski, RPR, CRR, CCP
22    (The foregoing certification of this transcript does
23    not apply to any reproduction of the same by any
24    means, unless under the direct control and/or
25    supervision of the certifying reporter.)
```

## Page 63

```
 1         INSTRUCTIONS TO WITNESS
 2
 3
 4         Please read your deposition over carefully
 5    and make any necessary corrections.  You should
 6    state the reason in the appropriate space on the
 7    errata sheet for any corrections that are made.
 8
 9         After doing so, please sign the errata sheet
10    and date it.  It will be attached to your
11    deposition.
12
13         It is imperative that you return the
14    original errata sheet to the deposing attorney
15    within thirty (30) days of receipt of the deposition
16    transcript by you.  If you fail to do so, the
17    deposition transcript may be deemed to be accurate
18    and may be used in court.
```

## Page 64

```
 1              ------
 2              ERRATA
 3              ------
 4    PAGE  LINE  CHANGE
 5    ___  ___  _____
 6     REASON: _____
 7    ___  ___  _____
 8     REASON: _____
 ...
```

## Page 65

```
 1         ACKNOWLEDGMENT OF DEPONENT
 2
 3       I, _____, do hereby
 4    acknowledge that I have read the foregoing pages, 1
 5    through 64, and that the same is a correct
 6    transcription of the answers given by me to the
 7    questions therein propounded, except for the
 8    corrections or changes in form or substance, if any,
 9    noted in the attached Errata Sheet.
13    WILLIAM R. SAWYER, Ph.D.        DATE
18    Subscribed and sworn to before me this
19    ____ day of _____, 20___.
20    My Commission expires: _____
22    _____
      Notary Public
```

17 (Pages 62 to 65)

Golkow Litigation Services - 1.877.370.DEPS

William R. Sawyer, Ph.D.

```
                                    Page 66
 1              LAWYER'S NOTES
 2    PAGE  LINE
 3    ____ ____ _____
 4    ____ ____ _____
 5    ____ ____ _____
 6    ____ ____ _____
 7    ____ ____ _____
 8    ____ ____ _____
 9    ____ ____ _____
10    ____ ____ _____
11    ____ ____ _____
12    ____ ____ _____
13    ____ ____ _____
14    ____ ____ _____
15    ____ ____ _____
16    ____ ____ _____
17    ____ ____ _____
18    ____ ____ _____
19    ____ ____ _____
20    ____ ____ _____
21    ____ ____ _____
22    ____ ____ _____
23    ____ ____ _____
24    ____ ____ _____
25
```

Golkow Litigation Services - 1.877.370.DEPS