# EXHIBIT 5

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

4   IN RE:  ROUNDUP PRODUCTS ) MDL No. 2741
    LIABILITY LITIGATION,      )
5                              ) Case No.
    _____  ) 16-md-02741-VC
6                              )
    This document relates      )
7   to:                        )
                               )
8   Hardeman v. Monsanto       )
    (3:16-cv-00525-VC)         )
9   _____  )

10

11

12

13

14

15          Video Deposition of DENNIS

16   WEISENBURGER, M.D., held at 700 West

17   Huntington Drive, Monrovia, California,

18   commencing at 8:35 a.m., on Thursday,

19   December 20, 2018, before Lisa Moskowitz,

20   California CSR 10816, RPR, CRR, CLR, NCRA

21   Realtime Systems Administrator.

22                    – – –

23          GOLKOW LITIGATION SERVICES

       877.370.3377 ph | 917.591.5672 fax

24          Deps@golkow.com

25

Dennis Weisenburger, M.D.

---

Page 2

APPEARANCES:

ANDRUS WAGSTAFF
BY:  KATHRYN M. FORGIE
    kathryn.forgie@andruswagstaff.com
1901 Harrison Street, Suite 1100
Oakland, California 94612
(310) 339-8214

Counsel for Plaintiff

ARNOLD & PORTER KAYE SCHOLER, LLP
BY:  JULIE DU PONT
    julie.dupont@arnoldporter.com
250 West 55th Street
New York, New York 10019-9710
(212) 836-8572
Counsel for Defendant Monsanto

ARNOLD & PORTER KAYE SCHOLER, LLP
BY:  KATHRYN M. PODSIADLO
    kathryn.podsiadlo@apks.com
777 South Figueroa Street, 44th Floor
Los Angeles, California 90017-5844
(213) 243-4273

Counsel for Defendant Monsanto

VIDEOGRAPHER:

RYAN SCHAEFER,
GOLKOW LITIGATION SERVICES
          – – –

---

Page 3

INDEX

EXAMINATION OF                    PAGE
DENNIS WEISENBURGER, M.D.
    By Ms. Du Pont          6, 113
    By Ms. Forgie           106


DEPOSITION EXHIBITS
NUMBER      DESCRIPTION            PAGE
1    Monsanto Company's Notice to      7
     Take Oral and Videotaped
     Deposition of Dr. Dennis
     Weisenburger

2    Dr. Weisenburger Materials        8
     List, November 13, 2018
3    Curriculum Vitae                  8
4    Handwritten Notes                15
5    Retention Agreement Expert       18
     Opinions and Testimony

6    Addendum to Dr. Weisenburger's   19
     Reference List
7    Expert Report of Dr. Dennis      21
     Weisenburger

8    IARC Monograph on Hepatitis C    54

9    Study by Dal Maso                62

10   Article by Mahale                70

---

Page 4

DEPOSITION EXHIBITS (Cont'd)
NUMBER        DESCRIPTION         PAGE
11    Castillo Article            87
12    Zuckerman Article          100

---

Page 5

MONROVIA, CALIFORNIA

THURSDAY, DECEMBER 20, 2018, 8:35 A.M.

        THE VIDEOGRAPHER:  We're now on record.  My name is Ryan Schaefer.  I'm a videographer for Golkow Litigation Services.

        Today's date is December 20, 2018, and the time is 8:35 a.m.  This video deposition is being held at 700 West Huntington Drive, Monrovia, California, in the matter of Hardeman versus Monsanto Company, case number 3:16-cv-00525-VC for the U.S. District Court, Northern District of California. The deponent is Dr. Dennis Weisenburger.

        Counsel will be noted on the stenographic record and will counsel please identify themselves.

        MS. FORGIE:  Kathryn Forgie of Andrus Wagstaff for the plaintiff Mr. Hardeman.

        MS. DU PONT:  Julie du Pont of Arnold Porter on behalf of Monsanto.

        MS. PODSIADLO:  Kathryn

---

Dennis Weisenburger, M.D.

Page 6

1   Podsiadlo on behalf of Monsanto.
2       THE VIDEOGRAPHER:  The court
3   reporter is Lisa Moskowitz and will now
4   swear in the witness.
5
6       DENNIS WEISENBURGER, M.D.
7   called as a witness, having been duly
8   sworn, was examined and testified as
9   follows:
10
11          EXAMINATION
12  BY MS. DU PONT:
13      Q.  Good morning, Dr. Weisenburger.
14      A.  Good morning.
15      Q.  It's nice to see you again.  We met
16  the other day.  I'm Julie du Pont, and I
17  represent Monsanto.
18      Do you understand that?
19      A.  Yes.
20      Q.  Can you go ahead, for the record,
21  and just state your name and business
22  address, please?
23      A.  Dennis Weisenburger, 1500 East
24  Duarte Road, Duarte, California.  I work at
25  City of Hope Center.

Page 7

1       Q.  Thank you.  And you've previously
2   given sworn testimony on behalf of
3   plaintiffs in the Roundup litigation against
4   Monsanto; correct?
5       A.  Yes.
6       Q.  And you stand by that prior
7   testimony as truthful and accurate?
8       A.  Yes.
9       Q.  Nothing you want to correct today
10  from that prior testimony?
11      A.  No.
12      Q.  Okay.  So why don't we go ahead.
13  I've marked as Exhibit 1 the notice of your
14  deposition in the Hardeman case.
15          (Exhibit Number 1 was marked
16      for identification.)
17  BY MS. DU PONT:
18      Q.  Do you see that in front of you?
19      A.  Yes.
20      Q.  And this notice asked you to bring
21  with you -- and your counsel has actually
22  provided to us -- a number of materials to
23  the deposition.  I'm going to go ahead and
24  mark those as well.  They include your
25  materials considered list, an updated

Page 8

1   list -- sorry, a list dated November 13,
2   2015.  2013.  Sorry.  November 13, 2018.
3       A.  Yes.
4       Q.  And we've marked that as Exhibit 2.
5           (Exhibit Number 2 was marked
6       for identification.)
7   BY MS. DU PONT:
8       Q.  You can set that aside.  You've
9   also brought with you your current CV from
10  August, 2018, that we have marked as
11  Exhibit 3.
12          (Exhibit Number 3 was marked
13      for identification.)
14  BY MS. DU PONT:
15      Q.  Do you see that?
16      A.  Yes.
17      Q.  There's nothing on this CV that you
18  need to update at this time; correct?
19      A.  Correct.
20      Q.  Okay.  Why don't we just take a
21  look, then, at your materials list dated
22  November 13.  This includes a number of
23  medical references, but it also includes a
24  number of case-specific materials on the
25  last two pages; is that right?

Page 9

1       A.  Yes.
2       Q.  And it looks like you've reviewed
3   Mr. Hardeman's medical records; is that
4   right?
5       A.  Yes.
6       Q.  And have you reviewed select
7   records of Mr. Hardeman?
8       A.  All available records.
9       Q.  Right.  And you've reviewed his
10  fact sheet?
11      A.  Yes.
12      Q.  And you've reviewed his pathology;
13  correct?
14      A.  Well, I did and I didn't.  I never
15  did get the diagnostic slides.  I did get
16  some slides that were not really relevant;
17  so I haven't reviewed his diagnostic
18  pathology.
19      Q.  Okay.  So let me try to figure out
20  exactly what you did get.  Did you get any
21  slides from his fine needle aspiration?
22      A.  That's what I got.
23      Q.  Okay.  Why do you say that those
24  were not relevant?
25      A.  Well, it was just necrotic material

Dennis Weisenburger, M.D.

Page 10

1  on it. It wasn't anything diagnostic.
2      Q. Okay.
3      A. The slides that were actually
4  diagnosed as diffuse large B-cell lymphoma,
5  I never obtained those, although they were
6  reviewed by other people, I think.
7      Q. Okay. And the -- so Mr. Hardeman
8  initially had a needle aspiration. It came
9  back and the original pathologists said it
10  just contains necrotic material, and that is
11  when they did a needle biopsy; correct?
12      A. Correct.
13      Q. You're saying the slides you got of
14  the needle biopsy, there was nothing there
15  to look at; correct?
16      A. Nothing diagnostic.
17      Q. Was it there was no material on the
18  slides they tried to cut from the original
19  pathology?
20      A. There was some material, but not
21  much. I think I probably had recut slides,
22  too, which meant there was very little --
23  there was some smears that I looked at that
24  had material, but the actual sections of the
25  material was almost nothing on the slide.

Page 11

1  So it was -- it wasn't helpful.
2      Q. Got it. Did you -- I think I know
3  the answer to this, but I'm going to ask it
4  anyway. You did not review any of the
5  slides where they did the amino
6  histochemistry staining?
7      A. No.
8      Q. So are you essentially relying on
9  the reports of his core biopsy in reaching
10  your conclusions here?
11      A. Yes, and apparently Monsanto also
12  has Dr. Arbor review the slides so I know
13  him well. I knew I would trust his
14  diagnosis. He basically agreed with local
15  pathologists; so I'm accepting those
16  diagnoses.
17      Q. So there's nothing -- at this
18  point, there's nothing in the original
19  pathology reports from Mr. Hardeman's
20  treaters that you disagree with?
21      A. Correct.
22      Q. Did you have an opportunity to look
23  at the bone marrow testing that was done on
24  his tumor?
25      A. I did look at the bone marrow.

Page 12

1  Again, it didn't show any disease.
2      Q. Okay.
3      A. It was normal.
4      Q. That was consistent with the
5  reports from his treating doctors that it
6  had not spread to his bone marrow --
7      A. Yes.
8      Q. -- his non-Hodgkin's lymphoma;
9  correct?
10      A. Yes.
11      Q. You also reviewed the testimony of
12  several of Mr. Hardeman's doctors, Dr. Ye,
13  Turk, and Turley; is that right?
14      A. Yes.
15      Q. You had the opportunity to review
16  the depo transcript of Mr. Hardeman; right?
17      A. Yes.
18      Q. Did you review the deposition
19  transcript of his wife's deposition?
20      A. Yes.
21      Q. That just wasn't listed here, but
22  you did, in fact, review it?
23      A. Yes.
24          MS. FORGIE: We'd like to add
25      it.

Page 13

1          MS. DU PONT: Okay.
2          MS. FORGIE: I thought it was
3      on there.
4  BY MS. DU PONT:
5      Q. Since you received -- since you
6  wrote your report, you've also had the
7  opportunity to review the reports of
8  Dr. Arbor, Grossbard, Levine and Steidl; is
9  that right?
10      A. Yes.
11      Q. Do you know Dr. Levine?
12      A. Yes.
13      Q. You worked together at the City of
14  Hope; right?
15      A. She was my boss.
16      Q. She was your boss but now she isn't
17  your boss?
18      A. Yes. She stepped down from her
19  position.
20      Q. Did you respect her?
21      A. Yes.
22      Q. Did you consider her to be a highly
23  qualified oncologist?
24      A. Yes.
25      Q. And you mentioned you also know

Dennis Weisenburger, M.D.

Page 14

1 Dr. Arbor and you respect him as well?
2    A. Yes.
3    Q. And, again, you believe him to be a
4 highly qualified pathologist?
5    A. Yes.
6    Q. And how do you know Dr. Arbor?
7    A. Just we move in the same circles.
8 He does the same thing I do. We always see
9 each other at meetings. He also did his
10 training at the City of Hope. We have kind
11 of a common bond there.
12    Q. Okay. Do you know Dr. Michael
13 Grossbard?
14    A. I don't.
15    Q. And do you know Dr. Steidl?
16    A. Yes.
17    Q. I may be pronouncing his name
18 wrong.
19    A. Steidl.
20    Q. How do you know him?
21    A. Sort of the same way, through just
22 we do -- we've done research together. You
23 know, we see each other at meetings. He's
24 visited City of Hope. So we know each other
25 through our academic endeavors.

Page 15

1    Q. Okay. And do you respect him?
2    A. Yes.
3    Q. Do you consider him to be highly
4 qualified in his field?
5    A. Yes.
6    Q. Okay. You can set that aside.
7 We've marked as Exhibit 4 your invoice for
8 your work in the Hardeman matter.
9       (Exhibit Number 4 was marked
10       for identification.)
11 BY MS. DU PONT:
12    Q. Can you take a look at that?
13    A. Yes.
14    Q. It looks like between October 20,
15 2018, and November 20, 2018, you billed
16 32-and-a-half hours; is that right?
17    A. Yes.
18    Q. At $500 an hour?
19    A. Yes.
20    Q. And so as of November 20, 2018 you
21 had made $16,250?
22    A. Yes.
23    Q. And have you worked on
24 Mr. Hardeman's case since November 20, 2018?
25    A. Yes.

Page 16

1    Q. How many hours have you billed?
2    A. 32.5. 35.5.
3    Q. So you worked an additional three
4 hours or you --
5    A. 35 hours. 35½ hours.
6    Q. In addition to the 32.5 you already
7 billed. Okay.
8       MS. PODSIADLO: 17,750.
9 BY MS. DU PONT:
10    Q. You've earned an additional $17,750
11 on Mr. Hardeman's case since November 20?
12    A. If the math is correct, yes.
13    Q. So in total you've made $34,000
14 working on Mr. Hardeman's case to date?
15    A. Sounds right.
16    Q. Okay. And that additional
17 35½ hours, how did you spend that time?
18    A. Mostly reading additional materials
19 on hepatitis C and hepatitis B and other
20 topics.
21    Q. And why did you feel the need to
22 read additional materials on hep C and hep B
23 and other topics?
24    A. It's not an area I'm particularly
25 an expert in; so I had to go back and learn

Page 17

1 a lot about hepatitis C and hepatitis B.
2 When I read the Monsanto expert reports,
3 there were some issues that I needed to
4 research and understand.
5       So I pulled additional articles
6 that were referenced in their reports.
7    Q. Did counsel for plaintiff provide
8 you with any additional articles on hep B
9 and hep C?
10    A. No.
11    Q. You said there were other topics.
12 What were the other topics that you looked
13 into for Mr. Hardeman?
14    A. We looked at -- into autoimmune
15 disease. I looked into eczema. I guess
16 those were the main things.
17    Q. Okay. Now, you can set your
18 invoice aside. We've marked as Exhibit 5
19 your retention agreement with Andrus
20 Wagstaff.
21       Do you see that?
22    A. Yes.
23    Q. Do you understand this to be your
24 retention agreement in the Roundup
25 litigation as well as your W-9 which is on

Dennis Weisenburger, M.D.

Page 18

1  the second page?
2      A.  Yes.
3          (Exhibit Number 5 was marked
4  for identification.)
5  BY MS. DU PONT:
6      Q.  You can set that aside.
7          MS. FORGIE:  I'd like to
8  redact.  I didn't realize his social
9  security number was in there.  I'd like
10  to redact that from the deposition.
11          Can we do that on the exhibit?
12          MS. DU PONT:  Sure.
13          MS. FORGIE:  Can we do that
14  now?
15          MS. DU PONT:  Yeah.  Do you
16  want to take a brief break?
17          MS. FORGIE:  Yeah, that's kind
18  of a big deal.
19          THE VIDEOGRAPHER:  The time is
20  8:49 a.m., and we are off the record.
21      (Recess taken from 8:50 a.m.
22  to 8:50 a.m.)
23          THE VIDEOGRAPHER:  The time
24  is now 8:50 a.m., and we are back on
25  the record.

Page 19

1          MS. FORGIE:  Just for the
2  record, we -- by agreement of all
3  counsel, we had the court reporter
4  redact Dr. Weisenburger's social
5  security number from Exhibit 5.  Thank
6  you.
7          MS. DU PONT:  Okay.
8  BY MS. DU PONT:
9      Q.  Moving on, marked as Exhibit 6 is
10  your addendum to your reference list.
11          (Exhibit Number 6 was marked
12  for identification.)
13  BY MS. DU PONT:
14      Q.  When did you prepare this addendum?
15      A.  It would have been last week.
16      Q.  So it was prepared after you wrote
17  your report and your report was served on
18  Monsanto; correct?
19      A.  Yes.
20      Q.  Is it fair to say that the articles
21  on this list you did not rely on in
22  preparing your report?
23          MS. FORGIE:  Objection.
24          THE WITNESS:  Well, many of the
25  articles on this are articles I pulled

Page 20

1  to learn about hepatitis B and hepatitis
2  C.  I didn't include them all in my
3  report, although I read them all.  I
4  guess I don't really need to rely on
5  them for purposes of my testimony.
6  BY MS. DU PONT:
7      Q.  So the main references that you are
8  relying on for purposes of your testimony
9  are those references that you included in
10  the Hardeman specific report itself?
11      A.  Yes.
12      Q.  And you had reviewed some of the
13  references on this addendum prior to serving
14  your report, and you believe that you
15  considered those materials but you are not
16  necessarily relying on them for your
17  opinions; is that accurate?
18      A.  Yes.
19      Q.  Okay.  I think you can set that
20  aside.
21          Now, did counsel for Mr. Hardeman
22  provide you with any memo or memos regarding
23  Mr. Hardeman's Roundup exposure?
24      A.  No, just the fact sheet.  The fact
25  sheet.

Page 21

1      Q.  Okay.  Let's take a look now at
2  your report that you served in the Hardeman
3  matter.  We have marked Dr. Dennis
4  Weisenburger's report under Hardeman versus
5  Monsanto as Exhibit 7.
6          (Exhibit Number 7 was marked
7  for identification.)
8  BY MS. DU PONT:
9      Q.  And is this your report in the
10  Hardeman matter, Dr. Weisenburger?
11      A.  Yes.
12      Q.  And this report discloses all the
13  opinions that you intend to offer at trial
14  in Mr. Hardeman's case?
15      A.  Yes.  There are a couple errors in
16  the report.  I don't know whether you want
17  to talk about them now or later.
18      Q.  You can go ahead and tell me what
19  the errors are now.
20      A.  So on the third written page at the
21  end of the second paragraph, I see the
22  latency is 29 years.  It's actually
23  26 years.  The first sentence of the
24  paragraph says 26 years.  The end
25  paragraph says 29 years.  It should be

Page 22

1 26 years.
2  Q. You're saying his exposure to
3 Roundup in this case should be 26 years and
4 not 29 years?
5  A. Yes.
6  MS. FORGIE: It's a typo
7 because the top says 26 years.
8  MS. DU PONT: Yes.
9  THE WITNESS: The other
10 correction is the odds ratio for BMI. I
11 put down the wrong odds ratio. I wrote
12 down 1.14. It should be 1.27.
13 BY MS. DU PONT:
14  Q. And is the confidence interval,
15 does that also need to be corrected?
16  A. Yes. The confidence interval is
17 1.09-1.47.
18  Q. And what I'll do later is we can
19 take a look at the reference that you're
20 relying on and understand where you're
21 getting those numbers.
22  A. Okay.
23  Q. Do you have any other corrections
24 that you want to make to your report at this
25 time?

Page 23

1  A. No.
2  Q. And your report along with your
3 reliance list discloses all of the bases for
4 the opinions you intend to offer in
5 Mr. Hardeman's case?
6  MS. FORGIE: Objection.
7  THE WITNESS: Yes.
8 BY MS. DU PONT:
9  Q. Did you, in your preparation of
10 this report, review any case-specific expert
11 reports for Mr. Hardeman's other
12 case-specific experts?
13  A. No.
14  Q. Did you review any of
15 Mr. Hardeman's other case-specific expert
16 reports after you prepared the report?
17  A. I did review the rough draft of the
18 Nabhan deposition.
19  Q. Did you review the case-specific
20 report in the Hardeman matter?
21  A. No.
22  Q. And anything you disagreed with
23 that Dr. Nabhan said at his deposition?
24  A. Not that I remember.
25  Q. Had you actually, prior to writing

Page 24

1 your Hardeman-specific report, reviewed
2 Dr. Nabhan's generic testimony in the MDL?
3  A. You mean his general causation
4 testimony?
5  Q. Yes.
6  A. I did review some of -- I don't
7 remember exactly what I reviewed, but I did
8 review some materials from him, yes. I
9 don't know whether it was his report or a
10 deposition. I don't remember.
11  MS. FORGIE: I'm going to
12 object to this. It's going into general
13 causation.
14  MS. DU PONT: I'm just
15 inquiring whether he read other
16 testimony from Dr. Nabhan who's a
17 case-specific expert in his report.
18 BY MS. DU PONT:
19  Q. On Exhibit A, if you want to refer
20 to Exhibit 2 which was your supplemental
21 list, I'll just note that you did list under
22 76 on that supplemental list that you
23 disclosed as part of the Hardeman record the
24 deposition transcripts and exhibits of
25 Dr. Nabhan taken on August 23, 2017.

Page 25

1  A. Where is that? Oh, okay.
2  Q. Take a look at Reference Number 76.
3 Just confirm for me that you did, in fact,
4 review his August, 2017, testimony.
5  MS. FORGIE: Objection.
6  THE WITNESS: Yes, I did.
7 BY MS. DU PONT:
8  Q. Okay. Do you generally agree with
9 the testimony that Dr. Nabhan gave in the
10 Hardeman matter, the rough draft that you
11 reviewed?
12  MS. FORGIE: Objection. Asked
13 and answered.
14  THE WITNESS: Yes.
15 BY MS. DU PONT:
16  Q. You don't intend to offer at trial
17 any opinions that are not disclosed in the
18 expert report that we've marked as
19 Exhibit 7; correct?
20  MS. FORGIE: Objection.
21  THE WITNESS: Correct.
22 BY MS. DU PONT:
23  Q. Let's talk about how you prepared
24 your report in this case. Am I correct that
25 you prepared the report yourself?

Dennis Weisenburger, M.D.

Page 26

1   A. Yes.
2   Q. And how long did you spend drafting
3  the report?
4   A. Hours. Many hours.
5   Q. Do you remember how many?
6   A. Well, most of my first --
7   Q. 32 hours were spent?
8   A. -- 32 hours were spent researching
9  it and writing it and correcting it.
10   Q. Describe your process for drafting
11  your report.
12   A. So I read through the materials
13  that were sent to me, the fact sheet. I
14  read through the medical records. What else
15  did I do? I had a telephone call with him
16  where we talked about -- a lot about his
17  exposures and talked about his medical
18  history and asked him questions about his
19  medical history. That's pretty much it. A
20  lot of the time was spent doing research
21  around what am I going to put in the report.
22  I did a lot of reading about hepatitis C and
23  hepatitis B.
24   Q. Okay.
25   A. Considered the literature on

Page 27

1  obesity and overweight.
2   Q. Okay. So let's talk a little bit
3  about the telephone interview that you had
4  with Mr. Hardeman. That took place on
5  November 1, 2018; is that right?
6   A. Yes, yes.
7   Q. And do you understand that was
8  prior to when Mr. Hardeman was deposed in
9  this matter?
10   A. Yes.
11   Q. How long did the telephone call
12  last that you had with Mr. Hardeman?
13   A. It was about an hour, more or less.
14  I don't remember exactly.
15   Q. If you billed for an
16  hour-and-a-half on November 1, would that
17  hour-and-a-half have been for your phone
18  call with Mr. Hardeman, or was it additional
19  work as well?
20   A. It's probably additional work.
21  Maybe preparation before the phone call. I
22  didn't spend an hour-and-a-half on the phone
23  with him. I believe it was 45 minutes to an
24  hour.
25   Q. Was anyone else on the call besides

Page 28

1  yourself and Mr. Hardeman?
2   A. No.
3   Q. And did you take notes of that
4  phone call?
5   A. Yes.
6   Q. And did you rely on those notes in
7  preparing your report in this case?
8    MS. FORGIE: Objection.
9    THE WITNESS: Yes.
10  BY MS. DU PONT:
11   Q. And did you review those notes
12  prior to this deposition today?
13   A. Yes.
14   Q. And I would just request at this
15  time that counsel for Mr. Hardeman produce
16  the notes from Dr. Weisenburger's telephone
17  interview with Mr. Hardeman?
18    MS. FORGIE: I'm inclined not
19   to, but I'll talk to him at the break
20   about it and make a final addition.
21    MS. DU PONT: Thank you.
22    MS. FORGIE: Pursuant to
23   Pretrial Order Number 7 which states we
24   don't have to produce drafts.
25    MS. DU PONT: I would just

Page 29

1  maintain I'm not sure telephone
2   interview notes are drafts, but would be
3   more a reflection of the interview that
4   took place and not a draft report.
5    MS. FORGIE: It includes notes
6   as well.
7  BY MS. DU PONT:
8   Q. It looks like you spent about ten
9  hours prior to your phone call with
10  Mr. Hardeman working on his case based on
11  the invoice you provided. If you want to
12  take a look at it, feel free. It's
13  Exhibit 4.
14   A. That's correct.
15   Q. And what did you do for those ten
16  hours?
17   A. It was mainly reviewing the medical
18  record and the fact sheet, which at that
19  time, I think that's all I had.
20   Q. Okay. You mentioned already that
21  your telephone conversation, one of the
22  things you talked to him about was his
23  exposures. What did you mean by that?
24   A. His use of Roundup, how did he use
25  Roundup.

Dennis Weisenburger, M.D.

Page 30

1    Q.  On the call with Mr. Hardeman, did
2   he have any trouble remembering the facts
3   about his Roundup use?
4    A.  No, I don't think so.  He was
5   pretty straightforward.
6    Q.  Okay.  And you said you asked him
7   about -- when you said exposures, did you
8   also consider other exposures to other
9   chemicals or any viruses?
10    A.  Yes, yes.  I asked about other
11   chemicals, solvents.
12    Q.  What did he tell you about those
13   other chemicals and solvents?
14    A.  That pretty much he only used
15   Roundup.  There were a few instances where
16   they had used something for ants, and there
17   were a few instances where they had sprayed
18   wasps or bees, I can't remember, but those
19   were very infrequent.
20    Q.  And what did he tell you about
21   various viruses that he had been exposed to?
22    A.  Well, he told me that he had had --
23   he had had hepatitis C which he acquired
24   sometime in the distant past, perhaps in the
25   '60s and that he had been treated for that

Page 31

1   in 2005.
2    Q.  Okay.  And then you mentioned you
3   went through his medical history with him.
4   What did he explain to you about his medical
5   history?
6    A.  Well, pretty much the medical
7   history I got from the medical records.  So
8   I really wanted to know about his follow-up,
9   whether he was still in remission, and I
10   asked him about risk factors that hadn't
11   been already covered in the medical record.
12    Q.  So with respect to whether or not
13   he was in remission, did he explain to you
14   that he was still in remission?
15    A.  Yes.
16    Q.  And what did he tell you about his
17   other risk factors?
18    A.  Well, I really didn't elicit any
19   other risk factors for him from our
20   discussion.  The fact that he had had
21   previous exposure to hepatitis B was in the
22   medical record, and then I asked him about
23   his weight and his height so I could
24   calculate his BMI.  And we went through the
25   usual list of risk factors just to make sure

Page 32

1   that nothing was missed from the review of
2   the medical record.
3    Q.  Right.  What is the usual list of
4   risk factors that you're referring to?
5    A.  So I asked him about
6   immunosuppression, any drugs he was on that
7   might be immunosuppressive.  I asked him
8   about autoimmune diseases.  I asked him
9   about other viral infections, bacterial
10   infections.  I asked him about his family
11   history of cancer.
12      Those were the main things, the
13   main risk factors.  I ran through the main
14   risk factors.
15    Q.  Did you note, in the medical
16   records, that Mr. Hardeman had eczema?
17    A.  Yes, actually I picked that up from
18   Dr. Levine's report.  I didn't pick it up
19   from the medical record.  And I didn't ask
20   him about it.
21    Q.  You did not ask him about his
22   eczema in the interview you had with him on
23   November '18?
24    A.  I didn't.
25    Q.  Anything else that you haven't

Page 33

1   already talked about that you discussed with
2   Mr. Hardeman on November 1, 2018?
3    A.  I think that pretty much covers it.
4    Q.  Prior to your telephone call with
5   Mr. Hardeman, had you formed an opinion
6   about what caused his non-Hodgkin's
7   lymphoma?
8    A.  No.
9    Q.  How long after you had spoken with
10   Mr. Hardeman did you form the opinion that
11   Roundup had caused his non-Hodgkin's
12   lymphoma?
13    A.  I don't know precisely.  I think at
14   the time I was writing the report I had
15   formed my opinion.
16    Q.  Now, in your report that we've
17   marked, I believe, as Exhibit 7, if you want
18   to take a look at that, you note that
19   Mr. Hardeman was diagnosed with diffuse
20   large B-cell lymphoma; is that right?
21    A.  Yes.
22    Q.  And that is a subtype of
23   non-Hodgkin's lymphoma; correct?
24    A.  Yes.
25    Q.  And it's the most common subtype of

Dennis Weisenburger, M.D.

Page 34

1 non-Hodgkin's lymphoma; correct?
2    A. Yes.
3    Q. And your conclusion is that Roundup
4 caused Mr. Hardeman's diffuse large B-cell
5 lymphoma; correct?
6    A. Yes, that it was a substantial
7 contributing factor.
8    Q. Now, I just want to talk a little
9 bit about Mr. Hardeman's health history. I
10 know we've talked a little bit already about
11 it, but on page 1 of your report, you note
12 that he had a history of liver cirrhosis
13 secondary to hep C infection, which may have
14 been contracted in 1966.
15      Do you see that, where I'm reading
16 that?
17    A. Yes.
18    Q. And you reviewed Mr. Hardeman's
19 medical records; correct?
20    A. Yes.
21    Q. Including the medical records that
22 discussed his hep C infection; correct?
23    A. Yes.
24    Q. And the medical records detail that
25 he likely contracted hep C in the 1960s due

Page 35

1 to one of the following factors, or maybe a
2 combination of them, which included
3 intravenous drug use, home tattoos, and a
4 girlfriend that was hepatitis C positive.
5      Do you recall that record?
6    A. Yes.
7    Q. And do you agree that it's likely
8 that Mr. Hardeman contracted hep C in the
9 late 1960s?
10    A. It's certainly possible.
11    Q. Well, it's more than possible.
12 That's what the records indicate that the
13 use -- the risk factors for contracting hep
14 C were in the late 1960s, and it was in the
15 late 1960s that he was using intravenous
16 drugs, and he was sleeping with women
17 including a woman that was hep C positive,
18 and he had home tattoos all in that period?
19      MS. FORGIE: Objection.
20      THE WITNESS: We don't really
21 know when he contracted hepatitis C.
22 The most we know, that when he applied
23 for medical insurance at Kaiser in 1980,
24 he had elevated liver enzymes and they
25 wouldn't give him the insurance.

Page 36

1      At least we know in 1980 that
2 he had active hepatitis. Before that,
3 we don't know. So it's likely it was in
4 the '60s. That's when his risky
5 behavior occurred, but we don't really
6 know.
7 BY MS. DU PONT:
8    Q. We don't know with absolute
9 certainty it was in the 1960s, but it's
10 likely that it occurred in the 1960s; fair?
11      MS. FORGIE: Objection. Asked
12 and answered. You can answer it again.
13      THE WITNESS: It's possible it
14 is likely, yes.
15 BY MS. DU PONT:
16    Q. It's likely; correct?
17      MS. FORGIE: Objection. Asked
18 and answered. You can answer it again.
19      THE WITNESS: It's possible.
20 It's likely.
21 BY MS. DU PONT:
22    Q. Is it your opinion that the
23 cirrhosis of his liver was a result of his
24 hep C infection?
25    A. Yes.

Page 37

1    Q. And you would agree that it
2 normally takes decades of time for a hep C
3 infection to develop -- for a person with
4 hep C infection to develop cirrhosis;
5 correct?
6      MS. FORGIE: Objection.
7      THE WITNESS: At least a
8 decade.
9 BY MS. DU PONT:
10    Q. If not more than one decade;
11 correct?
12      MS. FORGIE: Objection. Asked
13 and answered. You can answer it again.
14      THE WITNESS: At least a decade
15 or more, yes.
16 BY MS. DU PONT:
17    Q. Now, you write on page 3 of your
18 report that Mr. Hardeman had a prior history
19 of hep C infection, but was cured by therapy
20 in 2005, ten years before his diagnosis of
21 non-Hodgkin's lymphoma.
22      Do you see where I'm reading from?
23    A. Yes.
24    Q. But you're aware that the medical
25 records for Mr. Hardeman note that his

Dennis Weisenburger, M.D.

Page 38

1  treatment for hepatitis C actually did not
2  end until November of 2006; correct?
3       MS. FORGIE:  Objection.
4       THE WITNESS:  Correct.
5  BY MS. DU PONT:
6    Q.  So he could not have been cured of
7  hepatitis C if he was still being treated
8  for hepatitis C in November of 2006;
9  correct?
10      MS. FORGIE:  Objection.
11      THE WITNESS:  Well, he became
12   virus negative within 12 weeks.  And
13   then he wasn't positive after that; so
14   it was nine or ten years.  It's
15   somewhere between nine and ten years.
16   It depends when you consider him cured.
17   I consider when he became virus negative
18   and stayed negative.  That's probably
19   when he was cured.  But we don't really
20   know.
21  BY MS. DU PONT:
22    Q.  But his treating doctor,
23  Dr. Ruffner Stasner, didn't consider him
24  cured until he had completed his treatment;
25  correct?

Page 39

1       MS. FORGIE:  Objection.
2  BY MS. DU PONT:
3    Q.  That's what the medical records
4  say.
5       MS. FORGIE:  Objection.
6       THE WITNESS:  That's probably
7   true.  Sometimes they wait for a long
8   time afterwards.  But the fact that he
9   became virus negative very quickly, he
10   was what we call a rapid responder.  He
11   became negative very quickly, within 12
12   weeks, and then just stayed negative for
13   the next five years.  It's arbitrary
14   when you say he was cured.  Was he cured
15   at the end of treatment?  Was he cured
16   after 12 weeks of treatment?  Do you
17   wait to say he was cured after five
18   years?  It just depends.  It's an
19   arbitrary decision.
20  BY MS. DU PONT:
21    Q.  Okay.  But --
22    A.  But the virus was gone from his
23  blood and most people would consider the
24  person to be in a sustained remission from
25  the virus.  If you want to say nine years

Page 40

1  instead of ten years, I can't argue with
2  that.
3    Q.  And that negative test that you
4  said came back 12 weeks after treatment,
5  that was actually in 2006; correct?
6    A.  Yes.
7    Q.  Would you agree with me that
8  Mr. Hardeman -- let me start that again.  I
9  just lost my microphone.
10      Would you agree with me that
11  Mr. Hardeman likely had a chronic infection
12  of hepatitis C for nearly 40 years?
13      MS. FORGIE:  Objection.
14      THE WITNESS:  It's certainly
15   possible.  I think he had it for at
16   least 25 years.
17  BY MS. DU PONT:
18    Q.  If not 40 years?
19      MS. FORGIE:  Objection.  Asked
20   and answered.  You can answer it again.
21      THE WITNESS:  As we said, we
22   don't know when he got it.  It's likely
23   in the late 1960s, but we don't really
24   know.  I know for sure that he had it in
25   1980 when he was screened for insurance

Page 41

1  for Kaiser, but he probably had it
2  longer.  He most certainly had it longer
3  if they found it in 1980.
4  BY MS. DU PONT:
5    Q.  If he was already having abnormal
6  liver enzymes in 1980, he presumably was
7  already infected in the 1970s; correct?
8      MS. FORGIE:  Objection.  Asked
9   and answered about three or four times.
10   Wait, let me finish my objection.
11   You're starting to badger the witness.
12      You can answer.
13      THE WITNESS:  I don't know when
14   he was infected.  It's very likely he
15   was infected in the late 1960s, but we
16   don't really know.
17      MS. DU PONT:  I'd ask that you
18   object to form.  That's what the rules
19   are.
20      MS. FORGIE:  I'll make whatever
21   objections I think are appropriate.  I
22   would ask that you stop asking the same
23   question three or four times.
24      MS. DU PONT:  I'm not asking it
25   three or four times.

Dennis Weisenburger, M.D.

Page 42

1  MS. FORGIE:  Yes, you are.
2  MS. DU PONT:  Let's move to a
3  different topic.
4  BY MS. DU PONT:
5  Q.  Mr. Hardeman's Roundup use.  You
6  agree that he was using it as a home user;
7  correct?
8  A.  Yes.
9  Q.  He was not a farmer spraying it on
10 his crops; correct?
11 A.  Correct.
12 Q.  And in your report, you discuss for
13 a couple pages what his Roundup use was and
14 what his exposure was; correct?
15 A.  Yes.
16 Q.  And you mention that much of that
17 discussion in your report came from the
18 interview that you had with him in November
19 of -- November 1, 2018; correct?
20 A.  Yes.
21 Q.  But you also read his deposition;
22 right?
23 A.  I did.
24 Q.  And do you understand that there's
25 some inconsistencies in what he said at his

Page 43

1  deposition versus what he told you at that
2  interview on November 1?
3  MS. FORGIE:  Objection.
4  THE WITNESS:  Yes.
5  BY MS. DU PONT:
6  Q.  Do you remember any of those
7  inconsistencies right now, sitting here
8  today?
9  A.  Yeah.  So the main ones were that
10 he told me he used the Roundup all
11 year-round, pretty much every month.  He
12 used it intensively for about eight months
13 and less intensively for the other four
14 months.
15 At his deposition, he changed that
16 and said he used it intensively for about
17 six months out of the year and that he used
18 it less intensively only two months out of
19 the year.
20 So, yeah, there's some
21 discrepancies that occurred.  I can't
22 explain those things.  I didn't call him
23 back and ask him what the truth was because
24 by that time I had written my report.
25 So, you know, sometimes people have

Page 44

1  difficulty remembering things.  Sometimes
2  the chemotherapy affects how they think and
3  how they remember things.
4  I don't know what happened.  When I
5  questioned him, I was very careful to be as
6  precise as I could, and this is the history
7  that he gave to me.  So whether it was one
8  or the other, he still had significant
9  exposures to Roundup.
10 Q.  So it's your understanding that
11 when he gave his deposition under oath on
12 November 8, 2018, that he testified that
13 when he was spraying on the Forestville
14 property, he was only spraying for about
15 eight months per year; correct?
16 MS. FORGIE:  Objection.
17 THE WITNESS:  That's what he
18 said.
19 BY MS. DU PONT:
20 Q.  You did not note that discrepancy
21 between his deposition transcript and your
22 interview in your report; right?
23 A.  No, because I read his transcript
24 after I wrote my report.  So my report was
25 already written and submitted.

Page 45

1  Q.  Got it.  So you reviewed his
2  deposition transcript after the report was
3  served on Monsanto?
4  A.  Yes.
5  Q.  Would you agree with me, though,
6  that if we go by his testimony at his
7  deposition, that in your report, you
8  overestimated the amount of spraying that
9  Mr. Hardeman was doing?
10 MS. FORGIE:  Objection.
11 THE WITNESS:  That's correct.
12 BY MS. DU PONT:
13 Q.  And even though you've
14 overestimated his spraying in your report,
15 based on his deposition testimony, does it
16 change your opinion in this case that he had
17 sufficient exposure to put him at high risk
18 of non-Hodgkin's lymphoma?
19 A.  No.
20 MS. FORGIE:  Objection.
21 THE WITNESS:  No.
22 BY MS. DU PONT:
23 Q.  How much less would Mr. Hardeman
24 have had to have sprayed in order for it to
25 change your opinion that he was at high risk

Dennis Weisenburger, M.D.

Page 46

1  for non-Hodgkin's lymphoma?
2      A.  Well, I don't really have a good
3  answer to that question.  It would have had
4  to have been considerably less than he was
5  exposed to, even based on his deposition.
6      Q.  What is considerably less?
7      A.  I don't have a specific answer to
8  that.  It's case-specific in each case.  I
9  don't have a magic number.
10     Q.  Now, you wrote in your report that
11 he would often get the spray on his hands,
12 arms, face and sometimes mouth and sometimes
13 he inhaled the mist while spraying.
14     Do you recall writing that in your
15 report?
16     A.  Yes.
17     Q.  Did you actually ask Mr. Hardeman
18 in the interview how many times he got the
19 spray on his arms, face, and mouth?
20     A.  It was frequent.
21     Q.  But did you also review
22 Mr. Hardeman's deposition to see how many
23 times he had spilled on himself?
24     A.  I can't remember the numbers, but
25 it was less than what he told me.

Page 47

1      Q.  So if he testified at his
2  deposition that he spilled on himself about
3  ten times, does that sound right?
4      A.  I don't remember what the
5  deposition says.  It was considerably less
6  than what he told me.
7      Q.  But, again, if we went by what he
8  said in his deposition, that would have been
9  less exposure to Roundup; correct?
10         MS. FORGIE:  Objection.
11         THE WITNESS:  Well, I think
12     people get exposed to Roundup when they
13     use mist, whether they know it or not.
14     Okay?  So the fact that he -- what he
15     told me was that he frequently got it on
16     his hands and his arms when he was
17     spraying from the truck and over the
18     fence.  It was common.  That's what he
19     told me.
20         I don't understand him changing
21     his story in the deposition.  I wrote my
22     report based on what he told me, and I
23     believed it was true.  If you deposed
24     him today, he might tell you something
25     totally different.  I don't know.

Page 48

1  BY MS. DU PONT:
2      Q.  If we go by what he said in his
3  deposition and what you've written in your
4  report overestimates his exposure to
5  Roundup; right?
6          MS. FORGIE:  Objection.
7          THE WITNESS:  Probably,
8      although I think by him telling you that
9      he only got it on his hands ten times,
10     he's grossly underestimating his
11     exposure.
12 BY MS. DU PONT:
13     Q.  How do you know that?
14     A.  Because of the story.  When you
15 spray Roundup in a mist, you're going to get
16 it on your hands.  You're going to get it on
17 your arms.  You're going to get it on your
18 clothes, just by the nature of what you're
19 doing.
20     Q.  Have you sprayed Roundup before?
21     A.  No.  I prefer 2,4-D, thank you.
22     Q.  What's your basis for saying that
23 when you spray Roundup, you're going to get
24 it on your hands?
25     A.  Because it happens to me when I

Page 49

1  spray 2,4-D.
2      Q.  But you don't have any personal
3  experience spraying Roundup; correct?
4      A.  I don't.
5      Q.  Now, you understand that at his
6  deposition, he also testified that he only
7  inhaled Roundup about two or three times;
8  correct?
9          MS. FORGIE:  Objection.
10         THE WITNESS:  I believe that's
11     what he said.  What did I say?
12     Sometimes.
13 BY MS. DU PONT:
14     Q.  But regardless of whether we go
15 with what he said at his deposition or we go
16 with what he told you at his interview, you
17 think either looking at the deposition
18 testimony or looking at what he told you,
19 there was enough exposure for Roundup to
20 have caused his diffuse large B-cell
21 lymphoma?
22     A.  Yes, I do.
23     Q.  Mr. Hardeman also explained to you
24 that he would wash his hands if he spilled
25 on himself; correct?

Dennis Weisenburger, M.D.

Page 50

1   A.  So if he was mixing and he got it
2  on his hands, he would wash it off with a
3  hose.  If he was out in the field spraying
4  and he got it on his hands, he waited until
5  he got back, which could have been one, two,
6  three, four hours later.
7   Q.  But he would take a shower after
8  that happened, if he spilled it on himself;
9  correct?
10      MS. FORGIE:  Objection.
11      THE WITNESS:  Yes, he usually
12   took a shower after spraying.
13  BY MS. DU PONT:
14   Q.  Does the fact that someone washes
15  the Roundup off of them after they've gotten
16  it on their skin, does that decrease their
17  exposure in your mind?
18   A.  Yes.
19   Q.  You agree that hepatitis C is a
20  risk factor for non-Hodgkin's lymphoma;
21  correct?
22   A.  Yes.
23   Q.  And it's also a risk factor for
24  diffuse large B-cell lymphoma; correct?
25   A.  Yes.

Page 51

1   Q.  In fact, in your report you mention
2  that there's a 2 to 2.6-fold increased risk
3  of diffused large B-cell non-Hodgkin's
4  lymphoma with the infection of hepatitis C;
5  correct?
6   A.  Yes.
7   Q.  Do you know what the latency is
8  between exposure to hepatitis C virus and
9  development of diffuse large B-cell
10  lymphoma?
11   A.  There's one study that actually was
12  able to look at that.  It's probably
13  somewhere between 6 and 8 years.  These are
14  in people with active hepatitis.  So it's
15  not very long, actually.  Between 6 and
16  8 years.
17   Q.  What study is that that you're
18  referring to?
19   A.  It's one of the ones that I
20  reference.  I can't remember which one.
21   Q.  You can't remember, sitting here
22  today, what reference it is that says the
23  latency for hep C in development is 6 to
24  8 years?
25   A.  I can't.  It's one of the ones you

Page 52

1  reference, but I can't remember which one it
2  was.
3   Q.  Is that the median?
4   A.  Yes, that's the median.
5   Q.  So if there's a bell curve, it can
6  be much -- it could be shorter or it could
7  be longer than 6 to 8 years; correct?
8   A.  Yes.
9   Q.  And do you recall what that
10  reference says the bottom and the top of the
11  bell curve are, sitting here right now?
12   A.  I can't remember whether they give
13  that information.
14   Q.  Do you consider hepatitis C
15  infection to be a causative risk factor for
16  non-Hodgkin's lymphoma?
17      MS. FORGIE:  Objection.
18      THE WITNESS:  Yes, active
19   hepatitis C infection.  Chronic active
20   hepatitis C infection.
21  BY MS. DU PONT:
22   Q.  And do you consider chronic, active
23  hepatitis C infection to be a causative risk
24  factor for diffuse large B-cell lymphoma?
25      MS. FORGIE:  Objection.

Page 53

1      THE WITNESS:  Yes.
2  BY MS. DU PONT:
3   Q.  There are medical studies out there
4  that actually discuss that infection with
5  hepatitis C is not really a risk factor, but
6  that it is a cause of diffuse large B-cell
7  lymphoma; correct?
8   A.  Yes.
9   Q.  Are you familiar with the monograph
10  from the International Agency for Research
11  on Cancer regarding hep C?
12   A.  Yes.
13   Q.  But you did not cite that on any of
14  your reference lists; correct?
15   A.  I didn't think I needed to.
16   Q.  And that's because it's redundant
17  of your belief that hep C is a causative
18  risk factor for non-Hodgkin's lymphoma?
19      MS. FORGIE:  Objection.
20      THE WITNESS:  It would be for
21   the support.  I've already accepted that
22   as a fact in my report.
23  BY MS. DU PONT:
24   Q.  Okay.
25   A.  I could have referenced it, but I

Dennis Weisenburger, M.D.

Page 54

1 didn't.

2    Q. I'm going to go ahead and mark as

3 Exhibit 8 the IARC monograph on hepatitis C.

4       (Exhibit Number 8 was marked

5 for identification.)

6       MS. FORGIE:  Whenever you're

7 ready for a break.

8       MS. DU PONT:  We can finish

9 this document, and we'll take a break.

10      MS. FORGIE:  Thanks.

11 BY MS. DU PONT:

12   Q. If you turn to page 158 of the

13 monograph under Section 5, "Evaluation," do

14 you see that there is sufficient -- that

15 IARC writes, "There is sufficient evidence

16 in humans for the carcinogenicity of chronic

17 infection with HCV"?

18      Did I read that correctly?

19   A. Yes.

20   Q. And they note, "Chronic infection

21 with hepatitis C virus causes hepatocellular

22 carcinoma and non-Hodgkin's lymphoma."

23      Do you see that?

24   A. Yes.

25   Q. And then they go on to say,

Page 55

1 "Chronic infection with HCV is carcinogenic

2 to humans Group 1."

3      Do you see that?

4   A. Yes.

5   Q. So IARC concluded that there was

6 sufficient evidence that chronic infection

7 with the hepatitis C virus causes

8 non-Hodgkin's lymphoma; correct?

9   A. Yes.

10   Q. And that chronic infection with the

11 HCV or the hepatitis C virus is carcinogenic

12 to humans Group 1; correct?

13   A. Yes.

14   Q. And we know that Mr. Hardeman had

15 anywhere between 25 and 40 years of chronic

16 hepatitis C infection prior to his diagnosis

17 of non-Hodgkin's lymphoma; correct?

18      MS. FORGIE:  Objection.

19      THE WITNESS:  Correct.

20 BY MS. DU PONT:

21   Q. And do you understand that when

22 IARC concludes that there is sufficient

23 evidence of carcinogenicity with respect to

24 a virus or any substance, that that means

25 that there's a positive relationship that

Page 56

1 has been observed between the exposure and

2 the cancer in studies in which chance, bias,

3 and confounding could be ruled out with

4 reasonable confidence?

5      Do you understand that that's their

6 definition?

7   A. Yes.

8   Q. So with respect to hepatitis C, a

9 positive relationship has been observed

10 between exposure to chronic hepatitis C and

11 cancer in studies in which chance, bias, and

12 confounding could be ruled out with

13 reasonable confidence; correct?

14   A. Yes.

15   Q. So is it fair to say that IARC's

16 conclusion that chronic hepatitis C

17 infection is a carcinogen is a stronger

18 conclusion than IARC has put forth regarding

19 glyphosate and carcinogenicity findings in

20 humans?

21      MS. FORGIE:  Objection.

22      THE WITNESS:  Yes, they said

23 HCV's a Group 1 and glyphosate is a

24 Group 2A.

25 ///

Page 57

1 BY MS. DU PONT:

2   Q. And IARC has noted, with respect to

3 glyphosate, that there is limited evidence

4 of carcinogenicity in humans; correct?

5   A. Yes.

6   Q. And that's a lower standard than

7 what they found here, which is sufficient

8 evidence in humans with HCV infection and

9 non-Hodgkin's lymphoma; correct?

10   A. Correct.

11      MS. DU PONT:  We can take a

12 break now.

13      MS. FORGIE:  Thank you.

14      THE VIDEOGRAPHER:  The time is

15 9:30 a.m., and we are off the record.

16      (Recess taken from 9:31 a.m.

17 to 9:41 a.m.)

18      THE VIDEOGRAPHER:  The time is

19 now 9:41 a.m., and we are back on the

20 record.

21 BY MS. DU PONT:

22   Q. We're back on the record, Doctor.

23      Before the break we were talking

24 about hepatitis C and non-Hodgkin's

25 lymphoma.  Do you recall that discussion?

Dennis Weisenburger, M.D.

Page 58

1    A.  Yes.

2    Q.  You write in your report that --
3  this is on page 4, "There's no significant
4  increase in the risk of NHL for those who
5  are cured with therapy and do not have
6  circulating viral RNA."

7       Do you recall writing that?

8    A.  Yes.

9    Q.  Would you agree with me, though,
10  there are studies that you cite in your
11  report where a positive viral RNA was not a
12  prerequisite for inclusion of a case in the
13  studies?

14    A.  No.  Some of the epidemiology
15  studies use the serology for hepatitis C for
16  finding the antibodies.  When you do that,
17  you include cases that have active hepatitis
18  C infection and cases that have -- that
19  are -- have resolved the infection and are
20  immune to the virus.

21       So it's a screening method to find
22  people who have been infected versus those
23  who have not, but then when the studies look
24  more carefully at -- and divided the ones
25  who had the antibody into those which

Page 59

1  actually had the virus also in the blood and
2  those that did not, they found the increased
3  risk only for those who had the virus in the
4  blood.

5       So the conclusion is you have to
6  have an active chronic -- chronic, active
7  viral infection with viral particles, viral
8  RNA in the blood, to give you an increased
9  risk.  If you just have the antibody and no
10  evidence of chronic infection, then you're
11  not at increased risk.  And there are
12  multiple studies that I cited that clearly
13  show that.

14    Q.  But you would agree with me that
15  there are studies that you also cited where
16  they only looked at either the positive
17  viral RNA or the antibody test for inclusion
18  in the studies, and they were still finding
19  relative risks of over twofold; correct?

20    A.  Yes.  But that's because there were
21  enough patients with chronic infection to
22  actually increase the risk when you divided
23  it into the two sub-groups, you see the risk
24  with those with the chronic infection and
25  you see no risk in the group that just has

Page 60

1  the antibody.

2       So for epidemiology studies,
3  sometimes you have to do things in a certain
4  way.  It's much more sophisticated and
5  expensive to do the viral studies versus
6  just doing the antibody studies.

7       So that's why you see differences.
8  But I think the better studies looked also
9  for -- used the antibody as a screening tool
10  and then looked for the virus as a more
11  specific test for whether there was chronic
12  hepatitis or not.  It's really kind of the
13  methodology of epidemiology that determines
14  that.

15    Q.  Okay.  Would you agree that some
16  studies have reported relative risk for
17  hepatitis C and non-Hodgkin's lymphoma that
18  has been anywhere between four-fold and
19  ten-fold?

20       MS. FORGIE:  Objection.

21       THE WITNESS:  Yeah, smaller
22  studies can have very -- how to say
23  it -- very different numbers just based
24  on the mix of small number of cases.

25       So I mostly quoted large

Page 61

1  studies or made analyses, which I think
2  are more precise.

3  BY MS. DU PONT:

4    Q.  But there have been even meta
5  analyses that have reported higher relative
6  risk with HCV in NHL as high as 10.8;
7  correct?

8       MS. FORGIE:  Objection.

9       THE WITNESS:  Maybe some of the
10  early ones did.  It depends entirely
11  where you look too.  So if you do
12  your -- if most of your studies come
13  from endemic areas like Italy, like the
14  Far East, you're going to find higher
15  odds ratios than if you look in, for
16  example, North America where the odds
17  ratios are consistently much lower.

18       So it depends on what studies
19  go into the meta-analysis.  It includes
20  what patient population you're studying.
21  So in some places, it's high and in some
22  places, it's lower.  Meta-analysis sort
23  of merges it all together and gives you
24  one number, and that's pretty much what
25  I tried to use.

Page 62

BY MS. DU PONT:

Q. And all I'm asking you is there are meta-analyses that have been done that have reported a range of relative risks anywhere between two-fold and ten-fold with HCV and non-Hodgkin's lymphoma; correct?

MS. FORGIE: Objection.

THE WITNESS: I don't remember. I know there are studies and meta analyses that reported higher risks than what I quote here. I tried to use what I thought was the best data, the most recent meta-analyses.

BY MS. DU PONT:

Q. Okay. So I'm going to mark as Exhibit 9 a study by Dal Maso, "Hepatitis C Virus and Risk of Lymphoma and Other Lymphoid Neoplasms: A Meta-analysis of Epidemiologic Studies."

(Exhibit Number 9 was marked for identification.)

BY MS. DU PONT:

Q. Doctor, you actually cite this in your report, I believe, as Reference 6 in your reliance list for the Hardeman report;

Page 63

is that right?

A. Yes.

Q. And in this meta-analysis -- and I'm referring to the abstract -- the authors report the pooled relative risk for all non-Hodgkin's lymphoma among HC positive individuals was 2.5; correct?

A. Yes.

Q. And if we turn to page 2081 of the article, the authors report -- and this is in the left-hand column at the bottom of the first paragraph -- that the relative risk was 2.7 for diffuse large B-cell cases.

Do you see that?

MS. FORGIE: Objection.

THE WITNESS: Yes.

BY MS. DU PONT:

Q. So overall the risk of non-Hodgkin's lymphoma was 2.5-fold, but then it was slightly higher when just looking at diffuse large B-cell lymphoma cases, which is what Mr. Hardeman had; correct?

MS. FORGIE: Objection.

THE WITNESS: Correct.

Page 64

According to this data, yes.

BY MS. DU PONT:

Q. And if we look at page 2079 under, "Assessment of study quality," the last sentence in the second paragraph in that section states, "The availability of HCV RNA findings was not there for a prerequisite for inclusion in the present study."

Do you see that?

A. Yes.

Q. And they note that "While the presence of HCV RNA is the best marker for hepatocellular carcinoma risk, but whether detection of HC RNA in addition to anti-HC antibodies is a requirement in the association between HCV and NHL is still unclear."

Do you see that?

A. Where does it say that?

Q. The sentence right above the prior one I read.

MS. FORGIE: Where exactly are you? Can you show me, please.

MS. DU PONT: I'm sorry. Right here. 2079.

Page 65

THE WITNESS: I see where she read. It depends on what the purpose of the study is. If you want to do meta-analysis, you want to include as many studies as possible; so you will use probably the more comprehensive, but less precise measure.

This doesn't really contradict what I told you before. They're trying to do a meta-analysis and probably all of the studies did the antibody so they could include all those studies. But only a subset did the measurement of the viral RNA, and so they decided to use as many studies as possible.

It's just a strategy to maximize the number of studies and the number of cases that they're looking at.

BY MS. DU PONT:

Q. But the authors here note that it's the requirement of having the HCV RNA to establish an association between HCV and NHL is still unclear; right? That's what they're saying?

MS. FORGIE: Objection. Asked

Page 66

1 and answered. You can answer it again.
2 THE WITNESS: It's not really
3 clear to me what they're trying to say.
4 Are they trying to say that one is
5 better than the other? It's clear that
6 the viral RNA is a better test than the
7 other, based on the other studies that I
8 cite.
9 So it just depends on your
10 methodology and what -- in some studies,
11 how much money you have to do the
12 testing.
13 So you have to make -- you have
14 to make decisions based on a variety of
15 parameters. They could have done a
16 meta-analysis on the smaller group that
17 just had the RNA. And they could have
18 done that. They didn't do it.
19 BY MS. DU PONT:
20 Q. So the authors actually looked at
21 whether or not just having the HCV RNA
22 findings impacted the results.
23 I'll refer you to page 2083, the
24 last paragraph on the right-hand column.
25 The authors state, "Another possible

Page 67

1 source" -- do you see where I'm reading
2 from?
3 A. 2083 where?
4 Q. The last paragraph.
5 A. Yeah, okay.
6 Q. "Another possible source of
7 heterogeneity between studies could be the
8 definition of HCV infection that was not
9 consistent across studies or different
10 illicit generations used."
11 Then they note that some studies --
12 they basically say various studies are
13 defining HCV positivity differently.
14 They note that when only studies
15 using third-generation ELISA were included,
16 the pooled relative risk was 2.5, suggesting
17 that the HCV definition and ELISA generation
18 neither explained the heterogeneity between
19 studies nor adduced substantial bias; right?
20 A. I don't know. I'd have to reread
21 this again.
22 Q. Basically when they tried to --
23 when they did further analysis and
24 controlled for the different types of
25 studies, they didn't see inconsistent

Page 68

1 results when they were only looking at
2 sub-groups within their meta-analysis;
3 correct?
4 MS. FORGIE: Wait. Objection.
5 Asked and answered. You just asked that
6 question.
7 You can answer it again.
8 THE WITNESS: So I'd like to
9 read the paragraph.
10 BY MS. DU PONT:
11 Q. Okay.
12 A. I have to read it to understand it.
13 MS. FORGIE: You can read as
14 much as you need. You can read the
15 whole study if you need to.
16 THE WITNESS: So what they're
17 saying is that they had substantially
18 the same finding, whether they looked at
19 just the antibody or they looked at just
20 the RNA.
21 BY MS. DU PONT:
22 Q. Right.
23 A. But they didn't do the critical
24 thing and look at the risk for those that
25 had the antibody but didn't have the RNA.

Page 69

1 Okay?
2 So you would expect that both risk
3 ratios would be increased because a subset
4 of those with the antibody, maybe a
5 substantial subset, have the RNA. Okay?
6 So this doesn't really address the
7 question that's posed in some of the other
8 studies. Okay?
9 Q. Okay.
10 A. It's saying you can measure both,
11 and you'll pretty much find the same thing
12 because everybody -- because many people who
13 have the antibody also have the DNA -- or
14 the RNA.
15 So it doesn't really -- it doesn't
16 really -- they could have done this. They
17 could have taken the cases that had just the
18 antibody and didn't have the RNA and they
19 probably would have found what the other
20 papers I cite found, that the people with
21 just the antibody do not have an elevated
22 risk.
23 Q. Okay. You can put that aside.
24 Now, you also cite an article by
25 Mahale entitled, "The Effect of Sustained

Dennis Weisenburger, M.D.

Page 70

1  Virological Response on the Risk of
2  Extrahepatic Manifestations of Hepatitis C
3  Virus Infection."
4      A. In my report?
5      Q. In your supplemental list.
6      A. Okay.
7          MS. FORGIE: Is this 10?
8          MS. DU PONT: Yes, sorry. This
9  is Exhibit 10.
10         (Exhibit Number 10 was marked
11     for identification.)
12  BY MS. DU PONT:
13     Q. And this was included on your
14  supplemental list. Now, do you know if you
15  had reviewed this article prior to drafting
16  your report or after you had drafted your
17  report?
18     A. I don't know. I don't remember.
19     Q. Okay. And the results of this
20  paper in the conclusions on the second page,
21  they say, "Risks of several extrahepatic
22  manifestations of HCV infection are reduced
23  after antiviral therapy with sustained viral
24  response" -- sorry, "sustained virological
25  response. However, early initiation of

Page 71

1  anti-viral therapy may be required to reduce
2  the risk of glomerulonephritis,
3  non-Hodgkin's lymphoma, and stroke."
4      Do you see that?
5      A. Yes.
6      Q. And if we take a look at Figure 2
7  on page 16, the authors are looking at
8  several of what they call extrahepatic
9  manifestations, one of which is not
10  non-Hodgkin's lymphoma; right?
11     A. Right.
12     Q. What Figure 2D, which is referring
13  to non-Hodgkin's lymphoma, is showing, is
14  that over time, the longer you go without
15  anti-viral treatment, there is no reduction
16  in your risk of non-Hodgkin's lymphoma
17  because of that treatment; correct?
18         MS. FORGIE: Objection.
19         THE WITNESS: Well, what they
20     showed is that the most effective time
21     to institute therapy is shortly after
22     the diagnosis. Then you actually a
23     decrease in risk.
24  BY MS. DU PONT:
25     Q. But we know Mr. Hardeman had a

Page 72

1  chronic infection of hepatitis C for 25 to
2  40 years; right?
3      A. Right.
4          MS. FORGIE: Objection.
5  BY MS. DU PONT:
6      Q. So based on this, Mr. Hardeman
7  would not have had a reduction in risk of
8  non-Hodgkin's lymphoma because he'd had this
9  long-term chronic infection of HCV; correct?
10         MS. FORGIE: Objection.
11         THE WITNESS: Well, that's what
12     this paper would suggest, right.
13  BY MS. DU PONT:
14     Q. Okay. But you didn't note that in
15  your report?
16     A. I didn't.
17     Q. You certainly agree that
18  Mr. Hardeman was at risk for non-Hodgkin's
19  lymphoma during the 25 to 40 years that he
20  had a chronic infection; right?
21         MS. FORGIE: Objection.
22         THE WITNESS: Yes.
23  BY MS. DU PONT:
24     Q. And during that 25 to 40 years of
25  chronic infection from HCV, the infection,

Page 73

1  the HCV infection, could have caused his
2  diffuse large B-cell lymphoma. Fair?
3          MS. FORGIE: Objection.
4          THE WITNESS: Well, during that
5     25 to 40 years? Is that what you're
6     saying?
7  BY MS. DU PONT:
8      Q. Yes.
9      A. He could have developed a lymphoma
10  during that time, yes.
11     Q. And you would agree that you cannot
12  rule out the role that the 25 to 40 years of
13  chronic hepatitis C infection played in his
14  diffuse large B-cell lymphoma?
15         MS. FORGIE: Objection.
16         THE WITNESS: It could have
17     played a role. It could have played a
18     role. You know, it's my position that
19     the fact that he was treated, he was in
20     a sustained virologic remission for nine
21     or ten years would have markedly
22     decreased this risk. But I can't be
23     absolutely certain the hepatitis C
24     didn't contribute to his non-Hodgkin's
25     lymphoma. It very well could have.

Dennis Weisenburger, M.D.

Page 74

1 BY MS. DU PONT:
2    Q.  Okay.  And you can't rule out the
3 fact that the chronic HCV infection that he
4 had for 25 to 40 years caused mutations in
5 Mr. Hardeman; right?
6           MS. FORGIE:  Objection.
7           THE WITNESS:  I can't rule that
8    out.
9 BY MS. DU PONT:
10    Q.  You can't say that he did not have
11 any mutations caused by the HCV virus in the
12 1970s; right?
13           MS. FORGIE:  Objection.
14           THE WITNESS:  If he was
15    infected then, yes.
16 BY MS. DU PONT:
17    Q.  And if he was infected in the
18 1960s, you can't rule out that the HCV did
19 not cause mutations in Mr. Hardeman at that
20 time; correct?
21           MS. FORGIE:  Objection.
22           THE WITNESS:  It's unlikely
23    that mutations would stick around for so
24    long.  Usually mutations come and either
25    the cells are eliminated or additional

Page 75

1    mutations occur that make them -- give
2    them a survival advantage.  So it's
3    possible -- it's not so likely that
4    mutations in the 1960s affected his
5    cells to cause non-Hodgkin's lymphoma.
6    It's more likely that maybe the ones in
7    the later years did.
8 BY MS. DU PONT:
9    Q.  So the HCV infection during the
10 1980s, 1990s, and 2000s were more likely to
11 have caused mutations in his DNA that led to
12 his non-Hodgkin's lymphoma.  Fair?
13           MS. FORGIE:  Objection.
14           THE WITNESS:  It's possible.
15    They could have contributed, yes, to his
16    development of non-Hodgkin's lymphoma.
17 BY MS. DU PONT:
18    Q.  Okay.  Now, you agree that
19 hepatitis B infection is also a risk factor
20 for non-Hodgkin's lymphoma?
21    A.  Yes.
22    Q.  And do you agree that it is a
23 causative risk factor for non-Hodgkin's
24 lymphoma?
25           MS. FORGIE:  Objection.

Page 76

1           THE WITNESS:  Yes.
2 BY MS. DU PONT:
3    Q.  And in your report, you note that
4 the hepatitis B virus increases the risk of
5 non-Hodgkin's lymphoma by approximately
6 twofold; right?
7    A.  Right.
8    Q.  And you cite some articles to
9 support that in your report?
10    A.  Correct.
11    Q.  And are you aware that the
12 International Agency For Research on Cancer
13 has looked at the hepatitis B virus and
14 whether or not it is a human carcinogen for
15 non-Hodgkin's lymphoma?
16       Are you aware of that?
17    A.  I know they looked at it for a
18 cellular carcinoma, but I don't believe
19 they've looked at it for non-Hodgkin's
20 lymphoma.
21    Q.  Okay.
22    A.  I think they actually do mention in
23 their conclusions that there were some
24 studies that showed increased risk for
25 non-Hodgkin's lymphoma, but they didn't --

Page 77

1 the firm conclusion was really about
2 hepatocellular carcinoma.
3    Q.  They also noted positive
4 association between chronic infection with
5 HPV and non-Hodgkin's lymphoma; fair?
6    A.  Yes, they did.
7    Q.  And they classify hepatitis B as a
8 Class 1 human carcinogen; correct?
9    A.  Yes.
10           MS. FORGIE:  Objection.
11 BY MS. DU PONT:
12    Q.  And Mr. Hardeman had exposure to
13 hepatitis B?
14    A.  He had evidence of past infection.
15    Q.  And that was when he -- around the
16 time he was diagnosed with non-Hodgkin's
17 lymphoma in 2015, they ran a series of tests
18 on his -- to see if he had been exposed to
19 hepatitis B.  Fair?
20    A.  Right.  They also must have run a
21 test when he was diagnosed in 2005 with
22 hepatitis C, because there's a mention in
23 the record that he was found to be immune to
24 hepatitis B.
25    Q.  He was given therapy at that time,

Dennis Weisenburger, M.D.

Page 78

1  the vaccine?
2     A. And he was vaccinated, yes.
3     Q. And in 2015, though, they looked at
4  his hepatitis -- they did the various tests
5  on the hepatitis B virus, and they found
6  that his surface antigen was negative, his
7  surface antibody was negative, but that he
8  had a core antibody that was positive for
9  hepatitis B; correct?
10    A. That's correct.
11    Q. So what that means is that he had a
12 past or current hepatitis B infection;
13 right?
14       MS. FORGIE: Objection.
15       THE WITNESS: Well, it means
16   that he had a past infection. Usually
17   if you have a current infection, you
18   have an elevation of the surface
19   antigen, which he didn't have.
20       So it's evidence of a past
21   infection, which would make sense
22   because he had it ten years before. The
23   fact that he was vaccinated would tell
24   me that he didn't have an active
25   hepatitis B infection after 2005, but he

Page 79

1     may have had it prior to that. We don't
2     really know anything more about that.
3  BY MS. DU PONT:
4     Q. What is the significance of the
5  fact that his surface antibody was negative?
6     A. Sometimes the surface antibody goes
7  up and then it eventually, over time,
8  dwindles down to undetectable levels.
9     Q. Okay. But that doesn't say
10 anything about his past infection. The one
11 that was relevant to his past infection was
12 the core antibody; correct?
13    A. Yes. If the antibody to surface
14 antigen was up, that would also tell you
15 that he was immune, but often they're up
16 together. Sometimes, the surface antibody
17 eventually goes down and the core is more
18 likely to stay up.
19    Q. In terms of when it was more likely
20 that Mr. Hardeman was infected with the
21 hepatitis B virus, is the most likely
22 scenario that he was infected at the same
23 time he was infected with the hepatitis C
24 virus in the late 1960s?
25    A. It's likely. We don't know, but

Page 80

1  it's likely. The same risk factors for
2  infection -- they're the same risk factors
3  for infection, hepatitis B and hepatitis C.
4     Q. Okay. And Mr. Hardeman was treated
5  with prophylactic lamivudine. Do you know
6  what that is?
7        MS. FORGIE: I've been told
8     it's lamivudine.
9        MS. DU PONT: Hard to say.
10 BY MS. DU PONT:
11    Q. Do you know what it is?
12    A. It's an antiviral drug.
13    Q. He was given that prophylactically
14 at the time he received chemo for his
15 non-Hodgkin's lymphoma?
16    A. Yes.
17    Q. And the reason for that is because
18 they wanted to ensure that the hepatitis B
19 virus was not reactivated at the time he was
20 given chemotherapy. Fair?
21    A. Yes.
22    Q. So even after -- even though we see
23 that he has hepatitis B antibodies, that
24 doesn't mean the hepatitis B virus is
25 completely out of his body; right?

Page 81

1        MS. FORGIE: Objection.
2        THE WITNESS: It could be there
3     at a very low-level latent state.
4     That's true.
5  BY MS. DU PONT:
6     Q. Because it could be there at a low
7  level latent state, that's why they give
8  this prophylactic lamivudine, to ensure that
9  it's not reactivated as a result of the
10 chemo he was given. Fair?
11    A. Yes.
12    Q. And do you agree that Mr. Hardeman
13 was at risk for non-Hodgkin's lymphoma
14 during the years he had an active hepatitis
15 B infection?
16       MS. FORGIE: Objection. Asked
17   and answered.
18       You can answer it again.
19       THE WITNESS: Yes, if he ever
20   had an active hepatitis B infection. We
21   don't really know that he did. He could
22   have had an occult infection. He could
23   have had a subliminal infection. We
24   don't really know whether he had an
25   active hepatitis B infection or not.

Page 82

BY MS. DU PONT:

Q. But because we don't know if he had an active hepatitis B infection, you can't rule out that an active hepatitis B infection was not a contributing factor to his diffuse large B-cell lymphoma?

MS. FORGIE: Objection.

THE WITNESS: It's very unlikely, because he's been immune for a long time. And, again, like I said for hepatitis C, it's people who have chronic, active hepatitis at the time they're diagnosed with NHL, those are the people who have a high risk of NHL.

So people who, when they have the chronic active hepatitis, whether it's B or C, that's when they're at increased risk for NHL. Not when they develop immunity and live another 10 or 20 years.

BY MS. DU PONT:

Q. But you agree, though, if he had an active infection, he would have been at risk for NHL during that active infection; fair?

MS. FORGIE: Objection. Asked

Page 83

and answered.

You can answer it again.

THE WITNESS: Yes.

BY MS. DU PONT:

Q. So you can't rule out that that active infection caused mutations in Mr. Hardeman during the time of that active infection. Fair?

MS. FORGIE: Objection. Asked and answered. You can answer it again.

THE WITNESS: I can't rule it out, except it would have been sometime in the distant past, before 2005. It would have been more than 10 years. More than 10 years after he -- before he developed the diffuse large B-cell lymphoma.

BY MS. DU PONT:

Q. Okay. In your report, you note that Mr. Hardeman's obesity may have been a minor contributing factor to his diffuse large B-cell lymphoma.

Do you recall that?

A. Yes.

Q. Explain what you mean by it being a

Page 84

minor contributing factor.

A. Well, I don't really think he was obese. He was overweight. But even people who are overweight have an increased risk for NHL and they have an increased risk for large B-cell lymphoma. In his case, it was about a 30 percent increased risk. It's not a very large increased risk. It's a small increased risk. That's why I called it a minor risk factor.

Q. Because the relative risk is lower for obesity than it is for the studies you're relying on for non-Hodgkin's lymphoma?

A. Yes.

Q. And you said that Mr. Hardeman was not obese. He was overweight. Are you aware that shortly before he was diagnosed with diffuse large B-cell lymphoma, a report from December 26, 2014, shows his BMI was 32.18?

A. Yes, but, you know, when you're looking at BMI, you want to look at not the highest weight he ever had before he got his disease. You want to look at his average

Page 85

weight. His average weight was about 190 pounds over his lifetime.

So I wouldn't -- I wouldn't use the higher BMI to make that estimate. In this case, it doesn't matter very much because even if he was obese, his risk is only a little higher, not much. So it's kind of a moot point. But you don't use the highest weight. You usually use the average weight to calculate risk.

Q. Given what you just said about the relative risk really doesn't differ too much whether you're overweight or whether you're obese, does it change your opinion at all that it may have been a minor contributing factor if Mr. Hardeman is defined as obese versus overweight?

MS. FORGIE: Objection.

THE WITNESS: No, it doesn't change my opinion.

BY MS. DU PONT:

Q. And you corrected your report earlier, and I think it's based on a Castillo study, but I need to take a break because I have no more exhibit stickers.

Dennis Weisenburger, M.D.

Page 86

1    So can we go off the record for a
2 second?
3         (Discussion off the record.)
4         THE VIDEOGRAPHER:  The time is
5 now 10:15 a.m., and we are off the
6 record.
7         (Recess taken from 10:15 a.m.
8 to 10:29 a.m.)
9         THE VIDEOGRAPHER:  The time is
10 now 10:29 a.m., and we're back on the
11 record.
12 BY MS. DU PONT:
13    Q.  Before we took a break, we were
14 talking about Mr. Hardeman's weight and how
15 that impacted his non-Hodgkin's lymphoma.
16 And earlier in the deposition, you had
17 indicated that you wanted to correct your
18 report on the relative risk that was
19 reported with diffuse large B-cell lymphoma,
20 and I just wanted to mark for the record the
21 Castillo article entitled, "Obesity is
22 Associated with Increased Relative Risk of
23 Diffuse Large B-Cell Lymphoma:  A
24 Meta-Analysis of Observational Studies."
25 ///

Page 87

1         (Exhibit Number 11 was marked
2    for identification.)
3 BY MS. DU PONT:
4    Q.  Doctor, this is the citation you
5 refer to in your report when you're quoting
6 the relative risk with diffuse large B-cell
7 lymphoma and weight; correct?
8    A.  Yes.
9    Q.  And can you just refer me to the
10 number that you are correct -- where in this
11 article you've gotten the new number that
12 you've corrected in your report?
13    A.  Yeah, it's page 126, Table 3, which
14 is the table on overweight.  If you go down
15 on the second column, about the middle, it
16 says, "Male," and then you go across, it's
17 1.27.  With odds ratio -- 1.27 with a
18 95 percent confidence interval load of 1.09
19 to 1.47.
20         That's what I was quoting.
21 Actually, the paper confuses the odds
22 ratios.  In some places, it reverses them.
23 So it's hard to know what to rely on.
24         But I think this agreed with the
25 text so that's, in the end, what I used.

Page 88

1 The abstract, I think, is --
2    Q.  It flips them in the abstract.
3    A.  It flips them in the abstract; so
4 that's an error.  There's an error
5 somewhere, and we don't really know for sure
6 where the error is.
7    Q.  So are these based on Table 3, the
8 relative risk -- the unadjusted relative
9 risk for males that are overweight with
10 diffuse large B-cell lymphoma is 1.27 and
11 the adjusted relative risk is actually 1.34;
12 correct?
13    A.  Yes.
14    Q.  And explain to me why you are
15 relying on the unadjusted number and not the
16 adjusted number.
17    A.  I could have relied on either one.
18 It doesn't truly matter to me.
19    Q.  Okay.  And elsewhere, in this
20 paper, it notes that the relative risks of
21 diffuse large B-cell lymphoma in obese men
22 and women was 1.4 and 1.34, respectively.
23 That's in the abstract.
24         Do you see that?
25    A.  It says, "The relative risk of

Page 89

1 diffuse large B-cell lymphoma in overweight
2 men and women was 1.22 and 1.27,
3 respectively."
4         The number for men is wrong.
5    Q.  Right.
6    A.  So they just flipped those two, I
7 think, is what they did.
8    Q.  But I'm actually referring to later
9 in the text where they're talking about
10 obese men and women with diffuse large
11 B-cell lymphoma, and they report relative
12 risks of 1.4 and 1.34 in the abstract.
13         Do you see that?
14    A.  Yes, yes.  They didn't report the
15 adjusted odds ratios either in the abstract.
16    Q.  Right.  So the -- and in Table 4,
17 the relative risk for obese -- this is on
18 page 127, "The relative risk for obesity and
19 diffuse large B-cell lymphoma in males is
20 1.4"; correct?
21    A.  Yes.
22    Q.  Okay.  You can set that aside.
23         We talked at your deposition the
24 other day about how age is a risk factor for
25 non-Hodgkin's lymphoma.

Dennis Weisenburger, M.D.

Page 90

1      Do you remember that?
2      A.  Yes.
3      Q.  And you stand by the fact that age
4  is a risk factor for non-Hodgkin's lymphoma?
5      A.  Yes.
6      Q.  And you -- let me withdraw that.
7      You agree that diffuse large B
8  cells is most common in patients over 60?
9      A.  Yes.
10      Q.  And that cancer, in general, is a
11  function of age; right?
12      A.  Most cancers.
13      Q.  But with respect to diffuse large
14  B-cell lymphoma, that particular cancer is a
15  function of age?
16          MS. FORGIE:  Objection.  Asked
17      and answered.
18          THE WITNESS:  Yes.
19  BY MS. DU PONT:
20      Q.  And that's the type of cancer that
21  Mr. Hardeman had; correct?
22      A.  Yes.
23      Q.  And you can't rule out that his age
24  was a contributing factor to his diffuse
25  large B-cell lymphoma.  Fair?

Page 91

1          MS. FORGIE:  Objection.
2          THE WITNESS:  Well, as I said
3      before, I don't think that age is a
4      causative risk factor.  At least we
5      don't understand it.  So it is a risk
6      factor, but I wouldn't consider it a
7      causative risk factor in the sense that
8      age doesn't cause the lymphoma.  There
9      probably are some things about age that
10      may cause the lymphoma.
11  BY MS. DU PONT:
12      Q.  But you can't rule out those some
13  things that are about age that are
14  contributing to his lymphoma.  Fair?
15          MS. FORGIE:  Objection.  Asked
16      and answered.
17          THE WITNESS:  We don't know
18      what they are.
19  BY MS. DU PONT:
20      Q.  Right.  And Mr. Hardeman is male;
21  correct?
22      A.  Correct.
23      Q.  And we know that males are more
24  likely to develop non-Hodgkin's lymphoma
25  than females; correct?

Page 92

1      A.  Yes.
2      Q.  But, again, we don't really know
3  why it is that men are more likely to
4  develop non-Hodgkin's lymphoma than women;
5  correct?
6          MS. FORGIE:  Objection.
7          THE WITNESS:  Correct.
8  BY MS. DU PONT:
9      Q.  Similarly, because we don't know
10  why, you can't really rule out his male
11  gender as a contributing factor to his
12  diffuse large B-cell lymphoma?
13          MS. FORGIE:  Objection.
14          THE WITNESS:  Again, I wouldn't
15      consider it a causative risk factor.
16      It's a risk factor, but it's nothing we
17      really understand, and it's nothing he
18      can control either.
19  BY MS. DU PONT:
20      Q.  We can't control some causative
21  risk factors either, can we?
22          MS. FORGIE:  Objection.
23          THE WITNESS:  We can control
24      some.
25  BY MS. DU PONT:

Page 93

1      Q.  And you would agree that
2  Mr. Hardeman could have been diagnosed with
3  the exact same diffuse large B-cell lymphoma
4  without exposure to Roundup; true?
5      A.  It's possible.
6      Q.  Are you saying that Roundup
7  promoted an existing non-Hodgkin's lymphoma
8  in Mr. Hardeman?
9      A.  Well, no.  What I'm saying is
10  Roundup contributed to his development of
11  non-Hodgkin's lymphoma.  It could have done
12  it as an initiator or a promoter or both.
13  Likely both.
14      Q.  What's your basis for saying it's a
15  promoter for his non-Hodgkin's lymphoma?
16      A.  Well, so my understanding of
17  initiators and promoters are initiators sort
18  of get the process started, the first
19  mutation, for example, or the first genetic
20  abnormality.
21      Then other factors add in and can
22  do a variety of things that promote the
23  cancer, either to cause the cells to
24  proliferate or protect them from cell death,
25  or additional mutations can occur that give

Page 94

1 them a survival advantage. So that would be
2 promotion.
3     So there's initiation, which is
4 really the first event that prepares the
5 cell, kind of gets it going in the direction
6 towards cancer and then the other events
7 occur later, which are promoters.
8     And I think because Roundup or
9 glyphosate is a genotoxic agent, it could
10 be -- certainly could be an initiator, but
11 it also could be a promoter. There are some
12 studies that -- there's some studies that
13 suggest it is a promoter in some settings.
14     Q. And what study are you relying on
15 to say it was a promoter in this case?
16     MS. FORGIE: Objection. Even
17 though you phrased it as hard, it's a
18 general causation.
19     THE WITNESS: It's a study
20 of -- I'm trying to remember, skin,
21 tumors in mice, where they initiated the
22 tumors with a chemical other than
23 glyphosate and then they introduced
24 glyphosate. So there's one study that
25 suggests glyphosate is a promoter.

Page 95

1 BY MS. DU PONT:
2     Q. Sitting here today, other than that
3 one study, you cannot reference for me an
4 additional study that suggests that
5 glyphosate is a promoter; correct?
6     MS. FORGIE: Objection.
7 General causation.
8     THE WITNESS: No, but there are
9 many studies that have now demonstrated
10 that glyphosate or Roundup are genotoxic
11 agents and so certainly has the
12 potential to be an initiator or a
13 promoter, or both.
14 BY MS. DU PONT:
15     Q. But because something is genotoxic,
16 that suggests it is causing DNA damage;
17 correct?
18     MS. FORGIE: Objection.
19 Causation.
20     THE WITNESS: Right.
21 BY MS. DU PONT:
22     Q. And that's different from
23 promotion; correct?
24     MS. FORGIE: Objection.
25 General causation.

Page 96

1     THE WITNESS: Well, promotion
2 is just what happens after initiation to
3 make the cell move to become a true
4 cancer cell, and that could be things
5 that initiate proliferation, genetic
6 events that prevent the cell from dying,
7 or additional genotoxic events that give
8 additional mutations that eventually
9 move the cell along to becoming a cancer
10 cell.
11 BY MS. DU PONT:
12     Q. Do you agree that a patient with
13 the same medical history as Mr. Hardeman but
14 with no exposure to Roundup could still have
15 been diagnosed with non-Hodgkin's lymphoma?
16     MS. FORGIE: Objection. Asked
17 and answered.
18     THE WITNESS: Yes.
19 BY MS. DU PONT:
20     Q. So if you have a patient that has
21 the same background as Mr. Hardeman, but no
22 Roundup exposure, I should say, what caused
23 his non-Hodgkin's lymphoma?
24     A. We wouldn't know. It would be
25 considered idiopathic.

Page 97

1     Q. You agree that men in their 60s get
2 non-Hodgkin's lymphoma without exposure to
3 Roundup. Fair?
4     A. Yes.
5     Q. And men in their 60s get diffuse
6 large B-cell lymphoma without any exposure
7 to Roundup; correct?
8     MS. FORGIE: Objection. Asked
9 and answered.
10     THE WITNESS: Yes.
11 BY MS. DU PONT:
12     Q. And people who are overweight or
13 obese who have been exposed to Roundup get
14 non-Hodgkin's lymphoma; correct?
15     MS. FORGIE: Objection. Asked
16 and answered.
17     THE WITNESS: Yes.
18 BY MS. DU PONT:
19     Q. And people who are overweight or
20 obese who have never been exposed to Roundup
21 get diffuse large B-cell lymphoma; correct?
22     MS. FORGIE: Objection. Asked
23 and answered.
24     THE WITNESS: Yes.
25 ///

Dennis Weisenburger, M.D.

Page 98

BY MS. DU PONT:
 Q. And people with a history of chronic hepatitis C exposure who have never been exposed to Roundup get non-Hodgkin's lymphoma; correct?
 MS. FORGIE: Objection. Asked and answered.
 THE WITNESS: Yes.
BY MS. DU PONT:
 Q. And people with a history of hepatitis C exposure who have not been exposed to Roundup get diffuse large B-cell lymphoma; correct?
 MS. FORGIE: Objection. Asked and answered.
 THE WITNESS: Yes.
BY MS. DU PONT:
 Q. And people with a history of hep B exposure who have never been exposed to Roundup get non-Hodgkin's lymphoma; correct?
 MS. FORGIE: Objection. Asked and answered.
 THE WITNESS: Yes.
BY MS. DU PONT:
 Q. And people with a history of

Page 99

hepatitis B exposure who have never been exposed to Roundup get diffuse large B-cell lymphoma; correct?
 MS. FORGIE: Objection. Asked and answered.
 THE WITNESS: They can, yes.
BY MS. DU PONT:
 Q. Earlier in the deposition, you stated that Mr. Hardeman is in remission from his non-Hodgkin's lymphoma.
 Do you recall that testimony?
 A. Yes.
 Q. And is it your understanding that he continues to be in remission today?
 A. Yes.
 Q. And he's been in remission for over three years; correct?
 A. Yes.
 Q. And you're not offering an opinion on Mr. Hardeman's prognosis.
 Is that fair?
 A. I'm not.
 Q. That's outside your area of expertise?
 A. Today it is, yes.

Page 100

 Q. Earlier, we were talking about the latency between hepatitis C infection and the development of B-cell non-Hodgkin's lymphoma.
 Do you recall that discussion?
 A. Yes.
 Q. I'm going to mark as Exhibit 12 a paper in the Annals of Internal Medicine by Zuckerman entitled, "Hepatitis C Virus Infection in Patients With B Cell Non-Hodgkin's Lymphoma."
 (Exhibit Number 12 was marked for identification.)
BY MS. DU PONT:
 Q. Have you seen this paper before, Doctor?
 A. I don't believe so.
 Q. And I'll just direct you to the "Results" section of the abstract where it states, "Risk factors for HCV infection were present in 15 patients with B-cell lymphoma and occurred a median of 15 years before diagnosis of lymphoma."
 Do you see that?
 A. Yes.

Page 101

 Q. And if you -- so this paper is saying that the latency -- the median latency for HCV infection and development of lymphoma in this study was 15 years; correct?
 A. Yes.
 Q. And if you turn to page 4, the third paragraph in the middle of the page, do you see that they again are describing the period during which patients were at risk for percutaneous exposure to HCV preceded the diagnosis of B-cell lymphoma by a median of 15 years, range 5 to 35 years.
 Do you see that?
 A. It's odd terminology to use the word percutaneous. I don't understand why they're doing that. Are they talking about needles? I don't understand why they're using the term "percutaneous."
 Q. Regardless of the terms they're using, do you agree that this paper states that exposure to HCV preceded the diagnosis of B-cell lymphoma by a median of 15 years with a range between 5 and 35?
 A. That's what it says.

Dennis Weisenburger, M.D.

1    Q.   And so this paper is stating that
2  the latency period between exposure to HCV
3  and non-Hodgkin's lymphoma is 15 years with
4  a range of 5 to 35 years; correct?
5    A.   That's what it says, yes.
6    Q.   So you would agree that the latency
7  period for exposure between HCV and
8  non-Hodgkin's lymphoma ranges anywhere
9  between 5 and 35 years; correct?
10   A.   That's probably correct, yes.
11   Q.   Do we have any measurements for
12 Mr. Hardeman's glyphosate levels?
13   A.   No.
14   Q.   So we have no measurements before
15 he used Roundup; correct?
16   A.   I don't believe so.
17   Q.   And we have no measurements for his
18 glyphosate levels while he was using
19 Roundup; correct?
20   A.   Correct.
21   Q.   And we have no measurements of his
22 glyphosate levels any time before he was
23 diagnosed with lymphoma; correct?
24   A.   Correct.
25   Q.   And we have no measurements of

1  Mr. Hardeman's glyphosate levels after he
2  was diagnosed with lymphoma; correct?
3    A.   That's correct.
4    Q.   And we have no measure of his
5  glyphosate levels anytime after he stopped
6  using Roundup; correct?
7    A.   Correct.
8    Q.   And you would agree that the vast
9  majority of cases of diffuse large B-cell
10 like Mr. Hardeman's diffuse large B-cell
11 occur in patients who have never been
12 exposed to Roundup; correct?
13         MS. FORGIE:  Objection.
14         THE WITNESS:  I believe that's
15 correct.
16 BY MS. DU PONT:
17   Q.   You've never written a note in a
18 pathology report for a patient that
19 suggested that Roundup caused the patient's
20 non-Hodgkin's lymphoma; correct?
21   A.   Correct.
22   Q.   And there's no pathology test that
23 you could have performed on Mr. Hardeman's
24 tumor to determine whether Roundup caused
25 his cancer; correct?

1    A.   That's correct.
2    Q.   There's no examination that a
3  doctor could have done on Mr. Hardeman to
4  determine whether Roundup caused
5  Mr. Hardeman's non-Hodgkin's lymphoma;
6  correct?
7    A.   That's correct.
8    Q.   And there's no medical test that
9  could have been done on Mr. Hardeman to
10 determine whether Roundup caused his
11 non-Hodgkin's lymphoma; correct?
12   A.   That's correct.
13   Q.   And you can't tell by looking at
14 Mr. Hardeman's lymphoma underneath the
15 microscope whether he used Roundup or not;
16 correct?
17   A.   That's correct.
18   Q.   And you can't look at the various
19 genetic markers in his non-Hodgkin's
20 lymphoma and conclude that his non-Hodgkin's
21 lymphoma is associated with Roundup use;
22 correct?
23   A.   That's correct.
24   Q.   And Mr. Hardeman got the same
25 treatment for diffuse large B-cell lymphoma

1  that he would have gotten even if he hadn't
2  used Roundup; correct?
3    A.   Yes.
4    Q.   And nothing in Mr. Hardeman's
5  medical records suggests that Roundup caused
6  his cancer.  True?
7    A.   That's true.
8    Q.   And you reviewed the testimony of
9  Mr. Hardeman's treating doctors; correct?
10   A.   Yes.
11   Q.   And you saw that none of his
12 doctors attributed his non-Hodgkin's
13 lymphoma to Roundup.  True?
14         MS. FORGIE:  Objection.
15         THE WITNESS:  I don't remember
16 the specifics.  Some of them talked
17 about pesticides, herbicides causing
18 non-Hodgkin's lymphoma, but nobody
19 specifically pinpointed Roundup as the
20 cause.
21 BY MS. DU PONT:
22   Q.   And so you disagree with his
23 treating doctors?
24         MS. FORGIE:  Objection.
25         THE WITNESS:  I don't think his

Page 106

1  treating doctors rendered an opinion one
2  way or the other.
3         MS. DU PONT:  I don't have any
4  further questions at this time.
5         MS. FORGIE:  Thank you.  I just
6  have a few.
7
8         EXAMINATION
9  BY MS. FORGIE:
10  Q.  Dr. Weisenburger, did you perform a
11  differential diagnosis with regard to the
12  etiology of Mr. Hardeman's non-Hodgkin's
13  lymphoma?
14         MS. DU PONT:  Objection.
15         THE WITNESS:  Yes, that's what
16  I did in reviewing the medical records
17  and my interview with him, and that's
18  how I eliminated all the other known
19  causes.  It's clearly stated in my
20  report.
21  BY MS. FORGIE:
22  Q.  Okay.  And you were asked several
23  questions about risk factors that
24  Mr. Hardeman had -- for example, hep C, hep
25  B, obesity, age, the fact that he was male.

Page 107

1      Do you remember those questions?
2  A.  Yes.
3  Q.  Do you think that the fact that any
4  of those risk factors may or may not have
5  contributed to his development of
6  non-Hodgkin's lymphoma affected your
7  statement that Roundup was a substantial
8  contributing factor to his development of
9  non-Hodgkin's lymphoma?
10         MS. DU PONT:  Objection.  Form.
11         THE WITNESS:  No.
12  BY MS. FORGIE:
13  Q.  Why is that?
14  A.  Well, for the reasons that I gave
15  in my report, that he was in a sustained
16  virologic remission for at least nine years
17  before he developed non-Hodgkin's lymphoma
18  whereas he was using the Roundup frequently
19  right up through the time.
20      So it's possible that the hepatitis
21  C could have been contributing to that, but
22  I think the Roundup was the most substantial
23  contributing factor in this case.
24  Q.  Okay.  You were asked several
25  questions about causes of non-Hodgkin's

Page 108

1  lymphoma.
2      Do you remember those questions?
3  A.  Yes.
4  Q.  Do you consider yourself an expert
5  in the causes of non-Hodgkin's lymphoma?
6  A.  Yes.
7  Q.  In fact, you've published over 50
8  papers in peer-reviewed journals about the
9  causes of non-Hodgkin's lymphoma; correct?
10  A.  Yes.
11         MS. DU PONT:  Objection.  Form.
12  BY MS. FORGIE:
13  Q.  And prior to reviewing
14  Mr. Hardeman's medical records and giving
15  your expert reports, were you aware that
16  hepatitis B, hepatitis C, and the other risk
17  factors we've discussed were risk factors
18  for the development of non-Hodgkin's
19  lymphoma?
20  A.  Yes.
21         MS. DU PONT:  Objection.  Form.
22  BY MS. FORGIE:
23  Q.  You were asked several questions
24  about a telephone call you had with
25  Mr. Hardeman.  Do you recall that?

Page 109

1  A.  Yes.
2  Q.  Is everything that you relied upon
3  in forming your opinions with regard to the
4  Hardeman case and the telephone call that
5  you had included in your expert report of
6  Mr. Hardeman?
7         MS. DU PONT:  Objection.  Form.
8         THE WITNESS:  Yes.
9  BY MS. FORGIE:
10  Q.  Doctor, you were asked several
11  questions about the difference between what
12  Mr. Hardeman said in his deposition and
13  between what Mr. Hardeman told you in the
14  telephone interview you had with him.  Do
15  you remember those questions?
16  A.  Yes.
17         MS. DU PONT:  Objection.  Form.
18  BY MS. FORGIE:
19  Q.  You mentioned in your answer to
20  questions about that that you attributed
21  those differences to either the length of
22  time you discussed or to his brain being
23  affected by chemotherapy.
24      Do you remember that testimony?
25         MS. DU PONT:  Objection.  Form.

Dennis Weisenburger, M.D.

Page 110

1    THE WITNESS:  Yes, it's hard to
2  know why he gave different answers to
3  more or less the same questions.
4  Either -- it's hard to know.  Either he
5  wasn't remembering or something.  You
6  know, it could have been the effect of
7  the chemotherapy as well.  I don't know.
8  BY MS. FORGIE:
9    Q.  Why do you say that it could have
10  been the effect of the chemotherapy?
11    A.  Well, sometimes patients who get a
12  lot of chemotherapy have some deficits in
13  their memory.  It's due to the chemotherapy.
14    Q.  Is that sometimes referred to as
15  chemo brain?
16    A.  Yes.
17    MS. DU PONT:  Objection.  Form.
18  BY MS. FORGIE:
19    Q.  You're familiar with chemo brain;
20  correct?
21    A.  Yes.
22    MS. DU PONT:  Objection.  Form.
23  BY MS. FORGIE:
24    Q.  You were asked several questions
25  about why there were no glyphosate -- or the

Page 111

1  fact that there were no glyphosate levels at
2  any time in Mr. Hardeman's medical records.
3    Do you remember that?
4    A.  Yes.
5    Q.  Do you know why that is?
6    A.  Well, it's not something that a
7  doctor would measure.  It's something that a
8  toxicologist might measure as part of a
9  scientific study, but it's not something
10  that a doctor would measure.  It would have
11  to be done in some specialized laboratory.
12    So, you know, it's not surprising
13  that there are no measurements.  Nobody
14  thought to measure.
15    Q.  The reason there's no glyphosate
16  levels in the records is because those
17  measurements were never taken; correct?
18    A.  Yes.
19    MS. DU PONT:  Objection.  Form.
20  BY MS. FORGIE:
21    Q.  You were asked questions as to
22  whether or not there was a medical or
23  pathology test that could determine if
24  Roundup caused Mr. Hardeman's non-Hodgkin's
25  lymphoma.

Page 112

1    Do you remember that question?
2    A.  Yes.
3    MS. DU PONT:  Objection.  Form.
4  BY MS. FORGIE:
5    Q.  Is there any medical or pathology
6  test that could determine whether or not
7  hepatitis B caused Mr. Hardeman's
8  non-Hodgkin's lymphoma?
9    A.  No.
10    Q.  Is there any medical or
11  pathological test that could determine
12  whether hepatitis C caused Mr. Hardeman's
13  non-Hodgkin's lymphoma?
14    MS. DU PONT:  Object to form.
15    THE WITNESS:  No.
16  BY MS. FORGIE:
17    Q.  Is there any medical or
18  pathological test that could determine
19  whether any of the other risk factors that
20  were discussed today -- obesity, age, being
21  male -- could have -- could be shown to
22  cause his non-Hodgkin's lymphoma by a
23  medical or pathology test?
24    A.  No.
25    MS. DU PONT:  Object to form.

Page 113

1    MS. FORGIE:  That's all I have.
2    MS. DU PONT:  Just give me one
3  minute.
4    THE VIDEOGRAPHER:  The time is
5  now 10:55 a.m., and we are off the
6  record.
7    (Recess taken from 10:55 a.m.
8  to 10:57 a.m.)
9    THE VIDEOGRAPHER:  The time is
10  now 10:57 a.m., and we are back on the
11  record.
12
13    FURTHER EXAMINATION
14  BY MS. DU PONT:
15    Q.  Doctor, you didn't examine
16  Mr. Hardeman; correct?
17    A.  Correct.
18    Q.  And you did not perform a
19  neurological test on his brain to determine
20  what his neurological function was; correct?
21    A.  Correct.
22    Q.  So you're speculating when you say
23  that Mr. Hardeman -- you think he may have
24  had chemo brain; aren't you?
25    MS. FORGIE:  Objection.

Dennis Weisenburger, M.D.

Page 114

1    THE WITNESS: I'm speculating,
2  yes. We don't know why his memory
3  was -- why his memory on certain facts
4  changed. I don't know.
5  BY MS. DU PONT:
6    Q. Okay. And while I understand that
7  you testified that -- well, let me withdraw
8  that. We can do a test on a patient's blood
9  and determine whether they were exposed to
10  hep C or hep B; correct?
11    A. Yes.
12    Q. We can't do a test on the blood and
13  see if someone was exposed to Roundup, can
14  we?
15    A. You could if you looked at it right
16  after he applied it. You could do that.
17    Q. But we don't have that for
18  Mr. Hardeman?
19    A. We don't.
20    MS. DU PONT: Okay. I have no
21  further questions.
22    MS. FORGIE: Nothing else.
23    THE VIDEOGRAPHER: The time is
24  now 10:58 a.m., and we are off the
25  record.

Page 115

1    (Whereupon the deposition
2  concluded at 10:58 a.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 116

1    REPORTER'S CERTIFICATE
2
3    The undersigned Certified Shorthand
4  Reporter licensed in the State of California
5  does hereby certify:
6    That the foregoing deposition was
7  taken before me at the time and place
8  therein set forth, at which time the witness
9  was duly sworn by me;
10    That the testimony of the witness
11  and all objections made at the time of the
12  examination were recorded stenographically
13  by me and were thereafter transcribed, said
14  transcript being a true copy of my shorthand
15  notes thereof.
16    I further declare that I have no
17  interest in the outcome of the action.
18    In witness whereof, I have
19  subscribed my name this 20th day of
20  December, 2018.
21
22
23    _____
     LISA MOSKOWITZ
     CSR 10816, RPR, CRR, CLR
24    NCRA Realtime Systems Administrator
25

Page 117

1    INSTRUCTIONS TO WITNESS
2
3    Please read your deposition over
4  carefully and make necessary corrections.
5  You should state the reason in the
6  appropriate space on the errata sheet for
7  any corrections that are made.
8    After doing so, please sign the
9  errata sheet and date it.
10    You are signing same subject to the
11  changes you have noted on the errata sheet,
12  which will be attached to your deposition.
13    It is imperative that you return
14  the original errata sheet to the deposing
15  attorney within thirty (30) days of receipt
16  of the deposition transcript by you. If you
17  fail to do so, the deposition transcript may
18  be deemed to be accurate and may be used in
19  court.
20
21
22
23
24
25

Dennis Weisenburger, M.D.

```
 1      E R R A T A   S H E E T
 2          - - - - - -
 3
 4   PAGE    LINE   CHANGE
 5   _____  _____  _____
 6      REASON:  _____
 7   _____  _____  _____
 8      REASON:  _____
 9   _____  _____  _____
10      REASON:  _____
11   _____  _____  _____
12      REASON:  _____
13   _____  _____  _____
14      REASON:  _____
15   _____  _____  _____
16      REASON:  _____
17   _____  _____  _____
18      REASON:  _____
19   _____  _____  _____
20      REASON:  _____
21   _____  _____  _____
22      REASON:  _____
23   _____  _____  _____
24      REASON:  _____
25
```

```
 1      LAWYER'S NOTES
 2   PAGE    LINE
 3   _____  _____  _____
 4   _____  _____  _____
 5   _____  _____  _____
 6   _____  _____  _____
 7   _____  _____  _____
 8   _____  _____  _____
 9   _____  _____  _____
10   _____  _____  _____
11   _____  _____  _____
12   _____  _____  _____
13   _____  _____  _____
14   _____  _____  _____
15   _____  _____  _____
16   _____  _____  _____
17   _____  _____  _____
18   _____  _____  _____
19   _____  _____  _____
20   _____  _____  _____
21   _____  _____  _____
22   _____  _____  _____
23   _____  _____  _____
24   _____  _____  _____
25   _____  _____  _____
```

```
 1      ACKNOWLEDGMENT OF DEPONENT
 2
 3        I, DENNIS WEISENBURGER, M.D., do
 4   hereby certify that I have read the
 5   foregoing pages, 1-119, and that the same is
 6   a correct transcription of the answers given
 7   by me to the questions therein propounded,
 8   except for the corrections or changes in
 9   form or substance, if any, noted in the
10   attached Errata Sheet.
11
12
     _____   _____
13   DENNIS WEISENBURGER, M.D.   DATE
14
15
16
17
18
19
20
21
22
23
24
25
```