# EXHIBIT B

1     SUPERIOR COURT OF CALIFORNIA

2      COUNTY OF ALAMEDA

3 BEFORE THE HONORABLE WINIFRED Y. SMITH, JUDGE PRESIDING

4     DEPARTMENT NUMBER 21

5      ---oOo---

6 COORDINATION PROCEEDING  )
  SPECIAL TITLE (RULE 3.550)  )
7             )
  ROUNDUP PRODUCTS CASE   ) **JCCP No. 4953**
8             )
  _____ )
9             )
  THIS TRANSCRIPT RELATES TO:  )
10            )
  Pilliod, et al.     ) **Case No.  RG17862702**
11    vs.       )
  Monsanto Company, et al.  ) **Pages 2074 - 2350**
12  _____) **Volume 14**

13

14

15    **Reporter's Transcript of Proceedings**

16     Thursday, April 4, 2019

17

18

  Reported by: Kelly L. Shainline, CSR No. 13476, RPR, CRR
19      Lori Stokes, CSR No. 12732, RPR
       Court Reporters
20

21      BARS

22

23    **BAY AREA REPORTING**
      S O L U T I O N S
24      888.526.8243
    www.BayAreaReportingSolutions.com
25

              2074

**APPEARANCES OF COUNSEL:**

For Plaintiffs:

    THE MILLER FIRM, LLC
    108 Railroad Avenue
    Orange, Virgina  22960
    (540)672-4224
    **BY:  MICHAEL J. MILLER, ATTORNEY AT LAW**
        mmiller@millerfirmllc.com


    BAUM HEDLUND ARISTEI & GOLDMAN PC
    10940 Wilshire Boulevard, 17th Floor
    Los Angeles, California 90024
    (310) 207-3233
    **BY:  R. BRENT WISNER, ATTORNEY AT LAW**
        rbwisner@baumhedlundlaw.com
        **PEDRAM ESFANDIARY, ATTORNEY AT LAW**
        pesfandiary@baumhedlundlaw.com


    AUDET & PARTNERS, LLP
    221 Main Street, Suite 1460
    San Francisco, California  94105
    (415)568-2555
    **BY:  MARK BURTON, ATTORNEY AT LAW**
        mburton@audetlaw.com


      **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

2075

1    **APPEARANCES**:  (CONTINUED)

2    For Defendants:

3          EVANS FEARS & SCHUTTERT LLP
            2300 W. Sahara Ave, Suite 950
4          Las Vegas, Nevada  89102
            (702) 805-0290
5          **BY:  KELLY A. EVANS, ATTORNEY AT LAW**
                  kevans@efstriallaw.com
6
            HINSHAW
7          One California Street, 18th Floor
            San Francisco, California  94111
8          (415) 362-6000
            **BY:  EUGENE BROWN JR., ATTORNEY AT LAW**
9                 ebrown@hinshawlaw.com

10         GOLDMAN ISMAIL TOMASELLI BRENNAN & BAUM LLP
            564 West Randolph Street, Suite 400
11         Chicago, Illinois 60661
            (312) 681-6000
12         **BY:  TAREK ISMAIL, ATTORNEY AT LAW**
                  tismail@goldmanismail.com

13

14

15    (Multiple other counsel present as reflected in the
      minutes.)

16

17

18

19

20

21

22

23

24

25

                                                      2076

1                         **I N D E X**

2
   Thursday, April 4, 2019
3
   **PLAINTIFFS' WITNESSES**                    **PAGE  VOL.**
4

5  **JAMESON, CHARLES**

6  Direct Examination by Mr. Wisner              2091   14
   Cross-Examination by Mr. Ismail               2184   14
7  Redirect Examination by Mr. Wisner           2301   14
   Recross-Examination by Mr. Ismail             2337   14
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                          2077

```
 1    Thursday, April 4, 2019                    8:47 a.m.

 2              (Proceedings commenced in open court out of

 3    the presence of the jury:)

 4              THE COURT:  Good morning, Counsel.

 5              ALL:  Good morning, Your Honor.

 6              THE COURT:  Before we bring the jury in and we

 7    proceed with evidence, I will hear argument on the

 8    plaintiffs' motion to preclude advertisements related to

 9    safety testings and studies.

10              I've issued a tentative ruling.  Have you had

11    an opportunity to review it, and do you feel ready to

12    argue?

13              MR. BRADY:  Just briefly, Your Honor.

14              I've read and carefully considered your

15    tentative, and thank you for taking the time to address

16    this issue.

17              Your Honor, as far as the print advertising

18    goes, it sounds like you've made your mind up although

19    in our reply we talk about what we think is the

20    substantial difference between attorney advertising and

21    then touting the science and safety and then studies

22    which really are at issue in this case.  So, you know,

23    if the Court is firm on that, I won't go any further.

24              But the thing that I would like the Court to

25    address is we're still getting the geofencing here,
```

                                                        2078

1    Your Honor.  We're still having pop-up ads pop up on

2    cell phones basically touting this same information here

3    in this courthouse.

4         And the idea -- it's an interesting

5    technological feature that Monsanto has availed itself

6    of, but I think it's going too far.  And I don't think

7    that that affects their First Amendment rights or their

8    ability to sell their product by popping specific

9    information up to people who's geo coordinates are in

10   this building.

11        We're willing to refrain from doing any

12   attorney advertising until this trial is over if they're

13   willing to refrain from doing any geofencing.  It's just

14   a --

15        **THE COURT:**  So, you know, just one of -- and

16   as I said in the tentative, one of my thoughts is this

17   is just one trial.

18        First of all, I think prior restraint is just

19   out of the question regarding this.  But beyond that,

20   we're talking about hundreds of cases.  This is one case

21   going on today.  But there's the MDL and there's this

22   coordinated case and apparently coordinated cases in

23   St. Louis and hundreds of cases around the country that

24   are going to be tried over time.  So in another few

25   months, there's going to be hundreds of cases being

1    tried at the same time about this product.

2            And so unless and until something changes with

3    respect to Monsanto's ability to market Roundup, I can't

4    say, "Listen, you can't advertise.  You can't run an ad

5    about how" -- essentially advertising Roundup, which is

6    what they do.  They sell Roundup.  And until they can't

7    sell Roundup or something changes, I can't simply say,

8    "You can't" --

9                    (Simultaneous colloquy.)

10           **MR. BRADY:**  These aren't ads to buy Roundup.

11   They're touting its safety and the science and the

12   regulatory approval, in this building.  And for people

13   walking around this building, I still think that that's

14   a different issue.  I think that a narrow order just

15   prohibiting geofencing within, say, quarter of a mile of

16   this courthouse, you know, is a kind of a reasonable

17   order that we'd like to see at all the future trials.

18           **THE COURT:**  So these jurors are all over

19   Alameda County, which is a very long distance, so it's

20   not like just because they're here, whatever they see or

21   hear -- I mean, I think that the ability -- the jurors

22   are either going to follow my instructions or they're

23   not.

24           So when they turn their TV on and watch

25   whatever channel is -- you know, if you've used Roundup

1    and you think you might be sick, please call us, that's

2    going to happen.

3              Advertising, I don't know, if it's just your

4    firm or other firms, I don't think I've seen it yet on

5    TV.  But I understand that there are a number of ads

6    that are being run.  And so when they go home, when they

7    get on BART or they're driving in their cars, these same

8    jurors or whatever your potential jurors are in any

9    jurisdiction, it's going to be too wide and far even if

10   I were to say something like that.

11             **MR. BRADY:**  I agree, but when they get up at

12   break and they turn their cell phones back on because

13   they're no longer under your admonition while they're in

14   the courtroom where they finish here --

15             **THE COURT:**  No, no, they're always under my

16   admonition.

17                  (Simultaneous colloquy.)

18             **MR. BRADY:**  -- the first thing they see on

19   their cell phone when they turn it on is a pop-up and

20   its geofence targeted this building.  It's just -- it's

21   going too far.

22             **THE COURT:**  And that assumes that it's

23   targeting this building.  I mean, you're assuming a

24   subjective intent that I can't -- I don't know that.

25             **MR. BRADY:**  That's how geofencing works.  They

                                                          2081

1     put in particular longitude and latitude coordinates and

2     they pump advertisements to apps that are on the phones

3     of people within those coordinates.

4             Look, I agree with you --

5         **THE COURT:**  Unfortunately for -- I know from

6     your perspective, you're talking about the First

7     Amendment, and it is restraint -- prior restraint of

8     speech is serious.  And I know you know that and I know

9     you appreciate that.  I'm not trying to be

10    condescending.  It's just I can't do that.  I can't do

11    it.

12        **MR. BRADY:**  Fair enough, Your Honor.  Thank

13    you for considering our motion.

14        **MR. WISNER:**  Your Honor, I think there's

15    one -- and I get your point.  I think just to clarify

16    one procedural factual thing.  Right?  If I were to walk

17    over to a juror personally and say to you, "Hey, Juror

18    Number 3, Monsanto's stuff causes cancer and all these

19    studies show it," I mean, that would be a mistrial.

20    Instantaneously.  That's jury tampering.  Right?

21            Now if they do that same thing -- if I did the

22    same thing by targeting every person's phone in this

23    courtroom or every single person's phone in this

24    courthouse and pushing that information, that same

25    message to them on their phone -- and what happens is --

1    I don't know if you use your phone for this kind of

2    purposes, but, for example, when I look at my ESPN app

3    and I'm looking at the scores for the UCLA water polo

4    team, or whatever, you know, there's little ads that pop

5    up.

6              **THE COURT:**  Sure.

7              **MR. WISNER:**  And those ads are saying "Federal

8    judge says Roundup is safe."  That's the kind of stuff

9    we're seeing.

10             We saw this happening with quite intensity in

11   the *Johnson* trial.  Numerous jurors during voir dire

12   mentioned that they were having these things pushed on

13   them as soon as they walked in the building.

14             And so whether or not Monsanto is or is not

15   doing that, I think that if they are, that should be

16   prohibited.  That's not really a point of First

17   Amendment.  That is now clearly targeting people that

18   they know they can't speak to.

19             **THE COURT:**  And you're asking me to assign a

20   subjective intent that I don't know exists and it's

21   still prior restraint.  I mean, technology has taken us

22   places probably we never thought it would go.

23             **MR. BRADY:**  It's still jury tampering, though,

24   Your Honor.  You can talk about it in any nice way you

25   want with whatever --

                                                        2083

1              THE COURT:  I guess if I were picking sides, I
2      might believe that.  But I can't pick sides.
3              MR. BRADY:  Thank you, Your Honor.
4              MR. WISNER:  We appreciate your taking the
5      time to look at it.
6              MR. MILLER:  Unrelated, if I could,
7      Your Honor.
8              We were hoping to get time tomorrow on your, I
9      know, very busy schedule to talk about some page and
10     lines rulings on the Hugh Grant deposition.
11             THE COURT:  All right.  We'll probably have to
12     do that this evening because -- I'll see if I have time
13     tomorrow.  Are you all going to be here?
14             MR. MILLER:  We'll make ourselves available.
15     Absolutely.
16             THE COURT:  All right.  Well, let me see if I
17     can make some time tomorrow.  I have to look to see
18     what's on the calendars.  I have three calendars.  I
19     don't know what's on them.  If I do, I'd be happy to.
20             MR. WISNER:  The only other issue, and I was
21     talking with counsel before this, and I don't want to --
22     because it will come up in this deposition -- or during
23     this testimony, is you've tentatively admitted
24     portions -- and we haven't finished our conversation --
25     portions of EPA documents.

2084

1            And my concern is if they're admitted, that

2     means that they go back with the jury during

3     deliberations.  And if that's the case, then I'm going

4     to attempt to lay the foundation to get the IARC

5     monograph in through this witness.  He was one of the

6     authors of it.  He was participating.  He can lay the

7     custodial foundation as a business record, et cetera.

8            THE COURT:  So the monograph itself, my

9     thought was that probably the summary or some part of it

10    would probably come into evidence.  Just off the top of

11    my head, I would assume that the entire monograph would

12    not but that some portions of it might in the same way

13    that I have ruled that, you know, some of the EPA

14    documents, the summaries, the analysis that's done by

15    the agency itself would be appropriate, but the

16    underlying data would not.

17           So that would be my thought.  And I would

18    think maybe you could have a meeting of the minds about

19    what portion of the monograph might come in.

20           MR. WISNER:  I think that's helpful guidance.

21    And then I won't -- I will lay the foundation,

22    Your Honor, for getting the whole thing in, but I won't

23    seek to admit it during his testimony and we can address

24    the admission of it or portions of it --

25           THE COURT:  And I know we haven't finished the

2085

1    conversation about which documents are coming in or what

2    aren't.  So after today we'll have some time to talk.  I

3    think that with respect to who can stay in the building,

4    it's fine if you guys are here, we can talk a little bit

5    after court, even after 5:00 o'clock.  So we can plan to

6    chat.  And then we'll see how much more time we need.

7            It's just I can't keep the jury here or the

8    public here late after court.

9            **MR. WISNER:**  No problem, Your Honor.  I just

10   wanted to raise that issue because I didn't want to have

11   a sidebar about it.

12           **THE COURT:**  Well, yes.  And there are some

13   things about the page and line from our first

14   conversation about just the page and line designations

15   that remain confusing on some level because of the way

16   that they were done.

17           I know we had some conversations about whether

18   or not the documents were presented to be admitted or

19   were part of a cross -- you know, to -- I don't know

20   what purpose they're there and I don't know what the

21   underlying concerns are about the objections themselves:

22   Is it to the document?  Is it to the mention of the

23   document?

24           You know, when I had a conversation with

25   Mr. Griffis, I think he and I kind of understood better

                                                        2086

1    what some of the objections were and clarified that

2    perhaps whether or not you could confront or introduce

3    the document for the purpose of just a comment from the

4    expert or whoever the witness is as opposed to seeking

5    to have it admitted.

6         So I just went ahead and ruled based on

7    admissibility, but you guys may have introduced it for a

8    different purpose.  I don't know if the effect on the

9    listener is for admissibility or the effect on the

10   listener was just for comment.  So you need to clarify

11   that with me.

12        **MR. MILLER:**  We can walk that through this

13   afternoon.

14        There were a couple of documents that we were

15   just discussing and wanted to use for notice that I

16   think we'd like Your Honor to look at again and be

17   granted.

18        **MR. ISMAIL:**  Good morning, Your Honor.

19        So to tell you the conversation about these

20   foreign regulatory documents, indeed impeachment of

21   experts while they're testifying as to certain of their

22   opinions.

23        So we do have a category of documents and

24   portions thereof which are admitted under the RJN, and

25   as the Court indicated, we'll be talking about whether

1    that gets expanded or not and what goes back to the

2    jury.  And I understand Mr. Wisner wants portions of the

3    monograph, and we'll work with him hopefully to not have

4    a dispute -- or the Court on that issue.

5        The one issue I did want to raise, and we

6    talked about it at sidebar a little bit yesterday during

7    Dr. Portier, and that is, there are documents for which

8    we have not sought their admission under the RJN but

9    believe they are proper impeachment of the expert.

10       And I know yesterday we were all trying to

11   accommodate Dr. Portier and get him off the stand, and

12   we didn't have an extended hearing on that.

13       So, for example, when Dr. Portier testifies

14   that the oxidative stress data all points one direction,

15   we know his former institution has a study and made it

16   publicly available that says the opposite.  And when I

17   sought to challenge him on that, there was an objection

18   he's never seen it, and then I was asked to move on.

19   And that's all well and good for Dr. Portier.

20       So even if we don't seek to have it admitted,

21   sort of the contours of what would be permissible

22   impeachable of an expert is what perhaps we --

23       **THE COURT:**  We need to talk more about that.

24       **MR. WISNER:**  I think on that one, though, my

25   biggest concern was it wasn't published.  It had no date

1    on it, it had no publication on it.  It was literally

2    just words with an NTP logo on it.  We had no idea where

3    it came from.  And I think there has to be some

4    authentication of this document before it can be used.

5              He'd never seen it.  He said, "I looked at the

6    medical literature, I've never seen this before."  I

7    don't know how he could use that for impeachment.

8              **THE COURT:**  Well, you know, if we go back to

9    our old ham sandwich analogy which, you know, he could

10   say that:  I have no idea, I'm not even sure this is an

11   NTP document.  But whether or not counsel can present

12   him with it and then ask questions and attempt to

13   impeach him, no, it's not admissible, but under the ham

14   sandwich theory, yes.  And he's free to say this doesn't

15   even look like -- this doesn't even appear to be a

16   document --

17              (Telephone interruption.)

18              **THE COURT:**  I'm going to have the clerk work

19   with CourtCall.  I'll let him work that out.

20              But unless there's an issue with Dr. Jameson

21   today, can we just table this until we have a

22   conversation later?  Or is that something that's going

23   to come up today?

24              **MR. ISMAIL:**  Well, I don't think we have to

25   fully explore the contours of it, Your Honor.  If it

1    comes up, we'll deal with it in the ordinary course.

2              THE COURT:  That's fine.

3              (Recess taken at 8:59 a.m.)

4              (Proceedings resumed in open court in the

5    presence of the jury at 9:16 a.m.)

6              THE COURT:  Good morning.

7              ALL:  Good morning, Your Honor.

8              THE COURT:  Good morning, ladies and

9    gentlemen.  How are you this morning?

10             All right.  We're all set to go.  And

11   Mr. Wisner is going to put on his next witness.

12             Mr. Wisner.

13             MR. WISNER:  Thank you, Your Honor.

14             At this time, the plaintiffs call Dr. Charles

15   William Jameson to the stand.

16             THE COURT:  If you'd stand and be sworn,

17   Dr. Jameson.

18             THE WITNESS:  Good morning, Your Honor.

19                      **CHARLES JAMESON**,

20   called as a witness for the plaintiffs, having been duly

21   sworn, testified as follows:

22             THE WITNESS:  I do.

23             THE CLERK:  Thank you.  Please be seated.

24             And would you please state and spell your name

25   for the record.

1          **THE WITNESS:**  Good morning.  My name is

2     Charles William Jameson.  J-A-M-E-S-O-N.

3                    **DIRECT EXAMINATION**

4     **BY MR. WISNER:**

5          **Q.**   Good morning, Doctor.

6          **A.**   Good morning, Brent.

7          **Q.**   I understand you go by your middle name; is

8     that right?

9          **A.**   I've been called Bill since a child.

10         **Q.**   Okay.  Calling you Doctor Charles William

11    Jameson was very awkward for me right now.

12              Please introduce yourself to the jury.  Let

13    them know where you're from and what you do currently

14    for a living.

15         **A.**   I currently live in Cape Coral, Florida, which

16    is on the west coast of Florida, southwest coast, just

17    above Naples, Florida and about two hours south of

18    Tampa.

19              I retired there in 2007 after working for the

20    federal government, National Institutes of Health, for

21    over 30 years.

22              I have a Ph.D. in organic chemistry, but my

23    career has been in toxicology basically in environmental

24    cancer research.  I worked -- well, I graduated from the

25    University of Maryland with a Ph.D. 1975.

1    Q.   Dr. Jameson, I'm going to go through all this.

2    A.   Okay.

3    Q.   I just wanted to know where you're from and

4    what you do for a living.

5    A.   Sorry.

6    Q.   All right.  Let's start off with your

7    undergrad.  Where did you go to college?

8    A.   I did my undergraduate work at a small college

9    called Mount St. Mary's College in Emmitsburg, Maryland.

10   I got a bachelor's of science in chemistry from there.

11   Q.   Now, Doctor, I personally studied philosophy

12   in college.  Why would you study chemistry?

13   A.   I must admit I was influenced by a mentor, if

14   you will, at a very young age, my brother-in-law.  My

15   brother-in-law was a Ph.D. pharmacologist.  He worked

16   for a laboratory in the Washington, D.C. area called

17   Hazelton Labs.  Eventually he went out on his own and

18   started his own laboratory called Bionetics Laboratory,

19   and they had contracts with the National Cancer

20   Institute to do animal bioassay studies on pesticides.

21        And so I was always fascinated with the work

22   he did.  He would take me to his labs and show me the

23   animals and the mixing rooms and all that, and I just

24   got very interested in that and decided to pursue a

25   career in science.

2092

1          I loved chemistry in high school and decided

2     to major in chemistry, and that's why I majored in that

3     in college.

4          **Q.**   You said you had a chance to sort of deal,

5     with your brother-in-law, related to pesticide and

6     animal studies.

7          **A.**   Right.

8          **Q.**   Did you ever have a chance to actually work on

9     any of those studies yourself?

10         **A.**   Well, showing my age.  As a matter of fact,

11    when I was a rising senior in high school, my

12    brother-in-law offered me a summer job to work in his

13    laboratories.  The project I was working on was, like I

14    said, a contract with the National Cancer Institute to

15    study the effect of pesticides in mice.

16          Just being a junior in high school, what they

17    assigned me to do was work in the animal rooms to change

18    out the cages, change out the mice from the cages, and

19    then dump the dirty cages and put the mice in clean

20    cages.  It was a pretty nasty job, but I loved it

21    because I was, you know, working on an experiment.

22          I had the opportunity in talking to some of

23    the people there and they asked me, well, what are your

24    future plans, what do you plan to do?  And I told them,

25    well, I want to go major in chemistry.  So they told me

1    go talk to the chemist.

2            The chemist said, oh, well, you need to come

3    work for me.  And what happened is I ended up in the

4    chemistry department, and my job was to mix the

5    pesticide in the animal feed.

6            I would take the pesticide and make up a

7    premix in the feed and then put it in a blender and mix

8    up the feed.

9            And then the chemist would take samples and

10   make sure it was at the right concentration, that it was

11   homogeneous.  And so that was my first experience in

12   doing -- being associated with an animal bioassay.  And

13   it just turned out that eventually my whole career was

14   in that area.

15       Q.   You got your undergraduate degree in

16   chemistry.  Did you pursue a Ph.D. at some point?

17       A.   Yeah.  Upon completion of my bachelor's, I

18   applied to University of Maryland graduate program and

19   got accepted in the Ph.D. program in organic chemistry.

20   And initially I had a teaching assistantship and then a

21   research assistantship that paid for my education.  I

22   was very fortunate.  And I graduated from the University

23   of Maryland with a Ph.D. in organic chemistry in 1975.

24       Q.   Now, what is exactly -- what is organic

25   chemistry?  What is that?

2094

1        **A.**   Organic chemistry is the study of carbon,

2    basically the study of carbon.  It's the study of

3    compounds that are made up of carbon and other molecules

4    or chemicals with carbon in them.  So it's basically the

5    study of carbon compounds.

6        **Q.**   And did you do a dissertation in graduate

7    school?

8        **A.**   Yeah.  I did.  It was a two-prong

9    dissertation.  One of them was called the effect of

10    lanthanide shift reagents on NMR analysis of organic

11    chemicals.

12        **Q.**   I did the same thing.

13                (Laughter.)

14        **THE WITNESS:**  NMR analysis is a method in

15    organic chemistry where you can analyze the chemical

16    that you synthesized and it can help you determine the

17    structure of the organic chemical based on the signals

18    you get from the MRI -- from the nuclear magnetic

19    resonance that it's exposed to.  And the shift reagents

20    are something that we discovered would spread out the

21    signals and make it easier to interpret what you would

22    get.

23            The second part of my thesis was the

24    photochemistry of polyamides and emides.  These are

25    organic compounds that have nitrogen in them as well.

1    And what I was trying to do was to develop a

2    biodegradable polymer.  I was trying to make a polymer

3    that would hopefully have some useful applications; but

4    if you exposed it to sunlight, the UV radiation of

5    sunlight, it would degrade because of the chemical

6    structure of it.

7            And so I made some polyamides and emides, but

8    unfortunately the molecular weight of the polymers were

9    very low and really had no practical application.

10           But I did the research and it helped me get my

11   thesis done.

12   **BY MR. WISNER:**

13       **Q.**   Did you ever see the movie *The Graduate*?

14       **A.**   Yes.

15       **Q.**   The scene where he goes, "I've got one word

16   for you.  Plastics."

17       **A.**   Yes.

18       **Q.**   Were you able to invent a biodegradable

19   plastic?

20       **A.**   Well, no.  Well, let me qualify.  We got a

21   biodegradable plastic, but it had no practical use

22   because the molecular weight of the material was so low

23   you couldn't make it into anything, any kind of

24   container or bag or anything like that.  It was just too

25   low in molecular weight.

2096

1      **Q.**    All right.  So following your Ph.D. in organic

2      chemistry, where did you begin your career?

3      **A.**    Following that I started work for a company

4      called Tracor-Jitco.  That was an organization based in

5      Rockville, Maryland, and they had the prime contract

6      with the National Cancer Institute to manage their

7      rodent bioassay program.  That's the program that the

8      National Cancer Institute sponsored where they would

9      screen -- or test chemicals in rats and mice to see if

10     they would cause cancer in these laboratory animals.

11            So I was hired there as a chemist.  My first

12     responsibility there was to work with a -- the group of

13     scientists at the National Cancer Institute to identify

14     materials that should be studied in the animal bioassay

15     program.

16            So look at the literature and see if there was

17     data that indicated there was, A, significant exposure

18     to these materials to people, and B, if maybe they were

19     similar to other chemicals that are known to cause

20     cancer.  Or even if there was -- wasn't that

21     information, that there was no information known about

22     the chemical, we would still put it -- choose to test it

23     in the bioassay program just to screen it to make sure

24     it was safe, if you will, or that it did not cause

25     cancer.

1              I was also responsible for monitoring the

2      chemistry that was performed at all of the bioassay labs

3      that were under contract to Tracor-Jitco for doing these

4      animal bioassays for the National Cancer Institute.

5              So I would make sure that the, A, that the

6      chemistry support contract purchased the right material,

7      analyzed it, made sure it was safe in the materials we

8      wanted to mix it in to give to the animals.  And then I

9      would go to the laboratories and make sure they were

10     handling it properly and dosing the animals properly and

11     that type of thing.

12       Q.    And, Doctor, the jury had the opportunity to

13     hear from Dr. Christopher Portier for a few days this

14     week.  We're talking about animal bioassays.  Are you

15     talking about long-term rodent studies?

16       A.    Yes, these are two-year rodent studies which

17     are pretty much the lifetime of the animal.  And that's

18     the standard protocol for a rodent bioassay for

19     carcinogenesis.

20       Q.    Now, while you were at this laboratory and

21     running the National Cancer Institute's -- or overseeing

22     the rodent bioassay program, did the National Cancer

23     Institute ultimately hire you?

24       A.    Yes.  After working for Tracor-Jitco for

25     several years, I was actually recruited by the Cancer

                                                        2098

1    Institute to work directly for them.

2            And in 1979, I think it was, I went to work

3    directly for the National Cancer Institute as their

4    senior chemist and continued to be responsible for the

5    chemistry for the bioassay program and worked to

6    identify the chemicals that we needed to put on tests

7    for the bioassay program.

8        Q.   Did anything change at the National Cancer

9    Institute regarding your work?

10       A.   Well, shortly after I joined the Cancer

11   Institute, the animal bioassay program was transferred

12   from the Cancer Institute to another institute of the

13   National Institutes of Health called the National

14   Institute of Environmental Health Sciences which is

15   located in Research Triangle Park, North Carolina.  And

16   that's also where this new toxicology program for the

17   government called the National Toxicology Program was

18   headquartered.

19           So the bioassay program was transferred to the

20   National Toxicology Program, referred to as the NTP, in

21   North Carolina, and I went down there and worked on the

22   bioassay program for the NTP, again being responsible

23   for the same things:  Identifying chemicals to be

24   studied, being responsible for all the chemistry that

25   was done for the bioassay program, and monitoring those

2099

1    studies at the testing laboratories.

2         In addition, I became responsible for all the

3    chemistry done for the National Toxicology Program at

4    the National Institute of Environmental Health Sciences

5    in North Carolina.

6    Q.   While you were at NTP working at the NIEHS,

7    did you know Dr. Portier?

8    A.   Yes.  I met Chris Portier in 1980 when I first

9    moved down to the Research Triangle Park.  I believe

10   Chris was still a postdoc at the time.  He was working

11   in the laboratory of Dr. George Lucier as an

12   up-and-coming biostatistician.

13        And I got to know Chris then.  We eventually

14   started working on a number of projects together

15   throughout the 30-plus years I knew him down there.

16   Q.   And as Dr. Portier sort of elevated in the

17   ranks within NTP, did he actually become your boss?

18   A.   Well, he was not my direct boss.  He was my

19   supervisor boss, if you will.  He became director of

20   what was referred to as the Environmental Toxicology

21   Program for the NTP which was all of the research that

22   was done for the NTP.  So he was main director of that.

23        And then the deputy director, a fellow by the

24   name of John Bucher, he was my supervisor at the time.

25   So he was my supervisor's supervisor, if you will.

1          **Q.**    And talking about specifically about some of

2     the work you did at NTP, are you familiar with something

3     called the Report on Carcinogens?

4          **A.**    Yeah.   The Report on Carcinogens, now do you

5     want me to explain what the Report on Carcinogens or --

6          **Q.**    Well, first of all, did you work on it?

7          **A.**    I did.

8          **Q.**    So what is it?

9          **A.**    Okay.   I started working on the Report on

10    Carcinogens around 1990 when I moved from the bioassay

11    program at NIEHS to the director's office at NIEHS.

12              I was in the director's office, and upon

13    taking that new job, I became involved with what is

14    referred to as Report on Carcinogens.

15              Report on Carcinogens is a report that is

16    required by the Public Health Service Act of 1968-69, I

17    believe.   And that law requires that the Secretary of

18    Health and Human Services provide Congress with a

19    report, initially it was every year, but eventually it

20    was changed to every two years, but the Secretary of HHS

21    is to submit to Congress a report of all materials that

22    are either known to be human carcinogens or reasonably

23    anticipated to be human carcinogens and to which a

24    significant population within the United States are

25    exposed.

                                                          2101

1           So the Secretary is responsible for submitting

2      the report.  The Secretary delegated the responsibility

3      of preparing the report to the National Toxicology

4      Program.  And National Toxicology Program told me that

5      it was my job to get this report together.

6           So I became involved with the Report on

7      Carcinogens and in the way the report is prepared.  Do

8      you want me to go into those details now?

9           **Q.**   I don't think we need to get into too much

10     detail, but I guess the bottom line, the Report on

11     Carcinogens, were you responsible for helping identify

12     possible -- or probable human carcinogens?

13          **A.**   Yes, through the Report on Carcinogens.

14          The report has been dubbed, if you will, the

15     official United States government list of known or

16     reasonably anticipated human carcinogens.  So it is a

17     document of fairly good -- fairly great importance, if

18     you will.

19          Just as an aside, it is one of the sources

20     that is identified in, for example, California Prop 65

21     for carcinogens.  It's identified as an authoritative

22     source for that, for them to regulate something on the

23     basis of it being identified as a potential -- as a

24     known or anticipated carcinogen.

25          **Q.**   Now, the Report on Carcinogens, when you were

2102

1    helping prepare that, did you just look at, you know,

2    rodent studies or were you looking at all the science?

3        A.    No.  The specific criteria established for

4    reviewing the data for a chemical to be included in the

5    report as either a known or reasonably anticipated human

6    carcinogen, and the data that we look at includes the

7    exposure data, it includes the epidemiology data that's

8    available on the chemical, it includes the animal

9    toxicity data that's available for the chemical, and

10   also any mechanistic data, the genotoxicity and the

11   metabolism distribution and absorption data for a

12   particular chemical is all used in evaluating the data

13   and to see if it meets the criteria for including in the

14   report.  And all of that is outlined in the criteria for

15   reviewing that information.

16       Q.    And during your 30 years running the chemistry

17   group and a lot of these rodent bioassay programs and

18   the Report on Carcinogens for the NTP, how much of your

19   work focused on cancer issues?

20       A.    All of it.  Basically all of it was associated

21   with identifying environmental carcinogens.

22       Q.    And since you retired, how much of your work

23   after your retirement has focused on cancer issues?

24       A.    All of it has.  Again, all of the work that

25   I've done in my retirement.  When I retired from the

2103

1    government, I set up a consulting firm, CWJ Consulting

2    LLC.  Employment of one, me.  But I've used that to

3    consult for individuals and industry as well on issues

4    concerning environmental cancer.

5        Q.   And so starting senior year of high school,

6    you're helping your brother-in-law with rodent bioassays

7    to however many years it's been to today, would it be

8    fair to say that most of your adult life has focused on

9    issues related to cancer?

10       A.   Yes.  Yes.

11            I don't know if this is relevant or not, but

12   as an aside, my mother died when I was eight years old

13   and she died from breast cancer, and that affected me.

14   And I've always wanted to -- you know, as a child I said

15   I think I want to look into the causes of cancer.  And

16   so I don't know why I brought that up, but anyway.

17       Q.   Now you're here today; right?

18            I want to talk to you about something that

19   came up.  Well, before I do that, have you published in

20   peer-review journal articles and book chapters on issues

21   related to the cause of cancer?

22       A.   Absolutely, yes.

23       Q.   And have you done presentations to

24   professional organizations?

25       A.   I've done quite a number of presentations.

2104

1    I've written quite a number of publications in the

2    peer-review literature.  I've written a large number of

3    what are referred to as background documents on

4    individual chemicals which was used to evaluate them for

5    listing in the Report on Carcinogens.

6           And I've also participated in a number of IARC

7    working groups to publish monographs on environmental

8    carcinogens.

9       Q.   We're here to talk about IARC considerably and

10   that's what we're going to get to in a second.

11          But before that, I want to touch on something

12   that you mentioned.  I kind of have a question about it.

13          So you talked about this Report on Carcinogens

14   that you started working up in the 1980s.  Do you

15   recall?

16      A.   Correct.

17      Q.   This is a tumor chart that we put together

18   with Dr. Portier, who you know, about some of the tumors

19   in the glyphosate data.

20          And I understand as part of your opinions in

21   this case, you've actually reviewed all the same data;

22   right?

23      A.   Correct.

24      Q.   And -- oh, I wanted the mouse one.  All right.

25          Here's the mouse one.  And what I wanted to

                                                           2105

1    ask you about is this study right here from 1983.  Now

2    you said -- and the next one is obviously 1993.  But you

3    started working on the Report on Carcinogens in 1990; is

4    that right?

5         A.   Correct.

6         Q.   I want to talk to you about this study right

7    here.

8         A.   Okay.

9         Q.   This is the Knezevich & Hogan study from 1983.

10   And specifically I want to talk to you about these

11   kidney carcinomas and adenomas.

12             Are you familiar with the data about that

13   tumor?

14        A.   Yes.

15        Q.   When the study was originally submitted to the

16   EPA in 1983, what did this data show with regards to

17   these tumors?

18        A.   The original submission to the EPA showed that

19   there were three adenomas in the high dose and one in

20   the mid dose.  And if you're referring to the very

21   initial EPA evaluation of that data, they identified it

22   as being meeting the criteria to be classified as a

23   class C carcinogen.

24        Q.   Okay.  So when this first came out -- and I'll

25   do it in the doses, right.  So the control had zero.

                                                          2106

1    The low dose had zero.  The mid dose had one.  And the
2    high dose had three.
3        **A.**    Right.
4        **Q.**    And when that was -- when that was determined,
5    that led the EPA to classify it as a class C carcinogen;
6    is that right?
7        **A.**    Initially, their initial evaluation of that
8    data, the very first submission, that's what they
9    determined, that it met their criteria for a class C,
10   yes.
11       **Q.**    And if it had remained that way, if it had
12   stayed on a class C, is that -- would that have put
13   glyphosate on your radar in the 1990s when you were
14   talking about whether or not it was a carcinogen?
15       **A.**    It would have put it on the radar.  The fact
16   that it was identified as a class C, it would have been
17   something that we would have picked up and say, hmm,
18   this may be something we need to look at.
19            But I would point out that all of the data,
20   basically all of the data that was available for
21   glyphosate was provided by industry to EPA.  And since
22   it was provided to EPA, because -- for registration
23   purposes, it's considered confidential.  And so we
24   wouldn't be able to get that data from the EPA to look
25   at for our exercise of Report on Carcinogens, especially

2107

1     at that time back in the early '80s.

2          Q.   All right.  So the original study had this.

3     And this result, was that a statistically significant

4     trend?

5          A.   It was a statistically significant trend for

6     these adenomas in the kidney of the mice.  Plus these

7     tumors in the kidney of CD1 mice is a very rare tumor.

8     It doesn't occur spontaneously in those animals at a

9     very high incidence at all.

10          And so that's a surprising finding.  And since

11     it's an increase in a rare tumor, that places additional

12     emphasis on this observation.

13          Q.   Now, did this ever change?

14          A.   Yes.  In the course of -- well, what happened

15     was this was a classification from EPA.  I think then

16     the sponsor of the study, Monsanto, went back to the

17     original laboratory and said:  Hey, can you take a

18     harder look at the kidney tumors?

19          And when they did that, the pathologist that

20     they asked to look at the tumors came back and said, oh,

21     I found an additional tumor in the control.  One in the

22     control.

23          Q.   So that would change it --

24          A.   So that would change it from -- to 1, 0, 1, 3.

25     So by finding an additional tumor in the control, it

                                                              2108

1     takes away the statistical significance of the increase

2     in the trend of the formulation of these -- of that

3     tumor in those CD1 animals.

4          Q.   Well, did the EPA ever look at it --

5          A.   Well --

6          Q.   Hold on a second.  Is there actually a tumor

7     in that control group?

8          A.   Well, that is kind of up for question.  I've

9     been able to get some information concerning that review

10    and some additional reviews that were conducted.  I have

11    some papers that -- that were from the Environmental

12    Protection Agency.  It was basically a report from a

13    pathologist, a veterinary pathologist for the

14    Environmental Protection Agency, who was asked to look

15    at the kidney slides in this particular study.

16              So the pathologist got the slides.  He looked

17    at them.  His initial review is he couldn't find that

18    additional tumor in the control animal.

19          Q.   This one right here?

20          A.   That one there.  He went to a couple of

21    colleagues and asked them to look at it, and they really

22    couldn't verify that that lesion was actually there.

23    There may have been a questionable lesion in the

24    control, but they did not think it was an adenoma.

25              So, and that was a report that they submitted

2109

1     to the EPA.

2             Following that, the EPA required that Monsanto

3     hold another Pathology Working Group on these kidney

4     tumors.  Now I don't know if Dr. Portier explained

5     Pathology Working Group to you.  But a Pathology Working

6     Group is like you gather up a group of respected

7     pathologists, veterinary pathologists who are

8     experienced in reading the slides for tumors in

9     experimental animal studies, and you give them the

10    slides -- you blind the slides to them.  In other words,

11    you just give them a slide and say, "Tell me what you

12    see on this."  You're not telling them what tumors

13    you're looking for.  You may not even tell them what

14    tissue it is.  You just say, "These are the slides.

15    Give me your interpretation of it," and it's like a peer

16    review for pathology, if you will.

17            So that PWG looked at the slides, and they

18    submitted a report.  And their final report indicated

19    that the incidence of the tumors in this particular

20    study was one adenoma in the control, zero adenomas in

21    the low dose, one carcinoma in the mid dose.  So now

22    they've upgraded the tumor that they saw initially from

23    an adenoma, which is a benign tumor, to a carcinoma

24    which is a malignant tumor.  Then they also said in the

25    high dose animals, they saw one adenoma, the benign

2110

1    tumor, and two carcinomas, two malignant tumors in the

2    high dose animals in this study.

3           But the PWG said that they didn't feel it was

4    an association, but --

5      Q.   Let me ask you something.  Was that PWG, were

6    those people paid by Monsanto?

7      A.   I can't say for certain, but Monsanto was

8    instructed to perform a PWG.  So you could conclude from

9    that that the PWG was paid for by Monsanto.  And so

10   those people were paid for -- paid by Monsanto, yes.

11     Q.   So it appears that all the scientists that

12   were being put up by Monsanto, they were seeing a tumor,

13   but the ones at the EPA were not.

14     A.   The report from the EPA pathologist said he

15   could not confirm that there was a tumor in the control

16   animals, that's correct.

17     Q.   At this point, did EPA instruct Monsanto to

18   just redo the study?

19     A.   My understanding is that the EPA requested

20   them to perform a study, repeat the study in CD1 mice,

21   concentrate only on the males, and emphasize the

22   pathology of the kidney, and increase the number from 50

23   per group to 100 per group and have multiple dose levels

24   to see if they can find the tumor and the progression of

25   the tumor in that study.  That's what my understanding

2111

1    is of what EPA told them to do after this PWG.

2        **Q.**   And we have it on this chart, all these later

3    mouse studies.  Were any of those later mouse studies

4    actually done by Monsanto?

5        **A.**   Some of them were.  Some of them were done

6    by --

7        **Q.**   These ones?

8        **A.**   Pardon me?

9        **Q.**   Any of these mouse studies done by Monsanto?

10           **MR. ISMAIL:**  Your Honor, can the witness be

11   allowed to finish his answers?  Mr. Wisner keeps cutting

12   him off.

13           **THE COURT:**  Just one voice at a time.

14           **MR. WISNER:**  I apologize.

15           **THE WITNESS:**  It's all right.

16           To be honest, I'd like to look in my charts to

17   make sure who sponsored them.  But I don't remember if

18   they were all -- if all or any of them were sponsored by

19   Monsanto.

20   **BY MR. WISNER:**

21       **Q.**   Well, I'll tell you they've admitted they

22   never conducted a rodent --

23           **MR. ISMAIL:**  Objection, Your Honor.

24           **THE COURT:**  Sustained.

25           **MR. WISNER:**  I'll read the admission.

                                                        2112

1          **THE COURT:**  Well, counsel --

2          **MR. WISNER:**  No.  I have their admission.

3     They agreed to let me read that.  I'll just read it if

4     they're going to fight me about it.

5          **MR. ISMAIL:**  Your Honor, I think we're here to

6     get Dr. Jameson's testimony and not Mr. Wisner's.  So

7     perhaps we could just continue with the questioning.

8     BY MR. WISNER:

9          **Q.**   I'll do it after.  We'll talk about it later.

10         **A.**   Okay.

11         **Q.**   Doctor, in any event, every study after this

12    Knezevich & Hogan study, is it your understanding that

13    there's been findings of malignant lymphoma in every

14    mouse study?

15         **A.**   Yes.

16         **Q.**   All right.  Well, took a little side detour

17    there because we were talking about the Report on

18    Carcinogens.  I just want to ask you one last question.

19    In your assessment of the evidence in this case, did you

20    evaluate the data with the same scientific rigor with

21    which you evaluated the data when you working for the

22    NTP?

23         **A.**   Oh, absolutely.

24         **MR. WISNER:**  At this time, Your Honor, we

25    tender Dr. Jameson as an expert in the area of cancer

1    risk assessment.

2             **THE COURT:**  Voir dire?

3             **MR. ISMAIL:**  Your Honor, subject to prior

4    briefing and the Court's rulings, we'll reserve for

5    cross.

6    **BY MR. WISNER:**

7        **Q.**  All right.  Dr. Jameson, I want to focus on

8    IARC this morning.

9        **A.**  Okay.

10       **Q.**  And specifically you stated earlier that

11   you've worked with IARC before; is that right?

12       **A.**  Correct.

13       **Q.**  How many times have you worked with IARC as

14   part of the monograph program?

15       **A.**  As part of the monograph program, I think it's

16   about 20 times -- or 18 to 20 times, I think.  I can't

17   remember exactly.

18       **Q.**  Okay.  Well, the first time that you

19   participated in IARC, did you do so in your capacity

20   working with the NIEHS?

21       **A.**  Right.  Looking at my notes.  Sorry.

22            I participated in an IARC monograph meeting

23   for a total of 16 times.  I was -- anyway, for four of

24   those 16, I was sent there as a representative of the

25   NIEHS NTP as a representative for that -- for that

                                                      2114

1     organization that I was working for at the time.

2          It turns out that the NIEHS provided funding

3     to the IARC to perform some of the -- to perform these

4     reviews of the chemical carcinogens.  And so they

5     would -- the NTP would send representatives.  And since

6     I was involved in similar work with Report on

7     Carcinogens, they would send me to observe the

8     goings-on.

9          And as an observer, I was allowed to

10    participate in the discussions of the work groups and of

11    the whole -- and of the subgroup -- subgroups.  But I

12    wasn't allowed to write any documents or vote on any of

13    the listings, I was just there as a representative of my

14    organization.

15         I then attended -- was invited to attend a

16    total of 12 separate monograph meetings as a member of

17    the working group.  And as a member of the working

18    group, I would be requested to participate in one of the

19    subgroups, and it was always in the experimental animal

20    subgroup.

21         They would ask me to write -- draft a

22    monograph on the -- for the animal studies of several

23    chemicals that were being reviewed at the time and then

24    participate in the -- participate in the discussions and

25    vote on the listing.

                                                        2115

1        **Q.**   Now, participation as a working group member

2    on IARC, part of that you said is you actually vote and

3    helped write the monograph; is that right?

4        **A.**   I'm sorry, could you repeat that?

5        **Q.**   Vote on the classification and help write it?

6        **A.**   Right.  Correct.

7        **Q.**   Do you recall the first time that you were

8    called and invited to participate as a working group

9    member?

10       **A.**   To participate as a working group member, it

11   was in 2007, monograph Volume 97.

12       **Q.**   And when you were invited for the first time

13   to participate as a working group member, did you

14   consider that to be an honor?

15       **A.**   At the time I did.  IARC is a well-respected

16   international organization.  It's part of the World

17   Health Organization, part of the UN.  It is known for

18   inviting world-renown, I guess, or world-recognized

19   experts in the area of chemical carcinogenesis.  And to

20   be provided to participate with those people, I felt it

21   was an honor.

22       **Q.**   And you said you've gone to 16 different

23   working groups.

24       **A.**   Right.

25       **Q.**   Or monograph meetings.

2116

1           And how many hours does it take to work on

2      just one of them?  I'm just curious.

3           A.   Well, you have to realize that when you're

4      invited to participate -- I'm going to go through the

5      details of this, okay?  And if you're going to cover it

6      later --

7           Q.   We're going to cover it later.

8           A.   Okay.

9           Q.   I just want to know how much time --

10          A.   How much time --

11               (Simultaneous colloquy.)

12     BY MR. WISNER:

13          Q.   I'm just curious.  Ballpark, how many hours

14     for one of these monographs?  Or if you can guess

15     cumulatively for all the time you've spent working for

16     IARC.

17          A.   The invitation usually comes out twelve to

18     nine months ahead of the meeting.  And then you start

19     working on -- once you're accepted, you start working on

20     the document.

21               I would say probably for each monograph, it's

22     probably about at least a month's worth of work just

23     until you get to the meeting.

24          Q.   So considering all the monographs -- and I

25     understand you've also done additional publications and

                                                           2117

1    research for IARC independent of the monograph.

2        **A.**   Correct.

3        **Q.**   All totaled would it be fair to say that

4    you've spent thousands of hours of your life working on

5    IARC projects?

6        **A.**   That would be fair, yes.

7        **Q.**   So it would be fair to say, then, that IARC

8    has obviously paid you a lot of money for all the time

9    you've spent?

10       **A.**   No.  No.  It's all done gratis.  IARC agrees

11   to pay the airfare to get you to Lyon, France and gives

12   you a stipend to cover your meals and hotel room.  And

13   that's it.

14       **Q.**   So all those hours back at home reading

15   through studies and peer reviewing, all of that you're

16   doing for free?

17       **A.**   Yes, basically.  Yes.

18       **Q.**   Why?  Why are you spending so much time on

19   this?

20       **A.**   Well, first of all, I think it's important --

21   my whole career has been devoted to investigating

22   environmental carcinogens, to find -- to look at

23   materials, to identify materials that cause cancer in

24   humans.

25           I think it's very important that that

                                                        2118

1    information be published and get out to every one in the
2    world.  Because knowledge is power.  And my philosophy
3    is:  You look at the materials, you see if they cause
4    cancer.  If they cause cancer, you publish or you
5    announce that this material has been found to cause
6    cancer in laboratory animals and in humans and it is a
7    carcinogenic hazard.  And you, as a responsible
8    individual, need to be aware of this so that if this is
9    something that you're exposed to or are using in your
10   everyday life or in your job, you need to know that,
11   hey, this is a carcinogen, this is a hazard to me.  And
12   you need to be able to take steps to protect yourself.
13          It's not a situation where if a chemical is
14   looked at and is identified as a carcinogen, then you
15   just never have any dealings with it or contact with it
16   again.  That's not possible in a lot of cases.
17          But if you have knowledge that something is
18   harmful to you, then you can take that knowledge to
19   protect yourself.  And a lot of times it's as simple as
20   wearing a pair of gloves when you're handling something
21   that contains a carcinogen, or use a mask or a
22   respirator if you are spraying something that is a
23   carcinogen.  Or, you know, just take steps to avoid
24   exposure to the carcinogen.
25          But you need to have that knowledge to be able

2119

1    to protect yourself, to be able to do that.  And so

2    that's really why I got into this, is to study these

3    materials, to find out if they cause a hazard, and get

4    that information out to people.

5            That's why I felt that I was -- that's why I

6    was proud of the work I did for the Report on

7    Carcinogens.  I was getting the word out to people that

8    something causes cancer and you need to know this.

9            And that's why I was honored to be asked to go

10   to IARC because they have the same philosophy.  They're

11   looking at these materials to identify them as potential

12   carcinogens, to get that knowledge out to people so they

13   can use it to protect themselves.

14       Q.   Who funds IARC?

15       A.   IARC is funded by a number of organizations.

16   Like I said, it's part of the World Health Organization

17   and the UN so they get funding from that.  They also get

18   grants from a number of U.S. agencies, the National

19   Toxicology Program at NIEHS, the National Cancer

20   Institute in Bethesda, the U.S. Environmental Protection

21   Agency supports IARC.  And there are several other.

22   Those are the three main government agencies that I'm

23   aware of that provide a lot of support for the IARC

24   monograph.

25       Q.   What's the history of IARC?  How did it come

2120

1    about?

2       **A.**  Well, it actually started back in 1965, my

3    understanding.  There was an influential individual in

4    France.  I don't remember this name, the guy's name,

5    sorry.  And evidently he had a relative who came down

6    with cancer and died of cancer and evidently it was from

7    an environmental source.  And he was -- he made it his

8    goal to address the issue of identifying environmental

9    carcinogens.

10         So evidently he was the friend of Charles

11    de Gaulle.  Charles de Gaulle was the President of

12    France at the time.  That's following World War II he

13    became the president.  So he was a very influential

14    individual.

15         And he dictated that an organization be

16    established in France to address environmental cancer

17    and got it funded through the World Health Organization.

18    And so that's why the headquarters are located in Lyon,

19    France because the French President said he wanted this

20    established.

21         So this all started, and I don't remember the

22    exact date that the monograph series started.  It was

23    sometime later in the '70s, early to mid '70s that it

24    started.  But that's why it start.

25       **Q.**  And are there a set of rules and procedures

1    that govern how the IARC monograph program operates?

2        **A.**    Absolutely.  The IARC has published a preamble

3    to the monographs.  And the preamble outlines all the

4    procedures and steps that are needed in evaluating the

5    chemical that has been selected for review in the

6    monographs.

7            And it also lists the criteria.  It's very

8    important that the criteria be used in evaluating the

9    data to establish if something is a known or possible,

10   probable human carcinogen.

11       **Q.**    What are the classifications that IARC -- the

12   IARC monograph program assigns to compounds?

13       **A.**    Okay.  At the time -- currently?

14       **Q.**    Why don't we just -- historically what has it

15   been?

16       **A.**    Historically, okay.  Historically the

17   categories have been either known to be human

18   carcinogen -- a known human carcinogen, a probable human

19   carcinogen which is also referred to as their 2A

20   classification, a possible human carcinogen which is

21   referred to as their 2B category.

22            I should backtrack.  The known human

23   carcinogen category is known as 1A.

24            And then there is the inadequate or unable to

25   adequately evaluate the carcinogenicity, and that's the

2122

1    category 3.

2              And there was an additional fourth category,

3    not -- I forget the exact wording of it, but not

4    expected to be or not known to be a carcinogen, a human

5    carcinogen.  I think there was all of one chemical in

6    that category during the whole series.

7         Q.   About how many compounds has IARC looked at to

8    assess whether or not they cause cancer?

9         A.   They have looked at -- the current IARC

10   monograph contains a total of 1,013 chemicals.

11        Q.   And of those 1,013, what percentage of them

12   have fallen into number 1, a known human carcinogen?

13        A.   Into the known category, 12 percent of all the

14   materials they have reviewed have fallen into the known

15   category, that's 12 percent.

16        Q.   And then what about 2A, so the second highest?

17        A.   In the second highest, as a probable human

18   carcinogen only 8 percent of the chemicals reviewed have

19   fallen into that category.

20        Q.   And then of the third category, 2B?

21        A.   The 2B is a little bit more.  About 31 percent

22   of those chemicals reviewed fall into the 2B category.

23        Q.   And that's a possible human carcinogen?

24        A.   That's a possible human carcinogen.

25        Q.   And then the last one?

2123

1          **A.**    And just to round it out, the last category,

2     which is not classifiable as to its carcinogenicity, is

3     the wording that they use, 49 percent, essentially half

4     of the chemicals that have been looked at by IARC are

5     not classifiable.

6          **Q.**    So you understand what the IARC classification

7     for glyphosate is?

8          **A.**    Yes.

9          **Q.**    What is that?

10         **A.**    That's 2A.

11         **Q.**    So that's the second highest?

12         **A.**    That's the second, a probable carcinogen.

13         **Q.**    So for 1 and 2A, only about 20 percent of

14     compounds fall in that category?

15         **A.**    That's correct.

16         **Q.**    So 80 percent of the compounds looked at by

17     IARC fall below what glyphosate was chosen for.

18              **MR. ISMAIL:**  Objection.  Leading, Your Honor.

19              **THE COURT:**  Overruled.  You can answer.

20              **THE WITNESS:**  That's correct.

21     BY MR. WISNER:

22         **Q.**    When we talk about the evidence regarding

23     whether or not something causes cancer, what does the

24     IARC program look at?

25         **A.**    Well, as I indicated, the preamble outlines

                                                          2124

1    what must be looked at to review a chemical.  It

2    includes exposure information.  It's paramount to make

3    sure that we have adequate exposure information that

4    documents human exposure to the material.

5            We look at the human epidemiology data for

6    cancer.  We look at the experimental animal data for

7    cancer in experimental animals.

8            And we also look at the mechanistic data.  The

9    mechanistic data is an area that is quickly expanding in

10   the field of toxicology.  And that includes looking at

11   genotoxicity information:  Does it cause gene -- or

12   strand breaks or chromosomal aberrations?  And also does

13   it cause oxidative stress?  And that type of

14   information.  As well as absorption distribution and

15   metabolism data on the compound.

16       Q.   And when you talk about these compounds that

17   are reviewed, how are they selected?

18       A.   For IARC?

19       Q.   Yeah.

20       A.   The method for selecting in IARC is every five

21   years or so, they have an advisory group, they call

22   together an advisory group.  And I served on one of

23   these advisory groups early on.  When was that?  2003, I

24   served on an advisory group at IARC.

25           And what we do -- what was done at these

                                                    2125

1    advisory groups is, again, they call in experts from

2    around the world on chemical carcinogenesis, and they

3    ask them to prioritize lists of chemicals for review by

4    the IARC monograph group.

5         And prior to this meeting, the IARC sends out

6    announcements either targeted to particular individuals

7    or organizations that they have worked with before and

8    they also put out announcements on the Internet asking

9    anyone who has a concern or information about a chemical

10   that could be a potential carcinogen to please identify

11   them to see if it's something that the IARC should look

12   at.

13        So IARC gets all these nominations, if you

14   will, from various sources.  They also have staff that

15   do a literature search of the available cancer data that

16   has been published recently, if something new has come

17   up and shown to be a carcinogen, either from

18   epidemiology studies or animal studies or the strong

19   mechanistic evidence that a material could be a

20   carcinogen.

21        Then they have this list.  The experts look at

22   the list, and based on -- usually, to be honest, I think

23   based on the -- exposure plays a very important role in

24   prioritizing which chemical would be looked at first.

25   If you have a material that, you know, a lot of people

1    in the world are exposed to and it poses a potential

2    carcinogenic risk, then they would put that at the top

3    of the list to review.  Whereas if it's something that

4    doesn't have a significant or a large amount of

5    exposure, it may get a lower priority.

6           But they look at the list, prioritize it, and

7    from there the IARC staff proceeds to make its schedule

8    for reviewing or for performing different monograph

9    reviews.

10   Q.   So the IARC monograph program only looks at

11   these chemicals that have gone through this process; is

12   that right?

13   A.   That's correct.

14   Q.   So of those ones that have already gone

15   through that initial process for selecting things that

16   we actually have evidence or reason to look at them,

17   amongst that group only 20 percent of that group ever

18   get classified as a 2A or 1; is that right?

19   A.   That's correct.

20   Q.   Is IARC pretty robust or rigorous program as

21   they evaluate these compounds?

22   A.   Oh, definitely, yes.  Like I said, the

23   preamble specifically outlines what data needs to be

24   looked at and the rigor with which they must perform the

25   reviews.

                                                        2127

1            And, for example, for epidemiology the

2     preamble states that the Hill criteria for evaluation of

3     causality must be applied when reviewing the

4     epidemiology data for cancer in the monographs.

5         **Q.**   The Hill -- are you talking about the

6     Bradford --

7         **A.**   The Bradford-Hill criteria, yes.  That's

8     specifically identified in the criteria as something

9     that should be applied for the evaluation of the

10    epidemiology data.

11           **MR. WISNER:**  Your Honor, I have a binder for

12    the witness as well as for yourself.

13           **THE WITNESS:**  Thank you.

14    **BY MR. WISNER:**

15        **Q.**   Doctor, we're going to talk about the actual

16    glyphosate monograph in just a second.

17           But shortly after the meeting in March of

18    2015, there was a publication that came out.  It's

19    Exhibit 2068 in your binder.

20        **A.**   Okay.

21        **Q.**   Is this an article that you've seen and

22    studied before?

23        **A.**   I can't say that I've studied it.  I've read

24    through it, yes.

25        **Q.**   Okay.

                                                          2128

1           **MR. WISNER:**  Your Honor, permission to
2    publish.
3           **MR. ISMAIL:**  No objection, Your Honor.
4           **THE COURT:**  Granted.
5                   (Exhibit published.)
6    BY MR. WISNER:
7       **Q.**   So this is the article.  As you can see right
8    here, the title of it is "IARC Monographs:  40 Years of
9    Evaluating Carcinogenic Hazards to Humans."
10          Did I read that right, sir?
11      **A.**   Yes.
12      **Q.**   And as you can see right here, there's a lot
13   of authors; do you see that?
14      **A.**   Yes.
15      **Q.**   Some of them are going to be relevant later.
16          Do you know Dr. Aaron Blair?
17      **A.**   Yes, sir, I do.
18      **Q.**   Dr. Charles Lynch, do you know him?
19      **A.**   Lynch, yes.
20      **Q.**   He's actually one of the authors on the
21   current AHS publication?
22      **A.**   Yes.
23      **Q.**   Dr. Aaron Blair, what was his relationship
24   with the AHS?
25      **A.**   He actually would be considered the principal

                                                          2129

1   investigator on the AHS.  He is the individual who

2   initiated that study and has been overseeing it from the

3   beginning.

4       Q.   And did he have any involvement in the IARC

5   monograph for glyphosate?

6       A.   In the IARC monograph for glyphosate, he

7   participated in the working group.  In fact, he chaired

8   the meeting for Volume 112.

9       Q.   All right.  So in this article, at the end of

10  it they sort of explain where it comes from.  And it

11  says right here -- just to clarify, Doctor, look at the

12  front page.  This came out in June of 2015.  Do you see

13  that?

14      A.   Yes.

15      Q.   And it's on the bottom here.

16           All right.  So it says right here at the end:

17                For more than four decades the IARC

18                monograph program has provided evaluations

19                of cancer hazards to humans from many

20                different exposures and agents.  These are

21                often the first evaluations of new and

22                emerging threats to public health and

23                consequently are subject to intense

24                scrutiny.

25                Doctor, in your experience working in IARC on

1   16 different occasions, does IARC often deal with new

2   and emerging threats?

3       **A.**   Yes.

4       **Q.**   And why is that?

5       **A.**   Well, it's -- you know, they try to keep on

6   the forefront, if you will, of new research findings and

7   new data.  And if something comes up in the literature

8   that indicates that something is a strong or is a

9   potential carcinogen, they try to address it

10  immediately.

11      **Q.**   It says here:

12              Although -- it says:

13                  Although these evaluations are widely

14              respected and used by many organizations,

15              institutions, companies, and government

16              agencies to improve the public's health,

17              IARC has recently been subject to

18              criticism over conclusions on specific

19              agents, the process that led to such

20              conclusions, and membership of the Working

21              Groups.  Debate and criticism --

22              We'll stop right there, actually.

23      **A.**   Okay.

24      **Q.**   In June of 2015, so this is just a few months

25  after the glyphosate program, did you observe that there

2131

1    were suddenly criticisms being levied against IARC?

2         **A.**   Oh, very --

3              **MR. ISMAIL:**  Objection, Your Honor.  Hearsay.

4              **THE COURT:**  Sustained.  Unless he has personal

5    knowledge.

6              **MR. WISNER:**  Yeah, I asked if he observed.

7         **Q.**   Is it your understanding that following the

8    monograph program in 2015 on glyphosate, that there was

9    criticisms raised against IARC?

10             **MR. ISMAIL:**  Same objection.

11             **THE COURT:**  Personal understanding to the

12   document?

13             **MR. WISNER:**  That's correct.

14             **THE COURT:**  Not general "I think I know."

15             **MR. WISNER:**  Sure.  Let me clarify that then.

16             **THE COURT:**  Personally aware.

17   BY MR. WISNER:

18        **Q.**   Doctor, were you personally aware of any

19   criticisms levied against IARC following the glyphosate

20   program?

21        **A.**   Yes, sir, I am.

22        **Q.**   Were you personally subject to some of those

23   criticisms?

24        **A.**   Yes, sir, I was.

25        **Q.**   And, frankly, were you personally attacked?

                                                          2132

1                    **MR. ISMAIL:**  Objection, Your Honor.

2                    **THE COURT:**  Argumentative.

3       BY MR. WISNER:

4            **Q.**   Let's go to the conclusion here.  And I'll ask

5       if you agree with this.  It says:

6                         Disagreement with the conclusions in

7                    an IARC Monograph for an individual agent

8                    is not evidence for a failed or biased

9                    approach.  Some disagreement about the

10                   carcinogenic hazard of important agents

11                   seems inherent to the scientific

12                   enterprise and is unavoidable at the

13                   earlier stages of the hazard evaluation,

14                   where IARC usually operates.  Because the

15                   evaluations are not—and should not

16                   be—static, it is difficult to see how

17                   such assessments could be addressed any

18                   differently.  Substances now universally

19                   recognized as human carcinogens, for

20                   example, tobacco, asbestos, at one time

21                   went through a quite lengthy period of

22                   contentious debate.  Any process can in

23                   theory be improved with fair and

24                   constructive criticism; appropriate

25                   reviews may take place from time to time,

                                                              2133

1          and we would support continued review and

2          improvement of the IARC processes.

3          However, as a group of international

4          scientists, we have looked carefully at

5          the recent charges of flaws and bias in

6          the hazard evaluations by IARC Working

7          Groups, and we have concluded that the

8          recent criticisms are unfair and

9          unconstructive.

10         The criticisms that you personally observed

11    and experienced, do you agree that they were unfair and

12    unconstructive?

13         A.   Yes, they were absolutely unfair and

14    obstructive.  They in fact were false, what they were

15    saying.

16         Q.   And let's take a step back and talk about the

17    actual IARC meeting.

18         So the program -- well, when was glyphosate

19    announced that it was going to be reviewed by IARC?

20         A.   I don't remember the exact date, but it was

21    probably -- probably two years before the actual review

22    took place.

23         Q.   And when did you become aware -- let's lay

24    some foundation.

25         Did you participate in the IARC working group?

2134

1     **A.**   I did.  I participated as a member of the

2     working group, and I also served as chair as the

3     experimental animal subgroup for Volume 112.

4     **Q.**   And as the chair of the experimental animal

5     subgroup, does that mean you were going to look at all

6     the rodent studies?

7     **A.**   Yes, sir.

8          **THE COURT:**  You know what, Doctor, if you

9     could just speak a little more into the mic, your voice

10    might project a little better.

11         **THE WITNESS:**  I'm sorry.

12    **BY MR. WISNER:**

13    **Q.**   We can scoot it over too, if you want to, to

14    make it easier.  There you go.

15         When did you first become aware that you would

16    be working on the glyphosate monograph?

17    **A.**   I received an e-mail inviting me to

18    participate as a member of the working group.  And as a

19    standard procedure for an invitation of that type from

20    IARC, they said if I would be interested and available

21    to participate, to submit what they referred to as their

22    document of interest, or DOI, which is a conflict of

23    interest statements, if you will, to submit that to IARC

24    for their review for them to ensure that there would be

25    no conflict of interest in the review of any of the

1    materials that were going to be reviewed at a working

2    group meeting.  And upon review and acceptance of the

3    conflict of interest statement, they would send a formal

4    invitation.

5         So I did.  I submitted my conflict of interest

6    statement.  And then about, I don't know, two or three

7    weeks later I got another e-mail inviting me to serve as

8    a member of the working group for Volume 112 and also

9    asked me if I would serve as chairman of the

10   experimental animal subgroup.

11   **Q.**   What kind of work goes in to the working

12   group?  What kind of work -- strike that.  Let me ask a

13   better question.

14        What sort of work do you do leading up to the

15   actual program in March?

16   **A.**   Okay.  Once you receive the formal invitation,

17   that is usually followed up by --

18        I'm sorry, one of the jurors has a question, I

19   think.  Sorry.

20        **THE COURT:**  That's okay.  We'll deal with

21   that.  Go ahead.

22        **THE WITNESS:**  Once you get the formal

23   invitation, they also assign you specific chemicals to

24   be responsible for, to write a draft of the monograph

25   for the subgroup to which you have been assigned, and

2136

1    for me that was the animal -- experimental animal
2    subgroup.
3           They also give you a link to a website that
4    they have at IARC where they have files of all the
5    references that they have found in their literature
6    search for all of the chemicals that are being
7    considered under the -- for the particular monograph.
8           They say these are provided for your
9    information, but as a working group member you are
10   expected to conduct your own literature search and find
11   all the available literature you can to ensure that you
12   have all of the most recent information that has been
13   published in the open peer-review literature for the
14   material that's under consideration.
15          So once you do the literature search and find
16   the files of the actual articles in the IARC monograph
17   files, then you have to sit down and go through all
18   those papers, evaluate the studies, evaluate the data in
19   those papers, and then prepare a draft, what's referred
20   to as a draft monograph for the animal -- experimental
21   animal section that summarizes each and every study that
22   you've looked at, and then also prepare a table that
23   outlines, gives specific information for each study that
24   you have evaluated.
25   ///

1    BY MR. WISNER:

2         Q.   And so --

3              THE COURT:  Okay.  So we need to take a quick

4    break.

5              MR. WISNER:  Sure.

6              THE COURT:  We'll take our morning break now.

7    We'll come back at 10:30.  Thank you.

8              (Jury excused for recess.)

9              (Proceedings continued in open court out of

10   the presence of the jury:)

11             THE COURT:  I'm not going to give you the

12   question.  It was just a request for a short break.

13             I'm not going to count that as a juror

14   question.  I didn't want to single out anybody.

15             (Recess taken at 10:18 a.m.)

16             (Proceedings resumed in open court in the

17   presence of the jury at 10:34 a.m.)

18             THE COURT:  Thank you.

19             Mr. Wisner, you may proceed.

20             MR. WISNER:  Thank you, Your Honor.

21        Q.   Dr. Jameson, we were talking about the IARC

22   program for glyphosate.  Before we go back to that, I

23   just want to ask you a quick follow-up question.

24             My first one is:  As part of your career

25   looking at things that cause cancer, how many -- what

                                                        2138

1     percentage of that has focused on chemicals?

2          A.   On just on individual chemicals as opposed to

3     mixtures and biological?

4          Q.   Yeah.

5          A.   Oh, probably 75 to 80 percent are on

6     individual chemicals.

7          Q.   And as part of those, have you looked at

8     pesticides before?

9          A.   Oh, yes.  A number of pesticides for both the

10    Report on Carcinogens and at IARC.

11         Q.   Do you have a particular interest in looking

12    at pesticides as potential carcinogens?

13         A.   That's what sparked my interest in

14    participating in IARC Monograph Volume 112 was that they

15    were looking at a range of pesticides.

16              I've always been interested in looking at

17    pesticides.  It's always been my impression that

18    pesticides need to be looked at because they're

19    developed as poisons to begin with.  I mean, that's why

20    they are made, to be poison to something, to kill a weed

21    or a rodent or a bug or what have you.

22              So if they're designed to be a poison, then

23    obviously they're suspect right from the get-go that

24    they could be hazardous to humans.

25              So I feel it's very important to look at the

1    potential carcinogenicity of pesticides just to ensure

2    that they don't cause cancer.

3        **Q.**   This is sort of an also aside question before

4    we go back to IARC.  But you've had the occasion to

5    oversee the budgets for running rodent studies; is that

6    right?

7        **A.**   Correct.

8        **Q.**   I mean, how much money does it cost to do a

9    two-year bioassay on rodents?

10        **A.**   Well, it depends if you're talking currently

11    or if you're talking when I started in 1980 or --

12        **Q.**   Let's do both.  How has it changed?

13        **A.**   Well, let me just, for example, in 1980 when I

14    started with the National Toxicology Program, we started

15    100 new animal bioassay studies in one year.  That's how

16    many we started, 100.

17        The average -- the price depended on the route

18    of administration.  The cheapest were dose feed and

19    drinking water studies because you just mix it in either

20    their feed or their water and put it in the cage, and

21    that's it for the week.

22        The other studies like skin painting or

23    gavage, which is put a tube down the throat and deliver

24    it directly to the stomach, those are a little more

25    expensive because they're more labor-intensive.  You

2140

1     have to dose the animal onces a day for five days every

2     week.

3             And then the most expensive was inhalation

4     because of all the engineering and other technical

5     difficulties you had to come over in generating the gas

6     or the aerosol or the particulate.

7             But an average cost for, say, let's just take,

8     for example, the dose feeding study because most of the

9     studies that we did were either dose-feed or dose-water.

10            One of those in 1980 would cost anywhere from

11    let's say 250- to $300,000 per study.

12            As a side, I would say we realized when we

13    started 100 chemicals in 1980, we probably made a

14    mistake because that meant in 1982 we'd had

15    100 chemicals finishing and all needing pathology and

16    that caused us to get backed up and we actually got

17    criticized for not getting the studies published quick

18    enough.  But anyway that's an aside.

19            1980.  For a feeding study it was about 250-

20    to $300,000.

21            Currently the bioassay program starts maybe

22    three bioassays a year now.  That's mainly because of

23    the budget has been restricted pretty extensively over

24    the past year.  Plus the studies have become so

25    expensive.  And because the protocol has expanded and

                                                            2141

1    there's a lot more to a particular study rather than

2    just feeding the animals and evaluating the tissues for

3    tumors, there's a lot of additional, you know, tox

4    studies done and metabolism studies done.  Anyway, a

5    current feeding study for the NTP is probably running

6    anywhere between two-and-a-half and three million

7    dollars each.

8         Q.   Okay.  And -- all right.  That's helpful.  I

9    just wanted to get a sense --

10        A.   Sure.

11        Q.   -- of how much money.

12             And how long do they take typically?

13        A.   Well, it's called a two-year animal bioassay.

14   But the two years refers to the amount of time that the

15   animals are actually being dosed.

16             From initiation of the contract to do the

17   study, if you will, until you finish the pathology?  Or

18   are you talking about until you publish the report?

19        Q.   The whole thing.

20        A.   Okay.  The whole thing, it can take anywhere

21   from five to six years.

22        Q.   Okay.  All right.  So back to the IARC

23   monograph.

24             **MR. WISNER:**  Permission to publish

25   Exhibit 3029.  It was published yesterday.  It's the

                                                         2142

1    list of participants.

2              **MR. ISMAIL:**  No objection, Your Honor.

3              **THE COURT:**  Granted.

4                   (Exhibit published.)

5    **BY MR. WISNER:**

6         **Q.**  All right.  Doctor, we have here the list of

7    the IARC participants.  I'm going to call out the

8    members.

9              What does "the members" refer to?

10        **A.**  The members refer to the actual working group

11   members of the IARC monograph.  And those are the

12   individuals who participate in reviewing the data,

13   drafting up the actual monograph for the particular

14   sections that they were assigned, evaluating the data,

15   applying the criteria, and voting on what category the

16   materials would fall in based on the IARC criteria.

17        **Q.**  And here are some individuals we've already

18   discussed.  Dr. Aaron Blair; do you see that?

19        **A.**  Yes.

20        **Q.**  And he was the overall chair?

21        **A.**  He was the overall chair for the whole volume.

22        **Q.**  And then we have down here, we have yourself,

23   Dr. Jameson.  Do you see that?

24        **A.**  Yep, there I am.

25        **Q.**  And you are the subgroup chair?

                                                        2143

1          **A.**   Correct, for the cancer in experimental

2     animals.

3          **Q.**   We have some other individuals on here.  We

4     have, for example, Dr. Lauren Zeise.  Do you see that?

5          **A.**   Yes.  She's with the California Environmental

6     Protection Agency.

7          **Q.**   Do you know her?

8          **A.**   I've known Lauren for a number of years.  Yes,

9     she's an excellent scientist.

10         **Q.**   And we have Dr. Matthew Martin from the

11    U.S. EPA?

12         **A.**   Yes.  He was an EPA representative who

13    participated on the working group.

14         **Q.**   And does that create any problems having --

15    being that he works at the EPA in his day job but he's

16    now participating in the working group?

17         **A.**   No.  What it would be is, as a working group

18    member, he's there as a scientist really and not as a

19    representative of the EPA.

20              I think if you look at the list of either -- I

21    don't know if he was listed as an observer or

22    representative, but there was an individual there that

23    was also from the U.S. EPA that was not a member of the

24    working group but was there at the meeting.

25         **Q.**   Is that --

                                                        2144

1          **A.**   Yeah, Mr. Rowland, yes.

2          **Q.**   You said Mr. Rowland.  And this actually came

3     up yesterday.  Is Jesudosh Rowland a doctor?

4          **A.**   No.  I think he has a master's, but I don't

5     think he has a Ph.D.

6          **Q.**   All right.  And then we have obviously

7     observers here.  What role do the observers play at the

8     monograph?

9          **A.**   Well, because the process is an open process,

10    the monograph review process, people are invited to send

11    observers if they have a particular interest in the

12    material -- any of the materials that are being reviewed

13    for the monograph -- for the particular monograph.

14          And so industry routinely sends observers just

15    to monitor what's being done at the monograph review.

16    But the IARC is -- restricts, if you will, that only one

17    observer per an organization can come because if you

18    were allowed to have, you know, multiple people from the

19    different organizations, it would just be such a crowd,

20    it just wouldn't work.

21          So they outline very specifically in their

22    procedures that observers are welcome, but only one

23    observer per particular organization.

24          **Q.**   We have here Thomas Sorahan, Dr. Sorahan, from

25    the Monsanto Company.

                                                              2145

1       A.   Yes, he was the representative of Monsanto at

2   the Volume 112 review.  He's an epidemiologist.  In

3   fact, Dr. Sorahan has served on several monographs

4   before as an actual member of the monograph.  So I'm

5   sure he was chosen to be an observer for Monsanto

6   because he understood the process, understood the

7   program.

8       Q.   And then we have this person, Christian Strupp

9   from the European Crop Protection Association.  Do you

10   know who that is?

11       A.   That is a trade association in Europe of

12   farmers and producers, I believe.  I really don't know.

13   To be honest, I really don't know.  I know that there

14   was representatives there from the European agrichemical

15   companies.  And maybe that's what that is.  But I'm

16   sorry, I was speculating based on the name.

17       Q.   All right.  And I understand there was a

18   photograph taken of all the people who were there?

19       A.   Yeah.  Routinely they have a group photo of

20   the whole working group and observers and

21   representatives and what have you, is taken for every

22   monograph that's done.  I have a portfolio of 16.

23       Q.   Turn to Exhibit 1039 in your binder.

24            Is that a fair and accurate photo of the group

25   taken for the monograph program?

2146

```
 1          A.   Yes.   That looks like the photograph for
 2     Volume 112.
 3               MR. WISNER:   Permission to publish,
 4     Your Honor.
 5               MR. ISMAIL:   No objection, Your Honor.
 6               THE COURT:   Granted.
 7                    (Exhibit published.)
 8     BY MR. WISNER:
 9          Q.   So here we have IARC monographs on
10     carcinogenic risk to humans, Volume 112.
11               Let's take a little tour around here and
12     introduce the jury to some of the people.
13               So first, let's start off with you.  Is that
14     you back there?
15          A.   That's me in the back.
16          Q.   All right.  There's Dr. Jameson.
17               Here we go.  Who's that right there?
18          A.   The tall person in the middle is Chris
19     Portier.  And behind him to his right is Tom Sorahan,
20     the Monsanto representative.
21          Q.   Okay.  So those two -- all right.  What about
22     here in the front, who is that?
23          A.   That is the EPA observer or representative.
24          Q.   Jess Rowland?
25          A.   Right.  He wasn't a working group member, but
```

2147

1    he was there for the EPA.

2         Q.   Okay.  And who's next to Jess Rowland?  Who

3    are those people?

4         A.   To the right is Kurt Straif who, at the time,

5    was the head of the monograph program at IARC.

6              And to his left is Kate Guyton.  She was the

7    IARC staff member who was responsible for coordinating

8    and organizing the Volume 112 monograph review.

9         Q.   All right.  And right there, is that

10   Dr. Zeise, Lauren Zeise, from the California EPA?

11        A.   Right.  The blonde lady, right.  That's

12   Dr. Zeise, that's Lauren Zeise.

13        Q.   All right.  And right here in front next to

14   these three, who's that individual?

15        A.   That's Dr. Aaron Blair.  He was the overall

16   chair of the working group for Volume 112.

17        Q.   And just to get a sense of things, you know,

18   you were at this meeting with these individuals for over

19   a week.  Did you get to know them and interact with them

20   on a scientific basis?

21        A.   That's correct.  That's one of the things that

22   I liked about the IARC monograph or being able to

23   participate in the IARC monographs, is it gave me an

24   opportunity to interact with all these international

25   scientists and afforded me a chance to discuss data and

2148

1    get their ideas of what the data meant because sometimes

2    people in different countries have a different approach

3    to evaluating the data that I would be looking at.

4            And so that gave me the opportunity to pick

5    their brains, if you will, as to, well, in this

6    particular situation, how do you look at the data or

7    have you seen this before and that type of thing.

8            So, to me, that was part of the great thing of

9    going to IARC was to interact with all of these

10   internationally known and recognized scientists.

11       Q.   Now, ultimately, what classification did the

12   working group give to glyphosate?

13       A.   Glyphosate was given the 2A category as a

14   probable human carcinogen.

15       Q.   Now, were you there and present for the

16   debates and discussions about what to classify

17   glyphosate?

18       A.   Yes.   I was present for all the debates.

19       Q.   And my first question is:  Was there ever

20   consideration giving it a class 1 or a group 1

21   classification?

22       A.   What I can say is during a plenary session

23   where all of the members of the working group and where

24   everybody was present, when we started reviewing the

25   epidemiology section for the glyphosate, they were

                                                          2149

1    discussing all of the different studies, all the cohort

2    studies, the AHS study data that was available at the

3    time, the meta-analysis that had been done on the epi

4    studies.

5         And there was a debate at one time.  Several

6    of the members raised the point that they felt the data

7    raised was at a point where they would say it was

8    sufficient in humans that it would lead to a 1 -- to a

9    category 1 listing.

10        But I think it was the majority of the

11   epidemiologists which I guess you could say swayed the

12   rest of the working group that because the AHS study,

13   which was the only cohort study available for this, and

14   in epidemiologists' eyes, a cohort study is the gold

15   standard, if you will, for doing an epidemiology study.

16   And since the data there wasn't showing a positive

17   association -- a significant positive association for

18   cancer, they said that it's more in the limited

19   category, they felt, for human epidemiology data.

20        And so that was their argument and that's what

21   carried the vote.

22   Q.   Now, Doctor, you said cohort studies are often

23   the gold standard.

24   A.   I said for epidemiologists, that's --

25   Q.   Have you looked at the AHS?

2150

1        **A.**   Have I?

2        **Q.**   Yes.

3        **A.**   Yes.  Oh, yes.

4        **Q.**   Do you think it's a good study?

5        **A.**   No.  It's not a good study at all.  It has a

6   lot of flaws in it that seem to keep getting worse and

7   worse.  And in my mind, in my opinion, it wasn't

8   designed very well from the get-go.

9            And the flaws in the design, especially the

10  number of people who were in the initial response to the

11  questionnaires about their exposure and what have you,

12  and then the relatively few -- well, I mean, only

13  60 percent of the initial responders responded to the

14  questionnaire for follow-up.

15           And so they had to guesstimate what the people

16  who didn't respond, what their exposure was, and that

17  wasn't a very good thing to do because, as it turns

18  out -- I'm sorry.  Am I going into too much?

19       **Q.**   No.  Keep going.

20       **A.**   As it turns out, in the AHS study from when it

21  first started, the amount of glyphosate or Roundup being

22  used was high, very high.

23           But then right after the cohort study started

24  is when Monsanto introduced genetically modified seeds

25  to the -- to make them available to the farmers.  And

2151

1    these seeds would make the wheat or the corn or soybeans

2    or whatever, would make those plants resistant to

3    Roundup.

4              **MR. ISMAIL:**  Your Honor --

5              **THE COURT:**  I think we're --

6              **MR. ISMAIL:**  Getting far afield.

7              **THE COURT:**  Gray territory.

8    BY MR. WISNER:

9         **Q.**   Sure.  Let's not talk about that.

10        **A.**   Sorry.

11        **Q.**   No, it's fine.

12             Did Roundup use change at that time?

13        **A.**   Roundup.  Okay, the bottom line is Roundup use

14   changed significantly in the course of -- from the time

15   the cohort study started until the follow-up

16   questionnaire came.  And so the guesstimates or the

17   estimates that they were making for the people that

18   didn't respond were not accurately calculated.

19        **Q.**   And when you pit all that flawed AHS study

20   against all these positive case-control studies --

21        **A.**   The positive -- the case-control studies are

22   essentially all positive.  They're not all statistically

23   significantly positive, but they're all positive.

24   They're all showing an association between use of

25   Roundup and non-Hodgkin's lymphoma.

                                                      2152

1          And in my mind, those consistent results far

2     outweigh any result that you didn't see in a cohort

3     study.  And the other point being I feel the cohort

4     study is flawed.

5          Q.   All right.  So earlier with Dr. Portier, we

6     put together something called the three pillars of

7     causation.  Okay.  And I'm just going to write in here

8     what we did so you can get some background.

9               The first pillar was the animal data.  The

10    second one was epi.  And the last one was the cell data,

11    or I think we called it mechanistic data.

12         A.   Mechanistic data, right.

13         Q.   So did you, as part of your work on the

14    working group, look at all three of these pillars?

15         A.   Yes.

16         Q.   All right.  I'm going to go through each one.

17              What was the classification given to the

18    animal data?

19         A.   For the IARC monograph review, the

20    classification for animals was that there was sufficient

21    data that glyphosate caused cancer in experimental

22    animals.

23         Q.   And what does "sufficient" mean?

24         A.   "Sufficient" meaning that a positive

25    association has been seen in multiple studies, in

2153

1   multiple sexes, multiple species, or to an unusual

2   degree -- the tumor incidence is at an unusual degree

3   observed in the animals.

4        Q.   And is that the highest classification?

5        A.   That's the highest classification for the

6   animals, is "sufficient."

7        Q.   All right.  What about epidemiology, what did

8   the working group give that?

9        A.   The epidemiology was identified as limited.

10        Q.   Is that what you were saying a second ago,

11   between the sufficient and limited fight?

12        A.   Pardon me?  I'm sorry.

13        Q.   Is that what you were talking about the

14   sufficient and limited fight that was happening?

15        A.   What do you mean?  I don't understand what

16   you're --

17        Q.   Sorry.  Earlier you talked about how

18   category 1 was brought up as a possibility.

19        A.   Oh, yeah.

20        Q.   Was it about this point?

21        A.   Okay, yeah.

22        Q.   And so what did you guys find?

23        A.   Well, the working group indicated that for

24   epidemiology the data was limited.  "Limited" means that

25   the -- an association between exposure to the material

2154

1      and cancer is reasonable, it's found that a causative

2      relationship is -- what is the proper term?  Reasonable

3      or -- a causal association has been found.  But bias

4      confounding and could not be absolutely accounted for.

5          Q.   Do you want to look at the preamble just to

6      verify?

7          A.   Sure.

8          Q.   It's Exhibit 0946.  And I believe the

9      classification for limited --

10         A.   I'm sorry, I should have had this written to

11     memory.

12         Q.   It's all right.

13              All right.  It starts on, I think the very

14     bottom, page 21 --

15              MR. WISNER:  Your Honor, permission to publish

16     the preamble?

17              MR. ISMAIL:  No objection.

18              THE COURT:  Granted.

19                    (Exhibit published.)

20     BY MR. WISNER:

21         Q.   So I'll just show.  This is the preamble;

22     right?

23         A.   Right.

24         Q.   Go to page 21.  Down here they have the

25     definitions of "sufficient" and "limited."

                                                          2155

1          A.    Sufficient and limited.

2          Q.    Limited evidence of carcinogenicity; do you

3     see that?

4          A.    Right.

5          Q.    All right.  And it says right here:

6                    A positive association has been

7               observed between exposure to the agent and

8               cancer for which a causal interpretation

9               is considered by the Working Group to be

10              credible, but chance, bias, or confounding

11              could not be ruled out with reasonable

12              confidence.

13         A.    That's exactly what I was trying to say.

14         Q.    Well, it says here, I mean, I want to be

15    clear, the word is limited.

16         A.    Right.

17         Q.    But it says a causal interpretation is

18    considered by the working group to be credible.

19              What does that mean?

20         A.    That means that the data shows that

21    exposure -- in the case of glyphosate, that says that

22    the exposure to Roundup caused the observed

23    non-Hodgkin's lymphoma in the people exposed -- in the

24    workers exposed to it from the various cohort studies

25    and also from the meta-analysis of the cohort studies

2156

1     and the -- I'm sorry, I was mistaken.

2              That means that an association is credible

3     from all the case-control studies and also from all the

4     meta-analyses of the case-control studies and the cohort

5     studies.

6              So an evaluation was credible that exposure to

7     Roundup caused non-Hodgkin's lymphoma.  And these are

8     all at real world exposure levels.  These are people who

9     are using this stuff in their -- you know, daily in

10    their work and so they're exposed to real world

11    concentrations of this material.

12             And it is a causal relationship between

13    exposure to Roundup and non-Hodgkin's lymphoma, but

14    there are con -- but confounders and bias could not be

15    completely explained away.

16             Now, some of the bias -- some of the

17    confounders are that farmers and lawn care people aren't

18    exposed solely to glyphosate, they use other pesticides

19    in their day.

20             And so it wasn't -- the use of these other

21    pesticides was not taken into consideration when the

22    data was evaluated by the scientists in the papers for

23    the epidemiology that they did for these particular

24    workers.

25             But I would say that most of the pesticides

2157

1    that the workers would be exposed to have not been

2    identified as causing non-Hodgkin's lymphoma.  But the

3    fact that it wasn't -- that wasn't addressed in the

4    paper for the epidemiology, that's why they said the

5    confounders weren't considered.

6           And so because that's in there, there's also

7    some bias could be associated with the questionnaires

8    that people were asked.  You know, the questions that

9    people were asked, their responses might have been

10   biased because of their particular situation.

11          For example, if I may.  For example, you may

12   ask a worker:

13                We're investigating non-Hodgkin's

14                lymphoma in the use of Roundup.  You have

15                non-Hodgkin's lymphoma.  Have you ever

16                used Roundup?

17          Well, since the guy has non-Hodgkin's

18   lymphoma, he's going to think, oh, that's why I have it,

19   yes.  But in reality he didn't.  He didn't.  So but he

20   would have been placed incorrectly in a category that

21   hadn't been exposed to glyphosate or to Roundup and has

22   non-Hodgkin's lymphoma.

23   **Q.**   Dr. Jameson, in these studies that you're

24   talking about, that's not how it went?

25   **A.**   Oh, no.  No, no, no.  I was just giving an

2158

1    example.  I'm sorry.  I didn't mean to -- I'm sorry.  I

2    was just trying to use a relevant example.

3         Q.   Sure.  I appreciate that.

4              All right.  So I'm going to go back to the

5    thing -- I had to rewrite it because it disappeared when

6    I moved off the last document.

7              But this limited categorization, is that the

8    highest, second highest, third highest?

9         A.   Well, I guess you can refer to it as the

10   second highest category for epidemiology.

11        Q.   Okay.  It's sort of legible.

12             All right.  The last one here is the cell

13   data.  What category did IARC give that?

14        A.   They gave that -- the category that they gave

15   to that is strong, strong mechanistic evidence for

16   carcinogenicity.

17        Q.   And what was the mechanisms they identified?

18        A.   Basically they identified genotoxicity, which

19   refers to the DNA, affecting the DNA and that type of

20   thing.  And also oxidative stress.

21             Glyphosate causes extreme oxidative stress in

22   some cells.  And oxidative stress is a known mechanism

23   for the causing of cancer in humans and in animals.  And

24   I think oxidative stress has also been associated with

25   non-Hodgkin's lymphoma formation in humans.

                                                      2159

1          Q.   And is that the highest category?

2          A.   That's the highest category for genetox -- or

3     mechanisms, excuse me.

4          Q.   All right.  Now, I understand that IARC

5     focuses on publicly available data; is that right?

6          A.   That's right.

7          Q.   Why?  Why don't they look at anything under

8     the sun?

9          A.   Well, it's important that it's restricted to

10     peer-review data because you want to assure yourself

11     that the quality of the study and the quality of the

12     reporting of the data is verified by a review of peers,

13     if you will.

14               It's important to -- just to have confidence

15     that the data as reported is reliable and factual.

16          Q.   The decision to classify glyphosate as a

17     class 2 probable human carcinogen, was that a unanimous

18     decision?

19          A.   That was -- yes, it was a unanimous vote for

20     the classification, yes.

21          Q.   So every person on that working group voted

22     yes?

23          A.   Yes.

24          Q.   Now following the IARC classification, I

25     understand -- well, let's back up.

2160

1          How did you get involved in this litigation?

2     A.   You want the whole story?

3     Q.   Yeah, sure.

4          MR. ISMAIL:  Your Honor, just may we approach?

5          THE COURT:  Sure.

6              (Sidebar held but not reported.)

7     BY MR. WISNER:

8     Q.   Let's not talk about this issue.

9     A.   Okay.

10    Q.   Let's instead focus in on what happened after

11  IARC.

12    A.   Okay.

13    Q.   Were you and your working group members --

14  well, were you subpoenaed by Monsanto following the IARC

15  decision?

16    A.   Yes.  I was personally subpoenaed, and every

17  member of the animal working group was subpoenaed for

18  copies of documents that we prepared for the IARC

19  monograph review.

20    Q.   And I just want to be -- you've been on

21  16 other panels; right?

22    A.   Right.

23    Q.   Has that ever happened before?

24    A.   No, never.

25    Q.   Following the IARC monograph, are you aware of

2161

1    a group called EFSA disagreeing with it?

2         A.   Yes.

3         Q.   And I believe you joined a letter talking

4    about this issue with Dr. Portier; is that right?

5         A.   That's correct.

6         Q.   If you look in your binder, it would be

7    Exhibit 2131 -- oh, I'm sorry.

8              Actually if you look at Exhibit 1020, is that

9    one of the open letters that you signed from

10   November 2015?

11        A.   It looks like it, yes.

12        MR. WISNER:   Permission to publish,

13   Your Honor.   It was published yesterday.

14        THE COURT:   Granted.   If it's already been

15   published once, then you don't have to ask.

16        MR. WISNER:   Sorry.   I don't want to do

17   anything wrong.

18        THE COURT:   No, it's fine.

19                   (Exhibit published.)

20   BY MR. WISNER:

21        Q.   So this was a letter that was sent to the

22   Commissioner of Health and Food Safety, and it looks

23   like it was dated November 27, 2015; is that right?

24        A.   Correct.

25        Q.   Okay.   And I just want to quickly go to the

                                                      2162

1    signature line.  It starts here on page 8, and the first

2    signatory is Dr. Christopher Portier.

3        A.   That's correct.

4        Q.   And then if we just zoom in here, there's a

5    bunch of other signatories following that, someone from

6    the University of Sydney, Australia; do you see that?

7        A.   Yes.

8        Q.   University of Auckland in New Zealand; do you

9    see that?

10       A.   Yes.

11       Q.   And the next page, it goes on.  We have

12   researchers from Russia, France, Italy, Chicago, more

13   Italy; do you see that?

14       A.   Yes.

15       Q.   It keeps going.  We have people from Norway,

16   it looks like a researcher from Massachusetts,

17   professors at various universities, Boston University;

18   do you see that?

19       A.   Yes.

20       Q.   Let's keep going.  This one is sort of

21   interesting.  You have Dr. Anneclaire De Roos; do you

22   see that?

23       A.   Yes.

24       Q.   And she's an author on the AHS study?

25       A.   The AHS study, that's correct.

2163

1          Q.   And earlier -- we're still in the D's.

2               All right.  Hardell, do you see Dr. Hardell

3     here?

4          A.   Yes.

5          Q.   Is he also an author on some of the

6     epidemiological studies?

7          A.   Yes, he is, yes.

8          Q.   And then we have you.  Do you see that?

9     That's you, Doctor.

10         A.   Yes.  There I am.

11         Q.   And the list goes on for a while.  We have

12    different people from different places.

13              I want to talk about what was actually said in

14    the letter.  Okay?

15         A.   Okay.

16         Q.   So if we go to the first page, the first

17    paragraph reads:

18                   We are a group of independent

19                   academic and governmental scientists from

20                   around the world who have dedicated our

21                   professional lives to understanding the

22                   role of environmental hazards on cancer

23                   risks and human health.  We have banded

24                   together and write to you at this time to

25                   express our deep concern over the recent

2164

1              European Food Safety Agency, EFSA,

2              decision that the widely used herbicide

3              glyphosate is, quote, unlikely to pose a

4              carcinogenic hazard to humans.  We ask

5              that you forward the letter to the

6              representatives of all EU member states

7              before the next meeting of the standing

8              committee on plants, animals, food, and

9              feed.

10              Dr. Jameson, are you one of the people that

11     stood with this group of people who were banding

12     together?

13     **A.**   Yes, I did.

14     **Q.**   Why?

15     **A.**   Because I agreed with what was being said in

16     the letter, that the EFSA, the European Food Safety

17     Agency, decision was wrong.  I don't think they

18     adequately evaluated the data that was available on

19     glyphosate and their risk assessment or risk analysis of

20     it was not correct.  And I felt that it was something

21     that I agreed with, with the premise that they should

22     be -- it should be brought up that a number of people

23     disagreed with what they were coming out with.

24     **Q.**   The next paragraph reads:

25              The EFSA decision, based on the

1          renewal assessment reports provided by the

2          German Federal Institute for Risk

3          Assessment, BfR, runs counter to the

4          finding earlier this year by the

5          International Agency for Research on

6          Cancer, IARC, the highly respected cancer

7          arm of the World Health Organization, that

8          glyphosate is a probable human carcinogen.

9          This IARC classification is based on a

10          comprehensive assessment of the

11          peer-reviewed toxicologic and

12          epidemiologic literature undertaken over a

13          12-month period by a working group of

14          17 independent expert scientists.

15          I'm going to stop right there.

16          Is that correct, you guys were independent

17    expert scientists?

18    **A.**    That's correct.

19    **Q.**    It goes on:

20          The IARC review linked glyphosate to

21          dose-related increases in malignant tumors

22          at multiple anatomical sites in

23          experimental animals and an increased

24          incidence of non-Hodgkin's lymphoma in

25          exposed humans.

2166

1              Do you agree with all that?

2      A.    Yes, sir, I do.

3      Q.    It says down here:

4              In October 2015, the EFSA reported on

5           their evaluation of the renewal assessment

6           report for glyphosate.  EFSA concluded

7           that glyphosate is unlikely to pose a

8           carcinogenic hazard to humans and the

9           evidence does not support classification

10          with regard to its carcinogenic potential.

11          And then it reads:

12             In response to that, we have serious

13          concerns with regard to the scientific

14          evaluation in the BfR addendum and feel

15          that it is misleading regarding the

16          potential for a dose-dependent

17          carcinogenic hazard from exposure to

18          glyphosate.  Since the BfR addendum is the

19          basis for the European Food Safety Agency

20          conclusion, it is critical that we express

21          these concerns.

22          Why was it critical that you express these

23     concerns, Dr. Jameson?

24     A.    Well, it was important to get out that -- at

25     least what I was reading from the European -- from the

2167

1    EFSA review is they were addressing mostly contamination

2    of food products by Roundup and glyphosate.  So their

3    assessment was focusing only on that and not on the

4    general exposures of any other type, like the farmers

5    and lawn care workers and that type of thing.

6            So their evaluation was not -- was not focused

7    on the right issues and on the right outcomes that the

8    epidemiology studies especially.  So -- and to be very

9    honest with you, I didn't understand how they could look

10   at the same animal data that I had looked at and come to

11   such a different conclusion.

12       Q.   Now we go through some of the data.  In fact

13   there's a whole discussion about the animal data right

14   here.  And it kind of goes through their findings.  And

15   then sort of bottom line is it says:

16            Given this evidence, it is clear that

17            BfR differed from standard scientific

18            practices in order to reach their

19            conclusions.

20            Do you agree with that?

21       A.   Yes.

22       Q.   It says:

23            BfR reported seven positive mouse

24            studies with three studies showing

25            increases in renal tumors, two with

2168

1              positive findings for hemangiosarcomas and

2              two with positive findings for malignant

3              lymphomas.  BfR additionally reported two

4              positive findings for tumors in rats.

5              Eliminating the inappropriate use of

6              historical data, the unequivocal

7              conclusion is that there are negative

8              studies but in fact -- that these are not

9              negative studies but in fact document the

10             carcinogenicity of glyphosate in

11             laboratory animals.

12             Do you agree with that?

13    **A.**   I agree with it.  Like I was saying, I could

14    not believe they could be looking at the same data I was

15    and come to such a radically different conclusion.

16    **Q.**   All right.  I just want to go to the final

17    conclusions.  It says:

18              Science moves forward based on data,

19             careful evaluation of those data and a

20             rigorous review of the findings and

21             conclusions.  One important aspect of this

22             process is transparency in the ability to

23             question or debate the findings of others.

24             Doctor, this principle of transparency, is

25    that part of the monograph philosophy?

                                                          2169

1      **A.**   Yes, absolutely.

2      **Q.**   Why?

3      **A.**   Well, it's important that any reviews that the

4      IARC monograph performs is done in an open and

5      transparent manner so that everybody knows the process

6      by which the reviews took place and how the decisions

7      were made for listing something in the monograph.

8      **Q.**   It says:

9                    Due to the potential health

10                   implications of this extensively used

11                   pesticide, it is essential that all

12                   scientific evidence be freely available,

13                   reviewed openly in an objective manner,

14                   and that financial support, conflicts of

15                   interest, and affiliations of authors be

16                   fully disclosed.  Many aspects of the

17                   evaluation conducted by the BfR and EFSA

18                   do not meet this fundamental objective

19                   criteria and raise significant concerns of

20                   validity.

21             Do you agree with that?

22      **A.**   Yes.

23      **Q.**   Why is that, sir?

24      **A.**   Well, some of the data that EFSA used was of

25      questionable quality or of questionable sources.

                                                        2170

1          Q.   All right.   The very last point is right here.

2     It says on page 7:

3               The most parsimonious scientific

4               explanation of the cancer seen in humans

5               and laboratory animals supported by the

6               mechanistic data is that glyphosate is a

7               probable human carcinogen.

8               Sir, when you say "probable" there, are you

9     using it in the context of IARC?

10         A.   Yes, that's what it was meant.

11         Q.   (Reading aloud:)

12              On the basis of this conclusion and

13              the absence of contrary evidence, it is

14              reasonable to conclude that glyphosate

15              formulations should also be considered

16              probable human carcinogens.

17              Do you share that opinion, sir?

18         A.   Yes.

19         Q.   All right.   Now, the jury -- the jury heard a

20    little bit about this letter from Dr. Portier yesterday.

21    So I'm not going to go through it.   I didn't have a

22    chance to go through it with him like I am with you due

23    to time constraints, but you were an author on this

24    letter; is that right?

25         A.   Yes.   I signed the letter.

1          Q.   Well, let me back up.

2               Following this letter or even just before the

3     letter but following IARC, did you go beyond the data

4     that IARC considered in your evaluation?

5          A.   In -- are you talking about in my evaluation

6     that I used to prepare my report?

7          Q.   Yeah.  Let me back up.

8               So after IARC --

9          A.   Okay.

10         Q.   -- did you go farther than you had done in

11    IARC to look at glyphosate data?

12         A.   Yes, I did.

13         Q.   How much farther did you go?

14         A.   Well, when I -- when I came to the IARC

15    working group meeting, the first time I was made aware

16    of a particular publication that had just recently come

17    out, which is referred to as "the Greim paper" which was

18    a summary of all -- of a number of industry studies that

19    had been submitted to EPA evaluating the data on those

20    studies, all of which were not previously publicly

21    available.

22              Since I was just made aware of that study when

23    I arrived at the IARC working group meeting, the animal

24    subgroup did not have enough time to adequately evaluate

25    all the information in that paper, especially since

                                                           2172

1    there was supposed to be a supplemental table that

2    contained a lot of the data on individual animals that

3    was needed to do the evaluation, and the website or the

4    link that they provided for that we just couldn't get it

5    to work during the meeting.  So we really weren't able

6    to get to look at the data.

7              I think a hard copy of the reams and reams of

8    tables was made available to us sometime during the

9    meeting.  But, I mean, at the meeting we weren't just

10   evaluating glyphosate, we were looking at several other

11   chemicals as well, and so we did not have time to

12   adequately evaluate the Greim paper.

13             Some of the studies in the Greim paper, some

14   of the studies we had already had the opportunity to

15   look at because we got the information from EPA

16   documents.

17             But that's not to say we didn't address the

18   Greim paper in the monograph.  The Greim paper is

19   addressed in the monograph itself, and we summarized

20   what the information is for a particular study but say

21   we did not have ample time to adequately evaluate this

22   data.  So we acknowledged it, but we didn't -- we

23   couldn't evaluate it.

24             But anyway, following the monograph meeting,

25   it gave me the opportunity to go back and look at the

                                                          2173

1    Greim paper again, get all the tables and be -- have the

2    time to go through and look at the tables.  And what

3    happened was that with the animal data available from

4    those tables, I was able to find additional tumors that

5    we didn't find at IARC.

6              And so all of that information in that

7    particular paper was helpful in identifying more tumors

8    in different studies and to strengthen the evidence as

9    far as the animal carcinogenicity is concerned that

10   glyphosate is an animal carcinogen.

11        Q.   And what about the epi, has there been more

12   epidemiological evidence that has come out since IARC?

13        A.   Since IARC there has been an update of the AHS

14   study, the Agricultural Health Study.  I think that came

15   out in 2018.  Basically that -- the results from that

16   particular study didn't change what was observed in the

17   first set of data, is that no effect on any particular

18   cancer site was observed in that update.

19              But there have also been several additional

20   meta-analyses.

21              And has the jury been explained what an

22   meta-analysis is?

23        Q.   Yes.

24        A.   Okay.  If Chris was here, I'm sure he did.

25              Anyway, the meta -- two additional

                                                      2174

1    meta-analyses were published, some of them quite

2    recently, which took another look at all of the

3    case-control studies and added the information from the

4    2018 update of the AHS study.

5            And the two meta-analyses that have come out

6    just confirm you get a statistically significant

7    positive increase in risk for the association of

8    exposure to Roundup and non-Hodgkin's lymphoma.  Again,

9    these are all at real world concentrations.  These are

10   people that are using the material in their work and

11   daily lives.

12           So those additional works, really the data

13   that has come out since the IARC monograph just tends to

14   strengthen the data that it is, A, an animal carcinogen,

15   and B, that the epidemiology just continues to get

16   stronger that it is -- it causes non-Hodgkin's lymphoma

17   in exposed workers.

18       Q.   Now I understand there's a recent AHS update

19   2018; right?

20       A.   Correct.

21       Q.   When was the original AHS data published?

22       A.   That was -- was it 2006?  2007, I believe.  I

23   don't remember the date.  I'm sorry.

24       Q.   Fair enough.  But would it be fair to say that

25   as part of the working group, you guys considered that

2175

1    data carefully?

2         A.   Oh, absolutely.  The AHS was part of the

3    consideration of the epidemiology for the IARC working

4    group.  We had the reports, and those were taken into

5    consideration and evaluated by -- first by the epi

6    working group and then by the entire working group.

7         Q.   Hold on a second.  You said Dr. Aaron Blair

8    was the overall chair of the group.

9         A.   Yes.

10        Q.   And you also said he was the principal

11   investigator for the AHS.

12        A.   That's my understanding, yes.

13        Q.   And he -- despite that, he voted with you in

14   classifying Roundup as a class 2 carcinogen.

15        A.   Class 2A.  Yes, he did.

16        Q.   Did you, as part of your analysis for this

17   case, conduct a Bradford-Hill analysis?

18        A.   I did.

19        Q.   And I'm not going to run through it.  We did

20   that with Dr. Portier yesterday or the day before -- I

21   think it was yesterday.

22             Did you come to a conclusion based on your

23   Bradford-Hill analysis?

24        A.   Based on the Bradford-Hill criteria, I think

25   it met most of the criterias that are outlined in the

2176

1    Bradford-Hill for causality of the association of

2    exposure to glyphosate -- or to Roundup, excuse me, and

3    non-Hodgkin's lymphoma.

4        Q.   Now, yesterday we spent a lot of time reading

5    foreign regulatory conclusions to Dr. Portier and asking

6    if he disagreed with it.

7             And we actually showed this slide to him.  I'm

8    going to show it to you now.

9             It was a slide, and it had the regulatory

10   agencies -- it has the regulatory agencies -- the

11   regulators here and whether or not Dr. Portier agrees

12   right there.  Okay.

13       A.   Okay.  Yes.

14       Q.   I guess you can imagine what his opinion was

15   about each one of those.

16       A.   Yes.

17       Q.   Let me just ask you:  Does Dr. Portier stand

18   alone?  Do you also disagree with these?

19       A.   Yes, I also -- I concur with Chris' opinion,

20   and I also disagree with these -- these organizations

21   and their evaluation.

22       Q.   Indeed when we talk about, for example, EFSA

23   and ECHA, we looked at that letter a second ago; right?

24       A.   Right.

25       Q.   Not only does Chris not stand alone with you,

                                                      2177

1    but he has a hundred scientists that stand with him.

2        **A.**    Right.

3        **Q.**    Final thing, Doctor.  These are the final

4    questions I asked Dr. Portier, sort of the global

5    questions that we're trying to answer here.  I'm going

6    to ask them to you.

7            Based on your review of all the science, does

8    Roundup cause tumors in mammals?

9        **A.**    Yes.

10       **Q.**    Does Roundup cause malignant lymphoma in mice?

11       **A.**    Yes.  In several studies, in at least three

12   studies.

13       **Q.**    Does Roundup cause genetic damage in human

14   lymphocytes?

15       **A.**    Yes.

16       **Q.**    Does Roundup cause oxidative stress in human

17   cells?

18       **A.**    Yes.

19       **Q.**    Does non-Hodgkin's lymphoma -- sorry.  Does

20   Roundup cause non-Hodgkin's lymphoma in humans at real

21   world exposures?

22       **A.**    Yes.

23       **Q.**    And, Doctor, these answers you just gave me,

24   were they all given to a reasonable degree of scientific

25   certainty?

2178

1          **A.**   To a reasonable degree of scientific
2     certainty, glyphosate and glyphosate-formulated products
3     are probable human carcinogens, and the data is very
4     strong that glyphosate causes non-Hodgkin's lymphoma in
5     exposed workers.
6               **MR. WISNER:**  Thank you, Your Honor.
7               One second.
8               No further questions, Your Honor.  We pass the
9     witness.
10              **THE COURT:**  Do you need a minute to transition
11    the equipment?
12              **MR. ISMAIL:**  Yes, Your Honor.
13              **THE COURT:**  Okay.  So we're going to take a
14    five-minute break just to transition the technology.  So
15    if anyone would like to hop up and go to the ladies' and
16    men's room, but come right back, please.
17              (Recess taken at 11:31 a.m.)
18              (Proceedings resumed in open court in the
19    presence of the jury at 11:36 a.m.)
20              **THE COURT:**  Mr. Wisner has a couple of
21    questions he'd like to ask.
22              So before we go to cross-examination.
23    **BY MR. WISNER:**
24         **Q.**   Sorry, Dr. Jameson, there's a few more things
25    I want to ask you about.

                                                              2179

1              So you know we have these different -- the

2      tumor chart we were looking at a second ago; right?

3          A.   Right.

4          Q.   We talked earlier about the kidney tumors; do

5      you remember that?

6          A.   Yes.

7          Q.   And I wanted to ask you about the dosing

8      levels for some of the latter studies.

9          A.   Okay.

10         Q.   I understand that you've looked at the

11     Sugimoto study; is that right?

12         A.   Yes.

13         Q.   And do you recall what the low-, mid-, and

14     high-dose levels were for that study?

15         A.   For the Sugimoto, which was published in 1997,

16     the dose levels were zero, 1,600 parts per million,

17     8,000 parts per million, and 40,000 parts per million.

18         Q.   And when you say that, is that milligrams per

19     kilograms per day or --

20         A.   No.  That refers to the concentration in the

21     feed.

22         Q.   Okay.  How does that -- we've heard previous

23     testimony about milligrams/kilograms per day.  Do you

24     know what that number would be for those ones?

25         A.   Just off the top of my head, no.  I can't do

                                                        2180

1      the calculation.  Given a little time, I could do it.

2      But the milligrams per kilograms per day -- this is for

3      mice -- it depends on the amount of feed consumed during

4      the day and the body weight of the mouse.

5              Now, the mouse weighs about 30 or 40 grams,

6      and, you know, they consume about 2 or 3 grams of feed.

7      So --

8          Q.   Okay.  Let me ask you this way.  And I think

9      this might get closer to it.

10             We've heard reference to the dosing levels in

11     the Knezevich & Hogan study.  What were those numbers?

12         A.   Those numbers were a thousand -- were zero, a

13     thousand, 5,000, or 30,000 parts per million in the

14     feed.

15         Q.   So the Sugimoto study had higher doses?

16         A.   Higher levels, right.

17         Q.   What about the Kumar study?

18         A.   Kumar, those dose levels were zero, 100,

19     1,000, and 10,000 parts per million in the feed.

20         Q.   So they were almost --

21         A.   Lower.

22         Q.   -- a third less than the Knezevich & Hogan

23     study?

24         A.   Correct.

25         Q.   And in all three of those studies, there was a

                                                        2181

1    kidney tumor finding; is that right?

2         **A.**   That's correct, in the males.

3         **Q.**   And I -- we kind of addressed this, but I just

4    want to clarify.  You talked about a second ago how you

5    went and looked at the Greim article and found

6    additional tumors; is that right?

7         **A.**   Correct.

8         **Q.**   How does that work?  How did you not catch

9    them at IARC, but now you do see them; how does that

10   happen?

11        **A.**   Like I said, we had very -- we didn't have

12   adequate amount of time to adequately evaluate the Greim

13   paper when we arrived at IARC.  For whatever reason, the

14   paper wasn't made available to us until we got to the

15   meeting.

16             So having more time, you go in and look at the

17   actual tumor tables or the tumor incidences that were in

18   the supplemental data to the Greim paper.  And to be

19   honest, in addition, I had access to some of the actual

20   laboratory reports from the labs that performed the

21   studies for both Monsanto and for other industry

22   sponsors that were submitting these carcinogenicity

23   studies to EPA for the regulation.  And so I was able to

24   get some of those tumor incidence data from those

25   reports as well.

                                                      2182

1              So that was subsequent to the IARC meeting.

2         Q.   And that sort of evaluation you did after IARC

3    looking at the data that was made available, is that

4    what allowed you to find these tumors that you guys

5    weren't able to find in IARC?

6         A.   Correct.

7         Q.   And since you already classified the animal

8    data in the highest category in IARC, finding yet even

9    more tumors in more animal studies, did that strengthen

10   or weaken your assessment?

11        A.   No, I'm sorry.  That absolutely strengthened.

12   The data just got stronger.

13             As I indicated before, the data just gets

14   stronger the more you look into the available

15   information for glyphosate.

16        Q.   And just to be clear, Doctor, if you look in

17   your binder, it's Exhibit 1019.

18        A.   Okay.

19        Q.   And that is -- is that a fair and accurate

20   copy of the IARC monograph?

21        A.   It looks like that, yes.

22        Q.   And that's the monograph that you helped

23   write?

24        A.   Correct.

25        Q.   It's the monograph that you voted on?

                                                       2183

1     **A.**   Correct.

2     **Q.**   And I just want to clarify, making these

3     monographs, is that something that's done in the regular

4     course of what IARC does in the monograph program?

5     **A.**   Correct.  It's part of the process.  But I

6     would point out and emphasize that this monograph on

7     glyphosate is the product of the entire working group.

8     Even though I initially drafted this -- that was my

9     assignment, to initially draft the glyphosate

10    monograph -- the entire monograph is then reviewed by

11    the animal working group and then in plenary session by

12    the entire working group, and it is the entire working

13    group that is the author of this monograph.  No

14    individual person at the monograph meeting is considered

15    to be the author.

16    **Q.**   And that document, is that document created in

17    the routine and regular course of the monograph program?

18    **A.**   That's right.  That's correct.

19    **MR. WISNER:**  Thank you.

20    Pass the witness.

21    **THE COURT:**  All right.  Cross-examination.

22    **MR. ISMAIL:**  Good morning, everyone.

23    <u>**CROSS-EXAMINATION**</u>

24    BY MR. ISMAIL:

25    **Q.**   Good morning, Doctor.

2184

1      **A.**   Good morning.

2      **Q.**   We still have some part of the morning left.

3             Dr. Jameson, just sort of to orient the

4      process for this cross-examination, my questions are

5      going to be a little more different in format than what

6      Mr. Wisner was asking.  I'm going to be largely asking

7      yes-or-no questions.  And if you need to explain or if I

8      ask you to explain, of course we can get there.

9             But for the most part, if you wouldn't mind,

10     sir, can you answer my questions "yes" or "no" when they

11     fairly call for a yes-or-no answer.

12     **A.**   I'll try.

13     **Q.**   Very good.  Thank you.

14             Now, Doctor, just so we can orient the scope

15     of what you're testifying to here in this trial, you are

16     not a medical doctor; correct?

17     **A.**   I am not a medical doctor, that is correct.

18     **Q.**   And so given that, you have never diagnosed or

19     treated a patient with non-Hodgkin's lymphoma; true?

20     **A.**   That is true.

21     **Q.**   And in terms of your role here, you are not

22     here to discuss either Mr. Pilliod or Mrs. Pilliod

23     specifically; true?

24     **A.**   That is true.

25     **Q.**   You are not here to tell the jury what you

1   believe caused or did not cause their non-Hodgkin's

2   lymphoma; correct?

3       A.   That is true.

4       Q.   You're not -- you are not familiar with either

5   plaintiff's medical history; correct?

6       A.   That's correct.

7       Q.   Because you didn't review their medical

8   records, the depositions of their treating physicians,

9   for example; true?

10      A.   That's correct.

11      Q.   And so you're not aware of the risk factors,

12  clinical risk factors that Mr. Pilliod and Mrs. Pilliod

13  had for the development of non-Hodgkin's lymphoma; true?

14      A.   I know nothing about their exposure situation.

15      Q.   I'm sorry.  I didn't mean to interrupt.

16      A.   I don't know anything about their exposure

17  situation, that's accurate.

18      Q.   And I was actually going to ask that next.

19  Just in terms of how often, how much, on what days they

20  sprayed Roundup residentially, that's nothing that you

21  have any information about and can share with the jury;

22  true?

23      A.   That's correct.

24      Q.   Now, you do not consider yourself an expert on

25  non-Hodgkin's lymphoma; correct?

1      **A.**   Could you define "expert"?

2      **Q.**   Well, I'm going to provide -- give you a copy

3  of your deposition.

4          **MR. ISMAIL:**  May I approach, Your Honor?

5          **THE COURT:**  Yes.

6  BY MR. ISMAIL:

7      **Q.**   Sir.

8      **A.**   Thank you.

9          **MR. WISNER:**  Your Honor, I'm going to object

10  if this isn't impeachment.  He hasn't answered the

11  question.  He asked for a definition.  I'm not sure

12  what's going on.

13         **MR. ISMAIL:**  Well, Your Honor, if I could

14  direct counsel and the Court's attention to page 132,

15  line 6.

16         **THE COURT:**  Let's just see where we're going

17  with this.

18                  (Reviewing document.)

19         **MR. WISNER:**  So this was in the context -- if

20  you read the previous question, they're asking about

21  subtypes of NHL.  If he wants to ask if he's an expert

22  on the subtypes of NHL, I think that's a fair question.

23         **MR. ISMAIL:**  I asked literally the question

24  posed to the witness in the deposition.

25         **MR. WISNER:**  You didn't ask the questions

1    before it.  That's what -- he hasn't even answered the

2    question.  He's asking for a definition.

3              **THE COURT:**  No speaking objections.

4              **MR. WISNER:**  Sorry, Your Honor.

5              **THE COURT:**  You can ask the question.  Go

6    ahead.

7              **MR. ISMAIL:**  May I proceed, Your Honor?

8              **THE COURT:**  Yes.

9    **BY MR. ISMAIL:**

10        **Q.**   Dr. Jameson, are you at page 132 of your sworn

11   testimony?

12        **A.**   Yes, sir.

13        **Q.**   And you gave a deposition in this case;

14   correct?

15        **A.**   Correct, yes.

16        **Q.**   And this was taken September 2018?

17        **A.**   Yes.

18        **Q.**   You were under oath at that deposition, were

19   you not?

20        **A.**   Yes.

21        **Q.**   And a court reporter was there to transcribe

22   what was asked of you in your sworn testimony; correct?

23        **A.**   I'm sorry.  Could you repeat?

24        **Q.**   There was a court reporter there to transcribe

25   both the questions and the answers.

                                                        2188

1      **A.**   Yes.

2      **Q.**   And if you're with me at 132, line 6, were you

3 asked --

4         **MR. WISNER:**  Well, my objection, Your Honor,

5 was completeness.  We'd have to read the questions

6 leading up to it.  That was my point.

7         **THE COURT:**  That's okay.  You can ask that

8 question and answer that question.

9 **BY MR. ISMAIL:**

10      **Q.**   Are you at line 6, sir?

11      **A.**   I'm at line 6, yes.

12      **Q.**   So were you asked the following question?

13         You are not an expert on NHL; right?

14         And did you answer under oath?

15         No, I'm not an expert on NHL.

16      **A.**   That's what the document says, but I think we

17 should look at what led up to that particular question

18 in order to get a clarification as to why I answered

19 that way.

20      **Q.**   Sure.  So you were asked:

21         Do you know whether or not NHL is 60

22         separate diseases?

23         And you say:

24         I've heard it's a lot of different

25         diseases, separate diseases, but I don't

2189

```
1              know if 60 is the number.
2              You were asked if you were an expert on NHL,
3      right?
4              And you say:
5                  No, I'm not an expert on NHL.
6              That's your sworn testimony; correct?
7      A.    That's what I said there, yes.
8      Q.    Very good, sir.
9              Now in terms of your prior work in this
10     case -- I'm sorry -- prior work before you got involved
11     in this case, you described your professional background
12     at the National Toxicology Program; true?
13     A.    Before -- I'm sorry.  Would you repeat the
14     question?
15     Q.    I'd be happy to.
16             Before you retired, you worked for many years
17     at the NTP?
18     A.    Correct.
19     Q.    How many years did you work at that
20     organization?
21     A.    For the NTP, I worked 30 years.
22     Q.    So you gained some familiarity with the
23     quality of the -- both the scientists and the work of
24     NTP; true?
25     A.    That's correct.
```

2190

1    **Q.**   You would agree that NTP employs good

2    qualified scientists; correct?

3    **A.**   Yes.  Yes.

4    **Q.**   And you would agree that NTP performs good

5    quality scientific research; correct?

6    **A.**   Yes.

7    **Q.**   And NTP performs good quality evaluation of

8    data that has been generated both by their own

9    scientists and that which they review generated by

10   others?

11   **A.**   Yes.

12   **Q.**   Now, while you were at NTP, you had access to

13   the technical reports produced by the agency?

14   **A.**   Yes.  In fact, I participated in the

15   publication of quite a few of them myself.

16   **Q.**   So you are aware, sir, that there was an

17   evaluation by your colleagues at NTP on glyphosate?

18   **A.**   Yes, there was a -- the NTP performed a

19   pre-chronic study of glyphosate and published it in a

20   technical report series -- or a toxicology report

21   series, if you will.

22        It was conducted as a dose finding study in

23   anticipation of doing a chronic two-year bioassay on

24   glyphosate.

25   **Q.**   So I'm going to provide you a copy of that

2191

1    report that you just referenced, Exhibit 4455.

2                **MR. ISMAIL:**  Tender to the Court.

3                **THE COURT:**  Sure.  Thank you.

4    **BY MR. ISMAIL:**

5         **Q.**   This is a report you are familiar with;

6    correct, sir?

7         **A.**   Yes, sir.

8         **Q.**   And we have on the screen the copy of the

9    technical report.  Sir?

10        **A.**   I'm sorry?

11        **Q.**   Just confirming we're showing the jury --

12        **A.**   Okay, correct.

13        **Q.**   -- a copy of the technical report.

14        **A.**   Yes.  Sorry.

15        **Q.**   So the -- this report was actually prepared

16   during the time you were at this agency; correct?

17        **A.**   1992.  It's a time that I was at the agency.

18   However, I wasn't working in the bioassay program at

19   that time.  I had moved on to the director's office.

20   And my emphasis then at that time was the Report on

21   Carcinogens.

22        **Q.**   So, and we'll get to that in a minute, sir.

23   But just in terms of looking at which of the -- your

24   scientific colleagues at NTP worked on this particular

25   report, we see several of them listed here under the

                                                      2192

1    National Toxicology Program; correct?

2        **A.**    Yes.

3        **Q.**    And as is, you have the NTP pathology review,

4    are those the scientists who look at the actual samples

5    from the rodents in the studies?

6        **A.**    Those would be the pathologists that would

7    review the slides that were prepared from the necropsy

8    and his pathology that was performed on all the animals

9    from all the different dose groups in that study, yes.

10       **Q.**    And you can see that there was other

11   individuals who are listed here as contributors to this

12   study report; correct?

13       **A.**    That's correct.  The --

14       **Q.**    That's all I asked, sir.

15       **A.**    All right.  Yes.

16       **Q.**    And then you know that this study report

17   underwent peer review; correct?

18       **A.**    Yes.

19       **Q.**    And you can see on page 7 a listing of peer

20   reviewers who had a chance to comment and hopefully

21   improve the quality of the scientific evaluation being

22   undertaken in the report; correct?

23       **A.**    Sorry.  You say it's on page 7?

24       **Q.**    On page -- yeah.

25           **MR. WISNER:**  It's 9 on the bottom.

                                                          2193

1    BY MR. ISMAIL:

2         Q.    If you're looking at the bottom numbering.

3         A.    Oh, I'm sorry.

4         Q.    It says "Peer Review."

5         A.    I got you, yes.  Thank you.

6         Q.    And just, by the way, can you confirm that NTP

7    technical reports go through peer review to improve the

8    quality of the scientific analysis being undertaken; is

9    that a fair description?

10        A.    That's correct.  They're peer-reviewed by the

11   NTP board of scientific counselors, they have a

12   subcommittee that reviews the technical reports.

13        Q.    And you've reviewed this report, have you not?

14        A.    I've read through the report, yes.

15        Q.    You know that there is described in here a

16   genotoxicity study done in rodents; correct?

17        A.    Correct.

18        Q.    If you'd like to confirm, you can go to

19   page -- in terms of the dosing given, it's on page 23,

20   Table 7.

21              Are you there, sir?

22        A.    I'm just -- I'm confused by the numbering at

23   the top and the bottom.  I'm sorry.  23 at the top?

24        Q.    23 at the top.

25        A.    Okay.  Thank you.

2194

1      Q.   Table 7, are you there?

2      A.   Yes, sir.

3      Q.   Okay.  So this is reporting the dosing levels

4   on the rodents being studied in this analysis; correct?

5      A.   Correct.

6      Q.   In terms of the glyphosate consumed over here

7   on the far right column, in fact, if you go down to the

8   little footnote, that's telling us that's in milligrams

9   per kilograms per day.

10          Am I reading that correctly, footnote E?

11     A.   Footnote E is milligrams per kilogram per day.

12   Yes, I see.  Sorry.

13     Q.   So when Mr. Wisner was asking you this morning

14   about some of the rodent studies that you had analyzed

15   and was asking parts per million versus milligrams per

16   kilograms, this last column here is the milligrams per

17   kilograms; right?

18     A.   The conversion to milligrams per kilogram,

19   that would be based on feed consumption data, yes.

20     Q.   I'm sorry?

21     A.   That would be based on feed consumption data,

22   how much feed the animals ate.

23     Q.   So I think Dr. Portier told us yesterday that

24   in these rodent long-term -- any of these rodent studies

25   that we're talking about, the rodents are actually fed

2195

1      the glyphosate daily at the dosing levels described?

2              A.    That's accurate.

3              Q.    Now, in terms of what you can see here, some

4      of these doses are -- the two I've highlighted here --

5      in excess of 10,000 milligrams per kilogram of body

6      weight; correct?

7              A.    That's what the calculation says, yes.

8              Q.    In terms of this study, the researchers

9      conducted doses up to about the maximum dose that you

10     would ever try to conduct in a study like this?

11             A.    It looks like they were dosed at 50,000 parts

12     per million in the feed.  50,000 is the top dose they

13     would use in any NTP bioassay study.

14                   That's essentially -- converts to 5 percent of

15     the feed was glyphosate.  They do not go above 5 percent

16     in the feed because going above 5 percent would affect

17     the nutritional value of the feed on the animals.

18                   So therefore the question would come in, was

19     the effect you're seeing because they weren't getting

20     enough nutrition from the feed, or was it from the

21     actual chemical itself?

22                   So that's why in any bioassay study, the

23     maximum dose that they could give to an animal in feed

24     is 50,000 parts per million.

25             Q.    Okay.  So thank you.

                                                            2196

1                So in terms of the results of what this study

2       showed, if you can turn to page -- I'll use the top

3       page -- 33.

4           **A.**   Okay.

5           **Q.**   Are you there?

6           **A.**   Yes.

7           **Q.**   And on this page, some of the results are

8       being described; correct?

9           **A.**   Okay.

10          **Q.**   You go down --

11          **A.**   Yes.

12          **Q.**   Going down to the bottom, where it says

13      genetic toxicology.

14          **A.**   Okay.

15          **Q.**   Does -- do the scientists here at NTP say:

16      Glyphosate did not induce gene mutations in salmo --

17          **A.**   Salmonella.

18          **Q.**   -- salmonella strains in referencing the

19      particular strains being studied.  And then it goes on

20      to describe the protocol that these researchers were

21      evaluating in these studies; correct?

22          **A.**   That's accurate.  But it is well-known in the

23      literature that glyphosate is not a bacterial mutagen,

24      and this salmonella is a bacteria, and so therefore it's

25      not surprising that it was negative because glyphosate

                                                          2197

1    doesn't affect bacteria.

2        Q.   Sir, again I'm just asking you to confirm what

3    your colleagues wrote here in this paper.  It's a

4    yes-or-no question respectfully.  And I'm going to ask

5    you to do your best to restrict your answer to what I

6    actually ask.

7        A.   Okay.  Sorry.

8        Q.   Then they go on to describe a different type

9    of analysis, peripheral blood monochromatic

10   erythrocytes; that's a type of genotoxicity study;

11   correct?

12       A.   Correct.

13       Q.   And what they found was no increase in

14   micronuclei was observed for either males or females at

15   any dietary concentration of glyphosate.

16           Did I read that correctly?

17       A.   That's accurate for the doses they used in the

18   strain of mouse that they used.  But the B6C3F1 is --

19   and all the other studies that I've looked at, this

20   is -- the NTP is the only one that used a B6C3F1.  The

21   CD1 is usually what's used in the others.

22       Q.   The question is did I read that correctly?

23       A.   You read it correctly.

24       Q.   So the conclusion from these scientists at NTP

25   was that the glyphosate did not induce any increase in

2198

1   micronuclei in mice; correct?

2       A.   In these strain of mice, correct, yes.

3       Q.   And so this was a negative finding, meaning

4   there was an absence of effect in genotoxicity following

5   glyphosate exposure; correct?

6       A.   In this strain of mice, correct.

7       Q.   Now, you're aware that scientists at NTP have

8   also examined oxidative stress?

9       A.   Yes.

10      Q.   And you have reviewed recent data that has

11  been produced by scientists at NTP; true?

12      A.   Well, I can't say that I've reviewed the data.

13  I've reviewed what appeared to be a press release from

14  the NTP about some oxidative stress -- some oxidative

15  stress data that was done, but I don't think I've seen a

16  publication to that effect.

17      Q.   So let's just back up and make sure we have

18  the context correct.

19           Within the last couple of years, actually

20  within the last year, you're aware that your former

21  colleagues at NTP have studied the effects of glyphosate

22  and glyphosate formulations on this question of does it

23  increase oxidative stress; you're aware of that from

24  your review?

25      A.   I'm aware of that from following the status of

2199

1       the NTP and looking at the NTP website indicating that

2       the board of scientific counselors was provided a

3       research plan for addressing those issues, yes.

4           **Q.**   And you know that you have -- that that study

5       is being done in human cells?

6           **A.**   I wasn't aware of that, no.

7           **Q.**   Do you know from your review that the

8       scientists at NTP have found that both glyphosate and

9       glyphosate formulations do not increase oxidative

10      stress?

11          **A.**   I can't say that I've seen a publication to

12      that effect, no.

13          **Q.**   Not my question.

14          **A.**   Oh.

15          **Q.**   I didn't ask if you saw a publication.  I'm

16      asking if you are aware of the fact and the findings of

17      NTP scientists that there is no increase in oxidative

18      stress following the administration of glyphosate?

19              **MR. WISNER:**  Objection.  Move to strike.  The

20      attorney is testifying.

21              **THE COURT:**  Overruled.  He can answer.

22              **THE WITNESS:**  Are you saying this is in human

23      cells?

24      **BY MR. ISMAIL:**

25          **Q.**   Yes, sir.

                                                        2200

1      **A.**   I'm not aware of that.

2      **Q.**   Do you know whether scientists at NTP have

3    presented the results of their oxidative stress findings

4    at scientific conferences?

5      **A.**   I think there was an abstract for one that was

6    available, yes.

7      **Q.**   Did you, before you came to talk to this jury

8    about oxidative stress, did you review that abstract to

9    see what the scientists at NTP found?

10     **A.**   No.

11     **Q.**   Are you -- you said you're aware that there's

12   an abstract available?

13     **A.**   I think I saw an abstract for a meeting that

14   they were going to present some data, yes.

15     **Q.**   Do you know whether that meeting occurred?

16     **A.**   I -- I cannot remember which meeting it was

17   supposed to be at.  So I don't know if the meeting was

18   held or not.  It might have been the Society of

19   Toxicology meeting, but I can't remember.

20     **Q.**   I'm going to provide you a document to see if

21   it refreshes your recollection, sir.

22     **A.**   Thank you.

23     **Q.**   Exhibit 5810.

24          And just first a foundational question.

25          Dr. Jameson, you've obviously attended

2201

1    scientific conferences in your career.

2         A.   Yes.

3         Q.   You know the format of poster presentations

4    that can be presented by scientists?

5         A.   Yes.

6         Q.   NTP participates in scientific conferences and

7    presenting their data to others in the scientific

8    community; correct?

9         A.   Yes.

10         Q.   And if you -- are you familiar with any of the

11    names on this document that I provided?

12         A.   I'm familiar with the last one listed,

13    Dr. DeVito.

14         Q.   Dr. DeVito, you recognize, is a scientist who

15    works with NTP?

16         A.   Yes.

17         Q.   And when you talked about that abstract where

18    you were made aware that the scientists at NTP, this

19    quality scientific organization at which you used to

20    work, was studying glyphosate and glyphosate

21    formulations for oxidative stress, you remember seeing

22    Dr. DeVito's name listed in that abstract?

23         A.   Yes.

24         Q.   So in terms of this document I've provided

25    you, does that refresh your recollection that indeed the

2202

1    results of the study from the scientists at NTP, that

2    oxidative stress analysis was actually presented at a

3    scientific meeting?

4        A.   That's what this would indicate, yes.

5        Q.   Now, in terms of the results of the study, are

6    you, sir, familiar or made yourself aware of what the

7    NTP scientists actually found when they studied one of

8    the issues that you discussed with the jury?

9        A.   I'm sorry.  Could you repeat the question?  I

10   was --

11       Q.   Sure.

12       A.   I was reading something, and I had a question

13   for you, but I know I can't ask you a question.

14       Q.   Fair enough.  Let me break that down.

15            One of the things that you said, and I believe

16   it was on Mr. Wisner's last exhibit where he wrote

17   "yes," was a question of oxidative stress.

18       A.   Right.

19       Q.   And you gave your opinion to this jury about

20   whether or not you believe glyphosate and its

21   formulations increase oxidative stress.

22       A.   Right.  Correct.

23       Q.   My question to you, sir, is whether before you

24   came to talk with the jury about oxidative stress,

25   whether you reviewed the findings recently made

2203

1    available by the scientists at NTP on that precise

2    issue?

3        **A.**   I had seen this abstract and part of the

4    poster online, yes.

5        **Q.**   So you have seen it?

6        **A.**   Yes.  I'm sorry, I didn't mean to mislead you

7    if I did.  Sorry.

8        **Q.**   No.  I was confused.  I thought you were

9    telling us you hadn't reviewed the results.

10           But, okay, so you have reviewed the results?

11       **A.**   I have looked at them, yes.

12       **Q.**   And so you know that the findings of the NTP

13   scientists was that glyphosate does not increase

14   oxidative stress?

15       **A.**   In this one study that they did, yes.

16       **Q.**   And this one study that they did was in human

17   cells; correct?

18       **A.**   I'd have to read through just to verify that.

19           **MR. ISMAIL:**  In light of the witness's

20   testimony, Your Honor, may I publish?

21           **MR. WISNER:**  I actually don't believe that's

22   permitted, Your Honor.  That wasn't the agreement.

23           **MR. ISMAIL:**  He's reviewed the poster.

24           **MR. WISNER:**  Yeah, but it's not the Evidence

25   Code.  Published literature, yes, but not abstracts.

1     **BY MR. ISMAIL:**

2          **Q.**   Is this data -- let me lay more foundation for

3     you.

4               Dr. Jameson, you know as part of the process

5     of NTP's work that they do internal peer review on their

6     work; correct?

7          **A.**   Internal, you mean the NTP scientists peer

8     review their own work; is that what you're saying?

9          **Q.**   Let me rephrase.

10              Do you consider research generated and

11    analyzed by the NTP generally to be reliable research?

12         **A.**   Yes.

13         **Q.**   You generally accept it as authoritative

14    research?

15         **A.**   The research is authoritative, yes.

16         **Q.**   Quality research?

17         **A.**   Right.  But it also goes through a peer

18    review.

19         **Q.**   That was going to be my next question.  It

20    also goes through peer review; correct?

21         **A.**   Well, let me -- not all the research that is

22    performed at the NTP goes through a peer review.

23         **Q.**   The -- okay.  Now, in light of your

24    testimony --

25              **MR. ISMAIL:**  Your Honor, in light of the

                                                          2205

1    witness's testimony that the research is authoritative

2    and reliable, may I publish?

3              THE COURT:  I'm sorry.  Why don't you

4    approach?

5              MR. WISNER:  Yeah.

6              (Sidebar held but not reported.)

7    BY MR. ISMAIL:

8        Q.   Dr. Jameson?

9        A.   Yes, sir.

10              (Pause in the proceedings.)

11              THE COURT:  All right.  Go ahead.

12              MR. ISMAIL:  Thank you, Your Honor.

13        Q.   Dr. Jameson, did you bring a copy of the

14    abstract with you?

15        A.   No, sir.

16        Q.   The document that you have in your hand there?

17        A.   This?

18        Q.   Yes.

19        A.   It's what you gave me.

20        Q.   Oh, good.  Okay.  I was just confused.

21              Continuing with our conversation.

22              In terms of the study methods, you know that

23    in this particular analysis, glyphosate and glyphosate

24    formulation were included; correct?

25        A.   That's what the abstract says, yes.

                                                    2206

1      **Q.**   And they were using different dosing levels of

2    both the glyphosate and the glyphosate formulations;

3    correct?

4      **A.**   Yes.

5      **Q.**   And they measured whether oxidative stress was

6    increased in both the glyphosate and the glyphosate

7    formulations; correct?

8      **A.**   That's what the abstract says, yes.

9      **Q.**   And the researchers there in this study found

10   there was no increase in oxidative stress; correct?

11     **A.**   That's what they are reporting here.

12     **Q.**   Now --

13           **MR. ISMAIL:**   I'm going to turn to a new topic,

14   Your Honor.

15           **THE COURT:**   If you're going to turn to a new

16   topic, we're going to take our lunch break.

17           We're going to take an hour lunch break.

18   We'll come back at 1:15.

19           So please don't discuss anything that you've

20   heard in the courtroom.  Please don't do any outside

21   research.  Please don't talk among yourselves or with

22   anyone else about anything that has occurred in the

23   trial today.

24           So I will see you at 1:15.

25           If the gallery would remain for a few minutes,

2207

1    I would appreciate that.

2              (Jury excused for lunch recess.)

3              (Chambers conference held but not reported.)

4              (Proceedings continued in open court out of

5    the presence of the jury:)

6              **THE COURT:**  So, Dr. Jameson, I just want to

7    ask you a couple quick questions.

8              **THE WITNESS:**  Yes, ma'am.

9              **THE COURT:**  So I understand that while we were

10   having a sidebar, there was an exchange with a juror.

11             **THE WITNESS:**  Oh.

12             **THE COURT:**  And I want to know what that was,

13   who approached, who started the exchange.

14             **THE WITNESS:**  The juror sitting in the second

15   seat there, when you went to sidebar, evidently you

16   turned the sound off or something and it causes a

17   hissing sound.

18             **THE COURT:**  It's white noise so they can't

19   hear what's said.

20             **THE WITNESS:**  White noise, right.  When that

21   happened, the -- I just happened to be -- turn my head

22   and looked at the juror, and he said, "Uh-oh, here comes

23   the rain again."  And I smiled.  And then he started

24   saying something, and I noticed the juror sitting next

25   to him nudge him in the leg, and so he stopped talking.

2208

1           THE COURT:  Okay.

2           THE WITNESS:  And then this young lady came

3    over and instructed me that I'm not supposed to interact

4    with the jury.  So I apologize.  But that's what it was.

5           THE COURT:  Well, I just need to know what it

6    was because I'll need to admonish the jurors also not to

7    say anything to the witnesses.  But I just, for the

8    record, needed to know what that was.

9           THE WITNESS:  Yes, ma'am.  I'm sorry.

10          THE COURT:  You don't have to apologize.

11          And we're going to take our lunch break.

12   We'll be back in an hour.

13          (Luncheon recess was taken at 12:14 p.m.)

14   AFTERNOON SESSION                         1:20 p.m.

15   (The following proceedings were heard in the presence of

16                      the jury:)

17          THE COURT:  All right.  Are we ready to

18   continue?

19          Mr. Ismail, you may proceed.

20          MR. ISMAIL:  Thank you, Your Honor.

21   BY MR. ISMAIL:

22      Q.   Good afternoon, Doctor.

23      A.   Good afternoon.

24      Q.   Are you ready to proceed?

25      A.   Yes, sir.

                                                      2209

1          Q.   I want to turn to a topic that was raised with

2      you during the direct examination, this submission

3      called the Report on Carcinogens, okay?

4          A.   Okay.

5          Q.   And as you've described it, just to remind

6      everyone, this is a document that is submitted by the

7      secretary -- U.S. Secretary of Health and Human

8      Services, correct?

9          A.   Yes.

10         Q.   And it's actually a document submitted to

11     Congress?

12         A.   That's correct.

13         Q.   And what you told us this morning is that this

14     Report on Carcinogens is, to use your words, the

15     official list of substances that are known to the United

16     States government reasonably expected to be --

17         A.   Anticipated, sorry.

18         Q.   Anticipated, sorry.  Since I mixed up the

19     terminology, let's make sure we're all clear.

20              It's the list of substances that are known or

21     reasonably anticipated to be carcinogens?

22         A.   Correct.

23         Q.   And you describe it as sort of the official

24     list of the United States government, correct?

25         A.   The official list of carcinogens for the

                                                        2210

1    United States government, that's correct.

2        Q.    And in terms of how this document is prepared,

3    you described for us that the National Toxicology

4    Program has a role in advising the U.S. Department of

5    Human Health, correct?

6        A.    Well, just a point of clarification.  The

7    secretary is required to submit the report to Congress,

8    now, every two years.

9            The secretary delegated the responsibility of

10   preparing the report to the National Toxicology Program.

11   So the National Toxicology Program prepares the report

12   for the secretary.

13           Ultimately, the secretary has to approve the

14   report once it's provided to her by the NTP, but then

15   the secretary submits it to Congress.

16       Q.    So the actual preparation of the list of known

17   or reasonably anticipated to be carcinogens is prepared

18   by delegation by the NTP for approval and submission by

19   the Secretary of Health and Human Services?

20       A.    Correct.

21       Q.    And during your tenure at NTP, you had a role

22   in the preparation of the Report on Carcinogens,

23   correct?

24       A.    Correct.

25       Q.    Obviously, a role you took seriously?

2211

1          A.    Yes, sir, very seriously.

2          Q.    And from a personal and professional

3     perspective, you wanted to be able to communicate what

4     you and your colleagues believed were carcinogens just

5     to have them out in the public?

6          A.    To get the information to the general public

7     and to the world that, based on our evaluation of the

8     available data, that these materials posed a

9     carcinogenic risk.

10         Q.    And your experiences with your colleagues at

11    NTP also took the role seriously in advising on and

12    preparing this list for the Report on Carcinogens?

13         A.    Yes, sir.

14         Q.    During the time you were at NTP, the Report on

15    Carcinogens never included glyphosate, true?

16         A.    Glyphosate was never considered for inclusion

17    in the Report on Carcinogens, that's right.

18         Q.    And even right up until today, you can confirm

19    for the jury that glyphosate or glyphosate formulations

20    is not on the Report on Carcinogens, true?

21         A.    It is not on the report because it has not

22    been reviewed for inclusion in the report.

23         Q.    Now, the NTP, you described, has -- well,

24    withdraw that question.  Let me ask you a different

25    question.

2212

1          The NTP has some -- you said funding

2    connection with IARC?

3          A.    They provide annual funding; I believe it's in

4    the form of grants.  But they provide annual funding to

5    the International Agency for Research on Cancer, yes.

6          Q.    And, of course, NTP scientists have available

7    to them the IARC Monographs, as they were prepared and

8    issued publicly, correct?

9          A.    The IARC Monographs are available publicly,

10   and you can access all of the Monographs on the web.

11         Q.    And IARC is an organization well-known to the

12   NTP because they have some -- at least official

13   connection in terms of funding source and the like?

14         A.    Correct.

15         Q.    And even though the glyphosate Monograph from

16   IARC has come out in 2015, four years later, NTP has

17   never included glyphosate on its official list of

18   substances known or reasonably anticipated to be

19   carcinogens, true?

20         A.    It hasn't yet been reviewed by the Report on

21   Carcinogens for inclusion in the report, that's correct.

22         Q.    In fairness, sir, my question was different.

23         I was asking whether, today, it is on the

24   list.

25         Can you confirm for the jury that glyphosate

2213

1    is not on the list for the Report on Carcinogens?

2         A.    As of today, it is not on the list.  That is

3    correct.

4         Q.    Now, in terms of the role or the scope of the

5    review that IARC did and the IARC working group, what

6    IARC performed was what's known as a hazard assessment,

7    correct?

8         A.    Correct.

9         Q.    And the opinions you are offering in this

10   litigation also are a hazard assessment, correct?

11        A.    I performed a hazard assessment to identify

12   the carcinogenic hazards of glyphosate and glyphosate

13   formulations, yes.

14        Q.    And just to get our terminology straight.

15             In this scientific field, there's one type of

16   analysis known as hazard analysis, and that's what IARC

17   did and how you would describe the scope of your

18   opinions in this case, correct?

19        A.    Correct.

20        Q.    And there's another type of analysis called a

21   risk assessment, true?

22        A.    Correct.

23        Q.    And you are -- you agree that those

24   distinctions between what a hazard assessment is and a

25   risk assessment is an important distinction to keep in

                                                        2214

1    mind, true?

2         A.    That's true.  It's defined as -- a hazard

3    assessment is the first step in a risk assessment.  And

4    that risk equals hazard times the dose.

5         Q.    Dr. Jameson, we'll get there.  We just have to

6    take it in steps.  So if you just bear with me and do

7    the best to answer the questions as posed.

8              So I think you've agreed that hazard

9    assessment and risk assessment are different, correct?

10        A.    Correct.

11        Q.    And IARC, in its evaluation and its Monograph

12   program, does not perform a risk assessment, correct?

13        A.    That is not their job.  As you read in the

14   preamble in the beginning of the Monograph, there's is a

15   hazard assessment, correct.

16        Q.    Okay.  So the answer to my question is:  IARC

17   does not do a risk assessment, true?

18        A.    Correct.

19        Q.    And you also did not do a risk assessment,

20   true?

21        A.    Correct.  I was not asked to do a risk

22   assessment.

23        Q.    You described a cancer hazard as a potential

24   to cause cancer at some dose, correct?

25        A.    Correct.

                                                      2215

1      Q.   And as you indicated a moment ago, in sort of

2   the progression or hierarchy of these things, a hazard

3   assessment is the first step in the process?

4      A.   In a risk assessment, yes.  A hazard

5   assessment is usually the first step in a risk

6   assessment.

7      Q.   Now, you've described a risk assessment as

8   what happens at the human-relevant doses, correct?

9      A.   A risk assessment -- a risk is -- like I said,

10  risk is equal to hazard times dose.

11           And so to do a risk assessment, you have to

12  see if, at the levels people are exposed, does it cause

13  harm?

14     Q.   Right.  So a risk assessment looks to the

15  actual level of exposure that humans are exposed to and

16  whether that causes harm, correct?

17     A.   Correct.

18     Q.   That's not what IARC did in its review, by

19  definition, since they did a hazard assessment only,

20  true?

21     A.   Correct.  But what we looked at was the

22  epidemiology data at real world exposure levels, which

23  showed the positive association for non-Hodgkin's

24  lymphoma in Roundup.

25     Q.   Doctor, the answer to my question is:  IARC

2216

1    only did a hazard assessment, not the risk assessment as

2    you've described, true?

3         **A.**   Correct.

4         **Q.**   And again, your review of this case, since you

5    did a hazard assessment, also did not look to see

6    whether there was a risk at human-relevant doses, true?

7         **A.**   No.   That's not accurate, because I looked at

8    the human epidemiology data as part of my hazard

9    assessment.

10        And again, the human epidemiology data is for

11   people who are exposed at real world concentrations, the

12   people that use the material as a farmer or a lawn

13   keeper or what have you.

14        So those results from the case-control studies

15   and the meta-analysis indicate that at real world

16   exposure levels, Roundup formulations cause

17   non-Hodgkin's lymphoma.

18        **Q.**   We'll get to your assessment of the

19   epidemiology this afternoon, Doctor, I promise you.

20        But let me hand you an exhibit first.

21        **MR. ISMAIL:**   May I approach, Your Honor?

22        **THE COURT:**   Yes.

23   **BY QUESTIONER:**

24        **Q.**   Doctor, do you recognize Exhibit 5629 as the

25   11th Report on Carcinogens submitted by the

2217

1   U.S. Department of Health and Human Services, dated

2   2004?

3       A.   Yes, sir.

4       Q.   And if you turn the page, do you see on the

5   title page, it has, in addition to the U.S. Department

6   of Health and Human Services noted, also the National

7   Toxicology Program?

8       A.   That's correct.

9       Q.   You can confirm for the jury that this

10  particular Report on Carcinogens was something that you

11  had responsibility for, correct?

12      A.   Correct.

13      Q.   You actually wrote the introduction to this

14  report, correct?

15      A.   Correct.

16          MR. ISMAIL:  May I publish, Your Honor?

17          MR. WISNER:  No objection.

18          THE COURT:  Granted.

19  BY QUESTIONER:

20      Q.   So that's the title page, the 11th Report on

21  Carcinogens.  I think you told us initially it was a

22  document prepared yearly, and it's since progressed to a

23  every-two-year cycle for updating this report?

24      A.   Yes.  It's supposed to be submitted every two

25  years.  But if the truth be known, they've had trouble

2218

1    getting it published -- submitted to Congress in the

2    two-year period.  But it's supposed to be every two

3    years, yes.

4        Q.    So the work that the NTP scientists do and the

5    others that work on this document, sometimes it takes a

6    little longer than two years to update the document.

7            Is that a fair description?

8        A.    Between trouble updating and other obstacles

9    thrown at us to delay the publication of the report,

10   yes.

11       Q.    Here, we have 2004.  And there's a current

12   Report on Carcinogens out there, whenever the issue date

13   was.

14           But this is one that you actually worked on,

15   right?

16       A.    Correct.  The most recent one is the

17   14th Report on Carcinogens.

18       Q.    So if you turn, sir, to the introduction,

19   which, if you use the page numbering at the bottom, is

20   actually page 7.

21           Are you there?

22       A.    Yes, sir.

23       Q.    So this is material that you helped put

24   together, correct?

25       A.    Yes, sir.

                                                        2219

1        Q.   Let's look at what you wrote.

2             So at the top, you say:

3             "The probability that a resident in the United

4             States will develop cancer at some point in

5             his or her lifetime is one in two for men and

6             one in three for women."

7             That's information you provided in this

8    document, correct?

9        A.   Correct.  That is provided in the publication

10   from the American Cancer Society.

11       Q.   And then you note, as everyone here would

12   agree:

13            "Nearly everyone's life has been directly or

14            indirectly affected by cancer, correct?"

15       A.   Correct.

16       Q.   And then you say:

17            "Most scientists involved in cancer research

18            believe that the environment in which we live

19            and work may be a major contributor to the

20            development of cancer."

21            That's something that you and your colleagues

22   at NTP obviously believe in, right?

23       A.   Correct.

24       Q.   But then you define what you mean by

25   "environment" in the next sentence, right?

                                                      2220

1          **A.**    Correct.

2          **Q.**    You say:  "In this context" -- so "context"

3     being what you're saying here in this document, right?

4          **A.**    Okay.

5          **Q.**    Okay.

6                    "The environment is anything that people

7                    interact with, including exposures resulting

8                    from lifestyle choices, such as what we eat,

9                    drink, or smoke; natural and medical

10                   radiation, including exposure to sunlight;

11                   workplace exposures; drugs, socioeconomic

12                   factors that affect exposures and

13                   susceptibility; and substances in air, water

14                   and soil."

15                   And then you provide scientific support for

16    that statement, correct?

17         **A.**    Yes, sir.

18         **Q.**    So when you describe environmental sources for

19    causes of cancer, you're including all of those things

20    you had in that long sentence, correct?

21         **A.**    Among other things, yes.

22         **Q.**    And then you say:

23                   "Other things that play a major role in cancer

24                   development are infectious diseases; aging;

25                   and individual susceptibility, such as genetic

                                                              2221

1          pre-disposition."

2          Did I read that correctly?

3     **A.**   Yes, sir.

4     **Q.**   That's information you thought is

5     scientifically valid and important to include in this

6     document, correct?

7     **A.**   Correct.

8     **Q.**   So you note infectious diseases as playing a

9     role in development of cancer, true?

10    **A.**   Sure, yes.

11    **Q.**   Aging?

12    **A.**   Absolutely.

13    **Q.**   And individual susceptibility, such as genetic

14    pre-disposition, correct?

15    **A.**   Correct.

16    **Q.**   Some people just genetically are more likely

17    than others to develop cancer, right?

18    **A.**   That's accurate, yes.

19    **Q.**   And then you say:

20         "We rarely know what environmental factors and

21         conditions are responsible for the onset and

22         development of cancers; however, we have some

23         understanding of how some types of cancer

24         develop, especially cancers related to certain

25         occupational exposures or the use of specific

2222

1          drugs."

2          Correct?

3     A.   Correct.

4     Q.   And then you say:

5          "Many experts firmly believe that much of the

6          cancer associated with the environment may be

7          avoided."

8          Right?

9     A.   Correct.

10    Q.   And when you say "environment" there, it's the

11    same context that you provided earlier in the paragraph,

12    true?

13    A.   Right.  Among other things, correct.

14    Q.   Among other things.

15         And then you say in the next paragraph -- I

16    think this is consistent with how you described it in

17    your testimony:

18         "The Report on Carcinogens is a list of all

19         substances that, one, are either known to be

20         human carcinogens or may reasonably be

21         anticipated human carcinogens, and to which a

22         significant number of persons residing in the

23         United States are exposed."

24         Right?

25    A.   Right.

1      Q.   So, then, when you describe the context for
2   what would -- just so -- I'm at the bottom of the left
3   column, if you wanted to follow along on the exhibit.
4      A.   Okay.
5      Q.   So then you say:  "The ROC" -- that's Report
6   on Carcinogens, correct?
7      A.   Yes.
8      Q.   Okay.
9           "Does not present quantitative assessments of
10          the risks of cancer associated with these
11          substances."
12          Correct?
13     A.   That's correct.  The Report on Carcinogens is
14   a hazard identification document.
15     Q.   Exactly.  That was going to be my next
16   question.
17          The Report on Carcinogens is a hazard
18   assessment document, true?
19     A.   Correct.  Very similar to IARC.
20     Q.   IARC is a hazard assessment document, true?
21     A.   True.
22     Q.   Dr. Jameson's testimony and opinions are a
23   hazard assessment in this case, right?
24     A.   I did a hazard assessment in deriving my
25   conclusions about glyphosate and the glyphosate

                                                        2224

1    formulations, that's correct.

2         **Q.**   Okay.

3              "The listing of substances in the Report on

4              Carcinogens only indicates a potential hazard,

5              and does not establish the exposure conditions

6              that would pose cancer risks to individuals in

7              their daily lives."

8              Did I read that correctly?

9         **A.**   That's correct.   That's not the job of the

10   NTP; that's the job of the regulatory agencies.

11        **Q.**   And we're going to see that described here in

12   a minute.

13             I've underlined the last clause here in this

14   document.   So the first part of this, which is

15   describing the listing of substances in the Report on

16   Carcinogens only indicates a potential hazard.

17             That's a hazard assessment, correct?

18        **A.**   Yes, it's a hazard assessment.

19        **Q.**   What I've underlined here:

20             "Does not establish the exposure conditions

21             that would pose cancer risks to individuals in

22             their daily lives."

23             That is a risk assessment, true?

24        **A.**   That is correct.

25        **Q.**   And that's what you say in the very next

2225

1   sentence:

2           "Such formal risk assessments are the

3           responsibility of the appropriate federal,

4           state, and local health regulatory and

5           research agencies."

6           Correct?

7   **A.**   That's correct.

8   **Q.**   So putting this description together, the

9   Report on Carcinogens and IARC are only indicating a

10  potential hazard, correct?

11  **A.**   Identifying a cancer hazard, right.

12  **Q.**   The step of determining whether or not

13  exposure conditions that would result -- that would pose

14  cancer risks to individuals in their daily lives is the

15  risk assessment that IARC did not perform, true?

16  **A.**   They do not do risk assessment, that's

17  correct.

18  **Q.**   And so -- okay.  Dr. Jameson, we're going to

19  get off this chart so we stay on track.

20          **MR. ISMAIL:**  Do you mind if we keep going?

21          **THE COURT:**  No, go ahead.

22  BY MR. ISMAIL:

23  **Q.**   When you say here that the risk assessments

24  are the responsibility of the appropriate federal,

25  state, and local health regulatory and research

                                                    2226

1    agencies, that's what you were referring to a moment ago

2    when you were saying the risk assessment belonged to the

3    regulators?

4         A.   The regulators are supposed to determine at

5    what exposure levels you may not get the cancer.

6         Q.   Okay.  And in the case of pesticides, the

7    regulator in the United States is the EPA?

8         A.   Yes, sir.

9         Q.   And when we're talking about some of the other

10   regulatory agencies around the world that were referred

11   to in your direct examination -- either EFSA or Health

12   Canada -- they're doing risk assessments, correct?

13        A.   That's their job.

14        Q.   Right.  So IARC equals a hazard assessment,

15   right?

16        A.   Correct.

17        Q.   And as you've described, a hazard assessment

18   equals a potential hazard, correct?

19        A.   I don't know that I agree with "potential" as

20   a -- in that particular context.

21             A hazard assessment is performed to see if

22   material, it causes cancer.  So it's either a known --

23   it's either sufficient evidence that it causes cancer or

24   limited evidence or inadequate evidence.

25             So -- but once it's identified as a

                                                        2227

1    carcinogenic hazard, it is a hazard.  It's a hazard for

2    causing cancer.  It's not a potential hazard.  What we

3    have determined is that it's an actual hazard for

4    causing cancer.

5         Q.   So I'm using your words that you wrote for

6    submission to the United States Congress:  "Only

7    indicates a potential hazard."

8         A.   Okay.

9         Q.   You were speaking truthfully when you wrote

10   those words, correct?

11        A.   Yes.

12        Q.   And as you confirmed, IARC is doing the same

13   type of analysis as the Report on Carcinogens, correct?

14        A.   Correct.

15        Q.   Okay.

16        A.   But what I'm saying is:  Now, today, I may

17   rewrite the sentence and not use "potential" and just

18   say hazard.

19        Q.   Okay.  So I will -- I don't know how you want

20   me to mark that.  But I'll just say 2004.

21             That's what you wrote, correct?

22        A.   Okay.

23        Q.   And in 2015, that was still the definition,

24   right?

25        A.   Still the definition?

2228

1      **Q.**   Yeah.  That a hazard assessment is a

2    potential -- identifying a potential hazard, right?

3      **A.**   To be very honest with you, I need to see a

4    more recent edition of the Report on Carcinogens and

5    what the introduction is.  The introduction is changed

6    every time a report is published.

7           So in order to answer that question, I would

8    have to see a more recent edition of the Report on

9    Carcinogens to verify that.

10     **Q.**   I'll tell you what, Doctor, would it be better

11   if I said "hazard at some dose"?  That's what you said

12   earlier.

13     **A.**   I guess I would be comfortable with that.

14     **Q.**   All right.  So I will write:  Hazard at some

15   dose.  And I'll note that this is from 2019, your

16   testimony here today.

17           Now, as we've talked about, you're very

18   clear -- I think in your prior testimony, you said

19   hazard assessments and risk assessments are like apples

20   and oranges, comparing them, right?

21           That's your view?

22     **A.**   I don't remember saying anything like that.

23     **Q.**   Okay.  Not today, but at your deposition.

24           Do you recall saying that?

25     **A.**   No, I don't.  Sorry.

                                                      2229

1          Q.   Fair enough.  So let's continue on this

2     conversation.

3               So we have EPA and EFSA and Health Canada.

4     And you know I can go on and on; there's other

5     regulatory agencies that have commented on this issue,

6     right?

7          A.   Sure, yes.

8          Q.   And they do a risk assessment, right?

9          A.   Yes.

10         Q.   And you're very clear that these are two

11    different things, correct?

12         A.   Yes.  But I also stated earlier that I didn't

13    agree with their evaluation of the data.

14         Q.   I know, sir.  But I'm just talking about the

15    description of what the organizations themselves are

16    doing, okay?

17         A.   Okay.

18         Q.   And to use the definition that you use here in

19    this 2004 document:

20         "A risk assessment is determining whether

21    there's a cancer risk to individuals in their daily

22    lives," right?

23         A.   Correct.

24         Q.   Okay.  So IARC, in its assessment, did not do

25    a risk assessment; they did a hazard assessment.  And

2230

1   risk assessments belong to the regulatory agencies,

2   correct?

3      **A.**   It's their responsibility, correct.

4      **Q.**   Now, you know -- so you agree EPA has done a

5   risk assessment on glyphosate, correct?

6      **A.**   Yes.  Many times.

7      **Q.**   They've also done a hazard assessment on

8   glyphosate, correct?

9      **A.**   They've done a hazard assessment?

10     **Q.**   Yeah.  As part of their review.

11          And if you don't know that, you can just tell

12   us that.

13     **A.**   I'm really not sure that they did the hazard

14   assessment part.  They just did the risk assessment.

15     **Q.**   Okay.  So EPA was trying to answer this

16   question --

17     **A.**   Right.

18     **Q.**   -- that at the exposures that people have in

19   their daily lives, is there a cancer risk?

20          You agree, at least, that EPA has done that

21   several times?

22     **A.**   Right.

23     **Q.**   And EFSA has done that more than once, right?

24     **A.**   Correct.

25     **Q.**   And Health Canada has evaluated and

2231

1    re-evaluated whether there's any cancer risk to

2    individuals in their daily lives, correct?

3         A.   Correct.

4         Q.   Now, you can have a hazard without a risk,

5    right?

6         A.   Yes.

7         Q.   So it's possible for IARC to identify

8    something as a hazard that is still not a risk by using

9    these definitions, true?

10        A.   It's possible.  But again, if you identify the

11   hazard, then people protect themselves from that

12   particular hazard, and it no longer proposes a risk.

13   So --

14        Q.   Yeah, but that's not what -- I'm sorry, I

15   didn't mean to interrupt.

16             Are you done?

17        A.   That's the whole reason for doing a hazard

18   assessment, is to warn people of the carcinogenicity of

19   things they may be exposed to.

20        Q.   IARC was not undertaking an analysis of

21   whether protective gear changes the risk that comes from

22   any hazards, right?

23        A.   No.  That wasn't part of what they did, no.

24        Q.   That's not their scientific investigation,

25   correct?

2232

1      **A.**   No.

2      **Q.**   And you haven't investigated that, in

3    fairness, either, true?

4      **A.**   As far as what?  I don't understand the

5    question.

6      **Q.**   Okay.  I'll rephrase.

7           Well, let me ask it to you this way, sir:

8    When we're talking about animal studies and their role

9    in cancer -- either hazard assessment or risk

10   assessment, that's part of the information that you

11   considered in this case, correct?

12     **A.**   Correct.

13     **Q.**   The dose levels that are used in an animal

14   study, the purpose of that is to see whether it causes

15   cancer in the animals, not to mimic the levels in a

16   human situation, true?

17     **A.**   That's correct.

18     **Q.**   And you know, sir, that the doses used in the

19   animal studies were several thousand times higher than

20   humans are exposed to in their daily lives, true?

21     **A.**   That's probably true, yes.

22     **Q.**   And you're not aware of any biomonitoring

23   study that would establish that doses that humans are

24   exposed to in their daily lives in any way approaches

25   the doses that the animals are exposed in the rodent

2233

1    studies you discussed in your direct examination, true?

2         A.    The biomonitoring studies I've looked at have

3    indicated that there are residues or traces of

4    glyphosate in the biological samples from the humans

5    that they took the samples from, indicating that they

6    were exposed.

7              It didn't indicate at what doses they were

8    exposed; just that they found positive residues in the

9    humans, that they had been exposed to glyphosate.

10        Q.    Just to make sure we understand what you're

11   saying.

12             First, in answer to the question I asked you,

13   there's no biomonitoring study that would, in any way,

14   equate what humans are exposed to in applying Roundup to

15   the massive doses that the rodents are exposed to in

16   these tests.

17             You agree with that, correct?

18        A.    I don't know that you can really say that.

19   Because a human could have been exposed to a massive

20   dose of glyphosate, but the amount of circulating

21   glyphosate or metabolized glyphosate in the body would

22   be relatively small.

23        Q.    Okay.

24        A.    I don't know that they do the study to equate

25   the amount of material circulating in the blood and try

                                                        2234

1    to figure out at what level the person was exposed to.

2         Q.   In fairness, Doctor, the last answer you just

3    gave, you're speculating as to what the data might show,

4    right?

5              You're not aware of any study that would

6    support your prior answer, true?

7         A.   I guess I'm confused.

8         Q.   Sure.  Let's just take it in pieces.

9              I think you agree with at least this concept,

10   and then I'll ask you about what you just referred to.

11        A.   Okay.

12        Q.   You're not aware of any study that attempts to

13   equate what humans are exposed to -- in terms of

14   applying Roundup, for example -- to the massive amounts

15   of doses given to the rodents.

16             You're not aware of a human study that said

17   this is anywhere on par, true?

18        A.   I'm not aware of any; but I'm also not aware

19   of any that would even look at something like that.

20        Q.   Sure.  And in terms of what you said a moment

21   ago, you said that you're aware of some studies that

22   will measure whether there's any detectable residual in

23   folks after applying Roundup, right?

24        A.   Yes.  There are studies that have shown that

25   there is residual in the blood of people that have

1    applied Roundup.

2         Q.   But lots of those individuals had no

3    detectable glyphosate in their system after applying

4    Roundup, correct?

5         A.   Well, some didn't have detectable levels, and

6    others did.

7         Q.   And we're talking about folks who are

8    agricultural workers that use large amounts of

9    pesticides?

10        A.   Well, we're talking about those.  But there

11   were also some studies on people who were sprayed

12   mistakenly when they were trying to get rid of some

13   illegal crops down in South America.

14        Q.   And even those studies, though, don't equate

15   the doses to the animal doses; not even attempting to do

16   that, right?  Correct?

17        A.   That's not the purpose of their study, so why

18   would they address that?

19        Q.   It was a really simple question, Doctor.  You

20   brought up these studies, and I just wanted to make

21   sure --

22             MR. WISNER:  Your Honor, I'm going to object.

23   I've been letting it go on for a bit.  It's

24   argumentative.  He's badgering the witness.

25             THE COURT:  I'm going to overrule the

                                                      2236

1    objection.  I think Mr. Ismail can clarify -- actually,

2    let him clarify.  If the witness doesn't understand it,

3    then he can clarify.  I don't see this, at this point,

4    as argumentative.  So let him finish up his questions.

5              **MR. WISNER:**  Okay.

6    BY MR. ISMAIL:

7         **Q.**   Dr. Jameson, I asked you questions earlier,

8    and you mentioned residual studies, and I just wanted

9    you to confirm that in those studies, none of them, do

10   they attempt to say that the human doses approximate

11   anywhere near what the animals were given.

12             Do you agree with that?

13        **A.**   That wasn't the purpose of the study.  As far

14   as I can tell, they don't address that anywhere in the

15   report, that we confirm that the levels that people were

16   exposed to were so much lower than or equal to what the

17   animals were exposed to.

18             And I think, as has been explained before, the

19   purpose of an animal bioassay is to expose the animal to

20   the maximum amount they can tolerate for their lifetime.

21             **MR. ISMAIL:**  Your Honor, may I approach?

22             **THE COURT:**  Yes.

23   BY MR. ISMAIL:

24        **Q.**   Doctor, I've handed you Exhibit 5129.  And it

25   is a reassessment of glyphosate performed by Health

2237

1     Canada.  And I'd ask you to turn to page 9 of the

2     document.

3               Let me know when you're there, sir?

4          A.   Okay.

5          Q.   Now, Health Canada is one of the regulators

6     that did a risk assessment, correct?

7          A.   Correct.

8          Q.   And what they say in this document -- this

9     document is dated 2017, if you want to confirm that.

10    It's in the earlier part of the document.

11              But if you're comfortable with that

12    representation, we can move on.

13         A.   I'm sorry, you want me to verify that this was

14    in April of 2017?

15         Q.   Yes.

16         A.   Yes.  That's what the document says.

17         Q.   And what they're describing here is this March

18    2015 IARC meeting, which was the subject of much of your

19    direct examination today?

20         A.   Yes.

21         Q.   And what they -- first of all, I think you

22    indicated that there were multiple pesticides or

23    herbicides that were being discussed at that Monograph

24    meeting, correct?

25         A.   There were several additional pesticides

                                                          2238

1    reviewed at that same meeting, that is accurate.

2         Q.   So it is important to note that:

3              "An IARC classification is a hazard

4              classification."

5              That's a description that I know you agree

6    with, right?

7         A.   Correct.

8         Q.   Okay.

9              "And not a health risk assessment."

10             Which is also a definition that I know you

11   agree with, right?

12        A.   Correct.

13        Q.   Okay.

14             "This means that the level of human exposure,

15             which determines the actual risk, was not

16             taken into account by IARC."

17             Did I read that correctly?

18        A.   That's what the document says.  But I

19   vehemently disagree with that statement.

20        Q.   By the way, Health Canada is an organization

21   that, at times, has participated in the Monograph

22   program, right?

23        A.   I believe they have, yes.

24        Q.   And the scientists at Health Canada and the

25   folks who are preparing this reassessment, you would

2239

1    expect to have some familiarity with the IARC program?

2        **A.**   I can't say for sure how much familiarity they

3    would have with the IARC program.

4            But the case in point, if you will, is that

5    the level of human exposure was definitely taken into

6    account by IARC.

7            The epidemiology data that was thoroughly

8    reviewed at IARC is based on case-control studies and

9    cohort studies of people who are actually using Roundup

10   in their work and in their daily lives.  And that is a

11   real world exposure.

12           And based on those exposures and the data in

13   the epidemiology data, there's a strong correlation

14   between exposure to Roundup and non-Hodgkin's lymphoma

15   in the individuals.  So that statement is inaccurate.

16   Because real world exposures are definitely an important

17   consideration of the IARC Monograph.

18           In fact, they have a whole --

19        **THE COURT:**  Sorry, Doctor.  That's not

20   responding to the question.  I want you to listen to

21   Counsel's question and just answer what he asks.

22        **THE WITNESS:**  I'm sorry.  I just got a

23   little --

24        **THE COURT:**  That's okay.

25        **MR. ISMAIL:**  Thank you, Your Honor.  May I

2240

1    strike the answer as nonresponsive, Your Honor?

2              **THE COURT:**  Part of it, but we'll have to go

3    back.  Not right now.

4              **MR. ISMAIL:**  Thank you.

5    BY MR. ISMAIL:

6         **Q.**   Dr. Jameson, in terms of the epidemiology --

7    and I promise you we'll discuss that this afternoon --

8    as you've testified, the IARC working group's assessment

9    of epidemiology, which you point out is at human doses,

10   that evidence is limited, according to the definition

11   you told the jury about this morning, true?

12        **A.**   True.  A causative interpretation is credible,

13   but bias, confounding, and others couldn't be absolutely

14   discounted.  But a causal association is credible under

15   the limited definition.

16        **Q.**   Now, Mr. Wisner showed you these statements

17   from regulatory agencies around the world that we took

18   some time yesterday to go through with Dr. Portier.  And

19   don't worry, we're not going to go through all those

20   documents again.

21             But you indicated to Mr. Wisner that you

22   disagreed with every single one of these, right?

23        **A.**   Yes, sir, I do.

24        **Q.**   Did you actually read these documents?

25        **A.**   The first three, I did.  The Health Canada,

2241

1    I -- to be honest, I skimmed through very briefly.  And

2    the rest of them, I have not looked at.

3        Q.   So you noted your disagreement without

4    actually looking at how those scientists describe their

5    work and how they reach their conclusions, true?

6        A.   Correct.  But they were doing risk

7    assessments.  And if -- well, I'll just leave it at

8    that.  Yes.

9        Q.   Right.  They were doing risk assessments,

10   according to the definitions that we went over with the

11   jury; as opposed to a hazard assessment, like you and

12   IARC did, true?

13       A.   Right.

14       Q.   Okay.  So you -- you indicated that, in

15   particular with respect to EFSA, that's the European

16   Food Safety Authority, that was the one agency that you

17   co-signed a letter with Dr. Portier?

18       A.   Yes.

19       Q.   I think this came out yesterday.  But you and

20   Dr. Portier are friends and long-time colleagues, going

21   back 30 years?

22       A.   I've known Chris since 1980.  Worked together

23   with him in quite a number of projects, yes.

24       Q.   And you indicated that you sent this letter,

25   you laid out some of your -- I mean the collective you;

1    Dr. Portier was the signatory, you were noted as signing

2    on to that letter, right?

3        **A.**   Correct.

4        **Q.**   So you noted your -- the scientific

5    disagreement you had with the conclusions EFSA has

6    reached regarding glyphosate, correct?

7        **A.**   Correct.

8        **Q.**   And you brought together whatever arguments

9    and data that you thought were important to press your

10   side of the argument, so to speak, correct?

11       **A.**   Correct.

12       **Q.**   But EFSA wrote back to you, correct?

13       **A.**   I believe they did.

14       **Q.**   They wrote back to Dr. Portier and asked him

15   to distribute it to others who were signed on the

16   letter, right?

17       **A.**   Uh-huh.

18       **Q.**   And we walked through EFSA's response

19   yesterday.

20            Have you seen that, by the way?

21       **A.**   Yes, I've seen it.  But it's been awhile.  I

22   need to look at it again to refresh my memory.

23       **Q.**   We don't need to go through the details, the

24   jury saw it yesterday.

25            But you know that EFSA wrote back to

                                                      2243

1    Dr. Portier and noted their continuing disagreement with

2    the positions advocated in your letter, right?

3        **A.**   Yes.

4        **Q.**   And EFSA not only did that, the scientists

5    also kind of had their own detailed scientific rebuttal,

6    as it were, to the points you and your colleagues

7    raised, right?

8        **A.**   I -- yeah.  I vaguely remember that, yes.

9        **Q.**   And that's the -- that was, sort of, the state

10   of the correspondence.

11           But more than the correspondence, there was

12   the actual formal risk assessment documents prepared by

13   the scientists at EFSA, correct?

14       **A.**   You mean in their response, in their reply?

15       **Q.**   On the one hand, there was the scientist

16   communication between Dr. Portier and the folks at EFSA,

17   and that was a correspondence that, one portion of

18   which, you referenced this morning.

19           But there was kind of a back and forth between

20   the scientists on those letters, right?

21       **A.**   I don't recall, to be honest.

22       **Q.**   So you know that EFSA responded in some

23   fashion?

24       **A.**   Right.

25       **Q.**   But beyond just the correspondence, EFSA

2244

1     actually prepared a formal risk assessment or cancer
2     hazard assessment documents, right?
3          A.   I don't remember.
4          Q.   I guess I'm confused.  Because when Counsel
5     had this up and noted your disagreement with respect to
6     EFSA, for example, have you actually read their
7     scientific position paper that resulted in their
8     conclusion that's reflected on this slide?
9          A.   So "on this slide," which document are you
10    referring to?
11         Q.   I'm referring to, sir, EFSA's submitted
12    document wherein they assess the issue of whether
13    glyphosate poses any cancer hazards.
14         A.   So that's their initial assessment?
15         Q.   Are you aware of that document?
16         A.   Yes.  And that's the one I disagree with.
17         Q.   Now, ECHA also had a submission -- I'm sorry,
18    a scientific document on this question, correct?
19         A.   Yes.
20         Q.   Have you reviewed the contents of that
21    document?
22         A.   That's the European -- yes.
23         Q.   The European Chemical Agency.
24         A.   Right.  It's part of the European Union,
25    right?

1      **Q.**   Yes.

2      **A.**   Okay.

3      **Q.**   So you know that the document -- the letter

4   submitted by Dr. Portier, to which you signed on, was

5   also distributed to ECHA, right?

6      **A.**   Yes.

7      **Q.**   And ECHA had this scientific document,

8   which -- to which they conclude no hazard classification

9   for carcinogenicity is warranted, correct?

10      **A.**   That's what they said.

11      **Q.**   Right.  And they had their own scientific

12   assessment of the rodent data, the epidemiology data,

13   and the mechanism data, correct?

14      **A.**   Yeah.  But I still, for the life of me,

15   couldn't figure out how they came to that conclusion,

16   based on what they said.

17      **Q.**   I'll accept, Doctor, that you have a

18   scientific disagreement with the scientists at ECHA,

19   correct?

20      **A.**   That's fair.

21      **Q.**   So the scientists at ECHA have how they

22   interpreted the data and why they reached the

23   conclusions, and Dr. Jameson is entitled to his

24   scientific interpretation that just disagrees with ECHA,

25   right?

2246

1      **A.**   Right.   Most of their risk assessment is

2    looking at hazard from residue in food, not every --

3    overall exposure.

4      **Q.**   Doctor, they're looking at the exact same

5    rodent studies that you looked at, right?

6      **A.**   But their risk assessment is mostly based on

7    food safety.

8      **Q.**   And they're looking at the exact same

9    epidemiology data, which looks at, for example,

10   agricultural exposure, occupational exposure, correct?

11     **A.**   That's why, for the life of me, I can't

12   imagine why they came up with that evaluation.   Because

13   the data is so strong.

14     **Q.**   Noted.

15         You have a scientific disagreement with the

16   scientists at ECHA and EFSA and EPA and Health Canada

17   and Australia.

18         You accept that as true, right?

19     **A.**   I do, yes.

20     **Q.**   In terms of the animal data, you, of course,

21   agree that there are biological differences between

22   rodents and people, right?

23     **A.**   Yes, sir.

24     **Q.**   Probably the easiest question you'll get all

25   day.

                                                    2247

1              And there are plenty of examples in the

2     literature of compounds that are carcinogenic to

3     animals, but have not proven so to humans, true?

4          **A.**   I'm sorry, say again.

5          **Q.**   There are plenty of examples in the literature

6     of substances that have -- that are shown to be a cancer

7     hazard to animals, but not humans.

8              Are you aware of that?

9          **A.**   There are a large number that have shown to be

10    carcinogenic to animals and have not yet been shown

11    carcinogenic in humans, yes.

12         **Q.**   Now, you indicated that -- I think your

13    words -- for the life of you, you don't know how others

14    can look at the same data and come to a different

15    conclusion?

16         **A.**   Right.

17         **Q.**   I'm paraphrasing, not exactly quoting.

18             So there were differences in, sort of, the

19    methods that the scientists at all these other worldwide

20    scientific groups thought were important, and some of

21    the considerations that you and others thought were

22    important, right?

23         **A.**   That's true.  They don't look at high-dose --

24    they don't look at high-dose animal studies in the same

25    way we do.  They mostly discount them because they set a

                                                          2248

1    limit of a dose level that they would consider in part

2    of their risk assessment.

3         Q.    You anticipated my next question.

4              One of the reasons you diverge from all these

5    other scientists who are doing their risk assessment as

6    we've defined it is that those scientists consider that

7    the really high doses given to some of those animals

8    have less biological relevance, for example, correct?

9         A.    Well, that's not true.

10        Q.    I know you disagree.  But you were trying to

11   figure out how you disagreed with these other

12   scientists.  And one of the reasons you disagree is this

13   difference on philosophy of how to handle super high

14   doses in the animal studies.

15             That's fair, right?

16        A.    Mainly because the regulatory agencies usually

17   restrict themselves to only looking at lower doses.

18        Q.    So the answer to my question is yes?

19        A.    They look at lower doses, yes.

20        Q.    So that's one point of disagreement with you

21   and the regulators, right?

22        A.    Yes.

23        Q.    Another reason why you and all these other

24   scientists may come to different conclusions is -- well,

25   let me back up.

                                                      2249

1          You indicated that as part of IARC's review,

2     they have very strict guidelines as to what data they

3     can consider and what data they cannot consider, true?

4          **A.**   That's accurate.

5          **Q.**   And again, I'm not wanting to debate whether

6     those are good rules or bad rules.

7          But the consequence of that is that IARC

8     considered a smaller dataset to answer this question

9     than do the scientists at these regulatory bodies, true?

10         **A.**   I don't know if I necessarily agree with that.

11    Because for the IARC -- for -- specific to the IARC

12    review of glyphosate, we had access to all the publicly

13    available peer-reviewed literature, we had access to a

14    number of EPA documents that address the review of

15    several glyphosate studies submitted for registration

16    that was obtained by the Freedom of Information Act.

17         And then we also have the Greim study, the

18    Greim publication, which was a review of a fairly large

19    number of bioassays that were performed for various

20    industries and submitted to various regulatory agencies

21    for registration of the material.

22         So for glyphosate, we had a very large -- much

23    more than usual -- amount of data to look at and

24    evaluate.

25         **Q.**   Okay.

                                                       2250

1      A.   So --

2      Q.   Sorry.  Were you done?

3      A.   Yeah, I'm sorry.

4      Q.   Let me just break that down.

5           You told us candidly this morning that this

6     Greim publication -- which the jury hasn't seen yet --

7     is sort of a collection of different rodent studies on

8     glyphosate and cancer assessment, right?

9      A.   Correct.

10     Q.   And there were very voluminous data tables

11    that were submitted along with that publication, right?

12     A.   Eventually, yes.

13     Q.   And I think you told us this morning that it

14    wasn't until you arrived in France that your working

15    group was given access to those data?

16     A.   We were made aware of that data at that time,

17    yes.

18     Q.   And because of the volume of data included in

19    the Greim publication, just candidly, you didn't have

20    enough time to assess and analyze it all, true?

21     A.   Not all of it, but there were several studies

22    in there that we already had access to, either from

23    information that was obtained from the EPA, or I think

24    one or two of them had actually been published.

25     Q.   So, I guess, going back to my prior question:

2251

1      By definition, the regulators had more information about

2      these rodent studies that they had time to analyze and

3      consider than did IARC in March of 2015.

4              That's fair?

5      A.    That's probably fair.

6      Q.    In addition to that, there were genotoxicity

7      studies that you know were done and have been submitted

8      to regulators that were not part of the IARC review,

9      true?

10     A.    I'm sorry, repeat the question.

11     Q.    Genotoxicity studies.

12     A.    Right.

13     Q.    You know that there were many genotoxicity

14     studies that had been performed by 2015.  But because of

15     IARC's rules, were not part of the mechanism subgroups

16     review, true?

17     A.    Is that because they were done by industry and

18     submitted to a regulatory agency and were therefore

19     proprietary information --

20     Q.    Yes.

21     A.    -- and not available to the public?

22     Q.    Correct.

23           So the answer is yes?

24     A.    I guess that's true.

25     Q.    Again, I'm not criticizing IARC's rules or

2252

1    guidelines in any way.  I just want you to confirm the

2    fact that the regulator scientists had more information

3    than did the IARC working group, by definition.

4         A.   I don't know.  I don't know if the industry

5    submitted those studies to those regulators or not.

6         Q.   Okay.  Now, in terms of the animal subgroup,

7    you indicated that you were assigned the responsibility

8    of preparing the -- that portion of the Monograph,

9    correct?

10        A.   Glyphosate?  For glyphosate?

11        Q.   Yes.

12        A.   Yes.  I drafted the initial Monograph for

13   glyphosate.

14        Q.   And I think you told us this morning that you

15   got your assignment and the data -- let me back up one

16   second.  The last question on our prior conversation.

17             You know that there are individual animal data

18   available -- made available to the regulators for some

19   of those rodent studies that IARC did not have access

20   to.

21             You know that, correct?

22        A.   Yeah.  I know that, but I know that for some

23   of the studies, they were able to obtain EPA documents

24   that summarized the data.

25        Q.   So the answer to my question is:  Yes, there

2253

1    are individual animal data the regulators had that IARC

2    did not, true?

3         A.   I am aware of that, yes.

4         Q.   Okay.  Thank you.

5              Now, in terms of the drafting of the

6    Monograph, the section you were responsible for, you got

7    your assignment and some of the relevant materials,

8    what, three to four months before March 2015?

9         A.   It was probably closer to six months.

10        Q.   And you had the opportunity to do your own

11   literature review?

12        A.   Correct.

13        Q.   You were actually encouraged to do that?

14        A.   Yes.  Everybody is instructed to do their own

15   literature search.

16        Q.   So for the members of the jury, that means

17   there's, like, articles for -- that can be available and

18   accessed through search engines, for scientists to see

19   what's been published, right?

20             That's what a literature review is?

21        A.   A literature review -- for example, the

22   National Library of Medicine has an online service where

23   you can go online and search topics.  And you can look

24   at -- for example, you can do a search for glyphosate

25   and cancer, or glyphosate and animal studies, and

                                                      2254

1    glyphosate and epidemiology.  And that would -- the

2    MEDLINE would print out all of the publications that

3    have been published on that particular topic.

4         Q.   Okay.  Thank you, Doctor.

5              And in terms of the process that you went

6    through to prepare the draft of the Monograph, you, I

7    think, described when Mr. Wisner was asking you

8    questions, how seriously you took it, how much time you

9    committed to it, your review of the data, doing a

10   literature review, all that fairly captures -- even

11   before you get to the meeting, right?

12        A.   Right.

13        Q.   And then you prepared a draft of the

14   Monograph, right?

15        A.   Right.

16        Q.   I'm sorry, of your section.

17        A.   Right.

18        Q.   And you had the opportunity to submit it to

19   your colleagues on your working group for comment,

20   correct?

21        A.   Correct.

22        Q.   And when you get to France and you're all

23   together, you have a plenary session, where you can

24   discuss where you are in the drafting of the Monograph?

25        A.   First you meet in subgroup.  And the subgroup

1    goes through each draft and -- through that.  So all the

2    members of the subgroup have an opportunity to review

3    and make comment on the initial draft.

4          And once the subgroup is happy with the

5    initial draft, then it's sent -- it's distributed in the

6    plenary session for their comment.

7          Q.   With that background, I'm handing you what has

8    been marked as Exhibit 4005.

9          MR. ISMAIL:  Your Honor, a copy.

10         THE COURT:  Thank you.

11   BY MR. ISMAIL:

12         Q.   Dr. Jameson, do you recognize 4005 as a draft

13   of the animal subgroup for the glyphosate Monograph?

14         A.   That's what it's labeled as, yes.

15         MR. ISMAIL:  May I publish, Your Honor?

16         MR. WISNER:  Is this actually it?  I don't

17   know.  He says it says that.  I don't know if it is.

18         If it is what it is, then I have no problem.

19         MR. ISMAIL:  Well --

20         THE COURT:  Why don't we give him a minute.

21         Dr. Jameson, tell us yes or no, whether it is

22   or not.

23         THE WITNESS:  It looks like a draft of a

24   Monograph.  But it's just that, it's a draft.  It's a

25   working document.  It's something that's being reviewed

                                                        2256

1     and modified as we go along.

2             MR. WISNER:  No objection, Your Honor.

3             MR. ISMAIL:  Thank you.

4     BY MR. ISMAIL:

5         Q.   Okay.  So this draft -- and if we look here at

6     the bottom, this plenary, we know this version of it is,

7     at some point, during the five-day meeting when you're

8     in France, correct?

9         A.   I guess, okay.

10        Q.   And it is -- so this is a document that you

11    had those six months in the quiet of your office,

12    looking at your data to prepare the first draft of, send

13    out for comments, and incorporate as you saw fit to

14    discuss with others in France, correct?

15        A.   To be honest, I can't say if this is that one

16    or not.  I don't know.

17            THE COURT:  Why don't we give Dr. Jameson time

18    to take a look at it and tell us yes or no if this is

19    what he drafted.  That way we can proceed or not.

20            MR. ISMAIL:  Sure.

21            THE WITNESS:  This looks like it could be a

22    draft.

23            THE COURT:  Is or isn't?  We just need to know

24    for purposes of publishing or to continue to discuss it.

25            We can take a break, if you need to.

                                                           2257

1          **THE WITNESS:**  No, I don't need it.  This looks

2     like a draft document that we worked on, but we had many

3     drafts we worked on in the course.

4          I don't know.  This is probably one of the

5     drafts that we worked on.

6          **MR. WISNER:**  Your Honor, the question pending

7     is if this is the one he wrote in the comfort of his own

8     home.  He can't answer that.

9          **THE COURT:**  So let's take a ten-minute break

10    so he can look at it.

11                (Recess taken at 2:20 p.m.)

12              (Proceedings resumed at 2:38 p.m.)

13    (Proceedings held in chambers outside the presence of

14                        the jury.)

15         **MR. WISNER:**  Your Honor, I had a chance to

16    finally look at this.  And this appears to be some sort

17    of interim draft prepared during the IARC working group.

18         I'm going to object to this publication.  This

19    doesn't fall within the agreement we made about hearsay

20    documents being published to the jury.

21         **THE COURT:**  Well, if he drafted it, it's not

22    hearsay.  If he didn't draft it, and it's just a

23    document that's out there for the IARC, then that's

24    true.

25         But I think the question was:  Did he draft

                                                         2258

1    this document?  That's why I gave him time to look at

2    it.  Because that's different than it was presented and

3    discussed and it's interim; it's not the final.

4            **MR. WISNER:**  So the original draft, which this

5    is not, he did draft.  This is day three or four of

6    edits being made --

7            **THE COURT:**  But it's his work.  It's basically

8    his work, and he's there when they're making a draft --

9    I'm listening carefully, because I figured this may come

10   up.  If he drafted the document and changes were made,

11   he can say that.  But to say it's a hearsay document

12   because other people had input on it doesn't make it a

13   hearsay document.

14           **MR. WISNER:**  Well, all right.  I mean --

15           **THE COURT:**  The difference, for me, is that he

16   drafted the document.

17           **MR. WISNER:**  But he's not going to know which

18   parts he wrote and other people wrote.

19           **THE COURT:**  Well, maybe the question should

20   be, how does this process work?

21           He drafts it, and it goes to the IARC

22   subcommittee group, and they talk about it and changes

23   are made because people make suggestions that this

24   should be changed.

25           How does that work?  Is it some third party

2259

1    that does that?  Isn't Dr. Jameson the one who was chair

2    of it, so basically --

3            MR. WISNER:  This is plenary, so this is

4    actually the entire working group, not just a

5    subcommittee.

6            THE COURT:  Was this not his work at all?

7            MR. WISNER:  No, the original draft, which

8    this is not, was his original work.  And then this is

9    three days in.  They're making edits and changes.  So

10   this is just --

11           THE COURT:  So it's no longer his work, is

12   what you're saying?

13           MR. WISNER:  Exactly.  This is a real

14   352 issue.  Because they're going to point to sentences

15   that didn't make it into the final draft and suggest --

16   I don't know what they're going to suggest.

17           THE COURT:  I don't know.  If that's really

18   not his work, it shouldn't be published.  He can

19   certainly be cross-examined on the process, including

20   things that were said in the plenary session, how they

21   arrived at their decisions to finalize, if they decided

22   to take something out or put it in.

23           So while publication of that document may not

24   be appropriate because it's not his document, and it's

25   not the final work, questions about the process while at

2260

1      IARC, I think are admissible.

2            **MR. WISNER:**  I'm not objecting to that.  I was

3      purely objecting to the publication of this document

4      because it's being presented to the jury now that he

5      wrote these words, and I think that's incorrect.

6            The problem we're going to run into is that

7      they haven't presented him with his initial draft to

8      compare.  This is a four-year memory test to remember --

9            **THE COURT:**  I think the question is not so

10     much, did you author this?  But, was this what they

11     considered in arriving at their decision, is a different

12     question.

13           I don't want to speak for Mr. Ismail.

14           **MR. ISMAIL:**  Your Honor, the direct

15     examination built Dr. Jameson up as the chair of the

16     subgroup; he had ownership of the document, did the

17     initial draft.

18           And it's a collaborative effort, to be sure.

19     But he is the chair and is noted as such.  And I was

20     trying to lay the foundation as to the process, how it

21     works.  He prepares the first draft, then sends it to

22     his colleagues.  He accepts changes as he deems

23     appropriate.

24           And my reference to plenary here is to give

25     him comfort of where this is in the process.  We're no

1    longer Bill Jameson at his office in Florida, we are in

2    France, in March.  It's already gone through his six

3    months of work, his subgroup's consideration, and now

4    we're in plenary session.

5            And so it is not my point to say that

6    Dr. Jameson wrote every single -- you know, every clause

7    here is yours, as opposed to Dr. Blair's, as opposed to

8    somebody else's.

9            My point is:  This was pretty far along in the

10   process and had a lot of scientific input.  And there

11   are certain statements in here, as Mr. Wisner knows,

12   that don't make it into the Monograph.

13           And I know this witness isn't going to

14   remember why they were taken out or who took them out.

15   And that's less important to me than, after six months

16   of work and lots of scientific input, the working group

17   had these characterizations of the study in this draft

18   document.  And that's the purpose for which I would like

19   to examine the witness.

20           MR. WISNER:  That's precisely why it's more

21   prejudicial than probative.  Although California doesn't

22   recognize it, most states recognize an academic

23   privilege.  Because if drafts are disclosed, this is

24   exactly the type of attack they're going to get because

25   they had a sentence --

1           **THE COURT:**  Yeah.  I would say no.  If it's

2      not his document at that point, and it is just a draft

3      circulating -- if it were his document, fine, we would

4      publish the whole thing and he's cross-examined on it.

5           But if it's not his document, and it's a

6      draft, and you're confronting him with a document he

7      didn't author, and he has no idea at this point in the

8      process why anybody said anything, then it is more

9      prejudicial.

10          You know, it deserves some explanation, if

11     you're going to talk about what was his process?  Why

12     was it deleted?  I think you can ask him if he recalls

13     whether a particular document -- part of the document

14     was deleted or included.  But if he doesn't know, I

15     don't want to publish the statements as if they're

16     evidence to the jury, because they really aren't.

17          **MR. ISMAIL:**  Okay.  Well, I guess -- you know

18     there are -- I guess my confusion arises from the fact

19     that this draft is no less his work than was the

20     Monograph that -- this is probably more reflective of

21     his original work than the final document that kicks out

22     after additional input from others.

23          This is certainly closer in time to his

24     original draft.  He owns the document, in the sense he's

25     the chair of this, and the statements in here and how

2263

1   the studies are characterized.

2          **THE COURT:**  You can ask him whether or not

3   they characterized the studies as whatever is in there

4   at a point.  And ask him, does he recall -- I mean, was

5   that, in fact, true and why was it true?  If it didn't

6   make it into the final Monograph, why not?

7          You just can't publish the document.  You can

8   cross-examine him about the statements in it, I just

9   don't want to publish the document.  Because I do think

10  that depending on his answers, it may not be relevant.

11  I don't want to expose the jury to it.  Okay?

12         **MR. ISMAIL:**  I'll comply, Your Honor.

13         **THE COURT:**  Okay.

14  (Proceedings resumed in open court out of the presence

15                  of the jury at 2:41 p.m.)

16         **THE COURT:**  Proceed, Mr. Ismail.

17         **MR. ISMAIL:**  Thank you, Your Honor.

18  **BY MR. ISMAIL:**

19     **Q.**   Okay.  Dr. Jameson, have you had a chance to

20  review Exhibit 4005?

21     **A.**   Yes.

22     **Q.**   And just so we reorient everyone to where we

23  were before the break, we were talking about how you had

24  a drafting process of the Monograph that you went over

25  with Mr. Wisner, as to the animal section, the rodent

1    section of that study -- or that Monograph.

2              You had responsibility for doing the first

3    draft and sort of marshaling the comments through the

4    process?

5         A.   Correct.

6         Q.   Have you had a chance to look at this exhibit

7    and confirm that this looks like a draft of the work

8    that you and your colleagues were creating that resulted

9    in the Monograph?

10        A.   This appears to be a draft that was one of the

11   ones we were working on, as indicated in the top.  It

12   says:  "Section 3, 2nd draft, revision 4."

13             So this is the fourth revision of the second

14   draft of that Monograph.

15        Q.   Section 3, was that your section?

16        A.   Section 3 was an experimental animal section.

17        Q.   I want to direct your attention, sir, to the

18   second page.  And there's a discussion of one of the

19   rodent studies there beginning at line 16.

20        A.   Okay.

21        Q.   And looking at how that study is

22   characterized -- and feel free to consult your notes I

23   know that you have there -- that's concerning the

24   Atkinson study, right?

25        A.   Atkinson?

                                                        2265

1      **Q.**   Yes.

2      **A.**   Hold on.

3           It doesn't say Atkinson.  It just refers to

4    the WHO FAO report.  But based on dose levels, it looks

5    like it may be the Atkinson study.

6      **Q.**   All right.  Do you see in the draft, it

7    reports in the last line that:

8              "The report indicates that the tumor

9              incidences recorded in this study fell within

10             the historical ranges for controls."

11          Do you see where I am?  Lines 23 and 24.

12     **A.**   So it's referring to the tumor incidence for

13   the lymphoreticular/hematopoietic tissue?

14     **Q.**   Yes, sir.

15     **A.**   Okay.

16     **Q.**   And do you see how, in this draft, the working

17   group describes the underlying report that you all had a

18   chance to review, that the tumor incidences recorded in

19   this study fell within the historical ranges for

20   control?

21          Do you see where I am?

22     **A.**   Are you talking about the bracketed comments

23   at the very end?

24     **Q.**   Right before the bracketed comments.  Line 23,

25   "The report indicates."

                                                      2266

1          Do you see where I am?

2     A.   Yes.

3     Q.   Okay.  So that's information that was gathered

4     by the working group at this point in time, correct?

5     A.   Okay.

6     Q.   And you know that's a true statement, right?

7     A.   That the report indicated that the incidents

8     fell within the historical range?

9          That's what's written here, yes.

10    Q.   If we roll forward in this document; if we go

11    to, say, page 4 of the document, there's a study

12    described in -- at line 11.  And you can take a minute

13    to look at it.

14         And you'll recognize that as what we've been

15    describing here in court as the Sugimoto study?

16    A.   Okay.

17    Q.   If you look at line 16, after describing a

18    lung adenoma, a lung adenocarcinoma, and lymphomas, that

19    was one of the findings in that study, right?

20    A.   Okay.

21    Q.   This draft of the Monograph says:

22         "The authors concluded that glyphosate was not

23         carcinogenic in CD-1 mice in this study."

24         Is that what's reflected in the draft?

25    A.   That's what this version of the Monograph --

2267

1     this draft of the Monograph stated.

2          Q.   And that was a true statement, as reflected

3     here in this --

4          A.   That's what the report from the authors

5     stated.

6          Q.   Right.  And you can go down to the next -- on

7     that same page, at line 18, there's another study that

8     the jury has heard about; that's the Kumar study.

9               And if you look at line 24, does this draft of

10    the Monograph say:

11              "The authors indicated they felt the finding

12              was considered incidental"

13              Let me back up.

14              The draft of the Monograph is describing

15    lymphoma in the high-dose male group, correct?

16         A.   I'm sorry, could you repeat the question.

17         Q.   Sure.  I got ahead of myself in asking the

18    question.

19              If terms of the Kumar study here, it's

20    describing an incidence of lymphoma in the high-dose

21    male, correct?

22         A.   Okay.

23         Q.   And then in the section that I was directing

24    your attention to, the draft of the working group

25    Monograph says:

                                                      2268

1            "The authors indicated they felt the finding

2            was considered incidental background variation

3            based on historical control rate of

4            39.6 percent, and therefore technical grade

5            glyphosate was reported as not carcinogenic in

6            Swiss albino mice."

7        Did I read that correctly?

8    A.   That's what this draft says.

9    Q.   And that was and is a true statement, correct?

10   A.   That the author said that of this study, yes.

11   Q.   And we can go through several more examples in

12   this Monograph, this draft Monograph, but I think you

13   can confirm the bottom line:  That every single one of

14   the tumors identified as positive by the IARC working

15   group was determined by the authors of those studies

16   themselves as not being related to glyphosate, true?

17   A.   Okay.  The studies -- the authors of the

18   studies of the industry-sponsored studies, that's what

19   their report said, that they submitted to industry.

20   Q.   And so can you confirm, Dr. Jameson, that

21   those additional statements that we just went over with

22   the jury did not make it into the final Monograph?

23   A.   Well, if you look at the final Monograph,

24   they're not in there, absolutely.

25   Q.   Okay.

2269

1           **A.**   There's a good reason for that.  The IARC

2      directs the authors of the Monograph to draft the

3      Monograph to not include any conclusions that were

4      provided by the authors of the report, and they want the

5      working group to come to their own conclusion about what

6      the data says.

7                So that's why those statements were mistakenly

8      included in the draft section.  That's why it's such a

9      bad thing to get a draft of a working document.  Because

10     a draft of a working document --

11          **THE COURT:**  Dr. Jameson, that's nonresponsive

12     to the question.

13          **THE WITNESS:**  I'm sorry.

14     **BY MR. ISMAIL:**

15          **Q.**   Dr. Jameson, I think you --

16          **A.**   What was the question again, please?

17          **Q.**   Sure.

18                So Dr. Jameson, I'm not, in my question,

19     challenging whether it was a good thing or bad thing to

20     take it out of the draft; my question was actually

21     different.

22                Which was:  If you go through this draft,

23     you'll see statements in here in which the working group

24     is confirming that the authors of the individual studies

25     determined those findings to be not related to

                                                          2270

1    glyphosate, true?

2         A.    It's stating what the authors of the report

3    said.

4         Q.    And what you're telling us is that it came out

5    of the draft of the Monograph because, according to IARC

6    protocols, it's supposed to reflect the working group

7    comments, not the researchers providing the under --

8         A.    The Monograph is to reflect the working

9    group's evaluation of the data and their conclusions,

10   not the conclusions of the authors.

11        Q.    Okay.  So continuing in our discussion of the

12   Monograph, there was a study the jury heard about called

13   the George study.

14              Are you familiar with that?

15        A.    Yes, sir.

16        Q.    Exhibit 5184.

17              MR. WISNER:  I'll object to cumulative.

18              We didn't cover this study in his direct, and

19   this was covered with Dr. Portier yesterday.

20              THE COURT:  Overruled.

21              He can ask him questions about it if it's

22   within his expertise.

23              MR. WISNER:  Okay.

24   BY MR. ISMAIL:

25        Q.    So you're familiar with the George study,

                                                         2271

1   correct, sir?

2       A.   George was the initiation promotion study; is

3   that correct?

4       Q.   That is, indeed, the study I'm talking about.

5       A.   Okay.

6       Q.   And the IARC working group considered whether

7   that study was well-done and adequate for evaluation in

8   terms of your work, correct?

9       A.   Yes.

10      Q.   And if you turn to page 5184 -- sorry, it's

11  Exhibit 5184, page 34.

12           Are you with me, sir?

13      A.   Yes, sir.

14      Q.   So that we're oriented, we're talking about

15  this George study, and the jury may remember that this

16  is the painting study.

17           That was the method of this particular

18  analysis, right?

19      A.   Yes, sir.

20      Q.   And if we go over here, in the right column,

21  we see how the working group assessed the reliability of

22  the study, correct?

23      A.   Okay.

24      Q.   And these Monographs actually have a format to

25  them, where the things in brackets are the commentary

2272

1      from the working group member, right?

2          A.    That's accurate, yes.

3          Q.    So in the brackets is what you and your

4      colleagues are saying about the George study?

5          A.    Yes.

6          Q.    And you write:

7                "The glyphosate formulation tested appeared to

8                be a tumor promoter in this study."

9                That's what those authors report, correct?

10         A.    Yes.

11         Q.    Then you say:

12               "The study design was poor, with short

13               duration of treatment, no solvent controls,

14               small number of animals, and lack of

15               histopathological examination.  The working

16               group concluded that this was an inadequate

17               study for the evaluation of glyphosate."

18               Did I read that correctly?

19         A.    That's what it says.

20         Q.    And you voted to include that language in this

21     assessment of the George paper, true?

22         A.    Yes.

23         Q.    Now, there was a discussion you had with

24     Mr. Wisner about the -- one of the mouse studies that

25     underwent additional pathological evaluation.

                                                          2273

1              Do you recall the description of the pathology

2       working group?

3              A.    For the tumor kidneys -- for the kidney

4       tumors, excuse me, yes.

5              Q.    For the kidney tumors.

6                    And you told the jury that, in the initial

7       read of those samples, there was no tumor found in the

8       control group, and then it underwent reevaluation in

9       several different ways, correct?

10             A.    Correct.

11             Q.    Now, handing you what we marked as

12      Exhibit 4908.  If you turn to the second page of the

13      exhibit, sir -- second page of the document, first page

14      of the exhibit, you'll see -- this is some of the EPA

15      documentation surrounding the re-review of this study,

16      correct?

17             A.    Okay.

18                   **MR. WISNER:**  Your Honor, I need a quick

19      sidebar on this.

20                   **THE COURT:**  Okay.

21                   (Sidebar discussion not reported.)

22      BY MR. ISMAIL:

23             Q.    Dr. Jameson?

24             A.    Yes, sir.

25             Q.    Do you recognize Exhibit 4908 as -- on the

                                                            2274

1    topic that you were discussing with Mr. Wisner about the

2    tumor in the control group, which was ultimately

3    assessed as being there by the pathology working group,

4    correct?

5         A.   In this report, they say they see an adenoma,

6    yes.

7         Q.   Just so we're clear about the process, there

8    was initially a null finding, they didn't see a tumor in

9    the control group.

10              But then upon re-review, there was a tumor

11   identified, correct?

12        A.   The initial analysis was no tumors in the

13   control group.

14        Q.   And you indicated that as part of this

15   process, the EPA required Monsanto to convene a

16   pathology working group, right?

17        A.   After two additional analyses of the kidney

18   tumors, then the EPA requested an additional PWG, yes.

19        Q.   And you told us that the purpose of a

20   pathology working group is to bring in external experts

21   in the field that's being -- in the subject matter of

22   what's being discussed, true?

23        A.   True.

24        Q.   And you indicated that, as part of their

25   review, they were, quote, blinded to what they were

2275

1    reviewing, right?

2        **A.**   True.

3        **Q.**   What that means is, you brought in -- I think

4    it was five pathologists, correct?

5            If you look on page 7 of the document.

6        **A.**   Five pathologists, okay.

7        **Q.**   Correct?

8        **A.**   Five pathologists, yes.

9        **Q.**   And one of them, you actually know quite well,

10   Dr. Ward, correct?

11       **A.**   I know Jerry Ward, yes.

12       **Q.**   And you can speak to Dr. Ward's expertise and

13   integrity, true?

14       **A.**   He's a well-known veterinarian pathologist,

15   yes.

16       **Q.**   And Dr. Ward and the other four pathologists,

17   when we say they are blinded, that means when they're

18   given the tissue samples to look at, they don't know

19   whether they're looking at a control group sample or a

20   sample from the rodent that's been exposed to

21   glyphosate, true?

22       **A.**   True.

23       **Q.**   That's what blinded means.

24           And the idea is to try to take out any bias,

25   subjective or otherwise, in the review?

                                                        2276

1          **A.**   True.

2          **Q.**   So they're just calling balls and strikes.

3     They don't even know where these tissue samples are

4     coming from?

5          **A.**   Right.

6          **Q.**   And when they did that review, blinded expert

7     pathologists, they concurred that there was a tumor in

8     the control group in the study; isn't that right,

9     Dr. Jameson?

10         **A.**   That's what this report says, yes.

11         **Q.**   And thereafter, in IARC's review or EPA's

12    review or in EFSA's review, all the reviewers considered

13    the -- this study as having a tumor in the control

14    group, true?

15         **A.**   I'm trying to remember.  I'm trying to

16    remember.

17         **Q.**   Okay.

18         **A.**   Yes.  I was going through in my mind, the

19    review we did at IARC.  And about the adenoma in the

20    controls not being there, and then being there and not

21    being seen by the EPA pathologist, and then going to a

22    PWG and it's there.

23              There's no explanation and no discussion, I

24    don't think.  I didn't see anything in here that says

25    they addressed, you know, how it was missed in the first

1    place.

2              But, yes, at IARC, we knew that the final

3    evaluation was one adenoma in the control.

4         Q.   And in terms of what this expert panel

5    concluded, if you go to page 8, if you look at the very

6    bottom, under Table 1.

7         A.   Okay.

8         Q.   This PWG, pathology working group:

9              "Firmly believes and unanimously concurs with

10             the original pathologist and reviewing

11             pathologist that the incidences of renal

12             tubular-cell neoplasm in the studies are not

13             compound-related."

14             True?

15        A.   That's what this report says.  But you'll also

16   notice that they've upgraded the adenomas in the

17   high-dose and the mid-dose from -- two of the adenomas

18   are now carcinomas, or malignant neoplasms, and the one

19   in the mid-dose is also upgraded to a malignant

20   neoplasm.

21             And I think if you still look at these

22   incidents of tumors, and you compare them to historical

23   controls, you do see a significant trend in their

24   formation.

25        Q.   Okay.  Let's break that down.

                                                      2278

1           Even after doing the upgrading that you just
2     testified to, this five-person expert pathology working
3     group still concluded unanimously that the tumors were
4     not related to glyphosate, true?
5           A.   That was their opinion.  But I don't see where
6     they did any statistics anywhere.
7           Q.   And in terms of the statistics, do you recall,
8     Doctor, that the statistical significance assessment of
9     this study that IARC relied upon was not accurate?
10          A.   The statistical significance that IARC -- no,
11    I wasn't aware of that.
12          Q.   Do you recall how the statistical significance
13    for trend was determined in this study?
14          A.   By IARC?
15          Q.   Yes.  Do you recall that the working group
16    requested the assistance of Dr. Portier in calculating
17    the p-value for trend?
18          A.   Yeah, I'm sorry.  Yes, I remember that.  Since
19    he was there at the meeting, and he's one of the
20    best-known biostatisticians around, we asked him for
21    some help in calculating that.
22          Q.   And he gave you a test to use for calculating
23    the p-value, correct?
24          A.   I believe he did, yes.
25          Q.   And it resulted in a p-value less than .05,

2279

1    and that was relied upon by IARC as a positive study,

2    right?

3         A.   Okay, yes.

4         Q.   Do you know, since then, that Dr. Portier has

5    concluded that the p-value is above .05?

6         A.   Yes, he's rounded it to be 0.06.  Just barely

7    under significance.

8         Q.   Under IARC standards --

9              THE COURT:  One at a time.  Hold on a second.

10             THE WITNESS:  I'm sorry, Your Honor.

11   BY MR. ISMAIL:

12        Q.   Dr. Portier was here yesterday, and he

13   explained how this went down.

14        A.   Oh, okay.

15        Q.   So the working group, you folks believed and

16   relied upon the test that suggested this was

17   statistically significant, reported it as a positive

18   finding.

19             Now you agree that, under the better test, it

20   is not statistically significant at a .05 level,

21   correct?

22        A.   Correct.

23        Q.   And IARC, in determining what is a positive

24   finding, uses statistical significance at the .05 level,

25   true?

                                                        2280

1          A.   Yes.

2          Q.   And the national toxicology program, this gold

3     standard organization that you worked at, also uses for

4     positive finding p-value of .05, correct?

5          A.   Correct.

6          Q.   So this study, which was reported as positive

7     in the IARC Monograph, does not meet that positive

8     finding standard of .05?

9          A.   Not based on that criteria.

10         Q.   Thank you.

11              Now, in terms of the animal studies, Doctor, I

12    think it was described -- you told us on direct

13    examination that, after the IARC meeting, you went back

14    and did some additional analyses and identified all the

15    tumors that you believe constituted positive findings?

16         A.   Yes.

17         Q.   And do you recall when you did that, that you

18    looked at both the rat studies and the mouse studies?

19         A.   Correct.

20         Q.   And you considered a total of 12 studies as

21    the collection of reliable studies for your review,

22    right?

23         A.   Rats and mice?

24         Q.   Total.  Five mice, seven rats.

25         A.   Actually, I looked at 14 total.

                                                      2281

1      Q.   Oh, okay.

2           And when you did your -- well, back up one

3      step.

4           You agree that when animal researchers

5      conducting these studies are looking at tumors, they're

6      actually looking at a large number of different possible

7      tumor findings, correct?

8      A.   Right.

9      Q.   Up to 50 different tissues may be sampled for

10     tumors?

11     A.   Possibly.

12     Q.   And you're considering both whether there are

13     any trends and any what they call pairwise significant

14     findings, correct?

15     A.   Correct.

16     Q.   And you're looking at the males and the

17     females?

18     A.   Correct.

19     Q.   So each study has lots and lots and lots of

20     possible comparisons to look at, right?

21     A.   Yes, sir.

22     Q.   And you're familiar with the -- well, when you

23     did your review, you prepared a report for this case,

24     correct?

25     A.   Yes.

2282

1          Q.   And you reported what you, Dr. Jameson,
2     believed are the positive findings from the 12 or
3     14 rodent studies that you reviewed, correct?
4          A.   Correct.
5          Q.   And what you found were -- what you said were
6     16 positive findings, correct?
7          A.   I'd have to count them up to see, but that
8     sounds about right.
9          Q.   If you would like to -- it's page 29 of your
10    report, if you want to confirm it.
11               If that comports with your recollection, we
12    can move forward.
13         A.   Page 29 of my report.  Now I have to find my
14    report.
15         Q.   I can give you a copy.  I saw it was in your
16    binder, but I'm happy to give you a copy.
17         A.   That's okay.  I think I have it here.
18               You say it's on page 29?
19         Q.   I believe so.
20         A.   Okay.
21         Q.   Are you there?
22         A.   Yes, sir.
23         Q.   And we don't need to put it on the screen or
24    show it.  You can just eyeball that paragraph and
25    confirm, hopefully, that I did the math correctly.

                                                        2283

1        **A.**    I'm sorry, the question again is how many --

2        **Q.**    The positive findings you found in all the

3    rodent studies you reviewed.

4             There are 16, right?

5        **A.**    I count 17.

6        **Q.**    Okay.  Your report has what it is.  I don't

7    know what document you're looking at now, but we'll call

8    it 17 for this discussion.

9        **A.**    Okay.

10        **Q.**    What you did when you were trying to identify

11    a positive finding was to use what you always did in

12    your scientific practice with statistical significance

13    of .05 level, true?

14        **A.**    That's what I tried to do, yes.

15        **Q.**    And you know from looking at this that you

16    relied on Dr. Portier's initial statistics to identify

17    some of these tumor findings, right?

18        **A.**    In some cases.  In other cases, I used the

19    EPA's statistics.  I think for one of them, I used

20    statistics provided in the Greim study.

21        **Q.**    And you know that Dr. Portier has revised some

22    of the statistics that you relied upon?

23        **A.**    Yes.

24        **Q.**    And you know that some of the tumors that you

25    identified as positive because they were statistically

2284

1    significant, turns out that they're not statistically
2    significant, right?
3        **A.**   A few of them.
4        **Q.**   So, for example, this kidney tumor that you
5    and I were just talking about?
6        **A.**   Kidney tumors.
7        **Q.**   And there were others that Dr. Portier
8    initially said were statistically significant, and then
9    recalculated, and they're no longer statistically
10   significant, true?
11       **A.**   I'm checking.  Sorry.
12            There may have been one or two.
13       **Q.**   So the revised positive finding summary would
14   be some number below 17?
15       **A.**   Probably some -- maybe 15, 14 or 15.  Maybe.
16       **Q.**   Okay.  So first of all, you can confirm that
17   when you looked at the animal data, and applying the
18   same approach you did as a scientist outside of this
19   litigation, you did not find 35 tumors in the open
20   studies, right?
21       **A.**   Thirty-five?
22       **Q.**   Yes.  You found some number below 17?
23       **A.**   According to what I just read, I found 17.
24       **Q.**   And we already know that the truth of the
25   matter is somewhere below 17, right?

                                                        2285

1      **A.**   It may be on -- looking at the statistics that

2   were redone, it may come down to 15.

3      **Q.**   So we know Dr. Jameson doesn't think that

4   there are 35, 20, 25, or even 20 positive findings in

5   the glyphosate rodent studies, true?

6      **A.**   Okay.

7      **Q.**   Okay.  That's your --

8      **A.**   That's -- I told you that 15 is what I found.

9      **Q.**   Very good.

10      And you're familiar with the concept -- well,

11   there are hundreds of different comparisons done from

12   which you identified your findings, correct?

13      **A.**   I don't know if I follow what you're getting

14   at.

15      **Q.**   Sure.  We talked about how many different

16   possible analyses there are?

17      **A.**   You mean comparing tissues?

18      **Q.**   Yes.

19      **A.**   Okay.

20      **Q.**   And you know that the collection of the

21   comparisons from which you identified 15 positive

22   findings number in the hundreds, right?

23      **A.**   Would you -- could you say that again, please.

24      **Q.**   Sure.  You identified 15 positive findings,

25   right?

2286

1     **A.**   Okay.

2     **Q.**   Out of a collection of hundreds of different

3   possible comparisons?

4     **A.**   But that's not true.  That's not the

5   comparisons that are made.

6     **Q.**   So let me try this --

7     **A.**   When you do the histopathology on an animal,

8   you do look at all the tissue sites within the animals.

9   But then you compare, within the tissue sites, the

10   controls to the low, the mid, and the high dose.  That's

11   the comparison you're doing.

12        You can't go and say, look at all of the

13   hundreds or possibly thousands of different tissues I

14   looked at and compare a tumor in the liver to a tumor in

15   the lung or a tumor in the esophagus to a tumor in the

16   testes.  That's not how it's done.

17        That's not how the science is done.  And

18   that's what you're asking me to compare.

19     **Q.**   That's not what I'm asking you.

20     **A.**   Okay.

21     **Q.**   Let me ask it this way:  Do you know how many

22   comparisons were run from which you identified

23   15 positive findings?

24        And if you don't know, you can tell us you

25   don't know.

2287

1        **A.**   How many comparisons?

2        **Q.**   Yes.

3        **A.**   Well, you have to go and identify which tumor

4  site I'm finding a positive effect.  And if it's the

5  lymphoma in the mouse, then you look at the lymphomas in

6  that particular study.

7        **Q.**   So my question, Doctor, is:  Do you know how

8  many there are or how you would go about calculating

9  that number?

10        If you don't, just tell us.

11       **A.**   I don't understand your question at all.

12       **Q.**   Let's move on, Doctor.

13       Epidemiology.  You talked about that this

14  morning, okay?

15       **A.**   Okay.

16       **Q.**   You don't have a degree in epidemiology,

17  correct?

18       **A.**   No, sir.

19       **Q.**   You've never designed an epidemiology study,

20  true?

21       **A.**   I participated in epidemiology studies, but I

22  didn't design it, no.

23       **Q.**   Now, one of the papers or studies you talked

24  about was the Agricultural Health Study, correct?

25       **A.**   Right.

2288

1    Q.   And the Agricultural Health Study had an

2    analysis that was peer-reviewed and published, and that

3    was available to the working group in 2015, correct?

4        A.   That's right.  The 2006 De Roos study.

5             Is that what you're referring to?

6        Q.   Yes, sir.

7        A.   Okay.

8        Q.   And the working group looked to the

9    Agricultural Health Study to determine whether it was a

10   reliable and informative study, right?

11       A.   That's correct.

12       Q.   What the working group concluded was that the

13   Agricultural Health Study was a highly-informative

14   study, true?

15       A.   I think that's the wording they used for it,

16   yes.

17       Q.   And you know that the Agricultural Health

18   Study, in its publication in 2005, showed no increased

19   risk of non-Hodgkin's lymphoma following formulated

20   glyphosate exposure, true?

21       A.   You're saying the publication of the

22   Agricultural Health Study in 2005?

23       Q.   Yes, sir.

24       A.   I don't know if I'm aware of a 2005

25   publication of the Agricultural Health Study.

2289

1          **Q.**   Well, I'll show it to you.

2               Doctor, do you recognize Exhibit 4603 --

3          **A.**   Okay.

4          **Q.**   -- as the Agricultural Health Study that was

5     available for the working group to consider?

6          **A.**   Yes.  Sorry, I was mistaken.

7          **Q.**   And just so everyone is on the same page, you

8     just had the years mixed up.

9          **A.**   Yeah.  I had the years mixed up.  Sorry.

10         **Q.**   So this is the paper that we're looking at,

11    and we went through some of this yesterday with

12    Dr. Portier.

13              But since this was a study the working group

14    thought was highly informative, I want to ask you to

15    confirm the findings from this paper, okay?

16         **A.**   Okay.

17         **Q.**   If we go to page 52 of the paper.

18              The way these articles are prepared, the

19    authors will describe their methods, and then they'll

20    describe the results, and then they'll provide a

21    discussion of what these data mean, right?

22         **A.**   Correct.

23         **Q.**   What we're looking at here is how these

24    authors wrote up the results of their study.

25              They say:

2290

1           "There was no association between glyphosate
2           exposure and all cancer incidence for most of
3           the specific cancer subtypes we evaluated,
4           including NHL, whether the exposure metric was
5           ever used, cumulative exposure days, or
6           intensity-weighted cumulative exposure days."
7           Did I read that correctly?
8     A.    That's correct.
9     Q.    You agreed with that interpretation of the
10   data that's reported here, true?
11    A.    For this particular paper, yes.
12    Q.    So this was a study that the working group
13   thought was highly informative and was correctly
14   assessed to show no connection between glyphosate
15   formulations and non-Hodgkin's lymphoma, correct?
16    A.    And that's for exposures up to that time.  But
17   this really didn't take into account a lag time for the
18   formation of the tumors.
19    Q.    So then there was an updated study.
20           And you're familiar with this paper, correct?
21    A.    Yes.
22    Q.    And this paper comes out in 2018, so it comes
23   after the IARC working group in 2015, right?
24    A.    Yes, sir.
25    Q.    So when you were talking about, since the

2291

1    working group meeting, new studies have come out on this

2    issue, the Andreotti paper is one such --

3         A.   It's one of the studies that have come out

4    since the IARC meeting, that's correct.

5         Q.   And just to orient everyone here, these are

6    the authors on the paper.

7              And you know some of these folks, right?

8         A.   Yes.  I know Dr. Sandler.

9         Q.   You know Dr. Sandler, and you would agree she

10   is a highly-qualified, competent scientist?

11        A.   She's one of the investigators on the

12   Agricultural Health Study.  She's the lead pathologist

13   at the National Institute of Environmental Health

14   Sciences.  I've known Dale for quite a while.

15        Q.   Again, my question was qualified.

16        A.   She's qualified, yes.

17        Q.   And other folks on here, you know and respect.

18   You've got Dr. De Roos and other folks in here whose

19   qualifications and expertise you can vouch for, right?

20        A.   Yes.

21        Q.   And in terms of their affiliations, we've got

22   folks from your former shop, the National Institute of

23   Environmental Health Sciences; we've got folks from the

24   National Cancer Institute; we've got university

25   researchers and experts working on this paper, as well,

                                                        2292

1    correct?

2         **A.**   Correct.

3         **Q.**   And this is published in the Journal of the

4    National Cancer Institute?

5         **A.**   Yes.

6         **Q.**   One of the most highly-respected journals in

7    cancer research?

8         **A.**   Yes.

9         **Q.**   Undergoes peer review?

10        **A.**   In order to get it published.

11        **Q.**   And this is the post peer-reviewed publication

12   of this study, correct?

13        **A.**   If it came out in the Journal of NCI, then it

14   has been peer-reviewed.  Correct.

15        **Q.**   By definition.

16             Now, you recall, from reviewing this study,

17   that these authors whom you respect published results in

18   2018 that updated the Agricultural Health Study data,

19   correct?

20        **A.**   Okay.

21        **Q.**   Yes?

22        **A.**   Yes.  Up to that date.

23        **Q.**   Up to that date.

24             And they report on lots of different outcomes,

25   including non-Hodgkin's lymphoma, true?

                                                          2293

1        **A.**   That's correct.

2        **Q.**   And the jury has become accustomed to seeing

3    these values over here.  They recognize these as

4    relative risks.  And we know that if it's below 1 or

5    above 1 or around 1 -- let me start over.

6             A relative risk around 1 would show no effect,

7    positive or negative, correct?

8        **A.**   That's accurate.

9        **Q.**   And what we see here are values for how many

10   days of exposure the agricultural workers and other

11   participants had to glyphosate, correct?

12       **A.**   Which numbers are you referring to?

13       **Q.**   You know that the Q1, Q2, Q3, and Q4 are

14   showing increasing amounts of exposure to the agent

15   glyphosate?

16       **A.**   That's what they defined in the paper.  That's

17   how they defined it in the paper.

18       **Q.**   My point only being:  When they looked at the

19   various results from the data, they were trying to get a

20   look at dose response?

21       **A.**   That's what they were trying to get.

22       **Q.**   And what you can confirm here is that there's

23   no increased risk whatsoever shown in this peer-reviewed

24   study, correct?

25       **A.**   That's what they're reporting.

2294

1      **Q.**   Now, you talked about the epidemiology section

2   of IARC.  And I think I'm going to use your exhibit.

3   You were talking about the definition for what would be

4   limited or sufficient or inadequate data for human

5   epidemiology, according to the IARC definition?

6      **A.**   Uh-huh.

7      **Q.**   Okay.  This is a document you put up on your

8   direct examination, correct?

9      **A.**   I believe Brent put it up, yes.

10     **Q.**   Okay.  And so you were asked -- this was the

11  section you were asked about.

12          You were asked whether -- how the epidemiology

13  group and the working group assessed the human

14  epidemiology on glyphosate and non-Hodgkin's lymphoma,

15  right?

16     **A.**   Yes.

17     **Q.**   And you told Mr. Wisner, in response to his

18  question, that it was the second-highest classification.

19          Do you recall that?

20     **A.**   That's what we talked about, it being the

21  second-highest classification in human data.

22     **Q.**   In fairness, Doctor, it would be important to

23  know that there are -- the levels of data are

24  sufficient, limited, inadequate in evidence, suggesting

25  lack of carcinogenicity, correct?

2295

1          **A.**   That was the definition in 2015, yes.  They

2     have since changed.

3          **Q.**   So in terms of what the working group is

4     looking at and assessing, they used the definition --

5     what they didn't conclude was that the human

6     epidemiology shows that a relationship has been

7     established.

8               That was a classification that they rejected,

9     correct?

10         **A.**   They said it didn't meet sufficient evidence.

11         **Q.**   Right.  And instead, they chose limited

12    evidence as the classification, correct?

13         **A.**   A positive association is credible.

14         **Q.**   And there's a difference between association

15    and causation, correct?

16         **A.**   Association and causation?

17         **Q.**   If you don't understand the question, we can

18    move on.  I'll withdraw the question.  Let's move on.

19         **A.**   Okay.

20         **Q.**   In terms of what they said about causation,

21    they said it's credible, but they don't say it's been

22    established, true?

23         **A.**   They said it met that particular criteria for

24    the IARC.

25         **Q.**   And what they say is:

                                                       2296

1           "Chance, bias, or confounding could not be

2           ruled out."

3           Correct?

4      A.   Correct.  That's part of the definition.

5      Q.   We don't have to go over it here because we

6   did it yesterday.

7           But there's lots of potential confounders when

8   looking at the development of non-Hodgkin's lymphoma and

9   exposures, true?

10     A.   There could be.

11     Q.   Okay.  Last document I want to show you, sir.

12          You told us that additional studies have come

13   out since IARC; and one of these was AHS, which shows no

14   effect.  And there was --

15     A.   But that's not necessarily true.  That's not

16   accurate to say, the AHS showed no effect.  Because they

17   took the data from the 2018 AHS study and did two

18   meta-analyses including that data.

19          And the meta-analyses, in combination with the

20   case-control studies, get a significantly positive meta

21   risk.

22          THE COURT:  Dr. Jameson, I don't want to

23   interrupt you, but I am because Counsel didn't finish

24   his question.

25          THE WITNESS:  Oh.

                                                      2297

1          **THE COURT:**  I would like you to wait until

2     Counsel finishes his question, and then either respond

3     or not respond.

4          **THE WITNESS:**  I apologize, Your Honor.

5     BY MR. ISMAIL:

6          **Q.**   Was one of the papers you were referring to as

7     coming out since IARC the Leon study?

8          **A.**   Yes.

9          **Q.**   Is it your interpretation of that study that

10    it shows an overall increased risk of NHL following

11    glyphosate exposure?

12         **A.**   Based on their meta analysis?

13         **Q.**   Based on the cohort study that's described in

14    there.

15         **A.**   I'm under the -- the Leon study is a

16    meta-analysis of the data.

17         **Q.**   Are you familiar with the -- is it your

18    interpretation of the study that it shows an overall

19    increased risk of non-Hodgkin's lymphoma?

20         **A.**   The meta-analysis that they did, yes.

21         **Q.**   Have I handed you a copy of the Leon paper to

22    which you were referring?

23         **A.**   Yes.

24         **Q.**   And it's Exhibit 6762.

25              Yes, sir?

                                                              2298

1      **A.**   I'm sorry, I was reading.

2      **Q.**   I was just making sure we have here the Leon

3   paper from 2019; Exhibit 6762, correct?

4      **A.**   Correct.

5      **Q.**   And if you turn to Table 2.

6      **THE COURT:**  Page?

7      **MR. ISMAIL:**  Page 8, Your Honor.

8      **THE COURT:**  Thank you.

9   **BY MR. ISMAIL:**

10     **Q.**   Are you there, sir?

11     **A.**   Page 8?

12     **Q.**   Yeah.

13     **A.**   Okay.

14     **Q.**   In Table 2, do they report what the relative

15   risk is with glyphosate in this analysis for

16   non-Hodgkin's lymphoma?

17     **A.**   Okay.

18     **Q.**   Do you see it?

19     **A.**   Yes.

20     **Q.**   Tell the members of the jury what the relative

21   risk is for overall non-Hodgkin's lymphoma.

22     **A.**   For overall non-Hodgkin's lymphoma, yes, .95.

23     **Q.**   .95.  And is that indicative of an overall

24   increased risk of non-Hodgkin's lymphoma with glyphosate

25   exposure?

                                                      2299

1        Yes or no?

2        A.   Well, not for overall non-Hodgkin's, but I

3   think it was for the B-cell that they found that it was

4   statistically significant.

5        Q.   Are you aware -- let's just take this one step

6   at a time, sir.

7        The study which looked -- that just came out,

8   that you talked about with the jury as new information,

9   these researchers looked at whether glyphosate exposure

10  increased the risk of non-Hodgkin's lymphoma overall.

11       Correct?

12       A.   Of non-Hodgkin's lymphoma, okay.

13       Q.   And these researchers determined that, by

14  their data, there was no increased risk using the

15  overall NHL end point, true?

16       A.   For overall NHL.  But for B-cell, it was

17  significantly increased.

18       Q.   And are you aware of any other -- in terms of

19  the B-cell lymphoma that you're talking about, have you

20  looked to see whether other researchers have also

21  assessed whether there's a risk of B-cell lymphoma?

22       A.   I would be drawing on my memory.  I think so,

23  but I can't say for sure.

24       Q.   In terms of whether those other data show no

25  increased risk with B-cell lymphoma, you would have to

                                                  2300

1    rely on your memory to confirm or deny there's no

2    increased risk in those other studies, as well?

3        A.   Yeah.  I would have to find the studies and

4    look at them to give you a definitive answer on that.

5    Sorry.

6        Q.   In terms of the overall risk of non-Hodgkin's

7    lymphoma in the Leon paper that's come out since IARC,

8    you can agree that it shows no increased risk in NHL,

9    true?

10        A.   In overall NHL, but it is positive for B-cell.

11        MR. ISMAIL:  Thank you, sir.  No further

12    questions.

13        THE COURT:  Redirect?

14        MR. WISNER:  Yes, Your Honor.  Thank you.

15                  **REDIRECT EXAMINATION**

16    BY MR. WISNER:

17        Q.   Good afternoon, Doctor.

18             How are you holding up?

19        A.   Okay.

20        Q.   I understand you just had back surgery.

21             Is that right?

22        A.   Yes, it is.

23        Q.   Are you doing all right?

24        A.   I am, thank you.

25        Q.   I want to go backwards, starting from --

                                                    2301

1                (Short discussion off the record.)

2      **BY MR. WISNER:**

3          **Q.**   Doctor, I would like to sort of move backwards

4      from where Counsel was asking you questions.  We

5      actually have some time to do this today.  So let's go

6      backwards.

7                Let's start off with the Leon paper you were

8      just looking at, okay?

9          **A.**   Okay.

10         **Q.**   This is a pretty recent paper; is that right?

11         **A.**   That's correct.  It just came out, not too

12     long ago.

13         **Q.**   And the title of it is:

14               "Pesticide use and risk of non-Hodgkin's

15               lymphoid malignancies in agricultural cohorts

16               from France, Norway, and the USA:  A pooled

17               analysis from the AGRICOH Consortium."

18               Do you see that?

19         **A.**   Yes.

20         **Q.**   Is it your understanding that this looked at

21     results from three cohort studies?

22         **A.**   Yes.

23         **Q.**   One was the AHS?

24         **A.**   Yes.

25         **Q.**   And there was one from France and one from

                                                          2302

1    Norway, right?

2          **A.**    That's correct.

3          **Q.**    And if you actually go into the data here,

4    here on Table -- Figure 1, we have here some numbers

5    about the number of people included in the analysis.

6                Do you see that?

7          **A.**    Yes, sir.

8          **Q.**    So there's three studies.  There's the AGRICAN

9    study.

10                Do you see that?

11         **A.**    Yes.

12         **Q.**    That was the one from France?

13         **A.**    Yes.

14         **Q.**    The CNAP was from Norway?

15         **A.**    Right.

16         **Q.**    And the AHS?

17         **A.**    Absolutely.

18         **Q.**    And you would agree with me that the CNAP

19    study and the AGRICAN study are significantly larger

20    than the AHS?

21         **A.**    Significantly.  Yes.

22         **Q.**    When you look at if something is causing

23    non-Hodgkin's lymphoma, the way you measure the size of

24    the study is, you look at the number of people who have

25    cancer, right?

                                                          2303

1          **A.**   Correct.

2          **Q.**   And if we turn here to -- if we actually use

3     that table -- here it is.

4               If you go to the end of the study, Doctor,

5     there's some supplementary tables.

6               Do you see that?

7          **A.**   Okay.

8          **Q.**   If you go to, I believe it's the second one.

9     It lists out the size, the number of people that were

10    looked at.

11              Do you see that?

12         **A.**   Is this supplementary Table 2?

13         **Q.**   That's right.  Do you have it?

14         **A.**   Okay.

15              I found it.  All right.

16         **Q.**   So if you look under non-Hodgkin's lymphoma.

17              Do you see that?

18         **A.**   Yes.

19         **Q.**   It breaks it down by the three different

20    studies:  AGRICAN, CNAP, and AHS.

21         **A.**   Yes.

22         **Q.**   The AHS had 493.

23              Do you see that?

24         **A.**   Yes.

25         **Q.**   It looks like CNAP had 1,498 cases.

                                                              2304

1                    Do you see that?

2          **A.**   Yes, sir.

3          **Q.**   Let's look and see what the CNAP data showed

4     about overall NHL.

5          **A.**   Overall NHL.

6          **Q.**   To do that, you have to go to the portion of

7     the paper that specifically says glyphosate.

8                    So that would be on page -- if you find it

9     first, let me know.

10         **A.**   Page 11.

11         **Q.**   Thank you, sir.  Page 11.

12                   And you see that it starts at the bottom,

13    talks about glyphosate.

14                   Do you see that?

15         **A.**   Yes.

16         **Q.**   And then we turn to the next page.  It

17    actually records the incident rates for CNAP.

18                   Do you see that?

19         **A.**   Yes.

20         **Q.**   And it says:

21         "In CNAP, adjustment for ever use of other

22    pesticides generated a fully-adjusted hazard ratio

23    for ever use of glyphosate of larger magnitude, 1.67

24    1.05-2.6."

25                   Do you see that?

2305

1       A.    Yes, sir.

2       Q.    So the fully-adjusted cohort study that looked

3   at 1,500 cases had a statistically significant elevated

4   rate?

5       A.    Yes.  Correct.

6       Q.    So in the direct examination, when I said the

7   recent epidemiology that's coming out is reporting the

8   higher classification, is this what you were referring

9   to?

10      A.    Yeah.  That, and the other recent

11  meta-analysis that was published in a separate

12  publication.

13      Q.    We're going to get to that in two seconds.

14      A.    Okay.

15      Q.    There's also a section in here that looks at

16  something called diffuse large B-cell lymphoma.

17            Do you recall that?

18      A.    Yes.

19      Q.    I think you were saying that the study looked

20  at that specific subtype.

21      A.    Right.

22      Q.    When we talked about looking at the subtypes

23  of lymphoma, you would agree with me that, because they

24  are a rarer type of cancer, you need a lot of data?

25      A.    Correct.

1      Q.   And pulling in three massive cohorts kind of

2  gives you that data?

3      A.   It does.

4           MR. ISMAIL:   Your Honor, this is all leading.

5           THE COURT:   Pardon me?

6           MR. ISMAIL:   It's all leading, Your Honor, the

7  entire examination.

8           MR. WISNER:   I'll ask open-ended questions.

9  BY MR. WISNER:

10     Q.   Sir, there's a section here that says,

11  "Diffuse large B-cell lymphoma."

12          Do you see that?

13     A.   Yes.

14     Q.   And it reads:

15  "There was an elevated mHR of DLBCL with ever

16  use of glyphosate, 1.36, confidential interval

17  1.00-1.85."

18          Do you see that?

19     A.   Yes, sir.

20     Q.   What does that mean?

21     A.   That means there was a statistically

22  significant increase in the formation of this diffuse

23  B-cell lymphoma in the exposed group.

24     Q.   Sir, do you know that the two plaintiffs that

25  are filing this lawsuit --

                                                    2307

1          **MR. ISMAIL:**  Objection, Your Honor.  He

2   testified he has no information about the plaintiffs in

3   this case.

4          **MR. WISNER:**  He'll say he doesn't know.

5          **THE COURT:**  Well, no.  We agreed --

6          **MR. WISNER:**  I'm asking if he does.  I don't

7   know -- okay.  Let me ask an open-ended question.

8   **BY MR. WISNER:**

9       **Q.**   Do you know what type of cancer the two

10  plaintiffs have in this case?

11      **A.**   I know nothing about their condition, no.

12      **Q.**   Okay.  That's fine.

13          I want to talk about that Zhang study, okay?

14      **A.**   Okay.

15      **Q.**   This was a study we showed the jury yesterday

16  with Dr. Portier.  It's Exhibit 233.

17          **MR. WISNER:**  Your Honor, permission to

18  publish?  Actually, we published it yesterday.

19  **BY MR. WISNER:**

20      **Q.**   Is this a copy of the Zhang article, Doctor?

21      **A.**   Yes, sir.  I recognize it.

22      **Q.**   One of the things we see right here at the

23  beginning of it is that the title of it is:  "Exposure

24  to Glyphosate-based Herbicides and Risk for

25  Non-Hodgkin's lymphoma:  A Meta-Analysis and Supporting

                                                      2308

1    Evidence."

2              Do you see that?

3       A.    Yes.

4       Q.    And we have these different authors, right?

5       A.    Yes.

6       Q.    And it says right here that the lead author,

7    she's from Berkeley.

8              Do you see that?

9       A.    Yes.

10      Q.    All right.  And then there's a -- I want to go

11   to the signatory line, see what their declarations of

12   interest are.

13             It says right here -- oops.

14             It says:

15             "The authors have no financial conflicts of

16             interest to declare.  We disclose Drs. Zhang,

17             Taioli, and Sheppard served as Science Review

18             Board members of the U.S. EPA FIFRA Scientific

19             Advisory Panel meeting that evaluated

20             glyphosate in December 2016."

21             Do you know what that is referring to?

22      A.    That's the EPA Scientific Advisory Panel that

23   came out with the recommendation on regulating

24   glyphosate.

25      Q.    And you said this was a meta-analysis.

2309

1          What do you mean by that?

2          **A.**    Meta-analysis is a way of pulling the data

3     from several different studies that are similar in

4     design.  And by adding all of the studies together or

5     pooling the data from these studies, you're able to

6     increase the number of cases, the number of analyses

7     that you can do, thus giving you -- strengthening the

8     findings that you get.

9          **Q.**    It says right here:

10         "We conducted a new meta-analysis that included

11    the most recent update of the Agricultural Health

12    Study (AHS) cohort published in 2018, along with

13    five case-control studies."

14              Do you see that?

15         **A.**    That's correct.

16         **Q.**    Is it your understanding that this paper, this

17    meta-analysis, used the most recent AHS data?

18         **A.**    Yes, they did.

19         **Q.**    And if we go to the second part.

20              It says:

21         "We report the overall meta-relative risk of

22    NHL in GBH-exposed individuals was increased by

23    41 percent (meta-RR 1.41; confidence interval

24    1.13-1.75)."

25              Do you see that?

2310

1          A.   That's correct.

2          Q.   And then it goes on.

3               They said:

4          "To contextualize our findings of an increased

5     NHL risk to individuals with high GBH exposure, we

6     reviewed available animal and mechanistic studies."

7               Do you see that?

8          A.   Yes.

9          Q.   This study they showed you a minute ago, did

10    they look at animal studies?

11         A.   No.  That's just the publication of the

12    results of the cohort study.

13         Q.   Did they look at genotoxicity studies?

14         A.   No.  They didn't look at anything like that.

15    Like I said, they just reported the results of their

16    cohort study.

17         Q.   So what Dr. Zhang and her colleagues are doing

18    is going a step further?

19         A.   Yes.

20         Q.   It says:

21         "We documented further support from studies of

22    malignant lymphoma incidence in mice treated with

23    pure glyphosate, as well as potential links between

24    GBH exposure and immunosuppression, endocrine

25    destruction and genetic alterations that are

                                                      2311

1    commonly associated with NHL.  Overall, in

2    accordance with evidence from experimental animal

3    and mechanistic studies, our current meta-analysis

4    of human epidemiological studies suggests a

5    compelling link between exposures to GBHs and

6    increased risk for NHL."

7          Do you see that?

8    A.   Yes.

9    Q.   When you were working with the IARC working

10   group for glyphosate, did you have the benefit of this

11   comprehensive meta-analysis?

12   A.   No, we didn't have this analysis.  This just

13   came out in 2019.

14   Q.   Earlier, when I asked you about the recent

15   epidemiology that was coming out that was strengthening

16   your opinion, were you talking about this?

17   A.   Yes, this is what I was talking about.

18   Q.   During your cross-examination, do you recall

19   that Counsel showed you the IARC Monograph?

20   A.   Yes.

21   Q.   And if you actually look in our binder, there

22   is a copy of that Monograph.  It's Exhibit 1019.

23   A.   Okay.

24   Q.   During cross-examination, he showed you one

25   portion of it that related to the George study.

2312

1          Do you recall that?

2     **A.**   Yes.

3     **Q.**   Did he show the jury the rest of it?

4     **A.**   No.

5     **Q.**   Let's take a quick tour through.

6          **MR. WISNER:**   Permission to publish,

7     Your Honor?

8          **THE COURT:**   Granted.

9     **BY MR. WISNER:**

10    **Q.**   So this is the glyphosate Monograph.

11         Do you see that?

12    **A.**   That's correct.

13    **Q.**   Just to give the jury a sense of things, it's

14    a substantial document, right?

15    **A.**   Yes.

16    **Q.**   And it has -- well, let's run through it

17    quickly.

18         The first section of the Monograph is what?

19    **A.**   First section discusses exposure.

20    **Q.**   But I thought IARC didn't consider exposure,

21    sir?

22    **A.**   No, exposure is a very important part of the

23    overall review.  If you look at the preamble, there's a

24    big description in there about the part exposure plays

25    and how people are to go about identifying and using the

                                                    2313

1        exposure information in the evaluation.

2                It's critical for documenting human exposure

3        and the extent of human exposure that is known to the

4        materials we're reviewing.  And it also is essential to

5        the epidemiology people, for them to get a feel for what

6        industries are affected, what individuals in the public

7        domain are affected.

8                And, in fact, it's so important to the

9        epidemiologists that, here in the recent past, they

10       always assign an epidemiologist to the exposure section

11       to make sure that all the issues that the

12       epidemiologists need are addressed in the exposure

13       section.

14           Q.   So the first portion of it talks about

15       exposure, goes on for a while.  It has charts.  Keeps

16       going.

17               Then the first -- the next section is "Cancer

18       in Humans."

19               Is that right?

20           A.   That's correct.

21           Q.   It looks like the very first section they

22       discuss is cohort studies, correct?

23           A.   That's right.

24           Q.   And the only cohort study relevant here at

25       this time was?

                                                        2314

1          **A.**    The Agricultural Health Study.   That was the

2     only one available to us at the time.

3          **Q.**    If you go through it here, it looks like

4     they're looking at a whole bunch of different versions

5     of the Agricultural Health Study.   There's the

6     De Roos '05 one, there's Flower 2004, Engel 2005, Lee

7     2007, Andreotti 2009.

8               Do you see all that?

9          **A.**    Yes, sir.

10         **Q.**    Are these various publications that came out

11    of that cohort?

12         **A.**    The Agricultural Health Study, yes.

13         **Q.**    So they weren't just looking at NHL, all

14    cancers?

15         **A.**    Yes, that's right.

16         **Q.**    So after that, it gets into case control.

17              Do you see that?

18         **A.**    Yes, sir.

19         **Q.**    If you go through here, there's a table that

20    goes on for a while, and it's discussing these

21    case-control studies; is that right?

22         **A.**    Yes.

23         **Q.**    I'm just going to call one out here at random.

24              You mentioned Hardell earlier, this is one of

25    the studies, right?

                                                              2315

1          **A.**    Yes, one of the studies.

2          **Q.**    And it looks like the working group discusses

3     the study, discusses its size, discusses its analysis,

4     and discusses its results.

5               Do you see that?

6          **A.**    Yes.

7          **Q.**    For example, here, they highlight -- they note

8     the tripling of the risk.

9               Do you see that?

10         **A.**    Yes.

11         **Q.**    But they also highlight only 85 percent

12    increase, as well?

13         **A.**    Right.

14         **Q.**    So they're showing all the data and what

15    they're considering?

16         **A.**    That's correct.

17         **Q.**    All right.  This table goes for a bit.

18              And then after we get through the case-control

19    studies, they look at -- then we get to animals, right?

20         **A.**    Yes.

21         **Q.**    And you start off here with the mouse?

22         **A.**    Yes.

23         **Q.**    And then you move on to the rat?

24         **A.**    Rat.

25         **Q.**    If there were other animals, they would look

                                                        2316

1     at that, as well?

2          **A.**   Yes.

3          **Q.**   So we get through it all.  There's a section

4     titled "Mechanistic Data."

5               Do you see that?

6          **A.**   Yes, sir.

7          **Q.**   It says "toxicokinetic data."

8               Do you know what that means?

9          **A.**   That's looking at the kinetics of how the

10    material affects the different organisms in the body,

11    toxicokinetic studies.

12         **Q.**   I just wanted to sort of -- it looks like it

13    even has the chemical -- this is your area, right,

14    chemistry --

15         **A.**   Right.  That's glyphosate.  That's the

16    chemical structure of glyphosate.

17         **Q.**   Is it true that glyphosate is actually a very

18    simple molecule?

19         **A.**   Yeah, it's not very complicated.  It's a

20    phosphorus IMIDE.

21         **Q.**   We're going to act like we all understood what

22    that meant.

23               It keeps going, talks about metabolism,

24    mechanisms of carcinogens.

25               Do you see that?

                                                              2317

1    **A.**   Yes.

2    **Q.**   It keeps going.  More tables, more tables.

3    Each one of these lines here, just to specify, this is a

4    study?

5    **A.**   This is a genotoxicity study, yeah.  This

6    particular one is in plant systems.  They're looking at

7    DNA damage in the plants.

8    **Q.**   And you know that because it says DNA?

9    **A.**   Correct.

10   **Q.**   Or, for example, chromosome malignant damage?

11   **A.**   Correct.

12   **Q.**   So it keeps going, and finally we get to an

13   analysis of all this data:  "Summary Report."

14        Correct?

15   **A.**   Yes.

16   **Q.**   And they talk about the exposure, all those

17   sections we just went over; is that right?

18   **A.**   Yes.

19   **Q.**   All right.  And finally, we get to the overall

20   evaluation.

21        And I want to clear something up.  I think it

22   might have gotten confusing back there on

23   cross-examination.

24        There are assessments given to the epi?

25   **A.**   Yes.

2318

1    **Q.**   The animal data?

2    **A.**   Yes.

3    **Q.**   And the mechanistic data?

4    **A.**   Yes.

5    **Q.**   But then there's an overall assessment done?

6    **A.**   Correct.

7    **Q.**   Okay.  And so when you look at the evaluation

8    of the first section, the epidemiology, it states:

9            "There's limited evidence in humans for the

10           carcinogenicity of glyphosate."

11   **A.**   Correct.

12   **Q.**   Is that referring to the causal --

13   **A.**   A causal relationship is credible, but

14   confounding, bias, and other factors should not be

15   completely excluded.

16   **Q.**   Would it be fair to say that it's sort of like

17   saying that it's more likely than not causal?

18           **MR. ISMAIL:**  Objection, Your Honor.  A, it's

19   leading; and B, there's no quantitative significance to

20   any of --

21           **THE COURT:**  Sustained.

22   BY MR. WISNER:

23   **Q.**   It says right here:

24           "A positive association has been observed for

25           non-Hodgkin's lymphoma."

2319

1          **A.**   That's an important part of the finding, too.

2     The IARC working group stated that a positive

3     association has been observed for non-Hodgkin's lymphoma

4     and exposure to glyphosate and glyphosate formulations.

5          **Q.**   Typically when a chemical is classified as a

6     Group 1 carcinogen, there's usually an explanation as to

7     what tumor they say it's a carcinogen in.

8          **A.**   Right.

9          **Q.**   Is that what's going on here?

10         **A.**   Basically, that's what's being done here, yes.

11         **Q.**   We have the experimental animals:

12              "There's sufficient evidence in experimental

13              animals for the carcinogenicity of

14              glyphosate."

15         **A.**   Yes.

16         **Q.**   And in cross-examination, we explored what

17    sufficient meant.

18              Do you remember that?

19         **A.**   Right.

20         **Q.**   It means a causal association is established?

21         **A.**   It's established, yes.

22         **Q.**   And then down here, we have this -- sorry.

23              We have the overall evaluation.  We discussed

24    this before, Group 2A?

25         **A.**   Group 2A.

2320

1          Q.   Then we have this part down here.  It says:

2          "In making this overall evaluation, the working

3     group noted that the mechanistic and other relevant

4     data support the classification of glyphosate in

5     Group 2A.  In addition to limited evidence for the

6     carcinogenicity of glyphosate in humans and

7     sufficient evidence for carcinogenicity of

8     glyphosate in experimental animals, there's strong

9     evidence that glyphosate can operate through two key

10    characteristics of known human carcinogens, and that

11    these can be operative in humans."

12              I want to break that sentence down.

13    A.   Uh-huh.

14    Q.   They talk about these two key characteristics.

15         Do you remember that?

16    A.   Yes.

17    Q.   What are those?

18    A.   The two key characteristics?

19    Q.   Yes.

20    A.   For glyphosate, it's genotoxicity and

21    oxidative stress.

22    Q.   And here is the part that I want to focus on:

23    "And these can be operative in humans."

24    A.   Right.

25    Q.   What does that mean?

                                                      2321

1        **A.**   That just means that the genotoxicity and
2   oxidative stress are both known mechanisms to lead to
3   cancer in humans.
4        **Q.**   And in the data for glyphosate, do we actually
5   have data -- like, genotox of real people in real world
6   exposures having real genotoxicity?
7        **A.**   Yes.
8        **Q.**   That leads me to the point that was brought up
9   on cross-examination, the hazard and risk assessment.
10            Do you recall that?
11       **A.**   Yes.
12       **Q.**   And he put up a board and wrote some stuff on
13   it?
14       **A.**   Uh-huh.
15       **Q.**   I want to make sure I fully understand this
16   concept, okay?
17            Before you engage in a risk assessment, do you
18   first have to do a hazard assessment?
19       **A.**   Yes.  A hazard assessment is the first step of
20   a risk assessment.
21       **Q.**   And so you first ask the question, does it
22   cause cancer?
23       **A.**   Right.
24       **Q.**   And then if it does cause cancer, what is a
25   risk assessment trying to determine?

                                                              2322

1          **A.**    After you've established the hazard, the risk

2     assessment is trying to determine at what level -- at

3     what level of exposure to that particular material would

4     one be expected to get cancer.

5               They're trying to set limits of exposure they

6     can define as being safe for humans.

7          **Q.**    And if you don't conclude that it can cause

8     cancer in the first place, do you ever get to that

9     second set?

10         **A.**    No.   Not in my experience.   You have to

11    identify what the hazard is before you can do a risk

12    assessment for that particular hazard.

13         **Q.**    Counsel talked about the EPA, right?

14               Did the EPA ever conclude it could cause

15    cancer?

16         **A.**    Did the EPA conclude that glyphosate can cause

17    cancer?

18         **Q.**    Yeah.

19         **A.**    They did at one time.

20         **Q.**    Fair enough.

21               Currently, have they concluded --

22         **A.**    Currently, they said it does not cause cancer.

23         **Q.**    So if they didn't get to the first step, they

24    never got to the risk assessment?

25               **MR. ISMAIL:**   Objection, Your Honor.   Leading.

                                                              2323

1    Contrary to his prior testimony, in fact.

2              **MR. WISNER:**  Let me reask the question.

3              **THE COURT:**  Rephrase.

4              **MR. WISNER:**  Sure.

5    **BY MR. WISNER:**

6         **Q.**   If they didn't do a hazard assessment, could

7    they have done a risk assessment?

8         **A.**   It does not follow that they could have, no.

9         **Q.**   Did EFSA ever say it could cause cancer?

10        **A.**   No.  Not that I'm aware of.

11        **Q.**   So could they have gotten to the second

12   question?

13        **A.**   No.

14        **Q.**   That applies to all these regulators that were

15   shown to you a second ago.

16             Do you recall that?

17        **A.**   Yes.

18        **Q.**   Now, this distinction between risk and hazard,

19   did IARC respond to this issue publicly?

20        **A.**   Yes.  Because of all the controversy and

21   criticisms that IARC took over the evaluation of

22   glyphosate, the director of IARC wrote a pretty

23   extensive letter addressing all the issues that had been

24   cast against the IARC for their review.

25        **Q.**   Have you reviewed that letter?

| | | |
|---|---|---|
| 1 | **A.** | Yes. |
| 2 | **Q.** | Turn to your binder, Exhibit 2264. |
| 3 | | Is that a copy of that letter? |
| 4 | **A.** | Yes, it is. |
| 5 | **Q.** | And this is a document you've considered? |
| 6 | | Is this a document you've considered in |
| 7 | rendering your opinions? | |
| 8 | **A.** | Yes. |
| 9 | | **MR. WISNER:** Permission to publish, |
| 10 | Your Honor? | |
| 11 | | **MR. ISMAIL:** Objection. Hearsay, Your Honor. |
| 12 | | **THE COURT:** It is, actually. |
| 13 | | Source material? |
| 14 | | **MR. WISNER:** Sure. So I can't publish? |
| 15 | | **THE WITNESS:** Right. |
| 16 | | **MR. WISNER:** Then I won't publish. |
| 17 | **BY MR. WISNER:** | |
| 18 | **Q.** | Let's go through this a little bit, okay? |
| 19 | **A.** | Okay. |
| 20 | **Q.** | If you turn to page 9. |
| 21 | | Do you see that? |
| 22 | **A.** | Yes. |
| 23 | | **MR. WISNER:** Your Honor, I want to clarify, |
| 24 | I'm going to read passages and ask if he understands and | |
| 25 | can explain. | |

2325

1          Is that okay?

2          **THE COURT:**  That's okay.

3    **BY MR. WISNER:**

4     **Q.**   So on page 9 -- is everything okay?

5          On page 9, the title is:  "IARC Monographs

6    Identify Cancer Hazards and Do Not Include a Risk

7    Assessment."

8          Do you see that?

9     **A.**   Yes.

10    **Q.**   So Dr. Wild is actually responding to this

11   criticism?

12    **A.**   Yes.

13    **Q.**   And it reads:

14        "The IARC Monograph has identified carcinogenic

15   hazards, i.e., those agents having the potential

16   to cause cancer under some circumstances.  This has

17   led some to downplay the relevance of hazard

18   identification and to even suggest the exercise is

19   without value."

20        **MR. ISMAIL:**  Objection.  Hearsay, Your Honor.

21        **THE COURT:**  Step over to sidebar.

22        (Sidebar discussion not reported.)

23          (Recess taken at 4:06 p.m.)

24         (Proceedings resumed at 4:13 p.m.)

25        **THE COURT:**  Let's wrap it up.

2326

1          **MR. WISNER:**  Yes, Your Honor.

2     **BY MR. WISNER:**

3          **Q.**   We were talking a second ago about this letter

4     from Dr. Wild.

5               Have you had a chance to take a look at it

6     over the break?

7          **A.**   Yes.

8          **Q.**   I'm not going to read from it.  I want to talk

9     to you about some concepts that are in there, that I

10    think apply to what happened earlier.

11              We have this concept of hazard, right?

12         **A.**   Correct.

13         **Q.**   And that's step one, right?

14         **A.**   Correct.

15         **Q.**   Step two is risk.  Correct?

16         **A.**   Correct.

17         **Q.**   Now, in that letter, there's a discussion

18    about how risk is extrapolated after a hazard is

19    identified, right?

20         **A.**   Correct.

21         **Q.**   And that's a mathematical computation?

22         **A.**   The determination of the risk is a

23    mathematical determination, yes.

24         **Q.**   But the question of whether or not it can

25    cause hazard, is that a mathematical computation?

2327

1      **A.**   No.   That's part of the hazard assessment.

2      **Q.**   So, essentially, we're asking, can it cause

3   cancer in step one?

4      **A.**   Exactly.

5      **Q.**   And then we're trying to answer, when does it

6   cause cancer in step two?

7           **MR. ISMAIL:**   Your Honor, this is all leading

8   again.

9           **THE COURT:**   Overruled.

10          Go ahead.

11          **THE WITNESS:**   When or at what levels does it

12   cause cancer?

13   **BY MR. WISNER:**

14     **Q.**   So you're here to answer question one, right?

15     **A.**   Correct.

16     **Q.**   And question number two, that requires us to

17   take a look at the plaintiffs in this case?

18     **A.**   Yes.   For the determination of risk -- I hope

19   I'm not speaking out of turn.

20          But I think that's what the purpose of this

21   trial is, if the risk was high enough for them to

22   develop cancer.

23     **Q.**   And you haven't done that analysis, right?

24     **A.**   No, I have not.

25     **Q.**   Well, that analysis would look at how much

                                                              2328

1    were they spraying, for how long; that type of stuff,

2    right?

3         A.   Those types of things.  The exposure is the

4    essential part of determining the risk.

5         Q.   I want to clarify this.

6              When IARC did a hazard assessment, or when you

7    did a hazard assessment, you're helping us answer

8    question one, right?

9         A.   Correct.

10        Q.   And obviously, hopefully, some other person is

11   going to help answer question two?

12        A.   Question two, exactly.

13        Q.   Okay.  There was some discussion about the

14   data available to IARC as part of the Monograph.

15             Do you recall that?

16        A.   Yes.

17        Q.   And there was a discussion about the animal

18   data.

19             Do you recall that?

20        A.   Yes.

21        Q.   And there was an issue about whether or not

22   the EPA had access to, like, animal-level data, right?

23        A.   Yes.

24        Q.   You got a chance to look at the EPA report,

25   right?

1      **A.**   Yes, I have.

2      **Q.**   This is Exhibit 3066.

3            This is a copy of that EPA report, right?

4      **A.**   Yes.

5      **Q.**   And if we go to the animal section, and we

6      start looking at as it discussed various studies.  Like,

7      for example, Lankas.

8            Do you see that?

9      **A.**   Yes.

10     **Q.**   If you look at the citation, where does it

11     take you to?

12     **A.**   The citation?  I'm sorry.

13     **Q.**   Yeah.  Right here, it talks about Lankas.

14            You see that, 1981?

15     **A.**   Yeah.

16     **Q.**   And it has a citation.  What is that to?

17     **A.**   To Greim, et al., 2015.

18     **Q.**   So the EPA is looking at the same thing you're

19     looking at?

20     **A.**   Basically, yes.  They relied -- in their risk

21     assessment, they relied considerably on the Greim

22     publication for getting their information.

23     **Q.**   Now, I understand that there was a question

24     about dosing and the levels of doses in animal studies

25     compared to what a human might experience?

                                                          2330

1      **A.**    Uh-huh.

2      **Q.**    I want to clarify something.

3            Is that a relevant or appropriate question to

4      ask?

5      **A.**    No.  It's not really a relevant question.

6      Because as I've indicated before, the purpose of the

7      animal studies is to determine, if exposed at the

8      highest level they can tolerate for their life without

9      showing overt signs of toxicity, do the animals get

10     cancer?

11           To answer the question:  Under the most

12     extreme circumstances that we can give to these animals,

13     does the chemical cause cancer in those animals?  Yes or

14     no?

15           You do the study, you analyze the tissues, you

16     determine tumor incidence and answer the question:

17     Given the maximum tolerated dose, given the most they

18     can tolerate, does it cause cancer in these animals?

19           If the answer is yes, then it's identified as

20     an animal carcinogenic; and then it is biologically

21     plausible that this material can also cause cancer in

22     humans.

23           So epidemiology studies, if they haven't been

24     done, they should be conducted.

25     **Q.**    If you were to do an animal study using

2331

1    human-level dose exposures, how many animals would you

2    need to be able to see anything?

3         A.   Oh, to do it at human exposure levels?  Oh,

4    you'd probably need several orders of magnitude more

5    animals than the 65 per sex, per species, per dose.

6         Q.   Why would you need so many more animals --

7         A.   Because at those low dose levels, the

8    probability of detecting the cancer is very low.  So you

9    would need a large population, if you will, to be able

10   to find an effect.

11        Q.   And up here, we have the Lankas study.

12             Do you see that?

13        A.   Yes.

14             MR. WISNER:  Permission to get the board, Your

15   Honor?

16             THE COURT:  Yes.

17   BY MR. WISNER:

18        Q.   This is the tumor board we made with

19   Dr. Portier --

20        A.   Okay.

21        Q.   -- yesterday or the day before.

22             And Lankas 1981.  Do you see that?

23        A.   Correct.

24        Q.   That's that same study there, 1981?

25        A.   1981.

                                                      2332

1    **Q.**   Now, Monsanto is pointing to some of the high

2    doses of some of these studies to suggest that they're

3    very high.

4    **A.**   Right.

5    **Q.**   They pointed to the Knezevich and Hogan one,

6    which has 30,000 or whatever.

7    **A.**   Right.

8    **Q.**   What is the dosing in Lankas?

9    **A.**   The highest dose tested was 31 milligrams per

10   kilogram per day, is what this is saying.

11   **Q.**   They were talking about 4,000.

12         So this is orders of magnitude smaller?

13   **A.**   Right.

14   **Q.**   So it's closer to what you would expect to see

15   at human doses?

16   **A.**   It is, yes.

17   **Q.**   And notwithstanding that, there's still tumors

18   in the animals?

19   **A.**   Yes, sir.

20   **Q.**   So what is the significance of seeing, even at

21   lower doses, these rodents who were exposed to

22   glyphosate still getting tumors?

23   **A.**   Even at low doses, the material seems to be

24   causing cancer in these animals.  But you still can't

25   say -- can't equate it to a human dose, because the

1    human dose is probably still much lower than that.

2         And it's not the purpose of the study.  The

3    purpose of the study is to determine if the material can

4    cause cancer in the animals.  And the Lankas study

5    indicates that the -- even at these relatively lower

6    doses compared to some of the other studies, you still

7    get tumors caused by the glyphosate.

8    Q.   And then when we get to the epi, what kind of

9    dosing levels there?

10   A.   Those are real world exposure levels.  You're

11   recruiting people to participate in the study that is

12   using the material, the Roundup, in their everyday

13   working situation; they're spraying it in their fields,

14   they're using it in their landscaping, that type of

15   thing.

16        Those are the case -- the cohort and

17   case-control study people you're identifying that

18   actually use the material in real world situations.  So

19   therefore, it's at real world doses to see if that was

20   the cause of their non-Hodgkin's lymphoma.

21   Q.   And in the epidemiology from the case-control

22   studies, they're drawing from millions of people, right?

23   A.   Oh, yes.  Yeah.

24   Q.   And in the cohorts, they're dealing with

25   hundreds of thousands of people?

2334

1         A.    Yes.

2         Q.    And because you have so many, you're actually

3    able to see the cancer at real world exposures?

4         A.    Right.

5         Q.    Finally, there was a discussion about this

6    technical report.

7               Do you remember that from the NTP?

8         A.    Yes, sir.  On glyphosate?

9         Q.    Yeah.

10        A.    Yes.

11        Q.    And it did some genotox studies in this one

12   type of mouse?

13        A.    Right.  The 63F1 mouse.  It was negative.

14        Q.    That's one study?

15        A.    Right.

16        Q.    How many studies, overall, have there been on

17   genotox?

18        A.    Oh, for glyphosate?

19        Q.    Yeah.

20        A.    Oh, geez.  Hundreds, probably.  Hundreds.

21        Q.    And this jury got the chance to see the data

22   in humans.

23        A.    Right.  And that's very important to

24   emphasize, that a lot of the genotox data available on

25   glyphosate is in humans.

                                                          2335

1            The most relevant test cells or test agents

2     you can use in trying to establish a cause and effect is

3     the exposure of the glyphosate to human cancer.  If you

4     do it in human cells, it's very significant.

5        Q.   And in all of those various human cells that

6     have been examined by researchers around the world, is

7     it overwhelmingly positive or negative?

8        A.   It's pretty much all positive, yeah.  It's

9     pretty amazing how strong it seems to be in effect.

10       Q.   And on the first question that you've been

11    here to testify on, sir, do you have any doubt

12    whatsoever about whether or not Roundup can cause

13    non-Hodgkin's lymphoma?

14       A.   No.  Based on my evaluation of all of the

15    relevant data, the epidemiology data, the animal data,

16    the mechanistic data, to a reasonable degree of

17    scientific certainty, exposure to Roundup causes

18    non-Hodgkin's lymphoma in humans.

19         **MR. WISNER:**  Thank you, sir.  No further

20    questions.

21         **MR. ISMAIL:**  May I have three minutes,

22    Your Honor, for cross?

23         **THE COURT:**  Yes.

24         **MR. ISMAIL:**  Thank you.

25    ///

1          **RECROSS-EXAMINATION**

2     BY MR. ISMAIL:

3          **Q.**   Dr. Jameson, in terms of the epidemiology,

4     when you told the jury this morning that, since IARC,

5     the epidemiology has all been positive, you were

6     excluding in your testimony the Agricultural Health

7     Study publication in 2018 and the National Cancer

8     Institute journal, correct?

9               Because that's not been positive.

10         **A.**   Well, I guess maybe I was -- I kind of

11    misspoke.

12              What I was considering in that answer was the

13    fact that the 2018 Agricultural Health Study has been

14    included in the more recent meta-analyses.  And when

15    it's included in the meta-analyses, you get a positive

16    response from the medical -- from the meta-analysis of

17    all the data, which includes the 2018.

18         **Q.**   Right.  So that study doesn't show an

19    increased risk, the Agricultural Health Study, right?

20         **A.**   That's what they report.  Now, I have a

21    problem with the Agricultural Health Study because of

22    its design.  I think it's -- basically, I think it's a

23    flawed study.

24         **Q.**   And we went through the authors who you

25    respect and the journals that you respect --

2337

1          **A.**   Right.  But I still feel the design of the

2     study is flawed.

3               **THE COURT:**  Can you just wait until --

4               **THE WITNESS:**  I'm sorry.

5               **THE COURT:**  The reporter can't take down two

6     voices at once --

7               **THE WITNESS:**  I'm sorry, I'm sorry.

8               **THE COURT:**  We're almost done.

9     **BY MR. ISMAIL:**

10         **Q.**   This is the Leon paper.  And Mr. Wisner went

11    through, this is a meta-analysis, how big it was and how

12    that increases the reliability of the data, and lots of

13    different cohort studies combined, right?

14              You remember that in the redirect just now?

15         **A.**   Yes.

16         **Q.**   So this is data that's come out since IARC,

17    right?

18         **A.**   Yes.

19         **Q.**   And we have hazard ratio, correct?

20         **A.**   Yes.

21         **Q.**   And I'm showing you in this large

22    meta-analysis, the reliability of which you vouched for

23    on redirect, can you confirm for the jury that there's

24    no increased risk for non-Hodgkin's lymphoma overall

25    with glyphosate exposure?

1     **A.**    That's what these numbers are saying, yes.

2     **Q.**    And then with respect to the other

3 meta-analysis you talked about, the Zhang paper, you

4 know, sir, that that analysis did not incorporate all

5 the Agricultural Health Study data to record the

6 relative risk that you talked about on redirect, true?

7     **A.**    I believe it used just the high exposures in

8 that; so therefore, I see that as a valid thing to just

9 include the high doses in there.

10     **Q.**    So, yes or no, did the meta-analysis in Zhang

11 include all the data from the Agricultural Health Study?

12     **A.**    No.   It just included all the high dose

13 levels.

14     **Q.**    And the one thing you point out on redirect

15 with Mr. Wisner is this result over here:   1.36.

16            This is that meta-analysis result for a

17 particular subtype, right?

18     **A.**    For the B-cell, correct.

19     **Q.**    And you can't tell from your own review and

20 recollection that there's any other study that

21 replicates this finding, correct?

22     **A.**    None comes to mind right now.   I might be able

23 to find one, but none comes to mind right now.

24     **Q.**    And it touches 1 as the lower bound of the

25 confidence interval, correct?

1      **A.**    Right.   But that's the definition of being

2    statistically significant, if it includes 1.

3      **Q.**    If it just touches it, right?

4            And the overall risk, you can confirm for the

5    jury, is below a relative risk of 2, even for the data

6    that you are pointing to from this study.

7            Isn't that correct?

8      **A.**    What it is showing is a 36 percent increase in

9    the risk for B-cell lymphoma.

10     **Q.**    So the answer to my question is what, sir?

11     **A.**    That it shows a 36 percent increase.

12     **Q.**    Do you remember my question?

13           The question was:  Can you confirm for the

14   jury that the relative risk in this particular subset of

15   the data, that you went over on redirect with

16   Mr. Wisner, is below a relative risk of 2?

17           Yes or no?

18     **A.**    No.   I mean, this is what the paper says:

19   1.36, the 36 percent increase.

20     **Q.**    Thank you, Doctor.

21     **A.**    So it is below 2.

22     **Q.**    That's what I was asking.   Thank you very

23   much.

24           **THE COURT:**   I think we're all done.

25           **THE WITNESS:**   Thank you, Your Honor, for

                                                       2340

1    letting me testify in your court today.

2         **MR. WISNER:**  Your Honor.  I just want to read

3    this request for admission that came up during his

4    direct.

5         Do you recall?

6         **THE COURT:**  I do.

7         **MR. WISNER:**  They don't object.

8         **THE COURT:**  Okay.  I'm trying to recall

9    exactly what we're talking about.

10         **MR. WISNER:**  It was about whether or not

11    Monsanto had done another study.

12         **THE COURT:**  All right.  Go ahead.

13         **MR. WISNER:**  Dr. Jameson, you can step down.

14    You're free.

15         **THE WITNESS:**  That's a wonderful thing.

16              (Witness excused.)

17         **THE COURT:**  I think I should explain this.

18    It's 4:30, and I need to explain what that means.

19         That is, in fact, evidence, and maybe

20    that's --

21         **MR. WISNER:**  Can I just do admission, and we

22    can be done with it?  We can do it later.

23         **THE COURT:**  First of all, go ahead and step

24    down.

25         **MR. ISMAIL:**  We'll clean up, Doctor.

2341

1          **THE WITNESS:**  I'm just trying to get my junk.

2          **THE COURT:**  Ladies and gentlemen, Mr. Wisner

3     is going to read a response from discovery which is

4     evidence.  Just like the deposition that was referenced

5     yesterday, what qualifies as evidence, this qualifies as

6     evidence.  He's going to read it to you.

7          **MR. WISNER:**  Thank you, Your Honor.

8          It's Request for Admission Number 4:

9        "Admit that Monsanto has conducted no animal

10    carcinogenicity studies on glyphosate since 1991."

11         Response:

12       "Monsanto admits that after reasonable inquiry

13    into the information that is known or readily

14    obtainable, it has not identified any 12-month or

15    longer animal chronic toxicity studies that it has

16    conducted on glyphosate since 1991."

17         Thank you.

18         **THE COURT:**  So ladies and gentlemen, we're

19    done for the week.  It's Thursday.  We'll be back on

20    Monday at 9:00.  And I want to thank you for your time

21    and attention this week.

22         And I want to reemphasize even more so, since

23    this is the weekend, that it's really important not to

24    talk about anything that you've heard in the case so

25    far.  We're into it, but just barely.

2342

1          So when you talk about things that you are

2     hearing, you're sort of making decisions in your mind,

3     that's why it's important not to talk about it.

4          And you may not even realize it, but you do it

5     anyway.  So it's really critical that when you walk out

6     the door, that you leave all of this behind and not do

7     any research, not have any conversations, and just enjoy

8     yourself this weekend and come back ready to roll Monday

9     morning at 9:00.

10         Thank you for your time and attention so far.

11    You are excused until Monday.  Thank you.

12              (Short discussion off the record.)

13         (The following proceedings were heard out of the

14                   presence of the jury:)

15         **THE COURT:**  So I would suggest that you figure

16    out what things you want to cover, that we can cover in

17    a couple hours.  I know there were some issues regarding

18    the deposition.  So those page and line.

19         And I think we need to talk through some of

20    these documents.  Some of this issue we're having with

21    the documents; and that is to say, what we talked about

22    earlier, the meeting and conferring on documents that we

23    will have some issue with before we get into it.  I

24    don't know whether that's happening or not.  Maybe we

25    should talk a little more about how that's going to go.

2343

1    So just think about it.

2           MR. WISNER:  I'm going home.  I haven't been

3    home in a couple months.

4           THE COURT:  So when are you going home?

5           MR. WISNER:  Tonight.  Can I call in to the

6    hearing tomorrow at 2:15?

7           THE COURT:  So you won't be here?

8           MR. WISNER:  I won't.  But I'll have people

9    ready to argue the issues on the EPA documents, if I

10   could appear by phone.

11          THE COURT:  Sure.

12          MR. WISNER:  Thank you.

13          THE COURT:  I guess you'll have to set up a

14   CourtCall, because I don't think I have conferencing

15   ability on this phone.

16          MR. WISNER:  I'll set it up.

17          THE COURT:  All right.

18          MR. BROWN:  And I set up a medical appointment

19   for tomorrow afternoon.  But I trust my colleagues

20   implicitly, so I will be doing that.

21          THE COURT:  They're not going home.

22          MR. BROWN:  I'm not going home either.

23          Also, Your Honor, today was the first time --

24   we've only had two witnesses, and we've had some rulings

25   on some motions in limine and this witness got into GMOs

1    and all that.

2           It's important to remember that those

3    witnesses should be talked to before they hit the stand

4    and told what the parameters of the MILs are.  Because

5    we're certainly doing that with our witnesses, and I

6    think it's important.

7           **THE COURT:**  True.  There should be some

8    incidental mention of that, and I know that.  I'm

9    certainly not going to pipe up.

10          But to the extent that the subject matter

11   shouldn't be GMOs.  And to the extent we sort of started

12   going down that path today, it should not.

13          That Monsanto manufactures GMOs or that it

14   will incidentally be mentioned, it will happen from time

15   to time.  I know that.

16          So I want to be clear:  GMOs are going to come

17   up in conversation about what Monsanto either produces

18   or how it affects -- a little bit.  But I don't want the

19   subject matter to be production of or how anybody feels

20   about GMOs.

21          **MR. MILLER:**  Very, very minimally.  Only in

22   the context of, they sprayed more Roundup after GMOs

23   came out.  That's it.  Because that affects the results

24   of the epi study.  But no one is going to talk about

25   commercial or scientific --

                                                         2345

1        THE COURT:  I know.  But if they're going down

2   the -- you know, more resistant, then that's kind of

3   what --

4        MR. MILLER:  Not going there.  Not going

5   there.

6        MR. WISNER:  I think Dr. Jameson didn't

7   realize --

8        MR. EVANS:  The increased use of glyphosate,

9   we certainly don't disagree with that.  But I don't

10  understand why it needs to be tied to GMOs.

11       THE COURT:  And it doesn't.

12       MR. WISNER:  I think he wasn't thinking --

13       MR. EVANS:  But Mr. Miller just said that.

14       THE COURT:  It doesn't.  Particularly because

15  of the MIL, I would prefer that we stay away from it.

16       MR. MILLER:  Sure, Your Honor.  I understand.

17       THE COURT:  I'm not going to ask that no one

18  say the word GMO, because I know it's not possible not

19  to actually say the word in connection with some things

20  that are going to come up.

21       But I do take Mr. Brown's suggestion

22  seriously.  And every witness should be told what topics

23  are off limits and what topics are accepted.

24       MR. MILLER:  We agree, Your Honor.  We will.

25       MR. BROWN:  And I wasn't just referring to

2346

1    GMOs.  There are other issues that were covered on the

2    MILs.

3              **THE COURT:**  I know.

4              **MR. BROWN:**  I just want to make sure that

5    those things are covered with the witnesses before they

6    get on the stand.  That's all.

7              **THE COURT:**  I'm sure everyone is going to do

8    that with their witnesses.

9              **MR. MILLER:**  Absolutely.

10             Monday's witness will be Dr. Ritz, an

11   epidemiologist.  And I anticipate that will go the

12   entire day.

13             **MR. WISNER:**  And Tuesday will be

14   Dr. Weisenberger.  And we're hoping to be done by

15   Tuesday, but if he has to stay through Wednesday

16   morning, he's available.  And then Wednesday afternoon,

17   we believe Dr. O'Shanick will be here.

18             So we're disclosing our witnesses far ahead in

19   advance, and I think maybe the last witness next week

20   will be Sawyer.  That's not confirmed yet.

21             **MR. EVANS:**  Then you're resting?

22             **MR. WISNER:**  No.

23             **THE COURT:**  Okay.

24             **MR. ISMAIL:**  Your Honor, on the Sargon

25   rulings, I know they're still tentative.

2347

1      **THE COURT:**  I thought I --

2      **MR. ISMAIL:**  For example, for this witness, we

3  had -- at the hearing, we raised the question of

4  epidemiology subject of the last witness.  Dr. Jameson

5  was excluded from that in the MIL.

6      We asked at the Sargon hearing for Your Honor

7  to consider that in the final order.

8      **THE COURT:**  I -- that -- I thought I filed an

9  order which would have been very much, if not the exact

10  same order, that I would have filed it.

11      In fact, I thought I did.  I'm pretty sure I

12  signed it.

13      Chris, would you take a look and see.

14      **MR. ISMAIL:**  Just for the preservation of the

15  record purposes.

16      **THE COURT:**  I just thought I had.

17      **MR. ISMAIL:**  I know there's a final MIL

18  ruling.  I had not seen --

19      **THE COURT:**  And before Monday, I'm going to

20  try to get the other rulings that we discussed finalized

21  and filed so that they're filed.

22      But the Sargon ruling is -- I know there were

23  a couple of modifications, but I didn't change the

24  tentatives, I don't think, on any of the initial

25  rulings.

2348

1          So with respect to Dr. Jameson, did I --

2          MR. WISNER:  You did not exclude him.

3          MR. ISMAIL:  And I was operating on that

4     assumption, given the Court's comments.  I just would

5     like it -- that I wasn't waiving our objection to

6     qualifications since we had that change today.  And I

7     hadn't seen the final.  If it's in the record, it's my

8     mistake.

9          THE COURT:  I'll check right now.  Because I

10    know I signed something.  So whether it got off my desk

11    and actually filed, I don't know.  But I thought for

12    sure I had done that.  I'll double-check.

13         THE CLERK:  March 18th, it was filed.  Let me

14    see if I can print it.  The order on Sargon motions and

15    motion for summary judgment.

16         THE COURT:  Yeah, I did file it.  Yeah.

17         MR. ISMAIL:  Then I'm three weeks behind.

18         THE COURT:  I know I'm a little behind.

19         MR. MILLER:  You're fine, Your Honor.

20         THE COURT:  Well, listen.  Thank you.

21         I'll see everybody tomorrow.

22         (Proceedings adjourned at 4:42 p.m.)

23

24

25

```
 1    State of California            )
                                     )
 2    County of Alameda              )

 3

 4         We, Kelly L. Shainline and Lori Stokes, Court

 5    Reporters at the Superior Court of California, County of

 6    Alameda, do hereby certify:

 7         That we were present at the time of the above

 8    proceedings;

 9         That we took down in machine shorthand notes all

10    proceedings had and testimony given;

11         That we thereafter transcribed said shorthand notes

12    with the aid of a computer;

13         That the above and foregoing is a full, true, and

14    correct transcription of said shorthand notes, and a

15    full, true and correct transcript of all proceedings had

16    and testimony taken;

17         That we are not a party to the action or related to

18    a party or counsel;

19         That we have no financial or other interest in the

20    outcome of the action.

21    Dated:  April 4, 2019

22

23

24    Kelly L. Shainline                Lori Stokes
      CSR No. 13476, CRR                CSR No. 12732, RPR
25
```

2350