Aimee Wagstaff, SBN 278480
aimee.wagstaff@andruswagstaff.com
Andrus Wagstaff, PC
7171 West Alaska Drive
Lakewood, CO 80226
Telephone: (303) 376-6360
Facsimile: (303) 376-6361

Robin Greenwald
rgreenwald@weitzlux.com
Weitz & Luxenberg
700 Broadway
New York, NY 10003
Telephone: (212) 558-5500
Facsimile: (212) 344-5461

Michael Miller
mmiller@millerfirmllc.com
The Miller Firm LLC
108 Railroad Avenue
Orange, VA 22960
Telephone: (540) 672-4224
Facsimile: (540) 672-3055

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 |
| | Case No. 16-md-02741-VC |
| This document relates to: | **PLAINTIFF'S RESPONSE TO MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER ON *DAUBERT* GROUNDS** |
| *Dickey v. Monsanto Co.,* 3:16-cv-04102-VC | |
| *Domina v. Monsanto Co.,* 3:16-cv-05887-VC | |
| *Giglio v. Monsanto Co.,* 3:16-cv-05658-VC | |
| *Harris v. Monsanto Co.,* 3:17-cv-03199-VC | |
| *I. Hernandez v. Monsanto,* 3:16-cv-05750-VC | |
| *Janzen v. Monsanto Co.,* 3:19-cv-04103-VC | |
| *Mendoza v. Monsanto Co.,* 3:19-cv-06046-VC | |
| *Perkins v. Monsanto Co.,* 3:16-cv-06025-VC | |
| *Pollard v. Monsanto Co.,* 3:19-cv-04100-VC | |
| *Russo v. Monsanto Co.,* 3:16-cv-06024-VC | |
| *Sanders v. Monsanto Co.,* 3:16-cv-05752-VC | |
| *Tanner v. Monsanto Co.,* 3:19-cv-04099-VC | |

**PLAINTIFF'S RESPONSE TO MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER ON *DAUBERT* GROUNDS**

# I. Introduction

William Sawyer, Ph.D. "is a highly qualified toxicologist - currently chief toxicologist of Toxicology Consultants and Assessment in New York. He is Board Certified in forensic medicine, toxicology and pharmacology and is well published." *Fleming v. Nicholls-Wilcox, Inc.*, No. 02-1-7632-42, 2005 WL 5419258 (Ga. Super., May 10, 2005). Dr. Sawyer has more than 28 years of experience in public health and forensic toxicology including five years of governmental service. *See* Dr. Sawyer Affidavit ant CV (Sawyer Aff.) (Travers Decl., Ex. 1). He has a Ph.D. in toxicology and a Master's degree in cellular and molecular biology and has consulted for numerous governmental agencies including "the United States Attorney's Office, US Navy, various prosecutors, Attorney State General of Montana, New York, New Jersey and other states." *See Johnson v. Monsanto* Trial Transcript ("Johnson Tr.")  at 3586-3588. (Travers Decl., Ex. 2)  In fact, Dr. Sawyer has previously served as an expert witness for law firms representing Monsanto. *Pilliod v. Monsanto* Trial Transcript ("Pilliod Tr.") at 3079:7-3080:19 (Travers Decl., Ex. 3).

To date, Dr. Sawyer has given many dozens of hours of testimony in the Roundup® litigation through over 15 days of deposition and two days of testimony in the *Johnson* and *Pilliod* trials. He has spent hundreds of hours reviewing published studies, medical records and internal documents written by Monsanto scientists. Monsanto has repeatedly tried and failed to exclude or strike Dr. Sawyer's opinions. *See Pilliod v Monsanto Co.*, 2019 WL 2158266 (Cal.Super. Mar. 18, 2019); *Johnson v Monsanto Co.*, 2018 WL 2324413 (Cal.Super. May 17, 2018) (denying pre-trial preclusion); *Johnson v Monsanto Co.*, 2018 WL 5246323 (Cal.Super. Oct. 22, 2018) (denying Monsanto's post-trial motion to set aside the verdict).

Dr. Sawyer's core role at trial is to explain how Roundup® travels from the bottle to the bones of Roundup users. Pilliod Tr. at 3183:15-3184:3 (Travers Decl., Ex. 3) ("The bone is a preferential point of distribution...  That's where the [lymphoma] malignancy starts."). In toxicological terminology, this area of study is called Absorption, Distribution, Metabolism, Excretion ("ADME").  (Hernandez Report, 23, 55-122) (Travers Decl., Ex. 4); *see also* 1/13/2011 Monsanto Email ("Our glyphosate rat ADME study also shows that levels in bone are significantly higher than those in any other tissue/organ.") (Travers Decl., Ex. 5).  Dr. Sawyer will offer

testimony as to the effect of various types of clothing, protective gear and equipment on increasing or decreasing exposure to Roundup®; and how the instructions on the Roundup® label affect the exposure of Plaintiffs.   Hernandez Rep. at 17-25 (Travers Decl. Ex. 4).   Dr. Sawyer will testify as to the mechanism of carcinogenicity including the relative genotoxicity and promotion activity of both glyphosate and the formulated product (including adjuvants and impurities).  *Id.* at 29-48. Dr. Sawyer will be offering these general opinions in all Wave I cases.  Monsanto does not argue that Dr. Sawyer is unqualified to offer the aforementioned opinions, nor does Monsanto argue that these opinions are unreliable or irrelevant.

As noted in Plaintiffs' Expert Designations, Dr. Sawyer is being offered (in all cases) to:

...testify on issues concerning the mechanism of absorption of glyphosate-based formulations through the skin and other exposure pathways, the role of surfactants on dermal absorption, toxicology and animal studies on dermal absorption, including his analysis of the data and the interpretation and methodology related to that data; human exposure studies and data relating to glyphosate-based formulations, and the effect of wearing personal protective equipment on the exposure levels.

*See e.g.* Giglio Designation (Travers Decl., Ex. 6).

Dr. Sawyer is offering case specific opinions to varying degrees with respect to the Wave I plaintiffs.[1]  For most Plaintiffs, Dr. Sawyer is being offered to  "testify regarding Plaintiff's total exposure to Roundup, including the comparability of Plaintiff's exposure with the exposure data from applicators in studies on glyphosate-based formulations."[2] *Id.*   For those opinions, he relies either on the exposure calculations of other experts or his own calculations.  The calculations of Roundup® exposure he relies on allows Dr. Sawyer to compare the specific Plaintiff's days of Roundup® use to the epidemiological data showing an increased risk of Non-Hodgkin Lymphoma (NHL).  *In re Roundup Products Liability Litigation* (N.D. Cal., July 12, 2019, No. 16-CV-0525-VC) 2019 WL 3219360, at *1 (Dr. Weisenburger's testimony admissible where he testified that Hardeman's "...exposure levels still far exceeded the threshold used in most of the epidemiological

---

[1] Dr. Sawyer's opinions regarding Elaine Stevick have previously been briefed and Monsanto does not address those issues in their current challenge to the Wave I Plaintiffs.

[2] Dr. Sawyer is not offering case specific opinions for Perkins or Harris. For Ines Hernandez's he is offering limited case specific opinions regarding "specific exposures, PPE, equipment, mixing and dermal exposures."  Sawyer Aff. at ¶ 37 (Travers Decl., Ex. 1)

---

**PLAINTIFFS'RESPONSE TO MOTION TO EXCLUDE TESTIMONY OF DR. SAWYER**

literature, and specifically the McDuffie and Eriksson studies."). Dr. Sawyer also explains how each Plaintiff is exposed to Roundup based on the manner in which they spray and the personal protective gear they wear. *See* Hernandez Dep. at 27:4-23 (Defendant's Travers Decl., Ex. 8).

Monsanto's motion is focused almost entirely on opinions that Dr. Sawyer will not be offering. Dr. Sawyer is not being offered as a general causation expert on epidemiology, nor is Dr. Sawyer being offered to conduct a full differential etiology. Where he does provide case-specific opinions[3], he does so based primarily on the above exposure metric calculations and will offer the opinion that the Plaintiffs' exposure to Roundup® was sufficient to cause NHL. *See Pilliod Tr.* at 3241:16-20 (Travers Decl., Ex. 3) ("...I compared their days of exposure to those three studies to determine whether they were in reasonable range -- of those who were studied in the human epidemiology database that showed an increased risk of non-Hodgkin's lymphoma.").

Monsanto makes absurd contentions that Dr. Sawyer did not analyze genotoxicity studies of Roundup or consider any aspects of animal or cell studies for purposes of determining general causation. MTE Sawyer pp. 1, 9. Monsanto either does not cite to the record for these fabrications (p. 9) or completely misleads the Court as to what the citation represents (p. 1). For example, Monsanto cites the Giglio deposition (Travers Decl. Ex. 9 at 168:24-170:8) for the false assertion that Dr. Sawyer didn't consider animal and mechanistic studies for causation purposes. However, Dr. Sawyer, makes clear that he considers such data as "a prong of Bradford Hill. It's called experimental data. It is one of the many prongs of Bradford Hill, but it is not in itself a standalone means of determining causation."[4] *Id.*; *Hernadez Rep. at* 11 (Travers Decl. Ex. 4); *In re Roundup Products Liability Litigation* (N.D. Cal. 2018) 390 F.Supp.3d 1102, 1127 (animal and mechanistic

---

[3] Plaintiffs will not be eliciting an opinion from Dr. Sawyer at trial that the exposure of Plaintiffs to Roundup was a substantial contributing factor to his/her NHL diagnosis.

[4] What Dr. Sawyer is actually explaining in the testimony cited by Monsanto is that it is not appropriate to calculate a human's risk of cancer through software that extrapolates from doses in rodent studies for purposes of causation. *Id.* Dr. Sawyer clarified earlier in the deposition that defense counsel was referring to "an animal-derived cancer slope, which you and I both know can't be used in -- in a human cancer assessment. That was even ruled upon in the Johnson case." Giglio Dep. at 43:8-14; Johnson v. Monsanto Co., 2018 WL 2324413, at *15 (Cal.Super.) (Monsanto argued and Dr. Sawyer agreed that "Cancer slope factors should not be applied to reach a causation conclusion in an individual case.");

data are relevant to "the biological plausibility criterion that is part of the Bradford Hill analysis."). Dr. Sawyer specifically states in his report that "[g]enotoxicity is the ability of a chemical to cause damage to genetic information, *i.e.*, the DNA in cells, thereby causing genetic mutations that may lead to cancer" and proceeds to analyze the genotoxicity data for purposes of causation.  Hernandez Rep. 37-48; *see also* Sawyer Aff. 40-42. Dr. Sawyer also has conducted a detailed assessment of the animal carcinogenicity data, but that opinion is not being offered in the Wave I cases as Dr. Jameson and Dr. Portier will be providing that testimony. *See Johnson Rep.* at 91-120 (Travers Decl., Ex. 10) ("Evaluation of Carcinogenic Potential Using Animal Models")

Monsanto's motion should be denied in full, and the jury should be allowed to consider Dr. Sawyer's testimony before reaching its conclusions, as have juries in other Roundup® trials. *See, e.g.*, *Johnson*, 2018 WL 5246323 at *1 (noting that "this case required the jury to resolve the complex scientific question of whether Plaintiff's exposure to GBHs caused his NHL," which it did with the help of "Dr. Sawyer, a toxicologist, [who] testif[ied] about various aspects of the science underlying GBHs.").

**II. Legal Standard.**

Under Rule 702, reliable Expert opinion testimony has to " 'assist the trier of fact' either 'to understand the evidence' or 'to determine a fact in issue'"; and "the witness has to be sufficiently qualified to render the opinion"  *Primiano v. Cook* (9th Cir. 2010) 598 F.3d 558, 563, *as amended (Apr. 27, 2010)*.  However, "Reliable expert testimony need only be relevant, and need not establish every element that the plaintiff must prove, in order to be admissible." *Id.; Pyramid Technologies, Inc. v. Hartford Cas. Ins. Co.* (9th Cir. 2014) 752 F.3d 807, 816. *Whitlock v. Pepsi Americas* (9th Cir. 2013) 527 Fed.Appx. 660, 661–662 ("Because Dr. [William] Sawyer's opinion rests on a reliable foundation and is relevant to the task at hand it is admissible. Whether it proves causation is not a question of admissibility."). "The relevancy bar is low, demanding only that the evidence 'logically advances a material aspect of the proposing party's case.'" *Messick v. Novartis Pharmaceuticals Corp.* (9th Cir. 2014) 747 F.3d 1193, 1196;  *In re Roundup Products Liability Litigation* (N.D. Cal. 2018) 390 F.Supp.3d 1102, 1152 ("...opinions may be bolstered by Dr. Jameson's narrower opinions regarding glyphosate's ability to cause cancer in animals.")

Under California law, one expert is not required to "expressly link together the evidence of substantial factor causation." *Hernandez v. Amcord, Inc.* (2013) 215 Cal.App.4th 659, 675.

It is entirely proper for an expert witness to rely on reports and opinions of other experts, particularly experts as qualified as Dr. Ritz, Dr. Weisenburger and Dr. Portier. *In re Roundup Products Liability Litigation* (N.D. Cal. 2019) 358 F.Supp.3d 956, 959 (...the important point is that these experts will not be repeating the analysis of the general causation experts, but rather relying on them to rule in glyphosate."); *Beck v. Koppers, Inc.,* (N.D. Miss. Feb. 2, 2006) No. 3:03 CV 60 P D, 2006 WL 270260, at *10  ("[Dr. William] Sawyer's dosage and risk assessment testimony (as long as the latter is based on Dahlgren's general causation testimony) meets the threshold requirements of Rule 702. It is undisputed that Sawyer is qualified by his knowledge and education to render his dosage and risk assessment testimony."); *People v. Campos*, (1995) 32 Cal. App. 4th 304, 308, ("the expert witness may state the reasons for his or her opinion, and testify that reports prepared by other experts were a basis for that opinion."); *Asad v. Cont'l Airlines, Inc*., (N.D. Ohio 2004) 314 F. Supp. 2d 726, 741  ("an expert's testimony may be formulated by the use of the facts, data and conclusions of other experts.").; *Pulse Med. Instruments, Inc. v. Drug Impairment Detection Servs., LLC*, (D. Md. 2012) 858 F. Supp. 2d 505, 512 ("Courts in this circuit and across the country have consistently held that an expert may rely on the work of others when preparing an expert report, particularly when it is the sort of work that is reasonably relied upon by experts in the relevant area of expertise")

## III. Argument

### A. Dr. Sawyer's Opinions Are Reliable and Relevant.

Monsanto does not challenge Dr. Sawyer's qualifications to talk about general exposure issues, and does not contend that testimony about Roundup® exposure routes are irrelevant to this case. *See e.g.* MTE Sawyer at 7 ("...Dr. Sawyer may be qualified to give an opinion about a person's level of exposure...").   Indeed, Monsanto has designated its own experts to talk exclusively about exposure routes, rates of exposure and the effects of equipment on exposure without offering.  *See e.g.* Cohen Expert Report (Travers Decl., Ex. 11). Monsanto only challenges the reliability of his general exposure opinions regarding two studies and make no claim that the

---

vast majority of his opinions which are based on hundreds of published studies and internal Monsanto documents are unreliable.

It is anticipated that Dr. Sawyer's opinion will generally follow the testimony elicited at both the Johnson and Pilliod trials. Pilliod Tr. at 3104-3252 (Travers Decl., Ex. 3); Johnson Tr. at .3587-3679 (Travers Decl., Ex. 4). Dr. Sawyer's testimony will bolster the testimony of the causation experts by explaining how Roundup® makes it from the bottle through the skin, into the body, and ultimately is distributed through the blood and into the bone where malignant lymphocytes form. Sawyer Aff. ¶¶ 30, 40 (Travers Decl., Ex. 1) (Explaining extent of his general causation opinion). *See e.g., In re Roundup Products Liability Litigation* (N.D. Cal. 2018) 390 F.Supp.3d 1102, 1152 (Drs. Ritz, Portier and Weisenburger's "opinions may be bolstered by Dr. Jameson's narrower opinions regarding glyphosate's ability to cause cancer in animals"). A jury's understanding of how certain factors increase or decrease exposure to Roundup is relevant to their consideration of whether or not Roundup caused a plaintiffs cancer and whether Monsanto was responsible for that increased exposure. *See e.g In re Roundup Products Liability Litigation* (N.D. Cal., Nov. 19, 2019) 2019 WL 6133745, at *1 ("...a state court might find that 3M Cattle's provision of a defective sprayer foreseeably caused Trosclair's cancer by increasing the amount of Roundup he absorbed through his skin."). It will be helpful for jurors to understand how Roundup® is capable of penetrating the skin and circulating to lymphocyte cells in order for them to decide whether Roundup can cause NHL.

It is not within a typical lay juror's understanding how different spray equipment affects the particle size of Roundup. Jurors may have a faulty assumption that professional users and farmers, as a rule, get more intense exposure than home users. Dr. Sawyer, for example, will explain how different equipment affects exposure:

> The home use hydraulic sprayer is simply the fluid is pressurized and comes out a nozzle, and it presents a very wide distribution of particle size ranging from only as low as 50 or 100 micron on up to 1000 micron..., an aerosol that becomes airborne and the slightest amount of wind or moving the body allows that mist to make contact with the body, the clothing, and the skin.

Pilliod Tr. at 3150:17-3151:11 (Travers Decl., Ex. 3). In contrast there are other safer sprayer

---

**PLAINTIFFS'RESPONSE TO MOTION TO EXCLUDE TESTIMONY OF DR. SAWYER**

designs used by some professionals called "a controlled droplet atomizer. Instead of pressuring the fluid through a nozzle, there's virtually no pressure, it's a mechanical spinning device and it releases primarily just a narrow band of droplets that are a little larger and they tend to settle out quicker." *Id.* The wand length makes a difference in exposure because "the professional applicator generally has a long wand to hold it away from the body, where the home garden user doesn't have that ability, and when that's sprayed it's very close to the legs. And depending on the wind, it can actually affect beyond the body, beyond just the legs." *Id.* at 3152:5-11.

Farmers, who actually spray much more Roundup in terms of volume, do not necessarily have higher intensity of exposure than home users or landscapers. *Id.* 3228:10-3230:10; 3229:2-5 ("...the home applicator is getting an intense exposure for a short period, while the applicator in the tractor requires more hours of application to get a near-equivalent exposure."). These, perhaps counterintuitive, results are confirmed in multiple studies including unpublished analyses by Monsanto. Pilliod Tr. at 3140:15-16, 3233-3240; MONGLY01075506, Appendix 8-14 (Travers Decl., Ex. 12) (Under the UK POEM methodology, utilized by Monsanto, professional users have a range of doses from 0.066 to 0.67 mg/kg over 6 hours (0.011 - 0.11 mg/kg/hr) compared to a dose of 0.12 mg/kg for residential users after 30 minutes (0.24 mg/kg/hr.)). In fact, among farmers, the failure to wear rubber gloves has been shown to increase glyphosate absorption into the body by 500%. Hernandez Rep. p. 18 (Travers Decl, Ex. 4). Despite this knowledge, Monsanto does not warn landscapers or home users to wear gloves. The images below demonstrate how applicators can reduce exposure by using a CDA sprayer and adequate protective gear[5] or alternatively they can increase their exposure by applying Roundup as advertised by Monsanto.[6]

---

[5]  Picture of the Herbiflex4 "A hand-held CDA sprayer for the low volume application of herbicides in narrow bands. The Herbiflex 4 applies large droplets to minimise any risk of spray drift or operator exposure" https://www.multispray.com/index.php/products/micron-ulv-sprayers
[6] Monsanto Roundup commercial https://www.youtube.com/watch?v=pnuzEbz4hXw

---




Additionally, Monsanto attorneys try to conflate a Plaintiffs' awareness of exposure with the Plaintiffs' actual exposure. *See e.g.* Pilliod Tr. at 3277:10-22 (Travers Decl., Ex. 3).  It is helpful for Dr. Sawyer to correct this misleading argument by Monsanto:

> Q. So less than one time per year, she got Roundup on her hands, right?
>
> A. No, that's not true. Every time she used it, she received a -- an amount of Roundup on her hand, as per the peer-reviewed generally accepted studies that actually assessed exposure by individuals wearing neoprene gloves with cotton gauze on their gloves and measuring on the average how many mills [milliliters] per hour impacted those patches....But the insidious part is that users of Roundup accumulate aerosol droplets on their skin that they are not aware of.

Pilliod Dep. at 126:19-127:22 (Travers Decl., Ex. 13).

A lay juror may also assume that wearing long sleeve shirts and pants would prevent exposure to Roundup.  It does not.  Dr. Sawyer will testify and studies show that "an average of 22.9% of the glyphosate deposited on worker clothing might be expected to penetrate through it." Hernandez Report at 17 (Travers Decl. Ex. 4).  Based, in part, on this clothing penetration data, Monsanto scientists had recommended internally that applicators wear waterproof clothing and rubber gloves and boots. Pilliod Tr. at 3237:14-3240:21 (Travers Decl., Ex. 3); Hernandez Report at 23-25 (Travers Decl., Ex. 4). Those recommendations were never implemented by Monsanto.

While publicly advertising Roundup as safe to use with minimal clothing, internally Monsanto acknowledges that "Dermal exposure is the greatest risk of exposure for operators." *Id.*. at 105. Dr. Sawyer will explain why dermal exposure is the greatest risk of exposure for operators by explaining how Roundup is able to be absorbed into the body through the skin. *Id.* at. 57-60.

---

Dr. Sawyer explains "how a water-soluble chemical like glyphosate can make it through this keratin [protective] layer" and that "[o]nce you get past that protective layer, chemicals migrate through the lamellar granules and the keratinocytes very, very rapidly" Pilliod Tr. at 3135:3-3138:22 (Travers Decl., Ex. 3).  Dr. Sawyer explains how repeated glyphosate exposure increases permeability as it does "damage in the formation of keratinocytes as they move upward and turn into keratin cells." *Id.*  Dr. Sawyer will explain how other ingredients in the Roundup formulation enhance penetration through the skin. *Id.*  For example "[t]he propylene glycol and other related glycols used in the product tend to defat the keratin layer" removing the lipids that would normally repel hydrophilic chemicals like glyphosate. *Id.*  Surfactants likewise strip the keratin layer of these protective lipids; acts to spread glyphosate on the skin and increase adhesiveness to the skin allowing more time for absorption over a larger area; and acts as a skin irritant which increases absorption through increased capillary action near the skin surface.  *Id.* at 3141:12-3146:13. Dr. Sawyer will explain how Roundup forms a chemical reservoir in the dermis that is not easily washed off and can continue to release glyphosate into the body over days.  *Id.* at 3154:15-18; 3197:8-3198:22; 3214:8-19. Dr. Sawyer uses visual aids to explain each layer of skin and where glyphosate proceeds once it penetrates the skin. Hernandez Rep. at 58-59 (Travers Decl., Ex. 4).

Dr. Sawyer's opinions are confirmed by Monsanto's own internal and confidential memos which explain that:

Surfactants are able to increase glyphosate absorption through the skin by:

(1) removal of lipids (sebum) from the epidermal surface due to surfactant action; (2) increase of the hydration state of the skin (under closed exposure conditions);  (3) increase of skin contact (spreading of water droplets by surfactant action);  (4) increase--- of contact time with the skin due to decrease of evaporation of water from the droplets containing surfactant (surfactant monolayer at surface of droplets slows down passage to vapor phase; (5) increase of sub epidermal blood flow due to irritant action of surfactant; ....

MONGLY01839476 (Travers Decl., Ex. 14).  Monsanto commissioned a study, which they never submitted to EPA, that "confirm[ed] our expectation that surfactant concentration affects the dermal absorption."  Hernandez Rep. at 118; Pilliod Tr. at 3214:8-19 (internal Monsanto email acknowledging that "... as we know now, 5 to 20 percent of the dose of glyphosate could be stored in the skin.").  Furthermore, studies have shown that surfactants also " 'greatly facilitated" the

penetration of glyphosate through animal cell membranes." Hernandez Rep. at 109.

Once glyphosate penetrates the skin it can enter both the blood system and lymphatic system. Hernandez Rep. at 60 (Travers Decl., Ex. 4); Pilliod Tr. at 3145:8-15; 3147:22-3148:8 (Travers Decl., Ex. 3). Glyphosate preferentially travels to the bone and remains in the bone longer than any other organ. Hernandez Rep. at 98; Pilliod Tr. at 3180:2-3184:2. In an in vivo study published after the Pilliod trial, Dr. Sawyer notes that "glyphosate was found to increase the production of AICD in the spleen and bone marrow" of mice explaining that "AICD77 is known as a key pathogenic player in both MM and B-cell NHL." Hernandez Rep. at 37. Dr. Sawyer will explain that once Roundup is in the human body it damages cellular DNA (including lymphocytes and in bone marrow) as shown in in vivo and in vitro studies in both humans and animals; and has been demonstrated. *Id.* at 37-48. Dr. Sawyer will also testify that glyphosate formulations are more genotoxic than glyphosate itself. *Id.* at 41; Pilliod Tr. at 3166-3178.

None of the aforementioned exposure opinions by Dr. Sawyer are challenged as unreliable or inadmissible by Monsanto and represent the majority of his testimony that will be offered at trial. This testimony appropriately bolsters the general causation opinions of Drs. Portier, Weisenburg, Ritz and the case-specific causation opinions of the oncologists.

**B. Dr. Sawyer Opinions regarding the Plaintiffs' Exposure to Roundup are Reliable and Admissible.**

Dr. Sawyer "will not be repeating the analysis of the general causation experts" at trial. *In re Roundup Products Liability Litigation* (N.D. Cal. 2019) 358 F.Supp.3d 956, 959. However, relying upon the detailed assessment of the epidemiology by Drs. Ritz, Portier and Weisenburger, Dr. Sawyer is qualified to and will testify that the Roundup exposure of the Plaintiffs is sufficient to cause NHL[7] consistent with the epidemiological literature. In *Pilliod*, Judge Smith held that "Sawyer may provide testimony on specific causation, including rates of absorption, the effects of protective gear, and the estimated doses received by the Pilliods. ... Sawyer may testify even if he does not analyze other potential causes of NHL." *Pilliod v. Monsanto Co.*, 2019 WL 2158266, at

---

[7] Dr. Sawyer is also qualified to discuss latency. He does more than simply list studies and his opinion was thoroughly explored in the Johnson trial. Johnson Tr. at 3675-3678 (Travers Decl. Ex. 2) ("Yeah. I have -- for many years, have searched the literature and have kept track of latencies for different cancers."); *Id.* at 3764-3781

1 | *4 (Cal.Super.)

2 |     Defendants' conflate the issues of admissibility of evidence with the Plaintiffs' burden of

3 | proof. Expert opinions are admissible even if it goes to only one aspect of the evidence that the

4 | jury must consider in coming to a verdict.   In *Hernandez v. Amcord, Inc.*, a trial court excluded

5 | an expert who testified that a Plaintiffs' exposure to asbestos was sufficient to cause his case

6 | without making the ultimate conclusion that it was a legal cause of his cancer, where another

7 | medical expert did provide that opinion. 215 Cal. App. 4th 659, 674 (2013).  The Appeals Court

8 | reversed holding that there is no requirement "that a medical doctor must expressly link together

9 | the evidence of substantial factor causation." *Id.*

10 |     Dr. Sawyer's same type of testimony was deemed admissible in *Johnson, Pilliod* and

11 | deemed admissible by the Ninth Circuit. In *Whitlock,* the Court held:

> [T]he district court exceeded its gatekeeping function in excluding Dr. Sawyer's testimony that the alleged TCE and chromium exposure levels were "within [a] reasonable range of that known [from several studies] to induce" the alleged injuries. Plaintiffs' alleged exposures were not so low that the occupational studies were irrelevant. Because Dr. Sawyer's opinion "rests on a reliable foundation and is relevant to the task at hand,.., it is admissible. Whether it proves causation is not a question of admissibility

527 F. App'x at 661.

    Likewise, here, Dr. Sawyer's opinion that Roundup® exposure is sufficient to cause Plaintiffs' cancer may not satisfy Plaintiffs' burden of proof (in the absence of a full differential etiology), but it is admissible and helpful testimony, particularly where there are other experts have reviewed the Pilliods' medical records.

    It is appropriate for Dr. Sawyer to rely upon the detailed assessment of epidemiology by Drs. Ritz, Portier and Weisenburger particularly where he has his own experience in biostatics and epidemiology.  As Dr. Sawyer notes:

> ....I have training in biostatistics and epidemiology. In fact, for many years I taught a minor section of medical epidemiology when I served as an adjunct assistant professor in the Department of Medicine (and the Department of Preventive Medicine) at the State University of New York Upstate Medical University in Syracuse, NY (1988 – 2012). I served under the prior chairman Dr. Richard P. Oates teaching a section of medical epidemiology using US CDC disease causation methodologies (for example excessive caffeine and hip fracture causation as an example). I also taught a section of the 4th year clerkship course toxicology lectures.

Sawyer Aff. at ¶20 (Travers Decl., Ex. 1); *Johnson* Sawyer Dep. at 359:19-360:6 (Travers Decl.

---

at Ex. 15) ( detail analysis "best handled by the epidemiology experts that we have. I am not an epidemiologist. I've taught a section of the course in medical school. I've been trained in epidemiology. I use it every day in my practice...."). In *Pilliod*, Sawyer was permitted to "rely on epidemiology studies even if he is not an epidemiologist." 2019 WL 2158266, at *4.

Although Sawyer is not conducting a full differential etiology in the Wave 1 cases, he is qualified to testify as to whether other potential chemical exposures may have contributed to the Plaintiffs' NHL where he has conducted that analysis. Dr. Sawyer is a very experienced toxicologists and has testified extensively in toxic exposure cases. *See e.g. Stevick Dep.* 106:7-108:21 (Travers Decl., Ex. 16) ("... these are chemicals I'm familiar with. I've testified on a WD-40 case. I know the ingredients in it. I know the ingredients in GUNK... I identified nothing that contained any significant concentration of benzene that could raise the air level to even a measurable level..."); Sawyer Aff. at ¶¶ 33-37 (Travers Decl., Ex. 1) (identifying carcinogenicity of other potential exposures of Mr. Giglio); *Giglio Rep. at* 38 (Def. Ex. 1). This testimony will assist the jury where Monsanto tries to shift blame to other products for the Plaintiffs' NHL.

In arguing that Dr. Sawyer cannot testify about the Plaintiffs' exposure days, Defendants conflate the concept of "a factual basis" with the concept of an "expert opinion". The number of days and hours that the Pilliods was exposed to GBHs does not constitute an opinion, but rather constitutes a factual basis to support Dr. Sawyer's opinions. Although the jury can count up the days and hours the Pilliods used GBHs, it is still incumbent upon Dr. Sawyer to relate this factual basis to the jury and explain how it supports his opinions. *Owens v. Republic of Sudan*, (D.C. Cir. 2017) 864 F.3d 751, 790 ("For their conclusions to be admissible and credible, the plaintiffs' experts needed to disclose the factual basis for their opinions.").

The epidemiological studies are not consistent nor well-described in their methodology when using days of exposure and expert testimony will be helpful to explain how to compare the Plaintiffs' exposure to the epidemiological studies. Having Dr. Sawyer guide the jury through the nuances inherent in the different epidemiology studies will only aid the jury in understanding each study's characteristics. The following line of questioning reveals that certain studies may not be what they appear at first glance:

---

**PLAINTIFFS'RESPONSE TO MOTION TO EXCLUDE TESTIMONY OF DR. SAWYER**

Q. And when we're comparing apples to apples, we need to compare the exposure dates of the Pilliods to the exposure days in epidemiology studies, correct?
A. Yes.
Q. But it is true that the Eriksson study does not give us any information on the actual amount applied by the individuals who were studied in the Eriksson study, right?
A. That's right.
Q. Okay. And so a farmer, for instance, could apply glyphosate once a month, but he could apply dozens of gallons of Roundup in one full-day application over a field, right?
A. Right.
Q. And those applicators, this hypothetical farmer I mentioned, would have applied for a matter of hours continuously as opposed to spot spraying for a single hour, right?
A. That's right.
Q. And they would be -- potentially be exposed to a much greater volume of Roundup than the plaintiffs in this matter, right?
A. No. Actually, that's not true, and I can pull out the studies right now and show you. The tractor-mounted sprayer, farmers putting down 150 gallons covering 500 acres or whatever, their daily dose is not much different than that of a backpack sprayer.

Pilliod Dep. at 238 (Travers Decl., Ex. 13). In fact, Dr. Sawyer explained that "[y]ou could actually have a professional applicator working seven hours -- and I could show the tables -- with lower exposure than that of a --that is, if that person is wearing PPE -- a lower exposure than a home gardener working for one hour." *Id.* at 242.  At trial Dr. Sawyer will explain how the studies generally apply exposure days; and as illustrated at Dr. Sawyer's last deposition (for a different plaintiff) he explained how the epidemiology assesses exposure days. *Id.*

Monsanto criticizes Dr. Sawyer for not calculating a numerical dose of glyphosate exposure for most Plaintiffs in terms of mg/kg of glyphosate circulating in the body.  However, a dose calculation is not really helpful because there is no threshold dose identified in human studies where Roundup is shown to cause cancer.  Stevick Dep. at 231:7-233:10 (Travers Decl., Ex. 16) (Explaining that calculating exposure days is more reliable because "[t]here's no -- no such dose calculations performed in the human studies in a -- in a milligram per kilogram body weight per day on -- on a day of exposure".  Furthermore, it is well-recognized that "While 'precise information concerning the exposure necessary to cause specific harm [is] beneficial, such evidence is not always available, or necessary, to demonstrate that a substance is toxic ... and need not invariably provide the basis for an expert's opinion on causation.'"  *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1060 (9th Cir. 2003), as amended on denial of reh'g (Sept. 25, 2003)

(quoting *Westberry v. Gislaved Gummi AB,* (4th Cir. 1999)178 F.3d 257, 264; *Wright v. Willamette Indus., Inc.*, (8th Cir. 1996) 91 F.3d 1105, 1107  ("We do not require a mathematically precise table equating levels of exposure with levels of harm, but there must be evidence from which a reasonable person could conclude that a defendant's emission has probably caused a particular plaintiff the kind of harm of which he or she complains..."); *Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 157 (3d Cir. 1999) ("...even absent hard evidence of the level of exposure to the chemical in question, a medical expert could offer an opinion that the chemical caused plaintiff's illness.").

While Dr. Sawyer has calculated doses in mg/kg for previous cases, those doses were not presented to the jury.  The parties even stipulated that such dose calculations were unnecessary in the Johnson trial agreeing to the following:

1. Dr. Sawyer will not reference the California No Significant Risk Level or utilize the cancer slope factor in support of his opinions;
2. Neither party will reference argue, or offer testimony about reference doses derived from or used by domestic or foreign regulatory agencies;
3. Neither party will reference, argue or offer testimony that Mr. Johnson's dose/exposure is below or above any threshold reference dose derived from animal studies or regulatory agencies;
4. Plaintiff may question Dr. Sawyer regarding the meaning of the U.S. EPA's reference dose of 2 mg/kg/day as referenced in Dr. Farmer's testimony to explain it addresses toxicity and not carcinogenicity

Travers Decl. Ex. 17.  The only use for calculating mg/kg doses is to conduct comparative analyses of how various protective gear, equipment, and spraying methods affect the dose.

## C. DR. SAWYER MAY PROPERLY RELY UPON THE UK POEM MODEL

The UK Predictive Operator Exposure Model (UK POEM) is standard, well-recognized and validated model for assessing Roundup exposure and is utilized in many of the internal Monsanto documents and peer-reviewed published literature relied upon by Dr. Sawyer.[8] Defendant fails to present any evidence that this model does not yield reliable data. *Nw. Coal. for Alternatives to Pesticides (NCAP) v. U.S. E.P.A*., (9th Cir. 2008) 544 F.3d 1043, 1048–49 (Rejecting argument that pesticide exposure modeling is unreliable where "Petitioners have presented no evidence that modeling does not yield reliable data. There is nothing inherently unreliable about the use of models...").  In, a 2015 published article written by Monsanto employee

---

[8] Dr. Sawyer has calculated a mg/kg dose for only Russo in the Wave I cases.

David Saltmiras utilizes the UK POEM methodology explaining the systematic dose of applicators ca "is predicted to be between 0.0034 (German BBA model, tractor-mounted ground-boom sprayer) and **0.226 mg/kg bw/day (UK POEM, hand-held-spraying to low targets, data not shown).**"[9]  Defendants cite no evidence that the UK POEM is unreliable or not validated. In fact, the UK POEM is a well-accepted methodology. Dr. Sawyer did not agree that the UK POEM was not validated in the testimony cited by Monsanto.  Rather, he testified that it was validated using "a surrogate chemical in performing the validation studies that behaves as an aerosol similar to that of glyphosate." Wade Depo. at 137:18-20 (Travers Decl., Ex. 7).

The UK POEM was developed by the United Kingdom regulatory body. Sawyer Stevick Aff. at ¶ 65 (Travers Decl., Ex. 18).  It is recognized by the European Food Safety Authority (EFSA) as an available and reliable exposure modeling technique.  *Id*. at 85.  The latest regulatory body to review the UK POEM model notes that it "is an internationally developed model based on a robust dataset."  *Id.* at 67. Dr. Sawyer notes that the UK POEM has been peer-reviewed and relied upon in "numerous studies" including "a 2017 risk assessment of small farmers exposed to plant protection products in the Niger River valley" and a "2017 assessment of farmers' exposure to pesticides in the urban and peri-urban areas of Northern Benin."  *Id.* at 65-66.  In fact the UK POEM has actually been found to under estimate exposure. (Abukari, Pesticides Applicator Exposure Assessment: A Comparison between Modeling and Actual Measurement.  Journal of Environment and Earth Science, Vol.5, No.11, 2015.).  Recently it has been utilized to study glyphosate exposure in farmers in Ghana where  "[m]odeled farmer exposure to glyphosate was noted to be 0.3 mg/kg/BW/day on average (0.7 mg/kgBW/day 95th percentile) when full personal protective equipment (PPE) was used and an average of 4.2 (8.1 – 95th percentile) mg/kgBW/day when PPE was not used." *Hernandez Rep. at* 18-19 (Travers Decl., Ex. 4).

**D.    Dr. Sawyer May Rely on the George and Prasad Studies**

Monsanto additionally argues that Dr. Sawyer should be precluded from testifying about the George tumor promotion study. *See* George, J., et al., "Studies on glyphosate-induced carcinogenicity

---

[9] Greim, et al., "Evaluation of carcinogenic potential of the herbicide glyphosate, drawing on tumor incidence data from fourteen chronic/carcinogenicity rodent studies" Crit Rev Toxicol. 2015 Mar 16; 45(3): 185–208. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4819582/

in mouse skin: A proteomic approach," 2010, Journal of Proteomics, Vol. 73, pg. 951 - 964. Monsanto

made identical arguments in *Johnson* when seeking to overturn the jury's verdict and secure a new

trial, to no avail. *See Johnson v. Monsanto*, Memorandum of Points and Authorities in Support of

Defendant Monsanto Company's Motion for New Trial, 2018 WL 4904750, at *15 (Cal.Super.,

Sept. 18, 2018); 2018 WL 4904751, at *7 (Cal.Super., Sept. 18, 2018) (both citing the plaintiff's

reliance on the George study as a basis for disturbing the jury's finding, which the court ultimately

rejected when upholding the verdict).

>Dr. Sawyer's report explains the relevance of the George study in detail, specifically:

>In the carcinogenicity study, George, J., et al., (2010), glyphosate was demonstrated
>to have strong tumor-promoting activity. The study documented carcinogenic
>effects of glyphosate using a 2-stage mouse skin carcinogenesis model and
>proteomic analysis. The commercial formulation of Roundup Original (glyphosate
>41%, POEA = 5%, Monsanto Company, St. Louis, MO, USA) was topically
>applied to the skin of mice with a body weight of 12-15 g. The glyphosate dose was
>25 mg/kg body weight and was applied either two or three times per week . . . .

>The study demonstrated, to within 95% certainty, the carcinogenic potential of
>glyphosate as a powerful promoter in a 2-stage promotion model. The authors
>concluded in their results section that "These results clearly indicate significant
>tumor promoting potential of glyphosate in mouse skin model of carcinogenesis."

Hernandez Rep. at 34-36 (Travers Decl., Ex. 4). Dr. Sawyer goes on to apply an allometric scaling

method to convert the dose from the animals studies in George to humans. *Id.*, which establishes that

"the relatively low dermal exposure doses in mice[,] when converted to human doses, are reasonably

similar to that sustained by applicators (when applying the HED factor and dermal absorption rate of

3%)," such as the Plaintiffs. *Id.* at 36.

>Dr. Portier also relies upon the George study and explained why IARC would not generally

consider an initiator promotor study in the animal carcinogenicity section.  Johnson Tr. at 1858:22-

1865:9 (Travers Decl. Ex. 2) ("they typically don't use initiation promotion studies, especially if they

have good two-year cancer studies because a two-year cancer study is more definitive.") Dr. Portier

further discussed where he disagreed with IARC's analysis of the study and confirmed that IARC did

consider George to show that Roundup can act as a tumor promotor.  *Id.* at 1865:13-16.  Dr. Sawyer

also explained that this was not a study that would be used by IARC in the animal carcinogenicity

section because it looks at tumor promotion not initiation. Pilliod Tr. at 3285:9-21 (Travers Decl. Ex.

3); Russo Dep. 49:13-19 (Def. Ex. 23).  IARC specifically points out in its summary of the glyphosate evaluation that "A glyphosate formulation promoted skin tumours in an initiation-promotion study in mice." Travers. Decl., Ex. 19. The ATSDR likewise concluded that the George study "indicate[s] that the glyphosate formulation functioned as a tumor promoter, but not a tumor initiator or complete carcinogen."  Travers, Decl., Ex. 20.  The CLH analysis (like the EPA) cited by Monsanto evaluated only pure glyphosate and thus could not consider the George study because it "was performed with a commercial product that most likely contains irritating co-formulants." (Def. Ex. 25, p. 66).  Dr. Sawyer disagrees that there was inadequate control groups treated with solvent. Sawyer Aff. at ¶¶ 51-61 (Travers Decl., Ex. 1). (explaining that five groups which included solvent showed no tumors). Furthermore, the solvent in George is used commonly in toxicology studies and is not a tumor promoter.  *Id.* at ¶ 51.  Dr. Portier concurs stating "I think their controls were adequate in the study." Johnson Tr. at 1864:11-13 (Travers Decl., Ex. 2).

Dr. Sawyer did self-correct a calculation he made on the Prasad study which looked at chromosomal aberrations and micronuclei in bone marrow cells of Swiss albino mice.  However, "*Daubert* does not require that an expert's testimony be excluded simply because he admitted and corrected his own mistakes .... There is no stigma attached to such error correction, nor should there be. If anything, it strengthens the quality of the expert report."  *Crowley v. Chait*, 322 F. Supp. 2d 530, 540 (D.N.J. 2004); *In re Roundup Products,* 390 F.Supp.3d at 1146 ("Reliable experts sometimes make mistakes.")  *United States v. Tarwater*, 308 F.3d 494, 505 (6th Cir. 2002); *Davis v. United State*s, No. CV 07-00461 ACK-LEK, 2009 WL 10702627, at *5 (D. Haw. Apr. 24, 2009); *Baldwin v. Bader*, 539 F. Supp. 2d 443, 445 (D. Me. 2008); *Computer Assocs. Int'l v. Quest Software, Inc.*, 333 F.Supp.2d 688, 694–95 (N.D.Ill.2004).  Considering the numerous depositions, reports and hundreds of hours of reviewing material, it is not unreasonable for some mistakes to occur.  However, the corrected calculations do not alter Dr. Sawyer's overall conclusion that the dose of glyphosate used in Prasad is within a reasonable range encountered by human applicators.  Sawyer Aff. at ¶ 41.  While the Prasad opinion was a supplemental opinion, Dr. Sawyer has undergone five days of deposition since disclosing that opinion, so Monsanto can claim no prejudice.

---

**PLAINTIFFS'RESPONSE TO MOTION TO EXCLUDE TESTIMONY OF DR. SAWYER**

**E. Dr. Sawyer's Testimony Regarding Other Carcinogens in Roundup is Admissible.**

Monsanto asks the court to preclude Dr. Sawyer from testifying that Roundup® contained "trace" chemicals that may have contributed to Plaintiffs' NHL. Monsanto's request is unavailing. Dr. Sawyer's consideration of Roundup® and other GBHs' entire chemical makeup is not only appropriate, but necessary in evaluating whether Plaintiffs were exposed to known or suspected carcinogens. Such an analysis may also explain the greater carcinogenicity shown in studies of the completed Roundup product than in studies of glyphosate alone. *See, e.g.*, Hernandez Rep. at 113. Travers Decl. at Ex. 4.  To that end, Dr. Sawyer lists and describes the chemicals known to be present in Roundup® in various years of use, *id.* at 32-34, including several known carcinogens: formaldehyde, ethylene oxide, and n-nitroso. *Id.*. Dr. Sawyer will testify that while these carcinogens may not be sufficient alone to cause cancer, "the rule is in toxicology and even under EPA policy, that regardless of the concentration of the carcinogen, they are all additive in terms of their effect." Pilliod Tr. at 3133:3-11.

"[G]enerally recognized carcinogens with similar target endpoints (hematopoietic cancers) are, by definition, additive and should be considered in the overall carcinogen assessment of a product." Hernandez Rep. at 33-34. The presence of known carcinogens in Roundup® – despite Monsanto's failure to list these substances in its labeling, *id.* – "*requires* toxicological consideration." *Id.* (emphasis added). Dr. Sawyer's consideration of trace chemicals follows the EPA's "well-defined guidance on the manner in which additive effects are required to be assessed," *id.* , which, far from being a "novel" theory, falls well within "established [] carcinogenic assessment methodology." *Id.* His analysis is thus relevant, reliable, and will assist the jury in evaluating causation.

Dr. Sawyer obviously did not tell the jury in Pilliod "that trace ingredients in Roundup could kill a person upon opening the Roundup bottle."  However, ethylene oxide is a serious and dangerous impurity in the Roundup surfactants.  IARC labels it a class 1 carcinogen[10] capable of causing NHL. Sawyer Aff. at ¶¶ 67-69. As noted by Dr. Sawyer:

> **Ethylene Oxide** is a carcinogenic and mutagenic gas. It is classified by both U.S. EPA and by IARC as a human carcinogen by inhalation. Studies show that exposures to ethylene oxide are associated with an increased risk of cancers of white blood cells.

---

[10] https://monographs.iarc.fr/wp-content/uploads/2018/06/mono100F-28.pdf.

> Ethylene oxide was identified by Monsanto as being present in Roundup as long ago as 2000 (per Safety Data Sheet) noting that ethylene oxide accumulates in the top ("headspace") of product containers and can be inhaled when the lid is removed.

Hernandez Rep. at 33-34.   Although it is a recognized impurity in the surfactant, Monsanto does not collect data on the ethylene oxide levels in Roundup and therefore, the actual levels in Roundup are unknown.  Sawyer Aff. at ¶ 68.  Likewise formaldehyde is another class 1 carcinogen present in Roundup.  Sawyer Aff. at ¶¶ 64-66.  Formaldehyde has been measured in Roundup to exceed safe levels and is includes in Safety Data Sheet warnings for certain glyphosate manufacturing workers. *Id.*; Pilliod Tr. at 3129:14-16 ("...it is found in, for example, in the Monsanto centrifuge feed production at 1.3 percent, which is 13,000 ppm which is extraordinarily high."); Sawyer Aff. at ¶ 65.

**F. Dr. Sawyer May Rely on and Explain Technical Details Contained in Internal  Monsanto Documents**

Plaintiff agrees that Dr. Sawyer will not testify about the intent or state of mind of Monsanto, but Dr. Sawyer will rely upon and discuss the scientific findings, opinions and data contained in internal Monsanto documents.  Experts may rely and discuss corporate documents if the documents are relevant to their opinions. *In re Seroquel Prod. Liab. Litig.*, (M.D. Fla. July 20, 2009)No. 6:06-MD-1769-ORL-22D, 2009 WL 3806436, at *4  ("The Court determines that [experts] may appropriately rely on and discuss AstraZeneca's internal corporate documents for the specific purposes identified by Plaintiffs in their response to the motion.").  Also, there is "nothing particularly unusual, or incorrect, in a procedure of letting a witness relate pertinent information in a narrative form as long as it stays within the bounds of pertinency and materiality." *In re Yasmin & YAZ (Drospirenone) Mktg., Sales Practices & Prod. Liab. Litig.,* (S.D. Ill. Dec. 16, 2011) 2011 WL 6302287, at *18 (internal citations omitted) (rejecting argument that regulatory experts review of corporate emails "does not require the "specialized knowledge" contemplated by Rule 702, but rather is mere advocacy on plaintiff's behalf.").  Unfortunately, Monsanto has a corporate policy not to publish or publicize unfavorable data or scientific opinions on glyphosate. Therefore, much of the scientific data and opinions of Monsanto scientists and consultants are contained only in internal Monsanto documents and emails.

It is also entirely proper to apply one's expertise in a field to provide proper context to corporate emails and memoranda. *DePaepe v. General Motors Corp*., (7th Cir.1998) 141 F.3d

715, 720  ("He could give an opinion as an engineer that reducing the padding saved a particular amount of money; he might testify as an engineer that GM's explanation for the decision was not sound (from which the jury might infer that money was the real reason); but he could not testify as an expert that GM had a particular motive.").*See,* e.g., *United Food & v. Teikoku Pharma* USA, (N.D. Cal. Nov. 3, 2017) 2017 WL 5068533, at *25 (expert could opine as to what a reasonable company in the defendant's position would have done based on his understanding of the facts and in light of the record evidence he reviewed).

The emails cited by Dr. Sawyer are filled with technical knowledge that would not be easily comprehended by a lay juror.  For example the following email would not be easily understood without an understanding of the terms: uncertainty factors, risk assessment, biomonitoring, pharmacokinetics, IV experiment, and topical in vivo:

> Even though we can absorb additional 'uncertainty factors' in our risk assessment based on our biomonitoring results, I feel uncomfortable with this discussion. This approach by Spain sets a precedent and contradicts the fact that we always claimed to fully understand the glyphosate pharmacokinetics. The Wester IV experiment suggests that almost the entire 'systemically' available dose was excreted in urine. The low dose topical in vivo experiment suggests that almost the entire dose (82%) that was absorbed through the skin was excreted in feces ...

Hernandez Rep. at 104 (Travers Decl., Ex. 4;  See e.g. Pilliod Tr. at 3212-3220 (Travers Decl. Ex. 3) (explaining technical terms in admitted exhibits).

Furthermore, Dr. Sawyer will not be offering regulatory opinions or opine about labeling requirements. However, he can testify how the instructions on the label for protective gear increase or decrease exposure.  Pilliod Tr. at 3093-3104.  As noted by Judge Smith, Dr. Sawyer's reference to the Roundup label was relevant and admissible because "to the extent that the label is an issue, it's that it did not tell them to wear protective gear and they didn't wear protective gear...And therefore they were exposed to the Roundup when they were spraying and they absorbed here, there, and other..." *Id.* at 3093-3094.  Monsanto regularly questions Dr. Sawyer about the label as it relates to Plaintiffs' Exposure. Giglio Dep. at 106-111.  (Travers Decl. at Ex. 9).

**IV. CONCLUSION**

For the aforementioned reason, Monsanto's Motion to Exclude Dr. Sawyer should be denied.

---

1  Dated:  December 10, 2019

2                                                    Respectfully submitted,

3                                                    /s/ Robin Greenwald
4                                                    Robin Greenwald
                                                     rgreenwald@weitzlux.com
5                                                    Weitz & Luxenberg
6                                                    700 Broadway
                                                     New York, NY 10003
7
                                                     /s/ Aimee Wagstaff
8                                                    Aimee Wagstaff
                                                     aimee.wagstaff@andruswagstaff.com
9                                                    Andrus Wagstaff, P.C.
10                                                   7171 West Alaska Drive
                                                     Lakewood, CO 80226
11
                                                     /s/ Mike Miller
12                                                   Michael Miller
                                                     mmiller@millerfirmllc.com
13                                                   The Miller Firm LLC
14                                                   108 Railroad Ave
                                                     Orange, VA 22960
15                                                   *Co-Lead Counsel for Plaintiffs*
                                                     *in MDL No. 2741*
16

17

18

19

20

21

22

23

24

25

26

27

28

---

**PLAINTIFFS'RESPONSE TO MOTION TO EXCLUDE TESTIMONY OF DR. SAWYER**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 10th day of December, 2019, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

<u>/s/ Jeffrey Travers</u>