# EXHIBIT 9

Transcript of William Sawyer, Ph.D.
Conducted on September 15, 2019

---

105

1  told you he meant canvas sneakers when he said work
2  boots at his deposition; right?
3      **A.  I'm sorry, where are you?**
4      Q.  So if you look at footnote 73 of your report,
5  page 29, you state "During his March 21 deposition,
6  Mr. Giglio agreed he wore work boots.  Monsanto's
7  attorney did not follow up on the meaning of work boots.
8  When asked during the August 14, 2019, interview,
9  Mr. Giglio described canvas sneakers as his work boots."
10     Did I read that correctly?
11     **A.  That's right.**
12     Q.  Okay.  And again, you have no audio recording
13  of that conversation where he told you canvas sneakers
14  meant work boots; right?
15     **A.  No, but that's specifically what he said.**
16     Q.  Okay.  And in his August 29th deposition, did
17  he or did his attorneys clean that up as to his
18  occupational use as far as explaining that he meant
19  canvas sneakers when he said work boots when he was
20  applying it occupationally?
21     **A.  I don't know that anyone asked that question.**
22     Q.  Okay.  Well, you stated the Monsanto attorney
23  didn't follow up.  Did Mr. Giglio's attorneys follow up
24  to clarify that?
25     **A.  I don't think so.**

---

106

1      Q.  Okay.  Let's mark as Exhibits 13 and 14, two
2  Roundup labels.  Mark this as 13.
3          (Marked Deposition Exhibit 13.)
4      MS. SIZEMORE-WETZEL:  Thank you.
5      MR. KALAS:  Um-hum (affirmative).
6      Mark this as 14.
7          (Marked Deposition Exhibit 14.)
8      MR. KALAS:  Yeah.
9  BY MR. KALAS:
10     Q.  All right.  Now, I just want to ask you a few
11  questions about these labels.  Let's start with
12  Exhibit 13.  Is this one of the products you believe
13  Mr. Giglio might have used, Roundup Weed & Grass Killer
14  III?
15     **A.  Yes.**
16     Q.  And -- did I give you my highlighted copy?  I
17  don't know.  Hold on.
18     **A.  Yeah.**
19     Q.  Yeah.  Sorry.  That's all right, you can work
20  off it, I know where I'm going.
21     Let the record reflect I gave him my
22  highlighted copy.  I apologize.
23     If we go to --
24     MS. SIZEMORE-WETZEL:  Do you want to switch
25  them out, Counsel?

---

107

1      MR. KALAS:  Yeah.  That would be good,
2  actually.
3          (Remarked Deposition Exhibit 13.)
4  BY MR. KALAS:
5      Q.  There you go.
6      If you go to page 329 on the Bates numbers.
7  Well, let me ask the foundational question.  Does this
8  appear to be a true and correct label for Roundup
9  Ready-to-Use from 2013?
10     I know it's small.  Apologize for that.
11     **A.  I think the second-to-last page, there may be**
12 **a date there.**
13     Q.  Yes, right beneath C, Monsanto Company, bottom
14  left -- or next to C Monsanto Company, bottom left, it
15  says 2013 Monsanto Company.  Do you see that?
16     **A.  Monsanto Company.**
17     Q.  Right there, sir.  (Indicating.)
18     **A.  Yeah, I do.  Pretty small print.  Okay.**
19     Q.  And this is contemporaneous with when he would
20  have been using it; right?  Mr. Giglio?
21     **A.  Yeah.**
22     Q.  Okay.  So let's look at page 329.
23     **A.  Not -- not necessarily throughout the entire**
24 **period, but certainly --**
25     Q.  Occupationally at least?

---

108

1      **A.  During this -- the year 2013.  I don't know**
2 **about 2010, '11, '12.**
3      Q.  Okay, sure.  So let's look at this.
4      Is it true on the left-hand column, underneath
5  "When to apply," it states "Spray when air is calm to
6  prevent drift to desirable plants."  Do you see that?
7      It's right -- I'll show you where I'm looking,
8  right there (indicating).
9      MS. SIZEMORE-WETZEL:  Which page are you on?
10     MR. KALAS:  329, Counselor.
11 BY MR. KALAS:
12     Q.  Are you using your camera to magnify?  Okay.
13     **A.  Okay, the left column under "Directions of**
14 **Use."**
15     Q.  Yes, sir.  It says "When to apply"?  Do you
16  see that?
17     **A.  Yes.**
18     Q.  Okay.  And it says "Spray when winds" --
19  "wind" -- excuse me, strike that.
20     "Spray when air is calm to prevent drift to
21  desirable plants."
22     Did I read that correctly?
23     **A.  Yes.**
24     Q.  Okay.  Is it your understanding that
25  Mr. Giglio did not always spray when the air was calm?

---

**109**

1     A.  Yes, but he was not concerned about other
2  plants because of his close proximity to the ground.
3     Q.  Okay.  My question is is it your understanding
4  that he did not always spray when the air was calm?
5     A.  Correct.  But not -- not that he was concerned
6  about health warnings.  He was concerned about other
7  plants.  And if there wasn't other foliage of concern,
8  then this wouldn't apply.
9     Q.  Okay.
10     A.  This is not a health warning by any means.
11  It's a warning to protect other foliage.
12     Q.  Again, my question is not about his reasons
13  for not following it.  My question is simply did
14  Mr. Giglio only spray when the wind was calm?  Or are
15  you going to tell the jury that he sprayed when the air
16  was not calm?
17     A.  Yeah, because it was his understanding that
18  that could harm other foliage, not him.
19     Q.  Okay.  So if you turn to the precautionary
20  statement, sir, that's on the right-hand column there,
21  do you see the precautionary statements?
22        You're looking at Spanish.  There you go.
23     A.  Yeah, I was having trouble reading Spanish.
24        Yes.
25     Q.  And do you see it says "Caution"?

**110**

1     A.  Yes.
2     Q.  Okay.  And it says "Causes moderate eye
3  irritation.  Avoid contact with eyes and clothing" --
4  "or clothing.  Wash thoroughly with soap and water after
5  handling."
6        Did I read that correctly?
7     A.  Yes.
8     Q.  Okay.  Did Mr. Giglio always avoid contact
9  with clothing?
10     A.  No.
11     Q.  Okay.  Did Mr. Giglio always wash thoroughly
12  with soap and water after handling glyphosate?
13     A.  No.
14     Q.  Okay.  So let's look at another label.  That's
15  the gold one I marked.  And there was some confusion I
16  had about whether Mr. Giglio used 365 or this product,
17  "Extended Control," because 365 has a black label and
18  this has a gold, and he refers to gold labeling.
19        Do you believe this could have been one of the
20  products that Mr. Giglio used, this Extended Control?
21     MS. SIZEMORE-WETZEL:  Object to form.
22     THE WITNESS:  Based on the testimony, yes.
23  BY MR. KALAS:
24     Q.  Okay.  So let's look at the statements here.
25  And happily, I printed a little bit bigger for you.

**111**

1        So this is a label from 2015, which I believe
2  is on the back end of when he might have been applying;
3  correct?  Or is it post application?
4     A.  Well, it's post cancer diagnosis.
5     Q.  Okay, post cancer diagnosis.  And is it post
6  application?
7     A.  And very little application at that point.  I
8  didn't even include it in my calculations.
9     Q.  All right.  Well, if you didn't include it,
10  then we'll skip this because we have limited time.  So
11  we'll move on to something else.
12        Now, if you go to page 31 of your report, you
13  put together Table 6 here; right?
14     A.  Yeah.
15     Q.  Okay.  And this carries on eight pages,
16  through page 38; right?
17     A.  Yes.
18     Q.  Okay.  How did you go about putting this
19  inventory of substances together?  How did you come up
20  with the list?
21     A.  I think through photographs.
22     Q.  Photographs.  Photographs you took?
23     A.  I don't know.  I don't remember.  No, I didn't
24  take any photos.  But I don't know, I get these cases
25  mixed up, actually, in terms of whether I was given a

**112**

1  list or photographs.
2     Q.  Who would have given you a list?  The
3  attorneys or Mr. Giglio?
4     A.  Counsel.
5     Q.  Counsel would have given you a list.
6     A.  Yeah.
7     Q.  Do you know -- do you have that list still?
8     A.  Well, electronically, I would, but I would
9  imagine that's on my -- my list of documents.
10     Q.  Well, I'm not sure that it is.  So let's go to
11  that and make sure that that list is on there.
12        Did you write your documents that you referred
13  to?  Did you write the list of documents?  Or did -- did
14  the attorneys put it together for you?
15     A.  Umm.
16     Q.  I'm not casting any aspersions there.  That
17  happens pretty commonly, so.
18     A.  What I did was I took the prior previously
19  disclosed list.
20     Q.  Okay.
21     A.  And then added to it anything new in this
22  case.  And I did that by making sure that Jen Clark had
23  all of my electronic documents, and I also provided her
24  with all of the PDFs of any new studies or new Monsanto
25  documents that I can.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS

Transcript of William Sawyer, Ph.D.

42 (165 to 168)

Conducted on September 15, 2019

---

**165**

1 based on comparison to that in human occupational or
2 human epidemiological exposures and determine whether
3 the person falls within and above the threshold of such
4 studies.
5     Q.   When you mentioned the POEM method and said
6 Mr. Giglio's application method is different, what did
7 you mean by that?
8     A.   The POEM method uses what's called the
9 exposure rate, application dose, for example, an
10 application dose of 5 liters per hectare being very
11 common.
12         Mr. Giglio did not often broadcast spray the
13 acreage, but rather very often positioned himself low to
14 the ground, and using his own term, soaked the soil with
15 glyphosate with the understanding that this would
16 prevent the emergence of plants following the
17 application of the turf, causing the mat to pop up off
18 the ground from the emerging plants.
19         But in doing so, his upper body and head and
20 breathing zone were in closer proximity to the area
21 being treated than if he were standing.
22         Plus he used an electronic unit in his
23 commercial applications that produces a bounceback of
24 the spray onto the body.
25     Q.   And Mr. Giglio, did he describe contact that

**166**

1 the Roundup actually made with his legs?
2     A.   Yes.
3     Q.   And what do you recall about that?
4     A.   That he did have common contact with his legs.
5     Q.   I want to talk a little bit about -- or follow
6 up a little bit about the questions you were asked in
7 the McDuffie study, which is marked as Exhibit 9, if you
8 need to refer to that.
9         With regard to McDuffie, how were average days
10 per year quantified?
11     MR. KALAS:   Did you say quantified?
12     MS. SIZEMORE-WETZEL:   Quantified.
13     THE WITNESS:   Ten hours per year.
14 BY MS. SIZEMORE-WETZEL:
15     Q.   And with regard to the two days per year, did
16 it require a minimum number of years?
17     A.   No.
18     Q.   So looking at Mr. Giglio's occupational
19 exposure alone, did he meet the threshold for the
20 McDuffie study?
21     A.   Yes, at 15.6 exposure days, at eight hours per
22 day, that's 124.8 hours, divided by four years, which is
23 31.2 hours per year during his occupational exposure
24 years.
25         And that is clearly about three times above

**167**

1 the ten-hour-per-year threshold in McDuffie.
2     Q.   And is that also above the two-days-per-year
3 threshold?
4     A.   Yes.
5     MR. KALAS:   Objection to form on that one.
6 BY MS. SIZEMORE-WETZEL:
7     Q.   Does the 20 additional years of residential
8 exposure that Mr. Giglio had somehow decrease his risk
9 based on the McDuffie study?
10     A.   No.  And I pointed out early in this
11 deposition this morning that his exposure during those
12 years varied somewhere between a mean exposure
13 cumulative days of 0, above 0, and up to 6.2.  And
14 certainly that the residential exposure years added to
15 his overall risk.
16         And I'm not quantifying the exact number, I'm
17 giving you a range, with respect to his residential
18 exposure years.
19     Q.   So with regard to Mr. Giglio's residential
20 exposure, is it fair to say that those residential
21 exposure days are additive to the risk already imposed
22 by his occupational exposure?
23     MR. KALAS:   Object to form.
24     THE WITNESS:   Yes, or it could be ignored in
25 its entirety and it would still make no difference

**168**

1 because his occupational exposure dose in exposure
2 days is in far excess of all thresholds of both
3 McDuffie and Eriksson studies.
4 BY MS. SIZEMORE-WETZEL:
5     Q.   And your estimates for -- or calculations for
6 both occupational and residential exposure for
7 Mr. Giglio, were they both conservative estimates?
8     MR. KALAS:   Objection to form and compound.
9     THE WITNESS:   Yes.  In fact, I did not include
10 any of his occupational exposure time from 2009, at
11 which time, at some point in the year, he was
12 trained and began using it.  And I did not have
13 exact dates, so I completely ignored that exposure.
14 BY MS. SIZEMORE-WETZEL:
15     Q.   And you also did not include any occupational
16 exposure for 2015; is that correct?
17     MR. KALAS:   Object to form.
18     THE WITNESS:   Correct.
19     MS. SIZEMORE-WETZEL:   I don't have any further
20 questions.  Thank you.
21     MR. KALAS:   Okay.  A few follow-ups.
22         REDIRECT EXAMINATION
23 BY MR. KALAS:
24     Q.   All right.  You mentioned that using animal
25 data to calculate a human cancer risk is not generally

169

1 accepted; right?
2 **A. It's a prong of Bradford Hill. It's called**
3 **experimental data. It is one of the many prongs of**
4 **Bradford Hill, but it is not in itself a standalone**
5 **means of determining causation.**
6 **And if you go all the way back to, oh, I think**
7 **a case in Texas with DuPont, a federal court determined**
8 **that causation could not be determined simply on animal**
9 **studies.**
10 Q. I understand, sir. My question isn't going to
11 that.
12 But you said it was not generally accepted.
13 Is that what you mean, it's not generally acceptable to
14 use animal data to calculate human cancer risks?
15 **A. For the purpose of causation, that's correct.**
16 Q. Okay. But it is generally accepted by the
17 State of California to calculate human cancer risks
18 using animal data; right?
19 **A. Not for the purpose of causation, no, it's**
20 **not.**
21 Q. Okay.
22 **A. That is a regulatory value.**
23 Q. Sir, is risk the same as causation?
24 **A. No.**
25 Q. Okay. Is it generally accepted by the State

170

1 of California to use animal data to calculate human
2 cancer risks?
3 MS. SIZEMORE-WETZEL: Object to form.
4 THE WITNESS: Yes, and EPA as well, and animal
5 data is used in risk assessment.
6 BY MR. KALAS:
7 Q. Okay.
8 **A. But not in a causation analysis.**
9 Q. The application technique Mr. Giglio talked
10 about, we talked about the 2 foot and how he -- you
11 talked about the bounceback from that, and that's from
12 the occupational use.
13 Did you ask or do you know if he applied that
14 way, leaning over, residentially as well?
15 **A. He did not.**
16 Q. Okay. Now, you just, with counsel for
17 plaintiff, just went back to the McDuffie data. So I
18 want to -- I want to understand your testimony there.
19 So up until he started applying
20 occupationally, it's your testimony that he had
21 somewhere between 0 and 6.2 days of glyphosate use;
22 right?
23 **A. Yes.**
24 Q. Okay. And 6.2 days of glyphosate use would be
25 less than ten days in the Eriksson study, using the

171

1 eight-hour day from that study; right?
2 **A. It would be greater than one day, but less**
3 **than ten day.**
4 Q. Right. And so it would be in the
5 less-than-ten-days group in the Eriksson study; right?
6 **A. Yes, but still in the significant range.**
7 Q. But not statistically significant; correct?
8 That's not a statistically significant figure in the
9 Eriksson study, the 1.69; right?
10 It's page -- it's the third page, sir, Table
11 2.
12 **A. Yes. Correct.**
13 Q. Okay. And it would not -- he would not be at
14 a statistically significant increased risk or even any
15 increased risk in the McDuffie study because his average
16 use would be zero to two days per year; right?
17 **A. Correct.**
18 Q. And he would not be at an increased risk in
19 the Andreotti study because he would be in quartile 1
20 for NHL; correct?
21 **A. Correct.**
22 Q. So it's your opinion based on the human
23 epidemiology to which you apply Mr. Giglio's exposure
24 dates that up until he used Roundup occupationally, the
25 way he used Roundup did not increase his risk, at least

172

1 according to the epidemiology, in a significant manner;
2 correct?
3 MS. SIZEMORE-WETZEL: Object to form.
4 THE WITNESS: In a vacuum, ignoring the
5 occupational exposure, and relying only on those
6 two studies and not consulting the other studies,
7 whichever are ever/never or greater than one day,
8 if I were to -- under that hypothetical, that would
9 be correct.
10 BY MR. KALAS:
11 Q. Okay. And last question on the McDuffie
12 study, and then unless your counsel has more questions,
13 we'll stop. Did the McDuffie study parse the data
14 between occupational and residential use to reach their
15 average days per year the way you just did with counsel?
16 MS. SIZEMORE-WETZEL: Object to form.
17 THE WITNESS: No, but they did not require 25
18 years of continuous exposure, either.
19 BY MR. KALAS:
20 Q. You don't require 25 years of continuous
21 exposure to come up with a causation opinion, do you?
22 **A. I don't decide anything, I just review and**
23 **rely on what's been published and generally accepted.**
24 **And he clearly meets that requirement. He has four**
25 **years of exposure at nearly 30 hours a year, which is**