# EXHIBIT 11



**THE COHEN GROUP**

Environmental Health & Safety Services

October 23, 2019
Project No. 19125

Mr. John M. Kalas, Esq.
Hollingsworth LLP
1350 I St NW
Washington, DC 20005

RE:   In Re: Roundup Prods. Liab. Litig.
      U.S. District Court for the Northern District of California
      Case No. 16-MD-2741

      Ines Hernandez and Maria Hernandez v Monsanto Company
      Civil No.: 2:16-cv-1988

Dear Mr. Kalas:

Thank you for the opportunity to provide my expert opinions in connection with the above referenced matter. This summary of opinions is in response to your request for my review of the relevant exposure and industrial hygiene data and case-specific information and summarizes my opinions concerning Mr. Ines Hernandez's alleged exposure to Glyphosate from his use of Roundup® branded herbicides. The following opinions are based on my review and/or consideration of the materials listed in Attachment A and based upon my site visit to Mr. Hernandez's home on August 13, 2019 as well as on my training and expertise. A copy of my current CV is attached in Attachment C. A statement of my compensation is listed below. Attachment D is a list of cases in which I have testified in trial or deposition for the past four years. As new information becomes available, I reserve the right to alter or supplement these opinions.

My opinions are stated to a reasonable degree of professional and/or scientific certainty, and are based on my professional education, training and more than 40 years of experience, as well as my knowledge and review of the pertinent scientific literature and materials customarily relied upon and generally accepted by experts in the fields of industrial hygiene and occupational safety, my knowledge and review of applicable industry standards and practices, and the particular facts of this case.

Three Waters Park Drive
Suite 226
San Mateo
California 94403
Tel 650 349.9737
Fax 650 349.3378
www.thecohengroup.com

Page 2 - J. Kalas, Esq., Hollingsworth LLP

**Background and Qualifications**

My qualifications, background and publications are summarized in the attached Curriculum Vitae (CV) which can be found in Attachment B. Briefly, I have been engaged in the field of occupational health and safety for over 40 years. I have a Bachelor of Science degree (BS) from Oakland University at Rochester, Michigan (1972) and a Masters of Public Health degree (MPH) from the University of Michigan at Ann Arbor, Michigan (1974).

I am certified by the American Board of Industrial Hygiene in the Comprehensive Practice of Industrial Hygiene and have been so continuously since 1980 (last re-certified in 2018). In 2008, I was awarded the Fellow Award by the American Industrial Hygiene Association (AIHA) for my contribution to the practice of Industrial Hygiene. I have been a member of AIHA since 1973 and have served in leadership positions on several of their technical committees including Hygienic Guides and Construction Safety. I have also held several leadership positions with the Northern California Section of the AIHA, including President during 1984-1985. I am a diplomate of the Academy of Industrial Hygiene. I also serve as a Board member on the California Industrial Hygiene Council (CIHC) and have done so since 2006. I serve on the Cal/OSHA Advisory Committee as a Science Member. I have served as a committee member on several Cal/OSHA Technical Advisory Committees, including hazard communication, minimum ventilation, asbestos, Title 8 reform, sensitizing substances, and others.

I have authored or co-authored three books and more than two dozen papers on industrial hygiene and exposure to hazardous substances in occupational settings, and I have presented numerous technical papers at professional conferences. I have personally reviewed and conducted hundreds of assessments for various potentially hazardous substances, including pesticides. The categories of environmental stresses I am routinely asked to evaluate include chemical, biologic, physical, and ergonomic. I evaluate these stresses on the basis of observation using my experience and training, and with the aid of quantitative and qualitative measurement techniques.

Currently, I am the President and a Senior Occupational Health and Safety Consultant of The Cohen Group, an occupational health and safety consulting firm I founded in 1980. Prior to The Cohen Group, I was employed by the Aluminum Company of America, Stanford Research Institute (now called SRI International), Intel Corporation, and Hewlett Packard Company (H-P). At H-P, I was the Manager of Corporate Industrial Hygiene and Director of the Environmental Laboratory, an AIHA-accredited laboratory. I was the Corporate Industrial Hygienist and Assistant Manager of Corporate Health and Safety for Intel Corporation. At SRI, I was an industrial hygienist and project manager where I conducted applied research, primarily for the National Institute for Occupational Safety and Health (NIOSH). Much of my research efforts for NIOSH involved characterization of exposures to chlorinated hydrocarbons and engineering control studies. While employed at Alcoa, my work involved both industrial hygiene and environmental issues primarily at domestic smelting operations.

Page 3 - J. Kalas, Esq., Hollingsworth LLP

## Summary of Information on Mr. Hernandez's Exposure to Roundup®-branded Products and Other Relevant Products

Based on the sworn testimony of Mr. Hernandez and other case-specific materials, I was able to obtain the following information concerning Ines Hernandez Lopez's alleged exposure to Glyphosate, the manner in which he used Roundup®-branded products, and other relevant data pertinent to my exposure assessment.

- Mr. Hernandez was born                          in Mexico and immigrated to the United States in 1984, specifically Southern California. Before moving to the US, he worked in the agriculture industry and took care of cattle, which he did since he was 15 years old.
- Upon arrival in the US, he worked at a factory that "made set up for crib" [pg 23, L 14-15] which he did for 7 years (1984 to 1991). For the next 2 to 3 years, Mr. Hernandez worked with fabric (1991-1993/94). He was off work for the next 2 to 3 years due to a back injury (1993/94 - 1995/1997). He returned to work again performing work with fabric where he testified that he worked for another 2 to 3 years (1997 to 2000). Mr. Hernandez then stated he began a gardening company in 1994 (discovery documents state Mr. Hernandez started this business in June 1994). It is unclear why Mr. Hernandez's testimony concerning his work chronology does not seem to match his testimony when started his gardening work in June 1994 which is 10 years after moving to the US, but he testified he worked 11 to 13 years at other employments, and was off work for an additional 2 to 3 years.
- Mr. Hernandez stated he worked as a gardener until 2015. During this period of time, he had 5 employees and had 30 customers.
- In 2009, Mr. Hernandez was diagnosed with Non-Hodgkins Lymphoma (NHL) and did not work for 5 years (2009 to 2014). In 2015 he started working with an investor, providing gardening services with 2 employees at various properties performing work 3 days per week.
- Mr. Hernandez testified that he began to use Roundup in 1997 and continued to use the product until 2009 (12 years). He also stated that he would occasionally use the product around his home, but subsequently stated he stopped using the product following his diagnosis. He stated that he always purchased the Concentrate Fast Act product in the same size container (believed to be 64 oz). He stated that he used 7 gallons of the concentrate mix each week for 7 months a year.
- Mr. Hernandez testified that he used personal protective equipment consisting of gloves, goggles and a mask, but stated "sometimes I didn't use anything" [pg 49, L18-19]. He stated he would wear the mask "once or twice per week". Depending on the outdoor temperature, he would wear a T-shirt or long-sleeved T-shirt, long pants and work boots. This same clothing would be worn during product mixing and application. He stated that he would wash his hands following product mixing.

- Mr. Hernandez testified that he read the product label "the first time" [pg 53, L 2] and would use the cap to measure the proper amount of the mixture, but may use more of the product if he thought it was necessary. He would also use this same product at his home as needed, e.g., weeds along the fence or the driveway.
- He testified that he used a 1 gallon hand-held sprayer and a 5 gallon backpack sprayer for application of the product. During the site inspection, four, 1 gallon hand-held sprayers were observed as well as one, 3 gallon backpack sprayer. No 5 gallon backpack sprayer was observed during the site inspection. He stated that he began using the backpack sprayer in 1999. Application from the sprayers was through a hand-held wand with a regulator. Mr. Hernandez was clear that he would only do targeted spraying and would spray in a downward direction only.
- Mr. Hernandez testified that when spraying, he would sometimes feel the spray on his face or arms if it was a windy day when spraying. He also stated that he would feel the spray on his face when pumping, but would wash his face with water. He stated that he would sometimes feel liquid on his back when using the backpack sprayer and would use "wet hands" [pg 66, L 10] to clean off his back.

**Opinions**

1. *Based on Mr. Hernandez's sworn testimony concerning his work with Roundup Concentrate Fast Act, and from observations made during my site inspection, it is my professional Industrial Hygiene opinion that his exposure to Glyphosate would be well within acceptable limits of exposure, if he was exposed at all.*

Mr. Hernandez testified that he purchased a gardening business in 1994. However, his stated work chronology while in the United States conflicted with the start of this business in that he was working for other employers at the time. He testified that he began to use Roundup in 1997 and continued to use the product until 2009. He also stated that he would occasionally use the product around his home, but subsequently stated he stopped upon his diagnosis of NHL.
He testified that he purchased the product in the same container size, believed to be 64 oz. Following mixing, he stated he applied the product from a 1 gallon hand-held sprayer or from a 5 gallon backpack sprayer. However, during my site inspection I only observed 1 gallon sprayers and a 3 gallon backpack sprayer.

Mr. Hernandez stated that he wore gloves, goggles and mask when using the product but stated "sometimes I didn't use anything". He also stated he would wear the mask "once or twice per week". He would wear a short sleeve or long sleeve T shirt, long pants and work boots when mixing and applying the product.

Mr. Hernandez testified that when spraying, he would sometimes feel the spray on his face or arms if it was a windy day when spraying. He also stated that he would feel the spray on his face when pumping, but would wash his face with water. He stated that he would sometimes feel

Page 5 - J. Kalas, Esq., Hollingsworth LLP

liquid on his back when using the backpack sprayer and would use "wet hands" to clean off his back. During the site inspection, the backpack sprayer was filled with water, pressurized and used along the driveway with the applicator wand pointed in a downward position as if applying the product. It was clear that the spray was very directed and there was no observed misting on the driveway outside of the point of application, even though it was a windy day (up to 12 mph as reported at Long Beach Airport).

Mr. Hernandez stated that he would spray various properties for up to 7 months per year on a weekly or bi-weekly schedule. The spray schedule for the properties discussed during the deposition is shown in the attached calculation. My conservative estimate of time of spraying as shown is 160 to 335 minutes/week during the 7 months of product use. During these 7 months, Mr. Hernandez stated he would spray 7 gallons/week. That being the case, as shown in my calculations, Mr. Hernandez would need to purchase 3 containers of Roundup per month. Based on one receipt presented during his deposition, Mr. Hernandez purchased one container at a time.

In an attempt to determine Mr. Hernandez's dermally absorbed dose of Glyphosate, I made very conservative estimates of exposure which are shown in my calculations see Attachment B. The basis for these calculations is the American Industrial Hygiene Association publication on mathematically estimating occupational exposure to chemicals, specifically Chapter 13 which details dermal exposure modeling[1]. The values used for the calculations were Mr. Hernandez's testimony and the information obtained from the scientific literature. Furthermore, when there were unknowns, conservative estimates were made. These values are described below.

Given the density of Glyphosaate and the instructions for product mixing, which Mr. Hernandez stated he followed, Mr. Hernandez used about 35 grams of Glyphosate per day of spraying, assuming he worked a 5 day workweek. If, however, he worked 7 days, his daily product usage would be less.

A dermal absorbed dose rate was calculated based on Mr. Hernandez's average daily usage rate, which is referred to as an "event". The basis for this calculation is the calculated average time of spraying per day based on Mr. Hernandez' testimony.

The scientific literature reports the flux (or dermal permeability) for Glyphosate to be between 0.01 to 0.059 ug/cm2/hr (when adjusted for the same units of measure). For this calculation, I used the maximum reported flux for Glyphosate reported in the literature [Neilson 2009].

Although the frequency that Mr. Hernandez may have had some of the spray solution land on his skin during his work with the product is unknown, if it occurred at all, it is clear from his testimony that the application was from a hand-held wand which was pointed downward to the specific area where the spray solution was to be applied. Furthermore, it was clear from using

---

[1] Keil, CB, ed., et. al., *Mathematical Models for Estimating Occupational Exposure to Chemicals, 2nd Edition*, American Industrial Hygiene Association, Fairfax, VA, 2009

Page 6 - J. Kalas, Esq., Hollingsworth LLP

the backpack sprayer during the site inspection that the wand would direct the spray to a point source with no observable misting and the spray would be emitted from the wand at a point below the knee.  Even if some misting occurred, it is more likely than not that the spray would land on the front of the leg below the knee and possibly on the foot.  Mr. Hernandez stated that he would "sometimes…. feel [a mist] on my face or here on my arms when the wind hit."  He also stated that he would feel the mist on his face when pumping but would wash his face.  Based on his testimony and to account for these periodic occurrences when he believes some of the mist would land on his arms and face, the calculation assumes that his legs (front and back and thighs) would be the skin surface receiving some of the misting.  This more than doubles the surface area of just the lower leg skin surface.

Concerning exposure to the legs, Mr. Hernandez stated that he wore long pants similar to the ones worn by mechanics.  Oltmanns 2016 evaluated the effectiveness of personal protective equipment against dermal exposure.  He cited the Fenske study evaluating lindane in a dust formulation and found the cotton workpants to offer a 91.4% exposure reduction.  Oltmanns also cited the Driver and Ross study of pesticide handlers wearing single layer clothing including long pants and found for mixers/loaders, flaggers, applicators an exposure reduction of approximately 90%.  He cites an exposure reduction of 91.31% from the use of backpack sprayer when the above stated clothing is worn (see Table 5.21).  For my calculation of exposure, I assumed only a 50% reduction, an extraordinarily conservative estimate base on the scientific literature.

Mr. Hernandez's actual body weight is unknown.  As such I used 70kg which is a common weight cited in the literature for these types of assessments.

Based on these above conservative values, as shown in my calculations, the dermal absorbed dose of Glyphosate Mr. Hernandez's experienced on a spraying day ranged from 0.000705 to 0.0016 mg/kg/day.

Since Mr. Hernandez testified that he only used Roundup 7 months a year, his average daily dermal absorbed dose ranged from 0.00029 to 00064 mg/kg/day.

 EPA chronic reference dose (RfD) for Glyphosaate is 1.75 mg/kg/day which is "an estimate of the quantity of chemical that a person could be exposed every day for the rest of their life with no appreciable risk of adverse health effects."  The EU Acceptable Operator Exposure Limit is 0.1 mg/kg.  These dose limits are orders of magnitude above the conservative estimates of exposure.  For example, the calculated average daily dermal absorbed dose is 2,734 to 6,034 times lower than the EPA Reference Dose and 156 to 345 times below the EU limit.

The State of California through the Office of Environmental Health Hazard Assessment (OEHHA) pursuant to California's Proposition 65 has established a No Significant Risk Level (NSRL) for Glyphosate.  The NSRL for Glyphosate has been set at 1.1 mg/day.  This regulatory

Page 7 - J. Kalas, Esq., Hollingsworth LLP

limit is also orders of magnitude above my conservatively calculated dermal dose for Mr. Hernandez.

It is my professional Industrial Hygiene opinion that Mr. Hernandez's exposure to Glyphosate is well within governmental established acceptable limits of exposure, if he was exposed at all. This is based on extremely conservative dermal dose estimates. Based on these calculations, Mr. Hernandez's daily dermal dose to Glyphosate from his use of Roundup is orders of magnitude within a lifetime acceptable dose where ill effects would not be expected.

During my site inspection, I found several products in Mr. Hernandez's garage which contain petroleum hydrocarbons, including motor oil, transmission fluid, gas treatment, gear oil, wheel cleaner, power steering fluid, and octane booster. In addition to these petroleum products, I found anti-freeze coolant (generally ethylene glycol), epoxies, tile grout, and latex paints. Mr. Hernandez's frequency and use of these products is unknown but they may pose an exposure to the volatile compounds during their use.

2. ***Regulatory agencies worldwide have determined there is no carcinogenic risk from exposure to Glyphosate-Based Herbicides. IARC concluded that Glyphosate was a "probable" carcinogen, a term that IARC defines as "limited" evidence.***

Multiple regulatory agencies have reviewed the potential carcinogenicity of Glyphosate and only one has concluded that Glyphosate is a "probable carcinogen". The International Agency for Research on Cancer ("IARC") concluded Glyphosate was a probable carcinogen based on limited evidence in humans. [See IARC 2015]. The IARC preamble notes that calling a substance a carcinogen under IARC's process does not quantitate the risk of cancer to people from exposure to that substance, which may be minimal. The preamble draws the distinction between "hazard" and "risk" by stating, "the Monographs assess the strength of evidence that an agent is a cancer hazard. The distinction between hazard and risk is fundamental." Therefore, IARC is clear that they did not measure the risk of the probable cancer hazard to humans but stated that the substance is a probable carcinogen hazard based on limited evidence. [See IARC Preamble 2019]

Regulatory and scientific agencies from the U.S., Canada, Germany, the E.U., Australia, New Zealand, Japan, and the United Nations have all found Glyphosate exposure from the use of Glyphosate-based herbicides not to represent a carcinogenic risk. The proceedings of many of these agencies span many years were subject to comment and/or peer-review, and were conducted openly. EPA stated that their most recent "cancer evaluation is more robust than IARC's evaluation. IARC's evaluation only considers data that have been published or accepted for publication in the openly available literature. As a result, IARC only considered a subset of the studies...". [See EPA Interim Decision 2019]. Additionally, these agencies had access to unpublished data submitted pursuant to regulatory requirements which was not considered by IARC. It is therefore my professional opinion that unlike the aforementioned regulatory agencies, IARC did not consider all of the available scientific literature and did not quantitate the

risk from exposure. Therefore it is my professional opinion IARC's conclusion is different than many of the other scientific agencies from around the world.

3. ***The main route of exposure to Glyphosate via use of Glyphosate-Based Herbicides is dermal. Published and unpublished data indicate dermal absorption of Glyphosate is Low. The presence of surfactants does not appear to affect dermal absorption.***

Industrial Hygienists consider all routes of exposure at the workplace when characterizing exposure to a chemical or biologic agent. Glyphosate is not volatile and field studies of applicators of Glyphosate-based herbicides have shown that inhalation exposures to Glyphosate are minimal. [See Jauhinien 1991, Edmiston 1995]. IARC states "monitoring [for Glyphosate] in air is not a useful way of determining exposure in workers since most exposure occurs via the dermal route." Ingestion would be an inadvertent route of exposure. The main route of exposure from use of Glyphosate-based herbicides, subject to work practices, appears to be dermal. ATSDR states that "dermal contact appears to be the major route of exposure to Glyphosate for people involved in its application." [See ATSDR 2019, IARC 2015].

Glyphosate is a hydrophilic compound. The skin acts like a barrier to such compounds. Studies using human skin samples demonstrate that dermal penetration of Glyphosate is "very low." Once dermally absorbed, the literature indicates that Glyphosate remains largely unchanged within the body, is quickly excreted in urine, and does not bioaccumulate.

Multiple studies have examined the dermal absorption of Glyphosate and Glyphosate-based herbicides [See e.g. Franz 1983, Nielsen 2009, Smith 2014]. Formulated Glyphosate-based herbicides may contain surfactants such as polyoxyethene tallow amine (POEA) as one example. It is my professional Industrial Hygiene opinion that the most relevant of these studies to the human experience have used human skin *in vitro*, though there have also been studies using animal models. Many of the more recent studies have stated that the test methodology used have been conducted according to OECD guidelines, an internationally recognized protocol for the testing of chemicals on excised skin.

The rate and percentage of absorption do not appear to be affected by the presence of surfactants in formulations. Multiple studies indicate that the percentage of Glyphosate dermally absorbed is affected by diluting the mixture. The presence of surfactants does not appear to significantly affect absorption. For example, Franz 1983 shows that as the study transitioned from Glyphosate, to a concentrated form of Roundup®, to a Roundup® spray mix, the percent of Glyphosate absorbed increased each time even as the absolute amount of Glyphosate absorbed declined. That's despite the fact that the amount of surfactant in each formulation went from none to a high level to a much lower level. Franz states, "absorption of Glyphosate was lowest from the Roundup Spray Mix and this was in keeping with the much lower concentration of Glyphosate in the Spray Mix formulation. It should be noted however, that on a relative basis the percent absorption was actually greater from the Spray Mix formulation than from the other two. This phenomenon has been observed before with other topically applied materials and is related to the size of the applied dose. As the dose increases….the percent absorption falls off."

Clearly, the presence of the surfactants used in Glyphosate-based herbicides does not affect absorption. Franz concludes that Glyphosate absorption through human skin was 0.03 to 0.15% and that greater than 92% of the unabsorbed Glyphosate remained on the skin surface where it was "readily removed" by a water wash. Other studies show similar results [See Ward 2010, Smith 2014-2015, and Davies, 2015].

The small percentage of Glyphosate which is absorbed appears to quickly leave the body, largely unmetabolized as mentioned above [ATSDR 2019]. Glyphosate has been found to have a short half-life in the body. Laboratory studies have shown the majority of an intravenous dose of Glyphosate administered to monkeys has been eliminated unmetabolized within twenty-four hours. [Wester 1991; Maibach 1983]. The National Institute of Environmental Health Sciences National Toxicology Program (NTP) reported that rats administered intravenous doses of Glyphosate found that 98% of the Glyphosate was excreted in urine during the first twenty-four hour period. [NTP 1992]. Following a seven day excretion period, Wester examined the bodies of the topical skin treatment test subjects and determined that "there was no residual doses in tissues or skin." [Wester 1991]. In humans, biomonitoring studies show similar results. Peak urinary excretion comes as soon as 3 hours after task completion and, by 24 hours later, urinary concentration has fallen to background or near-background levels. [Connolly 2018].

All studies performed on human skin suggest very low dermal absorption. Industrial Hygienists commonly determine the extent of dermal absorption by a measure of flux value, which is the rate of absorption through the skin, and the percent absorbed. Franz 1983 and Nielsen 2009 have reported the flux between 0.01 to 0.059 [as shown and converted to same units] ug/cm2/hr for Glyphosate. No study using human skin indicates a percent of absorption greater than 2.2% [Wester 1991] and most are below 1% [Franz 1983, Smith 2014, Ward 2010]. These results are as expected for a hydrophilic compound like Glyphosate.

4. *Biomonitoring and passive dosimetry studies confirm that dermal absorption of Glyphosate from the use of Glyphosate-Based Herbicides is low and within regulatory limits of exposure.*

In addition to dermal absorption studies, there are biomonitoring and passive dosimetry studies that assess exposure and dose of Glyphosate in individuals applying Glyphosate-based herbicides in a variety of exposure scenarios. These studies are very useful in assessing home and workplace exposures including the quantity of Glyphosate that may land on the skin of individuals during product usage and potentially absorb. The dose reported in these studies can then be compared to toxicological and regulatory levels.

Overall, Glyphosate absorption has been recorded to range from 0.000013 mg/kg/day to 0.00456 mg/kg/day in biomonitoring studies. [See Bleeke 2007, Abdelghani 1995, as reported in Solomon 2016]. In a 70 kg (approximately 150 pounds) individual, that would calculate to a systemic daily dose of 0.00091 - 0.319 mg of Glyphosate a day, as follows:

Page 10 - J. Kalas, Esq., Hollingsworth LLP

$$\frac{0.000013 mg}{\frac{kg}{day}} \times 70 kg = 0.00091\ mg/day$$

$$\frac{0.00456\ mg}{\frac{kg}{day}} \times 70 kg = 0.319\ mg/day$$

Passive dosimetry studies (studies that use gauze pads applied to the skin or clothing, or cassettes placed in the breathing zone to capture airborne Glyphosate) reported doses approximately an order of magnitude above and below the recorded biomonitoring doses described above.   That said, doses recorded by passive dosimetry remain low.  [See Lavy 1992, Edmiston 1995].

Compared to regulatory and toxicological levels, absorbed doses of Glyphosate are extremely low.  Acquavella 2004 reports a maximum exposure dose of 0.004 mg/kg in a farmer-applicator, a dose significantly higher than any other exposure reported in this or other studies.  Interestingly, that applicator was observed by the study authors to have skin contact with Glyphosate while not wearing gloves and was also observed to smoke cigarettes while handling Glyphosate (potential for incidental exposure by ingestion).  [Acquavella 2004 at Figure 1].  The dose of 0.004 mg/kg is 437.5 times lower than the EPA RfD of 1.75 mg/kg, and 25 times lower than the EU Acceptable Operator Exposure Limit of 0.1 mg/kg.  [See Tarazona 2017].  Therefore, it is my professional Industrial Hygiene opinion that the literature reports levels well within acceptable exposure levels based on biomonitoring and passive dosimetry.  Dermal absorption, the primary route of exposure for Glyphosate, is very low and well below levels that would be considered of increased risk of ill health.

5. ***It is my professional Industrial Hygiene opinion that epidemiology studies of environmental health illnesses are stronger when they account for the extent of exposure to the alleged stressor.  Epidemiologic studies that control for potential confounders as well are stronger than studies that do not. Such studies that consider exposures and confounding factors confirm the findings of many government regulators that there is no increased risk of NHL from the use of Glyphosate.***

In a recognized Industrial Hygiene text by DiNardi[2], it states that "in occupational epidemiologic studies, one test for concluding the existence of cause and effect is the presence of an exposure-response relationship." [See DeNardi, pp 6-7, 1997]  DiNardi further states "confounding is a type of bias that [may] adversely affect the understanding of an exposure/disease relationship." [DiNardi pg 98] Thus, the need for exposure data and the need to control for confounding

---

[2] DiNardi, SR, ed, *The Occupational Environment – Its Evaluation and Control,* American Industrial Hygiene Association, Fairfax, VA, 1997

Page 11 - J. Kalas, Esq., Hollingsworth LLP

variables is important for determining risk of disease. Without consideration for dose and other causal factors, a study may report an association between a stressor and outcome, without recognizing a study bias. Unfortunately, the link to illnesses as reported in epidemiologic studies generally does not consider such variables within the studied cohort. Meta-analyses or pooled analyses that do not account for these issues also are subject to the same criticism.

Some epidemiological studies reported in the regulatory documents compare the rate of lymphoma in individuals who "ever" used Glyphosate against those who "never" used Glyphosate. Those studies do not have empirical exposure data to evaluate exposure levels. For this report, I have reviewed epidemiological studies on Glyphosate with a focus on individual studies that take the extent of exposure into account.

Some studies [e.g. Eriksson 2008, McDuffie 2001, Andreotti 2018] used data on yearly or lifetime days of use to evaluate dose. One can also see these studies referenced in the meta-analyses [e.g., Pahwa 2019, Zhang 2019]. Days of use without considering the extent of exposure provides some information, but is still a crude measure of dose. For example, McDuffie appears to have combined an individual who was exposed to Glyphosate-based herbicides three times a year with someone who was exposed to Glyphosate 300 times a year. Assuming those two individuals used Glyphosate-based herbicides in the same manner, the dose to the latter would be a 100 times greater than the former. On the other hand, if someone who only used Glyphosate herbicides one day a year with extremely large quantities as opposed to someone who used it 3 days a year at a lower quantity, the one day user may very well have had a larger exposure. Additionally the McDuffie and Errikson studies do not control for confounding variables that may influence outcome, eg family history of cancer.

Andreotti 2018, using a peer-reviewed methodology as reported in the Dosemeci 2002 and Coble 2011 studies, applied an intensity-weighted dose metric to its evaluation of the relationship between Glyphosate-based herbicide exposure and NHL. This metric considered the use of personal protective equipment (PPE) worn by applicators, which is an important variable to consider as one evaluates intensity of exposure. They also identified method of application. Though not a "real-time" dose assessment like biomonitoring, recording the use of PPE as one variable to characterize exposure, it is an important step in understanding whether any dose-response relationship exists between Glyphosate-based herbicides and cancer. Additionally, Andreotti controlled for other potential confounders. The results from Andreotti 2018, a relative risk below 1.0 for each exposure group were reported, suggesting that there is no relationship between Glyphosate-based herbicides and NHL. Because the Andreotti study considers dose metrics and because it controls for potential confounding factors, it is my professional Industrial Hygiene opinion that it is a stronger study than studies like the McDuffie or Eriksson studies for several reasons such as the Andreotti study is an extremely large cohort study, consisting of 54,251 pesticide applicators, rather than a case control study with a limited population. Apart from being the largest cohort study I reviewed, the researchers considered, exposure by

Page 12 - J. Kalas, Esq., Hollingsworth LLP

frequency of use, method of application and use of personal protective equipment as well as considered for other pesticide use.

> 6. *The following are my comments on the report of Plaintiff's expert, Dr. William Sawyer that relate to industrial hygiene.*

Based on my review of Dr. Sawyer's report, I find a number of areas in which Dr. Sawyer and I disagree, as follows:

> **A. Glyphosate is minimally absorbed, regardless of whether the exposure is to Glyphosate alone or formulated products containing Glyphosate, surfactants, and manufacturing impurities.**

Dr. Sawyer writes that the body absorbs up to 10% of the Glyphosate to which the skin is exposed and that surfactants speed the absorption process by damaging the epidermis. [Van Burgsteden 2003]

Dr. Sawyer's statement concerning the extent of absorption is based on one, outlying result in rats, a result that shows greater absorption than other rodent studies or the large number of human *in vitro* studies.  In fact, even the study authors generating the result upon which Dr. Sawyer relies concluded that "the poor recoveries combined with the high variation within the Glyphosate test groups make the data generated in this study unsuitable for risk assessment."  As I explained earlier in this report that, Franz 1983 and Nielsen 2009 have reported the flux between 0.01 to 0.059 [as shown and converted to same units] ug/cm2/hr for Glyphosate.  No study using human skin indicates a percent of absorption greater than 2.2% [Wester 1991] and most are below 1% [Franz 1983, Smith 2014, Ward 2010].

Dr. Sawyer's claims concerning the effects of surfactants are similarly unsupported by the existing scientific literature.  Early studies looked at Glyphosate, a concentrated Roundup, and a Roundup spray mix.  A comparison of the results from the concentrated and diluted Roundup results shows that rather than decreasing as the surfactants were diluted, the percent of Glyphosate absorbed increased with the dilution of the surfactants.  [Franz 1983]  The results of human *in vitro* studies of human skin suggest that the presence of surfactants in formulated Glyphosate products does not affect the skin.

> **B. Glyphosate does not remain in the human body for long but is, instead, quickly excreted.**

In his disclosure, Dr. Sawyer contends that Glyphosate bioaccumulates in skin and bone, and he then contends that it can be systemically available throughout the body.  Dr. Sawyer's contention is not supported by the existing literature.

Page 13 - J. Kalas, Esq., Hollingsworth LLP

My review of the literature indicates that the body quickly eliminates the small amounts of Glyphosate that may have been absorbed.  Various studies I have reviewed show a rapid elimination of Glyphosate in the urine, both in animals and in humans. [Wester 1991, Connolly 2018, Maibach 1983].  Wester 1991 reported that the majority of each dose of Glyphosate was excreted in the urine within 24 hours following intravenous administration to monkeys.  Connolly 2018 reported on biomonitoring which showed that, within a 24 hour period, Glyphosate urinary levels of human subjects peaked within 3 hours and then declined considerably by the next morning.  This is consistent with the finding of Maibach 1983 that the majority of urinary excretion by monkeys who had Glyphosate injected took place within the first 24 hour period.  ATSDR states that "approximately two-thirds of an oral dose of Glyphosate is excreted in the feces as unabsorbed parent compound." [ATSDR 2019]  Ingestion would not be a common route of exposure for a worker/applicator and therefore, based on my review of the scientific literature, it seems that most dermally absorbed Glyphosate is rapidly excreted in the urine.

### C.  Manufacturing impurities are not relevant.

Dr. Sawyer's discussion of manufacturing impurities in Glyphosate (such as formaldehyde, ethylene oxide, 1,4 dioxane, and n-nitrosoGlyphosate) is not tied to any proper exposure analysis.  Dr. Sawyer notes the existence of trace manufacturing impurities, but the levels of these may be so low, that they are not reportable under the OSHA Hazard Communication Standard.  More importantly, Dr. Sawyer has not demonstrated that these impurities, if present, are causes of ill health at the potential level of exposure, or are related to NHL.  Dr. Sawyer may have identified potential hazards, but he is not addressing risk; without taking the actual exposure and dose of these substances into account.

### D.  The days-of-exposure measurements are too crude to result in any accurate measure of dose.

In his report, Dr. Sawyer argues that Mr. Hernandez had an increased risk of NHL because he used Roundup more than two days a year and had used it for more than ten days over his lifetime, citing two case-control studies.  [McDuffie 2001; Eriksson 2008].  Above, I explained that these measurements are crude measures of dose, both because the groupings within each study combine in one category of individuals with far different actual exposures and because, between categories, those in the higher-day categories have not necessarily received higher doses.  With regard to Mr. Hernandez, Dr. Sawyer makes no effort to try to quantify the dose of Glyphosate to which Mr. Hernandez was exposed as I have done.  As such, I do not understand how Dr. Sawyer can state that Mr. Hernandez's dose was toxicologically significant.

### E.  Applicators who do not wear personal protective equipment (PPE) still do not exceed the doses set by various regulatory agencies.

Page 14 - J. Kalas, Esq., Hollingsworth LLP

Dr. Sawyer states that the product labels on Roundup should include recommendations for PPE. I have reviewed the scientific literature concerning passive dosimetry and biomonitoring, as well as that concerning *in vitro* skin absorption, and I have calculated Mr. Hernandez's retrospective dose to Glyphosate from his stated use of Roundup. Unquestionably, the use of PPE will reduce the applicator's dose of Glyphosate. However, reported doses of applicators in the passive dosimetry and biomonitoring literature as well as from my determination of Mr. Hernandez's dose calculation, show that exposure do not exceed the regulatory health levels based on the regulators' independent risk assessment of Glyphosate.

If Dr. Sawyer is suggesting that the PPE requirements identified in the safety data sheets (SDS) should be reflected on the product label, he ignores the purpose and intent of SDSs. Under OSHA's Hazard Communication Standard [29CFR1910.1200], the SDS is intended to provide employees with information about the use of a product they handle as the workplace on a regular basis. It is not intended for the consumer and the consumer's anticipated use. That said, the Roundup labels I have reviewed indicate the conditions of use, precautions, and safety information regarding steps to take if the solution gets on clothing or skin.

### F. Dr. Sawyer's chemical inventory is incomplete.

During my site visit on August 13, 2019, I observed many potentially hazardous substances in Mr. Hernandez's garage, including petroleum hydrocarbons, such as motor oil, transmission fluid, gas treatment, gear oil, wheel cleaner, power steering fluid, and octane booster. Mr. Hernandez's frequency and use of these products is unknown but they may pose an exposure to the volatile compounds during their use. Dr. Sawyer ignores the potential exposures Mr. Hernandez experienced from the use of these substances.

**Statement of Compensation**

Joel Cohen's hourly rate for consultation is $350.

Please contact me if you have any further questions.

Very truly yours,

Joel M. Cohen, MPH, CIH, FAIHA
The Cohen Group

Attachment A:   Materials Considered List of Joel Cohen, MPH, CIH, FAIHA
Attachment B:   Dose Calculations
Attachment C:   Curriculum Vitae of Joel Cohen, MPH, CIH, FAIHA
Attachment D:   Joel M Cohen 4-Year Trial and Deposition Testimony