Robin Greenwald
**Weitz & Luxenberg**
700 Broadway
New York, NY 10003
Telephone: (212) 558-5500
Facsimile: (212) 344-5461
rgreenwald@weitzlux.com

Michael Miller
**The Miller Firm LLC**
108 Railroad Avenue
Orange, VA 22960
Telephone: (540) 672-4224
Facsimile: (540) 672-3055
mmiller@millerfirmllc.com

Aimee H. Wagstaff (SBN 278480)
**ANDRUS WAGSTAFF, PC**
7171 W. Alaska Drive
Lakewood, CO  80226
Telephone: 303-376-6360
Fax: 303-376-6361
aimee.wagstaff@andruswagstaff.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 |
| | Case No. 3:16-md-02741-VC |
| *Dickey v. Monsanto Co.*, 3:19-cv-04102 | |
| *Domina v Monsanto Co.*, 3:16-cv-05887 | **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT MONSANTO COMPANY'S MOTION TO EXCLUDE TESTIMONY OF DR. CHARLES BENBROOK** |
| *Giglio v. Monsanto Co.*, 3:16-cv-05658 | |
| *Janzen v. Monsanto Co.*, 3:19-cv-04103 | |
| *Mendoza v. Monsanto Co.*, 3:19-cv-06046 | |

-i-

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT MONSANTO COMPANY'S MOTION TO
EXCLUDE TESTIMONY OF DR. CHARLES BENBROOK
MDL No. 2741

*Perkins v. Monsanto Co.*, 3:16-cv-06025-VC

*Pollard v. Monsanto Co.*, 3:19-cv-04100-VC

*Russo v. Monsanto Co.*, 3:16-cv-06024-VC

*Sanders v. Monsanto Co.*, 3:19-cv-05752-VC

*Tanner v. Monsanto Co.*, 3:19-cv-04099-VC

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT MONSANTO COMPANY'S MOTION TO
EXCLUDE TESTIMONY OF DR. CHARLES BENBROOK
MDL No. 2741

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

LEGAL STANDARD .......................................................................................................... 2

ARGUMENT ........................................................................................................................ 5

    I.      Dr. Benbrook is Highly Qualified to Offer His Disclosed Opinions ...................... 5

    II.     Dr. Benbrook Is Permitted to Testify About Underlying Factual Matters That the
           Jury May Consider in Assessing Monsanto's Intent, Motive, and State of Mind  11

    III.    Dr. Benbrook May Reasonably Base His Testimony on Monsanto's Documents
           and Employees' Statements ................................................................................. 14

    IV.    Dr. Benbrook May Properly Testify Regarding Monsanto's Duties as a Pesticide
           Manufacturer and Has Been Permitted to do so in the Past................................. 15

    V.     Preemption Does Not Apply Because Plaintiffs Have Not Alleged Any Fraud-
           On-The-EPA Claims ........................................................................................... 21

CONCLUSION.................................................................................................................... 23

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT MONSANTO COMPANY'S MOTION TO
EXCLUDE TESTIMONY OF DR. CHARLES BENBROOK
MDL No. 2741

# TABLE OF AUTHORITIES

**Cases**

*Adams v. United States*
2009 WL 1085481 (D. Idaho Apr. 20, 2009) ...................................................... 19, 20

*Bausch v. Stryker Corp.*
630 F.3d 546 (7th Cir. 2010) ............................................................................... 21

*Buckman v. Plaintiffs' Legal Committee*
531 U.S. 341 (2001) ........................................................................................ 21, 22

*Burke v. Dow Chem. Co.*
797 F. Supp. 1128 (E.D.N.Y. 1992) ................................................................... 16

*Cook v. Rockwell International Corp.*
580 F.Supp. 2d 1071 (2006) ................................................................................. 2

*Daubert v. Merrell Dow Pharm., Inc.*
43 F.3d 1311 (9th Cir. 1995) ................................................................................ 3

*Daubert v. Merrell Dow Pharm., Inc.*
509 U.S. 579 (1993) ............................................................................... 2, 3, 4, 14

*DePaepe v. General Motors Corp.*
141 F.3d 715 (7th Cir.1998) ............................................................................... 13

*Gen. Elec. Co. v. Joiner*
522 U.S. 136 (1997) ............................................................................................. 3

*George v. Ford Motor Co.*
2007 WL 2398806 (S.D.N.Y. Aug. 17, 2007) ................................................... 21

*Ginena v. Alaska Airlines, Inc.*
2013 WL 431827 (D. Nevada 2013) ................................................................... 20

*In re Gen. Motors LLC Ignition Switch Litig.*
2015 WL 8130449 (S.D.N.Y. Dec. 3, 2015) ...................................................... 21

*In re Genetically Modified Rice Litig.*
666 F. Supp. 2d 1004 (E.D. Mo. 2009) .............................................................. 12

*In re Roundup Prod. Liab. Litig.*
390 F. Supp. 3d 1102 (N.D. Cal. 2018) ............................................................ 2, 3

*In re Testosterone*
2017 WL 1836443 (N.D.Ill. May 8, 2017) ......................................................... 15

*In re Tylenol (Acetaminophen) Mktg., Sales Practices & Prod. Liab. Litig.*
181 F. Supp. 3d 278 (E.D. Pa. 2016) ............................................................ 20, 22

*In re Welding Fume Prod.*
2005 WL 1868046 (N.D. Ohio Aug. 8, 2005) .................................................... 14

*In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & PMF Prod. Liab. Litig.*
2011 WL 6740391 (S.D. Ill. Dec. 22, 2011) ...................................................... 22

**Cases (cont.)**

*In re Yasmin & YAZ (Drospirenone) Mktg., Sales Practices & Prod. Liab. Litig.*
   2011 WL 6302287 (S.D. Ill. Dec. 16, 2011) ........................................................... 12

*In re: Prempro Liability Litig.*
   554 F. Supp. 2d 871 (E.D. Ark. 2008) .................................................................... 13

*McClellan v. I-Flow Corp.*
   776 F.3d 1035 (9th Cir. 2015) ................................................................................ 21

*Messick v. Novartis Pharm. Corp.*
   747 F.3d 1193 (9th Cir. 2014) .................................................................................. 3

*Milward v. Acuity Specialty Products Group, Inc.*
   639 F.3d 11 (1st Cir. 2011) ................................................................................... 3, 4

*Peterson, et al. v. BASF Corp.*
   12 F. Supp. 2d 964 (D. Minn. 1998) ....................................................................... 20

*Placencia v. I-Flow Corp.*
   2012 WL 5877624 (D. Ariz. Nov. 20, 2012) ........................................................... 22

*Reiber v. Cty. of Gage*
   303 Neb. 325 (2019) ............................................................................................... 19

*Stambolian v. Novartis Pharm. Corp.*
   2013 WL 6345566 (C.D. Cal. Dec. 6, 2013) .......................................................... 22

*Stengel v. Medtronic Inc.*
   704 F.3d 1224 (9th Cir. 2013) ................................................................................ 21

*United Food & v. Teikoku Pharma USA*
   2017 WL 5068533 (N.D. Cal. Nov. 3, 2017) .......................................................... 13

*United States v. Pacific Gas and Electric Co.*
   2016 WL 1640462 (N.D. Cal. 2016) ....................................................................... 11

*Visteon Glob. Techs., Inc. v. Garmin Int'l, Inc.*
   2016 WL 4396085 (E.D. Mich. Aug. 18, 2016) ...................................................... 12

*Wendell v. GlaxoSmithKline LLC*
   858 F.3d 1227 (9th Cir. 2017) .............................................................................. 3, 4

*Wyeth v. Levine*
   555 U.S. 555 (2009) ............................................................................................... 22

**Statutes**

Federal Insecticide Fungicide and Rodenticide Act ("FIFRA")
   *7 U.S.C. §136 et seq. (1996)* ........................................................................... passim

Food, Drug and Cosmetic Act ("FDCA")
   21 U.S.C. § 301 et seq. 6, 20 ................................................................................... 7

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT MONSANTO COMPANY'S MOTION TO
EXCLUDE TESTIMONY OF DR. CHARLES BENBROOK
MDL No. 2741

**Other Authorities**

Food and Agricultural Organization International Code of Conduct on Pesticide Management ("FAO Code"), World Health Organization, Food and Agriculture Organization of the United Nations, Rome, 2014
[text at http://www.fao.org/fileadmin/templates/agphome/documents/Pests_Pesticides/Code/Code_ENG_2017updated.pdf] (last visited December 10, 2019) ............................................................ 17

Monsanto's *Commitments*
https://monsanto.com/company/commitments/ (last visited December 10, 2019) ................... 16

**Rules**

Fed. R. Evid. 702 ....................................................................................................... 2, 3, 12, 14

Fed. R. Evid. 704 ............................................................................................................ 12, 15

## INTRODUCTION

Dr. Charles Mallard Benbrook has worked throughout his career in the field of agriculture and pesticide registration, regulation, risk assessment, promotion, and use. He is eminently qualified to opine on the issues that lie at the heart of this case.[1] He has spent his 40-year professional life immersed in pesticide risk evaluation and related regulatory issues and pesticide industry stewardship and standards of care. He has testified before Congress on several of these subjects, advised pesticide companies on regulatory compliance and other related-issues, presented his work in a number of academic and professional settings, and published both peer-reviewed and non-peer-reviewed literature on his areas of expertise for decades. He had extensive pre-litigation knowledge of the pesticide regulatory scheme and published scientific literature on glyphosate use and hazards and has also undertaken a detailed review of the voluminous documentary record produced by Monsanto in this action. His anticipated testimony is well supported by the evidence.

Plaintiff will *not* offer Dr. Benbroo*k's testimony simply as a means of regurgitating facts or documents that the jury might otherw*ise consider directly. Instead, Dr. Benbrook will explain to the jury the history and structure of pesticide regulation by the Environmental Protection Agency ("EPA"), the regulation by the EPA of Roundup® and provide opinions as to Monsanto's corporate conduct regarding Roundup® and other glyphosate-based herbicides ("GBHs") with

---

[1] These issues include the U.S. pesticide regulatory scheme; the interplay between various pesticide regulations, pesticide risk assessment, and especially EPA's pesticide cancer risk assessment process and policy, about which Dr. Benbrook published a letter in the journal *Science* in 1983; the chronology of the use, registration, and labeling of Monsanto GBHs, and the substantial differences between Roundup® GBHs labeled for agricultural uses versus non-agricultural uses; critical differences in what EPA knows from its data requirements and risk assessment regarding the risks arising from exposure to technical, pure glyphosate (which no one uses as a pesticide) and formulated GBHs; Monsanto's conduct regarding the evaluation of and publication about the risks associated with use of its GBHs; Monsanto's public statements through labeling, advertising and marketing regarding its GBHs; the differences between the genotoxicity datasets evaluated by EPA and IARC in their respective evaluations of the carcinogenicity of glyphosate; pesticide industry stewardship and the standard of care, including industry codes of conduct; and Monsanto's adoption or ignorance of those codes of conduct with respect to its GBHs.

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT MONSANTO COMPANY'S MOTION TO EXCLUDE TESTIMONY OF DR. CHARLES BENBROOK
MDL No. 2741

respect to compliance and conformance with the provisions of the Federal Insecticide Fungicide and Rodenticide Act ("FIFRA") and voluntary pesticide industry standards of care, to which Monsanto is a signatory. Those opinions will not be based on any *interpretation* of Monsanto documents, but will be based on what Monsanto corporate managers, officials, and scientists have said about policies adopted by Monsanto, and on Monsanto's actions regarding Roundup® relative to those policies. Dr. Benbrook's testimony is no different than other "standard of care" experts whose testimony is admitted in countless other product liability trials.

## **LEGAL STANDARD**

Under Federal Rule of Evidence § 702 and the *Daubert* standard, the Court's gatekeeping obligation is to ensure that proffered expert testimony is relevant and based on reliable methods. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). A key goal of the adoption of the *Daubert* standard was to relax traditional barriers to admission of expert opinion testimony. *Daubert*, 509 U.S. at 588. Courts are thus in agreement that Rule 702 mandates a liberal standard of admissibility. As the Advisory Committee to the 2000 amendments to Rule 702 noted, with apparent approval, "[a] review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee note (2000); *see also Cook v. Rockwell International Corp.*, 580 F.Supp. 2d 1071, 1083 (2006). More specifically, "[t]he Ninth Circuit has placed great emphasis on *Daubert*'s admonition that a district court should conduct [the admissibility] analysis "with a 'liberal thrust' favoring admission." *In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d 1102, 1112 (N.D. Cal. 2018) (Chhabria, J.).

Under the standard, courts should *not* weigh evidence or draw conclusions about the strength of any particular piece of evidence; instead, the Court's focus "must be solely on principles and methodology, not on the conclusions that they generate." *Wendell v.*

*GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017) (quoting *Daubert*, 509 U.S. at 595). In other words, while mere conclusory testimony is inadmissible, *see Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997), it is not the Court's task to decide whether an expert's conclusions are correct. *See Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995) (*Daubert II*) ("[T]he *Daubert* test "is not the correctness of the expert's conclusions but the soundness of his methodology"). Nor is the Court empowered "to determine which of several competing scientific theories has the best provenance." *Milward v. Acuity Specialty Products Group, Inc.*, 639 F.3d 11, 15 (1st Cir. 2011) (internal quotation marks and citations omitted). Instead, the party submitting expert testimony must demonstrate that "the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion." *Id.*

In service of relaxing the admission of expert evidence, the Supreme Court has provided a list of non-exhaustive factors that a court may consider, including: "whether a theory or technique . . . can be (and has been) tested;" whether "the theory or technique has been subjected to peer review and publication;" whether, "in the case of a particular scientific technique," there is a high "known or potential rate of error" and "the existence and maintenance of standards controlling the technique's operation;" and whether the theory or technique enjoys "general acceptance" within a "relevant scientific community." *Daubert*, 509 U.S. at 593-94 (1993). However, "[t]hese factors are not a mandatory or inflexible checklist, and the Court has broad discretion to determine which factors are most informative in assessing reliability in the context of a given case. *In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d at 1112. The inquiry is thus "flexible," *Wendell*, 858 F.3d at 1235 (quoting *Daubert*, 509 U.S. at 594), and "Rule 702 should be applied with a 'liberal thrust' favoring admission." *Id.* (quoting *Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014)).

1    Exclusion of expert testimony is only appropriate when such testimony qualifies as

2  irrelevant or unreliable "junk science." *Wendell*, 858 F.3d at 1237. Otherwise, the court should

3  cede complex issues to the jury and rely on the traditional safeguards of the adversary system –

4  i.e., cross-examination, presentation of contrary evidence, and instruction on the burden of proof

5  – to test and evaluate even weak but otherwise admissible evidence. *See Milward*, 639 F.3d at 13

6  ("So long as an expert's scientific testimony rests upon 'good grounds, based on what is known,'

7  it should be tested by the adversarial process, rather than excluded for fear that jurors will not be

8  able to handle the scientific complexities." (quoting *Daubert*, 509 U.S. at 590, 596)). "[T]he

9  interests of justice favor leaving difficult issues in the hands of the jury and relying on the

10  safeguards of the adversary system." *Wendell*, 858 F.3d at 1237 (internal citations omitted). Under

11  the above principles, Dr. Benbrook's testimony is eminently reliable and admissible, and

12  Monsanto's instant motion to exclude his testimony should be denied.

13    For example, extensive sections in Dr. Benbrook's expert report address the genotoxicity

14  data reviewed by EPA on technical glyphosate and GBHs. His detailed, empirical analysis of the

15  genotoxicity assays cited in EPA's final report on glyphosate, in contrast to those cited by IARC

16  in its review of glyphosate, will be helpful to the jury in understanding why the EPA and IARC

17  could reach diametrically opposed conclusions. His methodology in reaching his empirical

18  conclusions, and how these conclusions informed his opinions relative to glyphosate and

19  genotoxicity, are fully described in both his expert report, and a 2019 paper he authored and

20  published in a peer-reviewed journal.

21    Likewise, Dr. Benbrook's detailed and exhaustive analysis of Monsanto's response to Dr.

22  James Parry's recommendations to Monsanto for further genotoxicity research is based on a

23  sound and clearly explained methodology. His analysis draws appropriately upon Monsanto

-4-

exhibits in which Dr. Donna Farmer, a senior Monsanto toxicologist deeply involved in glyphosate testing and regulation, identifies exactly what studies Monsanto conducted in response to Dr. Parry's specific recommendations. His analysis provides clear empirical evidence that Monsanto did not conduct all the additional genotoxicity assays recommended by Dr. Parry, contrary to the testimony and claims made by Monsanto.

## ARGUMENT

### I.     Dr. Benbrook is Highly Qualified to Offer His Disclosed Opinions

Dr. Benbrook earned his B.A. in Economics, cum laude, from Harvard University and went on to earn his M.A. and Ph.D. in Agricultural Economics from the University of Wisconsin in 1980. Just prior and then immediately subsequent to graduation, Dr. Benbrook served as an Agricultural Policy Analyst for the Council on Environmental Quality of the Executive Office of the President. Upon President Reagan's election, he served as Staff Director for the U.S. House of Representatives Subcommittee on Department Operations, Research and Foreign Agriculture (DORFA), which had jurisdiction over FIFRA pesticide regulation. *Johnson v. Monsanto Co.* Trial Transcript (attached as **Exhibit 1**), at 3857-58. Dr. Benbrook organized hearings on pesticide regulation conducted by DORFA. *Id.* at 3859-60. In his capacity as Staff Director in the early 1980s, Dr. Benbrook was well-versed in reviewing and commenting on the science and policy involved in the regulation of pesticides, particularly carcinogenic pesticides, by the EPA. For example, in 1983, Dr. Benbrook contributed to the public discussion and analysis of the science behind pesticide risk assessment and regulatory policy at the EPA in a Letter to the Editor published in the prestigious journal, *Science*, in the section, "Carcinogen Policy at EPA."

Benbrook, Carcinogen Policy at EPA, *Science*, Vol. 219, 798 (1983) (attached as **Exhibit 2**).[2] Dr. Benbrook's published letter addressed issues which were precisely the issues facing the EPA, at that time, in its evaluation of glyphosate's oncogenicity.[3] Dr. Benbrook was also involved in analyzing compliance with FIFRA, including FIFRA's reporting requirements under §6(a). Thus, despite Monsanto's protestations to the contrary, Dr. Benbrook, in real time, was involved with and had expertise in EPA pesticide regulations and the EPA Office of Pesticide Program's ("OPP") assessment of oncogenicity, carcinogenicity, and genotoxicity.

Dr. Benbrook's career assessing EPA pesticide regulations, policy, and evaluation of cancer risk continued in his next position as Executive Director (1984-1990) of the Board of Agriculture of the National Research Council ("NRC") of the National Academy of Sciences ("NAS"). These highly prestigious organizations were devoted to providing scientific research and guidance to governmental agencies, and in particular, in areas where federal law and/or federal agency policy and risk-assessment procedures were in conflict or were incompatible with the current science. Dr. Benbrook, in his position with the NRC, testified multiple times before Congress on issues related to pesticide use, the evaluation of pesticide oncogenicity, and risk-assessment science challenges, as well as the interplay of federal laws (FIFRA and the Food, Drug

---

[2] Dr. Benbrook wrote 36 years ago: "A congressional staff investigation of the pesticide regulatory program in the [EPA] . . . analyzed the scientific basis for several recent regulatory actions taken by the EPA in an effort to sort out legitimate scientific refinements in regulatory decision-making from changes in policy. The investigations findings, conclusions, and recommendations are contained in a DORFA Subcommittee report . . . . issued in December 1982. . . . Chapter 6 of the report focuses on regulation of pesticides shown to produce cancer in laboratory animals. *An in-depth review of several case studies, along with dozens of interviews with staff scientists responsible for analyzing available data on pesticide oncogenicity*, led subcommittee staff to conclude that indeed significant changes had been incorporated in the way the EPA balances and juxtaposes experimental evidence under the aegis of the 'weight-of-evidence' decision-making." *Id.* (emphasis added).

[3] Oncogenicity is the ability of a substance to cause tumors.

-6-

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT MONSANTO COMPANY'S MOTION TO
EXCLUDE TESTIMONY OF DR. CHARLES BENBROOK
MDL No. 2741

and Cosmetic Act ("FDCA")), and federal and state laws and regulatory schemes controlling the use of pesticides.[4]

For example, in his September 1988 testimony, Dr. Benbrook presented the findings of an extensive study, conducted by the NRC and completed at the request of the EPA, regarding procedures to follow when a pesticide (such as Roundup®) had been classified as a "potential oncogen" and was used on crops. *See generally* Dr. Benbrook Congressional testimony, September 7, 1988 (attached as **Exhibit 4**). This NRC pesticide risk assessment/regulatory analysis assignment resulted in a 255 page book, *Regulating Pesticides in Food: The Delaney Paradox*, which contains analyses of the oncogenic risk of pesticides, including sections on the methodology of estimating oncogenic risks and legal bases for regulation of pesticides, including: analyses, requirements, and discussion of FIFRA; the FDCA; the EPA pesticide registration process; the EPA's classification system for carcinogens, the legislative history of various aspects of pesticide regulation, and the EPA's application of various pesticide regulations. "Glyphosate (Roundup®)" was mentioned a number of times throughout the NRC study and, specifically, as one of the "potentially oncogenic pesticides identified by the EPA." *Id.* at p.52, Table 3-3, p. 68, Table 3-9, p. 76 Table 3-17, p. 85 Table 3-25. Thus, more than three decades ago (and completely unrelated to any litigation), Dr. Benbrook obtained knowledge of glyphosate, its oncogenic potential, its risks, how the EPA carried out its assessment of glyphosate oncogenicity, and the

---

[4] These Congressional appearances include: 1) Pesticide Food Safety Act of 1988, September 7, 1988, before the House Subcommittee on Department Operations, Research and Foreign Agriculture, 2) Coping With Delaney's Paradox, May 15, 1989 before the Senate Committee on Environment and Public Works Subcommittee on Toxic Substances, Environmental Oversight, Research and Development, 3) Will S. 7222 Unravel Delaney's Paradox?, June 6, 1989 before the Senate Labor and Human Resources Committee's Food Safety Hearing, 4) Alternatives to Pesticides: Findings and Recommendations from the NAS Report Alternative Agriculture, September 22, 1989 before the Senate Committee on Environment and Public Works' Subcommittee on Toxic Substances, Environmental Oversight, Research and Development Hearing on Pesticides, and 5) Unraveling Delaney's Paradox: Unfinished Business, October 19, 1989, before the House Committee on Agriculture Subcommittee on Department Operations, Research, and Foreign Agriculture. *See*, Dr. Benbrook Curriculum Vitae (attached as **Exhibit 3**).

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT MONSANTO COMPANY'S MOTION TO EXCLUDE TESTIMONY OF DR. CHARLES BENBROOK
MDL No. 2741

impact of the applicable regulations on its sale and use. When Congress held hearings on the foregoing issues, Dr. Benbrook was invited to present the conclusions and policy recommendations in the NRC *Delaney Paradox* report, and further summarized the analytical work done by the *Delaney Paradox* Committee, which was composed of various experts "in agricultural pest control, pesticide development, agricultural economics, cancer risk assessment, public health, food science, regulatory decision making, and law" who contributed to the study. *Id*. at Preface, p. v.

In addition to his testimony before Congress, Dr. Benbrook has been invited to present on pesticide risk and regulation before other entities. For example, on March 9-11, 1988, Dr. Benbrook presented at the Illinois Crop Protection Workshop sponsored by the Illinois Cooperative Extension Service entitled, "Beware the Future: Pesticides, Public Policy, and Pest Management." *See* Exhibit 3. Additionally, since serving as Executive Director of the NRC's Board on Agriculture, Dr. Benbrook has held appointments with prestigious public health organizations, including Johns Hopkins University, Bloomberg School of Public Health, and the U.S. Department of Agriculture Agricultural Biotechnology Advisory Committee. He has also served as the Chief Scientist of the Organic Center, where he was responsible for tracking scientific developments on the nutritional quality and safety of food, and the impact of pesticides on the environment. *Id.*

Since 1990, Dr. Benbrook has run a private consulting business providing, in part, "analytical services for domestic and international clients in the public and private sector [focusing on] biotechnology; pesticide use, risks and regulation; adoption and cost-benefits of Integrated Pest Management [and] impacts of federal environmental and food laws." *Id.* He has

conducted multiple pesticide label reviews for multiple clients. *Id*. at 102:6-11. He has also consulted as a contractor for the EPA. *Id*. at 69:11-19.

Throughout his career, Dr. Benbrook has presented his evaluations of pesticide risk and regulation through the publication of over 40 peer-reviewed articles, many involving issues related to herbicide use, risk and regulation. Several have focused specifically on GBHs.[5] He was the lead author of a seminal text on pesticide use and regulation in America, titled *Pest Management at the Crossroads*, published in 1996. He has also written a variety of reports, papers, and book chapters on the subject of pesticides and pesticide regulations.[6] Just this past January, Dr. Benbrook published a peer-reviewed article that provides a thorough analysis of the differences in the genotoxicity datasets reviewed by EPA and IARC in their respective glyphosate carcinogenicity reviews. *See generally* Benbrook, C., *How did the US EPA and IARC reach diametrically opposed conclusions on the genotoxicity of glyphosate-based herbicides?*, Environ Sci Eur 31:2 (2019) (attached as **Exhibit 5**). The editors of the journal, Environmental Sciences Europe, in which this article appears, published a rare and flattering commentary on Dr. Benbrook's work: *Some food for thought – A short comment on Charles Benbrook's paper 'How Did the U.S. EPA and IARC Reach Diametrically Opposed Conclusions on the Genotoxicity of Glyphosate-based Herbicides?' and its implications*, Environ Sci Eur 31:3 (2019) (attached as

---

[5] Some of Dr. Benbrook's peer-reviewed publications include, *Engineering Crops to Resist Herbicides* (1986), *What We Know, Don't Know and Need to Know About Pesticide Residues in Food* (1991), *Do GM Crops Mean Less Pesticide Use? (2001), Toward a "Reduced Risk" Pesticide Policy Worth of the Name* (2006). *Prevention, Not Profit, Should Drive Pest Management* (2008), *Impacts of Genetically Engineered Crops on Pesticide Use in the U.S.—the First Sixteen Years* (2012), *GMOs , Herbicides and Public Health* (2015), *Trends in Glyphosate Herbicide Use in the United States and Globally* (2016), *Is it Time to Reassess Current Safety Standards for Glyphosate-based Herbicides* (2017) and *Why Regulators Lost Track and Control of Pesticide Risks: Lessons from the Case of Glyphosate-based Herbicides and Genetically Engineered Crop Technology* (2018).

[6] For example, for the Cal-EPA, Department of Pesticide Regulation, he authored a report entitled, *Challenge and Change; A Progressive Approach to Pesticide Regulation in California* (1993). For the Consumers Union, he authored a paper, *Pesticide Management at the Crossroads* (1996). For the Organic Center, Dr. Benbrook authored a report *Successes and Lost Opportunities to Reduce Children's Exposure to Pesticides Since the Mid-1990s* (2006).

**Exhibit 6**). The editors noted that Dr. Benbrook's "manuscript contributes to the ongoing debate between scientists from academia, businesses and regulatory agencies on the genotoxicity (or lack thereof) of glyphosate and glyphosate based herbicides (GBHs) and their potential to cause, or contribute to, human cancer." *Id.* In response to the public controversy of the subject of Dr. Benbrook's paper, the editors instituted more-than-normal peer review, and ultimately acknowledged the valuable contribution of Dr. Benbrook's work:

> Usually, 2-4 reviews are sufficient to allow the editor to take an informed decision on the acceptance /rejection of a manuscript and to suggest improvements, if needed. However, this time, Environmental Sciences Europe asked for 10 anonymous reviews, which were provided by a group of renowned experts in genotoxicity and the risk assessment of pesticides in general and glyphosate in particular. The overall verdict was very positive . . . . We are convinced that the article provides new insights on why different conclusions regarding the carcinogenicity of glyphosate and GBHs were reached by the US EPA and IARC. *It is an important contribution to the discussions on the genotoxicity of GBHs.*

> As one of the reviewers put it: "The article transparently lays out not just that the EPA and IARC came to different conclusions about the genotoxicity of glyphosate-based herbicides, but how this result occurred and its impact on the overall conclusions about its carcinogenicity. *The analyses contained in this article and accompanying text enhances the understanding of the state of the science of the potential carcinogenicity of glyphosate-based herbicides and gaps in understanding that future studies may help to resolve. As such, it is an important contribution to the literature*".

*Id.* (emphases added).

As the Court is well aware, IARC and EPA have reached different conclusions regarding glyphosate genotoxicity. Dr. Benbrook's painstaking analysis demonstrates the differences in the genotoxicity data reviewed by these two agencies, and has been accepted as a valuable contribution to the scientific community as a whole. Jurors hearing about the differences in conclusions by EPA and IARC would certainly be assisted in reconciling these differences and making factual determinations regarding them by hearing the same analysis. Dr. Benbrook's

-10-

analysis and testimony will greatly assist the jury in evaluating why the conclusions of EPA and IARC regarding the carcinogenicity of glyphosate are different.

Towards that end, Dr. Benbrook has submitted detailed expert reports in the instant actions, *see generally* Dr. Benbrook Expert Report (attached as Monsanto Exhibit 6),[7] as well as a "materials considered list" of authorities on which he intends to rely in providing his testimony. *See generally* Dr. Benbrook Materials Considered List (attached as **Exhibit 7**). He has also provided testimony in multiple depositions wherein he thoroughly laid out his anticipated testimony and the bases therefor. His opinions were also fully disclosed in prior Roundup® actions, including in his expert reports, depositions, and trial testimonies in *Johnson*, *Pilliod*, and other cases, all of which Plaintiff has incorporated herein. Monsanto is thus highly familiar with Dr. Benbrook's opinions and methodologies concerning Roundup® – yet it has failed to support its motion with any expert evidence of its own that rebuts Dr. Benbrook's contentions, which is reason enough to deny the motion.

## II.     Dr. Benbrook Is Permitted to Testify About Underlying Factual Matters That the Jury May Consider in Assessing Monsanto's Intent, Motive, and State of Mind

Contrary to Monsanto's red herring argument, Dr. Benbrook will *not* opine on Monsanto's motive, intent, or state of mind. Rather, he will provide expert testimony regarding factual matters that may properly inform *the jury's own determination* of Monsanto's motive, intent, and state of mind. *See United States v. Pacific Gas and Electric Co.*, 2016 WL 1640462 (N.D. Cal. 2016) (holding that, while an expert witness may not opine as to a corporation's intent, he or she may testify about corporate practices and policies that the jury may use to ascertain corporate intent);

---

[7] For the sake of judicial economy, Plaintiffs do not attach every report that Dr. Benbrook issued in the Wave 1 Plaintiffs group, but can make all of the reports available to the Court promptly upon request.

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT MONSANTO COMPANY'S MOTION TO
EXCLUDE TESTIMONY OF DR. CHARLES BENBROOK
MDL No. 2741

*see also In re Genetically Modified Rice Litig.*, 666 F. Supp. 2d 1004, 1025 (E.D. Mo. 2009) ("If an expert is testifying to something within his area of expertise, he may opine as to the reasonableness of a party's behavior."); *Visteon Glob. Techs., Inc. v. Garmin Int'l, Inc.*, 2016 WL 4396085, at *4 (E.D. Mich. Aug. 18, 2016) ("Experts may testify to the facts underlying the issues of intent or motive . . . ."). Such testimony is entirely proper under Federal Rule of Evidence 704. *See* Fed. R. Ev. § 704 ("An opinion is not objectionable just because it embraces an ultimate issue.").

As a regulatory and standard of care expert, Dr. Benbrook will apply his own professional training and experience to the facts and record, and will testify regarding Monsanto's practices and policies with respect to Roundup®, as evidenced in both public and internal documents. The portions of his trial testimony (as previewed in his disclosures) analyzing Monsanto's internal documents *are not his personal opinions*, but, rather, are expert conclusions based on a very systematic review of the source materials.

There is "nothing particularly unusual, or incorrect, in a procedure of letting a witness relate pertinent information in a narrative form as long as it stays within the bounds of pertinency and materiality." *In re Yasmin & YAZ (Drospirenone) Mktg., Sales Practices & Prod. Liab. Litig.*, 2011 WL 6302287, at *18 (S.D. Ill. Dec. 16, 2011) (internal citations omitted). It is also entirely proper for an expert to provide context to corporate emails. The Court in the Yasmin litigation rejected the same argument that Monsanto makes here – that the plaintiff's regulatory expert's review of corporate emails "does not require the 'specialized knowledge' contemplated by Rule 702, but rather is mere advocacy on plaintiff's behalf," *id.* – and instead held that the testimony "will certainly be helpful to the jury's understanding of this complicated industry." *Id.* at *17. Of

course, Monsanto counsel will have an opportunity at trial to challenge any of Dr. Benbrook's statements or analyses based upon Monsanto emails, studies, or factual assertions.

Other Courts have similarly admitted expert testimony that explains the reasonableness of the defendant's actions within the context of applicable regulations and industry standards of care. *See, e.g.*, *DePaepe v. General Motors Corp.*, 141 F.3d 715, 720 (7th Cir.1998) ("He could give an opinion as an engineer that reducing the padding saved a particular amount of money; he might testify as an engineer that GM's explanation for the decision was not sound (from which the jury might infer that money was the real reason); but he could not testify as an expert that GM had a particular motive."); *United Food & v. Teikoku Pharma USA*, 2017 WL 5068533, at *25 (N.D. Cal. Nov. 3, 2017) (expert could opine as to what a reasonable company in the defendant's position would have done based on his understanding of the facts and in light of the record evidence he reviewed); *see also In re: Prempro Liability Litig.*, 554 F. Supp. 2d 871, 887 (E.D. Ark. 2008) (holding as admissible "opinions on the reasonableness of a pharmaceutical company's actions based on her observations over the years and her understanding of the regulations referenced in her expert report, her deposition, and the supplemental briefs.").

This action involves complex issues surrounding a pesticide that first went to market over 40 years ago. The regulatory history of Roundup® is particularly relevant because Plaintiffs allege that they were injured by defects in the design of the Roundup®, Monsanto's failure to warn, and negligence. The Monsanto documents and witness deposition testimony describing this history is voluminous. It is essential that Plaintiff's experts – including Dr. Benbrook – be permitted to describe this history and the supporting evidentiary record to assist the jury in reaching their conclusions. There is nothing improper in doing so; to the contrary, such detail will assist the jury in assessing Monsanto's state of mind and potential liability.

### III.    *Dr. Benbrook May Reasonably Base His Testimony on Monsanto's Documents and Employees' Statements*

Monsanto again relies on a red herring argument by asserting that Dr. Benbrook intends to "merely rea[d] or summarize[e] documents" that the jurors are capable of reading on their own. Def. Motion at 9. Plaintiff did not engage Dr. Benbrook to simply read to the jury. Instead, as Dr. Benbrook's disclosures reveal, he will draw on his special knowledge and expertise to present facts in a helpful context to the jury and opine on the evidence. This is precisely the kind of expert assistance permitted by Federal Rule of Evidence 702 and the *Daubert* standard.

This action involves a vast amount of documentary material, a large portion of which Dr. Benbrook reviewed prior to reaching his conclusions on the reasonableness of Monsanto's conduct. Contrary to Monsanto's arguments, most of these documents do not speak for themselves; many involve complex technical and scientific information, and thus require expertise to explain and put in the proper context. The jury would, quite simply, be incapable of considering the tonnage of documents at issue without expert assistance, and Dr. Benbrook must be permitted to assist where "the inferences those documents may or may not support are not at all simple." *In re Welding Fume Prod.*, 2005 WL 1868046 at *17 (N.D. Ohio Aug. 8, 2005). Dr. Benbrook's expert testimony is thus not only helpful, but in fact necessary for the jury to complete its functions.

Additionally, Dr. Benbrook's testimony will aid the jury's consideration of the evidence by providing an appropriate description of the history of Roundup® testing, regulation, and use, as shown in the extensive regulatory record and addressed in his published papers on glyphosate and GBHs. Dr. Benbrook is well qualified to explain these regulatory materials to the jury. As one federal court recently held, "to the extent [plaintiff's regulatory expert] is summarizing

-14-

voluminous records and materials, as appears to be the case, this aspect of his testimony is properly admitted under Federal Rule of Evidence 1006 as well as Rule 702 in the sense that he is identifying what he, given his background and expertise, considers to be the most salient aspects of those voluminous materials." *In re Testosterone*, 2017 WL 1836443 *15 (N.D.Ill. May 8, 2017).

A review of his reliance list also demonstrates the degree to which Dr. Benbrook had accessed, studied, analyzed, and written about the majority of the most important EPA documents in this litigation years – and in some cases decades – before engagement with this litigation. The 30-year controversy over glyphosate oncogenicity and dietary risks has been analyzed and tracked by Dr. Benbrook since the early 1980s, with special focus on the degree to which federal law and EPA risk assessments and label decisions, and Monsanto stewardship activities, were keeping pace with the phenomenal growth in the scale and diversity of GBH uses in the U.S. and abroad, and the resulting human exposures and risk, agronomic, and environmental impacts.

## IV.    *Dr. Benbrook May Properly Testify Regarding Monsanto's Duties as a Pesticide Manufacturer and Has Been Permitted to do so in the Past*

Dr. Benbrook will offer opinions concerning regulatory issues, including Monsanto's representations to the EPA concerning Roundup® and other GBHs. Testimony about what actions Monsanto should have taken, pursuant to the provisions of FIFRA and voluntary pesticide industry codes of conduct specifically adopted by Monsanto, are relevant to the determination of whether Monsanto actions were consistent with the company's stated commitment to product safety, various "Monsanto Pledges," and clear-cut obligations under pesticide industry codes of conduct to which Monsanto was a signatory. This testimony will aid the fact-finder, and comes nowhere near instructing the jury as to legal obligations. *See* Fed. R. Ev. 704 ("An opinion is not

-15-

objectionable just because it embraces an ultimate issue.").

The EPA's regulation of pesticides "serves to create a 'floor of safe conduct' but not 'a ceiling on the ability of states to protect their citizens.'" *Burke v. Dow Chem. Co.*, 797 F. Supp. 1128, 1138 (E.D.N.Y. 1992). Monsanto's website, in turn, states that "Monsanto's commitment to safety is central to everything we do . . . . We dedicate a team of hundreds of scientists to assess the safety of our products, and share their findings with regulatory authorities and the public." Monsanto, *Commitments*, available at <https://monsanto.com/company/commitments/>. Monsanto does not inform the public that it strives to meet only the bare minimum requirements for testing set forth by the EPA in order to sell its products.

As a brief example of Monsanto's conduct vis-à-vis its regulatory obligations, noted earlier and about which Dr. Benbrook will testify: Monsanto hired an internationally-recognized genotoxicity expert, Dr. James Parry, to assess the credibility of reports showing that glyphosate is genotoxic. *See generally* Dr. Benbrook Report, Monsanto Exhibit 6 at 91-100. Dr. Parry concluded that some reports *were* indeed credible and showed that glyphosate was genotoxic. Dr. Parry further recommended that Monsanto conduct various studies to investigate the genotoxicity of glyphosate and its formulations. However, after receiving Dr. Parry's report, and much ensuing internal deliberation, Monsanto ended its association with Dr. Parry and refused to undertake the majority of the recommended testing. *Id.* Monsanto also failed to submit Dr. Parry's report to the EPA, as required by FIFRA. *Id.* Dr. Benbrook relies on these facts for his opinion that "Dr. Parry's reports triggered an obligation for Monsanto to: (1) submit Dr. Parry's report to the EPA, under FIFRA Section 6(a)(2); (2) update the Roundup label to disclose the potential genotoxic risk following significant and/or long-term exposures to Roundup®; and (3) conduct the various studies proposed by Dr. Parry to further confirm or refute the genotoxicity of formulated GBHs,"

-16-

as any reasonably prudent pesticide manufacturer would do. *Id.* at 100. Instead, "Monsanto did not disclose Dr. Parry's reports to EPA, nor did it add a genotoxicity warning on Roundup labels." *Id.*

In addition to skirting its regulatory obligations, Monsanto failed to adhere to voluntary industry standards of care, such as the Food and Agricultural Organization International Code of Conduct on Pesticide Management ("FAO Code"), to which it was a signatory. Dr. Benbrook's report details Monsanto's deviations from the FAO Code's provisions, including its refusal to conduct sufficient oncogenicity and genotoxicity tests on its products, and most consequentially, no studies of the oncogenicity of Roundup, despite multiple lines of evidence well known to Monsanto (some of which it generated) showing that formulated Roundup® is more toxic, and especially more genotoxic, than pure, technical glyphosate *see* Dr. Benbrook Report (Monsanto Exhibit 6) at 116.

Dr. Benbrook's expert report also presents evidence documenting the actions of European regulators in the late 2000s that forced Monsanto-Europe to phase out all POEA-based Roundup® formulations sold in Europe by or about the end of 2014. This regulation-driven action, in effect, forced the company to switch to lower-risk quaternary ammonium surfactants. This reformulation of Roundup®-brand herbicides is a change Monsanto-US has not chosen to replicate in the U.S., despite compelling evidence it would lower risks arising from Roundup® exposures, both to farmers and non-agricultural applicators. Dr. Benbrook's explanation of the different actions taken by Monsanto-Europe versus Monsanto-US relative to reformulation of Roundup®, and likely changes in risk levels brought about by the reformulation, are clearly germane to Monsanto behavior and the company's stated commitment to product safety, and are developments that

-17-

juries would have a difficult time discerning from self-directed assessment of trail exhibits., *see id.* at 117.

Dr. Benbrook also articulates specific examples of Monsanto's sustained campaign to downplay the risks of Roundup® and recurrent failure to correct false claims about Roundup®'s safety in advertisements and other promotional activity. *See id.* at 199-200. Dr. Benbrook also sets forth the voluntary pesticide industry standards of care, adopted by Monsanto, in areas such as advertising and promotion of pesticides, and contrasts those standards to Monsanto's conduct in those areas. This evidence is obviously relevant to Monsanto's negligence and conduct vis-à-vis punitive damages.

It is thus *not* speculation for Dr. Benbrook to opine that Monsanto had an obligation to warn consumers of the risk of developing NHL from Roundup® exposure, and also to mitigate such risks, even uncertain and poorly quantified ones, by adding prudent, applicator safety requirements on Roundup® labels.   Nor is it speculation, based on an abundance of evidence, for Dr. Benbrook opine that Monsanto understated risks, overstated the "benign" nature of Roundup® and refused to comply with EPA requirements for additional worker-protection provisions on product labels. As Dr. Benbrook explains, "a reasonable and prudent pesticide manufacturer committed to the safety of its customers, as Monsanto professes to be, and as required by voluntary pesticide industry standards, would have added the common sense warning language called for by EPA in 1986 to all Roundup herbicide labels." *Id.* at 128. Given the knowledge Monsanto possessed at the relevant times, it *could* and *should have* undertaken certain actions within the context of applicable regulations and industry codes of conduct. Its failure to do so "has resulted in thousands, if not millions of people experiencing more, and much higher Roundup exposures than otherwise would have occurred." *Id.* at 134. Monsanto's inaction is

-18-

relevant to the jury's determination of whether it failed to conduct itself as a reasonably prudent manufacturer, and thus can be held liable for failing to warn end-users (such as the instant Plaintiffs) of the known or knowable risks of Roundup® exposure, and the need for discipline and caution when handling, mixing, and applying Roundup.

While Monsanto falsely calls it "speculation" for Dr. Benbrook to conclude that Monsanto could and should have issued safety warnings, Monsanto fails to acknowledge that Dr. Benbrook's explanation of the standard of care is essential to the jury's application of the negligence standard – i.e., "the reasonably prudent person standard, or some variation thereof; that is, what a reasonable person of ordinary prudence would have done in the same or similar circumstances." *Reiber v. Cty. of Gage*, 303 Neb. 325, 337 (2019). Moreover, "[w]hen the conduct in question involves specialized knowledge, skill, or training, *expert testimony may be helpful or even necessary to a determination of what the standard of care requires under particular circumstances,*" *id.* (emphasis added), as is the case here.

The decision in *Adams v. United States*, 2009 WL 1085481 (D. Idaho Apr. 20, 2009), which action involved the labeling of another pesticide ("Oust"), is on point. Rejecting a pre-trial motion to exclude, the court in *Adams* found admissible Dr. Benbrook's testimony as to: "(1) [t]he general roles of the EPA, the registrant, and the state in the registration process for pesticides; (2) the general regulatory framework set up by FIFRA; (3) the industry standards and the stewardship duty; (4) the factual circumstances surrounding the 1995 changes to the label and the obtaining of the 24(c) label; and (4) [his] opinions on whether DuPont's conduct satisfied

-19-

1   industry standards and any stewardship duty." *Id*. at *3.[8] Dr. Benbrook intends to testify similarly

2   in the instant matter, and his testimony should again be admitted.

3       Likewise, the Court in *In re Tylenol (Acetaminophen) Mktg., Sales Practices & Prod.*

4   *Liab. Litig*., 181 F. Supp. 3d 278 (E.D. Pa. 2016), held that the plaintiff's standard-of-care expert's

5   testimony was reliable, including: "how the defendants responded to FDA requests for

6   information, what they did to comply with FDA regulations, and what information they presented

7   to the FDA is all relevant to plaintiff's failure-to-warn and design defect claims." *Id*. at 289-90.

8   Similarly, in *Chandler v. Greenstone Ltd.*, 2012 WL 882756 (W.D. Wash., Mar. 14, 2012), the

9   court held that plaintiff's experts' testimony could assist the jury in understanding the "governing

10  regulatory scheme and its goals and limitations, the genesis and practical application of industry

11  standards, the testing options that were available to defendants at various times, the relevant

12  medical literature and other sources of information available to defendants, defendants' regulatory

13  filings, and the steps defendants took (or did not take) to evaluate the safety of combination

14  hormone replacement therapy." *Id*. at *1.   Dr. Benbrook's testimony will touch on the same

15  subject matter here, and the same result – denial of the motion to exclude – is warranted.

---

[8] In a later memorandum decision, the *Adams* court further explains that Dr. Benbrook has the expertise necessary to render opinions on how companies use the registration process, how they position their products, how they make labeling decisions and how they make marketing decisions regarding those products. *See also Ginena v. Alaska Airlines, Inc.*, 2013 WL 431827, at *5 (D. Nevada 2013) (reasoning that in an industry where the regulatory framework is complex, such as the environmental framework at issue in *Adams*, an expert may be permitted to testify as to industry standards and regulations). Likewise, the way a herbicide manufacturer (BASF) used federal regulatory requirements in furtherance of a two-tier price scheme designed to increase profits from one group of farmers in contrast to others, was the central issue in the Poast and Poast-Plus herbicide case in which Dr. Benbrook testified. *Peterson, et al. v. BASF Corp.*, 12 F. Supp. 2d 964 (D. Minn. 1998).

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT MONSANTO COMPANY'S MOTION TO
EXCLUDE TESTIMONY OF DR. CHARLES BENBROOK
MDL No. 2741

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**V.      Preemption Does Not Apply Because Plaintiffs Have Not Alleged Any Fraud-On-The-EPA Claims**

Finally, Monsanto argues that Dr. Benbrook's opinions concerning EPA actions and regulatory compliance are preempted. In supposed support, Monsanto cites only the United States Supreme Court's holding in *Buckman v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), which held that state fraud-on-the-FDA claims are preempted by federal law. Courts in numerous product liability cases since *Buckman* have had no difficulty recognizing that *Buckman* is not applicable to cases, like this one, in which the plaintiffs have made no claims for fraud on the EPA (or any other agency).

In *Buckman*, "[t]he Supreme Court manifestly did not lay down a rule of evidence, precluding admission of evidence of alleged misrepresentations to federal agencies." *George v. Ford Motor Co.*, 2007 WL 2398806, at *8 (S.D.N.Y. Aug. 17, 2007). Interpreting *Buckman* to broadly exclude *any* evidence that may be construed to show fraud, as opposed to simply excluding fraud-on-the-agency claims on the FDA – as Monsanto would have the Court do here – "distorts the holding of, and 'principles' behind, *Buckman* beyond recognition." *In re Gen. Motors LLC Ignition Switch Litig.*, 2015 WL 8130449, at *2 (S.D.N.Y. Dec. 3, 2015). Even in the extreme context of pre-market-approved medical devices, which unlike drugs, are governed by an express preemption clause, courts hold that *Buckman* preemption does not apply. *See Bausch v. Stryker Corp.*, 630 F.3d 546, 557 (7th Cir. 2010); *Stengel v. Medtronic Inc.*, 704 F.3d 1224, 1235 (9th Cir. 2013).

Applying the above principles, the Ninth Circuit in *McClellan v. I-Flow Corp.*, 776 F.3d 1035 (9th Cir. 2015), held that *Buckman* did not preempt the plaintiff's claims, as they "were not fraud-on-the-FDA claims," but were state-law-based failure to warn claims. *Id.* at 1040. Likewise,

-21-

1    in *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & PMF Prod. Liab. Litig.*, 2011

2    WL 6740391 (S.D. Ill. Dec. 22, 2011), the Court explained that the decision in "*Buckman* is

3    inapposite" to the question of whether evidence of the actions or omissions of a manufacturer in

4    communicating information to the FDA should be admitted. *Id.* at *2. Instead, the case of *Wyeth*

5    *v. Levine*, 555 U.S. 555 129 (2009)[9] "is a far better guidepost for this Court and for this litigation,"

6    because "[i]n a case such as this, the jury must be fully informed of any information withheld

7    from the FDA that could have effected decisions regarding the label." *Id.*

8

9        Other Courts have come to the same conclusion, and have rejected similar attempts to

10   apply *Buckman* preemption to expert testimony concerning regulatory history and compliance.

11   *See, e.g.*, *In re Tylenol (Acetaminophen) Mktg.*, 181 F. Supp. 3d at 289-90 ("[H]ow the defendants

12   responded to FDA requests for information, what they did to comply with FDA regulations, and

13   what information they presented to the FDA is all relevant to plaintiff's failure-to-warn and design

14   defect claims."); *Stambolian v. Novartis Pharm. Corp.*, 2013 WL 6345566, at *8 (C.D. Cal. Dec.

15   6, 2013) (admitting expert testimony on "the complex regulatory framework governing the

16   approval, labeling, advertising, and marketing of pharmaceutical medical products" under FDA

17   standards, as this "will be helpful to members of the jury who are likely not familiar with the

18   intricacies of FDA pharmaceutical drug approval and regulation process."); *Placencia v. I-Flow*

19   *Corp.*, 2012 WL 5877624, at *5-6 (D. Ariz. Nov. 20, 2012) (rejecting defendant's reliance on

20   *Buckman*, because, while "[i]t is true that Plaintiffs seek to present evidence of FDA regulations

21   and I-Flow's alleged violation of those regulations . . . this evidence will be presented not to make

22

23

24

25   _____

26   [9] Notably, the Supreme Court in *Wyeth* held that state law failure-to-warn claims are not preempted by federal law, because, "[t]o the contrary, [the FDA and Congress has repeatedly] cast federal labeling standards as a floor upon which States could build and repeatedly disclaimed any attempt to pre-empt failure-to-warn claims." *Wyeth*, 555 U.S. at 577-78.

27

28
-22-

out a claim for violation of the FDCA or fraud on the FDA, but as evidence that I-Flow breached the standard of care for purposes of the negligence claim . . . ."). Monsanto's preemption arguments are thus inapplicable to this action and do not form any basis for the exclusion of Dr. Benbrook's testimony.

## **CONCLUSION**

For the foregoing reasons, Monsanto's Motion to Exclude Dr. Benbrook's Opinion should be denied in its entirety.

Dated: December 10, 2019

Respectfully submitted,

By:     */s/ Robin Greenwald*
     Robin Greenwald
     **Weitz & Luxenberg**
     700 Broadway
     New York, NY 10003
     Telephone: (212) 558-5500
     Facsimile: (212) 344-5461
     rgreenwald@weitzlux.com

*/s/ Michael Miller*
Michael Miller
**The Miller Firm LLC**
108 Railroad Avenue
Orange, VA 22960
Telephone: (540) 672-4224
Facsimile: (540) 672-3055
mmiller@millerfirmllc.com

/s/ *Aimee H. Wagstaff*
Aimee H. Wagstaff (SBN 278480)
**Andrus Wagstaff, PC**
7171 W. Alaska Drive
Lakewood, CO  80226
Telephone: 303-376-6360
Fax: 303-376-6361
aimee.wagstaff@andruswagstaff.com

*Attorneys for Plaintiffs*

-23-

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 10th day of December 2019, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

*/s/ Robin Greenwald*

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT MONSANTO COMPANY'S MOTION TO EXCLUDE TESTIMONY OF DR. CHARLES BENBROOK
MDL No. 2741