# Exhibit 6

Michael L. Grossbard, M.D.

1          IN THE UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF CALIFORNIA
2                        -  -  -
3    IN RE:  ROUNDUP          :   MDL NO. 2741
     PRODUCTS LIABILITY       :
4    LITIGATION               :   Case No.
                              :   16-md-02741-
5                             :   VC
     _____:   _____
6                             :
     This Document Relates    :
7    to:                      :
                              :   Case No.
8    Sanders v Monsanto       :   3:19-cv-05752
     Co.,                     :
9                             :
            - and -           :
10                            :
     Jaime Alvarez Calderon   :   Case No.
11   V. Monsanto, Co.,        :   3:19-cv-01630
                              :
12
              C O N F I D E N T I A L
13
                       -  -  -
14
              November 26, 2019
15
                       -  -  -
16
              Videotaped deposition of
17   MICHAEL L. GROSSBARD, M.D., taken
     pursuant to notice, was held at the law
18   offices of Arnold & Porter Kaye Scholer,
     250 West 55th Street, New York, New York,
19   beginning at 12:03 p.m., on the above
     date, before Michelle L. Gray, a
20   Registered Professional Reporter,
     Certified Shorthand Reporter, Certified
21   Realtime Reporter, and Notary Public.
22                       -  -  -
           GOLKOW LITIGATION SERVICES
23     877.370.3377 ph| 917.591.5672
              deps@golkow.com
24

Page 2

1  APPEARANCES:
2
3    WEITZ & LUXENBERG
     BY: JERRY KRISTAL, ESQ.
4    BY: JOSH KRISTAL, ESQ.
     220 Lake Drive East, Suite 210
5    Cherry Hill, New Jersey 08002
     (856) 755-1115
6    jkristal@weitzlux.com
     joshkristal@weitzlux.com
7    Representing the Sanders Plaintiffs
8
     GOLDBERG & OSBORNE
9    By: DAVID J. DIAMOND, ESQ.
     698 East Wetmore Road, Suite 200
10   Tucson, Arizona 85705
     (520) 879-7168
11   Ddiamond@goldbergosborne.com
     Representing the Alvarez Calderon
12   Plaintiffs
13
     ARNOLD & PORTER KAYE SCHOLER, LLP
14   BY: BERT L. SLONIM, ESQ.
     BY: AARON H. LEVINE, ESQ.
15   250 West 55th Street
     New York, New York 10019
16   (212) 836-8897
     bert.slonim@kayescholer.com
17   aaron.levine@arnoldporter.com
     Representing the Defendants
18
19   VIDEOTAPE TECHNICIAN:
     Ingrid Rodriguez
20
     ALSO PRESENT:
21   Matthew Hans - Paralegal
     (Weitz Lux)
22
             - - -
23
24

Page 4

1         - - -
2    E X H I B I T S  (Cont'd.)
3         - - -
4
5    NO.       DESCRIPTION          PAGE
6    Grossbard-4  Determining if       107
             Something is a
7            Carcinogen
             American Cancer Society
8            Web Printout
9    Grossbard-5  Known and Probable   114
             Human Carcinogens
10           American Cancer
             Society
11           Web Printout
12   Grossbard-6  DeVita, Hellman &    120
             Rosenberg's
13           Cancer Principles
             & Practice of Oncology
14           11th Edition
15   Grossbard-7  Motion               130
             Pilliod v Monsanto
16
     Grossbard-8  Pretrial Order       147
17           Hardeman v Monsanto
18   Grossbard-9  Spinning Science     155
             & Silencing Scientists
19           Minority Staff Report
             MONGLY07894891-910
20           & E-mail, 5/11/15
             Subject, Post-IARC
21           Activities to Support
             Glyphosate
22           MONGLY01228576
23
24

Page 3

1         - - -
2    I N D E X
3         - - -
4
5    Testimony of:

6       MICHAEL L. GROSSBARD, M.D.

7       By Mr. Kristal      15, 342

8       By Mr. Slonim          271

9       By Mr. Diamond         367
10
11

12          - - -

13   E X H I B I T S

14          - - -

15   NO.       DESCRIPTION          PAGE
16   Grossbard-1  Expert Report of    29
             Michael Grossbard, MD
17           10/25/19
18   Grossbard-2  Screenshots from    73
             Lymphoma Presentation
19           NYU Langone
20
     Grossbard-3  Icahn School of    100
21           Medicine
             Profile of Michael
22           Grossbard, MD
23
24

Page 5

1         - - -
2    E X H I B I T S  (Cont'd.)
3         - - -
4
5    NO.       DESCRIPTION          PAGE
6    Grossbard-10  Proposal for      173
             Post-IARC Meeting
7            Scientific Projects
             Draft, 5/11/15
8            MONGLY01723742
9    Grossbard-11  Systematic Review  182
             And Meta-Analysis of
10           Glyphosate Exposure and
             Risk of Lymphohematopoietic
11           Cancers
             (Chang)
12
     Grossbard-12  Monsanto Manuscript  193
13           Clearance Form
             Global Regulatory
14           MONGLY02117800-04
15   Grossbard-13  Review of          199
             Genotoxicity of
16           Glyphosate and Glyphosate
             Based Formulations
17           MONGLY01691608-63
18   Grossbard-14  Review of          200
             Genotoxicity Studies
19           Of Glyphosate and Glyphosate
             Based Formulations
20           (Kier & Kirkland)
21   Grossbard-15  Differences in the  205
             Carcinogenic Evaluation
22           Of Glyphosate Between
             IARC & EFSA
23           (Portier)
24

Michael L. Grossbard, M.D.

Page 6

- - -
2           E X H I B I T S  (Cont'd.)
3                    - - -

5   NO.        DESCRIPTION        PAGE
6   Grossbard-16 How Did the US EPA   218
                & IARC Reach Diametrically
7               Opposed Conclusions on the
                Genotoxicity of
8               Glyphosate Based Herbicides?
                (Benbrook)
9
    Grossbard-17 IARC Monographs      226
10              On the Identification of
                Carcinogen Hazards to
11              Humans
12  Grossbard-18 Exposure to          231
                Glyphosate Based
13              Herbicides & Risk
                For Non-Hodgkin Lymphoma
14              (Zhang)
15  Grossbard-19 Profile of           232
                Emanuela Taioli
16              Mount Sinai
17  Grossbard-20 Glyphosate is a      250
                Weed Killer, or Herbicide
18              Icahn School of
                Medicine at Mount Sinai
19
    Grossbard-21 Notice to Take       259
20              Deposition in
                Sanders v Monsanto
21
    Grossbard-22 Monsanto's Responses 260
22              And Objections to
                Plaintiff's Requests
23
24

Page 8

- - -
2           E X H I B I T S  (Cont'd.)
3                    - - -

5   NO.        DESCRIPTION        PAGE
6   Grossbard-30 Glyphosate           350
                Exposure Data
7               IARC Monograph
                Pages 321-412
8
    Grossbard-31 Expert Report of     360
9               Dr. Grossbard
                RE: Hardeman
10              11/26/18
11  Grossbard-32 Expert Report of     363
                Dr. Grossbard
12              RE:  Gebeyehou
                11/26/18
13
14  Grossbard-33 Expert Report of     368
                Dr. Grossbard
15              RE:  Alvarez Calderon
                10/25/19
16
17                    - - -
18
19
20
21
22
23
24

Page 7

- - -
2           E X H I B I T S  (Cont'd.)
3                    - - -

5   NO.        DESCRIPTION        PAGE
6   Grossbard-23 Invoices of          260
                Dr. Grossbard
7               10/2/19
                11/8/19
8
    Grossbard-24 Trial Testimony      264
9               Of Dr. Grossbard
10  Grossbard-25 Curriculum Vitae     265
                Michael L. Grossbard, MD
11
    Grossbard-26 Statement from       276
12              Health Canada on
                Glyphosate
13              1/11/19
14  Grossbard-27 Evaluation of        286
                Carcinogenic Potential
15              Of the Herbicide
                Glyphosate
16              (Greim)
17  Grossbard-28 Glyphosate           313
                Reevaluation Decision
18              4/28/17
                Health Canada
19
    Grossbard-29 Document             346
20              8/4/15
                Subject, Glyphosate
21              Activities
                MONGLY01723742
22
23
24

Page 9

- - -
2         DEPOSITION SUPPORT INDEX
3                    - - -

5   Direction to Witness Not to Answer
6   PAGE   LINE  PAGE LINE    PAGE LINE
    None.
7
8   Request for Production of Documents
9   PAGE   LINE  PAGE LINE    PAGE LINE
    None.
10
11  Stipulations
12  PAGE   LINE  PAGE LINE    PAGE LINE
    None.
13
14  Questions Marked
15  PAGE   LINE  PAGE LINE    PAGE LINE
    None.
16
17
18
19
20
21
22
23
24

Michael L. Grossbard, M.D.

Page 10

1          - - -
2          THE VIDEOGRAPHER:  We are
3   now on the record.  My name is
4   Ingrid Rodriguez.  I'm a
5   videographer for Golkow Litigation
6   Services.
7          Today's date is
8   November 26th, 2019, and the time
9   is 12:03 p.m.
10         This video deposition is
11  being held at Arnold Porter LLP,
12  New York, New York, in the matter
13  of John D. Sanders versus Monsanto
14  Company and Jaime Alvarez Calderon
15  versus Monsanto Company, for the
16  United States District Court
17  Northern District of California.
18         The deponent is Dr. Michael
19  Grossbard.
20         All counsel present will be
21  noted on the stenographic record.
22         The court reporter is
23  Michelle Gray and will now swear
24  in the witness.

Page 11

1          - - -
2          ... MICHAEL L. GROSSBARD, M.D.,
3   having been first duly sworn, was
4   examined and testified as follows:
5          - - -
6          MR. KRISTAL:  Maybe we
7   should introduce ourselves on the
8   record and then you can hand me
9   whatever you intend to hand --
10         MR. SLONIM:  Sure.
11         MR. KRISTAL:  This is Jerry
12  Kristal.  I'm from Weitz &
13  Luxenberg, and I represent, along
14  with Josh Kristal and Matt Hans
15  who are also from Weitz &
16  Luxenberg, we represent John
17  Sanders.
18         Good morning, Doctor.
19         THE WITNESS:  Good morning.
20         MR. DIAMOND:  Dave Diamond.
21  I represent Jaime Alvarez
22  Calderon.
23         MR. SLONIM:  Bert Slonim.
24  I'm here with Aaron Levine, and we

Page 12

1   represent the defendants.
2          And Jerry, thank you.  I
3   wanted to hand you some documents
4   before we begin.
5          So first we have an updated
6   curriculum vitae for
7   Dr. Grossbard.  I'll hand that to
8   you.
9          MR. KRISTAL:  Thank you.
10         MR. SLONIM:  We also have an
11  updated trial testimony list for
12  the matters in which Dr. Grossbard
13  has given testimony in the past
14  four years.  I'm going to hand
15  that to you.
16         MR. KRISTAL:  Thank you.
17         MR. SLONIM:  We also have
18  invoices from Dr. Grossbard
19  covering the two matters that are
20  the subject of today's
21  questioning, the Sanders matter
22  and the Alvarez matter.
23         I'll hand you those
24  invoices.

Page 13

1          MR. KRISTAL:  Thank you.
2          MR. SLONIM:  And finally, we
3   did notice that there is a bit of
4   a typo in Dr. Grossbard's report
5   for the -- for Mr. Alvarez.
6          There are two paragraphs in
7   the Sanders report on Page 5 at
8   the bottom, the last the
9   paragraphs on the bottom.  It's
10  basically regarding risk factors
11  for the development of
12  non-Hodgkin's lymphoma.
13         Those were also supposed to
14  have been included in the Alvarez
15  report, but they were
16  inadvertently omitted due to a
17  typographical error.
18         MR. KRISTAL:  Which section
19  of the Sanders report?
20         MR. SLONIM:  If you take a
21  look at the Sanders report.
22         MR. KRISTAL:  Bert, you're
23  not adding something to Sanders.
24  You're adding something to Alvarez

Michael L. Grossbard, M.D.

Page 14

1  Calderon?
2      MR. SLONIM:  Correct.
3      MR. KRISTAL:  I'll let David
4  deal with that then.
5      MR. SLONIM:  There were two
6  paragraphs in the Sanders
7  report -- basically, one
8  paragraph, the last paragraph of
9  the Sanders report, concerning
10  risk factors for non-Hodgkin
11  lymphoma.  That should have been
12  also included in the Alvarez
13  report, but it was inadvertently
14  omitted.
15      MR. KRISTAL:  We'll deal
16  with that when we get there, I
17  guess.
18      MR. SLONIM:  Okay.  And just
19  one other thing before we start.
20  Of course, this depositions taken
21  pursuant to a notice.  I would
22  just note for the record that we
23  have submitted responses and
24  objections to the notice.

Page 15

1      MR. KRISTAL:  Anything else?
2      MR. SLONIM:  I think that's
3  it.
4          - - -
5      EXAMINATION
6          - - -
7  BY MR. KRISTAL:
8      Q.  I know you've been deposed
9  before.  So for my purposes, the most
10  important ground rule, so to speak, is if
11  you don't understand any question that
12  I'm asking you, please don't answer it.
13  Just tell me that you don't understand
14  it, and then it's up to me to rework it,
15  rephrase it, or do something with it so
16  you do understand it.  Okay?
17      A.  Sounds good, yes.
18      Q.  With that understanding, is
19  it fair that if you answer a question, we
20  can be assured that you did understand
21  the question?
22      A.  Yes.
23      Q.  Can you tell me what Sevin
24  is, S-E-V-I-N?

Page 16

1      A.  Sevin is an insecticide.
2      Q.  Okay.  And when was the
3  first time you heard of Sevin?
4      A.  Oh, gosh.  20 years ago or
5  more.
6      Q.  Okay.  In what context?
7      A.  Household use, I think.
8      Q.  You were using Sevin?
9      A.  I don't know if I ever used
10  it.  I can't say I did or didn't.  I just
11  knew the name.
12      Q.  Okay.  So what do you mean
13  by household use?
14      A.  As a -- as a spray you could
15  use for -- as an insecticide.
16      Q.  So your recollection is
17  about 20 years ago, you heard of the
18  insecticide Sevin that could be used to
19  spray around the house?
20      A.  That's my recollection.
21      Q.  Okay.  And in what context
22  would you have heard that?
23      A.  I don't remember.
24      Q.  Was it an ad, a commercial,

Page 17

1  somebody mentioned it to you?
2      A.  I have no recollection.
3      Q.  You have no recollection.
4  Okay.
5          Did you ever do any research
6  into whether or not Sevin -- strike that.
7          What is Sevin comprised of?
8  Do you know?
9      A.  I can't remember that off
10  the top of my head.
11      Q.  Okay.  Did you ever know?
12      A.  I did at one point.
13      Q.  Okay.  When did you know
14  what the components of Sevin were?
15      A.  So I can't give you all the
16  components.  But at some point I knew the
17  active ingredient.  I don't remember when
18  that was.
19      Q.  Okay.  Well, was it pursuant
20  to your work in Roundup litigation?
21      A.  No.  It was prior to that.
22      Q.  And in what context would
23  you have had a reason to find out what
24  the active ingredient of Sevin was?

Michael L. Grossbard, M.D.

Page 18

1    A.   I've previously read
2  literature on pesticides and cancer prior
3  to any work with Roundup.  I'm sure it
4  was in that context.  But I can't tell
5  you the time or date.
6    Q.   Is Sevin or any of its
7  active ingredients a carcinogen?
8    A.   The literature is not
9  conclusive in that regard.  There are
10  some data suggesting it is and some data
11  suggesting that it's not.
12    Q.   Okay.  In your opinion, to a
13  reasonable degree of certainty, is
14  exposure to Sevin associated with an
15  increased risk of non-Hodgkin lymphoma?
16    A.   I can't answer that with any
17  degree of certainty.  To my knowledge
18  it's not associated with any significant
19  increase in risk.
20    Q.   Is it associated with an
21  increase in risk of lymphoma?
22    A.   You've asked me
23  non-Hodgkin's lymphoma first?
24    Q.   I did.

Page 19

1    A.   Yeah.  It's not associated
2  with other types of lymphoma, mainly
3  Hodgkin's disease to the best of my
4  knowledge.
5    Q.   And when you say there's
6  some evidence that it may be associated
7  and some evidence it may not, what do
8  you -- what does the evidence that it is
9  and what is the evidence that it isn't?
10    A.   I can't quote you specific
11  literature on that today.
12    Q.   How about generally?
13    A.   I can't quote you anything
14  that I would feel comfortable that I've
15  looked at recently.
16    Q.   How about anything that you
17  looked at at any point in time?
18    A.   I can't quote that to you.
19    Q.   Okay.  Do you know who makes
20  Sevin?
21    A.   I do not.
22    Q.   Have you ever seen a Sevin
23  label?
24    A.   I don't know the answer.

Page 20

1  Maybe, maybe not.
2    Q.   So if I understand you, you
3  are not of the opinion, as you sit here
4  today, that exposure to Sevin is
5  associated with any cancer?
6    A.   Again, I know there's
7  literature on both sides of that, but I
8  can't name specifics today.
9    Q.   And that was not my
10  question.  I'm just asking you for your
11  opinion.  If you had an opinion one way
12  or the other, then we would backfill with
13  what's the basis of the opinion.
14         So my question is, as you
15  sit here today, do you have an opinion
16  whether or not exposure to Sevin is
17  associated with any kind of cancer?
18    A.   I'm not prepared to offer a
19  firm opinion on that today.
20    Q.   Okay.  How about a weak
21  opinion?
22    A.   I'm not even going to offer
23  a weak opinion.
24    Q.   I was just following up

Page 21

1  because you qualified "opinion."  So you
2  have no opinion one way or the other?
3    A.   Not today, no.
4    Q.   Okay.  Today is the day.
5    A.   Understood.
6    Q.   Okay.  But I appreciate what
7  you're saying.
8         How about Lorsban?  What is
9  Lorsban?
10    A.   It's also a pesticide.
11    Q.   And what kind of pesticide?
12    A.   I can't give you the
13  classification on that.
14    Q.   Meaning you don't know if
15  it's an herbicide, fungicide,
16  insecticide?
17    A.   Meaning I don't recall.
18    Q.   Okay.  Did you ever know?
19    A.   I did.
20    Q.   And in what context would
21  you have determined what kind of
22  pesticide Lorsban was?
23    A.   For that agent, it would be
24  in the context of this litigation and the

Michael L. Grossbard, M.D.

Page 22

1 reference I made to it in Mr. Sanders'
2 report. Based on his prior use.
3       Q.   Do you know what the active
4 ingredients of -- or ingredient of
5 Lorsban is?
6       A.   I do not recall.
7       Q.   Did you do any research in
8 terms of whether or not Lorsban is
9 associated with any cancer?
10      A.   I did not do research as to
11 whether it was associated with any
12 cancer. I did do research -- well, I did
13 do -- I did look up literature as to
14 whether it was associated with
15 non-Hodgkin lymphoma specifically, and
16 that is a cancer.
17      Q.   Right. And what is --
18 strike that.
19            What research did you do
20 into whether or not Lorsban exposure is
21 associated with non-Hodgkin lymphoma?
22      A.   I reviewed a couple of
23 papers on -- off of PubMed.
24      Q.   What papers?

Page 23

1       A.   I don't recall.
2       Q.   Okay. And there's no paper
3 that relates to Lorsban in your materials
4 considered list for Mr. Sanders, is
5 there?
6       A.   That's true.
7       Q.   What kind of -- strike that.
8            How many such papers did you
9 review from PubMed regarding Lorsban?
10      A.   Two or three. I can't
11 remember specifically.
12      Q.   Okay. That's fair enough.
13            And do you recall what kinds
14 of papers? Meaning, whether were they
15 epidemiological studies, or were they
16 genotoxicity studies?
17      A.   They would have been
18 epidemiological.
19      Q.   Okay. And do you consider
20 that a full review as to whether or not
21 Lorsban is or isn't associated with
22 non-Hodgkin lymphoma?
23      A.   I do not.
24      Q.   Okay. Do you have an

Page 24

1 opinion as you sit here today whether
2 Lorsban is or isn't associated with
3 non-Hodgkin lymphoma?
4       A.   I don't believe it is to any
5 significant degree.
6       Q.   And what do you mean by
7 "significant degree"?
8       A.   In other words, that there
9 was a statistically significant
10 association between Lorsban and lymphoma
11 in the papers that I looked at.
12      Q.   Okay. And if there were
13 statistically significant findings in one
14 of those papers, would it be your opinion
15 that Lorsban was associated with
16 non-Hodgkin lymphoma?
17            MR. SLONIM: Objection.
18            THE WITNESS: Not from a
19 single paper.
20 BY MR. KRISTAL:
21      Q.   Okay. What would be the
22 minimum evidence that you would need to
23 say that Lorsban was associated with
24 non-Hodgkin lymphoma?

Page 25

1       A.   So I would need to do a much
2 more thorough review of the literature on
3 that. I would need to assess a variety
4 of criteria regarding the methodology of
5 the publications, the statistical
6 significance of the findings, the aspects
7 of the specific studies themselves, were
8 they cohort studies, epidemiologic
9 studies, were they case-control studies.
10      Q.   May I just ask you -- it's
11 early, and I'm just asking him to slow
12 down for Michelle's sake so she can get
13 everything down.
14      A.   Sure.
15      Q.   That's all I'm --
16      A.   Sure.
17      Q.   That's all I'm trying to
18 say.
19            MR. SLONIM: Doctor, did you
20 complete your answer?
21            MR. KRISTAL: No, no, I
22 realize the answer wasn't
23 complete.
24            MR. SLONIM: Maybe we can do

Michael L. Grossbard, M.D.

Page 26

1  this.  Maybe we can have the
2  question read back, and the
3  doctor's --
4      MR. KRISTAL:  I can read the
5  doctor's answer if you like.
6      MR. SLONIM:  No, I prefer to
7  have the court reporter do that
8  please.
9      (Whereupon, the court
10  reporter read back the requested
11  portion of testimony.)
12      MR. SLONIM:  Doctor, if you
13  want to complete your answer --
14      THE WITNESS:  Sure.
15      MR. SLONIM:  -- if there was
16  more than what --
17      THE WITNESS:  Sure.  Just to
18  the extent possible, I'd want to
19  explore the strength of the
20  association that existed, whether
21  there was a temporal relationship
22  between exposure to the agent and
23  the development of lymphoma,
24  whether there was a mechanistic

Page 27

1  way that this could happen, in
2  other words a biological mechanism
3  by which this could happen.  I
4  want would want to explore if
5  there was a dose-response effect
6  that was seen -- higher dose, more
7  likelihood of lymphoma.
8      Those would be some of the
9  features.
10  BY MR. KRISTAL:
11      Q.   But you didn't do any of
12  that for Lorsban, correct?
13      A.   That's correct.
14      Q.   And you didn't do that for
15  Sevin either?
16      A.   That is correct.
17      Q.   What's Delnav?
18      A.   That's another pesticide.
19      Q.   Do you know what kind of
20  pesticide?
21      A.   Again, I don't recall.
22      Q.   Okay.  Did you do any
23  research on whether or not Delnav is
24  associated with any cancer?

Page 28

1      A.   I did similar type research
2  that I did for the other compound that we
3  just discussed.
4      Q.   And do you have an opinion
5  as you sit here today whether exposure to
6  Delnav is associated with non-Hodgkin
7  lymphoma?
8      A.   From the limited literature
9  that I reviewed, it did not appear to be
10  that there was a firm association or a
11  statistically significant association.
12      Q.   Has it been associated at
13  all?
14      A.   I don't recall.
15      Q.   Did you at one point in time
16  know that, and you don't recall it?  I'm
17  not sure I understand when you say "I
18  don't recall."  Don't recall means you
19  knew and you're just not remembering --
20      MR. SLONIM:  Objection.
21  BY MR. KRISTAL:
22      Q.   -- as opposed to not
23  knowing.
24      MR. SLONIM:  Objection.

Page 29

1      THE WITNESS:  Well, I
2  think -- I think I don't recall.
3  Again, I looked up two or three
4  papers.  I looked at them.  I did
5  not consider this to be a
6  substantial contributing factor to
7  Mr. Sanders' development of
8  lymphoma and didn't pursue it
9  further.
10  BY MR. KRISTAL:
11      Q.   Okay.  My question was
12  perhaps a little broader.  The question
13  is whether you associated Delnav exposure
14  with NHL?
15      A.   Again, I don't think there
16  was -- from my limited review, I did not
17  find a statistically significant
18  relationship to draw that conclusion.
19      Q.   I'm going to mark as
20  Exhibit 1, your report in Sanders.
21      (Document marked for
22  identification as Exhibit
23  Grossbard-1.)
24  BY MR. KRISTAL:

Michael L. Grossbard, M.D.

Page 30

1   Q.   Take a look at it.  And if
2  you can just tell us if that is your
3  report in Sanders with your CV that's now
4  been updated, your materials considered
5  list, and the update to your testimony.
6   A.   It looks -- it looks
7  accurate, yes.
8   Q.   If you turn to Page 6.
9  Third paragraph down, just let me know
10  when you're there.
11   A.   I'm there.
12   Q.   "Mr. Sanders had several
13  risk factors for NHL.  Mr. Sanders
14  testified that he was exposed to several
15  chemicals when he was employed as a ranch
16  hand beginning in the 1960s through his
17  retirement in 2014 that have been
18  associated with the development of NHL,
19  e.g., Sevin, Lorsban and Delnav."
20       Did I read that correctly?
21   A.   You did.
22   Q.   Okay.  So in your report,
23  you're stating that Sevin is associated
24  with the development of NHL, are you not?

Page 31

1   A.   I am.  Although I don't make
2  any conclusions about statistical
3  significance there.
4   Q.   Okay.  Why did you say today
5  that you don't have an opinion if when
6  you wrote the report you said Sevin has
7  been associated with the development of
8  NHL?  How are those two things possibly
9  consistent?
10   A.   Well, I think -- I think
11  they're consistent.  I believe that an
12  association doesn't draw a conclusion
13  that that's statistically significant and
14  a definite cause.
15   Q.   Nor did I ask you that.  I
16  asked earlier -- we can go back and look
17  at the question -- if Sevin was
18  associated with NHL.  And you said you
19  don't have an opinion.  You haven't done
20  enough research; is that right?
21       MR. SLONIM:  Objection.
22       Asked and answered.
23  BY MR. KRISTAL:
24   Q.   Did you say that?

Page 32

1       MR. SLONIM:  Speaks for
2    itself.  Argumentative.
3  BY MR. KRISTAL:
4   Q.   Okay.  You can answer.
5  Didn't you say that when I asked you?
6   A.   I did say that.
7   Q.   Okay.  In your report you
8  said, in essence -- I can read the whole
9  thing again, but Sevin has been
10  associated with the development of NHL.
11       Do you see that?
12   A.   I do.
13   Q.   Okay.  And you're saying
14  those answers are the same?
15   A.   Well, I'm saying I qualified
16  my answer as I answered it to you.
17   Q.   What do you mean you
18  qualified it?
19   A.   Again, by stating
20  statistical significance, which I did not
21  state here.
22   Q.   Well, two things.  In your
23  report, there's no mention of statistical
24  significance, correct?

Page 33

1   A.   That's correct.
2   Q.   So are you saying in your
3  opinion, Sevin has been associated with
4  the development of NHL, but you don't
5  believe it's a risk factor?
6       MR. SLONIM:  Objection.
7       THE WITNESS:  I would not
8    classify this as a risk factor for
9    Mr. Sanders' NHL, yes.
10  BY MR. KRISTAL:
11   Q.   Okay.  Yet that paragraph
12  says, Mr. Sanders -- "Mr. Sanders had
13  several risk factors for NHL."  And the
14  rest of that paragraph goes on to discuss
15  in part Sevin, right?
16   A.   That's correct.
17   Q.   So aren't you saying in that
18  paragraph that Sevin was a risk factor
19  for Mr. Sanders' NHL?
20   A.   I don't think so.
21   Q.   Okay.  Let's read it again.
22       "Mr. Sanders had several
23  risk factors for NHL."
24       That's the first sentence of

Michael L. Grossbard, M.D.

Page 34

1 the paragraph, right?
2     A.   That is correct.
3     Q.   And then you continue with
4 the next sentence.  "Mr. Sanders
5 testified that he was exposed to several
6 chemicals when he was employed as a ranch
7 hand, beginning in the 1960s through his
8 retirement in 2014, that have been
9 associated with the development of NHL,
10 e.g., Sevin, Lorsban and Delnav."
11         Correct?
12     A.   That is correct.
13     Q.   And that's the entire
14 paragraph?
15     A.   That is correct.
16     Q.   So what did you mean when
17 you said Mr. Sanders had several risk
18 factors for NHL and then followed it up
19 with the next sentence, talking about
20 Sevin being associated with the
21 development of NHL?  You're saying those
22 things are not connected?
23     A.   I'm saying those things are
24 not connected as risk factors for him.

Page 35

1 They are associations.
2     Q.   But why did you say
3 Mr. Sanders had several risk factors for
4 NHL?
5     A.   I go on through the rest of
6 the three paragraphs to describe risk
7 factors.
8     Q.   So you're saying --
9     A.   As well as -- as well as the
10 risk factors before.
11     Q.   Okay.  So you're telling us
12 that the sentence that follows right
13 after "Mr. Sanders had several risk
14 factors for NHL" has nothing to do with
15 the risk factors that Mr. Sanders had for
16 NHL?  Is that what you're telling us?
17     A.   I'm saying there is an
18 association between them.  But I can't
19 tell you that they are risk factors for
20 him, yes.
21     Q.   Despite the fact that the
22 sentence where you say they are
23 associated comes right after you say
24 Mr. Sanders had several risk factors?

Page 36

1     A.   Exactly, despite the fact.
2     Q.   Same thing with Lorsban,
3 correct?  You testified earlier Lorsban
4 had not been associated in your mind with
5 the development of NHL.  And here you're
6 saying it has, correct?
7         MR. SLONIM:  Objection.
8         THE WITNESS:  I believe I
9     also said in terms of statistical
10     significance.
11 BY MR. KRISTAL:
12     Q.   I can't find it right now.
13 We will go back to it.
14         If a person -- strike that.
15         Is radiation exposure a risk
16 factor for lymphoma?
17     A.   I believe it's both a risk
18 factor and a cause.
19     Q.   Okay.  So there are certain
20 things that -- certain exposures that can
21 be both risk factors and causes of
22 non-Hodgkin lymphoma, correct?
23     A.   I believe that's true, yes.
24     Q.   And there are certain things

Page 37

1 that can be a risk factor but not
2 necessarily a cause of NHL, correct?
3     A.   That's true.
4     Q.   Okay.  So how do you
5 determine which are the things that are
6 risk factors for non-Hodgkin lymphoma and
7 are causes of non-Hodgkin lymphoma?  What
8 criteria do you use?
9     A.   I think the easiest and
10 first thing to look at is a mechanism
11 of how something could cause lymphoma.
12         So I think that's the
13 question that you asked, so it would be
14 that.
15     Q.   Is there anything else?  I'm
16 just trying to lay out --
17     A.   Yeah, I mean --
18     Q.   -- what are the criteria
19 that you have to determine if a risk
20 factor for NHL is also a cause, and you
21 mentioned mechanism of action.  And I'm
22 just asking if -- I want to get the full
23 list and then come back.
24     A.   So I think just in relating

Michael L. Grossbard, M.D.

Page 38

1 risk factor to cause, it would actually
2 be mechanism of action, how it would
3 happen.
4      Q.   Okay.  Meaning does it cause
5 some genetic damage that could mutate
6 into a cancer cell?
7      A.   It -- either cause or
8 contribute to genetic damage.
9      Q.   Okay.  Is there any
10 particular -- strike that.
11           There are a number of
12 different ways that DNA can be damaged,
13 correct?
14      A.   Sure.
15      Q.   Is there a particular way
16 that a -- let's use a chemical -- causes
17 or contributes to genetic damage, other
18 than damage to DNA?
19           MR. SLONIM:  Objection.
20           THE WITNESS:  You're asking
21      a particular chemical
22      specifically?  I'm sorry.  As
23      opposed --
24 BY MR. KRISTAL:

Page 39

1      Q.   Well, any -- any -- we can
2 stick with a general substance.  If
3 you're determining whether a substance
4 that is a risk factor is a cause, you
5 said you look at the mechanism of action
6 to see whether it causes or contributes
7 to genetic damage.
8           What type of genetic damage
9 are you talking about?
10      A.   So ultimately that --
11           MR. KRISTAL:  Thank you for
12      the objection.  It was a terrible
13      question.
14           THE WITNESS:  Ultimately
15      that genetic damage would have to
16      contribute to a mutation.
17 BY MR. KRISTAL:
18      Q.   Okay.  And what are the
19 types of genetic damage, in your opinion,
20 that can contribute to a mutation?
21      A.   So direct -- direct damage
22 to DNA, impairment of replication, cell
23 division, increased stimulation of cell
24 division, making it more likely that

Page 40

1 there would be errors in DNA
2 transcription.  Those would be some of
3 the classes.
4      Q.   Okay.  Any others?
5      A.   Those are what I'm thinking
6 off the top of my head.
7      Q.   Okay.  What kind of direct
8 damage are you talking about?
9      A.   So direct damage would be
10 radiation, for example.  Direct damage to
11 the DNA strands.
12      Q.   No, and that's -- I'm sorry.
13 Were you done?
14      A.   Go ahead.  Yeah.
15      Q.   I was talking very generally
16 about direct damage.  Are you talking
17 about DNA strand breaks as one, as an
18 example?
19      A.   DNA strand breaks would be
20 one.
21      Q.   Sister chromatid exchange is
22 another?
23      A.   That would be.
24      Q.   Anything else in your

Page 41

1 opinion?
2      A.   Not for these agents, no.
3      Q.   When you say for these
4 agents --
5      A.   Sorry, not --
6      Q.   -- I'm talking very broadly,
7 as broad as you can get.  I want to take
8 the 10,000-foot view.
9      A.   Understood.  So you can
10 have -- you can have areas of DNA that
11 are spliced out, for example, for some
12 reason or another.  But I can't think of
13 any of these risks or causes that we are
14 talking about here that do that.
15      Q.   I'm not limiting it --
16      A.   Yeah, and I understand that
17 you want the entire --
18      Q.   So you're talking about a
19 translocation?  Is that what --
20      A.   No, not a translocation, but
21 actually just splicing it, just losing
22 part of the DNA.
23      Q.   Okay.
24      A.   I guess chromosomal

Michael L. Grossbard, M.D.

Page 42

1 translocations would be another result of
2 DNA damage.
3          Being very basic, point
4 mutations in the DNA.
5     Q.   When you're talking about
6 impairing replication, what are you
7 talking about there in terms of a
8 mechanism?
9     A.   Impairing cell division.
10 Essentially you can disrupt microtubular
11 formation, for example, or function.
12     Q.   Does damage to a tumor
13 suppressor gene fall in that category in
14 terms of --
15     A.   Go ahead.
16     Q.   -- then lacking control over
17 replication of cells?
18     A.   Yes.  Mutation of tumor
19 suppressor gene would fall into that
20 group.
21     Q.   Does oxidative stress lead
22 to DNA damage?  Can the -- strike that.
23          Can oxidative stress lead to
24 DNA damage?

Page 43

1     A.   Yes, it can.
2     Q.   Does damage to a tumor
3 promoter gene also fall in the category
4 of a mechanism?
5     A.   It's not usually damage to
6 the gene, but alteration of expression of
7 the gene.
8     Q.   That's a much better term.
9 Thank you.
10     A.   Okay.  Yes, that --
11     Q.   So if you alter the
12 expression of a tumor promoter gene, you
13 can thereby trigger replication of cells
14 that could lead to a cancer possibly?
15     A.   Correct.
16     Q.   You give an example in your
17 report that if a person was exposed to
18 radiation through radiation therapy and
19 subsequently developed a lymphoma within
20 the field of radiation, in your opinion
21 the radiation therapy caused the
22 lymphoma?
23     A.   That would be true.
24     Q.   Okay.  Is there any

Page 44

1 validated medical test that you would
2 follow to make that determination?
3     A.   There is no medical test
4 that I'm aware of.
5     Q.   Is there any validated
6 medical procedure that you would follow
7 to make that determination?
8     A.   No, there's no medical
9 procedure that would allow that
10 determination.
11     Q.   Is there a validated medical
12 protocol that you would follow to make
13 that determination?
14     A.   By protocol, you mean?
15     Q.   I don't know.  You used the
16 term in your report, "validated test,
17 procedure or protocol."  So what did you
18 mean?
19          You did use those terms,
20 right?
21     A.   I have to look back.  I may
22 have.
23     Q.   Okay.  Let's look.
24          On Page 5, are you with me?

Page 45

1 The paragraph just above the discussion
2 of Mr. Sanders' case, the last sentence.
3          "Moreover, it is
4 scientifically impossible for anyone to
5 conclude that exposure to Roundup either
6 induced or contributed to a particular
7 person's lymphoma because there is no
8 validated medical test, procedure, or
9 protocol for making such a
10 determination."
11          Did I read that correctly?
12     A.   You did.
13     Q.   What did you mean by
14 validated medical protocol?
15     A.   Be a set of procedures by
16 which one analyzes something.
17     Q.   Okay.  There's no such
18 procedure for the radiation lymphoma
19 issue, correct?
20     A.   Other than medical judgment
21 that radiation is a DNA-damaging agent,
22 if you will, that if lymphoma developed
23 in the field of radiation, that it would
24 be highly likely that that happened.

Michael L. Grossbard, M.D.

Page 46

1    Q.   Are you saying in your
2  report -- obviously you're not, given
3  your last answer -- that no -- no one can
4  ever scientifically say that exposure to
5  anything induces or contributes to a
6  cancer unless there's a validated medical
7  test, procedure, or protocol for making
8  such a determination?
9    A.   I'm obviously not saying
10  that for everything.
11    Q.   Okay.  Just Roundup?
12    A.   In that specific sentence,
13  Roundup.  There would be many other
14  things also.
15    Q.   Why is medical judgment --
16  strike that.
17        You seem to be throwing that
18  sentence in.  I don't mean that in a
19  derogatory way.  You have that sentence
20  in your report to in essence say, even if
21  Roundup was a potential cause for NHL in
22  an individual case, you couldn't say
23  whether it caused or contributed without
24  these validated medical tests, procedures

Page 47

1  or protocols.  Am I reading that right?
2    A.   Yeah, that would be correct.
3    Q.   Okay.  So for some
4  substances that you believe cause cancer,
5  you're saying that you need a validated
6  test, procedure, or protocol to determine
7  whether that substance caused or
8  contributed to that person's cancer and
9  in other situations you don't?
10    A.   No, I don't believe that I'm
11  saying that, in terms of a validated
12  test, protocol, or procedure.  But those
13  all depend upon medical literature,
14  medical knowledge, logic.
15    Q.   Well, of course.  Nobody is
16  throwing darts, right?
17    A.   I think --
18    Q.   You're doing the best that
19  you can as a scientist to make an
20  assessment of everything you've read and
21  putting it all together and coming up
22  with your opinion, right?
23        MR. SLONIM:  Objection to
24      that question and also -- and it

Page 48

1  may have been inadvertent counsel.
2  I'm sure it was.  But I don't
3  believe the doctor had finished
4  his prior answer.
5      MR. KRISTAL:  Oh.
6  BY MR. KRISTAL:
7    Q.   I thought you had.  Could
8  you -- if I do that, just put up your
9  hand and say -- I will stop talking.  I'm
10  not trying to interrupt you in any way.
11      MR. SLONIM:  I'd like to
12    have the court reporter read back
13    the pending question to which I
14    have an objection.
15      But can you read it back,
16    please.
17      MR. KRISTAL:  Sure.  I'm
18    going to blame it on the caffeine.
19    So I apologize.
20      (Whereupon, the court
21    reporter read back the requested
22    portion of testimony.)
23  BY MR. KRISTAL:
24    Q.   My question was, so for some

Page 49

1  substances that you believe cause cancer,
2  you're saying that you need a validated
3  test, protocol or procedure to determine
4  whether that substance caused or
5  contributed to that person's cancer, and
6  in other situations you don't.
7        And your answer was, "No, I
8  don't believe that I'm saying that, in
9  terms of a validated test, protocol or
10  procedure.  But those all depend upon
11  medical literature, medical knowledge,
12  logic."
13        Were you done with that
14  question?  And if not, please finish it.
15  And I do apologize.
16    A.   At this point, I don't
17  remember.  So let's just leave it there.
18    Q.   Okay.  So now I'm confused.
19  So I'm going to try to ask you questions
20  so I'm not confused.
21        In order for you to say that
22  radiation therapy caused someone's
23  lymphoma, you do not need any validated
24  medical test, procedure, or protocol.  Is

Michael L. Grossbard, M.D.

Page 50

1 that fair to say?  In the circumstance
2 that we gave where somebody had radiation
3 therapy and the lymphoma was within the
4 field of the radiation.
5      A.   Look, it's not a protocol or
6 a procedure, but it's an understanding of
7 the biology of tumors.  It's an
8 understanding of what radiation therapy
9 does.  It's an understanding that if it
10 happened a week after or three days after
11 radiation, that that would be
12 biologically implausible that it did it.
13 So it would have to have a proper
14 temporal relationship in terms of
15 occurring some years after the radiation.
16           I don't know if that's a
17 protocol or not.  But it's a way of
18 thinking.
19      Q.   Well, what did you mean when
20 you used the term "validated medical
21 test" in your report?  What does that
22 phrase mean, as you used it?
23      A.   For a --
24      Q.   Validated medical test?

Page 51

1      A.   For a test, a single test,
2 be it a blood test or a chromosome test
3 or some test that would give you an
4 answer.
5      Q.   What blood test would give
6 you an answer that an exposure to
7 something did or didn't cause cancer?
8 Does such a blood test exist?
9      A.   No.  And I'm saying there is
10 no such blood test.
11      Q.   What chromosome test exists
12 that would tell you whether or not
13 exposure to a substance did or didn't
14 cause a cancer?
15      A.   So it can give clues to it,
16 but can't be definitive.
17      Q.   Okay.  When you say it can
18 give clues to it, what do you mean?  When
19 you see chromosomal damage of some sort?
20      A.   Yes.
21      Q.   That doesn't tell you what
22 caused the chromosome damage, right?
23      A.   So for example -- and we're
24 out of the domain of lymphoma now, but

Page 52

1 we're talking generally.  If you have
2 something called myelodysplastic syndrome
3 as your diagnosis, and you received
4 chemotherapy three to five years before,
5 and you have abnormalities of Chromosome
6 5 or 7, there is a very strong
7 association between that, enough that
8 most doctors will say that that
9 chemotherapy was the cause of that
10 mutation.
11      Q.   And without that chromosomal
12 test, most doctors would say that anyway,
13 right, based on logic and knowledge of
14 the medical literature and those things?
15      A.   Most likely, yes.
16      Q.   Okay.  So you don't need
17 that particular test; it's not a
18 requirement?
19      A.   No, it's not a requirement.
20      Q.   Okay.  What did you mean
21 about the validated medical procedure?
22      A.   Some type of biopsy or study
23 of a specimen under a microscope,
24 something that would tell you what the --

Page 53

1 what the origin of that disease was.
2      Q.   Okay.  Anything else?
3      A.   No.  That's what I meant.
4      Q.   Okay.  What biopsy could you
5 look at under a microscope and say
6 "Substance X caused this or didn't cause
7 this"?  What are you talking about?
8      A.   I don't believe you can.
9      Q.   Right.  So there is no such
10 validated medical procedure?
11      A.   Right.
12      Q.   Okay.  Then why did you say
13 with respect to Roundup, unless there's a
14 validated medical test, procedure, or
15 protocol, you couldn't say whether
16 someone's exposure did or didn't cause
17 their NHL, if there is no such test to
18 begin with?
19      A.   Because there are other
20 agents for which I could.
21      Q.   Like what?
22      A.   Not for lymphoma, but
23 cigarette smoking and lung cancer.
24      Q.   Anything else?

Michael L. Grossbard, M.D.

Page 54

1    A.   That's the one that I think
2 of off the top of my head.
3    Q.   Is there anything else that
4 you can think of, that there's some kind
5 of test?
6    A.   Not that I'm thinking off
7 the top of my head.
8    Q.   Okay.  What do you mean by
9 validated medical protocol --
10    A.   Protocol --
11    Q.   -- as you used it in your
12 report?
13    A.   Yeah, protocol would imply a
14 series of tests in some sort of sequence
15 that would allow you to elucidate the
16 mechanism.
17    Q.   There's no such protocol
18 that exists to determine whether a
19 substance caused or contributed to
20 someone's cancer, right?
21    A.   Again, that would be
22 correct.
23    Q.   Okay.  So are you saying no
24 one can apply their best scientific

Page 55

1 judgment, having reviewed the literature,
2 having assessed the quality of the
3 literature, having looked at whether or
4 not there's an association, looking at
5 biological plausibility, looking at all
6 of those things, and no one can simply
7 disagree with you and say Roundup did
8 contribute to the development of this
9 particular person's NHL?
10    A.   I don't believe I'm saying
11 that.
12    Q.   Oh, okay.  So there are
13 reasonable doctors and scientists who
14 could make such a determination?
15    MR. SLONIM:  Objection.
16 BY MR. KRISTAL:
17    Q.   Right?
18    A.   Yeah.  I mean, I happen to
19 disagree with their opinions, but they
20 have their opinion, and I have mine.
21    Q.   I'm not -- I understand
22 that.
23    A.   Yeah.
24    Q.   And you're not saying there

Page 56

1 is no evidence whatsoever that exposure
2 to glyphosate is capable of causing
3 cancer.  You just don't believe it's
4 tipped to the point where you would say
5 it does.  Is that fair to say?
6    A.   I think for almost any agent
7 I would have to say there's not no
8 evidence.  There are thousands of pieces
9 in the literature on one side or another
10 for almost every scientific issue, and
11 many of them are in conflict.
12    I think the preponderance --
13 vast preponderance of the evidence would
14 suggest that glyphosate does not cause
15 lymphoma.
16    Q.   Are chemicals that, in your
17 opinion, are capable of -- strike that.
18    Are chemicals that are risk
19 factors for cancer also causative,
20 meaning with respect to chemicals
21 themselves, if it's determined to be a
22 carcinogen, then it's a risk factor and a
23 carcinogen -- am I making any sense here?
24 If not, please stop me.

Page 57

1    A.   Zero.
2    MR. SLONIM:  Object.  I'll
3 object.
4 BY MR. KRISTAL:
5    Q.   No, no, and that's why I
6 don't want you to guess.
7    Is there any chemical that
8 you believe is a risk factor for NHL that
9 is also not causative?
10    MR. SLONIM:  Objection.
11 BY MR. KRISTAL:
12    Q.   In other words, capable of
13 causing NHL?
14    A.   Sure.
15    Off the top of my head, I
16 can't think of an agent that I -- a
17 chemical that I would consider to be a
18 risk factor that wouldn't be a cause.
19    Q.   Okay.  Is Agent Orange a
20 risk factor for lymphoma?
21    A.   The literature, again, is
22 not very definitive in that regard.
23 There are some studies that suggest
24 there's a higher risk of lymphoma in

Michael L. Grossbard, M.D.

Page 58

1 association with Agent Orange.  There are
2 other studies that don't.  The Veterans
3 Administration clearly considers that to
4 be a coverable or reimbursable diagnosis
5 associated with Agent Orange exposure.
6     Q.   Okay.  So your opinion is
7 that Agent Orange is or isn't a risk
8 factor for lymphoma?
9     A.   I believe it's not a
10 significant risk factor for lymphoma.
11 I --
12     Q.   Okay.  Okay.  Go ahead.
13     A.   I commented specifically in
14 this report on Mr. Sanders' exposure to
15 agent orange and could not come down that
16 that was a risk factor for his lymphoma.
17     Q.   Okay.  And you used the term
18 in your answer "significant risk factor."
19 Is there a difference between a risk
20 factor and a significant risk factor?
21     A.   Shows a statistically
22 significant increase in the disease in
23 question.
24     Q.   So in order to be considered

Page 59

1 a risk factor in your opinion, there has
2 to be a statistically significant
3 association epidemiologically?
4     A.   For me, yes.
5     Q.   Okay.  Have you read the
6 literature regarding whether or not you
7 need to have statistically significant
8 results before you can render an opinion
9 that an exposure is associated with an
10 outcome?  Have you seen that body of
11 literature?
12     A.   No.
13     Q.   Is there anything magical
14 about statistical significance?
15     A.   What do you mean by magical?
16     Q.   Well, a P-value -- you know
17 what a P-value is?
18     A.   I do.
19     Q.   P-values can be selected
20 randomly, correct?
21         MR. SLONIM:  Objection.
22         THE WITNESS:  Well, they're
23     not usually selected randomly, but
24     they could be.

Page 60

1 BY MR. KRISTAL:
2     Q.   In other words, you could
3 have a P-value of .05, right, or for a --
4 yes?
5     A.   That's correct.
6     Q.   Or you could have a P-value
7 of .10?
8     A.   You could.
9     Q.   And if you had a -- if you
10 picked going into a study, we're going to
11 analyze statistically this data using a
12 P-value of .10, there would be more
13 things that would be considered
14 statistically significant, right?
15     A.   If you defined it as such,
16 yes.
17     Q.   Okay.  Are you saying that
18 in order to be a risk factor, something
19 has to be statistically significant at a
20 P of .05?
21     A.   For me, the confidence
22 interval that you measure, and if that's
23 at a .05 level or .01 level, it has to be
24 outside of that domain of one.  So it --

Page 61

1 there has to be either an increased risk
2 or decreased risk one way or the other,
3 but in this case, for a risk factor, an
4 increased risk.  And, yes, that has to
5 exceed one, being statistically
6 significant.
7     Q.   I understand that's a
8 definition of statistically significant.
9 It can't cross one, right, the confidence
10 interval?
11     A.   Sure.
12     Q.   Okay.  What I'm asking you
13 is a different question though.
14         Are you saying that in order
15 for you to say something is -- strike
16 that.
17         In order for you to say that
18 an exposure is associated with an
19 outcome, does it have to be statistically
20 significant at the P equals .05 level?
21     A.   So to say something is
22 associated, no.  To say it's
23 significantly associated, yes.
24     Q.   Okay.  So if something was

Michael L. Grossbard, M.D.

Page 62

1  statistically significant in a study at a
2  P equals .10, you would say that's
3  significantly associated or not?
4      A.   To my interpretation, that
5  would be not statistically significantly
6  associated because I use a .05 cutoff by
7  a large --
8      Q.   Why do you -- why do you use
9  a .05 cutoff?
10      A.   It's really what I was
11  taught in statistic classes in the
12  epidemiology classes that I took.
13      Q.   Okay.  .04, .06 make a
14  difference?
15      A.   Sure.  Below .05 is fine.
16  So .04, yes; .06, no.
17      Q.   Do you give any weight to
18  associations that are not statistically
19  significant?
20      A.   Sure.  I think you have to
21  include all of that in thinking about a
22  particular agent or product.
23      Q.   Okay.  What pesticides do
24  you consider to be risk factors for

Page 63

1  lymphoma, if any?
2      A.   Where I think the literature
3  is stronger than other places, DDT,
4  lindane.  Those would be a couple.
5  Malathion.
6      Q.   Have you done the level of
7  research on any one of those three
8  pesticides as you've done in this case
9  for glyphosate?
10      A.   I would have to say no.
11      Q.   What are you basing your
12  opinion on malathion, the IARC review?
13      A.   Not only IARC, although IARC
14  does classify it as a carcinogen.
15          Other papers I've come
16  across, I can't quote them to you.
17      Q.   Do you remember giving a
18  little presentation where you had a chart
19  where risk factors for lymphoma and you
20  listed pesticide exposure and you
21  mentioned Agent Orange?
22      A.   I don't.
23      Q.   Okay.  Let me take a minute
24  and see if we can boot that up.

Page 64

1      MR. SLONIM:  While you're
2  doing that, maybe we should take a
3  break.
4      MR. KRISTAL:  I was going to
5  ask somebody else to do it.  Or
6  if you -- anytime you want to take
7  a break is fine with me.  If you
8  want to take a break now, that's
9  fine.
10      MR. SLONIM:  I thought you
11  were -- I thought you were booting
12  something up.
13      MR. KRISTAL:  I'm moving it
14  down to the booter-upper.
15          Offshoot of my wife being my
16  volume turner-downer.
17  BY MR. KRISTAL:
18      Q.   All right.  If someone had
19  exposure to malathion and developed
20  lymphoma, would it be your opinion that
21  malathion contributed to the development
22  of a lymphoma?
23      A.   Potentially.  It would again
24  depend upon the extent of exposure, the

Page 65

1  temporal association, the same criteria
2  that we spoke about before.
3      Q.   Well, when you say extent of
4  exposure, what are you talking about?
5      A.   If they used malathion once,
6  one day, 27 years ago, I would not think
7  that it's a significant contributing
8  factor.
9      Q.   Okay.  Where is your cutoff
10  for that or any other pesticide exposure?
11  In other words, what do you use as a
12  guidepost or a metric?
13      A.   To some degree, that would
14  have to rely on published literature.
15      Q.   Fine.  Do you have cutoff?
16  Does it have to be -- where do you
17  derive --
18      A.   Yeah.
19      Q.   -- some cutoff?  If one day
20  27 years ago isn't sufficient -- and I'm
21  not saying it is or isn't -- what is the
22  cutoff?  Is it two days?  100 days?
23      A.   I can't give you an
24  arbitrary cutoff.  I'm not prepared based

Michael L. Grossbard, M.D.

Page 66

1 on malathion literature to answer that
2 question today.
3      Q.   Okay.  And where would you
4 get an answer to that question for any
5 pesticide that you believe is capable of
6 causing lymphoma?
7      A.   I think it would be very
8 hard to get an answer to that question in
9 any degree.
10      Q.   So then, how do you answer
11 it?  If in your opinion you need a
12 sufficient exposure, what are you looking
13 to to determine whether a particular
14 exposure is or isn't sufficient?
15      A.   So first of all, there has
16 to be a consistent epidemiologic
17 association in the literature with an
18 agent as being a cause of lymphoma.
19      Second of all, the person
20 would need to be exposed to that agent in
21 a temporally associated fashion.
22      Beyond that, it would really
23 depend on how strong the literature was.
24      Q.   Well, temporal association,

Page 67

1 is a gimme, right?  We don't live in a
2 bizarro world.  You have to have an
3 exposure prior to an outcome with a
4 sufficient latency, right?
5      A.   Well, I don't think that's a
6 gimme, unless you put in sufficient
7 latency.
8      In other words, if you were
9 exposed to malathion today --
10      Q.   Of course.
11      A.   -- and you get lymphoma
12 tomorrow -- so I don't think it's a
13 given.
14      Q.   What is your minimum latency
15 period with respect to non-Hodgkin
16 lymphoma and causation by a pesticide?
17      A.   It's hard to answer that
18 with any definitive sense.  In terms of
19 using other DNA-damaging agents, if I
20 argue that the mechanism for -- by which
21 this is happening is through some DNA
22 damage, typically between two and
23 six years.
24      Q.   Okay.  So --

Page 68

1      A.   Although it doesn't -- let
2 me extend that.  It doesn't go to zero
3 after six years.
4      Q.   Right.
5      A.   In other words --
6      Q.   Yeah, at a minimum it would
7 have to be between two and six.  It could
8 be 10, 15, 20.
9      A.   Correct.  As it gets farther
10 away, that risk would again diminish.
11      Q.   Well, for some substances it
12 could actually increase, no?  Well, I'm
13 just asking.
14      A.   Maybe in theory, but I can't
15 name any.
16      Q.   Okay.  So far we haven't
17 gotten to the exposure level issue.  And
18 how do you determine if someone had a
19 sufficient exposure?  I know you talked
20 about consistency and temporal and
21 latency.  I'm talking now about
22 sufficiency of exposure.  How do you --
23 is that a medical judgment based on
24 reading of the literature?

Page 69

1      A.   That's about the best you
2 can do, yes.
3      Q.   Okay.  And there's nothing
4 wrong with that.
5      MR. SLONIM:  Objection.
6      THE WITNESS:  I don't think
7      so.
8 BY MR. KRISTAL:
9      Q.   Let me ask another line of
10 questions, and maybe we'll take a
11 few-minute break and I can check out this
12 video, and then we'll come back.  Is that
13 all right?
14      A.   Sure.
15      Q.   Okay.  Is -- I think you
16 already answered this.  But I'll ask it.
17 Is smoking cigarettes a risk factor and a
18 cause of lung cancer?
19      A.   I believe it is, yes.
20      Q.   Okay.  And I know that you
21 have treated and cared for lots of lung
22 cancer patients.  Fair to say?
23      A.   I have.
24      Q.   And you have taken smoking

Page 70

1  histories from them?
2      A.   I have.
3      Q.   If someone had a
4  200-pack-year history with a sufficient
5  latency and then got lung cancer, would
6  you say that their cigarette smoking
7  caused their lung cancer, or at least
8  contributed to their lung cancer?
9      A.   At least contributed and
10 most likely caused.
11     Q.   Okay.  And you could do that
12 without using any validated medical test,
13 procedure, or protocol, correct?
14     A.   We always did.  Now, there
15 is now developed genetic signatures of
16 smoking-induced lung cancer.  But I do
17 not use that as a routine to make that
18 determination.  Correct.
19     Q.   Does radon exposure, in your
20 opinion, also cause lung cancer?
21     A.   I believe it does.
22     Q.   If someone lived in a house
23 that had high radon levels and after an
24 appropriate latency period they developed

Page 71

1  lung cancer, is it your opinion that the
2  radon exposure substantially contributed
3  to the development of their lung cancer?
4      A.   Assuming, again, on the
5  amount of their exposure and latency, and
6  I'm not prepared to give you amounts
7  today, but yes.
8      Q.   And I'm not going to ask
9  amounts.  I appreciate it.
10     A.   I thought you might.
11          Go ahead.
12          MR. SLONIM:  Why don't we
13 take a break.
14          MR. KRISTAL:  Well, let me
15 just finish this line of
16 questioning.
17 BY MR. KRISTAL:
18     Q.   And you can make that
19 determination about radon without any
20 validated medical test, procedure, or
21 protocol, correct?
22     A.   Yes.
23     Q.   Now, if someone had a
24 200-pack-year history of smoking and

Page 72

1  lived in that same house that had the
2  high radon levels and then got lung
3  cancer after an appropriate latency
4  period, would it be your opinion that
5  both exposures to cigarette smoke and to
6  radon substantially contributed to the
7  development of their lung cancer?
8          MR. SLONIM:  Objection.
9          THE WITNESS:  With a caveat
10     that I have not reviewed any
11     literature related to that
12     particular type of question,
13     perhaps ever, and certainly
14     recently, yes, I think it would
15     have substantially contributed
16     both.
17          MR. KRISTAL:  Okay.  Why
18 don't we take a short break.
19          And just while we're on --
20     if you ever need a break for any
21     reason, if it's not in the middle
22     of a question or in the middle of
23     an answer, just say so, we'll take
24     a break.

Page 73

1          THE WITNESS:  I'm aware.
2  Thank you.
3          THE VIDEOGRAPHER:  The time
4  now is 12:59 p.m., and we're off
5  the record.
6          (Short break.)
7          THE VIDEOGRAPHER:  This
8  marks the beginning of Tape Number
9  2.  The time now is 1:11 p.m.  We
10 are back on the record.
11 BY MR. KRISTAL:
12     Q.   We're marking as Exhibit 2.
13          (Document marked for
14     identification as Exhibit
15     Grossbard-2.)
16 BY MR. KRISTAL:
17     Q.   These are screen shots from
18 a video.  The first page says "NYU
19 Langone Medical Center, Lymphoma, Michael
20 Grossbard M.D.  Event, Blood disorders:
21 Types, symptoms and treatment.  Date
22 Wednesday, February 4th, 2014."
23          And I have captured on the
24 second page a slide that is entitled "Who

Page 74

1 Gets Lymphoma?"
2        So my first question is,
3 this is something that you prepared to
4 give this lecture or somebody at your
5 request prepared?
6        A.   No, no, nobody prepares
7 stuff for me.  So it must have been me.
8        Q.   Right.  I'm the same way.
9        So what was the nature of
10 this presentation?
11        A.   I don't remember.  I think
12 it was part of a grand rounds
13 presentation at NYU.  But I don't
14 remember.
15        Q.   Okay.  Was the audience, to
16 the best of your recollection, mainly
17 physicians?
18        A.   If it was grand rounds, it
19 was mainly physicians.
20        Q.   Okay.  What other scenarios
21 would you give this type of lecture,
22 other than in a grand rounds situation?
23        A.   Could have been to a support
24 group type, or sessions where people come

Page 75

1 to learn -- from the lay public, come to
2 learn generally about lymphoma.
3        Q.   Okay.
4        A.   I mean, I just don't
5 remember.  That's -- most likely it was
6 grand rounds.
7        Q.   Fair enough.  The second
8 page of Exhibit 2, there's a slide that
9 says "Who Gets Lymphoma?"
10        And the first bullet point
11 says, "Anyone!!"
12        Correct?
13        A.   Correct.
14        Q.   And then the second bullet
15 point you wrote, "There are risk
16 factors:"
17        Correct?
18        A.   Correct.
19        Q.   And you list a number of
20 risk factors underneath that heading
21 under that bullet point.
22        A.   Correct.
23        Q.   All right.  And one of those
24 risk factors listed is pesticide

Page 76

1 exposure, correct?
2        A.   Correct.
3        Q.   And I want to play, so that
4 you can see it, and then we'll turn the
5 video -- we'll turn the laptop around so
6 it can be video'd -- what you said at
7 that time, and I'm particularly focusing
8 in and using this now, because of the
9 questioning about whether Agent Orange is
10 a risk factor.
11        Are you with me on the
12 context?
13        A.   I understand.
14        Q.   Okay.  So it's not
15 particularly loud, but you'll be able to
16 hear yourself, I believe.
17        A.   It's not playing.
18        (Video playback.)
19        - - -
20        DR. GROSSBARD:  Who gets
21 lymphoma?  And I probably put my
22 question backwards, put my
23 question before the fact.  But
24 that's all right.

Page 77

1        So anyone.  I mean, everyone
2 is in some way a candidate to get
3 lymphoma.  That's not to make
4 everybody here feel real badly.
5 It just strikes across a broad
6 patient population.
7        So there are some risk
8 factors.  People who are older are
9 more at risk of lymphoma.  Men are
10 at a little bit more at risk than
11 women.  Caucasians are at a bit
12 more at risk than African
13 Americans and Asians.
14        There are exposures, toxins,
15 pesticide exposure.  One example
16 is Agent Orange exposure to people
17 who are exposed during the Vietnam
18 War.  There was an excess of
19 lymphomas in those patients.
20 Radiation exposure.  There was a
21 higher incidence of lymphoma in
22 atomic bomb survivors.
23        And then you can see that
24 sometimes there's a secondary

Michael L. Grossbard, M.D.

Page 78

1 cancer after you get radiation as
2 a therapy.
3         And then it's also seen in
4 patients who have immune system
5 deficiencies, for example,
6 patients with AIDS, acquired
7 immunodeficiency syndrome, and
8 transplant -- organ transplant,
9 like a transplant of a liver or a
10 kidney, when your immune system is
11 suppressed.
12        People who have autoimmune
13 disease, disease like lupus or
14 rheumatoid arthritis, are more
15 susceptible.
16        And then, unlike many
17 cancers, or perhaps unknown about
18 cancers, is there are infections
19 that can cause lymphoma because
20 they cause a stimulation in the
21 immune system chronically, and it
22 can lead to the development of
23 lymphoma.
24        There's a bacteria called

Page 79

1 Helicobacter pylori that can cause
2 lymphomas in the stomach.
3 Hepatitis C and HIV can cause
4 lymphoma.
5        Borrelia burgdorferi, which
6 is the organism that causes Lyme
7 disease, which I'm sure everybody
8 is familiar with, where you get
9 joint pains when you get bit by a
10 tick, that can cause a lymphoma of
11 the skin.
12        And then there's another
13 kind of organism called Chlamydia
14 that can give you lymphomas
15 involving the eye, the orbit.
16        So some of these are truly
17 bacterial infections.  And in some
18 of these cases, you can treat the
19 bacterial infection, like in a
20 lymphoma of the stomach, never
21 have to give chemotherapy, never
22 have to give radiation therapy.
23        And by reversing that
24 chronic infectious immune

Page 80

1 stimulation, you can actually have
2 the lymphoma regress completely.
3        (End video playback.)
4 BY MR. KRISTAL:
5    Q.   I'd like to ask you first.
6 Is that what you said at that time?
7    A.   Well, I'd think I would have
8 to say that, yes.  I also look much
9 younger then.  But that's a separate
10 problem.
11    Q.   We all did.
12    A.   Okay.
13    Q.   It's a temporal issue.
14        Do you stand by what you
15 said at that time?
16    A.   Yes.  And if I could also
17 use that, it reminds me of something
18 else.  If I could use that to amend one
19 of my earlier question -- answers to my
20 questions -- answers to your questions.
21 Is that possible?  Because it --
22    Q.   Right, there's always the
23 amendment to something right after a
24 break.  Go ahead.

Page 81

1        MR. SLONIM:  Objection.
2        THE WITNESS:  No, really,
3 it's -- it's that you showed me a
4 slide there that reminded me of
5 something, the second slide, which
6 I'm not sure why you showed.  But
7 you'll ask me about it I'm sure.
8        You asked if there's any --
9 the slide that shows that
10 Helicobacter pylori causes gastric
11 MALT lymphoma.
12        And you asked me if there
13 was test, procedure, protocol that
14 could -- could -- could be used to
15 determine if something -- somebody
16 has a lymphoma, what the cause of
17 lymphoma is.
18 BY MR. KRISTAL:
19    Q.   Right.
20    A.   In a Helicobacter
21 pylori-induced lymphoma or the other
22 bacterially induced lymphomas, I do think
23 there is a procedure or protocol by which
24 you can tell the cause.  That is, you

Michael L. Grossbard, M.D.

Page 82

1 identify the presence of the antibody to
2 that bacterial organism. You then treat
3 with antibiotics, and the lymphoma goes
4 away. That is a cause for the lymphoma.
5    Q. Okay. So let me just see if
6 I can follow up with what you're saying.
7       In that particular situation
8 where there is a lymphoma that is caused
9 by a bacteria, you could look to see if
10 the body has an antigen to that bacteria,
11 treat the bacteria, and if the treatment
12 to treat the bacteria is successful, and
13 the cancer goes away, you would say that
14 caused the lymphoma?
15    A. I would.
16    Q. Okay. And you certainly --
17 well, maybe not certainly. You certainly
18 have attributed H. pylori to the cause of
19 an individual's lymphoma without such a
20 test, correct?
21    A. Yes, but -- but I don't
22 think that they are ever independent of
23 one another. That is, you have the
24 lymphoma, your Helicobacter pylori

Page 83

1 positive, and you treat it.
2       If it -- if it didn't go
3 away -- and in the vast majority of cases
4 they do go away. If it didn't go away,
5 then I could not say that it was a
6 Helicobacter pylori-driven lymphoma.
7    Q. So unless you treat the H.
8 pylori and it goes away, you would say
9 that the H. pylori in that particular
10 person didn't cause or contribute to the
11 development of lymphoma?
12    A. I couldn't say definitively
13 in that setting.
14    Q. Okay. All of my questions
15 that I'm asking you about your opinions
16 are to a reasonable degree of
17 certainty -- certainty, whether something
18 is more likely than not. Okay. I'm not
19 asking you for certainty. Are you with
20 me?
21       MR. SLONIM: Objection.
22 BY MR. KRISTAL:
23    Q. Maybe I should have said
24 that earlier.

Page 84

1       Do you understand what more
2 likely than not means?
3    A. I do.
4    Q. Okay. Meaning the nose of
5 the football crosses the 50-yard line,
6 it's more likely than not?
7       MR. SLONIM: Objection.
8       THE WITNESS: It's more
9    likely than not what? That wasn't
10    a full -- that wasn't a full
11    sentence. If the nose of the
12    football crosses the 50-yard line,
13    it's more likely than not what?
14 BY MR. KRISTAL:
15    Q. My point is to be more
16 likely than not, something just has to be
17 more than 50 percent.
18    A. Agreed.
19    Q. Okay. That was my point.
20       So I want to turn this
21 around so we can start so the jury, or
22 whoever may be looking at this or not,
23 can see the video. It's going to play
24 the section.

Page 85

1       MR. SLONIM: You're going to
2 play the exact same clip?
3       MR. KRISTAL: Exact same
4    clip.
5       (Video playback.)
6            - - -
7       DR. GROSSBARD: Who gets
8 lymphoma? And I probably put my
9 question backwards, put my
10 question before the fact. But
11 that's all right.
12       So anyone. I mean, everyone
13 is in some way a candidate to get
14 lymphoma. That's not to make
15 everybody here feel real badly.
16 It just strikes across a broad
17 patient population.
18       So there are some risk
19 factors. People who are older are
20 more at risk of lymphoma. Men are
21 at a little bit more at risk than
22 women. Caucasians are at a bit
23 more at risk than African
24 Americans and Asians.

Michael L. Grossbard, M.D.

Page 86

1    There are exposures, toxins,
2  pesticide exposure.  One example
3  is Agent Orange exposure to people
4  who are exposed during the Vietnam
5  War.  There was an excess of
6  lymphomas in those patients.
7  Radiation exposure.  There was a
8  higher incidence of lymphoma in
9  atomic bomb survivors.
10    And then you can see that
11  sometimes there's a secondary
12  cancer after you get radiation as
13  a therapy.
14    And then it's also seen in
15  patients who have immune system
16  deficiencies, for example,
17  patients with AIDS, acquired
18  immunodeficiency syndrome, and
19  transplant -- organ transplant,
20  like a transplant of a liver or a
21  kidney, when your immune system is
22  suppressed.
23    People who have autoimmune
24  disease, disease like lupus or

Page 87

1  rheumatoid arthritis, are more
2  susceptible.
3    And then, unlike many
4  cancers, or perhaps unknown about
5  cancers, is there are infections
6  that can cause lymphoma because
7  they cause a stimulation in the
8  immune system chronically, and it
9  can lead to the development of
10  lymphoma.
11    There's a bacteria called
12  Helicobacter pylori that can cause
13  lymphomas in the stomach.
14  Hepatitis C and HIV can cause
15  lymphoma.
16    Borrelia burgdorferi, which
17  is the organism that causes Lyme
18  disease, which I'm sure everybody
19  is familiar with, where you get
20  joint pains when you get bit by a
21  tick, that can cause a lymphoma of
22  the skin.
23    And then there's another
24  kind of organism called Chlamydia

Page 88

1  that can give you lymphomas
2  involving the eye, the orbit.
3    So some of these are truly
4  bacterial infections.  And in some
5  of these cases, you can treat the
6  bacterial infection, like in a
7  lymphoma of the stomach, never
8  have to give chemotherapy, never
9  have to give radiation therapy.
10    And by reversing that
11  chronic infectious immune
12  stimulation, you can actually have
13  the lymphoma regress completely.
14    (End video playback.)
15  BY MR. KRISTAL:
16    Q.  The reason that we played
17  this video was because you had earlier
18  said that you did not consider Agent
19  Orange to be a risk factor for
20  non-Hodgkin lymphoma.
21    MR. SLONIM:  Objection.
22  Form.
23  BY MR. KRISTAL:
24    Q.  You did say that, correct?

Page 89

1    A.  That's true.
2    Q.  Okay.  So which is it?  In
3  2014, to this audience, whether it was
4  grand rounds and physicians were in the
5  audience, or whether it was some other
6  event where there might have been more
7  general members of the public, you said
8  Agent Orange was a risk factor.  And here
9  you said it wasn't.
10    A.  Correct.
11    Q.  So which one is it?
12    A.  It's the one that I just
13  stated to you, 2014 is six years ago.  In
14  the context of this case and Mr. Sanders'
15  exposure to Agent Orange, I looked up the
16  literature on Agent Orange because it
17  would have been very easy for me if I
18  could find a direct cause for his
19  lymphoma, something that I could say
20  something that contributed substantially,
21  there's no way they had any other cause
22  of his lymphoma would have made it very
23  easy for me to have an answer to this
24  case, as to why he has lymphoma.

Michael L. Grossbard, M.D.

Page 90

1   When I looked up the
2 literature I could come to no such
3 conclusion.  So opinions change based
4 upon literature that's available and
5 other information that's available.
6   Q.   Okay.  So let me see if I'm
7 understanding.  Are you saying that
8 sometime after you gave this talk in
9 2014, and up until the point that you
10 were doing research on Mr. Sanders' case,
11 which would have been a month or so ago,
12 there were some literature on Agent
13 Orange that made you change your opinion?
14 Is that what you're telling us?
15   A.   I don't think I'd given a
16 careful enough reasoning -- reading to
17 the literature in 2014.
18   Q.   So you're saying that it's
19 not something that occurred since 2014;
20 it's just a reevaluation of the evidence?
21   A.   That's correct.
22   Q.   So what you told this
23 audience of either doctors or the general
24 public at the time was not correct.  Is

Page 91

1 that what you're saying?
2   A.   It would be incorrect.
3   Q.   In any event, you do not
4 believe that Mr. Sanders' Agent Orange
5 exposure when he was in Vietnam
6 contributed or caused his particular
7 non-Hodgkin lymphoma, correct?
8   A.   I do not.
9   Q.   Are you familiar with the
10 term "modifiable risk factor"?
11   A.   I mean, I can -- I can
12 assume -- I'll tell you what I think it
13 means, and you can tell me if that's what
14 you mean.
15   Q.   Okay.
16   A.   That would be some risk
17 factor that you have that's associated
18 with a disease that you can change.  So
19 smoking would be a modifiable risk factor
20 for lung cancer.  You can stop smoking.
21   Q.   Exactly.  That's how I'm
22 using the term.
23   Something like your genetic
24 makeup unless we come to the point where

Page 92

1 you can modify your genetic makeup, is
2 not a modifiable risk factor.  Is that
3 fair to say?
4   A.   Not in the United States
5 right now, but in other countries, I'm
6 afraid.  But correct.
7   Q.   Well, we've done it with
8 plants.  Maybe we're going to start doing
9 it with people.
10   MR. SLONIM:  Objection.
11 BY MR. KRISTAL:
12   Q.   But you're aware that
13 Monsanto has modified the genes of
14 certain crops to be resistant to Roundup,
15 right?  That's not a secret.
16   MR. SLONIM:  Objection.
17   THE WITNESS:  I am aware.
18 BY MR. KRISTAL:
19   Q.   Okay.  Do you agree that the
20 more risk factors a person has for
21 non-Hodgkin lymphoma, the greater the
22 risk of getting non-Hodgkin lymphoma?
23   A.   Not necessarily.  I'm not
24 sure that risk factors work in a

Page 93

1 cumulative sense.
2   Q.   Well, so, if somebody had
3 radiation exposure, exposure to
4 malathion, Helicobacter pylori infection,
5 immunosuppressive, Hep C, HIV, you don't
6 think they're at a greater risk than if
7 someone only had one of those risk
8 factors?
9   MR. SLONIM:  Objection.
10 Form.
11   THE WITNESS:  That
12 particular aggregation of multiple
13 risk factors, I think, would place
14 someone at higher risk, yes.
15 BY MR. KRISTAL:
16   Q.   Well, that's what I'm
17 asking.  The more risk factors you have,
18 the greater the risk you have of getting
19 NHL?
20   MR. SLONIM:  Objection.
21 BY MR. KRISTAL:
22   Q.   Generally speaking.
23   A.   I'm sure I could think of
24 exceptions, but generally speaking that's

Michael L. Grossbard, M.D.

Page 94

1 probably true.
2 Q. Okay. Can you think of a
3 situation where the more risk factors you
4 have, the lower the risk would be to NHL?
5 A. Not off the top of my head,
6 no.
7 Q. And I know you said this
8 earlier in stating your understanding of
9 a modifiable risk factor, is the reason
10 it's modifiable is you can change your
11 exposure to that risk factor, right? You
12 can modify it?
13 A. Correct.
14 Q. Okay. So for example, I
15 would imagine, if someone comes in to you
16 and gives you a large pack year history,
17 or any history of smoking, you would
18 advise them to modify that risk factor by
19 cutting back or stopping smoking
20 entirely?
21 A. That is true.
22 Q. Do you agree that in order
23 for someone to modify a risk factor for
24 NHL, they first have to know that it's a

Page 95

1 risk factor?
2 MR. SLONIM: Objection.
3 THE WITNESS: If they are
4 going to intentionally set out to
5 do it, yes.
6 BY MR. KRISTAL:
7 Q. And if a person has
8 knowledge that a certain exposure is a
9 risk factor, they can then make a
10 decision whether or not they want to
11 reduce that risk factor, correct?
12 MR. SLONIM: Objection.
13 THE WITNESS: I think that's
14 true.
15 BY MR. KRISTAL:
16 Q. Or they can completely
17 eliminate the exposure, right?
18 A. They can certainly try.
19 Q. And thereby lower their
20 risk?
21 A. Potentially, yes.
22 Q. Have you ever done work for
23 the tobacco industry?
24 A. I don't believe so, no.

Page 96

1 Q. Before the Roundup
2 litigation, have you ever done work for
3 Monsanto?
4 A. I don't believe so, no.
5 Q. Okay. When were you first
6 asked to get involved? I know that the
7 Sanders case that we're here on, and
8 later today, the Alvarez Calderon cases
9 are not your first cases. The first two
10 cases were Hardeman, H-A-R-D-E-M-A-N, and
11 Gebeyehou, G-E-B-E-Y-E-H-O-U.
12 A. That's correct.
13 Q. All right. When were you
14 first contacted about whether or not you
15 wished to get involved in Roundup
16 litigation, approximately?
17 A. I would say spring or summer
18 of 2018.
19 Q. And what were the
20 circumstances that you were approached?
21 MR. SLONIM: So I'm going to
22 instruct the witness. Insofar as
23 that might call for the substance
24 of communications with counsel,

Page 97

1 that's privileged, and you
2 shouldn't -- you're instructed not
3 to answer.
4 Insofar as you can respond
5 to the question without disclosing
6 the substance of the
7 communications with counsel,
8 you're free to do so.
9 MR. KRISTAL: Yeah, let me
10 make it easier. I don't -- I
11 could fuss with you a little bit
12 over that, but it's no real
13 necessity to do that.
14 BY MR. KRISTAL:
15 Q. Who was the first person
16 that contacted you?
17 A. That, I believe, was
18 Mr. Slonim.
19 Q. And had you met before?
20 A. I did know him from before,
21 yes.
22 Q. And how did you know him?
23 A. We had worked previously, or
24 I had worked together with him and others

Michael L. Grossbard, M.D.

Page 98

1 on some litigation related to hormone
2 replacement therapy.
3     Q.   Okay.  The HRT cases?
4     A.   Correct.
5     Q.   Okay.  And were you
6 designated -- who was the defendant in
7 that case?  That was -- I'm blanking on
8 it.  Do you remember who the company was?
9     A.   I don't now.  Sorry.
10     Q.   Okay.  That's fair enough.
11         Did you testify in the HRT
12 litigation, either by deposition or
13 trial?
14     A.   I testified at deposition.
15     Q.   Okay.  And was your role in
16 that litigation similar to your role
17 here, to evaluate a person's medical
18 history and their use of hormone
19 replacement and render an opinion on
20 causation?
21     A.   That would be true.
22     Q.   Okay.  And what years were
23 that?  That would have been, five, six,
24 eight years ago?

Page 99

1     A.   Yeah, it was prior to 2014.
2 And I only remember that because I moved
3 to a new position at NYU in 2014.  I do
4 not remember doing any of that in --
5 after I moved to NYU.  2012, 2013, maybe.
6     Q.   Who or what is Perkins Coie,
7 C-O-I-E?
8     A.   I don't know.
9     Q.   You have no idea what that
10 law firm is?
11     A.   It's a law firm.  But I
12 don't -- I don't remember anything else,
13 no.
14     Q.   When you say you don't
15 remember anything else, did you have some
16 sort of relationship with them?
17     A.   Boy.  Not that I recall.
18     Q.   Let me show you a document.
19 You were at what became the Icahn,
20 I-C-A-H-N, School of Medicine at Mount
21 Sinai for a period of time after the
22 merger between Roosevelt and Beth Israel?
23     A.   That is true.
24     Q.   And at that facility, there

Page 100

1 is a requirement that you disclose sort
2 of outside company involvement, so to
3 speak?
4     A.   Yes.
5     Q.   Let me mark this as
6 Exhibit 3.
7         (Document marked for
8         identification as Exhibit
9         Grossbard-3.)
10 BY MR. KRISTAL:
11     Q.   This is the document that
12 has the Icahn School of Medicine at Mount
13 Sinai logo.  It says, "Michael Grossbard,
14 M.D., professor of medicine, hematology
15 and medical oncology."
16         That would be you?
17     A.   It would be.
18     Q.   Okay.  And then it has,
19 "Industry relationships."  And under
20 consulting it says Perkins Coie, C-O-I-E,
21 LLP, right?
22     A.   Mm-hmm.
23     Q.   As --
24     A.   Yes, sorry.

Page 101

1     Q.   -- somebody who you had
2 reported a relationship with during 2018
3 and/or 2019?
4     A.   Well, that would be
5 impossible though, because I haven't been
6 at Mount Sinai since 2014.  So I don't
7 know how I would have reported anything.
8 And I don't recall any relationship -- I
9 know the name.  I don't remember what I
10 did with them.  And I -- it certainly
11 wasn't in 2018 or 2019.
12     Q.   How were you contacted in
13 terms of getting involved?  Was it a
14 phone call, an e-mail to set up a
15 meeting?  How did that work?
16     A.   I think it was a phone call,
17 but I don't remember.
18     Q.   Okay.  I don't want to know
19 what was said or told to you.  But what
20 did you do or not do as a result of that
21 first phone call?
22     A.   I'm not sure how to answer
23 that question, not because I'm trying to
24 be difficult, but when you say --

Michael L. Grossbard, M.D.

Page 102

1  Q.  You get a phone call --
2  A.  I don't want to -- I don't
3  want to --
4  Q.  No.  You get a phone call.
5  Somebody says something about Roundup.
6  Do you want to get involved.  What did
7  you do next?  Did you say, "No, thank
8  you"?  Did you say, "I want to check into
9  Monsanto"?  Did you say "I want to" -- I
10  don't know.  I'm just hypothesizing what
11  your reaction is.
12  MR. SLONIM:  So --
13  BY MR. KRISTAL:
14  Q.  Not in terms of what you
15  said to counsel, what you did after the
16  fact.
17  MR. SLONIM:  Insofar as you
18  can answer the question without
19  disclosing the substance of any
20  communications with counsel, you
21  can answer.  Just bear that in
22  mind.
23  BY MR. KRISTAL:
24  Q.  Yeah, it's a rule that

Page 103

1  applies to experts and lawyers.  So I'm
2  not asking you what the --
3  A.  Yeah.
4  Q.  -- two of you actually said
5  to each other.  I just want to know,
6  after you hung up the phone, what was the
7  next step?
8  A.  I said we would meet and
9  discuss things.
10  Q.  Okay.  And did you meet and
11  discuss things?
12  A.  We did.
13  Q.  And who did you meet with,
14  and where did you meet?
15  A.  It was in my office.  It was
16  with Mr. Slonim and with Julie DuPont.  I
17  don't believe anybody else was there.
18  Q.  Okay.  And how long did you
19  meet with Mr. Slonim -- Slonim and
20  Ms. DuPont?
21  A.  Again, I don't remember.
22  Let's say between 30 minutes and an hour.
23  Q.  Okay.  Then what happened in
24  terms of what you did or didn't do

Page 104

1  afterwards?
2  A.  At that point I provided --
3  well, I mean, I provided some general
4  information about lymphoma.
5  MR. SLONIM:  I'm --
6  THE WITNESS:  I'm not -- I
7  mean --
8  MR. KRISTAL:  I'm not asking
9  that.  And I don't want you
10  instructing.
11  BY MR. KRISTAL:
12  Q.  I don't want to know what
13  you said to the lawyers.  I don't want to
14  know what the lawyers said to you.  I'm
15  talking about after the meeting ended,
16  whatever you discussed, whatever you said
17  or didn't say.
18  MR. SLONIM:  Any
19  communications, the substance of
20  any communications, information,
21  anything like that, that either
22  originated from the lawyers and
23  went to you or originated from you
24  or went to the lawyers, the

Page 105

1  substance of that, is off limits.
2  That's protected.
3  If he wants to know about
4  information about who, what, when,
5  where, that's fine.  The substance
6  is off limits.
7  THE WITNESS:  Next step, we
8  met again about a month, six weeks
9  later.
10  BY MR. KRISTAL:
11  Q.  Okay.  Between the time that
12  the first meeting ended in person and you
13  met again sometime later, did you
14  personally do anything involving Roundup
15  or glyphosate?
16  A.  Not to my recollection, no.
17  Q.  No, you didn't do any
18  research?  You didn't read anything,
19  study anything?
20  A.  Specifically on glyphosate,
21  I don't believe so, no.
22  Q.  How about pesticides in
23  general?
24  A.  No pesticides.

Michael L. Grossbard, M.D.

Page 106

1    Q.   Roundup?
2    A.   No.
3    Q.   Were you aware of the
4  Roundup litigation at the time that you
5  got the first call?
6    A.   I believe I was.  But I
7  can't -- I can't recall dates like that.
8    Q.   Were you aware of the
9  International Agency for Research on
10  Cancer's evaluation of glyphosate in 2015
11  before you had the phone call with
12  Mr. Slonim?
13    A.   I can't remember.  I was not
14  aware in the year 2015.  That, I can tell
15  you for sure.
16        When I became aware, I don't
17  know if it was after or before my phone
18  call with him.
19    Q.   You certainly would agree
20  that the International Agency for
21  Research on Cancer is a well respected
22  authority in the field of what does and
23  doesn't cause cancer?  Not that you agree
24  with them all the time.

Page 107

1        MR. SLONIM:  Objection.
2        THE WITNESS:  They are one
3    of many authorities that is
4    respected, yes.
5  BY MR. KRISTAL:
6    Q.   Okay.  And for example in
7  your report, you have a citation to the
8  American Cancer Society website, correct?
9    A.   I have to go back and look
10  at it.
11    Q.   On Page 5.  There's a blue
12  https link?
13    A.   Yes, correct.
14       (Document marked for
15       identification as Exhibit
16       Grossbard-4.)
17  BY MR. KRISTAL:
18    Q.   I'm going to mark as
19  Exhibit 4, some pages from the American
20  Cancer Society website.
21        If you look down at the
22  bottom, it's certainly the same website
23  link, except it's a different specific
24  link.

Page 108

1        Do you see that?
2    A.   Sure.  Yes.
3    Q.   Okay.  And the American
4  Cancer Society -- take your time if you
5  want to look at this for a second, a
6  minute, however long you need.
7    A.   Okay.  I didn't read
8  anything -- yeah, but --
9    Q.   No, and --
10    A.   -- if you have some -- if
11  you have some questions, sure.
12    Q.   That's great.  Okay.  And at
13  any time if I show you a document, you
14  can sort of look at it quickly and
15  familiarize yourself.  And if I ask a
16  question, you need to dive in deeply
17  before answering, then obviously that's
18  what you should do.
19    A.   Sure.
20    Q.   So the title of this has the
21  American Cancer Society logo.  And the
22  title is "Determining if something is a
23  carcinogen.  What is a carcinogen?"
24  That's how it starts?

Page 109

1    A.   Yes.
2    Q.   And the definition here is,
3  "Substances and exposures that can lead
4  to cancer are called carcinogens."
5        I assume you agree with
6  that?
7    A.   I do.
8    Q.   "In general, the American
9  Cancer Society does not determine if
10  something causes cancer, that is, if it
11  is a carcinogen, but we do look to other
12  respected organizations for help with
13  this."
14        Do you see that?
15    A.   I do see that.
16    Q.   And one of the -- if you
17  turn to Page 4 of 8.  There's a section
18  entitled -- called, "Who determines how
19  carcinogens are classified?  Several
20  national and international agencies
21  review the available evidence to try to
22  determine the cancer-causing potential of
23  different substances.
24        "International Agency for

Michael L. Grossbard, M.D.

Page 110

1 Research on Cancer, IARC.  The
2 International Agency for Research on
3 Cancer is part of the World Health
4 Organization.  One of its major goals is
5 to identify causes of cancer.  The most
6 widely used system for classifying
7 carcinogens comes from the IARC."
8         Do you agree with that, that
9 the most widely used system for
10 classifying carcinogens comes from IARC?
11     A.   I have no reason to disagree
12 with it.
13     Q.   Okay.  And have you in the
14 past, when you are trying to evaluate
15 whether a substance is a carcinogen, gone
16 to see, as part of your review, what IARC
17 has said about that carcinogen, if they
18 have in fact evaluated it?
19     A.   That is one of the pieces of
20 evidence that I use, yes.
21     Q.   If you look at Page 2 of 8.
22 Just want to ask you this.
23     A.   It's on Page 2?
24     Q.   Okay.  Yes, sir.  In the

Page 111

1 middle of the page.
2     A.   Yeah.
3     Q.   There's a paragraph that
4 starts, "Substances labeled as
5 carcinogens can have different levels of
6 cancer-causing potential."
7         Do you see that?
8     A.   I do.
9     Q.   All right.  Let me read
10 that, and then I'm going to ask you about
11 the last sentence.
12         "Some might increase cancer
13 risk after only a short exposure, but
14 others might only cause cancer after
15 prolonged high levels of exposure.  And
16 for any particular person, the risk of
17 developing cancer depends on many
18 factors, including how they are exposed
19 to a carcinogen, the length and intensity
20 of the exposure, and the person's genetic
21 makeup."
22         Do you see that?
23     A.   I do.
24     Q.   And do you agree with that

Page 112

1 last sentence that I read?
2     A.   Sure.  Those aren't the only
3 factors, but I would agree those are
4 factors.
5     Q.   Okay.  And when it says that
6 one of the factors for any particular
7 person is that person's genetic makeup,
8 is that what is known as individual
9 susceptibility?
10     A.   Again, I don't know that a
11 specific -- I don't have a specific
12 definition of individual susceptibility
13 in mind.  But to me it would be how
14 susceptible a given -- I'm being be
15 redundant.
16         I understand -- how
17 susceptible an individual is, so yeah, I
18 think that would probably go into that.
19     Q.   So just following up on
20 that --
21     A.   So susceptibility --
22     Q.   Okay.
23     A.   -- would not only include
24 the genetic makeup.  It would include how

Page 113

1 they process or absorb something, which I
2 guess is part of their genetic makeup
3 too, as far as their metabolism.  That's
4 true.  But yes, there are -- that's
5 part -- that's part of the factors that
6 go into it.
7     Q.   And as part of the factors
8 that go into whether or not someone
9 actually gets cancer from a particular
10 exposure, for example, some people may
11 get a cancer after a much shorter
12 exposure than someone else because of
13 their individual makeup.  Is that fair to
14 say?
15     A.   That's theoretically
16 possible, yes.
17     Q.   And we've also heard of, you
18 know, granny who smoked three packs of
19 cigarettes a day for 60 years and never
20 got hung cancer or any other sequelae of
21 cigarette smoking, right?
22     A.   That is true.
23     Q.   And that would be in essence
24 based on her particular genetic makeup,

Michael L. Grossbard, M.D.

Page 114

1 in part?
2      A.   Potentially, yes.
3           (Document marked for
4      identification as Exhibit
5      Grossbard-5.)
6 BY MR. KRISTAL:
7      Q.   I'm going to mark as
8 Exhibit 5 -- this is another page from
9 the American -- set of pages from the
10 American Cancer Society.  If you look
11 down at the bottom, just confirm that
12 that's the same website that you cited in
13 your report, different particular link.
14 This one is called "Known and probable
15 human carcinogens."
16     A.   Yes, it's from the same
17 www.cancer.org website.
18     Q.   And in this -- without going
19 through the entire thing, this again is
20 stating that, in part, the American
21 Cancer Society relies on IARC's
22 evaluation to make a determine whether
23 something is or isn't a carcinogen.  I
24 can read more detail if you want.  But

Page 115

1 I'm just asking if reading it, that's a
2 fair summary?
3      A.   I mean, this is -- this
4 document appears to have a list of agents
5 that are carcinogens, probably more as
6 you go further.  But that's one of the
7 things.  And they do say that they derive
8 that from IARC and NTP.
9      Q.   Right.  And it could be one
10 or the other, they say, right?
11     A.   That is correct.
12     Q.   It doesn't have to be on
13 both IARC or the National Toxicology
14 Program list?
15     A.   That looks to be correct,
16 yes.
17     Q.   But American Cancer Society
18 is telling the public, who may go to this
19 website, that IARC is one of the agencies
20 that they rely on to determine what does
21 or doesn't cause cancer?
22     A.   They are saying that, yes.
23     Q.   And here they list the
24 probable and known substances.  And if

Page 116

1 you turn to Page 11 of 21, this lists
2 glyphosate as a probable human carcinogen
3 as determined by IARC, correct?
4      A.   Yes, that is on that page,
5 and that is IARC determination.
6      Q.   And you just have a
7 reasonable scientific disagreement with
8 IARC's determination.  Is that fair?
9           MR. SLONIM:  Objection.
10          THE WITNESS:  Correct.
11     Although IARC uses specific
12     classifying criteria that they
13     use, and I may not use those same
14     criteria, nor may other people use
15     those same criteria to evaluate.
16 BY MR. KRISTAL:
17     Q.   Okay.  Do you agree that
18 IARC looks in part at the epidemiology,
19 the human studies?
20     A.   I do.
21     Q.   In part, IARC looks at
22 experimental studies using animals?
23     A.   I agree with that.
24     Q.   In part, IARC looks at the

Page 117

1 mechanism of action, the genotoxicity, so
2 to speak.
3      A.   I agree.
4      Q.   And in part, IARC looks at
5 exposures to the substance?
6      A.   Correct.  I agree.
7      Q.   Do you do anything
8 differently in your evaluation in terms
9 of the type of evidence you're looking at
10 to arrive at your opinion?
11     A.   I would not say that I use
12 different types of evidence.
13     Q.   Okay.  You can evaluate it
14 differently perhaps.  But that's a fairly
15 general methodology for evaluating
16 whether something is or isn't a
17 carcinogen?
18     A.   Those would all be
19 important.  I think we then throw in --
20 maybe you did -- bacterial studies to
21 look at if something's a mutagen.  That's
22 also something that IARC looks at.
23     Q.   I put that under
24 genotoxicity --

Michael L. Grossbard, M.D.

Page 118

1     A.   Okay.
2     Q.   -- meaning mechanism of
3 action.
4     A.   Sorry.  Yes.  Okay.  Sure.
5     Q.   You cite in your report to a
6 classic oncology text, DeVita?
7     A.   Yes.
8     Q.   Okay.  And is that a
9 textbook that you have referred to in
10 your career, outside of litigation?
11     A.   Have I used that text
12 before?
13     Q.   Yes.
14     A.   Yes.
15     Q.   Okay.  In your report, you
16 reference the 2015 volume.  You're aware
17 that 2019 volume is out, right?
18     A.   I'm probably not aware.
19     Q.   Okay.  Let me just show you
20 a chapter on chemical factors.
21         Do you know Karen Jacobson,
22 by the way, while I'm -- Dr. Jacobson,
23 who wrote -- who was a co-author on the
24 non-Hodgkin lymphoma chapter in DeVita?

Page 119

1     A.   I know who she is.  I don't
2 know her personally.
3     Q.   Certainly she has a good
4 professional reputation?
5     A.   I'm sure.  I honestly don't
6 know enough to comment on her reputation.
7     Q.   One way or the other?
8     A.   Yeah.
9     Q.   Do you know that she's also
10 a great person?
11         MR. SLONIM:  Objection,
12 Counsel.  Come on.
13         THE WITNESS:  She's also a
14 great person?  I don't know her.
15         MR. SLONIM:  That's an --
16 that's an improper question.
17 BY MR. KRISTAL:
18     Q.   I know she might read this
19 transcript, so I had to ask that.
20     A.   My answer is the same.  I
21 don't know her.
22         MR. SLONIM:  Okay.  Let's --
23 I don't think -- I don't think
24 it's necessary to comment on

Page 120

1 somebody's personality.
2         MR. KRISTAL:  I was digging
3 in that in a serious manner, you'd
4 be absolutely right.  But I'm not.
5         (Document marked for
6 identification as Exhibit
7 Grossbard-6.)
8 BY MR. KRISTAL:
9     Q.   Looking at Exhibit 6, a
10 portion of DeVita, Hellman, and
11 Rosenberg's Cancer Principles & Practice
12 of Oncology, 11th Edition.  And this is
13 2019.
14         We can turn to the page
15 after the photos.  It's got the copyright
16 page.  Sixth page in.
17     A.   Yes.
18     Q.   Okay.  It is 2019, 11th
19 edition?
20     A.   That's what it says, yes.
21     Q.   And there is a chapter in
22 prior versions of DeVita's cancer text on
23 chemical factors, which in this edition
24 is Chapter 9.  Do you recall that?

Page 121

1     A.   I don't.
2     Q.   Okay.  This chapter, Chapter
3 9, Chemical Factors, was written by
4 Amanda K. Ashley and Christopher J. Kemp.
5 Do you know either one of them?
6     A.   I do not.
7     Q.   Okay.  And the introduction
8 to this chapter reads, "It is convenient
9 to divide the causation of cancer into
10 two categories, genetic susceptibility
11 versus environmental exposure."
12         Is that a convenient
13 division in oncology, not necessarily the
14 only way?
15     A.   That is one way to divide
16 it, yes.
17     Q.   Okay.  And in this
18 particular sentence, the environmental
19 exposures would be what we had referred
20 to earlier as a modifiable exposure,
21 correct?
22     A.   I believe so.
23     Q.   All right.  "In this chapter
24 we focus on chemical factors in the

Page 122

1 etiology of cancer with the understanding
2 that genetic predisposition and
3 environmental exposure interact to
4 ultimately dictate cancer risk."
5       Do you agree with that, that
6 environmental exposure and genetic
7 predisposition interact to ultimately
8 dictate cancer risk?
9     A.   Sure.  Those aren't the only
10 two factors, but they certainly do
11 interact.
12    Q.   Okay.  And in that sentence,
13 the word "etiology," E-T-I-O-L-O-G-Y,
14 means cause, correct?
15    A.   That's true, yes.
16    Q.   All right.  And on the next
17 page, there's a heading, "Determining
18 Carcinogenicity."
19       Do you see that?
20    A.   I do see that.
21    Q.   And what's listed there
22 first is the "International Agency for
23 Research on Cancer monographs on the
24 evaluation of carcinogenic risk to

Page 123

1 humans," correct?
2     A.   Correct.
3     Q.   So is this text used to
4 teach medical students or is it used post
5 medical school by doctors?
6     A.   Ordinarily used post medical
7 school.
8     Q.   Okay.  So this is practicing
9 doctors who are in the field of cancer
10 medicine, would be the audience, so to
11 speak, for this book?
12    A.   It would be the primary
13 audience, yes.
14    Q.   And this primary audience is
15 being told in this chapter on determining
16 carcinogenicity, that one of the agencies
17 to look to is the International Agency
18 for Research on Cancer, correct?
19    A.   It appears that way.  Though
20 I'm not really reading any of this.  But
21 it appears that way.
22    Q.   Okay.  I don't want you to
23 answer a question -- take your time.
24 Read it.  It's -- you can read the first

Page 124

1 couple of paragraphs.  It then segues on
2 the next page to the National Toxicology
3 Program.  It's only two or three
4 paragraphs.
5     A.   Okay.
6     Q.   So I just want to -- in the
7 middle of the first paragraph --
8       MR. SLONIM:  What page are
9 you on, please?
10      MR. KRISTAL:  It's the page
11 "Determining Carcinogenicity" that
12 Dr. Grossbard was reading.
13      MR. SLONIM:  So I guess
14 these pages are not numbered, at
15 least on my copy.
16      MR. KRISTAL:  I guess so.  I
17 don't know why they're not
18 numbered.  That doesn't make any
19 sense.
20      MR. SLONIM:  Okay.  But just
21 so we're clear on the record, so
22 you're on the -- it says
23 "Determining Carcinogenicity," in
24 red.

Page 125

1       MR. KRISTAL:  Right.
2       MR. SLONIM:  And underneath
3 that it says, "International
4 Agency for Research on Cancer."
5       And then where are you?
6       MR. KRISTAL:  I'm in the
7 middle of the first paragraph
8 towards the right.  The sentence
9 that begins, "Since 1971."
10      THE WITNESS:  Okay.  I have
11 that.
12 BY MR. KRISTAL:
13    Q.   It says here, since 1971 --
14 and I'm paraphrasing -- more than a
15 thousand agents have been evaluated by
16 IARC.  Is that generally your
17 understanding?
18    A.   That is my general
19 understanding.
20    Q.   Okay.  And then dropping
21 down to the -- you're familiar with the
22 IARC classification in terms of --
23    A.   I am.
24    Q.   -- whether it is a definite

Michael L. Grossbard, M.D.

Page 126

1 carcinogen, probable carcinogen, possible
2 carcinogen, and then below that?
3     A.   Correct.
4     Q.   Okay.  And here in the last
5 paragraph, "According to" -- strike that.
6       You know that Group 1 is
7 agents that are carcinogenic to humans,
8 right, according to the IARC
9 classification?
10    A.   Correct.
11    Q.   And Group 2A, are agents
12 that are probably carcinogens, correct?
13    A.   Correct.
14    Q.   All right.  And it reads
15 here, "According to the IARC, 32 agents
16 used occupationally are classified as
17 Group 1, and 27 additional occupational
18 agents are classified as Group 2A."
19       Do you see that?
20    A.   I do see that.
21    Q.   So if we do simple math,
22 there are only 59 agents used
23 occupationally out of over a thousand
24 that IARC have determined to be either

Page 127

1 Group 1 or Group 2A, right?
2     A.    As it's written in this,
3 yes.  I don't know those 32 agents off
4 the top of my head.  I don't --
5     Q.   No, no, I'm not asking that.
6     A.   I don't know the 47 -- more
7 importantly, I don't know the other 400,
8 as to whether they are occupationally or
9 otherwise.  So I can't give you the exact
10 classification.  This is -- this may be
11 their summary.  This may be IARC's
12 summary.  I don't know.
13    Q.   Okay.  The point is, you
14 don't consider IARC to be a rubber stamp
15 for every agent they evaluate to be
16 considered either a Group 1 carcinogen or
17 a Group 2A probable carcinogen, correct?
18    A.   I don't think the
19 organization is a rubber stamp.  I think
20 they do classify a lot of agents as
21 carcinogens that I may have some question
22 as to their carcinogenicity.
23    Q.   Okay.  And that's just a
24 reasonable scientific disagreement,

Page 128

1 right?
2     A.   I think it's reasonable,
3 yes.
4     Q.   Okay.  I'm done with that,
5 unless you wanted to read other portions.
6 You're welcome to.
7     A.   Well, it's very exciting,
8 but we can move on.
9     Q.   Right.  We could be watching
10 paint dry, right?
11       What did you know about
12 Monsanto before you agreed to do work on
13 their behalf?
14       MR. SLONIM:  Objection.
15 Form.  It's a very broad question.
16       THE WITNESS:  I can answer?
17 BY MR. KRISTAL:
18    Q.   Yeah.
19    A.   Yeah.  Nothing really.
20    Q.   Had you ever heard of
21 Monsanto before you were asked to get
22 involved in this litigation?
23    A.   Yes.
24    Q.   And what was your

Page 129

1 understanding of Monsanto?
2     A.   Now, I might be wrong.  But
3 somewhere in my imagination sits that
4 Monsanto supplied the first Astroturf in
5 Houston.  Do you know if that's true?  I
6 know I'm not supposed to ask you
7 questions.  Don't know if you --
8     Q.   I really don't know.
9     A.   So that -- that's my belief
10 of where I first heard of Monsanto.
11    Q.   Right.  Okay.
12    A.   But I -- maybe I'm making
13 that up.  Well, I'm not making that up.
14 That's where I first heard of them.  I'm
15 making --
16    Q.   Exactly.
17    A.   Yeah.
18    Q.   Well, it matters not whether
19 that is true or not.
20    A.   Yes.
21    Q.   I'm asking your general
22 understanding.
23    A.   That's was -- that's was my
24 belief.  I do also somewhere recall

Michael L. Grossbard, M.D.

Page 130

¹ coming upon data, and it may have been in
² the late press, about genetically
³ modified crops.
⁴        I did not know -- I don't
⁵ believe I knew assistant point that
⁶ Monsanto made Roundup.
⁷    Q.    Did you know what Roundup
⁸ was?
⁹    A.    I had seen it in the --
¹⁰    Q.    Home Depot or Lowe's?
¹¹    A.    -- in the hardware store and
¹² whatnot.  But did I ever use it?  No.
¹³    Q.    You're aware that there have
¹⁴ been trials already in Roundup cases?
¹⁵    A.    Yes, I am.
¹⁶    Q.    I wanted to share with you
¹⁷ some comments that judges have written in
¹⁸ opinions after those trials and ask you
¹⁹ about that.
²⁰        (Document marked for
²¹        identification as Exhibit
²²        Grossbard-7.)
²³ BY MR. KRISTAL:
²⁴    Q.    So marking as Exhibit 7.

Page 131

¹ This is from July of 2019 in the Pilliod
² case, P-I-L-L-I-O-D.  It's the amended
³ order denying motions of defendant for
⁴ JNOV and conditionally granting motions
⁵ of defendant for new trial.
⁶        Do you see that?
⁷    A.    I do see that.
⁸    Q.    And if you turn to the
⁹ second page.  Do you have any
¹⁰ understanding of the three trials that
¹¹ have gone to verdict in Roundup?
¹²    A.    My understanding -- I mean,
¹³ I read about them in the newspaper.
¹⁴ Other than -- other than that, no.  And
¹⁵ of course, the Hardeman case I did look
¹⁶ at records in that one, wrote a report.
¹⁷ But the actual trial itself, no.
¹⁸    Q.    Okay.  You were never called
¹⁹ to testify in Hardeman, correct?
²⁰    A.    I was not.
²¹    Q.    Okay.  But you're aware of
²² the Hardeman verdict?
²³    A.    Yes.
²⁴    Q.    Okay.  And you're -- are you

Page 132

¹ aware in the three trials that, based on
² the evidence that was presented by both
³ sides, the juries, all three of them,
⁴ determined that punitive damages were
⁵ warranted against Monsanto?
⁶        MR. SLONIM:  Objection.
⁷ BY MR. KRISTAL:
⁸    Q.    Were you aware of that?
⁹        MR. SLONIM:  Objection.
¹⁰        THE WITNESS:  I'm not aware
¹¹    of those specifics.
¹² BY MR. KRISTAL:
¹³    Q.    Okay.  Have you ever heard
¹⁴ of the term "punitive damages"?
¹⁵    A.    Yes.
¹⁶    Q.    What's your understanding of
¹⁷ punitive damages?
¹⁸        MR. SLONIM:  Objection.
¹⁹        THE WITNESS:  Again, it's
²⁰    really a lay understanding --
²¹ BY MR. KRISTAL:
²²    Q.    Yeah, that's what I'm
²³ asking.
²⁴    A.    -- in that -- that it's sort

Page 133

¹ of extra -- extra costs or extra damages
² or extra payments that are made as
³ punishment, if you will.  I don't -- I
⁴ don't know beyond that.  That's really my
⁵ definition of punitive.
⁶    Q.    Pretty close.
⁷    A.    Pretty close.  It's what my
⁸ parents did to me when I didn't get an A,
⁹ punitive.
¹⁰    Q.    Exactly.  Exactly.  So you'd
¹¹ work harder and do it better next time.
¹²    A.    Probably not.
¹³    Q.    On Page 3, there's a section
¹⁴ of this opinion, punitive damages.  And
¹⁵ I'm going to read it and ask you a
¹⁶ question about it.
¹⁷        "The claim for punitive
¹⁸ damages required plaintiffs to prove by
¹⁹ clear and convincing evidence that
²⁰ Monsanto committed malice, oppression, or
²¹ fraud.  The Court finds the evidence can
²² support a finding by clear and convincing
²³ evidence that Monsanto committed malice,
²⁴ oppression, or fraud.  The Court

Michael L. Grossbard, M.D.

Page 134

1 addresses punitive damages in the motion
2 for a new trial."
3        Do you see that?
4    A.   I do see that.
5    Q.   Okay.  So is this the first
6 time that you're hearing that the jury --
7        MR. SLONIM:  Counsel, I'm
8    going to object to any questions
9    dealing with judicial opinions.
10    The witness is here as an
11   expert witness to offer testimony
12   about the opinions that he intends
13   to offer and the bases for these
14   opinions.  He's not here to answer
15   questions of law or to respond to
16   judicial opinions.  It's
17   completely improper.
18       MR. KRISTAL:  Well, I think
19   if you give it some time, he's
20   relying on certain articles, for
21   example, that were ghostwritten by
22   Monsanto that were part of the
23   punitive damages.  And I'm going
24   to be asking about whether he

Page 135

1 realizes that.
2        MR. SLONIM:  So -- I'm
3    sorry.
4        MR. KRISTAL:  If he doesn't
5    know that, it may affect his
6    evaluation of those studies.
7        In any event --
8        MR. SLONIM:  So I'm going
9    to -- I'm going to allow a little
10   latitude here.  I think it's
11   completely improper.  But if
12   there's a nexus -- I mean, if you
13   want to ask him questions about
14   articles he read, you can ask him
15   questions about that.
16       To tie it to a judicial
17   opinion that he hasn't looked at,
18   hasn't relied on, he's not a
19   lawyer, it doesn't form a basis
20   for his opinion, the judicial
21   opinion doesn't.
22       If you want to ask him about
23   the article, ask him about the
24   article.  But this is improper.

Page 136

1        I'll allow -- if there's a
2    connection, I'll allow it.  But
3    otherwise, I'm going to stop --
4    I'm going to shut down this line.
5        MR. KRISTAL:  I don't think
6    you have the right to do that.
7    But you'll do what you do.  And
8    I'll do what I do.
9 BY MR. KRISTAL:
10    Q.   Does it matter to you if
11 some of the evidence that you're relying
12 on for your opinion was in fact not
13 written by the authors who are in the
14 article but written by Monsanto?  Does
15 that matter to you?
16    A.   That's a hard question to
17 answer, because it depends on the
18 science.  It depends on whether the
19 authors have taken the responsibility.
20 It depends on the specifics that you're
21 mentioning.
22    Q.   Does it matter to you if
23 Monsanto -- what I've called ghostwrote
24 article and had other authors' name on

Page 137

1 them for the purpose of supporting
2 litigation defense?
3    A.   To answer the question you
4 want me to answer, I've never personally
5 ghostwritten an article.  I have had
6 colleagues that have had ghostwritten
7 articles.  Not necessarily by -- in the
8 kind of setting that you're describing.
9 But I -- whatever I put my name to, I
10 wrote.  So, again, it would depend on the
11 particular paper, the circumstances, et
12 cetera.
13    Q.   Well, you certainly rely on
14 the Greim, G-R-E-I-M, article?
15    A.   That is true.
16    Q.   And you rely on the Kier,
17 K-I-E-R, and Kirkland article?
18    A.   That is true.
19    Q.   Are you aware that those
20 were ghostwritten by Monsanto for
21 purposes of allowing an expert such as
22 yourself to be used in defense of
23 litigation?
24       MR. SLONIM:  Objection.

Page 138

1    THE WITNESS:  I'm not aware
2  of that.
3  BY MR. KRISTAL:
4    Q.   Are you saying that that
5  doesn't matter to you?  I mean, you've
6  been doing cancer work for decades.
7    A.   Correct.
8    Q.   You don't have to work for
9  Monsanto.  You have every right to work
10 or not work.  But does it matter to you
11 what the conduct of the company is that
12 you're working on behalf of?
13    MR. SLONIM:  Objection.
14    THE WITNESS:  I consider
15  myself to be an ethical person.
16    I can't -- I mean, your
17  question is a hard one.  I
18  hadn't -- I hadn't heard that
19  until two seconds ago.  I'd have
20  to read the paper again in that
21  context.  So I don't -- I don't
22  know.
23    If you're asking me do I
24  think it's good if a company is

Page 139

1  unethical in general?  I mean, I'm
2  not sure what -- ask a specific
3  question again.  I'll try to
4  answer it the best I can.
5  BY MR. KRISTAL:
6    Q.   No, I think you answered it
7  the best you can.  There's no trick or
8  something.
9    A.   No, I know there's no trick.
10 I'm just trying to answer your question.
11    Q.   And I think you answered the
12 question.
13    A.   Okay.
14    Q.   Reading from Page 16, second
15 paragraph.  "A defendant's efforts to
16 impede, discourage, or distort scientific
17 inquiry into facts could support an award
18 of punitive damages.  Such efforts would
19 show a conscious disregard for the health
20 of persons exposed to glyphosate by
21 interfering with the creation and
22 publication of scientific information
23 that is directly relevant to public
24 health."

Page 140

1    First of all, do you agree
2  with that?
3    MR. SLONIM:  Objection.
4    THE WITNESS:  Without --
5  without taking Mr. Slonim's words
6  from two minutes ago, I mean, this
7  is to my understanding, a legal
8  document.
9  BY MR. KRISTAL:
10    Q.   Yeah.
11    A.   I'm a little loathe to
12 disagree or agree to any judge's language
13 in any way, shape, or form.
14    Q.   Okay.  But if a company
15 impeded, discouraged, or distorted the
16 scientific inquiry, that would
17 demonstrate a conscious disregard for the
18 health of the persons exposed to that
19 substance, would it not?
20    MR. SLONIM:  Objection.  The
21  expert has no expertise in such
22  determinations.  He's here as a
23  medical witness -- a medical
24  witness and scientist on cancer

Page 141

1  and non-Hodgkin's lymphoma.
2    MR. KRISTAL:  Who was a
3  human being before he became a
4  doctor.
5    MR. SLONIM:  He's not
6  here -- he's not here to offer
7  opinions in regard to ethics,
8  corporate ethics, or any such
9  thing.  That's not his expertise.
10    MR. KRISTAL:  Nor am I
11  asking questions about that.
12    THE WITNESS:  Could you ask
13  your question -- or just repeat
14  it -- however.  Just one more
15  time.
16    MR. KRISTAL:  Sure.
17    (Whereupon, the court
18  reporter read back the requested
19  portion of testimony.)
20    THE WITNESS:  I guess I
21  would have to agree with that
22  statement.
23  BY MR. KRISTAL:
24    Q.   Okay.  And on Page 17, Judge

Michael L. Grossbard, M.D.

Page 142

1 Smith writes, second full paragraph, "In
2 this case, there was clear and convincing
3 evidence that Monsanto made efforts to
4 impede, discourage, or distort scientific
5 inquiry and the resulting science."
6        Is that the first time
7 you're hearing of that notion?
8        MR. SLONIM:  Objection.
9        THE WITNESS:  It is.
10 BY MR. KRISTAL:
11     Q.   Does it make a difference to
12 you?
13     A.   I don't think that's a
14 terrifically good thing.  But does it
15 make a difference in how I interpret the
16 literature?  That, I can't answer to you.
17     Q.   Well, if the company is
18 distorting the literature that you're
19 relying on, doesn't that make a
20 difference?
21     A.   Again, we'd have to go over
22 specific literature and what is
23 distorting and what I'm relying on before
24 I could really answer that question.

Page 143

1        MR. SLONIM:  Okay.  We've
2 been going for about an hour.
3 When you find a convenient time to
4 take a break.
5        MR. KRISTAL:  Take a break
6 now.
7        THE VIDEOGRAPHER:  The time
8 now is 2:10 p.m., and we're off
9 the record.
10        (Short break.)
11        THE VIDEOGRAPHER:  This
12 marks the beginning of Tape Number
13 3.  The time now is 2:21 p.m., and
14 we're back on the record.
15 BY MR. KRISTAL:
16     Q.   In Exhibit 1, your report in
17 the Sanders case, under the materials
18 considered, you list as Entry 42, Greim,
19 G-R-E-I-M, H, the letter H for the first
20 initial, et al.
21        You list that article?
22        MR. SLONIM:  Which reference
23 number was that?
24        MR. KRISTAL:  42.

Page 144

1 BY MR. KRISTAL:
2     Q.   Correct?
3     A.   Yes.
4     Q.   And you would consider --
5 the title is "Evaluation of Carcinogenic
6 Potential of the Herbicide Glyphosate
7 Drawing on Tumor Incidence Data From 14
8 Chronic Carcinogenicity Rodent Studies."
9        Do you see that?
10     A.   Yes.
11     Q.   And that is what is known as
12 a review article?
13     A.   Yes.  They review the 14
14 animal studies and mouse and rat studies
15 in some detail.
16     Q.   So it fair to say, because
17 they're not on your list, you did not
18 yourself read or evaluate the studies
19 that the Greim paper is reviewing?
20     A.   I don't believe that I read
21 the individual studies beyond the data
22 that are included in that article.
23     Q.   Okay.  And you specifically
24 cite to the Greim -- it's one of the few

Page 145

1 articles that you specifically cite to,
2 correct?
3        MR. SLONIM:  Objection.
4        THE WITNESS:  I don't know
5 if I would call it one of the few
6 articles that I specifically cite
7 to.  I cite to a number of
8 articles.  But I do cite to that.
9 BY MR. KRISTAL:
10     Q.   Okay.  In the animal and
11 genotoxicity studies, you cite to the
12 Greim article, correct?
13     A.   That's true.
14     Q.   And then in the genotoxicity
15 of glyphosate section, you cite to an
16 article, Kier and Kirkland.
17        Do you see that?
18     A.   I do see that.
19     Q.   And Kier and Kirkland is
20 another review article, right?
21     A.   Yes, it is.
22     Q.   It's entitled "Review of
23 Genotoxicity Studies of Glyphosate and
24 Glyphosate-Based Formulations."

Michael L. Grossbard, M.D.

Page 146

1          Do you see that?  It's 58 --
2     A.   58, I've got it.  Yes.
3     Q.   Entry 58 --
4     A.   Yes, I do see that.
5     Q.   -- on your materials
6 considered list.
7          I take it as well, because I
8 don't see them on your materials
9 considered list, that you did not review
10 the individual genotoxicity studies that
11 the Kier and Kirkland paper reviewed?
12     A.   I don't remember if they
13 included the Paz-y-Miño study in their --
14 in their report -- in the review or not.
15 Because I did review those, and I did
16 review the Bolognesi study.  And I don't
17 know if those are -- I can't remember
18 whether those were included in that
19 review article.
20     Q.   Okay.  And it's P-A-Z dash Y
21 dash M-I-N-O.  Paz-y-Miño.
22     A.   Oh, sorry.
23     Q.   No, that's not your fault.
24          Other than perhaps those

Page 147

1 two, if they are cited in Kier and
2 Kirkland, you did not read the other
3 genotoxicity studies themselves that were
4 reviewed by Kier and Kirkland?
5     A.   By and large, I would say
6 no.  I would have to look.  But my guess
7 is no.
8          (Document marked for
9          identification as Exhibit
10          Grossbard-8.)
11 BY MR. KRISTAL:
12     Q.   Okay.  I'm going to mark as
13 Exhibit 8.  This is the opinion in the
14 Hardeman case in which you have been
15 designated as an expert but did not
16 testify.
17          Is that right?  You were
18 designated in the Hardeman case?
19     A.   I wrote a report.  I guess
20 that means that I was designated as an
21 expert.
22     Q.   Right.
23     A.   I don't know the legal
24 language there, but...

Page 148

1     Q.   If you go to Page 4, I'm
2 going to read some stuff and ask you a
3 question.
4          "Monsanto raises two
5 challenges to the punitive damages award.
6 One, any award of punitive damages is
7 unsupported by the evidence; and, two,
8 even assuming some award of punitive
9 damages is appropriate, 75 million
10 exceeds the constitutional ceiling set by
11 the due process clause.
12          "Monsanto is wrong on the
13 first point.  Based on the evidence that
14 came in at trial, Monsanto deserves to be
15 punished.  As relevant here, California
16 law provides for an award of punitive
17 damages where the defendant acted with
18 malice, meaning either conduct which was
19 intended by the defendant to cause injury
20 to the plaintiff, or despicable conduct
21 which was carried on by the defendant
22 with a wilful and conscious disregard of
23 the rights of others.
24          "It was reasonable for the

Page 149

1 jury to put Monsanto's behavior in the
2 latter category because the evidence
3 easily supported a conclusion that
4 Monsanto was more concerned with tamping
5 down safety inquiries and manipulating
6 public opinion than it was with ensuring
7 that its product was safe."
8          MR. SLONIM:  Objection.
9 BY MR. KRISTAL:
10     Q.   Okay.  Is that the first
11 time you're hearing this, that it's
12 reasonable for a jury to evaluate
13 Monsanto's behavior based on the evidence
14 as despicable conduct?
15          MR. SLONIM:  Objection.
16          THE WITNESS:  It is.
17 BY MR. KRISTAL:
18     Q.   Okay.  And how does that
19 make you feel?
20          MR. SLONIM:  Objection.
21 That's completely improper.  His
22 feelings -- the witness's feelings
23 are not at issue here.  The
24 witness is testifying as an

Michael L. Grossbard, M.D.

Page 150

1   expert, offering scientific and
2   medical opinions and the bases for
3   those opinions.
4   BY MR. KRISTAL:
5       Q.   Okay.
6       A.   Look, I can't comment on
7   something that I don't know what the
8   despicable conduct is.  I didn't -- I
9   didn't see the trial.  I didn't read
10  transcripts from the trial.
11          I know I wrote a report in
12  this case, and I know that I felt very
13  strongly that ████████████████████
14  ███████████   So I had a firm
15  opinion on this, but I -- beyond that I
16  can't make any comment.
17      Q.   Well, I guess my question
18  was more, how do you feel about working
19  on behalf of such a company, if that's
20  true?
21          MR. SLONIM:  Objection.
22          THE WITNESS:  I don't see
23      myself as working on behalf of a
24      company, if you will.

Page 151

1          I see myself as addressing a
2      scientific question here.
3   BY MR. KRISTAL:
4       Q.   Do you disclose to your
5   patients who have had the misfortune of
6   having been diagnosed with NHL that
7   you're working on behalf of Monsanto in
8   litigation involving Roundup?
9       A.   If it has nothing to do with
10  Roundup, if their lymphoma has nothing to
11  do with Roundup, no.
12      Q.   Okay.  Well, in your
13  opinion, that would never happen?
14      A.   In my opinion that would
15  never happen.  Let me answer you
16  differently then.
17      Q.   Okay.
18      A.   I have in the last two
19  months, for the first time, had three --
20  three patients who came in and said that
21  they were joining in the Roundup suit.
22  That's the first time in my career that
23  anybody has ever said that to me.
24          I did disclose to those

Page 152

1   people that I am working on behalf of --
2   I didn't say Monsanto, but that I am an
3   expert on the side of the case that does
4   not believe that Roundup causes lymphoma.
5       Q.   That's great, because that
6   certainly at least is an appearance of a
7   conflict.  And that's what you're
8   supposed to do is be honest with your
9   patient so they can make a decision,
10  right?
11          MR. SLONIM:  Objection.
12      That is a completely improper,
13      loaded question.
14          MR. KRISTAL:  Loaded
15      question, the answer to which is
16      very supportive of the doctor for
17      having done that.
18  BY MR. KRISTAL:
19      Q.   You can answer the question.
20          MR. SLONIM:  Can --
21  BY MR. KRISTAL:
22      Q.   That's appropriate thing to
23  do, right?
24          MR. SLONIM:  Let's have

Page 153

1   the -- let's have the question
2   read back, please.  I want to -- I
3   want to think --
4          MR. KRISTAL:  I'm praising
5      the doctor in having him agree
6      with that.
7          MR. SLONIM:  I want --
8          MR. KRISTAL:  If you don't
9      want me to ask that, I won't.
10          MR. SLONIM:  Well, if you
11      withdraw it, then I don't need to
12      hear it.
13          MR. KRISTAL:  Okay.  I'll
14      withdraw it.
15  BY MR. KRISTAL:
16      Q.   I assume that you disclosed
17  that because you thought it was the
18  proper thing to do?
19          MR. SLONIM:  Objection.
20          THE WITNESS:  I did.
21  BY MR. KRISTAL:
22      Q.   Okay.  Does NYU Langone have
23  a disclosure of outside consultancy
24  policy?

Page 154

1    A.   They do.
2    Q.   Have you disclosed in that
3 forum that you are an expert on behalf of
4 Monsanto in a Roundup litigation?
5    A.   I didn't say on behalf of
6 Monsanto, but I did -- I expressed that I
7 am involved in litigation.
8    Q.   Okay.
9    A.   So what I --
10    Q.   That's the extent of it?
11    A.   What I need to disclose
12 is --
13    Q.   Right.
14    A.   -- any outside work that I'm
15 doing.
16    Q.   Right.
17    A.   And so I exposed that --
18 exposed -- I --
19    Q.   Disclosed?
20    A.   Disclosed, sorry.
21       -- disclosed that I'm
22 working on this litigation.  I didn't --
23 I don't know that I said the name of the
24 company involved.  I can't -- I can't

Page 155

1 recall.
2    Q.   Okay.
3    A.   Probably if I said anything,
4 I wouldn't have said Monsanto.  I
5 probably would have said Bayer to be
6 entirely honest.
7    Q.   Right.
8    A.   But I don't -- I don't
9 remember.
10    Q.   And that was appropriate to
11 disclose as well, right?
12    A.   Yes.
13    Q.   Because disclosures of
14 potential conflicts of interest is always
15 appropriate, right?
16       MR. SLONIM:  Objection.
17       THE WITNESS:  I believe so.
18 BY MR. KRISTAL:
19    Q.   Of course.
20       MR. KRISTAL:  I didn't think
21 that was controversial.
22       (Document marked for
23 identification as Exhibit
24 Grossbard-9.)

Page 156

1 BY MR. KRISTAL:
2    Q.   Marked as Exhibit 9, this is
3 a document entitled "Spinning Science and
4 Silence Go Scientists:  A Case Study in
5 How the Chemical Industry Attempts to
6 Influence Science."  And it's prepared by
7 the Minority Staff Report for members of
8 the Committee on Science, Space and
9 Technology, U.S. House of
10 Representatives, February 2018.
11       Have you seen this before?
12    A.   I have not.
13    Q.   By the way, have you ever,
14 in your regular practice, gone to the
15 EPA's evaluation of a chemical as to
16 whether or not it's carcinogenic or not?
17    A.   I have not.
18    Q.   Have you ever gone to Health
19 Canada's evaluation of a chemical to make
20 a determination --
21    A.   No.
22    Q.   -- along the lines as to
23 whether a chemical is carcinogenic or
24 not?

Page 157

1    A.   No, I have not.
2    Q.   Have you ever done to any
3 regulatory agency's evaluation of a
4 chemical's propensity or not to be a
5 carcinogen in the regular course of your
6 practice?
7    A.   I have not.
8    Q.   If you turn to the second
9 page, it's got the U.S. House of
10 Representatives logo on it, correct?
11    A.   It does.
12    Q.   And then I just want to read
13 a portion of the introduction so you can
14 get oriented.  And then if you need to,
15 or want to, you can skim it, read it, do
16 whatever you want --
17    A.   Okay.
18    Q.   -- or wait until I ask a
19 question.
20       On Page 1, "Introduction."
21 And by the way this one is -- has a
22 Monsanto Bates stamp number, MONGLY --
23 M-O-N-G-L-Y -- 07894891 is the first
24 page.  Under the paragraph, introduction.

Michael L. Grossbard, M.D.

Page 158

1       "On February 6, 2018, the
2   Committee on Science, Space and
3   Technology is scheduled to hold a hearing
4   entitled 'In Defense of Scientific
5   Integrity:  Examining the IARC Monograph
6   Program and Glyphosate Review.'  The
7   chemical glyphosate is an herbicide most
8   commonly found in Monsanto's commercial
9   weedkiller Roundup.
10      "Committee chairman Lamar
11  Smith scheduled this hearing after months
12  of letter writing criticizing the IARC
13  review of glyphosate and examining the
14  EPA's action on glyphosate.
15      "Many of the criticisms
16  contained in the committee's letters
17  regarding IARC mimic criticisms that the
18  chemical industry has leveled on the IARC
19  process.
20      "Since these industry
21  talking points are apparently the basis
22  for both a congressional investigation as
23  well as a committee hearing, minority
24  committee staff have written this staff

Page 159

1   report to better inform the committee
2   members about the chemical industry
3   tactics, which have ultimately produced
4   these industry talking points.
5       "The report necessarily
6   focuses on the Monsanto Company due to
7   their primary role in inventing, selling,
8   and marketing glyphosate and
9   glyphosate-resistant seeds.
10      "This report is based in no
11  small part on documents that had been
12  made publicly available due to ongoing
13  third-party litigation with Monsanto.
14      "These newly released public
15  documents have revealed in an
16  unprecedented manner the tactics of the
17  chemical industry in attacking public
18  health science related to their
19  products."
20      Did anybody show you this
21  document prior to today?
22      MR. SLONIM:  Objection.  And
23   I specifically instruct the
24   witness not to disclose anything

Page 160

1   about communications with counsel.
2       If you can answer the
3   question --
4       MR. KRISTAL:  I'll ask it a
5   different way to respect that
6   objection.
7   BY MR. KRISTAL:
8       Q.   Have you ever seen this
9   document before?
10      A.   No, I have not.
11      Q.   Had anybody told you about
12  this document?
13      MR. SLONIM:  Objection.
14  Insofar as it calls for any
15  disclosure about communications
16  with counsel, the witness is
17  instructed not to answer.
18      THE WITNESS:  I've never
19  seen or heard of this document.
20  BY MR. KRISTAL:
21      Q.   Okay.  And under background,
22  they first mention the IARC
23  classification of glyphosate in March of
24  2015, correct?

Page 161

1       A.   That is true.
2       Q.   And the first paragraph
3   ends, "As more scientific data is
4   gathered and analyzed to more fully
5   understand the impacts of glyphosate on
6   human health, it is important for the
7   science to lead the way and for industry
8   and politicians to remain on the
9   sidelines, but that has not happened."
10      Do you agree, in evaluating
11  the science on glyphosate, it's important
12  for the industry and politicians to
13  remain on the sidelines?
14      A.   For me personally, it is.  I
15  mean, I can't assess that in a global
16  sense, but...
17      Q.   And if that didn't happen?
18      MR. SLONIM:  Objection.
19      THE WITNESS:  For me?
20  BY MR. KRISTAL:
21      Q.   Yeah.
22      A.   Then I would be biased,
23  potentially.
24      Q.   I don't follow your answer.

Michael L. Grossbard, M.D.

Page 162

1    A.   If I -- if I was influenced
2  by industry in my decisions, I think I
3  would be biased.  I don't know if there
4  are any politicians trying to influence
5  me right now.
6    Q.   Obviously you're interested
7  in public health, or you wouldn't be in
8  the field you're in, correct?
9    A.   That's true.
10   Q.   Okay.  And working on behalf
11  of a company, if you believed that they
12  did things related to Roundup that was
13  contrary to the public health, that
14  doesn't make a difference to you, in
15  terms of whether you even want to work on
16  their behalf?
17   A.   I am fundamentally answering
18  science questions in this case.  Does
19  glyphosate cause lymphoma?  I don't think
20  it does.
21        IARC says it probably does.
22  Health Canada doesn't.  The European
23  regulatory agencies say it don't.  The
24  Australian regulatory agencies say they

Page 163

1  don't.
2        I'm not out on some fringe
3  somewhere.  I'm deciding something on the
4  basis of a scientific assessment.
5        So I don't -- I mean, I
6  don't know about the unethical conduct
7  that you're telling me about.  I'm not
8  aware of it, except what you've pointed
9  out today.  And I'm still not sure from
10  what you're showing me that there was
11  something unethical there.
12   Q.   Okay.
13   A.   So I don't -- I don't know.
14  I mean, if you ask me do I -- do I want
15  to work for evil people, it's not my
16  premise in life.
17   Q.   Next paragraph.  "There is
18  significant evidence that Monsanto
19  launched a disinformation campaign to
20  undermine IARC's classification of
21  glyphosate as a probable carcinogen."
22        Have you seen any of that
23  evidence?
24        MR. SLONIM:  Objection.

Page 164

1  BY MR. KRISTAL:
2    Q.   Has anybody shown that to
3  you?
4    A.   I have not.
5    Q.   If you drop down -- well,
6  let me continue since it's a long
7  sentence.  "A multi-district litigation
8  court case against Monsanto regarding
9  potential adverse health consequences of
10  exposures to glyphosate has revealed
11  hundreds of pages of internal Monsanto
12  e-mails, memorandums and other records
13  that clearly show Monsanto engaged in a
14  decades long concerted effort to fend off
15  any evidence suggesting potential adverse
16  human health effects from glyphosate, and
17  more recently to undermine IARC's
18  findings.
19        "They ghostwrote scientific
20  articles on glyphosate, established front
21  groups to help amplify their anti-IARC
22  message and scientific evidence they did
23  not like, and they attempted to silence
24  scientists who reached conclusions

Page 165

1  questioning glyphosate's safety."
2        Were you aware of any of
3  that?
4        MR. SLONIM:  Objection.
5        THE WITNESS:  I am not.
6  BY MR. KRISTAL:
7    Q.   And if we turn to the page
8  entitled "Ghostwriting."  Yeah,
9  ghostwriting.  Page 6.
10   A.   Okay.
11   Q.   "Internal Monsanto e-mails
12  show that Monsanto's scientists
13  ghostwrote scientific journal articles on
14  glyphosate.  It is clear from these
15  e-mails revealed in court documents that
16  ghostwriting articles on glyphosate was a
17  concerted effort by the company.
18        "Monsanto scientists wanted
19  to both steer the scientific studies away
20  from identifying potential adverse human
21  health effects from exposure to
22  glyphosate, and they wanted other
23  independent scientists listed on these
24  studies to provide the aura of

Michael L. Grossbard, M.D.

Page 166

1  objectivity and independence."
2       Is that the first time that
3  you're hearing this?
4       MR. SLONIM:  Objection.
5       THE WITNESS:  Since this
6       morning, yes.
7  BY MR. KRISTAL:
8       Q.   Is ghostwriting proper, in
9  your opinion?
10      MR. SLONIM:  Objection.
11      THE WITNESS:  Again, I
12      answered that earlier, that I
13      would never allow something that I
14      have to be ghostwritten.
15      Ghostwriting is in two
16      forms.  Ghostwriting is presenting
17      inaccurate or wrong data or
18      scientifically invalid data,
19      that's a scientific problem, as
20      well as a ghostwriting problem,
21      especially for those who put their
22      names on that particular document.
23      I don't even allow my good
24      work, or what I think is my good

Page 167

1       work, to be ghostwritten.  I write
2       it, bad or good.  I don't know.
3       I'm not a -- I'm not a
4       ghostwriting fan.
5  BY MR. KRISTAL:
6       Q.   And you would agree that
7  it's not just the actual data itself, but
8  the way you present data, and the words
9  that you use, if they're ghostwritten,
10 can also slant the evidence one way or
11 the other, right?
12      MR. SLONIM:  Objection.
13      THE WITNESS:  I believe
14      every scientific paper in its
15      conclusions in one way or another
16      is slanting it toward a -- toward
17      a direction.
18      Again, I think that's --
19      that's less on me.  And yes, I
20      would like to have any conflict of
21      interest declared, just like I
22      like to declare mine and feel a
23      need to declare mine.
24      Once it's there with a

Page 168

1       conflict of interest declared,
2       assuming that's done, then the
3       authors that put their name on
4       that paper, regardless of whoever
5       wrote it, have to stand by those
6       findings.
7  BY MR. KRISTAL:
8       Q.   Well, before it's even
9  declared, you agree that if an article is
10 ghostwritten, the publisher of the
11 journal to which it's submitted should
12 have that information before the article
13 is reviewed, right?
14      MR. SLONIM:  Objection.
15      THE WITNESS:  I don't know.
16      I mean, I -- again, I may be
17      talking from my own experience.
18      There are very well known
19      professors that I worked with at
20      Harvard who had their articles
21      ghostwritten.  They didn't write
22      them themselves.
23      I don't -- I don't agree
24      with that.  But they stand by

Page 169

1       that.  I don't know if the journal
2       knew that they were written by
3       someone else.
4  BY MR. KRISTAL:
5       Q.   Well, I assume you've sat on
6  journal review boards that were looking
7  at articles submitted to the journal in
8  terms of whether they should be accepted
9  or not accepted or reviewing them
10 generally?
11      A.   That, I have.
12      Q.   Okay.  Wouldn't you want to
13 know if you're reviewing an article that
14 was ghostwritten by a chemical company
15 that is anticipating litigation?
16 Wouldn't you want to know that fact, one
17 way or the other, going in?
18      A.   So anticipating litigation
19 or not, I would want that somewhere put
20 in that article, whether it uses the word
21 "ghostwritten," whether it says "funded
22 by," whether it says "sponsored."  I
23 mean, I don't -- I don't know how -- I
24 don't know how I would know.  Most of the

Michael L. Grossbard, M.D.

Page 170

1  things, I ready suspect some of them are
2  ghostwritten.  But I really have no idea.
3       Q.   Okay.  But there is a
4  difference between funding and sponsoring
5  an article, and ghostwriting an article,
6  right?
7       A.   There can be.
8       Q.   Okay.  Well, maybe we should
9  start -- what is your understanding of
10 what ghostwriting is?
11      A.   Someone -- my interpretation
12 of ghostwriting is someone else entirely
13 writes the article, that the actual
14 author whose name on there has not
15 written that article.  They, I hope, have
16 read that article before it's published.
17 But the writing is not their own.
18      Q.   If you drop down to the
19 second paragraph or third paragraph,
20 actually, on Page 6.  "Ghostwriting
21 Greim."
22           Do you see that?
23      A.   I do see that, yes.
24      Q.   The first sentence which

Page 171

1  gives a little bit of background in terms
2  of what Monsanto anticipated from IARC.
3  Is that fair to say?
4       A.   It does say that.
5       Q.   And in the middle of the
6  paragraph, "In an e-mail between Monsanto
7  scientists, Bill Heydens and Donna
8  Farmer, they discuss what became known as
9  the Greim paper, a 2015 study published
10 in Critical Reviews in Toxicology whose
11 listed authors include Helmut Greim and
12 David Saltmiras.
13           "In the e-mails they
14 contemplate paying for a study to combat
15 problematic findings, but determine a
16 cheaper option would be to ghostwrite the
17 exposure tox and genetox sections and add
18 Greim and Kier or Kirkland to have their
19 names on the publication, but we would be
20 keeping the costs down by us doing the
21 writing and they would just edit and sign
22 their names, so to speak."
23           That's not kosher, right?
24      MR. SLONIM:  Objection to

Page 172

1  form.
2           THE WITNESS:  I don't know
3  that's not kosher.  If you
4  actually edit the article and you
5  go through it -- if the authors
6  edit the article, if they verify
7  all the data that's in there, it's
8  not something that I would do, but
9  I don't know that that's
10 un-kosher, so to speak.
11 BY MR. KRISTAL:
12      Q.   Well, without disclosing the
13 fact that the paper was initially
14 written --
15      MR. SLONIM:  Objection.
16 Form.
17 BY MR. KRISTAL:
18      Q.   -- by the company?
19      MR. SLONIM:  Objection.
20 Form.
21           THE WITNESS:  I can't really
22 answer that question.  I mean,
23 what I -- what I would like is not
24 necessarily what the industry

Page 173

1  standard is, if you will.
2  BY MR. KRISTAL:
3       Q.   Right.  Because something is
4  an industry standard doesn't make it
5  right?
6       MR. SLONIM:  Objection to
7  form.
8           THE WITNESS:  You know,
9  there are so many things that are
10 the standard that aren't the right
11 in this country, that that's just
12 kind of hard to address, at least
13 in the next seven hours.
14 BY MR. KRISTAL:
15      Q.   We're going to come back to
16 this.  I want to show you Exhibit 10, is
17 a copy of a PowerPoint.
18           (Document marked for
19 identification as Exhibit
20 Grossbard-10.)
21 BY MR. KRISTAL:
22      Q.   It's a draft, May 11th,
23 2015.  The title is "Proposal for
24 Post-IARC Meeting, Scientific Projects."

Michael L. Grossbard, M.D.

1    The internal Bates number
2  from Monsanto, I believe, is UPL
3  0000001777008.
4    But the last page of this
5  has the -- where this document came from.
6    This is a Monsanto
7  PowerPoint.  It says at the bottom of the
8  first page if you -- second page,
9  "Monsanto Company confidential
10 information."
11   Do you see that?
12   A.   Okay.  I see that.
13   Q.   Okay.  And the title is "Why
14 Do More?"
15   MR. SLONIM:  I'm sorry.
16 Where are you reading?
17   Okay, got it.
18 BY MR. KRISTAL:
19   Q.   Do you see that?
20   A.   I do see that, yes.
21   Q.   And the first bullet point
22 is, "Severe stigma attached to Group 2A
23 classification."
24   Do you agree that if IARC

1  determines a company's product to be a
2  probable carcinogen, that that can be a
3  severe stigma?
4    MR. SLONIM:  Objection to
5  form.
6    THE WITNESS:  I think that
7    stigma, I don't know, raises a --
8    raises a flag for caution for
9    users.  Is that fair?
10 BY MR. KRISTAL:
11   Q.   Yeah.
12   A.   Sure.
13   Q.   Well, there should be a
14 caution for users, if a product does in
15 fact probably cause cancer.
16   A.   Right.  No, so I agree with
17 that.  I just don't know -- I just don't
18 know if I accept the word "stigma."
19   Q.   Oh, I am -- oh, I see what
20 you're saying.
21   A.   Yeah.
22   Q.   Okay.  And the reason that
23 it's important for people to know,
24 because if it's a modifiable risk factor,

1  people can decide for their own whether
2  they want to reduce or eliminate that
3  risk factor?
4    MR. SLONIM:  Objection.
5    THE WITNESS:  It's one of
6    several reasons why it would be
7    important.
8  BY MR. KRISTAL:
9    Q.   Okay.  And under "Why Do
10 More?" the fifth bullet point.  "Provide
11 additional support, air cover, for future
12 regulatory reviews."
13   Do you see that?
14   A.   I do see that.
15   Q.   Is that an appropriate use
16 of an article being contemplated for
17 authorship by a company?
18   MR. SLONIM:  Objection.
19 This is a draft that the --
20 there's no -- there's no
21 foundation.  The witness has never
22 seen this before.
23   MR. KRISTAL:  There's plenty
24 of foundation.  It's just not with

1  this witness.  Not like you
2  haven't seen this before.
3    MR. SLONIM:  No, there's
4  no -- there's absolutely no
5  foundation.  The document on its
6  face says draft.  The witness has
7  no idea what the context is, who
8  authored the -- the authorship of
9  this document is not stated.  It's
10 not stated if it's a final
11 document, if it's a third draft,
12 first draft.  It's completely
13 improper.
14 BY MR. KRISTAL:
15   Q.   Go ahead.
16   A.   I'm sorry.  Could you repeat
17 the question?
18   (Whereupon, the court
19 reporter read back the requested
20 portion of testimony.)
21   MR. SLONIM:  Objection.
22 Form.  Foundation.
23 BY MR. KRISTAL:
24   Q.   To provide air cover for

Michael L. Grossbard, M.D.

Page 178

1  future regulatory reviews?
2          MR. SLONIM:  Objection.
3  Form.  Foundation.
4          THE WITNESS:  Is that an
5  appropriate use of a scientific
6  article published in a
7  peer-reviewed journal?  Is that
8  what you're asking?  As opposed
9  to --
10 BY MR. KRISTAL:
11     Q.   That's --
12     A.   -- as opposed to is this a
13 marketing, company strategy, which it may
14 be appropriate for, even if I disagree
15 with it, versus --
16     Q.   Right.  Right.
17     A.   You're asking me the former?
18     Q.   You're contemplating
19 articles.  And I'm asking you the former.
20 That's right.
21         MR. SLONIM:  Objection.
22 Foundation.  Form.  Hypothetical.
23         THE WITNESS:  So is it
24 appropriate to contemplate such

Page 179

1      articles?  Is that what you're
2      asking?
3  BY MR. KRISTAL:
4      Q.   For that purpose, to provide
5  air cover for regulatory reviews.
6      A.   It's not why I would choose
7  to write an article personally.
8      Q.   Okay.  And the last bullet
9  point here, "Why Do More?" says,
10 "Litigation support."
11         Do you see that?
12     A.   I do see that.
13         MR. SLONIM:  Objection.
14 Foundation.  Form.  Context.
15 BY MR. KRISTAL:
16     Q.   Do you believe it's proper
17 for Monsanto to be contemplating putting
18 articles out in the scientific literature
19 to provide litigation support?
20         MR. SLONIM:  Objection.
21 Form.  Foundation.  Context.
22         THE WITNESS:  This is
23 getting into corporate strategy
24 things that really aren't in my

Page 180

1      area of expertise.
2  BY MR. KRISTAL:
3      Q.   Okay.  If you turn to Page
4  4, it's entitled "New Meta-Analysis."
5          Do you see that?
6      A.   I do see that.
7      Q.   And you're aware of what a
8  meta-analysis is obviously.
9      A.   I am.
10     Q.   Meta-analysis reviews
11 individual studies, kind of pools the
12 results, and runs various statistical
13 analyses.  Yes?
14     A.   In a broad manner, yes.
15     Q.   Okay.  And generally
16 speaking, a meta-analysis is done because
17 it provides what's known in epidemiology
18 as more power for the aggregate of the
19 studies to detect a risk if there is a
20 risk, one of the reasons?
21     A.   That's true.
22     Q.   And under project
23 description, it says, "Conduct proper
24 meta-analysis to support the position

Page 181

1      that glyphosate is not associated with
2  NHL and multiple myeloma."
3          Do you see that?
4      A.   I do.
5      Q.   And under risk for doing a
6  new meta-analysis, Monsanto wrote, "None,
7  since we've already done the analysis."
8          Do you see that?
9          MR. SLONIM:  Objection.
10 Form.  Foundation.
11         THE WITNESS:  I do, yeah.
12 BY MR. KRISTAL:
13     Q.   Now --
14         THE COURT REPORTER:  I
15 didn't hear an answer, please.
16         THE WITNESS:  I do.
17 BY MR. KRISTAL:
18     Q.   Below that in parentheses,
19 it says, "Timing, Donna checking with
20 Exponent, and currently estimate three to
21 four months to write plus two-plus months
22 to get online publication."
23         Do you see that?
24     A.   I do see that.

Page 182

1    Q.   Now, one of the
2  meta-analysis that you had read and
3  relied on is the Chang, C-H-A-N-G, and
4  Delzell meta-analysis?
5    A.   That's correct.
6    Q.   And you are aware that that
7  was sponsored by Monsanto, funded by
8  Monsanto?
9    A.   I can't remember right now.
10 In other words, if you show me the
11 manuscript, that it's cited in there,
12 then I'm sure I noticed it at one point.
13   Q.   Okay.  And you're also aware
14 that Chang -- it was under the auspices
15 of a consulting group called Exponent?
16   A.   I'm not aware that.
17      (Document marked for
18      identification as Exhibit
19      Grossbard-11.)
20 BY MR. KRISTAL:
21   Q.   I'm going to mark as
22 Exhibit 11, and tell me if this is an
23 article entitled "Systematic Review and
24 Meta-Analysis of Glyphosate Exposure and

Page 183

1  Risk of Lymphohematopoietic Cancers,"
2  Chang and Delzell 2016.
3      Do you see that?
4    A.   Yes.
5    Q.   Okay.  And if you look down,
6  the contact, down at the bottom for Ellen
7  Chang is an Exponent e-mail address.
8      Do you see that at the very
9  bottom?
10   A.   I see that.
11   Q.   It's listed as Health
12 Science Practice, Exponent, Inc.?
13   A.   Okay.
14   Q.   Are you familiar with
15 Exponent?
16   A.   I'm not.
17   Q.   Have you ever read -- do you
18 know who David Michaels is, former head
19 of OSHA?
20   A.   I do not.
21   Q.   Have you ever seen his book,
22 Doubt is Their Product?
23   A.   I have not.
24   Q.   You should read it.

Page 184

1      MR. SLONIM:  Objection.
2      MR. KRISTAL:  Dr. Grossbard
3  is going to do or not do whatever
4  he wants to do, regardless of my
5  suggestion that he read it.
6  BY MR. KRISTAL:
7    Q.   If you look -- I'm trying to
8  find the references, the acknowledgment.
9  Sorry, the funding.
10     "This work was supported by
11 Monsanto Company, the original producer
12 and marketer of glyphosate formulations."
13     Do you see that?
14   A.   I do see that.
15   Q.   Okay.  So Chang and Delzell
16 was an Exponent study, a meta-analysis,
17 right?
18   A.   Right.
19     MR. SLONIM:  Are you going
20 to ask him to read the disclosure
21 statement?
22     MR. KRISTAL:  We can read
23 the disclosure statement too.  I'm
24 not trying to hide anything.

Page 185

1  Where are you?  What statement
2  would you like him to read?
3      MR. SLONIM:  Page 424,
4  bottom line.
5  BY MR. KRISTAL:
6    Q.   "The sponsors were provided
7  the opportunity to review the manuscript
8  prior to journal submission, but
9  inclusion of their suggestions was left
10 to the discretion of the authors, who
11 retained sole control of the manuscript
12 content and findings.  Statements in this
13 paper are those of the authors and not
14 those of the authors' employer or the
15 sponsors.  The authors are employed by
16 Exponent, a scientific research and
17 consulting firm that provides services
18 for private and governmental clients,
19 including on projects concerning
20 glyphosate and other pesticides.
21     "In the past five years,
22 Ellen Chang has provided consulting
23 services through Exponent on behalf of
24 Monsanto Company on other issues, and she

Page 186

1 has also provided consulting services on
2 other pesticides and lymphohematopoietic
3 cancers for other clients."
4      Did I read that correctly?
5    A. You did.
6    Q. Okay. Now, do you have an
7 issue with the meta-analysis that have
8 been done on glyphosate?
9    A. I think all of them are
10 flawed to some degree just by the nature
11 of meta-analyses.
12    Q. Okay. So are they flawed by
13 the nature of meta-analyses to the extent
14 that every other meta-analysis is
15 similarly flawed?
16    A. Yes.
17    Q. Okay. But you're not saying
18 that the meta-analyses should not have
19 been done in the first place for some
20 reason?
21    A. No, I am not.
22    Q. Okay. Obviously, because
23 Monsanto themselves paid for and reviewed
24 and commented on one, correct?

Page 187

1     MR. SLONIM: Objection.
2     THE WITNESS: My opinions --
3    my opinions are unrelated to
4    whether Monsanto paid for them or
5    not.
6 BY MR. KRISTAL:
7    Q. But my point is, a
8 meta-analysis done in this case were
9 appropriate to do?
10    A. Sure. When you have a
11 number of small studies, and then one
12 significantly larger study, you would
13 like to try and pool data, as you said
14 to -- and as I would say, to increase the
15 power of the assessment.
16    Q. The next page, "Publication
17 on animal carcinogenicity data."
18     MR. SLONIM: I'm sorry.
19  You're back on --
20     MR. KRISTAL: Page 5.
21     MR. SLONIM: -- Exhibit 10.
22     MR. KRISTAL: Yes, I'm
23  referring to Exhibit 10. Thank
24  you.

Page 188

1 BY MR. KRISTAL:
2    Q. Do you see that?
3    A. I do see that.
4    Q. Okay. And here, under
5 project description, they mention, "Greim
6 and one or two other external authors?"
7 Right?
8     MR. SLONIM: Objection.
9  Objection to form.
10     THE WITNESS: I do see that.
11 BY MR. KRISTAL:
12    Q. And under cost, it says,
13 "Majority of writing can be done by
14 Monsanto keeping OS $ down."
15  Correct?
16    A. What does OS mean?
17     MR. SLONIM: Objection.
18  Form.
19 BY MR. KRISTAL:
20    Q. I'm not really allowed to
21 tell you. But --
22    A. Oh.
23    Q. -- the majority of the
24 writing here is being suggested to keep

Page 189

1 the costs down, right?
2     MR. SLONIM: Objection.
3  Form. Form. Foundation. Draft
4  document. Unknown authorship.
5  Lacks context.
6     MR. KRISTAL: We can speak
7  outside if you want to throw that
8  in.
9     THE WITNESS: I don't
10  know -- I mean, look, I -- the
11  statement is there. I don't know
12  what OS dollars means. I just
13  don't.
14 BY MR. KRISTAL:
15    Q. They're talking about
16 keeping whatever OS means dollars down,
17 right?
18     MR. SLONIM: Objection.
19  Form. Foundation.
20     THE WITNESS: Yes, they are.
21 BY MR. KRISTAL:
22    Q. Okay. And how are they
23 going to do that?
24    A. One of the ways, if I read

Michael L. Grossbard, M.D.

Page 190

1 that sentence, is that the majority of
2 writing can be done by Monsanto.
3     Q.   Okay.  On Page 8, the
4 PowerPoint is entitled "Genetox/MOA."
5     Do you see that?
6     A.  I do.
7     Q.   And you're aware MOA is an
8 abbreviation for mechanism of action?
9         MR. SLONIM:  I'm sorry.
10 You're on Page 6?
11        MR. KRISTAL:  Eight.
12        THE WITNESS:  Yes, that's
13        widely accepted.
14 BY MR. KRISTAL:
15     Q.   Okay.  And the first bullet
16 point is, "Counter IARC's" -- bless
17 you -- "claim of strong evidence of DNA
18 damage/oxidative stress."
19        Correct?
20        MR. SLONIM:  Objection.
21        Form.  Foundation.
22        THE WITNESS:  Correct as to
23        whether it says that, yes.
24 BY MR. KRISTAL:

Page 191

1     Q.   Right.  Now, it is true that
2 in the glyphosate monograph issued by
3 IARC, they did -- the working group
4 determined that there was strong evidence
5 of DNA damage and oxidative stress from
6 the glyphosate and Roundup studies,
7 correct?
8        MR. SLONIM:  Objection.
9        THE WITNESS:  There are
10        pieces of evidence related to DNA
11        damage and oxidative stress.  I
12        don't remember if they classified
13        it as strong.
14 BY MR. KRISTAL:
15     Q.   Okay.  We'll look at that in
16 a minute or two.
17        Have you ever been asked to
18 participate on an IARC working group
19 panel to evaluate any potential
20 carcinogen?
21     A.   No, I have not.
22     Q.   Do you have a general
23 understanding that the working group
24 chosen by IARC for any particular

Page 192

1 evaluation are considered to be experts
2 in their field?
3        MR. SLONIM:  Objection.
4        THE WITNESS:  That's my
5        general understanding, yes.
6 BY MR. KRISTAL:
7     Q.   Okay.  You have no reason to
8 think that that didn't happen with
9 respect to the glyphosate evaluation,
10 correct?
11     A.   I have no judgment
12 whatsoever regarding the people that were
13 on that panel.
14     Q.   Okay.  And Monsanto writes
15 in this PowerPoint, the second bullet
16 point under genetox/mechanism of action,
17 "Could be important for future litigation
18 support."
19        Do you see that?
20        MR. SLONIM:  Objection.
21        Form.  Foundation.
22        THE WITNESS:  I do see that.
23 BY MR. KRISTAL:
24     Q.   So is it clear that Monsanto

Page 193

1 was at least concerned about future
2 litigation from IARC's finding?
3        MR. SLONIM:  Objection.
4        Form.  Foundation.  Calls for
5        speculation.
6        THE WITNESS:  It appears
7        they were preparing for future
8        litigation.  Whether that's
9        related to IARC's finding or
10        otherwise, I can't say.
11 BY MR. KRISTAL:
12     Q.   Okay.  And indeed you are
13 using Greim in support of Monsanto's
14 litigation position in this case?
15     A.   As one of the pieces of
16 evidence, yes.
17     Q.   And you are using Kier and
18 Kirkland as one of the pieces of evidence
19 in this case?
20     A.   Yes, I am.
21        (Document marked for
22        identification as Exhibit
23        Grossbard-12.)
24 BY MR. KRISTAL:

Michael L. Grossbard, M.D.

Page 194

1    Q.   I'm going mark as Exhibit 12
2  the document entitled "Monsanto
3  Manuscript Clearance Form, Global
4  Regulatory."  The date is February 29,
5  2012.
6          Do you have that in front of
7  you?
8    A.   I do.
9    Q.   The Monsanto Bates number is
10  MONGLY 02117800.
11         And this Monsanto manuscript
12  clearance form starts out, "Please
13  indicate type of publication."
14         And the box "manuscript" has
15  an X in it, correct?
16    A.   Yes.
17    Q.   The next question, "Has this
18  information been publicly disclosed
19  previously?"  The answer is yes; is it
20  not?
21    A.   Yes, though I'm not sure
22  what information they're --
23    Q.   Well --
24    A.   -- they're asking about.

Page 195

1    Q.   Well, I'm going to get to
2  it.
3          And it says, "If yes, where
4  and when?"  And then on the document, it
5  says, "This manuscript reviews glyphosate
6  genotoxicity publications since the
7  Williams, et al., 2000 review."
8          Did I read that correctly?
9          MR. SLONIM:  Objection.
10  Form.  Foundation.
11         THE WITNESS:  You did.
12  BY MR. KRISTAL:
13    Q.   Are you relying on the
14  Williams, Munro, and Kroes article?
15    A.   I don't think I cite that,
16  no.
17    Q.   Okay.  Were you aware that
18  there had been a prior article reviewing
19  the genotoxicity in 2000?
20    A.   I'm not sure.
21    Q.   Okay.  If there was, you
22  haven't read it, the Williams, Munro, and
23  Kroes, K-R-O-E-S?
24    A.   I don't believe so.  I

Page 196

1  certainly didn't cite it as something
2  that I relied on.
3    Q.   And you certainly would not
4  know one way or the other whether that
5  was also ghostwritten by Monsanto?
6          MR. SLONIM:  Objection.
7  Form.  Foundation.
8          THE WITNESS:  I would not
9  know.
10  BY MR. KRISTAL:
11    Q.   Okay.  The title of the
12  article, the manuscript that's being
13  referenced here is, "Review of
14  Genotoxicity of Glyphosate and
15  Glyphosate-Based Formulations."
16         Do you see that?
17    A.   I do see that.
18    Q.   And that is the title of the
19  Kier and Kirkland manuscript; is it not?
20  The Kier and Kirkland article.
21    A.   Let me just double-check the
22  exact title.  Give me a second.
23    Q.   Yeah.  I think it was --
24    A.   58.

Page 197

1    Q.   -- 58.
2    A.   Okay.  More or less.  And
3  it's "Review of Genotoxicity Studies."
4  It's not the exact same title.  But --
5    Q.   Pretty close?
6    A.   -- it's more or less.
7    Q.   Okay.  And the authors are
8  listed as "David Saltmiras and Larry Kier
9  (consultant)."
10         Correct?
11    A.   That's correct.
12    Q.   And the author handling the
13  correspondence is David Saltmiras,
14  correct?
15    A.   That's correct.
16    Q.   Do you know that David
17  Saltmiras is a Monsanto -- was at the
18  time and still is at the time a Monsanto
19  employee?
20         MR. SLONIM:  Objection.
21  Form.  Foundation.
22         THE WITNESS:  I don't know
23  that.
24  BY MR. KRISTAL:

Michael L. Grossbard, M.D.

Page 198

1  Q.   Okay.  Under lead author's
2  comments, "This manuscript provide" --
3  "This manuscript provide a comprehensive
4  quality check on the large number of
5  genotoxicity publications on glyphosate
6  since the Williams, et al., 2000
7  glyphosate toxicology review manuscript.
8  This work falls under the scope of the EU
9  glyphosate task force and will be a
10  valuable resource in future product
11  defense claims that Monsanto is mutagenic
12  or genotoxic."
13       Do you see that?
14       MR. SLONIM:  Objection.
15  Form.  Foundation.
16       THE WITNESS:  I do see that.
17  BY MR. KRISTAL:
18  Q.   Okay.  And are you aware
19  that this later became the Kier and
20  Kirkland publication that you're relying
21  on?
22  A.   I am now.  I am now because
23  you're telling me.  Otherwise there's
24  nothing else in this thing that would

Page 199

1  tell me that.
2       (Document marked for
3  identification as Exhibit
4  Grossbard-13.)
5  BY MR. KRISTAL:
6  Q.   I'm going to mark -- I'm
7  going to mark as Exhibit 13 another
8  Monsanto document.  This is dated, let's
9  see -- I don't see a date on it.  Authors
10  Larry Kier, David Saltmiras.
11  Affiliations, Larry Kier is listed as a
12  private consultant.  David Saltmiras is
13  just listed as Monsanto Company.
14  Corresponding authors, David Saltmiras.
15       Do you see that?
16       And the title is "Review Of
17  Genotoxicity of Glyphosate and
18  Glyphosate-Based Formulations."
19       Correct?
20  A.   I do see that, yes.
21  Q.   And that's the same title
22  that we just looked at for Kier and
23  Kirkland?
24  A.   It's the same title that we

Page 200

1  just looked at on the Monsanto manuscript
2  clearance form.  I think it's slightly
3  different from the -- from the Kier and
4  Kirkland title.
5       (Document marked for
6  identification as Exhibit
7  Grossbard-14.)
8  BY MR. KRISTAL:
9  Q.   I'm going to mark as
10  Exhibit 14.  Is this the Kier and
11  Kirkland article that you're relying on?
12  A.   Yes, it is.
13  Q.   And if you look, certainly
14  the abstract starts out the same way --
15  not exactly certainly the same.  They
16  both start out, "An earlier review of the
17  toxicity of glyphosate in the original --
18  in the manuscript, it says, "original
19  Roundup formulation," and in the article
20  it says, "Roundup-branded formulation."
21       Right?
22  A.   Okay.
23  Q.   "Concluded that neither
24  glyphosate nor the formulation poses a

Page 201

1  risk for the production of
2  hereditable/somatic mutations in humans."
3       Right?
4       MR. SLONIM:  Object to form.
5       THE WITNESS:  Yes, I see
6  that.
7  BY MR. KRISTAL:
8  Q.   So I don't want to go
9  through a line-by-line comparison.  And
10  I'm sure it's not word-by-word the same.
11  But it appears to be at least the -- a
12  draft of the original manuscript that
13  became Kier and Kirkland?
14  A.   I mean the abstract is -- is
15  different.  Some of them -- some of the
16  words are the same.  It's obviously been
17  edited and rewritten since the -- from
18  the one to the other.
19  Q.   And that's why I said it
20  doesn't -- it's not word for word, but it
21  appears to be the same -- at least the
22  beginning of the article that became Kier
23  and Kirkland, right?
24  A.   From the abstract.

Michael L. Grossbard, M.D.

Page 202

1 Obviously without going through the text,
2 I can't say where the similarities are,
3 and where the similarities are -- or
4 where the differences are.
5     Q.   And if you look at the
6 acknowledgment on Kier and Kirkland.
7 They are acknowledging David Saltmiras
8 for providing regulatory studies and
9 thoughtful review of the manuscript --
10        MR. SLONIM:  Where are you
11    reading -- where are you reading,
12    please?
13        MR. KRISTAL:  310.
14        MR. SLONIM:  310 on the
15    bottom, continuing over to the
16    top?
17        MR. KRISTAL:  Yes, sir.
18        THE WITNESS:  Yes.
19 BY MR. KRISTAL:
20    Q.   Okay.  And did you know that
21 this article had been written for a
22 consortium of pesticide companies that
23 manufactured and used glyphosate-based
24 herbicides, glyphosate task force?

Page 203

1     A.   I knew that several
2 companies are cited here as supporting
3 this.  I didn't know it was specifically
4 for them.
5     Q.   Again, you have not read the
6 underlying studies that Kier and Kirkland
7 are reviewing here, so you wouldn't know
8 one way or the other how accurate their
9 review of the findings are, correct?
10    A.   I have only read them in the
11 context -- I haven't read the actual
12 studies.  I've only read summaries in the
13 context of IARC, Health Canada, and other
14 documents, including this one.
15    Q.   Okay.  Did you read the
16 glyphosate IARC manuscript, the
17 monograph?
18    A.   I did.
19    Q.   Fair to say that you have
20 read a very small fraction of the
21 articles that are referenced by IARC in
22 their evaluation?
23        MR. SLONIM:  Objection.
24        THE WITNESS:  I think that's

Page 204

1 fair to say.  I don't know very --
2 I've read a fraction.  Whether I
3 call it a very small fraction or
4 fraction is semantics.
5 BY MR. KRISTAL:
6    Q.   Well, you formed an opinion
7 in the Hardeman and Gebeyehou cases in 20
8 -- the fall of 2018, and if I'm recalling
9 correctly, there was about 12 or 15
10 articles that you were relying on in toto
11 for your opinions about glyphosate being
12 carcinogenic or not, right?
13    A.   I can't remember the exact
14 number of references, but you're probably
15 in the ballpark.
16    Q.   Okay.  And one of them had
17 35 references as materials considered.
18 The other had 38, and about half or more
19 related to other risk factors, such as
20 hepatitis C and those kinds of things?
21    A.   Probably.  You've looked at
22 it more recently than I have.
23    Q.   Okay.  Turning pages is a
24 good thing.

Page 205

1    A.   Depends how many are left.
2    Q.   That's true.
3    A.   It still is a good thing, I
4 guess.
5        MR. SLONIM:  At some
6    convenient time, why don't we take
7    a break.
8        MR. KRISTAL:  Okay.  Yeah.
9        MR. SLONIM:  Okay.
10       MR. KRISTAL:  Sure.
11       THE VIDEOGRAPHER:  The time
12    right now is 3:12 p.m., and we are
13    off the record.
14       (Short break.)
15       THE VIDEOGRAPHER:  The time
16    right now is 3:23 p.m., and we're
17    back on the record.
18       (Document marked for
19    identification as Exhibit
20    Grossbard-15.)
21 BY MR. KRISTAL:
22    Q.   Marking as Exhibit 15 an
23 article entitled "Differences in the
24 Carcinogenic Evaluation of Glyphosate

Michael L. Grossbard, M.D.

Page 206

1  Between the International Agency For
2  Research on Cancer (IARC) and the
3  European Food Safety Authority (EFSA)."
4         Have you seen this article
5  before?
6         A.   I don't think so.
7         Q.   How did you go about
8  obtaining the articles that are on your
9  materials considered list?
10        A.   I did a PubMed search
11  looking at glyphosate and lymphoma.  I
12  read the IARC report.  I pulled
13  references.  I found a number of review
14  articles in the course of time or
15  meta-analysis and pulled those original
16  manuscripts.
17        Those would be some of the
18  ways.
19        Q.   This article didn't come up
20  in your search?
21        A.   It may or may not have come
22  up in my search.  I may have not looked
23  at it.
24        Q.   Okay.  And this is dated

Page 207

1  August 2016, is it not, down at the
2  bottom?
3         A.   Yes, it is.
4         Q.   Published in the British
5  Medical Journal -- I'm sorry.  Journal of
6  Epidemiology and Community Health?
7         A.   Yes.
8         Q.   I guess that's owned by the
9  British Medical Journal.
10        And there are 94 authors,
11  are there not?
12        A.   You know, I'm going to take
13  your word on that one.
14        Q.   Well, you can see because of
15  the --
16        A.   Oh.
17        Q.   -- because of the footnotes.
18  They give all the affiliations, so the
19  last one is Number 94?
20        A.   Either you're smarter than I
21  am or I'm tired or one or the other.  But
22  yes, 94.
23        Q.   You have to understand
24  something.  I've been looking at these

Page 208

1  documents longer than you.  It took me a
2  while to figure that out.  The first time
3  I saw this I was literally --
4         A.   Well, I've read plenty of
5  scientific papers over time, so I
6  wouldn't know the number of authors by
7  that special technique that you've
8  developed.
9         Q.   Could you take a look -- I
10  realize that you haven't read this.  Do
11  you know any of these authors?  And I
12  just want to point out, for example,
13  someone who is a professor at the Icahn
14  School of Medicine at Mount Sinai,
15  Phillip Landrigan, Number 46.
16        A.   I know the name.
17        Q.   Do you know Dr. Landrigan?
18        A.   I know the name.  I don't
19  know him personally.  I spent one
20  miserable year there.
21        Q.   Ah.
22        A.   I've met Dr. Weisenburger in
23  the past.
24        Q.   Okay.  He's a respected

Page 209

1  cancer researcher, is he not?
2         MR. SLONIM:  Objection.
3         THE WITNESS:  I think so,
4  yes.
5  BY MR. KRISTAL:
6         Q.   And in the middle of the
7  page, Hardell, Lennart Hardell is listed.
8         A.   Well, I know --
9         Q.   You've got several of his
10  articles, epidemiological studies.
11        A.   Correct.  I know the name
12  from that.  I'm sure I've seen some of
13  these names as authors in publications
14  before, but I don't know any of them.
15        Q.   Okay.  And without reading
16  the entire article, if we turn to the
17  summary page.
18        A.   Okay.
19        Q.   Under the summary, WG stands
20  for working group?
21        A.   Yes.  That's what I was
22  flipping to look at.  But yes, I see
23  that.
24        Q.   So I just want to be able to

Michael L. Grossbard, M.D.

Page 210

1 say it in language. "The IARC working
2 group concluded that glyphosate is a
3 probable human carcinogen, putting it
4 into IARC Category 2A due to sufficient
5 evidence of carcinogenicity in animals,
6 limited evidence of carcinogenicity in
7 humans, and strong evidence for two
8 carcinogenic mechanisms."
9        Do you see that?
10       A.   I do see that.
11       Q.   So, and that is sort of
12 touching on the three areas that you say
13 are at least in large part what someone
14 evaluating the evidence for
15 carcinogenicity should be looking at,
16 right?  Epidemiology, animal studies, and
17 carcinogenic mechanistic studies?
18       A.   Correct.
19       Q.   Do you agree or disagree
20 that there's strong evidence for
21 carcinogenic mechanisms of glyphosate?
22       A.   I don't think the evidence
23 is strong, no.
24       Q.   Okay.  How would you

Page 211

1 categorize that evidence on just the
2 genotoxicity mechanism?
3       A.   So genotoxicity basically
4 largely from animal studies and from
5 bacterial studies, mostly rodent studies,
6 I would consider it to be relatively weak
7 evidence, and weak evidence particularly
8 with respect to lymphoma.
9       Q.   So you obviously disagree
10 with IARC on that evaluation?
11       A.   I do.
12       Q.   And you agree that the
13 epidemiology under IARC's definition of
14 limited evidence is what you would
15 consider limited evidence?
16       MR. SLONIM:  Object.
17 BY MR. KRISTAL:
18       Q.   That there's an association
19 but they could not rule out bias or
20 confounding, chance?
21       A.   I'm not sure about the
22 strength of the association even.
23       Q.   Okay.  These authors
24 conclude, if you look at the right-hand

Page 212

1 column under that little arrow bullet
2 point, "The most appropriate and
3 scientifically based evaluation of the
4 cancers reported in humans and laboratory
5 animals as well as supportive mechanistic
6 data is that glyphosate is a probable
7 human carcinogen."
8        Do you disagree with these
9 94 authors?
10       A.   I didn't read the manuscript
11 to know what their criteria are for
12 making that decision.  If their criteria
13 are the same as those of IARC, then I can
14 see why they came to that conclusion.
15       Q.   Okay.  But whatever criteria
16 they used, you disagree with it?
17       A.   I don't believe specifically
18 that glyphosate causes lymphoma -- is a
19 carcinogen-causing lymphoma.
20       Q.   Do you have a different
21 opinion -- strike that.
22        What's the difference
23 between glyphosate and Roundup?
24       A.   Glyphosate is the native --

Page 213

1 as I understand it, glyphosate is the
2 native chemical.  Roundup is a
3 formulation of glyphosate that includes
4 surfactant.  And that's the major
5 difference.
6       Q.   What's a surfactant?
7       A.   Surfactant is an agent that
8 helps with absorption of something or
9 helps -- it helps break down barriers
10 that inhibit absorption.  So surfactant
11 is also used in the lung, where it's a
12 lining of the lung, that promotes the
13 most expansion of the lung in babies.
14       Q.   And you are -- are you aware
15 that Monsanto has never tested the
16 formulated product in any long-term
17 chronic carcinogenicity study?
18       A.   Outside of epidemiologic
19 studies where they haven't formally
20 tested but where Roundup has been a
21 product that's used.
22       Q.   Right.  I'm not talking
23 about the epidemiologic --
24       A.   So you mean -- you mean --

Michael L. Grossbard, M.D.

Page 214

1 you're talking about Roundup itself as a
2 product in mice as opposed to glyphosate?
3 Is that --
4      Q.   Mice or any other rodent.
5      A.   Or any other species?
6      Q.   Exactly.
7      A.   I haven't seen any such
8 studies, correct.
9      Q.   Okay.  And you're aware that
10 Monsanto has never conducted any
11 epidemiological study on its workers that
12 were manufacturing glyphosate?
13      A.   I don't know the answer to
14 that question, but not to my knowledge is
15 there such a study.
16      Q.   Okay.  Certainly if there
17 was a study, you probably would have
18 stumbled about upon it in your search,
19 right?
20           MR. SLONIM:  Objection.
21           THE WITNESS:  I might have
22      stumbled.
23 BY MR. KRISTAL:
24      Q.   Okay.  Shouldn't a

Page 215

1 manufacturer, certainly if there is a
2 question that a substance that they
3 manufacture is carcinogenic at least do a
4 study on their own workers who are
5 manufacturing the product?
6           MR. SLONIM:  Objection.
7      Form.  Foundation.  Calls for
8      speculation.
9           THE WITNESS:  I don't know
10      the answer to that question,
11      because I don't know what
12      companies do in that setting.  I
13      don't know if that's a standard of
14      management for a company or not.
15 BY MR. KRISTAL:
16      Q.   Okay.  Are you aware of the
17 pesticide industry voluntary code of
18 conduct?
19      A.   I am not.
20      Q.   Okay.  You have testified,
21 though, in the past in some of your other
22 litigations on whether or not certain
23 conduct met or didn't meet certain
24 standards of care in the context of

Page 216

1 medical malpractice cases?
2           MR. SLONIM:  Objection.
3      Form.  Foundation.
4           THE WITNESS:  That would
5      be -- that would be true, yes.
6 BY MR. KRISTAL:
7      Q.   Yeah.  And that's a --
8 strike that.
9           What method -- did you --
10 I'm trying to find out the methodology
11 that you use when you're looking at a
12 standard of care and you're looking at
13 conduct.  Is it really just comparing and
14 contrasting and using your expert opinion
15 and analysis as to whether that conduct
16 fell below or above the standard of care?
17           MR. SLONIM:  Objection.
18      Form.  Foundation.  Malpractice
19      cases have nothing to do with
20      this.  This is a doctor who is
21      offering his scientific opinion
22      and medical opinion regarding
23      glyphosate and the particular
24      plaintiff.

Page 217

1           He's not offering any
2      opinions about malpractice, not
3      offering any opinions about
4      company conduct.  Completely
5      beyond the scope of his expert
6      opinion.
7           THE WITNESS:  The vast
8      majority of the malpractice work
9      that I do does not really relate
10      to standard of care.  It relates
11      more to the causation issue.
12 BY MR. KRISTAL:
13      Q.   Okay.  But the ones that did
14 relate to standard of care, it's a
15 compare and contrast?
16      A.   I used --
17           MR. SLONIM:  Objection to
18      form.
19           THE WITNESS:  I --
20           MR. SLONIM:  Foundation.
21      Relevance.
22           THE WITNESS:  I use my many
23      years of experience in the field,
24      and my knowledge of what's --

Michael L. Grossbard, M.D.

Page 218

1   standard of care really is defined
2   of what the majority of people in
3   a given community do in terms of
4   that particular problem.
5        So, yes, I use my experience
6   and knowledge of others in the
7   community to make that judgment.
8   BY MR. KRISTAL:
9        Q.   And that's certainly
10  reasonable?
11       A.   I think it is.
12            MR. SLONIM:  Objection.
13  Form.  Foundation.  Relevance.
14       (Document marked for
15       identification as Exhibit
16       Grossbard-16.)
17  BY MR. KRISTAL:
18       Q.   Let me mark as Exhibit 16.
19  Have you come across this article?  "How
20  did the U.S., EPA and IARC reach
21  diametrically opposed conclusions on the
22  genotoxicity on glyphosate-based
23  herbicides?"
24            Have you seen this one?  It

Page 219

1   was published in the --
2        A.   Yeah.
3        Q.   -- Journal of Environmental
4   Sciences Europe in 2019, by Charles M.
5   Benbrook?
6        A.   It's not listed in my
7   materials considered.  My recollection is
8   I saw this online somewhere.
9            But I haven't looked at it
10  recently.
11       Q.   And that's -- did you ever
12  think to do that yourself?  In other
13  words, how could these two bodies reach
14  different conclusions?  Why did they
15  reach different conclusions?
16       A.   Sure, not just those two
17  bodies.
18       Q.   Right.
19       A.   But other bodies.
20       Q.   Right.
21       A.   Yes.
22       Q.   Did you go through that
23  exercise to analyze what they were relied
24  on and what they did rely on?

Page 220

1        A.   So not in a formal way, but
2   yes, in a partial way.  That is, I looked
3   at the animal -- particularly with
4   respect to Health Canada, not so much
5   with respect to the EPA.  I looked on the
6   animal studies they relied on.  I looked
7   at the literature they relied on.  And
8   there were some differences.
9        Q.   Why Health Canada?  What
10  what's that got to do with -- why did you
11  choose Health Canada as the one which --
12       A.   No particular reason.
13       Q.   Eh?  I was doing a Canadian
14  accent?  So --
15       A.   Very poorly.
16       Q.   Admittedly so.
17            MR. DIAMOND:  I got it.
18            THE WITNESS:  Yeah, I
19  didn't.  And I'm not that slow.
20  BY MR. KRISTAL:
21       Q.   It's late.
22       A.   There was, again, in
23  searching sort of Google, PubMed, I came
24  up with that.

Page 221

1        Q.   If you look here in the
2   abstract -- and obviously you can read
3   whatever portion of the article you want.
4   Under conclusions, the article says, "EPA
5   and IARC reached diametrically opposed
6   conclusions on glyphosate genotoxicity
7   for three primary reasons.
8            "One, in the core tables
9   compiled by EPA and IARC, the EPA relied
10  mostly on registrant-commissioned
11  unpublished regulatory studies, 99
12  percent of which were negative, while
13  IARC relied mostly on peer-reviewed
14  studies of which 70 percent were
15  positive."
16            Do you see that?
17       A.   I do see that.
18       Q.   Okay.  And have you done
19  that level of analysis?
20       A.   I have not gone through the
21  118 papers or whatever to see how they
22  differed, positive, negative.
23       Q.   But that's a significant
24  difference, correct?  You understand that

Michael L. Grossbard, M.D.

Page 222

1  registrant-commissioned studies to be the
2  folks that are manufacturing and selling
3  glyphosate-based herbicides?
4       A.   I assumed that was the case,
5  so...
6       Q.   Okay.  Do you think that's
7  significant that 99 percent of their
8  studies were negative while the published
9  literature, 70 percent were positive?
10      A.   Again, I don't know what
11 their interpretation of positive is.  So
12 I don't know whether it's statistically
13 significantly positive, whether there's
14 just some association.  I can't interpret
15 that independently.
16      Q.   Okay.  The second reason
17 here in the abstract, "EPA's evaluation
18 was largely based on data from studies on
19 technical glyphosate, whereas IARC's
20 review placed heavy weight on the results
21 of formulated glyphosate-based herbicides
22 and AMPA assays."
23           Do you see that?
24      A.   Yes, although I'm not sure

Page 223

1  that I know what AMPA assays is.
2       Q.   Okay.  Do you know what AMPA
3  is?
4       A.   No.
5       Q.   Aminomethylphosphonic acid.
6           MR. SLONIM:  Objection.
7  BY MR. KRISTAL:
8       Q.   Do you know what that is in
9  the context of this litigation?
10          MR. SLONIM:  Objection.
11          THE WITNESS:  I don't want
12      to --
13 BY MR. KRISTAL:
14      Q.   No, no that's okay.
15      A.   No.  I mean --
16      Q.   I'm not trying to embarrass
17 you.
18      A.   Oh, no, you're not going to
19 embarrass me with that.
20      Q.   It's a metabolite of
21 glyphosate.
22      A.   I -- I just -- yeah, I've
23 seen it.  I just can't quote you an
24 answer.

Page 224

1       Q.   But in the realm of
2  determining carcinogenicity for humans,
3  one should look at whether or not a
4  metabolite of the parent compound can
5  also cause genetic damages, correct, as
6  part of the inquiry?
7       A.   That would usually be
8  incorporated into the study, because it's
9  hard to distinguish between the agent
10 itself and the metabolite as to what
11 causes it in most of your animal studies.
12      Q.   But if you can distinguish,
13 you can look at both, right, the parent
14 compound and the metabolite?
15      A.   If you could distinct them,
16 you could, yes.
17      Q.   And the third reason, in the
18 article here in the abstract, "EPA's
19 evaluation was focused on typical general
20 population dietary exposures, assuming
21 legal food crop uses, and did not take
22 into account nor address generally higher
23 occupational exposures and risks.  IARC's
24 assessment encompassed data from typical

Page 225

1  dietary, occupational, and elevated
2  exposure scenarios."
3           Do you agree with that?
4       A.   I can't say exactly what the
5  EPA looked at.  But IARC certainly looked
6  at occupational studies that were done.
7       Q.   And occupational studies of
8  individuals who were applying Roundup?
9       A.   Yes.  Sorry.  I could have
10 clarified that.
11      Q.   And EPA placed much less
12 weight on those studies?
13          MR. SLONIM:  Objection.
14          THE WITNESS:  That's what
15      these authors say.
16 BY MR. KRISTAL:
17      Q.   Is that your --
18      A.   I don't --
19      Q.   You don't know one way or --
20      A.   I don't have an
21 understanding.
22      Q.   Okay.  How about Health
23 Canada?
24      A.   How about Health --

Michael L. Grossbard, M.D.

Page 226

1    Q.   They placed -- they placed
2 less weight on those studies as well, the
3 studies of folks actually using Roundup?
4        MR. SLONIM:  Is that a
5    question?
6        MR. KRISTAL:  Yes.
7        THE WITNESS:  I don't know
8    that that's true, no.
9 BY MR. KRISTAL:
10    Q.   One way or the other?
11    A.   Correct.
12    Q.   Okay.  Have you seen the
13 IARC update, so to speak, on the
14 evaluation of glyphosate?
15        (Document marked for
16    identification as Exhibit
17    Grossbard-17.)
18 BY MR. KRISTAL:
19    Q.   This is a portion of a much
20 larger document that -- and the portion
21 that I've selected is the portion on
22 glyphosate.
23        This is marked as
24 Exhibit 17.  "The International Agency

Page 227

1 for Research on Cancer report of the
2 advisory group to recommend priorities
3 for the IARC monographs during 2020 to
4 2024."
5    A.   I don't believe I've seen
6 this.
7    Q.   Okay.  And if you turn to --
8 not the 103rd page of this document, but
9 in the original document, 103 is the
10 glyphosate section.
11    A.   You know, I don't have 103.
12 I've got 102 and 104.
13    Q.   It's not on the back?
14    A.   Truly.
15    Q.   Maybe it's on the back.
16    A.   Oh, maybe it's on the back?
17    Q.   It's two-sided.
18    A.   No, there's nothing on this
19 one.
20    Q.   All right.  Well, we'll have
21 to -- that's weird.  We'll have to
22 substitute.  You can use mine.
23    A.   Okay, sorry.
24    Q.   And if you look at the table

Page 228

1 of contents, Page 103, should be --
2    A.   Okay.  Got it.  Following
3 him.
4        MR. DIAMOND:  Do you want to
5    mark that one if that's the one
6    you're going to use?
7        MR. KRISTAL:  Yeah, that's a
8    good idea.
9 BY MR. KRISTAL:
10    Q.   Are you aware that
11 periodically IARC, in determining what
12 substances to evaluate in the future,
13 look at substances that they have already
14 evaluated to determine whether continued
15 evaluation is necessary or not?
16    A.   That, I am aware of, yes.
17    Q.   Okay.  And if you turn to
18 the glyphosate section.  It begins on
19 103, but I want to talk to you about the
20 summary paragraph on Page 104.
21    A.   Okay.
22    Q.   If you want to read the
23 whole thing, you can or skim it.
24    A.   Give me two minutes.

Page 229

1    Q.   Yeah.  Take your time.
2    A.   Okay.
3    Q.   It's only a page and a half
4 of glyphosate, and then they go on to the
5 next substance.  Yes?
6    A.   Golden seal, yes.
7    Q.   Right.  Okay.  And I'm not
8 going to ask you about golden seal.
9    A.   That would be really
10 wonderful for me.
11    Q.   In the summary paragraph,
12 IARC wrote, in Exhibit 17, "In summary,
13 the advisory group reviewed the evidence
14 published since IARC monographs Volume
15 112 and concluded that the evidence on
16 cancer in humans appears to remain
17 limited.  In addition, no changes
18 anticipated in the conclusions regarding
19 cancer in experiment on animals or
20 mechanistic evidence.  Therefore, a
21 reevaluation would not be warranted
22 within the next five years."
23        Do you see that?
24    A.   I do see that.

Michael L. Grossbard, M.D.

Page 230

1    Q.   Were you aware that IARC had
2  reviewed materials relevant to glyphosate
3  being carcinogenic or not, since its
4  evaluation in 2015 and made the
5  determination that I just read, that
6  they're not changing the evaluation or
7  seeking to reevaluate?
8    A.   I can't recall.
9    Q.   You don't recall if you saw
10 this or not?
11   A.   Yeah.
12   Q.   So you may have; you may not
13 have?
14   A.   Correct.
15   Q.   Okay.  It's not on your
16 materials considered list, correct?
17   A.   Yeah.
18   Q.   How did things get on the
19 materials considered list?
20   A.   They were a reference list
21 that I provided.
22   Q.   No, I understand that.
23   A.   Oh, sorry.
24   Q.   In other words, if you saw

Page 231

1  this and looked at it, why is it not on
2  your materials considered list?
3    A.   It's a fair question, of
4  course.  And anything that I considered I
5  would have -- would have looked at.
6       I mean, I don't remember
7  seeing this.  If it's not there and I
8  looked at it, it's because I left it out
9  inadvertently.
10       (Document marked for
11       identification as Exhibit
12       Grossbard-18.)
13 BY MR. KRISTAL:
14   Q.   Got it.  You're familiar
15 with the Zhang, Z-H-A-N-G, et al.,
16 meta-analysis that was published in 2019
17 entitled "Exposure to Glyphosate-Based
18 Herbicides and Risk For Non-Hodgkin
19 Lymphoma:  A Meta-Analysis and Supporting
20 Evidence"?
21   A.   Yes, I am.
22   Q.   And there are five women who
23 are listed as the authors here, five
24 scientists listed as the authors?

Page 232

1    A.   Yeah.  I'll take it for your
2  word that the second person is a woman.
3    Q.   Okay.  You're familiar with
4  Emanuela Taioli, the fourth author who is
5  an epidemiologist at Icahn where you
6  worked, Icahn School of Medicine?
7    A.   I'm not -- I don't work
8  there.  I did briefly.
9    Q.   You did.  I know that.
10   A.   Yeah.  I'm very adamant
11 about that issue.
12   Q.   I take it not a good time.
13   A.   Not a good time.
14   Q.   Is that because of new
15 management?  We don't need to --
16       (Document marked for
17       identification as Exhibit
18       Grossbard-19.)
19 BY MR. KRISTAL:
20   Q.   Marking as Exhibit 19 from
21 the Mount Sinai Icahn School of Medicine
22 website, Emanuela Taioli, M.D., Ph.D.'s
23 profile.
24       Do you see that?

Page 233

1    A.   Yeah, it looks like she
2  joined in 2015 after I left.
3    Q.   Oh, so it would have been
4  after you --
5    A.   Yeah.
6    Q.   Okay.  But she has a
7  master's of science and a Ph.D. in
8  epidemiology, according to her biography?
9    A.   Yes.
10   Q.   And she also is an M.D. from
11 the University of Milan?
12   A.   Yes.
13   Q.   Okay.  Do you have any
14 advanced degrees in epidemiology?
15   A.   I do not.
16   Q.   And she here, according to
17 this, was the associate director, at the
18 bottom, for population science and
19 co-leader of the cancer prevention and
20 control program.
21       Do you see that?
22   A.   Where is that?  I'm sorry.
23   Q.   Bottom of the first page on
24 to the top --

Michael L. Grossbard, M.D.

Page 234

1    A.   Oh, associate director.
2  Yeah, okay.  Yes, I see that.
3    Q.   And in the second paragraph
4  on the second page, she was the chief of
5  epidemiology for the Northwell Health
6  System at the Hofstra School of Medicine?
7    A.   Yes.
8    Q.   You have no quarrels with
9  her qualifications as an epidemiologist,
10 I take it?
11   A.   No.
12   Q.   In this study, you're aware
13 that three of the five authors of this
14 document were on the EPA scientific
15 advisory panel for glyphosate?  Are you
16 aware of that?
17   A.   That's my -- that's my
18 recollection, yes.
19   Q.   Have you ever served on the
20 scientific advisory panel for EPA for
21 anything?
22   A.   I have not.
23   Q.   And fair to say that that
24 speaks to the qualifications of these

Page 235

1  authors?
2        MR. SLONIM:  Objection.
3        THE WITNESS:  It speaks to
4     the qualifications of the authors,
5     but not necessarily the quality of
6     the publication.
7  BY MR. KRISTAL:
8    Q.   Okay.  If you look at -- I
9  just want to look at the summary table,
10 which is on Page 199 of the article --
11 it's table, oh, no -- yeah, it's Table 7.
12   A.   Okay.
13   Q.   You are aware that there
14 have been four meta-analyses conducted
15 over the last number of years with
16 respect to the epidemiology related to
17 exposure to Roundup, correct?
18   A.   Correct.
19   Q.   And Table 7 in this article
20 lays out the findings of the four
21 meta-analyses along with the findings of
22 the individual studies that were
23 considered, correct?
24   A.   Yes.

Page 236

1    Q.   Okay.  And you're familiar
2  with the first meta-analysis was by
3  Schinasi and Leon, S-C-H-I-N-A-S-I, and
4  Leon?
5    A.   That's correct.
6    Q.   And when they did their
7  meta-analysis and they combined results
8  of the prior individual studies, their
9  meta-analysis relative risk was 1.45, and
10 that was statistically significant,
11 correct?
12   A.   Yes, although they were
13 including studies that did not control
14 for other pesticides, among other things
15 they didn't control for, but yes, that's
16 the result of the meta-analysis.
17   Q.   And there are
18 acknowledgments in each of the
19 meta-analysis of the strengths and
20 limitations of their study, right, that's
21 standard protocol?
22   A.   Yes.
23   Q.   And the fact that they
24 didn't control for that doesn't mean that

Page 237

1  these results are meaningless, does it?
2    A.   Well, I think they need to
3  be interpreted very cautiously, to say
4  that they show that there is a
5  statistically significant increase in
6  lymphoma upon exposure to glyphosate --
7  or Roundup.
8    Q.   But the -- it was the
9  individual studies, whichever ones did or
10 didn't control for use of other
11 pesticides, that were used in the
12 meta-analysis, correct?
13   A.   Yes.  But combining several
14 bad or flawed studies in a meta-analysis
15 doesn't make your meta-analysis better.
16   Q.   Okay.  You understand the
17 third meta-analysis here, Chang and
18 Delzell, was paid for by Monsanto.  We
19 looked at that earlier, right?
20   A.   Yes.
21   Q.   And so are you saying that
22 going into a meta-analysis of the studies
23 that Monsanto paid for, they knew that
24 the underlying studies were flawed and,

Page 238

1 therefore, shouldn't be in the
2 meta-analysis?
3     A.   I'm not saying that.
4     Q.   Okay.  So Monsanto at least
5 felt the underlying studies were
6 sufficient enough to pay somebody to do a
7 meta-analysis, correct?
8         MR. SLONIM: Objection.
9         THE WITNESS: Again, I don't
10     know what their rationale is for
11     sponsoring that.  And I would hope
12     that they didn't sponsor it
13     knowing what the outcome was going
14     to be.
15 BY MR. KRISTAL:
16     Q.   Well, they already said in
17 the --
18     A.   Well, that --
19     Q.   -- PowerPoint that the risk
20 was none because they already had done
21 the analysis.
22         MR. SLONIM: Objection.
23     Objection. Form. Foundation.
24 BY MR. KRISTAL:

Page 239

1     Q.   That's what it said.
2     A.   That's fine.  That may be --
3         MR. SLONIM: Objection.
4     Form. Foundation. Let me -- let
5     me -- Doctor, you've just got to
6     give me a chance when he asks a
7     question --
8         THE WITNESS: Sorry.  I
9     apologize.
10         MR. SLONIM: -- to interpose
11     an objection.
12         Okay.
13         THE WITNESS: Say the
14     question again, please.
15         (Whereupon, the court
16     reporter read back the requested
17     portion of testimony.)
18         THE WITNESS: Okay.  Again,
19     I don't know that the risk was
20     none. I don't know.  I know what
21     you gave me, which was an internal
22     document by I don't know who,
23     whether it was a scientist,
24     whether it was a marketing person,

Page 240

1     whether -- I don't know who wrote
2     that honestly.  You may not even
3     know who wrote that.
4 BY MR. KRISTAL:
5     Q.   Well --
6     A.   But that said, I can only
7 take it for what it's worth.  I would
8 hope that the science was there.  The
9 authors, as we said, declared what their
10 conflict was, declared where the funding
11 was, and this was the result they had.
12     Q.   My point was, though, if
13 Monsanto thought that the underlying
14 studies was so significantly flawed that
15 you could not rely on the results of a
16 meta-analysis, they could have decided
17 not to do a meta-analysis, correct?
18         MR. SLONIM: Objection.
19     Form. Calls for speculation.
20     Lack of foundation.
21 BY MR. KRISTAL:
22     Q.   They didn't have to -- they
23 didn't have to fund the study, did they?
24         MR. SLONIM: Objection.

Page 241

1     Form. Foundation. Calls for
2     speculation.
3         THE WITNESS: I can't answer
4     the rationale for that, one way or
5     the other.
6 BY MR. KRISTAL:
7     Q.   Right.  You would agree that
8 nobody forced Monsanto to pay somebody
9 money to do a meta-analysis on Roundup?
10     A.   I would think that would be
11 unlikely.
12     Q.   Okay.  If we look at the
13 Chang and Delzell, even the Monsanto
14 study shows a meta-relative risk of 1.27
15 that's statistically significant,
16 correct?
17     A.   Correct.
18     Q.   All right.  And you know
19 that IARC itself did its own
20 meta-analysis during its evaluation,
21 correct?
22     A.   Correct.
23     Q.   And when IARC did its
24 meta-analysis, it came up with a relative

Michael L. Grossbard, M.D.

Page 242

1 risk of 1.30 that was also statistically
2 significant, correct?
3     A.   As is published here, yes.
4     Q.   Well, you're not arguing
5 that these numbers are not accurate, are
6 you?
7     A.   No.
8     Q.   Okay.  And under the current
9 meta-analysis in the Zhang study, they
10 did two analyses, one using the
11 Agricultural Health Study from 2005 and
12 the other meta-analysis using the
13 agricultural health study from 2018,
14 correct?
15         MR. SLONIM:  Objection.
16 Form.  Foundation.
17         THE WITNESS:  Yes.
18 BY MR. KRISTAL:
19     Q.   And in essence, the results
20 were not identical, but pretty darn
21 close, right?
22         MR. SLONIM:  Objection.
23 BY MR. KRISTAL:
24     Q.   Whichever -- whether you use

Page 243

1 the earlier Agricultural Health Study or
2 the later Agricultural Health Study, in
3 the meta-analysis, the meta-relative risk
4 was pretty close?
5         MR. SLONIM:  Objection.
6 Misrepresents the data.
7         THE WITNESS:  Well, they
8 only used half of the data from
9 the AHS 2018 study.
10 BY MR. KRISTAL:
11     Q.   Well, because they
12 specifically, a priori, stated that they
13 were looking at the higher exposure
14 groups, correct?
15     A.   That's correct.
16     Q.   Okay.  And that is something
17 that is proper epidemiologically because
18 if there is a risk, you would expect to
19 find it in the higher exposed groups,
20 correct?
21         MR. SLONIM:  Objection.
22 Form.  Foundation.
23         THE WITNESS:  As well as the
24 lower exposed groups.

Page 244

1 BY MR. KRISTAL:
2     Q.   Well, not necessarily, it
3 depends on the exposure, right?
4     A.   It depends on a lot of
5 factors for both groups.  But --
6     Q.   All right.  And in the --
7 I'm sorry.  Go ahead.
8     A.   But I can't intellectually
9 get my hand -- hand or something.  Head?
10 Some part of my body.  I can't
11 intellectually get some part of my body
12 around the fact that you take a much
13 larger study, a study that in terms of
14 number of entrants, participants, dwarfs
15 any of the other studies done by nearly
16 an order of magnitude, and yet you come
17 out with -- and a study that that in and
18 of itself was a negative study.  It did
19 not show -- the AHS 2018 report, it did
20 not show any statistically significantly
21 increased risk of lymphoma.
22         And yet you put that into
23 the mix, and you find even a higher
24 relative risk than you had before.  That

Page 245

1 doesn't -- that doesn't make intellectual
2 sense.
3     Q.   Now, you would agree that
4 the folks that were enrolled in the
5 Agricultural Health Study were licensed
6 pesticide applicators, correct?
7     A.   I would agree with that.
8     Q.   And you agree with respect
9 to a modifiable risk factor involving a
10 pesticide, that one can reduce their risk
11 by wearing certain -- what's called PPE,
12 personal protective equipment, correct?
13     A.   Most likely that's correct,
14 yes.
15     Q.   And are you aware that
16 licensed applicators are trained on what
17 personal protective equipment to use,
18 correct?
19     A.   To variable degrees, yes.
20     Q.   So in a study looking at a
21 population that is trained on how to
22 reduce their exposures, you would expect
23 there to be lower relative risks?
24         MR. SLONIM:  Objection.

Michael L. Grossbard, M.D.

Page 246

1  Form. Foundation.
2  Mischaracterizes the study.
3      THE WITNESS: Potentially.
4  So I don't recall -- and I'm happy
5  to look at the study specifically.
6  I don't recall a reference to the
7  use of PPE within that group of
8  people and the percent that used
9  it.
10 BY MR. KRISTAL:
11     Q.   Okay. The Zhang
12 meta-analysis found a relative risk of
13 1.45 statistically significant for the --
14 using the Agricultural Health Study from
15 2005, correct?
16     A.   That is correct.
17     Q.   And when they used the
18 Agricultural Health Study in 2008, the
19 relative risk was 1.41, also
20 statistically significant, correct?
21     MR. SLONIM: Objection. The
22     question mischaracterizes what was
23     used.
24     THE WITNESS: That's true,

Page 247

1      yes. Again, with the caveat that
2      they used only about half of the
3      participants in that study.
4  BY MR. KRISTAL:
5      Q.   And the authors who were on
6  the scientific advisory panel with
7  respect to glyphosate for EPA then also
8  go into a consideration of the mechanism
9  as well as the animal study evidence,
10 correct?
11     A.   Some selected animal study
12 evidence, but yes.
13     Q.   Well, you had less than
14 selected animal studies, right, because
15 you didn't read any of the underlying
16 studies, right? You read what somebody
17 else wrote about those studies?
18     MR. SLONIM: Objection.
19     THE WITNESS: I wouldn't say
20     that I had less than that, no.
21 BY MR. KRISTAL:
22     Q.   Well, you didn't read any of
23 the underlying animal studies, correct?
24     A.   No, but I looked at the

Page 248

1  summary data from all of them, which is
2  more than what I can say they do in this
3  paper.
4      Q.   Right. But my point is, you
5  were looking at what somebody wrote about
6  the animal studies, not what the authors
7  of the original animal studies wrote?
8      A.   As these people are.
9      Q.   Okay. So again, just a
10 reasonable disagreement among scientists?
11     MR. SLONIM: Objection.
12     THE WITNESS: No. No. They
13     left out -- they left out any rat
14     data, if I remember correctly.
15     There's no -- they have animal
16     data, but leave out all the rat
17     studies.
18 BY MR. KRISTAL:
19     Q.   Was this peer reviewed?
20     A.   It probably was. Everything
21 that's peer-reviewed isn't great.
22     Q.   And the final conclusion
23 was, if you turn to Page 204, "The
24 overall evidence from human, animal, and

Page 249

1  mechanistic studies presented here
2  supports a compelling link between
3  exposures to glyphosate-based herbicides
4  and increased risk for NHL."
5      You disagree with that?
6      A.   I do.
7      Q.   Have you ever written a
8  letter to the editor or commentary
9  expressing your disagreement with an
10 article or disagreement with the
11 methodology of an article?
12     A.   Any article?
13     Q.   Yeah, any article. I can
14 show you a couple if you don't remember.
15     A.   Okay. Go ahead. I mean, I
16 was going to say I have, and I don't know
17 if they were published.
18     Q.   Well, let me finish this,
19 and I'll come back to that.
20     I do -- well, it's probably
21 in my not likely to be used category, but
22 I'll get there. Remind me.
23     A.   Why would I do that?
24     Q.   In any event, there is a

Michael L. Grossbard, M.D.

Page 250

1  mechanism, whether you have personally
2  used it or not, to comment and criticize,
3  in the scientific debate, an article that
4  you viewed as flawed?
5       A.   Yes, there is.
6       Q.   Okay.  And you have not done
7  that with respect to this article?
8       A.   I have not.
9       Q.   Do you have any plans to do
10 that?
11      A.   I don't.
12          (Document marked for
13          identification as Exhibit
14          Grossbard-20.)
15 BY MR. KRISTAL:
16      Q.   I want to show you something
17 from the web from the Icahn School of
18 Medicine at Mount Sinai, entitled
19 "Glyphosate."
20          Have you seen this before?
21      A.   No, I have not.
22      Q.   Why don't you take a minute
23 to take a look at it.
24      A.   Okay.

Page 251

1       Q.   And here, the Mount Sinai
2  School of Medicine states on this
3  glyphosate sheet, quote, "How are we
4  exposed to glyphosate?  Glyphosate is
5  often applied to lawns and gardens and
6  can contaminate plants, soil, air and
7  food.  Glyphosate can be inhaled or
8  ingested."
9           Do you agree with that?
10      A.   Sure, I do.
11      Q.   "Glyphosate used on lawns
12 and in parks can be tracked into homes on
13 shoes or strollers that have had contact
14 with glyphosate treated surfaces.
15 Residues of glyphosate are detected on
16 some produce as well as in processed
17 foods."
18          Do you agree with that?
19      A.   Second statement, I know is
20 true.  The first statement I have no
21 reason to argue with.
22      Q.   Okay.  "What are the health
23 effects of glyphosate?  Children and
24 fetuses are most vulnerable to pesticide

Page 252

1  exposure due to their developing organ
2  systems and differences in the way they
3  metabolize toxins.  In addition,
4  developmentally normal hand-to-mouth
5  behavior, close proximity to the ground
6  where pesticides settle, and high
7  respiratory rates result in higher
8  exposures in children compared with
9  adults."
10          Do you agree with that?
11      A.   That may well be true.
12      Q.   "Cancer.  Glyphosate is
13 classified by the World Health
14 Organization's International Agency for
15 Research on Cancer as probably
16 carcinogenic to humans, based on strong
17 evidence that it causes cancer in
18 laboratory animals, and some evidence
19 that it increases cancer risk in humans."
20          And you agree that's whether
21 IARC says, but you disagree with that?
22      A.   I think that's a correct
23 statement.
24      Q.   Okay.  This also lists under

Page 253

1  health effects of glyphosate, there's a
2  section on hormone disruption.
3           Do you see that?
4       A.   I do.
5       Q.   Have you evaluated that
6  literature?
7       A.   Not really, no.
8       Q.   Birth defects is listed
9  here.  Have you evaluated that
10 literature?
11      A.   None of the primary
12 literature, no.
13      Q.   Nervous system toxicity,
14 have you evaluated that literature?
15      A.   I haven't evaluated the
16 primary literature, no.
17      Q.   Antibiotic resistance, have
18 you evaluated that literature?
19      A.   I have not.
20      Q.   If an individual is being
21 treated with antibiotics for Helicobacter
22 pylori, and glyphosate can lead to
23 antibiotic resistance, does that have an
24 effect on the risk of NHL for that

Michael L. Grossbard, M.D.

Page 254

1 particular person?
2          MR. SLONIM:  Objection.
3     Foundation.  Calls for
4     speculation.
5          THE WITNESS:  No, it would
6     not.
7 BY MR. KRISTAL:
8     Q.   "How can I reduce my
9 exposure to" --
10    A.   Can I -- can I -- I'm sorry.
11 Can I just clarify that?  You said
12 whether there's risk of NHL -- developing
13 NHL as opposed to the -- as opposed to
14 the outcome of treatment?
15          In other words, if it's
16 causing antibiotic resistance, that's
17 talking about the treatment.
18          You were asking if it has --
19 so I should have clarified the question
20 before I answered.
21    Q.   So let me -- let me -- no,
22 no, that's a good point.  And based on my
23 question, I appreciate the answer.
24          Let me be more specific

Page 255

1 because that's not quite what I was
2 asking you.
3          If it has antibiotic
4 resistance property, it would, you would
5 agree, affect the treatment for the H.
6 pylori, if it did?
7          MR. SLONIM:  Objection.
8     Lack of foundation.  Calls for
9     speculation.
10          THE WITNESS:  If it did and
11     if it was a specific antibiotics
12     that we use -- I mean, all
13     mechanisms of resistance --
14 BY MR. KRISTAL:
15    Q.   Right.
16    A.   -- aren't identical.  But it
17 potentially could affect the treatment,
18 yes.
19    Q.   And if it affected the
20 treatment, it could affect whether or not
21 the NHL in that person resolved?
22          MR. SLONIM:  Objection.
23     Lack of foundation.  Calls for
24     speculation.

Page 256

1          THE WITNESS:  In theory, it
2     could affect whether it resolved
3     from the antibiotics.  There are
4     other --
5 BY MR. KRISTAL:
6     Q.   That's what I'm talking
7 about.
8     A.   There are other -- there are
9 other treatment methods.
10    Q.   No, no, I appreciate that.
11 I'm just following up on the discussion
12 where you said if H. pylori is
13 successfully treated, you can have an NHL
14 go into remission.
15    A.   Sure.  And I was just
16 clarifying that it's a treatment effect
17 as opposed to risk of developing effect.
18    Q.   No, and that's a good point.
19 "How can I reduce my
20 exposure to glyphosate?  Avoid using weed
21 killers in" -- "weed killers that list
22 glyphosate as the active ingredient."
23 That would be one way to reduce exposure
24 to glyphosate, correct?

Page 257

1     A.   It would.
2     Q.   "Leave strollers" -- strike
3 that.
4          "Leave shoes, strollers and
5 wheeled luggage by the front door" -- "by
6 the door in your home."
7          That's another way to reduce
8 exposure, correct?
9     A.   In theory, yes.
10    Q.   "Wash your hands before
11 eating and after spending time outdoors."
12          That would be another way to
13 reduce your glyphosate exposure?
14    A.   There's probably many good
15 reasons for doing that, but yes.
16    Q.   "Choose GMO-free foods
17 labeled USDA organic or non-GMO project
18 verified."
19          That's another way to reduce
20 glyphosate exposure?
21    A.   I would assume so, yes.
22    Q.   "Advocate for glyphosate
23 bans in public spaces in your community."
24          That's another way to reduce

Michael L. Grossbard, M.D.

Page 258

1 exposure to glyphosate?
2         MR. SLONIM: Objection.
3     Form. Foundation.
4         THE WITNESS: Sure.
5 BY MR. KRISTAL:
6     Q.   And "Encourage neighbors to
7 avoid use of glyphosate-containing
8 products" is another way to reduce
9 exposure that the School of Medicine of
10 Mount Sinai has articulated.
11         MR. SLONIM: Objection.
12 BY MR. KRISTAL:
13     Q.   You would agree with that?
14     A.   Yeah. And I guess
15 specifically the Institute for Exposomic
16 Research --
17     Q.   Okay.
18     A.   -- which I have no idea what
19 that is.
20     Q.   Okay. Again, these efforts
21 to reduce exposure to glyphosate go back
22 to the issue of modifiable risk factors
23 if someone is aware that something is a
24 risk factor?

Page 259

1         MR. SLONIM: Objection.
2     Form.
3 BY MR. KRISTAL:
4     Q.   Even though you don't
5 consider --
6     A.   That would be the obvious
7 rationale behind this, yes.
8     Q.   We're making good progress.
9         I'm going to mark as
10 Exhibit 21 today's notice of deposition,
11 which is the invite.
12         (Document marked for
13     identification as Exhibit
14     Grossbard-21.)
15         MR. KRISTAL: I'm going to
16     mark the documents that counsel
17     had provided earlier.
18         MR. SLONIM: Counsel?
19         MR. KRISTAL: Yes.
20         MR. SLONIM: If you would,
21     could I ask you to mark the
22     responses and objections that we
23     interposed?
24         MR. KRISTAL: Sure. I don't

Page 260

1 have copies of those. I have a
2 single set, and I'll be happy to
3 mark that if you want.
4         MR. SLONIM: I appreciate
5     it.
6         MR. KRISTAL: Actually I
7 highlighted mine. Is yours
8 highlighted?
9     I would mark 22 as
10 Monsanto's responses and
11 objections to the documents
12 requested in the notice of
13 deposition.
14         (Document marked for
15     identification as Exhibit
16     Grossbard-22.)
17         MR. KRISTAL: I'm going to
18 mark 23 collectively your two
19 invoices, one from October 2nd,
20 2019, and the other one from
21 November 8th, 2019. I'll do that
22 collectively.
23         (Document marked for
24     identification as Exhibit

Page 261

1     Grossbard-23.)
2 BY MR. KRISTAL:
3     Q.   I'm not trying to embarrass
4 you in any way. But referenced in the
5 August 2nd, 2019 invoice is both Saunders
6 and Sanders. I'm assuming Saunders is
7 just a typo?
8     A.   It's a typo.
9     Q.   Okay. There wasn't a third
10 case.
11     A.   No, no, no.
12     Q.   Got it. Okay.
13     A.   No.
14         MR. SLONIM: Just to make
15     sure that I gave you the right
16     document --
17         MR. KRISTAL: I didn't even
18     look at it. I just marked it.
19         THE WITNESS: One is --
20     actually it looks like -- well, I
21     can't tell. You tell me.
22         MR. KRISTAL: Just take
23     off --
24         MR. SLONIM: I handed you

Michael L. Grossbard, M.D.

Page 262

1   the wrong document.
2         MR. KRISTAL:  Take the
3   sticker off 22 and put it on that
4   document, and we're good to go.
5         MR. DIAMOND:  Is 22 as it is
6   now my notice?
7         MR. SLONIM:  No.  22 was the
8   objections that we had interposed,
9   responses and objections in the
10  Sanders case.
11        Here you go.
12        What was 20, by the way?
13        THE WITNESS:  20 was this
14  glyphosate from Mount Sinai.
15        MR. SLONIM:  What was 19?
16        THE WITNESS:  19 was the
17  picture of Dr. Taioli with the
18  biography.
19        MR. SLONIM:  19, 20.  Okay.
20  Thank you.
21        THE WITNESS:  Sure.
22  BY MR. KRISTAL:
23        Q.   On November 8, 2019, there's
24  an entry for reviewing Scaggs report.

Page 263

1   You have to be a Boz Scaggs fan?  It's
2   Staggs, right?  That's another typo?
3         A.   So two things.  Number one,
4   that's a typo.  Number two, I can't stand
5   Boz Scaggs.
6         Q.   I actually like him.
7         A.   You like him.  That does not
8   surprise me.
9         Q.   So for both cases between
10  September 7th and October 23rd --
11        A.   I'm sorry.  I want to
12  clarify one other thing.  Within my
13  report, I actually also have a little
14  typo.  Every time I mentioned Staggs it
15  says Scaggs.
16        Q.   Ah.
17        A.   So I apologize for that
18  globally.  So it wasn't really a typo.
19  It was a correct assessment based on a
20  typo.
21        Q.   All right.  From
22  September 7, '19 through October 23, '19
23  you spent a total of 34 cases on the two
24  cases?

Page 264

1         A.   If that's what it totals to,
2   then yes, that's true.
3         (Document marked for
4   identification as Exhibit
5   Grossbard-24.)
6   BY MR. KRISTAL:
7         Q.   I'm going to mark as
8   Exhibit 24 both the updated testimony
9   list and the updated curriculum vitae.
10        Are there any articles --
11  strike that.
12        From looking at your older
13  curriculum vitae, most of the articles
14  that you've published related to
15  treatment therapies and efficacy around
16  that.  Is that fair to say?
17        A.   I think that's the majority
18  of papers that I published, yes.
19        Q.   Have you written any papers
20  that dealt with assessing the causation
21  of a potential carcinogen?
22        A.   I don't believe so.  I don't
23  think so.
24        THE WITNESS:  Is this

Page 265

1   supposed to have the sticker too?
2         MR. KRISTAL:  I just put
3   that together page of one.
4         THE WITNESS:  No?  Okay.
5         MR. KRISTAL:  We can mark it
6   separately.
7         MR. SLONIM:  It might be
8   easier to mark it separately,
9   don't you think?  Just to make it
10  for a cleaner record.
11        MR. KRISTAL:  It's of no
12  moment one way or the other.  So I
13  have no problem marking it
14  separately.
15        (Document marked for
16  identification as Exhibit
17  Grossbard-25.
18        (Whereupon, a discussion was
19  held off the stenographic record.)
20        MR. KRISTAL:  Okay.  So for
21  housekeeping purposes, Exhibit 24
22  is the updated list of testimony
23  and Exhibit 25 is the updated
24  curriculum vitae.

Michael L. Grossbard, M.D.

Page 266

1 BY MR. KRISTAL:
2     Q.   Correct?
3     A.   That's true.
4     Q.   All right.  Mr. Sanders'
5 report.  Exhibit 1, we're closing in on
6 the homestretch.  So we're approaching
7 third and the coach is signaling us home.
8     A.   Is this like the ball is a
9 little over the 50-yard line?
10    Q.   More like the 20 going --
11 we're in the red zone.
12         Okay.  If I am reading this
13 correctly --
14         MR. SLONIM:  What page are
15    you on?
16         MR. KRISTAL:  The page with
17    the conclusions, Page 10.
18 BY MR. KRISTAL:
19    Q.   It is your opinion that the
20 cause of Mr. Sanders non-Hodgkin lymphoma
21 is not known?
22    A.   That is my opinion.
23    Q.   Okay.  And you comment here,
24 in Point Number 5 in your conclusions

Page 267

1 that, "While plaintiff's expert
2 Dr. Staggs recounts Mr. Sanders' exposure
3 history to various agents, he does not
4 present reliable scientific evidence to
5 rule out these other exposures, nor any
6 other risk factors that epidemiologically
7 are more likely contributors than
8 Roundup."
9         Do you see that?
10    A.   Yes.
11    Q.   So what various agents are
12 you faulting Dr. Staggs for not
13 presenting reliable scientific evidence
14 to rule them out as risk factors?
15 Exposures to what agents specifically?
16    A.   Yeah, I get your question.
17    ████████████████████████████
18 █████████████████████████████████
19 ██████████████████████████████████
20 ████████████████████████████████
21 ███████████████████████████████
22 ████████████████████████
23         In terms of specific agents,
24 I mentioned Agent Orange in my report,

Page 268

1 although I said that I didn't think that
2 was a cause of his lymphoma.  I had
3 mentioned the other pesticides that we
4 talked about that I said I did not think
5 were a cause of his lymphoma.  But he
6 didn't mention those as best as I recall,
7 in his report.
8     Q.   Okay.  But for the Agent
9 Orange and the Sevin, the Lorsban and the
10 Delnav, you don't believe those are risk
11 factors, right?
12    A.   Correct.  I said there was
13 an association, but they were not
14 statistically significant.
15    Q.   Right.  So it's not only
16 that they, in your opinion, are not
17 causes of NHL, but they are not even risk
18 factors for NHL, correct, in your
19 opinion?
20    A.   Each one individually,
21 correct.  I didn't give you data that
22 they were.
23    Q.   Okay.  So are you faulting
24 Dr. Staggs for not ruling out something

Page 269

1 that you do not believe is even a risk
2 factor?
3     A.   I'm faulting him for not
4 pointing out risk factors.
5     Q.   Okay.  But --
6     A.   So the specific -- the
7 specific agents, not necessarily.  But
8 really the sentence also concludes
9 with -- with other risk factors that
10 epidemiologically are there.  But you're
11 asking --
12    Q.   ████████████████████████████
13 ████████████████████████████The
14 first part of that sentence is faulting
15 Dr. Staggs for not ruling out as risk
16 factors the chemical agents that you
17 mention in the report which you do not
18 believe are risk factors, right?
19    A.   Fair enough.
20    Q.   Okay.  And a reliable,
21 reasonable, physician doesn't go through
22 the process of ruling out things that
23 aren't risk factors, right?  I mean, you
24 can spend your entire day saying, "I'm

Michael L. Grossbard, M.D.

Page 270

1 ruling out coffee. I'm ruling out tea.
2 I'm ruling out rock and roll music." I
3 mean, you can go on through -- everything
4 else would be ruled out?
5     A.   In theory.
6     Q.   Well, and in reality, right?
7     A.   Sure.
8         MR. KRISTAL:  Those are all
9     the questions I have now, subject
10    to some other questions. But
11    thank you for your time.
12        THE WITNESS:  You're
13    welcome.
14        MR. SLONIM:  Why don't we
15    take a break and let me look at my
16    notes.
17        THE VIDEOGRAPHER:  The time
18    right now is 4:16 p.m., and we're
19    off the record.
20        (Short break.)
21        THE VIDEOGRAPHER:  This
22    marks the beginning of Tape Number
23    4. The time now is 4:44 p.m., and
24    we're back on the record.

Page 271

1         - - -
2         EXAMINATION
3         - - -
4 BY MR. SLONIM:
5     Q.   All right. Dr. Grossbard,
6 you were asked some questions about
7 Deposition Exhibit Number 9. Can I ask
8 you to pull that, please?
9     A.   Sure. Got it.
10    Q.   This is a document that was
11 prepared by the minority staff report of
12 the -- it was prepared for the --
13 entitled the minority staff report. It
14 was prepared for the members of the
15 Committee on Science, Space and
16 Technology from the House of
17 Representatives in February 2018; is that
18 correct?
19    A.   That is correct.
20    Q.   And you recall you were
21 asked some questions about that?
22    A.   Yes.
23    Q.   And by way of context, and
24 just to set the time frame, do you recall

Page 272

1 that the IARC monograph that you were
2 discussing with Mr. Kristal, that was
3 prepared in 2015?
4         MR. KRISTAL:  Objection to
5     form.
6         THE WITNESS:  Correct.
7 BY MR. SLONIM:
8     Q.   So let me rephrase the
9 question.
10        Doctor, do you recall the
11 year that IARC monograph regarding
12 glyphosate was released?
13    A.   2015.
14    Q.   Okay. And so it's your
15 understanding that this was about two and
16 a half or three years subsequent to the
17 monograph?
18    A.   Yes.
19    Q.   And is it your understanding
20 that after the IARC monograph regarding
21 glyphosate was prepared, that regulatory
22 agencies that had responsibility for the
23 safety of pesticides from around the
24 world re-reviewed the information

Page 273

1 regarding possible carcinogenicity and
2 genotoxicity of glyphosate?
3         MR. KRISTAL:  Object to
4     form.
5         THE WITNESS:  Yes. I
6     believe I said that earlier, but
7     yes.
8 BY MR. SLONIM:
9     Q.   And one of the agencies that
10 took a look at that was Health Canada; is
11 that correct?
12    A.   That is true.
13        MR. KRISTAL:  Objection.
14 BY MR. SLONIM:
15    Q.   In your expert report,
16 Doctor -- well, strike that.
17        In connection with your work
18 in this matter, did you have occasion to
19 review the materials that were prepared
20 by Health Canada regarding their review
21 of the carcinogenicity and genotoxicity
22 of glyphosate?
23    A.   I did and I included it in
24 my report.

Michael L. Grossbard, M.D.

Page 274

1    Q.    Now, taking a look at
2  Exhibit 9.  And let me ask you to turn
3  please to the first page, the
4  introduction.
5    A.    Yes.
6    Q.    And do you recall that
7  Mr. Kristal actually took the time to
8  read the first full paragraph into the
9  record.  Do you recall that?
10   A.    I do recall that.
11   Q.    Do you see sort of on the
12 bottom of that first paragraph the
13 authors, the authors of this report,
14 state that their report is, "based in no
15 small part on documents that have been
16 made publicly available due to ongoing
17 third-party litigation with Monsanto."
18       Is that your understanding,
19 that this document, which you had not
20 seen before, is based in large measure on
21 documents that were produced in
22 connection with litigation?
23   A.    That's what they say here.
24   Q.    And do you see, they

Page 275

1  reference Footnote 1, do they not?
2    A.    Yes, they do.
3    Q.    And Footnote 1 is a
4  reference to something that's called the
5  Monsanto papers; is that correct?
6    A.    It is.
7    Q.    Do you see it's also listed,
8  the name of the plaintiffs' law firm, the
9  Baum Hedlund firm?
10       MR. KRISTAL:  Objection to
11       form.
12       THE WITNESS:  I see that.
13 BY MR. SLONIM:
14   Q.    You understand that Baum
15 Hedlund is one of the plaintiffs' law
16 firms that is bringing actions against
17 Monsanto in regard to glyphosate?
18       MR. KRISTAL:  Objection.
19 BY MR. SLONIM:
20   Q.    Is that your understanding?
21       MR. KRISTAL:  Form.
22       THE WITNESS:  I didn't know
23       the name of that firm prior to
24       today, but that would be my

Page 276

1  assumption based on reading this.
2        (Document marked for
3        identification as Exhibit
4        Grossbard-26.)
5  BY MR. SLONIM:
6    Q.    Now, let me mark as
7  Deposition Exhibit Number 26 a document
8  that was issued by Health Canada on
9  January 11th, 2019.
10   A.    Okay.
11   Q.    Now, doctor, you've seen
12 this before, haven't you?
13   A.    Yes, I have.
14   Q.    And the document was dated
15 or issued by Health Canada on January 11,
16 2019; is that correct?
17   A.    That's what it says, yes.
18   Q.    And turning to the first
19 full paragraph --
20       MR. KRISTAL:  Do you have a
21       copy for me?
22       MR. SLONIM:  I'm sorry.  I
23       do not.
24       MR. KRISTAL:  We're at your

Page 277

1  firm.  You don't have copies.
2  Okay.  I'll take a look after the
3  doctor --
4        THE WITNESS:  Do you want --
5        MR. KRISTAL:  I'll do it
6        after you're done.  I find that
7        odd.
8  BY MR. SLONIM:
9    Q.    Doctor, they state that
10 Health Canada's primary objective in
11 regulating pesticides is to protect
12 Canadians' health and the environment.
13 Is that your understanding of Health
14 Canada's function?
15       MR. KRISTAL:  Objection to
16       form.
17       THE WITNESS:  That's what
18       they say.
19 BY MR. SLONIM:
20   Q.    In the second paragraph --
21 strike that.
22       What is your understanding
23 of what Health Canada did in 2017 in
24 regard to glyphosate?

Michael L. Grossbard, M.D.

Page 278

1    A.   They re-reviewed data,
2  re-reviewed animal, genotoxicity data and
3  re-reviewed all of the -- took another
4  look at the data at that point to see
5  whether they were going to be -- to see
6  whether -- to assess the safety of
7  glyphosate.
8    Q.   And Health Canada -- did you
9  read the Health Canada 2017 review?
10    A.   I did.
11    Q.   We're going to mark that in
12  just a minute or two.
13       Now, after Health Canada
14  published its reevaluation decision in
15  2017, did they -- is it your
16  understanding that they received
17  objections that the scientists at Health
18  Canada then considered?
19       MR. KRISTAL:  Objection to
20  form.
21       THE WITNESS:  That is what
22  they said, yes.
23  BY MR. SLONIM:
24    Q.   Okay.  And would you take a

Page 279

1  look, please, at the second paragraph and
2  the second sentence.  I'll read it.
3       It states, and I quote,
4  "There have also been concerns raised
5  publicly about the validity of some of
6  the science around glyphosate in what's
7  being referred to as the Monsanto
8  papers."
9       Did I read that correctly?
10    A.   You did.
11    Q.   Is it your understanding
12  that when Health Canada says that there
13  are questions that have been raised about
14  the validity of some of the science in
15  glyphosate, that they're talking about
16  the same concerns that are set forth in
17  Exhibit Number 9 which was the document
18  prepared by the minority staff?
19       MR. KRISTAL:  Objection.
20  Foundation.
21       THE WITNESS:  That would be
22  my belief, based on looking at
23  both documents.
24  BY MR. SLONIM:

Page 280

1    Q.   Okay.  And in other words,
2  in the Health Canada document it says
3  that the concerns were raised by what's
4  referred to as the Monsanto papers; is
5  that right?
6       MR. KRISTAL:  Objection to
7  form.
8       THE WITNESS:  Correct.
9  BY MR. SLONIM:
10    Q.   And Exhibit 9, Footnote 1,
11  references the Monsanto papers.  And they
12  say that this report is based in no small
13  part on documents that have been made
14  publicly available through third-party
15  litigation; is that correct?
16    A.   That's correct.
17       MR. KRISTAL:  Objection to
18  form.
19  BY MR. SLONIM:
20    Q.   Okay.  Now, direct your
21  attention, please, to the bottom -- to
22  the first page, the bottom, the bottom
23  paragraph.  It begins, "Our scientists
24  left no stone unturned."

Page 281

1       Do you see that?
2    A.   It's the second page of this
3  document, but that's okay.
4    Q.   I see.  When it copied, it
5  copied a little differently.
6    A.   I see it.
7    Q.   Would you -- would you read
8  that paragraph into the record, please,
9  beginning with, "Our scientists"?
10    A.   "Our scientists left no
11  stone unturned in conducting this review.
12  They had access to all relevant data and
13  information from federal and provincial
14  governments, international regulatory
15  agencies, published scientific reports,
16  and multiple pesticide manufacturers.
17  This includes the reviews referred to in
18  the Monsanto papers.  Health Canada also
19  had access to numerous individual studies
20  and raw scientific data during its
21  assessment of glyphosate, including
22  additional cancer and genotoxicity
23  studies.  To help ensure an unbiased
24  assessment of the information, Health

Michael L. Grossbard, M.D.

Page 282

1 Canada selected a group of 20 of its own
2 scientists who are not involved in the
3 2017 reevaluation to evaluate the notices
4 of objection.
5     Q.   Okay.  So let's unpack this
6 a little bit.  Is it your understanding
7 that when Health Canada conducted their
8 re-review of the potential
9 carcinogenicity and genotoxicity of
10 glyphosate, that their scientists
11 expressly considered the Monsanto papers
12 that are referred to in Exhibit 9,
13 reference Footnote 1?
14        MR. KRISTAL:  Objection.
15    Foundation.  Form.
16        THE WITNESS:  That's my
17    understanding.
18 BY MR. SLONIM:
19     Q.   And is it also your
20 understanding that they had access to the
21 individual studies and more scientific
22 data regarding glyphosate?
23        MR. KRISTAL:  Objection.
24    Form.

Page 283

1        THE WITNESS:  Correct.
2    That's true.
3 BY MR. SLONIM:
4     Q.    You recall plaintiff's
5 counsel asked you whether or not you had
6 reviewed the individual scientific
7 studies regarding genotoxicity.  Do you
8 recall being asked those questions?
9     A.    I do.
10     Q.   And you indicated that you
11 had read reviews; is that correct?
12     A.    That's correct.
13     Q.    Okay.  And did the reviews
14 you read, it included Kier and Kirkland;
15 is that correct?
16     A.    That is true.
17     Q.    Did the review also include
18 Health Canada reviews?
19     A.    That is true.
20     Q.    And is it your understanding
21 Health Canada, that their scientists
22 actually had access to the underlying raw
23 scientific data?
24        MR. KRISTAL:  Objection.

Page 284

1    Form.
2        THE WITNESS:  That's what
3    they stated, yes.
4 BY MR. SLONIM:
5     Q.    And take a look, please, at
6 the fourth -- fourth paragraph.  It says,
7 "After a thorough scientific review."  On
8 the first page, fourth paragraph.
9     A.    Okay.  Got it.
10     Q.    What's your understanding of
11 Health Canada's assessment after they
12 re-reviewed all of the scientific
13 evidence including the Monsanto papers?
14     A.    They felt that glyphosate
15 was safe for use and that it did not pose
16 a cancer risk.
17     Q.    Okay.  Now, do you recall in
18 connection with this Exhibit Number 9,
19 Mr. Kristal, the plaintiff's counsel,
20 directed your attention to Page 6.
21     A.    Yes.
22     Q.    And asked you some questions
23 about ghostwriting and your feelings
24 about ghostwriting.  Do you recall that?

Page 285

1     A.    Yes.
2     Q.    And do you recall he
3 specifically asked you some questions
4 about the Greim paper?
5     A.    Correct.
6     Q.    And do you see Greim is also
7 referred to on this Page 6?
8     A.    I do.
9     Q.    I don't believe Greim was
10 marked as a deposition exhibit.
11        MR. SLONIM:  Was it?
12        MR. KRISTAL:  You're asking
13    me?  I don't believe I marked it.
14        MR. SLONIM:  Well, let's do
15    this.  I have one copy.  I don't
16    believe Greim was marked.
17        THE WITNESS:  I'm not seeing
18    it in the documents.
19        MR. SLONIM:  I think you
20    marked Kier and Kirkland.
21        THE WITNESS:  That's true.
22    Well, that's true.  I have that
23    here.
24        MR. SLONIM:  Let's mark as

Michael L. Grossbard, M.D.

Page 286

1 the next deposition exhibit the
2 Greim paper.
3         (Document marked for
4    identification as Exhibit
5    Grossbard-27.)
6 BY MR. SLONIM:
7    Q.   Doctor, my computer is being
8 uncooperative.
9         Can I ask you please to turn
10 to the last page of the article, 2006?
11        MR. KRISTAL:  May I just
12    interrupt for a second.  Are you
13    done with the Health Canada
14    document?  If so, may I have it so
15    I can review it while you're --
16        THE WITNESS:  Sure.  I think
17    that was it.
18        MR. KRISTAL:  Yes.  Thank
19    you.
20 BY MR. SLONIM:
21    Q.   Can you take a look at
22 deposition exhibit -- Page 206 of the
23 Greim article.
24    A.   Yes.  Okay.  Yes.

Page 287

1    Q.   And, Doctor, can you read
2 please into the record the
3 acknowledgment?
4    A.   The acknowledgment says,
5 "Special thanks go to Elizabeth Webb,
6 Monsanto toxicologist for her detailed
7 attention to document and data table
8 formatting and as the reference library
9 curator.  Quality control and review of
10 data transcription were valued services
11 provided by Carrie Leigh Logan and Aparna
12 Desai Nemali, Monsanto quality assurance
13 specialists."
14    Q.   Based -- based on that
15 acknowledgment, is it your understanding
16 that Monsanto contributed to the
17 preparation of this article?
18    A.   They state that here, yes.
19    Q.   And then would you go down
20 please to the -- to the last page.  I'm
21 sorry, to the -- yeah, my computer is
22 being a little fussy over here.
23        Take a look, please, at the
24 declaration of interest.

Page 288

1    A.   Okay.
2    Q.   And directing your attention
3 to the second sentence.  Well, let's see.
4 Does it indicate that employee -- that
5 people that were involved in preparation
6 of this article were members of the
7 glyphosate task force?
8    A.   It does.
9    Q.   And does it indicate
10 further -- well, strike that.
11        Based on reading that
12 disclosure, who do you understand the
13 glyphosate task force to be?
14    A.   They say it's a consortium
15 of European glyphosate registrants.  So I
16 assume manufacturers.
17    Q.   Okay.  So it's your
18 understanding that the -- that the
19 manufacturers had input and were
20 disclosed as having input into the
21 preparation of this article?
22        MR. KRISTAL:  Objection.
23    Form.
24        THE WITNESS:  Yes.

Page 289

1 BY MR. SLONIM:
2    Q.   And then please read the
3 sentence about Dr. Helmut Greim.
4    A.   "Helmut Greim was funded as
5 an independent consultant for his expert
6 contributions to this manuscript."
7    Q.   So is it your understanding
8 that in this disclosure, it indicates
9 that Helmut Greim was being paid by the
10 consortium of glyphosate manufacturers?
11        MR. KRISTAL:  Objection.
12    Form.
13        THE WITNESS:  Yes.
14 BY MR. SLONIM:
15    Q.   Do you recall that you were
16 asked some questions about -- and we'll
17 take a look at some of these documents.
18 But you were asked some questions about a
19 Monsanto employee, David Saltmiras, and
20 his participation in the preparation of
21 this article?
22    A.   I do recall that.
23    Q.   Would you read, please, the
24 next sentence that talks about

Michael L. Grossbard, M.D.

Page 290

1 Mr. Saltmiras?
2        MR. KRISTAL:  It's doctor.
3        THE WITNESS:  "David
4 Saltmiras and Christian Strupp are
5 employed by member companies of
6 the GTF, Monsanto and ADAMA" --
7 A-D-A-M-A -- "Agricultural B.V."
8 BY MR. SLONIM:
9    Q.   Reading that disclosure,
10 does that tell you what Mr. Saltmiras was
11 employed by member companies of the
12 glyphosate task force, including
13 Monsanto?
14    A.   It does.
15    Q.   I'll direct your attention
16 to the next sentence, which also talks
17 about Mr. Saltmiras.  Would you please
18 read the disclosure there about
19 Mr. Saltmiras?
20    A.   David Saltmiras is also
21 chair of the toxicology technical working
22 group of the GTF.
23    Q.   Reading that statement, do
24 you understand what Mr. Saltmiras' role

Page 291

1 is as part of the glyphosate task force?
2    A.   Yes.  It appears he's a
3 representative of Monsanto on that task
4 force.
5    Q.   Going down two sentences,
6 does it explain what Monsanto's role is
7 with respect to glyphosate?
8    A.   It states that Monsanto was
9 the original producer and marketer of
10 glyphosate formulations.
11    Q.   And reading this disclosure,
12 would you have any-- was there any
13 question in your mind that Monsanto was
14 the original producer and marketer of
15 glyphosate, that it was a member of the
16 glyphosate task force, and that it
17 employed Mr. Saltmiras who contributed to
18 this article?
19        MR. DIAMOND:  Form.
20        MR. KRISTAL:  Objection to
21 form.
22        THE WITNESS:  Yes, all of
23 those are true.
24 BY MR. SLONIM:

Page 292

1    Q.   Would you please read the
2 next sentence of this disclosure?
3    A.   "The authors had sole
4 responsibility for the writing and
5 content of the paper, and the
6 interpretation and opinions expressed in
7 the paper are those of the authors and
8 may not necessarily be those of the
9 member companies of the glyphosate task
10 force."
11    Q.   You were asked some
12 questions about your opinion about the --
13 about ghostwriting and about the kinds of
14 disclosures.
15        Reading this disclosure, do
16 you have any reservations about the way
17 in which Monsanto's involvement in
18 preparation of this article and content
19 of this article is disclosed?
20        MR. KRISTAL:  Objection.
21 Foundation.
22        THE WITNESS:  I don't.  As I
23 said, I think you need to make
24 disclosures.

Page 293

1 BY MR. SLONIM:
2    Q.   Okay.  Now, you -- the Greim
3 paper itself, we're talking about the
4 disclosures.  This paper talks about the
5 animal studies of carcinogenicity; is
6 that correct?
7    A.   It does.
8        MR. KRISTAL:  Objection.
9 Form.
10 BY MR. SLONIM:
11    Q.   And is this a paper that you
12 reviewed in connection with your --
13 forming your expert opinions in this
14 matter?
15    A.   It is.
16    Q.   And do you recall that you
17 were asked about whether or not you had
18 reviewed any of the underlying studies
19 themselves?
20    A.   That's correct.
21    Q.   If you take a look, please,
22 at the last page of the article.  It's
23 probably Page 208.
24    A.   Sorry.

Michael L. Grossbard, M.D.

Page 294

1  Q. Last page.
2  A. Yes.
3  Q. And the very -- very bottom
4 indicates, "Supplementary material
5 available online."
6      Do you see that?
7  A. Correct.
8  Q. And it indicates that
9 there's supplementary -- there's
10 supplementary data for Studies 1 through
11 14; is that correct?
12  A. Yes.
13  Q. And that's how many studies
14 were actually discussed in the paper; is
15 that right, 14 studies?
16  A. That is true, yes.
17  Q. Did you have an opportunity
18 to take some look at the supplementary
19 data that's available online?
20  A. I glanced at it. I did not
21 go over it in any detail.
22  Q. Was that original source
23 data from each one of the 14 animal
24 studies that's discussed in the Greim

Page 295

1 paper?
2  A. That was my understanding.
3  Q. Okay. Now, another document
4 that you were shown was Deposition
5 Exhibit Number 10. Can you pull that
6 out, please.
7  A. Yes.
8  Q. This document, on its face,
9 what is the word -- what is the word
10 above May 11, 2015?
11  A. "Draft."
12  Q. What's your understanding of
13 what a draft is?
14  A. A draft is an incomplete
15 version, a sketch of some original ideas
16 that may or may not be the final product.
17  Q. Have you ever seen this
18 document before?
19  A. No.
20  Q. Do you know who wrote it?
21  A. I have no idea.
22  Q. Do you know if it's a final
23 document?
24  A. I do not.

Page 296

1  Q. Do you know if it was -- if
2 it was reviewed by anybody?
3  A. In terms of anybody? I
4 don't know who wrote it, who reviewed it,
5 who read it, who spoke it.
6  Q. You don't know if there were
7 any comments back and forth on that?
8  A. I don't know if there were
9 comments back and forth at all, no.
10  Q. You were asked some
11 questions about different comments here
12 about different kinds of studies and
13 things that might be conducted,
14 meta-analysis and so on.
15      Do you recall that?
16  A. I do.
17  Q. And, Doctor, is there
18 anything wrong with a company whose
19 product is being criticized from wanting
20 to get into the public domain relevant
21 information so that there's more
22 scientific evidence available and so that
23 information can be put into context and
24 evaluated?

Page 297

1      MR. DIAMOND: Form.
2      MR. KRISTAL: You're asking
3 hypothetically? Is that a hypo?
4 I object to form.
5 BY MR. SLONIM:
6  Q. You can answer the question,
7 Doctor. Do you want to have it read
8 back?
9  A. Please.
10      (Whereupon, the court
11 reporter read back the requested
12 portion of testimony.)
13      THE WITNESS: No.
14 BY MR. SLONIM:
15  Q. Doctor, if an assessment of
16 carcinogenicity is published, and if a
17 manufacturer believes that the assessment
18 is scientifically incorrect, do you have
19 any criticism of a company from
20 responding to that by putting into the
21 public domain additional information that
22 may be informative?
23      MR. KRISTAL: Same
24 objection.

Page 298

1    MR. DIAMOND:  Form.
2    THE WITNESS:  No, I don't.
3  BY MR. SLONIM:
4    Q.   Now, Doctor, one of the
5  exhibits that you were shown was
6  Deposition Exhibit Number 11, the Chang
7  and Delzell article.
8    Do you recall that?
9    A.   Yes.
10   Q.   Can you pull up Deposition
11 Exhibit Number 11.
12   A.   Okay.  I got it.
13   Q.   Can you turn, please, to
14 Page 424.
15   A.   Got it.
16   Q.   Do you -- on the right-hand
17 side, do you see the subheading
18 "Funding"?
19   A.   I do.
20   Q.   Would you read that once
21 into the record, please, and then I'm
22 going to ask a question.
23   A.   "This work was reported by
24 Monsanto Company, the original producer

Page 299

1  and marketer of glyphosate formulations."
2    Q.   Reading that disclosure,
3  what does that communicate to you or what
4  is your understanding of who paid for the
5  meta-analysis that these authors
6  published?
7    A.   Monsanto paid and funded the
8  work in this report.
9    Q.   Can you read into the
10 record, please, the full disclosure
11 statement, it's about four or five
12 sentences, and then I'm going to ask you
13 some questions.
14   A.   "The sponsors were provided
15 the opportunity to review the manuscript
16 prior to journal submission, but
17 inclusion of their suggestion was left to
18 the discretion of the authors, who
19 retained sole control of the manuscript
20 content and the findings.  Statements in
21 this paper are those of the authors and
22 not those of the authors' employer or the
23 sponsors.  The authors are employed by
24 Exponent, a scientific research and

Page 300

1  consulting firm that provides services
2  for private" -- "for private and
3  governmental clients, including on
4  projects concerning glyphosate and other
5  pesticides.
6    "In the past few years,
7  Ellen Chang has provided consulting
8  services through Exponent on behalf of
9  Monsanto Company on other issues, and she
10 has also provided consulting services on
11 other pesticides and lymphohematopoietic
12 cancers for other clients."
13   Q.   Reading that disclosure,
14 Doctor, do you have any concern that the
15 Chang and Delzell article is
16 ghostwritten?
17   A.   No, I don't.
18   Q.   Why not?
19   A.   She's clearly stated that --
20 what her -- what her conflicts are.  And
21 she's -- it's clearly funded by Monsanto.
22 And there's no indication here to suggest
23 that somebody else wrote this.
24   It specifically says the

Page 301

1  authors retained sole control of the
2  manuscript content.
3    Q.   Okay.  Now, another document
4  that you were asked about was Deposition
5  Exhibit Number 12.
6    A.   Tell me what that is.
7    Q.   It's the Monsanto manuscript
8  clearance form.
9    A.   Got it.  Okay.
10   Q.   Do you recall being asked
11 some questions about this, in particular,
12 Mr. Saltmiras?
13   A.   Yes.
14   Q.   And this is in connection
15 with the Kier and Kirkland article; is
16 that correct?
17   A.   That's true, yes.
18   Q.   Okay.  Now, let's take a
19 look at Kier and Kirkland.  That was
20 marked I guess as Exhibit Number 14.
21   A.   Okay.  I've got that.
22   Q.   Yeah, let's take a look at
23 one other while we are talking about
24 this.  Let's take a look also at

Michael L. Grossbard, M.D.

Page 302

1  Deposition Number 13.
2      A.   Okay.  I've got that.
3      Q.   Okay.  So do you recall in
4  Deposition Exhibit Number 12 you were
5  asked questions about whether
6  Mr. Saltmiras -- whether the role of
7  Monsanto was properly disclosed in the
8  Kier and Kirkland articles?
9      A.   I remember questions to that
10 effect.
11     Q.   And do you recall the same
12 thing in connection with being questioned
13 about Deposition Exhibit Number 13?
14     A.   Yes.
15     Q.   Now, let's take a look at
16 Deposition Exhibit Number 14.  Do you
17 have that?
18     A.   I do.
19     Q.   Could you turn, please, to
20 Page 310.  I direct your attention to the
21 lower right-hand side, acknowledgments?
22     A.   Okay.
23     Q.   Would you read please the
24 first sentence through David Saltmiras,

Page 303

1  just read that into the record.
2      A.   "The authors would like to
3  thank the following individuals for their
4  contributions to this work by providing
5  regulatory studies and their thoughtful
6  review of the manuscript:  David
7  Saltmiras, Monsanto Company."
8      Q.   So what's your understanding
9  insofar as that first sentence of
10 Mr. Saltmiras and the role that he played
11 in -- in this manuscript and study?
12     A.   Provided data on regulatory
13 studies, and he reviewed the manuscript.
14     Q.   And please take a look under
15 the last sentence of that acknowledgment.
16 And read that into the record, please.
17     A.   We would also like to
18 acknowledge David Saltmiras for his
19 invaluable service in providing
20 coordination with individual companies
21 and the glyphosate task force.
22     Q.   Are you able to glean
23 anything from that sentence in regard to
24 what Mr. Saltmiras did further by way of

Page 304

1  assistance to the authors in preparation
2  of this article?
3          MR. KRISTAL:  Objection.
4  Foundation.
5          THE WITNESS:  He helped to
6  coordinate their work with -- with
7  members and member companies from
8  the glyphosate task force.
9  BY MR. SLONIM:
10     Q.   Okay.  And looking down at
11 the declaration of interest.  Do you see
12 that?
13     A.   Yes.
14     Q.   The second sentence.  Please
15 read that about the -- that description
16 of the glyphosate task force.
17     A.   Oh, sorry.  "The glyphosate
18 task force is a consortium of 25 European
19 glyphosate registrants listed on" -- and
20 it gives a website.
21     Q.   Okay.  Now, based on reading
22 that disclosure, what is your
23 understanding of what the glyphosate task
24 force is?

Page 305

1          MR. KRISTAL:  Objection.
2  Foundation.
3          THE WITNESS:  As I stated
4  earlier, it's a consortium of
5  companies that manufacture
6  glyphosate.
7  BY MR. SLONIM:
8      Q.   No confusion about that in
9  your mind, is there?
10         MR. KRISTAL:  Objection.
11 Foundation.
12         MR. DIAMOND:  Form.
13         MR. KRISTAL:  And form.
14         THE WITNESS:  No.
15 BY MR. SLONIM:
16     Q.   Read, please, the -- go up
17 to the first sentence under the
18 declaration of interest.  Would you read
19 that, please.
20     A.   "Larry Kier and David
21 Kirkland were paid consultants of the
22 glyphosate task force for the preparation
23 of this review."
24     Q.   Reading that sentence, what

Michael L. Grossbard, M.D.

Page 306

1 does that -- what is your understanding
2 of the role of Larry Kier and David
3 Kirkland, the two named authors of this
4 article?
5 MR. KRISTAL: Objection.
6 Foundation.
7 THE WITNESS: They were paid
8 by manufacturers to prepare their
9 review.
10 BY MR. SLONIM:
11 Q. And then the third sentence
12 talks about Larry Kier's past employment.
13 Can you please read that.
14 A. "Larry Kier is also a past
15 employee of Monsanto Company."
16 Q. And then finally, would you
17 read the last sentence about the authors'
18 responsibility?
19 A. "The authors had sole
20 responsibility for the writing and
21 content of the paper, and the
22 interpretations and opinions expressed in
23 the papers are those of the authors and
24 may not necessarily be those of the

Page 307

1 member companies of the glyphosate task
2 force."
3 Q. Now, Doctor, having read the
4 acknowledgments and having read the
5 declaration of interest, is there any
6 concern in your mind that the Kier and
7 Kirkland paper was ghostwritten?
8 MR. KRISTAL: Objection to
9 foundation and form.
10 MR. DIAMOND: Form.
11 THE WITNESS: No.
12 BY MR. SLONIM:
13 Q. Why not?
14 A. Because it basically says
15 they were responsible for the writing and
16 content of the paper. I have to take
17 that for what it's worth.
18 Q. And it discloses -- strike
19 that.
20 And does it also disclose
21 the role of the glyphosate task force and
22 Monsanto?
23 MR. KRISTAL: Objection.
24 THE WITNESS: It does.

Page 308

1 BY MR. SLONIM:
2 Q. Now, doctor, can I ask you
3 to take a look, please, at Deposition
4 Number 15.
5 MR. DIAMOND: Exhibit 15.
6 MR. SLONIM: Exhibit 15.
7 THE WITNESS: What is it?
8 BY MR. SLONIM:
9 Q. It's the Portier article.
10 A. Not seeing it.
11 MR. KRISTAL: It's the one
12 with all the authors. 94.
13 THE WITNESS: I do remember
14 that.
15 MR. SLONIM: Keep the
16 Benbrook article. We may have
17 that next. Okay. Let's try to
18 find the Portier article.
19 There it is.
20 THE WITNESS: There it is.
21 How can you miss that?
22 BY MR. SLONIM:
23 Q. Okay. So, Doctor, do you
24 recall being questioned about this

Page 309

1 article?
2 A. I do.
3 Q. And this article purports to
4 explain differences in the evaluation
5 that was prepared by IARC versus the
6 evaluation that was prepared by the
7 European Food Safety Authority. Do you
8 recall being asked questions about that?
9 A. Correct, yes.
10 Q. And do you recall that
11 plaintiff's counsel pointed out that
12 there were multiple authors on this -- on
13 this paper?
14 A. Correct.
15 Q. He did not -- plaintiff's
16 counsel did not ask you about the
17 conflict of interest disclosure, did he?
18 A. He did not.
19 Q. Would you please turn to
20 Page Number 744.
21 A. Okay.
22 Q. Direct your attention to the
23 right, to the right-hand side, the middle
24 of the page, where there's a disclosure

Michael L. Grossbard, M.D.

Page 310

1  about competing interests.
2       Do you see that?
3       A.  Yes, I do.
4       Q.  Would you read please the
5  first full sentence under competing
6  interests?
7       A.  "CJP, MTS, and DDW are
8  providing advice to a U.S. law firm
9  involved in glyphosate litigation."
10      Q.  Is it your understanding
11 that the first named author, Dr. Portier,
12 and also Dr. Dennis Weisenburger, and a
13 third author on this paper were working
14 as paid experts for plaintiffs' attorneys
15 at the time they prepared this document?
16      A.  That would be my
17 understanding based on the competing
18 interest comment.
19      Q.  Okay.  Is it your
20 understanding -- strike that.
21      Do you recall that you were
22 also shown Deposition Exhibit Number 16,
23 an article by Dr. Benbrook?
24      A.  I do, yes.

Page 311

1       Q.  And that article purports to
2  explain how the U.S. EPA and IARC reached
3  diametrically opposite conclusions.  Do
4  you recall being asked some questions
5  about that?
6       A.  I do.
7       Q.  And do you recall that the
8  plaintiff's counsel asked you about
9  the -- for instance, the number of
10 regulatory studies, the genotoxicity
11 studies that were prepared by the
12 registrants as opposed to the number that
13 was reviewed by -- by IARC?  Do you
14 recall that, those questions?
15      A.  I do recall that, yes.
16      Q.  Okay.  Did plaintiff's -- I
17 don't -- strike that.
18      Did plaintiff's counsel ask
19 you about the conflict of interest
20 disclosure on the Benbrook article?
21      A.  Not to my recollection.
22      Q.  Okay.  Let's take a look at
23 that.
24      Would you turn, please, to

Page 312

1  Page 14 of 16.
2       A.  Yes.
3       Q.  And do you see in the
4  right-hand side, it talks about competing
5  interests?
6       A.  Yes.
7       Q.  Would you read the first
8  full sentence, please?
9       A.  "CB" -- or Charles
10 Benbrook -- "has served since
11 September 2016 as an expert witness for
12 plaintiffs in U.S. litigation involving
13 the impact of glyphosate-based herbicides
14 on non-Hodgkin's lymphoma."
15      Q.  So what's your understanding
16 of the author's -- the author of this
17 publications role in the litigation?
18      A.  He's serving as a
19 plaintiffs' expert.
20      Q.  A paid expert?
21      A.  Correct.
22      MR. KRISTAL:  Do you know
23      any others?
24 BY MR. SLONIM:

Page 313

1       Q.  Now, Doctor, I'm going to
2  mark as the next Deposition Exhibit 28,
3  the Health Canada glyphosate reevaluation
4  decision dated April 28, 2017.
5       (Document marked for
6       identification as Exhibit
7       Grossbard-28.)
8  BY MR. SLONIM:
9       Q.  Take a look, please, also at
10 Deposition Exhibit Number 1.  That's your
11 report.
12      A.  Yeah, I know.  I just have
13 to find it.  I guarantee these are in no
14 particular order.
15      Oh, here it is.  Got it.
16 Got it.
17      Q.  And if you take a look at
18 Page 8 of your expert report.
19      A.  Okay.  Got it.
20      Q.  Sort of the underneath the
21 geno -- animal genotoxicity studies, you
22 actually reference this document, don't
23 you?
24      A.  I do, yes.

Michael L. Grossbard, M.D.

Page 314

1    Q.   Okay.  So I want to ask you
2  some questions about this document.
3          When was this prepared
4  relative to the IARC monograph?
5    A.   About two years later.
6    Q.   Okay.  Turn, please, to Page
7  1.
8    A.   Okay.
9    Q.   Do you understand that this
10 document was prepared in response to
11 IARC?
12         MR. DIAMOND:  Form.
13         THE WITNESS:  I don't -- I
14     don't recall whether that was a
15     response to IARC or not.  I recall
16     they were doing an assessment of
17     regulated pesticides.
18 BY MR. SLONIM:
19   Q.   Okay.  Take a look, please,
20 at page -- bear with me.
21   A.   Sorry.  This is the
22 reevaluation?
23   Q.   Yes.
24   A.   Yeah, that was triggered in

Page 315

1  response to IARC, yes.
2    Q.   Okay.  And we may -- as we
3  work our way through the document, I
4  think we'll have an opportunity to point
5  out some places where that's made
6  clearer.
7          Now, directing your
8  attention now, this is -- right on the
9  very first page is their executive
10 summary; is that correct?
11   A.   That's correct.
12   Q.   Do you see right in the
13 middle of the page, they report overall
14 findings?
15   A.   Correct.
16   Q.   And would you read the first
17 bullet?
18   A.   Glyphosate is not genotoxic
19 and is unlikely to pose a human cancer
20 risk.
21   Q.   What does it mean when it
22 says glyphosate is not genotoxic?  What
23 does that mean?
24   A.   As we defined earlier it

Page 316

1  means that it's not causing DNA damage,
2  that it's not a mutagen, that it's not --
3  it's not a carcinogen through genotoxic
4  mechanisms.
5    Q.   What's it mean when it says
6  it's unlikely to pose a human cancer
7  risk?
8    A.   I don't know their
9  definition of unlikely.  But I mean, it
10 means not -- not likely, that there's
11 not -- in my mind, that there's not a
12 statistically significant association
13 between exposure to glyphosate and
14 developing cancer.
15   Q.   Do you recall that you were
16 asked some questions about whether Health
17 Canada and other regulatory agencies
18 adequately considered occupational
19 exposures as opposed to non-occupational
20 exposures?
21   A.   I do recall that.
22   Q.   Okay.  Directing your
23 attention, please, to Page 5.
24   A.   Okay.

Page 317

1    Q.   Let's start with the
2  non-occupational exposures at the top.
3  Do you see that?
4    A.   Yes.
5    Q.   Reading the first paragraph,
6  can you tell us how -- what kind of
7  non-occupational exposures Health Canada
8  considered?
9    A.   They considered residential
10 exposure from applying the
11 glyphosate-containing products to lawns,
12 gardens.  They considered it not only
13 from application, but also from mixing,
14 loading, and preparing the product for
15 use.
16         They looked at exposure
17 post -- post-application, including
18 incidental oral exposure, which I think
19 is something that we discussed on that
20 Mount Sinai document.
21         They looked at dermal and
22 inhalation exposure.  And then they -- I
23 think those are the major areas.  Then
24 they looked at chronic dietary exposure

Michael L. Grossbard, M.D.

Page 318

1 through food and drinking water.
2     Q.   Now, do you also -- so you
3 recall that in the Mount -- in the Mount
4 Sinai document that you looked at, there
5 were questions about children?
6     A.   Yes.
7     Q.   Did -- looking at the second
8 full paragraph under the non-occupational
9 exposures, did Health Canada consider
10 exposures that might occur with children?
11     A.   It looks like they did.
12     Q.   And they also considered --
13 did they also consider exposures that
14 could occur through inhalation or
15 ingestion from food that may have
16 glyphosate residue?
17     A.   Yes, they do.
18     Q.   Okay.  And directing your
19 attention, please, to the last full
20 paragraph of -- that subsection.
21 Would you please read the two sentences
22 into the record.
23     A.   This is in paragraph
24 "Occupational Risk"?

Page 319

1     Q.   No, non-occupational
2 scenarios.
3     A.   Sorry.  Non --
4 non-occupational scenarios.  Where do
5 you -- where are you directing my
6 attention to?  I'm sorry.
7     Q.   Yeah.  Yeah.  Right over
8 here.  Those two sentences.
9     A.   These two?
10     Q.   Yep.
11     A.   "Non-occupational scenarios
12 were aggregated with background
13 (chronic), dietary exposure (food and
14 drinking water).  The resulting aggregate
15 risk estimates reached the MOE for all
16 uses and are not of concern."
17     Q.   What's your understanding of
18 when they say the exposure were not of
19 concern?
20         MR. DIAMOND:  Form.
21         THE WITNESS:  That
22     they're -- that they're not
23     putting people at risk.
24 BY MR. SLONIM:

Page 320

1     Q.   Now, directing your
2 attention, please, to the bottom of the
3 page, do you see that they talk about
4 occupational exposures?
5     A.   Yes.
6     Q.   And do you recall that
7 Mr. Kristal asked you some questions
8 about whether the EPA and Health Canada
9 and other regulatory agencies gave
10 adequate consideration to occupational
11 exposures?
12         MR. KRISTAL:  Object to
13     form.
14         THE WITNESS:  I do recall
15     some version of that, yes.
16 BY MR. SLONIM:
17     Q.   Do you remember he suggested
18 that perhaps IARC gave more deference to
19 occupational exposures and that the
20 regulatory agencies gave inadequate
21 consideration?
22     A.   That I do remember.
23         MR. KRISTAL:  Objection to
24     form.  Misstates the evidence.

Page 321

1 BY MR. SLONIM:
2     Q.   Is that your understanding
3 of the thrust of Mr. Kristal's questions
4 to you?
5         MR. KRISTAL:  Objection.
6     Form.
7         THE WITNESS:  That was the
8     gist, yes.
9 BY MR. SLONIM:
10     Q.   Would you please read
11 that -- it's a short paragraph.  Please
12 read that short paragraph into the
13 record.
14     A.   "Risks to handlers are not
15 of concern for all scenarios.  Based on
16 the precautions and directions for use on
17 product labels reviewed for this
18 reevaluation, risk estimates associated
19 with mixing, loading, and applying
20 activities met the target dermal and
21 inhalation MOE" -- which is margins of
22 exposure -- "and are not of concern."
23     Q.   What's your understanding of
24 when they say that the exposure levels

Michael L. Grossbard, M.D.

Page 322

1 were not of concern?
2          MR. KRISTAL:  Objection.
3          THE WITNESS:  That they did
4     not increase the risk of a bad
5     outcome, specifically lymphoma or
6     other cancers.
7 BY MR. SLONIM:
8     Q.    Okay.  Now, turn, please, to
9 Page 17.
10     A.    Okay.
11     Q.    At the top, do you see that
12 there were comments that related to IARC
13 and IARC's assessment?
14     A.    I do see that.
15     Q.    Is that consistent with your
16 understanding that this document was
17 generated in response to IARC?
18          MR. KRISTAL:  Objection.
19     Form.
20          THE WITNESS:  Yes.
21 BY MR. SLONIM:
22     Q.    Turn, please, to Page 18.
23     A.    Okay.
24     Q.    Do you see the discussion of

Page 323

1 IARC?
2     A.    I do.
3     Q.    Okay.  And is it your
4 understanding that in this section of the
5 document, Health Canada scientists are
6 explaining some of the reasons why they
7 reached a different assessment than IARC
8 did?
9          MR. KRISTAL:  Objection to
10     form.
11 BY MR. SLONIM:
12     Q.    Well, let me rephrase it.
13          Doctor, take a minute,
14 please, and read Pages 18, and going over
15 to 19 on the IARC assessment.  Just read
16 that to yourself.
17     A.    Okay.
18     Q.    Is it your understanding
19 that in this document, that Health Canada
20 explains similarities and differences
21 between its assessment and IARC's
22 assessment?
23          MR. KRISTAL:  Objection.
24     Form.

Page 324

1          THE WITNESS:  I believe
2     that's true.
3 BY MR. SLONIM:
4     Q.    Going to Page 19.
5     A.    Yes.
6     Q.    Would you -- under the
7 subheading "Genotoxicity," would you read
8 that first two sentences into the record?
9     A.    "PMRA did not identify any
10 genotoxic potential for the active
11 ingredient glyphosate acid.  Negative
12 results for in vitro and in vivo gene
13 mutation and chromosomal effect assays in
14 mammalian cells contributed to the
15 overall conclusion that the active
16 ingredient glyphosate was not genotoxic."
17     Q.    What does it mean when it
18 says "negative results for in vitro and
19 in vivo genome mutation and chromosomal
20 effect assays"?  What's that mean?
21     A.    So those include studies in
22 a test tube, for example, bacterial
23 mutagenic assays.  And they also include
24 in vivo, so in animal studies.

Page 325

1     Q.    What's it mean when it says
2 they had negative results?
3     A.    It means that they didn't
4 find evidence of genotoxicity.
5     Q.    Directing your attention,
6 please, to the second paragraph.  It
7 starts with, "In a large battery."
8     A.    Okay.
9     Q.    Read the first two
10 sentences, please.
11     A.    "In large battery of
12 genotoxicity" -- "genotoxicity assays,
13 conducted according to the OECD, test
14 guidelines for glyphosate is available.
15 Many studies have been replicated several
16 times and all indicated negative results
17 for genotoxicity."
18     Q.    What significance if any is
19 it that there were replicated studies
20 from the international test guidelines
21 that showed negative results?
22          MR. KRISTAL:  Objection to
23     form.
24          THE WITNESS:  So when you're

Michael L. Grossbard, M.D.

Page 326

1  doing any kind of study you want
2  to make sure that a study is
3  either a -- is a true positive or
4  a true negative as opposed to a
5  false positive or false negative,
6  by repeating studies. And using a
7  multiplicity -- multiplicity of
8  studies to examine things, you can
9  carefully assess a question.
10 BY MR. SLONIM:
11     Q. Read the next sentence,
12 please.
13     A. "The IARC assessment did not
14 consider the majority of these studies."
15     Q. What significance if any
16 does that have in your assessment of IARC
17 and IARC's review?
18          MR. KRISTAL: Objection.
19 Foundation.
20          THE WITNESS: If there
21 were -- if there were many
22 negative studies that weren't
23 included, that can bias the
24 interpretation by IARC.

Page 327

1 BY MR. SLONIM:
2     Q. Read the next sentence,
3 please.
4     A. "Instead, the IARC monograph
5 reported mixed results for studies with
6 glyphosate-formulated products that
7 examined DNA damage, gene mutation, and
8 chromosomal aberrations and included
9 results from nonmammalian systems, for
10 example fish and plants, that are not
11 considered relevant for human health
12 hazard characterization."
13     Q. Doctor, do you agree that
14 results from nonmammalian systems, for
15 instance fish and plants, are not
16 relevant for human health hazard
17 characterization?
18          MR. KRISTAL: Objection to
19 form.
20          THE WITNESS: Yes, and I
21 think you need to be very careful
22 in extrapolating from any animal
23 model to people, or from any in
24 vitro model to people.

Page 328

1 BY MR. SLONIM:
2     Q. And so insofar as IARC did
3 not consider a majority of studies that
4 were performed according to international
5 guidelines and insofar as IARC did
6 consider studies from nonmammalian
7 systems, how would you characterize
8 IARC's analysis of genotoxicity?
9          MR. KRISTAL: Objection to
10 form. Also assumes facts not in
11 evidence.
12          THE WITNESS: I believe it
13 would have less relevance to the
14 true human situation.
15 BY MR. SLONIM:
16     Q. Direct your attention,
17 please, to the next paragraph. And would
18 you read that paragraph into the record.
19     A. "The IARC monograph also
20 noted that in several cases positive
21 results occurred at very high or toxic
22 levels only. It is important to
23 characterize the relationship of
24 genotoxic results in the context of

Page 329

1 observed cytotoxicity. Positive results
2 at very high or toxic dose levels
3 indicate that the genotoxic effects are
4 due to cytotoxicity, rather than direct
5 DNA acting properties of
6 glyphosate-formulated products."
7     Q. Let me ask you to stop you
8 there and let's see if we can unpack
9 this. Let's go to the first sentence.
10          What significance, if any,
11 is there of the fact that positive
12 results all occurred at very high or
13 toxic levels only?
14     A. So first of all, if you're
15 not duplicating a situation which people
16 may be exposed in life, a concentration
17 or level to which patients can be
18 exposed, it doesn't have much relevance
19 to a human situation.
20          Number two, if you're
21 getting to toxic dose levels you may be
22 causing cell death. And when you cause
23 cell death, the DNA damage can be a
24 result of that process of necrosis and

Michael L. Grossbard, M.D.

Page 330

1 death, rather than primary DNA damage
2 causing the problem.
3     Q.   In that context, directing
4 your attention to the third sentence that
5 you read. What does it mean when they
6 say, "Positive results at very high or
7 toxic dose levels indicate that the
8 genotoxic effects are due to cytotoxicity
9 rather than direct DNA acting properties
10 of glyphosate-formulated product"?
11        What -- in plain language,
12 can you tell us what that means?
13     A.   If you give -- if you
14 give --
15        MR. KRISTAL:  Object to
16 form.
17        THE WITNESS:  If you give a
18     poison or a toxin to a cell and it
19     dies, at the time of cell death,
20     or cytotoxicity, cell death, you
21     end up seeing changes in DNA,
22     fragments of DNA that may be the
23     result of the ongoing death
24     process rather than primary DNA

Page 331

1     damage from the agent.
2 BY MR. SLONIM:
3     Q.   Doctor, do you recall that
4 when Mr. Kristal questioned you for the
5 plaintiff, that he asked you some
6 questions about endocrine disrupting
7 activity?
8     A.   Mm-hmm.
9     Q.   The answer is yes?
10     A.   Yes.  Yes.  Sorry, I was
11 swallowing water.
12     Q.   And do you recall that he
13 also asked you some questions about
14 oxidative stress?
15     A.   Yes.
16     Q.   Now, directing your
17 attention, please, to Page 20.  The full
18 paragraph above carcinogenicity.
19        Do you see that?
20     A.   I do.
21     Q.   Would you read that full
22 paragraph into the record, please?
23     A.   "The IARC suggested other
24 mechanisms of action that might

Page 332

1 contribute to potential carcinogenicity,
2 such as inflammation, immunosuppression,
3 endocrine disrupting activity, and
4 oxidative stress which were based mainly
5 on in vitro studies. However, no
6 evidence of glyphosate-induced
7 immunosuppression was observed in a
8 registrant-supplied guideline" -- in a
9 registrant-supplied guideline
10 immunotoxicity study reviewed by the
11 PMRA.
12        "In addition, no other
13 studies in the extensive toxicity
14 database suggest a concern for
15 immunotoxicity, inflammation, or
16 oxidative stress.  Glyphosate also showed
17 no evidence of interaction with estrogen,
18 androgen, or thyroid endocrine pathways
19 in studies conducted by the U.S. EPA
20 Endocrine Disrupter Screening Program."
21     Q.   So let's take them one at a
22 time.
23        In regard to the effect that
24 glyphosate could have on endocrine

Page 333

1 pathways and endocrine disruption, is
2 that something that was reviewed by
3 Health Canada scientists?
4     A.   It was.
5     Q.   And what did they conclude?
6        MR. KRISTAL:  Objection.
7        THE WITNESS:  They conclude
8     that there was no evidence to
9     support that in people.
10 BY MR. SLONIM:
11     Q.   In regard to oxidative
12 stress, is it your understanding that
13 Health Canada scientists reviewed
14 evidence related to oxidative stress that
15 might have been brought about by
16 glyphosate?
17     A.   Yes, they did.
18     Q.   And what's your
19 understanding of Health Canada's
20 assessment of oxidative stress?
21        MR. KRISTAL:  Objection.
22        THE WITNESS:  That it was
23     seen -- that it was seen in vitro,
24     but that there was no evidence,

Michael L. Grossbard, M.D.

Page 334

1 again, in the animal studies or
2 other toxicity, that this was of
3 concern, as a mechanism of
4 carcinogenicity.
5 BY MR. SLONIM:
6   Q.   Now, let's take a look,
7 please, at Page 23.
8   A.   Okay.
9   Q.   You see the subheading,
10 "Conclusion"?
11   A.   Yes.
12   Q.   Would you read the first
13 full paragraph into the record, please.
14   A.   "Overall, the IARC concluded
15 that the evidence of carcinogenicity was
16 limited in humans but sufficient in
17 animals.  This conclusion was based on
18 statistically increased incidence of
19 tumor findings in four chronic studies in
20 rodents, two in rats, and two in mice, as
21 well results from genotoxicity, mostly in
22 vitro, assays using formulated products.
23        "However, the IARC did not
24 reflect the lack of dose-response

Page 335

1 relationships or other contextual
2 information, for example
3 background/historical control data,
4 cytotoxicity, in their decision."
5   Q.   In your own review of IARC,
6 and the other scientific evidence, did
7 you find that IARC did not consider the
8 lack of a dose-response relationship?
9        MR. KRISTAL:  Objection.
10        THE WITNESS:  Right.  I
11     don't believe they included that
12     as an assessment or important
13     criteria.
14 BY MR. SLONIM:
15   Q.   In your own -- in your own
16 review of IARC, were you concerned about
17 the absence of contextual information
18 such as historical control data and
19 cytotoxicity?
20        MR. KRISTAL:  Objection.
21     Foundation.
22        THE WITNESS:  Yes.  Many --
23     many murine systems, you see
24     spontaneous tumors, and so you'll

Page 336

1 need a lot of background on the
2 prior data from those mouse
3 strains or rat strains.
4 BY MR. SLONIM:
5   Q.   I want to walk through some
6 of the bulleted points on the bottom of
7 this page and onto the top of the next
8 page.
9        Would you read the first
10 bullet, please?
11   A.   A clear dose-response was
12 not observed for any of the noted tumors.
13   Q.   What's -- what is the --
14 what is the context for this?  Is this
15 animal studies?
16        MR. DIAMOND:  Form.
17        THE WITNESS:  Sorry?
18        MR. DIAMOND:  I just made an
19     objection.
20        THE WITNESS:  That is animal
21     studies, yes.
22 BY MR. SLONIM:
23   Q.   Of what significance is it
24 that a dose-response relationship was not

Page 337

1 observed?
2   A.   If you believe that an agent
3 is causing a particular tumor, be it
4 lymphoma, or be it sarcoma, then you'd
5 like to see the higher the dose that you
6 give, the more frequently those tumors
7 would occur in an animal.
8   Q.   Directing your attention to
9 the bottom bullet on that page where it
10 talks about slightly increased.
11        Do you see that?
12   A.   "Slightly increased tumor
13 incidences at dose levels at or above the
14 limit dose of testing, 1,000 milligrams
15 per kilogram of body weight per day, were
16 not considered relevant for human health
17 assessment."
18   Q.   Can you tell us what your
19 understanding of that is?
20   A.   So these are -- these are
21 quite large doses.  And you would not see
22 these doses in a real-world situation.
23   Q.   Is that an assessment --
24   A.   Doses is a bad word.

Michael L. Grossbard, M.D.

Page 338

1 Exposures.
2      Q.   Is that an assessment is
3 that you observed in your own review?
4      A.   Yes.
5      Q.   Turn to the next page,
6 please.
7      A.   Okay.
8      Q.   Read the next bullet,
9 please.
10      A.   "Incidences fell within
11 valid historical control data from the
12 respective performing laboratories."
13      Q.   Can you tell us what that
14 means, and what significance if any it
15 has?
16      MR. KRISTAL:  Objection.
17 Foundation.
18      THE WITNESS:  You -- you
19      will see in all of these mouse or
20      rat strains, spontaneous tumors
21      that occur.
22      And so in any given small
23      study, you might not see that
24      reflected as you would in a larger

Page 339

1      population of controls for many
2      studies.  You need to account for
3      the spontaneous tumor rate in
4      assessing any data.
5 BY MR. SLONIM:
6      Q.   Did IARC do that?
7      MR. KRISTAL:  Objection.
8      THE WITNESS:  Not carefully
9      enough, no.
10 BY MR. SLONIM:
11      Q.   Would you read the next
12 bullet, please.
13      A.   "There was a lack of
14 preneoplastic lesions, for example
15 fossae, hypertrophy, and hyperplasia
16 and/or other biologically plausible
17 evidence, for example, mode of action
18 data, to relate the noted tumors to
19 glyphosate treatments."
20      Q.   Can you explain what that
21 means and what, if any, significance it
22 has to you?
23      A.   Typically when you have
24 cancers, not necessary in lymphoma, but

Page 340

1 in other types of cancers, solid tumors,
2 leukemia, you can see precancerous
3 pathologic or histologic changes in the
4 tissue.  That would be indicative of a --
5 of a causation.  And then the other --
6 the other half of that is you need to
7 have a true mechanism of action for
8 something to do something.
9      Q.   Can you read the next bullet
10 that talks about, the weight of the
11 evidence.
12      A.   "The weight of evidence from
13 a wide range of assays, both in vitro and
14 in vivo, that examine various endpoints
15 such as gene mutation, chromosomal
16 damage, DNA damage and repair, indicated
17 no genotoxic concern for glyphosate."
18      Q.   What significance if any
19 does that have?
20      A.   Again, it's important that
21 the weight of evidence or the majority of
22 studies or the majority of studies
23 combined with the importance of those
24 studies does not suggest any genotoxic

Page 341

1 concern.
2      Q.   Now, so, Doctor, we've gone
3 through a bit of the genotoxicity and the
4 animal studies.
5      Are the data that Health
6 Canada sets forth in their assessment, is
7 that congruent with your own review?
8      A.   Yes, it is.
9      MR. KRISTAL:  Objection to
10      form.
11 BY MR. SLONIM:
12      Q.   Doctor, referring back to
13 the deposition exhibit that we marked at
14 the start, the Health Canada 2019.
15      A.   Okay.
16      Q.   Would you --
17      A.   Oh.
18      Q.   2019.
19      A.   I may not have that.  Now I
20 do.
21      Q.   Can I see that, please?
22      A.   Yeah.
23      Q.   Would you read the first
24 full sentence of the last paragraph?

Michael L. Grossbard, M.D.

Page 342

1   A.   "No pesticide regulatory
2  authority in the world currently
3  considers glyphosate to be a cancer risk
4  to humans at the levels at which humans
5  are currently exposed."
6   Q.   Is it -- Doctor, is that
7  consistent with your understanding?
8       MR. KRISTAL:  Objection.
9       MR. DIAMOND:  Form.
10      THE WITNESS:  Yes, it is.
11      MR. SLONIM:  I have no
12  further questions.  Thank you.
13      MR. KRISTAL:  You okay,
14  Michelle?
15      THE COURT REPORTER:  I'm
16  fine.
17      - - -
18      EXAMINATION
19      - - -
20  BY MR. KRISTAL:
21   Q.   Okay.  Let's start with
22  Greim, Exhibit 27.  Do you have that
23  there?
24   A.   Yes, I do.

Page 343

1   Q.   Okay.  Does it say anywhere
2  that the article was ghostwritten by
3  Monsanto?
4   A.   Does it say anywhere in the
5  article?
6   Q.   Yeah.
7   A.   Not that I'm aware of.  I
8  mean, I have to go through it, but I
9  don't recollect it from reading it.
10   Q.   Okay.  So when you read the
11  disclosures that are made, you're taking
12  that on face value, correct?
13      MR. SLONIM:  Objection.
14      THE WITNESS:  Why wouldn't
15  I?
16  BY MR. KRISTAL:
17   Q.   Well, have you looked -- why
18  wouldn't you?
19      In part because there is
20  evidence before you that shows that it's
21  not accurate.  Would you agree with that?
22      MR. SLONIM:  Objection.
23      THE WITNESS:  That what's
24  not accurate?  I'm sorry.

Page 344

1  BY MR. KRISTAL:
2   Q.   The disclosures don't
3  disclose that it was ghostwritten when
4  there is evidence that it was
5  ghostwritten, correct?
6       MR. SLONIM:  Objection.
7       THE WITNESS:  Right the
8  disclosures do not say it's
9  ghostwritten.  But it says here
10  the authors had sole
11  responsibility for the writing and
12  content of the paper.
13  BY MR. KRISTAL:
14   Q.   That's right.
15   A.   So I would not have a reason
16  to believe otherwise is what I'm saying.
17   Q.   That's right.  Because you
18  haven't looked at the evidence that might
19  say otherwise, correct?
20   A.   The only evidence that I
21  have is from -- from their declaration of
22  interest here.
23   Q.   Right.  So you have not
24  looked at any other evidence as to

Page 345

1  whether that statement is true or not
2  true?
3   A.   That is true.
4   Q.   And you have in front of you
5  the minority report, which indicates that
6  Greim was in fact ghostwritten, right?
7       MR. SLONIM:  Objection.
8  BY MR. KRISTAL:
9   Q.   That's what it says?
10      MR. SLONIM:  Objection.
11      THE WITNESS:  Let me pull
12  out Page 6.  Give me a second.
13      MR. DIAMOND:  What exhibit
14  number is that one?
15      THE WITNESS:  That's Exhibit
16  Number 9.
17      MR. DIAMOND:  Thanks.
18      THE WITNESS:  What it says
19  here, to quote, "In the e-mails,
20  they contemplate paying for a
21  study to combat problematic
22  findings, but determine a cheaper
23  outcome" -- "cheaper option would
24  be to ghostwrite the exposure tox

Michael L. Grossbard, M.D.

Page 346

1  and genetox sections and add Greim
2  and Kier or Kirkland to have their
3  names on a publication, but we
4  would be keeping the costs down by
5  us doing the writing and they
6  would just edit and sign their
7  names, so to speak."
8       Is that what you're
9  referring to?
10 BY MR. KRISTAL:
11    Q.   Right.  And you have not
12 looked at any of that evidence, correct,
13 to make your own determination whether
14 Greim was or wasn't ghostwritten?
15       MR. SLONIM:  Objection.
16       THE WITNESS:  No, I can only
17    go by what's declared in the
18    manuscript because that's what I
19    have available to me.
20       Even this doesn't give me
21    enough evidence to provide a
22    decision in either direction.
23       (Document marked for
24    identification as Exhibit

Page 347

1    Grossbard-29.)
2  BY MR. KRISTAL:
3    Q.   Okay.  Let me mark as
4  Exhibit 29.  This is a document dated
5  August 4th, 2015.  The subject is
6  "Glyphosate Activities."  The MONGLY
7  number is 01723742.  I will represent to
8  you that this is from Dr. Saltmiras.
9       Preliminary question, have
10 you asked Monsanto to send you any
11 depositions of Monsanto employees or show
12 you any Monsanto documents on these
13 subjects?
14    A.   I have not.
15    Q.   Do you plan on doing that?
16    A.   I do not.
17    Q.   Why not?
18    A.   I have made my assessment
19 based on the scientific data.  I don't
20 think -- I don't think who wrote it
21 actually matters as long as they're
22 standing -- the authors are standing by
23 the data that are in there.
24    Q.   Okay.  If you look at what

Page 348

1  Saltmiras wrote, if you look down to the
2  next-to-last paragraph, you see IARC --
3  IARC prep?
4    A.   I see that.
5    Q.   He writes, "IARC prep, AHS
6  Sorahan reanalysis for multiple myeloma
7  presented at EUROTOX 2012, Kier and
8  Kirkland (2013), ghostwrote Cancer review
9  paper, Greim et al. (2015)."
10       Do you see that?
11    A.   I do see that.
12    Q.   Are you accepting Saltmiras
13 on his word that he wrote here that he
14 ghostwrote that article?
15       MR. SLONIM:  Objection.
16    Form.  Foundation.
17       THE WITNESS:  This document
18    is what?  Just if you can
19    elaborate on a little bit more
20    so I can understand it better.
21 BY MR. KRISTAL:
22    Q.   That is a statement by
23 Saltmiras on his glyphosate activities
24 for his employer.

Page 349

1       MR. SLONIM:  Objection.
2    Form.  Foundation.
3       THE WITNESS:  I mean,
4    look --
5  BY MR. KRISTAL:
6    Q.   It certainly says what it
7  says, right?
8    A.   Yeah.  I can't -- I can't
9  argue with this one way or the other.
10    Q.   Okay.  Now, you were asked
11 about, in the Greim paper, whether they
12 provided supplementary materials online,
13 right?
14    A.   Yes, I was.
15    Q.   And you had access to that,
16 but you said honestly you only glanced at
17 it, correct?
18    A.   That is true.
19    Q.   So you don't know whether or
20 not the Greim paper accurately did or
21 didn't summarize those studies that were
22 the supplemental materials, correct?
23    A.   I could not tell you that,
24 correct.

Michael L. Grossbard, M.D.

Page 350

1  Q.  And you know that the IARC
2  group, the working group evaluating
3  glyphosate actually looked at that
4  supplementary material and determined
5  that it was insufficient and explained
6  why it was insufficient, right?
7  A.  That's correct.
8  Q.  Okay.  And they said it was
9  insufficient in part because information
10  was lacking on statistical methods,
11  correct?
12      MR. SLONIM:  Objection.
13      THE WITNESS:  Again, I'm not
14  remembering the specific details
15  but if you're reading --
16  BY MR. KRISTAL:
17  Q.  It's not a -- it's not a
18  memory test.
19  A.  If you're reading that, I
20  can look at it.  And I'm not going to
21  argue with it.
22      (Document marked for
23      identification as Exhibit
24      Grossbard-30.)

Page 351

1  BY MR. KRISTAL:
2  Q.  Here's Exhibit 30.  It's the
3  glyphosate section of Monograph 112?
4  A.  Sure.  What page?
5  Q.  Page 112 -- I'm sorry.  Page
6  354, Section 3.1.3, "Review Articles"?
7  A.  Got it.
8  Q.  And they're discussing the
9  Greim paper that we've been discussing,
10  correct?
11  A.  Correct.
12  Q.  And three quarters of the
13  way down that paragraph, "The working
14  group was unable to evaluate these
15  studies which are not included in Table
16  3.1 and section 5.3 because the
17  information provided in the review
18  article and its supplement was
19  insufficient, e.g., information was
20  lacking on statistical methods, choice of
21  doses, body weight gain, survival data,
22  details of histopathological examination,
23  and/or stability of dosed feed mixture."
24      That's what the IARC folks

Page 352

1  said about the Greim supplementary
2  materials, correct?
3  A.  That's correct.  That's what
4  it says here.
5  Q.  And, therefore, even though
6  Greim, et al., were providing this
7  material, do you have any reason to
8  disagree with the IARC working group's
9  analysis?
10      MR. SLONIM:  Objection.
11      THE WITNESS:  I have no
12  basis sitting here to make a
13  disagreement with that.
14  BY MR. KRISTAL:
15  Q.  Okay.  You were asked a
16  hypothetical about something along the
17  lines, anything wrong with a company
18  whose product is being criticized for
19  wanting to get into the public domain
20  relevant information.  Do you remember
21  that?
22  A.  I do recall that.
23  Q.  You don't know one way or
24  the other if that applies to Monsanto not

Page 353

1  having looked at any Monsanto documents,
2  correct?
3      MR. SLONIM:  Objection.
4      THE WITNESS:  Right.  As a
5  concept and as a hypothetical, I
6  don't have any problem with it.
7  BY MR. KRISTAL:
8  Q.  Nor should anybody.  But you
9  don't know if that happened here?
10      MR. SLONIM:  Objection to
11  form.  Foundation.
12      THE WITNESS:  That Monsanto
13  tried to get information into the
14  public domain?  Or that --
15  BY MR. KRISTAL:
16  Q.  You don't know if Monsanto's
17  product that was being criticized, they
18  wanted to get into the public domain
19  relevant information or whether they were
20  spinning science or anything about it?
21      MR. SLONIM:  Objection.
22  Form.  Foundation.
23      THE WITNESS:  Well, I mean,
24  look, they wanted to get science

Michael L. Grossbard, M.D.

Page 354

1   into the -- into the domain.
2   BY MR. KRISTAL:
3       Q.   How do you know that?
4       A.   I can't -- I can't tell --
5       Q.   How do you know that?
6       A.   If they're -- if they're
7   funding and sponsoring these particular
8   things, then the argument would be that
9   they want to get science into the domain.
10      Q.   Unless that they're
11  ghostwriting it, and they're doing it for
12  litigation support, such as you're
13  utilizing it here as we sit here?
14          MR. SLONIM:  Objection.
15  BY MR. KRISTAL:
16      Q.   Right?
17          MR. SLONIM:  Objection.
18          THE WITNESS:  So number one,
19      that I can't answer, obviously.
20  BY MR. KRISTAL:
21      Q.   Right.  That's what I'm
22  saying.  You don't know one way or the
23  other?  That's all I'm saying.
24      A.   Okay.  I have to agree with

Page 355

1   you on that.
2       Q.   Okay.  Chang and Delzell,
3   you were asked whether there's any
4   indication from the disclosure whether
5   that was ghostwritten or not, correct?
6          MR. SLONIM:  Objection.
7          THE WITNESS:  Yes.
8   BY MR. KRISTAL:
9       Q.   Okay.  Now, the fact that an
10  author doesn't disclose whether or not
11  the article was ghostwritten or not,
12  doesn't mean it wasn't ghostwritten,
13  right?
14          MR. SLONIM:  Objection.
15          THE WITNESS:  As I said
16      earlier, there are lots of
17      ghostwritten publications in the
18      literature.  I happen to know that
19      good academic publications, not
20      related to glyphosate in any way,
21      that I know are written by
22      somebody else, and the authors
23      have their name on it.
24  BY MR. KRISTAL:

Page 356

1       Q.   Okay.  And regardless of
2   whether Chang or Delzell was or wasn't
3   ghostwritten -- let's assume it wasn't.
4   It still came up with a meta-analysis
5   relative risk of 1.31 that was
6   statistically significant, right, for
7   NHL?
8       A.   Although --
9          MR. SLONIM:  Objection.
10          THE WITNESS:  Although the
11      conclusion of their study is that
12      there is no significant risk.
13  BY MR. KRISTAL:
14      Q.   Well --
15      A.   But the number that you
16  quoted that was published there, yes,
17  that is a one piece of evidence that's in
18  that paper.
19      Q.   All right.  The article that
20  had 94 authors, right?
21      A.   Yes.
22      Q.   Three of them disclosed that
23  they were working for plaintiffs as
24  experts in the Roundup litigation,

Page 357

1   correct?
2       A.   That is true.
3       Q.   91 have no such disclosure
4   to make, right?
5       A.   Or did not make, yes.
6       Q.   That's right.  And you're
7   not saying that because three of the 94
8   authors disclosed that they were
9   plaintiffs' experts, that somehow the
10  content of the article is wrong, are you?
11  You are not making that assertion?
12      A.   So I can't make that
13  assertion.
14      Q.   Right.  One way or the
15  other?
16      A.   Correct.
17      Q.   Same thing with the Benbrook
18  article.  The fact that Dr. Benbrook
19  disclosed that he was a plaintiffs'
20  expert is a positive, is it not?
21          MR. SLONIM:  Objection.
22  BY MR. KRISTAL:
23      Q.   That's what you are supposed
24  to do.

Page 358

1    MR. SLONIM: Objection.
2    THE WITNESS: I think
3    anybody disclosing, as I said
4    before, is the right thing to
5    do.
6 BY MR. KRISTAL:
7    Q.  Okay.  And you don't know
8 whether Dr. Benbrook's analysis is
9 correct or not correct, not having read
10 the article, correct?
11    A.  Correct.  I'm not going to
12 comment on his assessment.
13    Q.  Okay.  Now, with respect to
14 Health Canada.  Earlier -- and I can pull
15 up the exact question and answer, but you
16 said, you acknowledge that you had never
17 relied on Health Canada's evaluation of
18 anything in your regular professional
19 life, correct?
20    A.  Oh, outside of this?
21    Q.  Yes.
22    A.  That's right.
23    Q.  You don't consider this part
24 of your regular professional life, do

Page 359

1 you?
2    A.  It's regular.  It's part of
3 my professional life.  No, really.  It
4 is, but --
5    Q.  In your work as an
6 oncologist, outside of litigation --
7    A.  Have I relied --
8    Q.  -- have you ever relied on
9 Health Canada's evaluation of anything
10 for any reason?
11    A.  I have not.
12    Q.  Had you ever even heard of
13 Health Canada before this litigation?
14    A.  Yes.
15    Q.  Okay.  So despite the fact
16 that you heard of them, you never went to
17 them to review anything they said about
18 anything?
19    A.  It wouldn't be something
20 that would be relevant to my everyday
21 work, if you will.
22    Q.  Okay.  And in point of fact,
23 you formed the opinions that you have
24 here today not having reviewed Health

Page 360

1 Canada at the time that you first formed
2 those opinions, correct?
3    Let me make it easier.  I'm
4 going to mark the Hardemann and Gebeyehou
5 reports.  And you tell me if Health
6 Canada, either the --
7    A.  Oh, I'm sorry.  I
8 understand.  I may have misunderstood
9 your question.
10    Q.  Let me ask a clear question.
11 I know it's getting late in the day and
12 we're all hungry and we're rushing.
13    (Document marked for
14    identification as Exhibit
15    Grossbard-31.)
16 BY MR. KRISTAL:
17    Q.  In the Hardemann report,
18 this is your Hardemann report
19 November 26, 2018, there's a grand
20 total --
21    MR. SLONIM:  What number?
22    MR. KRISTAL:  That's 31.
23 BY MR. KRISTAL:
24    Q.  Grand total of 38 articles

Page 361

1 that you formed in considering your
2 Hardemann opinion, correct?
3    A.  Correct.
4    Q.  And for example, the first
5 one is about hepatitis B and C, right?
6    A.  Correct.
7    Q.  Third one is about chronic
8 hepatitis C, right?
9    A.  Correct.
10    Q.  The other is simply
11 statistics from the American Cancer
12 Society.  That has nothing to do with
13 glyphosate, correct?
14    A.  Yes and no.
15    Q.  Well, it doesn't speak to
16 glyphosate, right?
17    A.  No it speaks to the
18 incidence of the disease --
19    Q.  Yeah.
20    A.  -- and whether the disease
21 is rising.
22    Q.  Okay.  Number 6 is about
23 hepatitis virus?
24    A.  Yes.

Michael L. Grossbard, M.D.

Page 362

1    Q.   Number 7 is about hepatitis
2  B?
3    A.   Correct.
4    Q.   Number 8 is about obesity,
5  right?
6    A.   Correct.
7    Q.   Number 10 is about long-term
8  outcomes, right?
9    A.   Yes.
10   Q.   Hepatitis C is Number 11?
11   A.   Yes.
12   Q.   HCV infection is Number 19?
13   A.   Yes.
14   Q.   Viral elimination is Number
15  20?
16   A.   Yes.
17   Q.   Obesity is 21?
18   A.   Correct.
19   Q.   Hepatitis C is 23?
20   A.   Correct.
21   Q.   Hepatitis B is 24 and 25?
22   A.   True.
23   Q.   Hepatitis C is 27 and 28?
24   A.   Okay.  Yes.

Page 363

1    Q.   Hepatitis C is 30 and 33?
2    A.   Yes.
3    Q.   Hepatitis B is 35 and 36?
4    A.   Yes.
5    Q.   And hepatitis C is 38,
6  right?
7    A.   Yes.
8    Q.   So there was about 15, 16
9  articles that formed the basis of your
10  opinion in this litigation, not including
11  Health Canada, correct?
12   A.   Yes.  That would be true.
13  That would be true.
14   Q.   And the same thing is true
15  for the Gebeyehou report.
16       (Document marked for
17       identification as Exhibit
18       Grossbard-32.)
19  BY MR. KRISTAL:
20   Q.   We're going to mark that as
21  32.  This was prepared November 26, 2018.
22   A.   Yes.
23   Q.   And if you'll turn to the
24  back, this has less articles.  This has

Page 364

1  35, right?
2    A.   Correct.
3    Q.   And without going into great
4  detail, if you scan it, about half of
5  those -- and we can do it if you want --
6  relate to hepatitis C or hepatitis B or
7  something unrelated to glyphosate; is
8  that correct?
9    A.   Yeah, I don't think we need
10  to go through them.
11   Q.   Okay.  And Health Canada is
12  not mentioned in any materials considered
13  or in either report?
14   A.   That would be true.
15   Q.   Because you hadn't read it
16  at that time, right?
17   A.   That would be true.
18   Q.   Okay.  And you understand
19  that the glyphosate monograph itself, the
20  actual monograph, came out in 2017, even
21  though the working group met in 2015?
22   A.   That's true.
23   Q.   Okay.  When you were talking
24  about Health Canada, and I can see if I

Page 365

1  can pull up the exact quote, the question
2  was -- you were asked to read a
3  paragraph.  And you read, "Risks to
4  handlers are not of concern for all
5  scenarios.  Based on the precautions and
6  directions for use on product labels
7  reviewed for this reevaluation," and then
8  it goes on about risk assessment.
9    A.   Okay.
10   Q.   Do you have any idea what
11  the Canadian labels for glyphosate-based
12  herbicides say in terms of precautions
13  and directions?
14   A.   I do not.
15   Q.   That would affect whether or
16  not someone has exposure and, therefore,
17  whether they're at risk?
18   A.   Certainly the label on
19  handling would affect exposure.
20   Q.   And you don't know what it
21  said or didn't say, correct?
22   A.   That's correct.
23   Q.   All right.  And when you
24  were reading what Health Canada said, as

Michael L. Grossbard, M.D.

Page 366

1 Mr. Slonim had you read, you didn't read
2 the underlying studies to come to your
3 own evaluation. You're telling us what
4 Health Canada said about articles you
5 didn't read, correct?
6          MR. SLONIM: Objection.
7 BY MR. KRISTAL:
8     Q.   For the most part?
9     A.   In some cases, yes. In some
10 cases not.
11    Q.   Would you agree for the most
12 part, you had not read the underlying
13 studies?
14    A.   Related to the genotoxicity?
15    Q.   Genotoxicity?
16    A.   As I said earlier, I
17 wouldn't change my answers.
18    Q.   And the animal studies for
19 the most part --
20    A.   As I said earlier, I relied
21 on review articles on those.
22         MR. KRISTAL: Thank you
23    again. And this is like a tennis
24    match.

Page 367

1         So if Mr. Slonim has no more
2    questions, I have no more
3    questions. And if he has other
4    questions, I may have.
5         MR. DIAMOND: I have a few.
6    But if you want to go first.
7         MR. SLONIM: No. I have no
8    further questions with regard to
9    the Sanders.
10        MR. KRISTAL: I'm done.
11    And Mr. Diamond...
12             - - -
13 (Whereupon, a discussion was held off the
14 stenographic record.)
15             - - -
16         EXAMINATION
17             - - -
18 BY MR. DIAMOND:
19    Q.   Okay. Hi, Doctor. David
20 Diamond. I represent Jaime Alvarez
21 Calderon. I'll refer to him as
22 Mr. Alvarez. I'll do that when we're
23 talking.
24        I want to mark as whatever

Page 368

1 the next exhibit is -- 33.
2         (Document marked for
3    identification as Exhibit
4    Grossbard-33.)
5 BY MR. DIAMOND:
6    Q.   Your report in Mr. Alvarez's
7 case.
8         MR. DIAMOND: Bert, do you
9    have a copy?
10        MR. SLONIM: Yeah. I'll dig
11    out my copy.
12 BY MR. DIAMOND:
13    Q.   And just briefly, I know
14 before we started, and I can't even
15 remember what we said at the beginning.
16 But just to make sure that I'm clear on
17 it, your answers to Mr. Kristal regarding
18 his questions, if asked regarding
19 Mr. Alvarez, would be the same, correct?
20    A.   98 percent of his questions
21 would be generic as opposed to
22 plaintiff-specific, so yes.
23    Q.   Right, because I don't want
24 to get back into some of those same

Page 369

1 questions again.
2         MR. SLONIM: And, Counsel,
3    just one thing. We had indicated
4    earlier on that there was some --
5    a paragraph, basically, that was
6    omitted inadvertently from the
7    Mr. Alvarez report concerning risk
8    factors.
9         MR. DIAMOND: You know, I
10    wasn't aware of that. But that
11    was a question that I had.
12        MR. SLONIM: It's already in
13    this record. But let me -- just
14    so it's clear.
15        MR. KRISTAL: Before you do
16    that -- it might be easier for
17    Mr. Diamond if I give him the
18    Sanders report so he can see what
19    you're talking about.
20        MR. DIAMOND: Sure. One of
21    my questions was that I didn't
22    have any risk factors in
23    Mr. Alvarez's report. And I
24    wasn't aware of a supplemental

Michael L. Grossbard, M.D.

|  | Page 370 |
|---|---|
| 1 | report. |
| 2 | THE WITNESS: There is not. |
| 3 | MR. SLONIM: There's not a |
| 4 | supplemental report. Take a look |
| 5 | at Deposition Exhibit Number 1, |
| 6 | which is the Sanders report. |
| 7 | MR. DIAMOND: I have it. |
| 8 | MR. SLONIM: Turn to Page 5, |
| 9 | please. |
| 10 | MR. DIAMOND: I'm there. |
| 11 | MR. SLONIM: Okay. If you |
| 12 | look at the last paragraph and if |
| 13 | you go up a couple of sentences. |
| 14 | It says, "At the outset." |
| 15 | MR. DIAMOND: The last |
| 16 | paragraph at the bottom of Page 5. |
| 17 | MR. SLONIM: And then go up |
| 18 | a couple of sentences. It says, |
| 19 | "At the outset." |
| 20 | MR. DIAMOND: I see it. |
| 21 | MR. SLONIM: So beginning at |
| 22 | where it says, "At the outset," |
| 23 | and down to the bottom of Page |
| 24 | 5 -- |

|  | Page 371 |
|---|---|
| 1 | MR. DIAMOND: Okay. |
| 2 | MR. SLONIM: -- that same |
| 3 | text should have been included in |
| 4 | the Alvarez report, and we |
| 5 | realized belatedly that it was |
| 6 | not. |
| 7 | MR. DIAMOND: Okay. So let |
| 8 | me just take a quick look at it. |
| 9 | And then I may have a question or |
| 10 | two about it. |
| 11 | MR. SLONIM: Sure. |
| 12 | BY MR. DIAMOND: |
| 13 | Q. I did look at the Sanders |
| 14 | report before, and I looked at the |
| 15 | Hardeman report. And in those reports, |
| 16 | you discussed other specific risk factors |
| 17 | pertaining to those plaintiffs. |
| 18 | A. Correct. |
| 19 | Q. But I didn't see any |
| 20 | discussion of any specific risk factors |
| 21 | pertaining to Mr. Alvarez, which I'm |
| 22 | assuming is because he didn't have any |
| 23 | other risk factors? |
| 24 | A. That list of risk factors |

|  | Page 372 |
|---|---|
| 1 | that I provided as potential risk |
| 2 | factors, i▇▇▇▇▇▇▇▇▇▇▇ I |
| 3 | could not identify any of those risk |
| 4 | factors for Mr. Alvarez. |
| 5 | Q. Fair enough. That will make |
| 6 | things a little quicker. |
| 7 | And when I was looking at |
| 8 | your report, and I'm looking at Page 3 at |
| 9 | the top, the last sentence before the |
| 10 | non-Hodgkin's lymphoma paragraphs begin? |
| 11 | A. Okay. Maybe. Oh, okay. |
| 12 | Yes, I see it. I see it. Okay. |
| 13 | Q. I'll read it to you. |
| 14 | A. No, I got it. |
| 15 | "Scientifically impossible"? |
| 16 | Q. Yes. |
| 17 | A. Yes. |
| 18 | Q. And so it's my understanding |
| 19 | that that's your opinion in this case, is |
| 20 | that you can't determine the cause of |
| 21 | Mr. Alvarez non-Hodgkin's lymphoma? |
| 22 | A. That is true. |
| 23 | Q. Okay. And the basis for |
| 24 | that is because of your belief or opinion |

|  | Page 373 |
|---|---|
| 1 | that you can't make that determination |
| 2 | for anyone? |
| 3 | MR. SLONIM: Objection. |
| 4 | BY MR. DIAMOND: |
| 5 | Q. That's -- well, go ahead. |
| 6 | A. For anyone with lymphoma? I |
| 7 | mean -- |
| 8 | Q. It was a bad question. And |
| 9 | I didn't -- I'm misstating some things |
| 10 | that you said. So let me see if I can |
| 11 | figure it out a little bit better and ask |
| 12 | a good question. |
| 13 | Your opinion is just that |
| 14 | exposure to Roundup cannot be a cause of |
| 15 | non-Hodgkin's lymphoma? |
| 16 | A. That would be true. |
| 17 | Q. Okay. And that's based upon |
| 18 | everything that you discussed earlier |
| 19 | today, correct? |
| 20 | A. Yes. There would be no -- I |
| 21 | mean, what's in the report and any |
| 22 | questions that I've been asked, yes. |
| 23 | Q. Okay. But it's not based |
| 24 | upon any type of differential etiology or |

Michael L. Grossbard, M.D.

Page 374

1 differential diagnosis depending on how
2 you say it.  I think the court discusses
3 using the terms interchangeably --
4 interchangeably for legal purposes.
5        MR. SLONIM:  Objection.
6 Form.
7 BY MR. DIAMOND:
8        Q.   Is that correct?
9        A.   So I -- I -- the question
10 being?  I mean, I'm sorry.  I can't
11 name -- I can't say it's -- I can't say
12 what causes it because --
13        Q.   Of doing any type of ruling
14 in, ruling out factors?
15        A.   So I can rule in or rule out
16 factors, again, if you have some of these
17 things that I believe are causes.  If he
18 had radiation in the field, if he had
19 Helicobacter pylori, if there's HIV
20 infection, if there's EBV virus.
21            There's a whole litany that
22 we don't need to go through.  But absent
23 that, and without those well defined
24 factors, for the majority of patients, I

Page 375

1 can't -- or the majority of patients --
2 majority of individuals with lymphoma, I
3 can't say what caused their lymphoma.
4        Q.   And just turning to Page 6
5 of your report.
6        A.   Yes.
7        Q.   And we get down to where we
8 talk about clinical history.
9        A.   Yes.
10        Q.   I'm going to ask you about
11 some of the things that you put in these
12 few paragraphs.
13        A.   Sure.
14        Q.   Just to ask you what the
15 relevance to your opinions are of the
16 facts that you've sort of set forth,
17 okay?
18        A.   Absolutely.
19        Q.   So I'm going to try to break
20 it down, and then I'm going to ask you
21 for each one, what's the relevance to any
22 of your opinions.
23        A.   Okay.
24        Q.   ███████████████████

Page 376

1 ████████ has no relevance to your
2 opinions, does it?
3        A.   No.  It's all just part of
4 providing a medical history.
5        Q.   Okay.  The fact that he was
6 born in ████ does that have any
7 relevance?
8        A.   Older individuals, the older
9 you are, the more likely you are to have
10 lymphoma.  But I can't say that age
11 caused his lymphoma.
12        Q.   It may make him more
13 susceptible?
14        A.   No more susceptible, but
15 more likely that he got lymphoma.
16 Whether you call the word "susceptible"
17 or not is hard to say.
18        Q.   But it's not a cause?
19        A.   No.
20        Q.   Okay.  And then you
21 mentioned that ████████████████████
22 ███████████████████████
23        A.   Yes.
24        Q.   Is that relevant to your

Page 377

1 opinions?
2        A.   It is.  Family history is a
3 recognized risk factor, though not a
4 cause for lymphoma.
5        Q.   Okay.  And he doesn't have
6 that history?
7        A.   That is true.
8        Q.   ██████████████████████████
9 ████████████████████████
10        A.   That's true.
11        Q.   And that he was diagnosed
12 ██████████████████████████████████
13 Does have that any relevance to your
14 opinions?
15        A.   To the best of my knowledge,
16 there's no literature linking lymphoma
17 and osteosarcoma in families.
18        Q.   Okay.  And the same, you go
19 on and say that ███████████████████████
20 █████████████████████████████
21 ████████████████████████
22 █████████████████
23        A.   Yes.
24        Q.   Does that have any relevance



Michael L. Grossbard, M.D.



Page 378

1 to your opinions regarding Mr. Alvarez?
2    A.   No.  There's not enough
3 family history of cancer here to provide
4 a genetic reason for this.
5    Q.   Okay.  I'm skipping down a
6 paragraph.  From March '86 to the present
7 time, he's been employed by Sutter Home
8 Vineyards as a landscaper.  His work
9 includes pruning trees, watering, and
10 mowing the lawns and that he reports he
11 sprayed Roundup over an approximately
12 20-acre property.
13        Does that have any relevance
14 to your opinions?
15    A.   Well, it has relevance to
16 the fact that my opinion is really
17 whether Roundup is the cause of his
18 lymphoma.  So, I think stating his use of
19 Roundup matters.  If he never used it,
20 then we would never even be sitting here.
21    Q.   Okay.  And would it make any
22 difference if he sprayed 80 acres?
23    A.   Oh, in terms of quantitation
24 of acres?  Not to my -- no.

Page 379

1    Q.   Okay.  And you also
2 mentioned that he sprayed a soap-based
3 pesticide on plants.  Any relevance to
4 your opinions regarding Mr. Alvarez?
5    A.   I don't know what that
6 pesticide was and I don't know -- I can't
7 say that that caused lymphoma.
8        MR. KRISTAL:  It does kill
9        aphids, I can testify to that.
10        I'm sorry.
11        MR. DIAMOND:  And that's
12        correct.  That's what he said.  He
13        used it on his roses.
14        MR. KRISTAL:  I use it on
15        all my houseplants.
16 BY MR. DIAMOND:
17    Q.   Going down to the next
18 paragraph, you mentioned Mr. Alvarez
19 describes using both Roundup Ready-to-Use
20 Weed & Grass Killer III, as well as
21 Roundup Pro Concentrate between 1986 and
22 2017.
23        Any significance to your
24 opinions?

Page 380

1    A.   Just trying to document when
2 he used and what he used as far as
3 Roundup.  But the difference between
4 those as far as my opinion, no.
5    Q.   All right.  And the fact
6 that he sprayed -- you go on to say, "He
7 sprayed about every two days during the
8 spring months and less frequently in the
9 summer and fall.  And at deposition
10 Mr. Alvarez testified only to the use of
11 the concentrate."
12        Any specific -- any special
13 significance to that?
14    A.   It's not going to alter my
15 opinion, no.
16    Q.   Okay.  You mentioned in the
17 next paragraph that ███████████████
██ ████████████████████████████
██ ███████████████████████████
██ █████████████████████████████
██ ███████
22    A.   There could be.  But there
23 isn't in his case.  The reason to point
24 it out is that there are certain types of

Page 381

1 lymphoma that are associated with
2 Helicobacter pylori.  That does not
3 appear to be his type.
4    Q.   And that, you talked about
5 earlier, the MALT?
6    A.   Correct.
7    Q.   Okay.  And he didn't have
8 that type of lymphoma?
9    A.   No, he did not.
10    Q.   You also mentioned that he
11 was -- ████████████████████████
██ ████████████████████████████████
██ ██████████████████████████████
14        MR. KRISTAL:  Join the club.
15 BY MR. DIAMOND:
16    Q.   Any significance to those
17 for your opinions?
18    A.   A little bit.  Not with
19 respect to causation of lymphoma.
20    Q.   Okay.
21    A.   ████████████████████████
██ ██████████████████████████████
██ ███████████████████████████████
██ ████████████████████████████████

Page 382

5  Q.   And so that's where you
6  disagree with his treating doctor,
7  Dr. Andreadis?
8  A.   That would be true.
9  Q.   Okay.  You mentioned, if you
10 go down a little bit further, that his
11 height was 61 inches, and his weight was
12 134 pounds with a BMI of 25.8.  Any
13 specific significance to that?
14 A.   Only to the relevance that
15 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, would be
16 associated with lymphomas.  So I'm
17 pointing out to myself, to you, to
18 anyone, that that's not a risk factor
19 that I would cite here.
20 Q.   Okay.  And you mentioned the
21 next couple of sentences, that the one --
22 one note, ▮▮▮▮▮▮▮▮

Page 383

7  A.   With respect to causation of
8  lymphoma, no.
9  Q.   Okay.
14 A.   There's some very -- there
15 is some literature suggesting a
16 relationship between cigarette smoking
17 and specifically follicular lymphoma.  In
18 his case, I don't think that's a major
19 factor.
20 Q.   Okay.  So just to be clear,
21 you don't -- is it a factor or not a
22 factor?  More likely than not.
23 A.   Yeah, more likely than not
24 it is not a substantial contributing

Page 384

1  factor.
2  Q.   Fair enough.  Mr. Kristal
3  did such a great job.  I hardly have any
4  questions.
5  A.   Thank you, Mr. Kristal.
6  MR. KRISTAL:  I'll take that
7  to mean I asked a lot of
8  questions?
9  MR. SLONIM:  Given the fact
10 that it's 6:20, if you wanted to
11 wrap it up soon, I don't think
12 anyone would be upset.
13 MR. DIAMOND:  I don't think
14 so either.  Let me just take a
15 quick look over my notes.
16 In terms just of
17 housekeeping, do you have a copy
18 of my notice of deposition?  It
19 hasn't been marked.
20 MR. KRISTAL:  Did you bring
21 one?
22 MR. DIAMOND:  No.  I was
23 going to mark my notice of
24 deposition and just say that your

Page 385

1  objections would be the same.  Do
2  you want to stipulate to that?
3  MR. SLONIM:  I hesitate to
4  do that simply because I haven't
5  seen any.
6  MR. DIAMOND:  I gave it to
7  Aaron, and he looked it over.
8  So if I represent that the
9  documents that I asked to be
10 brought would be the same
11 documents that were requested in
12 Mr. Sanders' case, would it be
13 fair to say that the objections
14 would be the same?
15 MR. SLONIM:  Yes.  Agreed.
16 MR. DIAMOND:  Fair enough.
17 That's all I have.
18 Thank you.
19 MR. SLONIM:  I think we're
20 done.  Thank you very much.
21 THE VIDEOGRAPHER:  The time
22 now is 6:20 p.m., and we're off
23 the record.
24 (Excused.)

Michael L. Grossbard, M.D.

Page 386

```
1        (Deposition concluded at
2    approximately 6:20 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 388

```
1            INSTRUCTIONS TO WITNESS
2
3            Please read your deposition
4    over carefully and make any necessary
5    corrections.  You should state the reason
6    in the appropriate space on the errata
7    sheet for any corrections that are made.
8            After doing so, please sign
9    the errata sheet and date it.
10           You are signing same subject
11   to the changes you have noted on the
12   errata sheet, which will be attached to
13   your deposition.
14           It is imperative that you
15   return the original errata sheet to the
16   deposing attorney within thirty (30) days
17   of receipt of the deposition transcript
18   by you.  If you fail to do so, the
19   deposition transcript may be deemed to be
20   accurate and may be used in court.
21
22
23
24
```

Page 387

```
1
2            CERTIFICATE
3
4
5        I HEREBY CERTIFY that the
    witness was duly sworn by me and that the
6   deposition is a true record of the
    testimony given by the witness.
7
        It was requested before
8   completion of the deposition that the
    witness, MICHAEL L. GROSSBARD, M.D., have
9   the opportunity to read and sign the
    deposition transcript.
10
11
12   _____
     MICHELLE L. GRAY,
13   A Registered Professional
     Reporter, Certified Shorthand
14   Reporter, Certified Realtime
     Reporter and Notary Public
15   Dated:  December 2, 2019
16
17
18       (The foregoing certification
19   of this transcript does not apply to any
20   reproduction of the same by any means,
21   unless under the direct control and/or
22   supervision of the certifying reporter.)
23
24
```

Page 389

```
1    - - - - - -
            E R R A T A
2    - - - - - -
3
4  PAGE LINE  CHANGE
5  ____ ____ _____
6      REASON: _____
7  ____ ____ _____
8      REASON: _____
9  ____ ____ _____
10     REASON: _____
11 ____ ____ _____
12     REASON: _____
13 ____ ____ _____
14     REASON: _____
15 ____ ____ _____
16     REASON: _____
17 ____ ____ _____
18     REASON: _____
19 ____ ____ _____
20     REASON: _____
21 ____ ____ _____
22     REASON: _____
23 ____ ____ _____
24     REASON: _____
```

Michael L. Grossbard, M.D.

Page 390

1
2        ACKNOWLEDGMENT OF DEPONENT
3
4        I,_____, do
5   hereby certify that I have read the
6   foregoing pages, 1 - 391, and that the
7   same is a correct transcription of the
8   answers given by me to the questions
9   therein propounded, except for the
10  corrections or changes in form or
11  substance, if any, noted in the attached
12  Errata Sheet.
13
14
15  _____
16  MICHAEL L. GROSSBARD, M.D.      DATE
17
18
19  Subscribed and sworn
    to before me this
20  _____ day of _____, 20____.
21  My commission expires:_____
22

    _____
23  Notary Public
24

Page 391

1        LAWYER'S NOTES
2   PAGE  LINE
3   ____  ____  _____
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____