# Exhibit 5

Brent Staggs, M.D.

```
 1                UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF CALIFORNIA

 3

     IN RE: ROUNDUP PRODUCTS LIABILITY    )  MDL No. 2741
 4   LITIGATION,                          )  Case No.
                                          )  3:16-md-02741-VC
 5   This Document Relates To:            )
                                          )
 6                                        )
     Pollard vs. Monsanto Company         )
 7   Case No. 3:19-cv-04102-VC            )
                                          )
 8   _____      )

 9

10

11          VIDEO DEPOSITION OF BRENT STAGGS, M.D.

12             TAKEN ON BEHALF OF THE DEFENDANT

13                  IN LITTLE ROCK, ARKANSAS

14                    ON NOVEMBER 20, 2019

15

16

17

18

19

20

21

22

23

24

25   REPORTED BY: Karisa J. Ekenseair, CCR RPR, LS NO. 802
```

## Page 2

APPEARANCES

FOR THE PLAINTIFF:
    Robin Greenwald
    Attorney at Law
    Weitz & Luxenberg
    700 Broadway
    New York, New York 10003
    212-558-5500
    rgreenwald@weitzlux.com
    Matt Lundy
    Attorney at Law
    Lundy, Lundy, Soileau & South, LLP
    501 Broad Street
    Lake Charles, Louisiana  70601
    337-439-0707
    mlundy@lundylawllp.com

FOR THE DEFENDANT:
    Joseph E. Fornadel III
    Attorney at Law
    Nelson Mullins
    1320 Main Street, 17th Floor
    Columbia, South Carolina  29201
    803-255-9227
    joe.fornadel@nelsonmullins.com

ALSO PRESENT:
    John Sims, Videographer

* * * * *

## Page 3

TABLE OF CONTENTS

PAGE
EXHIBITS....................................  3
STIPULATIONS................................  4
DIRECT EXAMINATION BY MR. FORNADEL...........  5
REPORTER'S CERTIFICATE.......................  45

EXHIBITS
NUMBER    DESCRIPTION                          PAGE
1    MONSANTO COMPANY'S NOTICE TO TAKE     9
     ORAL AND VIDEOTAPED DEPOSITION OF
     DR. BRENT STAGGS.......................
2    PLAINTIFF'S OBJECTIONS AND RESPONSES   9
     TO DEFENDANT'S DOCUMENT REQUESTS IN
     ITS NOTICE OF DEPOSITION OF DR.
     BRENT STAGGS...........................
3    OCTOBER 9, 2019 REPORT................. 9
4    ████████████████████████████████  17
     ████████████████████████████████
     THE INTERLYMPH NON-HODGKIN LYMPHOMA
     SUBTYPES PROJECT, BRACCI 2014..........
5    GLYPHOSATE USE AND CANCER INCIDENCE    27
     IN THE AGRICULTURAL HEALTH STUDY.......
6    BRENT C. STAGGS ROUNDUP CHARGES       29
     CHART..................................
7    OCTOBER 11, 2019 INVOICE FOR          26
     PATHOLOGY SERVICES RE: DOMINA..........
8    OCTOBER 11, 2019 INVOICE FOR          37
     PATHOLOGY SERVICES RE: JANZEN..........
9    OCTOBER 11, 2019 INVOICE FOR          37
     PATHOLOGY SERVICES RE: DICKEY..........
10   OCTOBER 11, 2019 INVOICE FOR          38
     PATHOLOGY SERVICES RE: POLLARD.........

## Page 4

STIPULATIONS

    Produced, sworn, and examined, pursuant to notice, in the Marriott Hotel, 3 Statehouse Plaza, Little Rock, Arkansas, commencing at 7:56 p.m. on November 20, 2019, in the above-entitled cause now pending in the United States District Court, Northern District of California; said deposition being taken for all purposes, pursuant to the Federal Rules of Civil Procedure.

* * * * *

## Page 5

1  THE VIDEOGRAPHER:  We are on the audio
2  and video record.  Today's date is November 20th,
3  2019.  The time is approximately 7:56 p.m.  This is
4  the videotaped deposition of Dr. Brent Staggs.  This
5  is the case of Pollard versus Monsanto.  My name is
6  John Sims.  I'm a videographer out of Little Rock,
7  Arkansas.
8       Will counsel, please make a record of your
9  appearance?
10      MR. FORNADEL:  Joe Fornadel, Nelson Mullins
11 on behalf of Monsanto.
12      MS. GREENWALD:  Robin Greenwald for the
13 plaintiffs.
14      MR. LUNDY:  Matt Lundy for the plaintiff.
15      THE VIDEOGRAPHER:  Madam Court Reporter,
16 will you please swear in the witness?
17           BRENT STAGGS, M.D.
18 of lawful age, being first duly sworn, deposes and
19 says in reply to the questions propounded as follows:
20           DIRECT EXAMINATION
21 BY MR. FORNADEL:
22    Q.  All right.  Dr. Staggs, turning to Mr.
23 Pollard, are you aware that he had marginal zone
24 lymphoma?
25    A.  Yes, sir.

Page 6

1  Q. And do you have any opinion as to whether
2  -- anymore specific classification within that --
3  that subtype?
4  A. Well, that is its own subtype. It doesn't
5  have anything sort of beneath that, like
6  non-Hodgkin's lymphoma has all the subtypes. But I
7  guess, you said, like follicular lymphoma has grades.
8  No. I'm not aware that there's anything more unique
9  to the name than what they called it, the marginal
10 zone.
11 Q. Well, I understood that some marginal zones
12 can be referred to as nodal or extranodal, gastric.
13 I just wanted to know if you had any opinion in that
14 regard.
15 A. [redacted]
16 [redacted]
17 [redacted]
18 Q. But that's right, and it doesn't sound like
19 there is, but I just wanted to make -- to see if you
20 had any -- any more specific opinions than the -- the
21 broad marginal zone lymphoma diagnosis?
22 A. No. That's a good point. So if I
23 had -- if I had known that it was arising in the
24 bowel or the stomach, then it would be an extranodal
25 marginal zone, and those can -- even though they're

Page 7

1  cytologically and histologically identical to the
2  ones that arise in the node or you find in the bone
3  marrow, sometimes they're just in a different
4  setting.
5      But MALT lymphomas, that you've already
6  called them, can arise in the lung, any
7  mucosal-associated lymphoid tissue. But once they're
8  fairly systemic like in the bone marrow, then it's
9  often hard to tell where they came from.
10 Q. Understood. And in your view of the
11 epidemiological literature, did you identify any data
12 establishing a relationship between glyphosate
13 exposure and marginal zone lymphomas?
14 A. Well, I don't have all the literature
15 memorized. Certainly, again, I'd kind of back up a
16 step. Like we've already talked about, it is one of
17 the non-Hodgkin's lymphoma. Most of epidemiological
18 literature deals with non-Hodgkin's lymphoma as a
19 whole, of which B-cell lymphomas are the vast
20 majority. So it would be in that category.
21     I don't have the papers memorized on the
22 one or two that have a -- tried to subtype it out. I
23 don't have memorized the relative risks and whether
24 they were statistically significant, as I sit here.
25 I've looked at all that multiple times, I just don't

Page 8

1  have it right on the top of my memory.
2  Q. Okay. And similarly, you're not aware of
3  any literature indicating a -- a significantly
4  increased risk of marginal zone lymphomas in the
5  context of glyphosate exposure?
6      MS. GREENWALD: Objection. Form. Asked
7  and answered.
8      THE WITNESS: Well, because glyphosate now
9  known to cause non-Hodgkin's lymphoma and marginal
10 zone is -- and marginal zone lymphoma is a
11 non-Hodgkin's lymphoma, I would classify the
12 causation in that way.
13     Again, I'd just have to look at the
14 individual one or two papers that have subtypes to
15 refresh my memory as to whether they identified in
16 their analysis the subtype was statistically
17 significant. And then I would also have the same
18 comments about the etiology of B-cell lymphoma as a
19 whole and the ability to subtype it, especially since
20 marginal zone lymphoma has not a very characteristic
21 protein expression pattern due to cluster designation
22 markers, or through cluster designation markers. So
23 it's often nondescript and can be mistaken for other
24 types of non-Hodgkin's lymphoma.
25 BY MR. FORNADEL:

Page 9

1  Q. Okay.
2      (Exhibit Number 1 marked for identification.)
3  BY MR. FORNADEL:
4  Q. I'll hand you Exhibit 1, which is the
5  notice for this deposition.
6      (Exhibit Number 2 marked for identification.)
7  BY MR. FORNADEL:
8  Q. Exhibit 2, which are your objections and
9  responses.
10     (Exhibit Number 3 marked for identification.)
11 BY MR. FORNADEL:
12 Q. And just to give you the set, Exhibit 3,
13 which is your report in this case.
14     Now, just to confirm, I take it that the
15 responses and objections you listed here are
16 identical to what you've -- you've listed in the
17 other cases?
18 A. Yes, sir.
19 Q. Okay. And any other responsive documents
20 that you've brought with you specific to Mr. Pollard?
21 A. No, sir.
22 Q. Okay. And just to confirm that the same
23 MCLs apply to this case as well as to the others?
24 A. Correct.
25 Q. And that this report marked as Exhibit 3

Page 10

1 contains all the opinions you intend to offer in the
2 Pollard case?
3     A.   Generally, yes.
4     Q.   And did you discuss this case with anyone
5 besides Mr. Pollard or his attorneys?
6     A.   No, sir.
7     Q.   All right.  Now, in reading your report,
8 you indicate that you had a telephone call with
9 Mr. Pollard following his deposition.  What was
10 discussed on your call with Mr. Pollard?
11     A.   Similar to the other patients, just had him
12 go over his work history.  You know, and -- you know,
13 from the first job that he ever had all the way up to
14 current.
15          As you mentioned, I had already read his
16 medical records and his deposition so I had that
17 information at hand.  And then we talked about his
18 exposures to Roundup specifically, and to any other
19 possible confounding chemical.  Tried to have him
20 list off all the chemicals he could remember, along
21 with their -- you know, regularity and frequency as I
22 did with all of the other patients that we've talked
23 about, to find that, you know, all of it -- all the
24 while attempting to define all the possible risk
25 factors I could and potential causes contributing to

Page 11

1 his non-Hodgkin's lymphoma.
2     Q.   All right.  And you indicated you reviewed
3 his deposition; is that right?
4     A.   Yes, sir.
5     Q.   And you -- fair to say, you did not review
6 any of his treating doctors' depositions?
7     A.   That's right.
8     Q.   Cart before the horse here.  Can you tell
9 us what you have in your file for Mr. Pollard as far
10 as case-specific materials go?
11     A.   Sure.  Just like with the other gentlemen,
12 I have the -- his deposition testimony.  I have his
13 file of medical records.  And then I have two defense
14 expert reports.  One is a Dr. Baysal, B-A-Y-S-A-L,
15 and then also a Dr. Silberstein.
16     Q.   Okay.  And you have not reviewed any of the
17 industrial hygienist reports in these cases?
18     A.   No, sir.
19     Q.   All right.  And did you review the
20 plaintiff fact sheet submitted by Mr. Pollard in this
21 case?
22     A.   No, sir.  I don't think so.
23     Q.   All right.
24 BY MR. FORNADEL:
25     Q.   And for the medical records that you

Page 12

1 
2 
3     A.   Yes, sir.
4     Q.   Okay.  And specific to Mr. Pollard you
5 didn't review any internal documents produced by
6 Monsanto?
7     A.   Correct.
8     Q.   All right.  Now, as far as risk factors are
9 concerned, what risk factors did you identify as part
10 of your differential diagnosis?
11     A.   Primarily I worked through -- so he calls
12 himself an agronomist.  So he had worked with a few
13 more other chemicals than some of the other patient
14 farmers that we had.  So I worked through all of
15 those that I could.  I've got some listings of them
16 in various places in my report.
17          On page 11, you know, the Harness Xtra,
18 Biceps.  There's a couple more.  The Lorsban product
19 we've talked about before.  The Lasso product we've
20 talked about before.  I think those were about it.
21 Those are the main risk factors.
22 
23                                   Mainly other potential
24 pesticides and herbicides, and through my
25 investigation of those as with some of the others

Page 13

1 that we've already talked about, I didn't identify
2 good correlation between those and non-Hodgkin's
3 lymphoma, period.  And you know, he used them to a
4 much less degree than he did Roundup.
5     Q.   Okay.  And -- and again, cart before the
6 horse.  In your phone call with Mr. Pollard,
7 you -- the notes you took from that were worked
8 directly in the report and don't exist independently
9 anywhere?
10     A.   Correct.
11     Q.   Okay.  No -- no recording of that call
12 exists anywhere?
13     A.   No.  I wasn't recording it.  If somebody
14 else was, I don't know about it.
15     Q.   Fair enough.  So turning to the risk factor
16 that you did address, you indicate that you included
17 every pesticide that you're aware of that Mr. Pollard
18 was exposed to; is that right?
19     A.   Well, I tried to.  Certainly, I -- I would
20 rely on his testimony and -- as I would in any of
21 these cases.  And I tried to, you know, interrogate
22 them as -- as carefully as I could, you know, both in
23 the -- in his deposition and also when I talked to
24 him.  So you know, I kind of went back over them and
25 asked him if he remembered anything further, anything

Brent Staggs, M.D.

Page 14

1  different to, you know, add or subtract and he didn't
2  have anything more specific than what was already in
3  his testimony to my memory.
4      Q.  Fair enough.  And to the extent that he has
5  testified or indicated otherwise that he was exposed
6  to additional pesticides beyond what's in this
7  exposure history, you didn't evaluate those things?
8      A.  Well, I wouldn't go that far.  I tried to
9  evaluate -- maybe it didn't make it in my report for
10 some reason.  But I would rely on his testimony as I
11 went -- typically, as I go through the testimony
12 would be the first time that I would look them up and
13 see what they were.  You know, as we've already seen
14 now with a lot of the farmers, a lot of very similar
15 products.  So you know, I already knew that Lasso
16 was, you know, not significantly linked.
17      And when you bring up again atrazine and
18 2,4-D, we've dealt with those multiple times.  But
19 anything -- he's the one that had a few new ones that
20 I hadn't heard of, the Harness and Bicep and I think
21 one called First Rate.  To the extent that I could
22 find any information about those, I couldn't find
23 links to non-Hodgkin's lymphoma based on their
24 chemical names that I could identify.
25      Q.  Okay.  And to the extent that he was

Page 15

1  exposed to various herbicides that has he -- he
2  couldn't quite pin down as far as a specific name or
3  product, it's -- it's not possible for you to
4  evaluate the NHL risk posed by those unnamed
5  products?
6      A.  Correct.
7      Q.  Okay.  ████████████████████████████
████████████████████████████████████████
9  ████████████████████████████████████████
10 ██████████████████
11     A.  ███
12     Q.  Okay.
13     A.  ███
14     Q.  ██████████████████████████████
15 ██████████████████████████
16 ████████████████████████████████
17 ██████████████████████████
18     A.  ██████████████████████████████
19 ████████████████████████████████████
20 ████████████████████
21     Q.  ██████████████████████████████
22 ████████████████████████████████████████
23 ████████████████████████
24     A.  ██████████████████████████████
25 ████████████████████        I wouldn't

Page 16

1  remembered -- oh, no.  I have it here.  Yes.  I have
2  it in my notes.  Sure.
3      Q.  Okay.  ████████████████████████████
4  ████████████████████████████████████████
5  ██████████████████
6      A.  ██████████████████████████████
7  ████████████████████████████████████████
8  ████████████████████████████████████
9  ████████  So we've had this discussion now.  I
10 know we have to get it for every patient, but about
11 some papers that have shown an association █
12 ████████████████████████████████████████
13 ██████████████████████████████████
14 ████████████████
15     But at least one of the papers said that
16 they -- ████████████████████████████████
17 ████████████████████████████████████████
18 most part.  That may not be true for all of them.  I
19 just remember that excerpt from one of them.
20     Q.  Okay.  ████████████████████████████
21 ████████████████████████████████████████
22 ████████
23     A.  ██████████████████████████████████
24 ████████████████████████████████████████
25 ██████████

Page 17

1      Q.  Okay.  ████████████████████████████
2  ████████████████████████████████
3  ████████████████████████████████████
4  ██████████████████
5      A.  Yes.  I've cited some of those in my
6  updated list.  And we've talked about the reasons --
7  you know, the associations is different than the
8  cause.
9      Q.  All right.
10     (Exhibit Number 4 marked for identification.)
11 BY MR. FORNADEL:
12     Q.  Specific to Mr. Pollard, because I don't
13 think we have had a plaintiff with marginal zone just
14 yet, marked as Exhibit 4 the Bracci, B-R-A-C-C-I,
15 2014 article, which is the -- this is the -- some of
16 the InterLymph findings specific to marginal zone
17 lymphomas.
18     And if you'll turn with me to page 55,
19 Table 2, about half-way down in the family history,
20 at least one-degree category, the -- any hematologic
21 malignancy factor, the -- agree with me that the odds
22 ratio there is -- is 1.73; is that right?
23     A.  Yes, sir.
24     Q.  And is statistically significant?
25     A.  Yes.

Page 18

1    Q.   And the next category down, if you have a
2  male relative with hematologic malignancy, the odds
3  ratio goes up to 2; is that right?
4    A.   Right.
5    Q.   Also statistically significant?
6    A.   Yes, sir.
7    Q.   All right. So you agree with me there's
8  support in the literature for a meaningful
9  association between family history of hematologic
10 malignancies and NHL incidents?
11       MS. GREENWALD: Objection. Form.
12       THE WITNESS: That's right. It doesn't try
13 to insinuate what the causal assessment is, just that
14 there's an association identified in their numbers.
15 BY MR. FORNADEL:
16   Q.   All right. And again, just to confirm,
17 specific to Mr. Pollard, you won't be offering any
18 opinions about the concentrations or co-ingredients
19 or contaminants involved in any of the -- the
20 herbicides or pesticides he was exposed to?
21   A.   You're correct. I'm not going to offer
22 testimony like that.
23   Q.   Okay. And similarly for Mr. Pollard, you
24 won't be differentiating between glyphosate exposures
25 exposed to Roundup as formulated in -- in a product?

Page 19

1        MS. GREENWALD: Objection. Form.
2        THE WITNESS: That's right.
3  BY MR. FORNADEL:
4    Q.   ▮
5    ▮
6    ▮
7    A.   Like in the other patients, I'm not aware
8  there's a blood test available in the hospital to
9  even interrogate glyphosate. But having said that,
10 there is not anything in his medical record in the
11 lab work that has anything about glyphosate.
12   Q.   Okay. ▮
13 ▮
14 ▮
15   A.   It's the same answer. Right. There's
16 nothing even medically available that -- we can't --
17 right. We don't expect to see anything like that and
18 there's not anything like that reported.
19   Q.   Okay. ▮
20 ▮
21   A.   That's right.
22   Q.   All right. And even if you had, you
23 wouldn't expect to see anything on there indicating
24 Roundup involvement?
25   A.   Just like with lots of other carcinogens, I

Page 20

1  would not.
2    Q.   ▮
3  ▮
4  ▮
5    A.   I don't remember genomic analysis. Well,
6  doesn't really matter. I don't remember seeing a
7  genomic analysis. I don't -- there's no part of that
8  information I'm aware of would have -- indicate
9  Roundup exposure because there's nothing -- I mean,
10 there's just nothing we expect to see there that's
11 different.
12   Q.   Understood. ▮
13 ▮
14 ▮
15 ▮
16   A.   That's correct. ▮
17 ▮
18 ▮
19   Q.   ▮
20 ▮
21 ▮
22   A.   That's right. We don't expect them to show
23 anything like that, and they don't.
24   Q.   ▮
25 ▮

Page 21

1  ▮
2  ▮
3    A.   No, sir.
4    Q.   ▮
5  ▮
6  ▮
7    A.   No, sir.
8    Q.   Now, the fact that -- and I think you --
9  you answered the inverse of this with the last
10 plaintiff. ▮
11 ▮
12 ▮
13   A.   It's not. ▮
14 ▮
15   Q.   Okay. ▮
16 ▮
17 ▮
18 ▮
19   A.   No, sir. Wouldn't expect to see anything
20 and it's not reported. You know, just not something
21 you can assess with those tools.
22   Q.   Okay. And just more basically, the fact
23 that he had marginal zone lymphoma as opposed to the
24 other subtypes we've been discussing earlier, that --
25 that in and of itself doesn't suggest this was a

|  Page 22 | Page 24 |
|---|---|

**Page 22**

1  Roundup-induced NHL, does it?
2    A.   No.  The subtype doesn't give us a clue to
3  the causation.
4    Q.   All right.  And are you aware of any
5  medical record indicating that Mr. Pollard's marginal
6  zone lymphoma was caused by Roundup?
7    A.   I've not seen anything to that effect, nor
8  would I expect to.
9    Q.   All right.  And you'd agree with me that
10 there are patients diagnosed with marginal zone
11 lymphoma who have never been exposed to Roundup?
12   A.   I'm sure there are.
13   Q.   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
14 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
15 Does that match your understanding?
16   A.   I would rely on the medical records, but
17 that sounds about right.
18   Q.   Yeah.  The -- I'm sorry, page 10 of your
19 reports and pathology reports, the first paragraph
20 there.
21   A.   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
22 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
23 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
24 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
25 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

**Page 23**

1    Q.   Okay.  And you're not going to be offering
2  any opinions on the treatments he received?
3    A.   No, sir.
4    Q.   And you're not going to be offering any
5  opinions on his prognosis?
6    A.   No, sir.
7    Q.   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
8  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
9  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
10   A.   I don't think so.  We brought that up last
11 time, kind of interesting process.  I mean, I haven't
12 formed any opinions like that.  ▓▓▓▓▓▓▓▓▓▓▓▓
13 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
14 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
15 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
16 ▓▓▓▓▓▓▓▓  But I don't have any opinions like
17 that right now.  If I am asked to develop them, I'll
18 let you know.
19   Q.   Okay.  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
20 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
21 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
22   A.   Correct.
23   Q.   Okay.  One thing I did want to ask you
24 about:  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
25 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

**Page 24**

1  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓  Do you have any opinion
2  there on -- on which would be the more appropriate
3  classification?
4         MS. GREENWALD:  Objection.  Form.
5         THE WITNESS:  No.  Not as I sit here.  ▓
6  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
7  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
8  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
9  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
10 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
11 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
12 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
13 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
14 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
15   Q.   Okay.  And regardless of -- of where you or
16 -- or other doctors may come down on that specific
17 classification, does that have any impact on your
18 opinions in this case?
19   A.   No.
20   Q.   Okay.  Pages 11 and 12 of your report
21 contain your exposure history for Mr. Pollard,
22 including his use of various pesticides and his
23 varying use of protective equipment over time; is
24 that right?
25   A.   Yes, sir.

**Page 25**

1    Q.   Now, the history did not mention the fact
2  that Mr. Pollard continues to use Roundup.  Does that
3  match your understanding?
4    A.   I don't know if I remember that detail.  I
5  would rely on his testimony for that, but I don't
6  remember his comments on that.  We did discuss that
7  with everyone, but I -- I don't -- I didn't make a
8  note about him specifically in that.
9    Q.   Okay.  And in so far as he testified that
10 he continuous to use Roundup, you'll defer to him?
11   A.   Sure.  With the facts, right.
12   Q.   Understood.  For Mr. Pollard, you did not
13 calculate a specific dose of glyphosate that he
14 experienced over the years?
15   A.   Exactly.  Just like with the other patients
16 that we've looked at, I don't calculate a numerical
17 dose.  I consider the dose in a relative sense.
18   Q.   Sure.  And you won't be offering any
19 opinions about how much penetrated his skin or
20 entered circulation or both, anything in that regard?
21   A.   Correct.
22   Q.   And again, I think I know the answer to
23 this but just to confirm:  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓
24 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
25 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

|  | Page 26 |
|---|---|
| 2 | A. That's right. It's beyond medical science |
| 3 | right now to identify exactly when mutations occurred |
| 4 | or when they are occurring. |
| 5 | Q. Okay. |
| 7 | A. Well -- well, you can be a little more |
| 8 | specific on that one, to a degree. |
| 21 | Q. Understood. Now, as far as the -- your |
| 22 | latency opinion is concerned regarding Mr. Pollard, |
| 23 | we -- we've been through Eriksson before which is not |
| 24 | subtype specific, so I'm assuming in that regard you |
| 25 | would place him into that category of -- of a latency |

Page 27

1  period of -- well, since first exposure of over ten
2  years; is that right?
3      A.   Oh, sure.  He's -- since first exposure,
4  right.  He's been using Roundup for decades.
5      Q.   Okay.  And to the extent we've -- we've
6  gone through Eriksson before, discussing other
7  plaintiffs, that that discussion would apply equally
8  here?
9      A.   Sure.
10     Q.   Okay.  I have unfortunately one copy of
11 Andreotti left, but I'll give you that.  I'm going to
12 work through that because we are -- I believe we're
13 on 4 or 5?
14         MR. LUNDY:  Five.
15    (Exhibit Number 5 marked for identification.)
16         THE WITNESS:  Is this your copy with the
17 secret highlights?
18         MR. FORNADEL:  Secret, top-secret
19 highlights on it.
20 BY MR. FORNADEL:
21     Q.   Now, I want to direct you towards the
22 marginal zone lymphoma specific data in this article,
23 and wanted to ask if any of that data reflects an
24 increased risk of NHL -- or specifically marginal
25 zone lymphoma and Roundup use?

Page 28

1      A.   I don't see any.
2      Q.   Okay.  And just to be clear that I'm not
3  hiding anything, I actually do not have the
4  supplement on the copy I handed you, but it -- it
5  should be on counsel's copy, if you want to review
6  any of the supplemental data.
7      A.   I don't see any.
8      Q.   All right.  So just to summarize, nothing
9  from the agricultural health study reflects a
10 significant association between marginal zone
11 lymphoma and Roundup use?
12     A.   Correct.
13     Q.   All right.  Let's keep our pile straight.
14 I'll give this back to you.
15         More broadly, in your review of
16 Mr. Pollard's medical records, would you agree that
17 none of his treating physicians ever said that
18 Roundup causes NHL?
19     A.   I don't see that statement in the records.
20 I would rely on the records.  If it's there, then
21 it's there, but --
22     Q.   Okay.
23     A.   -- I don't remember.
24     Q.   And just as with the other cases, in
25 Mr. Pollard's case, you won't be offering any

Page 29

1  opinions specific as to specific pathology slides or
2  anything in the regard?
3      A.   No.
4         MS. GREENWALD:  Objection.  Form.
5  BY MR. FORNADEL:
6      Q.   Hand you a calculator here --
7      A.   Oh, right.
8      Q.   -- and mark this as Exhibit 6.
9     (Exhibit Number 6 marked for identification.)
10 BY MR. FORNADEL:
11     Q.   I know a room full of -- you'll probably be
12 all right with a room full of attorneys doing math.
13 It's a great way to end the night.
14         I put together a chart that I want to work
15 through and just organize my thoughts and then get
16 your confirmation that we're all on the same page
17 about the -- your Roundup invoices.
18         So starting with Kane, you were deposed
19 on -- on several times, but on -- on one of those
20 Kane depositions was on July 23rd, 2019?  Does that
21 sound right?
22     A.   Oh, Yes.
23     Q.   And during that deposition, you testified
24 that you had been working -- prior to April 18th,
25 2018, you had charged out approximately $54,900?

Page 30

1  Does that sound right?
2       MS. GREENWALD:  Do you have that testimony?
3  I was not at that deposition.  I would like to see
4  the testimony you're talking about.
5       MR. FORNADEL:  Sure.  I -- well, I say
6  sure.
7       MS. GREENWALD:  I think, most importantly,
8  the witness should be able to see it.  You're asking
9  him to do calculations.  It would be nice if you
10 showed him what he said.  Do you have the invoices?
11      MR. FORNADEL:  I do not have the invoices
12 from the Kane depositions.  So I've got the -- I've
13 got the page and line cites in my outline.  Do we
14 want to take a break and I can just give you the page
15 and line cites?
16      MS. GREENWALD:  No.  I'll just note my
17 objection that, you know, we're doing this based on
18 no documents that you're showing him, but go on.
19 It's not worth the time.
20 BY MR. FORNADEL:
21    Q.   All right.  So --
22      MS. GREENWALD:  Unless you want it.  I
23 shouldn't speak for you.
24      THE WITNESS:  No.  Well --
25      MS. GREENWALD:  Okay.

Page 31

1       THE WITNESS:  -- I don't remember real
2  well, but it's probably in the ballpark.
3  BY MR. FORNADEL:
4     Q.   Okay.  Fair enough.  And -- and if you'd
5  like to confirm afterwards, this is on pages -- page
6  35 lines 12 through 20 of your July 23rd, 2019
7  deposition.
8     A.   Okay.
9     Q.   And so just to -- so that -- and that's
10 represented in that first box on Exhibit 6.  Do you
11 see that, that 54,900?
12    A.   I see that.
13    Q.   And I'll represent to you that by my
14 measure, that deposition lasted about five hours.
15 And so you -- you charged $600 per hour of testimony;
16 is that right?
17    A.   Right.
18    Q.   All right.  So that would amount to $3,000
19 for the April 18th deposition?
20    A.   Correct.
21    Q.   And do you see that in the -- the second
22 box there?
23    A.   Yes, sir.
24    Q.   Okay.  Now, you later testified that you
25 spent about 80 hours working on the Kane file between

Page 32

1  April 19th, 2018, and July 23rd, 2019.  Does that
2  sound about right?
3     A.   I don't remember, but it -- I -- that's
4  probably in the ballpark.
5     Q.   Fair.  And if you'd like to confirm, that
6  was on pages -- page 35 line 24 through page 36 line
7  12 of your July 23rd deposition.
8     A.   Okay.
9     Q.   Now, if you multiply those 80 hours -- and
10 that would have been at 450 an hour for doc -- for
11 document review?
12    A.   That sounds right.
13    Q.   Okay.  And if you multiply 450 by 80, that
14 totals $36,000; is that right?
15    A.   Yes.
16    Q.   Okay.  Is that accurately reflected on the
17 third line there?
18    A.   Right.
19    Q.   Great.  Now, by my count, the time spent at
20 your July 23rd and 24th deposition is about ten hours
21 in total between the two.  Does that sound about
22 right?
23    A.   Sure.
24    Q.   And so at $600 an hour, that's $6,000?
25    A.   Right.

Page 33

1     Q.   Is that accurately reflected on the -- the
2  fourth line there?
3     A.   Yes.
4     Q.   All right.  Now, have you done any further
5  work on Kane -- on the Kane file beyond what's
6  reflected so far in the chart?
7     A.   No, sir.
8     Q.   Okay.  So that accurately captures
9  everything there?
10    A.   I think so.
11    Q.   Great.  Now, beyond Kane, have you done any
12 other Roundup work besides the six farming cases that
13 we've been discussing this month?
14    A.   No, sir.
15    Q.   Okay.  And just to clear this up, and we
16 can actually cross this off, on page 2, I had listed
17 Whitby.  In reviewing your prior depositions, Whitby
18 was one of the Kane plaintiffs, so that was not
19 a -- that was the first deposition you had, but
20 that -- just so we can clear up the record for that.
21 That was not -- that was part of the Kane case, so we
22 know --
23    A.   Oh, was it?
24    Q.   It was.  Yes.  But it was a multiplaintiff
25 case, so we -- he was a plaintiff but just not the --

Page 34

1 not the main one.
2    A.   Okay.
3    Q.   All right.  Now, at the Sanders deposition,
4 you produced an invoice which was Exhibit 7 that was
5 for $15,536.  Does that sound about right?
6    A.   Sure.  Yeah.  Whatever the invoice said.
7    Q.   Okay.  And do you -- for these, do you mind
8 writing these in so we can keep a running tally?
9    A.   Sure.  All right.  What was Sanders again?
10   Q.   15,536.
11   A.   All right.
12   Q.   And do you remember about -- well, I guess
13 that -- that deposition, do you remember about how
14 long that was?
15   A.   Well, it was -- I charge by the hour so I'm
16 going to charge the full six hours, but I think it
17 ended shortly before 10:00, so 4:30 to 10:30 is what
18 I've got blocked off.
19   Q.   Well, so Sanders and Tanner were both the
20 same night though.  Do you remember specifically --
21   A.   Oh --
22   Q.   -- how -- and just so we can keep these
23 straight.
24   A.   I see.  Let's just call it half the time.
25 I don't know, really remember.

Page 35

1    Q.   Okay.  So about three hours then; is that
2 right or --
3    A.   Sure.  I mean, it's kind of like what
4 you've done.  I mean, a lot of it was general and
5 then suddenly we -- we jumped in, you know, with the
6 -- in case-specific stuff, so probably just split it
7 about down the middle.
8    Q.   Well, and that's -- yeah.  I mean, as long
9 as we capture it between these two rows of Sanders
10 and Tanner, about how much would that be?
11   A.   Well, if -- well, three times six would be
12 18.  1800.
13   Q.   All right.  And then just looking quickly
14 through the invoices produced earlier, were there any
15 other expenses associated -- or rather any other
16 charges you had associated with the Sanders case
17 beyond what's reflected here?
18   A.   No, sir.
19   Q.   Okay.  And if we could tally those up so
20 that we just have one number for -- for the Sanders
21 case, if you don't mind doing that with the --
22   A.   Oh, 17,336.
23   Q.   All right.  Now, similarly for Tanner,
24 Exhibit 5 at that deposition indicated that -- an
25 invoice of $16,486?

Page 36

1    A.   Okay.
2    Q.   And so -- and then we attack on additional
3 1800 in -- in testimony time?
4    A.   Right.
5    Q.   All right.  And then if you don't mind
6 tallying that up for Tanner total?
7    A.   Okay.  18,286.
8        (Exhibit Number 7 marked as identification.)
9 BY MR. FORNADEL:
10   Q.   All right.  Now, I'll mark as Exhibit 7 the
11 -- rather your invoice from the Domina case.  And
12 that indicates a total of $10,272?
13   A.   Right.
14   Q.   And the deposition time we spent on Monday
15 would be on top of that?
16   A.   Right.  Yeah.  For all these, probably
17 going to be 1800 apiece, I'm guessing, because we got
18 about three hours apiece.
19   Q.   Well, in fairness, I think we ran -- well,
20 4:30 to --
21   A.   10:30.
22   Q.   -- 10:30 ish, so yeah.  So that
23 was -- okay.  So another 1800 for Domina?
24   A.   Uh-huh.
25   Q.   And similarly, let's tally that one.

Page 37

1    A.   All right.  12,072.
2    Q.   Great.
3        (Exhibit Number 8 marked for identification.)
4 BY MR. FORNADEL:
5    Q.   And I'll mark as Exhibit 8 the Janzen
6 invoice.  This is for a total of 9,500?
7    A.   Yes, sir.
8    Q.   All right.  And then another 1800 in
9 deposition testimony?
10   A.   Yes, sir.  11,3.
11       (Exhibit Number 9 marked for identification.)
12 BY MR. FORNADEL:
13   Q.   I'll mark as Exhibit 9 your invoice from
14 Dickey which totaled 12,262.  And you know to be
15 fair, it's 8:40 now.  Assuming we go to 9:30 to give
16 us an easy calculation, that's five hours we've got
17 to split between the two.  So two and a half for
18 each.  Sound fair?
19   A.   All right.  I'll hold you to that.
20   Q.   I didn't ask that.  I said, does that sound
21 fair.  So that's 15 --
22   A.   1500 apiece.  Yeah.  13,762.
23   Q.   All right.  Finally -- was that last
24 invoice 9?
25   A.   Yes.

|  | Page 38 |
|---|---|
| 1 | (Exhibit Number 10 marked for identification.) |
| 2 | BY MR. FORNADEL: |
| 3 | Q. Okay. I'll mark the Pollard invoice as 10. |
| 4 | Hand that to you. That's for $13,781, and then |
| 5 | additional 1500 in testimony? |
| 6 | A. 15,281. |
| 7 | Q. Yep. And just to be clear, and if I think |
| 8 | I understood your prior testimony correctly, this |
| 9 | then, page one, should capture all the Roundup work |
| 10 | you've done? |
| 11 | A. Well, that's right. There will be probably |
| 12 | another half-dozen hours or so in preparation for the |
| 13 | depositions, something like that. You know, each |
| 14 | time we've gotten one, I've probably spent a couple, |
| 15 | two or three hours, before the deposition getting |
| 16 | ready. |
| 17 | Q. Okay. So it would be two or three hours |
| 18 | for each of these six? |
| 19 | A. No. Two or three hours for each pair, for |
| 20 | each deposition. There's been two of them a piece, |
| 21 | something like that. I haven't billed that yet, but |
| 22 | I will. |
| 23 | Q. Okay. So let's do this: So if it's about |
| 24 | two or three hours, we'll split the difference, call |
| 25 | it two and a half, and then so you spent a total of |

|  | Page 39 |
|---|---|
| 1 | seven and a half over the six cases? |
| 2 | A. Sure. |
| 3 | Q. All right. So if you don't mind, putting |
| 4 | -- let's put a -- just put a separate box at the |
| 5 | bottom so we can keep this clean. Call it depo prep. |
| 6 | A. Okay. |
| 7 | Q. Or however you'd like to characterize it, |
| 8 | but that sounds like what it is. |
| 9 | A. 3,375. |
| 10 | Q. And then if you don't mind taking all that |
| 11 | and giving me a total down at the bottom there? |
| 12 | A. 191,312. |
| 13 | Q. That matched what I've got as well. So if |
| 14 | you don't mind indicating that at the bottom? |
| 15 | A. Grand total. |
| 16 | Q. And the other thing I had a question on, if |
| 17 | you -- and if you don't mind indicating down at the |
| 18 | bottom, I just wanted to -- to bookmark this, about |
| 19 | when did you start working on this? If -- I know |
| 20 | that's over a year ago, but it -- |
| 21 | A. On all of this? |
| 22 | Q. Uh-huh. |
| 23 | A. Well, we talked about that last time. |
| 24 | Yeah. I started reviewing literature in the summer |
| 25 | of 2017. |

|  | Page 40 |
|---|---|
| 1 | Q. Okay. And so that would have been part of |
| 2 | the -- the work captured in that first -- |
| 3 | A. That's the bulk of that -- right. I was |
| 4 | reviewing literature for a year before I gave my |
| 5 | first deposition. |
| 6 | Q. Okay. So if you don't mind at the bottom |
| 7 | then, maybe notating that as -- as summer 2017 |
| 8 | through November 2019? |
| 9 | A. Okay. |
| 10 | Q. And before we go any further, do you have |
| 11 | any reason to disagree with any of the calculations |
| 12 | or representations I've made to you? |
| 13 | A. No. I don't think so. |
| 14 | Q. Okay. And I'm assuming to the extent that |
| 15 | any of these cases move forward, there would be |
| 16 | additional review time and preparation time before |
| 17 | trial? |
| 18 | A. Oh, sure. |
| 19 | Q. In addition to the -- the $5,000 a day you |
| 20 | charge at trial; is that fair? |
| 21 | A. Right. Any preparation time, I charge that |
| 22 | by the hour and then, you know, traveling out of town |
| 23 | for trial is 5,000 a day. |
| 24 | Q. Okay. Now, I understand from your prior |
| 25 | testimony that you make approximately 200 to 300,000 |

|  | Page 41 |
|---|---|
| 1 | per year for asbestos work; is that right? |
| 2 | A. That's all litigation. |
| 3 | Q. Okay. So that's -- I wanted to clarify |
| 4 | that. So that -- on a per-year basis, that's for the |
| 5 | entirety of your litigation consulting? |
| 6 | A. That's my -- that's ballpark. I don't have |
| 7 | any way to track it. Right. But asbestos -- we |
| 8 | talked about that. Asbestos is most of that, |
| 9 | 80 percent or so. I don't know, 80 to 90, something |
| 10 | like that. |
| 11 | Q. Okay. And would that total also include |
| 12 | the autopsy work you described for me earlier as |
| 13 | well? |
| 14 | A. Yes. |
| 15 | Q. Okay. And so that was true for both 2018 |
| 16 | and 2019? |
| 17 | A. Probably so. Seems like -- |
| 18 | Q. Or rather will be true by the -- by the |
| 19 | time the end of 2019 comes? |
| 20 | A. Yeah. I may be a little busier this year. |
| 21 | I mean, it's kind of hard to tell. Similar number of |
| 22 | cases. Seems like more cases have a deposition now |
| 23 | for some reason. Several years ago, I did quite a |
| 24 | few cases but no depositions. But for whatever |
| 25 | reason, more depositions now. |

Page 42

1  Q.  Okay.  So am I then to understand, in
2  fairness, you've reduced your asbestos workload and
3  -- in light of the responsibilities you've picked up
4  in Roundup litigation?
5  A.  That's right.
6  Q.  Okay.  And just to be clear, and I think
7  you explained this to me but just to make sure I
8  understand, the income you receive through the
9  litigation work is not associated at all with the
10 Pathology Laboratories, that partnership?
11 A.  That's right.
12 Q.  And so there aren't any overhead or
13 expenses associated with your litigation consulting
14 work?
15 A.  Well, I mean, you know, I'll do like
16 immunohistochemical stains that I have to pay for.
17 If I have to have slides made, I pay for that.  When
18 I did autopsies, I pay the technicians and pay the
19 histology people to cut all the slides and make all
20 the blocks.  So there's some overhead.  I mean, I'm
21 trying to -- I never thought about it in an
22 accounting sense.  But the stain part is the big one.
23 They're fairly expensive.  I have several thousand
24 dollars a month in stain fees.  But other than that,
25 right.  It's just mostly my time, you know.  I don't

Page 43

1  maintain a different office or anything.  I office at
2  home, that I use mostly.
3  Q.  Okay.  Now, for those -- and I understand
4  you didn't do any of that here.  Is that
5  staining -- is that outsourced or are you able to do
6  with -- at Pathology Laboratories?
7  A.  Well, some -- I would -- if it's my own
8  case, then I pay them.  I pay myself sort of, but I'm
9  paying the group to have that done, just like we
10 charge anybody else to have that done.  And then some
11 of it, if -- if I don't have it in my own lab to do,
12 then I would pay another lab to do it.
13 Q.  Okay.  All right.
14     MR. FORNADEL:  I think we can go off the
15 record for a second.
16     THE VIDEOGRAPHER:  Going off the record.
17 The time is approximately 8:49 p.m.
18     (A short break was had.)
19     THE VIDEOGRAPHER:  We are back on the
20 record.  The time is approximately 8:57 p.m.
21     MR. FORNADEL:  Doctor, I don't any further
22 questions for you right now, unless your counsel
23 does.
24     MS. GREENWALD:  I do not have any
25 questions.

Page 44

1     THE WITNESS:  Yes, ma'am.  Okay.
2     MR. FORNADEL:  All right.
3     THE VIDEOGRAPHER:  This concludes the
4  deposition.  We're going off the record.  The time is
5  approximately 8:57 p.m.
6     (Whereupon the proceedings were concluded at
7           8:57 p.m.)

Page 45

1           REPORTER'S CERTIFICATE
2  STATE OF ARKANSAS )
                    ) ss
3  COUNTY OF PULASKI )
4      I, KARISA J. EKENSEAIR, Certified Court
   Reporter, Registered Professional Reporter in and for
5  the State of Arkansas, do hereby certify that BRENT
   STAGGS, M.D. was duly sworn by me prior to the taking
6  of testimony as to the truth of the matters attested
   to and contained therein; that the testimony of said
7  witness was taken by me in stenotype and was
   thereafter reduced to typewritten form by me or under
8  my direction and supervision; that the foregoing
   transcript is a true and accurate record of the
9  testimony given to the best of my understanding and
   ability.
10     I FURTHER CERTIFY that I am neither counsel
   for, related to, nor employed by any of the parties
11 to the action in which this proceeding was taken;
   and, further, that I am not a relative or employee of
12 any attorney or counsel employed by the parties
   hereto, nor financially interested, or otherwise, in
13 the outcome of this action; and that I have no
   contract with the parties, attorneys or persons with
14 an interest in the action that affects or has a
   substantial tendency to affect impartiality, that
15 requires me to relinquish control of an original
   deposition transcript or copies of the transcript
16 before it is certified and delivered to the custodial
   attorney, or that requires me to provide any service
17 not made available to all parties to the action.
       IN ACCORDANCE with Rule 30(e) of the Rules of
18 Civil Procedure, review of the transcript was not
   requested.
19     GIVEN UNDER MY HAND and SEAL OF OFFICE on this
   21st day of November, 2019.
20
21
22
         _____
23       Karisa Ekenseair, CCR, RPR  LS #802
         Notary Public in and for
24       Pulaski County, Arkansas
         Commission No. 12704567
25       Exp. 06-18-2028