# Exhibit 5

**COMMONWEALTH OF KENTUCKY**
**GREENUP CIRCUIT COURT**
**CIVIL ACTION NO. 01-CI-00392**





DENIZILYE M. DOUGLAS, As Personal Representative
Of the Estate of EARL E. DOUGLAS, deceased,

Plaintiff,

Vs.

**DAUBERT FINDINGS OF FACT AND
ORDER**

ASHLAND, INC. and U.S.X. CORPORATION, formerly known
As United States Steel Corporation

Defendants

On motion of the Defendant the Court held a Daubert hearing on January 13,

2006. The Honorable James M. O'Brien represented the Plaintiff and was present at the

hearing. The Honorable James E. Cleveland, III, and the Honorable W. Kyle Carpenter

represented the Defendants and were present at the hearing. The Court received

testimony from Mr. Steven Petty on behalf of the Plaintiff, and testimony from Mr. John

Spencer on behalf of the Defendants.

**FINDINGS OF FACT**

Mr. Steven Petty is an industrial hygienist and engineer from Dublin, Ohio. He

earned a B.S. and a M.S. in chemical engineering from University of Washington in

1979, and a M.B.A. from Dayton University in 1982. He is currently President of

Engineering & Environmental Services, Inc. He has been utilized as an expert witness in

over four dozen cases related to human exposure, and is currently working on nearly

three dozen cases for several clients. Mr. Petty is known for his ability to reproduce

1

complex sets of information into simple but accurate presentations on exposure and compliance with regulatory standards.

Mr. Petty managed the turnkey design, permitting and building of a Fuel Farm facility ($750 K) for The Ohio State University Airport in 2000. The project consisted of the layout, design and installation of six 12,000 gallon above-ground storage tanks and the removal and closure of four existing underground storage tanks. He has completed multiple ventilation projects for American Electric Power Plant facilities to determine best locations for hazardous gas monitors and whether or not ductwork was contaminated with mold. He was the process engineer for a 200-million gallons per day wastewater treatment plant improvement for a Weyerhauser paper mill.

Mr. Petty has prepared a hazardous waste evaluation for the NASA-Merritt Island Environmental Impact Assessment of Space Shuttle SRB refurbishing facility in a wildlife area and completed Environmental Assessment for NASA's Lewis Rocket Engine Test Facility. He has completed many other projects in the field including environment, health and safety, engineering. He has earned many certifications and honors in the field of engineering and industrial hygiene.

Mr. Petty testified that normally a chemical hygienist can monitor and measure the presence of different gases to which a worker is exposed. Using these measurements the hygienist can then calculate the amount of total exposure for the worker using a formula represented by the product of the time (t) times the parts per million (PPM), and then adding up the different exposure durations and intensities products to obtain a number that represents the exposure level of that particular worker to a known substance. This number is known as the parts per million (PPM) per year. Mr. Petty testified that

2

this is an accepted method in the scientific community of industrial and chemical hygienists.

When the Hooker plant in Greenup County, Kentucky was operational it utilized the two-stage "Raschig Phenol Process" to produce phenol, a hydrocarbon compound used in the plastics industry. In the first stage the Raschig Phenol Process begins with benzene and adds hydrochloric acid and oxygen heated to 230 degrees Centigrade. Copper and iron are added as catalysts, producing chlorobenzene and water. In the second stage the chlorobenzene is heated to 425 degrees Centigrade and silicon oxide is added as a catalyst. The reaction produces phenol and hydrochloric acid. These reactions occur in a huge container in which peanut shaped ceramic tiles act as collection surfaces for the products. The Raschig phenol process leaks benzene, and this leaked benzene was the source that the Plaintiff alleges he was exposed to that caused his illness.

In this process, the conversions are low and require recirculation. This means that the process was not very efficient, and that the raw materials, such as benzene in the first stage, and chlorobenzene in the second stage, were not well converted, leaving residual benzene in the product. Accordingly, the residual reactants are collected and recalculated for reuse. The process was not automated. Accordingly, workers were required to take frequent samples. When workers open valves to draw samples, the material was warm and tended to evaporate very quickly. In particular, when benzene was drawn from the process at 450 degrees Fahrenheit, it would have evaporated immediately.

In the case at bar, Mr. Petty was unable to take any measurements because the Hooker industrial facility located in Greenup County, Kentucky had been disbanded and

3

disassembled. In other words, there was no plant or industrial site to take measurements of the air.

Mr. Petty testified that when there exists no environment from which to take measurements, then industrial hygienists have to go about obtaining estimates of these measurements in other ways. Mr. Petty stated that one looks at any historical data of similar processes over the same time frame. He stated that an industrial hygienist can review the deposition of co-workers to see what they recalled about being in the industrial environment. The hygienist can monitor data from similar facilities, and obtain proxy levels where no monitoring data exists. Mr. Petty stated that if a person can smell a certain odor, then one can assume that the chemical compound that one smells must be present. But, being present and determining the amount of the chemical compound in the air are two different things. He stated that through several studies scientists have determined the minimum levels of various compounds that are necessary for a human being to detect it through odor. These tables of minimum levels are averages only and cannot take into account individual variations in humans who have strong senses of smell as opposed to weak senses of smell. Nevertheless, they represent averages that can give one a realistic idea of minimum levels that, at the very least, must be present in the environment around which the employee worked.

Hooker Chemical employed Earl E. Douglas at its South Shore, Kentucky facility from June 1961 to August 1971. Hooker Chemical hired Earl Douglas as a chemical operator. During his last five years at the Hooker Chemical plant, Mr. Douglas was a relief foreman. As a relief foreman, Mr. Douglas still worked as a chemical operator, and

only performed the duties of a foreman when a regular foreman was either on vacation, or had called off work for the day.

While a normal shift was eight hours, Mr. Douglas testified, "it was not unusual to work 12, 16 hours a day." Homer W. Bradley, one of Mr. Douglas' co-workers, testified that on average he (Bradley) worked 50 hours a week. At Hooker Chemical plant, Mr. Douglas worked 25% of the time in each of the first stage area, the second stage area, the distillation area, and the control room.

As a chemical operator in the first stage area, Mr. Douglas checked the towers and pumps for temperature and pressure and generally made sure that the equipment was running property. Mr. Douglas was also responsible for pulling samples of the material from the process, and to take the samples to the lab to run an analysis to determine if the towers were running properly, or if temperature or pressure adjustments were required.

Mr. Douglas smelled benzene at least 10% of the time that he was in the first stage area. He testified that he smelled benzene during maintenance outages in stage one, when the columns were opened, cleaned and repaired. On occasion, the odor of benzene was so intense that Mr. Douglas and other operators became light-headed from benzene fumes. Homer Bradley testified that these outages usually lasted two to three weeks at a time. Mr. Douglas estimated that these outages lasted from 24 hours to a week at a time, and indicated that he was exposed to strong benzene odors 75% of the time during these outages, which involved working inside vessels, and washing parts that had been removed from the vessels in a 55-gallon drum of benzene. These maintenance outages took place about twice a year.

5

Mr. Douglas smelled benzene when drawing samples and while taking the samples to the lab. Operators had to obtain samples every hour, and take them to the lab for analysis. In this regard, James W. Hardin testified, "you were out there a dozen times a day getting samples." An operator could smell benzene fumes when drawing the samples and when running tests on the benzene samples in the lab.

Samples obtained from the upper portion of Column 1 were pure benzene. When a benzene sample was drawn from Column 1, benzene vapors were visible, flashing off of the liquid sample. Samples obtained from other columns also contained benzene.

Hooker Chemical received one to two barges of benzene a month at its South Shore plant. During the first three years that the plant was operating, Mr. Douglas sampled benzene delivered to the plant by barges and railroad tank cars. It took Mr. Douglas from 30 to 45 minutes to perform a sampling on a benzene barge, during which time he could smell benzene.

The Hooker Chemical plant where Earl Douglas worked stored raw benzene in two three million gallon tanks. Benzene pumps leaked in the first stage operation, and operators performed some maintenance on these pumps. Mr. Douglas got benzene on his hands when taking samples in the first stage operation, and also when repairing seals on benzene pumps.

Mr. Douglas also performed maintenance on piping and equipment used to transport benzene, which further exposed him to benzene. He got benzene on him while performing these repairs. Not knowing that benzene was harmful, Mr. Douglas, like other workers at the plant, washed his hands in benzene to remove grease. At the end of

6

a workday, Mr. Douglas' work clothes sometimes smelled like benzene, particularly when he had worked in the first stage area.

Operators at the Hooker Chemical plant were exposed to benzene in both the first and second stage areas of the plant, as well as in the tank farm, where the benzene storage tanks were located. Since not all of the benzene was converted to chlorobenzene in the first stage operation, Mr. Douglas smelled benzene at times in the second stage operation where chlorobenzene was converted to phenol.

Mr. Petty was unable to obtain any measurements because of the dismantling of the plant, so he interviewed co-workers of the Plaintiff and read their depositions to obtain estimated time durations of their exposure to benzene. He then used those figures to obtain a rough estimate of the Plaintiff's exposure time.

While a worker can be exposed to a chemical by three means: inhalation, dermal exposure and ingestion, Mr. Petty only calculated Mr. Douglas' exposure level on the basis of inhalation exposure, even though Mr. Douglas described getting benzene on his skin.

Mr. Petty estimated the levels of benzene in the air by referring to the American Industrial Hygiene Association (hereinafter known as AIHA), tables from 1989. The number was expressed in parts per million (PPM) in the AIHA table.

In publishing its odor thresholds document, the AIHA brought together a group of professionals to assess the validity of the various odor thresholds reported throughout the literature. Specific requirements were necessary before an odor threshold could be considered as valid. The Committee looked at the underlying scientific methodology utilized by each author in support of his suggested odor threshold. It then determined

7

which studies met the pre-established criteria for validity.  Upon determining the

legitimacy of each study, the Committee then calculated the geometric mean for various

substances.

In explaining the need for its review of the odor threshold data reported in the

literature, the AIHA's report provides that:

> Odor threshold values are presented in virtually every health and safety text or
> reference manual.  Attempts to put these values to practical use, however, often
> can result in confusion over which values to report from which text.  This occurs
> partially because the thresholds reproduced in the literature often are from
> historical rather than updated sources.  Additionally, for the same substance,
> threshold values from different current sources can vary over several orders of
> magnitude.  Regardless, with time, threshold values tend to be considered
> physical constants instead of the statistical best estimate values they represent.
> The confusion created by this variation limits the utility of odor threshold values
> for the industrial hygienist.  AIHA believes that the critique of odor threshold
> literature reported here is a needed first step in addressing this situation.  In
> addition, the mean estimates of odor thresholds developed from acceptable data
> sources and presented herein should be useful to health and safety professionals.

> There are a number of threshold value computations available… None of these
> compendiums, however, critique the threshold values on the basis of their
> experimental design.  Such a critique is necessary to produce values useful from a
> health and safety viewpoint.  Threshold values reported from the first half of this
> century probably were not obtained under the same conditions of methodological
> precision taken for granted today.  Additionally, some values are reported from
> many interdisciplinary sources in which the intent is not threshold measurement
> per se.  Therefore, sensory experimental criteria are not considered a necessary
> factor in design.  Critiquing the experimental odor threshold determination
> reported in the literature provides a basis for developing a necessary refinement of
> the data available in odor threshold compilations.

> This report presents a single value representing the best estimate of the odor
> detection or recognition threshold for odorant chemicals for which a threshold
> limit value (TLV) has been published (and updated annually) by the American
> Conference of Governmental Industrial Hygienists.

AIHA, *Odor Thresholds for Chemicals with Established Occupational Health Standards*
sec. 1, p. 1 (1989).

8

"Odorant detectability (or threshold) refers to the theoretical minimum concentration of odorant stimulus necessary for detection in some specified percentage of the population, usually the mean." AIHA, *Odor Thresholds for Chemicals with Established Occupational Health Standards*, sec. 2.1, p. 2 (1989). "Threshold values are not fixed physiological facts or physical constants but are a statistical point of representing the best estimate value from a group of individual responses." *Id.* "[A] threshold value is a statistical point known as a mean value." *Id.* at sec. 2.2, p. 2.

There are two types of odor thresholds—a detection threshold and a recognition threshold. *Id.* at sec. 2.1, p. 2. "The detection threshold is the lowest concentration of odorant that will elicit a sensory response in the olfactory receptors of a specified percentage of a given population." *Id.* "The detection threshold is identified by an awareness of the presence of an added substance, but not necessarily recognized as an odor sensation." *Id.* In other words, the detection threshold is the level at which one first notices there is an odor present, even though one does not necessarily recognize the odor.

"The recognition threshold is defined as the minimum concentration that is recognized as having a characteristic odor quality by X percentage (usually 50 percent) of the population. It differs from a detection threshold in the subject's awareness of an odor sensation, and often is defined as the point at which a specific odor character description may be attributed." *Id.* The recognition threshold is usually higher than the detection threshold and is the level at which one not only notices that something is present, but can also comment on or describe the odor, and recognize what it might be.

Mr. Petty selected the number from the AIHA table by referring to the co-workers' depositions and determining how often they said they could smell the benzene

9

while on the job. Mr. Petty testified that in his opinion the AIHA's odor thresholds for chemicals from established occupational health standards from 1989 represented the best and most rigorous review of threshold data available. He also testified that industrial hygienists and other health and safety personnel refer to the AIHA table as a chemical odor threshold reference.

Odor threshold data is a conservative, reasonable estimate of exposure because odor threshold studies are performed in pristine conditions, while, on the other hand, industrial workers, who are exposed to chemicals every day, develop some insensitivity to the chemical and tend not to notice it due to olfactory fatigue, as well as due to the presence of other confounding odors in a chemical manufacturing plant. So if workers distinctly smell a particular chemical, then you can use the odor threshold information to quantify the exposure level.

Mr. Petty testified that he used the PPM threshold figures from the AIHA tables in determining his calculations. He multiplied the PPM threshold figures he obtained from the AIHA table by the estimated time durations of benzene exposure to obtain the products. These products where then added together for different exposure durations, which yielded a figure representing the cumulative level, expressed in PPM per year, to which the Plaintiff had been exposed to benzene while he worked at the South Shore, Kentucky facility. To be clear, Mr. Petty did not testify as to the cumulative level necessary to cause human cell structure change or mutation. He only testified as to the minimum cumulative levels that the Plaintiff had been exposed to based upon the model and calculations he performed. In other words, Mr. Petty did not link the estimated benzene levels as the proximate cause of his cancer.

10

Based on Mr. Douglas' deposition testimony, Mr. Petty calculated that Mr. Douglas worked six days a week, 50 weeks a year, for 12 to 16 hours a day.  According to this reading of Mr. Douglas' testimony, Mr. Douglas would have worked 300 days a year (6 x 50 = 300).  Mr. Douglas testified that he worked 12 to 16 hours a day, yielding a range of work hours per year of 3600 (300 x 12) to 4800 (300 x 16).  Given that Mr. Douglas worked in the first stage operations about 25% of the nine years that he worked at the plant, and taking into consideration the hours that he worked per day, Mr. Douglas would have had a range of  4.1 to 5.4 exposure years in the first stage operations.

Mr. Petty calculated Mr. Douglas' exposure levels in terms of both his general exposure while in the plant, as well as with regard to the specific activities that Mr. Douglas performed where he would have greater exposure, such as when performing maintenance and repair work sampling.  Mr. Petty calculated exposure ranges for the specific activities that Mr. Douglas performed, and then subtracted these exposure levels from his general exposure calculation.

For the 10% of the time that Mr. Douglas testified that he could smell benzene, Mr. Petty utilized the 97 ppm recognition odor threshold listed in the AIHA Odor Threshold Document.  For the other 90% of that time that Mr. Douglas worked in the first and second stages of the plant, Mr. Petty used a background exposure level range of 1 to 10 ppm, based upon OSHA's "Compliance Costs for Benzene Emergency Temporary Standard (May, 1977) as well as numerous other articles.

Given the 4.1 to 5.4 year range of Mr. Douglas' exposure in the first stage operations, and a like amount of time in the second stage operations, and further considering that Mr. Douglas was exposed to benzene levels of at least 97 ppm over 10%

11

of this time, and the background lower levels of from 1 to 10 ppm for the remaining 90%
of the time, Mr. Petty calculated Mr. Douglas' ppm years in the first stage operations at a
range of 44 to 101 ppm years, and a like range for the second stage operations.

For the time that Mr. Douglas worked cleaning towers and washing rings in a 55-
gallon drum of benzene during maintenance outages, Mr. Petty conservatively assigned a
benzene level of 97 ppm, utilizing the AIHA recognition odor threshold for benzene,
notwithstanding Mr. Douglas' testimony that he was exposed to *strong* benzene odors
75% of the time while performing this job.  Considering that this task lasted from 24 to
40 hours, or longer, and was performed once or twice a year over the nine years that Mr.
Douglas worked at the plant, Mr. Petty calculated Mr. Douglas' benzene exposure while
performing this job as ranging from 11 to 35 ppm years.

Mr. Petty's use of only a 97 ppm exposure level while Mr. Douglas cleaned inside
the towers and washed rings is conservative, given the testimony of Mr. Douglas and his
coworkers indicating that they became light-headed from benzene fumes while
performing this task.

Considering that operators were required to obtain samples from the first stage
process as often as every hour, and perhaps even more frequently, Mr. Petty's assumption
that Mr. Douglas performed two samples per shift, for 15 minutes at a time, including the
time of actually obtaining the sample and taking it to the lab to perform the analysis,
appears conservative.  Given that Mr. Douglas testified that he smelled benzene when
obtaining and analyzing these samples, Mr. Petty utilized the 97 ppm recognition odor
threshold listed in the AIHA Odor Threshold Document.  Over the nine years that Mr.
Douglas worked at the plant, Mr. Petty calculated his cumulative benzene exposure from

obtaining and analyzing samples in the first stage operations as ranging from 8 to 16 ppm years.

Using the same methodology (the 97 ppm recognition odor threshold listed in the AIHA Odor Threshold Document), and based upon the testimony of Mr. Douglas and his co-workers concerning the duration, frequency and their ability to smell benzene while performing repair work on benzene pumps, and while obtaining samples of benzene delivered to the plant in barges and rail cars, Mr. Petty calculated that Mr. Douglas had a cumulative benzene exposure from pump repair work ranging from 0.1 to 0.2 ppm years, and from sampling barges and rail cars of from 1 to 3 ppm years.

The sum of these six ranges arrives at the total range of Mr. Douglas' cumulative benzene exposure at the Hooker Chemical plant:

| JOB | PPM years |
|---|---|
| First Stage operator | 44 to 101 |
| Maintenance/Repair (cleaning towers and rings) | 11 to 35 |
| First Stage Benzene Sampling | 8 to 16 |
| Pump/Seal Repair | 0.1 to 0.2 |
| Benzene Sampling from Barges and Rail Cars | 1  to 3 |
| Second Stage Operator | 44 to 101 |
| Total | 108 to 256 |

Mr. Petty's calculations are conservative for a number of reasons. First, it accounts for only 60 to 70 percent of Mr. Douglas' work time during the nine years that he worked at the Hooker Chemical plant. In addition, Mr. Petty never uses a benzene

13

level greater than 97 ppm, the AIHA recognition odor threshold level, even though Mr.
Douglas described strong benzene odors while performing some jobs, and even reported
the neurological symptom of light-headedness while performing maintenance work inside
towers. In addition, the 108 to 256 ppm year range does not include Mr. Douglas' known
dermal exposure to benzene. Finally, Mr. Petty's analysis understates the frequency of
the sampling performed in the first stage process.

Mr. Petty stated that different industries have published tables for benzene
exposure for their respective industrial environments. These studies produced various
exposure amounts and assisted Mr. Petty in determining that his estimates of benzene
exposure by the Plaintiff were in the "ballpark." Several of the studies he relied on are
listed below:

| AUTHOR (DATE) | FACILITY/PRODUCT | BENZENE DATA |
|---|---|---|
| Williams et. al. (2005) | Industrial organics from benzene, shipments | 1970s avg. 2.0 ppm Similar process –2.2-8.8 |
| Rinsky, et. al. (1981) | Rubber manufacturing | Extensive –3.6 to 184 for various workers in 1976. |
| Yin, et. al. (1987, 1989) | Paint, shoe, rubber, leather adhesives factories | 528,729 workers-<13 ppm to 264 ppm |
| Hayes, et. al. (1997) | Chemical, rubber, others | Avg. chemical: 24.8 rubber: 58.5 |
| Bond et. al. (1986)-Dow | Organic chemicals/resins | 956 workers exposed to >0.1 to 35.5 ppm |
| Askoy (1972, 1971) | Adhesives, shoe manufacturing | 15-30 ppm/150-210 ppm |
| Bogardi-Sare (1997) | Shoe manufacturing | 1.9 to 14.6 ppm |
| Fan and Alexeef (2001)— California Environmental Protection Agency | Public Health Goal for Benzene in Drinking Water | |

Mr. John Spencer testified on behalf of the Defendant. He is also an industrial
hygienist and he resides in Baltimore, Maryland. Mr. Spencer has been an industrial

14

hygienist for 19 years and an environmental profiler for 15 years. He has written papers on the subject and taken thousands of samples for the gas and insurance industries. He has a Bachelor of Biological Sciences degree from the University of Maryland.

Mr. Spencer testified that he used a different approach in determining the exposure levels. He would begin an analysis by trying to understand the workplace environment by going to the area. Next, he would examine the job tasks and activities to be performed by the worker. He would review the frequency and duration of exposure including certain controls such as ventilation. Then, he would take his measurements. Mr. Spencer testified that Mr. Petty had simply not used the process used by industrial hygienist in determining exposure levels. He criticized Mr. Petty's model stating that industrial hygienists never use retrospective assessments to quantify exposure levels because of incremental uncertainty. Put another way, Mr. Spencer testified that one cannot do a scientific study of this nature by trying to determine levels after the gases you are trying to measure, are dissipated. He testified that he was unaware of any study done where the order of the measures occurred after the gases were gone. Instead, Mr. Spencer testified that when the information is gone, industrial hygienists take measurements in similar industrial sites and extrapolate the data to the particular situation they are studying to obtain a reasonable estimate. Mr. Spencer testified that an industrial hygienist can quantify the levels of exposure where an industrial plant is closed, but that it requires more work. Mr. Spencer did not testify as to what kind of additional work or study needed to be performed.

## OPINION

The burden of proof is on the party offering the evidence. *Staggs v.*

*Commonwealth,* 877 S.W.2nd 604 (Ky. 1993) Thus, the burden of proof is on the Plaintiff

to prove that the offered evidence meets the Daubert test. The aspects of the Daubert

doctrine are incorporated into KRE 703 that reads:

> (a) The facts or data in the particular case upon which an expert
> bases an opinion or inference may be those perceived by or made
> known to the expert at or before the hearing. If of a type reasonable
> relied upon by experts in the particular field in forming opinions or
> inference upon the subject, the facts or data need not be admissible
> in evidence.
> (b) If determined to be trustworthy, necessary to illuminate testimony,
> and unprivileged, facts or data relied upon by an expert pursuant
> to subdivision (a) may at the discretion of the court be disclosed to the jury
> even though such facts or data are not admissible in
> evidence. Upon request the court shall admonish the jury to
> use such facts or data only for the purpose of evaluation the validity
> and probative value of the expert's opinion or inference.

The "preliminary assessment" that a trial judge must make is a "a flexible

one" that requires the judge to focus "solely on principles and methodology, and not on

the conclusions that they generate." *The Kentucky Evidence Law Handbook(4th Edition),*

Lawson, Robert G., (LexisNexis, Matthew Bender, 2003). The assessment the court must

make includes, but is not limited to:

> (1) whether the theory or technique in question can be (and has been) tested; (2)
> whether it has been subjected to peer review and publication; (3) its known or
> potential rate of error; (4) the existence and maintenance of standards controlling
> its operation; and (5) whether the theory or technique has been generally (or
> widely) accepted in a relevant scientific community. *Daubert v. Merrel Dow
> Pharmaceuticals, Inc.,* 509 U.S. 579, 593-594, 113 S. Ct. 2786, 2796-2797, 125
> L. Ed. 2d 469,482-483 (1993).

The theory or technique for the model used by the Plaintiff to assess the level of

benzene exposure has been tested. The model of using the summation of the products of

16

time of exposure (T) and intensity measured in parts per million (PPM) is commonly used by industrial hygienists in the scientific community. What the Defendants take exception with is the manner in which the data was obtained that was plugged into the formula. Both experts agreed that when it is impossible to obtain the data through measurement of air quality, then one looks to alternative methods of obtaining this data. The Plaintiff has put forward a reasonable alternative that is self-described as "conservative" that helps to fill in the missing data.

Both the Plaintiff and Defendants agreed that the method, or formula, used by the Plaintiff had been subjected to peer review and publication. Again, they disagreed over the manner in which to insert the data into the model.

The Plaintiff offered no known or potential rates of error in his calculations. But, the Plaintiff offered the table from the studies of other industries to show that his calculations were in the "ballpark" when it came to assessing the level of benzene exposure.

Lastly, the Court must look to see if the theory or technique has been generally, or widely, accepted in a relevant scientific community. Again, the model of obtaining the summed up products of the time of exposure and intensity had gained generally or widely acceptance in the relevant scientific community. The question becomes whether the estimation techniques used by Mr. Petty had gained widely acceptance in the relevant scientific community. Mr. Petty said that it did, and Mr. Spencer said that it didn't. So, our investigation must take us further into the analysis. The Kentucky Supreme Court stated that, "While Daubert factors are helpful in evaluating the reliability of expert testimony, they are not an exclusive list. *Miller vs. Eldridge,* 146 SW3d 909(2004).

The test for admissibility is now based upon the reliability and relevance of the proposed evidence. "The relevance requirement ensures that there is a 'fit' between the testimony and the issue to be resolved at trial . . . [and the] reliability requirement is designed to focus on the methodology and principles underlying the testimony." *Greenwell vs. Boatwright,* 184 F.3d 492, 496-497 (6th Cir. 1999). The Plaintiff's expert has applied a mathematical model that almost all industrial hygienists agree upon as an accepted method of determining the amount of benzene exposure. Mr. Petty has been forced to rely upon "best guesses" to determine the numbers to apply to his formula because it is now impossible to obtain the data required. In his determination of ascertaining these "best guesses" he remained consistent with his use of a widely accepted model, and allowed estimated data to produce results while applying mathematical rules. Mr. Petty produced results that could not be altered except by putting different numbers into the formula. In other words, the methodology remained consistent through out his analysis. Mr. Petty tested the reliability of his results by contrasting them in other studies of proven benzene exposure levels in other industries that utilize benzene in the production process. This court is cognizant that the results reached by Mr. Petty can be manipulated through creative estimates, but he selected data to plug into his formula based on conservative estimates. The Court is examining only the method used by Mr. Petty in reaching his conclusions. The court is not scrutinizing Mr. Petty's result.

The Defendant argues that there are simply too many variables to take into account to justify Mr. Petty's estimates of benzene exposure. The Defendant's attorneys and their expert, Mr. Spencer, pointed out that some of these variables include: (1) Different people are sensitive to different levels of detecting benzene through odor; (2)

After a while all people become acclimated to the smell of substances and they experience "olfactory fatigue"; (3) There is just no data available upon which to base an estimate and others. The Court agrees that each of these are variables that cannot possibly be accounted for in this model. But, the failure to take into account every possible variable goes more to the weight of the testimony than its admissibility. *Miller vs. Eldridge,* 146 S.W.3d 909, 921 (Ky. Sup. Ct. 2004).

Under this analysis the Court must next look to the relevancy of the offered evidence. "It is well established that a plaintiff in a toxic tort case must prove that he or she was exposed to and injured by a harmful substance manufactured by the defendant. *Mitchell vs. Gencorp, Inc.*, 165 F.3d 778, 781 (10th Cir. 1999). In order to carry his burden, the Plaintiff must demonstrate, "the levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure to the defendant's toxic substance before he or she may recover." *Wright,* 91 F.3d at 1106 contained in 165 F.3d 778, *Mitchell vs. Gencorp, Inc.* (1999). It is obvious that the offered evidence is relevant.

The Defendants cited to the Court the *Miller, supra* case for the proposition that educated guesses are insufficient to prove the level of exposure in a toxic tort case of this nature. The Defendants are correct in making this point to the Court. In fact the *Miller* Court stated that, "We believe a plaintiff must prove level of the exposure using techniques subject to objective, independent validation in the scientific community. *See Moore v. Ashland Chemical, Inc.,* 151 F.3d 269, 276 (5th Cir. 1998) (en banc). At a minimum, the expert testimony should include a description of the method used to arrive at the level of exposure and scientific data supporting the determination. The expert's

19

assurance that the methodology and supporting data is reliable will not suffice. *Mitchell et. at. Vs. GENCORP INC.,* 165 F.3d 778 (1999). The Court went on to state that, "the plaintiff must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability requirements. *Mitchell, supra at* 781.

In *Mitchell*, the Plaintiff attempted to establish Mitchell's level of exposure through his own statements. He described the number and length of his visits to a "flammable room." Although, it may appear that is the situation we have in the case at bar, it is not. The expert in *Mitchell* offered an opinion that Mitchell's exposure to the toxic products were based only upon the expert studying material safety data sheets and pictures showing some chemical spillage. Based upon review of these documents and no scientific modeling effort, the expert opined that the Defendant's products cause leukemia. The situation in the case at bar is different in that the Plaintiff's expert offered an opinion only as to the level of exposure based upon a scientifically based model and study he performed. Again, the Court will not look at the result. It will only look to see if the model used to arrive at the result is based on scientifically based principles. The Court believes that the Plaintiff has met this burden.

"While *Daubert* burdens courts with a gatekeeping role, it does not require, or even allow, a court simply to lock the gate to innovative or unique scientific techniques that have been newly developed in response to the unusual facts of a particular case." *Miller, supra* a 919. Mr. Petty based his testimony on widely accepted physical and scientific principles. There exists little question that the techniques used by Mr. Petty to obtain his data to plug into his mathematical formula required innovative techniques. But,

20

Mr. Petty was not trying to show the exact figure of benzene exposure for the Plaintiff. He was only attempting to show the very least it could be based upon a widely accepted mathematical model. The Plaintiff's expert applied no "snake oil" to reach what he opines as his "conservative" estimate of benzene exposure. The opinion is based on the best evidence that anybody can calculate considering that it is impossible to take samples of the air at the now disbanded industrial site. He used a methodology to determine his opinion and it was based on scientific applications of mathematics and science. The variables that still exist in the model, such as exposure time and intensity amount, go more to the weight of the testimony than its admissibility. Therefore, the Court will overrule the Defendant's motion to exclude the testimony of Mr. Petty based upon a Daubert challenge.

**ORDER**

IT IS HEREBY THE ORDER OF THE COURT THAT, the Defendant's motion to exclude the testimony of Steven Petty under a Daubert challenge is hereby OVERRULED.

Entered this the _28th_ day of _Jan_____, 2006.

_Lewis D. Nicholls_

LEWIS D. NICHOLLS
CIRCUIT JUDGE
TWENTIETH JUDICIAL CIRCUIT

I hereby certify that true and accurate copies of the foregoing have been served this ___ day of February, 2006 by mailing same, postage prepaid, to:

Mr. R. Dean Hartley
Hartley O'Brien Parsons Thompson & Hill
2001 Main Street, Suite 600
Wheeling, WV 26003
*Attorneys for the Plaintiffs*

Ms. Angela McNeal Hoyer
Boehl Stopher & Graves
2300 Ageon Center
400 West Market Street
Louisville, KY 40202
*Attorney for Radiator Specialty Company*

Mr. James E. Cleveland, III
Huddleston, Bolen, Beatty, Porter & Copen, LLP
1422 Winchester Avenue
P.O. Box 770
Ashland, KY 41105
*Attorneys for U.S.X. Corporation*

Mr. Carl B. Epps, III
Nelson Mullins Riley & Scarborough, LLP
Keenan Building, Third Floor
1330 Lady Street
P.O. Box 11070
Columbia, SC 29201

Mr. Louis C. Woolf
Woolf, McClane, Bright, Allen & Carpenter, PLLC
Riverview Tower
P.O. Box 900
Knoxville, TN 37901

Anne A. Chesnut
Theodore R. Martin
Greenbaum Doll & McDonald, PLLC
100 W. Vine Street, Suite 1100
Lexington, KY 40507
*Attorneys for Third-Party Defendant*

BY: _____, D.C.