Robin Greenwald
**Weitz & Luxenberg**
700 Broadway
New York, NY 10003
Telephone: (212) 558-5500
Facsimile: (212) 344-5461
rgreenwald@weitzlux.com

*Attorney for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 |
| | Case No. 3:16-cv-05658-VC |
| *Dickey v. Monsanto Co.*, 3:19-cv-04102-VC | **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT MONSANTO COMPANY'S MOTION TO EXCLUDE TESTIMONY OF MR. STEPHEN PETTY** |
| *Domina v Monsanto Co.*, 3:16-cv-05887-VC | |
| *Janzen v. Monsanto Co.*, 3:19-cv-04103-VC | |
| *Mendoza v. Monsanto Co.*, 3:19-cv-06046-VC | |
| *Pollard v. Monsanto Co.*, 3:19-cv-04100-VC | |
| *Sanders v. Monsanto Co.*, 3:19-cv-05752-VC | |
| *Tanner v. Monsanto Co.*, 3:19-cv-04099-VC | |

1

**TABLE OF CONTENTS**

2   INTRODUCTION ..................................................................................................... 1

3   LEGAL STANDARD ............................................................................................... 5

4   ARGUMENT ........................................................................................................... 8

5       I.    Mr. Petty is Highly Qualified to Offer His Disclosed Opinions ............................. 8

6       II.   Mr. Petty's Highly Similar Testimony Has Been Admitted in Numerous Prior

7             Actions ............................................................................................................. 8

8       III.  Mr. Petty Is Permitted to Testify About Underlying Factual Matters That the Jury

9             May Consider in Assessing Monsanto's Conduct ............................................... 11

10            A.    Mr. Petty May Testify About Monsanto's Conduct Within the Context of

11                    Applicable Regulations, Industry Standards, and Codes of Conduct ....... 14

12      IV.   Plaintiffs Do Not State a Fraud-On-The-EPA Claim ........................................... 18

13  CONCLUSION ....................................................................................................... 20

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT MONSANTO COMPANY'S MOTION TO
EXCLUDE TESTIMONY OF MR. STEPHEN PETTY
MDL No. 2741

# TABLE OF AUTHORITIES

**Cases**

*Bausch v. Stryker Corp.*
630 F.3d 546 (7th Cir. 2010) ..................................................................... 19

*Buckman v. Plaintiffs' Legal Committee*
531 U.S. 341 (2001) ........................................................................... 18, 19

*Chandler v. Greenstone Ltd.*No. C04–1300 RSL, 2012 WL 882756 (W.D. Washington, March
14, 2012) ........................................................................................ 17

*Cook v. Rockwell International Corp.*
580 F.Supp. 2d 1071 (2006) ...................................................................... 6

*Daubert v. Merrell Dow Pharm., Inc.*
509 U.S. 579 (1993) .......................................................................... 5, 6, 7

*DePaepe v. General Motors Corp.*
141 F.3d 715 (7th Cir.1998) ..................................................................... 13

*Gen. Elec. Co. v. Joiner*
522 U.S. 136 (1997) ............................................................................. 6

*George v. Ford Motor Co.*
No. 03-CV-7643(GEL), 2007 WL 2398806 (S.D.N.Y. Aug. 17, 2007) ................................... 18

*Ginena v. Alaska Airlines, Inc.*
2013 WL 431827 (D. Nevada 2013) ............................................................... 17

*In re E. I. du Pont de Nemours & Co. C-8 Pers. Injury Litig.*
345 F. Supp. 3d 897 (S.D. Ohio 2015) ..................................................... passim

*In re Gen. Motors LLC Ignition Switch Litig.*
No. 14-MD-2543 (JMF), 2015 WL 8130449 (S.D.N.Y. Dec. 3, 2015) ................................. 19

*In re Roundup Prod. Liab. Litig.*
390 F. Supp. 3d 1102 (N.D. Cal. 2018) ...................................................... 6, 7

*In re Testosterone*
2017 WL 1836443 (N.D.Ill. May 8, 2017) ......................................................... 14

*In re Tylenol (Acetaminophen) Mktg., Sales Practices & Prod. Liab. Litig.*
181 F. Supp. 3d 278 (E.D. Pa. 2016) ...................................................... 17, 19

*In re Welding Fume Pro*d.
2005 WL 1868046 (N.D. Ohio Aug. 8, 2005) ...................................................... 13

*In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & PMF Prod. Liab. Litig.*
2011 WL 6740391 (S.D. Ill. Dec. 22, 2011) ...................................................... 18

*In re Yasmin & YAZ (Drospirenone) Mktg., Sales Practices & Prod. Liab. Litig.*
2011 WL 6302287 (S.D. Ill. Dec. 16, 2011) ................................................. 12, 13

*In re: E. I. Du Pont De Nemours & Co. C-8 Pers. Injury Litig.*
2016 WL 659112 (S.D. Ohio Feb. 17, 2016) .................................................. 4, 15

*In re: Prempro Liability Litig.*
554 F. Supp. 2d 871 (E.D. Ark. 2008) ................................................................. 13

*McClellan v. I-Flow Corp.*
776 F.3d 1035 (9th Cir. 2015) ................................................................. 18

*Messick v. Novartis Pharm. Corp.*
747 F.3d 1193 (9th Cir. 2014) ................................................................. 7

*Milward v. Acuity Specialty Products Group, Inc.*
639 F.3d 11 (1st Cir. 2011) ................................................................. 6, 7

*n re Genetically Modified Rice Litig.*
666 F. Supp. 2d 1004 (E.D. Mo. 2009) ................................................................. 12

*Placencia v. I-Flow Corp.*
2012 WL 5877624 (D. Ariz. Nov. 20, 2012) ................................................................. 20

*Stambolian v. Novartis Pharm. Corp.*
2013 WL 6345566 (C.D. Cal. Dec. 6, 2013) ................................................................. 19

*Stengel v. Medtronic Inc.*
704 F.3d 1224 (9th Cir. 2013) ................................................................. 19

*United Food & v. Teikoku Pharma USA*
2017 WL 5068533 (N.D. Cal. Nov. 3, 2017) ................................................................. 13

*United States v. Pacific Gas and Electric Co.*
2016 WL 1640462 (N.D. Cal. 2016) ................................................................. 12

*Visteon Glob. Techs., Inc. v. Garmin Int'l, Inc.*
2016 WL 4396085 (E.D. Mich. Aug. 18, 2016) ................................................................. 12

*Wendell v. GlaxoSmithKline LLC*
858 F.3d 1227 (9th Cir. 2017) ................................................................. 6, 7

*Wyeth v. Levine*
555 U.S. 555 (2009) ................................................................. 19

**Other Authorities**

Susan G. Hadden, *Labeling of Chemicals to Reduce Risk*, 46 LAW
AND CONTEMPORARY PROBLEMS, 235 (Jul. 1983) ................................................................. 16

**Rules**

Fed. R. Evid. 1006 ................................................................. 14

Fed. R. Evid. 702 ................................................................. passim

Fed. R. Evid. 704(a) ................................................................. 12

**Statutes**

Federal Insecticide Fungicide and Rodenticide Act ("FIFRA")
   7 U.S.C. §136 et seq. (1996)..........................................................................5, 14, 15, 19

Food, Drug and Cosmetic Act ("FDCA")
   21 U.S.C. § 301 et seq. ...................................................................................5, 15, 20

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT MONSANTO COMPANY'S MOTION TO
EXCLUDE TESTIMONY OF MR. STEPHEN PETTY
MDL No. 2741

## INTRODUCTION

Mr. Stephen E. Petty is a highly-qualified Certified Industrial Hygienist, Certified Safety Professional, Professional Engineer, Asbestos Hazard Evaluation Specialist, Certified Residential Mold Inspector, regulatory expert, and health and safety consultant, with nearly 40 years of experience in public health and workplace safety. He has earned Bachelor's and Master's degrees in Chemical Engineering, and a Master's degree in Business Administration, specializing in Behavioral Marketing. He is President of EES Group, Inc. (Engineering & Expert Services, Inc.). Prior to starting EES Group, Inc. in 1996, he was the Manager of Residential and Commercial Research at Columbia Energy, where he was awarded nine U.S. Patents, and a Senior Research Engineer at Battelle Laboratories. He has 37 years of environmental, health and safety, forensic engineering, environmental engineering, and energy experience. Since 2002, he has completed or supervised over 7,000 engineering forensics and health and safety projects for nearly 100 clients. His health and safety experience has focused on exposure assessments for the insurance industry, the legal community (expert witness), institutions, and the public (e.g., Ohio School Facilities Commission and the Ohio Bureau of Underground Storage Tank Regulators - BUSTR) and private sectors.

Mr. Petty has been involved as an expert in over 300 cases, of which approximately 200 have involved human exposure to substances such as benzene, gasoline, paint, organic chemicals, silica, acid gas, Legionella, and mold. *See generally* Stephen E. Petty, Expert Case List (attached as **Exhibit 1**). His company assembled a nine-member team of experts that won the expert witness contract for the Ohio School Facilities Commission (2004-2008) and wrote the underlying language for the Extreme Environmental Contamination statute and later served as the State's reviewer of applications provide under this statute. His health, safety and environmental experience includes completion of many complex projects in Risk Assessment (BUSTR, EPA and

VAP), Industrial Hygiene, Process Safety Management (PSM), Risk Management Plans (Health and Safety Audits), Environmental Assessments (EA) and Environmental Impact Statements (EIS), and air and water permits (PTI, PTO, NPDES, etc.) for numerous clients across the U.S. He has also been selected on multiple occasions to train regulators and the private sector risk assessment processes and PSM/RMP topics.  Along with mostly Ohio EPA regulators, he attended the first quarter long class offered by in Ohio by the Ohio State University/University of Cincinnati on the Risk Assessment Process in 1997 following the issuance of ASTM E1739-95 – the Standard Guide for Risk-Based Corrective Action Applied at Petroleum Release Sites first established by the American Society for Testing and Materials (ASTM) in 1995.

Mr. Petty has served in a leadership role in technology evaluations, business plans and product development activities for dozens of products and ventures. He has been the invited dinner/lunch speaker to American Society of Heating, Refrigerating and Air-Conditioning Engineers (ASHRAE), the American Industrial Hygiene Association (AIHA), and legal association functions. He has completed hundreds of indoor air sampling projects for residential, commercial, and industrial clients, including Nationwide Insurance Company and ~15 other insurance companies, American Electric Power, Northwest Local School District, Children's Hospital, Berger Hospital, Citgo, Salem University, and Nestle. He is a member of the American Industrial Hygiene Association (AIHA), American Conference of Governmental Industrial Hygienists (ACGIH), American Institute of Chemical Engineers (AIChE), ASHRAE, and the Indoor Environmental Standards Organization (IESO). He has presented his work in a number of academic and professional settings, and published both peer-reviewed and non-peer-reviewed literature on his areas of expertise for decades, including a peer-reviewed article on dermal absorption. *See generally* Stephen E. Petty, P.E., C.I.H., C.S.P., Curriculum Vitae (attached as **Exhibit 2**).

Mr. Petty has reviewed the voluminous documentary record in these actions, in order:

> to evaluate the extent to which Monsanto deviated from the standard of care - SOC (Monsanto's, Industry's, and the Government SOC) and was transparent with the information provided to users and to governmental agencies, such as the United States Environmental Protection Agency (U.S. EPA), Office of Pesticide Programs (OPP), ultimately used to develop warnings (e.g., labels) for their Roundup® products. Further, I was to opine on the impacts that any such lack of transparency would have on the users' knowledge and ability to protect themselves and thus the resulting increase in their exposure to hazardous constituents in Roundup® from the lack of such knowledge.

*Dickey v. Monsanto Co.*, Petty Report (attached as **Exhibit 3**), at 2.[1] His resulting general conclusions are disclosed in a thorough, 306-page report. *See generally id*. He has also conducted a standard Industrial Hygiene Exposure Assessment for five of the Wave 1 cases in which he primarily assessed exposure to Roundup®. These exposure assessments permitted him to calculate a range of hours of Roundup® use for each of the Plaintiffs he interviewed. He has been deposed by Monsanto for nine days in several different cases including the Wave 1 cases and has been questioned for hours on general opinions and individual exposure assessments.[2] Monsanto has been provided with a comprehensive opportunity to assess and challenge his anticipated trial testimony. *See generally Dickey v. Monsanto Co.*, Petty Deposition (attached as **Exhibit 4**).

---

[1] Mr. Petty submitted similar reports for each of the seven Wave 1 cases in which he was designated, with the exception of Appendices F and G to certain reports, which address specific plaintiffs. For the convenience of the Court, Mr. Petty's report in *Dickey v. Monsanto* – the report referred to by Monsanto in its Motion to Exclude – is provided as the exemplar report here.

[2] Mr. Petty has been deposed in the *Dickey*, *Domina*, *Janzen*, *Mendoza*, and *Pollard* cases. He has also been deposed in state court Roundup® cases, for a total of over seven additional days of testimony.

Monsanto is thus highly familiar with Mr. Petty's opinions and methodologies concerning Roundup®.

Mr. Petty's anticipated testimony in this action is substantially similar to his testimony in other toxic tort actions, which courts have consistently deemed reliable and admissible. Indeed, courts recognize that "Mr. Petty is known for his ability to reproduce complex sets of information into simple but accurate presentations on exposure and compliance with regulatory standards." *Douglas v. Ashland Inc.*, No. 01-CI-00392 (Ky.Cir.Ct. Feb. 28, 2006) (attached as **Exhibit 5**), at 1-2. It is thus unsurprising that "[n]umerous federal courts have found that Mr. Petty qualified to provide expert opinion on the standards of care in cases involving exposures to organic chemicals, inorganic chemicals," and other toxic substances. *In re E. I. du Pont de Nemours & Co. C-8 Pers. Injury Litig.*, 345 F. Supp. 3d 897, 916 (S.D. Ohio 2015) (toxic tort case involving personal injuries from exposure to a cancer causing chemical in drinking water).

For instance, in the ammonium perfluorooctanoate ("C-8" or "PFOA") litigation, the court permitted Mr. Petty to testify regarding the reasonableness of the defendant's conduct, the documentary record and regulatory history surrounding the product at issue, and the adequacy of its warning labels. *See generally id.* Following trial, the court upheld the jury's verdict in favor of the plaintiffs, rejecting the defendant's challenges to Mr. Petty's testimony. *See generally In re: E. I. Du Pont De Nemours & Co. C-8 Pers. Injury Litig.*, 2016 WL 659112 (S.D. Ohio Feb. 17, 2016). The C-8 decisions accord with several others wherein courts have permitted precisely the kind of testimony from Mr. Petty that Monsanto now seeks to exclude.

In contrast to this wealth of on-point case law, Monsanto has cited *no decisions* excluding Mr. Petty's testimony, and instead relies on inapplicable case law and misrepresentations of Mr. Petty's proffered opinions. Plaintiffs will *not* offer Mr. Petty's testimony simply as a means of regurgitating facts or documents that the jury might otherwise consider directly, nor will Mr. Petty

-4-

testify as to Monsanto's motive or intent. That is Monsanto's creation to divert the court from the relevance of his opinions to these cases.

Instead, consistent with his report and deposition, Mr. Petty will testify at trial on topics such as: the history and structure of pesticide regulation by the EPA; the requirements for pesticide warning labels, contained in the Federal Insecticide Fungicide and Rodenticide Act ("FIFRA") and the Food, Drug and Cosmetic Act ("FDCA"); applicable public health and safety and industrial hygiene concepts (including the nature, purpose and adequacy of warnings, as well as Monsanto's historic role in chemical and pesticide hazard labeling, such as its decades-long participation in the Labeling and Precautionary Information Committee of the Manufacturing Chemists Association); voluntary pesticide industry standards of care, including Monsanto's adoption of those standards; the sufficiency of Roundup® labeling and pathways of exposure to Roundup®, focusing primarily on dermal absorption – all of which have appropriately informed his opinions regarding the reasonableness of Monsanto's conduct. Those opinions will not be based on any *interpretation* of Monsanto documents, but will be based on what Monsanto corporate managers, officials and scientists have said about policies adopted by Monsanto, and on Monsanto's actions regarding Roundup® relative to those policies. Thus, Mr. Petty's testimony as to "standard of care" is no different than other "standard of care" experts whose testimony is admitted in countless other products liability trials and his testimony regarding pathways of exposure inform the jury, in part, regarding appropriate precautionary labeling of Roundup®.

**LEGAL STANDARD**

Under Federal Rule of Evidence § 702 and the *Daubert* standard, the Court's gatekeeping obligation is to ensure that proffered expert testimony is relevant and based on reliable methods.

*See Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 589 (1993). A key goal of the adoption of the *Daubert* standard was to relax traditional barriers to admission of expert opinion testimony. *Daubert*, 509 U.S. at 588. Courts are thus in agreement that Rule 702 mandates a liberal standard of admissibility. As the Advisory Committee to the 2000 amendments to Rule 702 noted, with apparent approval, "[a] review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee note (2000); *see also Cook v. Rockwell International Corp.*, 580 F.Supp. 2d 1071, 1083 (2006). More specifically, "[t]he Ninth Circuit has placed great emphasis on *Daubert's* admonition that a district court should conduct [the admissibility] analysis "with a 'liberal thrust' favoring admission." *In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d 1102, 1112 (N.D. Cal. 2018) (Chhabria, J.).

Under the standard, courts should *not* weigh evidence or draw conclusions about the strength of any particular piece of evidence; instead, the Court's focus "must be solely on principles and methodology, not on the conclusions that they generate." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017) (quoting *Daubert*, 509 U.S. at 595). In other words, while mere conclusory testimony is inadmissible, *see Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997), it is not the Court's task to decide whether an expert's conclusions are correct. *See Daubert v. Merrell Dow Pharm., Inc*., 43 F.3d 1311, 1318 (9th Cir. 1995) (*Daubert II*) ("[T]he *Daubert* test "is not the correctness of the expert's conclusions but the soundness of his methodology"). Nor is the Court empowered "to determine which of several competing scientific theories has the best provenance." *Milward v. Acuity Specialty Products Group, Inc*., 639 F.3d 11, 15 (1st Cir. 2011) (internal quotation marks and citations omitted). Instead, the party submitting expert testimony must demonstrate that "the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion." *Id*.

In service of relaxing the admission of expert evidence, the Supreme Court has provided a

list of non-exhaustive factors that a court may consider, including: "whether a theory or technique . . . can be (and has been) tested;" whether "the theory or technique has been subjected to peer review and publication;" whether, "in the case of a particular scientific technique," there is a high "known or potential rate of error" and "the existence and maintenance of standards controlling the technique's operation;" and whether the theory or technique enjoys "general acceptance" within a "relevant scientific community." *Daubert*, 509 U.S. at 593-94 (1993). However, "[t]hese factors are not a mandatory or inflexible checklist, and the Court has broad discretion to determine which factors are most informative in assessing reliability in the context of a given case. *In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d at 1112. The inquiry is thus "flexible," *Wendell*, 858 F.3d at 1235 (quoting *Daubert*, 509 U.S. at 594), and "Rule 702 should be applied with a 'liberal thrust' favoring admission." *Id.* (quoting *Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014)).

Exclusion of expert testimony is only appropriate when such testimony qualifies as irrelevant or unreliable "junk science." *Wendell*, 858 F.3d at 1237. Otherwise, the court should cede complex issues to the jury and rely on the traditional safeguards of the adversary system – i.e., cross-examination, presentation of contrary evidence, and instruction on the burden of proof – to test and evaluate even weak but otherwise admissible evidence. *See Milward*, 639 F.3d at 13 ("So long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversarial process, rather than excluded for fear that jurors will not be able to handle the scientific complexities." (quoting *Daubert*, 509 U.S. at 590, 596)). "[T]he interests of justice favor leaving difficult issues in the hands of the jury and relying on the safeguards of the adversary system." *Wendell*, 858 F.3d at 1237 (internal citations omitted).

Under the above principles, Mr. Petty's testimony is eminently reliable and admissible, as courts have consistently held in prior actions. Monsanto's motion to exclude his testimony should be denied.

## ARGUMENT

### I.   *Mr. Petty is Highly Qualified to Offer His Disclosed Opinions*

As noted above, Mr. Petty's decades' worth of extensive training and experience in the fields of engineering, industrial hygiene, safety, and marketing behavior make him uniquely qualified to assist the jury in understanding and evaluating the complex issues presented by this case.

### II.   *Mr. Petty's Highly Similar Testimony Has Been Admitted in Numerous Prior Actions*

While Mr. Petty has not previously testified in a Roundup® trial, he has testified in numerous products liability actions, and courts have consistently permitted him to offer the same kind of opinions that he will provide at trial here. Indeed, "[n]umerous federal courts have found that Mr. Petty qualified to provide expert opinion on the standards of care in cases involving exposures to organic chemicals, inorganic chemicals, mold, and bacteria." *In re E. I. du Pont de Nemours & Co. C-8 Pers. Injury Litig.*, 345 F. Supp. at 916.

For instance, in 2015, Mr. Petty was retained as an expert in a multidistrict litigation involving exposure to ammonium perfluorooctanoate ("C-8" or "PFOA") discharged from defendant DuPont's Washington Works plant. *See generally id.* Plaintiffs proffered Mr. Petty for the same purposes as here – namely, "to opine on DuPont's knowledge of and compliance with applicable standards of care with respect to C-8." *Id.* at 916-17. Towards that end, "Mr. Petty evaluated DuPont's historic conduct with regard to standards of care that he identified as arising from chemical industry standards and best practices, DuPont's own internal standards and policies, and governmental codes and standards," from which he ultimately concluded that DuPont "did not

-8-

comply with such standards of care/conduct, considering what it knew about the nature, extent, and significance of C-8 as to its employees, the public, governmental agencies, and the environment." *Id.* at 917 (internal quotation marks omitted).

DuPont moved to exclude Mr. Petty's testimony. The court denied DuPont's challenge, as "DuPont's arguments [were] not well taken." *Id.* The court noted that "[t]he fact that [Mr. Petty] was not employed by DuPont and did not speak to its employees does not subtract from his wealth of experience, skills and knowledge in the subject area of his opinions," *id.*, thus rejecting the same argument that Monsanto makes here. *See* Def. Motion at 15, n.5. The court further held that, while Mr. Petty could not directly opine on DuPont's motive, intent, or state of mind (as he does not intend to do here with regards to Monsanto), he was well qualified to offer his opinions on DuPont's internal policies, industry standards, and government codes. *Id.* at 917-18. The court also disagreed with DuPont's assertion that Mr. Petty and plaintiffs' other experts would merely "regurgitate" the facts from the documentary record that any lay "jury is fully capable of reading and understanding on its own," *id.* at 902, which Monsanto echoes in its instant motion, *see* Def. Motion at 1-2, 6, 12-15. Instead, the court reasoned as follows:

> The historical documents to which DuPont refers include the factual record that contains evidence of DuPont's conduct that began over fifty years ago and involves well over a decade of complex litigation, millions of documents, hundreds of witnesses operating in dozens of different regulatory, scientific, and technical fields, including, among others, toxicology, epidemiology, risk assessment, medicine, occupational health, regulatory compliance, public health, and chemical industry practices and policies. Indeed, this is the very same factual record that DuPont utilizes with its own expert witnesses . . . .
>
> [T]he parties' experts opine on DuPont's stewardship of C-8 within the framework of the then-governing industry standards, best practices, and the state and federal regulatory programs; deriving their opinions from their specialized and technical knowledge, which will assist the trier of fact.

*Id.* at 904-06.

Following trial, DuPont moved for judgment notwithstanding the verdict. *See generally* 2016 WL 659112. The court denied DuPont's motion, once again finding that Mr. Petty was "qualified to opine on the subjects on which [he] testified at trial, and that [he] rendered relevant and reliable expert testimony [on] DuPont's stewardship of C-8 within the framework of the then-governing industry standards, best practices, and the state and federal regulatory programs, deriving [his] opinions from [his] specialized and technical knowledge." *Id.* at *51. As in the C-8 litigation, Mr. Petty's proffered opinions here are admissible and will assist the jury in assessing Monsanto's conduct within the relevant regulatory framework.

Similarly, in an action involving exposure to chemical cleaning compounds, the defendant, Jefferson Supply Company ("Jefferson"), moved to exclude Mr. Petty's testimony on the basis that, *inter alia*, his "opinions as to Jefferson's duty and subsequent failure to provide adequate training regarding hazards [sic] products are improper as the same exceed the permissible testimony of an expert and should be excluded." *Kitzmiller v. Jefferson Supply Co.*, Case No 2:05-CV-22 (N.D.W. Va. Feb. 17, 2007) (attached as **Exhibit 6**), at 19 (internal quotation marks omitted). The Magistrate Judge recommended that the District Court deny Jefferson's motion, and instead permit Mr. Petty to testify that Jefferson failed to adhere to the relevant regulatory codes and standards of conduct. *Id.* at 22-26. The District Court adopted the Magistrate's recommendation. *See generally Kitzmiller v. Jefferson Supply Co.*, 2007 WL 1088646 (N.D.W. Va. Apr. 2, 2007).

In *Douglas v. Ashland Inc.*, No. 01-CI-00392 (Ky.Cir.Ct. Feb. 28, 2006), Mr. Petty testified on behalf of a plaintiff who developed cancer from benzene exposure at a chemical plant. The court first summarized Mr. Petty's impressive credentials (which, since 2006, he has only burnished with additional accomplishments), and recognized that "Mr. Petty is known for his ability to reproduce complex sets of information into simple but accurate presentations on exposure

and compliance with regulatory standards." Ex. 5 at 1-2. Ultimately, the court held that Mr. Petty's methodologies were reliable, enjoyed general acceptance in the scientific community, and withstood *Daubert* scrutiny. Ex. 5 at 21.

Mr. Petty's expert opinions were also admitted in *Mallory v. Goodyear Tire & Rubber Co.*, NO. CV-2007-11-8033 (Ohio Com.Pl. Feb. 22, 2010) (attached as **Exhibit 7**); *Knapper v. Safety Kleen Systems, Inc.*, No. 08-CV-00084-TH (E.D. Tex. Nov. 16, 2009) (attached as **Exhibit 8**); and *Oakley v. Air Prod. & Chemicals, Inc.*, No. 07-CV-351 (E.D. Tex. Nov. 25, 2008) (attached as **Exhibit 9**). Mr. Petty's testimony here should likewise be admitted, as it will help the jury understand Monsanto's conduct within the context of the relevant regulatory scheme and industry codes of conduct.

Moreover, Monsanto is simply wrong in asserting that Mr. Petty, a Certified Industrial Hygienist, is not qualified to offer opinions regarding general toxicology or epidemiology opinions. As Monsanto's *own proposed expert*, Mr. Alex LeBeau, stated in his report in *Mendoza v. Monsanto*, (attached as **Exhibit 10**), OSHA recognizes that "an industrial hygienist can provide expert insight in a variety of areas, including the magnitude of chemical, biological, or physical exposure, and the degree of associated risk." *Id.* at 1 (internal quotation removed). Mr. LeBeau further acknowledged that the certification exam for CIHs tests "broad-spectrum practical knowledge across many areas," including "community exposure," "toxicology," and "health risk analysis," and that "[e]pidemiology is also an area where a CIH must have practical knowledge." *Id.* at 1-2.

### III.  *Mr. Petty Is Permitted to Testify About Underlying Factual Matters That the Jury May Consider in Assessing Monsanto's Conduct*

Contrary to Monsanto's red herring argument, Mr. Petty will *not* opine on Monsanto's motive, intent, or state of mind. Rather, as he did in the above-cited actions, he will provide expert

-11-

testimony regarding factual matters that may properly inform *the jury's own determination* of Monsanto's motive, intent, and state of mind. *See United States v. Pacific Gas and Electric Co.*, 2016 WL 1640462 (N.D. Cal. 2016) (holding that, while an expert witness may not opine as to a corporation's intent, he or she may testify about corporate practices and policies that the jury may use to ascertain corporate intent); *see also In re Genetically Modified Rice Litig.*, 666 F. Supp. 2d 1004, 1025 (E.D. Mo. 2009) ("If an expert is testifying to something within his area of expertise, he may opine as to the reasonableness of a party's behavior."); *Visteon Glob. Techs., Inc. v. Garmin Int'l, Inc.*, 2016 WL 4396085, at *4 (E.D. Mich. Aug. 18, 2016) ("Experts may testify to the facts underlying the issues of intent or motive . . . ."). Such testimony is entirely proper under Federal law. *See* Fed. R. Evid. 704(a) (providing that "[a]n opinion is not objectionable just because it embraces an ultimate issue.").

As a public health, regulatory, and standard of care expert, Mr. Petty will apply his own professional training and experience to the facts and record, and will testify regarding Monsanto's practices and policies with respect to Roundup®, as evidenced in both public and internal documents. The portions of his trial testimony (as previewed in his disclosures) analyzing Monsanto's internal documents *are not his personal opinions*, but, rather, are expert conclusions based on a very systematic review of the source materials.

As such, there is "nothing particularly unusual, or incorrect, in a procedure of letting a witness relate pertinent information in a narrative form as long as it stays within the bounds of pertinency and materiality." *In re Yasmin & YAZ (Drospirenone) Mktg., Sales Practices & Prod. Liab. Litig.*, 2011 WL 6302287, at *18 (S.D. Ill. Dec. 16, 2011) (internal citations omitted). The Court in the Yasmin litigation rejected the same argument that Monsanto makes here – that the plaintiff's regulatory expert's review of corporate emails "does not require the 'specialized knowledge' contemplated by Rule 702, but rather is mere advocacy on plaintiff's behalf," *id.* –

-12-

and instead held that the testimony "will certainly be helpful to the jury's understanding of this complicated industry." *Id.* at *17.

Other Courts have similarly admitted expert testimony that explains the reasonableness of the defendant's actions within the context of applicable regulations and industry standards of care. *See, e.g.*, *DePaepe v. General Motors Corp.*, 141 F.3d 715, 720 (7th Cir.1998) ("He could give an opinion as an engineer that reducing the padding saved a particular amount of money; he might testify as an engineer that GM's explanation for the decision was not sound (from which the jury might infer that money was the real reason); but he could not testify as an expert that GM had a particular motive."); *United Food & v. Teikoku Pharma USA*, 2017 WL 5068533, at *25 (N.D. Cal. Nov. 3, 2017) (expert could opine as to what a reasonable company in the defendant's position would have done based on his understanding of the facts and in light of the record evidence he reviewed); *see also In re: Prempro Liability Litig.*, 554 F. Supp. 2d 871, 887 (E.D. Ark. 2008) (holding as admissible "opinions on the reasonableness of a pharmaceutical company's actions based on her observations over the years and her understanding of the regulations referenced in her expert report, her deposition, and the supplemental briefs.").

Mr. Petty's testimony will assist the jury in sorting through and understanding the voluminous record, which includes, *inter alia*, numerous Monsanto documents, communications, and depositions. Contrary to Monsanto's arguments, most of these documents do not speak for themselves; many involve complex technical and scientific information, and thus require expertise to put in the proper context. The jury would, quite simply, be incapable of considering the tonnage of documents at issue without expert assistance, and Mr. Petty must be permitted to assist where "the inferences those documents may or may not support are not at all simple." *In re Welding Fume Prod.*, 2005 WL 1868046 at *17 (N.D. Ohio Aug. 8, 2005). Mr. Petty's expert testimony is thus not only helpful, but in fact necessary for the jury to complete its functions. *See In re*

*Testosterone*, 2017 WL 1836443 *15 (N.D.Ill. May 8, 2017) ("[T]o the extent [plaintiff's regulatory expert] is summarizing voluminous records and materials, as appears to be the case, this aspect of his testimony is properly admitted under Federal Rule of Evidence 1006 as well as Rule 702 in the sense that he is identifying what he, given his background and expertise, considers to be the most salient aspects of those voluminous materials.").

**A.      Mr. Petty May Testify About Monsanto's Conduct Within the Context of Applicable Regulations, Industry Standards, and Codes of Conduct**

Mr. Petty will offer opinions concerning regulatory issues, including Monsanto's representations to the EPA concerning Roundup® and other GBHs. Testimony about what actions Monsanto should have taken, pursuant to the provisions of FIFRA and voluntary pesticide industry codes of conduct specifically adopted by Monsanto, are relevant to the determination of whether Monsanto actions were consistent with the company's stated commitment to product safety, various "Monsanto Pledges," and clear-cut obligations under pesticide industry codes of conduct, to which Monsanto was a signatory. That testimony will aid the fact-finder and comes nowhere near instructing the jury as to legal obligations.

Monsanto is mistaken in arguing that Mr. Petty is not qualified as an EPA or regulatory expert in this case. To the contrary, Mr. Petty has worked for the EPA going back 40 years and, among other relevant experience, has been selected to provide 40-hour risk assessment training to Ohio BUSTR regulators in 1999, helped draft the 1999 risk-based regulations for underground storage tanks (USTs) for the State of Ohio along with preparing the online RA spreadsheets and tutorial guide, and counseled numerous entities (both public and private) on regulatory compliance. *See generally* Ex. 2. He has also published scholarship on his areas of expertise, including environmental regulations, and has presented his research in various academic settings. *Id.* Acknowledging his credentials, the court in the C-8 litigation soundly rejected these arguments,

and instead allowed Mr. Petty to opine on regulatory matters, industry standards, and codes of conduct. *See generally* 345 F. Supp. 3d 897. The court also approvingly noted that, "[f]or over three decades . . . . he has provided environmental engineering experience to several different government agencies, including the [EPA]." *Id.* at 916; *see also generally* 2016 WL 659112 (affirming the jury's verdict and holding that DuPont's challenges to Mr. Petty's trial testimony were without merit). The *Douglas* court also praised Mr. Petty's regulatory expertise, recognizing that he "is known for his ability to reproduce complex sets of information into simple but accurate presentations on exposure and compliance with regulatory standards." Ex. 5 at 1-2.

Mr. Petty is also qualified to render opinions on the adequacy of warning labels. He is a Certified Industrial Hygienist (CIH), a Certified Safety Professional (CSP), and an expert on workplace safety and chemical exposures. *See generally* Ex. 1. He has provided consultations to both the public and private sectors on how to reduce risk, including by properly instructing workers on the use of safety equipment. *Id.* He drew from his expertise when reviewing the record in this action, and ultimately concluded that Monsanto failed to provide adequate Roundup® warnings. The bases for his labeling opinions are laid out in detail in his report. *See, e.g.*, Ex. 3 at 96-121 (explaining the history of FIFRA and FDCA and their pesticide labeling requirements, and showing that Monsanto failed to fulfill its affirmative duty to report new safety information about Roundup® to the EPA), 122-241 (providing a review of Roundup® MSDSs, labels, and advertising claims); 241-262 (citing internal Monsanto communications that show the company feared a loss in customers/market share if Roundup® included an adequate warning). He further concluded that adequate labeling would have prevented or reduced Roundup® exposures, which he based on, *inter alia*, scholarship establishing the effect of labeling on user behavior, *see id.* at

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT MONSANTO COMPANY'S MOTION TO
EXCLUDE TESTIMONY OF MR. STEPHEN PETTY
MDL No. 2741

91-93,[3] as well as *Monsanto's own internal marketing assessment* that users would have heeded a stronger warning. *Id.* at 223-27.[4]

The evidence regarding EPA regulations, Roundup® labeling, and Monsanto's conduct is at the heart of this action. Given the knowledge Monsanto possessed at the relevant times, it could and should have undertaken certain actions within the context of applicable regulations and industry codes of conduct. Monsanto's inaction is central to the jury's determination of whether Monsanto failed to conduct itself as a reasonably prudent manufacturer, and thus can be held liable for failing to warn end-users of the known or knowable risks of Roundup® exposure.[5] *See, e.g.,*

---

[3] Mr. Petty cites the article by Susan G. Hadden, *Labeling of Chemicals to Reduce Risk*, 46 LAW AND CONTEMPORARY PROBLEMS, 235-266 (Jul. 1983), which reviewed the history of labeling requirements over the last century and their effects on consumer behavior. Emphasizing that "information is a central element in a person's ability to reduce or take control over the decision to assume risks that confront him," Professor Hadden showed that proper warnings can reduce and even eliminate risks, and recommended that labeling programs going forward "increase emphasis on long-term risks." *Id.*

[4] See also Ex. 11 at Vol. II, p. 54 (PDF p. 120) ("I will offer an opinion based on Hadden's work and others that I factually cite in this document, about how people [] read and understand warnings as well as how people would tend or not tend to use protective equipment. I think some of that is borne out in the marketing studies that Monsanto themselves did on wanting to avoid moving from the word caution to warnings. They understood human behavior in terms of the effect it would have on the sale of their product.").

[5] The primary basis for Monsanto's argument that Mr. Petty should be precluded from offering opinions about alleged failures to warn is that such claims are preempted. Plaintiffs herein incorporate the Opposition to Monsanto's Motion for Summary Judgment, which addresses Monsanto's preemption argument.

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT MONSANTO COMPANY'S MOTION TO EXCLUDE TESTIMONY OF MR. STEPHEN PETTY
MDL No. 2741

*In re Tylenol (Acetaminophen) Mktg., Sales Practices & Prod. Liab. Litig.*, 181 F. Supp. 3d 278, 289-90 (E.D. Pa. 2016) ("[H]ow the defendants responded to FDA requests for information, what they did to comply with FDA regulations, and what information they presented to the FDA is all relevant to plaintiff's failure-to-warn and design defect claims."). It is essential that Plaintiffs' experts – including Mr. Petty – be permitted to describe the history of Monsanto's conduct within the context of applicable regulations and industry standards. *See Ginena v. Alaska Airlines, Inc.*, 2013 WL 431827, at *5 (D. Nevada 2013) (reasoning that in an industry where the regulatory framework is complex, such as the environmental framework at issue in *Adams*, *supra*, an expert may be permitted to testify as to industry standards and regulations). Similarly, in *Chandler v. Greenstone Ltd.*, No. C04–1300 RSL, 2012 WL 882756 (W.D. Washington, March 14, 2012), the court held that plaintiff's experts' testimony could assist the jury in understanding the "governing regulatory scheme and its goals and limitations, the genesis and practical application of industry standards, the testing options that were available to defendants at various times, the relevant medical literature and other sources of information available to defendants, defendants' regulatory filings, and the steps defendants took (or did not take) to evaluate the safety of combination hormone replacement therapy."

There is nothing improper in offering such testimony; to the contrary, such detail will assist the jury in assessing Monsanto's state of mind and potential liability. Of course, Monsanto will be free to subject Mr. Petty to vigorous cross examination at trial, and to make whatever objections it deems fit throughout his testimony, as has been the case in previous Roundup® trials; however, pre-trial exclusion is unwarranted.[6]

---

[6] Finally, Monsanto *does not* move to preclude Mr. Petty's testimony regarding how Roundup® enters the human body through oral, inhalation and, primarily, dermal pathways, topics about

-17-

*IV.    Plaintiffs Do Not State a Fraud-On-The-EPA Claim*

Finally, with no basis, Monsanto argues that Mr. Petty's opinions concerning EPA actions and regulatory compliance are preempted. *See* Monsanto Motion at 10. In supposed support, Monsanto cites the United States Supreme Court's holding in *Buckman v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), which held that state fraud-on-the-FDA claims are preempted by federal law. Courts in numerous product liability cases since *Buckman* have had no difficulty recognizing that *Buckman* is not applicable to cases, like this one, in which the plaintiffs have made no claims for fraud on the EPA (or any other agency).

The Ninth Circuit in *McClellan v. I-Flow Corp.*, 776 F.3d 1035 (9th Cir. 2015), held that *Buckman* did not preempt the plaintiff's claims, as they "were not fraud-on-the-FDA claims," but were state-law-based failure to warn claims. *Id.* at 1040. Likewise, in *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & PMF Prod. Liab. Litig.*, 2011 WL 6740391, at *2 (S.D. Ill. Dec. 22, 2011)*,* the Court's decision in "*Buckman* is inapposite" to the question of whether evidence of the actions or omissions of a manufacturer in communicating information to the FDA should be admitted. *Id.* at *2. In *Buckman*, "[t]he Supreme Court manifestly did not lay down a rule of evidence, precluding admission of evidence of alleged misrepresentations to federal agencies[.]" *George v. Ford Motor Co.*, No. 03-CV-7643(GEL), 2007 WL 2398806, at *8 (S.D.N.Y. Aug. 17, 2007). Holding that *Buckman* excludes any evidence of fraud, as opposed to excluding claims predicated on fraud on the FDA "distorts the holding of, and 'principles' behind,

---

which he has published and testified in the past. He is trained and qualified to testify as to the standard industrial hygiene methods to reduce exposures to hazardous materials, and has conducted extensive interviews of five of the Wave 1 plaintiffs calculating areas for exposure ("wetting events") and cumulative hours of exposure to Roundup®.

*Buckman* beyond recognition." *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2015 WL 8130449, at *2 (S.D.N.Y. Dec. 3, 2015). Even in the extreme context of pre-market-approved medical devices, which unlike drugs, are governed by an express preemption clause, courts hold that *Buckman* preemption does not apply. *See Bausch v. Stryker Corp.*, 630 F.3d 546, 557 (7th Cir. 2010); *Stengel v. Medtronic Inc.*, 704 F.3d 1224, 1235 (9th Cir. 2013).

Instead, the case of *Wyeth v. Levine*, 555 U.S. 555 129 (2009)[7] "is a far better guidepost for this Court and for this litigation," because "[i]n a case such as this, the jury must be fully informed of any information withheld from the FDA that could have effected decisions regarding the label." *Id.* Moreover, in any event, as plaintiffs have previously briefed on more than one occasion, FIFRA preemption is substantially different from FDA preemption.

Other Courts have come to the same conclusion, and have rejected similar attempts to apply preemption to expert testimony concerning regulatory history and compliance. *See, e.g., In re Tylenol (Acetaminophen) Mktg.*, 181 F. Supp. 3d at 289-90 ("[H]ow the defendants responded to FDA requests for information, what they did to comply with FDA regulations, and what information they presented to the FDA is all relevant to plaintiff's failure-to-warn and design defect claims."); *Stambolian v. Novartis Pharm. Corp.*, 2013 WL 6345566, at *8 (C.D. Cal. Dec. 6, 2013) (admitting expert testimony on "the complex regulatory framework governing the approval, labeling, advertising, and marketing of pharmaceutical medical products" under FDA standards, as this "will be helpful to members of the jury who are likely not familiar with the

---

[7] Notably, the Supreme Court in *Wyeth* held that state law failure-to-warn claims are not preempted by federal law, because, "[t]o the contrary, [the FDA and Congress has repeatedly] cast federal labeling standards as a floor upon which States could build and repeatedly disclaimed any attempt to pre-empt failure-to-warn claims." *Wyeth v. Levine*, 555 U.S. 555, 577-78 (2009).

-19-

intricacies of FDA pharmaceutical drug approval and regulation process."); *Placencia v. I-Flow Corp.*, 2012 WL 5877624, at *5-6 (D. Ariz. Nov. 20, 2012) (rejecting defendant's reliance on *Buckman*, because, while "[i]t is true that Plaintiffs seek to present evidence of FDA regulations and I-Flow's alleged violation of those regulations . . . this evidence will be presented not to make out a claim for violation of the FDCA or fraud on the FDA, but as evidence that I-Flow breached the standard of care for purposes of the negligence claim . . . .").

Monsanto's preemption arguments are thus inapplicable to this action and do not form any basis for the exclusion of Mr. Petty's testimony.

**<u>CONCLUSION</u>**

For the foregoing reasons, Monsanto's Motion to Exclude the Testimony of Mr. Stephen Petty should be denied in its entirety.