# Exhibit 3

**FACTUAL SUMMARY AND EXPERT OPINIONS REPORT**

***Dickey vs. Monsanto Company***

**United State District Court
Northern District of California**

**Case No. 3:19-cv-04102**

**Prepared by:**

**Mr. Stephen E. Petty, P.E., C.I.H., C.S.P.
Engineering & Expert Services, Inc.
(EES Group, Inc.)**

**October 3, 2019**

## 1.0    INTRODUCTION:

My scope of work was to evaluate the extent to which Monsanto deviated from the standard of care - SOC (Monsanto's, Industry's, and the Government SOC) and was transparent with the information provided to users and to governmental agencies, such as the United States Environmental Protection Agency (U.S. EPA), Office of Pesticide Programs (OPP), ultimately used to develop warnings (e.g., labels) for their Roundup® products.  Further, I was to opine on the impacts that any such lack of transparency would have on the users' knowledge and ability to protect themselves and thus the resulting increase in their exposure to hazardous constituents in Roundup® from the lack of such knowledge.

My opinions will center on the extent to which Monsanto:

➢    Was not fully transparent/honest with users and the U.S. EPA OPP with what they knew about the hazards of Roundup® and when they knew of these hazards; and

➢    The impact of not adequately warning users of their Roundup® product of potential hazards resulted in users of their product not adequately protecting themselves from such hazards, thus increasing their exposures and potential impacts from such exposures.

My overall opinions are based on Monsanto's self-reported industry and regulatory standards of care (SOC) for requirements to be transparent, regarding information related to the health and safety of their products (in this case Roundup® products and their efforts to minimize the health effects to customers and end users of their products).

Sub-opinions and analysis are contained within this report.  Sub-opinions are indicated by brackets [sub-opinions].

This report also contains background information and factual support underlying the opinions I will proffer in this case, including:

➢    Roundup® History and Timeline.

➢    Properties and Characteristics of Roundup®.

➢    Public Health and Safety and Industrial Hygiene Concepts.

➢    Review of the Dermal Studies and Literature.

➢    FIFRA and FFDCA – Background, Their History, and Their Requirements on Pesticide Warnings.

➢    Review of Roundup® Labels.

➢    Review of Roundup® MSDSs/SDSs.

➢    Monsanto's Industry and Governmental Standards of Care (SOC).

➢    Summary Opinions.

Photos of Roundup® Weed and Grass Killer Super Concentrate are illustrated in Figures 1-1 and 1-2:



**Figure 1-1: Photo of Roundup® Weed and Grass Killer Super Concentrate (https://www.roundup.com/en-us/products/concentrates/ roundup-weed-grass-killer-super-concentrate)**



**Figure 1-2: Close-up Photo of Roundup® Weed and Grass Killer Super Concentrate (https://www.roundup.com/en-us/products/concentrates/ roundup-weed-grass-killer-super-concentrate)**

One is drawn to the words "Super Concentrate", "Kills", "Rainproof", and "Caution".

Note that Monsanto color codes their products (Figure 1-3):



**Figure 1-3: Color Coding Products**
**(Exhibit 272, Bates MONGLY07702790)**

Further, as observed in their April 30, 2013 Packaging Standards package (Exhibit 272), Monsanto provides a page titled: "Design Architecture – Priority of Communication" for its labels.   As noted in Figure 1-4, *none* of the listed communication priorities (#1 through #4) reference the user warnings:



**Figure 1-4: 2013 Label Communication Priorities
(Exhibit 272, Bates MONGLY07702794)**

Note that the Food and Agriculture Organization (FAO) under Section 9 (labelling) of the Guidelines for The Registration and Control of Pesticides (Exhibit 541, pgs. 33-34) states that:

> "*Since the primary purpose of the pesticide label is to communicate the essential elements of the safe and effective use of a pesticide to the end use, it is essential that the audience can understand the message.*"

And

> "*Remember, the label is the main (and often, only) medium for instructing, users in correct and safe use practices.*"

[Thus, Monsanto's labeling communication strategy is not focused on safety as is required by industry's standard of care (SOC)].

Graneto and Heydens, in an October 2015 presentation (Exhibit 524) outline the history of Roundup products (Figure 1-5) and product families by container type and color (Figure 1-6):



**Figure 1-5: Roundup Product History**
**(Exhibit 524, pg. 13)**



**Figure 1-6: Roundup Products**
**(Exhibit 524, pg. 20)**

## 2.0    INFORMATION RESOURCES CONSIDERED:

In preparing this report, many papers and reports regarding completion of exposure assessments, relevant exposure literature, and related regulations have been relied upon and/or considered.   Some of these references are listed below; others are included in the References Section at the end of this report:

➢ Daugherty, Jack, Assessment of Chemical Exposures – Calculation Methods for Environmental Professionals, CRC Press LLC, 1998.

➢ Ignacio, Joselito S. and William H. Bullock. 2006. A Strategy for Assessing and Managing Occupational Exposures, Third Edition, American Industrial Hygiene Association (AIHA) Press.

➢ Jayjack, Chapter 2 in The Occupational Environment: Its Evaluation, Control, and Management edited by DiNardi, AIHA Press, 2003.

➢ Keil, Charles B. editor. 2000.  Mathematical Models for Estimating Occupational Exposure to Chemicals, AIHA Exposure Assessment Strategies Committee – Modeling Subcommittee, AIHA Press.

➢ Mulhausen, John R. and Joseph Damiano. 1998. A Strategy for Assessing and Managing Occupational Exposures, Second Edition, American Industrial Hygiene Association (AIHA) Press.

➢ Patty's Industrial Toxicology Handbooks, Sixth Edition, 2012.

➢ Patty's Toxicology, Volume 4, Fifth Edition, John Wiley & Sons, Inc., 2001.

➢ ACGIH's Documentation of the TLVs and BEIs.

➢ EPA Regulations – 1976 Toxic Substances Control Act (TSCA) and Resource Conservation and Recovery Act (RCRA).

➢ 42 U.S.C., United States Code, Title 42 – The Public Health and Welfare Chapter 116 – Emergency Planning and Community Right to Know (EPCRA),  Public Law 99–499, Title III, §301, Oct. 17, 1986, 100 Stat. 1729.

➢ EPA Risk Management Program (RMP) - 40 CFR Part 68 - Accidental Release Prevention Requirements: Risk Management Programs Under Clean Air Act Section 112(r)(7), Initially promulgated in  Federal Register / Vol. 61, No. 120 / Thursday, June 20, 1996, pg. 31668.

➢ OSHA Regulations - 29 CFR 1910.119 – Process Safety Management of Highly Hazardous Chemicals; 29 CFR 1910.1200 – OSHA Hazard Communication Standard

➢ ANSI Z129.1-2000, American National Standard for Hazardous Industrial Chemicals – Precautionary Labeling

➢ ANSI Z129.1-1976, American National Standard for Hazardous Industrial Chemicals – Precautionary Labeling

➢ ANSI Z129.1-1982, American National Standard for Hazardous Industrial Chemicals – Precautionary Labeling

➢ ANSI Z129.1-1988, American National Standard for Hazardous Industrial Chemicals – Precautionary Labeling

➢ ANSI Z129.1-1994, American National Standard for Hazardous Industrial Chemicals – Precautionary Labeling

➢ Manual L-1, A Guide for the Preparation of Warning Labels for Hazardous Chemicals, 1945 - 1970.  Manufacturing Chemists' Association of the United States

➢   ANSI Z400.1-2003, American National Standard for Hazardous Industrial Chemicals – Material Safety Data Sheets – Preparation (Draft)

➢   ANSI Z400.1-1998, American National Standard for Hazardous Industrial Chemicals – Material Safety Data Sheets – Preparation

Additional reliance materials are listed in the Reference Section below the signature page at the end of the report and as Exhibits in Appendix A.

I also rely on my knowledge and experience, including that as a professional Certified Industrial Hygienist (C.I.H.), Certified Safety Professional (C.S.P.), and Professional Engineer (P.E. – FL, KY, OH, PA, TX, and WV).

Extractions of Monsanto Roundup® Material Safety Data Sheets – MSDSs – are included in Appendix B.  A copy of Chapter 12 – Labeling Claims from the US EPA Label Review Manual is provided in Appendix C.

My CV, including my publications within the last ten (10) years and testimony at deposition or trial, are included in Appendix D.

The terms of my compensation for this matter are set forth in Appendix E.

Notes from my interviews of Mr. Dickey are provided in Appendix F.

Calculations of exposure events and times and other information from the interviews, are provided in Appendix G.

I reserve the right to update my opinions based on additional information reviewed, or received (*e.g.*, depositions and additional documents) for review.


## 3.0    ROUNDUP® HISTORY / TIMELINE:

Glyphosate or N-(phosphonomethyl) glycine was first discovered by Swiss chemist Henri Martin, working for Cilag in 1950 when researching for a drug.  He could not find a use for the chemical so it was set aside.  Meanwhile, Cilag was purchased by Johnson & Johnson in 1959.  They sold several research products off, including glyphosate to Aldrich Chemicals.  It was sold again to Stauffer Chemical Company who identified it as a chemical chelator.  Finally glyphosate was sold to Monsanto.  John Franz, with a Ph.D. in chemistry, began working with Monsanto's agricultural division in 1967; by 1970 he discovered the herbicidal properties of glyphosate and was issued a patent for such use on March 26, 1974 (Exhibit 52, pg. 118; Exhibit 53-4, pg. 2; Exhibit 333, pg. 1).

According to Monsanto registration documents (Exhibit 508, Bates MONGLY00245013 and Exhibit 509, Bates MONGLY01337674), Roundup®, was first registered for industrial and non-crop uses on April 5, 1974 and given its first full registration for agricultural use on December 23, 1975.  Roundup® was reportedly first sold to farmers in 1974 (Exhibit 48 - Myers et al., 2016; Exhibit 52, pg. 118, Exhibit 197-HH, pg. 29).  The usage of glyphosate (as an acid) in Roundup® on crops in the U.S. has increased substantially with time (Myers et al., 2016; Exhibit 98, Bates MONGLY00919401; and Exhibit 170, Bates MONGLY02873488; Exhibit 214, pg. 12; Exhibit 333, pg. 5; Exhibit 440, pg. 15):

| Year | Glyphosate Usage (million pounds a.i.) |
|------|----------------------------------------|
| 1974 | 0.9 |
| 1987 | 6 to 8 |
| 1991 | 18.7 |
| 1997 | 34 to 38 |
| 1999 | 67 to 73 |
| 2001 | 85 to 100 |
| 2003 | 128 to 133 |
| 2005 | 155 to 160 |
| 2007 | 180 to 185 |
| 2014 | 240 to 249 |
| 2015 | 286 |

Monsanto's glyphosate patent expired in 2000 and the number of companies selling glyphosate increased from one (Monsanto in 1999) to nine in 2000 and 30 by 2011. In 1999, Monsanto produced six (6) glyphosate-based products at four (4) concentrations (Exhibit 407, pg. 4 and Exhibit 442, pg. 25).

In 2009, glyphosate herbicides accounted for ~53.5% of all herbicides applied in the United States.  Roundup® ready crops accounted for more than 90% of the corn, cotton, and soybeans planted in the United States in 2014/2015 (Exhibit 170, Bates MONGLY02873488 and Exhibit 407, pg. 4).  Application rates are 1.5 to 2.0 kg/ha for pre-harvest, post-planting, and pre-emergence usage and ~4.3 kg/ha for vines, orchards, pastures, forestry, and industrial weed control (Exhibit 53-4, pg. 3).

## 4.0    Properties and Characteristics of Roundup®:

This Section provides an overview of the herbicide Roundup®, including why it is defined as a pesticide, its properties, how it is regulated, and resulting issues related to its toxicity, dermal transport across the skin, and implications for personal protective equipment.

### 4.1    How is Roundup® a Pesticide when it is a Herbicide?:

Roundup® is a herbicide (https://www.epa.gov/sites/production/files/2017-06/documents/_epaoig_20170621-17-p-0278.pdf):

> "Herbicides (a type of pesticide) are chemicals used to manipulate or control undesirable vegetation such as weeds."

Over 750 products containing glyphosate as the active ingredient, have been reported in the United States alone (Exhibit 53-4, pg. 2).

EPA defines a "pesticide" as follows (https://www.epa.gov/ingredients-used-pesticide-products/basic-information-about-pesticide-ingredients):

> A pesticide is any substance or mixture of substances intended for:
> - Preventing, destroying, repelling, or mitigating any pest.
> - *Use as a plant regulator, defoliant, or desiccant.*
> - Use as a nitrogen stabilizer.

Thus Roundup® is considered a pesticide and covered by pesticide regulations although it is also defined as a herbicide.

## 4.2    Pesticide Regulations – "Active" vs. "Inert" Ingredients:

Roundup®, like many herbicides/pesticides and as seen in a review of hundreds of Roundup® Material Safety Data Sheets (MSDSs) later in this summary, is generally defined as a combination of the "active" ingredients and "inert" ingredients.

The term "active" was developed under early Food and Drug Administration (FDA) rules to regulate pesticides (and continued by the EPA) and was associated with the pesticide ingredients associated with killing the plant or insect.  On the other hand, the term "inert" was historically associated with the balance of the product carrying/delivering the active ingredient; inorganic or organic chemicals such as freons, carbon dioxide, inert hydrocarbons, or even water.

These regulatory terms are now archaic as "inert" ingredients are no longer "inert" and may have toxicities greater than the active ingredients or even cause a synergistic toxic effect.  Monsanto recognizes the archaic nature of these terms when on June 29, 2016, Dr. Goldstein writes (Exhibit 196-FF, MONGLY07600050; draft version MONGLY07602810) to a reader of a recent Intercept paper as follow (Figure 4-1 – see highlights):



Daniel A. Goldstein, M.D.
Monsanto Company
Mail Zone C3ND
800 North Lindbergh Blvd.
St. Louis, MO 63167
Phone: (314) 694-6469     (fax 314-694-4028)
e-mail: daniel.a.goldstein@monsanto.com

June 29, 2016

Re:  Glyphosate formulation and surfactant safety

Dear Mr. Zimmerman;

Thank you for your inquiry regarding glyphosate/surfactant formulations (Roundup™ being a Monsanto brand name for these products).  I have had the opportunity to look at the article in *The Intercept* as well.  Unfortunately, this article inaccurately represents both the history of the product and what we know about the ingredients.  This article is fear-mongering of the worst variety as indicated by the picture showing applicators in haz-mat suits presumably applying glyphosate in the field.  I do not know what, if anything, is actually being applied, but there are NO glyphosate formulations anywhere that carry label instructions for this kind of protective equipment. The photo has nothing to do with glyphosate and is either staged for the purpose or taken when something else was applied.

The article in *The Intercept* also characterizes the term "inerts" as being misleading.  This word is the term chosen by Congress when they wrote the law regarding pesticides.  Inert refers to anything other than the active ingredient.  Nobody in industry would suggest that inerts are in fact toxicologically inert, as virtually everything is a toxin in sufficiently large doses.  I would agree that this is probably not the clearest choice of terminology, but nobody is relying on the terminology to assess toxicity.  Early on, inerts required less data than active ingredients.  This has been largely rectified in recent years and we now have data sets on the various classes of surfactants including short and long term toxicity studies.

**Figure 4-1: Archaic Nature of Terms "Active" and "Inert" Ingredients**

[Monsanto clearly understands that not all "inert" ingredients are really inert.]

## 4.3    Roundup® Composition and Physical Property Information:

In the case of Roundup®, the active ingredient is listed, but often the inert ingredients are not.

For most Roundup® formulations, the "active" ingredient is glyphosate:

➢    Glyphosate (Isopropyl amine salt of N-Phonomehtyl Glycine) – a/k/a Glyphosate). CAS and IUPAC name is N-(phosphonomethyl) glycerin.

➢    From Exhibit 214, "Glyphosate can exist in the form of the acid itself (CAS number 1071-83-6, $C_3H_8NO_5P$, M = 169.1 g/mol) or formulated as a salt (Budavari, 1996; Giesy et al., 2000), as isopropylamine (IPA) (CAS number 38641-94-0, $C_6H_{17}N_2O_5P$, M = 228 g/mol), which is the one found in original Roundup® products (Malik et al., 1989)."

The acid form of the active ingredient – glyphosate formula and molecular weight (169.07) are shown in Figure 4-2 (Exhibit 53-4, pg. 1):

1.1.2  Structural and molecular formulae and relative molecular mass

Molecular formula: $C_3H_8NO_5P$
Relative molecular mass: 169.07

**Figure 4-2: Chemical Formula and Molecular Weight of Glyphosate – Acid Form**

However, Roundup® formulations can have up to 5 active ingredients (Exhibit 257, MONGLY07702776-82).   Detailed formulations from EPA Registrations #'s 524-308, 524-333, 524-339, 524-445, 524-454, 524-475, 524-517, 524-536 and 524-512 are listed in Exhibit 273.

The acid form of glyphosate ($C_3H_8NO_5P$) is of medium solubility in water at 11.6 g/ℓ at 25 C (Exhibit 53-4, pg. 2).  Budavari reports that at 25° the solubility of the acid form of glyphosate is only ~12 mg/mℓ (acid) (Budavari, 1996) whereas glyphosate IPA salt has a solubility of 900 mg/mℓ.  This increased solubility in water of the salt form is the main reason why glyphosate is formulated as the IPA salt in Roundup® (Exhibit 214, pg. 3).

The active amount of ingredient in a product is typically designated as "ai" (lbs./gal.) and differs from the amount of acid equivalent designated as "ae" (also in lbs./gal.) because it includes the salt (Exhibit 407, pg. 4).  Prior to 2000, Monsanto Ultra®, a commonly used product contained 3 lb. ae/gal. of glyphosate (Exhibit 407, pg. 4; Exhibit 424, pg. 3).  The inter-relationship between the amount of glyphosate in a product as the acid, or the salt, is defined as follows (Exhibit 214, pg. 3):

> "Active ingredient includes the weight of the salt, formulated with glyphosate acid, and as the salt does not have herbicidal activity, active equivalent only includes the amount of glyphosate, present as acid. EQ1, outlines the relationship between glyphosate acid and glyphosate IPA salt:
>
> EQ1: a. i. = [(Molecular mass of the acid-1)/(Molecular mass of the salt) * 100]
>
>           = [(169-1)/ 228) * 100] = 74%

As an example (EQ2), it is given on the product sheet of Roundup® 2000 that the product contains 400 g/ℓ of glyphosate acid and 541 g/ℓ of glyphosate IPA salt. This is consistent with EQ1, as the amount of glyphosate acid can be calculated based on the amount of glyphosate IPA salt:

EQ2: 541 g/ℓ (salt) * 0.74 = 400 g/ℓ (acid)

In general, the formulations contains different concentrations of the IPA salt, even though 360 g/ℓ (a.e.) is one of the most frequently used (Giesy et al., 2000, Exhibit 448, pg. 32).  Note typical grain application rates are 0.36 to 2.16 kg as/ha – "as" is active substance (Exhibit 448, pg. 32).

The conversion from g/ℓ to lbs./gal. is: 0.008345 [(3.78541 ℓ /gal. / 453.592 g/lb.)]. Thus, 541 g/ℓ (salt) = 4.5 lbs./gal. salt (541 * 0.008345) or 3.4 lbs./gal acid. Note that the salt form produced prior to 2000 that contained 3 lbs./gal. acid would equate to ~485 g/ℓ (salt) or ~ 360 g/ℓ (acid). These formulas allow one to convert the various formulations between salt and acid forms and between metric and English units.

Kier and Kirkland (Exhibit 453, pg. 285) reported in 2015 that: "The original Roundup™-branded formulation (MON 2139) containing 41% isopropylamine glyphosate salt and 15.4% MON 0818 (a polyethoxylated tallowamine based surfactant blend), is no longer sold in many markets." MON 2139 was the original Roundup formulation introduced in 1974 (Exhibit 515, pg. 6).

Martinez et al., in their 1991 paper entitled "Oral and Pulmonary Toxicology of the Surfactant used in Roundup Herbicide" (Exhibit 165; Exhibit 197-L, Bates MONGLY01330410) noted that:

> "Roundup herbicide is available in three usual formulations:
>
> 1.  41% glyphosate, 15% POEA concentrate,
> 2.  18% glyphosate, 7% POEA concentrate,
> 3.  1% glyphosate, 0.4% POEA ready-to-use.

Peluso et al., 1998 (Exhibit 197-II, pg. 55) wrote that:

> "Roundup is a complex technical formulation, which contains 14.4–75% of glyphosate-isopropylammonium (CAS No.: 38641-94-0), glyphosate-trimesium (CAS No.: 81591-81-3), or glyphosate-sesquisodium (CAS No. 70393-85-0), as active ingredient and a large amount of different additives, coformulants, and surfactants that enhance the herbicidal activity of glyphosate salt [Kidd and James, 1991; Worthing and Hance, 1991]."

Thus, Peluso et al. found that Roundup® products contained between 14.4% and 75% glyphosate; the balance were "inert" ingredients that consisted of surfactants like POEA and other materials.

Some of the ingredients Monsanto identified as "inert" are reproduced below.

➢    Inert ingredients listed as surfactants.

Surfactant (sometimes specified as Ethoxylated Tallowamines or Triethylamine Salt of Triclopyr). Mark Martens, in an April 19, 1999 memo (Exhibit 66, Bates MONGLY06486905), lists some surfactants by product:

•    Polyethoxylated tallowamine (MON 0818)

•    $C_8$ to $C_{10}$ alkyl sulphate IPA salt (MON 8080)

•    Dodigen 4022

•    Tween 20.

Cindy Gross in a March 8, 2000 memo (Exhibit 73, Bates MONGLY00878831), lists some Roundup® surfactants being tested for their toxicity:

•    Cocoamine

- Benzalkonium chloride
- Tallow amine
- $C_{12}$ alkyl sulfate
- MON 59117.

Mark Martens notes in a February 12, 2001 memo (Exhibit 75, Bates MONGLY 00923066) some Roundup® surfactants as follows:

- MON 58121
- MON 59112
- MON 59117
- Alkyl amines
- Dodigen.

Note that these products are often coded so a user does not know their formulation for purposes of protection.

Katholm (Exhibit 214, pgs. 5-6) cites the following information regarding POEA:

- POEA is the surfactant most used in Roundup® (Giesy et al., 2000).
- POEA usually constitutes 15%, or less, of the formulations, corresponding to 150 g/ℓ (Giesy et al., 2000;
- Tallowamine is a derivative of tallow, containing complex mixtures of different fatty acids. These include oleic acid (37-43%), palmitic acid (24-32%), stearic acid (20-25%), myristic acid (3-6%), and linoleic acid (2-3%) (Diamond and Durkin, 1997).

Products at times have included formaldehyde - <1 g/kg (Exhibit 448, pg. 30; see also Exhibit 525, pgs. 6 and 8) and ethylene glycol (Exhibit 70, pg. MONGLY01832749).   Recent U.S. formulations reportedly contain <2% to 12% ethylene glycol (Exhibit 439, Bates MONGLY01745304).

Also, some products are the same, but given different names (e.g., Rodeo is Custom; Pro is Ultra and MON 2139 in France is the same as Morocco) (Exhibit 72, pg. MONGLY01832750).

As part of a Freedom of Information Act request response (Exhibit 488), the inert ingredients contained in Monsanto glyphosate products on/about 2008 was provided (Table 4-1):

**Table 4-1: Roundup® Inert Ingredients by Product and EPA Registration Number**
**(Exhibit 488, Bates MONGLY01287399-418)**

| Inert Ingredient | Presence of Inert Ingredient by Monsanto Product and Registration Number | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Kleeraway Systemic Weed & Grass Killer2 (#71995-2) | Roundup Conc. Weed & Grass Killer (#71995-6) | Roundup Super Conc. Weed & Grass Killer (#71995-7) | Roundup L&G Ready-to-Use Fast Acting Formula Grass & Weed Killer (#71995-8) | Glyphosate Ready-to-Use Herbicide (# 71995-10) | Glyphosate Concentrate Herbicide (# 71995-14) | Roundup Garden Foam & Grass Killer (# 71995-16) | Roundup Rainfast Tough Weed (# 71995-20) | GroundClear SuperEdger Grass & Weed Control 1 (# 71995-21) | Roundup Ready-to-Use Weed & Grass Killer Plus (#71995-23) |
| Polyoxyethylene Alkylamine (POEA) | X | X | X | X | X | X | X | X | X | X |
| 1,2-Benzisothiazoline-3-One | | | | X | X | | | | X | X |
| Cis-1-(3-Chloroallyl)-3,5,7-Triaza-1-Azoniaadamantane Chloride | | | | | | | | | X | |
| 1 Octyl-2-Pyrrolidone | | | | | | | | | X | |
| 2-((Hydroxymethyl) amino) Ethanol | | | | | X | | | | | |
| 3-Iodo-2-Propylnyl Butyl Carbamate | X | X | | X | X | X | | X | X | X |
| 8-Hydroxyquinoline Sulfate | X | | | | | | | | | |
| 3(2H)-Isothiazolone, 2-Methyl- | | | | X | X | | | X | X | X |
| 3(2H)-Isothiazolone, 5-Chloro-2-Methyl | | | | X | X | | | X | X | X |
| Ammonium Sulfate | | | | X | X | | X | | | X |
| Dimethylpolysiloxane | | | | X | X | | | X | X | |
| Dipropylene Glycol | | | | X | X | X | | | | X |
| Glycerine | | | | X | | | | | | X |
| Hexamethylenetetraminechlor-Allyl Chloride - Cis | | | | | | | | | | X |
| Isobutane | | | | | | | X | | | |
| Methyl p-Hydroxybenzoate | | | | X | | | | | | |
| N-Methyl Pyrrolidone | | | | | | | | | X | |
| Nonanoic Acid | | | | X | X | X | | | X | X |
| Octamethylcyclotetrasiloxane | | | | | | | | | X | |
| o-Phenylphenol, Sodium Salt | | | | X | | | | | | |
| Phosphate Ester Mixture | | | | X | | | | X | | X |

| Inert Ingredient | Presence of Inert Ingredient by Monsanto Product and Registration Number | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Kleeraway Systemic Weed & Grass Killer2 (#71995-2) | Roundup Conc. Weed & Grass Killer (#71995-6) | Roundup Super Conc. Weed & Grass Killer (#71995-7) | Roundup L&G Ready-to-Use Fast Acting Formula Grass & Weed Killer (#71995-8) | Glyphosate Ready-to-Use Herbicide (# 71995-10) | Glyphosate Concentrate Herbicide (# 71995-14) | Roundup Garden Foam & Grass Killer (# 71995-16) | Roundup Rainfast Tough Weed (# 71995-20) | GroundClear SuperEdger Grass & Weed Control 1 (# 71995-21) | Roundup Ready-to-Use Weed & Grass Killer Plus (#71995-23) |
| Polyethylene Glycol | | | | X | | | | X | | X |
| Polyoxyethylene Monoundecyl Ether | | | | X | X | | | | | |
| Polyoxypropylene-Polyoxyethylene Block Co-Polymer | | | | | | | | | X | |
| Potassium Hydroxide | | | | X | X | | X | | X | X |
| Propane | | | | | | | X | | | X |
| Propylene Glycol | | | | X | | | | | | |
| Silicone Emulsion | X | | | X | X | X | X | X | | X |
| Sodium Benzoate | | | | | X | | X | | | |
| Sodium Monoalkyl Dialkylphenoxy Benzene-Disulphonate | | | | | | | | | X | |
| Sorbic Acid | | X | | X | X | | | | | |
| Xanthan Gum | | | | | | | X | | | |
| FD&C Blue #1 | x | X | | X | X | X | X | X | | X |
| Water | X | X | X | X | X | X | X | X | X | X |

**Table 4-1: Roundup® Inert Ingredients by Product and EPA Registration Number – Continued**
**(Exhibit 488, Bates MONGLY01287399-418)**

| Inert Ingredient | Presence of Inert Ingredient by Monsanto Product and Registration Number | | | | | | |
|---|---|---|---|---|---|---|---|
| | Roundup Super Concentrate Weed & Grass Killer (# 71995-25) | Roundup Weed & Grass Killer Concentrate (# 71995-26) | Roundup Ready-to-Use Herbicide 2 (# 71995-27) | Roundup Weed & Grass Killer Concentrate Plus (# 71995-29) | Roundup Weed & Grass Killer Ready-to-Use (# 71995-32) | MON 78783 (# 71995-36) | MON 78736 (# 71995-37) |
| Polyoxyethylene Alkylamine (POEA) | X | X | X | X | X | | X |
| 1,2-Benzisothiazoline-3-One | | X | X | | X | X | |
| Cis-1-(3-Chloroallyl)-3,5,7-Triaza-1-Azoniaadamantane Chloride | | | | | | X | |
| 1-Dodecanamine | X | | | | | | |
| 1 Octyl-2-Pyrrolidone | | | | | | | |
| 2-((Hydroxymethyl) amino) Ethanol | | | | | | | |
| 3-Iodo-2-Propylnyl Butyl Carbamate | | X | | X | | X | |
| 8-Hydroxyquinoline Sulfate | | | | | | | |
| 3(2H)-Isothiazolone, 2-Methyl- | | X | X | | X | X | |
| 3(2H)-Isothiazolone, 5-Chloro-2-Methyl | | X | X | | X | X | |
| Ammonium Sulfate | | | | | X | X | |
| Carmal Color | X | | | | | | |
| Dimethylpolysiloxane | X | X | X | X | X | X | X |
| Dipropylene Glycol | | X | | X | X | | X |
| Glycerine | | | | | | | |
| Hexamethylenetetraminechlor-Allyl Chloride - Cis | | | | | | | |
| Isobutane | | | | | | | |
| Methyl p-Hydroxybenzoate | | | | | | | |
| N-Methyl Pyrrolidone | | | | | | | |
| Nonanoic Acid | | | | | X | | |
| Octamethylcyclotetrasiloxane | | | | | | | |
| o-Phenylphenol, Sodium Salt | | | | | | | |
| Phosphate Ester Mixture | | | | | | | |

| Inert Ingredient | Presence of Inert Ingredient by Monsanto Product and Registration Number | | | | | | |
|---|---|---|---|---|---|---|---|
| | Roundup Super Concentrate Weed & Grass Killer (# 71995-25) | Roundup Weed & Grass Killer Concentrate (# 71995-26) | Roundup Ready-to-Use Herbicide 2 (# 71995-27) | Roundup Weed & Grass Killer Concentrate Plus (# 71995-29) | Roundup Weed & Grass Killer Ready-to-Use (# 71995-32) | MON 78783 (# 71995-36) | MON 78736 (# 71995-37) |
| Polyethylene Glycol | | | | X | X | | X |
| Polyoxyethylene Alkyl Phosphate Ester | X | X | | X | X | | X |
| Polyoxyethylene Monoundecyl Ether | | | | | | X | |
| Polyoxypropylene-Polyoxyethylene Block Co-Polymer | | | | | | | |
| Potassium Hydroxide | | | | | X | | |
| Propane | | | | | | | |
| Propylene Glycol | X | X | | | | | |
| Silicone Emulsion | | | | | | | |
| Sodium Benzoate | | | | | | | |
| Sodium Monoalkyl Dialkylphenoxy Benzene-Disulphonate | | | | | | | |
| Sorbic Acid | | | | | | | |
| Xanthan Gum | | | | | | | |
| FD&C Blue #1 | | | | | | | |
| Water | X | X | X | X | X | X | X |

Of the 17 products listed in Table 4-1, 16 or ~94% used POEA as one of the inert ingredients.

On/about 2009, Monsanto Roundup® Weed and Grass Killer products contained surfactant 59112 at levels up to 15% (Exhibit 252 and Exhibits 254a and b).  MON 59112 surfactant is given as a blend of tallowamine and phosphate ester; MON 0818 was reported as being just tallowamine-based (Exhibits 254a and b).  Thus, the Weed and Grass Killer products contained POEA.

As illustrated in Exhibit 273, most Roundup products contained POEA; in 1981, Monsanto reported POEA was the surfactant used in Roundup (Exhibit 481, Bates MONGLY00154356).

Monsanto's webpage (https://monsanto.com/products/safety-information/what-is-a-surfactant /) provides the following descriptions and links regarding surfactants (Figures 4-3 and 4-4):



**Figure 4-3: Monsanto's Webpage on Surfactants**

Monsanto says that the function of the surfactant is to keep more of the pesticide on the plant, or cover more of the plant surface area.



**Figure 4-4: Monsanto's Webpage on Surfactants – cont.**

Monsanto's Dr. Goldstein (Exhibit 196-FF, Bates MONGLY07600050) describes the function of surfactants similarly when he says:

> "Glyphosate formulations contain glyphosate itself as well as surfactants (detergents) to allow for spreading and penetration of the waxy leaf-coat of plants."

The link on "How Surfactants Work" takes one to the following YouTube video: https://www.youtube.com/watch?v=8KmRmftGj7o (see Petty Video 1).  This video provides a clear illustration of the effects of surfactants on plants: i) to cover more of the plant surface area by reducing surface tension and ii) break down the waxy layer on plants to facilitate movement of the herbicide into the plant (Figure 4-5):



**Figure 4-5: How a Surfactant Works**

Specifically they note that: "A surfactant improves the delivery of a herbicide into the targeted weed by enabling the herbicide to stick to the weed leaves, instead of rolling off and onto the soil"; the same language used by Monsanto in their NewsDesk email (Exhibit 171, Bates MONGLY07598396).  The European Food Safety Authority (EFSA) reported (Exhibit 465, pg. 4) that: "Glyphosate can be used in combination with *POE*-tallowamine, a co-formulant that *promotes the penetration of the active substance into plants*."

Robin reports that Roundup® products contain between 14.5 and 75% glyphosate (Exhibit 54, pg. 77 – Bates P1.2841.90) but actual formularies are difficult to find.  Two such formularies, from dermal work completed in 2002 (Exhibit 82, Bates pg. MONGLY00888362), are summarized in Table 4-2:

### Table 4-2: Roundup® Formularies and Properties

| Property | Formulary | |
|---|---|---|
| | **MON 35012** | **MON 0139 70%** |
| Product Category | Herbicide | Herbicide |
| Active Ingredient (CAS) | Glyphosate (38641-94-0) | Glyphosate (38641-94-0) |
| Composition: | | |
| Active Ingredient | Isopropylene salt of glyphosate – 46% w/w | Isopropylene salt of glyphosate – 62% w/w |
| Inert Ingredients | Surfactant Cocoamine – 18% w/w<br>Water & minor formulating ingred. – 35.5% w/w | Inert Ingredients – 38% w/w (no surfactant specified) |
| Glyphosate content | 399.6 g/ℓ | 405.5 g/ℓ |
| Density (20 C) | 1.1604 g/mℓ | 1.1782 g/mℓ |
| Molecular Weight (MW) | 228.2 | 228.2 |
| Appearance | Yellow to amber liquid. | Clear liquid. |

Another Roundup® product, MON 78623, is specified as containing 58% potassium salt of glyphosate and a surfactant.  This product apparently differs by MON 78272 only by the lack of 0.27% citric acid (Exhibit 91, Bates pgs. MONGLY02335782, 790).  When sprayed, this report notes that the mean aerosol particle diameter is 2.9 or 3.8 μ with 67% or 53% of the particles ≤4.0 μ (Exhibit 91, Bates pgs. MONGLY02335802).

As shown below, sometimes the surfactant is listed in the MSDS and sometimes it is not, even for the same product (e.g., Roundup Original™ Herbicide – 1/25/2001 MSDS vs. 6/26/2003 MSDS (Figure 4-6 and 4-7):

**2.  COMPOSITION/INFORMATION ON INGREDIENTS**

**Active ingredient**
Isopropylamine salt of N-(phosphonomethyl)glycine; {Isopropylamine salt of glyphosate}

**Composition**

| COMPONENT | CAS No. | % by weight (approximate) |
|---|---|---|
| Isopropylamine salt of glyphosate | 38641-94-0 | 41 |
| Surfactant | 61791-26-2 | 8 |
| Water | 7732-18-5 | 51 |

Trade secret composition.

**Figure 4-6: Roundup Original™ Herbicide – 1/25/2001 MSDS
with Surfactant Listed**

**2.  COMPOSITION/INFORMATION ON INGREDIENTS**

**Active ingredient**
Isopropylamine salt of N-(phosphonomethyl)glycine; {Isopropylamine salt of glyphosate}

**Composition**

| COMPONENT | CAS No. | % by weight (approximate) |
|---|---|---|
| Isopropylamine salt of glyphosate | 38641-94-0 | 41 |
| Other ingredients | | 59 |

**Figure 4-7: Roundup Original™ Herbicide – 6/26/2003 MSDS
without Surfactant Listed**

[The lack of identification of "inert" ingredients, like POEA, in Roundup® formulations make it difficult, if not impossible, for the end user to know the chemicals to which they are exposed, the hazards of these chemicals, and the ability to select appropriate personal protective equipment.]

Note that 41% glyphosate is ~360 g/ℓ glyphosate acid equivalent as the isopropylamine salt (Exhibit 187, pg. 952).

The Chemical Abstract Services (CAS) # for the surfactant in this MSDS is 61791-26-2, which is PEG-10 hydrogenated tallow amine (POEA) and is reported as a skin irritant (https://chem.nlm.nih.gov/chemidplus/rn/61791-26-2).  Franz, Mao, and Sikorski, in their ACS Monograph 189 published in 1997 (Exhibit 319) stated that "*Roundup is a formulation containing 41% of the IPA salt of glyphosate and a surfactant (most commonly MON 0818) in water* (Exhibit 319, Bates MONGLY03296534); MON 0818 is POEA (see Exhibit 66, Bates MONGLY06486905).  Literature indicates that POEA may be up to 2,000 times more toxic to cells than glyphosate (Myers, 2016 - https://ehjournal.biomedcentral.com/track/pdf/10.1186/s12940-016-0117-0?site=ehjournal.biomed central.com; see also Exhibit 370 and 432, pg. 213 demonstrating the formulations are more toxic than glyphosate alone).

One of the reasons for this increased toxicity may be that in 1981 Monsanto found that their POEA surfactant contained dioxane and that their formulations contained between 265 and 1,662 ppm dioxane (Exhibit 481, Bates MONGLY00154356); dioxane is a recognized toxic chemical.   ASTDR reported that (https://www.atsdr.cdc.gov/phs/phs.asp?id=953&tid=199): i) the International Agency for Research on Cancer (IARC) has determined that 1,4-dioxane is possibly carcinogenic to humans; that ii) The U.S. Department of Health and Human Services (HHS) considers 1,4-dioxane as reasonably anticipated to be a human carcinogen, and iii) The EPA has established that 1,4-dioxane is likely to be carcinogenic to humans.  Monsanto recognized that dioxane was an animal carcinogen, but concluded in an exposure/risk assessment that the risk was low (Exhibit 481, Bates MONGLY00154362-80).

The products, despite claims otherwise, are not completely biodegradable, with ~2% degrading in 28 days based on an internal Monsanto study (Exhibit 54, pg. 75).  Other studies indicate the half-life of glyphosate in soils ranges from a few days to several months and even a year depending on soil composition (Exhibit 48, pg. 5; see also Exhibit 438, pg. 5 – 3 days to 3 years).

Bolognesi et al., 2004 (Exhibit 373), in a study of floriculturists in Italy, reported gene mutation, chromosomal mutation, and DNA damage to worker's blood samples using glyphosate pesticides.  In later work, Bolognesi et al., 2009 (Exhibit 374) states that the genotoxicity associated with studies evaluating Roundup may be due to the "different co-formulants and surfactants contained in commercial products" rather than glyphosate alone.  This finding is supported by others (Exhibit 405, Exhibit 412, and Exhibit 413). Monsanto has disputed *glyphosate* is genotoxic in letters to the editor (Exhibit 381) and other papers, including the 2000 Williams et al. paper they ghostwrote (Exhibit 355, Bates MONGLY01869261-412, published as Exhibit 206).  [*This practice of using scientific study results and marketing materials based solely on the active ingredient glyphosate rather than product formulations actually used by consumers (i.e., Roundup products) to pseudo represent Roundup's formulations is a common practice seen in Monsanto-published material as will be demonstrated throughout this report*].

The lethal dose of Roundup® to humans is ~200 mℓ; symptoms are edema coupled with respiratory distress, violent vomiting, and diarrhea. Acute symptoms are eye irritation, vision problems, headaches, skin lesions and irritation, nausea, dry throat, asthma, respiratory difficulties, nosebleeds, and dizziness (Exhibit 54, pg. 87). Suicide attempts using 41% glyphosate Roundup® formulations have ingested an average of 120 mℓ (Exhibit 197-L, Bates MONGLY01330410); other data suggest a similar amount [150 cc (or mℓ)] are fatal (Exhibit 280, Bates MONGLY01938130). Japanese data on ingestion levels of Roundup® (~41% IPA, ~15% POEA and ~44% water) during suicide attempts found that surviving patients consumed on average 104 mℓ (~3.5 oz.) while those that died consumed on average 206 mℓ (~7.0 oz.) (Exhibit 414, MONGLY01239044).

Recently, the World Health Organization (WHO) International Agency for Research on Cancer (IARC) concluded that glyphosate is probably carcinogenic to humans (Exhibit 48, pg. 2 and Exhibit 52, pg. 127).

It has been suggested that the exposures to pesticides like Roundup® from inhalation are expected to be small and mostly are expected to be from dermal (skin) absorption since the product is not very volatile (i.e., vapor pressure is low at $1.31 \times 10^{-5}$ mPa at 25 C; negligible – Exhibit 53-4, pg. 2 and Exhibit 448, pg. 31; or $1.6 \times 10^{-8}$ mm Hg - Exhibit 341, MONGLY00368834). However, the airborne form with sprayers will be an aerosol (droplet) rather than a vapor. Boom sprayers initially create aerosol droplets between 50 µm to 500 µm with many of the droplets transformed to smaller sizes due to very fast evaporation of volatile constituents; the resulting MMAD (mass medium aerodynamic diameter) of the aerosol particle for Roundup® being 11 µm (Exhibit 11).

Stokes Law (Burton, 2000) can be used to estimate the time such small particles would stay in the air:

Eq. 4-1:        $V_s = 0.0052 * (S.G.) * D^2$

      Where:        $V_s$ = settling velocity in units of feet per minute (fpm).

                           S.G. = specific gravity of particle/aerosol – for Roundup® ~1.17

                           D = diameter of particle/aerosol in units of µm (i.e., 11)

Thus, $V_s = 0.0052 * (1.17) * 11 * 11 = 0.74$ fpm. In still air, it would take a droplet ~1.36 minutes to drop one (1) foot or ~81 seconds to drop this same foot of distance. For a six foot drop, the time increases to 8.15 minutes or ~489 seconds. [Thus, these small aerosol particles can stay in the air for relatively long timeframes and when breathed in, result in an inhalation exposure from these aerosol particles (i.e., not the vapor).]

## 4.4     "Active" vs. "Inert" Language:

The United States Environmental Protection Agency (US EPA) discusses "inert" ingredients on its webpage (https://www.epa.gov/ingredients-used-pesticide-products/basic-information-about-pesticide-ingredients):

> *The name "inert" does not mean non-toxic*. All inert ingredients must be approved by EPA before they can be included in a pesticide. We review safety information about each inert ingredient before approval. If the pesticide will be applied to food or animal

feed, a food tolerance is required for each inert ingredient in the product, and we may limit the amount of each inert ingredient in the product.

*Inert ingredients play key roles in pesticide effectiveness and product performance.* Examples of functions inerts can serve include:

- *Act as a solvent to help the active ingredient penetrate a plant's leaf surface*.

- *Improve the ease of application by preventing caking or foaming*.

- Extend the product's shelf-life.

- Improve safety for the applicator.

- Protect the pesticide from degradation due to exposure to sunlight.

Under federal law, the identity of inert ingredients is confidential business information. *The law does not require manufacturers to identify inert ingredients by name or percentage on product labels.* In general, only the total percentage of all inert ingredients is required to be on the pesticide product label.

[While the EPA states that the manufacturer is not required to identify them by name or percentage on the label, which appears to conflict with language in 40 CFR 170 regarding warnings – see Figures 4-1 and 4.-7 and Table 4-2 above and Appendix B, nevertheless the manufacturer is required to provide the EPA with safety information pertaining to each inert ingredient].

However, these inert ingredients, such as solvents, carriers, emulsifiers, and surfactants are often not inert and can be toxic in their own right (e.g., Exhibit 52, pgs. 130-132). Their intent is to "intensify the physio-chemical properties of the active ingredients, which have no pesticide effect of their own" (Exhibit 54, pg. 77).

For example, Robin notes that the role of these additives is to "enable glyphosate to penetrate into the plant". One of the Monsanto Roundup® surfactants used, polyethoxylated tallowamine (POEA), "is a detergent, favoring the spread of spray droplets on the leaves" (Exhibit 54, pg. 77).

Evidence shows that the toxicity of Roundup® products are greater than the active ingredient, glyphosate, alone (see also Exhibit 54, pgs. 80-86 and Exhibit 53, pg. 285).

[The addition of a surfactant has at least two important implications from a chemical engineering and industrial hygiene perspective:

i)      The surfactant causes the Roundup® product to better wet a surface (e.g., as an analogy, think of water beading up on a windshield due to the surface tension of the water in the droplets and then adding a surfactant product like Rain-X®, which causes the droplets to spread out (surfactant reduces the surface tension of the droplets) and form a smoother film.

        Thus, it can be seen that the addition of a surfactant in a product like Roundup® would be important because it would help the product spread out over the plant surface to be wetted and help it hold onto this surface longer (vs. the product beading up on the plant surface).

i)      The addition of a surfactant forming the product Roundup® also has implications to people from a health and safety standpoint vs. evaluations of the ingredient glyphosate only:

a)    The surfactant (and other inert ingredients) can be toxic.

b)    The combined toxicity of the Roundup® product with the surfactant that is also toxic will increase the toxicity of the Roundup® vs. glyphosate alone and there could be enhanced synergistic toxicity effects.

c)    From a dermal exposure standpoint, the Roundup® product with the surfactant will wet the skin better than glyphosate alone, increasing dermal fluxes and dermal doses.

Thus, from a chemical engineering and industrial hygiene standpoint, it is likely that the Roundup® products behave differently than characteristics garnered from just the typically listed active ingredient - glyphosate.]

### 4.4.1   Defarge et al., 2018 – Exhibit 178:

Defarge, N. et al., in their 2018 paper entitled "Toxicity of Formulants and Heavy Metals in Glyphosate-Based Herbicides and Other Pesticides" (Exhibit 178, pgs. 156-163), addressed the effects of Roundup® formulants on toxicity to plants and human cells, specifically addressing the issue of whether the toxicity of glyphosate, the active ingredient in Roundup®, is the same as the toxicity of the product Roundup® itself.

For plants, the effects were illustrated by applying water, glyphosate only, Roundup® in various strengths, and a surfactant (POEA) and observing the effect of these substances on the plants with time (up to 120 hrs.).   The effects from the paper are reproduced and illustrated in Figure 4-8 below:



**Figure 4-8: Effects of Water, Glyphosate, Roundup®, and a Surfactant on Plants with Time**

As the author's noted:

> "*G (glyphosate) alone did not show any herbicidal activity over 5 days*, *in contrast with the 3 compared formulations (of Roundup®)....Hence, G did not appear to be the main active substance of the herbicide, but rather the formulants*."

[Based on the experimental results illustrated in Figure 4-8, and the EPA definition of an active ingredient, POEA should have been declared an active ingredient.]

The authors also investigated the effects of Roundup® formulations on human embryonic kidney cells and found similar results to those found with plants:

"***Human embryonic cells are killed by glyphosate-based formulations (i.e., Roundup® products – GBH) and the formulant family (i.e., POEA), but not by G (glyphosate)***"

The authors also found significant amounts of heavy metals (i.e., arsenic, cadmium, nickel and lead) in Roundup® products (Figure 4-9):



**Figure 4-9: Heavy Metal Levels in Pesticide Products (Exhibit 178, pg. 161)**

[Roundup® products were found to contain heavy metals, dioxane, and formaldehyde as inert ingredients, all toxic in their own right with unreported cumulative toxicity.]

Under the Discussion Section, the authors make several key points:

*G (glyphosate)* is known as a specific inhibitor of the shikimate pathway in plants, especially in vitro [19]. This is declared by the manufacturers to explain it's widely claimed herbicidal activity. *However, G is never used alone in agriculture but only mixed with formulants, which are mainly composed of various oxidized petroleum distillates or derivatives [16, 20, 21]. These are supposed to be surfactants, diluents or adjuvants*

*stabilizing G and allowing its penetration in plants [22].* **However, the fact that their composition is considered confidential business in formation does not allow scientists to describe their mechanism of action either on non-target organisms or even on plants. They are declared as inert by manufacturers, <u>because they are not considered to be directly responsible for the herbicidal activity. In this work, the main family of formulants was demonstrated to be herbicides when applied alone at agricultural dilutions, but G was not as we already suggested [23]. G alone may not penetrate or concentrate enough in plants, in contrast with the formulants, which act quickly and hence are not inert.</u>**

We do not demonstrate in this work that G cannot inhibit the plant specific enzyme enolpyruvylshikimate phosphate synthase in vitro or in vivo, ***<u>however at recommended 1% dilution of GBH formulants are more toxic on plants than G in a short term</u>***. This is even more obvious in human cells, as we previously demonstrated in different models [7, 10, 12, 16, 21]. This work presents the most comprehensive comparison of the cytotoxicity of GBH formulations, formulants, and G and one of its salts. ***<u>There is no instance in which G reaches the toxicity of any formulant, either in the formulations or alone.</u>*** The mechanisms of actions of formulants have been described as membrane disruption [16, 21, 24, 25], apoptosis [26], mitochondrial respiration inhibition [16, 21, 27], and DNA damaging [28, 29]. G alone appears to enter the cells [30], but its toxic action is not well documented at this level and appears very secondary in time and effects in contrast with that of the formulants. *The formulants also penetrate and bioaccumulate from the studies described above because of their chemical amphiphilic nature, as, for instance, with petroleum oxidative derivatives.* Evidence for penetration is the cellular endocrine disruption observed below toxic levels in this work. **We demonstrate that non-target effects below toxicity thresholds are not due to the declared active ingredient G but undoubtedly to the formulants alone and in formulations, as previously documented for some instances [16]**…..

***<u>The present results and others reviewed [1] show that the difference between "active ingredient" and "inert compound" is a regulatory assertion with no demonstrated toxicological basis.</u>* Indeed, the toxicity of formulants in pesticides has been well documented for years [34–37].**

*In conclusion, **<u>G being tested alone in chronic regulatory experiments to establish the ADI (RfD in USA) appears inappropriate</u>**, in light of these results. As a matter of fact, **<u>synergistic toxic effects undoubtedly occur, and therefore ADI calculations and other regulatory experiments should be performed with the full formulations and all components</u>**, especially should be declared and/or measured, because other active ingredients could be in formulants.*

[This paper demonstrates that:

i)    The registration of pesticides in the U.S. based primarily on acute testing of the "active" ingredient is flawed as the toxicity of the product is likely greater than the "active" ingredient alone.

ii)   "Inert" ingredients are not really inert.

iii)  Roundup® as a product appears to be more toxic than its "active" ingredient glyphosate.

iv)   The lack of requirements on pesticide manufacturers to list "inert" ingredients in their products leaves public officials, scientists, and the public in the dark as to

what is actually in the products, how toxic the products as a whole may be, and how to protect oneself from exposures to such products not knowing their composition or health effects.

v)  Heavy metals such as arsenic, chrome, cobalt, lead, and nickel and are present in 10's of parts per billion (ppb) in these Monsanto Roundup® formulations.]

The levels of these metals are at, or approach, U.S. EPA Drinking Water Standards (Table 4-3):

**Table 4-3: U.S. Drinking Water Standards for Metals Found in Roundup® Formulations (https://www.epa.gov/ground-water-and-drinking-water/national-primary-drinking-water-regulations)**

| Inorganic Chemicals[1] | | | | |
|---|---|---|---|---|
| Contaminant | MCLG[2] (mg/L)[3] | MCL or TT[2] (mg/L)[3] or (PPM)[4] | MCL (PPB)[4] | Potential Health Effects from Long-Term Exposure above the MCL (unless specified as short-term) |
| Arsenic<br>- Quick reference guide<br>- Consumer fact sheet | 0 | 0.010 as of 01/23/06 | 10 | Skin damage or problems with circulatory systems, and may have increased risk of getting cancer. |
| Cadmium | 0.005 | 0.005 | 5 | Kidney damage. |
| Chromium (total) | 0.1 | 0.1 | 100 | Allergic dermatitis. |
| Lead<br>- Quick reference guide<br>- Rule information | Zero | TT[5]; Action Level=0.015 | 15 | Infants and children:  Delays in physical or mental development; children could show slight deficits in attention span and learning abilities.<br>Adults: Kidney problems; high blood pressure. |

[1] The National Primary Drinking Water Regulations (NPDWR) are legally enforceable primary standards and treatment techniques that apply to public water systems. Primary standards and treatment techniques protect public health by limiting the levels of contaminants in drinking water.

[2] Definitions:

- Maximum Contaminant Level Goal (MCLG) - The level of a contaminant in drinking water below which there is no known or expected risk to health. MCLGs allow for a margin of safety and are non-enforceable public health goals.

- Maximum Contaminant Level (MCL) - The highest level of a contaminant that is allowed in drinking water. MCLs are set as close to MCLGs as feasible using the best available treatment technology and taking cost into consideration.  MCLs are enforceable standards.

- Maximum Residual Disinfectant Level Goal (MRDLG) - The level of a drinking water disinfectant below which there is no known or expected risk to health. MRDLGs do not reflect the benefits of the use of disinfectants to control microbial contaminants.

- Treatment Technique (TT) - A required process intended to reduce the level of a contaminant in drinking water.

- Maximum Residual Disinfectant Level (MRDL) - The highest level of a disinfectant allowed in drinking water. There is convincing evidence that addition of a disinfectant is necessary for control of microbial contaminants.

[3] Units are given in milligrams per liter (mg/L) unless otherwise noted. Milligrams per liter are equivalent to parts per million (PPM).

[4] Unit labels are: PPM - parts per million and PPB – parts per billion (1,000 x PPM).

[5] Lead and copper are regulated by a treatment technique that requires systems to control the corrosiveness of their water. If more than 10% of tap water samples exceed the action level, water systems must take additional steps.

Interestingly, John E. Franz's March 26, 1974 patent (Exhibit 326, pg. 15) for n-phosphonomethyl-glycine compositions (e.g., glyphosate – Exhibit 337, pg.1 – Bates MONGLY01377219)) states under the first claim "…a herbicide comprising of a "salt-

forming cation selected from the group consisting of cations of *alkali metals, alkaline earth medals, copper, zinc, manganese, nickel,* ammonium, aliphatic ammonium and mixtures thereof."  Thus, metals such as nickel were under consideration as part of the pesticide formulation in patented work by Monsanto in the early 1970s.

### 4.4.2   Peixoto, Francisco, 2005 – Exhibit 168:

Peixoto, in his 2005 paper entitled "Comparative Effects of Roundup and Glyphosate on Mitochondrial Oxidative Phosphorylation" (Exhibit 168, pgs. 1115-22), addressed the effects of Roundup® formulants on rat liver mitochondria, specifically addressing the issue of whether the toxicity of glyphosate, the active ingredient in Roundup®, is the same as the toxicity of the product Roundup® itself.

Information from the Discussion and Conclusions Sections of this paper are reproduced below:

> "*Data obtained in this study clearly demonstrate the ability of Roundup to impair mitochondrial bioenergetics reactions.*
>
> ***The observed alterations** in mitochondrial bioenergetics caused by **Roundup cannot be exclusively attributed to the active ingredient**, but may as well be the result of other chemicals e.g. **POEA, or due to the possible synergy between glyphosate and Roundup formulation products.*** This synergy between glyphosate and Roundup inert ingredients has also been reported in cell division (Marc et al., 2002), where the delay observed in the cell cycle could be the result of alterations on the mitochondrial bioenergetics reactivity's, which haves drastic consequences on cellular function through the perturbation of the bioenergetic charge and balance of the cell. Therefore, the reduced energetic efficiency of mitochondria may account for some toxic effects resulting from the impairment of the energy requirements of the cell and from the crucial importance of energy metabolism in active tissues, e.g. liver.
>
> ***In short, in this study, we found that the so called "inert ingredients" used in Roundup are greatly responsible for the observed toxicity at the bioenergetic level.***"

[This paper demonstrates that:

i)      Roundup® as a product appears to be more toxic than its "active" ingredient glyphosate, regarding exposures to rat liver cells.

ii)     The "inert" ingredients in Roundup® are not truly inert.]

### 4.4.3   Martinez et al., 1991 – Exhibit 165:

Martinez et al., in their 1991 paper entitled "Oral and Pulmonary Toxicology of the Surfactant used in Roundup Herbicide" (Exhibit 165, Bates MONGLY01330407-1330411), exposed rats by tracheal and oral administration to saline solution, Roundup®, a surfactant POEA used in Roundup®, and PS-80 and looked at death rates. Overall, death rates for rats exposed to Roundup® were the highest, followed by those to POEA.

The paper then goes on to cite work by Tai, Yamashita, and Wakimori stating that this work "*has shown that cardia depression observed by Roundup® injection is mostly due to the POEA surfactant…*"

[Again, these statements demonstrate that "inert" ingredients in pesticides like Roundup® are not inert.]

### 4.4.4   Rank et al., 1993 – Exhibit 176:

Rank et al., in their 1993 paper entitled "Genotoxicity Testing of the Herbicide Roundup and its Active Ingredient Glyphosate Isopropylamine using the Mouse Bone Marrow Micronucleus Test, Salmonella Mutagenicity Test, and Allium Anaphase-TeloPhase Test, Mutation Research" (Exhibit 176, pgs. 29-36), evaluated genotoxic effects of Roundup® and glyphosate on mice bone marrow, allium cepa onion bulbs – root cells and Salmonella.  Conclusions reached in this work are reproduced below:

> "***The present study shows that Roundup***, which is a mixture of several agents, and among these 360g glyphosate per liter, ***can induce weak mutations in Salmonella typhimurium TA98 and TA100, and can induce chromosome aberrations in Allium cepa meristem root cells*** at concentrations close to the level of toxicity. ***<u>As no genotoxicity was found for glyphosate isopropylamine the effect must be due to some other ingredients in Roundup</u>***. Menkes et al. (1991) reported that the formulation of Roundup contains 15% polyoxyethylene surfactants, with an oral $LD_{50}$ value in the range of 1000-4000 mg/kg, which could explain the higher toxicity of Roundup compared with glyphosate. To our knowledge there are no published genotoxicity data on these surfactants.
>
> ***<u>The conclusion of the present study is that we find it insufficient only to test the active agent in a formulated product</u>. Because of the possibility of additive and synergistic effects it is just as important to investigate the complex mixture as well as the other ingredients of the product."***

[This paper demonstrates that:

i)     "Glyphosate" does not appear to be the only active ingredient in Roundup® formulations.

ii)    "Inert" ingredients are not really inert.

iii)   Roundup® as a product appears to be more genotoxic than its "active" ingredient glyphosate.]

### 4.4.5   Peluso et al., 1998 – Exhibit 177:

Peluso et al., in their 1998 paper entitled "[32]P-Postlabeling Detection of DNA Adducts in Mice Treated with the Herbicide Roundup" (Exhibit 177, pgs. 55-59), evaluated DNA adduct effects of Roundup® and glyphosate on rat kidneys and livers.  Information from the Discussion and Results Sections of this paper are reproduced below:

> Discussion:
>
> "***<u>Our data show that Roundup, a well-known herbicide which is applied as a foliage spray for the control or destruction of most herbaceous plants, induces a</u>***

*dose-dependent formation of DNA adducts in mice (Fig. 1, Table I) **and that Roundup DNA adducts were not related to the active ingredient, the isopropylammonium salt of glyphosate (Fig. 2), but to another, unknown component of the herbicide mixture.***

*The identification and characterization of the nature of Roundup* DNA adducts *will be very difficult and involve a great deal of effort,* which we are now considering in our future plans, ***since the precise composition of the mixture analyzed in the present study is not available due to protection by patent regulation***.

However, ***we know that Roundup is a complex technical formulation which contains up to 85.6% of so-called "inert ingredients"*** including additives, coformulants, and surface-active agents [Kidd and James, 1991; Worthing and Hance, 1991], such as sodium lauryl sulfate, Tween 20, polyoxyethylene amines, alkoxylated fatty amines, and long-chain monocarboxylic fatty acids or their salts [Menkes et al., 1991; Sato et al., 1994a,b; Khan and Bonnet, 1994]. Although there are, to our knowledge, no published genotoxicity data on these compounds, it has been reported that the commercial preparations containing fatty amines, such as those used as surfactants in Roundup mixtures, may be contaminated with substantial amounts of long-chain N-nitroso compounds [Kamp and Eisen- brand, 1991]."

[This paper demonstrates that:

i)      "Inert" ingredients are not really inert.

ii)     Roundup® as a product appears to be more toxic than its "active" ingredient glyphosate.

iii)    The lack of requirements on pesticide manufacturers' to list "inert" ingredients in their products leaves public officials, scientists, and the public in the dark as to what is actually in the products, how toxic the products as a whole may be, and how to protect oneself from exposures to such products not knowing their composition or health effects.]

### 4.4.6   Marc et al., 2002 – Exhibit 166:

Marc et al., in their 2002 paper entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation" (Exhibit 166, pgs. 326-331), evaluated the effects of Roundup® and glyphosate on sea urchin embryos. Information from the Discussion and Results Sections of this paper are reproduced below:

Discussion:

"***Roundup contains surfactants, which promote wetting of plant surface and rapid herbicide penetration***. In previous reports, the toxicity of Roundup was ascribed to the surfactant component (12). We show that glyphosate and formulation products act in synergy on the cell cycle indicating an effect of glyphosate by itself. Our experiments indicate that glyphosate requires the presence of the formulation products to be effective on the embryo. *It is likely that the formulation products favor the penetration of glyphosate in the embryos that were already reported to be impermeable to some compounds* (9).

[This paper demonstrates that:

i)      "Inert" ingredients, like surfactants, are not really inert.

ii)     As expected, from a chemical engineering perspective, the surfactant enhances the mass transfer of the active ingredient past the plant surface by wetting more of the plant surface and breaking down the plant surface layer(s).  This increases the relative rate of transfer of the active (and other) ingredients into the plant.]

### 4.4.7   Marc et al., 2004 – Exhibit 167:

Marc et al., in their 2004 paper entitled "Glyphosate-Based Pesticide Affect Cell Cycle Regulation" (Exhibit 167, pgs. 1-5), evaluated the effects of Roundup® and other glyphosate-based pesticides on sea urchin embryo cell cycle regulation (i.e., delays, if any, in the rate of cell division).  Information from the Discussion and Results Sections of this paper are reproduced below:

> Discussion:
>
> "***From the concentration of each product inducing cell cycle disorder around*** 1 mM for Amega, Cosmic and Cargly and ***8-12 mM for the Roundup formulations, the threshold adverse dose of glyphosate sufficient to provoke dysfunction of at least one cell was estimated to be 10 µM when present*** in Amega, Cosmic and Cargly, and 80-120 µM when present ***in Roundup Biovert or Roundup 3 plus.***
>
> ***Since the manufacturers recommend spraying the formulation products at a concentration of glyphosate of 40 mM, the products present in the sprayed droplets are present at 500 to 4000 times higher concentration than the threshold adverse concentration towards the cell cycle.***
>
> ***Therefore, glyphosate-based pesticides are clearly of possible human health concern by inhalation in the vicinity of spraying."***

[This paper demonstrates that:

i)      Roundup® products, as well as other glyphosate-containing products, caused sea urchin embryo cell division delays (i.e., cell-cycle disorder or disruptions).

ii)     These disruptions in sea urchin cells were seen at exposures 500 to 4,000 times lower than expected in recommended spray operation concentrations.]

### 4.4.8   Cavalli et al., 2013 – Exhibit 173:

Cavalli et al., in their 2013 paper entitled "Roundup Disrupts Male Reproductive Functions by Triggering Calcium-Mediated Cell Death in Rat Testis and Sertoli Cells" (Exhibit 173, pgs. 1-12), evaluated the effects of Roundup® and glyphosate alone on rat testis.

The paper begins by stating:

> "***Although glyphosate is described as the primary active ingredient present in Roundup (Monsanto Co., St. Louis, MO, USA), this commercial formulation has greater side effects than glyphosate alone [2, 3]. Moreover, it has been demonstrated that toxic events triggered by Roundup might be due to synergistic effects between glyphosate and other formulation products [4–6]. The adjuvants***

*are considered inert; however, <u>the polyethoxylated tallow amine (POEA) is toxic and could facilitate glyphosate penetration through plasmatic membranes</u> and consequently potentiate its action and toxicity [3, 7–10]."*

Information from the Discussion and Results Sections of this paper are reproduced below:

<u>Discussion:</u>

"*Particularly, the herbicide **Roundup has been described as an environmental endocrine disruptor** by inhibiting the steroid ogenic acute regulatory protein expression in Leydig cells [12]. **Interestingly, glyphosate alone did not alter steroid production, indicating that at least another component of the formulation is required to disrupt steroidogenesis [12]."***

[This paper demonstrates that:

i)      "Inert" ingredients, like surfactants, are not really inert.

ii)     As expected, from a chemical engineering perspective, the surfactant breaks down the surface tension of the active ingredient, wetting more of the plant surface. This increases the relative rate of transfer of the active (and other) ingredients into the plant, or for humans, into their skin.

iii)    Roundup® as a product appears to be more toxic than its "active" ingredient glyphosate.]

4.4.9   <u>e-mails dated April 5, 2002 – 12:46 AM – from R. Garnett to D. Farmer, F. Broeckaert, C. Gustin, A. LI, C. Healy, M. Martens, J. Kronenberg, S. Wratten, E. Jacobs, R. McKenna, W. Heydens, and R. Garnett (Exhibit 80):</u>

R. Garnett writes specifically to Donna Farmer regarding elevated dermal glyphosate flux rates in a rat study and the need to stop the work because it produced concerning results:

"Donna

<u>**We dropped the programme for glyphosate because a further study was not likely to help us meet the project objective**</u>:

➢      *We initiated the studies from a regulatory angle* to help meet the requirements for operator exposure, given that the Annex I end point for dermal absorption for glyphosate was set at 3%, which we believed was a high value based on a weight of evidence approach.

➢      *The results of the rat skin studies* show levels of absorption for glyphosate of a similar order to the Annex I end point; also <u>*confirm our expectation that surfactant concentration affects the dermal absorption*</u>.

➢      *Therefore, from a regulatory angle, there is no point in pursuing the studies further*…"

[Clearly Monsanto knows, and has data showing, that the rate of dermal transfer through skin associated with the Monsanto product vs. glyphosate alone is enhanced (up to a factor of 35.6 – see dermal discussion below) and that this enhancement is associated with the surfactant.  Thus, they closed down the project after getting initial dermal transfer test results that were unfavorable.]

4.4.10 <u>e-mails from October 17, 2008 to October 20, 2008 regarding European Efforts to Ban Roundup® Surfactant – Exhibit 169:</u>

<u>Richard P. Garret October 20, 2008 e-mail to Jeff Graham, R. Mannion, H. Ophoff, D. Goldstein and others titled "RE: Akzo called about the Germany Meeting.</u>

In this e-mail, Garret writes:

> "We sell tallow amine containing products in most EU countries including Germany, even if not always directly in Roundup branded product.  *Tallow amine is also a component of MON 78273*, together with coco-amine, which has been one of the low cogs developments we have tried to register in the EU.  Further, the BVL did make a link with etheramines, so they are potentially impacted by this as well.  ***We have dealt with 2 attempts to ban tallow amines in Germany over the past 9 years – firstly due to genotox allegations (2000), then due to the Relyea allegations on amphibians (2006-7).  <u>Maybe the noose is tightening but</u>***….
>
> ***In my view we need to fight this rather than just go for the replacement route.  <u>Surfactants are, not too surprisingly, surface active agents, designed to have an effect which can result in a toxicological impact</u>***, <u>*Regulators*</u> and "antis" <u>***often refer to the formulation being more toxic than glyphosate itself because of the nasty properties of surfactants***</u>, *forgetting that they plaster surfactants over themselves several times a day.*  ***Dan Goldstein made the point very we***ll – there is little or no evidence that many surfactants are significantly better from a tox point of view*, **merely that the data don't exist.  <u>Ignorance is bliss</u>**.  Therefore in future other surfactants could be attacked in the same way.
>
> Then there is the position of the surfactant suppliers.  *Do I read between the lines that they want to capitulate?*  What feeling do you get?
>
> Finally some questions about the suppliers themselves.  Huntsman don't supply EMEA with tallow amine and they don't have their etheramine registered in Europe – do they have another concern?  **Our main supplier is Clariant** and they have not been involved in any of these communications – there is a meeting with them next month.  For Akzo, I don't understand why their US colleagues are involved in worrying about the EU market when their company is EU based – *is that due to their participation in the <u>inerts task force</u>* and worry about what impact the data you are generating will have in the EU REACH process?"

[This e-mail illustrates Monsanto's knowledge and strategies regarding Roundup® and its surfactants at many levels:

i)   Monsanto knew that "inert" ingredients, like surfactants, are not actually really inert.

ii)  Monsanto knew that surfactants, like those used in Roundup®, have a toxicological impact.

iii)   Monsanto knew regulators and others believe that the toxicity of Roundup®
       products are likely greater than the "active" ingredient, glyphosate, alone.

iv)    Monsanto and surfactant suppliers have been following the toxicological literature
       for years, as well as regulatory actions associated with this literature.

v)     Monsanto's strategies for keeping surfactants from being banned has been to
       count on the lack of studies and efforts to conflate surfactants used safely in
       other applications with those used in Roundup®, even though their
       concentrations and applications are not similar.

vi)    Suppliers of "inert" surfactants appear to be concerned, and perhaps willing to
       accept the EU ban for use in pesticides.  Also, Akzo appears to be a participant
       in an "inerts task force".

vii)   Monsanto's strategy of dealing with the known position that the Roundup®
       formulations are likely more toxic than the "active" ingredient is to not do the
       testing to find the answer – "Ignorance is Bliss" – see Exhibit 169.]

Jeff Graham in a follow-up e-mail to Richard Garnett and others lets his feeling about
the suppliers' position knows when he says:

>   "*We will make it clear to Akzo and Huntsman that we will fight this every
>   step of the way and __we expect them to align with us__*…"

Donna Farmer to John C. Combest – Monsanto email dated September 21, 2009
(Exhibit 163, Bates MONGLY01192115-7) – Responding to Australia Fremantle Herald
Article:

1st:  On September 21, 2009 10:56 AM - Honi McNaughton – Monsanto Public Affairs
Manager writes to John McGregor and others at Monsanto stating among other things:
"*We may also need to compose a letter to all of Scott's Roundup customers (in WA)
dismissing the allegations in the article.*"

2nd:  On September 21, 2009 12:39 PM - Neil Anderson – QA & Formulations Lead,
Asia Pacific – Monsanto Australia follows up to McNaughton stating:  "*The reporter has
printed the correct information that 'Glyphosate is biodegradable but the surfactant is
not.'  However, then she goes into a sensationalism mode quoting 'studies' that suggest
Roundup is not safe, which is probably derived from her interview with the Fremantle
activist.   I feel the response to FH needs to reiterate that her statement on
biodegradability is correct, **reiterate that Roundup is safe** (and provide references),
and if there are flaws in any of the studies quoted, point out these flaws.*"

3rd:  Ultimately, this issue works its way up to Donna Farmer, who on September 21,
2009, 5:12 PM, writes in part on how to answer questions regarding Roundup®:

>   "*5. How does Roundup work? ...or this – **you cannot say that Roundup does not
>   cause cancer…we have not done carcinogenicity studies with 'Roundup'**.*
>
>   *2. Will Roundup harm my family or me?  Based on the results for short term and long
>   term testing, it can be concluded that Roundup poses no danger to human health when
>   used according to label directions.   __In long term exposure studies of animals,__*

> *Roundup did not cause cancer, birth defects or adverse reproductive changes at dose levels far in excess of likely exposure.*
>
> *I will follow up with the Monsanto folks who interface with Scotts …they are aware that Scotts does these things."*

[Four conclusions can be drawn from this string of correspondence:

1.  ***Donna Farmer says privately that one cannot say Roundup® does not cause cancer, but wants to say publically that Roundup® does not cause cancer.***

2.  *Monsanto is telling its Distributor Scotts that Roundup® is safe.*

3.  *Scotts was telling its customers that Roundup® was biodegradable when it was not.*

4.  *Monsanto knew in 2009 that Scotts was misrepresenting the biodegradability of Roundup® by saying it was biodegradable.*]

Yet Monsanto was implying glyphosate was biodegradable and not bioaccumulative back in 1986.  In a February 11, 1986 presentation to a U.S. EPA Science Advisory Panel, Monsanto made the following claims (Exhibit 241, Bates MONGLY00233248-52, 56:

➢   Under Conclusions Monsanto states in part (MONGLY00233251):

  •   In summary, N-phosphonomethylglycine, formulated as the IPA-salt (**glyphosate**)…is inactive and immobile in soil and ***is very susceptible to total biodegradation by microflora.***

  •   "At observed residual levels in feed grain components (0.1-0.2 ppm negligible residues) **there is _no_ likelihood of detectable residue carry over to humans and other animals consuming components of these crops**."

  •   "**With demonstrated** low soil-to-plant uptake, and **low animal toxicities**, **the chances for adverse effects** due to glyphosate in or on crops, animals, soil or water **are deemed vanishingly small**."

➢   "**Environmental Chemistry studies show this herbicide (Roundup®)** to be quite safe in projected uses, and **to be _non-persistent_**" (Bates MONGLY00233252).  Monsanto further states this more explicitly as follows: "*Glyphosate is almost totally degraded to natural products in the soil*s" (Bates MONGLY0233250)

  **[Note Monsanto is stating that all the ingredients in Roundup, _not just glyphosate_, are non-persistent]**.

➢   "**Glyphosate is degraded readily by soil microflora** to aminomethylphosphonic acid (AMPA) and to $CO_2$ and other natural products" (MONGLY0023349).

➢   Under the title "Special Studies" Monsanto says: "In summary, the lack of appreciable retention and the rapid elimination of glyphosate as shown in these

studies, *__indicates that bioaccumulation in the food chain will not occur__*"
(Bates MONGLY00233256).

[In early 1986, Monsanto was telling the U.S. EPA, and their Science Advisory Panel, that glyphosate was biodegradable, did not bioaccumulate, and that the chances for adverse effects in animals or the environment were "vanishingly small". The statement on effects in animals is somewhat rich given that at the time the purpose of this early 1986 Monsanto presentation was to address the EPA's position that glyphosate is a possible human carcinogen based on a 1983 mouse study with results showing kidney tumors. The other two statements that glyphosate is biodegradable and that it does not bioaccumulate are misleading/not true as demonstrated below and elsewhere in this report.]

Roundup® products, despite claims otherwise, are not completely biodegradable, with ~2% degrading in 28 days based on an internal Monsanto study (Exhibit 54, pg. 75). Other studies indicate the half-life of glyphosate in soils ranges from a few days to several months and even a year depending on soil composition (Exhibit 48, pg. 5; see also Exhibit 438, pg. 5 – 3 days to 3 years).

Monsanto, through internal correspondence, understands the distinction between commenting on the toxicity of glyphosate, the "active" ingredient, and Roundup®, the product, as illustrated below:

Donna Farmer to Skhar Nataragan – Monsanto email dated November 22, 2003 – Exhibit 86 and https://usrtk.org/wp-content/uploads/2017/08/27-Internal-Monsanto-Email-You-Cannot-Say-That-Roundup-is-not-a-Carcinogen.pdf - MONGLY00922458-9):

> "*__The terms glyphosate and Roundup cannot be used interchangeably__* nor can you use 'Roundup' for all glyphosate-based herbicides any more. *__For example you cannot say the Roundup is not a carcinogen…we have not done the necessary testing on the formulation to make that statement__*. *The testing on the formulations are not anywhere near the level of the active ingredient*. *We can make that statement about glyphosate __and can infer__ that there is no reason to believe that Roundup would cause cancer*.
>
> *__We cannot support the statement about 'no adverse effects whatsoever on__ flora, or fauna or on __the human body__*.' Adverse effects are seen on flora (glyphosate is meant to kill vegetation), adverse effects on fauna – in studies with laboratory animals – even death is seen (LD50 studies for example) and in humans – mild reversible eye and skin irritation as seen with normal use and death can occur in suicide attempts. *Therefore we advise using the phrase… 'When Roundup herbicides are used according to label directions, no __unreasonable__ adverse effects to people, wildlife, and the environment __are expected__*."

Ashley Roberts to Donna Farmer/William Heydens and William Heydens to Ashley Roberts – emails dated August 6, 2015 – Exhibit 137/197-B - MONGLY01183934-5):

> Roberts:
>
> Just received a question from Keith in response to my email message on the exposure piece this morning.
>
> He has asked *if we need to give any consideration to exposures of formulants in the commercial product*, at least in applicators? *__I was under the impression these__*

*were inert but reading a response this morning in the <u>Ecologist makes it sound like it is the combination that is toxic!!!</u>*

<u>Heydens:</u>

I think *the short answer is <u>no</u>.  The focus of this is what is the carcinogenic potential of <u>glyphosate</u>.*

That said, *<u>the surfactant in the formulation will come up</u> in the tumor promotion skin study <u>because we think it played a role there</u>*.

[Again, even as late as August 2015, these statements support the opinion that the toxicity of the Roundup® product is largely unknown and that even Monsanto cannot state Roundup® is not a carcinogen.  Even Ms. Farmer's suggested "warnings" statement is a bit of wordsmithing and arguably false since she really does not know that "no <u>unreasonable</u> adverse effects to people are expected" and never defines the word "unreasonable".]

Monsanto understands the risks of conducting health effect studies on the product formulations as opposed to just the "active" ingredient when Ms. Farmer writes on August 2, 1999 (Exhibit 164, Bates MONGLY00877683-877685) to William Heydens and others as follows:

"*<u>I will not support doing any studies on glyphosate formulations or other surfactant ingredients</u> at this time with the limited information we have on the situation.*"

This position was expanded on in an e-mail from Xavier Belvaux to Sophie Gardett dated March 5, 2013 (Exhibit 111, Bates MONGLY01159775-9778; Exhibit 197-H, Bates MONGLY01159775-6):

"*<u>We do not conduct</u> sub-chronic, chronic or teratogenicity <u>studies with our formulations.</u> The long term exposure has been assessed according to regulatory requirements for chronic and carcinogenicity studies conducted with the <u>active ingredient glyphosate</u>….*"

"*Yes it should be sufficient if you properly inform them that the <u>long term toxicity is covered by studies on the active ingredient</u>.*"

These statements provide additional insights into Monsanto's knowledge and intentions as well:

i)      Monsanto's stated position is that it has not, and does not intend to, study the carcinogenicity of its Roundup® products (formulations) even ~40 years after Roundup® was introduced to the marketplace in 1974 and despite the fact evidence is clear that the Roundup® product is more toxic than the active ingredient (glyphosate) alone.

ii)     Monsanto wants to continue in the position of not generating any information on the toxicity of formulations and/or surfactants since there is a belief that the results would not be helpful to Monsanto.  Monsanto is following its self-described position that "ignorance is bliss"!

<u>Donna Farmer to William Heydens and Richard Dicks – Monsanto email dated April 25, 2002 – Exhibit 81 - MONGLY00885526-30):</u>

D. Farmer is discussing the "sea urchin claims" paper and makes the following statement:

> **"…*The interest is <u>glyphosate all basically had no effect the formulated product did – does this point us to the coformulants – surfactants</u>?"*

W. Heydens responds back by saying in part:

> "We discussed the situation with Hoson and DeSesso and concluded, ***not surprisingly, that <u>we are in pretty good shape with glyphosate but vulnerable with surfactants</u>***."

[Both Farmer and Heydens clearly understand that toxicological work has focused on the "active" ingredient glyphosate, but not the "inert" ingredients like the surfactants or the product as a whole.  Moreover, they are following other research that says the Roundup® product formulations are more toxic than the "active" ingredient, glyphosate, alone.]

<u>Mark Martens to Larry Kier, Donna Farmer, William Heydens and Richard Garnett – Monsanto email dated February 12, 2001 – Exhibit 75 - MONGLY00923065-6):</u>

Mark Martens is commenting on Dr. Parry's recommendations regarding work evaluating the toxicity of surfactants:

> "***In vitro micronucleus assay with and without antioxidants – <u>why not use the MON 35050 study here</u>*** as well [later he says "As a fall back position we can agree with some testing on either surfactant solutions (would suppliers agree with this?) or *with glyphosate **formulations <u>which don't exist anymore on the market (e.g., MON 35050</u>***)"]. *I still see no need to do these assays… but if testing surfactant solutions gets discussed then – let's include talk about laundry detergents, hand soap, dishwashing detergents, shampoos as well and not limit it to those used only in AG.  People have significantly more exposure to surfactant solutins [sic] used in those products than they would AG products.  I don't know for sure how suppliers would react – **but if somebody came to me and said they wanted to test Roundup I know how I would react – <u>with serious concern</u>***…"

> "***In vitro data on surfactants*** – same comments as above…***<u>For this class of chemicals I see no need for further testing.  If he (Parry) continues to push we may still need to consider that we need to end the relationship</u>***."

[These statements regarding Dr. Parry's work provides additional insights into Monsanto's knowledge and intentions as well:

i)      They would like to deceive the public by using toxicological results from products no longer on the market to represent products currently on the market with different surfactants.

ii)     Monsanto's strategy regarding surfactants in Roundup® products or formulations is to falsely compare them with consumer products containing surfactants.  From a chemical engineering perspective this is clearly a false comparison as all the

consumer products referenced contain surfactants used in aqueous (water) solutions with low toxicity as compared to the Roundup® products where the active ingredient kills vegetation and the surfactant clearly enhances the ability to kill.

iii)     If Dr. Parry insists on continuing to recommend scientific toxicological work that Monsanto does not want completed, they are discussing terminating their relationship with him.]

The lack of transparency on the composition of Roundup® formulations continued for decades.  Even as late as 2016, the outside scientific community is trying to determine the Roundup® formulations and their toxicities.  Monsanto, who is following the 2016 Intercept article and the Third World Network are aware of these insightful comments from the Network (Exhibit 197-TT, MONGLY05516378-R, 9-R):

> "*Independent scientists have been reporting since at least 1991 that herbicides containing glyphosate along with other ingredients were more toxic than glyphosate on its own.  <u>In 2013, scientists were able to deduce the chemical structure of additives in six of nine formulations containing glyphosate</u> and found that <u>each of the supposedly inert ingredients in them was more toxic than glyphosate alone</u>.*"

They further write:

> The situation highlights the folly of letting co-formulants fly under the regulatory radar.  Although <u>the general public is never exposed to pure glyphosate alone</u>, government agencies routinely set safe exposure levels for the declared active ingredient in Roundup and other herbicides without necessarily considering the co-formulants.

<u>Monsanto NewsDesk to Distribution – ISSUE ALERT: French Authority Intends to Impose New Restrictions on Surfactants – Monsanto email dated April 8, 2016 – Exhibit 171, Bates MONGLY07598395-400):</u>

In an email to distribution from Monsanto's NewsDesk, Monsanto writes:

> "***The French pesticide regulatory authority***, ANSES, has notified Monsanto and other glyphosate registrants in France that it ***intends to restrict the use of one type of surfactants, known as <u>tallowamines</u>, in formulated glyphosate products***…
>
> Based on what has been a political debate in Europe, ***we have already been preparing for a gradual transition away from tallowamine to other types of surfactants <u>for commercial reasons</u>***…
>
> Meanwhile, ***we will accelerate the transition of our formulations that has already been underway*** and comply with the agency's final decision."

The above statements are related to the toxicity of tallowamines and efforts to remove them from formulations.

Nevertheless, Monsanto continues to issue misleading statements regarding the toxicity/safety of products with surfactants as illustrated in this same NewsDesk release:

*Importantly, *tallowamine-based products do not pose an imminent risk for human health* when used according to instructions.  In a 2009 review of toxicological data on tallowamine, the U.S. EPA found no evidence that tallowamines are neurotoxic, mutagenic or clastogenic.

*Surfactants such as tallowamines are soapy substances that help to reduce surface tension of the water.  *Surfactants are found in many everyday products such as toothpaste, deodorant, shampoo, detergent and many other cleaning products.* A surfactant improves the delivery of a herbicide into the targeted weed by enabling the herbicide to stick to the weed leaves, instead of rolling off and onto the soil.

Q3. Does tallowamine pose risks to human health or the environment?

A3. ***Tallowamine surfactants have a long history of safe use. All of our formulated herbicide products, whether or not they contain tallowamine as a surfactant, have been evaluated by appropriate regulatory authorities and have been determined to pose no unreasonable risk to human health* or the environment when used according to the instructions.**

Q5. Have your formulated glyphosate products been evaluated for safety?

A5. ***Yes. All of our formulated glyphosate herbicide products,* whether or not they contain tallowamine as a surfactant, *have been evaluated by appropriate regulatory authorities* and have been determined to pose no unreasonable risk to human health** or the environment when used according to the instructions.

[The language used in these previous paragraphs is misleading and uses wordsmithing gymnastics to obfuscate what is actually known:

1.    The statement that: "tallowamine-based products do not pose an *imminent* risk for human health" leaves out the concern for *non-imminent* risks to public health.

2.    The statement that:  "In a 2009 review of toxicological data on tallowamine, the U.S. EPA *found no evidence that tallowamines are neurotoxic, mutagenic or clastogenic*" sounds very positive but ignores other likely health effects that are listed in the literature, including MSDSs.

3.    The statement that:  "***Tallowamine surfactants have a long history of safe use***" is made with no basis or facts; moreover, clearly the French do not believe this as suggested by them wanting it removed from products.  As discussed earlier, this is the first time European officials have tried to ban this surfactant from products.

4.    The statement that:  "All of our ***formulated herbicide products***, whether or not they contain tallowamine as a surfactant, ***have been evaluated by appropriate regulatory authorities*** and ***have been determined to pose no unreasonable risk to human health***" is wordsmithing at its best.  The basis for approval of these pesticides has focused on one ingredient, glyphosate, not on the toxicity of the formulations or other ingredients.]

Katholm (Exhibit 214, pg. 16) summarizes some of the literature on the toxicity of POEA vs. glyphosate vs. Roundup® as follows (see also Exhibit 196-S, pg. 17):

"The information regarding content of surfactants in Roundup, are usually kept confidential by the manufacturer.  This makes it difficult to determine exactly what is used in Roundup – and thereby to create sufficient risk assessments.  ***Mesnage et al. (2013) concluded that it was the ethoxylated surfactants of glyphosate-based formulations that were the active principles of human cell (embryonic, placental and hepatic) toxicity, with POE-15 displaying the greatest effect.  <u>In addition to this finding, all formulations were more toxic than glyphosate itself.</u>  Results from Mesnage et al. (2014 – see Exhibit 207 and also Exhibit 208) supported these findings, as they found <u>Roundup to be 125 times more toxic to human cells</u> (embryonic, placental and hepatic), than glyphosate was.***  Benachour and Seralini (2009) concluded that surfactants, like POEA, changed the human cell permeability of three different cell types (umbilical, embryonic and placental) and amplified the toxicity, already induced by glyphosate, through apoptosis and necrosis.  Other experiments sought to test the toxicities on aquatic organisms. In a study by Folmar et al. (1979), ***POE-15 had approximately the same acute toxicity towards fish and aquatic invertebrates, as Roundup had***. ***However, <u>the contribution of glyphosate to the toxicity of Roundup, only ranged from 29% to 33% (Folmar et al., 1979).</u>***  Other studies focusing on the aquatic habitat (different fish species) also concluded that it were the surfactants, which were mainly responsible for the toxicity observed (Mitchell et al., 1987; Servizi et al., 1987)."

Despite Monsanto's public statements that tallowamines were safe, Monsanto began removing POEA (i.e., tallowamines) from Roundup® formulations in 2016 after it was banned in Europe (Exhibit 477).

## 4.5    Review of Roundup® Dermal Exposure Literature:

Despite contradictory evidence showing much higher rates of dermal absorption in earlier studies (which are reviewed at length below), EFSA's 2015 Conclusion on the Peer Review of the Pesticide Risk Assessment of the Active Substance Glyphosate (Exhibit 448, pg. 41) wrote that the dermal absorption for MON 52276 is "1% for concentrate and dilutions based on human skin *in vitro*" even though rates of 3% were used in the UK POEM models (Exhibit 459, Bates MONGLY06509237).  Rates would expect to differ by formulation and concentration simply based on Fick's law.  Moreover, the low rates would reduce any risks calculated.

Nevertheless, a review of dermal exposure studies, and an interpretation of those studies, follow.

### 4.5.1   Review of 2009-2010 Dermal Technology Laboratory, Ltd. (DTL) Dermal Exposure Studies:

Monsanto Company (St. Louis, MO) contracted a series of studies to the Dermal Technology Laboratory, Ltd. (DTL).  These studies were conducted using only a portion (epidermis) of human skin (*in vitro*) to evaluating the dermal transfer of glyphosate through the skin using various glyphosate formulations.

Curiously, these tests were set up with the apparent goal of keeping dermal values as low as possible (Exhibit 349, Bates MONGLY02199478, Exhibit 513, Bates MONGLY02199507) as demonstrated when Simon Hill e-mails David Saltmiras, cc'd to Christophe Gustin on January 20, 2009 stating:

> ***"…I believe it is in everyone's best interested (sic) to get as lower a dermal absorption value as possible for the representative use so I've had a couple of suggestions regarding dermal absorption…"***

Further, regarding the Wester dermal study, he recommended that a Mr. Brian Jones could diminish results from that study when he says:

> **"…Hopefully he could put a position together on the non-relevance of the findings in the old non-human primate study."**

Copied on the e-mail, and related e-mails, are individuals from Monsanto, Syngenta, and Cheminova (Exhibits 513 and 514) who are members of the ToxTWG – The Toxicology Technical Working Group (ToxTWG) of the Joint Glyphosate Task Force, LLC (JGTF) (Exhibit 512, Bates MONGLY01688221).

David Saltmiras notes the structure of the ToxTWG in a February 16, 2009 presentation (Exhibit 515, pg. 18):

**Toxicology TWG: Toxicologists and regulatory managers from:**

- **Monsanto**
- **Cheminova**
- **Syngenta**

With the activities consisting of:

- Salivary gland lesions in rodents
- **Dermal absorption.**

On page 20, Saltmiras writes under Dermal Absorption – Operator Systemic Exposure & Risk Assessment:

- Exposure assessment will impact politically (and scientifically) driven use restrictions in the EU.
- **Operator Exposure is dependent on dermal absorption.**
- **Syngenta:   0.1 – 0.3% dermal absorption based on *in vitro* human skin study.**
- **Monsanto:  3% dermal absorption based on older non-GLP data.**
- **Toxicology TWG agreed all three companies will undertake the same regulatory driven in vivo human skin absorption study design as Syngenta on relevant formulated products (at the same laboratory – DTL in the UK and using same/equivalent study protocols).**

Regarding the DTL dermal penetration studies to be conducted by Monsanto, David Saltmiras writes a January 16, 2009 e-mail to Simon Hill (Exhibit 514, Bates MONGLY02199508) stating:

> "Before I arrange in vitro dermal penetration studies of Monsanto formulated glyphosate at DTL, I would like to take a look at your DTL protocol.  ***At the Tox TWG meeting we had agreed to share this to adopt a common approach to this assay to be conducted by all at DTL.***  *Please let me know when you will be able to share this with Monsanto & Cheminova.*"

Clearly approaches to dermal studies on glyphosate were being coordinated by the Tox TWG.

Near the end of his presentation (pgs. 25 and 26) Saltmiras notes that surfactant containing 75% POEA is severely irritating (Figure 4-10):



**Figure 4-10: David Saltmiras February 16, 2009 Presentation
(Exhibit 515, pg. 25)**

Yet he concludes (Figure 4-11) that glyphosate-containing products have low irritation potential (except eye), contradicting findings associated with POEA used in Roundup formulations.



**Figure 4-11: David Saltmiras February 16, 2009 Presentation
(Exhibit 515, pg. 26)**

Monsanto DTL studies, and results from these studies, are summarized as follows:

➢   July 1, 2009 Report (Exhibit 320).  Used concentrate and spray strength dilutions of MON 79545, MON 52276, and MON 79351 with marked $^{14}$C-glyphosate to monitor dermal transfer of glyphosate over a 24 hour period.  Mean absorbed doses for concentrate and diluted (1:15.6 v/v) MON 79545 were reported to be 0.009% and 0.091% of the applied dose respectively.  Mean absorbed doses for concentrate and diluted (1:12.5 v/v) MON 52276 were reported to be 0.006% and 0.021% of the applied dose respectively.  Mean absorbed doses for concentrate and diluted (1:16.7 v/v) MON 79351 were reported to be 0.007% and 0.102% of the applied dose respectively.  Glyphosate in the skin or skin washings was not reported.  The study concluded that the rate of dermal transfer of glyphosate through the skin as "very slow" and the potential exposure as "minimal."

➢   February 19 2010 Report (Exhibit 321).  Used MON 52276 in concentrated, 1/12.5 v/v dilution and 1/150 v/v dilution with marked $^{14}$C-glyphosate to monitor dermal transfer of glyphosate over a 24 hour period.  Mean absorbed doses were reported to be 0.009%, 0.029%, and 0.092% of the applied dose respectively. The mean absorbed dose found in the skin was 0.120%, 0.235%, and 0.505% of the applied dose respectively.

➢   February 19, 2010 Report (Exhibits 323).  Used MON 79545 in concentrated, 1/15.6 v/v dilution and 1/188 v/v dilution with marked $^{14}$C-glyphosate to monitor dermal transfer of glyphosate over a 24 hour period.  Absorbed doses were reported to be 0.012%, 0.129%, and 0.082% of the applied dose respectively. The mean absorbed dose found in the skin was 0.064%, 0.753%, and 0.364% of the applied dose respectively.

➢   February 19, 2010 Report (Exhibit 325).  Used MON 79351 in concentrated, 1/16.7 v/v dilution and 1/200 v/v dilution with marked $^{14}$C-glyphosate to monitor dermal transfer of glyphosate over a 24 hour period.  Absorbed doses were reported to be 0.007%, 0.182%, and 0.048% of the applied dose respectively. The mean absorbed dose found in the skin was 0.256%, 0.100%, and 0.891% of the applied dose respectively.

The preparation of the skin was reported as follows (e.g., Exhibit 320, Bates MONGLY02171787):

> ### 3.5.6   Human epidermis preparation:
>
> "Human skin samples were obtained from a tissue bank.  _The skin samples were immersed in water at 60 ºC (140 ºF)_ for 40-45 seconds and the epidermis teased away from the dermis.
>
> Each membrane was given an identifying number and _stored frozen, at approximately  -20 ºC (-4 ºF),_ on aluminum foil until required for use."

The preparation of the skin samples suffers from some flaws:

1.   No composition information is provided.  For example, what surfactants or other ingredients known to increase dermal transfer, if any, were part of the formulations used in the studies?

2.   Nothing is known about how the skin samples were originally collected, stored at the tissue bank, and their storage conditions while transported to DTL.

3.   The thickness of the _in vitro_ skin is not provided.  Partial thickness or split thickness skin (200 to 400 µm thick) to remove the capillary layer is recommended (see Petty, 2011, OECD Exhibit 347, pg. 17 and OECD Exhibit 315, pg. 28).

4.   Immersing skin samples in 140 F water and then freezing them to -4 F is not a recommended practice (i.e., OECD practice) and likely altered skin dermal transport characteristics.  No auditing was apparently done to ensure that DTL treated skin would reflect recommended skin preparation dermal transport rates.

The OECD (Exhibit 315, pgs. 27-28) notes the following regarding skin samples to be used in studies (see also, OECD Exhibit 347, pg. 17):

> "28.    Crucial points might be the clear description of skin origin and preparation and the proof of skin integrity prior to use by an appropriate method (see for example Davies et al. (2004)), **temperature (preferably around 32°C),** the choice of a suitable receptor fluid (in which the test compound must be adequately soluble, see Section 4.4), the description of the diffusion cells used, the actual area of skin dosed, the number of cells/samples and donors, the duration of study/sampling period (preferably not more than 24 hours for substances that penetrate the skin rapidly), and the determination of the amount retained in skin after washing, irrespective of whether tape stripping was performed or not.

The recommended skin preparation temperature is 32 ºC or 89.6 F, not 140 ºF (Exhibit 347, pg. 21).  Franz, 1983 (Exhibit 346, Bates MONGLY00135634-703) kept the skin near this temperature at 37 ºC or 98.6 ºF.

Permeate mean recovery should be 100 ± 10% except in certain circumstances with volatile permeates where the recovery of 100 ± 20% may be acceptable (Exhibit 347, pg. 24).

### 4.5.2   Review of 2002 TNO Dermal Exposure Study:

Monsanto Europe S.A. contracted studies to TNO Nutrition and Food Research, Netherlands evaluating the transfer of glyphosate with (and without) surfactants across rat skin (*in vitro*).

In a March 20, 2002 Monsanto memo, Fabrice Broeckaert reports on results of recent dermal experimental work at TNO with MON 35012 and MON 0139 70% (Exhibit 79, Bates MONGLY03738296):

➢   The EU rapporteur for glyphosate used a dermal penetration factor of 3% based on several published in vitro/in vivo dermal penetration studies.

➢   Concentrated MON 35012 - % in vitro penetration of glyphosate through rat skin was between 5% and 10%.

➢   Spray dilution of MON 35012 - % in vitro penetration of glyphosate through rat skin was ~2%.

➢   Dermal penetration of glyphosate itself in the absence of surfactant is lower than 1.5%.

The data from the actual report by Johan van Burgsteden of TNO Nutrition and Food Research in the Netherlands dated June 14, 2002 (Exhibit 82) is summarized in Tables 4-4 and 4-5:

**Table 4-4:  TNO Roundup® Dermal Data – MON 35012 with Surfactant**

| Property | Data | |
|---|---|---|
| | **MON 35012 – Full Strength (with Surfactant)** | **MON 35012 – Diluted (with Surfactant)** |
| # Tests | 6 | 6 |
| Product Composition | Isopropylamine salt of glyphosate - ~46 % <br> Surfactant Cocoamine - ~18 w/w % <br> Water and minor ingredients - ~35.5 w/w% | Same as MON 35012 but field diluted (factor of 71.1 – see relative dose values below) concentrations |
| Glyphosate Dose (mg/cm²) | 6.249 mg/cm² | 0.080 mg/cm² |
| Penetration (% Dose) with Time <br><br> 8 hrs. <br> 24 hrs. <br> 48 hrs. | <br><br> 2.40% <br> 7.59% <br> *10.34%* | <br><br> 0.84% <br> 1.93% <br> *2.62%* |
| Dermal Flux (µg/cm²/hr) | *35.6* | *0.127* |
| Dermal $K_p$ Value (cm/hr.) | 0.89 x 10⁻³ | 0.025 x 10⁻³ |
| Lag Time (hr.) | 4.1 | 3.2 |

**Table 4-5: TNO Roundup® Dermal Data – MON 0139 70% without Surfactant**

| Property | Data | |
|---|---|---|
| | **MON 0139 70% – Full Strength (no listed Surfactant)** | **MON 0139 70% – Diluted (no listed Surfactant)** |
| # Tests | 6 | 6 |
| Product Composition | Isopropylamine salt of glyphosate - ~62 % Inert ingredients - ~38% (no surfactant) | Same as MON 0139 but field diluted (factor of 79.3 – see relative dose values below) concentrations |
| Glyphosate Dose (mg/cm²) | 6.343 mg/cm² | 0.080 mg/cm² |
| Penetration (% Dose) with Time | | |
| 8 hrs. | 0.17% | 0.35% |
| 24 hrs. | 0.94% | 1.19% |
| 48 hrs. | *1.27%* | *1.42%* |
| Dermal Flux (µg/cm²/hr) | *2.01* | *0.100* |
| Dermal $K_p$ Value (cm/hr.) | 0.005 x 10⁻³ | 0.019 x 10⁻³ |
| Lag Time (hr.) | 2.2 | 4.8 |

The dermal data for each test situation in this table reflected averaged data from six separate tests.

What this means:

➢ *For full strength products*, the data for MON 35012 with a surfactant vs. the data for MON 0139 70% show much higher rates of dermal transfer through the skin both on an absolute and relative basis:

- *48-hr. % dose penetrating skin: 10.34% vs. 1.27% or factor of 8.14 (814%) greater.* Plus, the assumed European rate used in Risk Assessments was only 3%. By August of 2011, Monsanto had modelled 3% dermal uptake of MON 79991 using the UKPOEM model for dermal penetration *and found it did not pass* when the product was applied at 3.6 kg/ha from a tractor mounted sprayer; thus the 10.34% rate was of concern regarding dermal exposures of applicators (Exhibit 101, Bates MONGLY04107778). From Section 4.4.9 above, *the 10.34% penetration rate far exceeded their internal value of 3.0%.*

- *Dermal Fluxes (µg/cm²/hr.): 35.6 vs. 2.01 or factor of 17.71 (~1,771%) greater.*

➢ *For diluted products*, the data for MON 35012 with a surfactant vs. the data for MON 0139 70% show much higher rates of dermal transfer through the skin both on an absolute and relative basis:

- *48-hr. % dose penetrating skin: 2.62% vs. 1.42% or factor of 1.85 (~185%) greater.*

- *Dermal Fluxes (µg/cm²/hr.): 0.127 vs. 0.100 or factor of 1.27 (~127% greater).*

Thus, the Roundup® product dermal flux (rate of transfer through the skin) vs. glyphosate alone (by itself) were 17.71 times greater for the concentrated product and 1.27 times greater for the diluted product.

[Thus, this work demonstrates that the surfactant clearly enhances dermal transfer of glyphosate through the skin, especially for the concentrated product.  Further, Monsanto clearly knows that the Risk Assessments do not adequately address dermal exposures in Risk Models.]

Moreover, in a November 10, 2008 e-mail between Monsanto's Richard Garnett to others he states (Exhibit 94, Bates MONGLY02155827):

> ➤ ***Dermal exposure is the greatest risk of exposure for operators***…

> ➤ The WHO and EU focus on the IV and oral (routes of exposure) but not the dermal.

> Further, even the U.S. EPA in 2015 and later was assuming oral exposure was the primary route of exposure (Exhibit 449, pg. 4) even though it is universally recognized – that the primary route of exposure is dermal – through the skin (Exhibit 459 – UK POEM model, Bates MONGLY06509244 and Exhibit 479, pg. 13).

Also, note that the dermal studies summarized in Tables 4-2 and 4-3 were based on *in vitro* dermal transfer through (0.84 mm or 840 µm) dorsal and flank skin of 7 week old male Wistar rats.  ***This appears to be full-thickness skin which for in vitro studies would produce lower transfer rates than with partial thickness skin recommended for use in in vitro studies*** (see Petty, 2011 – human skin – partial-thickness of 200 to 400 µm).  The fatty capillary layer for *in vitro* (i.e., cadaver) skin is a barrier to mass transfer with no blood flowing through the capillary layer and should be removed to simulate *in vivo* (i.e., live) conditions.  Thus, the general observation the partial thickness cadaver skin is the best simulation for full thickness live skin.

[Thus, even the dermal fluxes shown in this work, which were not liked by Monsanto and resulted in further work being stopped by Monsanto, reflected results are still likely low based on the skin thickness used.]

Lastly, *the authors recognized that these dermal flux data results, when modeled, would result in excessive exposure rates to applicators* (using the UKPOEM model for dermal penetration it was found it did not pass when the product was applied at 3.6 kg/ha from a tractor mounted sprayer)  [The baseline UKPOEM model for dermal exposure used in Europe by Monsanto assumed an application rate of MON 79991 of 2.16 kg/ha for most uses and 3.6 kg/ha for hand held spot applications (Exhibit 101, Bates MONGLY04107779)].

Further dermal work was shut down by Monsanto as a result of these findings:

In an April 2, 2002 e-mail from W. Heydens to Charles Healy regarding additional dermal work, he writes in part (Exhibit 79, Bates MONGLY03738295):

> "….*My primary concern is with the glyphosate in terms of the potential for this work to blow Roundup risk evaluations (getting a much higher dermal penetration than we've ever seen before.*"

April 4, 2002 e-mail – 5:39 AM – from F. Broeckaert to C. Gustin, A. LI, C. Healy, M. Martens, J. Kronenberg, D. Farmer, S. Wratten, E. Jacobs, R. McKenna, W. Heydens and R. Garnett he writes in part (Exhibit 80, Bates MONGLY03737015):

> "….*we came to the conclusion that <u>the penetration of glyphosate would have been (probably) greater than the 3% already imposed by the German authorities.  We decided to STOP this study (effective today morning).</u>*"

In a follow-up April 4, 2002 e-mail – 7:25 PM – from D. Farmer to F. Broeckaert, C. Gustin, A. LI, C. Healy, M. Martens, J. Kronenberg, S. Wratten, E. Jacobs, R. McKenna, W. Heydens and R. Garnett, she writes in part (Exhibit 80, Bates MONGLY03737015):

> "….*For clarification – a decision was made to not repeat the rat skin study and to stop any further dermal penetration studies with MON 35012 with and without surfactant – correct?  Are any other glyphosate-based formulations going to be tested?  Or has the whole program been dropped?*"

In a follow-up April 5, 2002 e-mail – 14:46 AM – from R. Garnett to D. Farmer, F. Broeckaert, C. Gustin, A. LI, C. Healy, M. Martens, J. Kronenberg, S. Wratten, E. Jacobs, R. McKenna, W. Heydens and R. Garnett, he writes in part (Exhibit 80, Bates MONGLY03737015):

> "Donna
>
> *<u>We dropped the programme for glyphosate because a further study was not likely to help us meet the project objective</u>*:
>
> ➢   *We initiated the studies from a regulatory angle* to help meet the requirements for operator exposure, given that the Annex I end point for dermal absorption for glyphosate was set at 3%, which we believed was a high value based on a weight of evidence approach.
>
> ➢   *The results of the rat skin studies* show levels of absorption for glyphosate of a similar order to the Annex I end point; also *<u>confirm our expectation that surfactant concentration affects the dermal absorption</u>*.
>
> ➢   *Therefore, from a regulatory angle, there is no point in pursuing the studies further*…"

In a follow-up April 5, 2002 e-mail – 8: 47 PM – from C. Gustin to R. Garnett, D. Farmer, F. Broeckaert, A. LI, C. Healy, M. Martens, J. Kronenberg, S. Wratten, E. Jacobs, R. McKenna, W. Heydens and R. Garnett, he writes in part (Exhibit 80, Bates MONGLY03737015):

> "*Shouldn't TNO at least try to find out what caused these unexpected results?  We are left with too many questions after this.  <u>I thought they offered to recheck their system and redo the rat-skin test on their own expense.</u>*  If so, I don't really see why we would not accept that…"

Finally, in a follow-up April 5, 2002 e-mail – 9: 44 PM – from C. Healy to R. Garnett, D. Farmer, F. Broeckaert, C. Gustin, A. LI, , M. Martens, J. Kronenberg, S. Wratten, E. Jacobs, R. McKenna, W. Heydens and R. Garnett, he writes in part (Exhibit 80, Bates MONGLY03737015):

> "*…Without a clear understanding of what happened, I see no way we could or should move forward with any other work at the moment.*

Yet it is also clear that Monsanto knew that it had investigated the dermal uptake of only *one* Roundup formulation in July 2001 (Exhibit 275, Bates MONGLY01839476) and had little dermal uptake information on which to rely:

> "*Until today Monsanto has conducted formulation specific dermal uptake research on the formulation Roundup (MON 2139).  It is clear that because of compositional differences the dermal uptake data for Roundup can't be extrapolated as such towards the wide range of formulations.*"

Monsanto also clearly understand mechanisms affecting the rate of transport of surfactant/glyphosate blends into the skin when they write.

> "*Formulations based on the same surfactant type (surfactant/glyphosate ratio) will have a comparable interaction and contact with the skin.  The second basis for clustering becomes a combination of the surfactant type, the surfactant load, the surfactant/glyphosate ratio and the glyphosate load in the formulation.*"

[Thus Monsanto clearly recognized that the dermal fluxes of glyphosate alone predicted by this work (that now includes formulations and excludes other toxic constituents), would result in excessive modeled exposure risks to those exposed to their products, killed the project because they were unhappy with the results.  Further, they apparently did not report the results of this significant TNO study results to regulators.]

### 4.5.3   Review of 1991 Wester et al. Study – Glyphosate Skin Binding, Absorption, Residual Tissue Distribution, and Skin Decontamination Exposure Studies (Exhibit 205, Bates MONGLY021431080-87):

The paper covered the following four sets of dermal exposure studies with Roundup® provided by Monsanto:

➢ *In vitro* percutaneous glyphosate absorption experiments using human thigh skin (Undiluted and diluted (1:20 and 1:32 v/v) Roundup® - unknown formulation – $^{14}$C labeled glyphosate in 1 $cm^2$ test cells for 30 minutes, 4, 8 and 16 hrs.).

➢ Glyphosate absorption experiments using balls of human stratum corneum skin contacting undiluted (30 min., 4 hrs. and 8 hrs.) and diluted – 1:20 and 1:32 v/v (30 min., 4, hrs., 8 hrs. and 16 hrs.).

➢ Glyphosate *in vivo* percutaneous glyphosate absorption experiments using Roundup® injected into young adult female rhesus monkeys at two dose levels (93 µg in 790 µℓ – 4.3 µCi and 9 µg in 940 µℓ – 3.1 µCi) and the glyphosate

monitored for in the urine, feces and contaminated solids over a period of up to 8 days.

➢ Glyphosate *in vivo* percutaneous glyphosate absorption experiments using Roundup® applied dermally onto young adult female rhesus monkey belly skin at two dose levels (5,400 µg/20 cm² and 500 µg/20 cm²) and the glyphosate monitored for in the urine, feces, skin surface washes and contaminated solids over a period of up to 8 days.

The first and last experiments are of the most interest and results and summarized and commented on below:

4.5.3.1        In vitro percutaneous glyphosate absorption experiments using human thigh skin results and observations:

Absorption results with time, along with Petty calculations from these results are summarized in Table 4-6:

**Table 4-6: Wester et al. Roundup® Dermal Absorption Data/Results – Using In Vitro Human Thigh Skin**

| Wester et al. Input | | | Petty Calculated Values | | | % Absorbed with Time (hrs.) | | | | S.D. % Absorbed with Time (hrs.) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Conc. (µg/cm²) | Vol. (mℓ/m²) | Area (cm²) | Conc. (µg) | Vol. (mℓ) | Conc. (µg/mℓ) | 0.5 | 4 | 8 | 16 | 0.5 | 4 | 8 | 16 |
| Undiluted | | | | | | | | | | | | | |
| 15.4 | 0.014 | 1 | 15.4 | 0.014 | 1,100.0 | 0.02 | 0.30 | 0.06 | N/A | 0.02 | 0.00 | 0.10 | N/A |
| 77.0 | 0.07 | 1 | 77.0 | 0.07 | 5.4 | 0.00 | 0.03 | 0.00 | N/A | 0.00 | 0.06 | 0.00 | N/A |
| 154.0 | 0.14 | 1 | 154.0 | 0.14 | 21.6 | 0.02 | 0.00 | 0.40 | N/A | 0.02 | 0.00 | 0.20 | N/A |
| Diluted 1:20 | | | | | | | | | | | | | |
| 4.1 | 0.07 | 1 | 4.1 | 0.07 | 58.6 | 0.00 | 1.40 | 0.80 | 0.20 | 0 | 0.7 | 1.3 | 0.1 |
| 8.3 | 0.14 | 1 | 8.3 | 0.14 | 1.2 | 0.00 | 0.90 | 0.10 | 1.60 | 0 | 1.3 | 0.1 | 2.3 |
| Diluted 1:32 | | | | | | | | | | | | | |
| 2.6 | 0.07 | 1 | 2.6 | 0.07 | 37.1 | 0.10 | 0.10 | 2.20 | 0.30 | 0.1 | 0.01 | 0.5 | 0.2 |
| 3.2 | 0.14 | 1 | 3.2 | 0.14 | 0.4 | 0.70 | 0.30 | 0.90 | 0.50 | 1.2 | 0.5 | 1.5 | 0.6 |

Petty calculated values are taken directly from Wester et al., input data (e.g., Conc. in µg = Conc. in µg/cm² x cm²).

It is visually instructive to plot the results in terms of dermal absorption rates vs. time for each concentration (Table 4-7 and Figure 4-12):

**Table 4-7: Wester et al. Roundup® Dermal Absorption Data/Results –
Using In Vitro Human Thigh Skin - Results**

| Conc. (µg/mℓ) | % Absorbed with Time (Hrs.) | | | |
|---|---|---|---|---|
| | 0.5 | 4 | 8 | 16 |
| 0.45 | 0.70 | 0.30 | 0.90 | 0.50 |
| 1.2 | 0.00 | 0.90 | 0.10 | 1.60 |
| 5.4 | 0.00 | 0.03 | 0.00 | N/A |
| 21.6 | 0.02 | 0.00 | 0.40 | N/A |
| 37.1 | 0.10 | 0.10 | 2.20 | 0.30 |
| 58.6 | 0.00 | 1.40 | 0.80 | 0.20 |
| 1,100 | 0.02 | 0.30 | 0.06 | N/A |



**Figure 4-12: Wester et al., Absorption Through Human Skin Results
(% vs. Time and Concentration)**

While the results suggest % absorbed levels between ~0 and ~2.2%, a review of the plots in Figure 4-12 suggests flawed experiments:

1)    Based on Fick's Law the % absorbed should increase with increasing concentration – results are random.

2)    The individual curves show no consistency of absorption with time; one would expect a rapid rise, a flattening and then a slow decay.  Again the results are random.

Research has also shown that increased dermal fluxes occur with degraded skin and from perspiration on skin (e.g., https://oem.bmj.com/content/oemed/61/4/376.full.pdf and Exhibit 487).

OECD (Exhibit 315, pg. 36 – Figure 1) provides examples of percent absorbed vs. time curves (Figure 4-13):



**Figure 4-13: OECD, 2011 (Exhibit 315, Pg. 36, Figure 1 of Paper) – Typical Dermal Absorption Curve of % Absorbed vs. Time**

After an initial delay, the rate of absorption rises with time to an inflection point and then slows down with a decreasing rate of rise with time until the percent absorbed reaches a final value.  The Wester data plotted in Figure 4-12 is inconsistent with what would be expected as shown in Figure 4-13.

Franz (Exhibit 335, Figure 1) illustrates how the basic dermal absorption curve based on flux should appear (Figure 4-14):



**Figure 4-14: Franz, 1983 (Exhibit 335, Paper Figure 1) – Typical Dermal Absorption Curve of Flux vs. Time**

The flux is the amount of permeate (e.g., glyphosate for Roundup) that penetrates a given area of skin over a given amount of time (i.e., mg or µg per $cm^2$ per hour - $µg/cm^2/hr$.).  Multiplying the dermal flux by the skin area wetted (e.g., $cm^2$) and time of wetting (e.g., hrs.) results in the dermal dose (e.g., µg).

The flux has an initial delay period, then rises with time, flattens out, and then begins to fall with time.  The area under the curve at any time is proportional to the % absorbed. Again, the Wester data plotted in Figure 4-10 do not reflect typical absorption curves, calling into question the validity of the experiments.

4.5.3.2        Glyphosate *in vivo* percutaneous glyphosate absorption experiments using Roundup® applied dermally onto young adult female rhesus monkey belly skin:

Results of this set of experiments are summarized in Table 4-8:

### Table 4-8: Wester et al. – Deposition of Glyphosate Following Topical Administration to Rhesus Monkeys (Table 4 of Exhibit 205)

| Disposition Site* | Percentage of Applied Dose | |
|---|---|---|
| | Dose C ($270 \ µg/cm^2$) | Dose D ($25 \ µg/ \ cm^2$) |
| Urine | *2.2* | *0.8* |
| Feces | 0.7 | 3.6 |
| Surface Washes | 73.5 | 77.1 |
| Contaminated Solids | <u>0.05</u> | <u>0.3</u> |
| TOTAL | 76.5 | 81.8 |

* Customized chairs were used to prevent exfoliated abdominal skin from contaminating excreta (94: 1, MONGLY02155826).

In the abstract, the authors conclude that "Percutaneous absorption in vivo in rhesus monkey was *0.8*% for the low dose (25 µg/$cm^2$) and *2.2*% for the high dose (270 µg/$cm^2$)" seemingly low values.

**[However, note that this conclusion assumed the only absorbed dose was that associated with glyphosate found in the urine!  Using values associated with urine, feces, and contaminated solids increases the values from 0.8% and 2.2% to 2.95% and 4.7% respectively.  Adding in the unaccounted for values (23.5% and 18.2%) increases results further to 26.45% and 22.9% respectively.  Also, technically, some of the surface wash material was absorbed into the skin and would be considered a dose if it penetrated the surface of the skin and was contained in the skin itself.]**

Monsanto themselves recognizes in a series of 2003 and 2008 e-mails (Exhibit 318 and Exhibit 94) the flaws in reporting the absorbed percentages simply based on what percentage was found in the urine:

➢     Fabrice Broeckaet to Richard Garnett and cc'd to Chantal Van Bellinghen – February 2, 2003 (Exhibit 318, Bates MONGLY06398326).   "*We should*

remember that Wester excluded the presence of glyphosate in the skin due to the absence of partition of glyphosate with the stratum corneum.  By contrast, in the Franz study, **a large amount of glyphosate was detected in the epidermis (0.5-5%).  And we know now, 5-20% of the dose of glyphosate could be stored in the skin**.”

**[Monsanto knows that glyphosate stored in the skin is technically a dose.]**

Also, the August 18, 2011 Guidance Notes on Dermal Absorption No. 156 (Exhibit 315) by the Organization for Economic Co-Operation and Development (OECD) guidelines, in development since 2005 state that the dermal dose should include the product entering the skin including that from experimental skin washings (Exhibit 315, pg. 22; see also Exhibit 490):

“9.     When considering the fate of the chemical remaining in the skin at the end of a study, the existing guidance should be consulted, in particular OECD GD 28 (OECD 2004c):

•     ***The current default approach taken by nearly all regulatory agencies is to determine the dermal absorption value by adding the absorbed dose and the chemical remaining in the skin, following washing.***  This is appropriate for both in vivo and in vitro studies, unless compelling evidence is presented that demonstrates that some portion of the residue in the skin is unlikely to be absorbed; and,

*7.1.1   Definitions and existing guidance*

67.     The existing OECD test guidelines and guidance documents (OECD 2004a,b,c) form the basis of current considerations on whether to include or exclude the absorbable dose, which represents the test substance present in or on the skin following washing.

68.     ***The current approach taken by nearly all regulatory agencies is to determine the dermal absorption value by adding the absorbed dose and the chemical remaining in the application site and surrounding skin following washing.*** *This is appropriate for both in vivo and in vitro studies, unless compelling evidence is presented that demonstrates that at least some portion of the residue in the skin is unlikely to be absorbed.* However, there is currently some international disagreement about whether part or all of the test substance should be included in the dermal absorption value that is retained in the stratum corneum and can be removed by tape stripping.”

Thus, the dermal dose, according to OECD guidelines, should include product (i.e., glyphosate) in the skin, feces, and urine, not just the urine.

OECD also notes that not all skin areas absorb equally and that pesticides absorb more readily through the hands and forearms (Exhibit 315, pg. 23):

“*11.     The anatomical location of exposure affects the dermal absorption:*

- *Common exposure locations include abdominal or breast skin (human in vitro) or the forearm or back (human in vivo), but other anatomical locations demonstrate greater (or lower) absorption. The forearms and hands are potentially the areas most exposed to chemicals during occupational use. Nevertheless dermal absorption data obtained using abdominal and breast skin is considered representative of typical exposure situations.* **Studies with pesticides have indicated that dermal absorption may be greater than that for hands and forearms** (Maibach and Feldmann, 1967; Maibach, 1971)."

Finally, OECD also notes that monkey skin dermal results may not conservatively estimate human dermal exposures (Exhibit 315, pg. 26):

"*26.    Species Selection:*

"….Sometimes, studies on skin obtained from other species such as monkey or pig or on artificial and cultured skin (epidermis grown from keratinocytes) are submitted. ***Data show that*** rat, mouse and rabbit skin are generally more permeable than human skin, but that ***the use of monkey or pig skin may not always result in a conservative estimate*** (ECETOC 1993)."

➢ Christophe Gustin, Jr. to Jaime Costa and cc'd to Donna Farmer and David Saltmiras – November 4, 2008 – 15:40 (Exhibit 94, Bates MONGLY02155830-31) – Regarding Wester et al. study, experiment iv he says: "Since all of the iv administered doses were excreted in urine, the percutaneous absorption of glyphosate is estimated to be 0.8-22% (sic 2.2%) of the applied dose" (p728-729). **"They did not take the feces into account based on the iv-study"**.

➢ Christophe Gustin, Jr. to David Saltmiras and Jaime Costa and cc'd to Donna Farmer, Joel Kronenberg and Richard Garnett – November 5, 2008 – 5:45 AM (Exhibit 94, Bates MONGLY02155829) – Regarding Wester et al. study, experiment iv he says: "***The Wester iv-experiment suggests that almost the entire 'systemically' available dose was excreted to the urine. The low dose topical in vivo experiment suggests that almost the entire dose (82%) that was absorbed through the skin was excreted in feces*** (3.6% versus 0.8% in urine)."

A response suggests that the Wester study be repeated.

➢ Richard Garnett to David Saltmiras, Christophe Gustin, Jr. and Donna Farmer and cc'd to Joel Kronenberg – November 10, 2008 – 4:07 AM (Exhibit 94, Bates MONGLY02155826-7) – Regarding Wester et al. study, experiment iv he says:

➢ "Our dermal end point is based on the literature and, as I recall, we failed to get the original data to support the results.

➢ ***The movement of glyphosate in the blood flow from dermal contact is different to that through oral or intravenous exposure. The little data we have suggests that the excretion is significantly more through the feces than the urine***."

[Clearly the Wester iv-experimental dermal results were misrepresented in the paper and Monsanto understood this fact as well as the fact that other literature was representing the dermal endpoint was glyphosate in the urine.]

Further, regarding Wester et al. study, the following questions are raised in another document (Exhibit 457, pg. 6):

➢ "Is the Wester study adequate?

• - For regulatory purposes?

• - For stewardship purposes?

### 4.5.4 Review of 1983 Maibach & Dirks – California School of Medicine Dermal Exposure Studies (Exhibit 197-AA, Bates MONGLY02142353-67):

Monsanto contracted two Roundup® dermal exposure studies using Rhesus monkeys. The studies used radioactive labeled $^{14}C$ glyphosate (Roundup MON 0139) that i) injected the Roundup® and ii) applied Roundup® to the skin of the monkeys. No details are provided on the formulation other to state that it contained glyphosate.

Results were as follows:

➢ For monkey tests with injected Roundup®, 89.6% of the applied glyphosate dose was recovered in the urine within 7 days; 85.6% after one day.

➢ For monkeys with Roundup® applied to abdomen skin (7.9 cm$^2$ or 1.22 in.$^2$), only 0.4% of the applied glyphosate dose was recovered in the urine after 24-hrs.

The author concluded that the glyphosate penetrated the skin slowly. The total percent recovery of the applied glyphosate is 16.0%; but this consists of the amount washed off the skin (14.2%) and that recovered from the urine (1.8%). The other 84% is unaccounted for. The authors note that a "definitive explanation can not be offered as to the low recovery" – 1.8%!

The authors' dermal work relied on their injection work. They made the assumption that product transferred through the skin would show up in the urine like that injected through the skin; this assumption looks questionable given the very low recovery rates.

Dermal doses do not all show up in the skin and urine, but also in the feces, bone, bone marrow, kidneys, and the liver. $^{14}C$ labeled glyphosate administered orally to rats and goats reported having the highest tissue concentrations of glyphosate showing up in the bone, bone marrow, kidney and livers of the animals. 60 to 70% was eliminated to the feces and whole body clearance (~99%) occurred in 168 hours. The estimated half life of glyphosate in the body of these animals was estimated at 2.1 to 7.5 hrs. for the alpha phase and 67 to 337 hrs. for the beta phase (Exhibit 408, pg. 99; see also Exhibit 448, pg. 37). Using mean half life times (4.8 hrs. and 202 hrs.) and 5 half lives, 3.125% ($1/2^5$) of the glyphosate would remain in the bodies of the animals 24 hrs. (alpha) and 1,010 hrs. (beta) later. EFSA reported lower glyphosate half-lifes ranging from 6 to 12 hours meaning 3.125% ($1/2^5$) of the glyphosate would remain between 30 and 60 hours later (Exhibit 448, pg. 37).

Finally, the authors are measuring the rate of transfer of glyphosate through the skin and must assume that the Roundup® product itself would transfer through the skin at the same rate as glyphosate.

The average flux of glyphosate over 7 days can be estimated based on the following parameters:

$M_A$ - Amount of glyphosate transferred through the skin – micrograms (µg)

SA – Surface area of skin exposed – 7.9 cm².

T – Time in hours – 7 days = 24*7 = 168 hrs.

$Flux_A = M_A/SA/T$ (µg /cm²/hr.).

The only real determination to be made is the value for $M_A$:

Mass of glyphosate solution used – started with - 25 µℓ

Concentration of glyphosate in solution – 4 mg/mℓ or 4 µg/µℓ

Percent of solution passing through the skin – based on urine – 1.8%

Thus, $M_A$ = [(1.8%/100) * (25 µℓ) * (4 µg/µℓ)] = 1.8 µg; and the

$Flux_A = M_A/SA/T$ = [(1.8 µg) / (7.9 cm²) / (168 hrs.)] = 1.36 x $10^{-3}$ µg /cm²/hr.

This value of 1.36 x $10^{-3}$ µg /cm²/hr. from this 1982 work are very low when compared to fluxes calculated from the 2002 TNO work where the values ranged from 0.1 to 35.6 µg /cm²/hr.   The 1982 flux value is between 74 times (7,373%) and 2,625 times (2,624,907%) less (lower) than the 2002 results!

The dermal work completed in this 1983 study is essentially useless; only 1.8% of the product is accounted for moving through the skin, and this is based on an assumption that all the product moving through the skin was picked up in the urine (this same erroneous assumption was used in later Monsanto work – e.g., Exhibit 260, BatesMONGLY01848864).  A comparison with more recent 2002 work shows the 1982 value to be extremely low in comparison to more recent work.  Moreover, whether this reflected metabolites such as AMPA (Exhibit 196-U) is not known.  *Monsanto itself, in a February 7, 2003 e-mail from Richard Garnett acknowledges that the recovery rates in this study were low and that data from the study should not be used (Exhibit 318, Bates MONGLY06398326).*

4.5.5   Review of 1983 Franz – University of Washington Dermal Exposure Studies (Exhibit 346, Bates MONGLY00135622-703 and Exhibit 489):

Monsanto contracted Roundup® dermal exposure studies using full thickness human cadaver skin.  The studies used radioactive labeled $^{14}$C glyphosate (Roundup MON 0139, Roundup, and Roundup Spray Mix.  Little else is known about these formulations other than the glyphosate content (i.e., 573-575 mg/mℓ, 358-360 mg/mℓ, and 2.25 to 11.5 mg/mℓ respectively).

Overall results are summarized in Table 4-9:

**Table 4-9: Mean Data (% of Dose)**

| Dose Location | Percent of Dose by Product and Location | | |
|---|---|---|---|
| | MON 0139 | Roundup Formulation | Roundup Spray Mix |
| Skin Washes | 98.93 | 100.85 | 92.09 |
| Epidermis | 0.04 | 0.1 | 4.02 |
| Dermal Bathing Solution | *0.013* | *0.024* | *0.110* |
| Dermis | *0.015* | *0.039* | *0.042* |
| Total Absorbed | <u>0.028</u> | <u>0.063</u> | <u>0.152</u> |
| **TOTAL RECOVERY** | **99.00** | **101.05** | **96.26** |

Mean data show large variations results for the three products:

➢ Values of product retained in the epidermis vary by two orders of magnitude or a factor of ~100 (0.04 vs. 4.02).

➢ Values of product retained in the dermal bathing solution on the back side (receptor) of the skin vary by a factor of ~10 (0.013 vs. 0.11).

➢ Total absorbed (not including skin washes) varied by a factor of ~5 (0.028 vs. 0.152).

Typical experimental results are illustrated in Figure 4-15:



**Figure 4-15: Franz, 1983 – Dermal Fluxes with Time Through Human Cadaver Skin (Exhibit 346, Bates MONGLY00135641)**

Except for the odd dip in the two upper curves at about three hours, the experiments follow expected curves.

As illustrated in Figure 13, Franz notes that:

"*The data show that glyphosate absorption occurs relatively rapidly from all three formulations, with a peak rate of absorption being reached at less than 8 hours.*"

This means that those dermally exposed to Roundup are likely to see peak exposures during the time they use the product as it is not uncommon to wash up until the end of the workday or the next morning – well within the peak rate being reached at less than 8 hrs. after exposure.

Overall, Franz concludes that:

➢ Glyphosate absorption through human skin is in the range of .03 - .15 % of the applied dose from the three formulations examined in this study.

➢ Greater than 92% of the unabsorbed glyphosate remains on the surface of the skin and is readily removed by wash water.

➢ A small amount of glyphosate can be found in the epidermis following water wash, in the range of 2-5 $\mu$gram/cm$^2$.

➢ The dermis is not a barrier to glyphosate absorption.

Limitations to Franz's work include:

➢ Lack of product composition information.  Based on TNO work described earlier, MON 0139 does not appear to contain a surfactant.  The lack of surfactants would likely lower dermal transfer rates.

➢ No specifications on where the human skin was taken from.

➢ Use of full thickness skin in most experiments; full thickness cadaver skin is known to slow dermal transfer rates as the blood no longer circulates through the capillary layer and acts as a resistance to dermal mass transfer though the skin.

The partial thickness skin (dermis) used in partial thickness tests was prepared "by holding full thickness skin between 60-65 ºC blocks for 2-3 minutes."  He concludes that the dermis provides little resistance to dermal transfer, but skin heated to 60-65 ºC (140-149 ºF) is likely damaged.  For example, skin will suffer third degree burns at 140 to 149 F in 2 to 3 seconds (Table 4-10):

**Table 4-10: Temperature to Cause 3rd Degree Burns to Skin**
**(http://www.the-med.org/media/Scald%20Burns%20Flyer.pdf)**

| Temperature (F) | Time for 3rd Degree Burn to Occur |
|---|---|
| 104 | Safe for bathing |
| 120 | 5 minutes |
| 125 | 2 minutes |
| 130 | 10 seconds |
| 140 | 3 seconds |
| 148 | 2 seconds |
| 155 | 1 second |

Subjecting skin to temperatures of 140 °F to 149 °F for 120 to 180 seconds (2 to 3 minutes) clearly would damage skin, which would suffer the effect of 3rd degree burns in only 2 or 3 seconds (~1% to ~2.5% of this time).  Thus, the results and conclusions (i.e., #3 and #4) regarding the dermis and epidermis which were split under this heated conditions are questionable.

➢ Franz's conclusion that the wash data reflects product on the surface of the skin but not in the skin is speculation.

➢ Franz does not, as OECD recommends, include the skin washes as part of the dermal dose.  This would increase the dose to nearly 100%.

### 4.5.6  Review of 1986 Maibach – California School of Medicine Dermal Exposure Studies (Exhibit 199, MONGLY01315001-004):

Monsanto contracted again with Maibach to evaluate the short-term (acute) effects of the following four (4) products on human skin:

i)     Glyphosate herbicide – Roundup® – formulation contained 41% glyphosate, water, and a surfactant.

ii)    Cleaner – Pine-Sol Liquid.

iii)   Shampoo – Johnson's Baby Shampoo®.

iv)    Liquid Dishwashing Detergent – Ivory Liquid.

Five types of experiments were completed using live human volunteers:

i)     Acute irritation – 0.1 mℓ of test products placed on normal and abraded skin – looked for effects at 24 and 48 hrs. (24 volunteers).

ii)    Cumulative irritation – test products applied to skin 5 weekdays/wk. for 21 days (23 volunteers).

iii)   Modified Draize Skin Sensitization Study – 0.2 mℓ of test materials placed on upper arm or back skin; 1st 3 weeks patches applied 3x/wk.; no patches for next 2 wks. and then patch added for 48-hr. period (204 volunteers).

iv)    Photoirritation Study – Skin on upper arms or back stripped with cellophane tape removing most of stratum corneum.  Test products applied to skin for 24 hrs. and UVA and UVB light (15 volunteers).

v)     Modified Photo Draize Skin Sensitization Study - 0.2 mℓ of test materials placed non-woven fiber patches to upper arm skin with tape for 24-hrs.  Process repeated 3x/wk. for 3 weeks.  Then area irradiated with 3 MED's of unfiltered light, then 2 wk. rest period, and duplicate pad added and irradiated with 10 MED's of window glass filtered light and left in place for 24-hrs. (24 volunteers).

No skin effects were observed for any of the subjects in tests iii) and v) involving 243 of the 290 volunteers noted in the 5 tests listed above - ~84%.

Skin test scoring was classified under one of six classifications:

| Classification | Description of Classification |
|---|---|
| 0 | Negative Reaction |
| ± | Equivocal Reaction |
| 1 | Erythema |
| 2 | Erythema and Induration |
| 3 | Erythema, Induration, and Vesicle |
| 4 | Erythema, Induration, Vesicle, and Bullae |

The Abstract states: "...The herbicide was less irritant than a standard dishwashing detergent and a general all purpose cleaner…" The Conclusion states: "These data, derived from utilizing normal volunteers, provide a baseline for choosing appropriate diagnostic patch test concentration. *We suspect that 10% glyphosate in water should be non-irritant,* in light of several hundred volunteers tested at full-strength without significant reaction. *However, without further retesting of reactive subjects, one cannot rule out the possibility of the excited skin syndrome*."

Single application test results for unabraded and abraded skin (1st test "i") are summarized in Table 4-11 below:

**Table 4-11: Acute Unabraded and Abraded Skin Results (Exhibit 199)**

| Product Tested | Test Score Ratings | Unabraded Skin | | Abraded Skin | |
|---|---|---|---|---|---|
| | | 24 h | 48 h | 24 h | 48 h |
| Glyphosate Herbicide | Negative Reaction [0] | 24 | 23 | 10 | 10 |
| | Equivocal Reaction [±] | 0 | 0 | 4 | 6 |
| | Erythema [1] | **0** | **1** | **10** | **8** |
| | Erythema & Induration [2] | **0** | **0** | **0** | **0** |
| All Purpose Liquid Cleaner | Negative Reaction [0] | 16 | 16 | 15 | 14 |
| | Equivocal Reaction [±] | 5 | 4 | 8 | 7 |
| | Erythema [1] | **2** | **4** | **1** | **3** |
| | Erythema & Induration [2] | **1** | **0** | **0** | **0** |
| Liquid Dishwashing Detergent | Negative Reaction [0] | 18 | 16 | 13 | 10 |
| | Equivocal Reaction [±] | 5 | 4 | 8 | 8 |
| | Erythema [1] | **2** | **4** | **3** | **6** |
| | Erythema & Induration [2] | **1** | **0** | **0** | **0** |
| Baby Shampoo | Negative Reaction [0] | 23 | 24 | 21 | 20 |
| | Equivocal Reaction [±] | 1 | 0 | 3 | 4 |
| | Erythema [1] | **0** | **0** | **0** | **0** |
| | Erythema & Induration [2] | **0** | **0** | **0** | **0** |
| Water | Negative Reaction [0] | 23 | 23 | 23 | 22 |
| | Equivocal Reaction [±] | 1 | 1 | 1 | 2 |
| | Erythema [1] | **0** | **0** | **0** | **0** |
| | Erythema & Induration [2] | **0** | **0** | **0** | **0** |

Adding up the total number of events, for either 24 hrs. or 36 hrs., where the ratings reported either a "1" or a "2" (i.e., not non-zero or equivocal effects), resulted in the following:

➢ Glyphosate Herbicide – 19 (1 non-abraded and 18 abraded skin).

➢ All Purpose Liquid Cleaner - 11 (7 non-abraded and 4 abraded skin)

➢ Liquid Dishwashing Detergent - 16 (7 non-abraded and 9 abraded skin)

➢ Baby Shampoo – 0 (0 non-abraded and 0 abraded skin)

➢ Water – 0 (0 non-abraded and 0 abraded skin)

Thus, Glyphosate Herbicide has the most reportable total skin events, followed by the Dishwashing Detergent (16), the Liquid Cleaner (11), and then Baby Shampoo and Water reporting no events.   In terms of abraded skin, associated with workers performing repetitive tasks, the Glyphosate Herbicide abraded skin results are 50% higher or more than the other products.  Monsanto's claims in e-mails that Roundup® is as safe as Baby Shampoo is clearly false (e.g.: Exhibit 75 - MONGLY00923065).

[Several important observations can be made in reviewing this paper so often relied on by Monsanto:

i)    >84% (243 volunteers in last three tests and some in the first two tests of the 290 volunteers) had no reported skin effects.  Thus, results are quoted suggesting hundreds of volunteers were with no dermal health effects; this is misleading since no health effects were seen at all with baby shampoo, water, etc. suggesting the tests may not have been effective predicting whether or not Roundup® Herbicide impacted skin.

ii)   The amount of products applied to the skin was very small, between 0.2 mℓ and 1 mℓ.  By way of comparison, ~4 drops of product are ~0.2 mℓ of volume and ~20 drops of product are ~1.0 mℓ of volume (0.05 mℓ/drop -http://convert-to.com/conversion/volume/convert-drop-to-ml.html).

iii)  A review of the acute results, which were either not zero or unequivocal, says that Roundup® Herbicide did have more observable skin effects than the other products and had at least 2x the skin effects of other products using degraded skin.

iv)   While the title of the paper suggests limited observed effects, the actual conclusions from the work are quite reserved, "*These data, derived from utilizing normal volunteers, provide a baseline for choosing appropriate diagnostic patch test concentration.  We suspect that 10% glyphosate in water <u>should be</u> non-irritant, in light of several hundred volunteers tested at full-strength without significant reaction.  <u>However, without further retesting of reactive subjects, one cannot rule out the possibility of the excited skin syndrome.</u>*"  The conclusion about 10% glyphosate is clearly speculative and the other results should be verified by retesting, according to the author.]

<u>Monsanto's Use of 1983 Maibach Dermal Study and Subsequent 1986 Maibach Study:</u>

On February 9, 1987, Monsanto's Thomas Armstrong writes US EPA's Robert Taylor (Exhibit 180) requesting glyphosate products (e.g., Roundup®) lower its labeling requirements and be excluded from the Worker Safety Rules based primarily on work by Maibach (dermal report expert).  Specifically he writes in part:

> "Dear Sir:
>
> In the glyphosate registration standard (issued August 11, 1986 – see also Exhibit 259, Bates MONGLY01298456), *the Agency requested that "Worker Safety Rules" appear on all glyphosate formulated products labeled for agricultural or aquatic uses* (refer to pages 14, 21, 22, 28 and 29) of the Glyphosate Guidance Document). *The rules required that specific protective clothing be worn to "reduce the risk of injury to skin."*
>
> Monsanto firmly believes that the Agency's requested "Worker Safety Rules" are unjustified, and they are neither necessary nor required for the safe use of glyphosate products.   Our comments that support this position were previously submitted (November 7, 1986) to the Agency as part of Monsanto's comments to the Glyphosate Guidance Document.
>
> *The purpose of this submission is to offer additional expert information which further supports our position that dermal exposure to glyphosate formulations (when used according to label instructions) do not cause skin injuries; and therefore that the requested addition of "Worker Safety Rules" to glyphosate product labels should be deleted.*
>
> *Monsanto is now submitting a report entitled "Irritation, Sensitization, Photoirritation and Photosensitization Assays with Glyphosate Herbicide" by Dr. Howard I. Maibach* of the University of California, San Francisco Medical Center (Contact Dermatitis 1986: 15: 152-156).   *In this study glyphosate herbicide was evaluated for acute irritation, cumulative irritation, photoirritation and allergic and photallergic potential in 346 human volunteers.  These data show glyphosate herbicide was less irritating than a standard liquid dishwashing detergent and a general all-purpose cleaner* **[As discussed in a review of the paper above, this statement is false]**.  *There was no evidence for the induction of photoirritation, allergic potential, or photoallergic contact dermatitis.*

[While the statement is technically true, it is very misleading; no evidence found on any of the products tested; calls into question the relevance of the tests].

[Despite the clear flaws/limitations in the 1983 and 1986 dermal experimental work, Monsanto used work by Maibach to help convince regulators that the product was dermally safe, which ultimately resulted in lowered labeling warnings/categories and personal protective equipment (PPE) recommendations/requirements.]

The misinterpretation/misrepresentation of this Maibach paper (along with examples of dermal irritation case studies) has also been commented on by Peter Elsner, Susanne Darr-Foit and Sibylle Schliemann in a 2017 letter to the editor of the Journal of the German Society of Dermatology (Exhibit 480, pg. 70-71) when they write:

> "…*However, there have also been case reports of acute irritant contact dermatitis following exposure to glyphosate [3, 5].  This apparent contradiction is resolved by reviewing the Maibach study more closely [1]:  While glyphosate had virtually no irritant effects on intact skin, it led to pronounced irritant reactions in half of the subjects when applied to abraded skin; these effects were significantly stronger than those produced by the irritants used for comparison.  In individuals with preexisting skin*

*damage and under-occlusive conditions, contact with glyphosate is likely to result in irritant contact dermatitis, which may be severe in some cases.*"

US EPA's Mr. Taylor acknowledged receipt of the Monsanto request on July 5, 1987 and Curt Luchick responds as follows

3.0  Conclusions:

Based on the Toxicology Branch one-liners and poisoning incidences reported for glyphosate used in California, ***EAB concludes that some formulations of glyphosate are eye irritants and possibly skin irritants***. To clarify possible ambiguities in the Registration Standard in regards to worker safety rules, ***EAB is proposing the two attached labels for non-home use products. Attachment 2 is intended for all glyphosate products that contain the signal word "WARNING" based on either dermal irritation or eye irritation and Attachment 3 is intended for all glyphosate products that contain the signal word "CAUTION.*"

Attachment 1 reports 70 cases of workers in California from 1982-1985 reporting skin irritation or skin and eye irritation despite Monsanto's representations of the Maibach, 1986 study (Figure 4-16):

## GLYPHOSATE WORKER SKIN

## HEALTH EFFECTS  - CALIFORNIA

Summary of Occupational Illness due to Glyphosate in California, 1982-1985.

| Type of Worker | Systemic | Eye | Skin | Eye and Skin | Total |
|---|---|---|---|---|---|
| Ground Applicator | 6 | 19 | 17 | 0 | 42 |
| Hand Applicator | 18 | 44 | 35 | 3 | 100 |
| Other type Applicator | 0 | 1 | 0 | 0 | 1 |
| Subtotal Applicators | 24 | 64 | 52 | 3 | 143 |
| Mixer-Loader | 1 | 24 | 7 | 0 | 32 |
| Coincidental Exposure | 3 | 7 | 2 | 0 | 12 |
| Exposure to Field Residue | 0 | 0 | 5 | 0 | 5 |
| Other type Residue Exposure | 1 | 0 | 0 | 0 | 1 |
| Exposure to Concentrate | 0 | 4 | 1 | 0 | 5 |
| Subtotal other Workers | 5 | 35 | 15 | 0 | 55 |
| Grand total | 29 | 99 | 67 | 3 | 198 |

Ground Applicator:  Person exposed while applying by dust or spray rig.

Hand Applicator:    Person exposed while applying by hand-pump, hose-end, or backpack sprayer, duster or aerosol can.

Coincidental
  Exposure:         Person exposed to an application-strength dilution, not directly involved in handling the pesticide.  Primarily includes persons exposed to spray drift.

Exposure to Field
  Residue:          Person exposed to residues while working in a previously treated field.

Exposure to
  Concentrate:      Persons involved in handling pesticide products between packaging and use (warehouses, truckers, retailers).

**Figure 4-16: California Worker Dermal Impacts
(Exhibit 180, Bates MONGLY00241331)**

Attachments #2 and #3 (Figures 4-17 and 4-18) show the differences in dermal protection based on signal words "WARNING" and "CAUTION"; little dermal protection is offered to workers using products labeled with the word "CAUTION".

**Attachment 2**   WORKER SAFETY RULES FOR ALL GLYPHOSATE PRODUCTS CONTAINING THE SIGNAL WORK "WARNING" FOR SKIN OR EYE IRRITATION

Keep all unprotected persons, children, livestock, and pets away from treated areas or where there is danger of drift.

Do not rub eyes with hands.  See First Aid (Practical Treatment) Section.

HANDLE THE CONCENTRATE ONLY WHEN WEARING THE FOLLOWING PROTECTIVE CLOTHING AND EQUIPMENT.

Wear chemical resistant gloves, chemical resistant apron, chemical resistant shoes, shoe coverings, or boots, long sleeve shirt, long legged pants, and a face shield or goggles.

WEAR THE FOLLOWING PROTECTIVE CLOTHING DURING APPLICATION, EQUIPMENT REPAIR, CLEANING, DISPOSAL OF THE SPRAY SOLUTION, AND DURING REENTRY TO TREATED AREAS BEFORE THE SPRAY HAS DRIED.

Wear long sleeved shirt, long legged pants, chemical resistant gloves, and a face shield or goggles.  A helmet with visor may be worn during open cockpit aerial application.

Only during application from a tractor with a completely enclosed cab or aerially with an enclosed cockpit will the face shield or goggles and gloves not be required.  Chemical resistant gloves must be available in the cab or cockpit and must be worn while exiting.

IMPORTANT!  Before removing gloves, wash them with soap and water. Always wash hands, face and arms with soap and water before smoking, eating, drinking, or toileting.

AFTER WORK, wash protective clothing and equipment with soap and water after each use.  Personal clothing worn during use should be laundered seperately from household articles.  Clothing or protective equipment heavily contaminated or drenched with glyphosate must be disposed of in accordance with state or local regulations.

HEAVILY CONTAMINATED OR DRENCHED CLOTHING CANNOT BE ADEQUATELY DECONTAMINATED.

## Figure 4-17: Recommended Worker Rules for Glyphosate Products with the Word "WARNING" (Exhibit 180, Bates MONGLY00241332)

Attachment 3.   WORKER SAFETY RULES FOR ALL GLYPHOSATE PRODUCTS
                INTENDED FOR AGRICULTURAL USES AND CONTAINING
                THE SIGNAL WORK "CAUTION"

---

Keep all unprotected persons, children, livestock, and pets away
from treated areas or where there is danger of drift.

When handling this product wear chemical resistant gloves, long
sleeve shirt, and long legged pants.

Before removing gloves, wash them with soap and water.  Always
wash hands, face, and arms with soap and water before smoking,
eating and drinking, or toileting.

After work:  Wash clothing and gloves with soap and water after
each use.  Personal clothing worn during use should be laundered
seperately from household articles.  Clothing or protective
equipment heavily contaminated or drenched with glyphosate must
be disposed of in accordance with state or local regulations.
Heavily contaminated or drenched clothing cannot be adequately
decontaminated.

**Figure 4-18: Recommended Worker Rules for Glyphosate Products with the
Word "CAUTION" (Exhibit 180, Bates MONGLY00241333)**

Monsanto follows up with letters (October 20, 1987 March 22, 1988) by Dr. Timothy
Long (see also earlier 1987 letter – Exhibit 290, pg.2) to US EPA's Mr. Taylor again
requesting exemption of glyphosate products from chemically protective PPE:

> "Dear Sir:
>
> …Specifically, **since all of the glyphosate containing products covered by the
> reregistration standard <u>fall into the toxicity categories III or IV for both dermal
> toxicity and dermal irritation</u>, the <u>requirement for "chemical resistant apron,
> chemical resistant shoes and shoe coverings or boots" should be deleted</u>**…".

US EPA's Dr. Long, because of the Category III and IV designations, somewhat
concedes to Monsanto in 1988 stating "***We, therefore, agree to the request from the
Monsanto Company to postpone additional requirements for PPE product
labeling in regard to pesticide handlers under the assumption*** that the PR Notice
will go into effect in a reasonable timeframe and ***<u>that the submitter begin
investigating the high number of eye and/or skin injuries associated with
glyphosate use in California</u>***."

[The flaw in this discussion is Monsanto's position that glyphosate products should be
classified dermal toxicity Category III or IV products rather than Category II!

1.   From a dermal toxicity standpoint, the work by Maibach et al., 1983 is clearly
     flawed and incomplete.  It would be incorrect to state, based on this limited and
     flawed study, that the dermal toxicity of glyphosate products requires essentially
     no dermal protection.

2.   The Maibach 1986 work on dermal irritation has severe limitations and is inconsistent with actual exposures and reported symptoms by workers.  Despite the request from US EPA that this inconsistency be resolved as part of the Agreement, no evidence has been discovered it was in fact ever resolved.

***Thus, the basis for Monsanto attempting to avoid the signal word "WARNING" and the resulting dermal protection warnings is based on flawed/very limited and inconsistent work by Maibach et al. from the 1980s.  Monsanto, then utilized this very cursory/conflicted research to persuade the US EPA that the glyphosate products should not require dermal skin protection warnings.***]

Later in July 1988, U.S. EPA's Edwin Tinsworth, Director Registration Division Office of Petroleum Programs writes to Monsanto's Dr. Timothy Long, Roundup® Registration Manager in July 1988 that Iowa Roundup® advertising showed applicators wearing gym shoes, short sleeve shirts, and long pants – a caller wondered about the safety of applicators.  Mr. Tinsworth reminds Monsanto's Dr. Long that EPA has not agreed that Monsanto is exempt from Worker Safety Rules requiring specific PPE to limit skin exposure to Roundup® (see Figures 4-19 and 4-20):

R____ _IVED AUG 0 2 1988



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

JUL 2 6 1988

OFFICE OF
PESTICIDES AND TOXIC SUBSTANCES

Dr. Timothy Long
Roundup Registration Manager
Monsanto Corporation
800 North Lindbergh Boulevard
St. Louis, Missouri  63167

Dear Dr. Long:

On June 8, 1988, a member of the medical school faculty at
the University of Iowa, Iowa City, informed the EPA that there
were television advertisements for Roundup, showing the chemical
being applied from a "bean bar". The applicators were wearing
gym shoes, short sleeve shirts and long pants. The caller was
concerned about safety to the applicators using Roundup as
depicted in the ad. We have viewed a tape of this advertisement

In the Glyphosate Registration Standard  issued by the
Agency in June, 1986, the Agency concluded that "formulations of
glyphosate for agricultural use cause moderate eye irritation and
some skin irritation." The following worker safety language was
required to appear on all end-use products containing glyphosate
(except for those labeled for homeowner use only) in order to
reduce worker exposure to formulations of Glyphosate, such as
Roundup:

        Worker Safety Rules

    THIS PRODUCTS CAUSES EYE IRRITATION AND SKIN
    IRRITATION...

    WEAR THE FOLLOWING PROTECTIVE CLOTHING DURING APPLICATION,
    EQUIPMENT REPAIR, CLEANING, DISPOSAL OF THE PESTICIDE
    SPRAY SOLUTION, AND DURING REENTRY TO TREATED AREAS
    BEFORE THE SPRAY HAS DRIED.

    Wear goggles or a face shield, chemical-resistant
    gloves and chemical-resistant shoes, shoe covers or
    boots...

These label changes were to have appeared on all products in
channels of trade by June 30, 1988.

**Figure 4-19: U.S. EPA's July 1988 Letter from Mr. Tinsworth to Monsanto's
Dr. Long – Worker Rules Still Apply to Monsanto's Roundup®
(Exhibit 181, Bates MONGLY00223580)**

> In a May 1988 letter to you, the Agency stated that it would defer the label requirements for Worker Safety Rules for eye and skin protection until a planned PR notice on personal protective equipment had gone into effect. The Agency also stated that "we feel that you should begin a investigation of the high number of eye and/or skin injuries associated with glyphosate use in California."
>
> At no time, however, were the label requirements modified or waived. This deferral does not imply that it is safe to use products containing glyphosate without protective equipment. The California Department of Food and Agriculture reported that glyphosate ranked third in the number of illnesses reported from exposure to pesticides. The majority of these illness were skin and eye irritations occurring during mixing, loading and application of glyphosate.

We are concerned that advertisements for Roundup (running through July in Iowa and perhaps other soybean growing areas) show the product being applied in a manner inconsistent with protective clothing requirements. In addition to our specific concerns with the safe use of Roundup, we believe that any advertisement for a pesticide should depict usage that minimizes unnecessary skin and eye exposure.

We feel that these advertisements are inappropriate, and we request that you cease running these spots, or that they be suitably modified. Please look into this matter immediately and contact us.

Sincerely,

Edwin Tinsworth, Director
Registration Division
Office of Pesticides Programs

cc: David McLaughlin C2NC
    Advertising Manager for Roundup
    Monsanto

**Figure 4-20: U.S. EPA's July 1988 Letter from Mr. Tinsworth to Monsanto's Dr. Long – Worker Rules Still Apply to Monsanto's Roundup® - cont. (Exhibit 181, Bates MONGLY00223581)**

Also, Monsanto's David McLaughlin, Advertising Manager for Roundup®, was copied on the letter.

In September 1988 U.S. EPA's Gerald B. Stubs (Acting Director – Compliance Division) writes Monsanto's Kevin Cannon regarding the need to show appropriate PPE in their advertising (Figure 4-19) and in October 1988 the U.S. EPA's Edwin F. Tinsworth (Acting Director, Registration Division) again writes Monsanto's Dr. Long addressing any past potential misunderstanding on Monsanto's need to follow the Worker Protection Rules (Figures 4-21 to 4-23):

P1.3024.10





UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

WASHINGTON, DC 20460

AUG 3 1 1988

RECEIVED SEP 0 7 1988

OFFICE OF
PESTICIDES AND
TOXIC SUBSTANCES

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Kevin F. Cannon, PhD.
Monsanto Company
1101 17th Street, NW
Suite 604
Washington, D.C.  20036

Dear Dr. Cannon:

    This is in regard to a television advertisement, which
appeared in Iowa for the product "Roundup".  My staff has
reviewed a film of the advertisement and noted that the
applicators did not have on the appropriate protective
clothing as specified in the regulation standards for the
chemical.  Instead, some of the applicators were wearing
short sleeved shirts and they appeared not to be wearing
goggles.

    On June 28 and July 7, 1988, Ms. Rose Burgess of my
staff discussed our concerns with you about the film.  As
a result of those conversations, as well as follow-up
discussions within the Agency, OCM has learned that the
Registration Division (RD) has agreed to defer the require-
ment for protective clothing for glyphosate from the
June 30, 1988 date until such time that a PR Notices is
issued by RD and goes into effect.

    The purpose of this letter is to advise you that
all advertisements for "Roundup" that are shown on or
after the effective date of the subject PR Notice should
be revised to address EPA's concerns regarding protective
clothing.

    If you have any questions or comments, please do
not hesitate to contact us.

                    Sincerely yours,

                    Gerald B. Stubbs, Acting Director
                    Compliance Division (EN-342)

**Figure 4-21: U.S. EPA's September 1988 Letter to Monsanto – Advertisement PPE
Not for Monsanto's Roundup® Applicators Not Appropriate
(Exhibit 181, Bates MONGLY00223579)**



RECEIVED OCT 3 1 1988

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

OCT 27 1988

OFFICE OF
PESTICIDES AND TOXIC SUBSTANCES

Dr. Timothy J. Long
Monsanto Company
1101 17th Street NW.
Washington, DC  20036

Dear Dr. Long:

Subject:  Glyphosate Products – Request for Postponement
          of Additional Requirements for Protective Clothing

     In reply to your letter of August 3, 1988, your assurance
that future advertisements for glyphosate products will be
consistent with the protective clothing requirements set forth
in the proposed rule on Worker Protection Standards alleviates
our concerns pertaining to the television advertisement for
"Round-Up."  Thank you for your assistance in resolving this
issue.

     I have reviewed all correspondence related to the issue
of protective clothing for your glyphosate products.  It
appears that there has been a misunderstanding as to the
protective clothing requirements necessary for these products.

     The Glyphosate Registration Standard (issued August 11,
1988) required that worker protection language appear on all
glyphosate-formulated products labeled for agricultural and
aquatic uses.  The Standard required that specific protec-
tive clothing be worn to "reduce the risk of injury to skin."

     In your letters dated September 30, October 20, November 2,
1987 and March 22, 1988, the Monsanto position on this issue
was presented to the Agency.  Monsanto Company also requested
(letter of October 20, 1987) deferral of parts of the worker
saftey label requirements for "chemical-resistant apron,
chemical-resistant shoes and shoe coverings or boots" since
these items are only requirements for Toxicity Category I
and II pesticides (the glyphosate toxicity categories are III
and IV).

**Figure 4-22: U.S. EPA's October 27, 1988 Letter to Monsanto –
Worker Rules Still Apply to Monsanto's Roundup®
(Exhibit 181, Bates MONGLY00223577)**

-2-

On May 13, 1988, the Agency responded to Monsanto Company's original request to defer the requirement for protective clothing until the "Worker Safety Rules" were implemented. The use of the term "protective clothing" is not specific. The Agency's only deferral was for your original request for postponement of the requirements for "chemical-resistant apron, chemical-resistant shoes and shoe covering or boots." Therefore, the following worker safety language "Wear goggles or a face shield, chemical-resistant gloves and chemical resistant shoes, shoe covers or boots . . ." required by the Standard is modified to read "Wear goggles or a face shield . . . ."

To correct this situation, contact the Product Manager for glyphosate (Robert J. Taylor, PM 25 ]703[ 557-1800) and arrange a meeting to review your present labeling to ensure that the labels are in compliance with Agency requirements.

For your information the proposed rule, when finalized, on Worker Protection Standards will take precedence over the Registration Standard.

In relation to the requirement to investigate ". . . the high number of eye and/or skin injuries associated with glyphosate use in California," we will comment on this issue after the review and evaluation of your findings submitted in reply to the Glyphosate Registration Standard. This review will be completed within a month from the date of this letter.

Sincerely,

Edwin F. Tinsworth, Acting Director
Registration Division

**Figure 4-23: U.S. EPA's October 27, 1988 Letter to Monsanto –
Worker Rules Still Apply to Monsanto's Roundup® - cont.
(Exhibit 181, Bates MONGLY00223578)**

He also reminds Monsanto, as noted nearly a year earlier, that Monsanto is to determine the conflict between observed skin injuries in California against Monsanto's claims that applying Roundup® is not a dermal (skin) issue.

In July 2001, Monsanto's Gustin, Martens, and Bates address the issue of the effects of their surfactants more technically as it would apply to the movement of glyphosate through human skin when they state (Exhibit 275, Bates MONGLY01839478):

"*Surfactants*

The upper barrier of the skin (epidermis) is very lipophilic. This natural barrier prevents dehydration of the skin and prevents for instance bacteria and other outer micro-elements from entering the body through the skin. Glyphosate on the other hand is very hydrophilic so initially a low interaction between glyphosate and the human skin is to be expected. S*urfactants are able to increase glyphosate absorption through the skin by (1) removal of lipids (sebum) from the epidermal surface due to surfactant action, (2) increase of the hydration state of the skin (under closed exposure conditions), (3) increase of skin contact (spreading of water droplets by surfactant action), (4) increase in contact time with the skin due to decrease of evaporation of water from the droplets containing surfactant (surfactant monolayer at surface of droplets slows down*

*passage to vapour phase),* (5) *increase of sub epidermal blood flow due to irritant action of surfactant,* (6) *intra-epidermal and sub epidermal intercellular water accumulation due to the irritant action of the surfactant*."

Thus, in 2001, Monsanto clearly writes that the surfactant in Roundup causes irritation of the skin [see items (5) and (6)] - and enhanced flux of glyphosate into the body through the skin.  Oddly, EPA in their 2009 Glyphosate Human Health Assessment refers to glyphosate as a slight skin irritant (Exhibit 286, pg. 5 – Bates MONGLY01201709) clearly not recognizing the effects surfactants (and the product as a whole) have on skin irritation – a fact clearly known by Monsanto as early as 2001.  Consequently, and surprisingly, the US EPA does not consider any short, intermediate or long-term dermal health effects in their 2009 human health risk assessment (Exhibit 286, pg. 22 – Bates MONGLY01201786).

The issue of field-reported incidents received by the U.S. EPA continued into 2009 (Exhibit 186, pg. 2).  In a February 26, 2009 U.S. EPA Office of Pesticide Programs (OPP) memorandum, regarding an updated review of glyphosate incident reports, 271 reports were received from February 2002 through June 2008.  Of these incidents, dermal complaints were reported in 29.5% (80) of the reports and neurological complaints in 36.2% (98) of the reports.  Similarly, in the June 3, 2009 U.S. EPA Glyphosate Human Health Assessment report, 289 incidents were noted to have been reported from 2002 to 2008 (Exhibit 286, pg. 13 – Bates MONGLY01201717); 87 (30.1%) were dermal.

[Clearly, the field reports of dermal issues, first reported in California data in the 1980s, has not been resolved by Monsanto or the U.S. EPA 20 years later.]

Other work also shows that Monsanto was aware of the lack of PPE worn in the field by actual applicators and skin exposures.  Regarding PPE used in the actual applications of Roundup®, Monsanto's John Acquavella and John Cowell, reporting on results of a South Carolina field site back to their Family Farm Exposure Task Force (July 7, 2000 memo – Exhibit 74), noted that:

➤    The application they observed involved Roundup® Ultra sprayed over approximately 22 acres of Roundup® Ready soybeans. The application rate was one quart per acre and applied using a boom sprayer.  Over the last two weeks, ~2,000 acres were sprayed.

➤    "The farmer did not use any protective equipment.  He wore shorts and did not use gloves.  That seemed to be his standard practice.  It took about an hour to complete the spraying.  During the spraying, one of the nozzles malfunctioned.  Both times, the farmer stopped the tractor in the middle of the field and got out to fix the nozzle.  There was obvious exposure to his bare legs and his bare hands.  The farmer washed his hands, but not his legs, after he finished the application."

The memo also noted that there were lots of errors in the notebooks being completed by technicians, urine samples were not being fully taken, and that questionnaires were not being completed.  Also, apparently Exponent was associated with this work.

OECD, in their 2011 Guidance Notes on Dermal Absorption (Exhibit 315, pg. 42), states that surfactants used in pesticides that they "may cause irritancy and erythema."

Thus, known information clearly demonstrate irritation to the skin from dermal exposures to Roundup®.

### 4.5.7 Review of 1983 Bio/Dynamics, Inc. Division of Biology and Safety Evaluation Dermal Studies on Roundup and Glyphosate Dermal Exposure Studies (Exhibit 346, MONGLY00135561-611):

As part of a package developed for the U.S. EPA by Monsanto dated December 20, 1983 (Exhibit 346, Bates MONGLY00135556), two dermal sensitization studies by Bio/Dynamics, Inc., on guinea pigs were included using Roundup in one study and glyphosate in the other study. Both studies were funded by Monsanto. A review of both studies follows:

### 4.5.7.1 Review of Report Dated October 7, 1983 on Dermal Sensitization Study of Guinea Pigs Including Roundup® Formulation by Carol Auletta, Ira Daly, and Craig Lamb of Bio/dynamics, Inc. (Exhibit 346, Bates MONGLY135561-583:

Groups of male and female guinea pigs were used to determine their skin sensitization to a Monsanto Roundup® formulation containing 41.06% IPAG (balance of ingredients not specified), and two controls (0.85% saline solution and DNCB (1-chloro 2,4-dinitrobenzene in an 80% ethanol acetone solution). Dosing procedures were as follows:

Induction Phase:  "On the day prior to the first application, the hair on the dorsal and lateral surfaces was clipped short with an electric clipper. The materials were administered in a volume of 0.2 mℓ beneath a surgical gauze square, 1" x 1", eight single layers thick, placed directly on the test site. The test site was the right side of the midline, as close to the midline as possible. The patch was covered by an overlapping, impermeable plastic. This was firmly secured by an elastic bandage (Elastophast®) which was wound around the torso of the animal. The patch was left in place for 6 hours, after which it was removed and the skin was wiped free of any excess material. This was repeated three times a week for three weeks, for a total of nine exposures…..Animals were reclipped as necessary.

Challenge Phase:

a.    Test Animals: Fourteen days after the last sensitization exposure, the challenge treatment was administered. Animals were clipped as before and the test or control substance was administered in the same manner as in the induction phase, but at a second site, on the left side of the midline. After six hours of exposures, the patches were removed and the skin wiped free of any excess material.

b.    Irritation Control Animals:  In order to differentiate dermal reactions produced by irritation from those produced by sensitization, previously untreated animals were subjected to the same challenge procedures as the animals which received the nine induction exposures of either the control or test materials."

In summary:

➢ The induction phase consisted of *repeated* exposures to test substances at six-hour intervals, three times a week, for three weeks, resulting in 9 observations of the skin condition per animal.

➢ The challenge tests, to both previously exposed, and animals not previously exposed, consisted of a six-hour single exposure event resulting in 1 observation of the skin condition per animal.

Dermal sensitization was measured as outlined in the work by Maibach discussed earlier and the study stated that: "Dermal scores of 1 or greater (in the absence of dermal response in irritation control studies) are considered clearly indicative of sensitization."

Note that 0.2 mℓ [volume = 0.2 cm$^3$ or 0.0122 cubic inches (0.2/2.54$^3$)] applied over a 1 square inch area, results in an initial liquid thickness of 0.0122 inches (or ~0.31 mm).

Test results from repeated exposure to the Roundup formulation from the paper are shown in Figure 4-24:



**Figure 4-24: Dermal Sensitization Results Using Monsanto Roundup Formulation – Repeated Exposures – 9 Events over 3 Weeks – (Exhibit 346, Bates MONGLY00135577)**

Dermal observation categories used in the table were defined as shown in Table 4-12 below:

### Table 4-12: Dermal Sensitization Observation Categories
### (Exhibit 346, MONGLY00135606)*

| Category | Observation |
|---|---|
| 0 | No Reaction |
| ± | Very Slight (barely perceptible) Erythema, Usually Nonconfluent |
| 1 | Slight (well defined) Erythema, Usually Confluent |
| 2 | Moderate Erythema |
| 3 | Severe Erythema, With or Without Edema, Necrosis or Eschar Formation |

\* If edema (i.e., watery fluid collecting in body cavity), necrosis (i.e., death of living tissue) or eschar (i.e., a dry, dark scab or falling away of dead skin) formulation occurred, they were also indicated by the following code: Edema – Ed; Necrosis – N and/or Eschar – E. [Desquamation was not defined in Appendix B as suggested, but means "skin peeling or the shedding of the outermost membrane or layer of the skin].

As can be observed from the data in Figure 4-24:

➢ Skin irritation (Category 1 and Category 2 with Edema) was observed as early as the fifth application at the end of the first week of testing.

➢ Including edema (i.e., watery fluid collecting in body cavity), skin effects were observed in 9 of 10 animals by the end of the first week.

Single application challenge test results did not show skin irritation.

Regarding Roundup formulation study results, the study stated under the Results section that:

"***Very slight to moderate dermal irritation was noted in all animals following the third induction dose of ROUNDUP***. Several animals exhibited edema, desquamation (i.e., scaling of the skin) and mild necrosis (i.e., mild death of living tissue). Since the range-finding study had not shown the dose of ROUNDUP used for induction to be nonirritating, ***the responses observed were attributed to cumulative irritation or skin fatiguing effect of the test compound***. Upon challenge with the same dose of ROUNDUP to a naïve site, no dermal response was observed. This indicated that ROUNDUP did not exhibit the potential to produce dermal sensitization in guinea pigs."

And concluded by stating:

"*Under conditions of this study, ROUNDUP® FORMULATION exhibited some potential to produce dermal irritation after repeated exposures*; however, no potential to produce dermal sensitization in guinea pigs was seen."

Thus, it is clear that this study showed a Roundup formulation to be a skin irritant in all animals with repeated exposures (results seen in as few as three (3) exposure events by the end of the first week) but not a skin sensitizer for single exposures. Thus, Monsanto knew by 1983, repeated use of a Roundup formulation irritated the skin of the vast majority of test animals after only three applications. The last statement in the results and in the conclusions is odd and obfuscates the obvious findings stated in the

balance of the results paragraph.  Use of the word "potential" in the conclusions is also odd since the vast majority of the test animals had skin irritation after only three applications of Roundup formulation to their skin within the first week of the three week study; it was the potential for skin irritation, but actual skin irritation was observed.

4.5.7.2     Review of Report Dated July 22, 1983 on Dermal Sensitization Study of Guinea Pigs Including Roundup® Formulation by Carol Auletta, Ira Daly and Craig Lamb of Bio/dynamics, Inc. (Exhibit 346, Bates MONGLY135586-606:

Groups of male and female guinea pigs were used to determine their skin sensitization to a Monsanto glyphosate (white powder) and two controls (saline solution and DNCB (1-chloro 2,4-dinitrobenzene in an 80% ethanol acetone solution).  Dosing procedures were as follows:

Induction Phase:  "On the day prior to the first application, the hair on the dorsal and lateral surfaces was clipped short with an electric clipper.  The negative and positive control materials were administered in a volume of 0.2 mℓ beneath a surgical gauze, square 1" x 1", eight single layers thick, placed directly on the test site.  The test material was applied dry (0.2 cc), moistened with 0.2 mℓ of saline, and covered with a gauze square.  The test site was the right side of the midline, as close to the midline as possible.  The patch was covered by an overlapping, impermeable plastic.  This was firmly secured by an elastic bandage (Elastophast®) which was wound around the torso of the animal.  The patch was left in place for 6 hours, after which it was removed and the skin was wiped free of any excess material.  This was repeated three times a week for three weeks, for a total of nine exposures…..Animals were reclipped as necessary. Note: On one occasion (the eighth induction) the exposure period was decreased from 6 hours to 4 hours because of extreme weather conditions (snow emergency, blizzard conditions) which necessitated an early closing of the laboratory.  It was not felt that this miner deviation would affect the quality or integrity of the study.

Challenge Phase:

a.     Test Animals: Fourteen days after the last sensitization exposure, the challenge treatment was administered.  Animals were clipped as before and the test or control substance was administered in the same manner as in the induction phase, but at a second site, on the left side of the midline.  After six hours of exposures, the patches were removed and the skin wiped free of any excess material.

b.     Irritation Control Animals:  "In order to differentiate dermal reactions produced by irritation from those produced by sensitization, two groups of three male and three female animals (previously untreated) were subjected to the same challenge procedures as the animals which received the nine induction exposures of either the positive control or test material."

In summary, like with the Roundup formulation study:

➢ The induction phase consisted of *repeated* exposures to test substances at six-hour intervals, three times a week, for three weeks resulting in 9 observations of the skin condition per animal.

➢ The challenge tests, to both previously exposed, and animals not previously exposed, consisted of a six-hour single exposure event, resulting in 1 observation of the skin condition per animal.

Dermal sensitization was measured as outline in the work by Maibach discussed earlier and the study stated that: "Dermal scores of 1 or greater (in the absence of dermal response in irritation control studies) are considered clearly indicative of sensitization."

Test results from repeated exposure to glyphosate from the paper are shown in Figure 4-25:



**Figure 4-25: Dermal Sensitization Results Using Monsanto Roundup Formulation – Repeated Exposures – 9 Events over 3 Weeks – (Exhibit 346, Bates MONGLY00135600)**

As can be observed from the data in Figure 4-25:

➢ Skin irritation (Category 1 – Erythema) was observed as early as the sixth application at the end of the second week of testing.

➢ By the third week (skin applications #7 through #9), skin irritation (Category 1 – Erythema, Category 2 Erythema and Induration, and Category 3 – Erythema [i.e., reddening of the skin), Induration (i.e., harden), and Vesicle (i.e., small blister filled with clear fluid)], as well as edema (i.e., watery fluid collecting in body

cavity), was observed in 9 of 10 animals.  This includes all animals (10 of 10) if the last animal's desquamation results are included in application #9 results.

Single application challenge test results did not show skin irritation.

Regarding glyphosate study results, the study stated under the Results section that:

> "***Mild irritation was noted was observed following the sixth induction dose of glyphosate which persisted for the remainder of the induction period.*** Several animals exhibited moderate to severe erythema, edema and necrosis. Since the range-finding study had not shown the dose of glyphosate used for induction to be nonirritating, ***the responses observed were attributed to cumulative irritant or skin fatiguing effect of the test compound***.  Upon challenge with the same does of glyphosate to a naïve site, no dermal response was observed.  This indicated that glyphosate did not exhibit the potential to produce dermal sensitization in guinea pigs"

And concluded by stating:

> "Under conditions of this study, glyphosate did not exhibit the potential to produce dermal sensitization in guinea pigs."

Thus, it is clear that this study showed glyphosate to be a skin irritant in all animals with repeated exposures (results seen in as few as six (6) exposure events by the end of the second week) but not a skin sensitizer for single exposures.  Thus, Monsanto knew by 1983, repeated use of glyphosate irritated the skin of the vast majority of test animals after only six applications.  The last statement in the results and in the conclusions is odd and obfuscates the obvious findings stated in the balance of the results paragraph. Use of the word "potential" in the conclusions without mentioning the repeated effects of the skin irritation findings is also odd since the vast majority of the test animals had skin irritation after only six applications of glyphosate to their skin within the second week of the three week study; it was the potential for skin irritation, but actual skin irritation that was observed.

Finally, it is clear that Roundup formulations irritated the skin quicker than just glyphosate alone (i.e., data in Figure 4-22 vs. Figure 4-23), suggesting other ingredients in Roundup other than glysophate also irritate skin.  This fact too was also known by Monsanto in the early 1980s.

Results of the 1983 dermal irritation studies demonstrate skin irritation effects on animals (guinea pigs and monkeys).  As illustrated in Section 6.3, Table 6-1 below, the dermal toxicity Category II applies to products causing severe dermal irritation – 72 hrs.; whereas the dermal toxicity Category III applies to products causing moderate dermal irritation.  However, under signal word categories (Table 6-2 and text that follows), the signal word "WARNING" is defined as:

> "Indicates _the pesticide product_ is moderately toxic if eaten, absorbed through the skin, inhaled or it ***causes moderate*** eye or _skin irritation_."

Under Table 6-8, Typical Statements for Primary Skin Notation, under the signal word "WARNING" the statement is: "***Causes Skin Irritation***…."  The signal word "CAUTION" contains no such language.

Note that the key 1986 Maibach dermal study demonstrated moderate dermal effects at 36 hours, well below the 72-hr. limitation set by the EPA.

[The 1983 Bio/Dynamics demonstrated much earlier formation of more severe dermal effects of the Roundup® formulation vs. glyphosate alone.  Thus, by no later than the early to mid-1980s, the appropriate signal word that Monsanto should have been using on its Roundup formulations was "WARNING", which would have required considerably more PPE than the signal word "CAUTION" used to this day.]

Further, Exhibit 296, UCIPM Video #3 on PPE states that the signal word "WARNING" should be used for any product causing dermal irritation.

### 4.5.8  UK POEM Model Roundup™ Exposure Modeling Studies:

Modeling of Operator exposures when spraying Round™ formulation MON 2139/MON 52276 SL (water based) undertaken using the UK POEM model are summarized in Exhibit 459 (Bates MONGLY06509226-58).  Spray volume/dose parameters used in the modeling are reproduced in Figure 4-26 and UK POEM model data entries in Figure 4-27:

| Equipment | Dose (l/ha) | | Spray volume (l/ha) | | | | |
|---|---|---|---|---|---|---|---|
| | | | Cda 20 | Very low 35-70 | Low 80 | Standard 200 | High 250 |
| Tractor mounted sprayer | Standard | 3 | | | x | x | x |
| | High | 6 | | | x | x | x |
| Knapsack | Standard | 5 | | x | x | x | x |
| | High | 10 | | | | x | |
| cda | Standard | 5 | x | | | | |
| | High | 10 | x | | | | |

*Table 1: Spray volume / dose combination for different applicator type in UK*

**Figure 4-26: Spray Volume/Dose Parameters
(Exhibit 459, Bates MONGLY006509236)**

Equipment used was either i) a tractor mounted sprayer, ii) a knapsack or iii) a rotary disc sprayer.  Spray doses ranged from 3 to 10 ℓ/ha and spray volumes ranged from 20 to 250 ℓ/ha.

| Table 2: UK POEM data entries | |
|---|---|
| **Formulation** | MON 2139 / MON 52276 SL (water based) |
| **Concentration** | 360 g a.e./L (a.e. = glyphosate acid) |
| **Application dose** | 6 litres/ha (Tractor mounted) |
| | 5 litres/ha (hand held) |
| **Volume of spray solution**<br>    Closed cab application<br>    Hand held outdoors hydraulic nozzles<br>    Hand held outdoors rotary disks atomizers | 80 liters/ha<br>35 liters/ha<br>20 liters/ha |
| **Workload   Tractor:** | 50 ha /day |
| **             Hand held** | 1 ha/day |
| **Application equipment** | Tractor mounted equipment (with cab-without cab) |
| | Hand held outdoors hydraulic nozzles |
| | Hand held outdoors rotary disks atomizers |
| **Dermal penetration factor** | 3% |
| **Bio-availability from inhalation** | 100% |
| **Penetration through clothes**<br>**Trunk-level/leg-level:**<br>    Closed cab application<br>    Hand held outdoors hydraulic nozzles<br>    Hand held outdoors rotary disks atomizers | <br><br>5% / 15%<br>20% / 18%<br>5% / 20% |

| **Personal protective equipment** | **Reduction factor** | |
|---|---|---|
| | **Mixing & Loading** | **Application** |
| Gloves | 5% | 10% |
| Impermeable clothes (trunk, legs) | 5% | 5% |

**Figure 4-27: UK POEM Model Input Parameters**
**(Exhibit 459, Bates MONGLY006509237)**

The absorbed dermal dose was assumed to be 3%. Dermal penetration through trunk-level clothes was assumed to range from 5% to 20% and through leg-level clothes was assumed to range from 15% to 20%. Actual experimental data showed penetration rates through clothes to range from 4% to 40% (MONGLY06509257).

Results using very non-conservative applications rates (i.e., low to very low spray volumes) an assumed body weight of 60 kg and AOEL of 0.2 mg/kg body weight/day (since 2015 the value has been reduced to 0.1 mg/kg body weight/day - https://www.efsa.europa.eu/en/press/news/151112 and Exhibit 465) are presented in Figures 4-28 to 4-30 for tractor, hand held nozzles, and hand held disks respectively:



## 4.1. Tractor mounted with cab: low spray volume (80 l/ha)

### A. Product data

| | | |
|---|---|---|
| 1. | Product name: | Roundup (MON 2139) |
| 2a. | Active ingredient (a.i.) | glyphosate |
| 2b. | Concentration | 360 mg/mL (acid equivalent) |
| 3. | Formulation type | SL |
| 4a. | Main solvent | water |
| 4b. | Concentration of solvent | not applicable |
| 5. | Maximum in use a.i. concentration | 27 mg/mL |

### B. Exposure during mixing and loading

| | | NONE | GLOVES |
|---|---|---|---|
| 1a. | Container size | 5 liter | |
| 1b. | Hand contamination per operation | 0.01 mL/ operation | |
| 2. | Application dose | 6 liters product/ha | |
| 3. | Work rate | 50 ha/day | |
| 4. | N° operations / day | 60/day | |
| 5. | Hand contamination | 0.6 mL/day | |
| 6. | Protective clothing | NONE | GLOVES |
| 7. | Transmission to skin | 100 % | 5 % |
| 8. | Dermal exposure to formulation | 0.6 mL/day | 0.03 mL/day |
| 9. | Concentration of a.s. | 360 mg/mL | 360 mg/mL |
| 10. | Dermal exposure to a.s. | 216 mg/day | 10.8 mg/day |
| 11. | Percent absorbed | 3% | 3% |
| 12. | Absorbed dose (mg/person/day) | 0.108 | 0.0054 |

### C. Exposure during spray application

| | | | | | |
|---|---|---|---|---|---|
| 1. | Application technique: | Vehicle mounted (with cab) Hydraulic nozzles | | | |
| 2. | Application volume | 80 liter/ha | | | |
| 3. | Volume of surface contamination | 10 mL/h | | | |
| | | **HANDS** | **HANDS** | **TRUNK** | **LEGS** |
| 4. | Exposure distribution | 65 % | 65 % | 10 % | 25 % |
| 5. | Clothing | none | gloves | permeable | permeable |
| 6. | Penetration | 100 % | 10 % | 5% | 15% |
| 7. | Dermal exposure (mL/h) | 6.5 | 0.65 | 0.05 | 0.375 |
| 8. | Duration of exposure | 6h | 6h | 6h | 6h |
| | | **PPE:** | **NONE** | **GLOVES** | |
| 9. | Total dermal exposure to spray | | 41.55 mL/day | 6.45 mL/day | |
| 10. | Concentration of a.i. | | 27 mg/mL | 27 mg/mL | |
| 11. | Dermal exposure to a.i. | | 1121.85 mg/day | 174.15 mg/day | |
| 12. | Percent absorbed | | 3% | 3% | |
| 13. | Absorbed dose | | 33.6555 mg/day | 5.2245 mg/day | |

### D. Inhaled exposure during spray application

| | | |
|---|---|---|
| 1. | Inhalation exposure | 0.01 mL/h |
| 2. | Duration of exposure | 6 h |
| 3. | Concentration of a.i. | 27 mg/mL |
| 4. | Inhalation exposure to a.i. | 1.62 mg/day |
| 5. | Percent absorbed | 100% |
| 6. | Absorbed dose | 1.62 mg/day |

### E. Predicted exposure

| | | | |
|---|---|---|---|
| 1. | No gloves | 0.6959 mg/kg bw/day | 347 % AOEL |
| 2. | Gloves only when mixing & loading | 0.5933 mg/kg bw/day | 297 % AOEL |
| 3. | Gloves during M&L and during spray application | 0.1195 mg/kg bw/day | 60 % AOEL ← OK! |

**Figure 4-28: UK POEM Model Input Results – Tractor Mounted with Cab – Low Spray Volume – 80 ℓ/ha (Exhibit 459, Bates MONGLY006509238)**

Results of the calculations by the authors for a tractor cab worker shown in Figure 4-28 illustrate that only when wearing gloves during all activities is the calculated glyphosate exposure below 0.2 mg/kg-body weight/day and in no cases would the values meet the 0.1 value present since 2015.



**4.2. Hand-held outdoors hydraulic nozzles: Low level Application: very low spray volume (35 l/ha)**

Protective equipment:
Gloves at all time + waterproof jacket and trousers + rubber boots

**A. Product data**

| 1. | Product name: | Roundup (MON 2139) |
| 2a. | Active ingredient (a.i.) | glyphosate |
| 2b. | Concentration | 360 mg/mL (acid equivalent) |
| 3. | Formulation type | SL |
| 4a. | Main solvent | water |
| 4b. | Concentration of solvent | not applicable |
| 5. | Maximum in use a.i. concentration | 51.43 mg/mL |

**B. Exposure during mixing and loading**

| 1a. | Container size | 5 liter |
| 1b. | Hand contamination per operation | 0.01 mL/ operation |
| 2. | Application dose | 5 liters product/ha |
| 3. | Work rate | 1 ha/day |
| 4. | N° operations / day | 2/day |
| 5. | Hand contamination | 0.02 mL/day |
| 6. | Protective clothing | GLOVES |
| 7. | Transmission to skin | 5 % |
| 8. | Dermal exposure to formulation | 0.001 mL/day |
| 9. | Concentration of a.s. | 360 mg/mL |
| 10. | Dermal exposure to a.s. | 0.36 mg/day |
| 11. | Percent absorbed | 3% |
| 12. | Absorbed dose | 0.0108 mg/day |

**C. Exposure during spray application**

| 1. | Application technique: | Hand-held Outdoors Hydraulic Nozzles: Low level application |
| 2. | Application volume | 35 liter/ha |
| 4. | Volume of surface contamination | 50 mL/h |

|  |  | HANDS | TRUNK | LEGS |
|---|---|---|---|---|
| 4. | Exposure distribution | 25 % | 25 % | 50 % |
| 5. | Clothing | gloves | impermeable | impermeable |
| 6. | Penetration | 10 % | 5% | 5% |
| 7. | Dermal exposure (mL/h) | 1.25 | 0.625 | 1.25 |
| 8. | Duration of exposure | 6h | 6h | 6h |

|  |  | PPE: | GLOVES |
|---|---|---|---|
| 9. | Total dermal exposure to spray |  | 18.75 mL/day |
| 10. | Concentration of a.i. |  | 51.43 mg/mL |
| 11. | Dermal exposure to a.i. |  | 964.31 mg/day |
| 12. | Percent absorbed |  | 3% |
| 13. | Absorbed dose |  | 28.92 mg/day |

**D. Inhaled exposure during spray application**

| 1. | Inhalation exposure | 0.02 mL/h |
| 2. | Duration of exposure | 6 h |
| 3. | Concentration of a.i. | 51.43 mg/mL |
| 4. | Inhalation exposure to a.i. | 6.17 mg/day |
| 5. | Percent absorbed | 100% |
| 6. | Absorbed dose | 6.17 mg/day |

**E. Predicted exposure**

| 1. | Gloves during M&L and during spray application | *0.585 mg/kg bw/day* | *293 % AOEL* |

**Figure 4-29: UK POEM Model Input Results – Hand Held Outdoors Hydraulic Spray Nozzles – Very Low Spray Volume – 35 ℓ/ha (Exhibit 459, Bates MONGLY006509239)**

Results of the calculations by the authors for a worker using a hydraulic sprayer shown in Figure 4-29 illustrate that the calculated glyphosate exposure is 0.585 mg/kg body weight/day, nearly three (3) times the recommended 0.2 mg/kg-body weight/day allowed and nearly six (6) times the 0.1 value present since 2015. The inhalation portion of the calculated exposure was 17.6% of the total exposure and the dermal component 82.4% of the total exposure.

These calculations use non-conservative assumptions assuming 10%, 5%, and 5% of the dose applied to the hands, trunk, and legs reached the skin.  If one is conservative and assumed 100% of the dose reached the skin, the results increase to 7.82 mg/kg body weight/day from 0.585 mg/kg body weight/day, ~39 times the recommended 0.2 mg/kg-body weight/day and ~78 times the 0.1 value present since 2015.



**Figure 4-30: UK POEM Model Input Results – Hand-Held Outdoor Rotary Disk Atomizers – Very Low Spray Volume – 20 ℓ/ha (Exhibit 459, Bates MONGLY006509240)**

Results of the calculations by the authors for a worker using a hydraulic sprayer shown in Figure 4-30 illustrate that the calculated glyphosate exposure is 0.3871 mg/kg body weight/day, nearly two (2) times the recommended 0.2 mg/kg-body weight/day allowed and nearly four (4) times the 0.1 value present since 2015.  The inhalation portion of the calculated exposure was 23.2% of the total exposure and the dermal component 76.8% of the total exposure.

These calculations use non-conservative assumptions assuming one 10%, 5%, and 5% of the dose applied to the hands, trunk and legs reached the skin.  If one is conservative and assumed 100% of the dose reached the skin, the results increase to 1.01 mg/kg body weight/day from 0.3871 mg/kg body weight/day, ~5 times the recommended 0.2 mg/kg-body weight/day and ~10 times the 0.1 value present since 2015.

In all scenarios the dermal exposures vastly exceed the calculated inhalation exposures and in nearly all the cases the exposures exceeded the recommended value of 0.2 mg/kg body weight/day.   Regarding hand-held spray equipment, and even with aggressive skin protection assumptions, the report concludes that:

> *"Systemic operator exposure calculated for hand-held equipment (hydraulic nozzles & RDA) was 2 to 3 times above the AOEL (0.2 mg/kg bw/day), when low spray volumes are applied, and this even when considering that gloves and impermeable clothes are worn during mixing, loading and application."*

Results are much worse when no such gloves and clothing are worn.

### 4.5.9  US EPA Model Roundup™ Exposure Modeling Studies:

In 1981, out of concern regarding the presence of Dioxane found in the Roundup™ POEA surfactant, Monsanto completed risk/exposure assessments based in part on a US EPA dermal model (Exhibits 481 and 482).  The model was (see for example Bates MONGLY00154365 and MONGLY00154394):

DOSE = BEXP * DCF * AREA * RATE * AR

Where:

BEXP =       base exposure data (i.e., pesticide active ingredient dermal deposition and inhalation exposure rates) from studies in the U.S. Environmental Protection Agency's generic data base.

DCF =        the 1,4 dioxane correction factor based on the ratio of dioxane to a.i. in the formulated product.

AREA =       the number of acres or hectares treated in one day.

RATE =       the application rate for the formulated product.

AR =         the absorption rate for 1,4 dioxane via dermal and inhalation exposure.

While this equation was used for dioxane, it clearly could be used for glyphosate; many of the variables used in the subsequent analysis were based on glyphosate applications and recognized the increased exposures for different clothing and transfer systems (Figure 4-31):

| Protective Clothing Scenario | Open Transfer System | Closed Transfer System |
|---|---|---|
| Long Pants Long Sleeves Gloves | 19.3 | 1.9 |
| Long Pants Short Sleeves No Gloves | 75.6 | 7.6 |

**Figure 4-31: Dermal and Inhalation Exposures – Glyphosate - With and Without Gloves and Open/Closed Transfer Systems (Exhibit 481, Bates MONGLY00154366 and 375-376 & Exhibit 482, Bates MONGLY00154395 and 405-408)**

From the data is Figure 4-31, it is clear that Monsanto knew in 1981 that:

➢ Dermal exposures to Roundup's active ingredient glyphosate were greatly decreased simply by the use of gloves:

- Open transfer cases – gloves vs no gloves – 19.3 vs 75.6 – exposure reduced by a factor of 3.92 or 392%.

- Closed transfer cases – gloves vs no gloves – 7.6 vs 1.9 – exposure reduced by a factor of 4.00 or 400%.

Monsanto calculated that dermal was the dominant portion (96.7% to 99.2%) of the total exposure.

Other parameters used in the tractor exposure assessment were: i) acres/day: 150; ii) Days/Yr.: 100; iii) Glyphosate application rates – µg/lb ai applied 1.9 to 75.6.

For aerial mixer/loading applications, parameters used were: i) glyphosate dose – 0.000108 mg/kg/lb a.i. applied; ii) application rate - 2.0 lb/acre or 6.3 ℓ/ha; iii) area/project or day - 99 acres or 40 ha and, iv) applications/yr. - 25.

For manual backpack sprayer applications, parameters used were: i) glyphosate dose – 0.000294 mg/kg/lb a.i. applied; ii) application rate - 1.5 lb/acre or 4.8 ℓ/ha; iii) area/project or day - 3.7 acres or 1.5 ha, and iv) applications/yr. – 13.

The U.S. EPA Office of Pesticide Programs developed Pesticide Handler Unit Exposure Surrogate Reference Tables beginning in April 2011 (Exhibit 483) with the latest updates to these table in 2018 (https://www.epa.gov/sites/production/files/2018-06/documents/opp-hed-pesticide-handler-surrogate-unit-exposure-table-june-2018.pdf). An example of the effect of gloves vs no gloves can be observed from the data presented:

➢ Mixer / Loader / Applicator, Manually-Pressurized Handwand – for Greenhouses, Wildlife management, Nurseries, Landscaping, Industrial/Commercial areas, Poultry/livestock houses, Animal treatments, Outdoor residential areas, Interior landscaping, Aquatic areas, Exterior building components, Mushroom houses, Christmas Tree Farms:

- No Gloves - Unit Exposure - 100,000 µg/lb ai.

- Gloves - Unit Exposure - 430 µg/lb ai.

➢ Mixer / Loader / Applicator - Mechanically-pressurized Handgun Sprayer for Orchards, Vineyards, Specialty Agricultural Crops, Rights-of-way, Nurseries:

- No Gloves - Unit Exposure – 6,050 µg/lb ai.

- Gloves - Unit Exposure – 2,050 µg/lb ai.

Clearly gloves can have a dramatic affect on dermal doses.


## 5.0    PUBLIC HEALTH AND SAFETY & INDUSTRIAL HYGIENE CONCEPTS:

### 5.1    Concept of Warnings

Conceptually, the concept of "warnings" are defined by the Cambridge dictionary as (https://dictionary.cambridge.org/us/dictionary/english/warning):

**Notice of a possible danger or problem, so that it can be prevented or avoided.**

Thus, "warnings" in their basic form are notice(s) about a possible danger or problems that alert the person so the danger or problem can be prevented or avoided by an individual.

### 5.2    Concept of Erring on the Side of Public Health and Safety and Those Informed of Hazards Better Protect Themselves from Such Hazards than the Uniformed:

Susan Hadden (Exhibit 39), in her paper "Labeling of Chemicals to Reduce Risk", illustrates the importance of warnings to reduce risks of exposures to chemicals by workers and consumers by being informed of the hazards they face:

"Of the fifteen or so major risk-abatement laws enacted during the 1970's, _all_ except the ones pertaining to clean air and water _require or permit_ **labeling** _of hazardous products_ **as one way of reducing risks to consumers** and workers."

Hadden goes on to state that risk "expresses some likelihood that something harmful or undesirable will occur, and so it is the joint consideration of probability and of adverse consequences."  She notes:

"_One of the most troublesome aspects of risk for many people is the extent to which certain involuntary or uncontrollable risk are_ **unknowingly assumed**…."

"In sum, **information is a central element in a person's ability to reduce or take control over the decision to assume risks that confront him**."

[Conversely the lack of information gives the individual no ability to know of or control the risks that confront someone exposed to a potential hazard.  Hadden notes that the two primary reasons for lack of knowledge about the risks one faces are:

1.      The information is not available

2.      The information is not accurate.]

Hadden notes that reduction of risk – probability, magnitude, and severity – is based on communications with the intent to reduce "*either the number of people* or the land or water area affected *or the seriousness of the consequences of undertaking a particular act.*"  Further, Hadden states:

> *"Labeling is designed to accomplish these purposes by informing people (who would otherwise not know) that a risk exists and informing people (who do know that there is a risk) how to reduce or avoid it through the proper use or preventive measures."*

This concept has been present for decades if not longer.  Davis (Exhibit 46), the Assistant Medical Director for Goodyear wrote in 1929 that one of the preventive measures for minimizing worker exposure was an "educational program" and reflects the industrial hygiene concept that workers that are aware of hazards to which they are exposed are more likely to protect themselves from such hazards than workers not so informed.  The same concept applies to the public.

Hadden notes that labeling activities stretch back the early 1900s with serious work associated with the MCA's LAPI Committee from 1946 to 1970 followed by ANSI 129.1 from 1976 forward.  Hadden also notes that the focus on labeling was on acute Standards until the 1982 ANSI 129.1 Standard began addressing chronic hazards.

Hadden also notes the broad definition of labeling, citing the 1976 Federal Food Drug, and Cosmetic Act definition is as follows:

> *"The written, printed, or graphic matter attached to, in the package of, or otherwise closely associated with a product or substance."*

The last portion of the definition, which would include advertising, has been challenged in the courts but remains part of the definition of a label.

[Thus, it is clear that:

*i)      A user of a product that is properly/accurately informed of its hazards is more likely to protect themselves from those hazards and subsequently reduce their exposures to those hazards compared with those not informed.*

*ii)     Uninformed people are given no choice regarding these risks/ hazards/ exposures since they are uninformed.*]

Regarding labeling conventions, Hadden states:

"*The overall effect of these labeling conventions is that <u>the user must come to the label already in possession of an abundance of information</u>.*"

And,

"*The effectiveness of labeling as a risk control strategy assumes people will read, understand, and act on the information presented.*

Hadden notes that labels should be: i) arresting (to increase initial awareness), ii) simple (to increase comprehension), iii) consistent (to increase comprehension), and iv) salient (to increase utilization).

For warnings to be effective the information contained is (e.g., Exhibit 33):

➢    Readable (e.g., font size, layout, placement, pictorial symbols)

➢    Accurate (e.g., signal words such as DANGER vs. NOTICE)

➢    Actionable (e.g., familiarity and training, demographics).

[Thus, for individuals to protect themselves, it is critical that the warning information such as labels be both available, readable, accurate, and actionable.]

[Often the font on labels is so small a magnifying glass is needed to read it; thus under normal circumstances it is simply not read rendering the warning ineffective at best. Key warnings should be prominent and easily read.  Words such as "DANGER" and "WARNING" have historically conveyed a stronger hazard than "CAUTION" or "NOTICE".  In addition, clearly the warning must be accurate in terms of the warning. For example, if the product could cause cancer, but if this warning is not indicated, the user may not take the same precautions using the product as when such a cancer warning was prominent.  Finally, are the warnings actionable for a typical end-user? Terms like "use appropriate gloves" is not actionable or trainable.  What does the word "appropriate" mean to a typical end user?  Instead, a warning such as "use Neoprene gloves when using this product" would be much better and actionable.]

Finally, noting the lack of chronic risk information in labeling, as opposed to acute risks, Hadden (in 1983) concludes by stating:

"*<u>A comprehensive revision of labeling programs</u> **would increase emphasis on long-term risks**, standardized labels, ensure availability of more detailed information to anyone for whom it is germane, <u>and supplement labels with education and training programs</u> that enhance their utility.*"

This problem of the lack of information on the long-term effects of pesticides on humans was recognized by the FDA by 1969 (Exhibit 49); the issue remained unresolved in 1983 (Hadden, 1983), and the issue effectively remains unresolved to pesticide labeling to this day.

The World Health Organization's (WHOs) Precautionary Principle, articulated in 2004 (Exhibit 198-T) reflects the older public health principle "to error on the side of public health and safety" when making public health decisions.  The WHO Precautionary Principle is defined as follows (Exhibit 198-T, Pgs. 1, 3, 8, 20, 184, and 186):

"*The concepts of precaution and prevention have always been at the heart of public health practice*."

"*The principle states that in the case of serious or irreversible threats to the health of humans or the ecosystem, acknowledged scientific uncertainty should not be used as a reason to postpone preventive measures*."

"*Currently available methods for evaluating the risks to human health and ecosystems, mostly designed to deal with direct associations between exposure and disease, are often not sufficient for effectively characterizing complex environmental risks. Limitations in scientific tools and in the ability to identify or to quantify causal relationships are occasionally misinterpreted as evidence of safety.  Thus, when proposed or ongoing technologies or activities entail potential long-term, unknown adverse health effects, the need for more accurate scientific information has often been used as a reason for inaction.  Further, government agencies frequently have to wait until sufficient evidence of harm is established beyond a reasonable doubt before they can act to prevent harm.  This constraint can result in public health and environmental policies based on reaction, involving remedial action after a hazard has caused adverse effects, rather than preventive, precautionary action*."

And:

"*The concept of precaution has a long history in medicine and public health, but as a principle it was established by the German 'Vorsorgeprinzip' (literally, the 'foresight principle') to deal with serious, emerging though not proven risks to ecosystems and health."*

"*Precaution and public health pursue similar goals in identifying the causes of risks and reducing or preventing them when possible at their source rather than seeking to control proximate risk factors and to remedy damage after it is done."*

"*…effectively implementing precaution involves particular attention to transparency, accountability and empowerment."*

Thus, the public health and industrial hygiene concept commonly referred to "err on the side of public safety" (e.g., CDC, 1984 - https://www.cdc.gov/mmwr/preview/mmwrhtml/00000266.htm).

## 5.3    Early Standards Regarding Communication of Hazards:

Definitions for the terms Codes, Regulations, Standards and Guidelines from (https://www.cdc.gov/niosh/docs/74-117/), pg. 85 follow:

➢    Code:  is a body of law established either by legislative or by administrative agencies with rule-making authority.

➢    Regulation:  is an authoritative rule dealing with details of procedure; or, a rule or order having the force of law, issued by an executive authority of government.

➢    Standard:  is any rule, principle, or measure established by authority.

➢    Guide:  is an instrument that provides directive or guiding information.

Until the 1970s, very few codes regulating labeling were in place (see below), but many standards, primarily developed by industry, were in place (e.g., CMA LAPI and ANSI 129.1).   Early standards related to warnings/communicating hazards are discussed below.

The National Safety Council (NSC), first organized in 1913 with the goal of "*providing an avenue of communication, an exchange of views, and various solutions to common problems in accident preventions*" (NSC, 2001, pg. 7).  NSC noted that the "goal that workers learn how to keep themselves and others safe and healthy (NSC, 2001, pg. 680).  Thus, the early concept of the role of communication in preventing accidents and keeping one safe and healthy.

The National Institute for Occupational Safety and Health (NIOSH) (https://www.cdc.gov/niosh/docs/74-117/) in their classic "White Book," discussed how knowledge affects one's ability to protect themselves (pgs. 517-518):

> "Traditionally, little effort has been made to teach workmen about either the equipment or the materials they handle.  *In the past few decades, safety engineers have shown over and over again that there are direct benefits to be gained from teaching workmen about the physical hazards in their environment and to how to avoid those hazards. More recently, industrial hygiene engineers have begun, usually in periodic safety meetings, to teach workmen about the hazards of materials and energies and, perhaps not surprisingly, have found similar benefits.*
>
> Hazards associated with the occupational environment impinge first on the men who work directly with materials, process equipment, and processes.  As these men are the first affected, they may well be the first to recognize adverse effects, and if so, *if they are knowledgeable about the effects of the materials and energies they work with, they may be able to pinpoint problems before those problems become severe*……
>
> *An aware workman can often anticipate and circumvent hazards before they become serious to him, his fellow workers, or to the physical facilities.*  Furthermore, once the source of a hazard has been found, workmen, rather than supervisors or engineers, quite often have the best ideas of how to eliminate the problem with the least effort and expense.  And finally, aware workmen often can be used to assist in industrial hygiene surveys (see also Pendergrass, J.A. Planning Industrial Hygiene Studies to Utilize Plant Personal, Am. Ind. Hyg. Assoc. J. 25: 416, 1964), thereby freeing the industrial hygiene engineer for perhaps more productive tasks."

Again, from an industrial hygiene standpoint, informed workers will take steps to protect themselves, a concept not unique to workers, but the public as well.  Thus, most OSHA and EPA standards contain training sections in the Standards (e.g., 29 CFR 1910. 1200, 29 CFR 1910.134).

## 5.4   Definition of an Industrial Hygienist and the Practice of Industrial Hygiene:

From the American Industrial Hygiene Association (AIHA), the definition of the field of Industrial Hygiene is (https://www.aiha.org/about-ih/Pages/default.aspx):

> "*That science and art devoted to the anticipation, recognition, evaluation and control of those environmental factors or stressors arising in or from the workplace, which may cause sickness, impaired health and well-being, or significant discomfort among workers or among of the citizens of the community.*"

The AIHA defines an Industrial Hygienist as (https://www.aiha.org/about-aiha/Press/Documents/What%20is%20IH.pdf) as:

> "*Scientists and engineers committed to protecting the health and safety of people in the workplace and the community.*"

[**The key words here are the "anticipation" and "recognition" of factors that "_may_ cause sickness, impaired health and well-being, or significant discomfort among workers or among the citizens of the community".  Thus, the field of industrial hygiene is devoted, in part, to err on the side of public health in controlling hazards the _may_ cause public health issues.  It is not just a discipline that awaits absolute proof the heath of the public has been compromised.  Again, it is clear that in this definition, industrial hygienists are to "err on the side of public safety".**

**Also, from an industrial hygiene and public health and safety warnings standpoint, the public should be provided with transparent and accurate warnings which should err on the side of public health and safety since it is well understood that science levels often used to try to protect the public have evolved with time.**

**Finally, it is well known that the ACGIH's TLVs or OSHA's PEL have almost always dropped with time, meaning the chemical/substance is found to be more toxic, not less toxic, with time.  That is why these levels, at any point in time, are not bright line "safe" levels and should never be referred to as being safe levels.]**

## 6.0   FIFRA and FFDCA Regulations – Background, Their History, and Their Requirements on Pesticide Warnings:

The first Federal efforts to study pesticides began in 1949 when the National Communicable Disease Center in Atlanta, GA established a laboratory to begin studies on pesticides.  The Office of Pesticides was set up in November 1964 to provide a mechanism for responding to a number of health-related recommendations, which followed from a study of pesticides by the Life Sciences Panel of the President's Science Advisory Committee.  In August of 1966, the office was transferred to Atlanta, GA and renamed the Pesticides Program.  The Program was transferred to the FDA on July 1, 1968 (from the Report of the Secretary's Commission on Pesticides and Their Relationship to Environmental Health – Parts I and II, 1969, U.S. Dept. of Health, Education and Welfare, December).

From a regulatory standpoint the two major acts, FIFRA and FFDCA, addressed pesticides; a review of the history and content of these two regulations follow:

## 6.1   Background of FIFRA and FFDCA

Two statutes: the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA – Also known as the Act of June 25, 1947), governing the sale and use of pesticide products within the United States, and the Federal Food, Drug, and Cosmetic Act (FFDCA),

which limits pesticide residues on food in interstate commerce (including imports) are the two Governmental Statutes regulating pesticides. These regulations ultimately set requirements on labeling and warnings for pesticides.

The EPA (Exhibit 550, pg. 6) noted that by early 1980s the purpose of FIFRA "has shifted from pesticide efficacy issues to minimizing risks associated with toxicity and environmental degradation."

Schierow and Esworthy also provided an summary of the intent of these two Regulations along with a history of these Statutes for the U.S. Congress in a November 14, 2012 report entitled "Pesticide Law: A Summary of the Statute" (Exhibit 32). Their background on these two regulations is provided intact below:

> "***FIFRA requires EPA to regulate the sale and use of pesticides in the United States through registration and labeling***. *Pesticides are broadly defined in FIFRA Section 2(u) as chemicals and other products used to kill, repel, or control pests.* Familiar examples include pesticides used to kill insects and weeds that can reduce the yield, and sometime harm the quality, of agricultural crops, ornamental plants, forests, wooden structures (e.g., through termite damage), and pastures. But the broad definition of "pesticide" in FIFRA Section 2 also applies to products with less familiar "pesticidal uses". For example, substances are pesticides when used to control mold, mildew, algae, and other nuisance growths on equipment, in surface water, or on stored grains. The term also applies to disinfectants and sterilizing agents, animal repellents, rat poison, and many other substances."

> "***FIFRA directs EPA to restrict the use of pesticides as necessary to prevent unreasonable adverse effects on people and the environment***, *taking into account the costs and benefits of various pesticide uses.* The act prohibits sale of any pesticide in the United States unless it is registered (licensed) and labeled to indicate approved uses and restrictions…"

> "For the 600 or more pesticides (i.e. , active ingredients) registered for use in food production, the FFDCA Section 408 authorizes EPA to establish maximum allowable residue levels (also known as "tolerances") to ensure that human exposure to the pesticide ingredients in food and animal feed will be "safe." (The authors note that: "*Ingredients in pesticide products are categorized as active or inert. Active ingredients are those that are intended to control the pest, while inert ingredients, now generally known as* "**other ingredients**", *are used to deliver the active ingredients effectively to the pest. Other ingredients often are solvents or surfactants and often comprise the bulk of the pesticide product. Some inerts are known to be toxic*, some are known to be harmless and others have unknown toxicity). ***A "safe" tolerance is defined in the law as a level at which there is "a reasonable certainty of no harm from the exposure***, *even when considering total cumulative and aggregate pesticide exposure of children*. Under FFDCA, foods with a residue of a pesticide ingredient for which there is no tolerance established, or with a residue level exceeding an established tolerance limit, are declared "unsafe"' and "adulterated"; such foods cannot be sold in interstate commerce or imported to the United States. Pesticides may not be registered under FIFRA for use on food unless tolerances (or exemptions) have been established under the FFDCA."

Major observations drawn from this introductory review of the FIFRA and FFDCA statutes are bolded and underlined above and summarized below:

➢ The Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) requires EPA to regulate the sale and use of pesticides in the United States through registration and labeling.

➢ The Federal Food, Drug, and Cosmetic Act (FFDCA) Section 408 authorizes EPA to establish maximum allowable residue levels (also known as "tolerances") to ensure that human exposure to the pesticide ingredients in food and animal feed will be "*__safe__*" for the 600 or more pesticides (i.e., active ingredients) registered for use in food production.

➢ Pesticides are broadly defined in FIFRA Section 2(u) as chemicals and other products used to kill, repel, or control pests.  Pesticides include products that are used to kill, repel or control insects, weeds, mold, mildew, algae, other nuisance growths, disinfectants and sterilizing agents, animal repellents, and rat poison.

➢ Ingredients in pesticide products are categorized as "*__active__*" or "*__inert__*".  Under FFDCA, *__a "safe" tolerance is defined in the law as a level at which there is "a reasonable certainty of no harm from the exposure__*", even when considering total cumulative and aggregate pesticide exposure of children.

## 6.2    History of FIFRA and FFDCA with Focus on Warnings Language:

The history of FIFRA and FFDCA, with a focus on the language pertaining to Warnings is provided in the following two Sections:

### 6.2.1   History of FIFRA with Focus on Warnings Language:

The history of FIFRA, with a focus on warnings language, is outlined below:

➢ 1910 – Federal pesticide legislation first enacted the Insecticide Act of 1910.  It authorized the U.S. Department of Agriculture (USDA) to set standards for the manufacture of insecticides and fungicides and to require them to be labeled. USDA could inspect and remove from the market products that were adulterated (i.e., purity and strength of the product) or ineffective.  However, it did not require registration of pesticides (Exhibit 18, pp. 28242).

➢ 1947 – Original version of FIFRA (known as the Federal Insecticide, Fungicide, and Rodenticide Act – P.L. 80-104) enacted broader law to include more types of pesticides, required product registration with the USDA prior to interstate or international shipment, and *required that labels carry adequate warnings and precautionary instructions for product use.*  Like the 1910 Act, its goal was to protect consumers and did provide the requirement to register pesticides but registrations could not be denied (Exhibit 18, pp. 28242).

➢ 1964 – Amendments to FIFRA (known as the Federal Insecticide, Fungicide, and Rodenticide Act Amendments – P.L. 88-305).   The main provision in these amendments was the ability of the government to reject/deny a registration.

➢ 1970 – FIFRA responsibility shifted from USDA to US EPA.

➢ 1972 – Complete replacement of the 1947 FIFRA law (known as the Federal Environmental Pesticide Control Act (FEFCA) – P.L. 92-516) based on Congressional concerns about "long- and short-term toxic effects of pesticide

exposure on people who applied pesticides (applicators), wildlife, insects, and birds not targeted by the pesticide product, and on food consumers." Congress directed EPA to register pesticide products and to "reregister" older products in order to assess their safety in light of more demanding and current scientific standards." "The 1972 amendments completely restructured the Federal pesticide regulator scheme and refined its thrust. FIFRA was changed 'from a labeling law into a comprehensive regulatory statute that will henceforth more carefully control the manufacture, distribution, and use of pesticides'. *It was clear that Congress' primary purpose in enacting FEPCA was to ensure that pesticide use was subject to a thorough* environmental and *human health hazard review*" (Exhibit 18, pg. 28242)."

[Note: Even by 1972 it was recognized that warnings, regarding effects of pesticides on people and the environment, should be updated to reflect current scientific knowledge.]

➢   1975 – July 3, 1975 - Expanded development of 40 CFR Part 162 – Regulations for the Enforcement of the Federal Insecticide, Fungicide, and Rodenticide Act (known as the Federal Insecticide, Fungicide, and Rodenticide Act Extension – P.L. 94-140). As EPA stated (Exhibit 18, pg. 28242; see also Exhibits 19-20): "The intent of this rulemaking is to revised present procedures for the registration of pesticides and establish procedures for the reregistration of pesticides to conform to the provisions of the amended FIFRA."

Under §162.3 – Definitions, definitions of key terms were set; some of these are reproduced below:

(c)     The term "*active ingredient*" means –

(1)     In the case of a pesticide other than a plant regulator, defoliant, or desiccant, an ingredient which will prevent, destroy, repel, or mitigate any pest;

(2)     In the case of a plant regulator, an ingredient which, through physiological, biochemical action, will accelerate or retard the rate of growth or rate of maturation or otherwise alter the behavior of ornamental or crop plants or the product thereof;

(3)     In the case of a defoliant, an ingredient which will cause the leaves or foliage to drop from a plant; and

(4)     In the case of a desiccant, an ingredient which will artificially accelerate the drying of plant tissue.

[As mentioned earlier, one must question, given the plant reaction in Figure 4-4 and the FIFRA definition of an "active" ingredient, why the POEA surfactant was not declared an "active" ingredient?]

(d)     The term "*acute dermal LD50*" means a single dermal dose of a substance, expressed as milligrams per kilogram of body weight, that is lethal to 50% of the test population of animals under test conditions as specified in the Registration Guidelines.

(e)     The term "*acute LC50*" means a concentration of a substance, expressed as parts per million parts of medium, that is lethal to 50% of the test population of animals under test conditions as specified in the Registration Guidelines.

(f)     The term "*acute oral LD50*" means a single orally administered dose of a substance, expressed as milligrams per kilograms of body weight, that is lethal to 50 percent of the test population of animals under test conditions as specified in the Registration Guidelines.

(r)     The term "*hazard*" *means the likelihood that use of a pesticide would result in an adverse effect on man or the environment in a given situation.*

(t)     The term "*inert ingredients*" means all ingredients which are not active ingredients as defined in § 162.3(c), and includes, but is not limited to, the following types of ingredients (except when they have pesticidal efficacy of their own): solvents such as water; baits such as sugar, starches, and meat scraps; dust carriers such as talc and clay; fillers; wetting and spreading agents; propellants in aerosol dispensers; emulsifiers.

(bb)    The term "*oncogenic*" *means the property of a substance or a mixture of substances to produce or induce benign or malignant tumor formations in living animals.*

(ff)    The term "*pesticide*" means any substance or mixture of substances intended for preventing, destroying, repelling, or mitigating any pest, and any substance or mixture of substances intended for use as a plant regulator, defoliant, or desiccant.

       The term "*pesticide*" when not specifically modified or delimited by other words, shall include any one or combination of the following aspects of the term: the active ingredient (chemical or biological); the pesticide formulation; and the pesticide product.

(kk)    The term "*residue*" means the active ingredient(s), metabolite(s) or degradation product(s) that can be detected in the crops, soil, water, or other component of the environment, including man, following the use of the pesticide.

(nn)    The term "*toxicity*" means the property of a substance or mixture of substances to cause any adverse effects.

       (1)     The term "*acute toxicity*" means the property of a substance or mixture of substances to cause adverse effects in an organism through a single short-term exposure.

       (2)     The term "*subacute toxicity*" means the property of a substance or mixture of substances to cause adverse effects in an organism upon repeated or continuous exposure within less than ½ the lifetime of that organism.

       (3)     The term "*chronic toxicity*" means the property of a *substance or mixture of substances to cause adverse effects in an organism upon repeated or continuous exposure over a period of at least ½ the lifetime of that organism.*

Four categories of *acute* toxicities were set up for labeling based on oral, inhalation, dermal, eye, and skin effects (§162.10, see Exhibit 18, pp. 28279).

Under §162.11 – Criteria for Determination of Unreasonable Adverse Effects, the FIFRA regulations begin to address what happens when a pesticide has chronic

risks. §162.11 (a) begins by stating: "*Criteria for Issuance of* **Notice of Intent to Deny Registration***, Cancel Registration, or to Hold a Hearing.*" Later, under (3) Risk Criteria, (ii) Chronic Toxicity, it states: "(A) *Induces oncogenic effects in experimental mammalian species or in man as a result of oral, inhalation, or dermal exposure*; or induces mutagenic effects, as determined by multitest evidence. (B) Produces any other chronic or delayed toxic effect in test animals at any dosage up to a level, as determined by the Administrator, which is substantially higher than that to which humans can reasonably be anticipated to be exposed taking into account ample margins of safety, or (C) Can reasonably be anticipated result in significant local, regional, or national population reductions in nontarget organisms, or fatality to members of endangered species."

[Thus, in 1975, FIFRA will deny applications for pesticides with certain defined chronic unreasonable adverse effects – i.e., carcinogens. Thus labeling becomes a moot point as such products would not ever be registered by the EPA except for those with defined acute hazards.]

➢ 1978 – Congress, impatient with progress on the pace of pesticide reregistration streamlined the process, allowed for EPA to review groupings of products having the same active ingredients and made provisions for cost sharing of data (see Exhibit 21). This law was known as "The Federal Pesticide Act of 1978" (P.L. 95-396).

➢ 1980 – Amendments to FIFRA (known as the Federal Insecticide, Fungicide and Rodenticide Act Amendments – P.L. 96-539).

➢ 1988 – May 4, 1888 - This Law also focused on accelerating the progress of pesticide registration and reregistration (known as Federal Insecticide, Fungicide, and Rodenticide Amendments of 1988 – P.L. 100-532). The Final Rule was published on May 4, 1988 (see Exhibit 22).

Section 156 – Labeling Requirements for Pesticides and Devices, was added. §162.10 – Labeling Requirements was redesignated §156.10 (Exhibit 22, pg. 15953).

Several important and relevant portions of the standard were definitions for "Active" and "Inert" ingredients of pesticides under §158.153 and a Table under defining certain substances as inerts. Definitions of "active" and "inert" substances under §158.153 follow:

(a) "Active ingredient" means any substance (or group of structurally similar substances, if specified by the Agency) that will prevent, destroy, repel or mitigate any pest, or that functions as a plant regulator, desiccant, or defoliant within the meaning of FIFRA sect. 2(a).

(f) "Inert ingredient" means any substance (or group of structurally similar substances if designated by the Agency), other than an active ingredient, which is intentionally included in a pesticide product.

Also of note, Section 158 – Data Requirements for Registration, provided detailed requirements for information on the toxicity of both active and inert ingredients.

*Pesticides are for the first time defined as "restricted use" for those with certain toxicities* (Subpart I – Classification of Pesticides and specifically §152.170 – see Exhibit 22, pp 15986 to 15987) as "restricted use products." Specifically for those using an end-use pesticide product (i.e., Residential & Institutional uses or all other uses), the chronic criteria for restricted use is defined as [§152.170 (1)(b)(vi) & (2)(vii)]:

> *When used in accordance with label directions, or widespread and commonly recognized practice, the pesticide may cause significant subchronic toxicity, chronic toxicity, or delayed toxic effects on man, as a result of single or multiple exposures to the product ingredients or residues."*

Under these conditions the pesticide is a "restricted use product"; the labeling requirements that are specified under §152.166 – Labeling of Restricted Use Products. These labeling requirements are:

> **§152.166 Labeling of restricted use products** (a) *Products intended for end use.* A product whose labeling bears directions for end use and that has been classified for restricted use must be labeled in accordance with the requirements of §156.10 of this chapter or other Agency instructions. The Agency will permit the use of stickers or supplemental labeling as an interim alternative to the use of an approved amended label, in accordance with §152.167. (b) *Products intended only for formulation…..*

Limitations on the distribution and advertising of restricted use product were also promulgated (§152.167 and §152.168 respectively):

> **§152.167 Distribution and sale of restricted use products** Unless modified by the Agency, the compliance dates in this section shall apply to restricted use products.
>
> (a) *Sale by registrant or producer.* (1) No product with a use classified for restricted use may be distributed or sold by the registrant or producer after the 120th day after the effective date of such classification unless the product: (i) *Bears an approved amended label which contains the terms of restricted use imposed by the Agency and otherwise complies with Part 156 of this chapter,* (ii) Bears a sticker containing the product name, EPA registration number, and any terms of restricted use imposed by the Agency; or (iii) Is accompanied by supplemental labeling bearing information listed in paragraph (a)(1)(ii) of this section. (2)… (3)…
>
> (b) *Sale by retailer.* No product with a use classified for restricted use by a regulation may be distributed or sold by a retailer or other person after the 270th day after the effective date of the final rule unless the product

bears a label or labeling which complies with paragraph (a)(1) of this section.

### §152.168  Advertising of restricted use products

(a)   Any product classified for restricted use shall not be advertised unless the advertisement contains a statement of its restricted use classification.

(b)   The requirement in paragraph (a) of this section applies to all advertisements of the product, including but not limited, to:

  (1)   Brochures, pamphlets, circulars and similar material offered to purchasers at the point of sale or by direct mail.

  (2)   Newspapers, magazines, newsletters and other material in circulation or available to the public.

  (3)   Broadcast media such as radio and television.

  (4)   Telephone advertising.

  (5)   Billboards and posters.

(c)   The requirement may be satisfied for printed material by inclusion of the statement "Restricted Use Pesticide," or the terms of restriction, prominently in the advertisement.  The requirement may be satisfied with respect to broadcast or telephone advertising by inclusion in the broadcast of the spoken words "Restricted use pesticide", or a statement of the terms of restriction.

(d)   The requirements of this section shall be effective:

  (1)   After 270 days after the effective date of restriction of a product that is currently registered, unless the Agency specifies a shorter time period;

  (2)   Upon the effective date of registration of a product not currently registered.

[Thus a product that contains a carcinogen that may cause significant chronic toxicity must be labeled a restricted use product and must contain additional warnings regarding the reason(s) for the restricted designation.  Further, advertising restrictions exist for restricted use pesticides.]

➢   1992 – August 21, 1992 U.S. EPA Worker Protection Standard, Hazard Information, Hand Labor Tasks on Cut Flowers and Ferns Exception; Final Rules and Proposed Rules (see Exhibit 23).  The overall intend of this regulation was to inform, train, and protect workers exposed to pesticides.   Under §156.10 Labeling Requirements (2)(viii)(c.) and new Subpart K – Worker Protection Statements was promulgated consisting of §156.200 – Worker Protection Statements (Exhibit 23, pp. 38146).  The stated scope was: 1) "This subpart prescribes statements that must be placed on the pesticide label and in pesticide labeling.   These statements incorporate by reference the Worker Protection

Standard, part 170 of this chapter…; 2) This subpart prescribes interim requirements that must be placed on a pesticide label and in pesticide labeling.

§156.200 (labeling requirements), §156.212 (personal protective equipment – PPE - statements) and §170 (worker protection standard) were major additions and expansions for protection of those using pesticides.  Effective dates for these various new §156 Subparts ranged from October 20, 1992 to October 23, 1995 (Exhibit 23, pg. 38146) and for new §170 Subparts ranged from October 20, 1992 to April 15, 1994 (Exhibit 23, pp. 38152).

The PPE statements outline protective equipment to be worn based on the _acute_ toxicity characteristics of the active ingredient(s) in the pesticide.  However, §156.204 – Modification and waiver of requirements (a) states:

> _If the Agency concludes in accordance with §154.25(c), of this chapter that a pesticide should be placed in Special Review because the pesticide meets or exceeds the criteria for human health effects of §154.7(a)(1)(2) or (6) of this chapter, the Agency may modify the personal protective equipment required for handlers or early-entry workers or both, the restricted-entry intervals, or the notification to workers requirements._

Sections _§154.7(a)(1)(2) & (6)_ and _§154.25(c)_ follow:

**154.25 Public announcement of final decision whether to initiate a Special Review.**

(a)     The Administrator shall evaluate the available information and the comments received in response to the notice under §154.21 and any notice issued under §154.23, and shall issue for publication in the FEDERAL REGISTER a notice under paragraph (b) or (c) of this section.

(b)     If the Administrator determines after having given notice under §154.21 not to initiate a Special Review, he shall issue his decision for publication in the FEDERAL REGISTER with a statement of reasons.

(c)     _If the Administrator determines after having given notice under §154.21 that one or more of the risk criteria set forth in §154.7 have been satisfied, the Agency shall issue a notice for publication in the FEDERAL REGISTER which shall include_:

   (1)     Identification of the pesticide uses for which a Special Review has been initiated and an identification of the criteria which have been satisfied.

   (2)     A brief discussion of the Agency's reasons for determining that the criteria have been satisfied.

   (3)     A statement indicating that EPA has established a docket for the Special Review, the contents of the docket, the location of the docket, and the times during which the docket will be available for inspection and copying.

(4)     An invitation to all interested persons to submit further information concerning the risks and benefits associated with each use of the pesticide subject to the Special Review.

(5)     A brief description of the Special Review process and a statement that registrants and applicants bear an affirmative burden of supporting registration of a pesticide product.

(6)     A date by which information in response to the Agency's request for further information must be submitted.

(d)   In his discretion, the Administrator may request that the Scientific Advisory Panel hold a public meeting to review the scientific issues related to the Special Review.

### 154.7 Criteria for initiation of Special Review.

(a)   *The Administrator may conduct a Special Review of a pesticide use if he determines, based on a validated test or other significant evidence, that the use of the pesticide* (taking into account the ingredients, impurities, metabolites, and degradation products of the pesticide):

(1)     May pose a risk of serious acute injury to humans or domestic animals.

(2)     *May pose a risk of inducing in humans an oncogenic*, heritable genetic, teratogenic, fetotoxic, reproductive effect, or a chronic or delayed toxic effect, which risk is of concern in terms of either the degree of risk to individual humans or the number of humans at some risk, based upon:

(i)      Effects demonstrated in humans or experimental animals.

(ii)     Known or predicted levels of exposure of various groups of humans.

(iii)    The use of appropriate methods of evaluating data and relating such data to human risk.

(3)     May result in residues in the environment of nontarget organisms at levels which equal or exceed concentrations acutely or chronically toxic to such organisms, or at levels which produce adverse reproductive effects in such organisms, as determined from tests conducted on representative species or from other appropriate data.

(4)     May pose a risk to the continued existence of any endangered or threatened species designated by the Secretary of the Interior or the Secretary of Commerce under the Endangered Species Act of 1973, as amended.

(5)     May result in the destruction or other adverse modification of any habitat designated by the Secretary of the Interior or the Secretary of Commerce under the Endangered Species Act as a critical habitat for any endangered or threatened species.

(6)     May otherwise pose a risk to humans or to the environment which is of sufficient magnitude to merit a determination whether the use of the pesticide product offers offsetting social, economic, and environmental benefits that justify initial or continued registration.

(b)     In making any determination that a pesticide use satisfies one of the criteria for issuance of a Special Review specified by paragraph (a) of this section, the Administrator shall consider available evidence concerning both the adverse effect in question and the magnitude and scope of exposure of humans and nontarget organisms associated with use of the pesticide.

➢   1995 – June 19, 1995 U.S. EPA Rule entitled "Technical Amendments to Pesticides; Final Rules" (see Exhibit 24).  No changes to §156 and §170.

➢   1998 – February 23, 1988 U.S. EPA Rule entitled "Flammability Labeling Requirements for Total Release Fogger Pesticides; Final Rule (see Exhibit 25).  No changes to §156 and §170; the focus of this rule was ensuring proper labeling on the flammability of certain pesticides.

➢   2001 – December 21, 2001 U.S. EPA Rule 40 CFR Parts 152 and 156 entitled "Pesticide Labeling and Other Regulatory Revisions; Final Rule (see Exhibit 26). The major change was the addition of Subpart D – Human Hazard and Precautionary Statements added to §156.10 Labeling Requirements (a)(1)(vii)(c). Key provisions added in Subpart D were:

•   §156.62        Toxicity Category (1 through 4; 1 being the highest toxicity)

•   §156.64        Signal Word

•   §156.70        Precautionary Statements for Human Hazards

•   §156.78        Precautionary Statements for Physical or Chemical Hazards

Additional details on these provisions follow later in this report.

➢   2006 – August 16, 2006 U.S. EPA Rule 40 CFR Parts 9, 156 and 165 entitled "Pesticide Management and Disposal; Standards for Pesticide Containers and Containment; Final Rule (see Exhibit 27).  The pesticide rule was focused on the labeling and disposal of pesticide containers.

➢   2008 – December 12, 2008 U.S. EPA Rule 40 CFR Parts 150-180 entitled "Pesticide Technical Amendments; Final Rule (see Exhibit 27).  Modest changes were made to §156 and §170; modified sections of interest follow:

Section §156.204 Modification and Waiver of Requirements (b) Other Modifications stated: "*The Agency*, pursuant to this subpart and authorities granted in FIFRA sections 3, 6, and 12, *may, on its initiative or based on data submitted by any person, modify or waive the requirements of this subpart, or permit or require alternative labeling statements.  Supporting data may be either data conducted according to Subdivisions U or K of the Pesticide Assessments guidelines or data from medical, epidemiological, or health effect studies.*  A registrant who wishes to modify any statements required in §§156.206, 156.208, 156.210, or 156.212 must submit an application for amended registration unless specifically directed otherwise by the Agency.

Section §170.104 changes PPE to personal protective equipment and §170.130 provides for additional training and documentation of training of pesticide workers (defined as a "handler" of pesticides – see §170.3 definition below).

*"Handler"* means any person, including a self-employed person:

(1)     Who is employed for any type of compensation by an agricultural establishment or commercial pesticide handling establishment to which subpart C of this part applies and who is:

    (i)     Mixing, loading, transferring, or applying pesticides.

    (ii)     Disposing of pesticides or pesticide container.

    (iii)     Handling open containers of pesticides.

    (iv)     Acting as a flagger.

    (v)     Cleaning, adjusting, handling, or repairing the parts of mixing, loading, or application equipment that may contain pesticide residues.

    (vi)     Assisting with the application of pesticides.

    (vii)     Entering a greenhouse or other enclosed area after the application and before the inhalation exposure level listed in the labeling has been reached or one of the ventilation criteria established by this part (§170.110(c)(3)) or in the labeling has been met:

        (A)     To operate ventilation equipment.

        (B)     To adjust or remove coverings used in fumigation.

        (C)     To monitor air levels.

    (viii)     Entering a treated area out-doors after application of any soil fumigant to adjust or remove soil coverings such as tarpaulins.

    (ix)     Performing tasks as a crop advisor:

        (A)     During any pesticide application.

        (B)     Before the inhalation exposure level listed in the labeling has been reached or one of the ventilation criteria established by this part (§170.110(c)(3) or in the labeling has been met.

        (C)     During any restricted-entry interval.

(2)     The term does not include any person who is only handling pesticide containers that have been emptied or cleaned according to pesticide product labeling instructions or, in the absence of such instructions, have been subjected to triple-rinsing or its equivalent.

Thus, this pesticide Worker Protection Standard (40 CFR Part 170) defines those protected by the standard broadly.

6.2.2   <u>History of FFDCA with Focus on Warnings Language:</u>

The history of FFDCA, with a focus on language pertaining to warnings, is outlined below:

➢ 1938 – Original version of FFDCA (known as the Federal Food, Drug, and Cosmetic Act – Act of June 25, 1938) enacted. This Act "established the structure of the current law" and "required the Food and Drug Administration (FDA, then a part of USDA) to set tolerances for unavoidable poisonous substances in food."

➢ 1954 – Congress "acted to protect consumers from pesticide residues on food in 1954 by adding a new Section 408 to the FFDCA" (known as the Federal Food, Drug, and Cosmetic Act Amendment – Act of July 22, 1954). This Act "directed FDA to set residue tolerances for all pesticides in raw agricultural commodities."

➢ 1958 – Congress "expanded the requirement for tolerances in the Food Additives Amendment of 1958" (known as the Food Additive Amendment of 1958 – P.L. 85-929), adding Section 409 which directed the FDA to set tolerances for food additives, including pesticide residues in processed foods. _Section 409 also_ **_forbade the addition to food of any additive_** _(including pesticide residue), if it was found to be a potential cancer causing agent; this provision was referred to as the "Delaney Clause"._

**[Thus, by 1958, the addition of** **any pesticide residue that was a potential** **cancer causing agent, was precluded from being in any food.]**

A review of the MCA's lead-up activities, as well as positions (under Food Additives and the Association) on the "Delaney" clause, follows (MCA, 1972, pgs. 42, 44-45):

"In 1950, MCA established a Food Additives Committee, a name later changed to Food, Drug and Cosmetic Chemicals Committee. The 1951 annual report described the association's action: 'Broadly speaking, the purpose of the Committee is to study and make recommendations on general problems and legislation relating to the safe use of chemicals in the manufacture, processing and packaging of food products…the Committee (recognizes)…that the public interest… is best served not only through provisions of safeguards from possible harmful effects of chemicals that may be contained in foods, but also through provision of incentive to industry to develop new and better materials for use in our foods.'

The following year MCA participated in an Inter-Industry Conference on Chemicals in Food. Some 450 people attended. Included were governmental representatives, members of the press, interested citizens and those from the chemicals, food and allied products industries. The objective – to orient the chemical and food industries to general problems facing both in light of current sentiment and legislative activities.

_While the Association opposed precertification of new chemicals,_ _preferring its proposal of prenotification_, it favored modernization of the Food, Drug and Cosmetic Act. **_MCA's 1953 annual report put the_** **_Association on record "…_** **_as favoring mandatory pretesting of all_**

*new substances before foods containing them are offered for sale to the public. It believes, further, that the testing should be adequate and not perfunctory, and that the Government should have full information as to the tests and their results before foods containing new additives are made available to the public*….'

It was not until 1957 that the Secretary of Health, Education, and Welfare sent a bill to Congress to provide for controlling the use of chemically produced ingredients in food. In 1958, this became law as an amendment to the Food, Drug and Cosmetic Act. *The Association favored the enactment as MCA's 1957 report so stated, noting support for providing of 'improved Governmental policing to insure safety of the substances which enter the nation's food supply…'* It added, however, that MCA would 'urge that new regulatory procedures not be restrictive to such an extent as to retard the development of beneficial new products.'

**[Note Monsanto's John L. Gillus was Chairman of the MCA at this time – 1956-1957 and clearly would have been aware of this new policy regarding testing of additives to the public to ensure their safety before they are offered for sale to the public.]**

*The Association* was so convinced of the new law's modernization that it *did not then oppose what has come to be known as the Delaney clause* – a highly controversial stricture *prohibiting the use of any substance which causes cancer in man or in animals.* Later, realizing the tremendous impact of the clause, MCA unsuccessfully opposed its inclusion in the 1960 Color Additive Amendment. The Association held that it created 'an important block to research on carcinogens' and on the question – could safe levels be set for them?

**[Monsanto, as early as 1957-1958, would have known that any substance that causes cancer in man or animals was prohibited from entering food supplies.]**

➤ 1970 – "The authority to establish tolerances for pesticide residues was transferred to the newly formed EPA. FDA, in the Department of Health and Human Services (HHS), retained responsibility for enforcement of tolerances in food that is imported or sold across state boundaries."

➤ 1978-1989 – Various studies and efforts to determine the carcinogenicity of glyphosate in animals (Exhibits 219 to 246):

• August 21, 1978 U.S. EPA – Toxicology Branch (TB) Review of Monsanto chronic glyphosate study on albino rats (Exhibit 219). The TB concluded as follows (pg. 3): "Thus adequate data exist to support a *tentative* conclusion that this product does not induce a carcinogenic or tumorigenic response in rats *even though the absence of some records precludes* drawing a firm conclusion regarding the potential carcinogenicity of this product. TB needs to evaluate this summary."

• December 31, 1979 Bio/dynamics, Inc. report for Monsanto-sponsored 3-month glyphosate feeding mouse study (Exhibit 223). The report

concluded (Bates MONGLY01631846): "The results ….did not reveal any evidence of effects related to the administration of Glyphosate (Roundup® technical."

- July 1983 U.S. EPA report reviewing testing done by pesticide active ingredient by Industrial Bio-Test Laboratories, Inc. (IBT) and non-IBT labs; IBT was found to be conducting fraudulent studies (Exhibit 229). Further, IBT had conducted studies on 93% of the pesticides with studies completed. For glyphosate (Exhibit 229, pg. 19), 1 of 1 oncogenicity studies was completed by IBT – the only study was completed by a lab found to be performing fraudulent work. Further, again for glyphosate, four of the five (80%) of the mutagenicity studies were completed by IBT, only one of the five by another lab.

[Thus, it appears that by 1983, nearly 10 years after Roundup® was introduced, the only (1) study completed on glyphosate's oncogenic potential was found to be completed by a fraudulent lab. Clearly the carcinogenic potential of glyphosate, let alone the Roundup® formulations, remained unknown at that time.]

- February 10, 1984 U.S. EPA Memo regarding review and recommendations of Monsanto's submitted mouse study for glyphosate toxicity (Exhibit 230, pg. 2). The TB noted that: ***Review of the mouse oncogenicity study indicates that glyphosate is oncogenic***, producing renal tubule adenomas, a rare tumor, in a dose-related manner (0 tumors in controls and 4 tumors in dosed animals). Therefore, Toxicology Branch considers that the PP#3E2845 is not toxicologically supported. A risk assessment by Toxicology Branch is required."

  **[Monsanto embarked on a nearly five year effort to refute the findings of this study.]**

  ▪ February 21, 1985 meeting between Monsanto and the U.S. EPA TB to determine: "what we can do to get this thing off of group 'c'?" Monsanto had been told on a separate occasion this was a "serious matter".

  ▪ February 26, 1985 U.S. EPA memo addressing Monsanto's position that the mouse study results were not statistically valid (Exhibit 232). The U.S. EPA strongly rejected this Monsanto argument by conducting their own statistical analysis and noted "***Our position is one of protecting the public health when we see suspicious data.***"

  ▪ March 4, 1985 U.S. EPA U.S. EPA memo summarizing the TB's "Consensus Review on Glyphosate" (Exhibit 233, Bates MONGLY04269067-9070). The U.S. EPA concluded, regarding their classification of glyphosate, as follows "***In accordance with EPA proposed guidelines (FR of Nov. 23, 1984) the panel has classified Glyphosate as a Category C oncogen***."

  **[i.e., p*ossible human carcinogen*]**

- March 13, 1985 letter from Monsanto to the U.S. EPA (Exhibit 234, Bates MONGLY00246215-6219) stating the evidence (e.g., statistics and etiology) do not support the EPA's findings, a request for reconsideration and a reminder to EPA that "*Roundup is an extremely important herbicide to agriculture in the U.S. and around the world. Monsanto is concerned that even the initiation of formal regulatory action would have serious negative economic repercussions* which we believe are not justified by the scientific evidence."

- Monsanto hired Dr. Marvin Kuschner to re-review the kidney sections (Exhibit 235, Bates MONGLY04277789; Exhibit 236, Bates MONGLY04269049). Dr. Kuschner confirmed the four tumors in treated mice but also reported one tumor in a control animal, significantly affecting the statistics. Monsanto provided this "new" information to the U.S. EPA on May 21, 1985 (Exhibit 237, Bates MONGLY00253801-9). U.S. EPA's Louis Kasza examines the control sample reportedly containing a tumor by Monsanto/Dr. Kuschner and states: "*it is my opinion that the presence of a tumor <u>can not</u> definitely be established*" (Exhibit 240, Bates MONGLY00235488).

- U.S. EPA agrees to have a Science Advisory Panel (SAP) meeting in which Monsanto can present their position(s) on the oncology of glyphosate. Monsanto develops strategy positions for this meeting (Exhibits 238-239, Bates MONGLY04268980-3) noting that: "*We don't have a lot of faith that, presented with the same evidence*, Ted Farber (US. EPA) *will* want to back off and *change his mind.*" Monsanto's strategy to get the EPA to change their position on the oncology of glyphosate is, in part, as follows: I (Monsanto's E.J. Brandt) recommend that we bring all ten of the toxicologists to the S.A.P. meeting. There is a tendency to 'count the votes' at S.A.P. meetings. *We can make a difference by lining up a large number of experts on our side.*"

- January 5, 1988 U.S. EPA memo regarding Monsanto's comments on the EPA glyphosate guidance document (Exhibit 242, Bates MONGLY00223052-262). The U.S. EPA has asked Monsanto to repeat the mouse study using only male mice and a larger number of mice at the same dose levels; Monsanto does not want to conduct the EPA-recommended study. EPA notes: "*TB does not concur with Monsanto regarding the waiver of the repeat mouse oncogenicity study*" (Bates MONGLY00223054; see also Exhibit 435) but does agree with the S.A.P. recommendation to re-classify glyphosate to Group D (not classified) until the further study is completed (Bates MONGLY00223056 and Exhibit 243, pgs. 1-22).

- June 19, 1989 U.S. EPA Memo (Exhibit 245, Bates EPAHQ_0000612-76): However, based on a meeting held on June 7, 1989, TB concludes that: "*a repeat of the mouse oncogenicity study is not required <u>at this time</u>*" (Exhibit 245, Bates

EPAHQ_0000613).  This position is forwarded to Monsanto by the U.S. EPA in a July letter dated July 6, 1989 by Robert Taylor (Exhibit 246, Bates MONGLY01307725).

- October 30, 1991 U.S. EPA Memo (Exhibit 436).  EPA finally agrees glyphosate should not be classified as a carcinogen.

- 1996 - Congress substantially revised requirements for pesticide residue tolerance setting in the Food Quality Protection Act (FQPA – P.L. 104-170).  *The FQPA redefined terms so that pesticide residues in processed foods were no longer regulated as food additives, and therefore no longer were subject to the Delaney Clause*.  The FQPA also established a new safety standard of a "*reasonable certainty of no harm*" from exposure to pesticides or what is known as "Tolerance Setting."

**[The original 1983 mouse study results had at least two implications: i) The product labeling would have fallen in the restricted use classification and would have required special labeling, and ii) The product would have fallen under the Delaney clause severely restricting its usage on crops since no carcinogenic residual would be allowed on foods under this clause.]**

Tolerance Setting:

"EPA determines whether a "safe" level of pesticide residue, or tolerance can be established under the FFDCA.  A tolerance must be established before a pesticide registration may be granted for use on food crops.

Any person who has registered a pesticide may petition EPA proposing establishment of a tolerance or an exemption for that pesticide to permit its use on food-related crops.  Tolerance petitions must include information about pesticide application rates, measured concentrations of pesticide residues on the food after the pesticide has been applied according to directions on its label, and safety of pesticide use on food crops. The FFDCA requires EPA to respond to each petition by establishing a tolerance or exempting the pesticide from the requirement. If the pesticide will not leave residues above an established safe level, EPA will register the pesticide.

If registration is granted, the agency specifies the approved uses and conditions of use, including safe methods of pesticide storage and disposal, which the registrant must explain on the product label.  FIFRA requires that federal regulations for pesticide labels pre-empt state, local, and tribal regulations.  Use of a pesticide product in a manner inconsistent with its label is prohibited."

Federal Government pesticide regulations (i.e., FIFRA and FFDCA) both were originally promulgated to be operated under the United Stated Department of Agriculture (USDA), but in 1970 were moved under the US EPA.  Since 1970 EPA has the responsibility to regulate and determine the safety of pesticides.

In 1958, any additive (including pesticide residue) found to be a potential cancer causing agent was prohibited to be present in foods, but this clause was removed in 1996 and replaced by a safety standard of "reasonable certainty of no harm". Schierow and Esworthy (Exhibit 32) go on to detail FFDCA requirements to determine a "safe level" as follows:

> The FFDCA, Section 408, as amended by the FQPA, requires EPA to assess safety in terms of total exposure to the pesticide (that is, to the concentration of pesticide allowed by the tolerance, together with all other dietary and non-food exposures for which there is reliable information) as well as to other pesticides that have the same toxic effects on people. No quantitative standard of safety is established by law, but the Committee on Commerce noted in its report on the bill that became the FQPA that EPA should continue setting standards to ensure safety as it had in the past:
>
> > ..the Committee expects that *a tolerance will provide a **'reasonable certainty of no harm'** if the Administrator determines that the aggregate exposure to **the pesticide chemical residue will be lower by an ample margin of safety than the level at which the pesticide chemical residue will not cause or contribute to any known or anticipated harm to human health**. The Committee further expects, based on discussions with the Environmental Protection Agency, that **the Administrator will interpret an ample margin of safety to be a 100-fold safety factor applied to the scientifically determined 'no observable effect' level when data are extrapolated from animal studies** (U.S. House of Representative s, Committee on Commerce, Food Quality Protection Act of 1996, H. Rept. I04 -669, part 2. I04th Cong. 2nd Session, 1996. pg. 6).
>
> In determining a safe level, the FFDCA directs EPA to take into account many factors, including available information on dietary exposure to pesticides among infants and children.  The FQPA strictly limited the nature and influence of benefits considered in tolerance setting under Section 408 of the FFDCA.  *As amended, Section 408 allows EPA to maintain or modify existing tolerances (but not to establish new tolerances) at higher than "safe" residue levels only if the pesticide use avoids other greater risks to consumers, or is necessary to avoid significant disruption in domestic production of an adequate, wholesome, and economical food supply.  **Such higher tolerance levels may be set only for pesticides that are potential carcinogens** (or have some other health effect) for which there is no known level of exposure at which no harm is anticipated (known as a non-threshold effect)*. The higher tolerance level allowed for such pesticide residues must be "safe" for infants and children, as well as with respect to health effects for which there is a known threshold (that is, a level below which exposure is known to be harmless). *The higher cancer (or other non-threshold) risk posed by the tolerance on an annual basis may not be more than 10 times the risk at a " safe" level of exposure and not more than twice the risk of a "safe" level over a lifetime.*

**[Thus, for pesticides that are shown to be "potential" carcinogens in animal studies, the factor of safety is only allowed to increase by up to a factor of 2x or 10x the safe factor of 100.  This implies pesticides that are potential carcinogens must use a factor of 200 to 1,000 below the NOELs set by animal studies.  Of interest, Daniel Goldstein writes a May 24, 2015 e-mail to B. Lebbing (Exhibit 197-KK, Bates MONGLY00935713) making an odd statement that "We do not know the average levels of glyphosate (if any) in specific infant formulas or in infant formulas collectively", but "What we DO know is that allowable daily intakes for glyphosate are set to protect infants and children…"  These statements conflict,**

Goldstein states that he does not know levels of glyphosate in the product, but knows that the levels in the consumed product are ok.]

For non-threshold effects, the House Commerce Committee provided additional guidance for establishing a level of residue that should be considered "safe".

> _In the case of a non-threshold effect which can be assessed through quantitative risk assessment, such as a cancer effect_, the Committee expects, _based on its understanding of current EPA practice, **that a tolerance will be considered** to provide a **'reasonable certainty of no harm'** if any increase in lifetime risk, based on quantitative risk assessment using conservative assumptions, **will be no greater than "negligible"**._  It is the Committee's understanding that, under current EPA practice, **_EPA interprets a negligible risk to be a one-in-a-million lifetime risk._** The Committee expects the Administrator to continue to follow this interpretation (U.S. House of Representatives, Committee on Commerce, Food Quality Protection Act of 1996, H. Rept. I04 -669, part 2. I04th Cong. 2nd Session, 1996. pg. 6).

**[Another "reasonable certainty of no harm" criteria is a lifetime cancer risk of one in one million (1 x 10$^{-6}$); a criteria commonly used in risk assessments.  This means that the lifetime dose will not result in any more than 1 case in 1 million people developing cancer.]**

> The "safe" standard applies to both raw and processed foods, and requires EPA to consider cumulative and aggregate exposure to pesticides in food, drinking water, air, and consumer products.  _Congress directed EPA to reevaluate all existing tolerances against this standard before August 2006._

> FFDCA directs the FDA and USDA to monitor pesticide residue levels in food in interstate commerce and to enforce tolerances through their food inspection programs.  USDA is responsible for inspecting meat and poultry; FDA inspects all other foods. States also may monitor pesticide residues in food sold within their jurisdictions.

## 6.3    Summary of U.S. EPA Pesticides Warnings Language:

As illustrated in Tables 6-1 to 6-9 below (and discussed in Section 6.1 above), pesticide warnings language in FIFRA (i.e., 40 CFR Subpart D – Human Hazard and Precautionary Statements to §156.60 to §156.80 – see Exhibit 29) is based on _acute_ rather than _chronic_ (e.g., carcinogenic) hazards.

### Table 6-1:  Toxicity Categories

| Study | Category I | Category II | Category III | Category IV |
|---|---|---|---|---|
| Acute oral | Up to and including 50 mg/kg | >50 through 500 mg/kg | >500 through 5,000 mg/kg | >5,000 mg/kg |
| Acute dermal | Up to and including 200 mg/kg | >200 through 2,000 mg/kg | >2,000 through 5,000 mg/kg | >5,000 mg/kg |
| Acute inhalation˙ | Up to and including 0.05 mg/liter | >0.05 through 0.5 mg/liter | >0.5 through 2 mg/liter | >2 mg/liter |
| Primary eye irritation | Corrosive (irreversible destruction of ocular tissue) or corneal involvement or irritation persisting for more than 21 days | Corneal involvement or other eye irritation clearing in 8-21 days | Corneal involvement or other eye irritation clearing in 7 days or less | Minimal effects clearing in less than 24 hours |

| Study | Category I | Category II | Category III | Category IV |
|---|---|---|---|---|
| Primary skin irritation | Corrosive (tissue destruction into the dermis and/or scarring) | Severe irritation at 72 hours (severe erythema or edema) | Moderate irritation at 72 hours (moderate erythema) | Mild or slight irritation at 72 hours (no irritation or slight erythema) |

*4-hour exposure

### Table 6-2: Signal Word as Determined by Toxicity Category

| Toxicity category | Signal word* |
|---|---|
| I | DANGER |
| II | WARNING |
| III | CAUTION |
| IV | None required |

\* Signal words are found on pesticide product labels, and they describe the acute (short-term) toxicity of the formulated pesticide product. The signal word can be either: **DANGER, WARNING,** or **CAUTION**.

Products with the **DANGER** signal word are the most toxic.

**DANGER:** Means that the pesticide product is highly toxic by at least one route of exposure. It may be corrosive, causing irreversible damage to the skin or eyes. Alternatively, it may be highly toxic if eaten, absorbed through the skin, or inhaled. If this is the case, then the word "POISON" must also be included in red letters on the front panel of the product label.

**WARNING:** Indicates the pesticide product is moderately toxic if eaten, absorbed through the skin, inhaled, or it causes moderate eye or skin irritation.

**CAUTION:** Products with the signal word **CAUTION** are lower in toxicity. Protection Agency (EPA) requires a signal word on most pesticide product labels. They also require it to be printed on the front panel, in all capital letters, to make it easy for users to find. The only pesticide products that are not required to display a signal word are those that fall into the lowest toxicity category by all routes of exposure (oral, dermal, inhalation, and other effects like eye and skin irritation).

### Table 6-3: Examples of Signal Words Based Upon Toxicity Studies

| Type of study | Product A | Product B | Product C | Product D | Product E |
|---|---|---|---|---|---|
| Acute oral | III | IV | I* | III | II |
| Acute dermal | IV | III | III | IV | II |
| Acute inhalation | III | IV | III | III | II |
| Primary eye | III | II | I | I | II |
| Primary skin | IV | IV | II | IV | II |
| Contains >4% methanol | No | No | No | No | Yes** |
| **Signal Word \*\*\*** | **CAUTION** | **WARNING** | **DANGER** | **DANGER** | **DANGER** |

\*    Product C must also bear the skull and crossbones symbol in close proximity to the word "POISON" which must appear in red on a contrasting background due to acute oral toxicity.

\*\*   Product E must also bear the skull and crossbones symbol in close proximity to the word "POISON" which must appear in red on a contrasting background due to its formulation containing at least 4% methanol.

\*\*\*  Signal Word determined on highest acute hazard category.

### Table 6-4:  Typical Statements for Acute Oral Toxicity

| Toxicity Category | Signal Word | Statements |
|---|---|---|
| I | DANGER-POISON Skull and crossbones required* | Fatal if swallowed. Wash thoroughly with soap and water after handling and before eating, drinking, chewing gum, or using tobacco. |
| II | WARNING | May be fatal if swallowed. Wash thoroughly with soap and water after handling and before eating, drinking, chewing gum, or using tobacco. |
| III | CAUTION | Harmful if swallowed. Wash thoroughly with soap and water after handling and before eating, drinking, chewing gum, or using tobacco. |
| IV | CAUTION (optional) | No statements are required. However, manufacturers may choose to use category III labeling. |

*For products containing ≥4% methanol, EPA believes that in order to mitigate potential risk the following statement should be added to the label: "Methanol may cause blindness."

### Table 6-5:  Typical Statements for Acute Dermal Toxicity.

| Toxicity Category | Signal word | Statements |
|---|---|---|
| I | DANGER-POISON Skull and crossbones required | Fatal if absorbed through skin. Do not get in eyes, on skin, or on clothing. Wash thoroughly with soap and water after handling and before eating, drinking, chewing gum, or using tobacco. Wear (appropriate protective clothing listed here). Remove and wash contaminated clothing before reuse. |
| II | WARNING | May be fatal if absorbed through skin. Do not get in eyes, on skin, or on clothing. Wash thoroughly with soap and water after handling and before eating, drinking, chewing gum, or using tobacco. Wear (appropriate protective clothing listed here). Remove and wash contaminated clothing before reuse. |
| III | CAUTION | Harmful if absorbed through skin. Avoid contact with skin, eyes, or clothing. Wash thoroughly with soap and water after handling and before eating, drinking, chewing gum, or using tobacco. Wear (appropriate protective clothing listed here). Remove and wash contaminated clothing before reuse. |
| IV | CAUTION (optional) | No statements are required. However, manufacturers may choose to use category III labeling. |

### Table 6-6: Typical Statements for Acute Inhalation Toxicity

| Toxicity Category | Signal Word | Statements |
|---|---|---|
| I | DANGER-POISON Skull and crossbones required | Fatal if inhaled. Do not breathe (dust, vapor, or spray mist listed here). Wear (appropriate respiratory protection listed here). Remove and wash contaminated clothing before reuse. |
| II | WARNING | May be fatal if inhaled. Do not breathe (dust, vapor, or spray mist listed here). Wear (appropriate respiratory protection listed here). Remove and wash contaminated clothing before reuse. |
| III | CAUTION | Harmful if inhaled. Avoid breathing (dust, vapor, or spray mist listed here). Remove and wash contaminated clothing before reuse. |
| IV | CAUTION (optional) | No statements are required. However, manufacturers may choose to use category III labeling. |

### Table 6-7: Typical Statements for Primary Eye Irritation

| Toxicity Category | Signal Word | Statements |
|---|---|---|
| I | DANGER | Corrosive.* Causes irreversible eye damage. Do not get in eyes or on clothing. Wear (appropriate protective eyewear such as goggles, face shield, or safety glasses listed here). Wash thoroughly with soap and water after handling and before eating, drinking, chewing gum, or using tobacco. Remove and wash contaminated clothing before reuse. |
| II | WARNING | Causes substantial but temporary eye injury. Do not get in eyes or on clothing. Wear (appropriate protective eyewear such as goggles, face shield, or safety glasses listed here). Wash thoroughly with soap and water after handling and before eating, drinking, chewing gum, or using tobacco. Remove and wash contaminated clothing before reuse. |
| III | CAUTION | Causes moderate eye irritation. Avoid contact with eyes or clothing. Wear (specify protective eyewear, if appropriate, here). Wash thoroughly with soap and water after handling and before eating, drinking, chewing gum, or using tobacco. |
| IV | CAUTION (optional) | No statements are required. However, manufacturers may choose to use category III labeling. |

*The term "corrosive" is not required if corrosive effects were not observed during the study.

### Table 6-8:  Typical Statements for Primary Skin Irritation

| Toxicity Category | Signal Word | Statements |
|---|---|---|
| I | DANGER | Corrosive. Causes skin burns. Do not get in eyes, on skin, or on clothing. Wear (appropriate protective clothing and gloves listed here). Wash thoroughly with soap and water after handling and before eating, drinking, chewing gum, or using tobacco. Remove and wash contaminated clothing before reuse. |
| II | WARNING | Causes skin irritation. Do not get on skin or on clothing. Wear (appropriate protective clothing and gloves listed here). Wash thoroughly with soap and water after handling and before eating, drinking, chewing gum, or using tobacco. Remove and wash contaminated clothing before reuse. |
| III | CAUTION | Avoid contact with skin or clothing. Wash thoroughly with soap and water after handling and before eating, drinking, chewing gum, or using tobacco. Wear (appropriate protective clothing and gloves listed here). |
| IV | CAUTION (optional) | No statements are required. However, manufacturers may choose to use category III labeling. |

### Table 6-9: Typical Statements for Dermal Sensitization.

| Study Results | Statement |
|---|---|
| Product is a sensitizer or is positive for sensitization. | Prolonged or frequently repeated skin contact may cause allergic reactions in some individuals. |
| Product is not a sensitizer or is negative for sensitization. | No labeling is required for this result. |

Thus, as long as the pesticide poses only an *acute hazard*, and the acute hazard is at levels shown in Table 6-1, the labeling of pesticide containers is prescriptive as indicated in Tables 6-1 to 6-9.

The first signal word requirements for Roundup® in 1974 was "DANGER", not "CAUTION" used from the 1980s onwards.

<u>1974 – U.S. EPA Letter and Attachments from Charles L. Smith (Acting Assistant Director, Registration Division) to Monsanto's L.H. Hannah dated March 13, 1974 (Exhibit 201, Bates MONGLY00784683, pg. 02:</u>

On/about March 13, 1974 – U.S. EPA's Charles L. Smith (Acting Assistant Director, Registration Division) wrote a letter with labeling attachments to Monsanto's L.H. Hannah.   Requirements for the label were to use the most stringent signal word, "DANGER" (see Figure 6-1):



**Figure 6-1: Label Attachment to U.S. EPA's March 13, 1974 Letter from U.S. EPA's Charles Smith to Monsanto's L.H. Hannah – Monsanto Roundup® Label (Exhibit 201, Bates MONGLY00784684, pg. 03)**

The cover sheet says *(Exh. 201, Bates MONGLY00784682, pg. 01)*:

> "*Notice that Roundup herbicide will be approved once label changes are made.*"

> "*Change signal word to '<u>Danger</u>'.*"

The signal words, from highest to lowest warnings run from "DANGER" to "WARNING" to "CAUTION" to "CAUTION – optional as the Categories run from "I" to "IV".

<u>1978 – U.S. EPA Note from Robert J. Taylor (Product Manager, Fungicide-Herbicide Division, Registration Division) to Monsanto's L.H. Hannah on/about February 21, 1978 (Exhibit 201, Bates MONGLY00784384-4404, pgs. 07-27):</u>

By early January 1978, Monsanto had convinced the U.S. EPA to lower the signal word on labels to "WARNING" (Figure 6-2):



**Figure 6-2: Label Attachment to U.S. EPA's February 21, 1978 Letter from U.S. EPA's Robert Taylor to Monsanto's L.H. Hannah – Monsanto Roundup®  Label (Exhibit 201, Bates MONGLY00784387, pg. 10)**

***On the other hand, if the hazard is*** not within the bounds of acute hazards in Table 6-1, is a sub-chronic hazard, or is ***a chronic hazard*** (e.g., a carcinogen), and the risks are viewed as a substantial risk, ***the U.S. EPA with either not register the pesticide or will register it under the restricted category with supplemental labeling.***  U.S. EPA's criteria for determining if the pesticide is safe (i.e., "reasonable certain of no harm" criteria) were discussed in the previous two Sections.  In such cases, the EPA depends on, and requires transparent transmittal of health and safety data by the applicant.  The U.S. EPA made this clear as far back as 1975 (Exhibit 18, pg. 28249) when they said:

> "Several commenters objected to the policy of this section (§162.8).  They argued that the applicant would only be responsible for submitting his own data and not data found in the general literature.  <u>Section 6(a) of the Act and §162.8(d) of these regulations imposes on the registrant the affirmative duty to report any additional factual information regarding adverse effects on man or the environment of the pesticide.  EPA interprets report of scientific findings in the general literature as within that duty.  This same affirmative duty is imposed upon the applicant for reregistration as well.  The burden for establishing the safety of a product is on the applicant at all times.</u>  He must convince the Administrator, in part, that the pesticide will perform its intended function and that it will be used without unreasonable adverse effects on the environment before the initial decision may be made to register the product.  ***<u>This duty falls on the applicant and registrant because they are in the better position to monitor the literature as regards to a particular pesticide.</u>***"

Thus, the pesticide applicant's duty is to provide the U.S. EPA with an affirmative and current review of the general scientific literature since they are in the best position to monitor the literature for their particular product.  Further, the U.S. EPA relies on the fact this is done and done transparently (see *§162.8 language below*):

### 162.8 Data to support of registration and classification

(c)     Data requirements for reregistration –

(1)     *General.* Unless additional data are requested by the Agency pursuant to paragraph (d) of this section or the applicant secures a waiver of a data requirement pursuant to paragraph (a)(3) of this section, pesticide products subject to registration under §162.6(b)(5) shall be supported by the following data to determine their use classification(s) and reregistrability.

(2)     *Acute Toxicity Data...*

(3)     *Subacute and chronic toxicity data.*  For the purposes of reregistration and classification under §§ 162.6(b)(5) and 162.11(c)(2), registrants of pesticide products which meet the criteria listed below shall be required to submit supportive data. Acceptable procedures for required studies are specified in the Registration Guidelines.  If such data have been previously submitted and meet the intent and reliability of standards established in the Registration Guidelines, the registrant shall so notify the Agency and need not resubmit the required data.

(i)     Teratogenic evaluation of the active ingredient(s)….

(ii)    Oncogenic evaluation of the active ingredient(s) will be required if (A) the active ingredient(s), its metabolite(s) or degradation product(s) contains a substance structurally related to a known or suspected oncogenic agent, or (B) the pesticide needs a tolerance or an exemption from the requirement to obtain a tolerance [see §162.7(d)(1)(v)]

(iii)   Chronic feeding studies of the active ingredients will be required (A) for pesticides which need a tolerance or an exemption from the requirement to obtain a tolerance, or (B) for pesticides intended for use in residences, enclosed working spaces, or their immediate vicinity.  Such chronic feeding studies shall include, at least, studies of effects on the central nervous system, hematopoietic system, and histological changes in the liver, kidney, and both male and female reproductive systems.

(d)     *Additional data.*

(1)     A registrant or applicant shall submit any additional data other than that required by these regulations and the registration Guidelines which the Agency has determined is necessary to support the registration.  If any additional information is required on previously registered pesticides, the Agency shall permit sufficient time to obtain such additional information.  The Agency shall periodically revise the information needed to support the registration of a pesticide.  Such revisions of required information shall be contained in the Registration Guidelines.

(2)     ***If at any time after the registration of a pesticide product, the registrant had additional information regarding any adverse***

*effects on man or the environment he shall submit such information to the Administrator.*   Such information may be obtained directly by the applicant or come to his attention and shall include, but is not limited to, published or unpublished laboratory studies and accident experience.

The U.S. EPA OPP in their Label Review Manual (https://www.epa.gov/ sites/production/files/2017-09/documents/lrm-complete-aug-2017.pdf) confirm this position in Chapter 6 – Use Classification and Chapter 9 – Physical or Chemical Hazards – that pesticide products with a Restricted Use classification (vs. Unclassified – products not generally classified for general use by the Agency) are determined based on acute and chronic risk reviews; including periodic Reregistration Eligibility Decision (RED) reviews.   If the product were determined to contain a carcinogen, than a tolerance analysis must be completed and passed (i.e., risk level adequately low).  Note that as early as 1975, the Agency has made it clear that the base case labels are determined by "acute" criteria; chronic criteria such as the product being capable of causing cancer results in the product either not being registered or being registered as a Restricted Use Pesticide which requires special labeling.

Hadden notes that under U.S. EPA, pesticide "*labels based on toxicity categories address only acute hazards*" unlike OSHA which "*provided for similarly direct warnings for the underlinechronic hazards of a few chemicals that must be labeled underlineCANCER HAZARD.*" (Exhibit 32, pgs. 253-254).  Hadden also notes "*that there are two rather different kinds of labels: some triggered by a hazard and others triggered by the existence of certain level of hazard was explicitly articulated by the early MCA-LAPI Committees.  Many of the label designations that are tied to (acute) hazards, EPA signal words, for example, have that standard in their ancestries.  OSHA's labels on the other hand, and to a large extent DOT's, are made for each chemical*" (Exhibit 39, pg. 255).

The U.S. EPA OPP in their Label Review Manual also state that tolerance exemptions must also be in place for inert ingredients to ensure they are not also unacceptably toxic (Chapter 5, pg. 13).

[Two clear observations from a review of the Regulatory Language and Monsanto's efforts to limits their effects on Roundup®:

*It is clear that if glyphosate were to be found to be a probable human carcinogen this would move Roundup® from the Unclassified Product category to either a Restricted Use Pesticide or the product's registration being revoked.  Thus, the importance of whether or not the product is a carcinogen on labeling and PPE for workers and their resulting exposures.*

*It is also clear that the labeling and PPE requirements change dramatically between Category II ("DANGER" or "WARNING" signal words) and Category III ("CAUTION" signal word), that Monsanto has worked hard to keep the lower "CAUTION" word to apply to Roundup® labels, and continues even into 2015 to keep the labeling language as it existed (Exhibit 193, P1.3377.1, 3, 6, 7 and 9). This has largely been accomplished by misrepresenting/misleading dermal work on glyphosate and by separating the toxicity of glyphosate from that of the formulation/product Roundup®.]*

## 7.0   Review of Roundup® MSDSs, Labels, and Advertising Claims:

Examples of Monsanto misrepresenting information to customers on their labels, MSDSs, and advertising follow:

### 7.1   <u>Misleading Monsanto Roundup® Labeling Information:</u>

The U.S. EPA OPP in their Label Review Manual (https://www.epa.gov/ sites/production/files/2017-09/documents/lrm-complete-aug-2017.pdf) dedicate an entire Chapter (Chapter 12, Labeling Claims – last revised in December 2014 – Attached as Appendix C) to misrepresentations on labels.

> "***Labeling is defined*** in the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) Section 2(p)(2) ***as meaning <u>labels</u>*** and ***<u>all other written, printed, or graphic material accompanying a pesticide or device at any time</u>*** <u>***or to which reference is made on the label or in accompanying literature***</u>."

Thus, a label, under the FIFRA's (part of US EPA) definition, includes anything on the container/device or anything referenced or accompanying the container/device (e.g., MSDSs).  Thus, MSDSs and advertising would technically be part of the label.

They define these misrepresentations as "labeling claims" which are defined as:

> "<u>***a statement of something as fact or an assertion***</u> on the label <u>***open to challenge***</u>."

These claims are stated to fall under one of three categories:

➢   ***General Claims.***

➢   ***Claims Associated with the Product Name.***

➢   ***Efficacy Related Claims.***

<u>*General Claims:*</u>

General claims are defined by FIFRA as:

> As defined in FIFRA Section 2(q)(1)(A) ***a pesticide is misbranded if its labeling bears any statement, design or graphic representation which is false or misleading***. ***FIFRA*** Section 12(a)(1)(E) ***provides that <u>it is unlawful</u> for any person to distribute or sell any pesticide which is misbranded***.  EPA's regulation, at 40 CFR 156.10(a)(5)

EPA (40 CFR 156.10(a)(5) provides examples of misbranding general claims include:

> "A false or misleading statement concerning the composition of the product;
>
> A false or misleading statement concerning the effectiveness of the product as a pesticide or device (EPA may review and approve or disapprove non-pesticidal claims appearing on a pesticide label);

A false or misleading statement about the value of the product for purposes other than as a pesticide or device;

*A false or misleading comparison with other pesticides or devices*;

Any statement directly or indirectly implying that the pesticide or device is recommended or endorsed by an agency of the Federal Government;

The name of a product if the name suggests some but not all the active ingredients in the product, even though the names of the other ingredients are stated elsewhere in the labeling;

*A true statement used in such a way to give a false or misleading impression to the purchaser*;

Label disclaimers or warranty statements which negate or detract from labeling statements required under FIFRA and EPA's regulations;

*Safety claims of the pesticide, or its ingredients, including statements such as trusted, safe, nonpoisonous, noninjurious, harmless or nontoxic to humans and pets with or without such a qualifying phrase as when used as directed*.

*Non-numerical and/or comparative statements on the safety of the product, including but not limited to:* i) Contains all natural ingredients, ii) *Among the least toxic chemicals known*, or iii) *Pollution approved*."

*Biodegradable: The term "biodegradable" is generally unacceptable for any pesticide product.  Except the term may be used only in reference to the package or packaging and then only if the registrant certifies that the package breaks down and they provide information to support it.  Otherwise "biodegradable" may not be used on a pesticide label in any context.*

Claims made about the active ingredient, in this case glyphosate, must include only *appropriate comparisons*:

**C. Appropriate Comparison**:  *If the subject product is a single active ingredient product, the claim should only refer to another similar single ingredient product.*  If the subject product is a multiple active ingredient product, the claim should only refer to another similar multi-ingredient product with the same active ingredients. Appropriate disclaimers stating that the generic product is not manufactured or distributed by the maker or marketer of the brand-name product as well as the trademark of the brand may be cross-referenced by use of a footnote.

Claims made in advertising are also addressed in Section X of the Manual as follows:

*"Advertising and collateral literature or verbal claims for the product must not substantially differ from any claims made on the label or labeling. See FIFRA § 12(a)(1)(B).*  In other words, *if a claim is not on the label or substantially differs from what appears on the label (or any part of its distribution or sale which for example appears on a brochure); it cannot be made in advertising.*  Although OPP does not routinely review advertising used in the marketing of the product in connection with the registration, the Agency may require advertising to be submitted upon request and be reviewed to see that it is in compliance with *FIFRA section 12(a)(1)(B).*"

Monsanto's corporate representative for marketing-related matters (Exhibit 553, pg. 12), including labeling and promotional materials (Exhibit 553-05) – Mr. Muckerman, testified in his deposition that "our position is that glyphosate-based Roundup products are safe when used according to the EPA guideline" (Exhibit 553, pgs. 27, 85-86, 259-264, 302, 305) and that EPA has determined that glyphosate-based Roundup products are safe (Exhibit 553, pgs. 32, 34-35, 37, 87, 95, 273, 303).   Yet Mr. Muckerman acknowledged in his deposition that both FIFRA 40 CFR 156.10(a)(5)(ix) and the International Code of Conduct on the Distribution and Use of Pesticides stated that the use of terms like "safe" or "non-toxic" are false or misleading statements (Exhibit 553, pgs. 39-40, 91, 214-215; Exhibit 554, pg. 483; Exhibit 554-41, Roundup 101 pg. 5).  He also admitted in his deposition that Monsanto's website (www.MonsantoITO.com – Exhibit 553-19) contained promotional materials stating glyphosate-containing Roundup materials are "safe" (Exhibit 563, pg. 89), that it contained comparisons with other products (Exhibit 553, Exhibit 20) and that the website link was provided to customers (I.e., and webpage content) in marketing materials (Exhibit 553-21, Exhibit 553-22, Exhibit 554-26).

As to the use of the word "safe" in labeling, FIFRA 40 CFR 156.10 (a)(5)(ix) states (Exhibit 553-01, Exhibit 553-03 and Exhibit 553-04 – 1999, 2002, and 2009 versions):

> **(5)  *False or misleading statements*.** Pursuant to section 2(q)(1)(A) of the Act, a pesticide or a device declared subject to the Act pursuant to §152.500, is misbranded if its labeling is false or misleading in any particular including both pesticidal and non-pesticidal claims.  ***Examples of statements or representations in the labeling which constitute misbranding include:***
>
> > **(ix)  *Claims as to the safety of the pesticide or its ingredients, including statements such as* "*safe*,**" "nonpoisonous," "noninjurious," "harmless" or "nontoxic to humans and pets" *with or without such a qualifying phrase as "when used as directed*";

This link contains EPA Questions and Answers (https://www.epa.gov/pesticide-labels/pesticide-labeling-questions-answers#logos - Exhibit 552) also supports this FIFRA position regarding the use of the term "safe" in labeling/advertising:

> In the "advertising claims" section is the Q&A below re: using the word "safe" appears:
>
> **A lawn care operator (LCO) has advertising in a local newspaper advertising its service, claiming mosquito and other pest elimination from customer yards. At the bottom of the ad, it states "Safe." Is stating a service using a registered product is "safe" in an advertisement a violation of FIFRA or its associated regulations? (LC08-0177)**
>
> Section 12(a)(1)(B) of FIFRA makes unlawful any sale or distribution of "any registered pesticide if any claims made for it as a part of its distribution or sale substantially differ from any claims made for it as a part of the statement required in connection with its registration." The statement required for registration must include "a statement of all claims to be made for [the pesticide]." FIFRA 3(c)(1)(C).
>
> ***"EPA generally has not allowed the use of "safe" in labeling because it has been considered to be false or misleading. 40 CFR § 156.10(a)(5)(ix). False and misleading claims make a product misbranded and sale and distribution of such***

*product unlawful. See FIFRA §§ 2(q)(q)(A); 12(a)(1)(E).  <u>If use of the term "safe" has not been allowed in labeling and use of the term hasn't been otherwise approved, use of "safe" in advertising the sale or distribution of a pesticide product would generally be considered to substantially differ from what was approved in the registration and sale or distribution of the pesticide would be unlawful under section 12(a)(1)(B) of FIFRA."</u>*

Mr. Muckerman's continual statements as Monsanto's Corporate Representative that the EPA has said glyphosate-based Roundup products are safe is also in violation of FIFRA (e.g., 40 CFR 156.10 (a)(5)(v)):

    **v)**    *<u>Any statement directly or indirectly implying that the pesticide or device is recommended or endorsed by any agency of the Federal Government.</u>*

Monsanto also published customer training materials claiming Roundup products were "safe" (e.g., Exhibit 554-46) and published them to their website (www. monsantoITO.com) (Exhibit 554-47).

Further, Mr. Muckerman, in his deposition, agrees that comparisons of the toxicity of Roundup, and glyphosate, to other products like apple cider vinegar, table salt, Advil, aspirin, coffee, properly chlorinated pool, nicotine, cyanide, and chocolate were in apparent violation of the International Code of Conduct on the Distribution and Use of Pesticides (Exhibit 553, pgs. 226-257. 274, 276-277, 280; Exhibit 554, pgs. 330, 333-334, 349-351, 365-368, 374-379, 381-384, Exhibit 554-24, Bates MONARCH 000299; Exhibit 554-27, Bates MONGLY07273392, 97-98; Exhibit 554-28, Exhibit 554-29, Exhibit 554-30, Exhibit 554-31, Bates MONGLY07601026, Exhibit 554-32, Bates MONGLY07601008, Exhibit 554-33, Exhibit 554-34, Bates MONGLY07600971, Exhibit 554-35, Bates MONGLY07600953, Exhibit 554-36, Exhibit 554-37, Bates MONGLY07194544), nor would such comparisons likely be allowed by the EPA (Exhibit 553, pg. 283).

These false/misleading comparisons, along with statements regarding degradation to natural components (e.g., Exhibit 554-23, pg. 5; Exhibit 554-41, Roundup 101 pg. 5) are also addressed under FIFRA 40 CFR 156.10 (a)(5):

    (iv)    *<u>A false or misleading comparison with other pesticides or devices</u>*;

    (vii)    *A true statement used in such a way as to give a false or misleading impression to the purchaser*;

    (viii)    *Label disclaimers which negate or detract from labeling statements required under the Act and these regulations*;

    (x)    *<u>Non-numerical and/or comparative statements on the safety of the product</u>*, including but not limited to: (A) "Contains all natural ingredients"; (B) "Among the least toxic chemicals known" (C) "Pollution approved".

Interestingly, Mr. Muckerman, Monsanto's Corporate Representative on "marketing-related" issues testified that he had never read the FIFRA regulations (Exhibit 554, pg. 481).

Mr. Muckerman also apparently confused/misrepresented EPA statements in his testimony regarding glyphosate and cancer vs. Roundup (formulations) and cancer by stating EPA has reviewed every formulation for its potential to cause cancer (Exhibit 553, pgs. 285-287) despite Monsanto's Donna Farmer stating Monsanto cannot clearly state the formulation does not cause cancer (e.g., Exhibit 553-16 and Exhibit 553-17). Moreover, discovery does not support the fact that EPA reviewed the potential for all glyphosate-based Roundup formulations to cause cancer.   He admits promotional materials and a PowerPoint presentation state that Roundup formulations do not cause cancer (Exhibit 554, pgs. 432, 439) despite the fact that Monsanto's toxicologist states this claim regarding formulations cannot be made.  He later admits he is not qualified to answer the question regarding whether or not the formulation is a carcinogen or not (Exhibit 554, pg. 423) and does not know if any glyphosate-based Roundup formulation has been tested for cancer or genotoxicity in animals (Exhibit 554, pgs. 433, 478).

Nevertheless, Monsanto continues to advertise to the public that its Roundup products are as safe or safer than commonly used products such as apple cider vinegar, Advil, aspirin, and vitamin D-3 as evidence in a video taken by Kathy Feldman at a Hawaii State Farm Fair (http://www.hawaiistatefarmfair.org) in July 2015.   A blog, by Zen Honeycutt, dated August 17, 2018, includes a link to the video taken by Kathy Feldman (see Petty Video 11 from https://www.momsacrossamerica.com/monsanto _rep_says _roundup_is - Exhibit 296 and 556).  Clips from this video are shown in Figure 7-1:



**Figure 7-1: Clip from Video taken during the July 2015 Hawaii State Farm Fair Where Monsanto Roundup Compared with Other Products (from Petty Video 11)**

The authenticity of this video using Kathy Feldman's phone was made during the September 25, 2019 deposition of Kathy Feldman (Exhibit 555).

A comparison chart used at this display is reproduced in Figure 7-2:



**Figure 7-2: Comparison Materials Present at July 2015 Hawaii State Farm Fair Where Monsanto Roundup Compared with Other Products (Exhibit 555 Exhibit 3)**

Donna Farmer writes in an April 21, 2014 e-mail to Bill Reeves and others, that the FAO Code of Conduct does not allow such comparisons, stating Section 11.2.9 of the Standard that comparison of "risk, hazard or safety of different pesticides or other substances" are not allowed (Exhibit 553-18, MONGLY02415335) with this same chart attached.  Yet it continues to be used a year later at the Hawaii Farm Fair and was present on the MonsantoITO.com webpage over five years later on August 30, 2019 during Mr. Muckerman's deposition (Exhibit 553, pgs.221-223 – Exhibits 19 and 20 – Exhibits 553-19 and 553-20).

A summary of Label contents by product and time follows in Table 7-1, a review of Roundup® MSDSs follows in Section 7-2, and Monsanto's Roundup® misleading advertising follows in Section 7-3:

128

## Table 7-1: Roundup® Labels Warnings by Product and Time

| DATE | PRODUCT | INGREDIENTS/% | WARNINGS | DIRECTIONS FOR USE | MIXING INSTRUCTIONS | COMMENTS |
|------|---------|---------------|----------|--------------------|--------------------|----------|
| 3/13/1974 | Roundup, Postemergence Herbicide | *Isopropylamine Salt of Glyphosate - 41; INERT INGREDIENTS: 59; *Contains 480 grams per liter or 4 pounds of the active ingredient isopropylamine salt of N-(phosphonomethyl) glycine per U.S. gallon. | **DANGER**! Keep out of reach of children.  **DANGER**! CAUSES EYE BURNS AND SKIN IRRITATION. HARMFUL IF SWALLOWED. Avoid contact with eyes, skin or clothing.  Wear goggles or face shield when handling. | INDUSTRIAL AND NON-AGRICULTURAL USES: To control annual and perennial weeds on this label on non-crop areas such as railroad, pipeline, highway, power and telephone rights-of-way; petroleum tank farms and pumping installations; roadsides; storage areas; lumberyards; fencerows; industrial plant sites; parking areas; airports and similar industrial or non-crop areas. | For ground or industrial type sprayers fill the spray tank with one half the required amount of water.  Add the proper amount of herbicide (See Directions for Use) and mix well before filling the remaining portion of water. Place the filling hose below the surface of the liquid solution to prevent excessive foaming.  Remove hose from tank immediately to avoid back siphoning into water source.  Do not use mechanical agitators.  For use in knapsack type sprayers, it is suggested that the proper amount be mixed with water in a larger container.  Fill sprayer from the tank or container of stock solution. Apply in properly maintained and calibrated equipment capable of delivering desired rates of solution or volume per acre.  For ground and industrial sprayers (railroad, trucks, etc.) use nozzles designed to apply the appropriate rate of solution per acre at spray pressure not exceeding 40 pounds per square inch (PSI).  Do not apply under wind or other conditions which will allow drift to occur.  High pressure hand gun applications should be properly directed to avoid spraying desirable vegetation. By-pass lines should terminate at the bottom of the tank to minimize foaming.  For fixed-boom power equipment, use 50 mesh nozzle and line screens. | MONGLY00784 682-684 |
| 2/21/1978 | Roundup Herbicide | *Isopropylamine Salt of Glyphosate - 39.9; INERT INGREDIENTS - 60.1*Contains 480 grams per liter or 4 pounds of the active ingredient isopropylamine salt of N-(phosphonomethyl) glycine per U.S. gallon. Equivalent to 359 grams per liter or 3 pounds per U.S. gallon of the acid, glyphosate. | Hazard to Humans and Domestic Animals.  **WARNING**!  Keep out of reach of children.  CAUSES EYE IRRITATION. HARMFUL IF SWALLOWED.  Do not get in eyes, on skin or on clothing. | It is a violation of Federal Law to use this product in any manner inconsistent with its labeling. | Apply these spray solutions in properly maintained and calibrated equipment capable of delivering desired volumes.  Do not apply under wind or other conditions which allow drift to occur.  Hand gun applications should be properly directed to avoid spraying desirable plants. Note:  Reduced results may occur if water containing soil is used, such as water from ponds and unlined ditches. Tank Mixtures: 3. If a wettable powder is used, make a slurry with the water carrier, and add it SLOWLY through the screen into the tank.  Continue agitation.  4.  If a flowable formulation is used, pre-mix one part flowable with one part water.  Add diluted mixture SLOWLY through the screen into the tank.  5. Pour one part Lasso into two parts water and mix.  Add diluted mixture SLOWLY through the screen into the tank. 6.  Continue filling the sprayer tank with water and add the required amount of Roundup near the end of filling process. Maintain good agitation at all times until the contents of the tank are sprayed.  NOTE: If spray mixture is allowed to settle at any time, thorough agitation is required to resuspend the mixture before spraying is resumed. | MONGLY00784 384-404 |

| DATE | PRODUCT | INGREDIENTS/% | WARNINGS | DIRECTIONS FOR USE | MIXING INSTRUCTIONS | COMMENTS |
|---|---|---|---|---|---|---|
| 4/20/1978 | Roundup Herbicide | | **WARNING**! Keep out of reach of children. | Ground Application: See the "Mixing and Application Instruction" section of the label for Roundup. | HERBACEOUS ANNUALS: Apply 1/2 to 2 quarts of this product in a minimum of 2 gallons of water per acre for evaluation of control of annual herbaceous weeds. HERBACEOUS PERENNIALS: Apply 2 to 5 quarts of this product in a minimum of 2 gallons of water per acre for evaluation of control of most perennial herbaceous weeds. WOODY BRUSH: Use 1 to 4 quarts of this product in a minimum of 2 gallons of water per acre for evaluation of control of woody brush species...DECIDUOUS TREES: Use 1 to 5 quarts of this product in a minimum of 2 gallons of water to evaluate control of deciduous trees... | MONGLY00784 351-353 |
| 7/17/2002 | QuikPro | *Glyphosate, N-(phosphonomethyl) glycine, in the form of its Isopropylamine Salt - 73.3.  Diquat Dibromide [6,7-dihydrodipyrido(1,2-a:2'-1'-c) - 2.9.  OTHER INGREDIENTS: 23.8. *Equivalent to 66.6% of the acid, glyphosate. 1.0 pound QuickPRO herbicide contains 0.73 pound of the ammonium salt of glyphosate and 0.03 pound of the dibromide salt of diquat. | Keep out of reach if children. **CAUTION**!  HARMFUL IF SWALLOWED.  HARMFUL IF INHALED.  CAUSES MODERATE EYE IRRITATION.  Avoid breathing dust or spray mist.  Avoid contact with eyes or clothing.  Remove contaminated clothing and wash clothing before reuse.  Wash thoroughly with soap and water after handling. | AVOID CONTACT OF HERBICIDE WITH FOILAGE, GREEN STEMS, EXPOSED NON-WOODY ROOTS O FRUIT OF CROPS, DESIRABLE PLANTS AND TREES, BECAUSE SEVERE INJURY OR DESTRUCTION MAY RESULT.  Read the entire label before using this product.  Use only according to label instructions.  It is a violation of Federal law to use this product in any manner inconsistent with its labeling. THIS IS AN END-USE PRODUCT.  MONSANTO DOES NOT INTEND AND HAS NOT REGISTERED IT FOR REFORMULATION OR REPACKAGING. | Procedure for Preparing Spray Solution: Use the following procedure to mix this product in water alone or when preparing tank mixture with other labeled products. 1.  Place a 20 to 35 mesh screen or wetting basket over filling port.  2.  Through the screen, fill the spray tank one-half with water and start agitation.  3.  Add QuikPRO herbicide using a circular motion while pouring.  4.  If second product is a wettable powder, first make a slurry with the water carrier, then add the slurry SLOWLY through the screen into the tank.  Continue agitation. 5. If a flowable formulation is used, premix one part flowable with one part water.  Add diluted mixture SLOWLY through the screen into the tank.  Continue agitation.  6.  If an emulsifiable concentrate formulation is used, premix one part emulsifiable concentrate with two parts water.  Add diluted mixture slowly through the screen into the tank.  Continue agitation. 7.  Continue filling the spray tank with water and add water soluble liquids near the end of the filling process.  When tank mixing QuikPRO herbicide with other products, maintain good agitation at all times until the contents of the tank are sprayed.  If the spray mixture is allowed to settle, thorough agitation is required to resuspend the mixture before spraying is resumed.  Keep by-pass line on or near the bottom of the tank to minimize foaming.  Screen size in nozzle or the strainers should be no finer than 50 mesh.  Always predetermine the compatibility of labeled tank mixtures of this product with water carrier by mixing small proportional quantities in advance.  Refer to the "Tank Mixing" section of "GENERAL INFORMATION" for additional precautions. **Mixing for Hand-Held Sprayers:** Prepare the desired volume of spray solution by adding the desired amount of this product as shown in the following table to a clean, empty sprayer.  Add the appropriate amount of water and stir or agitate to ensure dissolution of QuikPRO herbicide.  For use in backpack sprayers, it is suggested that the recommended amount of this product be mixed with water in a larger container. Fill sprayer with the mixed solution. | MONGLY07368 403-420 |

| DATE | PRODUCT | INGREDIENTS/% | WARNINGS | DIRECTIONS FOR USE | MIXING INSTRUCTIONS | COMMENTS |
|------|---------|---------------|----------|--------------------|--------------------|----------|
| 8/15/2002 | MON 0139 62% Technical Solution | Glyphosate, N-(phosphonomethyl) glycine, in the form of its isopropylamine salt - 62.  OTHER INGREDIENTS - 38.  Contains 769 grams per liter or 6.42 pounds per U.S. gallon of the active ingredient glyphosate, in the form of its isopropylamine salt.  Equivalent to 570 grams per liter or 4.75 pounds per U.S. gallon of the acid, glyphosate. | Keep out of reach of children.  **CAUTION**!  In case of an emergency involving this product, Call Collect, day or night, (314) 694-4000. | It is a violation of Federal law to use this product in any manner inconsistent with its labeling.  **USE ONLY FOR MANUFACTURING AND FOMULATING INTO HERBICIDES THROUGH DILUTION AND BLENDING.**  This product may only be reformulated or repackaged into a herbicide for use in aquatic, industrial, turf, ornamental nursery... | | MONGLY07159402-403 |

| DATE | PRODUCT | INGREDIENTS/% | WARNINGS | DIRECTIONS FOR USE | MIXING INSTRUCTIONS | COMMENTS |
|---|---|---|---|---|---|---|
| 11/20/2002 | Base Brand Name: Accord XL Herbicide (Alternate Brand Names: Accord SP Herbicide, RangerPro Herbicide, Mangy Herbicide, MONState Herbicide, Ranger XL Herbicide, Ranger Extra Herbicide, Honcho XL Herbicide, Honcho Extra Herbicide, MONMaster Herbicide, TopHand XL Herbicide, TopHand Extra Herbicide. | *Glyphosate, N-(phosphonomethyl) glycine, in the form of its Isopropylamine Salt - 41.  OTHER INGREDIENTS: 59.  *Contains 480 grams per liter or 4 pounds per U.S. gallon of the active ingredient glyphosate, in the form of its isopropylamine salt.  Equivalent to 356 grams per liter or 3 pounds per u's gallon of the acid, glyphosate. | Keep out of reach of children.  **CAUTION!** CAUSES EYE IRRITATION.  Avoid contact with eyes or clothing. | AVOID CONTACT OF HERBICIDE WITH FOILAGE, GREEN STEMS, EXPOSED NON-WOODY ROOTS OR FRUIT OF CROPS (EXCEPT AS SPECIFIED FOR INDIVIDUAL ROUNDUP READY CROPS), DESIREABLE PLANTS AND TREES, BECAUSE SEVERE INJURY OR DESTRUCTION MAY RESULT.  Herbicide of Roundup Ready Crops.  Selective broad-spectrum weed control in Roundup Ready crops.  Non-selective, broad-spectrum weed control for many cropping systems, farmsteads and Conservation Reserve Program acres.  A member of the Roundup Family of Herbicides by Monsanto.  "The President's Green Chemistry Award was presented in 1996 to Monsanto for its innovative "zero-waste" process in the manufacture of Roundup Herbicide."  Not all products recommended on this label are registered for use in California.  Check the registration status of each product in California before using.  THIS IS AN END-USE PRODUCT.  MONSANTO DOES NOT INTEND AND HAS NOT REGISTERED IT FOR REFORMULATION.  SEE INDIVIDUAL CONTAINER LABEL FOR REPACKAGING LIMITATIONS. | Mixing with Water:  This product mixes readily with water.  Mix spray solutions of this product as follows:  Fill the mixing or spray tank with the required amount of water.  Add the recommended amount of this product near the end of the filling process and mix well.  Use caution to avoid siphoning back into the carrier source.  Use approved anti-back-siphoning devices where required by state or local regulations.  During mixing and application, foaming of the spray solution may occur.  To prevent or minimize foam, avoid the use of mechanical agitators, terminate by-pass and return lines at the bottom of the tank and, if needed, use an approved anti-foam or defoaming agent.  Tank Mixing Procedure: Mix labeled tank mixtures of this product with water as follows: 1. Place a 20- to 35-mesh screen or wetting basket over filling port.  2.  Through the screen, fill the spray tank one-half full with water and start agitation.  3.  If ammonium sulfate is used add it slowly through the screen into the tank.  Continue agitation.  Ensure that dry ammonium sulfate is completely dissolved in the spray tank before adding other products.  4.  If a wettable powder is used, make a slurry with the water carrier, and add it SLOWLY through the screen into the tank.  Continue agitation.  5.  If a flowable formulation is used, premix one part flowable with one part water.  Add diluted mixture SLOWLY through the screen into the tank.  Continue agitation.  6.  If an emulsifiable concentrate formulation is used, premix one part emulsifiable concentrate with two parts water.  Add diluted mixture slowly through the screen into the tank.  Continue agitation.  7.  Continue filling the spray tank with water and add the required amount of this product near the end of the filling process.  8.  Add individual formulations to the spray tank as follows:  wettable powder, flowable, emulsifiable, concentrate, drift control additive and water soluble liquid.  Maintain good agitation at all times until the contents of the tank are sprayed.  If the spray mixture is allowed to settle, thorough agitation is required to resuspend the mixture before spraying is resumed.  Keep by-pass line on or near the bottom of the tank to minimize foaming.  Screen size in nozzle or line strainers should be no finer than 50 mesh.  Always predetermine the compatibility of labeled tank mixtures of this product with water carrier by mixing small proportional quantities in advance.  Ensure that the specific tank mixture product is registered for application at the desired site.  Mixing for Hand-Held Sprayers:  Prepare the desired volume of spray solution by mixing the amount of this product in water as shown in the following table:  Spray Solution: Desired Volume:  1/2% - 1% - 1-1/2% - 2% - 5% - 10% | MONGLY07159 419-539 |

| DATE | PRODUCT | INGREDIENTS/% | WARNINGS | DIRECTIONS FOR USE | MIXING INSTRUCTIONS | COMMENTS |
|---|---|---|---|---|---|---|
| 7/2/2003 | Roundup Original MAX Herbicide | *Glyphosate, N-(phosphonomethyl) glycine, in the form of its Isopropylamine Salt - 48.7.  OTHER INGREDIENTS: 51.3. *Contains 660 grams per liter or 5.5 pounds per U.S. gallon of the active ingredient glyphosate, in the form of its isopropylamine salt.  Equivalent to 540 grams per liter or 4.5 pounds per u's gallon of the acid, glyphosate. | Keep out of reach of children. **CAUTION**!  CAUSES MODERATE EYE IRRITATION.  Avoid contact with eyes, skin or clothing. **Personal Protective Equipment (PPE):**  Some of the materials that are chemical-resistant to this product are listed below.  If you want more options.  Follow the instructions for Category A on an EPA chemical-resistance category selection chart.  **Applicators and other handlers must wear:** Long-sleeved shirt and long pants, socks, shoes, and chemical-resistant gloves made of any waterproof material such as polyethylene or polyvinyl chloride.  Follow manufacturer's instructions for cleaning/ maintaining PPE (Personal Protective Equipment).  If no such instructions for washables, use detergent and hot water.  Keep and wash PPE separately from other laundry.  Discard clothing and other absorbent materials that have been drenched or heavily contaminated with this product's concentrate.  Do not reuse them.  When handlers use closed systems, enclosed cabs, or aircraft in a manner that meets the requirements listed in Worker Protection Standard (WPS) for agricultural pesticides [40 CFR 170.240 (d) (4-6)], the handler PPE requirements may be reduced or modified as specified in the WPS.  IMPORTANT: When reduced PPE is worn because a closed system is being used, handlers must be provided all PPE specified above for "applicators and other handlers" and have such PPE available for use in an emergency, such as a spill or equipment breakdown. **User Safety Recommendations: Users Should:** - Wash hands before eating, drinking, chewing gum, using tobacco, or using the toilet. - Remove clothing immediately if pesticide gets inside. Then wash thoroughly and put on clean clothing. | It is a violation of Federal law to use this product in any manner inconsistent with its labeling.  This labeling must be in the possession of the user at the time of herbicide application.  AVOID CONTACT OF HERBICIDE WITH FOLIAGE, GREEN STEMS, EXPOSED NON-WOODY ROOTS OR FRUIT OF CROPS (EXCEPT AS SPECIFIED FOR INDIVIDUAL ROUNDUP READY CROPS), DESIRABLE PLANTS AND TREES, BECAUSE SEVERE INJURY OR DESTRUCTION MAY RESULT.  Do not apply directly to water, to areas where surface water is present or to intertidal areas below the mean high water mark.  Do not contaminate water when cleaning equipment or disposing of equipment washwaters. | Apply 22 fluid ounces to 3.3 quarts of this product in 5 to 15 gallons of water per acre using aerial (helicopter only) applications.  To broaden the spectrum of control, Garlon 4 may be tank mixed with this product at the rate of 0.5 to 2 quarts per acre.  The rate of Garlon should not exceed one-half of the rate of this product (e.g. 1 quart of Garlon to 2 quarts of this product) for best results. | MONGLY07402 848-864 |

| DATE | PRODUCT | INGREDIENTS/% | WARNINGS | DIRECTIONS FOR USE | MIXING INSTRUCTIONS | COMMENTS |
|------|---------|---------------|----------|--------------------|--------------------|----------|
| 2/24/2006 | Landmaster Herbicide (Roundup Power Max) | **Active Ingredients\*** Glyphosate, N-(phosphonomethyl) glycine, in the form of its isopropylamine salt - 13.3.  2, 4-D, 2-4-dichlorophenoxyacetic acid, in the form of its isopropylamine salt - 11.1.  Other Ingredients 75.6.  \*Contains 144 grams per liter or 1.2 lbs per U.S. gallon of the active ingredient glyphosate, in the form of its isopropylamine salt and 120 grams per liter or 1 lb per U.S. gallon of the active ingredient 2,4-D, in the form of its isopropylamine salt. Equivalent to 108 grams per liter or 0.9 lb per U.S. gallon of the acid, glyphosate and 96 grams per liter or 0.8 lb per U.S. gallon of the acid, 2,4-D. | Keep out of the reach of children **DANGER!**  In case of emergency involving this product, call collect, day or night, (314) 694-4000. | For distribution and use only within the State of Florida).  It is a violation of Federal law to use this product in any manner inconsistent with its labeling.  This label must be in the possession of the user at the time of herbicide application. | This product mixes readily with water.  Mix spray solutions of this product as follows.  Fill the mixing or spray tank with approximately 90% of the required amount of water.  Add the recommended amount of this product near the end of the filling process, finish filling the spray tank and mix well.  Filling hose should have an anti-siphon divide or an air gap should be maintained between the hose end and mix solution.  Remove hose from tank immediately after filling to avoid siphoning back into the carrier source.  During mixing and application, foaming of the spray solution may occur.  To prevent or minimize foam, avoid the use of mechanical agitators, terminate by-pass and return lines at the bottom of the tank, and if needed, use an approved anti-foam or defoaming agent.  Tank Mixing Procedure: Mix labeled tank mixtures of this product with water as follows: 1. Place a 20 to 35 mesh screen or wetting basket over filling port.  2.  Through the screen, fill the spray tank one-half full with water and start agitation only if tank-mix partner requires agitation.  3.  If a wettable powder is used, make a slurry with the water carrier, and add it SLOWLY through the screen into the tank.  Continue agitation. | MONGLY07611 452-455 |
| 1/1/2009 | Roundup Weed & Grass Killer Concentrate Plus | Glyphosate, isopropylamine Salt‡ - 18.00.  Diquat Dibromide - 0.73.  Other Ingredients - 81.27 | Keep Out Of Reach Of Children **CAUTION USER SAFETY RECOMMENDATIONS** -Clothing and protective equipment exposed to this product should be washed in detergent and hot water.  Such items should be kept and washed separate from other laundry.  - Users should wash hands before eating, drinking, chewing gum, using tobacco, or using the toilet.  - Users should remove clothing immediately if product gets inside; then wash thoroughly and put on clean clothing. | For best results:  6 fl oz (12 Tbs) per gallon of water.  Apply on warm days in bright sunlight.  For easy to kill weeds such as seedlings add 3 fl oz (6 Tbs) per gallon of water.  It is a violation of Federal law to use this product in a manner inconsistent with its labeling. | **Tank Sprayer: In galvanized or unlined steel sprayer:** Add 6 fl oz (12 Tbs) to 1 gallon of water.  **Hose-End Sprayer:** -Set dial to 6 oz.  -To sprayer jar add 6 fl oz (12 Tbs) for each 300 sq ft.  DO NOT add water.  -Spray evenly over measured area.  -After spraying, unused product can be poured back into its original container.  For easy to kill weeds such as seedlings add 3 fl oz (6 Tbs) to 1 gallon of water. | MONGLY07309 263-268 |

| 134 |

| DATE | PRODUCT | INGREDIENTS/% | WARNINGS | DIRECTIONS FOR USE | MIXING INSTRUCTIONS | COMMENTS |
|---|---|---|---|---|---|---|
| 1/1/2010 | Ranger Pro Herbicide | *Isopropylamine Salt of Glyphosate - 41; OTHER INGREDIENTS: 59; *Contains 480 grams per liter or 4 pounds per U.S. gallon of the active ingredient isopropylamine salt. Equivalent to 356 grams per liter or 3 pounds per U.S. gallon of the acid, glyphosate. | Keep out of reach of children. **CAUTION!**  Avoid contact with eyes or clothing.  Personal Protective Equipment (PPE): Some of the materials that are chemical-resistant to this product are listed below.  If you want more options. Follow the instructions for Category A on an EPA chemical-resistance category selection chart. Applicators and other handlers must wear: Long-sleeved shirt and long pants, socks, shoes, and chemical-resistant gloves made of any waterproof material such as polyethylene or polyvinyl chloride. Follow manufacturer's instructions for cleaning/ maintaining PPE (Personal Protective Equipment).  If no such instructions for washables, use detergent and hot water.  Keep and wash PPE separately from other laundry.  Discard clothing and other absorbent materials that have been drenched or heavily contaminated with this product's concentrate.  Do not reuse them. When handlers use closed systems, enclosed cabs, or aircraft in a manner that meets the requirements listed in Worker Protection Standard (WPS) for agricultural pesticides [40 CFR 170.240 (d) (4-6)], the handler PPE requirements may be reduced or modified as specified in the WPS. **User Safety Recommendations: Users Should:** - Wash hands before eating, drinking, chewing gum, using tobacco, or using the toilet. - Remove clothing immediately if pesticide gets inside. Then wash thoroughly and put on clean clothing. | It is a violation of Federal law to use this product in any manner inconsistent with its labeling. This product can only be used in accordance with the Directions for Use on this label or in separately published Monsanto Supplemental Labeling or Fact Sheets. Supplemental labeling can be found on the internet at www.agrian.com, www.cdms.net or www.greenbook.net websites or obtained by contacting your Authorized Monsanto Retailer or Monsanto Company Representative.  Do not apply this product in a way that will contact workers or other persons, either directly or through drift.  Only protected handlers may be in the area during application.  For any requirements specific to your State or Tribe, consult the agency responsible for pesticide regulations. **Agricultural Use Requirements:** Use this product only in accordance with its labeling and with the Worker Protection Standard 40 CFR Part 170.  This Standard contains requirements for the protection of agricultural workers on farms, forests, nurseries, and greenhouses, and handlers of agricultural pesticides.  It contains requirements for training, decontamination, notification and emergency assistance.  It also contains specific instructions and exceptions pertaining to the statements on this label about Personal Protective Equipment (PPE) and restricted entry interval.  The requirements in this box only apply to users of this product that are covered by the Worker Protection Standard.  Do not enter or allow worker entry into treated areas during the restricted entry interval (REI) of 4 hours.  PPE is required for early entry to treated areas that is permitted under the Worker Protection Standard and that involves contact with anything that has been treated, such as plants, soil or water, is: coveralls, chemical resistant gloves greater than 14 mils in thickness composed of materials such as butyl rubber, natural rubber, neoprene rubber, or nitrile rubber, shoes plus socks.  **Non-Agricultural Use Requirements:** The requirements in this box apply to uses of this product that are not within the scope of the Worker Protection Standard (40 CFR Part 170) for agricultural pesticides.  The WPS applies when this product is used to produce agricultural plants on farms, forests, nurseries or greenhouses.  Keep people and pets off treated areas until spray solution has dried. | Mixing with Water:  This product mixes readily with water. Mix spray solutions of this product as follows:  Fill the mixing or spray tank with the required amount of water. Add the recommended amount of this product near the end of the filling process and mix gently (well).  During mixing and application, foaming of the spray solution may occur.  To prevent or minimize foam, avoid the use of mechanical agitators, terminate by-pass and return lines at the bottom of the tank and, if needed, use an approved anti-foam or defoaming agent.  Tank Mixtures: This product does not provide residual weed control.  This product may be tank-mixed with other herbicides to provide residual weed control, a broader weed control spectrum or an alternate mode of action.  Always read and follow label directions for all products in the tank mixture.  Use according to the most restrictive precautionary statements for each product in the mixture. Any labeled rate of this product may be used in a tank mix.  When this label describes a tank mixture with a generic active ingredient such as diuron, 2, 4-D or dicamba, the user is responsible for ensuring the mixture product label allows the specific application.  Buyer and all users are responsible for all loss or damage in connection with the use of handling of mixtures of this product with herbicides or other materials not identified on this label may result in reduced performance.  Spray Solution = Desired Volume of 1 gal, 25 gal, 100 gal to amount of Ranger Pro Herbicide - 1/2% - 1% - 1-1/2% - 2% - 5% - 10%. | MONGLY07600 345-354 |

| DATE | PRODUCT | INGREDIENTS/% | WARNINGS | DIRECTIONS FOR USE | MIXING INSTRUCTIONS | COMMENTS |
|------|---------|---------------|----------|--------------------|--------------------|----------|
| 1/1/2010 | Roundup PowerMax | | Keep out of reach of children. **CAUTION!** CAUSES MODERATE EYE IRRITATION. Avoid contact with eyes, skin or clothing. **Personal Protective Equipment (PPE):** Some of the materials that are chemical-resistant to this product are listed below. If you want more options. Follow the instructions for Category A on an EPA chemical-resistance category selection chart. **Applicators and other handlers must wear:** Long-sleeved shirt and long pants, socks, shoes, and chemical-resistant gloves made of any waterproof material such as polyethylene or polyvinyl chloride. Follow manufacturer's instructions for cleaning/ maintaining PPE (Personal Protective Equipment). If no such instructions for washables, use detergent and hot water. Keep and wash PPE separately from other laundry. Discard clothing and other absorbent materials that have been drenched or heavily contaminated with this product's concentrate. Do not reuse them. When handlers use closed systems, enclosed cabs, or aircraft in a manner that meets the requirements listed in Worker Protection Standard (WPS) for agricultural pesticides [40 CFR 170.240 (d) (4-6)], the handler PPE requirements may be reduced or modified as specified in the WPS. IMPORTANT: When reduced PPE is worn because a closed system is being used, handlers must be provided all PPE specified above for "applicators and other handlers" and have such PPE available for use in an emergency, such as a spill or equipment breakdown. **User Safety Recommendations: Users Should:** - Wash hands before eating, drinking, chewing gum, using tobacco, or using the toilet. - Remove clothing immediately if pesticide gets inside. Then wash thoroughly and put on clean clothing. | It is a violation of Federal law to use this product in any manner inconsistent with its labeling. This product can only be used in accordance with the Directions for Use on this label or in separately published Monsanto Supplemental Labeling or Fact Sheets. Supplemental labeling can be found on the internet at www.agrian.com, www.cdms.net or www.greenbook.net websites or obtained by contacting your Authorized Monsanto Retailer or Monsanto Company Representative. Do not apply this product in a way that will contact workers or other persons, either directly or through drift. Only protected handlers may be in the area during application. For any requirements specific to your State or Tribe, consult the agency responsible for pesticide regulations. **Agricultural Use Requirements:** Use this product only in accordance with its labeling and with the Worker Protection Standard 40 CFR Part 170. This Standard contains requirements for the protection of agricultural workers on farms, forests, nurseries, and greenhouses, and handlers of agricultural pesticides. It contains requirements for training, decontamination, notification and emergency assistance. It also contains specific instructions and exceptions pertaining to the statements on this label about Personal Protective Equipment (PPE) and restricted entry interval. Do not enter or allow worker entry into treated areas during the restricted entry interval (REI) of 4 hours. PPE is required for early entry to treated areas that is permitted under the Worker Protection Standard and that involves contact with anything that has been treated, such as plants, soil or water, wear: coveralls, shoes plus socks and chemical resistant gloves made of waterproof materials. **Non-Agricultural Use Requirements:** The requirements in this box apply to uses of this product that are not within the scope of the Worker Protection Standard (40 CFR Part 170) for agricultural pesticides. The WPS applies when this product is used to produce agricultural plants on farms, forests, nurseries or greenhouses. Keep people and pets off treated areas until spray solution has dried. | Mixing with Water: This product mixes readily with water. Mix spray solutions of this product as follows: Fill the mixing or spray tank with the required amount of water. Add the recommended amount of this product near the end of the filling process and mix gently (well). During mixing and application, foaming of the spray solution may occur. To prevent or minimize foam, avoid the use of mechanical agitators, terminate by-pass and return lines at the bottom of the tank and, if needed, use an approved anti-foam or defoaming agent. Tank Mixtures: This product does not provide residual weed control. This product may be tank-mixed with other herbicides to provide residual weed control, a broader weed control spectrum or an alternate mode of action. Always read and follow label directions for all products in the tank mixture. Some tank-mix products have the potential to cause crop injury under certain conditions, at certain growth stages and/or under other circumstances. Read all labels for products used in the tank mixture prior to use to determine the potential for crop injury. Tank mixtures with other herbicides, insecticides, fungicides, micronutrients or foliar fertilizers may result in reduced weed control or crop injury and are NOT recommended for applications of this product unless otherwise noted in this product label, or in separate supplemental labeling or Fact Sheets published by Monsanto. Monsanto has not treated all tank-mix product formulations for compatibility, antagonism or reduction in product performance. Buyer and all users are responsible for all loss of damage in connection with the use or handling of mixtures of this product with herbicides or other materials that are not expressly specified in this labeling or in separate supplemental labeling or Fact Sheets published by Monsanto for this product. When a tank mixture with a generic active ingredient, such as 2,4-D, atrazine, dicamba, diuron, or pendimethalin is listed on this label, the user is responsible for ensuring that the specific application being made is included on the label of the product being used in the tank-mix. Refer to all individual product labels, supplemental labeling and Fact Sheets for all products in the tank mixture, and observe all precautions and limitations on the label, including application timing restrictions, soil restrictions, minimum re-cropping interval and rotational guidelines. Use according to the most restrictive precautionary statements for each product in the tank mixture. Always predetermine the compatibility of all tank-mix products together in the carrier by mixing small proportional quantities in advance. For best results, apply tank mixtures with this product at a minimum spray volume rate of 10 gallons per acre. Mixing for Hand-Held Sprayers: Prepare the desired spray volume by mixing the amount of this product indicated in the following table in water: Spray Solution = Desired Volume of 1 gal, 25, gal, 100 gal to Amount of Roundup PowerMAX Herbicide of 0.4% - 0.7% - 1% - 1.5% - 4% - 7%. | MONGLY07601 350-375 |

| DATE | PRODUCT | INGREDIENTS/% | WARNINGS | DIRECTIONS FOR USE | MIXING INSTRUCTIONS | COMMENTS |
|---|---|---|---|---|---|---|
| 1/1/2010 | Roundup ProMax | *Glyphosate, N-(phosphonomethyl) glycine, in the form of its Isopropylamine Salt - 48.7.  OTHER INGREDIENTS: 51.3. *Contains 660 grams per liter or 5.5 pounds per U.S. gallon of the active ingredient glyphosate, in the form of its isopropylamine salt.  Equivalent to 540 grams per liter or 4.5 pounds per US gallon of the acid, glyphosate. | Keep out of reach of children. **CAUTION!**  CAUSES MODERATE EYE IRRITATION.  Avoid contact with eyes, skin or clothing.  Avoid breathing vapor or spray mist.  **Personal Protective Equipment (PPE):** Applicators and other handlers must wear: long-sleeved shirt and long pants, shoes plus socks.  Follow manufacturer's instructions for cleaning/ maintaining PPE.  If there are no such instructions for washables, use detergent and hot water.  Keep and wash PPE separately from other laundry.  When handlers use closed systems, enclosed cabs, or aircraft in a manner that meets the requirements listed in Worker Protection Standard (WPS) for agricultural pesticides [40 CFR 170.240 (d) (4-6)], the handler PPE requirements may be reduced or modified as specified in the WPS. | It is a violation of Federal law to use this product in any manner inconsistent with its labeling.  This product can only be used in accordance with the Directions for Use on this label or in separately published Monsanto Supplemental Labeling or Fact Sheets.  Supplemental labeling can be found on the internet at www.agrian.com, www.cdms.net or www.greenbook.net websites or obtained by contacting your Authorized Monsanto Retailer or Monsanto Company Representative.  Do not apply this product in a way that will contact workers or other persons, either directly or through drift.  Only protected handlers may be in the area during application.  For any requirements specific to your State or Tribe, consult the agency responsible for pesticide regulations.  **Agricultural Use Requirements:** Use this product only in accordance with its labeling and with the Worker Protection Standard 40 CFR Part 170.  This Standard contains requirements for the protection of agricultural workers on farms, forests, nurseries, and greenhouses, and handlers of agricultural pesticides.  It contains requirements for training, decontamination, notification and emergency assistance.  It also contains specific instructions and exceptions pertaining to the statements on this label about Personal Protective Equipment (PPE) and restricted entry interval.  The requirements in this box only apply to users of this product that are covered by the Worker Protection Standard.  Do not enter or allow worker entry into treated areas during the restricted entry interval (REI) of 4 hours.  PPE is required for early entry to treated areas that is permitted under the Worker Protection Standard and that involves contact with anything that has been treated, such as plants, soil or water, is: coveralls, chemical resistant gloves greater than 14 mils in thickness composed of materials such as butyl rubber, natural rubber, neoprene rubber, or nitrile rubber, shoes plus socks.  **Non-Agricultural Use Requirements:** The requirements in this box apply to uses of this product that are not within the scope of the Worker Protection Standard (40 CFR Part 170) for agricultural pesticides.  The WPS applies when this product is used to produce agricultural plants on farms, forests, nurseries or greenhouses.  Keep people and pets off treated areas until spray solution has dried. | Mixing with Water:  This product mixes readily with water.  Mix spray solutions of this product as follows:  Fill the mixing or spray tank with the required amount of water.  Add the recommended amount of this product near the end of the filling process and mix gently (well).  During mixing and application, foaming of the spray solution may occur.  To prevent or minimize foam, avoid the use of mechanical agitators, terminate by-pass and return lines at the bottom of the tank and, if needed, use an approved anti-foam or defoaming agent.  Tank Mixtures:  This product does not provide residual weed control.  This product may be tank-mixed with other herbicides to provide residual weed control, a broader weed control spectrum or an alternate mode of action.  Always read and follow label directions for all products in the tank mixture.  Use according to the most restrictive precautionary statements for each product in the mixture.  Any labeled rate of this product may be used in a tank mix.  When this label describes a tank mixture with a generic active ingredient such as diuron, 2, 4-D or dicamba, the user is responsible for ensuring the mixture product label allows the specific application.  Buyer and all users are responsible for all loss or damage in connection with the use of handling of mixtures of this product with herbicides or other materials not identified on this label may result in reduced performance.  Spray Solution = Desired Volume of 1 gal, 25 gal, 100 gal to amount of Ranger Pro Herbicide - 0.4% - 0.7% - 1.0% - 1.5% - 4% - 7%. | MONGLY07600 368-379 |

| DATE | PRODUCT | INGREDIENTS/% | WARNINGS | DIRECTIONS FOR USE | MIXING INSTRUCTIONS | COMMENTS |
|------|---------|---------------|----------|--------------------|--------------------|----------|
| 1/1/2012 | Roundup Custom for Aquatic & Terrestrial Use | *Glyphosate, N-(phosphonomethyl) glycine, in the form of its Isopropylamine Salt - 53.8.  OTHER INGREDIENTS: 46.2. *Contains 648 grams per liter or 4.5 pounds per U.S. gallon of the active ingredient glyphosate, in the form of its isopropylamine salt.  Equivalent to 480 grams per liter or 4.0 pounds per US gallon of the acid, glyphosate. | Keep out of Reach of Children.  **CAUTION**!   Applicators and other handlers must wear: Long-sleeved shirt and long pants, socks, shoes, and chemical-resistant gloves made of any waterproof material such as polyethylene or polyvinyl chloride.  Follow manufacturer's instructions for cleaning/ maintaining PPE (Personal Protective Equipment).  If no such instructions for washables, use detergent and hot water.  Keep and wash PPE separately from other laundry.  **Engineering Control Statements:**   When handlers use closed systems, enclosed cabs, or aircraft in a manner that meets the requirements listed in Worker Protection Standard (WPS) for agricultural pesticides [40 CFR 170.240 (d) (4-6)], the handler PPE requirements may be reduced or modified as specified in the WPS.  **User Safety Recommendations:** - Wash hands before eating, drinking, chewing gum, using tobacco, or using the toilet. - Remove contaminated clothing and wash clothing before reuse. | It is a violation of Federal law to use this product in any manner inconsistent with its labeling.  This product can only be used in accordance with the Directions for Use on this label or in separately published Monsanto Supplemental Labeling or Fact Sheets.  Supplemental labeling can be found on the internet at www.agrian.com, www.cdms.net or www.greenbook.net websites or obtained by contacting your Authorized Monsanto Retailer or Monsanto Company Representative.  Do not apply this product in a way that will contact workers or other persons, either directly or through drift.  Only protected handlers may be in the area during application.  For any requirements specific to your State or Tribe, consult the agency responsible for pesticide regulations.  Agricultural Use Requirements: Use this product only in accordance with its labeling and with the Worker Protection Standard 40 CFR Part 170.  This Standard contains requirements for the protection of agricultural workers on farms, forests, nurseries, and greenhouses, and handlers of agricultural pesticides.  It contains requirements for training, decontamination, notification and emergency assistance.  It also contains specific instructions and exceptions pertaining to the statements on this label about Personal Protective Equipment (PPE) and restricted entry interval.  The requirements in this box only apply to users of this product that are covered by the Worker Protection Standard.  Do not enter or allow worker entry into treated areas during the restricted entry interval (REI) of 4 hours.  PPE is required for early entry to treated areas that is permitted under the Worker Protection Standard and that involves contact with anything that has been treated, such as plants, soil or water, is: coveralls, chemical resistant gloves greater than 14 mils in thickness composed of materials such as butyl rubber, natural rubber, neoprene rubber, or nitrile rubber, shoes plus socks.  Non-Agricultural Use Requirements: The requirements in this box apply to uses of this product that are not within the scope of the Worker Protection Standard (40 CFR Part 170) for agricultural pesticides.  The WPS applies when this product is used to produce agricultural plants on farms, forests, nurseries or greenhouses.  Keep people and pets off treated areas until spray solution has dried. | Mixing with Water:  This product mixes readily with water. Mix spray solutions of this product as follows:  Fill the mixing or spray tank with the required amount of water. Add the recommended amount of this product near the end of the filling process and mix gently (well).  During mixing and application, foaming of the spray solution may occur.  To prevent or minimize foam, avoid the use of mechanical agitators, terminate by-pass and return lines at the bottom of the tank and, if needed, use an approved anti-foam or defoaming agent.  Tank Mixtures:  This product does not provide residual weed control.  This product may be tank-mixed with other herbicides to provide residual weed control, a broader weed control spectrum or an alternate mode of action.  Always read and follow label directions for all products in the tank mixture.  Use according to the most restrictive precautionary statements for each product in the mixture. Any labeled rate of this product may be used in a tank mix.  When this label describes a tank mixture with a generic active ingredient such as diuron, 2, 4-D or dicamba, the user is responsible for ensuring the mixture product label allows the specific application.  Buyer and all users are responsible for all loss or damage in connection with the use of handling of mixtures of this product with herbicides or other materials not identified on this label may result in reduced performance.  Spray Solution = Desired Volume of 1 gal, 25 gal, 100 gal to amount of Ranger Pro Herbicide - 0.5% - 0.75% - 1.0% - 1.5% - 4% - 8%. | MONGLY07602 076-104 |

138

| DATE | PRODUCT | INGREDIENTS/% | WARNINGS | DIRECTIONS FOR USE | MIXING INSTRUCTIONS | COMMENTS |
|---|---|---|---|---|---|---|
| 5/8/2013 | Roundup Weed & Grass Killer Concentrate Plus (Roundup Concentrate Plus Weed & Grass Killer) | *Glyphosate, isopropylamine salt - 18.  Diquat dibromide - 0.73. Other Ingredients - 81.27.  *Contains 1.19 lbs glyphosate acid per US gallon. | Keep out of Reach of Children **CAUTION:** Causes moderate eye irritation.  Avoid contact with eyes or clothing.  Wash thoroughly with soap and water after handling.  To prevent tracking product to unintended areas such as your yard, keep people and pets out of treated area until spray has dried. (Alternate Text) People and pets may enter treated area after spray has dried.  **USER SAFETY RECOMMENDATIONS:** -Clothing and protective equipment exposed to this product should be washed in detergent and hot water.  Such items should be kept and washed separate from other laundry.  -Users should wash hands before eating, drinking, chewing gum, using tobacco, or using the toilet.  -Users should remove clothing immediately if product gets inside; then wash thoroughly and put on clean clothing. | It a violation of Federal law to use this product in a manner inconsistent with its labeling. | For tough established weeds / For best results,) add (measure) 6 fl oz (12 TBS) to (per) (1) gallon of water.  -Spot treat or spray evenly over 300 sq ft.  **Hose-End Sprayer:** -Set dial to 6 oz.  -To sprayer jar add 6 fl oz (12 Tbs) for each 300 sq ft.  DO NOT add water.  -Spray evenly over measured area.  -After spraying, unused product can be poured back into its original container. | Internet - Pgs. 1-23 |

| DATE | PRODUCT | INGREDIENTS/% | WARNINGS | DIRECTIONS FOR USE | MIXING INSTRUCTIONS | COMMENTS |
|---|---|---|---|---|---|---|
| 1/31/2014 | Roundup Weed & Grass Killer Concentrate Plus MASTER LABEL | Glyphosate, Isopropylamine Salt¹ - 18.00.  Diquat Dibromide - 0.73.  OTHER INGREDIENTS - 81.27.  ¹Contains 1.19 lbs. glyphosate acid per US gallon. | Keep out of Reach of Children **CAUTION**: Causes moderate eye irritation.  Avoid contact with eyes or clothing.  Wash thoroughly with soap and water after handling.  People and pets must not enter treated areas or tough treated plants until after spray has dried.  **USER SAFETY RECOMMENDATIONS**: -Clothing and protective equipment exposed to this product should be washed in detergent and hot water.  Such items should be kept and washed separate from other laundry.  -Users should wash hands before eating, drinking, chewing gum, using tobacco, or using the toilet.  -Users should remove clothing immediately if product gets inside; then wash thoroughly and put on clean clothing. | It is a violation of Federal law to use this product in a manner inconsistent with its labeling.  Always read and follow label directions. | 1 Tablespoon (Tbs.) = 3 teaspoons (tsp) 1 fl oz = 2 Tbs 1 capful= 3 fl oz 2 capfuls= 6 fl oz.  **Tank Sprayer:** add [[two/ 2] capful] [6 fl oz (12 Tbs)/ (6 fl oz)] per gallon of water.  **Ortho Dial N Spray Hose-End Sprayer:** [Set dial to 6.oz.  Pour concentrate into sprayer jar.  DO NOT add water. [Connect [garden] hose to the sprayer and turn on water.]  After spraying, unused product can be poured back into its original container.]  For easy to kill weeds such as (small) seedlings, use [one/ 1/a] capful] [3 fl oz (6 Tbs)/ (3 fl oz] per gallon of water.  **Application Restriction:** Do not apply this product in a way that will contact any person or pet, either directly or through drift.  Only the person applying this product may be in the area during application. | MONGLY03467 041-056 |
| 3/6/2014 | Roundup Ultra2 Liquid Herbicide | **GAURANTEE:** Glyphosate, 540 grams acid equivalent per liter, present as potassium salt.  Water Soluble Herbicide for non-selective weed control. | **CAUTION** POISON WARNINT-EYE AND SKIN IRRITATION **PRECAUTIONS** KEEP OUT OF REACH OF CHILDREN.  HARMFUL IF SWALLOWED.  HARMFUL IF INHALED.  CAUSES EYE AND SKIN IRRITATION.  Avoid contact with eyes, skin or clothing.  Avoid inhaling spray mist.  Wear a long-sleeved shirt and long pants during mixing, loading, application, clean-up and repair.  In addition, wear goggles or a face shield and chemical-resistant gloves during mixing and loading, clean-up and repair.  Do not enter treated field within 12 hours of application.  **TOXICOLOGICAL INFORMATION:** Treat symptomatically.  This product contains a petroleum distillate.  Vomiting may cause aspiration pneumonia. | Roundup Ultra2 Liquid Herbicide, a water soluble liquid, mixes readily with water for application as a foliage spray for the control or destruction of most herbaceous plants.  It may be applied through most standard industrial or field type sprayers after dilution and thorough mixing with water in accordance with the booklet instructions. | **ATTENTION: AVOID CONTACT WITH FOLIAGE, GREEN STEMS, OR FRUIT OF CROPS, DESIRABLE PLANTS AND TREES SINCE SEVERE INJURY OR DESTRUCTION MAY RESULT.  APPLY THESE SPRAY SOLUTIONS IN PROPERLY MAINTAINED AND CALIBRATED EQUIPMENT CAPABLE OF DELIVERING DESIRED VOLUMES.  DO NOT USE IN GREENHOUSES.  REDUCED RESULTS MAY OCCUR IF WATER CONTAINING SOIL IS USED, SUCH AS WATER FROM PONDS AND UNLINED DITCHES.  DO** NOT use human flaggers.  Apply only when the potential for drift to areas of human habitation or areas of human activity such as houses, cottages, schools and recreational areas is minimal.  Take into consideration wind speed, wind direction, temperature, application equipment and sprayer settings.  **MIXING WITH WATER:** For ground or industrial type sprayers, fill the spray tank with one-half the required amount of water.  Add the proper amount of herbicide, see "**Weed Control**" (sections 7.1 and 8.1) and mix well before adding the remaining portion of water.  Placing the filling hose below the surface of the liquid solution will prevent excessive foaming.  Removing hose from tank immediately will avoid back siphoning into water source.  Use of mechanical agitators may cause excessive foaming.  Bypass lines should terminate at the bottom of the tank.  For use in knapsack sprayers, it is suggested that the proper amount of this herbicide be mixed with water in a larger container.  Fill sprayer with the mixed solution. | MONGLY07601 434-518 |

| DATE | PRODUCT | INGREDIENTS/% | WARNINGS | DIRECTIONS FOR USE | MIXING INSTRUCTIONS | COMMENTS |
|---|---|---|---|---|---|---|
| 1/1/2015 | Roundup Weed & Grass Killer Concentrate Plus | (Cannot read) | Keep Out of Reach of Children **CAUTION:** Causes moderate eye irritation.  Avoid contact with eyes or clothing.  Wash thoroughly with soap and water after handling. People and pets must not touch treated plants or enter treated areas until after spray has dried. | It is a violation of Federal law to use this product in a manner inconsistent with its labeling. Always read and follow label directions.  **USER SAFETY RECOMMENDATIONS:** -Clothing and protective equipment exposed to this product should be washed in detergent and hot water. Such items should be kept and washed separate from other laundry.  -Users should wash hands before eating, drinking, chewing gum, using tobacco, or using the toilet.  -Users should remove clothing immediately if product gets inside; then wash thoroughly and put on clean clothing.  **Entry Restrictions:** People and pets must not touch treated plants or enter treated areas until after spray has dried. | 1 Tablespoon (Tbs.) = 3 teaspoons (tsp) 1 fl oz= 2 Tbs 1 capful= 3 fl oz 2 capfuls= 6 fl oz.  **Tank Sprayer:** For best results, add 6 fl oz (12 Tbs) per gallon of water. Each gallon covers 300 sq ft.  Hose-End Sprayer: -Set dial to 6 oz.  -Pour concentrate into sprayer jar.  DO NOT add water. -Connect garden hose to the sprayer and turn on water.  -After spraying, unused product can be poured back into its original container.  -Refer to the Ortho Dial 'N Spray label and booklet for additional information and cleaning instructions.  For east to kill weeds such as seedlings, use 3 fl ox (6 Tbs) per gallon of water. | |
| 1/1/2015 | Roundup WeatherMax with Transorb 2 Technology Liquid Herbicide | **GAURANTEE: Glyphosate, 540 grams acid equivalent per liter, present as potassium salt.  Water Soluble Herbicide for non-selective weed control.** | **PRECAUTIONS** KEEP OUT OF REACH OF CHILDREN. HARMFUL IF SWALLOWED. HARMFUL IF INHALED.  CAUSES EYE AND SKIN IRRITATION. Avoid contact with eyes, skin or clothing.  Avoid inhaling spray mist. Wear a long-sleeved shirt and long pants during mixing, loading, application, clean-up and repair.  In addition, wear goggles or a face shield and chemical-resistant gloves during mixing and loading, clean-up and repair.  Do not enter treated field within 12 hours of application.  **TOXICOLOGICAL INFORMATION:** Treat symptomatically.  This product contains a petroleum distillate. Vomiting may cause aspiration pneumonia. | Roundup WeatherMAX with Transorb 2 Technology Liquid Herbicide, a water soluble liquid, mixes readily with water for application as a foliage spray for the control or destruction of most herbaceous plants.  It may be applied through most standard industrial or field type sprayers after dilution and thorough mixing with water in accordance with the booklet instructions. | **ATTENTION: AVOID CONTACT WITH FOLIAGE, GREEN STEMS, OR FRUIT OF CROPS, DESIRABLE PLANTS AND TREES SINCE SEVERE INJURY OR DESTRUCTION MAY RESULT.  APPLY THESE SPRAY SOLUTIONS IN PROPERLY MAINTAINED AND CALIBRATED EQUIPMENT CAPABLE OF DELIVERING DESIRED VOLUMES.  DO NOT USE IN GREENHOUSES.  REDUCED RESULTS MAY OCCUR IF WATER CONTAINING SOIL IS USED, SUCH AS WATER FROM PONDS AND UNLINED DITCHES.**  DO NOT use human flaggers.  Apply only when the potential for drift to areas of human habitation or areas of human activity such as houses, cottages, schools and recreational areas is minimal.  Take into consideration wind speed, wind direction, temperature, application equipment and sprayer settings.  **MIXING WITH WATER:** For ground or industrial type sprayers, fill the spray tank with one-half the required amount of water.  Add the proper amount of herbicide, see "**Weed Control**" (sections 7.1 and 8.1) and mix well before adding the remaining portion of water.  Placing the filling hose below the surface of the liquid solution will prevent excessive foaming.  Removing hose from tank immediately will avoid back siphoning into water source.  Use of mechanical agitators may cause excessive foaming. Bypass lines should terminate at the bottom of the tank. For use in knapsack sprayers, it is suggested that the proper amount of this herbicide be mixed with water in a larger container.  Fill sprayer with the mixed solution. | MONGLY07601 519-623 |

| DATE | PRODUCT | INGREDIENTS/% | WARNINGS | DIRECTIONS FOR USE | MIXING INSTRUCTIONS | COMMENTS |
|---|---|---|---|---|---|---|
| 2/18/2015 | Roundup Concentrate Extended Control Weed & Grass Killer Plus Weed Preventer | Glyphosate, isopropylamine salt - 18. Imazapic, ammonium salt - 0.30. Diquat Dibromide - 0.73. Other Ingredients - 80.97. Contains 1.2 lbs. glyphosate acid equivalent and 0.025 lb imazapic acid equivalent per US gallon. | Keep Out of Reach of Children **CAUTION** | It is a violation of Federal law to use this product in a manner inconsistent with its labeling. Always read and follow label directions. **USER SAFETY RECOMMENDATIONS:** -Clothing and protective equipment exposed to this product should be washed in detergent and hot water. Such items should be kept and washed separate from other laundry. -Users should wash hands before eating, drinking, chewing gum, using tobacco, or using the toilet. -Users should remove clothing immediately if product gets inside; then wash thoroughly and put on clean clothing. **Entry Restrictions:** People and pets must not touch treated plants or enter treated areas until after spray has dried. | **Tank Sprayer:** **-Add 6 fl oz per gallon of water**. -Each gallon covers 300 sq ft. | |
| 3/12/2015 | Roundup Extended Control Weed & Grass Killer Plus Weed Preventer | Glyphosate, Isopropylamine Salt¹ - 18.00. Imazapic, ammonium Salt - 0.30. Diquat Dibromide - 0.73. OTHER INGREDIENTS - 80.97. ¹Contains 1.2 lbs. glyphosate acid equivalent and 0.025 lb imazapic equivalent per US gallon. | Keep Out of Reach of Children **CAUTION** USER SAFETY RECOMMENDATIONS -Clothing and protective equipment exposed to this product should be washed in detergent and hot water. Such items should be kept and washed separate from other laundry. -Users should wash hands before eating, drinking, chewing gum, using tobacco, or using the toilet. -Users should remove clothing immediately if product gets inside; then wash thoroughly and put on clean clothing. **Entry Restrictions:** People and pets must not tough treated plants or enter treated areas until after spray has dried. CAUTION: Causes moderate eye irritation. Avoid contact with eyes or clothing. Wash thoroughly with soap and wart after handling. People and pets must not tough treated plants or enter treated areas until after spray has dried. | It is a violation of Federal law to use this product in a manner inconsistent with its labeling. Always read and follow label directions. | **Tank Sprayer:** -Add 6 fl oz per gallon of water. -Each gallon covers 300 sq ft. | MONGLY00858 800-809 |

| DATE | PRODUCT | INGREDIENTS/% | WARNINGS | DIRECTIONS FOR USE | MIXING INSTRUCTIONS | COMMENTS |
|------|---------|---------------|----------|--------------------|--------------------|----------|
| 1/1/2016 | HonchoK6 Herbicide for Roundup Ready Crops | *Glyphosate, N-(phosphonomethyl) glycine, in the form of its potassium salt - 48.7.  OTHER INGREDIENTS - 51.3.  *Contains 660 grams of the active ingredient glyphosate, in the form of it potassium salt, per liter or 5.5 pounds per U.S. gallon, which is equivalent to 540 grams of the acid, glyphosate, per liter or 4.5 pounds per U.S. gallon (39.8% by weight). | Keep out of reach of children **CAUTION** Causes moderate eye irritation.  Avoid contact with eyes, skin, or clothing.  **Personal Protective Equipment (PPE)** Some of the materials that are chemical-resistant to this product are listed below.  Applicators and other handlers must wear:  long-sleeved shirt and long pants, socks and shoes, and chemical-resistant gloves made of any waterproof material, such as polyethylene or polyvinyl chloride.  Follow manufacturer's instructions for cleaning maintaining PPE (Personal Protective Equipment).  If there are no instructions for washables, use detergent and hot water.  Keep and wash PPE separately from other laundry.  When handlers use closed systems, enclosed cabs, or aircraft in a manner that meets the requirements listed in the World Protection Standard (WPS) for agricultural pesticides [40 CFR 170.240 (d) (4-6)], the handler PPE requirements may be reduced or modified as specified in the WPS.  IMPORTANT: When reduced PPE is worn because a closed system is being used, handlers must be provided all PPE specified above for "applicators and other handlers" and have such PPE immediately available for use in an emergency, such as a spill or equipment breakdown. | It is a violation of Federal law to use this product in any manner inconsistent with it labeling.  This product may only be used in accordance with the Directions for Use on this label or on separately published supplemental labeling.  Supplemental labeling for this product can be obtained from your Authorized Monsanto Retailer or Monsanto Company Representative.  Do not apply this product in a way that will contact workers or other persons, either directly or through drift.  Only protected handlers may be in the area during application.  For ay requirements specific to your State or Tribe, consult the agency responsible for pesticide regulation. **Spray Drift Management:** AVOID CONTACT OF THIS HERBICIDE WITH FOLIAGE, GREEN STEMS, EXPOSED NON-WOODY ROOTS OR FRUIT OF CROPS, DESIREABLE PLANTS AND TREES, EXCEPT AS DIRECTED FOR USE ON ROUNDUP READY CROPS, AS SEVERE PLANT INJURY OR DESTRUCTION COULD REUSLT.  Do not allow this herbicide solution to mist, drip, drift, or splash onto desirable vegetation, as small quantities of this product can cause severe damage or destruction to the crop, plants or other vegetation on which application was not intended.  AVOID DRIFT.  USE EXTREME CARE TO PREVENT INJURY TO DESIRABLE PLANTS AND CROPS WHEN APPLYING THIS PRODUCT. Avoiding spray drift at the application site is the responsibility of the applicator.  The interaction of many equipment- and weather-related factors determines the potential for spray drift.  The applicator and grower are responsible for considering all these factors when making decisions regarding the application of this product.  The result of injury occurring as the result of spray drift while applying this product increases when winds are gusty, as wind velocity increases , when wind direction is constantly changing or when there are other meteorological conditions that favor spray drift.  When spraying avoid combinations of pressure and nozzle type that will result in splatter or generation of fine particles (mist) that are likely to drift.  TO PREVENT INJURY TO ADJACENT DESIRABLE VEGETATION, APPROPRIATE BUFFERS MUST BE MAINTATINED.  AVOID APPLYING THIS PRODUCT AT EXCESSIVE SPEED OR SPRAYER PRESSURE. | **Mixing with Water:**  This product mixes readily with water.  Mix spray solutions of this product as follows:  Begin filling the mixing tank or spray tank with clean water.  Add the required amount of this product near the end of the filling process and mix gently.  Foaming of the spray solution can occur during mixing.  To prevent or minimize foaming mix gently, terminate bypass and return lines at the bottom of the tank, and, if necessary, add an appropriate anti-foam or defoaming agent to the spray solution.   **Spray Solution = Desired Volume of 1 gal, 25 gal, 100 gal to amount of Ranger Pro Herbicide - 0.4% - 0.7% - 1.0% - 1.5% - 4% - 7%.** | MONGLY07601 115-137 |

| DATE | PRODUCT | INGREDIENTS/% | WARNINGS | DIRECTIONS FOR USE | MIXING INSTRUCTIONS | COMMENTS |
|---|---|---|---|---|---|---|
| 10/18/2016 | Roundup Custom Herbicide (AquaMaster Herbicide, Roundup AquaMaster Herbicide, Roundup Custom for Aquatic & Terrestrial Use) | *Glyphosate, N-(phosphonomethyl) glycine, in the form of its Isopropylamine Salt - 53.8.  OTHER INGREDIENTS: 46.2. *Contains 648 grams per liter or 4.5 pounds per U.S. gallon, which is equivalent to 480 grams of the acid, glyphosate, per liter or 4.0 pounds per US gallon (39.9% by weight). | Keep out of Reach of Children. **CAUTION**!  Applicators and other handlers must wear: Long-sleeved shirt and long pants, socks and shoes.  **Personal Protective Equipment (PPE)** Follow manufacturer's instructions for cleaning maintaining PPE (Personal Protective Equipment).  If there are no instructions for washables, use detergent and hot water.  Keep and wash PPE separately from other laundry. **User Safety Recommendations:** Users should: -Wash hands before eating, drinking, shewing gum, using tobacco, or using the toilet.  -Remove clothing immediately if pesticide gets inside.  Then wash thoroughly and put on clean clothing. | It is a violation of Federal law to use this product in any manner inconsistent with its labeling.  Do not apply this product in a way that will contact workers or other persons, either directly or through drift.  Only protected handlers may be in the area during application.  For any requirements specific to your State or Tribe, consult the agency responsible for pesticide regulation.  Use this product in accordance with its labeling and with the Worker Protection Standard, 40 CFR Part 170.  Refer to supplemental labeling under "Agricultural Use Requirements" in the Directions for Use Section for information about this standard.  Spray Drift Management: AVOID CONTACT OF THIS HERBICIDE WITH FOLIAGE, GREEN STEMS, EXPOSED NON-WOODY ROOTS OR FRUIT OF CROPS, DESIREABLE PLANTS AND TREES, EXCEPT AS DIRECTED FOR USE ON ROUNDUP READY CROPS, AS SEVERE PLANT INJURY OR DESTRUCTION COULD REUSLT.  Do not allow this herbicide solution to mist, drip, drift, or splash onto desirable vegetation, as small quantities of this product can cause severe damage or destruction to the crop, plants or other vegetation on which application was not intended.  AVOID DRIFT.  USE EXTREME CARE TO PREVENT INJURY TO DESIRABLE PLANTS AND CROPS WHEN APPLYING THIS PRODUCT. Avoiding spray drift at the application site is the responsibility of the applicator.  The interaction of many equipment- and weather-related factors determines the potential for spray drift.  The applicator and grower are responsible for considering all these factors when making decisions regarding the application of this product.  The result of injury occurring as the result of spray drift while applying this product increases when winds are gusty, as wind velocity increases , when wind direction is constantly changing or when there are other meteorological conditions that favor spray drift.  When spraying avoid combinations of pressure and nozzle type that will result in splatter or generation of fine particles (mist) that are likely to drift.  TO PREVENT INJURY TO ADJACENT DESIRABLE VEGETATION, APPROPRIATE BUFFERS MUST BE MAINTATINED.  AVOID APPLYING THIS PRODUCT AT EXCESSIVE SPEED OR SPRAYER PRESSURE. | Mixing with Water:  This product mixes readily with water.  Mix spray solutions of this product as follows:  Fill the mixing or spray tank with the required amount of water.  Add the recommended amount of this product near the end of the filling process and mix gently (well).  During mixing and application, foaming of the spray solution may occur.  To prevent or minimize foaming, mix gently, terminate by-pass and return lines at the bottom of the tank and, if necessary, add an appropriate anti-foam or defoaming agent to the spray solutions. Tank Mixtures: This product does not provide residual weed control.  This product may be tank-mixed with other herbicides to provide residual weed control, a broader weed control spectrum or an alternate mode of action.  When a tank-mix with a generic active ingredient, such as  2,4-D or dicamba, or any other product or material, is listed on this label, the user is responsible for ensuring that the specific application being made and the use site is included on the label of the product used in the mix. **Spray Solution = Desired Volume** of 1 gal, 25 gal, 100 gal to amount of Ranger Pro Herbicide - 0.5% - 0.75% - 1.0% - 1.5% - 4% - 8%. | |

| DATE | PRODUCT | INGREDIENTS/% | WARNINGS | DIRECTIONS FOR USE | MIXING INSTRUCTIONS | COMMENTS |
|------|---------|---------------|----------|--------------------|--------------------|----------|
| No Date | RD 1686 Herbicide | Glyphosate, Isopropylamine Saltᴵ - 18.00.  Imazapic, ammonium Salt - 1.6.  Diquat Dibromide - 0.73.  OTHER INGREDIENTS - 76.67.  ᴵContains 1.2 lbs. glyphosate acid equivalent and 0.14 lb imaxapic equivalent per US gallon. | Keep Out of Reach of Children **CAUTION**:  Causes moderate eye irritation.  Avoid contact with eyes, skin or clothing.  Wash thoroughly with soap and water after handling and before eating, drinking, chewing gum, using tobacco or using the toilet.  People and pets must not touch treated plants or enter treated areas until after spray has dried. | It is a violation of Federal law to use this product in a manner inconsistent with its labeling.  Always read and follow label directions.  **User Safety Recommendations:** Clothing and protective equipment exposed to this product should be washed in detergent and hot water.  Such items should be kept and washed separate from other laundry.  -Users should d wash hands before eating, drinking, chewing gum, using tobacco, or using the toilet.  -Users should remove clothing immediately if product gets inside; then wash thoroughly and put on clean clothing.  **Entry Restrictions:**  People and pets must not touch treated plants or enter treated areas until after spray has dried. | 1 Tablespoon (TBS) = 3 teaspoons (tsp) 1 fl oz = 2 Tbs [1 capful = 3 fl oz] 2 capfuls = 6 fl oz **Tank Sprayer:** -Add [[two/ 2] capfuls] [6 fl oz (12 Tbs)/ (6 fl oz)] per gallon of water.  -[One/ Each] gallon [covers/treats] 300 sq ft. | MONGLY03466 430-445 |
| No Date | WarrantUltra Herbicide - Roundup Ready PLUS | *Acetodhlor - 30.2. **Fomesafen, sodium salt - 7.1.  OTHER INGREDIENTS - 62.7. *Contains 2.82 Pounds/ gallon or 338 grams/ liter of 2-chloro-N-ethoxymethyl-N-(2-ethyl-6-methylphenyl) acetamide.  **Contains equivalent to 6.72% or 0.63 pounds/ gallon or 75 grams/ liter of fomesafen active ingredient (5-[2-chloro-4-(trifluoromethyl) phenoxy]-N-(methylsulfonyl)-2-nitrobenzamide). | Keep out of reach of children **DANGER! CAUSES IRREVERSIBLE EYE DAMAGE.** Do not get in eyes, on skin, or on clothing.  Wear protective eyewear.  Prolonged or frequently repeated skin contact may cause allergic reactions in some individuals.  Remove contaminated clothing and wash before reuse.  Wash thoroughly with soap and water after handling and before eating, drinking, chewing gum, using tobacco or using the toilet. | It is a violation of Federal law to use this product in any manner inconsistent with its labeling.  This product can only be used in accordance with the Directions for Use on this label.  Do not apply this product in a way that will contact workers or other persons, whether directly or through drift.  Only protected handlers may be in the area during application.  For any requirements specific to your State or Tribe, consult the agency responsible for pesticide regulation. | **NOTE:**  Direct contact or exposure to this product or spray mixture of this product could be minimized.  The following instructions for transfer, mixing, cleaning or repairing equipment should be followed in order to minimize this exposure.  Review the protective clothing requirements as listed in the "PRECAUTIONARY STATEMENTS" section of this label and do not use this product until you have the necessary protective clothing.  **2.5 Gallon Containers:**  Open pouring from these containers can result in exposure from splashing or spilling.  Special care in lifting and pouring are strongly recommended.  **Bulk Containers:**  Open pouring from these containers can result in exposure from splashing or spilling and is not recommended.  This product should be transferred from these containers to the mix or spray tank using pumps or transfer probes.  The probe or pump should not be removed from the container or disconnected until the container is emptied and rinsed.  Use the pump or probe system to rinse the empty container and transfer the rinsate directly to the mix of spray tank. | MONGLY07607 494-500 |

As illustrated in Table 7-1 and Figures 6-1 and 6-2, the warnings degraded with time from the signal word "DANGER" to "WARNING" to "CAUTION" or EPA Pesticide Warnings Categories "I" to "III."  Monsanto wrote on February 26, 1987 (Exhibit 508, Bates MONGLY00245013) that the signal word changed from "DANGER" to "CAUTION" on October 17, 1974 but this was not the case as illustrated in Tables 7-1 and 7-2.

An overview of the deficiencies observed in the Roundup® Labels is summarized in Table 7-2 below:

### Table 7-2: Overview of Deficiencies in Monsanto Roundup® Labels by Date and Product

| Date of Label | Product(s) | Label Issues |
|---|---|---|
| 3/13/1974 | Roundup®, Postemergence Herbicide | Under Warnings states: Signal Word – DANGER with warnings to - *Avoid* contact with eyes, skin or clothing.  Wear goggles or face shield when handling. Under Mixing Instructions states: Do not apply under *wind or other conditions* which will allow drift to occur. Terms such as "avoid," and "wind or other conditions" are not defined, nor actionable.  No specific skin or respiratory protection PPE listed.  What wind speed or other conditions are not acceptable for application of the product? |
| 2/21/1978 | Roundup® Herbicide | Under Warnings states: Signal Word – WARNING with warning - *Do not get in eyes, on skin or on clothing.* Under Mixing Instructions states: Do not apply under *wind or other conditions* which will allow drift to occur. Terms such as "wind or other conditions" are not defined, nor actionable.  No specific eye, skin or respiratory protection PPE listed.  What wind speed or other conditions are not acceptable for application of the product? |
| 4/20/1978 | Roundup® Herbicide | Under Warnings states: Signal Word – WARNING. No specific eye, skin or respiratory protection PPE listed. |
| 7/17/2002 | QuikPro | Under Warnings states: Signal Word – CAUTION with warnings to - *Avoid* breathing dust or spray mist.  *Avoid* contact with eyes or clothing. Terms such as "avoid," are not defined, nor actionable.  Odd that warning says to avoid having product contact clothing, but nothing about avoiding product contact with one's skin.  No specific eye, skin or respiratory protection PPE listed. Note that between 1974 and 2002, the signal words have changed from "DANGER" - Cat. I to "CAUTION" – Cat. III, suggesting that the product is somehow safer with time requiring less PPE. |
| 8/15/2002 | MON 0139 62% Technical Solution | Under Warnings states: Signal Word – CAUTION. No specific eye, skin or respiratory protection PPE listed. |
| 11/20/2002 | Base Brand Name: Accord XL Herbicide (Alternate Brand Names: Accord SP Herbicide, RangerPro Herbicide, Mangy Herbicide, MONState Herbicide, Ranger XL Herbicide, Ranger Extra Herbicide, Honcho XL Herbicide, Honcho Extra Herbicide, MONMaster Herbicide, TopHand XL Herbicide, TopHand Extra Herbicide. | Under Warnings states: Signal Word – CAUTION with warning – *Avoid contact with eyes or clothing.* Terms such as "avoid" are not defined, nor actionable.  Odd that warning says to avoid having product contact clothing, but nothing about avoiding product contact with one's skin.  No specific eye, skin or respiratory protection PPE listed. |
| 7/2/2003 | Roundup® Original MAX Herbicide | Under Warnings states: Signal Word – CAUTION with warning – *Avoid* contact with eyes, skin or clothing and under PPE *states -* Some of the materials that are *chemical-resistant* to this product are listed below.  If you want more options.  Follow the instructions for Category A on an EPA chemical-resistance category selection chart.  Applicators and other handlers must wear: Long-sleeved shirt and *long pants, socks, shoes,* and *chemical-resistant gloves* made of any waterproof material such as |

| Date of Label | Product(s) | Label Issues |
|---|---|---|
| | | polyethylene or polyvinyl chloride.  Also says: Remove clothing immediately *if pesticide gets inside.*  Then wash thoroughly and put on clean clothing. |
| | | Terms such as "avoid" and "chemically resistant" are not defined, nor actionable.  Odd that warning says to wear chemically-resistant gloves but not to wear chemically resistant shirts, pants, socks or shoes; why is one skin area more important than others?  How is one to know if a product gets inside of one's clothes until they are already exposed; also inconsistent with the fact that unclothed skin areas get wetted immediately and no similar recommendation to stop and clean skin is made?  No specific eye, skin or respiratory protection PPE listed.  Note that skin added to warning for the first time in this listing. |
| 2/24/2006 | Landmaster Herbicide (Roundup® Power Max) | Under Warnings states: Signal Word – DANGER. |
| | | Note the appearance of the word "DANGER" which would have implications for increased PPE to protect the eyes, skin and lungs.  No specific eye, skin or respiratory protection PPE listed. |
| 1/1/2009 | Roundup® Weed & Grass Killer Concentrate Plus | Under Warnings states: Signal Word – CAUTION.  Also says: Users should remove clothing immediately *if product gets inside*; then wash thoroughly and put on clean clothing. |
| | | No specific eye, skin or respiratory protection PPE listed.  Also, how is one to know if a product gets inside of one's clothes until they are already exposed; also inconsistent with the fact that unclothed skin areas get wetted immediately and no similar recommendation to stop and clean skin is made? |
| 1/1/2010 | Ranger Pro Herbicide | Under Warnings states: Signal Word – CAUTION with warning – *Avoid* contact with eyes or clothing and under PPE *states* -Some of the materials that are *chemical-resistant* to this product are listed below.  If you want more options.  Follow the instructions for Category A on an EPA chemical-resistance category selection chart.  Applicators and other handlers must wear: Long-sleeved shirt and *long pants, socks, shoes,* and *chemical-resistant gloves* made of any waterproof material such as polyethylene or polyvinyl chloride.  Also says: Remove clothing *immediately if pesticide gets inside.*  Then wash thoroughly and put on clean clothing. |
| | | Terms such as "avoid" and "chemically resistant" are not defined, nor actionable.  Odd that warning says to wear chemically-resistant gloves but not to wear chemically resistant shirts, pants, socks or shoes; why is one skin area more important than others?  Odd that warning says to avoid having product contact clothing, but nothing about avoiding product contact with one's skin – the skin warning from 2006 is now missing.  How is one to know if a product gets inside of one's clothes until they are already exposed; also inconsistent with the fact that unclothed skin areas get wetted immediately and no similar recommendation to stop and clean skin is made?  No specific eye skin (non-hands), or respiratory protection PPE listed. |
| 1/1/2010 | Roundup® PowerMax | Under Warnings states: Signal Word – CAUTION with warning – *Avoid* contact with eyes, skin or clothing and under PPE *states* -Some of the materials that are *chemical-resistant* to this product are listed below.  If you want more options.  Follow the instructions for Category A on an EPA chemical-resistance category selection chart.  Applicators and other handlers must wear: Long-sleeved shirt and *long pants, socks, shoes,* and *chemical-resistant gloves* made of any waterproof material such as polyethylene or polyvinyl chloride. Also says: Remove clothing *immediately if pesticide gets inside.*  Then wash thoroughly and put on clean clothing. |
| | | Terms such as "avoid" and "chemically resistant" are not defined, nor actionable.  Odd that warning says to wear chemically-resistant gloves but not to wear chemically resistant shirts, pants, socks or shoes; why is one skin area more important than others?  How is one to know if a product gets inside of one's clothes until they are already exposed; also inconsistent with the fact that unclothed skin areas get wetted immediately and no similar recommendation to stop and clean skin is made?  Skin warning present for this product 1/1/2010 label.  No specific eye, skin (non-hands) or respiratory protection PPE listed. |

| Date of Label | Product(s) | Label Issues |
|---|---|---|
| 1/1/2010 | Roundup® ProMax | Under Warnings states: Signal Word – CAUTION with warning – Applicators and other handlers must wear: Long-sleeved shirt and long pants, socks, shoes, and *chemical-resistant* gloves made of any waterproof material such as polyethylene or polyvinyl chloride.<br><br>Terms such as "avoid" are not defined, nor actionable.  Odd that warning says to wear long-sleeved shirts, long pants, socks and shoes but doesn't specify degree of resistant to wetting by the product.  No specific eye, skin or respiratory protection PPE listed. |
| 1/1/2012 | Roundup® Custom for Aquatic & Terrestrial Use | Under Warnings states: Signal Word – CAUTION with warning – *Avoid* contact with eyes, skin or clothing and *Avoid* breathing vapor or spray mist.  Under PPE states - Applicators and other handlers must wear: long-sleeved shirt and long pants, shoes plus socks. Now the dirty clothing warning just says: Remove contaminated clothing and wash clothing before reuse.<br><br>Terms such as "avoid" are not defined, nor actionable.  Odd that warning says to wear chemically-resistant gloves but not to wear chemically resistant shirts, pants, socks or shoes; why is one skin area more important than others?  The contaminated clothing warning simply is non-protective; if the clothes are wetted through they have been providing dermal exposure – no warning to remove them, shower and put on new clothes as with previous, 2010 era warnings.  No specific eye or respiratory protection PPE listed. |
| 5/8/2013 | Roundup® Weed & Grass Killer Concentrate Plus (Roundup® Concentrate Plus Weed & Grass Killer) | Under Warnings states: Signal Word – CAUTION with warning – *Avoid* contact with eyes or clothing.  Also says: Users should remove clothing immediately *if product gets inside*; then wash thoroughly and put on clean clothing.<br><br>Terms such as "avoid" are not defined, nor actionable.  Odd that warning says to avoid having product contact clothing, but nothing about avoiding product contact with one's skin – the skin warning from 2006 is now missing.  How is one to know if a product gets inside of one's clothes until they are already exposed; also inconsistent with the fact that unclothed skin areas get wetted immediately and no similar recommendation to stop and clean skin is made?  No specific eye, skin or respiratory protection PPE listed. |
| 1/31/2014 | Roundup® Weed & Grass Killer Concentrate Plus MASTER LABEL | Under Warnings states: Signal Word – CAUTION with warning – *Avoid* contact with eyes or clothing.  Also says: Users should remove clothing immediately *if product gets inside*; then wash thoroughly and put on clean clothing.<br><br>Terms such as "avoid" are not defined, nor actionable.  Odd that warning says to avoid having product contact clothing, but nothing about avoiding product contact with one's skin – the skin warning from 2006 is now missing.  How is one to know if a product gets inside of one's clothes until they are already exposed; also inconsistent with the fact that unclothed skin areas get wetted immediately and no similar recommendation to stop and clean skin is made?  No specific eye, skin or respiratory protection PPE listed. |
| 3/6/2014 | Roundup® Ultra2 Liquid Herbicide | Under Warnings states: Signal Word – CAUTION with warning – *Avoid* contact with eyes, skin or clothing and *Avoid* breathing vapor or spray mist.  Under PPE states - Wear a long-sleeved shirt and long pants during mixing, loading, application, clean-up and repair.  In addition, wear goggles or a face shield and *chemical-resistant* gloves during mixing and loading, clean-up and repair.<br><br>Terms such as "avoid" and "chemically resistant" are not defined, nor actionable.  Odd that warning says to wear chemically-resistant gloves but not to wear chemically resistant shirts, pants, socks or shoes; why is one skin area more important than others?  No specific skin (non-hands) or respiratory protection PPE listed.  Skin warning back. |
| 1/1/2015 | Roundup® Weed & Grass Killer Concentrate Plus | Under Warnings states: Signal Word – CAUTION with warning – *Avoid* contact with eyes or clothing.<br><br>Under Directions for Use states: Users should remove clothing immediately if product gets inside; then wash thoroughly and put on clean clothing.<br><br>Terms such as "avoid" are not defined, nor actionable.  Odd that warning says to avoid having product contact clothing, but nothing about avoiding product contact with one's skin – the skin warning is again missing.  How is one to know if a product gets inside of one's clothes until they are already |

| Date of Label | Product(s) | Label Issues |
|---|---|---|
| | | exposed; also inconsistent with the fact that unclothed skin areas get wetted immediately and no similar recommendation to stop and clean skin is made?  No specific eye, skin or respiratory protection PPE listed. |
| 2/18/2015 | Roundup® Concentrate Extended Control Weed & Grass Killer Plus Weed Preventer | Under Warnings states: Signal Word – CAUTION. Under Directions for Use states: Users should remove clothing immediately if product gets inside; then wash thoroughly and put on clean clothing. Terms such as "avoid" are not defined, nor actionable.  Also, how is one to know if a product gets inside of one's clothes until they are already exposed; also inconsistent with the fact that unclothed skin areas get wetted immediately and no similar recommendation to stop and clean skin is made?  No specific eye, skin or respiratory protection PPE listed. |
| 1/1/2015 | Roundup® WeatherMax with Transorb 2 Technology Liquid Herbicide | Under Warnings states: Signal Word is missing.  Warnings also state to: – _Avoid_ contact with eyes, skin or clothing and to _Avoid_ inhaling spray mist. Also says: Wear a long-sleeved shirt and long pants during mixing, loading, application, clean-up and repair.  In addition, wear goggles or a face shield and _chemical-resistant_ gloves during mixing and loading, clean-up and repair. Terms such as "avoid" are not defined, nor actionable.  Odd that warning says to wear chemically-resistant gloves but not to wear chemically resistant shirts, pants, socks or shoes; why is one skin area more important than others?  No specific eye, skin (non-hand) or respiratory protection PPE listed. |
| 3/12/2015 | Roundup® Extended Control Weed & Grass Killer Plus Weed Preventer | Under Warnings states: Signal Word – CAUTION with warning – _Avoid_ contact with eyes or clothing.  Also says: Users should remove clothing immediately _if product gets inside_; then wash thoroughly and put on clean clothing. Terms such as "avoid" are not defined, nor actionable.  Odd that warning says to avoid having product contact clothing, but nothing about avoiding product contact with one's skin – the skin warning from 2006 is now missing.  How is one to know if a product gets inside of one's clothes until they are already exposed; also inconsistent with the fact that unclothed skin areas get wetted immediately and no similar recommendation to stop and clean skin is made?  No specific eye, skin or respiratory protection PPE listed. |
| 1/1/2016 | HonchoK6 Herbicide for Roundup® Ready Crops | Under Warnings states: Signal Word – CAUTION with warning – _Avoid_ contact with eyes, skin or clothing and _Avoid_ breathing vapor or spray mist. Under PPE states - Some of the materials that are chemical-resistant to this product are listed below.  Applicators and other handlers must wear: long-sleeved shirt and long pants, socks and shoes, and _chemical-resistant_ gloves made of any waterproof material, such as polyethylene or polyvinyl chloride. Under Directions for Use states: _AVOID_ DRIFT and The result of injury occurring as the result of spray drift while applying this product increases when _winds are gusty_, as wind velocity increases, when wind direction is constantly changing or when there are _other_ meteorological conditions that favor spray drift. Terms such as "avoid," "gusty" and "other" are not defined, nor actionable. Odd that warning says to wear chemically-resistant gloves but not to wear chemically resistant shirts, pants, socks or shoes; why is one skin area more important than others?  No specific eye, skin (non-hands) or respiratory protection PPE listed. |
| 10/18/2016 | Roundup® Custom Herbicide (AquaMaster Herbicide, Roundup® AquaMaster Herbicide, Roundup® Custom for Aquatic & Terrestrial Use) | Under Warnings states: Signal Word – CAUTION with warning – _Avoid_ contact with eyes or clothing and that "Applicators and other handlers must wear: Long-sleeved shirt and long pants, socks and shoes."  Also says: Remove clothing immediately _if pesticide gets inside_.  Then wash thoroughly and put on clean clothing. Terms such as "avoid" are not defined, nor actionable.  Odd that warning says to avoid having product contact clothing, but nothing about avoiding product contact with one's skin?  How is one to know if a product gets inside of one's clothes until they are already exposed; also inconsistent with the fact that unclothed skin areas get wetted immediately and no similar recommendation to stop and clean skin is made?  No specific eye, skin or respiratory protection PPE listed. |

| Date of Label | Product(s) | Label Issues |
|---|---|---|
| No Date | RD 1686 Herbicide | Under Warnings states: Signal Word is missing.  Warnings also state to: _Avoid_ contact with eyes, skin or clothing. |
| | | Under Directions for Use states: Users should remove clothing immediately _if product gets inside;_ then wash thoroughly and put on clean clothing. |
| | | Terms such as "avoid" are not defined, nor actionable.  Also, how is one to know if a product gets inside of one's clothes until they are already exposed; also inconsistent with the fact that unclothed skin areas get wetted immediately and no similar recommendation to stop and clean skin is made?  No specific eye, skin or respiratory protection PPE listed. |
| No Date | WarrantUltra Herbicide - Roundup® Ready PLUS | Under Warnings states: Signal Word is "DANGER."  Warnings also state to:  _Do not get in eyes, on skin, or on clothing._  Wear protective eyewear. _Prolonged_ or _frequently repeated_ skin contact may cause allergic reactions in some individuals.  Remove contaminated clothing and wash before reuse. |
| | | Terms such as "frequently," "prolonged" and "repeated are not defined, nor actionable.  Also, the warning to not get the product in eyes, skin or clothing is not practical; how does one ensure this – the warning should anticipate, and protect the user, from such potential exposures?  The warning regarding contaminated clothing does not address the issue of when it was contaminated was it contributing to dermal exposure.  If wet to the skin, dermal exposure has already occurred and the warning provides no protection to the user as they are already exposed.  No specific eye, skin or respiratory protection PPE listed. |

As illustrated in Table 7-2, the label warnings were inconsistent in terms of language and actionability.

[Specifically:

➢ Signal words downgrade from "DANGER," to "WARNING," to "CAUTION" with time degrading warning language as discussed earlier in Section 6.  Further, this degradation was a direct result of Monsanto lobbying, and ignoring the U.S. EPA to maintain worker pesticide rules as detailed in Section 4-5 and Section 7-3 below.

➢ Terms such as "avoid," "chemically resistant," "frequently," "prolonged," and "repeated" are not defined, nor actionable – see Section 7-2 discussion above.

➢ Skin warnings were often missing from the label.

➢ Inconsistent skin warnings were present throughout the label warnings.  For example, label warnings stated the user should wear "chemically resistant" gloves but non-"chemically resistant" long-sleeve shirts, long pants, socks and gloves.  Why hands should be dermally protected and other skin areas not protected is illogical; skin is skin.  Also, the non-clothed/protected areas such as the face and neck are never addressed; again either skin should be protected in total or not protected in total.

➢ Warnings regarding whether or not to cease working once clothes were wetted through, were inconsistent as well.  In some cases, the warnings essentially warned the user to stop work, remove clothes, clean skin, and put on clean clothes.  In other cases no such warning was given, or the warning said to clean contaminated clothes with no recognition that the dermal exposure had already occurred and the warning was essentially useless from a dermal exposure standpoint.  Also, even the warning to stop, remove contaminated clothes, clean

skin and put on clean clothes does not address non-covered skin (e.g., face, neck, etc.) and what to do if it is wetted by the product.]

The Good Laboratory Practice (GLP) rules were set up by the US Food and Drug Administration in 1978 to attempt to "end the serious problem of fraud in industry testing of pesticides, chemicals and pharmaceutical drugs for regulatory assessment."   As Antoniou et al. writes (Exhibit 196-Z, pg. 21), "GLP is a management system.  It is not a hallmark – much less a guarantee – of 'good science'."  He then goes on to write:

> "***Interestingly, both the IBT and Craven Labs fraud cases involved toxicological and residue tests of Roundup for regulatory purposes by laboratories under contract to Monsanto***.  Monsanto says it later repeated the tests under GLP rules[127], though this is hardly reassuring given that the Craven Labs fraud occurred after GLP rules were in place[128].  *Clearly, GLP neither prevents fraud, nor assures high quality science.*"

Monsanto has a history of accessing data, specifically for Roundup® in the 1990s, from a laboratory accused of fraud.

On the other hand, industry and regulatory bodies use the fact other peer reviewed work showing concerns about Roundup® health effects is not from GLP laboratories to suggest such studies are inferior work to be dismissed.   Again, Antoniou et al. illuminates this as follows:

> "Though the aims of GLP were laudable, they have been used to create a regulatory system that excludes open peer reviewed scientific literature.  ***One critic <u>called GLP a "shield" that industry uses to protect itself from inconvenient findings</u> in the independent scientific literature***[132].  *Regulatory bodies across the world – including the EU Commission's DG SANCO and the European Food Safety Authority (EFSA) – <u>collude in this process</u> by designating industry's GLP-compliant toxicity studies as the highest quality data.  <u>**They rely almost exclusively on these industry-sponsored studies for pesticide and chemical assessments, rejecting studies from the open peer reviewed scientific literature because they are not conducted under GLP rules**</u>*[133][134].

> ***<u>Thus, Monsanto is able to dismiss Carrasco's research and other independent studies showing harm from glyphosate/Roundup by saying that the testing systems are "unvalidated" and the studies "inappropriate and irrelevant for human health risk assessment purposes"</u>***[135].  ***In other words, they are not GLP***.

> <u>*The tyranny of GLP over regulatory processes*</u> has been heavily criticized in a paper co-authored by 30 scientists. <u>*The authors point out that GLP "specifies nothing about the quality of the research design, the skills of the technicians, the sensitivity of the assays, or whether the methods employed are current or out-of-date*</u>."

[Thus Monsanto can simply, and miss-leadingly, dismiss non-GLP studies as unvalidated, inappropriate, or irrelevant simply because they were not completed in GLP facilities.]

Visual examples of misleading Monsanto Roundup® labeling information is illustrated below:

7.1.1   ~2008 – Label for Roundup® (Exhibit 185, MONGLY07111581):

Marie-Monique Robin, in her book "The World According to Monsanto," and in her film with the same title (https://www.youtube.com/watch?v=aK7gAZS0lbY; see Petty Video 2 for clip), provides examples of misleading product information regarding Monsanto's Roundup® products.  For example, Monsanto described, in large letters, that the product was "Biodegradable" in early labels, but later removed this label when it was clear it was not (Figure 7-3):

 

**Figure 7-3: Monsanto Roundup® "Biodegradable" Label**

As Robin reports (Exhibit 54, pgs. 4 and 70-71 - Bates PL.2841.17 and .83-.84):

> "*It should be noted that 70 percent of the GMOs cultivated in the world were at the time resistant to Roundup, Monsanto's prize herbicide, which **the firm used to claim was 'biodegradable and good for the environment' (an assertion that earned it, as we shall see, two official findings of false advertising**.*"
>
> "**Respects the environment**," *"**100% biodegradable**," and "**Leaves no residues in the soil**.*"
>
> "***Used according to directions, Roundup poses no risk to people, animals, or the environment**.*"

As evidenced by Monsanto's own words, the product Roundup® is not biodegradable (see Section 7, France - 2001 and New York State - 1996 legal actions fraudulent claims decisions on biodegrades language).  In fact, in February 1987, Monsanto wrote a report on earlier internal studies in European processed wheat, barley, and oats where they found significant glyphosate residuals on these crops after harvesting and processing (Exhibit 196-E).   Yet Monsanto was still advertising Roundup® as biodegradable upwards of 20 years later (e.g., Exhibit 554-42).

[Clearly, the biodegradation claims are not allowed under the U.S. EPA/FIFRA code language cited above.  Moreover, the claims that the product is "good for the environment" are highly questionable given it is not biodegradable as claimed.]

7.1.2  2009 – Label for Roundup® Weed & Grass Killer Concentrate Plus (Exhibit 201, Bates MONGLY07309263-9268, pgs. 403-408):

In this 2009 label for Roundup® Weed & Grass Killer Concentrate Plus (Figure 7-4) Monsanto's warnings for dermal (skin) protection (Figure 7-5) do not require any specific chemically-resistant items which is a violation of the U.S. EPA's requirements for dermal protection:



**Figure 7-4: Monsanto Roundup® Weed & Grass Killer Concentrate Plus – Exhibit 201, Bates MONGLY07309263, pg. 403**



**Figure 7-5: Monsanto Roundup® Weed & Grass Killer Concentrate Plus – PPE Warnings – Exhibit 201, Bates MONGLY07309265, pg. 405**

[Note, nothing regarding wearing of any dermal protective equipment or PPE in general is mentioned. The only warning is remove clothing if product "gets inside," wash thoroughly and put on clean cloths. No mention is made of what to do if product gets on unclothed skin such as the face or neck.

The warning to apply only when the "air is calm" is a situation that almost never exists and is an undefined and unlikely warning to be followed.]

Moreover, the label suggests no skin PPE is required as shown in Figure 7-6:



**Figure 7-6: Monsanto Roundup® Weed & Grass Killer Concentrate Plus –
Bare Hands – Exhibit 201, Bates MONGLY07309264, pg. 404**

Note bare skin is shown when pouring the product from the container and when mixing it.

### 7.1.3   2010 – Label for Roundup® ProMax (Exhibit 188, Bates MONGLY07600863):

In this 2010 label for Roundup® ProMax (Figure 7-7) Monsanto's warnings for dermal (skin) protection (Figure 7-8) do not require any specific chemically-resistant items which is a violation of the U.S. EPA's requirements for dermal protection:



The complete broad-spectrum postemergence professional herbicide for non-crop, industrial, turf and ornamental weed control.

## Complete Directions for Use

AVOID CONTACT OF HERBICIDE WITH FOLIAGE, STEMS, EXPOSED NON-WOODY ROOTS OR FRUIT OF CROPS, DESIRABLE PLANTS AND TREES, BECAUSE SEVERE INJURY OR DESTRUCTION IS LIKELY TO RESULT.

EPA Reg. No. 524-579                                          2010-1

| GROUP | 9 | HERBICIDE |
|-------|---|-----------|

Read the entire label before using this product.

Use only according to label instructions.

Not all products listed on this label are registered for use in California. Check the registration status of each product in California before using.

Read the LIMIT OF WARRANTY AND LIABILITY statement at the end of the label before buying or using. If terms are not acceptable, return at once unopened.

THIS IS AN END-USE PRODUCT. MONSANTO DOES NOT INTEND AND HAS NOT REGISTERED IT FOR REFORMULATION OR REPACKAGING.

PRODUCT INFORMATION

# 1.0 INGREDIENTS

ACTIVE INGREDIENT:
*Glyphosate, N-(phosphonomethyl)glycine,
  in the form of its potassium salt................................................. 48.7%
OTHER INGREDIENTS:.................................................................. 51.3%
                                                                          100.0%

## Figure 7-7: Monsanto Roundup® ProMax – Exhibit 188, Bates MONGLY07600863

**Personal Protective Equipment (PPE)**

Applicators and other handlers must wear: long-sleeved shirt and long pants, shoes plus socks.

Follow manufacturer's instructions for cleaning/maintaining PPE. If there are no such instructions for washables, use detergent and hot water. Keep and wash PPE separately from other laundry.

When handlers use closed systems, enclosed cabs, or aircraft in a manner that meets the requirements listed in Worker Protection Standard (WPS) for agricultural pesticides [40 CFR 170.240 (d) (4-6)], the handler PPE requirements may be reduced or modified as specified in the WPS.

**Figure 7-8: Monsanto Roundup® ProMax Inadequate Dermal (Skin) Warnings – Exhibit 188, Bates MONGLY07600863**

None of the PPE items listed in the label (long-sleeved shirts and long pants, nor shoes plus socks) are PPE even though they are listed under PPE.  In fact the EPA explicitly states these items listed by Monsanto as PPE in their label are not PPE [40 CFR Title Chapter I - Subchapter E - Part 170 Section 170.240 (b)(2)]:

§170.240   **Personal protective equipment.**

(a) *Requirement.* Any person who performs tasks as a pesticide handler shall use the clothing and personal protective equipment specified on the labeling for use of the product.

(b) *Definition.* (1) Personal protective equipment (PPE) means devices and apparel that are worn to protect the body from contact with pesticides or pesticide residues, including, but not limited to, coveralls, chemical-resistant suits, chemical-resistant gloves, chemical-resistant footwear, respiratory protection devices, chemical-resistant aprons, chemical-resistant headgear, and protective eyewear.

(2) Long-sleeved shirts, short-sleeved shirts, long pants, short pants, shoes, socks, and other items of work clothing are not considered personal protective equipment for the purposes of this section and are not subject to the requirements of this section, although pesticide labeling may require that such work clothing be worn during some activities.

(c) *Provision.* When personal protective equipment is specified by the labeling of any pesticide for any handling activity, the handler employer shall provide the appropriate personal protective equipment in clean and operating condition to the handler.

(1) When "chemical-resistant" personal protective equipment is specified by the product labeling, it shall be made of material that allows no measurable movement of the pesticide being used through the material during use.

[57 FR 38151, Aug. 21, 1992, as amended at 69 FR 53346, Sept. 1, 2004]

**[None of the PPE items listed in the label under PPE (long-sleeved shirts and long pants, nor shoes plus socks) are PPE according to the EPA even though they are listed in Monsanto's label as PPE].**

Note that Exhibit 197-EE (Bates MONGLY0711150) shows an illustration of a 2013 container of Roundup® ProMax shows the signal word "CAUTION" which would imply worker rules requiring chemical resistant gloves and goggles are required PPE; the same signal word appeared in 2011 – see Section 7.1.4 below.

Note, nothing regarding wearing of protective gloves or eye protection is mentioned. Moreover, "shoes plus socks" are not defined; what level of protection, and types of materials should be defined.]

According to Monsanto, ProMax and QuickPro were the "MOST" important and profitable of the company (Exhibit 190, Bates MONGLY07112404).

### 7.1.4   2011 – Label for Roundup® Quick-Pro Concentrate (Exhibit 185, Bates MONGLY07111581):

In this 2011 label for Roundup® Quick-Pro concentrate (Figure 7-9) Monsanto's warnings for dermal (skin) protection (Figure 7-10) do not require any specific chemically-resistant items which is a violation of the U.S. EPA's requirements for dermal protection:



**Figure 7-9: Monsanto Roundup® Quick-Pro Concentrate – Exhibit 185, Bates MONGLY07111581**

**Personal Protective Equipment (PPE)**
**Applicators and other handlers must wear:** Long-sleeved shirt and long pants, protective footwear plus socks, and protective eyewear. Discard clothing and other materials that have been heavily contaminated with this product's concentrate. Follow manufacturer's instructions for cleaning/maintaining PPE. If no such instructions for washables exist, use detergent and hot water. Keep and wash PPE separately from other laundry.

**Figure 7-10: Monsanto Roundup® Quick-Pro's Inadequate Dermal (Skin) Warnings – Exhibit 185, Bates MONGLY07111581**

**[Again, none of the PPE items listed in the label (long-sleeved shirts and long pants, nor shoes plus socks) are PPE even though they are listed under PPE.**

Note, nothing regarding wearing of protective gloves is mentioned.   Moreover, "Protective footwear plus socks" and "Protective eyewear" are not defined; the level of protection and types of materials should be defined.]

### 7.1.5   2014 – Monsanto's Claims Roundup® Does Not Bioaccumulate:

In a 2014 report entitled Monsanto Backgrounder: Summary of Human Risk Assessment and Safety Evaluation on Glyphosate and Roundup® Herbicide, by Williams, Kroes, and Munro (https://www.monsantoglobal.com/glyphosate/Documents/ summary-of-human-risk-assessment-and-safety-evaluation.pdf), they stated:

> **Glyphosate does not bioaccumulate**. "The potential for systemic exposure is limited by the combination of poor absorption and rapid excretion of glyphosate after oral and/or dermal contact."  (p. 124) "As glyphosate is not stored in the body, any exposure from skin contact or inhalation would be quickly eliminated by humans and animals."

The Backgrounder was written in 2014 and reflected on work from these same authors in 2000 (see Exhibit 206); nevertheless they still assert that glyphosate does not bioaccumulate.

Steven Gould, Monsanto's IT&O Account Manager, in a 2010 Training presentation repeated the Monsanto claim that Roundup in "non-bioaccumulating" (Exhibit 554-42), as did so again in another presentation (Exhibit 554-43).  Mr. Gould's information was available to the public as he published their webpage (www.monsantoITO.com) on the front page of one presentation and the last page of the other presentation.

Food Democracy Now and the Detox Project (Exhibit 196-S, pgs. 117-18) write that:

> **"Glyphosate Bio-Accumulates in Major Organs and Bones**
>
> While Monsanto and U.S. regulatory agencies routinely claim that glyphosate is excreted quickly from the body, a number of studies in Europe have discovered higher levels of glyphosate residue found in cows raised in countries where GMO feed was allowed (Denmark) and significantly lower in areas considered "GM free" (Germany).[102]
>
> ***Despite Monsanto's repeated claim that glyphosate does not bio-accumulate[103], this 2014 study found glyphosate residues in multiple organs of slaughtered cows, including the intestine, liver, muscles, kidney, and spleen, bringing into question Monsanto's claim that glyphosate is rapidly excreted and does not bio-accumulate in animals or humans***.
>
> Beyond accumulation in vital organs, glyphosate has also been found to accumulate in bones due to its strong chelating activity or ability to bind with calcium. According to the EPA's own internal documents, reporting on corporate-paid studies submitted by Monsanto, a significant portion of glyphosate is absorbed into the bones of mice and rats used in laboratory experiments.
>
> In 1993, in the EPA's Reregistration Eligibility Decision (RED) on Glyphosate as reported by the Office of Prevention, Pesticides and Toxic Substances: "Less than 1.0% of the absorbed dose remained in tissues and organs, primarily in bone tissue[104]."

References #102 to #104 are:

#102   Krüger M, Schledorn P, Schrödl W, Hoppe HW, Lutz W, et al. (2014) Detection of Glyphosate Residues in Animals and Humans. J Environ Anal Toxicol 4: 210. http://www.omicsonline.org/open-access/detection-of-glyphosate-residues-in-animals-and-humans-2161-0525.1000210.php?aid=23853.

#103   Monsanto, Backgrounder: Summary on Human Risk Assessment and Safety Evaluation on Glyphosate and Roundup Herbicide (Updated November 2014), Williams, Gary M, Kroes, Robert, Munro, Ian C. http://www.monsanto.com/glyphosate/documents/summary-of-human-risk-assessment-and-safety-evaluation.pdf.

#104   USEPA. 1993. Reregistration Eligibility Decision (RED) Glyphosate. Office of Prevention, Pesticides and Toxic Substances. Washington DC.

Defarge, et al., 2018 (Exhibit 178) also contained a review of the literature illustrating that Roundup® does bioaccumulate.

[Thus, the claim that Roundup® products do not bioaccumulate do not appear to be accurate.]

### 7.1.6   2015 – Label for Roundup® Quick-Pro Concentrate (Exhibit 185, MONGLY07111581):

In this 2015 label for Roundup® Weed & Grass Killer concentrate (Figure 7-11) Monsanto's warnings for dermal (skin) protection (Figure 7-12) do not require any specific chemically-resistant items which is a clear violation of the U.S. EPA's requirements for dermal protection:



**Figure 7-11: Monsanto Roundup® Weed & Grass Killer Concentrate – Exhibit 192, pg. 1**

**Figure 7-12: Monsanto Roundup® Weed & Grass Killer Concentrate –
Exhibit 192, pg. 3, 5**

[Note, nothing regarding wearing of any dermal protective equipment or PPE in general is mentioned.  The only warning is to avoid contact with eyes or clothing; no mention of skin or skin protection in this label.]

7.1.7   2016 – June 29th – Letter from Dr. Goldstein to Mr. Zimmerman
         (Exhibit 196-FF, Bates MONGLY07600050-53):

In a letter dated June 29, 2016, Dr. Goldstein writes in part to Mr. Zimmerman – CWC Chemical, a reader of a recent Intercept paper stating the hazards of Roundup®:

> "Much has been made of the fact that the surfactant components in glyphosate formulations is 'more toxic than glyphosate'." This is not saying much, given that glyphosate is among the least acutely toxic chemicals known.  The rodent lethal dose of aspirin or acetaminophen is about 150 mg/kg, salt about 2000 mg/kg, and glyphosate greater than 5000 mg/kg - the highest dose we test historically (more than a pound if scaled up to humans). In other words, glyphosate is significantly less acutely toxic than table salt."

This 2016 response to the public repeats many of the same claims found in 2015 to be misleading and fraudulent by the New York Attorney General (see Exhibit 196-EE, pg. 1) and for which Monsanto was fined and ordered to cease and desist).

[Namely the statement is misleading and fraudulent because:

1.      It makes statements about the active ingredient glyphosate which are not accurate regarding the product Roundup® formulations itself.

2.    It compares _acute ingestion_ toxicities of glyphosate to other products, suggesting glyphosate is safe. But this statement is misleading and fraudulent because it represents only the acute ingestion toxicity but does not explicitly say this. Moreover, the statement again implies this information reflects the product as a whole.

**_These statements are repeated after Monsanto has been ordered to not make them by the State of New York, has been fined by the State of New York, and has agreed to cease and desist making such statements, suggesting contempt for agreements made with officials such as the Attorney General of New York._**

Oddly, he goes on to say that the "acute poisoning seen in glyphosate ingestions is the result of the surfactant." This more accurately is really about the ingestion of Roundup® formulations, not glyphosate alone, but does acknowledge Roundup® is more toxic than glyphosate.]

He then adds several more misleading statements:

➢    "Studies have demonstrated that this is true of a wide variety of surfactants, including many surfactants used routinely in household products. The same toxic effects on cells will occur with components of liquid soaps, shampoos, laundry detergents, and dish soap."

[This statement is both misleading and false. Maibach's 1996 work, summarized earlier, clearly does not show this; for example the baby shampoo tests had no observed dermal effects.]

➢    "We put surfactants on ourselves every time we use shampoo, conditioner, or liquid soaps, and ingest dish detergent residue in foods- all without recognizable adverse effects."

[Same comments as with previous statement.]

➢    "The "discovery" by Mesnage (see Exhibit 207 and also Exhibit 208) and others, after years of work, _that surfactant co-formulants are more toxic than glyphosate is simply a ruse. This was obvious from the material safety data sheets on POEA and related surfactants_ and studies demonstrating this fact in dogs were published decades ago by Monsanto. The surfactants are well known (since the 1970's at least) to be toxic to aquatic life, including frogs, _and the products with surfactants are not labeled for use over water_ (non-surfactant containing formulations do exist for aquatic weed control)."

[Again, these statements are simply false. D. Farmer indicated that no toxicity studies on formulations had been completed as of 2003, the suggestion that products were more toxic than glyphosate simply knowing the toxicity of the surfactant had not been proven. Moreover, often (see MSDS tables above) the formulation surfactant name and percent were not provided so this inference could not be made anyway. Also, from a toxicity standpoint, the synergies between all the formulary components could not be known. Finally, the statement that products with surfactants were not labeled for use near waters is not consistent with the New York State findings where they found advertising suggesting Roundup® could be used in waters despite what the MSDS may, or may not have said.]

➢    "Finally, regarding non-Hodgkin's lymphoma (NHL), there is simply no significant evidence to support a relationship to glyphosate."

[Again, the statement is simply false.  In 2016, the IARC results from 2015, stating glyphosate was a probable human carcinogen and was associated with causing NHL, was available.  While Monsanto may disagree with the finding, it is simply wrong to say there is no significant evidence.  A more accurate reporting would have been to acknowledge the IARC findings and state they disagreed with them.]

7.1.8  2017 – July 13th e-mail from Tim P. Ford to Randy Townsend – BWI Companies, Inc. Regarding Monsanto Information/Positions Regarding Glyphosate, IARC, and Prop 65 (Exhibit 197-S, Bates MONGLY07599872)

In a July 13, 2017 e-mail from Monsanto's Tim Ford, Jr. to BWI Companies, Inc.'s Randy Townsend he attached a Monsanto position statement on glyphosate, IARC, and Prop. 65.  The statement says in part:

"Does glyphosate cause cancer?  No.  No *regulatory agency* in the world has concluded that glyphosate is a carcinogen."

[This 2017 statement, while true, is misleading; while it may be true that no regulatory agency has concluded that glyphosate is a carcinogen, IARC under the World Health Organization did find it a probable human carcinogen in 2015.

**7.2    Review of Monsanto Roundup® MSDSs:**

A detailed downloading and review of Roundup® Material Safety Data Sheets from MSDS.com and discovery was completed.  Composition and warnings information, by product and date were completed and are summarized in Appendix B for the following products:

➢    Roundup® Biactive
➢    Roundup® Brush Killer Concentrate
➢    Roundup® Custom Herbicide
➢    Roundup® Dry Herbicide
➢    Roundup® Dry Pak Water Soluble Granule
➢    Roundup® Fast Act Foam RTU Herbicide
➢    Roundup® Fastforward Herbicide
➢    Roundup® GC
➢    Roundup® Herbicide
➢    Roundup® IPCO Herbicide
➢    Roundup® Max Control 365 Concentrated
➢    Roundup® MAX Original Herbicide
➢    Roundup® Non-Selective Herbicide Cone
➢    Roundup® Poison Ivy Brush Non-Select RTU Pull 'n Spray
➢    Roundup® Poison Ivy Tough Brush Killer 1 RTU
➢    Roundup® Poison Ivy Tough Brush Killer 2 RTU

- Roundup® Poison Ivy Tough Brush Killer 3
- Roundup® Poison Ivy Tough Brush Killer
- Roundup® Poison Ivy Tough Brush Killer Plus RTU
- Roundup® Power MAX II Herbicide
- Roundup® PRO Herbicide Concentrate
- Roundup® PRO Herbicide
- Roundup® PRODry Herbicide
- Roundup® ProMax Herbicide
- Roundup® Pull'n Spray
- Roundup® Pump 'n Go
- Roundup® QuickPro Herbicide
- Roundup® Quik Stik Grass Weed Killer
- Roundup® Ready Herbicide with Plant shield
- Roundup® Ready-to-Use Herbicide
- Roundup® Renew Herbicide
- Roundup® RT Herbicide
- Roundup® Super Concentrate Herbicide
- Roundup® Sure Shot Foam
- Roundup® Tab
- Roundup® Tough Weed Formula
- Roundup® Tran sorb HC Liquid Herbicide
- Roundup® Tree Stump Root Killer
- Roundup® Ultra 3000 EXTRA.CTED
- Roundup® Ultra Dty Herbicide
- Roundup® Ultra Herbicide
- Roundup® Ultra Max Herbicide
- Roundup® Ultra Max II Herbicide
- Roundup® Wand Applicator RTU
- Roundup® WeatherMAX Herbicide
- Roundup® Weed Grass Killer 1 Ready-to-Use
- Roundup® Weed Grass Killer Concentrate Plus
- Roundup® Weed Grass Killer Concentrated
- Roundup® Weed Grass Killer
- Roundup® Weed Grass Killer III
- Roundup® Weed Grass Killer LG
- Roundup® Weed Grass Killer FastAct Select RTU

➢     Roundup® Weed Grass Killer Plus Weed Prev. II

➢     Roundup® Weed Grass Killer Plus Weed Preventer

➢     Roundup® Weed Grass Killer Precision Gel

➢     Roundup® Weed Grass Killer Ready-to-Use Plus

➢     Roundup® Weed Grass Killer RTU

➢     Roundup® Weed Grass Killer Super Concentrate

➢     Roundup® Weedkiller Fast Action

➢     Roundup® Wild Black Plus Vine Brush Killer Conc.

➢     Roundup® WSD

➢     Roundup® Xtend Vaporgrip Technology

A detailed review of MSDSs for Roundup® Weed and Grass Killer Super Concentrate follows in Table 7-3:

## Table 7-3:  MSDSs for Roundup® Weed and Grass Killer Super Concentrate

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| ROUNDUP WEED & GRASS KILLER SUPER CONTCENTRATE | | | | | | | | | | |
| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | CONTROL / PPE | | |
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 04/16/1999 | Glyphosate, Isopropylamine Salt | 41 | 38641-94-0 | IMMEDIATE CONCERNS: Causes eye irritation. Avoid contact with eyes or clothing. Wash thoroughly with soap and water after handling.  Keep out of reach of children. | NG | This substance is not expected to cause skin irritation. If absorbed through the skin, this substance is considered practically non-toxic to internal organs.  This product is not expected to cause allergic skin reaction. | Overexposure to spray mist may result in minor irritation of the upper respiratory tract. | Ingestion may produce irritation of the digestive tract as demonstrated by signs and symptoms of mouth membrane irritation, nausea, vomiting and diarrhea. | Use this material only in well ventilated areas. | Although this product does not present a significant skin concern, minimize skin contamination by following good industrial practice. Wearing protective gloves is recommended. Wash hands and contaminated skin thoroughly after handling. | Avoid breathing vapor or mist.  This product is not likely to pose an airborne exposure concern when handled and used in accordance with label instructions. |
| 07/26/2000 | Glyphosate, Isopropylamine Salt | 50.2 | 38641-94-0 | IMMEDIATE CONCERNS: May cause eye irritation. Avoid contact with eyes or clothing. Wash thoroughly with soap and water after handling.  Keep out of reach of children. | NG | This substance is not expected to cause skin irritation. If absorbed through the skin, this substance is considered practically non-toxic to internal organs.  This product is not expected to cause allergic skin reaction. | Overexposure to spray mist may result in minor irritation of the upper respiratory tract. | Ingestion may produce irritation of the digestive tract as demonstrated by signs and symptoms of mouth membrane irritation, nausea, vomiting and diarrhea. | No special ventilation is necessary. | Although this product does not present a significant skin concern, minimize skin contamination by following good industrial practice. Wearing protective gloves is recommended. Wash hands and contaminated skin thoroughly after handling. | For Handling the Concentrated Product:  Avoid breathing vapor or mist.  This product concentrate is not likely to pose an airborne exposure concern during manufacture or packaging.  In the event of abnormal exposure conditions, use NIOSH approved equipment.  In work situations where an air purifying elements for protection against |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **MONSANTO ROUNDUP MSDS'** | | | | | | | | | | |
| | | | | | | | | | | organic vapor and dust/ mist approved for pesticides is recommended. Full facepiece replaces the need for chemical goggles.  Observe respirator use limitations specified by the manufacture's.  Respiratory protection programs must comply with 29 CFR 1910.134.  For use of Product in accordance with label instructions: Respirators are not required for use of this product in accordance with label instructions. |
| 10/31/2000 | Glyphosate, Isopropylamine Salt | 50.2 | 38641-94-0 | IMMEDIATE CONCERNS: Causes eye irritation. Avoid contact with eyes or clothing. Wash thoroughly with soap and water after handling.  Keep out of reach of children. | NG | This substance is not expected to cause skin irritation. If absorbed through the skin, this substance is considered practically non-toxic to internal organs.  This product is not expected to cause allergic skin reaction. | Overexposure to spray mist may result in minor irritation of the upper respiratory tract. | Ingestion may produce irritation of the digestive tract as demonstrated by signs and symptoms of mouth membrane irritation, nausea, vomiting and diarrhea. | No special ventilation is necessary. | Although this product does not present a significant skin concern, minimize skin contamination by following good industrial practice.  Wearing protective gloves is recommended.  Wash hands and contaminated skin thoroughly after handling. | For Handling the Concentrated Product:  Avoid breathing vapor or mist.  This product concentrate is not likely to pose an airborne exposure concern during manufacture or packaging.  In the event of abnormal exposure conditions, use NIOSH approved equipment.  In work situations where an air purifying elements for protection against organic vapor and dust/ mist approved for pesticides is |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | recommended. Full facepiece replaces the need for chemical goggles. Observe respirator use limitations specified by the manufacture's. Respiratory protection programs must comply with 29 CFR 1910.134. For use of Product in accordance with label instructions: Respirators are not required for use of this product in accordance with label instructions. |
| 01/23/2002 | Isopropylamine Salt of Glyphosate | 41 | 38641-94-0 | OSHA: Hazardous WARNING! Keep out of reach of children. Causes substantial but temporary eye injury. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | Have eye wash facilities immediately available at locations where eye contact can occur. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 59 | NG | | | | | | | | |
| 04/03/2003 | Isopropylamine Salt of Glyphosate | 50.2 | 38641-94-0 | OSHA: Hazardous CAUTION! Causes moderate eye irritation. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a |
| | Other Ingredients | 49.8 | NG | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | given application. |
| 10/16/2009 | Isopropylamine Salt of Glyphosate | 50.2 | 38641-94-0 | OSHA: Hazardous CAUTION! Causes moderate eye irritation. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 49.8 | NG | | | | | | | | |
| 08/26/2010 | Isopropylamine Salt of Glyphosate | 41 | 38641-94-0 | OSHA: Hazardous CAUTION! Causes eye irritation. Harmful if swallowed. | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 59 | NG | | | | | | | | |
| 12/15/2010 | Isopropylamine Salt of Glyphosate | 50.2 | 38641-94-0 | OSHA: Hazardous CAUTION! Causes moderate but temporary eye irritation. Causes skin irritation. Harmful if inhaled. | Skin contact, eye contact, inhalation. | May cause skin irritation. | Harmful by inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | No special requirement when used as recommended. If airborne exposure is excessive: Provide adequate ventilation to keep airborne concentration below exposure limits. | Wear chemical resistant gloves. If there is significant potential for contact: Wear face shield. Wear chemical resistant clothing/footwear. | If airborne exposure is excessive: Wear respirator. Full facepiece/ hood/ helmet respirator replaces need for chemical goggles. Respiratory protection programs must comply with all local/ regional/ national regulations.  When |
| | Other Ingredients | 49.8 | NG | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| 07/29/2013 | Isopropylamine Salt of Glyphosate | 41 | 38641-94-0 | OSHA:  Hazardous CAUTION!  Eye and skin irritant.  Causes eye irritation.  Causes skin irritation.  Harmful if swallowed. | Skin contact, eye contact, ingestion. | May cause skin irritation. | Harmful by inhalation. | Harmful if swallowed. | Provide local exhaust ventilation. | No special requirement when used as recommended. If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Surfactant | 14.5 | NG | | | | | | | | |
| | Water and minor formulating ingredients | 44.5 | NG | | | | | | | | |
| 05/08/2015 | Isopropylamine Salt of Glyphosate | 50.2 | 38641-94-0 | OSHA:  Acute toxicity, inhalation - Category 4 WARNING!  Harmful if inhaled. | Skin contact, eye contact, inhalation. | May cause skin irritation. | Harmful by inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | No special requirement when used as recommended. If airborne exposure is excessive: Provide adequate ventilation to keep airborne concentration below exposure limits. | Wear chemical resistant gloves. If there is significant potential for contact: Wear face shield. Wear chemical resistant clothing/footwear. | If airborne exposure is excessive: Wear respirator.  Full facepiece/ hood/ helmet respirator replaces need for chemical goggles.  Respiratory protection programs must comply with all local/ regional/ national regulations.  When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 49.8 | NG | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/15/2015 | Isopropylamine Salt of Glyphosate | 50.2 | 38641-94-0 | OSHA:  Acute toxicity, inhalation - Category 4  WARNING!  Harmful if inhaled. | Skin contact, eye contact, inhalation. | May cause skin irritation. | Harmful by inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | No special requirement when used as recommended.  If airborne exposure is excessive:  Provide adequate ventilation to keep airborne concentration below exposure limits. | Wear chemical resistant gloves.  If there is significant potential for contact: Wear face shield.  Wear chemical resistant clothing/footwear. | If airborne exposure is excessive: Wear respirator.  Full facepiece/ hood/ helmet respirator replaces need for chemical goggles.  Respiratory protection programs must comply with all local/ regional/ national regulations.   When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 49.8 | NG | | | | | | | | |
| | Monoethanola mine Salt of Glyphosate | 29.2 | 40465-76-7 | | | | | | | | |
| | Surfactant | ≤5 | 68478-96-6 | | | | | | | | |
| | Water and minor formulating ingredients | ≤51.3 | NG | | | | | | | | |

[These warnings would not have adequately warned about the inhalation or dermal hazards. Moreover, use of the terms such as "appropriate," "chemically resistant," "excessive," "prolonged," "minimize," "not likely," "protective," "repeated," "significant," and "special" are not defined, nor actionable. Moreover, the glove recommendation to "chemically resistant" gloves, clothing, or footwear provides no guidance on glove, clothing, or footwear products to use. No recommendations are provided regarding protecting other skin exposures. Moreover, how resistant is sufficiently resistant is not defined. Finally, the warning "if inhaled" cannot be practical as it would be likely inhalation would occur unless PPE were worn, so the recommendation is meaningless. What constitutes an excessive exposure is also not defined and would be nearly impossible for a residential customer or laborer to understand.]

The concept that MSDSs must contain language that is actionable by a user is both practical from a common sense point of view and by others historically. Mr. Mason, Manager, Compounding for Kelly Tire (Figures 7-13 and 7-14) illustrates this deficiency when requesting additional and actionable information in a September 30, 1971 memo to D.J. Shepherd (Goodyear – Akron) Manager, Product and Process Development "Control Procedures for Handling Materials Which May Have Toxicological Properties" questions how workers and managers are to deal with vague warning instructions when he notes:

"When looking over the "Special Handling Precautions" sheets issued by Goodyear's Medical Department, *it can be readily seen that many minor fundamental questions can be brought up which we should be able to answer with some degree of uniformity throughout the organization*. These questions are listed below:

1. *On what basis can we recommend that an individual avoid breathing dust if we do not recommend any protective equipment?*

2. *How can we recommend that a individual avoid prolonged or repeated skin contact with chemicals, and yet we do not recommend any type protective equipment-gloves or otherwise?   How long is prolonged, and how often is repeated contact?*

3. *When periodic medical surveillance is required, how often is periodic?*

4. *When instructed to wash thoroughly immediately after handling a particular material, is the end of the shift or the end of the days work "immediately" enough?*

5. *How much of the information listed on the Special handling Precautions sheet is to be made available to Labor and with what, if any, accompanying instructions?*

6. Does Goodyear have a program in the planning stage to list or point out certain handling precautions on factory formulations and compound booksheet, and if so, how soon will this program be presented to the domestic plants?

***These questions may seem elementary, but they represent the type of questions we will get from the individuals actually working the job.*** We would like to have some corporate guidance in how to answer them."



**Figure 7-13: Mason (Kelly Tire) memo to Shepherd (Goodyear) on Problems Interpreting Warnings**



**Figure 7-14: Mason (Kelly Tire) memo to Shepherd (Goodyear) on Problems Interpreting Warnings Cont.**

[It is clear that labeling and warnings information would not be actionable (quantified) using vague terminology as is pointed out by Mr. Mason.

As another example, an MSDS simply stating one must wear chemically resistant gloves is not adequate.  The manufacturer of the product is in the best position to know which glove material is best for protecting against dermal exposure for their product and should specify a glove type or types for the user.]

## 7.3    **Misleading Monsanto Roundup® Advertising Information:**

A review of Codes and Standards relevant to Roundup labeling and advertising follows.

### 7.3.1   Advertising Codes and Standards – A Review:

Multiple Codes and Standards exist for the proper content of advertisements regarding pesticides.  These include:

➢     U.S. EPA Label Review Manual – see Section 7-1 above.

➢     International Code of Conduct on the Distribution and Use of Pesticides – 1985 through 2015 versions.

➢     New York State Statutes on Advertising.

➢     Missouri State Statutes on Advertising.

The first of these was summarized in Section 7-1 above, the balance (along with a review of pertinent FAO Codes of Conduct) are briefly summarized below:

7.3.1.1        FAO International Code of Conduct on the Distribution and Use of Pesticides – 1985 to 2014 Versions and other FAO Standard of Care Documents)

The Food and Agriculture Organization (FAO) of the United Nations, as early as 1985, published a Standard called: "International Code of Conduct (CoC) on the Distribution and Use of Pesticides."  Excerpts from 1985 and 2002/2003 versions of these FAO CoC documents are contained below:

1985 FAO International Code of Conduct (CoC) on the Distribution and Use of Pesticides (Exhibit 519):

Key Standard of Care elements can be found within this version of the CoC:

➢     Section: 1:  Objectives of the Code:  Subsections 1.4, 1.5.3

➢     Section 3:  Pesticide Management: Subsection 3.4.4

➢     Section 4:   Testing of Pesticides (not active agent): Subsection 4.1 and 4.1.1, 4.1.4

➢     Section 5:  Reducing Health Hazards:  Subsection 5.2 and 5.2.2 and 5.2.3

➢     Section 8:  Distribution and Trade:  Sections 8.1 and 8.1.1, 8.1.2, 8.1.3 and 8.1.9

➢   Section 10:  Labelling, Packaging, Storage and Disposal:  Section 10.1

➢   Section 11 Advertising:   Subsection 11.1 and 11.1.1, 11.1.2, 11.1.5, 11.1.6, 11.1.7, 11.1.8, 11.1.9, 11.1.10, 11.1.12, 11.1.13, 11.1.15, 11.1.16 and 11.1.17

➢   Section 12:  Monitoring the Observance of the Code:  Subsection 12.3 and 12.4.

These sections and subsections are illustrated in Figures 7-15 to 7-22:

1.4 The entities which are addressed by this Code include: international organizations; governments of exporting and., importing countries; industry, including manufacturers, trade associations, formulators and distributors; users; and public sector organizations such as environmental groups, consumer groups, and trade unions.

1.5 The standards of conduct set forth by this Code:

1.5.1 encourage responsible and generally accepted trade practices;

1.5.2 assist countries which have not yet established controls designed to regulate the quality and suitability of pesticide products needed in that country and to address the safe handling and use of such products;

1.5.3 promote practices which encourage the safe and efficient use of pesticides including minimizing adverse effects on humans and the environment and preventing accidental poisoning from improper handling;

1.5.4 ensure that pesticides are used effectively for the improvement of agricultural production and of human, animal and plant health.

**Figure 7-15: 1985 Food and Agricultural Organization (FAO) Code of Conduct Distribution and Use of Pesticides – Section 1 and Subsection 1.5 - Objectives**

Note that the Standard of Conduct is "*promote practices which encourage the safe and efficient use of pesticides <u>including minimizing adverse effects on humans</u> and the environment and preventing accidental poisoning from improper handling.*"

3.4 Manufacturers and traders should observe the following practices in pesticide management, especially in countries without legislation and means of implementing regulations:

3.4.1 supply only pesticides of adequate quality, packaged and labelled as appropriate for each specific market;

3.4.2 pay special attention to formulations, presentation, packaging and labelling in order to reduce hazard to users, to the maximum extent possible consistent with the effective functioning of the pesticide in the particular circumstances in which it is to be used;

3.4.3 provide, with each package of pesticide, information and instructions in a form and language adequate to ensure safe and effective use;

3.4.4 retain an active interest in following their products to the ultimate consumer, keeping track of major uses and the occurrence of any problems arising in the actual use of their products as a basis for determining the need for changes in labelling, use directions, packaging, formulation or product availability.

**Figure 7-16: 1985 Food and Agricultural Organization (FAO) Code of Conduct Distribution and Use of Pesticides – Section 3 and Subsection 3.4 – Pesticide Management**

ARTICLE 4 - TESTING OF PESTICIDES

4.1 Pesticide manufacturers are expected to:

4.1.1 ensure that each pesticide and pesticide product is adequately and effectively tested by well recognized procedures and test methods so as to fully evaluate the safety, efficacy (13) and fate (14) with regard to the various anticipated conditions in regions or countries of use;

4.1.4 take care to see that the proposed use pattern, label claims and directions, packages, technical literature and advertising truly reflect the outcome of these scientific tests and assessments;

**Figure 7-17: 1985 Food and Agricultural Organization (FAO) Code of Conduct Distribution and Use of Pesticides – Section 4 and Subsections 4.1 – Testing of Pesticides**

5.2 Even where a control scheme is in operation industry should:

5.2.1 Cooperate in the periodic re-assessment of the pesticides which are marketed and in providing the poison control centres and other medical practicioners information about hazards;

5.2.2 make every reasonable effort to reduce hazard by:

5.2.2.1 making less toxic formulations available;

5.2.2.2 introducing products in ready-to-use packages and otherwise developing safer and more efficient methods of application;

5.2.2.3 using containers that are not attractive for subsequent reuse and promoting programmes to discourage their reuse;

5.2.2.4 using containers that are safe (e.g. not attractive to or easily opened by children), particularly for the more toxic home-use products;

5.2.2.5 the use of clear and concise labelling;

5.2.3 halt sale and recall products when safe use does not seem possible under any use directions or restrictions.

**Figure 7-18: 1985 Food and Agricultural Organization (FAO) Code of Conduct Distribution and Use of Pesticides – Section 5 and Subsections 5.2 and 5.3 – Reducing Health Hazards**

ARTICLE 8 - DISTRIBUTION AND TRADE

8.1 Industry should:

8.1.1 test all pesticide products to evaluate safety to human health and the environment prior to marketing as provided for in Article 4, and ensure that all pesticide products are likewise adequately tested for efficacy and stability and crop tolerance under procedures that will predict performance under the conditions prevailing in the region where the product is to be used, before they are offered there for sale;

8.1.2 submit the results of all such tests to the local responsible authority for independent evaluation and approval before the products enter trade channels in that country;

8.1.3 take all necessary steps to ensure that pesticides entering international trade conform to relevant FAO (6), WHO (12) or equivalent specifications for composition and quality (where such specifications have been developed) and to the principles embodied in pertinent FAO guidelines, and in rules and regulations on classification and packaging, marketing, labelling and documentation laid down by

international organizations concerned with the mode of transport (ICAO, IMO, RID and IATA in particular);

8.1.9 see that persons involved in the sale of any pesticide are trained adequately to ensure that they are capable of providing the buyer with advice on safe and efficient use;

**Figure 7-19: 1985 Food and Agricultural Organization (FAO) Code of Conduct Distribution and Use of Pesticides – Section 8 and Subsections 8.1 – Distribution and Trade**

ARTICLE 10 - LABELLING, PACKAGING, STORAGE AND DISPOSAL

10.1 All pesticide containers should be clearly labelled in accordance with applicable international guidelines, such as the FAO Guidelines on Good Labelling Practice (9).

**Figure 7-20: 1985 Food and Agricultural Organization (FAO) Code of Conduct Distribution and Use of Pesticides – Section 10 and Subsections 10.1 – Labeling, Packaging, Storage, and Disposal**

**ARTICLE 11 - ADVERTISING**

11.1 Industry should ensure that:

11.1.1 all statements used in advertising are capable of technical substantiation;

11.1.2 advertisements do not contain any statement or visual presentation which directly or by implication, omission, ambiguity or exaggerated claim is likely to mislead the buyer, in particular with regard to the safety of the product, its nature, composition, suitability for use, or official recognition or approval;

11.1.5 advertising does not encourage uses other than those specified on the approved label;

11.1.6 promotional material does not include use recommendations at variance with those of the recognized research and advisory agencies;

11.1.7 advertisements do not misuse research results or quotations from technical and scientific literature; and scientific jargon and irrelevancies are not used to make claims appear to have a scientific basis they do not possess;

11.1.8 claims as to safety, including statements such as safe", "non-poisonous", "harmless", "non-toxic", are not made, with or without a qualifying phrase such as "when used as directed";

11.1.9 statements comparing the safety of different products are not made;

11.1.10 misleading statements are not made concerning the effectiveness of the product;

11.1.12 advertisements do not contain any visual representation of potentially dangerous practices, such as mixing or application, without sufficient protective clothing; use near food; use by or near children;

11.1.13 advertising or promotional material draws attention to the appropriate warning phrases and symbols as laid down in the labelling guidelines (9);

11.1.14 technical literature provides adequate information on correct practices including the observance of recommended rates, frequency of and pre-harvest intervals;

11.1.15 false or misleading comparisons with other pesticides are not made;

11.1.16 all staff involved in sales promotion are adequately trained and possess sufficient technical knowledge to present complete, accurate and valid information on the products sold;

11.1.17 advertisements encourage purchasers and users to read the label carefully, or have the label read to them if they cannot read.

**Figure 7-21: 1985 Food and Agricultural Organization (FAO) Code of Conduct
Distribution and Use of Pesticides – Section 11 and
Subsections 11.1 – Advertising**

12.3 All parties addressed by this Code should observe this Code
and should promote the principles and ethics expressed by the
Code, irrespective of other party's ability to observe the Code.
The pesticide industry should cooperate fully in the observance
of the Code and promote the principles and ethics expressed by

the Code, irrespective of a government's ability to observe the
Code.

12.4 Independently of any measures taken with respect to the
observance of this Code, all relevant legal rules, whether
legislative, administrative, judicial or customary, dealing with
liability, consumer protection, conservation, pollution control,
and other related subjects, should be strictly applied.

**Figure 7-22: 1985 Food and Agricultural Organization (FAO) Code of Conduct
Distribution and Use of Pesticides – Section 12 and Subsections 12.3 and
12.4 – Monitoring the Observance of the Code**

2002/2003 FAO International Code of Conduct (CoC) on the Distribution and Use of
Pesticides (Exhibit 172, Bates MONGLY01922198, Exhibit 520, Exhibit 533, and Exhibit
538):

Key Standard of Care elements can be found in the following elements contained in this
version of the CoC:

➢ Section 1:  Objectives of the Code:  Subsections 1.5 and 1.7

➢ Secton 3:  Pesticide Management:  Subsection 3.4.4

➢ Section 4:  Testing of Pesticides (not active agent):  Subsection 4.1 and 4.1.1,
4.1.4

➢ Section 5:  Reducing Health Hazards and Environmental Risks:  Subsection 5.2
and 5.2.5

➢ Section 8:  Distribution and Trade:  Sections 8.1 and 8.1.1, 8.1.2 and 8.1.3 and
8.2.7

➢ Section 11:  Advertising:  Subsection 11.2 and 11.2.1, 11.2.2, 11.1.5, 11.1.6,
11.1.7, 11.1.9, 11.1.10, 11.1.12, 11.1.13, 11.1.15, 11.1.16 and 11.1.17

➢ Section 12:  Monitoring the Observance of the Code: Subsection 12.3 and 12.4.

Chapter 11 of the Code (2003 Version) is entitled "Advertising" and is reproduced with
highlights in Figures 7-23 and 7-24:

## Article 11.  Advertising

**11.1**    Governments should control, by means of legislation, the advertising of pesticides in all media to ensure that it is not in conflict with label directions and precautions, particularly those relating to proper maintenance and use of application equipment, appropriate personal protective equipment, special precautions for children and pregnant women or the dangers of reusing containers.

**11.2**    Pesticide industry should ensure that:

    **11.2.1**    all statements used in advertising are technically justified;

    **11.2.2**    advertisements do not contain any statement or visual presentation which, directly or by implication, omission, ambiguity or exaggerated claim, is likely to mislead the buyer, in particular with regard to the "safety" of the product, its nature, composition or suitability for use, official recognition or approval;

    **11.2.3**    pesticides which are legally restricted to use by trained or registered operators are not publicly advertised through journals other than those catering for such operators, unless the restricted availability is clearly and prominently shown;

    **11.2.4**    no company or individual in any one country simultaneously markets different pesticide active ingredients or combinations of ingredients under a single brand name;

    **11.2.5**    advertising does not encourage uses other than those specified on the approved label;

    **11.2.6**    promotional material does not include recommendations at variance with those of the recognized research and advisory agencies;

    **11.2.7**    advertisements do not misuse research results, quotations from technical and scientific literature or scientific jargon to make claims appear to have a scientific basis they do not possess;

    **11.2.8**    claims as to safety, including statements such as "safe", "non-poisonous", "harmless", "non-toxic" or "compatible with IPM," are not made without a qualifying phrase such as "when used as directed". *[However, reference to use within specified IPM programmes may be included if validated by the regulating authority and the claim qualified accordingly];*

    **11.2.9**    statements comparing the risk, hazard or "safety" of different pesticides or other substances are not made;

    **11.2.10**    misleading statements are not made concerning the effectiveness of the product;

**Figure 7-23: 2003 Food and Agricultural Organization (FAO) Code of Conduct Distribution and Use of Pesticides – Section 11**

11.2.11  no guarantees or implied guarantees, such as "more profits with..." or "guarantees high yields," are given unless definite evidence to substantiate such claims is available;

11.2.12  advertisements do not contain any visual representation of potentially dangerous practices, such as mixing or application without sufficient protective clothing, use near food or use by or in the vicinity of children;

11.2.13  advertising or promotional material draws attention to the appropriate warning phrases and symbols as laid down in the FAO labelling guidelines (3);

11.2.14  technical literature provides adequate information on correct practices, including the observance of recommended application rates, frequency of applications and pre-harvest intervals;

11.2.15  false or misleading comparisons with other pesticides are not made;

11.2.16  all staff involved in sales promotion are adequately trained and possess sufficient technical knowledge to present complete, accurate and valid information on the products sold;

11.2.17  advertisements encourage purchasers and users to read the label carefully, or have the label read to them if they cannot read;

11.2.18  advertisements and promotional activities should not include inappropriate incentives or gifts to encourage the purchase of pesticides.

11.3  International organizations and public sector groups should call attention to departures from this Article.

**Figure 7-24: Food and Agricultural Organization Code – Chapter 11 – cont.**

For purposes of advertising, sections 11.2.1, 11.2.2, 11.2.9, and 11.2.12 of the 2002 CoC are key provisions:

11.2   Pesticide industry should ensure that:

11.2.1   *all statements* used in advertising *are technically justified*;

11.2.2   *advertisements do not contain any statement or visual presentation which, directly or by implication, omission, ambiguity or exaggerated claim, is likely to mislead the buyer, in particular with regard to the "safety" of the product,* its nature, composition or suitability for use, official recognition or approval;

11.2.9   *statements comparing the risk, hazard or "safety" of* different pesticides or *other substances are not made*;

11.2.12   *advertisements do not contain any visual representation of potentially dangerous practices*, such as mixing or application without sufficient protective clothing, use near food or use by or in the vicinity of children.

The 2014 version of this CoC contains similar language to that of the 2002/2003 version of this CoC (see http://www.fao.org/fileadmin/templates/agphome/documents/Pests_Pesticides/Code/Code_ENG_2017updated.pdf).

Other FAO Standard of Care Codes of Conduct that apply are to Monsanto's Standard of Care are:

➢ Guidelines on Good Labeling Practice for Pesticides - 1995 (e.g., Sections 1; Section 2 - 2.1 and 2.2; Section 3 - 3.1, 3.2, 3.3, 3.4 and 3.5; Section 4 - 4.2; Appendix A-3.1 and A-5) and 2015 (e.g., Sections 1 - 1.3, 1.5, 1.6. 1.7; Section 3 - 3.1, 3.2 and Section 4: - 4.13) (Exhibit 534 and Exhibit 527; see also Exhibit 521).

➢ Guidelines for The Registration and Control of Pesticides - 1985 (e.g., Section 8 - 8.3 and Section 9 (Exhibit 541).

➢ Guidelines for Legislation on the Control of Pesticides - 1989 (Exhibit 521).

➢ Guidelines on Highly Hazardous Pesticides - 2016 (Exhibit 523).

➢ Pesticide Labeling Legislation - 1988 (e.g., Secton 2 - 2.1, 2.2., 2.3, 2.4, 2.5; pgs. 117-123) (Exhibit 542).

Monsanto's Paul Shelton, in a February 6, 2006 presentation entitled FAO Code of Conduct, reviewed the updated (2002/2003) FAO International Code of Conduct (CoC) on the Distribution and Use of Pesticides (Exhibit 522) including key "Monsanto Opportunity Areas" under sections 3, 5, 10, 11, and 12. He also notes that Monsanto is "Active on FAO Code implementation with CropLife" (Exhibit 522, pg. 32).

He gave an updated version of this presentation in December 2006 (Exhibits 535 and 536; see also Exhibit 544 – Bates MONGLY02091031, Exhibit 543 – Bates MONGLY02091028, Exhibit 547 – Bates MONGLY02894819 and Exhibit 553-10 – see also Exhibit 553-12 and 553-15) noting on pg. 3 that Monsanto would comply with the code based on membership in CropLife and that Hugh Grant – CEO, has signed an original agreement to this effect (Figure 7-25):



**Figure 7-25: Monsanto Stewardship Position and Adoption of FAO CoC (Exhibit 536, pg. 3)**

CropLife, International, a trade group that includes companies such as Monsanto, states in their October 2011 publication (Exhibit 292, pg.52) that: "*CropLife International, its member associations and leading companies support implementation of the Code (i.e., International Code of Conduct), and adherence to it is a condition of membership to*

*CropLife (see Appendix 3 for similar 2011 code language regarding Advertising, Pesticide Management and Labels).*

Monsanto's Chemical Stewardship Working Group (CSWG), in minutes from a February 14, 2007 meeting of the group (Exhibit 530 and 553-11) also committed to implementing FAO e-training modules.

Finally, Graneto and Heydens, in an October 2015 presentation (Exhibit 524) outlined their commitment to Product Stewardship – "Doing the Right Thing" and subscribing to the FAO Code of Conduct on the Distribution and Use of Pesticides (Figure 7-26):



**Figure 7-26: Monsanto Stewardship Position and Adoption of FAO CoC (Exhibit 524, pg. 60)**

7.3.1.2          State of New York General Business Law Statute §350 and the Executive Law §63 (12) & (15):

New York statutes covering false advertising fall under the General Business Law §350 and the Executive Law §63; these are reproduced below:

2013 New York Consolidated Laws - GBS - General Business
Article 22-A - (349 - 350-F-1)
CONSUMER PROTECTION FROM DECEPTIVE ACTS AND PRACTICES

Section §350. False advertising unlawful. ***False advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in this state is hereby declared unlawful.***

New York Consolidated Laws, Executive Law - EXC § 63. General duties –
Sections 12 and 15

The attorney-general shall:

12.     *Whenever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business, the attorney general may apply, in the name of the people of the state of New York, to the supreme court of the state of New York, on notice of five days, for an order enjoining the continuance of such business activity or of any fraudulent or illegal acts, directing restitution and damages* and, in an appropriate case, cancelling any certificate filed under and by virtue of the provisions of section four hundred forty of the former penal law  or section one hundred thirty of the general business law, and the court may award the relief applied for or so much thereof as it may deem proper.  The word "fraud" or "fraudulent" as used herein shall include any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions.  The term "persistent fraud" or "illegality" as used herein shall include continuance or carrying on of any fraudulent or illegal act or conduct.  The term "repeated" as used herein shall include repetition of any separate and distinct fraudulent or illegal act, or conduct which affects more than one person.  Notwithstanding any law to the contrary, all monies recovered or obtained under this subdivision by a state agency or state official or employee acting in their official capacity shall be subject to subdivision eleven of section four of the state finance law.

In connection with any such application, the attorney general is authorized to take proof and make a determination of the relevant facts and to issue subpoenas in accordance with the civil practice law and rules.  Such authorization shall not abate or terminate by reason of any action or proceeding brought by the attorney general under this section.

15.   *In any case where the attorney general has authority to institute a civil action or proceeding in connection with the enforcement of a law of this state, in lieu thereof he may accept an assurance of discontinuance of any act or practice in violation of such law from any person engaged or who has engaged in such act or practice.*  Such assurance may include a stipulation for the voluntary payment by the alleged violator of the reasonable costs and disbursements incurred by the attorney general during the course of his investigation.  Evidence of a violation of such assurance shall constitute prima facie proof of violation of the applicable law in any civil action or proceeding thereafter commenced by the attorney general.

### 7.3.1.3      State of Missouri Title XXVI Trade and Commerce – Chapter 407:

Title XXVI TRADE AND COMMERCE
Chapter 407

407.020.   *Unlawful practices*, penalty — exceptions. —

1.      ***The act, use*** or employment ***by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce*** or the solicitation of any funds for any charitable purpose, as defined in section 407.453, in or from the state of Missouri, ***is declared to be an unlawful practice. The use by any person, in connection with the sale or advertisement of any merchandise in trade or commerce*** or the solicitation of any funds for any charitable purpose, as defined in section 407.453, ***in or from the state of Missouri*** of the fact that the attorney general has approved any filing required by this chapter as the approval, sanction or endorsement of any activity, project or action of such person, ***is declared to be an unlawful practice***.  ***Any act, use or employment declared unlawful by this***

*subsection violates this subsection <u>whether committed before, during or after the sale</u>, advertisement or solicitation.*

2.      Nothing contained in this section shall apply to:

(1)     The owner or publisher of any newspaper, magazine, publication or printed matter wherein such advertisement appears, or the owner or operator of a radio or television station which disseminates such advertisement when the owner, publisher or operator has no knowledge of the intent, design or purpose of the advertiser; or

(2)     Any institution, company, or entity that is subject to chartering, licensing, or regulation by the director of the department of insurance, financial institutions and professional registration under chapter 354 or chapters 374 to 385, the director of the division of credit unions under chapter 370, or director of the division of finance under chapters 361 to 369, or chapter 371, unless such directors specifically authorize the attorney general to implement the powers of this chapter or such powers are provided to either the attorney general or a private citizen by statute.

(3)     Any person who willfully and knowingly engages in any act, use, employment or practice declared to be unlawful by this section with the intent to defraud shall be guilty of a class E felony.

(4)     It shall be the duty of each prosecuting attorney and circuit attorney in their respective jurisdictions to commence any criminal actions under this section, and the attorney general shall have concurrent original jurisdiction to commence such criminal actions throughout the state where such violations have occurred.

(5)     It shall be an unlawful practice for any long-term care facility, as defined in section 192.2300, except a facility which is a residential care facility or an assisted living facility, as defined in section 198.006, which makes, either orally or in writing, representation to residents, prospective residents, their families or representatives regarding the quality of care provided, or systems or methods utilized for assurance or maintenance of standards of care to refuse to provide copies of documents which reflect the facility's evaluation of the quality of care, except that the facility may remove information that would allow identification of any resident.  If the facility is requested to provide any copies, a reasonable amount, as established by departmental rule, may be charged.

(6)     Any long-term care facility, as defined in section 192.2300, which commits an unlawful practice under this section shall be liable for damages in a civil action of up to one thousand dollars for each violation, and attorney's fees and costs incurred by a prevailing plaintiff, as allowed by the circuit court.

None of the exceptions appear to apply to the Missouri 407.020 (1).

### 7.3.2  Advertising – A Review:

On May 17, 2016, Monsanto's Dan Schulz and Julio Negeli e-mailed that Roundup® advertising was headed by Brighton as the head agency and HLK for digital media (Exhibit 195); which agencies were used prior to this time is unknown.

Examples of misleading Monsanto Roundup® product advertising is presented below:

7.3.2.1      *1988, July through October – U.S. EPA – Monsanto Iowa Advertisement*
             *Showing   Workers   Federal   PPE   Requirements   (Exhibit   161,*
             *MONGLY00223580-1):*

Beginning in July 1988, U.S. EPA's Edwin Tinsworth, Director Registration Division
Office of Petroleum Programs writes to Dr. Timothy Long, EPA's Roundup® Registration
Manager in July 1988 that Iowa Roundup® advertising show applicators wearing gym
shoes, short sleeve shirts, and long pants – a caller wondered about the safety of
applicators.  Mr. Tinsworth reminds Dr. Long that EPA has not agreed that Monsanto is
exempt from Worker Safety Rules requiring certain PPE for protecting skin exposures
(see Figures 7-27 and 7-28):



**Figure 7-27: U.S. EPA's July 1988 Letter from Mr. Tinsworth to Monsanto's**
**Dr. Long – Worker Rules Still Apply to Monsanto's Roundup®**
**(Exhibit 181, Bates MONGLY00223580)**

In a May 1988 letter to you, the Agency stated that it would defer the label requirements for Worker Safety Rules for eye and skin protection until a planned PR notice on personal protective equipment had gone into effect. The Agency also stated that "we feel that you should begin a investigation of the high number of eye and/or skin injuries associated with glyphosate use in California."

At no time, however, were the label requirements modified or waived. This deferral does not imply that it is safe to use products containing glyphosate without protective equipment. The California Department of Food and Agriculture reported that glyphosate ranked third in the number of illnesses reported from exposure to pesticides. The majority of these illness were skin and eye irritations occurring during mixing, loading and application of glyphosate.

We are concerned that advertisements for Roundup (running through July in Iowa and perhaps other soybean growing areas) show the product being applied in a manner inconsistent with protective clothing requirements. In addition to our specific concerns with the safe use of Roundup, we believe that any advertisement for a pesticide should depict usage that minimizes unnecessary skin and eye exposure.

We feel that these advertisements are inappropriate, and we request that you cease running these spots, or that they be suitably modified. Please look into this matter immediately and contact us.

Sincerely,

Edwin Tinsworth, Director
Registration Division
Office of Pesticides Programs

cc: David McLaughlin C2NC
    Advertising Manager for Roundup
    Monsanto

**Figure 7-28: U.S. EPA's July 1988 Letter from Mr. Tinsworth to Monsanto's Dr. Long – Worker Rules Still Apply to Monsanto's Roundup® - cont. (Exhibit 181, Bates MONGLY00223581)**

Also, Mr. David McLaughlin, Advertising Manager for Roundup® was copied on the letter.

Yet on/about September 11, 1988 Monsanto through Osbuorn & Barr Communications (Exhibit 262, Bates MONGLY07461378) advertises that for Roundup Ultra has the following "additional benefits":

➢   "Minimal worker safety, Personal Protective Equipment (PPE) requirements," and

➢   "Caution label, the least precautionary signal word."

In September 1988 U.S. EPA's Gerald B. Stubs (Acting Director – Compliance Division) writes Monsanto's Kevin Cannon regarding the need to show appropriate PPE in their advertising (Figure 7-6) and in October 1988 the U.S. EPA's Edwin F. Tinsworth (Acting Director, Registration Division) again writes Monsanto's Dr. Long addressing any past potential misunderstanding on Monsanto's need to follow the Worker Protection Rules (Figures 7-29 through 7-30):



**Figure 7-29: U.S. EPA's September 1988 Letter to Monsanto – Advertisement PPE Not for Monsanto's Roundup® Applicators Not Appropriate (Exhibit 181, Bates MONGLY00223579)**

The U.S. EPA is directing Monsanto to cease false advertising regarding dermal protection and revise advertising to be consistent with required dermal (skin) protection.



RECEIVED OCT 3 1 1988

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
WASHINGTON, D.C. 20460

OCT 27 1988

OFFICE OF
PESTICIDES AND TOXIC SUBSTANCES

Dr. Timothy J. Long
Monsanto Company
1101 17th Street NW.
Washington, DC  20036

Dear Dr. Long:

Subject:  Glyphosate Products – Request for Postponement
          of Additional Requirements for Protective Clothing

    In reply to your letter of August 3, 1988, your assurance
that future advertisements for glyphosate products will be
consistent with the protective clothing requirements set forth
in the proposed rule on Worker Protection Standards alleviates
our concerns pertaining to the television advertisement for
"Round-Up."  Thank you for your assistance in resolving this
issue.

    I have reviewed all correspondence related to the issue
of protective clothing for your glyphosate products.  It
appears that there has been a misunderstanding as to the
protective clothing requirements necessary for these products.

    The Glyphosate Registration Standard (issued August 11,
1986) required that worker protection language appear on all
glyphosate-formulated products labeled for agricultural or
aquatic uses.  The Standard required that specific protec-
tive clothing be worn to "reduce the risk of injury to skin."

    In your letters dated September 30, October 20, November 2,
1987 and March 22, 1988, the Monsanto position on this issue
was presented to the Agency.  Monsanto Company also requested
(letter of October 20, 1987) deferral of parts of the worker
saftey label requirements for "chemical-resistant apron,
chemical-resistant shoes and shoe coverings or boots" since
these items are only requirements for Toxicity Category I
and II pesticides (the glyphosate toxicity categories are III
and IV).

**Figure 7-30: U.S. EPA's October 27, 1988 Letter to Monsanto –
Worker Rules Still Apply to Monsanto's Roundup®
(Exhibit 181, Bates MONGLY00223577)**

–2–

    On May 13, 1988, the Agency responded to Monsanto
Company's original request to defer the requirement for
protective clothing until the "Worker Safety Rules" were
implemented.  The use of the term "protective clothing"
is not specific.  The Agency's only deferral was for your
original request for postponement of the requirements for
"chemical-resistant apron, chemical-resistant shoes and shoe
covering or boots."  Therefore, the following worker safety
language "Wear goggles or a face shield, chemical-resistant
gloves and chemical resistant shoes, shoe covers or boots
. . ." required by the Standard is modified to read "Wear
goggles or a face shield . . . ."

    To correct this situation, contact the Product Manager
for glyphosate (Robert J. Taylor, PM 25 )703[ 557-1800) and
arrange a meeting to review your present labeling to ensure
that the labels are in compliance with Agency requirements.

    For your information the proposed rule, when finalized,
on Worker Protection Standards will take precedence over the
Registration Standard.

    In relation to the requirement to investigate ". . . the
high number of eye and/or skin injuries associated with gly-
phosate use in California," we will comment on this issue after
the review and evaluation of your findings submitted in reply
to the Glyphosate Registration Standard.  This review will be
completed within a month from the date of this letter.

Sincerely,

Edwin F. Tinsworth, Acting Director
Registration Division

**Figure 7-31: U.S. EPA's October 27, 1988 Letter to Monsanto –
Worker Rules Still Apply to Monsanto's Roundup® - cont.
(Exhibit 181, Bates MONGLY00223578)**

7.3.2.2       *1991* – Roundup® *Grass & Weed Killer Advertisement (Petty Video 3):*

In this 1991 video, the user is shown spraying Roundup® Ready-to-Use Grass & Weed Killer with no dermal protection of the hands or eyes; clips of this video are shown in Figure 7-32:



**Figure 7-32: 1991 Monsanto Roundup® Product Advertisement – No Chemical Resistant Gloves or Eye Protection (Petty Video 3)**

7.3.2.3       *1992 - April – U.S. EPA – Monsanto's Misleading Claims (Exhibit 181, Bates MONGLY00223572):*

In April of 1992, U.S. EPA's Leo J. Alderman, Chief, Toxics and Pesticides Branch Air and Toxics Division sent a certified letter to Monsanto's Agricultural Products Division asking them to cease and desist making false advertising claims (Figure 7-33).

P1.3024.3



UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

APR 0 7 1992

REGION VII
726 MINNESOTA AVENUE
KANSAS CITY, KANSAS 66101

APR 0 1 1992

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Monsanto Co., Agricultural Products
Mail Zone C2NJ
800 N. Lindbergh
St. Louis, Missouri  63166

Gentlemen:

    In connection with the enforcement of the Federal
Insecticide, Fungicide, and Rodenticide Act (FIFRA), as amended,
we have reviewed copies of advertising literature pertaining to
your distribution of the pesticide product ROUNDUP.

    This literature makes claims considered misleading regarding
the aforementioned product, such as, "Roundup doesn't stay in the
soil, won't leach to nearby plants and breaks down into natural
substances...Nothing kills weeds better, or easier, than
Roundup...Easy-to-use...Biodegradable."  Statements such as these
were never accepted in connection with the registration of the
product.  Use of these statements in connection with the
marketing of the product would constitute a violation of the
FIFRA.  Therefore, such statements should be removed from all
literature advertising the product or data submitted to support
them.

    We are requesting that you review all pesticide advertising
literature for misleading claims.  We are also requesting that
you cease distribution of ROUNDUP advertising material until all
misleading claims have been deleted, and that you send us copies
of the revised advertising material within thirty (30) days from
receipt of this letter.

    This letter does not preclude us from taking enforcement
action in this matter.

    You may contact Pamela Johnson, of my staff, at (913)
551-7480 if you have any questions regarding this letter.

                              Sincerely,

                              Leo J. Alderman, Chief
                              Toxics and Pesticides Branch
                              Air and Toxics Division

**Figure 7-33: U.S. EPA's April Letter from Mr. Alderman to Monsanto Regarding
False Advertising of Monsanto's Roundup® Product
(Exhibit 181, Bates MONGLY00223572)**

As shown in Figure 7-33, Mr. Alderman writes in part:

"*This literature makes claims considered misleading regarding the
aforementioned product, such as, "Roundup doesn't stay in the soil, won't
leach to nearby plants and breaks down into natural substances... Nothing
kills weeds better, or easier, than Roundup...Easy-to-use... Biodegradable*."
*Statements such as these were never accepted in connection with the
registration of the product.  Use of these statements in connection with the
marketing of the product would constitute a violation of the FIFRA.*

> *Therefore, such statements should be removed from all literature advertising the product or data submitted to support them.*
>
> *We are requesting that you review all pesticide advertising literature for misleading claims.  We are also requesting that you cease distribution of ROUNDUP advertising material until all misleading claims have been deleted, and that you send us copies of the revised advertising material within thirty (30) days from receipt of this letter.*

The U.S. EPA considered Monsanto's Roundup® advertising regarding the biodegradability to be a false claim and a violation of FIFRA and asked them to cease and desist from making such claims.

Yet Monsanto continued to make such claims years later (see for example Exhibit 271 – 2016 presentation by Monsanto's Steven Gould, pg. 31 – "Binds tightly to soil making it unlikely to move to groundwater, and it also has no soil residual activity, so it won't be taken up by the roots of non-target plants.")

7.3.2.4      *1996 – State of New York – Office of the Attorney General - NYAG (Exhibit 52, pgs. 123-124, Exhibit 196-DD, Exhibit 554-25, Exhibit 554-40 and http://big.assets.huffingtonpost.com/ fraud.pdf for a copy of the New York State Agreement with Monsanto in this case; see also Exhibit 196-C):*

"*In 1996, complaints filed with the Consumer Frauds and Protection Bureau of New York had compelled the company to negotiate a settlement with the State Attorney General, who had opened an investigation of 'false advertising by Monsanto regarding the safety of Roundup herbicide (glyphosate)'.  In a very detailed statement of findings, the bureau reviewed the numerous Monsanto newspaper and television ads, including 'Glyphosate is less toxic to rates than table salt following acute oral ingestion' and 'Roundup can be used where kids and pets'll play and breaks down to natural material'.  This was 'false and misleading advertising,' the attorney general found.*

Specifically among the representations that NYAG found deceptive and misleading about the human and environmental safety of glyphosate and/or Roundup® were the following:

a)      "*Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences.*" – Exhibit 554-25, e.g., MONGLY Y09272463, 480.

b)      "*And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.*" – Exhibit 554-25, e.g., MONGLY Y09272463, 482.

c)      "*Roundup biodegrades into naturally occurring elements.*" - Exhibit 554-25, e.g., MONGLY Y09272463, 484

d)	"*Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.*" – Exhibit 554-25, e.g., MONGLY Y09272463, 487.

e)	"This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it." – Exhibit 554-25, e.g., MONGLY Y09272463, 490.

f)	"*You can apply Accord with 'confidence because it will stay where you put it' it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.*" – Exhibit 554-25, e.g., MONGLY Y09272463, 492.

g)	"*Glyphosate is less toxic to rats than table salt following acute oral ingestion.*" – Exhibit 554-25, e.g., MONGLY Y09272464, 494.

h)	"Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it." – Exhibit 554-25, e.g., MONGLY Y09272464, 496.

i)	"*You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic'* as it pertains to mammals, birds and fish." – Exhibit 554-25, e.g., MONGLY Y09272464, 498.

j)	"*Roundup can be used where kids and pets will play and breaks down into natural material.*"  This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup. – Exhibit 554-25, e.g., MONGLY Y09272464, 500.

Also the NYAG found Monsanto's Roundup® advertising said or implied the following:

a)	"Monsanto's *glyphosate-containing pesticide products and the components thereof are safe and will not cause <u>any</u> harmful effects to <u>people or the environment</u>*."

b)	"Monsanto's ***<u>glyphosate-containing pesticide products and the components thereof are safe because they will quickly break down into natural substances</u>***."

c)	"Monsanto's *glyphosate-containing pesticide products and the components thereof stay where they are applied and will not move through the environment by any means*."

d)	"Monsanto's *glyphosate-containing pesticide products and the components thereof are good for the environment*."

e)	"Monsanto's *glyphosate-containing pesticide products and the components thereof <u>are less toxic than certain common household products.</u>*"

f)	"*The characterization of Monsanto's glyphosate-containing pesticide products and the components thereof as practically non-toxic implies broad application to all potential toxic effects (acute and chronic)*."

g)	"***<u>The characteristics of Monsanto's glyphosate-containing pesticide products can be adequately described by the characteristics of glyphosate alone</u>***."

The New York attorney general concluded that these two sets of statements **constitute false and misleading advertising.**

[Also, these Monsanto Roundup® claims clearly do not meet the EPA labeling manual requirements.]

On/around November 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "***to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that***:

a)    its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b)    its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

c)    its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d)    its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e)    glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f)    its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

Monsanto was also agreed to pay a $75,000 fine for suggesting in an advertisement featuring a California horticulturist that the "herbicide could be sprayed in and around water" because it was known for its good environmental characteristics. *The New York Attorney General barred Monsanto, under penalty of fine, from declaring its herbicide was 'safe, nontoxic, harmless or free from risk'.*  Monsanto's reaction to this was to describe the incident as a "black eye" but just a state regulatory issue (Exhibit 274).

Monsanto's Donna Farmer's later responses to these false claims, when explaining them to Gary Winston of the State of Illinois, after he writes her on November 9, 2004 (Exhibit 198-J. Bates MONGLY01908632-3) follows:

> "Dear Donna:
>
> I need your advise [sic] once again.  One of the "experts" on the other side wrote in his statement, "***At the beginning, Monsanto declared its product to be without any concerns for the environment***.  ***Now this claim has been withdrawn due to two agreements with law enforcement agencies, making Monsanto pay (a) huge sum of money because of false and misleading advertisement."***  He cites the Journal of Pesticide Reform, which I know is a publication of the Northwest Coalition of Alternatives to Pesticides, to the best of my knowledge an activist group.  ***What really happened in this instance?***"

Dr. Farmer writes back as follows:

> "Gary:
>
> I have attached for you:
>
> 1- *a backgrounder and a Q and A – **our marketing people, like most marketing people like simple catchy phrases**.  **The New York Attorney General took exception to these phrases.***

2 – JPR/NCAP backgrounder, the glyphosate "factsheet" by NCAP and two third party evaluation of the NCAP factsheet – Dost and Nove AE news."

[The phrases used by Dr. Farmer: *"**our marketing people, like most marketing people like simple catchy phrases**.   **The New York Attorney General took exception to these phrases**"* seem dismissive of the Attorney General's findings given that the advertisements were found to be misleading/fraudulent and the decision required Monsanto to pay a fine and sign a cease and desist order.]

Moreover, the backgrounder and the Q&A sent to this State of Illinois official contain misleading/fraudulent statements as outlined below.

Later, in an internal e-mail dated July 25, 2006, Farmer admits they are not in compliance with the FAO CoC regarding their advertising of Roundup products (Figure 7-34):



**Figure 7-34: July 25, 2006 e-mail from D. Farmer to Michael Hilton (Exhibit 540, Bates MONGLY01922198)**

### 7.3.2.5          *1998 – September Advertising Literature for Roundup® Ultra:*

In print Q & A literature dated September 3, 1998 (fax from Osborn & Barr Communications) for Roundup® Ultra (Exhibit 183, Bates MONGLY07461374-7461377) entitled "Take Advantage of the New Lower Price of Roundup Ultra, Selling More Roundup Ultra and Answering your Customer Needs," the following claims are made:

> "Q:     I use Gramoxone to kill weeds in fallowbeds.  Should I consider Roundup Ultra?
>
> A.      …***Minimal* work(er) *safety, Personal Protection Equipment (*PPE*), requirements.***
>
>          ***Caution label, the least precautionary signal word***."

[The first statement regarding "minimal PPE requirements" is very misleading; the minimal PPE requirements could be **no PPE**. The second statement is also misleading; the "CAUTION" label is for U.S. EPA Class III pesticides; but Class IV substances are less hazardous and require **no signal word**. Moreover, in both cases, it is not allowed to make safety comparisons between two different products.]

7.3.2.6      _1998 – Just the Facts - Roundup® Original Herbicide vs Zeneca's Sulfosate Product:_

In print Q & A literature dated 1998 and entitled "Just the Facts….Roundup Original Herbicide vs Zeneca's Sulfosate Product for Roundup® Original", the following statement is made under the title "Roundup Original has more Convenient Handling and Use Requirement" (Bates MONGLY07454721):

> "For Starters, **_the label of Zeneca's Product requires applicators to wear waterproof gloves, while the Roundup Original label does not._**"

This statement implies that Monsanto is fully aware, and considers the wearing of PPE such as waterproof gloves, to be less convenient than wearing of such PPE.

7.3.2.7      _1999 – February Advertising Literature for Roundup® Ultra:_

On a the cover page for promotional material for Roundup® Ultra (Exhibit 265, Bates MONGLY07454773) entitled "If you like the weed control Roundup Ultra gives you before planting…" the cover page clearly shows an individual with a bare hand (see thumbnail showing – Figure 7-35) implying no gloves are needed when using the product:



**Figure 7-35: Monsanto Roundup® Ultra Promotional Material – No Gloves (Exhibit 265, Bates MONGLY07454773)**

7.3.2.8        *2000 - Criminal court in Lyon, France:*

Rubin (Exhibit 54, pg. 70 – see also http://news.bbc.co.uk/2/hi/europe/ 8308903.stm and Exhibit 198-L) quotes Monsanto's advertisement regarding the safety of Roundup® as follows:

> "***Glyphosate is less toxic to rats than table salt following acute oral ingestion.***"
>
> *From March 20, 2000 to May 28, 2000 Monsanto broadcasts an ad in France 381 times showing "this lighthearted ad showing a dog happily spraying Roundup on weeds in the middle of a lawn and then digging up the bone it had buried in the very spot where the herbicide had shriveled the roots of weeds. Rex's enthusiastic bark suggest that the dog will gnaw on that bone with complete assurance because Roundup is completely harmless."*

Elements of this add are reproduced as Figures 7-36 to 7-38 (https://www.youtube.com/watch?v=aK7gAZS0lbY, see Petty Video 4 for clip):



**Figure 7-36: Monsanto Roundup® Dog Commercial Clips (Biodegradable Claim)**



**Figure 7-37: Monsanto Roundup® Dog Commercial Clips (Leave both the Soil and Rex's Bone Pollution Free) – cont.**



**Figure 7-38: Monsanto Roundup® Dog Commercial Clips – cont.**

Robin reports on the litigation regarding this false advertising as follows (Exhibit 54, pgs. 73-75):

"*On November 4, 2004, the criminal court in Lyon, where the headquarters of the French subsidiary of Monsanto was located, began in which the company was charged with 'false and misleading advertising."*

*"..The hearing was finally held at the Lyon criminal court on January 26, 2007, exactly six years after the complaint had been filed.  (In 2009) **The heads of Scotts France and Monsanto were fined €15,000**, a penalty worth a few dilatory maneuvers.  The court found that "the combined use on labels and packaging [of herbicides in the Roundup product range] of the terms and expressions 'biodegradable' and 'leaves the soil clean' …could lead the consumer to believe erroneously in the complete and immediate harmlessness of these products following the quick biological degradation after use…whereas they can on the contrary remain durably in the soil, and even spread into the water table."*

*"Even more bothersome for Monsanto, which appealed, **the court determined that the company knew 'prior to publication of the challenged advertisements that the products concerned were ecotoxic in nature,' because 'according to studies conducted by Monsanto itself, a level of biological degradation of merely two percent may be reached in 28 days'**."*

Similarly, One-Minute World News (Exhibit 481) reported on October 15, 2009 that:

"***The court confirmed*** *an earlier judgement* **that Monsanto had false advertised its herbicide as "biodegradable" and claimed it "left the soil clean**."

Other research demonstrates that glyphosate remains in soils from days up to a year depending on soil type and that glyphosate and its metabolite aminomethylphosphonic acid (AMPA) remain on residuals on foods such as soybeans (Exhibit 48).  In 1993, EPA (Exhibit 53-04, pgs. 5, 9) reported that once in surface waters, glyphosate "is not readily broken down by water or sunlight."  The 2015 EFSA Risk Assessment on Glyphosate (Exhibit 448, pgs. 54-55) clearly demonstrates that some applied glyphosate remains in soils more than a year after application.

Just after the fine was issued (February 2007) a series of Monsanto e-mails regarding advertising content on the toxicity of Roundup products in France occurs (Exhibit 278):

1.   February 12, 2007 – 10:40 AM.  E-mail from Xavier Belvaux to Daniel Goldstein:

   "….Is it acceptable to answer the following (to consumers)?

   ***Roundup is not toxic to mammalians, no hazard for humans or pets (cats and dogs)….***"

2.   February 12, 2007 – 1:24 PM.  E-mail from Daniel Goldstein to Donna Farmer:

   "….We need to be very careful here…..

   ***We CANNOT state that Roundup is "not toxic" or carriers "no hazard"***…..*"*

3.   February 12, 2007 – 7:28 PM.  E-mail from Donna Farmer to Daniel Goldstein, Xavier Belvaux, Kris Leemans:

   ***"Dan is absolutely correct.  You cannot say that***"…..*"*

In late August 2011 (Exhibit 463), the USGS reported that "*Glyphosate*, also known by its tradename Roundup, *is commonly found in rain and rivers in agricultural areas in the Mississippi River watershed*, according to two new USGS studies released this month." Also, the glyphosate degradation product, aminomethylphosphonic acid (AMPA), was found to have a longer lifetime in the environment than glyphosate.

*7.3.2.9      2006 – Roundup® Ready-to-Use Advertisement (Petty Video Clip 5):*

In this 2006 video, the user is shown spraying a Roundup® Ready-to-Use product with no dermal protection of the hands; a clip of this video is shown in Figure 7-39:



**Figure 7-39: 2006 Monsanto Roundup® Product Advertisement –
No Chemical Resistant Gloves (Petty Video 5)**

*7.3.2.10      2009 – Australia (Exhibit 175):*

"Thirteen years after the first false advertising conviction, Monsanto's distributor, Scotts Australia, continues to make the "***completely biodegradable***" claim on its website,

even though the giant chemical company no longer promotes as such" reported the Fremantle Herold in a September 9, 2009 article entitled "New Questions over Herbicide." They further added: "Scotts technical director Greg Neighbour told the *Herald* 'we rely on Monsanto for the information and this is something I must urgently investigate. *Glyphosate, the active ingredient of Roundup, is biodegradable but the product's surfactant – which helps 'deliver' the chemical to the plant – is not.*"

False "completely biodegradable" claim regarding Monsanto's Roundup® continues to be used in selling product to users. Scott's technical director Greg Neighbour claims he relies on Monsanto and must urgently investigate whether or not what they have been telling customers about the biodegradability of Roundup® is true or not – clearly he did not know!

The follow-up e-mails (Exhibit 163, Bates MONGLY01192115-7) to this article at Monsanto is telling:

1st:  On September 21, 2009 10:56 AM - Honi McNaughton – Monsanto Public Affairs Manager writes to John McGregor and others at Monsanto stating among other things: "*We may also need to compose a letter to all of Scott's Roundup customers (in WA) dismissing the allegations in the article.*"

2nd:  On September 21, 2009 12:39 PM - Neil Anderson – QA & Formulations Lead, Asia Pacific – Monsanto Australia follows up to McNaughton stating:  "*The reporter has printed the correct information that 'Glyphosate is biodegradable but the surfactant is not.' However, then she goes into a sensationalism mode quoting 'studies' that suggest Roundup is not safe, which is probably derived from her interview with the Fremantle activist.  I feel the response to FH needs to reiterate that her statement on biodegradability is correct, reiterate that Roundup is safe (and provide references), and if there are flaws in any of the studies quoted, point out these flaws.*"

3rd:  Ultimately, this issue works its way up to Donna Farmer, who on September 21, 2009 5:12 PM writes in part:

> "5. How does Roundup work? ...or this – **you cannot say that Roundup does not cause cancer...we have not done carcinogenicity studies with 'Roundup**.'
>
> 2. Will Roundup harm my family or me?  Based on the results for short term and long term testing, it can be concluded that Roundup poses no danger to human health when used according to label directions.  *In long term exposure studies of animals, Roundup did not cause cancer*, birth defects or adverse reproductive changes at dose levels far in excess of likely exposure.
>
> I will follow up with the **Monsanto folks who interface with Scotts …***they are aware that Scotts does these things.*"

This is consisted with Donna Farmer's earlier e-mail to herself on April 10, 2007 (Exhibit 279, Bates MONGLY01221733) where she notes that the toxicology, ecotoxicology and environmental fate of Roundup branded products remain to be determined.

[This string of correspondence demonstrates that:

1.    Scotts was telling its customers that Roundup® was biodegradable when it was not.

2.    Monsanto knew in 2009 that Scotts was misrepresenting the lack of biodegradability of Roundup® by saying it was biodegradable.

3.    Donna Farmer says privately that one cannot say Roundup® does not cause cancer, but then wants to say publically that Roundup® does not cause cancer.]

It must be added that Monsanto's claim that Roundup® is safe must also be questioned in light of the fact that one of its labs has been criminally charged with falsification of data.  Studies by Craven Laboratories, a laboratory hired to evaluate pesticide residuals including that of Roundup® on plums, potatoes, grapes, and sugar beets, and in the soil and water, were found to have generated falsified data.  The owner of the lab was sentenced to five years in prison, based on 20 felony counts and the lab was heavily fined (Exhibit 39, pg. 72, Exhibit 52, pgs. 111-122 and Exhibit 437).

### 7.3.2.11    *2013 – Roundup® Extended Control Weed & Grass Killer Advertisement (Petty Video Clip 6):*

In this 2013 video, the user is shown spraying a Roundup® Extended Control Weed & Grass Killer product with no dermal protection of the hands or eyes; clips of this video are shown in Figure 7-40 and 7-41:



**Figure 7-40: 2013 Monsanto Roundup® Product Advertisement – No Chemical Resistant Gloves or Eye Protection (Petty Video 6)**

 

**Figure 7-41: 2013 Monsanto Roundup® Product Advertisement – No Chemical Resistant Gloves or Eye Protection (Petty Video 6)**

*7.3.2.12*        <u>*2014 – August 14 – Brochure entitled "What is Glyphosate?" (Exhibit 162,*</u>
                  <u>*Bates MONGLY07607159-74):*</u>

In this brochure, Monsanto falsely claims that glyphosate, the active ingredient in
Roundup®, kills most plants by stopping a specific enzyme – EPSP synthase – "***found
ONLY in plants and many bacteria***" (see Figures 7-42 to 7-45):



**Figure 7-42: Monsanto Roundup® EPSP Synthase Claims –
Exhibit 162, Bates MONGLY07607165**



Glyphosate-based herbicides are simple mixtures of glyphosate, water and a surfactant system that are extremely effective for controlling unwanted vegetation without the worry of regrowth. Glyphosate specifically inhibits an enzyme that is essential to plant growth; this enzyme is not found in humans or other animals, contributing to the low risk to human health from the

P1.3351.9

Glypho

use of glyphosate according to label directions. When a Roundup® brand herbicide is sprayed on plant foliage, glyphosate is absorbed and then moved – or translocated – throughout the plant's tissues. The surfactant enhances the delivery of glyphosate into the plant. Once inside the plant, glyphosate inhibits the activity of an enzyme, called EPSP synthase, which in turn prevents the plant from manufacturing certain essential amino acids needed for plant growth and

**Glyphosate** is the Roundup® brand was the trade nam Monsanto may ha molecule, but tod way of controlling other companies glyphosate-based to the success of

## Mode of action
How it works in the plant

Glyphosate-based herbicides are simple mixtures of glyphosate, water and a surfactant system that are extremely effective for controlling unwanted vegetation without the worry of regrowth. Glyphosate specifically inhibits an enzyme that is essential to plant growth; this enzyme is not found in humans or other animals, contributing to the low risk to human health from the

use of glyphosate according to label directions. When a Roundup® brand herbicide is sprayed on plant foliage, glyphosate is absorbed and then moved – or translocated – throughout the plant's tissues. The surfactant enhances the delivery of glyphosate into the plant. Once inside the plant, glyphosate inhibits the activity of an enzyme, called EPSP synthase, which in turn prevents the plant from manufacturing certain essential amino acids needed for plant growth and life.[7]

[7] Franz, J. E., Mao, M. K., Sikorski, J. A. (1997). Glyphosate: A Unique Global Herbicide, ACS Monograph No. 189. American Chemical Society, Washington, DC.

Confidential – Produced Subject to Protective Order

GLY_DC7_AUG 2014

MONGLY07607167

**Figure 7-43: Monsanto Roundup® EPSP Synthase Claims –
Exhibit 162, Bates MONGLY07607167.**







**Figure 7-44: Monsanto Roundup® EPSP Synthase Claims –
Exhibit 162, Bates MONGLY07607169.**



**Figure 7-45: Monsanto Roundup® EPSP Synthase Claims –
Exhibit 161, Bates MONGLY07600440**

These same claims have been placed on actual containers of products (Figure 7-46) and appeared in Walmart ads selling Roundup® (Figure 7-47):



**Figure 7-46: Monsanto Roundup® False EPSP Synthase Claims –
2013 Roundup® Ready-to-Use Weed & Grass Killer III
(from http://realfarmacy.com/class-action-lawsuit-monsanto/)**

Note the label says in large green print: "***Did You Know***?" followed up with the answer: ***Glyphosate targets an enzyme found in plants but not in people or pets***."

Similarly, in an advertisement for Wal-Mart, the ad shows the following text making these same enzyme claims (Figure 7-47):



https://www.walmart.com/ip/Roundup-Ready-To-Use-Weed-Grass-Killer-III-1-gal/16911851

**Figure 7-47: Monsanto Roundup® False EPSP Synthase Claims –
2013 Roundup® Ready-to-Use Weed & Grass Killer III**

Also, in print/video advertising titled "Learning the Basics" Monsanto continues to make these same enzyme claims (Figure 7-48; see also Petty Video 7):

Before you use a product around your landscapes, it's important to know how it works. That's why we're providing you with this handy info about the science behind Roundup® Weed & Grass Killer products. Let's get learning.

**RIGHT ON TARGET**

All Roundup® Weed & Grass Killer products contain the same active ingredient*, ==glyphosate, which targets an enzyme found in plants but not in people or pets.== (Unless your pet is a plant. Sorry, Seor Habanero.)



**Figure 7-48: Monsanto Roundup® False EPSP Synthase Claims –
Ready-to-Use Weed & Grass Killer -
How Do Roundup Weed and Grass Killer Products Work
(https://www.roundup.com/en-us/library/learning-basics/how-do-roundup-weed-grass-killer-products-work)**

Finally, in a 1996 Brochure entitled "A Briefing for Corn Growers" (Exhibit 261, Bates MONARCH 000441) regarding the benefits of Roundup, it says:

> "Roundup® works because it prevents the production of an essential plant enzyme, EPSP synthase.  Without this enzyme, plants cannot survive and slowly die. (***Humans and animals have different metabolisms that don't contain EPSP synthase***)."

This same claim continues to be made in 2017 (https://www.roundup.com/sites/g/files/oydgjc121/files/asset_files/T50746_520021025_LB10386_101317_CFL.pdf) and again in 2018 (Exhibit 484):

> "*Glyphosate targets* **an enzyme found in plants that does not exist in humans or animals**.  This is why it can effectively control weeds, but also why it has a safe history of use for humans and wildlife."

The statements in Figures 7-42 through 7-48, and related text that follows, are explicit; Roundup® glyphosate, which disrupts the EPSP synthase enzyme process in plants to kill them does not occur in humans and animals, thus making glyphosate less risky to the health of humans and animals.

This is not true, as EPSP synthase does occur in the bacteria that inhabit the guts of animals and humans.  Roundup®, as far back as 2001, was found to kill/diminish these bacteria, leading to reported increased health effects (e.g., stomach and bowel problems, indigestion, ulcers, colitis, gluten intolerance, insomnia, lethargy, depression,

Crohn's Disease, Celiac Disease, allergies, obesity, diabetes, infertility, liver disease, renal failure, autism, Alzheimer's, endocrine disruption) by the loss/lowering of counts of these bacteria (Exhibits 213 and 215).

Katholm (Exhibit 214) reports that: "glyphosate residues in feed may have the capacity to affect gut microorganisms when ingested by livestock and, potentially, reaching critical levels in the gut.  Previous studies have found that glyphosate may affect the growth characteristics of dominating microorganisms in gut of monogastrics and ruminants, in potential favor of pathogenic bacteria, affecting health parameters negatively (Ackermann et al., 2015; Krüger et al., 2013b; Shehata et al., 2013a; Shehata et al., 2013b).  These studies have typically worked either with glyphosate acid or with Roundup."

These same false claims that Roundup® only affects the EPSP Synthase in plants but not animals or humans continued to be made into 2015.  Monsanto's container label stated, "Did You Know? Glyphosate targets an enzyme only found in plants and not in humans or animals," has been challenged in Los Angeles, CA (e.g., http://yournewswire.com/lawsuit-against-monsanto-for-false-advertising-on-roundup/).

The label constitutes false advertising since Roundup® targets the enzyme EPSP synthase which is also found in both animals and humans.  "EPSP synthase is found in the microbiota (mostly friendly bacteria) that reside in our intestinal tracts (guts) and is partly responsible for immunity activation and even helps our guts and our brains communicate with one another."

### 7.3.2.13       *2014 –* Roundup® *QuickPro Advertisement (Exhibit 196-B):*

In this 2014 print add, the user is shown spraying a Roundup® QuickPro on a children's playground implying it is safe to apply near children (Figure 7-49):



**Figure 7-49: 2014 Monsanto Roundup® QuickPro Advertisement – Application where Children Play (Exhibit 196-B)**

The label instructions state: "Keep out of reach if children."  As illustrated, this application would not imply the product should be kept away from children.

In his April 28, 2018 Deposition testimony, James Myron Richardson agreed that the advertisement with a playground would presume that is an area where children play (Exhibit 198, pg. 213).

On April 29, 2016, Daniel Blaeser, of Helen Chemical, e-mails a request to Monsanto's Tim Ford (Exhibit 197-U, Bates MONGLY07603230) for input if it is ok to apply Roundup® products on public grounds, like presented in the add shown in Figure 7-47:

> "Tim, this is some kind of record.  You have not heard from me in years and now two months in a row.  ***Does Monsanto have any propaganda for the public defending the use of Roundup products on public grounds?  We are now being attacked by TWO parents in our Las Cruces Public School District grounds.  They are having a meeting with them and an organization out of Santa Fe*** ***trying to ban the use***.  I told them I would gather ammunition but I will not do any speaking."

In response Monsanto sends documents entitled:

i)      What is Glyphosate? (Exhibit 197-U, Bates MONGLY07603233-48).

ii)     March 17, 2015 Newsletter titled Glyphosate/Roundup in the News, Safety Information (Exhibit 197-U, Bates MONGLY07603249-50).

iii)    Frequently Asked Questions about Glyphosate (Exhibit 197-U, Bates MONGLY07603251-62).

iv)     Glyphosate Basics (Exhibit 197-U, Bates MONGLY07603263).

v)      Regulatory Authorities on Glyphosate: No Evidence of Carcinogenicity (Exhibit 197-U, Bates MONGLY07603264).

vi)     September 2002 Monsanto Backgrounder – Glyphosate and Standard Toxicology Studies (Exhibit 197-U, Bates MONGLY07603265-69).

vii)    May 2005 Monsanto Backgrounder – Summary of Human Risk Assessment and Safety Evaluation on Glyphosate and Roundup® Herbicide – Update (Exhibit 197-U, Bates MONGLY07603270-73).

Each of these documents contained misleading and/or false information:

➢      The "What is Glyphosate?" document (Exhibit 197-U, Bates MONGLY07603239), discussed at length in Section 7.3.2.10, made the misleading statement shown in Figure 7-27 that "Glyphosate stops a specific enzyme, EPSP synthase.  This enzyme is found ONLY in plants and many bacteria."

Under Bioaccumulation (Exhibit 197-U, Bates MONGLY07603246), this document falsely (see Section 7.2.4 discussion) states "*Glyphosate does not bioaccumulate* thus does not magnify through the food chain…."

David Saltmiras, in his February 16, 2009 presentation (Exhibit 515, pg. 5) states that glyphosate has "no residual activity," "does not accumulate in soil after typical multiple applications," "Glyphosate does not bioaccumulate in the food chain," and "Degrades over time by microorganisms – AMPA major plant

metabolite and environmental degradate & mineralizes to carbon dioxide, phosphoric acid."

➢ In the March 17, 2015 Newsletter titled Glyphosate/Roundup in the News, Safety Information document it states (Exhibit 197-U, Bates MONGLY07603250) that:

> "All labeled uses of glyphosate are *safe for human health*….." and

> "It's important to put this IARC classification into perspective.  Many common exposures are classified in <u>*Category 2*</u>, *including coffee, aloe vera extract, cell phones, pickled vegetables as well as professions such as barbers and fry cooks.*"

[First, the State of New York found that Monsanto's statement that "a) Monsanto's glyphosate-containing pesticide products and the components thereof are safe..." to be false and misleading advertising.

Second, the EPA's Labeling Manual clearly states it is inappropriate to use misleading product comparisons in pesticide labels.  Also, Monsanto makes the comparison to IARC Category 2; but IARC does not have a Category 2, only IARC Category 2A (*probably* a human carcinogen) and Category 2B (*possibly* a human carcinogen).  IARC listed glyphosate in the 2A category.]

Caffeic acid is found at a very modest level in coffee and caffeic acid is the compound listed as Category 2B carcinogen, so the reference to coffee is clearly very misleading.

Aloe vera extract, cell phone use, pickled vegetables (traditional in Asia), and high temperature frying are listed as Category B carcinogens (https://monographs.iarc.fr/ENG/Classification/ClassificationsAlphaOrder.pdf)

The profession of barber is listed in Category 2A, but for exposure to certain products when working as a barber.  Emissions from high temperature fryers are listed in Category 2A, but high temperature frying itself is listed as Category 2B.

**[Since IARC does not use Category 2 (just 2A and 2B which are quite different classifications), and most of the compared products are Category 2B (possible carcinogen) vs. glyphosate in Category 2A (probable carcinogen – more likely than not), this information provided by Monsanto is extremely misleading.]**

**[This same misleading/fraudulent claim (i.e., "*It's important to put this classification in perspective.  Most common exposures are classified in Category 2, including coffee, aloe vera extract, cell phones, pickled vegetables as well as professions such as barbers and fry cooks*") is made in a March 20, 2015 e-mail from Kimberly Link to Myron Richardson titled "IARC communication materials".]**

**[Under industry and regulatory Standards of Care, Monsanto should not be making claims that Roundup is safe.]**

➢ In the Monsanto publication entitled "Frequently Asked Questions about Glyphosate  the document makes several false and/or misleading statements:

Under the Q&A by Steve Savage (Exhibit 197-U, Bates MONGLY07603256) he states:

> "The consensus among regulators is quite clear that glyphosate has no real health or environmental issues."

**[At best this is misleading, clearly the State of New York found such statements to be misleading or fraudulent.]**

Under the Q&A by David Saltmiras regarding whether or not it is safe to drink small amounts of Roundup® or if safe level exists, he writes (Exhibit 197-U, Bates MONGLY07603258) in part:

> "Drinking *dishwashing detergent or shampoo* out of the container, for example, is not advised, because these chemical products *contain surfactants that should not be intentionally consumed yet low levels of dishwashing detergent and shampoo residues are consumed daily off of cups, plates and utensils and during showering*, without adverse health effects.   And rightfully so, people are not concerned about use or consumption of trace amounts of detergents.
>
> *The same is true for herbicides.* *Roundup-brand products also contain surfactants like those found in dishwashing detergents and shampoos and, like these consumer products*, should not be intentionally consumed. However, low levels of these surfactants and the active ingredient in Roundup-brand products (glyphosate), which gives it its weed-killing power, ingested from the food we eat are well below what has been determined acceptable for daily human consumption."

[Aside from violating EPA/FIFRA statutes for misleading comparisons, and similar New York State Attorney General Findings, the previous two paragraph comparisons misrepresents the dermal skin irritation finding from work completed by Maibach, 1986 – see Section 4.5.3.]

> "The use of every herbicide on food crops in the United States is considered and evaluated by the Environmental Protection Agency (EPA) against a standard of reasonable certainty that the use would cause no harm to human health or the environment.  *In order to make this safety determination for Roundup® products, EPA considers how much glyphosate residue the use would contribute to the daily intake and then adds that amount to the amount of glyphosate residue consumed by all other possible routes of exposure, including on other foods, in drinking water, through accidental ingestion of water during swimming, etc.  This total consumption of glyphosate residues are then compared to the total* *acceptable daily intake, or ADI, that has been established for glyphosate, based on toxicity studies that look at a variety of toxic effects, such as immediate or acute toxicity, effects on reproductive processes, cancer-causing and other long-term effects, etc.*  Just to be on the safe side, the EPA sets the acceptable daily intake (ADI) a minimum of 100-times lower than any dose level that showed any kind of toxicity in any study

conducted.  No more uses of a pesticide like Roundup-brand products can be added once the ADI has been reached. If use of a pesticide is expanded, the additional consumption has to be considered."

[This answer is a dodge (i.e., misleading) regarding the toxicity of Roundup® the product or formulation; the ADI discussed here is only the toxicity of one ingredient in Roundup®, glyphosate.]

Under the Q&A by Donna Farmer, Monsanto, regarding whether or not the surfactant increases the toxicity of Roundup®, she writes (Exhibit 197-U, Bates MONGLY07603260) in part:

> "*Thanks for asking about the toxicity of glyphosate versus that of surfactants used with glyphosate*. For herbicides like glyphosate to be most effective at controlling unwanted plants, they need to be applied with a surfactant. Surfactants (short for "surface-acting agents") are soapy substances that help to reduce surface tension of the water so the drop of spray solution can spread over the surface of a leaf and help to penetrate the waxy layer (the cuticle) of the plant. Herbicidal soaps are often used in organic gardening to help penetrate the waxy layer of plants and cause the plant to dehydrate and die."

[This answer is clearly a dodge (i.e., misleading), the question was not about the toxicity of glyphosate or a surfactant, but of glyphosate and a surfactant combined as a product – e.g., Roundup®.  The question is avoided and the answer misleading.]

> *The surfactants used with glyphosate are similar to those used in personal-care and household cleaning products* that we are exposed to every day when we wash our hands, hair and dishes.  The surfactants in these products perform the same function as they do when mixed with a herbicide like glyphosate.  For example, surfactants found in *shampoos* reduce the surface tension of water to help it spread and move around our hair and help remove the oily layer with dirt from our hair.

[Again, aside from violating EPA/FIFRA statutes for misleading comparisons, and similar New York State Attorney General Findings, the previous two paragraph comparisons completely misrepresents the dermal skin irritation finding from work completed by Maibach, 1986 – see Section 4.5.3 – no skin irritations observed with shampoo.]

> You are correct that glyphosate for acute oral toxicity is placed in the US Environmental Protection Agency Toxicity Category III.  The surfactants used with glyphosate are also in Toxicity Category III for acute oral toxicity, as are many of the surfactants used in personal and household cleaning products.  *The surfactants mixed with glyphosate in Roundup-brand products do not increase this acute toxicity level*. For example, Roundup-brand products (containing primarily glyphosate, surfactants and water) are in Toxicity Category IV for acute oral toxicity.  The reason for

the change from Category III to Category IV is the result of the formulated product being diluted with water.

[This paragraph is misleading and consistent with Monsanto referencing only "acute" studies rather than also including sub-chronic and chronic work. Moreover, mixing just the surfactant and the glyphosate (two ingredients) is not the same mixture as the product Roundup® with its other ingredients (including heavy metals) and would not necessarily represent the toxicity of the product Roundup®.]

You may have read claims on the Internet that when glyphosate is mixed with surfactants, the formulated Roundup-brand products are more toxic. These claims relate to the results of petri dish experiments. Glyphosate and Roundup-brand products were poured over unprotected cells in a petri dish.  This direct exposure to high concentrations used in these studies intentionally bypasses normal processes and limits exposure. While glyphosate had very little effect on cell function, the Roundup® formulations because of the surfactant component did alter cell function. This is not a surprise, given that the surfactants in the Roundup-brand product in the Petri dish were doing what any surfactant would do: they were disrupting the biological membrane of the unprotected cell.  In fact, surfactants are routinely used in cell biology to disrupt cell membranes to isolate membrane proteins.  *Petri dish experiments with surfactants from personal and home care products, as well as caffeine and citric acid (normal components in coffee and orange juice, respectively), have shown they, too, can disrupt cell function*.

[As discussed earlier, misleading comparisons are not allowed under EPA/FIFRA rules outlined in their Labeling Manual.  Also, as discussed earlier, caffeic acid (not coffee) is a Category 2B (possible carcinogen) vs. glyphosate which is in Category 2A (probable carcinogen – more likely than not), this comparison provided by Monsanto is at best very misleading.]

Glyphosate, the surfactants used with glyphosate and Round up-brand products, when used according to label directions, all have a long history of safe use and will not pose any *unreasonable risk* to human health.

[This is misleading as the term unreasonable risk is not defined; moreover some labeling instructions are nearly impossible to follow, like to apply only in calm wind conditions, and do not reflect reality.  I suspect it would be nearly impossible to find Roundup® applicators working in zero wind speed (calm) conditions.]

➢    In the Glyphosate Basics document, it states (Exhibit 197-U, Bates MONGLY07603264) in part:

"**How Glyphosate Works:**  Glyphosate works by inhibiting a specific enzyme that plants need to grow.  This enzyme is not found in human or animal cells."

[Again, this same misleading claim was addressed in Section 7.3.2.12 above.]

➢ In Regulatory Authorities on Glyphosate: No Evidence of Carcinogenicity (Exhibit 197-U, Bates MONGLY07603264). It lists simply regulatory agencies and their opinions on the carcinogenicity of glyphosate.

[The handout is misleading in two dimensions: 1) only Regulatory Agencies are cited so IARC's finding are not included, and 2) only one ingredient of Roundup® is addressed from the standpoint of being a carcinogen, not the product as a whole.]

➢ In Monsanto's September 2002 Monsanto Backgrounder – Glyphosate and Standard Toxicology Studies (Exhibit 197-U, Bates MONGLY07603265-69) the document addresses the toxicology of glyphosate and the active product (see Figure 7-50).



**Figure 7-50:  2002 Monsanto Backgrounder Suggesting Roundup® and Glyphosate had the Same Acute Toxicities (Exhibit 197-U, Bates MONGLY07603270)**

The graphic in the yellow box implies that the Roundup product has the same acute toxicity as glyphosate; one must read the fine print to realize that this implication is false. Clearly the suggestion that Roundup's acute toxicity is >5,000 mg/kg is misleading.

[The handout is again misleading and reflects Monsanto's efforts to conflate the toxicology of glyphosate alone with that of Roundup® which is unknown – at least according to Donna Farmer e-mails. It also provided a Figure of acute toxicities, suggesting Roundup® and Glyphosate had the same toxicities (Figure 7-48).]

This same type of misleading figure (Exhibit 515, pg. 8) is used in a February 16, 2009 David Saltmiras presentation (Figure 7-51):



**Figure 7-51: David Saltmiras February 16, 2009 Presentation
(Exhibit 515, pg. 8)**

[Moreover, as indicated in the note below the figure "FAO Code of Conduct – we would not publically compare these products" Monsanto knows they are in violation of the industry code of conduct by making such comparisons.]

Note also the MON 0818, POEA, is more acutely toxic than glyphosate.

➤ This May 2005 Monsanto Backgrounder – Summary of Human Risk Assessment and Safety Evaluation on Glyphosate and Roundup® Herbicide – Update (Exhibit 197-U, Bates MONGLY07603270-73) was based on a 2000 Monsanto paper by Williams, Kroes, and Munro (Exhibit 206) and made the following misleading/false statements:

"**Glyphosate is <u>not</u> a carcinogen**.  *<u>The</u> chronic toxicity and oncogenic potential of glyphosate have been evaluated by a number of regulatory agencies and by <u>international scientific organizations</u>*."

[This statement in the handout is clearly false as by this time IARC, an international science organization, had declared glyphosate a probable human carcinogen – Category 2A and Monsanto knew this to be the case.]

"**Roundup herbicide, like glyphosate,** has *very low <u>acute</u> toxicity*, which means very high exposure is required to cause an adverse effect."

[This statement in the handout is misleading.  Clearly acute hazard analysis are only part of the hazard determination and would not include whether or not Roundup® was a carcinogen.  Also, Donna Farmer said as early as 2002 and implied as late as 2013 that the chronic hazards of Roundup® (i.e., was it a carcinogen) were not known.  The statement that a very high exposure is required to cause an adverse effect is simply wrong, since the Roundup® exposures to cause adverse effects, such as dermal or eye irritation, occurred at expected application levels.  Moreover, the term high is undefined.]

"*Under present and expected conditions of use*, **Roundup herbicide does not pose a health risk to humans**."

[Aside from unknown assumptions from present and expected conditions of use, the health risks (e.g., cancer) of exposure to Roundup® were not known.  This statement is simply false.]

***Glyphosate does not bioaccumulate***.  "The potential for systemic exposure is limited by the combination of poor absorption and rapid excretion of glyphosate after oral and/or dermal contact" (p. 124).  *As glyphosate is not stored in the body*, any exposure from skin contact or inhalation would be quickly eliminated by humans and animals.

[As discussed, glyphosate does bioaccumulate, so the statement is misleading.]

What was not sent to their customers was information that Roundup® had been banned in New York State or other studies showing health effect concerns regarding the use of Roundup® near children.

Finally, this was not the first and only time Monsanto's Tim Ford (IT&O Account Manager) sent some of this same (i.e., "What is Glyphosate") misleading information to customers.  Earlier, on October 1, 2015, he e-mailed Carl Hinder – Univar USA stating:

"The attached presentation on "What is Glyphosate" gives you the facts about glyphosate.  *It will give you the information necessary to have a meaningful conversation with customers*.  When the EPA comment period opens, Monsanto will need your voice and the voice of your customers to be heard to protect the continued labeled uses of Roundup and glyphosate."

Recall the two false statements contained in this document and discussed earlier:

➢ The "What is Glyphosate?" document (Exhibit 197-U, Bates MONGLY07603239), discussed at length in Section 7.3.2.10 made the misleading statement shown in Figure 7-27, that "Glyphosate stops a specific enzyme, EPSP synthase.  This enzyme is found ONLY in plants and many bacteria."

➢ Under Bioaccumulation (Exhibit 197-U, Bates MONGLY07603246), this document falsely (see Section 7.2.4 discussion) states "Glyphosate does not bioaccumulate thus does not magnify through the food chain…."

Monsanto's Lisa Drake, in an internal March 26, 2015 e-mail to Melissa Duncan (Exhibit 198-X, Bates MONGLY07164540) regarding potential bans of Roundup® formulations writes: "*Kimberly is working on an amended background and cover noted for Myron (Richardson) and his team to get to their network of dealers and customers.  On my team, I will take that amended document and circulate as well to a broader distribution of golf course superintendents, RIS member affiliates, greens companies, landscape contractors and others*, in order to head off any negative policy decisions on glyphosate use.*"

The impact of provided misleading or false information to crop protection users is recognized in the industry trade group CropLife's April 2006 Guidelines for the Safe and

Effective Use of Crop Protection Products when they state under the topic Training (Exhibit 277, pg. 9):

> "*Suppliers (e.g., Monsanto) also <u>have a responsibility to ensure that their sales staff and retailers are adequately informed and trained to demonstrate and give advice on the safe use and handling procedures of crop protection products</u>.*"

[It would appear that this is the May updated Monsanto Backgrounder. It is clear from this e-mail that Monsanto intends to communicate not only to its distributors, but to the public as well and to communicate their version of the facts rather than be fully transparent about what is being published both on glyphosate and Roundup® formulations.]

*7.3.2.14      <u>2015 – Graphic Label on Roundup® Weed & Grass Killer Concentrate Plus (Exhibit 192, pg. 2):</u>*

In this label, Monsanto falsely claims that Roundup® Weed & Grass Killer Concentrate Plus can be handled using unprotected, bare hands (Figure 7-52):



**Figure 7-52: Monsanto 2015 Roundup® Weed & Grass Killer Concentrate Plus Claims – Can Handle with Bare Hands (Exhibit 192, pg. 2)**

7.3.2.15    *2015 – Monsanto Promotor Claims Roundup® So Safe One Can Drink It (Petty Video 8:*

In 2015, Patrick Moore, made the claim that Roundup® was so safe one could actually drink a quart of it.  He states that people often try to commit suicides by drinking it and often fail at it and that "it is not dangerous to humans."  When offered the opportunity to drink a glass of Roundup®, he refuses to do so and terminates the interview (https://www.youtube.com/watch?v=AbfJ4VwHIqw, see Petty Video 8) – Figure 7-53:

 

**Figure 7-53: Monsanto Contractor Claiming Roundup can be Drunk – Refused to Do So (Petty Video 8)**

The lethal dose of Roundup® to human is ~200 mℓ; symptoms are edema coupled with respiratory distress, violent vomiting, and diarrhea.  Acute symptoms are eye irritation, vision problems, headaches, skin lesions and irritation, nausea, dry throat, asthma, respiratory difficulties, nosebleeds and dizziness (Exhibit 54, pg. 87).  Suicide attempts using 41% glyphosate Roundup® formulations have ingested an average of 120 mℓ (Exhibit 197-L, Bates MONGLY01330410); other data suggest a similar amount [150 cc (or mℓ)] are fatal (Exhibit 280, Bates MONGLY01938130).  Japanese data on ingestion levels of Roundup® (~41% IPA, ~15% POEA and ~44% water) during suicide attempts found that surviving patients consumed on average 104 mℓ (~3.5 oz.) while those that died consumed on average 206 mℓ (~7.0 oz.) (Exhibit 414, MONGLY01239044).

Dr. Moore states that one can safely drink a quart of Roundup® or about ~946.353 mℓ.  This is ~475% or ~4.75 times the reported lethal dose.  This is a misleading and erroneous statement regarding the safety of Roundup®.  Monsanto clearly had a relationship with Dr. Moore as he was mentioned in a Trish Jordan e-mail dated July 18, 2005 (Exhibit 197-NN, Bates MONGLY01915402) responding to a David Suzuki paper when she says: "I sent off a brief note to Dr. Patrick Moore asking him if he was aware of Suzuki's latest column and whether he ever responds to stuff like this."

Nine years later, Dr. Moore, working for Golden Rice Now (i.e., pmoore@allowgoldenricenow.org), writes Hugh Grant (President of Monsanto – Exhibit 197, pg. 284) and cc's others (e.g., Jesus Madrazo) on February 21, 2014 regarding an article on a web link - nhrighttoknowgmo.org/BreakingNews/Glyphosate II Samsel-Seneff.pdf. (Exhibit 197-OO, Bates MONGLY07154972):

"Sorry to bother you about this, but it is all over Twitter, and I imagine your people have some response, which I would be grateful to receive and disseminate widely."

Hugh Grant responds the next day requesting Jesus Madrazo and Phillip Miller from Monsanto to respond saying:

"Can you help with a response for Patrick? Thanks Hugh

Jesus Madrazo responds the same day requesting M. Duncan and T. Reynolds from Monsanto to respond as follows:

"Can you help put together a response for Patrick? Thanks

[Clearly these folks know each other since they refer to Dr. Moore only by his first name "Patrick". Moreover, Dr. Moore clearly knows people high up at Monsanto as he was emailing the President of Monsanto, Hugh Grant. Also, based on these two e-mails, the relationship is nearly a decade old by the time Dr. Moore is seen on video saying one can safely drink a quart of Roundup®.]

Apparently Golden Rice Now (see Dr. Moore's e-mail address) was set up and funded by the leader of the Golden Rice project, Gerald Barry, who previously was the Director of Research at Monsanto (https://realfarmacy.com/monsanto-lied-patrick-moore-forbes-promoted-lie/).

### 7.3.2.16    *2015 – Roundup® Ready-to-Use Weed & Grass Killer III Advertisement (Petty Video Clip 9):*

In this 2015 video, the user is shown spraying a Roundup® Ready-to-Use Weed & Grass Killer III product with no dermal protection of the hands, eyes, and elsewhere; clips of this video are shown in Figures 7-54A and B:



**Figure 7-54A: 2015 Monsanto Roundup® Product Advertisement – No Chemical Resistant Gloves or Eye Protection (Petty Video 9)**



**Figure 7-54B: 2015 Monsanto Roundup® Product Advertisement –
No Chemical Resistant Gloves or Eye Protection (Petty Video 9)**

Note the applicator is wearing a short-sleeve shirt and shorts and no chemical-resistant gloves, suggesting no dermal concerns.

*7.3.2.17        2016 – December 8th – Roundup® Weed & Grass Killer for Lawns
                Advertisement (Petty Video Clip 10):*

In this 2016 video, the user is shown spraying a Roundup® Weed & Grass Killer (Concentrate on left) for Lawns product with no dermal protection of the hands or eyes; clips of this video are shown in Figure 7-55:





**Figure 7-55: 2016 Monsanto Roundup® Product Advertisement –
No Chemical Resistant Gloves when Using Concentrate
(Petty Video 10)**

Note the applicator is not wearing chemical resistant gloves when pouring the Roundup® concentrate and the label on the back of the container shows bare skin on their hands and forearm.

Note also the caption that says these products are not registered for sale or use in New York State; a reflection of that state enacting legislation [Section 37-0115(1) and (2)] to ban it from use in that state (Exhibit 196-W, pg. 1).

### 7.3.2.18    2016 – Monsanto's Public Response to Sharon Lerner's May 18, 2016 Article in The Intercept (Exhibit 197-TT, Bates MONGLY05516382-R

In response to a May 18, 2016 Intercept paper entitled: "New Evidence about the Dangers of Monsanto's Roundup, Monsanto responded as follows:

> "While we have sympathy for the plaintiffs, the science simply does not support the claims made in these lawsuits.  *The U. S. EPA and other pesticide regulators around the world have reviewed numerous long-term carcinogenicity studies and agree that there is no evidence that glyphosate causes cancer, even at very high doses.  Surfactants such as tallowamines are soapy substances that help to reduce surface tension of the water and are found in many everyday products such as toothpaste, deodorant, shampoo, detergent and many other cleaning products.  Tallowamine-based products do not pose an **imminent** risk for human health when used according to instructions*.  In a 2009 review of toxicological data on tallowamine, the U.S. EPA found no evidence that tallowamines are neurotoxic, mutagenic or clastogenic."

[Even as late as mid-2016, Monsanto continues to make misleading and false statements.  The response continues to dodge the issue about whether or not Roundup® the product is a carcinogen and carefully uses the word regulators to avoid including the IARC study results declaring glyphosate a probable human carcinogen. The text on surfactants, aside from violating EPA/FIFRA statutes for misleading comparisons, and similar New York State Attorney General Findings, is simply false, completely misrepresenting the dermal skin irritation findings from work complete by Maibach, 1986 – see Section 4.5.3.  Baby shampoo showed no skin irritation effects compared with glyphosate in the dermal irritation study.]

## 7.4    Additional Information Regarding Monsanto's Duty to Fully and Transparently Inform the Public Regarding Potential Hazards Associated with Their Products:

Under Monsanto's Product Stewardship and The Pledge (https://monsanto.com/ products/product-stewardship/stewardship-pledge/), they note:

> "Labels and safety data sheets for Monsanto's crop protection products, as well as other safety and technical information on Monsanto's products, are available here."

The U.S. EPA OPP in their Label Review Manual (https://www.epa.gov/sites/ production/files/2017-09/documents/lrm-complete-aug-2017.pdf) address MSDSs/SDSs in Chapter 3 – General Labeling Requirements as follows:

> **(D)** "**Safety Data Sheets (formerly called Material Safety Data Sheets or MSDS's)** The Occupational Safety and Health Administration (OSHA), and not the Agency has direct authority over SDSs.   *However, when an SDS is distributed with a pesticide it becomes a part of the pesticide labeling because it is accompanying the product (FIFRA 2(p)(2)(A)).  Because an SDS becomes part of the labeling, an SDS could render the pesticide misbranded if it includes warnings, precautions or any other information in conflict with the FIFRA-approved label.*   However, in 2012 OSHA adopted a revised Hazard Communication Rule for SDSs which utilizes the criteria for signal words adopted by multiple countries under the Globally Harmonized System (GHS) for hazard communication language and symbols.  EPA has not adopted the GHS criteria, and thus an OSHA SDS may have a signal word that differs from the one EPA approved for a pesticide product label…

> **[Note that the language clearly applies to MSDSs as well.]**

> **(E) Websites**   If there is reference to the company's website on the label, then the website becomes labeling under the Federal Insecticide Fungicide and Rodenticide Act and is subject to review by the Agency.  If the website is false or misleading, the product would be misbranded and unlawful to sell or distribute under FIFRA section 12(a)(1)(E).   40 CFR 156.10(a)(5) list examples of statements EPA may consider false or misleading.   *In addition, regardless of whether a website is referenced on a product label, claims made on the website may not substantially differ from those claims approved through the registration process.*"

**[Thus, information contained in MSDSs/SDSs or the company's website are considered labeling under FIFRA.]**

FIFRA, in the Label Review Manual, makes clear that warning statements must be actionable (Chapter 3, pgs. 5-7):

> Problematic:  Latex gloves are recommended

> vs.

> Preferred:  Latex gloves provide the best protection.

Finally, as noted above the Agency (Exhibit 18, pg. 28249) expectations from applicants are that it will receive accurate, current, and timely information:

> *Section 6(a) of the Act and §162.8(d) of these regulations imposes on the registrant the affirmative duty to report any additional factual information regarding adverse effects on man or the environment of the pesticide.  EPA interprets report of scientific findings in the general literature as within that duty. This same affirmative duty is imposed upon the applicant for reregistration as well.  **The burden for establishing the safety of a product is on the applicant***

***at all times.***  *He must convince the Administrator, in part, that the pesticide will perform its intended function and that it will be used without unreasonable adverse effects on the environment before the initial decision may be made to register the product.  **This duty falls on the applicant and registrant because they are in the better position to monitor the literature as regards to a particular pesticide.***"

In addition, any new information regarding the toxicity of a pesticide must be forwarded to the EPA in a timely fashion:

## 162.8 Data to support of registration and classification

(c)      Data requirements for reregistration –

(3)      *Subacute and chronic toxicity data.*   For the purposes of reregistration and classification under §§ 162.6(b)(5) and 162.11(c)(2), registrants of pesticide products which meet the criteria listed below shall be required to submit supportive data. Acceptable procedures for required studies are specified in the Registration Guidelines.   If such data have been previously submitted and meet the intent and reliability of standards established in the Registration Guidelines, the registrant shall so notify the Agency and need not resubmit the required data.

(i)      ……

(ii)      Oncogenic evaluation of the active ingredient(s) will be required if (A) the active ingredient(s), its metabolite(s) or degradation product(s) contains a substance structurally related to a known or suspected oncogenic agent, or (B) the pesticide needs a tolerance or an exemption from the requirement to obtain a tolerance [see §162.7(d)(1)(v)]

(iii)      Chronic feeding studies of the active ingredients will be required (A) for pesticides which need a tolerance or an exemption from the requirement to obtain a tolerance, or (B) for pesticides intended for use in residences, enclosed working spaces, or their immediate vicinity.   Such chronic feeding studies shall include, at least, studies of effects on the central nervous system, hematopoietic system, and histological changes in the liver, kidney, and both male and female reproductive systems.

(d)      *Additional data.*

(1)      …..

(2)      ***If at any time after the registration of a pesticide product, the registrant had additional information regarding any adverse effects on man or the environment he shall submit such information to the Administrator.***   Such information may be obtained directly by the applicant or come to his attention and shall

include, but is not limited to, published or unpublished laboratory studies and accident experience.

**[It is clear that rather than make new information available to the U.S. EPA, they embarked on campaigns to discredit studies that might negatively impact glyphosate or Roundup® products. In other cases, such as the TNO dermal work, Monsanto simply buried the work with no evidence it was ever provided to regulatory agencies or decided not to conduct studies on Roundup® formulations that they believed would not benefit them.]**

## 8.0    MONSANTO'S MARKET RESEARCH ON IMPACTS OF EPA SIGNAL WORDS TO SALES OF ROUNDUP PRODUCTS:

In 1998 (Exhibit 485) and again in 2001 (Exhibit 486), Monsanto contracted with Marketing Horizons, Inc. to conduct market research on their customers regarding the signal words "CAUTION," "WARNING," and "DANGER". The purposes of both studies are reproduced in Figure 8-1:



**Figure 8-1: 1998 Monsanto Roundup® Signal Word Market Research – (Exhibit 485, pg. i) and**
**2001 Monsanto Roundup® Signal Word Market Research – (Exhibit 486, pg. i))**

In both cases, the studies were to determine customers' understanding of the EPA signal words and the implications on sales of Roundup if the signal word CAUTION were changed to either WARNING or DANGER to improve the safety of the product to the consumer.

Key findings from the 1998 study included:

➢ Overall, most growers were unaware of the three signal words that the EPA uses to classify herbicides. California growers were considerably more likely to be aware of the signal words than were growers in other parts of the country. Less than one out of three growers on an unaided basis were able to identify "Caution", "Danger", and "Warning" as the three EPA signal words.

➢ Reflective of the perceived "relativity" between the three signal words, most growers (60%) considered the difference between a Caution label and a Danger label to be very significant. Interestingly, a similar percentage (50%) felt that the difference between Warning and Danger would be <u>very significant</u>. But, only 20 percent felt that the difference between Caution and Warning would be very significant. Thus, a signal word of Danger would tend to strongly differentiate, in a negative sense, one herbicide product from another.

➢ *Overall, one out of three (32%) current users indicated that their usage of Roundup Ultra would change in response to a Danger signal word. Fourteen percent indicated they would alter their usage if the signal word for Roundup Ultra were to change from Caution to Warning.* **A move to a Danger signal word has the potential to trigger a 17 percent decrease in Roundup Ultra usage**. The decline was most noticeable among California users.

➢ *All things being equal, users would prefer that Roundup Ultra not have a Danger label.* <u>*However, from a competitive perspective, the Roundup brand is vulnerable to competing formulations that offer enhanced features in return for a Danger label.*</u> *That is, a significant segment of current users would accept a Danger signal word for Roundup in return for: improved broadleaf control, a lower price, and faster visual symptoms.*

➢ <u>*At the other end of the spectrum, over half of the current users indicated they would switch to a "generic" Roundup Ultra with a Caution label rather than use an unimproved Roundup Ultra formulation with a Danger label.*</u>

Thus, it is clear from this 1998 market research study that Monsanto knows by 1998 that sales of Roundup will likely decrease if they change the signal word from the less safe CAUTION to WARNING or DANGER.

The report provided the following recommendation:

➢ <u>*In developing its Roundup product portfolio,*</u> **<u>Monsanto must be committed to retaining a Caution label on at least one of its primary product offerings</u>**. <u>*If there is a compelling reason to do so, the signal word could "slip" to a Warning label without significantly eroding grower confidence.*</u> *But, moving to a Danger label, even with accompanying product enhancements, has the potential to alienate a significant segment of current users.*

Thus, Monsanto also knows that limited decreases in sales of Roundup will occur if the signal word changes from CAUTION to WARNING; a change that would require dermal protection and reduce exposures.

Key findings from the 2001 study included:

➢ Unaided awareness of the three signal words that the EPA uses to classify herbicides was very limited. That is, 52% of growers were unable to recall, on an unaided basis, any of the three words. In contrast, 17% mentioned all three EPA signal words, while 15% got two of them right and 18% were able to correctly identify only one of the signal words used.

➢ In spite of this apparent "ignorance" of signal words, growers still perceived the differences between them to be significant. For example:

- *73% perceived the difference between Caution and Warning to be very (26%) or somewhat significant (47%).*

- *77% perceived the difference between Caution and Danger to be very (39%) or somewhat significant (38%).*

- *78% perceived the difference between Warning and Danger to be very (46%) or somewhat significant (32%).*

➢ ***The potential exists for significant share erosion if growers are fully informed that Roundup has a Warning signal word that "instructs users to wear long-sleeved shirts, long pants, shoes, socks, protective eye-wear, and chemical-resistant gloves."*** Additional information that competitive glyphosate products had a Caution signal word would have little, incremental impact.

➢ Only 14% of growers are currently meeting all of the requirements of this more restrictive Warning signal word.

➢ *In conclusion,* ***the potential risk of a signal word change is*** *not necessarily what is communicated, but rather* ***what could happen if growers are faced with a description of what is actually required of them*** *when mixing and handling Roundup.*

➢ *In total,* ***18% of current users reported that they would use less Roundup under*** *one of the three* ***Warning scenarios****. This ranged from 3% for the Warning only scenario to 21% for Warning - least restrictive definition, and 29% for Warning - most restrictive definition.*

➢ *Growers likely to decrease their Roundup usage because of a signal word change (from Caution to Warning) were somewhat more likely to agree that the signal word on the label is a serious consideration when choosing between competitive products.*

➢ *Absent any brand loyalty,* ***only 37% of growers indicated they were very or somewhat likely to purchase a glyphosate product with a Warning signal word if competitive products were priced the same and had a Caution signal word****.*

Thus, by 2001, Monsanto clearly knows from its customers that it could lose significant markets share with Roundup if the signal word was changed from "CAUTION" to "WARNING" once the customer knew what the change implied in terms of PPE.

Some of the 2001 reports conclusions/recommendations were:

➢ *Growers do not have a "working knowledge" of EPA signal words.  Specifically, on an unaided basis:*

- *Most are unable to identify the signal words associated with the herbicides they use (including Roundup).*

- *Very few are able to identify the signal words used by the EPA.*

- *Growers associate the same general/vague precautions with each of the signal words.*

➢ *However, when brought to their attention, the issue of "signal words" is a very emotional one for many growers.*

- ***73% perceive the difference between Caution and Warning to be very (26%) or somewhat significant (47%).***

- *58% of growers reported that they always (25%) or sometimes (33%) make a conscious effort to avoid herbicides that carry a Warning label (52% also agreed that they try to avoid herbicides labeled as Caution).*

- *43% strongly/somewhat agree that the signal word on the label is a serious consideration when choosing between competitive products.*

➢ ***There is very little, if any, "market share risk"*** *associated with introducing a Roundup formulation with a Warning signal word **if growers are not fully educated as to the precautions associated with the label.  However, the potential exists for Roundup to lose over 20 share points should growers be fully informed as to the requirements of a Warning signal word.** The "risk" is not significantly different between the two potential levels of warning signal words.*

➢ *Given historical market conditions, it is doubtful that through "normal course of business," growers will recognize a change in Roundup's signal word (from Caution to Warning), or fully understand what, if anything, they would be required to do differently as a result of the change.  **Therefore, the risk lies with an aggressive competitor who might attempt to use its Caution signal word as a non-price point of differentiation.*** The option to use a "safer" glyphosate product has a fairly strong "emotional" appeal to growers accounting for about 20% of current Roundup volume.

➢ *If Monsanto is reasonably confident that competitors will not attempt to use a Caution versus Warning label as a marketing tactic, plans should proceed with developing an enhanced Roundup formulation even if it were to carry a Warning signal word.*

Thus, by 2001 Monsanto clearly knows that so long as their customers are not educated on the difference in PPE between the signal words "CAUTION" and "WARNING" on Roundup™ products, they would likely not lose market share.  On the other hand, once the customer learns about the increased PPE requirements associated with the label "WARNING" vs "CAUTION" Monsanto could lose 20% market share.

These documents clearly illustrate Monsanto knew the market and sales implications of moving between the EPA signal words of "CAUTION," "WARNING," and "DANGER" though market research they actively funded, beginning in the late 1990s.

## 9.0    REQUIREMENTS TO PROVIDE ACCURATE/TIMELY TOXICOLOGY AND LABELING INFORMATION TO ALL STAKEHOLDERS:

It is important to recall that under FIFRA, as stated in the Labeling Manual:

> "**Labeling is defined** in the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) Section 2(p)(2) **as meaning _labels_** and **_all other written, printed, or graphic material accompanying a pesticide or device at any time_ or to which reference is made on the label or in accompanying literature**."

A label, under the FIFRA's (part of US EPA) definition, includes anything on the container/device or anything referenced or accompanying the container/device (e.g., MSDSs).

FIFRA defines label misrepresentations as "labeling claims" which are defined as:

> "**_a statement of something as fact or an assertion_** on the label **_open to challenge._**"

Examples of violations in each area follow:

## 9.1    Monsanto Violated Industry Stewardship Policies and Historical Industry Best Practices to Transparently Share Information about its Products like Roundup®:

Hadden (Exhibit 39) notes that:

> "In 1934, the Surgeon General of the United States appointed a Chemical Products Agreement Committee to review the wording of labels to be used to indicate the dangers of chemicals to workers.  From that time until about 1952, individual firms entered into agreements with the government about the kinds of warnings that they would use.  In 1944, the Labels and Precautionary Information (LAPI) Committee of the Manufacturing Chemists Association (MCA) was formed.  The committee published its first guide to labeling of hazardous chemicals in 1946; there have been six revisions since.  In 1952, these guidelines replaced the agreements between individual firms and the Surgeon General.  In 1976, the then current MCA-LAPI manual was adopted as the official standard of the American National Standards Institute (ANSI)."

The transition to not only informing workers of product hazards, but to informing the public of product hazards began with industry's Labeling and Precautionary Information (LAPI) Manuals, first issued in 1945, and continuing with updates until 1970.  The LAPI Manuals were issued by the Manufacturing Chemists' Association (MCA), later known as the Chemical Manufacturing Association (CMA), and now known as the American Chemical Council (ACC).

Mr. Minteer of Monsanto wrote a paper "Precautionary Labeling of Hazardous Chemicals" in June of 1955 (Exhibit 217) summarizing the history of LAPI MCA work, stating in part:

> "*The objectives of the (MCA) labeling committee were largely attained with the development of the warning label programs and the publication of the first manual.  The manual has been through three revisions, the latest published in 1953.  Industry voluntarily adopted the program to a remarkable degree, and it was felt that this would forestall state and federal ordinances requiring warning labels.  However, this has not been the case*."

He then goes onto write:

> "*In 1948 the Federal Insecticide, Fungicide, and Rodenticide Act was passed, which required, among other things, that labels for economic poisons should contain warning statements to protect the users of these substances.  The LAPI committee worked closely with the U.S. Department of Agriculture, with the result that regulations published under the above law required warning labels which correspond closely with LAPI principles…*
>
> *It became apparent that industry's voluntary use of precautionary labeling of industrial chemicals would not be sufficient to forestall state legislation. It was felt that the next best thing would be to lend LAPI Committee efforts to help the states draft uniform regulations.*"

Finally, in closing, he writes under "Education to the Public":

> "*There still remains an important task, that of educating the public to understand the significance of warning labels and teaching them to read the label.  In this task of education, help is needed*."

Monsanto was a member of the American Chemical Council (ACC), formerly known as the Chemical Manufacturing Association (CMA) and the Manufacturing Chemists Association (MCA) (Exhibit 31 and Exhibit 217).  Monsanto's involvement with the MCA began in 1910 only ~8 years after it was founded (as Monsanto Chemical Works) on November 29, 1901; moreover, A. Cochrane & Co., acquired by Monsanto was an original founding member of MCA in 1872 (MCA, 1972, pg. 97).  Monsanto was a very active member of the MCA as:

➢ Monsanto's G. Robert Sido, from 1971-1973, served as MCA Chairman for the Labels and Precautionary Information Committee (MCA, 1972, pg. 124).

➢ Monsanto's John L. Gillis, from 1956-1957, served as MCA's Chairman.

➢ Monsanto's Edward J. Bock (term expired on May 31, 1972) and H. Harold Bible (term expired on May 31, 1975) served on MCA's Board of Directors (MCA, pg. 121).

➢ Monsanto's Chairman, Dr. Charles Allen Thomas, was the Speaker for the MCA's 1964 annual meeting (MCA, 1972, pg. 119).

As Chairman of MCA's Labels and Precautionary Information Committee, Mr. Sido's job was to:

> "advise the Board of Directors concerning the labeling of chemicals, especially precautionary labeling of hazardous chemicals, and in accord with Association policies and procedures, formulate and publish labeling principles and encourage their adoption and use, promote uniformity in laws and regulations conforming with these principles, and cooperate with other committees, organizations and governmental agencies in labeling matters…"

It is noteworthy that under its Bylaws, one of the four items listed is (MCA, 1972, pg. 3):

> "*To provide leadership and guidance and to undertake programs to improve the chemical industry's service to the public by developing and promoting safe and clean practices in the* manufacture, transportation, handling, and *use of chemicals and chemical products*."

And under Precautionary Labeling Leadership, they noted in their 1938 report (MCA, 1972, pgs. 40-41):

> "***The necessity of a thorough toxicological investigation of a new** chemical or **chemical product before introduction** onto the market is fortunately well-recognized in our industry.  **The importance of adequate investigation before commercial production and safe handling can hardly be over-emphasized** on account of the constant development of new products and uses*.
>
> **[Note the use of the term "product" not "ingredient".]**
>
> *These investigations are commonly carried out by three groups: (1) universities with facilities for toxicological research; (2) consulting toxicologists; and (3) the U.S. Public Health Service at the National Institutes of Health…*
>
> ***Directly related to the subject is the use of appropriate precautionary labels on containers and … (the)…industry is conscious of its responsibility in this field***.

Succeeding years have continued to prove the dedication of MCA and its members to adequate testing and precautionary labeling.  A few highlights follow:

- A 1944 member conference to discuss: (1) Liability of the chemical manufacturer on hazardous products; (2) Review of pertinent liability suits against the chemical manufacturer; (3) ***Customer education on the use of hazardous chemicals***; (4) ***Necessity of toxicological tests on new products***; (5) Experience in agreements with the Surgeon General; and (6) *Problems connected with the introduction of new products.*

- The publication two years later of a completely revised manual – Illustrative Warning Labels for Hazardous Chemicals – which contained recommended label cautions for 200 chemicals.  The original publication,

issued the previous year, had covered some 70 products. The revision also included 'basic principles for the preparation of warning labels', from which chemical manufacturers are able to select appropriate warning words and caution phrases for their products.

- Strong action in 1946-1947 by the technical committee concerned with labeling was supported equally as strongly by the **Association's Executive Committee**. **It had been suggested that chemical products shipped commercially which had not been thoroughly investigated and whose properties were not fully known carry the label: 'Caution! The properties of this product are not fully known. Its handling and use may be hazardous. Exercise due care.' The proposal met an emphatic 'No' and the Executive Committee sent all members the following advisory**: **'…recommended…that NO chemical products be placed on the market without investigation of properties and hazards which may reasonably be expected to arise**….'

- Never-ending revisions and additions to the labeling manual, Guide to the Precautionary Labeling of Hazardous Chemicals Seventh Edition, was issued in 1970.

*While the direct responsibility for agricultural chemicals, including insecticides, pesticides, and fungicides, has rested with another trade association, MCA early expressed its safety-conscious attitude regarding DDT. In May 1944, an MCA subcommittee began meeting to consider its precautionary labeling* although the entire DDT production was then consigned to important World War II military requirements.

The following year, MCA assigned representatives to a committee which included members of the Agricultural Insecticide and Fungicide Association (now National Agricultural Chemicals Association) and the National Association of Insecticide and Disinfectant Manufacturers (now Chemical Specialties Manufacturers Association). *The result of this cooperative was the announcement of cautions for DDT*, concurrent with its auspices of representatives of the U.S. Public Health Service, the Division of Pharmacology of the Food and Drug Administration and the Insecticide Division of the U.S. Department of Agriculture.

*The joint committee of associations went further than the announcement. Representatives fanned out over the United States to confer with state officials on the desirability of uniform adoption of the specific cautions to adequately protect users of DDT formulations*.

**[i.e., formulations, not just one ingredient.]**

Monsanto was active in following the industry and government activities regarding labeling of products back into the 1940s, was helping to influence governmental entities, and most importantly recognized that the public was not reading or understanding labeling even at that time.

John L. Henshaw, formerly in Monsanto's corporate industrial hygiene group and then Director at OSHA (Exhibit 57, pg. D106), in a February 2007 paper (Exhibit 56, pg. D17) noted the following:

*"The National Safety Council (NSC), a not-for-profit safety organization established in 1913 that received financial support and technical information from labor, industry, and government was already reaching over six million workers by 1920 through its publications.  The NSC was one of the most effective organizations at that time for communicating hazards to employers and workers and what they might do to prevent occupational disease and injury."*

In fact, 20 years earlier in 1975 (Exhibit 64, pg. 429), Monsanto was one of the founding companies to form CIIT (Chemical Industry Institute of Toxicology) with startup costs of $12 million to respond to the "*need for better information, faster communication and improved techniques for the testing of chemicals for safety – particularly for long-term exposures.*"

[Thus, Monsanto was well aware of the role of the NSC to communicate along with the role industry had to communicate foreseeable hazards to workers.  Of note, the NSC and others (i.e., MCA LAPI standards) recognized the need to communicate and protect not only workers from foreseeable hazards to which they would be exposed, but the public as well (see MCA LAPI standards and NSC's "Accident Prevention Manual for Business and Industry – Administration & Programs" published from 1948 forward.]

He further noted that: "…chemical companies (i.e., DuPont, Dow, *Monsanto, etc.) and others formed medical industrial hygiene, and safety departments in the early 1900s*" (Exhibit 56, pg. D17).

Monsanto has also been a long-time active member of the American Industrial Hygiene Association (AIHA) as reflected by Elmer P. Wheeler being on their Board of Directors in 1955-1956 (Exhibit 59); Kenneth E. Storms being on the Applied Industrial Hygiene Editorial Review Board from 1986-1988 (Exhibits 61 and 62), and Mr. J.T. Garrett leading the May 13-17, 1968 AIHA annual conference in St. Louis, MO (Exhibit 60).

Monsanto also has had long-term influence on the U.S. EPA.  They also were key participants in policy sessions.  For example they were key participants in the U.S. EPA's Office of Toxic Substances (OTS) February 12-13, 1986 sessions on Inhalation Exposure (Jerry M. Schroy – one of five from industry) and Engineering Controls (John L. Henshaw – one of four from industry) (Exhibit 63, pg. R-13).

**[Thus, Monsanto was aware of industry best practices and standards regarding the need to communicate the hazards of its chemicals to workers and the public, so that the workers and the public would be in a position to protect themselves from such hazards.]**

As illustrated in Table 9-1, Monsanto had long-term knowledge of the need to keep workers and the public informed of chemical/product hazards to which they were exposed as part of Monsanto's membership and participation in its industry associations:

### Table 9-1: Examples of Industry Best Practice and Standards Documents Regarding Communication of Hazards

| Date | Document Title | Author | Excerpt Regarding Public Safety / Warnings of Hazards | Ref. # / Bates # |
|------|----------------|--------|-------------------------------------------------------|------------------|
| 1945 | A Guide for the Preparation of Warning Labels for Hazardous Chemicals (Adopted 1945) | Manufacturing Chemists' Association (MCA) | The following are excerpts from the preamble to guidelines set forth by the Labels and Precautionary Information (LAPI) Committee of the MCA in 1945; Monsanto closely followed the development of the various versions of these LAPI Standards back well into the 1950s.<br><br>"The development of new chemical products and the introduction of chemical processes into ever-widening fields has accentuated the need for furnishing appropriate information for those cases where special precautions are necessary."<br><br>"The educating of employees regarding chemical hazards is, and must remain, the direct responsibility of their employers. **However, such hazards are not confined to employees alone, and information concerning them should, so far as practicable, reach every person using, transporting, or storing chemicals.** The most practical means for the seller to disseminate this information appears to be by labels affixed to containers of the hazardous chemicals, bearing appropriate precautionary statements and instructions from time to time as additional recommended labels are developed." | Ex. 36 & Ex. 217 |
| June 1955 | Paper – Industrial and Engineering Chemistry | R.D. Minteer, Monsanto Chemical Co., St. Louis, MO. | Mr. Minteer, in his paper "Precautionary Labeling of Hazardous Chemicals writes a review of history of the MCA's Labeling and Precautionary Information Committee (LAPI) work, its goals and how the Federal and State governments are reacting to the need for labeling of products.  He writes:<br><br>"The objectives of the (MCA) labeling committee were largely attained with the development of the warning label programs and the publication of the first manual.  The manual has been through three revisions, the latest published in 1953.  *Industry voluntarily adopted the program to a remarkable degree, and it <u>was felt that this would forestall state and federal ordinances requiring warning labels.  However, this has not been the case</u>.*"<br><br>He then goes onto write:<br><br>"*<u>In 1948 the Federal Insecticide, Fungicide, and Rodenticide Act was passed, which required,</u> among other things, that labels for economic poisons should contain <u>warning statements to protect the users of these substances</u>.  The LAPI committee worked closely with the U.S. Department of Agriculture, with the result that regulations published under the above law required warning labels which correspond closely with LAPI principles*….<br><br>*It became apparent that industry's voluntary use of precautionary labeling of industrial chemicals would not be sufficient to forestall state legislation*.  It was felt that the next best thing would be to lend LAPI Committee efforts to help the states draft uniform regulations."<br><br>Finally, in closing, he writes under "Education to the Public":<br><br>"*<u>There still remains an important task,</u> that <u>of educating the public to understand the significance of warning labels and teaching them to read the label</u>.  In this task of education, <u>help is needed</u>.*"<br><br>[Clearly, Monsanto was active in following the industry and government activities regarding labeling of products back into the 1940s and recognized that the public was not reading or understanding labeling even at that time.] | Ex. 217 |

| Date | Document Title | Author | Excerpt Regarding Public Safety / Warnings of Hazards | Ref. # / Bates # |
|------|----------------|--------|------------------------------------------------------|------------------|
| 3/14/61 | Report to the Chemical Packaging Committee to the MCA Board of Directors | Robert F. Uncles, Chairman | In his presentation to the MCA Board of Directors in March of 1961, Robert Uncles – Chairman of the Chemical Packaging Committee addressed the chemical industry's moral responsibility in regards to the public:<br><br>"Popular though the thought of saving money may be, particularly in these times of austerity, there is a third area of responsibility which the Chemical Packaging Committee and its **predecessors have always ranked as number one on its deliberations – safety. The chemical industry is unique in that a high percentage of its products are hazardous to life and prosperity if improperly or carelessly handled.**<br><br>Further ***the industry has always recognized and honored a moral responsibility beyond any legal or regulatory requirement to protect those handling its products*** from any mishap which could have been prevented by proper instruction and adequate packaging.<br><br>Because of this emphasis on safety, the Chemical Packaging Committee maintains a very close liaison with the Bureau of Explosives, the Interstate Commerce Commission to ensure, through close cooperation and mutual respect, that the ICC Regulations which specify, among other things, minimum packaging requirements for hazardous commodities, **do not deviate from the rigid standards which have proved so successful over the years in safeguarding the public.**" | Ex. 37; CMA06792 6-929 |
| 3/14/61 | Report of the Labels and Precautionary Information Committee to the MCA Board of Directors | Chester L. French, Chairman | In his presentation to the MCA Board of Directors in March of 1961, Chester French – Chairman of the LAPI Committee gave a brief history of why the committee was founded and the direction of regulations based on the committee's work:<br><br>"**The expansion of the [chemical] industry and the broadened use of its products brought recognition of the need for more comprehensive labeling and more adequate liability protection.** One of the early steps in this direction came in 1934, and covered the uniform precautionary labeling of six products or product groups under a series of voluntary agreements arranged by MCA between the manufacturers of these products and the Surgeon General of the United States."<br><br>"Due to the greatly accelerated growth of our industry during World War II, the important matter of product liability became even more accentuated and the need for a comprehensive program of education in the safe handling of chemicals became obvious. Early in 1944, MCA considered this problem at a meeting of its member executives. **It was decided that the best method to reach the handler or user of chemical products was by means of instruction labels**, and the formation of a 'Labels and Precautionary Information Committee' was accordingly authorized."<br><br>"Within months after the organization of the LAPI Committee in 1944, its chairman was asked to serve as advisor to the State of California, which subsequently became the first of several states to regulate the precautionary labeling of hazardous chemicals…The ensuing years have seen similar laws and/or regulations adopted in many other states…**All have been based upon the MCA principles** of uniform precautionary labeling due largely to the efforts of the LAPI Committee." | Ex. 37; CMA06793 0-935 |
| 1969 | National Environmental Policy Act | United States Congress | The Council on Environmental Quality (CEQ) was established as an agency within the Executive Office of the President. This occurred shortly before the establishment of the EPA in December of 1970 (Exhibit 161). The second chairman of the CEQ in the late Nixon years and Ford years was Russell Peterson, a former Governor of Delaware and DuPont executive (Exhibit 163) During this time, they began a study of the potential for metals and synthetic organic chemicals to endanger human health and the environment. At that time, the government had no power to require that chemicals be tested before they were put into commerce. | Ex. 41 and Ex. 43 |

| Date | Document Title | Author | Excerpt Regarding Public Safety / Warnings of Hazards | Ref. # / Bates # |
|---|---|---|---|---|
| 3/11/69 | Agenda for the Meeting of the MCA Board of Directors, Exhibit A (Houston, TX – 3/10-11/1969) | Manufacturing Chemists' Association (MCA) | _To demonstrate the participation level of Monsanto within the MCA, the registrants for the MCA Board of Directors Meeting and Related Events from March 10-11, 1969 are listed below._ Note that most companies in attendance had one or two employees present. _Monsanto had three members attending:_ Robert V. Butz, John L. Gillis, and W.F. Zimmerman. | Ex. 31; CMA069005-012 |
| 3/11/69 | Report to the MCA Board of Directors on the Activities of the Labels and Precautionary Information Committee | Edward J. Masek, Chairman | Speaking of the activities of the LAPI Committee during his annual report to the MCA, Mr. Masek described the role of industry in self-governance:<br>"We expect to publish a new [LAPI] Manual before the fall of the year.  The new Manual will reflect significant changes in precautionary labeling which have occurred since the previous publication.  For example, the new standard of care involving firefighting, leak and spill instructions first introduced by the MCA Chem Card Program now necessitates the inclusion of these instructions on labels.  **Apart from its usefulness to members, the significance of the Manual lies in the fact that it constitutes self-regulation by the industry.  Whenever there arises a cry for industrial labeling regulation, we offer the Manual as evidence that we can and do regulate ourselves; that we strive to protect those who use our products; that there is no need for government action.** Should, nevertheless, pressure for legislation be unyielding we offer the program set forth in the Manual as a model to be adopted by the regulatory body." | Ex. 31: CMA069019-020 |
| 1976 | ANSI Z129.1-1976: American National Standard for the Precautionary Labeling of Hazardous Industrial Chemicals | ANSI | This standard superseded MCA L-1 on December 15, 1977 as adopted by the Department of Defense.<br>As listed in the forward: "The Labels and Precautionary Information Committee of the Manufacturing Chemists Association had the following members while this standard was being developed: [1 Monsanto Company employee listed]<br>G.R. Sido (Monsanto Company) | Ex. 38 |
| 1983 | Labeling of Chemicals to Reduce Risk | S.G. Hadden, University of Texas at Austin | "In 1934, the Surgeon General of the United States appointed a Chemical Products Agreement Committee to review the wording of labels to be used to indicate dangers of chemicals to workers. From that time until 1952, individual firms entered into agreements with the government about the kinds of warnings that they would use.  _In 1944, the Labels and Precautionary Information (LAPI) Committee of the Manufacturing Chemists Association (MCA) was formed.  The committee published its first guide to labeling of hazardous chemicals in 1946; there have been six revisions since.  In 1952, these guidelines replaced the agreements between individual firms and the Surgeon General.  In 1976, the then current MCA-LAPI manual was adopted as an official standard of the American National Standards Institute_." | Ex. 39 |
| 9/14/87 | American Journal of Industrial Medicine 13:531-559 (1988) – _Corporate Influence on Threshold Limit Values_ | B. Castleman, G. Ziem | From heading of Role of Industry in TLV Process:<br>[Dr. John Knox, Turner and Newell in 1960] "The legislative framework under which industries operate in the U.S.A. makes it difficult for me here to follow the lines of thought which prompt action over there in the matter of standards of industrial practice.  _In many industries, the employers seem so far in front of legislation as to have created a special code of practice for themselves._"<br>"**_It was well recognized that, to the extent that data existed on exposures to toxic agents and ill health in industry, they had been mostly developed by industry._**"<br>["Describing the American chemical industry's contribution of data on new substances to the TLV committee as 'pathetic', _Stokinger, who was employed at the U.S. Public Health Service, addressed industry's responsibility directly in 1969_"] "**The TLVs are industry's values...industry has the sole responsibility to develop data on its own products; government is not in a** | Ex. 40 |

| Date | Document Title | Author | Excerpt Regarding Public Safety / Warnings of Hazards | Ref. # / Bates # |
|------|----------------|--------|-------------------------------------------------------|------------------|
| | | | position to develop the facilities to handle the problem *in total*, nor should it, when reliable toxicologic consultants are now available." (*original emphasis*) "_The following year, (1970), the Occupational Safety and Health Act was passed by the U.S. congress, and virtually the entire 1968 list of TLVs became enforceable federal standards._ | |
| 2004 | The Precautionary Principle: Protecting Public Health, the Environment and the Future of our Children | WHO | "_The concepts of precaution and prevention have always been at the heart of public health practice._" "_The principle states that in the case of serious or irreversible threats to the health of humans_ or the ecosystem, acknowledged scientific uncertainty *should not be used as a reason to postpone preventive measures.*" "_The concept of precaution has a long history in medicine and public health_, but as a principle it was established by the German 'Vorsorgeprinzip' (literally, the 'foresight principle') to deal with serious, emerging though not proven risks to ecosystems and health." "_Precaution and public health pursue similar goals in identifying the causes of risks and reducing or preventing them when possible at their source rather than_ seeking to control proximate risk factors and to _remedy damage after it is done._" "…effectively _implementing precaution involves_ particular _attention to transparency_, accountability and empowerment." | Ex. 198-T |

Monsanto was a member of various trade organizations or societies that have historically pushed for safety, not only in the workplace, but for safer products in general; most notably the Manufacturing Chemist's Association (MCA) (Exhibit 31, Bates CMA 069011). According to the Chemical Heritage Foundation, "the Manufacturing Chemist's Association (MCA) was formed in 1872 and initially was concerned with product standards and quality. Later the association became involved in chemical safety and the environment."

Additionally, the creation of the Labels and Precautionary Information (LAPI) Committee by the MCA in 1944 represented a non-governmental approach to warnings and was effective in standardizing how the public would be notified of their risk of using various products. The MCA-LAPI manual was officially adopted as a standard by the American National Standards Institute (ANSI) in 1976. The preamble to the guidelines set forth in the very first LAPI manual adopted in 1945 provided that "**such hazards are not confined to employees alone, and information concerning them should, so far as practicable, reach every person using, transporting, or storing chemicals.**" In non-technical language, if a company knows of a hazard, it is their duty to inform the public through labels or other educational materials of that hazard.

Seven more versions of this manual with similar language were produced through 1970. The Preamble to the 1970 LAPI Manual provides: "MCA had early recognized the place of precautionary labeling in relations both with its customers and with state and federal governments…***MCA members believed this safety record could be projected to the plants and homes of their customers to their mutual benefit*.** There was always the shadow of litigation that faces any producer as a result of real or alleged injury by a product. Chemical manufacturers had already seen the possible alternative of federal and state legislation which might or might not be wisely framed. MCA chose the path of self-regulation."

While the MCA LAPI manuals apply to chemical products and conveying information regarding their hazards to customers, it illustrates the chemical industry's understanding of the need to provide information on the hazards of chemicals they produce to the public in a transparent form, and the need to do so without the need for government regulations.

The MCA LAPI manual became the source document for the ANSI 129.1 Standard, an industry consensus standard.

In 1979, the MCA became known as the Chemical Manufacturers Association (CMA). In July of 1979 the CMA produced an "Outline of Industry Communications Plan" (Exhibit 203, Bates CMA 062555-590). The very first page of this outline ascribes to the following:

> "Companies within the chemical industry, together with their 200-member association [of which Monsanto was a member], have long been deeply concerned with protecting their employees **and the public** against the risks inherent in the production **and use** of industry products. This concern has been expressed in a rising tide of capital expenditures for environmental protection, as well as in a multitude of direct actions aimed at improving risk management in products, in the workplace, in transportation and in waste disposal.

> Despite all this positive, constructive activity, however, the industry finds itself in increasing difficulties caused by poor state of public awareness of what it is doing. Problems get far more attention than solutions – leading to an adverse climate regarding public position of the industry, to adverse legislation and regulation, etc. Obviously, the scale of public and political perception need to be better balanced if the nation is to continue getting the full benefits from this essential, dynamic industry. This is the purpose of the program outlined on the following pages."

The summary of this outline (Exhibit 203, Bates CMA 062558) contained several points regarding the notification of the public about risks:

➢ Growing public concern is evident about chemical dangers in products, the environment, and the workplace, and that the industry is not doing enough in management of these risks.

➢ A major, cohesive, long-term program is needed to evaluate and communicate industry's position.

➢ Message objective: to increase recognition that **the chemical industry is committed to doing a responsible job to protect the public from the health and safety risks of chemicals – specifically in the major concern areas of air/water pollution**, product safety, transportation safety, and hazardous waste disposal.

   **[Coincidentally, this was also the message objective for the communications program].**

➢ Utilize all appropriate communication tools: press contact, advertising, publications/film, speaking programs.

➢    Timing:    begin expanded public relations effort in 3rd quarter, 1979; advertising program January, 1980.

The outline continues with a section on "Opportunities" (Exhibit 203, Bates CMA 062562), in which the CMA professes that "there are indications that the public is willing to listen to the industry's viewpoint; also, **that effective, forthright communications can begin to shift public attitudes toward a more balanced understanding of chemicals**." The "Role of Communications" is specifically addressed (Exhibit 157, Bates CMA 062563) as a way to increase the public's awareness of "the steps being taken by the industry to identify and reduce chemical dangers."

As a member of the CMA and its predecessor MCA, Monsanto ascribed to these philosophies and to the overall plan for communication. This plan was one based on being forthright and committed to protecting the public.

A January 1990 document from the CMA concerning its Communications Program had four goals: (1) improve public perception of the chemical industry, (2) introduce the Responsible Care® initiative, (3) raise awareness of industry commitment and progress, and (4) define measurements for future industry performance (Exhibit 204, Bates CMA 066334). The target audience included the public and the proposed budget for 5 years of this outreach was $50 million.

Monsanto is a member of the American Chemistry Council as of the writing of this report, and reportedly ascribes to its Responsible Care® initiative (https://www.americanchemistry.com/Media/PressReleasesTranscripts/ACC-news-releases/American-Chemistry-Council-Approves-Eight-New-Members-and-Two-Responsible-Care-Partners.html) since the 1980s (http://www.eaglegroupusa.com/html/ monsanto.html):

> "*Monsanto has been a long-standing member of ACC and has been following the Responsible Care guiding principles since the 1980s*"

The initiative "has helped member companies significantly enhance their performance, discover new business opportunities, and improve employee safety, the health of the communities in which they operate and the environment as a whole."[1] This product code was not created by government regulation, was and is purely voluntary, and lists the following guiding principles (from the ACC website):

➢    To lead in ethical ways that increasingly benefit society, the economy and the environment.

➢    To design and develop products that can be manufactured, transported, used and disposed of or recycled safely.

➢    **To work with customers, carriers, suppliers, distributors and contractors to foster the safe and secure use, transport and disposal of chemicals and provide hazard and risk information that can be accessed and applied in their operations and products.**

➢    To design and operate facilities in a safe, secure and environmentally sound manner.

---

[1] The American Chemical Council, Inc., http://www.americanchemistry.com/

➢ To instill a culture throughout all levels of the organizations to continually identify, reduce and manage process safety risks.

➢ To promote pollution prevention, minimization of waste and conservation of energy and other critical resources at every stage of the life cycle of products.

➢ To cooperate with governments at all levels and organizations in the development of effective and efficient safety, health, environmental and security laws, regulations, and standards.

➢ **To support education and research on the health, safety, environmental effects and security of products and processes.**

➢ To communicate product, service and process risks to stakeholders and listen to and consider their perspectives.

➢ **To make continual progress toward a goal of no accidents, injuries or harm to human health** and the environment from products and operations and openly report health, safety, environmental and security performance.

➢ To seek continual improvement in the integrated Responsible Care Management System® to address environmental, health, safety and security performance.

➢ To promote Responsible Care by encouraging and assisting other companies to adhere to these Guiding Principles.


**[Monsanto was heavily involved in the MCA (and CMA and ACC) and its direction, as shown throughout the referenced documents above and was well aware of the industry best practices and needs to properly communicate the hazards and protections needed by the public. As illustrated in this report, they did not follow these industry best practices.]**

In a June 11, 2002 Monsanto draft report by Acquavella, Bleeke, Farmer – member of Stewardship team (Exhibit 197-Y, Bates MONGLY01992819), Goldstein and Gustin titled Glyphosate Stewardship, Epidemiology, and the Farm Family Exposure Study – FFES Study - $2 million study – Monsanto share $275K with $150K reimbursed for analytical work (Exhibit 197-A, Bates MONGLY00905650-9):

➢ Under the Introduction title the document states:

"..*We have been working to maintain glyphosate's <u>favorable reputation</u> through a strategy that anticipates challenges and puts appropriate initiatives in place.* "

**[Under the stewardship, the goal is to "protect the public from the health and safety risks of chemicals" rather than ensure a products "favorable reputation".]**

➢ Under the Strategy title the document states:

*Glyphosate stewardship consists of four elements*: 1) publish <u>*relevant*</u> *toxicologic, ecologic, and epidemiologic information about glyphosate in the peer reviewed literature; 2) review the literature regularly for glyphosate findings <u>and respond when appropriate</u>; 3) establish a network of prestigious scientists in key world areas <u>and provide them the latest information about glyphosate</u>; and 4) assess data gaps and fund <u>appropriate</u> research.*

Item #3 was clearly done as reflected in a February 15, 2008 e-mail from Daniel Goldstein to Xavier Belvaux and Donna Farmer (Exhibit 280, MONGLY01938131) when he states:

> "Note – John Jackson is of course a great resource.  In addition, both Sir Allister Vale (Director of the PCC at Birmingham) and his co-workers, Sally Bradbury and Alex Proudfoot (the 3 are co-authors of the latest review article on glyphosate) and Dr. Alex Campbell (the director at Edinburgh) know our product line well."

**[This strategy is not consistent with stewardship concepts of protecting the public from the health and safety risks of chemicals.  Based on a review of documents provided in this case it is clear that Monsanto was focused ensuring publications were favorable to Roundup® and glyphosate, that they responded to unfavorable literature by the Whack-a-Mole strategy – diminish the works, set up scientists to ghost write favorable papers, diminish negative papers and influence favorably public officials and funded research only where results furthered the goal of protecting the "molecule".]**

➢ Under the Implications (of the FFES study) title the document states:

> "*Results from the FFES <u>show that self-reported use of glyphosate is not a reliable predictor of absorbed dose for applicators</u> and that worst-case exposures are orders of magnitude below regulatory limits. Detectable urinary levels were found to be rare for spouses and children. Detectable levels for children were associated with helping or being present during pesticide mixing or application.*"
> And then say:
>
> *<u>"The FFES provides "real world" information about how our pesticides are being used in the U.S.</u> Subsequent analyses are planned to support predictive exposure models. Inspection of the FFES field reports for glyphosate show that children's exposure in the study, though trivial, probably could have been prevented by rudimentary precautions (e.g. wearing gloves when helping their fathers, taking care to avoid incidental contact with containers). Likewise, farmers' failure to wear gloves while mixing and loading was a common finding for those who showed detectable glyphosate values.  <u>We are</u> currently <u>looking to leverage the FFES data into a stewardship opportunity, perhaps in collaboration with the EPA and agricultural organizations.</u>*"

And then go onto say:

➢ *<u>The FFES has become a key element in our scientific network briefings and in our responses to allegations about glyphosate</u>.*  We're working actively to disseminate the results for glyphosate.  *FFES presentations have already occurred at 7 public meetings - including the last 3 AHS advisory panel meetings - and 10 peer-reviewed publications are planned.  Longer term, <u>we expect publication and presentation of these results to influence agricultural epidemiology positively</u>.*  We are coordinating an international symposium later this year in Oxford, UK – convened by Sir Richard Doll - on pesticides and cancer.  This affords an international scientific platform for the FFES data and for

glyphosate toxicology data. *The proceedings of this symposium will be published in the Scandinavian Journal of Work, Environment, and Health as a special supplement, making <u>the FFES findings broadly available in a high profile publication</u>.*

**[The initial two statements demonstrate a clear conflict; i) that "self-reported exposure information is not reliable and ii) Monsanto claims that the FFES provides "real-world" information on how Roundup® is being used – clearly contradictory statements. Nevertheless they intend to publish the paper in the interest of Stewardship and to influence the EPA and the public.]**

➢   Finally, under the Challenges (of the FFES study) title the document states:

"*Monsanto's analytic chemistry expertise was essential to the FFES. <u>However, our current method is outdated</u>.* It requires relatively large volumes of urine (100 ml, versus 5 ml for the 2, 4-D and chlorpyrifos methods) and produces less precise results than methods for other FFES chemicals. *Given the likelihood that human health allegations will continue to surface for glyphosate, <u>it seems advisable to invest in modernizing the analytic method to increase analytic flexibility and precision</u>.*

**[*As noted* earlier, Monsanto was reimbursed $150K for their lab work in the FFES study but oddly enough they note the current method used is "old", and lacks "precision". No evidence or information has been found in subsequent publications/promotions about the FFES study about Monsanto using an old lab method or one that may not be very accurate thus calling into question the transparency of their efforts to influence the public on the low toxicity of glyphosate to the public using this study.]**

**[Finally, the study only monitored for glyphosate in the urine. Glyphosate is also discharged in the feces and retained in the body (it bioaccumulates) and converts to metabolites in the urine; thus the exposure findings likely do not reflect the total glyphosate exposure of those monitored. The study also ignores "inert" ingredients such as surfactants, formaldehyde, heavy metals exposures and perhaps dioxane. Nevertheless Monsanto intends to, and has, extolled the value of findings from the FFES study to regulators and the public.]**

Further, regarding Wester et al. dermal study, the following questions are raised (Exhibit 457, pg. 6):

➢   "*Is the Wester study adequate?*

•      - For regulatory purposes?

•      - *For stewardship purposes?*

Monsanto has been a long-time member of the Food and Agriculture Organization (FAO) of the United Nations through its membership with CropLife and has agreed to comply with FAO policy documents such as those outlined in detail in Section 7.3.1.1 of this report and summarized below:

➢ International Code of Conduct on the Distribution and Use of Pesticides - 1985 through 2014 versions (Exhibits 172, 519, 520, 533, and 538).

➢ Guidelines on Good Labeling Practice for Pesticides - 1995 and 2015 versions (Exhibit 527 and Exhibit 534; see also Exhibit 521).

➢ Guidelines for The Registration and Control of Pesticides - 1985 (Exhibit 541).

➢ Guidelines for Legislation on the Control of Pesticides - 1989 (Exhibit 521).

➢ Guidelines on Highly Hazardous Pesticides - 2016 (Exhibit 523).

➢ Pesticide Labeling Legislation - 1988 (Exhibit 542).

**[A comparison of the requirements contained in these documents for communications with the public, including labeling and advertisements, with actual labels and advertising, clearly demonstrates violations of these FOA documents.]**

**9.2     Monsanto Violated its Self-Imposed Publically Stated, Product Stewardship and Code of Business Conduct Policy Statements to Deal "With People Openly and Freely" Regarding Information About their Products like Roundup® (e.g., accurately Communicating with Workers and the Public about the Hazards of Roundup®)**

Monsanto's Chairman and CEO, Richard J. Mahoney provided a keynote speech at the 1989 American Industrial Hygiene Conference (AIHA) in St. Louis in 1969 entitled "Finding a Balance: Technology and Public Safety" (Exhibit 51).  In that speech he said:

> *"**Industry in the United States gets its freedom to operate from the people.** The people grant it by allowing us to build plants and manufacture and sell products.  They limit that freedom through legislation and regulations passed by their representatives in government.   And occasionally, they withhold that freedom through bans or harsh restrictions.   **We have to earn that right to operate by dealing with people openly and freely, and by working with them to address their problems and concerns.**"*

**[Clearly, Mr. Mahoney is recognizing the need for corporations like Monsanto to earn the right to operate (and sell products to people) by "<u>dealing with people openly and freely</u>". This implies that Monsanto will be transparent with the impacts of the products on people and the environment.]**

As shown by examples in this report, Monsanto clearly violated the following provisions of their 2012 Code of Business Conduct endorsed by Hugh Grant, Chairman, President, and CEO of Monsanto (Exhibit 198-F):

> Mr. Grant himself writes: "*Our business decisions have a direct impact on our customers, business partners, shareowners and the communities where we live and work.  That means **we always need to do what is right, even when we are faced with situations not governed by specific laws or regulations**. Our*

*Code is designed to aid us in making the right choice by providing clear instructions for appropriate business conduct.*"

**[Monsanto clearly demonstrates that <u>they will not be bound simply by laws or regulations in terms of "doing what is right."</u>]**

James Myron Richardson, a 30-yr. Monsanto employee, was the U.S Account Manager for the Industrial Turf and Ornamental group, agreed in his April 28, 2018 deposition that this Code of Business Conduct does not allow for false or misleading advertising (Exhibit 198, pg. 209) or bribing government officials (Exhibit 198, pg. 218).

In the "Our Pledge" Section (pg. iii) under "Transparency" & "Sharing" Monsanto declares: "*We will ensure that information is available, accessible, and understandable"* and "*We will share knowledge and technology to advance scientific understanding, to improve* agriculture and *the environment*, to improve crops, and to help farmers in developing countries.*"

**[A review of the misleading/fraudulent advertisement and public statements illustrated in this report (e.g., Section 7) clearly show Monsanto violated these Monsanto Code of Conduct statements.]**

In the "Introduction" Section (pg. 1) under "About Our Code" Monsanto says: "*At Monsanto, <u>we place value on doing things the right way – openly, honestly and with the utmost respect and integrity</u>.*"

**[This language is clearly violated by the false advertising; it does not allow for false or misleading advertising (Section 7) or bribing of Governmental Officials (Exhibit 198, pg. 218).]**

Under the "Our Commitment to our Partners, Customers and Suppliers" Section under "Product Stewardship" (pg. 7), Monsanto says: "*Product stewardship is Monsanto's obligation to assess and support our products* and technologies. We do so *by evaluating whether those products* and technologies <u>*are safe*</u> and environmentally responsible.*"

Under the "Our Commitment to our Partners, Customers and Suppliers" Section under "Regulatory Compliance" (pg. 8), Monsanto says: "*At Monsanto, we comply with all relevant international, national and local laws and regulations. We conduct rigorous assessments to establish the safety of all our products.  <u>In addition, by meeting **or exceeding** all regulatory requirements</u>, we assure our customers, growers and consumers that we have established the safety of all our products and, when required, have satisfied rigorous reviews by appropriate regulatory authorities to assure the freedom to use our products and market them internationally.*"

**[As illustrated in this report, Monsanto has not tested Roundup® formulations as products for decades as to whether or not they are carcinogens despite knowing the formulated product is more toxic than the active ingredient glyphosate – Daniel Goldstein's statement "ignorance is bliss" regarding the toxicity of Roundup® formulations says it all – Monsanto does not want to know the answer on whether or not these products are carcinogenic.  Monsanto's Code of Business Conduct Product Stewardship language does not suggest ensuring its products are**

**safe, it is to take the position of "ignorance is bliss".  It would appear that what Monsanto tells the public clearly differs from how they behave internally.]**

Under the "Our Commitment to our Partners, Customers and Suppliers" Section under "Fair Marketing Practices" (pg. 8), Monsanto says: "*When marketing or selling our products, it is vital that we use only fair, ethical tactics*. ***Those of us with selling, advertising, promotion and marketing responsibilities must*** take care to ***fulfill these duties through truthful and accurate representations.  We must never make false or misleading statements*** about the quality and availability of our products, nor those of our competitors.  Further, ***we may not make unfair or untrue comparisons*** between our competitors' products and our own. This includes "cherry picking" or making incomplete statements about our competitors' products or our own.

**[Again, as an illustration, Monsanto has not tested Roundup® formulations for decades regarding whether or not they are carcinogens.  In fact, when questioned about health effects of the toxicity of Roundup®, their response is typically to not answer the question and comment on the toxicity of one ingredient, glyphosate because that is what is required by the U.S. EPA.  In cases where scientific work has looked at the potential toxicology of Roundup® formulations, the record is filled with examples of Monsanto besmirching this work, instead of answering the questions themselves.  Exceeding the regulations, as suggested by this portion of Monsanto's Code of Business Conduct, would have been to test Roundup® formulations for toxicity and health effects – something Monsanto has not done and who's Daniel Goldstein addresses by stating "ignorance is bliss".]**

***Dealing fairly in our industry also means we never engage in commercial bribery***. *Commercial bribery occurs when we give something of value to others – or they give something of value to us – with the intent to improperly influence a business decision or act.  Regardless of whether commercial bribery is done directly, or through a third party, Monsanto neither condones nor tolerates this behavior.* "

**[Again, as evidenced throughout Section 7 of this report, Monsanto has violated U.S. EPA and State (New York) labeling and advertising Statutes, clearly violating this portion of Monsanto's Code of Business Conduct. Monsanto's fine for bribing Indonesian Government Officials (see details below - Exhibit 198-I, P1.3414.1) clearly illustrates violation of another portion of Monsanto's Code of Business Conduct.]**

Under the "Our Commitment to our Company and Shareholders" Section under "Avoid Conflicts of Interest" (pg. 11), Monsanto says: "*A key component in fulfilling our commitment to our Company and shareowners is avoiding conflict of interest situations.  A conflict of interest occurs when our personal, social, financial or political interests conflict with those of our Company.  **Conflicts of interest can hinder our Company's success and create the impression that we do not conduct business fairly or without bias.  Conflicts can arise from***

_**dealings with external persons or groups**_, as well as from relationships we share with others at Monsanto".

**[Not only has Monsanto not avoided conflicts of interest, they have participated in establishing them.  An example of this would be the "ghost" writing of scientific papers, giving the public the impression an independent scientist wrote the paper when in fact it was primarily written by Monsanto.]**

Under the "Use Company Technologies Appropriately" Section under "Social Media Use" (pg. 15), Monsanto says: "_**Further, we should not use social media to disparage our customers, suppliers, fellow employees or other stakeholders, or make misleading or unsupported statements about Monsanto, its products**, its competitors or their products._"

**[As illustrated throughout this report, Monsanto has sent e-mails to governmental officials or distributors misrepresenting, for example, the biodegradability of Roundup®, etc. and to disparage scientific work critical of Roundup® formulations.]**

This effort to disparage other scientific work is touched on in a June 6, 2005 email from Dr. Gary Winston – Chief Toxicologist, Israel Ministry of Health, Department of Environmental Health to Monsanto's Donna Farmer when he writes (Exhibit 198-J, Bates MONGLY01908630) in part:

> "What I have noticed is that every epidemiological study in the literature has been criticized by other epidemiologists on the exact same grounds.  _I began to wonder if, in any instance of challenge to a Monsanto chemical in the epidemiological literature, there has **been agreement by Monsanto** consultants that the study might have merit_ and hence, led to recall or any internal regulation of the product?  _**Wouldn't it be nice for me to be able to show an example of total objectivity by a Monsanto consultant**_?"

Monsanto's Donna Farmer rejects this criticism of "total objectivity" out of hand writing him:

> "As we have discussed before the consultants we use are of the highest caliber with unblemished reputations – two reasons why...we want quality people looking at the data and telling us if we are missing something and secondly we know that they will not jeopardize their careers and reputations on poor science - _so I once again must respectfully disagree with you...**that just because no consultant has told us to recall or internally regulate our product based on one epi study** does not mean they are not "totally objective"._

And then provides the often stated Monsanto glyphosate response regarding the toxicity of glyphosate but ignoring the questions about the toxicity of Roundup® formulations:

> "No credible regulatory agency, scientist, or scientific body (we also submitted those _**glyphosate**_ epi studies for the 2004 WHO review - and

they increased the ADI from 0.3 mg/kg/day to 1.0 mg/kg/day!) has concluded those studies to be evidence of harm to human health."

Under the "Use Company Technologies Appropriately" Section under "Accurate External Communications" (pg. 16), Monsanto says: "*We have a responsibility to communicate candidly and with transparency with our shareowners and the public.*"

**[Again, a review of the misleading/fraudulent advertisement and public statements illustrated in this report (e.g., Section 7) clearly show Monsanto violated this Monsanto Code of Conduct statement.  Both the U.S. EPA and the State of New York, for example, have found Monsanto's claims to be misleading and/or fraudulent.  In the case of New York State, Monsanto agreed to a fine and cease and desist order for such advertisements.  Yet they continue to produce literature, and have key marketing/sales staff, support some of these same claims (e.g., Roundup® is biodegradable.]**

Under the "Our Commitment to the World" Section under "No Bribery or Corrupt Practices" (pg. 18), Monsanto says: "*As a global organization, our Company is subject to various anti-corruption laws around the world.  Such laws are designed to help us maintain fair, ethical and transparent interactions with government officials.  Complying with global anti-corruption laws including the U.S. Foreign Corrupt Practices Act ("FCPA") means that neither we nor our third party agents ever bribe or attempt to bribe a government official to secure a benefit for Monsanto.*"

**[Monsanto was fined $1,000,000 by the U.S. Department of Justice in 2005 for bribing a senior Indonesian Government Official (Ministry of Environment) in 2002 for a $50,000 bribe (Exhibit 198-I).]**

Monsanto e-mail correspondence demonstrates that they have ghost written scientific papers; a practice where Monsanto drafts most of a scientific paper and has others from the scientific community publish the paper under their names to make the paper appear to come from independent sources (see for example MONGLY00977267, MONGLY02913530-31; Exhibit 317; Exhibit 355, Bates MONGLY01869261-412, published as Exhibit 206 in 2000 with authors listed as Gary M. Williams, Robert Kroes, and Ian C. Munro; Exhibit 359., Bates MONGLY01723742 – ghost wrote cancer review paper Greim et al. (2015); Exhibit 452, Exhibit 455, Bates MONGLY02117800-04 – ghost written paper by Kier and Kirkland "Review of Genotoxicity of Glyphosate and Glyphosate-based Formulations" (Exhibit 453 and Exhibit 454) which often cites Williams et al., (Exhibit 206) which was also ghost written, Bates MONGLY02598454-55; https://science.house.gov//imo/media/doc/02.06.18%20-%20Spinning%20 Science%20 and%20Silencing% 20Scientists_0.pdf?1 (Exhibit 360); Exhibit 361; and https://www.ehn.org/  monsanto-effort-to-skew-science-2581194459.html) clearly breaching their stated code of conduct to communicate transparently to the public.

Finally, at the close of the policy, Monsanto says under Waivers: "*While waivers of our Code are never expected, they may be granted in certain limited instances.  Any waiver of or amendment to our Code must be approved by the*

_Monsanto Board of Directors_.  This includes any waiver requested by directors and executive officers including our Chief Executive Officer. Further, _such waivers_ or amendments _must be disclosed publicly_ as required by applicable law or stock exchange rules."

**[No evidence exists that Monsanto, for example, waived the Bribery Clause of the Monsanto Code of Business Conduct nor informed the public of their intent to do so.]**

Monsanto contracted customer market research (Section 8.0) that clearly demonstrated the negative impacts on sales of Roundup™ should the EPA signal word "WARNING" or "DANGER" be used rather that the less safe signal word "CAUTION."  Nevertheless, despite evidence of dermal irritation of the skin by applicators, Monsanto continued to push for the use of the signal word "CAUTION" rather than the more protective word "WARNING" or "DANGER."

Under Monsanto's Product Stewardship and The Pledge (https://monsanto.com/products/product-stewardship/stewardship-pledge/), they note:

"Overseeing Monsanto's work are many internal, cross-functional, global teams that work hard to examine our research and development, products, and processes to make certain _we are obeying the law, meeting Monsanto's high stewardship standards, and operating with integrity in accordance with our Pledge values_.  Various teams focus on product stewardship from lab to field to protect the safety of our people, communities and the environment.

To learn about Product Stewardship and Safety, click here."

Product Stewardship

"At Monsanto, Product Stewardship is the responsible development, management, and use of technologies and products across our seeds, traits, and crop protection businesses throughout the entire product life cycle."

Stewardship of Crop Protection Products

Monsanto places the highest priority on the responsible development, manufacture, and use of crop protection products. "Our Crop Protection Stewardship is focused on providing growers with sustainable choices that increase productivity as well as promoting the safe and responsible use of existing products such as glyphosate consistent with Monsanto's corporate stewardship standards.  _We subscribe to international stewardship standards, including the International Code of Conduct on Pesticide Management_ issued by the United Nations Food and Agricultural Organization and fully supported by Responsible Care Global Charter."

Monsanto also states that it will follow the International Code of Conduct on Pesticide Management:

The International Code of Conduct on Pesticide Management (http://www.fao.org/agriculture/crops/thematic-sitemap/theme/pests/code/en/)   is the framework on pesticide management for all public and private entities engaged in, or associated with, production, regulation and management of

pesticides.  The new *Code of Conduct on Pesticide Management* was approved by the FAO Conference in June 2013. The Code provides standards of conduct and serves as a point of reference in relation to sound pesticide life cycle management practices, in particular for government authorities and the pesticide industry.

Also, in their 2015 Sustainability Report (https://www.monsantoglobal.com/ global/uk/Documents/monsanto-2015-sustainability-report.pdf) Monsanto made the following commitment under the Executive Summary (pg. 4):

> "*Our approach (to people, planet and company) encompasses these key principles: i) Act Ethically and Responsibly, ii) Advance Product Stewardship...*"

Later (pg. 81), Monsanto states:

> "**Leading with Integrity.**  *Ethical business conduct is the responsibility of every employee, and it is up to management to lead by example….We refreshed and deployed the anti-corruption training course for employees who were identified as having the potential to interact with government officials.*"

Thus, Monsanto made a commitment to act ethically (not just legally) and to be a good product steward.  Yet on page 7 it makes a conflicting statement regarding glyphosate:

> "**Supporting the Science on Glyphosate:**  *After the International Agency for Research on Cancer (IARC) panel classified glyphosate in Category 2A ("probably carcinogenic to humans"), Monsanto asked a panel of 16 experts to review IARC's assessment.  They concluded "none of the results from a very large database, using different methodologies, provides evidence of, or a potential mechanism for human carcinogenesis" (Page 87).*

> Pgs. 87-88:  *"In March 2015, the International Agency for Research on Cancer (IARC) evaluated the potential carcinogenicity of several pesticides including glyphosate, an active ingredient in many popular herbicides, including Monsanto's Roundup® family of herbicides.  After the one week review, the IARC panel classified glyphosate as a Category 2A hazard ("probably carcinogenic to humans"), a category in which IARC recently included red meat.*

> *Based on the overwhelming weight of evidence, key regulatory agencies, as well as Monsanto, disagreed with IARCs classification of glyphosate.*

> *Importantly, IARC overlooked decades of thorough and science-based analysis by regulatory agencies around the world and selectively interpreted data to arrive at its classification of glyphosate.  No regulatory agency in the world considers glyphosate to be a carcinogen.*

> *Regulatory agencies have reviewed all the key studies examined by IARC – as well as many more studies – and arrived at the overwhelming consensus that glyphosate poses no unreasonable risks to humans of the environment when used according to label instructions.*

*Most recently, the European Food Safety Authority (EFSA) announced its conclusions that 'glyphosate is unlikely to pose a carcinogenic hazard to humans and evidence does not support classification with regard to its carcinogenic potential.' EFSA's conclusion builds upon the science-based proposed re-evaluation decision by the Canadian Pest Management Regulatory Agency from April 2015, which concluded that 'the overall weight of evidence indicate that glyphosate is unlikely to pose a human cancer risk."*

*To better understand how IARC arrived at such an inconsistent conclusion, Monsanto asked a panel of 16 experts to review IARC's assessment. The panel evaluated IARC's process and also examples of the large data set evaluated by regulatory agencies. They concluded "none of the results from a very large database, using different methodologies, provide evidence of, or a potential mechanism for, human carcinogenesis."*

Under the next Topic – *Pursuing Effective Regulatory Approval – Monsanto's Dr. Phil Miller, Vice President, Global Government and Regulatory Affairs, is quoted as saying:*

*"What Monsanto looks for in regulations is effectiveness, predictability and robustness"*

**[But not public health and safety associated with the use or their products.]**

Thus, despite the misleading title that Monsanto was <u>Supporting the Science</u> (of IARC), they note they put a panel together to refute the science and make other statements besmirching the work of IARC. In fact, internal documents discussed later will show a concerted effort to undermine the IARC findings.

Also, several of these Monsanto statements, underlined above, require further comment (see below) since other scientists and health and safety professionals have provided significant differences of opinions regarding Monsanto's public statements of glysophate reproduced above.

Listed below are Monsanto public statements (underlined) which have been refuted by scientists and health and safety professionals who have provided significant counter arguments to these statements:

i)   <u>*Glyphosate is not a probable human carcinogen as suggested by IARC*</u> – many reports and analysis by pre-eminent scientists support IARC's position and that positive association with Non-Hodgkin Lymphoma (NHL) (e.g., see Exhibit 2-10).

ii)  <u>*IARC took only a one-week review to make their decision*</u> –Those selected to be on the panel are selected months in advance and spend months reviewing the available information before meeting. The meeting simply provides a forum to develop a consensus (or not develop a consensus) based on months, if not years of individual research on the topic. In this assessment, the pre-meeting review period was nearly one year (Exhibit 52, pg. 127). Dr. Blair, in his March 20, 2017 deposition noted that members spent three months before the meeting studying documents associated with the decision (Exhibit 53, pg. 34).

iii) Internal e-mails show Monsanto's public position on glyphosate and Roundup® differs from internal correspondence: Donna Farmer to Skhar Nataragan –

Monsanto email dated November 22, 2003 (Exhibit 86, Bates MONGLY00922458-9 and https://usrtk.org/wp-content/uploads/2017/08/27-Internal-Monsanto-Email-You-Cannot-Say-That-Roundup-is-not-a-Carcinogen.pdf):

> "***The terms glyphosate and Roundup cannot be used interchangeably*** nor can you use 'Roundup' for all glyphosate-based herbicides any more. ***For example you cannot say that Roundup is not a carcinogen…we have not done the necessary testing on the formulation to make that statement***. The testing on the formulations are not anywhere near the level of the active ingredient. We can make that statement about glyphosate and can infer that there is no reason to believe that Roundup would cause cancer.
>
> *We cannot support the statement about 'no adverse effects whatsoever on* flora, or fauna or on *the human body*.' Adverse effects are seen on flora (glyphosate is meant to kill vegetation), adverse effects on fauna – in studies with laboratory animals – even death is seen (LD50 studies for example) and in humans – mild reversible eye and skin irritation as seen with normal use and death can occur in suicide attempts. *Therefore we advise using the phrase… 'When Roundup herbicides are used according to label directions, no unreasonable adverse effects to people, wildlife, and the environment are expected*."

- Ashley Roberts to Donna Farmer/William Heydens and William Heydens to Ashley Roberts – emails dated August 6, 2015 – Exhibit 137/197-B, Bates MONGLY01183934-5):

  Roberts:

  Just received a question from Keith in response to my email message on the exposure piece this morning.

  He has asked ***if we need to give any consideration to exposures of formulants in the commercial product***, at least in applicators? ***I was under the impression these were inert** but reading a response this morning in the **Ecologist makes it sound like it is the combination that is toxic!!!***

  Heydens:

  I think **the short answer is *no***. **The focus of this is what is the carcinogenic potential of *glyphosate*.**

  That said, ***the surfactant in the formulation will come up** in the tumor promotion skin study **because we think it plays a role there***.

  Again, even as late as August 2015, these statements support the opinion that the toxicity of the Roundup® product is largely unknown and that even Monsanto cannot state Roundup® is not a carcinogen. Even Ms. Farmer's suggested "warnings" statement is a bit of wordsmithing and arguably false since she really does not know that "no unreasonable adverse effects to people are expected" and never defines the word "unreasonable."

**[These statements support the opinion that the toxicity of the product is largely unknown and that even Monsanto cannot state Roundup® is not a carcinogen.  Even Ms. Farmer's suggested statement is a bit of wordsmithing and arguably false since she really does not know that "no unreasonable adverse effects to people are expected."]**

Katholm (Exhibit 214, pg. 17) noted that Roundup® containing POEA may show synergistic toxic effects and must be tested to determine the product toxicity rather than just glyphosate alone:

> "Tsui and Chu (2003) investigated whether POEA also accounted for the toxicity of Roundup to microorganisms.  Bacteria (Vibrio fischeri) and protozoa (Tetrahymena pyriformis and Euplotes vannus) had more or less similar sensitivities towards Roundup. *For the same species, POEA showed considerably lower toxicity levels, and generally, glyphosate IPA salt was least toxic.*
>
> *Based on these findings it becomes obvious, how important it is to investigate whole Roundup formulations. In formulations, it is always important to know the individual toxicities of the different compounds – but also their combined effects, as they might influence each other.*

Monsanto, in an internal Regulatory Leadership Meeting presentation much later (November 1-4, 2010) recognized that POEA had been the dominant surfactant in their formulations (POEA suppliers were Akzo and Clariant) until the late 1990s, was being banned in Europe and had developed the following strategies regarding POEA: 1) Defend POEAs, 2) Register non-POEA formulations in 2011 through 2013, and 3) Managed exit from POEAs.  POEA continued to be used in Roundup formulations years after concerns regarding its toxicity were known because these formulations containing POEA "are business critical" (Exhibit 441, pgs. 8-9).

- Internally documented efforts (e. g., David Saltmiras 2013 Performance Review) to influence groups like the Glyphosate Toxicology Technical Working Group which Monsanto's David Saltmiras chaired (e.g., delaying groups glyphosate carcinogenicity review/manuscript transmission to influence the group and impact data considered and coordinating letters to the editor against papers not favorable to glyphosate) (Exhibit 433, Bates MONGLY01045298-306).

- Monsanto's efforts to influence U.S. EPA's Mr. Rowland for favorable positions regarding glyphosate or to close down research/analysis of science that might produce unfavorable results for Monsanto's glyphosate (Exhibit 52, pgs. 135-137 and

https://usrtk.org/wp-content/uploads/2017/03/JessRowlandMarion Copelyfiling. pdf).

Marion Copley, formerly a long-term employee at U.S. EPA and dying of cancer writes her boss, Jess Rowland (Exhibit 218, pg. 11):

*"...Previously, CARC concluded that glyphosate was a "possible human carcinogen". The kidney pathology in the animal studies would lead to tumors with other mechanisms listed above. Any one of these mechanisms alone listed can cause tumors, but glyphosate causes all of them simultaneously. It is essentially certain that glyphosate causes cancer. With all of the evidence listed above, the CARC category should be changed to "probable human carcinogen". Blood cells are most exposed to chelators, if any study shows proliferation of lymphocytes, then that is confirmatory that glyphosate is a carcinogen.*

*Jess, you and I have argued many times on CARC. You often argued about topics outside of your knowledge, which is unethical. Your trivial MS degree from 1971 Nebraska is far outdated, thus CARC science is 10 years behind the literature in mechanisms. For once in your life, listen to me and don't play your political conniving games with the science to favor the registrants. For once do the right thing and don't make decisions based on how it affects your bonus. You and Anna Lowit intimidated staff on CARC and changed MI ARC and IIASPOC final reports to favor industry. Chelators clearly disrupt calcium signaling, a key signaling pathway in all cells and mediates tumor progression. Greg Ackerman is supposed to be our expert on mechanisms, but he never mentioned any of these concepts at CARC and when I tried to discuss it with him he put me off. Is Greg playing your political games as well, incompetent or does he have some conflict of interest of some kind? Your Nebraska colleague took industry funding, he clearly has a conflict of interest. Just promise me not to ever let Anna on the CARC committee, her decisions don't make rational sense. If anyone in OPP is taking bribes, it is her.*

**I have cancer and I don't want these serious issues in MED to go unaddressed before I go to my grave. I have done my duty.**

Marion Copley March 4, 2013.

Excerpts of Mr. Jenkins (Monsanto) discussions with Jess Rowland (U.S. EPA), and resulting favorable glyphosate decisions by the U.S. EPA demonstrate Monsanto's influence over the regulation of glyphosate to which Ms. Copley was discussing (see Exhibit 52, pgs. 135-137).

- Funding University work indirectly (provide research monies to a University Foundation, which is then tapped by a Professor to write

a Monsanto favorable paper, without the Professor having to state the ultimate source(s) of the funding).

- Influence of Regulators, especially those at the U.S. EPA OPP. Gillam (pgs. 32-35) provides detailed insights into Monsanto's efforts to influence the 1993 EPA RED decision for glyphosate. They worked to reclassify initial 1985 EPA conclusions that glyphosate was oncogenic – possibly carcinogenic to humans to have the possibility of it being a carcinogen removed in the 1993 RED.

Efforts to influence Regulators outlined in Monsanto's September 10, 2013 PowerPoint presentation entitled: "Global Impact of Re-registrations" (Exhibit 55).  Under their "worst case" scenario they note: i) *limits on continuous use of glyphosate due to* weed resistance and/or environmental and *health concerns raised by Huber and others*, ii) Go ground or aerial broadcast application on undefined sites, iii) *Need for higher Tier evaluation of glyphosate with respect to endocrine effects*, iv) EPA pressured into unnecessary action by public comment period, and v) Lawsuits against EPA. The history of whether or not glyphosate is a carcinogen is summarized briefly by Katholm (Exhibit 214, pgs. 15-16) as follows:

"Glyphosate as a carcinogen?

In addition to the questioning about which components lead to the toxicity of glyphosate formulations, if toxicity is observed at all, there has been some controversy about the carcinogenic potential of glyphosate.

In 1985, The United States Environmental Protection Agency (U.S. EPA) classified glyphosate as possibly carcinogenic to humans (Group C), based on tumor studies in mice (EPA, 1985).

However, when the study was reevaluated by US EPA in 1991, the classification of glyphosate was changed to evidence of non-carcinogenity in humans, instead (Group E) (IARC, 2015).

In 2015, the International Agency for Research Against Cancer, (IARC), reclassified glyphosate as probably carcinogenic to humans (Group 2A) (Guyton et al., 2015). This category is used for pesticides showing limited evidence of carcinogenity in humans (non-Hodgkin lymphoma) but sufficient evidence in animals (Guyton et al., 2015; IARC, 2015).

After a peer-review of the carcinogenic potential of glyphosate, the European Food Safety Authority (EFSA) concluded that glyphosate is unlikely to pose a carcinogenic threat to humans, in contrast to the evaluation by IARC (Exhibit 448).

*However, IARC evaluated both glyphosate and glyphosate-formulations, whereas EFSA only included studies concerning the active substance, which might influence the outcome of the reviews* (EFSA, 2015a)."

Evidence clearly shows Monsanto's massive effort to influence EPA's decisions and the public's knowledge by enlisting a broad set of resources and personnel to denigrate the results of the 2015

findings on glyphosate by IARC; even before the IARC results are released (Exhibit 196-H; Exhibit 444, Exhibit 445, Exhibit 446, Exhibit 447, Exhibit 456).  This included ghostwriting (to reduce Monsanto's costs of such publications) papers critical of IARC (Exhibit 445, pgs. 5 and 7) and to compile "3rd party statements in defense of glyphosate" to EPA and Germany (Exhibit 456, Bates MONGLY03316370).

- Use of Monsanto's developed toxicity data and/or laboratory analysis, suggesting no health effects.

- Communications by Monsanto sales staff and customer's parroting misleading claims in notices and advertising.

Dan Schulz, Monsanto's Roundup® Marketing Manager for three years - ~2013 to ~2015, (Exhibit 196, pgs. 22, 95, 171-172, 411) and who also was on the registration review team (Exhibit 196, pg. 107) testified that he had the ability, and did, communicate with the entire U.S. sales staff (Exhibit 196, pgs. 117, 144).  In this role, he testified that he only sent out information that was based on "sound science" and EPA's recommendations (Exhibit 196, pgs. 112, 138, 140, 165-166, 184, 212-213, 221, 266, 268, 271, 308, 315, 322, 367, 370, 402, 437); yet admitted he did not know what "sound science" was (Exhibit 196, pg. 489).  On the other hand, he was told by Monsanto's scientists that the IARC glyphosate 2A classification was not based on sound science (Exhibit 196, pgs. 285-286, 461, 499-500), nor was Seralini's work (Exhibit 196, pgs. 419-420, 424-425, 445-446).

Mr. Schulz testified that he did not believe, to the day of his deposition, that Roundup® can cause diseases in humans, including cancer, yet was not aware of outside studies in Monsanto's possession that demonstrated these possibilities (Exhibit 196, pgs. 150, 152, 159, 292, 309, 418).  Cancer (from the IARC work) was "noise in the marketplace" to Mr. Schulz and had to be addressed or tamped down (Exhibit 196, pgs. 504-507); not unlike the Whack-a-Mole view held by Monsanto's Dr. Goldstein (Exhibit 196, pgs. 362-372, 380); who also referred to some Monsanto critics as "those GM burp nappies" (Exhibit 196, pgs. 374, 378).  In fact, Mr. Schulz, Manager of Marketing admitted that they:

- Created a brochure (#3359) five months after the 2015 IARC glyphosate decision stating glyphosate was a probable human carcinogen stating glyphosate was not associated with cancer (Exhibit 196-L, referenced in Exhibit 196, pgs. 313; see also Exhibit 196-N) even though Donna Farmer said they could not say that Roundup does not cause cancer because the work to make that statement had not been completed.  Schulz admitted that he sent out information that glyphosate was unequivocally not a carcinogen even though

conflicting information was known to him was true and that he had no basis to make such a statement since he was not a scientist (Exhibit 196, pgs. 464-478, 491-493). He doubles down in an October 29, 2015 e-mail to Sales (Exhibit 196-N, MONGLY07598378-9) with the following statements: i) "…*Glyphosate is not a carcinogen*…, and ii) …*The claim that the registration of glyphosate is based on manipulated information is baseless and unfounded*." Again, despite the fact that he admits he is not a scientist and is unaware of most of the relevant scientific literature in the possession of Monsanto's scientists, he produces and distributes erroneous/parsed information. This is especially dangerous as Mr. Schulz is communicating miss-information regarding the hazards of Roundup® to the sales staff, distributors, and ultimately the public using Roundup®.

In fact, Steve Knodle writes on March 11, 2015 that "*Dan Schulz is on point from our team* working with Kim Magin *providing needed materials* to ensure we are protecting the molecule (glyphosate) *for our farmer customers* for current and continued use going forward" (Exhibit 196-H, MONGLY07596745). This too was clearly not a transparent effort to inform the public of the positive and negative science regarding Roundup® to the public.

- He also admitted he thought, and was told, Roundup® was biodegradable even though it was not (Exhibit 196, pg. 191).

- He testified that he was aware their advertising showed applicators with no PPE; despite requirement to wear some PPE (Exhibit 196, pg. 518)

Donna Farmer, Chemistry Stewardship Lead (Exhibit 515, pg. 27; see also Exhibit 547 - Bates MONGLY02894807-19), in a February 16, 2009 Saltmiras presentation presents (Figure 9-1) the role of the Glyphosate Stewardship Team as follows (Exhibit 515, pg. 23):

**Figure 9-1: David Saltmiras February 16, 2009 Presentation (Exhibit 515, pg. 25)**

Stating that the role of the Glyphosate Stewardship team was for "Freedom to Operate" (FTO) and "Defense of Glyphosate & RR (Roundup Ready) crops" clearly is in conflict with Monsanto corporate stewardship statements (see also Exhibit 511, Bates MONGLY01720499-501).

Mr. Schulz testified that he equates the words "consumer fraud" with "lying" (Exhibit 196, pgs. 185-186); yet he testified he was not aware his company had been found to have committed consumer fraud (Exhibit 196, pgs. 192-196, 199-209, 220-229) nor that his views and information he forwarded to sales staff and distributors that Roundup® did not cause cancer or was biodegradable were also false.

In addressing Germany's 2009 concerns about Roundup formulations containing POEA, Monsanto representatives respond in a series of e-mails (Exhibit 526, Bates MONGLY02639007-9) discussing the issue.  Two points illustrating the lack of meeting their Standard of Care were illustrated in these e-mails:

1.    Richard Garnett writes on 2-18-2009 (MONGLY02639008) that: "We also, as Holger points out, need to 'offer something' towards a compromise.  An easy give would be to recommend respiratory protection where there is a risk of knapsack sprayers being used to treat high vegetation, leading to a risk of drift in the face.  We already have such

recommendations (in fact we were given them by law) in the UK for drift spraying in forestry."

**[Clearly Monsanto knows the product remains in the air and with POEA is of a more toxic concern – recall Stokes Law discussion. Monsanto is recommending respiratory protection to appease regulators, yet this recommendation is not included on warnings! Since the dermal route is the larger route of exposure, dermal PPE would be even a bigger need.]**

Regarding concerns about POEA in Roundup formulations, and toxicity test results of MON 2139 (original formulation) containing MON 0818 (POEA), Monsanto says:

2.     Terry Kaempfe writes on 2-19-2009 in a followup e-mail regarding tallow amine tox issues in Germany (MONGLY02639007) regarding tox data given in a poster presentation – "We have a draft manuscript of the data from the poster that will probably never see the light of day; if you really want to open a can of worms. I can send it to you (and by "I", I mean Donna."

**[Clearly <u>Monsanto</u> has some information on the increased toxicity of Roundup containing POEA vs. glyphosate tox only but <u>does not want the information "to see the light of day" or "open a can of worms.</u>"]**

Timothy Paul Ford, Jr., Monsanto's Roundup® Account Manager (17 states) in the Industrial Turf and Ornamental group  and 37.5 year employee at Monsanto (Exhibit 197, pgs. 79, 92, 110, 115 and 303) *testified that he had the ability, and did, communicate Monsanto prepared information to distributors.* Specifically, he testified that:

▪     *When he got information on toxicity he would share it with people in the sales field* (Exhibit 197, pgs. 23, 37, 370, 394); but he could not pass on information that he did not have (Exhibit 197, pgs. 26-27, 46, 49, 90, 225, 231, 370). He had to rely on what the scientists at Monsanto said or passed along (Exhibit 197, pgs. 55-56, 58, 89, 202-203, 210, 220, 331); he knew toxicologist Donna Farmer (Exhibit 197, pgs. 58, 90-91, 93, 97-98, 176, 285). He was unaware of Donna Farmer writing in 2003 that one could not rule out that Roundup® was a carcinogen as the tests had not been completed (Exhibit 197, pgs. 94-96, 323, 334) but did recall her giving a presentation at one of their annual sales meeting – did not recall what she spoke about (Exhibit 197, pgs. 176-177).

▪     He does not agree, and would not make the claim that Roundup® was as safe as table salt (Exhibit 197, pgs. 276-278) nor that one could drink it (Exhibit 197, pg. 278). *On the other hand, he admitted <u>he told distributers multiple</u>*

_times_ _that the oral toxicity for Roundup®_ _(not glyphosate)_ _was lower than table salt_ (Exhibit 197, pg. 298).  Again, he was not aware the Attorney General for the State of New York declared the advertisement to be false and misleading (Exhibit 197, pg. 295).

- He was provided information by Monsanto that Roundup® was biodegradable (Exhibit 197, pgs. 262-264, 290, 293); but that Monsanto agreed to cease and desist that claim by action brought by the Attorney General of the State of New York (Exhibit 197, pgs. 291-292, 296).

- He was provided information by Monsanto that glyphosate did not bio-accumulate in the body (Exhibit 197, pgs. 328-329) despite literature that said otherwise.

- He had not heard from anyone, including Monsanto scientists, that the Roundup® formulation was more toxic than the active ingredient glyphosate alone (Exhibit 197, pgs. 61, 65-66, 89, 183, 339-340, 352-353); he was under the impression that the Roundup® formulation had been tested for its toxicity as part of the labeling process (Exhibit 197, pgs. 332, 334).

- He testified that the label required a long sleeve shirt, long pants, shoes and socks, but not goggles and gloves (Exhibit 197, pg. 112).  When shown EPA PPE requirements under the signal word "CAUTION" he admits it states chemical resistant gloves are required (Exhibit 197, pg. 130).  When shown Petty Video 9 where the user is wearing no gloves and is wearing shorts and a short-sleeve shirt, _he agrees if_ _the label says "CAUTION" then gloves would be required_ (Exhibit 197, pgs. 136, 138).

Mr. Ford, Jr. was unaware of any studies on the toxicity of POEA on humans nor the ability of Roundup® to affect cell-cycle regulation or other health effects/dermal studies completed on Roundup® (Exhibit 197, pgs. 86-87, 99, 119, 154, 159, 162, 164, 172, 180, 184, 186, 206, 211-216, 230, 242-243, 245-246, 251-252, 317, 322, 337, 342, 353, 359); he agreed it would have been a good idea for him to be provided with this information (Exhibit 197, pg. 168).  He was never told to compare Roundup® toxicity to shampoo, laundry detergent, or hand soaps (Exhibit 197, pg. 101).  He was aware that some Roundup® products contained the surfactant polyethoxylated tallow amine (POEA) (Exhibit 197, pgs. 77-78, 82); but was not aware it had been banned in Germany (Exhibit 197, pg. 82).

As a primary source for information, he relied on "Backgrounder" information contained on the Monsanto Industrial Turf and Ornamental website (Exhibit 197, pgs. 32, 43).  As shown in Section 7.3.2.13, the "Backgrounder" presented false information

such as the fact that glyphosate does not bioaccumulate – see Section 7.1.5 for information that bioaccumulation does occur.

Mr. Ford, Jr. agreed that "*someone purchasing a product regardless of what the product is would like to know as much as they can know about it*" (Exhibit 197, pgs. 219-220).

James Myron Richardson, a 30-yr. Monsanto employee, was the U.S Account Manager for the Industrial Turf and Ornamental group from 2010 to 2015 (Exhibit 198, pgs. 61, 149, 164, 168, 173, 194, 225), *testified that he had the ability, and did, communicate Monsanto prepared information to Distributors*.  Specifically, he testified that:

- *He admitted that he had told people Roundup® was biodegradable because he believed it to be true (Exhibit 198, pg. 215).*  He testified that he did not know Roundup® was not biodegradable (Exhibit 198, pg. 176); but understood it was biodegradable for years (Exhibit 198, pgs. 200-201, 213).

- He testified that he did not write the Monsanto statement that "The IARC precautionary classification does not establish a link between glyphosate and an increase in cancer" and testified that he had no opinion on this statement (Exhibit 198, pgs. 16-18, 25).  He also testified that Samuel Murphey – from Communications – prepared the statement (Exhibit 198, pg. 22).  *However, he did send the Monsanto IARC statement to people, including key accounts - larger distributors - in the field (Exhibit 198, pgs. 19, 24) even thought he had never seen or read the language in the actual IARC monograph* (Exhibit 198, pgs. 21-22, 26-27).  <u>*They were the primary Monsanto employees who passed information regarding Roundup®️ to distributors*</u> *– it was a primary responsibility* (Exhibit 198, pgs. 152-153).  He knew IARC 2A meant that glyphosate was classified as a probable human carcinogen (Exhibit 198, pgs. 40-41).

- He agreed that the advertisement with a playground would presume that is an area where children play (Exhibit 198, pg. 213).

- He agreed that Monsanto Integrity Code of Business Code (Exhibit 198, pgs. 124-127, 139, 147, 160-161) would not allow for false or misleading advertising (Exhibit 198, pg. 209) or bribing government officials (Exhibit 198, pg. 218).

- He admitted he was concerned that the IARC and Prop 65 (Prop 65 was enacted in California in 1986 and required among other items, for chemicals that could cause cancer or reproductive toxicity to clearly warn users of these potential health hazards – see Exhibit 478) issues might cause people to ban the use of Roundup® products (Exhibit 198, pg. 77).

Monsanto estimated that loss from Prop 65 in California could be up to 200,000 Roundup® Equivalent Gallons (REG) annually (Exhibit 198, pgs. 82-83). He testified that he really did not get any feedback from distributors that customers wanted to stop using Roundup® until after the IARC cancer monograph was published in 2015 (Exhibit 198, pgs. 37-38).

Total Roundup® sales in the IT&O Division for 2015 were 3 million REGs (Exhibit 198, pgs. 178-179).

- He admitted he had no background in science and relied on Monsanto scientists and others in St. Louis for his information (Exhibit 198, pgs. 13, 29, 36, 41, 45, 97, 107, 127-128, 134-135, 157-158, 191 and 216).

- He testified that no-one in the company in 30 years had told him Roundup® could be absorbed through the skin (Exhibit 198, pg. 173).

- Other than the IARC study and a birth defects study, he was not aware or did not recall of other studies on the possible health effects associated with glyphosate or Roundup® (Exhibit 198, pgs. 45-46, 79, 81, 103, 105-109, 113, 129-131, 134, 150-151, 165).

- Prior to the 2015 IARC classification of glyphosate as a 2A carcinogen, Monsanto had a detailed plan in place and under implementation to besmirch IARC results regarding glyphosate (e.g., Exhibit 356, Exhibit 357, Exhibit 358)

- Following the 2015 IARC classification of glyphosate as a 2A carcinogen and California's notice of intent to include glyphosate on the Prop 65 list (Exhibit 196-R and Exhibit 198-Q), Steven Gould, Monsanto IT&O Account Manager writes (Exhibit 196-P, MONGLY07606984) that "*Monsanto is the manufacturer stewarding the Glyphosate molecule*" and to "Ask your customers to not panic.." as "*Monsanto is working to see what can be done about this situation at this time. Rest assured we are working very hard on this!*"

  **[Mr. Gould's definition of stewardship is to protect the product sales, not ensure the safety of the public by being fully transparent about what is known about the potential hazards from exposure to Roundup®. This clearly conflicts with Monsanto's stated Stewardship positions of being transparent to the public and protecting the public and the environment from negative effects of the chemicals they produce.]**

- Communications by Monsanto sales and marketing staff to municipalities considering banning Roundup® products. February 20-21 e-mails (Exhibit 196-F) between Monsanto staff regarding a response to the city of Richmond, CA who is considering banning Roundup® products discusses getting their Sacramento lobbying firm involved, submitting information to a friendly council member (if

one exists), and sending out information refuting the recent IARC glyphosate cancer determination.

**[Clearly this is an effort to continue to sell the product, not one to share with the City Council all they know internally regarding potential hazards of exposure to Roundup® products.]**

• Monsanto scientists' attitudes toward scientific papers not favorable to Roundup® were to treat them like the "Whack-a-Mole" game; something to be smashed or discredited rather than being accorded credibility.  In the "Whack-a-Mole" game (Figure 9-2), a mole pops out a hole and then is hammered back in wherein another mole pops up at another hole:



**Figure 9-2: Whac-a-Mole Game**

The following correspondance between Mr. Bruce Chassy and Mr. Daniel Goldstein illustrate contempt for science (in this case a paper from Jeffrey M. Smith entitled GM Foods are More Dangerous for Children than Adults) that conflicts with their need to protect Roundup® products:

Chassy to Goldstein with cc to Eric Sachs – 3-3-2010 – 10:39 AM:

Dan:

*This is like playing **Whack-a-mole** at the carnival.  **Jeff's back again.***

We'll be working on this too.  *Isn't freedom of speech wonderful?*

Bruce

Goldstein to Chassy with cc's to Eric Sachs & Donna Farmer – 3-3-2010 – 11:08 AM CST:

RE: *another mole needing whacking*…

Two comments:

1)   Funny you should say that.... ***Donna Farmer (glyphosate tox) and I have been playing Whack-a-Mole for years and calling it just that. We were joking about it yesterday***.

2)   As a pediatrician, I have to tell you that I have been waiting for the child health shoe to drop for years now - and surprised given GMFreeSchools.org and the like - that we have NOT seen this played up already.

> ***This is a particular issue for soy as the highest intake group by far are non-breastfeeding infants*** ..... although corn intake per kg also maxes out in childhood. ***So far, they don't seem to eat a lot of cotton…but you do need to worry about those GM burp nappies…***

**[Aside from the use of very derogatory language, Monsanto scientists had the following knowledge:**

**i)   By 2010, Donna Farmer, Dan Goldstein, and Bruce Chassy have spent years attempting to destroy or diminish any science that conflicts with their goal of selling Roundup® products.**

**ii)   know that children are most impacted by their products, especially soybeans; yet apparently have not been transparent with the public about what they know and do not intend to do so in 2010.**

**iii)   intend to play "Whack-a-Mole" with Jeffrey Smith's paper.**

**These statements and positions clearly are inconsistent with Monsanto's corporate Stewardship positions.]**

- Monsanto also followed major newspapers and social media (e.g., twitter) throughout the world on stories or tweets regarding Roundup® or glyphosate.  A summary of items from each paper was followed by an "Action" statement on whether or not a "rebuttal" is required.  Moreover, unfriendly journalists are referred to as "activist journalists".  In reading the comments, this is an effort by Monsanto to counter any negative publications regarding their products (Exhibit 196-CC).

Monsanto is a member of The International Code of Conduct on Pesticide Management (ICCPM).  Under §4.1.4 of the ICCPM, it states as follows: *ensure that the proposed use, label claims and directions, packages, safety data sheets, technical literature and advertising **truly reflect** the outcome of these scientific tests and assessments*; under §6.2.2 it states: *provide national regulatory authorities with any new or updated information that could change the regulatory status of the pesticide, as soon as it becomes available;* and under §11.2.7 it states: *advertising does not misrepresent research results, quotations from technical and scientific literature or scientific jargon to make claims appear to have a scientific basis they do not possess.*

**[It is clear Monsanto worked diligently to besmirch the most current health and safety work of IARC so that Roundup® would not receive a more hazardous health label.]**

- Finally, none of the science regarding the use of Roundup® appears to be based on the product, but on the active ingredient glyphosate.  The inert ingredient(s) can also be hazardous in their own right or enhance the hazard of the active ingredient (e.g., polyethoxylated tallow amine (POEA) which increases the effective surface area on the plant or human).  Gallow (pg. 12; see also pgs. 86-88) writes:

    "The lawyers – and several scientists – contend that Roundup is more dangerous than glyphosate alone because of an added ingredient that Monsanto used for many years to help the glyphosate adhere to plants.  Some research has shown that this added ingredient, polyethoxylated tallow amine (POEA), can be extremely damaging to human cells.  Regulators did not require extensive safety tests on the combination of glyphosate and POEA, and Monsanto did little such testing…."

**[None of these activities suggest Monsanto is fully-transparent with the public and regulators about what it knows or is doing regarding the hazards of its products like Roundup®, despite Monsanto's claims otherwise.]**

### 9.3 Monsanto Violated EPA/FIFRA Standards Section 6(a) of the Act and §162.6, 8 &11 Regarding Accurate and Timely Information Regarding Hazards Associated with Pesticide Products Such as Roundup®

The requirements of EPA/FIFRA Standards Section 6(a) of the Act and §162.6, 8 &11 require manufacturers of pesticide products such as Roundup® to accurately and timely provide information regarding hazards of their products.

**[It is clear, based on examples shown in Sections 4 and 7 of this report that regarding Roundup® formulations Monsanto:**

➢ **Was aware of information that indicated Roundup® formulations (products) were more toxic than the active ingredient glyphosate, yet intentionally for decades refused to test for the toxicity of formulations because as Danial Goldstein best said: "Ignorance is Bliss."**

➢ **Mislead the public by conflating the toxic properties of glyphosate with those of Roundup® formulations.**

➢ **Were aware of information generated internally (e.g., TNO dermal study) that could negatively affect the registration of glyphosate products, but apparently withheld it from governmental officials and the public.**

➢ **Monsanto's use of laboratories found to have committed fraud in their work regarding Monsanto Roundup® toxicity of formulation ingredient(s).**

➢ Misrepresented dermal work by Maibach et al. to influence the U.S. EPA to lower signal words from "DANGER" or "WARNING" to "CAUTION" which lowered warnings and protections of end users of Roundup® formulations.

➢ Besmirched work of other scientists and ghost wrote scientific papers (giving the illusion they were independently generated) to influence both public and private entities that the Monsanto formularies were safer than perhaps they were.

➢ Funding of (both directly and indirectly) second and third-party entities to conduct surveillance to denigrate papers/information that might negatively impact their Roundup® formulations and to produce positive statements/ communications that would positively impact the availability of Roundup® formulations.

➢ Misrepresenting POEA to the U.S. EPA as a surfactant when it meets the definition of an "active" ingredient.

All these efforts negatively impacted the public's knowledge regarding potential health effects and the safety of Roundup® formulations.]

## 9.4    Monsanto Violated Federal and State Statutes regarding false and misleading advertising of pesticide products such as Roundup®

Under FIFRA, as stated in the Labeling Manual (see Section 6 for more on Pesticide Regulations):

> "***Labeling is defined*** in the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) Section 2(p)(2) ***as meaning <u>labels</u>*** and ***<u>all other written, printed, or graphic material accompanying a pesticide or device at any time</u> <u>or to which reference is made on the label or in accompanying literature</u>***."

Thus, a label, under the FIFRA's (part of US EPA) definition, includes anything on the container/device or anything referenced or accompanying the container/device (e.g., MSDSs).

FIFRA defines label misrepresentations as "labeling claims" which are defined as:

> "***<u>a statement of something as fact or an assertion</u> on the label <u>open to challenge</u>***."

As detailed in Section 7, labeling claims from the physical labels themselves, to MSDSs, to advertising and print materials sent directly or indirectly to both public officials and the public at large were either misleading or in some cases fraudulent.  Examples include:

➢ The U.S. EPA complaint to Monsanto that their labeling must reflect the PPE required in Worker Protection Rules (e.g., goggles and chemically resistant gloves) and that it did not.

➢ The U.S. EPA complaint to Monsanto that their advertising that applicators could wear gym shoes, short sleeve shirts, and long pants was misleading and a likely violation of FIFRA advertising rules.

➢ Litigation by the Attorney General for the State of New York that concluded numerous advertising claims were either misleading and/or fraudulent. Monsanto paid a fine and agreed to cease and desist with this misleading/ fraudulent advertising.

➢ Monsanto advertising and position papers/written materials that stated Roundup® and/or glyphosate were i) biodegradable, ii) not biopersistent, and iii) would only affect a certain enzyme in plants, but not animals or humans.

Monsanto advertisements stating Roundup® products were biodegradable were summarized in Sections 7.1.1, 7.3.2.3, 7.3.2.4, 7.3.2.8 and 7.3.2.10 of this report; evidence that this is not true was included in Section 4.4.10 of this report and not allowed by the EPA under 40 CFR 156.10(a)(5) – Section 7.1 of this report.

➢ Misleading/fraudulent Monsanto written statements to both public officials and the public (e.g., March 17, 2015 Newsletter titled Glyphosate/Roundup in the News, Safety Information) (Exhibit 197-U, Bates MONGLY07603250) that stated:

"All labeled uses of glyphosate are *safe for human health*....." and

"It's important to put this IARC classification into perspective.   Many common exposures are classified in <u>*Category 2*</u>, *including coffee, aloe vera extract, cell phones, pickled vegetables as well as professions such as barbers and fry cooks.*"

First, the State of New York found that Monsanto's statement that "a) Monsanto's glyphosate-containing pesticide products and the components thereof are safe..." to be false and misleading advertising.  Also, the EPA's Labeling Manual clearly states it is inappropriate to use misleading product comparisons in pesticide labels.

Also Monsanto makes product comparisons to IARC Category 2; but IARC uses Category 2A (*probably* a human carcinogen) and Category 2B (*possibly* a human carcinogen), not Category 2.  Categories 2A and 2B are quite different classifications.   IARC listed glyphosate in the 2A category compared to other products listed and compared to by Monsanto:

• Caffeic acid is found at a very modest level in coffee and caffeic acid is the compound listed as Category 2B carcinogen, so the reference to coffee is clearly very misleading, plus it is in 2B not 2A (possible carcinogen vs. probable carcinogen).

• Aloe vera extract, cell phone use, pickled vegetables (traditional in Asia), and high temperature frying are listed as Category B carcinogens (https://monographs.iarc.fr/ENG/Classification/ClassificationsAlpha Order.pdf).

• The profession of barber is listed in Category 2A, but for exposure to certain products when working as a barber.  Emissions from high temperature fryers are listed in Category 2A, but high temperature frying itself is listed as Category 2B.

- Working at night is not listed under either Category 2A or 2B, but IARC did state that "Shiftwork that involves circadian disruption is probably carcinogenic to humans." Circadian disruption is defined as the disruption of sleep/wake cycles and biological rhythms.

**[Since IARC does not classify by Category 2, but by 2A and 2B, and almost all of the compared products are Category 2B (possible carcinogen) vs. glyphosate in Category 2A (probable carcinogen – more likely than not), this information provided by Monsanto is extremely misleading.]**

Monsanto repeats such misleading claims in an April 14, 2015 brochure entitled "Key Facts About Glyphosate Safety" (Exhibit 328, Bates MONGLY07598374) which states: ***"IARC has given this same classification to occupations such as being a barber or working at night."*** "Working at night" has not been stated by IARC as probably carcinogenic to humans as stated by Monsanto.

➢ Misleading/fraudulent Monsanto written statements to both public officials and the public (e.g., Under the Q&A by Donna Farmer, Monsanto, regarding whether or not the surfactant increases the toxicity of Roundup®, she writes (Exhibit 197-U, Bates MONGLY07603260) in part:

> *<u>The surfactants used with glyphosate are similar to those used in personal-care and household cleaning products</u> that we are exposed to every day when we wash our hands, hair and dishes.* The surfactants in these products perform the same function as they do when mixed with a herbicide like glyphosate. For example, <u>surfactants found in</u> *<u>shampoos</u>* reduce the surface tension of water to help it spread and move around our hair and help remove the oily layer with dirt from our hair.

**[Aside from violating EPA/FIFRA statutes for misleading comparisons, and similar New York State Attorney General Findings, the previous two paragraph comparisons completely misrepresents the dermal skin irritation finding from work complete by Maibach, 1986 – see Section 4.5.3 – no skin irritations were observed in the Maibach 1986 paper with shampoo.]**

➢ Misleading/fraudulent Monsanto package labeling and MSDSs regarding PPE. In addition, many of the warning statements are not actionable.


## 10.0   METHODOLOGY UTILIZED IN FORMING OVERALL OPINIONS & OVERALL SUMMARY OPINIONS:

The methodology used to arrive at my overall opinions is straight-forward, and included assessment of the following questions:

1.   What were Monsanto's Industry's, and Governmental Agency's Standards of Care - SoC (i.e., policies, best practices, standards, and codes) for communicating the hazards of pesticides, in this case Roundup®, and for minimizing their potential/actual effects, to the public and the environment?

2.      How did Monsanto's actual practices regarding compliance with their own, Industry's and Governmental Agency's Standards of Care for communication of the hazards of pesticides, in this case Roundup®, and for minimizing their potential/actual effects, to the public and the environment compare with (1) above?

The methodology used was to compare and contrast (i.e., differential diagnosis) Monsanto's actual behavior with respect to its own, Industry's and Governmental Agency's Standards of Care for communication of the hazards of pesticides, in this case Roundup®, and for minimizing their potential/actual effects, to the public and the environment versus what would be required based on these Standards of Care.

My overall opinion is that Monsanto did not meet their own, industry's and Governmental Agency's Standards of Care for communication of the hazards of pesticides, in this case Roundup®, and for minimizing their potential/actual effects, to the public and the environment.  Specifically, Monsanto had an obligation from 1974 forward to provide accurate toxicological and labeling information on Roundup®, not just glyphosate to the U.S. EPA, and to the public through their labels, MSDSs, and advertising, but failed to do so.  The basis for this opinion is:

1.      Violations of Monsanto's publically stated, Stewardship and Code of Business Conduct (Integrity) corporate pledge statements to deal "with people openly and freely" regarding information about their products like Roundup® (e.g., accurately communicating with workers and the public about the hazards of Roundup®) and to minimize the potential/actual effects of their Roundup® products to the public and the environment.

2.      Violations of industry stewardship policies and historical best practices to transparently share information about their products like Roundup® (e.g., accurately informing workers and the public about the hazards of Roundup®) and to minimize the potential/actual effects of their Roundup® products to the public and the environment.

3.      Monsanto violated EPA/FIFRA Standards Section 6(a) of the Act and §162.6, 8 & 11 regarding accurate and timely information regarding hazards associated with pesticide products such as Roundup® to the public.

4.      Monsanto violated Federal and State Statutes regarding false and misleading advertising of pesticide products such as Roundup® to the public.

Further support for these opinions is found within the body of the report, related sub-opinions, and information relied on to form these opinions.

Sincerely,

Stephen E. Petty, P.E., C.I.H., C.S.P.
**President**

# References

ACGIH, 2013 Guide to Occupation Exposure Values, Compiled by the American Conference of Governmental Industrial Hygienists, ACGIH, 1330 Kemper Meadow Drive, Cincinnati, OH 45240-4146, 2012.

ACGIH, 2012 Guide to Occupation Exposure Values, Compiled by the American Conference of Governmental Industrial Hygienists, ACGIH, 1330 Kemper Meadow Drive, Cincinnati, OH 45240-4146.

ACGIH, 2004.  ACGIH Documentation of the Threshold Limit Values for Chemical Substances, 7th Edition, American Conference of Governmental Industrial Hygienists (ACGIH).

ACGIH, 1995.  Industrial Ventilation – A Manual of Recommended Practice, 22nd Edition, American Conference of Governmental Industrial Hygienists (ACGIH).

AIHA, 2013.  Odor Thresholds for Chemicals with Established Occupational Health Standards, 2nd edition, Edited by Sharon S. Murnane, Alex H. Lehocky, and Patrick D. Owens American Industrial Hygiene Association, AIHA Press, 2700 Prosperity Avenue, Suite 250, Fairfax, VA 22031.

AIHA, 2009.  Mathematical Estimating Occupational Exposure to Chemicals, 2nd edition.  Edited by C. B. Keil, C. Simmons, and T. R. Anthony, AIHA Press, 2700 Prosperity Avenue, Suite 250, Fairfax, VA 22031.

AIHA, 1989.  Odor Thresholds for Chemicals with Established Occupational Health Standards, American Industrial Hygiene Association, AIHA Press, 2700 Prosperity Avenue, Suite 250, Fairfax, VA 22031.

Anna, D.A., PhD, CIH, CSP, editor, 2011.  The Occupational Environment: Its Evaluation, Control and Management, 3rd Edition, Volume 1, Published by the American Industrial Hygiene Association (AIHA), Falls Church, VA.

Anna, D.A., PhD, CIH, CSP, editor, 2011.  The Occupational Environment: Its Evaluation, Control and Management, 3rd Edition, Volume 2, Published by the American Industrial Hygiene Association (AIHA), Falls Church, VA.

ASTM, 2010.  E1739-95 Standard - Standard Guide for Risk-Based Corrective Action Applied at Petroleum Release Sites.  Published by ASTM International, 100 Bar Harbor Drive, P.O. Box C700, West Conshohocken, PA 19428.

ATSDR – US Agency for Toxic Substances and Disease Registry (Website: http://www.atsdr.cdc.gov/.

Barreiro, T.J. D.O. and I. Perillo, MD, 2004. An Approach to Interpreting Spirometry, Downloaded from the American Family Physician Web site at www.aafp.org/afp. Copyright© 2004 American Academy of Family Physicians.

Beverley, KJ, Clint, JH, and Fletcher, PDI, "Evaporation Rates of Pure Liquids Measured Using Gravimetric Technique", Phys. Chem. Phys., Vol 1, pp 149-153, 1999.

Burton, D. Jeff. 1995. IAQ and HVAC Workbook – 2nd Edition, IVE, Inc., 2974 South Oakwood Drive, Bountiful, UT 84010.

Burton, D. Jeff. 1997. *Industrial Ventilation Workbook – 4th Edition*, IVE, Inc., 2974 South Oakwood Drive, Bountiful, UT 84010.

Burton, D. Jeff. 2000. *Useful Equations – Practical Applications of OH&S Math – 1st Edition*, IVE, Inc., 2974 South Oakwood Drive, Bountiful, UT 84010.

Burton, D. Jeff, *Burton Field Guide for Industrial Hygiene*, AIHA Publication, 2001.

Cavalli, V., D. Cattani, C. Rieg, P. Pierozan, L. Zanatta, E. Parisotto, D. Filho, F. Silva, R. Purer and A. Zamoner, 2013.  Roundup Disrupts Male Reproductive Functions by Triggering Calcium-Mediated Cell Death in Rat Testis and Sertoli Cells, Free Radical Biology and Medicine, 65: 335-346. (Exhibit 173)).

Daugherty, Jack, Assessment of Chemical Exposures – Calculation Methods for Environmental Professionals, CRC Press LLC, 1998.

DiNardi, R., *The Occupational Environment: Its Evaluation, Control, and Management*, 2nd Edition, AIHA Press, 2003.

Defarge, N., J. de Vendomois and G.E. Seralini, 2018. Toxicity of Formulants and Heavy Metals in Glyphosate-Based Herbicides and Other Pesticides, Toxicology Reports, 5: 156-163. (Exhibit 178).

Federal Register. 1978. Toxic Substances Control Act, Statement of Interpretation and Enforcement Policy; Notification of Substantial Risk, March 16, pp.11110-11116.

Federal Register. 1991.  Registration and Agreement for TSCA Section 8(e) Compliance Audit Program; Notice, February 1, pp. 4128-4131.

Federal Register. 1991.  Registration and Agreement for TSCA Section 8(e) Compliance Audit Program Modification; Notice, April 21, pp. 19514-19515.

Federal Register. 1991.  Registration and Agreement for TSCA Section 8(e) Compliance Audit Program Modification; Notice, June 20, Vol. 56, No. 119.

Gerstman, B. Burt, 2003. Epidemiology Kept Simple – An Introduction to Traditional and Modern Epidemiology, 2nd ed., John Wiley and Sons, Hoboken, NJ.
Larrangaga, Michael, D. editor. 2012. Engineering Reference Manual, 3rd Edition, Published by the American Industrial Hygiene Association (AIHA), Falls Church, VA.

Gillam, Carey, 2017.  "White Wash – The Story of a Weed Killer, Cancer, and the Corruption of Science," Island Press, Washington, D.C., 20036

Glass DC and Gray GG, "Estimating Mean Exposures from Censored Data: Exposure to Benzene in the Australian Petroleum Industry", Ann. Occup. Hyg., Vol. 45, No. 4, pp. 275-282, 2001b.

Ignacio, Joselito S. and William H. Bullock. 2006. A Strategy for Assessing and Managing Occupational Exposures, Third Edition, American Industrial Hygiene Association (AIHA) Press.

Jayjack, Chapter 2 in The Occupational Environment: Its Evaluation, Control, and Management edited by DiNardi, AIHA Press, 2003.

Keil, Charles B. editor. 2000.  Mathematical Models for Estimating Occupational Exposure to Chemicals, AIHA Exposure Assessment Strategies Committee – Modeling Subcommittee, AIHA Press.

Larrangaga, Michael, D. editor. 2012. Engineering Reference Manual, 3rd Edition, Published by the American Industrial Hygiene Association (AIHA), Falls Church, VA. McDermott, H.J., and S.E. Killiamy, Jr., 1978.  "Quest for a Gasoline TLV," AIHA Journal, pp 110 – 117, February.

Marc, J., O. Muner-Lorillon, S. Boulben, D. Hureau, G. Durand and R. Belle, 2002. Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation, Chem. Res. Toxicol., 15: 326-331 (Exhibit 165, MONGLY01330407-1330411).

Marc, J., O. Mulner-Lorillon and R. Belle, 2004. Glyphosate-Based Pesticides Affect Cell Cycle Regulation, Biology of the Cell, 96: 245-249. (Exhibit 167).

Martinez, T.T. and K. Brown, 1991.  Oral and Pulmonary Toxicology of the Surfactant Used in Roundup Herbicide, Proc. West. Pharmacol. Soc., 34: 43-46 (Exhibit 165, Bates MONGLY01330407-411).

MCA, 1972. *MCA – 1872-1972 A Centennial History*, Manufacturing Chemists' Association, Inc., 1825 Connecticut Avenue, N.W., Washington, D.C., 20009.

Meyers, John Peterson, M.N. Antoniou, B. Blumberg, L. Carroll, T. Colburn, L.G. Everett, M. Hanson, P.J. Landrigan, B.P. Lanphear, R. Mesnage, L.N. Vandenberg, F. S. vorn Saal, W.V. Welshons and C. M. Benbrook, 2016.  Concerns Over Use of Glyphosate-Based Herbicides and the Risks Associated with Exposures: A Consensus Statement, Environmental Health, 15: 19, ODI 10.1186/s12940-016-0117-0.

Mulhausen, John R. and Joseph Damiano. 1998. A Strategy for Assessing and Managing Occupational Exposures, Second Edition, American Industrial Hygiene Association (AIHA) Press.

National Association of State Departments of Agricultural (NASDA), 2014. "National Pesticide Applicator Certification Core Manual," 2nd Edition, NASDA Research Foundation,

National Safety Council, 2001. "Accident Prevention Manual for Business and Industry – Administration & Programs," 12th edition, edited by Hagan, Montgomery and O'Reilly, National Safety Council, Itasca, IL

Nicas, M., "Estimating Exposure Intensity in an Imperfectly Mixed Room"' Am. Ind. Hyg. Assoc. J., 57, pp 542 – 50, 1996.

Nicas, M, "Using Mathematical Models to Estimate Exposure to Workplace Air Contaminants", *Chemical Health & Safety*, Jan/Feb, 2003.

NIOSH, 1973.  The Industrial Environment – Its Evaluation and Control (White Book), U.S. Department of Health and Human Services, Public Health Service, Center for Disease Control, National Institute for Occupational Safety and Health (https://www.cdc.gov/niosh/docs/74-117/).

Offermann, Francis (Budd) and M. Nicas, "Use with Adequate Ventilation?," ASHRAE, pp. 70-76, May 2018.

OSHA Toxics Release Inventory, Appendix C – Basis of OSHA Carcinogen Listing for Individual Chemicals, (www.epa.gov/tri/chemical/appendixc1999pdr.pdf ), 1999.

Patty, Frank A., 1949.  Industrial Hygiene and Toxicology, Vol. II, Interscience Publishers, Inc., New York, NY.

Patty's Industrial Hygiene Handbooks.

Patty's Industrial Toxicology Handbooks, Sixth Edition, 2012.

Patty's Toxicology, Volume 4, Fifth Edition, John Wiley & Sons, Inc., 2001.

Peluso, M., A. Munnia, C. Bolognesi and S. Parodi, 1998.  $^{32}$P-Postlabeling Detection of DNA Adducts in Mice Treated with the Herbicide Roundup, Environmental and Molecular Mutagenisis, 31: 55-59. (Exhibit 177).

Perkins, J.L., *Modern Industrial Hygiene,* Vol. I, 1st Edition, *Recognition and Evaluation of Chemical Agents.* New York: Van Nostrand Reinhold, 1997.

Perkins, J.L., *Modern Industrial Hygiene,* Vol. I, 2nd Edition, *Recognition and Evaluation of Chemical Agents.* American Conference of Governmental Industrial Hygienists (ACGIH), 1330 Kemper Meadow Drive, Cincinnati, OH 45240-4146, 2008.

Perkins, J.L., *Modern Industrial Hygiene,* Vol. 2, *Biological Aspects,* American Conference of Governmental Industrial Hygienists (ACGIH), 1330 Kemper Meadow Drive, Cincinnati, OH 45240-4146, 2003.

Perkins, J.L., *Modern Industrial Hygiene*, Vol. 3, *Control of Chemical Agents.* American Conference of Governmental Industrial Hygienists (ACGIH), 1330 Kemper Meadow Drive, Cincinnati, OH 45240-4146, 2011.

Petty, Stephen E., M. Nicas and A. B. Boiarski, 2011. A Quantitative Method for Estimating Dermal Benzene Absorption from Benzene-containing Hydrocarbon Liquids, Int. J. Occup. Envrion. Health, Vol. 17, No. 4, pp. 287-300, October/December (including letter to the editor and response from authors).

Peixoto, Francisco, 2005. Comparative Effects of Roundup and Glyphosate on Mitochondrial Oxidative Phsphorylation, Chemosphere, 61: 1115-1122. (Exhibit 168).

Popendorf, William, 2006. Industrial Hygiene Control of Airborne Chemical Hazards, CRC Press, Taylor & Francis Group,  6000 Broken Sound Parkway NW, Suite 300, Boca Raton, FL 33487-2742.

Phalen, Robert, N., 2018.  Not All Gloves are Created Equal - Guidelines and Tools for Selecting and Using Chemical-Resistant Products, Synergist, December.

Proctor, N.H., Hughes, J.P., and Fischman, M.L., 1988.  Chemical Hazards of the Workplace, II Ed., 92, Lippincott, Philadelphia, 1988.

Rank, J. A.G. Jensen, B. Skov, L.H. Pedersen and K. Jensen, 1993.  Genotoxicity Testing of the Herbicide Roundup and its Active Ingredient Glyphosate Isopropylamine using the Mouse Bone Morrow Micronucleus Test, Salmonella Mutagenicity Test, and Allium Anaphase-TeloPhase Test, Mutation Research, 300, pgs. 29-36 (Exhibit 176).

Reid, R. C., J. M. Prausnitz and T. K. Sherwood. "The Properties of Gases and Liquids", Third Edition, McGraw-Hill Book Company, New York, NY, 1977.

Robin, Marie-Monique, 2008/2010.  "The World According to Monsanto – Pollution, Corruption, and the Control of the World's Food Supply," Translation from French to English by New Press

United States Environmental Protection Agency (US EPA), 1989.  Risk Assessment Guidance for Superfund: Volume I – Human Health Evaluation Manual (Part A). EPA/540/1-89/002.  Office of Emergency and Remedial Response.  Washington, DC 20460.
United States Environmental Protection Agency (US EPA), 1991, TSCA Section 8(e) Reporting Guide, Office of Toxic Substances, June

United States Environmental Protection Agency (US EPA), 1995. Exposure Factors Handbook, EPA/600/P-95/002A, Table 4-2, 1995.

United States Environmental Protection Agency (US EPA), Updated March 2003. Guidance Document for Soil-Gas Surveying, Prepared under EPA EMSL-LV Contract No. 68-03-3245 by C.L. Mayer, Lockheed Engineering and Sciences Company, Las Vegas, NV.

United States Environmental Protection Agency (US EPA), October 2004.  Analytical Methods TO-14a and TO-15: What are the Differences? www.epa.gov/region3/esc/qa/pdf/to14_15.pdf.

United States Environmental Protection Agency (US EPA), The Toxic Substances Control Act (15 U.S.C. 2601–2692) consists of Public Law 94–469 (Oct.11, 1976; 90 Stat. 2003) and the amendments made by subsequent enactments.  Effective January 1, 1977.  Downloaded from: http://www.epw.senate.gov/tsca.pdf.

United States Environmental Protection Agency (US EPA), 2009. Exposure Factors Handbook: 2009 Update, EPA/600/R-09/052A, Office of Research and Development, National Center for Environmental Assessment, Washington, DC 20460, External Review Draft, Chapter 7, July.

United States Environmental Protection Agency (US EPA), 2011. Exposure Factors Handbook: 2011 Edition, EPA/600/R-090/052F, Office of Research and Development, National Center for Environmental Assessment, Washington, DC 20460, External Review Draft, Chapter 7, September – www.epa.gov.

United States Environmental Protection Agency (US EPA), 2017. Office of Pesticide Programs – Label Review Manual (https://www.epa.gov/sites/production/files/2017-09/documents/lrm-complete-aug-2017.pdf).

# Codes and Standards (Not Already in Petty List of Exhibits)

➢ ACGIH's Documentation of the TLVs and BEIs, 7th Edition and Annual TLV Booklets – 2001 to 2019.

➢ ANSI/AIHA Z9.1-2006, American National Standard for Ventilation and Control of Airborne Contaminants During Open – Surface Tank Operations

➢ ANSI Z88.2-1969, American National Standard – Practices for Respiratory Protection

➢ ANSI Z88.2-1980, American National Standard – Practices for Respiratory Protection

➢ ANSI Z88.6-1984, American National Standard for Respiratory Protection – Respirator Use – Physical Qualifications for Personnel

➢ ANSI/AIHA Z88.6-2006, American National Standard for Respiratory Protection – Respirator Use – Physical Qualifications for Personnel

➢ ANSI Z129.1-2000, American National Standard for Hazardous Industrial Chemicals – Precautionary Labeling

➢ ANSI Z129.1-1976, American National Standard for Hazardous Industrial Chemicals – Precautionary Labeling

➢ ANSI Z129.1-1982, American National Standard for Hazardous Industrial Chemicals – Precautionary Labeling

➢ ANSI Z129.1-1988, American National Standard for Hazardous Industrial Chemicals – Precautionary Labeling

➢ ANSI Z129.1-1994, American National Standard for Hazardous Industrial Chemicals – Precautionary Labeling

➢ Manual L-1, A Guide for the Preparation of Warning Labels for Hazardous Chemicals, 1945. Manufacturing Chemists' Association of the United States

➢ ANSI Z400.1-2003, American National Standard for Hazardous Industrial Chemicals – Material Safety Data Sheets – Preparation (Draft)

➢ ANSI Z400.1-1998, American National Standard for Hazardous Industrial Chemicals – Material Safety Data Sheets – Preparation

➢ Manuals L-1 – A Guide for the Preparation of Warning Labels for Hazardous Chemicals, Labeling and Precautionary Information (LAPI) Standards – Manufacturing Chemist's Association (MCA) – 7 versions (1945 through 1970).

➢ NIOSH Guide to Industrial Respiratory Protection, DHHS Publication No. 87-116, September 1, 1987.

➢ 29 CFR 1910.119 – Process Safety Management of Highly Hazardous Chemicals

➢ 29 CFR 1910.132 – OSHA General PPE Standard

➢ 29 CFR 1910.134 – OSHA Respiratory Protection Standard

➢ 29 CFR 1910.146 – Permit Required Confined Spaces

- ➤ 29 CFR 1910.1000 – OSHA PEL and Controls Standard
- ➤ 29 CFR 1910.1020 – Access to Employee Exposure and Medical Records
- ➤ 29 CFR 1910.1200 – OSHA Hazard Communication Standard
- ➤ 29 CFR 1926.57– Safety and Health Regulations for Construction - Occupational Health and Environmental Controls - Ventilation
- ➤ www.osha.gov:   Health & Safety\HAZCOM\CPL 02-02-038 - CPL 2-2 38D - Inspection Procedures for the Hazard Communication Standard.htm
- ➤ 40 CFR Part 68 – Protection of the Environment – Chapter I – EPA – Part 68 Chemical Accident Prevention Provision (i.e., Risk Management Plans – RMP).
- ➤ 40 CFR 700 – Toxic Substances Control Act (TSCA).

# APPENDIX A

## List of Exhibits Reviewed for this Outline

# List of Exhibits

| Exhibit | Description |
|---|---|
| 1 | Wagstaff, Aimee for Andrus Wagstaff, PC Law Firm, October 27, 2017 "Plaintiffs' (1) Response in Opposition to Monsanto Company's Daubert and Summary Judgement Motion Based on Failure of General Causation Proof and (2) Daubert of Monsanto to Strike Certain Opinions of Monsanto Company's Expert Witnesses," In Re: Roundup Products Liability Litigation, MDL No. 2741, Case No. 16-md-02741-VC, United States District Court – Northern District of California. |
| 2 | April 21, 2017 Expert Report of Dennis D. Weisenburger, M.D., In Re: Roundup Products Liability Litigation – All Actions, MDL No. 2741, Case No. 16-md-02741-VC, United States District Court – Northern District of California. |
| 3 | December 18, 2017 Supplemental Report of Dr. Dennis D. Weisenburger, M.D., Pursuant to PTO No. 34 and in Support of General Causation on Behalf of Plaintiffs, In Re: Roundup Products Liability Litigation, MDL No. 2741, Case No. 16-md-02741-VC, United States District Court – Northern District of California. |
| 4 | July 31, 2017 Expert Report of William Fleming, M.D., Ph.D. – All Actions, In Re: Roundup Products Liability Litigation, MDL No. 2741, Case No. 16-md-02741-VC, United States District Court – Northern District of California. |
| 5 | July 31, 2017 Expert Report of Warren G. Foster, Ph.D., FCAHS – All Actions, Professor McMaster University, Hamilton, Ontario, Canada, In Re: Roundup Products Liability Litigation, MDL No. 2741, Case No. 16-md-02741-VC, United States District Court – Northern District of California. |
| 6 | July 31, 2017 Expert Report of Jay I. Goodman (Glyphosate: Review and Interpretation of Key Aspects of the Scientific Literature Concerning Genotoxicity and Oxidative Stress Data) – All Actions,  In Re: Roundup Products Liability Litigation, MDL No. 2741, Case No. 16-md-02741-VC, United States District Court – Northern District of California. |
| 7 | May 12, 2017 Expert Report of Dr. Charles W. Jameson, Ph.D. in Support of General Causation on Behalf of Plaintiffs – All Actions,  In Re: Roundup Products Liability Litigation, MDL No. 2741, Case No. 16-md-02741-VC, United States District Court – Northern District of California. |
| 8 | July 31, 2017 Expert Report of Lorelei A. Mucci, ScD, MPH – All Actions,  In Re: Roundup Products Liability Litigation, MDL No. 2741, Case No. 16-md-02741-VC, United States District Court – Northern District of California. |
| 9 | April 28, 2017 Expert Report of Alfred II Neugut, MD, PHD in Support of General Causation on Behalf of Plaintiffs – All Actions,  In Re: Roundup Products Liability Litigation, MDL No. 2741, Case No. 16-md-02741-VC, United States District Court – Northern District of California. |
| 10 | Rebuttal Report of Dr. Christopher J. Portier in Support of General Causation on Behalf of Plaintiffs – All Actions, In Re: Roundup Products Liability Litigation, MDL No. 2741, Case No. 16-md-02741-VC, United States District Court – Northern District of California. |
| 11 | Bemer, D., J. Fismes, I. Subra, V. Blachere and Jean-Claude Protois, 2007. "Pesticide Aerosol Characteristics in the Vicinity of an Agricultural Vehicle Cab During Application," Journal of Occupational and Environmental Hygiene, 4: 476-482, July. |
| 12 | Campbell, J.L., M.A. Smith, M.A. Eiteman, P.L. Williams and M.F. Boeniger, 2000. "Comparison of Solvents for Removing Pesticides from Skin Using an In Vitro Porcine Model," AIHAJ, 61: 82-88, January/February. |
| 13 | Curwin, B.D., M.J. Hein, W.T. Sanderson, M.G. Nishioka, S.J. Reynolds, E.M. Ward and M.C. Alavanga, 2005.  "Pesticide Contamination Inside Farm and Nonfarm Homes," Journal of Occupational and Environmental Hygiene, 2: 357-367, July. |

| Exhibit | Description |
|---------|-------------|
| 14 | Deadman, J.E., G. Church, C. Bradley, B. Armstrong and G. Theriault, 1995. "Retrospective Estimation of Exposures to Confirmed or Suspected Carcinogens in an Electrical Utility," Appl. Occup. Envrion. Hyg., 10 (10): 856-871, October. |
| 15 | Esphanhol-Soares, M., M.T. de Oliveira and J.G. Machado-Neto, 2017. "Loss of Effectiveness of Protective Clothing After its Use in Pesticide Sprays and Its Multiple Washers," Journal of Occupational and Environmental Hygiene, Vol. 14, No. 2: 113-123. |
| 16 | Lenhart, Steve, W., 1997. "Personal Protective Equipment Requirements for Pesticide Handlers – Conflicts Between Toxicity-Based and Exposure Assessment-Based Approaches," Appl. Occup. Envrion. Hyg., 12 (10): 856-871, October. |
| 17 | J. A., K. Rasanen, R. Sarantila, J. Nuutinen and J. Kangas, 1991. "Occupational Exposure of Forest Workers to Glyphosate During Brush Sawing Work," Am. Ind. Hyg. Assoc. J., 52: 2, pp. 61-64, February. |
| 18 | 1975-7-3 Federal Register, Vol. 40, No. 129, 40 CFR Part 162 |
| 19 | 1975-8-1 Federal Register, Vol. 40 No. 149, 40 CFR Part 162 |
| 20 | 1975-8-21 Federal Register, Vol. 40, No. 163, 40 CFR Part 162 |
| 21 | 1978-2-9 Federal Register, Vol. 43, No. 28, 40 CFR Part 162 |
| 22 | 1988-5-4 Federal Register, Vol. 53, No. 86, 40 CFR Part 152, 153, 156, 158, 162, 163 |
| 23 | 1992-8-21 Federal Register, Vol. 57, No. 163, 40 CFR Parts 156 and 170 |
| 24 | 1995-6-19 Federal Register, Vol. 60, No. 117, 40 CFR Part 156 et al |
| 25 | 1998-2-23 Federal Register, Vol. 63, No. 35, 40 CFR Part 156 |
| 26 | 2001-12-01 Federal Register, Vol. 66, No. 241, 40 CFR Parts 152 and 156 |
| 27 | 2006-8-16 Federal Register, Vol. 71, No. 158, 40 CFR Parts 9, 156 and 165 Containers |
| 28 | 2008-12-12 Federal Register, Vol. 73, No. 240, 40 CFR Parts 150-180 |
| 29 | 2017 Code of Federal Regulations (CFR) Title 40, Vol. 26, Part 156 |
| 30 | 2017 Code of Federal Regulations (CFR) Title 40, Vol. 26, Part 170 |
| 31 | Manufacturing Chemists Association (MCA) Agenda and Meeting Minutes for March 11, 1969 Meeting in Hotel America, Houston, TX. |
| 32 | Schierow, Linda-Jo and R. Esworthy, 2012. "Pesticide Law: A Summary of the Statutes," Congressional Record Search for Congress – Prepared for Members and Committees of Congress, Congressional Research Service, RL31921, November 14, 2012. |
| 33 | U.S. EPA, 1993. "R.E.D. Facts - Glyphosate, United States Environmental Protection Agency, EPA-738-F-93-011, September. |
| 34 | U.S. EPA, 2017. "EPA Can Strengthen Its Oversight of Herbicide Resistance with Better Management Controls, Report No. 17-P-0278, June 21, 2017. |
| 35 | Wogalter, M.S., V.C. Conzola, T.L. Smith-Jackson, 2002, Research-based Guidelines for Warning Design and Evaluation, Applied Ergonomics, Vol. 33, pp. 219-230. |
| 36 | A Guide for the Preparation of Warning Labels for Hazardous Chemicals. Labeling and Precautionary Information (LAPI) Committee, Manufacturing Chemists' Association, 1945. |
| 37 | March 14, 1961. Report of the Chemical Packaging Committee to the MCA Board of Directors. R.F. Uncles, Chairman. Detroit, Michigan |
| 38 | ANSI Z129.1-1976. American National Standard for the Precautionary Labeling of Hazardous Industrial Chemicals. ANSI 1430 Broadway, New York, NY 10018. |

| Exhibit | Description |
|---------|-------------|
| 39 | 1983.  Labeling of Chemicals to Reduce Risk.  Susan G. Hadden, University of Texas. |
| 40 | 1988.  Corporate Influence on Threshold Limit Values.  B.I. Castleman and G.E. Ziem.  American Journal of Industrial Medicine 13:531-559. |
| 41 | The Toxic Substances Control Act: History and Implementation. http://www.epa.gov/oppt/newchems/pubs/chem-pmn/appendix.pdf |
| 42 | CRS Report for Congress, Order Code RL33152, The National Environmental Policy Act: Background and Implementation, November 16, 2005, http://www.fta.dot.gov/documents/Unit1_01CRSReport.pdf |
| 43 | CEQ REVISITED THE ROLE OF THE COUNCIL ON ENVIRONMENTAL QUALITY by Boyd Gibbons, Prepared for The Henry M. Jackson Foundation, http://www.google.com/url?url=http://www.hmjackson.org/file_viewer.php%3Fid%3D773&rct=j&frm=1&q=&esrc=s&sa=U&ei=VIVOVLfUDou1yQSvx4GgDg&ved=0CCwQFjAE&usg=AFQjCNGYBXcVpQPK6PV1Uz6RyB7O_KZc2w. |
| 44 | 1914. Thompson, M.D., William Gilman, The Occupational Diseases – Their Causation, Symptoms, Treatment and Prevention, D. Appleton and Company. |
| 45 | 1965.  Bradford-Hill, Sir Austin, The Environment and Disease: Association and Causation?, Proceedings of the Royal Society of Medicine, January 14. |
| 46 | July 10, 1929.  Davis, P.A., Toxic Substances in the Rubber Industry, Rubber Age. |
| 47 | November 1971.  Toxicology and Applied Pharmacology, Food and Drug Administration Advisory Committee on Protocols for Safety Evaluation:  Panel on Carcinogenesis Report on Cancer Testing in the Safety Evaluation of Food Additives and Pesticides, August 1970, Received April 26, 1971, Toxicology and Applied Pharmacology 20, 419-438 (1971). |
| 48 | 2016.  Concerns Over Use of Glyphosate-Based Herbicides and Risks Associated with Exposures: A Consensus Statement, Environmental Health 15:19. |
| 49 | December 1969.  Report of the Secretary's Commission on Pesticides and Their Relationship to Environmental Health, Parts I & II, US Department of Health, Education, and Welfare. |
| 50 | 2004.  Do Warning Labels Really Work? Jennifer J. Argo, Kelley J. Main. |
| 51 | November 1989.  Finding a Balance: Technology and Public Safety, Richard J. Mahoney. |
| 52 | July 13, 2017.  Neal et al. vs. Monsanto, Petition In the Circuit Court of the City of St. Louis, State of Missouri, Jury Trial Demanded, 1722-CC10773. |
| 53 | March 20, 2017.  Deposition of Aaron Earl Blair, Ph.D., National Cancer Institute. |
| 53-01 | February 6, 2017.  Curriculum Vitae of Aaron Earl Blair. |
| 53-02 | 2006.  IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, Preamble, World Health Organization. |
| 53-03 | March 3-10, 2015.  IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, Volume 112: Some Organophosphate Insecticides and Herbicides:  Diazinon, Glyphosate, Malathion, Parathion, and Tetrachlorvinphos, Lyon, France. |
| 53-04 | 2015.  IARC Monographs, Glyphosate. |
| 53-05 | May 2015.  Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon, and Glyphosate. |
| 53-06 | November 25, 2016.  IARC, World Health Organization, Originally Prepared as a Confidential Briefing for Governing Council Members on IARC Evaluation of Glyphosate and Requests for Meeting from CropLife. |

| Exhibit | Description |
|---------|-------------|
| 53-07 | 2014.  The North American Pooled Project (NAPP): Pooled Analyses of Case-Control Studies of Pesticides and Agricultural Exposures, Lymphohematopoietic Cancers and Sarcoma. |
| 53-08 | Series of e-mails Bate-Stamped MONGLY02365009-02365101 and not Provided. |
| 53-09 | September 15, 2014; February 20, 2015; February 24, 2015. IARC Monographs: 40 Years of Evaluating Carcinogenic Hazards to Humans. |
| 53-10 | March 19, 2014.  E-mail from Blair to Straif re: Monograph Meeting |
| 53-11 | March 21, 2014.  E-mail from Guyton to Blair, re: Monograph Meeting. |
| 53-12 | Vol 112 – Overview of Assignments. |
| 53-13 | March 6, 2015.  Handwritten Notes re: Plenary General Remarks, Exposure Assessment; Epidemiology. |
| 53-14 | October 23, 2014.  E-mail form Blair to Pahwa et al. re: Minutes from NAPP Meeting on October 20. |
| 53-15 | October 29, 2014.  E-mail from Harris to Spinelli et al., re: Proposal to Analyze Glyphosate Exposure and NHL Risk in NAPP. |
| 53-16 | June 3, 2015.  An Detailed Evaluation of Glyphosate Use and the Risk of Non-Hodgkin Lymphoma in the North American Pooled Project (NAPP), Occupational Cancer Research Centre, CSEB Conference, Mississauga, ON Presentation. |
| 53-17 | November 3, 2004.  Cancer Incidence among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study, Anneclair J. De Roos, Aaron Blair et al., Environmental Health Perspectives, Volume 113, Number 1, January 2005. |
| 53-18 | March 3, 2016.  Differences in the Carcinogenic Evaluation of Glyphosate between the International Agency for Research on Cancer (IARC) and the European Food Safety Authority (EFSA), JECH Online. |
| 53-19A | February 6, 2013.  DRAFT- Risk of Total and Cell Specific Non-Hodgkin Lymphoma and Pesticide use in the Agricultural Health Study, Alavanja. |
| 53-19B | March 15, 2013.  DRAFT- Lymphoma Risk and Pesticide use in the Agricultural Health Study, Alavanja. |
| 53-20 | April 23, 2014.  Non-Hodgkin Lymphoma and Occupational Exposure to Agricultural Pesticide Chemical Groups and Active Ingredients:  A Systematic Review and Meta-Analysis, Schinasi and Leon, Int. J. Environ. Res. Public Health 2014, 11, 4449-4527. |
| 53-21 | February 28, 2014.  E-mail from Alavanja to Sandler et al., re: A Second thought about the IJC Rejection of the NHL Manuscript. |
| 53-22 | September 16, 2016.  E-mail from Sandler to blairkansas@aol.com, re: Subpoena Aaron Received. |
| 53-23 | March 25, 2015.  E-mail from Buvton to Blair, re: Interview with Betsy Jibben and the Farm Journal. |
| 53-24 | September 29, 2016.  E-mail from Gillam to Blair, re: Quick Question from Carey Gillam. |
| 53-25 | August 19, 2016.  E-mail form Marie-Monique Robin to Blair, re: Marie-Monique Robin/ On Behalf of Kathleen Guyton. |
| 53-26 | March 25, 2016.  E-mail from Straif to Blair, re: IARC. |
| 53-27 | March 1, 2016.  International Agency for Research on Cancer, World Health Organization, Q&A on Glyphosate. |
| 53-28 | May 13, 2016.  E-mail to Henry, Natasha re: Meeting on Glyphosate. |

| Exhibit | Description |
|---------|-------------|
| 54 | 2008.  2010 English Translation, The World According to Monsanto, Pollution, Corruption, and the Control of the World's Food Supply, Marie-Monique Robin. |
| 55 | September 10, 2013.  Global Impact of Re-registrations, U.S. Glyphosate Registration Review (Power Point Presentation). |
| 56 | 2007.  John L. Henshaw, Henry F. Smyth Jr. Award Lecture Historical Review – Employer Responsibility for Workplace Health and Safety. |
| 57 | October 2006.  Steven P. Levine, 2006 Donald E. Cummings Memorial Award Lecture Industrial Hygiene:  The Founders, The Pioneers, and The Next Generation. |
| 58 | 1969.  Keith R. Long et al., The Epidemiology of Pesticides in a Rural Area. |
| 59 | 1955-1956. American Industrial Hygiene Association Officers. |
| 60 | December 5, 1967 to May 13-17, 1968.  Meetings in Prospect. |
| 61 | 1986-1987. ACGIH Board of Directors and Applied Industrial Hygiene Editorial Review Board. |
| 62 | May 1988.  Applied Industrial Hygiene, Volume 3 No. 5, Editorial Board. |
| 63 | February 12-13, 1986.  Workshop: Predicting Workplace Exposure to New Chemicals, U.S. Environmental Protection Agency. |
| 64 | 1975.  Cummings Memorial Lecture, The Market Basket:  Food for Thought, Hon. William B. Deichman, PhD. |
| 65 | 1997.  The American Industrial Hygiene Association IH Accredited Laboratories. |
| 66 | April 19, 1999.  Marten e-mail to Kier et al., re: Meeting Minutes February 25; MONGLY06486905-908. |
| 67 | June 21, 1999.  Heydens e-mail to Farmer, re: Roundup Documents; MONGLY03751016. |
| 68 | Martens e-mail to Fontana et al., re: Roundup Mutagenicity; MONGLY00877683-685. |
| 69 | September 16, 1999.  Heydens e-mail to Martens et al, re: Parry Report; MONGLY03734971. |
| 70 | 1999. James M. Perry, Evaluation of the Potential Genotoxicity of Glyphosate, Glyphosate Mixtures and Component Surfactants, Centre for Molecular Genetics and Toxicology; MONGLY01314233-4283. |
| 71 | June 2010.  Obituary of James M. Parry (1940-2010). |
| 72 | October 21, 1999.  Goldstein e-mail to Ward et al., re: US Products-Database; MONGLY01832749-2753. |
| 73 | May 12, 2000.  Farmer e-mail to Bunch et al., re: A Couple of Things!; MONGLY00878828-8832 |
| 74 | July 7, 2000.  Acquavella Memo to Farm Family Exposure Task Force, re: Site Visit to South Carolina Field Site; MONGLY07080361-369 |
| 75 | February 13, 2001.  Farmer e-mail to Garnett, re: Position on Parry's Recommendations; MONGLY00923065-3066. |
| 76 | April 10, 2001.  Heydens e-mail to Jacobs et al., re: Propachlor Sample Request; MONGLY00905534-5536. |
| 77 | January 3, 2002.  Rogers Memorandum to Hjelle re: Mark Martens Appointment to Fellow; MONGLY00905589. |
| 78 | March 8, 2002.  Garnett e-mail to Graham, re: In Vitro Dermal Study; MONGLY06409924-9927. |
| 79 | April 2, 2002.  Heydens e-mail to Healy, re: TNO Dermal Penetration Studies: New Issues and Topics for the Conf. Call of Tuesday, 2 April; MONGLY03738295-8296. |

| Exhibit | Description |
|---------|-------------|
| 80 | April 5, 2002.  Wratten e-mail to Healy et al., re: TNO Dermal Penetration Studies; MONGLY03737014-7016. |
| 81 | April 25, 2002. Farmer e-mail to Heydens, re: European Commission Endocrine Disrupters Developments (1); MONGLY00885526-5530. |
| 82 | June 14, 2002.  Burgesteden fax to Broeckaert, re: Study 4478, Unaudited Draft Report; MONGLY00888353-8388. |
| 83 | September 23, 2002.  Garnett e-mail to Cockburn et al., re: Issues Handling for Glyphosate; MONGLY06414231-4232. |
| 84 | May 22, 2003.  Carroll e-mail to Heydens et al., re: Dermal Penetration Studies; MONGLY06653096-3100. |
| 85 | August 11, 2003.  Martens e-mail to Heydens et al., re: K-Salt of Glyphosate – MON 78623; MONGLY06722561-2564. |
| 86 | November 24, 2003. Farmer e-mail to Natarajan et al., re: Agitation Against Roundup; MONGLY00922458-2460. |
| 87 | July 9, 2004.  Garnett e-mail to Healy, re: MON 59117 GI Tract Study; MONGLY06424476-4478. |
| 88 | September 23, 2004.  Cunningham e-mail to Kirby et al., re: Vision Risks; MONGLY00925905-5912. |
| 89 | December 20, 2007.  Haupfear e-mail to Graham, re: Question re Metallic Ions in Glyphosate; MONGLY02478386-8387. |
| 90 | August 19, 2008.  Healy e-mail to Saltmiras et al., re: Manuscript CBTO548 for Review with High Priority; MONGLY02286842-6843. |
| 91 | August 20, 2008.  Garnett e-mail to Velcev et al., re: MON78273 for Russia, Acute Nose-Only Inhalation Toxicity Study in Rats with MON 78623.pdf; TI Study; MONGLY02335782-5858. |
| 92 | September 9, 2008.  Healy e-mail to Farmer, re: CBTO548; MONGLY01189468. |
| 93 | October 14, 2008.  Farmer e-mail to McAllister et al., re: Study Shows Herbicides Increase Risk of Non-Hodgkin's Lymphoma – Beyond Pesticides, October 14; MONGLY01179185-9186. |
| 94 | November 12, 2008.  Gustin e-mail to Kronenberg et al., re: PK Recovery Wester et al. Comparison of Gly Monkey Studies.xls; MONGLY02155826-5832 |
| 95 | February 22, 2009.  Garnett e-mail to Saltmiras et al., re: Glyphosate Expert Panel Follow up Meeting, Consultancy Nik Hodges; MONGLY01061857-1859. |
| 96 | October 6, 2009.  Gustin e-mail to self and Farmer et al., re: Glyphosate Excretion Kinetics, Dermal Uptake:  Strategy; MONGLY06385823-5824. |
| 97 | January 16, 2010.  Levine e-mail to Farmer re: Issuance of Glyphosate Test Orders for the EDSP; MONGLY02162507-2508. |
| 98 | November 18, 2010.  Farmer e-mail to DeSesso, re: First Half; MONGLY00919381-9445. |
| 99 | December 8, 2010.  Heydens e-mail to Saltmiras, re: FW: Updated Glyphosate Activities Presentation for Friday's CPTLT Meeting; MONGLY02067858-7859 |
| 100 | December 14, 2010.  Adams e-mail to Klopf et al., re: Response Need – Re: Glyphosate Questions (Argentina); FW: Publicaciones CASAFE en la Pagina; MONGLY01155974-5979. |
| 101 | August 23, 2011.  Gustin e-mail to De Billot, re: Dermal Penetration Study Argumentation for Applicability to MON 7999; MONGLY04107778-7779. |
| 102 | July 19, 2012.  Buelig e-mail to Gustin et al., re: AW: Genotox Review: Your Approval Requested!; MONGLY02145917-5930. |

| Exhibit | Description |
|---------|-------------|
| 103 | August 13, 2012.  Saltmiras e-mail to Rubinstein et al., re: LAS Tox Expert Panel; MONGLY00971543. |
| 104 | September 7, 2012.  Letter from Shawna Lemke to Prof. A. Wallace Hayes, Harvard School of Public Health, re: Authorization Letter to Consulting Agreement; MONGLY02185742. |
| 105 | September 20, 2012.  Saltmiras e-mail to Goldstein et al.: re: Paper; MONGLY1096619-6622. |
| 106 | September 26, 2012.  Sachs e-mail to Heydens, re: Letters to the Editor?; MONGLY02063095-3098 |
| 107 | September 26, 2012.  Sachs e-mail to Heydens et as., re: Chassy / Hayes; MONGLY00900629-0633. |
| 108 | September 28, 2012.  Sachs e-mail to Goldstein et al., re: Slides – Seralini Publication; MONGLY00936725-6727. |
| 109 | October 10, 2012.  Saltmiras e-mail to Lemke et al., re: Seralini – Key Points from Americas/ Europe and Asia Teleconferences Yesterday; MONGLY00978886-8891. |
| 110 | January 28, 2013.  Kier e-mail to Saltmiras, re: Adding Author; MONGLY04086537-6541. |
| 111 | March 5, 2013.  Belvaux e-mail to Gardette et al., re Dossiers d'homologation Mon 79351 et Mon 79376; MONGLY01159775-9778. |
| 112 | October 22, 2013.  Garnett e-mail to Ugalino et al., re: Glyphosate 95TC – Indonesia; Formaldehyde as an Impurity of Technical Glyphosate for Indonesia MONGLY01051709-1714. |
| 113 | November 2, 2013.  Martino-Catt e-mail chain; MONGLY03293245-3254. |
| 114 | May 19, 2014.  Macinnes e-mail to Koch et al., re: MEA Salt Scavenger to keep NNG Low and Plant Test; MONGLY03771170-1172. |
| 115 | September 10, 2014.  Koch e-mail to Sherman et al., re: Tier 2 Feedback, Rat Carc Tier II MSK; Rat combined Chronic-Care Example; 18-Month Mouse example; Mouse Carc Tier II MSK; 1-Year Dog Waiver Draft Final for Canada Review; MONGLY02111857-892 (heavily redacted). |
| 116 | September 18, 2014.  Acquavella e-mail to Farmer, re: Long Time; MONGLY01208470-8471. |
| 117 | September 29, 2014.  Farmer e-mail to Acquavella re: IARC Review; MONGLY01207342-7344. |
| 118 | October 15, 2014.  Heydens e-mail to Garnett et al., re: IARC Evaluation of Glyphosate; MONGLY00989918. |
| 119 | January 23, 2015.  Acquavella e-mail to Donna re: New BfR Review Glyphosate Findings Human Urine; ACQUAVELLAPROD00008909. |
| 120 | February 5, 2015.  Heydens e-mail to Koch et al., re: IARC Planning – Work Plan; MONGLY00977264-7270. |
| 121 | February 20, 2015.  Heydens e-mail to Jenkins, re: EPA Folks Going to IARC; MONGLY00986901. |
| 122 | February 23, 2015.  Glyphosate:  IARC, Draft; MONGLY02913526-3531. |
| 123 | February 24, 2015.  Sachs e-mail to Vicini et al., re: Opportunity: Glyphosate and IARC; MONGLY01005425-5427. |
| 124 | March 14, 2015.  Sorahan e-mail to Farmer, re: EPA openly Discussed IARC Findings at a CLA Meeting on Thursday; MONGLY00977035-7036. |
| 125 | March 17, 2015.  Heydens e-mail to Monken, re: CE Collaboration Project: MONGLY00990361. |
| 126 | March 18, 2015.  Heydens e-mail to Vicini, re: IARC Outcomes, Process, and Response; MONGLY02063611-3574. |

| Exhibit | Description |
|---|---|
| 127 | April 9, 2015.  Acquavella e-mail to Farmer, re: Need Input: WHO Report on Glyphosate and Cancer – ICABR Session in June; ACQUAVELLAPROD00010215-0221. |
| 128 | April 27, 2015.  Sachs e-mail to Jenkins, re: WHO Report on Glyphosate and Cancer; MONGLY03327609-7624. |
| 129 | April 28, 2015.  Heydens e-mail to Jenkins, re: Glyphosate IARC Question; MONGLY00987755-7758. |
| 130 | May 11, 2015.  Koch e-mail to Heydens et al., re: Post-IARC Activities to Support Glyphosate; MONGLY01023968-3969. |
| 131 | June 5, 2015.  Reynolds e-mail to Hood et al., re: US Government Outreach – WHO IARC Clarification on Glyphosate; MONGLY02953363-3366. |
| 132 | June 24, 2015.  Jenkins e-mail to Listello and Heydens, re: ATSDR; MONGLY02060344-0345. |
| 133 | June 24, 2015.  Jenkins e-mail to Heydens et al., re: GA Update on US Government Outreach – WHO IARC Clarification on Glyphosate; MONGLY03064695-4702. |
| 134 | July 1, 2015.  Hodge-Bell e-mail to Farmer et al., re: EDSP WoE; MONGLY01179968-9971. |
| 135 | July 31, 2015.  Farmer e-mail to Acquavella, re: A Question, NNG Overview; MONGLY01185582-5583. |
| 136 | August 4, 2015.  Re: Glyphosate Activities; MONGLY01723742. |
| 137 | August 7, 2015.  Farmer e-mail to Roberts, re: Keith, Document List; MONGLY01183933-3936. |
| 138 | August 14, 2015.  Gault e-mail to Farmer, re: Larry Kier…Consultant Same Role as Acquavella for the Expert Panel; MONGLY02816607-6609. |
| 139 | August 31, 2015.  Letter from Acquavella to Monsanto Company, re: Consulting Invoice; MONGLY03934897-4898. |
| 140 | September 3, 2015.  Jenkins e-mail to Reynolds et al., re: High Level Summary of 2 Recent Message Studies (also Low Dose Response as FYI); MONGLY03351983-1985. |
| 141 | October 5, 2015.  Murphey e-mail to Sasaki et al., re: Glyphosate Litigation Messaging; MONGLY03315608-5609. |
| 142 | October 26, 2015.  Heering e-mail to Jenkins et al. re: ATSDR; MONGLY03878138-8139. |
| 143 | November 2, 2015.  Roberts e-mail to Heydens, re: Poster Abstract; MONGLY00978170-8173. |
| 144 | November 6, 2015.  Heydens e-mail to Acquavella, Farmer re: John, Glyphosate Expert Panel Poster at 2015 SRA Annual Meeting; MONGLY01030787-0793. |
| 145 | January 6, 2016.  Heydens e-mail to Roberts re: Glyphosate Expert Panel Manuscripts; MONGLY00999487-9490. |
| 146 | January 7, 2016.  Heydens e-mail to Acquavella re: Invoicing; ACQUAVELLAPROD00014559-4560. |
| 147 | January 13, 2016.  Heydens e-mail to Roberts re: Summary Report; Attachments: Combined Manuscript DRAFT January 11, 2016 (3) with Review; MONGLY00998682-8720. |
| 148 | February 2, 2016.  Jenkins e-mail to Collins re: Jack Housenger at ARA MONGLY03379079-9084. |
| 149 | February 4, 2016.  Heydens e-mail to Roberts, re: Introduction Paper; Attachments: Introduction Expert Panel Added HX & Use Info; MONGLY02085862-5863. |
| 150 | February 9, 2016.  Heydens e-mail to Roberts, re: Summary Article; Attachments: Summary Manuscript Draft 2 February 5, 2016 MONGLY01000676-0729. |

| Exhibit | Description |
|---------|-------------|
| 151 | February 12, 2016.  Heering e-mail to Stump et al., re: Summary of this Afternoon's Meeting with EPA; MONGLY03859549-9551. |
| 152 | March 31, 2016.  Heydens e-mail to Jenkins et al., re: EPA Glyphosate Questions; MONGLY02054538-4540. |
| 153 | April 4, 2016.  Nyangulu e-mail to Heydens, Koch, re: Follow up from Today's Conversations; MONGLY02358772-8773. |
| 154 | April 6, 2016.  Jackson e-mail to Rebman et al., re: French Embassy Visit; MONGLY03401522-1526. |
| 155 | April 22, 2016.  Goldstein e-mail to Vicini, Reynolds re: Glyphosate and Medical Toxicologists in Europe; Attachments: Contemporary Concepts in Toxicology; MONGLY02056568-6576. |
| 156 | June 1, 2016.  Wakimori e-mail to Jenkins et al., re: Glyphosate TAC; MONGLY03410604-0607. |
| 157 | July 6, 2016.  Lynch e-mail to Listello et al., re: Update on Proposed Meeting to Discuss Alignment on Collaborations to Pursue Action on IARC; MONGLY03558820-8823. |
| 158 | July 7, 2016.  Heydens e-mail to Roberts, re: Final Revisions; MONGLY02356274-6273. |
| 159 | August 9, 2016.  Heering e-mail to Murphey et al., re: Talking Points for Conversation with Gina; MONGLY03550799-0801. |
| 160 | March 21, 2017.  Litzenburg e-mail to Stiop et al., re: Deposition of Jess Rowland (not Bates Stamped). |
| 161 | 2015(?) What is Glyphosate, Monsanto; MONGLY07600438 – 0449 |
| 162 | 2015(?) What is Glyphosate, Monsanto; MONGLY07607159 – 7174 |
| 163 | September 21, 2009.  Farmer e-mail to Combest re: Roundup Article in Fremantle Herald; MONGLY01192115-1192117. |
| 164 | August 3, 1999.  Martens e-mail to Fontana et al. re: Roundup Mutagenicity; MONGLY00877683-877685. |
| 165 | 1991, Oral and Pulmonary Toxicology of the Surfactant Used in Roundup Herbicide by T.T. Martinez & K. Brown, Proc. West. Pharmacol. Soc 34: 43-46; MONGLY01330407-1330411. |
| 166 | 2002, Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/ Cyclin B Activation, Chem. Res. Toxicol 15, 326-331. |
| 167 | 2004, Glyphosate-Based Pesticides Affect Cell Cycle Regulation, Julie Marc et al., Elsevier. Apr;96(3): 245-9 |
| 168 | 2005, Comparative Effects of the Roundup and Glyphosate on Mitochondrial Oxidative Phosphorylation, Francisco Peixoto, Elsevier. Dec;61(8):1115-22 |
| 169 | October 20, 2008.  Goldstein e-mail to Garnett re: Akzo Called about the Germany Meeting; MONGLY02621529-2621534. |
| 170 | August 18, 2015.  Swarthout e-mail to Vicini et al. re: New England Journal of Medicine; MONGLY02873485-2873489. |
| 171 | April 8, 2016.  Christiansen e-mail to Miyamura et al. re: Issue Alert:  Frency Authority Intends to Impose New Restrictions on Surfactants; MONGLY07598394-7598400. |
| 172 | July 25, 2006.  Farmer e-mail to Hilton re: FAO code.pdf; MONGLY01922198-1922238. |
| 173 | June 24, 2013.  Roundup Disrupts Male Reproductive Functions by Triggering Calcium-Mediated Cell Death in Rat Testis and Sertoli Cells, Vera Lucia de Liz Oliveira Cavalli et al., Free Radical Biology and Medicine, Elsevier. Dec;65:335-46 |

| Exhibit | Description |
|---------|-------------|
| 174 | 2016, European Food Safety Authority Letters re: Public Access Request Related to the Correspondence between EFSA and Monsanto. |
| 175 | September 19, 2009.  New Questions Over Herbicide, Fremantle Herald (WA); MONGLY01192182-1192184. |
| 176 | November 18, 1992.  Genotoxicity Testing of the Herbicide Roundup and its Active Ingredient Glyphosate Isopropylamine using the Mouse Bone Marrow Micronucleus Test, Salmonella Mutagenicity Test, and Allium Anaphase-Telophase Test, J. Rank et al. 1993 29-36 Elsevier. |
| 177 | 1998, $^{32}$P-Postlabeling Detection of DNA Adducts in Mice Treated with the Herbicide Roundup, Environmental and Molecular Mutagenesis 31:55-59. |
| 178 | 2018, (Toxicity of Formulants and Heavy Metals in Glyphosate-Based Herbicides and other Pesticides, Toxicology Reports, Elsevier. 5:156-163 |
| 179 | April 1, 1983.  Titles: (a) Elimination of $^{14}$C-Glyphosate in Rhesus Monkeys Following A Single Dose (b) Percutaneous Absorption of $^{14}$C-Glyphosate in Roundup Formulation in Rhesus Monkeys Following A Single Topical Dose, Howard I. Maibach Study Results; MONGLY02142353-2142367. |
| 180 | 1986-1988.  GLY: Roundup Worker Safety; MONGLY00241308-241333. |
| 181 | 1988-1992.  Glyphosate Advertising; MONGLY00223570-223581. |
| 182 | September 1, 1995. Skin Reservoir Formation and Bioavailability of Dermally Administered Chemicals in Hairless Guinea Pigs, I. Chu et al., Fd Chem. Toxic. Vol. 34, No. 3, pp. 267-276, 1996. |
| 183 | September 3, 1998.  Take Advantage of the New Lower Price of Roundup Ultra, Selling More Roundup Ultra and Answering your Customer Needs; MONGLY07461374-7461377. |
| 184 | October 18, 2006.  Monsanto Company Roundup Original Herbicide Material Safety Data Sheet: 1-9 |
| 185 | Roundup Quik Pro Box Layout; MONGLY07111581. |
| 186 | February 26, 2009.  Hawkins Memorandum to Pates re: Updated Review of Glyphosate (103601) Incident Reports: 2-55 |
| 187 | December 15, 2009.  Studies on Glyphosate-Induced Carcinogenicity in Mouse Skin: A Proteomic Approach, Jasmine George et al., Science Direct, Elsevier: 73(5):951-64 |
| 188 | 2010; Roundup ProMax Herbicide Complete Directions for Use; MONGLY07600863-7600885. |
| 189 | October 10, 2013.  Spray.  Penetrate.  Kill.  Eliminate rain delay and re-spray worries with the added protection of the Roundup Pro Max 30-minute Rainfast Warranty; MONGLY07470656-7470567. |
| 190 | March 4, 2014.  Richardson e-mail to Gould re: Monsanto WevEx Training; MONGLY07112403-71122405. |
| 191 | 2015. Get to the Root of the Problem.  **Faster.** Roundup ProMax; MONGLY07470717. |
| 192 | 2015. Picture of Roundup Weed & Grass Killer Concentrate Plus with Labels: 1-10 |
| 193 | May 5, 2015.  Listello e-mail to Jacobs et al. re: Glyphosate Strategy Team Meeting – Wednesday May 6; MONGLY07598762. |
| 194 | May 29, 2015.  Monsanto Company Roundup ProMax Herbicide Safety Data Sheet; MONGLY07607686-7607695. |
| 195 | May 17, 2016.  Ozimkiewicz e-mail to Negreli et al. re: Roundup; MONGLY7596889. |
| 196 | April 19, 2018.  Deposition of Dan Schulz, In the Circuit Court of the City of St. Louis, State of Missouri, Earl Neal, et al., Plaintiffs, vs. Monsanto Company, Defendant. |

| Exhibit | Description |
|---------|-------------|
| 196-A | Duplicate Citation to Exhibit 53-03, *see above.* |
| 196-B | Marketing for Roundup QuickPro, Visual Control in Under 24 Hours; MONGLY07470665. |
| 196-C | Assurance of Discontinuance Pursuant to Executive Law § 6315): 1-6 |
| 196-D | June 16, 2008.  Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells, Nora Benachour et al. Chem. Res. Toxicol, 2009 22, 97-105l |
| 196-E | July 11, 1991.  Submission of Alternate Sources of Non-Craven Data, Volume 5 of 5; MONGLY00164425-164443. |
| 196-F | February 21, 2015.  Richardson e-mail to Gould re: Pesticide Ban; MONGLY07112877-7112890. |
| 196-G | March 3, 2010.  Chassy e-mail to Farmer re: Another Mole Needing a Whacking; MONGLY01249878-1249881. |
| 196-H | March 11, 2015.  Knodle e-mail to Sissons et al. re: IARC 2A Rating with Updated Supporting Materials; MONGLY07596745-7596754. |
| 196-I | September 20, 2016.  Passive Exposure to Agricultural Pesticides and Risk of Childhood Leukemia in an Italian Community, Carlotta Malagole et al., International Journal of Hygiene and Environmental Health: 1-7 |
| 196-J | April 30, 2015.  Gould, Steven to Gough, George re: Parent wants to know if his Daughter's School is Safe; MONGLY03023810-3023811. |
| 196-K | September 25, 2015.  Schulz e-mail to Listello re: Glyphosate/ Roundup in the News, Safety Information; MONGLY07598218-7598321. |
| 196-L | August 20, 2015.  Richard e-mail to Schulz et al. re: PPT Slides – Registration Review and Glyphosate Safety; MONGLY07598321. |
| 196-M | September 4, 2015. Schulz e-mail to #dl-ag-chem-CPLT re: Prop 65 – Glyphosate; MONGLY0759832307598325. |
| 196-N | October 29, 2015.  Schulz e-mail to Murphey re: KeyFactsGlyphosate.pdf; MONGLY07598378-07598380. |
| 196-O | September 6, 2017.  Schulz e-mail to #dl-ag-CCLT re: Thanks for a Great Year; MONGLY07619515-07619516. |
| 196-P | September 14, 2015.  Gould, Steven to Gould, Steven et al. re: Finding and Prop 65 Situation; MONGLY07606982-07606984. |
| 196-Q | November 27, 2015 Letter from Prof. Christopher J. Portier et al re: Review of the Carcinogenicity of Glyphosate by EFSA and BfR; MONGLY01033453-1033474. |
| 196-R | Duplicate Citation to Exhibit 53-03, *see above.* |
| 196-S | Glyphosate: Unsafe on any Plate, Food Testing Results and Scientific Reasons for Concern, Report by Food Democracy Now! And The Detox Project: 1-29 |
| 196-T | June 25, 2015.  Schulz, Daniel to Ford, Tim re: More Bad News on Roundup; MONGLY07607805-07607816. |
| 196-U | June 6, 2013.  Determination of Glyphosate Residues in Human Urine Samples from 18 European Countries, Medizinisches Labor Bremen: 1-13 |
| 196-V | March 12, 2018.  Weed Killer Glyphosate Detected in Urine by City Dwellers from 18 European Countries, BUND Analysis of Glyphosate in Urine: 1-2 |
| 196-W | May 14, 2015.  State of New York 5471, 2015-2016 Regular Sessions, In Senate, Environmental Conservation Law. |

| Exhibit | Description |
|---------|-------------|
| 196-X | Duplicate Citation to Exhibit 86, *see above.* |
| 196-Y | April 20, 2009.  Glyphosate Effects on Diseases of Plants, G.S. Johal, D.M. Huber, Europ. J. Agronomy 31 (2009) 144-152. |
| 196-Z | June 2011; Roundup and Birth Defects.  Is the Public Being Kept in the Dark?: 1-52 |
| 196-AA | Duplicate Citation to Exhibit 53-03, *see above.* |
| 196-BB | Drawing on World Map. |
| 196-CC | April 11, 2017. FleishmanHillard e-mail to Rands re: Daily Glyphosate Report 11.04.17; MONGLY07303950-7303959. |
| 196-DD | November 1996. Attorney General of the State of New York.  Consumer Frauds and Protection Bureau.  Environmental Protection Bureau.  1996  In the Matter of Monsanto Company, Respondent.  Assurance of Discontinuance Pursuant to Executive Law §63(15).  New York, NY, Nov.: 1-13 |
| 196-EE | World Map with Red Dots and lines. |
| 196-FF | June 29, 2016. Letter from Daniel A. Goldstein, M.D., Lead, Medical Sciences and Outreach, Senor Science Fellow re: Glyphosate Formulation and Surfactant Safety; MONGLY07600050-7600053. |
| 197 | April 24, 2018.  Deposition of Timothy Paul Ford, Sr., Account Manager for Monsanto, In the Circuit Court of the City of St. Louis, State of Missouri, Earl Neal, et al., Plaintiffs, vs. Monsanto Company, Defendant. |
| 197-41 | Drawing with Choice 1, 2, and 3. |
| 197-A | June 11, 2002.  Glyphosate Stewardship, Epidemiology, and the Farm Family Exposure Study, Draft; MONGLY00905650-905659. |
| 197-B | Duplicate Citation to Exhibit 137, *see above.* |
| 197-C | Duplicate Citation to Exhibit 163, *see above.* |
| 197-D | Duplicate Citation to Exhibit 81, *see above.* |
| 197-E | Duplicate Citation to Exhibit 196-R, *see above.* |
| 197-F | Duplicate Citation to Exhibit 86, *see above.* |
| 197-G | Duplicate Citation to Exhibit 75, *see above.* |
| 197-H | Duplicate Citation to Exhibit 111, *see above.* |
| 197-I | Duplicate Citation to Exhibit 80, *see above.* |
| 197-J | Duplicate Citation to Exhibit 183, *see above.* |
| 197-K | Duplicate Citation to Exhibit 196-B, *see above.* |
| 197-L | Duplicate Citation to Exhibit 165, see above. |
| 197-M | January 2005.  Cancer Incidence Among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study, Anneclaire J. DeRoos et al., Environmental Health Perspectives, Volume 113, Number 1, January 2005: 49-54 |
| 197-N | March 16, 2005.  Comparative Effects of the Roundup and Glyphosate on Mitochondrial Oxidative Phosphorylation, Francisco Peixoto, Chemosphere 61 (2005) 1115-1122. |
| 197-O | Duplicate Citation to Exhibit 196-F, *see above.* |
| 197-P | April 1, 1992.  Letter from Alderman, US EPA to Monsanto re: Misleading Marketing; MONGLY00223570-223581. |

| Exhibit | Description |
|---------|-------------|
| 197-Q | May 13, 1988.  GLY Roundup Worker Safety; MONGLY000241308-241333. |
| 197-R | Duplicate Citation to Exhibit 196-G, *see above.* |
| 197-S | July 13, 2017.  Bryan Whiffen e-mail to Ford re: Glyphosate & Prop 65; MONGLY07599870-7599874. |
| 197-T | September 20, 2016.  Passive Exposure to Agricultural Pesticides and Risk of Childhood Leukemia in an Italian Community, Carlotta Malagoli et al., International Journal of Hygiene and Environmental Health 219 (2016) 742-748. |
| 197-U | April 29, 2016.  Ford e-mail to Blaeser re: NMDOT with Attachments: Glyphosate Safety and Health Final Version, Glyphosate ITO Briefing 3-27-15, Glyphosate Booklet, Glyphosate Basics; MONGLY07603230-7603273. |
| 197-V | November 9, 2016.  Ford e-mail to Conroy re: Glyphosate; MONGLY07601409-7601413. |
| 197-W | August 5, 2015.  Ford e-mail to Markwardt re: Monsanto Comments to Thongprakaisang 2013; MONGLY07607471-7607475. |
| 197-X | Duplicate Citation to Exhibit 173, *see above.* |
| 197-Y | August 1, 2008.  Mitchell e-mail to Gilligan et as. Re: Issues Management – Argentina; MONGLY01992819-1992820. |
| 197-Z | Duplicate Citation to Exhibit 196-V, *see above.* |
| 197-AA | Duplicate Citation to Exhibit 179, *see above.* |
| 197-BB | March 31, 2016.  State of New York, 7141, In Senate, An Act to Amend the Environmental Conservation Law. |
| 197-CC | Duplicate Citation to Exhibit 187, *see above.* |
| 197-DD | June 2009.  Parental Exposure to Pesticides and Childhood Brain Cancer: U.S. Atlantic Coast Childhood Brain Cancer Study, Youn K. Shim et al., Environmental Health Perspectives, Volume 117, Number 6, June 2009: 1002-1006 |
| 197-EE | July 18, 2013.  Hardy e-mail to Downs et al. re: Roundup ProMax Sales Information; MONGLY07111248-7111251. |
| 197-FF | March 18, 2010.  Overton e-mail to Gould re: QuikPro Sell Sheet; MONGLY07111305. |
| 197-GG | Duplicate Citation to Exhibit 53-03, *see above.* |
| 197-HH | November 18, 1992.  Genotoxicity Testing of the Herbicide Roundup and its Active Ingredient Glyphosate Isopropylamine using the Mouse Bone Marrow Micronucleus Test, Salmonella Mutagenicity Test, and Alium Anaphase-Telophase Test, J. Rank et al., Mutation Research, 300 (1993) 29-36. |
| 197-II | August 17, 1997.  $^{32}$P-Postlabeling Detection of DNA Adducts in Mice Treated with the Herbicide Roundup, Marco Peluso et al., Environmental and Molecular Mutagenesis 31:55-59. |
| 197-JJ | April 12, 2013.  Richardson e-mail to Beaupre re: Job Description/Pay Grade, ITO Regional Account Manager; MONGLY07295467-7295471. |
| 197-KK | March 30, 2015.  Lebbing e-mail to Goldstein re: GMOA #3298 – Abbott Review; MONGLY00935712-935715. |
| 197-LL | January 30, 2015. Scientific Studies Research Papers Testimonials and messages Submitted to Monsanto Corporation Board and Shareholders as Evidence of Harm from GMOs and Glyphosate, Moms Across America and Supporters; MONGLY02575300, MONGLY02575518-2575520. |
| 197-MM | 2018.  Glyphosate Exposure in Pregnancy and Shortened Gestational Length:  A Prospective Indiana Birth Cohort Study, Parvez et al., Environmental Health: 1-12 |

| Exhibit | Description |
|---------|-------------|
| 197-NN | July 30, 2005. Jordan e-mail to Self and Cunningham et al., re: Response to The Daily Gleaner; MONGLY01915399-1915407. |
| 197-OO | February 24, 2014. Vicini e-mail to Swarthout re: Fwd: nhrighttoknowgmo.org/BreakingNews/GlyphosateIISamsel-Seneff.pdf; MONGLY07154971-154972 |
| 197-PP | Duplicate Citation to Exhibit 196-DD, *see above.* |
| 197-QQ | Duplicate Citation to Exhibit 196-FF, *see above.* |
| 197-RR | June 29, 2016. Goldstein e-mail to Doug Zimmerman re: Roundup; MONGLY07602810-7602817. |
| 197-SS | November 20, 2017. Amy Cole e-mail to Ford re: Herbicides – Global Market Outlook (2017-2023). MONGLY07599466 |
| 197-TT | June 20, 2016. Rebman e-mail to Garnett et al. re: [TWN Biosafety Info] Co-Formulants in Glyphosate-based Herbicides Require Greater Scrutiny; MONGLY005516376-R-05516382-R. |
| 197-UU | July 28, 2017. Gould e-mail to Trevor Whitson re: Environmental Issues and Most Exposures; MONGLY0714856-7148657. |
| 197-VV | March 17, 2017. Gould e-mail to Alan Bishop et al. re: ISSUE ALERT: Fresno Judge Rules in Favor of Motion to Dismiss Monsanto's Prop 65 Lawsuit, To Our Valued Partners; MONGLY07143557-7143560. |
| 197-WW | October 1, 2015. Ford e-mail to Carl Hinderer re: Glyphosate Slide Deck, What is Glyphosate Presentation; MONGLY07606821. |
| 197-XX | March 24, 2015. Ford e-mail to Dennis Markwardt re: Monsanto's Chief Technology Director; MONGLY07609879-7609880. |
| 197-YY | July 7, 2017. Ford e-mail to Dennis Markwardt re: Monsanto Continues Legal Challenge of Improper Prop 65 Listing of Glyphosate; MONGLY07648357-7648360. |
| 198 | April 26, 2018. Deposition of James Myron Richardson, In the Circuit Court of the City of St. Louis, State of Missouri, Earl Neal, et al., Plaintiffs, vs. Monsanto Company, Defendant. |
| 198-01 | |
| 198-A | September 24, 2015. Farmer e-mail to Goldstein, re: OEHHA Announces Intention to List Glyphosate on Prop 65 list. "ACTION BEING REQUESTED"; MONGLY001031800-1805. |
| 198-B | Duplicate Citation to Exhibit 196-R, *see above.* |
| 198-C | Duplicate Citation to Exhibit 86, *see above.* |
| 198-D | Duplicate Citation to Exhibit 196-B, *see above.* |
| 198-E | Duplicate Citation to Exhibit 196-F, *see above.* |
| 198-F | 2012. Integrity, Monsanto Code of Business Conduct: 1-28 |
| 198-G | Duplicate Citation to Exhibit 196-J, *see above.* |
| 198-H | Duplicate Citation to 196-L, *see above.* |
| 198-I | January 6, 2005. Department of Justice, Monsanto Company Charged with Bribing Indonesian Government Official: Prosecution Deferred for Three Years, Company Agrees to Cooperate with Investigation, Retain Independent Compliance Expert, Pay $1 Million Penalty: 1-2 |
| 198-J | June 14, 2005. Farmer e-mail to Gary Winston re: Garry Study; MONGLY01908628-8642. |
| 198-K | April 14, 2007. Israel Law Reports, Salim Abu Madigam and Others v. 1. Israel Land Administration; 2. Ministry of Industry, Trade and Employment, and 3. Ministry of Agriculture, The Supreme Court Sitting as the High Court of Justice: 62-118 |

| Exhibit | Description |
|---------|-------------|
| 198-L | January 26, 2007.  Monsanto Fined in France for 'False' Herbicide Ads. |
| 198-M | Duplicate Citation to Exhibit 179, *see above*. |
| 198-N | Prop 65 Cost on CA Municipalities Markets, By Steve Gould; MONGLY07111865. |
| 198-O | Duplicate Citation to Exhibit 190, *see above*. |
| 198-P | Duplicate Citation to Exhibit 53-03, *see above*. |
| 198-Q | December 29, 2017.  State of California, Environmental Protection Agency, Office of Environmental Health Hazard Assessment, Safe Drinking Water and Toxic Enforcement Act of 1986, Chemical Known to the State to Cause Cancer or Reproductive Toxicity: 1-22 |
| 198-R | Duplicate Citation to Exhibit 197-JJ, *see above*. |
| 198-S | Duplicate Citation to Exhibit 196-DD, *see above*. |
| 198-T | 2004.  The Precautionary Principle:  Protecting Public Health, the Environment and the Future of our Children, Marco Martuzzi and Joel A. Tickner, World Health Organization, Europe: 1-209 |
| 198-U | Agents Classified by the IARC Monographs, Volumes 1-120: 1-21 |
| 198-V | September 4, 2015.  Richardson e-mail to Christiansen re: Prop 65; MONGLY07725836-5838. |
| 198-W | Duplicate Citation to Exhibit 197-VV, *see above*. |
| 198-X | March 26, 2015.  Duncan e-mail to Drake et al. re: Golf Courses; MONGLY07164540. |
| 198-Y | March 24, 2015.  Richardson e-mail to Link re: IT&O / Stop Spray Notices; MONGLY07180617-621. |
| 198-Z | March 23, 2015.  Richardson e-mail to Link re: IARC Communication Materials; MONGLY07296736-737. |
| 198-AA | April 3, 2015.  Richardson e-mail to Bates et al. re: Updated PDF with Working Links/ Glyphosate/ Roundup in the News, Safety Information; MONGLY07180961-962. |
| 198-BB | September 9, 2015.  Underwood e-mail to Richardson et al. re: ISSUE ALERT: State of California Intends to Add Glyphosate to "Prop 65" List; MONGLY07285960-966. |
| 199 | 1986.  Irritation, Sensitization, Photoirritation and Photosensitization Assays with a Glyphosate Herbicide, Howard I. Maibach, Contact Dermatitis 1986: 15: 152-156 |
| 200 | Duplicate Citation to Exhibit 52, *see above*. |
| 201 | Miscellaneous Labels and Label Documents. |
| 202 | 1986?  INCHEM, Glyphosate, Evaluation for Acceptable Intake. |
| 203 | July 1, 1979.  Outline of Industry Communications Plan; CMA 062555-590. |
| 204 | January 1990.  Chemical Manufacturers Association Communications Program, Glen H., GE Plastics; CMA 066329-346. |
| 205 | December 28, 1990.  Ronald C. Wester et al., Glyphosate Skin Binding, Absorption, Residual Tissue Distribution, and Skin Decontamination, Fundamental and Applied Toxicology 16, 725-732 (1991). |
| 206 | December 6, 1999.  Gary M. Williams et al., Safety Evaluation and Risk Assessment of the Herbicide Roundup and its Active Ingredient, Glyphosate, for Humans, Regulatory Toxicology and Pharmacology 31, 117-165 (2000). |
| 207 | February 26, 2014.  Robin Mesnage et al., Major Pesticides are More Toxic to Human Cells than their Declared Active Principles, Biomed Res Int. 2014: 179691. |

| Exhibit | Description |
|---------|-------------|
| 208 | 2017.  Robin Mesnage and Michael N. Antoniou, Ignoring Adjuvant Toxicity Falsifies the Safety Profile of Commercial Pesticides; www.ncbi.nlm.nig.gov/pmc/articles/PMC5785549/#!po=12.8788. |
| 209 | Who Funds this Website? GMO Answers, gmoanswers.com/ask/who-funds-website. |
| 210 | Frequently Asked Questions About:  Glyphosate, GMO Answers. |
| 211 | January 29, 2016.  Are you Paid by Monsanto to Tell Lies on this Pathetic Website that Promotes GMOs? / GMO Answers. |
| 212 | May 13, 2016.  Harrie Buist, Dermal Absorption and Toxicological Risk Assessment: Pitfalls and Promises. |
| 213 | November 12, 2013.  Anthony Samsel & Stephanie Seneff, Glyphosate, Pathways to Modern Diseases II: Celiac Sprue and Gluten Intolerance, Interdiscip Toxicol 2013, Vol. 6(4): 159-184. |
| 214 | January 31, 2016.  Charlotte Lynggaard Katholm, Effects of Roundup (glyphosate) on Gut Microorganisms of Farm Animals, Master Thesis, Agrobiology – Health and Welfare. |
| 215 | February 13, 2001.  Ernst Schonbrunn et al., Interaction of the Herbicide Glyphosate with its Target Enzyme 5-enolpyruvylshikimate 3-phosphate Synthase in Atomic Detail, 1376-1380, PNAS, Vol. 98, No. 4. |
| 216 | Miscellaneous MSDSs. |
| 217 | March 25, 1955.  R.D. Minteer, Monsanto Chemical Corp, Precautionary Labeling of Hazardous Chemicals, Industrial and Engineering Chemistry, Vol. 47, No. 6 pp 1202-1203. |
| 218 | February 27, 2017.  Plaintiffs' Reply in Support of Motion to Compel Deposition of Jess Rowland, with March 4, 203 Copley e-mail to Jess Rowland, October 4, 2016 Stilp e-mail to Litzenburg; August 10, 2016 Litzenburg e-mail to Blake; Subpoena to Testify at a Deposition of Jesudoss Rowland. |
| 219 | August 21, 1978.  Letter from W. Dirkstra to Robert Taylor re: Roundup – glyphosate; Evaluation of Validation of I.B.T. B-546: 2-year Chronic oral toxicity study with CP67573 in Albino Rats E.P.A. Reg. #524-30 Caswell #: 661A. |
| 220 | September 24, 1979.  Letter from Rick Oleson, Monsanto to Hogan, Bio/dynamics, Inc. re: r Reassignment of Dr. Frederick R. Johannsen with himself; MONGLY04269227. |
| 221 | November 29, 1979.  Letter from Hogan, Bio/dynamics Inc., to R. Oleson, Monsanto re: Glyphosate; MONGLY04269226. |
| 222 | December 11, 1979.  Letter from Lankas, Bio/dynamics Inc. to R. Oleson, Monsanto re: Glyphosate; MONGLY04269225. |
| 223 | December 31, 2979.  Bio/dynamics Inc. Project No. 77-2111, A Three Month Feeding Study of Glyphosate (Roundup Technical) in Mice, Final Report; MONGLY01631845-1924. |
| 224 | January 10, 1980.  Monsanto Overseas Outgoing Message to C.T. Dickerson, Tokyo, Japan re: The Final Report for the 18-Month Mouse Study at Bio/Dynamics; MONGLY04269224. |
| 225 | January 14, 1980.  Letter from Oleson, Monsanto to Lankas, Bio/dynamics re: 18-Month Chronic Feeding Study in ice with Glyphosate; BDN-77-420; B/d 77-2061; MONGLY04269223. |
| 226 | January 24, 1980.  Oleson, Monsanto Memo to R.W. Street, N3C re: Lifetime Feeding Study in Mice with Glyphosate; MONGLY04269222. |
| 227 | January 29, 1980.  Letter from Lankas, Bio/dynamics to Oleson, Monsanto, re: 77-2061 Final Protocol; MONGLY04269221. |
| 228 | January 31, 1980.  Memo from Oleson to R.W. Street, N3C re: Lifetime Feeding Study in Mice with Glyphosate, BDN-77-420; B/d 77-2061; MONGLY04269220. |

| Exhibit | Description |
|---------|-------------|
| 229 | July 1983.  United States Environmental Protection Agency, Summary of the IBT Review Program, Office of Pesticide: 2-46 |
| 230 | February 10, 1984.  US EPA Memo from Dykstra to Hoyt re: Review of Mouse Oncogenicity Study. |
| 231 | February 22, 1985.  Monsanto Memo from Gingerich to Armstrong et al., re: EPA Toxicology Branch/Roundup; MONGLY04269072-9075. |
| 232 | February 26, 1985.  US EPA Memo from Lacayo to Engler re: Use of Historical Data in Determining the Weight of Evidence from Kidney Tumor incidence in the Glyphosate Two-Year Feeding Study; and some Remarks on False Positives. |
| 233 | March 4, 1985; March 25, 1985.  US EPA Memo to Robert Taylor re: Consensus Review of Glyphosate, Caswell No. 61A; MONGLY04269067.-9070. |
| 234 | March 13, 1985.  Letter from Frank Serdy, Monsanto to Campt, Office of Pesticide re: Roundup Herbicide Chronic Mouse Study with Glyphosate; MONGLY00246215-6219. |
| 235 | April 2, 1985.  Roush Memo to Evans re: Glyphosate as Class C; MONGLY04277789. |
| 236 | April 3, 1985.  Letter from Knezevich, Bio/dynamics to Kushner re: Shipment of Kidneys from Animals; MONGLY04269049. |
| 237 | May 21, 1985.  Letter from Serdy, Monsanto to Tayler, Office of Pesticide re: Roundup Herbicide. Chronic Mouse Study with Glyphosate; MONGLY0253801-3809. |
| 238 | August 20, 1985.  Gingerich Monsanto Memo to Armstrong et al. re: Roundup S.A.P. Meeting; MONGLY04268982-983. |
| 239 | August 28, 1985.  Serdy Memo to Long re: Glyphosate Mouse Study, Additional Steps; MONGLY04268980-981. |
| 240 | December 4, 1985.  Kasza EPA Memo to Dykstra re: Glyphosate – Evaluation of Kidney Tumors in Male Mice.  Chronic Feeding Study; MONGLY00235488. |
| 241 | February 11, 1986.  Information to Support the Conclusion that Glyphosate is Not a Class C Oncogen, Science Advisory Panel Meeting; MONGLY00233235-3391. |
| 242 | January 5, 1988.  EPA Tech Review: Toxicology; MONGLY00223052-3262. |
| 243 | September 30, 1988.  US EPA Memo from Dykstra to Taylor re: Glyphosate – EPA Registration No. 524-308-Roundup – PP#SF3673 – Glyphosate in/on Cora – Tolerance Request and "Free Standing Summary". |
| 244 | November 10, 1988.  Meeting with EPA, Glyphosate – Issues Related to Oncogenicity; MONGLY01307675-7678. |
| 245 | June 19, 1989.  US EPA Memo from Dykstra to Taylor re: Glyphosate – EPA Registration Nos. 521-318 and 524-333 – Historical Control Data for Mouse Kidney Tumors; EPAHQ_0000612-676. |
| 246 | July 6, 1989.  US EPA Letter from Taylor to Elaine Dorwood-King re: MON 0139 (Additional Information for Mouse Oncogenicity Study) EPA Registration No. 524-318; MON 0139 62% Solution; EPA Registration No. 524-333, Your Letter Dated December 12, 1988 MONGLY01307724-7768. |
| 247 | November 30, 2011.  United States Environmental Protection Agency, Washington, D.C., Inert Ingredient Frequently Asked Questions; MONGLY05340965-942. |
| 248 | February 16, 2009.  Monsanto Glyphosate Formulations, Terry Kaempfe, Power Point Presentation. |

| Exhibit | Description |
|---------|-------------|
| 249 | February 8, 2018.  Confidential Videotaped Deposition of Dr. Charles M. Benbrook, Dewayne Johnson, Plaintiff, vs. Monsanto Company, Defendant, Superior Court of the State of California for the County of San Francisco. |
| 250 | January 22, 2018.  Expert Report and Witness Statement of Dr. Kassim Al-Khatib, Professor of Plant Sciences, University of California – Davis. |
| 251 | April 3, 1998.  Pesticide Registration Notice 98-3, Notice to Manufacturers, Formulators, Producers, Distributors and Registrants of Pesticide Products, Subject:  Guidance on Final FIFRA Section 6(a)(2) Regulations for Pesticide Product Registrants. |
| 252 | 1999 Roundup Product Formulations Excel Spreadsheet - Compilation 3359671 Native MONGLY02198946 |
| 253 | July 06, 2013. PR Email re Allegations made by MOMs Across America MONGLY00940540 |
| 254a | 2009 Roundup Formulations PowerPoint Presentation - 2627640 Native MONGLY01057841 – (PowerPoint File) |
| 254b | 2009 Roundup Formulations PowerPoint Presentation - 2627640 Native MONGLY01057841 – (.pdf File) |
| 255 | Duplicate Citation to Exhibit 247, *see above.* |
| 256 | Duplicate Citation to Exhibit 250, *see above.* |
| 257 | October 31, 2011. Monsanto Guidelines for References to Roundup and Roundup Ready. MONGLY07702776-82. |
|  |  |
| 257 | 2011-10-31 Monsanto Guidelines for References to Roundup and Roundup Ready. MONGLY07702776-82. |
| 258 | June 15, 1983.  Pesticide & Toxic Chemical News; MONGLY04267349-350. |
| 259 | June 1986, EPA Guidance for the Reregistration of Pesticide Products Containing Glyphosate as the Active Ingredient; MONGLY01298420-1298604. |
| 260 | March 1990, MSL-9656 Assessment of Forest Worker Exposures to Glyphosate During Backpack Foliar Applications of Roundup Herbicide, J.E. Cowell and J.R. Steinmetz; MONGLY01848857-1849023. |
| 261 | 1986.  A Briefing for Corn Growers, Monsanto; MONARCH 000424-443. |
| 262 | September 11, 1998.  Activity of Roundup Ultra in Fallowbeds; MONGLY07641378. |
| 263 | 1998.  Just the Facts…Roundup Original Herbicide vs. Zeneca's Sulfosate Product; MONGLY07454718-723. |
| 264 | January 1999.  Roundup Ready Soybeans, The Proof is in the Profit!; MONGLY07447299-300. |
| 265 | February 1999.  If you like the Weed Control Roundup Ultra gives you before Planting…; MONGLY07454773-776. |
| 266 | January 2002.  (P1.834) You Asked For It.  We Listened.  Introducing QuickPro Herbicide; MONGLY07468095. |
| 267 | 2003.  (P1.767.1-5) See Why Roundup UltraMax Herbicide Provides More Value On Your Farm; MONGLY07467622-626. |
| 268 | October 10, 2013.  (P1.2476.1-2) Spray. Penetrate. Kill Roundup ProMax; MONGLY07470656-657. |
| 269 | 2014.  (P1.2483) Roundup QuickPro, Visual Control in Under 24 Hours; MONGLY07470665. |

| Exhibit | Description |
|---------|-------------|
| 270 | 2015.  (P1.2492.1) Get to the Root of the Problem.  Faster.  Roundup ProMax; MONGLY07470717. |
| 271 | 2016 Monsanto IT&O Business Strategy Presentation by Steven Gould, Monsanto. |
| 272 | April 30, 2013.  Roundup Packaging Standards; MONGLY07702784-800. |
| 273 | Chronological History of EPA Regulations; MONGLY01446229. |
| 274 | October 25, 2000.  Farmer e-mail to Kurtz re: Glyphosate – the Latest in California!; MONGLY01905758-759 |
| 275 | July 2001.  Clustering Glyphosate Formulations with Regard to the Testing for Dermal Uptake; MONGLY01839476-81. |
| 276 | October 2004.  CropLife Guidelines for Personal Protection when Using Crop Protection Products in Hot Climates. |
| 277 | April 2006.  CropLife Guidelines for the Safe and Effective Use of Crop Protection Products. |
| 278 | February 12, 2007.  Farmer e-mail to Goldstein re: Re-entry Time; MONGLY03202659. |
| 279 | April 10, 2007.  Farmer e-mail to Farmer re: Roundup Branded Products; MONGLY01221733. |
| 280 | February 15, 2008.  Farmer e-mail to Goldstein et al. re: URGENT – RoundUp RTU Incident; MONGLY01938130-134. |
| 281 | September 11, 2008. Farmer e-mail to Saltmiras re: Intro Comments; MONGLY01187228-230. |
| 282 | October 28, 2008.  Table of List of Studies, Data Requirement, EPA Guideline, Test Material, Req'd, Study Title, and MRID. |
| 283 | October 29, 2008.  Adams e-mail to Farmer re: Tox Data List, Attached: Data Requirement List_Glyphosate.xlsx, High Importance; MONGLY01191918 |
| 284 | March 30, 2009.  Letter from Clyde Livingston, Monsanto to U.S. EPA Document Processing Desk re: Active Ingredient: Glyphosate, Products: Roundup Herbicides with Glyphosate, Information which may be required under Section 6(a)(2) of FIFRA; MONGLY01025193-218. |
| 285 | June 2009.  Glyphosate Summary Document, Registration Review: Initial Docket; MONGLY02568150-165. |
| 286 | June 3, 2009.  Memorandum from Julie M. Langsdale et al., United States Environmental Protection Agency, to John Pates/Susan Lewis, Special Review and Reregistration Division re: Glyphosate.  Human-Health Assessment Scoping Document in Support of Registration Review MONGLY01201705-786. |
| 287 | September 22, 2009.  Adams e-mail to Hewitt & Treacy re: Monsanto Comments to the EPA Glyphosate Registration Review; MONGLY01227790. |
| 288 | September 21, 2009.  Letter from Stephen A. Adams, Monsanto to OPP Regulatory Public Docket, Office of Pesticide Programs, U.S. Environmental Protection Agency re: Docket ID: EPA-HQ-OPP-2009-0361; Comments on the Registration Review of Glyphosate; MONGLY01227776-789. |
| 289 | December 29, 2009.  Glyphosate Final Work Plan (FWP) Registration Review Case No. 0178; MONGLY02131391-397. |
| 290 | 1986-2009.  US EPA Archived Document with Registration Paperwork from Monsanto to EPA and Correspondence. |
| 291 | 2010.  This Specimen Label is Provided for General Information Only, Roundup Pro Herbicide. |
| 292 | October 2011.  A Stocktaking Report: Crop Protection Stewardship Activities of the Plant Science Industry 2005-2011. |

| Exhibit | Description |
|---------|-------------|
| 293 | January 10, 2012.  Adams e-mail to Bleeke re: Glyphosate Submission – Revised; MONGLY01209042-52. |
| 294 | April 4, 2012.  Clauss e-mail to Farmer re: One More Thing…; MONGLY01250861. |
| 295 | September 6, 2012.  Letter from Katie Miller, USA-Canada Joint Glyphosate Task Force, LLC (JGTF) to Document processing Desk, Office of Pesticide Programs, U.S. Environmental Protection Agency re: JGTF Submission in Response to Generic Data Call-In for Glyphosate Issued September 1, 2010; ID # RR-417300-3012; EPA Company Number: 87785; MONGLY01995219-21. |
| 296 | Petty Report Videos One through Eleven and Lisa Blecker, Pesticide Safety Coordinator Pesticide Safety Education Program Modules 1 through 6. |
| 297 | July 5, 2013.  Goldstein e-mail to Chassy re: FYI – Open Letter to Monsanto, from Moms – Moms Across America; MONGLY00940540-46. |
| 298 | August 27, 2014.  Lemke e-mail to Koch re: New Yorker GMO Labeling; MONGLY05208837-40. |
| 299 | September 12, 2014.  Tan e-mail to Garnett & Farmer re: Toxicity Data on Roundup Surfactant; MONGLY02862075-76. |
| 300 | April 7, 2015.  Guard e-mail to Webb re: Draft – L&G Brand Extensions Stewardship Guidelines; MONGLY07721242-44. |
| 301 | June 18, 2015.  Adams e-mail to Sato & Favoretto re: Studies Owned by North American JGTF; MONGLY02461675-76. |
| 302 | June 18, 2015.  JGTF Studies Submitted to EPA in Response to EDSP Test Order. |
| 303 | June 29, 2015.  Memorandum from Greg Akerman from Office of Pesticide Programs, United States Environmental Protection Agency to Jolene Trujillo, Chemical Review Manager re: EDSP Weight of Evidence Conclusions on the Tier I Screening Assays for the List 1 Chemicals; MONGLY00973441-510. |
| 304 | September 8, 2015.  Johnson e-mail to Sor et al. re: FW: APAC SDS Review and NFPA/ HMIS III Rating Request – Due by 14 Sept. 2015; MONGLY01995986-88. |
| 305 | October 1, 2015.  Memorandum from Rowland, ESEPA to Smith, Risk Assessment Branch I re: Glyphosate: Report of the Cancer Assessment Review Committee; MONGLY02325015-101. |
| 306 | 2013-2015. Table with Received Date, Product Code Description 1, EPA Registration Number, Reason Code Description 3, and Issue Summary Columns Complaints. |
| 307 | February 11, 2016.  Presentation of Worker Protection Standard Training and Industry Perspective by Jennifer Thomasen; MONGLY02296053-097. |
| 308 | May 31, 2016.  Updated List of Studies Needed for Glyphosate; MONGLY02296053-97. |
| 309 | July 12, 2016.  Nguyen e-mail to Jenkins et al. re: Monsanto Glyphosate Studies Requested by EPA; MONGLY02297090-97. |
| 310 | September 12, 2016.  Glyphosate Issue Paper:  Evaluation of Carcinogenic Potential, EPA's Office of Pesticide Programs; MONGLY05125176-402. |
| 311 | September 23, 2016.  Wakimori e-mail to ? (Foreign e-mail) re: EPA Glyphosate Issue Paper; MONGLY05125174-175. |
| 312 | June 2018.  US Environmental Protection Agency, Office of Pesticide Programs, Occupational Pesticide Handler Unit Exposure Surrogate Reference Table. |
| 313 | August 30, 2018.  Pest Committee Meeting, Public Hearing, EU Authorisation [sic] Procedure for Pesticides – Comparative Analysis of Authorisation [sic] Procedures in OECD Countries, Preparatory Questions. |

| Exhibit | Description |
|---------|-------------|
| 314 | Crop Protection Stewardship, Stewardship Vision 2020, CropLife International. |
| 315 | August 18, 2011.  Environment Directorate, Joint Meeting of the Chemicals Committee and The Working Party on Chemicals, Pesticides and Biotechnology, Guidance Notes on Dermal Absorption. |
| 316 | January 29, 2015.  Renewal Assessment Report, Glyphosate, Volume 3, Toxicology and Metabolism; MONGLY06057432-8430. |
| 317 | June 2018.  Leemon B. McHenry, The Monsanto Papers: Poisoning the Scientific Well, The International Journal of Risk & Safety in Medicine. |
| 318 | February 10, 2003.  Garnett e-mail to Broeckaert re: Dermal Absorption; MONGLY06398326-27. |
| 319 | 1997.  John E. Franz, Michael K. Mao, and James A Sikorski, Glyphosate:  A Unique Global Herbicide; MONGLY03296528-549. |
| 320 | July 1, 2009.  Preliminary Investigation of the In Vitro Absorption of Glyphosate from Three Formulations through Human Epidermis, Report Number: JV2082-TEC; MONGLY02171768-817 and MONGLY00694596-645. |
| 321 | February 19, 2010.  360 g/L Glyphosate SL Formulation (MON 52276), In Vitro Absorption of Glyphosate through Human Epidermis, Report Number: JV2084-REG; MONGLY02160280-319. |
| 321-2 | SIGMA TWEEN 20 Product Information; Product used in JV2084 Study (Jerry K 2019-05-12). |
| 322 | February 19, 2010.  360 g/L Glyphosate SL Formulation (MON 52276), In Vitro Absorption of Glyphosate through Human Epidermis, Confidential Supplement to Report JV2084-REG, Report Number: JV2084-REG-SUP; MONGLY02160320-328. |
| 323 | February 19, 2010.  450 g/L Glyphosate SL Formulation (MON 79545), In Vitro Absorption of Glyphosate through Human Epidermis, Report Number JV2083-REG; MONGLY02161643-681. |
| 324 | February 19, 2010.  450 g/L Glyphosate SL Formulation (MON 79545), In Vitro Absorption of Glyphosate through Human Epidermis, Confidential Supplement to Report JV2083-REG, Report Number: JV2083-REG-SUP; MONGLY02161682-90. |
| 325 | February 19, 2010.  480 g/L Glyphosate SL Formulation (MON 79351), In Vitro Absorption of Glyphosate through Human Epidermis, Report Number: JV2085-REG; MONGLY02173105-107. |
| 325-2 | February 19, 2010.  480 g/L Glyphosate SL Formulation (MON 79351), In Vitro Absorption of Glyphosate through Human Epidermis, Confidential Supplement to Report JV2085-REG; Report No.: JV2085-REG-SUP |
| 326 | March 26, 1974.  United States Patent Office, N-Phosphonomethyl-Glycine Phytotoxicant Compositions, John E. Franz, Crestwood, MO., Assignor to Monsanto Company, St. Louis, MO. |
| 327 | January 5, 2014.  (P1.3302.1-25) US Roundup Business Update, Steve Knodle, Global Marketing Presentation. |
| 328 | October 28, 2015.  (P1.3362.1-4) Murphey e-mail to Schulz re: What is Going On 1?  With Attachment: KeyFactsGlyphosate.pdf; MONGLY07598371-74. |
| 329 | February 24, 2015.  (P1.3772.1-6) Richmond, Community Services Building, City Council Agenda. |
| 330 | (P1.3774.1-4) Chapter 9.48 – Integrated Pest Management (IPM). |
| 331 | August 8, 2014.  (P1.3780.1-4) Jeff Ritterman, M.D., One Little Piggy Had Birth Defects: Is Monsanto's Roundup to Blame? |
| 332 | March 20, 2018.  (P1.4371.1-131) Monsanto Facilities Around the World. |
| 333 | 2016.  (P1.4398.1-15) Charles M. Benbrook, Trends in Glyphosate Herbicide use in the United States and Globally, Environ Sci. Eur. 28:3. |

| Exhibit | Description |
|---------|-------------|
| 334 | February 26, 2016.  (P1.2512.1-17) Nicolas Defarge et al., Co-Formulants in Glyphosate-Based Herbicides Disrupt Aromatase Activity in Human Cells below Toxic Levels, International Journal of Environmental Research and Public Health. |
| 335 | November 1983.  Thomas J. Franz, M.D., Kinetics of Cutaneous Drug Penetration, International Society of Tropical Dermatology, Inc. |
| 336 | April 11, 1983.  Interoffice Correspondence from Richard C. Dirks, Senior Product Toxicologist, Monsanto to R.W. Street et al., re: Roundup Formulation: Elimination and Dermal Penetration in Monkeys; MA-81-349; MONGLY01330781-83. |
| 337 | February 1988.  Restricted Distribution, Monsanto, Report No.: MSL-7206, Title: Metabolism of Glyphosate in Sprague-Dawley Rats.  Part II.  Identification, Characterization, and Quantitation of Glyphosate and its Metabolites after Intravenous and Oral Administration, by Howe, R.K.; Chott, R.C.; McClanahan, R.H.; MONGLY01377215-373. |
| 338 | 1996.  Macpherson D, Glyphosate Acid: biotransformation in the Rat, Central Toxicology Laboratory, Zeneca Unpublished Report No. CTL/P/5058, Study Dates 26 November 1995 to May 1996; MONGLY01830037-38. |
| 339 | July 5, 2000.  Letter from John Acquavella and John Cowell to Farm Family Exposure Task Force re: Site Visit to Minnesota Field Site; MONGLY07080361-369. |
| 340 | December 1, 2000.  Titulo Do Estudo, BIACRI, Monsanto Do Brasil LTDA; MONGLY03254769-807. |
| 341 | March 2004.  John F. Acquavella et al., Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study, Environmental Health Perspectives, Volume 112, Number 3; MONGLY00368830-35. |
| 342 | 2005.  Jack S. Mandel et al., Biomonitoring for Farm Families in the farm Family Exposure Study, Scand J Work Environ Health, Vol 31, Suppl 1. |
| 343 | December 18, 2009.  Saltmiras e-mail to Garnett re: PK Summary Document; MONGLY02198245. |
| 344 | October 21, 2014.  Goldstein e-mail to Lebbing re: GMOA Question that Includes you Name Specifically #2775; MONGLY01865021-23. |
| 345 | May 19, 2015.  RTP e-mail to Gustin re: RTP-15-157 – Request to Review; MONGLY04782974-75. |
| 346 | December 20, 1983.  Additional Information Submitted in Support of Roundup Herbicide EPA REG. No. 524-308, Dermal Sensitization and Dermal Absorption Studies, Franz pg. 79; MONGLY00135556-703. |
| 347 | March 5, 2004.  Environment Directorate, Joint Meeting of the Chemicals Committee and the Working Party on Chemicals, pesticides and Biotechnology, Guidance Document for the Conduct of Skin Absorption Studies, OECD Series on Testing and Assessment Number 28. |
| 348 | December 11, 2007.  Wright e-mail to Green re: MON Number Request, Agnique PG 8107; MONGLY03663466-68. |
| 349 | January 20, 2009.  Simon e-mail to Saltmiras re: Dermal Penetration Protocols with Attached DTL Protocol.doc; MONGLY02199478-505. |
| 350 | February 23, 2009.  Simon e-mail to Saltmiras re: Dermal Penetration Protocols; MONGLY02343101-105. |
| 351 | May 6, 2009.  Dermal Technology Laboratory LTD, Preliminary Investigation of the In Vitro Absorption of Glyphosate from Three Formulations through Human Epidermis, Study Number: JV2082, Protocol Amendment Number: 1; MONGLY03571604-09. |

| Exhibit | Description |
|---------|-------------|
| 352 | April 18, 2012.  DTL Glyphosate Acid, Glyphosate Acid – In Vitro Absorption through Abraded Rabbit Skin using [$^{14}$C]-Glyphosate, Final Report; MONGLY00519009-45. |
| 353 | August 16, 2013.  US EPA Office of Pesticide Programs – Confidential Statement of Formula, Monsanto M1750 Herbicide, MON76757. |
| 354 | May 10, 2017.  Nowack e-mail to Ahmad Ayyub re: Confidential – Project Stardust; MONGLY07742149-53. |
| 355 | July 30, 1999.  Heydens e-mail to [Redacted] re: Glyphosate Mammalian Manuscript with Attached Manuscr9.doc; Tableall.doc; ReferAll2.doc; MONGLY01869261-413. |
| 356 | February 5, 2015.  Heydens e-mail to Koch re: IARC Planning; MONGLY0264-270. |
| 357 | February 23, 2015.  Glyphosate: IARC, Monsanto Company Confidential; MONGLY02913526-31. |
| 358 | February 26, 2015.  Helmut Greim, David Saltmiras, Volker Mostert, and Christian Strupp, Evaluation of Carcinogenic Potential of the Herbicide Glyphosate, Drawing on Tumor Incidence Data from Fourteen Chronic/Carcinogenicity Rodent Studies, Critical Reviews in Toxicology, Taylor and Francis. |
| 359 | August 4, 2015.  Glyphosate Activities; MONGLY01723742. |
| 360 | February 2018.  Spinning Science & Silencing Scientists: A Case Study in How the Chemical Industry Attempts to Influence Science, Minority Staff Report, Prepared for Members of the Committee on Science, Space & Technology, U.S. House of Representatives. |
| 361 | June 25, 2018.  Sheldon Krimsky, Monsanto's Ghostwriting and Strong-Arming Threaten Sound Science – and Society. |
| 362 | March 26, 2008. 510 Citations on Glyphosate. |
| 363 | Volume 1 through 7 Product Registration, Data Submission, Label Submission, Amendment, Notification, CSF, DCI etc. and EPA Correspondence; MONGLY00784270-860827. |
| 364 | 2005. John F. Acquavella et al., Implications for Epidemiologic Research on Variation by Pesticide in Studies of Farmers and their Families, Scand J Work Environ Health; 31 Suppl 1:105-109; MONGLY02441749-53. |
| 365 | October 22, 20002.  Michael C. R. Alavanja et al., Use of Agricultural Pesticides and Prostate Cancer Risk in the Agricultural Health Study Cohort, American Journal of Epidemiology, Vol. 157, No. 9.; MONGLY02688555-69. |
| 366 | September 6, 2010.  Carlos Alvaraz-Moya et al., Evaluation of Genetic Damage Induced by Glyphosate Isopropylamine Salt using Tradescantia Bioassays, Genetics and Molecular Biology, 34, 127-130 (2011). |
| 367 | November 26, 2008.  Gabriella Andreotti et al., Agricultural Pesticide Use and Pancreatic Cancer Risk in the Agricultural Health Study Cohort, Int. J. Cancer; 124, 2495-2500 (2009); MONGLY01604513-18. |
| 368 | August 26, 2010.  Pierre R. Band, Zenaida Abanto et al., Prostate Cancer Risk and Exposure to Pesticides in British Columbia Farmers, The Prostate 71:168-183 (2011); MONGLY01644246-61. |
| 369 | 2012.  Erio Barale-Thomas, Letter to the Editor, Food and Chemical Toxicology; MONGLY01574769-70. |
| 370 | December 23, 2008.  Nora Benachour, RoundUp: Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells, American Chemical Society, NW Resistance Against Genetic Engineering. |
| 371 | 2012.  Colin Berry Letter to the Editor, Food and Chemical Toxicology; MONGLY02591076-77. |

| Exhibit | Description |
|---------|-------------|
| 372 | 2009.  Aaron Blair and Laura Beane Freeman, Epidemiologic Studies of Cancer in Agricultural Populations: Observations and Future Directions, NIH Public Access, J. Agromedicine; 14(2): 125-13; WEEDPROD00001227-36. |
| 373 | September 24, 2003.  Claudia Bolognesi et al., Cytogenetic Biomonitoring of a Floriculturist Population in Italy: Micronucleus Analysis by Fluorescence in Situ Hybridization (FISH) with an All-Chromosome Centromeric Probe, Mutation Research 557 (2004) 109-117. |
| 374 | 2009.  C. Bolognesi et al., Biomonitoring of Genotoxic Risk in Agricultural Workers from Five Columbian Regions: Association to Occupational Exposure to Glyphosate, Journal of Toxicology and Environmental Health, Part A: 986-997, 2009. |
| 375 | February 9, 2005.  Tania Carreon et al., Gliomas and Farm Pesticide Exposure in Women: The Upper Midwest Health Study, Environmental Health Perspectives, Volume 113, Number 5, May 2005; ACQUAVELLAPROD00001874-79. |
| 376 | March 27, 2003.  A J De Roos et al., Integrative Assessment of Multiple Pesticides as Risk Factors for non-Hodgkin's Lymphoma among Men, Occup. Environ. Med. 2003. |
| 377 | November 3, 2004.  Anneclaire J. De Roos et al., Cancer Incidence among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study, Environmental Health Perspectives, Volume 113, Number 1, January 2005; MONGLY02357319-24. |
| 378 | 2012.  Lucia de Souza Letter to the Editor, Food and Chemical Toxicology; MONGLY02591078. |
| 379 | July 30, 2004.  Lawrence S. Engel et al., Pesticide Use and Breast Cancer Risk among Farmers' Wives in the Agricultural Health Study, American Journal of Epidemiology, Vol. 161, No. 2; MONGLY02688614-28. |
| 380 | February 20, 2008.  Mikael Eriksson et al., Pesticide Exposure as Risk Factor for non-Hodgkin Lymphoma Including Histopathological Subgroup Analysis, Int. J. Cancer: 123, 1657-1663 (2008); WEEDPROD00002236-42. |
| 381 | June 2005.  Farmer et al., Glyphosate Results Revisited, Environmental Health Perspectives, Volume 11, Number 6; MONGLY03212304-28. |
| 382 | April 2004.  Kori B. Flower et al., Cancer Risk and Parental Pesticide Application in Children of Agricultural Health Study Participants, Environmental Health Perspectives, Volume 112, Number 5; ACQUAVELLAPROD00002324-28. |
| 383 | June 1, 2005.  L. Fritschi et al., Occupational Exposure to Pesticides and Risk of Non-Hodgkin's Lymphoma, American Journal of Epidemiology, Vol. 162, No. 9; WEEDPROD00001418-26. |
| 384 | December 15, 2009.  Jasmine George et al., Studies on Glyphosate-Induced Carcinogenicity in Mouse Skin: A proteomic Approach, Journal of Proteomics 73 (2010) 951-964; MONGLY03248706-19. |
| 385 | December 26, 2014.  Helmut Greim, David Saltmiras et al., Evaluation of Carcinogenic Potential of the Herbicide Glyphosate, Drawing on Tumor Incidence Data from Fourteen Chronic/Carcinogenicity Rodent Studies, Critical Reviews in Toxicology 2015; 45(3): 185-208; MONGLY01209743-66. |
| 386 | November 7, 2012.  Wim Grunewald Letter to the Editor, Food and Chemical Toxicology; MONGLY02591079-80. |
| 387 | 2013.  Bruce Hammond, Letter to the Editor, Food and Chemical Toxicology, 53 (2013) 459-464; MONGLY02544494-99. |
| 388 | September 28, 1998.  Lennart Hardell, Mikael Eriksson, A Case-Control Study of Non-Hodgkin Lymphoma and Exposure to Pesticides, Cancer, March 15, 1999, Volume 85, No. 6; WEEDPROD00002252-59. |

| Exhibit | Description |
|---------|-------------|
| 389 | October 30, 2001.  Lennart Hardell, Mikael Eriksson and Marie Nordstrom, Exposure to Pesticides as Risk Factor for Non-Hodgkin's Lymphoma and Hairy Cell Leukemia:  Pooled Analysis of Two Swedish Case-Control Studies, Leukemia and Lymphoma: 2002, Vol. 43 (5) pp. 1043-1049; MONGLY01734199-201. |
| 390 | 2012.  Jack A. Heinemann Letter to the Editor, Food and Chemical Toxicology; MONGLY01574776. |
| 391 | 2008.  William F. Heydens et al., Genotoxic Potential of Glyphosate Formulations: Mode-of-Action Investigations; Journal of Agricultural and Food Chemistry, 56, 15170-1523; MONGLY01466382-388 |
| 392 | December 22, 2011.  Chandima P. Karunanayake et al., Hodgkin Lymphoma and Pesticides Exposure in Men: A Canadian Case-Control Study, Journal of Agromedicine, 17:30-39, 2012; ACQUAVELLAPROD00017952-62. |
| 393 | July 29, 1983.  GK Hogan, A Chronic Feeding Study of Glyphosate (Roundup Technical) In Mice; MONGLY00253810-4249. |
| 394 | April 22, 2009.  Ola Landgren et al., Pesticide Exposure and Risk of Monoclonal Gammopathy of Undetermined Significance (MGUS) in the Agricultural Health Study, Blood Journal; MONGLY02007227-249. |
| 395 | November 26, 2007.  Timothy L Lash, Bias Analysis Applied to agricultural Health Study Publications to Estimate Non-Random Sources of Uncertainty, Journal of Occupational Medicine and Toxicology; WEEDPROD00001621-29. |
| 396 | March 31, 2004.  WJ Lee et al., Agricultural Pesticide use and Adenocarcinomas of the Stomach and Oesophagus, Occupational Environmental Medicine 2004; 61:743-749; WEEDPROD00002908-2914. |
| 397 | June 3, 2005.  WJ Lee et al., Agricultural Pesticide use and Risk of Glioma in Nebraska, United States, Occupational Environmental Medicine 2005; 62:786-792; WEEDPROD00002925-31. |
| 398 | November 2001.  Helen H. McDuffie et al., Non-Hodgkin's Lymphoma and Specific Pesticide Exposures in Men: Cross-Canada Study of Pesticides and Health, Cancer Epidemiology, Biomarkers & Prevention; WEEDPROD00002303-2311. |
| 399 | 2007.  Patricia Monge et al., Parental Occupational Exposure to Pesticides and the Risk of Childhood Leukemia in Costa Rica; Scand J Work Environ Health 2007, Vol 33, No 4; WEEDPROD00002936-47. |
| 400 | 2005.  Claudia Milena Monroy, Citotoxicidad y Genotoxicidad en Celulas Humanas Expuestas in Vitro a Glifosato, Biomedica 2005; 25:335-45. |
| 401 | January 9, 1998.  M Nordstrom et al., Occupational Exposures, Animal Exposure and Smoking as Risk Factors for Hairy Cell Leukaemia Evaluated in a Case-Control Study, British Journal of Cancer (1996) 77(11), 2048-2052; WEEDPROD00002312-16. |
| 402 | 2012.  Louis Ollivier, Letter to the Editor, Food and Chemical Toxicology; MONGLY01534869. |
| 403 | November 2011.  Punam Pahwa et al., Soft-Tissue Sarcoma and Pesticides Exposure in Men, Results of a Canadian Case-Control Study, JOEM, Volume 53, Number 11; MARSHPROD00003107-14. |
| 404 | 2012.  Alexander Y. Panchin, Letter to the Editor, Food and Chemical Toxicology; MONGLY01574767. |
| 405 | November 7, 2006.  Cesar Paz-y-Mino et al., Evaluation of DNA Damage in an Ecuadorian Population Exposed to Glyphosate, Genetics and Molecular Biology, 30, 2, 456-460 (2007); AARDEMAPROD00001179-83. |

| Exhibit | Description |
|---------|-------------|
| 406 | May 1996. Marco Peluso et al., $^{32}$P-Postlabeling Detection of DNA Adducts in Peripheral White Blood Cells of Greenhouse Floriculturists form Western Liguria, Italy, Cancer Epidemiology, Biomarkers & Prevention, Vol. 5, 361-369; KIERPROD00034249-58. |
| 407 | December 21, 2018. Edward D. Perry, et al., Product Concentration and Usage: Behavioral Effects in the Glyphosate Market, Journal of Economic Behavior and Organization. |
| 408 | September 20-29, 2004. Pesticide Residues in Food, Report of the Joint Meeting of the FAO Panel of Experts on Pesticide Residues in Food and the Environment and the WHO Core Assessment Group of Pesticide Residues, Rome, Italy. |
| 409 | August 5, 2004. Piesova, The Influence of Different Treatment Length on the Induction of Micronuclei in Bovine Lymphocytes after Exposure to Glyphosate, Folia Veterinaria, 48: 130-134, 2004; MONGLY02811247-51. |
| 410 | January 12, 2005. Elena Piesova, The Effect of Glyphosate on the Frequency of Micronuclei in Bovine Lymphocytes in Vitro, Acta Veterinaria (Beograd), Vol. 55, No. 2-3, 101-109; MONGLY02811252-60. |
| 411 | 2012. Roberto Pilu, Letter to the Editor, Food and Chemical Toxicology; MONGLY02591087 |
| 412 | October 8, 2008. G.L. Poletta et al., Genotoxicity of the Herbicide Formulation Roundup (Glyphosate) in Broad-Snouted Caiman (Caiman Latirostris) Evidenced by the Comet Assay and the Micronucleus Test, Mutation Research 672 (2009) 95-102; MONGLY01523492-99. |
| 413 | February 10, 2009. Sahdeo Prasad et al., Clastogenic Effects of Glyphosate in Bone Marrow Cells of Swiss Albino Mice, Hindawi Publishing Corporation, Journal of Toxicology Volume 2009, Article ID 308985, 6 Pages; MONGLY01205800-08. |
| 414 | October 3, 1987. Yushuke Sawada and Yoshikazu Nagai, Roundup Poisoning – Its Clinical Observation Possible Involvement of Surfactant, Journal of Clinical and Experimental Medicine, (Igaku No Ayumi) Vol. 143, No. 1, p. 25-27; MONGLY01239043-54. |
| 415 | 2012. Frederic Schorsch, Letter to the Editor, Food and Chemical Toxicology; MONGLY01574781-82. |
| 416 | August 2, 2012. Billes-Eric Seralini et al., Long Term Toxicity of a Roundup Herbicide and a Roundup-Tolerant Genetically Modified Maize, Food and Chemical Toxicology; MONGLY01132531-41. |
| 417 | June 1, 2004. Woo-Chan Son and Chirukandath Gopinath, Toxicologic Pathology, Early Occurrence of Spontaneous Tumors in CD-1 Mice and Sprague – Dawley Rats, Society of Toxicologic Pathology; MONGLY02733349-53. |
| 418 | July 10, 1992. Dr. I. Stammberger, Study of the Mutagenic Potential in Strains of Salmonella Typhimurium (AMES Test) and Escherichia Coli, Hoechst, Pharma Development Central Toxicology; MONGLY05745612-43. |
| 419 | December 16, 1992. Dr. I. Stammberger, Dodigen 4022, Chromosome Aberrations in Vitro in V79 Chinese Hamster Cells, Hoechst, Pharma Development Central Toxicology; MONGLY05745644-79. |
| 420 | September 26, 1990. L.D. Stout and F.A. Ruecker, Chronic Study of Glyphosate Administered in Feed to Albino Rats, Monsanto Agricultural Company, Volumes 1 through 6; MONGLY01570847-3030. |
| 421 | 1977. Sugimoto, Histopathology – Incidence of Microscopic Neoplastic Lesions in Male Mice (Partial); MONGLY01513083-93. |
| 422 | 1992. Suresh, Dominant Lethal Test in Wistar Rats; MONGLY01178576-79. |

| Exhibit | Description |
|---------|-------------|
| 423 | 2012. Dung Le Tien, Letter to the Editor, Comments on "Long Term Toxicity of a Roundup Herbicide and a Roundup-Tolerant Genetically Modified Maize", Food and Chemical Toxicology; MONGLY02591088-89. |
| 424 | May 6, 2006. Tomerlin, J.R., Glyphosate: Safflower and Sunflower; Summary of Analytical Chemistry and Residue Data, Petition Number 4E6878. |
| 425 | 2012. David Tribe, Letter to the Editor, Review of the Seralini et al. (2012) Publication on a 2-Year Rodent Feeding Study with Glyphosate Formulations and GM Maize NK603, Food and Chemical Toxicology.; MONGLY01574798-803. |
| 426 | 2012. Robert Wager, Letter to the Editor, Food and Chemical Toxicology; MONGLY01574810-11. |
| 427 | May 5, 2010. Scott Weichenthal et al., A Review of Pesticide Exposure and Cancer Incidence in the Agricultural Health Study Cohort; Environmental Health Perspectives; MONGLY02617868-915. |
| 428 | December 6, 1999. Gary M. Williams et al., Safety Evaluation and Risk Assessment of the Herbicide Roundup and Its Active Ingredient, Glyphosate, for Humans, Regulatory Toxicology and pharmacology 31, 117-165 (2000); MONGLY02840226-274. |
| 429 | 2009. E. Wood et al., Glyphosate Technical: Dietary Carcinogenicity Study in the Mouse (Partial); MONGLY01513601-603. |
| 430 | 2009. E. Wood et al., Glyphosate Technical: Dietary Combine Chronic Toxicity/Carcinogenicity Study in the Rat; MONGLY01513597-600. |
| 431 | April 24, 1980. Wrenn, Dominant Lethal Mutagenicity Assay with Technical Glyphosate in Mice, Dominant Lethal Study in Mice, International Research and Development Corporation; MONGLY00512173-244. |
| 432 | December 11, 2013. (P1.2835.1-9) T. Bohn et al., Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup Ready GM Soybeans, Food Chemistry 153 (2014) 207-215. |
| 433 | Reviewer Recommendation and Comments for Manuscript Number CBTO548, Cytotoxicity of Herbicide Roundup and its Active Ingredient, Glyphosate in Rats", Chris Healy; MONGLY01238768-772. |
| 434 | November 17, 1986. Supplemental Information or Peer Review Worksheet, Glyphosate; MONGLY04278139-42. |
| 435 | April 3, 1987. Letter from Glynadee Edwards, Monsanto to SB 950 Response, Pesticide Registration Branch, California Department of Food and Agriculture re: Glyphosate, Reconsideration of Chronic/Oncogenicity Mouse Study; MONGLY04278109-10. |
| 436 | October 30, 1991. (P1.287.1-19) Memorandum from Dykstra, USEPA to Robert Tayler re: Second Peer Review of Glyphosate. |
| 437 | June 2005. (P1.2839) Monsanto Imagine, Backgrounder, Testing Fraud: IBT and Craven Laboratories. |
| 438 | 1995. (P1.2847.1-16) Caroline Cox, Glyphosate, Part 2: Human Exposure and Ecological Effects, Journal of Pesticide Reform, Volume 15, Number 4, Winter 1995, Northwest Coalition for Alternatives to Pesticides, Eugene, OR. |
| 439 | Ethylene Glycol; MONGLY01745304-07. |
| 440 | February 2011. (P1.2830.1-41) EPA Pesticides Industry Sales and Usage, 2006 and 2007 Market Estimates. |
| 441 | November 1-4, 2010. Chemistry, Glyphosate / Acetochlor / Business Needs. |
| 442 | November 2011. (P1.2831.1-60) Who will Control the Green Economy? |

| Exhibit | Description |
|---------|-------------|
| 443 | August 20, 2013.  Saltmiras Business Performance, Business Goals; MONGLY01045298-06 |
| 444 | February 3, 2015.  Draft, IARC Carcinogen Rating of Glyphosate Preparedness and Engagement Plan; MONGLY01021845-47. |
| 445 | May 11, 2015.  Proposal for Post-IARC Meeting Scientific Projects, Draft. |
| 446 | December 31, 2016.  Exhibit A to Consulting Agreement Dated August 17, 2015, Between Larry D. Kier and Monsanto Company, Project Amendment Letter; MONGLY01680756-57. |
| 447 | 2015.  Monsanto IARC Literature/Document List; MONGLY00947788-95. |
| 448 | October 30, 2015.  (P1.2862.1-107) EFSA Conclusion on the Peer Review of the Pesticide Risk Assessment of the Active Substance Glyphosate, European Food Safety Authority Journal 2015;13(11);4302. |
| 449 | October 18-21, 2016.  (P1.2853.1-4) Glyphosate: Evaluation of Carcinogenic Potential, Charge to the FIFRA SAP Meeting. |
| 450 | March 16, 2017.  (P1.2854.1-101) US EPA Transmission of Meeting Minutes and Final Report of the December 13-16, 2016 FIFRA SAP Meeting Held to Consider and Review Scientific Issues Associated with EPA's Evaluation of the Carcinogenic Potential of Glyphosate. |
| 451 | October 27, 2017.  Case 3:16-md-02741-VC Document 648-13, Action Plan ECHA. |
| 452 | October 27, 2017.  Case 3:16-md-02741-VC Document 648-29, Glyphosate Publications Recommendations for Process; October 27, 2017.  Case 3:16-md-02741-VC Document 648-13, Action Plan ECHA.2598454-59. |
| 453 | October 27, 2017.  Case 3:16-md-02741-VC Document 649-1, Kier and Kirkland, Review of Genotoxicity Studies of Glyphosate and Glyphosate-Based Formulations, Critical Reviews in Toxicology, 2013; 43(4): 283-315. |
| 454 | October 27, 2017.  Case 3:16-md-02741-VC Document 649-2, Review of Genotoxicity of Glyphosate and Glyphosate Based Formulations; MONGLY001691608. |
| 455 | October 27, 2017.  Case 3:16-md-02741-VC Document 649-13 Monsanto Manuscript Clearance Form Global Regulatory; MONGLY02117800-04. |
| 456 | IARC Follow Up, Demonstrate Safety of Glyphosate; MONGLY03316369-71. |
| 457 | Why are we Revisiting This Issue? |
| 458 | October 7.  Glyphosate Review, OEHHA Meeting, Monsanto. |
| 459 | Operator Exposure Assessment for MON 2139, UK – Case; MONGLY06509236-58. |
| 460 | August 2, 2001.  (P1.2842.1-2) David Barboza, The Power of Roundup: A Weed Killer Is a Block for Monsanto to Build… |
| 461 | October 15, 2009.  (P1.2844) Monsanto Guilty in 'False Ad' Row, One-Minute World News. |
| 462 | May 3, 2010. (P1.2832.1-4) William Neuman and Andrew Pollack, Farmers Cope With Roundup-Resistant Weeds, The New York Times. |
| 463 | August 29, 2011.  (P1.2834.1-3) Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin, USGS. |
| 464 | April 14, 2014.  (P1.2856.1-2) Holland's Parliament Bans Glyphosate Herbicides. |
| 465 | 2015.  (P1.2863.1-4) Glyphosate, EFSA Explains Risk Assessment. |
| 466 | May 10, 2015.  (P1.1822.1-12) Colombia to Ban Coca Spraying Herbicide Glyphosate, Latin America & Caribbean. |
| 467 | May 11, 2015.  (P1.2858.1-11) Minister: Importation of "Roundup" Suspended. |

| Exhibit | Description |
|---------|-------------|
| 468 | May 14, 2015.  (P1.1821.1-3) Christina Serich, Brazil's Public Prosecutor Wants to Ban Monsanto's Chemical Following Recent Glyphosate-Cancer Link, Global Research. |
| 469 | May 25, 2015.  (P1.1813.1-4) Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides. |
| 470 | June 15, 2015.  (P1.2857.1-7) France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. Calls It 'Probable Carcinogen'. |
| 471 | May 2, 2016.  (P1.2852.1-5) Carey Gilliam, What is Going On With Glyphosate?  EPA's Odd Handling of Controversial Chemical. |
| 472 | June 29, 2016.  (P1.2870.1-3) Arthur Neslen, Controversial Chemical in Roundup Weedkiller Escapes Immediate Ban. |
| 473 | March 4, 2016.  (P1.2867.1-3) Arthur Neslen, EU States Rebel Against Plans to Relicense Weedkiller Glyphosate. |
| 474 | March 8, 2016.  (P1.2868.1-3) Arthur Neslen, Vote on Controversial Weedkiller's European Licence[sic] Postponed. |
| 475 | June 28.  (P1.2869.1-5) Commission Prolongs Glyphosate Licence[sic] by 18 Months |
| 476 | June 28, 2016.  (P1.2866.1-3) European Commission to Extend Glyphosate License for 18 Months. |
| 477 | June 29, 2016.  (P1.2871.1-3) EU Agrees Ban on Glyphosate Co-Formulant. |
| 478 | (P1.2860.1-10) Xavier Becerra, Attorney General, Frequently Asked Questions – View All. |
| 479 | December 5, 2018.  Alison Connolly et al., Evaluating Glyphosate Exposure Routes and Their Contribution to Total Body Burden: A Study Among Amenity Horticulturalists. |
| 480 | 2017.  JDDG Correspondence, Peter Elsner et al., Clinical Letter, Occupational Koebnerization of Psoriasis Caused by Glyphosate. |
| 481 | June 12, 1990.  Cancer Risk Assessment for Agricultural and Forestry Applications of Herbicide Surfactant Containing 1,4-Dioxane, Volume 1 of 2, R.D. 974; MONGLY00154342-80. |
| 482 | June 12, 1990.  Cancer Risk Assessment for Agricultural and Forestry Applications of Herbicide Surfactant Containing 1,4-Dioxane, Volume 2 of 2, R.D. 974; MONGLY00154381-409. |
| 483 | November 2016.  US Environmental Protection Agency Office of Pesticide Programs, Occupational Pesticide Handler Unit Exposure Surrogate Reference Table; June 12, 1990.  Cancer Risk Assessment for Agricultural and Forestry Applications of Herbicide Surfactant Containing 1,4-Dioxane, Volume 1 of 2, R.D. 974. |
| 484 | July 27, 2018.  Are Roundup Weed & Grass Killer Products Safe? |
| 485 | August 1998.  Signal Word, Prepared For: Monsanto Agricultural Company; MONGLY03576739-96. |
| 486 | August 2001.  Signal Work Impact Study – Growers (Study #1800), Prepared For:  Monsanto U.S. AG Sector by Marketing Horizons, Inc. |
| 487 | June 11, 2003.  Ryan L. Williams, Linda S. Aston and Robert I Krieger, Perspiration Increased Human Pesticide Absorption Following Surface Contact During an Indoor Activity Program, Journal of Exposure Analysis and Environmental Epidemiology (2004) 14, 129-136. |
| 488 | January 3, 2008.  Letter from Calvin Furlow, EPA to Russell Schneider, Monsanto, re: Freedom of Information Act Request RIN-0119-05, Identification of Ingredients. |
| 489 | April 30, 1983.  Evaluation of the Percutaneous Absorption of Roundup Formulations in Man Using an In-Vitro Technique, Conducted for Monsanto Company (Study No. UW-81-346) by Thomas J. Franz, MD; MONGLY00135634-646. |

| Exhibit | Description |
|---------|-------------|
| 490 | November 27, 2002.  European Commission, Health &Consumer Protection Directorate-General, Guidance Document on Dermal Absorption, Sanco/222/2000 rev. 6; MONGLY06653101-114. |
| 491 | November 28, 2018.  Deposition of Robert Miller, Walter Winston, et al. v. Monsanto Company, No. 1822-CC00515 and Deposition Exhibits 1-9. |
| 491-01 | Exhibit # 01 to the Deposition of Robert Miller, November 14, 2018 Notice of Videotaped Deposition. |
| 491-02 | Exhibit # 02 to the Deposition of Robert Miller, RoundUp Container and Label Photographs, Sales Receipts, Turf 2 Motor Cart and Sprayer, Hand Sprayer, and I.D. Badges. |
| 491-02 | Exhibit #02 to the Deposition of C. Miller, Photograph of a 3M 8511 NIOSH, N95 Paper Face Mask. |
| 491-03 | Exhibit # 03 to the Deposition of Robert Miller, May 1, 2018 Plaintiff's Fact Sheet. |
| 491-04 | Exhibit # 04 to the Deposition of Robert Miller, September 12, 2018 Plaintiff's Fact Sheet. |
| 491-05 | Exhibit # 05 to the Deposition of Robert Miller, Disability Report 0 Adult – Form SSA-3368 for Robert William Miller. |
| 491-06 | Exhibit # 06 to the Deposition of Robert Miller, Photographs from Google Maps of 10585 Jane Eyre Dr., Orlando, FL 32825. |
| 491-07 | Exhibit # 07 to the Deposition of Robert Miller, Photographs from Google Maps of 8246 Bailey Dr., Clermont, FL 34711. |
| 491-08 | Exhibit # 08 to the Deposition of Robert Miller, Photographs from Google Maps of 3181 Lindsay Meadow, Hickory, NC 28601. |
| 491-09 | Exhibit # 09 to the Deposition of Robert Miller, Petition, Jury Trial Demanded. |
| 492 | November 30, 2018.  Deposition of Kyle Chaplick, Walter Winston, et al. v. Monsanto Company, No. 1822-CC00515 and Deposition Exhibits 1-7. |
| 492-01 | Exhibit #01 to the Deposition of Kyle Chaplick, October 29, 2018, Plaintiff Kyle Chaplick's Objections and Responses to Defendant Monsanto Company's First Requests for Production of Documents. |
| 492-02 | Exhibit #02 to the Deposition of Kyle Chaplick, November 14, 2018 Notice of Videotaped Deposition of Kyle Chaplick. |
| 492-03 | Exhibit #03 to the Deposition of Kyle Chaplick, October 29, 2018 Plaintiff Kyle Chaplick's Objections and Responses to Defendant Monsanto Company's First Set of Interrogatories. |
| 492-04 | Exhibit #04 to the Deposition of Kyle Chaplick, Photograph of Roundup Containers. |
| 492-05 | Exhibit #05 to the Deposition of Kyle Chaplick, Google Photograph of 358 Merlot Dr. |
| 492-06 | Exhibit #06 to the Deposition of Kyle Chaplick, Google Arial Photograph. |
| 492-07 | Exhibit #07 to the Deposition of Kyle Chaplick, April 18, 2018 Plaintiff's Fact Sheet. |
| 493 | December 6, 2018.  Deposition of Vicki Gatewood, Walter Winston, et al. v. Monsanto Company, No. 1822-CC00515 and Deposition Exhibits 1-4. |
| 493-01 | Exhibit #01 to the Deposition of Vicki Gatewood, November 26, 2018 Notice of Videotaped Deposition. |
| 493-02 | Exhibit #02 to the Deposition of Vicki Gatewood, Lowes Receipts. |
| 493-03 | Exhibit #03 to the Deposition of Vicki Gatewood, April 2, 2018 Plaintiff's Fact Sheet. |
| 493-04 | Exhibit #04 to the Deposition of Vicki Gatewood, Vicki Gatewood Intake Note. |

| Exhibit | Description |
|---------|-------------|
| 494 | December 7, 2018.  Deposition of Vicki Gatewood, Volume II, Walter Winston, et al. v. Monsanto Company, No. 1822-CC00515 and Deposition Exhibits 5-9. |
| 494-05 | Exhibit #05 to the Deposition of Vicki Gatewood, March 2012 First Amended Complaint. |
| 494-06 | Exhibit #06 to the Deposition of Vicki Gatewood, Petition. |
| 494-07 | Exhibit #07 to the Deposition of Vicki Gatewood, Photographs and Correspondence. |
| 494-08 | Exhibit #08 to the Deposition of Vicki Gatewood, Handwritten Notes. |
| 494-09 | Exhibit #09 to the Deposition of Vicki Gatewood, Caring Bridge Journal. |
| 495 | December 13, 2018.  Deposition of Steven Calvin Gatewood, Walter Winston, et al. v. Monsanto Company, No. 1822-CC00515 and Deposition Exhibits 1-8. |
| 495-01 | Exhibit #01 to the Deposition of Steven Calvin Gatewood, December 11, 2018 Defendant Monsanto Company's Second Amended Notice of Deposition of Steven Gatewood. |
| 495-02 | Exhibit #02 to the Deposition of Steven Calvin Gatewood, April 18, 2018 Plaintiff's Fact Sheet. |
| 495-03 | Exhibit #03 to the Deposition of Steven Calvin Gatewood, Aerial Google Photograph of House. |
| 495-04 | Exhibit #04 to the Deposition of Steven Calvin Gatewood, Google Photograph Front of House. |
| 495-05 | Exhibit #05 to the Deposition of Steven Calvin Gatewood, Aerial Google Photograph 1460 Wholly Oaks Lake Rd. |
| 495-06 | Exhibit #06 to the Deposition of Steven Calvin Gatewood, Photograph of Front of Home. |
| 495-07 | Exhibit #07 to the Deposition of Steven Calvin Gatewood, Photograph taken through Screened-in Porch. |
| 495-08 | Exhibit #08 to the Deposition of Steven Calvin Gatewood, Photograph of Yard. |
| 496 | December 14, 2018.  Deposition of Steven Calvin Gatewood, Volume II, Walter Winston, et al. v. Monsanto Company, No. 1822-CC00515 and Deposition Exhibits 9-25. |
| 496-09 | Exhibit #09 to the Deposition of Steven Calvin Gatewood, April 23, 2003 Gastroenterology Consultation Report for Steven Gatewood. |
| 496-10 | Exhibit #10 to the Deposition of Steven Calvin Gatewood, June 13, 2003 Check-up Report. |
| 496-11 | Exhibit #11 to the Deposition of Steven Calvin Gatewood, January 4, 2011 Consult. |
| 496-12 | Exhibit #12 to the Deposition of Steven Calvin Gatewood, August 12, 2011 Office Consultation. |
| 496-13 | Exhibit #13 to the Deposition of Steven Calvin Gatewood, October 23, 2015 Baptist MD Anderson Cancer Center Patient Intake Form. |
| 496-14 | Exhibit #14 to the Deposition of Steven Calvin Gatewood, August 17, 2011- September 9, 2011 Hematology. |
| 496-15 | Exhibit #15 to the Deposition of Steven Calvin Gatewood, March 5, 2002 Progress Notes. |
| 496-16 | Exhibit #16 to the Deposition of Steven Calvin Gatewood, February 2, 2012, 21st Century Oncology of Jacksonville Exam. |
| 496-17 | Exhibit #17 to the Deposition of Steven Calvin Gatewood, June 28, 2012, 21st Century Oncology of Jacksonville Exam. |
| 496-18 | Exhibit #18 to the Deposition of Steven Calvin Gatewood, December 27, 2012, 21st Century Oncology of Jacksonville Exam. |
| 496-19 | Exhibit #19 to the Deposition of Steven Calvin Gatewood, July 21, 2014, 21st Century Oncology of Jacksonville Exam. |

| Exhibit | Description |
|---------|-------------|
| 496-20 | Exhibit #20 to the Deposition of Steven Calvin Gatewood, Social Security Administration, Retirement, Survivors and Disability Insurance Benefits. |
| 496-21 | Exhibit #21 to the Deposition of Steven Calvin Gatewood, August 29, 2011 Consultation Report form Baptist Medical Center, Wolfson Children's Hospital. |
| 496-22 | Exhibit #22 to the Deposition of Steven Calvin Gatewood, Caring Bridge Journal. |
| 496-23 | Exhibit #23 to the Deposition of Steven Calvin Gatewood, December 13, 2016 Photograph of Sprayer Tanks. |
| 496-24 | Exhibit #24 to the Deposition of Steven Calvin Gatewood, April 29, 2009 Front Page of Buyer's First Choice Home Inspections Report. |
| 496-25 | Exhibit #25 to the Deposition of Steven Calvin Gatewood, Photograph of Un-installed Doors. |
| 497 | December 19, 2018.  Deposition of Richard L. Haley, Sr., Walter Winston, et al. v. Monsanto Company, No. 1822-CC00515 and Deposition Exhibits 1-3. |
| 497-01 | Exhibit #01 to the Deposition of Richard L. Haley, Sr., December 11, 2018 Notice of Videotaped Deposition. |
| 497-02 | Exhibit #02 to the Deposition of Richard L. Haley, Sr., September 12, 2018 Plaintiff's Fact Sheet. |
| 497-03 | Exhibit #03 to the Deposition of Richard L. Haley, Sr., April 12, 2006 Pulmonary Diagnostic Study Sleep Consult. |
| 498 | January 19, 2019.  Deposition of Bryan Cook, Walter Winston, et al. v. Monsanto Company, No. 1822-CC00515 and Deposition Exhibits 1-6. |
| 498-01 | Exhibit #01 of the Deposition of Bryan Cook, December 19, 2018 Notice of Videotaped Deposition. |
| 498-02 | Exhibit #02 of the Deposition of Bryan Cook, Photograph of Head Stabilizer for Cancer Treatment. |
| 498-03 | Exhibit #03 of the Deposition of Bryan Cook, Photograph of Head Stabilizer for Cancer Treatment. |
| 498-04 | Exhibit #04 of the Deposition of Bryan Cook, Color Photograph in Hospital. |
| 498-05 | Exhibit #05 of the Deposition of Bryan Cook, Color Photograph in Hospital. |
| 498-06 | Exhibit #06 of the Deposition of Bryan Cook, May 15, 2018 Plaintiff's Fact Sheet. |
| 499 | January 22, 2019.  Deposition of Marcus Hammond, Walter Winston, et al. v. Monsanto Company, No. 1822-CC00515 and Deposition Exhibits 1-4. |
| 499-01 | Exhibit #01 to the Deposition of Marcus Hammond, January 10, 2019 Notice of Videotaped Deposition. |
| 499-02 | Exhibit #02 to the Deposition of Marcus Hammond, May 18, 2018 Plaintiff's Fact Sheet. |
| 499-03 | Exhibit #03 to the Deposition of Marcus Hammond, November 20 2018 Plaintiff Marcus Hammond's Objections and Responses to Defendant Monsanto Company's First Set of Interrogatories. |
| 499-04 | Exhibit #04 to the Deposition of Marcus Hammond, Petition, Jury Trial Demanded. |
| 500 | January 23, 2019.  Deposition of James Dean Cole, Walter Winston, et al. v. Monsanto Company, No. 1822-CC00515 and Deposition Exhibits 1-5. |
| 500-01 | Exhibit #01 to the Deposition of James Dean Cole, January 7, 2019 Notice of Videotaped Deposition. |
| 500-02 | Exhibit #02 to the Deposition of James Dean Cole, September 13, 2018 Plaintiff's Act Sheet. |
| 500-03 | Exhibit #03 to the Deposition of James Dean Cole, Gofundme Web Page for James Dean. |
| 500-04 | Exhibit #04 to the Deposition of James Dean Cole, May 10, 2018 Plaintiff's Fact Sheet. |

| Exhibit | Description |
|---------|-------------|
| 500-05 | Exhibit #05 to the Deposition of James Dean Cole, Petition, Jury Trial Demanded. |
| 501 | January 28, 2019.  Deposition of Lafayette Jenkins, Walter Winston, et al. v. Monsanto Company, No. 1822-CC00515 and Deposition Exhibits 1-11. |
| 501-01 | Exhibit #01 to the Deposition of Lafayette Jenkins, January 24, 2019 Notice of Videotaped Deposition. |
| 501-02 | Exhibit #02 to the Deposition of Lafayette Jenkins, Lafayette Jenkins e-mail to Chauncey Taylor re: Resignation. |
| 501-03 | Exhibit #03 to the Deposition of Lafayette Jenkins, Color Photograph Roundup QuikPro. |
| 501-04 | Exhibit #04 to the Deposition of Lafayette Jenkins, Sales Invoice. |
| 501-05 | Exhibit #05 to the Deposition of Lafayette Jenkins, Shoe Choice Examples. |
| 501-06 | Exhibit #06 to the Deposition of Lafayette Jenkins, April 23, 2015 West Palm Hospital Report. |
| 501-07 | Exhibit #07 to the Deposition of Lafayette Jenkins, June 4, 2007 Palm Beach Physicians Group Report. |
| 501-08 | Exhibit #08 to the Deposition of Lafayette Jenkins, January 18, 2018 Office Visit Report. |
| 501-09 | Exhibit #09 to the Deposition of Lafayette Jenkins, May 12, 2015 New Patient Evaluation, Florida Cancer Specialists. |
| 501-10 | Exhibit #10 to the Deposition of Lafayette Jenkins, Lafayette Jenkins Records Provided by The Marker Group. |
| 501-11 | Exhibit #11 to the Deposition of Lafayette Jenkins, Petition, Jury Trial Demanded. |
| 502 | January 30, 2019.  Deposition of Joseph Sessions, Walter Winston, et al. v. Monsanto Company, No. 1822-CC00515 and Deposition Exhibits 1-7. |
| 502-01 | Exhibit #01 to the Deposition of Joseph Sessions, January 8, 2019 Notice of Videotaped Deposition. |
| 502-02 | Exhibit #02 to the Deposition of Joseph Sessions, Color Photographs 3695 Detroit St., Cocoa, Florida 32926. |
| 502-03 | Exhibit #03 to the Deposition of Joseph Sessions, February 10, 2015 Cancer Institute Report. |
| 502-04 | Exhibit #04 to the Deposition of Joseph Sessions, April 16, 2018 Plaintiff's Fact Sheet. |
| 502-05 | Exhibit #05 to the Deposition of Joseph Sessions, September 13, 2018 Plaintiff's Fact Sheet. |
| 502-06 | Exhibit #06 to the Deposition of Joseph Sessions, Photographs (all but one color). |
| 502-07 | Exhibit #07 to the Deposition of Joseph Sessions, Petition, Jury Trial Demanded. |
| 503 | February 7, 2019.  Deposition of Walter Winston, Walter Winston, et al. v. Monsanto Company, No. 1822-CC00515 and Deposition Exhibits 1-24. |
| 503-01 | Exhibit #01 to the Deposition of Walter Winston, January 25, 2019 Notice of Videotaped Deposition. |
| 503-02 | Exhibit #02 to the Deposition of Walter Winston, Color Photograph of House. |
| 503-03 | Exhibit #03 to the Deposition of Walter Winston, Color Photograph of House. |
| 503-04 | Exhibit #04 to the Deposition of Walter Winston, July 30, 2018 Medical Records of Walter Winston, Provided by The Marker Group. |
| 503-05 | Exhibit #05 to the Deposition of Walter Winston, September 21, 2018 Medical Records of Walter Winston, Provided by The Marker Group. |

| Exhibit | Description |
|---------|-------------|
| 503-06 | Exhibit #06 to the Deposition of Walter Winston, June 2, 2017 SSM Health St. Mary's Hospital – St. Louis Hospital Record. |
| 503-07 | Exhibit #07 to the Deposition of Walter Winston, May 19, 2012 Doctors Exam Record. |
| 503-08 | Exhibit #08 to the Deposition of Walter Winston, February 9, 2013 St. Louis Connect Care Letter to Referring Provider. |
| 503-09 | Exhibit #09 to the Deposition of Walter Winston, May 28, 2015 Washington University in St. Louis Medical Record. |
| 503-10 | Exhibit #10 to the Deposition of Walter Winston, June 28, 2016 SSM Cancer Care DPMG Report. |
| 503-11 | Exhibit #11 to the Deposition of Walter Winston, April 7, 2016 Medical Report. |
| 503-12 | Exhibit #12 to the Deposition of Walter Winston, February 27, 2018 Affinia Healthcare Medical Report. |
| 503-13 | Exhibit #13 to the Deposition of Walter Winston, March 1, 2017 Affinia Healthcare Medical Report. |
| 503-14 | Exhibit #14 to the Deposition of Walter Winston, July 7, 2016 SSM Health DePaul Hospital – St. Louis Medical Discharge Summary. |
| 503-15 | Exhibit #15 to the Deposition of Walter Winston, July 25, 2017 Affinia Healthcare Medical Record. |
| 503-16 | Exhibit #16 to the Deposition of Walter Winston, April 10, 2017 Office Visit Record. |
| 503-17 | Exhibit #17 to the Deposition of Walter Winston, October 20, 2009 Office Visit Record. |
| 503-18 | Exhibit #18 to the Deposition of Walter Winston, June 12, 2018 Affinia Healthcare Office Visit Record. |
| 503-19 | Exhibit #19 to the Deposition of Walter Winston, August 11, 2016 Affinia Healthcare Office Visit Record. |
| 503-20 | Exhibit #20 to the Deposition of Walter Winston, July 27, 2016 SSM Health Cancer Care Clinical Summary. |
| 503-21 | Exhibit #21 to the Deposition of Walter Winston, May 7, 2016 SSM Health DePaul Hospital – St. Louis Medical Record. |
| 503-22 | Exhibit #22 to the Deposition of Walter Winston, July 24, 2018 Affinia Healthcare Office Visit Record. |
| 503-23 | Exhibit #23 to the Deposition of Walter Winston, July 31, 2018 SSM Health DePaul Hospital – St. Louis Medical Record. |
| 503-24 | Exhibit #24 to the Deposition of Walter Winston, Petition, Jury Trial Demanded. |
| 504 | February 14, 2019.  Deposition of Joshua Karr, Walter Winston, et al. v. Monsanto Company, No. 1822-CC00515 and Deposition Exhibits 1-8. |
| 504-01 | Exhibit #01 to the Deposition of Joshua Karr, February 7, 2019 Notice of Videotaped Deposition. |
| 504-02 | Exhibit #02 to the Deposition of Joshua Karr, Color Photograph, Turner Feed Center, 8808 Bright Star Road, Douglasville, GA 30134 from Google Maps. |
| 504-03 | Exhibit #03 to the Deposition of Joshua Karr, July 2, 2004 Harbin Clinic Office Visit. |
| 504-04 | Exhibit #04 to the Deposition of Joshua Karr, August 18, 2004 Northwest Georgia Oncology Centers, P.C. Consultation Report. |
| 504-05 | Exhibit #05 to the Deposition of Joshua Karr, November 9, 2009 Northwest Georgia Oncology Centers, P.C. Progress Notes. |

| Exhibit | Description |
|---------|-------------|
| 504-06 | Exhibit #06 to the Deposition of Joshua Karr, June 13, 2014 Northwest Georgia Oncology Centers, P.C. Progress Notes. |
| 504-07 | Exhibit #07 to the Deposition of Joshua Karr, September 2, 2014 Northwest Georgia Oncology Centers, P.C. Progress Notes. |
| 504-08 | Exhibit #08 to the Deposition of Joshua Karr, Medical Records Provided by The Marker Group. |
| 505 | May 15, 2019.  Deposition of Joshua Karr, Volume II, Walter Winston, et al. v. Monsanto Company, No. 1822-CC00515. |
| 506 | March 5, 2019.  Deposition of Michael Puchbauer, Walter Winston, et al. v. Monsanto Company, No. 1822-CC00515 and Deposition Exhibits 1-2. |
| 506-01 | Exhibit #01 to the Deposition of Michael Puchbauer, February 12, 2019 Notice of Videotaped Deposition. |
| 506-02 | Exhibit #02 to the Deposition of Michael Puchbauer, April 10, 2018 Plaintiff's Fact Sheet. |
| 507 | June 10, 2019.  Deposition of Deion Sanders, Walter Winston, et al. v. Monsanto Company, No. 1822-CC00515 and Deposition Exhibits 1-9. |
| 507-01 | Exhibit # to the Deposition of Deion Sanders, June 3, 2019 Notice of Videotaped Deposition. |
| 507-02 | Exhibit # to the Deposition of Deion Sanders, Color Photographs 130 Millboro Lane, College Park, Georgia; 25 Golightly Street, Fairburn, Georgia; 212 Fayetteville Road, Fairburn, Georgia; and 16 Aberdeen Court, Newnan, Georgia. |
| 507-03 | Exhibit # to the Deposition of Deion Sanders, November 27, 2018 Piedmont Radiology Report. |
| 507-04 | Exhibit # to the Deposition of Deion Sanders, February 24, 2012 RADONC LTR Medical Report. |
| 507-05 | Exhibit # to the Deposition of Deion Sanders, January 11, 2013 Emory Healthcare Final Report. |
| 507-06 | Exhibit # to the Deposition of Deion Sanders, August 8, 2012 Electronic Correspondence. |
| 507-07 | Exhibit # to the Deposition of Deion Sanders, July 3, 2018 Records Obtained by The Marker Group. |
| 507-08 | Exhibit # to the Deposition of Deion Sanders, September 21, 2018 Records Obtained by The Marker Group. |
| 507-09 | Exhibit # to the Deposition of Deion Sanders, Petition, Jury Trial Demanded. |
| 508 | February 26, 1987.  GLY: Salt Chronological File, Correspondence from F.S. Serdy re: Glyphosate Salt Registrations; MONGLY00245010-23. |
| 509 | Roundup Ready Approval History; MONGLY01337673-80. |
| 510 | April 5, 1974.  Registration Certificate for Roundup Herbicide; MONGLY00784677-79. |
| 511 | August 26, 2013.  Donna Farmer, Chemistry Stewardship Lead FY2013, Business Performance – Goals; MONGLY01720495-502. |
| 512 | JGTF Toxicology TWG Comments on Glyphosate PRVD, Review of Relevant Toxicology Sections of April 13, 2014 Glyphosate Proposed Re-evaluation; MONGLY01688221-227. |
| 513 | January 20, 2009.  Saltmiras e-mail to Simon Hill et al re: Dermal Penetration Protocols; MONGLY02199506-507. |
| 514 | January 16, 2009.  Saltmiras e-mail to Hill Simon, Spanogle & Gustin re: Dermal Penetration Protocols; MONGLY02199508-520. |
| 515 | February 16, 2009.  Glyphosate Product Overview, Toxicology, Regulatory Submissions and Product Support Presentation by David Saltmiras. |

| Exhibit | Description |
|---------|-------------|
| 516 | 2009, Fadya A. Orozco et al., Monitoring Adherence to the International Code of Conduct, Highly Hazardous Pesticides in Central Andean Agriculture and Farmers' Rights to Health, Int J Occup Environ Health; 15:255-268. |
| 517 | New World Center for Sustainable Urban Food Systems Launched, Are we on Track to Achieve Agenda 2030? |
| 518 | September 1, 2011.  Farmer e-mail re: Monsanto Required CBT/WHO International Code of Conduct on the Distribution of Use of Pesticides; MONGLY04154010. |
| 519 | 1985, E. International Code of Conduct on the Distribution and Use of Pesticides. |
| 520 | 2002, Rome – International Code of Conduct on the Distribution and Use of Pesticides (Revised Version) (adopted by the Hundred and Twenty-third Session of the FAO Council in November 2002). |
| 521 | January 2013.  International Code of Conduct on the Distribution and Use of Pesticides, Annotated List of Technical Guidelines for the Implementation of the International Code of Conduct on the Distribution and use of Pesticides. |
| 522 | February 6, 2006.  FAO Code of Conduct Presentation. |
| 523 | 2016, Rome – International Code of Conduct on Pesticide Management, Guidelines on Highly Hazardous Pesticides. |
| 524 | October 2015.  Regulatory 103 Training, Global Regulatory Organization, How Chemistry Products move form Discovery to Market. |
| 525 | 2000/2001, FAO Specifications and Evaluations for Plant Protection Products, Glyphosate, Food and Agriculture Organization of the United Nations (FAO). |
| 526 | February 19, 2009.  Kaempfe e-mail to Garnett re: Tallow Amine Tox Issues in Germany; MONGLY02639007-09. |
| 527 | August 2015.  International Code of Conduct on Pesticide Management, Guidelines on Good Labelling Practice for Pesticides (Revised). |
| 528 | Pesticides Management, Code of Conduct on Distribution/ Use of Pesticides & Harmonization of Pesticides Registration, FAO Pesticide Management Group, Plant Protection Service (AGPM) Presentation. |
| 529 | Pesticides Management, Code of Conduct on Distribution/ Use of Pesticides & Harmonization of Pesticides Registration, FAO Pesticide Management Group, Plant Protection Service (AGPM), New Features of the Revised Version of the Code of Conduct. |
| 530 | February 14, 2007.  Chemical Stewardship Working Group Meeting Chaired by Bill Heydens. |
| 531 | Duplicate of 530. February 14, 2007.  Chemical Stewardship Working Group Meeting Chaired by Bill Heydens. |
| 532 | January 2013.  Annotated List of Technical Guidelines for the Implementation of the International Code of Conduct on the Distribution and Use of Pesticides; MONGLY03096305-318. |
| 533 | 2003, Rome – International Code of Conduct on the Distribution and Use of Pesticides (Revised Version), Adopted by the Hundred and Twenty-third Session of the FAO Council in November 2002. |
| 534 | 1995, Guidelines on the Good Labelling Practice for Pesticides, FAO. |
| 535 | December 2006.  FAO Code of Conduct, Update Meeting by Paul Shelton, Monsanto Presentation. |
| 536 | December 2006.  FAO Code of Conduct, Update Meeting by Paul Shelton, Monsanto Presentation. |

| Exhibit | Description |
|---------|-------------|
| 537 | February 22, 2007.  Kyle e-mail to Austin re: Notes from the CSWG Meeting Feb 14 with attached 2007Feb14 Minutes.doc; MONGLY03949140. |
| 538 | 2003, Rome – International Code of Conduct on the Distribution and Use of Pesticides (Revised Version), Adopted by the Hundred and Twenty-third Session of the FAO Council in November 2002 (Duplicate of 533); MONGLY01922200-238. |
| 539 | 11.2.8 claims as to safety, including statements such as "safe", "non-poisonous", "harmless", "non-toxic" or "compatible with IPM," are not made without a qualifying phrase such as "when used as directed". [However, reference to use within specified IPM programmes may be included if validated by the regulating authority and the claim qualified accordingly]; 11.2.9  statements comparing the risk, hazard or "safety" of different pesticides or other substances are not made; MONGLY01922199 |
| 540 | July 25, 2006.  Farmer e-mail to Hilton re: Advertisements… with attached FAO Code.pdf; MONGLY01922198. |
| 541 | March 1985, Rome – Guidelines for The Registration and Control of Pesticides, (including a model scheme for the establishment of national organization), Food and Agriculture Organization of the United Nations. |
| 542 | 1988, FAO Pesticide Labelling Legislation. |
| 543 | July 10, 2007.  Kyle e-mail to Boyd et al., Subject: Agenda for Tomorrow's CSWG Meeting; MONGLY02091028-29. |
| 544 | Food and Agriculture Organization (FAO) International Code of Conduct on the Distribution and Use of Pesticides; MONGLY02091031. |
| 545 | June 2013.  Profiling Membership Opinion of CropLife America Initiatives, Organizational Performance, and Future Strategic Direction, 2013 Report, Jefferson Davis Associates, Inc.; MONGLY02518084-8224. |
| 546 | 1985, The State of Food and Agriculture, Mid-Decade Review of Food and Agriculture, FAO. |
| 547 | October 2008, Issued June 3, 2003.  Program 18, Chemical Product Stewardship, Monsanto; MONGLY02894807-819. |
| 548 | April 2010.  International Code of Conduct on the Distribution and Use of Pesticides, Guidelines for the Registration of Pesticides, World Health Organization. |
| 549 | 2005.  Robert L. Bronaugh and Howard I. Maibach, Percutaneous Absorption, Drugs – Cosmetics – Mechanisms – Methodology, Fourth Edition. |
| 550 | 2015.  Compliance Monitoring Strategy for Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), U.S. Environmental Protection Agency, Office of Enforcement and Compliance Assurance. |
| 551 | September 6, 2017.  US EPA Notice of Pesticide Registration, Quick Acting Weed Killer Concentrate, Agent for Ragan and Massey, Inc. |
| 552 | August 7, 2019.  US EPA, Pesticide Labeling Questions & Answers. |
| 553 | August 30, 2019.  Deposition of Matthew Muckerman, Volume I. |
| 553-01 | July 1. 1999.  40 CFR Ch. 1, 156.10 Subpart A – General Provisions, Labeling Requirements. |
| 553-02 | July 12, 2019.  UW EPA, Glyphosate. |
| 553-03 | July 1. 2002.  40 CFR Ch. 1, 156.10 Subpart D – Human Hazard and Precautionary Statements. |
| 553-04 | July 1. 2009.  40 CFR Ch. 1, 156.3 Subpart H – Container Labeling. |
| 553-05 | March 27, 2019.  Amended Notice of Video Deposition. |

| Exhibit | Description |
|---|---|
| 553-06 | List of Employees who Matt Muckerman Met with in Preparation for his Deposition. |
| 553-07 | December 4, 1998.  1998-99 Communication Plan. |
| 553-08 | September 15, 2008.  Marketing Research Guiding & Measuring Our Success, Mike Hilton, GSC Meeting. |
| 553-09 | February 18, 2015.  Global Marketing, Pricing Strategy & Communicating Value Overview, Mike Hilton, Monsanto. |
| 553-10 | December 12, 2006. Shelton e-mail to Graf et al, re: FAO Code of Conduct; MONGLY02123877. |
| 553-11 | February 22, 2007.  Kyle e-mail to Austin et al, re: Notes from the CSWG Meeting Feb. 14; MONGLY03949140, MONGLY03084390, and MONGLY03084391. |
| 553-12 | July 10, 2007.  Kyle e-mail to Boyd et al. re: Agenda for Tomorrow's CSWG Meeting; MONGLY02091028-29, MONGLY02091031. |
| 553-13 | May 28, 1984.  E. International Code of Conduct on the Distribution and Use of Pesticides. |
| 553-14 | November 2002.  International Code of Conduct on the Distribution and Use of Pesticides, Revised Version. |
| 553-15 | 2014.  Product Stewardship and The Pledge. |
| 553-16 | February 13, 2007.  Garnett e-mail to Belvaux re: Re-Entry Time; MONGLY06813897-98. |
| 553-17 | September 21, 2009.  Farmer e-mail to Combest, re: Roundup Article in Fremantle Herald; MONGLY01192115-117. |
| 553-18 | April 21, 2014.  Farmer e-mail to Reeves et al., re: Infographic – Glyphosate Toxicity Compared to Other Chemicals; MONGLY02415335-36. |
| 553-19 | Monsanto IT&O, Roundup PROMAX. |
| 553-20 | How Toxic Is It?  Washington Friends of Farms & Forests. |
| 553-21 | August 25, 2015.  Gould e-mail to Conroy et al., re: Freedom to Operate Presentation; MONGLY07087909. |
| 553-22 | October 12, 2016.  Gould e-mail to Bakr re: Presentation for Tomorrow; MONGLY07132589. |
| 554 | September 4, 2019.  Deposition of Matthew Muckerman, Volume II. |
| 554-23 | February 16, 2009.  Glyphosate, Product Overview, Toxicology, Regulatory Submissions and Product Support, David Saltmiras. |
| 554-24 | June 5, 2018.  Affidavit of Authenticity of Jaun Estrada. |
| 554-25 | November 7, 1996.  Assurance of Discontinuance Pursuant to Executive Law § 63(15); MONGLY09272462-500. |
| 554-26 | Horizon Presentation by Mike Krebsbach, Monsanto Company, Horizon Product Training Workshop. |
| 554-27 | October 25, 2016.  Devitre e-mail to Modena et al., re: New Resource: Special Issue: Glyphosate (Benefits & Safety); MONGLY07273392-98. |
| 554-28 | October 25, 2016.  Reynolds e-mail to Heering et al., re: New Resource: Special Issue: Glyphosate (Benefits & Safety); MONGLY12154643-44. |
| 554-29 | October 26, 2016.  Goldstein e-mail to Divitre et al., re: New Resource: Special Issue: Glyphosate (Benefits & Safety); MONGLY07273341-42. |
| 554-30 | The Safety and Benefits of Glyphosate, Monsanto; MONGLY07238524-25. |

| Exhibit | Description |
|---------|-------------|
| 554-31 | January 27, 2017. Ford e-mail to Pierce re: Emailing – in%20Ag%2010.25.16.pdf; MONGLY07061022-39. |
| 554-32 | January 27, 2017. Ford e-mail to Fowler re: Emailing- in%20Ag%2010.25.16.pdf; MONGLY07061004-21. |
| 554-33 | January 27, 2017. Fowler e-mail to Ford re: Emailing- in%20Ag%2010.25.16.pdf; MONGLY07061003. |
| 554-34 | January 27, 2017. Ford e-mail to Brown6710@aol.com re: Emailing- in%20Ag%2010 .25.16.pdf; MONGLY070600967-84. |
| 554-35 | January 27, 2017. Ford e-mail to Townsend et al., re: Emailing- in%20Ag%2010.25.16.pdf; MONGLY070600949-966. |
| 554-36 | January 27, 2017. Townsend e-mail to Ford, re: Emailing- in%20Ag%2010.25.16.pdf; MONGLY070600945. |
| 554-37 | March 22, 2017. Hood e-mail to Gough re: Monsanto Contact Us – Message: MONGLY07194539-58. |
| 554-38 | July 26, 1988. Letter from Edwin Tinsworth, Director, Registration Division, Office of Pesticides Programs to Timothy Long, Roundup Registration Manager re: Safety of Applicators; MONGLY00223580-81. |
| 554-39 | April 1, 1992. Letter from Alderman, Chief Toxics and Pesticides Branch, Air and Toxics Division, US EPA to Monsanto re: Roundup Distribution; MONGLY00223572. |
| 554-40 | April 14, 1998. Assurance of Discontinuance Pursuant of Executive Law § 63(15); MONGLY07742297-301. |
| 554-41 | February 12, 2008. Underwood e-mail to Underwood et al., re: Updated Chem Presentations and One Pagers; MONGLY07116067-70. |
| 554-42 | 2010. Monsanto Vegetation Management Products Training. |
| 554-43 | The Proper Use of Glyphosate in Urban Settings, Steve Gould; MONGLY07122140-195. |
| 554-44 | 2011. Monsanto Products Training, Steve Gould. |
| 554-45 | January 7, 2014. Ford e-mail to Conroy, re: Monsanto Product Training 2014; MONGLY07611899. |
| 554-46 | March 14, 2016. Gould e-mail to Muhlbeler re: Monsanto Customer Training Powerpoint Auto.pptx; MONGLY07127887. |
| 554-47 | March 19, 2016. Gould e-mail to Robbins, re: Roundup Training Power Point w Audio; MONGLY07102587. |
| 554-48 | July 8, 2019. EPA Takes Next Step in Review Process for Herbicide Glyphosate, Reaffirms No Risk to Public Health. |
| 554-49 | December 2016. Office of Pesticide Programs, Label Review Manual. |
| 554-50 | March 5, 2014. The Dose Makes the Poison, Cami Ryan. |
| 554-51 | April 23, 2019. Glyphosate, Proposed Interim Registration Review Decision, Case Number 0718, Docket Number EPA-HQ-OPP-2009-0361. |
| 554-52 | August 8, 2019. EPA Takes Action to Provide Accurate Risk Information to Consumers, Stop False Labeling on Products, EPA Press Office. |
| 554-53 | August 12, 2019. OEHHA Statement Regarding US EPA's Press Release and Registrant Letter on Glyphosate, Office of Environmental Health Hazard Assessment, California Environmental Protection Agency. |

| Exhibit | Description |
|---------|-------------|
| 554-54 | April 19, 2018.  Certified for Publication, Appeal from a Judgment of the Superior Court of Fresno County. |
| 554-55 | IARC Monographs – 112, Glyphosate. |
| 554-56 | September 3, 2019.  Comments from the Natural Resources Defense Council, Glyphosate Proposed Interim Registration Review Decision (PID), (Document ID EPA-HQ-OPP-2009-0361-2340). |
| 554-57 | July 5, 2018.  Banner e-mail to Rands, re: Notes; MONGLY144411101-08. |
| 554-58 | February 12, 2019.  Roundup Products Liability, Deposition of Todd Rands. |
| 554-59 | Brief Biography of Attorney General Scott Pruitt. |
| 554-60 | March 16, 2017.  Memorandum USEPA re: Transmission of Meeting Minutes and Final Report of the December 13-16, 2016 FIFRA SAP Meeting Held to Consider and Review Scientific Issues Associated with EPA's Evaluation of the Carcinogenic Potential of Glyphosate. |
| 554-61 | December 14, 2015.  Summary of ORD Comments of OPP's Glyphosate Cancer Assessment. |
| 554-62 | September 4, 2015.  Gould e-mail to Gough, re: Issue Alert: State of California Intends to Add Glyphosate to "Prop 65" List. |
| 554-63 | September 6, 2017.  US EPA Notice of Pesticide Registration, Quick Acting Week Killer Concentrate. |
| 555 | September 25, 2019.  Deposition of Kathy Feldman with Exhibits 1-7, Photographs. |
| 556 | August 17, 2018.  Moms Across America, Monsanto Rep says Roundup is Safer than Vinegar or Vitamin D3. |

# APPENDIX B

## Extractions from Monsanto MSDSs

## By

## Product and Date

MSDS data from the following listing of Roundup Products follow:

➢ Roundup Biactive

➢ Roundup Brush Killer Concentrate

➢ Roundup Custom Herbicide

➢ Roundup Dry Herbicide

➢ Roundup Dry Pak Water Soluble Granule

➢ Roundup Fast Act Foam RTU Herbicide

➢ Roundup Fastforward Herbicide

➢ Roundup GC

➢ Roundup Herbicide

➢ Roundup IPCO Herbicide

➢ Roundup Max Control 365 Concentrated

➢ Roundup MAX Original Herbicide

➢ Roundup Non-Selective Herbicide Cone

➢ Roundup Poison Ivy Brush Non-Select RTU Pull 'n Spray

➢ Roundup Poison Ivy Tough Brush Killer 1 RTU

➢ Roundup Poison Ivy Tough Brush Killer 2 RTU

➢ Roundup Poison Ivy Tough Brush Killer 3

➢ Roundup Poison Ivy Tough Brush Killer

➢ Roundup Poison Ivy Tough Brush Killer Plus RTU

➢ Roundup Power MAX II Herbicide

➢ Roundup PRO Herbicide Concentrate

➢ Roundup PRO Herbicide

➢ Roundup PRODry Herbicide

➢ Roundup ProMax Herbicide

➢ Roundup Pull'n Spray

➢ Roundup Pump 'n Go

➢ Roundup QuickPro Herbicide

➢ Roundup Quik Stik Grass Weed Killer

➢ Roundup Ready Herbicide with Plant shield

➢ Roundup Ready-to-Use Herbicide

➢ Roundup Renew Herbicide

➢ Roundup RT Herbicide

➢ Roundup Super Concentrate Herbicide

- ➢ Roundup Sure Shot Foam
- ➢ Roundup Tab
- ➢ Roundup Tough Weed Formula
- ➢ Roundup Tran sorb HC Liquid Herbicide
- ➢ Roundup Tree Stump Root Killer
- ➢ Roundup Ultra 3000 EXTRA.CTED
- ➢ Roundup Ultra Dty Herbicide
- ➢ Roundup Ultra Herbicide
- ➢ Roundup Ultra Max Herbicide
- ➢ Roundup Ultra Max II Herbicide
- ➢ Roundup Wand Applicator RTU
- ➢ Roundup WeatherMAX Herbicide
- ➢ Roundup Weed Grass Killer 1 Ready-to-Use
- ➢ Roundup Weed Grass Killer Concentrate Plus
- ➢ Roundup Weed Grass Killer Concentrated
- ➢ Roundup Weed Grass Killer
- ➢ Roundup Weed Grass Killer III
- ➢ Roundup Weed Grass Killer LG
- ➢ Roundup Weed Grass Killer FastAct Select RTU
- ➢ Roundup Weed Grass Killer Plus Weed Prev. II
- ➢ Roundup Weed Grass Killer Plus Weed Preventer
- ➢ Roundup Weed Grass Killer Precision Gel
- ➢ Roundup Weed Grass Killer Ready-to-Use Plus
- ➢ Roundup Weed Grass Killer RTU
- ➢ Roundup Weed Grass Killer Super Concentrate
- ➢ Roundup Weedkiller Fast Action
- ➢ Roundup Wild Black Plus Vine Brush Killer Conc.
- ➢ Roundup WSD
- ➢ Roundup Xtend Vaporgrip Technology

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| ROUNDUP BIACTIVE | | | | | | | | | | |
| | | | | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
| DATE | COMPONENT | WGT % | CAS # | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 10/25/2005 | Isopropylamine Salt of Glyphosate | 41.5 | 38641-94-0 | EU & UK Not classified as dangerous. | Skin, eye contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Surfactant | 16 | | | | | | | | | |
| | Water | 42.5 | 7732-18-5 | | | | | | | | |
| 06/23/2008 | Isopropylamine Salt of Glyphosate | 41.5 | 38641-94-0 | EU & UK Not classified as dangerous. | Skin, eye contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Surfactant | 16 | | | | | | | | | |
| | Water | 42.5 | 7732-18-5 | | | | | | | | |
| 06/01/2012 | Isopropylamine Salt of Glyphosate | 41.5 | 38641-94-0 | EU & UK Not classified as dangerous. EU: Do NOT empty into drains. Keep only in the original container. UK: Keep out of reach of children. Keep away from food, drink and | Skin, eye contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. Chemical | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the |
| | Surfactant(s) | 16 | | | | | | | | | |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **MONSANTO ROUNDUP MSDS'** | | | | | | | | | | | | |
| | Water | 42.5 | 7732-18-5 | animal feedingstuffs. Avoid contact with skin.  After contact with skin, wash immediately with plenty of water.  Do NOT empty into drains.  Do not contaminate water with the product or its container.  KEEP IN ORIGINAL CONTAINER, tightly closed, in a safe place. | | | | | | | resistant gloves include those made of waterproof materials such as nitrile, butyl, neoprene, polyvinyl chloride (PVC), natural rubber and/or barrier laminate. | appropriate type of equipment for a given application. |
| 07/18/2014 | Isopropylamine Salt of Glyphosate | 41.5 | 38641-94-0 | EU & UK Not classified as dangerous. EU: Do NOT empty into drains.  Keep only in the original container. UK: Keep out of reach of children.  Keep away from food, drink and animal feedingstuffs. Avoid contact with skin.  After contact with skin, wash immediately with plenty of water.  Do NOT empty into drains. | Skin, eye contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. Chemical resistant gloves include those made of waterproof materials such as nitrile, butyl, neoprene, polyvinyl chloride (PVC), natural rubber and/or | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Surfactant | 16 | | | | | | | | | | |
| | Water | 42.5 | 7732-18-5 | | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | barrier laminate. | |

**ROUNDUP BIACTIVE GL**

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / CARCINOGEN | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 01/13/2014 | Potassium Salt of Glyphosate | 35 | 70901-12-1 | UK Not classified as dangerous.  If medical advice is needed, have product container or label at hand.  Keep out of reach of children.  Read label before use.  Keep only in original container.  Store product away from food and drink. Dispose of | Skin, eye contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Alkylpolyglycoside | <20 | 68515-73-1 | | | | | | | | |
| | Nitroryl | <3 | 226563-63-9 | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Water | >42 | 7732-18-5 | contents/container to a household waste recycling centre as hazardous waste except for empty containers which can be disposed of by recycling.  Contact your local council for details.  To avoid risks to human health and the environment, comply with the instructions for use. | | | | | | |

**ROUNDUP PRO BIACTIVE**

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 01/13/2014 | Isopropylamine Salt of Glyphosate | 41.5 | 38641-94-0 | EU & UK Not classified as dangerous. EU:  Do NOT empty into drains.  Keep only in the original container.  UK: Keep out of reach of children.  Keep away from food, drink and | Skin, eye contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. Chemical | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the |
| | Surfactant(s) | 16 | | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Water | 42.5 | 7732-18-5 | animal feedingstuffs. This material and its container must be disposed of in a safe way.  Wear suitable gloves.  If swallowed, seek medical advice immediately and show this container or label. | | | | | resistant gloves include those made of waterproof materials such as nitrile, butyl, neoprene, polyvinyl chloride (PVC), natural rubber and/or barrier laminate. | appropriate type of equipment for a given application. |

**ROUNDUP BRUSHKILLER**

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 03/15/1996 | Isopropylamine Salt of Glyphosate - Isopropylamine Salt of N-(phosphonomethyl) glycine | 13.5 | 38641-94-0 | On the basis of available information, this material is not expected to produce any significant adverse health effects when recommended use instruction are followed.  EU:  Not classified as dangerous. | None Given | None Given | None Given | None Given | See section 10 - 'materials to avoid' for equipment. (10- This material will react with galvanized or unlined steel (except stainless steel) to produce hydrogen, a highly flammable gas that can cause explosions. Should be mixed, stored and applied in | Hand: Wear impermeable gloves. Skin Protection :  Wear suitable protective clothing. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Alkoxylated Fatty Amine Surfactant | 11 | | | | | | | | | |
| | Non Hazardous inorganic Adjuvant | 24 | | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Water & Minor Formulating Ingredients | 51.5 | | | | | | | stainless steel, Aluminium, fiberglass, plastic or plastic-lined steel container. | |

### ROUNDUP CONCENTRATE BRUSHKILLER

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 08/03/1995 | Isopropylamine Salt of N-(phosphosnom ethyl) glycine | 18 | 38641-94-0 | EU: Not classified as dangerous. IMMEDIATE CONCERNS: May cause eye irritation. Avoid contact with eyes, skin or clothing. Keep out of reach of children. | None Given | This substance is not expected to cause prolonged or significant skin irritation. If absorbed through the skin, this substance is considered practically non-toxic to internal organs. This product is not expected to cause allergic skin reaction. See Toxicology information section (11). | Overexposure to spray mist may result in minor irritation of the upper respiratory tract. | Ingestion may produce irritation of the digestive tract as demonstrated by signs and symptoms of mouth membrane irritation, nausea, vomiting and diarrhea. | No special ventilation is necessary. | No special skin protection is usually necessary. Avoid prolonged or frequently repeated skin contact with this material. Skin contact can be minimized by wearing protective clothing. Wash thoroughly with soap and water after handling. | Handling of the undiluted product is not likely to present an airborne exposure concern during normal handling. In the event of an accidental discharge of the material during manufacture or handling which produces a heavy vapor or mist, workers should put on respiratory protection equipment. Consult respirator manufacturer to determine appropriate type of equipment. Observe respirator (?) limitations specified by NIOSH MSHA or the manufacturer. For application of product diluted in accordance with label instructions, no special respiratory protection is required. |
| | Inert Ingredients | ~81 99 | | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 04/07/1999 | Glyphosate, Isopropylamine Salt | 27 | 38641-94-0 | IMMEDIATE CONCERNS: Causes eye irritation. Avoid contact with eyes or clothing. Wash thoroughly with soap and water after handling.  Keep out of reach of children. Glyphosate is not considered to be a carcinogen. Glyphosate did not produce tumors in any of the long-term toxicology studies. EPA has classified glyphosate in category "E" (Evidence of noncarcinogenicity for humans). | None Given | This substance is not expected to cause prolonged or significant skin irritation.  If absorbed through the skin, this substance is considered practically non-toxic to internal organs.  This product is not expected to cause allergic skin reaction. See Toxicology information, section 11 | Overexposure to spray mist may result in minor irritation of the upper respiratory tract. See Toxicology information, section 11 | Ingestion may produce irritation of the digestive tract as demonstrated by signs and symptoms of mouth membrane irritation, nausea, vomiting and diarrhea. See Toxicology Information, section 11. | No special ventilation is necessary. | Although this product does not present a significant skin concern, minimize skin contamination by following good industrial practice. Wearing protective gloves is recommended. Wash hands and contaminated skin thoroughly after handling. | For Handling the Concentrated Product:  Avoid breathing vapor or mist.  This product concentrate is not likely to pose an airborne exposure concern during manufacture or packaging.  In the event of abnormal exposure conditions, use NIOSH/MSHA approved equipment.  In work situations where an air purifying respirator is appropriate to be use, use of a full face respirator equipped with purifying elements for protection against organic vapor and dust/mist approved for pesticides is recommended.  Use Cartridges with NIOSH/MSHA approval number TC-23C or canister with NIOSH/MSHA approval number TC-14G.  Full facepiece replaces the need for chemical goggles. Observe respirator use limitation specified by the manufacturers. Respiratory protection programs must comply with 29 CFR 1910.134.  For |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Use of Product in accordance with label instructions: Respirators are not required for use of this product in accordance with label instructions. |
| 07/25/2002 | Isopropylamine Salt of Glyphosate | 27 | 38641-94-0 | CAUTION! Causes eye irritation. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a |
| | Other Ingredients | 73 | | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | given application. |

**ROUNDUP CUSTOM HERBICIDE**

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 01/30/2001 | Isopropylamine Salt of Glyphosate | 53.5 | 38641-94-0 | CAUTION! | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | No special requireme nt when used as recomme nded. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Water | 46.5 | 7732-18-5 | | | | | | | | |

**ROUNDUP CUSTOM HERBICIDE - FOR AQUATIC & TERRESTRIAL USE**

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 07/03/2012 | Isopropylamine Salt of Glyphosate | 53.8 | 38641-94-0 | CAUTION! OSHA Status: This product is not hazardous according to the OSHA Hazard Communication Standard, 29 CFR 1910.1200 | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Single Ingestion: Not expected to produce significant adverse effects when recommende d use instructions are followed. | No special requirement when used as recommended. | No special requireme nt when used as recomme nded. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Water | 46.2 | 7732-18-5 | | | | | | | | |
| 05/29/2015 | Isopropylamine Salt of Glyphosate | 53.8 | 38641-94-0 | Not classified as hazardous. OSHA Status: This product | Skin contact, eye contact, | Not expected to produce significant | Not expected to produce significant | Single Ingestion: Not expected | No special requirement when used as | No special requireme | No special requirement when used as |

**MONSANTO ROUNDUP MSDS'**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Water | 46.2 | 7732-18-5 | is not hazardous according to the OSHA Hazard Communication Standard, 29 CFR 1910.1200 | inhalation. | adverse effects when recommended use instructions are followed. | adverse effects when recommended use instructions are followed. | to produce significant adverse effects when recommended use instructions are followed. | recommended. | nt when used as recomme nded. | recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| 10/15/2015 | Isopropylamine Salt of Glyphosate | 53.8 | 38641-94-0 | Not classified as hazardous. OSHA Status: This product is not hazardous according to the OSHA Hazard Communication Standard, 29 CFR 1910.1200 | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Single Ingestion: Not expected to produce significant adverse effects when recommende d use instructions are followed. | No special requirement when used as recommended. | No special requireme nt when used as recomme nded. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Water | 46.2 | 7732-18-5 | | | | | | | | |

**ROUNDUP DRY HERBICIDE**

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 01/19/1998 | Glyphosate: N-(phosphsnom ethyl) glycine in the form of its monoammoniu m salt | 75 | 38641-94-0 | Keep out of reach of children. Causes eye irritation. May be a skin sensitizer. | Skin contact and inhalation are expected to be the primary routes of occupational | None Given | None Given | Gastrointestin al discomfort, nausea, vomiting and diarrhea. | Provide natural or mechanical ventilation to minimize exposure. If practical, use local mechanical exhaust ventilation at | Although Roundup Dry herbicide does not present a significant skin concern, | Roundup Dry herbicide is not likely to present an airborne exposure concern under normal use. Use NIOSH/MSHA approved respiratory protection |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **MONSANTO ROUNDUP MSDS'** | | | | | | | | | | | |
| | Inert Ingredients | 25 | 7732-18-5 | | exposure to Roundup Dry herbicide. | | | | sources of air contamination such as open process equipment. | minimize skin contamination by following good industrial practice. Wearing chemical resistant gloves is recommended. Wash hands and exposed skin thoroughly with soap and water after handling. | equipment during unusual handling conditions.  Consult respirator manufacturer to determine appropriate type equipment for a give application.  Observe respirator use limitations specified by Nosh/MSHA or the manufacturer.  Refer also to CSA Standard Z94.4-1993.  Selection, Care and Use of Respirators. |
| 04/09/1998 | Glyphosate: N-(phosphosnomethyl) glycine in the form of its monoammonium salt | 74.7 | 38641-94-0 | Keep out of reach of children.  Danger!  Causes eye Burns.  Harmful if swallowed.  Do not contaminate water when disposing of equipment washwaters. | Skin contact and inhalation are expected to be the primary routes of occupational exposure to Roundup Dry herbicide. | Avoid contact with skin, eyes or clothing. | Avoid breathing dust. | Gastrointestinal discomfort, nausea, vomiting and diarrhea. | Provide natural or mechanical ventilation to minimize exposure.  If practical, use local mechanical exhaust ventilation at sources of air contamination such as open process equipment. | Although Roundup Dry herbicide does not present a significant skin concern, minimize skin contamination by following good industrial practice. Wearing chemical resistant gloves is recommended. | Roundup Dry herbicide is not likely to present an airborne exposure concern under normal use.  Use NIOSH/MSHA approved respiratory protection equipment during unusual handling conditions.  Consult respirator manufacturer to determine appropriate type equipment for a give application.  Observe respirator use limitations specified by Nosh/MSHA or the manufacturer.  Refer |
| | Inert Ingredients | 25.3 | 7732-18-5 | | | | | | | | |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **MONSANTO ROUNDUP MSDS'** | | | | | | | | | | | |
| | | | | | | | | | | Wash hands and exposed skin thoroughly with soap and water after handling. | also to CSA Standard Z94.4-1993. Selection, Care and Use of Respirators. |
| 01/27/2004 | Ammonium Salt of Glyphosate | 74.7 | 11437 0-14-8 | DANGER! Causes eye burns. May be harmful if inhaled. | Skin contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. Note: A very small percentage of particularly sensitive people may suffer skin or respiratory reactions. | Excessive, intentional misuse: Respiratory Effects: Pneumonitis (aspiration); Gastro-intestinal Effects: Nausea/vomiting, diarrhea, abdominal pain, bloody vomiting (hematemesis). Cardiovascular Effects: Abnormal heart rhythm (cardiac dysrhythmia), decreased heart outputs (myocardial depression). General/Systemic Effects: Disturbances of fluid and electrolyte regulation, abnormally decreased blood volume | Have eye wash facilities immediately available at locations where eye contact can occur. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Surfactant(s) | 21 | | | | | | | | | |
| | Sodium Sulphite | ≤0.5 | 7757-83-7 | | | | | | | | |
| | Impurities | 3.5 | | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | (hypovolemia), elevated serum amylase, fluid loss (haemoconcentration), no cholinesterasinhibition. | | | |

**ROUNDUP DRY PAK WATER SOLUBLE GRANULE HERBICIDE**

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 10/01/1992 | Glyphosate: N-(phosphosnomethyl) glycine in the form of its monoammonium salt | 93.6 | 38641-94-0 | Keep out of reach of children. May cause eye irritation. Harmful if swallowed or inhaled. Reformulation or repackaging is prohibited. | Skin contact and inhalation. | Roundup Dry Pak Water Soluble Granule herbicide is no more than slightly toxic and practically non-irritating based on toxicity studies. | Roundup Dry Pak Water Soluble Granule herbicide is no more than slightly toxic if inhaled based on toxicity studies. | Roundup Dry Pak Water Soluble Granule herbicide is no more than slightly toxic based on toxicity studies. No significant adverse health effects are expected to develop if only small amounts (less than a mouthful) are swallowed. | No special precautions are recommended. | Wear appropriate protective clothing to prevent skin contact. Applicators and other handlers must wear long-sleeved shirt, long pants, shoes plus socks. Follow manufacturer's instructions for cleaning/ maintaining PPE. | Roundup Dry Pak Water Soluble Granule herbicide is not likely to present an airborne exposure concern under normal use. In work situations where an air purifying respirator is appropriate to be used, use a half face or full face respirator equipped with purifying elements for protection against dust/mist. Use filtering elements with MSHA/NIOSH approval prefix TC-21C. The respirator use limitations specified by NIOSH/MSHA or the manufacturer must be observed. |
| | Inert Ingredients | 6.04 | 7732-18-5 | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | If no such instructions for washables, use detergent and hot water. Keep and wash PPE separately from other laundry. |

**ROUNDUP CUSTOM HERBICIDE - FOR AQUATIC & TERRESTRIAL USE**

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 07/16/2002 | Isopropylamine Salt of Glyphosate | 0.96 | 38641-94-0 | None Given | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | No special requirement when used as recommended. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Water and minor formulating ingredients | 99.04 | | | | | | | | | |
| 08/20/2003 | Isopropylamine Salt of Glyphosate | 0.96 | 38641-94-0 | None Given | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | No special requirement when used as recommended. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Water and minor formulating ingredients | 99.04 | | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 08/05/2005 | Isopropylamine Salt of Glyphosate | 0.96 | 38641-94-0 | None Given | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | No special requirement when used as recommended. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Water and minor formulating ingredients | 99.04 | | | | | | | | | |
| 11/06/2007 | Isopropylamine Salt of Glyphosate | 0.96 | 38641-94-0 | None Given | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | No special requirement when used as recommended. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Water and minor formulating ingredients | 99.04 | | | | | | | | | |
| 08/26/2010 | Isopropylamine Salt of Glyphosate | 0.96 | 38641-94-0 | CAUTION!  Causes eye irritation. Harmful if swallowed. | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Single Ingestion: Harmful if swallowed. | No special requirement when used as recommended. | No special requirement when used as recommended. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Water and minor formulating ingredients | 99.04 | | | | | | | | | |
| 07/29/2013 | Isopropylamine Salt of Glyphosate | 0.96 | 38641-94-0 | CAUTION!  Causes eye irritation. Harmful if | Skin contact, eye contact. | Not expected to produce significant | Not expected to produce significant | Single Ingestion: Harmful if | No special requirement when used as | No special requireme | No special requirement when used as |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Water and minor formulating ingredients | 99.04 | | swallowed. | | adverse effects when recommended use instructions are followed. | adverse effects when recommended use instructions are followed. | swallowed. | recommended. | nt when used as recomme nded. | recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |

**ROUNDUP FASTFORWARD HERBICIDE**

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 06/10/1998 | Glyphosate; N-(phosphosnom ethyl) glycine, as the Isopropylamine salt | 35.1 | 1071-83-6 | Keep out of reach of children.  DANGER! Causes eye burns. Harmful if swallowed or inhaled.  May cause skin irritation. Reformulation or repacking is prohibited. | Dermal and Inhalation | Occupational exposure to this material has not been reported to cause significant adverse human health effects, though workplace experience with this formulation is limited. | | | Provide ventilation to minimize exposure.  Use local mechanical exhaust ventilation at sources of air contamination such as open process | Wear chemical resistant gloves and appropriat e clothing to prevent skin contact. Consult | Respiratory protection is not required under normal use and handling conditions. During periods of abnormal exposure to heavy spray or mist, use of U.S. NIOSH/MSHA approved cartridge |
| | Ammonium Salt of glufosinate | 1.4 | 77182-82-2 | | | | | | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | MONSANTO ROUNDUP MSDS' | | | | | | | | |
| | Inert Ingredients | 63.5 | | | | | | equipment. | glove manufacturer to determine appropriate type glove for given application. Wear chemical goggles, a full face shield, and a chemical resistant apron that provides a carrier when splashing is likely. Wash immediately if skin is contaminated. Remove contaminated clothing promptly and launder before reuse. Clean protective equipment before reuse. Wash thoroughly after handling. | respirator for pesticides is advised. Consult respiratory manufacturer to determine appropriate type equipment for given application. Respirator use limitations specified by NIOSH/MSHA or the manufacturer must be observed. Refer also to CSA Standard Z 94.4-M1982, Selection, Care and Use of Respirators. |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 07/26/2000 | Glyphosate; N-(phosphosnomethyl) glycine, as the Isopropylamine salt | 35.1 | 1071-83-6 | Keep out of reach of children.  DANGER!  Causes eye burns.  Harmful if swallowed or inhaled.  May cause skin irritation.  Reformulation or repacking is prohibited. | Eye and skin contact. | May cause skin irritation. | May cause irritation. | This product is expected to be no more than slightly toxic based on toxicity studies of components of this material.  No significant adverse health effects are expected to develop if only small amounts (less than a mouthful) are swallowed. | Provide ventilation to minimize exposure.  Use local mechanical exhaust ventilation at sources of air contamination such as open process equipment. | Wear chemical resistant gloves and appropriate clothing to prevent skin contact.  Consult glove manufacturer to determine appropriate type glove for given application.  Wear chemical goggles, a full face shield, and a chemical resistant apron that provides a carrier when splashing is likely.  Wash immediately if skin is contaminated.  Remove contaminated clothing promptly and launder before | Respiratory protection is not required under normal use and handling conditions.  During periods of abnormal exposure to heavy spray or mist, use of U.S. NIOSH/MSHA approved cartridge respirator for pesticides is advised.  Consult respiratory manufacturer to determine appropriate type equipment for given application.  Respirator use limitations specified by NIOSH/MSHA or the manufacturer must be observed.  Refer also to CSA Standard Z 94.4-M1982, Selection, Care and Use of Respirators. |
| | Ammonium Salt of glufosinate | 1.4 | 77182-82-2 | | | | | | | | |
| | Inert Ingredients | 63.5 | | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | reuse. Clean protective equipment before reuse. Wash thoroughly after handling. |

### ROUNDUP GC

| | | | | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DATE | COMPONENT | WGT % | CAS # | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 03/15/1996 | Isopropylamine Salt of Glyphosate - Isopropylamine Salt of N-(phosphosnomethyl) glycine | 13.5 | 38641-94-0 | On the basis of available information, this material is not expected to produce any significant adverse health effects when recommended use instruction are followed. EU: Not classified as dangerous. | None Given | None Given | None Given | None Given | See section 10 - 'materials to avoid' for equipment. (10- This material will react with galvanized or unlined steel (except stainless steel) to produce hydrogen, a highly flammable gas that can cause | Hand: Wear impermeable gloves. Skin Protection : Wear suitable protective clothing. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Alkoxylated Fatty Amine Surfactant | 11 | | | | | | | | | |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **MONSANTO ROUNDUP MSDS'** | | | | | | | | | | | |
| | Non Hazardous inorganic Adjuvant | 24 | | | | | | | explosions. Should be mixed, stored and applied in stainless steel, Aluminium, fiberglass, plastic or plastic-lined steel container. | | |
| | Water & Minor Formulating Ingredients | 51.5 | | | | | | | | | |
| 10/30/2008 | Isopropylamine Salt of Glyphosate | 0.96 | 38641-94-0 | EU & UK: Not classified as dangerous | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Surfactant(s) | 6 | 77182-82-2 | | | | | | | | |
| | Water and minor formulating ingredients. | 78.5 | | | | | | | | | |
| 12/10/2009 | Isopropylamine Salt of Glyphosate | 15.5 | 38641-94-0 | EU & UK: Not classified as dangerous | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Surfactant(s) | 6 | | | | | | | | | |
| | Water and minor formulating ingredients. | 78.5 | | | | | | | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **ROUNDUP HERBICIDE (Original, Original I & II)** | | | | | | | | | |
| | | | | **HAZARDS / HEALTH EFFECTS** | | | | **CONTROL / PPE** | |
| **DATE** | **COMPONENT** | **WGT %** | **CAS #** | **HAZARDS / CARCINOGENICITY** | **ROUTE(S)** | **SKIN** | **INHALATION** | **INGESTION** | **ENGINEERING** | **SKIN** | **RESPIRATORY** |

| | | | | MONSANTO ROUNDUP MSDS' | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/01/1985 | Isopropylamine Salt of Glyphosate | 41 | 38641-94-0 | Keep out of reach of children. WARNING! Causes eye irritation. Harmful if swallowed. May cause skin irritation. Not for reformulation or repacking. | Dermal and inhalation. | Do not get in eyes, skin or on clothing. Prolonged contact with Roundup herbicide may cause dermal irritation. | | If swallowed, this product will cause gastrointestinal tract irritation. Ingestion of Roundup herbicide has been reported to produce gastrointestinal discomfort, nausea, vomiting and diarrhea. | No special precautions are recommended. | In cases in which prolonged or repeated skin contact with Roundup herbicide may occur, long-sleeved shirt, long pants, and chemical protective (e.g. rubber) gloves are recommended. Wash hands and contaminated skin after handling. Clothing soaked with Roundup solution should be promptly removed and laundered before reuse. | Respiratory protection should not be required for normal use and handling. During periods of abnormal exposure to heavy spray or mist, use of NIOSH/MSHA approved equipment for pesticide vapor/mist is recommended. The respirator use limitations specified by Nosh/MSHA or the manufacturer must be observed. |
| | Inert Ingredients | 59 | | | | | | | | | |
| 08/01/1989 | Isopropylamine Salt of Glyphosate | 41 | 38641-94-0 | This material is not considered to be a carcinogen by the | Skin or eye contact, inhalation. | No irritation is likely after brief contact but may | Prolonged or repeated exposure or | Swallowing large quantities | Local mechanical exhaust | Long-sleeved shirt, | Wear a NIOSH-approved self-contained breathing |

| | MONSANTO ROUNDUP MSDS' | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Surfactant(s) | 15 | Trade Secret | National Toxicology Program, the International Agency for Research on Cancer, or the Occupational Safety and Health Administration. | | be irritating after prolonged contact. | breathing very high concentrations may cause headaches, nausea, and vomiting. | causes headaches, nausea, vomiting, and perhaps unconsciousness. | ventilation capable of minimizing emissions at the point of use. | trousers, safety shoes, rubber gloves, and rubber apron. Eye wash and safety shower should be nearby and ready for use. | apparatus in the pressure demand mode, or a supplied-air respirator if use conditions generate vapor or mist. |
| | Other Ingredients | Balance | Trade Secret | | | | | | | | |
| 08/01/1989 | Glyphosate, N-Phosphonomethyl glycine, in the form of its Isopropylamine Salt. | 41 | 1071-83-6 | Keep out of reach of children. WARNING!  Causes eye irritation. Harmful if swallowed or inhaled.  May cause skin irritation. Reformulation is prohibited.  See individual container label for repackaging limitations. | Dermal and inhalation. | Do not get in eyes, skin or on clothing. Prolonged contact with Roundup herbicide may cause skin irritation. | Avoid breathing vapor or spray mist. | Ingestion of Roundup herbicide has been reported to produce gastrointestinal discomfort with irritation of the mouth, nausea, vomiting and diarrhea. Oral ingestion of large quantities of concentrated product has been reported to result in hypotension and pulmonary edema. | No special precautions are recommended. | In cases in which prolonged or repeated skin contact with Roundup herbicide may occur, long-sleeved shirt, long pants, and chemical protective (e.g. rubber) gloves are recommended. Wash hands and contaminated skin after handling. | Respiratory protection should not be required for normal use and handling.  During periods of abnormal exposure to heavy spray or mist, use of NIOSH/MSHA approved equipment for pesticide vapor/mist is recommended.  The respirator use limitations specified by Nosh/MSHA or the manufacturer must be observed. |
| | Inert Ingredients | 59 | Not Applicable | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | Clothing soaked with Roundup solution should be promptly removed and laundered before reuse. | |
| 06/01/1992 | Glyphosate, N-Phosphonomethyl glycine, in the form of its Isopropylamine Salt. | 41 | 1071-83-6 | Hazardous Chemical(s) under OSHA Hazard Communication Standard:  This product contains, as components, which are identified as hazardous chemicals Ethoxylated Tallowamines (CAS 61791-26-2) | Skin contact and inhalation. | The surfactant components of Roundup herbicide is reported to cause irritation to the eyes and skin and may contribute to the irritation potential reported for this herbicide. | Do not breathe spray mist. | Ingestion may produce gastrointestinal irritation, nausea, vomiting and diarrhea. | No special precautions are recommended. | Wash thoroughly with soap and water after handling. Remove contaminated clothing and wash before reuse. Roundup herbicide does not present significant skin concern requiring special protection. | Respiratory protection should not be required for normal use and handling.  During periods of abnormal exposure to heavy spray or mist, use of NIOSH/MSHA approved equipment for pesticide vapor/mist is recommended.  The respirator use limitations specified by NIOSH/MSHA or the manufacturer must be observed. |
| | Inert Ingredients | 59 | Not Applicable | | | | | | | | |
| 01/01/1994 | Glyphosate, N-(phosphonomethyl) Glycine, in the form of its Isopropylamine Salt) | 41 | 1071-83-6 | Keep out of reach of children. WARNING!  (If you do not understand the label, find someone to explain it to you in detail.) Causes substantial | Skin contact and inhalation. | Roundup herbicide is no more than slightly toxic and not more than slightly irritating based on toxicity | Roundup herbicide is no more than slightly toxic if inhaled based on toxicity studies. | Roundup herbicide is not more than slightly toxic based on toxicity studies.  No significant | No special precautions are recommended. | Wear appropriate protective clothing to prevent skin contact. | *For Handling of the Undiluted Product:* Undiluted Roundup herbicide is not likely to present an airborne exposure concern during normal handling.  In |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Ethoxylated Tallowamines (component) | NG | 61791-26-2 | but temporary eye injury.  Harmful if swallowed or inhaled.  Reformulation is prohibited.  See individual container label for repackaging limitations. | | studies. | | adverse health effects are expected to develop if only small amount (less than a mouthful) are swallowed.  Ingestion of similar formulations has been reported to produce gastrointestinal discomfort with irritation of the mouth, nausea, vomiting and diarrhea.  Oral ingestion of large quantities of one similar product has been reported to result in hypotension and lung edema. | Applicators and other handlers must wear long-sleeved shirt, long pants, shoes plus socks.  Follow manufacturer's instructions for cleaning/ maintaining PPE.  If no such instructions for washables, use detergent and hot water.  Keep and wash PPE separately from other laundry. | the event of an accidental discharge of the material during manufacture or handling which produces a heavy vapor or mist, workers should use NIOSH/MSHA approved equipment.  In work situations where an air purifying respirator is appropriate to be used, use of a full face respirator equipped with purifying elements for protections against organic vapor and dust/mist approved for pesticides is recommended.  Use cartridges with MSHA/NIOSH approval number TC-23C or canister with MSHA/NIOSH approval number TC-14G.  Full facepiece replaces the need for chemical goggles.  Observe respirator use limitations specified by the manufacturers.  Respiratory protection programs must comply with 29 CFR 1910.134.  *For Application of Product Diluted in accordance with Label Instructions:* Respirators are not |
| | Inert Ingredients | 59 | NG | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | required for applications of use - dilutions of Roundup herbicide. |
| 06/08/1994 | Glyphosate, N-(phosphonomethyl) Glycine, in the form of its Isopropylamine Salt) | 41 | 1071-83-6 | Keep out of reach of children.  (If you do not understand the label, find someone to explain it to you in detail.)  Causes substantial but temporary eye injury. Harmful if swallowed or inhaled. Reformulation is prohibited.  See individual container label for repackaging limitations. | Skin contact and inhalation. | Roundup herbicide is no more than slightly toxic and not more than slightly irritating based on toxicity studies. | Roundup herbicide is no more than slightly toxic if inhaled based on toxicity studies. | Roundup herbicide is not more than slightly toxic based on toxicity studies.  No significant adverse health effects are expected to develop if only small amount (less than a mouthful) are swallowed. Ingestion of similar formulations | No special precautions are recommended. | Wear appropriate protective clothing to prevent skin contact. Applicators and other handlers must wear long-sleeved shirt, long pants, shoes plus | For Handling of the Undiluted Product: Undiluted Roundup herbicide is not likely to present an airborne exposure concern during normal handling.  In the event of an accidental discharge of the material during manufacture or handling which produces a heavy vapor or mist, workers should use NIOSH/MSHA approved equipment.  In work situations where an |
| | Ethoxylated Tallowamines (component) | NG | 61791-26-2 | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Inert Ingredients | 59 | NG |  |  |  | has been reported to produce gastrointestinal discomfort with irritation of the mouth, nausea, vomiting and diarrhea. Oral ingestion of large quantities of one similar product has been reported to result in hypotension and lung edema. |  |  | socks. Follow manufacturer's instructions for cleaning/ maintaining PPE. If no such instructions for washable s, use detergent and hot water. Keep and wash PPE separately from other laundry. | air purifying respirator is appropriate to be used, use of a full face respirator equipped with purifying elements for protections against organic vapor and dust/mist approved for pesticides is recommended.  Use cartridges with MSHA/NIOSH approval number TC-23C or canister with MSHA/NIOSH approval number TC-14G.  Full facepiece replaces the need for chemical goggles. Observe respirator use limitations specified by the manufacturers. Respiratory protection programs must comply with 29 CFR 1910.134. *For Application of Product Diluted in accordance with Label Instructions:* Respirators are not required for applications of use - dilutions of Roundup herbicide. |
| 03/09/1995 | Ethoxylated Tallowamines (component) | NE | 61791-26-2 | Not Carcinogenic: NTP; IARC; OSHA. | Skin contact and inhalation. | No more than slightly toxic and no more than slightly irritating based on toxicity | No more than slightly toxic and no more than slightly irritating based on | No more than slightly toxic and no more than slightly irritating | No special precautions are recommended. | Appropria te protective clothing to prevent | Handling undiluted product: In event of accidental material discharge during manufacturing/handli |

| | MONSANTO ROUNDUP MSDS' | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Glyphosate, N-(phosphonomethyl) Glycine, in the form of its Isopropylamine Salt) | 41 | 1071-83-6 | | | studies. | toxicity studies. | based on toxicity studies. No significant adverse health effects expected if only sm amts (<mouthful) are ingested. Ingest of similar formulation produces GI discomfort. Lg. amouts ingested causes gastrointestinal discomfort, irritation of mouth, nausea, vomiting, diarrhea, hypotension, lung edema. | | skin contact. Long-sleeved shirt/long pants/shoes/socks/protective eyewear. Wash hands before eat/drink/chew gum/use tobacco/toilet. Wash well contaminated clothing. Follow manufacturer's instruction on clean/maintain PPE. | ng producing heavy vapor/mist use NIOSH/MSHA approved equipment. Full-face respirator with purifying elements against organic vapor/dust/mist for pesticides. Cartridges: TC-23C; TC-14G. |
| | Inert Ingredients | 59 | NG | | | | | | | | |
| 11/01/1997 | Glyphosate, N-(phosphonomethyl) Glycine, in the form of its Isopropylamine Salt) | 41 | 1071-83-6 | Keep out of reach of children.  (If you do not understand the label, find someone to explain it to you in detail.)  Causes substantial but temporary eye injury. | Skin contact and inhalation. | Roundup Original herbicide is no more than slightly toxic and not more than slightly irritating based on toxicity | Roundup Original herbicide is no more than slightly toxic if inhaled based on toxicity | Roundup Original herbicide is no more than slightly toxic based on toxicity studies.  No | No special precautions are recommended. | Wear appropriate protective clothing to prevent skin contact. | *For Handling of the Undiluted Product:* Undiluted Roundup Original herbicide is not likely to present an airborne exposure concern during normal |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Inert Ingredients | 59 | NG | Harmful if swallowed or inhaled. Reformulation is prohibited. See individual container label for repackaging limitations. | | studies. | studies. | significant adverse health effects are expected to develop if only small amount (less than a mouthful) are swallowed. Ingestion of similar formulations has been reported to produce gastrointestinal discomfort with irritation of the mouth, nausea, vomiting and diarrhea. Oral ingestion of large quantities of one similar product has been reported to result in hypotension and lung edema. | Applicators and other handlers must wear long-sleeved shirt, long pants, shoes plus socks. Follow manufacturer's instructions for cleaning/ maintaining PPE. If no such instructions for washables, use detergent and hot water. Keep and wash PPE separately from other laundry. | handling. In the event of an accidental discharge of the material during manufacture or handling which produces a heavy vapor or mist, workers should use NIOSH/MSHA approved equipment. In work situations where an air purifying respirator is appropriate to be used, use of a full face respirator equipped with purifying elements for protections against organic vapor and dust/mist approved for pesticides is recommended. Use cartridges with MSHA/NIOSH approval number TC-23C or canister with MSHA/NIOSH approval number TC-14G. Full facepiece replaces the need for chemical goggles. Observe respirator use limitations specified by the manufacturers. Respiratory protection programs must comply with 29 CFR 1910.134. *For Application of Product Diluted in accordance with Label Instructions:* |
| | Ethoxylated Tallowamines (component) | NG | 61791-83-6 | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Respirators are not required for applications of use - dilutions of Roundup herbicide. |
| 01/15/1998 | Glyphosate: N-(phosphonomethyl) Glycine as the Isopropylamine Salt | 41 | 1071-83-6 | Patch testing of 50 human volunteers with Roundup Original herbicide at use concentration and 5X use concentration produced no positive reaction following initial application, any of 15 repeated applications in the induction phase, or on subsequent challenge 2 weeks later. Roundup Original herbicide is not considered a primary irritant or a sensitizing agent. | Dermal contact and inhalation. | Prolonged contact may cause dermal irritation. | | Ingestion of Roundup herbicide has been reported to produce gastrointestinal discomfort, nausea, vomiting and diarrhea. | No special precautions are recommended. | In cases in which prolonged or repeated skin contact with Roundup herbicide may occur, long-sleeved shirt, long pants, and chemical protective (e.g. rubber) gloves are recommended. Wash hands and contaminated skin after | Respiratory protection should not be required for normal use and handling. During periods of abnormal exposure to heavy spray or mist, use of NIOSH/MSHA approved equipment for pesticide vapor/mist is recommended. The respirator use limitations specified by NIOSH/MSHA or the manufacturer must be observed. Refer also to CSA Standard Z 94.4-M1982. Selection, Care and Use of Respirators. |
| | Inert Ingredients | 59 | NG | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | handling. Clothing soaked with Roundup Original solution should be promptly removed and laundered before reuse. |
| 07/22/1999 | Glyphosate: N-(phosphonomethyl) Glycine as the Isopropylamine Salt | 41 | 1071-83-6 | Keep out of reach of children.  May cause eye irritation.  Harmful if swallowed.  Avoid contact with eyes or prolonged contact with skin. | Skin contact and inhalation. | This product is no more than slightly irritating based on toxicity studies.  Prolonged contact may cause dermal irritation. | This product is no more than slightly toxic if inhaled based on toxicity studies. | This product is no more than slightly toxic based on toxicity studies.  No significant adverse health effects are expected to develop if only small amount (less than a mouthful) are swallowed.  Ingestion of similar formulations has been reported to produce gastrointestinal discomfort with irritation of the mouth, nausea, vomiting and diarrhea.  Oral ingestion of large | No special precautions are recommended. | In cases in which prolonged or repeated skin contact with Roundup Original herbicide may occur, long-sleeved shirt, long pants, and chemical protective (e.g. rubber) gloves are recommended.  Wash hands and contaminated skin | Respiratory protection should not be required for normal use and handling.  During periods of abnormal exposure to heavy spray or mist, use of NIOSH/MSHA approved equipment for pesticide vapor/mist is recommended.  The respirator use limitations specified by NIOSH/MSHA or the manufacturer must be observed.  Refer also to CSA Standard Z 94.4-M1982.  Selection, Care and Use of Respirators. |
| | Inert Ingredients | 59 | NG | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | quantities of one similar product has been reported to result in hypotension and lung edema. | | after handling. Clothing soaked with Roundup Original solution should be promptly removed and laundered before reuse. | |
| 01/25/2001 | Glyphosate, N-(phosphonomethyl) Glycine, in the form of its Isopropylamine Salt) | 41 | 38641-94-0 | WARNING!  Keep out of reach of children. Causes substantial but temporary eye injury. Harmful if swallowed. | Skin contact and eye contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Ingestion, excessive, Intentional misuse: Respiratory effects: pneumonitis (aspiration). Gastro-intestinal Effects: Nausea/vomiting, diarrhea, | Have eye wash facilities immediately available at locations where eye contact can occur. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Surfactant | 59 | 61791-26-2 | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Water | NG | 7732-18-5 | | | | | abdominal pain, bloody vomiting (haematemesis). Cardiovascular Effects: Abnormal heart rhythm (cardiac dysrhythmia), decreased heart output (myocardial depression). General/Systemic Effects: Disturbances of fluid and electrolyte regulation, abnormally decreased blood volume (hypovolaemia), elevated serum amylase, fluid loss (haemoconcentraton), no cholinesterase inhibition. Laboratory Effects - Blood Chemistry: Elevated serum transaminases, mild acidosis. | | | |
| 02/05/2002 | Isopropylamine Salt of Glyphosate | 41 | 38641-94-0 | OSHA: Product is hazardous. WARNING!  Causes | Skin contact, eye contact, | Not expected to produce significant | Harmful by inhalation. | Harmful if swallowed. Causes | Have eye wash facilities immediately | No special requireme | If airborne exposure is excessive:  Wear respirator.  Full |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **MONSANTO ROUNDUP MSDS'** | | | | | | | | | | | |
| | Inert Ingredients | 59 | NG | substantial but temporary eye injury. Harmful if swallowed. Harmful if inhaled. | inhalation. | adverse effects when recommended use instructions are followed. | | gastrointestin al tract irritation. | available at locations where eye contact can occur. | nt when used as recomme nded. If repeated or prolonged contact: Wear chemical resistant gloves. | facepiece/hood/helm et respirator replaces need for chemical goggles. Respiratory protection programs must comply with all local/regional/nation al regulations. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| 06/26/2003 | Isopropylamine Salt of Glyphosate | 41 | 38641-94-0 | OSHA: Product is hazardous. WARNING! Causes substantial but temporary eye injury. Harmful if swallowed. Harmful if inhaled. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Harmful by inhalation. | Harmful if swallowed. Causes gastrointestin al tract irritation. | Have eye wash facilities immediately available at locations where eye contact can occur. | No special requireme nt when used as recomme nded. If repeated or prolonged contact: Wear chemical resistant gloves. | If airborne exposure is excessive: Wear respirator. Full facepiece/hood/helm et respirator replaces need for chemical goggles. Respiratory protection programs must comply with all local/regional/nation al regulations. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Inert Ingredients | 59 | NG | | | | | | | | |
| 10/18/2006 | Isopropylamine Salt of Glyphosate | 41 | 38641-94-0 | OSHA: Product is hazardous. WARNING! Causes | Skin contact, eye contact, | Not expected to produce significant | Harmful by inhalation. | Harmful if swallowed. Causes | Have eye wash facilities immediately | If repeated or | No special requirement when used as |

**MONSANTO ROUNDUP MSDS'**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Inert Ingredients | 59 | NG | substantial but temporary eye injury. Harmful if swallowed.  Harmful if inhaled. | inhalation. | adverse effects when recommended use instructions are followed. | | gastrointestinal tract irritation. | available at locations where eye contact can occur. | prolonged contact: Wear chemical resistant gloves. | recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| 02/09/2010 | Isopropylamine Salt of Glyphosate | 41 | 38641-94-0 | WARNING!  Causes substantial but temporary eye injury. Harmful if swallowed.  Harmful if inhaled. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Harmful by inhalation. | Harmful if swallowed. Causes gastrointestinal tract irritation. | Have eye wash facilities immediately available at locations where eye contact can occur. | No special requirement when used as recommended.  If repeated or prolonged contact: Wear chemical resistant gloves. | If airborne exposure is excessive:  Wear respirator.  Full facepiece/hood/helmet respirator replaces need for chemical goggles.  Respiratory protection programs must comply with all local/regional/national regulations. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Inert Ingredients | 59 | NG | | | | | | | | |

**ROUNDUP IPCO HERBICIDE**

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 02/05/1998 | Glyphosate: N-(phosphonomethyl) Glycine as the Isopropylamine Salt | 41 | 1071-83-6 | Read the label and attached brochure before using this product. PRECAUTION! Keep out of reach of | Dermal contact and inhalation. | Prolonged contact with IPCO Roundup Herbicide may cause dermal irritation. | | Ingestion of IPCO Roundup Herbicide has been reported to | No special precautions are recommended. | In cases in which prolonged or repeated skin | Respiratory protection should not be required for normal use and handling.  During periods of abnormal |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **MONSANTO ROUNDUP MSDS'** | | | | | | | | | | | |
| | Inert Ingredients | 59 | NG | children. May cause eye irritation. Harmful if swallowed. Patch testing of 50 human volunteers with Roundup Original herbicide at use concentration and 5X use concentration produced no positive reaction following initial application, any of 15 repeated applications in the induction phase, or on subsequent challenge 2 weeks later. Roundup Original herbicide is not considered a primary irritant or a sensitizing agent. | | | | produce gastrointestinal discomfort, nausea, vomiting and diarrhea. | | contact with Roundup Original herbicide may occur, long-sleeved shirt, long pants, and chemical protective (e.g. rubber) gloves are recommended. Wash hands and contaminated skin after handling. Clothing soaked with Roundup Original solution should be promptly removed and laundered before reuse. | exposure to heavy spray or mist, use of NIOSH/MSHA approved equipment for pesticide vapor/mist is recommended. The respirator use limitations specified by NIOSH/MSHA or the manufacturer must be observed. Refer also to CSA Standard Z 94.4-M1982. Selection, Care and Use of Respirators. |
| 08/07/2000 | Glyphosate: N-(phosphonomethyl) Glycine as the Isopropylamine Salt | 41 | 38641-94-0 | Read the label and attached brochure before using this product. Keep out of reach of children. CAUTION! May cause eye irritation. Avoid contact with | Skin contact and inhalation. | IPCO Roundup Transorb Herbicide is not more than slightly toxic and no more than slightly irritation based on toxicity | IPCO Roundup Transorb Herbicide is no more than slightly toxic if inhaled based on toxicity | IPCO Roundup Transorb Herbicide is not more than slightly toxic based on toxicity | No special precautions are recommended. | In cases in which prolonged or repeated skin contact with IPCO | Respiratory protection should not be required for normal use and handling. During periods of abnormal exposure to heavy spray or mist, use of |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
|  | Inert Ingredients | 59 | NG | eyes or clothing. |  | studies. | studies. | studies. No significant adverse health effects are expected to develop if only small amounts (less than a mouthful) are swallowed. Ingestion of similar formulations has been reported to produce gastrointestinal discomfort with irritation of the mouth, nausea, vomiting and diarrhea. Oral ingestion of large quantities of one similar product has been reported to result in hypotention and lung edema. | Roundup Transorb Herbicide may occur, long-sleeved shirt, long pants, and chemical protective (e.g. rubber) gloves are recommended. Wash hands and contaminated skin after handling. Clothing soaked with ICO Roundup Transorb Herbicide solution should be promptly removed and laundered before reuse. | NIOSH/MSHA approved equipment for pesticide vapor/mist is recommended. The respirator use limitations specified by NIOSH/MSHA or the manufacturer must be observed. Refer also to CSA Standard Z 94.4-M1982. Selection, Care and Use of Respirators. |

**ROUNDUP MAX CONTROL 365 CONCENTRATED HERBICIDE**

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 05/15/2014 | Isopropylamine Salt of | 18 | 38641-94-0 | This product is hazardous according | Skin contact, eye | Irritating to skin. | Not expected to produce | Not expected to produce | No special requirement | Wear chemical | No special requirement when |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Glyphosate | | | to OSHA. | contact, inhalation, ingestion. | | significant adverse effects when recommended use instructions are followed. | significant adverse effects when recommended use instructions are followed. | when used as recommended. | resistant gloves. Chemical resistant gloves include those made of waterproof materials such as nitrile, butyl, neoprene, polyvinyl chloride (PVC), natural rubber and/or barrier laminate. If there is significant potential for contact: Wear face shield. Wear chemical resistant clothing/footwear. Applicators and other handlers must wear: Long sleeved shirt, long pants and shoes with | used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| Ammonium Salt of Imazapic | 1.6 | 104098-49-9 | | | | | | | | |
| Diquat Dibromide | 0.73 | 85-00-7 | | | | | | | | |
| Surfactant(s), water and minor formulating ingredients. | 79.67 | | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | socks. Follow manufacturer's instructions for cleaning/ maintaining Personal Protective Equipment. If no such instructions for washables, use detergent and hot water. Keep and wash personal protective equipment separately from other laundry. | |
| 11/04/2015 | Isopropylamine Salt of Glyphosate | 18 | 38641-94-0 | OSHA: Acute toxicity, inhalation - Category 4; STOT RE - Category 2. Harmful if inhaled. May cause damage to eyes or kidney through prolonged or | Skin contact, eye contact, inhalation, ingestion. | Irritating to skin. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions | No special requirement when used as recommended. | Wear chemical resistant gloves. Chemical resistant gloves include | No special requirement when used as recommended. When recommended, consult manufacturer of |
| | Ammonium Salt of Imazapic | 1.6 | 104098-49-9 | | | | | | | | |
| | Diquat Dibromide | 0.73 | 85-00-7 | | | | | | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **MONSANTO ROUNDUP MSDS'** | | | | | | | | |
| | Surfactant(s), water and minor formulating ingredients. | 79.67 | repeated exposure. Do not breathe mist/vapours/spray. Do not eat, drink or smoke when using this product.  Wash thoroughly after handling.  Use only outdoors or in a well-ventilated area.  If inhaled:  Remove person to fresh air and keep comfortable for breathing.  Call a poison center or doctor/physician if you feel unwell. Dispose of contents/container in accordance with local, regional, national and international regulations. | | | | are followed. | those made of waterproof materials such as nitrile, butyl, neoprene, polyvinyl chloride (PVC), natural rubber and/or barrier laminate. If there is significant potential for contact: Wear face shield. Wear chemical resistant clothing/footwear. Applicators and other handlers must wear: Long sleeved shirt, long pants and shoes with socks. Follow manufacturer's instructions for | personal protective equipment for the appropriate type of equipment for a given application. |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | cleaning/ maintaining Personal Protective Equipment.  If no such instructions for washables, use detergent and hot water.  Keep and wash personal protective equipment separately from other laundry. | |

**ROUNDUP MAX ORIGINAL HERBICIDE**

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 06/27/2003 | Potassium Salt of Glyphosate | 49 | 70901-12-1 | OSHA: Hazardous. CAUTION! Causes moderate eye irritation. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | Wear chemical resistant gloves. If there is significant potential for contact: Wear face shield. Wear chemical resistant clothing/ footwear. Applicators and other handlers must wear: Wear long sleeved shirt, long pant and shoes with socks. Follow manufacturer's instructions for cleaning/ maintaining Personal Protective Equipment. If no such instructions for washables, use | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 51 | NG | | | | | | | | |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | detergent and hot water. |
| 08/26/2005 | Potassium Salt of Glyphosate | 49 | 70901-12-1 | OSHA: Hazardous. CAUTION! Causes moderate eye irritation. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions | Not expected to produce significant adverse effects when recommended use instructions | None Given | No special requirement when used as recommended. | Wear chemical resistant gloves. If there is significant potential for | No special requirement when used as recommended. When recommended, consult manufacturer of |

**MONSANTO ROUNDUP MSDS'**

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Other Ingredients | 51 | NG | | | are followed. | are followed. | | | contact: Wear face shield. Wear chemical resistant clothing/ footwear. Applicators and other handlers must wear: Wear long sleeved shirt, long pant and shoes with socks. Follow manufacturer's instructions for cleaning/ maintaining Personal Protective Equipment. If no such instructions for washables, use detergent and hot water. | personal protective equipment for the appropriate type of equipment for a given application. |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/18/2006 | Potassium Salt of Glyphosate | 49 | 70901-12-1 | OSHA: Hazardous. CAUTION! Causes moderate eye irritation. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | Wear chemical resistant gloves. If there is significant potential for contact: Wear face shield. Wear chemical resistant clothing/ footwear. Applicators and other handlers must wear: Wear long sleeved shirt, long pant and shoes with socks. Follow manufacturer's instructions for cleaning/ maintaining Personal Protective Equipment. If no such instructions for washables, use | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 51 | NG | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | detergent and hot water. | |

**ROUNDUP NON-SELECTIVE HERBICIDE CONCENTRATE**

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 08/26/2010 | Isopropylamine Salt of Glyphosate | 18 | 38641-94-0 | CAUTION! Causes eye irritation. Harmful if swallowed. | Skin contact and inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Harmful if swallowed. | No special requirement when used as recommended. | No special requirement when used as recommended. If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 82 | NG | | | | | | | | |
| 07/29/2013 | Isopropylamine Salt of Glyphosate | 18 | 38641-94-0 | CAUTION! Eye Irritant Harmful if swallowed. | Skin contact and inhalation. | Not expected to produce significant | Not expected to produce significant | Harmful if swallowed. | No special requirement when used as | No special requireme | No special requirement when used as |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Surfactant | ≤7 | NG | | | adverse effects when recommended use instructions are followed. | adverse effects when recommended use instructions are followed. | | recommended. | nt when used as recomme nded. If repeated or prolonged contact: Wear chemical resistant gloves. | recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Water and minor formulating ingredients. | 75 | NG | | | | | | | | |
| 04/07/2017 | Isopropylamine Salt of Glyphosate | 18 | 38641-94-0 | CAUTION!  Eye Irritant  Harmful if swallowed. | Skin contact and inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Harmful if swallowed. | No special requirement when used as recommended. | No special requireme nt when used as recomme nded.  If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Surfactant | ≤7 | NG | | | | | | | | |
| | Water and minor formulating ingredients. | 75 | NG | | | | | | | | |

| ROUNDUP POISON IVY BRUSH CONTROL NON-SELECT READY TO USE PULL 'N SPRAY | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **DATE** | **COMPONENT** | **WGT %** | **CAS #** | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
| | | | | **HAZARDS / CARCINOGENICITY** | **ROUTE(S)** | **SKIN** | **INHALATION** | **INGESTION** | **ENGINEERING** | **SKIN** | **RESPIRATORY** |
| 06/18/2015 | Isopropylamine Salt of Glyphosate | 1.92 | 38641-94-0 | CAUTION!  Eye Irritant  Harmful if swallowed. | Skin contact, eye contact, inhalation, ingestion. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Harmful if swallowed. | No special requirement when used as recommended. | No special requireme nt when used as recomme nded.  If repeated or prolonged contact: Wear chemical resistant | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Pelargonic and related fatty acids | 2 | 112-05-0 | | | | | | | | |
| | Other Ingredients | 96.08 | NG | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | gloves. | |

**ROUNDUP POISON IVY PLUS TOUGH BRUSH KILLER**

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 10/16/2009 | Isopropylamine Salt of Glyphosate | 18 | 38641-94-0 | CAUTION!  Causes moderate eye irritation. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | Provide adequate ventilation to keep airborne concentration below exposure limits. | No special requireme nt when used as recomme nded. | If airborne exposure is excessive: Wear respirator.  Full facepiece/ hood/ helmet respirator replaces need for chemical goggles. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Triethylamine Salt of Triclopyr | 2 | 57213-69-1 | | | | | | | | |
| | Other Ingredients | 80 | | | | | | | | | |

**ROUNDUP POISON IVY & TOUGH BRUSH KILLER 1**

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 07/25/2002 | Isopropylamine Salt of Glyphosate | 27 | 38641-94-0 | CAUTION!  Causes eye irritation. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 73 | NG | | | | | | | | |

**ROUNDUP POISON IVY & TOUGH BRUSH KILLER 2**

| DATE | COMPONENT | WGT | CAS # | HAZARDS / HEALTH EFFECTS | CONTROL / PPE |
|---|---|---|---|---|---|

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | **%** | | **HAZARDS / CARCINOGENICITY** | **ROUTE(S)** | **SKIN** | **INHALATION** | **INGESTION** | **ENGINEERING** | **SKIN** | **RESPIRATORY** |
| 09/16/2002 | Isopropylamine Salt of Glyphosate | 2 | 38641-94-0 | CAUTION! Causes moderate eye irritation. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | No special requireme nt when used as recomme nded. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 98 | NG | | | | | | | | |

**ROUNDUP POISON IVY & TOUGH BRUSH KILLER 3**

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | **HAZARDS / CARCINOGENICITY** | **ROUTE(S)** | **SKIN** | **INHALATION** | **INGESTION** | **ENGINEERING** | **SKIN** | **RESPIRATORY** |
| 07/22/2002 | Isopropylamine Salt of Glyphosate | 1.92 | 38641-94-0 | CAUTION! Causes eye irritation. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 98.08 | NG | | | | | | | | |

**ROUNDUP POISON IVY & TOUGH BRUSH KILLER PLUS (Wand Applicator & Wand Applicator Refill)**

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | **HAZARDS / CARCINOGENICITY** | **ROUTE(S)** | **SKIN** | **INHALATION** | **INGESTION** | **ENGINEERING** | **SKIN** | **RESPIRATORY** |
| 05/17/2003 | Isopropylamine Salt of Glyphosate | 1 | 38641-94-0 | CAUTION! | Skin contact, eye contact, | Not expected to produce significant | Not expected to produce significant | None Given | No special requirement when used as | None Given | No special requirement when used as |

| | | | | MONSANTO ROUNDUP MSDS' | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Triethylamine Salt of Triclopyr | 0.1 | 57213-69-1 | | inhalation. | adverse effects when recommended use instructions are followed. | adverse effects when recommended use instructions are followed. | | recommended. | | recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 98.9 | | | | | | | | | |
| 10/16/2015 | Isopropylamine Salt of Glyphosate | 1.92 | 38641-94-0 | CAUTION!  Eye irritant.  Harmful if swallowed. | Skin contact, eye contact, inhalation, ingestion. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Harmful if swallowed. | No special requirement when used as recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Pelargonic and related fatty acids | 2 | 112-05-0 | | | | | | | | |
| | Other Ingredients | 96.08 | | | | | | | | | |

| ROUNDUP POWERMAX II HERBICIDE | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 09/11/2014 | Potassium Salt of Glyphosate | 48.8 | 70901-12-1 | OSHA:  Hazardous. CAUTION!  Causes moderate eye irritation.  Harmful if inhaled. | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions | Harmful by inhalation. | None Given | Provide local exhaust ventilation. | Wear chemical resistant gloves. Chemical resistant gloves include | If airborne exposure is excessive:  Wear full facepiece/ hood/ helmet respirator. Respiratory protection programs must comply with all local/ regional/ |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Surfactant(s), water and minor formulating ingredients. | 51.2 | NG | | | are followed. | | | | those made of waterproof materials such as nitrile, butyl, neoprene, polyvinyl chloride (PVC), natural rubber and/or barrier laminate. If there is significant potential for contact: Wear face shield. Wear chemical resistant clothing/foot wear. Applicators and other handlers must wear: Wear long sleeved shirt, long pants and shoes with socks. Follow manufacturer's instructio | national regulations. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | ns for cleaning/ maintaini ng Personal Protective equipmen t.  If no such instructio ns for washable s, use detergent and hot water. Keep and wash personal protective equipmen t separatel y from other laundry. | |
| 05/29/2015 | Potassium Salt of Glyphosate | 48.8 | 70901-12-1 | OSHA:  Hazardous. WARNING! Harmful if inhaled.  Avoid breathing mist, vapours or spray. Use only outdoors or in a well-ventilated area.  IF INHALED: | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions | Harmful by inhalation. | None Given | Provide local exhaust ventilation. | Wear chemical resistant gloves. Chemical resistant gloves include | If airborne exposure is excessive:  Wear full facepiece/ hood/ helmet respirator. Respiratory protection programs must comply with all local/ regional/ |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **MONSANTO ROUNDUP MSDS'** | | | | | | | | | | |
| | Surfactant(s), water and minor formulating ingredients. | 51.2 | NG | Remove person to fresh air and keep comfortable for breathing. Call a POISON CENTER or doctor/ physician if you feel unwell. | | are followed. | | | | those made of waterproof materials such as nitrile, butyl, neoprene, polyvinyl chloride (PVC), natural rubber and/or barrier laminate. If there is significant potential for contact: Wear face shield. Wear chemical resistant clothing/foot wear. Applicators and other handlers must wear: Wear long sleeved shirt, long pants and shoes with socks. Follow manufacturer's instructio | national regulations. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **MONSANTO ROUNDUP MSDS'** | | | | | | | | | | | |
| | | | | | | | | | | ns for cleaning/ maintaini ng Personal Protective equipmen t. If no such instructio ns for washable s, use detergent and hot water. Keep and wash personal protective equipmen t separatel y from other laundry. | |
| 10/19/2015 | Potassium Salt of Glyphosate | 48.8 | 70901-12-1 | OSHA: Hazardous. WARNING! Harmful if inhaled. Avoid breathing mist, vapours or spray. Use only outdoors or in a well-ventilated area. IF INHALED: | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions | Harmful by inhalation. | None Given | Provide local exhaust ventilation. | Wear chemical resistant gloves. Chemical resistant gloves include | If airborne exposure is excessive: Wear full facepiece/ hood/ helmet respirator. Respiratory protection programs must comply with all local/ regional/ |

| | MONSANTO ROUNDUP MSDS' | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Surfactant(s), water and minor formulating ingredients. | 51.2 | NG | Remove person to fresh air and keep comfortable for breathing.  Call a POISON CENTER or doctor/ physician if you feel unwell. | | are followed. | | | | | those made of waterproof materials such as nitrile, butyl, neoprene, polyvinyl chloride (PVC), natural rubber and/or barrier laminate. If there is significant potential for contact: Wear face shield. Wear chemical resistant clothing/f oot wear. Applicator s and other handlers must wear: Wear long sleeved shirt, long pants and shoes with socks. Follow manufact urer's instructio | national regulations. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | ns for cleaning/ maintaini ng Personal Protective equipmen t. If no such instructio ns for washable s, use detergent and hot water. Keep and wash personal protective equipmen t separatel y from other laundry. | |

| ROUNDUP PRO HERBICIDE | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
| DATE | COMPONENT | WGT % | CAS # | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 08/01/1995 | Glyphosate, N-(phosphonomethyl) Glycine, in the form of its Isopropylamine Salt) | 41 | 38641-94-0 | OSHA:  Not hazardous.  CAUTION! Harmful if inhaled.  Causes eye irritation.  Reformulation if prohibited.  See individual container label for repackaging limitations. | Skin contact and inhalation. | Roundup Pro herbicide is no more than slightly toxic and no more than slightly irritating based on toxicity studies. | Roundup PRO herbicide is no more than slightly toxic based on toxicity studies. | Roundup PRO herbicide is not more than slightly toxic based on toxicity studies.  No significant adverse health effects are expected to develop if only small amounts (less than a mouthful) are swallowed.  Ingestion of similar formulations has been reported to produce gastrointestinal discomfort with irritation of the mouth, nausea, vomiting and diarrhea.  Oral ingestion of large quantities of one similar product has been reported to result in hypotention and lung edema. | No special precautions are recommended. | Wear appropriate protective clothing to prevent skin contact.  Applicators and other handlers must wear long-sleeved shirt, long pants, shoes plus socks.  Follow manufacturer's instructions for cleaning/ maintaining PPE.  If no such instructions for washables, use detergent and hot water.  Keep and wash PPE separately from other laundry. | For Handling of the Undiluted Product:  Undiluted Roundup Original herbicide is not likely to present an airborne exposure concern during normal handling.  In the event of an accidental discharge of the material during manufacture or handling which produces a heavy vapor or mist, workers should use NIOSH/MSHA approved equipment.  In work situations where an air purifying respirator is appropriate to be used, use of a full face respirator equipped with purifying elements for protections against organic vapor and dust/mist approved for pesticides is recommended.  Use cartridges with MSHA/NIOSH approval number TC-23C or canister with MSHA/NIOSH approval number TC-14G.  Full facepiece replaces the need for chemical goggles.  Observe respirator use limitations specified by the manufacturers. |
| | Inert Ingredients (Including surfactant) | 59 | NG | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Respiratory protection programs must comply with 29 CFR 1910.134.  For Application of Product Diluted in accordance with Label Instructions: Respirators are not required for applications of use - dilutions of Roundup herbicide. |
| 02/12/1999 | Glyphosate, N-(phosphonomethyl) Glycine, in the form of its Isopropylamine Salt) | 41 | 38641-94-0 | Keep out of reach of children.  CAUTION!  Causes eye irritation.  Avoid contact with eyes or clothing. | Skin contact and inhalation. | Roundup Pro herbicide is no more than slightly toxic and no more than slightly irritating based | Roundup PRO herbicide is no more than slightly toxic based on toxicity studies. | Roundup PRO herbicide is not more than slightly toxic based on | No special precautions are recommended. | Wear appropriate protective clothing to prevent | For Handling of the Undiluted Product: Undiluted Roundup Original herbicide is not likely to present an airborne |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **MONSANTO ROUNDUP MSDS'** | | | | | | | | |
| | Inert Ingredients | 59 | NG - Trade secret. | | | on toxicity studies. | | toxicity studies.  No significant adverse health effects are expected to develop if only small amounts (less than a mouthful) are swallowed.  Ingestion of similar formulations has been reported to produce gastrointestin al discomfort with irritation of the mouth, nausea, vomiting and diarrhea.  Oral ingestion of large quantities of one similar product has been reported to result in hypotention and lung edema. | | skin contact.  Applicator s and other handlers must wear long-sleeved shirt, long pants, shoes plus socks.  Follow manufact urer's instructio ns for cleaning/ maintaini ng PPE.  If no such instructio ns for washable s, use detergent and hot water.  Keep and wash PPE separatel y from other laundry. | exposure concern during normal handling.  In the event of an accidental discharge of the material during manufacture or handling which produces a heavy vapor or mist, workers should use NIOSH/MSHA approved equipment.  In work situations where an air purifying respirator is appropriate to be used, use of a full face respirator equipped with purifying elements for protections against organic vapor and dust/mist approved for pesticides is recommended.  Use cartridges with MSHA/NIOSH approval number TC-23C or canister with MSHA/NIOSH approval number TC-14G.  Full facepiece replaces the need for chemical goggles.  Observe respirator use limitations specified by the manufacturers.  Respiratory protection programs must comply with 29 CFR 1910.134.  For Application of Product Diluted in |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | accordance with Label Instructions: Respirators are not required for applications of use - dilutions of Roundup herbicide. |
| 04/22/2000 | Glyphosate, N-(phosphonomethyl) Glycine, in the form of its Isopropylamine Salt) | 41 | 38641-94-0 | Keep out of reach of children.  CAUTION! Causes eye irritation. Avoid contact with eyes or clothing. | Skin contact and inhalation. | Roundup Pro herbicide is no more than slightly toxic and no more than slightly irritating based | Roundup PRO herbicide is no more than slightly toxic based on toxicity studies. | Roundup PRO herbicide is not more than slightly toxic based on | No special precautions are recommended. | Wear appropriate protective clothing to prevent | For Handling of the Undiluted Product: Undiluted Roundup Original herbicide is not likely to present an airborne |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Inert Ingredients | 59 | NG - Trade secret. | | | on toxicity studies. | | toxicity studies. No significant adverse health effects are expected to develop if only small amounts (less than a mouthful) are swallowed. Ingestion of similar formulations has been reported to produce gastrointestinal discomfort with irritation of the mouth, nausea, vomiting and diarrhea. Oral ingestion of large quantities of one similar product has been reported to result in hypotention and lung edema. | | skin contact. Applicators and other handlers must wear long-sleeved shirt, long pants, shoes plus socks. Follow manufacturer's instructions for cleaning/ maintaining PPE. If no such instructions for washables, use detergent and hot water. Keep and wash PPE separately from other laundry. | exposure concern during normal handling. In the event of an accidental discharge of the material during manufacture or handling which produces a heavy vapor or mist, workers should use NIOSH/MSHA approved equipment. In work situations where an air purifying respirator is appropriate to be used, use of a full face respirator equipped with purifying elements for protections against organic vapor and dust/mist approved for pesticides is recommended. Use cartridges with MSHA/NIOSH approval number TC-23C or canister with MSHA/NIOSH approval number TC-14G. Full facepiece replaces the need for chemical goggles. Observe respirator use limitations specified by the manufacturers. Respiratory protection programs must comply with 29 CFR 1910.134. For Application of Product Diluted in |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | accordance with Label Instructions: Respirators are not required for applications of use - dilutions of Roundup herbicide. |
| 07/16/2001 | Glyphosate, N-(phosphonomethyl) Glycine, in the form of its Isopropylamine Salt) | 41 | 38641-94-0 | Keep out of reach of children.  CAUTION! Causes eye irritation. Avoid contact with eyes or clothing. | Skin contact and inhalation. | Roundup Pro herbicide is no more than slightly toxic and no more than slightly irritating based | Roundup PRO herbicide is no more than slightly toxic based on toxicity studies. | Roundup PRO herbicide is not more than slightly toxic based on | No special precautions are recommended. | Wear appropriate protective clothing to prevent | For Handling of the Undiluted Product: Undiluted Roundup Original herbicide is not likely to present an airborne |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | **MONSANTO ROUNDUP MSDS'** | | | | |
| | Inert Ingredients | 59 | NG - Trade secret. | | | on toxicity studies. | | toxicity studies. No significant adverse health effects are expected to develop if only small amounts (less than a mouthful) are swallowed. Ingestion of similar formulations has been reported to produce gastrointestinal discomfort with irritation of the mouth, nausea, vomiting and diarrhea. Oral ingestion of large quantities of one similar product has been reported to result in hypotention and lung edema. | | skin contact. Applicators and other handlers must wear long-sleeved shirt, long pants, shoes plus socks. Follow manufacturer's instructions for cleaning/ maintaining PPE. If no such instructions for washables, use detergent and hot water. Keep and wash PPE separately from other laundry. | exposure concern during normal handling. In the event of an accidental discharge of the material during manufacture or handling which produces a heavy vapor or mist, workers should use NIOSH/MSHA approved equipment. In work situations where an air purifying respirator is appropriate to be used, use of a full face respirator equipped with purifying elements for protections against organic vapor and dust/mist approved for pesticides is recommended. Use cartridges with MSHA/NIOSH approval number TC-23C or canister with MSHA/NIOSH approval number TC-14G. Full facepiece replaces the need for chemical goggles. Observe respirator use limitations specified by the manufacturers. Respiratory protection programs must comply with 29 CFR 1910.134. For Application of Product Diluted in |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | accordance with Label Instructions: Respirators are not required for applications of use - dilutions of Roundup herbicide. |
| 07/25/2001 | Isopropylamine Salt of Glyphosate | 41 | 38641-94-0 | CAUTION!  Causes eye irritation. | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Surfactant | 14.5 | NG | | | | | | | | |
| | Water and minor formulating ingredients | 44.5 | NG | | | | | | | | |
| 04/21/2005 | Isopropylamine Salt of Glyphosate | 41 | 38641-94-0 | OSHA:  Hazardous CAUTION!  Causes eye irritation. | Skin contact, eye contact. | Not expected to produce significant | Not expected to produce significant | None Given | No special requirement when used as | If repeated or | No special requirement when used as |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Other Ingredients | 59 | NG | | | adverse effects when recommended use instructions are followed. | adverse effects when recommended use instructions are followed. | | recommended. | prolonged contact: Wear chemical resistant gloves. | recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| 02/11/2011 | Isopropylamine Salt of Glyphosate | 41 | 38641-94-0 | OSHA: Hazardous CAUTION! Causes eye irritation. | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | No special requirement when used as recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. Applicators and other handlers must wear: Wear long sleeved shirt, long pants and shoes with socks. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 59 | NG | | | | | | | | |
| 05/08/2015 | Isopropylamine Salt of Glyphosate | 41 | 38641-94-0 | OSHA: Hazardous WARNING! Harmful if inhaled. Avoid | Skin contact, eye contact. | Not expected to produce significant | Not expected to produce significant | Not expected to produce significant | Provide local exhaust ventilation. | If repeated or | No special requirement when used as |

| | | | | **MONSANTO ROUNDUP MSDS'** | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Other Ingredients | 59 | NG | breathing mist, vapours or spray. Use only outdoors or in a well-ventilated area.  If inhaled: Remove person to fresh air and keep comfortable for breathing.  Call a poison center or doctor/ physical if you feel unwell. | | adverse effects when recommended use instructions are followed. | adverse effects when recommended use instructions are followed. | adverse effects when recommended use instructions are followed. | | prolonged contact: Wear chemical resistant gloves. Applicators and other handlers must wear: Wear long sleeved shirt, long pants and shoes with socks. | recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| 10/19/2015 | Isopropylamine Salt of Glyphosate | 41 | 38641-94-0 | OSHA:  Hazardous WARNING! Harmful if inhaled.  Avoid breathing mist, vapours or spray. Use only outdoors or in a well-ventilated area.  If inhaled: Remove person to fresh air and keep comfortable for breathing.  Call a poison center or doctor/ physical if you feel unwell. | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Provide local exhaust ventilation. | If repeated or prolonged contact: Wear chemical resistant gloves. Applicators and other handlers must wear: Wear long sleeved shirt, long pants and shoes with socks. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 59 | NG | | | | | | | | |

| **ROUNDUP PRO CONCENTRATE HERBICIDE** | | | | | | | |
|---|---|---|---|---|---|---|---|
| **DATE** | **COMPONENT** | **WGT** | **CAS #** | **HAZARDS / HEALTH EFFECTS** | | **CONTROL / PPE** | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | **%** | | **HAZARDS / CARCINOGENICITY** | **ROUTE(S)** | **SKIN** | **INHALATION** | **INGESTION** | **ENGINEERING** | **SKIN** | **RESPIRATORY** |
| 10/09/2001 | Isopropylamine Salt of Glyphosate | 50.2 | 38641-94-0 | OSHA: Hazardous CAUTION! Causes moderate eye irritation. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 49.8 | NG | | | | | | | | |
| 10/18/2006 | Isopropylamine Salt of Glyphosate | 50.2 | 38641-94-0 | OSHA: Hazardous CAUTION! Causes moderate eye irritation. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 49.8 | NG | | | | | | | | |
| 06/29/2011 | Isopropylamine Salt of Glyphosate | 50.2 | 38641-94-0 | OSHA: Hazardous CAUTION! Causes moderate eye irritation. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | No special requirement when used as recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. Applicators and other handlers must wear: Wear long sleeved | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Surfactant | 13 | 61791-26-2 | | | | | | | | |
| | Other Ingredients | 36.8 | NG | | | | | | | | |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **MONSANTO ROUNDUP MSDS'** | | | | | | | | | | | |
| | | | | | | | | | | | shirt, long pants and shoes with socks. |
| 05/29/2015 | Isopropylamine Salt of Glyphosate | 50.2 | 38641-94-0 | OSHA:  Hazardous | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | No special requirement when used as recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. Applicators and other handlers must wear: Wear long sleeved shirt, long pants and shoes with socks. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Ethoxylated Tallowamine | 13 | 61791-26-2 | | | | | | | | |
| | Other Ingredients | 36.8 | NG | | | | | | | | |
| 10/19/2015 | Isopropylamine Salt of Glyphosate | 50.2 | 38641-94-0 | OSHA:  Hazardous | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | No special requirement when used as recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. Applicators and other handlers must wear: Wear long | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Ethoxylated Tallowamine | 13 | 61791-26-2 | | | | | | | | |
| | Other Ingredients | 36.8 | NG | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | sleeved shirt, long pants and shoes with socks. |

| ROUNDUP PRODRY HERBICIDE | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 04/06/1999 | Glyphosate, N-(phosphonomethyl) Glycine, in the form of its Isopropylamine Salt) | 71 | 11437 0-14-8 | OSHA: Hazardous CAUTION. Harmful if swallowed. Causes moderate eye irritation. Avoid contact with eyes or clothing. | Inhalation, eye and skin contact. | This material is practically nontoxic and slightly irritating based on toxicity studies. | This material is practically nontoxic if inhaled based on toxicity studies. | Slightly toxic based on toxicity studies. | Provide ventilation to minimize exposure. The use of local mechanical exhaust ventilation at sources of air contamination such as open process equipment is recommended. | Although this material does not present a significant skin concern, minimize skin contamination by following good industrial practice. Wearing protective gloves is recommended. Wash hands and contaminated skin thoroughly after handling. | Avoid breathing dust. Use NIOSH equipment approved for vapor/ mist/ dust when airborne exposure is excessive. Consult respirator manufacturer to determine appropriate type of equipment for given application. The respirator use limitations specified by NIOSH or the manufacturer must be observed. Respiratory protection programs must be in compliance with 29 CFR 1910.134. |
| | Surfactant/ Antifoam | 25 | NG | | | | | | | | |
| | Other Inerts | 4 | NG | | | | | | | | |
| 07/30/2001 | Ammonium Salt of Glyphosate | 71.4 | 11437 0-14-8 | OSHA: Hazardous CAUTION. Harmful if swallowed. | Skin contact, eye contact, | Not expected to produce significant | Not expected to produce significant | Harmful if swallowed. | No special requirement when used as | If repeated or | No special requirement when used as |

| | | | | MONSANTO ROUNDUP MSDS' | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Surfactant and miner formulating ingredients | 28.6 | NG | Causes moderate eye irritation. | inhalation. | adverse effects when recommended use instructions are followed. | adverse effects when recommended use instructions are followed. | | recommended. | prolonged contact: Wear chemical resistant gloves. | recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Sodium Sulphite | ≤0.5 | 7757-83-7 | | | | | | | | |
| 10/18/2006 | Ammonium Salt of Glyphosate | 71.4 | 11437 0-14-8 | OSHA: Hazardous CAUTION! Causes moderate eye irritation. Harmful if swallowed. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Harmful if swallowed. | No special requirement when used as recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Surfactant and miner formulating ingredients | 28.6 | NG | | | | | | | | |
| | Sodium Sulphite | ≥0-≤0.5 | 7757-83-7 | | | | | | | | |
| 09/25/2007 | Ammonium Salt of Glyphosate | 71.4 | 11437 0-14-8 | OSHA: Hazardous CAUTION! Causes moderate eye irritation. Harmful if swallowed. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Harmful if swallowed. | No special requirement when used as recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Surfactant and miner formulating ingredients | 28.6 | NG | | | | | | | | |
| | Sodium Sulphite | ≥0-≤0.5 | 7757-83-7 | | | | | | | | |

**ROUNDUP PROMAX HERBICIDE**

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 01/23/2008 | Potassium Salt of Glyphosate | 48.7 | 70901-12-1 | OSHA: Hazardous. CAUTION! Causes moderate eye irritation. | Skin contact, eye contact, inhalation, ingestion. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | No special requirement when used as recommended. | Wear chemical resistant gloves. If there is significant potential for contact: Wear face shield. Wear chemical resistant clothing/ footwear. Applicators and other handlers must wear: Wear long sleeved shirt, long pant and shoes with socks. Follow manufacturer's instructions for cleaning/ maintaining Personal Protective Equipment. If no such instructions for washables, use | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 51.3 | NG | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | detergent and hot water. |
| 07/24/2013 | Potassium Salt of Glyphosate | 48.7 | 70901-12-1 | CAUTION! Causes eye irritation. | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions | Not expected to produce significant adverse effects when recommended use instructions | None Given | No special requirement when used as recommended. | No special requirement when used as recommended. If | No special requirement when used as recommended. When recommended, consult |
| | Surfactant | ≤9 | 68478-96-6 | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Water and minor formulating ingredients | ≤42 | NG | | | are followed. | are followed. | | | repeated or prolonged contact: Wear chemical resistant gloves. Applicators and other handlers must wear: Wear long sleeved shirt, long pants and shoes with socks. Follow manufacturer's instructions for cleaning/ maintaining Personal Protective Equipment. If no such instructions for washables, use detergent and hot water. | manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| 05/29/2015 | Potassium Salt of Glyphosate | 48.7 | 70901-12-1 | OSHA: Hazardous WARNING!  Harmful if inhaled.  Avoid | Skin contact, eye contact, | Not expected to produce significant | Not expected to produce significant | Not expected to produce significant | Provide local exhaust ventilation. | No special requireme | No special requirement when used as |

| | | | | MONSANTO ROUNDUP MSDS' | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Surfactant | ≤9 | NG | breathing dust/ fume/ gas/ mist/ vapours/ spray. Use only outdoors or in a well-ventilated area. If inhaled:  Remove person to fresh air and keep comfortable for breathing.  Call a poison center or doctor/ physician if you feel unwell. | inhalation, ingestion. | adverse effects when recommended use instructions are followed. | adverse effects when recommended use instructions are followed. | adverse effects when recommended use instructions are followed. | | nt when used as recommended.  If repeated or prolonged contact:  Wear chemical resistant gloves.  Applicators and other handlers must wear:  Wear long sleeved shirt, long pants and shoes with socks.  Follow manufacturer's instructions for cleaning/ maintaining Personal Protective Equipment.  If no such instructions for washables, use detergent and hot water. | recommended.  When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Water and minor formulating ingredients | ≤42 | NG | | | | | | | | |

| | | | | MONSANTO ROUNDUP MSDS' | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/15/2015 | Potassium Salt of Glyphosate | 48.7 | 70901-12-1 | OSHA: Hazardous WARNING! Harmful if inhaled. Avoid breathing dust/ fume/ gas/ mist/ vapours/ spray. Use only outdoors or in a well-ventilated area. If inhaled: Remove person to fresh air and keep comfortable for breathing. Call a poison center or doctor/ physician if you feel unwell. | Skin contact, eye contact, inhalation, ingestion. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Provide local exhaust ventilation. | No special requirement when used as recommended. If repeated or prolonged contact: Wear chemical resistant gloves. Applicators and other handlers must wear: Wear long sleeved shirt, long pants and shoes with socks. Follow manufacturer's instructions for cleaning/ maintaining Personal Protective Equipment. If no such instructions for washables, use detergent and hot | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Surfactant | ≤9 | NG | | | | | | | | |
| | Water and minor formulating ingredients | ≤42 | NG | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | water. | |

**ROUNDUP PULL'n SPRAY**

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 07/16/2002 | Isopropylamine Salt of Glyphosate | 0.96 | 38641-94-0 | NG | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | No special requirement when used as recommended. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Water and minor formulating ingredients | 99.04 | NG | | | | | | | | |

**ROUNDUP PUMP 'N GO**

| DATE | COMPONENT | WGT | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | **%** | | **HAZARDS / CARCINOGENICITY** | **ROUTE(S)** | **SKIN** | **INHALATION** | **INGESTION** | **ENGINEERING** | **SKIN** | **RESPIRATORY** |
| 11/04/2008 | Isopropylamine Salt of Glyphosate | 0.96 | 38641-94-0 | NG | Eye contact. Skin contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Harmful if swallowed. | No special requirement when used as recommended. | No special requirement when used as recommended. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Water and minor formulating ingredients | 99.04 | NG | | | | | | | | |
| 10/21/2011 | Isopropylamine Salt of Glyphosate | 0.96 | 38641-94-0 | NG | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Harmful if swallowed. | No special requirement when used as recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Water and minor formulating ingredients | 99.04 | NG | | | | | | | | |
| 07/29/2013 | Isopropylamine Salt of Glyphosate | 0.96 | 38641-94-0 | NG | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Harmful if swallowed. | No special requirement when used as recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Water and minor formulating ingredients | 99.04 | NG | | | | | | | | |
| 01/24/2014 | Isopropylamine Salt of Glyphosate | 0.96 | 38641-94-0 | NG | Skin contact, eye contact. | Not expected to produce significant | Not expected to produce significant | Harmful if swallowed. | No special requirement when used as | If repeated or | No special requirement when used as |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Water and minor formulating ingredients | 99.04 | NG | | | adverse effects when recommended use instructions are followed. | adverse effects when recommended use instructions are followed. | | recommended. | prolonged contact: Wear chemical resistant gloves. | recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| 01/20/2017 | Isopropylamine Salt of Glyphosate | 0.96 | 38641-94-0 | NG | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Harmful if swallowed. | No special requirement when used as recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for a given application. |
| | Water and minor formulating ingredients | 99.04 | NG | | | | | | | | |

| ROUNDUP QUIKPRO HERBICIDE | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 01/16/2004 | Ammonium Salt of Glyphosate | 73.3 | 114370-14-8 | OSHA: Hazardous CAUTION. Harmful if swallowed. Causes moderate eye irritation. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Harmful by inhalation. | Harmful if swallowed. | Provide local exhaust ventilation. | No special requirement when used as recommended. If repeated or prolonged contact: Wear chemical resistant gloves. | If airborne exposure is excessive: Wear respirator. Full facepiece/ hood/ helmet respirator replaces need for chemical goggles. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Diquat Dibromide | 2.9 | 85-00-7 | | | | | | | | |
| | Other Ingredients | 23.8 | NG | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/18/2006 | Ammonium Salt of Glyphosate | 73.3 | 11437 0-14-8 | OSHA: Hazardous CAUTION. Harmful if swallowed. Harmful if inhaled. Causes moderate eye irritation. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Harmful by inhalation. | Harmful if swallowed. | Provide local exhaust ventilation. | No special requirement when used as recommended. If repeated or prolonged contact: Wear chemical resistant gloves. | If airborne exposure is excessive: Wear respirator. Full facepiece/ hood/ helmet respirator replaces need for chemical goggles. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Diquat Dibromide | 2.9 | 85-00-7 | | | | | | | | |
| | Other Ingredients | 23.8 | NG | | | | | | | | |
| 07/02/2010 | Ammonium Salt of Glyphosate | 73.3 | 11437 0-14-8 | OSHA: Hazardous CAUTION. Harmful if swallowed. Harmful if inhaled. Causes moderate eye irritation. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Harmful by inhalation. | Harmful if swallowed. | Provide local exhaust ventilation. | No special requirement when used as recommended. If repeated or prolonged contact: Wear chemical resistant gloves. | If airborne exposure is excessive: Wear respirator. Full facepiece/ hood/ helmet respirator replaces need for chemical goggles. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Diquat Dibromide | 2.9 | 85-00-7 | | | | | | | | |
| | Other Ingredients | 23.8 | NG | | | | | | | | |
| 02/23/2011 | Ammonium Salt of Glyphosate | 73.3 | 11437 0-14-8 | OSHA: Hazardous CAUTION. Harmful if swallowed. Harmful if inhaled. Causes moderate eye irritation. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Harmful by inhalation. | Harmful if swallowed. | Provide local exhaust ventilation. | No special requirement when used as recommended. If repeated or prolonged contact: Wear chemical resistant gloves. | If airborne exposure is excessive: Wear respirator. Full facepiece/ hood/ helmet respirator replaces need for chemical goggles. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a |
| | Diquat Dibromide | 2.9 | 85-00-7 | | | | | | | | |
| | Other Ingredients | 23.8 | NG | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | given application. |
| 05/29/2015 | Ammonium Salt of Glyphosate | 73.3 | 11437 0-14-8 | OSHA:  Hazardous DANGER!  Causes damage to kidney, liver, adrenal, ovary, thyroid, or blood through prolonged or repeated exposure.  Do not breathe dust/ fume/ gas/ mist/ vapours/ spray.  Wash thoroughly after handling.  Do not eat, drink or smoke when using this product.  Get medical advice/ attention if you feel unwell.  Dispose of contents/ container in accordance with local, regional, national and international regulations. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Harmful by inhalation. | Harmful if swallowed. | Provide local exhaust ventilation. | No special requireme nt when used as recomme nded.  If repeated or prolonged contact:  Wear chemical resistant gloves. | If airborne exposure is excessive: Wear respirator.  Full facepiece/ hood/ helmet respirator replaces need for chemical goggles.  When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Diquat Dibromide | 2.9 | 85-00-7 | | | | | | | | |
| | Other Ingredients | 23.8 | NG | | | | | | | | |
| 11/04/2015 | Ammonium Salt of Glyphosate | 73.3 | 11437 0-14-8 | OSHA:  Hazardous WARNING!  May cause damage to eyes or kidney through prolonged or | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when | Harmful by inhalation. | Harmful if swallowed. | Provide local exhaust ventilation. | No special requireme nt when used as | If airborne exposure is excessive:  Wear respirator.  Full facepiece/ hood/ helmet respirator |
| | Diquat Dibromide | 2.9 | 85-00-7 | | | | | | | | |

| | MONSANTO ROUNDUP MSDS' | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Other Ingredients | 23.8 | NG | repeated exposure. Do not breathe dust/ fume/ gas/ mist/ vapours/ spray.  Get medical advice/ attention if you feel unwell.  Dispose of contents/ container in accordance with local, regional, national and international regulations. | | recommended use instructions are followed. | | | | recomme nded.  If repeated or prolonged contact: Wear chemical resistant gloves. | replaces need for chemical goggles. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |

| ROUNDUP QUIK STIK GRASS & WEED KILLER | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 01/01/1992 | Glyphosate, N-phosphonomet hyl glycine. | 60 | 38641-94-0 | OSHA: Hazardous Keep out of reach of children.  CAUTION! | Inhalation and skin contact. | Occupational exposure to this material has not been reported to cause significant adverse human health effects.  On the basis of available information, exposure to Roundup /Quik Stik grass & weed killer is not expected to produce significant adverse human effects when recommended safety precautions are followed. | | | No special requirement when used as recommended. | Roundup Quik Stik grass & weed killer is not likely to present significant skin concern requiring special protection . | Roundup Quik Stik grass & weed killer is not likely to present an airborne exposure concern under normal use. Use NIOSH/MSHA approved respiratory protection equipment if needed for vapor, mist, or dust exposure during unusual handling conditions. Consult respirator manufacturer to determine appropriate type equipment for given application. Observe respirator use limitations specified by NIOSH/MSHA or manufacturer. Respiratory protection programs |
| | Inert Ingredients | 40 | NG | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | must comply with 29CFR 1910.134. |

**ROUNDUP READY HERBICIDE with PLANTSHIELD**

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 10/02/2007 | Ammonium Salt of Glyphosate | 75.9 | 114370-14-8 | OSHA: Hazardous. DANGER!  Causes eye burns.  Harmful if swallowed. | Skin contact, inhalation. | May cause allergic skin reaction. | May cause allergic respiratory reaction. | Harmful if swallowed. | Have eye wash facilities immediately available at locations where eye contact can occur. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Surfactant(s) | ≤20 | NG | | | | | | | | |
| | Sodium Sulphite | ≤0.5 | 7757-83-7 | | | | | | | | |
| | Surfactant(s), water and minor formulating ingredients. | 3.6 | NG | | | | | | | | |

**ROUNDUP READY TO USE HERBICIDE**

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 11/17/1997 | Glyphosate, N-phosphonomethyl glycine as the Isopropylamine Salt | 0.94 | 1071-83-6 | NG | NG | NG | NG | Ingestion of a similar, but more concentrated formulation of Roundup has been reported to produce gastrointestin | No special requirement when used as recommended. | Long-sleeved shirt, long pants and rubber or plastic gloves. Launder contaminated | Not required for normal use.  For heavy spray: NIOSH/MSHA approved equip. for pesticide vapour/ mist is recommended. |
| | Inert Ingredients | 99.06 | NG | | | | | | | | |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **MONSANTO ROUNDUP MSDS'** | | | | | | | | | | | |
| | | | | | | | | al discomfort, nausea, vomiting and diarrhea. | | clothing before reuse. | |
| 01/31/1999 | Glyphosate, N-(phosphonomethyl) glycine as the Isopropylamine Salt. | 0.94 | NG | NG | | NG | NG | NG | No special precautions are recommended. | No special precautions are recommended. | Although this product does not present a significant skin concern, avoid prolonged contact with skin by following good industrial practice. Wash hands and contaminated skin thoroughly after handling. | Avoid breathing vapour or mist. |
| 08/16/1999 | Glyphosate, N-(phosphonomethyl) glycine as the Isopropylamine Salt. | 0.94 | NG | NG | | NG | NG | NG | No special precautions are recommended. | No special precautions are recommended. | Although this product does not present a significant skin concern, avoid prolonged contact with skin by following good industrial practice. Wash | Avoid breathing vapour or mist. |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | hands and contaminated skin thoroughly after handling. | |
| 07/16/2002 | Isopropylamine Salt of Glyphosate | 0.96 | 38641-94-0 | NG | Eye contact. Skin contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | NG | No special requirement when used as recommended. | No special requirement when used as recommended. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Water and minor formulating ingredients | 99.04 | NG | | | | | | | | |

| ROUNDUP RENEW HERBICIDE | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
| DATE | COMPONENT | WGT % | CAS # | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 06/02/1999 | Glyphosate Acid Equivalent: present as the mono-ammonium salt. | 65 | 1071-83-6 | WARNING!  Eye irritant.  Precaution! Keep out of reach of children.  Causes eye irritation.  Avoid contact with eyes, skin or clothing. Wash thoroughly with soap and water after handling. Potential skin sensitizer. | Skin contact and inhalation | This material is practically nontoxic and slightly irritating based on toxicity studies.  May cause allergic skin reaction based on toxicity studies. | This material is practically nontoxic if inhaled based on toxicity studies. | No more than slightly toxic and no more than slightly irritating based on toxicity studies.  No significant adverse health effects expected if only small amounts (less than a mouthful) are swallowed. | Provide ventilation to minimize exposure.  The use of local mechanical exhaust ventilation at sources of air contamination such as open process equipment is recommended. | Although this product does not present a significant skin concern, avoid prolonged contact with skin by following good industrial practice. Wash hands | Avoid breathing dust.  Use NIOSH equipment approved for vapor/ mist/ dust when airborne exposure is excessive. Consult respirator manufacturer to determine appropriate type of equipment for given application.  The respirator use limitations specified by NIOSH or the manufacturer must be observed. Respiratory |
| | Other Ingredients | 35 | Trade Secret | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | and contaminated skin thoroughly after handling. | protection programs must be in compliance with 29 CFR 1910.134. |
| 08/01/2000 | Glyphosate Acid Equivalent: present as the mono-ammonium salt. | 65 | 1071-83-6 | WARNING!  Eye irritant.  Precaution!  Keep out of reach of children.  Causes eye irritation.  Avoid contact with eyes, skin or clothing.  Wash thoroughly with soap and water after handling.  Potential skin sensitizer. | Skin contact and inhalation | This material is practically nontoxic and slightly irritating based on toxicity studies.  May cause allergic skin reaction based on toxicity studies. | This material is practically nontoxic if inhaled based on toxicity studies. | No more than slightly toxic and no more than slightly irritating based on toxicity studies.  No significant adverse health effects expected if only small amounts (less than a mouthful) are swallowed. | Provide ventilation to minimize exposure.  The use of local mechanical exhaust ventilation at sources of air contamination such as open process equipment is recommended. | Although this product does not present a significant skin concern, avoid prolonged contact with skin by following good industrial practice.  Wearing protective gloves is recommended.  Wash hands and contaminated skin thoroughly after handling. | Avoid breathing dust.  Use NIOSH equipment approved for vapor/ mist/ dust when airborne exposure is excessive.  Consult respirator manufacturer to determine appropriate type of equipment for given application.  The respirator use limitations specified by NIOSH or the manufacturer must be observed.  Respiratory protection programs must be in compliance with 29 CFR 1910.134. |
| | Other Ingredients | 35 | Trade Secret | | | | | | | | |

| ROUNDUP RT & RT3 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 09/01/1992 | Glyphosate, N-(phosphonomethyl) Glycine, in the form of its Isopropylamine Salt) | 41.3 | 1071-83-6 | OSHA Toxic Chemical(s): Ethoxylated Tallowamines. Keep out of reach of children. WARNING! Causes substantial but temporary eye injury. Harmful of inhaled or swallowed. Do not get in eyes or on clothing. Avoid breathing vapor or spray mist. Wear goggles or face shield. Wash thoroughly with soap and water after handling. Remove contaminated clothing and wash before reuse. | Skin contact and inhalation. | NG | NG | Ingestion of similar formulations has been reported to produce gastrointestinal discomfort with irritation of the mouth, nausea, vomiting and diarrhea. Oral ingestion of large quantities of one similar product has been reported to result in hypotension and lung edema. | No special precautions are recommended. | In cases in which prolonged or repeated skin contact with Roundup RT Herbicide is may occur, long sleeved shirt, long pants, and chemical protective (e.g. rubber) gloves are recommended. Wash hands and contaminated skin after handling. Clothing soaked with a solution of Roundup RT Herbicide should be promptly removed and laundered before reuse. | Respiratory protection should not be required for normal use and handling. During periods of abnormal exposure to heavy spray or mist, use of NIOSH/MSHA approved equipment for pesticide vapor/mist is recommended. The respirator use limitations specified by NIOSH/MSHA or the manufacturer's must be observed. |
| | Ethoxylated Tallowamines (component) | NG | 61791-26-2 | | | | | | | | |
| | Inert Ingredients | 58.7 | NG | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 07/01/1994 | Glyphosate, N-(phosphonomethyl) Glycine, in the form of its Isopropylamine Salt) | 41.3 | 1071-83-6 | OSHA: Hazardous Chemical Toxic Chemical(s):  Keep out of reach of children. WARNING!  Causes substantial but temporary eye injury. Harmful of inhaled or swallowed. Reformulation is prohibited.  See individual container label for repackaging limitations. | Skin contact and inhalation. | Roundup RT herbicide is not more than slightly toxic and no more than slightly irritating based on toxicity studies. | Roundup RT herbicide is no more than slightly toxic if inhaled based on toxicity studies. | Roundup RT herbicide is no more than slightly toxic based on toxicity studies.  No significant adverse health effects are expected to develop if only small amounts (less than a mouthful) are swallowed.  Ingestion of similar formulations has been reported to produce gastrointestinal discomfort with irritation of the mouth, nausea, vomiting and diarrhea.  Oral ingestion of large quantities of one similar product has been reported to result in hypotension and lung edema. | No special precautions are recommended. | Wear appropriate protective clothing to prevent skin contact.  Applicators and other handlers must wear long-sleeved shirt, long pants, shoes plus socks.  Follow manufacturer's instructions for cleaning/ maintaining PPE. If no such instructions for washables, use detergent and hot water.  Keep and wash PPE separately from other laundry. | For Handling of the Undiluted Product: Undiluted Roundup Original herbicide is not likely to present an airborne exposure concern during normal handling.  In the event of an accidental discharge of the material during manufacture or handling which produces a heavy vapor or mist, workers should use NIOSH/MSHA approved equipment.  In work situations where an air purifying respirator is appropriate to be used, use of a full face respirator equipped with purifying elements for protections against organic vapor and dust/mist approved for pesticides is recommended.  Use cartridges with MSHA/NIOSH approval number TC-23C or canister with MSHA/NIOSH approval number TC-14G.  Full facepiece replaces the need for chemical goggles.  Observe respirator use limitations specified by the manufacturers. |
| | Ethoxylated Tallowamines (component) | NG | 61791-26-2 | | | | | | | | |
| | Inert Ingredients | 58.7 | NG | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Respiratory protection programs must comply with 29 CFR 1910.134.  For Application of Product Diluted in accordance with Label Instructions: Respirators are not required for applications of use - dilutions of Roundup RT herbicide. |
| 01/30/2006 | Potassium Salt of Glyphosate | 48.8 | 70901-12-1 | OSHA:  Hazardous.  CAUTION!  Causes moderate eye irritation.  Harmful if inhaled. | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Harmful by inhalation. | None Given | No special requirement when used as recommended. | Wear chemical resistant gloves.  Applicators and other handlers must wear:  Wear long sleeved shirt, long pant and shoes with socks.  If there is significant potential for contact:  Wear face shield.  Wear chemical resistant | No special requirement when used as recommended.  When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 51.2 | NG | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | clothing/footwear. |
| 05/14/2010 | Potassium Salt of Glyphosate | 48.8 | 70901-12-1 | OSHA: Hazardous. CAUTION! Causes moderate eye irritation. Harmful if inhaled. | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Harmful by inhalation. | None Given | No special requirement when used as recommended. | Wear chemical resistant gloves. Applicators and other handlers must wear: Wear long sleeved shirt, long pant and shoes with socks. If there is significant potential for contact: Wear face shield. Wear chemical resistant clothing/footwear. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 51.2 | NG | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 05/02/2012 | Potassium salt of N-(phosphonomethyl) glycine; {Potassium Salt of Glyphosate} | NG | NG | OSHA: Hazardous. CAUTION! Causes moderate eye irritation. Harmful if inhaled. | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Harmful by inhalation. | None Given | No special requirement when used as recommended. | Wear chemical resistant gloves. Applicators and other handlers must wear: Wear long sleeved shirt, long pant and shoes with socks. If there is significant potential for contact: Wear face shield. Wear chemical resistant clothing/footwear. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| 09/06/2012 | Potassium Salt of Glyphosate | 48.8 | 70901-12-1 | OSHA: Hazardous. CAUTION! Causes moderate eye irritation. Harmful if inhaled. | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Harmful by inhalation. | None Given | No special requirement when used as recommended. | Wear chemical resistant gloves. Applicators and other handlers must wear: Wear long sleeved shirt, long pant and shoes with | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 51.2 | NG | | | | | | | | |

| | | | | MONSANTO ROUNDUP MSDS' | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | socks. If there is significant potential for contact: Wear face shield. Wear chemical resistant clothing/footwear. | |
| 05/29/2015 | Potassium Salt of Glyphosate | 48.8 | 70901-12-1 | OSHA: Hazardous. WARNING! Harmful if inhaled. Avoid breathing dust/ fume/ gas/ mist/ vapours/ spray. Use only outdoors in a well-ventilated area. If inhaled: Remove person to fresh air and keep comfortable for breathing. Call a poison center or doctor/ physician if you feel unwell. | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Harmful by inhalation. | None Given | No special requirement when used as recommended. | Wear chemical resistant gloves. Applicators and other handlers must wear: Wear long sleeved shirt, long pant and shoes with socks. If there is significant potential for contact: Wear face shield. Wear chemical resistant clothing/footwear. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 51.2 | NG | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/15/2015 | Potassium Salt of Glyphosate | 48.8 | 70901-12-1 | OSHA:  Hazardous.  WARNING!  Harmful if inhaled.  Avoid breathing dust/ fume/ gas/ mist/ vapours/ spray.  Use only outdoors in a well-ventilated area.  If inhaled:  Remove person to fresh air and keep comfortable for breathing.  Call a poison center or doctor/ physician if you feel unwell. | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Harmful by inhalation. | None Given | No special requirement when used as recommended. | Wear chemical resistant gloves.  Applicators and other handlers must wear:  Wear long sleeved shirt, long pant and shoes with socks.  If there is significant potential for contact:  Wear face shield.  Wear chemical resistant clothing/footwear. | No special requirement when used as recommended.  When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 51.2 | NG | | | | | | | | |

| ROUNDUP SUPER CONCENTRATE | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | |
| DATE | COMPONENT | WGT % | CAS # | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 12/01/1987 | N-Phosphonomethyl glycine, glyphosate, in the form of the isopropylamine salt | 41 | 1071-83-6 | OSHA:  Hazardous Chemical  Keep out of reach of children  WARNING!  Causes eye irritation.  Harmful if swallowed or inhaled.  May | Dermal contact and inhalation. | Prolonged contact with Roundup upper concentrate may cause dermal irritation. | None Given | Ingestion of Roundup super concentrate has been reported to produce | No special precautions are recommended. | Roundup Super Concentrate may cause skin irritation. | Respiratory protection should not be required for normal use and handling.  During abnormal circumstances |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Inert Ingredients | 59 | NG | cause skin irritation. Reformulation or repacking is prohibited.  Keep people and pets off treated areas until spray solution has dried. | | | | gastrointestinal discomfort, nausea, vomiting and diarrhea. | | As with any chemical product, prudent handling practices and care are advised to minimize skin contact. Wash hands and contaminated skin thoroughly with soap and water after handling. Clothing soaked with a solution of Roundup super concentrate should be promptly removed and laundered before reuse. | where possible exposure to heavy mists may occur, prudence would dictate the use of an appropriate NIOSH/MSHA respirator to minimize the exposure.  The respirator use limitations specified by NIOSH/MSHA or the manufacturer must be observed. |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/01/1989 | Glysophate; N-Phosphonomethyl glycine, in the form of the isopropylamine salt | 41 | 1071-83-6 | OSHA: Hazardous Chemical WARNING! Causes eye irritation. Harmful if swallowed. May cause skin irritation. Reformulation or repacking is prohibited. | Dermal contact and inhalation. | Prolonged contact with Roundup Super Concentrate may cause dermal irritation. | None Given | Ingestion of Roundup super concentrate has been reported to produce gastrointestinal discomfort, nausea, vomiting and diarrhea. Oral ingestion of large quantities of concentrated product has been reported to result in hypotension and pulmonary edema. | No special precautions are recommended. | In cases in which prolonged or repeated skin contact with Roundup Super Concentrate may occur, long-sleeved shirt, long pants, and chemical protective (e.g. rubber) gloves are recommended. . Wash hands and contaminated skin after handling. Clothing soaked with a solution of Roundup Super Concentrate should be promptly removed and laundered before | Respiratory protection should not be required for normal use and handling. During abnormal circumstances where possible exposure to heavy mists may occur, prudence would dictate the use of an appropriate NIOSH/MSHA respirator to minimize the exposure. The respirator use limitations specified by NIOSH/MSHA or the manufacturer must be observed. |
| | Inert Ingredients | 59 | NG | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | reuse. |
| 01/15/1998 | Glysophate; N-Phosphonomethyl glycine, in the form of the isopropylamine salt | 41 | 1071-83-6 | OSHA: Hazardous Chemical WARNING! Causes eye irritation. Harmful if swallowed. May cause skin irritation. Reformulation or repacking is prohibited. | Dermal contact and inhalation. | Prolonged contact with Roundup L&G Super Concentrate may cause dermal irritation. | None Given | Ingestion of Roundup L&G Super Concentrate has been reported to produce gastrointestinal discomfort, nausea, vomiting and diarrhea. | No special precautions are recommended. | In cases in which prolonged or repeated skin contact with Roundup Super Concentrate may occur, long-sleeved shirt, long pants, and chemical protective (e.g. rubber) gloves are recommended. . Wash hands and | Respiratory protection should not be required for normal use and handling. During abnormal circumstances where possible exposure to heavy mists may occur, prudence would dictate the use of an appropriate NIOSH/MSHA respirator to minimize the exposure. The respirator use limitations specified by NIOSH/MSHA or the manufacturer must be observed. Refer also to CSA Standard Z94.4-M1982, Selection, Care and Use of Respirators. |
| | Inert Ingredients | 59 | NG | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | contaminated skin after handling. Clothing soaked with a solution of Roundup Super Concentrate should be promptly removed and laundered before reuse. |

**ROUNDUP SURE SHOT FOAM**

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 04/07/1999 | Glyphosate, Isopropylamine Salt | 0.96 | 38641-94-0 | IMMEDIATE CONCERNS: Causes eye irritation. Avoid contact with eyes or clothing. Wash thoroughly with soap and water after handling. Keep out of reach of children. | Inhalation and skin contact. | This substance is not expected to cause skin irritation. | If inhaled, this substance is considered practically non-toxic to internal organs. This substance may be irritating if inhaled. | If swallowed, this product may cause gastrointestinal tract irritation. | No special ventilation is necessary. | Although this product does not present a significant skin concern, minimize skin contamination by following good industrial practice. Wearing protective gloves is recommended. | For Handling the Concentrated Product: Avoid breathing vapor or mist. This product concentrate is not likely to pose an airborne exposure concern during manufacture or packaging. In the event of abnormal exposure conditions, use NIOSH approved equipment. In work situations where an air purifying elements for protection against organic vapor and |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | Wash hands and contaminated skin thoroughly after handling. | dust/ mist approved for pesticides is recommended.  Full facepiece replaces the need for chemical goggles. Observe respirator use limitations specified by the manufactures. Respiratory protection programs must comply with 29 CFR 1910.134.  For application of product in accordance with label instructions, no special respiratory protection is required. |
| 05/05/2010 | Isopropylamine Salt of Glyphosate | 0.96 | 38641-94-0 | OSHA: Hazardous CAUTION! | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | No special requirement when used as recommended. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Pelargonic and related fatty acids | 1 | 112-05-0 | | | | | | | | |
| | Isobutane | 5 | 75-28-5 | | | | | | | | |
| | Water and minor formulating ingredients. | 94.04 | NG | | | | | | | | |

**ROUNDUP TAB**

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 03/20/1996 | Glyphosate | 63.5 | 1071-83-6 | None. | NG | On the basis of available information, this material is not expected to produce any significant adverse health effects when recommended use instructions are followed. | | | Not applicable. | Wear suitable gloves. Wear | No special requirement when used as recommended. |
| | Sodium Bicarbonate | 31.5 | NG | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Minor Formulating Ingredients | 5 | NG | | | | | | | suitable protective clothing. |

**ROUNDUP TOUGH WEEDKILLER**

| | | | | HAZARDS / HEALTH EFFECTS | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|
| DATE | COMPONENT | WGT % | CAS # | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 08/03/1995 | Glysophate, isopropylamine salt of N-Phosphonomethyl glycine | 18 | 38641-94-0 | IMMEDIATE CONCERNS: May cause eye irritation. Avoid contact with eyes, skin or clothing. Keep out of reach of children. | | This substance is not expected to cause prolonged or significant skin irritation. If absorbed through the skin, this substance is considered practically non-toxic to internal organs. This product is not expected to cause allergic skin reaction. See Toxicology Information section (11) | Overexposure to spray mist may result in minor irritation of the upper respiratory tract. | Ingestion may produce irritation of the digestive tract as demonstrated by signs and symptoms of mouth membrane irritation, nausea, vomiting and diarrhea. | None Given | No special skin protection is usually necessary. Avoid prolonged or frequently repeated skin contact with this material. Skin contact can be minimized by wearing protective clothing. Wash thoroughly with soap and water after handling. | Handling of the undiluted product is not likely to present an airborne exposure concern during normal handling. In the event of an accidental discharge of the material during manufacture or handling which produces a heavy vapor or mist, workers should put on respiratory protection equipment. Consult respirator manufacturer to determine appropriate type of equipment. Observe respirator use limitations specified by NIOSH MSHA or the manufacturer. For application of product diluted in accordance with label instructions, no special respiratory protection is required. |
| | Inert Ingredients | ~81.99 | NG | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 08/08/2000 | Glysophate; N-Phosphonomethyl glycine, in the form of the isopropylamine salt | 18 | 38641-94-0 | Keep out of reach of children.  CAUTION! Harmful if swallowed.  May Cause eye irritation.  Reformulation or repackaging is prohibited.  Keep people and pets off treated areas until spray solution has dried. | NG | No more than slightly toxic and no more than slightly irritating based on toxicity studies. | No more than slightly toxic if inhaled based on toxicity studies. | No more than slightly toxic based on toxicity studies.  No significant adverse health effects are expected to develop if only small amounts (less than a mouthful) are swallowed.  Ingestion of similar formulations (but more concentrated) has been reported to produce gastrointestinal discomfort with irritation of the mouth, nausea, vomiting and diarrhea.  Oral ingestion of large quantities of one similar product (also more concentrated) has been reported to result in hypotension and lung edema. | Not applicable. | As with any chemical product, prudent handling practices and care are advised to minimize skin contact.  Wash hands and contaminated skin thoroughly with soap and water after handling.  Clothing soaked with a solution of Roundup super concentrate should be promptly removed and laundered before reuse.  Follow manufacturer's instructions for cleaning/ maintaini | For Handling of the Undiluted Product: Undiluted product is not likely to present an airborne exposure concern during normal handling.  In the event of an accidental discharge of the material during manufacture or handling which produces a heavy vapor or mist, workers should put on respiratory protection equipment.  Consult respirator manufacturer to determine appropriate type of equipment.  Observe respirator use limitations specified by NIOSH MSHA or the manufacturer.  For Application of Product Diluted in accordance with label instruction: Respirators are not required for applications of use - dilutions of this product. |
| | Trade Secret | 72-77 | NG | | | | | | | | |
| | Ethoxylated Tallowamines | 5-10 | 61791-26-2 | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | ng personal protective equipmen t. If no such instructio ns for washable s, use detergent and hot water. Keep and wash personal protective equipmen t separatel y from other laundry. |
| 10/25/2000 | Isopropylamine Salt of Glyphosate | 15.3 | 38641-94-0 | | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Surfactant and minor formulating ingredients | 6 | NG | | | | | | | | |
| | Water | 78.7 | 7732-18-5 | | | | | | | | |

| ROUNDUP TRANSORB HC LIQUID HERBICIDE | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | **HAZARDS / HEALTH EFFECTS** | | | | | **CONTROL / PPE** | | |
| **DATE** | **COMPONENT** | **WGT %** | **CAS #** | **HAZARDS / CARCINOGENICITY** | **ROUTE(S)** | **SKIN** | **INHALATION** | **INGESTION** | **ENGINEERING** | **SKIN** | **RESPIRATORY** |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12/04/2014 | Potassium Salt of Glyphosate | 48.8 | 70901-12-1 | CAUTION! POISON. Harmful if swallowed. Harmful if inhaled. Causes eye irritation. Causes skin irritation | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | Provide local exhaust ventilation. | Wear chemical resistant gloves. Applicators and other handlers must wear: Wear long sleeved shirt, long pants and shoes with socks. If there is potential for contact: Wear face shield. Wear chemical resistant clothing/ footwear. | If airborne exposure is excessive: Wear respirator. Full facepiece/ hood/ helmet respirator replaces need for chemical goggles. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 51.2 | NG | | | | | | | | |

| ROUNDUP TREE STUMP AND ROOT KILLER | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
| DATE | COMPONENT | WGT % | CAS # | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 12/10/2009 | Isopropylamine Salt of Glyphosate | 41.5 | 38641-94-0 | EU & UK: Not classified as dangerous | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of |
| | Surfactant(s) | 16 | NG | | | | | | | | |
| | Water | 42.5 | 7732-18-5 | | | | | | | | |

| | | | | MONSANTO ROUNDUP MSDS' | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | equipment for a given application. |
| 02/11/2015 | Isopropylamine Salt of Glyphosate | 41.5 | 38641-94-0 | National Classification - Irelan:  Not classified as dangerous | Skin contact, eye contact. | Avoid contact with skin.  After contact with skin, wash immediately with plenty of water. | None Given | None Given | No special requirement when used as recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Surfactant(s) | 16 | NG | | | | | | | | |
| | Water | 42.5 | 7732-18-5 | | | | | | | | |

**ROUNDUP ULTRA 3000**

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 10/19/2000 | Isopropylamine Salt of Glyphosate | 41.5 | 38641-94-0 | None Given | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Surfactant | 16 | NG | | | | | | | | |
| | Water | 42.5 | 7732-18-5 | | | | | | | | |
| 06/24/2008 | Isopropylamine Salt of Glyphosate | 41.5 | 38641-94-0 | None Given | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the |
| | Surfactant | 16 | NG | | | | | | | | |
| | Water | 42.5 | 7732-18-5 | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | appropriate type of equipment for a given application. |
| 08/03/2009 | Isopropylamine Salt of Glyphosate | 41.5 | 38641-94-0 | None Given | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Surfactant | 16 | NG | | | | | | | | |
| | Water | 42.5 | 7732-18-5 | | | | | | | | |

| ROUNDUP ULTRA HERBICIDE | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 11/01/1995 | Glysophate, isopropylamine salt of N-Phosphonomethyl glycine | 41 | 38641-94-0 | Keep out of reach of children.  CAUTION! Harmful if swallowed.  Causes eye irritation. Reformulation is prohibited.  See individual container | Skin contact, inhalation. | Roundup Ultra herbicide is not more than slightly toxic and no more than slightly irritating based on toxicity | Roundup Ultra herbicide is no more than slightly toxic if inhaled based on toxicity studies. | Roundup Ultra herbicide is no more than slightly toxic based on toxicity studies.  No | No special precautions are recommended. | Wear appropriate protective clothing to prevent skin contact. | For Handling of the Undiluted Product: Undiluted Roundup Original herbicide is not likely to present an airborne exposure concern during normal |

| | MONSANTO ROUNDUP MSDS' | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Inert Ingredients | 59 | NG | label for repackaging limitations. | | studies. | | significant adverse health effects are expected to develop if only small amounts (less than a mouthful) are swallowed. Ingestion of similar formulations has been reported to produce gastrointestinal discomfort with irritation of the mouth, nausea, vomiting and diarrhea. Oral ingestion of large quantities of one similar product has been reported to result in hypotension and lung edema. | Applicators and other handlers must wear long-sleeved shirt, long pants, shoes plus socks. Follow manufacturer's instructions for cleaning/ maintaining PPE. If no such instructions for washables, use detergent and hot water. Keep and wash PPE separately from other laundry. | handling.  In the event of an accidental discharge of the material during manufacture or handling which produces a heavy vapor or mist, workers should use NIOSH/MSHA approved equipment.  In work situations where an air purifying respirator is appropriate to be used, use of a full face respirator equipped with purifying elements for protections against organic vapor and dust/mist approved for pesticides is recommended.  Use cartridges with MSHA/NIOSH approval number TC-23C or canister with MSHA/NIOSH approval number TC-14G.  Full facepiece replaces the need for chemical goggles.  Observe respirator use limitations specified by the manufacturers.  Respiratory protection programs must comply with 29 CFR 1910.134.  For Use of Product in accordance with label instructions:  Respirators are not |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | required for use of Roundup Ultra herbicide in accordance with label instructions. |
| 05/26/1999 | Glysophate, isopropylamine salt of N-Phosphonomethyl glycine | 41 | 38641-94-0 | Keep out of reach of children.  CAUTION! Causes eye irritation. Avoid contact with eyes or clothing. | Skin contact, inhalation. | This product is no more than slightly toxic and no more than slightly irritating based on toxicity studies. | This product is no more than slightly toxic if inhaled based on toxicity studies. | This product is no more than slightly toxic based on toxicity studies.  No significant adverse health effects are expected to develop if only small amounts (less than a mouthful) are swallowed. Ingestion of similar formulations has been reported to produce gastrointestin al discomfort with irritation of the mouth, nausea, vomiting and diarrhea. Oral ingestion of large | No special precautions are recommended. | Wear appropriate protective clothing to prevent skin contact. Applicator s and other handlers must wear long-sleeved shirt, long pants, shoes plus socks. Follow manufact urer's instructio ns for cleaning/ maintaini ng PPE. If no such instructio | For Handling of the Undiluted Product: Undiluted Roundup Original herbicide is not likely to present an airborne exposure concern during normal handling.  In the event of an accidental discharge of the material during manufacture or handling which produces a heavy vapor or mist, workers should use NIOSH/MSHA approved equipment.  In work situations where an air purifying respirator is appropriate to be used, use of a full face respirator equipped with purifying elements for protections against organic vapor and dust/mist |
| | Inert Ingredients | 59 | NG | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | quantities of one similar product has been reported to result in hypotension and lung edema. | | | | ns for washable s, use detergent and hot water. Keep and wash PPE separatel y from other laundry. | approved for pesticides is recommended.  Use cartridges with MSHA/NIOSH approval number TC-23C or canister with MSHA/NIOSH approval number TC-14G.  Full facepiece replaces the need for chemical goggles.  Observe respirator use limitations specified by the manufacturers.  Respiratory protection programs must comply with 29 CFR 1910.134.  For Use of Product in accordance with label instructions:  Respirators are not required for use of Roundup Ultra herbicide in accordance with label instructions. |
| 06/22/1999 | Glysophate, isopropylamine salt of N-Phosphonomet hyl glycine | 41 | 38641-94-0 | Keep out of reach of children.  CAUTION!  Causes eye irritation.  Avoid contact with eyes or clothing. | Skin contact, inhalation. | This product is no more than slightly toxic and no more than slightly irritating based on toxicity studies. | This product is no more than slightly toxic if inhaled based on toxicity studies. | This product is no more than slightly toxic based on toxicity studies.  No significant adverse | No special precautions are recommended. | Wear appropriat e protective clothing to prevent skin contact. | For Handling of the Undiluted Product:  Undiluted Roundup Original herbicide is not likely to present an airborne exposure concern during normal |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Inert Ingredients | 59 | NG | | | | | health effects are expected to develop if only small amounts (less than a mouthful) are swallowed. Ingestion of similar formulations has been reported to produce gastrointestinal discomfort with irritation of the mouth, nausea, vomiting and diarrhea. Oral ingestion of large quantities of one similar product has been reported to result in hypotension and lung edema. | | Applicators and other handlers must wear long-sleeved shirt, long pants, shoes plus socks. Follow manufacturer's instructions for cleaning/ maintaining PPE. If no such instructions for washables, use detergent and hot water. Keep and wash PPE separately from other laundry. | handling.  In the event of an accidental discharge of the material during manufacture or handling which produces a heavy vapor or mist, workers should use NIOSH/MSHA approved equipment.  In work situations where an air purifying respirator is appropriate to be used, use of a full face respirator equipped with purifying elements for protections against organic vapor and dust/mist approved for pesticides is recommended.  Use cartridges with MSHA/NIOSH approval number TC-23C or canister with MSHA/NIOSH approval number TC-14G.  Full facepiece replaces the need for chemical goggles. Observe respirator use limitations specified by the manufacturers. Respiratory protection programs must comply with 29 CFR 1910.134.  For Use of Product in accordance with label instructions: Respirators are not |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | required for use of Roundup Ultra herbicide in accordance with label instructions. |
| 02/09/2001 | Isopropylamine Salt of Glyphosate | 41 | 38641-94-0 | CAUTION!  Causes eye irritation. | Skin contact, inhalation. | Not expected to product significant adverse effects when recommended use instructions are followed. | Not expected to product significant adverse effects when recommended use instructions are followed. | None Given | No special precautions are recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Surfactant | 14.5 | NG | | | | | | | | |
| | Water and minor formulating ingredients | 44.5 | NG | | | | | | | | |
| 05/18/2004 | Potassium Salt of Glyphosate | 41 | 70901-12-1 | DANGER!  Eye and skin irritant. | Skin contact, eye contact, inhalation. | Irritating to skin. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | Provide local exhaust ventilation. Have safety shower available at locations where skin contact can occur. | Wear chemical resistant gloves.  If there is potential for contact: Wear chemical resistant clothing/ footwear. | If airborne exposure is excessive:  Wear respirator.  Full facepiece/ hood/ helmet respirator replaces need for chemical goggles. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 59 | NG | | | | | | | | |
| 02/11/2011 | Potassium Salt of Glyphosate | 41 | 70901-12-1 | CAUTION!  Causes eye irritation. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions | Not expected to produce significant adverse effects when recommended use instructions | Not expected to produce significant adverse effects when recommended use instructions | No special requirement when used as recommended. | If repeated or prolonged contact: Wear chemical resistant | No special requirement when used as recommended. When recommended, consult manufacturer of |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **MONSANTO ROUNDUP MSDS'** | | | | | | | | | | | |
| | Other Ingredients | 59 | NG | | | are followed. | are followed. | are followed. | | gloves. Applicators and other handlers must wear: Wear long sleeved shirt, long pants and shoes with socks. | personal protective equipment for the appropriate type of equipment for a given application. |
| 05/14/2015 | Acetochlor | 30.2 | 34256-82-1 | DANGER!  Causes serious eye damage. May cause an allergic skin reaction. May cause allergy or asthma symptoms or breathing difficulties if inhaled.  May cause damage to kidney, liver, respiratory tract, skin, or eye though prolonged or repeated exposure. Suspected of causing cancer. | Skin contact, eye contact, inhalation, ingestion. | Eye Contact, Short Term: Risk of serious damage to eyes. Skin Contact, Short Term: May cause allergic skin reaction. Skin Effects: Sensitization in Susceptible Individuals.  Skin Contact, Repeated, Non Occupational, Occupational: Irritation. Eye Contact, Non Occupational, Occupational: Irritation. | Inhalation, Short Term:  Not expected to produce significant adverse effects when recommended use instructions are followed. Inhalation Excessive, Non Occupational, Occupational: Gastro-Intestinal Effects: Nausea/vomiting; General/Systemic Effects: Fatigue; Neurological Effects: Headache, confusion, incoordination, drowsiness, vertigo/dizziness, disturbance of level of consciousness, convulsions. | Single Ingestion: Not expected to produce significant adverse effects when recommended use instructions are followed. Ingestion, Short Term, Intentional Misuse, Accidental Misuse: Respiratory Effects: Pneumonitis (aspiration); Gastro-Intestinal Effects: Abdominal pain, diarrhea; Note: May cause effects similar to those described under | Have eye wash facilities immediately available at locations where eye contact can occur. | Eye Protection: If there is potential for contact: Wear chemical goggles. Skin Protection: Wear chemical resistant gloves.  If there is significant potential for contact: Wear chemical resistant clothing/ footwear. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment of the appropriated type of equipment for a given application. |
| | Fomesafen, Sodium Salt | 7.1 | 10873 1-70-0 | | | | | | | | |
| | Glycerin | <=7 | 56-81-5 | | | | | | | | |
| | Hydrocarbon Solvent | <=2 | 64742-47-8 | | | | | | | | |
| | Surfactant(s), Water and Minor Formulating Ingredients. | <=54 | NG | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Inhalation. | | | |

**ROUNDUP ULTRA DRY HERBICIDE**

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 05/23/1999 | Glyphosate, N-(phosphonomethyl) Glycine, in the form of its Isopropylamine Salt) | 71 | 11437 0-14-8 | OSHA: Hazardous CAUTION. Harmful if swallowed. Causes moderate eye irritation. Avoid contact with eyes or clothing. | Inhalation, eye and skin contact. | This material is practically nontoxic and slightly irritating based on toxicity studies. | This material is practically nontoxic if inhaled based on toxicity studies. | Slightly toxic based on toxicity studies. | Provide ventilation to minimize exposure. The use of local mechanical exhaust ventilation at sources of air contamination such as open process equipment is recommended. | Although this material does not present a significant skin concern, minimize skin contamination by following good industrial practice. Wearing protective gloves is recommended. Wash hands and contaminated skin thoroughly after handling. | Avoid breathing dust. Use NIOSH equipment approved for vapor/ mist/ dust when airborne exposure is excessive. Consult respirator manufacturer to determine appropriate type of equipment for given application. The respirator use limitations specified by NIOSH or the manufacturer must be observed. Respiratory protection programs must be in compliance with 29 CFR 1910.134. |
| | Surfactant/ Antifoam | 25 | NG | | | | | | | | |
| | Other Inerts | 4 | NG | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/14/2002 | Ammonium Salt of GlyphosateSurfactant and minor formulating ingredients | 71 | 11437 0-14-8 | OSHA: Hazardous CAUTION! Causes moderate eye irritation. Harmful if swallowed. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Harmful if swallowed. | No special requirement when used as recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Surfactant/ Antifoam | 28.6 | NG | | | | | | | | |
| | Sodium Sulphite | ≤0.5 | 7757-83-7 | | | | | | | | |
| 09/25/2007 | Ammonium Salt of GlyphosateSurfactant and minor formulating ingredients | 71 | 11437 0-14-8 | OSHA: Hazardous CAUTION! Causes moderate eye irritation. Harmful if swallowed. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Harmful if swallowed. | No special requirement when used as recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Surfactant/ Antifoam | 28.6 | NG | | | | | | | | |
| | Sodium Sulphite | ≥0-≤0.5 | 7757-83-7 | | | | | | | | |
| **ROUNDUP ULTRA MAX HERBICIDE** | | | | | | | | | | | |
| **DATE** | **COMPONENT** | **WGT %** | **CAS #** | **HAZARDS / HEALTH EFFECTS** | | | | | **CONTROL / PPE** | | |
| | | | | **HAZARDS / CARCINOGENICITY** | **ROUTE(S)** | **SKIN** | **INHALATION** | **INGESTION** | **ENGINEERING** | **SKIN** | **RESPIRATORY** |
| 08/03/2000 | Glysophate; N-Phosphonomethyl glycine, in the form of the isopropylamine salt | 50.2 | 38641-94-0 | Keep out of reach of children. CAUTION! Causes moderate eye irritation. Avoid contact with eyes or clothing. | Skin contact and inhalation. | This product is no more than slightly toxic and no more than slightly irritating based on toxicity studies. | This product is no more than slightly toxic if inhaled based on toxicity studies. | Ingestion of Roundup super concentrate has been reported to produce gastrointestin | No special precautions are recommended. Consult NFPA Standard 91 for design of exhaust | Wear appropriate protective clothing to prevent skin contact. | For Handling the Concentrated Product: Avoid breathing vapor or mist. This product concentrate is not likely to pose an airborne exposure |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Other Ingredients | 49.8 | NG | | | | | al discomfort, nausea, vomiting and diarrhea. Oral ingestion of large quantities of concentrated product has been reported to result in hypotension and pulmonary edema. | systems. | Applicators and other handlers must wear long-sleeved shirt, long pants, shoes plus socks. Follow manufacturer's instructions for cleaning/ maintaining PPE. If no such instructions for washables, use detergent and hot water. Keep and wash PPE separately from other laundry. | concern during manufacture or packaging. In the event of abnormal exposure conditions, use NIOSH/MSHA approved equipment. In work situations where an air purifying respirator is appropriate to be use, use of a full face respirator equipped with purifying elements for protection against organic vapor and dust/mist approved for pesticides is recommended. Use Cartridges with NIOSH/MSHA approval number TC-23C or canister with NIOSH/MSHA approval number TC-14G. Full facepiece replaces the need for chemical goggles. Observe respirator use limitation specified by the manufacturers. Respiratory protection programs must comply with 29 CFR 1910.134. For Use of Product in accordance with label instructions: Respirators are not required for use of this product in accordance with label instructions. |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 08/24/2001 | Isopropylamine Salt of Glyphosate | 50.2 | 38641-94-0 | CAUTION!  Causes moderate eye irritation. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special precautions are recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 49.8 | NG | | | | | | | | |

**ROUNDUP ULTRA MAX II HERBICIDE**

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 02/11/2011 | Potassium Salt of Glyphosate | 49 | 70901-12-1 | OSHA:  Hazardous CAUTION!  Causes moderate eye irritation.  Harmful if inhaled. | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Harmful by inhalation. | None Given | No special requirement when used as recommended. | Wear chemical resistant gloves. Applicators and other handlers must wear: Wear long sleeved shirt, long pants and shoes with socks.  If there is potential for contact: Wear face shield. Wear chemical resistant | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 51 | NG | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | clothing/ footwear. |
| 06/27/2003 | Potassium Salt of Glyphosate | 49 | 70901-12-1 | OSHA:  Hazardous CAUTION!  Causes moderate eye irritation.  Harmful if inhaled. | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Harmful by inhalation. | None Given | No special requirement when used as recommended. | Wear chemical resistant gloves.  Applicators and other handlers must wear:  Wear long sleeved shirt, long pants and shoes with socks.  If there is potential for contact:  Wear face shield.  Wear chemical resistant clothing/ footwear. | No special requirement when used as recommended.  When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 51 | NG | | | | | | | | |

| ROUNDUP READY-TO-USE WITH WAND APPLICATOR SOLUTION | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / HEALTH EFFECTS | | | | CONTROL / PPE | | |
| DATE | COMPONENT | WGT % | CAS # | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 01/24/2014 | Isopropylamine Salt of Glyphosate | .96 | 38641-94-0 | CAUTION!  Eye irritant.  Harmful if swallowed. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Harmful if swallowed. | No special precautions are recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Water and minor formulating ingredients | 99.04 | NG | | | | | | | | |
| 03/03/2015 | Isopropylamine Salt of Glyphosate | .96 | 38641-94-0 | CAUTION!  Eye irritant.  Harmful if swallowed. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Harmful if swallowed. | No special precautions are recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Water and minor formulating ingredients | 99.04 | NG | | | | | | | | |
| 01/20/2017 | Isopropylamine Salt of Glyphosate | .96 | 38641-94-0 | CAUTION!  Eye irritant.  Harmful if swallowed. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Harmful if swallowed. | No special precautions are recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Water and minor formulating ingredients | 99.04 | NG | | | | | | | | |

| ROUNDUP WEATHER MAX HERBICIDE | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |

| | | | | | **MONSANTO ROUNDUP MSDS'** | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 04/30/2002 | Potassium Salt of Glyphosate | 49 | 70901-12-1 | OSHA: Hazardous CAUTION! Causes moderate eye irritation. Harmful if inhaled. | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Harmful by inhalation. | None Given | No special requirement when used as recommended. | Wear chemical resistant gloves. Applicators and other handlers must wear: Wear long sleeved shirt, long pants and shoes with socks. If there is potential for contact: Wear face shield. Wear chemical resistant clothing/ footwear. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 51 | NG | | | | | | | | |
| 11/04/2003 | Potassium Salt of Glyphosate | 49 | 70901-12-1 | CAUTION! Poison. Harmful if swallowed. Harmful if inhaled. Causes eye irritation. Causes skin irritation. | Skin contact, eye contact. | Irritating to skin. | Harmful by inhalation. | Harmful if swallowed. | No special requirement when used as recommended. | Wear chemical resistant gloves. Applicators and other handlers must wear: Wear long sleeved shirt, long pants and shoes with socks. If | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 51 | NG | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | there is potential for contact: Wear face shield. Wear chemical resistant clothing/footwear. | |
| 08/26/2005 | Potassium Salt of Glyphosate | 49 | 70901-12-1 | OSHA: Hazardous CAUTION! Causes moderate eye irritation. Harmful if inhaled. | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Harmful by inhalation. | None Given | No special requirement when used as recommended. | Wear chemical resistant gloves. Applicators and other handlers must wear: Wear long sleeved shirt, long pants and shoes with socks.  If there is potential for contact: Wear face shield. Wear chemical resistant clothing/footwear. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 51 | NG | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 01/08/2007 | Potassium Salt of Glyphosate | 49 | 70901-12-1 | CAUTION! Poison. Harmful if swallowed. Harmful if inhaled. Causes eye irritation. Causes skin irritation. | Skin contact, eye contact. | Irritating to skin. | Harmful by inhalation. | Harmful if swallowed. | No special requirement when used as recommended. | Wear chemical resistant gloves. Applicators and other handlers must wear: Wear long sleeved shirt, long pants and shoes with socks. If there is potential for contact: Wear face shield. Wear chemical resistant clothing/ footwear. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 51 | NG | | | | | | | | |
| 09/09/2008 | Potassium Salt of Glyphosate | 49 | 70901-12-1 | OSHA: Hazardous CAUTION! Causes moderate eye irritation. Harmful if inhaled. | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Harmful by inhalation. | None Given | No special requirement when used as recommended. | Wear chemical resistant gloves. Applicators and other handlers must wear: Wear long sleeved shirt, long pants and shoes with socks. If | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 51 | NG | | | | | | | | |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **MONSANTO ROUNDUP MSDS'** | | | | | | | | | | | |
| | | | | | | | | | | | there is potential for contact: Wear face shield. Wear chemical resistant clothing/ footwear. |
| 01/09/2010 | Potassium Salt of Glyphosate | 49 | 70901-12-1 | WARNING!  Poison. Harmful if swallowed.  Harmful if inhaled.  Causes eye irritation. Causes skin irritation. | Skin contact, eye contact. | Irritating to skin. | Harmful by inhalation. | Harmful if swallowed. | No special requirement when used as recommended. | Wear chemical resistant gloves.  Applicators and other handlers must wear: Wear long sleeved shirt, long pants and shoes with socks.  If there is potential for contact: Wear face shield. Wear chemical resistant clothing/ footwear. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 51 | NG | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 01/12/2011 | Potassium Salt of Glyphosate | 49 | 70901-12-1 | WARNING! Poison. Harmful if swallowed. Harmful if inhaled. Causes eye irritation. Causes skin irritation. | Skin contact, eye contact. | Irritating to skin. | Harmful by inhalation. | Harmful if swallowed. | No special requirement when used as recommended. | Wear chemical resistant gloves. Applicators and other handlers must wear: Wear long sleeved shirt, long pants and shoes with socks. If there is potential for contact: Wear face shield. Wear chemical resistant clothing/ footwear. | If airborne exposure is excessive: Wear respirator. Full facepiece/ hood/ helmet respirator replaces need for chemical goggles. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 51 | NG | | | | | | | | |
| 10/31/2013 | Potassium Salt of Glyphosate | 49 | 70901-12-1 | OSHA: Hazardous CAUTION! Causes moderate eye irritation. Harmful if inhaled. | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions | Harmful by inhalation. | None Given | No special requirement when used as recommended. | Wear chemical resistant gloves. Chemical resistant gloves include | If airborne exposure is excessive: Wear respirator. Full facepiece/ hood/ helmet respirator replaces need for chemical goggles. When |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Other Ingredients | 51 | NG | | | are followed. | | | | those made of waterproof materials such as nitrile, butyl, neoprene, polyvinyl chloride (PVC), natural rubber and/ or barrier laminate. If there is significant potential for contact: Wear face shield. Wear chemical resistant clothing/ footwear. Applicators and other handlers must wear: Wear long sleeved shirt, long pants and shoes with socks. Follow manufacturer's instructio | recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | ns for cleaning/ maintaini ng Personal Protective Equipmen t. If no such instructio ns for washable s, use detergent and hot water. Keep and wash personal protective equipmen t separatel y from other laundry. | |
| 01/09/2014 | Potassium Salt of Glyphosate | 49 | 70901-12-1 | WARNING!  Harmful if inhaled. | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions | Harmful by inhalation. | None Given | Provide local exhaust. | Wear chemical resistant gloves. Chemical resistant gloves include | | If airborne exposure is excessive: Wear respirator.  Full facepiece/ hood/ helmet respirator replaces need for chemical goggles. When |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Other Ingredients | 51 | NG | | | are followed. | | | | those made of waterproof materials such as nitrile, butyl, neoprene, polyvinyl chloride (PVC), natural rubber and/ or barrier laminate. If there is significant potential for contact: Wear face shield. Wear chemical resistant clothing/ footwear. Applicators and other handlers must wear: Wear long sleeved shirt, long pants and shoes with socks. Follow manufacturer's instructio | recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | ns for cleaning/ maintaini ng Personal Protective Equipmen t.  If no such instructio ns for washable s, use detergent and hot water. Keep and wash personal protective equipmen t separatel y from other laundry. | |
| 05/29/2015 | Potassium Salt of Glyphosate | 49 | 70901-12-1 | WARNING!  Harmful if inhaled. | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions | Harmful by inhalation. | None Given | Provide local exhaust. | Wear chemical resistant gloves.  Chemical resistant gloves include | If airborne exposure is excessive:  Wear respirator.  Full facepiece/ hood/ helmet respirator replaces need for chemical goggles.  When |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **MONSANTO ROUNDUP MSDS'** | | | | | | | | | |
| | Other Ingredients | 51 | NG | | | are followed. | | | | those made of waterproof materials such as nitrile, butyl, neoprene, polyvinyl chloride (PVC), natural rubber and/ or barrier laminate. If there is significant potential for contact: Wear face shield. Wear chemical resistant clothing/ footwear. Applicators and other handlers must wear: Wear long sleeved shirt, long pants and shoes with socks. Follow manufacturer's instructio | recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | ns for cleaning/ maintaining Personal Protective Equipment. If no such instructions for washables, use detergent and hot water. Keep and wash personal protective equipment separately from other laundry. | |
| 10/19/2015 | Potassium Salt of Glyphosate | 49 | 70901-12-1 | WARNING!  Harmful if inhaled. | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions | Harmful by inhalation. | None Given | Provide local exhaust. | Wear chemical resistant gloves. Chemical resistant gloves include | If airborne exposure is excessive:  Wear respirator.  Full facepiece/ hood/ helmet respirator replaces need for chemical goggles.  When |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Other Ingredients | 51 | NG | | | are followed. | | | | those made of waterproof materials such as nitrile, butyl, neoprene, polyvinyl chloride (PVC), natural rubber and/ or barrier laminate. If there is significant potential for contact: Wear face shield. Wear chemical resistant clothing/ footwear. Applicators and other handlers must wear: Wear long sleeved shirt, long pants and shoes with socks. Follow manufacturer's instructio | recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | ns for cleaning/ maintaini ng Personal Protective Equipmen t. If no such instructio ns for washable s, use detergent and hot water. Keep and wash personal protective equipmen t separatel y from other laundry. | |

| ROUNDUP WEED AND GRASS KILLER (GRASS AND WEED KILLER) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
| DATE | COMPONENT | WGT % | CAS # | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 09/01/1989 | Ethoxylated Tallowamines | 5-10 | NG | Keep out of reach of children. CAUTION! Harmful if swallowed. May cause eye irritation. Keep people and pets off treated areas until spray solution has dried. | Dermal and inhalation. | None provided by supplier. | None provided by supplier. | This product will cause gastrointestinal tract irritation. | No special precautions are recommended. | Roundup L&G concentrate grass and weed killer may cause skin irritation. As with any chemical product, prudent handling practices and care are advised to minimize skin contact. Wash hands and contaminate skin thoroughly with soap and water after handling. Clothing soaked with a solution of Roundup L&G concentrate grass and weed killer should be promptly removed | Respiratory protection should not be required for normal use and handling. During abnormal circumstances where possible exposure to heavy mists may occur, prudence would dictate the use of an appropriate NIOSH/MSHA respirator to minimize the exposure. The respirator use limitations specified by NIOSH/MSHA or the manufacturer must be observed. |

| MONSANTO ROUNDUP MSDS' |
|---|

| | | | | | | | | | | and laundered before reuse. | |

**ROUNDUP WEED AND GRASS KILLER (GRASS AND WEED KILLER) CONCENTRATE**

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 08/03/1995 | Glysophate, isopropylamine salt of N-Phosphonomethyl glycine | 18 | 38641-94-0 | IMMEDIATE CONCERNS: May cause eye irritation. Avoid contact with eyes, skin or clothing.  Keep out of reach of children. | NG | This substance is not expected to cause prolonged or significant skin irritation.  If absorbed through the skin, this substance is considered practically non-toxic to internal organs.  This product is not expected to cause allergic skin reaction. | Overexposure to spray mist may result in minor irritation of the upper respiratory tract. | Ingestion may produce irritation of the digestive tract as demonstrated by signs and symptoms of mouth membrane irritation, nausea, vomiting and diarrhea. | No special ventilation is necessary. | No special skin protection is usually necessary.  Avoid prolonged or frequently repeated skin contact with this material.  Skin contact can be minimized by wearing protective clothing.  Wash thoroughly with | Handling of the undiluted product is not likely to present an airborne exposure concern during normal handling.  In the event of an accidental discharge of the material during manufacture or handling which produces a heavy vapor or mist, workers should put on respiratory protection equipment.  Consult respirator manufacturer to determine appropriate type of equipment.  Observe respirator use limitations specified by NIOSH MSHA or |
| | Inert Ingredients | ~81.99 | NG | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |  |  | soap and water after handling. | the manufacturer. For application of product diluted in accordance with label instructions, no special respiratory protection is required. |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/31/2000 | Glyphosate, Isopropylamine Salt | 25 | 38641-94-0 | IMMEDIATE CONCERNS: Causes eye irritation. Avoid contact with eyes or clothing. Wash thoroughly with soap and water after handling.  Keep out of reach of children. | NG | This substance is not expected to cause prolonged or significant skin irritation.  If absorbed through the skin, this substance is considered practically non-toxic to internal organs.  This product is not expected to cause allergic skin reaction. | Overexposure to spray mist may result in minor irritation of the upper respiratory tract. | Ingestion may produce irritation of the digestive tract as demonstrated by signs and symptoms of mouth membrane irritation, nausea, vomiting and diarrhea. | No special ventilation is necessary. | Although this product does not present a significant skin concern, minimize skin contamination by following good industrial practice. Wearing protective gloves is recommended. Wash hands and contaminated skin thoroughly after handling. | For Handling the Concentrated Product:  Avoid breathing vapor or mist.  This product concentrate is not likely to pose an airborne exposure concern during manufacture or packaging.  In the event of abnormal exposure conditions, use NIOSH/MSHA approved equipment.  In work situations where an air purifying respirator is appropriate to be use, use of a full face respirator equipped with purifying elements for protection against organic vapor and dust/mist approved for pesticides is recommended.  Use Cartridges with NIOSH/MSHA approval number TC-23C or canister with NIOSH/MSHA approval number TC-14G. Full facepiece replaces the need for chemical goggles.  Observe respirator use limitation specified by the manufacturers.  Respiratory protection programs must comply with 29 CFR 1910.134.   For |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Use of Product in accordance with label instructions: Respirators are not required for use of this product in accordance with label instructions. |

**ROUNDUP WEED AND GRASS KILLER CONCENTRATE PLUS**

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 01/01/1970 | Isopropylamine Salt of Glyphosate | 18 | 38641-94-0 | OSHA: Hazardous. CAUTION! Causes moderate eye irritation. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when | Not expected to produce significant adverse effects when | None Given | Provide local exhaust ventilation. | No special requireme nt when used as | If airborne exposure is excessive: Wear respirator. Full facepiece/ hood/ helmet respirator |
| | Diquat Dibromide | 0.73 | 85-00-7 | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Water and minor formulating ingredients | 81.27 | NG | | | recommended use instructions are followed. | recommended use instructions are followed. | | | recommended. If repeated or prolonged contact: Wear chemical resistant gloves. | replaces need for chemical goggles. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| 06/05/2002 | Isopropylamine Salt of Glyphosate | 18 | 38641-94-0 | OSHA: Hazardous. CAUTION! Causes moderate eye irritation. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | Provide local exhaust ventilation. | No special requirement when used as recommended. If repeated or prolonged contact: Wear chemical resistant gloves. | If airborne exposure is excessive: Wear respirator. Full facepiece/ hood/ helmet respirator replaces need for chemical goggles. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Diquat Dibromide | 0.73 | 85-00-7 | | | | | | | | |
| | Other Ingredients | 81.27 | NG | | | | | | | | |
| 10/16/2009 | Isopropylamine Salt of Glyphosate | 18 | 38641-94-0 | OSHA: Hazardous. CAUTION! Causes moderate eye irritation. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | Provide local exhaust ventilation. | No special requirement when used as recommended. If repeated or prolonged contact: Wear chemical resistant gloves. | If airborne exposure is excessive: Wear respirator. Full facepiece/ hood/ helmet respirator replaces need for chemical goggles. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Diquat Dibromide | 0.73 | 85-00-7 | | | | | | | | |
| | Water and minor formulating ingredients | 81.27 | NG | | | | | | | | |
| 12/15/2010 | Isopropylamine Salt of Glyphosate | 18 | 38641-94-0 | OSHA: Hazardous. CAUTION! Causes moderate eye | Skin contact, eye contact, | Not expected to produce significant | Not expected to produce significant | Not expected to produce significant | Provide local exhaust ventilation. | No special requireme | If airborne exposure is excessive: Wear respirator. Full |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | **MONSANTO ROUNDUP MSDS'** | | | | | | | |
| | Diquat Dibromide | 0.73 | 85-00-7 | irritation. | inhalation. | adverse effects when recommended use instructions are followed. | adverse effects when recommended use instructions are followed. | adverse effects when recommended use instructions are followed. | | nt when used as recomme nded. If repeated or prolonged contact: Wear chemical resistant gloves. | facepiece/ hood/ helmet respirator replaces need for chemical goggles. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Water and minor formulating ingredients | 81.27 | NG | | | | | | | | |
| 05/13/2015 | Isopropylamine Salt of Glyphosate | 18 | 38641-94-0 | OSHA:  Hazardous. DANGER!  Causes damage to liver, kidney, blood, eyes, cardiovascular system and/ or gastrointestinal tract through prolonged or repeated exposure. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommende d use instructions are followed. | No special requirement when used as recommended. If airborne exposure is excessive: Provide adequate ventilation to keep airborne concentration below exposure limits. | No special requireme nt when used as recomme nded.  If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended.  If airborne exposure is excessive: Wear respirator. Full facepiece/ hood/ helmet respirator replaces need for chemical goggles. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Diquat Dibromide | 0.73 | 85-00-7 | | | | | | | | |
| | Water and minor formulating ingredients | 81.27 | NG | | | | | | | | |
| 11/04/2015 | Isopropylamine Salt of Glyphosate | 18 | 38641-94-0 | OSHA:  Hazardous. WARNING!  May cause damage to eyes or kidneys through prolonged or repeated exposure. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommende d use instructions | No special requirement when used as recommended. If airborne exposure is excessive: Provide | No special requireme nt when used as recomme nded.  If repeated | No special requirement when used as recommended.  If airborne exposure is excessive: Wear respirator. Full facepiece/ hood/ |
| | Diquat Dibromide | 0.73 | 85-00-7 | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Water and minor formulating ingredients | 81.27 | NG | | | | | are followed. | adequate ventilation to keep airborne concentration below exposure limits. | or prolonged contact: Wear chemical resistant gloves. | helmet respirator replaces need for chemical goggles. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| 05/17/2016 | Isopropylamine Salt of Glyphosate | 18 | 38641-94-0 | OSHA:  Hazardous.  WARNING!  May cause damage to eyes or kidneys through prolonged or repeated exposure. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | No special requirement when used as recommended. If airborne exposure is excessive: Provide adequate ventilation to keep airborne concentration below exposure limits. | No special requirement when used as recommended. If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended.  If airborne exposure is excessive: Wear respirator.  Full facepiece/ hood/ helmet respirator replaces need for chemical goggles. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Diquat Dibromide | 0.73 | 85-00-7 | | | | | | | | |
| | Water and minor formulating ingredients | 81.27 | NG | | | | | | | | |

| ROUNDUP WEED AND GRASS KILLER 1 CONCENTRATE | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | **HAZARDS / HEALTH EFFECTS** | | | | | **CONTROL / PPE** | |
| **DATE** | **COMPONENT** | **WGT %** | **CAS #** | **HAZARDS / CARCINOGENICITY** | **ROUTE(S)** | **SKIN** | **INHALATION** | **INGESTION** | **ENGINEERING** | **SKIN** | **RESPIRATORY** |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 04/07/1999 | Glyphosate, Isopropylamine Salt | 18 | 38641-94-0 | IMMEDIATE CONCERNS: Causes eye irritation. Avoid contact with eyes or clothing. Wash thoroughly with soap and water after handling. Keep out of reach of children. | NG | This substance is not expected to cause prolonged or significant skin irritation. If absorbed through the skin, this substance is considered practically non-toxic to internal organs. This product is not expected to cause allergic skin reaction. | Overexposure to spray mist may result in minor irritation of the upper respiratory tract. | Ingestion may produce irritation of the digestive tract as demonstrated by signs and symptoms of mouth membrane irritation, nausea, vomiting and diarrhea. | No special ventilation is necessary. | Although this product does not present a significant skin concern, minimize skin contamination by following good industrial practice. Wearing protective gloves is recommended. Wash hands and contaminated skin thoroughly after handling. | For Handling the Concentrated Product:  Avoid breathing vapor or mist.  This product concentrate is not likely to pose an airborne exposure concern during manufacture or packaging.  In the event of abnormal exposure conditions, use NIOSH/MSHA approved equipment.  In work situations where an air purifying respirator is appropriate to be use, use of a full face respirator equipped with purifying elements for protection against organic vapor and dust/mist approved for pesticides is recommended.  Use Cartridges with NIOSH/MSHA approval number TC-23C or canister with NIOSH/MSHA approval number TC-14G.  Full facepiece replaces the need for chemical goggles.  Observe respirator use limitation specified by the manufacturers. Respiratory protection programs must comply with 29 CFR 1910.134.  For |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Use of Product in accordance with label instructions: Respirators are not required for use of this product in accordance with label instructions. |
| 10/31/2000 | Glyphosate, Isopropylamine Salt | 1.92 | 38641-94-0 | IMMEDIATE CONCERNS: Causes eye irritation. Avoid contact with eyes or clothing. Wash thoroughly with soap and water after handling.  Keep out of reach of children. | NG | This substance is not expected to cause skin irritation. | If inhaled, this substance is considered practically non-toxic to internal organs.  This substance may be irritating if inhaled. | If swallowed, this product may cause gastrointestinal tract irritation. | No special ventilation is necessary. | Although this product does not present a significant skin concern, minimize skin contamination by following good industrial practice. Wearing protective gloves is recommended. Wash hands and contaminated skin thoroughl | Avoid breathing vapor or mist. |

**MONSANTO ROUNDUP MSDS'**

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | y after handling. |
| 07/22/2002 | Isopropylamine Salt of Glyphosate | 1.92 | 38641-94-0 | OSHA: Hazardous. CAUTION! Causes eye irritation. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | No special requirement when used as recommended | No special requirement when used as recommended.  If airborne exposure is excessive: Wear respirator.  Full facepiece/ hood/ helmet respirator replaces need for chemical goggles.  When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 98.08 | | | | | | | | | |

**ROUNDUP WEED AND GRASS KILLER III READY-TO-USE**

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 01/23/2012 | Isopropylamine Salt of Glyphosate | 2 | 38641-94-0 | OSHA: Hazardous. CAUTION! Causes moderate but temporary eye irritation. | Eye contact, skin contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions | Not expected to produce significant adverse effects when recommended use instructions | Not expected to produce significant adverse effects when recommended use | No special requirement when used as recommended. If airborne exposure is excessive: | No special requirement when used as recommended. | No special requirement when used as recommended. When recommended, consult |
| | Pelargonic and related fatty acids | 2 | 112-05-0 | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Other Ingredients | 96 | NG | | | are followed. | are followed. | instructions are followed. | Provide adequate ventilation to keep airborne concentration below exposure limits. | | manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| 08/21/2013 | Isopropylamine Salt of Glyphosate | 2 | 38641-94-0 | OSHA: Hazardous. CAUTION! Causes moderate but temporary eye irritation. | Eye contact, skin contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | No special requirement when used as recommended. | No special requirement when used as recommended. If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Pelargonic and related fatty acids | 2 | 112-05-0 | | | | | | | | |
| | Other Ingredients | 96 | NG | | | | | | | | |
| 05/13/2015 | Isopropylamine Salt of Glyphosate | 2 | 38641-94-0 | OSHA: Hazardous. WARNING! Causes serious eye irritation. | Eye contact, skin contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | No special requirement when used as recommended. | No special requirement when used as recommended. If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Pelargonic and related fatty acids | 2 | 112-05-0 | | | | | | | | |
| | Other Ingredients | 96 | NG | | | | | | | | |
| 05/13/2015 | Isopropylamine Salt of Glyphosate | 2 | 38641-94-0 | OSHA: Hazardous. WARNING! Causes serious eye irritation. | Eye contact, skin contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions | Not expected to produce significant adverse effects when recommended use instructions | Not expected to produce significant adverse effects when recommende d use | No special requirement when used as recommended. | No special requireme nt when used as recommen ded. If | No special requirement when used as recommended. When recommended, consult |
| | Pelargonic and related fatty acids | 2 | 112-05-0 | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Other Ingredients | 96 | NG | | | are followed. | are followed. | instructions are followed. | | repeated or prolonged contact: Wear chemical resistant gloves. | manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |

| ROUNDUP L&G HERBICIDE READY-TO-USE | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | **HAZARDS / HEALTH EFFECTS** | | | | | **CONTROL / PPE** | | |
| **DATE** | **COMPONENT** | **WGT %** | **CAS #** | **HAZARDS / CARCINOGENICITY** | **ROUTE(S)** | **SKIN** | **INHALATION** | **INGESTION** | **ENGINEERING** | **SKIN** | **RESPIRATORY** |
| 02/01/1990 | N-(phosphosnomethyl) glycine in the form of its monoammonium salt | 0.96 | 1071-83-6 | OSHA: Not hazardous. Keep out of reach of children. CAUTION! | Inhalation and dermal. | No significant adverse health effects when recommended safety precautions are followed. | No significant adverse health effects when recommended safety precautions are followed. | No significant adverse health effects when recommended safety precautions are followed. | No special precautions are recommended. | Roundup L&G ready-to-use herbicide does not present significant skin concern requiring special precautions. | Respiratory protection is not required for normal use and handling. |
| | Inert Ingredients | 99.04 | NG | | | | | | | | |
| 07/01/1991 | N-(phosphosnomethyl) glycine in the form of its monoammonium salt | .99 | 1071-83-6 | OSHA: Not hazardous. Keep out of reach of children. CAUTION! | Inhalation and dermal. | No significant adverse health effects when recommended safety precautions are followed. | No significant adverse health effects when recommended safety precautions are followed. | No significant adverse health effects when recommended safety precautions are followed. | No special precautions are recommended. | Roundup L&G ready-to-use herbicide does not present significant skin concern requiring special precautions. | Respiratory protection is not required for normal use and handling. |
| | Inert Ingredients | 99.01 | NG | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 09/01/1992 | N-(phosphosnomethyl) glycine in the form of its monoammonium salt | 18 | 1071-83-6 | OSHA: Not hazardous. Keep out of reach of children. CAUTION! Harmful if swallowed. May cause eye irritation. Keep people and pets off treated areas until spray solution has dried. | Inhalation and dermal. | No significant adverse health effects when recommended safety precautions are followed. | No significant adverse health effects when recommended safety precautions are followed. | No significant adverse health effects when recommended safety precautions are followed. | No special precautions are recommended. | Roundup L&G Concentrate Grass & Weed Killer may cause skin irritation. As with any chemical product, prudent handling practices and care are advised to minimize skin contact. Wash hands and contaminated skin thoroughly with soap and water after handling. Clothing soaked with a solution of Roundup L&G Concentrate Grass & Weed Killer should be promptly removed | Respiratory protection should not be required for normal use and handling. During abnormal circumstances where possible exposure to heavy mists may occur, prudence would dictate the use of an appropriate NIOSH/MSHA respirator to minimize the exposure. The respirator use limitations specified by NIOSH/MSHA or the manufacturer must be observed. |
| | Inert Ingredients | 82 | NG | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | and laundered before reuse. |

**ROUNDUP WEED & GRASS KILLER PLUS FAST ACT SELECT READY-TO-USE**

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 11/04/2015 | Isopropylamine Salt of Glyphosate | 2 | 38641-94-0 | OSHA: Hazardous WARNING! Causes serious eye irritation. | Skin contact, eye contact, inhalation, ingestion. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions | Provide local exhaust ventilation. Provide adequate ventilation to keep airborne concentration | No special requirement when used as recommended. If repeated | If airborne exposure is excessive: Wear respirator. Respiratory protection programs must comply with all local/ regional/ national regulations. |
| | Diquat Dibromide | 0.11 | 85-00-7 | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Other Ingredients | ≤98 | NG | | | | | are followed. | below exposure limits. | or prolonged contact: Wear chemical resistant gloves. Keep and wash personal protective equipment separately from other laundry. Follow manufacturer's instructions for cleaning/ maintaining Personal Protective Equipment. If no such instruction for washables, use detergent and hot water. | Full facepiece/ hood/ helmet respirator replaces need for chemical goggles. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |

**ROUNDUP WEED & GRASS KILLER 1 PLUS PREVENTER**

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 11/04/2015 | Isopropylamine Salt of Glyphosate | 1 | 38641-94-0 | CAUTION! Causes moderate eye irritation. | Skin contact, eye contact, | Not expected to produce significant | Not expected to produce significant | Not expected to produce significant | No special precautions are recommended. | No special requireme | No special requirement when used as |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **MONSANTO ROUNDUP MSDS'** | | | | | | | | | | | |
| | Dithiopyr | 0.03 | 97886-45-8 | | inhalation. | adverse effects when recommended use instructions are followed. | adverse effects when recommended use instructions are followed. | adverse effects when recommended use instructions are followed. | | nt when used as recomme nded.  If repeated or prolonged contact: Wear chemical resistant gloves. | recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 98.97 | NG | | | | | | | | |
| 04/21/2004 | Isopropylamine Salt of Glyphosate | 18 | 38641-94-0 | CAUTION!  Causes moderate eye irritation. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommende d use instructions are followed. | No special precautions are recommended. | No special requireme nt when used as recomme nded. | If airborne exposure is excessive: Wear respirator.  Observe respirator use limitations specified by NIOSH or the manufacturer. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Diquat Dibromide | 0.73 | 85-00-7 | | | | | | | | |
| | Ammonium Salt of Imazapic | 0.3 | 10409 8-49-9 | | | | | | | | |
| | Other Ingredients | 80.97 | NG | | | | | | | | |
| 07/13/2004 | Isopropylamine Salt of Glyphosate | 18 | 38641-94-0 | CAUTION!  Causes moderate eye irritation. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommende d use instructions are followed. | No special precautions are recommended. | No special requireme nt when used as recomme nded. | If airborne exposure is excessive: Wear respirator.  Observe respirator use limitations specified by NIOSH or the manufacturer. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Diquat Dibromide | 0.73 | 85-00-7 | | | | | | | | |
| | Ammonium Salt of Imazapic | 0.3 | 10409 8-49-9 | | | | | | | | |
| | Other Ingredients | 80.97 | NG | | | | | | | | |
| **ROUNDUP WEED & GRASS KILLER PREVENTER II READY-TO-USE EXTENDED CONTROL** | | | | | | | | | | | |

| | | | | MONSANTO ROUNDUP MSDS' | | | | | | |
| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/21/2006 | Pelargonic and related fatty acids | 2 | 112-05-0 | OSHA: Hazardous CAUTION! Causes moderate eye irritation. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special precautions are recommended. | No special requirement when used as recommended. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Isopropylamine Salt of Glyphosate | 1 | 38641-94-0 | | | | | | | | |
| | Ammonium Salt of Imazapic | 0.017 | 104098-49-9 | | | | | | | | |
| | Other Ingredients | 96.983 | NG | | | | | | | | |
| 10/16/2009 | Pelargonic and related fatty acids | 2 | 112-05-0 | OSHA: Hazardous CAUTION! Causes moderate eye irritation. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special precautions are recommended. | No special requirement when used as recommended. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Isopropylamine Salt of Glyphosate | 1 | 38641-94-0 | | | | | | | | |
| | Ammonium Salt of Imazapic | 0.017 | 104098-49-9 | | | | | | | | |
| | Other Ingredients | 96.983 | NG | | | | | | | | |
| 12/15/2010 | Pelargonic and related fatty acids | 2 | 112-05-0 | OSHA: Hazardous CAUTION! Causes moderate eye irritation. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | No special precautions are recommended. | No special requirement when used as recommended. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Isopropylamine Salt of Glyphosate | 1 | 38641-94-0 | | | | | | | | |
| | Ammonium Salt of Imazapic | 0.017 | 104098-49-9 | | | | | | | | |
| | Other Ingredients | 96.983 | NG | | | | | | | | |
| 05/13/2015 | Pelargonic and related fatty | 2 | 112-05-0 | OSHA: Hazardous CAUTION! Causes moderate eye | Skin contact, eye contact, | Not expected to produce significant | Not expected to produce significant | Not expected to produce significant | No special requirement when used as | No special requireme | No special requirement when used as |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | acids | | | irritation. | | inhalation. | | adverse effects when recommended use instructions are followed. | adverse effects when recommended use instructions are followed. | adverse effects when recommended use instructions are followed. | recommended. If airborne exposure is excessive: Provide adequate ventilation to keep airborne concentration below exposure limits. | nt when used as recommended. | recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Isopropylamine Salt of Glyphosate | 1 | 38641-94-0 | | | | | | | | | | |
| | Ammonium Salt of Imazapic | 0.017 | 104098-49-9 | | | | | | | | | | |
| | Other Ingredients | 96.983 | NG | | | | | | | | | | |
| 10/15/2015 | Pelargonic and related fatty acids | 2 | 112-05-0 | OSHA: Hazardous CAUTION!  Causes moderate eye irritation. | | Skin contact, eye contact, inhalation. | | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | No special requirement when used as recommended. If airborne exposure is excessive: Provide adequate ventilation to keep airborne concentration below exposure limits. | No special requirement when used as recommended. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Isopropylamine Salt of Glyphosate | 1 | 38641-94-0 | | | | | | | | | | |
| | Ammonium Salt of Imazapic | 0.017 | 104098-49-9 | | | | | | | | | | |
| | Other Ingredients | 96.983 | NG | | | | | | | | | | |

**ROUNDUP WEED & GRASS KILLER PRECISION GEL**

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 11/04/2015 | Isopropylamine Salt of Glyphosate | 1 | 38641-94-0 | OSHA: Hazardous WARNING!  Causes eye irritation. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions | Provide adequate ventilation to keep airborne concentration below exposure limits.  Have eye wash facilities | If repeated or prolonged contact: Wear chemical resistant | If airborne exposure is excessive: Wear respirator.  Observe respirator use limitations specified by NIOSH or the manufacturer. When |
| | Pelargonic and related fatty acids | 2 | 112-05-0 | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Water and minor formulating ingredients | 98.97 | NG | | | | | are followed. | immediately available at locations where eye contact can occur. | gloves. Chemical resistant gloves include those made of waterproof materials such as nitrile, butyl, neoprene, polyvinyl chloride (PVC), natural rubber and /or barrier laminate. If there is a significant potential for contact: Wear face shield. Wear chemical resistant clothing/ footwear. | recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |

**ROUNDUP WEED & GRASS KILLER READY-TO-USE**

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/01/1993 | Glyphosate, N-(phosphonomethyl) Glycine, in the form of its Isopropylamine Salt) | .96 | 1071-83-6 | OSHA:  Not Hazardous  Keep out of reach of children.  CAUTION! | Inhalation and skin contact. | None. | None. | Swallowing of a similar, but more concentrated formulation has been reported to produce gastrointestinal discomfort, nausea, vomiting and diarrhea. | No special precautions are recommended. | Roundup ready-to-use week & grass killer does not present significant skin concern requiring special precautions. | Respiratory protection is not required for normal use and handling. |
| | Inert Ingredients | 99.04 | NG | | | | | | | | |
| 09/25/1995 | Glyphosate, N-(phosphonomethyl) Glycine, in the form of its Isopropylamine Salt) | .96 | 38641-94-0 | IMMEDIATE CONCERNS: Wash thoroughly with soap and water after handling.  Causes eye irritation.  Avoid contact with eyes or clothing.  Keep out of reach of children. | NG | This substance is not expected to cause skin irritation. | If inhaled, this substance is considered practically non-toxic to internal organs.  This substance may be irritating if inhaled. | If swallowed, this product may cause gastrointestinal tract irritation. | No special ventilation is necessary. | No special skin protection is usually necessary.  Avoid prolonged or frequently repeated skin contact with this material.  Skin contact can be minimized by wearing protective clothing.  Wash thoroughly with soap and water after handling. | Handling of the undiluted product is not likely to present an airborne exposure concern during normal handling.  In the event of an accidental discharge of the material during manufacture or handling which produces a heavy vapor or mist, workers should put on respiratory protection equipment. Consult respirator manufacturer to determine appropriate type of equipment.  Observe respirator use limitations specified by NIOSH MSHA or the manufacturer.  For application of product in accordance with label instructions, no special respiratory protection is |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | required. |
| 01/27/1997 | Glyphosate, N-(phosphonomethyl) Glycine, in the form of its Isopropylamine Salt) | .96 | 38641-94-0 | IMMEDIATE CONCERNS: Wash thoroughly with soap and water after handling. Causes eye irritation. Avoid contact with eyes or clothing. Keep out of reach of children. | NG | This substance is not expected to cause skin irritation. | If inhaled, this substance is considered practically non-toxic to internal organs. This substance may be irritating if inhaled. | If swallowed, this product may cause gastrointestinal tract irritation. | No special ventilation is necessary. | Although this product does not present a significant skin concern, minimize skin contamination by following good industrial practice. Wearing protective gloves is recommended. Wash hands and contaminated skin thoroughly after handling. | Avoid breathing vapor or mist. |
| | Inert Ingredients | ~99.04 | NG | | | | | | | | |
| 04/07/1999 | Glyphosate, Isopropylamine Salt | 0.96 | 38641-94-0 | Not a carcinogen. IMMEDIATE CONCERNS: Causes eye irritation. Avoid contact with eyes or clothing. Wash thoroughly with soap and water after handling. Keep out of | NG | This substance is not expected to cause skin irritation. | If inhaled, this substance is considered practically non-toxic to internal organs. This substance may be irritating if inhaled. | If swallowed, this product may cause gastrointestinal tract irritation. | No special ventilation is necessary. | Although this product does not present a significant skin concern, minimize skin | Avoid breathing vapor or mist. |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | children. | | | | | | | contamination by following good industrial practice. Wearing protective gloves is recommended. Wash hands and contaminated skin thoroughly after handling. |
| 07/22/2002 | Isopropylamine Salt of Glyphosate | 2 | 38641-94-0 | CAUTION!  Causes moderate eye irritation. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | No special requirement when used as recommended. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 98 | NG | | | | | | | | |
| 10/19/2004 | Isopropylamine Salt of Glyphosate | 2 | 38641-94-0 | CAUTION!  Causes moderate eye irritation. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | No special requirement when used as recommended. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 98 | NG | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 07/05/2006 | Isopropylamine Salt of Glyphosate | 0.96 | 38641-94-0 | CAUTION! | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | No special requirement when used as recommended. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 99.04 | NG | | | | | | | | |

### ROUNDUP WEED & GRASS KILLER READY-TO-USE PLUS

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 05/28/2004 | Isopropylamine Salt of Glyphosate | 2 | 38641-94-0 | CAUTION! Causes moderate eye irritation | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | No special requirement when used as recommended. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Pelargonic and related fatty acids | 2 | 112-05-0 | | | | | | | | |
| | Water and minor formulating ingredients | 96 | NG | | | | | | | | |
| 10/22/2009 | Isopropylamine Salt of Glyphosate | 2 | 38641-94-0 | OSHA: Hazardous CAUTION! Causes moderate eye irritation | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | No special requirement when used as recommended. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Pelargonic and related fatty acids | 2 | 112-05-0 | | | | | | | | |
| | Water and minor formulating ingredients | 96.52 | NG | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12/15/2010 | Isopropylamine Salt of Glyphosate | 2 | 38641-94-0 | OSHA: Hazardous CAUTION! Causes moderate eye irritation | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | No special requirement when used as recommended. If airborne exposure is excessive: Provide adequate ventilation to keep airborne concentration below exposure limits. | No special requirement when used as recommended. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Pelargonic and related fatty acids | 2 | 112-05-0 | | | | | | | | |
| | Water and minor formulating ingredients | 96 | NG | | | | | | | | |
| 08/21/2013 | Isopropylamine Salt of Glyphosate | 2 | 38641-94-0 | OSHA: Hazardous CAUTION! Causes moderate eye irritation | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | No special requirement when used as recommended. | No special requirement when used as recommended. If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Pelargonic and related fatty acids | 2 | 112-05-0 | | | | | | | | |
| | Water and minor formulating ingredients | 96 | NG | | | | | | | | |
| 08/21/2013 | Isopropylamine Salt of Glyphosate | 2 | 38641-94-0 | OSHA: Hazardous CAUTION! Causes serious eye irritation | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | No special requirement when used as recommended. | No special requirement when used as recommended. If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Pelargonic and related fatty acids | 2 | 112-05-0 | | | | | | | | |
| | Water and minor formulating ingredients | 96 | NG | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/15/2015 | Isopropylamine Salt of Glyphosate | 2 | 38641-94-0 | OSHA: Hazardous CAUTION! Causes serious eye irritation | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | No special requirement when used as recommended. | No special requirement when used as recommended. If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Pelargonic and related fatty acids | 2 | 112-05-0 | | | | | | | | |
| | Water and minor formulating ingredients | 96 | NG | | | | | | | | |

| ROUNDUP WEED & GRASS KILLER SUPER CONTCENTRATE | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | CONTROL / PPE | | |
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 04/16/1999 | Glyphosate, Isopropylamine Salt | 41 | 38641-94-0 | IMMEDIATE CONCERNS: Causes eye irritation. Avoid contact with eyes or clothing. Wash thoroughly with soap and water after handling. Keep out of reach of children. | NG | This substance is not expected to cause skin irritation. If absorbed through the skin, this substance is considered practically non-toxic to internal organs. This product is not expected to cause allergic skin reaction. | Overexposure to spray mist may result in minor irritation of the upper respiratory tract. | Ingestion may produce irritation of the digestive tract as demonstrated by signs and symptoms of mouth membrane irritation, nausea, vomiting and diarrhea. | Use this material only in well ventilated areas. | Although this product does not present a significant skin concern, minimize skin contamination by following good industrial practice. Wearing protective gloves is recommended. Wash hands and contaminated skin | Avoid breathing vapor or mist. This product is not likely to pose an airborne exposure concern when handled and used in accordance with label instructions. |


| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | thoroughly after handling. | |
| 07/26/2000 | Glyphosate, Isopropylamine Salt | 50.2 | 38641-94-0 | IMMEDIATE CONCERNS: May cause eye irritation. Avoid contact with eyes or clothing. Wash thoroughly with soap and water after handling.  Keep out of reach of children. | NG | This substance is not expected to cause skin irritation. If absorbed through the skin, this substance is considered practically non-toxic to internal organs.  This product is not expected to cause allergic skin reaction. | Overexposure to spray mist may result in minor irritation of the upper respiratory tract. | Ingestion may produce irritation of the digestive tract as demonstrated by signs and symptoms of mouth membrane irritation, nausea, vomiting and diarrhea. | No special ventilation is necessary. | Although this product does not present a significant skin concern, minimize skin contamination by following good industrial practice. Wearing protective gloves is recommended. Wash hands and contaminated skin thoroughly after handling. | For Handling the Concentrated Product:  Avoid breathing vapor or mist.  This product concentrate is not likely to pose an airborne exposure concern during manufacture or packaging.  In the event of abnormal exposure conditions, use NIOSH approved equipment.  In work situations where an air purifying elements for protection against organic vapor and dust/ mist approved for pesticides is recommended.  Full facepiece replaces the need for chemical goggles. Observe respirator use limitations specified by the manufacture's. Respiratory protection programs must comply with 29 CFR 1910.134.  For use of Product in accordance with label instructions: |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Respirators are not required for use of this product in accordance with label instructions. |
| 10/31/2000 | Glyphosate, Isopropylamine Salt | 50.2 | 38641-94-0 | IMMEDIATE CONCERNS: Causes eye irritation. Avoid contact with eyes or clothing. Wash thoroughly with soap and water after handling.  Keep out of reach of children. | NG | This substance is not expected to cause skin irritation. If absorbed through the skin, this substance is considered practically non-toxic to internal organs.  This product is not expected to cause allergic skin reaction. | Overexposure to spray mist may result in minor irritation of the upper respiratory tract. | Ingestion may produce irritation of the digestive tract as demonstrated by signs and symptoms of mouth membrane irritation, nausea, vomiting and diarrhea. | No special ventilation is necessary. | Although this product does not present a significant skin concern, minimize skin contamination by following good industrial practice. Wearing protective gloves is recommended. Wash hands and contaminated skin thoroughly after handling. | For Handling the Concentrated Product:  Avoid breathing vapor or mist.  This product concentrate is not likely to pose an airborne exposure concern during manufacture or packaging.  In the event of abnormal exposure conditions, use NIOSH approved equipment.  In work situations where an air purifying elements for protection against organic vapor and dust/ mist approved for pesticides is recommended.  Full facepiece replaces the need for chemical goggles. Observe respirator use limitations specified by the manufacture's. |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Respiratory protection programs must comply with 29 CFR 1910.134.  For use of Product in accordance with label instructions: Respirators are not required for use of this product in accordance with label instructions. |
| 01/23/2002 | Isopropylamine Salt of Glyphosate | 41 | 38641-94-0 | OSHA:  Hazardous WARNING!  Keep out of reach of children.  Causes substantial but temporary eye injury. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | Have eye wash facilities immediately available at locations where eye contact can occur. | If repeated or prolonged contact:  Wear chemical resistant gloves. | No special requirement when used as recommended.  When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 59 | NG | | | | | | | | |
| 04/03/2003 | Isopropylamine Salt of Glyphosate | 50.2 | 38641-94-0 | OSHA:  Hazardous CAUTION!  Causes moderate eye irritation. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | If repeated or prolonged contact:  Wear chemical resistant gloves. | No special requirement when used as recommended.  When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 49.8 | NG | | | | | | | | |
| 10/16/2009 | Isopropylamine Salt of Glyphosate | 50.2 | 38641-94-0 | OSHA:  Hazardous CAUTION!  Causes moderate eye | Skin contact, eye contact, | Not expected to produce significant | Not expected to produce significant | None Given | No special requirement when used as | If repeated or | No special requirement when used as |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **MONSANTO ROUNDUP MSDS'** | | | | | | | | | | | |
| | Other Ingredients | 49.8 | NG | irritation. | inhalation. | adverse effects when recommended use instructions are followed. | adverse effects when recommended use instructions are followed. | | recommended. | prolonged contact: Wear chemical resistant gloves. | recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| 08/26/2010 | Isopropylamine Salt of Glyphosate | 41 | 38641-94-0 | OSHA:  Hazardous CAUTION!  Causes eye irritation. Harmful if swallowed. | Skin contact, eye contact. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | No special requirement when used as recommended. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 59 | NG | | | | | | | | |
| 12/15/2010 | Isopropylamine Salt of Glyphosate | 50.2 | 38641-94-0 | OSHA:  Hazardous CAUTION!  Causes moderate but temporary eye irritation.  Causes skin irritation. Harmful if inhaled. | Skin contact, eye contact, inhalation. | May cause skin irritation. | Harmful by inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | No special requirement when used as recommended. If airborne exposure is excessive: Provide adequate ventilation to keep airborne concentration below exposure limits. | Wear chemical resistant gloves.  If there is significant potential for contact: Wear face shield. Wear chemical resistant clothing/footwear. | If airborne exposure is excessive: Wear respirator.  Full facepiece/ hood/ helmet respirator replaces need for chemical goggles. Respiratory protection programs must comply with all local/ regional/ national regulations. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 49.8 | NG | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 07/29/2013 | Isopropylamine Salt of Glyphosate | 41 | 38641-94-0 | OSHA:  Hazardous CAUTION!  Eye and skin irritant.  Causes eye irritation. | Skin contact, eye contact, ingestion. | May cause skin irritation. | Harmful by inhalation. | Harmful if swallowed. | Provide local exhaust ventilation. | No special requirement when used as recommended.  If repeated or prolonged contact:  Wear chemical resistant gloves. | No special requirement when used as recommended.  When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Surfactant | 14.5 | NG | Causes skin irritation.  Harmful if swallowed. | | | | | | | |
| | Water and minor formulating ingredients | 44.5 | NG | | | | | | | | |
| 05/08/2015 | Isopropylamine Salt of Glyphosate | 50.2 | 38641-94-0 | OSHA:  Acute toxicity, inhalation - Category 4 WARNING!  Harmful if inhaled. | Skin contact, eye contact, inhalation. | May cause skin irritation. | Harmful by inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | No special requirement when used as recommended.  If airborne exposure is excessive: Provide adequate ventilation to keep airborne concentration below exposure limits. | Wear chemical resistant gloves.  If there is significant potential for contact:  Wear face shield.  Wear chemical resistant clothing/footwear. | If airborne exposure is excessive: Wear respirator.  Full facepiece/ hood/ helmet respirator replaces need for chemical goggles.  Respiratory protection programs must comply with all local/ regional/ national regulations.  When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Other Ingredients | 49.8 | NG | | | | | | | | |
| 10/15/2015 | Isopropylamine Salt of Glyphosate | 50.2 | 38641-94-0 | OSHA:  Acute toxicity, inhalation - Category 4 | Skin contact, eye contact, | May cause skin irritation. | Harmful by inhalation. | Not expected to produce significant | No special requirement when used as | Wear chemical resistant | If airborne exposure is excessive: Wear respirator.  Full |

**MONSANTO ROUNDUP MSDS'**

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Other Ingredients | 49.8 | NG | WARNING! Harmful if inhaled. | inhalation. | | | adverse effects when recommended use instructions are followed. | recommended. If airborne exposure is excessive: Provide adequate ventilation to keep airborne concentration below exposure limits. | gloves. If there is significant potential for contact: Wear face shield. Wear chemical resistant clothing/footwear. | facepiece/ hood/ helmet respirator replaces need for chemical goggles. Respiratory protection programs must comply with all local/ regional/ national regulations. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |

**ROUNDUP WEEDKILLER FAST ACTION READY-TO-USE**

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |
| 03/22/2011 | Isopropylamine Salt of Glyphosate | 1 | 38641-94-0 | EU & Ireland, U.K.: Not classified as dangerous. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | NG | If repeated or prolonged contact: Wear chemical resistant gloves. Chemical resistant gloves include those made of waterproof materials such as nitrile, butyl, neoprene, polyvinyl | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Pelargonic and related fatty acids | 1 | 112-05-0 | | | | | | | | |
| | Water and minor formulating ingredients. | 98 | NG | | | | | | | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | chloride (PVC), natural rubber and/or barrier laminate. |
| 02/12/2015 | Isopropylamine Salt of Glyphosate | 1 | 38641-94-0 | EU, Irelan: Not classified as dangerous. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | None Given | NG | If repeated or prolonged contact: Wear chemical resistant gloves. Chemical resistant gloves include those made of waterproof materials such as nitrile, butyl, neoprene, polyvinyl chloride (PVC), natural rubber and/or barrier laminate. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Pelargonic and related fatty acids | 1 | 112-05-0 | | | | | | | | |
| | Water and minor formulating ingredients. | 98 | NG | | | | | | | | |

**ROUNDUP WILD BLACKBERRY PLUS VINE & BRUSH KILLER**

| DATE | COMPONENT | WGT % | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / CARCINOGENICITY | ROUTE(S) | SKIN | INHALATION | INGESTION | ENGINEERING | SKIN | RESPIRATORY |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 12/15/2010 | Isopropylamine Salt of Glyphosate | 18 | 38641-94-0 | OSHA: Hazardous CAUTION! Causes moderate but temporary eye irritation. | Skin contact, eye contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | No special requirement when used as recommended. If airborne exposure is excessive: Provide adequate ventilation to keep airborne concentration below exposure limits. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Triethylamine Salt of Triclopyr | 2 | 57213-69-1 | | | | | | | | |
| | Other Ingredients | 80 | | | | | | | | | |
| 05/13/2015 | Isopropylamine Salt of Glyphosate | 18 | 38641-94-0 | OSHA: Not Hazardous | Eye contact, skin contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | No special requirement when used as recommended. If airborne exposure is excessive: Provide adequate ventilation to keep airborne concentration below exposure limits. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Triethylamine Salt of Triclopyr | 2 | 57213-69-1 | | | | | | | | |
| | Other Ingredients | 80 | | | | | | | | | |
| 05/13/2015 | Isopropylamine Salt of Glyphosate | 18 | 38641-94-0 | OSHA: Not Hazardous | Eye contact, skin contact, inhalation. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | No special requirement when used as recommended. If airborne exposure is excessive: Provide adequate ventilation to keep airborne concentration below exposure limits. | If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Triethylamine Salt of Triclopyr | 2 | 57213-69-1 | | | | | | | | |
| | Other Ingredients | 80 | | | | | | | | | |
| ROUNDUP WSD | | | | | | | | | | |
| DATE | COMPONENT | WGT | CAS # | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |

| MONSANTO ROUNDUP MSDS' | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | **%** | | **HAZARDS / CARCINOGENICITY** | **ROUTE(S)** | **SKIN** | **INHALATION** | **INGESTION** | **ENGINEERING** | **SKIN** | **RESPIRATORY** |
| 12/01/1991 | Glyphosate | 93.96 | 1071-83-6 | Keep out of reach of children. Causes eye irritation. May be a skin sensitizer. | Skin contact and inhalation. | None Given | Harmful if inhaled. | Harmful if swallowed. | No Special precautions are recommended. | Roundup WSD Herbicide was not irritating to skin in animal tests. However, as with any chemical product, prudent handling practices are advised to minimize skin contact. Wash hands and exposed skin thoroughly with soap and water after handling. | Respiratory protection should not be required. During abnormal circumstances wherein the product may become dusty, prudence would dictate the use of an appropriate NIOSN/ MSHA respirator to minimize exposure. The respirator use limitations specified by NIOSH/ MSHA or the manufacturer must be observed. |
| | Inert Ingredients | 6.04 | NG | | | | | | | | |

| ROUNDUP XTEND WITH VAPORGRIP TECHNOLOGY | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAZARDS / HEALTH EFFECTS | | | | | CONTROL / PPE | | |
| **DATE** | **COMPONENT** | **WGT %** | **CAS #** | **HAZARDS / CARCINOGENICITY** | **ROUTE(S)** | **SKIN** | **INHALATION** | **INGESTION** | **ENGINEERING** | **SKIN** | **RESPIRATORY** |
| 10/09/2014 | Diglycolamine Salt of Dicamba | 14.5 | 10404 0-79-1 | OSHA: Hazardous CAUTION! Causes moderate eye | Skin contact, eye contact, | Not expected to produce significant | Not expected to produce significant | Not expected to produce significant | No special requirement when used as | No special requireme | No special requirement when used as |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **MONSANTO ROUNDUP MSDS'** | | | | | | | | | | | |
| | Monoethanola mine Salt of Glyphosate | 29.2 | 40465-76-7 | irritation. | inhalation, ingestion. | adverse effects when recommended use instructions are followed. | adverse effects when recommended use instructions are followed. | adverse effects when recommende d use instructions are followed. | recommended. | nt when recomme nded. If repeated or prolonged contact: Wear chemical resistant gloves. | recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Surfactant | ≤5 | 68478-96-6 | | | | | | | | |
| | Water and minor formulating ingredients | ≤51.3 | NG | | | | | | | | |
| 03/05/2015 | Diglycolamine Salt of Dicamba | 14.5 | 10404 0-79-1 | OSHA: Hazardous CAUTION! Causes moderate eye irritation. | Skin contact, eye contact, inhalation, ingestion. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommende d use instructions are followed. | No special requirement when used as recommended. | No special requireme nt when used as recomme nded. If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Monoethanola mine Salt of Glyphosate | 29.2 | 40465-76-7 | | | | | | | | |
| | Surfactant | ≤5 | 68478-96-6 | | | | | | | | |
| | Water and minor formulating ingredients | ≤51.3 | NG | | | | | | | | |
| 06/01/2015 | Diglycolamine Salt of Dicamba | 14.5 | 10404 0-79-1 | OSHA: Not Hazardous CAUTION! Causes moderate eye irritation. | Skin contact, eye contact, inhalation, ingestion. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommende d use instructions are followed. | No special requirement when used as recommended. | No special requireme nt when used as recomme nded. If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Monoethanola mine Salt of Glyphosate | 29.2 | 40465-76-7 | | | | | | | | |
| | Surfactant | ≤5 | 68478-96-6 | | | | | | | | |
| | Water and minor formulating ingredients | ≤51.3 | NG | | | | | | | | |
| 10/19/2015 | Diglycolamine Salt of Dicamba | 14.5 | 10404 0-79-1 | OSHA: Not Hazardous CAUTION! Causes | Skin contact, eye contact, | Not expected to produce significant | Not expected to produce significant | Not expected to produce significant | No special requirement when used as | No special requireme | No special requirement when used as |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
|  | **MONSANTO ROUNDUP MSDS'** |
| | Monoethanola mine Salt of Glyphosate | 29.2 | 40465-76-7 | moderate eye irritation. | inhalation, ingestion. | adverse effects when recommended use instructions are followed. | adverse effects when recommended use instructions are followed. | adverse effects when recommende d use instructions are followed. | recommended. | nt when used as recomme nded.  If repeated or prolonged contact: Wear chemical resistant gloves. | recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Surfactant | ≤5 | 68478-96-6 | | | | | | | | |
| | Water and minor formulating ingredients | ≤51.3 | NG | | | | | | | | |
| 05/24/2016 | Diglycolamine Salt of Dicamba | 14.5 | 10404 0-79-1 | NG | Skin contact, eye contact, inhalation, ingestion. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommended use instructions are followed. | Not expected to produce significant adverse effects when recommende d use instructions are followed. | No special requirement when used as recommended. | No special requireme nt when used as recomme nded.  If repeated or prolonged contact: Wear chemical resistant gloves. | No special requirement when used as recommended. When recommended, consult manufacturer of personal protective equipment for the appropriate type of equipment for a given application. |
| | Monoethanola mine Salt of Glyphosate | 29.2 | 40465-76-7 | | | | | | | | |
| | Surfactant | ≤5 | 68478-96-6 | | | | | | | | |
| | Water and minor formulating ingredients | ≤51.3 | NG | | | | | | | | |

# APPENDIX C

## US EPA LABEL REVIEW MANUAL

## Chapter 12 – Labeling Claims

Revised November 2013

# Label Review Manual

## Chapter 12: Labeling Claims



**Label Review Manual**

# I.  Introduction

This chapter provides guidance for reviewing claims made on proposed labels. A label claim is a statement of something as a fact or an assertion on the label open to challenge. For purposes of this chapter there are three types of claims: 1) general claims, 2) claims associated with the product name, and 3) efficacy related claims. This chapter also provides guidance on Warranty and Disclaimer statements on labels and claims made in advertising.

# II.  General claims

Every pesticide must have labeling which is accepted by EPA before the pesticide can be sold or distributed. Labeling is defined in the *Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) Section 2(p)(2)* as meaning labels and all other written, printed, or graphic material accompanying a pesticide or device at any time or to which reference is made on the label or in accompanying literature. As defined in *FIFRA Section 2(q)(1)(A)* a pesticide is misbranded if its labeling bears any statement, design or graphic representation which is false or misleading. *FIFRA Section 12(a)(1)(E)* provides that it is unlawful for any person to distribute or sell any pesticide which is misbranded. EPA's regulation, at *40 CFR 156.10(a)(5)* provides examples of statements that are considered to be misbranded; such as:

- ► A false or misleading statement concerning the composition of the product;

- ► A false or misleading statement concerning the effectiveness of the product as a pesticide or device (EPA may review and approve or disapprove non-pesticidal claims appearing on a pesticide label);

- ► A false or misleading statement about the value of the product for purposes other than as a pesticide or device;

- ► A false or misleading comparison with other pesticides or devices;

- ► Any statement directly or indirectly implying that the pesticide or device is recommended or endorsed by an agency of the Federal Government;

- ► The name of a product if the name suggests some but not all the active ingredients in the product, even though the names of the other ingredients are stated elsewhere in the labeling;

- ► A true statement used in such a way to give a false or misleading impression to the purchaser;

- ► Label disclaimers or warranty statements which negate or detract from labeling statements required under FIFRA and EPA's regulations;

Mr. Robert (Bob) Dickey - Monsanto Roundup® Case

**Label Review Manual**

> ► Safety claims of the pesticide, or its ingredients, including statements such as trusted, safe, nonpoisonous, noninjurious, harmless or nontoxic to humans and pets with or without such a qualifying phrase as when used as directed.

> ► Non-numerical and/or comparative statements on the safety of the product, including but not limited to:

> > • "Contains all natural ingredients"

> > • "Among the least toxic chemicals known"

> > • "Pollution approved"

For certain aquatic use products, claims to reduce sludge and unpleasant odors in water or to clean, clarify or deodorize ponds and lakes are not considered pesticidal claims; nor are claims regarding the reduction of nutrients and organic matter in water, provided no claim is directly made or implied that the reductions will result in reduced pest populations. The claims "Reduces critical nutrients for cleaner, clearer ponds", "Ponds with algae need to reduce nutrients", and "Bacterial Product to Control Excess Nutrients for Clear, Clean Ponds" imply pesticidal use and therefore require registration.

Slime and odor control agents and other products expressly claiming control of microorganisms of economic or aesthetic significance are **not** considered to be public health related, but should bear accurate pesticide labeling claims. Registrants are still responsible for ensuring that these products perform as intended by developing efficacy data, which must be kept on file by the registrant.

EPA's policy does *not* permit the use of the terms "natural", or "naturally" in the labeling of any registered product, including biopesticide products, both microbials and biochemicals. These terms cannot be well defined, and may possibly be misconstrued by consumers as a safety claim.

The claim "new" may be used on the labeling of a product of new composition for a period of 6months following approval of the labeling; however, the word "new" may not be a part of the product name of record. If a label reviewer is in doubt as to whether a claim or statement is false or misleading, he or she should consult their division's Ombudsperson or OGC representative before allowing the claim. *PR Notices 98-10* and *93-6* also provide guidance on claims, however, the statute and applicable regulations take precedence.

## III. Some examples of unacceptable claims

> ► Statements that imply or suggest that the product can or will prevent or control disease or offer health protection, such as an insecticide that claims control of Lyme disease.

Mr. Robert (Bob) Dickey - Monsanto Roundup® Case

**Label Review Manual**

► "Commercial Line," "Commercial Size", "Institutional Size", "Garden Center Size":
The use of these terms for products clearly intended for consumer household use is
misleading.

► "Kills Numerous Insects", "Kills Many Insects", "Kills All Insects": These claims
imply a greater range of effectiveness than labeled. If however, these claims are limited
to those pests listed on the label, i.e., "Kills many insects as listed below (or as listed on
the label)", it may be acceptable.

► Claims about the *Absence* of an Ingredient: Statements or claims that express the
absence of certain ingredients may be misleading statements prohibited by
*40 CFR 156.10 (a)(5)*. These claims are examples of a true statement used in such a way
as to give a false or misleading impression to the purchaser. Even though a claim
expressing the absence of an ingredient is true, it would generally be considered to be
misleading because  it falsely suggests to the purchaser that the product is less risky,
better, or more desirable than a product containing the ingredient in question. Further, a
product must not claim that it does not contain an ingredient if it never contained or was
not likely to contain in the first place.

► "Child Resistant Package" or Other CRP Related Claims: If a pesticide product requires
child-resistant packaging (CRP), and has complied with the CRP regulations in
*40 CFR 157* then the claim to that effect on the label is acceptable. Whether CRP is
mandatory or voluntary the label may indicate the use of CRP and the proper use
instructions for the CRP. However, in no circumstances may any safety claims beyond
the statement "in Child Resistant Packaging" be made due to the use of CRP.

► "Organic", "For Organic Lawns", "Organic Disease Control", "An Organic Alternative to
_____", and "Your Organic Solution" are all examples of misleading label
claims as to safety. Under the National Organic Program (NOP), the phrase, "*For
Organic Production*", and "*For Organic Gardening*" located on the front panel of the
label in close proximity to the product name are examples of acceptable labeling
statements relating to the term "organic". The phrase should not appear above the product
name (in the location normally reserved for a Restricted Use Statement). See the next
section for more information on organic claims.

► Biodegradable: The term "biodegradable" is generally unacceptable for any pesticide
product. Except the term may be used only in reference to the package or packaging and
then only if the registrant certifies that the package breaks down and they provide
information to support it. Otherwise "biodegradable" may not be used on a pesticide
label in any context.

► Claims Such as "Prevents Infection", "Controls Infection", or "Prevents Cross
Infection" or that the product will control or mitigate any disease, infection or
pathological conditions constitute public health claims and are not acceptable.

Chapter 12: Labeling Claims                                                    **12-3**

Label Review Manual

- ► The term "steri-" implies sterilant activity and is not acceptable as a product name or on a product label unless it is a sterilant.

- ► Statements that imply indefinite or all encompassing protection against bacteria, fungi or algae such as "germ-free," or "algae-free" are not acceptable.

## IV. Pesticides Eligible for USDA's National Organic Program

Certain information on the pesticide label assists organic growers in knowing which products meet the requirements of the National Organic Program (NOP) Rule. If the criteria described in *Pesticide Registration (PR) Notice 2003-1*, and the clarification attached to it, http://www.epa.gov/PR_Notices/pr2003-1-clarification.html are met, a pesticide product may bear the following phrases

*"For Organic Production",*

*"For Organic Gardening",*

*"For Organic Lawn Care", and*

*"For Use in Organic Production".*

Label language and/or logos from other groups that review materials proposed for organic agriculture may also be considered (E.g. OMRI). The reviewer needs to determine if this information is false or misleading. Label reviewers should consult with the National Organic Program Liaison in the Biopesticides and Pollution Prevention Division for an evaluation of the product's proposed labeling before approving any organic claims, regardless of whether BPPD is the registering division.

## V. Claims made about the active ingredient

A product label may include the statement "contains [name of active ingredient], the active ingredient used in [Brand Name (™ or ®)]", if the following criteria are met:

### A.  Placement

The claim may be placed anywhere on the label, however the preferred location is in close proximity to the Ingredient Statement.

### B.  Presentation

The claim should not be presented in an overly large font, such that the claim is set in a font type no larger than that of the Signal Word on the label. Furthermore, the claim should not be presented with heavily bolded or highlighted type or use coloring to cause the claim to

Mr. Robert (Bob) Dickey - Monsanto Roundup® Case

**Label Review Manual**

excessively stand out over the rest of the labeling text. The format of the claim should not be in such a way that is causes greater attention than other required precautionary labeling on the label.

**C.  Appropriate Comparison**

If the subject product is a single active ingredient product, the claim should only refer to another similar single ingredient product. If the subject product is a multiple active ingredient product, the claim should only refer to another similar multi-ingredient product with the same active ingredients. Appropriate disclaimers stating that the generic product is not manufactured or distributed by the maker or marketer of the brand-name product as well as the trademark of the brand may be cross-referenced by use of a footnote.

## VI.  Product names

The name, brand, or trademark under which the pesticide product is sold shall appear on the front panel of the label. See *40 CFR 156.10(b)*. No name, brand, or trademark may appear on the label which is false or misleading, or has not been approved by the Administrator through registration, or that the Agency has been notified of a name via supplemental registration, as an additional name pursuant to *40 CFR 152.132*, or by notification as allowed by *PR Notice 98-10*.

Product names cannot constitute false and misleading claims. Although a company has the discretion to name its product, the company is still governed by the false and misleading standard. An example of a misleading product name is, "*Fresh Squeezed Disinfectant*". The phrase "Fresh Squeezed" in the name is misleading because it could convey that the product is meant to be consumed. Following is the Agency's current guidance on false or misleading product names:

1.  Product names, claims or statements that express or imply a higher-level of efficacy than demonstrated by testing are not acceptable.

2.  General superlative terms such as "super", "superior", and "ultra" no longer need to be qualified by the term "brand" in a product name. However, this determination still does not allow terms or claims like those which clearly imply heightened efficacy (e.g., "hospital strength", "professional strength", etc.) (see PR Notice 93-6).

3.  The Office of Pesticide Programs is under no obligation to ensure registrants use the correct trademark $^{TM}$ or ® and copyright © symbols on labels. Registrants are encouraged to use the correct symbols.

4.  If a product falls within the scope of the Worker Protection Standard and contains an organophosphate (i.e., an N-organophosphorus ester that inhibits cholinesterase) or an N-methyl carbamate (i.e., an N-methyl carbamic acid ester that inhibits cholinesterase), the

Mr. Robert (Bob) Dickey - Monsanto Roundup® Case

**Label Review Manual**

label shall indicate the term directly under the Product Name or in the first aid statement. *40 CFR 156.206(c)(1)*.

The exact same name cannot be used for different products registered by any registrant. *40 CFR 156.10(b)(2)(ii)*. The product name must be sufficiently different to clearly distinguish one product from another. However, a supplemental distributor may use the same product name as the parent product. See *40 CFR 152.132(d)*.

# VII. Efficacy-related claims

Even though registrants/applicants must conduct efficacy studies, the Agency only routinely requires the submission of these studies for certain types of products. Nevertheless, each registrant must ensure through testing that his product is efficacious when used in accordance with label directions and commonly accepted pest control practices. The Agency reserves the right to require, on a case-by-case basis, submission of efficacy data for any pesticide product registered or proposed for registration. EPA routinely reviews efficacy data (also referred to as product performance data) when a pesticide product bears a claim to control pest organisms that pose a threat to human health. Such pests include, but are not limited to, (a) microorganisms which are infectious to man in any area of the inanimate environment, (b) vertebrates (e.g., rodents, birds, bats, dogs, and skunks) that may directly or indirectly transmit diseases to or injure humans, and (c) insects that carry human diseases (e.g., mosquitoes, ticks, etc.). *40 CFR 158.400*. EPA also requires submission of efficacy data to support claims for the control of termites. On a case-by-case basis, the Agency may require substantiation of an efficacy claim.The following points should be kept in mind when reviewing labels bearing public health efficacy claims:

1.  The terms "microbiocide", "microbicide", and "microbiostat" generally are not acceptable on a public health product. If used on a non-public-health product, the claim must be qualified to indicate that the product does not provide public health protection.

2.  The term "biocide" generally is unacceptable on a public health product because it implies that the product can kill all living organisms. It may be used on a non-public-health product provided it is qualified by directions for use or other statements that make clear the types of organisms to be controlled.

3.  True, non-misleading claims regarding the effectiveness of a product against target pests, e.g., "kills roaches", "controls target pests", and "kills pests on contact" are acceptable. However, such claims may not be exaggerated or used in a way that would make them misleading. EPA may require additional efficacy data to substantiate claims that go beyond mere control of claimed pests. *PR Notice 93-6*.

Chapter 12: Labeling Claims                                                    **12-6**

**Label Review Manual**

4. Terms which describe a specific level of efficacy and which are standard EPA-accepted claims such as "bacteriostatic", "sanitizer", "disinfectant" and "sterilant" are acceptable when data supports their use. *PR Notice 93-6.*

5. Implied claims (e.g., any statement, design, graphic representation or brand name) of heightened efficacy of a pesticide product by itself or as compared with another product or device are false and misleading. Examples of such claims include, but are not limited to: "professional strength", "extermination strength," "hospital strength", "industrial strength", "institutional strength", "super strength", "ultra strength", "maximum strength", "maximum efficacy", "extra strength", "double-strength", "triple-strength", "hospital grade", "high potency", and "high-powered" *PR Notice 93-6.*

6. Terms which function only to define a use site and which are not themselves claims of heightened efficacy, provided that such terms are not used in a manner that is misleading, are acceptable. For example, "hospital use" may be acceptable as long as it doesn't imply "hospital strength", is not used in the product name and is not highlighted on the label to the exclusion of other acceptable use sites. *PR Notice 93-6.*

7. Words or phrases that imply a product possesses unique characteristics because of its composition are not acceptable. See *40 CFR 156.10(a)(5)(i).* Examples of such terminology are, "unique formula", or "strongest on the market". Other statements  not supported by efficacy data that has been reviewed and accepted by the Agency are not allowed.

8. Claims that are inconsistent with efficacy established by testing are unacceptable. For example, a claim of 30-second efficacy is not acceptable if testing and/or use directions require two-minute contact time for efficacy.

9. Claims of efficacy based on an unsubstantiated, or improbable site/pest relationship are unacceptable. For example, a claim for control of Legionnaire's disease in cooling tower water is unacceptable.

## VIII.  Instructions to label reviewers for efficacy issues

Check with the efficacy reviewers if the label makes unusual claims, deviates from a standard use pattern, or if the formulation changes. For example, formulation changes in an antimicrobial product can alter the efficacy of the product. Also, alternate formulations are not acceptable for rodenticides. Request a formal efficacy review for all claims that differ significantly from existing claims.

Mr. Robert (Bob) Dickey - Monsanto Roundup® Case

**Label Review Manual**

As mentioned earlier, do not allow any claim that would render the product misbranded under FIFRA or false and misleading under *40 CFR part 156.10(a)(5)*.

# IX. Warranty and disclaimer statements

Most, if not all, pesticide labels contain some type of warranty disclaimer language. It is important, as always, that the Agency be consistent in reviewing such language when it is first submitted or subsequently amended. Warranty and Disclaimer statements containing language intended to limit liability of the registrant or act as disclaimers or warranties for the product are generally covered by state law or may fall under the jurisdiction of the Federal Trade Commission. The Agency will evaluate these statements to assess the extent to which the statements impact FIFRA label standards or the Agency's implementing regulations. An EPA guidance document on warranty statements was developed in 2006 and the examples it offers may be consulted at this site: *http://www.epa.gov/pesticides/regulating/labels/pdf/warranty.pdf* . Also see Chapter 3, Section IV. C. (page 8) for information on what is allowable for warranty statements on distributor product labels.

There are four types of label language associated with disclaimers, warranties and limitations of liability that the Agency has found to be unacceptable under statutory and regulatory standards. It is important to recognize that these statements must be assessed on a case-by-case basis. They are as follows:

1.  Overly broad statements negating or detracting from the Directions for Use or other label language (including precautionary statements and directions for use). For instance, a warranty statement that the product may not work would undermine Directions for Use that explain how the product is to be used.

2.  Label language asserting that the buyer has accepted the manufacturer's statement of his/her respective rights. (e.g., manufacturer states buyer's rights are extremely limited; "all of these conditions are beyond the control of registrant X"). Because these statements are almost always incomplete (in terms of fully explaining a buyer's rights in the jurisdiction (state) of purchaser and because they can mislead buyers into thinking that they have no legal remedy, they may constitute "misbranding" under FIFRA.

3.  Overly broad language implying buyer has no legal right to recover damages from manufacturer (e.g., "all such risks shall be assumed by the buyer").

4.  Because EUP labels must be used in strict accordance with the EUP program, the warranty on EUP labels may not disclaim control over use. As with No. 2 above, these statements can be considered to be misleading.

Chapter 12: Labeling Claims                                                      **12-8**

**Label Review Manual**

The reviewer should check the proposed label for warranty/disclaimer/liability language statements (like those above) that appear to negate or detract from Directions for Use or other language. The label reviewer should make sure that the disclaimer statement makes it clear that it is the **registrant's** or **manufacturer's** warranty disclaimer, by using such statements like "To the fullest extent permitted by law, the manufacturer shall not be liable..." or "It is the manufacturer's intention that...". This way it is clear that the language is coming from the registrant (and not EPA).

The following are examples of problematic warranty statements. The problematic portions of the label statements are stricken, and necessary language is added in red.

### EXAMPLE 1

#### IMPORTANT: READ BEFORE USE

Read the entire Directions for Use, Conditions of Warranties and Limitations of Liability before using this product. If terms are not acceptable, return the unopened product container at once.

By using this product, user or buyer accepts the following Conditions, Disclaimer of Warranties and Limitations of Liability.

**CONDITIONS:** The directions for use of this product are believed to be adequate and ~~should~~ must be followed carefully. However, it is impossible to eliminate all risks associated with the use of this product. Crop injury, ineffectiveness or other unintended consequences may result because of such factors as weather conditions, presence of other materials, or the manner of use or application, all of which are beyond the control of XXXX. All such risks shall be assumed by the user or buyer.

**DISCLAIMER OF WARRANTIES:** To the extent consistent with applicable law, XXX makes no other warranties, express or implied, of merchantability or of fitness for a particular purpose or otherwise, that extend beyond the statements made on this label. No agent of XXX is authorized to make any warranties beyond those contained herein or to modify the warranties contained herein. To the extent consistent with applicable law, XXX disclaims any liability whatsoever for special, incidental or consequential damages resulting from the use or handling of this product.

**LIMITATIONS OF LIABILITY:** To the extent consistent with applicable law, the exclusive remedy of the user or buyer for any and all losses, injuries or damages resulting from the use or handling of this product, whether in contract, warranty, tort, negligence, strict liability or otherwise, shall not exceed the purchase price paid or at XXX's election, the replacement of product.

Chapter 12: Labeling Claims                                                          **12-9**

**Label Review Manual**

## Reasons for Corrections

The phrase "should follow directions" could mislead users to believe that the directions for use are only suggestions and not enforceable restrictions on how the product may be used; therefore, all statements relating to using the product in accordance with its labeling will be required to be mandatory (i.e., "must").

The phrase, "to the extent consistent with applicable law" has been added to the disclaimers of liability and damages to avoid the statements being false or misleading. Some states or localities may not allow certain disclaimers of liability or damages; therefore, the user/buyer may have a remedy under other law governing warranties.

**EXAMPLE 2**

**Warranty and Disclaimer Notice**

**Warranty**

The directions for use of this product are believed to be adequate and ~~should~~ must be followed carefully, it is impossible to eliminate all risks inherently associated with the use of this product. Crop injury, ineffectiveness, or other unintended consequences may result due to such factors as weather conditions, presence or absence of other materials, or the manner of use or application, all of which are beyond the control of XXX, the manufacturer, or the seller.

To the extent consistent with applicable law, the products sold to you are furnished "as is" by XXX. The manufacturer and the seller are subject only to the manufacturer's warranties, if any, which appear on the label of the product sold to you. Except as warranted by this label ~~expressly provided herein~~, XXX, the manufacturer, or the seller makes no warranties, guarantees, or representations of any kind to the buyer or the user, either express or implied, or by usage of trade, statutory or otherwise, with regard to the product sold or use of the product, including, but not limited to, merchantability, fitness for a particular purpose or use, or eligibility of the product for any particular trade usage. ~~Except as expressly stated herein, XXX., the manufacturer, or the seller makes no warranty of results to be obtained by use of the product.~~ To the extent consistent with applicable law, Buyer's or user's exclusive remedy, and XXX, the manufacturer's or the seller's total liability shall be limited to damages not exceeding the cost of the product. No agent or employee of XXX, or the seller is authorized to amend the terms of this warranty disclaimer or the product's label or to make a presentation or recommendation different from or inconsistent with the label of this product.

To the extent consistent with applicable law, XXX, the manufacturer, or the seller shall not be liable for consequential, special, or indirect damages resulting from the use,

Chapter 12: Labeling Claims                                    **12-10**

**Label Review Manual**

handling, application, storage, or disposal of this product or for damages in the nature of penalties, and the buyer and the user waive any right that they may have to such damages.

### Reasons for Corrections

Prior to legal use of a pesticide product it must be registered under the Federal Insecticide, Fungicide and Rodenticide Act, as amended (FIFRA). Registration of a pesticide requires, in part, that the product be effective in controlling the pest(s) for which it is registered. In registering the product under FIFRA, the product must perform as purported when used in accordance with its labeling. The phrase, "Except as expressly stated herein, XXX., the manufacturer, or the seller makes no warranty of results to be obtained by use of the product", is overly broad and could be misleading to the consumer. Overly broad statements, which negate or detract from the Directions for Use, must be qualified by a phrase such as "Except as warranted in this label". Statements such as those used in the example above ("Except as expressly provided herein" and "Except as expressly stated herein") are not adequate qualifiers because they are misleading in that they do not clearly incorporate the warranty offered through the act of registration.

State and local laws may not allow the manufacturer to limit its liability by offering its product "as is". In addition, the same laws may not allow certain limitations of liability or remedy. Therefore "to the extent consistent with applicable law" has been added in appropriate places.

More examples of Warranty and Disclaimer Statements can be found on EPA's *Labeling Committee Projects* Web site. If, after reviewing the examples, a label reviewer is still in doubt as to the acceptability of any warranty or disclaimer statement, the statement should be referred to the Office of General Counsel.

Chapter 12: Labeling Claims                                                    **12-11**

**Label Review Manual**

## X.  Claims made in advertising

Advertising and collateral literature or verbal claims for the product must not substantially differ from any claims made on the label or labeling. See *FIFRA § 12(a)(1)(B)*. In other words, if a claim is not on the label or substantially differs from what appears on the label (or any part of its distribution or sale which for example appears on a brochure), it cannot be made in advertising. Although OPP does not routinely review advertising in connection with the registration, the Agency may require advertising used in the marketing of the product to be submitted upon request and be reviewed  to see that it is in compliance with *FIFRA section 12(a)(1)(B)*. If reviewers come across any advertising inconsistencies, refer them to the following address for further investigation:

Branch Chief
Agriculture Branch
Agriculture Division
Office of Compliance (2225A)

Mr. Robert (Bob) Dickey - Monsanto Roundup® Case

# APPENDIX D

## CV and Case History of Stephen E. Petty, P.E., C.I.H., C.S.P.

**Mr. Stephen E. Petty, P.E., C.I.H., C.S.P.**
**President**

## Company

EES Group, Inc.
(d/b/a - Engineering & Expert Services, Inc.)
1701 E. Atlantic Blvd., Suite 5
Pompano Beach, FL 33060

## Education

B.S., Chemical Engineering, University of Washington

M.S., Chemical Engineering, University of Washington

M.B.A., University of Dayton

## Experience

### General

Mr. Petty is President of EES Group, Inc. (Engineering & Expert Services, Inc.).  He started EES Group, Inc. in 1996, ultimately having offices in Ohio (Columbus and Cleveland) and in Florida (Pompano Beach).  In 2015, he sold the Ohio portion of EES Group, Inc. while retaining Florida operations.  Prior to starting EES Group, Inc. in 1996, Mr. Petty was the Manager of Residential and Commercial Technology at Columbia Energy and a Senior Research Engineer at Battelle.  He has 37 years of forensic engineering, environmental health and safety, and energy experience.  Since 2002, he has completed or supervised over 7,000 engineering forensic and health and safety projects for nearly 100 clients.  This culminated in the writing of a Forensic Engineering textbook targeted at assessing claims for the insurance industry (*Forensic Engineering: Damage Assessments for Residential and Commercial Structures*, January 3, 2013, CRC Press publication).

Mr. Petty's health and safety experience has focused on projects for the legal community (expert witness), the insurance industry, institutions, and the private sector.  His expertise covers the area of Professional Engineering (PE's in six states), Industrial Hygiene (registered Certified Industrial Hygienist - CIH) and safety (registered Certified Safety Professional - CSP).  As a CIH, he investigates the causes/solutions of an individual's sickness, impaired health, and discomfort at work and in the home.  As a CSP, he investigates situations primarily arising out of possible Occupational Safety and Health Administration (OSHA) violations associated with workplace injuries.  In other cases this extends to customers injured at facilities where they are working or are shopping.  Finally, he is certified as an Asbestos Evaluation Specialist in Ohio.

Mr. Petty has been involved in ~200 expert witness cases to date, with a primary focus on exposure to organic chemicals, inorganic chemicals, mold, bacteria (legionella), heat and bio-toxins; OSHA workplace compliance (slips, trips and falls & amputations) and building systems.  He has also supported/testified on building envelope, water cause and origin, structural, and roof damage claims.  His company assembled a nine-member team of experts that won the expert witness contract for the Ohio School Facilities Commission (OSFC) from 2004-2008.

Mr. Stephen E. Petty, P.E., C.I.H., C.S.P

Mr. Petty has extensive expertise on heating, ventilation and air conditioning (HVAC) systems and holds nine (9) U.S. patents primarily related to HVAC systems.

His safety and environmental experience also includes completion of many complex projects in Risk Assessment (BUSTR, EPA and VAP), Industrial Hygiene, Process Safety Management (PSM), Risk Management Plans (Health and Safety Audits), Environmental Assessments (EA) and Environmental Impact Statements (EIS), and air and water permits (PTI, PTO, NPDES, etc.) for numerous clients across the U.S.

Finally, he has served in a leadership role in technology evaluations, business plans, and product development activities for dozens of products and ventures.  He has been the invited dinner/lunch speaker to ASHRAE/AIHA and legal association functions.

**Health and Safety Experience**

➢ Mr. Petty has been utilized as an expert witness in ~200 cases primarily related to human exposure(s) and safety (OSHA).  In the exposure area, he has worked on/testified on cases of exposure to benzene, gasoline, formaldehyde, paint, organic chemicals, silica, acid gas, PFOA, Legionella, and mold.  In the safety area, he has worked on/testified in worker fall and amputation cases and the standard of care required to protect workers and customers.  He is recognized for his ability to reduce complex sets of information regarding exposure and compliance with regulatory standards into simple but accurate presentations.  Areas of practice include:

- Occupational Safety and Health Administration Regulations:
  - OSHA Health and Safety Regulations for Workers 29 CFR 1910 General Industry and 29 CFR 1926 Construction Industry
  - OSHA Process Safety Management of Highly Hazardous Chemicals - 29 CFR 1910.119
  - Personal Protective Equipment - PPE - 29 CFR 1910.132
  - Respiratory Protection Standard - 29 CFR 1910.134
  - 29 CFR 1910.1000 - OSHA PEL and Controls Standard
  - 29 CFR 1910.1028 - Benzene Standard
  - Hazard Communication Standard - HAZCOM - 29 CFR 1910.1200
- Mine Safety Health Administration (MSHA) EH&S Regulations - 30 CFR Parts 1 to 199
- United State Environmental Protection Agency - USEPA - 40 CFR (Including hazardous wastes, permitting, remediation and Process Safety Management).
- DOT Transportation Regulations and Spill Response - Hazardous Waste Operations and Emergency Response (HAZWOPER) - 46 CFR.

Mr. Petty is also trained in Hazardous Waste Operations and Emergency Response (HAZWOPER) (40-hr.) and has served as a trainer for the 40-hr. course.

2

Mr. Stephen E. Petty, P.E., C.I.H., C.S.P

➢   Mr. Petty is a recognized expert in Risk Assessment (RA) having been one of 14 to take the first Risk Assessment courses offered by the Ohio State University & University of Cincinnati Schools of Public Health in 1997.  In addition to having completed a dozen risk assessments, he was selected by the State of Ohio Bureau of Storage Tank Regulators (BUSTR) to help write their 1999 UST RA regulations and was selected to train BUSTR staff RA (5 week course) and to help write the on-line RA webpage, proof the equations and to help with the on-line help handbook.

➢   He has completed dozens of indoor air sampling projects for residential, commercial, and industrial clients.  Recent clients include Grange Insurance Company, Northwest Local School District, Children's Hospital, Berger Hospital, Citgo, Salem University, and Nestle.

➢   He has completed dozens of mold field evaluation projects.  In this area, he attended a one-week ACGIH mold course in late 2002.  He also received his residential mold inspector credentials from the IESO in 2003.

➢   Examples of specific projects completed are:

•   Conducted worker illness IAQ program where Iraqi documents were being scanned.  Sampled for anthrax, bio-toxins, mold, bacteria, VOCs, CO and $CO_2$, temperature and humidity to help determine cause of worker complaints.

•   Sampled surface and materials for anthrax and bio-toxins at two commercial facilities.

•   Selected and completed analysis to determine cause of illness to players in their locker room at Nationwide Arena for the Columbus Blue Jackets professional hockey team.

•   Served as an expert to the OSFC on building HVAC and human comfort issues in school buildings.

•   Developed implementation templates for several Process Safety Management (PSM) and Risk Management Program (RMP) clients (e.g. Nestle facilities).

•   Prepared public meeting presentation materials for AEP RMPs at their Conesville and Tanners Creek power plants.  Focus was to match public legal requirements with needs of the client, and development and presentation of worst case and alternative case release scenarios under Part 68 of 40 CFR.

•   Completed PSM programs for two Southwest Research Institute (SwRI) facilities and two Nestle facilities.  Focus was on completing process hazards analyses (PrHAs) and on setting up ongoing PSM programs.  For Nestle, set up file-based system, wrote plans for all 14 major elements, and provided detailed checklists and guidance on sections such as training, mechanical integrity, etc.

•   Completed multiple ventilation projects for American Electric Power Plant facilities to determine best locations (performance vs. cost) for hazardous

3

Mr. Stephen E. Petty, P.E., C.I.H., C.S.P

gas monitors in power plants and whether or not ductwork was contaminated with mold.

- Completed series of EH&S projects for Dublin schools (e.g. air quality audits and noise analyses). Completed air clearance testing and reporting and held public meetings for the vandalism clean-up efforts of Grizzell Middle School.

- Conducted industrial hygiene audits and testing for numerous public and private clients. Focused on HVAC systems, sampling (CO, $CO_2$, relative humidity, molds, dust, bacteria, formaldehyde, VOCs, and isocyanates) and remediation/abatement.

- Completed Failure Modes & Effects Analyses (FMEA) for DOD BZ Nerve Agent Plant design. Plant was later built, operated, and decommissioned in Pine Bluff, AR without incident.

➢ Developed IAQ solutions based on ASHRAE Standards and new technologies (e.g. desiccants).

➢ Developed and taught OSHA HAZWOPPER courses (40-hr, 24-hr and 8-hr).

➢ Voting member ASHRAE TC 8.3; corresponding member ASHRAE TC 3.5 (Desiccants).

➢ Adjunct Professor at Franklin University. Instructor of Environmental and Earth Sciences courses.

**Engineering Experience**

➢ President and Owner of EES Group, Inc. (EES) since 1996. Developed EES into one of the leading forensic companies in the state of Florida and Ohio.

➢ Author of *Forensic Engineering: Damage Assessments for Residential and Commercial Structures*, January 3, 2013, a CRC Press publication. The book provides guidance on engineering claims assessments for the insurance industry.

➢ Developed forensics libraries and technical bulletins on how to assess insurance claims and fraud associated with claims. Lead author of refereed journal article reviewing hail damage from ~750 individual assessments.

➢ Completed or supervised over 7,000 forensics inspection projects for ~100 insurance companies and other private sector clients since 2002. Projects were associated with structural failures in residential and commercial buildings, structural damage and failures caused by vehicles striking buildings, water causation and origin analysis, causes of plumbing failures, HVAC failures and damage, roof system failures and structural damage, mold cause, origin and removal, lead cause and removal, hail damage, and lightning claims. Also completed or supervised over 200 insurance appraisals (negotiated settlements) for the industry. Was selected and completed role as an umpire for a 36-building one million dollar hail claim dispute. Testified in trial on roofing claim disputes. Specifically requested for difficult projects and for projects in the state of Texas.

4

Mr. Stephen E. Petty, P.E., C.I.H., C.S.P

➢ Led company in efforts to bid and win roofing and environmental contracts with the Ohio School Facilities Commission (OSFC).

➢ Managed the turnkey design, permitting, and building of a fuel farm facility ($750K) for The Ohio State University (OSU) Airport (2000). Project entailed the layout, design, and installation of six above-ground storage tanks (ASTs), 12,000 gallons each, and the removal and closure of four existing USTs. Fuels included Jet-A and Av-Gas. Project roles included site plans/layouts, preparation of subcontractor specifications, construction oversight, concrete foundation and subsurface design, permitting (PTI and PTO), start-up troubleshooting, and commissioning activities.

➢ Was lead researcher on two teams of nationally-recognized residential and commercial heat pump development programs: i) Battelle (Double-Effect Absorption Heat Pump) and ii) Columbia Gas System (Dual Cycle Heat Pump). Both projects met goals for performance (efficiency and capacity). Research resulted in receipt of six U.S. Patents.

➢ Co-designed parking lot and storm water collection system for major trucking firm on 40-acre site in Cleveland. Project began as a site assessment and concluded with facility design.

➢ Process engineer for 200 million gallons-per-day wastewater treatment plant for a Weyerhaeuser paper mill.

➢ Evaluated incineration technology and cost/benefit for an incinerator that burned organophosphate and chlorinated thio-ether wastes. Developed source term for present and future emissions under varying load rates.

➢ Prepared a carbon treatment designs for removing organophosphates and chlorinated thio-ether, and nerve agents from wastewater.

➢ Designed/permitted first of three mobile wastewater treatment facilities in the State of Ohio.

➢ Developed a process to eliminate HF/tar hazardous waste generation from an electronics manufacturing process.

➢ Developed processes to reduce contamination of water from oil spills, including biodegradation and controlled combustion.

➢ Conducted bench-scale analysis of reverse osmosis, ultrafiltration, wet air oxidation, and solvent extraction treatment processes.

**Environmental Experience**

➢ Provided 8-hr. Tier 1 & Tier 2 training to State of Ohio BUSTR site coordinators (May 23, 2000).

➢ Provided approximately 40 hours of Risk Assessment Training (5 8-hr. training sessions) to BUSTR coordinators (May, 1999).

➢ Member of BUSTR's new rules advisory committee (1999).

5

Mr. Stephen E. Petty, P.E., C.I.H., C.S.P

➢ Completed over a dozen BUSTR Tier 2 and Tier 3 Risk Assessments (RA) for clients such as CITGO, AEP, Anderson Concrete, and the Port Columbus Airport Authority.  Creative solutions saved years of remediation and millions of dollars.

➢ Completed BUSTR Tier 4 RA for American Electric Power.

➢ Completed Environmental Assessment for NASA - Lewis Rocket Engine Test Facility.

➢ Completed dozens of Federal/State air, water, and hazardous waste permits (e.g., PTI, PTO, FESOP and NPDES) for dozens of industrial clients.

➢ Developed Spill Prevention, Controls and Countermeasures (SPCC) Plan template according to 40 CFR 112.  Developed SPCC template, which has been audited and accepted by Ohio EPA.  Prepared site-specific SPCC's for clients such as L.J. Minor (Cleveland), Mickley Oil Company, Doersam LLC, Federal Express Corporation (Blue Ash), and Central Ohio Asphalt.

➢ Prepared hazardous waste evaluation for the NASA–Merritt Island Environmental Impact Assessment of Space Shuttle SRB refurbishing facility in a wildlife area.

➢ Developed a portion of the database used in preparing the original Resource Conservation and Recovery Act (RCRA).

➢ Developed BUSTR Residential and Commercial Risk Assessment (RA) Models.

**Other Experience**

➢ Responsible for all intellectual property (e.g., patents) and commercialization of residential, commercial, vehicle, and fuel cell technology for Columbia Gas System and their development partners.

➢ Served on 11 Industry Advisory Bodies [Gas Research Institute (GRI), American Gas Association (AGA), U.S. Department of Energy Funding Initiative - $2 billion (USDOE-FI), and Gas Utilization Research Forum (GURF)].

➢ Served as U.S. DOE expert reviewer on cooling, heat pump, desiccant, and power generation proposals.

➢ Served on U.S. DOE expert review panel for desiccant program area.

➢ Prepared business acquisition due diligence for Columbia Gas System corporate staff (e.g. micro-turbines).

➢ Provided technical and business due diligence for three venture capital firms on a dozen emerging markets.

➢ Authored budget recommendations for DOE Funding Initiative in Power Generation, Cooling, and NGV areas based on industry consensus meetings.

➢ Served/Serving on ANSI and ASHRAE Standards Working Groups (Z21.40 and SPC 40).

➢ Provided keynote presentations on Energy Deregulation for four major utilities and several industry groups.

➢ Completed nationally recognized market research on U.S. cooling, refrigeration, and controls markets.

6

Mr. Stephen E. Petty, P.E., C.I.H., C.S.P

## Certifications, Registrations, and Honors

Registered Professional Engineer, State of Florida #76583, State of Kentucky #24116, State of Ohio #49063, State of Pennsylvania #PE-053899-E, State of Texas #101855 (also listed windstorm inspector), and State of West Virginia #16311

Certified Industrial Hygienist, 8067 CP, November 2000.

Certified Safety Professional, 23563, November 2012

Asbestos Hazard Evaluation Specialist – State of Ohio #ES34643

Certified Residential Mold Inspector – (IESO) - 2004

ASHRAE Certificate of Appreciation, May 2002, ASHRAE Standard 40.

ASHRAE Fundamentals of HVAC Systems – 35 CEUs (Feb. to April 2008).

AIHA CIH Refresher (Univ. of Michigan) – 40-hr. class - 1998

Certificate of Accomplishment in Risk Assessment from The Ohio State University School of Public Health – 120-hr. class – 1997

Certificate of Achievement – Ohio Department of Transportation 80-hr. class – Managing in the Environmental Process – 1997

Roof Consulting Institute (RCI) Courses:

- Advanced Thermal & Moisture Control (5/14/2008)
- Professional Roof Consulting (5/15-16/2008)
- Roof Technology & Science I (9/15-16/2009)
- Roof Technology & Science II (9/17-18/2009)

Undergraduate Scholarships from the Pulp and Paper Foundation Scholarship Fund for Freshman, Sophomore, and Junior Years.

Certificate of High Scholarship – Department of Chemical Engineering – University of Washington – Jr. Year - 1978.

Undergraduate Scholarship from Department of Chemical Engineering, Senior Year.

Undergraduate B.S. Ch.E. – Cum Laude.

Graduate School - M. S. Ch. E. – 2nd in Class

Raymond Roesch Award, University of Dayton, (awarded annually to top MBA graduate); graduated first in MBA class with 4.0 GPA – 1988.

## Memberships

Member, American Industrial Hygiene Association (AIHA)

Member, American Conference of Governmental Industrial Hygienists (ACGIH)

Member, American Society of Heating, Refrigeration, and Air Conditioning Engineers (ASHRAE).  Voting Member TC 8.3.

Member, American Institute of Chemical Engineers (AIChE)

7

Mr. Stephen E. Petty, P.E., C.I.H., C.S.P

Member, Indoor Environmental Standards Organization (IESO)

Member, Roof Consulting Institute (RCI)

Member, Society of Automotive Engineers (SAE)

Member, Sigma Xi

**U.S. Patents**

U.S. 6,649,062.  November 18, 2003. Fluid-Membrane Separation. Petty.

U.S. 6,109,339.  August 29, 2000. Heating System.  Talbert, Ball, Yates, Petty, and Grimes.

U.S. 5,769,033.  June 23, 1998.  Hot Water Storage. Petty and Jones.

U.S. 5,636,527.  June 10, 1997. Enhanced Fluid-Liquid Contact.  Christensen and Petty.

U.S. 5,546,760.  August 20, 1996. Generator Package for Absorption Heat Pumps. Cook, Petty, Meacham, Christensen, and McGahey.

U.S. 5,533,362.  July 9, 1996. Heat Transfer Apparatus for Heat Pumps.  Cook, Petty, Meacham, Christensen, and McGahey.

U.S. 5,339,654.  August 23, 1994. Heat Transfer Apparatus for Heat Pumps.  Cook, Petty, Meacham, Christensen, and McGahey.

U.S. 5,067,330.  November 26, 1991. Heat Transfer Apparatus for Heat Pumps.  Cook, Petty, Meacham, Christensen, and McGahey.

U.S. 4,972,679.  November 27, 1990. Absorption Refrigeration and Heat Pump System with Defrost. Petty and Cook.

**Books**

Forensic Engineering: Damage Assessments for Residential and Commercial Structures, January 4, 2013, CRC Press, 804 pp.

8

Mr. Stephen E. Petty, P.E., C.I.H., C.S.P

## Publications

Stephen E. Petty, Mark Nicas, Anthony A. Boiarski, 2011. *A quantitative Method for Estimating Dermal Benzene Absorption from Benzene-containing Hydrocarbon Liquids,* Int. J Occup Environ Health, Vol. 17/No. 4, Oct./Dec. 2011, pgs. 287-300.

Stephen E. Petty, PE, CIH, Mark Petty, Tim Kasberg, 2009. *Evaluation of Hail-Strike Damage to Asphalt Shingles Based on Hailstone Size, Roof Pitch, Direction of Incoming Storm, and Facing Roof Elevation*, Interface, The Journal of RCI; May/June, Vol. XXVII, No. 5, pgs. 4-10.

Peter F. Infante, MPH, DRPH, Stephen E. Petty, PE, CIH, D. H. Groth, G. Markowitz, D. Rosner, 2009. *Vinyl Chloride Propellant in Hair Spray and Angiosarcoma of the Liver among Hairdressers and Barbers: Case Reports*, Int. J Occup Environ Health; 15:36-42.

Petty, S.E., Ball, D., Nation, J. and S. Talbert, 1997. *A New, Integrated Compact Combo System for Multi-Family Residences*, Proceedings of the 48th Conference Papers Available from the 48th International Appliance Technical Conference (IATC), May 12 - 14, 1997, Ohio State University – Fawcett Center, Columbus, OH.

Petty, S.E., 1997. *Mack's LNG Truck Ready to Move into Refuse Collection Market,* NGV Tech Update, Gas Research Institute, Spring Edition, pgs. 1 and 3.

Petty, S., 1983. *Combustion of Crude Oil on Water*, Fire Safety Journal, Vol. 5, pgs. 123-134.

Petty, S., B.A. Garrett-Price and G.L. McKown, 1983. *Preliminary Assessment of the Use of Heat Transfer Fluids for Solar Thermal Energy Systems*, EPA-600/S7-83-021, U.S. Environmental Protection Agency, April.

English, C.J., S.E. Petty and D.S. Sclarew, 1983. *Treatment of Biomass Gasification Wastewaters Using a Combined Wet Air Oxidation/Activated Sludge Process,* PNL-4593, Contract DE-AC06-76RLO-1830, U.S. Department of Energy, February.

Petty, S.E., W. Wakamiya, C.J. English, J.A. Strand and D.D. Mahlum, 1982. *Assessment of Synfuel Spill Cleanup Options,* PNL-4244, UC-11,90i,91, Contract DE-AC06-76RLO 1830, U.S. Department of Energy, April.

Wakamiya, W., Petty, S.E., Boiarski, A., Putnam, A., 1982. *Combustion of Oil on Water: An Experimental Program*, U. S. Department of Energy, DOE/NBM/1002, Contract # AC06-76RLO 1830, February.

Petty, S., B.A. Garrett-Price and G.L. McKown, 1982. *Preliminary Assessment of the Use of Heat Transfer Fluids for Solar Thermal Energy Systems*, PNL-4182, IAG No. AD-89-F-1-623-0, U.S. Environmental Protection Agency, January.

Petty, S.E., N.E. Bell and C.J. English, Jr., 1981. *Treatment of Biomass Gasification Wastewaters Using Wet Air Oxidation, Solvent Extraction and Reverse Osmosis,* PNL SA-10093, Proceedings of the 13th Biomass Thermochemical Conversion Contractor's Meeting, Arlington, VA, October 27-29, pgs. 718-747.

9

Mr. Stephen E. Petty, P.E., C.I.H., C.S.P

Petty, S.E., N.E. Bell and C.J. English, Jr., 1981. *Treatment of Biomass Gasification Wastewaters Using Wet Air Oxidation, Solvent Extraction and Reverse Osmosis,* Contract DE-AC06-76RLO-1830, U.S. Department of Energy, October.

Petty, S.E., S.D. Eliason and M.M. Laegreid, 1981. *Treatment of Biomass Gasification Wastewaters Using Reverse Osmosis,* PNL-4018, Contract DE-AC06-76RLO-1830, U.S. Department of Energy, September.

Mercer, B.W., W. Wakamiya, S.E. Petty, J.A. Strand and D.D. Mahlum, 1981. *Assessment of Synfuel Spill Cleanup Options,* PNL-SA-9806 – Proceedings of DOE Workshop on Processing, Needs, and Methodology for Wastewater from the Conversion of Coal, Oil Shale and Biomass to Synfuels, Richland, WA.

Eakin, D.E., J.M. Donovan, G.R. Cysewski, S.E. Petty and J.V. Maxham, 1981. *Preliminary Evaluation of Alternative Ethanol/Water Separation Processes,* PNL-3823, UC-98d, Contract DE-AC06-76RLO-1830, U.S. Department of Energy, May.

Zima, G.E., G.H. Lyon, P.G. Doctor, G.R. Hoenes, S.E. Petty and S.A. Weakley, 1981. *Some Aspects of Cost/Benefit Analysis for In-Service Inspection of PWR Steam Generators,* NUREG/CR-1490, PNL-3388, U.S. Nuclear Regulatory Commission, May.

Petty, S.E., 1981. *Potential Synthetic Fuel Spill Sources and Volumes to the Year 2000,* Contract DE-AC06-76RLO 1830, U.S. Department of Energy, March.

Petty, S.E. and W. Wakamiya, 1981. *Projections on Synfuels Production to the Year 2000,* Contract DE-AC06-76RLO 1830, U.S. Department of Energy, January

Petty, S.E., and J.V. Maxham, 1981. *Ethanol-Water Separation Using a Corn as a Dehydration Agent,* Contract DE-AC06-76RLO 1830, U.S. Department of Energy, January.

J.V. Maxham and S.E. Petty, 1980. *Dehydration of Alcohol/Water Solutions with Solid Dehydration Agents to Produce Alcohol for Gasohol,* Contract DE-AC06-76RLO 1830, U.S. Department of Energy, September.

Petty, S.E., and J.V. Maxham, 1980. *Ethanol-Water Separation Using a Reverse Osmosis Process,* PNL-3579, Contract DE-AC06-76RLO 1830, U.S. Department of Energy, September.

English, C.J., S. E. Petty and G.W. Dawson. 1980. *Identification of Hazardous Waste Disposal Sites and Management Practices in Region 10.* Contract WA-79-A375, U.S. Environmental Protection Agency, February.

Dawson, G.W., C.J. English and S.E. Petty, 1980. *Physical Chemical Properties of Hazardous Waste Constituents,* U. S. Environmental Protection Agency, Southeast Environmental Research Laboratory, Athens, Ga. March 5.

Wakamiya, W., J.V. Maxham and S.E. Petty, 1979. *Biomass Gasification Wastewater Treatment – Interim Report,* PNL-SA-8165, Contract EY-76-C-06-1830, U.S. Department of Energy, September.

10

Mr. Stephen E. Petty, P.E., C.I.H., C.S.P

**SUMMARY OF RECENT PRESENTATIONS**

By

**Stephen Petty**

| DATE | LOCATION | AUDIENCE | TOPIC | DURATION (Hrs) |
|---|---|---|---|---|
| April 1, 1999 | Bureau of Underground Storage Tank Regulators (BUSTR) Reynoldsburg, OH | BUSTR Chief and State Coordinators, Training Session | BUSTR RISK ASSESSMENT TRAINING Introductory Session | 8 hours |
| April 22, 1999 | Bureau of Underground Storage Tank Regulators (BUSTR) Reynoldsburg, OH | BUSTR Chief and State Coordinators, Training Session | BUSTR RISK ASSESSMENT TRAINING Second Session | 8 hours |
| May 6, 1999 | Bureau of Underground Storage Tank Regulators (BUSTR) Reynoldsburg, OH | BUSTR Chief and State Coordinators, Training Session | BUSTR RISK ASSESSMENT TRAINING Third Session | 8 hours |
| May 27, 1999 | Bureau of Underground Storage Tank Regulators (BUSTR) Reynoldsburg, OH | BUSTR Chief and State Coordinators, Training Session | BUSTR RISK ASSESSMENT TRAINING Fourth Session | 8 hours |
| June 4, 1999 | Bureau of Underground Storage Tank Regulators (BUSTR) Reynoldsburg, OH | BUSTR Chief and State Coordinators, Training Session | BUSTR RISK ASSESSMENT TRAINING Fifth Session | 8 hours |
| May 23, 2000 | Bureau of Underground Storage Tank Regulators (BUSTR) Reynoldsburg, OH | BUSTR Chief and State Coordinators, Training Session | Factors Influencing Tier 1 and Tier 2 Evaluations Training Session for New Rules | 8 hours |
| January 18, 2001 | Engineer's Club, Dayton, OH | ASHRAE, Dayton Chapter, Dinner Speaker | Energy and Cost Benefit Analyses of Heating, Ventilation and Air Conditioning Systems Available for Ohio Schools | 2 hours |

11

Mr. Stephen E. Petty, P.E., C.I.H., C.S.P

| DATE | LOCATION | AUDIENCE | TOPIC | DURATION (Hrs) |
|---|---|---|---|---|
| January 25, 2001 | Riffe Tower, Columbus, OH | Ohio School Facilities Commission, Ohio Department of Development, State School A/Es | Energy and Cost Benefit Analyses of Heating, Ventilation and Air Conditioning Systems Available for Ohio Schools | 7 hours |
| March 13, 2001 | Ashland Chemical, Columbus, OH | PDMA – Columbus Chapter, Breakfast Speaker | The Product Development Process - Case Studies | 1 hour |
| July 30, 2001 | Toledo, OH | City of Toledo, Environmental Director and Staff | Status of BUSTR's New Rule, March 31, 1999 | 2 hours |
| September 21, 2001 | Lexington, KY | ASHRAE  Region VII & Bluegrass Chapter, Invited Luncheon Speaker | Energy and Cost Benefit Analyses of Heating, Ventilation and Air Conditioning Systems Available for Ohio Schools | 1.5 hour |
| November 13, 2001 | Wadsworth, OH | ASHRAE Akron Chapter, Dinner Speaker | Energy and Cost Benefit Analyses of Heating, Ventilation and Air Conditioning Systems Available for Ohio Schools | 2 hours |
| February 12, 2002 | Cincinnati, OH | ASHRAE Cincinnati Chapter, Lunch Speaker | Evaluation of Heating, Ventilation and Air Conditioning Systems (HVAC) Systems Available for Ohio Schools | 1.5 hours |
| July 2002 | Cleveland, OH | AIHA Luncheon Speaker | IAQ Cost – Benefit Analyses For Heating, Ventilation and Air Conditioning Systems (HVAC) Systems Available for Ohio Schools | 1.5 hours |
| September 24, 2002 | Columbus, OH | Ohio Builds 2002 | Evaluation of HVAC Systems Contained in the OSFC Design Manual | 1.5 hours |
| February 5, 2003 | Toledo, OH | ASHRAE Toledo Chapter, Dinner Speaker | Energy and Cost Benefit Analyses of Heating, Ventilation and Air Conditioning Systems Available for Ohio Schools | 2 hours |
| May 9, 2004 | Atlanta, GA | American Industrial Hygiene Conference and Expo (AIHce), Professional Development Course #418 | Mold Contamination: A Hands-On Workshop Addressing Inspection, Remediation Specifications, Project Oversight and Post-Remediation Assessment | 8 hours |
| September 14, 2004 | Gahanna, OH | Gahanna Board of Realtors Luncheon Speaker | Mold – After the Contract | 1 hour |

12

Mr. Stephen E. Petty, P.E., C.I.H., C.S.P

| DATE | LOCATION | AUDIENCE | TOPIC | DURATION (Hrs) |
|---|---|---|---|---|
| November 4, 2004 | Cincinnati, OH | Cincinnati Bar Association Luncheon Speaker | Mold – Facts/Fiction/Who Knows? | 2 hours |
| November 17, 2004 | Columbus, OH | Ohio Public Facility Maintenance Association (OPFMA) Annual Meeting | Impact of Temperature on Occupants: Theory vs. Reality | 1.5 hours |
| October 17, 2005 | Phoenix, AZ | LexisNexis Benzene Litigation Conference | How Low Can You Go?  Measuring Exposure to Benzene | 1 hour |
| April 21, 2006 | Cleveland, OH | National Business Institute Proving Damages Caused by Mold Infestation in Ohio | Make a Mold Claim and Litigate the Case | 2 hours |
| November 9, 2006 | Columbus, OH | Bricker & Eckler Building Industry | Avoiding and Handling Mold Claims | 1 hour |
| June 3, 2008 | New Orleans, LA | Harris-Martin Benzene Conference | Historic Levels of Benzene in Products | 1 hour |
| August 14, 2009 | Columbus, OH | State Auto Insurance Company | Assessment of Hail and Wind Damage | 3 hours |
| December 4, 2009 | Akron, OH | Nationwide Insurance Company | Presentation and Seminar on Log Cabin Construction, Maintenance & Reparability | 2 hours |
| March 17, 2010 | Westerville, OH | Nationwide Insurance Company | Seminar on Impact of Wind & Hail Damage to Building Materials | 1 hour |
| May 9, 2012 | Dublin, OH | Grange Insurance Company | Lightning Damage Assessments | 3 hours |
| June 18, 2013 | Delaware, OH | Nationwide Insurance Company | Forensic Analysis of Fire Damage to Foundation Walls | 3 hours |

13

Mr. Stephen E. Petty, P.E., C.I.H., C.S.P

**SUMMARY OF CLASSES TAUGHT AT FRANKLIN UNIVERSITY**
**By**
**Stephen Petty**

| Class Title | Description | Term | Dates | # Students | Comments |
|---|---|---|---|---|---|
| SCIE131 Q1WW | Environmental Science 131 | Winter 2003 | 1/3/03 to 4/24/03 | 17 | Online class |
| SCIE131 E1FF | Environmental Science 131 | Summer 2003 | 5/21/03 to 6/25/03 | 13 | In-Class |
| SCIE114 F2FF | Earth Science 114 | Fall 2003 | 9/29/03 to 11/3/03 | 17 | In-Class |
| SCIE131 H1FF | Environmental Science 131 | Fall 2003 | 11/12/03 to 12/17/03 | 15 | In-Class |
| SCIE131 Q1WW | Environmental Science 131 | Summer 2004 | 05/17/04 to 08/07/04 | 14 | Online class |
| SCIE131 H1FF | Environmental Science 131 | Fall 2004 | 11/10/04 to 12/15/04 | 19 | In-Class |
| SCIE 131 H1FF | Environmental Science 131 | Fall 2005 | 11/9/05 to 12/14/05 | 19 | In-Class |
| SCIE 131 H1FF | Environmental Science 131 | Spring 2006 | 3/27/06 to 5/1/06 | ? | In-Class |

SCIE 114 – 4 Semester Credit Hours
SCIE 131 – 4 Semester Credit Hours

14

# APPENDIX E

## Rates and Terms and Conditions of

## Stephen E. Petty, P.E., C.I.H., C.S.P.



**EES** GROUP
ENGINEERING & EXPERT SERVICES

1701 E. Atlantic Boulevard · Suite 5 · Pompano Beach · FL 33060 · Phone: 754-220-8844 · Fax: 754-220-8763

January 26, 2018

Ms. Carol Moore
Levin Papantonio
316 South Baylen Street
Pensacola, FL 32502

**Re:  Stephen Petty Expert Witness Consulting Agreement and Support Package**

Dear Ms. Moore:

Thank you for your interest in the expert witness services of Stephen Petty and EES Group, Inc. Attached, please find our consulting agreement and expert witness case package.

This agreement is entered into between Stephen E. Petty and EES Group, Inc., the consultant, and Levin Papantonio Thomas Mitchell Rafferty & Proctor, P.A.

The purpose of this agreement is to procure the services of the consultant in relation to the Monsanto matter.  EES Group, Inc. is not dependent upon the findings that they render, or on the outcome of any legal action, mediation, arbitration, or the amount or terms of any settlement of the underlying legal cause, nor on any contractual arrangement between the client-attorney and any other person or party.

At the time of the execution of this agreement, the client-attorney shall tender a retainer fee in the amount of $7,500.00, made payable to EES Group, Inc.  Invoices for services performed or expenses incurred shall be charged against the retainer fee until it is exhausted.  The remaining balance and/or additional fees will be paid according to the terms outlined in this agreement to EES Group, Inc.

The client-attorney shall not identify any EES Group, Inc. staff as testifying expert(s) until the expert agrees to be disclosed as a testifying expert.  Until that time, and upon execution of this agreement, the EES Group, Inc. expert shall be designated as a consulting expert.

Fees for services provided by EES Group, Inc. follow.  Out-of-pocket expenses will be billed at cost plus 10%:

| Labor | Hour |
|---|---|
| Stephen E. Petty, P.E., C.I.H., C.S.P. | $385.00 |
| Sr. Engineer | $265.00 |
| Project Engineer | $195.00 |
| Technician | $95.00 |
| Secretarial/Administrative Assistant | $80.00 |

Levin Papantonio                              2                          January 26, 2018

For testimony at deposition or trial, Mr. Petty shall be compensated at the rate of $3,000 per half day (≤ 4 hours) and $5,000 per day (> 4 hours; maximum of 8 hours per day) plus travel and expenses if applicable. If continuous time for deposition/trial is to exceed eight hours, testimony will be billed as a second day, at the rates previously defined. The tabulated rates above shall apply to time while travelling, should it be necessary. These rates for testimony shall apply both while waiting to give testimony, whether at an office or court and for time taken for breaks or meals, as well as for time spent actually giving testimony. Deposition payments must be received by EES Group, Inc. prior to or at the start of the deposition in order for experts to testify. EES Group, Inc. reserves the right to cancel testimony if account balances are not current. If less than 48 hours' notice is given for the cancellation of a deposition or trial, a minimum of one-half day fee of $3,000 will be charged.

The client is responsible for payments to EES Group, Inc. as outlined in this contract, regardless of any arrangement the client has with any party or parties he represents. EES Group, Inc. will issue invoices on a semi-monthly/monthly basis, or whatever other interval is deemed appropriate. Invoices are due upon receipt, and shall be considered delinquent if unpaid more than thirty days after their date of issuance. In the event that a bill remains unpaid for sixty or more days after the date of issuance, EES Group, Inc. shall have the unrestricted right to resign from performing additional services for the client-attorney on any and all cases that they are working on for the client-attorney's firm.

EES Group, Inc. carries a comprehensive insurance package, including $2 million general liability insurance. Certificates will be provided upon request.

One signed faxed, e-mailed, or mailed copy of this letter will serve as our authorization to proceed. This agreement is effective for a period of thirty (30) days. The attached General Conditions are a part of this work order.

If we can answer any questions, please do not hesitate to contact our office at (754) 220-8844.

Approved by EES Group, Inc:                    Approved by Levin Papantonio Thomas
                                               Mitchell Rafferty & Proctor, P.A:

_____                        _____
Stephen E. Petty, P.E. C.I.H.
President

_____2/9/18_____                           _____2/9/18_____
Date                                           Date

Attachment

EEs Group                                      Engineering & Expert Services, Inc.®

Levin Papantonio                           3                    January 26, 2018

---

**Engineering & Expert Services, Inc. (EES Group, Inc.)**
**General Conditions**

---

1.  **PARTIES & WORKSCOPE:** Engineering & Expert Services, Inc. (hereinafter referred to as EES) shall include said company, its affiliates, suppliers, or subcontractors performing the work. "Work" means the specific services to be performed by EES as set forth in EES's proposal, and these General Conditions. Client refers to the person or business entity ordering the work to be done by EES. If the client is ordering the work on behalf of another, the client represents and warrants that the client is the duly authorized agent of said party for the purpose of ordering and directing said work. Unless otherwise stated in writing, the client assumes sole responsibility for determining whether the quantity and nature of the work ordered by the client is adequate and sufficient for client's purposes. The ordering of work from EES constitutes acceptance of the terms of EES's proposal and these *General Conditions*.

2.  **SCHEDULING OF WORK:** The services set forth in EES's proposal will be accomplished in a timely, workmanlike and professional manner by EES personnel at the prices quoted. If EES is required to delay commencement of the work, or if, upon starting the work, EES is required to stop or interrupt the progress of its work as a result of changes in the scope of the work requested by the client, to fulfill the requirements of third parties, or other causes beyond the direct reasonable control of EES, additional charges will be applicable and payable by the client. Additional charges will be billed at rates so stated in the proposal.

3.  **CONFIDENTIALITY:** EES agrees not to violate the confidentiality of the client through the release or disclosure of contractual agreements, testing results, processing procedures and any other information made available by the client in the conduct of said project, without client's express consent, except where such disclosure is required by a court or governmental agency of competent jurisdiction.

4.  **INSURANCE:** EES shall maintain all appropriate Workmen's Compensation and General Liability Insurance.

5.  **LIMITED WARRANTY:** Materials supplied by EES are warranted per the manufacturer's written warranty. Installation is warranted for six months, ordinary use, wear or tear, or damage from abuse or accident accepted. NO OTHER WARRANTY IS EXPRESSED OR IMPLIED.

6.  **PAYMENT:** The client shall be invoiced at least once each month for work performed during the preceding period. The client agrees to pay each invoice upon its receipt. Past due payments shall bear interest at the rate of 1 1/2% per month on the outstanding balance until paid. In the event of default in payment or any other terms of this Agreement by client, EES may, at its option: (i) terminate this Agreement; or (ii) declare the unpaid balance due and payable, without notice or demand to client, and sue and recover from client said amount, together with all reasonable costs and attorney's fees incurred by EES relating to its enforcement or preservation of its rights hereunder.

7.  **TERMINATION:** This Agreement may be terminated by either party upon seven (7) days written notice. In the event of termination, EES will be compensated by the client for all services performed up to and including the termination date.

8.  **INDEMNITY:** The client, and if the client is acting as an agent for a principal in ordering work from EES, then also said principal, agrees to indemnify, defend and hold EES, its officers, employees and agents harmless from any and all claims, suits, losses, costs and expenses, including but not limited to, court costs and reasonable attorney's fees arising or alleged to have arisen out of or resulting or alleged to have resulted from the performance of EES's work on or about the project and caused in whole or in part by any negligent, willful or wanton act or omission of the client or the client's principal or any party directly or indirectly employed by the client or the client's principal or anyone for whose costs the client or the client's principal may be liable except to the extent, and only to such degree, as such claim, suit, loss or damage is caused by the sole negligence or willful, or wanton act of EES, its officers, agents, employees or anyone for whose acts EES may be liable. In the event that the client or the client's principal shall bring any suit, cause of action, claim or counterclaim against EES, and to the extent that EES shall prevail upon such suit, cause of action, claim or counterclaim, the person or business initiating such actions shall pay EES the costs expended by EES to answer and/or defend against such suit, cause of action, claim or counterclaim, including reasonable attorney's fees, witness fees, and other related expenses.

9.  **NOTICE OF COMMENCEMENT:** This contract constitutes an immediate and continuing request by EES that it be provided with a copy of the Notice of Commencement on this project from the owner and execution of this agreement constitutes acknowledgment by client of this request.  Owner shall prepare and record a Notice of Commencement on this project and respond timely to requests for copies of the Notice of Commencement by sub-trades. EES shall not start work until it has received proof that a Notice of Commencement has been recorded by the owner with the County Recorder and shall be entitled to an extension of time for every day of delay caused by a late filing of the Notice of Commencement.

10. **DIRECT PAYMENTS:** Owner shall make no direct payments to subcontractors or suppliers on the project without giving ten (10) day written notice to EES of its intention to do so. If EES disputes or contests this direct payment in writing to the owner within this ten (10) day period, owner will refrain from any such direct payment unless EES is adjudged bankrupt, insolvent or in receivership.

11. **COMPLETE AGREEMENT:** Client and EES mutually agree that the EES written proposal and these *General Conditions* comprise the full and entire agreement between the parties and no other agreement or understanding has been entered into or will be recognized, and that all negotiations, acts, or representations made prior to the ordering of work shall be deemed merged in, integrated and superseded by the EES proposal and these general conditions. This agreement may be amended only by an instrument in writing signed by both parties.

EEs Group                                                    Engineering & Expert Services, Inc.©

# APPENDIX F

# Mr. Robert (Bob) Dickey's Interviews



1701 E. Atlantic Blvd. · Suite 5 · Pompano Beach · FL · 33060 · P: (754) 220-8844 · F: (754) 220-8783 · www.eesgroup.us

## *Mr. Robert (Bob) Dickey's Interview Summary Sheet*

**Date:**          **July 26, 2019     Time: 10:30 AM to 11:45 AM**

                 **August 23, 2019   Time: 2:34 PM to 2:44 PM**

**Interviewee:**   **Mr. Robert Dickey**

**Interviewer:**   **Mr. Stephen Petty – EES Group, Inc.**

**Outside Party(s):   Ms. Robin Greenwald and Matt Hans from Weitz & Luxenberg, P.C. and David Domina from DominaLaw Group PC LLO**

This phone log is not an official transcript of the phone conversation; rather this is a general summary of questions and answers asked and responded to during these telephone interviews.

**DISCUSSION ITEMS:**

Plaintiff:   ■ Yes;   ☐ No          Spouse:   ☐ Yes;   ☐ No

Children of Plaintiff: ☐ Yes;      ☐ No     Co-Worker: ☐ Yes;   ☐ No

**Plaintiff Background Information:**

Date of Birth: ██████████     Location: ████████

Disease:  Non Hodgkin Lymphoma (NHL); Date of Diagnosis:  November/December 2008

Education:  H.S.:  Laurel Public Schools High School, Laurel, NE.  Graduated in May 1958.

Further Education:  Mr. Dickey attended the University of Nebraska for two years (~1958-1959) and received a two-year general certificate.

Military:  Mr. Dickey served in the Army from the fall of 1960 to the fall of 1962.  He played trumpet while in the Army and was not aware of any chemical exposures during this time.

Smoking History: ████████████████████████████
████████

July 26, 2019 and August 23, 2019 Telephone Log – Interviews of Mr. Robert (Bob) Dickey

**Exposures to Various Products by Location:**

**Location #1:**

Location:        ☐ Home;    ■ Work

Company Name:  Neighbor

Address:  Various

Job Title:  Truck Driver

Timeframe Working at this Location:   He worked the summer of ~1959 for ~2.5 to ~3 months.

Work Activities:   Picked up chickens and drove them from northeast Nebraska to a Campbell's Soup facility in Minnesota.

Work Schedule:  Varied.

Products Used:  No known chemical exposures when working at this location.

PPE:

Gloves        ☐ Yes;    ■ No   Type:

Respirator    ☐ Yes;    ■ No   Type:

2

July 26, 2019 and August 23, 2019 Telephone Log – Interviews of Mr. Robert (Bob) Dickey

**Location #2:**

Location:        ☐ Home;   ■ Work

Company Name:  Alfalfa D.I. Plant

Address:  In and around Laurel, NE.

Job Title:  Laborer

Timeframe Working at this Location:  He worked nights during the summer of ~1960 for ~3 months.

Work Activities:  Mostly cut alfalfa, operating a tractor.

Work Schedule:   He worked nights, from ~12:00 AM to ~8:00 AM and worked ~36 to ~40 hrs./wk.

Products Used:   Other than dust, no known chemical exposures when working at this location.

PPE:

Gloves        ☐ Yes;      ■ No   Type:

Respirator    ☐ Yes;      ■ No   Type:

**Location #3:**

Location:        ☐ Home;        ■ Work

Company Name:  Worked for Father on the farm.

Address:  Near Laurel, NE

Job Title:  Laborer

Timeframe Working at this Location:  He worked the summers of ~1959 and ~1960 for ~3 months each before entering the military.

Work Activities:   Chores around the farm; mostly feeding dairy cows, beef cows, and hogs.

Work Schedule:  Varied.

Products Used:  No known chemical exposures when working at this location.

PPE:

Gloves          ☐ Yes;        ■ No   Type:

Respirator      ☐ Yes;        ■ No   Type:

4

July 26, 2019 and August 23, 2019 Telephone Log – Interviews of Mr. Robert (Bob) Dickey

**<u>Location #4:</u>**

Location:         ☐ Home;       ■ Work

Company Name:  Farmer – self-employed.

Address:  Near Laurel, NE.

Job Title:  Farmer.

Timeframe Working at this Location:   1963 to 2003; last season worked was the 2002 season.

Work Activities:  Farming.

Work Schedule:  ~Varied; season was from mid-May until August/September.

Products Used:

➤    2, 4 D – from 1963 to ~1975/1976.  Used $\leq$ 1x/mo.  Each event lasted between ~4 and ~6 hours.
➤    Roundup ® concentrate – from ~1975/1976 until 2003.

PPE:

Gloves         ■ Yes;        ■ No  Type:  Cotton or leather work gloves at times.
Respirator     ☐ Yes;        ■ No  Type:

July 26, 2019 and August 23, 2019 Telephone Log – Interviews of Mr. Robert (Bob) Dickey

**Pesticide Use Location** — **Farm - Near Laurel, NE.**

**_Activities:_**

**Activity #1:**  Sprayed weeds using ~1-gal. tank hand-held tank with wand and nozzle. — Spraying.

Location:        ☐ Home;    ■ Work

Location:  Farm near Laurel, NE.

Product Name(s):  Roundup® Concentrate

Manufacturer:  Monsanto

Application:  Started using products in ~1975/1976 timeframe until ~1996 to spray weeds.

Container Size(s):  He used Roundup® Concentrate in ~2.5 gal. jugs the entire time.  He believed that the containers were white in color.

Season:  Mid-May to August/September each year.

Method Dispensed:  He mixed the concentrate product into an ~1 gal. tank, filling the balance of the tank with water.  The concentrate was added as per the mixing instructions on the container.  The mixed product was dispensed using a hand-held pumped tank with a wand and a nozzle.

Product Exposure Data:

Mixing:

➢  Season:  from mid-May to August/September.
➢  Seasons:  ~10 to ~11 seasons (~1975/1976 to ~1986).
➢  Events or Days/Mo.:  ~2 to ~3 mixes/ spraying event.
➢  Hrs./Mixing Event:  ~5 min./ event on average.
➢  Distance away:  ~2' to ~3'.

Spraying:

➢  Season:  from mid-May to August/September.
➢  Seasons:  ~10 to ~11 seasons (~1975/1976 to ~1986).
➢  Events or Days/Season.:  ~30 days or events/season on average.
➢  Hrs./Day or Event:  ~6 to ~7 hrs./day or event on average.
➢  Used ~2 to ~3 batches of mixed product/day or event.
➢  Distance Away:  ~2' to 3'.

6

PPE (all times):

Gloves ■ Yes; ■ No  Type: Cotton gloves at times.

Respirator ☐ Yes; ■ No  Type

**Activity #2:**  Sprayed weeds using ~20-gal. tank with hand-held wand and nozzle.  The tank was mounted on a 4-wheeler tractor with four seats and wands with nozzles occupied by others who would spray while he drove – <u>Spraying</u>.

Location:  Farm near Laurel, NE.

Product Name(s):  Roundup® Concentrate

Manufacturer:  Monsanto

Application:  ~1986 through 2002 season.

Container Size(s):  He used Roundup® Concentrate in ~2.5 gal. jugs the entire time.  He believed that the containers were white in color.

Season:  May through August each year.

Method Dispensed:  He mixed the concentrate product into an ~20 gal. tank, filling the balance of the tank with water.  The concentrate was added as per the mixing instructions on the container.  The mixed product was dispensed using a pump and hand-held wands and nozzles.

Product Exposure Data:

<u>Mixing:</u>

➢  Season:  from May through August.

➢  Seasons:  ~16 seasons (~1986 through 2002 season).

➢  Events or Days/Mo.:  ~2 to ~3 mixes/ spraying event.

➢  Hrs./Mixing Event:  ~10 min./ event on average.

➢  Distance away:  ~2' to ~3'.

<u>Spraying:</u>

➢  Season:  from May through August.

➢  Seasons:  ~16 seasons (~1986 through 2002 season).

➢  Events or Days/Season.:  ~30 days or events/season on average.

➢  Hrs./Day or Event:  ~6 to ~8 hrs./day or event on average.

July 26, 2019 and August 23, 2019 Telephone Log – Interviews of Mr. Robert (Bob) Dickey

➤     Used ~2 to ~3 mixes of mixed product/day or event.

➤     Nozzles ~5' to ~6' away.

PPE (all times):

Gloves          ☐ Yes;         ■ No   Type:

Respirator      ☐ Yes;         ■ No   Type.

**Activity #3:**  Sprayed weeds using ~20-gal. tank with hand-held wand and nozzle.  The tank was mounted on a 4-wheeler tractor with four seats and wands with nozzles occupied by others who would spray while he drove – <u>Cleaning Clogged Nozzles</u>.

Location:  Farm near Laurel, NE.

Product Name(s):  Roundup® Concentrate

Manufacturer:  Monsanto

Application:  ~1986 through 2002 season.

Container Size(s):  He used Roundup® Concentrate in ~2.5 gal. jugs the entire time.  He believed that the containers were white in color.

Season:  May through August each year.

Method Dispensed:  He mixed the concentrate product into an ~20 gal. tank, filling the balance of the tank with water.  The concentrate was added as per the mixing instructions on the container.  The mixed product was dispensed using a pump and hand-held wands and nozzles.

Product Exposure Data:

<u>Cleaning Clogged Nozzles:</u>

➤     Season:  from May through August.

➤     Seasons:  ~16 seasons (~1986 through 2002 season).

➤     Events or Days/Season:  ~2 days/season.

➤     Time/Cleaning Event:  ~5 to ~10 min./event on average.

➤     Distance away:  ~1' to ~2'.

PPE (all times):

Gloves          ☐ Yes;         ■ No   Type:

Respirator      ☐ Yes;         ■ No   Type.

8

**Activity #4:**  Sprayed weeds using ~20-gal. tank with hand-held wand and nozzle.  The tank was mounted on a 4-wheeler tractor with four seats and wands with nozzles occupied by others who would spray while he drove – Bad Event.

Location:  Farm near Laurel, NE.

Product Name(s):  Roundup® Concentrate

Manufacturer:  Monsanto

Application:  ~1986 through 2002 season.

Container Size(s):  He used Roundup® Concentrate in ~2.5 gal. jugs the entire time.  He believed that the containers were white in color.

Season:  May through August each year.

Method Dispensed:  He mixed the concentrate product into an ~20 gal. tank, filling the balance of the tank with water.  The concentrate was added as per the mixing instructions on the container.  The mixed product was dispensed using a pump and hand-held wands and nozzles.

Bad event:  Wind came up when he was putting concentrate into the ~20 gallon tank and blew product on him, soaking him with concentrate.  He was wearing a t-shirt and jeans.  Approximately 1 quart of concentrated product blew onto him.

Product Exposure Data:

Bad Exposure Event:

➢   Events or Days/Season:  1x.
➢   Time/Event:  ~30 to ~45 seconds.
➢   Distance away:  coated him with concentrate product.

PPE (all times):

Gloves          ☐ Yes;       ■ No  Type:

Respirator    ☐ Yes;       ■ No  Type.


A summary of Mr. Dickey's usage and/or exposures to the pesticide products obtained during these telephone interviews follows:

9

July 26, 2019 and August 23, 2019 Telephone Log – Interviews of Mr. Robert (Bob) Dickey

**Pesticide Usage and Exposure Information – Farm- Near Laurel, NE**

| Location/ Activity | Container Size/ Spray Can Used | Exposures and Consumption | | | | | Dermal Exposures | | | |
| | | Timeframe/ Job | # Events/ Day or Week | Amount Used/ Event | Time/ Event (hrs.) | Distance Away (Feet) | Part of Body Wet | % Area Wet | % Time Wet | Post Appl. (Yes, wet to dry; no) |
|---|---|---|---|---|---|---|---|---|---|---|
| Farm<br><br>Spraying Weeds – Handheld Sprayer - Spraying | ~2.5 gal. Monsanto Roundup® Conc. Container mixed into ~1 gal. Tank. | ~10 to ~11 seasons (Mid-May to Aug./ Sept.) (~1975/1976 to ~1986). | ~30 days or events/season | Mixed conc. with water as per instr. ~2 to ~3 mixes/event. | ~6 to ~7 hrs./event day on avg. | ~2' to ~3' | Both Hands Both Wrists Both Forearms<br><br>Never wore gloves. | ~50% ~50% ~25% | ~25% ~15% to ~20% ~5% to ~10% | Product would remain on skin for ~4 to 10 hrs. until he went home and cleaned up. |
| Farm<br><br>Spraying Weeds – Handheld Sprayer - Mixing | ~2.5 gal. Monsanto Roundup® Conc. Container mixed into ~1 gal. Tank. | ~10 to ~11 seasons (Mid-May to Aug./ Sept.) (~1975/1976 to ~1986). | ~30 days or events/season | Mixed conc. with water as per instr. ~2 to ~3 mixes/event. | ~5 min./event day on avg. | ~2' to ~3' | Both Hands Both Wrists Both Forearms<br><br>Never wore gloves. | ~75% to ~100% ~50% ~10% to ~15% | ~50% to ~75% ~50% to ~75% ~25% | Product would remain on skin for ~4 to 10 hrs. until he went home and cleaned up. |
| Farm<br><br>Spraying Weeds – Tractor Mounted Sprayer - Spraying | ~2.5 gal. Monsanto Roundup® Conc. Container mixed into ~20-gal. Tank. | ~16 seasons (May through August) (~1986 through 2002 season). | ~30 days or events/season | Mixed conc. with water as per instr. ~2 to ~3 mixes/event. | ~6 to ~8 hrs./event day on avg. | ~5' to ~6' | No dermal exposures recalled.<br><br>Never wore gloves. | | | |
| Farm<br><br>Spraying Weeds – Tractor Mounted Sprayer - Mixing | ~2.5 gal. Monsanto Roundup® Conc. Container mixed into ~20 gal. Tank. | ~16 seasons (May through August) (~1986 through 2002 season). | ~30 days or events/season | Mixed conc. with water as per instr. ~2 to ~3 mixes/event. | ~10 min./event day on avg. | ~2' to ~3' | Both Hands Both Wrists Both Forearms<br><br>Never wore gloves. | ~75% to ~100% ~50% ~10% to ~15% | ~50% to ~75% ~50% to ~75% ~25% | Product would remain on skin for ~4 to 10 hrs. until he went home and cleaned up. |
| Farm<br><br>Spraying Weeds – Tractor Mounted Sprayer – Cleaning Clogged Nozzles | N/A | ~16 seasons (May through August) (~1986 through 2002 season). | ~2 days or events/season | N/A. | ~5 to ~10 min./event day on avg. | ~1' to ~2' | Both Hands Both Wrists Both Forearms Both Upper Arms<br><br>Never wore gloves. | ~100% ~50% to ~75% ~25% to ~40% ~25% to ~40% | ~100% ~50% to ~75% ~25% ~25% | Product would remain on skin for ~4 to 10 hrs. until he went home and cleaned up. |

10

July 26, 2019 and August 23, 2019 Telephone Log – Interviews of Mr. Robert (Bob) Dickey

| Location/ Activity | Container Size/ Spray Can Used | Exposures and Consumption | | | | | Dermal Exposures | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Timeframe/ Job | # Events/ Day or Week | Amount Used/ Event | Time/ Event (hrs.) | Distance Away (Feet) | Part of Body Wet | % Area Wet | % Time Wet | Post Appl. (Yes, wet to dry; no) |
| Farm<br><br>Spraying Weeds – Tractor Mounted Sprayer – One Time Soaking Event – Wind Blew Concentrate on Him - Soaked | N/A | During ~16 season period (May through August) (~1986 through 2002 season). | 1x | N/A. ~1 qt. of concentrate blew onto him. | ~30 to ~45 seconds | Conc. Product on him | Both Hands<br>Both Wrists<br>Both Forearms<br>Both Upper Arms<br>Chest<br>Legs<br>Face<br>Neck<br><br>Soaked.<br><br>Never wore gloves, wearing a t-shirt and jeans at the time. | ~100%<br>~100%<br>~100%<br>~100%<br>~100%<br>~100%<br>~100%<br>~100% | ~100%<br>~100%<br>~100%<br>~100%<br>~100%<br>~100%<br>~100%<br>~100% | Product would remain on skin for ~4 to 10 hrs. until he went home and cleaned up. |

11

July 26, 2019 and August 23, 2019 Telephone Log – Interviews of Mr. Robert (Bob) Dickey

**PPE and Warnings Information – Terminology and Training:**

Ever hear of the term Respiratory Protection Standard?          ☐ Yes;          ■ No

Ever medically cleared to wear a respirator?                    ☐ Yes;          ■ No

Ever fit tested to wear a respirator?                           ☐ Yes;          ■ No
        He never wore a respirator.

Ever hear of the term Hazard Communication Standard or HAZCOM? ☐ Yes;     ■ No

Ever hear of the term Material Safety Data Sheet or MSDS?       ☐ Yes;          ■ No

Ever provided any training on chemical hazards of Roundup® products?

        ■ Yes;     ■ No

        Mr. Dickey never thought Roundup had the potential to harm him until after he got sick and began to wonder about how safe it actually was.

        In the 1970s a local Laurel, NE Roundup® representative told him on two to three occasions it was "totally safe" and also that it was so safe "you could drink it." He also told him it would "save him money."

        He also attended annual Commodity Classic Meetings, typically held once per year in the south (e.g., Orlando, FL and San Antonio, TX) and in the winter (late February to early March). He went to the Monsanto booth and asked the Monsanto representative (~late 1970s) about the safety of Roundup® products to verify what he was being told locally. He was told by the representative that Roundup® products were "completely safe."

12

# APPENDIX G

**Exposure Summary Information and Calculations based on Information from Mr. Robert (Bob) Dickey's Interviews**

| Data Item | Values | | | | Dermal Data | | | | Reference |
|---|---|---|---|---|---|---|---|---|---|
| | Low | High | Midpoint | Units | Area(s) | % Area | % Time | Post Dermal Time | |
| Activity #1a: Mixing Conc. Into 1 Gal. Spray Tank | | | | | | | | | |
| Years | ~1975/1976 | ~1986 | | | | | | | Dickey Interviews - pg. 13. |
| Seasons | 10 | 11 | 10.5 | Seasons | 2 Hands | ~75% - ~100% | ~50% - ~75% | Yes, ~4 to ~10 hrs. | Dickey Interviews - pg. 13. |
| Months in Season (Mid-May - Aug./Sept.) | 2.5 | 3.5 | 3.0 | #/mo. | 2 Wrists | ~50% | ~50% - ~75% | Yes, ~4 to ~10 hrs. | Dickey Interviews - pg. 13. |
| Total Months | 25.0 | 38.5 | 31.8 | Months | 2 Forearms | ~10% - ~15% | ~25% | Yes, ~4 to ~10 hrs. | Calculated and Dickey Interviews - pg. 13. |
| Spray Days/Season | | | 30 | Spray Days/Season | | | | | Dickey Interviews - pg. 13. |
| Mixing Events/Spray Day | 2 | 3 | 2.5 | Mix. Events/Spray Day | | | | | Dickey Interviews - pg. 13. |
| **Mixing Events - Total** | **600** | **990** | **795** | **Events - Total** | | | | | Calculated. |
| Time/Mixing Event | | | 5 | Min./Event | | | | | Dickey Interviews - pg. 13. |
| **Mixing Time - Total** | 3,000 | 4,950 | 3,975 | Minutes | | | | | Calculated. |
| | 50.0 | 82.5 | 66.3 | **Hrs.** | | | | | Calculated. |
| Post Application Time/Event | 4 | 10 | 7 | Hrs./Event min. | | | | | Dickey Interviews - pg. 13. |
| *Post Application Time* | *2,400* | *9,900* | *6,150* | *Hrs. - Post* | | | | | Calculated. |
| | | | | | | | | | |
| Activity #1b: Spraying from 1 Gal. Spray Tank | | | | | | | | | |
| Years | ~1975/1976 | ~1986 | | | | | | | Dickey Interviews - pg. 13. |
| Seasons | 10 | 11 | 10.5 | Seasons | 2 Hands | ~75% | ~30% - ~50% | Yes, ~4 to ~10 hrs. | Dickey Interviews - pg. 13. |
| Months in Season (Mid-May - Aug./Sept.) | 2.5 | 3.5 | 3.0 | #/mo. | 2 Wrists | ~50% | ~30% - ~50% | Yes, ~4 to ~10 hrs. | Dickey Interviews - pg. 13. |
| Total Months | 25.0 | 38.5 | 31.8 | Months | 2 Forearms | ~50% | ~10% - ~20% | Yes, ~4 to ~10 hrs. | Calculated and Dickey Interviews - pg. 13. |
| Spray Events/Season | | | 30 | Spray Days/Season | | | | | Dickey Interviews - pg. 13. |
| **Spraying Events - Total** | **300** | **330** | **315** | **Events - Total** | | | | | Calculated. |
| Time/Spray Event or Day | 6 | 7 | 6.5 | Hrs./Event | | | | | Dickey Interviews - pg. 13. |
| **Spraying Time - Total** | **1,890** | **2,205** | **2,048** | **Hrs.** | | | | | Calculated. |
| Post Application Time/Event | 4 | 10 | 7.0 | Hrs./Event min. | | | | | Dickey Interviews - pg. 13. |
| *Post Application Time* | *1,260* | *3,150* | *2,205* | *Hrs. - Post* | | | | | Calculated. |

| Data Item | Values | | | | Dermal Data | | | | Reference |
|---|---|---|---|---|---|---|---|---|---|
| | Low | High | Midpoint | Units | Area(s) | % Area | % Time | Post Dermal Time | |
| **Activity #2a: Mixing Conc. Into 20 Gal. Spray Tank** | | | | | | | | | |
| Years | ~1986 | Through 2002 | | | | | | | Dickey Interviews - pg. 13. |
| Seasons | | | 16 | Seasons | 2 Hands | ~75% - ~100% | ~50% - ~75% | Yes, ~4 to ~10 hrs. | Dickey Interviews - pg. 13. |
| Months in Season (May - through August) | | | 4 | #/mo. | 2 Wrists | ~50% | ~50% - ~75% | Yes, ~4 to ~10 hrs. | Dickey Interviews - pg. 13. |
| Total Months | | | 64 | Months | 2 Forearms | ~10% - ~15% | ~25% | Yes, ~4 to ~10 hrs. | Calculated and Dickey Interviews - pg. 13. |
| Spray Days/Season | | | 30 | Spray Days/Season | | | | | Dickey Interviews - pg. 13. |
| Mixing Events/Spray Day | 2 | 3 | 2.5 | Mix. Events/Spray Day | | | | | Dickey Interviews - pg. 13. |
| **Mixing Events - Total** | **960** | **1,440** | **1,200** | **Events - Total** | | | | | Calculated. |
| Time/Mixing Event | | | 10 | Min./Event | | | | | Dickey Interviews - pg. 13. |
| **Mixing Time - Total** | 9,600 | 14,400 | 12,000 | Minutes | | | | | Calculated. |
| | 160 | 240 | 200 | **Hrs.** | | | | | Calculated. |
| Post Application Time/Event | 4 | 10 | 7 | Hrs./Event min. | | | | | Dickey Interviews - pg. 13. |
| *Post Application Time* | *3,840* | *14,400* | *9,120* | *Hrs. - Post* | | | | | Calculated. |
| | | | | | | | | | |
| **Activity #2b: Spraying from 20 Gal. Spray Tank** | | | | | | | | | |
| Years | ~1986 | Through 2002 | | | | | | | Dickey Interviews - pg. 13. |
| Seasons | | | 16 | Seasons | No recollections of dermal exposures. | | | | Dickey Interviews - pg. 13. |
| Months in Season (May - through August) | | | 4 | #/mo. | | | | | Dickey Interviews - pg. 13. |
| Total Months | | | 64 | Months | | | | | Calculated and Dickey Interviews - pg. 13. |
| Spray Events/Season | | | 30 | Spray Days/Season | | | | | Dickey Interviews - pg. 13. |
| **Spraying Events - Total** | | | **480** | **Events - Total** | | | | | Calculated. |
| Time/Spray Event or Day | 6 | 8 | 7 | Hrs./Event | | | | | Dickey Interviews - pg. 13. |

| Data Item | Values | | | | Dermal Data | | | | Reference |
|---|---|---|---|---|---|---|---|---|---|
| | Low | High | Midpoint | Units | Area(s) | % Area | % Time | Post Dermal Time | |
| **Spraying Time - Total** | **2,880** | **3,840** | **3,360** | **Hrs.** | | | | | Calculated. |
| Post Application Time/Event | 4 | 10 | 7 | Hrs./Event min. | | | | | Dickey Interviews - pg. 13. |
| *Post Application Time* | *1,920* | *4,800* | *3,360* | *Hrs. - Post* | | | | | Calculated. |
| | | | | | | | | | |
| Activity #2c: Clean Nozzles: | | | | | | | | | |
| Years | ~1986 | Through 2002 | | | | | | | Dickey Interviews - pg. 13. |
| Seasons | | | 16 | Seasons | 2 Hands | ~100% | ~100% | Yes, ~4 to ~10 hrs. | Dickey Interviews - pg. 13. |
| Months in Season (May - through August) | | | 4 | #/mo. | 2 Wrists | ~50% - ~75% | ~50% - ~75% | Yes, ~4 to ~10 hrs. | Dickey Interviews - pg. 13. |
| Total Months | | | 64 | Months | 2 Forearms | ~25% - ~40% | ~25% | Yes, ~4 to ~10 hrs. | Dickey Interviews - pg. 13. |
| Spray Events/Season | | | 30 | Spray Days/Season | 2 Upper Arms | ~25% - ~40% | ~25% | Yes, ~4 to ~10 hrs. | Dickey Interviews - pg. 13. |
| Cleaning Events or Days/Season | | | 2 | Events/Season | | | | | Dickey Interviews - pg. 13. |
| **Cleaning Events - Total** | | | **32** | **Events - Total** | | | | | Calculated. |
| Time/Cleaning Event | 5 | 10 | 7.5 | Min./Event | | | | | Dickey Interviews - pg. 13. |
| **Cleaning Time - Total** | 160 | 320 | 240 | Minutes | | | | | Calculated. |
| | **2.7** | **5.3** | **4.0** | **Hrs.** | | | | | Calculated. |
| Post Application Time/Event | 4 | 10 | 7 | Hrs./Event min. | | | | | Dickey Interviews - pg. 13. |
| *Post Application Time* | *128* | *320* | *224* | *Hrs. - Post* | | | | | Calculated. |
| | | | | | | | | | |
| Activity #2d: Soaking Event: | | | | | | | | | |
| Years | ~1986 | Through 2002 | | | | | | | Dickey Interviews - pg. 14. |
| Seasons | | | 16 | Seasons | 2 Hands | ~100% | ~100% | Yes, time unknown. | Dickey Interviews - pg. 14. |
| Months in Season (May - through August) | | | 4 | #/mo. | 2 Wrists | ~100% | ~100% | Yes, time unknown. | Dickey Interviews - pg. 14. |
| Total Months | | | 64 | Months | 2 Forearms | ~100% | ~100% | Yes, time unknown. | Dickey Interviews - pg. 14. |
| Spray Events/Season | | | 30 | Spray Days/Season | 2 Upper Arms | ~100% | ~100% | Yes, time | Dickey Interviews - pg. 14. |

| Data Item | Values | | | | Dermal Data | | | | Reference |
|---|---|---|---|---|---|---|---|---|---|
| | Low | High | Midpoint | Units | Area(s) | % Area | % Time | Post Dermal Time | |
| | | | | | | | | unknown. | |
| Soaking Events - Total | | | 1 | Event | Chest | ~100% | ~100% | Yes, time unknown. | Dickey Interviews - pg. 14. |
| **Soaking Events - Total** | | | **1** | **Events - Total** | Legs | ~100% | ~100% | Yes, time unknown. | Calculated and Dickey Interviews, pg. 14. |
| Time/Soaking Event | 0.50 | 0.75 | 0.63 | Min./Event | Face | ~100% | ~100% | Yes, time unknown. | Dickey Interviews - pg. 14. |
| **Soaking Time - Total** | 0.50 | 0.75 | 0.63 | Minutes | Neck | ~100% | ~100% | Yes, time unknown. | Dickey Interviews - pg. 14. |
| | **0.008** | **0.013** | **0.010** | **Hrs.** | | | | | |
| Post Application Time/Event | 4 | 10 | 7 | Hrs./Event min. | | | | | |
| *Post Application Time* | *4* | *10* | *7* | *Hrs. - Post* | | | | | |
| **Overall Totals:** | | | | | | | | | |
| **Events - Total** | **2,373** | **3,273** | **2,823** | **Events** | | | | | Calculated. |
| **Time in Hours - Total** | **4,983** | **6,373** | **5,678** | **Hrs.** | | | | | Calculated. |
| **Post Dermal Time - Total** | **3,184** | **7,960** | **5,572** | **Hrs.** | | | | | Spraying and Repair/Maint. Times Only - Avoids Double Counting when Spraying, Mixing, and Cleaning Nozzles. |

## Summary of Event and Time Calculations

### Total Events

| Person | Events | | |
|---|---|---|---|
| | **Low** | **High** | **Midpoint** |
| **Dickey, Robert (Bob) (Spraying, Mixing, & Cleaning)** | 2,373 | 3,273 | 2,823 |

### Time Totals (hrs.) - Spraying*

| Person | Hours | | |
|---|---|---|---|
| | **Low** | **High** | **Midpoint** |
| **Dickey, Robert (Bob) (Spraying, Mixing, & Cleaning)** | 4,983 | 6,373 | 5,678 |

* Entries do not include significant post-dermal application exposure times; see details table above.