# Exhibit 10

Expert Report

Alex LeBeau, PhD, MPH, CIH

Mendoza v. Monsanto Company

Case No. 3:16-CV-06046

United States District Court

Northern District of California

My Name is Alex Lance LeBeau. I am a certified industrial hygienist (CIH), a board certification issued by the American Board of Industrial Hygiene (ABIH), and I am licensed by the State of Florida, Department of Business and Professional Regulations as a Mold Assessor. I possess a Master of Public Health (MPH) degree and a Doctor of Philosophy (PhD) degree in toxicology and risk assessment from the University of South Florida (USF) College of Public Health. I also hold a certificate in clinical epidemiology from the USF College of Public Health. My doctoral dissertation research involved an evaluation of pesticide biomarkers in a sample of the U.S. population and the assessment of risk from exposure to prevalent insecticides.

I am currently the owner of Exposure Assessment Consulting, LLC in Orlando, FL, where I offer toxicology, industrial hygiene, and public health consulting services. During my twelve-year career, I have evaluated exposures to a number of chemicals and performed various toxicological evaluations of substances. I have assessed the safety of novel antimicrobial pesticide products for Canadian registration purposes and evaluated the efficacy of registering a product that was considered an antimicrobial pesticide by the U.S. Environmental Protection Agency (U.S. EPA). I have also assessed occupational and environmental exposure to various chemicals, substances, biological agents, and physical stressors. I've also served as an adjunct professor at USF, serving as a guest lecturer in toxicology and risk assessment classes.

The U.S. Department of Labor, Occupational Safety and Health Administration (OSHA) recognizes industrial hygienists as occupational safety and health professionals who focus on recognizing, evaluating, and controlling chemical or biological health hazards or stressors that may cause sickness, impaired health and wellbeing, or significant discomfort and inefficiency in workers or in the community. As OSHA recognizes, an industrial hygienist can provide expert insight in a variety of areas, including the "magnitude of chemical, biological, or physical exposure, and the degree of associated risk" (OSHA 3160, 1999).

A CIH is an individual that has passed a rigorous qualifying examination (OSHA 3160, 1999). For examination eligibility, the ABIH requires several years of experience. The exam tests an individual's broad-spectrum practical knowledge across many areas of industrial hygiene. The ABIH has minimum rubrics established for examination question categorizations, including analytical chemistry, biohazards, community exposure, thermal stressors, toxicology, work environments and industrial processes, engineering controls, industrial ventilation, and health risk analysis (ABIH Rubrics, 2011). Epidemiology is also an area where a CIH must have practical

knowledge. The ABIH requires that applicants complete an ethics course before sitting for the examination and requires the completion of an ethics refreshers before certification renewal. As a CIH, I am bound by the Code of Ethics to protect the public from conditions where injury and damage are reasonably foreseeable (ABIH Code of Ethics, 2007).

Industrial hygienists with toxicological training are often asked to evaluate how, if at all, chemicals, biological agents, or other substances impact living organisms and determine the safety of those substances. Toxicological evaluations of substances can be performed using assay methods, animal studies, or reviewing epidemiological data. Training in toxicology is helpful to an industrial hygienist when evaluating exposure and identifying potential adverse health effects.   Industrial hygienists may apply their toxicological training in evaluating the effect of a given dose on a health outcome. Additionally, toxicologists evaluate the absorption, distribution, metabolism, and excretion (ADME) of a substance to understand how it interacts with biological systems.

Elements of industrial hygiene and toxicology evaluations are necessary components of a causal analysis.  Sir Austin Bradford Hill is often credited with establishing the first organized structure for evaluating a causal link between an alleged exposure and a potential disease outcome (Bradford Hill, 1965). Often referred to as the Bradford Hill Analysis or Hill's Causal Criteria, these criteria are used to establish causal inferences between a claimed exposure and a potential disease outcome.  In my current opinion, I have applied these criteria when appropriate and I have especially focused on the dose evaluation aspect of the criteria.

A core principal of risk assessment is understanding the difference between hazard and risk. Hazard is a potential source of harm from a substance before taking into account the concepts of exposure and dose. Risk is the probability of potential adverse effects resulting from exposure to a hazard. It is important to understand that exposure to a hazard does not mean in and of itself that a person is at realistic risk of an associated health outcome. Moreover, the fact that someone has been exposed to a realistic risk threshold does not mean that the health outcome is a result of that exposure.

I have performed risk assessments on contaminated sites in the U.S. using U.S. EPA and state and local regulatory guidelines. Risk assessments utilize combinations of exposure factors and toxicological data to model both potential exposure and dose under realistic exposure pathway scenarios. The critical elements of a risk assessment are hazard identification, exposure assessment, toxicity assessment, and risk characterization. Performing a risk assessment requires the understanding of how individuals may be exposed (e.g., inhalation, dermal, and ingestion), the exposure routes (e.g., air, water, or soil), the conditions that will allow someone to become exposed to those elements (i.e., complete exposure pathways), how toxic the substances are (including the bioavailability of the substances), and a characterization of the aggregate risks to determine if exposures to contaminants of concern will result in excess risks. These prospective exposure assessments are conservative to allow for the evaluation of risk for sensitive subgroups.

I have also performed safety assessments of food ingredients per U.S. Food and Drug Administration (FDA) requirements to determine the generally recognized as safe (GRAS) status of an ingredient using scientific procedures. Exposure and dose modeling of these ingredients under the specified conditions of use is performed to establish a safe average daily consumption

amount (i.e., dose) for U.S. consumers eating the ingredient in final food products. Safety studies are typically performed to support the establishment of safe use levels. These safety studies usually include a combination of *in vitro* (genotoxicity and mutagenicity) and *in vivo* (subchronic 90-day rat study) assays to show that the estimated consumption level (i.e., dose) would be safe for consumers in the U.S. population.

A list of publications and presentations is provided on my curriculum vitae in Appendix A.

In preparation for my opinion, I was asked to review regulatory publications, guidance documents, manufacturer-sponsored studies, and peer-reviewed research publications relating to the background, exposure assessment, and potential adverse health outcomes associated with glyphosate and glyphosate-containing products. I also performed an independent search of the publicly available literature in conjunction with my work on this report. Finally, I was asked to perform a retrospective dose assessment of Ms. Mendoza's absorbed dose of glyphosate from her alleged use of glyphosate-based herbicides. In performing this assessment, I reviewed Ms. Mendoza's deposition transcript, plaintiff fact sheets (PFS), performed a site visit at Ms. Mendoza's current residence, and assessed other relevant information as appropriate. All opinions expressed in this report are to a reasonable degree of scientific certainty unless otherwise stated. A full list of documents I reviewed in preparation for this opinion is in Appendix B. I have testified once in the previouos four years, in Giglio v. Monsanto. I was compensated at a rate of $340 per hour.  My rate for deposition or trial testimony is $510 per hour.

## Chemical Properties

Glyphosate (CAS # 1071-83-6) is a non-selective, broad-spectrum herbicide used in residential, commercial, and agricultural settings to kill or suppress targeted broadleaf and grassy weeds. Glyphosate is a glycine amino acid with a phosphomethyl group attached. The herbicide targets the shikimate acid pathway unique to plants, binding to the enzyme 5-enolpyruvylshikimate-3-phosphate synthase and inhibiting the synthesis of aromatic amino acids necessary for plant growth and function. This amino acid synthesis pathway is not found in mammalian systems.

Pure glyphosate is an organic acid and is a white, solid crystalline substance. Glyphosate is often available as a white powdery salt form, which is used in formulated products to increases glyphosate's solubility in water. The isopropylamine salt is the most common formulation, although it can also exist in other salt forms (IARC, 2015). See Figure 1 for the structure of Glyphosate isopropylamine salt.



[Figure 1; ATSDR, 2019]

Glyphosate delivery to the target plant species is typically in an aqueous form, which means the solubility in water is essential for efficient mixing and delivery. The solubility of glyphosate in water

at 25°C is 12,000 mg/L and the isopropylamine salt solubility is 1,050,000 mg/L (ATSDR, 2019), depending on the reference cited. The high solubility indicates that glyphosate prefers to remain in an aqueous suspension, which is characteristic of the hydrophilic nature of the compound. The hydrophilic nature of the compound will limit the ability of glyphosate to enter the body, as will be evaluated later.

Liquid suspensions of pure technical-grade glyphosate acid are not commercially available. Commercial formulations are manufactured using the glyphosate in a salt form to ensure that thorough mixing achieves uniform distribution within a solution.  Other chemicals are included in these commercial formulations to aid in emulsification of the mixture. Polyethoxylated tallow amines (POEA) are one of the types of surfactants used in glyphosate formulations. This class of tallow amines can also be found in household products like Lysol and hair coloring products (NIH HPDB, 2019).

Formulated products often contain incidental impurity products, which are byproducts of the manufacturing process and formulation. Identified relevant impurities in glyphosate formulations include formaldehyde and N-nitrosoglyphosate (Temple, NZ EPA, 2016; IARC, 2015). These impurities are found in low concentrations and are regulated using established thresholds (EPA RED, 1993).

**Exposure and Dose Assessment**

The EPA defines exposure assessment as the "determination or estimation (qualitative or quantitative) of the magnitude, frequency, duration, and route of exposure" to a chemical, substance, or biological agent (RAGS A, 1989). A dose is the amount of a substance that is absorbed by an individual and is available for interacting with biological processes once the substance has crossed an outer boundary of an organism.  Exposure and dose are related but they are not the same thing.  Exposure is the opportunity to contact a substance at an outer boundary of an organism and the opportunity to absorb a dose. A dose is the amount of exposure actually absorbed. An exposure must occur before a dose is received (Harbison et al., 2015). If there is no exposure, then there is no dose. For nearly every case, the dose rather than the exposure is the critical measurement when evaluating potential adverse health effects because the studied compound must enter the body for an adverse health effect to occur.

In the case of glyphosate, an individual's exposure to a glyphosate-based herbicide must be assessed prior to determining the dose of glyphosate that he or she may have received. In general, an exposure can be determined by 1) measuring or estimating the amount of a substance at an outer boundary of an organism and 2) determining the duration of the exposure. In general, a dose can be determined by measuring the amount of substance that is in the body, or it can be estimated by applying knowledge about the potential bioavailability of a substance to exposure data. Understanding the dynamic between exposure and dose is critical for evaluating potential health effects following an encounter with a substance.

Quantifying an individual's contact with a chemical, substance, or physical agent is the primary method for characterizing the nature and magnitude of an exposure and determining whether the exposure is considered hazardous under the specified use condition.  Quantifying an exposure is

typically done using active monitoring methods, when the technique is feasible and available.  In the case of glyphosate and the nature of the application methods, passive dosimetry sampling techniques were sometimes used, involving the use of absorptive material and wiping of skin surfaces. Dermal contact is the most common exposure route identified in the literature when evaluating mixing, loading, application, and bystander contact with glyphosate. Use of patches affixed to likely glyphosate exposure points was identified in the literature as an effective method for quantifying exposure. Some exposure monitoring studies also evaluated potential inhalation exposure; exposure via this route was found to be minimal.

In addition to quantifying exposure using passive dosimetry, some studies have quantified dose by use of biological monitoring. In general. biological monitoring is preferred to passive dosimetry because it does not rely on incorporating information on bioavailability and is instead a direct measurement of the amount of the substance within the body. In the case of glyphosate, biomonitoring is performed via urinalysis, which is considered by researchers and regulators as a reliable method for establishing a dose.

**Biomonitoring and Passive Dosimetry Studies**

There are numerous studies available using passive dosimetry and/or biological monitoring of exposed individuals to quantify a dose.  A small sample of studies representative of the full dataset is summarized below.  A more extensive set of available studies reviewed is available in Appendix B.

Edmiston et al. (1995) evaluated California Department of Transportation employees to assess exposure to glyphosate under normal work conditions. Full body dosimetry was performed using 100% cotton shirts and 100% cotton long johns worn under the normal work clothes and PPE. Hand, face, and neck exposures were evaluated with wipe samples at various times throughout the day.  The average dermal exposure for exposed individuals was 2.460 mg/person. The calculated absorbed average dose was 8.96 x$10^{-4}$ mg/kg. This calculated dose took into account both dermal and inhalation exposures.

Lavy et al. (1992) affixed cotton patches to nine locations across the body of USDA Forest Service field workers as they applied RoundUp formulations at two nurseries in the United States. In addition to exposure monitoring, the investigators evaluated urine for concentrations of glyphosate to assess the dose received by the applicators and weeders, which were applying the glyphosate formulations. Patch data revealed that the ankles and thighs were the body parts that received the highest amount of glyphosate for the exposed workers. Applicator passive dosimetry data revealed an average of 7.2 x $10^{-4}$ mg/kg/hr (equivalent to 5.8 x $10^{-3}$ mg/kg adjusted for an 8-hour workday). Weeder passive dosimetry data revealed an average of 2.0 x $10^{-4}$ mg/kg/hr (1.6 x $10^{-3}$ mg/kg adjusted for an 8-hour workday). Estimated urinary glyphosate concentrations were approximately one order of magnitude lower than passive dosimetry data for both applicators and weeders. Other studies have seen a similar disparity between passive dosimetry and biological monitoring data (see Cowell and Steinmetz, 1990).   Investigators failed to detect glyphosate in any urine sample collected from the workers. Because of this data gap, the investigators used the ½ the lower limit of the method validation for urine glyphosate concentration to postulate a dose for the applicators.

Acquavella et al. (2004) evaluated glyphosate concentrations in the urine of farmers, their spouses, and their children in South Carolina and Minnesota using 24-hour composite urine samples. The measured absorbed doses ranged from non-detect to 0.004 mg/kg body weight. The farmer applicator with the highest dose was observed repairing a boom sprayer without gloves, applying glyphosate without gloves, and smoking during application (suggesting oral exposure in addition to dermal). Despite engaging in activities that would be expected to increase the absorbed dose, the actual measured absorbed dose of the farmer was 0.28 mg assuming a weight of 70 kg for the farmer.

Other biomonitoring studies performed by researchers worldwide have found low glyphosate levels in urine samples collected from both the general population, and from applicators and their family members. Many of these studies have undergone peer-review and have been reviewed and relied upon by regulators. These data demonstrate that exposures during routine and atypical glyphosate application situations do not result in a high glyphosate body burden and do not suggest evidence of bioaccumulation.

The data from the available studies establish that passive dosimetry data can be used to estimate exposures and potential exposures to glyphosate and that evaluation of urine samples for the glyphosate biomarker can be used to calculate dose. The data also suggest that passive dosimetry data overestimates dose by approximately an order of magnitude.[1]

**Dermal Bioavailability**

Estimating the absorbed dose of glyphosate from passive dosimetry studies is dependent upon absorption data. Because studies evaluating agricultural and commercial applications of glyphosate have identified the dermal pathway as the main contributory exposure pathway when applying to target plant species, the bioavailability of glyphosate following incidental dermal contact must be determined. Data available in both the peer-reviewed literature and from manufacturer-sponsored studies can be used to determine the dose of glyphosate entering the body following dermal contact with a liquid formulation. The absorbed amount is usually reported as flux, which is the amount of substance penetrating the skin over a specified surface area and for a certain time period at equilibrium (i.e., $mg/cm^2/hr$) (OECD, 2004b).

The water solubility of glyphosate is important when evaluating the permeability of the compound across the skin. The skin consists of an outer layer called the epidermis, and a lower layer called the dermis. The epidermis serves as a physical barrier to hydrophilic compounds. Because glyphosate is so highly hydrophilic, the epidermis serves as a natural protective barrier to prevent absorption of water-based formulations. The human dermal permeability studies are discussed below.

---

[1] Some studies have evaluated the effectiveness of protective barriers in preventing and/or delaying glyphosate exposure to the skin. Those studies indicate that clothing is effective in preventing exposure to glyphosate. See Lavy et al. (1992), Wester et al. (1996), and Manning (1991).

A small sample of studies representative of the full dataset on the dermal permeability of glyphosate is summarized below.  A more extensive set of available studies reviewed is available in Appendix B.

Franz (1983) evaluated three formulations of glyphosate to determine their percutaneous absorption and potential for systemic toxicity. One of the formulations was without a surfactant, while the other two formulations contained surfactant (one concentrated and one diluted).  Using cadaver skin, Franz showed that dermal application for up to 24 hours resulted in a less than 0.2% dermal absorption in all formulations. The fact that the absorption percentage of glyphosate increased each time the amount of active ingredient was diluted (whether or not surfactants were present) suggests that diluting glyphosate formulations may result in increased penetration over time (as a percentage), but that surfactants did not play a role in increased penetration. If they had, the absorption rate percentage for the concentrated formulation would have been higher than the diluted. The fact that diluted glyphosate-based herbicides have increased absorption percentages compared to concentrated glyphosate-based herbicides is expected given the decreased loading on the skin. One should note, however, that the absolute amount of glyphosate absorbed will typically be much lower.

Nielsen et al. (2009) evaluated nine compounds to evaluate dermal penetration using human skin samples. Of those nine, glyphosate was the most hydrophilic compound. This means that it was the compound of those studied that was most attracted to water and, thus, had the most difficult time passing into and through the stratum corneum (the outer layer of the epidermis). The measured dermal penetration resulted in a flux very similar to that of Franz (1983) and in studies conducted by Wester et al. (1991), Ward, Smith, and Davies (See Appendix B).

Overall, the well-performed dermal permeability studies demonstrate that the epidermis is an effective barrier to glyphosate absorption, that glyphosate is highly hydrophilic, and that dermal glyphosate absorption is low.

**Toxicokinetics**

Evaluating the toxicokinetics of a substance involves the determination and quantification of the process or events involved in the absorption, distribution, metabolism, and excretion of a dose (EPA IRIS, 2011). It is the process of evaluating a substance at the point where a dose is internalized after crossing an outer boundary, through biological interaction within the body during metabolism and ultimately, the elimination/excretion of the substance from the body. The route of exposure (e.g., oral versus dermal) will often result in different toxicokinetic mechanisms. Examples include different bioavailability, different absorption and metabolism, and different routes of excretion (e.g., urine versus feces).

Absorption will depend on the exposure concentration and bioavailability of the substance. Once internalized into the body, the distribution to body compartments will follow certain toxicodynamic properties, with potential metabolism occurring at different points along the distribution system. Excretion is the ultimate elimination of the substance from the body via either urine, feces, or exhaled breath.

A critical determination in the absorbed dose of a substance is the half-life, which is an indication of how long the substance will be in the body before elimination.  For example, 7 half-lives will result in eliminating approximately 99% of the substance from the body. Dermally absorbed glyphosate is expected to be systemically distributed throughout the body. Laboratory studies have been performed to evaluate the half-life of glyphosate in both animal models and humans following systemic distribution. These studies show that glyphosate is excreted mostly as the parent compound as it is not well metabolized in mammals.

A small sample of the studies representative of the full dataset on glyphosate toxicokinetics is summarized below.  A more extensive set of available studies reviewed is available in Appendix B.

Connolly et al. (2018) evaluated glyphosate's half-life in human spot urine samples using urinary excretion rates. Based on multiple analyses, the investigators estimated the mean human half-life of glyphosate at 5.5 to 10.0 hours.  Using the average half-lives determined by Connolley et al. (2018), 99% of the glyphosate in the body will be eliminated in approximately 1.5-3 days.

The National Institute of Environmental Health Sciences (NIEHS) National Toxicology Program (NTP) also evaluated the half-life of glyphosate administered intravenous (i.v.) to a rat model. The results of the experiment indicated that 98% of the administered glyphosate was excreted via the urine after 24 hours (NTP, 1992).

**Regulatory**

Regulatory and governmental organizations were tasked with evaluating the potential risk associated with glyphosate use. Most industrialized countries require the registrant to submit a safety dossier for regulatory review before introducing pesticides into the marketplace. Glyphosate is classified as a pesticide and registration approval of the herbicide is required before use. As a part of these safety assessments, these registration eligibility decisions typically evaluate several different exposure scenarios, including exposure from residential use (i.e., handling and post-application), non-occupational bystander indirect exposure, and operator/applicator exposure. These modeled exposures are overly conservative both due to the need to capture sensitive populations and because the models used are often based on characteristics of surrogate chemicals with higher potential exposure due to different reference chemical characteristics. These regulatory models often overestimate both potential exposure and estimated quantitative dose because they are developed to ensure a margin of safety; the purpose of the model is not to quantify exposures to a particular individual applying a chemical.

Regulatory authorities also require sponsor-supplied data to support pesticide safety before receiving approval on an eligibility decision.  These types of studies can include toxicological and exposure/dose studies. The Organisation for Economic Co-operation and Development (OECD) publishes guidelines for performing studies according to Good Laboratory Practices (GLP). OECD member countries accept studies performed by these guidelines for regulatory purposes because they harmonize methodologies. These data are used by the regulatory authority to determine safety, evaluate exposure, and calculate risk if the authority determines that a realistic human health hazard exists.

Glyphosate was introduced to the U.S. market in 1974 and was consistently recognized as having no carcinogenic risk to humans by various world-wide health organizations for 40 years. In 2015, the World Health Organization (WHO) International Agency for Research on Cancer (IARC) performed a hazard assessment of glyphosate and determined that glyphosate is probably carcinogenic to humans.  Following this conclusion, other regulatory bodies initiated a re-review of the glyphosate data used to support registration as well as data published in the peer-reviewed literature and performed independent assessments as to the carcinogenic potential of the herbicide. According to the re-evaluations of organizations such as the U.S. EPA, the European Food Safety Authority (EFSA), the European Chemicals Agency (ECHA), the United Nations Joint meeting on Pesticide Residues, Health Canada, The Australian Pesticide and Veterinary Medicine Authority, the New Zealand Environmental Protection Authority, and Japan's Food Safety Commission, no carcinogenic risk for glyphosate was found in humans.

It is important to understand that the assessment performed by IARC and those performed by the various regulatory agencies differed in the endpoints that were evaluated. IARC performed a hazard assessment (i.e., determining whether glyphosate could be carcinogenic at some hypothetical dose), whereas the regulatory agencies performed a hazard assessment in addition to a risk assessment (i.e., evaluating whether or not glyphosate was a human health risk at some dose). Overwhelmingly the regulatory agencies have determined that glyphosate does not represent a carcinogenic risk to humans; however, the regulatory agencies identified other health endpoints for glyphosate. Those agencies have issued requirements that human exposures to glyphosate be held under thresholds established for where non-carcinogenic health effects were observed; these thresholds are subject to a margin of safety. The lowest of the dose thresholds set by a regulatory agency who performed a risk assessment on glyphosate is the European Union Acceptable Operator Exposure Level AOEL (at 0.1 mg/kg/day) (Tarazona et al., 2017).  No study was identified that reported biomonitoring or passive dosimetry data to suggest measured human doses have exceeded the 0.1 mg/kg/day threshold (Solomon, 2019).

**Epidemiology**

Epidemiology is the study of distribution and determinants of health status in specified human populations (EPA IRIS, 2011). In the case of glyphosate, certain epidemiological studies have attempted to discern if glyphosate use is associated with Non-Hodgkin's Lymphoma (NHL). During my review of the available data, I evaluated the reliability and usefulness of the various dose assessment methodologies used in glyphosate epidemiology studies.

McDuffie et al. (2001) and Eriksson et al. (2008) evaluated whether being ever exposed to glyphosate is associated with an increased incidence of NHL vs. never being exposed to glyphosate. However, these studies also attempt to evaluate the effect of dose on the potential relationship of glyphosate and NHL by stratifying the data into days of use. This stratification technique is a rudimentary methodology for assessing dose, as it does not take into account application methods or PPE use. Additionally, both of these studies used only a univariate analysis for statistical evaluation for their dose response statistical evaluation. A univariate

analysis only looks at one dependent variable.[2] A more robust way of identifying any potential association between an exposure and any alleged disease outcome would be to use a multivariate methodology for comparing multiple variables. Without controlling for confounding it is difficult to draw causal associations in epidemiological studies.[3]

Other studies like Andreotti et al. (2018) used a validated intensity weighting metric available in the peer-reviewed literature (See Dosemeci et al., 2002, and Coble et al., 2011) which takes into account other factors associated with dose (e.g., PPE use and method of application). The Andreotti et al. (2018) study, which is a well-powered cohort study supported by the NIEHS, EPA, and other governmental agencies, observed no relationship between glyphosate exposure and NHL at any of the dose levels evaluated.

It is my opinion that the AHS contains a more robust dose evaluation metric. Further, it is also my opinion that the increased odds ratios observed in the reviewed case-control studies using days per year as a dose metric are a result of a less sophisticated methodology for dose evaluation. Furthermore, the increased odds ratios have not been shown to be statistically significant once controlling for other exposures. See Eriksson et al. (2008).

**Yolanda Mendoza**

The current case involves Ms. Yolanda Mendoza, a resident of the State of California. Ms. Mendoza claims that exposure to RoundUp resulted in her Non-Hodgkin's lymphoma (High-grade B-cell lymphoma (Burkitt's lymphoma)) diagnosed in October 2013 (Mendoza PFS[4]). Ms. Mendoza claims that she was exposed to glyphosate from alleged RoundUp application during residential use.

**Ms. Mendoza's Residential Use**

**Retrospective Residential Dose Modeling**

Models can be used to estimate Ms. Mendoza's residential dose following her alleged RoundUp exposure. The models used in this dose reconstruction are from the American Industrial Hygiene Association text Mathematical Models for Estimating Occupational Exposure to Chemicals, 2nd edition. These daily dose model equations are established methods for modeling dermal exposures to substances and have been accepted by industrial hygienists.

The following equations can be used to estimate Ms. Mendoza's dermal dose per use when applying residentially.

---

[2] It is worth noting that when the authors of Eriksson et al. (2008) performed a multivariate analysis on their ever/never use data, they found no statistically significant relationship between exposure and NHL.
[3] Combined analyses that uses univariate figures suffer from the same deficiencies as McDuffie et al. (2001) or Eriksson et al. (2008). See Zhang et al. (2019).  Pahwa et al. (2019) evaluated a study population and determined that there was no statistically significant association between the highest use metric (>7; numbers of years used X number of days/year handled) and NHL overall when adjusting for exposures to other pesticides (Table S1).
[4] Including amended PFS.

Calculating dermal dose per use:

$$Dose\left(\frac{mg}{kg}\right) = \frac{SA * T * Kp * C}{BW} \qquad\qquad (Equation\ 1)$$

Where:

- Dose = dose of glyphosate in mg/kg
- SA = Skin surface area exposed during RoundUp Application in $cm^2$
- T = Duration of exposure in hours
- $C^5$ = Concentration of glyphosate in liquid formulation in $mg/cm^3$
- $K_p$ = Dermal permeability of glyphosate over surface area in cm/hr
- BW = Body weight in kg

A discussion of Ms. Mendoza's potential average daily dose will follow assessment of her alleged residential use.

**Residential Use**

Ms. Mendoza's PFS indicates that she used RoundUp residentially from 2005-2013 at her house in Atwater, CA (Mendoza PFS) for a total of nine (9) years.



Photo #1: Ms. Mendoza's home at 1415 Norfolk Ave, Atwater, CA. Google earth image.

---

[5] Note: 1 $cm^3$ = 1 mL

She testified that she originally used a ready-to-use RoundUp product purchased from Walmart, which may have been applied in 2004 (which she identified as "at the very beginning") (31 July 2019 Pg. 74, 9-17).

She testified that her neighbor told her that she needed "the Roundup that the farmers use", which is a concentrated product to take care of the weeds at her house (31 July 2019 Depo Pg. 75, 15-24). In 2004, she began purchasing the concentrated product from Automatic Rain, a gardening store (31 July 2019 Depo Pg. 76, 3-24; Pg. 77, 1-6). She described the concentrate bottle as blue with a white lid that would be diluted with water (31 July 2019 Depo Pg. 80, 9-18).[6]  She would always purchase the gallon sized concentrate bottle (31 July 2019 Depo Pg. 80, 23-25).  She would purchase one-gallon container per season (31 July 2019 Depo Pg. 81, 9-11).

She testified to using RoundUp once per week when she first started using it (31 July 2019 Depo Pg. 110, 7-12).  She would apply RoundUp for one hour each time she used it, typically on Sundays (31 July 2019 Depo Pg. 111, 1-4, 23-25). The hour would include mixing and spraying (31 July 2019 Depo Pg. 112, 3-5).  She would also do weekly yard work (e.g., mowing, trimming, weed whacking) (31 July 2019 Depo Pg. 111, 5-15). She indicated that after the pool was installed it would take her maybe 45 minutes to spray, although she is not exactly sure when she stopped spraying following pool installation (31 July 2019 Depo Pg. 114, 6-24). She would alternate front yard and back yard spraying every other week, so one week would be treating the front yard and the following week would be treating the back yard (31 July 2019 Depo Pg.116, 17-21). She testified that spraying in the front yard took a little longer than the backyard (31 July 2019 Depo Pg. 119, 4-9). She testified to pointing the sprayer down towards the weeds when spraying (31 July 2019 Depo Pg. 120, 3-6).

Part of the hour that Ms. Mendoza spent spraying weeds involved her walking along the fence line of her property, identifying weeds, and spraying them (31 July 2019 Depo Pg. 110, 7-12). There is a gravel area between Ms. Mendoza's yard and the street. She testified to spraying this area more liberally than in the rest of the yard (31 July 2019 Depo Pg. 127, 19-24). She also testified to spraying on weeds coming up on places in the driveway (31 July 2019 Depo Pg. 131, 10-18). She testified to spot spraying some areas whereas others she would spray continuously (31 July 2019 Depo Pg. 156, 7-21). A pool was installed at her house in 2012 and she hired a gardener following installation (31 July 2019 Depo Pg. 86, 22-25).

She testified to using one to two ounces per gallon during dilution, where she could not recall the exact amount, and testified to diluting the product according to the instructions using the included cup (31 July 2019 Depo Pg. 135, 1-13). She testified to adding the concentrated RoundUp into a backpack sprayer then adding water, allowing the water to mix the formulation (31 July 2019 Depo Pg. 135, 16-24; Pg. 136, 1-24). She testified to filling the backpack sprayer two times per use (31 July 2019 Depo Pg. 137, 2-15). She testified to previously using a gallon handheld container with a pump (31 July 2019 Depo Pg. 137, 16-25); Pg. 138, 1-5).  She does not recall when she switched from the handheld sprayer to a backpack applicator (31 July 2019 Depo Pg. 138, 1-10). She testified that her ex-husband (Um-Allah) would help mix and spray sometimes (31 July 2019

---

[6] At my October 7, 2019 site visit, I observed a 1.67-gallon RoundUp ProMax bottle.  I will presume that when she mentions gallon, she is referring to the 1.67-gallon container.

Depo Pg. 139, 21-25). While her ex-husband helped, she testified that there was not a month that went by where she was not spraying (31 July 2019 Depo Pg. 140, 8-14), although she also testified that she would not spray during the months of the year when there was a lot of rain or when it was moist (31 July 2019 Depo Pg. 141, 20-25). Her spray would depend on the amount of rain (31 July 2019 Depo Pg. 142, 1-8).

She testified to not washing off her hands after mixing but she would wash her hands at the very end because the mixed product would get on her hands (31 July 2019 Depo Pg. 144, 9-17; Pg. 145, 3-13; Pg. 147, 5-14). She would shower at the end of the day (31 July 2019 Depo Pg. 146, 22-24). She testified that she would get mixture on her legs when she wore shorts but could not recall a specific incident (31 July 2019 Depo Pg. 155, 1-25).

She did not recall any time the backpack leaked to get on her (31 July 2019 Depo Pg. 148, 19-25; Pg. 149, 2-4). She would never leave any RoundUp in the backpack when she finished for the day (31 July 2019 Depo Pg. 149, 18-25). She testified to smelling Roundup when mixing and applying (31 July 2019 Depo Pg. 167, 5-14).

**Protective Barriers**

Ms. Mendoza testified to wearing whatever outfit she was already wearing on that Sunday when mixing from the RoundUp concentrate (31 July 2019 Depo Pg. 141, 8-11). She would sometimes wear long sleeves, but also shorts, depending on the weather (31 July 2019 Depo Pg. 141, 8-19). She did not wear a mask when applying and wore tennis shoes with socks (31 July 2019 Depo Pg. 153, 14-25; Pg. 154, 1). At the end of the day she would remove her clothes and put them in the laundry room, washing them only when there was a large enough load (31 July 2019 Depo Pg. 154, 6-14). She testified to not wearing gloves or using sunglasses or goggles while mixing RoundUp (31 July 2019 Depo Pg. 144, 3-8). During a site inspection on October 7, 2019, no visible signs of leaking or staining were observed on the backpack applicator and she did not recall a time the backpack leaked on to her.

**RoundUp Product**

Ms. Mendoza detailed originally using a size product matching the description of a pint container of RoundUp. Following her unsatisfactory results from this use, her neighbor recommended she get the RoundUp that the farmers use, a concentrated version (31 July 2019 Depo Pg. 75, 15-24). The product observed at her property on my October 7, 2019 site visit was RoundUp ProMax (Photo #4, below).

Because Ms. Mendoza had exposure to the concentrate and a formulated mixture, the amount of glyphosate acid in each will need to be determined. The label on the 1.67-gallon RoundUp ProMax bottle indicates that there are 540 grams of glyphosate acid per liter of the concentrate. This converts to 540 milligrams (mg) per milliliter (mL).

Ms. Mendoza could not recall if she used one or two ounces per gallon when she was mixing (31 July 2019 Depo Pg. 135, 3-8). To be conservative, I will presume that she used two ounces of ProMax concentrate per gallon water, which makes a 1.5% RoundUp ProMax mix, where the glyphosate acid is slightly less than 1% of the mixture. The mixing instructions for RoundUp

ProMax calls for mixing two (2) ounces with one (1) gallon (i.e., 128 ounces) to achieve a 1.5% RoundUp mixture. One (1) ounce is approximately 29.5 mL, so two (2) ounces is 59 mL.

Equation 2 shows the conversion of the weight of the glyphosate acid (GA) in one mL of concentrate times 59 mL, the number of milliliters in two (2) ounces.

$$\frac{540\ mg\ GA}{1\ mL} \times 59\ mL\ =\ \mathbf{31,860}\ mg\ of\ GA\ in\ 2\ ounces\ of\ concentrate \qquad (Equation\ 2)$$

There are 3,785 mL in one gallon (i.e., 128 ounces). To determine the amount of mg GA per mL, the total weight of the GA (in mg) is divided by the total number of mL in one gallon of water (i.e., 3,785 mL). See (Equation 3).

$$\frac{\mathbf{31,860\ mg}}{3,785\ mL\ water}\ =\ \frac{\mathbf{8.4\ mg\ GA}}{1\ milliliter\ mixed\ formulation} \qquad (Equation\ 3)$$

Based on the information Ms. Mendoza provided in deposition, the conversion calculates out to 8.4 milligrams of glyphosate acid per milliliter of formulation.

**Application of Exposure Variables to Residential Dose per Use**

Ms. Mendoza used the RoundUp in two ways at her residence: one as a mixer and one as an applicator. When mixing, she testified to making a mixture two times per application event. Covering the hour that she testified to using the backpack applicator, a mixing per use dose and an application per use dose will be calculated.

The following inputs were included in my dose assessment:

RoundUp Mixing- Table 1 (Appendix C)

- Skin Surface area: 112 cm$^2$

The surface area that will be included in the dose assessment will be up to 25% of the surface of one hand. Ms. Mendoza does not recall getting any concentrated formulation on her hands while mixing. Therefore, this is a conservative but realistic assumption for mixing, taking into account the hand that is not holding the concentrated product. The female hand mean surface area was obtained from the U. S. EPA Exposure Factors Handbook (2011), Table 7-13.

- Dermal Permeability: 5.90x10$^{-6}$ cm/hr

Dermal permeability experimentally derived from Nielsen et al., (2009).

- Concentration in solution: 540 mg/cm$^3$

Based on the concentration of glyphosate acid in RoundUp ProMax.

- Time per event: 1.0 hour

Ms. Mendoza testified to mixing twice per application period. I am conservatively calculating that the material stayed on her hand the entire time she was using and applying the mixed formulation, as she testified to washing it off her hands at the very end.

- Body Weight: 71 kg

Ms. Mendoza's 156 lbs. weight in production document YMendoza-OBGYNAT-000005.

$$156 \, lbs. \times \frac{0.454 \, kg}{1 lb.} = 71 \, kg \qquad\qquad (Equation \ 6)$$

Applying these variables in Equation 1, it is estimated that Ms. Mendoza absorbed a maximum of **0.005 mg/kg** during each RoundUp ProMax mixing event (covering two mixings per hour for a total of one (1) hour contact time.

<u>RoundUp Application</u>- Table 2 (Appendix C)

- Skin Surface area: 2,075 cm$^2$

The surface area that will be included in the dose assessment is the front half of the lower legs and ¼ of the thighs (front lower halves). The mean surface areas of these body parts were obtained from the U. S. EPA Exposure Factors Handbook (2011) for females, Table 7-13.

- Dermal Permeability: 5.90x10$^{-6}$ cm/hr

Dermal permeability experimentally derived from Nielsen et al., (2009).

- Concentration in solution: 8.4 mg/cm$^3$

Based on the conservative concentration of up to approximately 1% glyphosate acid in the formulation she mixed from RoundUp ProMax concentrate.

- Time per event: 0.83 hours

Ms. Mendoza testified using the product for up to one hour, which included mixing the formulation.  I will assume that she applied for 50 minutes per use.

- Body Weight: 71 kg

Ms. Mendoza's 156 lbs. weight in production document YMendoza-OBGYNAT-000005. See Equation 6.

Applying these variables in Equation 1, it is estimated that Ms. Mendoza absorbed a maximum of **0.0012 mg/kg** during each RoundUp formulation application for a period of 50 minutes (one hour for total use time, with the remainder of the hour captured under mixing time).

Adding 0.005 mg/kg during mixing and 0.0012 mg/kg during application yields 0.0062 mg/kg of glyphosate acid per use.  This estimated exposure falls within the range of previously reported studies for similar activities (Solomon, 2016).

**Residential Dermal Dose per Use**

Based on the calculations in Table 2, the aggregate dose per use Ms. Mendoza encountered while both mixing RoundUp ProMax and applying the mixed formulation was **0.0062 mg/kg**. The total dose Ms. Mendoza experienced can be calculated by multiplying the GA concentration by Ms. Mendoza's weight in kilograms.[7] See Equation 7.

$$Per\ use\ Dose = \frac{0.0062\ mg}{kg} \times 71\ kg = 0.44\ mg\ GA \qquad (Equation\ 7)$$

**Application of Exposure Variables to Average Daily Dose**

In addition to calculating a daily dose, one can also calculate an average daily dose by multiplying the daily dose by the number of days applied and dividing that figure by the number of days over the application period. See Equation 8.

Calculating an average daily dose:

$$ADD\left(\frac{mg}{kg-day}\right) = \frac{DAevent * EV * ED * EF * SA}{BW * AT} \qquad (Equation\ 8)$$

Where:

- ADD = Average daily dermal absorbed dose of glyphosate in mg/kg-day
- $DA_{event}$ = Absorbed dose per event in mg/cm$^2$-event
- EV = Event frequency in events per day in hours
- ED = Exposure duration in years
- EF = Exposure frequency in days/year
- SA = Skin surface area exposed during RoundUp Application in cm$^2$
- AT = Averaging time in days
- BW = Body weight in kg

$DA_{event}$ is the dermal absorbed dose rate per event for an aqueous vehicle. It requires the concentration of the chemical in water, the dermal permeability of the chemical over a skin surface area (experimentally derived), and the amount of contact time with the substance. This equation can be used with highly ionized organic chemicals (RAGS E, 2007).

---

[7] Ms. Mendoza's weight included on production document YMendoza-OBGYNAT-000005.

$$DA\ event = Kp * C * \text{Tevent} \qquad\qquad (Equation\ 9)$$

Where:

- $DA_{event}$ = Absorbed dose per event in mg/cm$^2$-event
- C = Concentration of glyphosate in liquid formulation in mg/ml
- $K_p$ = Dermal permeability of glyphosate over surface area in cm/hr
- $T_{event}$ = Duration of exposure in hours

<u>Aggregated Average Daily Dose</u>- Table 3 (Appendix C)

The dose per use RoundUp glyphosate concentration, $K_p$, application time, and Ms. Mendoza's weight inputs will be used to determine average daily dose, in addition to:

- Skin surface area-Mixing: 112 cm$^2$
- Skin surface area-Application: 2,075 cm$^2$

See dose per use specific sections for determination of skin surface area exposure.

- Event Frequency: 1 event/day

Ms. Mendoza used RoundUp for each residential application per day. Because she performed both mixings and applications within the same time period, the frequency will be one total event per day.

- Exposure Frequency:
  - Mixing: 52 days/year
  - Applying: 52 days/year

Ms. Mendoza testified to applying weekly, with the front yard one week and the back yard the following week in an alternating pattern. The consistency of her applications depended on the weather and the amount of rain. Therefore, to be conservative, I will assume she applied weekly each year she was using the product.

- Exposure Duration: 9 years

Based on information Ms. Mendoza supplied on her PFS, she applied residentially from 2005-2013.

- Averaging time: 3,285 days

Number of days in nine (9) years of exposure from 2005-2013.

- $DA_{event}$ Mixing: 3.2 x 10$^{-3}$
- $DA_{event}$ Applying: 4.1 x 10$^{-5}$

See Equation 9.

Applying these variables in Equations 8 and 9, and summing the weighted doses, it is estimated that Ms. Mendoza's aggregated average daily dose (ADD) was **0.00089 mg/kg-day**.

Ms. Mendoza's aggregated average daily dose can be determined by using her reported weight in production document YMendoza-OBGYNAT-000005.

$$Aggregated\ Average\ Daily\ Dose = \frac{0.00089\ mg}{kg - day} \times 71\ kg = \frac{0.063\ mg\ GA}{Day} \qquad (Equation\ 10)$$

Therefore, Ms. Mendoza's aggregated Average Daily Dose from 2005-2013 was 0.063 mg of glyphosate acid per day.

**Comparison to Regulatory Dose Levels**

There are established thresholds for doses which can be used to evaluate Ms. Mendoza's dose. The European Food Safety Authority (EFSA) established an acceptable operator exposure level (AOEL) of 0.1 mg/kg and an acceptable daily intake (ADI) of 0.5 mg/kg (EFSA, 2015).  The U.S. EPA has proposed a chronic daily glyphosate reference dose ($R_fD$) of 1.0 mg/kg b.w./day (Solomon, 2019). Ms. Mendoza's aggregated daily dose per use was calculated at 0.0062 mg/kg and her aggregated average daily dose was calculated at 0.00089 mg/kg/day, both values are below the ADI and AOEL, respectively.[8]

The State of California, Office of Environmental Health Hazard Assessment (OEHHA) established a no significant risk safe harbor level for glyphosate at 1.1 mg/day.[9]  OEHHA calculated this value based on a study used in the IARC hazard assessment.  Both Ms. Mendoza's aggregated residential per use dermal dose and the aggregate average daily dermal dose are below this safe harbor level (i.e., 0.44 mg/day and 0.063 mg/day, respectively).

**Site Assessment**

I performed a site visit at Ms. Mendoza's current residence on October 7, 2019 where I inspected the exterior of the residence and the attached garage (I was denied access to the interior of the home) and I was not allowed to touch any of the observed chemical containers with the exception of the RoundUp ProMax bottle.

There were various chemicals stored in the garage of the residence.  This storage area can be observed in Photo #7. This area is the same that Ms. Mendoza indicates she stored the pump sprayer (on the top level of the bookshelf).

---

[8] The maximum dose administered in the chronic rodent feeding studies of glyphosate was approximately 5,000 mg/kg/day. Assuming 20% absorption via the GI tract, the dose administered to rodents in the high dose study was orders of magnitude higher. Those rodents received that dose every day of their lives (EPA, 2017; Solomon, 2016).

[9] Dr. Sawyer cites to all previous deposition testimony, trial testimony, etc. in his report for Ms. Mendoza. See Appendix A reference 1 in MCL. Though he does not specifically discuss the California EPA classification of glyphosate in in his Mendoza report, he has cited to previous reports where it was discussed. As such, I will discuss the classification here even though the California EPA did not undertake an independent risk assessment (EPA, 2019).



Photo #2: House number and front of house.



Photo #3: Bottle of RoundUp ProMax and RL Pro Model 614 backpack sprayer.



Photo #4: Bottle of RoundUp ProMax.



Photo #5: Caution label on side of RL Pro Model 614 backpack sprayer.



Photo #6: RL Pro Model 614 backpack pump apparatus.



Photo #7:  Area of garage chemical storage.



Photo #8: Bottle of Spectracide Weed Stop for Lawns, in garage.



Photo #9: One set of sprinkler pumps located on the property.



Photo #10:  House side yard with well pad, south backyard.



Photo #11:  Sevin Dust located on back porch of house.

Ms. Mendoza had a number of chemicals stored in her garage. While I was not allowed to examine them in detail, I was able to review the exposed labels.  One identified product was Spectracide Weed Stop for Lawns, which contains 2,4-D as the highest weight percentage active ingredient. Also observed was a can of Krylon indoor/Outdoor Gloss Rich Plum spray paint.  The Safety Data Sheet (SDS) states that this product has a California Proposition 65 warning. These products typically carry this warning on the label, but I was unable to verify it on the bottle in her garage during my site visit.  Ms. Mendoza had a bottle of Garden Tech Sevin Ready-To-Use 5% dust, which contains both carbaryl and respirable crystalline quartz. Both of these substances have been listed under Proposition 65 as causing cancer.

Ms. Mendoza testified to using a backpack sprayer to apply the mixed product on her property. The RL Pro Model 614p powered by Solo was the backpack applicator that was represented as the one that she used to apply.  There were no visible signs of staining from leaks on the exterior of the backpack sprayer.  There is a caution warning on the side of the sprayer stating to wear eye protection and read operators manual (Photo #5).  The manual for Model 614 states that long sleeve shirts, long pants, goggles, gloves and durable shoes should always be warn. Ms. Mendoza testified to not using gloves, sunglasses, or goggles when mixing the product.

Ms. Mendoza lives in Atwater, CA, which is located in the San Joaquin valley area of California. This area has been identified as having some of the most contaminated groundwater in the nation (Water Deeply, 2017). The city of Atwater has issued notices regarding the detection of 1,2,3-trichloropropane above the maximum contaminant levels (MCLs).  Other contaminants have also been detected in the groundwater. The former Castle Air Force Base (AFB) is approximately four (4) to five (5) miles to the north east of Ms. Mendoza's home. Ms. Mendoza reportedly worked on the Castle AFB property for a short amount of time.[10]  Castle AFB is listed on the national priority list for EPA Superfund sites. Some of the groundwater contaminants of concern include carbon tetrachloride, tetrachloroethene (PCE), trichloroethene (TCE), and vinyl chloride.[11] I am not aware of any investigations into Ms. Mendoza's drinking or well water. Studies have shown associations between exposures to TCE and PCE and the development of cancer, including non-Hodgkin's lymphoma (Guyton et al., 2014; Chiu et al., 2013; Purdue et al., 2011).  I am not offering an opinion as to the cause of Ms. Mendoza's NHL other than to state that it does not appear based on the evidence available to me that glyphosate can cause NHL in humans.  However, to the extent plaintiffs' experts assign blame for Ms. Mendoza's cancer to a single exposure – glyphosate – I am of the opinion that such a toxicological evaluation is incomplete.  A full evaluation of other potential co-exposures, especially in an area with active agricultural operations a few blocks from Ms. Mendoza's home, documented groundwater contamination, and where the local water utility has issued notices, should be considered when determining the cause of Ms. Mendoza's NHL.  Failure to account for potential exposures to other chemicals associated with NHL and/or cancer would represent an incomplete toxicological evaluation as to the specific cause of Ms. Mendoza's cancer.

---

[10] According to Petty Mendoza Expert Report. She did not testify to this at deposition.
[11] Identified in the Final Five-Year Review report for Former Castle Air Force Base, California. Others chemicals are also identified that exceeded the respective MCL.

**Summary of Opinions**

1. Use of glyphosate under realistic user scenarios is not expected to result in high glyphosate exposure concentrations.
2. Glyphosate is primarily absorbed via the dermal route.
3. Glyphosate is poorly absorbed via the dermal route.
4. The presence of surfactants does not appear to have an appreciable impact on dermal absorption.
5. The absorbed glyphosate dose under realistic use scenarios is very low.
6. The half-life of glyphosate within the body is short (i.e., 5.5-10 hours on average).
7. Systemically dosed glyphosate is primarily excreted via the urine.
8. Any potential impurities present in the final formulation are very low and are regulated so as to be present at levels below any potential health concern.
9. Biomonitoring measurements indicate realistic user exposures to glyphosate are below regulatory levels of concern.
10. Epidemiological data that controls for other exposures and properly takes variables into account associated with dose (e.g., PPE, method of application) do not find an association between exposure to glyphosate and NHL at any exposure level.
11. All regulatory risk evaluations indicate that glyphosate is not a carcinogenic risk to users.
12. Ms. Mendoza testified that she believes she was exposed to glyphosate through residential use.
13. Ms. Mendoza's alleged exposure was during her residential use from 2005-2013.
14. Based on a retrospective dose assessment, Ms. Mendoza's aggregate residential dose per use was 0.0062 mg/kg and her aggregated average daily dose was 0.00089 mg/kg/day.
15. Biomonitoring data collected from occupationally exposed applicators in real world scenarios show that doses are relatively low.
16. Ms. Mendoza's glyphosate use exposures are similar to others that are available in the glyphosate dataset.
17. Ms. Mendoza's per use and average daily dermal dose were below all regulatory health thresholds.
18. To the extent an external cause of Ms. Mendoza's cancer is identified as the plaintiff's experts purport to do here, all potential relevant external exposures should be evaluated, and none of the plaintiff experts performed such an evaluation.

**Response to Plaintiff Experts**

**Glyphosate does not Bioaccumulate**

Plaintiff's experts argue that data shows that glyphosate builds up in the skin and/or bone.[12] However, they ignore that both of these endpoints have been evaluated within the glyphosate dataset. Starting with the skin, they ignore the relevant portions of the Wester et al. (1991) study, which found essentially zero glyphosate in human stratum corneum in an *in vitro* test model (Study Table 2). The cited discussion of a chemical reservoir in the skin from the Mabiach (1983) study is readily explained by rudimentary skin washing techniques which resulted in low glyphosate recovery in the study. I am aware of no study performed in the past 35 years that suggests a chemical reservoir in the skin created by glyphosate exposure and no scientific or regulatory body subscribes to this theory.

Dr. Sawyer cites the Brewster et al. (1991) study to posit that glyphosate is not quickly eliminated via the urine and claims that glyphosate remaining in the body stays in the bone. This assessment mischaracterizes the Brewster study, which indicates that glyphosate is cleared from all tissues in the body. Moreover, other studies (e.g., Wester et al.,1991) support the fact that glyphosate is not retained in the body.

A study reported in the Renewal Assessment Report (2015) evaluated the half-life of glyphosate in different compartments of the rat using a single 10 mg/kg b.w. oral dose of ($^{14}$C) radiolabeled glyphosate.  The half-life in male rats was estimated to be 5.9 hours.  These investigators took an additional step beyond Brewster et al. (1991) and separated the higher vascularized bone marrow from the calcium-rich bone.  The investigators identified that the bone marrow had a much smaller percentage of radioactivity (0.01%) after 6 hours versus the bone (0.12%), which was the peak concentration in the provided data. This indicates that there is no meaningful accumulation of glyphosate in the bone marrow.  The NTP also evaluated the half-life of glyphosate administered i.v. to a rat model.  The results of the experiment indicated that 98% of the systemically administered glyphosate was excreted via the urine after 24 hours.

**Lack of credible scientific support when arguing that systemically absorbed glyphosate is excreted via the feces**

Plaintiff's experts claim that Wester et al. (1991) is proof that dermally absorbed glyphosate is excreted via the feces as opposed to the urine. To reach this conclusion, they selectively cite a single datapoint within the Wester study, while ignoring the remaining well characterized pharmacokinetic data found in the Wester et al. (1991) study and other studies (NTP, 1992). The excretion profile of the low dose topical administration group in Wester et al. (1991) suggests that the study monkeys likely ingested the topically applied glyphosate. This is supported by the fact that there Is no mention of a breast plate being used during the study while the monkeys were confined. In fact, the authors themselves state that excretion is via the urine. The authors cited to urinary data when calculating percutaneous absorption following topical administration. It should

---

[12] See Dr. Sawyer's Mendoza report, Appendix A reference 1 in MCL.

be further noted that the chemical profile of glyphosate (extremely hydrophilic, relatively low molecular weight) suggests excretion via the urine.

**Dermal absorption studies do not indicate the formulated product damages the skin**

Dr. Sawyer claims that exposures to surfactants and other ingredients in formulated products results in damage to the skin, which subsequently increases absorption. If exposure resulted in damaged skin, the concentrated formulation products would consistently have a higher percentage of absorption than the diluted products in *in vitro* studies. However, the *in vitro* studies indicate that the opposite is true, suggesting that surfactants in RoundUp products do not degrade the epidermal layer.

**Misrepresentation of OECD guidelines**

Plaintiff's experts claim that OECD guidelines were violated in the interpretation and/or design of pharmacokinetic studies using glyphosate-based formulated products. In the Wester et al. (1991) study, Dr. Sawyer claims that the lost mass balance must be added in the topical absorption data because, under the OECD guidelines, the lost mass balance must be considered absorbed. However, the guidelines state that, if there is an indication that lost mass balance is due to the loss of unabsorbed material, then normalization of dose is considered appropriate (OECD, 2011: Paragraph 106).

Multiple studies in the published glyphosate dataset discuss the difficulty with mass balance recovery due to the extreme solubility of glyphosate (Nielsen et al., 2007; Franz, 1983). Nielsen et al. (2007) points out that, although recovery was low, it was clear that the unrecovered glyphosate was not absorbed, which could be observed due to the use of ($^{14}$C) radiolabeling. A similar radiolabeling technique was applied in Wester et al. (1991), where low residual glyphosate was detected after 7 days in the monkeys used in the study.  Based on what is known about glyphosate washing techniques, there is reason to believe the low recovery was due to loss of unabsorbed material and normalization is appropriate due to OECD guidelines.

They also argues that the conduct of the "DTL" studies (i.e., the Ward, Smith, and Davies studies) was inappropriate under OECD guidelines because of the heat separation and freezing techniques applied. However, those studies cite the OECD guidance they are being performed in accordance with. For example, OECD #28 (2004)[13] specifically calls for heat separation at 60°C for human skin (#37). Moreover, it states that epidermal membranes can be stored at -20°C for up to 466 days with no changes in permeability compared to fresh skin (#41). The guidance does caution that frozen storage may deteriorate the barrier integrity of human skin and/or enhance permeability in some cases. However, there is no suggestion that freezing skin can decrease permeability. Other OECD documents also endorse the use of frozen skin samples in dermal permeability studies (OECD 2011, #30).

---

[13] Guidance Document for the Conduct of Skin Absorption Studies, March, 2004.

**The TNO study in rat skin does not support arguments regarding human skin permeability**

Using a study performed in rats, Dr. Sawyer claims that the dermal absorption of glyphosate may be as high as 10%. By definition, this rat skin study is less relevant to human dermal penetration than the multiple *in vitro* studies using actual human skin, all of which indicate dermal penetration is much lower than 10% (with most indicating less than 1%). A limitation of the TNO study involves the high variability in recoveries; the authors point out this fact and state that the data are not acceptable for regulatory use and risk assessment (in addition to other deficiencies in the study). Based on this assessment, the TNO rat skin study does not present reliable data that would outweigh the well characterized dermal permeability profile of glyphosate *in vitro* studies using human skin.

**Failure to quantify impurity levels in RoundUp products sold to consumers**

Dr. Sawyer claims that the RoundUp contains multiple impurities (e.g., formaldehyde; n-nitrosoglyphosate; ethylene oxide; 1,4 dioxane). As discussed previously, the levels of these trace impurities are regulated by the appropriate health authorities. See Sawyer Giglio Deposition Exhibit 20.  In addition, Dr. Sawyer fails to associate these impurities with NHL. Based on his analysis, it appears that Dr. Sawyer is engaging in a potential hazard spotting exercise without taking actual exposure and dose into account. The impurities cited by Dr. Sawyer are found in our daily lives in items as varied as fruit, medical equipment, meat, and shampoos. Simply mentioning the presence of these impurities in RoundUp without taking into account the concentration of the impurities in RoundUp is toxicologically irrelevant to assessing any potential increased risk for NHL.  Additionally, he hypothesizes that ethylene oxide may volatilize, but given the very low Henry Law Constant for ethylene oxide, it is unlikely to volatilize out of a water-based formulation. The Henry Law Constant for ethylene oxide is 0.000148 atm-m$^3$/mol at 25°C (EPA RSL, 2019).

**Improperly equating days of exposure to dose**

Dr. Sawyer reports that Ms. Mendoza was at an increased risk of NHL based upon her use of RoundUp for greater than 2 days a year or 10 days over her life. To reach this conclusion, Dr. Sawyer cites the McDuffie et al. (2001) and Eriksson et al. (2008) studies. As discussed previously, days per year is a rudimentary methodology for assessing dose and the data Dr. Sawyer relies upon is not controlled for other exposures and other potential confounders. Notably, Dr. Sawyer fails to quantify a retrospective dose for Ms. Mendoza. Without such a calculation one cannot argue that Ms. Mendoza's dose ever reached a level of toxicological significance.[14] Additionally, because most of his exposures were residential, evaluating an exposure per day is an unacceptable metric. Though I am not offering an opinion as to the cause of Ms. Mendoza's NHL, Dr. Sawyer's reliance on the uncontrolled McDuffie et al. (2001) and Eriksson et al. (2008)

---

[14] In previous cases, it appears Dr. Sawyer calculated a retrospective dose using the U.K. POEM methodology. This methodology lacks reliability for assessing retrospective doses from hydrophilic herbicides. See EFSA (2014) guidance, ICPS (2014), and Browse, (2013). Additionally, the POEM model overestimates the dose by at least one order of magnitude (i.e., factor of 10). See Dr. Sawyer Giglio Deposition Exhibit 19.

data, while ignoring more robust and adjusted AHS data (which incorporates PPE use and application method), is insufficient to meet the dose-response arm of Hill's Causal Criteria.[15]

**Applicators who do not wear PPE do not exceed regulatory limits**

Plaintiff's experts suggests that certain PPE recommendations should be included in labeling for RoundUp. The biomonitoring and passive dosimetry dataset, along with my retrospective dose assessment of Ms. Mendoza, consider applicators using minimal protective barriers (e.g., short sleeve shirts, no gloves, etc.). Though it is true that wearing PPE may reduce exposures to glyphosate-based herbicides to varying degrees, no applicator, regardless of the PPE being worn, has been recorded in a biomonitoring or passive dosimetry study to have an absorbed dose that exceeds regulatory health levels from any regulator that has performed an independent risk assessment on glyphosate.

To the extent that plaintiff's experts suggests that safety data sheet (SDS) PPE requirements should be included on the label, he conflates the purpose of an SDS that may be meant for a bulk handler as opposed to a label, which is meant for a specific use situation and approved for that use situation by EPA.[16] For example, the SDS for Arm and Hammer Clump and Seal cat litter indicates that inhalation of the product may cause cancer, yet the current labeling does not require PPE for home users. Again, it is worth noting that in the case of glyphosate a reduction or introduction of PPE does not meaningfully effect dose; no matter the PPE or protective barrier, dose is below regulatory levels.

**Use of the UK-POEM Dose Calculation**

Dr. Sawyer discusses calculations using the United Kingdom Predictive Operator Exposure Model (U.K. POEM).[17] There are many limitations of the POEM mentioned in the literature. The International Programme on Chemical Safety, a part of the World Health Organization, states that the POEM is not validated (IOMC 242, 2014). This lack of validation can be illustrated by the lack of available foundation information for the model. The details of the underlying data used in the model are not described at the study level (IOMC 242, 2014).  Further, the exposure data are only available in classes and the statistics used in the model are not disclosed (Browse, 2011). The model was developed in the late 1980s (IOMC 242, 2014), meaning that the underlying data are likely up to 30 years old. Analytical methods, sampling methods, and the designs of the studies used in the model would not meet the current guidelines (Browse, 2011). Additionally, application technology from the late 1980's would not reflect more up-to-date technological upgrades. In previous cases, the POEM model has assumed a 50 ml/hour rate of deposition, that is in excess of any reported value for volume of surface contamination that I am aware of.

---

[15] Dr. Sawyer's reliance on meta analyses applying the uncontrolled data from McDuffie et al. (2001) and Eriksson et al. (2008) to the dose response question is similarly misplaced.
[16] Additionally, Dr. Sawyer cites internal Monsanto documents to support his arguments regarding PPE. The applicator use scenarios do not match Ms. Mendoza's use as Ms. Mendoza testified to applying far less volume than the amount modeled in those documents. See Dr. Sawyer Giglio Deposition Exhibit 18.
[17] Dr. Sawyer did not use any modeling to calculate a dose for Ms. Mendoza.

Alex LeBeau, PhD, MPH, CIH