# EXHIBIT 12

# SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF SAN FRANCISCO

DEWAYNE JOHNSON,

   Plaintiff,

  v.

MONSANTO COMPANY,

   Defendants.

Case No.  CGC-16-550128

# EXPERT REPORT OF CHARLES BENBROOK

## TABLE OF CONTENTS

I. Summary of Opinions ............................................................................................... 5
   A. Focus of Case ....................................................................................................... 6
   B. Monsanto's Responsibilities................................................................................ 8
      1. Product Stewardship Standards for Communicating Warnings ...................... 10
      2. Failure to Adequately Warn and Prevent Risks is Misbranding..................... 13
      3. Responses to Mr. Johnson's Inquiry ............................................................. 17
   C. Monsanto's Ethics and Behavior....................................................................... 18
      1. Failure to Repeat Key 1983 Mouse Oncogenicity Study.............................. 19
      2. Monsanto's Third Party Network of Experts................................................. 21
   D. Critical Science Judgements Impacting the Use of Glyphosate .......................... 22
      1. Why Glyphosate's Cancer Classification was So Important............................ 22
      2. Negative Genotoxicity Studies Give Rise to a False Sense of Safety.............. 23
   E. Influencing Regulators and the Scientific Community ........................................ 28
      1. Cherry Picking Science ................................................................................. 29
      2. Failure to Impose Needed, Commonsense Worker-Safety Provisions ........... 30

II. Expert Background and Qualifications ................................................................. 31

III. The EPA Pesticide Regulatory Decision Process .................................................. 40
   A. Three Major OPP/EPA Actions and Decisions .................................................... 40
      1. Applications to Register a New Pesticide....................................................... 41
      2. Actions Impacting the Future Use of an Already-Registered Pesticide ........... 43
   B. Impacts of OPP Cancer Determinations in Tolerance Setting ............................ 44
      1. Setting Tolerances under Sections 408 and 409 of the FDCA........................ 46

IV. Early EPA Actions on Glyphosate Herbicide and Monsanto Efforts to Influence the OPP's
Evaluation of Glyphosate Toxicity....................................................................... 48
   A. Initial Approved Uses and Tolerance Actions.................................................... 48
   B. Studies on Glyphosate Conducted by IBT Create Massive Hole in Toxicology Dataset ................ 51
   C.  Contaminants, Adjuvants, and Surfactants ...................................................... 53
      1. Sources of Pesticide Product Risk ................................................................ 54
      2. Impurities in Glyphosate Active Ingredient .................................................. 55
      3. Adjuvants and Surfactants in Roundup End Use Products .............................. 56
      4. Assessing Glyphosate's Capacity to Disrupt the Endocrine System................. 61
   D. Patterns Emerge in OPP-Monsanto Interactions over Glyphosate's Toxicology Database ........... 61

V. Bio/dynamics Mouse Oncogenicity Study Triggers a Change in Glyphosate's Cancer
Classification .................................................................................................... 64
   A. Results of Bio/dynamics' Mouse Oncogenicity Study......................................... 64
      1. The High Stakes Review of the Bio/dynamics Mouse Oncogenicity Study...................... 66
      2. Second 1/31/1984 Gingerich Memo to Monsanto Colleagues ...................... 68
      3. OPP Dismisses Monsanto's Historical Control Data Argument ....................... 73
      4. Monsanto Takes Its Case to the Director of the OPP Registration Division ........... 75
      5. Monsanto's Next Move – Hire Another Pathologist to Re-read the Kidney Slides ................ 76
   B. Pending Actions Heighten Monsanto's Concern Over Public Release of Glyphosate's Cancer

Classification ........................................................................................................................ 77
  C. Re-sectioning of the Mouse Kidney Slides – Monsanto's Next Effort to Change OPP's Mind ....... 81
  D. The 1986 SAP Review of the Mouse Oncogenicity Study .......................................................... 84
    1. SAP Meeting Discussion and Outcome ........................................................................................ 85

**VI. Monsanto Efforts to Influence Scientific Community and Regulatory Assessments of
Glyphosate Risks ................................................................................................................. 89**
  A. Ignore, Delay, or Refuse to Fulfill EPA Requests for Information, New Studies, or Label
  Precautions ........................................................................................................................... 89
    1. OPP Requirement for Repeat Mouse and Rat Oncogenicity Studies............................................ 90
    2. Monsanto Refuses to Conduct a New Mouse Oncogenicity Study ................................................ 91
    3. OPP Review of Arguments on the Need to Repeat the Mouse Study ............................................ 95
  B. Monsanto Efforts to Delay and/or Defuse Worker Safety Language on Roundup Labels ............. 97
    1. Registration Standard Worker Safety Provisions..................................................................... 98
    2. Impact of Monsanto's Refusal to Accept EPA-Required Worker Safety Rules ............................ 101
    3. Monsanto Recognized that the Drift of Roundup Herbicides onto Applicators Using Backpack
    Sprayers Could Pose Excessive Risk ........................................................................................... 106
    4. Monsanto Efforts to Address Concerns over Worker-Risk Assessments..................................... 107
    5. BiF Pushes Monsanto on Worker Risks.................................................................................... 109
  B. Cultivate Relationships with "Friendly" Scientists and Officials in EPA ................................... 114
    1. Jess Rowland ........................................................................................................................ 114
    2. Jack Housenger ..................................................................................................................... 117
  C. Scientific Literature and Third Party Voices.......................................................................... 120
    1. Response to a Key Epidemiological Study ................................................................................ 121
    2. Monsanto Response to Positive Genotoxicity Studies .............................................................. 125
    3. Monsanto Asks Dr. Parry to Assess Glyphosate Genotoxicity ................................................... 128
  D. Monsanto Reliance on Ghost-writing .................................................................................. 135
    1. Acquavella Calls Monsanto Out for Unethical Behavior............................................................ 137
    2. Gary Williams et al 2000 Paper .............................................................................................. 138
    3. Williams et al 2012 ............................................................................................................... 144
    4. Kier and Kirkland 2013 Paper ................................................................................................ 146
    5. *Critical Reviews of Toxicology* Special Issue on Glyphosate Risks .............................................. 147
    6. The Many Forms of Ghost-Writing – Monsanto Style ............................................................... 148
  D. Attacks on Scientists or Organizations Producing Adverse Data on Glyphosate ....................... 151
    1. Intimidation of IARC Working Group Members........................................................................ 151
    2. Seralini Team....................................................................................................................... 152
  E. The IARC Bombshell ........................................................................................................... 157
    1. Placing the IARC Classification in Perspective......................................................................... 158
    2. Monsanto's Preparation for the IARC Report and Classification ................................................ 161
    3. Monsanto Selects Donna Farmer to be a Key IARC-Response Spokesperson ............................... 164
    4. "Why Do More?"................................................................................................................... 167
    5. Producing the CRT Special Issue on Glyphosate Toxicity .......................................................... 168
    6. Content of the *CRT* Special Issue on Glyphosate Safety ........................................................... 171
    7. Political and Other Activities Post-IARC .................................................................................. 175
  E. Allied Organizations, Front Groups, and the Media................................................................ 177
    1. CropLife America and CropLife International ........................................................................... 178
    2. Engaging PR Firms ................................................................................................................ 180
    3. Shaping the Agenda and Supporting Scientific Meetings ........................................................... 182

**VII. Protecting "Freedom to Operate" and Scientific Deceit Characterize Monsanto's Assessments of and Response to Glyphosate-Related Risks** ............................................. **185**
    **A. Mission One – Protect Freedom to Operate (FTO)** ...................................................... **186**
        1. Section 6(a)(2) of FIFRA............................................................................................. 187
        2. Responding to FQPA Challenges ............................................................................. 187
    **B. Overstating Roundup Benefits and Understating Possible Risks**............................. **189**
        1. Attempts to Influence the IARC Review .............................................................. 189
        2. Kier (2015) Sets a Record for Speedy Publication ............................................... 190
        3. "Inappropriate Absolutes" Used to Promote Kier (2015) .................................... 192
        4. Advertising ............................................................................................................. 196
    **C. Tactics Used to Bury or Obscure Issues Perceived to Raise Risk and Regulatory Threats to Future Sales** ...................................................................................................................................... **196**
        1. Positive Evidence of Carcinogenicity..................................................................... 196
        2. Counteracting Positive Epidemiology Study Findings .......................................... 197
        3. Dermal Absorption................................................................................................. 200
        4. Nitrosamine Contaminants in Roundup Herbicide ................................................ 205

**Appendix A. Resume** ........................................................................................................... **208**

## Notes:

1. Several documents are cited by reference to their MONGLY number; others are referenced as a numbered exhibit. In some cases, a reference lists just the first page of a cited source, while in other cases, all pages in the source, or a selected subset of pages, are listed. In all cases where only the first page of a cited source is listed, I may have relied on content throughout the document in forming my opinions.

2. I had in my files many of the documents that appear in the discovery record of this case. At the suggestion of Counsel in such instances, I identify these documents with their MONGLY or exhibit number.

# I. Summary of Opinions

1.      I was asked by the Plaintiff's lawyers in this case to review extensive material on Roundup® and to give an opinion as to whether Monsanto® should have warned the public about the risk of non-Hodgkin Lymphoma (NHL) associated with use of and exposure to glyphosate and glyphosate-based formulations.

2.      It is my opinion that Monsanto failed to adequately warn about the risk of NHL associated with the use of Roundup® and RangerPro®[1] beginning in, or before 2001 for reasons explained below.  I was also asked to opine whether Monsanto fulfilled its duty as a pesticide manufacture with respect to the stewardship of Roundup®.  It is my opinion they did not as further detailed and for the reasons below.

3.      Prior to being contacted by Plaintiff's lawyers I had been independently researching, for many years, the use, toxicological properties, and regulation of glyphosate in the United States. My research findings have been published in peer-reviewed science journals. And have included the need for reform in the regulation of herbicides in general, and glyphosate in particular.

4.      In order to inform these opinions, I carried out independent research using online EPA resources, publicly available literature, and regulatory documents.  I also have long professional experience researching glyphosate and Roundup®.   Plaintiff's lawyers sent me several volumes of documents containing mostly internal Monsanto communications. I requested follow-up information in several areas, drawing on the discovery record in this case.

---

[1] In this report Roundup® and RangerPro® are used interchangeably. They are similar products manufactured by Monsanto containing the active ingredient glyphosate and the surfactant POEA. Both products were used by Dewayne Johnson.

5.      The opinions in this report are based on my education, experience, review of the documentation, and independent research.  These opinions are held to a reasonable degree of certainty.

## A. Focus of Case

6.      This case is about the way Dewayne Johnson used and applied RangerPro and Roundup ProConcentrate in the course of carrying out job-related, weed management duties for the Benicia Unified School District.

7.      Dewayne Johnson applied glyphosate-based herbicides in 2012-2014. In those years, farmers and ranchers applied about 90.3% of the total pounds of glyphosate herbicide used in the U.S., while non-agricultural uses accounted for about 9.7%. (Benbrook C. [2016]. Trends in glyphosate herbicide use in the United States and Globally, *Environmental Sciences Europe* Vol 28:3; DOI 10.1186/s12302-016-0070-0).

8.      Of the 9.7% of total glyphosate use that is non-agricultural, I estimate that at least two-thirds of that was applied on golf courses, along roads and rights-of-ways (railroad tracks, power lines), and on industrial facilities. The majority of these non-ag applications were carried out using mid- to large-scale spray equipment with cabs and air filtration systems, or by airplanes or helicopters.

9.      Hence, glyphosate applications made using a hand held or backpack sprayer likely accounted for under 3% of the total U.S. use of glyphosate-based herbicides in the 2012-2014 period.

10.       Government statistics, and the records in this case, show that over the years, a highly disproportionate share of the glyphosate-related, worker-safety poisoning and illness episodes arise from hand-held, backpack, or other application methods that result in markedly

higher exposures and risks than typical, larger-scale applications of Roundup.

11. By "highly disproportionate," I mean, for example, one-half or more of the reported, glyphosate-based herbicide illness episodes arise from hand held/backpack applications of the herbicide that account for well less than 3% of the total volume of glyphosate applied.

12. The reason is clear. Most glyphosate applied on farms is sprayed using large equipment with enclosed cabs that have air filtration systems, where the operator/driver/pilot is far-removed from the spray, and also protected from exposure by a glass/metal cab and an air filtration system.

13. The sizable differential in routine, expected exposures between ag and many non-ag uses of glyphosate arises because of the proximity of people using a hand held or backpack sprayer to the spray solution, their need to walk within and through an area that was sprayed just minutes before, the absence of a barrier or shield to protect them from spray drift, and the absence of an air filtration system (since a respirator is not required on any Roundup labels).

14. Since the 1980s, Monsanto has known that individuals applying a glyphosate-based herbicide through a hand-held or backpack sprayer face markedly higher exposures and risks, especially on windy days.

15. The company has also known that risks are higher for individuals that apply the herbicide for many days a year and/or many hours during a given day, yet there are no statements on Roundup labels or label provisions that require stricter worker protection measures as a function of how many hours in a work week, or over a year, that a person sprays glyphosate herbicides as part of their job.

16. Accordingly, a key question at the heart of this case is whether Monsanto acted responsibly in the face of information pointing to greatly elevated exposures and risks of cancer,

specifically non-Hodgkin Lymphoma ("NHL") for some individuals like Dewayne Johnson, who applied Roundup herbicides in known, high-exposure scenarios.

### B. Monsanto's Responsibilities

17.     Monsanto was responsible for four things that are central to this case. First, the company was responsible for assuring that the specific herbicide products sold to the school district for which Mr. Johnson worked were as safe as they could be, given existing knowledge and technology.

18.     Second, Monsanto was responsible for the content, scope, and effectiveness of the label directions for use, use restrictions, warnings about high-risk scenarios, and worker-safety requirements on the RangerPro and Roundup ProConcentrate labels.

19.     While Monsanto had to comply with several generic, EPA requirements regarding what and how such worker safety information appears on an herbicide label, the company bore the primary responsibility to assure that the label directions on its products, as well as any restrictions, warnings, and precautions, were adequate to avoid any "unreasonable adverse effect on man or the environment."

20.     Third, Monsanto bore an obligation to draw upon its extensive field testing and scientific resources to progressively improve the utility and safety of its products in two basic ways: (1) through progressively safer formulations, and (2) through label directions and worker-safety provisions that both adequately warn those handling, mixing, and applying Monsanto-brand herbicides about potential high-exposure scenarios, and require adoption and adherence to worker-safety provisions sufficient to prevent significantly elevated exposure episodes.

21.     Fourth, Monsanto was and remains obligated to work cooperatively and openly with the EPA to assure that both the company's internal assessments of risk, including worker

risks, and those done by the EPA, are as accurate as possible. This obligation flows from the company's product stewardship pledges, as well as provisions in federal law.

22.     Accuracy in worker risk assessments is an essential foundation upon which the company and EPA can then develop effective, commonsense methods to reduce applicator exposures and risk.

23.     The record of this case shows that Monsanto repeatedly failed in carrying out each of these four, essential tasks and responsibilities. Monsanto failed to warn about the risk of NHL, other forms of cancer, or damage to the liver or kidneys, stemming from the use of Ranger Pro and Roundup Pro.

24.     Instead, the company overstated the benign nature of its glyphosate-brand herbicides, calling them biodegradable and safe to use, without any qualification. Monsanto also did little to counter the often-heard claim that "Roundup is safe enough to drink."

25.     In dozens of instances, the company generated, or came into possession of, scientific information pointing to higher risks than previously recognized. Instead of sharing the information with the EPA, as often required by law, and acting on the new information to update risk assessments and determine whether new, exposure and risk-reduction measures were warranted, Monsanto took active steps to not disclose the information and keep it from becoming public knowledge.

26.     In many instances, the company sought ways to undermine the relevance or legitimacy of results in studies that it had commissioned and paid for. Monsanto's determination to change the results of a Bio/dynamics mouse oncogenicity study is a case in point discussed at length in this report.

27.     Furthermore, it is important to emphasize that it is Monsanto's responsibility to

take steps to increase margins of safety for users of its products like Dewayne Johnson, through alteration of formulations and addition of new worker-safety language on labels.

28.     Such changes should be made whenever the company recognizes an opportunity to make their products safer. Across the pesticide industry, the majority of proactive steps taken to increase margins of safety in the use of specific pesticides are initiated by companies, not the EPA.

29.     The number of label amendments proposed by pesticide registrants, and approved generally without change by the EPA, greatly outnumbers label changes required by the EPA.

**1. Product Stewardship Standards for Communicating Warnings**

30.     A company selling a pesticide to the public is responsible for the testing of its product to ensure it can be used safely.  It is not the EPA's responsibility to test the product, nor does the agency have the financial resources required to do so.

31.     In addition, a company selling a pesticide product to the public bears responsibility for adequately warning users about any potential risks associated with the use of its product. Companies are also obligated to require on product labels practical and effective steps that users must take, or should take to mitigate (reduce) such risks (referred to throughout this report as worker-safety requirements or provisions).

32.     While EPA requires and oversees adherence to generic, worker safety labeling requirements, it is crystal clear in the industry that companies bear the primary responsibility to assure that label directions and restrictions are clear, effective, and comprehensive in addressing possible risks from the use of a given product.

33.     The purposes for which Dewayne Johnson applied Ranger Pro and other Roundup herbicides, and the methods he used to apply them, were common and routine, as were the

factors giving rise to potentially unsafe exposures from Johnson's lawful applications.

34.     This responsibility to warn and mitigate extends to the full range of foreseeable circumstances and situations in which a pesticide can be applied in accord with the directions on its label (e.g., a leaky hose fitting on a backpack sprayer, or an application on a windy day).

35.     Under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), "a manufacturer seeking to register a pesticide must submit a proposed label to EPA as well as certain supporting data."  (7 U.S.C. §§ 136a(c)(1)(C), (F))

36.     Manufacturers have a duty to update pesticide product labels when new safety information and insights are discovered, for example from tracking documented poisoning episodes. The routine method for them to do so is by requesting EPA to approve a label amendment that builds into a product's existing label, new language imposing additional safety precautions and worker safety provisions.

37.     EPA almost always approves such requests for label amendments, and in most cases, quickly.

38.     A pesticide product is considered misbranded under FIFRA if:

 "(F) the labeling accompanying it does not contain directions for use which are necessary for effecting the purpose for which the product is intended and if complied with, together with any requirements imposed under section 136a(d) of this title, are adequate to protect health and the environment; [or] (G) the label does not contain a warning or caution statement which may be necessary and if complied with, together with any requirements imposed under section 136a(d) of this title, is adequate to protect health and the environment..." § 136(q)

39.     A pesticide product can be misbranded even if the EPA has registered the pesticide and approved its label, because manufacturers bear the responsibility to assure that labels incorporate new and/or adequate safety information and worker safety restrictions to prevent applications leading to excessive exposures and risks.

40.     FIFRA explicitly states that "registration does not provide a defense to the violation of the statute." 7 U.S.C. § 136a(f)(2)

41.     Additionally, manufacturers are not limited to warning the public through just the text appearing on a product label.  Indeed, many product labels are long, complex, and technical documents, which are often not carefully read by users.

42.     For this reason, manufacturers also need to utilize other methods to communicate safety information to users. Common methods include advertising, media interviews, websites, blogs, trade and scientific publications, training materials, phone calls, email, information shared by their sales force, and point-of-sale warnings and use directions.

43.     Manufacturers can also warn about the risks of pesticides through safety data sheets governed by OSHA.  Safety Data Sheets are often provided to employers of chemical applicators, as Dewayne Johnson was by his supervisor working for the Benicia Unified School District.

44.     An important provision in OSHA regulations provides that:

"Chemical manufacturers, importers, distributors, or employers who become newly aware of any significant information regarding the hazards of a chemical shall revise the labels for the chemical within six months of becoming aware of the new information, and shall ensure that labels on containers of hazardous chemicals shipped after that time contain the new information." (29 CFR 910.1200(f)(11))

45.     Manufacturers must include information about the carcinogenicity of their product on safety data sheets.

46.     They may conduct their own assessment of the oncogenic potential of their products, or rely on testing and cancer risk assessments made by another organization or company.  However, an assessment by IARC, if available, must be included on OSHA safety data sheets, because IARC determinations are regarded by governments around the world as

credible, data-driven, and authoritative.  (29 C.F.R. § 1910.1200, Appendix A)

## 2. Failure to Adequately Warn and Prevent Risks is Misbranding

47.     Since 1985 when EPA toxicologists concurred that glyphosate was a potential human carcinogen, the labels for Roundup and other glyphosate based formulations have been misbranded because they did not contain adequate instructions to protect the health of people applying the products.

48.     Beginning in 1985, Monsanto could and should have added a warning to the labels on glyphosate-based herbicides, and utilized other methods to inform the public that glyphosate had been shown to be oncogenic in animal studies.  A reasonable and prudent manufacturer would have accepted the EPA's position that glyphosate was possibly oncogenic, and as a result, included that information on the label, in chemical safety data sheets, and in its marketing material.

49.     A reasonable and prudent pesticide manufacturer would have added such a warning to adequately safeguard the health of the people using its products, and coupled the warning statement with the addition of a set of practical worker safety provisions that would markedly reduce potential exposure (e.g., wearing gloves, a requirement ***not*** on the labels of the Monsanto herbicides Johnson applied).

50.     Monsanto was well aware that such added worker safety requirements were especially needed in the case of high-exposure application methods and scenarios, like those encountered by Dewayne Johnson in the course of his job.

51.     A year later, in 1986, the EPA issued a new Registration Standard document on glyphosate. It set forth just such a set of prudent and practical worker safety requirements designed to markedly reduce the frequency and severity of high-exposure episodes.

52.     These new provisions were supposed to be on all labels sanctioning use of glyphosate-based herbicides by June 30, 1988, except for very dilute products marketed to homeowners in ready-to-spray bottles.

53.     But Monsanto resisted the new worker safety provisions called for in the 1986 Registration Standard, and the most important of them are ***still are not included on most of Monsanto's glyphosate product labels in the U.S***.

54.     Cancer is not the only adverse health effect possibly associated with use of glyphosate herbicides that Monsanto should have warned users about via product label amendments.

55.     Beginning in 1999 Monsanto could and should have added a warning to their labels, and otherwise informed the public, that exposure to formulated glyphosate products can cause oxidative stress and lead to genotoxic damage.  In lay terms, such a warning might state "exposure to this product can damage cells and trigger disease."

56.     The company was aware of new genotoxicity studies reporting such impacts. To determine the proper course of action moving forward, Monsanto commissioned an internationally respected expert, Dr. James Parry, to review recent genotoxicity studies and render his opinion whether the findings reported were credible.

57.     Dr. Parry concluded that some were, and recommended Monsanto take a number of steps to better understand the nature, magnitude and likely causes of newly discovered genotoxic risks stemming from, especially, exposure to formulated glyphosate herbicides.

58.     After receiving Dr. Parry's expert report, a reasonable and prudent pesticide manufacturer would have added a genotoxicity warning to Roundup labels, and conducted the additional, more sophisticated and sensitive testing that Dr. Parry had recommended to resolve

"outstanding issues."

59.     Instead, Monsanto ended its association with Dr. Parry and refused to do the testing he recommended.

60.     Beginning around 2002, Monsanto could and should have added a warning to their label, and otherwise informed the public and biomedical community, that exposures to Roundup formulations increase the risk of a specific cancer, NHL, after learning about the results of two epidemiological studies showing a statistically significant increase in the risk of NHL among users of glyphosate-based herbicides. (Hardell and Eriksson (1999). A case-control study of non-Hodgkin lymphoma and exposure to pesticides, *Cancer* 85: 1353-1360; McDuffie et al. (2001) Non-Hodgkin's Lymphoma and Specific Pesticide Exposures in Men: Cross-Canada Study of Pesticides and Health, *Cancer Epidemiology, Biomarkers & Prevention* Vol 10: 1155-1163)

61.     Had Monsanto amended the label to include a risk of NHL in 2002, the EPA would have approved that amendment.

62.     These initial NHL results were reinforced in 2003 and 2008 in studies by DeRoos et al. and Eriksson et al.

63.     These human epidemiological findings in peer-reviewed science journals take on added importance in light of the confidential, Monsanto commissioned report by Dr. Parry.

64.     A reasonable and prudent pesticide manufacturer, aware of recently published evidence of genotoxicity, Dr. Parry's evaluation of these studies, and now a series of positive epidemiological studies, would have added a NHL warning to its glyphosate-based herbicide labels, and added long-overdue worker safety requirements, in order to more adequately safeguard the health of applicators and others exposed to elevated levels of glyphosate herbicide.

65.     Beginning in at least by June 30, 1988 in response to the 1986 glyphosate Registration Standard, Monsanto could and should have added the EPA-required worker safety provisions to all their glyphosate labels. These would have included instructions to applicators regarding the additional steps needed to reduce their exposure to Roundup formulations, particularly in the case of high exposure-risk scenarios (e.g., when an applicator is using a backpack or hand held sprayer).

66.     Such steps for backpack or hand-held application methods would include wearing a face shield or googles to avoid exposure to drift; wearing chemical-resistant gloves and shoes or boots; walking perpendicular to the direction of the wind; and, more cautious handling of clothing and other gear used during spraying operations, including disposal of heavily contaminated clothing and equipment.

67.     A reasonable and prudent pesticide manufacturer would have added the EPA-required provisions in 1987-1988, at a minimum, as well as new warning language to more assuredly safeguard the health of applicators on, for example, windy days.

68.     In addition to new label language, beginning on the above referenced dates, Monsanto should have conveyed the above warnings and instructions through media outreach, applicator training sessions, scientific publications, its website, third-party bloggers it influences, training materials, advertisements, OSHA safety data sheets, and direct communications by sales and technical support staff.

69.     Without doubt, Monsanto should have conducted long-term carcinogenicity tests of at least its top two or three Roundup formulations in the 1990s (ranked by sales), in the wake of the near-decade long fight with EPA over the 1983 Bio/dynamics mouse oncogenicity study.

70.     Having learned from multiple, credible published studies, its hired scientific

advisers, and its own internal research that formulated glyphosate-based products are far more toxic than 100% pure glyphosate, a reasonable and prudent pesticide manufacturer would have tested at least the most widely sold, formulated Roundup products to determine if they were genotoxic and/or carcinogenic.

71.     A reasonable and prudent manufacturer that repeatedly pledges allegiance to sound science would not engage in a campaign to "orchestrate outcry," "invalidate the relevance," and cut the funding of IARC, one of the most respected and authoritative scientific bodies in the world charged with a serious, difficult task -- determining the causes of cancer in the hope of reducing the burden of disease worldwide.

72.     Monsanto's failure on the label of Ranger Pro herbicide to adequately warn users about the risk of NHL, and reduce exposures in high-risk application scenarios via prudent worker safety requirements, increased Mr. Johnson's exposure to glyphosate and therefore increased his risk of NHL.

73.     Instead of warning the public about the risk of NHL, Monsanto has devoted enormous resources to try to sow doubt and discredit scientifically valid claims that Roundup and RangerPro formulations increase the risk of NHL, as extensively detailed in this report.

**3. Responses to Mr. Johnson's Inquiry**

74.     Importantly, Dewayne Johnson reports that he called a number listed on the RangerPro packaging and was connected to the Missouri Poison Control Center on March 27th 2015.  Mr. Johnson asked whether RangerPro was a cause of his NHL, and whether it was safe for him to keep using RangerPro.  The operator at the poison control center stated that his symptoms were not consistent with the symptoms following glyphosate exposure, and as a result Mr. Johnson continued to spray RangerPro. (MONGLY00500667).   Mr. Johnson reports that the

operator further advised that an employee from Monsanto would contact him with additional information.

75.     A report of Mr. Johnson's call to the Missouri Poison Control Center was sent to Monsanto in April of 2015.  Monsanto did not follow-up to inform Mr. Johnson that IARC had, just a week before, determined that glyphosate was a probable human carcinogen associated with NHL.  Mr. Johnson was unaware of the IARC classification at the time he called.

76.     A Monsanto employee utilized email to contact California School District employees to deny that Roundup was associated with NHL. For example, in a 2010 email responding to a grounds supervisor relaying a parent's concern about RoundupPro and NHL, an employee stated. "I want to assure you that Roundup Is almost non-toxic to all species except plants. It has a caution label and has been shown not to cause cancer. The first place to go to look for information about Roundup is our website www.monsanto.com/ito."

77.     Horizon, the distributor that sold Monsanto herbicides to Mr. Johnson's school district, utilized a Powerpoint created by Monsanto for training people such as Mr. Johnson. This Powerpoint states that "Based on laboratory studies conducted with animals, Roundup® Brand IT&O Herbicides: Do not cause cancer."  However, Monsanto has never conducted a carcinogenicity study of Roundup on animals.

78.     This unequivocal and reassuring statement also contradicts Donna Farmer's warning to Monsanto scientific and outreach personnel to ***not*** say that "Roundup does not cause cancer," because the company has never tested formulated Roundup for carcinogenicity.

## C. Monsanto's Ethics and Behavior

79.     Monsanto's stated, primary goals driving its herbicide business is opening up new markets for Monsanto products (i.e., gaining new registrations), and minimizing any possible

adverse impacts on the sale of Monsanto products already on the market.

80.     The later sort of impact – protecting the company's existing pesticide products and sales -- is often referred to inside Monsanto as preserving glyphosate's "Freedom to Operate" (FTO).

81.     Monsanto's rejection of new and better science as a way to reduce pesticide risks is evident in essentially all of the key actions and initiatives taken by the company over the last 40 years to first expand the uses of glyphosate, and in later years, protect the glyphosate FTO.

**1. Failure to Repeat Key 1983 Mouse Oncogenicity Study**

82.     A contract laboratory called Bio/dynamics conducted a Monsanto-commissioned mouse oncogenicity study in the early 1980s. The study results were submitted to EPA in 1983. The agency's preliminary review of the study concluded that glyphosate had caused a dose-related increase in renal tubule adenomas, a rare tumor, and as a result was a possible human carcinogen.

83.     This EPA determination contradicted the Bio/dynamics interpretation of the results, as well as Monsanto's. The conflicting conclusions based on the results of this pivotal study set the stage for an intense, high-stakes conflict between Monsanto and the EPA.

84.     To gain approval of new tolerances covering glyphosate residues in food, and new agricultural registrations for Roundup, Monsanto simply ***had to reverse*** the EPA Office of Pesticide Programs (OPP) cancer classification of glyphosate.

85.     When such disagreements arise over the interpretation of a specific study, the routine response by OPP/EPA is to require the company to conduct a new, and hopefully more carefully designed study. And so, OPP required Monsanto to conduct a new, much more powerful (statistically) mouse oncogenicity study.

86.     Monsanto responded to EPA's request by arguing no such study was needed. OPP/EPA responded by stating why it felt such a study was indeed essential.

87.     After eight years of back and forth covered in detail in this report, Monsanto had displayed to the OPP that it would always be willing and able to take whatever next step was necessary to raise new scientific issues in need of exploration, prior to a final OPP decision on whether the 1983 Bio/dynamics study was positive or negative for cancer, or needed to be repeated.

88.     Monsanto also had demonstrated multiple times both its ability and willingness to direct political pressure on the agency. The company's clout in Congress, and at senior levels in Executive Branch agencies, made it possible for Monsanto to continuously raise the stakes facing OPP/EPA, until OPP brought its evaluation of the Bio/dynamics study into alignment with Monsanto's, and as a result, changed the cancer classification of glyphosate in a way acceptable to the company.

89.     In short, Monsanto convinced the OPP that it was not an effective use of the agency's limited resources to continue the fight.

90.     In 1991, EPA changed its interpretation of the 1983 mouse oncogenicity study, on account of one seemingly "magic" tumor found by a Monsanto-commissioned pathologist, who had been asked to reread the kidney slides in the study. This one magic tumor in the male mouse control group turned the seemingly positive Bio/dynamics mouse study into a negative one.

91.     All of the pathologists that worked for the EPA and viewed the mouse kidney slides from the Bio/dynamics study could not see, and did not agree that the magic tumor existed in the kidney of one male, control mouse.

92.     All of the pathologists paid by Monsanto to assess the kidney slides for the male

mouse control group agreed that there was one tumor in the control mouse #1028, *except* for the pathologist working for Bio/dynamics who did the initial assessment of the tumors in all animals.

93.     This pathologist reported at that time no renal tubule adenomas in control male mouse #1028, nor any other control male mouse. Years later, after re-reading the kidney slides, this pathologist agreed with the other pathologists hired by Monsanto to evaluate the presence of renal tubule adenomas in the control group of male mice.

94.     Monsanto still has not repeated the mouse oncogenicity study.

95.     The primary reason is clear – legitimate concern in the company that the results of such a study would affirm the key finding in the original Bio/dynamics mouse oncogenicity study, and result in EPA classifying glyphosate as at least a "possible human carcinogen."

**2. Monsanto's Third Party Network of Experts**

96.     Monsanto made heavy use of supposedly independent scientists in carrying out its "Scientific Outreach" (SO) and PR campaigns in support of the safety of glyphosate and Roundup-brand herbicides. Such individuals were appointed to an ad hoc, or standing advisory committee or panel. In other cases, they simply worked on a fee-for-service basis on a defined task.

97.     Many of these glyphosate-friendly, consulting experts had once worked for Monsanto. Many have authored or co-authored one to multiple papers commissioned and paid for by the company. In addition, most of these papers contained passages ghost-written by Monsanto scientists, and some were largely ghost-written by Monsanto.

98.     "Ghost-writing" refers to contributions to a written document by a person not listed as the author, or among the co-authors of a document. (See VI, C.2 for details).

99.     In addition, Monsanto frequently asked and/or sponsored glyphosate-friendly

experts to present oral and/or written comments to regulatory agencies or their advisory groups, make presentations to allied groups, and assist in gaining positive media coverage of glyphosate health issues.

100.     While the roles and contributions of dozens of glyphosate-friendly scientists are described in the body of my report, there are far too many instances, and individuals, to provide a comprehensive accounting of this tactic. A list of some members in Monsanto's glyphosate safety third party network appears in IV, section C.

101.     After my review of records in this case, I am shocked by the scope, systematic focus, and brazenness of Monsanto's efforts to utilize supposedly independent scientists to: (1) restate and amplify company positions and scientific conclusions, (2) influence and contribute to the literature in peer-reviewed, science journals on glyphosate safety issues, (3) shape and control the information accessible to regulators, and (4) reinforce via repetition key Scientific Outreach and PR messages reaching the farm community, allied organizations, the general public, and political leaders regarding the safety of glyphosate-based herbicides.

102.     These actions are inconsistent with applicable industry standards and do not comport with how a reasonable company would act with respect to tapping outside scientific expertise in the hope of elucidating and preventing human health risks.

## D. Critical Science Judgements Impacting the Use of Glyphosate

### 1. Why Glyphosate's Cancer Classification was So Important

103.     Various terms are used to refer to the potential of a chemical to cause cancer. The term "carcinogenic risk" used in the Monograph series issued by the International Agency for Research on Cancer (IARC) means that "an agent is capable of causing cancer."

104.     In this report, I follow standard practice in EPA and the toxicology community.

The word "oncogen" refers to a chemical thought to cause benign or malignant tumorous growths in animals or humans; the term "carcinogen" refers to a chemical thought to cause malignant tumors in animals or humans.

105.    The Toxicology Branch within the EPA's Office of Pesticide Programs (OPP) decided that glyphosate should be classified as a possible human oncogen in 1984. This decision posed a significant economic threat to Monsanto, as stated by Frank Serdy, Monsanto's Manager of Federal and State Regulatory Affairs in his March 13, 1985 letter to the OPP Registration Division Director, Doug Campt.

106.    In the 1980s, once glyphosate was classified as a potential oncogen, any significant, future expansion in agricultural use of Roundup herbicides would require the establishment of dozens of Section 409 food-additive tolerances to cover the residues that would be present in certain fractions of grains and oilseed crops.

107.    But glyphosate-related Section 409 petitions in the EPA pipeline, and any future Section 409 tolerance petitions, would be blocked by the anti-cancer Delaney Clause under then-current law and policy.

108.    The Delaney Clause is a provision in Section 409 of the Food, Drug, and Cosmetic Act that prohibits the use of cancer-causing food additives; when pesticide residues concentrate in certain foods or food ingredients (like wheat bran), they are considered a food additive to which the Delaney Clause applied.

**2. Negative Genotoxicity Studies Give Rise to a False Sense of Safety**

109.    The first round of mutagenicity and genotoxicity studies on glyphosate were commissioned by Monsanto in the 1970s, conducted by IBT, and were found to be invalid and/or fraudulent. The second round was done in the early 1980s, and fulfilled the then-existing OPP

mutagenicity and genotoxicity data requirements.

110.    The laboratories conducting these cell-assay studies on nearly 100% pure glyphosate for Monsanto reported no evidence of mutagenic or genotoxic effects, and EPA scientists accepted this determination. So, throughout the 1970s and for the next ~40 years, all EPA documents report that glyphosate, and glyphosate-based herbicides, are not genotoxic.

111.    EPA's genotoxicity determination played a central role in the successful effort by Monsanto to change OPP's mind on the results of the highly-disputed, 1983 Bio/dynamics mouse oncogenicity study.

112.    Despite what EPA regarded as clear evidence of a dose-response increase in renal tubule adenomas in male mice in that mouse study, Monsanto argued, and EPA eventually accepted, that the absence of any evidence of genotoxicity provided strong support for the conclusion that the increase in renal tubule adenomas in male mice was not treatment related.

113.    Over and over for decades, the absence of evidence of genotoxicity is cited by Monsanto and the EPA as a reason, if not the major reason, to ignore other evidence of mammalian toxicity following exposure to glyphosate-based herbicides.

114.    Unfortunately, glyphosate-based herbicides had always been genotoxic to multiple organisms, and via several mechanisms, but the testing methods available in the 1970s and 1980s had not yet detected such effects.

115.    Critically, essentially all of the genotoxicity testing required by the EPA and commissioned by Monsanto was carried out on nearly pure glyphosate, rather than on the formulated glyphosate herbicides people use and are exposed to.

116.    The first evidence of genotoxicity of glyphosate-based herbicides appeared in the open, scientific literature in the 1990s (see the genotoxicity study subsection in VI., C.1).

117.    By 2003, there was considerable evidence in peer-reviewed scientific journals suggesting that at least certain glyphosate-based herbicides were genotoxic.

118.    When the International Agency for Research on Cancer (IARC) reviewed glyphosate in 2015, it found "***strong evidence***" of both genotoxicity and the capacity to induce oxidative stress in cells, two mechanisms that can lead to cancer.

119.    In the 1980s, Monsanto was aware of the potential, if not probable genotoxicity of formulated, glyphosate-based herbicides, as opposed to pure glyphosate active ingredient.

120.    In response and to this day, the company has worked diligently, and with great success, to avoid having to conduct any further, or more sensitive internal or external genotoxicity studies on formulated Roundup and/or other glyphosate-based herbicides.

121.    In my opinion, Monsanto did not want to test their formulated glyphosate-based herbicides because they expected such studies to produce positive evidence of genotoxicity.

122.    Any positive genotoxicity assay results would have to be, by law, provided to the EPA. Such data would, in turn, almost certainly lead to new, EPA-mandated restrictions on where and how Roundup herbicides could be used, especially on Roundup labels sanctioning non-agricultural applications with backpack or hand-held sprayers, such as those used by the plaintiff in this case, Dewayne Johnson.

123.    Almost inevitably, such new studies would curtail glyphosate FTO, at least to some degree.

124.    In 1997 Monsanto reached out to Dr. James Parry, a prestigious, independent academic genotoxicity expert that Monsanto was cultivating as a possible "glyphosate-friendly" spokesperson. To test Parry's scientific beliefs and judgements on glyphosate genotoxicity, Monsanto asked Parry to conduct a preliminary assessment of what he learned from a review of

several published genotoxicity studies on glyphosate and/or glyphosate-based herbicides.

125.    Following his review, Parry prepared and submitted a detailed report to Monsanto acknowledging some evidence of genotoxicity. Dr. Parry also recommended that Monsanto undertake a set of more sensitive genotoxicity studies on glyphosate *and* formulated Roundup herbicides, to determine if the findings reported in earlier studies were replicable, and hence real.

126.    Parry and some Monsanto scientists were in agreement that improved, new and more sophisticated genotoxicity studies should be carried out to resolve lingering questions.

127.    In response, Monsanto planned to first do similar tests in-house, in order to know what to expect if Dr. Parry, or another scientist, was funded to do the studies.

128.    The implication is clear – the results of their internal studies would dictate how, and whether they proceeded to commission the new studies, rather than the recognized need for better studies and more reliable genotoxicity data.

129.    Over many years and consistently, Monsanto has provided funding to friendly scientists that invariably challenge and criticize the design, implementation, and/or findings of studies producing results not aligned with Monsanto's internal studies on the genotoxicity of glyphosate and/or Roundup, most of which are negative.

130.    Monsanto has commissioned, and ghostwritten portions of at least four purportedly "independent" scientific reviews on the genotoxicity of glyphosate and/or glyphosate-based herbicides. Each one concludes there is no credible evidence to suggest glyphosate or Roundup herbicide poses a genotoxic risk.

131.    This fundamental scientific mistake was perpetuated by the reticence of Monsanto to test the genotoxicity of Roundup herbicides formulated with POEA surfactants, and Monsanto's dogged determination to dissuade independent scientists and regulators from

conducting such tests.

132.     The failure by Monsanto to properly test for genotoxicity is, in my opinion, one of the primary reasons that the EPA, and other regulatory authorities, have failed for nearly a half-century to recognize the potential for glyphosate-based herbicides to increase the risk of NHL and other cancers in humans.

### 3. Failure to Test Formulated Glyphosate-Based Herbicides

133.     Over the entire history of glyphosate use and regulation, Monsanto has worked diligently, and with considerable success, to **not** test its formulated Roundup herbicides.

134.     When independent scientists have conducted and published studies on formulated, glyphosate-based herbicides, Monsanto always aggressively challenged the studies, but only if they produced positive results.

135.     This pattern of behavior no doubt has discouraged scientists from conducting experiments using formulated glyphosate herbicides.

136.     The 40+ year absence of well-designed and carefully conducted short-term genotoxicity and long-term chronic feeding studies using formulated glyphosate-based herbicides is the most significant source of uncertainty in the current appraisal of the link between use of, and exposure to glyphosate-based herbicides and human health risks.

137.     Monsanto perpetuated this uncertainty through its systematic actions, and inadvertently set the stage for the explosive impact of the review of the carcinogenicity of glyphosate and Roundup herbicides issued by the IARC in March 2015.

138.     The record shows clearly that Monsanto knew that the risks posed by formulated Roundup herbicides were considerably greater than the risks posed by pure glyphosate, because some of the inert ingredients in Roundup are more toxic than glyphosate itself, and the inert

ingredients in Roundup increase the amount of glyphosate reaching and penetrating cell walls, hence increasing the risk of adverse impacts in exposed humans.

139.    Instead of using sound science to better understand, and then reduce, the heightened risks stemming from use of the formulated herbicides applied by Dewayne Johnson, Monsanto used its resources and considerable influence to perpetuate the focus of glyphosate testing on an herbicide no one ever used, nor was ever exposed to -- 100% pure glyphosate.

## E. Influencing Regulators and the Scientific Community

140.    The goal of Monsanto's engagement with independent scientists was succinctly stated in an internal, May 26, 1999 email. The goal is to encourage "… people to get up and shout Glyphosate is Non-toxic." (MONGLY00904009)

141.    "Non-toxic" is not an accurate description of glyphosate or Roundup herbicides. Yet through advertising and promotional material, and the messaging advanced by sales staff, Monsanto systematically worked to convince the general public that Roundup is, in fact, safe because it is "non-toxic."

142.    Dewayne Johnson was told by his supervisors that Roundup was safe enough to drink, a dangerous and disingenuous claim that is frequently voiced but has rarely been challenged by Monsanto. After his diagnosis, Johnson contacted the Missouri Poison Control Center and asked if it was safe for him to continue applying Ranger Pro herbicides, and was told his symptoms were not an expected response from exposure to the product.

143.    The more formal statement of the "Overall purpose" of Monsanto's "Glyphosate Scientific Outreach Plan," or SO Plan, appears at the beginning of a June 1999 document describing the SO plan:

> "Ensure that Monsanto's glyphosate-containing herbicides are widely viewed throughout the scientific community as posing no threat to human health or the environment. This

support will be used to favorably influence current and future possible challenges in the regulatory and public arena." (GLYMON00904774)

**1. Cherry Picking Science**

144.    The record in this case shows that Monsanto does not, in general, use science in the organized pursuit of knowledge and deeper understanding of the potential human and environmental risks associated with use Roundup herbicides, but rather to gain new product registrations, and defend the company's Freedom to Operate, especially when placed in jeopardy by new information regarding potential risks.

145.    Monsanto has conducted internal testing to determine what a similar, new study done by another scientist or laboratory is likely to show, prior to committing to pay for the new study by an independent laboratory, the results of which might have to be submitted to the EPA.

146.    The reason is clear – Monsanto's priority is to invest testing dollars in gaining new registrations and preserving glyphosate FTO, not to contribute to the science-base needed for refined, more accurate risk assessments and more effective worker-safety label precautions and requirements.

147.    Again, in many instances discussed in this report, Monsanto has selectively drawn upon the results of studies, in effect cherry-picking the findings most favorable to its position and desired outcome, while ignoring, or criticizing findings that caste a less favorable light on the safety of glyphosate and Roundup herbicides.

148.    In the case of some studies, remarkably, Monsanto does both, highlighting a finding that is aligned with its position, and in general endorsing the quality of the study, only to then elsewhere criticize the study and some negative finding it reports.

149.    Monsanto's abuse of science is so systematic and consistent that it seems to track some, perhaps unstated, internal company policy.

150.    In every aspect of its "Scientific Outreach" program, in communications with regulators, in public presentations and commentary, and in the ghost-written materials the company or its contractors generate and insert in peer-reviewed papers authored by purportedly independent scientists, Monsanto spins science to support its FTO and attain the company's regulatory objectives.

151.    The company almost never uses science as a structured path to deeper insights on the properties and toxicity of its products, so that better ways can be identified to use them safely.

### 2. Failure to Impose Needed, Commonsense Worker-Safety Provisions

152.    Monsanto repeated failures to assist regulators in developing more accurate assessments of worker-safety risks is a clear and consequential breach of the company's pledge to adhere to the best science available, and serve as a responsible steward of Roundup herbicide products.

153.    Grave consequences have occurred for some applicators of Monsanto herbicides like Dewayne Johnson, as a result of Monsanto's failure to propose and/or agree to more restrictive worker-safety provisions, especially in known, high-exposure application scenarios.

154.    Monsanto's egregious lack of concern for product stewardship, and the safety of applicators spraying the company's herbicides, substantially increased Mr. Johnson's exposures, and hence his risk of NHL.

## II. Expert Background and Qualifications

155.     I received a B.A. in Economics from Harvard University in 1971, and a Ph.D. in Agricultural Economics from the University of Wisconsin in 1980.  I have worked on the impact of agricultural technology on pesticide use, efficacy, and risks, as well as on public health and farmer costs for nearly 40 years.

156.     My work has also encompassed the impacts of regulatory policies, requirements, actions, and laws on pesticide use, dietary exposure, worker risks, pest management systems, and food quality and safety.

157.     I was the Staff Director of the Subcommittee on Department Operations, Research, and Foreign Agriculture (DORFA) of the House Committee on Agriculture for three years (1981 to 1983). This Subcommittee had jurisdiction over the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), the primary federal statute governing pesticide regulation.

158.     During this period, I organized several DORFA hearings on pesticide issues, and worked with Members of Congress in drafting potential changes in federal laws impacting the Environmental Protection Agency's (EPA) Office of Pesticide Programs (OPP). During my tenure as the DORFA Staff Director, around one-half of the time and focus of the Subcommittee was devoted to pesticide regulatory issues.

159.     I made dozens of visits to OPP headquarters during this time-period, collecting information and speaking with OPP management, staff, and scientists on issues that had been brought to the attention of the Subcommittee, as well as issues of concern to OPP. These visits resulted in the flow of substantial information from OPP to the Subcommittee. Information provided by OPP/EPA helped the Subcommittee prioritize the issues addressed in forthcoming

Subcommittee hearings, and/or in need of legislative intervention.

160.    On behalf of the Subcommittee, I organized several hearings on pesticide regulatory activities, issues, and controversies. This entailed drafting a hearing charter (purpose, focus, goals), identifying and securing the participation of witnesses, managing the flow of information submitted as part of delivered testimony and follow-up question from Subcommittee members, and preparing the hearing report issued by the House Committee on Agriculture, on behalf of the Subcommittee.

161.    The Subcommittee carried out a two-year investigation of pesticide regulatory policy and issues, with a principle focus on OPP/EPA activities. Several controversial areas of EPA action, or inaction, arose during the investigation. These included the OPP/EPA and industry response to the IBT scandal, the role of state versus federal government agencies in pesticide regulation, the way known or possible carcinogenic pesticides were regulated, the timeliness of OPP decision-making, the burden of proof governing OPP/EPA suspension and cancellation actions, the cost of program activities and possible need for user fees, among other issues.

162.    During the DORFA investigation of OPP/EPA activities, I visited OPP in Crystal City multiple times. I met many times with managers in the various divisions of OPP, as well as with many staff scientists in the residue chemistry, toxicology, and registration divisions. I interacted with several of the OPP administrators and staff who were responsible at the time, and in subsequent years, for various aspects of OPP's assessment and regulation of glyphosate herbicides.

163.    The DORFA Subcommittee investigation culminated in the publication of a Subcommittee report (Volume I), and three supporting volumes of information (Volumes II-IV).

.

164.     The IBT toxicological data scandal was among the issues explored in the Subcommittee's investigative report and supporting volumes. At the request of the Subcommittee, OPP provided a detailed accounting of the pesticide-company studies submitted to OPP from IBT. The list included several studies commissioned by Monsanto on glyphosate. In fact, most of the initial data supporting the first regulatory decisions on glyphosate in the 1973-1980 period was from IBT, and was subsequently deemed invalid and/or fraudulent. All such studies had to be replicated, and were replicated during the 1980s and 1990s.

165.     While serving as the DORFA Subcommittee Staff Director, I met multiple times with Mr. Chester Dickerson. Mr. Dickerson worked for Monsanto and was based in the corporation's Washington, D.C. office. Mr. Dickerson attended virtually every pesticide-related hearing conducted by the Subcommittee in the time period I worked as Staff Director. I had lunch dozens of times with Mr. Dickerson, who was generous with his time and shared his extensive knowledge of the pesticide regulatory process and pesticide issues in general.

166.     Mr. Dickerson advanced his, and Monsanto's views regarding the way the OPP was implementing federal law, the OPP response to the IBT scandal, and the subsequent steps Monsanto took to replace fraudulent data. Other common topics of discussion included the need for legislative reforms, a variety of pesticide risk assessment issues, including how known or possible carcinogenic pesticides are regulated.

167.     From 1984-1990 I served as the Executive Director of the Board on Agriculture, a major unit of the National Academy of Sciences/National Research Council (NAS/NRC).

168.     In February 1985, the EPA "asked the Board on Agriculture (BA) of the National Research Council to study the EPA's methods for setting tolerances for pesticide residues in

food. Specifically, the EPA asked the board to examine the current and likely future impacts of the Delaney Clause on the tolerance-setting process" (quote from preface, *Regulating Pesticides in Food: The Delaney Paradox*, NAS, 1987).

169.    My job was to support the BA's work in recruiting the study committee, collecting necessary information and records from the OPP/EPA, commissioning and overseeing analytical work in support of the Committee's deliberations, and drafting the Committee's report, which was entitled *Regulating Pesticides in Food: The Delaney Paradox.*

170.    The report was released in 1987, and estimated the level and distribution of potential cancer risk across foods in the diet, stemming from the about 2,500 tolerances covering the residues in food of 53 oncogenic pesticides. It also called for the reform of the Delaney Clause's paradoxical impact on pesticide tolerance setting, and the EPA's and industry's efforts to reduce pesticide-related cancer risk in food.

171.    In 1988, the Congress directed the EPA to request the Board on Agriculture of the NAS/NRC to conduct a study on the unique vulnerability of pregnant women, infants, and children following pesticide exposures. This new study was commissioned as a follow-up to the *Delaney Paradox* report.

172.    As ED of the Board on Agriculture, I developed the scope of work, helped the Board identify and recruit the study committee, and supported the initial 2.5 years of the Committee's work. I left my position as the ED of the Board on Agriculture in late 1990.

173.    The report written by the new NAS/NRC Committee was entitled *Pesticides in the Diets of Infants and Children*. It was released in June, 1993. Hearings on the report were held in both the House and Senate on the day of release. The recommendations were widely embraced both by the pesticide industry and environmental/consumer advocates, and provided the basic

framework for an historic piece of legislation that was passed and signed into law in the summer of 1996, the "Food Quality Protection Act" (FQPA).

174.    I started Benbrook Consulting Services (BCS) in late 1990. Since that time BCS has carried out several dozen projects involving pesticide use, risks, and regulation for federal and State government agencies, companies, private institutions, and non-governmental organizations.

175.    In the 1990s, several BCS projects involved analytical work on risks stemming from residues of cancer-causing pesticides in food. The impact of the Delaney Clause was a focus of all such projects, as was the long-standing effort by the Congress to pass legislation implementing the recommendations in the 1987 and 1993 NAS/NRC reports.

176.    BCS's major client in the 1993-2002 period was Consumers Union (CU), publisher of *Consumer Reports*. I was hired initially to work with senior CU staff in writing a book on pest management and pesticide use/regulatory issues in the U.S. *Pest Management at the Crossroads* (*PMAC*) came out in October 1996 and was widely disseminated and often-discussed in pesticide policy circles.

177.    Chapter 3 in *PMAC* addressed human-health risks stemming from pesticide use and exposure, and notes that "More than 70 active ingredients cause cancer in animal tests, and cancer has been the most common reason cited by the EPA in pesticide cancellation and suspension actions."

178.    Chapter 4 in *PMAC* focuses on pesticide regulation and includes a detailed explanation of the purpose, provisions, and impact of the recently-passed Food Quality Protection Act, with multiple references to both the 1987 and 1993 NAS/NRC reports.

179.    The FQPA changed the basic standard and risk-assessment process governing the

setting of tolerances in the case of possibly cancer-causing pesticides that concentrate in processed foods.

180.     The FQPA's core provisions were effective upon enactment, but required the EPA to revisit the 8,066 tolerances covering residues of pesticides then on the market. These included 130 tolerances covering all forms of glyphosate and its metabolites, as well as 14 additional tolerances covering residues of the isopropylamine salt form of glyphosate (the primary form of glyphosate sold by Monsanto).

181.     From late-1996 through about 2002 I continued work with Consumers Union on the implementation of the FQPA. I carried out multiple analytical projects for CU, the results of which were typically included in rule-making comments to the EPA on various aspects of FQPA implementation. BCS also worked on FQPA implementation issues for other clients.

182.     In 1996, the first genetically-engineered (GE), herbicide-resistant (HR) soybean and cotton seeds were commercially sold. These crops had been engineered to tolerate post-emergent applications of glyphosate (i.e., an application over-the-top of a growing crop), and were labeled "Roundup Ready" crops. Applied in this way, at this stage of crop growth, glyphosate killed actively growing weeds in farm fields, but left the crop unharmed.

183.     The commercialization of GE-HR crops triggered rapid growth in the overall sales and pounds applied of glyphosate in the U.S., and globally.

184.     I began Ag Biotech InfoNet in 1998, a website covering the use, risks, and regulation of genetically engineered crops. The website grew incrementally through the early 2000s, but was taken off the Internet around 2005. Herbicide-resistant crops, and especially Roundup Ready crops, were a major focus of the website, as was the use and regulation of glyphosate-based herbicides.

185.     Beginning in 1996, Monsanto and pesticide and biotechnology industry trade associations and spokespeople claimed repeatedly that GE crops were reducing overall pesticide use.

186.     As part of my ongoing analytical work since the early 1990s, I download the pesticide use data collected and released annually by the U.S. Department of Agriculture (USDA). Each year I track changes in herbicide use, as well as overall pesticide use in the three major GE crops – soybeans, corn, and cotton.

187.     It was clear to me by the early 2000s that both herbicide and overall pesticide use was rising on acres planted to GE-HR soybeans, corn, and cotton, and that Monsanto claims that its new, GE crops were reducing pesticide use were not supported by official USDA pesticide use data.

188.     In 2003 I released the first of several reports on the impacts of GE crops on pesticide use. Ag BioTech InfoNet Technical Paper #6 was issued in 2003, and documented the increase in overall pesticide use on GE soybeans, corn, and cotton from 1996 through 2002. In 2004, Ag BioTech InfoNet released Technical Paper # 7, quantifying the impact of GE crops on pesticide use over the first nine years of use.

189.     During my tenure as Chief Scientist of The Organic Center (TOC), I wrote and issued a November 2009 "Critical Issue Report" covering the impact of GE crops on pesticide use over the first 13 years of use. And in October 2012, I published a paper entitled "Impacts of genetically engineered crops on pesticide use in the U.S. – the first 16 years" in the peer-reviewed journal *Environmental Sciences Europe*.

190.     Each of the reports I wrote on the impact of GE crops on overall pesticide use highlighted the role of rapidly rising use of glyphosate-based herbicides in pushing upward the

overall pounds of pesticides applied by U.S. soybean, corn, and cotton farmers.

191.    The reason why was obvious and not in dispute – farmers who planted Roundup Ready crops switched from herbicides applied at a rate ranging from 0.01 pound per acre to over 1.0 pounds, and averaging about 0.3 pounds per acre, by glyphosate-based herbicides applied at an average rate per crop year of between 1.2 and 2.5 pounds of glyphosate per acre.

192.    In 2016, I published the first complete accounting of the use of glyphosate-based herbicides in the U.S. and globally, based on publically available pesticide use data. The paper was entitled "Trends in glyphosate herbicide use in the United States and Globally" and was published in *Environmental Sciences Europe* (Vol 28:3; DOI 10.1186/s12302-016-0070-0).

193.    Also in 2016, I was the principle and senior author of a paper entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement" that was published in the peer-reviewed journal *Environmental Health* (Volume 15:19; DOI 10.1186/s12940-016-0117-0).

194.    From late 1990 through 2006, I ran BCS and all my work was via contracts with BCS.

195.    From 2006 through mid-2012, I worked as the Chief Scientist of The Organic Center, a small non-profit responsible for tracking new science on the environmental and consumer health impacts of organic food and farming. The impact of organic farming on pesticide use and risks was an ongoing focus during my tenure as TOC Chief Scientist.

196.    I took a non-tenure track Research Professor appointment at Washington State University in June 2012, a position I held for three years. During this time, I ran the "Measure to Manage" program. Our focus was development and application of analytical tools useful in quantifying the impact of agricultural technology and farm production systems on agriculture's

environmental footprint and public health outcomes.

197.    As a result of multiple research collaborations with Newcastle University scientists, I was appointed as a Visiting Professor in the School of Agriculture, Food and Rural Development, Newcastle University in the United Kingdom.

198.    In March 2017, I became a Visiting Scholar in the Department of Environmental Health and Engineering in the Bloomberg School of Public Health, Johns Hopkins University.

199.    Both of these academic appointments are ongoing.

200.    My resume appears in Appendix A.

# III. The EPA Pesticide Regulatory Decision Process

201.    The data requirements, risk assessment protocols, and decision criteria supporting

pesticide regulatory decisions made by the OPP/EPA change incrementally over time. The

changes have, to varying degrees, tracked scientific advances in the underlying residue

chemistry, toxicology, and environmental sciences.

202.    Sorting out the impact of changes over time in data requirements, study protocols,

risk assessment methods, decision criteria governing OPP/EPA regulatory actions, and politics is

a complex endeavor, especially in the case of a pesticide like glyphosate that has been registered

by EPA since the mid-1970s and gone through so many profound changes in use patterns, test

results, and risk assessments.

203.    Changes in when, where, how, and how widely a pesticide is used often occur

over time, and such changes typically alter exposure and risk levels in ways that are hard to

predict, or even detect. This is surely the case with glyphosate, an herbicide that has come to be

used in several major ways beyond those covered by the original Roundup labels granted by

EPA in the late 1970s.

## A. Three Major OPP/EPA Actions and Decisions

204.    There are three major types of pesticide regulatory actions and/or decisions made

by the OPP/EPA: (1) a "yes"/"no" response, or a conditional or amended "yes," to a petition

from a pesticide manufacturer asking the EPA to establish new tolerance(s) covering residues of

a pesticide in food(s) derived from a crop or crops for which the pesticide will be labeled for use;

(2) a "yes"/"no" response, or an amended or conditional "yes," to an application from a pesticide

manufacturer for a registration (i.e. label) authorizing a new pesticide product for use on

specified crops under defined conditions; and (3) a cancellation, suspension, or refusal to re-

register an existing registration for a pesticide already on the market; or, re-registration of an

existing product under different, and usually restricted terms and conditions.

205.     Each of these three major types of decisions/actions arises from well-defined

OPP/EPA application, review, risk assessment, and approval/denial processes. These processes

typically require companies to conduct new studies and submit new data to the agency.

206.     Once all, or most of the requested and/or required information is submitted to

OPP, a scientific review is undertaken of submitted studies in the residue chemistry, toxicology,

or environmental effects branches.

207.     OPP staff determine whether: (1) all required studies have been undertaken and

submitted, (2) the studies were conducted in accord with Good Laboratory Practices (GLP) and

other requirements set forth in EPA guidance and policy documents, and (3) study results

support the "gateway" OPP action(s) or decision(s) requested by the applicant/registrant.

208.     By "gateway actions," I mean actions or decisions that OPP/EPA must make prior

to approving a new registration application. The three most important are:

 (1) The setting of a tolerance level at "x" parts per million in food "y." Tolerances are set at a
level to cover residues of the pesticide likely to be in crop "y" at harvest after an application
made in accord with all label directions, or in foods made from crop "y".
(2) Establishing a mammalian (i.e. human) chronic Reference Dose at "z" milligrams of
pesticide per kilogram of bodyweight. A cRfD is the key human-exposure benchmark that
approved registrations of a pesticide cannot exceed.
(3) Whether the pesticide has potential to cause cancer. Pesticides are classified by OPP/EPA as
a possible, probable, or proven oncogene, or not carcinogenic, or unknown.

### 1. Applications to Register a New Pesticide

209.     In the case of an application for a food crop use, or uses, of a new pesticide active

ingredient, the OPP must decide which data requirements must be satisfied prior to making a

final "yes"/"no" decision. Required and submitted studies must be evaluated by OPP for

adherence to study protocols and GLPs set forth in OPP's detailed data requirements spelled out

Section 408 of the Code of Federal Regulations.

210.    Any required tolerances covering residues of the pesticide in foods derived from treated crops must be approved and in place prior to OPP action in response to a registration application.

211.    Companies generate studies and collect other data to submit to the OPP in support of requested actions. Registrant-generated materials submitted to OPP include: (1) suggestions and/or requests to establish tolerances in specific foods at a defined level expressed in parts per million of the pesticide (measured by weight of the pesticide and food); and (2) a suggestion to establish the pesticide's chronic Reference Dose at a given level, expressed as milligrams of pesticide per kilogram of bodyweight per day. (A pesticide's chronic Reference Dose (cRfD) establishes the maximum amount of the pesticide that a person of known weight can be exposed to in a day, without exceeding the EPA's "level of concern").

212.    In the event estimated exposures exceed the EPA's "level of concern," the agency will either request additional data to refine its estimates of exposure and risk, or impose restrictions on labeled uses that bring expected exposures below the agency's "level of concern".

213.    Once all requested data is submitted and deemed acceptable (i.e., it satisfies OPP-imposed data requirements), OPP science-branch managers must then determine whether submitted studies support the actions requested by applicants (set a tolerance, register a new use of a pesticide). The key decision criterion is whether the exposure levels likely to occur following use of a pesticide in accord with its label directions might exceed EPA's "level of concern."

214.    Such "levels of concern" vary depending on: (1) the exposed organism; (2) the age and vulnerability of population groups; (3) the type of risk under review (e.g., acute, chronic,

reproductive); and (4) the magnitude, persistence, and reversibility of any possible adverse effects.

215.    The level of certainty/uncertainty in OPP/EPA exposure or risk assessments also plays a role in determining whether the agency's "level of concern" has been exceeded.

216.    The EPA will approve the registration of a new pesticide if all applicable data requirements are satisfied, and no estimated exposure levels for non-target organisms (e.g., people, birds, bees, fish), exceed EPA's "level of concern."

217.    In some cases, the OPP/EPA will grant a "conditional registration" for a new pesticide, or a new use of a previously registered pesticide. Such registrations are accompanied by a requirement that the registrant must conduct and submit additional studies or data to OPP by a given date.

### 2. Actions Impacting the Future Use of an Already-Registered Pesticide

218.    In the case of re-registration, cancellation, and suspension actions impacting already-registered pesticide uses, the EPA is bound by the FIFRA statute to balance the risks and benefits associated with ongoing, or altered use of the already-registered pesticide.

219.    As stated in the 1996 Consumers Union book *Pest Management at the Crossroads*, "New pesticides are guilty until proven innocent, with applicants bearing the burden of proof. Old pesticides are innocent until proven guilty, with EPA bearing the burden of proof" (page 93).

220.    Before restricting the use of a previously registered pesticide, OPP must first show that: (1) exposure levels to one or more non-target organisms (and especially people), exceed the EPA's level of concern, and (2) the risks stemming from the ongoing use of the pesticide exceed the benefits flowing from such uses.

221.     To make judgements regarding risks versus benefits, the OPP must carry out detailed assessments of how a given pesticide is used on a given crop, pesticide efficacy (number and severity of pests controlled, how well are they controlled, and for how long), how use varies across the country, the cost of the pesticide plus its application, and what combination of factors can lead to exposures above EPA's level of concern.

222.     This use-specific information is essential for EPA to identify relatively high-risk uses, as well as options to reduce exposure levels. At the end of its assessment of pesticide uses, benefits, and risks, the OPP must decide whether restricting or cancelling the use of a pesticide will cause unacceptable crop losses or damage, and/or force farmers to increase reliance on another pesticide that might pose even more serious risks.

## B. Impacts of OPP Cancer Determinations in Tolerance Setting

223.     The terminology used in describing the potential of pesticides to cause or increase the risk of cancer is important, and can be confusing. This report adheres to the common definitions of terms in the OPP/EPA, as well as in the scientific community.

224.     An *oncogen* is a chemical thought to possibly increase the risk of triggering growth of benign and/or malignant tumors. A *carcinogen* is a substance thought to trigger the growth of malignant tumors. *Oncogenicity* is the capacity to cause or amplify growth of benign or malignant tumors, while *carcinogenicity* is the capacity to trigger or amplify growth of cancerous, malignant tumors.

225.     The EPA was formed in 1972. According to a 1994 EPA document, cancer risk had been, at that point in the agency's history, the most commonly cited reason for OPP pesticide cancellation and suspension actions (*Status of Pesticides in Reregistration and Special Review*, 738-R-94-008).

226.     As of the mid-1980s, the NAS/NRC report *Regulating Pesticides in Food – The Delaney Paradox* identified about 2,500 tolerances covering residues of 53 food-use pesticides thought by EPA to pose some level of cancer risk (NAS/NRC, 1987).

227.     As of June 1986, there were 8,477 food tolerances in the Code of Federal regulations, so about 30% of all tolerances covered uses of possibly oncogenic pesticides (data on number of tolerances from Table 2-1, p. 35, NAS/NRC, 1987)

228.     Congressional hearings conducted by the DORFA Subcommittee in 1981-1983 included extensive testimony from OPP officials, the pesticide industry, and consumer health advocates on OPP/EPA methods and policies governing the regulation of possibly cancer-causing pesticides.

229.     Special focus was directed to the conundrum faced by OPP/EPA in working through sometimes conflicting statutory standards applicable to the tolerance setting process in the case of certain possibly oncogenic pesticides. The "Delaney Paradox" arises from the conflicting mandates in the two statutes governing the tolerance setting process.

230.     The Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) is the dominant statute governing pesticide regulation. It directs the OPP/EPA to apply a risk/benefit balancing standard in deciding whether to approve a pesticide registration, reregister an already-approved pesticide use, or cancel or suspend an existing registration.

231.     According to the OPP –

"Before EPA may register a pesticide under FIFRA, the applicant must show, among other things, that using the pesticide according to specifications 'will not generally cause unreasonable adverse effects on the environment.' FIFRA defines the term 'unreasonable adverse effects on the environment' to mean: '(1) any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide, or (2) a human dietary risk from residues that result from a use of a pesticide in or on any food inconsistent with the standard under section 408 of the Federal Food, Drug, and Cosmetic Act.'" (quote from *Summary of the Federal*

*Insecticide, Fungicide, and Rodenticide Act*, https://www.epa.gov/laws-regulations/summary-federal-insecticide-fungicide-and-rodenticide-act)

**1. Setting Tolerances under Sections 408 and 409 of the FDCA**

232.    A second federal statute establishes the authority for OPP/EPA to set tolerances -- the Food, Drug, and Cosmetic Act (FDCA). Section 408 was added to the FDCA in 1954 in order to provide a mechanism for the Food and Drug Administration (FDA) to control pesticide residue levels in food.

233.    Section 408 authorizes the establishment of tolerances in raw agricultural products at the point such products would typically leave the farm gate. Section 408 requires that such tolerances be set at levels deemed necessary to protect public health. Residues in excess of the applicable tolerance render food adulterated, and hence unlawful for sale.

234.    Responsibility for establishing tolerances under Section 408 was granted to the EPA upon formation of the agency in 1972.

235.    Section 409 of the FDCA provides the FDA general authority to regulate food additives – "any substance the intended use of which results or may reasonably be expected to result…in its becoming a component of the food." (21 USC § 321(s) [1984]).

236.    Section 409 goes on to exempt pesticide residues in food up to the level authorized by a Section 408 tolerance applicable to the given food, in recognition of the fact that such levels are subject to control via the tolerance setting process.

237.    However, in some cases, pesticide residues in raw agricultural commodities concentrate in processed agricultural products, or food ingredients derived from the raw agricultural commodities. Common examples include residues in raisins, in contrast to the grapes the raisins come from (and indeed any dried food); milling wheat to produce wheat germ and flour; making tomato paste or ketchup from raw tomatoes; or, extracting oils from crops like

canola, soybeans, or olives.

238.    As in the case with Section 408, EPA has been granted the responsibility of setting tolerances under the authority granted in Section 409 of the FDCA.

239.    In the 1958, Congress amended Section 409 of the FDCA to include the so-called Delaney Clause (named after its author, New York Congressman James Delaney).  The clause states that "the Secretary of the Food and Drug Administration shall not approve for use in food any chemical additive found to induce cancer in man, or, after tests, found to induce cancer in animals."

240.    The Delaney Clause applies to all food additives regulated under Section 409 of the FDCA, including pesticide residues in processed foods that concentrate above the level in the corresponding raw agricultural commodity.

241.    Based on the EPA's interpretation of the requirements in Section 409, the key factor in determining whether a Section 409 tolerance must be granted is whether a pesticide residue concentrates in a processed food above the level typically found in the raw agricultural commodity, *not* whether the level in the processed food is expected to exceed the Section 408 tolerance level.

242.    In the 1980s and 1990s, EPA denied the registration of several new pesticides and/or new uses of an already-registered pesticide that OPP had classified as a possible oncogen, because a Section 409 food-additive tolerance was required.

243.    Glyphosate was among the pesticide active ingredients that was directly impacted by the Delaney Clause from 1983 into the 1990s, by virtue of OPP's classification of glyphosate as a possible human carcinogen in 1983.

# IV. Early EPA Actions on Glyphosate Herbicide and Monsanto Efforts to Influence the OPP's Evaluation of Glyphosate Toxicity

244.    The Office of Pesticide Programs in EPA processed the initial tolerance petitions and registration applications for Monsanto's new herbicide, glyphosate, in the 1974-1977 period, just after the formation of the EPA in 1972.

245.    Glyphosate is a broad-spectrum herbicide that kills any growing plant, whether regarded as a weed or a crop. It also kills most vines, shrubs, and trees. The herbicide is most effective when sprayed on young and immature plants; higher doses are required to kill well established, mature plants, vines, and trees.

246.    By virtue of the indiscriminate nature of glyphosate, the herbicide cannot be sprayed on any crops, trees, vines, or other desirable vegetation after the plants had germinated and were growing above the ground. Glyphosate could be sprayed after crop harvest to kill any surviving weeds and plants.

247.    At the time Monsanto requested the first registrations for its Roundup herbicide containing the active ingredient glyphosate, the company envisioned that glyphosate would be used for general weed control: (1) in industrial settings like lumber yards, electrical transmission facilities, along roads and railroad tracks, and within a variety of other rights of way, (2) to kill early-germinating weeds prior to the planting of a crop, or the crop's emergence, (3) on fields that farmers want to remain fallow, but largely weed free, and (4) after a crop is harvested.

## A. Initial Approved Uses and Tolerance Actions

248.    The first EPA actions on glyphosate occurred in 1974, and approved of temporary tolerances for the combined residues of glyphosate and its metabolite aminomethylphosphonic acid (AMPA) in the crops harvested from 9,715 acres of experimental uses of glyphosate. The

temporary tolerances requested were: corn fodder and foliage at 0.5 ppm; cottonseed and cotton forage and hay at 0.5 ppm; and corn, soybean, and wheat grain at 0.1 ppm.

249.    The above temporary tolerances, along with similar tolerances on several other crops, were approved and eventually became permanent tolerances, in response to tolerance petitions 4G1444, 5G1523, 5G1561, and 5F1560.

250.    The first agronomic crops on which glyphosate herbicides were registered for use were cotton and soybeans. On March 5, 1976 Monsanto requested EPA to establish temporary tolerances on cottonseed and cotton forage, and soybean grain, hay, and forage, in order to allow harvest and use of crops grown under an Experimental Use Permit. (MONGLY03579293)

251.    EPA approved Monsanto's request for temporary cotton and soybean tolerances in a letter dated September 7, 1976. The tolerances would be in effect for one year.

252.    The letter goes on to alert Monsanto that: "A food additive tolerance is being established for residues of glyphosate and its metabolite in soybean hulls at 20 ppm." So, from September 1976, Monsanto was aware that it would have to request, and EPA approve, food additive tolerances for at least some, and indeed likely most, proposed glyphosate food crop uses.

253.    Such tolerances were then subject to the Delaney Clause and would not be approved by EPA in the event glyphosate was determined to be a possible animal or human oncogen.

254.    Over the next 10+ years, several other applications for Experimental Use Permits were submitted and most were granted by EPA, sometimes in a modified form. In addition, most of the requests for the temporary tolerances required to allow crop harvest and use were approved. Several approval letters from EPA to Monsanto contained a similar paragraph

explaining that the agency had also established Section 409 food additive tolerances, on a temporary basis.

255.     Both the number and scope of pending temporary and permanent tolerance petitions expanded steadily during the late 1970s, as did the number of tolerances that were granted.

256.     The status of OPP actions on 21 pending glyphosate tolerance petitions is discussed in a March 15, 1977 Toxicology Branch memo by Raymond Landolt. It identifies the data supporting existing tolerances, the need for some additional studies, and corrects an error in an earlier memo regarding the no effect level in a three-generation rat reproduction study.

257.     It also includes the following passage: "TB [Toxicology Branch] memo of June 4, 1974 concluded that 'the residue on human food crop are negligible and the fraction that is non-extractable would be sufficiently low to be toxicologically insignificant.'"

258.     In 1975, permanent tolerances covering the combined residues of glyphosate and AMPA were established at 0.1 ppm for corn and soybean forages and grain, as well as for wheat, sorghum, oats, and barley grain and forages. With the exception of soybeans and the wheat straw tolerances, the above tolerances remained in place at the 0.1 ppm until 1996.

259.     The tolerances were increased 10- to 40-fold in 1996, to cover the much higher residues stemming from new and emerging uses of Roundup herbicide.

260.     On February 21, 1986, Monsanto submitted an application to OPP/EPA seeking registration of preharvest use of glyphosate on soybeans. Such uses were intended to kill the growing plants to accelerate harvest and/or prepare the fields for the planting of another crop. (MONGLY03692349) The application included a list of proposed changes in soybean tolerances required to cover residues in soybean grain (up to 20 ppm, from 6 ppm), and soybean hay (up to

200 ppm, from 15 ppm). In addition, Monsanto acknowledged that a Section 409 food additive tolerance in soybean hulls would be required, and proposed that it be set at 100 ppm.

261.    As long as EPA considered glyphosate a possible oncogene, approval of the Section 409 tolerance would likely not occur. For example, in an April 18, 1985 memo to the Registration Division and Toxicology Branch from the Residue Chemistry Branch, R.W. Cook reviews a pending tolerance petition that requests increases in glyphosate plus AMPA tolerances in wheat grain and wheat straw. The memo states: "4b. TOX has concluded (W. Dykstra, 3/19/85) that food additive tolerances for glyphosate are not appropriate due to the Delaney rule." (page 4)

262.    The soybean grain tolerance was increased from 0.1 ppm to 6.0 ppm in 1985, and to 15.0 ppm in 1990, to cover residues in soybeans harvested from fields sprayed with preharvest glyphosate as a desiccant (i.e., to kill the mother plants). The soybean hay tolerance was raised to 200 ppm, and the soybean straw tolerance was set at 100ppm.  The wheat straw tolerance was raised to 40 ppm.

## B. Studies on Glyphosate Conducted by IBT Create Massive Hole in Toxicology Dataset

263.    Early interactions between OPP and Monsanto were complicated by the IBT pesticide data scandal.

264.    IBT was a major contract laboratory doing toxicological studies destined for submission to OPP/EPA for many pesticide manufacturers in the 1970s and 1980s.

265.    In 1976, a routine FDA audit of an IBT test facility uncovered problems with the conduct of some studies and lead to a thorough EPA assessment of all studies done by IBT that supported regulatory actions by OPP.

266.    Most of the initial toxicological database supporting the early tolerance petitions

and registrations of glyphosate were done by IBT. The "IBT Tracking System Report" released in 1983 notes 30 studies done by IBT on glyphosate, of which 17 were invalid and 2 were pending final judgements (Exhibit B, "Summary of the IBT Review Program," OPP, July 1983).

267.    On July 1, 1977, OPP generated a one-page summary of the eight toxicology studies used to support establishment of all existing glyphosate tolerances. All eight studies were submitted between 1972 and 1974, and all eight were done by IBT.

268.    An August 21, 1978 memo from William Dykstra of the Toxicology Branch to Robert Taylor in the Registration Branch discusses the EPA's assessment of the validity of a key, 2-year chronic oral toxicity study done in Albino rats by IBT. For a variety of reasons, the EPA judged the study to be invalid, yet it served as the basis of the then-current chronic Reference Dose of 0.1 mg/kg/day (called an ADI, or Acceptable Daily Intake in 1978).

269.    A July 27, 1982 memo from the Toxicology Division to the Registration Division reported EPA's judgement that the 2-year dog study (No. 651-00565) done by IBT for Monsanto and completed in 1973 was invalid because of missing data, failure to record diet preparation records, and other deficiencies.

270.    Accordingly, it took about a decade for EPA to determine that most of the toxicological database submitted to the agency by Monsanto in the mid-1970s, and used by EPA to support all early EUP, tolerance, and registration actions, was invalid.

271.    Problems also arose with some of the replacement studies that Monsanto commissioned to replace invalid IBT studies. In July 1979, Monsanto decided to terminate a 2-year mouse study on NNG because of excessive mortality in treated groups of animals (MONGLY04272266).

272.    Via an agreement with OPP, Monsanto repeated all of the invalid IBT studies at

different laboratories. In the interim, EPA allowed existing registrations and tolerances to remain in place.

273.    The first of the replacement studies were submitted to OPP beginning in the early 1980s. For about a decade, the early registrations and tolerances covering all uses of glyphosate were not supported by a complete set of valid toxicology studies.

## C.  Contaminants, Adjuvants, and Surfactants

274.    The EPA grants two basic types of registrations and labels for pesticides: technical use registrations and labels, and formulated, "end use" product registrations and labels.

275.    A first step in the regulatory process typically entails a chemical company applying for and gaining a technical use product label covering a product composed of 100%, or nearly 100% pure active ingredient. Such registrations are granted to basic manufacturers that are involved in pesticide discovery research and development, and own and/or operate chemical plants synthesizing pure, 100% pesticide active ingredients.

276.    The EPA labels issued for technical use products generally do not include detailed lists of approved crop or industrial uses, rates of application, or other specific use instructions. They do address proper handling, storage, and transport methods and precautions.

277.    Technical use pesticides may be used internally by the basic manufacturer to make its own brand-name formulated product, like Roundup herbicide containing glyphosate as the active ingredient and various adjuvants and surfactants.

278.    Technical use products are also sometimes sold to pesticide companies that formulate "end use" products labeled for specific uses. Such "end use" products are ready to be used and applied by farmers, applicators, home owners, land managers, or other people involved in pest management.

279.     The distinctions between technical use and end-use products are important for many reasons. Different data requirements apply. End use products often have a substantially different set of environmental fate properties, compared to the pure active ingredient(s) in them. These differences can dramatically alter the nature and outcome of both environmental and human-health risk assessments and outcomes.

280.     End-use products are often more toxic than pure active ingredients. Companies seeking and obtaining end-use product labels are responsible for a much more extensive set of decisions regarding uses, rates, and methods of application, than companies just seeking and gaining technical use registrations.

281.     In addition, end-use pesticide products contain much more complete label directions and safety precautions that collectively will, hopefully, assure that the pesticides do not cause any "unreasonable adverse effect on man or the environment."

282.     The "label is the law" is the basic statutory provision in federal law that applies to all pesticide labels. The presumption, and hope, is that when a pesticide is applied in accord with all label directions, there will be no "unreasonable" adverse impacts on people or the environment.

**1. Sources of Pesticide Product Risk**

283.     Human health and environmental risks from pesticide use can arise from three general categories of ingredients, or components, in a commercial pesticide product: (1) the active ingredient itself, (2) any impurities in the active ingredient that are formed during the manufacturing process, or as a result of a chemical reaction that occurs between the time the pesticide is made and/or mixed at a plant and applied by a user, and (3) the so-called "inert ingredients" added to essentially all end-use pesticide products (e.g., surfactants and adjuvants).

284.    "Inert ingredients" are added to liquid, end-use pesticide products like Roundup herbicide to assure that the active ingredient (glyphosate) remains thoroughly mixed and stable, is compatible with other pesticides or liquid fertilizers that might be combined in a tank-mix and applied via a single pass through a field, and sticks or adheres to whatever weeds or unwanted vegetation the herbicide is sprayed on.

285.    Herbicide adjuvants and surfactants are labeled "inert ingredients" because they do not contribute directly to the capacity of the herbicide to kill or control weeds. But several inert ingredients, by themselves, pose toxicological and/or environmental risks, and hence are not "inert" in the sense of contributing to the risk profile of an end-use herbicide product.

286.    Some of the most important, unresolved scientific and regulatory issues and uncertainties arise because of impurities in glyphosate-based herbicides and the inert ingredients incorporated in formulated, end-use glyphosate-based herbicides.

287.    Indeed, in my opinion, the near-complete, 40+ year absence of well-designed and rigorously conducted long-term chronic feeding studies on formulated glyphosate-based herbicides is the largest single source of uncertainty in the existing appraisal of the link between use of and exposure to glyphosate-based herbicides, and human health risks.

**2. Impurities in Glyphosate Active Ingredient**

288.    Since the 1970s, Monsanto scientists were aware of two impurities associated with Roundup herbicides: NNG and formaldehyde. NNG is formed when glyphosate interacts chemically with nitrosating agents, to form the oncogenic nitrosamine contaminant NNG. The later contaminant is an unavoidable, low-level contaminant in glyphosate that occurs as a result of the manufacturing process used by Monsanto.

289.    In addition, Monsanto was aware that the "glycine process" for manufacturing

glyphosate (used by Syngenta) "may rightly avoid formaldehyde." (Wratten email of April 19, 2008 in MONGLY02530945; more detailed discussions of both NNG and formaldehyde in glyphosate appear in MONGLY03909609)

### 3. Adjuvants and Surfactants in Roundup End Use Products

290.    There are substantial differences between pure, 100% glyphosate and the formulated, glyphosate-based herbicides that people purchase and apply. The differences arise from the so-called "inert ingredients" added to the active ingredient, i.e. glyphosate in the case of formulated Roundup herbicides.

291.    The two major categories of inert ingredients are surfactants and adjuvants. Surfactants are added to formulated herbicides to "interfere with proper membrane function" (MONGLY01700591), such as keeping foreign chemicals, viruses, and bacteria out of cells.

292.    Such differences can be important to regulators, applicators, and public health outcomes in cases where the inert ingredients in a pesticide alter the toxicity profile of the formulated pesticide product, in contrast to the pure active ingredient. This can happen in several different ways.

293.    For example, the primary surfactant used for years Roundup formulations is polyoxyethkene alkylamine (POEA). According to Monsanto, it was generally present at in a 3:1 ratio of glyphosate to POEA in the early years of commercial use, with the concentration of POEA falling to ratios around 7:1 in Roundup brands since ~2000. (MONGLY01700591)

294.    Some inert ingredients change the properties of formulated pesticides, for example by increasing the persistence of a pesticide or its ability to penetrate cell walls, or both.

295.    This distinction between the risks associated with 100% pure active ingredients (i.e. glyphosate), in contrast to formulated products containing inert and active ingredients (i.e.,

Roundup), is a central issue in this case, because almost all the testing and government risk assessments – and claims of safety for Roundup – are based on tests conducted using pure glyphosate, rather than tests using Roundup.

296.    But people applying Roundup are never exposed just to glyphosate, they are always exposed to glyphosate and a mix of inert ingredients.

297.    In the case of pure glyphosate versus formulated Roundup, the risks posed by the latter are considerably greater than the former, both because the inert ingredients in Roundup are more toxic in some ways than glyphosate itself, and the inert ingredients increase the amount of glyphosate reaching and penetrating cell walls, and hence posing risks of adverse impacts in exposed humans.

298.    A short paper in the prestigious medical journal *The Lancet* appeared in 1988 (Sawada et al., Probable toxicity of surface-active agent in commercial herbicide containing glyphosate, *The Lancet*, 1(8580): 299). It attributed acute, glyphosate-herbicide poisoning symptoms among several Japanese patients to the "inert ingredient" surfactant POEA in formulated Roundup, and not the active ingredient (glyphosate).

299.    The Japanese team reported that the acute lethal dose (i.e., LD-50) of POEA is one-third that of glyphosate, which explains why the LD-50 of glyphosate active ingredient is much higher than the LD-50 of Roundup herbicides formulated with the surfactant POEA.

300.    While both Monsanto and EPA were aware of the differential toxicity of glyphosate and POEA when the first glyphosate tolerances and registrations were moving through the agency in the late 1970s, this article in *The Lancet* triggered, to my knowledge, the first attention by independent scientists on the possible human health impacts of the inert ingredients in Roundup herbicides.

301.    Among the adverse mammalian impacts of POEA noted by the Japanese scientists was damage to red blood cells.

302.    Inert ingredients in formulated pesticide products can also, themselves, contain toxic impurities and contaminants. While pure glyphosate contains the nitrosamine-impurity NNG, the POEA surfactant in formulated Roundup products contains 1,4-dioxane.

303.    A U.S. National Cancer Institute bioassay of 1,4-dioxane found that the chemical causes hepatocellular adenomas and carcinomas in the kidneys of rats. https://ntp.niehs.nih.gov/ntp/htdocs/lt_rpts/tr080.pdf   In 1982, the International Agency for Research on Cancer classified 1,4-dioxane as a possible human carcinogen (IARC, *IARC monographs on the evaluation of the carcinogenic risk of chemicals in humans. Supplement 4*, WHO, 1982). An EPA report from 1986 listed 1,4-dioxane as a probable human carcinogen.

304.    In July, 1999 the Italian Pesticide Committee, a European regulatory body, held a meeting on the regulation of Roundup herbicide. It decided that new genotoxicity studies on both glyphosate and formulated Roundup would be required to assess DNA reparation, following OECD Guideline 486 (1998). Such studies were needed to address lingering and complex risk issues arising from impurities in both pure glyphosate, and the inert ingredients used to make formulated glyphosate-based herbicides, including Roundup.

305.    Monsanto employee ███████████ forwarded the news regarding this new genotoxicity study requirement to senior Monsanto officials including ███████ William Heydens, Donna Farmer, Larry Kier, and ███████████ in a July 29, 1999 email. (MONGLY00877684)

306.    In response, ██████ said that the OECD 486 test "is not an unreasonable request but suggest some liver toxicity along with it to explain bumpy responses at the high dose. This

test has also been requested by the French for MON 4660 and there the risk is greater because of extreme liver toxicity." (MONGKY0877684)

307.    A few hours later, William Heydens adds to the email chain this comment: "I don't think an in vivo UDS [the OECD 486 test] is reasonable for glyphosate…Now, formulations are obviously another issue…liver toxicity with formulations could be a confounding factor, and we would have to design and conduct the study very carefully (using our alachlor & acetochlor experience) if we are ultimately forced to do it."

308.    This is one of dozens of examples in the record where the response of Monsanto to a new issue or concern, or a request from a regulatory for a new study, amounts to "how can avoid doing any new, possibly damaging lab studies," rather than how can Monsanto conduct, or commission the best possible science to deepen understanding of the impacts of exposure to glyphosate-based herbicides, in order to more assuredly recognize and reduce human health risks.

309.    Two days later, Donna Farmer adds to this email chain, and writes: "Sorry I am weighing in on this late…It is too premature to discuss conducting any studies. I will not support any studies on glyphosate formulations or other surfactants at this time…".
(MONGLY00877684)

310.    Despite a steady stream of new studies over three decades pointing to the heightened toxicity of Roundup formulations including POEA surfactants, Monsanto continued to defend their safety and use worldwide.

311.    In January 30, 2010 email, William Heydens shared two reasons to continue defending POEA tallowamine surfactants: first the prospect of a "'domino effect' on etheramines; defend other world areas to the best of our ability." The second reason for concern

was that "they [Brazilian Monsanto employees] are worried about this coming across the Atlantic to their part of the American hemisphere." (MONGLY02062439)

312.    Heydens was responding to a January 25, 2010 email from his colleague ████ ████ on the question of whether to phase out POEA surfactants. After discussing some new studies underway on an alternative surfactant, ████ wrote: "Anyway, there are non-hazardous formulations so why sell a hazardous one?" (MONGLY02062440)

313.    In a June 8, 2010 email on the vulnerability of Roundup formulations containing POEA surfactants in Argentina, William Heydens wrote to colleagues in Argentina and at Monsanto headquarters in St. Louis:

> "So I would think that a backup plan of reducing POEA content is not sufficient, but rather a POEA-free formulation (or formulations) would be necessary to totally protect your business in Argentina." (MONGLY02013061)

314.    In the slide deck prepared for "Regulatory Leadership Meetings" in November 2010, a slide addresses the business impact of the loss of POEA surfactants. "Germany is major concern" noting that "restrictions on POEA uses pre-harvest had significant negative impact on sales in 2010." (MONGLY02721133)

315.    The "Strategy in Germany" included three core elements: (1) defend POEAs; (2) register non-POEA formulations; and (3) "Managed exit from POEA" to "Avoid a ban"; "Focus: voluntary non-renewal of registrations (e.g. MON 14420 end 2012)"; and, (3) "No sales of any POEA products after 2012." (MONGLY02721133)

316.    Over the last decade or so, European regulators forced Monsanto to phase out POEA surfactants in all glyphosate-based herbicides, including Roundup, but POEA surfactants are still present in several Roundup products in the U.S.

### 4. Assessing Glyphosate's Capacity to Disrupt the Endocrine System

317.    The European Commission had put in place a new set of testing guidelines to assess the degree to which pesticides have the potential to disrupt the functioning of the endocrine system. Such chemicals are generally referred to as "endocrine disruptors."

318.    In April 2002 Monsanto employees in Europe report to headquarters that European regulators are working on development of a list of possible endocrine disrupting pesticides, and that some new assays might be required on glyphosate and/or formulated Roundup herbicides.

319.    In response to this news, William Heydens sends an email at 7:20 a.m. on April 25th to Donna Farmer. In it, he suggests a call to "…to see if there is anything more we should be doing besides the usual 'pay no attention to the man behind the curtain'." He ends this email by saying "…this damn endocrine crap just doesn't go away, does it."

320.    Farmer replies to Heydens at 8:19 a.m. (just under an hour later), and writes that the "interest[ing] point" is that published tests of possible glyphosate-endocrine disruption show that pure glyphosate has no effect, but formulated product (i.e. Roundup) does. (MONGLY00885551).

321.    In response to Farmer, Heydens responds at 10:47 a.m. the same day, and reports that after discussions with other Monsanto experts, they: "…concluded, not surprisingly, that we are in pretty good shape with glyphosate but vulnerable with surfactants."

## D. Patterns Emerge in OPP-Monsanto Interactions over Glyphosate's Toxicology Database

322.    Applicants seeking registration of pesticide products and/or petitioning for the establishment of tolerances routinely submit studies that satisfy OPP/EPA data requirements. Submissions of such studies typically include the applicant's interpretation of the study results,

as well as the regulatory actions or decisions that the applicants believe the study results support. This is a standard feature of pesticide manufacturer-OPP interactions.

323.   When OPP science branch reviews find studies to be acceptable (i.e., conducted in accord with Good Laboratory Practices, proper reporting of results, acceptable statistical analyses), agency scientists then determine whether they agree with the applicant's interpretation of the study results. When there is at least general agreement, scientific reviews usually include a finding that the request to establish a tolerance or grant a new registration is "supported" in terms of the purview of the relevant science branch.

324.   In many cases, a recommendation is made to ask the applicant to satisfy some minor deficit in the supporting data, or information about how a given study was conducted. In other cases, an issue possibly impacting the interpretation of a study, or altering estimates of exposure or environmental risks, might be flagged as a way to trigger an assessment by another part of OPP.

325.   General patterns emerge from a review of Monsanto-OPP interactions from 1974 to the present relative to glyphosate's toxicological data base, OPP reviews of submitted studies, and OPP risk estimates and regulatory actions.

326.   Monsanto agrees and supports OPP/EPA assessments when they generally are consistent with the assessments advanced by Monsanto and support requested or proposed agency actions.

327.   When OPP's assessment of a study deviates from Monsanto's and results in, or points toward a decision or action by OPP/EPA that Monsanto regards as unfavorable, the company typically first presents arguments bolstering its initial interpretation of study results, and the EPA actions supported by the study.

328.     In cases where OPP and Monsanto continue to disagree about a given study, Monsanto will sometimes come around to agreeing with OPP that certain study deficiencies should be corrected, or that a study protocol could somehow be improved.

329.     On this basis, Monsanto would often then offer to generate a replacement study on the understanding that the status quo, or some acceptable, interim change in a pesticide product's label provisions, will suffice until the replacement study is completed, submitted to OPP, and reviewed.

330.     In other cases, OPP has requested a replacement study on some aspect of glyphosate toxicity and Monsanto has resisted, arguing that the existing study is valid and should satisfy agency data requirement.

# V. Bio/dynamics Mouse Oncogenicity Study Triggers a Change in Glyphosate's Cancer Classification

331.     Based on the flawed, long-term glyphosate cancer study in rats conducted by IBT in the 1970s, OPP classified glyphosate as "not oncogenic in the rat" in or around 1977, and hence not likely to pose human oncogenic risk.  This classification remained in place until EPA's March 4, 1985 "Consensus Review of Glyphosate" classified glyphosate as a category C, possible oncogene.

332.     Throughout the 1977-1983 period, there was rapid growth in the number of approved tolerances and registered agricultural uses of Monsanto's glyphosate-based herbicides, despite the lack of a valid set of long-term feeding studies in mice and rats.

333.     A new mouse oncogenicity study on glyphosate was among the IBT replacement studies submitted by Monsanto to OPP (EPA Accession #: 251007-014; Bio/dynamics Project No. 77-2061). It was conducted by the contract laboratory Bio/dynamics to fill a pending data gap, and was submitted to EPA on July 29, 1983.

## A. Results of Bio/dynamics' Mouse Oncogenicity Study

334.     The study followed routine design protocols for a chronic feeding study. There were four groups of Charles River CD-1 mice: control, 1,000 ppm glyphosate technical in the animals' diet, 5,000 ppm, and 30,000 ppm. There were 50 male mice and 50 female mice in each group. Animals were observed twice daily, and mortality during the study was reported as "normal for this age and strain of mice." (MONGLY04275682)

335.     In the section "Results" in its summary report to Monsanto, Bio/dynamics states: "No treatment-related effects were demonstrated." In other words, the study was "negative" for oncogenicity.

336.     But the Bio/dynamics summary report does address a number of statistically

significant increases in tumors observed in the study. Table 1 in the report lists four "microscopic changes" that were elevated in the treatment groups in a statistically significant way: central lobular hepatocyte hypertrophy (elevated in male mice), central lobular hepatocyte necrosis (elevated in males), chronic interstitial nephritis (elevated in males), and proximal tubule epithelial basophilia and hypertrophy (elevated in females).

337.   Bio/dynamics dismisses all four types of lesions noted in their Table 1 by saying "All these findings, however, were of the type and severity common to long-term mouse studies."

338.   The central issue of debate over the results of the Bio/dynamics mouse study -- the incidence of renal tubule adenomas -- was addressed in the summary:

> "The incidence of renal tubule adenomas was 0/49, 0/49, 1/50, and 3/50, in control through high-dose males, respectively. This lesion, however, was not observed in any of the female treatment groups, and, as mentioned previously, this data was not statistically different from control. While not observed in control animals in this study, renal tubule adenomas have previously been observed in control male CD-1 mice of comparable age. ***The slightly increased incidence of adenomas in the high-dose males was considered spurious and unrelated to glyphosate administration***." (Emphasis added; MONGLY04275683)

339.   The debate over these renal tumors in the Bio/dynamics mouse study continues to this day. In March 2015, it arose anew in the development and wake of the classification of glyphosate, and glyphosate-based herbicides as "probably carcinogenic to humans" by the International Agency for Research on Cancer (IARC) (see section VI., D. The IARC Bombshell).

340.   In the male mice, the incidence of renal tubule adenomas reported by Bio/dynamics was 0/49 male mice in the control group, and 0/49, 1/50, 3/50 in the three treatment groups (1,000 ppm, 5,000 ppm, 30,000 ppm).

341.   Three aspects of this Bio/dynamics summary statement no doubt attracted the

attention of OPP scientists when they evaluated this study: (1) the rarity and seriousness of renal tubule adenomas, (2) the hail-Mary like statement that renal tubule adenomas had been observed in control, male CD-1 mice in other studies (and so the absence of tumors in the control male mice in this study means that this study's control group data should be discounted), and (3) the Bio/dynamics assertion that the increase in renal tubule adenomas in the treated, male mice is spurious and not statistically significant, when there is a clear, treatment-related, dose-response trend in the occurrence of renal tubule adenomas in the male mice (i.e., 0, 0, 1, 3).

### 1. The High Stakes Review of the Bio/dynamics Mouse Oncogenicity Study

342.    The importance of OPP's evaluation of the Bio/dynamics mouse oncogenicity study on glyphosate was widely recognized inside EPA and Monsanto, and among many others following pesticide regulatory decisions.

343.    Interested parties included members of Congress and their staffs (then including C. Benbrook), senior Administration political appointees, pesticide trade associations, farm groups, environmental and consumer advocates, the media, and other state and federal government agencies.

344.    The importance of OPP's assessment of the study would be markedly heightened if the agency determined that the study was "positive." Such a judgement would reverse the status quo classification of glyphosate as "not oncogenic," and dramatically alter the outcome of a number of pending and forthcoming tolerance petitions and registration applications, both in the U.S. and globally.

345.    Two memos dated January 31, 1984 were sent from Monsanto toxicologist Lyle Gingerich to four colleagues (MONGLY04269118; MONGLY04269119-20). The first memo reports on a recent conservation Dr. Gingerich had with Robert Taylor.

346.     Taylor was the senior official in OPP's Registration Division responsible for managing the flow through OPP/EPA of glyphosate-Roundup herbicide tolerance petitions and registration applications, as well as managing interactions between Monsanto and OPP on the fulfillment of data requirements, label changes, data compensation, and other issues that arise regarding the regulatory status of Monsanto's glyphosate-based herbicides.

347.     In the first 1/31/1984 memo, Dr. Gingerich reports on presumably separate, face-to-face meetings on January 31, 1984 at OPP with Robert Taylor of the Registration Division and W.L. Burnam, Deputy Director of the Hazard Evaluation Division.

348.     The Gingerich memo reports that Mr. Taylor told him that W.G. Dykstra of the OPP toxicology division had reviewed the new mouse oncogenicity study done by Bio/dynamics. The memo states: "R.J. Taylor said that he saw something in writing to indicate that when the review is sent to him it will state that Roundup is an oncogen."

349.     The memo goes on to report that according to OPP's Mr. Taylor, various pending tolerance petitions will be denied, presumably as a result of this important change in OPP's characterization of glyphosate's chronic toxicity.

350.     Dr. Gingerich reports in this first of two January 31, 1984 memos that he intends to speak later the same day, again, with R.J. Taylor and W.L. Burnam of the toxicology branch, in order to request "W.G. Dykstra's review and [discuss] what would be an appropriate forum for Monsanto inputs."

351.     The first of two 1/31/1984 Gingerich memos to colleagues closes with an unusual question: "Do you think it would be appropriate for our legal department to caution EPA on possible premature leaks of this review's conclusions prior to Dr. Kasza's [senior OPP pathologist] re-review and final disposition of the matter?"

352.    If such a caution had been communicated, through any channel, it would have constituted an unambiguous "shot across the bow" from Monsanto to OPP. The fact that Monsanto officials even considered expressing such "caution" to OPP's legal department reflects how serious this turn of events was in terms of OPP actions on pending and future glyphosate tolerance petitions and registration applications.

353.    This Monsanto position regarding OPP communication of preliminary OPP science determinations relative to glyphosate oncogenicity stands in sharp contrast to Monsanto efforts three decades later to encourage a premature EPA release of the Cancer Assessment Review Committee's (CARC) re-assessment of glyphosate's carcinogenicity.

**2. Second 1/31/1984 Gingerich Memo to Monsanto Colleagues**

354.    Later during January 31, 1984, Dr. Gingerich either met with, or spoke on the phone again with W.L. Burnam of the OPP toxicology branch, according to the second of two memos to Monsanto colleagues sent by Dr. Gingerich on January 31, 1984.

355.    In this second memo, Gingerich reports to his colleagues that Burnam told him that:

> "A 'complete' review of the glyphosate mouse study has not been done. There has been no section or branch sign-off of W.G. Dykstra's review. The question of kidney tumors was pointed out by W.G. Dykstra and is being evaluated by either C. Chaisson or Dr. L. Kasza. W.L. Burnam asked that we send in historical control data to document the claims made in our summary. He cautioned that these be from the same laboratory and time period. He said to be sure to report the numbers study by study, rather than as an overall average."

356.    This second 1/31/1984 memo goes on to say that "R.J. Taylor continues to be concerned that Roundup actions will be held up for a few months until this is resolved." By "this," Dr. Gingerich is referring to the classification of glyphosate as a possible oncogen, an OPP action that would have major implications for several pending OPP decisions and

regulatory actions.

357.    It is remarkable and worth noting that on the same day that Monsanto learned that the then-incomplete OPP evaluation of the new Bio/dynamics mouse oncogenicity study was likely to lead to OPP classifying glyphosate as a possible oncogen, a representative of Monsanto stationed in the company's Washington D.C. office (Dr. Gingerich) had at least two face-to face meetings with senior representatives of the OPP Registration and Toxicology Divisions, at least two follow-up calls or meetings with these same individuals, and furthermore, had received a clear, substantive request from Dr. Burnam for more data relevant to the primary issue explaining why Monsanto and OPP reached different conclusions regarding the results of the Bio/dynamics mouse oncogenicity study (the number of kidney tumors in the control group of male mice).

358.    On February 10, 1984, Hoyt Jamerson of the OPP Registration Division received a memo from William Dykstra of the Toxicology Branch addressing the results of the newly submitted Bio/dynamics mouse study. Under "Recommendations," it states: "Review of the mouse oncogenicity study indicates that glyphosate is oncogenic, producing renal tubule adenomas, a rare tumor, in a dose-related manor. Therefore, Toxicology Branch considers that the PP#3E2845 [pending tolerance petition] is not toxicologically supported."

359.    This memo confirms that only 10 days transpired between the OPP-Monsanto discussions on January 31, 1984 regarding the then-incomplete Dykstra review of the new mouse study, and presumably both section and Toxicology Branch sign-off on Dykstra's conclusion that glyphosate caused an increase in a rare kidney tumor in male mice in a dose-related manner.

360.    The conclusion set forth in the February 10, 1984 memo is the first known written confirmation that OPP now regarded glyphosate as a possible oncogen. This conclusion had

significant implications known to both OPP and Monsanto.

361. As noted earlier, once glyphosate was classified as a possible oncogen, the OPP would no longer be able to approve any required, Section 409 food additive tolerances. Moreover, final action on any pending tolerance petitions or major, new food use registrations would likely also be delayed or denied.

362. On March 20, 1984, Monsanto submitted to OPP historical control data on the incidence of renal tubule adenomas in the control groups of CD-1 mice in past studies, as requested by Toxicology Branch Deputy Chief Bill Burman in his second conversation on January 31, 1984 with Monsanto's Lyle Gingerich.

363. Burman had suggested Monsanto submit historical control data from the same laboratory, and roughly from the same time period (i.e. within 3-4 years of the time the glyphosate mouse study was conducted). Monsanto submitted such historical control data from Bio/dynamics, as well as from two other "major" contract laboratories. (MONGLY04276057)

364. The final memo codifying Dykstra's review of the mouse oncogenicity study was sent to Taylor in the Registration Division on September 4, 1984. In its "Recommendations" section, the Toxicology Division states that "1. Glyphosate was oncogenic in male mice causing renal tubule adenomas, a rare tumor, in a dose-related manner. The study is acceptable as core-minimum data. 2. A [cancer] risk assessment by Toxicology Branch is required."

365. On February 5, 1985 Monsanto sent the Director of the OPP Registration Division another letter advancing similar arguments in support of the company's conclusion that the renal tubule adenomas in the male mice were not treatment related nor statistically significant.

366. The 2/5/85 Monsanto letter sets forth six arguments in support of the company's assertion that the observed renal tubule adenomas were not treatment related: (1) tumors were

only observed in male mice, (2) renal tubule adenomas were only present at the end of the study, suggesting they were caused by the age of the male mice, rather than exposure to glyphosate in the animal's feed, (3) Only benign tumors were observed, (4) another Bio/dynamics, 2-year chronic feeding study in the same strain of mice with N-nitrosoglyphosate (NNG) produced no renal tubule adenomas in any control or treatment group, (5) glyphosate was not mutagenic in a number of assays, and (6) a complex statistical argument suggesting that the dose-related increase in renal tubule adenomas in the male mice was not statistical significant.

367.    Toxicology Branch scientists assessed the data and arguments in this Monsanto letter prior to deciding whether to re-open their consideration of the renal tubule adenoma data. The review was conducted by Herbert Lacayo, and after a complex statistical analysis, he concluded that "a prudent person would reject the Monsanto assumption that Glyphosate dosing has no effect on kidney tumor production" (2/26/1985 memo, Lacayo to Reto Engler; Benbrook files).

368.    It is worth noting that the 2/5/85 Monsanto letter contains two pieces of information that actually undercut two of the points raised in it.

369.    First, regarding the differential rates of renal tubule adenomas in male and female mice in the glyphosate mouse study, Monsanto reports that "Historically, this lesion is observed only in male mice [four references are cited]. Control animal data from several laboratories indicate an historical control incidence in females of zero." Accordingly, the difference in incidence in this tumor, in this strain of mice, should not have been surprising, nor a reason to call into question the study's outcome.

370.    Second, in the letter's point number 4, Monsanto reports zero incidence of renal tubule adenomas in the male and female control group of Charles River CD-1 mice in a similar, Monsanto-commissioned Bio/dynamics mouse study on NNG, undercutting their effort to convince OPP that the absence of renal tubule adenomas in the male mice control group was not supported by similar control-group data from other studies.

371.    This and earlier letters, and multiple contacts with Monsanto officials, had made

OPP well aware that the company was determined to reverse the OPP determination that the mouse oncogenicity study was positive. So, to determine whether there was consensus among senior EPA toxicologists and cancer experts, the OPP held a meeting on February 11, 1985 attended by eight senior scientists in the Toxicology Branch.

372.     The 2/11/85 meeting's stated purpose was to "evaluate and discuss the data base on Glyphosate, and in particular the potential oncogenic response of Glyphosate." The attendees reviewed the OPP assessment of the new mouse study, as well as the arguments and data submitted by Monsanto in its February 5, 1985 letter.

373.     The attendees concurred unanimously that: "In accord with EPA proposed guidelines (FR of Nov. 23, 1984) the panel has classified Glyphosate as a Category C oncogen."

374.     On February 21, 1985, another, Monsanto-requested meeting was held with the OPP Toxicology Branch (TB), attended by the TB Chief Ted Farber and then-Assistant Chief Bill Burnam. Dr. Gingerich, Frank Serdy, and Fred Johannsen represented of Monsanto.

375.     A February 22, 1985 memo from Dr. Gingerich to Monsanto colleagues characterized the meeting mood as "relaxed, informal, and open." The memo states that Dr. Farber called the February 11, 1985 decision by OPP to classify glyphosate as a possible oncogen "an extremely close call and that EPA remains open to any new information that would make their decision easier." (MONGLY04269072)

376.     The memo sets forth Monsanto's goals for the meeting, which including: "(1) see if we could respond to their concerns [the renal tubule adenomas] before any unnecessary comments became a part of the Roundup permanent file. (2) determine exactly what their concerns are. (3) gauge the level of their concern."

377.     Under the heading "Concerns of Toxicology Branch" in the February 22nd memo

by Gingerich, he reports that Dr. Farber opened the meeting by describing the conclusions of the OPP toxicology branch review of the mouse oncogenicity study. Specific points noted were: "Oncogenic in mouse, IARC ranking 'c' [possible human carcinogen]; Company's letter [Monsanto's February 5th letter] was too weak to be convincing; Biologically significant rare tumors; Historical controls [data] not helpful; Will ask to re-section tissues, consider crystal formation, etc."

378.    The meeting memo then states that "Dr. Farber indicated that a substantial re-look at tissues may cause the EPA pathologist [Dr. Kasza] to change his position. If no carcinomas are found the second time, our arguments about 'only benign' tumors would be stronger. I [Gingerich] read this to mean that the EPA pathologist (Kasza) is open to persuasion."

379.    Next, the memo reports on several questions raised during the meeting, and their answers. Monsanto representative FJ (Frank Johannsen) then asked OPP's Dr. Farber "…what the EPA would be likely to do if we [Monsanto] re-sectioned the slides and found no carcinomas. Dr. Farber said that it would force them to get the internal peer review group together again."

380.    This and other questions raised during the February 21, 1985 meeting demonstrated that Monsanto acted to find some basis, any basis, to change OPP's conclusion on the mouse oncogenicity study, and the classification of glyphosate as a possible oncogen.

### 3. OPP Dismisses Monsanto's Historical Control Data Argument

381.    On February 5, 1985, Monsanto sent to the Director of the OPP Registration Division a four-page letter transmitting additional information related to the Bio/dynamics chronic mouse study.

382.    Four days later, on February 26, 1985, a memorandum was sent to OPP

statistician Reto Engler, an individual involved in the Toxicology Branch science review of glyphosate's oncogenicity and responsible for carrying out the recommended quantitative risk assessment of glyphosate's oncogenicity. The memo was written by an OPP statistician Herbert Lacayo, and sent through and signed off by Bertram Litt, OPP's Statistics Team Leader.

383.    The memo focused on whether the additional, mouse historical control data for kidney tumors submitted by Monsanto alters the OPP assessment of the significance of the reported tumors in the Bio/dynamics study. It begins by noting that Monsanto submitted "historical control data from Bio/dynamics and two other laboratories," despite Dr. Burnam's unambiguous request during the February 22nd meeting that Monsanto only consider, and submit historical control data from the same laboratory where the Bio/dynamics study was conducted, and within an appropriate window of time (3-4 years).

384.    The summary of the Lacayo statistical review of the historical control data states that "…we can conclude that Glyphosate dosing has a statistically significant effect (at the $p = .006$ level) in the production of kidney tumors in male mice" (i.e., highly statistically significant, since the usual cut-off for significance is the $p = 0.05$ level).

385.    A March 4, 1985 memo on the subject "Consensus Review of Glyphosate" codified the conclusion reached by the eight Toxicology Branch scientists, each of whom signed the consensus review document (MONGLY04269067). The signatories included the Chief of the Toxicology Branch Theodore Farber, OPP's senior pathologist who read the Bio/dynamics mouse study histopathology slides, Bertram Litt, OPP's senior statistician, and William Dykstra, author of the original OPP review of the mouse study.

386.    This is an unusual memo, and clearly was written to codify in the glyphosate registration file, and communicate to Monsanto, that senior scientists in the Toxicology Branch

were united in their classification of glyphosate as a possible oncogen, despite all the back and forth with Monsanto, and the review and assessment of historical control data.

387.     The memo was sent to Robert Taylor in the Registration Division, and marked the end of the beginning of a protracted debate between OPP and Monsanto over the results of the Bio/dynamics mouse study.

388.     The managers and scientists in OPP's Toxicology Branch were aware of the significance of this change in glyphosate's cancer classification. The memo was prepared in anticipation of a vigorous response from Monsanto to senior officials in OPP and at political levels within EPA, and possibly as well in the White House and Congress on OPP.

### 4. Monsanto Takes Its Case to the Director of the OPP Registration Division

389.     Only two days passed before Monsanto again wrote to OPP, this time to Douglas Campt, then Director of the OPP Registration Division. The five page, March 13, 1985 letter was sent by Frank Serdy, the Monsanto Manager, Federal and State Registration Affairs.

390.     The letter recounts the recent history of OPP's evaluation of the Bio/dynamics mouse oncogenicity study, the numerous meetings and back-and-forth involving OPP and Monsanto scientists, and asserts that the renal tubule adenomas observed in the male mice in the study are not treatment related, nor statistically significant. It also restates the many Monsanto arguments advanced over the past six weeks.

391.     In closing his letter to Mr. Campt, Mr. Serdy states that:

 "As you know, glyphosate is an extremely important herbicide to agriculture in the U.S. and around the world. Monsanto is concerned that even the initiation of formal regulatory action would have serious negative economic repercussions which we believe are not justified by the scientific evidence."

392.     In 1984, an estimated 8.9 million pounds of glyphosate active ingredient were applied nationwide by U.S. farmers and ranchers (Benbrook, C [2016]. Trends in glyphosate use

in the United States and Globally, *Environmental Sciences Europe*, Vol. 28:3; data on use in the

U.S. is from Supplemental Table S18, data on global use is from S24). In 2014, agricultural use

in the U.S. had risen to 249.9 million pounds, 28-times higher than the level of use in 1984.

393.    Globally in 1994 (first year a global estimate is possible), an estimated 124

million pounds of glyphosate active ingredient were applied. In 2014, 1.65 billion pounds of

glyphosate were applied, 13-times more than in 1994, and likely well over 25-times more than

global use in 1984.

394.    The "negative economic repercussions" referenced in Serdy's letter would have

included curtailment of much of the dramatic rise in glyphosate use that began in 1996 with the

commercial launch of genetically engineered crops able to withstand post-emergence

applications of Roundup.

395.    In an April 3, 1985 memo from William Dykstra to the Registration Division's

Robert Taylor, the official Toxicology Branch judgement regarding glyphosate's oncogenicity

was stated as it had been previously: "Glyphosate was oncogenic in male mice causing renal

tubule adenomas, a rare tumor, in a dose-related manner."

### 5. Monsanto's Next Move – Hire Another Pathologist to Re-read the Kidney Slides

396.    Also on April 3, 1985, Dr. George Levinskas, a scientist in the Monsanto

Department of Medicine and Environmental Health, circulated a brief update inside the company

stating that "Senior management at EPA is reviewing a proposal to classify glyphosate as a class

'C' possible human carcinogen' because of kidney adenomas in male mice. [Private, consulting

pathologist] Dr. Marvin Kuschner will review kidney sections and present his evaluation of them

to EPA in an effort to persuade the agency that the observed tumors are not related to

glyphosate." (MONGLY04277789)

397.    Dr. Kuschner had not been involved with the design, conduct, or evaluation of the Bio/dynamics mouse oncogenicity study, and had not previously reviewed the study's histopathology slides.

398.    When Dr. Levinskas wrote that Dr. Kuschner will review the slides "in an effort to persuade the agency that the tumors are not related to glyphosate," the implication is clear. Dr. Kuschner was chosen for a specific assignment – turning the EPA review of the Bio/dynamics mouse study from "positive" to "negative" for oncogenicity. Moreover, based on previous discussions with OPP toxicology branch managers, Monsanto officials recognized that the identification of even one tumor in the group of male control mice was one way to do so.

399.    Also on April 3, 1985, a letter is sent by Dr. Aleksanday Knezevich, Senior V-P, Pathology at Bio/dynamics to Dr. Marvin Kushner, a private consulting pathologist living in New York. (MONGLY04269049) The letter informs Dr. Kushner: "The enclosed shipment is being sent to you at the request of Dr. Tim Long of Monsanto. It contains slides of kidney sections from all animals on the references study [mouse oncogenicity study]."

400.    On April 14, 1985, Dr. Kushner signed for the receipt of a box from Federal Express containing 422 slides of kidney sections representing 399 animals in the Bio/dynamics mouse oncogenicity study.

## B. Pending Actions Heighten Monsanto's Concern Over Public Release of Glyphosate's Cancer Classification

401.    Clearly, Monsanto was working hard to turn around OPP's judgement on the Bio/dynamics mouse oncogenicity study before there was any public acknowledgement of the EPA's change in the cancer classification of glyphosate. Monsanto had responded, or began to fashion its strategy, at each step in the EPA process on the same day, or within days of learning new information about the OPP review of the study.

402.    The company realized it would need time to generate new data sufficiently persuasive to change what was now stated as a firm, consensus OPP judgement. In the interim, it Monsanto attempted to prevent the new cancer classification from being acknowledged in the normal course of OPP public statements and federal register notices, and especially notices pertaining to the many glyphosate tolerance petitions at various stages of OPP review.

403.    Two such circumstances that might have led to OPP stating its new position on glyphosate oncogenicity are addressed in an April 10, 1985 update memo to company colleagues by T.F. Armstrong, a Monsanto scientist working with the EPA. In the memo, he reports on an April 9, 1985 phone call with Jim Ackerman of OPP, involving Frank Serdy, Lyle Gingerich, and himself.

404.    OPP's Ackerman reportedly told Armstrong that the glyphosate mouse oncogenicity peer review would be completed in a few weeks, and that the Assistant Administrator for Pesticides and Toxic Substances, Dr. Jack Moore (a Presidential appointee and individual responsible for actions by OPP), had assigned a Dr. Barnes in his office to assess the outstanding issues in the evaluation of the mouse study.

405.    Dr. Moore's office had been drawn into assessment of the status of the glyphosate oncogenicity study because of the need for a timely EPA response to a pending Section 18 emergency exemption label request on behalf of the National Wheat Growers for use of glyphosate "through selective equipment on wheat." (MONGLY04269047). In this context, "selective equipment" is referring to a rope-wick applicator, and a pending 1983 application for a Section 18 emergency exemption from the State of Oklahoma.

406.    This Section 18 request from Oklahoma is historically important, because it marks the first, known instance in which OPP indicated that it would deny a necessary Section 409

food-additive tolerance because of the Delaney Clause in the Food Drug, and Cosmetic Act (FDCA).

407.    There was a second public event in which Monsanto worried that EPA would be forced to respond, on the record, to a direct question about the status of OPP's assessment of the glyphosate mouse oncogenicity study.

408.    On April 17, 1985, a public hearing was scheduled on the use of glyphosate in the aerial herbicide-spray program targeting marijuana cultivation in South America. The meeting was organized by the Drug Enforcement Agency and a representative of the OPP would be in attendance.

409.    Monsanto expected that "at this public hearing, we suspect the Drug Enforcement people will ask the EPA if glyphosate is safe to use, and if the EPA answers anything but Yes, the mouse study situation could be released to the public at this hearing." (MONGLY04269047)

410.    The DEA's concern over glyphosate human health effects included acute effects on people living in and around treated areas, as well as acute and chronic effects among U.S. citizens smoking marijuana contaminated with residues of glyphosate and AMPA, glyphosate's major metabolite.

411.    Armstrong's April 10th memo to his Monsanto colleagues ends with this statement: "Based on the foregoing points, a possible Monsanto action on the glyphosate mouse study would be to submit a letter to the EPA to prevent an inappropriate release of the 'tentative' mouse study conclusions. This letter needs to be received by the EPA prior to next week's Marijuana Public Hearing, and preferably it should be written by a toxicologist that is highly respected by Dr. Barnes and/or Dr. Moore."

412.    The above "should we warn OPP" instance is one of several since the January 31,

1984 Gingerich memo in which Monsanto officials considered having its legal department "caution" EPA over pre-mature public discussion of information on OPP's evaluation of the mouse oncogenicity study.

413.    This extraordinary series of events drives home the magnitude of the negative repercussions that Monsanto expected, if the OPP officially and publicly announced its conclusion that glyphosate possibly causes cancer.

414.    Sometime in or around mid-May 1985, Kushner submitted his report to Bio/dynamics and Monsanto. The company reviewed the report, and submitted it to OPP.

415.    In a June 14, 1985 memo from OPP's senior statistician Reto Engler to Robert Taylor of the Registration Division, Dr. Engler reports that after a TB peer-review process:

> "We have determined that the incidence of renal adenomas in male mice (a rare tumor) is inconsistent with the historical control incidence of this tumor. The registrant, in several letters, has refuted our statistical analysis of the data. Basically the registrant contends that the highest incidence ever observed in historical controls should be used to judge the incidence in the Glyphosate study. The use of any historical control data in this manner is biologically as well as statistically inappropriate and misleading." (Underlining in original).

416.    Then, Dr. Engler goes on to report that the registrant has now submitted a report (presumably from Dr. Kushner) "which shows that a re-reading of the kidney slides has revealed one (1) kidney tumor in the control group but no additional tumors in the treatment groups." In light of this new information, Engler writes that:

> "Given the overall uncertainty concerning the significance of the observed tumor incidence we believe a systematic reevaluation of this kidney lesion has become necessary in order to fully evaluate Glyphosate."

417.    This memo marks at least a temporary victory for Monsanto, since their efforts ro commission, and their submission of the Kushner report delayed OPP's final determination as to glyphosate oncogenicity in the Bio/dynamics study.

418.     OPP's decision to re-section the slides also created the possibility that new information would emerge supporting Dr. Kushner's assessment of the slides, and/or changing the number of tumors in the male mice control and three treatment groups in a way that eliminates the dose-related response in the frequency of renal tubule adenomas. (MONGLY00235097 at 5412)

## C. Re-sectioning of the Mouse Kidney Slides – Monsanto's Next Effort to Change OPP's Mind

419.     "If the results of the kidney re-sectioning do not resolve the glyphosate issue within OPP, we will be faced with an adverse OPP decision," wrote Lyle Gingerich to Monsanto colleagues in an August 20, 1985 memo. (MONGLY04268982)

420.     Gingerich also discusses the prospect that OPP might decide to place unresolved science issues before the agency's Scientific Advisory Panel (SAP), especially if a deadlock emerges between the conclusions of Monsanto's and OPP's pathologists.

421.     Gingerich goes on to ask "Can we change the focus of the question to the S.A.P. to: 'Is 30,000 ppm too high [a dose] to be used in a meaningful risk assessment?'…If we assembled 10 respected toxicologists, would all ten agree that the feeding level is too high to be meaningful?" He then suggests that the 10 toxicologists agreeing with Monsanto's position should be brought to the SAP meeting and asked to speak in support of the company's assessment of the mouse study, given "…the importance of this issue to Monsanto."

422.     Gingerich then explains why he has suggested that all 10 toxicologists should be brought to the SAP meeting: "There is a tendency to 'count the votes' at S.A.P. meetings. We can make a difference by lining up a large number of experts on our side."

423.     Eight days later, on August 28th, Frank Serdy, the Director of Federal and State Regulatory Affairs for Monsanto, wrote a memo to his colleague Tim Long, another official

working on the effort to change EPA's mind on the mouse oncogenicity study. Serdy wrote on the topic of "Additional Steps" in the effort to change EPA's mind on the Bio/dynamics mouse study, and the renal tubule adenomas in particular (MONGLY04268980).

424.    He voices confidence that glyphosate will ultimately be shown to be not oncogenic, but lays out some "additional steps" if the results of the re-sectioning of the kidneys does not change EPA's mind.

425.    First, Serdy writes: "We continue to feel it is important to identify and contact those outside 'experts' who we feel would testify on our behalf both to EPA and SAP that, based on the results, glyphosate is not oncogenic."

426.    Serdy's second "additional step" is prefaced by acknowledging that "We do not have a lot of faith, presented with the same evidence, Ted Farber [senior OPP scientist in the Toxicology Branch] will want to back off and change his mind." Serdy then writes: "Hence we feel that it is equally as important to identify and contact 'experts' in the area of statistics who would be willing to testify both to the EPA and SAP that 1-0-1-3 cannot be considered statistically significant."

427.    Note that in Serdy's second point he is assuming that EPA has, or will accept Dr. Kushner's conclusion that one mouse in the male control group had a renal tubule adenoma that was not detected, or reported in the original Bio/dynamics report on the results of the study. In the absence of that one, additional adenoma in the male mice control group, the tumor incidence would have remained as originally reported, 0-0-1-3, and reflect a trend which is unambiguously dose-related and highly statistically significant, as Lacayo's 2/26/85 memo had concluded.

428.    Driving home the importance of these "additional steps," Serdy writes that:

   "It seems imperative that we continue to do all that is possible in order to have the
   Agency reverse its decision. Hopefully, the testimony of several respected 'experts' will

be enough to cause EPA to change their minds."

429.     The re-sectioning of the male mice kidneys, and the re-evaluation of the slides, was done by Bio/dynamics, at the request of Monsanto. The OPP pathologist Dr. Kasza had been consulted in the process of developing the procedures. R.F. McConnell, a pathologist consulting with Bio/dynamics, read both the original slides, and the slides from the re-sectioned kidneys.

430.     The Bio/dynamics report covering the re-sectioned kidney tumors was dated September 26, 1985, and presumably was submitted to the EPA a few days later.

431.     The significant result in the Kushner-Bio/dynamics report is finding one renal tubule adenoma in the control group of male mice (mouse # 1028). The report states: "Confirmation of the diagnosis of the original renal tubular adenomas was made, including concurrence with Dr. Marvin Kushner on the presence of a lesion in the control group which represented a developing tumor. No new tumors were found in any of the [other] control or treated groups."

432.     The reported conclusion was precisely what Monsanto had hoped for: "The renal tumors observed were considered to be incidental and not toxicologically significant."

433.     The technical response from the Toxicology Branch to the September 26, 1985 Bio/dynamics report was done by Dr. Kasza, OPP's senior pathologist, and the scientist who had been consulted by Bio/dynamics on the procedures to be followed in the re-sectioning of the kidneys. The December 4, 1985 memo was sent to William Dykstra, the lead reviewer of the mouse study in OPP's Toxicology Branch.

434.     The single, critical question was whether Dr. Kasza agreed with Dr. Kushner and the Bio/dynamics pathologist Dr. McConnell that male mouse #1028 in the control group had a renal tubule adenoma. Kasza requested and carefully re-read the original slides for male mice in

the study with reported kidney tumors, and studied the newly re-sectioned kidney slides. He found no differences in the number of renal tubule adenomas in the treatment groups.

435.    In reference to the one, additional control group tumor in mouse # 1028 reported by Kushner-McConnell, Dr. Kasza wrote:

> "It is my opinion that the presence of a tumor cannot be definitely be established. My interpretation is similar to the conclusion of Bio/dynamics' pathology staff and Dr. McConnell, that the lesion 'may be' a proliferative change having the potential to lead to the development of a frank tumor. But as the tissue can be seen under the microscope as a small well-demarcated focal cell aggregate morphologically different from the healthy looking surrounding kidney tissue, this morphological alteration does not represent a pathophysiologically significant change."

436.    Based on Dr. Kasza's reading of the newly sectioned kidney of animal #1028, there was a group of cells that looked different and that might become a lesion of some sort, but the cell mass had not reached the stage justifying identification as a renal tubule adenoma.

## D. The 1986 SAP Review of the Mouse Oncogenicity Study

437.    Kasza's interpretation was accepted within EPA. As a result, the EPA and Monsanto were dead-locked, and the stage was set for asking the SAP to help the agency work through the unresolved issues.

438.    A January 17, 1986 Federal Register notice announced the two-day SAP meeting on February 11-12, 1986 during which the Bio/dynamics mouse study would be evaluated. Agenda item 1 read: "Review of a set of scientific issues related to apparent oncogenicity being considered by the Agency in connection with the preparation of a Registration Standard for glyphosate."

439.    The phrase "apparent oncogenicity" shows that EPA viewed the renal tubule adenomas in the male mice a treatment related, and triggered a swift, firm response from Monsanto.

440.     Monsanto's January 23, 1986 letter came a week after the Federal Register notice was published. It was sent to Steven Johnson, a senior EPA official, and signed by Thomas Armstrong, Monsanto's Registration Manager.

441.     After noting that EPA said the SAP would assess glyphosate's "apparent oncogenicity," Armstrong wrote: "Monsanto firmly believes that glyphosate is not an oncogen, and we therefore do not agree with this position taken by the Agency. The Agency is in error in reaching this conclusion…"

442.     The letter argues that the OPP determination does not follow EPA's Proposed Guidelines for Carcinogen Risk Assessment. Armstrong then writes:

> "In addition to Monsanto's own evaluation, this matter has been reviewed by five independent experts. The unanimous conclusion reached by these scientists is that there is no treatment-related oncogenic effect of glyphosate in the chronic mouse study…"

443.     Recall the August 20, 1985 Gingerich memo discussed above. It suggested that Monsanto recruit 10 experts to testify before the SAP, and that "There is a tendency to 'count the votes' at S.A.P. meetings." (MONGLY04268982)

**1. SAP Meeting Discussion and Outcome**

444.     The focus of the glyphosate oncogenicity discussion during the February 11, 1986 SAP meeting was on the histopathology of the kidney slides, and in particular:

- The number of tumors in the male mouse control group;
- The appropriate statistical analysis to use, and whether the renal tubule adenoma incidence reached statistical significance; and
- The proper use of historical control data.

445.     The primary presentation by EPA was done by Dr. Farber, and Monsanto's presentation was made largely by Robert Harness, Director of Environmental and Government Affairs, Dr. Timothy Long, in the company's Medical Department, and Mr. Wayne Withers.

446.     In addition, Monsanto brought to the SAP meeting, three experts who had been

involved with the study and/or the reading of the controversial kidney slides: Dr. Marvin Kushner, the pathologist who re-read the original mouse study kidney slides; Dr. R.F. McConnell, the consultant to Bio/dynamics that read the original slides, as well as the re-sectioned slides; and Dr. Ira Daly, the Bio/dynamics laboratory director.

447.    Each of these individuals brought by Monsanto were given opportunities to make short presentations and participate in the Q & A with SAP members.

448.    In addition, Monsanto announced to the SAP that they had submitted the data in question to a panel of four consulting experts (Squires, Olsen, Stemmer, Goodman), all of whom agreed with Monsanto's interpretation of the mouse oncogenicity study results. These experts also participated in the Q&A.

449.    One of the invited experts – Dr. Don Goodman – was asked by Monsanto to attend and represent the conclusions of a second review panel convened at the request of Monsanto by Pathco Inc, a pathology consulting group. The Pathco panel reviewing the same mouse oncogenicity data included five scientists (Sourer, Anver, Stranberg, Ward, Goodman).

450.    Accordingly, the Monsanto team offering conclusions and presenting data before the SAP included 14 people: three from Monsanto, three individuals involved with the study, four consulting experts, and four additional experts who joined Dr. Goodman (in attendance) on the Pathco Inc panel.

451.    The report providing the SAP panel's answers to the two questions EPA asked the panel to address on February 11, 1986 was transmitted to the Director of OPP on February 24, 1986, and was released publicly soon thereafter. The section "Panel response" begins by saying: "In the instance of Glyphosate, the Panel concurs that the data on renal tumors in male mice are equivocal."

452.     The SAP report goes on to state: "The vast majority of the pathologists, who examined the proliferative lesion in the male control animal, agreed that the lesion represented a renal adenoma. Therefore, statistical analysis of the data should utilize this datum."

453.     This conclusion that the "vast majority" of pathologists agreed with the Monsanto interpretation contradicts a statement made by the EPA in its assessment of the differing views on whether control animal #1028 had a renal tubule adenoma.

454.     In Dr. Faber's presentation to the SAP, he states: "we [EPA] do see an increased incidence statistically…" On the critical issue of whether there was a renal tubule adenoma in one male mouse in the control group, Dr. Farber's offered his accounting of the differing views: "…perhaps three pathologists saying no [tumor], perhaps four or more pathologists saying yes."

455.     However, given the number of additional experts brought to the meeting by Monsanto, "counting the votes" expressed just during the meeting produced a very different outcome -- 14 to 3 "vote" in favor of Monsanto's position.

456.     The three individuals at the SAP meeting supporting the conclusion that there was "no tumor" in control animal #1028 were EPA scientists (Faber, Kasza, Lacayo), while all 14 "yes" votes were expressed by individuals working for, or hired by Monsanto.

457.     Taking into account the uncertainty over the number of renal tubule adenomas, the use of historical controls, and the statistical methods used to judge whether the observed tumors were treatment related, the SAP's final judgement was equivocal:

> "…the Panel does not believe that it is possible to categorize Glyphosate clearly into Group C (possible human carcinogen) or Group E (no evidence of carcinogenicity in humans). The Panel proposes that Glyphosate be categorized as Group D (not classified) and that there be a data call-in for further studies in rats and/or mice to clarify unresolved questions."

458.     Despite requests from OPP to redo the mouse study, Monsanto has refused to do

so, arguing that its interpretation of the Bio/dynamics study has been widely embraced and there is no need to conduct any more long-term, mouse oncogenicity studies on glyphosate.

459.    In short, Monsanto considered then, and still does believe and assert publicly that the science issues addressed by the SAP in its 1986 report are "settled."

460.    Developments over the last three decades prove this is clearly not the case (see VI., section A.1).

# VI. Monsanto Efforts to Influence Scientific Community and Regulatory Assessments of Glyphosate Risks

461.    It is entirely appropriate and expected that Monsanto would devote time and resources to the task of persuading regulatory agencies, the scientific community, political leaders, farmers and farm organizations, competitors, the media, and the general public that the health and safety data developed by the company is valid and supports the conclusion that all Monsanto products are "safe." When pushed, the company falls back to statements like "…Roundup herbicides pose 'acceptable risks' when applied in accord with label directions."

462.    To one degree or another, and in a wide diversity of ways, all pesticide registrants invest resources in defending the safety of their pesticide products.

463.    The tactics, strategies, and messages deployed by Monsanto over the last 40+ years in defense of Monsanto-brand Roundup herbicides is a central issue in this case. A core question is – Did Monsanto grow sales by overstating the safety of Roundup, and by under-protecting people who bought and applied the company's products in a lawful manner in accord with label directions?

## A. Ignore, Delay, or Refuse to Fulfill EPA Requests for Information, New Studies, or Label Precautions

464.    On August 11, 1986, OPP issued the glyphosate Registration Standard (RS) document setting forth guidance to companies seeking to register new or retain existing pesticide product labels for herbicides containing glyphosate (the date on the RS document is June 1986; the 8/11/86 date of the RS release is from multiple sources, e.g. 10/27/88 letter from Tinsworth to Long in MONGLY00223577).

465.    In 1986, Monsanto was the sole manufacturer of glyphosate-based herbicides, so guidance in the 1986 RS document regarding steps that manufacturers of glyphosate herbicides

must take was clearly guidance to Monsanto, and all responses to the RS by industry, and actions taken and not taken, were Monsanto actions/inactions.

466.    The RS document is a key historical milestone in the EPA's assessment of glyphosate uses, risks, and benefits, as well as actions that the EPA regards as essential to assure that, on an ongoing basis, benefits stemming from glyphosate uses will routinely exceed any risks.

467.    Key functions of the 1986 RS document were to specify required labelling statements and precautions that must appear on product labels, identify data gaps that must be filled, and alert companies to the studies that they must agree to commission and submit to the agency in a timely way, in order to retain existing registrations/product labels, or win approval of new uses/labels in the future.

468.    The 1986 glyphosate RS document states on page 2: "Failure to comply with these requirements [e.g. filling data gaps, adding new worker safety rules] may result in the issuance of a Notice of Intent to Cancel or a Notice of Intent to Suspend (in the case of failure to submit data)."

### 1. OPP Requirement for Repeat Mouse and Rat Oncogenicity Studies

469.    Under the heading "Chronic Feeding/Oncogenicity Data," the glyphosate Registration Standard notes that available studies included 2-year mouse and rat chronic feeding studies and a 1-year dog study. But because of limitations in study design and/or questions over the interpretation of equivocal results, none of these studies satisfied core, OPP chronic feeding study data requirements.

470.    Hence, the "Summary Science Statement" in the Registration Standard states that "Repeat oncogenic studies are required in mice and rats." (Page 5).

471.     EPA required the company to repeat the invalid IBT rat oncogenicity study that, among other things, failed to reach the Maximum Tolerated Dose (MTD) in the high-dose treatment group (maximum doses in long-term feeding studies are supposed to come close to the MTD).

472.     About three weeks after the public release of the glyphosate RS, Frank Serdy, the head of product registrations at Monsanto sent an internal memo to Monsanto colleagues involved in the ongoing debate over glyphosate oncogenicity. In this August 28, 1986 memo, Serdy outlines "suggestions" for Monsanto's response to the Registration Standard's data call-in for repeat mouse and rat oncogenicity studies. (MONGLY04278162)

473.     After describing possible Monsanto arguments to EPA challenging the need for repeat studies, Serdy writes:

> "If successful [EPA drops the requirement], this approach has the following downside: EPA's response may be: 'Fine, don't repeat either study. We will just put you into class C [a possible oncogene under EPA's classification system]'".

474.     The "downside" described by Serdy had, in fact, been the status quo position of the OPP Toxicology Branch since the February 11, 1985 consensus meeting of eight senior scientists in the Toxicology Branch.

**2. Monsanto Refuses to Conduct a New Mouse Oncogenicity Study**

475.     Monsanto's pushback on OPP's determination that the Bio/dynamics mouse oncogenicity study was positive for renal tubule adenomas had been immediate, intense, and non-stop from the day (1/31/84) Monsanto learned that Dykstra's (the Tox Branch reviewer) initial judgement was that the mouse study was positive for a "rare" tumor in mice, renal tubule adenomas.

476.     Monsanto's aggressive campaign to change the Toxicology Branch's

determination eventually led to OPP's decision to seek the opinion of the Scientific Advisory Panel (SAP) on two glyphosate-oncogenicity questions during the panel's February, 1986 meeting. Monsanto had, in fact, foreseen such an outcome.

477.    The SAP's conclusion was that the results of the mouse study were equivocal, and its core recommendation to EPA was that the agency should require Monsanto to repeat the mouse oncogenicity study.

478.    In the 1986 glyphosate Registration Standard, this is precisely what OPP did. In doing so, EPA set the stage for the next, years-long round of arguments and interventions from Monsanto, and supporting political moves, intended to avoid repeating the mouse chronic feeding study.

479.    Soon after the release of the glyphosate RS document in August 1986, Monsanto communicated via several channels its vehement disagreement with several aspects of the actions required by EPA in the document.

480.    Monsanto's written response to EPA challenging the requirement that the company repeat the mouse oncogenicity study flows directly from the strategic options Serdy presented to his colleagues in the August 28, 1986 memo.

481.    Serdy asserts in his RS-response letter to OPP that:

"The results of the mouse bioassay do not provide positive, or even suggestive, evidence of carcinogenicity. The most that can be said is that the results were equivocal as, in fact, the Scientific Advisory Panel stated."

482.    Serdy does not explain the distinction between "suggestive" evidence and "equivocal" evidence, but acknowledges there is some of the later, but not the former.

483.    The RS-response letter to EPA from Monsanto/Serdy adds some new and echoes some old arguments: (1) the majority of experts testifying at the SAP meeting concluded the

study was equivocal and did not support a treatment-related effect (reminiscent of the "count the votes" strategy suggested by Gingerich in his August 20, 1985 memo to colleagues (MONGLY04268982); (2) Monsanto had already agreed to redo the rat oncogenicity study, so OPP would have a new, purportedly higher-quality study to use in revisiting its judgement regarding glyphosate oncogenicity; and (3) the mouse study should not be repeated as designed because it is "clear" that the maximum does tested in the study (30,000 ppm), was over the MTD.

484.    In the RS-response letter to OPP, Monsanto notes that the company had asked several consulting experts to testify at the SAP meeting, with their time and expenses paid for by Monsanto. The Serdy letter states that the experts "were asked to evaluate the need for a repeat study. All experts agreed that additional testing is not justified…" (page 2).

485.    This recounting of the role of the seven consulting experts brought to the SAP meeting by Monsanto, and their testimony at the meeting, is not accurate.

486.    The lead person representing Monsanto at the SAP meeting was Robert Harness, Director of Environmental and Government Affairs. In his opening comments to the SAP, Harness said: "Because glyphosate is the largest selling herbicide in the world, with many registered uses, we consulted a group of scientists to advise us *on the questions raised by the EPA and presented to you by Dr. Farber* [lead OPP/EPA presenter at the SAP meeting]." (Emphasis added)

487.    The two questions presented to the SAP by the EPA were:

"(1) Based on the Agency's weight of the evidence assessment with emphasis on the mouse kidney tumors, the Agency has classified Glyphosate as a class C (possible human) carcinogen. The Agency specifically requests any comment the Panel may wish to present with regard to its assessment of the weight of the evidence and subsequent determination of carcinogenicity according to the Agency's Cancer Guidelines."

"(2) The Agency requests also that the Panel consider what weight should be given to this marginal increase in kidney tumors, the importance of this type of tumor in the assessment of the carcinogenicity of Glyphosate, and the weight placed on historical and concurrent controls for this type of evaluation."

488.    Accordingly, based on Monsanto's own direct statement to the SAP, the consulting experts were not asked to offer an opinion on whether the mouse study should be repeated, as Monsanto claimed in its November 7, 1986 response to the RS document.

489.    The transcript of the February 11, 1986 SAP meeting provides further, clear evidence that supports this conclusion.

490.    In his opening statement to the SAP, Harness summarizes the key conclusions reached by each of the Monsanto-invited experts, as well as the expert panel convened at Monsanto's request by Pathco Inc.

1. Dr. Marvin Kushner, found an additional tumor in the male mouse control group, no additional tumors in the treatment group, switching the study from purportedly positive to negative for renal tubule adenomas. His concluding statement, quoted by Harness, is that "I see no reason to assign carcinogenic potential to glyphosate."

2. Robert Squires, "In summary, I feel the weight of the evidence strongly suggests the renal adenomas in male mice were naturally occurring and not treatment related."

3. Robert Olsen, "In summary, it is my view that these findings do not support the view that [text cut off]."

4. Dr. Robert McConnell, "It is and has been the opinion of this pathologist that the tumors were incidental and were not toxicologically significant."

5. Dr. Klaus Stemmer, "The incidence of renal tubule adenomas is in all probability biologically by chance."

6. Pathco Inc panel (Drs. Sourer, Anver, Stranberg, Ward, and Goodman, who represented the panel at the SAP meeting), "The incidence of renal tubule cell neoplasms in this study are not compound related."

6. Monsanto's Dr. Timothy Long provided an overview of the back and forth over the mouse study pathology results, and then summarized Monsanto's position by stating, "The overall incidence [of renal tubular adenomas], therefore, remained at 1-0-1-3 [one tumor in controls and mid-range treatment group, 3 in the high-dose treatment group].

These [kidney section] slides and/or supporting data have now been reviewed by a total of 10 pathologists and toxicologists and the unanimous conclusion of all the experts is that there is no evidence of any treatment related oncogenicity."

491.     Two things are clear from the above-cited summary statements presented or quoted by Monsanto representatives at the SAP meeting. First, the consulting experts did, in fact, adhere to their assignment from Monsanto by predominantly addressing the two questions advanced by OPP to the SAP prior to the meeting.

492.     Second, the opening remarks provided during the meeting by the Monsanto consulting experts were laser-focused on the incidence of renal tubule adenomas in male mice in the Bio/dynamics mouse study. None of them spoke to the issue of whether the mouse study should be repeated.

493.     After Monsanto's prepared presentation, the ensuing dialogue between members of the SAP, EPA scientists, and Monsanto's representatives and invited experts is captured in full in the last, approximate 20 pages of the SAP meeting transcript.

494.     In these 20-pages of SAP transcript, there is not a single statement by any of the Monsanto-invited experts addressing whether the mouse study should be replicated.

**3. OPP Review of Arguments on the Need to Repeat the Mouse Study**

495.     Per routine OPP procedures, Monsanto's observations, scientific arguments, and requests for waivers of RS data requirements, including a repeat mouse study, were reviewed by the relevant branches of OPP.

496.     Monsanto had formally requested waivers for two RS-document study requirements: (1) an LC-50 inhalation study, and (2) a repeat mouse chronic feeding/oncogenicity study. William Dykstra in the Toxicology Branch reviewed the request, and the supporting data and arguments submitted by Monsanto. He prepared the Tox Branch

memo regarding "Glyphosate – Monsanto Comments to Glyphosate Guidance Document."
(MONGLY00223052)

497.    Dykstra concurred/approved waiver request (1). On request (2), he wrote: "TB
[Toxicology Branch] does not concur with Monsanto regarding the waiver of the repeat mouse
oncogenicity study (see discussion in review section [pages 3-6 of the memo])."

498.    In his review of Monsanto's arguments in support of a waiver for the mouse
study, Dykstra wrote: "Regarding the need to repeat the mouse oncogenicity study with
glyphosate, TB fully concurs with the conclusion and recommendation of the Scientific Advisory
Panel (SAP)."  The SAP had concluded that glyphosate be classified as Group D (not classifiable
as to oncogenicity) and recommended that replacement studies in mice and/or rats be carried out.

499.    He then writes: "TB believes the oncogenic potential of glyphosate in mice still
remains unresolved and that a repeat mouse study is necessary to fully and adequately assess this
potential." (MONGLY00223052)

500.    Dykstra's memo goes on to say that the new mouse oncogenicity study should be
"specially designed" (emphasis in original) to clarify "certain unresolved questions relating to
the potential oncogenicity of glyphosate."

501.    Dykstra's specific requirements for the new study were unusual, and clearly had
to be unwelcomed by Monsanto.

502.    First, he recommended retaining the 30,000 ppm high-dose treatment rate, since
survival in that group of male mice exceeded survival in the control group (and hence, according
to EPA, had not exceeded the MTD). Second, two additional treatment groups should be added
to more definitely delineate whether there is a dose-response – 7,500 ppm, and 15,000 ppm.
Third, there should be 200 male mice per group, to enhance statistical power.

503. Dykstra also stated that the study should focus just on unresolved questions from the first study. This concession to Monsanto was presumably predicated on the fact that some of his recommendations would have markedly increased the cost of the study (200 male mice in each group, instead of 50; adding two additional treatment groups).

504. First, the study can include only male mice (cutting the size of the study in half). Second, a "tier approach" was acceptable in the pathology examination phase of the study, focusing first on kidney and liver sections in all groups of male mice. If the "first tier" examination produces no evidence of an oncogenic response, "then additional histopathological examination will not be necessary."

505. Last, the memo states: "The registrant should be requested to submit a proposed protocol for the repeat mouse study to the Agency for comment before the experimental work is initiated."

506. Monsanto continued to resist EPA's call for a new mouse oncogenicity study, and indeed has still not redone the study as requested by EPA.

507. The primary reason is clear – legitimate concern in the company that the results of such a study would affirm the key finding in the original Bio/dynamics study mouse oncogenicity study, and result in EPA classifying glyphosate as a "possible human carcinogen."

## B. Monsanto Efforts to Delay and/or Defuse Worker Safety Language on Roundup Labels

508. The 1986 glyphosate Registration Standard (RS) specified new worker safety language that must appear on Roundup product labels in channels of commerce as of June 30, 1988.

509. In a February 9, 1987 letter to the Director of the OPP Registration Division, Monsanto argues that the worker-protection language in the 1986 RS is unjustified, for reasons

first set forth in Monsanto's November 7, 1986 letter/response to the RS.

510.   The 2/9/87 letter restated and expanded upon the arguments set forth in the 11/7/86 letter. The February 1987 letter also transmitted to OPP a new contact-dermatitis study done by a University of California scientist.

511.   OPP's review of the February 1987 letter, the actions it requested, and the newly-submitted dermatitis study was done by Curt Kunchick, a scientist in OPP's Exposure Assessment Branch. His June 18, 1987 review notes that the focus of Monsanto's arguments is contact dermatitis and the newly submitted dermatitis study, while OPP/EPA's principal concerns were eye and skin irritation. (MONGLY00241308)

512.   There are three important attachments included with Kunchick's 6/18/87 review: (1) a report on glyphosate poisoning episodes in California, (2) "Worker Safety Rules for Glyphosate Products Containing the Signal Word 'Warning' for Skin or Eye Irritation"; and, (3) "Worker Safety Rules for All Glyphosate Products Intended for Agricultural Uses and Containing the Signal Word 'Caution'".

**1. Registration Standard Worker Safety Provisions**

513.   The required worker-safety protection statements in Attachment 2 were taken essentially verbatim from the 1986 Registration Standard section setting forth "Required Labelling" (page 28-29).

514.   Attachment 1 was the primary basis for OPP concern over eye and skin irritation. It included data submitted to EPA by the California Department of Food and Agriculture in a June 6, 1988 report entitled "Glyphosate Poisoning Statistics Summary." The author was Jerome Blondell.

515.   Data were recorded and reported by Blondell for three categories of applicators:

ground application using a tractor or spray rig (42 out of 143 total cases); hand application with a backpack sprayer or hand-pump device (100 out of 142 cases); and, other types of application (1 of 142 cases).

516.    Blondell's data covered 64 applicator and 24 mixer/loader cases of eye irritation between 1981 and 1985, and 52 applicator and 7 mixer/loader skin injury cases. In addition, there were a total of 24 "Systemic" illnesses reported, 6 cases among spray rig applicators and 18 among hand applicators. Hand applicators like Dewayne Johnson had suffered the majority of total-applicator injury cases: for the eye, 44 out of 64, and for skin, 35 of 52 irritation cases.

517.    A section of Blondell's report addresses the relationship between the number of physician-treated occupational illnesses in California and the total pounds of glyphosate applied. The Blondell report contains the following, surprising finding that almost certainly caught EPA's attention:

> "The number of California physician-treated occupational illnesses (average per year, 1981-1985) per million pounds of glyphosate reported sold in California in 1984 was 17.0. On average, for all pesticides, we find 1.3 poisonings per million pounds sold, per year in California."

518.    The scope and specificity of the worker-safety provisions required in the 1986 glyphosate Registration Standard (RS), and referenced in Attachments 2 and 3 of the 6/18/87 Exposure Assessment Branch memo are central to this case.

519.    Section D, Part 4 of the glyphosate RS states that "Worker Safety Rules must appear on end-use products containing glyphosate except for those labeled for homeowner use only." (page 28). (Products marketed to homeowners contain 2% or less glyphosate; such dilute products require less stringent safety precautions for those applying the products).

520.    EPA required worker-safety provisions on glyphosate products like those applied at work by Dewayne Johnson include:

"HANDLE THE CONCENTRATE ONLY WHEN WEARING THE FOLLOWING PROTECTIVE CLOTHING AND EQUIPMENT."

"Wear goggles or a face shield, chemical resistant gloves, chemical resistant apron, chemical resistant shoes, shoe coverings, or boots."

"WEAR THE FOLLOWING PROTECTIVE CLOTHING DURING APPLICATION EQUIPMENT REPAIR, CLEANING, DISPOSAL OF THE SPRAY SOLUTION, AND DURING REENTRY TO TREATED AREAS BEFORE THE SPRAY HAS DRIED."

"Wear goggles or a face shield, chemical-resistant gloves and chemical-resistant shoes, or boots. A helmet with visor may be worn during open cockpit aerial application."

"IMPORTANT! Before removing gloves, wash them with soap and water. Always wash hands, face and arms with soap and water before smoking, eating, drinking, or toileting."

"AFTER WORK, wash protective clothing and equipment with soap and water after each use. Personal clothing worn during use should be laundered separately from household articles. Clothing or protective equipment heavily contaminated or drenched with glyphosate must be disposed of in accordance with State and local regulations."

"HEAVILY CONTAMINATED OR DRENCHED CLOTHING CANNOT BE ADEQUATELY DECONTAMINATED." (Page 29, glyphosate RS)

521.    In late 1986 and 1987, OPP was working on a generic policy document setting forth new worker-safety requirements for product labeling that would apply to all registered pesticides. OPP planned on issuing the new worker-safety labeling requirements via what is called a PR Notice (Pesticide Regulatory).

522.    In a 11/2/87 letter to Robert Taylor, OPP's registration manager for glyphosate, Monsanto requested a postponement of certain additional protective clothing requirements on Roundup labels. Such added, worker-safety protections for applicators were called for in the 1986 RS, and were supposed to appear on all Roundup-product labels in commerce as of June 30, 1988.

523.    EPA assigned the task of reviewing and responding to this Monsanto request for deferral to Alan Nielsen in OPP's Exposure Assessment Branch. He received the assignment on

11/18/87 and a memo setting forth his recommended action is dated 1/28/88.

524.    Nielsen agreed to Monsanto's request to postpone additional requirements for personal protective equipment (PPE) on Roundup labels subject to two conditions. The first was that the new worker-protection PR notice would be issued "…in a reasonable time frame…", and hence lead to changes in Roundup worker safety language

525.    His second condition for approval of Monsanto's deferral request stands as one of the first clear statements of OPP/EPA concern over adverse health effects suffered by some Roundup herbicide applicators. Nielsen's second condition was that: "…the submitter [Monsanto] begin investigating the high number of eye and/or skin injuries associated with glyphosate use in California."

526.    Reinforcing his concern, Nielsen added in his memo to the Registration Division that: "Myself and other members of the Exposure Assessment Branch would like to meet with appropriate representatives of the Monsanto Company to discuss their response to this concern [the adverse impacts data from California] within six months. Please arrange with the submitter."

**2. Impact of Monsanto's Refusal to Accept EPA-Required Worker Safety Rules**

527.    The August 11, 1986 glyphosate RS set forth the detailed worker-safety label language quoted above. This language had to be included on Roundup product labels in commercial channels of trade as of June 20, 1988.

528.    Monsanto repeatedly challenged EPA's requirements for stricter worker-safety provisions through multiple communications over several years. Some arguments were procedural (e.g., defer changes in labeling until the new, generic worker-safety labeling PR notice was issued), while others were based on Monsanto-commissioned exposure studies and risk calculations.

529.    The impact of Monsanto efforts to delay or defuse the addition of new worker-safety requirements on Roundup labels can be determined by comparing worker-safety language on Monsanto's glyphosate-based herbicides in 1986, the year the RS was issued, to the worker-safety requirements that appear on labels in subsequent years.

530.    The plaintiff in this case, Dewayne Johnson, applied two glyphosate-based herbicides from June 2012 through September 2015: RangerPro and Roundup ProConcentrate. He worked as an integrated pest management specialist for a school district, and applied these glyphosate products 20-40 times per year.

531.    The RangerPro label in 2012-2014 carried the signal word "Caution" in the section "3.1 Hazards to Humans and Domestic Animals." This concentrated, formulated herbicide was marketed to professional weed managers for "industrial, turf and ornamental weed control." It contained 41% glyphosate and 59% "OTHER INGREDIENTS (including surfactants)."

532.    The Roundup ProConcentrate label and the RangerPro labels are nearly identical. There is a modest difference in the concentration of active ingredient and surfactant. Roundup ProConcentrate contains 50.2% glyphosate and 49.8% "OTHER INGREDIENTS (including 13% surfactant)," while RangerPro contains 41% and 59% glyphosate and "OTHER INGREDIENTS."

533.    Both herbicides are applied at essentially the same rate of glyphosate and surfactant per area of land, and would pose comparable risks during the mixing and loading process and application.

534.    The RangerPro and Roundup ProConcentrate labels include an identical section on human hazards that sets forth mandatory "Personal Protective Equipment (PPE)" and

recommended safety precautions.

535.    Both labels include this language:

**"Personal Protective Equipment (PPE)**
**Applicators and other handlers must wear:** long-sleeved shirt and long pants, shoes plus socks…[no other PPE is required]"

536.    The phrase "other handlers" encompasses those mixing and loading, shipping, storing, or handling these herbicides.

537.    Both labels require that PPE be kept and washed separately from other laundry, and then provide this instruction to applicators and other handlers:

"Discard clothing and other absorbent materials that have been drenched or heavily contaminated with ***this product's concentrate***. Do not reuse them." (Emphasis added).

538.    Under the heading "User Safety Recommendations," both labels state that "Users should:

"Wash hands before eating, drinking, chewing gum, using tobacco or using the toilet. Remove clothing immediately if pesticide gets inside. Then wash thoroughly and put on clean clothing."

539.    There is also a "Non-Agricultural Use Requirement" on each label: "Keep people and pets off treated areas until spray solution has dried."

540.    During his many applications of RangerPro and Roundup ProConcentrate between 2012 and 2014, Mr. Johnson went well beyond the PPE required on the product labels. He wore a Tyvek suit, googles, and a face mask, none of which were required on either label.

541.    He reported that the Tyvek suit only went up to his throat, leaving most of his neck, and the back of his head exposed.

542.    Mr. Johnson also reported that when he was applying Ranger or Roundup herbicide with a backpack sprayer, he was often exposed around the neck and on his head from spray drift, especially when the wind was blowing. In his deposition in a worker's compensation

action against the school district he worked for, Johnson stated" "And the mist [spray drift], you know, it happened a lot, where you just – you can't control it. One minute you're spraying and you get a drift of wind and it's on you, you know." (Dewayne Johnson deposition, Dewayne Johnson vs. Benicia Unified School District, 10/28/2015, page 131).

543.    He also experienced two significant exposure events to the mixed glyphosate herbicide-water solution. In one, there was a leak in the hose of his backpack sprayer, resulting in the flow of some of the spray solution down his back; the second occurred when a hose on a sprayer in the back of his truck broke and he had to fix it. As a result of the second episode, he reported being drenched with the spray mixture in the tank, and had glyphosate and surfactant on his body for hours.

544.    Because of Monsanto's refusal to add to Roundup product labels the new, worker-safety language set forth in the 1986 RS, substantial differences persisted in the worker-safety provisions on the RangerPro and Roundup ProConcentrate labels in 2012-2014, compared to the PPE and other exposure-reduction provisions called for in the RS.

545.    For those mixing and loading either herbicide applied by Johnson, the provisions in the RS would have stated, as quoted above:

> "HANDLE THE CONCENTRATE ONLY WHEN WEARING THE FOLLOWING PROTECTIVE CLOTHING AND EQUIPMENT."
> "Wear goggles or a face shield, chemical resistant gloves, chemical resistant apron, chemical resistant shoes, shoe coverings, or boots."

546.    The mixer/loader and applicator worker-safety requirements on both the RangerPro and Roundup ProConcentrate products that Dewayne Johnson applied: (1) did not require any gloves, let alone chemical resistant gloves; (2) did not require a chemical resistant apron; and, (3) did not require chemical resistant shoes.

547.    The worker-safety language requirements for glyphosate herbicides set forth in

the 1986 RS include:

>"IMPORTANT! Before removing gloves, wash them with soap and water. Always wash hands, face and arms with soap and water before smoking, eating, drinking, or toileting."

548.    In addition to not requiring any gloves, the labels on both of the products that Mr. Johnson applied lacked the above "IMPORTANT" instructions regarding washing hands, face, and arms with soap and water. Instead, the RangerPro and Roundup ProConcentrate labels only offer a recommendation that users should "wash hands before eating, drinking, chewing gum, using tobacco or using the toilet."

549.    There is another important difference between the worker-safety language required by the 1986 glyphosate RS and the language on the labels of the glyphosate products Mr. Johnson applied. The RS language states:

>"HEAVILY CONTAMINATED OR DRENCHED CLOTHING CANNOT BE ADEQUATELY DECONTAMINATED" and hence should be discarded.

550.     Both RangerPro and Roundup ProConcentrate labels require that the herbicide be mixed with water prior to application. The labels provide detailed instructions regarding how much water an applicator should mix with a given volume of the formulated herbicide.

551.    Both labels call for discarding clothing or other absorbent materials that "have been drenched or heavily contaminated with *this product's concentrate*" (emphasis added).

552.    Clothing, or other absorbent material, could become drenched with RangerPro or Roundup ProConcentrate *only* during the mixing/loading process, or in the event a container of the concentrate herbicide was ruptured during transport or in storage.

553.    Neither label requires discarding of clothing drenched during the *application* of the products, after the herbicide is mixed with water and poured into a backpack sprayer or spray tank.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8506-12   Filed 12/20/19   Page 107 of 208

### 3. Monsanto Recognized that the Drift of Roundup Herbicides onto Applicators Using Backpack Sprayers Could Pose Excessive Risk

554.     Throughout the 1990s and 2000s, Monsanto aggressively resisted efforts by U.S. and European regulators to place more restrictive worker-safety requirements on Roundup products labeled for use in non-agricultural settings.

555.     Regulators in the EU and U.S. were concerned about growing evidence of worker poisoning episodes, as well as the impact of POEA surfactants on the worker risks posed by formulated Roundup herbicides.

556.     Monsanto was well aware of the concerns, because there had been a steady flow of new information from their ongoing research and testing around the world that pointed to the need to address high-exposure scenarios and eliminate high-risk surfactants, at a minimum.

557.     Regulators in the UK required Monsanto to add a requirement for respiratory protection on certain Roundup labels, as a result of high-exposures around the face when Roundup is applied to trees via a backpack sprayer. (MONGLY06454420)

558.     EU forced Monsanto to phase out POEA surfactants in a wide range of Roundup products, a task completed by or around 2010.

559.     But in the U.S., Monsanto blocked or curtailed more restrictive worker-safety language on most formulated product labels in the U.S., and retained POEA surfactants in products from which they had been removed in the E.U.

560.     In many internal emails and technical presentations (e.g., Powerpoints for scientific staff), Monsanto acknowledges that:

- POEA surfactants increase the risk of worker-safety problems;
- Safer and equally effective alternative surfactants exist, albeit sometimes at higher cost; and
- Regulators will eventually force elimination of POEA surfactants and the addition of new worker-safety requirements.

561.    In several instances during which Monsanto employees debated when and whether to make changes in Roundup product formulations and/or add new requirements to reduce worker risks, one or a group of employees voiced the opinion (paraphrasing) "why not just make the changes now?"

### 4. Monsanto Efforts to Address Concerns over Worker-Risk Assessments

562.    ███████████, a European-based Monsanto scientist, sent a November 10, 2008 email to his Monsanto colleagues Saltmiras, ████, Farmer, and Kronenberg. In it, ████ shares his strongly held view that Monsanto needed to conduct additional studies to obtain better data to address lingering worker-exposure concerns across Europe.

563.    The new data and analyses that ████ was advocating would be included in an Annex to the dossier Monsanto was developing for submission to the German regulatory authority, as part of the re-registration of glyphosate in the EU.

564.    In his email, ████ writes: "Dermal exposure is the greatest risk of exposure to operators. Therefor we need to be secure on the ADME of such exposure." ADME stands for **A**bsorption, **D**istribution, **M**etabolism, and **E**xcretion. (MONGLY02155827)

565.    A few days earlier (November 7, 2008), ████ had sent an email to Monsanto colleagues, including ██████████ a Monsanto employee based in Germany who was interacting with BfR on glyphosate re-registration issues.

566.    ████'s 11/7/2008 email outlines the topics of discussion on a call addressing adverse worker-exposure episodes the BfR was aware of. Four areas of "preparation" for future interactions with BfR were outlined, including: "3. Toxicology: counter the allegation on synergistic effects of tallow amine [POEA surfactants] with glyphosate." (MONGLY010122033)

567.    Achieving this goal would require a successful effort by Monsanto to downplay

the relevance, or reliability of the many published studies showing that formulated Roundup products containing POEA surfactants were more toxic than 100% pure glyphosate alone.

568.     In several instances, new data called for by a specific regulatory agency in Europe, South America, or some other foreign country, led Monsanto to conduct new studies that were submitted to the specific regulator that had asked for new or better data.

569.     In many cases, such new studies called into question the accuracy of critical parameters and assumptions embedded not just in Monsanto's worker-safety risk assessments, but also the risk assessments carried out by most regulators worldwide.

570.     Regulators in Italy and Germany were, in particular, concerned over data published in several peer-reviewed journals showing that Roundup products formulated with POEA surfactants pose greater risks than glyphosate alone, because POEA is more toxic than glyphosate, and the POEA in Roundup products increases the portion of glyphosate that penetrates the skin and cell walls.

571.     Regulators base their glyphosate worker-risk assessments on data provided predominantly by Monsanto. If the data from Monsanto is not current or is inaccurate, regulatory risk assessments will also be inaccurate, and hence may poorly reflect actual risks in the field.

572.     The failure of Monsanto to submit to the EPA and other regulators updated, more accurate data, as it becomes available to the company, delays the actions that the EPA and other regulators would need to take to produce more accurate, realistic worker-risk assessments.

573.     Keeping regulators in the dark, by failing to share new information it gained from its internal research, was a common tactic Monsanto relied on to delay or block stricter worker-safety label requirements. In the U.S., some such failures likely violate the so-called "adverse effects reporting requirement" set forth in Section 6(a)(2) of FIFRA.

574.    In the record of this case, there are many instances where Monsanto became aware from its internal research, or studies required by a given country, that some component or parameter in its worker-risk calculations probably, or surely understated actual worker risks.

575.    Consistently in such cases, Monsanto's responded in two ways. First, the company would assess whether there was a way to generate new data that contradicts, obscures, or renders irrelevant the new information that suggested current worker risks were understated.

576.    Second, and typically on a parallel track, Monsanto would deploy a variety of strategies to avoid having to share such new information with regulators, even when they were seemingly obligated to do so under law.

577.    In the interim, Monsanto would often change formulations, or voluntarily alter label provisions in a way that preempted the need to update risk assessments or label requirements. This tactic has often been successfully deployed by Monsanto to hide past sins of omission (i.e., not informing regulators that the risks associated with a given use of Roundup are likely higher than currently estimated).

**5. BiF Pushes Monsanto on Worker Risks**

578.    There is a particularly germane example of these Monsanto behaviors in the company's internal deliberations on how to deal with growing concerns in Europe over worker-exposures and risk.

579.    The German regulatory authority, the BfR, was the rapporteur for the EU re-registration review of glyphosate. They had raised with Monsanto concerns over the heightened risk of formulated Roundup herbicides containing POEA surfactants, compared to risks based on data derived from studies focused on 100% pure glyphosate.

580.    A published, peer-reviewed genotoxicity paper came out in 2007 that no doubt

was among the papers triggering new concerns in Europe over formulated Roundup products. It

was entitled "Cytotoxicty of the herbicide glyphosate in human peripheral blood mononuclear

cells (Martinez A, Reyes I, Reyes N, *Biomedica* 27(4):594-604). The results and conclusions

sections from the abstract of the paper follow:

> *RESULTS:*
> Both technical grade glyphosate and Roundup formulation were toxic to human
> peripheral blood mononuclear cells. Cytotoxicity of Roundup was higher than
> cytotoxicity of glyphosate, since the LC50 (50% lethal concentration) determined by the
> trypan blue exclusion method at 24 h was the equivalent of 56.4 microg/ml of glyphosate
> in the form of Roundup and 1,640 microg/ml (1.64 mg/ml) for technical grade
> glyphosate.
>
> *CONCLUSIONS:*
> This in vitro study confirmed the toxic effects on human cells by glyphosate and its
> commercial preparations. Commercial formulations were more cytotoxic than the active
> component alone, supporting the concept that additives in commercial formulations play
> a role in the toxicity attributed to glyphosate-based herbicides.

581.    It is worth highlighting that under the conditions of the 2007 Reyes et al study, the

glyphosate-plus-surfactants in formulated Roundup products were 29-times more cytotoxic than

pure glyphosate. A 29-fold increase in any pesticide-related risk is substantial and would

typically trigger a re-assessment of current risk estimates, and often as a result, changes in

relevant label provisions require by the EPA and other regulatory authorities.

582.    Plans and initiatives to deal with such concerns were a primary focus of a

"Glyphosate Toxicology Peer Review" meeting held in London on June 22, 2007. Three senior,

corporate Monsanto scientists were present (Donna Farmer, ███████ ███████ Bill Graham), and

a fourth participated via the phone (███████████). The experts in attendance were Professor

████████, Dr. ███████, and Dr. ███████. ████████████ is listed as "Consultant."

(MONGLY0118777)

583.    One section of the meeting overview document is entitled "NOTES TAKEN

DURING THE PRESENTATIONS." It includes sections addressing the most controversial and consequential issues facing Monsanto in preserving its glyphosate-related FTO (Freedom to Operate) in Europe: carcinogenicity, endocrine disruption, co-formulants, and operator exposure.

584.    Under "**4. Operator exposure**," there is a section setting forth "**Proposals for Action**." The first bulleted item reads: "Label recommendations for hand held spraying should include recommendation for using shields and not walking through the spray or sprayed area. **ACTION:** ██" (MONGLY0118777)

585.    Recall that the EPA-required worker-safety rules in the 1986 glyphosate Registration Standard document included a requirement for googles or a face shield. This requirement is still not on the RangerPro label in the U.S., the herbicide that accounted for most of the glyphosate-based herbicide that Dewayne Johnson applied.

586.    In the phrase "**ACTION:** ██**,**" ██ stands for ████████, who was head of Regulatory Affairs for Monsanto in Europe and would be responsible for submitting new or revised glyphosate-based herbicide label directions, including worker-safety requirements, to regulatory authorities.

587.    A few years earlier, Monsanto commissioned new studies on the rate of dermal penetration of Roundup herbicides, in response to questions from EU regulators. Studies responsive to this request were needed to sharpen estimates of worker-exposure risk, especially in the case of formulated Roundup products containing POEA.

588.    To address evolving worker-risk concerns among European regulators, Monsanto commissioned a dermal penetration study in rats. It was conducted by a Denmark contract laboratory, TNO. The results of the rat skin penetration study using a Roundup formulation suggested that 5% to 10% of the glyphosate in this Roundup formulation was dermally absorbed,

in contrast to the standard, 3% estimate relied on by EU and U.S. regulators.

589.    Monsanto was worried about the potential that the study would "blow Roundup risk evaluations. (getting a much higher dermal penetration than we've ever seen before." (MONGLY03738295)  Therefore, they decided to stop any further work with TNO to generate new rat skin dermal penetration data.

590.    To my knowledge, the results of the TNO rat skin penetration study showing 5% to 10% dermal penetration were not submitted by Monsanto to the U.S. EPA, as required under the Section 6(a)(2) "adverse effects" reporting requirement in FIFRA.

591.    Nor, to my knowledge and based on the records I have reviewed, was the TNO data shared with any other regulatory agency. If the company did transmit a 6(a)(2) submission to EPA with these data, or provide it to other regulators, Monsanto will surely correct the record in deposition and/or at trial.

592.    In addition, Monsanto continued for years to argue in all regulatory submissions, peer-reviewed journal publications (some with an accurate listing of authorship, others ghost-written), and in the media that the 3% estimate of glyphosate-dermal penetration in the case of Roundup products formulated with POEA *overstated* actual penetration and risks, even after the company knew that the opposite was almost certainly the case.

593.    Accordingly, for many years, Monsanto consciously perpetuated possibly unsafe uses of RangerPro, Roundup ProConcentrate, and other Roundup products in three ways.

594.    First, the company knowingly mislead regulators, and users of RangerPro and Roundup ProConcentrate, including Dewayne Johnson, by failing to disclose to regulators that an erroneously low dermal absorption estimate was included in worker-safety risk assessments.

595.    Second, Monsanto knew that people applying Roundup products with backpack

sprayers were subject to much higher dermal exposure levels when the person applying the herbicide walks roughly in the same direction as the wind, or when the herbicide is applied in an upward direction (e.g., when tall vegetation, like trees).

596.    In light of such common knowledge about the risk of applicator exposure to spray drift when various Roundup brands are applied by hand held or backpack sprayers, Monsanto employees in Europe had considered the addition of a new label provision requiring applicators, on windy days, to walk perpendicular to the direction of the wind. To my knowledge, this simple, low-cost, worker-risk-mitigation measure has still not been included on Roundup product labels in Europe or the U.S.

597.    Third, Monsanto refused to add to its RangerPro and Roundup ProConcentrate labels the more restrictive and cautious worker-safety provisions that EPA called for in the 1986 glyphosate Registration Standard, nor has the company added similar provisions designed to bring about a comparable degree of risk reduction.

598.    The failure of Monsanto to assist regulators in producing progressively more accurate, real world worker-safety risk assessments is a clear and consequential breach of the company's pledge to adhere to the best science available in the manufacture and marketing of its herbicides.

599.    In addition, Monsanto's failure to propose, and/or agree to incrementally more restrictive worker-safety provisions, especially in known, high-exposure application scenarios, enabled and perpetuated unsafe Roundup application episodes, including many of the legal applications made by Dewayne Johnson in 2012-2014.

600.    For these reasons, I conclude that Monsanto's egregious lack of concern for product stewardship and the safety of certain Roundup users substantially increased Mr.

Johnson's many exposures to the glyphosate and surfactants in the formulated herbicides he applied, and hence Mr. Johnson's risk of contracting NHL.

## B. Cultivate Relationships with "Friendly" Scientists and Officials in EPA

601.     Monsanto invested considerable effort in establishing open channels of communication with selected scientists and decision makers in EPA. Frequent interactions helped Monsanto understand how receptive a given person in EPA would likely be, if asked to move toward Monsanto's view of a given study or issue, or at least give Monsanto a "head's up" about forthcoming agency decisions or actions.

602.     My review of the record convinces me that Monsanto had established unusually close relationships with some key officials and scientists in the EPA's Office of Pesticide Programs (OPP) who were involved in either the science reviews or decisions impacting glyphosate-based herbicides. Two examples are discussed herein.

### 1. Jess Rowland

603.     Jess Rowland was the Deputy Director of the OPP Health Effects Division. He was directly involved in managing the EPA's internal assessment of glyphosate's oncogenicity, as well as the EPA's interactions with and response to the IARC review of glyphosate. He also served as a point of contact between EPA and other federal agencies, and managed CARC (Cancer Assessment Review Committee), a key, internal OPP committee that rendered judgement of whether a given pesticide poses cancer risk.

604.     In a 2/20/15 email as Monsanto was preparing for the release of the IARC report on glyphosate, William Heydens writes to Dan Jenkins, his Monsanto colleague that works most closely with EPA on registration issues. The topic is "EPA Folks going to IARC" (i.e., attending

the final IARC Working Group meeting in Lyons, France March 10-14, 2015).

605.    Heydens reports on the two EPA scientists that "will actually participate in the meeting," and two other EPA representatives that will be attending as observers. He identifies the two observers as "Catherine [Eiden] is a Special Assistant in the Pesticide Re-evaluation Division, and we all know Jess." (MONGLY00986901)

606.    The phrase, "we all know Jess," implies a high degree of familiarity among several Monsanto people.

607.    In an April 27, 2015 email exchange between Dan Jenkins (registration, EPA interface) and William Heydens (toxicology, safety), Heydens asks Jenkins about approaching EPA and asking them directly "about what area they see as most problematic [in the IARC monograph] or just ask if there is anything that would help them [EPA] defend the situation?"

608.    In effect, Heydens is asking Jenkins if there is anything Monsanto can do to support EPA in sticking by the agency's current position that glyphosate is not oncogenic, despite the IARC determination. Jenkins responds: "I think you and I could get on the phone w Jess Rowland and discuss this openly. He'll give us straight talk." (MONGLY03929023)

609.    The next day (April 28th), Jess Rowland called Dan Jenkins "out of the blue" and told Jenkins:

> "We have enough to sustain our conclusions [that glyphosate is not oncogenic]. Don't need gene tox or epi. The only thing is the cheminova [another registrant of glyphosate herbicides] study with the sarcoma in mice – we have that study now and its conclusions are irrelevant…I am chair of the CARC and my folks are running this process for glyphosate in reg review." (MONGLY00987756)

610.    But Rowland had another message to pass on to Jenkins that day. The Agency for Toxic Substances and Disease Registry (ATSDR), another U.S. government agency responsible for assessing the toxicity of chemicals, was planning to undertake a review of glyphosate. It was

well known in the toxicology community, and in Monsanto, that ATSDR historically reached conclusions similar to IARC. Monsanto was deeply concerned that an ATSDR determination similar to IARC's would raise serious doubts about the EPA's position that glyphosate does not pose cancer risk.

611.     In this email, Rowland then asks Jenkins for a contact name at ATSDR, and reports that there is no coordination underway between EPA and ATSDR in terms of ATSDR's pending assessment of glyphosate. Then, according to Jenkins's email, Rowland said: "If I can kill this [the ATSDR review] I should get a medal."

612.     I am not aware of another instance in which a senior scientist in the Office of Pesticide Programs made such a blatantly inappropriate statement to a pesticide registrant. In the government agencies for which I have tracked similar regulator-company interactions over the last few decades, an act so blatantly solicitous and inappropriate would have been grounds for dismissal, or worse.

613.     Monsanto recognized Rowland's actions and eagerness to help in the company's efforts to downplay the risk of glyphosate-based herbicides. In a September 3, 2015 email to a large group of colleagues, Dan Jenkins wrote that:

> "No questions but Jess Rowland at EPA is quite proud of their recent endocrine conclusions and is also on point regarding their IARC response. Jess will be retiring from EPA in ~5-6 mos and could be useful as we move forward with ongoing glyphosate defense." (MONGLY03351980)

614.     Rowland was responsible for an October 2015 evaluation of glyphosate as head of the Cancer Assessment Review Committee (CARC).  In conducting this review Rowland apparently violated EPA's own cancer assessment guidelines in concluding that glyphosate was "Not Likely to be Carcinogenic to Humans."  In a May 2, 2016 email, Jim Jones, an Assistant Administrator at the EPA, informed Gina McCarthy, the Administrator of the EPA that the

CARC "assessment was not consistent with Agency's guidelines." (EELI_0000037)

615. This Assessment was "inadvertently" released to the public despite its violation of guidelines and "Monsanto saw it and put out a release saying EPA had confirmed glyphosate is not carcinogenic." (EELI_0000037)

**2. Jack Housenger**

616. As events unfolded in 2015 after the release of the IARC classification, Monsanto's most commonly mentioned rebuttal was that the EPA's Office of Pesticide Programs still classified glyphosate as not likely to pose a human cancer risk. Moreover, EPA had been working for years on its own re-registration of glyphosate. There was intense interest in whether the IARC classification would alter EPA's judgement regarding glyphosate herbicide cancer risk.

617. If EPA did change its position, that would be an extremely grave development, almost sure to seriously curtail Monsanto's "Freedom to Operate," and it would also, in all likelihood, impact the causality phase of ongoing or future litigation.

618. If EPA stuck by its existing determination, it would be helpful to Monsanto in multiple venues, and likely reduce threats to the company's FTO.

619. At the time, Jack Housenger was the Director of the Office of Pesticide Programs, and had been a senior OPP manager for many years.

620. The record (including some text message exchanges) shows a close, deferential, and supportive relationship in communications flowing from Housenger and Monsanto, as well as from Monsanto and Housenger. In short, the communications give rise to the sense that Housenger and Monsanto are on the same "team," pursuing the same goals.

621. In one important sense, they did share a common goal – defending the EPA's scientific judgement that glyphosate herbicides do not pose a risk of cancer to humans, a

judgement directly challenged by IARC's March 2015 classification of glyphosate as a probable human carcinogen. But this EPA-Monsanto comradery obviously depended on EPA sticking to its current judgement regarding glyphosate cancer risk.

622.     So, priority number one in Monsanto's interactions with EPA was to assure they did not change their classification of glyphosate herbicide cancer risk, and priority number two was to encourage, if not compel via political pressure, the EPA to be vocal in defense of its position and criticism of IARC.

623.     One example of Housenger taking the initiative to help Monsanto occurred in May, 2015, about two months after the release of the IARC report. Monsanto, Jess Rowland of EPA, and apparently Housenger were concerned that a review of glyphosate toxicity by ATSDR might align with IARC's, and undermine EPA's view of the science.

624.     After asking Monsanto for help identifying contacts at ATSDR, and calling the ATSDR staff member assigned to carry out the review, Housenger sent a May 20, 2015 email to Patrick Breysse, head of the ATSDR program. Housenger introduced himself as the Director of the EPA Office of Pesticide Programs (OPP), and updated him on the near-complete, comprehensive OPP review. Then he wrote:

> "However, given that our reviews [OPP's and ATSDR's] would be basically done very close in time to one another, there is a question of whether this is a good use of government resources. I's like to talk to you about this and can be reached at the number below." (Public document).

625.     Breysse responds nine minutes later: "Can we discuss today or tomorrow".

626.     Housenger's email and call with Breysse, the ATSDR Director, was not the only contact he made. In an email sent June 24, 2015 to Dan Jenkins, Monsanto's top, D.C.-based registration official, Housenger writes:

> "Dan, here is everyone I talked to

Henry [Abadin] was the one who ended up saying that they [ATSDR] would put glyphosate on hold holding the OPP risk assessment release [he actually meant "pending" rather than "holding" the OPP risk assessment release]

Hope this helps

Breysse, Patrick N…he's the Director of HCEH/ATSDR
Stephan, James W (aka Jimmy) he's the acting director of the Division of Community Health Investigation
Henry Abadin…..he's the branch chief
Hannah Pohl…..is the person doing the work on glyphosate" MONGLY04028722)

627.    This Housenger email to Jenkins reads like a status report from a junior staff person to his/her manager. It reflects a desire to be helpful to Monsanto that is fundamentally at odds with Housenger's role as the senior manager of the EPA's Office of Pesticide Programs.

628.    On October 13, 2016, Jay Vroom of CropLife America (Monsanto's lobbying organization) called and emailed Jack Housenger to discuss removing epidemiologist Peter Infante from the glyphosate SAP panel and to invite him to a retreat with Monsanto and other Industry executives at a West Virginia casino and resort.  EPA-HQ-2017-000442-0000205.

629.    On October 14, 2016, the OPP announces that it was postponing the SAP hearing on glyphosate scheduled for October 18, 2016.  On October 19, 2016, the OPP announced that Peter Infante would no longer be on the SAP panel evaluating glyphosate.

630.    Jack Housenger attended a CropLife retreat at a Casino and Resort with executives of Monsanto and other pesticide companies in November of 2016, one month before a key SAP Panel Hearing on glyphosate.  These executives noted that, "[w]e had some quality time with EPA OPP Office Director Jack Housenger to dig into key issues and operational matters at that vital department of EPA." MONGLY07063555.

## C. Scientific Literature and Third Party Voices

631.     The record in this case shows that Monsanto worked diligently, and with great

success, in influencing the scientific community. It did so by:

- Shaping the published record of science;
- Controlling, to the full extent possible, the information and scientific data accessible to regulators; and
- Influencing, if not controlling, the conclusions drawn by regulators on questions regarding the safety of glyphosate herbicide.

632.     Monsanto uses the term "third party experts" or "third party network" to describe

scientists it is working with, or has worked with in the past, on glyphosate-science and

communication/outreach issues and challenges.

633.     The following paragraph contains a partial list of scientists that were, at least at

one point of time, either a member of the company's third party network of experts, or were

being vetted in anticipation of Monsanto inviting them to become a member.

634.     Members, or individuals under consideration for membership, in Monsanto's third

part network of experts include: Dr. Bruce Chassy, formerly University of Illinois, now editor of

Academic Reviews (runs industry-sponsored journal that publishes Monsanto-friendly pieces,

including several ghost-written ones); Dr. K. Chipman; Dr. John DeSesso; Dr. Stuart Dobson,

Institute of Terrestrial Ecology, UK (member "Roundup Scientific Committee"); Sir Richard

Doll; Dr. John Entine, Genetics Literacy Project (runs industry-funded organization attacking

scientists that raise questions over GE crops, pesticides, and glyphosate); Dr. Kevin Folta,

University of Florida (advocate of GE crops, active on social media); Dr. C. Harris; Dr. John

Geisy, Michigan State University (member RSC); Dr. Malcolm Harrington; Dr. Jack Mandel;

Dr. Nikolas Hodges, University of Birmingham, UK; Dr. Rich Irons; Dr. Larry Kier, consultant

and former Monsanto official; Dr. David Kirkland, Vrije Universsiteit Brussel, consultant to

Monsanto and co-author of ghost-written papers; Dr. Ron Kleinman, help with IARC response;

Dr. Robert Kroes; Dr. James Lamb, former EPA official; Dr. Henry Miller, Hoover Institute,

former FDA official (writes pro-GE and pesticide op-eds for Forbes, the Wall Street Journal and

other publications); Dr. Pam Mink, Emory University (one paid review of cancer risk, one paid

review other risks); Dr. Richard Peterson, University of Wisconsin (member RSC); Dr. G.

Portal; Dr. Jerry Rice, former IARC official; Dr. Keith Solomon, Canadian Network of

Toxicology Centers and University of Guelph (member RSC); Dr. Tom Sorahan; Dr. Gary

Williams, New York Medical College (member RSC, co-author multiple ghost-written papers,

presented before regulatory bodies).

635.     ████████ is a Monsanto employee working on outreach/communications

efforts. She was asked by Monsanto management for her views in response to this question:

"What additional tools and resources would be helpful to your team in responding to issues and

communicating about glyphosate?" (MONGLY03398170)

636.     In response to this question from headquarters, ████ wrote a clear, cogent

summary of the role that third party experts, aka third party voices, play in Monsanto's outreach

and communication efforts:

> "Additional support in the area of recruitment of third party voices to ensure that we are
> not the only supporter of Glyphosate in the debate (ideally we should be a catalyst rather
> than the focal point for a campaign) – could be new academic resources or in some ways
> more importantly populist voices that recognize the practical benefits and can make a
> simple common sense case for the product; *we need real media traction for positive
> messages and third parties are key in making this a reality*." (Emphasis added;
> MONGLY03398170)

### 1. Response to a Key Epidemiological Study

637.     Whenever a scientific paper, report from an organization, a piece in high-impact

media, or other widely publicized event occurred or appeared that challenged Monsanto's view

of glyphosate safety, the company called upon its third-party network to challenge the validity of the new information, label it as poor science, biased or driven by activists, or just not relevant, given "glyphosate's 40+ history of safe use."

638.    Several examples of how Monsanto used third party voices to promote its PR and science messaging are addressed in this section, and other examples are described elsewhere in this report.

639.    In 1999 Hardell and Eriksson published in the journal *Cancer* an epidemiological study done in Sweden focused on the connection between pesticide use and Non-Hodgkin lymphoma (NHL) (Hardell, L., Eriksson, M. (1999). A Case-Control Study of non-Hodgkin Lymphoma and Exposure to Pesticides, *Cancer* 85:1353-1360).

640.    These scientists reported statistically significant associations between exposure to all pesticides and NHL (Odds Ratio [OR]=1.6), use of any fungicide (OR=3.7), and 4-chloro-2-methyl phenoxyacetic acid [MCPA] (2.7). (Odds Ratios over 1.0 indicate heightened risk, and any statistically significant value for a chemical over 2.0 typically raises considerable alarm. Following commonly accepted conventions, an OR is regarded as "statistically significant" if the 95% confidence interval does not include a value less than or equal to 1.0).

641.    The odds ratio for an association between use of glyphosate and NHL was 2.3, with a 95% confidence interval of 0.4 to 13.0. Hence, this association is not regarded as statistically significant because the lower-bound of the confidence interval is less than 1.0. This wide confidence interval was caused by the low number of people with NHL in the study that reported use of glyphosate (there were only 4 individuals who reported use of glyphosate among the 404 individuals with NHL in the study, and 3 individuals among the 741 controls).

642.    In an additional analysis, the authors attempted to correct for confounding

between reported use of glyphosate and MCPA. The resulting OR for glyphosate was 5.8, with a 95% confidence interval of 0.6 to 54.0.

643. While the number of glyphosate-linked cases of NHL was small in this study, leading to the wide confidence intervals noted above, the odds ratios were markedly elevated, pointing to the need for a more powerful study with larger numbers of people exposed vs. unexposed, with and without disease symptoms.

644. Two senior Monsanto scientists – John Acquavella and Donna Farmer – wrote a detailed internal review of the Hardell study, dated April 14, 1999. (MONGLY00555372). It included their estimation of an ~0.30 p-value for the reported association between use of glyphosate and NHL. This means there is about a 30% chance the elevated odds ratio is brought about by chance, and about a 70% probability it is real.

645. Aquavella, his Monsanto colleague Dr. Donna Farmer, and Mark Cullen, a Monsanto consultant, co-authored a letter to the editor of the journal *Cancer* on the Hardell-Eriksson study. The letter, along with a response from Hardell and Eriksson, was published in the August 15, 1999 issue (Vol. 86, No. 4, pages 729-730).

646. The Aquavella-Farmer-Cullen letter made many of the same basic points, often nearly word for word, as in the detailed review of the Hardel-Eriksson study done by Acquavelle in April.

647. The Hardell-Eriksson response dismissed the basis of the letter's major criticisms, and added an important, new quantitative result.

648. Hardel and Eriksson wrote in their response that they had conducted a second case-control study focused on a rare form of NHL called hairy cell leukemia. The results of the hairy cell leukemia study were briefly mentioned in the original Hardell-Eriksson paper, and led

to an odds ratio of 3.1, with a 95% confidence interval of 0.8-12.0. Hence, while suggestive, the association was not statistically significant.

649.     But in their *Cancer* response to the Aquavelle-Farmer-Cullen letter, Hardell and Eriksson reported the results of a pooled assessment of the association between use of glyphosate and both NHL and hairy cell leukemia. In this analysis, there were 8 exposed cases of NHL and 8 exposed controls, leading to an odds ratio of 3.04 and a now, statistically significant 95% confidence interval of 1.08-8.52.

650.     After the results of the Hardell-Eriksson study were published, Monsanto convened an internal meeting on June 29, 1999 to discuss their scientific outreach goals.  In response to the Hardell-Eriksson study showing a link between glyphosate and NHL, the minutes note "Network formation underway in Europe, the will do US. Raising awareness about "H" study (claims about G and cancer, small scale, poor study, poor science.). **Goal, be sure bad Epi conclusions do not spread."**  (MONGLY00904905)

651.     In September 2003, another study was published showing an association between glyphosate and NHL.  In De Roos et al.  (2005) the authors reported a statistically significant odds ratio of 2.1 for glyphosate and NHL ("Cancer Incidence among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study," *Environmental Health Perspectives* Vol 113(1): pages 49-54).

652.     In a September 2, 2003 email John Acquavella of Monsanto writes to his colleagues "Strangely, glyphosate looks to be one of the pesticides most associated with NHL in this analysis." MONGLY00896655.  He further notes "I'm afraid this could add more fuel to the fire for Hardell et al." and states "[i]t looks like NHL and other lymphopoietic cancers continue to be the main cancer epidemiology issues both for glyphosate and alachlor."

653.     In October 2008, another study was published showing an association between glyphosate and NHL.  In Eriksson el al. (2008) the authors reported a significant odds ratio of 2.02 for exposure to glyphosate ("Pesticide exposure as a risk factor for non-Hodgkin lymphoma including histopathologcal subgroup analysis," *Int. J. Cancer* Vol 123: pages 1657-1663) (MONGLY01179185.  The authors conclude that their new study "considerably strengthened" the association between Roundup and NHL reported in the earlier, Hardell-Eriksson study.

654.     Donna Farmer of Monsanto was forwarded an email containing an article reporting the study results and recommending that consumers "Avoid carcinogenic herbicides in foods by supporting organic agriculture, and on lawns by using non-toxic land care strategies that rely on soil health, not toxic herbicides."  MONGLY01179185.  Farmer responds, by stating "We have been aware of this paper for awhile and knew it would only be a matter of time before the activists pick it up..." and asks "... how do we combat this?"  (MONGLY01179185)

655.     In all of the extensive back-and-forth among Monsanto scientists and corporate officials over this series of epidemiological studies showing that use of Roundup heightens the risk of NHL, there is not a single mention of steps Monsanto could take to improve product safety (e.g., by phasing out the POEA surfactants) or reduce exposures by adding more complete worker safety requirements on their product labels.

656.     It is important to emphasize that it is Monsanto's responsibility to take such steps, and add new language on labels, when it recognizes a need to do so and ways to make their products safer. Across the pesticide industry, the majority of proactive steps taken that increase margins of safety in specific pesticide uses and products are initiated by companies, not the EPA.

### 2. Monsanto Response to Positive Genotoxicity Studies

657.     In the 1990s, it became increasingly clear to Monsanto that the current regulatory

status of glyphosate was in jeopardy, worldwide, because of papers published in the peer-reviewed journals reporting genotoxic impacts. Several such papers also explored or speculated on the possible mechanisms leading to observed, adverse impacts on cell and organism viability.

658.   Monsanto was deeply concerned by the growing focus in the scientific community on the genotoxic impacts, and possible mechanisms, following exposures to formulated, glyphosate-based herbicides. The company understood that solid evidence of genotoxicity following exposure to glyphosate-based herbicides would be a "game changer" for the regulatory treatment of glyphosate. (E.g., Heydens previously quoted statement that the genotoxicity of Roundup formulations "are obviously another issue" compared to questions over the genotoxicity of 100% pure glyphosate).

659.   Moreover, during this same time period, Monsanto was aggressively pursuing hundreds of new tolerances and labels around the world for use of Roundup as a pre-harvest desiccant to accelerate harvest operations in dozens of crops, as well as post-emergence applications of Roundup on genetically engineered (GE), so-called "Roundup Ready" corn, soybeans, and cotton.

660.   Monsanto knew that these newly sought and evolving desiccant and GE crop uses of Roundup would create huge growth potential for Roundup sales in the agricultural sector, but the company was also aware that these particular new uses, by their very nature, would lead to sizable increases in estimates of dietary exposure by regulatory authorities. (In general for most crops, the later a pesticide is applied in the growth cycle of a crop, the higher the residues likely to remain in the crop at harvest. Post-emergent, GE-crop uses of glyphosate could be made within ~two months of harvest, instead of before crop germination, and crop desiccation uses are typically made just a few days to two weeks prior to harvest).

661.    Monsanto knew there would be major increases in glyphosate plus AMPA residues in several major food crops, and that these residues would require much higher tolerances, which in turn would force regulators to update dietary exposure and risk assessments, and revisit past judgements that overall exposures to glyphosate and its major metabolite, AMPA, do not pose unacceptable levels of risk to humans.

662.    Any new, credible adverse human-health data on glyphosate-based herbicides would have almost certainly made it more difficult, if not impossible, for Monsanto to gain approval of the much-higher tolerances that had to be approved prior to the EPA, and other regulators, granting new registrations for desiccant and GE-crop uses of Roundup.

663.    This is why Monsanto worked so hard throughout the 1990s on two critical fronts: (1) resisting any new regulatory requirements for genotoxicity testing of glyphosate-based herbicides, and discounting or burying any published studies reporting genotoxic effects, and (2) reversing EPA's judgement that the 1983 Bio/dynamics mouse oncogenicity study was positive in male mice for renal tubule adenomas.

664.    As noted earlier, one of Monsanto's core tactics to discount published evidence of genotoxic impacts following exposure to glyphosate-based herbicides was to commission independent, academic scientists to publish "glyphosate-friendly" reviews of existing genotox literature on glyphosate. A "glyphosate-friendly" genotoxicity review is one that generally strives to dismiss any positive evidence in the literature by focusing on study limitations, while also highlighting the results in negative studies, with little or no attention to their limitations.

665.    The two strategies, when deployed together, amount to cherry-picking science, and is a tactic that Monsanto used routinely and with considerable success. Among other things, it helped perpetuate the folklore that people, including Dewayne Johnson, don't have to worry if

they come into contact with it because Roundup is safe enough to drink.

666.    Three reviews of genotoxicity studies were commissioned and paid for by Monsanto: Williams et al. (2000); Williams et al. 2012; and, Kier and Kirkland, 2013. Each is discussed in the section on ghost-written studies.

667.    A review of Monsanto's role in these company-commissioned reviews of the genotoxicity of glyphosate and/or glyphosate-based herbicides demonstrates the remarkable degree to which Monsanto's strategy of engaging "friendly" scientists was successful.

668.    Monsanto's deployment of this strategy was "successful" in two ways vital to the interests of the company.

669.    First, the strategy delayed the solidification of consensus in the independent scientific community that exposures to glyphosate-based herbicides was causing, and/or could be causing adverse impacts on a wide variety of organisms, including people, through genotoxic mechanisms.

670.    It accomplished this goal, in part, by authoring scathing, negative reviews that delayed or blocked the publication of several studies reporting positive genotoxicity studies that had been submitted to peer reviewed journals.

671.    Second, the strategy perpetuated the "glyphosate is not genotoxic" conclusion reached by regulatory agencies worldwide, which in turn facilitated Monsanto efforts to downplay glyphosate's oncogenic potential.

**3. Monsanto Asks Dr. Parry to Assess Glyphosate Genotoxicity**

672.    In the 1990s several positive genotoxicity studies were published including:

- Lioi et al., (1998, Genotoxicity and oxidative stress induced by pesticide exposure in bovine lymphocyte cultures in vitro, *Mutation Research* 403: 13-20);
- Lioi et al., (1998, Cytogenic damage and induction of pro-oxidant sate in human lymphocytes exposed in vitro to glyphosate, vinclozolin, atrazine, and DPX-

E9636, *Environ. Mol. Mutagenesis* 32: 39-46);
- Bolognesi et al (1997, Genotoxic activity of glyphosate and its technical formulation Roundup, *J. Agric Food Chem* 45: 1957-1962); and
- Clements et al (1997).

673.    These recently published studies conflicted with Monsanto's testing and the long-standing regulatory conclusion that glyphosate, and glyphosate-based herbicides are not genotoxic.

674.    In addition to several other efforts, the company decided to reach out to a well-known and respected expert in genotoxicity, Dr. James Parry, a professor in the School of Biological Sciences, University of Wales Swansea, in the UK.

675.    To gauge how helpful Dr. Parry might be (i.e. whether he would be reliably "glyphosate-friendly") before committing to a more open-ended consulting agreement, Monsanto decided to give him a short-term assignment that entailed reviewing a set of recently published genotoxicity papers. A series of Monsanto emails were sent on May 16-18, 1999 discussing Parry's role and the hoped for outcome. (MONGLY01825649)

676.    The emails discussed Parry's fee (600 pounds a day), and estimated that the requested review would take 10 days (total cost of 6,000 pounds).

677.    In a letter dated August 18, 1999, Dr. Parry transmitted his evaluation report to ▮▮▮▮▮▮▮, a Monsanto toxicologist.

678.    After reviewing a set of published, genotoxicity studies, along with the results of several of Monsanto's own studies, he offered 19 conclusions on the genotoxicity of glyphosate and/or formulated glyphosate-based herbicides.

679.    Based on Dr. Parry's review of the studies: (1) six of his 19 conclusions were that certain types of studies showed no evidence of genotoxicity; (2) 6.5 studies/types of studies were positive for evidence of genotoxicity; and (3) 6.5 were equivocal and would need to be refined

and/or repeated. (Parry's conclusion number 5 notes one positive study, and three negative or equivocal ones in a category of genotoxicity assays; hence, the split score).

680.    Parry then states: "I conclude that glyphosate is a potential clastogenic in vitro." He was unable to draw a conclusion on the clastogenicity of formulated glyphosate-based herbicides because of a lack of studies. And that "glyphosate mixtures may be capable of inducing oxidative damage *in vivo*."

681.    It is important to note that Parry's two conclusions, reached in 1999, were basically the same as the primary reasons that the International Agency for Research on Cancer, in its March 2015 monograph on glyphosate, classified the evidence on genotoxicity/Mode of Action as "strong."

682.    In addition to his written report, Dr. Parry provided Monsanto with a detailed list of recommended research activities to clear up lingering questions over the genotoxicity of glyphosate herbicides, the mechanisms giving rise to genotoxicity, and relevance of these mechanisms to the evaluation of glyphosate's other health effects, and especially oncogenicity. (MONGLY01314264)

683.    In his final, summary statement in the research recommendations document, Parry writes: "My overall view is that if the reported genotoxicity of glyphosate and glyphosate formulations can be shown to be due to the production of oxidative damage then a case could be made that any genetic damage would be thresholded. Such genetic damage would only be biologically relevant under conditions of compromised antioxidant status."

684.    Clearly, in this final paragraph, Parry was delivering to Monsanto a "good news-bad news" message. The "bad news" is glyphosate is likely genotoxic via induction of oxidation damage in cells, and likely other modes of action. The "good news" is that Monsanto might be

able to convince regulators that one or more of these mechanisms might be subject to threshold effects, leading to the possibility that Monsanto could show that the effects are not likely under real-world exposure scenarios.

685.    But Parry's added assertion that oxidative damage from exposure to glyphosate herbicides would only be a problem for people "of compromised antioxidant status" is significant.

686.    Undoubtedly, Monsanto scientists should have known at the time that most people in developed nations consume a diet seriously deficient in total antioxidant activity, and that most countries and international scientific bodies were recommending about a doubling in the daily servings of fresh or lightly cooked fruits and vegetables in order to increase total antioxidant intake via the diet.

687.    Two Monsanto scientists shared their reviews of the Parry report with colleagues. Stephen Wratten wrote an email entitled "Comments on Parry write-up" to ████████ and Donna Farmer. It starts by saying: "I was somewhat disappointed…The style and rather casual lack of completeness and preciseness would make it hard to circulate this around to anyone as supporting information."

688.    Wratten acknowledges that Parry's conclusion -- glyphosate and formulated glyphosate herbicides are likely genotoxic via an oxidative stress mechanism -- will be hard to disseminate and characterize as "supporting information" for Monsanto's long-held belief, and contention, that glyphosate is not genotoxic.

689.    In the next several days in early July 1999, Monsanto officials discuss internally whether to:

- Commission the new genotoxicity research studies Parry recommended;
- Ask someone else to interface with Parry to rough out the edges of his

conclusions; or

- End the effort to cultivate Parry as a "glyphosate-friendly" expert.

690.    The final decision came about two months later. In a September 16, 1999 email

from ██████████ (Monsanto person communicating with Parry) to Heydens and Farmer,

██████ asked for "your opinions and then have a discussion on the action to take?"

(MONGLY03734971)

691.    Heydens responds to ██████ and Farmer later the same day, and writes:

"However, let's step back and look at what we are really trying to achieve here. We want to find/develop someone who is comfortable with the genotox profile of glyphosate/Roundup and who can be influential with regulators and Scientific Outreach operations when gentox issues arise. My read is that Parry is not currently such a person, and it would take quite some time and $$$/studies to get him there. We simply aren't going to do the studies Parry suggests." (MONGLY03734971)

692.    Then, in this same email, Heydens states that Monsanto should accelerate the

search for other genotoxicity experts who would be more "comfortable" with glyphosate's

genotoxicity profile (and hence be glyphosate-friendly). The reason – "We have not made much

progress and *are currently very vulnerable in this area*. We have time to fix that, but only if we

make this a big priority now." (Emphasis added)

693.    In my judgement, this decision was predicated on three points of general

agreement among the Monsanto scientists exchanging emails on the purpose and process of

engaging Parry, and discussing among themselves the substance of Parry's report: (1) Parry

would not change his mind regarding the genotoxicity of glyphosate herbicides until the studies

he recommended were done and assessed; (2) it would be costly to commission and tricky to

conduct the studies Parry recommended in a way that would assure all the bioassays were

negative for genotoxicity; and (3) if done, the studies would likely contribute further evidence in

support of the genotoxicity of at least some glyphosate-based herbicides via an oxidative stress

mechanism, and possibly other mechanisms, and hence would, in the end, not change Parry's mind.

694.    For years, Monsanto continued to discuss internally Parry's recommendations for more refined genotoxicity testing. There was a February 15, 2001 phone meeting in which Dr. Parry and two Monsanto scientists participated (███████████████████). Internal reports and emails describe the meeting, which "started off in a tense atmosphere because Parry was irritated by the language used in the mutagenicity section of the Williams et al. paper." (MONGLY02626553)

695.    In this and other Monsanto-Parry communications, Parry bristled at over-the-top criticisms of other scientists in papers published by teams convened and paid by Monsanto, like the Williams et al. (2000) paper noted above.

696.    In a February 12, 2001 email from ██████████, a Monsanto toxicologist, to his colleagues Larry Kier, Donna Farmer, and William Heydens, ███████ addresses Parry's recommendation to do additional in vitro micronucleus assays on Roundup surfactants. First, he says "let's include talk about laundry detergents, hand soap, dishwashing detergents…" that contain similar surfactant chemicals, to shift attention away from "AG products."

697.    On the prospect of another company asking Monsanto for permission to test the genotoxicity of Roundup formulations, ███████ says: "I know how I would react – with serious concern."

698.    In explaining why he would be concerned, ███████ lists five reasons or arguments that could be advanced to scientists or regulators. First, the surfactants in home cleaning products pose greater risk that ag products. Second, a positive study on a Roundup formulation might trigger the notion that glyphosate might be, or is also genotoxic. Third, pure glyphosate is not

genotoxic, based on data generated mostly by Monsanto. Fourth, some tests on certain formulations and surfactants have been negative (not, of course, mentioning those that have been positive).

699.    His fifth reason is identified as a "fall back position," presumably if the above four arguments fail to satisfy some individuals (e.g. Parry) or regulatory agencies.

> "…we can agree with some testing on either surfactant solutions (would suppliers agree with us?) or with *glyphosate formulations which don't exist anymore on the market* (e.g. MON 35050) [Roundup "classic"]." [Emphasis added].

700.    Why would ▮▮▮▮ acquiesce to the testing of a Roundup formulation no longer on the market, if the company's goal was to understand and avoid exposing people now buying and spraying Roundup herbicides from possible risk?

701.    This 2/12/2001 email demonstrates that Monsanto was avoiding testing its current Roundup formulations, because if they were adequately tested for genotoxicity, the studies would likely confirm Dr. Parry's core conclusion that at least some formulated Roundup products are indeed genotoxic.

702.    This email also shows that when pushed hard to conduct new studies to address some lingering concern, Monsanto's response is to tap into its considerable scientific experience and talent to devise a *seemingly* responsive set of actions or studies that might, at worst, raise risk concerns about a product no longer on the market. This strategy would help assure that regulators will have little, or no interest in the findings. Such a "fall back" position will, at the very least, protect the brand and Monsanto's "Freedom to Operate" (FTO).

703.    On December 23, 2008, the journal *Chemical Research and Toxicology* published online a study by Benachour-Seralini entitled "Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells" (Vol 22(1): 97-105;

134

http://pubs.acs.org/doi/abs/10.1021/tx800218n).

704.    On January 5, 2009, ███████, a Monsanto information specialist, sent an email to over a dozen senior Monsanto scientists alerting them to the online release of this study. In her email to Monsanto colleagues, she writes: "As you know RU [Roundup] is under pressure in France particularly and the team needs talking points very quickly. We would need an issue alert and response to the paper." (MONGLY00987424)

705.    Two days later, one of the recipients of the ██████ alert, Donna Farmer, replies to several of her colleagues: "As usual, the main objective of Seralini in this type of study is to force us (and the regulators) to set long term studies with formulations and not only the active..."

706.    Monsanto failed to provide the Parry Report to the EPA as required under 40 CFR § 159.158. This section of FIFRA spells out the information that must be submitted by registrants:

> (a) General. Information which is reportable under this part must be submitted if the registrant possesses or receives the information, and the information is relevant to the assessment of the risks or benefits of one or more specific pesticide registrations currently or formerly held by the registrant. Information relevant to the assessment of the risks or benefits also includes conclusion(s) or opinion(s) rendered by a person who meets any of the following:
> (1) Who was employed or retained (directly or indirectly) by the registrant, and was likely to receive such information.
> (2) From whom the registrant requested the opinion(s) or conclusion(s) in question.
> (3) Who is a qualified expert as described in § 159.153(b).

## D. Monsanto Reliance on Ghost-writing

707.    As used in this report, the term "ghost-writing" refers to three types of contributions to a written document by a person not listed as the author, or among the co-authors of a document: (1) producing the first and original draft of a document, or section(s) of a document; (2) revising a document, or its section(s), in a way that adds to or alters the substantive content of the document; and (3) providing information and text, either as original

writing or text derived from an existing document, that is used by a listed author or co-author, or document editor, to alter the content of a document and/or respond to comments made during peer review.

708.     Each of the above three types of ghost-writing are unethical and unacceptable in the scientific and regulatory communities.

709.     As part of Monsanto's effort to discredit the Seralini paper and force its retraction, Monsanto and its network of third-party experts, including Dr. Bruce Chassy, referenced the Committee on Publication Ethics (COPE) "Ethical Guidelines for Peer Reviewers (Irene Hames on behalf of COPE Council, March 2013, v.1, www.publicationethics.org), and shared it with Wally Hayes, editor of *Food and Chemical Toxicology*, the journal that published the Seralini study.

710.     The COPE guidelines include that authors and/or reviewers must "declare all potential conflicts of interest" and "recognize that impersonation of another individual during the review process is considered serious misconduct."

711.     In multiple instances, Monsanto authors and reviewers failed to disclose obvious, serious conflicts of interest in their interactions with journal editors. Multiple reviews were submitted by one Monsanto scientist that were ghost-written, in whole or part, by others "impersonating" the reviewer-of-record.

712.     A 2005 editorial entitled "Ghost Writing Initiated by Commercial Interests" appeared in the *Journal of General Internal Medicine* (Vol. 20:549). It begins by saying:

> "The integrity of the published record of scientific research depends not only on the validity of the science but also on honesty in authorship…The scientific record is distorted if the primary purpose of an article is to persuade readers in favor a special interest, rather than to inform and educate, and this purpose is concealed."

713.     Monsanto routinely and regularly ghost-wrote scientific papers published in peer-

reviewed journals, reports, statements submitted to regulatory bodies, op-eds, letters to the editor, promotional material, testimonials, and many other forms of written communications.

714.     Ghost-writing, especially of the sort regularly conducted by Monsanto, is grounds for immediate rejection of a submitted manuscript in accord with the disclosure policies of nearly all reputable, peer reviewed journals.

715.     If ghost-writing were discovered and proven after a paper passes peer-review and is published, *all* reputable journals will demand a full, published explanation and disclosure of the role of those who provided ghost-written material, and *most* reputable journals would retract the paper.

716.     The record in this case involves dozens of examples of ghost-writing by Monsanto employees. Only a sampling of significant cases are addressed herein.

**1. Acquavella Calls Monsanto Out for Unethical Behavior**

717.     A clear example arose in the wake of the efforts by Monsanto to produce peer-reviewed papers and make presentations at scientific meetings critical of the IARC Working Group's classification of glyphosate as a Group 2A "probable human carcinogen."

718.     William Heydens was organizing a group of Monsanto third-part experts and consultants for the "Expert Panel Review of the Carcinogenic Potential of the Herbicide Glyphosate," to be held at the 2015 SRA Annual Meeting. (MONGLY01030787)

719.     Via a November 3, 2015 email, he circulated the panel makeup to John Acquavella and Larry Kier, individuals who had been involved in writing, and/or ghost-writing the papers published in the special glyphosate issue of *Critical Reviews of Toxicology* published in 2016.

720.     John Acquavella replied about an hour later that his name should be in the author

list, to which Heydens replies: "I thought we discussed previously that…we would not be able to use you or Larry as Panelists/authors because of your prior employment at Monsanto."

721.    Just over an hour later, Acquavella responds to Heydens: "I didn't realize that Bill. Also, I don't think that will be okay with my panelists. We call that ghost writing and it is unethical." (MONGLY01030787)

722.    Heydens replied to Acquavella, writing: "We will have to pick this up tomorrow." The next day at 9:25 a.m., Heyden emails Acquavella, copying Donna Farmer, the Monsanto scientist managing Acquavella's consulting work. Heydens proposed a call later in the day. Acquavella responds and sets 11:30 a.m. Arizona time for the call. And then he adds:

> "You guys know me. I can't be a part of deceptive authorship on a presentation or publication. Please note the ICME guidelines below [which he attached to his email] that everyone goes by to determine what is honest/ethical regarding authorship." (MONGLY01030787)

### 2. Gary Williams et al 2000 Paper

723.    In 2000, the peer-reviewed journal *Regulatory Toxicology and Pharmacology* published a paper entitled "Safety Evaluation and Risk Assessment of the Herbicide Roundup and Its Active Ingredient Glyphosate, for Humans" (Williams, GM, Kroes, R, Munroe, AC, Volume 3, pages 117-165).

724.    In a Powerpoint presentation done on December 10, 2010 by David Saltmiras, a Monsanto toxicologist, this Williams et al (2000) paper was called "an invaluable asset" for "Monsanto responses to agencies…Scientific affairs rebuttals…Regulatory reviews." Later in the same slide, Saltmiras states that "More current external expert publications are now needed to support our FTO and Registration Reviews," and poses a question that had come up before in Gingerich's speculation about an EPA Scientific Advisory Panel meeting (see paragraphs x-y): "Will weight of evidence be measured by number of publications or quality of the science??"

(emphasis in original, MONGLY02067858)

725.     The paper emerged from a Monsanto commissioned and paid for project

undertaken by the consulting firm then known as Intertek Cantox

(http://www.intertek.com/scientific-regulatory-consultancy/).

726.     Cantox commissioned and paid for Dr. Williams and Dr. Kroes to write a review

of the human safety of glyphosate and Roundup herbicides, and a Cantox employee Dr. Ian

Monroe served as a third, listed co-author.

727.     Dr. Gary Williams was a professor in the Department of Pathology, New York

medical Center, Valhalla, New York. He had been a consultant to Monsanto in the past and was

well-known and trusted within the company.

728.     Dr. Robert Kroes worked for ROTOX, University of Utrecht, The Netherlands,

and had worked with several Monsanto scientists stationed in Europe.

729.     Dr. Ian Munro was an employee of Cantox Health Sciences International, the

consulting firm hired by Monsanto to produce several peer-reviewed journal articles on

glyphosate-based herbicides, in addition to Williams et al..

730.     The Williams et al. (2000) paper is unusual in its breathe and detail. It covers 48

pages in the journal and strives to accomplish two goals.

731.     First, it provides a summary of a significant, but strategically selective, portion of

the toxicology test results from Monsanto-commissioned studies done to fulfill regulatory data

requirements. In short, it restates Monsanto's findings and conclusions, and spin, from company-

commissioned studies as submitted to regulatory authorities worldwide.

732.     Second, the paper discusses scientific findings relevant to the risk characterization

and risk assessment of exposures to glyphosate and glyphosate-based herbicides. It directs

special focus on papers in the peer-reviewed literature that the company regarded as inconsistent with its conclusions with respect to glyphosate oncogenicity and the genotoxicity of formulated glyphosate-based herbicides.

733.    The paper's "Purpose and Scope" section states:

"Certain sectors of the scientific and nonscientific communities have commented on the safety and benefits of pesticide use. With this in mind, parts of this assessment address specific concerns that have been raised by special interest groups. This review will focus on technical glyphosate acid; its major breakdown product aminomethylphisphonic acid (AMPA); its Roundup formulations; and the polyethoxylated tallow amine surfactant (POEA)."

734.    There is no financial disclosure statement in the paper.

735.    To determine if a financial disclosure statement had been added, the journal's website was visited November 25, 2017, and a search was conducted for the Williams et al paper. The search results were to this link:

http://www.sciencedirect.com/science/article/pii/S0273230099913715

736.    The paper is now available for online purchase via the url in paragraph 361. The abstract is available for no charge, and lists the three authors and their affiliations, but no information is offered on who paid for the study, or the substantial role of Monsanto in writing the paper.

737.    The paper's Acknowledgement statement reads in full:

"The authors acknowledge the assistance of individuals who participated in the preparation of this document. First, we are grateful to those who gathered and made available the large amount of information used to write the manuscript for this document. Second, we thank the toxicologists and other scientists at Monsanto who made significant contributions to the development of exposure assessments and through many other discussions. The authors were given complete access to toxicological information contained in the great number of laboratory studies and archival material at Monsanto in St. Louis, Missouri, and elsewhere. Key personnel at Monsanto who provided scientific support were William F. Heydens, Donna R. Farmer, Marian S. Bleeke, Stephen J. Wratten, and Katherine H. Carr. We also acknowledge the participation and assistance of Douglass W. Bryant and Cantox Health Sciences International for scientific and logistical

support in the preparation of the final manuscript."

738.    The second point in the Acknowledgment statement credits "toxicologists and

other scientists at Monsanto who made significant contributions to the development of exposure

assessments and through many other discussions."

739.    "Significant contributions to the development of exposure assessments" refers to

methodological and/or data and statistical work done by Monsanto on exposure assessment, but

clearly does not encompass ghost-writing of the sections of the paper on exposure assessment.

740.    The acknowledgement that Monsanto toxicologists and other scientists "made

significant contributions through…many other discussions" does not disclose, or even hint at

ghost-writing.

741.    On the role of five "key personnel" at Monsanto, the authors state that their

participation and assistance entailed "scientific support," a phrase that most scientists would

interpret to mean Monsanto provided access to data and other scientific information generated by

Monsanto.

742.    Accordingly, this Acknowledgement statement is false, incomplete, and

misleading, because it fails to disclose the multiple, substantial instances of ghost-writing in the

paper as published.

743.    William Heydens admitted in a 2015 email that Monsanto ghostwrote Williams

(2000) when discussing plans to ghostwrite an updated publication stating "...we ghost-write the

Exposure Tox & Genetox sections...we would be keeping the cost down by us doing the writing

and they would just edit & sign their names so to speak. Recall that is how we handled Williams

Kroes & Munro, 2000." (MONGLY00977264)

744.    In addition to Dr. Heydens admitting that he ghostwrote the article, Monsanto also

documented the writing process for the Williams article showing that Heydens was responsible for drafting the manuscript. (MONGLY02598454)

*Steps:*

1.  **Prepare Rough O** ███████████████  **3. Write Draft** ████████

•  WHO:  Monsanto ███████  •  WHO: ████████████

745.     Heydens efforts were extensive, as he noted "I have sprouted several new gray hairs during the writing of this thing..." (MONGLY0186926)

746.     On June 18, 1999 at 3:18 pm, Douglas Bryant, a Cantox employee, sent a "progress report" on "Roundup documents [papers in preparation by Cantox]" in an email to his client and principle Monsanto contact, Lisa Drake. He copied two people: (1) William Heydens, the senior Monsanto corporate official overseeing the Cantox project and similar "science outreach" efforts, and (2) Cantox colleague and paper co-author Ian Munro.

747.     On the subject of the Williams et al. paper on glyphosate health effects, Bryant reports on the status of various reviews, including by co-author Kroes and Dick Peterson. He writes: "Bill Heydens, Donna Farmer, Kathy Carr and all those at Monsanto have been helping get the document through QA."

748.     If doing so simply entailed catching and fixing errors, such input would be consistent with the acknowledged role in the paper played by Monsanto scientists and toxicologists.

749.     Bryant then outlines the final steps in the process prior to submission of the paper to the journal: Bill Heydens completes the QA changes; sends edited and corrected version back to Cantox to incorporate final comments by the internal-to-Monsanto and Cantox reviewers (e.g. Peterson), and then the paper will be sent to the journal.

750.     Twenty-seven minutes after the Bryant email was sent, Heydens sent this reply to

Bryant and the other recipients of the original email. It was addressed to "All," and states:

> "A clarification – there is one step missing – I will review the final manuscript with the reviewers comments incorporated (in revision mode so I can find them easily) before it is sent to the publisher. I will commit to conducting this review very quickly. Assuming the reviewers don't throw any surprises (I'm especially thinking of Peterson), I can turn this back around with a very minimal investment of time."

751. Three days later, on June 21, 1999, Heydens sends a two-line email to his colleague Donna Farmer. The first line simply says "FYI," and is obviously referring to his forward of the Bryant email exchange of June 18th discussed above. The second line of his short email to Donna Farmer states: "And Dougie [referring clearly to Bryant] thinks I would actually leave the final editing to him unsupervised…"

752. This short quip to Farmer speaks volumes about the degree to which Monsanto controlled the content of the Williams et al (2000) paper, and no doubt many other glyphosate-related papers and communications that Monsanto has ghost-written to one degree or another over the past 40 years.

753. The degree of Monsanto control over the content of the Williams et al. paper is clear in a September 15, 1999 email from Heydens to his Monsanto colleagues Donna Farmer and Stephen Wratten.

754. By September 15th, nearly-three months after the June 18, 1999 Bryant email exchange, there had been multiple calls, exchanges of written material, and meetings between Bryant and Cantox, and Monsanto regarding the content and finalization of the Williams et al paper. (MONGLY00905085)

755. The September 15th email from Bryant to Heydens copies Lisa Drake and Katherine Carr of Monsanto, but not any of the co-authors. It states that: (1) Bryant is sending a revised draft of the paper to the three co-authors Williams, Kroes, and Munro today; (2) the draft

manuscript includes "all the changes that were discussed today and during calls last week. Please check it over to be sure that I have been thorough"; each co-author is asked "to complete his review and respond so journal submission (Food and Chemical Toxicology) can be finalized for September 30, 1999"; and, thanks everyone "for all your effort (undoubtedly there will be more)…"

756.    Later that same day, September 15, 1999, Heydens sends another short, cryptic email to Donna Farmer and Stephen Wratten. This time he writes (exactly as in email): "FYI – in case you want to see how it ended up (hopefully, that is! – I'll strangle Kroes or Williams if they ask for any re-writes!!)  Bill"

757.    By "it," Heydens is referring to the pre-submission, near-final draft of the Williams et al paper.

758.    An honest submission of this paper to a peer-reviewed journal would have listed several senior Monsanto scientists as the co-authors.

759.    It is not clear in the record whether Munro made any substantive contributions to the paper. In a July 30, 1999 email from Heydens to Munro, Heydens writes: "Everyone at Monsanto has agreed with adding you as an author – please do so." (MONGLY01869261)

**3. Williams et al 2012**

760.    In 2012, Monsanto commissioned another team to produce an updated review of recent studies assessing the differential cellular toxicity of glyphosate and formulated Roundup herbicides. This paper appeared in the *Journal of Toxicology and Environmental Health, Part B Critical Reviews* (15(1): pages 39-96). The lead author was AL Williams (not Gary Williams), and RE Watson and JM DeSesso were listed as co-authors.

761.    Monsanto employee Donna Farmer made significant contributions to the

manuscript, but was not listed as an author. In an email sending her workup of the manuscript to DeSesso, Farmer states, "[a]ttached is the first 46 pages. I added a section in genotox from the Gasnier study ...see a attached a critique we did that I took that from. Am working on a section for Gasiner in the mechanistic section. Also we cut and pasted in summaries of the POEA surfactant studies. Attached are more detailed summaries - see Knapp." MONGLY00919381

762.    In the draft manuscript attached to the email Donna Farmer's name is edited out as an author. (MONGLY00919400)

**Developmental and Reproductive Outcomes in Humans and Animals after Glyphosate Exposure: A Critical Analysis of the Available Literature**

Amy Lavin Williams[1,2]
Rebecca E. Watson[1,3]
Donna R. Farmer[4]
John M. DeSesso[1,2,94]

763.    The co-authors conducted a detailed review of dozens of studies, and concluded:

"An evaluation of this database found no consistent effects of glyphosate exposure on reproductive health or the developing offspring. Furthermore, no plausible mechanisms of action for such effects were elucidated. Although toxicity was observed in studies that used glyphosate-based formulations, the data strongly suggest that such effects were due to surfactants present in the formulations and not the direct result of glyphosate exposure."

764.    The 2012 review was critical of a set of five genotoxicity studies carried out by a team of French scientist led by Dr. R. Belle.

765.    In an effort to explain the substantial difference in the conclusions expressed by Williams et al. (2012), in contrast to several published studies, a Letter to the Editor by Belle et al. (2012, Toxicity of Roundup and Glyphosate, Vol 15: pages 233-237) states:

"The authors [of Williams et al (2012)] do not take into account in their interpretation of our results the very poor cell membrane permeability of pure glyphosate."

766.    In concluding their hard-hitting letter, Belle et al. write:

"Although we notice that Monsanto, the manufacturer of Roundup, financed their work, we would have expected strong scientific arguments against our results or alternative findings that would evidence the contrary. This is not the case, and, to our knowledge, our experiments, first published in 2002 and brought to Monsanto's knowledge as early as 1999, have not been demonstrated to be incorrect or biased."

### 4. Kier and Kirkland 2013 Paper

767.    In 2013, the journal *Critical Reviews in Toxicology* published a peer-reviewed paper entitled "Review of genotoxicity studies of glyphosate and glyphosate-based formulations" (Vol 43(4)). Two authors were listed -- Monsanto consultant and former employee, Larry Kier, and Dr. David Kirkland, a professor and Monsanto consultant.

768.    The abstract of the 2013 paper reports that it updates an earlier review of studies on the genotoxicity of glyphosate and formulated glyphosate-based herbicides. This earlier review was the Monsanto commissioned and ghost-written paper Williams et al. (2000) discussed earlier.

769.    The "Monsanto Manuscript Clearance Form" for the 2013 Kier-Kirkland publication is dated 2/29/2012, and lists two authors: "David Saltmiras, Larry Kier (consultant)." Under "Lead Author's Comments," Saltmiras (presumably) writes: "This work falls under the scope of the EU Glyphosate Task Force and will be a valuable resource in future product defense against claims that glyphosate is mutagenic or genotoxic." (MONGLY02117600)

770.    When published, the authors are listed as Kier and Kirkland. Saltmiras's name is deleted. Accordingly, the 2013 genotoxicity review paper is a partially ghost-written update of a partially ghost-written 2000 review.

771.    In the published version of the Lier-Kirkland 2013 paper, the "Declaration of Interest" states:

"Larry Kier and David Kirkland were paid consultants of the Glyphosate Task Force for the preparation of this review. The

146

> Glyphosate Task Force is a consortium of 25 European
> glyphosate registrants, listed on http://www.glyphosatetask-
> force.org/. Larry Kier is also a past employee of Monsanto
> Company. Monsanto Company was the original producer and
> marketer of glyphosate formulations. The authors had sole
> responsibility for the writing and content of the paper and the
> interpretations and opinions expressed in the paper are those
> of the authors and may not necessarily be those of the member
> companies of the Glyphosate Task Force."

772.    Clearly, this "Declaration of Interest" is only partially truthful. Kier and Kirkland did not write the paper; a third author, David Saltmiras, had contributed substantially to the paper, but is not listed as a co-author (but his help is noted in the Acknowledgements).

773.    The authors did not have sole responsibility for the content, and Monsanto, through its consultants Kier and Kirkland, and employee Saltmiras, was largely responsible for the content, not the Glyphosate Task Force. (MONGLY02145924-30)

**5. *Critical Reviews of Toxicology* Special Issue on Glyphosate Risks**

774.    One of the most egregious examples of ghost-writing in the record of this case is the special issue put out by *Critical Reviews of Toxicology* (*CRT*). This special issue was conceived and commissioned by Monsanto when the company learned that the International Agency for Research on Cancer (IARC) would soon issue a monograph discussing the potential of glyphosate-based herbicides to cause cancer.

775.    In short, the contents of this entire special issue of *CRT* was a Monsanto-controlled, and largely Monsanto-written rebuttal of the evidence cited by IARC in support of its "probable human carcinogen" classification.

776.    There are dozens of emails and other documents in the case record memorializing the role Monsanto played in the conceptualization, writing, and publication of the papers in the special issue of *CRT*.

777.    Many of the communications are between Monsanto scientists and individuals working for the Canadian consulting firm Intertek. This firm was hired by Monsanto to put together the papers that would appear in the special issue of *CRT*.

778.    It is important to note that the consulting firm Intertek is basically the same company that Monsanto hired in 1998 to manage the process of putting together the also-ghost-written Williams et al (2000) review of glyphosate toxicity. Back then, the consulting firm's name was CanTox Intertek.

779.    Intertek served as the primary mechanism through which ghost-written material from Monsanto was incorporated in the drafts of the papers that were subsequently reviewed, edited, augmented, and approved by the listed, non-Monsanto co-authors.

780.    In addition, Intertek also served as the primary point of contact with the editor of the journal *CRT*. This arrangement shielded the journal from evidence of Monsanto's direct role, not just an occasional ghost-writer of parts of some of the papers, but as the primary author of several of them, and an important contributor to all of them.

781.    MONGLY00998684 and other documents record how Monsanto drove the selection of the papers to be included in the special issue.

782.    MONGLY00998682 transmits William Heydens edits on the "Summary Report" paper for the *CRT* special issue back to Ashley Roberts, Senior VP of the Food and Nutrition Group at Intertek. Roberts served as the principle point of contact between Monsanto and Intertek, and between Intertek and paper co-authors.

783.    Throughout the review process, Roberts also was the primary point of contact between the paper co-authors and the journal *CRT*.

**6. The Many Forms of Ghost-Writing – Monsanto Style**

784.    The above cited examples of ghost-writing involve unattributed contributions to papers in peer-reviewed scientific journals with explicit, usually clear conflict of interest and disclosure rules that clearly prohibit ghost-writing.

785.    But Monsanto deployed the same basic ghost-writing tactics in several other types of written communication. A few of many examples in the record are briefly described below.

786.    On August 19, 2008, Dr. Charles Healy, a senior Monsanto scientist, received an email request from the Editor of the journal *Cell Biology and Toxicology* to review a glyphosate genotoxicity paper entitled "Cytotoxicity of herbicide Roundup and its active ingredient, glyphosate in rats." (MONGLY02286842)

787.    He accepted the assignment, and contacted his Monsanto colleagues David Saltmiras and Donna Farmer later in the same day. He asked them to conduct the review, explaining:

> "You two would be the reviewers in fact and I would then collate your comments and be the reviewer of record."

788.    In such a circumstance, it would have been entirely routine for Healy to write back to the Editor and ask for permission to conduct the review with assistance from two Monsanto colleagues who have deep expertise on the subject matter of the paper.

789.    The Editor would have almost certainly approved Healy's request, and thanked him in advance for taking on the assignment.

790.    But Healy's decision to rely on ghost-writing in the case of this review is evidence of a deep-set cultural inclination within the company to rely on ghost-written material, even when there was no real reason to do so, nor anything to gain as a result.

791.    The ghost-written Healy et al. review of the paper is nearly five pages, single-spaced, and is about the same length of the paper when it was published about a year later. The

Healy et al. review is brutal, rating the paper a 5 on a scale of 1 to 100 (100 top rating) and unacceptable for publication.

792.    On September 9, 2008, an email from the journal is sent to Healy stating: "I have had completely opposite reviews on this paper. I would be very grateful for your comments before giving the authors a decision." Later the same day, Healy forwarded this message to Saltmiras and Farmer, and adds: "Looks like ours will be the deciding vote as to whether the glyphosate paper is published."

793.    A little over a year later, a revised version of the paper reviewed by Healy et al. appeared in the journal *Environmental Toxicology and Pharmacology* (Vol 28:379-385). The author is Nahla S. El-Shenawy.

794.    Rising concerns over Roundup herbicide human health effects in Latin America led to a Toxicology Expert Panel meeting in October 2012. David Saltmiras was charged with putting together an invited, expert panel for the meeting. A seminar on the history and activities of the EU Glyphosate Expert Advisory Panel was among the presentations Saltmiras was organizing.

795.    In an August 13, 2012 email, Saltmiras shares with colleagues that he will invite Sir Colin Berry or Jack Mandel to do the seminar, and adds that "I will likely prepare the presentation and send to him to change/adapt as he sees fit."

796.    David Saltmiras engaged in an email discussion on January 26, 2013 with Monsanto-consultant and former employee Larry Kier over whether Saltmiras should be added as a co-author of Kier and Kirkland (2013), since he wrote a significant portion of the paper. Saltmiras tells Kier that he had been strongly encouraged by "Senior Monsanto management" to author some peer reviewed publications, and that this Kier and Kirkland paper "is the fifth such

Glyphosate related manuscript I have been involved with over the past few years without co-authorship."

797.    

798.    As part of his 2015 performance evaluation, Saltmiras summarized his glyphosate-related activities, which included "ghost wrote cancer review paper Greim et al. (2015), coord Kier (2015) update to K&K, pushed for Sorahan (2015)." (MONGLY017223742)

## D. Attacks on Scientists or Organizations Producing Adverse Data on Glyphosate

### 1. Intimidation of IARC Working Group Members

799.    Dr. Consolato Maria Segi, a professor at the University of Alberta, Canada, was a member of the IARC Working Group that carried out the assessment of the oncogenicity of glyphosate.

800.    After the release of IARC Monograph 112 and announcement of the 2A classification, Dr. Sergi received a letter dated October 31, 2016 from a U.S. based law firm, Hollingsworth LLP. This firm had been hired by Monsanto to carry out various activities in response to the IARC decision. Apparently, several other, if not all of the other IARC Working Group members received a similar letter.

801.    According to Dr. Sergi's response dated November 4, 2016, the law firm's letter

requested "disclosure of files used in connection with the preparation of the IARC Monograph Volume 112." Prior to responding, she consulted with colleagues on the Working Group and IRAC.

802.     She replied that the files belonged to IARC, and the result of their deliberations were explained in detail in the monograph. She then wrote:

> "I found your letter **intimidating** and **noxious** even though transparency is important…It is impolitic to mention possible consequences without identifying the correct background. I find your approach reprehensive and lacking of common courtesy even by today's standards. As a graduate of a British educational system, I consider your letter **pernicious**, because it maliciously seeks to instill some anxiety and apprehension in an independent group of experts…Please avoid contacting me or any of my colleagues in the future regarding this issue." (Emphasis in original; Heydens Exhibit 3-54)

**2. Seralini Team**

803.     On September 19, 2012, a team of French scientists led by Gilles-Eric Seralini published a paper entitled "Long term toxicity of a Roundup herbicide and a Roundup-tolerant genetically modified maize" in the journal *Food and Chemical Toxicology* (Vol 50: 4221-4231).

804.     The paper reported the results of a two-year rat study. Both formulated Roundup herbicide and GE-corn, fed separately and together, were found to trigger a variety of pathologies including cancer, damage to the pituitary gland, liver, and kidneys, and premature death.

805.     The kidney emerged as a particularly vulnerable organ, given that 76% of the impacted parameters were associated with kidney deficiencies.

806.     The abstract ends with this statement:

> "These results can be explained by the non-linear endocrine-disrupting effects of Roundup, but also by the overexpression of the transgene in the GMO and its metabolic consequences."

807.     The Seralini study was the first, independent two-year rat feeding study designed

to sort out the individual and combined impacts of long-term exposure to a GE corn (NK603) and formulated Roundup herbicide. Previously, Seralini and colleagues had conducted several genotoxicity experiments comparing the toxicity of glyphosate and formulated Roundup in cell assay systems.

808.    The paper's findings received extensive media coverage in the U.S. and Europe, and posed a significant threat to Monsanto's commercial interests, as well as a major challenge for regulators who had approved both Roundup and GE corn.

809.    The next day, September 20th, David Saltmiras sent an email to Sir Colin Barry and Andrew Cockburn, a consultant working for Monsanto. It marks the beginning of a campaign that would last years, with the goal of discrediting the Seralini paper and team.

810.    In the email, Saltmiras calls the paper "junk science," questions what happened with the journal's peer review process, and states: "I also suspect this paper may be in our own best interests – the last rites for Seralini's few remaining shreds of scientific credibility." (MONGLY01096620)

811.    Regardless of the merits and faults of the paper, the rapidity and scope of negative commentary, beginning on the day the paper was released, was virtually unprecedented.

812.    A week after the paper's release, a Monsanto-funded, retired academic in the U.S., Dr. Bruce Chassy, emailed the journal editor Wallace Hayes calling for the paper to be retracted, in order to save the reputation of the journal. (MONGLY00900629)

813.    After Hayes responds and says he will process Chassy's email as a letter to the editor, and give the Seralini team an opportunity to reply in accord with standard journal policy, Chassy quickly replies and writes that his initial email "was a heartfelt expression by a caring colleague who is deeply concerned…My intent was to urge you to roll back the clock, retract the

paper, and restart the review process." Then, Chassy alleges that "The paper in question has not been peer reviewed," a claim which he no doubt knew was false.

814.    In the coming weeks and months, Monsanto encourages and helps orchestrate a series of progressively more critical commentaries, that soon include allegations of scientific fraud by the Seralini team.

815.    A remarkable exchange of emails between senior Monsanto officials and scientists occurs on September 26, 2012. Saltmiras starts the email chain at 11:50 a.m., which is sent to seven colleagues, including Eric Sachs, Bill Heydens, Bruce Hammond, and Daniel Goldstein.

816.    In the email, he reports on a call he had earlier that morning with the journal editor, Wallace (Wally) Hayes. Saltmiras writes:

> "He [Hayes] expressed concern that to date he has only received links to blogs, web postings, media releases, etc. and no formal letters to the Editor…Therefore, he urgently needs rational, objective and authoritative formal letters to the Editor….I believe he would like such letters <u>TODAY</u>!" (Emphasis in original, MONGLY02063095-96)

817.    Among "Actions" Saltmiras lists in his email, he reports that he has emailed the EU Glyphosate Task Force (GTF) Toxicology Working Group about the GTF submitting a letter; that Eric Sachs (Monsanto's head of Regulatory Policy & Scientific Affairs) will follow-up with "his third party scientific experts…and request they consider formal letters to the Editor." Last, Saltmiras asks for his colleague's "thoughts on promptly moving forward."

818.    Eric Sachs responds 13 minutes later, reporting that Bruce Chassy will soon submit his letter to the journal, and "notify other scientists that have sent letters [to media outlets or Monsanto] to do the same. He understands the urgency."

819.    Fifteen minutes later, Heydens replies to the group: "And I very strongly believe we must go ahead and put together a Monsanto letter to the editor…"

820.    At 12:22 p.m., four minutes after Heydens email, Eric Sachs writes to the group:

"I remain adamant that Monsanto must not be put in the position of providing the critical

analysis that leads the editors to retract the paper." (MONGLY02063096)

821.    Heydens replies privately to just Sachs 10 minutes later:

"This [Sachs' recommended role for Monsanto] makes no sense to me at all. We have
defended our science every step of the way since our 1st encounter with him [Seralini].
That fact remains that the external sector has not given us what we need, and the editor is
telling us it is the 11th hour…"

822.    Then Sachs replies just to Heydens 16 minutes later:

"I am not challenging that Monsanto should defend our science – we absolutely should
and have. There is a difference between defending science and participating in a formal
process to retract a publication that challenges the safety of our products. We should not
provide ammunition for Seralini, GM critics and the media to charge that Monsanto used
its might to get this paper retracted. The information we provided clearly establishes the
deficiencies in the study as reported and makes a strong case that the paper should not
have passed peer review. We have done our part. It is time now for the public sector and
especially our network of experts to do theirs." (MONGLY02063095-96)

823.    In this exchange, Sachs argues that Monsanto must not be perceived as

orchestrating and supporting a campaign that is designed to force the journal to retract the

Seralini paper, but that is essentially what they did, beginning with the sharing of Monsanto-

written criticisms of the Seralini study, before its public release, to a number of its third-party

experts who were quoted in various media stories, and/or wrote blogs, commentaries, and letters

to the editor.

824.    Two days later, in an email from Daniel Goldstein to Sachs on the effort to

encourage letters to the editor, Goldstein writes to Sachs: "We are being asked to keep internal

correspondence down on this subject." (MONGLY00936725)

825.    In early October, Goldstein shared notes from conference calls with Monsanto

scientists and registration specialists in Asia/Pacific the Americas/Europe/Africa with dozens of

colleagues regarding the fallout from the Seralini study. It includes "A list of pending actions in St. Louis is provided below." (MOMGLY00978885-90)

826.    These actions and "Key Points" cover Monsanto efforts to support the retraction campaign; studies that Monsanto should consider undertaking to have a basis to challenge the findings in the Seralini paper; and, rebuttal arguments and related talking points to share with regulators trying to determine whether and/or how to react to the Seralini paper's explosive findings.

827.    Then Goldstein writes: "c. And finally – the one [new study that Monsanto should consider doing] you have all been waiting for: 2 year rat/chronic studies of pesticide formulations on crop."

828.    The Monsanto letter to the Editor of *Food and Chemical Toxicology* appeared *[date].* It spanned six pages of text in the journal; the original Seralini paper was 11 pages, of which about 4.5 pages were tables, figures, and photos. The Monsanto letter was signed by three Monsanto scientists: Bruce Hammond, Daniel Goldstein, and David Saltmiras.

829.    Remarkably, the authors of the letter write "The authors declare that there are no conflicts of interest" in the section of the letter labeled "Conflict of Interest," when in fact it is hard to imagine how three authors could be more directly conflicted.

830.    On November 19, 2013, *Food and Chemical Toxicology Editor* Wallace Hayes wrote Seralini a letter informing him his paper would be retracted. The letter included the retraction statement that Hayes was going to publish. It recounts the controversy, the letters to the editor, "and even allegations of fraud."

831.    Then, Hayes writes:

"Unequivocally, the Editor-in-Chief found no evidence of fraud or intentional misrepresentation of the data…Ultimately, the results presented (while not incorrect) are

inconclusive, and therefore do not reach the threshold of publication in *Food and Chemical Toxicology*."

832.    The retraction of a scientific paper for reporting inconclusive results is extremely rare, and if such a test for conclusiveness of results were adhered to consistently, the number of published papers would be dramatically reduced.

833.    The real reasons for the retraction of the Seralini paper, in my opinion, were the economic threat the paper's findings posed to two of Monsanto's most profitable products (GE corn, Roundup), and the orchestrated retraction campaign carried out by Monsanto's network of third party experts. "Inconclusive results" was, in short, a lame excuse, but apparently the best that Wally Hayes could come up with.

### E. The IARC Bombshell

834.    The International Agency for Research on Cancer (IARC) released a summary of its Working Group report on glyphosate and glyphosate-based herbicides via a short report published in the May 2015 issue of *The Lancet Oncology*, a highly regarded medical journal. The full Working Group monograph was published on January 26, 2917 (http://monographs.iarc.fr/ENG/Monographs/vol112/mono112.pdf).

835.    The key, concluding section of the full monograph discussing the basis for the Working Group's classification decision states:

### "6.3 Overall evaluation

Glyphosate is *probably carcinogenic to humans (Group 2A).*

### 6.4 Rationale

In making this overall evaluation, the Working Group noted that the mechanistic and other relevant data support the classification of glyphosate in Group 2A.

In addition to limited evidence for the carcinogenicity of glyphosate in humans and sufficient evidence for the carcinogenicity of glyphosate in experimental animals, there is strong evidence that glyphosate can operate through two key characteristics of known human carcinogens, and that these can be operative in humans. Specifically:

• There is strong evidence that exposure to glyphosate or glyphosate-based formulations is genotoxic based on studies in humans in vitro and studies in experimental animals.

One study in several communities in individuals exposed to glyphosate-based formulations also found chromosomal damage in blood cells; in this study, markers of chromosomal damage (micronucleus formation) were significantly greater after exposure than before exposure in the same individuals.

• There is strong evidence that glyphosate, glyphosate-based formulations, and aminomethylphosphonic acid can act to induce oxidative stress based on studies in experimental animals, and in studies in humans in vitro. This mechanism has been challenged experimentally by administering antioxidants, which abrogated the effects of glyphosate on oxidative stress. Studies in aquatic species provide additional evidence for glyphosate-induced oxidative stress."

## 1. Placing the IARC Classification in Perspective

836.    Monsanto had hoped that the IARC Working Group would classify glyphosate and glyphosate-based herbicides in Group 4 ("The agent is probably not carcinogenic to humans"), or at least in Group 3 ("The agent is not classifiable as to its carcinogenicity to humans").

837.    But since Monsanto scientist Tom Sorahan had been among the invited, industry observers at the public meetings of the Working Group, the company was aware of the Working Group's likely judgements in the key areas that drive IARC determinations – animal testing, human epidemiology, and genotoxicity/possible mechanism(s) of action.

838.    Given that the IARC classification system is clearly explained and is driven by the strength of evidence these three areas, Monsanto had a reasonably firm basis for projecting

that the ultimate Working Group classification decision, would be either a 2B classification ("possible human carcinogen") or a 2A classification ("probable human carcinogen") was possible, if not the most likely outcome.  A memo prepared in advance of the meeting stated "We should assume and prepare for the outcome of a 2B rating (possible human carcinogen); a 2A rating (probable human carcinogen) is possible but less likely." MONGLY02913526

839.    In the spring of 2015, I was among many scientists awaiting the IARC decision on glyphosate and the Working Group's report. When I learned of the Group 2A, "probable human carcinogen" classification, I was very surprised, since I had expected a Group 2B classification.

840.    I read with interest the membership of the Working Group, which was chaired by Dr. Aaron Blair. I had met Dr. Blair in 1982 or 1983, when he was invited to give Congressional testimony on behalf of the National Cancer Institute (Blair's employer) on cancer-causing pesticides to the Department Operations, Research, and Foreign Agriculture Subcommittee (DORFA), of the House Committee on Agriculture. From 1981-1983, I served as the staff director of the DORFA Subcommittee.

841.    Over the years, I remained in touch with Dr. Blair, sought his advice on scientific matters, and considered him a professional colleague. To me, the Working Group's 2A classification decision was unexpected, and bound to trigger a strong response from Monsanto, other glyphosate-based herbicide registrants, and farmers choosing to grow GE crops reliant on Roundup herbicides. It would also have significant regulatory ramifications.

842.    To better understand the thinking of the Working Group, I called Dr. Blair and had a phone conversation with him on or about March 22, 2015. He outlined the factors leading to the Working Group's decision, and said both the Working Group and IARC had anticipated

the strong reactions that had already started to appear in media stories and various blogs.

843.  In response to a question I asked about how strong the support was in the Working Group for the 2A classification, Dr. Blair told me that as the Working Group approached a final decision, the most extended debate was not between a 2A ("probable") or 2B ("possible") human carcinogen classification, but actually between a Group 1, "The agent is carcinogenic to humans" and a Group 2A classification ("The agent is probably carcinogenic to humans").

844.  Again, this was shocking information.

845.  I suspected that the focus of the internal debate within the Working Group would eventually become public knowledge, and when it did, it would place the Working Group's 2A decision in a substantially different light.

846.  The fact that the Working Group almost classified glyphosate as a Group 1 carcinogen did become public knowledge as a result of an Andrew Cockburn story in the September 2015 issue of *Harpers Magazine.* The story was entitled "Weed Whackers – Monsanto, glyphosate, and the war on invasive species" (https://harpers.org/archive/2015/09/weed-whackers/).

847.  Cockburn's story labels the IARC classification "a massive speed bump" undercutting Monsanto's 'mantra…all labeled uses of glyphosate are safe for human health'…"

848.  To gain perspective on the IARC Working Group's assessment of the science, Cockburn interviewed Aaron Blair. The germane passage in Cockburn's story reads:

"According to Blair, there were good grounds to declare that glyphosate definitely causes cancer [i.e., to classify it as a Group 1, *proven* human carcinogen]. This did not happen, he said, because 'the epidemiologic data was a little noisy.' In other words, while several studies suggested a link, another study, of farmers in Iowa and North Carolina, did not. Blair pointed out that there had been a similar inconsistency in human studies of benzene, now universally acknowledged as a carcinogen. In any case, this solitary glitch in the data

caused the group to list glyphosate as a probable (instead of a definite) cause of cancer."

## 2. Monsanto's Preparation for the IARC Report and Classification

849.    In mid-September 2014, Donna Farmer, a senior Monsanto toxicologist, learned of the forthcoming IARC review of the oncogenicity of glyphosate and glyphosate-based herbicide, and began developing a plan to respond to the forthcoming report. (MONGLY01207339)

850.    A month later, William Heydens sent an email to Monsanto colleagues including ███, Farmer, ███, Koch, and Saltmiras, in which he asked: "…wouldn't an adverse IARC evaluation have the real potential to impact the results of the Annex 1 renewal [re-registration of glyphosate in the EU]." Then, he also notes:

> "And while we have vulnerability in the area of epidemiology, we also have potential vulnerabilities in the other areas that IARC will consider, namely, exposure, genotox, and mode of action." (MONGLY00989918)

851.    In November 2014, a consulting agreement was completed between former Monsanto epidemiologist John Acquavella and Monsanto at $400 per hour, with Donna Farmer as the principle point of contact. (MONGLY01224009)

852.    A December 17, 2014 email from Kimberley Link in Monsanto's communications division to Daniel Goldstein discusses the need to identify third-part voices. It reports that Monsanto has hired Potomac Communications to place favorable op-eds, targeting the Washington Post and USA Today, and a potential plan to approach officials in the American Academy of Pediatrics to find someone to serve as "high profile author." (MONGLY01021656)

853.    A document dated 2/15/15 describes "Glyphosate Key Points Following IARC Decision," and was developed by a Heydens-Farmer-Saltmiras led team preparing for the release of the IARC decision. In the event that IARC assigns glyphosate-based herbicides "an

unfavorable 2B classification," the company set forth a plan that would hopefully generate an "orchestrated outcry" after the March 3-10, 2015 IARC working group meeting when, presumably, the final classification decision would be made.

854.  The plan set forth seven "Key Industry Points" critical of the feared, 2B classification. (MONGLY01021709-11) Seven more talking points for "Academics" are outlined, and include:

- "IARC has done a disservice by creating baseless fears with a cancer rating for glyphosate, and the confusing classification is certainly open to distortion by alarmists";
- The IARC decision "was predictable and political"; and
- "Government regulators remain reassuring about the potential risks."

855.  On February 19, 2015 William Heydens sent an email to Donna Farmer, copied to Koch, Saltmiras, and Hodge-Bell, on the subject "RE: IARC Planning." The email describes "the next two most important things that we need to do…" These were a meta-analysis of epidemiology studies, and a re-assessment of Agricultural Health Study data that established a weak link between use of a glyphosate-based herbicide and multiple myeloma. (MONGLY00977267)

856.  Heydens goes on to describe possible approaches to generate peer-reviewed journal articles countering the IARC classification. He writes that:

"If we went full-bore, involving experts in all major areas (Epi, Tox, Genotox, MOA [Mechanism of Action], Exposure – not sure who we'd get), we could be pushing $250k or maybe even more. A less expensive/more palatable approach might be to involve experts only for areas of contention, epidemiology and possibly MOA…and we ghost-write the Exposure Tox & Genotox sections. An option would be to add Greim and Kier or Kirkland to have their names on the publication, but we would be keeping the cost down by us doing the writing and they would just edit & sign their names so to speak. Recall that is how we handled Williams Kroes & Munro, 2000." (MONGLY00977267

857.  The "option" laid out in Heydens email is essentially what Monsanto did in the course of developing the papers that were published September 28, 2016 in a special, glyphosate-

162

safety issue of the journal *Critical Reviews of Toxicology*.

858.    In a detailed, internal document dated February 23, 2015, Monsanto describes its multi-faceted plan for responding to the IARC decision due to be announced in about two weeks. It provides background on IARC, and states, for example,

> "IARC has a history of questionable and politically charged rulings on the carcinogenic properties of products such as cell phones, coffee and caffeine. We should assume and prepare for the outcome of a 2B rating (*possible* human carcinogen); a 2A rating (*probable* human carcinogen) is possible but less likely." (MONGLY02913526)

859.    Attachment A to this document sets forth the "Objectives for Preparedness & Engagement" in Monsanto's response to the IARC decision. The two-bulleted items read:

- "Protect the reputation and FTO of Roundup by communicating the safety of glyphosate"; and
- "Provide cover for regulatory agencies to continue making re-registration decisions based on science."

860.    Under "Strategies/Tactics" to achieve the above stated objectives, the Attachment A document states, under the heading "Post-IARC": "4. Orchestrate Outcry with IARC Decision ~ March 10, 2015." (MONGLY02913530)

861.    The introductory section of the full, 2/13/15 document states that: "Regulatory is not aware of a situation where a regulatory body took a different position than IARC." (MONGLY02913526)

862.    The "Key Deliverables" section outlines 24 items and actions, organized by milestone date (pre-IARC decision; week of Feb. 23-27; Post-Decision/Posting, etc). These include:

- Engage Henry Miller, "Inoculate/establish public perspective on IARC reviews" (Miller produced a hard-hitting Forbes piece the day of the release of the IARC decision);
- Blog posts;
- Outreach to EPA/IARC participants;
- Contact journals to inquire about press releases, for "amplification of scientific

studies (a Saltmiras task, which went badly awry);
- "Inform/Engage Industry Associations", with the objective "Lead voice in 'who is IARC' plus 2B outrage"; and
- Post-release of decision, "Outreach to key stakeholders," including grower groups, in order to "Neutralize impact of decision/gain support.

863.    A March 17, 2015 email is sent from Eric Sachs, head of Monsanto's public affairs and outreach efforts, to Henry Miller, a long-term, glyphosate-friendly member of Monsanto's third-party network. In it, Sachs forwards to Miller a Monsanto/Potomac Communications-written draft of Miller's op-ed for Forbes.

864.    Five days earlier, Sachs had emailed Miller to ask him if he would be willing to write more on the IARC decision, to which Miller replied: "I would be if I could start from a high-quality draft." (MONGLY02063615)

### 3. Monsanto Selects Donna Farmer to be a Key IARC-Response Spokesperson

865.    On February 25, 2015, Donna Farmer received an email from Kimberley Link informing her that "you have been selected as one of the primary spokespersons for the company to defend glyphosate." (MONGLY01210309)

866.    Michael Koch, a senior official and part of Monsanto's communications team, emails Farmer seven minutes later to "discuss" this new role for Farmer in the IARC response, and writes that "In the short term I think you are the right 'fix'."

867.    A flurry of emails then address how to rapidly gear up the third-party expert response, in support of Monsanto's critical reaction to the expected IARC 2B classification of glyphosate (MONGLY01021648)

868.    The communications team asks Dan Goldstein several times to identify experts that are vetted, and prepared to say and write messages aligned with Monsanto's position. Such third-party experts would work with Farmer, and are needed so that the communications team

and Potomac Communications can move ahead with writing and placement of favorably, largely ghost-written op-eds.

869.    Goldstein replies in a remarkable email sent 2/23/15:

"I realize that a non-paid individual would be preferred – but I do not know anyone who has kept up with this in their 'spare time' as a toxicologist and *one needs to be mighty prepared if one wishes to feel comfortable arguing with IARC*." (Emphasis added)

870.    Goldstein estimates that a new expert would need "a good 10 hours of work in this, at $200 per hour" to accomplish the task.

871.    On February 23, 2015, Kelly Clauss, another person working on Monsanto's IARC outreach and media response, emails Goldstein with a list of experts to engage in the response effort, and for work with Potomac Communications. Five epidemiologists are identified, and were listed in the email in order of "most to least familiar with published studies and data [the focus of IARC's work]." The scientists identified in her ordered list are:

- ██████████, University of Birmingham (was an invited observer at the IARC meeting);
- Pam Mink, Emory University (did one review on glyphosate-cancer studies, one on non-cancer issues, both paid for by Monsanto);
- John Acquavella, former Monsanto employee, now retired and consulting with Monsanto;
- Elizabeth Delzell, University of Alabama-Birmingham; and
- Nalini Sathiakumar, University of Alabama-Birmingham (works with Delzell).

872.    ██████████ replies to the list, and writes that "██████████ knows glyphosate but his contract, FCPA etc have expired so that would take 6 weeks to sort out."

873.    A few days later, on February 26th, Donna Farmer responds to the now lengthy email chain on the Subject "RE: URGENT: Draft email for experts to help with IARC." She begins her response to Goldstein and the communications team (Carlo Lord, Kelly Clauss and Kimberley Link) with this sentence: "Help me understand why these folks were selected and who is Potomac?"

874.    On February 27, 2015, now less than two weeks before the IARC decision, Carla Lord responds to Farmer and others on the email chain, with a remarkably clear explanation of the plan outlined earlier in the IARC response document:

> "Donna,
>
> Thanks and I'm sorry. I didn't realize until now that you were not on the original email string (included below). Potomac is a media house that is writing op-eds and letters to editors in response to negative press surrounding glyphosate. These would be 'authored' by those on the list then placed by Potomac in media where needed. Potomac writers would do the heavy lift with the expert authors as final editor. We know these items in the media need to be from those outside the industry." (MONGLY01021648)

875.    On March 14, 2015, four says after the end of the Working Group meeting and six days before the March 20th release of the embargo on the decision and publication of the results of the IARC review in *The Lancet Oncology*, Donna Farmer reported that a Monsanto colleague was on a CropLife Americas (CLA) call (pesticide industry trade association), and that an EPA representative, Jess Rowlands, announced the IARC decision to classify glyphosate as a Group 2A carcinogen. (MONGLY00977253)

876.    Farmer's 3/14/2015 email was sent to ▮▮▮▮▮▮, Monsanto's invited observer at the meeting, and other Monsanto colleagues including ▮▮▮▮▮▮, ▮▮▮▮▮▮, and William Heydens. These individuals were most directly involved with the IARC meeting. In the email, Farmer restates several of the plans and talking points in the IARC response plan document. She closes it by writing: "We know it must have been a challenging week for all of you to try to keep the assessments based on sound science…"

877.    ▮▮▮▮, the invited observer at the IARC Working Group meeting that represented Monsanto, replies to Farmer and others on the email chain:

> "I do know of instances where observers at IARC felt they had been treated rudely or brusquely at Monograph meetings. That was not the case for me at Vol. 122 [the one containing the glyphosate review and classification]. I found the Chair, sub-chairs and

invited experts to be very friendly and prepared to respond to all comments I made…In my opinion the meeting followed the IARC guidelines. ███████, the Director of the Monographs programme, has an intimate knowledge of the IARC rules and insists they were followed."

**4. "Why Do More?"**

878.    In the weeks and months after the release of the IARC decision, the nature and scope of Monsanto's "response" activities expand. There is a discernable sense of urgency.

879.    Another Monsanto internal document circulated in April 2015 with the title "IARC Follow Up." Unlike all pre-decision planning documents, Monsanto is now dealing with the very serious Group 2A "probable human carcinogen" classification.  The goals, activities, and work products is this document include:

- "Invalidate relevance of IARC";
- "Protect regulatory FTO [Freedom to Operate]";
- "Litigation prevention/defense";
- "Protect Sales Globally"; and
- "Compilation of 3rd Party Statements in defense of glyphosate." (MONGLY03316369-71)

880.    About the same time, John Acquavella sends an email to Donna Farmer. In it, he discusses IARCs assessment and final judgements on the epidemiology data. He writes:

"IARC's classification of the epidemiology evidence follows directly from their definition of 'limited' [evidence]. There is not really much to quarrel about with respect to the epidemiology classification." (AcquavellaPROD00010215)

881.    A draft Powerpoint entitled "Proposal for Post-IARC Meeting Scientific Projects" dated May 11, 2015, is circulated internally in preparation for a meeting. It begins by asking

"**Why do more**?" in large letters, and then lists these reasons:

- "Severe stigma attached to Group 2A Classification";
- Aaron Blair continues to defend work & exaggerate number of studies w/association while ignoring AHS";
- "In response to our critique, can expect IARC to beef-up monograph as much as possible";
- ASTDR;

- Prop 65 [California State law requiring labeling of oncogenic products]; and
- Litigation support. (MONGLY01228577)

882.    Several new projects and scientific papers are outlined, nearly all to be authored by third-party experts. But in order to increase credibility and lower costs, "Majority of writing can be done by Monsanto."

### 5. Producing the CRT Special Issue on Glyphosate Toxicity

883.    Most of the internal documents and emails setting forth possible post-IARC actions include discussion of the need for new, Monsanto-commissioned and controlled peer-reviewed papers providing Monsanto's critique of the basis of IARC's decision, and/or critical reviews of the findings and conclusions advanced by other scientists not adequately aligned with Monsanto's positions and messaging.

884.    From the fall of 2014, about six-months before the release of the IARC decision, to mid-2015 (about 4 months after the release of the decision), these discussions led to a plan to convene a "Glyphosate Expert Panel Review" of the scientific basis for IARC's classification of glyphosate as a probable human carcinogen (Group 2A).

885.    The "Expert Panel" idea was eventually adopted, funds were committed, and the plan implemented, starting in late-June 2015. The panel would meet, discuss the issues, and produce a set of papers suitable for publication.

886.    A detailed proposal describing several options for moving forward was presented to the "Glyphosate Strategy Team Meeting" on June 18, 2015. (Acquavella Exhibit 10-27; MONGLY03500777)

887.    "**Approach A**" would entail an Expert Panel that "consists primarily of people we have worked with already…they have some/much knowledge…[and this approach would have] Lowest cost (est. $200-250k), but also lowest credibility/impact."

888.   "**Approach B**" would be to add "a few 'big name' scientists & possibly some who have not worked for Monsanto before (more credibility)… hire a firm (Intertek, formerly CanTox) to manage the meeting…Cost estimate - $350-400k."

889.   "**Approach C**" takes another step toward "credibility/impact" and would include hiring a well-respected risk assessment firm (presumably Intertek did not fall in this category based on Monsanto's assessment), in order to:

> "set up a totally independent review: they choose scientists, conduct meeting, write the report…Most credibility/impact but we have virtually no control…Cost estimate - $375-450k."

890.   **Approach B** was the recommended path forward advanced during the meeting, and the one adopted. In fleshing out the plan, the document states: "Monsanto provides draft report which Experts edit & then publish…Use journal with quick review time…Negotiate for expedited review with journal editor."

891.   A "Backup Slide" provides an even more detailed "Summary of Overall Process" and individual actions/steps include:

- "Review IARC Monograph to identify all areas that need to be addressed";
- "Prepare initial draft document";
- "Edit draft manuscript to capture meeting discussion/conclusions";
- "Send draft manuscript to Experts for their review";
- "Send manuscript to journal for review";
- "Revise manuscript per comments from journal"; and
- "Re-submit [papers] & get final approval from journal."

892.   In other words, in Approach B, Monsanto would control every step of the process, from producing an initial draft of the report/papers, to managing the revision of the draft in response to the meeting of the experts, making and/or approving final edits prior to submission to a journal, and managing/approving any changes made in response to peer-review comments.

893.   This "Backup" slide failed to include two other key responsibilities Monsanto

clearly reserved to itself – (1) deciding which names would appear on each published paper, and (2) deciding on what information would be provided to the expert panel and teams of co-authors.

894.    The first task – deciding the list of co-authors on various papers -- ended up creating many problems and challenges for Monsanto and its scientific staff, its hired third-party experts/co-authors, and the journal to which Monsanto-controlled papers were submitted for publication.

895.    A February 8, 2016 exchange between Monsanto consultant and *CRT* paper co-author John Acquavella and Intertek's Ashley Roberts focuses on the difficulty Intertek, Monsanto, and the third-party expert co-authors were having in reaching a consensus on who would be the listed as the author or co-authors on summary paper in the *CRT* special issue.

896.    Both Acquavella and Roberts wanted the entire expert panel to sign the summary report. But Acquavella tells Roberts that:

> "I've had some initial correspondence from the panelists about the summary article and the consensus is that they will not be authors on an article that has inflammatory comments about IARC. Assuming those inflammatory comments were carried over from the animal carcinogenicity and genotoxicity articles, I'm sure the epi panelists would not want to be associated with those articles either. To achieve the complete authorship goal, an extensive revision of the summary article is necessary."

897.    Roberts forwards Acquavella's email to Heydens, and writes: "Hi Bill, Please take a look at the latest from the epi group!!!!  Can you call me once you have digested this."

898.    Heydens replies the next day:

> "Ashley,
>
> OK, I have gone through the entire document and indicated what I think should stay, what can go, and in a couple of spots did a little editing." (Heydens Exhibit 3-20)

899.    The second responsibility generally reserved to Monsanto, and specifically claimed in the case of the Intertek/*CRT* paper-preparation process was deciding what scientific

materials to provide to the experts and co-authors. While Monsanto could not control access to published studies by its expert panel members, it had total control over what parts of its proprietary testing results would be supplied to expert panel members.

900.    This is evident in an August 6, 2015 email from Ashley Roberts to Donna Farmer in which he asks: "Please could you let me know in a sentence what we will be providing to the Animal Bioassay Expert group." (MONGLY01183933)

901.    By the "we" in the phrase above, "what we will be providing," he really means what information will Donna Farmer/Monsanto provide to her/Intertek, so she/Intertek can then provide the information to the expert panel.

902.    The discovery record in this case shows clearly that violation of widely accepted ethical norms in scientific publishing was a routine, accepted part of the culture at Monsanto. Over several decades, such actions were conceived and implemented in the interest of heightening the "credibility/impact" of scientific papers the company commissioned and controlled.

### 6. Content of the *CRT* Special Issue on Glyphosate Safety

903.    The 2015-2016 Intertek expert panel review of the IARC decision and monograph resulted in the publication of five papers, and a Foreword by the journal editor, Roger McClellan (all open access, i.e. accessible for free at

http://www.tandfonline.com/toc/itxc20/46/sup1?nav=tocList). The papers included:

- Gary Williams et al., overview paper on the carcinogenic potential of glyphosate and the IARC assessment;
- Keith Solomon, assessment of exposure studies;
- Acquavella et al. on epidemiological studies;
- Gary Williams et al. on rodent bioassays; and
- Brusick et al. on weight of evidence evaluation of glyphosate, formulated glyphosate herbicides, and AMPA (major glyphosate metabolite).

904.    Roger McClellan was acutely aware of the scrutiny his journal's special issue on glyphosate safety would receive. On multiple occasions, he stressed in exchanges with Ashley Roberts, the employee of Intertek that managed the process of developing the papers, the importance of clarity and full transparency in the Acknowledgements and Declaration of interest sections of the papers.

905.    In a June 19, 2016 email to Roberts, McClellan writes:

"I am still concerned about the tone in some places. Why antagonize the reader? I am still not clear as to the process used by all of the Panels. These reports are essentially a rebuttal of the IARC process and conclusions. There appears to be a reluctance to be absolutely clear in presenting exactly what IARC concluded, the panels conclusions and how they differ. Am I missing something?" (MONGLY02360733-34)

906.    Six days later, Roberts replies from vacation. He states that "I am getting a lot of pressure to publish the papers for a lot of reasons as you can imagine." He then asks for the specific changes McClellan wants in the Acknowledgements and Declaration of interest (DOI) statements.

907.    Just 90 minutes later, McClellan responds to Roberts. He spells out the changes he wants in the Acknowledgements (thank the reviewers for extensive comments received). He also says that "The Acknowledgements section should also identify any other reviewers of the paper and any editorial assistance." (MONGLY02360732)

908.    In reference to the DOI, McClellan writes that it should:

"…make clear how individuals were engaged, i.e. by Intertek. If you can say without consultation with Monsanto that would be great. If there was any review of the reports by Monsanto or their legal representatives that needs to be disclosed."

909.    Each of the papers has a similar "Declaration of Interest" statement. The "Declaration of interest" statement in the Brusick et al paper is quoted below:

"The employment affiliation of the authors is as shown on the cover page. However, it should be recognized that each individual participated in the review process and

172

preparation of this paper as an independent professional and not as a representative of their employer….[Past and current relationship of each co-author to Monsanto is then listed]"

"The Expert Panel Members recruitment and evaluation of the data were organized and conducted by Intertek Scientific & Regulatory Consultancy…"

"Funding for this evaluation was provided by Monsanto Company which is a primary producer of glyphosate and products containing this active ingredient. Neither any Monsanto company employees nor any attorney reviewed any of the Expert Panel's manuscripts prior to submission to the journal."

910.    The major differences across the DOI statements arise from differences in the current and past affiliations of each co-author with Monsanto. The Acquavella et al. paper contains a different version of the statement regarding Monsanto's role in the review of the papers; the Acquavella et al. DOI states "The authors had sole responsibility for the content of the paper, and the interpretations and opinions expressed in the paper are those of the authors."

911.    The first paragraph in the above quoted DOI is presumably truthful, the second paragraph is not truthful, and the second sentence in the third paragraph is not truthful.

912.    Via direct interactions with Roberts of Intertek, it is clear that Monsanto reviewed, and approved of the content of the papers prior to submission, and again after the papers were revised in response to peer review comments.

913.    The expert panel evaluation, and the composition of the panel itself, was controlled by Monsanto. Indeed, a July 1, 2015 email from William Heydens (Monsanto's lead in the scientific response to IARC) to Ashley Roberts, the man running the Monsanto project for Intertek, Heydens tells Roberts "we" (Monsanto) are adding two additional scientists, and that: "We just learned this morning that we can't have you send out 'invitations' until the names have been approved by our legal group." (MONGLY00992949-51)

914.    Heydens places the word "invitation" in quotes because the Intertek contact/invite is not really the invitation, since the scientists had all previously been contacted by Monsanto

and had all agreed to serve.

915.    The record shows clearly that Monsanto was heavily involved in most stages of paper preparation, from deciding on the information that would be provided to the co-author teams by Intertek; producing drafts of the papers, or sections of papers provided to the teams; deciding on whose name(s) would appear on the papers; interacting with the teams on how to address tricky, key issues, and especially clear-cut evidence of risk from glyphosate exposures in well-designed, published studies; responding to review comments; and, the final stages of editing.

916.    Heydens, in particular, played a direct, hands-on role in all stages of the process.

917.    An August 28, 2015 email to Donna Famer and other Monsanto colleagues from Heydens circulates for comment his first draft of the Intertek Expert Panel report on the carcinogenic potential of glyphosate (Acquavella Exhibit 10-30; MONGLY02844211)

918.    In the draft Heydens circulated, "William Heydens" does not appear as a co-author, nor does his name appear on any of the papers as published. In failing to truthfully acknowledge authorship, and declaring in the conflict of interest disclosures that Monsanto employees played no role in the review of the papers, Monsanto violated well known ethical norms governing scientific publishing, including the policies of the journal *Critical Reviews in Toxicology*.

919.    Heydens was influential, if not responsible for many critical decisions about how strongly to make positive statements regarding the safety of glyphosate and Roundup herbicides, and how sharply to criticize the IARC report and the studies in the peer-reviewed scientific literature that the IARC working group relied upon in reaching its "probable human carcinogen" classification.

920.     For example, Heydens sharply disagreed with some panel-members, and ex-employee Acquavella over how sharply to be critical of IARC and its classification decision. Examples of such disagreements are evident throughout Heydens' track-changes comments and editing of Acquavella's edits to the draft of the summary panel report. (MONGLY01000680-01000709)

### 7. Political and Other Activities Post-IARC

921.     The breadth of Monsanto's activities in response to the IARC classification of glyphosate herbicide as a probable human carcinogen is striking. A June 5, 2015 update on "US Government Outreach – WHO IARC Classification on Glyphosate" outlines dozens of ongoing and proposed actions and goals. Under "**THE STRATEGY**", the document states:

> "One strategy for addressing widespread confusion in the wake of the IARC classification has been to seek clarification from the World Health Organization (WHO) which would provide the proper context of the classification for governments and regulators around the world to have greater confidence defending their science based regulatory decisions." (MONGLY02953363)

922.     The document reports on multiple briefings given to U.S. government agencies, including a Donna Farmer briefing of Dr. Mitchell Wolfe, the Deputy Assistant Secretary for Global Heath, in the of Department of Health and Human Services (HHS), to which "we came prepared with a robust set of technical materials for the Secretary's background…".

923.     In the briefing for the HHS Deputy Secretary Dr. Wolfe, he was told about ATSDR (Agency for Toxic Substances and Disease Registry), an agency under HHS of which he was reportedly unaware. Monsanto then told Wolfe about the ongoing ATSDR review of glyphosate, and made the case that such a review was unnecessary and that the EPA bears the primary responsibility for "determination of pesticide safety."

924.     Then Monsanto briefed Wolfe on "A common element between IARC and

ATSDR…Christopher Portier Ph.D…[who] was Director of ATSDR and co-chair of the IARC

Advisory Group."

925.    Dr. Portier's views on glyphosate oncogenicity were no doubt discussed, as was

the fact that Dr. Portier "was an invited specialist representing the Environmental Defense

Fund."

926.    According to Monsanto's recounting of the meeting "Dr. Wolfe said he would

follow up on what was going on with ATSDR and he was encouraged to have discussions with

the EPA staff, as well."

927.    Last, Monsanto asked for Wolfe's and HHS's "assistance in securing a WHO

clarification. We emphasized that we were not seeking changes to IARC, the classification or the

IARC process."

928.    In fact, Monsanto had already initiated, and is still carrying out campaigns to

punish IARC for its classification through, among other things (details below):

- Lobbying members of Congress to challenge U.S. government funding for IARC, via U.S. government support for the WHO;
- Calling for Congress to hold hearings;
- Mounting a campaign to force IARC to release drafts of its glyphosate review document and notes from Working Group deliberations;
- Working with a Washington Post reporter purportedly doing a hit piece; and
- Mounting multi-faceted outreach and third-party expert criticisms of the IARC process, the people who participated in it, the conclusion it reached, and its accountability.

929.    Accordingly, the statement in Monsanto's account of the Wolfe-HHS briefing that

"…we were not seeking changes to IARC, the classification or the IARC process" was clearly

not truthful.

**Blocking the ATSDR Review of Glyphosate**

930.    Another important Monsanto action-item, post-IARC, was stopping an ongoing

ATSRD review of glyphosate safety. Monsanto regarded the ATSDR review as a clear threat

because the agency is "IARC-like," very conservative, and has often disagreed with EPA in the

past.

931.    An ATSDR review that supported IARC's conclusions and classifications was to

be avoided. (MONGLY03342947)

932.    Since Monsanto suspected that ATSDR would agree with IARC on the science,

the only way to avoid a huge setback in Monsanto's ongoing campaign to isolate and

marginalize IARC would be to stop ATSDR from issuing the results of its review.

933.    In pursuit of their ATSDR goal, Monsanto:

- Sought and carried out meetings, briefings, and webinars with ATSDR to communicate its assessment of the issues, explain why it felt the ATSDR review was unneeded, and the scientific flaws in the IARC review;
- Received significant help from two senior OPP/EPA officials – Jess Rowland and the OPP Director, Jack Housenger;
- Sought assistance and support from the Deputy Assistant Secretary for Global Health in HHS (the agency home of ATSDR);
- Asked Monsanto's home-state Senators to contact HHS and reinforce the urgency of quick HHS action to intercede with ATSDR, given information Monsanto had obtained suggesting the ATSDR report might be released in only a few weeks;
- Lobbied Congresswoman Lynn Jenkins to submit questions regarding the ASTDR glyphosate review to the Secretary of HHS at the conclusion of a hearing before the House Ways and Means Committee on health care reform (MONGLY03064699); and
- Recruited individuals to write letters to Congressmen complaining that the ATSDR review was duplicative and a waste of taxpayer money, so that the letter(s) could be used to trigger media coverage of the campaign to stop the ATSDR study. (MONGLY03342947)

## E. Allied Organizations, Front Groups, and the Media

934.    Monsanto engages with a wide diversity of organizations in the course of

promoting its business and industry objectives. These include pesticide industry trade

associations, the most important of which is CropLife America, which is part of CropLife

International. (CropLife America was formerly called the National Agricultural Chemicals Association, or NACA).

935.    Monsanto and other pesticide manufacturers use CropLife to align the industry on issues, organize and carry out initiatives that are responsive to industry-wide issues, lobby the U.S. Congress and federal agencies, and conduct a wide array of media and PR activities.

936.    Monsanto also works with all major farm commodity groups (corn growers, cotton growers etc), and general farm organizations like the Farm Bureau and Future Farmers of America. It provides financial and content support to most agriculture and food-relevant scientific and professional society meetings.

937.    The company is working simultaneously with several PR, communications, and issue management companies on specific projects.

938.    In some cases, Monsanto's financial support is welcomed and acknowledged, while in other cases it is not. In the later case, Monsanto works out a scheme to route its funding through one or a few organizations, in order to hide the source of the funding (Monsanto) from the person or entity receiving the funding, as well as from the general public.

939.    While comprehensive statistics are not publically available, I suspect that a substantial portion of Monsanto's funding for scientific organizations, science-related activities, and individual scientists is provided through circuitous channels that avoid the need for recipients to openly acknowledge the company's funding support.

940.    Such practices are not unique to Monsanto, but I am not aware of another company in the pesticide industry that invests so heavily, creatively, and aggressively in its third-party network of scientists and the activities of scientific organizations.

### 1. CropLife America and CropLife International

941.     CropLife America routinely carries out special projects and activities, with funding provided by member companies, or sometimes one or a few company members. In some cases, such funding comes from routine membership dues, in other cases, CropLife requests and/or is offered targeted support for a special project. Many such projects are done under contract by consulting firms or academics with ties to the industry.

942.     Such arrangements often assure that funding from a given company passes through at least two entities before reaching the person or entity carrying out an activity. As a result, it becomes difficult, if not impossible for members of the public to know exactly who actually paid for a given activity or project, nor the basic motivation leading to the project or activity.

943.     A good example unfolded in the fall of 2015. Several pesticide manufacturers were concerned by the way OPP/EPA was using epidemiological studies done by scientists not working for, or representing the pesticide industry. Several such studies had been published in peer-reviewed journals, and had become a part of the science-base reviewed by EPA in the pesticide risk assessment process.

944.     Three companies were acutely aware of the risk posed to one of their major products: Dow AgroSciences over epidemiological studies showing a link between chlorpyrifos insecticide use and neurodevelopment in infants and children; Syngenta over the link between atrazine exposures via drinking water and breast cancer; and, Monsanto over the cancer risks posed by glyphosate.

945.     A decision was made by the companies to commission a scientific critique of how OPP/EPA had utilized the results of epidemiology studies. On behalf of the companies, CropLife America requested a proposal from a closely aligned consulting firm, Exponent. Exponent

provided a detailed proposal to CropLife outlining such a study, at a projected cost across three major tasks of $70,000-$100,000. (MONGLY02134326)

946.    Task 1a in the proposal describes four case studies focused on glyphosate, organophosphate insecticides (and especially Dow's chlorpyrifos), and Syngenta's atrazine.

947.    On January 4, 2016 Exponent released the 89-page report commissioned via the September contract. It was entitled "Human Epidemiology Data Incorporated Into Regulatory Risk Assessment: Retrospective Analysis." (MONGLY03409329-03409423)

948.    After the release of the IARC classification, CropLife International developed and implemented a multi-prong response on behalf of the industry. Key activities included:

- "Generating influencer commentary on IARC…to challenge the credibility of IARC…working with the issue management consultancy v-Fluence to generate proactive news/commentary articles…all articles have been pushed widely on social media channels through a wide network of industry commentators";
- "High level outreach to WHO";
- "Building credible 3rd part support…(in particular toxicologists and academics)"; and
- "Coordinating industry alignment."

**2. Engaging PR Firms**

949.    Over the years, Monsanto used a variety of PR and communication firms to assist in the defense of glyphosate herbicides. These firms were typically tasked with actions that would be difficult and/or tainted if undertaken by Monsanto staff.

950.    There is nothing unusual about pesticide manufacturers or other companies engaging such firms in support of outreach, policy, regulatory, and political goals. But the scope and nature of the activities pursued by Monsanto via such firms stands out as uniquely broad and aggressive.

951.    Monsanto commissioned Potomac Communications to place not just one or a few supportive op-eds and letters to the editor in response to the IARC decision, but dozens.

952.    In May 2015, Monsanto received a detailed document from the PR firm FleishmanHillard (FH). This firm had conducted multiple projects for Monsanto in the past. The current proposal focused on triggering expressions of support for the EPA's re-registration of glyphosate in the political, farm, academic, and gardening communities. (MONGLY03550020-24)

953.    FH recommended targeting two audiences: "those who live and work in congressional districts with significant agricultural glyphosate use and whose elected representative sit on committees relevant to EPA"; and second, "those who live in suburbs that lean conservative politically." FH then adds:

> "Please note that this general consumer approach is intended as a supplement to a stakeholder outreach campaign targeting farmers, agricultural trade associations and other agricultural audiences…Finally, please note that the below campaign elements represent efforts that FH would conduct above and beyond the scope of ongoing support for the [Monsanto-funded] Cultivating Trust campaign."

954.    The scope of the newly proposed "Re-registration Campaign" is impressive. Seven "markets" would be included (suburban Dallas and/or Houston, Atlanta, Davenport/Iowa City; Detroit, Indianapolis, Memphis Minneapolis/St. Paul; St. Louis); a table describes each area, noting key politicians or reasons why the area was selected.

955.    Within each area, a set of FH-paid "community organizers" (COs) would be assigned a specific set of tasks and goals. Each "would target 750-1,000 consumer signatures/comments or letters and 15-25 'high quality' letters …per month of the [glyphosate re-registration] comment period (either 60-90 days)."

956.    The proposal then spells out what FH would do to prepare/support the COs in achieving their target goals. In addition, FH "would manage a paid digital campaign on Facebook, using sponsored content targeted at a relevant audience…with the aim of driving them

to Monsanto's comment generation website."

957.     The estimated budget for the proposed 3-4 months of activity was $355,000-$400,000.

### 3. Shaping the Agenda and Supporting Scientific Meetings

958.     There are several instances in the record of this case documenting why and how Monsanto played a role in shaping the focus of a scientific meeting to include discussion of glyphosate risk issues, as well as some instances where Monsanto also provided the funding needed for a meeting to occur.

959.     In a March 10, 2016 email, Dan Goldstein, Monsanto's "Lead, Medical Sciences and Outreach," contacts a colleague, Allister Vale, a consulting clinical pharmacologists and Director of the National Poisons Information System (Birmingham Unit), in the U.K.

960.     Dr. Vale is active in several organizations that convene meetings of medical toxicologists, a group that Monsanto is striving to engage in the ongoing reaction to IARC and debate over glyphosate safety.

961.     In his "preliminary inquiry," Goldstein asks Vale if she would work with Sir Colin Berry to "reincarnate" an expert panel, this time composed of European medical toxicologists. (MONGLY0256574-75) He writes that: "Cost (including Honoria) will be picked up by Monsanto via an appropriate granting mechanism which allows for a proper degree of academic independence."

962.     Vale and Goldstein meet briefly later in the month at a meeting of the Society of Toxicology (SOT). They discuss the idea raised by Goldstein in the March 10 email, and agree to get back in touch after the meeting.

963.     Vale sends Goldstein a March 24, 2016 email apologizing for her limited time

during the SOT meeting and stating:

> "The issues you raise in regard to glyphosate are of course of considerable professional interest to me…we have proposed a symposium for next year's SOT which will include a discussion of the carcinogenicity of glyphosate."

964.    Goldstein responds the next day, and provides much more detail, and points out that "the situation around glyphosate continues to be, frankly, bizarre." He goes on to note "serious process issues surrounding this IARC assessment. Then he writes:

> "Our only goal at this point is to create a large number of medical toxicologists who know about glyphosate products. You have hit on the key problem of course – direct involvement of Monsanto is not going to be acceptable to experts in the EU."

965.    Goldstein then returns to the issue of funding for a meeting. He writes:

> "I assume that the cost will be considerable….Funding can perhaps come from the Glyphosate Consortium which is conducting the EU re-registration or via ECETOX or CEFIC, for example, and be routed via SOT or one or more academic institutions. At that point, we can be 'hands off' altogether."

966.    So, under the Goldstein proposal, Monsanto would provide funding to the Glyphosate Consortium, the Consortium would contract with one or more academic institutions, and/or route funding to the SOT, which would then make invitations and cover the costs of participants and presenters. As Goldstein notes in his email, there would be an "appropriate degree" of separation between Monsanto funds and the people receiving them.

967.    Vale responds two weeks later, in general agreeing that an indirect funding mechanism could be found. But she then reminds Goldstein, "However, to make this work, neither I nor they could be in receipt of direct funding from Monsanto or the [industry-funded] Glyphosate Consortium."

968.    This correspondence is important not because of the impact of one meeting, or even whether the meeting took place. It is important because it documents clearly the techniques Monsanto deploys to engineer meetings, papers, events, and other activities where the company

will have a well-controlled forum, or a mechanism to communicate its view of some set of issues to a possibly influential audience.

969.    Goldstein ends his March 25th email to Vale with a statement referring to the government-employed medical toxicologists that Monsanto is trying to reach out to: "As important resources for their respective national agencies, we are of course hopeful that they can support *a balanced and scientific approach in the EU*." (Emphasis added).

970.    Of course, such an approach would have to be aligned with Monsanto's positions on issues, and certainly not IARC's on the issue of glyphosate oncogenicity.

# VII. Protecting "Freedom to Operate" and Scientific Deceit Characterize Monsanto's Assessments of and Response to Glyphosate-Related Risks

971.    Pesticide companies bear an obligation vested in various laws and regulations, and common corporate decency, to assure that the products they bring to market are safe and will reliably produce the benefits for which they are registered, i.e. control of weeds as in the case of glyphosate.

972.    The term "product stewardship" is used within the industry and regulatory agencies to describe and encompass the actions pesticide manufacturers should take on an ongoing basis in the interest of product stewardship, before and after a new use of a pesticide is approved.

973.    In the pesticide arena, the sciences supporting both human-health risk assessments and environmental-impact assessments are dynamics and imperfect, and heavily dependent on location- and even application-specific data, which is almost never available. So, in companies and regulatory agencies alike, many assumptions and a considerable degree of judgement is essential in deciding upon the science that must be conducted prior to seeking, and approving a new use of a pesticides.

974.    Where to draw the line between presumably safe and possibly risky pesticide uses is also fraught with scientific, social, and political challenges, uncertainty and tension.

975.    The same is true after approval, as companies and regulators strive to refine and agree on the nature and magnitude of risks after a pesticide is approved and has been applied for a period of time.

976.    But in general, Monsanto claims that they base all their product development, testing, commercialization, and regulatory actions on the best available science. Such science is

often produced and communicated by pesticide registrants in the hope of altering the outcome of risk assessments conducted by regulators, especially when existing estimates of risk point to potential problems (e.g., a risk that exceeds the EPA's "level of concern").

977. The crux of most protracted and contested regulatory confrontations over the last half-century has been debate over what the "best" or "soundest" science shows relative to the balance of pesticide risks and benefits.

978. This is surely the case with glyphosate and Roundup herbicides.

## A. Mission One – Protect Freedom to Operate (FTO)

979. Tensions often arise between the commercial interests of a pesticide manufacturer and what the latest and best science suggests is the most responsible way to manufacture and sell a given pesticide.

980. In Monsanto, protecting the Freedom to Operate in the manufacture and sale of glyphosate-brand herbicide was the dominate objective across the whole company. Science was valuable, and supported, only when and to the extent it was expected to support glyphosate FTO.

981. Monsanto's John Acquavelle makes the case for one such investment in science as part of a proposal for a new, industry-funded, multi-pesticide non-Hodgkin lymphoma epidemiology study.

982. The goal of the study, among other things, would be to respond to the positive glyphosate-NHL results in the Hardell-Eriksson, and the forthcoming epidemiological study results from the National Cancer Institute's "Agricultural Health Study:

> "There are a number of reasons why industry should consider this proposal seriously. First, allegations that pesticides cause cancer are important to the business and regulatory climate for pesticide manufacturers and, indeed, companies have a product stewardship obligation to ensure that their products can be used safely." (MONGLY00894005)

983. Monsanto did not follow Acquavella's advise and has never conducted an

epidemiological study to evaluate the relationship between NHL and Roundup formulations.

## 1. Section 6(a)(2) of FIFRA

984.    Section 6(a) (2) of FIFRA, discussed earlier, is a provision in federal law intended to vest clear responsibility on pesticide registrants to report to the EPA any information, data, or new insights regarding pesticide risks that are gained by the registrant, regardless of the source of the information.

985.    The June 1986 Registration Standard for glyphosate contains this passage: "Registrants [at this time for glyphosate, only Monsanto] are reminded that FIFRA sec. 6(a)(2) requires them to submit factual information concerning possible unreasonable adverse effects of a pesticide at any time that they become aware of such information…including interim or preliminary results of studies, if those results suggest a possible adverse effect on man or the environment. This requirement continues as long as your products are registered by the Agency." (page 3)

986.    Dozens of instances arise in the 40+ year record of glyphosate in which Monsanto chose not to disclose information that might suggest a new or heightened risk from use of glyphosate-based herbicide. Some information not disclosed under Section 6(a)(2) arose from the company's inhouse research or commissioned studies, while other information was learned from the experience of users of the company's products.

## 2. Responding to FQPA Challenges

987.    Passage of the Food Quality Protection Act (FQPA) in 1996 changed the basic standard and rules governing the setting of food-additive tolerances for pesticide known to be oncogenic, including glyphosate beginning in 1983. Implementation of the FQPA required EPA to deal with dozens of science and risk assessment policy issues over several years, some of

which had potential impacts on a number of Monsanto products, including glyphosate.

988.    Monsanto established an "FQPA Core Team to engage with EPA as it developed FQPA policies and procedures, and to alert colleagues of possible implications for the labels and tolerances sanctioning use of specific Monsanto pesticide products." (MONGLY03750989)

989.    Abby Li [FND/1735] was a member of this FQPA Core Team. She sent a November 20, 1999 email to several Monsanto management team and senior officials regarding the activities of the FQPA Core Team. After listing the six members of the FQPA Core Team, the email stated:

> "This [membership] is a good mix of people that allows us to have external influence as well as ensure that we have practical understanding of the full impact to our products. I'd like to make sure we push hardest on those issues that are threatening our business." (MONGLY03750989)

990.    Two days earlier, on November 18, 1999, Abby Li sent an email to 10 Monsanto colleagues regarding a scoping session on the evolving OPP policies governing aggregate risk assessment under the FQPA. (The FQPA directed the EPA to take account of exposures to a given pesticide from water, food, occupational, atmospheric, and any other routes of exposure; such total estimates of exposure from all routes are called "aggregate exposure" in the context of FQPA implementation).

991.    The email begins: "Dear people who might be interested in the FQPA,…" The last paragraph addresses the membership of the FQPA Core Team and key areas of expertise that need to be represented. Then, Abby Li writes: "A key goal is to understand how our products are impacted so we know what issues Monsanto should fight the hardest on." (MONGLY03750990)

992.    The implication is clear. The number one goal driving Monsanto's assessment of evolving EPA science policies and regulatory procedures is minimizing the impact on FTO and sale of Monsanto products.

993.    In the records I have reviewed, I have not encountered a single example of a person working for Monsanto who reacted to a new pesticide law or regulatory requirement by assessing where and how compliance might make the company's products inherently safer, or reduce the frequency of high-exposures application scenarios, like some of those experienced by Dewayne Johnson.

## B. Overstating Roundup Benefits and Understating Possible Risks

994.    In the portion of the discovery record in this case that I have reviewed, there are dozens of examples where Monsanto employees, consultants, third party network scientists, and PR firms prepare and share written materials that overstate the certainty of some things (e.g., get up and shout glyphosate is non-toxic"), and downplay the significance of other known facts (e.g., glyphosate-based herbicides are genotoxic in some tests).

995.    No doubt the total number of such episodes that could be identified after a comprehensive review of the whole record would be in the hundreds.

996.    In an episode described in detail earlier, Monsanto officials substantially mischaracterized statements made by third-party experts that Monsanto had brought to an EPA Scientific Advisory Panel meeting.

997.    The inaccurate statements were contained in a letter from Monsanto's senior U.S. registration specialist, to EPA after the SAP meeting. The letter asserted that Monsanto's invited guests testified at the SAP meeting that a repeat of the controversial Bio/dynamics mouse study was not warranted, when none of the invited experts made such a statement.

998.    Only a small group of other examples are discussed below.

### 1. Attempts to Influence the IARC Review

999.    Monsanto knew that the IARC review of glyphosate herbicide carcinogenicity

was coming in the spring of 2015. In 2014, they initiated a number of activities in the hope of influencing the decision reached by the IARC Working Group assessing glyphosate carcinogenicity.

1000.   IARC procedures and policies are clearly stated and well known. For example, see the 2015 published paper "IARC Monographs: 40 Years of Evaluating Carcinogenic Hazards to Humans" (Donna Farmer Exhibit I-44; or access online https://ehp.niehs.nih.gov/wp-content/uploads/123/6/ehp.1409149.alt.pdf).

1001.   IARC Working Groups review and rely only on the results, insights, and information in scientific papers published in peer-reviewed journals. Unpublished studies conducted by companies, or papers in the publication process, but not accepted, are not considered.

1002.   This is why Monsanto wanted two papers published before the end of the IARC review process, so that both would be among those in the peer-reviewed literature, and hence eligible for consideration by the IARC Working Group.

1003.   Both papers had been in preparation for some time, and included a paper by Kier on genotoxicity and one by Greim et al. on the results of rodent bioassays.

**2. Kier (2015) Sets a Record for Speedy Publication**

1004.   Monsanto commissioned and paid for a review article focused on genotoxicity biomonitoring studies.

1005.   The goals for the paper were to first, influence the outcome of the IARC assessment, assuming the timing of the paper's publication allowed, and second, to have a current, peer-reviewed paper offering Monsanto's assessment of positive, genotoxicity studies available for use as Monsanto worked to discredit the legitimacy and science-base of the IARC

classification decision.

1006. Larry Kier, then a consultant to Monsanto and a former, long-term employee, wrote the paper, which was submitted to Roger McClellan, Editor of the journal *Critical Reviews in Toxicology* (*CRT*). This journal had been used several times by Monsanto to, in effect, spin and/or recycle in a peer-reviewed science journal the company's proprietary, internal studies, findings, and assessments of glyphosate risk issues, including those that had been previously submitted to regulators.

1007. The 2015 *CRT* paper by Kier was entitled "Review of genotoxicity biomonitoring studies of glyphosate-based formulations" (Vol 45(3): pages 209-218; accessed 12/10/17 at http://www.tandfonline.com/doi/pdf/10.3109/10408444.2015.1010194?needAccess=true).

1008. The paper's "History" declaration states that the initial paper was submitted to *CRT* on January 7, 2015, and was revised by the author and submitted back to *CRT* on January 17, 2015. It was accepted for publication by the journal the next day, January 18th, and published online February 16, 2015, or about one month before the March 3-10, 2015 final meeting of the IARC Working Group conducting the glyphosate assessment.

1009. Accordingly, 11 days transpired from the date of the original submission to the receipt and acceptance of the Kier paper. This meant that the peer review process, the editor's assessment of the reviewer comments, the author's revisions in response to peer-review comments, submission back to the journal, the editor's consideration of the author's response to reviewer comments, and decision to accept and publish all occurred in 11 days!

1010. I have published about three-dozen peer-reviewed papers. Between several months to over a year transpired between initial submission and acceptance of each of them, a time-frame that is typical of most papers, and most peer-reviewed science journals.

1011.   Over the last 30+ years at the request of journals, I have served over 100 times as a peer-reviewer of papers submitted for possible publication.  It generally takes a few weeks to two months for me to free up sufficient time to complete and submit such reviews.

1012.   Not a single paper of mine, or paper that I reviewed, progressed through the publishing process in 11 days. Indeed, I doubt that many, *if any*, papers in the history of scientific publishing in a well-respected journal have matched this record for "timely" publication.

1013.   Clearly, there had to have been an extraordinary set of circumstances driving the pace of the publication process for the Kier (2015) *CRT* paper. Based on the record, the two most important special circumstances were the close and long-term relationship between this journal and Monsanto, and second, Monsanto's openly-stated need for the paper to be published before the final meeting in March of the IARC, glyphosate Working Group.

1014.   But for this to happen, the company had to find a friendly journal willing to conduct the peer-review process in world-record time. They did in *CRT*.

**3. "Inappropriate Absolutes" Used to Promote Kier (2015)**

1015.   On February 19th, a few days after the Kier (2015) *CRT* paper was published online, an email exchange occurred between the paper author, Larry Kier, the journal editor Roger McClellan, and Monsanto's David Saltmiras.

1016.   This exchange focused on the content of promotion material on the Kier paper that Saltmiras had sent to the journal editor, along with a request that McClellan and the publisher take steps to raise the visibility of the paper. (MONGLY01087311-17)

1017.   This email chain starts on 2/19/17 with an email from David Saltmiras to *CRT* editor McClellan that begins "Roger – FYI on press releases." This email was not cc'd to the

lead authors of the papers (Greim and Kier).

1018.    The Saltmiras email to McClellan then lists the full citation to the papers by Greim et al. (2015) and Kier (2015) that are being published at the same time in *CRT*, a summary of each paper, the paper abstracts, and "Sound bytes for social media."

1019.    A few hours later in response to the suggestion from Saltmiras, McClellan sent an email to Charles Whalley, a senior manager at the publishing company Taylor and Francis (T and F). This is the publishing company that puts out McClellan's journal, *CRT*. The email begins:

> "I spoke with David Saltmiras today concerning the two Glyphosate papers that will be the lead papers in the next issue of Critical Reviews in Toxicology with regard to F and F [referring to T and F, the first "F" in the original text is a typo] putting out any publicity on these two papers. The email below includes complete citations for the papers, abstracts and some information developed by Monsanto Company on the papers."

1020.    The McClellan email goes on to state the relevance of the Kier (2015) paper to the ongoing IARC glyphosate review, and then writes:

> "As a bottom line the two papers [Greim et al. and Kier] published on line in *CRT* are likely to attract some attention in the scientific and regulatory community and, possibly, by lay media."

1021.    McClellan then asks about Taylor and Francis policies regarding the publisher's promotion of just-released papers, and asserts that the two papers "would be excellent candidates" for such a promotional effort by the publisher.

1022.    As a courtesy, McClellan had also sent a copy of his seemingly innocuous, 2/19/17 email to David Saltmiras and Larry Kier. Just under a half-hour later, Kier responded by email to *CRT* Editor McClellan. He begins: "I'm a little cautious about high levels of publicity for the biomonitoring review and have concerns about some of the suggested publicity material." (MONGLY01087312)

1023.   Kier then writes: "I don't know who wrote the 'Summary' for my paper and certainly don't want to offend them but it is not the way I would have worded it and I would personally not want this used to characterize my paper."

1024.   The differences between the "Summary" of Kier's paper sent to McClellan by Saltmiras, and presumably written by him, and the revised "Summary" Kier wrote and included in his email to McClellan are subtle, but significant.

1025.   The key passages from the Saltmiras-submitted "Summary" of Kier's paper read: "The author concluded that there are no direct risks to human DNA under normal exposure conditions" and "these results confirm previous conclusions that glyphosate-based herbicides do not damage DNA in humans following real world exposures."

1026.   The comparable passages that Kier wrote for a revised "Summary" of his paper read: (1) "The author concluded that these studies [on genotoxicity] do not indicate significant genotoxic risks to humans from glyphosate-based herbicides under normal exposure conditions"; and (2) "These findings are consistent with an earlier review of an extensive number of laboratory studies that indicated little likelihood of significant genotoxic risk or reaction with DNA under normal exposure conditions."

1027.   The Saltmiras version of sentence (1) is unequivocal – "there are no direct risks to human DNA." Kier's rewrite of (1) includes an important change. Instead of "no risk," Kier writes that there is an absence of "significant genotoxic risks," implying there might be some risk.

1028.   In key passage (2) quoted above, the Saltmiras version states that glyphosate-based herbicides "do not damage DNA in humans." Kier's rewrite says that there is "little likelihood of significant genotoxic risk or reaction with DNA under normal exposure

conditions."

1029.   This version contains two, and perhaps three caveats. First, there is "little

likelihood," but hence some chance of "significant genotoxic risk or reaction." Second, Kier

again leaves the door open for less than "significant" genotoxic risk or reaction.

1030.   In the same email to McClellan, Kier then turns his attention to the "Sound bytes

for social media" in the Saltmiras email to McClellan sent earlier the same day. The sound bytes

state that glyphosate-based herbicides "do not damage cellular DNA…" and are "not associated

with DNA damage in human cells." About these statements, Kier writes:

> "I also don't think the 'Sound bytes for social media' are accurately worded. They are
> way too absolute for my taste and place undue emphasis on the strength of the
> biomonitoring data. Unfortunately, I can't readily suggest alternatives that fit nicely into
> the 'sound byte' format."

1031.   Nine minutes later at 5:12 p.m., after receiving the above described and unusual

email from Kier, *CRT* Editor McClellan responds to Kier, sending a copy to Saltmiras. He

writes:

> "Larry:
>
> What I forwarded to T and F (Charles Whalley) is what I received from David Saltmiras.
> I assumed you were in the loop on what had been developed at Monsanto. I suggest you
> get in touch ASAP with David."

1032.   Around noon the next day, Larry Kier does email David Saltmiras. His message is

terse and to the point, and quoted in full below:

> "David,
>
> I think I might have misunderstood something in our earlier conversation today but
> apparently the Summary and Sound bytes were from Monsanto.
>
> Please consider the bcc: comments I sent earlier to Roger. While I definitely support
> glyphosate and GBF's [glyphosate-based formulations] I really don't want to have
> ***inappropriate absolutes*** representing this [Kier, 2015] review." (Emphasis added;
> MONGLY01087311)

### 4. Advertising

1033.   In June 1988, a member of the medical school faculty at the University of Iowa saw an advertisement for Roundup herbicide on TV, depicting a bean bar application of the herbicide. The person in the advertisement was wearing gym shoes, a short sleeve shirt, and long pants. He called the EPA to raise concern over the safety of such a method of application under the conditions depicted in the advertisement.

1034.   Edwin Tinsworth, then Director of the OPP Registration Division, wrote a July 26, 1988 letter to Dr. Timothy Long, then Roundup's Registration Manager, stating that: "We are concerned that advertisements for Roundup (running through July in Iowa and perhaps other soybean growing areas) show the product being applied in a manner inconsistent with protective clothing requirements…and we request that you cease running these spots."

1035.   In a certified letter dated April 7, 1992 to Monsanto, Leo Alderman of the Toxics and Pesticides Branch in EPA Region VII challenges misleading claims made in Monsanto advertising literature promoting Roundup sales. These statements included "Roundup doesn't stay in the soil, won't leach to nearby plants and breaks down into natural substances…Nothing kills weeds better, or easier, than Roundup…Biodegrable."

1036.   He instructs Monsanto that "such statements should be removed from all literature advertising the product…" Alderman directs Monsanto to cease distributing all advertising material with such claims and that the Monsanto send him/EPA copies of the revised advertising material within 30 days.

## C. Tactics Used to Bury or Obscure Issues Perceived to Raise Risk and Regulatory Threats to Future Sales

### 1. Positive Evidence of Carcinogenicity

1037.   Given the facts of this case, one of the most compelling and germane statements by a senior Monsanto scientist on the topic of glyphosate's carcinogenicity comes from Donna Farmer.

1038.   In alerting an overseas spokesperson for Monsanto about what can be said to the media on the question of glyphosate health risks, she writes "…you cannot say that Roundup is not a carcinogen…we have not done the necessary testing on the formulation to make that statement." She goes on to acknowledge that "The testing on the formulations are not anywhere near the level of the active ingredient." (MONGLY00922457-8)

1039.   Instead, she advises the spokesperson to respond to questions about glyphosate safety by saying: "When Roundup herbicides are used according to label directions, no unreasonable adverse effects to people, wildlife, and the environment are expected." (MONGLY092259)

### 2. Counteracting Positive Epidemiology Study Findings

1040.   In 2000, Dr. John Acquavella, a Monsanto epidemiologist, attended a meeting of the International Society for Environmental Epidemiology (ISEE) in Buffalo New York. (MONGLY02628625). Two papers focusing on pesticide-cancer linkages were presented by scientists working for Health Canada.

1041.   Dr. Helen Mcduffee was the lead scientist at the Center for Agricultural Medicine at the University of Saskatchewan, and carried out the Health Canada-funded case-control study of 517 individuals with non-Hodgkin lymphoma (NHL) and 1,506 controls. The paper presented at the ISSE reported a statistically significant odds ratio of 2.1 (95% CI 1.2-3.6) for individuals with NHL who sprayed Roundup more than 2 days per year.

1042.   Following Dr. McDuffee's presentation, Acquavella sought her out for further

discussion of her work, and in the hope of establishing a dialogue. He characterized her as "a reasonable person" who does not have "preconceived notions about glyphosate."

1043.   In Acquavella's memo to senior colleagues responsible for health assessments of Roundup, the following agreements and next steps were outlined:

- McDuffee would share her paper on these results when it is ready for submission;
- She was asked, and agreed to attend a meeting where her work would be presented to an industry audience; and
- She was given a copy of the Monsanto-commissioned CANTOC review of glyphosate and Roundup toxicity, and told about the ongoing Monsanto Farm Family Exposure Study (FFES).

1044.   A second study by a member of Dr. McDuffee's team, Pahwa Punam, was presented via a poster at the ISEE meeting. This presentation focused on regional differences in the association between Roundup use and NHL, and Hodgkin's disease (HD).

1045.   "Of interest to us," according to Acquavella, was the significant association between glyphosate/Roundup and HD in the Canadian province British Columbia. In that province, there was a markedly elevated, statistically significant odds ratio of 4.0 (CI 1.4-11.3), in contrast to no such association in the other Canadian provinces.

1046.   Acquavella asked Punam if she had any explanations for the very different, and worrisome result in British Columbia. According to Acquavella, "she speculated that the variation might be explained by the heavier use or the tendency to use higher exposure application equipment in specific provinces."

1047.   Acquavella then reports that if "we [Monsanto] get inquiries" regarding the Roundup-HD association, "we can point out that the variation [across provinces] in the findings is inconsistent with a causal relationship with glyphosate."

1048.   Then, Acquavella addresses "Follow-up Plans," which include:

- Developing a "collegial relationship" with Dr. McDuffee;

- Sharing information on the FFES;
- Adding McDuffee "in our plans to develop a scientific outreach network in Canada; and
- Inviting McDuffee to present her data at a Monsanto-sponsored scientific outreach meeting in Canada later in the year.

1049.   Such follow-up actions, according to Acquavella, could be important strategically in light of Health Canada's continued investment in agricultural epidemiology and the ongoing networking between Health Canada and the [U.S.] NCI [National Cancer Institute]." In addition, the above meetings "would allow her to consider her findings in light of the available glyphosate toxicology/exposure information…"

1050.   Clearly, Acquavella was concerned that a positive epidemiological study sponsored by the Canadian government linking glyphosate/Roundup to NHL and HD would carry weight, and possibly reinforce similar associations identified in other studies, including, perhaps, those emerging from the ongoing NCI Agricultural Health Study.

1051.   His follow-up actions included providing McDuffee with the Cantox review, and likely the Williams et al (2000) review of glyphosate/Roundup toxicity, both of which were commissioned by Monsanto, co-authored by proven, glyphosate-friendly members of the company's Scientific Outreach team, and substantially ghost-written by Monsanto scientists.

1052.   He does not mention providing her with any of the published, positive genotoxicity studies, nor Dr. Parry's report.

1053.   These follow-up actions are a good example of the way Monsanto establishes a relationship with independent scientists in order to discover, first, whether a scientist is already glyphosate-friendly, and if so, whether he/she would be willing to be a public spokesperson in defense of glyphosate/Roundup safety.

1054.   In cases where a scientist has reported, and/or appears ready to publish and

discuss in public findings that are not favorable to glyphosate-based herbicides, Monsanto strives to alter the scientist's interpretation and/or explanation of a study's findings in a way that minimizes the potential damage to Monsanto's unequivocal claim that "Roundup is safe," a message Monsanto wants people to get up and shout.

1055.   Via this sort of follow-up actions, the company also makes it clear that the work of a scientist like McDuffee will be examined closely and any limitation or possible confounding factor will, in all likelihood, be used to discredit the study's design, methodologies, and findings, if and when the study is published, discussed publicly, or especially, if it becomes available to regulators.

1056.   There is no universally accepted way to distinguish between legitimate give-and-take between scientists, and intimidation. However, Monsanto has a well-deserved reputation for engaging in aggressive and systematic defense of its products, and especially glyphosate/Roundup. Such actions have undoubtedly discouraged some scientists from publishing results from studies that have limitations, like small sample sizes or potential recall bias.

1057.   In other cases, scientists may state their findings and conclusions in a more equivocal way than they otherwise would, in the hope of not triggering overt and covert actions by Monsanto to discredit the research, or the researcher.

**3. Dermal Absorption**

1058.   The rate of dermal absorption when a person's skin is exposed to a glyphosate-based herbicide like Roundup is a key variable in estimating applicator exposure and risk.

1059.   In the hope of maximizing Roundup sales and minimizing regulatory warnings and/or restrictions, Monsanto has worked to convince regulators that the dermal absorption rate

for glyphosate and Roundup herbicide is very low, as a percentage of the amount of glyphosate or Roundup that initially comes into contact with a person's skin.

1060.   Low dermal-absorption rates for any pesticide, other things being equal, will result in less worrisome warning symbols on labels, less strict limits on the conditions of use, and/or fewer and less onerous requirements for personal protective clothing and equipment for those mixing and loading Roundup, or applying the herbicide.

1061.   In EPA's 1986 glyphosate Registration Standard and the 1993 Re-registration Eligibility Document (RED), the agency incorporated an estimated 3% dermal absorption rate for glyphosate in its estimates of applicator exposures and risk. This estimate, in turn, was based on studies conducted by Monsanto and submitted to the agency in the past.

1062.   As the diversity of Roundup uses expanded in the consumer market in the U.S. and worldwide, regulators became more concerned about the dermal route of exposure, especially in the case of people engaged professionally in weed control on a farm, in an horticultural or industrial setting, or in parks, around schools, or golf courses, among other places.

1063.   To prevent the EPA from imposing additional restrictions, or requiring higher-level warnings on Roundup labels, Monsanto continued to conduct dermal absorption studies periodically, in the hope of eventually convincing the EPA, and/or other regulators, to lower the standard estimate of dermal absorption to below 3%.

1064.   Glyphosate-based herbicides were going through the European re-registration process in the late 1990s into the 2000s. The German regulatory authority had been assigned the task of serving as the rapporteur through the process on behalf of the EU. German regulators had asked registrants of glyphosate-based herbicides to repeat some old dermal absorption studies

that did not meet current European regulatory standards, a request that Monsanto agreed to carry out. (MONGLY03737015)

1065.   An email exchange occurred in April 2002 between Monsanto employees in Europe working on the new data required by German regulators, and senior Monsanto personnel in St. Louis (Heydens, Healy, Farmer, ████, Wratten, among others).

1066.   ████████, a Brussels-based Monsanto employee, reported that Monsanto had agreed to conduct a new *in vitro* dermal penetration study with rat skin, work that had begun with a contract laboratory called TNO.

1067.   An email chain was started on March 29, 2002 by ████ on the topic of the newly requested dermal absorption study. It described preliminary findings reported to Monsanto by TNO, steps taken in response, and addressed the need for a conference call to agree on "next steps."

1068.   In an April 2, 2002 email from William Heydens to his colleague Charles Healy about the "new issues and topics for the conf call of Tuesday, 2 April," Heydens wrote: "My primary concern is with glyphosate in terms of the potential for this work to blow Roundup risk evaluations (getting a much higher dermal penetration than we've ever seen before." (Text as it appears in email). (MONGLY03738295)

1069.   By "this work," Heydens was clearly referring to the new rat skin dermal penetration study. His concern that such a study might "blow Roundup risk evaluations" arose from the fact that a higher dermal absorption rate would invariably increase estimated risks, and possibly by enough to raise serious new concerns among regulators and restrict glyphosate's FTO.

1070.   In an April 4, 2002, email, ████ reports to the group that, as a result of the

preliminary TNO results reported to Monsanto, "we came to the conclusion that the penetration of glyphosate would have been [probably] greater than the 3% already imposed by the German authorities. We decided thus to **STOP** the study (effective today)." (Emphasis in original; MONGLY03737015)

1071.    Donna Farmer replied to this email later the same day, asking for clarification, leading to an email the next day from ██████████, a Monsanto scientist more directly involved with the scope and focus of recent and ongoing work on dermal absorption.

1072.    ██████ wrote in his April 5, 2002 email response to Farmer, and all others on the April 2 email chain, "We dropped the programme for glyphosate because a further study was not likely to help us meet the project objective...", which was to make the case for reducing below 3% the glyphosate dermal absorption rate used by regulators.

1073.    This decision was triggered by preliminary results from TNO showing that the dermal absorption rate for the glyphosate in formulated Roundup herbicide (MON 35012) through rat skin is 5% to 10%, compared to less than 1.5% for pure glyphosate. (MONGLY03738296)

1074.    According to ██████, this surprisingly large difference between the dermal absorption rate of pure glyphosate (~1.5%), compared to formulated Roundup (5% to 10%), "confirm our expectation that surfactant concentration affects dermal absorption."

1075.    So, the early data from TNO suggested that a properly conducted set of dermal absorption studies on Roundup herbicides would actually lead to a substantial increase in the then-current 3% estimate of dermal absorption.

1076.    This new data was obviously not helpful, given Monsanto's stated objective in conducting new, improved dermal absorption studies (reducing the 3% estimate of dermal

absorption used by regulators).

1077.   Moreover, the sharp contrast between the absorption rate for pure glyphosate, as opposed to the absorption data for the glyphosate in formulated Roundup with surfactants, highlighted a critical risk assessment and regulatory issue that Monsanto had worked diligently since the late 1970s to suppress and ignore – the very different risk profile stemming from exposure to the glyphosate in formulated Roundup products, in contrast to studies quantify the risk of exposure to pure glyphosate.

1078.   This episode is one of dozens in the record showing that Monsanto's primary interest in conducting tests on glyphosate and/or Roundup was to defend current registrations and/or convince regulators to approve new uses, rather than to understand more accurately actual risk levels.

1079.   Monsanto was simply not interested in providing regulators new data that would provide a sounder base of information to quantify risk levels, so that high-risk application scenarios can be identified and addressed.

1080.   Nor was Monsanto willing to use better information on worker risk levels to devise label instructions that warn applicators about high-risk application methods and circumstances, like using a backpack sprayer on a windy day, and commonsense measures to reduce exposures, like walking perpendicular to the wind when spraying on windy days.

1081.   In all likelihood, this episode involving the TNO study of dermal penetration is an example of Monsanto's many failures to comply with the so-called adverse effects reporting requirement in federal pesticide law (FIFRA Section 6(a)(2)).

1082.   This provision in FIFRA places a clear obligation on pesticide registrants to report to the EPA on a timely basis any information the company comes into the possession of that

suggests the existence of new risks, or higher risks than previously recognized and addressed by the EPA.

1083.   The TNO data suggesting that the actual dermal absorption rate for glyphosate in formulated Roundup should be 5% to 10%, instead of 3%, is exactly the type of important, new information that Section 6(a)(2) in FIFRA requires registrants submit to the EPA.

1084.   I conclude that the failure to share the results of the preliminary TNO rat skin dermal penetration study was a likely violation of Section 6(a)(2), recognizing that Monsanto may have submitted the data in compliance with Section 6(a)(2).

1085.   If Monsanto did make such a disclosure to the EPA of the TNO glyphosate dermal absorption data, the company will surely challenge my opinion and correct the record, by sharing with the court the documents confirming that such a transmission of data was made in accord with Section 6(a)(2) requirements.

### 4. Nitrosamine Contaminants in Roundup Herbicide

1086.   In a July 14, 1977 "Recommendation" in response to a Monsanto request for an extension of an existing Experimental Use Permit (EUP) that would sanction use of 705 gallons of Roundup in 1978, EPA notes that the Toxicology Branch has previously raised concern over the 0.2 to 0.4 ppm of N-nitrosoglyphosate (NNG) in formulated, Roundup herbicide (MONGLY00223253).

1087.   The "Recommendation" was to not approve the EUP extension because the petitioner, Monsanto, "…has made no assessment of possible hazards…" to applicators and those handling the herbicide.

1088.   Accordingly, since 1977, EPA concerns over the NNG content of Roundup herbicides were among the health and safety issues in play between EPA and Monsanto.

1089.   Several new toxicology studies were submitted by Monsanto to EPA in the 1977-1980 period in support of pending temporary tolerance petitions and EUPs, including some specifically in response to the agency's concern over NNG.

1090.   An October 4, 1977 memo from the Toxicology and Residue Chemistry Branch evaluated four new studies, only one of which was judged "satisfactory" (an oral LD-50 study using rats) (MONGLY00223244).

1091.   The October 7, 1977 memo ends with the statement "However, we have not recommended, and do not intend to recommend, for either permanent tolerances or registrations, based on these data." This is one of several EPA memos raising concerns with the quality and completeness of the data submitted by Monsanto in support of both tolerances and registrations.

1092.   In 1978, Monsanto submitted to EPA an internal study assessing the metabolism of NNG in rats. This report discusses the possibility that glyphosate can interact with nitrite in the diet to form cancer-causing nitrosamines. (MONGLY00922461)

1093.   Several years later in 2004, a Canadian agricultural scientist wrote Monsanto about this concern, and asked if the company had any new data or insights they could share on this possible source of cancer risk.

1094.   The response from Monsanto was that such a concern is unwarranted because "…glyphosate has been carefully monitored for years by regulatory agencies around the world, and, consistently it is not detected in drinking water sources."

1095.   While there were limited reports of glyphosate in drinking water in 2004, just a few years later there would be several.

1096.   Over the last decade, scientists in Europe, South America, and the U.S. have reported steadily rising levels of glyphosate in drinking water resources. In heavily farmed areas where Roundup Ready crops are widely planted and Roundup is heavily used, glyphosate detections in drinking water are now common.

*Charles Benbrook*

12/21/17