# EXHIBIT 13



## Deposition of
# Charles Benbrook, PhD

**Date:** September 13, 2018

**Case:** James Adams Jr., et al. v. Monsanto Company

**No.** 17SL-CC02721

**Court Reporter:** Jennifer Bajwa Melius, RPR

Paszkiewicz Court Reporting
Phone:  618-307-9320
Toll-Free:  855-595-3577
Fax:  618-855-9513
www.spreporting.com

Page 1

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
STATE OF MISSOURI

---

JAMES ADAMS JR., et al.,                    Case No:
                                            17SL-CC02721
     Plaintiffs,

vs.

MONSANTO COMPANY,

     Defendant.

---

DEPOSITION OF CHARLES BENBROOK, PhD

September 13, 2018

---

Charles Benbrook, PhD
September 13, 2018

## Page 2

1    APPEARANCES
2    ON BEHALF OF THE PLAINTIFFS:
        DAVID WOOL, ESQ
3        Andrus Wagstaff, P C
         7171 West Alaska Drive
4        Lakewood, Colorado  80226
         (303)376-6360
5        david wool@andruswagstaff com
6    ON BEHALF OF THE DEFENDANT:
7        MATTHEW J MALINOWSKI, ESQ
         Hollingsworth LLP
8        1350 I Street Northwest
         Washington, D C   20005
9        (202)898-5800
         mmalinowski@hollingsworthllp com
10       and
         ZACHARY FAYNE, ESQ
11       (appearing telephonically)
         Arnold & Porter
12       Three Embarcadero Center, 10th Floor
         San Francisco, California  94111
13       (415)471-3114
         zachary fayne@arnoldporter com
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1            PURSUANT TO NOTICE and the appropriate rules
2    of civil procedure, the deposition of CHARLES BENBROOK,
3    PhD, called for examination by the Defendant, was taken
4    at Andrus Wagstaff, P.C., 7171 West Alaska Drive,
5    Lakewood, Colorado, commencing at 11:13 a.m. on
6    September 13, 2018, before Jennifer Bajwa Melius, a
7    Notary Public and Registered Professional Reporter in
8    and for the State of Colorado.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1              I N D E X
2    EXAMINATION:                    PAGE
3    By Mr  Malinowski          7, 189
4    By Mr  Wool                183, 195
5
6    EXHIBITS:                       PAGE
7    1   Plaintiffs' Objections to Monsanto     10
         Company's Notice of Videotaped Deposition
8        of Charles Benbrook, PhD
9    2   Expert Report of Charles Benbrook      9
10   3   Glyphosate-Based Herbicides Enhances the  10
         Uterine Sensitivity to Estradiol in Rates,
11       Schimpf, et al
12   4   E-mail Chain, Subject:  The document I   13
         quickly looked at this AM, dated July 30
13       through August 20, 2018
14   5   E-mail, Subject:  Food Industry "Badges of  14
         Honor" and "Smarter" Metrics, dated July
15       13, 2018
16   6   E-mail Chain, Subject:  My New Paper Out,  14
         dated July 15 through July 16, 2018
17
18   7   E-mail Chain, Subject:  Gordon Conference  14
         Metabolomics and Human Health Feb 3-8 2019,
19       dated September 10, 2018
20   8   E-mail Chain, Subject:  Greetings;        15
         Question, dated June 21, 2018
21   9   Retention Agreement:  Expert Opinions and  15
         Testimony, dated July 30, 2018
22
23   10  Comparison of Transcriptome Responses to   16
         Glyphosate, Isoxaflutole,
24       Quizalofop-p-ethyl and Mesotrione in the
         HepaRG Cell Line, Mesnage, et al
25

## Page 5

1    11  Time Spent on Glyphosate Case for Angus    20
         Flagstaff [as written]:  July -- August 31,
2        2018
3    12  Long-Term Trends in the Intensity and       23
         Relative Toxicity of Herbicide Use, Kniss
4
5    13  Just Label It Website Printout             91
6    14  E-mail Chain, Subject:  Yes on 522's New   98
         Rocking GMO Salmon Ad; Dr  Bronner's
7        Donates Another $500,000, dated October 29,
         2013
8    15  PLOS ONE Paper Release Team and Activities,  113
         dated December 1, 2013
9
10   16  Why Regulators Lost Track and Control of   119
         Pesticide Risks:  Lessons from the Case of
11       Glyphosate-Based Herbicides and Genetically
         Engineered-Crop Technology, Benbrook
12   17  Safety Evaluation and Risk Assessment of   123
         the Herbicide Roundup and its Active
13       Ingredient, Glyphosate, for Humans,
         Williams, et al
14
15   18  Review of Genotoxicity Studies of          138
         Glyphosate and Glyphosate-Based
16       Formulations, Kier, et al
17   19  Glyphosate-Based Herbicides and Cancer     142
         Risk:  A Post-IARC Decision Review of
18       Potential Mechanisms, Policy and Avenues of
19       Research, Davoren, et al
19   20  Environmental Protection Agency            150
         Subpart B -- Docketing and Public
20       Participation Procedures
21   21  US Environmental Protection Agency Office  162
         of Pesticide Programs Notice of Pesticide
22       Registration for Roundup PROMAX, dated
         June 20, 2007
23
24   22  Label Amendment for Roundup PROMAX         166
         Herbicide, dated November 1, 2007
25

2  (Pages 2 to 5)

Charles Benbrook, PhD
September 13, 2018

## Page 6

1  23  Memo from James Tompkins to Dawn Fee-White,    167
        Subject:  Roundup ProMax Herbicide (Revise
2       Master Label), EPA Registration No
        524-579, Application Dated May 13, 2009,
3       dated July 1, 2009
4  24  Memo from Jim Tompkins to Dawn Fee-White,    168
        Subject:  EPA Reg  524-579/Supplemental
5       Label, dated August 17, 2009
6  25  Roundup PROMAX Herbicide Label          169
7  26  Memo from Gregory Akerman and Monique      173
        Perron to Caitlin Newcamp and Neil
8       Anderson, Subject:  Response to the Final
        Report of the Federal Insecticide,
9       Fungicide, and Rodenticide Act Scientific
        Advisory Panel (FIFRA SAP) on the
10      Evaluation of the Human Carcinogenic
        Potential of Glyphosate, dated December 12,
11      2017
12 27  Biomonitoring of Genotoxic Risk in         180
        Agricultural Workers from Five Colombian
13      Regions:  Association to Occupational
        Exposure to Glyphosate, Bolognesi, et al
14
15 28  E-mail Chain, Subject:  Manuscript - Kier &  187
        Kirkland + Environ Conc docx, dated
15      December 6, 2012
16
17 29  Monsanto Manuscript Clearance Form Global    195
        Regulatory, dated February 29, 2012
18
19
20
21
22
23
24
25

## Page 7

 1          P R O C E E D I N G S
 2          CHARLES BENBROOK, PhD,
 3   having been first duly sworn, was examined and testified
 4   as follows:
 5          EXAMINATION
 6   BY MR. MALINOWSKI:
 7       Q.  Doctor, a little delay, but thank you for
 8   your patience and we'll try to be as efficient as we can
 9   in here.  I know you've been deposed a number of times
10   and you've testified recently, correct?
11       A.  Correct.
12       Q.  And you testified in the Dewayne Johnson
13   trial a few weeks ago, correct?
14       A.  Correct.
15       Q.  Have you read your testimony from that trial?
16       A.  No.
17       Q.  Have you seen the transcript from that trial?
18       A.  No.
19       Q.  Have you --
20       A.  Not yet.  I'm looking forward to it.
21       Q.  Okay.  Have you talked to any of the
22   plaintiffs' lawyers at all about your testimony?
23          MR. WOOL:  Objection.
24       A.  Briefly afterwards.
25       Q.  (By Mr. Malinowski)  Okay.

## Page 8

 1       A.  When we were in San Francisco.
 2       Q.  While the trial was still going on and you
 3   got off the stand, you talked to the lawyers a little
 4   bit?
 5       A.  Correct.
 6       Q.  Okay.
 7       A.  I didn't fly back until the next day.
 8       Q.  Since the verdict came down, have you talked
 9   to the plaintiffs' lawyers other than counsel here
10   today?
11       A.  So let's see.  The verdict came down
12   August -- or --
13       Q.  It's been a while.
14       A.  Yeah.  Yeah.  I've had several conversations
15   with various attorneys about the ongoing cases and then
16   the verdict.
17       Q.  Why don't you tell me what you did to prepare
18   for the deposition today.
19       A.  I reread my expert report and gathered
20   together a -- the reliance list that's been provided to
21   you and tried to identify documents responsive to your
22   request.
23       Q.  Okay.  So is this the expert report you're
24   referring to here in the Dewayne Johnson case?
25       A.  It looks like it.

## Page 9

 1       Q.  Okay.  I'll mark that as Number 2.  I might
 2   refer to it.
 3          (Exhibit Number 2 was marked.)
 4       A.  Okay.
 5       Q.  (By Mr. Malinowski)  But that's been the
 6   subject of other depositions and your testimony in that
 7   Dewayne Johnson trial, of course, correct?
 8       A.  Correct.
 9       Q.  Are there any other reports -- expert
10   reports -- that have been served yet other than that
11   Dewayne Johnson report, to your recollection?
12       A.  No, sir.
13       Q.  Okay.
14          MR. WOOL:  And, Counsel, do you have another
15   copy of that exhibit?
16          MR. MALINOWSKI:  I do.  I have one copy.  I
17   may have to look over your shoulder a couple of times.
18          MR. WOOL:  Okay.
19          THE REPORTER:  And I'm sorry.  Can you speak
20   a little bit louder with the air conditioner?
21          MR. MALINOWSKI:  Yeah.  Sorry.
22       Q.  (By Mr. Malinowski)  Okay.  Right before the
23   deposition, Counsel handed me -- or sitting on the table
24   were a couple different sets of documents, correct?
25       A.  Yes.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Charles Benbrook, PhD
September 13, 2018

Page 10

1    (Exhibit Number 1 was marked.)
2    Q.  (By Mr. Malinowski)  Can you tell me -- well,
3  I see -- what Number 1 is -- purports to be Plaintiffs'
4  Objections to Monsanto Company's Notice of Videotaped
5  Deposition of Dr. Benbrook today.  I'll mark that as
6  Number 1.
7        Number 2 was marked as your expert report.
8        MR. MALINOWSKI:  And then are these -- these
9  are clipped.  Why are they clipped?  Are these separate
10  documents or the same?
11        MR. WOOL:  They're separate documents.
12        MR. MALINOWSKI:  Okay.
13        MR. WOOL:  I just clipped them together to --
14        MR. MALINOWSKI:  Okay.
15        MR. WOOL:  -- keep everything straight that
16  was responsive to --
17        MR. MALINOWSKI:  Thank you.
18        MR. WOOL:  -- the request.
19        MR. MALINOWSKI:  I'm going to mark them
20  separately, I think, just to keep it -- because we have
21  so many stickers, we might as well use them, right?
22        (Exhibit Number 3 was marked.)
23    Q.  (By Mr. Malinowski)  Number 3.  Can you
24  identify what Number 3 is for me, please?
25    A.  This is a peer-reviewed journal article on

Page 11

1  glyphosate toxicity that came out just in the last week
2  or so.  It was not included in my reliance list, so I
3  thought it best I bring it along and share a copy with
4  you.
5    Q.  Okay.  And this looks like it's a manuscript.
6  So has this been actually published yet?
7    A.  You're talking about the same thing?
8    Q.  Yeah.
9    A.  Yes.  It's a -- it's -- yeah.  It's been
10  published in some journal.  I don't -- I can't even
11  remember which one.  I don't know why the information on
12  what journal isn't here.  But, yeah, it's from
13  Bioscientifica -- Bioscientifica -- which is a
14  peer-reviewed science journal.
15    Q.  Is that based in the United States, do you
16  know?
17    A.  I don't know.
18    Q.  And how did you get this document?
19    A.  I don't really recall whether I was alerted
20  to its presence by a listserv that I track or whether a
21  colleague sent it to me.  The -- Maria Milesi, one of
22  the authors, is -- was the lead author of an earlier
23  study that's on the reliance list.
24        So this is one of the teams conducting
25  genotoxicity research on glyphosate-based herbicides.

Page 12

1  And it's an area that I'm trying to stay current with,
2  so any number of people could have sent me an e-mail
3  alert that it exists, and so I went to the journal and
4  downloaded this.  I have -- I've read the abstract, but
5  I have not read the full paper yet.
6    Q.  And did this -- so you haven't read the full
7  paper, but you've read the abstract --
8    A.  Right.
9    Q.  -- you said?
10    A.  Yeah.  Yes.
11    Q.  Is the abstract included in here?  I don't
12  see it.
13    A.  Oh, I guess it's not.
14    Q.  Just so I'm clear, so you were able to look
15  at this online?
16    A.  I got it online, yeah.
17    Q.  And I'm familiar with PubMed.  So is it kind
18  of like a PubMed server where you go and you click on
19  the article and you can read the abstract, and then you
20  decide whether or not to download it or --
21    A.  I don't -- I didn't get it from PubMed.  I
22  got it directly from the journal.
23    Q.  Okay.
24    A.  The journal website.
25    Q.  And this is what you got --

Page 13

1    A.  Yeah.
2    Q.  -- when you downloaded it, right?  How did --
3  how did you read the abstract if there's no abstract
4  here?
5    A.  I guess I didn't.  I -- you know, there's an
6  introduction.  As I said, I haven't studied the paper in
7  depth.  It's -- but it was a new study that came out
8  since I submitted the reliance list, and I wanted to get
9  it on -- bring it to your attention.
10    Q.  Okay.  Do you -- do you know any of these
11  authors personally?
12    A.  No.
13    Q.  Do you know if any of these authors are
14  involved as consultants in any way for the plaintiffs or
15  anyone in this glyphosate litigation?
16    A.  I have no knowledge about that.
17    Q.  Okay.
18        (Exhibit Number 4 was marked.)
19    Q.  (By Mr. Malinowski)  I'll mark as Number 4 a
20  document that appears to be a July 30th e-mail.  Could
21  you identify what that is, please?
22    A.  Yes.  In your request for documents, you
23  asked for communications with William Sawyer, who was
24  one of the experts in the Johnson case, and these are
25  the two e-mails that I exchanged with Dr. Sawyer --

4 (Pages 10 to 13)

Charles Benbrook, PhD
September 13, 2018

---

Page 14

1      Q.  Okay.
2      A.  -- around the time or right after the trial.
3      Q.  Okay.
4          (Exhibit Number 5 was marked.)
5      Q.  (By Mr. Malinowski)  All right.  And
6  Number 5, another e-mail dated July 13th, 2018,
7  between -- it looks like between you and a Robin --
8  Mesnage?
9      A.  Mesnage, yeah.
10     Q.  And this is responsive to our document
11 request as well?
12     A.  Yeah.
13         (Exhibit Number 6 was marked.)
14     Q.  (By Mr. Malinowski)  Okay.  July 16th is
15 Number 6, another e-mail between you and Robin --
16 Mesnage?  Is that how you --
17     A.  Yes.
18     Q.  Okay.
19     A.  Well, I can't see it, but yes.
20     Q.  Oh, I'm sorry.  Here you go.  I didn't mean
21 to. . .
22         (Exhibit Number 7 was marked.)
23     Q.  (By Mr. Malinowski)  Number 7.  I'll hand it
24 to you.  It's an e-mail dated September 10th, 2018,
25 between you and Michael -- Antoniou?

---

Page 15

1      A.  Antoniou.
2      Q   Antoniou  Okay
3      A.  Michael Antoniou is another one of the
4  individuals cited in your request for --
5      Q   Sure
6      A.  -- communications.  And I sent him an e-mail
7  that I received from a listserv about a scientific media
8  Gordon Conference on metabolomics and human health.  And
9  knowing what I know about Michael Antoniou and Robin's
10 research in metabolomics, I thought this was a
11 conference they'd be interested in attending, and so I
12 brought it to their attention.
13     Q   Okay
14         (Exhibit Number 8 was marked )
15     Q   (By Mr Malinowski)  Number 8 is a July --
16 I'm sorry -- June 21st --
17     A.  June -- yeah.
18     Q   -- 2018, e-mail between you and Aaron Blair,
19 correct?
20     A.  Correct.
21     Q   Again, this is responsive to our document
22 request?
23     A.  Yeah.
24         (Exhibit Number 9 was marked.)
25     Q   (By Mr Malinowski)  All right  Number 9

---

Page 16

1  appears to be a retention agreement from Andrus Wagstaff
2  sent by David Wool, Esquire, and you.  And this appears
3  to be just a retention agreement between you and this
4  law firm --
5      A.  Yeah.
6      Q.  -- correct?
7      A.  Yes.
8      Q.  Signed July 30th of 2018, right?
9      A.  Correct.
10         (Exhibit Number 10 was marked.)
11     Q.  (By Mr. Malinowski)  Number 10 -- I'll hand
12 that to you -- appears to be a publication in Toxicology
13 Reports from 2018 with Robin Mesnage as the lead author
14 there; is that correct?
15     A.  Correct.
16     Q.  Also Michael Antoniou is listed as an author
17 as well?
18     A.  Correct.
19     Q.  And --
20     A.  I can't recall if I got this onto the
21 reliance list or not, so that's why I'm giving you a
22 copy of it.
23     Q.  Okay.
24     A.  It came out quite recently.
25     Q.  The title of the article is "Comparison of

---

Page 17

1  Transcriptome Responses to Glyphosate" --
2      A.  Yeah.
3      Q.  -- "Isoxaflutole" --
4      A.  Yeah.  Quizalofop --
5      Q.  Yeah.  I may murder this one.  What's that?
6  How do you say that?
7      A.  Quizalofop-p-ethyl --
8      Q.  -- "Quizalofop-p-ethyl" --
9      A.  That's one of the so-called fops -- f-o-p,
10 fops.
11     Q.  -- "and Mesotrione in the HepaRG Cell Line,"
12 correct?
13     A.  Correct.
14     Q.  And have you reviewed this article?
15     A.  Yeah.
16     Q.  Has it impacted your opinions in this case?
17     A.  Just added to them.
18     Q.  Added to them.  Fair enough.
19     A.  Supported them.
20     Q.  And at the back here -- I'm still looking at
21 this -- if you don't mind, I'm still looking at
22 Number 10.  There's an acknowledgment section at the
23 end; is that right?
24     A.  Yeah.
25     Q.  It said, This work was funded by the

---

5 (Pages 14 to 17)

Charles Benbrook, PhD
September 13, 2018

Page 18

1  Sustainable Food Alliance (USA) --
2      A.  I see that.
3      Q.  -- whose support is gratefully acknowledged,
4  correct?
5      A.  I see that, yeah.
6      Q.  What's the Sustainable Food Alliance?
7      A.  I don't know.
8      Q.  Well, when you read the study and reviewed
9  it, did you go look up what the Sustainable Food
10  Alliance was?
11      A.  No.
12      Q.  Why not?
13      A.  I didn't feel that was important information
14  for me to have in understanding the scientific research
15  that was done and the findings reported in the paper.
16      Q.  And then above that, still looking at Exhibit
17  Number 10, the end, it says, Competing interests, there
18  in that section.
19      A.  Correct.
20      Q.  Do you see that?
21      A.  Uh-huh.
22      Q.  And it says, The authors declare they have no
23  competing interests, correct?
24      A.  Yes.
25      Q.  Now, is -- Robin Mesnage, is she an -- is it

Page 19

1  she or he?
2      A.  It's a male.
3      Q.  He.  Is he a consultant in this litigation,
4  to your knowledge?
5      A.  He certainly wasn't at the time this paper
6  was done, but he may be now.  I don't know.
7      Q.  This was published in 2018, correct?
8      A.  Very recently, which is why I'm giving it to
9  you as opposed to just listing it in the reliance list.
10      Q.  It was -- if you look on the front of the
11  study, if you look on the bottom in the footnote there,
12  it says, Received June 14th, 2018, and accepted
13  August 9th, 2018, correct?
14      A.  Right, and available online August 11th.
15      Q.  Right.
16      A.  So that's approximately a month ago.
17      Q.  So at the time this was accepted for
18  publication in August of 2018, your understanding is
19  that Mr. Mesnage was not a consultant in the litigation?
20      A.  I don't believe he was, but I guess I never
21  asked him.
22      Q.  Okay.  And what about Michael Antoniou?  Was
23  he a consultant in the litigation as well?
24      A.  He was not.
25      Q.  Is he now, do you know?

Page 20

1      A.  I don't -- I have no reason to believe that
2  he is.
3      Q.  And it hasn't been disclosed in the competing
4  interests if they are, correct?
5      A.  If they had been retained, they certainly
6  should have cited that, yes.
7         MR. WOOL:  And, Doctor, if you don't
8  specifically know whether he was a consultant or not,
9  you know, you don't have to --
10         THE DEPONENT:  Yeah.
11         MR. WOOL:  -- speculate.
12      Q.  (By Mr. Malinowski)  If you don't know, you
13  don't know.  It's fine.
14      A.  Yeah.
15      Q.  Okay.  That's 10.  I may come back to that.
16  I don't know.  At a break I'll look at it.
17         (Exhibit Number 11 was marked.)
18      Q.  (By Mr. Malinowski)  Number 11.  Could you
19  just tell us what Number 11 is?
20      A.  This is the first invoice that I submitted to
21  Andrus Flagstaff [sic] for the work on the case in the
22  month of August.
23      Q.  Okay.  A total of 16 and a half hours?
24      A.  Correct.
25      Q.  I'm sorry.  18 --

Page 21

1         MR. WOOL:  18 -- yeah.
2      Q.  (By Mr. Malinowski)  18 and a half hours?
3      A.  Oh, yeah.  Yeah.
4      Q.  All right.  16.5 case-specific, 2 general,
5  for a total of 18.5 hours, correct?
6      A.  Correct.
7      Q.  And that's at $300 an hour, true?
8      A.  Correct.
9      Q.  Any -- has that been paid yet, do you know?
10      A.  No, it hasn't.
11      Q.  Any subsequent things to add to this?
12      A.  In August?  No.
13      Q.  What about in -- well, did you come down
14  yesterday for this deposition?
15      A.  I came down -- I traveled on Tuesday, and I
16  worked with Mr. Wool yesterday, and I'm doing the
17  deposition today.
18      Q.  How -- roughly how long did you meet with
19  plaintiff's counsel yesterday?
20      A.  Six hours maybe.
21      Q.  Here at the office?
22      A.  Correct.
23      Q.  Did you look at documents?
24      A.  We spent a significant amount of the time
25  going over your request for documents as part of the

6 (Pages 18 to 21)

Charles Benbrook, PhD
September 13, 2018

Page 22

1 deposition. I gave Mr. Wool the documents that I had
2 been able to identify that I felt were responsive, and
3 so those documents were exchanged. I think there was
4 some discussion about certain -- a couple aspects of my
5 expert report, and --
6         MR. WOOL: And, you know, you don't have to
7 go into what we --
8         THE DEPONENT: Yeah.
9         MR. WOOL: -- discussed specifically.
10        Q. (By Mr. Malinowski) Okay. So about ten days
11 ago we got -- we received the supplemental
12 materials-considered list, which I think is by agreement
13 between the parties. Did you create that or did the
14 lawyers create that or how did --
15        A. I created it.
16        Q. Did the lawyers send you stuff that you added
17 on to that or was it mostly stuff that you kind of
18 obtained on your own? How did it work?
19        MR. WOOL: Objection. Vague.
20        A. The reliance list that I sent to Andrus
21 Flagstaff contains as full a -- of a list of the
22 peer-reviewed scientific publications that I have in my
23 files on glyphosate and glyphosate-based herbicides, and
24 it has as full a record as I could compile of the
25 Bates-stamped documents from the discovery in this case

Page 23

1 that I have used and relied upon in reaching my opinions
2 in the case.
3        Q. (By Mr. Malinowski) Do you type up or do you
4 have someone that types it up for you or --
5        A. I did it.
6        Q. Okay. So six hours yesterday and then
7 whatever time we'll spend today. Any other meetings in
8 September that I'm missing thus far?
9        A. With who?
10       Q. With the lawyers -- the plaintiffs' lawyers.
11       A. No. None of those.
12       Q. Okay.
13          (Exhibit Number 12 was marked.)
14       Q. (By Mr. Malinowski) I'll mark as Number 12 a
15 document that we received in your materials-considered
16 list, I think.
17       A. Yeah.
18       Q. And this appears to be an article in a
19 publication called Nature Communications; is that right?
20       A. Correct.
21       Q. And the author is named Andrew Kniss or --
22       A. Kniss.
23       Q. K-n-i-s-s. Do you know -- I assume he's a
24 PhD, but I'm not sure. But do you know --
25       A. He is a PhD.

Page 24

1        Q. Do you know Dr. Kniss?
2        A. I've never met him personally. I've read
3 some of his work, and I've exchanged a few e-mails with
4 him. We both work in the area of glyphosate use in
5 agriculture and have -- you know, have maybe exchanged
6 e-mails two or three times over the last two or three
7 years.
8        Q. And just for the record, this document is --
9 was accepted by Nature Communications on
10 January 31st, 2017, and published April 10th of 2017,
11 correct?
12       A. Correct.
13       Q. Is Nature Communications a peer-reviewed
14 journal?
15       A. Yes.
16       Q. It's one that you keep abreast of in your
17 practice; is that fair?
18       A. Correct.
19       Q. And the title of the document is "Long-Term
20 Trends in the Intensity and Relative Toxicity of
21 Herbicide Use," correct?
22       A. Correct.
23       Q. And before I -- I'm going to ask you some
24 questions about this, but before I do, is this a
25 document the lawyers sent you or did you find it on your

Page 25

1 own?
2        A. Oh, no. When this came out, the -- probably
3 the day it came out I had -- I knew of the study.
4 Several people brought it to my attention, and then I
5 read it. And I think I actually had some e-mail
6 correspondence with him about a couple aspects of the
7 methodology, which I found interesting. And that's the
8 long and short of it.
9        I mean, you know, it's -- on the -- in terms
10 of the data on herbicide use, it covers data and uses
11 data that I'm very familiar with. And what this paper
12 adds is his attempt to create a toxicity index based on
13 herbicide use per acre, and that's mostly what I
14 interacted with him about, the underlying methodology
15 that he used.
16       Q. So Dr. Kniss is a professor in the department
17 of plant sciences at University of Wyoming in Laramie,
18 correct?
19       A. He certainly was when he wrote this. I
20 haven't had any interactions with him of late. I don't
21 know if he's still there or not. I think he is.
22       Q. Do you still have the e-mails you exchanged
23 with him?
24       A. No.
25       Q. You don't have those?

7 (Pages 22 to 25)

Charles Benbrook, PhD
September 13, 2018

Page 26

1    A. Oh, no.
2    Q. What were the -- what was the nature of the
3    e-mails?
4    A. I was interested in how he developed his
5    toxicity index of herbicide use. And there -- I don't
6    remember the technical issues that I asked him, but
7    that's what -- that was the subject of the e-mail
8    exchange.
9    Q. Was there a disagreement between you and the
10   way that he employed his methodology?
11   A. No. No.
12   Q. You thought he -- his methodology was sound?
13   A. No.
14   Q. So you disagreed with it?
15   A. I didn't disagree with it. I asked him
16   questions about it.
17   Q. When he -- did he answer the questions?
18   A. Yeah.
19   Q. Once he answered the questions and explained
20   himself, did you still take issue with it?
21   A. Well, I don't -- I don't regard it as a valid
22   methodology. I didn't regard it as valid when I read
23   it. After he explained to me a couple of aspects of the
24   methodology that weren't clear based on the methods
25   section of the paper, it didn't change my opinion.

Page 27

1    And, you know, I mean, it -- he did what
2    could be done using the particular index that he used,
3    but it's -- it's an index I've followed for many years,
4    and the flaws of it have been well-documented in the
5    past.
6    Q. So would it be fair to say that the exchange
7    you had with Dr. Kniss regarding his methodology
8    employed in this paper, that was a scientific dialogue
9    the two of you were having about --
10   MR. WOOL: Objection.
11   Q. (By Mr. Malinowski) -- methodology; is that
12   fair?
13   A. Correct. Yeah.
14   THE REPORTER: I'm sorry. Can you make your
15   objections a little louder?
16   MR. WOOL: Sorry. Sorry. I'm used to having
17   a mic. Objection to form.
18   Q. (By Mr. Malinowski) And was this all over
19   e-mail?
20   A. Yes.
21   Q. Did you ever pick up the phone and call him
22   or talk to him in person?
23   A. I don't remember -- I don't recall doing so,
24   no. I mean, I just don't recall. I don't think I did.
25   Q. What e-mail address would you have been

Page 28

1    e-mailing from? Was it from Washington State?
2    A. Well, let's see. No. I had left Washington
3    State by then, so it would have been my
4    charlesbenbrook@gmail.com.
5    Q. Your Gmail account?
6    A. Yeah.
7    Q. And you didn't save any of these e-mail
8    exchanges between you and Dr. Kniss?
9    A. How would I know whether he saved them or
10   not?
11   Q. I said did you.
12   A. No.
13   Q. Did you --
14   A. Excuse me. I thought you asked did he save
15   them.
16   Q. Yeah, if I did, I didn't mean to.
17   A. Okay.
18   Q. But if --
19   A. Well, I think we're clear.
20   Q. I don't expect you to know what he did.
21   A. No. I just. . .
22   Q. Okay. So you didn't save the e-mail dialogue
23   between you and Dr. Kniss. Did you create any other
24   documents, notes, diary, anything handwritten or typed
25   up regarding this dialogue you had with Dr. Kniss

Page 29

1    regarding the study?
2    A. No.
3    Q. Okay. So you've known about this since, you
4    said, the day it was published, right?
5    A. Or, yeah, within a couple of days. When
6    it -- when it was publicly discussed, I don't remember
7    exactly how I first heard about it, but it was probably
8    through a -- either a news media source or a
9    professional colleague that knows that I work in the
10   area.
11   Q. Okay. And I'm just looking on the first
12   page. I'm going to ask you about some of the statements
13   in this since you did -- you did at least consider this
14   in --
15   A. Oh, yeah.
16   Q. -- your analysis in this case --
17   A. Yeah.
18   Q. -- correct?
19   A. Yeah.
20   Q. And is it fair to call this first page --
21   even though it doesn't say abstract, that's really the
22   abstract of the article, correct?
23   A. Correct.
24   Q. And four -- five lines down -- I think it
25   might even be highlighted in gray on your --

8 (Pages 26 to 29)

Charles Benbrook, PhD
September 13, 2018

Page 30

1    A.  Yeah.
2    Q.  There's some highlights in there.  You can
3  ignore that, but I might -- it might help me, you know,
4  direct you to where I'm looking.
5    A.  Okay.
6    Q.  Five lines in it says, quote, Although GE --
7  that means genetically-engineered crops, correct?
8    A.  Yes.
9    Q.  -- have been previously implicated in
10  increasing herbicide use, herbicide increases were more
11  rapid in the non-GE crops, correct?
12    A.  That's what it says, yeah.
13    Q.  Non-GE crops meaning crops that are not
14  genetically engineered, correct?
15    A.  Correct.
16    Q.  And that was Mr. -- I'm sorry -- Dr. Kniss's
17  findings when he studied the data that he's reporting
18  about here; is that fair enough?
19    A.  This is the -- an abstract of what he reports
20  doing in -- and discussing in the paper.
21    Q.  All right.  And we can look at it in the
22  paper.  And that sentence is replicated further on in
23  the paper, correct?
24    A.  I would assume so.
25    Q.  Well, why don't we. . .

Page 31

1    I'm on the second page of the article here,
2  which is Page Number 2, right-hand column.  I think it's
3  highlighted.  Dr. Kniss writes, quote, Pesticide
4  toxicity is often discussed in a very general sense,
5  parentheses, for example, using more toxic herbicides,
6  closed quote -- closed paren -- but there is not
7  necessarily a strong relationship between acute and
8  chronic toxicity, and therefore, the distinction between
9  these two measures of toxicity is important.  Do you see
10  that?
11    A.  Yes, I do.
12    Q.  Do you agree with that?
13    A.  Yes.
14    Q.  Okay.  Flipping to the next page there,
15  there's a bunch of stuff that's highlighted.  I'm not
16  going to necessarily ask you about all of it.  But on
17  the left-hand column, there's a heading called Maize
18  toxicity trends.  Do you see that?
19    A.  I do.
20    Q.  And maize is a type of corn, right?
21    A.  Maize is corn.
22    Q.  Right.  And Dr. Kniss concludes that
23  throughout -- quote, Throughout the 1990s, atrazine was
24  responsible for a large majority of the chronic hazard
25  quotient in maize, and then he cites to a supplementary

Page 32

1  figure, correct?
2    A.  Yes.
3    Q.  Atrazine is what?
4    A.  Herbicide.
5    Q.  And then he goes on -- Dr. Kniss says,
6  In 2014, just two herbicides, atrazine and mesotrione,
7  were responsible for 88 percent of the chronic hazard
8  quotient, correct?
9    A.  That's what it says, yeah.
10    Q.  What is a chronic hazard quotient, if you
11  know?
12    A.  It's a -- it would be discussed in the
13  methodology section, which I guess in the way that this
14  journal works, the methodology section is at the end.
15  Yeah, methods.  You'll see it on page 6.
16    The data sources -- is -- identifies that the
17  information used by Dr. Kniss's analysis on herbicide
18  use comes from the USDA National Agricultural Statistics
19  Service Quick Stats, which is the same source that I
20  have used in all of my analysis, and including all the
21  analysis of glyphosate use as part of this case.  I
22  don't believe there's any significant disagreement
23  between Dr. Kniss and I on what the USDA data shows
24  relative to herbicide use in corn maize and cotton, the
25  major GE crops.

Page 33

1    The methods section goes on to identify that
2  the source of acute rat LD50s, which is the basic metric
3  of acute toxicity, I assume comes from -- oh, he took it
4  from the Herbicide Handbook, and if not from that, the
5  US EPA.  So it's a -- it's a standard technical
6  publication with widely accepted rat and mouse LD50
7  data.  Again, there would be no substantial disagreement
8  between Dr. Kniss and other analysts, including myself,
9  on what those acute toxicity numbers are.
10    The area treatments that he gives to the --
11  the way that he calculates them in the next section of
12  the methodology -- and then the relative toxicity, this
13  is the section that describes the hazard quotient, and
14  it's basically the amount of the pesticide used divided
15  by his measure of toxicity.  And the hazard -- quote,
16  The more toxic the herbicide, the higher the hazard
17  quotient.
18    Q.  Okay.
19    A.  So that's how it works.  But it's based
20  solely on -- for acute toxicity, it's based on the LD50,
21  and then somewhere I assume he's got a chronic toxicity
22  one as well, but -- actually, I don't see that.  Maybe
23  it's just acute.  Hang on a second.
24    Even as herbicide use -- I'm reading from the
25  abstract.  Even as herbicide use increased, chronic

9 (Pages 30 to 33)

Charles Benbrook, PhD
September 13, 2018

Page 34

1  toxicity associated with herbicide use decreased in two
2  of the six crops, while acute toxicity decreased in four
3  of the six.
4        So I see in the methods an explanation of
5  how -- oh, so the acute rat LD50 and the chronic
6  24-month NOEL -- okay.  So that's the basis for the
7  chronic toxicity hazard quotient in this particular
8  analysis.
9     Q.  What is the 24-month rat NOEL, N-O-E-L?
10    A.  That would be the no observable effect level
11 in a two-year chronic feeding study of rats.
12    Q.  Okay.
13    A.  And it's a very curious approach because only
14 for a subset of the 118 herbicides that Dr. Kniss
15 evaluated was the two-year rat feeding study the source
16 of the chronic reference dose, which is really the
17 appropriate metric for this sort of analysis.
18    Q.  Which if --
19    A.  And I'm sure that's one of the things that I
20 said to him when I e-mailed him.
21    Q.  Which -- can you identify any -- which of the
22 herbicides that he included in this analysis that did
23 not have the appropriate 24-month rat NOEL data upon
24 which to base the chronic toxicity?
25    A.  It would be all of the herbicides for which

Page 35

1  the basis for the chronic reference dose was not the
2  NOEL from a 24-month rat chronic feeding study.
3     Q.  Right.  And I'm asking can you identify any
4  specific ones?
5     A.  Well, sure I can, but I'd have to go to the
6  supplemental information and -- or go to my records and
7  go through them one at a time.
8     Q.  Does glyphosate fall into that, do you know?
9     A.  Yes.
10    Q.  Do you know that for sure?
11    A.  Yes.  The basis of the glyphosate chronic
12 reference dose is not the 24-month chronic feeding
13 study.
14    Q.  What's the basis of the glyphosate chronic
15 index?
16    A.  It's a rabbit developmental study.
17    Q.  For how long?
18    A.  90 days, I believe it was.
19    Q.  Okay.
20    A.  Did I say rat or rabbit?
21    Q.  You said rabbit.
22    A.  Rabbit.  Yes.  R-a-b-b-i-t.
23    Q.  That's what you meant, right?
24    A.  Yeah, yeah.  I'm sorry.  I just -- you know,
25 I thought maybe I left off the b-i-t.

Page 36

1     Q.  Okay.  I'm back on page --
2     A.  Okay.  So we answered your question about the
3  basis of the hazard quotient.
4     Q.  Good.  I'm back on page 3 now here.
5     A.  Okay.
6     Q.  Dr. Kniss says, Acute -- left-hand column,
7  just the next sentence.  Acute herbicide toxicity has
8  decreased 88 percent in maize from an acute hazard
9  quotient of 7016 in 1990 to 819 in 2014.  Do you see
10 that?
11    A.  Correct.
12    Q.  Then he attributes, Much of that reduction in
13 acute toxicity was due to phasing out of alachlor and --
14    A.  Cyanazine.
15    Q.  -- cyanazine from the maize market.  Those
16 are two other herbicides, correct?
17    A.  Correct.
18    Q.  Okay.  So if I'm understanding you, you think
19 that there -- well, let me ask it this way.  Does the
20 fact that you don't think that the chronic toxicity for
21 glyphosate would be captured by this 24-month rat NOEL
22 data mean that you can't draw conclusions about
23 glyphosate accurately from a chronic exposure standpoint
24 from this article?
25        MR. WOOL: Objection.  Form.

Page 37

1     A.  Correct.
2     Q.  (By Mr. Malinowski)  Did you talk to -- in
3  your e-mails with Dr. Kniss, did you make that point to
4  him?
5     A.  Oh, I really -- I may have.  I didn't -- I
6  obviously didn't have to.  He's a very bright man and
7  knows this area.  And obviously a simple metric that's
8  simply based on the pounds of a herbicide applied on an
9  acre relative to some single measure of toxicity doesn't
10 have anything to do with human risk really because, for
11 example, there's no way to correlate this hazard index
12 to exposure.  And if you don't know anything about
13 exposure, then, you know, you're -- it's an extremely
14 crude measure.
15        In addition, of course, nobody -- no farmer
16 applies pure glyphosate, and the acute toxicity -- or
17 any of the herbicides as a pure active ingredient, yet
18 the acute toxicity data behind this paper and the
19 chronic toxicity data behind this paper are both based
20 on studies done with pure active ingredient and not
21 formulated product.
22        And we know for a fact from a wide range of
23 public literature that, for many of these herbicides,
24 the formulated product as bought and applied by farmers
25 varies -- is much different in terms of toxicity

10 (Pages 34 to 37)

Charles Benbrook, PhD
September 13, 2018

Page 38

1  compared to the parent compound. So it -- it's a very
2  crude metric which really is not terribly useful.
3      Q.  Have you ever -- you've published in
4  peer-reviewed journals before, correct?
5      A.  Yes.
6      Q.  And you've seen sometimes in a peer-reviewed
7  journal there'll be letters to the editor if someone --
8  if another -- if a peer or another scientific member of
9  the scientific community has an issue with an article,
10 they'll send a letter to the editor and point out where
11 they think the deficiencies in the article were,
12 correct?
13     A.  Correct.
14     Q.  Did you send such a letter with regard to
15 Dr. Kniss's article here?
16     A.  No.
17     Q.  Why not?
18     A.  Didn't feel it was worth the time.
19     Q.  So you didn't feel that his -- what you
20 thought were errors in his methodology were worth the
21 time to point out to the --
22     A.  For --
23     Q.  -- people who publish Nature Communications?
24     A.  Professionals in this area that do this type
25 of work are well -- very fully aware of the weaknesses

Page 39

1  in a methodological approach like this, and it really
2  wasn't -- you know, I didn't think it was important or
3  necessary for me to take the time to point out the
4  obvious limitations, which I'm sure he discusses them
5  in -- back in the discussion section of the paper.
6      Q.  Okay. So I'm on page 3 still --
7      A.  Yeah.
8      Q.  -- in the right-hand column.  I think it's
9  the last highlight on your paper there, but if not, it's
10 right here. It says -- Dr. Kniss writes, quote, Similar
11 to the soybean, the peak of glyphosate dominance in the
12 cotton market occurred in 2005 in this USDA-NASS data
13 set. You agree with that, correct?
14     A.  I'd have to go back and try to understand
15 dominance relative to what. Is it acre treatments? Is
16 it pounds applied?
17     Q.  But my point is, you -- I think you said that
18 USDA-NASS data is commonly well-accepted in the field,
19 correct?
20     A.  Absolutely, but that does not -- this
21 statement, "peak of glyphosate dominance," one could
22 measure the dominance of herbicide use in a crop like
23 cotton in a number of different ways. And I can assure
24 you that for most -- for most crops and time periods,
25 different herbicides will appear to be the dominant

Page 40

1  herbicide under some metrics of dominance while others
2  will look to be dominant in others. So for --
3      Q.  But you don't know what metric he used? I'm
4  not trying to cut you off. I'm sorry.
5      A.  Well, as I said before, for me to speak to --
6  in any detail to this, I'd have to read the methodology
7  section and read this in context so I understand what he
8  means by "the peak of glyphosate dominance." I'm quite
9  sure he explains it in the paper. I just haven't taken
10 the time to reread the paper. This is -- you know, I
11 read this a couple years ago.
12     Q.  And so you read this a couple years ago but
13 have not disclosed it on your materials-considered list
14 until ten days ago, right?
15     A.  Excuse me?
16     Q.  You've -- read this a couple years ago,
17 right?
18     A.  Yeah. Correct.
19     Q.  But have not disclosed this in this
20 litigation until ten days ago, correct? It was not on
21 your materials-considered list?
22     A.  Oh, I don't -- I don't remember whether I
23 disclosed it or not --
24     Q.  Okay.
25     A.  -- in the earlier list.  I'd have to look.

Page 41

1      Q.  So anyway, when Dr. Kniss says -- putting
2  aside that you're -- the peak glyphosate dominance
3  comment, he says, In the -- in the cotton market
4  occurred in 2005 in the USDA-NASS data set, when
5  glyphosate represented 54 percent of all area
6  treatments. You don't have reason to dispute that he's
7  accurately reporting what the USDA-NASS is saying there?
8      A.  In the data set that I have it in and what I
9  call the pesticide use data system, I calculate exactly
10 the same. He calls it area treatments. I call it acre
11 treatments.
12     Q.  Okay.
13     A.  I think it's the same concept. And I
14 would -- I would be -- I would expect that if I -- if
15 you asked me to replicate this number for 2005, I would
16 get 54 percent as well.
17     Q.  Okay. And then Dr. Kniss goes on to say,
18 Even with this high reliance on glyphosate for weed
19 control, this herbicide was responsible for only
20 0.2 percent of the chronic hazard quotient. Do you see
21 that?
22     A.  Yes.
23     Q.  And then he says, Glyphosate's contribution
24 to the acute hazard quotient was similar to its
25 contribution to total area treatments at 52 percent of

11 (Pages 38 to 41)

Charles Benbrook, PhD
September 13, 2018

Page 42

1  acute toxicity in 2005, correct?
2  **A.  Correct.**
3      Q.  And so what this is -- what Dr. Kniss is
4  saying here is that, despite the fact that glyphosate,
5  according to this data, represented 54 percent of all
6  area treatments, or acre treatments as you would say, it
7  had only a 0.2 percent responsibility for chronic hazard
8  quotient according to him, correct?
9  **A.  As he calculated, correct.**
10     Q.  And you just disagree with that calculation?
11 **A.  I don't -- I'm sure his math is correct, but
12 I think the metric is flawed and essentially
13 meaningless.**
14     Q.  Have you published -- I don't mean sending a
15 letter to the editor in response to this, but have you
16 published about your concerns about the methodology
17 generally that Dr. Kniss has used here?
18 **A.  No.**
19     Q.  Okay.
20 **A.  Not a paper that's specifically focused on
21 the problems with Dr. Kniss's methodology.**
22     Q.  Did you talk about this paper by Dr. Kniss
23 with other scientists in the field?  I know that's
24 broad, but I mean it to be broad.
25 **A.  I don't believe so.**

Page 43

1      Q.  Okay.  Now I'm looking at the discussion.  I
2  agree with you that the setup of this paper is kind of
3  strange.  But we're on the discussion, which starts at
4  page 5.  Do you see that?
5  **A.  Yes, sir.**
6      Q.  Dr. Kniss says, If left uncontrolled, weeds
7  could reduce world food population by as much as 20 to
8  40 percent, and he cites a reference for that, correct?
9  **A.  Where are we at?**
10     Q.  Up at the top of the discussion, second --
11 third line.
12 **A.  The third line.**
13     MR. WOOL:  The -- yeah.
14 **A.  Okay.  I see it.  The first highlighted
15 section.**
16     Q.  (By Mr. Malinowski)  Yeah, the first
17 highlighted section.
18 **A.  Yes.  I -- that is what it says.**
19     Q.  And that's true, isn't it?
20 **A.  Certainly, if no effort was made to control
21 weeds, there would be a significant drop in crop
22 production.  But it's hard to imagine that farmers
23 anywhere in the world would simply stop controlling
24 weeds.  That would be a very irrational way to run a
25 farm operation.**

Page 44

1      Q.  That's right, because a farmer has to control
2  weeds in order to protect the crop and essentially
3  protect the food source, right?
4  **A.  Every acre everywhere, correct.**
5      Q.  And do you take issue with his reference to
6  the 2006 study, Number 20 in the bibliography here, by
7  Dr. Oerke, O-e-r-k-e, in the Journal of Agricultural
8  Science in 2006 that, if weeds were left uncontrolled,
9  it could reduce the world food production by as much as
10 20 to 40 percent?
11 **A.  I mean, it's a -- it's a common figure that's
12 thrown around.  Again, it's not a figure that anybody
13 takes terribly seriously because, you know, no one,
14 including Dr. Kniss, is implying that if farmers didn't
15 apply herbicides that they would do nothing else to
16 control weeds.  It's a -- it's a straw-man argument that
17 really is not terribly relevant.**
18     Q.  All right.  I'm looking down at the next
19 highlighted section on the left-hand column on
20 page 5, Exhibit 12.
21 **A.  Okay.**
22     Q.  Dr. Kniss says, quote, A dramatic increase in
23 glyphosate use has justifiably generated concern among
24 scientists, policy makers, and the general public.
25         And you would certainly agree with that,

Page 45

1  right?
2  **A.  Yes.**
3      Q.  And then he says, As this analysis shows,
4  however, the increased use of herbicides may not be
5  inherently bad, as sometimes these changes corresponded
6  with lower toxicity.  Do you see that?
7  **A.  Yeah, I do.**
8      Q.  And that's a true statement as well, isn't
9  it?  Generally.
10 **A.  Yes, it's possible.**
11     Q.  And then I'm looking at the top of the second
12 column there, first highlight.  Dr. Kniss writes, At
13 least some of the widespread increase in herbicide use
14 is certainly attributable to adoption of conservation
15 tillage practices.  Do you see that?
16 **A.  Yes.**
17     Q.  Do you agree with that statement?
18 **A.  Yes.**
19     Q.  What's "tillage practices"?  I'm sorry.
20 "Conservation tillage practices."
21 **A.  Conservation tillage practices are ways for a
22 farmer to prepare a field for planting that minimally
23 disturb the surface of the soil and which are designed
24 to leave a -- as high a degree as possible of crop
25 residue on the surface of the soil, hence protecting the**

12 (Pages 42 to 45)

Charles Benbrook, PhD
September 13, 2018

Page 46

1  soil from the erosive impacts of water or wind.
2      Q.  And then Dr. Kniss says, It is important,
3  then, to weigh the concern of increased herbicide use
4  with the benefits that may have also accrued, correct?
5      A.  Correct.
6      Q.  And that's also -- you would agree with that
7  statement, right?
8      A.  Yes.
9      Q.  And one of those benefits he's referring to
10  is what you just alluded to, which is the rise of
11  conservative tillage practices that help preserve the
12  soil, correct?
13      A.  Correct.
14      Q.  And glyphosate played at least some role
15  in -- in that benefit; would you agree with that?
16      A.  Yes.
17      Q.  And then Dr. Kniss goes on in the next
18  paragraph down.  I think it's the next highlight.  It
19  is, In fact, herbicide area treatments increased at a
20  faster rate in rice and wheat compared with the
21  glyphosate-resistant crops, so the claim that
22  glyphosate-resistant crops are the primary driver of
23  increasing herbicide use is at odds with the empirical
24  data.  Do you see that?
25      A.  Yes.

Page 47

1      Q.  And do you have any basis -- well, let me ask
2  you this.  Do you agree with that or disagree?
3      A.  It depends on the time period that it refers
4  to.
5      Q.  Okay.  In the time period roughly 1995
6  through twenty -- well, that's too big, right?  2000
7  through 2017, would you agree with that?
8      A.  Dr. Kniss notes that for the crops included
9  in his analysis, the most recent data that he had was
10  either 2014 or 2015.
11      Q.  Oh, you're right.  Okay.  How about from 2000
12  to 2014, to be conservative?
13      A.  Again, I would have to replicate the analysis
14  to state with a high level of confidence that I agree
15  with it or not agree with it.
16      Q.  So you --
17      A.  Certainly there have been substantial changes
18  in 2016, 2017, and 2018 in herbicide use patterns
19  that -- that would need to be taken into account as well
20  in terms of the trends in reliance on different
21  herbicides.  It's been -- as Dr. Kniss knows and anyone
22  working in the field, there have been unusually high
23  changes in herbicide use in these three crops over the
24  last 15 years, 20 years.
25      Q.  But as we sit here today, you have no basis

Page 48

1  to either agree or disagree with Dr. Kniss's statement
2  here that, Herbicide area treatments increased at a
3  faster rate in rice and wheat compared with the
4  glyphosate-resistant crops, so the claim that
5  glyphosate-resistant crops are the primary driver of
6  increasing herbicide use is at odds with the empirical
7  data, from twenty -- 2000 to 2014 at least, correct?
8      A.  I'm not going to -- you know, I haven't done
9  the analysis in rice and wheat.  They're not
10  genetically-engineered crops, and they're not -- they're
11  not crops on which glyphosate or Roundup herbicides have
12  been used widely.  So I haven't done that analysis, so I
13  can't -- I can't agree or disagree with his conclusion.
14      Q.  Okay.  So the answer to my question is yes,
15  you have no basis to agree or disagree at this point, as
16  you sit here today, correct?
17      A.  Yeah.  I haven't done the analysis.
18      MR. WOOL:  Asked and answered.
19      THE REPORTER:  I'm sorry?
20      MR. WOOL:  I'm sorry.  I said asked and
21  answered.
22      Q.  (By Mr. Malinowski)  Okay.  On page 6 now on
23  the left-hand column.  And I think this is speaking more
24  towards what you were talking about with regard to the
25  method -- methodology.  The first highlight says, quote,

Page 49

1  Of the chronic toxicity data that are readily available
2  for herbicides, the no observable effect level from
3  24 -- NOEL from the 24-month chronic rat studies is the
4  most consistent, and was therefore chosen to compare the
5  chronic toxicity of herbicides in this analysis.  Do you
6  see that?
7      A.  Yes.
8      Q.  And you agree with that, right?
9      A.  No, I don't agree that that's the most
10  consistent basis to compare chronic toxicity.
11      Q.  I thought you said you -- what's the most
12  consistent basis?
13      A.  It would be the chronic reference dose as
14  established by EPA and then the study from which the
15  NOEL was derived for all of the individual herbicides.
16  That would be analytically a much more accurate way to
17  create this sort of chronic toxicity index.
18      Q.  Do you disagree with Dr. Kniss when he says
19  the chronic toxicity data are readily available for
20  herbicides with respect to the no observable effect
21  level from 24-month chronic rat studies?
22      A.  I don't think there's much difference in the
23  availability of the NOELs from the 24-month chronic rat
24  studies or mouse studies or really any of the other
25  studies that have been used to establish the chronic

13 (Pages 46 to 49)

Charles Benbrook, PhD
September 13, 2018

Page 50

1  reference doses of these herbicides.  I mean, it -- you
2  know, that -- the data used to establish chronic
3  reference doses is widely available.
4      Q.  Okay.  I thought -- correct me if I'm wrong.
5  We were talking about the methods section about five
6  minutes ago.  I thought you took issue with the fact
7  that he used the 24-month rate NOEL chronic reference
8  dose -- I'm sorry -- model for determining chronic
9  toxicity because I thought you said that it wasn't
10  available for the vast majority of the herbicides he
11  studied.
12      A.  I didn't say that.
13      Q.  All right.  Then tell me exactly, because I
14  misunderstood you then.
15      A.  The -- for all of the -- for all of the 118
16  herbicides that he included in his analysis, there
17  almost certainly is a 24-month chronic rat study and a
18  24-month chronic mouse study in the EPA registration
19  file.
20          For -- I'm just going to guess off the top of
21  my head -- maybe 15 percent of the chronic reference
22  doses for the -- this 118 herbicides has been the basis
23  for the chronic reference dose that EPA has set.  There
24  is -- and Dr. Kniss, I think, would agree with me that
25  the most valid way to compare the chronic toxicity of

Page 51

1  these 118 herbicides is the chronic reference dose set
2  by EPA for dietary exposure, which is the primary
3  concern that the EPA has in regulating any pesticide use
4  because dietary exposure is the principal way that the
5  general public is exposed to herbicides.
6          So, you know, frankly, I don't know why he
7  didn't use the chronic reference doses.  It would have
8  eliminated one of the major methodological flaws of the
9  paper.
10          And I actually remember I told him, I have no
11  idea how you got this through peer review because it's
12  not the best measure of relative chronic toxicity
13  because, for some herbicides, a different study -- a
14  reproductive study, a blood chemistry study, a survival
15  study in dogs, a study on neurological effects -- may
16  have been the source of the NOEL used to establish the
17  chronic reference dose.
18      Q.  So I think I'm maybe starting to understand
19  you now.  So you think that he should have used the
20  chronic reference doses set by EPA for each of the
21  100-plus herbicides that he studied in this paper,
22  correct?
23      A.  If he wanted to do this analysis drawing upon
24  the most credible data, despite the fact that even with
25  the credible data it's a very flawed metric, he should

Page 52

1  have used the chronic reference dose, yes.
2      Q.  And that would be -- is your position that
3  the chronic reference dose, as set by the EPA, would be
4  available for every single one of these --
5      A.  Oh, absolutely.
6      Q.  -- these herbicides?
7      A.  Yeah.
8      Q.  But also the no observable effect from a
9  24-month chronic rodent study would also be available
10  for each?
11      A.  Correct.
12      Q.  And that's what he chose to use, correct?
13      A.  Correct.
14      Q.  And you chose not to point this out to the
15  publication here, correct?
16      A.  No.
17          MR. WOOL:  Objection.  Asked and answered.
18      A.  No, I did not.  But I did point it out to him
19  as a professional courtesy.
20      Q.  (By Mr. Malinowski)  When's the last time
21  you -- have you ever spoken to Dr. Kniss?
22      A.  I can't remember if we talked on the phone.
23  I don't -- as I said before, I don't think we did.  I
24  know we exchanged probably two e-mails, maybe three.
25      Q.  I'm not talking about this.  I mean in

Page 53

1  general.  Have you talked to him before?  Do you know
2  him?
3      A.  Yes.  I've talked to him a couple of other
4  times on other papers.  He's done a critique of one of
5  my papers.  I think I called him or e-mailed him about
6  that.  He has been -- yeah.  He has been among the
7  university scientists that has responded to my published
8  work in the past.
9      Q.  Okay.  I'm looking at the bottom here of this
10  column.  I'm on --
11      A.  Bottom of what page?
12      Q.  Page 6.
13      A.  Okay.
14      Q.  I'm almost done with this document.
15      A.  Okay.
16      Q.  It's highlighted there -- partially.  I'm
17  going to go beyond the highlights, though, on your
18  paper.  It says -- Dr. Kniss says that, The World Health
19  Organization International Agency for Research on
20  Cancer, IARC, declaring that glyphosate is probably
21  carcinogenic to humans while the US EPA recently
22  concluded that glyphosate is not likely to be
23  carcinogenic to humans at doses relevant to human health
24  risk assessment.
25          And that's a correct statement, right?  IARC

14 (Pages 50 to 53)

Charles Benbrook, PhD
September 13, 2018

Page 54

1    said probably carcinogenic; EPA says probably not,
2    correct?
3        **A. Correct.**
4        Q. Or not likely, I should say, for EPA.
5        And then Dr. Kniss goes on to say, Neither
6    the IARC nor EPA analyses assess whether glyphosate use
7    is better or worse than herbicides, or other weed
8    control strategies, that would be used in its place,
9    correct?
10       **A. That's what it says.**
11       Q. And that's true as well, correct?
12       MR. WOOL: Objection.
13       **A. Well, for the most part, yes.**
14       Q. (By Mr. Malinowski) Then down in the last
15   paragraph before Methods, Dr. Kniss concludes that,
16   Glyphosate has a lower chronic toxicity than 90 percent
17   of all herbicides in this analysis, but it falls much
18   further from the median chronic toxicity value compared
19   with acute toxicity, correct?
20       **A. That's what it says.**
21       Q. And you think the -- his math -- Dr. Kniss's
22   math -- but you don't take any issue on -- you're sure
23   that that's correct, but you just think he used the
24   wrong inputs to get to that point; is that fair?
25       **A. Yeah. The underlying methodology is flawed.**

Page 55

1        Q. Okay. In the next sentence, Dr. Kniss
2    concludes, In the last year of survey data for each
3    crop, glyphosate made up 20 percent -- 26 percent of
4    maize, 43 percent of soybean, and 45 percent of cotton
5    area treatments, but only contributed .1 percent --
6    that's 0.1 percent -- 0.3 percent, and 3.5 percent of
7    the total chronic hazard quotients in those crops
8    respectively. Do you see that?
9        **A. Yes.**
10       Q. Okay. You disagree with his conclusions on
11   that, correct? Because of his methodology?
12       **A. I believe that Dr. Kniss made his**
13   **calculations accurately, and based on the methodology**
14   **that he's laid out in the paper, I don't -- I'm not**
15   **questioning his math. I'm just saying that it's a**
16   **flawed methodology. He used the wrong data for a metric**
17   **for chronic toxicity. It takes -- it has -- it doesn't**
18   **take exposure into account at all. All of the -- all of**
19   **the acute and chronic toxicity data is based on pure**
20   **active ingredient as opposed to the formulated product,**
21   **which is what all farmers and all consumers are exposed**
22   **to. So it's just -- it's almost a meaningless paper**
23   **relative to true human health risks.**
24       Q. Dr. Kniss goes on to say, So although the
25   chronic hazard quotient increased in two of the three

Page 56

1    glyphosate-resistant crops, if glyphosate were not used,
2    the chronic hazard quotient would almost certainly be
3    even greater since other herbicides with greater chronic
4    toxicity would have been used instead. Do you see that?
5        **A. Yes.**
6        Q. And I take it you disagree with that
7    conclusion as well, correct?
8        **A. Yes.**
9        Q. And then he concludes by saying, quote,
10   Similarly, if glyphosate use were discontinued, as was
11   recently proposed in the EU, the resulting displacement
12   of glyphosate by other herbicides is likely to have a
13   negative impact on chronic health risks faced by
14   pesticide applicators, correct?
15       **A. That's what he says.**
16       Q. And another study by Peterson called "A
17   Comparative" -- this is Number 28 in the list -- called
18   "A Comparative Ecological Risk Assessment for Herbicides
19   Used on Spring Wheat: The Effect of Glyphosate when
20   used within a Glyphosate-Tolerant Wheat System," and it
21   was published in Weed Science in 2014, correct?
22       **A. Yeah. Weird reference.**
23       Q. Okay. Have you ever read that Peterson
24   article?
25       **A. No.**

Page 57

1        Q. Obviously didn't consider it in your opinions
2    here in this litigation?
3        **A. No, I didn't.**
4        Q. And I take it you disagree with the final
5    sentence --
6        **A. Well, first of all --**
7        Q. -- is that fair?
8        **A. -- a glyphosate-tolerant system in wheat was**
9    **never approved --**
10       Q. Okay.
11       **A. -- has never been used commercially --**
12       Q. In the United States?
13       **A. In the United States or anywhere in the**
14   **world, as far as I know.**
15       Q. Okay.
16       **A. And Peterson and Hulting, their paper is a**
17   **comparative ecological risk assessment, not human health**
18   **risk assessment. So how Dr. Kniss feels that that**
19   **particular reference supports this statement is unclear**
20   **to me.**
21       Q. And you disagree with the statement in
22   itself, correct?
23       **A. Yes.**
24       Q. Okay. Now, in the -- at the end of this
25   article, he says, Author contributions, and Dr. Kniss

15 (Pages 54 to 57)

Charles Benbrook, PhD
September 13, 2018

Page 58

1    says he conceived, designed, and conducted the analysis,
2    created the figures, and wrote the manuscript, correct?
3        A.  Yes.
4        Q.  And in the additional information, the
5    competing interests notes that he's received grants or
6    research contracts from various companies listed there,
7    including Monsanto, correct?
8        A.  Yes.
9        Q.  Also things like the University of Wyoming
10   School of Energy Resources and various academic
11   institutions, correct?
12       A.  Correct.
13       Q.  And that's normal for a professor in this
14   area to receive grants -- research grants and other
15   types of research contracts, correct?
16       A.  Well, it's certainly common for academic
17   scientists like Dr. Kniss to receive a part of their
18   funding from private companies.  And for someone that
19   works on pest-management issues and pesticides, it would
20   be common for there to be some support from a pesticide
21   company.  It's not common for someone to list
22   essentially all of the major players in the industry as
23   sources of funding.  This is a fairly extensive list.
24       Now, there is no information in this -- in
25   the competing interests portion of this paper on how

Page 59

1    much funding was received from any individual company or
2    all of the companies together relative to the funding
3    from public sector sources, so it's not possible to draw
4    any conclusions about the extent of Dr. Kniss's research
5    that's funded by pesticide manufacturers compared to
6    public sources of funding.
7        Q.  And you're -- to be fair, you're talking just
8    generally there, correct?  Not specific to this paper,
9    right?
10       A.  Yes.
11       Q.  So above the author contributions it says,
12   Acknowledgments.  Do you see that?  And it says,
13   Publication costs were provided by the Wyoming
14   Agricultural Experiment Station --
15       A.  Correct.
16       Q.  -- through funding received by the United
17   States Department of Agriculture National Institute for
18   Food and Agriculture, Hatch Project, correct?
19       A.  Correct.
20       Q.  So that would have been who funded his
21   analysis that's outlined in this paper?
22       A.  No.
23       Q.  No?
24       A.  No.  That's who funded the page charge --
25       Q.  Okay.

Page 60

1        A.  -- to make this open access.
2        Q.  To make this open.  I see.  I see.  Okay.
3    But there's no information in here that Monsanto paid a
4    single dollar to him with respect to this study,
5    correct?
6        A.  Correct.
7        Q.  Or any of those other companies listed?
8        A.  Right.  You can't -- can't tell what the
9    support from those entities was used for.
10       Q.  Or lack of support for that particular,
11   correct?
12       A.  Yeah.  Correct.
13       Q.  Okay.  I'm going to switch gears a little bit
14   here.  You used to work at a -- you were staff director
15   at DORFA, which is Department Operations Research and
16   Foreign Agriculture house subcommittee that was -- that
17   worked on issues related to organic food production; is
18   that fair?
19       A.  No.  No.  The DORFA subcommittee was a
20   subcommittee of the house agriculture committee.
21       Q.  Okay.
22       A.  And it had jurisdiction within the house
23   committee on agriculture for oversight of all of USDA --
24   all USDA programs:  exports, research, conservation,
25   commodity programs, nutrition, Forest Service, soil

Page 61

1    conservation service.  In addition, it had jurisdiction
2    over the Federal Insecticide, Fungicide, and Rodenticide
3    Act --
4        Q.  Okay.
5        A.  -- which is the primary federal legislation
6    governing pesticide regulation in the US.  So during
7    my -- so I was the staff director of that
8    subcommittee --
9        Q.  Right.
10       A.  -- and, hence, I supported the work of the
11   subcommittee within -- on the issues that came before
12   the subcommittee within its jurisdiction.
13       Q.  And one of those issues was the Organic Food
14   Production Act; is that right?
15       A.  The Organic Food Production Act evolved from
16   legislation drafted by Congressman Fred Richmond, who
17   was the chair of the subcommittee on forest and family
18   farms.  The -- so this was another subcommittee within
19   the committee on agriculture.
20       And, as a matter of fact, I shared an office
21   with the two staff members that worked for Congressman
22   Richmond, and actually during my three years, that's
23   when the very earliest rendition of the Organic Food
24   Production Act was drafted by those two staff members
25   for that subcommittee with -- you know, working with the

16 (Pages 58 to 61)

Charles Benbrook, PhD
September 13, 2018

Page 62

1  member -- members on the committee and the various
2  people that they were interacting with in the farm
3  community.
4      Q.  And there were hearings that were held
5  leading up to the passage of the Organic Food Production
6  Act, correct?
7      A.  Correct.
8      Q.  And did you -- were you present at those
9  hearings?
10     A.  So they were done in the other subcommittee.
11     Q.  Okay.
12     A.  And I actually did attend --
13     Q.  Okay.
14     A.  -- a couple of them, I remember, yeah.
15     Q.  And the Organic Food Production Act
16 ultimately became part of the 1990 farm bill; is that
17 correct?
18     A.  Correct.
19     Q.  And the critical issue there, both with the
20 Organic Food Production Act and then ultimately the farm
21 bill was kind of a distinction between organic food
22 and -- I'm sorry -- organic foods and natural foods; is
23 that correct?
24     A.  No.  No.  Organic food and conventionally
25 grown food.

Page 63

1      Q.  Isn't there a difference between organic and
2  natural foods?
3      A.  The term "natural food" is very ambiguous.
4  It has no formal definition recognized by the
5  government, any commodity organization, or really
6  anyone, which is, of course, one of the reasons why
7  foods labeled "natural" have been such a frequent
8  subject of litigation.
9      Q.  Do you recall citing a declaration wherein
10 you said, quote, During this period -- meaning 1981 to
11 '83 -- the first hearings were held leading to the
12 passage of the Organic Food Production Act legislation
13 that became part of the 1990 farm bill.  One of the
14 critical issues at that time was the difference between,
15 quote, organic and, quote, natural foods.  Do you
16 remember that?
17     A.  Well, you know, I -- back in the day, you
18 know, maybe that's -- that's true that natural food was
19 used as a synonym for conventional food.  There was
20 never any confusion or ambiguity in the minds of the
21 people working on the Organic Food Production Act about
22 what organic meant.
23         And I think everyone understood that the
24 principal alternative to organic was -- through most of
25 the years, it's just regarded as conventional food.  But

Page 64

1  a lot of conventional food is labeled as natural, so,
2  sure, it's a fair comparison.
3      Q.  Did your DORFA subcommittee draft any reports
4  at all with respect to the Organic Food Production Act?
5      A.  I don't think so.
6      Q.  If they did, would those be on your CV?
7      A.  Well, perhaps.
8      Q.  Were you a lead author on any reports
9  regarding organic food production, whether through your
10 DORFA experience or otherwise?
11     A.  So the DORFA subcommittee was -- we were
12 certainly aware of the work of the subcommittee on
13 forest and family farms.  I'm almost certain that we
14 cosponsored a hearing or two on organic farming issues,
15 and whether those hearings directly addressed the
16 legislation -- the draft legislation that was evolving
17 at the time, I don't recall.
18         I do know that in that era there were --
19 there were some important issues on the minds of people
20 in the agricultural community and food community and the
21 federal agencies and members of congress about trying to
22 harmonize regulation of organic food.  And it -- while
23 Congressman Richmond and his forest and family farms
24 subcommittee was clearly the most active and Congressman
25 Richmond was the lead author of the earliest version of

Page 65

1  the legislation that ultimately became the Organic Food
2  Production Act as part of the 1990 farm bill, because we
3  were the Department Operations Research and Foreign
4  Agriculture, we had -- our subcommittee had jurisdiction
5  over all research in USDA.
6         So in -- all of the legislation that came
7  forward addressing organic food had a research component
8  to it, and it had a labeling and certification component
9  to it.  So it was standard operating procedure when
10 there was a hearing on organic research that Fred
11 Richmond's subcommittee called for that we would be
12 involved as a cosponsor, and we would have -- our
13 subcommittee would have an opportunity to suggest
14 witnesses, to help draft the charter for the hearings,
15 et cetera.  So there's probably some evidence of that in
16 my CV.
17     Q.  And you would do that -- you would do that?
18 You would -- in your role at DORFA, you would
19 participate in these hearings and -- as you just laid
20 out, correct?
21     A.  I would work with the -- with my -- the staff
22 of the other hearing.  I had relatively limited
23 interaction with the members of the subcommittee,
24 although there was some.  But, yeah, in terms of
25 drafting hearing charters, identifying the best

17 (Pages 62 to 65)

Charles Benbrook, PhD
September 13, 2018

Page 66

1    witnesses from the government, from the outside, the
2    questions that needed to be asked, it was very collegial
3    and, actually, very bipartisan back then.
4         Q.  Would you characterize yourself as an
5    advocate for the organic food industry?
6              MR. WOOL:  Objection to form.
7         A.  No.  I'm an advocate for nutritious and safe
8    food, wherever it comes from.
9         Q.  (By Mr. Malinowski)  Are you currently the
10   chief scientist at Organic Center?
11        A.  No.
12        Q.  What is The Organic Center?  Do you know?
13        A.  The Organic Center is a -- a nonprofit
14   organization that -- I was the chief scientist of The
15   Organic Center from 2006 to 2012, something like that.
16   I can speak much more authoritatively to the activities,
17   funding, et cetera, of The Organic Center during that
18   time period.  I haven't had a lot to do with the center
19   since I left in mid-2012.
20             But the goal of The Organic Center is to try
21   to draw upon published peer-reviewed science to
22   understand the impacts of organic farming systems and
23   technology on food safety, the environment, the
24   nutritional quality of food, the safety of agricultural
25   operations, and other public health and environmental

Page 67

1    impacts of organic farming systems, typically in
2    contrast to conventional farming systems.
3         Q.  Did you get paid in your role as a chief
4    scientist by -- from 2006 to roughly 2012 at The Organic
5    Center?
6         A.  Yes.
7         Q.  And I think you mentioned it's a nonprofit.
8    Who are its -- or who funds it, at least when you were
9    there from '06 to 2012?
10        A.  I can't remember the percent of the annual
11   funding, but it was a large percent, perhaps over half,
12   that came from our major benefit dinner that was held at
13   the Natural Products Expo West trade show in -- usually
14   in March of every year.  It's a very large trade show
15   attended by all of the companies, farmer groups, NGOs
16   that are active in the -- both the organic food industry
17   and the natural products industry.
18             The Organic Center put on a benefit dinner.
19   Tickets were $125 apiece, and there was a fundraising
20   ask --
21        Q.  Sure.
22        A.  -- and other people, you know, pledged $500
23   or $50,000 or whatever.  So about -- certainly a
24   significant chunk of the funding each year came from
25   that benefits dinner, and the other -- the rest of the

Page 68

1    funding came from grants from individuals or organic
2    food companies or co-ops or entities involved in some
3    way or another in organic supply chains.
4         Q.  And entities involved in the organic supply
5    chains and also organic food companies, they would
6    sponsor this dinner, correct?
7         A.  Right.  Yes.
8         Q.  And that's what you're talking about?  The
9    big-ticket people donating $50,000 do that in order to
10   be -- have a sponsorship, right?
11        A.  They buy a table or --
12        Q.  Right.
13        A.  Yeah.  So they -- but some of those companies
14   also provided a grant independent of the dinner.
15        Q.  Right.  So this would be in addition to?
16        A.  Yeah.  Correct.
17        Q.  And The Organic Center, did it have, like,
18   member companies?
19        A.  No.
20        Q.  No.  Who succeeded you there?  Do you know?
21   As chief scientist.
22        A.  Jessica Shade, S-h-a-d-e.
23        Q.  Okay.
24        A.  And she still holds the position, as far as I
25   know.

Page 69

1         Q.  Okay.  Why did you leave that position as
2    chief scientist of The Organic Center?
3         A.  There was a feeling in the -- the board of
4    The Organic Center, the staff of The Organic Center, and
5    the major funders of The Organic Center that the work of
6    The Organic Center was not getting the attention or
7    having the impact that it should, the technical work,
8    and it was widely agreed that the reason it wasn't was
9    because our analytical work and scientific work was not
10   appearing in peer-reviewed publications.
11        Q.  What --
12        A.  It was further --
13        Q.  I'm sorry.  I didn't mean to cut you off, but
14   something you said interested me.  But go ahead and
15   finish, unless you want to --
16        A.  Go ahead and ask your question.
17        Q.  All right.  So you said that -- just maybe it
18   will be quicker if I can ask it like this.
19             So you said the work was not -- you felt --
20   there was a feeling that the work -- the technical and
21   analytical work was not getting the type of support it
22   needed; is that fair?
23        A.  Was not what?
24        Q.  Receiving the type of support it needed in
25   order to --

18  (Pages 66 to 69)

Charles Benbrook, PhD
September 13, 2018

Page 70

1    A. No.
2    Q. -- get peer-reviewed publication?
3    A. No.
4    Q. No? Okay.
5    A. It was not having the impact or reaching the
6  breadth of people that were interested in the impact of
7  organic farming systems on food safety, food quality,
8  and the environment. And the reason was -- the primary
9  reason that that was not happening was because our
10  analytical work was not appearing in peer-reviewed
11  publications.
12    Q. Now, you were trying to get it -- The Organic
13  Center, not you personally -- but The Organic Center
14  would fund research, correct? And analytical work?
15    A. Correct.
16    Q. And the goal of that is to get it accepted in
17  peer-reviewed publications, and --
18    A. Certainly one of the goals, yes.
19    Q. One of the goals, for sure -- a big goal.
20       And part of the reason for that is because if
21  you get accepted into peer-reviewed publications, then
22  that, you know, boosts the profile of the organization,
23  may bring more money in to help support whatever
24  research you're doing; is that fair?
25       MR. WOOL: Objection. Form.

Page 71

1    A. I think that many nonprofit organizations
2  consider getting their work published in high-impact
3  peer-reviewed journals as a way to validate the quality
4  of the science that they're doing and to reassure
5  members of the media, policy makers, skeptics, that the
6  findings and conclusions stated in published scientific
7  reports are valid and deserve attention.
8    Q. (By Mr. Malinowski) So through this time,
9  you're submitting manuscripts to be analyzed by
10  peer-reviewed journals, correct, at The Organic Center?
11    A. Not many, no.
12    Q. Why not?
13    A. Didn't have the time and the support to do
14  that. There -- I was the only full-time technical staff
15  person for The Organic Center for most of the six years
16  I was chief scientist. I had a broad range of
17  responsibilities, and it was just completely impractical
18  for me to put the extra time that would be required to
19  get the results of one of my analytical projects into
20  the -- a form that would pass peer review.
21       The -- it just -- it's a much -- it's a
22  different -- it's a different task and a much more
23  resource-intensive task to get something published in a
24  peer-reviewed journal, especially a prestigious one.
25    Q. Okay. So you said -- I think I heard you say

Page 72

1  you hadn't even submitted many articles or manuscripts
2  for a peer-reviewed journal?
3    A. Not many.
4    Q. And of the ones that you did submit, what
5  percentage would you say got accepted for
6  peer-reviewed --
7       MR. WOOL: Objection.
8    Q. (By Mr. Malinowski) -- publication?
9    A. I'd have to look at my list of publications
10  and remember the number that came out from twenty --
11  2006 to 2012 and then try to remember how many I -- that
12  were submitted but not accepted --
13    Q. Okay.
14    A. -- to give you a solid answer.
15    Q. Well, from 2006 to 2012, you were doing other
16  literature not associated with The Organic Center,
17  correct?
18    A. Doing what?
19    Q. You were doing other research not associated
20  the -- well, let me step back. Was it a full-time job
21  you had as chief science officer at The Organic Center?
22    A. It was -- yeah. I was -- I had a full-time
23  salary, I had health benefits, yes.
24    Q. Did you have any other jobs at the same time
25  from --

Page 73

1    A. I --
2    Q. -- 2006 to 2012?
3    A. I did some consulting primarily in a few
4  lawsuits involving some aspect of pesticide use, yeah.
5    Q. Have you ever testified or consulted on
6  behalf of a pesticide manufacturer as opposed to against
7  one?
8    A. Yes.
9    Q. Okay. What was the company?
10    A. One of the cases I was involved in
11  involved -- let's see if I can remember the name.
12  United. They were a me-too manufacturer, and the
13  litigation that I was involved with on behalf of United
14  Industries, the defendant was Dow AgroSciences, and the
15  nature of the lawsuit was over chlorpyrifos insecticide
16  and a problem that arose between these two companies.
17    Q. So a couple things you said there I have to
18  unpack a little bit. When you say "me-too
19  manufacturer," you're talking about a generic
20  manufacturer?
21    A. Correct.
22    Q. "Me too" nowadays has a completely
23  different --
24    A. Oh, that's right.
25       MR. WOOL: Yes.

Charles Benbrook, PhD
September 13, 2018

---

Page 74

1      Q.  (By Mr. Malinowski)  Right.  So you were --
2  United was a generic manufacturer, correct?
3      A.  Correct.
4      Q.  And they were the plaintiffs, and they were
5  bringing the suit against the brand name --
6      A.  Dow AgroSciences.
7      Q.  -- the brand holder Dow AgroSciences,
8  correct?
9      A.  Of chlorpyrifos, correct.
10     Q.  Okay.  So there you're testifying for a
11  generic manufacturer who's on the plaintiff's side of
12  the V, correct?
13     A.  Correct.
14     Q.  Any other litigation work for -- on behalf of
15  the pesticide or herbicide manufacturer?
16     A.  No.
17     Q.  Okay.  When was that roughly?  Do you
18  remember?  It doesn't have to be exact.
19     A.  It's in my CV.
20     Q.  All right.
21     A.  The -- my litigation, experience and -- with
22  the dates -- is in my CV.
23     Q.  Okay.
24         THE REPORTER:  Is this a good time for a
25  break?

---

Page 75

1         MR. MALINOWSKI:  Yeah.  We can take a quick
2  break.
3         (Recess taken from 12:41 p.m. to 12:55 p.m.)
4      Q.  (By Mr. Malinowski)  Doctor, do you continue
5  to consult with the organic food industry to this day?
6      A.  I haven't for a while.
7      Q.  When's the last time?
8      A.  Well, I don't actually -- haven't had any
9  direct support -- in terms of what I think the typical
10  meaning of consulting is from the organic food industry
11  for many years.
12         I did have a contract or an agreement with
13  Organic Valley to put together a scientific team and
14  lead an analysis and publish a paper on the impact of
15  dairy cow rations on the nutritional quality of organic
16  milk, but that was a -- that was a discrete project that
17  was designed to produce a peer-reviewed published paper,
18  and that was done and that work is over.  So I have no
19  consulting going on at the current time with any organic
20  food company.
21     Q.  And Organic Valley is an organic food
22  company, correct?
23     A.  Correct.  Organic dairy.
24     Q.  Sure.  And you served for several years on
25  the technical standards committee of something called

---

Page 76

1  the Non-GMO Project, correct?
2      A.  Yes.
3      Q.  Tell me what the Non-GMO Project is.
4      A.  It's a private organization that has
5  established a set of standards and a process to verify
6  that manufactured food products do not contain
7  ingredients from genetically-engineered crops.
8      Q.  That's -- GMO stands for genetical-modified
9  organism?
10     A.  Which is the functional equivalent of
11  genetical-engineered crops.
12     Q.  Okay.  And who funded the Non-GMO Project?
13     A.  They are -- they charge a fee for their
14  services.  So the food companies that contract with them
15  to verify the claim of non-GMO content in adherence to
16  the standards established by the Non-GMO Project, that's
17  who funds them.
18     Q.  So this would be organic food companies,
19  correct?
20     A.  Actually the majority of their income and the
21  majority of food bearing the Non-GMO Project label are
22  conventional foods.
23     Q.  Conventional foods that don't use -- utilize
24  genetical-modified practices?
25     A.  No.  Conventional foods that are manufactured

---

Page 77

1  without any ingredients derived from a
2  genetically-engineered crop --
3      Q.  Gotcha.
4      A.  -- or an animal fed genetically-engineered
5  feed.
6      Q.  What did you do -- what did the technical
7  standards committee do?
8      A.  The Non-GMO Project has a very complete and,
9  in certain respects, quite technical set of standards
10  and a process for reaching judgments about whether a
11  craft oat-based energy bar can bear the Non-GMO Project
12  label.
13         The technical standards committee was
14  responsible for dealing with a variety of technical
15  issues that came up in the course of refining or
16  clarifying the standards, determining what levels of
17  unavoidable contamination from gene flow from
18  genetically-engineered crops could be tolerated in foods
19  bearing the non-GMO label, a lot of technical issues in
20  terms of the analytical methods used to detect GM
21  content, and other issues that arise in helping the food
22  industry understand what they have to do to comply with
23  the requirements and standards of the program.
24     Q.  So the Non-GMO Project would set these
25  standards that they would -- that they basically policed

---

20  (Pages 74 to 77)

Charles Benbrook, PhD
September 13, 2018

Page 78

1  with respect to whether or not someone could be
2  certified as a non-GMO-containing product; is that
3  right?
4      A.  That's not exactly correct --
5      Q.  Okay.
6      A.  -- the way that you used the term "police."
7  The non-GMO-verified label is their label.
8      Q.  Okay.
9      A.  In order for a food company to be authorized
10 to put that label on one of their food products, they
11 have to go through the process to be certified as in
12 compliance with the technical standards of the Non-GMO
13 Project.
14         In addition, on an annual basis, they -- they
15 have to agree to do certain testing and provide
16 information to the administrative staff of the Non-GMO
17 Project to prove that a product verified in 2016 is
18 still in compliance in 2017 and 2018.
19     Q.  So in some ways it's almost like
20 reregistering?  You have to --
21     A.  It's reregistering, correct.
22     Q.  Okay.
23     A.  And it's not that they police in the sense
24 that they're going out and trying to find --
25     Q.  Sure.

Page 79

1      A.  -- companies that are not adhering, but that
2  there is an annual renewal cycle that entails a
3  submission of various information, a certain amount of
4  testing, and other information that a currently verified
5  food product has to submit on an annual basis.  And if
6  any issues arise in that renewal process, then the
7  Non-GMO Project would assess it and try to resolve it
8  with the company.
9      Q.  Okay.  Well, that's helpful.  So, I mean --
10 let me see if I can say it in my nonscientific words and
11 if I get it correct.  So a company who wants to be able
12 to call itself non-GMO certified would pay money to
13 the --
14     A.  Okay.  Let me stop you right there.
15     Q.  Okay.
16     A.  The certification is not for a company.  It's
17 for a specific food product.
18     Q.  Okay.  Let me start over.
19     A.  Okay.
20     Q.  A specific -- for a specific food product to
21 be certified non-GMO, whoever sponsors that product or
22 makes that product would pay some fee to the Non-GMO
23 Project, correct?
24     A.  Correct.
25     Q.  Then they'd go through some analysis by a

Page 80

1  Non-GMO personnel or consultants who would look at that
2  product and see whether or not it fit those standards,
3  correct?
4      A.  That's done in-house by technical employees
5  of the Non-GMO Project.
6      Q.  Okay.  So they are paid directly by the
7  Non-GMO Project?
8      A.  Correct.
9      Q.  When you served on the technical standards
10 committee, were you paid by the Non-GMO Project?
11     A.  No.
12     Q.  Did you get any kind of anything from the
13 Non-GMO -- let me ask a better question.
14         Did you get any compensation at all,
15 whether -- even if it's not money -- from the non-GMO --
16 your work on the technical standards committee for the
17 Non-GMO Project?
18     A.  None.  It was entirely voluntary.
19     Q.  And what years were you serving on the
20 technical standards committee?
21     A.  I think it's in my résumé, isn't it?
22     Q.  It may be.  I'm just asking -- I don't have
23 your résumé in front of me.
24     A.  I don't remember.  It was a long time.  I
25 think at least six years.  Maybe something like 2006

Page 81

1  to 2012, something like that.  I've been off it for
2  several years.
3      Q.  Okay.  How did you get -- get on it?  Did you
4  get nominated by someone?  Did you apply for it?  How
5  did that happen?
6      A.  I -- because of my work at The Organic Center
7  and the series of reports that we had put out through
8  The Organic Center, my technical knowledge of the rules
9  governing organic farming, scientific risk assessment
10 methods, a lot of pesticide issues were important, and
11 certainly a lot of issues arising from Agricultural
12 Biotechnology Report, and that, of course, was in --
13 were areas that I had been very active in, published in
14 peer-reviewed journals, et cetera.  And I was -- I was
15 asked by the Non-GMO Project to join the committee.  I
16 don't know how they got the idea to ask me.
17     Q.  Okay.  And then so once a food -- specific
18 food product is certified as non-GMO, that means it's
19 met those standards that -- promulgated by the Non-GMO
20 Project, correct?
21     A.  Correct.
22     Q.  And then is it a year?  Whatever it is, every
23 year or two years -- whatever the period is, there were
24 policies in place to make sure that they were still
25 compliant with those standards, correct?

21 (Pages 78 to 81)

Charles Benbrook, PhD
September 13, 2018

Page 82

1     A.  Correct.
2     Q.  And that was on the -- whoever was trying to
3  get that food item to be certified, it was on them to
4  get access and give the non-GMO Project --
5     A.  Correct.
6     Q.  -- access to that?  Okay.  And why did you
7  leave the Non-GMO Project?
8     A.  They had a standard policy for people.  I
9  think the term was two years, and I was reappointed
10  twice.  And, I mean, I don't think I was the
11  longest-serving member, but, you know, it was time for
12  them to get some fresh blood.  And I was -- it was
13  actually a fairly time-consuming and technically
14  challenging assignment.
15     Q.  How big was that technical committee?
16     A.  Eight, nine, maybe ten members, and you'd get
17  anywhere from six or seven to nine on any call.
18     Q.  Were any of the members that served on that
19  committee affiliated with industry in any way?
20     A.  Yes.
21     Q.  What kind of industries?
22     A.  Food industry, principally.
23     Q.  Were any of them affiliated with the organic
24  food industry?
25     A.  Yes.

Page 83

1     Q.  What companies?
2     A.  Well, let's see.  I remember one of the
3  gentlemen was in the retail business.  Another gentleman
4  was in the grain/wheat/oats/barley business.  And I
5  just -- you know, it's been a long time.  I don't
6  remember.  But I -- you know, there was almost certainly
7  somebody from the dairy industry involved.
8     Q.  The organic dairy industry, you're referring
9  to?
10     A.  Not necessarily.
11     Q.  No?
12     A.  I mean, it could be a yogurt manufacturer, it
13  could be a lot of -- I mean, there were certainly
14  several people on the non-GMO standards committee that
15  did a lot of work with or on behalf of some player in
16  the organic food sector, but most of the people had
17  other interests and did other things as well.
18     Q.  Were there any -- would you characterize
19  yourself during that time period as kind of in the
20  academic field?  Or what would you characterize
21  yourself --
22     A.  Yeah, I was a technical expert.
23     Q.  Were there any other people that would fall
24  in the same category --
25     A.  Yes.

Page 84

1     Q.  -- as you on that?  Who were they?
2     A.  I don't remember.
3     Q.  Is the Non-GMO Project still around?
4     A.  Yes.
5     Q.  Do you have any involvement with it at all
6  since you stepped off the technical committee?
7     A.  No.
8     Q.  Are you familiar with an organization called
9  Just Label It?
10     A.  Yes.
11     Q.  What is that?
12     A.  It was an organization -- I'm not -- I don't
13  remember exactly when it was formed, but I would say
14  maybe 2010, some -- plus or minus a couple years.  It
15  was an organization formed during the time period when
16  there was major ballot initiatives at the state level in
17  play in the political process calling for the labeling
18  of organic food -- labeling of food as derived from
19  genetically-engineered crops.  So it was just label it
20  if it was -- if the food was derived from or contained
21  an ingredient from a genetically-engineered crop.
22     Q.  And so what would you see -- well, let me see
23  this.
24        What was your involvement with the Just Label
25  It organization?

Page 85

1     A.  I had no ongoing involvement with them.  The
2  man that was largely responsible for starting it -- and
3  I'm -- I don't know what his position title was -- was a
4  gentleman named Gary Hirshberg, who was previously the
5  CEO of Stonyfield Dairy, an organic yogurt company.
6  Gary Hirshberg had been an active supporter and
7  participant, as his -- and his company had been an
8  active supporter in the work of The Organic Center, so I
9  had gotten to know Gary in that 2006 to 2012 period.
10        You know, sometime -- well, as I said,
11  around 2010 -- I think Gary started it -- started Just
12  Label It.  I -- there probably were some other
13  individuals involved.  And, as I said, its primary focus
14  was dealing with the -- the state ballot initiatives
15  calling for the labeling of genetically-engineered food,
16  and then ultimately the federal legislation when it
17  started to take shape.
18        The only financial support I got from Just
19  Label It was they agreed to pay my travel to a
20  legislative hearing before the Pennsylvania Committee on
21  Agriculture.  I had been invited by the committee to
22  come and testify on an educational hearing that the
23  committee had called on genetically-engineered foods and
24  crops.
25        And I -- at the time I lived in Oregon, and I

22 (Pages 82 to 85)

Charles Benbrook, PhD
September 13, 2018

Page 86

1    wasn't -- I wasn't prepared to cover my expenses.  And I
2    told that to the committee, and someone said, Do
3    you mind if we find somebody that will cover your
4    expenses?  And I said, Fine, and they contacted Just
5    Label It, and they paid for my airfare travel.
6        Q.  And so this presentation to the -- or the --
7    well, let me back up.
8            You made a presentation at this legislation
9    hearing?
10       A.  Yeah.  I delivered testimony as part of a
11   panel.  There was maybe six of us.
12       Q.  And there was a competing presentation by
13   whoever was opposed to the bill or opposed to the --
14       A.  There was no bill at the time.  It was an
15   educational hearing.
16       Q.  Okay.
17       A.  It was at a time when GE labeling issues and
18   all the controversy about genetically-engineered crops
19   had not received much attention at the state level in
20   the state of Pennsylvania, and the committee chairman
21   felt that it was time for the committee to put its feet
22   in the water and start to learn about the underlying
23   issues.
24           I thought they did a great job putting the
25   hearing together.  There was folks from, you know, all

Page 87

1    perspectives, and I think the committee got a lot out of
2    it.
3        Q.  And your presentation was taking the approach
4    of supporting companies that were against genetic
5    engineering being included in foods?
6        A.  No.  No.
7        Q.  So you were in favor of genetic engineering?
8        MR. WOOL:  Objection.  Form.
9        A.  I don't take a position on anything as broad
10   as genetic engineering.  It's like do you take a
11   position on air or do you take a position on water?  If
12   you dive into a swimming pool and stay at the bottom,
13   the water's going to kill you.
14           I was -- I think I was asked to discuss some
15   specific issues.  I'm sure I was asked to discuss the
16   impacts of genetically-engineered crops on pesticide use
17   because that's something I've published on.  My
18   testimony is in the record of the hearing if you want to
19   see what I had to say.  I don't -- I don't really
20   remember what I got into, but there's a written
21   statement that's part of the record of the committee.
22       Q.  (By Mr. Malinowski)  And I'm just looking at
23   the website printout from the Just Label It
24   organization, and it notes -- it has sponsors -- various
25   different company sponsors.  You're familiar with this,

Page 88

1    right?
2        A.  I haven't looked at their website for years.
3    Do they even still exist as an organization?  I'm not
4    even sure they do.
5        Q.  It's printed out in early August of this
6    year.
7        A.  So -- okay.
8        Q.  It says, If you're interested in becoming a
9    partner, we'd love to have you sign up here, and it has
10   platinum sponsors.  National Co-op Grocers.  Are you
11   familiar with that organization?
12       A.  Just modestly.
13       Q.  Natural -- Nature's Path Organic.  You're
14   familiar with them, correct?
15       A.  Yes.
16       Q.  Stonyfield Organic you already referenced,
17   right?
18       A.  Correct.
19       Q.  Then gold sponsors.  Organic Valley, who
20   sponsored some of your work, correct?
21       A.  Correct.
22       Q.  Annie's.  Silver sponsors.  The Boulder Food
23   Group.  Are you familiar with that organization?
24       A.  No.
25       Q.  Aurora Organic Dairy.  Are you familiar with

Page 89

1    them?
2        A.  Yes.
3        Q.  Happy Family Organics, correct?
4        A.  Don't know them.
5        Q.  You don't know them?  Bronze sponsors.
6    Global Organics.  Are you familiar with that company?
7        A.  No.
8        Q.  Health Warriors.  Are you familiar with that?
9        A.  No.
10       Q.  What I'm getting at is this is sponsored --
11   most of the sponsors that I can see on their website,
12   this Just Label It, are organizations that are -- I
13   would characterize as part of the organic food industry.
14   Does that sound about right to you based on your
15   knowledge of Just Label It?
16       A.  I'd have to -- there's several of them I
17   don't know anything about.
18       Q.  Okay.
19       A.  And if you take Annie's, Annie's is not a
20   private company anymore.  They're part of General Mills,
21   I think, so. . .
22       Q.  Do they label any of their products as
23   non-GMO?
24       A.  I'd have to look.  I don't know.
25       Q.  You don't know?

23 (Pages 86 to 89)

Charles Benbrook, PhD
September 13, 2018

Page 90

1      A. I don't know.
2      Q. And you published a paper called "GMOs,
3   Herbicides, and Public Health," correct?
4      A. It's certainly a title that I could have
5   written. I mean, I'm sure you're going to show it to
6   me, so let's just talk about something specific.
7      MR. WOOL: And I don't want to interrupt your
8   flow, but it looks like our food is probably here,
9   so. . .
10      MR. MALINOWSKI: Okay. Can I just finish one
11   question here?
12      MR. WOOL: Oh, yeah, yeah. Take whatever you
13   need.
14      Q. (By Mr. Malinowski) So didn't the
15   New England Journal of Medicine actually require you to
16   divulge your connections for your work with Just Label
17   It in -- what do you call it? In the -- in the paper?
18      A. No. That's not an accurate description of
19   what they -- my interactions with them. And this has
20   been gone over ad infinitum --
21      Q. Okay.
22      A. -- in the earlier depositions.
23      Q. Okay.
24      MR. MALINOWSKI: Let's take -- we can go
25   ahead and eat.

Page 91

1      MR. WOOL: Okay.
2      (Recess taken from 1:18 p.m. to 1:47 p.m.)
3      (Mr. Fayne was not present.)
4      Q. (By Mr. Malinowski) Okay, Doctor. Good
5   lunch?
6      A. Yeah.
7      Q. Good.
8      (Exhibit Number 13 was marked.)
9      Q. (By Mr. Malinowski) Okay. I'm just going to
10   mark something here. This is, again, from the Just
11   Label It website, Number 13. It was printed out on
12   August 4th, 2018. Do you see that document?
13      A. Yes, I see the document.
14      Q. And in this website, the Just Label It
15   organization notes that there are companies fighting
16   over our right to know. It says, quote, Transparency is
17   our right, yet a handful of companies such as Monsanto,
18   Kraft, Kellogg's, and General Mills have gotten away
19   with hiding important information about our food for
20   nearly two decades. Do you see that?
21      A. I do.
22      Q. Have you ever looked at the Just Label It
23   website before?
24      A. It's been years.
25      Q. Sure.

Page 92

1      A. I -- yeah. This is all new to me.
2      Q. And this is the same organization that paid
3   for your travel expenses to go testify at a legislative
4   hearing in Pennsylvania, correct?
5      A. Correct.
6      Q. And -- okay.
7      A. Several years ago.
8      Q. In any of your publications, have you ever
9   disclosed any relationship you have with Just Label It?
10      A. I don't have a relationship with them.
11      Q. Have you ever disclosed that they paid your
12   travel expenses?
13      A. I don't --
14      (Telephone interruption.)
15      MR. MALINOWSKI: Hello. You're on.
16      UNIDENTIFIED SPEAKER: Yes. I have a client
17   calling in for the deposition.
18      MR. MALINOWSKI: Okay. Hello?
19      MR. FAYNE: Yeah, this is Zach Fayne at
20   Arnold & Porter.
21      MR. MALINOWSKI: All right. We just started,
22   Zach. You didn't miss much.
23      MR. FAYNE: Okay. Thank you.
24      Q. (By Mr. Malinowski) You were in the middle
25   of an answer, and then you said, I don't, and then you

Page 93

1   stopped.
2      MR. WOOL: I think you were in the middle --
3   yeah. Why don't you repeat the question.
4      MR. MALINOWSKI: Okay.
5      Q. (By Mr. Malinowski) I said have you ever
6   disclosed to any of the peer-reviewed journals that
7   you've submitted papers for consideration that the Just
8   Label It organization paid travel expenses for you to
9   testify at that hearing?
10      A. No, I don't think so.
11      Q. Okay. And based on your understanding of
12   this Just Label It organization, you would agree that
13   one of its main opponents, according to the website at
14   least that we just looked at, is Monsanto; is that fair?
15      A. Not entirely, no.
16      Q. What part of it isn't?
17      A. I think Monsanto has taken a position in the
18   past that they support transparency and open, honest
19   communication with consumers about
20   genetically-engineered food. And, you know, I can't --
21   Monsanto doesn't exist anymore as an independent
22   organization, so it -- I can't speak to what Bayer's
23   policies are relative to the labeling of organic food.
24      But back in the day, Monsanto did not take an
25   aggressive and public position on labeling. They tried

24 (Pages 90 to 93)

Charles Benbrook, PhD
September 13, 2018

## Page 94

1 to stay below the radar screen in the public and
2 political fight that was going on.
3     Q.  By "back in the day," you mean before the
4 IARC undertook an evaluation of glyphosate or --
5     THE REPORTER:  I'm sorry.  I didn't hear that
6 one.  Can you repeat?
7     Q.  (By Mr. Malinowski)  By "back in the day,"
8 are you referring to before IARC, I-A-R-C, undertook its
9 evaluation of glyphosate as a potential carcinogen?
10    A.  Yes.
11    Q.  So what dates was that?  Was that 2017?
12    A.  As I said --
13    Q.  2015.  I'm sorry.
14    A.  -- the time period when I was aware that the
15 Just Label It project was doing things and being active
16 and the time period when I was aware of what they were
17 doing was when the California ballot initiative was --
18 the second one was up for a vote, when the second Oregon
19 ballot initiative was up for a vote, and when the ballot
20 initiative in the state of Washington was up for a vote.
21 That was the time period when I was aware that the Just
22 Label It project was active.
23    I didn't have much to do with Just Label It
24 in the later years when they were involved with the
25 federal legislation calling for the labeling of

## Page 95

1 genetically-engineered food.
2     Q.  So I think you told me that this legislative
3 hearing was in Pennsylvania, correct?
4     A.  Uh-huh.
5     Q.  Yes?
6     A.  Correct.
7     Q.  And that was in, you thought -- I think you
8 said around 2012; is that right?
9     A.  I really don't recall.  It's -- do you have a
10 copy of my résumé?  I could --
11    Q.  I don't have one in front of me right now.
12    A.  Okay.  Well, I think it's in there.
13    Q.  Okay.  But I think you mentioned that --
14 well, were you still at Washington State at the time?
15    A.  Like I said, I don't -- I don't remember --
16    Q.  Okay.
17    A.  -- if it was before or after I worked for
18 Washington State.
19    Q.  So if you look at the second page of what I
20 marked as Exhibit 13 -- just flip the page.
21    A.  Okay.
22    Q.  There it's listing out -- do you see that
23 decal in the upper right-hand corner --
24    A.  Yes.
25    Q.  -- and it has a photo.  It looks like a flier

## Page 96

1 that says, Who's fighting your right to know?  Do you
2 see that?
3     A.  Yes.
4     Q.  And then, Top "no on 37" spenders.  37 is
5 California's Proposition 37 --
6     A.  Oh, okay.
7     Q.  -- that you just referred to, correct?
8     A.  I guess so, yeah.
9     Q.  It says November of 2012, and lists Monsanto
10 as the number-one biggest opponent --
11    A.  Well, there you go.
12    Q.  -- is that correct?  And so you knew about
13 that when you testified to the legislative -- at the
14 legislative hearing in Pennsylvania when Just Label It
15 paid your travel expenses for that, correct?
16    MR. WOOL:  Objection.  Foundation.
17    A.  No, I didn't know about that.
18    Q.  (By Mr. Malinowski)  That didn't come up in
19 your testimony?
20    A.  No, it didn't.
21    Q.  Did the fact that Just Label It paid for your
22 expenses come up in your testimony?
23    A.  I don't remember whether I thanked them for
24 making it possible for me to travel there or not.  I
25 just -- I don't remember.

## Page 97

1     Q.  Now, you're familiar with the organization
2 called Moxie Media, correct?
3     A.  No.
4     Q.  No?
5     A.  Moxie Media?
6     Q.  Yeah.  It's a self- -- it's a purported
7 national political consulting firm that has won
8 competitive elections in more than 40 states at every
9 level of the ballot on behalf of progressive
10 organizations, coalitions, and candidates since 1999,
11 and it's women-owned outside the DC beltway.  Does
12 that --
13    A.  No.  I don't --
14    Q.  -- refresh your recollection at all?
15    A.  I don't know anything about them.
16    Q.  Never had any interactions or e-mails or
17 anything with them?
18    A.  I don't -- I don't recognize that firm name.
19 I don't know who the principals are in the firm.  I
20 assume that they were part of the political campaign on
21 one of the ballot initiatives.  And so to the extent
22 that I corresponded with somebody about the issues in a
23 ballot initiative that they may have gotten a copy of an
24 e-mail or something, I just -- I don't know.
25    Q.  Are you familiar with the company called

25 (Pages 94 to 97)

Charles Benbrook, PhD
September 13, 2018

---

Page 98

1  Dr. Bronner's?
2  **A.  Yes.**
3  Q.  What is Dr. Bronner's?
4  **A.  They are a company in California that makes**
5  **toothpaste and soap and personal-care products.**
6  Q.  And organic food -- I'm sorry -- an organic
7  body-care company manufacturer --
8  **A.  Yeah.**
9  Q.  -- correct?
10  **A.  Yeah.**
11  Q.  And they bill themselves out as organic and
12  they market themselves out --
13  **A.  Yeah.  Castile soap and Dr. Bronner's**
14  **toothpaste are their big products.**
15  **(Exhibit Number 14 was marked.)**
16  Q.  (By Mr. Malinowski)  I'll show you what I've
17  marked as Number 15 [sic] here, Doctor.
18  **A.  Yes.**
19  Q.  This is an e-mail string of which you're on.
20  But let's go back to the first one, which is the last --
21  last on the page.  It starts on the bottom of page 3,
22  and it's dated October 29th, 2013.
23        And it's an e-mail -- well, you can't see all
24  the recipients, but it's from David Bronner, who is, I
25  assume, a principal of Dr. Bronner's; is that right?

---

Page 99

1  **A.  Correct.**
2  Q.  And this is regarding a campaign regarding a
3  Proposition 522.  Do you remember that?
4  **A.  This is obviously one of the state ballot**
5  **initiatives.  I don't remember which state it is.**
6  Q.  Okay.  And if you flip to the back of it,
7  Mr. Bronner -- do you know Dave Bronner --
8  **A.  Yes.**
9  Q.  -- personally?  Have you ever done any work
10  for Dr. Bronner's or that company at all?
11  **A.  Dr. Bronner's supported work at The Organic**
12  **Center as one of the many funders, and Dr. Bronner's**
13  **has -- David has been a supporter of my work since I**
14  **left The Organic Center.**
15  Q.  How has he supported your work since you left
16  The Organic Center?
17  **A.  He writes a check.**
18  Q.  How often does that happen?
19  **A.  Pardon me?**
20  Q.  How often does that happen?
21  **A.  Once a year.**
22  Q.  Tell me how that -- like what is it?  Is it
23  an endowment that he -- that you receive or what?
24        MR. WOOL:  Objection.  Form.
25  **A.  No.  He's provided me with a few -- you know,**

---

Page 100

1  **one-time annual grants to support my general work, not**
2  the -- I haven't -- it hasn't been for projects in
3  support of Dr. Bronner.
4  Q.  (By Mr. Malinowski)  What kind of projects
5  has he supported you on?
6  **A.  He supports my analytical work in pesticides**
7  **primarily.**
8  Q.  And you said it's an annual check for the
9  most part?
10  **A.  Yes.**
11  Q.  Does it come at the same time or whenever he
12  decides to open the checkbook?
13  **A.  Sort of, yes.**
14  Q.  What kind of amounts are we talking about?
15  **A.  Is it any of your business?**
16  Q.  Are you going to concede --
17  **A.  I'm not --**
18  Q.  -- that you're a consultant for the organic
19  food industry?
20  **A.  I have done work supported by the organic**
21  **food industry, and I would consider the work that I have**
22  **done with the support from Dr. Bronner to be comparable.**
23  **I have never done a project for Dr. Bronner's that**
24  **advanced the sales of one of their products or helped**
25  **them calculate the sustainability of their supply**

---

Page 101

1  **chains, which are -- which I would consider the sorts of**
2  **things that a consultant for the company would do.**
3  **Dr. Bronner -- David Bronner has seen fit to**
4  **provide a -- basically an unrestricted grant to me to**
5  **support my scientific and analytical work.  And usually**
6  **it's -- most of it has gone into the -- building my**
7  **pesticide databases, et cetera.**
8  Q.  But you don't want to tell me how much
9  he's --
10  **A.  No.**
11  Q.  -- donated to support your work over the
12  course of the years?
13  **A.  It has nothing to do with this case.**
14  Q.  David Bronner, is he CEO of Dr. Bronner's?
15  **A.  Correct.**
16  Q.  Is that a privately-held company?
17  **A.  Yes, I believe it is.**
18  Q.  And has the amount of his contributions
19  exceeded $100,000 over the years to you?
20  **A.  Probably not.**
21  Q.  But you would agree that Dr. -- that David
22  Bronner and Dr. Bronner's, his company, pays you money
23  in order to support your research efforts, correct?
24  **A.  Yes.**
25  Q.  And that's been true since when?

26 (Pages 98 to 101)

Charles Benbrook, PhD
September 13, 2018

Page 102

1      A.  Well, he started as a funder to The Organic
2  Center when I was chief scientist sometime in the late
3  2000s.  I don't remember when he became a funder of The
4  Organic Center, and I don't remember how many years he
5  provided grants to The Organic Center.  But subsequent
6  to my leaving The Organic Center in 2015, you know, he's
7  supported my work for, I think, two grants -- two annual
8  grants.
9      Q.  So I wrote down that you left The Organic
10  Center in 2012.  Was it 2012 or 2015?
11      A.  No.  I started work in 2012, and I left in
12  the middle of 2015.
13      Q.  Okay.
14      A.  Oh, no.  That's WSU.  Are -- Organic Center
15  was 2006 to 2012.
16      Q.  That's what I had down.
17      A.  That's correct.  And I went from The Organic
18  Center to being a research professor at Washington State
19  University from mid-2012 to mid-2015.
20      Q.  And so David Bronner, would he personally
21  write you a check or would it be on behalf of the
22  Dr. Bronner's company?  Do you know?
23      A.  From the company.
24      Q.  And that continued on at least two times
25  since you left The Organic Center?

Page 103

1      A.  I think that's roughly accurate.
2      Q.  Are there any other either companies or
3  principals within the organic food manufacturing or
4  organic product manufacturing sector that have similarly
5  given you grants --
6      MR. WOOL:  Objection.  Form.
7      Q.  (By Mr. Malinowski) -- to support your work
8  since you left The Organic Center?
9      A.  We've already discussed the only other one,
10  which was the grant that Organic Valley --
11      Q.  Okay.
12      A.  -- provided me to do the analytical work
13  leading to the publication of a paper on the nutritional
14  benefits of grass-based dairy production.
15      Q.  Okay.  And so I'm still looking at the back
16  of this --
17      A.  Okay.
18      Q.  -- packet.  It says -- Mr. Bronner goes on,
19  and in the last sentence of that carry-over paragraph
20  says, Dr. Bronner's is stepping up with another $500,000
21  to help the campaign close this out toe-to-toe with BIO
22  all guns blazing in all media markets.  Another 500K --
23  meaning $500,000 -- would sure be sweet.  Do you see
24  that?
25      A.  Yes.

Page 104

1      Q.  Now, what's he referring to, if you know?
2  I'm not asking you to speculate, but what does BIO mean?
3      A.  It's the Biotechnology Industry Organization.
4      Q.  Of which Monsanto would, at that time, have
5  been a part, correct?
6      A.  I would assume so.
7      Q.  And then he goes on in the next sentence to
8  say -- "he" being Mr. Bronner -- goes on to say, I
9  recently contributed an article to the GOOD.is website,
10  that's not yet publicly -- public and should run any
11  day, that plainly explains the pesticide industry
12  boondoggle driving the genetic engineering of food
13  crops.  Do you see that?
14      A.  Yes.
15      Q.  And this is consistent with your
16  understanding of efforts made by Dr. Bronner's, the
17  company, and Mr. Bronner in particular, to fight the
18  pesticide industry in political battles; is that fair?
19      MR. WOOL:  Objection.  Form.
20      A.  The e-mail speaks for itself.  It's his
21  e-mail.  It's his opinions.
22      Q.  (By Mr. Malinowski)  And then you see there's
23  other -- the e-mails -- there are additional e-mails.
24  And unfortunately you can't see -- his other response on
25  October 29, 2013, he reaches out.  He says, Hey, Lisa

Page 105

1  and Delana -- Hey, all.  Lisa and Delana have advised
2  that the campaign -- to effectively use funds, they need
3  to be received by tomorrow.
4      A.  Yeah.
5      Q.  Do you see that?
6      A.  I see that.
7      Q.  And then it goes -- and then there's another
8  big e-mail, it looks like, one minute later, although it
9  could be a time change -- on October 29th, 2013, at
10  12:49 p.m. from Lisa MacLean, whose e-mail is
11  ███████████████████  Do you see that?
12      A.  Yeah.  Okay.  So here's where we get to Moxie
13  Media.
14      Q.  Yeah.  And this goes -- and this has a whole
15  laundry list of recipients on here that are copied,
16  right?
17      A.  Correct.
18      Q.  It says, We have them on -- Ms. MacLean
19  writes, We have them on the run.  Let's close strong and
20  seal this victory, correct?
21      A.  That's what the e-mail says, correct.
22      Q.  And you were copied on that e-mail, correct?
23      A.  I don't remember, but if you can -- you've
24  probably looked through it.
25      Q.  If you want to --

27 (Pages 102 to 105)

Charles Benbrook, PhD
September 13, 2018

Page 106

1    A. Where am I?
2    Q. Right here about five lines down, six lines
3  down, it says Charles Benbrook.
4    A. Okay. So this is back in, yeah, the WSU
5  days.
6    Q. Right. So your e-mail there was
7  cbenbrook@wsu.edu?
8    A. Correct.
9    Q. That was your e-mail when you worked at
10 Washington State, correct?
11    A. Correct.
12    Q. And you worked at Washington State on
13 October 29th of 2013, correct?
14    A. Yes.
15    Q. And you respond to Moxie Media's e-mail. By
16 the way, why would you be -- why do you think you're
17 included on this cc list?
18    MR. WOOL: Objection. Form.
19    Q. (By Mr. Malinowski) If you know.
20    A. I don't really know.
21    Q. And there's a bunch of other people --
22 there's people from Stonyfield on this cc list, correct?
23 I see Gary Hirshberg. That's someone who you were just
24 referring to --
25    A. Correct.

Page 107

1    Q. -- correct? fwwatch.org. Do you know what
2  that is?
3    A. Food and Water Watch maybe.
4    Q. Okay. That's another pro-organic
5  manufacturer entity, correct?
6    A. No. They're an NGO.
7    Q. NGO. Okay. So what is an NGO?
8    A. Nongovernment organization.
9    Q. Okay. And, in any event, you respond to Mox
10 Media's -- Moxie Media's e-mail October 29th at
11 2:03 p.m., correct? I'm looking at the --
12    A. This is at the top?
13    Q. Nope. The bottom of the first page.
14    A. I don't understand the -- you know, so Robyn
15 O'Brien --
16    Q. Let me see if I can walk you through it,
17 okay?
18    A. All right.
19    Q. You see at the bottom of the first page --
20 it's about five lines up. It says on October 29th,
21 2013, at 2:30 p.m. --
22    A. I wrote -- yeah.
23    Q. It says, Charles Benbrook -- or Benbrook,
24 Charles wrote. Do you see?
25    A. Yeah.

Page 108

1    Q. And you told this group that you had calls
2  from The Economist and the Washington Post, correct?
3    A. Yeah. I don't know who I sent that to,
4  whether I sent it to Robyn or whether I cc'd the whole
5  group. I don't really remember.
6    Q. Okay. But in any -- whoever you sent it to,
7  you said, There is going to be a huge amount of media
8  focus in the next ten days or so, correct?
9    A. Yeah. As I said, I had calls that day from
10 The Economist and the Washington Post.
11    Q. And their -- The Economist and Washington
12 Post are calling you to comment on this political ballot
13 fight on the 522 campaign, correct?
14    A. Correct.
15    Q. And Moxie Media, you know, they're not
16 representing the BIO companies or the pesticide
17 companies, are they? They're representing the companies
18 fighting against the BIO companies, correct?
19    MR. WOOL: Objection. Form.
20    A. That's certainly my understanding.
21    Q. (By Mr. Malinowski) And then you tell
22 whoever you wrote this to on October 29th, Really
23 important to craft the right messages post-vote because
24 this is a marathon and the beat will go on. And you
25 sign it Chuck, correct?

Page 109

1    A. Correct.
2    Q. Do your friends call you Chuck?
3    A. Yes.
4    Q. And --
5    A. Even some enemies.
6    Q. Okay. And then Robyn O'Brien from -- well,
7  Robyn O'Brien. Do you know who she is?
8    A. Yes.
9    Q. It looks like she's from an -- some kind of
10 entity called Allergy Kids. Do you know what that is?
11    A. Yes.
12    Q. What is it?
13    A. It's a nongovernmental organization that
14 works primarily with parents of children that have food
15 allergies to try to help them access medical resources
16 to deal with their kids' allergies. They've done a huge
17 amount of work on the peanut allergy, which can be
18 sometimes fatal. They've supported some research on
19 allergies -- food allergies among kids. And Robyn
20 founded the organization because two or three of her
21 five kids have severe food allergies.
22    Q. So the Allergy Kids is an NGO that basically
23 serves as a lobbying firm; is that fair enough?
24    A. No. No, they don't really lobby.
25    Q. They don't lobby?

28 (Pages 106 to 109)

Charles Benbrook, PhD
September 13, 2018

Page 110

1   A.  They don't have a -- I mean, it's a
2   one-person -- to the extent that I know what Allergy
3   Kids has done and is continuing to do, it's pretty much
4   a one-person operation.  They don't have a political
5   action committee, she doesn't spend a lot of time in
6   Washington lobbying congress.  I mean, she probably has
7   given a congressional briefing a time or two in the last
8   15 years, but it's not what -- she's not a -- Allergy
9   Kids is not a predominantly lobbying organization.
10   Q.  So I used the wrong word, obviously.  I don't
11   mean lobbying, and you're correct in your taking issue
12   with it.
13       What I meant to say is Allergy Kids is an
14   organization -- an NGO organization that is an
15   advocate -- that kind of advocates against pesticide and
16   BIO companies; is that fair enough?
17   A.  No.  It's an organization that advocates for
18   investments and policies that support healthy childhood
19   development and help prevent serious food allergies.
20   Q.  And Ms. O'Brien writes that, Wall Street
21   is paying attention too.  Chipotle's stock hit a record
22   high last week when they announced they would raise
23   prices to go non-GMO, and that's on October 29th, 2013,
24   correct?
25   A.  Correct.

Page 111

1   Q.  Do you own stock in Chipotle?
2   A.  Pardon me?
3   Q.  Did you ever own stock in Chipotle?
4   A.  No.
5   Q.  But she's noting here that Chipotle is
6   actually benefitting financially due to its marketing
7   non-GMO ingredients; is that fair enough?
8   A.  Well, her e-mail speaks for itself.  You
9   know, whether there's a connection between the Chipotle
10   announcement and the change in their stock prices, you
11   know, I don't know if that's true or not.
12   Q.  Now, at some point around that time in 2013,
13   Chipotle announced it was going to not include any GMO
14   ingredients in its product, correct?
15   A.  That I recall, yes.  Correct.
16   Q.  And then after that, Chipotle's had some
17   pretty serious health scares associated with it; is that
18   fair?
19   A.  Yeah.  They had some microbiological
20   contamination in their food and people got sick and --
21   Q.  There was --
22   A.  -- sued the company.
23   Q.  There was an E. coli breakout, at least
24   alleged, in December of 2015, correct?
25   A.  I don't remember the exact date, but that's

Page 112

1   about -- that sounds about right.
2   Q.  There was also a norovirus scare around 2017.
3   Do you remember that?
4   A.  Yes, I do.
5   Q.  Now, did you ever go out and conduct any
6   studies on those healthcare scares associated with
7   Chipotle's non-GMO products to determine what impacts
8   those non-GMO ingredients were having on those scares?
9   A.  No.
10   MR. WOOL:  Objection.  Form.
11   Q.  (By Mr. Malinowski)  Okay.  And I think you
12   mentioned earlier a study I think you did -- I think
13   when you were at Washington State -- a study on the
14   benefits of organic milk; is that fair?
15   MR. WOOL:  I'm sorry.  You said organic milk?
16   MR. MALINOWSKI:  Milk, yeah.
17   A.  We did several things on organic milk.
18   Can -- you need to be more specific if we're going to
19   get into any details.
20   Q.  (By Mr. Malinowski)  Okay.  But you did
21   mention that -- I think it was Organic Valley funded
22   some studies you did with respect to organic milk; is
23   that right?
24   A.  Yes.  I've done two studies that resulted in
25   peer-reviewed papers on organic milk.

Page 113

1   Q.  Okay.
2   (Exhibit Number 15 was marked.)
3   Q.  (By Mr. Malinowski)  I'll show you what I've
4   marked as 15.
5   MR. WOOL:  Wait.  I think -- oh, no.  Never
6   mind.  I'm just --
7   MR. MALINOWSKI:  Yeah.  That was 14.
8   Q.  (By Mr. Malinowski)  Do you see that
9   document, sir?
10   A.  Yes.
11   Q.  Okay.  Now, is this a document you created?
12   A.  Yes.
13   Q.  Okay.  Just tell me what it is, please.
14   A.  The first study that I did and led the team
15   was published in PLOS ONE.  And this was the plan for
16   releasing the -- when the paper came out in the journal.
17   This talks about the press outreach effort and reporters
18   that -- it's got several lists of reporters and
19   organizations that we were targeting in the outreach
20   activities, myself and Eric Sorenson, who's the guy
21   that -- the man that worked with the College of
22   Agriculture in Washington State University on this sort
23   of research report.
24   Q.  And Organic Valley also funded your work when
25   you were at The Organic Center, correct?

29 (Pages 110 to 113)

Charles Benbrook, PhD
September 13, 2018

Page 114

1    A.  They were one of many supporters.
2    Q.  Now, was this -- the creation of this study,
3  was that part of your work that you did on behalf of --
4  while you were at Washington State?
5    A.  Yes.  Well, I don't know -- I don't remember
6  when it started, but it probably started when I was at
7  Washington State.
8    Q.  And so would it be fair to say that Organic
9  Valley at least paid part of your salary while you were
10  at Washington State or funded it somehow?
11    A.  Yes.  They were one of the core funders of my
12  program at WSU.
13    Q.  And Organic Valley is an organic dairy
14  company we talked about?
15    A.  Co-op, yeah.
16    Q.  And so they manufacture or create organic
17  milk, correct?
18    A.  Milk, butter --
19    Q.  Cheese?
20    A.  -- yogurt, cheese.
21       MR. WOOL:  Dairy products.
22       MR. MALINOWSKI:  Dairy products, sure.
23    Q.  (By Mr. Malinowski)  Now, in that --
24  study ultimately was peer-reviewed and published in a
25  peer-reviewed journal, correct?

Page 115

1    A.  Yes.
2    Q.  Did you disclose in that paper that the study
3  had been funded by Organic Valley?
4    A.  Yes.  Well, the funding was -- all the
5  funding sources were noted.
6    Q.  Did you share your drafts of your manuscript
7  with anyone at Organic Valley before you published it?
8    A.  There were two coauthors -- two of the
9  coauthors were scientists working for Organic Valley,
10  so, yes, they had and worked on all the drafts.  No
11  ghostwriting in my work, sir.
12    Q.  Did you disclose in that publication that
13  Organic Valley had funded your work while you were at
14  The Organic Center?
15    A.  I don't remember the exact wording used, but
16  the -- the support of Organic Valley and their
17  involvement was very clearly spelled out in the
18  appropriate ways required by PLOS ONE at the time.
19    Q.  In that study, did you disclose your previous
20  work at The Organic Center?
21    A.  I don't remember what I -- what was said.  I
22  mean, I'm sure it's in my author affiliation.
23    Q.  You think it's in that -- in the author
24  affiliation?
25    A.  Well, I would assume so.  I mean, you're --

Page 116

1    Q.  Should it be there?
2    A.  Do you have a copy of it?
3    Q.  Should it be there?
4    A.  Should it be there?  I don't remember the
5  exact timing.  So if you want to go into more details on
6  the author disclosures or conflict of interest or
7  funding or acknowledgments or content of the paper, I'd
8  like to have it in front of me.
9    Q.  Do you remember if you disclosed your
10  previous work with the Non-GMO Project in that
11  publication?
12    A.  I'm sure I didn't.
13    Q.  Did you -- do you remember if you disclosed
14  your receiving travel expenses by Just Label It to go to
15  a legislative hearing in Pennsylvania on this issue in
16  that --
17    A.  I'm sure I didn't, and I'm not even sure if
18  that Pennsylvania meeting happened before or after.
19    Q.  Okay.  And then I'm looking at page 4 of your
20  document here, marked Number 15.  This is a list of
21  people that you want to get your paper to in order to
22  get coverage for your paper; is that fair enough?
23    A.  Yes.  These are the wire services,
24  organic-influence writers, people that typically cover a
25  new scientific study on organic food.  And then there's

Page 117

1  a long list of basically food and agriculture-related
2  writers in Washington, DC --
3    Q.  And that --
4    A.  -- that --
5    Q.  Oh, I'm sorry.
6    A.  -- most of which are not -- would not be
7  accurately characterized as organic or conventional
8  writers.  They cover anything that's newsworthy in the
9  area of food and agriculture.
10    Q.  And then on page 5, it says, Tier 2 Targets.
11  Is that your --
12    A.  Yeah.
13    Q.  Is that your phrase that you came up with,
14  tier 2 targets?
15    A.  Yes.
16    Q.  And what do these consist of?  Why are these
17  tier 2 targets?
18    A.  These are people that sometimes cover this
19  sort of thing, the sort of story -- a major new paper
20  coming out in PLOS ONE with some very novel and
21  important findings.  These were people that we felt
22  would be interested, but might not necessarily do a
23  story.
24    Q.  So Georgina Gustin -- I'm looking at the
25  first tier 2 target there --

30 (Pages 114 to 117)

Charles Benbrook, PhD
September 13, 2018

Page 118

1    A.  Yeah.
2    Q.  -- from the St. Louis Post-Dispatch.  That's
3  the major newspaper in the St. Louis area, correct?
4    A.  I believe that's the case, yeah.
5    Q.  Why would -- why -- St. Louis seems like an
6  odd choice.  Why would that be on there?
7    A.  Well, it certainly wasn't because Monsanto's
8  based there.  I don't -- I don't know exactly why.  I
9  hadn't -- I remember being contacted once or twice by
10  her, and it's why she wasn't on the first-tier list.
11  There's just not a deep or long relationship with her,
12  and no one else on the team expressed any knowledge or
13  relationship with her.
14    Q.  Now, did anyone else collaborate with you on
15  this document or did you make it yourself?
16    A.  I think it's fair to say that I compiled it.
17  You know, I worked with my team of coauthors to come up
18  with it, as well as Eric Sorenson, who was my primary
19  contact with -- in the Washington State University
20  communications office.  It -- they were the ones that
21  put out the press release and managed a lot of the
22  interactions with the media.  So, you know, some of
23  these names may have come from Eric.  I don't remember
24  all the back and forth on it.
25    MR. MALINOWSKI:  I'll mark Number 16 here.

Page 119

1    (Exhibit Number 16 was marked )
2    Q  (By Mr Malinowski)  That's a document I'm
3  sure you recognize, correct?
4    A.  Yes.
5    Q  This is a paper authored by you and published
6  this year, 2018, correct?
7    A.  Correct.
8    Q  The title of the paper is "Why Regulators
9  Lost Track and Control of Pesticide Risks:  Lessons From
10  the Case of Glyphosate-Based Herbicides and
11  Genetically-Engineered Crop Technology "  Do you see
12  that?
13    A.  Yes.
14    Q  And this -- the whole point of this paper is
15  you're talking about the -- about glyphosate, correct?
16    A.  No.  That is not a correct characterization
17  of the paper.
18    Q  Okay  You talk about it a lot -- glyphosate
19  a lot throughout the paper, correct?
20    A.  It's a part of the paper, yes.
21    Q  You mention specifically Monsanto a number of
22  times throughout this, correct?
23    A.  I'd have to look.  I mean, Monsanto is the
24  major manufacturer of Roundup, and Monsanto was a major
25  player in the policy arena.  This is a policy-related

Page 120

1  paper.
2    Q.  Okay.  And this was published in the Current
3  Environmental Health Reports, correct?
4    A.  Correct.
5    Q.  Peer-reviewed?
6    A.  Yes.
7    Q.  And if you look on the last page there, it
8  says Conflict of Interest.
9    A.  Yes.
10    Q.  And you say -- and it says, Charles Benbrook
11  declares that he has no conflict of interest, correct?
12    A.  That's correct.
13    Q.  And then two sentences later you say, CMB --
14  those are your initials, right?
15    A.  Correct.
16    Q.  Has served as an expert witness in litigation
17  involving pesticides and the labeling of foods derived
18  from GE crops.  Do you see that?
19    A.  Correct.
20    Q.  You don't say you are a -- you have served as
21  an expert witness or a consultant in litigation
22  involving glyphosate in particular, do you?
23    A.  That's subsumed in the word "pesticides."
24    Q.  Well, pesticides -- how many pesticides are
25  there?  Thousands, right?

Page 121

1    A.  Active ingredients or end-use products?
2    Q.  Both.
3    A.  Both?  There are approximately 650 active
4  ingredients and 45,000 end-use products.
5    Q.  So you're talking about a lot of different
6  things subsumed by the word "pesticides," correct?
7    A.  Yeah.  Yes.
8    Q.  You don't think -- so do you think it's an
9  accurate statement to say you have no conflict of
10  interest when writing about and evaluating lessons from
11  the case of glyphosate-based herbicides and
12  genetically-engineered crop technology to not disclose
13  that you had been an expert witness in this litigation
14  involving glyphosate?
15    MR. WOOL:  Objection.  Foundation.
16    A.  That is correct.  This is not -- this is an
17  analysis of the decisions made in the late '80s and
18  early '90s when the first two major agriculture
19  biotechnologies, which were Roundup Ready or
20  glyphosate-resistant crops and so-called Bt-transgenic
21  crops, were first brought on to the market.  It's a
22  paper about the policy and efforts made by the federal
23  government to understand and curtail the potential risks
24  associated with these technologies.
25    Q.  (By Mr. Malinowski)  And, now, this article

31 (Pages 118 to 121)

Charles Benbrook, PhD
September 13, 2018

Page 122

1   was published in July of 2018, correct?
2       A.  I --
3       Q.  I'm looking at the front page there.
4       A.  Yeah.  That's the published online date.
5       Q.  Sure.
6       A.  July 12th, 2018.
7       Q.  So at that point you had already been
8   consulting with law firms in this glyphosate litigation
9   and getting paid by law firms in the glyphosate
10   litigation -- plaintiffs' firms --
11       A.  Correct.
12          MR. WOOL:  Foundation.
13       Q.  (By Mr. Malinowski) -- for years, correct?
14       A.  Correct.
15       Q.  And you would agree with me that someone
16   reading this conflict of interest would actually not
17   realize that you were actually getting paid to testify
18   on behalf of the plaintiffs in this glyphosate-based
19   litigation if they just read this, correct?
20          MR. WOOL:  Objection.  Calls for speculation.
21       A.  This paper has nothing to do with this
22   litigation or the potential of Roundup herbicides to
23   cause non-Hodgkin's lymphoma.  No relation.
24       Q.  (By Mr. Malinowski) Okay.  And you mentioned
25   a second ago ghostwriting.  That's something you talk

Page 123

1   about a lot, correct, in this litigation?
2       A.  It's a topic addressed in my expert report,
3   yes.
4          (Brief interruption in proceedings.)
5          (Exhibit Number 17 was marked.)
6       Q.  (By Mr. Malinowski) Okay.  I've handed you
7   Number 17, Doctor.
8       A.  Yes.
9       Q.  And, you know, this is something you're well
10   familiar with, the Williams paper?
11       A.  Correct.
12       Q.  You testified about it at trial and --
13       A.  That's not correct.
14       Q.  -- it's part of this litigation.  You did not
15   testify about this?
16       A.  I was not asked about it at trial.
17       Q.  That's right.  You would have been, but we're
18   not allowed -- plaintiffs' lawyers were not allowed to
19   ask you about this, right?
20       A.  Yeah.  What a shame.
21       Q.  So -- but it's something you talk about in
22   your expert report, correct?
23       A.  It's one of, yeah, many papers talked about
24   in the expert report.
25       Q.  And one of the things you allege is that this

Page 124

1   paper was ghostwritten by Monsanto personnel, correct?
2       A.  Well, that's how William Heydens
3   characterized it, and I have no reason to doubt his
4   judgment.
5       Q.  And William Heydens is specifically named in
6   the acknowledgments on page 160 of this paper, correct?
7       A.  Yeah.  He's one of the people listed, if my
8   memory serves me correctly.
9       Q.  Yeah.  In the acknowledgments section there,
10   it says, The authors acknowledge the assistance of
11   individuals who participated in the preparation of this
12   document.  Do you see that?
13       A.  Uh-huh.
14       Q.  Yes?
15       A.  Yes, I see that.
16       Q.  I'm not fussing at you, but she can't take
17   down "uh-huh."
18       A.  Oh, okay.
19       Q.  And then they say, First, we are grateful to
20   those who gathered and made available the large amount
21   of information used to write the manuscript for this
22   document, correct?
23       A.  That's what it says.
24       Q.  And it says, Second, we thank the
25   toxicologists and other scientists at Monsanto who made

Page 125

1   significant contributions to the development of exposure
2   assessments and through many other discussions, correct?
3       A.  That's what it says.
4       Q.  So on its face, this acknowledgment so far is
5   telling whoever reads this that people at Monsanto
6   assisted with the preparation of this and of this
7   document, correct?
8       A.  In the collection of the studies that the --
9   supposedly the three coauthors analyzed and used as the
10   basis of the paper, they're acknowledging that, and,
11   second, as you accurately read, that other toxicologists
12   and scientists at Monsanto made contributions to the
13   development of exposure assessments, which would refer
14   to the amount of glyphosate or glyphosate-based
15   herbicides individuals are exposed to, which is not a
16   terribly significant portion of the paper.  And then,
17   through many other discussions, it's really hard to say
18   what that refers to.
19       Q.  But just reading this on its face without any
20   skin in the game without being paid by either side, a
21   neutral scientist could read this and come to the --
22   reasonably come to the conclusion that toxicologists and
23   other scientists at Monsanto made significant
24   contributions to the development of exposure assessments
25   and through discussions with the authors, correct?

32 (Pages 122 to 125)

Charles Benbrook, PhD
September 13, 2018

Page 126

1    MR. WOOL:  Objection to form.
2    A.  Yes.  I think it's -- probably most
3  scientists that had taken the time to read the paper and
4  knew what was in the paper had a reasonably good
5  understanding of what that referred to and what that
6  meant.
7    Q.  (By Mr. Malinowski)  And you say exposure
8  assessments, and you kind of attached some -- your own
9  definition of what that means.  Have you ever talked to
10  Dr. Williams?
11    A.  No.
12    Q.  Have you ever talked to Dr. Kroes or
13  Dr. Munro?
14    A.  No.
15    Q.  Can you point to me any single sentence in
16  this paper that was written by someone at Monsanto
17  rather than one of those three authors?
18    A.  I can't remember.  There's many, many
19  documents in the discovery record about this particular
20  paper, about the portions that were ghostwritten by
21  different Monsanto scientists.  There's clear
22  acknowledgment by William Heydens, as I said, that
23  Williams and Kroes is an example of a paper that was
24  ghostwritten by Monsanto in order to reduce the cost of
25  the paper.

Page 127

1    I know that in some of the -- some of the
2  review articles sponsored by Monsanto and wholly or in
3  part ghostwritten by Monsanto, there are actually drafts
4  of the papers in the discovery record.  I don't remember
5  if this is one of them.  I didn't feel any need to try
6  to go deeper into the record --
7    Q.  This is a --
8    A.  -- to identify --
9    Q.  This is a published study.  This is the
10  actual published study.
11    A.  I understand that.
12    Q.  Okay.
13    A.  Because there is a clear and unambiguous
14  acknowledgment by William Heydens than this was an
15  example of their ghostwritten studies, I didn't see any
16  reason to try to identify exactly which paragraphs or
17  portions had been drafted by a Monsanto scientist that's
18  not listed among the three authors.
19    Q.  Now -- okay.  So you can't tell me a single
20  sentence in here that was written by someone at Monsanto
21  rather than one of these three authors, correct?
22    A.  I just answered that question.
23    Q.  What portion of this -- it can be just a
24  sentence or just a word.  What portion was ghostwritten?
25    A.  As I said, William Heydens identified this as

Page 128

1  an example of a paper ghostwritten by Monsanto in order
2  to reduce the cost.  Because of that, I -- you know, I
3  saw no need to try to identify which word or which
4  passages were ghostwritten.  I would suspect a
5  significant portion of them.
6    Q.  Yet you've never talked to William Heydens,
7  have you?
8    A.  No.
9    Q.  And so you can't tell me what word even was
10  added in here, based on -- I'm familiar with the
11  documents and with the e-mails.  I'm not asking about
12  that.  I'm asking, based on your own personal knowledge,
13  what -- just point out one sentence written by someone
14  other than these three authors.
15    A.  I have not had -- I have not had access to
16  the earlier drafts of this, nor have I seen it in the
17  discovery record, you know, a clear history of the
18  evolution of this paper.  So I don't know whether
19  Saltmiras was the person that ghostwrote portions of it
20  or which of the other scientists, so, no, I can't
21  identify any individual word.
22    Q.  Now, in your expert report -- I think you
23  referenced this already when we were looking at the
24  acknowledgment.  Paragraph 741 of your expert report,
25  you state that the, quote, unquote, scientific

Page 129

1  support -- which is one of the words used in the
2  acknowledgments, right?
3    A.  Correct.
4    Q.  You say that's a phrase most scientists --
5  this is a quote.  That is, quote, A phrase that most
6  scientists would interpret to mean Monsanto provided
7  access to data and other scientific information, closed
8  quote.  Do you see that?
9    A.  Correct.
10    Q.  Are you familiar with that?
11    A.  Yeah.
12    Q.  Now, you say "most scientists."  So you're an
13  expert being paid by the plaintiffs in the glyphosate
14  litigation, correct?
15    A.  Correct.
16    Q.  There are other scientists being paid by the
17  plaintiffs in the glyphosate litigation.  You're aware
18  of that, correct?
19    A.  Yes.
20    Q.  Other than those scientists that are being
21  paid by plaintiffs' lawyers in the glyphosate
22  litigation, can you identify a single scientist anywhere
23  in the world that has said this acknowledgment section
24  here on page 160 of the document doesn't adequately
25  disclose Monsanto's involvement in the case?

33 (Pages 126 to 129)

Charles Benbrook, PhD
September 13, 2018

Page 130

1    A.  I'm not -- I'm not sure I've had that
2  specific conversation with anyone, but I can assure you
3  that if I sat down with a majority of active scientists
4  that don't work for the industry and explained to them
5  what I know about this paper that they would consider
6  that acknowledgment statement to be grossly inadequate
7  and not cover the fact that substantial portions of this
8  document were ghostwritten by Monsanto scientists and
9  inserted into a peer-reviewed publication for the
10  purpose of trying to suggest to the scientific community
11  that these independent scientists carried out an
12  independent analysis of this -- there's a large number
13  of studies discussed in this.
14    This is a -- this is a very long paper.  I
15  mean, any scientist that is used to reading scientific
16  literature looking at this paper would know that this
17  was a lot of work, a lot of time to independently
18  analyze and put together all these tables.  You know, it
19  was a big project.  And I think that reading the --
20  reading the acknowledgment statements, anyone would
21  understand that many of the studies talked about are
22  proprietary to Monsanto.  They're not publicly
23  available.  So the only way that Williams, Kroes, and
24  Munro have access to them is if Monsanto gave them
25  those studies, including the raw data in those studies.

Page 131

1    So that -- and in terms of scientific
2  support, the Monsanto scientists probably -- it would
3  have been totally appropriate for them to have
4  discussions about the methodologies used in the studies,
5  the statistics used in the evaluation of the studies,
6  critical elements of the evaluation of this large body
7  of unpublished, un-peer-reviewed regulatory studies that
8  are the primary focus of this.
9    The record in this case makes it clear that
10  this peer-reviewed article was the vehicle through which
11  Monsanto brought into the public scientific community
12  the results of a significant portion of their
13  proprietary regulatory studies.  That's what they did in
14  this.
15    And in this -- in this review article, the
16  three authors provide the Monsanto company's judgments
17  about what this body of work shows.  And the
18  objectionable facet of this and why it is properly
19  identified as a ghostwritten piece of work, even -- you
20  know, obviously William Heydens's characterizing -- it
21  is that -- is the most compelling evidence that that's
22  the case.  The interpretation of each of these studies,
23  if you go through them, you know, one at a time, is in
24  line with Monsanto company's interpretation.
25    So -- and that's not terribly surprising,

Page 132

1  given what is disclosed about the paper.  It's --
2  obviously, Monsanto trusted these scientists, provided
3  them access to this large body of proprietary work, and,
4  of course, you know, it's not surprising that the
5  conclusions reached by these three gentlemen are in
6  align -- or roughly aligned with those of the company.
7    But the fact that portions of the paper and,
8  I think, a reading of the discovery record is that
9  significant portions of the paper were written by other
10  Monsanto scientists who are not listed as coauthors,
11  that is what makes this properly characterized as a
12  ghostwritten article and wise -- you know, people in the
13  scientific community would regard the acknowledgment
14  statement as inadequate.
15    Q.  That was a super long answer, and I
16  appreciate it.  Thank you.  But I don't -- respectfully,
17  I don't think it even responded to my question.
18    My question was simply this.  Other than you
19  and the other scientists paid by the plaintiffs' lawyers
20  in the glyphosate litigation, can you identify a single
21  scientist anywhere in the world that has looked at this
22  acknowledgement and said it's an improper acknowledgment
23  of interest?  Yes or no?
24    A.  I haven't -- I can't, and I haven't tried.
25    Q.  Okay.  Thank you.  Now, a lot of the other

Page 133

1  stuff you talked about was going into the substance of
2  the paper, and that's fine, and I appreciate your
3  answer.  I really do.  This is a review article,
4  correct?
5    A.  Yes.
6    Q.  It's not new -- it's not new science being
7  generated.  It's looking at other studies that are --
8  had already been done, correct?
9    A.  Correct.
10    Q.  Can you point to anything in this study --
11  like you said, it's a long study.  Can you point to
12  anything -- any conclusions or any language in this
13  study that is not scientifically accurate?
14    MR. WOOL:  Objection.  Form.
15    A.  I'm not prepared to answer that without
16  rereading it carefully.
17    Q.  (By Mr. Malinowski)  How many times have you
18  read this?
19    A.  Oh, several.
20    Q.  Okay.
21    A.  And different parts of it --
22    Q.  Okay.
23    A.  -- more than several.
24    Q.  Can you identify a single entity that has
25  looked at this study -- scientific entity, a

34 (Pages 130 to 133)

Charles Benbrook, PhD
September 13, 2018

Page 134

1 peer-reviewed panel -- that has looked at this paper and
2 said, It's not good? It's not a good paper and we
3 shouldn't consider it?
4 **A. No.**
5 Q. IARC did not look at this, did they?
6 MR. WOOL: Objection. Mischaracterizes. . .
7 **A. I don't remember if IARC cites this or not.**
8 **IARC depends predominantly on studies published in the**
9 **peer-reviewed literature. I don't remember if the IARC**
10 **working group felt that the summaries of these -- the**
11 **summary of the proprietary studies in this met their --**
12 **their criteria.**
13 THE REPORTER: I'm sorry. I heard
14 "objection, mischaracterizes," and I didn't hear
15 anything after that.
16 MR. WOOL: I think it was probably
17 mischaracterizes the evidence.
18 Q. (By Mr. Malinowski) So you don't know as you
19 sit here today whether IARC looked at it or not or even
20 considered it?
21 **A. I can look at monograph 112 and tell you in a**
22 **few minutes.**
23 Q. Well, if it's not cited in monograph 112, you
24 have no basis to think that they actually looked at it
25 and considered it?

Page 135

1 **A. That would be correct.**
2 Q. Another publication from twenty -- that was
3 17, right?
4 **A. No. This is 2000.**
5 Q. No. Number 17.
6 **A. Oh.**
7 Q. Around page -- I'm sorry -- paragraph 666 of
8 your report, you don't -- I'm not going to quote it, but
9 you talk about a publication in 2013 by Kier and
10 Kirkland.
11 **A. Right.**
12 Q. K-i-e-r. Do you remember that?
13 **A. Yeah. Give the paragraph -- 616 you said?**
14 Q. 666.
15 **A. 666. Let me refresh my memory which one**
16 **we're talking about.**
17 Q. Kier and Kirkland, 2013. And I think you
18 alleged that this was also ghostwritten, correct?
19 **A. Yes. Portions of it, at least.**
20 Q. And what's the basis for that allegation?
21 **A. The record.**
22 Q. What record -- what are you --
23 **A. The discovery record.**
24 Q. And you referred earlier to Dr. Saltmiras,
25 right?

Page 136

1 **A. Saltmiras, yeah.**
2 Q. He was at least an employee of Monsanto,
3 correct?
4 **A. Yes.**
5 Q. Did you look at his deposition?
6 **A. Yes.**
7 Q. When did you read his deposition?
8 **A. I don't remember. I mean, I've picked it up**
9 **and looked at it more than once, you know, over the**
10 **course of the litigation.**
11 Q. And so you saw him categorically deny any
12 kind of ghostwriting of this article, correct?
13 **A. I remember him making that assertion, yes.**
14 Q. And you never -- you never talked to Dr. Kier
15 or Dr. Kirkland, did you?
16 **A. No.**
17 Q. So you don't know if they would agree with
18 your assertion that this was ghostwritten or not, do
19 you?
20 **A. I never asked them, no.**
21 Q. Other than -- same question as before. Other
22 than scientists paid by the plaintiffs' lawyers in the
23 glyphosate litigation, including yourself, can you
24 identify any other scientist anywhere in the world that
25 would share your view that this document was

Page 137

1 ghostwritten?
2 **A. I can't name any right now. I haven't made a**
3 **survey of scientists that have looked at this paper.**
4 Q. And in the declaration of interest,
5 Dr. Saltmiras is actually acknowledged as someone having
6 assisted with this paper, correct?
7 **A. Correct.**
8 MR. WOOL: Objection. He doesn't have the
9 study in front of him.
10 MR. MALINOWSKI: Okay. I can show it to him
11 if he wants it.
12 Q. (By Mr. Malinowski) But you remember that
13 from --
14 **A. I do.**
15 Q. -- your review? And you know that Dr. Kier
16 was disclosed as having been an employee of Monsanto in
17 the past, correct?
18 **A. Correct.**
19 Q. And in the declaration of interest, the
20 authors specifically say, Monsanto Company was the
21 original producer and marketer of glyphosate
22 formulations. Do you see that?
23 **A. Correct.**
24 Q. And then they --
25 MR. WOOL: Wait. Wait. You're asking him if

35 (Pages 134 to 137)

Charles Benbrook, PhD
September 13, 2018

Page 138

1    he sees that --
2            MR. MALINOWSKI: I'm sorry. You're right. I
3    am.
4            MR. WOOD: -- but that's not in front of him.
5        Q. (By Mr. Malinowski) But you remember that
6    though?
7        A. I do.
8        Q. And then the authors say, quote, The authors
9    had sole responsibility for the writing and content of
10   the paper and the interpretations and opinions expressed
11   in the paper are those of the authors and may not
12   necessarily be those of the member companies of the
13   Glyphosate Task Force. Do you remember that?
14       A. I recall that there's a passage like that.
15   Why don't you give me a copy of it?
16       Q. Sure.
17       A. Let's stop playing games.
18       Q. I was just trying to speed it up here.
19           (Exhibit Number 18 was marked.)
20       Q. (By Mr. Malinowski) Here's Number 18 --
21           MR. WOOL: Thank you.
22       Q. (By Mr. Malinowski) -- which is the 2013
23   publication by Dr. Kier and Dr. Kirkland called "Review
24   of Genotoxicity Studies of Glyphosate and
25   Glyphosate-Based Formulations." Do you see that --

Page 139

1        A. Right.
2        Q. -- see that, Doctor?
3        A. Yes.
4        Q. It's published in the Journal of Critical
5    Review -- what is that?
6        A. Critical Reviews in Toxicology.
7        Q. Peer-reviewed journal, correct?
8        A. Yes.
9        Q. Well-respected, right? If you know.
10       A. I think that's a -- it depends on who you
11   ask.
12       Q. And then at the back -- I'm looking at the
13   back right before it says -- in the acknowledgments
14   you'll see -- it's consistent with what I represented to
15   you, which is, quote, The authors would like to thank
16   the following individuals for their contributions to
17   this work by providing regulatory studies and their
18   thoughtful review of the manuscript, and it lists
19   Dr. Saltmiras from Monsanto, correct?
20       A. Correct.
21       Q. And not just him but other individuals from
22   other companies, correct?
23       A. Correct.
24       Q. And so they say right there that these people
25   listed, including Dr. Saltmiras, gave thoughtful review

Page 140

1    of the manuscript, right?
2        A. Yes.
3        Q. So they disclosed that there was review of
4    the manuscript before it was published by Monsanto and
5    other companies, correct?
6        A. Correct.
7        Q. That's appropriate to do, right?
8        A. Yes, especially if it's accurate.
9        Q. And then just since I feel like I've been
10   accused of not reading it correctly, for declaration of
11   interest, it says, Larry Kier and David Kirkland were
12   paid consultants of the Glyphosate Task Force for the
13   preparation of this review, correct?
14       A. Correct.
15       Q. And then it defines the Glyphosate Task Force
16   as a consortium of 25 European glyphosate registrants,
17   and then it gives a website to list all of them,
18   correct?
19       A. Correct.
20       Q. Have you ever gone to that website and looked
21   at it and seen who were all these members of the
22   Glyphosate Task Force?
23       A. I believe I did, yes.
24       Q. Monsanto certainly was on there, correct?
25       A. Correct.

Page 141

1        Q. But nothing's being hidden here? These
2    authors on this peer-reviewed publication are disclosing
3    these people had something to do with this study,
4    correct?
5            MR. WOOL: Objection. Form.
6        Q. (By Mr. Malinowski) Or this paper, I should
7    say.
8        A. The acknowledgments, you know, are -- state
9    the -- that these various individuals reviewed the
10   manuscript and/or provided data. What it doesn't say is
11   that portions of the paper were written by other
12   Monsanto scientists that aren't listed among the
13   coauthors.
14           There's a difference between authoring a
15   section of a paper and providing comments on an already
16   drafted manuscript. I think that is the issue with this
17   paper and with several of them where the -- again, the
18   discovery record shows that Saltmiras had more than just
19   a -- played more of a direct role in drafting parts of
20   the manuscript, in addition to reviewing the manuscript,
21   as is acknowledged here.
22       Q. Can you identify a single word in here that
23   was written by anyone from Monsanto rather than Dr. Kier
24   or Dr. Kirkland?
25       A. I think I -- and as I said before, I don't

36 (Pages 138 to 141)

Charles Benbrook, PhD
September 13, 2018

Page 142

1  have access to and I -- I don't know if the discovery
2  record includes the earlier drafts where it would be
3  possible -- or it might be possible to actually identify
4  different passages, so I cannot do that.
5       But the -- again, the discovery record is
6  quite clear that the involvement of some individuals
7  other than the two listed coauthors in the actual
8  drafting of the paper and the conclusions reached in the
9  paper, you know, was -- went well beyond providing
10 comments on an already drafted paper.
11      Q.  And you can't name anyone else at Monsanto
12 that you think wrote any single word in that paper, can
13 you?
14      A.  I'd have to go back and, you know, look at
15 the -- look at the e-mail traffic and the Bates
16 documents around this.  I mean, there's a lot of --
17 there's a lot of discussion of these different review
18 articles in the record, and I don't remember all of
19 them.
20      (Exhibit Number 19 was marked.)
21      Q.  (By Mr. Malinowski) I'll show you what I
22 marked as Number 19.  And this is a recent article --
23      A.  Yeah.
24      Q.  -- published in Carcinogenesis --
25      A.  Correct.

Page 143

1       Q.  -- correct?  Are you familiar with that
2  publication?
3       A.  Yeah, and I believe I put it in my reliance
4  list.
5       Q.  This one here?
6       A.  Yeah.
7       Q.  Okay.  I don't recall --
8       A.  This is quite new.
9       Q.  Published --
10      A.  You know, July --
11      Q.  -- July --
12      A.  Yeah.
13      Q.  -- 28th, 2018 --
14      A.  Correct.
15      Q.  -- correct?
16      A.  Correct.
17      Q.  Try not to speak over me because -- for her
18 benefit.  I'll try to do the same, okay?  You're doing a
19 good job so far though.
20      This is a review article, correct?
21      A.  Yes.
22      Q.  It says "Glyphosate-based -- this is the
23 title.  "Glyphosate-Based Herbicides and Cancer Risk:  A
24 Post-IARC Decision Review of Potential Mechanisms,
25 Policy and Avenues of Research."  Do you see that?

Page 144

1       A.  Yes, I do.
2       Q.  And there's two authors -- two named authors,
3  Michael Davoren and Robert Schiestl.  Do you see that?
4       A.  I do see that.
5       Q.  And they're -- it looks like UCLA, correct?
6       A.  Correct.
7       Q.  Do you know either of those authors?
8       A.  No, I do not.
9       Q.  And you said you've reviewed this article
10 before?
11      A.  I read the abstract and I quickly thumbed
12 through it, but I haven't done a careful review of it.
13      Q.  Okay.  I don't have any substantive questions
14 about it, but I'm looking at the back here.  There's a
15 section called -- right before the references, there's a
16 section called Funding.  Do you see that?
17      A.  Yes.
18      Q.  And it says that the -- the review was
19 self-funded by the authors, right?
20      A.  Correct.
21      Q.  Not associated with any grant, academic or
22 private, correct?
23      A.  Correct.
24      Q.  And there's a conflict of interest statement.
25 Do you see that?

Page 145

1       A.  Oh, yeah.  I remember this now.  Yeah.
2       Q.  What do you remember about it?  In what
3  context?
4       A.  I remember reading it.
5       Q.  Oh, you remember reading it.
6       A.  Yeah.  And as far as I know, it's one of the
7  consultants to the one of the law firms involved with
8  the litigation.
9       Q.  So RHS is referring to the author -- listed
10 author Robert Schiestl -- it's S-c-h --
11      A.  Correct.
12      Q.  -- i-e-s-t-l -- right?
13      A.  Correct.
14      Q.  It says, RHS is a -- why did that catch your
15 interest?
16      A.  Because it's -- this UCLA -- I assume a
17 professor -- you know, is working with a Baum Law Firm,
18 which -- after my participation in the trial -- and --
19      Q.  Right.
20      A.  -- I knew was involved in the litigation,
21 so --
22      Q.  So --
23      A.  -- it caught my eye.
24      Q.  -- this is what they -- he writes.  Quote,
25 RHS is a consultant with Baum, Hedlund, Aristetti -- I'm

37 (Pages 142 to 145)

Charles Benbrook, PhD
September 13, 2018

Page 146

1    sorry -- Aristei and Goldman PC.  Do you see that?
2        A.  Yeah.
3        Q.  Now, scientists read these review articles
4    for the most part, correct?
5        A.  Certainly would be the --
6        Q.  Carcinogenesis --
7        A.  -- primary readership.
8        Q.  Carcinogenesis, that's a scientific journal,
9    correct?
10       A.  Yes.
11       Q.  So it's not a -- something that would ever be
12   sent -- like part of something a lawyer would read every
13   day unless they're interested in the topic --
14       A.  Correct.
15       Q.  -- would you agree with that?  Now,
16   scientists in the field -- reading this disclosure of
17   interest that Mr. -- I'm sorry -- Dr. Schiestl is a
18   consultant with Baum, Hedlund, Aristei and Goldman, that
19   doesn't even identify that as a law firm, does it?
20       A.  No, it doesn't.
21       Q.  It could be an accounting firm, for all a
22   scientist would know, correct?
23       A.  It could be a pesticide company.
24       Q.  Sure.  It doesn't say anything in here -- and
25   it says "consultant."  It doesn't say anything about

Page 147

1    being paid -- well, step back.
2        Baum Hedlund, that law firm, they were the
3    lead trial counsel for the plaintiffs in the D. Johnson
4    case, correct?
5        A.  I'm not -- well, Robert Wisner presented the
6    opening and closing statements.
7        Q.  Sure.
8        A.  I'm not sure how one designates the lead
9    counsel in a litigation like that, but they -- clearly
10   they were involved.
11       Q.  Let me step back.  I don't want to use legal
12   words.  I'll just use regular talk, okay?
13       Baum Hedlund were the lawyers for the
14   plaintiffs in the D. Johnson trial, correct?
15       A.  Yeah.  They were among the lawyers, yes.
16       Q.  Mr. Wisner, he did the opening, he did the
17   closing, and he -- he defended you when -- or he put
18   your direct examination on at trial, correct?
19       A.  Correct.
20       Q.  And most of the other scientists involved in
21   that case were put on by Baum Hedlund for the
22   plaintiffs, correct?  If you know.
23       A.  I don't know what portion.  Certainly some of
24   them.
25       Q.  Now, this doesn't say anything about Mr. --

Page 148

1    I'm sorry -- Dr. Schiestl being involved in litigation
2    regarding glyphosate, which is what he's writing about
3    in this paper, does it?
4        A.  No, it doesn't.
5        Q.  He should have probably divulged that, don't
6    you think?
7            MR. WOOL:  Objection.  Foundation.
8        A.  I haven't read the disclosure and funding and
9    conflict of interest requirements of this journal.  It's
10   an Oxford journal, which is a large -- they have a wide
11   number of journals.  And I actually have looked at
12   their -- their conflict of interest requirements because
13   one of the journals that I publish nutrition stuff in is
14   an Oxford journal.
15       Q.  (By Mr. Malinowski)  Yeah.
16       A.  So I have a vague familiarity with it.  I had
17   nothing to do with this.  This is what they wrote.  I
18   don't know what their journal required of them, so I
19   really can't express an opinion on whether this was
20   responsive to --
21       Q.  Sure.
22       A.  -- the requirements.
23       Q.  But just to be clear, someone who's -- some
24   scientist who is disinterested who has not been involved
25   in this litigation and has no idea who this Baum Hedlund

Page 149

1    is or what -- how -- what their involvement is with the
2    plaintiffs on the glyphosate litigation, just reading
3    this would have no idea that Dr. Schiestl is consulting
4    with the plaintiffs in the glyphosate litigation, true?
5        A.  I think that's a fair read.
6        Q.  Thanks.
7            MR. MALINOWSKI:  Let's take a quick break, if
8        that's all right.
9            MR. WOOL:  Yeah.
10           (Recess taken from 2:59 p.m. to 3:09 p.m.)
11       Q.  (By Mr. Malinowski)  Okay.  And let's shift
12   gears a little bit here and talk about communications
13   between Monsanto and EPA.
14       A.  Okay.
15       Q.  Okay.  And you discussed some of that in your
16   report, actually, quite a bit.  And thinking
17   specifically about paragraph 328 in your report, in that
18   paragraph you write, quote, In cases where OPP and
19   Monsanto continue to disagree about a given study,
20   Monsanto will sometimes come around to agreeing with OPP
21   that certain study deficiencies should be corrected or
22   that a study protocol could somehow be improved.  Does
23   that sound familiar?
24       A.  Yes.
25       Q.  And, now, OPP is the Office of Pesticide

38 (Pages 146 to 149)

Charles Benbrook, PhD
September 13, 2018

Page 150

1   Programs at EPA?
2       **A.  Correct.**
3       Q.  Did you ever work at OPP?
4       **A.  No.**
5       Q.  Did you ever work at any government agency
6   responsible for regulating pesticides?
7       **A.  No.**
8       Q.  You're not saying that when a manufacturer is
9   attempting to register or reregister its herbicide or
10  pesticide, there should be no communications with OPP or
11  with EPA, right?
12      **A.  That's correct.  I don't say that.**
13      Q.  In fact, they -- CFR specifically asks for
14  that to happen, for there to be dialogue between the
15  registrant and the agency when there's issues that
16  arise, correct?
17      **A.  I can't think of a specific passage in the**
18  **Code of Federal Regulations that says that, but**
19  **certainly communication and interaction back and forth**
20  **between the registrants and OPP is essential to an**
21  **efficient carrying out of the pesticide regulatory**
22  **program, yeah.**
23          **(Exhibit Number 20 was marked.)**
24      Q.  (By Mr. Malinowski)  All right.  Let's look
25  at an excerpt from the CFR.  I've marked it as

Page 151

1   Number 20.  And this is for the CFR Sections 15 -- I'm
2   sorry -- 155.27 and 155.30.  Do you see those?
3       **A.  Yes, I do.**
4       Q.  And you're familiar with these CFR sections,
5   right?
6       **A.  Oh, boy.  I haven't -- I haven't read them**
7   **for a long time.  No, I'm not -- are you going to ask me**
8   **about this?**
9       Q.  I will.
10      **A.  Because I'll read them.**
11      Q.  Yeah, yeah.  We will --
12      **A.  Okay.**
13      Q.  I was just asking if -- you know, if you've
14  seen them before.  I mean, so 15 -- I'm sorry.  I don't
15  know why I keep saying 15.  155.30 is the section
16  regarding meetings and communications, correct?
17      **A.  Yes.**
18      Q.  And here in the CFR it notes, quote, EPA
19  personnel may, upon their own initiative or upon request
20  of any interested person or party, meet or communicate
21  with persons or parties outside of government concerning
22  a registration standard under development.  Do you see
23  that?
24      **A.  Yes.**
25      Q.  And that's normal to have this -- EPA either

Page 152

1   on its own communicate with a registrant or have the
2   registrant open up a line of communication with EPA,
3   correct?
4       **A.  Correct.**
5       Q.  And then up at the top of the second column
6   it says Purpose.  And the purpose of the -- is, quote,
7   Meetings and communications may be for the purpose of
8   receiving and considering information, exchanging views,
9   exploring factual and substantive positions, discussing
10  regulatory options, or for any other purpose deemed
11  appropriate by the agency in its deliberations
12  concerning development of a registration standard,
13  correct?
14      **A.  Yes.  Correct.**
15      Q.  This is -- and this governs EPA's rights and
16  responsibilities, correct?  The CFR?
17      **A.  Some of them relative to meetings and**
18  **communications with registrants.**
19      Q.  Okay.  So when you wrote in paragraph 328 of
20  your report that OPP -- In cases where OPP and Monsanto
21  continue to disagree about a given study, Monsanto
22  sometimes comes around to agreeing with OPP that certain
23  study deficiencies should be corrected or that a study
24  protocol should somehow be improved, you aren't
25  suggesting there was something wrong about that, were

Page 153

1   you?
2       **A.  No.**
3       Q.  And then in paragraph 329 of your report, you
4   write, quote, Monsanto would often then offer to
5   generate a replacement study on the understanding that
6   the status quo or some acceptable interim change in a
7   pesticide product's label provisions will suffice until
8   the replacement study is completed, submitted to OPP,
9   and reviewed.  Do you see that?
10      **A.  Yes.**
11      Q.  And, again, that's consistent with the CFR
12  mandate of open dialogue between the company and the
13  agency, correct?
14      **A.  It's one of the outcomes that has often been**
15  **brought about in the history of Roundup herbicides**
16  **following discussions between Monsanto and the Office of**
17  **Pesticide Programs.**
18      Q.  And there's nothing in EPA regulations that
19  say those kind of communications where the company says,
20  you know, Okay, well, we're still considering our
21  options here, that there's anything wrong with that,
22  right?
23      **A.  Correct.**
24      Q.  And there's nothing in the EPA regulations
25  that would make it improper for -- while that discussion

39 (Pages 150 to 153)

Charles Benbrook, PhD
September 13, 2018

---

Page 154

1  and dialogue is happening for the label to remain status
2  quo until something finalized -- can be finalized,
3  right?
4      A.  That's correct.
5      Q.  Okay.  The next paragraph, which I think is
6  330 in your expert report, you say -- or you write,
7  quote, In other cases, OPP has requested a replacement
8  study on some aspect of glyphosate toxicity, and
9  Monsanto has resisted, arguing the existing study is
10  valid and should satisfy agency data requirement.  Do
11  you see that?
12     A.  Yes.
13     Q.  And you can't point to anything in the EPA
14  regulations that say -- that would prohibit the company
15  from doing that and having taken that position, correct?
16     A.  No.  I mean, I -- yeah.  A company is free to
17  take that position if that is the course of action that
18  they want to pursue.
19     Q.  And can you identify, as you sit here today,
20  any instance at all of OPP or EPA demanding that
21  Monsanto conduct a replacement study and Monsanto
22  ultimately said, No, we're not going to do it?
23     A.  Well, certainly the replacement of the 1983
24  biodynamic mouse study was the -- sort of the classic
25  example, and in the context of this case, probably the

---

Page 155

1  most important example, sure.
2      Q.  And you can't point to a single document from
3  EPA saying, You need to redo that 1983 mouse study, can
4  you?
5      A.  Yes, I can.
6      Q.  Okay.  What is it?
7      A.  The 1986 registration standard, for example,
8  calls for a replacement rat and mouse two-year chronic
9  feeding study.
10     Q.  Rat and/or mouse, correct?
11     A.  No, no.  Rat and mouse.
12     Q.  Okay.  And that was done, right?
13     A.  The rat study was actually in progress at the
14  time the registration standard was issued, so it -- so
15  the -- there was no debate about replacing the rat
16  study, the invalid IBT rat study.  But Monsanto refused
17  to either replace the 1983 two-year mouse oncogenesis
18  study or chronic feeding study, and they also refused to
19  conduct the study specifically requested by OPP to
20  resolve the issues around the renal tubular adenomas in
21  the 1983 biodynamic study.
22     Q.  So in the 1986 EPA document you were
23  referring to, glyphosate was classified as Group D,
24  correct?  Cancer?
25     A.  It was classified as a possible human

---

Page 156

1  carcinogen, Group C.
2      Q.  No.  That was in the 1983, correct?
3      A.  Re-ask the question.
4      Q.  I'll come back to it.  I'm still looking at
5  Number 20 here.  This is the CFR excerpts.
6      A.  Okay.
7      Q.  It says EP -- I'm looking at Section 155.27.
8      A.  Okay.
9      Q.  Agency review of data.  Do you see that?
10     A.  I do.
11     Q.  It says, EPA will independently, or using the
12  services of disinterested contractors or consultants,
13  review available data in preparation for the development
14  of a registration standard and will be responsible for
15  drafting of the registration standard based on such data
16  reviews, correct?
17     A.  Correct.
18     Q.  The agency will not permit registrants to
19  prepare or assist in the preparation of data reviews or
20  other registration standard documents.  The agency may,
21  however, meet the registrants to -- meet with
22  registrants to discuss its pending reviews, decisions,
23  or documents in accordance with the meeting procedures
24  in Section 155.30 and the docketing procedures in
25  Section 155.32, correct?

---

Page 157

1      A.  Yes.  Read correctly.
2      Q.  And that's the CFR laying out the agency's
3  responsibility with respect to reviewing data and doing
4  their own independent analysis without relying on the
5  company submitting the registration to do it for them,
6  correct?
7      A.  Correct.
8      Q.  And just so we're clear, you're not making
9  any claims in this case that EPA -- that Monsanto
10  somehow went and sat in the shoes of EPA and did that
11  data review for EPA?  You understand EPA did the data
12  review itself, right?
13     A.  Correct.
14         MR. WOOL:  Objection.  Form.
15     Q.  (By Mr. Malinowski)  All right.  And then are
16  you opining that Monsanto prepared or pressured EPA with
17  respect to the Cancer Assessment Review Committee report
18  signed on October 1st of 2015 by 13 EPA scientists?
19     A.  Which date?  I'm sorry.
20     Q.  Let me restate the question.
21     A.  Okay.
22     Q.  Bad question.  You're familiar with the
23  October 2015 Cancer Assessment Review Committee?
24     A.  Right.
25     Q.  CARC, right?

---

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Charles Benbrook, PhD
September 13, 2018

Page 158

1    A. Yes, I am familiar with that.
2    Q. There's 13 EPA scientists signed on to that,
3  correct?
4    A. I believe that's the number.
5    Q. And you're not claiming Monsanto actually
6  prepared that and forced these EPA scientists to sign
7  it? You know that EPA did its own evaluation and signed
8  it themselves, right?
9       MR. WOOL: Objection. Form.
10    A. That's correct. I'm not claiming that.
11    Q. (By Mr. Malinowski) And EPA has released
12  several risk assessments on glyphosate's carcinogenicity
13  since that October 2015 CARC report? You're familiar
14  with those, right?
15    A. There have been a series of documents, yes.
16    Q. Including in September of 2016, OPP published
17  its glyphosate issue paper, "Evaluation of Carcinogenic
18  Potential"? You're familiar with that, right?
19    A. Yes.
20    Q. And that's the document where OPP concluded
21  that glyphosate was not a -- not a carcinogen in humans,
22  correct? One of them?
23    A. OPP concluded that glyphosate did not pose an
24  oncogenic risk to the general public based on the levels
25  of exposure that were to be expected from labeled uses

Page 159

1  of the herbicide.
2    Q. And that analysis was done by EPA without
3  Monsanto or any other registrant doing it for them,
4  correct?
5    A. Well, of course, much of the underlying data
6  had been originally generated by Monsanto, but OPP
7  conducted an independent evaluation of each of those
8  individual studies and then was solely responsible for
9  its own exposure assessment and risk assessment.
10    Q. And when they're doing these risk
11  assessments, they also determine whether or not
12  something additional needs to be added on to the label,
13  correct?
14    A. The risk assessment is done --
15    Q. Separate from that?
16    A. -- sort of separate.
17    Q. Okay.
18    A. If the risk assessment part of EPA identifies
19  a case where some segment of the population or some
20  aspect of the environment is likely to experience an
21  unreasonable adverse effect, then it becomes incumbent
22  on other parts of EPA to consider changes to the
23  label --
24    Q. Right.
25    A. -- that will mitigate that risk. And that

Page 160

1  process of trying to identify ways that a -- the use of
2  a pesticide can be changed via label instructions
3  without undermining the utility of the pesticide to the
4  ultimate users is a vital and important ongoing function
5  for EPA to do in concert with the registrants. But most
6  of those label changes are agreed to through this
7  process of, Well, how can we reduce the exposure?
8    Q. So I think we're saying the same thing and
9  I'm just not using the correct terminology. Let me see
10  if I can break it down a little bit, okay?
11       So EPA ultimately has to approve any changes
12  that happen with a registered pesticide or herbicide,
13  correct -- label?
14    A. EPA has to approve any amendment to an
15  existing registration or -- and, of course, it approves
16  the initial label for a pesticide, yes.
17    Q. Okay. And so EPA has to approve everything
18  included in the initial label for a pesticide, correct?
19    A. Correct.
20    Q. And if that initial label or subsequent
21  labels ever wants to be changed or amended somehow, EPA
22  has to specifically approve that proposed amendment as
23  well, correct?
24    A. That is correct.
25    Q. And so if a pesticide manufacturer wants to

Page 161

1  make a change -- a significant warnings change in the
2  label -- they want to add a warning that exposure to
3  this pesticide can cause heart failure -- significant
4  warning change, correct?
5    A. That would certainly be a significant one,
6  yes.
7    Q. They would have to go and submit a proposal
8  to EPA, and EPA would have to consider it, and it would
9  be up to the EPA whether they allowed that change to be
10  made or not, correct?
11    A. Ultimately EPA would have to approve any
12  label amendment.
13    Q. Yeah.
14    A. But I can't think of a single case in all my
15  40 years of tracking EPA where the Office of Pesticide
16  Program -- Programs refused to amend a label in a way
17  that provided additional guidance to pesticide users
18  about how to avoid potentially excessive exposures or
19  environmental harm or any adverse effect, whether to
20  people or the environment. But that is -- those sorts
21  of provisions are -- fall in the category of the
22  responsibility of registrants, and the EPA welcomes them
23  and essentially always approves them.
24    Q. Okay. I'm going to show you -- yeah. But
25  ultimately if someone wants to add a warning that this

41 (Pages 158 to 161)

Charles Benbrook, PhD
September 13, 2018

Page 162

1  certain compound might cause cancer in humans, EPA has
2  to agree with that and allow them to add that warning,
3  correct?
4      **A.  That they would have to approve the proposed**
5  **label amendment.**
6          **(Exhibit Number 21 was marked.)**
7      Q.  (By Mr. Malinowski)  I'll show you what I've
8  marked as 21.
9          MR. WOOL:  Thank you.
10     Q.  (By Mr. Malinowski)  And this document --
11 this is an EPA document, correct?
12     **A.  Yeah, from June 20th, 2007, on Roundup**
13 **PROMAX.**
14     Q.  Right, Roundup PROMAX.  And this is -- it
15 says, Notice of Pesticide Registration, correct?
16     **A.  Yeah, conditional.**
17     Q.  Okay.  But it's a registration --
18     **A.  It's a registration document, yeah.**
19     Q.  So this is when this -- Roundup PROMAX was
20 just first coming on the market because otherwise it
21 would be a reregistration, correct?
22     **A.  Correct.**
23     Q.  And it is this the -- are you familiar with
24 these kind of documents --
25     **A.  Yes.**

Page 163

1      Q.  -- from your work in this field?
2      **A.  Yes.**
3      Q.  And this would be something that would be
4  generated by the agency when they're evaluating a
5  request for a registration from a company trying to get
6  a product registered?
7      **A.  The first page and the back of the first**
8  **page.  The rest of it's generated by Monsanto.**
9      Q.  Okay.  The first page and the back of the
10 first page.  So the rest is generated by Monsanto,
11 correct?
12     **A.  Correct.**
13     Q.  And the rest, the Monsanto part, that's the
14 application basically, right?
15     **A.  No.  That's the label.**
16     Q.  That's the label?
17     **A.  The master label.**
18     Q.  The master label.  Okay.  So this is -- this
19 would be what the -- in this case Monsanto presented
20 what they think the label should look like, EPA reviews
21 it, correct?
22     **A.  But -- it's not just what it would look like**
23 **but the content of it -- all of the content.**
24     Q.  That's what I meant.
25     **A.  Okay.**

Page 164

1      Q.  That's what I meant.  This is -- let me be
2  more precise.  So starting at this -- the third page of
3  the Exhibit Number 21 where it says, Master Label for
4  EPA Reg -- Registration Number 524-New.  Do you see
5  that?
6      **A.  Yes.**
7      Q.  It has a handwritten 3/44 in the upper
8  right-hand corner?
9      **A.  Correct.**
10     Q.  That portion, 3/44, all the way to the end of
11 Exhibit 21, which is 44/44, that's Monsanto's proposed
12 label -- substantive Monsanto's proposed label for this
13 new registered product, correct?
14     **A.  That is correct.**
15     Q.  And the front of it here is EPA's cover sheet
16 saying, All right, this is conditionally approved,
17 correct?
18     **A.  They would call it a control sheet.**
19     Q.  Control sheet?
20     **A.  I think you're on the -- essentially the same**
21 **thing.**
22     Q.  And before EPA would affix this control
23 sheet --
24     **A.  Yeah.**
25     Q.  -- as you say, that's dated June 20th

Page 165

1  of 2007, it would have reviewed all the substance in
2  this proposed label, made itself comfortable with what
3  it says, and approved it, correct?
4      **A.  And I think -- I think this is the final**
5  **notice, right?  I'm looking at the. . .**
6          **The control sheet signed by EPA -- by the EPA**
7  **product manager and dated 6/20/07 states that this**
8  **product is conditionally registered in accordance with**
9  **the FIFRA requirements based on two conditions, which**
10 **are laid out.  And that's why it's a conditional**
11 **registration as opposed to a non -- a final**
12 **registration.**
13     Q.  And so once the -- well, you tell me.  You're
14 the expert.  So when there's a conditional registration
15 like this and they give you two conditions, it's
16 incumbent on the company to make those conditions and
17 redo the label; is that fair enough?  Or --
18     **A.  No.  Well, perhaps -- so, for example, in the**
19 **label in the very first line it says, Master Label for**
20 **EPA Reg. Number 524-New.  The reason it says "new" is**
21 **they don't know what the number is until it's approved.**
22     Q.  Gotcha.
23     **A.  So that's the second condition, Add the**
24 **phrase to your label before you release the product.**
25 **So, see, it says 524-579.  They're going to replace the**

42 (Pages 162 to 165)

Charles Benbrook, PhD
September 13, 2018

Page 166

1  letters N-E-W with the numbers 579. So that's one of
2  them.
3      Q.  Okay. Go ahead.
4      A.  And the other change is, Submit or cite all
5  data required for registration of your product when the
6  agency requires all registrants of similar products --
7  okay. So that's a very generic requirement.
8      Q.  All right.
9          (Exhibit Number 22 was marked.)
10     Q.  (By Mr. Malinowski) So I'm handing you
11 Number 22 now, and that's just a couple weeks, really,
12 later, right? It says 11/1/07 at the top, correct?
13     A.  Yes.
14     Q.  And I think --
15     A.  So it was June.
16     Q.  Right. But then if you look at the bottom,
17 it says, Submitted August 6th, 2007, right?
18     A.  Okay. Yes.
19     Q.  You know, a month later. And if you look at
20 the second page of that, it now says, Master Label for
21 Reg. Number --
22     A.  Right.
23     Q.  -- 524-579.
24     A.  Okay. So they've added in the 579.
25     Q.  So that's Monsanto complying with that

Page 167

1  specific --
2      A.  Right.
3      Q.  -- condition --
4      A.  That's correct.
5      Q.  -- which is what they're supposed to do,
6  right?
7      A.  Correct.
8      Q.  Okay.
9          (Exhibit Number 23 was marked.)
10     Q.  (By Mr. Malinowski) And let me show you
11 Number 23. We can go through this pretty quickly.
12         So 23, if you look at the -- if you flip the
13 page to the first -- you know, the first page on 3/49.
14     A.  Just --
15     Q.  Okay.
16     A.  Okay.
17     Q.  Okay. And you see at the top there it says,
18 Master label for, and it's got the same registration
19 number as the ones we just looked at, correct?
20     A.  Yes.
21     Q.  524-579. It says Ranger [sic] PROMAX, right?
22     A.  Correct.
23     Q.  And so this is a document from July 1st of
24 2009, if you look at the first page, EPA, correct?
25     A.  The cover letter --

Page 168

1      Q.  Yeah.
2      A.  -- from EPA back to Monsanto is dated July 1,
3  2009, correct.
4      Q.  And so, again, this is the process we were
5  talking about before, which is if there's going to be a
6  label change, the company submits a proposal, EPA looks
7  at it, considers it, tells them yes or no or these are
8  the conditions, and then has them fill the conditions,
9  correct?
10     A.  That is correct.
11     Q.  And just a couple more of these. I just want
12 to make sure.
13         (Exhibit Number 24 was marked.)
14     Q.  (By Mr. Malinowski) I'll give you Number 24.
15     MR. WOOL:  Thank you.
16     Q.  (By Mr. Malinowski) Number 24 is a -- on the
17 first page is an EPA cover letter with a handwritten
18 date August 17th, 2009. Do you see that?
19     A.  Correct.
20     Q.  And Jim Tompkins, who is in the herbicide
21 branch of EPA, signed this, correct?
22     A.  Correct.
23     Q.  And he says, The supplemental label is
24 acceptable. The supplemental label must be incorporated
25 to the master label within 18 months from the date of

Page 169

1  this letter, correct?
2      A.  Correct.
3      Q.  And then attached to it is the supplemental
4  label that ought to be used, correct?
5      A.  Correct.
6      Q.  And this would be normal -- a normal way in
7  order to get a label change approved by the registrant,
8  correct?
9      A.  Yes, sir.
10     Q.  Okay.
11         (Exhibit Number 25 was marked.)
12     Q.  (By Mr. Malinowski) And Number 25. There
13 you go. And this is the actual label. It looks like
14 it's from 2010.
15     A.  2010.
16     Q.  Yeah. But this is the 2010 label that was in
17 place in 2010 for Roundup PROMAX Herbicide, correct?
18     A.  Yes.
19     Q.  Okay. Every statement in here, in order to
20 not constitute misbranding, had to have been approved --
21 specifically approved by EPA, correct?
22     A.  Yes.
23     Q.  Okay.
24     A.  Just to be clear on that -- my last response,
25 had Monsanto made a change in this label relative to the

43 (Pages 166 to 169)

Charles Benbrook, PhD
September 13, 2018

Page 170

1    earlier approved label, that would be regarded by OPP as
2    not acceptable.
3        Q.  Misbranding, correct?
4        A.  I guess they would call it misbranding.  I'm
5    not sure -- that's certainly not the only basis for a
6    label being misbranded, but OPP would certainly question
7    any additional changes made without their review and
8    approval.
9        Q.  But a company -- they don't want -- OPP, EPA,
10   they don't want a company -- a pesticide company or
11   organics company, anyone -- going out and just changing
12   the label on its own without consulting EPA and getting
13   their approval?  That would be frowned upon at least,
14   correct?
15       A.  Absolutely.
16       Q.  It would be illegal, wouldn't it?
17       A.  Yes.
18       Q.  Okay.  The other thing I wanted to ask you
19   about quickly, there's this notion -- and you put it in
20   your expert report around page 9.  I think it's
21   paragraph 23.  You said -- you referenced that Monsanto
22   didn't do enough to counter the often-heard claim that
23   Roundup is safe enough to drink.  Do you remember that?
24       A.  Yes.
25       Q.  You didn't see that in any company documents,

Page 171

1    did you?  The allegation that Roundup may be -- is safe
2    to drink?
3        A.  Oh, it comes up, I'd say, several times in
4    various e-mail chains and reports on meetings.  It's
5    a -- it's something that is -- that several Monsanto
6    officials were aware of, some Monsanto officials were
7    quite concerned about and thought that they should
8    actually do more than they had to discourage people from
9    doing it.
10           It was -- it's something that they were aware
11   it was being said by some people.  And some people
12   thought it was fine because they were convinced that
13   Roundup is nontoxic, and some of the other people were
14   concerned about it and felt that it really was not a
15   good idea for somebody to drink Roundup.
16       Q.  Well, you haven't seen any marketing material
17   that markets glyphosate as something that people can
18   drink, correct?
19       A.  Monsanto-drafted marketing material?  No.
20       Q.  Right.  That's what I'm talking about.  You
21   haven't seen any Monsanto documents that are sent out
22   into the public saying, Go ahead and drink this, have
23   you?
24       A.  No.
25       Q.  You haven't seen any instance anywhere where

Page 172

1    someone -- an official from Monsanto told members of the
2    public, Go ahead and drink this, have you?
3        A.  There -- there's certainly evidence in the
4    record of Monsanto salesmen and people involved in
5    marketing, people involved with making presentations
6    about the products that are aware that that has been
7    said and who did not take it upon themselves to
8    discourage people from doing that.
9        Q.  Have you talked to any of those people?
10       A.  Huh?
11       Q.  Have you talked to any of those people?
12       A.  No.
13       Q.  Have you -- and you can't identify a single
14   member of the public that was informed by anyone
15   associated with Monsanto, Go ahead and drink this
16   product, can you?
17       A.  Well, Lee Johnson was told by his supervisor
18   that his supervisor has been told by the company that he
19   bought -- that the school district bought the Roundup
20   products from that it was safe enough to drink.
21       Q.  Okay.  And his supervisor was not a Monsanto
22   employee, was he?
23       A.  His supervisor was not a Monsanto employee,
24   nor was the regional distributor.
25       Q.  And the regional distributor and

Page 173

1    Mr. Johnson's employer, they didn't identify any
2    specific person from Monsanto by name who said, Go ahead
3    and drink this, did they?
4        A.  I'm not aware that they did.
5        Q.  And you can't identify anyone either,
6    correct?
7        A.  That is a Monsanto employee?
8        Q.  That has said that to members of the public.
9            MR. WOOL:  You said to drink Roundup?
10           MR. MALINOWSKI:  Right.
11       A.  To drink Roundup.  I'm trying --
12       Q.  (By Mr. Malinowski)  I'm talking about your
13   personal knowledge.  I'm not talking about looking at
14   documents and drawing inferences.
15       A.  No.  I've never been in a meeting where a
16   Monsanto employee encouraged me or anyone else in the
17   meeting to drink Roundup.
18       Q.  Okay.  Let's shift gears here a little bit
19   again.  I don't have too much more.  I promise.
20           (Exhibit Number 26 was marked.)
21       Q.  (By Mr. Malinowski)  I'm handing you
22   Number 27 [sic].  Number 27 is a document dated
23   December 12, 2017, from the EPA, correct?
24       A.  Yes.
25       Q.  And the subject is, quote, Response to

44 (Pages 170 to 173)

Charles Benbrook, PhD
September 13, 2018

Page 174

1 Final -- the Final Report of the Federal Insecticide,
2 Fungicide, and Rodenticide Act Scientific Advisory
3 Panel, FIFRA SAP, on the Evaluation of the Human
4 Carcinogenic Potential of Glyphosate, correct?
5    A. Yes.
6    Q. And it's from -- and it's Greg Akerman --
7 Gregory Akerman and Monique Perron are listed there in
8 the front, right?
9    A. Correct.
10    Q. They're with the Health Effects Division of
11 the EPA?
12    A. Correct.
13    Q. You've seen this document before, right?
14    A. Yes.
15    Q. This is a response -- EPA's response to the
16 scientific advisory board -- I'm sorry -- scientific
17 advisory panel's comments to them, correct?
18    A. Correct.
19    Q. You're aware that the 2005 EPA guidelines for
20 carcinogenic risk assessment are intended as guidance
21 only rather than a checklist for determining whether
22 tumor findings are related to treatment, true?
23    A. Yes, in general -- as a general statement.
24    Q. And these EPA cancer guidelines emphasize how
25 important to is to weigh multiple lines of evidence in

Page 175

1 reaching conclusions regarding human carcinogenic
2 potentials, correct?
3    A. Correct.
4    Q. It's going to take -- EPA, when it does its
5 evaluation of human carcinogenic potential, it's going
6 to take into account biological and statistical
7 significance usually, right?
8    A. Yes.
9    Q. And the -- this SAP, the scientific advisory
10 panel, it reviewed the carcinogenicity -- the alleged
11 carcinogenicity or human carcinogenic potential of
12 glyphosate in 2016, didn't it?
13    A. The SAP meeting --
14    Q. Yeah.
15    A. -- was in -- yeah, it was in 2016.
16    Q. And that purpose was to review the potential
17 for human carcinogenic --
18    A. Correct.
19    Q. -- potential, correct? I'm looking at
20 page 10 of 12 here.
21    A. Okay. I'm at page 10 of 12.
22    Q. Before I do that, so this -- EPA reviewed the
23 SAP's recommendations then published this response,
24 correct?
25    A. Correct.

Page 176

1    Q. And that's normal practice that's always
2 happened, correct? Right?
3    A. Correct.
4    Q. Okay. If you say -- if you look down towards
5 the bottom, it says, Summary of Recommendation. Do you
6 see that?
7    A. Yes.
8    Q. That's in the section Data Evaluation of
9 Genetic Toxicity, correct?
10    A. Yeah. Correct.
11    Q. And EPA here says, One panel member -- quote,
12 One panel member encouraged the agency to consider two
13 key human biomonitoring studies in their evaluation of
14 general toxicity, specifically studies by Bolognesi,
15 B-o-l-o-g-n-e-s-i, et al., 2009, and Koureas,
16 K-o-u-r-e-a-s, et al., 2014, correct?
17    A. Yes. You read it correctly.
18    Q. And EPA's response -- it actually says in
19 bold, EPA Response, and then it says, quote, These
20 studies were considered by the agency in the issue paper
21 presented to the SAP and were assigned a low-quality
22 ranking. Do you see that?
23    A. That's what it says, correct.
24    Q. It says, Bolognesi, 2009, was assigned a
25 low-quality ranking based on the considerations outlined

Page 177

1 in Figure 3.1, correct?
2    A. Where is Figure 3.1? Is it in here?
3    Q. I'll get to it. But do you see where I'm
4 reading? I'm just kind of directing you to where I'm
5 reading --
6    A. Okay.
7    Q. -- all right? Now -- and then further down
8 in that paragraph at the end going over the top,
9 you see it says, The agency concluded that studies
10 assigned a low-quality ranking do not provide reliable
11 information to evaluate associations between glyphosate
12 exposure and genotoxic or cancer outcomes. Do you see
13 that?
14    A. That's what it says, correct.
15    Q. And so Bolognesi, 2009, that's one that you
16 actually testified at trial, I think, about, didn't you?
17    A. I was not asked --
18    Q. Yeah. It's in your report though?
19    A. It's in my report, correct.
20    Q. And same with -- same with the Koureas paper,
21 which was also a sign of low-quality ranking due to the
22 questionable sample size. Do you see that?
23    A. Yeah. That's what it says.
24    Q. Lack of information regarding the number of
25 exposed subjects, the use of an immunoassay that is less

45 (Pages 174 to 177)

Charles Benbrook, PhD
September 13, 2018

Page 178

1  specific than other methods for measuring the biomarker
2  of interest, and the outcome evaluated does not measure
3  the consequence of genetic damage. Do you see that?
4  **A. Yes, I do.**
5  Q. That's all referring to the Koureas, 2014,
6  study, correct?
7  **A. That's correct.**
8  Q. And it's important to have information
9  regarding the number of exposed subjects? You'd agree
10  with that, correct?
11  **A. Yes.**
12  Q. It's important to use an immunoassay that is
13  specific to the methods for measuring the biomarker of
14  interest, correct?
15  **A. You know, this statement by EPA about the**
16  **fact that this team used an immunoassay that's less**
17  **specific than other methods, you know, whether the fact**
18  **that there might be a more specific bioassay available,**
19  **what -- the degree to which that renders the findings of**
20  **the study not useful, I'm not prepared to speak to right**
21  **now. It's a -- it could be a very technical argument.**
22  **I -- you know, I -- certainly the Bolognesi**
23  **study is an important one in the history of the**
24  **evaluation of the genotoxicity of glyphosate and**
25  **glyphosate-based herbicides. I don't remember as much**

Page 179

1  **about the Koureas, et al. study. If we're going to talk**
2  **about it, you need to put it in front of me and let me**
3  **refresh my memory about it.**
4  Q. But ultimately EPA in 2017 concluded both
5  Bolognesi and Koureas were of low quality and not
6  sufficient to provide reliable information regarding
7  evaluating the association between glyphosate exposure
8  and genotoxic or cancer outcomes, right?
9  **A. You've correctly read what they have written,**
10  **yes.**
11  Q. You take issue with that. I understand that.
12  **A. I'm not taking a position on it without**
13  **reading in detail what the scientific advisory panel**
14  **said about the studies and probably going and looking at**
15  **the transcript. This is a short and cryptic evaluation**
16  **of a -- probably a day-long meeting, and many of the**
17  **issues are quite complicated. And, you know, just**
18  **glancing at it, you know, it's clear that there -- there**
19  **wasn't a unanimity of opinion on the scientific advisory**
20  **panel itself about some of these matters.**
21  **So, you know, I think what the agency says in**
22  **this document is an accurate reflection of their --**
23  **their judgments at the time, but whether I -- I agree**
24  **with them or whether scientists who are experts in these**
25  **genotoxicity assays would argue otherwise, I'm not --**

Page 180

1  **I'm not in a position to argue one way or another on at**
2  **this time.**
3  Q. Okay. And you -- I think we already
4  established, you did cite the Bolognesi study in your
5  expert report, correct?
6  **A. I believe I did. I certainly talked about**
7  **genotoxicity, and the Bolognesi study -- I don't**
8  **remember the exact paragraphs.**
9  Q. Okay.
10  **A. It's certainly part of the reviews that I**
11  **talk about so, yes, it's part of the overall database.**
12  (Exhibit Number 27 was marked.)
13  Q. (By Mr. Malinowski) So I've handed you what
14  I think is the 2009 Bolognesi paper, correct?
15  **A. Correct.**
16  Q. And identified as Exhibit Number 27 to this
17  deposition, right?
18  **A. Correct.**
19  Q. If you look at the very end of this, Mr. --
20  I'm sorry -- Dr. Benbrook, do you see the last paragraph
21  there?
22  **A. Is this before References?**
23  Q. Yeah, right before References?
24  **A. Yes. Okay. I see it.**
25  Q. The authors of Bolognesi in 2009 conclude,

Page 181

1  quote, Further studies are needed to better characterize
2  the potential genotoxic risk associated with the
3  application of glyphosate for sugarcane maturation. Do
4  you see that -- where I'm reading?
5  **A. Yes.**
6  Q. Then they say, The smaller number of subjects
7  recruited in this study and small amount of information
8  about the exposure precluded any conclusions, correct?
9  **A. Correct.**
10  Q. The authors who actually looked at the data
11  and wrote this study concluded that they could not --
12  they were precluded from making any conclusions due to
13  the small number of subjects and the small amount of
14  information provided, correct?
15  **A. Correct.**
16  Q. And then at the end it says -- I'll read the
17  whole sentence. Many pesticides are used in
18  conventional agriculture in Colombia and many pesticides
19  are used in the production of coca -- and it cites a
20  couple studies -- however -- this is the authors
21  again -- quote, There is not sufficient information to
22  correlate the frequency of MN -- what does MN mean?
23  **A. It's micronuclei changes. That's the measure**
24  **of genotoxicity that's the subject of the paper.**
25  Q. All right. So let me read it again. Quote,

Charles Benbrook, PhD
September 13, 2018

Page 182

1  There is not sufficient information to correlate the
2  frequency of micronuclei -- genotoxicity, basically --
3  to the pesticide exposure, correct?
4  **A.  That's what it says, yes.**
5  Q.  It's not -- this study is not concluding
6  glyphosate causes genotoxic changes?  It's saying
7  actually the opposite.  They can't make that claim based
8  on this study, right?
9  MR. WOOL:  Objection.  Form.
10  **A.  I wouldn't agree with the phrasing of the**
11  **question.  I think your reading of what they say is**
12  **accurate, but they do not state that, based on their**
13  **study, glyphosate does not cause.  They're uncertain**
14  **about that.  They're unable to definitively sort out the**
15  **impact of exposure to glyphosate from other factors.**
16  Q.  (By Mr. Malinowski)  All right.  Well, let me
17  try to rephrase it in a better way then.
18  The authors of Bolognesi 2009 concluded they
19  didn't have sufficient information to say one way or
20  another whether glyphosate causes genotoxic changes,
21  correct?
22  **A.  Correct.**
23  Q.  Do you have a flight leaving today?
24  **A.  Pardon me?**
25  Q.  Do you have a flight leaving today?

Page 183

1  **A.  No.**
2  Q.  Okay.  Let me look at my notes.  I might be
3  able to wrap it up.  There's a bunch of other stuff I
4  could ask you, but I might be able to stop right here,
5  okay?
6  MR. WOOL:  Do you want to go off the record
7  for a minute?
8  MR. MALINOWSKI:  Yeah.
9  (Recess taken from 3:55 p.m. to 3:58 p.m.)
10  MR. MALINOWSKI:  Doctor, I've looked over my
11  notes.  I think that's all I have for now.  Again, thank
12  you for being patient with us getting a court reporter
13  here.
14  THE DEFENDANT:  Yeah.
15  MR. MALINOWSKI:  I appreciate it.
16  THE DEFENDANT:  Thank you, sir.
17  MR. WOOL:  And I'm going to have just a
18  couple of follow-up questions real quick.
19  THE DEPONENT:  Okay.
20  EXAMINATION
21  BY MR. WOOL:
22  Q.  Okay.  If you can, you've got Exhibit 2 in
23  front of you, which is the expert report you authored in
24  the Dewayne Johnson versus Monsanto case, correct?
25  **A.  Yes.**

Page 184

1  Q.  And if you turn, I believe, to the end of
2  that report, it has a signature date of December 21st of
3  2017, correct?
4  **A.  Correct.**
5  Q.  And it is now September 13th, 2018, correct?
6  **A.  Correct.**
7  Q.  And you have read and reviewed a number of
8  articles on the topic of glyphosate and glyphosate
9  and/or Roundup and non-Hodgkin's lymphoma since you
10  authored this report; is that correct?
11  **A.  Correct.**
12  Q.  And, in fact, as you sit here today, you are
13  offering opinions in the James Adams, et al. versus
14  Monsanto case, correct?
15  **A.  Correct.**
16  Q.  Now, Doctor, you were asked a series of
17  questions about articles -- or about a 2000 article on
18  Williams, et al. and then a Kier and Kirkland article
19  from -- 2013?
20  **A.  '13, correct.**
21  Q.  Okay.  And do you remember that line of
22  questioning?
23  **A.  I do.**
24  Q.  And you were asked whether you could identify
25  any words written in either of those articles that were

Page 185

1  authored by Monsanto employees, correct?
2  **A.  I was asked that, yes.**
3  Q.  And in providing your opinions, you've seen a
4  number of internal Monsanto documents, correct?
5  **A.  Yes.**
6  Q.  And it was my impression of your testimony,
7  so correct me if I'm wrong, that those documents
8  indicated to you that portions of those two articles
9  that were discussed were not authored by the authors on
10  the articles themselves?
11  **A.  That's correct.**
12  Q.  Okay.  And specifically with respect to the
13  Kier and Kirkland article, you were asked if you could
14  point to any word within the article that was not
15  written by either Larry Kier or David Kirkland, correct?
16  **A.  Correct.**
17  Q.  And you could not do that because you didn't
18  have the documents in front of you that showed --
19  **A.  I --**
20  Q.  -- who wrote what, correct?
21  **A.  I didn't have the original outline, the first**
22  **draft, I didn't have the file from David Saltmiras of**
23  **the original language that went into the first draft, or**
24  **maybe it was the second draft.  So, no, I don't have**
25  **the -- I don't have access to the complete record of how**

47 (Pages 182 to 185)

Charles Benbrook, PhD
September 13, 2018

Page 186

1  the document was put together and put into final form.
2      Q.  Let me ask you to grab Exhibit 18, which is
3  the Kier and Kirkland article, please.
4      A.  Got it.
5      Q.  And if you will, turn to page 311, which is
6  the declaration of interest section and the references,
7  please.
8      A.  Okay.  I'm there.
9      Q.  Okay.  And the last sentence of the
10 declaration of interest states, quote, The authors had
11 sole responsibility for writing -- for the writing and
12 content of the paper, and the interpretations and
13 opinions expressed in the paper are those of the authors
14 and may not necessarily be those of the member companies
15 of the Glyphosate Task Force, correct?
16     A.  Correct.
17     Q.  All right.  It doesn't mention that any of
18 the writing content came from an individual named David
19 Saltmiras, does it?
20     A.  No, it doesn't.
21     Q.  And a scientist reading this declaration of
22 interest section wouldn't know that an individual named
23 David Saltmiras actually did write words of the Kier and
24 Kirkland article?
25         MR. MALINOWSKI:  Object to the form.

Page 187

1      A.  That's correct.
2      Q.  (By Mr. Wool)  Okay.  I am going to hand
3  you --
4          MR. WOOL:  Counsel, if you wouldn't mind
5  handing me an exhibit sticker.  I think we're on 28.
6          (Exhibit Number 28 was marked.)
7      Q.  (By Mr. Wool)  And so what I'm handing you is
8  an e-mail from December 6, 2012.  It's an internal
9  Monsanto e-mail.  Have you seen this before?
10     A.  Yes.
11     Q.  All right.  And this is an e-mail from Larry
12 Kier to David Saltmiras, correct?
13     A.  Correct.
14     Q.  All right.  And you will see at the bottom of
15 the first section from Larry Kier about four lines from
16 the signature, he states, quote, I'm all right with the
17 changes on pages 2, comma, 42, and 46, correct?
18     A.  Yes.
19     Q.  And that is an e-mail send to David
20 Saltmiras, correct?
21     A.  Right.
22     Q.  And if you look down at David Saltmiras's
23 e-mail near the bottom, you'll see a note that says,
24 Page 2, added human and environment to the end of the
25 abstract, correct?

Page 188

1      A.  Correct.
2      Q.  Okay.  Now, if you look at the abstract from
3  the Kier and Kirkland article, which, again, is
4  Exhibit 18, at the very end, the last three or four
5  words state, Human or environmental exposures, correct?
6      A.  Correct.
7      Q.  And so is it your belief, sitting here today,
8  that those words were written by David Saltmiras?
9      A.  Yes.
10     Q.  And if you look at the e-mail, which is
11 Exhibit 28, you will see at the top there is what is
12 referred to as an attachment, which I didn't print out
13 for you, but based on the content of the e-mail, it
14 would appear that that has the changes that David
15 Saltmiras indicates in the bottom of his e-mail,
16 correct?
17     A.  Yes.
18     Q.  Okay.  And -- okay.  You were asked some
19 questions about misbranding.  Do you remember that?
20     A.  Yes.
21     Q.  And I believe you agreed that misbranding is
22 illegal, correct?
23     A.  Yes.
24     Q.  And misbranding, as defined by FIFRA, also
25 includes labels that do not contain a warning statement

Page 189

1  that is adequate to reflect adverse effects on humans or
2  the environment, correct?
3      A.  Well, it's the responsibility of the
4  pesticide registrant to include on the label use
5  instructions and guidance and restrictions and warnings
6  that, taken together, if adhered to, will prevent
7  unreasonable adverse effects on man or the environment.
8          THE REPORTER:  Adverse what on the
9  environment?
10         THE DEPONENT:  Unreasonable adverse effects
11 on man or humans or the environment.  So it is the -- it
12 is the company's direct responsibility to assure that
13 the label instructions and requirements and restrictions
14 accomplish that goal.  And in the event of a label not
15 accomplishing that goal, it -- the label can be
16 characterized as misbranded.
17     Q.  (By Mr. Wool)  And it can be misbranded
18 regardless of whether the EPA approved the label or not,
19 correct?
20     A.  Oh, absolutely.
21         MR. WOOL:  That's it.
22         MR. MALINOWSKI:  Just a couple follow-ups.
23             EXAMINATION
24 BY MR. MALINOWSKI:
25     Q.  So EPA certainly has not determined that the

48 (Pages 186 to 189)

Charles Benbrook, PhD
September 13, 2018

## Page 190

1 label for Roundup or Ranger PRO is misbranded because it
2 doesn't include a warning for cancer in the label, has
3 it?
4 **A. That's correct.**
5 Q. It could have if it wanted to, but it has
6 actually gone the opposite way and said, We think that
7 there's no evidence of oncogenicity in humans, correct?
8 MR. WOOL: Objection. Form.
9 **A. The EPA has not, to my knowledge, issued an**
10 **oncogenic risk assessment of either Ranger PRO or Ranger**
11 **PRO concentrate, which are so-called IT&O products that**
12 **are not intended for use on food crops. It's a -- so**
13 **they simply have not made that evaluation.**
14 **So there -- the -- they would have no basis**
15 **to conclude whether or not use or exposure to those**
16 **products pose a cancer risk to a mixer loader or an**
17 **applicator, that that's not -- that's not what their**
18 **detailed cancer risk assessment focused on. It**
19 **focused -- the detailed cancer risk assessment was the**
20 **exposures incurred by the general public, predominantly**
21 **through residues in food and secondarily in -- through**
22 **drinking water and other beverages.**
23 Q. (By Mr. Malinowski) And they've said, both
24 in 2017 and now in -- well, in 2017, EPA concluded
25 there's no -- there's not sufficient evidence of Roundup

## Page 191

1 or Ranger PRO -- I'm sorry -- of glyphosate showing any
2 oncogenic properties in humans, correct?
3 MR. WOOL: Objection. Form.
4 **A. No.**
5 Q. (By Mr. Malinowski) Or risks in human?
6 **A. That's not what they say.**
7 Q. Okay.
8 **A. They say that -- their conclusion is that the**
9 **existing evidence does not support oncogenic risk to**
10 **people based on the typical and expected levels of**
11 **exposure from the currently labeled uses. And so**
12 **that's -- it's a -- and the entire analysis, again, is**
13 **based on the exposures through the diet and/or beverages**
14 **for the general public.**
15 **There is essentially no risk assessment in**
16 **the document that's focused on mixer loader applicator**
17 **exposures for these non-agricultural uses. It's not --**
18 **it's just not addressed.**
19 Q. Sure. That's not what I'm talking about.
20 I'm saying, I think, exactly what you're saying, which
21 is there's no evidence of increased risk of oncogenic
22 risks for members of the general public --
23 **A. Correct.**
24 Q. -- is what they've said, correct?
25 **A. Yeah, that's what they say.**

## Page 192

1 MR. WOOL: Objection to form of the question.
2 Q. (By Mr. Malinowski) And just going back to
3 Exhibit 28, which is --
4 **A. The e-mail.**
5 Q. -- the e-mail that you just discussed with
6 counsel. Now, in -- and referring back to the -- what
7 number is -- is it 18?
8 MR. WOOL: Kier and Kirkland is 18, if that's
9 what you're --
10 MR. MALINOWSKI: Kier and Kirkland is 18.
11 Q. (By Mr. Malinowski) So you read the -- the
12 acknowledgments at the back were -- we went over it
13 before, I thought, but, The authors would like -- this
14 is the Kier and Kirkland article. Quote, The authors
15 would like to thank the following individuals for their
16 contributions to this work by providing regulatory
17 studies and their thoughtful review of the manuscript.
18 Do you see that?
19 **A. Yes.**
20 Q. And it lists out David Saltmiras, correct?
21 **A. Correct.**
22 Q. And, of course, if you're reviewing
23 something, you don't just read it and say nothing,
24 right? If someone asks you to review a scientific
25 article, they're asking you to comment on it, correct?

## Page 193

1 **A. Correct.**
2 MR. WOOL: Objection. Form.
3 Q. (By Mr. Malinowski) And that's what they
4 did -- and that's what Mr. -- or Dr. Saltmiras is doing
5 here on December 6th, 2012? He's commenting on a draft
6 of this manuscript, correct?
7 **A. Commenting and suggesting the addition of**
8 **language.**
9 Q. But you don't -- well, it says, Added human
10 and environmental. That's the -- that's on page 2,
11 right?
12 **A. Correct.**
13 Q. That's the -- what we talked about in the
14 abstract on Exhibit 18, correct?
15 **A. Yes.**
16 Q. It says, quote, Human and environmental. Do
17 you see that -- closed quote?
18 **A. Yes.**
19 Q. If you look at the abstract, it says what?
20 Present significant -- it says, Glyphosate and typical
21 GBFs do not appear to present significant genotoxic risk
22 under normal conditions of human or environmental
23 exposures, right?
24 **A. Correct.**
25 Q. He doesn't use the same language. He changed

49 (Pages 190 to 193)

Charles Benbrook, PhD
September 13, 2018

Page 194

1 the suggestion that was suggested by Dr. Saltmiras,
2 doesn't he? "Human and" is actually --
3 **A. Instead of --**
4 Q. -- very different than "human or," isn't it?
5 **A. Not hugely different, but --**
6 Q. Well, it's -- it can be -- it can actually be
7 opposite if -- depending on what you're comparing,
8 correct?
9 **A. I think most people would read the phrase**
10 **"human and environmental risks" as suggesting that it**
11 **could be one or the other.**
12 Q. Okay.
13 **A. You know, if it were assuredly both, it would**
14 **say "both human and environmental."**
15 Q. So, in any event, this is -- this e-mail is
16 showing a discussion between Dr. Kier, who authored the
17 study, and Dr. Saltmiras where Dr. Saltmiras is making
18 suggestions that Dr. Kier is saying whether or not he
19 agrees with them, right?
20 **A. Right. This is the --**
21 Q. So he could say, No, I'm not going to do
22 that, and there's no -- nothing in this article -- or
23 I'm sorry -- in this e-mail in Number 28 where
24 Dr. Saltmiras is trying to twist Dr. Kier's arm and say,
25 You better put this in. It's just, Here's a suggestion.

Page 195

1 He can take it or leave it, right?
2 MR. WOOL: Objection. Form.
3 **A. I don't know what was in Larry Kier's mind in**
4 **responding to this round of suggestions from Saltmiras.**
5 MR. MALINOWSKI: All right. Thank you.
6 That's all.
7 MR. WOOL: Well, let me just ask a couple
8 more questions.
9 MR. MALINOWSKI: Okay.
10 EXAMINATION
11 BY MR. WOOL:
12 Q. Okay. You were just asked about the Kier and
13 Kirkland article and I believe the declaration of
14 interest section, as well as the acknowledgments,
15 correct?
16 **A. Correct.**
17 Q. And you are asked -- specifically counsel
18 intimated that review of an article involves giving
19 comments and/or thoughts. Do you remember those
20 questions?
21 **A. Yes, sir.**
22 Q. Okay.
23 (Exhibit Number 29 was marked.)
24 Q. (By Mr. Wool) So I'm going to hand you what
25 is being marked as Exhibit Number 29. I'm sorry about

Page 196

1 the quality of this, but this was taken from, I think,
2 David Saltmiras's deposition. And we see this document
3 is dated 2/29 of '12, correct?
4 **A. Yes.**
5 Q. Okay. And you will see that under the
6 section of, Has this information been publicly disclosed
7 previously, the sort of statement that's written there
8 is, This manuscript reviews glyphosate genotoxicity
9 publications since the Williams, et al., 2000 review.
10 Do you see that?
11 **A. Yes, sir.**
12 Q. Okay. And under Title it says, "Review of
13 Genotoxicity of Glyphosate and Glyphosate-Based
14 Formulations, correct?
15 **A. Yes.**
16 Q. And that's actually the same title of
17 Exhibit 18, which is the Kier and Kirkland article,
18 isn't it?
19 **A. Yes, exactly the same.**
20 Q. And if you look at the authors, it says David
21 Saltmiras and Larry Kier, who is listed as a consultant,
22 correct?
23 **A. Correct.**
24 Q. However, on Exhibit 18, David Saltmiras's
25 name does not appear, does it?

Page 197

1 **A. No, it doesn't.**
2 Q. And on Exhibit 29 --
3 MR. MALINOWSKI: I'm sorry. You said
4 Exhibit 17 or 18?
5 MR. WOOL: Oh, I'm sorry. I meant 18. If I
6 said 17, I'm sorry.
7 THE DEPONENT: No, you said 18.
8 MR. WOOL: Okay.
9 Q. (By Mr. Wool) And David Kirkland is not
10 listed on Exhibit 29 at all as an author, is he?
11 **A. That is correct.**
12 Q. And under the section Author Handling
13 Correspondence, David Saltmiras is the only name listed?
14 **A. That is correct.**
15 MR. WOOL: No more questions.
16 MR. MALINOWSKI: Thank you.
17 THE REPORTER: All right. Can I get
18 transcript orders on the record, please?
19 MR. MALINOWSKI: Yeah, whatever we always do
20 for me.
21 THE REPORTER: Okay. I can check in with the
22 office.
23 MR. MALINOWSKI: Mini -- yeah, mini,
24 electronic. We don't have to sync it, thankfully.
25 MR. WOOL: Yeah. I guess -- we don't need it

50 (Pages 194 to 197)

Page 198

1  expedited or anything like that, but we would like a
2  rough and then the final whenever you normally do.
3            * * * * * * *
4            WHEREUPON, the foregoing deposition was
5  concluded at the hour of 4:15 p.m.

Page 199

1            I, CHARLES BENBROOK, PhD, the deponent in the
2  above deposition, do acknowledge that I have read the
3  foregoing transcript of my testimony, and state under
4  oath that it, together with any attached Statement of
5  Change pages, constitutes my sworn statement.

7  _____ I have made changes to my deposition
8  _____ I have NOT made any changes to my deposition

11  _____
            CHARLES BENBROOK, PhD

14  Subscribed and sworn to before me this _____
15  day of _____.

19      My commission expires: _____

23      _____
            Notary Public

Page 200

1            REPORTER'S CERTIFICATE

3            I, Jennifer Bajwa Melius, a Registered
4  Professional Reporter and Notary Public within and for
5  the State of Colorado, commissioned to administer oaths,
6  do hereby certify that previous to the commencement of
7  the examination, the witness was duly sworn by me to
8  testify the truth in relation to matters in controversy
9  between the said parties; that the said deposition was
10  taken in stenotype by me at the time and place aforesaid
11  and was thereafter reduced to typewritten form by me;
12  and that the foregoing is a true and correct transcript
13  of my stenotype notes thereof.
14            That I am not an attorney nor counsel nor in
15  any way connected with any attorney or counsel for any
16  of the parties to said action nor otherwise interested
17  in the outcome of this action.
18            My commission expires:  August 31, 2019.

21      _____
            Jennifer Bajwa Melius
22            Registered Professional Reporter
            Notary Public, State of Colorado