# EXHIBIT 3

Stephen E. Petty, PE, CIH, CSP

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

MDL No. 2741

Case No. 3:16-md-02741-VC

IN RE:  ROUNDUP PRODUCTS
LIABILITY LITIGATION

This document relates to:

Janzen v. Monsanto
Company

Case No.3:16-cv-04103-VC
_____/


VIDEOTAPED DEPOSITION OF
STEPHEN E. PETTY, PE, CIH, CPS


DATE TAKEN:        November 6, 2019

TIME:              9:04 a.m. - 12:08 p.m.

LOCATION:          Best Western Plus Oceanside Inn
                   1180 Seabreeze Boulevard
                   Fort Lauderdale, Florida 33316

COURT REPORTER:    Lori G. Erwin, RPR
                   Notary Public - State of Florida

Stephen E. Petty, PE, CIH, CSP

---

Page 2

```
 1   APPEARANCES:
 2   JERRY KRISTAL, ESQUIRE
     Weitz & Luxenberg
 3   700 Broadway
     New York, New York 1000
 4   212-558-5500
     jkristal@weitzlux.com
 5   Appearing on behalf of the Plaintiff
 6   JOHN M. KALAS, ESQUIRE
     Hollingsworth LLP
 7   1350 I Street, N.W.
     Washington, DC 20005
 8   202-898-5800
     jkalas@hollingsworthllp.com
 9   Appearing on behalf of the Defendant
10
     Also Present:
11
     ELYSE SHIMADA, ESQUIRE
12   DANIEL MURNER, ESQUIRE
     Hollingsworth, LLP
13   1350 I Street, N.W.
     Washington, DC 20005
14
     Danielle DeSantis, Videographer
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 4

```
 1             E X H I B I T S
 2
     DEFENDANT'S EXHIBIT 8, EES GROUP       13
 3   INVOICES
 4   DEFENDANT'S EXHIBIT 9, FACTUAL         52
     SUMMARY AND EXPERT OPINIONS REPORT,
 5   IN RE: JANZEN
 6   DEFENDANT'S EXHIBIT 10, ROUNDUP       116
     LABEL
 7
     DEFENDANT'S EXHIBIT 11, ROUNDUP       120
 8   LABEL
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 3

```
 1             I N D E X
 2   Witness                           Page
 3   Stephen E. Petty, PE, CIH, CSP
 4     DIRECT EXAMINATION
       BY MR. KALAS                       6
 5
       CROSS EXAMINATION
 6     BY MR. KRISTAL                    160
 7
 8
 9
10             E X H I B I T S
11
12   Exhibit                           Page
     (Exhibits attached to transcript)
13
     DEFENDANT'S EXHIBIT 1, MONSANTO       8
14   COMPANY'S NOTICE TO TAKE ORAL AND
     VIDEOTAPED DEPOSITION OF STEPHEN E. PETTY
15
     DEFENDANT'S EXHIBIT 2, SUMMARY OF     9
16   EXPERT WITNESS CASES
17   DEFENDANT'S EXHIBIT 3, DECEMBER 12,  10
     2017 AMENDED RESIDENTIAL EXPOSURE
18   ASSESSMENT FOR RESIDENTIAL REVIEW
19   DEFENDANT'S EXHIBIT 4, OVERVIEW OF   11
     FACTORS AFFECTIVE DERMAL ABSORPTION
20   OF GLYPHOSATE THROUGH SKIN
21   DEFENDANT'S EXHIBIT 5, PETTY REVIEW  11
     COMMENTS ON DAVIES DERMAL REPORTS
22
     DEFENDANT'S EXHIBIT 6, STEPHEN E.    12
23   PETTY CURRICULUM VITAE
24   DEFENDANT'S EXHIBIT 7, RETENTION     12
     AGREEMENT OF STEPHEN E. PETTY
25
```

---

Page 5

```
 1        Fort Lauderdale, Florida
 2        Wednesday, November 6, 2019
 3        9:04 a.m.
 4            THE VIDEOGRAPHER:  We are now on the
 5        record.  My name is Danielle DeSantis.  I'm a
 6        videographer for Golkow Litigation Services.
 7        Today's date is November 6th, 2019, and the
 8        time is 9:04 a.m.
 9            This video deposition is being held in
10        Fort Lauderdale, Florida, in the matter of
11        Janzen versus Monsanto Company for the
12        United States District Court, Northern
13        District of California.  The deponent is
14        Steven E. Petty.
15            Will counsel please identify themselves.
16            MR. KRISTAL:  Jerry Kristal from Weitz &
17        Luxenberg on behalf of the plaintiff.
18            MR. KALAS:  John Kalas, Elyse Shimada, and
19        Daniel Murner, who will be joining us later
20        from Hollingsworth LLP, on behalf of Monsanto
21        Company.
22            THE VIDEOGRAPHER:  The court reporter is
23        Lori Erwin and will now swear in the witness.
24            THE COURT REPORTER:  Would you raise your
25        right hand.
```

---

Stephen E. Petty, PE, CIH, CSP

## Page 6

1      Do you swear or affirm the testimony you
2  give will be the truth, the whole truth, and
3  nothing but the truth?
4      THE WITNESS:  I do.
5      STEPHEN E. PETTY, PE, CIH, CSP,
6  was thereupon called as a witness herein, and after
7  having been first duly sworn or affirmed to testify to
8  the truth, was examined and testified as follows:
9      DIRECT EXAMINATION
10 BY MR. KALAS:
11     Q.  Good morning, Mr. Petty.
12     A.  Good morning.
13     Q.  How are you today?
14     A.  Great.
15     Q.  Good.  Thanks for being with us today.
16         You've been deposed a lot of times, right?
17     A.  Yes.
18     Q.  So if you need a break at any time, let me
19 know, and we'll try to take a break.  Okay?
20     A.  It will be more important for her than us.
21     Q.  Okay.  And if you don't understand a question
22 I ask for any reason, let me know, and I'll try to
23 rephrase it.  I don't want you to guess at any answers.
24 Okay?
25     A.  Sounds good.

## Page 7

1      Q.  Okay.  Now, if I wanted to put a warning about
2  cancer on a glyphosate label today in the
3  United States, could I do it?
4      A.  You could propose it to EPA and -- today, I
5  don't know about today.  But if you wanted to put a
6  warning on there, you could petition EPA to do so and
7  see what the response would be.
8      Q.  Okay.  I'm not sure if I understand your
9  answer there.  You said you don't know about today.
10     If I wanted to put a warning on it today,
11 warning on a glyphosate product in the United States
12 today, could I do it given the EPA's position?
13     A.  You could petition them to do so and see how
14 they would respond to it.
15     Q.  Okay.  So could I do it absent a petition?  In
16 other words, could I unilaterally do it?
17     A.  I don't know the answer to that.
18     Q.  Okay.  Now, you received a notice of
19 deposition for your deposition today, and it was
20 amended to change the location to this Best Western
21 we're at.  So I'm going to mark a copy of the notice
22 that had the old location on it but otherwise being
23 identical.
24     A.  We know what that place looks like.  We were
25 there yesterday.

## Page 8

1      (Defendant's Exhibit 1 was marked.)
2      MR. KALAS:  Here you go, Jerry.
3      MR. KRISTAL:  Thank you.
4  BY MR. KALAS:
5      Q.  And we asked you to provide some documents,
6  and you provided some documents via email, I believe,
7  two nights ago before Mr. Upshaw deposed you yesterday,
8  correct?
9      A.  I brought three sets in yesterday and they
10 requested that I bring three additional sets in today,
11 and I think I sent them electronically to Jerry.  So
12 what went on beyond that is -- I don't know.
13     Q.  Okay.  But beyond that, you also served like a
14 supplemental MCL, right, with some additional materials
15 on it?
16     A.  MCL?
17     Q.  Materials considered list, sir.
18     A.  I guess so, yeah.
19     Q.  Okay.  And you also provided some billing
20 records to us, right?
21     A.  I don't know if they've been marked in this
22 case.  Yesterday I did, certainly, yes.
23     Q.  Right.  And I've got them all here from Jerry.
24 So I'm going to mark them all, get them into the
25 record.  I don't know if I have too many questions

## Page 9

1  about them, but we're just going to get them on the
2  record here.
3      A.  Sure.  I think those are in triplicate, the
4  stuff I brought in.
5      Q.  Right.  So 2 will be a document entitled
6  Summary of Expert Witness Cases, Stephen Petty.
7      (Defendant's Exhibit 2 was marked.)
8  BY MR. KALAS:
9      Q.  As far as you know, is that a true and correct
10 list of the cases in which you provided expert
11 testimony in your, I guess, career?
12     A.  Well, I don't know about my career.
13     Q.  Okay.
14     A.  It's cases where I've been designated as a
15 testifying expert as opposed to a consulting expert.
16     Q.  Understood.
17     A.  I've had hundreds, if not thousands, on the
18 consulting side.
19     Q.  Okay.
20     A.  And also, I think, like for example, the --
21 it's about a month old, so I don't think the Monsanto
22 cases that I've previously been deposed in are on
23 there, but it's close.
24     MR. KRISTAL:  Yeah.  And yesterday this
25 document had been updated as of August 2019.

3 (Pages 6 to 9)

Stephen E. Petty, PE, CIH, CSP

| | Page 10 |
|---|---|

1     Mr. Petty had asked his administrator to
2   update it. So the date was updated, but the
3   Roundup depositions that have occurred, that
4   obviously Monsanto is aware of, didn't get
5   added. So I just wanted to make sure that's
6   clear.
7         MR. KALAS: Cool. Thank you.
8         Put that aside.
9         (Defendant's Exhibit 3 was marked.)
10   BY MR. KALAS:
11     Q.  You provided an EPA document titled Amended
12   Residential Exposure Assessment for Residential Review
13   from December 12, 2017, right?
14     A.  Yeah. That was a -- well, you weren't here
15   for the previous six days, but there was a discussion
16   on the fifth day about EPA risk assessments, and I said
17   I'd reviewed a risk assessment and had concerns about
18   it. Counsel had provided some documents on risk
19   assessment. No, that's not it. So what I had brought
20   in yesterday was just the document that I had reviewed.
21   So that's why that's here.
22     Q.  Okay. You provided a document entitled
23   Overview of Factors Affecting Dermal Absorption of
24   Glyphosate through the Skin. I'm marking that as
25   Exhibit 4, correct?

| | Page 11 |
|---|---|

1         (Defendant's Exhibit 4 was marked.)
2         THE WITNESS: Correct.
3   BY MR. KALAS:
4     Q.  You provided a document entitled Petty Review
5   Comments on 2015, 2016, and 2017, Davies Dermal
6   Reports. Marking that as Exhibit 5.
7         (Defendant's Exhibit 5 was marked.)
8         THE WITNESS: Technically there's four
9         documents. There's two in -- I've indicated
10         two in 2015 and then one in '16 and one in
11         '17. Just for accuracy.
12   BY MR. KALAS:
13     Q.  Got it. Appreciate that.
14         And let me ask you this about your comments on
15   those studies. Those studies were not published after
16   October 4, 2019, right?
17     A.  Were not published after October 4; that would
18   be correct.
19     Q.  Okay. Those were studies that you had
20   available to you prior to the submission of your expert
21   report in this case, correct?
22     A.  No.
23     Q.  They were not available to you?
24     A.  I didn't have them.
25     Q.  Okay. The attorneys hadn't sent them to you?

| | Page 12 |
|---|---|

1     A.  They did.
2     Q.  But they had not sent them to your prior to
3   October 4, 2019?
4     A.  They have not.
5     Q.  Okay. And so because they had not sent the
6   documents to you, that you reviewed in the supplement
7   dated November 1, 2019, you did not consider them in
8   your report of October 4, 2019, correct?
9     A.  They were not part of that; that's right.
10     Q.  Okay. Exhibit 6 is a CV.
11         Is this a current up-to-date CV, as far as you
12   know, for yourself?
13         (Defendant's Exhibit 6 was marked.)
14         THE WITNESS: It's probably the same one
15         I've had for the last year or so. So yeah.
16   BY MR. KALAS:
17     Q.  Okay. Exhibit 7 is a set of invoices, I
18   believe.
19         (Defendant's Exhibit 7 was marked.)
20         THE WITNESS: It's a retention agreement
21         and then invoices.
22   BY MR. KALAS:
23     Q.  Thanks for the correction. Why don't I mark
24   as Exhibit 7 the actual retention agreement. And just
25   so you know going forward, you don't have to bring the

| | Page 13 |
|---|---|

1   retention agreement every time. We have it now so -- I
2   mean, just for your edification.
3         But at any rate, here's the retention
4   agreement again. I'm sure it's been marked in previous
5   cases.
6         MR. KRISTAL: We're going to have to make
7         a copy of that little snippet because next
8         time Mr. Petty's deposed, somebody's going to
9         say, how come you didn't bring the
10         retention --
11         MR. KALAS: You can make a copy of it.
12         I'll stip to that.
13         THE WITNESS: Well, generally they ask for
14         the admin file, so I just bring it as the
15         admin file so...
16   BY MR. KALAS:
17     Q.  Got it.
18     A.  So that's been traditionally the way I've done
19   it for forever. But if you don't want it next time,
20   that's fine by me. We'll save a part of a tree.
21     Q.  That's right.
22         (Defendant's Exhibit 8 was marked.)
23   BY MR. KALAS:
24     Q.  All right. And then Exhibit 8, which I'm
25   paper clipping, are a set of invoices in this matter.

4 (Pages 10 to 13)

Stephen E. Petty, PE, CIH, CSP

Page 14

```
1    And when I say this matter, what I mean are invoices
2    across the five cases in which you've been offered on
3    case specific opinions, which are the Janzen, Pollard,
4    Dickie, Domina, and Mendoza cases; is that correct?
5        A.  No.
6        Q.  No, okay.  So what am I missing?
7        A.  There's two additional ones as well.
8        Q.  Okay.  And what are those for?
9        A.  It's the Sanders and Tanner.
10       Q.  Okay.  Do you have case specific opinions on
11   Sanders and Tanner?
12       A.  I would, yes.
13       Q.  You would have case specific opinions in
14   Sanders and Tanner.  Did you interview Mr. Sanders or
15   Mr. Tanner?
16       A.  Huh-uh.
17       Q.  Okay.  Have you been designated as having case
18   specific opinions in Sanders or Tanner?
19           MR. KRISTAL:  Maybe if you define case
20   specific, we can --
21   BY MR. KALAS:
22       Q.  Are you going to tell the jury how Mr. Sanders
23   used Roundup?
24       A.  No.  I would -- right now what I would do is
25   have opinions regarding warnings.
```

Page 15

```
1        Q.  Okay.  But you don't know how Mr. Sanders
2    interpreted those warnings because you haven't talked
3    to Mr. Sanders, correct?
4        A.  Well, I haven't talked to Mr. Sanders or
5    Mr. Tanner.
6        Q.  Right.  So when I ask you if you have case
7    specific opinions, I mean opinions particular about
8    Mr. Sanders' or Mr. Tanner's use of Roundup, personal
9    protective equipment while using Roundup, or other
10   co-exposures they may have had.
11       A.  Okay.
12       Q.  Do you have opinions on those?
13       A.  Well, I have opinions on what information he
14   would have been provided and the adequacy of that
15   information.
16       Q.  Okay.  But I don't want to talk around each
17   other.
18       A.  Well, I don't either.
19       Q.  Okay.  Mr. Sanders and Mr. Tanner, they are
20   two individuals you have not spoken to?
21       A.  That's correct.
22       Q.  Okay.  You don't know, because you have not
23   spoken to Mr. Sanders, how Mr. Sanders interpreted the
24   Roundup label, correct?  Him particularly, not a
25   general person.
```

Page 16

```
1        A.  I have not spoken to Mr. Sanders or
2    Mr. Tanner.  I would agree with that.
3        Q.  Okay.  You don't know if Mr. Sanders read the
4    entirety of the Roundup label?
5        A.  I haven't spoken to him.  I don't know how
6    many more times I can answer the question the same way.
7        Q.  Okay.  So what I'm trying to get at is the
8    opinions you will offer as to Mr. Sanders and
9    Mr. Tanner are the general opinions about the adequacy
10   of the warnings in your report and not specific
11   opinions about how the adequacy or lack thereof of the
12   warnings reached Mr. Sanders or Mr. Tanner in
13   particular; is that true?
14       A.  Partially.
15       Q.  Which part is not true, sir?
16       A.  Well, there's more than just the warnings
17   piece of my -- based on a report.  There's all the
18   analysis of the dermal studies, et cetera.
19       Q.  You aren't going to say how Mr. Sanders'
20   ███████ affected the absorption of Mr. Sanders'
21   Roundup that got on him because you don't know what
22   Mr. Sanders' ████████ was?
23       A.  I don't know his ████████ but I know
24   the -- I know from literature that -- and I've cited
25   that in one of these documents -- that most of the base
```

Page 17

```
1    tests -- I call them virgin ███ tests -- are not what
2    people actually see.  And you have degraded █████████
3    ████████ if you use a product multiple times.
4        So I would have opinions that if you're -- if
5    you use a product over and over again, your ███ would
6    be degraded inherently.
7            MR. KALAS:  Let me ask Jerry this
8    question.  Jerry, are you offering --
9            MR. KRISTAL:  The opinions in Tanner and
10   Sanders are going to be the opinions contained
11   in the report served in Tanner and Sanders.
12           MR. KALAS:  Understood.  So there are no
13   opinions beyond his report in Sanders and
14   Tanner, correct?
15           MR. KRISTAL:  Well, plus whatever else he
16   brought in today on the Davie stuff.  But,
17   yes, other than that, that's correct.
18           MR. KALAS:  Okay.
19           MR. KRISTAL:  There's no specific exposure
20   assessment done by Mr. Petty in Sanders or
21   Tanner.
22           MR. KALAS:  Thank you.  We can move on
23   then.
24           MR. KRISTAL:  But that's -- if you had
25   asked him that, he would say the same thing.
```

5 (Pages 14 to 17)

Stephen E. Petty, PE, CIH, CSP

Page 18

1    MR. KALAS: Okay. Well, I didn't. I
2  asked you.
3    MR. KRISTAL: Right.
4  BY MR. KALAS:
5    Q. Okay. Going back to the invoices. So the
6  invoices have to do with general opinions that you've
7  reached in this case that would apply to all seven of
8  the cases you've been disclosed in, along with case
9  specific exposure assessments in five of the cases,
10  correct?
11    A. As well as some of the supplemental material
12  that we have here today.
13    Q. Understood.
14    MR. KRISTAL: Can we take a quick break?
15  This is Robin who --
16    MR. KALAS: Sure. Let's go off the
17  record.
18    THE VIDEOGRAPHER: 9:17 a.m. Going off
19  the record.
20    (A break was taken.)
21    THE VIDEOGRAPHER: 9:21 a.m. Back on
22  record.
23  BY MR. KALAS:
24    Q. All right. So since you've submitted these
25  invoices, you've been deposed, right?

Page 19

1    A. I have.
2    Q. Okay. And you'll bill for that time as well,
3  right?
4    A. Correct.
5    Q. And that'll be at the rate of $385 per hour,
6  right?
7    A. For the prep time, yeah.
8    Q. Okay. And how about for the deposition time?
9    A. Depositions are, running clock, it's four
10  hours, it's 3,000; eight hours, it's 5,000.
11    Q. Okay. And beyond the prep time for the
12  deposition, how long would you say that went?
13    A. For what?
14    Q. How long was your prep time for the deposition
15  yesterday and today?
16    A. Well, I didn't have any prep time yet today.
17    Q. No. I meant the prep time preceding the
18  depositions that took place yesterday and today.
19    A. I don't know, probably a day-and-a-half maybe.
20    Q. Okay. And then the depositions would have
21  been billed at your typical eight-hour rate for
22  yesterday and today, right, if they go seven hours?
23    A. The running clock was way more than seven
24  hours.
25    Q. Okay.

Page 20

1    A. I learned a lesson when in a deposition in
2  San Francisco where I showed up at nine o'clock. We
3  had a one-hour deposition. Then he said, woop, I got
4  to go to the courthouse, shows back up at 6:00.
5    Q. Oh, gosh.
6    A. Deposes me for two hours and says, well, you
7  can bill for three hours.
8    Well, I learned my lesson right away that when
9  I show up at nine o'clock, when I get done, it starts
10  at nine o'clock.
11    Q. Because you can't do anything else, right?
12    A. What else am I going to do?
13    Q. Right. Anything else you're going to bill for
14  since you submitted these invoices beyond prep time for
15  the deposition and the deposition time?
16    In other words, was there any other research
17  on articles? I guess you have your supplemental
18  materials here you brought.
19    A. Oh, we -- yeah. I keep forgetting that we
20  talked yesterday so -- and you're new. So I've since
21  received -- I haven't had time to look at them --
22  defense reports. I'll certainly look at those and
23  prepare comments on those perhaps.
24    Q. Approximately how much time have you spent on
25  those?

Page 21

1    A. Zero.
2    Q. So far?
3    A. I mean, maybe fifteen minutes.
4    Q. Okay. So you have no opinions today regarding
5  the reports of Monsanto's defense experts in the cases
6  you've been designated in?
7    A. I don't. Not yet.
8    Q. Okay. All right. We'll keep moving.
9    Now, I think you've testified that you've
10  testified in over two hundred cases?
11    A. Well, I've been retained in two hundred cases.
12  I don't know if I've testified in two hundred cases.
13    Q. Okay. You've been retained in over two
14  hundred cases?
15    A. Yes.
16    Q. Have you testified in over a hundred cases at
17  either deposition or trial?
18    A. I don't know. It's got to be close, I guess.
19    Q. Okay. And you worked --
20    A. Well, they are -- I mean, you just add them
21  up. They're listed on the list. I just don't know.
22    Q. You worked with the firm that retained you in
23  this case, the Levin Papantonio firm, on the PFOA C8
24  litigation, right?
25    A. I did.

Stephen E. Petty, PE, CIH, CSP

Page 22

1      Q.  Okay.  And I've read those transcripts.  I'm
2   not going to ask you too much about it.  But you've
3   been working with them for many years on that
4   litigation, right?
5      MR. KRISTAL:  Object to form.
6      THE WITNESS:  Well, it was the only
7      project I worked with them on, but I guess it
8      would have been from the time I started to the
9      time the trials finished, two to three years.
10  BY MR. KALAS:
11     Q.  Okay.  Are you continuing to work with them on
12  that litigation?
13     A.  I've been asked recently to, whether I'd be
14  interested in doing it again.  I'm trying to retire.
15     Q.  Okay.
16     A.  So we're having that discussion.
17     Q.  Okay.  And I don't want to know anything about
18  the contents of that discussion.
19        How much -- and the Levin Papantonio firm is
20  the firm who retained you originally in this case,
21  right?
22     A.  That's correct.
23     Q.  Okay.  And they're involved then in the
24  Roundup litigation as well, right?
25     A.  I assume so.  I've not ever really dealt with

Page 23

1   them on Roundup, to be honest with you, other than
2   being retained.
3      Q.  You know Mike Papantonio, right?
4      A.  Oh, sure.
5      Q.  You've seen all the videos he posts on the
6   internet about Roundup, right?
7      A.  No.
8      Q.  No?  Okay.
9      A.  I spend my free time in numismatics.
10     Q.  Coin collecting, right?  I remember reading
11  that.
12     A.  Yeah.  I spend about three hours a day on coin
13  collecting.
14     Q.  Okay.  How much would you say you billed to
15  the Levin Papantonio firm in PFOA litigation?
16     A.  I have no idea.
17     Q.  Over $100,000?
18     A.  I just don't know.  I mean, it would be
19  whatever the records were that I provided in those
20  deps.
21     Q.  Okay.
22     A.  I have admin people -- I don't mean to duck
23  your question.  I have admin people deal with that and
24  they prepare monthly billings based on time sheets and
25  it is what it is.

Page 24

1      Q.  Now, you sold EES, or at least your ownership
2   interest in EES, a few years ago, right?
3      A.  No.
4      Q.  No?
5      A.  I sold part of it.
6      Q.  You sold part of it, okay.
7         Do you have a controlling interest in EES any
8   longer?
9      A.  In the Florida operations, I do.
10     Q.  Okay.  In the Florida operations?
11     A.  Sure.  I own Florida EES.  Originally EES had
12  Ohio and Florida operations, and I sold the Ohio
13  portion when my son died.
14     Q.  Okay.  So you still have your Florida
15  operations in EES?
16     A.  Yeah.  I still own all the buildings.  I
17  always had a real estate company that owned the
18  buildings and leased back to EES.  So I control the
19  buildings in Ohio.
20     Q.  Okay.  Do you understand the difference
21  between passive and active income?
22     A.  Well, I believe so.
23     Q.  Okay.  And so as far as active income, as far
24  as work EES did in 2018, how much of that was
25  litigation support?

Page 25

1      A.  In 2018?
2      Q.  Yes, sir.
3      A.  Probably almost all of it.
4      Q.  Okay.  And what was EES's income in 2018?  I
5   mean gross income, not net.
6      A.  I don't know.  Half a mill, something like
7   that.
8      Q.  Okay.  And was there anybody else doing
9   litigation consulting at EES beyond you in 2018?
10     A.  Other than my paralegal, no.
11     Q.  You have a paralegal?
12     A.  Well, she's basically a paralegal, yeah.
13     Q.  Okay.  Do you stand by your previous testimony
14  in the Roundup litigation?
15     MR. KRISTAL:  Objection to form.
16     THE WITNESS:  I don't know what you're
17     asking.
18  BY MR. KALAS:
19     Q.  Is there any testimony you've given in the
20  Roundup litigation thus far in the depositions
21  Mr. Upshaw took that you thought about and you'd like
22  to amend today?
23     A.  I think the only thing that came up is
24  between -- I was deposed by Mr. Upshaw for five days,
25  ballpark, before yesterday.  And the first three days

7 (Pages 22 to 25)

Stephen E. Petty, PE, CIH, CSP

Page 26

1   were down here in Florida and the second two were in my
2   offices up in Ohio, EES offices in Ohio.
3          And he asked in Ohio if I had spoken to one of
4   the plaintiff's experts, another plaintiff's expert,
5   and I said I had.  And he said, well, you just
6   basically perjured yourself because in the previous
7   three days you said you hadn't.  And I said, well, all
8   I can tell you is I know that I've since spoken to him.
9          Well, I went back and looked at the records,
10  and the answer to that was that I spoke to him between
11  the two sets of depositions.
12     Q.  Which expert was that?
13     A.  I believe it was Mr. Sawyer.
14     Q.  Bill Sawyer?
15     A.  Yeah.
16     Q.  And he's a forensic toxicologist over in
17  Sanibel, right?
18     A.  I don't know what his background is.  They
19  called me and I answered their questions.
20     Q.  You answered Mr. Sawyer's -- or Dr. Sawyer's
21  questions?
22     A.  Well, I know there was attorneys and people on
23  the phone so I -- they asked questions and I answered
24  them.
25     Q.  Okay.  And Dr. Sawyer answered them as well?

Page 27

1      A.  I don't think I asked him any questions.  I
2   really --
3      Q.  No.  Did he answer the attorneys' questions as
4   well on the call?  And I don't want to know the
5   content.
6      A.  I don't recall all the details.  It was a
7   five-, ten-minute call.
8      Q.  Have you spoken to Dr. Sawyer since that
9   discussion between your third and fourth deposition
10  day?
11     A.  No.  I haven't spoken to him again.
12     Q.  Are you aware Dr. Sawyer's relying on some of
13  your witness interviews in his reports?
14     A.  In the St. Louis cases, I was.  In this case I
15  don't know one way or the other.  I've not been told
16  that.  You just said it.  So if it's true, then now I
17  know.
18     Q.  I don't lie, man.
19     A.  I'm sure.  You seem like an honest guy.
20     Q.  Do you want to amend anything that has
21  appeared in expert reports that you've submitted in the
22  Roundup litigation?
23     A.  Well, I made two corrections yesterday to the
24  reports I've submitted in this litigation.  So those --
25  I've made those changes.  Then I've also added some

Page 28

1   material based on things that I've looked at between
2   October 3rd and today.  Well, not today but yesterday.
3      Q.  Okay.
4      A.  So to that extent, yeah, I have.
5      Q.  Okay.  Anything else you can think of today?
6      A.  Other than the corrections we've made
7   throughout the process.  Starting with the St. Louis
8   depositions, we found typos and things like that, and
9   they've been corrected and changed with time.
10     Q.  Okay.  You're an industrial hygienist by
11  training, right?
12     A.  Well, that's part of my training.  I'm more
13  than an industrial hygienist.  I'm a certified
14  industrial hygienist.
15     Q.  Okay.  You're a certified industrial hygienist
16  by training?
17     A.  Well, there's a huge difference between the
18  two.  I can take you out on a project and you sign up
19  with AIHA and you're now an industrial hygienist.
20  There's a big gulf between calling yourself an
21  industrial hygienist and a CIH versus, say, in the
22  engineering field where I'm also a PE, I mean, you can
23  call yourself an engineer if you're degreed engineer,
24  but you can't call yourself a professional engineer, of
25  course, unless you've passed exams.  But there's not

Page 29

1   such a gulf there, but there's a big gulf between
2   calling yourself an industrial hygienist and a
3   certified industrial hygienist.
4      Q.  What's it mean to be a CIH?
5      A.  Ultimately it means you passed the two
6   eight-hour exams, although they've changed that since
7   I've been there.  It's now a single exam.  But you have
8   to have so many years of qualified experience and then
9   you basically take two eight-hour exams.  And if you
10  pass those -- I mean once you pass them, you have certain
11  maintenance requirements, like a lot of these things.
12     Q.  And there's questions on that exam about
13  toxicology concepts, right?
14     A.  I think 40 percent of the exam's toxicology.
15     Q.  And there's questions on that exam about
16  epidemiology concepts, right?
17     A.  There are.
18     Q.  There's questions on that exam about exposure
19  concepts, right, as far as biomonitoring and passive
20  dosimetry?
21     A.  I'm sure there are.  I don't -- I mean, I
22  remember the rubrics differently than that.  I remember
23  them as ionizing radiation, non-ionizing, toxicology,
24  epidemiology, environmental health and safety law, that
25  sort of thing, heat stress.  There's thirteen rubrics.

8 (Pages 26 to 29)

Stephen E. Petty, PE, CIH, CSP

Page 30

1  So that's what makes it interesting is there's thirteen
2  disciplines.
3      Q.  And you've reviewed, you said, just started to
4  review the reports of Monsanto's experts, right, in the
5  fields that they've been sent to you, right?
6      A.  Yeah.  I mean --
7      Q.  Okay.  Do you recall which experts you've
8  received reports for?
9      A.  I don't.
10     Q.  Okay.  Did you see that Monsanto's experts are
11 all certified industrial hygienists as well?
12         MR. KRISTAL:  Objection.
13         THE WITNESS:  All of their experts are?
14 BY MR. KALAS:
15     Q.  In exposure, sir.
16     A.  I have -- I mean, I spent fifteen minutes.  I
17 don't know.  I couldn't answer your question one way or
18 the other.  If you want to say that they are...
19     Q.  Well, you'll see when you read them.
20     A.  Exactly.
21     Q.  Okay.  And what's your undergraduate degree
22 in?
23     A.  Chemical engineering.
24     Q.  What's your master's degree in?
25     A.  I have two, chemical engineering and MBA,

Page 31

1  finished first in class.
2      Q.  Your Ph.D. in?
3      A.  I do not have a Ph.D.
4      Q.  Okay.  Now, in the three cases you're
5  designated in there, do you intend to opine as to
6  whether or not glyphosate is genotoxic?
7         Well, let me break it up since we're supposed
8  to break up these depos.  When I said the three cases
9  you're designated in, I was referring to Janzen,
10 Mendoza, and Pollard.  But let me ask you a more
11 general question.
12     A.  Okay.
13     Q.  In all the reports you've submitted in the
14 MDL, do you intend to opine personally that you have
15 concluded to a reasonable degree of scientific
16 certainty, toxicological certainty, that glyphosate is
17 genotoxic?
18     A.  I will rely on the expertise of others for
19 that determination, but I will use that information in
20 the sense that if that information is known, or at
21 least purported that it's something to be considered in
22 the label.
23         So from an industrial hygiene standpoint, from
24 a warning standpoint, I would use that information, but
25 I wouldn't be the one that's making the determination

Page 32

1  as to whose study is right or wrong.
2      Q.  I understand.
3         Okay.  So it's your -- so when you come in and
4  tell the jury, go under oath and you're testifying up
5  on the stand and somebody asks you, Mr. Petty, have you
6  deduced yourself whether or not glyphosate is
7  genotoxic, you'll answer no to that question, you're
8  deferring to others?
9      A.  In general, that would be true.  I would rely
10 on the literature that says or -- whatever the
11 literature says, I would say -- because, see, I'm --
12 I'm looking at it from an industrial hygiene standpoint
13 where we're supposed to err on the side of public
14 health and safety in our warnings.
15         In other words, we're not waiting for perfect
16 information.  We're not waiting for a whole bunch of
17 people to be diseased or hurt.  We want to present that
18 information to individuals so that they can make the
19 choice.
20         For example, on an MSDS, on the cancer
21 warning, typically the three entities that you look at
22 are NTP, IARC, and EPA.  And so there can be -- there
23 can be different opinions on that, even within the
24 MSDS.
25         We're -- our job is to provide the public,

Page 33

1  when we do warnings, with information so they can make
2  choices, even if the information isn't perfect.  We're
3  not trying to play judge and jury with that.
4         So our job from an industrial hygiene
5  standpoint is always the workers or individuals that
6  have information then have choices about how to protect
7  themselves.  And there's good theory that says if they
8  have that information, they'll take steps to do so.  So
9  that's why it's important that they have that
10 information, so they can make those choices.
11        Whether or not it's an absolute certainty that
12 that's the case or not isn't -- isn't our -- isn't what
13 we do.  What we do is we try to provide the spectrum of
14 information that's available so the individual can make
15 that choice.  And that's what I'll tell the jury.
16     Q.  Okay.
17     A.  It's --
18     Q.  That was a really long answer, and I'm not
19 sure if you answered my question.  So I'm going to just
20 make sure I'm clear because I just need to be clear.
21        If you're asked whether or not you personally
22 have determined glyphosate is genotoxic, will you say
23 no?
24        MR. KRISTAL:  Objection.  Asked and
25 answered.

9 (Pages 30 to 33)

Stephen E. Petty, PE, CIH, CSP

## Page 34

1    THE WITNESS: I will say -- I will say if
2  I personally -- I mean, that's -- I've
3  personally looked at some of the reported
4  research. In fact, I put some of that in my
5  report.
6    Did I go out and personally do the
7  research studies, no. But am I looking at
8  what people have said as part of the issue of
9  industrial hygiene and warnings, yes. That's
10  why that question is not absolutely a yes or
11  no answer.
12  BY MR. KALAS:
13  Q.  So I understand that you haven't personally
14  done the test, and that's helpful. So thank you for
15  that answer.
16  A.  Right.
17  Q.  The question's a little different, and I
18  probably asked it poorly.
19  The question is, have you personally deduced,
20  using your training, your expertise, that glyphosate is
21  genotoxic, or are you relying on others' opinions that
22  glyphosate is genotoxic to reach your warnings opinion?
23  That's what I'm trying to figure out.
24    MR. KRISTAL: Objection. Asked and
25  answered.

## Page 35

1    THE WITNESS: Well, it has -- it has the
2  same -- from an industrial hygiene
3  perspective, as I've tried to be as direct as
4  I can, we're not waiting for legal definitions
5  of causation. We shouldn't be.
6    Our job -- one of the fundamental roles in
7  industrial hygiene is anticipation and
8  recognition of potential hazards and to
9  provide warnings and protection before the
10  information is fully vetted. And in that
11  context, I have looked at studies that claim
12  that it is. And have I done those studies,
13  no, I haven't done those studies, but I'm not
14  going to say that they're either right or
15  wrong.
16    I'm just going to say there has been some
17  reporting, not unlike an MSDS would with
18  respect to a cancer warning. They're not --
19  the MSDS, when it says provide the information
20  on a cancer warning for IARC, NTP, or EPA,
21  isn't making judgments on whether those
22  agencies are right or wrong. They're just
23  saying, here's the information.
24  BY MR. KALAS:
25  Q.  Okay.

## Page 36

1  A.  And that's how I'm looking at the issue of
2  genotoxicity.
3  Q.  Let me try this one more way because I think
4  that answer was nonresponsive. I'm going to note it as
5  nonresponsive. But I think maybe we can get at it a
6  different way, and hopefully we can figure this out.
7    Mr. Kristal's standing up there on your direct
8  examination and he says, Mr. Petty, have you concluded
9  that glyphosate is genotoxic. What will your answer
10  be?
11    MR. KRISTAL: Objection. Asked and
12  answered.
13    THE WITNESS: I would give you the same
14  answer I just gave you.
15    MR. KALAS: Okay. Mark as nonresponsive.
16    THE WITNESS: Okay. That's what I would
17  say.
18  BY MR. KALAS:
19  Q.  Okay. Now --
20    MR. KRISTAL: How can -- how can --
21    MR. KALAS: I don't need a speech, Jerry.
22  You can --
23    MR. KRISTAL: You're asking him what he
24  would answer. How can it possibly be
25  nonresponsive?

## Page 37

1    MR. KALAS: Jerry, I'm marking it as
2  nonresponsive. I asked him three different
3  ways. We'll keep moving.
4    MR. KRISTAL: I'm not suggesting we
5  shouldn't keep moving. But when you ask
6  somebody what they would say and they say what
7  they would say --
8  BY MR. KALAS:
9  Q.  Are you an expert in genotoxicity?
10  A.  I would have limited -- I would be much less
11  limited expertise in genotoxicity than I would, say,
12  epidemiology and toxicology. But the genotoxicity is
13  sort of a sub-branch of that.
14    So that's a difficult question to ask because
15  I certainly don't claim to be, spend my entire life
16  looking at or doing studies on genotoxicity. But from
17  an industrial hygiene standpoint, we have to consider
18  genotoxicity as part of the toxicity equation.
19    So from the IH standpoint, I would say yes.
20  If you ask me am I, is that what I do as a full-time
21  job, I would say no.
22  Q.  From an IH standpoint, do you consider -- and
23  maybe the answer is no.
24  A.  Toxicology is critical in what we do.
25  Q.  Different question coming. From an IH

Stephen E. Petty, PE, CIH, CSP

Page 38

1    standpoint, do you consider the quality of a study?  In
2    other words, do you look at the study and say that this
3    study was a good study or not a good study, or do you
4    just say there's all this stuff out there that says
5    this, we have to assume it's all true unless I have a
6    reason not to assume it's true; hence, it should go on
7    the warnings?
8        MR. KRISTAL:  Objection to form.
9        THE WITNESS:  I think you got a bunch of
10       questions there, but let me try to answer at
11       least part of them.
12   BY MR. KALAS:
13       Q.  Okay.
14       A.  If the information is in peer-reviewed,
15   published studies -- science is constantly evolving.  I
16   mean, I've been around for 43 years.  That's a long
17   time.  That's after school.  And I can give you
18   examples of having done my undergraduate thesis on MTBE
19   because nobody can make it and it's come to be -- it
20   was going to be the godsend to save air pollution
21   problems, and it turned in to be a material that was a
22   water pollution problem 30 years later.  Now it's not
23   used anymore in gasoline.
24       So peoples' perceptions or knowledge on
25   science, on issues, constantly evolve.  So when you ask

Page 39

1    a question like that as an absolute, it's difficult for
2    me, based on having done this for a long time, to
3    say -- when you say, well, even if the study's not true
4    or true, I am not of the opinion that, in general,
5    people are hopefully not publishing stuff in
6    peer-reviewed journals that they inherently think's
7    untrue.
8        Instead what may happen is that the science
9    evolves.  It's not unlike looking at the literature on
10   cigarette smoking in the '50s versus cigarette smoking
11   in the '80s.  I think you would see those studies
12   entirely differently.
13       So since we're in the business of anticipating
14   and recognizing and erring on the side of public health
15   and safety, we're going to present that information to
16   the end user without really an opinion as to -- if we
17   think it's a legitimate study, we're not going to say,
18   we're going to say it's true or false.  We're going to
19   say -- it's just like when I said earlier on MSDSs.
20   When IARC says something and EPA says something and NTP
21   says something, we're not going to say, as an
22   industrial hygienist, that EPA is wrong and IARC's
23   right or IARC's wrong and EPA's right.  That's not our
24   job.
25       Our job is to provide that information in a

Page 40

1    way that the public -- at two levels.  First, they have
2    the opportunity to make decisions themselves; and,
3    secondly, we're going to begin to protect in case all
4    of this stuff is true because we're going to -- if
5    there's a -- if my job is to protect you, you're in a
6    plant and you're making Roundup and you have inhalation
7    and dermal exposures, would you prefer that I provided
8    PPE that protects you from those exposures, even today,
9    or would you prefer that I not protect you?
10       Well, my job would be to protect you, even
11   though perhaps the evidence isn't as concrete as it may
12   be later; because that's my job is to protect you and
13   the public from hazards with information that isn't
14   necessarily complete.
15       MR. KALAS:  Motion to strike as
16   nonresponsive.
17   BY MR. KALAS:
18       Q.  Sir, my question was simply getting at one
19   issue, which is do you consider study quality when
20   reaching an opinion on warnings or do you not?
21       A.  Well, I just answered that at length.  It's
22   kind of a yes or no question -- answer.  It's --
23       Q.  Well, let me ask you what you did here.
24       A.  We like to see --
25       Q.  Let me withdraw that question.

Page 41

1        What did you do here?  Did you consider study
2    quality in reviewing the glyphosate literature here?
3        A.  That was an attempt to do that.  But did I --
4    from an industrial hygiene standpoint, yes.  I'm trying
5    to look at the information.  In fact, that's why I'm so
6    critical.
7        I mean, if you look at my analysis of the
8    dermal studies -- appreciate, I was hired by
9    governmental agencies to review programs at Oakridge,
10   et cetera, et cetera.  My background was I was
11   recognized on ten or twelve national committees for the
12   ability to go in and look at studies and determine
13   whether or not people are blowing smoke.
14       And so of course you're looking at the
15   information, trying to determine whether you think it's
16   reasonable or not, did I go in to the entire field
17   of epidemiology or carcinogenicity, no.  But for the
18   studies I looked at, of course I'm looking at them to
19   see if I think they're reasonable or not and, in fact,
20   I'm critical of a whole bunch of them.
21       Q.  Did you consider dosing levels in the
22   genotoxicity studies that you looked at here?
23       A.  Not so much.
24       Q.  Okay.
25       A.  Not so much.

11 (Pages 38 to 41)

Stephen E. Petty, PE, CIH, CSP

Page 42

1      Q.  So, for instance, I could take -- you have
2  coffee in that, right?
3      A.  No.  There's water actually.
4      Q.  Water, okay.  Even better.  I could take a
5  petri dish, I could put some cells in my petri dish,
6  and I could pour some water on them.  And if I poured
7  enough water on them, they'd die, right?
8      MR. KRISTAL:  Objection.
9      THE WITNESS:  I don't know.
10  BY MR. KALAS:
11      Q.  You don't know?
12      A.  I mean -- I mean, it depends on the
13  experiment.
14      Q.  Okay.  So you don't know right now if I pour
15  enough water on some cells, they'll die?  That's fine.
16  We'll move on.
17      Are you an expert in oxidative stress?
18      A.  On what?
19      Q.  Oxidative stress, sir.
20      MR. KRISTAL:  You don't have to raise your
21  voice.
22  BY MR. KALAS:
23      Q.  Oxidative stress, sir.
24      MR. KRISTAL:  You don't have to raise your
25  voice.  You're sitting three feet away from

Page 43

1  him.
2      THE WITNESS:  Could you ask that again?
3  BY MR. KALAS:
4      Q.  Are you an expert in oxidative stress, sir?
5      A.  Define it.
6      Q.  Okay.  If you don't know what it means, then
7  we'll move on.
8      A.  No.  That's not true.  I'm a chemical
9  engineer.  I certainly know oxidation.
10      Q.  Okay.  We'll move on.
11      Are you an expert in the benefits of
12  glyphosate?
13      A.  I don't know what you mean by that.  I mean,
14  I've seen papers from Monsanto or marketing literature
15  that talks about the benefits of glyphosate, but that's
16  not been my focus.  My focus was on specifically
17  exposure and warnings.
18      Q.  Okay.  Are you an expert in the safer -- in
19  any possible safer alternative design of glyphosate or
20  based herbicides that are as efficacious as the designs
21  on the market?
22      MR. KRISTAL:  Objection to form.
23      THE WITNESS:  Well, I certainly have been
24  critical of the use of POEA.  In fact, I've
25  suggested in my report that it should have

Page 44

1  been defined as an active ingredient based on
2  what it does to plants so -- and it's a
3  fundamental concept of industrial hygiene, as
4  you seem to well know, that there are four
5  approaches to protecting individuals and
6  workers in this level of hierarchy:
7  Substitution, get rid of the thing that's
8  causing the problem; engineering controls,
9  keep it contained in a device so it doesn't
10  get to the person; administrative controls,
11  keep them away from the area; and lastly,
12  personal protective equipment, least
13  desirable.
14      So certainly, as an industrial hygienist,
15  one of the reasons I was looking at the issue
16  of the inert ingredients was why did they
17  continue to use it for decades when there's
18  evidence that it's toxic.  The obvious answer
19  would have been to substitute, as a chemical
20  engineer and as an industrial hygienist.
21      MR. KALAS:  Motion to strike as
22  nonresponsive.
23  BY MR. KALAS:
24      Q.  My question is about a safer alternative
25  design that's as efficacious.  Do you understand what I

Page 45

1  mean by as efficacious?
2      A.  And I just answered it, exactly.
3      Q.  Okay.  Do you understand as what I mean by as
4  efficacious?
5      A.  As effective.
6      Q.  Okay.  Is there another design of Roundup,
7  absent POEA, that kills weeds as well as the design of
8  Roundup with POEA that you have an independent expert
9  opinion about?
10      A.  Well, Monsanto has clearly removed it, and
11  they still sell the product.
12      Q.  And is it your opinion -- have you determined
13  that the product is as efficacious?  Do you understand
14  that part of it?
15      A.  I have not made that determination but --
16      Q.  Okay.
17      A.  -- you asked the issue of whether or not I've
18  looked at Roundup from the standpoint of industrial
19  hygiene, and I certainly have.  And the number one
20  thing you do from an industrial hygiene/chemical
21  engineering standpoint is substitution.  And Monsanto
22  clearly understands that because they've pulled it.
23      Q.  Do you have an opinion about whether or not
24  Roundup specifically caused the NHL in the plaintiffs
25  you've offered expert reports for?

Stephen E. Petty, PE, CIH, CSP

Page 46

1    A.  I'm not here as a causation -- well, let me
2 say this.  I've been qualified in the courts as a
3 general causation expert.  I'm precluded from being a
4 specific causation expert because I don't have a
5 medical degree.  But in this case I will not offer
6 causation opinions, be it -- I will not offer specific
7 causation opinions so -- and I'm not qualified to do
8 so.
9    Q.  Okay.  Do you have any opinions that you're
10 going to offer about any of the plaintiffs' reports on
11 the MDL regarding the pain and suffering that they've
12 had?
13    MR. KRISTAL:  We're morphing from the
14 Janzen deposition to other questions.  So I'd
15 ask you to stick to Janzen.
16    MR. KALAS:  No.  I'm going to ask the
17 question I asked.  He can answer it.
18    MR. KRISTAL:  Okay.  And I will object to
19 the question as beyond the scope of the
20 deposition except as to Janzen.
21    THE WITNESS:  I think I made it clear to
22 you on multiple answers already that I'm here
23 as an exposure and as a warnings expert.
24 BY MR. KALAS:
25    Q.  Okay.  Are you going to offer any opinions

Page 47

1 about the regulatory scheme of the California EPA?
2    A.  Regulatory scheme of the California EPA?
3    MR. KRISTAL:  Objection to form.
4    THE WITNESS:  Well, I've certainly
5    testified in cases in California related to
6    office of hazardous and health evaluations.
7    So I don't intend to, but if I were on cross
8    asked some question and I thought I could
9    answer it, I would.
10 BY MR. KALAS:
11    Q.  Okay.  But you don't intend to on direct?
12    A.  I don't intend to --
13    Q.  Okay.
14    A.  -- but if it comes up, I'm not going to
15 preclude myself from answering those questions if I
16 think I can cross.
17    Q.  Are you going to tell the jury that
18 glyphosate's carcinogenic in rodent bioassays?
19    A.  I'm not the -- I'm not going to be offered as
20 the cancer expert, but to the extent that I talk about
21 the impact of what was done by Monsanto with the mouse
22 study, the back and forth between EPA, and the
23 implications it would have on warnings, then I would
24 talk about it.
25    So from a warnings industrial hygiene

Page 48

1 standpoint, I would talk about it.
2    Q.  Okay.  I think I understand.  So you'll talk
3 about the rodent bioassays from a warning standpoint,
4 correct?
5    A.  Yeah.  And what went on with respect -- I
6 mean, I had a year's worth of graduate level
7 statistics, so I understand what was done there with
8 respect to looking for whether or not the baseline case
9 had a tumor or not and what implications that would
10 have on the statistics.
11    And so do I intend to offer opinions on all
12 the carcinogenic studies, no.
13    Q.  Okay.
14    A.  But with respect to how those studies impacted
15 decisions about warnings and -- then I would bring it
16 in in that sense.
17    Q.  Okay.  And the reason that you're not going to
18 offer an opinion on all the carcinogenicity studies is
19 because, as you said, you're not the cancer expert.
20 That's Dr. Portier or somebody else?
21    A.  That's my understanding.
22    Q.  Okay.  Are you going to tell the jury that
23 glyphosate, in your opinion, has been shown to be
24 carcinogenic in epidemiology studies?
25    A.  I'm going to say IARC has declared it that

Page 49

1 way, yes.
2    Q.  IARC has.  But I asked about your opinion.
3    Are you going to tell the jury that you have
4 determined, after your independent review of the
5 epidemiology studies, that you believe glyphosate has
6 been shown to be carcinogenic in the epi?
7    A.  The best way that I can answer that is the way
8 I've answered this question before.  On the MSDSs you
9 have three different agencies where they -- whatever
10 their status is on the carcinogenicity of that
11 particular compound or mix, there can be -- there can
12 be the same opinions or differing opinions.
13    And to the extent that I'm relying on -- and
14 the anticipation recognition in trying to protect
15 against a potential hazard, then I would say that IARC
16 has declared it a possible human carcinogen.  And
17 that's why I would want to err on the side of public
18 health and safety with respect to both warnings and in
19 terms of protecting people from the material.
20    So from that standpoint, I would.  From a
21 standpoint of getting into the bows of whether IARC's
22 right or wrong or EPA's right or wrong, I wouldn't
23 be -- that's not what I'm here to do.
24    MR. KALAS:  Motion to strike as
25    nonresponsive.

13  (Pages 46 to 49)

Stephen E. Petty, PE, CIH, CSP

---

Page 50

BY MR. KALAS:

Q. I didn't ask about regulatory or agency opinions. I asked about the epidemiology studies. So just can you focus on that part of my question, please.

I'm going to re-ask it. Have you conducted an independent assessment, yourself, as to whether or not glyphosate has been shown to be carcinogenic in people in epidemiology studies?

MR. KRISTAL: Objection. Asked and answered.

MR. KALAS: Not answered.

THE WITNESS: Well, I've conducted the -- I have -- I have not done the research program of looking at all the epi studies and that, but I have looked at what, from a industrial hygiene standpoint and from a warning standpoint, I have looked at what folks have said who have done those studies, and my opinions are based on that.

BY MR. KALAS:

Q. Okay. Do you have a Ph.D. in epidemiology?

A. I do not.

Q. Do you have a Ph.D.--

A. Well, I think you asked the question about a Ph.D., so why would you ask questions on individual

---

Page 51

areas?

Q. I'm just asking. Do you have a --

A. Well, I don't have a Ph.D., period.

Q. Okay. Do you have a Ph.D. in toxicology?

MR. KRISTAL: Don't answer that.

MR. KALAS: You're instructing him not to answer if he has a Ph.D. in toxicology?

MR. KRISTAL: Yeah. Because you're harassing him because you asked him if he has any Ph.D. and he said no. So now it's harassment.

MR. KALAS: Okay. We're going to note that he was instructed not to answer the question, Do you have a Ph.D. in toxicology. Okay.

MR. KRISTAL: In the context of you having already asked him if he has any Ph.D. and Mr. Petty saying no.

MR. KALAS: Maybe I'll ask it in the next depo, Jerry.

MR. KRISTAL: You can ask it in whatever depo you want to ask it, but if you ask him the general question and he says no, it becomes harassment.

---

Page 52

BY MR. KALAS:

Q. Have you been recognized by your peers as a Fellow of the American Industrial Hygiene Association?

A. No. I don't believe so.

Q. Okay. Have you taught a college course in the past ten years?

A. Probably not in last ten. It's been a while.

Q. Okay. Now, prior to getting involved in the Roundup litigation, had you evaluated the warnings on Roundup before?

A. On specifically Roundup?

Q. Yes, sir.

A. No.

Q. Okay. Had you ever used Roundup at any point in your life?

A. I don't know. I don't think so. I've used a product called Clear...

Q. Clear-Away?

A. Clear-Away? It's an Ortho product.

Q. Yeah, Clear-Away.

Okay. I'm going to mark as Exhibit 9 your report in the Janzen matter. Apologies to the trees.

A. No. Wearnova (phonetic) put me through school and they promised that I would use lots of trees when I got out of school.

---

Page 53

(Defendant's Exhibit 9 was marked.)

MR. KRISTAL: I have a copy.

MR. KALAS: I wish you told me ahead of time, Jerry.

MR. KRISTAL: I apologize. I didn't realize, but I didn't think you'd be bringing the Full Monty here because the first X number of pages are all the same. But anyway, okay.

BY MR. KALAS:

Q. All right. Now, if we turn to, I guess, the first -- or page 2 of this report, you have two things bulleted here in the introduction. It states: My opinions will center on the extent to which Monsanto was not fully transparent/honest with users and the U.S. EPA OPP with what they knew about the hazards of Roundup and when they knew of these hazards; and the impact of not adequately warning users of their Roundup product of potential hazards resulted in users of their product not adequately protecting themselves from such hazards, thus increasing their exposures and potential impacts from such exposures.

Did I read that correctly?

A. You did.

Q. Okay. And I understand you have a 600-some-odd page report here.

---

14 (Pages 50 to 53)

Stephen E. Petty, PE, CIH, CSP

Page 54

1     MR. KRISTAL:  Well, it's 266 pages and the
2 rest are appendices and tables.
3 BY MR. KALAS:
4     Q.  Okay.  There are 600-some-odd pages printed
5 out here that were served on us but -- and I don't want
6 to make you think that I am trying to tie you down to
7 only those two bullets.  But what I am trying to ask
8 are do those two bullets summarize the main contours of
9 your opinion in this case?
10     MR. KRISTAL:  Objection to form.
11     THE WITNESS:  Well, I would say that to
12     answer your question, what I've done with this
13     report is wherever there are either -- Section
14     10 has my overall over-reaching opinions.
15 BY MR. KALAS:
16     Q.  Okay.
17     A.  And then within the report itself, if I have
18 sub-opinions, I've tried to bracket them.
19     Q.  Okay.  And when did you first reach your
20 opinions regarding the warnings on Roundup?
21     A.  When?  Well, I certainly expressed a lot of
22 them in the deposition testimony for the St. Louis
23 cases.
24     Q.  Okay.  So it would have been last year?  You
25 were retained last year?

Page 55

1     A.  No.  I think -- well, I'm not disagreeing with
2 when I was retained.  I'm just trying to think out loud
3 of when I was deposed, but it was August, September of
4 this year.  So that would have been the first time I
5 offered opinions.  Because at that time I just issued a
6 report of factual -- a factual summary report.
7     So the opinions were first offered in
8 deposition testimony for the five depositions that I
9 took in August and September, I believe.
10     Q.  Let me ask a slightly different question.
11 When did you first reach the opinion that the warnings
12 on Roundup labeling were inadequate?
13     A.  It would have been close to when I issued the
14 report of factual summary.
15     Q.  Okay.  And you issued a first report of
16 factual summary in a case called Neal.  Do you remember
17 that?  That was in 2018.
18     A.  I don't -- I don't recall issuing -- it may
19 have been captioned that, but it was really the Winston
20 cases.  I never really did interviews on Neal.
21     Q.  You don't remember in Neal that you were
22 disclosed as an expert and you were supposed to be
23 deposed in Columbus and then the deposition didn't
24 happen at the last minute?
25     A.  Oh, yeah.  You're right.  You're right.

Page 56

1     Q.  Yeah.
2     A.  We were all sitting there and you guys
3 canceled.  Not you personally but...
4     Q.  Well, it was me personally actually.
5     A.  Was it?
6     Q.  Yeah.  So 2018 --
7     A.  You missed a nice conference room.
8     Q.  Better than this one probably.
9     A.  Oh, yeah.
10     Q.  So that was in 2018 that you reached an
11 opinion that the warnings on Roundup were inadequate?
12     A.  I mean, I hadn't said those anywhere.  I
13 hadn't written those down anywhere, but I would have --
14 if I had been deposed that day, I would have had those
15 opinions, yes.
16     Q.  Well, the record will speak for itself on
17 that, but that's fine.
18     Now, Mr. Janzen used Roundup for farming,
19 correct?
20     A.  Correct.
21     Q.  Okay.  And he used various formulations over
22 the years of Roundup, right?
23     A.  Well, let's go to the interview.  Are you
24 asking about the interview?  Are we going to get into
25 that?

Page 57

1     Q.  Yeah.  We can -- we can get into the
2 interview.  That's fine.
3     A.  I mean, if we're going to --
4     Q.  Yeah.  We can get into the interview.
5     A.  -- talk about Mr. Janzen, we might as well
6 look at the interview and see what he told me.
7     Q.  That's fine.
8     A.  I think it's 517 is where it starts.
9     Q.  That's where I have it.
10     A.  So we're on the same page.
11     Okay.  Your question again?
12     Q.  My question was just, Mr. Janzen used various
13 formulations of Roundup over the years; is that true?
14     A.  I don't know that he knew the formulations.
15 That's why I'm hesitating.  What he said was -- I mean,
16 I know in looking at the history of the formulations, I
17 may know that, but he just said he used Roundup
18 concentrate.  I'm looking at 524, for example.
19     Q.  Okay.  Why don't you --
20     A.  That was the entire --
21     Q.  Sorry.  I didn't mean to cut you off.
22     Why don't you look at 522 though.  Pesticide
23 use, location 2, product names.
24     A.  Oh, I see what you're saying.  Okay.
25     Q.  So let me ask it again.

15 (Pages 54 to 57)

Stephen E. Petty, PE, CIH, CSP

Page 58

1    A. Yeah. Thank you.
2    Q. Over the years Mr. Janzen used various
3  formulations of Roundup?
4    A. That's what he indicated, yes. You're
5  correct. Thank you.
6    Q. Yep. Now, let me just ask you about these
7  witness interviews generally that you've done in, I
8  think, all the Roundup cases since at least the Winston
9  case. Why do you conduct these interviews?
10    A. Well, that's not true.
11    Q. Okay.
12    A. I haven't interviewed the last two in this --
13    Q. Sanders and Tanner. That is correct. You're
14  right. So excluding those two, why do you --
15    A. I'm just trying to be accurate.
16    Q. Be accurate, please. This is going to be a
17  written record.
18        Why do you do these interviews?
19    A. Because I want -- there's two reasons. I want
20  firsthand knowledge about what they recall because from
21  an industrial hygiene standpoint, whether I'm doing
22  litigation or non-litigation or forensics, we always do
23  an interview because the people involved that are
24  affected are likely to have the best knowledge about
25  what they did or what happened to them. So you want

Page 59

1  firsthand knowledge.
2        And then secondly, it's been my experience in
3  doing several hundred of these interviews that, since
4  I'm really pretty well known in the industry as a
5  dermal expert, that rarely do the depositions ask the
6  dermal questions. In fact, I've never seen a
7  deposition ask the dermal questions that I ask, which I
8  need if I'm going to do -- ultimately, I'm doing this
9  because I want to know what they knew with respect to
10  their use so that I can do ultimately inhalation and
11  dermal exposure calculations, should I choose to do so
12  or be asked to do so.
13        So I'm basically collecting information from
14  them on what they did and how they were warned and how
15  they were trained, if they were in an employment
16  situation, and what other products they may have used
17  over their life history and some basic information
18  about, about their background.
19        I want to also find out when the date of
20  diagnosis because, at least in litigation, it's
21  generally -- I can't, you know, I generally am not
22  going to calculate exposures after date of diagnosis.
23  So, I mean, so I need an end point, if you will, for
24  the calculations.
25        But I ask very specific questions about skin

Page 60

1  areas impacted, with respect to the skin areas, the
2  percent wetted, the percent time it's wetted, the --
3  whether or not, since there's exposure after
4  application, I want to know how long it stayed on the
5  skin after it was applied because you have additional
6  dermal exposures after, after the initial application
7  exposure, and that continues to add to the dose.
8        So the questions I ask, I will tell you I have
9  never seen a defense deposition ask those questions in
10  that level of detail. And that's the level of detail I
11  need to do a dermal exposure assessment.
12    Q. Okay. So I wrote down what I think you just
13  said. Tell me if this is a good list of why you do
14  these interviews. You want to get firsthand knowledge
15  from the person about their use and their
16  interpretation of warnings, true?
17        MR. KRISTAL: Asked and answered.
18        THE WITNESS: From an industrial hygiene
19    standpoint it's -- the understanding is that
20    the person that's been exposed would have the
21    best information about their exposure.
22  BY MR. KALAS:
23    Q. All right. So that's one reason you do it,
24  right?
25    A. Sure.

Page 61

1    Q. Okay. Another reason you do it is to get more
2  detailed information about their dermal exposure, so
3  how long their clothes were wetted, what have you?
4        MR. KRISTAL: Asked and answered.
5        THE WITNESS: Well, dermal inhalation,
6    ingestion, all of those, all the pathways.
7  BY MR. KALAS:
8    Q. All the pathways for exposure?
9    A. Sure.
10    Q. Okay. And just so the jury's clear on this,
11  there's a big difference between exposure and dose,
12  true? Those aren't the same thing?
13    A. Actually, you're correct.
14    Q. Okay. First time today, right. Okay.
15    A. We'll train you yet.
16    Q. You want to know what other products somebody
17  has used, right?
18        MR. KRISTAL: Asked and answered.
19        THE WITNESS: Sure. Well, other
20    products -- you know, I always ask smoking,
21    for instance, things like that.
22  BY MR. KALAS:
23    Q. Sure. You want to know the date of diagnosis,
24  correct?
25        MR. KRISTAL: Asked and answered.

16 (Pages 58 to 61)

Stephen E. Petty, PE, CIH, CSP

Page 62

1      THE WITNESS:  I would like to know the
2   date of diagnosis.  I'd like to know their
3   entire job history if I can.
4   BY MR. KALAS:
5      Q.   Including -- okay.  Their job history?
6      A.   I always start with that.
7      Q.   Okay.  Anything else you're looking for in
8   these interviews?
9      A.   Well, I always ask a series of questions on
10   PPE and warnings.
11      Q.   Okay.  Anything else you're looking for?
12      A.   Well, that's what I start with.  And then
13   depending on -- I mean, you have to go with the flow.
14   In other words, if there's something that comes up --
15   in this case it didn't seem relevant, but I just
16   finished a three-week project on radiation exposure.
17   So that's a whole different dimension.
18      I've done cases on heat and cold stress.  So
19   there would be different questions in an environment
20   where somebody worked in an extremely warm environment
21   so -- but in this situation, I certainly wanted -- I
22   didn't -- I didn't think we were looking at mold and
23   bacteria or ionizing radiation so -- but if he'd have
24   said to me as part of his job history, oh, by the way,
25   I worked in a nuclear power plant, I'd want to know

Page 63

1   about that.
2      Q.   Sure.
3      A.   Because, appreciate, I worked on the defense
4   side almost my entire career, working for the insurance
5   industry.  I did ten -- I wrote the book on forensic
6   engineering for the insurance industry.  So I did four
7   thousand projects for them.  And so we were constantly
8   being asked to do a complete assessment of what
9   happened to the building or the people in the
10   buildings.
11      And so that in that sense, I want to have a
12   complete history of what this person did, whether you
13   know, so that I know what all the confounders are as
14   best I can understand them.
15      Q.   Okay.  So you want a complete history as best
16   as you can understand of all the confounders he may
17   have had?
18      A.   I'm trying.  I'm trying.
19      Q.   Okay.
20      A.   But like I said, I don't ask them all
21   because -- unless something comes up in the job -- I
22   mean, that's why I go through the job histories first.
23   And I always ask, what chemicals or products did you
24   use and where were you working and what was your job.
25      I'm trying to figure out then, based on my

Page 64

1   experience and training, what are some things that I
2   need to follow up on with respect to exposure.
3      Q.   All right.  So you had two --
4      A.   So there's no indication as a farmer he worked
5   in a nuclear power plant.
6      Q.   Got it.  You had two calls to Mr. Janzen,
7   correct?  Page 517.
8      A.   I'll get there.  I did.
9      Q.   Okay.  And the first call was in July 2019,
10   right?
11      A.   It was.
12      Q.   Okay.  That was after Mr. Janzen was deposed
13   under oath in this case, right?
14      A.   I don't know that one way or the other.
15      Q.   Have you not read Mr. Janzen's deposition in
16   this case?
17      A.   I have not.  I don't have it.
18      Q.   So when you said that you know the attorneys
19   don't ask the questions about dermal, you don't know
20   that they didn't ask the questions in this case?
21      A.   No.  You misrepresented what I said.  I said,
22   in general, they don't.
23      Q.   Okay.  But you don't know in this case if they
24   didn't?
25      A.   I don't know absolutely, but I'd bet -- I'd

Page 65

1   bet a lot on the fact that I'm right.
2      Q.   If I was taking the deposition, you'd probably
3   be wrong.  But that's all right.  We'll keep going.
4      MR. KRISTAL:  Did you take the deposition?
5      MR. KALAS:  I don't know.  I don't
6   remember.  I take a lot, Jerry.
7      Let's keep going.
8      THE WITNESS:  I mean, if the -- we'll see.
9   I mean, I've said in general it's been my
10   experience and I want to have that information
11   when I'm talking to him.  That's why I take
12   it.
13   BY MR. KALAS:
14      Q.   So you have not read -- I want the record to
15   be clear.  You have not read Mr. Janzen's deposition
16   under oath in this case; is that true?
17      MR. KRISTAL:  Objection.  Asked and
18   answered.
19      THE WITNESS:  That's true.  I have not
20   read his deposition.
21   BY MR. KALAS:
22      Q.   Okay.  Now, you understand that Mr. Janzen had
23   his attorney there at a deposition, right?  That would
24   normally be the case?
25      A.   I don't know anything about that.

17 (Pages 62 to 65)

Stephen E. Petty, PE, CIH, CSP

Page 66

1    Q.  Okay.  Would his attorneys have had an
2  opportunity to ask him questions at the deposition if
3  they were there?
4    A.  That's up to them.  I don't know.
5    Q.  Would they have had the opportunity, sir?  Not
6  whether they did.
7    A.  I guess.  I don't know.
8    Q.  Okay.  And Mr. Janzen also provided a
9  plaintiff fact sheet and exposure checklist that he
10  himself prepared at his deposition.  Were you aware of
11  that?
12    A.  I wasn't at his deposition, so how would I be
13  aware of what he had at his deposition?
14    Q.  But you don't know that he actually prepared
15  an exposure checklist himself prior to the deposition?
16  You didn't know that?
17    A.  I didn't have that checklist so --
18    Q.  Mr. Kristal didn't send that to you?
19    A.  I don't have that.
20    Q.  Okay.  Let me ask you this.  When you're
21  working on a litigation case and -- you talked about in
22  general defense attorneys don't ask the right questions
23  about dermal absorption, right?
24    A.  Not the right -- I didn't say the right
25  questions.  They don't ask the extent of the -- I mean,

Page 67

1  I never made a comment about them being right questions
2  or wrong questions.  I mean, you like to throw those
3  adjectives and descriptors in there, which is fine, but
4  it's not accurate.
5      What I said is you won't find -- and I can say
6  this based on a review of over two hundred depositions
7  where I've done these analyses -- I've never seen the
8  detailed questions that I ask and that I need in order
9  to do a dose calculation.
10    Q.  So it's your --
11    A.  So my experience is that I want to ask those
12  questions.
13    Q.  Sure.  So it's your -- it's been your practice
14  in other cases you've worked on to review the
15  deposition transcript in addition to doing your
16  interview, correct?
17    A.  Sometimes yes, sometimes no.
18    Q.  Okay.  Now, when you had these calls with
19  Mr. Janzen, was he under oath?  Was he sworn in by a
20  court reporter or anybody else?
21    A.  Not to my knowledge.
22    Q.  Okay.  Have you ever been in a deposition
23  where you weren't under oath?
24    A.  Not that I recall.
25    Q.  It's a normal practice in a deposition to be

Page 68

1  sworn in to tell the truth and nothing but the truth,
2  correct?
3    A.  Sure.
4    Q.  Okay.
5    A.  But I've never -- I've done a thousand
6  interviews.  I've never had the interviewee sworn in.
7    Q.  Okay.  There wasn't a court reporter sitting
8  there with Mr. Janzen, writing down everything he said,
9  right?
10    A.  Not to my knowledge.
11    Q.  And, in fact, you note here on this log that
12  these aren't official transcripts, right?
13    A.  Yeah.  It's not a word-for-word transcript.
14  That's right.
15    Q.  Now --
16    A.  But I'm here to testify that it's an accurate
17  representation of what was said.
18    Q.  Okay.  I appreciate that.
19      You had two calls, right?  One that went two
20  hours, thereabouts, right?
21    A.  Correct.
22    Q.  And the second one -- I just want to make sure
23  it's clear -- it says it went twelve hours.  I'm pretty
24  sure that's a typo.
25    A.  Yeah.  It sure is.

Page 69

1    Q.  So that should be fifteen minutes or so?
2    A.  Yeah.  It was very short.  You are correct.
3    Q.  Who took these notes down for the Janzen call?
4    A.  I did.
5    Q.  Okay.  And there were attorneys on the call,
6  right?
7    A.  On the first one, there were.
8    Q.  Okay.  The attorneys talk?
9    A.  Only on introducing, very little.
10    Q.  When you say very little, I need to know what
11  they said.  What did the attorneys say on the call?
12      MR. KRISTAL:  Objection.  Privileged.
13      THE WITNESS:  I think --
14      MR. KRISTAL:  Don't answer the question.
15      MR. KALAS:  Let me make a record here
16    then.
17  BY MR. KALAS:
18    Q.  Are you relying on your notes for your
19  testimony in the case here?
20    A.  Sure.
21    Q.  Okay.  Did you find out your information about
22  how Mr. Janzen used the product based upon your notes
23  in the call?
24    A.  Whatever I recorded here is what I learned
25  from the call.

18 (Pages 66 to 69)

Stephen E. Petty, PE, CIH, CSP

Page 70

1    MR. KALAS: Okay. So we're going to make
2  a record that we're going to reserve relief if
3  that's not privileged. But we can take it up
4  later with the judge if you're going to
5  continue to assert that.
6        Are you going to continue to assert that?
7        MR. KRISTAL: Ask your questions. I'll
8  assert it or not assert it. Depends on the
9  question.
10 BY MR. KALAS:
11   Q. Did the attorneys talk on the call?
12   A. Yeah. They introduced me and introduced me to
13 him and then they said -- they put their phones on mute
14 and I did the interviews.
15   Q. Okay. You said they said very little. Beyond
16 introductions, did they say anything else?
17   A. Most of the time they dropped off.
18      No. I don't recall -- I really don't recall
19 them -- at the end they would say thank you or whatever
20 and there was closing, but most of the time they just
21 dropped off, to be honest with you.
22   Q. Why were the attorneys on the call?
23   A. It was their client, I guess. I don't know.
24   Q. Why did they need to be part of your
25 investigation? You're an independent expert, right?

Page 71

1    A. Just to introduce me to their client, I guess.
2    Q. Okay. Now, another way this is different than
3  Mr. Janzen's deposition, for instance, is that the
4  Monsanto attorneys weren't there as well, right?
5    A. No. They weren't there.
6    Q. Okay.
7    A. I don't know that in a thousand interviews,
8  that I've ever had opposing counsel on the interview.
9    Q. Did you invite, either through Mr. Kristal or
10 directly to Mr. Upshaw or any other Monsanto attorneys
11 you were aware of, did you invite them to participate
12 in the call?
13     MR. KRISTAL: No. Just like you don't
14 invite us to participate in your calls with
15 your expert.
16     MR. KALAS: Jerry, did I ask you the
17 question?
18     MR. KRISTAL: No, but it's --
19     MR. KALAS: Then don't answer it, Jerry.
20     MR. KRISTAL: It's a ridiculous question.
21     MR. KALAS: Don't answer it, Jerry.
22     MR. KRISTAL: It's a ridiculous question.
23 BY MR. KALAS:
24   Q. You can answer the question, sir.
25   A. What's the question?

Page 72

1    Q. I'll ask it again. Did you invite any
2  Monsanto attorneys to participate in the call?
3    A. I don't believe so.
4    Q. Okay. Did you invite any experts from
5  Monsanto to attend or participate in the call?
6    A. No. I didn't set up the calls. I was -- it
7  was a call-in and I called in.
8    Q. Do you know if Mr. Kristal invited any experts
9  from Monsanto to attend or participate in the call?
10   A. I don't know one way or the other.
11   Q. Okay. Do you know why the experts from
12 Monsanto wouldn't be invited to participate in the
13 call?
14     MR. KRISTAL: Objection. He said he
15 doesn't know one way or the other if they were
16 or weren't invited.
17 BY MR. KALAS:
18   Q. Do you know why the experts from Monsanto
19 wouldn't be invited to participate in the call?
20     MR. KRISTAL: Objection. Foundation.
21     THE WITNESS: I was -- I have no idea. I
22 wasn't part of that process.
23 BY MR. KALAS:
24   Q. Do you think it's fair to the development of
25 the record in this case for you to get to ask

Page 73

1  Mr. Janzen questions and Dr. Phalen not to get to ask
2  Mr. Janzen questions?
3      MR. KRISTAL: Objection to foundation.
4      THE WITNESS: I think that you folks had
5    plenty of time to ask him questions.
6    Apparently you, you know, you have the ability
7    to ask him the same questions I asked him.
8      So I don't -- I think there's no issue of
9    fairness. And, in fact, the fact of the
10   matter is you get to see before they even
11   issue their reports what I've said and who
12   I've talked to and what they've told me.
13 BY MR. KALAS:
14   Q. Now, when you say you get to ask, you mean me,
15 an attorney, right?
16   A. Sure.
17   Q. Okay. Did Dr. -- Dr. Phalen is the CIH expert
18 in this case for Monsanto. Have you heard that name?
19   A. I think he is one of the names, yes.
20   Q. In fact, you've cited some of his work in your
21 report. Do you remember that?
22   A. My report?
23   Q. Yes.
24   A. Perhaps. If you want to show it to me --
25   Q. Okay. Do you think Dr. Phalen should have the

19 (Pages 70 to 73)

Stephen E. Petty, PE, CIH, CSP

Page 74

1    opportunity to interview Mr. Janzen with us there?
2         MR. KRISTAL:  Objection.  Beyond the
3    scope.
4         THE WITNESS:  I don't know.  I don't know
5    what the rules and -- I mean, if you wanted to
6    go to the deposition, I don't know.  I don't
7    know what the rules are for that.
8    BY MR. KALAS:
9         Q.  So go to 562 of your report here.
10        MR. KRISTAL:  We've been going about an
11   hour since that four-minute break we had.
12        MR. KALAS:  All right.  Let's take a
13   break.
14        MR. KRISTAL:  When you hit, you know, the
15   next couple minutes.
16        MR. KALAS:  All right.  Two more
17   questions -- two more little things and
18   we'll --
19        MR. KRISTAL:  I'm just trying to stop --
20   I'm just saying --
21        THE WITNESS:  What page are you on, sir?
22   BY MR. KALAS:
23        Q.  562, please.
24        A.  562?
25        Q.  Yeah.  And that's probably from the PDF.  So

Page 75

1    hold on.  Let me put it in the PDF and I'll be able to
2    direct you a little better.
3         A.  Okay.
4         Q.  This is on your materials considered list at
5    page 6 of your report.
6         A.  Materials considered on page 6.
7         Q.  So it's in there --
8         A.  Materials considered are separate from the
9    report.
10        Q.  No.  You have it attached to it.  It's this
11   page.
12        MR. KRISTAL:  There was an updated
13   materials considered.  So this is the one --
14   let's see if this is --
15        THE WITNESS:  Are you going to my appendix
16   A?  Is that where you're at?
17   BY MR. KALAS:
18        Q.  Yeah.  I'm in appendix -- no.  It says Roundup
19   Case Materials Considered.
20        I just need to ask you about the citation.
21        A.  It's not a page.  That's what I'm confused by
22   because the end of my report is 542.
23        Q.  Right.  So --
24        A.  I mean, there was a separate materials
25   considered.

Page 76

1         MR. KRISTAL:  It's Appendix A.  Is this
2    what you're talking about?
3         MR. KALAS:  I'm talking about this page.
4         MR. KRISTAL:  That's the references.
5         THE WITNESS:  No.  That's the references.
6         MR. KALAS:  I'm sorry.
7         THE WITNESS:  I mean, you're either going
8    to my report or you're going to materials
9    considered.  I'm just trying to understand
10   what you're going to.
11        MR. KALAS:  It's hard for me to remember
12   all the labels of them.
13        MR. KRISTAL:  So you're talking about 271
14   where it says Robert Phalen?
15        THE WITNESS:  Well, my reports are always
16   the same.
17        MR. KALAS:  Yes, sir.  That's the one I'm
18   asking about.
19        MR. KRISTAL:  271, the fourth entry down.
20        THE WITNESS:  Okay.  Appendix A.
21        MR. KRISTAL:  No, no.  Page 271.
22        THE WITNESS:  271.
23        MR. KRISTAL:  Yeah.  It's the references.
24        THE WITNESS:  Yeah, yeah.  Appendix A.
25   I'm sorry.  I write the reports the same every

Page 77

1    time.  So I know that and you don't.
2         MR. KALAS:  I apologize.
3         MR. KRISTAL:  The fourth entry down.
4         MR. KALAS:  I think it may be in here
5    twice.
6         THE WITNESS:  Yeah, yeah.  I see the 2018,
7    All Gloves Are Not Created Equal.
8    BY MR. KALAS:
9         Q.  Okay.  What were you relying on Dr. Phalen's
10   article there for, or what did you use it for here?
11        MR. KRISTAL:  Objection to form.
12        THE WITNESS:  Let's see.  I don't know
13   that I used it specifically in this report.
14   These are -- these are references because I've
15   learned a long time ago that if I don't list
16   the material that I might consider, especially
17   if it goes to a Daubert, then I can't rely on
18   the document.
19        So these are general industrial hygiene
20   type texts or papers, et cetera, that I list
21   as basic background materials that I may or
22   may not use.
23   BY MR. KALAS:
24        Q.  Okay.  So you thought you might want to rely
25   on that article by Dr. Phalen?

20 (Pages 74 to 77)

Stephen E. Petty, PE, CIH, CSP

Page 78

```
 1          MR. KRISTAL: Objection. Misstates the
 2     testimony.
 3          THE WITNESS: I think I just described why
 4     they're in here.
 5     BY MR. KALAS:
 6          Q.  Do you have any opinions sitting here today on
 7     that article?
 8          A.  I do not.
 9          Q.  Okay. And then on the last, very last page of
10     what I marked as Exhibit 9 --
11          A.  Exhibit 9.
12          Q.  -- which is the videos, Exhibit 296.
13          A.  Are we going back to the materials considered?
14          Q.  Yeah. It's what I marked exhibit -- it's
15     literally the very last --
16          A.  Yeah. This is kind of a --
17          Q.  It's this page.
18          A.  It's kind of a -- you've really marked
19     something that's two different items, but that's okay.
20     This is the report. This is the materials considered.
21          Q.  Okay. It's probably at the end of that. I'm
22     sorry.
23          A.  So that's why it's confusing.
24          Q.  Are we --
25          MR. KRISTAL: Exhibit 9 is the Janzen
```

Page 79

```
 1     report.
 2          MR. KALAS: Right. That's it.
 3          THE WITNESS: No. But he attached this to
 4     the Janzen report. That's what's confusing.
 5          MR. KALAS: That's how it was served on
 6     us, so that's why it was attached to it.
 7          THE WITNESS: I'm not arguing about it one
 8     way or the other. I'm just saying --
 9          MR. KALAS: I know. They need to stay
10     together for the exhibit, is all I'm saying,
11     at the end of the day.
12          THE WITNESS: I would have marked it as a
13     separate exhibit, but that's fine because this
14     was an update of the materials considered that
15     was in the report.
16          MR. KALAS: Okay. Last page of that that
17     you have held out there.
18          THE WITNESS: What he's done is attach --
19          MR. KRISTAL: No. I understand.
20          THE WITNESS: That's what's confusing to
21     me at first.
22          MR. KRISTAL: The updated materials
23     considered report has now been attached to
24     Exhibit 9; is that what you're saying?
25          MR. KALAS: No.
```

Page 80

```
 1          THE WITNESS: It's included as part of
 2     Exhibit 9.
 3          MR. KALAS: This is just what was served
 4     on us as his report. This is the original.
 5          THE WITNESS: Marked them together.
 6     That's all I'm saying. And it confused me as
 7     well, but that's okay. I'm just trying to
 8     make --
 9          MR. KRISTAL: You do understand there was
10     an updated materials considered?
11          MR. KALAS: I do understand there is. I
12     just marked what was originally served, yeah.
13          MR. KRISTAL: Okay.
14          MR. KALAS: Can we go to the last page.
15          THE WITNESS: I'm just trying to get my
16     arms around this. That's all I'm saying.
17     BY MR. KALAS:
18          Q.  I understand. Last page of this one.
19          A.  Okay.
20          Q.  Do you see that there's a citation there or
21     videos there for six videos that are listed as RUP
22     Al-Khatib? Do you see that?
23          A.  I do.
24          Q.  What are those?
25          A.  Those are -- I forget the university that he
```

Page 81

```
 1     works out of. It's in California.
 2          Q.  Davis, UC Davis.
 3          A.  Davis. But they're videos that he prepared
 4     there about the topics that are listed.
 5          Q.  Do you have opinions on those videos?
 6          A.  I would if you showed me individual ones, I
 7     would, yes.
 8          Q.  Sitting here today, can you think of any
 9     opinions on those videos that occurred to you?
10          A.  Yeah. He's -- he makes some very specific
11     recommendations about what PPE should be worn when
12     applying pesticides to protect against dermal.
13          Q.  And what would you say at trial if asked about
14     those videos?
15          A.  I would say that his recommendations are not
16     consistent with what Roundup -- with what Monsanto was
17     recommending.
18          MR. KALAS: All right. Let's take a
19     break.
20          THE VIDEOGRAPHER: 10:26 a.m. Going off
21     the record.
22          (A break was taken.)
23          THE VIDEOGRAPHER: 10:38 a.m. Back on
24     record.
25
```

21 (Pages 78 to 81)

Stephen E. Petty, PE, CIH, CSP

Page 82

BY MR. KALAS:
Q.  All right.  Now, when you had these phone interviews with Mr. Janzen -- going back to your notes on Mr. Janzen -- do you know if anybody else was in the room with Mr. Janzen?
A.  If there is someone else in the room and I am aware of it, I will note that.
Q.  Okay.
A.  Typically, the -- typically, for instance, a spouse might be there.  If they are, then I note that.  And I'll hear them because they might chime in.  And if they chime in, I'll note the spouse said this or whatever.
Q.  Was Mr. Domina in the room with Mr. Janzen, to your knowledge?
A.  Mr. Domina?
Q.  Yes, sir.
A.  If he was -- when we first start the call, everybody acknowledges who they are.  That's how I -- so if they -- if they -- if they're noticed, if you will, then I write their names down.  So if I didn't, I wouldn't write their --
Q.  Well, I see that you wrote outside parties here, Matt Hans, David Domina.  Do you see that on page 517?

Page 83

A.  Yeah.  I'm just trying to get there.  That's why -- I apologize.  I'm trying to get to this page.  Yeah.  So Mr. Domina was on the phone.
Q.  He was on the phone.  He was not in the room?
A.  I don't -- I don't...
Q.  If you don't know --
A.  I don't know for sure.  But my thought was that he, that he was on the conference call.
Q.  He was on the call?
A.  Right.
Q.  But not in the room with Mr. Janzen, to your knowledge?
A.  To my knowledge he wasn't, but I don't know that for a fact, I guess.
Q.  You didn't ask Mr. Janzen, "who's in the room with you," on the call?
A.  I didn't.  I did not.
Q.  Okay.  Did you video conference for this or was it an audio call?
A.  It's audio.
Q.  Okay.  Did you tape record the conversation?  In other words, an audio tape?
A.  I did not.
Q.  Okay.  Why not?
A.  I never have.  I've done thousands of them.  I

Page 84

just never have.
Q.  You had a two-hour call and then a 15-minute call.  And out of the two-hour call and 15-minute call, we have -- I'm not casting any aspersions when I say this -- but we have eleven pages of notes; is that correct?  And then you have your tables you created after.
A.  Well, the tables are the notes because I -- I think you probably -- well, I don't know that you know that.  I can't say that.  But I was asked in previous depositions to give sort of a blind form on the starting point of where I, you know, kind of a, do I have a -- not a template -- but some sort of form that I start from.
Q.  So we have 16 pages of notes, if I include the tables.
A.  So that -- what I'm saying is the tables are what I fill in as I talk to them.
Q.  So we have 16 pages of notes including the tables, correct?  517 to 532?
A.  If your math's right, then I'll agree with you.
Q.  Okay.  So of these 16 pages of notes, that encompasses approximately two hours of conversations with Mr. Janzen, right?

Page 85

A.  That's correct.
Q.  Okay.  Is there anything that you talked about that you didn't find important to write down?
A.  No.  I wouldn't do that.  I wouldn't do that.  Like I said, I did these for years for the insurance industry on the defense side.  There's -- it may sound self-serving, but I call balls and strikes.  Whatever they tell me, I put down.
Q.  Okay.  But, again, when you're testifying at trial, the jury is going to have to take your word that the best record of what was said on this call is your notes because you did not audio record the call; is that true?
A.  Well, there's two -- I did not -- I think I've already answered I did not audio record the call.  What was your other question?
Q.  Well, it wasn't two questions.  It was the because.
A.  It was just a statement.
Q.  It was the because part of it.  So the question was --
A.  I'm trying to figure out what the question is.
Q.  When you're testifying at trial, the jury's going to have to take your word -- when you're testifying at trial, the jury's going to have to take

Stephen E. Petty, PE, CIH, CSP

Page 86

1  your word that the best record of what was said on the
2  call is your notes because of the fact you did not
3  record the call, true?
4         MR. KRISTAL: Object to form of the
5      question.
6         THE WITNESS: No. It's not true because
7      they're going to have the deposition
8      testimony, they're going to have him, who's
9      been crossed or directly talked to.
10        So if there's something that's said here
11     that turns out that isn't -- that somebody
12     says isn't right -- the jury's going to get to
13     hear other, from him directly, both direct and
14     cross probably, and they also have the
15     deposition testimony. So there are other ways
16     to get at this information and verify it.
17 BY MR. KALAS:
18     Q.  Okay. So my question was about the call, not
19  about all the evidence. It's about the particular
20  calls you had.
21     A.  No. It was about whether the jury would have
22  to rely on this and I --
23     Q.  You misunderstood my question then.
24     A.  Okay.
25     Q.  Okay. My question has to do with the record

Page 87

1  of the calls, okay, not the record of everything
2  Mr. Janzen has said in totality about his exposure.
3  The record of the calls.
4         Do you understand that's the narrowness of my
5  question here?
6      A.  In this case, I do.
7      Q.  Okay.
8      A.  You changed the question, but go ahead.
9      Q.  Maybe I have. And if I have, I'm sorry for
10  misleading you on the first question.
11     A.  No. It's not misleading. I'm just saying --
12  there's nothing nefarious about it. I'm just saying
13  the question has changed.
14        MR. KRISTAL: Right. You leave the
15     nefarious to me.
16 BY MR. KALAS:
17     Q.  It's true that at trial the jury is going to
18  need to rely on your notes as the best record of what
19  was said at the call because you did not audio record
20  the call, true?
21        MR. KRISTAL: Objection.
22        THE WITNESS: No. Because -- because
23     you -- you, if you wanted on cross could walk
24     him through this call and ask him directly,
25     did you tell Mr. Petty that.

Page 88

1         So you have recourse to validate or not
2      validate what he told me at trial.
3  BY MR. KALAS:
4      Q.  Okay. So it's your testimony that the way to
5  examine whether or not what was said on the call is
6  actually what was said on the call is to cross examine
7  Mr. Janzen about what was said on the call months after
8  the call occurred?
9         MR. KRISTAL: Objection to the form.
10        THE WITNESS: No. I don't think that's
11     what I said at all. I said one way -- you
12     changed the question again. But the -- you
13     asked if there's a way other than my notes to
14     validate whether or not this is what was said,
15     and I said you could ask him directly.
16 BY MR. KALAS:
17     Q.  Where can I find the transcript of this call,
18  the official transcript?
19     A.  There is not an official transcript. I mean,
20  you've already asked that question.
21     Q.  Okay. Now, he's diagnosed in 2013, right?
22     A.  June of 2013. That's correct.
23     Q.  And he was 63 years old when he was diagnosed,
24  right?
25     A.  Yeah. I mean, I believe that's correct, yes.

Page 89

1  From '49 to 2013.
2      Q.  There is nothing unusual about a 63-year-old
3  being diagnosed with NHL. It, in fact, happens every
4  day in this country, right?
5         MR. KRISTAL: Objection. Beyond the
6      scope.
7         THE WITNESS: I'm not the causation guy,
8      so I wouldn't be able to answer that question
9      one way or the other.
10 BY MR. KALAS:
11     Q.  You can't answer whether there's a 63-year-old
12  diagnosed with NHL every day in this country? Is that
13  your testimony?
14     A.  No. I don't know if that's true or not.
15     Q.  Okay.
16     A.  I mean, it could be, it could not be. I don't
17  have any statistics or basis to have an opinion on
18  that.
19     Q.  Okay. Are there people diagnosed with NHL in
20  this country who've never used Roundup a day in their
21  life?
22        MR. KRISTAL: Objection. Beyond the
23     scope.
24        THE WITNESS: Could -- I don't know the
25     answer to that. I mean, any answer I would

23 (Pages 86 to 89)

Stephen E. Petty, PE, CIH, CSP

Page 90

1  give you would be speculation because I just
2  don't know.
3  BY MR. KALAS:
4     Q.  Did NHL exist before Roundup was introduced to
5  the market?
6        MR. KRISTAL:  Objection.  Beyond the
7     scope.
8        THE WITNESS:  I don't know.  Probably.
9     I'm not an NHL expert.  I'm not the causation
10    expert.  So you're asking me questions I can't
11    answer.
12 BY MR. KALAS:
13    Q.  Okay.  You can't answer that, okay.
14       Is NHL a signature disease of Roundup exposure
15 the way mesothelioma is a signature disease of asbestos
16 exposure?
17       MR. KRISTAL:  Objection.  Beyond the
18    scope.
19       THE WITNESS:  I don't know how to answer
20    that question.  I really don't.  I'm not the
21    causation guy.  You're asking the wrong guy
22    those questions.  I'm here -- I'm here on
23    exposure and I'm here on warnings.
24 BY MR. KALAS:
25    Q.  You've testified in many, many benzene cases

Page 91

1  over the course of your career, right?
2     A.  Sure.
3     Q.  Okay.  You've heard of the disease AML, right?
4     A.  Yes.
5     Q.  And AML is very strongly associated with
6  benzene exposure, right?
7        MR. KRISTAL:  Objection.  Beyond the
8     scope.
9        THE WITNESS:  Well, I'd like to have you
10    say that to some other defense attorneys.
11 BY MR. KALAS:
12    Q.  Okay.  Is that your opinion?
13    A.  I'm going to take that testimony and remind
14 them of that.
15    Q.  Is that your opinion?
16    A.  I don't have opinions on the causation.  I'm
17 not the specific causation guy.  I'm not even in
18 benzene.
19       Here's -- the industrial hygienist's role --
20 if you ask me the question -- I remember the exam
21 question on benzene.  There was one on my CIH exam.
22 Unfortunately, I have too good a memory.  But it was
23 what disease is associated with leukemia and they
24 listed five chemicals to which --
25    Q.  Which chemical is associated with leukemia,

Page 92

1  not what disease is associated.
2        MR. KRISTAL:  You just misspoke.
3        THE WITNESS:  I misspoke.  It said --
4        MR. KRISTAL:  What chemical.
5        THE WITNESS:  -- what chemical is
6     associated with leukemia.  I'm sorry.  And it
7     had five chemicals listed.  And the proper
8     answer was benzene.
9        That question -- and that's the kind of
10    question if somebody -- we're looking at it
11    from -- outside of litigation, when I'm asked
12    to go out and figure out why somebody's not
13    feeling well, we have the universe of things
14    that can make them not feel well.  And our job
15    is to winnow it down to things we think are
16    most likely in test for those or rule things
17    in, rule things out.
18       If somebody has -- so if somebody has
19    leukemia when we interview them, we're going
20    to be looking for benzene containing chemicals
21    or exposures to benzene containing chemicals
22    or products as part of that because we have to
23    know the general causation in order to do our
24    job.
25       It's just like the example I gave

Page 93

1  yesterday.  I was asked to go into a home --
2  aside from doing the forensics investigation,
3  the reason they liked me is I was a PE and a
4  CIH.  They didn't have to hire two people.
5  And I did the interview and I was supposed to
6  go in there and test for mold.
7     I did the interview.  Her symptoms were
8  all gastrointestinal.  I did the inspection.
9  There's a raw sewage leak in her basement.
10 The bottom line was, I called the insurance
11 guy and I said, I want to test for bacteria.
12 He says no, no, no, I sent you there to test
13 for mold.
14    I said, wait a second.  Pretend I'm a
15 mechanic and you hire me to -- you ask me to
16 fix your car and I notice that it's smoking
17 and you say, no, I only want you to work on
18 the tires.  I said, well, I'm the mechanic,
19 I'm the expert.  No, I need to work on your
20 engine.  It's not the tires that's your
21 problem.
22    This is the same problem.  It was a long
23 argument.  I said, I'll test for mold, but I
24 said, this is a bacteria -- more likely than
25 not, a bacteria exposure.  Now, can I say that

24 (Pages 90 to 93)

Stephen E. Petty, PE, CIH, CSP

## Page 94

1    that -- in fact, it turned out that the
2    bacteria levels were very high.
3         Now, can I say that that bacteria caused
4    her disease, no.  I can say the bacteria is
5    associated with the symptoms she had.  But the
6    physician's going to take my report, his
7    examination, and make that specific causation
8    call.
9         So as -- how I'm answering your question
10   is, from an industrial hygiene standpoint, we
11   have to know because of the toxicology
12   requirements.  To do this winnowing process, I
13   have to know benzene, for example, is
14   associated with leukemia.  Do I have to know
15   all the subtypes of leukemia that are
16   validated yes two times or whatever the
17   epidemiologists do -- I mean, I've read --
18   I've got the entire benzene -- I've got twenty
19   thousand documents on benzene.
20        So I know the epi stuff, et cetera.  But
21   that's not what I'm hired to do.  So do I
22   peripherally know some of that stuff in
23   benzene because I've done so many cases on
24   benzene, yeah, but that's not what I'm
25   there -- I'm there for the same reasons I'm

## Page 95

1    here, exposure and warnings.  And that's what
2    I do.
3         MR. KALAS:  Motion to strike as
4    nonresponsive.  I think that's the fourth
5    five-minute narrative answer we've gotten
6    today.  Let's keep moving.
7         MR. KRISTAL:  A, they were all responsive.
8    B, they were not five minutes.
9    BY MR. KALAS:
10   Q.  Okay.  Are you going to opine NHL is a
11   signature disease of Roundup exposure, yes or no?
12        MR. KRISTAL:  Objection.  Beyond the
13   scope.
14        MR. KALAS:  If it's beyond the scope, he
15   can say no.
16        MR. KRISTAL:  Well, if it's beyond the
17   scope and since you have his report, you're
18   just wasting time.
19   BY MR. KALAS:
20   Q.  Are you going to opine Roundup -- NHL is a
21   signature disease of Roundup exposure?
22   A.  I'm going to say that NHL has been associated,
23   based on the IARC work, with NHL.  Would I use the word
24   signature disease, I'm not sure I would -- all of that
25   detail about whether it's signature or not is going to

## Page 96

1    be left to the toxicology and epidemiology experts.
2    Q.  So you would not use the word signature
3    disease?
4         MR. KRISTAL:  Objection.  Beyond the
5    scope.
6         THE WITNESS:  I would say that it has been
7    associated in the literature with NHL.  That
8    would be what I would -- I would do it from a
9    general causation standpoint.
10   BY MR. KALAS:
11   Q.  Understood.
12        Now, you asked Mr. Janzen in your interview
13   about his occupational exposures, correct?
14   A.  I did.
15   Q.  Okay.  Starting with the hospital that he
16   worked at, which is location number 2?
17   A.  Oh, location 2, okay.
18   Q.  How did you go about finding out the products
19   that were used in the hospital?  You have a products
20   used section here.  What questions did you ask?
21   A.  A very open question; were there products that
22   you -- were there any products you used in that job
23   that you can recall having -- I'll say, do you recall
24   any chemicals that you worked with or products you used
25   that would have given you chemical exposures.  And

## Page 97

1    they'll either list them or they won't.
2    Q.  Did you ask him if he cleaned medical
3    instruments in that hospital?
4    A.  I did not.
5    Q.  Okay.  What was used to clean medical
6    instruments in hospitals in the '70s?
7         MR. KRISTAL:  Objection.  Beyond the
8    scope.
9         THE WITNESS:  I'm not -- I don't know the
10   answer to that question right here and now.
11   BY MR. KALAS:
12   Q.  You never heard of ethylene oxide?
13   A.  Oh, yeah.  As a chemical engineer I've heard
14   of ethylene oxide.
15   Q.  Was ethylene oxide used to clean medical
16   equipment in hospitals?
17   A.  I think I just answered that question.
18        MR. KRISTAL:  Objection.  Beyond the
19   scope.
20   BY MR. KALAS:
21   Q.  Which is?  Maybe I don't recall.
22        What did you say?  I'm sorry.  I really don't.
23   A.  You ask them so fast, you don't even hear the
24   answers.  That's pretty funny.
25        So I said that I certainly understand -- I

Stephen E. Petty, PE, CIH, CSP

Page 98

1 certainly know about ethylene oxide, but I haven't sat
2 down and looked at -- I'm not prepared right now to
3 look at what the history was of using, what cleaning
4 agents were used in that time frame. I don't have that
5 information on the top of my fingertips right now.
6    Q.   You have to know general causation, right --
7    A.   Sure.
8    Q.   -- as an industrial hygienist? Has ethylene
9 oxide been associated in the literature with NHL?
10    A.   I don't know the answer to that off the top of
11 my head.
12    Q.   Okay. How about cleaning gas canisters, did
13 you ask him if he cleaned gas canisters in the
14 hospital?
15    A.   I did not.
16    Q.   Did you ask him -- so you didn't ask him then
17 what chemicals would have been in those canisters since
18 you didn't ask him about gas canisters, right?
19    A.   That's a good presumption, yes.
20    Q.   Okay. Did you ask him about the use of
21 formalin or formaldehyde in the hospital?
22    A.   I did not.
23    Q.   Has formaldehyde been associated with
24 lymphatic cancers?
25    A.   I have to go back and look.

Page 99

1    I've done -- I've done measuring of
2 formaldehyde. I don't know the question off the top of
3 my head.
4    Q.   You don't know the answer?
5    A.   The answer, yeah.
6    Q.   Okay. That's fine. So you don't have an
7 opinion about that, sitting here today?
8    A.   I'd have to think about it.
9       MR. KRISTAL: Objection. Beyond the
10 scope.
11       THE WITNESS: I'd have to think about it.
12    I mean, it's -- I've done -- I've done cases
13    and I've done, outside of litigation cases
14    with formaldehyde exposure, measured it. I
15    just don't remember off the top of my head
16    what the diseases were that are associated
17    with it.
18 BY MR. KALAS:
19    Q.   And then you asked Mr. Janzen about his
20 exposures on the farm.
21       What questions did you ask him about his
22 exposures on the farm?
23    A.   Well, for example, on page 520 I would ask him
24 what chemical products did you use when you were on the
25 farm, and he would list those. And I'd say, are there

Page 100

1 any more, and he would list them.
2    Q.   Okay. So your specific question was, what
3 chemical products did you use on the farm?
4    A.   And then he would start to list those.
5    Q.   Okay. And then you'd follow up and ask if
6 there were any more?
7    A.   Right.
8    Q.   And then any follow-up questions beyond that,
9 or would that be the end of the questions?
10    A.   Well, sure. Once I got that list, then
11 eventually I would really drill down on the Roundup
12 exposure because that's what I was most interested in.
13    Q.   Now, that's interesting you say that. Why
14 were you most interested in Roundup exposure as opposed
15 to all exposures?
16       MR. KRISTAL: Objection to form.
17       THE WITNESS: In the sense of
18    calculating -- because that's the one where I
19    was going to calculate the exposure, the
20    detailed exposure times, events, et cetera.
21       It's not to say that I wasn't -- I mean,
22    I'm being absolute honest -- I mean, I'm
23    being -- what I'm trying to do is delineate
24    all the products that he says he used. I'm
25    not trying to hide that from anybody.

Page 101

1 BY MR. KALAS:
2    Q.   I understand.
3    A.   So it's not like I'm not considering those
4 other things. I'm trying to be as explicit as I can
5 about what they are. But the details on the Roundup
6 are because I may be asked to do detailed calculations
7 for dose and for inhalation exposure. So I'm going to
8 collect the information to be able to do that.
9    Q.   You may be asked by Mr. Kristal to do that?
10    A.   I mean, I do these interviews oftentimes early
11 because the individual may be sick, we don't know how
12 long they'll live, et cetera, et cetera.
13       So I'm trying to get some information while
14 they're still with us. And what the attorney may or
15 may not ask me to do with that -- I'm trying to collect
16 the information as if I would have to do a detailed
17 exposure analysis.
18    Q.   So outside of litigation for a moment here.
19    A.   Sure.
20    Q.   When you get asked -- when somebody has a
21 disease or sickness, you get asked to come in and do an
22 exposure assessment, okay, that's happened to you in
23 your career?
24    A.   It has.
25    Q.   Okay. And you come in and you do an interview

Stephen E. Petty, PE, CIH, CSP

Page 102

1    like you did here where you find out all of the things
2    they may have been exposed to, right?
3        A.  Sure.
4        Q.  Okay.
5        A.  Although usually -- usually on the insurance
6    side, it's much more targeted, believe it or not.
7        Q.  Okay.  But your general practice is to come --
8        A.  I mean -- I apologize.  They've already almost
9    told me -- like I gave you the example of mold versus
10   bacteria, they've told me what they want me to do based
11   on the individual's been to a physician.
12           They're anticipating their exposure, if you
13   will.  I'm still going to try to figure out if that's
14   right or not independently.  But it's usually pretty
15   targeted, if you will.
16       Q.  And the attorneys here asked you to do the
17   dose assessment you did here as far as exposure days,
18   right?
19       A.  Oh, I never did a dose assessment.
20       Q.  Excuse me.  Exposure assessment.
21       A.  I mean, I could, I could but --
22       Q.  That's right.
23       A.  I thought you said you understood the
24   difference.
25       Q.  I do.  The attorneys here asked you to do the

Page 103

1    exposure assessment you did here, correct, of Roundup
2    exposure?
3        A.  No.  They didn't direct it -- the interview
4    and the questions I asked were my own.
5        Q.  No.
6        A.  As far as doing the calculations where I
7    summed the total events and the total days and the
8    total hours and the time and all that, they never asked
9    me to do that.  I did that independently.
10       Q.  Okay.  So why didn't you do an exposure
11   assessment on days and times and what have you on any
12   of the other agricultural chemicals Mr. Janzen was
13   exposed to?
14       A.  Because I didn't collect the same detailed
15   information for that.
16       Q.  Okay.  You weren't as interested in that
17   information?
18       A.  I wouldn't say that.  That's a
19   misrepresentation.  I was interested in all the
20   chemicals he was exposed to so that I could put that on
21   the record.
22       Q.  Okay.  But you didn't, for instance, follow up
23   with Mr. Janzen about his exposure, days, mixing of any
24   of the other pesticides.  I don't have a table for any
25   of the other pesticides he talked about here like I

Page 104

1    have for Roundup, right?
2        A.  That's correct.
3        Q.  Okay.
4        A.  That's correct.
5        Q.  Okay.  Do you know if this is a full and
6    complete list of every pesticide, herbicide,
7    rodenticide and insecticide that Mr. Janzen handled?
8        A.  That's what he told me.  That's all I can tell
9    you.
10       Q.  Have you farmed?
11       A.  I have.  I grew up on a farm.
12       Q.  Okay.  What did you grow on that farm?
13       A.  We mainly just grew stuff for ourselves and
14   then we mainly raised cattle, chickens, ducks, hogs.
15       Q.  So it was livestock?
16       A.  It was mainly pastures, but we did have a
17   huge, an acre garden.  I can tell you I spent days
18   hauling manure from the barn to the garden in
19   rototiller.  It's a fun job.
20       Q.  So it was an acre garden?
21       A.  Yeah.  But then we had pastures that we had to
22   take -- there was a weed out there called Tansy that
23   was toxic to the cows.  So we got our job was to spend
24   days pulling those by hand.
25       Q.  Oh, that's interesting.  So it took days for

Page 105

1    you to pull weeds on your property that you grew up on?
2        A.  No.  I said I spent days doing that.
3        Q.  You spent -- because it took you days, right?
4    You didn't go out there for fun.
5        A.  No.  We'd go out for an hour or two and dad
6    would say, hey, you're causing too much trouble in the
7    house, go out there and pull some weeds.
8        Q.  And was that physical -- was that physical
9    labor?
10       A.  Not relative to the eight hours a day of
11   chores I had, no.
12       Q.  Did you have to --
13       A.  That was easy.
14       Q.  Did you have to lean over each time you pulled
15   a weed?
16       A.  I assume so.
17       Q.  From an ergonomic point of view -- you're an
18   industrial hygienist -- from an ergonomic point of
19   view, can injuries occur from pulling weeds again and
20   again?
21       A.  Not nearly as much as having a cow hit you or
22   a bull hit you or hauling bales that are a hundred
23   pounds, no.  The ergonomics of pulling weeds was a
24   piece of cake in comparison to the other things that I
25   did.

27 (Pages 102 to 105)

Stephen E. Petty, PE, CIH, CSP

### Page 106

1    Q. Let's keep moving.
2        Have you farmed on a commercial farm raising
3    soybeans or corn?
4    A. No. We had a separate farm that raised
5    alfalfa.
6    Q. Okay. So not soybeans or corn?
7    A. Not soybeans or corn.
8    Q. And when did you leave that farm?
9    A. When did I leave it?
10   Q. Yeah. When did you go out into the world?
11   A. When I went out to the world?
12   Q. Yeah. What year?
13   A. I thought I'd been in the world pretty much
14   before then. When I went to college, 18.
15   Q. What year was that, sir?
16   A. Oh, my gosh. 1975.
17   Q. 1975. What pesticides did you use on the
18   farm?
19   A. We didn't. We didn't use any pesticides. We
20   were poor. We couldn't -- we -- I can tell you I had a
21   car that I bought on 25 cords of wood and I spent my
22   whole life in a junkyard trying to keep it going. So
23   we didn't spend much money on anything.
24   Q. Okay. Is it your testimony that a modern corn
25   or soybean farm -- and I guess in the case of

### Page 107

1    Mr. Janzen, we're talking about soybeans, I believe.
2        Is it your testimony that a modern soybean
3    farm uses only the pesticides that you -- and by
4    pesticides, I mean pesticides, insecticides,
5    herbicides, rodenticides -- uses only the ones you
6    wrote down here from your exposure assessment?
7        MR. KRISTAL: Objection. Beyond the
8    scope.
9        THE WITNESS: I don't know how to answer
10   that question. I mean, it's so broad. I
11   mean, you're defining a modern farm, and
12   there's a whole spectrum of things I'm sure
13   that people use or don't use.
14   BY MR. KALAS:
15   Q. Well, I guess my question's getting at this.
16   Maybe this will make it a little easier for you.
17       Did you do anything after you spoke to
18   Mr. Janzen to verify that these are the only types of
19   pesticides that would normally be used on a farm like
20   this?
21       MR. KRISTAL: Objection. Beyond the
22   scope.
23       MR. KALAS: I'm just asking what he did.
24       MR. KRISTAL: What's the difference of
25   what was normally used on some abstract

### Page 108

1    hypothetical farm to what Mr. Petty is here
2    for? That's why it's beyond the scope.
3        THE WITNESS: Yeah. My focus was on
4    exposure, his exposure, in this particular
5    case, and the extent to which he was warned
6    and the extent to which the information that
7    Monsanto used would have resulted in adequate
8    warnings.
9    BY MR. KALAS:
10   Q. Well, I guess my --
11   A. So that's my focus. I'm not -- I'm not being
12   offered up as a farming expert.
13   Q. We could short-circuit this a little bit, I
14   think. Did you do anything after talking to Mr. Janzen
15   to check out, so to speak, whether or not what he was
16   telling you appeared to be a complete history of
17   exposure on a farm like his?
18       MR. KRISTAL: Objection.
19       THE WITNESS: Well, I had the second
20   interview to fill in some blanks but --
21   BY MR. KALAS:
22   Q. Okay. Beyond speaking to him?
23   A. I'm not sure what you're asking. I really am
24   not. I mean, it's so broad. I don't know how I would
25   answer that question.

### Page 109

1    Q. I'm asking this. After you spoke to
2    Mr. Janzen, you received his exposure history, did you
3    do any other independent research to determine whether
4    or not the types of exposures he talked about would
5    have actually been used on a farm that he worked on or
6    if there were also other exposures that might have been
7    on the type of farm that he worked on?
8        MR. KRISTAL: Objection to form. Beyond
9    the scope.
10       THE WITNESS: I think there are multiple
11   questions there.
12       I mean, I've got almost five hundred
13   exhibits. So there's certainly papers in
14   there that I reviewed that have to do -- I'm
15   sure there are things in there that have to do
16   with farming.
17       So to the extent that I looked at other
18   materials, it would be whatever's listed in
19   the list of materials considered.
20   BY MR. KALAS:
21   Q. What sort of tractor did Mr. Janzen use on the
22   farm, or tractors?
23   A. He spoke about on page 522 about using a four
24   wheeler tractor, so that -- with a 25-gallon tank. So
25   it's a four wheeler.

28 (Pages 106 to 109)

Stephen E. Petty, PE, CIH, CSP

Page 110

1    Q.  Okay.  What was the fuel used in that --
2         MR. KRISTAL:  He's not done answering the
3    question.
4    BY MR. KALAS:
5    Q.  Go ahead and finish your answer, and then I'll
6    ask you about each one.
7    A.  Yeah.  That would be nice.
8         Let me just peel through these.  In the next
9    case he just describes it as a --
10   Q.  What page, sir?
11   A.  524.  I'm sorry.  Describes it as simply a
12   tractor that had two, three hundred gallon mounted
13   tanks on it.
14   Q.  Okay.
15   A.  And then the next one he describes a tractor
16   with initially two hundred gallon tanks and then three
17   hundred gallon tanks.  That's what he told me about the
18   tractors.
19   Q.  Did you ask a follow-up question about what
20   sort of fuel the tractors used?
21   A.  I did not.
22   Q.  Okay.  You've worked on cases involving diesel
23   exhaust before, right?
24   A.  I have.
25   Q.  What have you opined about in those diesel

Page 111

1    cases?
2         MR. KRISTAL:  Objection.  Beyond the
3    scope.
4         THE WITNESS:  You want to -- I have no
5    idea how to answer that question.
6    BY MR. KALAS:
7    Q.  Let me ask a better question.
8    A.  All the cases I've worked on and all the
9    opinions that might have been offered.
10   Q.  Have you opined that diesel exhaust has been
11   associated in literature with cancer?
12        MR. KRISTAL:  Objection.  Beyond the
13   scope.
14        THE WITNESS:  If you want to show me a
15   case, I can either agree or disagree.  I've
16   worked on a half a dozen or a dozen diesel
17   exhaust cases.  So generally -- generally,
18   those have been associated with diseases of
19   the lung, as I recall.  But for me to recall
20   in this setting exactly all my opinions and
21   what I said or didn't say, I just can't tell
22   you.
23   BY MR. KALAS:
24   Q.  Is diesel a group 1 IARC carcinogen, diesel
25   exhaust?

Page 112

1         MR. KRISTAL:  Objection.  Beyond the
2    scope.
3         THE WITNESS:  I don't know off the top of
4    my head.
5    BY MR. KALAS:
6    Q.  You didn't write down a list of IARC
7    carcinogens before you had this interview to make sure
8    you asked about those exposures?
9         MR. KRISTAL:  Beyond the scope.
10        THE WITNESS:  I did not write down a list
11   of IARC category 1 carcinogens.  That's true.
12   BY MR. KALAS:
13   Q.  Okay.  So you didn't -- okay.  Keep moving.
14        Did you assess generally exposures to diesel
15   on the farm to Mr. Janzen?
16   A.  It's -- I didn't, but it's an outdoor
17   exposure.  So I would expect, if you've looked at any
18   of my diesel exhaust reports, you would recognize --
19   well, wouldn't really matter whether it was diesel
20   exhaust or anything else, but very difficult to get
21   high exposures on outdoor exposures.
22   Q.  Did you ask if he ran the diesel engines while
23   inside the barn while repairing equipment or anything
24   like that?
25   A.  I did not.

Page 113

1    Q.  Okay.  Did you ask Mr. Janzen --
2    A.  But he wasn't applying the pesticide inside
3    the barn.
4    Q.  Okay.  I understand the clarification, but
5    that wasn't what I asked anyway, but we'll move on.
6         Did you ask about what Mr. Janzen's source of
7    drinking water was?
8    A.  I did not.
9    Q.  Okay.  So you don't know if he had well water
10   or city water?
11   A.  I don't.
12   Q.  Okay.  Are you aware of the nitrate levels in
13   the drinking water in Nebraska?
14   A.  Well, I'm sure they vary.  Just like I've
15   looked at nitrate levels in well water of Ohio but not
16   Nebraska.
17   Q.  And you didn't ask or do any research on the
18   nitrate levels in the drinking water of Nebraska when
19   doing your exposure assessment for Mr. Janzen, correct?
20   A.  I did not.
21   Q.  Okay.  How about a burn pit?  Did you ask
22   Mr. Janzen if he had a burn pit on site?
23   A.  I did not.
24   Q.  Are PAHs a group 1 IARC carcinogen?
25   A.  I'd have to -- I don't know the answer to that

Stephen E. Petty, PE, CIH, CSP

## Page 114

1   off the top of my head.
2     Q. Okay. And you didn't know the answer to that
3   when you were interviewing Mr. Janzen either, right?
4     A. Well, I'd have to look and see what they're
5   saying. I mean, I certainly have known from a long
6   time ago that benzoate pyrene, which is a PAH --
7   obviously when we did risk assessments, that's one of
8   concern, BAP. But, no, if it was outdoors and in a
9   residential setting, I think those exposures would be
10   minimal.
11     Q. Did Mr. Janzen live in a residential setting
12   or did he live in an agricultural setting?
13     A. Well, it's certainly not industrial. I mean,
14   I consider the farm to be an outdoor environment where
15   he's living.
16     Q. Have you been to his farm?
17     A. I've not been to his farm.
18     Q. Are you aware it's one of the largest farming
19   operations in Nebraska?
20     A. I don't know whether it is or isn't.
21     Q. Do you know how many employees Mr. Janzen has
22   on his farm?
23     A. I do not.
24     Q. Okay.
25     A. I'm looking again specifically at the exposure

## Page 115

1   detail. It doesn't affect those -- it doesn't affect
2   those decisions.
3     Q. Okay. Now, did you review the pictures taken
4   on the site visit of Mr. Janzen's property by
5   Dr. Phalen?
6     A. No. I haven't seen those.
7     Q. Has Mr. Kristal sent those to you?
8     A. I do not have those.
9     Q. It's November 6th. Are you aware those were
10   served on October 25th?
11     A. Five days ago, six days ago?
12     Q. It's two weeks ago now, sir. Are you aware
13   those were served two weeks ago?
14     A. How would I be aware of it if I haven't seen
15   them? I mean, that's a silly question.
16     Q. Are you aware that there were pesticides
17   observed on the site visit not on your list from your
18   interview?
19     A. I don't know how I would know that one way or
20   the other.
21     Q. Okay. Now, if we go to page 521, you talk
22   about the Roundup formulations that Mr. Janzen used.
23   This is at, I think, starting at 521, his home use.
24   And then I think we looked at earlier -- I'm looking
25   for the portion -- yes. If we go to -- let's go to

## Page 116

1   525, pesticide use location for family farm.
2     Let me know when you're there.
3     A. Okay. I'm there.
4     Q. Okay. And you said that -- and I know I asked
5   this before, but I'm just saying it to establish some
6   foundation here. You said that he used Roundup
7   concentrate, progression of product names from original
8   to Ultra and finally Power Max, right?
9     A. Correct.
10     Q. Okay. And I'm going to mark as Exhibit -- if
11   I can find my stickers -- Exhibit 10, a label that
12   actually appeared in your report.
13     A. Can you show me the report where it appeared,
14   please?
15     Q. Yeah. Give me one sec to mark it. Just
16   making sure I'm marking the right one here. Give me
17   one sec.
18     (Defendant's Exhibit 10 was marked.)
19   BY MR. KALAS:
20     Q. Going to the PDF here real quick.
21     All right. It says -- it's page 118 of your
22   Janzen -- that's Pollard, but I imagine it's probably
23   the same for Janzen. Hold on.
24     Yep. You're looking at it. Page 118. And
25   this is a label for Roundup from 1974, correct?

## Page 117

1     A. Correct.
2     Q. Okay. This would have been the first label at
3   least you've seen that -- Jerry -- that was out there
4   for Roundup, right?
5     A. It was one of the early ones, yes.
6     Q. Okay. And I just want to make sure that I
7   understand what's on this label. This label states
8   underneath the title Roundup, postemergence herbicide
9   by Monsanto. It states: Danger, keep out of reach of
10   children, use only according to label instructions.
11     Did I read that correctly?
12     A. Yes.
13     Q. Okay. And then moving on past the "this side
14   up" portion, to that column to the right of "this side
15   up." So I'm looking over here.
16     A. Okay.
17     Q. At the top of the label it says: Keep out of
18   reach of children, danger.
19     Did I read that correctly?
20     A. I'm having a hard time reading this but --
21     Q. It's a miniature facsimile of what was on the
22   label but --
23     A. I mean, this is the problem of labels. You
24   can't read them.
25     Q. Okay. So I'm just asking if I read it

Stephen E. Petty, PE, CIH, CSP

## Page 118

1    correctly.  And if you can't read it, then just tell me
2    you can't read it and we'll move on.
3         A.  Having a hard time.  I see the word danger,
4    but it's really blurry.
5         Q.  Okay.  If you keep going, sir, it states:
6    Causes eye burns and skin irritation.
7            Did I read that correctly?
8         A.  Where are you at?
9         Q.  Right underneath danger.
10        A.  I see the word irritate.  It's hard to read.
11        Q.  Okay.  Moving on, it states:  Avoid contact
12   with eyes, skin, or clothing.
13           Did I read that correctly?
14        A.  I think so.  The same issue.
15        Q.  Okay.  You have another label that appears in
16   your report.  I'll mark --
17        A.  What's the word avoid mean?  I mean, I'm very
18   critical of that.  I've been critical of that for
19   years.
20           I mean, if you're using the product, you
21   either -- that word has absolute -- it's
22   non-actionable.  It has -- you just read it, and it's
23   one of my criticisms.  How do you avoid a chemical when
24   it stays in the air for minutes at a time as an
25   aerosol?  And you either -- you either are protected

## Page 119

1    from it -- you either use it and you're exposed or you
2    don't use it.
3            But what's avoid mean?  I have no idea what
4    that word means to an end user.
5         Q.  I mean this with all due respect to you.  Did
6    I ask you what the label meant or did I ask you to read
7    it?
8         A.  You didn't ask me to read it.  You read it.
9         Q.  Okay.  And I asked you if I read it correctly,
10   right?
11        A.  Right.
12        Q.  Okay.  Did I ask you what it meant?
13        A.  You brought the label up for a reason and the
14   language for a reason.
15        Q.  Sir, my question was, did I ask you what the
16   label meant.  If I didn't ask you it, just say, you
17   didn't ask me that.  And we'll move on.
18        A.  I said that word avoid is a word that's not
19   actionable.
20        MR. KALAS:  I'm going to move to strike
21        everything you said after reading the label
22        and I'm going to note the wasting of time for
23        the fifth time today.  We're going to keep
24        going.
25           Exhibit 11 --

## Page 120

1         MR. KRISTAL:  And I would note that it was
2    not a waste of time in any way, shape, or
3    form.  The fact that you didn't like it
4    doesn't make it a waste of time.
5         MR. KALAS:  The fact that it's not
6    responsive makes it a waste of time.
7         MR. KRISTAL:  You who are asking questions
8    that have nothing to do with his report or his
9    opinions should be the last one to complain
10   about wasting time.
11        (Defendant's Exhibit 11 was marked.)
12   BY MR. KALAS:
13        Q.  Did Mr. Janzen use Roundup during the time
14   period that these labels were out there?
15        MR. KRISTAL:  Out where?
16        MR. KALAS:  Out in the public, sir.
17   Public domain.
18        MR. KRISTAL:  Object to form.
19   BY MR. KALAS:
20        Q.  You know what, I withdraw the question.
21        A.  I think the answer's no because it says '84
22   and this is a '74 label.  So I think that --
23        Q.  Okay.  Does this label appear in your report
24   about Mr. Janzen?
25        A.  It appears in the report, but it appears in

## Page 121

1    the report because what I'm looking at is the
2    transition from signal word from danger, which I think
3    is an appropriate word, to caution, which I don't.
4         Q.  Okay.  Let's look at the next label, 11.  I
5    just marked it.  This also appears in your report,
6    correct?
7         A.  Show me where, please.
8         Q.  I believe it is the page after the one we were
9    just looking at.  I think it's page 119.
10        A.  Okay.  I'm there.
11        Q.  Okay.  And this label says, under
12   precautionary statements:  Do not get in eyes, on skin,
13   or on clothing.
14           Did I read that correctly?
15        A.  I can't read it.
16        Q.  Okay.
17        A.  I see the word warning.  I can read that word.
18        Q.  Okay.
19        A.  Herein lies the problem.  It's hard to read
20   them even when they're blown up.
21        Q.  Okay.  If you can't read it, that's fine.  The
22   record will speak for itself.
23           Let me ask you this.  If you could read the
24   label and it said, do not get in eyes, on skin, or on
25   clothing, would somebody following that label and

31 (Pages 118 to 121)

Stephen E. Petty, PE, CIH, CSP

Page 122

1    trying to avoid getting Roundup on their clothing, for
2    instance, would somebody following that label reduce
3    their exposure, even if it is impossible to completely
4    avoid getting Roundup on clothing?
5         MR. KRISTAL:  Objection to form.
6         THE WITNESS:  Ask the question again.  I
7    think it's multiple questions.
8    BY MR. KALAS:
9         Q.  Okay.  It's your opinion that it is impossible
10   to avoid getting Roundup on your skin when applying,
11   correct?
12        A.  No.
13        Q.  You believe that it is --
14        A.  I've never used the word -- I don't know that
15   I've use the word impossible.
16        Q.  Okay.  Do you believe --
17        A.  That's an exaggeration by you, but that's
18   fine.  I've never used that word.
19        Q.  Okay.  Do you believe that one can avoid
20   getting Roundup on their skin when applying?
21        A.  I would never use the word avoid.  If -- I
22   would say instead -- if I were the preparer of the
23   label and I thought that that was a probability, then I
24   would simply provide the appropriate PPE to keep that
25   from happening.

Page 123

1         Q.  I'm not asking about a label here.  I'm asking
2    about your review of the --
3         A.  It is the label.
4         Q.  I'm not asking about the label when I ask that
5    question.  So I'm trying to clarify it for you, sir.
6         Based on your review of the scientific
7    literature sounding Roundup that are cited in your
8    report, do you believe it is possible to avoid getting
9    Roundup on your skin when applying Roundup?
10        A.  Yeah.
11        Q.  Okay.  So if it is --
12        A.  It's possible, sure.
13        Q.  Okay.  So if it is possible to avoid getting
14   Roundup on your skin when applying Roundup, would a
15   warning to not get Roundup on your skin reduce exposure
16   to Roundup?
17        A.  Would a warning not to get Roundup -- if it's
18   given in context with a PPE recommendation that doesn't
19   protect the skin, then no.
20        Q.  Okay.  On this label they just say don't get
21   it on your skin, right?
22        A.  There's all sorts of warnings that are not
23   actionable.  We -- I talk about that at length.
24        Q.  Okay.  So it's your --
25        A.  It's my opinion --

Page 124

1         MR. KRISTAL:  Let him answer.
2         THE WITNESS:  Let me finish, please.  You
3    like to go, go, go, and I like to finish my
4    answer.
5    BY MR. KALAS:
6         Q.  I haven't gotten the same courtesy from
7    Mr. Kristal's colleagues, but I will certainly give it
8    to you.  Please continue.
9         A.  Well, you haven't.  That's my point.
10        MR. KRISTAL:  I'm not sure what that means
11   but...
12        THE WITNESS:  But -- and, believe me, I'm
13   a very courteous person.  So I'd appreciate
14   the same from you.
15   BY MR. KALAS:
16        Q.  I'm trying.
17        A.  Well, you're not being courteous, I'm telling
18   you.  I've been deposed many times.
19        Q.  Okay.
20        A.  And what I'm saying is if the language is
21   knowingly not actionable -- they're in the position to
22   create these labels.  They know the suspension rate of
23   these droplets.  They know the size of these droplets.
24        If they have industrial health and safety
25   people, which I'm sure they do, then to make a blanket

Page 125

1    statement that says, "do not get it on your skin" is a
2    meaningless statement because if you're going to use
3    the product and you don't tell people how to keep it
4    from getting on their skin, how are they going to know
5    what to do?  These aren't Ph.D.s walking around doing
6    this work.
7         Q.  Let me ask you a hypothetical.  If I went out
8    and applied Roundup and I read that whole label and I
9    saw do not get it on my skin, okay, and I sprayed
10   Roundup and I felt some blow-back on my skin and I
11   recalled that the label said don't get it on my skin,
12   so then I went and removed it from my skin using a
13   wash, what have you, would that reduce my exposure?
14        MR. KRISTAL:  Objection to form.
15        THE WITNESS:  If you washed it off, would
16   you have lower exposure, of course, to some
17   degree.
18   BY MR. KALAS:
19        Q.  Thank you.  Let's keep going.
20        A.  And it depends -- remember --
21        Q.  There's no question pending.
22        A.  No, no, no, no.  I said to some degree, and I
23   hadn't finished my answer.
24        Q.  Okay.  Finish your answer.
25        A.  I just had --

32 (Pages 122 to 125)

Stephen E. Petty, PE, CIH, CSP

Page 126

1  Q. Finish your answer.
2  A. This is where you're not very courteous.
3  Q. Okay.
4  A. I provided to you the Davies reviews. And
5  what they show in there is even when you do a wash at
6  six hours -- they were doing a wash 24 hours later, and
7  there was significant residual 24 hours after it had
8  all been washed off.
9  Q. Did you review the Zhai study, Z-H-A-I, 2008?
10  A. I don't know.
11  Q. Did you review the Wester '91 skin washing
12  study?
13  A. Sure, absolutely.
14  Q. Did you see that washing after five minutes,
15  ten minutes, thirty minutes, is up to 80 to 90 percent
16  effective of removing glyphosate from the skin?
17  A. I did, but you're missing my point. You're
18  missing the point of the recent literature which shows
19  when you do the detailed washing at six hours and then
20  you -- so and stuff's removed -- and then you measure
21  again the material moving -- you wash the skin again 18
22  hours later. The amount coming, pulling out of the
23  skin is four times what they're measuring going through
24  the skin, four hundred times.
25  So my point simply is, yes, it will reduce it,

Page 127

1  but there's still a significant exposure, even if you
2  do a wash.
3  Q. Now, that washing technique is in vitro dermal
4  absorption study, right?
5  MR. KRISTAL: Objection. What are you
6  referring to?
7  MR. KALAS: In Davies that you're talking
8  about.
9  THE WITNESS: Which Davies?
10  BY MR. KALAS:
11  Q. All the Davies studies are in vitro dermal
12  absorption studies, correct?
13  A. They are, but which one are you referring to?
14  Q. The washing techniques you're referring to
15  after six hours.
16  A. Okay. They're different studies with
17  different materials, but that's fine. Go ahead.
18  Q. Okay. They're all in vitro studies though,
19  correct?
20  A. They are. They're dead skin, yeah.
21  Q. Okay. You're aware that the skin washing
22  evaluation in the Wester study was done in vivo model,
23  correct?
24  A. That's correct. They were monkeys.
25  Q. Okay. What's the difference between an in

Page 128

1  vitro and in vivo model, if you have any opinion on
2  that?
3  A. Well, I've written about it.
4  Q. Okay. So what's the difference between an in
5  vitro and in vivo model?
6  A. In what sense? I mean, what are you asking --
7  Q. What do the words mean?
8  A. What are you asking me about?
9  Q. What do the words mean? What does the word in
10  vivo mean?
11  A. In vivo, in lay terms, means live skin, living
12  skin, in the sense that it's on an animal or an
13  individual who's alive.
14  Q. Okay. And what's -- I'm sorry. Go ahead.
15  A. And in vitro is traditionally cadaver skin.
16  It's dead -- I call it dead skin. It's cadaver skin.
17  Q. Now --
18  MR. KRISTAL: And how did he do on the
19  test?
20  MR. KALAS: I'm sorry?
21  MR. KRISTAL: How did he do on the test?
22  MR. KALAS: Oh, I don't know. We're still
23  pending.
24  THE WITNESS: He doesn't know the answer.
25  MR. KALAS: We're still pending.

Page 129

1  BY MR. KALAS:
2  Q. All right.
3  A. I'm just teasing you.
4  Q. I'm down for teasing.
5  Now, it's true that Mr. Janzen, like all of
6  us, is exposed to compounds every day that have been
7  designated as carcinogenic by IARC and other agencies
8  that are not Roundup?
9  MR. KRISTAL: Objection to form. Beyond
10  the scope.
11  THE WITNESS: I don't know how to answer
12  that.
13  BY MR. KALAS:
14  Q. Okay. When I go to the gas station, I fill up
15  the car, do I have some low level of exposure to
16  benzene?
17  MR. KRISTAL: Objection. Beyond the
18  scope.
19  Don't complain about wasting time when
20  you're asking about pumping gas.
21  MR. KALAS: Okay. I'm asking about his
22  methodology, but okay.
23  MR. KRISTAL: I'm asking you to make it
24  more relevant to what we're doing here since
25  that has nothing to do with what we're doing

33 (Pages 126 to 129)

Stephen E. Petty, PE, CIH, CSP

Page 130

1    here.
2         THE WITNESS: The question again?
3
4    BY MR. KALAS:
5         Q.  When I go to the gas station to pump gas, am I
6    exposed to some low level of benzene?
7         A.  Potentially.
8         Q.  Okay.  When I'm walking around outside, am I
9    exposed to some low level of ambient asbestos?
10        MR. KRISTAL:  Same objection.
11        THE WITNESS:  We call it de minimis.
12   BY MR. KALAS:
13        Q.  Okay.  But there is still some in the air,
14   just the ambient air?
15        A.  Well, here's the difference, I mean, as an
16   industrial hygienist.  The exposures of concern in
17   occupational settings, of concern typically are factors
18   at least a thousand, often ten thousand times
19   background.  So, you know, it's minimal.  I mean, there
20   may be something there, but it's very minimal.
21        Q.  Absolutely.  It's the old saw, dose makes the
22   poison, right?
23        A.  To some extent.  Pericles.  But also there's
24   saturation.
25        So in other words, you can get to a level

Page 131

1    where increasing the level of the dose doesn't
2    effectively change it.
3         Q.  No.  I was just -- I made that look because
4    you said Pericles.  I think it's Paracelsus.  But
5    anyway, we'll keep going.
6         So what dose -- well, let me ask you this
7    rather than asking you it directly.  Are you going to
8    offer an opinion to the jury about what dose of Roundup
9    exposure -- or excuse me -- what dose of Roundup
10   absorption can cause an increased risk of NHL in
11   people?  Is that an opinion you're offering?
12        MR. KRISTAL:  Objection.  Beyond the
13   scope.
14        THE WITNESS:  I'm not a causation expert,
15   so I wouldn't offer a causation opinion.
16        I'm going to offer an opinion that he had
17   thousands of exposure events in days and
18   thousands of hours of exposure and that there
19   was significant dermal exposure as well as
20   inhalation.
21   BY MR. KALAS:
22        Q.  But you aren't going to tell the jury, if I
23   understand correctly, that the exposure Mr. Janzen had
24   was sufficient to cause an increased risk of NHL in
25   Mr. Janzen; is that true?

Page 132

1         MR. KRISTAL:  Asked and answered, beyond
2    the scope.
3         THE WITNESS:  I've answered this question
4    much earlier when we had this discussion about
5    specific and general causation, and I said I'm
6    precluded, not being a medical doctor, from
7    offering specific causation opinions.  And
8    you're asking am I going to offer a specific
9    causation opinion, and I'm saying no.
10   BY MR. KALAS:
11        Q.  Okay.  Well, my question was slightly
12   different, but we'll keep going.
13        There's a difference between hazard and risk,
14   right?
15        A.  Well, they're different terms, yeah.
16        Q.  Okay.  Hazard -- tell me if you agree with
17   this definition.  A hazard is something that has the
18   capability of causing an outcome, be it cancer or
19   reproductive defect or anything else.
20        MR. KRISTAL:  Objection.  Beyond the
21   scope.
22        THE WITNESS:  Well, I'm not sure how to
23   answer that question.
24        From my background, whether I'm doing a
25   risk assessment or I'm doing a hazard exposure

Page 133

1    assessment -- one's on the EPA world, one's in
2    the OSHA world primarily -- they're both
3    potential for dose.
4         The dose is what actually gets into the
5    body versus the exposure, if you will, which
6    is the material outside the body, if you will.
7    And so that's how I look at that terminology.
8         When you start to get into risk
9    assessment, hazard assessment, I can tell --
10   I've done and I've taught that stuff.  I look
11   at it differently.  I can tell you what they
12   do and what those things calculate.  But to
13   get into the nuances of what's the word hazard
14   versus risk mean, I'm not sure I really even
15   have an opinion or would know.
16        I can tell you I've done hazard
17   assessments, I've done risk assessments, and I
18   can tell you what I've done in them.
19   BY MR. KALAS:
20        Q.  So let me see if this makes sense.  When you
21   do a risk assessment, you take a hazard assessment, you
22   combine it with an exposure assessment, and then you
23   calculate what the risk would be; is that a fair
24   statement?
25        MR. KRISTAL:  Objection.  Beyond the

34 (Pages 130 to 133)

Stephen E. Petty, PE, CIH, CSP

Page 134

1    scope.
2        THE WITNESS: Well, I think I took some of
3    the very first risk assessment courses at Ohio
4    State in the 1990s. In fact, I'm sure of it.
5    I was one of the few industry people. They
6    were all EPA people. And it's all based on
7    the ASTM 1739-95 standard. And, in fact,
8    that's the standard I used to develop the OSHA
9    rules for risk assessment, or help develop
10   them in the 1999 time frame.
11       The hazards assessment is part of the
12   process typically at picking the pathways, and
13   that's where I'm so critical of EPA, where
14   they assumed away the cancer pathway, they
15   assumed away the dermal pathway, they assumed
16   away the inhalation pathway, and they left the
17   ingestion pathway.
18       And my comment in previous depositions is,
19   as part of that hazards analysis, if you
20   assume away all the risks, pathways, you have
21   a low risk. You don't have to be a scientist
22   to understand that. And that's what they did.
23   And that's my criticism.
24       I believe there are real dermal pathways.
25   The dermal should have been considered in the

Page 135

1    risk assessment, and it wasn't. It was -- it
2    was deleted in the hazards assessment portion
3    of that risk assessment.
4        MR. KALAS: Move to strike as not
5    responsive.
6    BY MR. KALAS:
7        Q. Let me ask it a different way because I don't
8    think you're answering my question.
9        What's a hazard?
10       MR. KRISTAL: Objection. Beyond the
11   scope.
12       THE WITNESS: From my perspective, a
13   hazard is a situation that has the potential
14   to cause harm. It could be chemical, it could
15   be mechanical, it could be heat, it could be
16   cold.
17   BY MR. KALAS:
18       Q. What's a risk?
19       A. A risk is --
20       MR. KRISTAL: Beyond the scope.
21       THE WITNESS: A risk assessment --
22   BY MR. KALAS:
23       Q. Not a risk assessment. What's a risk?
24       A. Well, it's part of risk assessment. You're
25   not letting me finish.

Page 136

1        Q. But you're answering a different question,
2    sir. What's a risk?
3        A. Are you an expert in risk assessment?
4        Q. I'm just asking what a risk is, not what a
5    risk assessment is.
6        A. Well, it's part of risk assessment --
7        Q. Finish your answer. Finish your answer.
8        A. What that is, risk a risk assessment is
9    looking at risk, and it's a combination of human health
10   models with transport models.
11       Q. Okay. And the human health model would be the
12   hazard and the transport model would be the exposure?
13       MR. KRISTAL: Objection. Beyond the
14   scope.
15       THE WITNESS: No. No, no, no, no.
16       The human health models ultimately in the
17   EPA world are either as a carcinogen or
18   noncarcinogen and they have reference doses,
19   reference concentrations, et cetera.
20       The transport models are the models that
21   move the material from the environment to the
22   body, whether it be from the soil, whether it
23   be from the air, whether it be from ingestion,
24   et cetera. Those are the transport models.
25       And one just has to look at ASTM 1739 to see

Page 137

1    that.
2    BY MR. KALAS:
3        Q. Do you agree, sir, that a hazard can be
4    defined as a situation with a potential for injury,
5    damage to property, or damage to the environment?
6        MR. KRISTAL: Objection. Beyond the
7    scope.
8        THE WITNESS: Oh, if you want to look at
9    the hazard with respect to property and
10   environment, yeah, that would have a
11   broader -- yes, absolutely.
12   BY MR. KALAS:
13       Q. Okay. Do you agree a risk can be defined as
14   the likelihood that injury, damage, or loss will occur
15   as a result of a given hazard?
16       MR. KRISTAL: Objection. Beyond the
17   scope.
18       THE WITNESS: And that's what I just
19   explained to you.
20   BY MR. KALAS:
21       Q. Okay. Do you agree with the definition I just
22   read?
23       A. It's one definition of risk, yes, but it's the
24   same -- really the same definition with respect to
25   human health risks that I just described in risk

35 (Pages 134 to 137)

Stephen E. Petty, PE, CIH, CSP

Page 138

1  assessment, which is the combination of human health
2  models and transport models so that you can calculate
3  the risk relative to the non-risk.
4      Q.  What is the likelihood that Mr. Janzen would
5  have gotten NHL from the exposure you calculated?  Are
6  you going to offer an opinion on that?
7          MR. KRISTAL:  I just want to say
8      something.  You have a lengthy report, so you
9      know the scope of Mr. Petty's opinions.
10     You're complaining about wasting time and
11     you're asking him questions that we're going
12     to be offering through other experts.
13         So we've spent a good portion of today's
14     deposition with Mr. Petty saying, "that's not
15     something I intend to offer," or me making a
16     scope objection.  I'm not sure why you're
17     doing this, but it's a complete waste of time.
18         MR. KALAS:  Thanks for the speech, Jerry.
19         MR. KRISTAL:  You're welcome.  Hopefully
20     you'll take something from it.
21  BY MR. KALAS:
22     Q.  Are you going to be -- what is the likely --
23  or do you have an opinion as to the likelihood
24  Mr. Janzen would have developed NHL from the exposure
25  you assessed in this case?

Page 139

1          MR. KRISTAL:  Objection.  Beyond the
2      scope.
3          THE WITNESS:  You're asking me causation
4      questions.  I don't know how many times I've
5      told you I'm not the causation expert.
6  BY MR. KALAS:
7      Q.  So you have no opinion?
8      A.  That is a causation question.  I'm not going
9  to offer those opinions here.
10     Q.  Okay.  Let's keep going.
11     A.  You ask the same question over and over again.
12  Different words.
13     Q.  All right.  Now, the lowest dose that
14  regulatory agencies have -- let me ask this a better
15  way.
16         You've reviewed a lot of the dose levels that
17  have been set by the various regulatory agencies for
18  acceptable operator exposures, RFDs, that sort of
19  thing, in your materials considered list, right?
20     A.  Not necessarily.  I looked at -- I looked at
21  the British work a little bit on ingestion, I believe,
22  but I didn't calculate a dose.  So I had no reason to
23  go make a comparison.
24     Q.  Okay.
25     A.  All I calculated was events and time.

Page 140

1      I mean, I've tried to -- I've tried to bring
2  to this table my opinions and what I've done so that
3  you can ask me questions about that, but you keep
4  asking me questions about what I didn't do.
5      Q.  Go to page 89 of your report, please.
6      A.  Sure.
7      Q.  Do you see your discussion there about a
8  figure called an AOEL?
9      A.  Right.
10     Q.  And that is acceptable operator exposure
11  level, correct?
12     A.  Okay.
13     Q.  Is that correct?
14     A.  At that time it was, yes.
15     Q.  Okay.  But that's what AOEL means?  That's
16  what my question is.
17     A.  It's an exposure limit, yeah.
18     Q.  Okay.  And you state below that:  Results are
19  much worse when no such gloves and clothing are worn.
20         Do you see that?
21     A.  Yes.
22     Q.  Okay.  And you're talking about the UK POEM
23  model, figure 430 on the previous page?
24     A.  Correct.
25     Q.  And the UK POEM model is a model, right?  It

Page 141

1  is not actual measurements in the field of glyphosate
2  exposure, true?
3          MR. KRISTAL:  Objection to form.
4          THE WITNESS:  Well, ultimately it's based
5      on -- it's a model, no doubt, but the model
6      has to have input parameters, and those input
7      parameters come from studies.
8  BY MR. KALAS:
9      Q.  When you're being up front with the jury and
10  being honest with the jury, if you present this
11  information to the jury, you'll tell them it's a model
12  and not something that was measured on an actual person
13  applying glyphosate, right?
14         MR. KRISTAL:  Object to the form of the
15     question.
16         THE WITNESS:  I'll answer it the same way
17     I just answered it.  It's a model that's --
18     when you say to me that it's not based on
19     any data --
20  BY MR. KALAS:
21     Q.  That's not what I asked.
22     A.  No.  You said it's not based on actual
23  measurements in the field.
24     Q.  Right.  Is this based on actual measurements
25  in the field?

36  (Pages 138 to 141)

Stephen E. Petty, PE, CIH, CSP

Page 142

1      A.  And this has -- this has to be based
2  ultimately on -- some of these input parameters have to
3  have a basis.
4      Q.  Okay.  What is the highest volume of surface
5  contamination measured for glyphosate in the field
6  ever?
7          MR. KRISTAL:  Objection to form.
8          THE WITNESS:  I have no idea.
9  BY MR. KALAS:
10     Q.  You have no idea, okay.
11     A.  I mean, I don't think -- I mean, the highest
12  would -- it would be interesting to see what that's
13  been reported because it would depend a lot on the PPE
14  and on the time, et cetera, so...
15     Q.  A model is only as good as the parameters
16  input into the model; is that true?
17     A.  Well, you can run Monte Carlos around it, so
18  you can get competence intervals and the data.
19         So the midpoint of that statement is true, but
20  then you can run Monte Carlo simulations of the
21  variability and the input data so that you get a more
22  likely estimation of the population.
23     Q.  Did you run any Monte Carlo simulations on
24  this data here?
25     A.  I haven't done it, but I did last week on a

Page 143

1  different case.
2      Q.  Okay.  Did you do it in this case?
3      A.  I did not calculate a dose in this case.  I
4  mean, you ask me that question again and again, and you
5  know what I did.  So why are you asking me what I
6  didn't do?
7      Q.  Are you going to talk about the UK POEM model
8  to the jury at trial?
9      A.  Yeah.
10     Q.  Okay.  So then I'm asking about the model.
11  I'm not asking about anything else.
12         So did you run a Monte Carlo simulation on
13  this model?
14     A.  I did not.
15     Q.  Okay.  So go back to 89, please.
16     A.  Okay.
17     Q.  You talk about the AOEL and you state here
18  about the AOEL:  Results are much worse when no such
19  gloves and clothing are worn, right?
20     A.  Correct.
21     Q.  Okay.  What study in an applicator in real
22  life in the field has indicated a dose above that AOEL
23  of point two mgs per kgs body weight per day?
24         MR. KRISTAL:  Objection to form.
25         THE WITNESS:  I don't know.  I didn't look

Page 144

1  at that.
2  BY MR. KALAS:
3      Q.  Okay.  Let's keep going.
4      A.  I mean, the ones I've looked at, I've looked
5  at.  But have I looked at the universe of everything
6  that's out there, probably not.
7      Q.  There are applicators in the literature that
8  you've reviewed who were wearing shorts while applying.
9      A.  Exactly.
10     Q.  Okay.  There are applicators in the literature
11  you've reviewed who are wearing short-sleeve shirts
12  while applying, correct?
13     A.  And I've commented on those in places where
14  they only measure the urine.  And I don't necessarily
15  agree that that's the only -- there's a question of --
16  there's a whole series of questions about those
17  studies, and I oppose some of those.
18         MR. KALAS:  Motion to strike as
19  nonresponsive.
20  BY MR. KALAS:
21     Q.  My question was, are there applicators in the
22  literature wearing short-sleeve shirts?
23         MR. KRISTAL:  Objection to form.
24         THE WITNESS:  I think that Monsanto was
25  cited by -- or was reprimanded by EPA for, in

Page 145

1  fact, having advertising showing that.
2  BY MR. KALAS:
3      Q.  Okay.  I'm asking about biomonitoring studies,
4  sir.
5      A.  Well, you're asking me where they were wearing
6  shorts, and the one I'm trying to recall -- you asked
7  me if I can recall that.  I'm trying to give you an
8  example.
9      Q.  Okay.  So I'm not asking about advertising.
10  I'm asking about the biomonitoring and passive
11  dosimetry literature.  Okay?  Can you focus on that set
12  of literature?
13         MR. KRISTAL:  Well, why didn't you ask
14  that initially?
15  BY MR. KALAS:
16     Q.  Okay.  There are applicators in the
17  biomonitoring and passive dosimetry literature who are
18  wearing shorts?
19     A.  Okay.
20     Q.  Are there?
21     A.  I don't know.
22     Q.  Okay.  Are there applicators in the
23  biomonitoring --
24     A.  I'd have to look at that.
25     Q.  Okay.  Are there applicators in the

37 (Pages 142 to 145)

Stephen E. Petty, PE, CIH, CSP

Page 146

1 biomonitoring and passive dosimetry literature wearing
2 gloves -- were not wearing gloves?
3      A.  I assume there are.
4      Q.  Okay.  Are there applicators in the
5 biomonitoring passive dosimetry literature upon which
6 spill incidents were observed?
7      A.  I don't know how to answer that question,
8 other than if you show me a study or whatever, I can
9 say yes or no.
10      Q.  Okay.  You mentioned your urine criticism, you
11 know, we're going to keep moving here.  But are passive
12 dosimetry studies dependent on urinalysis?
13      A.  Well, I'm not a big believer in passive
14 dosimeters.  But, no, they would not be dependent on
15 urine analysis, but some of the studies that I've
16 reviewed in the field do rely on urine samples.
17      Q.  Okay.  And that class of studies is known as a
18 biomonitoring study, correct?
19      A.  Well, at least it's partially biomonitoring.
20      Q.  Okay.  And the passive dosimetry involves
21 patches on the outside or inside of the clothes,
22 correct?
23      A.  Yeah.  And they're -- I have opinions on that
24 but --
25      Q.  Okay.  So nobody has to pee in a cup for those

Page 147

1 studies?
2      MR. KRISTAL:  Unless you have to go to the
3 bathroom.
4      MR. KALAS:  You pee in a cup, Jerry?
5      MR. KRISTAL:  Sometimes.  You never peed
6 in a cup?  I'm joking.
7 BY MR. KALAS:
8      Q.  All right.  Let me ask it again because that
9 transcript's going to be messed up.
10      You don't have to urinate in order to get
11 measurements in the passive dosimetry studies, correct?
12      A.  No, not necessarily.  If it's a patch, I would
13 much prefer an active pumped sample but...
14      Q.  And there are actually blood sampling studies
15 done on glyphosate as well.  Are you aware of that?
16      A.  I'm sure there are.
17      Q.  Have you reviewed those to see the doses in
18 the blood?
19      A.  Whatever I reviewed are in my report.
20      Q.  Do you believe glyphosate, after it enters the
21 body, is systemically distributed through the blood via
22 dermal absorption?
23      A.  I'm not sure how to answer your -- how to
24 answer that question.
25      It certainly, as it comes into the body

Page 148

1 through dermal absorption, it is going to get into the
2 capillaries and into the bloodstream.  It's also going
3 to be in the fatty tissue, et cetera so -- and then
4 it's distributed in part where the blood goes as well.
5 So I don't know if that answers your question or not.
6      Q.  It's good enough.
7      Okay.  Let's keep finishing up here with
8 Janzen.  Mr. Janzen, from a days-per-year point of
9 view, in your interview, was exposed to
10 approximately -- I think I wrote down here somewhere
11 around thirty days per year, and that might have
12 changed depending on the season.  Is that fair?
13      A.  It is whatever he told me.  I mean, whatever
14 the interview says and whatever I calculated, that's --
15      Q.  So I'm not focused -- I want you to know what
16 I'm focused on.  I'm not focused on events here.  I'm
17 focused on actual days he used the product.
18      A.  Okay.
19      Q.  Okay.  So every year Mr. Janzen stated to you
20 that he used the product about thirty days a year; is
21 that right?
22      A.  I don't -- I don't -- I don't know one way or
23 the other.  I did individual calculations for each of
24 these.  And whatever they are, they are.
25      Q.  Okay.  And the record will speak for itself.

Page 149

1      Have you reviewed a study called Andreotti
2 2018?
3      A.  I don't believe so.
4      Q.  Okay.  I saw on here you have a study called
5 Erikson 2008.  Do you remember that study?
6      A.  Briefly.
7      Q.  Okay.  Are you offering any opinions about
8 that study?
9      A.  Only to -- if they're in the report, I would
10 be, if you want to point out where I've done that.
11      If not, the only way I would would be if it
12 were brought up in cross and somebody showed me
13 something and I was asked about it, then I would.
14      Q.  Okay.  Let's go back to the interview you had
15 with Mr. Janzen.  He ran a farm, right?  I'm looking at
16 page 532 now.  I'm going to ask some questions about
17 that.
18      A.  Ran a farm on 532, is that what it says?
19      Q.  Well, 532 doesn't say he ran a farm, but I'm
20 going to ask some questions about --
21      A.  Well, it's your preface to the question so
22 I've got to make sure that's accurate.
23      Q.  I was just trying to send you over.  We'll go
24 to --
25      A.  I mean, are you going to -- well, it's

38 (Pages 146 to 149)

Stephen E. Petty, PE, CIH, CSP

Page 150

1  important though. How you set the question up is
2  important.
3      Q.  Okay. Let's go back to his employment
4  history.  Mr. Janzen is described in your employment
5  history, location 3, as running -- or as a farmer on
6  the family farm.
7      A.  Well, the only reason I'm hesitating is the
8  accurate answer is that initially he was young, he
9  worked on the farm as a helper, helped his dad.  And
10  then eventually as he got older, his dad got older, he
11  had an increasing role.
12      Q.  And now he runs the farm, true?
13      A.  And now he does, but he didn't always run it.
14      Q.  And now he farms five thousand acres, right?
15  That's on the same page we were just looking at, 520.
16      A.  520, yes.
17      Q.  Okay.  Does he farm five thousand acres by
18  himself?
19      A.  Don't know.  I just asked about his personal
20  exposure.
21      Q.  Okay.  Let's go to 532 now.  Under OSHA --
22      A.  32?
23      Q.  532.  Under OSHA, would a farm be considered a
24  place of employment?
25      A.  He's self-employed.  Technically, yes.

Page 151

1      Q.  Okay.  And under OSHA, are you supposed to
2  have a SDS available for every chemical, at least
3  agricultural chemical, used on the farm?
4      A.  If it's provided to you.
5      Q.  Okay.  Are SDSs online?
6      A.  Well, SDSs are recent.  You mean MSDSs? I
7  mean, most of his history they were MSDSs so --
8      Q.  So I'll use the term MSDS.
9      A.  I mean, that --
10      Q.  I'll be exact.
11      A.  Well, I mean, it's not a matter of being
12  exact. It's a time frame question.  If you would say
13  SDSs, that's like in the last couple, three years.
14      Q.  Under OSHA, are MSDSs supposed to be at a
15  place of employment when MSDSs were in use?
16      A.  No.  The OSHA requirements are different than
17  that.  They're to be provided to the employer.
18      Q.  And where did Mr. Janzen purchase his Roundup?
19      A.  If he told me, it would be here.  If he
20  didn't, it wouldn't.  That's all I can tell -- we can
21  get to the chase that way or I can go through all this
22  and see if I can find what he said.
23          Do you want me to go through all these to see
24  if I --
25      Q.  Just asking if you know.  Do you know where he

Page 152

1  purchased his Roundup?
2      MR. KRISTAL:  Well, in order for him to
3  know, he's got to review his notes.  So let
4  him review his notes.
5      THE WITNESS:  I'm just trying to -- I'm
6  just trying to make it quicker for you.
7      MR. KALAS:  I didn't tell him not to.
8      THE WITNESS:  You're worried about time.
9  So I'm trying to help you.
10      MR. KALAS:  Appreciate that.
11      THE WITNESS:  But if you want me to read
12  them, that's fine.
13          Unless I missed it, I'm not seeing where
14  he told me where he purchased the chemicals.
15  BY MR. KALAS:
16      Q.  Okay.  You don't know if the SDS was provided
17  at the time of purchase by the place where he purchased
18  the chemicals, or the MSDS?
19      A.  Well, I do know from 532 that he says he's
20  never heard of the term material safety data sheet or
21  MSDS.  So that calls into question whether he was ever
22  given them, especially over the time frame involved.
23  It's not like one year.  So he's not aware of the term
24  MSDS, which caused him to question whether he got them.
25      Q.  Let's assume he's not self-employed, since you

Page 153

1  didn't read his deposition.
2          Assuming he has employees, would he be --
3      A.  Well, he can be self-employed and be an
4  employer at the same time.
5      Q.  Well, let's assume that he has an LLC, okay,
6  or an LLP, a company.
7      A.  Fine.  Like I do.
8      Q.  Okay.  Is he required under OSHA to provide
9  his employees with MSDSs or SDSs of chemicals they use?
10      MR. KRISTAL:  Objection.  Beyond the
11  scope.
12  BY MR. KALAS:
13      Q.  Or at least make them available?
14      A.  If he's provided them, then he would be.
15      Q.  Okay.  And when he said he had never heard of
16  a material safety data sheet, did you ask him before
17  that question whether he had been provided with
18  material safety data sheets?
19      A.  I did not.
20      Q.  Did you ask him after that question whether he
21  had been provided with material safety data sheets?
22      A.  I did not.
23      Q.  Okay.  Now, he says that he was never told
24  anything about the safety of Roundup products by
25  Monsanto representatives.  Do you see that?

39 (Pages 150 to 153)

Stephen E. Petty, PE, CIH, CSP

Page 154

1     A.  Uh-huh.
2     Q.  Okay.  So he was never told by any Monsanto
3  representative, according to your interview with him,
4  that the LD50 of glyphosate was similar to salt?
5     A.  What's the question?
6     Q.  Well, you have in your report some pictures
7  from some Hawaii fairs and that sort of thing.
8        MR. KRISTAL:  Yeah.  That Monsanto was
9  using to promote their product.
10       MR. KALAS:  Are you testifying now, Jerry?
11       MR. KRISTAL:  Well, you're making it sound
12  like it was some poster hanging in the
13  hotel --
14       MR. KALAS:  Are you testifying, Jerry?
15       MR. KRISTAL:  No, I'm not testifying.  I'm
16  correcting your misleading lead-in to the next
17  question.
18       MR. KALAS:  Okay.  So if you want to
19  designate yourself as an expert, Jerry, you
20  are welcome to.  But if you're not, then I'm
21  going to ask Mr. Petty the question.
22       MR. KRISTAL:  And I didn't say you
23  shouldn't ask him the question.
24  BY MR. KALAS:
25     Q.  Mr. Petty, you have some pictures in your

Page 155

1  report from a Hawaii agricultural fair, I believe, or
2  something like that, regarding Monsanto promotional
3  materials about glyphosate LD50 as compared to some
4  other chemicals.  Do you recall that?
5     A.  As well as reference to the fact it was on
6  their website.
7     Q.  Okay.  Did you ask Mr. Janzen if he looked at
8  Monsanto's website?
9     A.  I did not.
10    Q.  Okay.  Did you ask Mr. Janzen if he had ever
11  seen anything about the LD50 of glyphosate from a
12  Monsanto representative?
13    A.  I didn't ask him if he'd seen an LD50.  I
14  asked him -- I'd asked him whether he'd been told
15  about -- whether he'd been provided any information on
16  the hazards of Monsanto Roundup products.  And that's
17  the response I got.
18    Q.  And you said here he was never told anything
19  about the safety of Roundup products, right?  That's
20  what you wrote?
21    A.  Correct.
22    Q.  Okay.
23    A.  That's what he -- that's what he told me.
24    Q.  Okay.  Now, one question --
25    A.  Well, that's part of what he told me.  You

Page 156

1  didn't finish the sentence, but that's fine.
2     Q.  The co-op salesman that you talk about here
3  worked for Monsanto, to your knowledge?
4     A.  I don't know the answer to that one way or the
5  other.  He was representing Monsanto.
6     Q.  He was representing Monsanto?
7     A.  Well, if he was talking to him about Monsanto
8  products, at a minimum he was representing the Monsanto
9  products.
10    Q.  Okay.  Did the co-op salesman, was he an
11  employee of Monsanto?  Did you ask that question?
12    A.  I did not.  You asked that question already.
13    Q.  Okay.  Did you ask Mr. Janzen if he read the
14  label?
15    A.  Let me go back.
16       I know in telling you -- what I'm looking at
17  is the mixing instructions --
18    Q.  Yes, sir.
19    A.  -- where he was telling me how much he mixed.
20  And he was telling me that he mixed -- he was basing
21  that on the instructions on how to mix.  I do remember
22  that.  That's where these numbers came from, the one
23  quart, et cetera.
24       So to that extent, he was reading the label
25  with respect to mixing instructions.

Page 157

1     Q.  Did you ask Mr. Janzen if he read the full
2  label, front to back?
3     A.  I don't think I asked that question.
4     Q.  Okay.  Back to your report in Janzen, the
5  general report -- just a few more questions on it and
6  then I think we'll be ready to take a break.
7        One thing you talk about in this report
8  points are commercials that did not air in the
9  United States.  Do you recall that?
10    A.  Sure.
11    Q.  Okay.  Is there any evidence you have that
12  Mr. Janzen or any of the plaintiffs you've opined on in
13  the MDL have seen those commercials?
14       MR. KRISTAL:  Object to form.
15       THE WITNESS:  I didn't ask him that
16  question.
17  BY MR. KALAS:
18    Q.  Okay.  So you can't point me to anything right
19  now from a deposition transcript or anything else where
20  they said, I was in France, I was in Australia, and I
21  saw that commercial?
22       MR. KRISTAL:  When you said they said,
23  what are you talking about?
24       MR. KALAS:  The seven plaintiffs you've
25  offered reports for on the MDL.

40 (Pages 154 to 157)

Stephen E. Petty, PE, CIH, CSP

Page 158

1    THE WITNESS:  I haven't seen their
2    deposition testimony.
3
4  BY MR. KALAS:
5    Q.  Okay.
6    A.  So all I would have was the information from
7  the interviews.
8    Q.  And you didn't ask them if they actually saw
9  those non U.S. commercials, right?
10    A.  I think the interview speaks for itself.
11    Q.  Okay.
12    A.  Whatever I asked him, I asked him, and those
13  are the responses I got.
14    Q.  Any evidence that you have that the non U.S.
15  commercials affected the personal protective equipment
16  worn by the plaintiffs in the MDL cases you've opined
17  in?
18    MR. KRISTAL:  Objection.  We're only here
19  talking about Janzen.
20    MR. KALAS:  We're not going to do it that
21  way.  I'm going to ask the question --
22    MR. KRISTAL:  We are going to do it that
23  way because Judge Chhabria has said we have to
24  do it that way.
25    MR. KALAS:  I think that was your

Page 159

1  position, but I'm going to ask --
2    MR. KRISTAL:  It is my position because
3  Judge Chhabria is saying these are individual
4  cases that have to be handled individually.
5  So he's here on the Janzen case to answer
6  questions about Janzen.
7    MR. KALAS:  I'm going to ask the question.
8  And if you instruct him not to answer, that is
9  fine.  We will mark it.
10  BY MR. KALAS:
11    Q.  Sir, is there any evidence in any of the seven
12  cases of which you've offered reports that the
13  plaintiffs saw those non U.S. commercials?
14    MR. KRISTAL:  Objection.
15  BY MR. KALAS:
16    Q.  And it affected their PPE use?
17    MR. KRISTAL:  Objection.
18    THE WITNESS:  I don't know the answer one
19  way or the other.
20    MR. KALAS:  Let's go -- well, Jerry, how
21  do -- I assume you want to ask questions on
22  the Janzen case, and then we'll do it that way
23  rather than doing your questions at the end of
24  the day?
25    MR. KRISTAL:  Yes.

Page 160

1    MR. KALAS:  Okay.  All right.  So let's go
2  off the record now.  I'll turn over the
3  witness.
4    THE VIDEOGRAPHER:  12:00 p.m.  Going off
5  record.
6    (A break was taken.)
7    THE VIDEOGRAPHER:  12:06 p.m.  Back on
8  record.
9    CROSS EXAMINATION
10  BY MR. KRISTAL:
11    Q.  I just have -- this is Jerry Kristal -- a very
12  few questions.
13    With respect to the poster that was utilized
14  by Monsanto to promote Roundup at the Hawaii farm fair
15  entitled How Toxic Is It, which you wrote about, what
16  is the relevance of that to your opinions regarding
17  Monsanto and its following or not following FIFRA and a
18  industry standard of care?
19    MR. KRISTAL:  Objection to form.
20  BY MR. KRISTAL:
21    Q.  Well, I'll break it up.
22    What is your opinion with respect to the use
23  of that material to promote Roundup with respect to
24  FIFRA?
25    A.  Well, it's a violation of FIFRA to make those

Page 161

1  comparisons.
2    Q.  Okay.  And what is the relevance with respect
3  to the use of that in promoting Roundup, the use of the
4  How Toxic Is It poster, with respect to the voluntary
5  industry standard of care?
6    A.  It's also a violation of those standard of
7  care documents as well.
8    Q.  Okay.  And what's the relevance of the
9  commercials that are contained throughout your report
10  here?
11    A.  Well, the relevance is that, for instance, in
12  France and then again in New York state, there's a
13  history of cited mis -- violations of accuracy in terms
14  of what they're representing.  False advertisement
15  basically.
16    In France it was that they argued that it was
17  biodegradable, and it was found to not be true.  The
18  interesting -- the reason that that's relevant is that
19  they continued to make those claims for a decade longer
20  in the U.S. in their marketing material, even though
21  they knew -- obviously they knew because they'd been
22  fined over it.  And then they were fined again in New
23  York state over it.
24    So they were aware that there were false
25  claims being made, and they continued to do that

41 (Pages 158 to 161)

Stephen E. Petty, PE, CIH, CSP

## Page 162

```
 1    anyway.
 2         MR. KRISTAL:  Those are all the questions
 3    I have.
 4         MR. KALAS:  All right.  I think with that,
 5    we are off the record in the Janzen case,
 6    although we'll move on to something else.
 7         THE VIDEOGRAPHER:  12:08 p.m.  Going off
 8    the record.  This marks the end of the
 9    deposition.
10         (Deposition concluded at 12:08 p.m.)
11         (Signature not waived.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 164

```
 1                    ERRATA SHEET
 2         RECORD CHANGES HERE - DO NOT WRITE ON THE TRANSCRIPT
 3    IN RE:  Janzen vs Monsanto Company
 4    DATE:  Wednesday, November 6, 2019
 5    PAGE  LINE        CHANGE            REASON
 6    _____
 7    _____
 8    _____
 9    _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20    _____
21    _____
22    Under penalties of perjury, I declare that I have read
23    the foregoing document and that the facts stated in it
      are true
24    _____        _____
25    Date                   STEPHEN E. PETTY, PE
```

## Page 163

```
 1              CERTIFICATE OF DEPONENT
 2
 3    STATE OF FLORIDA
 4    COUNTY OF PALM BEACH
 5
 6         I, the undersigned, declare under penalty of
 7    perjury that I have read the foregoing transcript, and I
 8    have made any corrections, additions, or deletions that
 9    I was desirous of making; that the foregoing is a true
10    and correct transcript of my testimony contained herein.
11         EXECUTED this _____ day of _____,
12    20___, at _____, _____.
13         (City)        (State)
14
15
16         _____
17              STEPHEN E. PETTY, PE, CIH, CSP
18
19
20
21
22
23
24
25
```

## Page 165

```
 1               CERTIFICATE OF OATH
 2
 3
      STATE OF FLORIDA
 4
      COUNTY OF PALM BEACH
 5
 6
 7         I, Lori G. Erwin, Registered Professional
 8    Reporter, Notary Public, State of Florida, certify that
 9    STEPHEN E. PETTY, PE, CIH, CSP, personally appeared
10    before me on the 6th day of November, 2019, and was duly
11    sworn.
12
13         Signed this 11th day of November, 2019.
14
15
16
17         _____
18         Lori G. Erwin, RPR
           Notary Public, State of Florida
19         My Commission GG 297744
           Expires: 02/16/2023
20
21
22
23
24
25
```

42 (Pages 162 to 165)

Stephen E. Petty, PE, CIH, CSP

Page 166

```
 1                CERTIFICATE OF REPORTER
 2
 3    THE STATE OF FLORIDA
 4    COUNTY OF PALM BEACH
 5
 6         I, Lori G. Erwin, Registered Professional
      Reporter, do hereby certify that I was authorized to
 7    and did stenographically report the deposition of
      STEPHEN E. PETTY, PE, CIH, CSP; that a review of the
 8    transcript was requested; and that the foregoing
      transcript, pages 4 through 162, is a true and
 9    complete record of my stenographic notes.
10         I further certify that I am not a relative,
      employee, attorney, or counsel of any of the parties,
11    nor am I a relative or employee of any of the
      parties' attorney or counsel connected with the
12    action, nor am I financially interested in the
      action.
13
           The foregoing certification of this transcript
14    does not apply to any reproduction of the same by any
      means unless under the direct control and/or
15    direction of the certifying reporter.
16
17         Dated this 11th day of November, 2019.
18
19

20    _____
      Lori G. Erwin, RPR
21    Registered Professional Reporter
22
23
24
25
```