# EXHIBIT 5



## Deposition of
# Stephen E. Petty, P.E., C.I.H., C.S.P.

### Volume II

**Date:** July 10, 2019

**Case:** WALTER WINSTON, et al. v. MONSANTO COMPANY

**No.** 1822-CC0515

**Court Reporter:**  Matthew McKinney, FPR

Paszkiewicz Court Reporting
Phone:  618-307-9320
Toll-Free:  855-595-3577
Fax:  618-855-9513

Page 1

IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
STATE OF MISSOURI


WALTER WINSTON, et al.,

        Plaintiffs,

vs.                    CASE NO.: 1822-CC0515

MONSANTO COMPANY,

        Defendant.
_____/


VIDEOTAPED DEPOSITION OF
STEPHEN E. PETTY, P.E., C.I.H, C.S.P.

Taken on Behalf of the Defendant, Monsanto Company

VOLUME II



DATE TAKEN:   Wednesday, July 10, 2019

TIME:        9:27 a.m. - 5:27 p.m.

LOCATION:    Regus, Cypress Park West
             6750 North Andrews Avenue
             Suite 200
             Fort Lauderdale, Florida  33309





Examination of the witness taken before:

Matthew McKinney, FPR

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

## Page 2

APPEARANCES OF COUNSEL

On behalf of the Winston Plaintiffs:
   JERRY KRISTAL, Esquire
   Weitz & Luxenberg
   Cherry Hill Office
   220 Lake Drive East
   Suite 210
   Cherry Hill, New Jersey 08002
   (856) 755-1115
   Jkristal@weitzlux.com

      and

   ROBIN L GREENWALD, Esquire
   Weitz & Luxenberg
   New York Office
   700 Broadway
   New York, New York 10003
   (212) 558-5500
   Rgreenwald@weitzlux.com

On behalf of the Defendant, Monsanto Company:
   ANTHONY N. UPSHAW, Esquire
      and
   MELISSA R. ALVAREZ, Esquire
   McDermott Will & Emery, LLP
   333 Southeast 2nd Avenue
   Suite 4500
   Miami, Florida 33131
   (305) 347-6540
   Aupshaw@mwe.com
   malvarez@mwe.com

Also Present:
   Thomas Olender, Videographer

## Page 3

### INDEX

WITNESS:  STEPHEN E. PETTY                    PAGE
Direct Examination (Cont.) by Mr. Upshaw         5
Certificate of Oath                           269
Certificate of Reporter                       270


            INDEX TO EXHIBITS

DEFENDANT'S      DESCRIPTION          PAGE
Exhibit 15 "Interview Summary Sheet" on EES Group    11
      letterhead

Exhibit 16 E-mail from ██████ dated 1/20/09,    195
      e-mail from David Saltmiras dated
      1/16/09, and DTL protocol attachment

(Reporter's Note: Defendant's Exhibits 1 through 14 were
marked in Volume I of Mr. Petty's deposition.)

      ---

## Page 4

MR. KRISTAL:  Before we go on the video, one
thing is last night we provided the interview form
that was requested, and I understand the 16th video
that we referenced yesterday has now been copied.
And also, regarding the UK POEM document, I brought
the internal Monsanto e-mail attaching it to show
who was the author.  I don't know if you want to
see it or don't see it, but we have it.

      MR. UPSHAW:  I'll look at it.

      MR. KRISTAL:  It's just because there was a
question yesterday.

      MR. UPSHAW:  Yeah, I don't think it was --
yeah, it's fine.

      MR. KRISTAL:  I pulled out the MONGLY number
just prior to the number on the UK POEM document.
It's an internal e-mail, so if you want that, you
can see it, or if not, but it's here.

      MR. UPSHAW:  Great.  Thank you.

      THE VIDEOGRAPHER:  This is the videotaped
deposition of Stephen Petty.  Today's date is July
10th, 2019.  This is the case of Walter Winston, et
al, plaintiffs, versus Monsanto Company, defendant,
case number 1822-CC0515, in the Circuit Court, City
of St. Louis, State of Missouri.

      My name is Thomas Olender.  I am representing

## Page 5

Paszkiewicz Court Reporting.  The court reporter is
Matthew McKinney, also representing Paszkiewicz
Court Reporting.  This deposition is taking place
at Regus, 6750 North Andrews Avenue, Suite 200,
Fort Lauderdale, Florida.

      Will counsel please state your appearances for
the record?

      MR. UPSHAW:  Anthony Upshaw for the defendant.

      MS. ALVAREZ:  Melissa Alvarez on behalf of the
defendant.

      MR. KRISTAL:  Jerry Kristal from
Weitz & Luxenberg, along with Robin Greenwald, for
the Winston plaintiffs.

      THE REPORTER:  And, Mr. Petty, I'll just
remind you that you're still under oath from
yesterday.

      THE WITNESS:  Yes, sir.

      STEPHEN E. PETTY,
having been previously sworn, continued to testify as
follows:

      DIRECT EXAMINATION (Continued)
BY MR. UPSHAW:
   Q.  Good morning, Mr. Petty.
   **A.  Good morning.**
   Q.  We're going to start our next day's

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 6

1 festivities pretty much where we left off last night.
2    **A. All right.**
3    Q. We're going to talk a little bit -- continue
4 talking about some of the generalities of the plaintiff
5 interviews that you undertook of the several plaintiffs
6 in this Winston case. We were talking about things that
7 mattered when you were taking the interviews, and I'll
8 pick up where I left off.
9      Did it matter to you whether the individual
10 washed their hands or showered after using the product?
11    **A. Sure.**
12    Q. And did the length of time have -- that the
13 person did this, was that important as well?
14    **A. Yes.**
15      MR. KRISTAL: Object to the form.
16    Q. And how --
17    **A. I mean --**
18      MR. KRISTAL: By "this" meaning?
19 BY MR. UPSHAW:
20    Q. Washed their hands or showered.
21    **A. Well, it was important from the standpoint of**
22 **I was looking at post-dermal exposure, so I would ask**
23 **questions about how long it would be or a range of times**
24 **it might be from the time that they applied the product**
25 **to when they cleaned various skin surfaces.**

Page 7

1    Q. Okay. And what -- why did that matter to you,
2 as to how long that they had the product either on their
3 clothing or on their skin?
4    **A. Well, it matters because if I were going to do**
5 **a dermal dose, there's a continued exposure so long as**
6 **the product remains on their skin.**
7    Q. When you took these interviews, were you under
8 the impression that you were going to do a dermal dose
9 for each plaintiff?
10    **A. No.**
11    Q. So why would you take down this information
12 then?
13    **A. Because it's my standard industrial hygiene --**
14 **it's the same interview I do -- when I have the**
15 **opportunity to talk to these people, I always take --**
16 **it's an industrial hygiene interview, so I'm going to**
17 **take that information regardless. It's the same**
18 **information I collect on hundreds of people that I've**
19 **interviewed.**
20    Q. I understand that. And on hundreds of people
21 that you take, are you taking that information to
22 eventually undertake a dermal dose or some type of
23 exposure risk assessment?
24    **A. Sometimes, and sometimes not.**
25    Q. In this case, so you were taking this

Page 8

1 information without any intention to do any further
2 modeling or assessment of that particular plaintiff; is
3 that correct?
4    **A. That's correct. My understanding was that was**
5 **not my scope of work, but I was collecting the**
6 **information in case things would change.**
7    Q. Do you know if any other expert in this
8 litigation will be relying on the information that
9 you've collected on these 15 -- I'm sorry -- 14
10 plaintiffs?
11    **A. I've not talked to any other experts, so I**
12 **wouldn't.**
13    Q. We talked a little yesterday about conflicts,
14 and I wasn't clear on our responses yesterday.
15      If you found some conflict, I believe it was
16 your testimony that whatever that conflict was, wasn't
17 going to make a difference to you with regard to your
18 opinions; is that correct?
19      MR. KRISTAL: Object to the form.
20    **A. No, I don't think that's what I said. I said**
21 **that -- I think what I said was it's not unusual that**
22 **there would be some conflicts because people's memories**
23 **are -- it's hard to remember things with time, and if**
24 **you asked them the same questions, a lot of questions**
25 **six months later, you're going to get different answers**

Page 9

1 **to some extent. So that was part of my answer, as I**
2 **recall.**
3      **And then the other part was that since I**
4 **wasn't doing -- the other part was that my opinions were**
5 **going to be regarding the totality of events and times**
6 **and that, while it might make some small differences, I**
7 **didn't believe it would make order of magnitude**
8 **differences on numbers of events and numbers of -- we're**
9 **not talking about -- you know, I've got hundreds of**
10 **thousands of exposures. I wouldn't expect any of those**
11 **differences to make an order of magnitude change in**
12 **those numbers, and I'm going to testify that they had**
13 **hundreds of thousands of those exposure events and**
14 **hundreds to thousands of hours of exposure.**
15      **So in that sense, it's not going -- I mean,**
16 **it's kind of a yes-no answer. Could it possibly change**
17 **them a little bit? Yes. But to the extent it would**
18 **affect my opinion? Probably not.**
19    Q. Would it change your -- if you were doing a
20 dermal assessment, would it change your dermal -- your
21 final dermal assessment on a particular plaintiff where
22 you found conflicts?
23    **A. That has kind of a yes or a no answer. I**
24 **guess I have to ask a question to put it in context.**
25      **Have you seen any of my benzene dermal**

3 (Pages 6 to 9)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 10

1 exposure analysis?
2   Q. No.
3   A. Okay. So I need to back up and explain. I
4 always do an exposure analysis where I do a Monte Carlo
5 analysis. In other words, I'll look at the range of
6 data, as well as the midpoint, and look at the 95
7 percent interval.
8        Technically, would it change it somewhat, yes,
9 but almost always it's been my experience that whatever
10 the small changes are, they're within that interval, if
11 that makes any sense. Because I don't look at just a
12 single value when I do -- if I do a dose or a dermal
13 exposure analysis, and I've done hundreds -- not
14 hundreds, but dozens of them -- I'm going to do a Monte
15 Carlo analysis, which will generally incorporate that,
16 that variability.
17   Q. So you've said you've taken thousands of
18 interviews. You use the --
19   A. Well, I'll say hundreds. Well, maybe if you
20 include the -- and I apologize for interrupting. If you
21 look at the forensics, yeah, it's thousands.
22   Q. Let me start again.
23      I think you've testified that you've done
24 thousands of interviews similar to the interviews that
25 you took of the 14 plaintiffs in the Winston case.

Page 11

1   A. No, I don't believe that's true. But if I
2 did, the answer's dozens to hundreds, for litigation
3 purposes. Overall, for forensics, industrial hygiene as
4 well -- remember, my predominant role for -- of the 25
5 years EES has existed, 20 of it I was primarily working
6 for the insurance industry doing forensics and
7 industrial hygiene reports. And in all of those cases,
8 we would interview people, similar to what we do in
9 industrial hygiene.
10      So I just want to make sure the record's clear
11 on that. If I mislead you on that, then I apologize,
12 but what I'm talking about for litigation purposes would
13 be dozens to hundreds.
14   Q. Are your interviews for litigation purposes
15 different from the interviews you would do for forensic
16 purposes?
17   A. Sure.
18   Q. Okay. Let me mark Exhibit 15.
19      (Defendant's Exhibit 15 marked for
20 identification.)
21   A. Well, I should add it depends on whether I'm
22 doing industrial hygiene or not as part of that, but in
23 general it would be different.
24   Q. This document -- here you go.
25   A. Sure. Thank you.

Page 12

1      MR. UPSHAW: Do you need a copy?
2      MR. KRISTAL: Yeah, please, thank you.
3      MR. UPSHAW: I'll hand it to you after. You
4 sent it to me last night.
5 BY MR. UPSHAW:
6   Q. This is a document that was provided last
7 night to us. And, Mr. Petty, can you identify the
8 document for us, please?
9   A. This is just a baseline set of forms that I
10 would use as a starting point for interviewing someone
11 like I did for the interviews in this particular
12 situation.
13   Q. Right. So we talked about this yesterday,
14 right, that this is just a baseline. And as you take an
15 interview, you go where the questions lead you and you
16 modify it as necessary; correct?
17   A. Correct.
18   Q. Okay.
19   A. It looks like, by the way, that this is
20 printed oddly because this should be --
21   Q. Yeah, it should have been -- it changes font.
22   A. It's not a complete document.
23   Q. I noticed that. We have the --
24   A. That's all I want to say --
25   Q. -- correct one.

Page 13

1   A. -- is that it's not really -- technically,
2 it's not my interview form.
3   Q. Yeah, it changes font. I saw that when I saw
4 the copy.
5   A. It goes from portrait to landscape for the
6 dermal -- I call them the dermal pages, are landscape,
7 so it's cutting off some of the information.
8   Q. That's fine. We're going to -- when we look
9 at the interviews, we'll see the correct one, I believe,
10 that you've copied for us right there.
11   A. Well, you'll see a landscape version of that
12 form, yeah.
13   Q. Okay. Thank you for pointing that out.
14   A. But, technically, it isn't my -- I mean, I'm
15 not trying to be picky, but it doesn't fully represent
16 my baseline forms.
17   Q. We're going to see your baseline form because
18 that's the same form you used for the 14 interviews
19 we're going to discuss, is it not?
20   A. I don't know that it's the same form, but it's
21 a variance of that based on whatever I learned from the
22 interviews.
23   Q. We'll look at that, and then we'll look at
24 what the differences are.
25   A. Well, we can't see them, is my point. That's

4 (Pages 10 to 13)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 14

1  all my point is.
2  Q. Understood your point, sir.
3      MR. KRISTAL: Right. And just so the record
4  is clear, there's a portion of Exhibit 15 where are
5  the pages that have the telephone log with sort of
6  a spreadsheet, and the way it's printed in this
7  exhibit is in portrait rather than landscape so
8  that it's oriented on the page differently than it
9  would be in the original, and parts of the pages
10  that should be landscape format as opposed to
11  portrait are cut off.
12      MR. UPSHAW: For now.
13      MR. KRISTAL: For now, and that's pages --
14      MR. UPSHAW: When we get it reprinted, it will
15  be done right, and this entire 10 minutes will be
16  of no use. So moving on --
17      MR. KRISTAL: It's pages 8, 9, and 10 of
18  Exhibit 15.
19  BY MR. UPSHAW:
20  Q. Moving on, the point I showed you -- why I'm
21  showing you this is: I want to get an idea of how many
22  times you've used this similar template for interviews,
23  whether they're forensic interviews, litigation
24  interviews or interviewing your neighbors.
25      How many times have you used this template?

Page 15

1      MR. KRISTAL: Object to the form.
2  A. Well, appreciate that this form has evolved
3  over the years, okay. So subject to that caveat -- but
4  I call it the industrial hygiene form, okay.
5  Q. Okay.
6  A. Interview form. Subject to those limitations,
7  I've used this form dozens to hundreds of times.
8  Q. And of those dozens to hundreds of times that
9  you've used the IH interview form, as Exhibit 15 which
10  will be modified, how many times of those dozens or
11  hundreds of times have you continued forward with a
12  dermal absorption assessment?
13  A. I don't know the answer to that question. I
14  can give you a part answer. I would say -- if I was
15  doing a benzene case, where I was going to do a benzene
16  dermal analysis, probably 75 percent of those I might do
17  a dose. But I use this form for -- I'll give you an
18  example.
19      In the last five weeks, I was deposed five
20  times, five different chemicals. Only one was a benzene
21  case. There was dioxycyanate. There was asbestos.
22  There was diesel exhaust. So in those cases, I wouldn't
23  be doing a dermal dose analysis, unless -- the only time
24  that I really do the dermal dose analysis is for some of
25  the benzene cases.

Page 16

1  Q. Is it your testimony today that in all those
2  cases that you have given deposition testimony in, in
3  the last two months, that you've interviewed the
4  plaintiff using this form?
5  A. Or a version of this form, yeah. The
6  industrial hygiene form, yes. Yeah, to the best -- as
7  long as they were alive. I mean, I have to say the
8  caveat; a lot of times I'll end up using it for
9  coworkers as well. I mean, the form's set up to look at
10  coworkers or family members, whether they be spouses or
11  children. So the form's not only used for the
12  plaintiff, but in some cases, in fact in many cases, the
13  plaintiff's not alive, so I have to use coworkers and
14  family members.
15  Q. Okay. Are you familiar with the concept
16  reporting bias or recall bias?
17  A. I don't know what -- in what context? I don't
18  know. I mean, I understand the word "bias."
19  Q. You've never heard of recall bias before?
20  A. I may have heard of the term, but I'm not sure
21  I've done any particular -- I don't have any particular
22  specific expertise in recall bias.
23  Q. Okay. When you created Exhibit 13, which is
24  the spreadsheet, in creating that, did you rely on any
25  of Monsanto's internal documents?

Page 17

1  A. No. This was a summary of the interviews. It
2  was based on the interviews only. I think I testified
3  to that.
4  Q. All right. Okay. So let's look at the --
5  A. It was extractions from the interviews.
6  Q. Let's look at Exhibit 13, then, in detail.
7      Page 1 of Exhibit 13, as you said, is a --
8  what's the term we used yesterday -- rounding up?
9  A. Roll-up.
10  Q. Roll-up.
11  A. It's a roll-up of the roll-up.
12  Q. Roll-up of the roll-up. Okay. So when you
13  have here "Events," right --
14  A. Correct.
15  Q. -- what are you -- what are "events"? Just
16  define "events" for me.
17  A. "Events" are a specific occasion where they
18  used the pesticide, a specific -- so if, for example, I
19  ask them how many times a week would you have used
20  Roundup, and they say one per day or five times a week,
21  then I would have one event per day or five events per
22  week. Then I'll ask, well, how long did that event take
23  place, and they'll say, you know, 15 to 20 minutes, 60
24  to -- 60 minutes. I mean, whatever they say, they say.
25  If they give me a range, I write that down. If they

5 (Pages 14 to 17)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 18

1  give me a specific value, I write that down. That's why
2  I end up in some cases with low and high values.
3      Q. So that's my next question. What do the
4  values mean, "low," "high" and "midpoint"?
5      A. As you move through the -- I mean, you can see
6  the basis for it in the tables below. I mean, I've
7  given you the absolute values. So what they represent
8  is a roll-up of the calculated values on the events side
9  for the minimum number of events that they would have
10 claimed, based on a variety of, perhaps, scenarios, as
11 well as the high would represent the highest number.
12     So if they gave me a range of one to three
13 events per week, the midpoint would be two and the low
14 would be one and the high would be three. And so then
15 you would multiply that by the weeks or months or
16 whatever they said they used this product in that
17 particular scenario, and that would give you a range of
18 values from low to high in terms of events, as well as a
19 midpoint value.
20     In some cases, there were ranges. In some
21 cases, they weren't. So in situations where there was
22 only a midpoint value, to get the low value, you would
23 use all the low values where there was a range and then
24 you would add the midpoint value to those to get the
25 total for low.

Page 19

1      Same with high. If you had a bunch of high
2  values for different scenarios but there were some cases
3  where they didn't give you a range, then you would use
4  the midpoint for that particular slice of the data.
5      Q. Okay. On page 2, you have a roll-up of the
6  roll-up, and the top says "Time Total Hours by
7  Individual Spraying."
8      What does that mean?
9      A. With the double asterisk.
10     Q. Correct.
11     A. What it means is, this is -- it's -- it's
12 similar to the events in the sense that they -- you can
13 have variability either in the spray time or you can
14 have variability in the events and it would result in a
15 range of values. Does that make any sense?
16     In other words, if some somebody said they
17 used it one to three times a week, but they used it 60
18 minutes per -- or an hour per event, then you would
19 have, for that particular slice of the data, one in
20 three hours is a range, one to three hours, with a
21 midpoint of two hours per week.
22     Or you can have a scenario that's just the
23 opposite, where they said we only used it twice a week
24 but we used it from 30 to 60 minutes, and that would
25 give you a variability in terms of total time. Does

Page 20

1  that make any sense?
2      So you're accounting for both the variability
3  in events per unit time as well as the time per event.
4  And so this is a summation of the events for each
5  activity, times the range of events for each activity,
6  including the midpoint, along with the range of times
7  for each event, multiplied together and then summed, and
8  that's how you arrive at this. So it's simply a
9  mathematical roll-up of the data in terms of, most
10 simplistically, event times time per event and then
11 looking at the variability of that if there are ranges
12 of values.
13     Q. And what's the significance of these values?
14     A. It's just -- well, and I should add that I've
15 also added the post-exposure dermal time as well, where
16 it exists.
17     Q. Okay. Let me ask you that in a second.
18     A. Okay.
19     Q. Because that's going to go through the
20 asterisk; right?
21     A. Yes.
22     Q. Okay. So what's the significance of these
23 values? Just as an example, for Kyle Chaplick, he's
24 got -- you have here "Hours," "Low," "533." "High,"
25 "1,298." "Midpoint," "916."

Page 21

1      A. Okay.
2      Q. What's the significance of that?
3      A. The significance of that is that's what they
4  say their exposures were in terms of time to Roundup
5  products.
6      Q. So is it to Roundup products only?
7      A. Yes.
8      Q. So if they used other pesticides, you
9  subtracted that time and event?
10     A. I didn't do the calculations for that. If the
11 data are there, I mean, they can be done. I'm not
12 hiding that data from anyone --
13     Q. So this is -- I'm sorry. I didn't mean to cut
14 you off.
15     A. It's just for Roundup products.
16     Q. Okay. So where we see in the interviews that
17 there was a mention of some other pesticide use, you at
18 some point extracted that from your calculations?
19     A. No. I just never -- no. If I was going to do
20 the other products, I would do a separate spreadsheet
21 for those other products.
22     Q. Did you do that?
23     A. I did not. But it's easily done, the same way
24 I did this, but I was interested in what the Roundup
25 exposures were.

6 (Pages 18 to 21)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 22

1      Q. All right. So tell me what the double
2  asterisk means when you say some of the entries contain
3  significant post-dermal application exposure times.
4      A. Sure. The best way to see this is to go to
5  page 3 under -- I mean, they exist in all of these
6  several tables. But if I can draw your attention to
7  page 3 of this exhibit --
8      Q. Yeah. Right now, I just want you to tell me
9  in general what this means, and then we can go to all
10  examples. Actually, we're going to go through each one,
11  so we don't have to --
12      A. Well, it's the only way for me to explain it.
13      Q. You can't explain it otherwise?
14      A. Well, I mean, I can, but it's easier just to
15  show you an example.
16          I can do a word version of it, I guess, just
17  talk through it.
18      Q. Yeah. If I'm looking at this, I don't have
19  any other data. I have your roll-up of your roll-up,
20  and I see two asterisks that say, "Entries contain
21  significant post-dermal application exposures." You've
22  added the word "significant" for a reason.
23          Does that mean you didn't add when they were
24  not significant post-dermal application exposure times?
25      A. No, I --

Page 23

1      Q. You made some --
2      A. You misstated what I said here.
3      Q. Okay.
4      A. I said, "Some of the entries contain
5  significant post-dermal application exposure times."
6      Q. Okay.
7      A. So what I'm doing is being dead-on honest with
8  you in saying this includes not only the application
9  time but it includes the post-application time; in other
10  words, the time between when they finished doing the
11  work and they went and cleaned their skin. And I'm just
12  saying, to the reader, this -- and anybody that's read
13  my dermal work will understand the concept of
14  application time, dermal exposure and post-application
15  time. And all I'm saying is I'm including the
16  post-application time as well in these numbers.
17      Q. So when we look at -- when you're calculating
18  the hours here, and you said -- you gave us the formula
19  for how you calculated that, event times -- well, I
20  won't go back through it.
21          When you come up with the time of the event,
22  if they, for example, used Roundup for 20 minutes on a
23  particular event and didn't wash their hands for another
24  two hours, then the time was two hours and 20 minutes?
25      A. For that particular slice of the data, it

Page 24

1  would be, yes.
2      Q. For that event; right?
3      A. For that type of event. In other words, if
4  you look at the detailed spreadsheets, they would be
5  many different scenarios, and for -- so what I would do
6  is either -- if there was a range of times, I would
7  indicate the range of times, the midpoint as you
8  suggest, or if there was just a single value, if they
9  said it was two hours before they cleaned up.
10          And the simplest -- I don't know that there
11  was one, but in the simplest case it would be two hours
12  times the number of events for that particular scenario,
13  yes. I mean, you have to get into the details to answer
14  that question fully.
15      Q. Okay. Did it make a difference, when you were
16  determining these times, the time of a particular event,
17  what was being sprayed, where they were spraying?
18      A. There's two questions there, right, what was
19  being sprayed and where they were spraying.
20      Q. Well, you only did -- so there really isn't a
21  question of -- let me break it down, then. You've taken
22  issue with my question, so I'll break it down.
23      A. Well, it's a multiple-question question.
24      Q. And -- okay.
25          MR. KRISTAL: Objection.

Page 25

1          MR. UPSHAW: Doing your job for you. Come on.
2  Wake up. Get with it.
3  BY MR. UPSHAW:
4      Q. Did it matter to you where the plaintiff was
5  spraying during a particular event?
6      A. The context of that question is yes, in terms
7  of the interview, I would report that information. And
8  as I mentioned yesterday, when I'm simply looking at the
9  calculation times and events, that wouldn't have
10  factored into that. But it's certainly factored into my
11  interview because I reported that information.
12          This is simply an extraction of the
13  information from the interview to look at times and
14  events. It's not reflective of all the data from the
15  interview. So when you ask that question, you have
16  to -- in my mind, I have to answer it from the context
17  of the interview and that this is simply an extraction
18  of some of that data.
19      Q. Okay. So for your purposes for this -- for
20  the Winston plaintiffs case, the data is just the data,
21  no interpretation, no modulation of that data. It's
22  merely what you heard, you -- simple calculation, and
23  you put it into this spreadsheet?
24      A. Well, the best way to answer it is if you go
25  to the individual pages, I've cited each of -- where the

7 (Pages 22 to 25)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 26

1 information comes from, from the interview, correct, and
2 then I've been very detailed about that and, hopefully,
3 I didn't mess it up. And I've either indicated whether
4 I've calculated it or whether or not it's -- what page
5 the information comes from.
6     So, numerically, the numbers are just simply
7 calculations, but you can't divorce yourself from the
8 fact they come -- they're extractions from the
9 interview, and the interview in my mind is what counts.
10 This is just simply the initial efforts to derive some
11 information from those interviews. So I don't view this
12 as being, well, I didn't -- I'm doing this analysis so
13 I've just ignored what's in the interviews. I don't
14 look at it that way at all, if that makes any sense.
15 This is simply a way to begin the process of pulling
16 some of that information out.
17     For instance, I don't talk about any of the
18 skin areas. I don't talk about the distance away. So
19 it's simply a roll-up of the time and events
20 information. But to suggest that it doesn't care about
21 those other factors I think misrepresents what the real
22 intent was, which was to do the interview to find out
23 all that information. This is just simply pulling some
24 of that information out and putting it in one place.
25     Q. That's all my question reflected. This is not

Page 27

1 the sum total of what you've learned about a particular
2 plaintiff. This is merely the numbers; this is merely
3 the unabridged they reported X number of events, they
4 said it was X amount of time, and you did a calculation
5 and here's the result?
6     A. Subject to -- well, my answer's the same. I
7 mean, I think we've touched on this multiple times.
8 It's straightforward. The interview is the basis for
9 this, but this doesn't mean there isn't more behind
10 this. It's just that it hasn't all been written down.
11 But I have referenced interviews. I've referenced them
12 by page.
13     Q. The -- you mentioned earlier that these
14 calculations are merely for Roundup. If the plaintiff
15 was exposed to other glyphosate herbicides, those
16 weren't included either, even though it's the same
17 active ingredient?
18     A. This was just for when they reported using
19 Roundup products, yes.
20     Q. Okay. What is glyphosate?
21     A. In what sense?
22     Q. What is it?
23     A. Chemically?
24     Q. Yeah.
25     A. It's an organic -- phosphorus organic -- well,

Page 28

1 it can be in two forms. It can be in an acid form or it
2 can be in a salt form. The acid form is less soluble
3 than the salt form, so that's why they put the product
4 together in a salt form. So I can give you the
5 structural formula if you want, but it depends on
6 whether it's in a salt or acid form.
7     Q. That's in your factual summary; right?
8     A. Right.
9     Q. Okay. How does it work?
10     A. I'd have to -- I mean, I've read how it works.
11 I just don't know it off the top of my head. It's
12 considered an active ingredient, so it has the effects
13 of -- I mean, the definition of an "active ingredient"
14 says how it works in the sense that it's either a
15 defoliant, desiccant or -- it obviously works to stop
16 the metabolic processes in the plant.
17     Q. And so which of those does glyphosate do?
18     A. I don't recall off the top of my head.
19     Q. Do you have it in your factual summary?
20     A. Yeah, I probably do. I probably do. They
21 talk about that enzyme -- yeah, there's the particular
22 process, enzymatic process that's stopped or slowed
23 down. I think that's in there as well.
24     Q. So does glyphosate kill a weed?
25     A. I mean, I'm not here to talk about the -- I'm

Page 29

1 really not here to talk about the mechanism of all of
2 that.
3     Q. If you know, you know. If you don't, you
4 don't. I'll move on to the next question if you say you
5 don't know.
6     A. Well, certainly the intent is to eliminate the
7 weed. The question is: Does it always do so? Of
8 course you've got your super weeds now that aren't
9 susceptible. So I don't know how to answer that
10 question.
11     Q. My question was not does it eliminate the
12 weed. My question was: Does glyphosate kill the weed?
13     A. I assume that's the intent -- well, it depends
14 on -- obviously, it depends on the definition of "weed,"
15 but -- because you've got products that it doesn't kill.
16 And if you're rotating crops, in one case it would be a
17 weed, and in one case it wouldn't, I guess. But -- so,
18 yeah, the intent is to eliminate what they consider
19 nuisance plants.
20     Q. Okay. Have you ever used Roundup or any
21 Monsanto product that contains glyphosate?
22     A. I'm sure I have at some point in the past.
23     Q. Did you buy it at your local hardware store,
24 or you bought it somewhere else?
25     A. If I bought an herbicide, it would have been

8 (Pages 26 to 29)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 30

1    at a Lowe's or Home Depot, somewhere like that.  I
2    typically didn't use that product.  I used a GroundClear
3    product when I used a product.
4        Q.  Did it contain glyphosate?
5        A.  I don't know.
6        Q.  What was the name of the product?
7        A.  I think it was an Ortho product called
8    GroundClear or something like that.
9        Q.  And did you look at the label to see if it
10   contained -- what the active ingredient was?
11       A.  No.
12       Q.  Did it work?
13       A.  Not as well as I'd like.  I had to reuse it.
14       Q.  All right.  The high-low numbers -- going back
15   to 13, the high-low values --
16       A.  Are you on the first or second page?
17       Q.  For both.  Are they a yearly number, or that's
18   lifetime?  So for "Events" on page 1, is this lifetime
19   events or yearly events?
20       A.  Lifetime.  Well, it's whatever -- it's an
21   entire period through the interview where everybody's
22   using Roundup products.  So I guess, in your
23   terminology, you'd call it lifetime.
24       Q.  Right.  Because if they -- the lifetime -- the
25   portion of their life that they used Roundup?

Page 31

1        A.  Yeah.  It was whatever they reported using --
2    it was whatever the times were and the amounts of times
3    that they reported using Roundup products, yes.
4        Q.  Okay.  All right.
5            All right.  Are you offering any opinion or
6    have you been asked to offer any opinion with regard to
7    exposure values or causation of disease?
8        A.  I think there's two questions there.  Is that
9    the multiple-question question again?
10       Q.  So can you answer it, or both?
11           MR. KRISTAL:  Object to form.
12       A.  Ask me one at a time, please, and I'll answer
13   them.
14       Q.  Can -- have you been asked to offer -- have
15   you been asked to offer an opinion with regard to
16   exposure values and causation?
17           MR. KRISTAL:  Object to form.
18       A.  I think it's a multiple-question question
19   again.
20       Q.  No, it isn't, so answer my question.
21       A.  Well, yeah, it's got the "and."  You're
22   asking --
23       Q.  Yeah, they go together, exposure value and
24   causation.
25           MR. KRISTAL:  Well --

Page 32

1        A.  No.
2            MR. KRISTAL:  -- he could be offering an
3    opinion on one and not the other.  He could be --
4            MR. UPSHAW:  So my question is --
5            MR. KRISTAL:  -- offering an opinion on both.
6            MR. UPSHAW:  My question is --
7            MR. KRISTAL:  It's a compound question.
8    BY MR. UPSHAW:
9        Q.  Are you providing an opinion with regard to
10   exposure values and causation?  If you're offering one
11   or the other, you can say that.  The question is are you
12   offering them, and.  It's two portions to that question.
13           Are you doing both?
14           MR. KRISTAL:  Okay.  I object to form.
15       A.  I'm not doing both.
16       Q.  Okay.  That's simple.  I don't know why that
17   was so difficult.
18           Are you offering --
19           MR. KRISTAL:  I don't know why you couldn't
20   have asked it in two simple questions.
21           MR. UPSHAW:  Because I wanted the answer where
22   they worked together.
23           MR. KRISTAL:  No, but you could ask, are you
24   offering an opinion on exposure values, yes or no,
25   are you offering an opinion on causation, yes or

Page 33

1    no, and then you'll have your answer.
2            MR. UPSHAW:  That wasn't the question that I
3    was asking.  So in your depo of this witness, you
4    can ask that question.
5            MR. KRISTAL:  And when you ask a compound
6    question, we're going to object.
7            MR. UPSHAW:  I disagree that it was compound,
8    but you're entitled to object, which you did.
9    BY MR. UPSHAW:
10       Q.  Are you offering an opinion on whether
11   plaintiff's exposure to Roundup caused that particular
12   plaintiff's non-Hodgkin's lymphoma?
13           MR. KRISTAL:  We've already told you yesterday
14   he's not offering a medical causation opinion.
15   BY MR. UPSHAW:
16       Q.  So then the answer should be really, really
17   simple, sir.
18           MR. KRISTAL:  It shouldn't be a question
19   because we told you he's not offering opinions on
20   that.
21   BY MR. UPSHAW:
22       Q.  And the answer to the question is -- he's --
23       A.  Same --
24       Q.  -- lodged his objection.  You can answer the
25   question.

9 (Pages 30 to 33)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 34

1    A.  Same answer as I gave you yesterday.
2    Q.  Which was, sir?
3    A.  Same question as you -- it's the same answer
4  as I gave you yesterday.
5    Q.  Which was what, sir?
6    A.  It's the same answer as I gave you yesterday.
7    MR. KRISTAL:  Why are we wasting time?  It
8  doesn't matter if --
9    MR. UPSHAW:  We wouldn't be wasting time -- if
10  you could be quiet for a second, we could get
11  through this whole --
12    MR. KRISTAL:  It doesn't matter --
13    MR. UPSHAW:  -- Roundup question in two
14  minutes.
15    MR. KRISTAL:  It doesn't matter what the
16  witness's answer is on this question.  It's a
17  matter of what we intend to offer him on, and we
18  have told you yesterday and he has answered
19  yesterday he is not going to be asked questions
20  about medical causation.
21  BY MR. UPSHAW:
22    Q.  Okay.  Are you going to be asked any questions
23  with regard to non-Hodgkin's lymphoma in general?
24    A.  I don't know.
25    Q.  Okay.  Well, according to your attorney, you

Page 35

1  might be.  So do you have an opinion with regard to
2  non-Hodgkin's lymphoma?
3    MR. KRISTAL:  Okay.  And I'm not Mr. Petty's
4  attorney.  I'm attorney for the plaintiffs, not Mr.
5  Petty.
6  BY MR. UPSHAW:
7    Q.  Well, the attorney for the plaintiffs has not
8  said you are not going to offer any opinions with regard
9  to non-Hodgkin's lymphoma.  Are you going to --
10    MR. KRISTAL:  I didn't say that.  I said he's
11  not offering opinions on medical causation.
12    A.  Again, I answered that question at length
13  yesterday, and I said that I'm not a medical doctor.
14  I'm not offering causation opinions, specific causation
15  opinions.  I don't intend to offer general causation
16  opinions, but if I were asked, I may, depending on the
17  nature of the question.  I don't want to preclude myself
18  from that because the courts have ruled me in as a
19  general causation expert.
20    It's not my intent to do so, but if I felt
21  that the question was general enough and that I could
22  answer it, then I might, only if I was asked that
23  question in cross.  But it's not my intent in direct to
24  offer causation opinions with respect to disease.
25    Q.  Do you have an opinion on whether exposure to

Page 36

1  Roundup can cause non-Hodgkin's lymphoma?
2    MR. KRISTAL:  Don't answer that question.
3    MR. UPSHAW:  Why not?
4    MR. KRISTAL:  Because we're not offering him
5  on that subject, so it's completely irrelevant to
6  this deposition.
7    MR. UPSHAW:  He just gave a whole line of if
8  he was asked a question on cross.  I want to know
9  what his answer's going to be if I ask him the
10  question on cross at trial.
11    MR. KRISTAL:  Why would you ask a person a
12  question on cross if we're not offering him in that
13  subject matter?
14    MR. UPSHAW:  Because I'm allowed to explore
15  other than what you're offering him on --
16    MR. KRISTAL:  No, you're not.
17    MR. UPSHAW:  Okay.  Well --
18    MR. KRISTAL:  No, you're not.  In what
19  jurisdiction can you offer --
20    MR. UPSHAW:  Let's cut this short.  We can do
21  it real easy.  Are you instructing this witness,
22  who is not your client, to not answer the
23  question --
24    MR. KRISTAL:  No.
25    MR. UPSHAW:  -- or are you advising him to not

Page 37

1  answer the question?
2    MR. KRISTAL:  What I'm telling you is, if
3  you're going to be asking Judge Mullen for extra
4  time after these three days, we're going to use
5  this as Exhibit 4 or 5.  So I'm just asking you to
6  move on and ask pertinent questions rather than
7  wasting time.  So I'm giving you a heads-up as to
8  what we believe is going on.
9    MR. UPSHAW:  And if you let him answer the
10  question, we would stop wasting time with you and I
11  going back and forth.
12    MR. KRISTAL:  It's not a question of wasting
13  time on my end.  You're the one wasting time by
14  asking the question --
15    MR. UPSHAW:  You've identified your position.
16  I appreciate that.  Thank you very much.
17  BY MR. UPSHAW:
18    Q.  Can you answer my question, Mr. Petty?
19    A.  What's the question?
20    Q.  Do you have an opinion on whether or not
21  Roundup causes non-Hodgkin's lymphoma?
22    MR. KRISTAL:  Same objection.
23    A.  I'm not -- I'm not tendered as to -- I'll rely
24  on other experts to offer those opinions.
25    Q.  Okay.  The question is do you have an opinion.

10  (Pages 34 to 37)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 38

1    I didn't ask you what your opinion was.
2        MR. KRISTAL:  Same objection.
3        **A.  I'm not going to offer an opinion, period, on**
4    **those.  I don't intend to.**
5        Q.  All right.  You're a chemical engineer;
6    correct?
7        **A.  Among other things, yes.**
8        Q.  Among other things, yes, sir.  I didn't mean
9    to limit you to just a chemical engineer.
10       Are you planning on offering any testimony on
11   the subject of chemical engineering with regard to
12   glyphosate or non-Hodgkin's lymphoma -- well, I'll
13   withdraw the second part -- with regard to glyphosate?
14       **A.  With respect to dermal, certainly.  I mean,**
15   **the whole basis for dermal exposure is Fick's law, and**
16   **it's a fundamental concept of chemical engineering.**
17       Q.  Okay.
18       **A.  It's part of mass transfer.  It's one of our**
19   **basic -- it's an undergraduate concept.**
20       Q.  Do you consider yourself also an environmental
21   engineer?
22       **A.  I do.**
23       Q.  Okay.  Are you planning to offer testimony on
24   the subject of environmental engineering in this
25   litigation?

Page 39

1        **A.  Could.  Depends on the nature of the question.**
2        Q.  The question is:  Have you prepared any
3    opinions to provide us today with regard to
4    environmental engineering and glyphosate?
5        **A.  I really don't know what that question means.**
6    **I honestly don't.  Environmental engineering is a**
7    **massive field.**
8        Q.  Okay.  Do you have any opinions that you are
9    planning to offer today, that use your expertise in
10   environmental engineering?
11       **A.  If you will qualify what you mean by**
12   **"environmental engineering," what aspect of**
13   **environmental engineering you're asking the question**
14   **about, then I will try to answer that question.**
15       Q.  Sure.
16       **A.  But the question is so broad...**
17       Q.  That you can't answer it?
18       **A.  Well, environmental engineering includes EPA**
19   **standards, risk assessment.**
20       Q.  Okay.  Do you plan on talking about both of
21   those?
22       **A.  Sure, I'm going to talk about EPA standards,**
23   **the FIFRA and FDCCA.**
24       Q.  Risk assessment?
25       **A.  Potentially.  I already told you that**

Page 40

1    yesterday.
2        Q.  That you have an opinion with regard to risk
3    assessment?
4        **A.  I talked about the 2018 or '19 EPA risk**
5    **assessment.**
6        Q.  Oh, so that's EPA again.  Okay.
7        MR. KRISTAL:  No.  It's risk assessment.
8        **A.  It's both.  I mean, you asked me environmental**
9    **engineering.  I said it had to do with regulatory --**
10   **regulations from the EPA because 40 CFR is typically the**
11   **environmental side of the world, and within that are --**
12   **amongst other places, are the risk assessment standards**
13   **along with ASTM 1739.  You know, if I'm asked questions**
14   **that are relevant in that area, I will answer them.**
15       Q.  Okay.  I didn't ask you this yesterday.  Do
16   you have any degrees in environmental engineering?
17       **A.  No degrees, but I'm qualified in it because my**
18   **PE -- I was so early in engineering that I took the**
19   **general PE exam, which meant that I'm qualified in all**
20   **areas of engineering which I feel I'm capable of**
21   **practicing.  It's a very unusual certification.**
22       Q.  That is.  It's a catch-all that you get to
23   define.
24       **A.  Exactly.  And I've, in fact, practiced in**
25   **electrical, civil, structural, environmental, nuclear,**

Page 41

1    and chemical, and mechanical.
2        Q.  Okay.
3        **A.  In fact, my textbook's on structural,**
4    **primarily.**
5        Q.  Given all of those fields -- and I don't want
6    to give you a compound question, which is today's
7    word -- are you going to employ your mechanical
8    engineering training or degree in giving your opinions
9    with regard to this litigation?
10       **A.  I could.**
11       Q.  How so?
12       **A.  Depends on the question.**
13       Q.  What question would have to be --
14       **A.  The field of mechanical engineering is equally**
15   **broad.**
16       Q.  What questions -- what opinions do you have
17   that in any way touch on mechanical engineering?
18       **A.  Mechanical engineering has everything to do --**
19   **say, for example, how equipment works.**
20       Q.  Are you going to discuss equipment?
21       **A.  Well, I can -- I've actually discussed -- in**
22   **the interviews, we have examples where the equipment**
23   **leaks or fails, so yeah, I could.**
24       Q.  Are you going to discuss how that equipment is
25   manufactured, how it mechanically works, for the jury?

11 (Pages 38 to 41)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 42

1    A.  I don't know if I'll go into that detail or
2  not.  But when you ask me am I going to preclude myself
3  from talking about anything in the field of mechanical
4  engineering, I'm not going to do that.
5    Q.  I didn't ask the question, "Are you going to
6  preclude yourself" --
7    A.  Yes, you did.
8    Q.  Okay.  So let me rephrase the question.
9      Are any of your opinions going to touch on
10  your knowledge of mechanical engineering?
11    A.  Sure, they could.
12    Q.  In what sense?  That's all I'm trying to find
13  out.
14    A.  Mechanical engineering has everything to do
15  with HVAC or ventilation or fresh air or air exchanges
16  or wind.  I mean, there's such a gauntlet of things that
17  could come up, that if asked, I'll answer those
18  questions.
19    Q.  What is your opinion with regard to HVAC and
20  glyphosate, as it deals with these 15 plaintiffs?
21    A.  I'm talking about the concept of air motion.
22  That's what I'm talking about.  Ventilation.
23  Ventilation includes air movement, whether it be indoors
24  or outdoors.
25    Q.  Ventilation includes air movement outdoors?

Page 43

1    A.  Sure.
2    Q.  Okay.
3    A.  In fact, the biggest concept in reduction of
4  indoor pollutants is how much ventilation of outdoor air
5  you have.
6    Q.  Oh, the vent -- okay.  All right.  Now I
7  understand how you're using the term "outdoor air."  Let
8  me move on to your civil engineering since you mentioned
9  that as well.
10      How are you going to employ your knowledge in
11  civil engineering with regard to your opinions in this
12  case?
13    A.  We go through each of the factual sections,
14  and I'll answer that question.  That's the place to
15  answer them.  I can't, off the top of my head -- I've
16  got opinions on almost every page of this report.  So
17  when we get to those, I will remember to tell you
18  whether it's civil, mechanical or whatever.  That's the
19  way to ask that question.
20    Q.  We haven't done it today, but let's be clear.
21  That's not a report; right?  It's just a factual
22  summary?
23    A.  It's a factual summary.  We call it a
24  document.
25    MR. KRISTAL:  Right.  We've given you more

Page 44

1  than is required so that you can use it as a basis
2  to then ferret the opinions by going through the
3  factuals.  If you don't want to do that, that's up
4  to you.
5    MR. UPSHAW:  Was that an objection?
6    MR. KRISTAL:  No.  It's a statement of what's
7  going on here.
8    MR. UPSHAW:  Okay.  So we can stop the
9  statements, and I can continue to move forward.
10    MR. KRISTAL:  You can stop commenting on
11  whether I should stop the statements.  And if you
12  don't want to waste time when I make a statement,
13  just move on.
14    MR. UPSHAW:  Just cut the extra statements,
15  please, so we can move on.
16  BY MR. UPSHAW:
17    Q.  Let me ask the same question.  You also
18  brought up structural engineering.
19    A.  Sure.
20    Q.  How is your knowledge of structural
21  engineering --
22    A.  I think the best way to address the individual
23  areas --
24    Q.  I didn't finish the question, but since you
25  know where I'm going, go ahead.

Page 45

1    A.  My apologies.  I'll let you ask your question.
2    Q.  Yeah, because I don't want to lead you in the
3  wrong way and you give a different answer.
4      How is your knowledge of structural
5  engineering going to be used with regard to your
6  opinions in this case?
7    A.  As we move through this document where I
8  express opinions, I will let you know which field -- I
9  will make an effort to let you know which field of
10  engineering I think would apply or industrial hygiene or
11  health and safety.
12    Q.  Give me an example of where you applied
13  structural engineering in this factual summary.
14    A.  Unless you want me to start to offer opinions
15  on each section so that I could then see whether it
16  applies to those, I can't answer that off the top of my
17  head because I have so many opinions I would offer you.
18    Q.  Just give me one.
19    A.  I would want to go through --
20    Q.  You can start at page 2, and you give me the
21  first one you find where you have applied structural
22  engineering.
23    A.  Structural engineering may have to do with the
24  equipment that they -- for example, in the interviews,
25  the equipment, the mechanical equipment, if they were

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 46

1 using a cart or equipment, then I could comment on that
2 cart or equipment.
3 Q. How so? I'm not understanding. You can
4 comment on --
5 A. Because it's delivering the product --
6 Q. Wait a minute. He can't take it down.
7 I'm trying to determine how, when you say you
8 would comment on that cart or equipment, how that
9 relates to structural engineering.
10 A. Because it's part of the design of the
11 equipment. It's the structural design.
12 Q. So you have an opinion with regard to the
13 structural design of the equipment being used by the
14 plaintiffs in this case?
15 A. I'm not certain, but I'm telling you that
16 if -- if you decided in cross to ask me about the cart
17 that he was -- one of these people were using,
18 Mr. Winston, when he worked in the city of -- in the
19 city, I'm not going to preclude myself from mechanical
20 engineering -- answering it from a mechanical
21 engineering standpoint because I don't know what
22 question you're going to ask in cross.
23 Q. Right. We're on structural now.
24 A. Huh?
25 Q. We're on structural now.

Page 47

1 A. I know. On all the fields of engineering.
2 Q. So you can't go through and give me an
3 example?
4 A. No, that's not what I said. I said if we want
5 to go through this, at each time I will do that for you
6 as I offer my opinions.
7 Q. I asked you to, right now, pick up Exhibit 7,
8 start on page 1, and the first time you see somewhere
9 where you're going to apply your knowledge of structural
10 engineering, you tell me.
11 A. And the efficient way to do that for all the
12 fields of engineering, all the fields of industrial
13 hygiene and all the fields of health and safety are to
14 go through and ask my opinions and then ask me whether
15 I'm going to offer any opin- -- that opinion is going to
16 be based on mechanical engineering, et cetera.
17 That's -- because we're going to go through the same
18 process for each of the fields of engineering, and I
19 don't think it's very efficient.
20 Q. Well, the efficiency of the process is not for
21 you to determine here at the deposition, sir.
22 A. Well --
23 Q. The options --
24 A. Well, that's fine.
25 Q. The options you have are either to answer my

Page 48

1 question or not answer my question.
2 A. If you want me to go through this and you want
3 me to comment, I'll do it.
4 MR. KRISTAL: Are you asking the witness to go
5 page by page over this 300-page report, plus
6 100-something pages of appendices, to answer a
7 question about structural engineering?
8 MR. UPSHAW: No. I'll repeat my question
9 since you missed it.
10 BY MR. UPSHAW:
11 Q. My question was: You can start on page 1, and
12 when you get to the first -- the first -- I want one
13 example of where you're going to apply your structural
14 engineering knowledge to your opinions, not page by
15 page. If it's an opinion you have, I want to know how
16 you're going to apply your structural engineering
17 knowledge. If you have to go page 2, page 3, page 4
18 until you find an opinion that structural engineering is
19 involved, I'm happy to hear that.
20 A. And there are no opinions in this report.
21 Q. Then why are you going through the report and
22 why did you tell me you need to go page by page?
23 A. Because I'm going to offer -- it's a statement
24 of facts and I'm going to offer opinions on many of
25 these pages, because this is not a report of opinions.

Page 49

1 Q. Correct.
2 A. So if you want me to start to offer the
3 opinions, page by page, and then tell you which one
4 finally is mechanical, structural, I'll do that. But
5 it's going to take -- it's going to take the length of
6 time to read this thing to do that.
7 Q. Okay.
8 A. That's all I'm saying.
9 Q. The factual summary doesn't have your
10 opinions. You have your opinions in your head; correct?
11 MR. KRISTAL: Therefore, why don't you ask him
12 about that?
13 MR. UPSHAW: Which is what I'm doing, which
14 opinions --
15 MR. KRISTAL: I don't think -- we've been here
16 over a day and you haven't asked. You asked, I
17 think, one opinion yesterday.
18 BY MR. UPSHAW:
19 Q. Okay. Mr. Petty, do you have an opinion that
20 you can tell me now that involves the engineering
21 specialty of structural engineering?
22 MR. KRISTAL: Same objection; it's been asked
23 and answered. We've been doing this for 10 minutes
24 now. It's the same question you just asked.
25 BY MR. UPSHAW:

13 (Pages 46 to 49)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

---

Page 50

1    Q.  Mr. Petty, you know your opinions; right?  You
2  know which opinions you want to provide.  You've talked
3  to the attorneys for the plaintiffs what you want to
4  provide.  Your first opinion that you want to provide
5  today, be my guest to tell me what's your first opinion
6  with regard to this case and why you've been hired by
7  these plaintiffs.
8    A.  Well, my first opinion is going to be based on
9  information in Section 9.  The overriding one and many
10  of the rest of the opinions are supportive of that
11  opinion, and that's going to be under 9.1 on page 199.
12    I'm going to point out what the industry
13  stewardship practices and historical industry best
14  practices were for labeling and providing transparency
15  of information to its product Roundup to the public, and
16  I'm going to compare and contrast what Monsanto -- what
17  the industry says, in the first case, they should have
18  done with what was actually done, and I'm going to opine
19  that Monsanto violated industry steward policies and
20  historical industry best practices with respect to
21  providing labeling information.
22    Q.  Okay.  Does the opinion that you just stated
23  have anything to do with your knowledge of structural
24  engineering?
25    A.  I don't know.

---

Page 51

1    Q.  Does your knowledge of structural engineering
2  inform you in any way with regard to your ultimate
3  opinion that you've just provided?
4    A.  It may.  That's what I --
5    Q.  How so?
6    A.  If we get to a point where I'm asked questions
7  about the equipment or strength of materials or
8  whatever -- I don't necessarily intend to offer opinions
9  on that, but if I'm asked, I don't want to be precluded
10  from offering opinions that I might -- that's why I have
11  a general engineering PE.
12    Q.  In the opinion that you just provided, with
13  regard to whether or not Monsanto met some standard of
14  care, is there any part of that opinion that has
15  anything to do with the structure of any equipment used
16  by any of these plaintiffs?
17    A.  I don't know necessarily.  I'm just saying, if
18  asked about something in that dimension and I felt
19  like -- that's why I have a general PE.  If I was asked,
20  and I felt that I had knowledge that would add to the
21  knowledge of the jury, and I was asked in cross about
22  some structural issue, I would offer that opinion.  I
23  don't intend to at this time, but I'm not going to
24  preclude myself from offering opinions on structural
25  engineering.  I'm just not going to do it.

---

Page 52

1    Q.  Is there a difference between industrial
2  health and safety and industrial hygiene?
3    A.  I would say that there is.  I would say that
4  the industrial hygiene is -- well, where's the
5  definition of "industrial hygiene"?  It's in Section 5.
6  Let me not misquote it.
7    It's on page 85 of this document.  It's the
8  science and art devoted to the anticipation,
9  recognition, evaluation and control of those
10  environmental factors or stressors arising in or from
11  the workplace which may cause sickness, impaired health
12  and wellbeing or significant discomfort among workers or
13  among the citizens of the community.  And an industrial
14  hygienist is scientists and engineers committed to
15  protecting the health and safety of people in the
16  workplace and community, so...
17    Q.  Okay.  That's the definition.  My question
18  was:  Is there a difference between industrial health
19  and safety and industrial hygiene?
20    A.  Well, I've just given you the definition of
21  "industrial hygiene," which would include safety and
22  health, so there are certainly -- people would tend
23  to -- safety is a subset of industrial hygiene.  There
24  is the concept that people that are certified safety
25  professionals are then qualified as safety professionals

---

Page 53

1  per se, but the reason that, as an industrial hygienist,
2  you don't have to take the first CSP exam is because
3  they realize you've -- that they're a subset of the
4  industrial hygiene, if that makes any sense.
5    Q.  Okay.  Part of your disclosure talks about
6  human factor and product warnings.  What is human -- or
7  what are human factors?
8    A.  The way in which -- in this context, it would
9  be the way in which people utilize the information or
10  products based on circumstances.
11    Q.  And how is that different from product
12  warnings?
13    A.  Product warnings themselves are -- again,
14  that's in this document.  I think label -- product
15  warnings are, in general, covered by the word
16  "labeling," which covers everything from what we
17  consider labels on a product to -- it can include MSDSs;
18  it can include advertising.  I mean, I've gone through
19  what FIFRA says the definition of "labeling" is.  So it
20  pretty much includes the whole concept of product
21  warnings.
22    The difference is that product warnings also
23  goes back and looks at the nonregulatory world because
24  the regulatory world is relatively recent.  In terms of
25  warnings, that concept of erring on the side of public

14 (Pages 50 to 53)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 54

1  safety to alert people to things that may be hazardous
2  to their health or safety goes way back into the early
3  1900s by Hamilton and others.
4      So I think the term "warnings" is broader
5  than, say, "labeling." But "labeling" is the more
6  modern, regulatory term. But "product warnings" is a
7  broader term that goes back and encompasses industry
8  best practices and the literature on how to protect
9  people and workers from hazards.
10  Q  Okay  Have you been asked to provide an
11  opinion with regard to human factors in this case?
12     A.  With respect to how -- I will offer an opinion
13  based on Hadden's work and others that I factually cite
14  in this document, about how people -- how people read
15  and understand warnings as well as how people would tend
16  or not tend to use protective equipment. I think some
17  of that is borne out in the marketing studies that
18  Monsanto themselves did on wanting to avoid moving from
19  the word caution to warnings. They understood human
20  behavior in terms of the effect it would have on the
21  sale of their product.
22     So all of that is human factors. It's factors
23  that affect behavior. And, really, a lot of that
24  background comes from the stuff I cited here, but as I
25  told you yesterday, my MBA was -- a big portion of it

Page 55

1  was on behavioral marketing, why people make decisions
2  they make and how they're influenced, so I would draw on
3  that background as well.
4     Q.  All right. So now is the opportunity. What
5  are your opinions with regard to human factor?
6     A.  Well, I'll start with the first one. If we
7  move to page -- pages 4 and 5 of this document, Exhibit
8  7, this is a mock-up of a label, Monsanto Roundup label,
9  shown in figure 1-4, and part of the human factors is
10  what are you drawn towards when you look at a label or
11  warning. And this particular -- this was a larger
12  package of materials regarding these labels, but what
13  was interesting to me was that this particular document
14  or figure was labeled "Priority of Communication." This
15  is Monsanto's priority of communication; in other words,
16  what they're trying to convey on their product label to
17  the consumer.
18     And what's fascinating to me is that they list
19  four items as to what it is that they're trying to
20  communicate to the customer. Those four items have
21  nothing to do with health and safety. So Monsanto's
22  first four priorities in their labeling as they say, in
23  terms of priority communication, have nothing to do with
24  health and safety. So my -- one of my opinions is going
25  to be that Monsanto did not have health and safety as a

Page 56

1  priority in their labeling.
2     Q.  Okay.  And what was the human factor portion
3  of the...
4     A.  This would be how humans would look at a
5  label -- this is clearly Monsanto's understanding of the
6  process of communication to people and what do people --
7  what are they drawn towards when they look at, say, a
8  graphic. And they're developing this label to
9  prioritize what the consumer will want -- will see
10  first, second, third and fourth. And so the human
11  factor is the understanding of how people behave with
12  respect to reading a label, and Monsanto's clearly
13  indicated what their priorities are with respect to
14  reading that label.
15     Q.  And it's your opinion that that was wrong of
16  Monsanto --
17     A.  Absolutely.
18     Q.  -- to not -- well, let me finish the question.
19     A.  You don't have to.
20     Q.  That Monsanto was wrong for not having health
21  and safety as a priority in this particular label?
22     A.  To not have it as one of the top four, yes,
23  absolutely, a chemical product. And I'm trying to go to
24  another reason that supports that opinion. Bear with
25  me.

Page 57

1     I'm drawn to page 82. I'm citing work by
2  Hadden in 1983, which is -- I was interested in 1983
3  because that goes back a ways into really where a lot of
4  the regulatory activity was just getting started. And
5  if you -- if you look at what she says at the bottom of
6  the page are the -- what makes warnings effective.
7     Q.  That's H-a-d-d-e-n?
8     A.  It's page 82, yes.
9     And the very first one is, "Readable, i.e.
10  font size, layout, placement, pictorial symbols." In
11  other words, the bigger font size is going to draw your
12  attention more than the smaller size. The placement,
13  the layout, this is all consistent with what Monsanto is
14  really saying: These are our priorities. We're going
15  to -- if you look at the items that they make priorities
16  of the largest fonts, they're in prominent positions.
17     And so it's well-understood from a human
18  factor standpoint that -- and Monsanto clearly
19  understands that because this is one of many, many pages
20  with different titles on the labels, and this particular
21  page, it simply says "Priority of Communication,"
22  meaning this is how we're going to -- this is what we
23  want to tell the customer in order of priority. And the
24  first thing that they say is Monsanto "brandmark."
25  That's their first priority. They want to make the

15 (Pages 54 to 57)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 58

1    product recognized -- Roundup recognized.
2         Then the second is what they call a "variant,"
3    as you see in figure 1-4 on page 5 of Exhibit 7. "The
4    text is enlarged to highlight product type, purpose and
5    is set in the Avant Garde Medium, all caps." So -- and
6    of course you can see the red bullets that are
7    consistent with that.
8         "Primary Product Claim," "This text is in
9    Avant Garde medium," et cetera. "Secondary Product
10   Claim," the text is next to the -- so you can see that
11   all four of these don't go down to the word "caution" or
12   "precaution." Those aren't our priority for Mon- -- if
13   it were a priority, they would list it.
14        Q.  In your opinion?
15        A.  Well, it's not my opinion. It's Monsanto's
16   opinion. They're saying -- it's black and white.
17   They're saying these are our priorities.
18        Q.  Your opinion is if it was important, they
19   would list it, is it not?
20        A.  Well, they've said it's not. That's my point.
21   That's my opinion.
22        Q.  Where does it say that product safety or
23   safety is not a priority for us, using those words?
24        A.  In this label, Monsanto is not designating the
25   word "caution" or "precaution" in terms of priority of

Page 59

1    communication, so that says it's not a priority to them.
2         Q.  Okay. And your authority to make this opinion
3    is your MBA degree?
4         A.  My authority is my experience in warnings.
5         Q.  Your experience in warnings, okay.
6         Any other human factor opinions before I get
7    off that subject?
8         A.  I'm sure there are.
9         Q.  Now is the time.
10        A.  Let me flip through it.
11        You just want the human factor ones? You
12   don't want opinions, period?
13        Q.  Yeah. I'm trying to give us some semblance of
14   order here.
15        A.  The real order is to go through these and not
16   have to spin through this document each time for each
17   category.
18        Another -- I mean, one I'll retouch on was
19   yesterday, where the warnings on pages -- this is the
20   PPE warnings.
21        Q.  Okay. PPE warnings.
22        A.  I'll get that one out of the way.
23        Q.  What's your opinion with regard to that?
24        A.  Well, it's the same as I went through
25   yesterday, but let me get to the pages.

Page 60

1         Q.  Are you referring to what we discussed
2    yesterday, if plaintiffs had proper PPE, they would have
3    greatly reduced their exposure?
4         A.  Yeah. But the human factor side of it is that
5    if you're warned -- if the warning doesn't -- says that
6    you can wear work clothes rather than PPE, that's what
7    you're going to do, and you're going to think that -- if
8    you're told that's PPE, because that's the title of each
9    of those warnings, and that work clothes represent PPE,
10   then the human factor is you're going to think that
11   you're safe or you're protected by wearing long-sleeved
12   shirts and pants, work clothes pants.
13        Q.  What PPE should, in your opinion, have been
14   worn by these plaintiffs?
15        A.  Well, I think the PPE that's designated -- at
16   a minimum the PPE that was designated under the warnings
17   worker protection rules.
18        Q.  Which would be what?
19        A.  Well, we'll go to that.
20        Q.  Well, I didn't mean to skip over -- yeah,
21   let's finish what you were doing, and then we'll go to
22   your other section, because you took time to find those
23   pages
24        A.  The pages we spoke about yesterday -- and now
25   I have -- I'm offering a different opinion. The

Page 61

1    opinions I offered yesterday were that they were in
2    violation of 40 CFR 170 with respect to defining as PPE
3    things that aren't defined by EPA as PPE. But the human
4    factor side of that is that when you tell a user that
5    this is PPE, they're going to think it's PPE, and that's
6    clearly misleading to them. They're thinking they're
7    being protected because this is personal protective
8    equipment, and it's not.
9         Q.  Okay. So are we ready for my follow up
10   question?
11        A.  So they're -- no, I'm not finished.
12        Q.  Okay.
13        A.  So their behavior would be such that they
14   would wear these items thinking they were protected and
15   they weren't, and that's the human factors part.
16        Q.  Okay. So now I'll go to my follow-up
17   question.
18        A.  Sure.
19        Q.  Which was: What, in your opinion, should the
20   plaintiffs have been wearing when they were using
21   Roundup?
22        A.  They should have been wearing PPE that would
23   protect against having Roundup contact the skin.
24        Q.  Which would be what?
25        A.  It would be -- the best way to look at that

16 (Pages 58 to 61)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

## Page 62

1  would be the EPA's -- I'm trying to find it. Bear with
2  me.
3      Q   No worries  It's a big document you have
4  there
5      A.  I have two pages on worker protection rules.
6          So again I'm on Exhibit 7, looking at pages 60
7  and 61. I think the figure 4-15, as I've said before,
8  based on the fact --
9      Q   Wait a minute  Oh, 60  Go ahead  Figure
10 4-15  Got it
11     A.  Right.  Which is the protection rules
12 associated with the "warning" signal word, versus figure
13 4-16 which is for "caution."  And I have other opinions
14 on that as well, but a review of the dermal work, along
15 with the EPA correspondence, clearly shows that the
16 appropriate word, along with their marketing
17 information -- clearly shows that the word "warning"
18 would be most appropriate to protect from dermal because
19 "caution" doesn't protect you from dermal exposure.
20     Q   Wait  My question was: What should the
21 plaintiffs have been -- should have been wearing at the
22 time they were spraying?
23     A.  Right.  And I'm trying to set the table.
24     Q   Okay  All right  I just wanted to make sure
25 I remembered my question

## Page 63

1      A.  And so if you read what EPA has said should be
2  the protective equipment, that would be my
3  recommendation to protect the skin, that would be the EPA
4  warnings language with respect to dermal protection.
5  And I can read the various words here, if you want, that
6  I think are directly applicable.
7          But it says -- I would say wear
8  chemical-resistant gloves, chemical-resistant apron,
9  chemical-resistant shoes, shoe covering or boots.
10 That's the part of the language that I -- you want PPE
11 that's recognized in the industrial hygiene community to
12 protect the skin.  So you want impermeable, as Monsanto
13 says in the POEM calculations, where you reduce the
14 dermal transfer through the material from 100 to 10, to
15 5 percent.  That would be the material you want.  You
16 want that material that's resistant to transfer through
17 the material so that it doesn't get to the skin.
18     Q.  What items of personal protection equipment,
19 specifically, should the plaintiffs have been wearing?
20     A.  Clothing that was impermeable to the product.
21     Q.  Such as what?
22     A.  You go to the compatibility tables.  Are you
23 asking me where I go to Target to buy the equipment or
24 whatever?
25     Q.  You're telling me that what they were wearing

## Page 64

1  was inappropriate.
2      A.  It is.
3      Q.  Then what should they have been wearing?
4      A.  They would be wearing equipment that, as
5  Monsanto shows in their POEM modeling results, that's --
6  resists the permeability of -- I'll say the same answer
7  that Monsanto's saying.  They're saying clothing that's
8  impermeable.
9      Q.  Identify for me what you would consider
10 impermeable clothing.
11     A.  I'm not here to -- if you ask me in non-real
12 time to go and spec equipment, I could do that for you.
13 But in real time, to go out and say, okay, I'm going to
14 go to a health and safety catalog and pull the equipment
15 out, I'm going to tell you I could go and do that, but
16 it would depend on the size of the person and the
17 various materials.  But it would be the chemically
18 impermeable clothing.
19     Q.  I'm just trying to determine, in layman's
20 terms, okay, if a person's about to go into their garage
21 or shed, grab a bottle of Roundup to spray the weeds in
22 their driveway, in your opinion, what should they be
23 wearing?  And not the definition of what they should be
24 wearing.  What actual pieces of clothing?
25         I suspect sandals is not what you're going to

## Page 65

1  say.  But you are going to say some type of footwear,
2  and I want to know what type of footwear they should be
3  wearing, not the definition.
4      A.  Absolutely I'm going to say the definition,
5  because that's what you do as an industrial hygienist.
6  You're not going to -- the warnings are going to say
7  you're going to wear impermeable clothing, you're going
8  to wear impermeable gloves.  And, for instance, I
9  believe nitrile would be a good example.
10     Q.  Nitrile?
11     A.  Nitrile.
12     Q.  Okay.  Is that a brand of glove?
13     A.  No.  It's a material.
14     Q.  Okay.  So --
15     A.  But you have --
16     Q.  Hold on.  Hold on.  If I'm going to go spray
17 Roundup, I need to go buy some nitrile gloves?
18     A.  I would say nitrile would have the highest
19 potential for resistant -- resisting, in general, it
20 does for chemicals.
21     Q.  All right.  Now, what kind of upper-body
22 protection should I be wearing?
23     A.  Similarly impermeable clothing.
24     Q.  So there's nitrile shirts that I can buy?
25     A.  I don't know what the material is off the top

17 (Pages 62 to 65)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 66

1  of my head.
2      Q.  Can you name any material that would be --
3  that would fit your definition as to what someone should
4  wear?
5      A.  Well, sure.  I mean, you can wear -- if you
6  want to go to level A or level B, you could wear -- as
7  opposed to Tyvek, you could wear rubber suits, for
8  example.  I don't think you have to go all that far, but
9  there are impermeable materials that are short of
10  wearing full, rubber suits.
11      Q.  So tell me -- I'm a consumer.  Tell me what
12  Mr. Petty says I should go buy so that I can spray.
13      A.  My point is that's not my job.  That's
14  Monsanto's job.  That's my point.  My point is that --
15  no, seriously.  That is not my job.  My job is to say
16  wear impermeable clothing.  It's not to go out and tell
17  you the store to go to and the exact garment to buy.
18      Q.  You can't tell me, can you?
19      A.  Well, if I was asked to do that job, I could
20  do it in a heartbeat.
21      Q.  When you go and spray Roundup in your yard, as
22  you've told us you've used it before, what did you wear?
23      A.  Jeans and a long-sleeved shirt.
24      Q.  Okay.  Was that sufficient, in your mind, when
25  you sprayed Roundup?

Page 67

1      A.  Probably not.
2      Q.  So when you spray Roundup, in your mind,
3  wearing jeans and a long-sleeved shirt at the time you
4  were spraying it was not sufficient for you?
5      A.  No, because the labels didn't say --
6  obviously, the labels say "caution."
7      Q.  So given what you know now, when you go out to
8  spray Roundup, if you do, what are you going to wear?
9      A.  I don't use Roundup.
10      Q.  Whether you do or don't use Roundup, if you --
11      A.  I'm not going to use Roundup.  That's the
12  point.
13      Q.  If you use a glyphosate herbicide, what are
14  you going to wear, Mr. Petty?
15      A.  I'm not going to use a glyphosate herbicide.
16      Q.  When you use any herbicide similar to
17  glyphosate --
18      A.  I don't know.
19      Q.  -- what are you going to wear.
20      A.  That's a hypothetical --
21      MR. KRISTAL:  Object to form.
22      THE WITNESS:  -- and I would have to look at
23  the label and make that decision at that time.
24  BY MR. UPSHAW:
25      Q.  What kind of footwear should these plaintiffs

Page 68

1  have been wearing?
2      A.  It should have been impermeable -- well, you
3  can either put covers on, but you want to stop --
4  ultimately, it's the combination of socks, shoes or
5  cover on the above that are impermeable to the movement
6  of glyphosate to the skin.  So there are multiple
7  options there.
8      Q.  Such as?
9      A.  I just gave them to you.
10      Q.  Multiple options is -- you said that you wear
11  a shirt, shoes, or socks.
12      A.  No.  You didn't listen to my answer.
13      Q.  I missed it.  Say it again.
14      A.  I said you have options on your footwear, from
15  impermeable sock materials, impermeable shoes or
16  impermeable covers.
17      Q.  Okay.
18      A.  And you could use one or more of those to
19  protect from getting that material to the skin.  That's
20  the goal here.  It's quite simple.
21      Q.  Understood.  As an industrial hygienist, do
22  you know where you can purchase impermeable socks?
23      A.  Sure.  You can go to Lab Safety and Equipment,
24  I think is one of the suppliers.
25      Q.  Is that on Amazon?

Page 69

1      A.  I don't know anything that's on Amazon, but I
2  don't know; I haven't looked it up.  But we used to
3  have -- routinely in the labs, we'd have Lab Safety and
4  Supply Equipment catalogs.
5      Q.  So you'd recommend that if someone is going to
6  buy Roundup, that they need to go to a lab saying
7  facility and purchase socks when they do that?
8      A.  That's not what my answer was before.  You
9  keep misrepresenting my testimony.
10      Q.  I don't want to do that.  Tell me how I'm
11  wrong.
12      A.  Remember I talked about one of the three,
13  remember?  Socks, shoes or covers.  As long as of one of
14  those three, if not more, are impermeable to stop the
15  material from getting to the skin, that's acceptable.
16  So you just said I had to use socks, and I didn't say
17  that.
18      Q.  Then I was mistaken.  One of the ways you
19  could do it was to make the clothing impermeable for
20  your footwear would be to buy impermeable socks from a
21  lab supply company.  That's one way.  Is that more
22  correct for you?
23      A.  Potentially.
24      Q.  Okay.
25      A.  But you're not -- I'm not saying that that has

18 (Pages 66 to 69)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

---

Page 70

1  to be the option.
2  Q.  Understood.  That's one option, is to go to a
3  lab company and buy impermeable socks.
4  A.  No, not a lab company.  You go to a supply
5  company for safety clothing and equipment.
6  Q.  Okay.  All right.  And another way, then,
7  would be to use some type of shoe that's
8  impermeable; right?
9  A.  Sure.
10  Q.  Okay.  So if you had some weatherproof boots
11  or something like that, that would work just
12  fine; right?
13  A.  Depends.  I mean --
14  Q.  On?
15  A.  Whether or not it's impermeable to that
16  chemical.  That's the whole purpose in -- one of my
17  biggest criticisms of -- and if you read my warnings
18  things, my biggest criticisms are that the manufacturer
19  is in the superior knowledge position of the
20  compatibility of their products with permeability
21  through various materials.  On gloves, you've got
22  Buna-N, you've got nitrile, you've got viton, you've got
23  polyvinyl chloride, you've got latex.
24  So when somebody says -- even if they say wear
25  protective gloves, my criticism is tell them which glove

---

Page 71

1  to wear so they can go buy that glove.  And so I happen
2  to know, but I'm -- I am much more trained and educated
3  than a typical consumer for buying health and safety
4  equipment.  So -- but even there, to try to memorize the
5  compatibility tables between materials and chemicals,
6  nobody does that, not even in my field.
7  So what you can do, though, is you can look at
8  the permeability of the ingredients you're trying to
9  protect from versus various materials.  You'll know that
10  if you're involved with development of that material.
11  And instead of saying that, you'd say, okay, for gloves,
12  wear nitrile gloves.  Then the consumer or whoever uses
13  the product, it's on them.  They can go -- if they don't
14  do it, it's on them.  But you can say, okay, go to the
15  store and buy nitrile gloves.
16  Or if you have certain equipment you want them
17  to wear that's a compatibility, so when you have -- then
18  they can go buy that specific thing.  Specify it for
19  them.  Because you're in the position -- not you
20  personally, but the manufacturer is in the position to
21  know the compatibility table for their particular
22  materials much more so than the employer and much more
23  so than an individual or employee.
24  So I think it's incumbent, if you really want
25  to protect somebody, to tell them what to buy.  I agree

---

Page 72

1  with you 100 percent.  But the manufacturer's in the
2  best position to do that.  If you ask me to do that for
3  the manufacturer, not in real time, but to sit down and
4  do it, I'm certainly qualified and I would come back to
5  you.  If you ask me those questions, in a couple of
6  hours I could look up the compatibility tables and tell
7  you here's some stuff I recommend; here's some places
8  you can get it.
9  MR. KRISTAL:  We've been going about an hour
10  and a half, unless you're in the middle of some
11  thought --
12  MR. UPSHAW:  I am, so I'll ask one more
13  question and finish my thought on that, because
14  I'll definitely lose it.
15  BY MR. UPSHAW:
16  Q.  You made a statement just now that even when a
17  manufacturer tells the consumer or user of the product
18  to wear gloves and they don't wear gloves, that's on
19  them; right?
20  A.  If it's PPE.
21  Q.  Only if it's PPE.  So if they say "wear
22  gloves," and you don't wear gloves, then it's not on the
23  consumer?
24  A.  Well, my view is that if it's not PPE, it's
25  not protective.

---

Page 73

1  Q.  Not my question.
2  A.  So no.  If PPE is required to protect the skin
3  and you're wearing -- leather gloves, cotton gloves are
4  not protective.
5  Q.  So it doesn't matter?
6  A.  It's not going to matter.
7  Q.  Okay.
8  A.  I mean, not -- it has a yes and a no.  Will it
9  slow the process?  Potentially.  But it's not recognized
10  in the industrial hygiene community as PPE, not all
11  gloves.
12  Q.  Second question, and then we can take a break.
13  Have you ever seen a label that you can recall that said
14  "wear nitrile gloves"?
15  A.  I have.
16  Q.  With what product?
17  A.  They're generally products that have solvents
18  in them.
19  Q.  Such as?
20  A.  It just doesn't come to me, but I have seen
21  them.  I have seen them.
22  Q.  While we're together, if you can think of a
23  product that you've seen the label that says "wear
24  nitrile gloves," would you let me know?
25  A.  I will.  But I have seen them.  They're

---

19 (Pages 70 to 73)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 74

1   solvents. They're always solvents, I just don't know
2   which solvent, whether it's toluene or xylene or...
3           MR. UPSHAW: You've got to stop talking so he
4   can turn off the --
5           THE WITNESS: Oh.
6           THE VIDEOGRAPHER: This marks the end of video
7   media number 1 --
8           MR. KRISTAL: Well, you need to finish your
9   answer.
10          THE VIDEOGRAPHER: -- the time is 11:01, and
11  we're going off the record.
12          (Recess from 11:01 a.m. to 11:14 a.m.)
13          THE VIDEOGRAPHER: We're back on the video
14  record. This is the start of video media disc
15  number 2 of the video deposition of Stephen Petty.
16  The time is 11:14.
17  BY MR. UPSHAW:
18      Q. Okay. A little housekeeping. We've got
19  landscaped copies for Exhibit 15, I believe it is.
20  We'll trade those out, and we'll get that straightened
21  out.
22          Okay. Mr. Petty, there was some confusion at
23  the end, before we took our break, whether or not you
24  were done with your answer.
25          Do you have anything to add?

Page 75

1       A. No. I don't recall off the top of my head
2   specifically which products recommend the use of
3   nitrile, but I can say affirmatively that I've seen
4   those.
5       Q. Okay. But the products that you have seen or
6   that you recall, having a specific request for use of
7   nitrile gloves, contained a solvent?
8       A. Generally, they -- the chemicals of concern in
9   the product were solvents, yes.
10      Q. Solvents such as what?
11      A. Naphtha, mineral spirits, toluene, xylene,
12  ethylbenzene.
13      Q. So if I go and buy a can of mineral oil at my
14  local hardware store, is it your testimony that that can
15  is going to say that I should use nitrile gloves when
16  I'm using the product?
17          MR. KRISTAL: Objection; that wasn't his
18  testimony.
19          MR. UPSHAW: That's a question.
20      A. I don't know whether it would or not.
21  BY MR. UPSHAW:
22      Q. Okay. All right. We were going over human
23  factor opinions. You talked about --
24      A. Right. So we just --
25      Q. I was just trying to bring us up to where we

Page 76

1   were  You were at page 80, 81  I didn't know if we
2   were done with that or you were moving to your next --
3       A. Yeah, I just commented if the warning says PPE
4   and it's not really from an industrial hygiene EPA
5   Section 170, it's not really industrial hygiene, then
6   obviously that creates a behavior that isn't protective,
7   I guess is the best way to summarize that opinion.
8       Q. Can you go back to page 60, if you would?
9       A. Okay.
10      Q. I just want to understand where figure 4-15 is
11  from
12      A. Figure 4-15...
13      Q. On page 60
14      A. It's indicated at the bottom of the page.
15      Q. Yeah, I know  It says "Recommended Worker
16  Rules for Glyphosate Products with the Word 'WARNING'"
17  I don't understand why you took us to this versus -- you
18  contrast that with figure 4-16 which says "Recommended
19  Worker Rules for Glyphosate Products with the Word
20  'CAUTION'"
21      A. My main purpose was to blend an opinion I have
22  that the "warning" signal word should have been used
23  rather than "caution." My real opinion about that goes
24  back to what we talked about yesterday on EPA 170, which
25  is the definition of what PPE is. In other words --

Page 77

1       Q. Where was that? Did you show that to us?
2   That was yesterday's --
3       A. Yeah, it was Exhibit -- it's 14.
4       Q. I have that.
5       A. And I was -- it's in here in multiple places,
6   but the page that we chatted about at the end of
7   yesterday's deposition time was page 22, under 40 CFR
8   Section 170.240, which is "Personal Protective
9   Equipment." And they have definitions here, item (b),
10  and we talked about that as to how they define PPE, and
11  then we also talked about item (b)(2), which is items
12  they say explicitly are not considered to be PPE.
13          And so I had pulled a couple of labels out of
14  this factual material document to illustrate that
15  Monsanto had titled items as PPE, which included
16  long-sleeved shirts and pants or things like that, that
17  clearly are defined as not being PPE.
18      Q. Okay. And so when you referred us just now to
19  page 60 of the factual summary, which is Exhibit 7,
20  and --
21      A. What I was specifically referring to was the
22  chemically resistant items.
23      Q. Which is paragraph 4 there, which says, "Wear
24  chemical-resistant gloves, chemical-resistant apron,"
25  that paragraph?

20 (Pages 74 to 77)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 78

1    A. A portion of it, yes.
2    Q. So it says wear -- the whole thing says, "Wear
3  chemical-resistant gloves, chemical-resistant apron,
4  chemical-resistant shoes, shoe coverings or boots,
5  long-sleeve shirt, long-legged pants, and a face shield
6  or goggles." That's the entire paragraph; right?
7    **A. It is. But you'll recall my testimony was**
8  **just the chemical-resistant portion of that paragraph,**
9  **because that's the only portion that's real PPE. This**
10 **thing doesn't necessarily define what real PPE is, but**
11 **the regulation itself does.**
12   Q. And when you say "this thing" -- I'm just
13 going to make sure we're talking about the same thing --
14   **A. This paragraph.**
15   Q. When you say "this thing" -- okay. In figure
16 4-15?
17   **A. Yeah, it's not defining that as PPE one way or**
18 **the other.**
19   Q. And what is figure 4.15? I know it says here
20 that it's Exhibit 180 and it says a MONGLY number, but
21 is that a Monsanto document? Is that an EPA document?
22 Where does this come from? What's the context of this?
23   **A. It comes from Exhibit 180. I'd have to pull**
24 **that exhibit, and then I could tell you. I think it**
25 **was --**

Page 79

1        MR. KRISTAL: It was on the thumb drive we
2  gave you.
3        THE WITNESS: It was an attachment to -- it
4  was -- my point was simply to point to the words
5  that say "use protective equipment," which is PPE.
6  And my opinion is they should wear PPE to prevent
7  dermal exposures.
8  BY MR. UPSHAW:
9    Q. Do you know whether or not this was submitted
10 to -- part of a package that was submitted to the EPA?
11       MR. KRISTAL: What is the "this" you're
12 talking about?
13       MR. UPSHAW: Well, we're talking about figure
14 4-15.
15   **A. Well, if you show me the document -- you're**
16 **obviously reading from something over there, so --**
17 BY MR. UPSHAW:
18   Q. I'm going from what you've --
19   **A. Well, I know, but I mean --**
20       MR. KRISTAL: Do you want me to show Mr. Petty
21 what Exhibit 180 is?
22       MR. UPSHAW: Yeah, why don't you show
23 Mr. Petty what 180 is -- and we should say Exhibit
24 180 from your list.
25       THE WITNESS: So we're just looking at Exhibit

Page 80

1    180 of...
2        MR. KRISTAL: You can scroll just by hitting
3  that button while that arrow is there, and the page
4  that you cited was 13 -- 1332.
5  BY MR. UPSHAW:
6    Q. Let me know when you're ready for questions.
7    **A. Okay. I think I'm ready for questions.**
8    Q. Okay. So you had a chance to review your
9  exhibit -- I say your Exhibit 180 because that's what
10 it's listed as in your document; right?
11   **A. Well, it's referring to the M-O-N-G-L-Y number**
12 **as well.**
13   Q. Right. And rather than saying
14 MONGLY00241317 --
15   **A. Well, I'm giving you the page number using the**
16 **Bates stamp basically.**
17   Q. Right. What you've listed as part of your
18 factual summary was a portion of a submission to the
19 EPA, was it not?
20   **A. It appears to be, yes.**
21   Q. Okay. And the portion you've put in
22 section -- or figure 4-15 was language to be used on
23 non-home products; correct? Actually, it was suggested
24 language to be used on non-home products; correct?
25       MR. KRISTAL: You want to get to the page

Page 81

1  there, I presume?
2  BY MR. UPSHAW:
3    Q. Let me give you the page so you don't have to
4  hunt around.
5        MR. KRISTAL: 1332. It's the next-to-the-last
6  page.
7  BY MR. UPSHAW:
8    Q. 1317 is the page I'm looking at.
9        MR. KRISTAL: 1317?
10       MR. UPSHAW: Page 2, number 2, subheading A.
11       MR. KRISTAL: Well, there's a series of
12 different letters back and forth. In other words,
13 it's an aggregate document.
14       MR. UPSHAW: I know, Counsel. But my question
15 stands with the witness about this particular
16 figure. If I'm wrong, then he can say I'm wrong.
17       MR. KRISTAL: I have no idea what the question
18 is.
19 BY MR. UPSHAW:
20   Q. The question was: The figure 4-15 was
21 language that was suggested for use in non-home
22 products?
23       MR. KRISTAL: Well, we have to go down to that
24 page now. I don't know why you're on 1-7 if 332
25 was the --

21 (Pages 78 to 81)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 82

1    MR. UPSHAW:  Not sure what the comments are
2  for, but I'm waiting for an answer.
3    MR. KRISTAL:  Well, I'm trying to direct
4  everybody to the right page.
5    MR. UPSHAW:  I understand.
6    MR. KRISTAL:  It's in page 60.  It's the Bates
7  number that ends 332.  Did you get it?
8    THE WITNESS:  I see that.  I'm just trying to
9  figure out what it's attached to.
10   I guess the bottom line is that's not clear
11 necessarily who said what to who.  The last
12 correspondence we have is on M-O-N-G-L-Y 00241327.
13 It's just not clear.  It's just attached to the end
14 of that set of documents.
15 BY MR. UPSHAW:
16   Q.  Okay.  That's fine.  Let me ask you, then:
17 You obviously pulled this -- that particular page -- or
18 these last two pages from this particular document, 332
19 and 333, figures 4-15 and 4-16.
20   A.  Yes.
21   Q.  Is there anywhere in your factual summary
22 where those pages are put into context of where they
23 came from?
24   A.  Well, I've listed the document and the Bates
25 number.

Page 83

1    Q.  I mean in your actual writing of your factual
2  summary.
3    A.  I think I just answered the question.  I'm
4  not --
5    Q.  I know you --
6    A.  You asked where they came from, and I just
7  told you that.
8    Q.  I asked -- right.  That is true.  You do list
9  here that it's Exhibit 180 from your exhibit list and
10 you give the MONGLY number, which I understand.  In
11 fact, figure 4-14 is from the same document.
12   Is there anywhere in your factual summary, in
13 the statements, the writing, the editorial that you
14 provide in this area, that give the reader some idea of
15 the context figure 4-14, figure 4-15, and figure 4.16
16 were used in that document?
17   A.  I guess probably not.  That's why it's a
18 statement of factual information because I'm just
19 producing information from documents; I'm not forming
20 opinions.
21   Q.  All right.  So these are just facts picked
22 from the hundreds or multiples of hundreds of documents
23 that you've reviewed, some of which are Monsanto
24 documents?
25   A.  I guess that's correct.  I mean, what -- the

Page 84

1  attempt here is to provide examples of language I may or
2  may not use during this deposition for supporting or
3  commenting on opinions.
4    Q.  Okay.  All right.  Okay.  Any other human
5  factor opinions?
6    A.  I've got several.
7    Q.  Okay.
8    A.  I'll go to page 186 of the Exhibit 7.
9  Particularly, I'll draw your attention to what I call
10 figure 7-36.
11   Q.  Let me get to 187.
12   Okay.  I'm on 187.  What were we referring to?
13   A.  It really has to do with the figure in the
14 third bullet down.  This is part of a Backgrounder from
15 Monsanto in 2002, which was -- continued to be used and
16 sent out to distributors and clients, and particularly
17 in this figure, I'll draw your attention to the box that
18 says "Glyphosate (active ingredient)" and "Roundup
19 (formulated product)," and if you read that, it implies,
20 on first blush, that Roundup and glyphosate are
21 essentially the same in terms of toxicity, acute
22 toxicity, at 5,000 milligram per kilogram.  The only
23 problem is you have to read the little one that sort of
24 giveths to you and taketh back.  The little one -- and
25 I've blown this up -- says -- the one says, "Roundup

Page 85

1  refers to the original single active ingredient
2  formulation."
3    So the implication, when you read this, is
4  that glyphosate and Roundup have the same toxicity.  We
5  know from testimony from Roundup folks cited here that
6  that's not the case, and -- so this is very misleading
7  to -- when you're sending it out to the public, at best,
8  it's misleading.  And so when you make a prominent
9  statement of glyphosate and Roundup having the same
10 acute toxicity, you know, that's certainly -- from a
11 human-factor standpoint, that's what you're telling the
12 reader, but they have to know in fine print that that's
13 not really what they're being told.
14   Q.  So your opinion is they should not have added
15 the fine print or they should have made the fine print
16 larger?
17   A.  My opinion is that Roundup should never have
18 been included in that box because it's completely
19 misleading.
20   Q.  And what's the background on this September
21 2002 Monsanto Backgrounder?  Who was it sent to?
22   A.  Well, it was used as a base document sent out
23 to many people, but specifically, in this package, it
24 was -- I'll go back.  If you go to page 183, it was
25 being sent out as late as April 29th, 2016.  Oh, it's

22 (Pages 82 to 85)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 86

1  produced in 2002. And this was being -- this is the
2  statement where it says, "Does Monsanto have any
3  propaganda for the public defending the use of Roundup
4  on public grounds?" And it's one of the package of
5  documents that Monsanto then sent to public officials
6  based on -- it was part of the package of these
7  documents, and you can see it's number 6 on that list.
8      Q. Uh-huh.
9      A. And so we know it's being utilized as late as
10  April 29th of 2016 as propaganda. That's how they
11  define it.
12      So to me, the fact that --
13      Q. When you say -- I'm sorry.
14      A. The fact that Monsanto would refer to it as
15  propaganda is more evidence that the intent was to
16  mislead.
17      Q. So what you're reading from is on page 183, an
18  e-mail from Daniel Blaeser?
19      A. Right.
20      Q. B-l-a-e-s-e-r, of Helen Chemical?
21      A. Right.
22      Q. Is that part of Monsanto?
23      A. No. But he's asking whether they have any,
24  and the response is the Monsanto documents.
25      Q. So because they sent documents to Mr. Blaeser

Page 87

1  of Helen Chemical, then it's your opinion that Monsanto
2  agreed that the enclosed seven documents were, quote,
3  unquote, propaganda?
4      A. No, my -- I'm not saying that at all. What
5  I've said my opinion was, if you go back to my original
6  opinion, that particularly in this background of it --
7  obviously, it existed for some time because we're
8  talking about 14 years later, it's still being
9  utilized -- that they're lumping, in a prominent
10  position -- as you read this particular graphic, your
11  eyes are drawn to that box, that glyphosate and Roundup
12  have the same toxicity.
13      Q. Okay. I was trying to ask if you said --
14      A. And I'm saying that's a human-factors issue
15  with respect to a person receiving this information and
16  reading it without going to the fine detail that says,
17  well, really the Roundup under superscript 1 isn't
18  Roundup; it's just glyphosate.
19      Q. Okay. So I was going back to you said they
20  consider this propaganda, and then I asked you who
21  "they" was, and you said Monsanto?
22      A. No, no. This is -- it is as it's described.
23  This is correspondence from Blaeser to Monsanto and then
24  the response that Monsanto sent back.
25      Q. All right. I just want to make it clear

Page 88

1  whether or not you were -- that you weren't saying
2  Monsanto agreed that this was propaganda. Okay.
3      A. No. But I would tell you that this is -- this
4  is, at best, extremely misleading if not just flat-out
5  false advertising.
6      And the other thing is -- the other opinion I
7  have is it's clear that FIFRA does not allow you to make
8  comparisons with other products. FIFRA is very explicit
9  that if you make comparisons, you have to compare
10  glyphosate to glyphosate, for example. You're not
11  allowed to compare glyphosate to paraquat or to the
12  chloroform. So that's a clear violation of FIFRA.
13      Q. And where is that?
14      A. Back in the section on FIFRA.
15      The section that I'm talking about starts on
16  page 111 of -- well, it's actually on 110 of Exhibit 7
17  for the deposition.
18      Q. Okay.
19      A. Regarding false claims.
20      Q. Section 7?
21      A. Right.
22      Q. Okay.
23      A. And the first area of violation is a -- is --
24  I've highlighted it there. I've already talked about
25  the fact that it's a violation of FIFRA by making a

Page 89

1  misleading comparison. But the other thing is that a
2  false or misleading comparison with other pesticides is
3  a violation.
4      And specifically, if you go to page 112, if
5  the single product is a single active ingredient, the
6  claim shall only refer to -- the word should is not --
7  only refer to another simple single-ingredient product.
8  So I would say under -- one of my opinions would be that
9  there were at least two violations of FIFRA represented
10  in this particular graphic.
11      Q. So wait. One violation is on page 112 --
12      A. Well, no. One is a "false or misleading
13  statement concerning" -- "a false or misleading
14  statement about the value of the product for purposes
15  other than a pesticide or..."
16      Q. And where are you reading from?
17      A. I'm on 111.
18      Q. Okay.
19      A. And then a "false or misleading comparison
20  with other pesticides or devices."
21      Q. That's EPA 40 CFR 156?
22      A. Correct.
23      Q. Okay. That was one.
24      A. And the next one down is "a true statement
25  used in such a way as to give a false or misleading

23 (Pages 86 to 89)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 90

1  impression to the purchaser." Well, that's clearly the
2  case when you're representing Roundup has the same
3  toxicity as glyphosate, although you kind of take it
4  away in the fine print.
5      Q.  So in the end they don't make this statement
6  which is false or misleading because they have fine
7  print?
8      A.  It is misleading, period, because of human
9  factors being that you're drawn to -- there is no
10  logical reason why you would do this, knowing it's not
11  true, in the main.
12      Q.  Again, that's your -- this is part of your
13  opinion; right?
14      A.  No, no, no.  Donna Farmer says flat-out we
15  don't know about the -- for instance, she says, "We
16  can't say Roundup is not a carcinogen.  We say
17  glyphosate isn't."  So they know internally the toxicity
18  of glyphosate is different than the toxicity of Roundup,
19  and they're implying here it's the same, because under
20  both of those items, it says less than -- or greater
21  than 5,000 milligram per kilogram.
22      Q.  Again, that's part of your opinion that
23  there's some implication?
24      A.  Well, it's part -- you asked about human
25  factors --

Page 91

1      Q.  Yes.
2      A.  You asked about human factors.  I don't
3  think -- you take 100 people in a room, and you ask them
4  about what would you draw from this graphic, I think it
5  would be pretty clear what most people would draw from
6  that graphic.
7      Q.  Did you do that?
8      A.  And at best they would say it's misleading.
9      Q.  Did you do that?
10      A.  I haven't done it.  But I'm telling you that
11  we do have some -- my next opinion we'll talk about
12  where Monsanto actually did stuff like that.
13      Q.  Okay.  Well, let's go back to this opinion
14  before we move to the next opinion, because you --
15      A.  Well, I want to finish my statement.
16      Q.  Okay.  Go ahead.
17      A.  So I said it has a human-factors opinion
18  associated with it, which I've given, and it also has
19  opinions -- in my opinion, it violated the general
20  claims provisions under label -- labeling information.
21      Q.  Which is where?
22      A.  Which is on -- well, I've referred to it on
23  page 111.  We spent time on that.
24      Q.  Okay.  Wait.  Did I miss something?  You
25  pointed out the last two paragraphs on page 111.

Page 92

1      A.  Well -- no, no.  I pointed out two -- I even
2  tried to make this as easy as possible.  For that
3  graphic, I've highlighted the two sentences that would
4  define false or misleading statements concerning --
5  misbranding claims under 40 CFR 156 10(a)(5).
6      Q.  Okay.
7      A.  And I'm saying that, one, there's a misleading
8  comparison to other pesticides or devices, and secondly,
9  it's a true statement but it gives a false or misleading
10  impression to the purchaser, and I think there's no
11  doubt about that.
12      Q.  Okay.  And those all refer to figure 7-36?
13      A.  I'm using those in part.  I use those for
14  other -- I have other opinions of other labels --
15      Q.  That you use this section for?
16      A.  That I used this Section 7.
17      Q.  Okay.  Okay.  Any more?
18      A.  And then we have the whole Section 8, which is
19  really Monsanto's market research is really looking at
20  human factors; that is, how people would change their
21  purchasing behavior based on information they were
22  provided.  And I've summarized a lot of the findings
23  on -- well, in Section 8, and my opinions related to
24  this would be that it's clear Monsanto understood that
25  if the user were to know that they needed to wear PPE or

Page 93

1  move the --
2          They're really looking at movement of the
3  "caution" word -- I shouldn't say that -- the signal
4  word from "caution" to "danger" or "warning."  In other
5  words, making it -- erring more on the side of public
6  safety, because those would begin to require PPE, if you
7  had to use the word "warning" or "danger."
8      Q.  I'm sorry.  I didn't follow that because I was
9  writing it down.  So you started with the opinion it's
10  clear Monsanto understood if the user knew they have to
11  wear PPE, and then I lost you.
12      A.  That they would lose market share.
13      Q.  Okay.
14      A.  And there's a whole variety of statements
15  here, but let me point you to one.
16          On the bottom of page 195, beginning on 196, I
17  highlight, "A move to the 'Danger' signal word has
18  potential to trigger a 17 percent decrease in Roundup
19  Ultra usage."
20      Q.  And what are you referring here at the bottom
21  of -- referring to at the bottom of page 195 and the top
22  of page 196?
23      A.  This is simply reference to their 1998
24  marketing study, Exhibit 485.
25      Q.  Okay.

24 (Pages 90 to 93)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 94

1    A.  I'm just -- these are quoted words.
2    Q   And this was Monsanto's 1998 Signal Word
3  Market Research?
4    A.  Well, I mean, we can go back and look at
5  whatever the title was.
6    Q   That's your figure 8 1?
7    A.  Yeah, it's -- I've indicated here in both
8  studies what they said their purpose was in doing the
9  work, trying to be transparent.  And what they're really
10 looking at is what's the impact to our market share if
11 we change warnings, part of which is signal words.
12   Q   And this research was for the product Roundup
13 Ultra?
14   A.  Well, the purpose of the first study says --
15 I'm reading again on figure 8.1, 195 -- the primary
16 purpose of this research was to explode -- explore, I
17 should say, the potential impact of changing the signal
18 word on Roundup brands from "caution" to "danger."  And
19 the second -- and there are other items there as well.
20 But the purpose of the second -- the 2001 study was to
21 receive input from growers regarding their impressions
22 of and actions taken due to signal word information on
23 herbicide product labels.
24   Q   And then doesn't it refer us to specific
25 products when you go to the other bullet points?

Page 95

1    A.  It does on -- as a subset, it does refer to
2  Roundup Ultra.
3    Q.  Okay.  Do you know where Roundup Ultra is
4  used?
5    A.  I don't have -- I assume it was used by
6  farmers because that's who they interviewed.  At least
7  that was one set group of people.
8    Q.  So this has nothing to do with human factor
9  regarding consumer -- consumers; correct?
10       MR. KRISTAL:  Objection.
11   A.  A farmer's a consumer.
12   Q.  Let me rephrase the question.
13       This research had nothing to do with human
14 factor regarding lawn and garden consumers?
15       MR. KRISTAL:  Objection.
16   A.  Not necessarily.
17   Q.  Okay.
18   A.  I mean, just because you -- because you do a
19 market research study on one subset doesn't mean that
20 the results won't be used or applied to other subgroups.
21   Q.  That wasn't my question.  My question was:
22 The subgroup, if you want to call it that -- I would
23 call it the group that's being tested -- was not a group
24 of Home Depot, Lowe's or garden-use consumers?
25   A.  They're not being tested.  They're being asked

Page 96

1  questions about their -- how they would behave.  This is
2  a market behavioral study.
3    Q.  The point is:  It's a different group, isn't
4  it, sir?
5    A.  A different group of what?
6    Q.  The people who are being polled in these two
7  marketing research studies is different than the group
8  using Roundup product designed for use by everyday
9  consumers in their home use?
10       MR. KRISTAL:  Objection to form.
11   A.  We don't know that necessarily because they
12 could also be using it for other purposes other than for
13 farming, which we have examples of some of the -- we
14 have an example I know, in one of the interviews, where
15 a person does farming as well as does work for others.
16   Q.  And there's no way to tell, from the
17 information that you've reviewed, whether someone who
18 was in this group actually used another Roundup product
19 for their home use?
20       MR. KRISTAL:  Objection.
21 BY MR. UPSHAW:
22   Q.  Is there?
23   A.  I'm not certain one way or the other.  I'd
24 have to go reread the studies in their entirety to know
25 and see -- Monsanto clearly would have background

Page 97

1  information, I would think, on the actual interviews,
2  but they didn't provide that as an appendix.
3    Q.  Okay.  But the whole point of this figure
4  being included in your factual summary was to support
5  your opinion that Monsanto understood if users knew that
6  they had to wear PPE, that their market share would
7  decrease?
8        MR. KRISTAL:  Objection to the form.
9    A.  No.  The point for the figure is to provide
10 the front-end pages for both these studies so that I was
11 transparent to the reader about what the purpose of the
12 studies were.  The opinions I am having about the
13 results that they found from actually completing the
14 study, which is different than figure 8.1, which is
15 simply outlining what the intent of the programs were --
16 and they were clearly market research programs, and I
17 know that because I was trained in market research
18 formally.
19   Q.  You know that also because, as you note, they
20 contracted with Marketing Horizons, Inc. --
21   A.  Sure.
22   Q.  -- for this poll.
23   A.  But, I mean, it's not like there's any mystery
24 here, but I'm just telling you that I have a market
25 research background.

25 (Pages 94 to 97)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

| Page 98 | Page 100 |
|---|---|

**Page 98**

1    Q   I appreciate that
2    A.   And so you can -- I just reproduced the
3    findings, and the findings are clear that it would have
4    an impact -- it would have an impact -- if the "danger"
5    word went up and the consumer knew that it would change
6    their PPE -- their requirements where they would have to
7    wear real PPE, that they would lose market share.
8         The only reason they wouldn't is if -- unless
9    they could do it and the customer didn't appreciate the
10   differences in the words, but their concern was that
11   their competitors would then tell the customers, hey, by
12   the way, that means you got to do something different
13   than you've done in the past.  And that's what they're
14   saying.  And I think the findings are not a surprise.
15   You'll see on page 198 --
16        Q   Let me ask you a question on that before
17   you --
18        A.   Let me finish --
19        MR KRISTAL: Let him finish
20        THE WITNESS:  -- because I want to not just
21   say the words, but quote the words
22   BY MR UPSHAW:
23        Q   Go right ahead
24        A.   On 198, they say, "There is very little, if
25   any, market share risk associated with introducing

**Page 99**

1    Roundup formulations with a 'warning' signal word if
2    growers are not fully educated."  That's an interesting
3    concept, that we don't want to fully educate our
4    customers.  That doesn't look like erring on the side of
5    public health and safety.  But they said "educated as to
6    the precautions associated with the label.  However, the
7    potential exists for Roundup to lose over 20 share
8    points should growers be fully informed as to the
9    requirements of the 'warning' signal word."
10        So -- and then they say, later on, in the
11   next --
12        Q.   Wait, finish that paragraph.
13        A.   "The risk is not significantly different
14   between the two potential levels of 'warning' signal
15   words."
16        Q.   Okay.  So --
17        A.   So then -- let me finish.  Let me finish --
18        Q.   I don't want to let you finish because I have
19   a question on this --
20        MR. KRISTAL:  No, no.  Let him finish.
21        THE WITNESS:  Let me finish.
22        MR. KRISTAL:  You can write it down and then
23   come back to your question.
24        MR. UPSHAW:  Easy, Jerry.
25        MR. KRISTAL:  You keep interrupting.

**Page 100**

1         MR. UPSHAW: Easy.
2         THE WITNESS:  So then the second part of that
3    is where they talk about the potential, assuming
4    that the workers were informed, then basically as
5    long as they're ignorant, they won't really know
6    much of a difference.  But then they say,
7    "Therefore, the risk lies with an aggressive
8    competitor who might attempt to use its 'caution'
9    signal word as a non-price point of
10   differentiation."
11        Differentiation in marketing is a clear
12   concept; that is, how do we differentiate our
13   product from another with either features that are
14   more beneficial or less restrictive.  For our
15   product, we use a factor called convenience factor,
16   how -- is our product more convenient to use than
17   your product.  And adding PPE obviously is not a
18   convenience factor.
19        I mean, if, in fact, it was legitimate that
20   you didn't need to wear PPE, in terms of protecting
21   your skin, then obviously that makes it easier to
22   use your product than if, in fact, you have to wear
23   PPE.  And they clearly understand that from doing
24   this work.  That's my point.
25   BY MR. UPSHAW:

**Page 101**

1    Q.   All right.  Let's work backwards.
2         You just read a paragraph that starts with,
3    "There is very little," comma, "if any market share risk
4    associated with introducing Roundup formulation with a
5    'warning' signal," and then you highlight, "if growers
6    are not fully educated as to the precautions."
7         And then you make a statement that Monsanto
8    does not want growers who are fully educated.
9         A.   No --
10        Q.   Where in your reading did you see anywhere
11   that Monsanto said they do not want growers to be fully
12   educated?
13        A.   That's not what I said.
14        Q.   That is exactly what you said because I wrote
15   it down.
16        A.   I said, "if growers are not fully educated,"
17   why would Monsanto say that statement?  Because the
18   obvious logic flow is that our growers aren't fully
19   educated.  And, in fact, the research that's shown
20   earlier in here in other paragraphs shows that they
21   aren't fully educated as to the meanings of these words.
22   So it's not that I'm making this up.  It's clear, if you
23   read the totality of both reports, that a large portion
24   of the users do not understand the differences in the
25   meanings of these signal words.

26 (Pages 98 to 101)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 102

1  Q. And is it your opinion that Monsanto wants
2  these growers not to know the difference?
3      A. My opinion is that if -- if they were
4  confident that they wouldn't understand the implications
5  of that, then they would go and change the signal words.
6  But their fear is that -- assuming they didn't educate
7  them on the difference, their competitor would, and that
8  would result in a loss of market share. It's an
9  interesting perspective.
10     I'm not saying what they're saying isn't true,
11 but it's certainly -- as an industrial hygienist and a
12 safety expert, this is not language that a company would
13 use to say we're going to do -- we're going to err on
14 the side of public health and safety. We're going to
15 allow the customer to continue to not be educated and
16 hope that our competitors wouldn't educate them. This
17 is a passive position, not an active position in terms
18 of educating a consumer.
19     Q. And it's your opinion that Monsanto took a
20 passive position and not an active position when it
21 comes to educating the consumer?
22     A. It's -- it's my position that they never used
23 the -- they never went back and changed the word from
24 "caution" to "warning."
25     Q. So is that passive --

Page 103

1      A. So they didn't have to deal -- they didn't
2  have to deal with the issue.
3      Q. So is that passive or is that an aggressive
4  stance?
5      A. To not deal with the issue? It's passive.
6  You're not erring on the side of public health and
7  safety.
8      Q. So my original question was: Is it your
9  opinion that Monsanto took a passive view and not an
10 aggressive view when educating consumers?
11     A. Based on the totality of the information that
12 I have listed here, it is clear that not only did they
13 take a passive view, they took a proactive view to
14 minimize the signal words used. So if it was proactive,
15 it was proactive not to err on the side of public health
16 and safety. That's my opinion.
17     Q. So it's your opinion that Monsanto proactively
18 attempted to keep consumers uninformed because they used
19 the word "caution" and not "warning"?
20     A. Amongst other things. It's --
21     Q. We just went --
22     A. No, no. Let's go through it because --
23     Q. Well, stick with that one first, answer my
24 question, then we'll go forward --
25     A. I am trying to answer, but you keep cutting me

Page 104

1  off.
2      Q. Well, because you're not answering my
3  question.
4      A. I haven't even started my answer.
5      Q. Start again.
6      A. You've got to let me answer.
7      Q. Well, you've got to answer my questions.
8      MR. KRISTAL: Well, he is answering your
9  questions. If you don't like the answer, then
10 that's a different issue.
11     MR. UPSHAW: I've enjoyed every one of his
12 answers so far.
13     MR. KRISTAL: It's not a question of enjoying
14 or not enjoying. It's just a matter of letting him
15 finish.
16 BY MR. UPSHAW:
17     Q. Go ahead, sir.
18     A. We just got done talking about the
19 implications of the word "caution" versus "warning."
20 And this market study, again, reinforces that, that the
21 "warning" word would require PPE.
22     Q. I'm sorry. Say that again. The "warning"
23 word would require PPE?
24     A. That's their concern, in this market study --
25     Q. Oh, using the word "warning." I'm sorry. I

Page 105

1  got caught up in your language. I'm sorry.
2      A. Well, we're on the -- we're talking about the
3  signal words.
4      Q. Got you. Go ahead.
5      A. We just had a long discussion about the fact
6  that PPE -- in these two studies, as well as I talked
7  about the human factors associated when they listed PPE,
8  they listed stuff that wasn't PPE. But it's clear from
9  their market research that if consumers actually had to
10 wear PPE, it would impact sales of product. And so
11 that's what I'm saying. They clearly understood that,
12 and they chose not to change the signal word.
13     Q. Chose not to change the signal word. Okay.
14     This applies to all consumers of every Roundup
15 product?
16     A. If you're going to err on the side of public
17 health and safety, yes.
18     Q. Regardless of the products' concentration of
19 glyphosate as an active ingredient?
20     A. If you're going to err on the side of public
21 health and safety, based on indications of dermal
22 irritation -- we haven't gotten all my opinions on
23 dermal. But if you look at the totality of the factual
24 information I've provided, then I would say the -- that
25 the word "warning" should have been used, because

27 (Pages 102 to 105)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 106

1 otherwise you don't protect from the exposure -- dermal
2 exposure.
3      I mean, I'm looking at this from -- since
4 dermal exposure is the -- by all accounts, is the major
5 route of -- there's four ways -- as an industrial
6 hygienist, there's four ways to be exposed:  Inhalation,
7 dermal, skin, ingestion and injection.  Well, typically,
8 you're not drinking or eating it unless it's a suicide
9 situation or injecting it, so the two primary roots of
10 exposure are inhalation and dermal or skin, and the data
11 are clear that dermal is the pathway of most concern
12 from an industrial hygiene standpoint and an exposure
13 standpoint.
14     So then the question that I ask from a warning
15 standpoint is:  If it's going to err on the side of
16 public health and safety, are you going to allow the
17 skin to be exposed basically to the product with no PPE?
18 You basically are saying we're not offering any
19 protection of the skin to the -- to exposure.  I mean,
20 because normal work clothes aren't viewed as PPE, not by
21 me, but by the regulators and by the standard codes of
22 conduct in industrial hygiene.
23   Q.  Using the word "warning" doesn't require the
24 use of PPE?
25     I'm sorry.  Using the word "caution" doesn't

Page 107

1 require the use of the word -- use of PPE?
2   A.  The only requirement as I recall is eye
3 protection.
4   Q.  Where does it say that?
5   A.  For what?
6   Q.  If I -- if the EPA says you need to use the
7 word "caution," where does it say that the EPA then
8 requires are you to list these protective items for that
9 particular product?
10   A.  It goes back to -- well, on the acute side --
11 appreciate that I'm not saying my opinions are based
12 solely on the EPA.  My opinions are based on the
13 standard of care that goes way back before the EPA even
14 formed.
15   Q.  Okay.  Understood.
16   A.  But to answer your question, with that
17 limitation in mind, I spent quite a bit of time in
18 section -- it's in Section 6, I believe.
19     Yeah.  Table [sic] 105, table 6-7, under eye
20 protection, "Primary Eye Irritation."  It says --
21   Q.  Wait a minute.  Hold on.  Oh, okay.  Got you.
22   A.  Wear protective eyewear, under "caution."
23   Q.  Okay.  That's with regard to primary eye
24 irritation.
25   A.  Well, it's with respect to your eyes.

Page 108

1   Q.  Okay.  What about the rest of PPE?  Caution
2 has nothing to do with that?
3     I should word that better because you and I
4 know what we're talking about and that was a horrible
5 question.
6     When you're using the word "caution" on the
7 label, does the only PPE the EPA requires deal with
8 primary eye irritation?
9   A.  The best way to look at it is -- well, we can
10 go through all these statements, but go to page 106
11 on -- there's similar categories for "Typical Statements
12 for Primary Skin Irritation. "
13   Q.  Okay.
14   A.  Under "caution," at least the first category
15 of "caution," it just says, "Avoid contact with skin or
16 clothing."  It doesn't say anything about PPE.  Whereas
17 on "warning," it says, "Wear appropriate protective
18 clothing and gloves."
19     Well, "protective" by definition means PPE,
20 essentially, because we know from 170 that work clothes
21 aren't viewed as protective equipment with respect to
22 exposure.
23   Q.  So I'm confused.  Looking at what you're
24 looking at, which is table 6-8 on page 106, which
25 gives -- I believe it's the EPA definitions for what

Page 109

1 should be used with particular signal words --
2   A.  Right.
3   Q.  -- are you saying that -- rather, I should
4 say:  In your opinion, under "warning," it says wear
5 PPE?
6   A.  No.  It's saying, "Wear appropriate
7 protective clothing and gloves," and there --
8   Q.  And where are you -- I'm sorry.
9   A.  And therein lies the difficulty, because
10 Monsanto has taken that to mean that you can use work
11 clothes because that's what they use in their warning.
12 And I'm saying, as an industrial hygienist, that work
13 clothes at -- not only as an industrial hygienist, from
14 our background, but even EPA in their FIFRA code
15 regarding PPE doesn't view work clothes as personal
16 protective equipment.
17   Q.  But does it view work clothes as appropriate
18 protective clothing, which is what's stated here under
19 "warning"?
20   A.  Well, that's my point, is that Roundup has --
21 I mean, Monsanto has interpreted in their warnings, as
22 I've illustrated in my earlier opinions, that
23 "appropriate" would mean work clothes.  That's -- I
24 don't believe that to be the case.
25   Q.  And I understand that's your opinion, and I'm

28 (Pages 106 to 109)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 110

1  testing your opinion by asking you:  Does the EPA think
2  appropriate protective clothing only includes items
3  considered under the definition of PPE, or is it broader
4  than that?
5      A.  EPA -- it's clear from the -- that question
6  is -- that question's difficult to answer with respect
7  to EPA because they don't fully define it beyond that.
8      Q.  "Beyond that" being appropriate protective
9  clothing?
10      A.  Right.
11      Q.  Okay.  So if you're --
12      A.  But from an industrial hygiene standpoint and
13  knowing what the law says here, as an industrial
14  hygienist, protective clothing is not work clothes.
15  That's all I'm telling you.
16      Q.  Do you think there are any industrial
17  hygienists that work for EPA?
18      A.  Certified industrial hygienists?
19      Q.  Sure.
20      A.  Within the bowels of EPA, I'm sure there's
21  some.
22      Q.  Okay.  Do you think there are any certified
23  industrial hygienists who look at labels for the EPA?
24      A.  Don't know the answer to that question.
25      Q.  Well, that's why I said "do you think."  You

Page 111

1  may not know specifically or their names
2      A.  I don't know how to answer that question.  I
3  mean, I could go and look -- if you ask me to -- the CIH
4  is all listed on a registry, so I could go to try to
5  find out.  I just haven't done that.
6      Q.  Okay  If I read the warning label, pursuant
7  to what the EPA has required here under the signal word
8  "warning," as a consumer, am I supposed to assume that
9  appropriate protective clothing does not include long
10  pants, long sleeve shirt?
11      A.  I think it's -- that's why the market research
12  for Monsanto is interesting.  Monsanto understands that
13  when they move to the word from "caution" to "warning,"
14  it's their understanding that it will require PPE.  So
15  their interpretation is really the same as mine, in that
16  the warning should require -- the warnings signal word
17  should require PPE.
18      MR UPSHAW: I don't think that answered my
19  question
20      Could you read back my question, please?
21      (The preceding question was read back by the
22  reporter )
23      THE WITNESS: I think I did answer it  I said
24  it should require PPE
25  BY MR UPSHAW:

Page 112

1      Q.  You said it should require PPE?
2      A.  That -- I said both Monsanto and I would agree
3  that that "warning" word implies it should require PPE.
4  That's why they did the market research study.
5      Q.  So the consumer then, if you're answering my
6  question -- to put your answer in another way, the
7  consumer should know where they read "appropriate
8  protective clothing," that that means they should wear
9  PPE and not just long-sleeve shirt and long pants?
10      A.  No.  The affirmative duty on labels is
11  ultimately the information is incumbent on the
12  registrant.  So Monsanto submits what they want to
13  provide and the basis for it, and we'll get into the
14  back and forth between EPA, I assume, because I have
15  opinions on that and these warnings and how they changed
16  with time.
17      But the consumer's not going to the EPA
18  website in general, I wouldn't think.  They would be
19  using the warnings provided to them in the product, and
20  those warnings are ultimately approved, but they're
21  based on the presumption that -- the EPA has put the
22  burden on the registrant to provide accurate and timely
23  information regarding the hazards on the label.  And
24  that's why I say, when -- the insight you get in looking
25  at the market research work is they're looking at the

Page 113

1  implications of going from work clothes to PPE by going
2  from the signal word "caution" to "warning" or "danger."
3  And they clearly understand those implications.
4      Q.  Who is the final arbiter of what goes on the
5  label, the registrant or EPA?
6      A.  EPA is subject to the fact that the -- it's
7  the same equation you see in many things.  EPA is only
8  as good as the information they're provided.
9      Q.  Understood
10      A.  And if the EPA -- the EPA makes it absolutely
11  clear, as I said yesterday, that there's an affirmative
12  responsibility on the registrant to provide them with
13  accurate and updated information.  One of my opinions is
14  that they didn't do that, so that's why -- yeah, they
15  have the final say, but it's subject to the fact that
16  they're given accurate and timely information.
17      Q.  Okay  So the answer to my question is:  EPA
18  is the final arbiter?
19      MR KRISTAL:  Objection to form; he's answered
20  that question
21      A.  You're asking me the same question.
22      Q.  I am  I'm asking you without all of the
23  qualifiers
24      A.  And I'll give you the same answer because it
25  isn't -- it's the same answer you get when you say:  Is

29 (Pages 110 to 113)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 114

1   the employer responsible for training the employee?
2   Yes, subject to the fact that they're given information
3   that's accurate so they can train appropriately.
4       Q.   And one of your opinions, which we'll go back
5   to, is that Monsanto did not provide EPA with all the
6   information when it comes to labeling?  Did I state your
7   opinion correctly or --
8       A.   No, no, no.  I said that if you review the
9   information they submitted to EPA -- primarily the
10  dermal irritation information is all based on Maibach
11  '86, and if you analyze the information that they put on
12  the cover letter to that study, versus the study itself,
13  you'll come to different conclusions.  So it was mis- --
14  they mislead the EPA on what that study said.
15      Q.   Okay.  Obviously, there have been other dermal
16  studies since Maibach '86; right?
17      A.   There's been ones before that as well.
18      Q.   Obviously, there have been other studies since
19  Maibach '86; right?
20      A.   And to my knowledge that information -- yes,
21  and to my knowledge, it wasn't provided to EPA.
22      Q.   Okay.  And there's been how many products that
23  have been registered with EPA since 1986?
24      A.   I don't know the number.
25      Q.   Do you have a list --

Page 115

1           MR. KRISTAL:  Pesticide products?  Are you
2   talking about Monsanto products?
3           MR. UPSHAW:  That's all this case is about, is
4   pesticides, so how many other Roundup --
5           MR. KRISTAL:  When you say, "How many other
6   products are listed with EPA" --
7           MR. UPSHAW:  The objection is?
8           MR. KRISTAL:  And I'm just asking you to
9   define what you mean by "products."
10          MR. UPSHAW:  So the objection is to the form.
11  And if I ask you, "What form," you would say, "That
12  question is unclear," and I will try to rephrase it
13  for you.
14          MR. KRISTAL:  Thank you.
15  BY MR. UPSHAW:
16      Q.   How many other Roundup products have been
17  registered since -- how many Roundup products have been
18  registered since 1986?
19      A.   I don't know the number off the top of my
20  head.  I've seen a number of documents summarizing
21  various registrations, but I --
22      Q.   Ballpark it.  How many?
23      A.   I don't know.
24      Q.   Over 200?
25      A.   I don't know.

Page 116

1       Q.   No idea?
2       A.   I haven't done that analysis, so I don't know.
3       Q.   How many of those glyphosate-based Monsanto
4   products have been re-registered?
5       A.   Same answer.
6       Q.   Since 1986?
7       A.   Same answer.
8       Q.   There is a requirement for re-registration, is
9   there not?
10      A.   Sure.
11      Q.   Any time you make a change to the product
12  itself, it has to be re-registered, does it not?
13          MR. KRISTAL:  Objection.
14      A.   I don't believe that's true necessarily.
15      Q.   Okay.  Anytime you --
16      A.   It depends on --
17      Q.   I'm sorry.  Go ahead.
18      A.   I think there are some caveats to that.  If
19  there's new information, then yes.  But if it's -- I
20  think there are some nuances there that if there are
21  minor changes, then you don't have to re-register.
22      Q.   Are you a specialist?  Are you well-versed in
23  the EPA registration process?
24      A.   I don't think I'm being offered up as that.
25  I'm being offered up as an exposure and a warnings

Page 117

1   expert.
2       Q.   Well, but you've made comments about what the
3   EPA has or hasn't had, so I would suspect you would be
4   familiar with the process of what has to be provided to
5   the EPA in order for you to make the comment that the
6   EPA was not provided all the information that was
7   necessary.
8       A.   I don't think I said that.  I said that -- I
9   said that the information they were provided was
10  misleading, particularly in the dermal area.  I've been
11  very specific about that.
12      Q.   Okay.  And it's your conclusion that it was
13  misleading because it's all based on the '86 dermal
14  test?
15      A.   The irritation data -- the skin irritation
16  data appears to be primarily related to Maibach '86.
17      Q.   Okay.  Other data is also provided in the
18  packet for registration other than the dermal absorption
19  testing, is it not?
20      A.   I don't understand your question.
21      Q.   Is the only document that's presented, when
22  you're trying to get a product label through the EPA,
23  dermal absorption data?
24      A.   No, of course not.
25      Q.   Okay.  So there would be other data that's

30 (Pages 114 to 117)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

---

Page 118

1  presented to the EPA when you're determining how and
2  what language should be used on an EPA-approved label;
3  correct?
4      A.  Yes, I'm sure that's true.
5      Q.  What other information is provided?
6      A.  I don't know.  I focused on the dermal aspect
7  because that was the part that I think drove ultimately
8  the -- if, in fact, the studies had been interpreted
9  differently or the studies -- at least the information
10  presented about the -- I should say the information
11  presented, say, about Maibach had been more accurately
12  presented, then the conclusion might have been different
13  from EPA's standpoint about which warning word's
14  appropriate.  Because recall that even though all the
15  different -- there's different categories that set what
16  the ultimate warning signal word is, the one that has
17  the most restriction sets the overall ranking.
18          And since the dermal irritation study was
19  based on Maibach -- and they still -- the market
20  literature still refers to Maibach, saying that it's
21  just as safe as shampoos, which of course isn't true,
22  but -- looking at Maibach '86.  But it's clear, when you
23  read the front-end language, which I've put in this
24  statement of facts, that they submitted to the EPA about
25  the dermal study, and when you look at the results of

---

Page 119

1  the dermal study, that they're conflicted.
2      Q.  You're not equating marketing information with
3  information and data presented to the EPA, are you?
4      A.  No, but I'm going to have opinions about use
5  of that information to consumers and that it's
6  misleading.
7      Q.  All right.  Understood.  But that's not what
8  we're referring to at the moment.  We're talking about
9  the EPA and the toxicity category; right?
10      A.  But we were talking about utilization of
11  Maibach '86, and I'm saying it's still being used in the
12  2000s.
13      Q.  Okay.  You were saying earlier -- just as a
14  side note -- talking about how glyphosate can be -- can
15  enter the body.  Are you aware as to whether or not you
16  can commit suicide by drinking glyphosate?
17      A.  Yeah, I comment on it.
18      Q.  Where?
19      A.  Well, not glyphosate, but Roundup.
20      Q.  My question was glyphosate.
21      A.  I'm not familiar with people using the salt of
22  glyphosate.  I don't have any data on that one way or
23  the other.
24      Q.  Okay.  So where do you comment in here on
25  people committing suicide with Roundup?

---

Page 120

1      A.  Where do I?
2      Q.  You said, "I comment on it."
3      A.  Yeah, I was just looking at it from a toxicity
4  standpoint, how much is -- can be ingested, and there
5  are a number of studies that have looked at that, and I
6  put the results of those down.
7      Q.  Where are those in the factual summary,
8  Exhibit 7, just so I'm familiar with it?  You're much
9  more familiar with this document than I am.
10      A.  I talk about it on the bottom of page 20.
11      Q.  20, okay.
12      A.  Of Exhibit 7.
13          And I have an exhibit that refers to the
14  lethal dose of about 200 milliliters.
15      Q.  And what's that exhibit?  I guess we can turn
16  back to the --
17      A.  54.
18      Q.  Let's see what that is.
19      A.  You know, I'd like to take you to a different
20  place because there's a better version of that
21  information elsewhere.
22      Q.  All right.  Let me figure out what 54 was and
23  then we'll --
24      A.  It still refers to 54.
25      Q.  54 was the 2008, 2010 English Translation of

---

Page 121

1  The World According to Monsanto by ██████████?
2      A.  Apparently, yes.
3      Q.  Okay.  Okay.  Understood.  So we're going to
4  somewhere other than page 20?
5      A.  Yes.  189.
6      Q.  189.
7      A.  So --
8      Q.  Hold on.  Let me get there.
9      A.  It's right under figure 7-38.
10      Q.  One second.  Okay.
11      A.  The paragraph that begins under the figure
12  7-38.
13      Q.  Okay.
14      A.  We still have the same information you've just
15  cited, Exhibit 54, and then I have additional sources.
16  Suicide attempts using the 41 percent glyphosate Roundup
17  formulations have averaged 120 milliliters, and then you
18  have Japanese data which is on suicide attempts, that
19  the surviving patients on average consumed 104
20  milliliters, while those that died averaged consuming
21  206.
22      Q.  And that's Exhibit 414?
23      A.  414.
24      Q.  "Clastogenic Effects of Glyphosate in Bone
25  Marrow Cells of Swiss Albino Mice" -- not 414.  Sorry.

---

31 (Pages 118 to 121)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 122

1 Wrong one.
2 "1987, Roundup Poisoning"?
3 **A. Right.**
4 Q. "Its Clinical Observation." Okay.
5 "Involvement of Surfactant." Okay.
6 **A. And the other one was 280.**
7 Q. 280.
8 **A. Which was a Roundup e-mail.**
9 Q. "Roundup RTU Incident," I have no idea what
10 that is.
11 **A. No. 280.**
12 Q. 280, "February 15th, 2008, Farmer e-mail to
13 Goldstein, et al., Urgent - Roundup RTU Incident."
14 Is that the right one?
15 **A. Yes.**
16 Q. Okay.
17 Okay. I think we are done with that opinion.
18 Next human factor, or do you want to do
19 something?
20 MR. KRISTAL: Should we take our lunch break
21 now?
22 MR. UPSHAW: Now? Since we're going to move
23 to another opinion?
24 THE WITNESS: I don't know. It's 12:25.
25 MR. UPSHAW: We should ask Matthew. How do

Page 123

1 you feel?
2 THE REPORTER: I'm fine. Just a restroom
3 break is all I request. But other than that...
4 MR. KRISTAL: Well, if we're going to do that,
5 why don't we take a lunch break?
6 MR. UPSHAW: It's up to these two. I can stop
7 or go. If we go, I'll just do -- we'll do whatever
8 his next opinion is, or if we stop, we can wait
9 till after lunch.
10 THE WITNESS: I certainly have opinions where
11 they've represented -- it's part of human factors,
12 it's part of other things -- where they've
13 represented that it's biodegradable,
14 non-bioaccumulative, those sorts of things in
15 advertising, or doesn't affect certain enzymes in
16 the gut.
17 When they tell the consumer that, they're
18 basically suggesting the product's safe, and of
19 course, they've been fined and reprimanded doing
20 that in New York State, for example. So I will
21 have -- you know, the human -- I have other
22 opinions as to that's false and misleading
23 statements, but from the human factor standpoint,
24 the fact that that's being presented to people in
25 advertising through labeling, et cetera, would

Page 124

1 affect their beliefs on the safety of the product.
2 BY MR. UPSHAW:
3 Q. Okay. Is that different than the other
4 opinions you've given, or they all kind of come to the
5 same opinion that the advertising misleads consumers?
6 **A. Well, if you -- if you're comfortable with --**
7 **we were going through individual examples, that's all**
8 **I'm saying.**
9 Q. That's what I was trying to clarify.
10 **A. But if you're comfortable with the fact that**
11 **I'm going to testify that the advertising -- the**
12 **labeling, including advertising, presented misleading**
13 **information to consumers and affected their views as to**
14 **how to protect themselves and whether or not the product**
15 **was safe, then -- and I'll say that that didn't meet the**
16 **standard of care by -- even within Monsanto's stated**
17 **standard of care, with the industry standard of care,**
18 **and with regulatory standard of care, then we're good,**
19 **we're done. I mean, the balance of these are just more**
20 **examples of that. I just thought you wanted me to go**
21 **through various examples.**
22 Q. We will because you -- I do want to understand
23 your examples, but I also want to get your overall
24 opinion which you just stated succinctly for me, was
25 that, therefore, they didn't meet the standard of care.

Page 125

1 And you don't have to remember. I can ask for it to be
2 read back. That way, you don't have to try to repeat
3 yourself.
4 **A. Yeah, I mean, my overall opinion is that.**
5 MR. UPSHAW: Let him read that back, then I'll
6 get that down, and you can elaborate if you wish.
7 Therefore, it didn't meet the standard of
8 care --
9 MR. KRISTAL: Why don't you read that whole
10 line to him --
11 MR. UPSHAW: Yeah, that would be great.
12 MR. KRISTAL: -- then we'll all have it.
13 (The following answer was read back by the
14 reporter: Page 124, line 7 through line 18.)
15 BY MR. UPSHAW:
16 Q. Is there something you wanted to add to that?
17 **A. No.**
18 MR. UPSHAW: Okay. We can go off the record
19 for lunch.
20 THE VIDEOGRAPHER: This marks the end of video
21 media disc number 2. The time is 12:30, and we're
22 going off the record.
23 (Recess from 12:30 p.m. to 1:34 p.m.)
24 THE VIDEOGRAPHER: We're back on the video
25 record. This is the start of video media disc

32 (Pages 122 to 125)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 126

1    number 3 of the deposition of Stephen Petty.  The
2    time is 1334.
3    BY MR. UPSHAW:
4        Q.  Okay, Mr. Petty.  Good afternoon.
5        **A.  Good afternoon.**
6        Q.  Welcome back from lunch.
7        **A.  Thank you.**
8        Q.  We left off with your explanation or providing
9    opinions that had to deal with human factor.
10       **A.  I think we finished with my overall opinion.**
11       Q.  We did finish with your overall opinion, but
12   you did say, if I recall, that you had some other
13   examples that you thought were pertinent to this
14   opinion.
15       **A.  Okay.**
16       Q.  Would you like to start with those?
17       **A.  Sure.**
18       Q.  Okay.
19       **A.  I'm just going to try to methodically work**
20   **through this.**
21       Q.  Just so I'm familiar with how we're working
22   through this, we've gotten your overall opinion, and
23   you're going to give us examples and you'll tell me how
24   they fit into your overall opinion.
25       **A.  Yes, I'll try to do that.**

Page 127

1        Q.  Thank you.
2            MR. KRISTAL:  Are we just talking now about
3    things that are human factors-related or anything
4    that falls within the umbrella "opinion"?
5            MR. UPSHAW:  You must have been on your phone,
6    dude.  We just talked about that.
7            He's going to walk through, I believe, the
8    factual summary and talk about examples that
9    support the overall opinion that we ended with
10   prior to lunch.
11           Is that right?
12           MR. KRISTAL:  It's not limited to human
13   factors?
14           MR. UPSHAW:  No, because Mr. Petty had said we
15   were done with that part.  We were going to go
16   to --
17           MR. KRISTAL:  I don't think he said we were
18   done with that part, but --
19           MR. UPSHAW:  Either way, that's where we're
20   going.
21           THE WITNESS:  The -- beginning on pages 10,
22   and I have quite an extensive series of pages
23   trying to look at the concepts of -- well, to look
24   at the -- trying to figure out the Monsanto
25   formulations, the chemistry, if you will.  And I

Page 128

1    then, by page 18 -- and I'm particularly looking at
2    the surfactant called POEA, and I guess just to
3    close on that, if you -- EPA has language where a
4    pesticide has active and inert ingredients, and
5    they have distinct definitions for those, which
6    I'll touch on in a second.
7        If you look at the information on page 23,
8    where I've taken a figure from Defarge -- hope I've
9    said that right -- what Defarge did was apply -- as
10   a control, he applied water to some plants and
11   looked at their behavior over 120 hours, then he
12   applied glyphosate only, then he applied three
13   different -- I don't know if it's a he.  I should
14   be careful.  They applied three different strengths
15   of Roundup, and then they applied the POEA by
16   itself.  And what you observe is that, at least
17   from this work and this study, the POEA data,
18   plants themselves, would appear to suffer the
19   greatest effects.
20       And if you look at the definitions -- there's
21   a 1975 and 1980 definition of "active ingredients."
22   Bear with me for a minute.
23       To get to those definitions -- I'm going to
24   hang on to page 23, but in Section 6, and
25   specifically let's start with page 88, bottom of

Page 129

1    the page.  In 1975, FIFRA defined the term "active
2    ingredient."  And the words are all there, but I'll
3    draw your attention to items 2 and 3, but
4    specifically 3, where it says, "In case of a
5    defoliant, an active ingredient which causes the
6    leaves or foliage to drop from a plant, and in the
7    case of a desiccant, an ingredient which will
8    artificially accelerate the drying of the plant
9    tissue --
10           THE REPORTER:  I'm sorry.  Could you --
11           THE WITNESS:  Did I go too fast?  I apologize.
12   And then in item 4, it talks about desiccant and
13   what it can do, but --
14           MR. UPSHAW:  Do you need him to repeat that?
15           THE REPORTER:  I do.
16           THE WITNESS:  Let's start over.  I'm referring
17   from 2 through 4, and I'll read them all much
18   slower.
19           Under the term "active ingredient" for a
20   pesticide, it's first defined as "a plant
21   regulator, defoliant or other desiccant, an active
22   ingredient which will prevent, destroy, repel or
23   mitigate any pest."  Specifically under item 2, "In
24   the case of a plant regulator, an ingredient which,
25   through physiological biochemical action, will

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 130

1    accelerate or retard the rate of growth or the rate
2    of maturation or otherwise alter the behavior of
3    ornamental or crop plants for the product thereof."
4        And then item 3 says, "In the case of a
5    defoliant, an ingredient which will cause leaves or
6    foliage to drop from the plant." It's really
7    item 2 that I have the most emphasis. That's the
8    definition of an "active ingredient" in 1975. And
9    then on page --
10   BY MR. UPSHAW:
11       Q. Wait. I'm sorry. Section (c) is the term
12   "active ingredient," and Section (c)(2) is one part of
13   that definition? Did I understand --
14       A. "Active ingredient" has four designations as I
15   understand it.
16       Q. Okay. You're --
17       A. In 1975, under 162.3.
18       Q. And you're focusing on Section (2) of that
19   definition? Is that what you just --
20       A. Yeah, because we're not talking about
21   insecticides or things like that, so we're mainly
22   looking at a plant regulator, something that deals with
23   plants.
24       So anyway, if you go to 1988, which is on page
25   90, they've changed the ingredients -- or the

Page 131

1    definitions slightly. The bottom of page 190 [sic],
2    the -- under now what is 158.153, they define an active
3    ingredient as a substance that will prevent, destroy,
4    repel or mitigate any pest and it functions as a plant
5    regulator, desiccant, defoliant. An inert ingredient is
6    any substance other than the active ingredient,
7    basically.
8        So when I go back -- I'll kind of set the
9    table, if you will. When I go back and I look at this
10   figure, along with I've got subsequent analysis as well,
11   by those definitions, it certainly looks like the POEA
12   acts as an active ingredient. So my opinion is that
13   POEA should have been -- based on this evidence, it
14   should have been treated also as an active ingredient,
15   and it was not. And that had an impact ultimately on,
16   obviously, the registration of the product because the
17   active ingredient in most cases was glyphosate. And
18   there's clear evidence that there's additional toxicity
19   associated with the surfactant in this case.
20       I've also provided in that earlier part where
21   I was talking about the chemistry of Roundup products --
22   and I don't pretend to have them all, but I got a list
23   that I summarized on page 11, beginning on page 11,
24   table 4-1, in 2008, which was the inert ingredients, if
25   you will, in various forms of glyphosate -- or various

Page 132

1    forms of Roundup. And it turns out that in all but one
2    case, this POEA is an ingredient.
3        And so one of my opinions is that -- is that
4    it's -- it seems clear from this diagram that POEA
5    should have been declared an active ingredient.
6        Q. Wait. Run me through that again, because you
7    referred to figure 4-9?
8        A. 4-8. I'm sorry if I misspoke.
9        Q. Yes -- okay. So where is your -- the list you
10   refer to?
11       A. Oh, I'm sorry. As to where POEA is located?
12       Q. Yeah.
13       A. I -- there's a whole series of text that
14   begins on page -- it begins on page 10, where I'm
15   looking at formulations. But, specifically, there's a
16   pretty good roll-up of a lot of the formulations from
17   this Exhibit 48 that I show on table 4-1.
18       Q. Which is on what page?
19       A. Page 13. Starts on page 13.
20       Q. Oh, and then continues for several pages?
21       A. Yeah. The very first row is POEA, so I'm
22   listing all of the inert ingredients, but I put POEA as
23   the first row. And you'll see that for all but one, as
24   you move through this table, 4-1, at least for the data
25   that were available in 1988, 16 out of 17 or about 94

Page 133

1    percent of the products use POEA as one of the inert
2    ingredients.
3        The reason that that is important is because
4    there's additional factual evidence that part of the
5    skin irritation is associated with ingredients other
6    than the glyphosate. And, specifically, I would refer
7    you to two tables, one table on page 69, and one table
8    on page -- it's actually figures. Figure 22 on page 69
9    and figure 23 on page 72.
10       Now, these are 1983 results by Biodynamics,
11   and let me -- what they are, the first table is looking
12   at skin irritation on animals for Roundup formulation.
13   And the second figure or table is looking at glyphosate
14   alone.
15       Q. So, specifically, figure 4-22 is looking at
16   dermal sensitization --
17       A. Correct.
18       Q. -- study in guinea pigs?
19       A. Yeah -- I said "animals," but yes, guinea
20   pigs.
21       Now, these tables are a little bit hard to
22   read, but I'll explain them. The bottom line is you
23   see -- if you look across the top of each of these
24   tables, you'll see numbers that begin with 1 and end
25   with 9. The way this study was run is it was a

34 (Pages 130 to 133)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 134

1   three-week study, so numbers 1, 2, and 3 represent data
2   from the first week; numbers 4, 5 and 6 from the second
3   week; and data from 7, 8 and 9 from the third week, and
4   that's true in both studies.
5         And what you see is the beginning of effects
6   with the Roundup product at the end of the first week;
7   in other words, the column that's under 3. But you
8   don't see the sensitization show up from glyphosate
9   alone until the very end, for some of the animals, of
10  week two. And, clearly, there's a difference there,
11  suggesting that the sensitization is earlier with the
12  formulation than it is with glyphosate alone.
13        So where this is all headed is that I have
14  opinions that the -- ultimately, I have opinions that
15  the warnings didn't sufficiently protect -- one of the
16  opinions that supports the overall opinion is that the
17  warnings weren't sufficient to protect people dermally,
18  and also that the dermal information that was available
19  clearly shows skin irritation, albeit in animals here.
20  And, moreover, that skin irritation appears to be
21  related to not only the glyphosate but also the other
22  products. There's other data that I have in this that
23  show that POEA itself is known as a skin irritant.
24        So when you look at the characteristics of the
25  POEA on plants visually, it's clear that those plants

Page 136

1   A.   No, no. I'm saying the text.
2   Q.   Oh, oh, okay.
3   A.   The text under 4.2 says that the Roundup
4   formulations can have up to five active ingredients. So
5   all I'm saying to you is that Monsanto clearly
6   registered products with more than one active
7   ingredient. It wasn't like they couldn't or didn't do
8   that. What I'm saying is it's incumbent on Monsanto to
9   define what the active ingredients are and then provide
10  those as part of the registration process.
11  Q.   Can EPA disagree that an ingredient that the
12  registrant wants to list as inactive should be listed as
13  an active ingredient?
14  A.   I sort of have a yes and no answer to that.
15  It's probably -- it probably is true that they could,
16  but EPA's explicitly clear that their -- that it's
17  incumbent upon the registrant to provide that
18  information, not them.
19  Q.   To provide what information, sir?
20  A.   The information needed to register the
21  product.
22  Q.   Right. So they provided -- in a case where
23  Monsanto presented a Roundup product that listed
24  glyphosate as an active ingredient and POEA as an
25  inactive ingredient in that particular product, it was

Page 135

1   look a lot less healthy with just POEA than they even do
2   with Roundup or glyphosate alone. So -- and based on
3   the definitions of an "active ingredient," my opinion
4   would be that -- again, that POEA should have also been
5   an active ingredient in the process of registration of
6   Roundup products where it was contained.
7   Q.   Okay. Who determined that when POEA was used
8   in Roundup, that it would be considered a non-active
9   ingredient?
10  A.   Well, I think that that's how it was presented
11  to EPA by Monsanto. They didn't actively say, "Let's
12  consider POEA as an active ingredient." I mean, it's
13  their responsibility to tell -- we have -- to answer
14  your question, it's -- it's significant that you ask
15  that because there's information that suggests that
16  there are Roundup products that have upwards of five
17  active ingredients. So it's not like -- in fact, it's
18  on page 10 of my report, under figure 4-2 -- of this
19  document, I should say.
20        And so it's not like Monsanto didn't know or
21  couldn't provide products with multiple active
22  ingredients.
23  Q.   Wait.
24  A.   So they just chose not to here.
25  Q.   I'm lost. Figure 4-2 shows what?

Page 137

1   at that point for the EPA to determine whether or not
2   POEA would remain inactive or be listed as active,
3   wasn't it?
4         MR. KRISTAL:  Object to form.
5   A.   No, I -- no, because they're reliant on --
6   I'll go back to the specific language the EPA provides
7   on that.
8         Again, I'm going back to 108. We talked about
9   it yesterday. They're saying that Section 6(a) of the
10  Act in 162 8(d) of this regulation, it's imposed on the
11  registrant the affirmative duty to report any additional
12  factual information regarding adverse effects on man or
13  the environment of the pesticide. And then at the
14  bottom it says, "This duty falls on the applicant
15  registrant because they are in the better position to
16  monitor the literature as regards to a particular
17  pesticide."
18        So this goes back to -- that's why it has a
19  yes or no response. They can only act on, or they're
20  only saying they're going to act on, what they're
21  presented, and if they're not presented the whole
22  picture, then they're not in a position to do so. The
23  yes part of that answer is, well, I guess technically
24  they could, but it really depends on the information
25  they're provided.

35 (Pages 134 to 137)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 138

1    Q. Is it your opinion that Monsanto did not
2  present relevant information, with regard to POEA, to
3  the EPA when they moved to register a product that
4  includes POEA as an inactive ingredient?
5    **A. No. It's my position that Monsanto didn't**
6  **tell the EPA it was an active ingredient.**
7    Q. I think you just said what I said.
8    **A. No, I think it's different than that. You**
9  **said "relevant information." I said --**
10   Q. Okay. So you're saying what Monsanto didn't
11  do was say, hey, we think POEA is an active ingredient
12  and should be listed as an active ingredient?
13   **A. Yes, based on the various literature that I've**
14  **included in this document.**
15   Q. Have you looked at all the literature
16  regarding POEA?
17   **A. I would doubt that I've looked at all the**
18  **literature.**
19   Q. But based on what you've seen?
20   **A. Based on what I've seen, it appears to fit the**
21  **definition of an active ingredient. And there's a**
22  **second opinion on all of this stuff if you're done with**
23  **this.**
24   Q. Nope. And it's your opinion that if you rely
25  on the information you've seen and you apply the

Page 139

1  definition as you would, then EPA should have made sure
2  or -- I'm sorry -- Monsanto should have made sure that
3  POEA was listed as an active ingredient.
4     Did I get that right?
5    **A. From the standpoint of erring on the side of**
6  **public health and safety, yes, that would have been the**
7  **appropriate thing to do.**
8    Q. So you're saying that there was some question
9  then, and if you want to err, then they should have
10  erred on the side of public safety?
11   **A. Well, I also say that based on the data that's**
12  **presented that I reviewed, that it certainly appears**
13  **that the POEA itself, the visual evidence is clear that**
14  **it looks to be an active ingredient based on the**
15  **explicit definition in FIFRA.**
16   Q. Right. Your interpretation and application of
17  that definition to the data you've seen with regard to
18  POEA?
19   **A. I think that was the interpretation of the**
20  **writer of the paper as well.**
21   Q. Writer of what paper?
22   **A. Oh, Defarge. I think they were saying, look,**
23  **the POEA is more active than the glyphosate alone.**
24   Q. Did you look at any other papers that looked
25  at whether POEA should be considered an active

Page 140

1  ingredient when included in some type of pesticide
2  formulation?
3    **A. Yeah. There's a whole series of papers that I**
4  **talk about briefly that show -- well, it goes to my**
5  **second opinion, but we'll get to that.**
6    Q. Okay.
7    **A. Let me get to the other papers.**
8    **There's a series of papers that I cite**
9  **beginning on page 28, 29, et cetera, that are attempting**
10  **to address the issue of why the Roundup has -- is more**
11  **toxic than the glyphosate alone, and this kind of ties**
12  **into my other opinion. It's hard to divorce the two.**
13  **The early efforts are stymied by the fact that the**
14  **formulary doesn't list the inactive ingredients.**
15   Q. Is this your opinion?
16   **A. No. It's a statement of fact.**
17   Q. Okay. I was just making sure of that.
18  Because you said they were tied together, so I thought
19  you were going to tell me --
20   **A. So the difficulty is that one of my opinions,**
21  **from an industrial hygiene standpoint, is if you're**
22  **trying to protect an individual from exposure to**
23  **chemicals, but you don't know what the chemical is, then**
24  **how do you do that? We were having that discussion this**
25  **morning of how do I specify a glove or, you know, do the**

Page 141

1  **matrix of chemicals versus protective materials.**
2    **Well, if all I'm listing is the active**
3  **ingredient, and everything else is proprietary, then how**
4  **do I, as an industrial hygienist, let alone as an**
5  **employer or individual -- how do I know what's in those**
6  **inert ingredients, because Monsanto's admitted the inert**
7  **ingredients are toxic as well.**
8    Q. Monsanto has -- wait a minute. Let me put it
9  down. I didn't mean to interrupt you. Go ahead.
10   **A. Yeah, they've been -- and it's in here.**
11   **And so, as an industrial hygienist, you're**
12  **trying to look at all the ingredients and protect**
13  **against all of those ingredients, and it's impossible to**
14  **do so if you don't know what they are. So one of my**
15  **opinions is that for those materials that were toxic,**
16  **they should have been listed so that, from an industrial**
17  **hygienist standpoint, we could select appropriate PPE.**
18   Q. Let me get this right. For materials that are
19  toxic, they -- I guess that's Monsanto; right?
20   **A. Yes, the manufacturer.**
21   Q. Should have listed?
22   **A. Those ingredients so that the appropriate PPE**
23  **could be selected.**
24   Q. Okay.
25   **A. To protect the end user.**

36 (Pages 138 to 141)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 142

1    So the early papers going back -- you asked me
2  a question. I'm trying to get back and not dodge your
3  first question, which was other papers regarding
4  toxicity of POEA, and what you find in the early
5  papers -- the reason I wanted to bring that other thing
6  up is they're finding there's increased toxicity in the
7  product versus glyphosate alone, but they're stymied by
8  the fact they don't know what the other ingredients are.
9  And that has implications, obviously, for them doing the
10  toxicology work, but it has big implications for us on
11  the industrial hygiene side because we don't know what
12  they are. And if we don't know what they are, we don't
13  have the ability to look up compatibility charts and
14  figure out what PPE to offer.
15    Q. Let me ask you a question now that we're at a
16  good point here. On page 28, at the top, I think you
17  were making comments with regard to the Rank, et al.,
18  paper of 1993, Exhibit 176; is that correct?
19    A. No. I'm making comments all the way back to
20  the beginning of 4.4 on page 21. That's where I start
21  to review the literature of active versus inert.
22    Q. Well -- okay. So the writing on the top of
23  page 28 says, "This paper clearly shows." What -- which
24  paper are you referring to?
25    A. Okay. Let me look at that and see if I've --

Page 143

1  so...
2    So I am referring -- well, I am referring to
3  the Rank paper as well, where they do now identify POEA
4  as one of the surfactants.
5    Q. Okay. So --
6    A. The early papers don't. They say there's
7  increased toxicity. This is where it kind of gets
8  blended, if you will, with my opinions.
9    Q. Okay. So let me ask another question. How am
10  I, the reader of this, supposed to know where you say
11  "this paper," which to me appears to refer to the Rank
12  paper, is actually discussing all of the papers before
13  it?
14    A. Well, I would say that those opinions apply --
15  I'll say this. Those opinions apply not only to the
16  Rank paper but they also apply to the information that
17  precedes it.
18    Q. So you would agree that little "i," little two
19  "i," and little three "i" are your opinions; right?
20    A. Yes. Well, they're statements doing compare
21  and contrast.
22    Q. What else is that other than an opinion?
23    A. No, it's not an opinion because I haven't
24  said -- my opinion was that it should have -- is
25  proactively that it should have been treated as an

Page 144

1  active ingredient.
2    Q. Mr. Petty, I understand that that's your
3  overall opinion, but your opinions with regard to this
4  paper are listed in "i," double "i" and triple "i," are
5  they not?
6    A. They're not opinions. They're just reflecting
7  what's said.
8    Q. And is it your statement today, where you have
9  on page 29, where it says, "This paper clearly shows" --
10    A. Right.
11    Q. -- referring to Marc 2002, those aren't your
12  opinions?
13    A. They're not opinions. They're just
14  observations of what the data show.
15    Q. And that observation's not colored either way
16  by your -- by your perception of or reading of the
17  paper?
18    A. I wouldn't say that. But my opinions are
19  different than statements about what the paper say. My
20  opinions are the two opinions I just offered, that
21  were -- that Roundup -- that the POEA -- looking at all
22  of this stuff, the POEA -- because you just asked me my
23  opinions --
24    Q. Yes, sir.
25    A. -- should have been treated as an active

Page 145

1  ingredient. That's my opinion.
2    Q. What's your opinion with regard to the Marc,
3  et al., 2002 paper?
4    A. That the information in that paper would
5  support my first opinion regarding the fact that I think
6  POEA should be treated as an active ingredient.
7    Q. So where you say, "Inert ingredients like
8  surfactants are not really inert," that's not part of
9  your opinion? That's just a statement of fact?
10    A. It's not a statement of fact. It's an
11  observation from the paper.
12    Q. Your observation?
13    A. Yes.
14    Q. Okay.
15    A. But it's not an opinion. I haven't voiced an
16  opinion about what all this says until now.
17    Q. Okay.
18    A. And the other -- the other opinion clearly was
19  that -- and I show it on -- let me give you an example.
20    If you go to page 19, and if I could draw your
21  attention to the bottom of the page on figures 4-6 and
22  4-7.
23    Q. Okay.
24    A. This goes to the heart of my second opinion
25  about this area that we've been talking about.

37 (Pages 142 to 145)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 146

1    Q.  And before we get into the heart, what is your
2  second opinion, because you said it was mixed in with
3  the one we just talked about?
4    A.  Well, if you don't identify the ingredients,
5  it makes it very difficult, if not impossible, to
6  provide the end user with the appropriate PPE.
7    Q.  So is that somewhat different from your
8  opinion of, for materials that are toxic, Monsanto
9  should have listed those ingredients so appropriate PPE
10  could be --
11    A.  No, I'm saying the same thing.
12    Q.  -- selected?
13    A.  I'm saying the same thing.
14    Q.  Oh, okay.  All right.  I just want to make
15  sure I'm getting all your opinions.  That's all.
16    A.  And I apologize.  What I'm saying is:  Without
17  knowing what the ingredients are, how do you pick PPE?
18    Q.  Okay.
19    A.  That's the essence of it.  And I'm saying my
20  opinion is that they should have listed those products
21  that they knew had toxicity so that the end -- so
22  whoever was responsible for selecting PPE had that
23  information so they could do so.  And to give you
24  examples of that, on page 19, I've drawn your attention
25  to what appear to be similar formulations.  We don't

Page 147

1  know that absolutely, but in the first case, under 4-6,
2  we've got the glyphosate at 41 percent.  Of course, on
3  4-7, we have it also at 41 percent.
4    Above, they do split out the surfactant in
5  water, so we know what water is.  The surfactant is 8.
6  The water's 51.  Down below, they just say, "Other
7  ingredients, 59."  Well, 51 and 8 is 59, so it's not a
8  big stretch to believe that the other ingredients
9  probably are surfactant and water.  We don't know that
10  absolutely, but regardless -- regardless, we don't know
11  what the surfactant is and we don't know what other
12  ingredients are.
13    If this is the information that we're getting
14  on the MSDS or the label, we don't know whether there's
15  another toxic material in there or not.  And my
16  criticism or my opinion is that, from an industrial
17  hygiene, health and safety perspective, we have to have
18  that information in order to protect the end user.
19    Q.  Okay.
20    A.  Now, the other -- in this area, while we're
21  here, the other opinion I have is, if we go to page
22  24...
23    Q.  Uh-huh.
24    A.  In this paper -- again, this paper is Defarge,
25  if I pronounced that right -- they present some

Page 148

1  interesting information on the heavy metal content of
2  the pesticide products.  And we already know from
3  earlier testimony that they found dioxane in the
4  products as well, which was a recognized animal
5  carcinogen.  But, here, we find also that there are
6  metals, arsenic, cobalt, chromium, nickel and lead in
7  pretty significant amounts.  I mean, we're talking about
8  10 to 30 -- individually, you know, upwards of 10 or 20
9  parts per billion.  I've then given what the drinking
10  water standards are for by just way of example, for what
11  would be allowed.
12    The interesting thing about this is that when
13  I go back to the original Franz patent -- because I'm
14  always interested in patents, being in charge of
15  intellectual property for a long time.  And on page 26
16  just above Section 4.4 2, I went back and read John
17  Franz's March 26th, 1974 patent.  And it's interesting
18  that he said it's an herbicide containing alkaline earth
19  metals, copper, zinc, magnesium, nickel, ammonium,
20  aluminum sulfate.  So clearly there were metals in the
21  original --
22    Q.  Wait.  I'm sorry.  I'm sorry.  You see
23  aluminum sulfate?
24    A.  I'm sorry.  I said alkaline metals -- alkaline
25  earth metals, copper, zinc -- see where it's...

Page 149

1    Q.  Manganese, nickel?
2    A.  Right.
3    Q.  I didn't see aluminum sulfate.
4    A.  Well, I must have misspoke.  I didn't mean to.
5  Whatever those words are, the point that I'm making is
6  the metals, copper, zinc, magnesium, nickel, are clearly
7  part of the patented formulation.  What's interesting is
8  we don't see metals ever listed in any of the
9  ingredients, and yet, when some product was tested in
10  2018, we're finding heavy metal levels that begin to
11  approach drinking water standards.
12    Q.  That begin to -- okay.
13    A.  So if -- you know, because -- and you have to
14  kind of break these bars apart.  I did produce it in
15  color so you can kind of see the individual
16  contributions.  Because you'll see it below, there's a
17  key, like red is arsenic; the blue if you will, if I
18  read that right, is cobalt; and chromium is yellow.
19  Nickel is sort of a gray, and lead is a black.  And so
20  you'd have to go in and slice those to get the
21  individual contributions.  But you can see above the
22  total metals content of these various formulations --
23  and they have other people's formulations as well, but
24  you can see that there's a considerable metal content.
25    So the question is -- and then when you

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 150

1  combine that with Franz's patent, which says it will
2  include metals, including some of the metals listed
3  here, you're saying to yourself: Okay, why doesn't the
4  list of ingredients include metals? Are there no metals
5  in the product? Well, there appear to be metals in the
6  product based on somebody testing it later on. So this
7  goes to the heart of my second opinion, which is they
8  should have listed all the ingredients so people could
9  protect themselves from those materials, including
10 metals that are toxic.
11      Q.  And it's your assumption that metal is an
12 ingredient?
13      A.  Well, it's certainly part of the patent, and
14 it shows up in testing done in 2018. So it's -- it's
15 kind of hard to say than not that there's some metals
16 present in these formulations.
17      Q.  So that's your opinion, that more likely than
18 not metals is an ingredient in Roundup?
19      A.  Based on this data, yes. But my more
20 important opinion is that they should have been
21 proactively listed.
22      Q.  As an ingredient?
23      A.  As an -- well, I don't know if it's an
24 ingredient. There's a lot of times you have an
25 ingredient that has multiple constituents. Does that

Page 152

1      Q.  Who says they should be listed, Mr. Petty?
2      A.  I'm saying hazardous -- I'm saying, from an
3  industrial hygiene standpoint, if you're trying to
4  protect people, they should be listed because you need
5  them in terms of PPE. I'm saying --
6      Q.  Who, other than you, says that metals, in this
7  case in Roundup, should have been listed on the label?
8  Who agrees with you?
9      A.  I don't know who agrees with me.
10      Q.  Did you find anybody in all your research, in
11 the 400 and some odd pages and all the papers you worked
12 with that said, just like you, metals should have been
13 included on the label?
14          MR. KRISTAL: Object to form.
15      A.  What we found was we found a paper that
16 finally found it, and they're saying, whoa, look out,
17 there's some metals in this product.
18      Q.  That's your opinion of the paper, because it
19 doesn't say in the paper "whoa"; right?
20      A.  This is quite an impressive graph. It
21 certain -- these are not just ordinary metals. These
22 are metals of concern. When we talk about industrial
23 hygiene, we're looking at chemicals, we're looking at
24 substances of concern.
25      Q.  COCs. I'm familiar with it.

Page 151

1  make any sense?
2      Q.  It does.
3      A.  In other words --
4      Q.  When you list the ingredient, are you saying
5  that if they listed an ingredient like glyphosate salt,
6  which is naturally occurring, and there were metals in
7  the salt, then they should have broke out what's in
8  glyphosate salt?
9          MR. KRISTAL: Object to the form of the
10 question.
11 BY MR. UPSHAW:
12      Q.  Is that what you're saying?
13      A.  I don't think I'm saying that. I'm saying
14 that if you do an analysis of a product after you've
15 mixed it all up, one of the things you can do is do a
16 metal scan through atomic absorption, and you can see
17 right away whether that product contains metals; if so,
18 what they are and what their levels of concentrations
19 are, and that would then allow -- no matter what
20 ingredient they came from, you would know then what the
21 total metal contribution is. And if they're metals of
22 concern like metals that are in drinking water
23 standards, then they should be listed, because this
24 stuff's being applied on a lot of acreage where you have
25 runoff.

Page 153

1      A.  So certainly in the metals category, these are
2  all metals of concern. They're not listing all metals.
3      Q.  Did you find anybody who agreed with you in
4  all your research, including the Defarge paper -- did
5  the Defarge paper say that Monsanto should list these
6  metals on their product listings?
7      A.  I don't know if they said it or not, but I'm
8  telling you, as an industrial hygienist, in order to --
9  as a certified industrial hygienist and health and
10 safety expert, you have no way of warning people on the
11 hazards of products they face if you're not told what's
12 in them. That's all I'm saying.
13      Q.  Okay. And when we're talking specifically
14 about your opinion regarding the metals which were found
15 in this one study of 2018, Defarge, et al., did you find
16 anybody, either before this study came out or since that
17 study came out, asking --
18      A.  We put --
19      Q.  Wait a minute -- asking that Monsanto list
20 heavy metals on their Roundup labels?
21      A.  Well, first of all, your predicate's wrong
22 because it's not just this paper. The patent itself
23 says there's metals in the product.
24      Q.  Even better. Anyone, since the patent came
25 out, say that we should list metals?

39 (Pages 150 to 153)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 154

1    A.  I don't know.  I don't know.  But I'm telling
2  you, as an industrial hygiene expert, that in order to
3  protect somebody against exposure to things like metals
4  or whatever the other proprietary ingredients are, you
5  have to know what they are.
6    Q.  And is there a threshold there?  Any product
7  that has any trace metal of concern or, is there some
8  threshold that you have to reach, in your opinion,
9  before it has to be listed?
10   A.  Well, under OSHA there is.
11   Q.  Does OSHA do anything with labeling of
12  products?
13   A.  Absolutely.
14   Q.  Okay.
15   A.  It's the basis of the whole HazCom standard.
16  Section F is all on labeling, and Section G is all on
17  MSDSs.
18   Q.  Anywhere that OSHA told EPA that Roundup --
19  that Monsanto's Roundup should have metals added to the
20  label?
21   A.  I don't know the answer to that.  I don't have
22  access to all their correspondence.  I'm telling you, as
23  an industrial hygienist and a health and safety
24  expert --
25   Q.  Anything --

Page 155

1    A.  -- in order to -- let me finish, please.
2    Q.  Finish, please, yes, go ahead.
3    A.  In order to make -- this is my primary
4  opinion.  I'm bringing the metals in as an illustrative
5  of the fact that we don't know what's in the product
6  because all that's listed is the glyphosate.  What I'm
7  saying is that it's incumbent on the manufacturer to
8  tell us the hazardous materials that are there so we can
9  protect against them.  That's all I'm saying.  That's my
10  opinion.
11   Q.  I understand that.  And I'm questioning one of
12  the examples you use to support that opinion.  That's
13  what we're talking about.
14   A.  Right.
15   Q.  So I'll go back, then.  If metals were in the
16  patent, then the world has known, since glyphosate has
17  been used as an herbicide, that there are some level of
18  metals in the Roundup formula; right?
19   MR. KRISTAL:  Objection as to form.
20   A.  You're making a presumption, because I'm the
21  one that went back to the patent.  When I saw this paper
22  in 2018 -- remember, I have a good background on patent.
23  I mean, I was in charge of a lot of intellectual
24  property for Columbia Gas, so I understand the process,
25  I understand how to read patents.  And I'm thinking to

Page 156

1  myself, okay, this is a study that came out in 2018.  Do
2  I have any other verification?  This is me doing the
3  homework.  And I'm saying, well, let's go back and look
4  at the patent.  And the patent, whoa, it says there's
5  metals in what we're patenting as a formulation.  So all
6  I'm telling you is I've tried to go back and see whether
7  or not this 2018 study is an outlier, and what I'm
8  saying is, well, the patent says metals can be in the
9  product.
10       But the important thing is that -- and the
11  other thing that I've done is I've looked at, well, what
12  are these metal levels -- how do they compare to
13  drinking water standards, for example?  That would be
14  something that would be relevant.  And I've said that
15  they approach drinking water standards, if not exceed.
16  And so I'm saying, well, if that's true, then we need to
17  know that.  That's all I'm saying.  My whole opinion
18  lies with, if you don't know what's in the product, how
19  do you protect people from it, from the hazardous
20  constituents of that product.
21   Q.  Okay.  All right.  Where do you want to go to
22  next?
23   A.  Sorry.  I think I want to go to some of the
24  opinions I have regarding the dermal work.  And, again,
25  this relates to my view that Monsanto didn't perform, in

Page 157

1  terms of industrial hygiene and health and safety, to
2  the standard of care -- their own standard of care,
3  industry standard of care, or governmental standard of
4  care.  That's how I'm looking at the dermal work.  And I
5  start reviewing that work on page 37.
6    Q.  So rather than go through a recitation of your
7  review of dermal work, why don't you just tell me what
8  your -- you're saying that your dermal work supports
9  your general opinion?
10   A.  It does.
11   Q.  Just in general, tell me how it supports your
12  opinion.
13   A.  There are multiple ways.  On some of the work
14  that's been done, there was a proactive attempt to
15  select materials that would minimize dermal exposure --
16  dermal absorption, and that's stated explicitly on the
17  top of page 138.  I believe it's --
18   MR. KRISTAL:  What page was that?
19   THE WITNESS:  38.
20   MR. KRISTAL:  I thought you said 138.
21   MR. UPSHAW:  You did say 138.  Is it 38 or
22  138?
23   THE WITNESS:  38.
24   MR. KRISTAL:  38.
25   MR. UPSHAW:  So I heard the same thing.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

---

Page 158

1 THE WITNESS: Sorry. I didn't speak well. So
2 this is just before they're starting up the DTL
3 2009, '10 studies, and there's some e-mail
4 correspondence that I reference in 2009 and --
5 BY MR. UPSHAW:
6 Q. Understood -- wait. And you're going to get
7 into detail. I see where you're going. And my question
8 is:
9 How does the dermal work support your general
10 theory in total, not the specifics of e-mails -- I'm
11 going to give you an opportunity to explain all of that,
12 but I'm trying to find out why should we go through the
13 dermal work.
14 A. Because in general it doesn't support the
15 standard of care and the dimensions that I've been
16 talking about in my overall opinions.
17 Q. So the testing by Monsanto doesn't support
18 your opinions with regard to standard of care?
19 A. The way in which it was done, the way in which
20 it was interpreted, the way it wasn't done --
21 Q. So I'm trying to paraphrase here so I get the
22 opportunity to question you on your --
23 MR. KRISTAL: Well, if you'd let him finish.
24 MR. UPSHAW: Hold on.
25 MR. KRISTAL: He said "the way in which it was

---

Page 159

1 done, the way in which it wasn't done." There was
2 a third thing.
3 THE WITNESS: And the way it was interpreted.
4 MR. KRISTAL: Right.
5 THE WITNESS: And there are two dimensions to
6 that. One is --
7 MR. UPSHAW: Hold on.
8 BY MR. UPSHAW:
9 Q. Way interpreted.
10 Okay. Please continue.
11 A. Sure. Thank you.
12 There are sort of two dimensions. One has to
13 do with the studies related to dermal absorption, and
14 the other has to do with dermal irritation, okay. So
15 I'm looking at those three factors with regards to the
16 studies, where they talk about either the rate of
17 absorption or the skin irritation studies. And I'll
18 just try to highlight some of my opinions about each of
19 those studies in those dimensions.
20 Q. I have a bunch of questions on these, but I'll
21 go ahead and let you finish your --
22 A. No, go ahead, if you have questions.
23 Q. Well, no. I want to hear what your opinions
24 are. Go.
25 A. Well, on the DTL study, a statement's made, "I

---

Page 160

1 believe it's in everyone's interest" --
2 Q. I'm sorry What page are you on?
3 A. 38. He says "interested," but "interest to
4 get as low a dermal absorption value as possible for the
5 representative use, so I have a couple suggestions
6 regarding dermal absorption."
7 That's clearly an attempt to select materials
8 that would have lower dermal absorption, and they say it
9 explicitly. That's not the way that -- if someone was
10 interested in doing dermal absorption to figure out what
11 the maximum exposure to these products might be or to at
12 least meet the standard of care to err on the side of
13 public health and safety, you wouldn't intentionally
14 select a material that has lower dermal absorption rates
15 because that would misrepresent what the exposures might
16 be.
17 Q. Okay You're referring to the quote you have
18 on the top of page 38, to an e-mail from ███████ to
19 David Saltmiras?
20 A. Correct.
21 Q. Okay
22 A. And CC'd to ███████████
23 Q. Right On --
24 A. Or ████████ (pronouncing).
25 Q. Yeah

---

Page 161

1 A. ███████
2 Q. On January 20, 2009?
3 A. Correct. This is --
4 Q. Did you look at the e-mails that preceded and
5 followed this e-mail, to give it context?
6 A. I'm sure I did.
7 Q. Okay. And in what context was this statement
8 made?
9 A. This is -- they're getting ready to do the DTL
10 studies that were then done later in 2009 and 2010, and
11 they're basically scoping out how to do those -- how to
12 tell DTL how to scope out -- they're going to provide
13 materials, and they're trying to scope out what
14 materials -- I say materials -- formulations or products
15 to provide to them in order for them to do their work.
16 Q. Okay. The "them" is Dermal Technology
17 Laboratory?
18 A. Yes.
19 Q. Is that right? Is that who you're referring
20 to?
21 A. Yes, because this work is -- or these e-mails
22 are in context with doing the DTL work.
23 Q. And "DTL" is Dermal Technology Laboratory?
24 A. Correct.
25 The other --

41 (Pages 158 to 161)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 162

1    Q.  What was the response to this line?
2    A.  We don't know.  That's the one -- what we do
3  know, we do know that you can go through -- as I go
4  through on 38, you can go through and look at the
5  products that are used, but the difficulty there is I
6  don't -- I don't have -- and I've cross-checked a bunch
7  of these with where I know what the formulations are,
8  but in many cases I don't even know what they are.
9         And that's one of the problems, is that all
10  you know is this statement's made and then the work was
11  done.  I don't have any correspondence as to the
12  specific composition of those particular products.  But
13  it's somewhat immaterial based on what they did with the
14  skin, which is my next opinion.
15    Q.  Before you go to your next opinion, am I clear
16  that you haven't seen or are unable to cross-reference
17  any follow-up e-mail to the statement that you have at
18  the top of page 38; is that correct?
19    A.  Well, there may be follow-up e-mails, but
20  nothing that alerts me as to the back-and-forth as to
21  what materials they picked and why, beyond this
22  statement.
23    Q.  Did you see any response to a statement that
24  said, "I believe it's in everyone's best interest (sic)
25  to get as lower a dermal absorption value as possible

Page 163

1  for the representative use"?
2    A.  I think there was follow-up correspondence,
3  but there was nothing to suggest that we shouldn't do
4  that.  In other words, there was no pushback against --
5  my words -- no pushback against that statement that I
6  saw.
7    Q.  All right.  And then, when you tried to figure
8  out which samples were actually provided on -- you could
9  not figure out what the actual formula was that was
10  tested?
11    A.  I don't believe --
12    Q.  Formulation.  I'm sorry.
13    A.  Yeah, I -- my recollection is I did try to
14  cross-check these.  It's not easy because there's a lot
15  of different products, but I couldn't find the
16  formulations.  Now, whether one of them's buried in here
17  somewhere in one of the documents or not, I won't say
18  for certainty, but I made an effort to try to identify
19  what they were, and I couldn't.
20    Q.  So do you know whether or not the samples that
21  were selected were actually those that would give a
22  lower dermal absorption?
23    A.  I wouldn't know that without knowing the
24  composition.
25    Q.  Okay.

Page 164

1    A.  I do know -- I do have some access to that
2  effect when I talk about the subsequent studies that
3  I'll talk about, but not here.
4    Q.  Not here.  Okay.  You were about to continue.
5    A.  Yeah, going on to page 39, the rates at which
6  they found absorbed doses were really small and
7  unusually so when you compare it to all of the other
8  studies.  And so --
9    Q.  Okay.  Wait -- wait.  Only reason I'm stopping
10  you is I'm confused.
11        Now, when you're saying "the rates they
12  found," are these the DTL study rates?
13    A.  Yes, yes.
14    Q.  Okay.  I'm just trying to keep it clear
15  because there's a lot of letters here, and I'm just
16  trying to make sure.
17    A.  No, no, that's fair, and I apologize on that.
18        If you go to page 39, where I cite how they
19  prepared the skin, they said that the skin samples were
20  taken from a tissue bank immersed in water at 60 ºC,
21  which is 140 Fahrenheit, for 40 to 45 seconds, and then
22  it was stored and frozen at minus 4 ºC.  And the -- let
23  me take you somewhere else.
24        First of all that's --
25        MR. KRISTAL:  Minus 4  C or?

Page 165

1        THE WITNESS:  Minus 4  F.
2        MR. KRISTAL:  Right, okay.
3        THE WITNESS:  Minus 20  C, minus 4  F.  I'm
4  sorry.
5        So I have some opinions that -- first of all,
6  that's not the way the OECD recommends preserving
7  skin.  Secondly, we know -- and I've got it in
8  another place if you want me to go chase it down,
9  but at that temperature you get third-degree burns
10  on the skin within seconds, so it's going to damage
11  the skin tissue.  And let me find --
12  BY MR. UPSHAW:
13    Q.  So you're questioning the skin preparation and
14  storage by DTL?
15    A.  Yeah.  It doesn't comply with the OECD, which
16  is an international body on how to -- one of the things
17  they do is there's a document I'm citing here that tells
18  you how to -- what you should be doing with respect to
19  dermal absorption studies in terms of skin preparation
20  and other things.
21        The other thing is that we know nothing about
22  what happened to the skin samples after they were
23  treated this way; in other words, how long were they
24  stored, where were they stored, what temperatures were
25  they stored before the experiments actually occurred.

42 (Pages 162 to 165)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

---

Page 166

1    The other --
2    Q.  I'm sorry.
3    A.  The other thing is that --
4    Q.  Wait.  Before you go on, didn't you just say
5    they were stored at a particular temperature?  So you
6    just don't know how long they were stored?
7    A.  Exactly.
8    Q.  But you know what temperature they were stored
9    at?
10   A.  I mean, was this a year, six months, five
11   years?  We just don't know.
12   Q.  Okay.  Because you had said, "We don't know
13   the temperature or the length."  But the length of the
14   storage is what we're missing?
15   A.  Yes, you are correct.
16        And then the other thing that's really
17   important, and this is the subject of my paper -- it's
18   also in OECD -- is that the thickness of the skin is
19   critical in doing dermal absorption studies.  And the
20   simplest way for me to explain it to lay people is that
21   partial thickness dead skin or cadaver skin, also known
22   as in vitro, is equivalent to full thickness, live or in
23   vivo skin, and the reason for that is quite
24   straightforward.  All dermal absorption is -- and I'll
25   try to be quick.  All dermal absorption is based on

---

Page 167

1    Fick's law, which says that if you have a concentration
2    on one side and a lower concentration on the other side,
3    that the higher concentration will want to move to the
4    lower concentration.
5         And this could be illustrated simply by having
6    an aquarium with a piece of glass in the middle, with a
7    small pinhole you close; you put a bunch of dye on one
8    side; you open the pinhole, and which way does the red
9    go, the dye?  It would go to the clear side.  And the
10   rate on which it goes to the clear side depends on the
11   difference in concentrations.
12        So what happens with -- I'll call it dead
13   skin.  It's not the scientific way.  We call it in
14   vitro -- is that the capillary layer on the back side
15   where the blood would normally flow, if it were live and
16   the blood's flowing, it's pulling away anything that
17   gets through.  So it's keeping the concentration low on
18   the back side of the skin.
19        Now, if it's dead skin, it looks like Swiss
20   cheese.  It's just got a bunch of holes, capillary
21   holes, and so the concentration builds up; it's not
22   pulled away, so it drives down the rate of transfer.  As
23   I said before, it's dependent on the difference in
24   concentration.  So you're kind of -- I won't say it's
25   absolutely true, but if you have live skin, that

---

Page 168

1    concentration on the back side is close to zero.  It
2    keeps getting pulled away, unless you have a lot of skin
3    impacted.  Whereas in cadaver skin, that area is just
4    Swiss cheese that just accumulates the stuff.
5         So what you do in -- what is clear from the
6    literature -- and I cited my own paper, because there's
7    so many studies done with full-thickness skin on cadaver
8    skin, and it gives false results.  What it does is the
9    dermal rate of transfer, when you leave the
10   full-thickness skin with cadaver skin, is it's a factor
11   of 10 less.  So you always look to see whether they're
12   using partial-thickness skin, which is typically the
13   thickness is 200 to 400 microns, micrometers.  And
14   they -- we don't know here whether they did that or not.
15   It's just never specified.
16   Q.  And this was at DTL, the Dermal Technology
17   Laboratory?
18   A.  Correct.
19   Q.  Because they don't cite the thickness of the
20   skin at the Dermal Technology Laboratory where they're
21   doing these tests --
22   A.  Yeah, I think the biggest factor in --
23   Q.  Wait a minute.
24   A.  I'm sorry.
25   Q.  You're questioning the results of the test?

---

Page 169

1    A.  Absolutely.
2    Q.  Okay.
3    A.  And what I'm saying is -- the primary
4    reason -- I'm looking at why these results are so low
5    compared to other studies Monsanto's even done, and I'm
6    saying these results are like a factor of 10, 20 less.
7    I mean, I spent my life looking at scientific work for
8    DOE and others to figure out why does this -- you know,
9    does this make sense or not.  And this one immediately
10   to me says there's something odd.
11   Q.  Wait a minute.  You spent your life work
12   looking at dermal tests to figure out does this make
13   sense?
14   A.  No, no, looking at scientific tests as a -- I
15   was on eight committees to review research for almost 10
16   years, all over the United States, and then I was hired
17   specifically by DOE to look at work being done at Oak
18   Ridge and the Pittsburgh Energy Center as to whether it
19   should continue to be funded or not.  These are all
20   Ph.D.'s, academics, looking for additional money to
21   continue their work.  And, you know, they're smart
22   people, and they're trying to convince you, "Just give
23   us a little more money, and we'll get the answer you
24   want."
25        And the question always is:  Well, is that

---

43 (Pages 166 to 169)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 170

1    really -- are we really making progress or not?  That's
2    the question.
3         Q.  So that wasn't limited to dermal absorption
4    testing?  Is that what you're saying?
5         A.  No, no, not at all.  But I'm just saying that
6    I have that background -- that background, that ability
7    to look -- believe me, on the private side, people know
8    I have an uncanny ability to separate wheat from chaff
9    with respect to experimental work.
10        Q.  You've said that.
11        A.  So I'm just saying, when I look at data, these
12   are the issues that I would say why are these results
13   low, that's all I'm telling you.  And the ones that jump
14   out are these reasons, but the primary one I think is
15   the way the skin was handled, by heating it to such a
16   high temperature and then freezing it.  And I've got --
17        Q.  Okay.  That wouldn't have been -- I'm sorry.
18   That wouldn't have been your recommended method of
19   testing --
20        A.  Wouldn't have been mine or OECD's.
21        Q.  -- in vitro -- let me finish the sentence --
22   testing in vitro skin?
23        A.  Not just mine.  OECD's.
24        Q.  Okay.  And OECD lays out a specific method for
25   preparing and storing human epidermis skin samples?

Page 171

1         A.  They do.  They do.
2         Q.  Okay.
3         A.  I'm not saying -- they're -- you know, their
4    methodology is not any different than what I've known
5    for a long time, because I've written papers in 2011 on
6    this.
7         Q.  Who is OECD?
8         A.  I knew you'd ask that.  Organization for
9    Economic Cooperation and Development.  It's on page 49
10   at the top of the page.
11        Q.  And who are they?
12        A.  They're part -- I believe they're part of the
13   World Health Organization, but I'm not certain of that.
14   It will be on that exhibit.  You'll see.  I'm pretty
15   sure they're part of the World Health Organization, but
16   I'm not 100 percent sure.  They're an international
17   entity.  They're not a U.S. entity.
18        Q.  So have they been adopted by U.S. entities or
19   organizations, or is this just some global organization
20   that you're referring to?
21        A.  Well, I think there's reference -- I really
22   don't know the answer to that.  They've come relatively
23   late, and their recommendations are consistent with what
24   I wrote in my paper and what has relatively been known
25   in this field for well over a decade, about two decades.

Page 172

1         Q.  Is there somewhere in the United States,
2    somewhere in some best lab practices, as to how human
3    epidermis should be -- or recommended to be stored for
4    testing?
5         A.  Well, I think people would go with OECD.
6         Q.  You think?
7         A.  Yeah.  If you had to -- if you were forced to
8    do that.
9         Q.  What do you mean, "if you were forced to do
10   that"?
11        A.  Well, it was readily known knowledge.  OECD
12   just accumulated what was already understood.
13        Q.  So it's your opinion that DTL just ignored
14   this OECD in preparation of these skin samples?
15        A.  I don't know that they were the ones that did
16   the preservation of the skin or not.  I don't know if
17   they got the skin from a third party.  I don't know
18   anything about that.  All I know is what they reported
19   as to how the skin was handled.
20        Q.  Okay.
21        A.  And all I'm telling you is my opinion is that
22   these -- these results are probably -- my opinion would
23   be that these dermal results are not usable.
24        Q.  And so where were they eventually used?
25        A.  I don't know.

Page 173

1         Q.  So DTL did this testing.  You don't agree with
2    the testing.  And did Monsanto at some point use the DTL
3    testing for some purpose?
4         A.  I don't know the answer to that.  I know the
5    answer on some of these studies, but I never found
6    anything that said one way or the other.
7         Q.  So how does this -- how does the discussion in
8    your factual summary of the DTL testing have any bearing
9    on your opinion, if Monsanto didn't use it or you don't
10   know whether Monsanto used it?
11        A.  It has bearing primarily because of my opinion
12   on page 38 where they're trying to select formulants
13   that would -- it has to do with whether or not they're
14   meeting a standard of care for trying to protect -- err
15   on the side of public safety.  And when there's
16   correspondence that says, We want to pick a -- for this
17   series of tests, We want to pick a formulation that
18   keeps the rate as low as possible, I think that's not
19   erring on the side of public health and safety, period.
20   It goes to their attitude about public health and
21   safety.
22        Q.  But you don't know whether they used the final
23   test or not?
24        A.  That's not so important to me when I'm trying
25   to figure out are they meeting the standard of care in

44 (Pages 170 to 173)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 174

1  terms of being transparent and providing information to
2  the public, regulators, et cetera.
3      Q. So this test was used, then, to provide
4  knowledge to the public?
5      A. We don't know.
6      Q. Okay.
7      A. I'm saying that -- I'm saying that that goes
8  to their -- it supports my position that they did not
9  meet the standard of care by simply having that attitude
10  about how to conduct dermal studies.
11      Q. Okay. First, this is one person's, quote,
12  unquote, attitude; right?
13      A. It's one example of many.
14      Q. What we're talking about right now, with
15  regard to the DTL study, is one person's e-mail on one
16  occasion, evidently; correct?
17      A. We don't see any pushback, so there's
18  correspondence between -- it's not one person talking to
19  themselves.
20      Q. Let's take this a little slower, then. This
21  is one person's opinion or -- that they wrote in an
22  e-mail; correct?
23      A. Yeah, it's the ███ e-mail.
24      Q. Do you see -- let me rephrase that.
25          You didn't see anywhere that this opinion by

Page 175

1  ███ was repeated in any other e-mail, did you?
2      A. I didn't see any pushback. That's what I
3  would be --
4      Q. That's not my question.
5      A. I know. But that's what I care about.
6      Q. My question is: Did you see it repeated in
7  anyone else's e-mail?
8      A. Did I see that statement repeated?
9      Q. Yes, sir.
10      A. I didn't see it repeated, but I didn't see any
11  pushback.
12      Q. I understand you've said that. My question
13  was: Did you see it repeated?
14      A. I think I just answered that question multiple
15  times.
16      Q. Okay. Do you know who ███ is?
17      A. I would if I looked it up. The key to me is
18  that he's corresponding with known Monsanto people.
19      Q. Okay. Well, looks like he worked at
20  Monsanto; right?
21      A. Who?
22      Q. ███.
23      A. Well, we'll pull that document out. I know
24  David Saltmiras did, and I know ███████████ did.
25  I just don't know off the top of my head. I haven't

Page 176

1  memorized where all these people worked.
2      Q. All right. Let's look at 349.
3      A. It's -- you want me to give the M-O-N-G-L-Y
4  number? Does that help you guys or --
5      Q. No. We got it by your number, I believe.
6  Let's see. Looks like 349 starts at 478. Your
7  Exhibit 349 starts with document 378.
8          All right. So the first page of this document
9  is the e-mail to Mr. --
10      MR. KRISTAL: You need to show him the
11  document.
12      MR. UPSHAW: I thought he had it.
13      THE WITNESS: How would I have it?
14      MR. UPSHAW: Do we have it over there?
15      MS. ALVAREZ: No.
16      MR. UPSHAW: Okay. So you're going to have to
17  pull it up on your computer.
18      MR. KRISTAL: Well, no, I suggest we make a
19  copy so we can all read it.
20      MR. UPSHAW: Yeah, let's see if we can make a
21  copy of it.
22      MS. ALVAREZ: (Inaudible.)
23      MR. UPSHAW: Okay.
24      Yeah, we'll come back to this one.
25      THE WITNESS: Okay. Would you like for me to

Page 177

1  move to the second dermal study, or do you still
2  have questions on that one, on my opinions?
3  BY MR. UPSHAW:
4      Q. No, I think we can move to the second dermal
5  study.
6      A. I'm moving -- Counsel, just for your
7  background, I'm moving to page 40, which is the TNO
8  study in Europe.
9          And my opinions on this have to do two-fold:
10  One, the work suggests -- it doesn't suggest -- it says,
11  depending on whether -- remember I said earlier there's
12  two ways to sort of take data? It can be a flux, which
13  is a unit rate, or it can be a total percent. They
14  provided data under four scenarios for both of those
15  parameters.
16          And what they did was they had a product that
17  was apparently full strength with surfactant and a
18  product that was -- that had surfactant that was
19  diluted. That was one set of data. And then they had
20  another product that was full strength but no
21  surfactant, and then also diluted, no surfactant.
22      Q. No listed surfactant?
23      A. Well, it is what it is.
24          So they're explicit that there is a surfactant
25  in one case, and they're saying they don't know of one

45 (Pages 174 to 177)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 178

1  in a second case, so we'll leave it at that.
2      Q.  All right.
3      A.  If you compare either the percent dose with
4  time or the flux, you'll see on page 41 I've done some
5  math.  I've said that the -- for the full-strength
6  products, the rate of penetration at 48 hours for the
7  full-strength product was 10.34 percent versus 1.24
8  percent.  In other words, the full-strength product has
9  a higher rate of dermal transfer than the lower-strength
10  product, and that makes sense because Fick's law
11  applies.  We've got a higher concentration, we'd expect
12  more to get through; right?  That makes sense, I mean.
13      Q.  Okay.  Go ahead.
14      A.  So I'm okay with that.  That makes sense to me
15  that you get full strength, you should have a higher
16  flux -- or a higher penetration rate.  The fluxes are
17  similar, although a different order of magnitude or
18  different numerical value.  It's 35.6 versus 2.01 or a
19  factor of almost 18 times higher with the full strength
20  versus -- and a surfactant and the diluted product.
21  Now -- or not the diluted, but the diluted product
22  with -- no, I should say full-strength product.  So I'm
23  looking at full strength to full strength.
24      Then for the diluted products -- and the full
25  strength to full strength is known surfactant -- we

Page 179

1  don't know of a surfactant.  So that says, well, we know
2  we have a surfactant present; we're seeing a higher rate
3  of dermal transfer.  And that's not a surprise because
4  the surfactant has multiple effects.  It increases the
5  wettability.  It's sort of like if you've ever used
6  Rain-X on your car -- I mean, if you've ever had rain on
7  your car, you get droplets, but if you put Rain-X, they
8  get real flat and it kind of looks like a film.  The
9  surfactant in that case, in Rain-X, basically breaks
10  down the surface tension and spreads the water out over
11  your windshield.
12      So I've talked about, earlier in this report,
13  that Monsanto has said straight-up in their videos that
14  that's the purpose of the surfactant, is to spread the
15  material out over the leaf of the plant surface as well
16  as try to hold it there.  And the other thing that the
17  surfactant does on plants is that it breaks down that
18  initial barrier, the waxy layer, so that the glyphosate
19  can get in faster.
20      And it turns out that for skin, Monsanto says
21  the same thing, that it breaks down the waxy layer --
22  I'm trying to find that.  Let me not misquote anybody.
23  And I apologize for making you jump around.
24      Q.  It's all right.
25      A.  But on page 66 -- I just want to address the

Page 180

1  issue of with a surfactant, the rate of transfer through
2  the skin was greater than without, and that would be
3  expected, but it's good to see -- Monsanto said that
4  earlier about plants, but have they said it about
5  people?  Well, indeed, at the bottom of page 66, I'll
6  read what Monsanto says about surfactants.  And it's
7  very informative.  And it's not a surprise.
8      "The upper barrier of the skin (epidermis) is
9  very lipophilic.  This natural barrier prevents
10  dehydration of the skin and prevents, for instance,
11  bacteria and other microorganisms from getting to the
12  body through the skin.  Glyphosate on the other hand is
13  very hydrophobic, so initially a low" --
14      Q.  Hydrophilic?
15      A.  Hydrophilic, I'm sorry.
16      Q.  Yeah, we don't want to call it hydrophobic.
17      A.  Yeah, yeah, I'm sorry.  I'll slow down too for
18  the poor court reporter.
19      "Glyphosate, on the other hand, is very
20  hydrophilic, so initially a low interaction between
21  glyphosate and human skin is to be expected," i.e., our
22  lower rate without surfactants.  "Surfactants are able
23  to increase glyphosate absorption through the skin by,
24  one, removing of the lipids," the fatty portion, "from
25  the epidermal surface of the skin surface due to surface

Page 181

1  surfactant action; two, increase of the hydration state
2  of the skin, and it says "under closed exposure
3  conditions; three, increase of skin contact" -- we
4  talked about that, spreading of the material over
5  greater areas rather than have droplets.
6      "Four, increase the contact time with the skin
7  due to the decrease of evaporation of water from the
8  droplets containing the surfactants; five, increase of
9  subepidermal blood flow due to irritant action of the
10  surfactant; six, intra-epidermal and sub-epidermal
11  intercellular water accumulation due to the irritant
12  action of the surfactant."
13      This is -- by the way, I'll add this is -- as
14  I say in the text below, this is -- clearly supports my
15  opinion that the product as a whole, including the
16  surfactant, irritates the skin, as Monsanto says so.
17      Q.  Okay.  Has it ever been questioned that
18  Roundup, the product Roundup, irritates the skin?
19      A.  Oh, yeah, absolutely.  In fact, it's the whole
20  basis of Maibach on the skin irritation so that they
21  could get the signal word changed from "warning" to
22  "caution," and we can go through that.
23      Q.  So wait.  Maybe I didn't say that right.
24      Has Monsanto ever said that Roundup does not
25  cause skin irritation?

46 (Pages 178 to 181)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 182

1  A.  They've implied -- well, we'll go through that
2  study.  I'm going to get to that dermal study.  Can I
3  hold the answer to that question until we get to Maibach
4  '86?
5  Q.  How about you give me a quick answer and then
6  you can elaborate, because I will forget.
7  A.  The answer is sort of yes or no.  I don't know
8  if they used those exact words, but what they said was
9  that it was -- basically had the same irritation
10  potential as, say, shampoos, baby shampoo, which was not
11  the case, by the way.
12  Q.  All right.  So they didn't say -- again,
13  you're going to be able to walk me through this, which
14  I'm happy for you to do.  They didn't say it doesn't
15  irritate the skin.  Just they gave an example of the
16  level of irritation, which you're saying was incorrect?
17  A.  Well, we can go to the cover letter that they
18  sent with the Maibach work, and it will speak for
19  itself.
20  Q.  Right.  But am I in the general vicinity?  And
21  we're going to go to it, right, because I don't want to
22  get you off of what you're doing here.
23  A.  Yeah, I mean, it's -- I think that the -- I'm
24  not sure they use those exact words, but I'll call it
25  the cover letter or the cover words on the document, on

Page 183

1  the Maibach study sent to EPA, is at best misleading.
2  Q.  Okay.  That wasn't my question.  I think you
3  answered it to the extent you need to.
4  A.  With respect to the issue of dermal
5  irritation, I think that answers it.
6  Q.  Okay.
7  A.  So let's go back.  So, again, I just wanted to
8  point out that the fact the Roundup product goes through
9  the skin faster with a surfactant than without it is not
10  a surprise, and in fact, separately, Monsanto says that.
11  They agree.  No mystery there.
12  Then when you look at the diluted products,
13  surfactant -- no listed surfactant, the relative rate of
14  penetration relative to the full-strength products is
15  less --
16  Q.  What page are you on again?  I'm sorry.
17  A.  41.  I apologize.
18  Q.  Oh, I'm at 40.  Okay.  Go ahead.
19  A.  At the bottom of that page, where I look at
20  the diluted products, you can see that similarly, as you
21  might expect, the rate of transfer, whether it be
22  percent or dermal flux, is greater for the product with
23  a surfactant than one with no listed surfactant.  Not a
24  surprise, based on all the stuff we've just talked
25  about.

Page 184

1  So that sets the table for sort of my opinion.
2  This study, as we move on to 42 and 43 --
3  Q.  Wait.  Sets the table for your opinion, which
4  is?
5  A.  My opinion is that Monsanto at that time knew
6  the UK POEM model for pesticides had a limitation on
7  glyphosate penetration of 3 percent.
8  Q.  So wait.  At the time Monsanto received the
9  TNO dermal exposure study, it knew the UK POEM --
10  A.  Let me bring you to the bottom of page 42.
11  Q.  Yeah, because that didn't make sense.
12  A.  I will use Monsanto's own words.
13  So these results come out.  Their early
14  results come out of this study, and there's a series of
15  correspondence going back and forth that I've cited on
16  pages 42 to 44.  Basically, Monsanto shuts the study
17  down even though --
18  Q.  Which study?
19  A.  This study, the TNO study.
20  Q.  Okay.
21  A.  And even though TNO had volunteered to do the
22  study over again for free.  So here's the
23  correspondence.  The correspondence that I'm referring
24  to begins at the bottom of page 42, an e-mail from
25  Heydens to Charles Healy regarding the dermal work.

Page 185

1  "My primary concern is with the glyphosate in
2  terms of the potential of this work to blow Roundup risk
3  evaluations, getting a much higher dermal penetration
4  than we have ever seen before."
5  Then there's additional correspondence going
6  back and forth at the bottom of that page.  You can see
7  who it's between.  "We came to the conclusion that the
8  penetration of glyphosate would have been probably
9  greater than the 3 percent already imposed by German
10  authorities.  We decided to stop on" -- and this is in
11  caps.  I didn't put it that way -- "this study effective
12  today."
13  So they know that there's a regulatory limit
14  on dermal penetration of 3 percent by the Germans, and
15  as we've seen from the data, we're seeing 10 percent or
16  more, and they shut this study down, even though you see
17  some correspondence internally from people on the
18  European side on the next page, on 43.  "Shouldn't TNO
19  at least try to find out what caused these unexpected
20  results?  We are left with too many questions after
21  this.  I thought they offered to recheck their system
22  and redo the test on their own expense.  If so, I don't
23  see why we should not accept that."
24  I would tend to agree with that statement.
25  Q.  And that's not in -- you added that last line,

47 (Pages 182 to 185)

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 186

1    right, "I" being you --
2         A.  Stephen Petty would say that would be the
3    appropriate thing to do if I were working in a lab.
4         And then the subsequent correspondence is,
5    "Without a clear understanding of what happened, I see
6    no way we could or should move forward with any other
7    work at the moment."
8         Q.  So let me back up a second.
9         A.  So this study was killed.
10        Q.  Okay.  The TNO study you're referring to was
11   not a study of human skin.  It was rat skin?
12        A.  It was animal --
13        MR. KRISTAL:  Objection.  As planned or as
14   done?
15        THE WITNESS:  This was on animal skin, and I
16   believe you are correct; it was rats.
17   BY MR. UPSHAW:
18        Q.  Okay.  Do you have any issue with the
19   preparation of the rat skin?
20        A.  I didn't.  I did look at that.  I didn't see
21   any issues with the preparation of the rat skin.
22        Q.  In your review of the study materials, did you
23   find any issue with the study itself, in the preparation
24   or anything else?
25        A.  I really didn't because the results follow

Page 187

1    what you would expect from Fick's law, that higher
2    concentration should have higher fluxes, and
3    concentrations including surfactants should have higher
4    fluxes, so it was consistent that way.
5         Q.  Did you see, in your review of any Monsanto
6    e-mails regarding the TNO dermal exposure study, that
7    there was some question with regard to the validity of
8    the study test method?
9         A.  Oh, I'm sure there was.  They didn't like the
10   results.
11        Q.  Let me go back then and ask the question.  Did
12   you see any question in the Monsanto e-mail regarding
13   the methodology used in the test -- in the TNO dermal
14   exposure study?
15        A.  If you want to point me to what you're
16   referring to, that's fine.  I think there was some
17   statements about -- there was some people speculating on
18   why the results might be high, but I don't think there
19   was ever any resolution of that because the study was
20   just shut down.
21        Q.  Okay.
22        A.  And my point -- my opinion simply is that this
23   goes to the -- my original point about the standard of
24   care and the code of conduct, about whether or not
25   Monsanto met its, industry's or the government's

Page 188

1    standard of care for protecting the public health and
2    safety, and when you shut down a study that has results
3    you don't like, I don't think that's erring on the side
4    of public health and safety.
5         Q.  All right.
6         A.  I think the answer would have been either
7    figure out why the results aren't valid or -- to my
8    knowledge, this data was never provided to the EPA.
9    I've never seen any document that says it has.
10        Q.  Okay.  Well, we're going to get to the
11   standard of care opinions when we get done with the
12   dermal stuff.
13        A.  I do -- just to answer your question a little
14   fuller, on page 42, I did look for methodology, and I
15   need to correct that answer slightly.  You'll see on the
16   paragraph on 42 where it begins "Also," it looks like
17   they used full-thickness skin, which for -- so that's --
18   as long as it -- that's probably okay.  But if it -- if
19   the animals were dead -- I need to check on that -- then
20   it wouldn't be; the results would be too low.
21        Q.  So you don't know whether they used live
22   animals or dead?
23        A.  I'm pretty sure they used skin from dead
24   animals.
25        Q.  Dead rats.

Page 189

1         A.  Dead rats.
2         Q  We don't have to speculate on what kind of
3    animal it is
4         A.  Now, here's what I'm commenting on, is that
5    the skin thickness was 840 micrometers.  Well, even on
6    full-thickness skin, the general recommendation is to
7    hold it below 700 microns.  So it's relatively thick
8    skin is all I'm saying, which would have the effect of
9    making the results even lower than maybe they would have
10   been if you had picked skin that was not -- the in
11   vivo skin limitations around -- in vitro -- in vivo skin
12   is around 700 micrometers, is what you like.
13        If you're going to do in vitro where you take
14   the capillary layer off, it's about 200 to 400.  So I
15   was just looking at the -- if they were live animals,
16   but the thickness of the skin was pretty thick.
17        Q  So they used the wrong animals?
18        A.  No, no.  There's -- on all animals, including
19   humans, different skin areas have different thicknesses.
20   Like, for example, the thinnest skin on males is genital
21   skin and in your palate.  And that's why a lot of drugs
22   are taken in the mouth because they go through the
23   palate skin so quickly.
24        Q  So the use of dorsal or flank skin of these
25   rats was the wrong spot to take the skin from?

48 (Pages 186 to 189)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 190

1    A.  I don't know if I want to say it's wrong.  I'm
2  just saying it's -- I'm just pointing out the skin is
3  relatively thick, so when you look at it from a Fick's
4  law standpoint and you look at traditionally the
5  thicknesses of skin that are used in studies, it seems
6  to be a little thick.
7    Q.  Okay.  Have you conducted any dermal testing
8  yourself?
9    A.  I have not.
10   Q.  Have you reviewed any peer-reviewed literature
11 regarding dermal studies?
12   A.  Oh, many.  I mean, when I did the 2011 paper,
13 I spent three years writing that paper.
14   Q.  No, no.  I didn't say you wrote the paper.
15 Did you --
16   A.  No, no --
17   Q.  -- review someone else's work as a peer
18 reviewer?
19   A.  Oh, as a peer reviewer?
20   Q.  Yes, sir.  I'm sorry.  That was a bad question
21 to begin with.
22   A.  I have to think about that, because I think --
23 I may have been a peer reviewer on a dermal paper for
24 the Journal of Occupational and Environmental Hygiene.
25 I'll have to think about that, because Mark Nicas and I

Page 191

1  were both asked to review it and rejected the paper.
2    Q.   And the paper you wrote -- where was that?  I
3  thought it was right at the top of your list.
4    A.  I think it's at the end, maybe.
5    MR. UPSHAW:  I thought he had it on his list,
6  but maybe not.  It wasn't on his CV, was it?
7    THE WITNESS:  It's on the top of page 235.
8  BY MR. UPSHAW:
9    Q.  Yeah, of your CV.
10   A.  It's in the references.
11   Q.  Yeah.
12   Okay.  Your paper, your 2011 paper, titled "A
13 Quantitative Method For Estimating Dermal Benzene
14 Absorption of Benzene Containing Hydrocarbon Liquids,"
15 you discuss a methodology for estimating the benzene
16 absorption?  That's what the paper's about; right?
17   A.  Yeah.  The first part of it is a methodology.
18 We're just curve fitting actual experimental data, so
19 the methodology is just statistical analysis of the
20 data.  In other words, we're taking experimental data
21 and we're just curve fitting it so it's at least
22 squared.
23   Q.  You're doing what to it?
24   A.  We were taking data from various papers and
25 we're plotting them, percent benzene in the material

Page 192

1  versus flux -- and there's all kinds of data -- and we
2  draw a line through that based on statistical
3  methodologies.
4    Q.  Like a meta-analysis?
5    A.  It was a meta-analysis on the application --
6  the application portion of the paper was a
7  meta-analysis, basically, using statistical curve fits.
8    Q.  Right.  But no original absorption work --
9    MR. KRISTAL:  Object to the form.
10 BY MR. UPSHAW:
11   Q.  -- with either human epidermis or animal skin?
12   A.  No.  But, interestingly enough, in 2017, CDC
13 did work that basically supported our findings.  So the
14 second part of the -- I really haven't fully answered
15 your first question.
16   Q.  Okay.
17   A.  The second part was, and where the real work
18 was, was looking at what happens after what we call
19 post-dermal exposure; meaning, once it's on the skin and
20 it stays there, you have this complex situation where --
21 especially we had a very complex situation where you
22 have benzene in all kinds of different materials,
23 gasoline, hexane, toluene, mineral spirits, et cetera.
24 And the question is:  How fast does the benzene
25 evaporate away versus go back into the person; right?  I

Page 193

1  mean, because not only is some of it available to create
2  additional dermal exposure, but the concentration's
3  dropping with time.
4    And we did lots of work -- like I said, it
5  took three years to find appropriate work on evaporation
6  rates of benzene from complex materials, and we were
7  looking at ultimately from mineral spirits, from crude
8  oil, and from gasoline.  And what you find, when you
9  look at evaporation rates and plot all that, is that
10 covers the universe of mixes pretty well.  And so then
11 it becomes -- so then we have curves, curve fits, that
12 look at the absorption as the benzene content drops with
13 time, and we've presented those in the paper.  The
14 difficulty with all of that is it requires numerical
15 integration to solve those equations, and of course
16 that's what I do, is use numerical integration when I do
17 those kinds of dose calculations for the post-dermal.
18   Now, both methodologies were challenged in
19 federal court in Texas, and the judge ruled against both
20 Daubert motions.  So the methodology was approved by the
21 federal courts.
22   MR UPSHAW:  All right  Move to strike as
23 nonresponsive
24   THE REPORTER:  May we take a break soon?
25   MR UPSHAW:  We can break right now

49 (Pages 190 to 193)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

---

Page 194

```
1        THE VIDEOGRAPHER:  This marks the end of video
2   media disc number 3.  The time is 1511, and we're
3   going off the record.
4        (Recess from 3:11 p.m. to 3:25 p.m.)
5        THE VIDEOGRAPHER:  We're back on the video
6   record.  This is video media disc number 4 of the
7   deposition -- excuse me -- of Stephen Petty.  The
8   time is 1525.
9   BY MR. UPSHAW:
10       Q.  Okay.  All right.  Before we move forward, let
11  me go back to the subject where we had to have the
12  document copied from the hard drive -- or the thumb
13  drive you provided, and it was Exhibit 320 on your
14  exhibit list with a MONGLY of 02171787.
15       A.  Where are you at again?  I'm sorry.
16       Q.  I'm on the top of page 38, and I was starting
17  to ask you about that document, because on page 37 you
18  make the comment that the tests were set up with the
19  apparent goal of keeping dermal values as low as
20  possible, 349.
21       A.  I just cited what was said.
22       Q.  Right.
23       MR. KRISTAL:  Where -- is 320 the right --
24       MS. GREENWALD:  349.
25       MR. KRISTAL:  349?
```

---

Page 195

```
1        MR. UPSHAW:  Yes.
2        MR. KRISTAL:  I think you -- did you read the
3   MONGLY number wrong?
4        MR. UPSHAW:  Did I read it wrong?
5        MR. KRISTAL:  The MONGLY number --
6        MR. UPSHAW:  Oh, I read the one for the other
7   one.
8        MR. KRISTAL:  Right, that's what I'm saying.
9        MR. UPSHAW:  Yeah, yeah.  The MONGLY number,
10  I'm sorry, is 02199478.
11       MR. KRISTAL:  Okay.  Exactly.
12       MR. UPSHAW:  There you go.  My mistake.
13  Is this two copies?
14       MS. ALVAREZ:  Yes, two copies.
15       MR. UPSHAW:  Okay.  We'll mark it as 16.  I'm
16  going to hand -- oh, how come this one is so much
17  lighter?  Because I forgot the rest of it.
18       (Defendant's Exhibit 16 marked for
19  identification.)
20       MR. KRISTAL:  Thank you.  Do you want to put
21  the sticker on the one that's fully stapled?
22       MR. UPSHAW:  It doesn't matter.  You can take
23  the staple out.  The staple's not going to go
24  through.  This little baby's not going to make it.
25       MR. KRISTAL:  It's a little bit cut off on the
```

---

Page 196

```
1   top.
2        THE WITNESS:  Okay.
3        MR. KRISTAL:  I think you cut off part of what
4   you wanted to ask about.
5        MR. UPSHAW:  No, I think we can see it,
6   because we have the date, we have who it's to, and
7   we have who it's from.  That's all I need to tell.
8        MR. KRISTAL:  This one doesn't have who it's
9   from.  I don't know.  Maybe you're looking at
10  something different.  You know what I'm saying?  It
11  cut the very top line off somehow, or am I -- it's
12  from ████ and ████ should be at the top.
13       MR. UPSHAW:  Yeah, the "F" is cut off.  It's
14  r-o-m.  It's the one that's dark in there.  See
15  down, right above the date?
16       MR. KRISTAL:  Okay.
17       MR. UPSHAW:  See?  It's from --
18       MR. KRISTAL:  Yeah, yeah.
19       MR. UPSHAW:  You see it now?
20       MR. KRISTAL:  I didn't see the word from
21  because the "F" is cut off.  My fault.
22       MR. UPSHAW:  No worries.
23  BY MR. UPSHAW:
24       Q.  Okay.  We marked that as 16.  This was a
25  document we didn't have in front of us when I was trying
```

---

Page 197

```
1   to discuss the document.
2        You've seen this before; right?
3        A.  Yes.
4        Q.  Okay.  And this is where you took the quote
5   from in your factual summary, Exhibit 7; right?
6        A.  Yes.
7        MR. KRISTAL:  Is there another copy?
8        MS. ALVAREZ:  One other copy.
9        MR. UPSHAW:  Thank you.
10       MR. UPSHAW:  I don't have another --
11       MR. KRISTAL:  No, that's okay.  I have clips.
12  Thanks.
13       THE WITNESS:  Do we have the Bates on these
14  somewhere?
15       MR. KRISTAL:  Yeah, the Bates were cut off.
16       MS. ALVAREZ:  It's just the way they print
17  them here at Regus.
18  BY MR. UPSHAW:
19       Q.  Oh, okay.  All right.  And I asked you then do
20  you remember who ████ was, and of course you
21  didn't have the document in front of you.  And now that
22  you do, do you know who ████ was or may still be?
23       A.  He worked for Syngenta.
24       Q.  Not Monsanto; right?
25       A.  Correct.
```

---

50 (Pages 194 to 197)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 198

1  Q.  And what was the context that ▇▇▇ was
2  writing to Mr. Saltmiras at Monsanto?
3      A.  Well, they're looking to set up the -- he's
4  providing advice on setting up the DTL studies.
5      Q.  Yeah, Mr. Saltmiras at the bottom of that
6  first page said, "Before I arrange the in vitro skin
7  dermal penetration studies of Monsanto's formulated
8  glyphosate at DTL," he wants to take a look at the DTL
9  protocol.  That's what he's saying at the bottom of the
10  page; right?
11      A.  That's who -- who David Saltmiras is saying?
12  Yes.
13      Q.  Yeah.  And then so ▇▇▇ responds with the
14  information, part of which is the quote that you place
15  prominently in Exhibit 7; right?
16      A.  Yes.
17      Q.  The quote in Exhibit 7 which you equate to
18  Monsanto's state of mind.
19      A.  In the sense that they didn't push back.
20      Q.  They didn't push back against somebody who was
21  not from their company, which they should have done, who
22  was sending them the protocol from DTL?
23      A.  Exactly.
24      Q.  Okay.
25      A.  Exactly.

Page 199

1      Q.  All right.
2      A.  If somebody told me that, and my job was to
3  protect the public health and safety, I'd say, "No,
4  we're not going to do it that way."
5      Q.  Okay.
6      A.  That's --
7      Q.  You didn't see any response to Mr. Hill's
8  e-mail; right?
9      A.  That's what I said.  I've seen no pushback.
10      Q.  That wasn't my question.  I said:  Have you
11  seen any response to Mr. Hill's, like, "Thank you very
12  much for the information," or, "We're moving forward,"
13  or anything?
14      A.  I'm uncertain.  I just don't recall.
15      Q.  All right.  All right.  I didn't want to leave
16  that hanging out there.
17          You were on, when we took a break, Section
18  4.5.2, the review of the TNO study.  Were we completed
19  with that?
20      A.  Yeah, I'm sorry.  I'm just hesitating on this.
21      Q.  Don't worry about it.
22      A.  In context with all that lack of pushback, I
23  would add that the commentary below the one that I've
24  cited and you've cited on page 38, there's also the
25  comments he makes regarding the -- clearly from the

Page 200

1  Wester dermal study, saying, "Hopefully, he can put
2  together a position on the non-relevance of the findings
3  in the old non-human primate study."
4      Q.  Where are you referring to?  Are you back on
5  our Exhibit 16?
6      A.  Page 38.  Yes, I'm on that as well.
7          But I'm just saying that the whole context of
8  my comments about pushback was not just the first
9  sentence; it was the second sentence.  And the
10  interesting part about that is the Wester study in fact
11  was the study that was used as the basis for the risk
12  assessment in the 2000 paper.  So it's -- it's an
13  interesting comment that clearly -- these folks are all
14  familiar with the work that's going on at Monsanto.
15  This is --
16      Q.  Hold on.  So -- you're using terms that are --
17      MR. KRISTAL:  Please let him finish the
18  answer.
19      MR. UPSHAW:  I need to find out what he means
20  by "these folks."
21      MR. KRISTAL:  No, you need to let him finish
22  the answer, and then you can go back and say who is
23  he talking about, but you can't cut him off in the
24  middle of it.  When he's on a phrase, you don't
25  interrupt.

Page 201

1  So finish your answer.
2      MR. UPSHAW:  We're doing just fine, Jerry.
3  Who was --
4      MR. KRISTAL:  We are doing just fine.  Except
5  when you interrupt, we're not doing fine.
6  So finish your answer.
7  BY MR. UPSHAW:
8      Q.  Who are you referring to?
9      MR. KRISTAL:  Finish your answer first, and
10  then you can tell him who you're referring to.
11      A.  I'm referring to the same conversation with
12  ▇▇▇ -- between ▇▇▇ and the Monsanto folks, in
13  the same paragraph, actually.
14      Q.  Thank you.
15      A.  And all I'm saying is we focus -- when we
16  focus so much on the first quoted sentence, we didn't
17  also focus on the second quoted sentence which is in the
18  same paragraph, and it's that context -- this isn't a
19  conversation with people that aren't really familiar
20  with what Monsanto's been doing on dermal, because he's
21  talking about the primate study work, which was
22  obviously done -- or at least it was sponsored by
23  Monsanto as well.
24          So it's interesting that they want to make
25  that study nonrelevant, yet it serves as the basis for

51 (Pages 198 to 201)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

## Page 202

1 the 2000 paper that basically concludes there isn't a
2 risk associated with dermal exposure.
3    Q.  What 2000 paper are you referring to?
4    A.  It's -- it was the one that was ghostwritten
5 by Monsanto.
6    Q.  Is that your opinion, that it was
7 ghostwritten?  Do we need to get into that?
8    A.  No, no.  It's actually proven.  The documents
9 will prove it.
10    Q.  Okay.  Is that going to be one of the opinions
11 that you provide at trial, about ghostwriting by
12 Monsanto?
13    A.  I'm going to say that that's not -- that's --
14 that would not be an appropriate standard of care.
15    Q.  Okay.
16    A.  That would be another example, yes.
17    MR. KRISTAL:  Also, Exhibit 16 is not the same
18 as Exhibit 349.  It seems to be the same e-mail,
19 but it's a different document.  I'm looking at 349
20 from the thumb drive.
21    MS. ALVAREZ:  This is the one that I -- yeah,
22 that we downloaded and I e-mailed to --
23    MR. KRISTAL:  I'll just share mine.
24    MS. ALVAREZ:  This is the one I have.  It's
25 MONGLY 349, which is from --

## Page 203

1    MR. KRISTAL:  Now, does what you're looking at
2 look like what I'm looking at on my screen?
3    MS. ALVAREZ:  No.  This part, yeah.
4    MR. KRISTAL:  Isn't that odd?
5    MS. ALVAREZ:  That is odd.
6    MR. UPSHAW:  We wouldn't have it other than
7 your thumb drive.
8    MS. ALVAREZ:  Yeah, this is stuff that was
9 produced in that big --
10    MR. KRISTAL:  I'm not ascribing any blame.
11 All I'm saying is what's printed out and what's on
12 my thumb drive -- was it the thumb drive I gave
13 you?
14    MS. ALVAREZ:  This is from the Citrix
15 documents that were produced for the July weekend.
16 These are from that set.
17    MR. KRISTAL:  Okay.
18    MS. ALVAREZ:  Because from the thumb drive, I
19 just took the videos.
20    MR. KRISTAL:  That's bizarre -- okay.  I'm
21 trying to compare the content.  The content appears
22 to be the same, so that's make about their
23 header seems to be different.  That was my only --
24 one is in military time, one is in...
25    MS. ALVAREZ:  It could be that the Citrix --

## Page 204

1 maybe it was a metadata thing in terms of how they
2 put together the --
3    MR KRISTAL:  Okay, yeah, I'm just pointing it
4 out and wanted to see -- that's bizarre
5    THE WITNESS:  Counsel, let me reference you to
6 page 214
7 BY MR UPSHAW:
8    Q  214
9    A.  You asked about the 2000 paper that I hadn't
10 identified.  Second paragraph, that paper is the
11 Williams, Kroes and Munro paper, and it's my Exhibit 359
12 -- or, no, I'm sorry.  It's my exhibit -- yeah, 206.
13 About middle of the second paragraph, do you see that?
14    Q  Middle of the second paragraph, okay
15    A.  Where I say, "As published in Exhibit 206 in
16 2000, authors listed as Gary Williams, Roger Kroes and
17 Ian Munro."
18    Q  Correct
19    A.  And then I say -- if you look at Exhibit 359,
20 you can see the reference I have to the ghostwriting of
21 that paper.
22    Q  The ghostwriting in your opinion of the Greim
23 paper or the Williams paper?
24    A.  The Williams paper.
25    Q  Okay

## Page 205

1    A.  So let me get back to where we were.  I'm not
2 sure where we were.
3    Q.  I had us in the 40s.  TNO was the last thing
4 that we covered.
5    A.  So I think we've -- I've offered my opinions
6 on the TNO.  The only thing I would add is on page 44,
7 it's clear that Monsanto was familiar with the impact
8 that the formulation could have on dermal uptake because
9 they say that on page 44.
10    Q.  Where specifically?
11    A.  It says, the first indented paragraph, "Until
12 today, Monsanto conducted formulation-specific dermal
13 uptake research on formulation Roundup (MON 2139).  It
14 is clear that because of compositional differences, the
15 dermal uptake data for Roundup can't be extrapolated as
16 such towards the whole range of formulations."
17    So that means that they understand that the
18 formulations impact the dermal transfer rate, and of
19 course we know that somewhat because we know, for
20 example, surfactants increase the rate; we know that
21 higher strength would obviously increase the rate, so...
22    And the other statement they make about their
23 knowledge about the effective formulations on dermal
24 transport is in the second indented paragraph, where
25 they write, "Formulations based on the same surfactant

52 (Pages 202 to 205)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 206

1  type (surfactant to glyphosate ratio) will have a
2  comparable interaction in contact with the skin. The
3  second basis for clustering becomes a combination of the
4  surfactant type, the surfactant load, the
5  surfactant/glyphosate ratio, and the glyphosate load in
6  the formulation."
7      So they have clearly done considerable work to
8  understand cause and effect with respect to dermal
9  transfer rates. That's all I'm saying. They understand
10  what increases or decreases dermal transfer rates.
11  That's what they're saying.
12      Q. Okay. And how does that support your opinion?
13      A. Well, my opinion again was that Monsanto, with
14  respect to the standard of care both internally, with
15  industrial best practices as well as government
16  requirements, didn't meet the standard of care to
17  protect or minimize exposure of workers to hazardous
18  materials, in this case Roundup.
19      MR. UPSHAW: Hold on. Can you read that back
20  a second?
21      (The preceding answer was read back by the
22  reporter.)
23  BY MR. UPSHAW:
24      Q. And workers -- can you define what you mean by
25  "workers" in that statement?

Page 207

1      A. Well, in that statement, I would say -- and
2  maybe I should clarify it. You make a good point. I
3  would say workers and -- I would say "users of Roundup"
4  would be a better term because it would include members
5  of the public that may or may not be declared as
6  workers. So with that clarification, that's what I
7  would offer.
8      Q. So you're including in that statement anyone
9  who uses commercial as well as residential?
10      A. "End users," yes, that's a better term. And I
11  apologize for using "workers."
12      Q. That's all right. Just wanted to clarify
13  that.
14      A. I appreciate it.
15      Q. Okay. Anything else on the dermal front?
16      A. We've got to go to the next dermal study.
17      Q. Okay.
18      A. The next one is -- begins on page 44. I'll
19  try not to drag you through it all, but this is the
20  so-called Wester, et al , study, and I'll drive --
21  without -- I'll drive you to information on page 46, the
22  figure. And what this is, is a figure of -- remember, I
23  have a good sense for whether things make sense or not.
24      Q. I know. You've mentioned it several times.
25      A. You may not believe me, but I'll proffer that

Page 208

1  that's the case.
2      We've got to laugh a little.
3      But if you look at 4-11, which is how a dermal
4  study should show up, whether it be -- if you're looking
5  at dermal absorption with time as a percent of the
6  material absorbed, it should have this characteristic
7  curve where it rises and then kind of bends over and
8  then plateaus.
9      If you're looking at the flux side of it,
10  which is a little different way to look at it -- and
11  these are referenced, as you can see -- the flux is a
12  little different. You would expect initially to have a
13  high rate of flux, and then as the -- a combination of
14  either the material begins to be less available, in
15  other words it's used, it goes through the skin and
16  there's not as much left, and/or you get a buildup on
17  the other side, you would expect the flux to come to a
18  peak, if you will, and then obviously it would decay
19  away.
20      So when you're looking at the percent
21  absorbed -- what I did was I took the Wester data -- and
22  you can either believe me or not, but I took the Wester
23  data and I inverted it and plotted it percent absorbed
24  versus time. And then I looked at how do those curves
25  stack up with changes in concentration. Now, one would

Page 209

1  expect to see the highest initial burst and the highest
2  curve with the highest concentration and the lowest
3  curve with the lowest concentration.
4      Does that make sense?
5      In other words, again, Fick's law, you would
6  expect the higher the concentration, the higher the rate
7  of dermal transfer, and the lower the concentration, the
8  lower the dermal transfer. What you see here is, not
9  only do you see no consistency -- in other words, the
10  highest concentration is one of the lowest curves. And
11  not only that, the curves don't have the style that you
12  see on the opposite page, which would have sort of a
13  rise, plateau, and then decay. I mean, some of them
14  sort of do. Some of them just have a decay. And so you
15  look at this data, and you're like, there's something a
16  little odd about this data.
17      Now, my real opinion, though, about the data
18  comes from page -- first of all, so I think the
19  experiment is questionable. Secondly, on page 48, if
20  you go to the table 4-8 on that table, this is straight
21  from their paper. They're looking at, well, where
22  did the --
23      Q. Hold on.
24      A. I'm sorry.
25      Q. I see table 4-7 and 4-10. Am I on the wrong

53 (Pages 206 to 209)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 210

1  page here?
2  A.  Oh, I'm sorry.  Go to the next page that your
3  right hand's on.  See the table there on page 48?
4  Q.  Oh, okay.  I see.  They're kind of misnumbered
5  there.  We kind of skipped a few.
6  A.  Actually, the tables and figures have their
7  own running numbers.  Does that make any sense?
8  Q.  Got you.  Yes.
9  A.  And this is data from the paper.  And what --
10  a couple of things.  One, he reports -- that is, Wester,
11  et al., reports in his paper that depending on really
12  the concentration of the glyphosate, that the left
13  column is a higher concentration, obviously 270
14  micrograms applied per cubic centimeter of skin area,
15  and then the other one is 25, that he found -- 2.2
16  percent of it shows up in the urine, and .8 percent
17  shows up in the urine for the lower concentration.  Not
18  a surprise that one would be higher than the other.
19  And then you have .7 percent in the feces for
20  the higher concentration, but 3.6 in the lower
21  concentration.  That's a little odd.
22  And then surface washes, you've got the
23  numbers that are there.
24  And then contaminated solids, which is I guess
25  hair and skin that fell to the floor that they

Page 211

1  collected, and then you have a total.
2  The opinion I have is that this data was used
3  to suggest in the Munro paper, for example, that the
4  dermal absorption of glyphosate in Roundup was, at most,
5  2.2 percent.  But the OECD and most others believe
6  that -- and, in fact, even Monsanto says, ultimately,
7  that that interpretation is wrong.  The total absorbed
8  dose should include not only the urine but the feces,
9  the surface washes, so that you get a total.  And more
10  importantly, ideally you have an 80 percent or higher
11  recovery -- or 90 percent or higher, and it's kind of
12  marginal in some cases of 80.
13  But the authors report in the abstract that
14  the percutaneous absorption in vivo -- this is live
15  animals -- in rhesus monkeys was .8 percent for the low
16  dose and 2.2 percent for the high dose.  That's just
17  flat-out false, because, obviously, what ended up in the
18  feces, what ended up in the other -- perhaps the
19  contaminated solids -- and also it's considered the
20  surface washes, because when you wash a skin, it doesn't
21  mean that when you wash it, that that material hasn't
22  penetrated part of the skin.  It just hasn't gotten
23  further beyond the skin.  So the state of the art or the
24  standard of care is to include that as part of the
25  dermal absorption, unless you can absolutely prove that

Page 212

1  it was on the surface.
2  And so this particular study gets used in
3  papers, in a paper, and ultimately, though, even
4  Monsanto, even though it gets used in this paper that's
5  looking at risk assessment for Roundup in 2000, and they
6  use only the material that goes into the urine, that's
7  clearly wrong, I mean, because the material that gets
8  into the feces had to get in through the skin.
9  Q  What 2000 paper used this --
10  A.  This is the paper with Munro, et cetera, that
11  we talked about earlier.
12  Q  And that --
13  A.  They used the dermal absorption from Wester,
14  but they used the .8 to 2.2 percent.
15  Q  And are you criticizing not only the Wester
16  paper but you're criticizing the 2000 paper as well?
17  A.  Yes.
18  Q  Okay
19  A.  And so you see some series of -- you see that
20  Monsanto realizes that this -- this clearly is not --
21  only representing that the material that shows up in the
22  urine from a dermal dose study is not correct.  Yet,
23  Monsanto never really ever comments that we really ought
24  to correct the record.
25  Q  Where would Monsanto supposedly have done

Page 213

1  this?  Where would Monsanto have, quote, unquote,
2  corrected the record?
3  A.  Well, they should have done it in the 2000
4  Munro paper.  They could have either written a letter to
5  the editor, or it appears that they helped -- they were
6  certainly reviewers on that paper, and they could have
7  corrected the record as a reviewer.
8  So, again, utilizing data that isn't
9  conservative is not meeting the standard of care nor
10  being protective of dermal exposures to end users.
11  Q.  So in your opinion, anytime you use data
12  that's not conservative, that's not upholding the
13  standard of care?
14  A.  It's not only that.  In this case we know that
15  it's -- it's not only using conservative data, it's
16  using data that clearly misrepresents how you're to use
17  the data.  In other words, there's nothing conservative
18  or nonconservative, if you will; it's just what's right
19  and what's wrong in terms of how you report data
20  regarding a dermal exposure experiment.
21  Q.  And you're going to show me later on that how
22  you report data regarding a dermal exposure experiment
23  is written somewhere in the standard of care?
24  A.  OECD -- yeah, the OECD reports it.
25  Q.  Does it say anywhere that the OECD -- that

54 (Pages 210 to 213)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 214

1 Wester didn't follow OECD protocols?
2 A. Does what say? I'm sorry.
3 Q. Does the Wester paper say that they didn't
4 follow OECD protocols or make any mention of OECD as the
5 governing body for standard of care?
6 A. I'm not sure they reference that or not, but
7 I'm just telling you that it's -- as a practicing
8 chemical engineer, industrial hygienist and one that's
9 an expert in dermal exposures, it's understood that the
10 material that gets through the skin and shows up in
11 the -- if it's a dermal study, and the only place it's
12 getting applied to the body is the skin, and it shows up
13 in the feces, for example, it's got to be part of what
14 came through the skin.
15 Q. Okay. Is OECD --
16 A. And I reference the OECD on the next page, on
17 49, just for your reference.
18 Q. Oh, okay. Yeah, we referred to this earlier.
19 That's where we got the actual name of what OECD stood
20 for.
21 A. Correct, correct, when we were talking about
22 the acronym. And the relevant language I believe with
23 respect to dermal tests, I've tried to reproduce here
24 and on the next page.
25 And to support again my opinion there, you can

Page 215

1 go to page 50 and you'll see that, again, ███████
2 ██ ███ is comment -- or reporting back to Donna Farmer
3 and others that -- regarding the Wester study, which we
4 just talked about, that since all of the IV-administered
5 dose were excreted in the urine, the percutaneous
6 absorption of the glyphosate is estimated to be .8 to
7 2 -- it should say 2.2 percent there. I'm sorry.
8 Oh, no, they actually said 2.22 in the e-mail,
9 but it's clearly 2.2. You see where I'm saying "sic"?
10 Q. I may be reading the wrong thing.
11 A. Okay. I'm on the first bullet on page 50.
12 Q. Oh, the first bullet. I was reading the
13 second bullet. Sorry. Go ahead.
14 A. I read .8 to 22, and I thought I made a typo,
15 but I've got a "sic" there, so it was obviously a typo
16 in the e-mail. And we know it's a typo because,
17 obviously, I just showed you the data that was .8 to
18 2.2.
19 Regarding it, he says, "They did not take the
20 feces into account based on the" -- 4 is the Wester
21 study he was referring to.
22 Q. There was more than one Wester study?
23 A. No. He's referring to multiple elements in
24 the study.
25 Q. So when he says "Wester 4"?

Page 216

1 A. Right. It's the -- you have to go in and look
2 at his bullet points. If you want to pull the ultimate
3 document up, it's clear what this does.
4 Q. Okay.
5 A. And then similar -- this is in 2008, a day
6 later, there's some back and forth obviously,
7 regarding -- it says, "Regarding Wester, et al., study,
8 experiment 4" -- the thing was, in the Wester study,
9 there were four different experiments, and so we're
10 specifically referring to the primate study on the in
11 vivo, in other words live animals.
12 "The Wester 4 study" -- that's the one where I
13 produced all the data that you see earlier -- "suggests
14 that almost all the entire systematically available dose
15 was excreted in the urine. The low dose in vivo
16 experiment suggests that almost the entire dose, 82
17 percent, that was absorbed through the skin was excreted
18 in the feces."
19 So even Monsanto recognizes that Wester has
20 misrepresented that study, yet they've never corrected
21 the -- this was in 2008.
22 Q. Wait. So the next line? I'm sorry.
23 A. "A response suggests the Wester study should
24 be repeated."
25 Q. Okay.

Page 217

1 A. Is that what you're asking?
2 Q. Yes.
3 A. And I don't disagree with that, but it never
4 was and there was no correction to the record.
5 Q. To the record. Whose record?
6 A. Well, for instance, the 2000 paper, which is
7 often cited as the risk assessment for exposure of
8 people to Roundup.
9 (Cell phone interruption.)
10 MS. GREENWALD: Let me put this on silent.
11 I'm sorry.
12 MR. UPSHAW: That's okay.
13 MS. GREENWALD: Why is it not going off? I
14 turned it off.
15 THE WITNESS: So that's --
16 (Brief interruption.)
17 BY MR. UPSHAW:
18 Q. Hold on, hold on.
19 A. I'm sorry.
20 Q. That's all right.
21 Okay. Go ahead.
22 A. So specifically I'm referring to that. That
23 was a big paper doing a risk assessment on looking at
24 exposures under various scenarios of individuals to
25 glyphosate.

55 (Pages 214 to 217)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 218

1    Q.  You mean Munro?
2    A.  Munro, et cetera, yeah.  There were three
3  authors.
4         And then there's additional correspondence,
5  which is the third bullet down, again pretty much
6  amongst the same group of individuals in November, five
7  days later.  And one of the statements made was that,
8  "The movement of glyphosate in the blood flow from
9  dermal contact is different to that through oral,
10  intravenous exposure.  The little data we have suggests
11  that excretion is significantly more through the feces
12  than the urine."
13         Again, all I'm saying is Monsanto clearly knew
14  that the results of the Wester work, in terms of
15  conclusions, were flawed, and yet that work was allowed
16  to be used in the 2000 Munro paper, and there was never
17  any correction to the record.
18    Q.  So --
19    A.  So I'm just saying that that doesn't -- that
20  certainly doesn't meet a standard of care with respect
21  to ensuring that the public health and safety of those
22  who might be exposed to this product is minimized.
23    Q.  And it's your contention that Monsanto should
24  have corrected the authors of the Munro paper, when
25  using the Wester results?

Page 219

1    A.  That -- that study was reviewed by Monsanto
2  people in 2000, before it was published, so they
3  certainly had the ability to correct the record, and
4  they didn't do that.
5    Q.  Was that study also peer reviewed before it
6  was published?
7    A.  I'm not certain, but I will tell you two
8  stories about peer review.  Peer review has very little
9  meaning today.
10    Q.  My question is:  Do you know whether that
11  Munro paper was published in a peer-reviewed journal?
12    A.  I assume it was.  That doesn't -- I will tell
13  you, having been a peer reviewer, peer review doesn't --
14  and it shows up in context with this litigation.  Peer
15  review does not have the same meaning it once had.
16    Q.  According to you?
17    A.  It's not only according to me.  I'm telling
18  you that I was a peer reviewer on a paper along with
19  Mark Nicas at Berkeley, and we said the paper should not
20  be published.  And that's pretty -- norm ally, you don't
21  do that.  You try to figure out a way to get it changed
22  and get it worked out.  The editor wrote -- the journal
23  wrote us back and said, "We appreciate your comments and
24  we'll take them into advisement as we publish the
25  paper," and it was published.

Page 220

1    Q.  What journal was that?
2    A.  I'll have to go back and look.  I don't
3  recall.  But it was a peer-reviewed journal, and it
4  was -- that was the dermal that I was talking about.  It
5  was a theory that was being proposed that had no basis
6  in science.
7    Q.  So things get published that have no basis in
8  science?
9    A.  Well, they get published -- well, I won't say
10  no.  But certainly are -- conflict dramatically with --
11  it would be the equivalent of saying that I'm going to
12  publish a dermal model that suggests that lower
13  concentrations would have higher exposure rates than
14  higher concentrations.  It would be in complete conflict
15  with Fick's law.
16    Q.  Didn't you just give us an example that you
17  were involved in that -- of that very thing, that the
18  paper should not have been published, but it was?
19    A.  I just did.
20    Q.  Right.  I just said you just gave us the
21  example, then you said no, it doesn't happen that way.
22    A.  I'm sorry.
23    Q.  Our record's clear.  I don't need to clarify.
24    A.  I said -- I said that the peer-reviewed
25  process doesn't necessarily imply that what's published

Page 221

1  is necessarily -- it doesn't necessarily make that work
2  any better than something that wasn't peer reviewed.
3  The intent is that it would.  I'm just saying that it
4  doesn't always happen, and I have firsthand knowledge
5  that it doesn't always happen.  And Mark Nicas at
6  Berkeley will tell you the same thing.
7    Q.  It's not exactly what you said, but we're
8  good
9         Okay  What's next?
10    A.  The next study is -- well, and the next
11  comments are on Maibach and -- the next comments that I
12  have are on page 54 at the bottom, and I want -- I'm not
13  drawing it necessarily to Franz '83.  What I'm saying
14  is, recall when I said --
15         MR KRISTAL:  Franz '83?
16         THE WITNESS:  Yeah, that's the -- Franz '83
17         MR KRISTAL:  Oh, I thought you were saying
18  you were looking at Maibach  That's the only
19  reason I said that  My fault
20         THE WITNESS:  Remember when we were talking
21  about the detail work and that they -- there's
22  something on the order of 40 to 60 seconds, they
23  were exposing skin to 140 degrees Fahrenheit?
24  BY MR  UPSHAW:
25    Q   Yes

56 (Pages 218 to 221)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 222

1    A.  And this is where I talked a little bit about
2  the fact that I don't believe that was an appropriate
3  way to treat a skin, because you can look up how long it
4  takes at various temperatures to scald or cause
5  third-degree burns on skin, and at 140 degrees, it's
6  about three seconds, according to the literature.
7      So that means -- if you think about a
8  third-degree burn to a skin, do you think that skin is
9  representative of skin that would be on a normal human
10 being as living skin?
11   Q.  Is it supposed to be?
12   A.  Well, yeah.  You're trying -- when you're
13 using cadaver skin, you're trying to simulate live skin.
14 The problem is you can't use live human skin for all the
15 obvious reasons, so all I'm saying is -- remember my
16 comment or my opinion before, that that study was highly
17 questionable because of the way in which the skin was
18 treated?
19      I'm just drawing back to that and saying --
20 and, remember, I said I had some reference that at some
21 point the skin heated to that temperature is burned, and
22 I'm just saying that's where I had that information.
23 I'm just drawing you back to that.
24   Q.  I understand.  And you're saying that the skin
25 that was used in the TNO study --

Page 223

1    A.  DTL.
2    Q.  I'm sorry.  You're right.  DTL.  I don't know
3  where that came from.
4      DTL study, because it was in water at 140
5  degrees over three seconds, was probably burned to the
6  third degree, pursuant to table 4-10; right?
7    A.  Yeah.  If you go to page 39, they held the
8  skin in water at 60 centigrade or 140 -- I ballpark 140.
9  I convert everything to Fahrenheit for us -- for 40 to
10 45 seconds.  And you compare that to data on what causes
11 third-degree burns to skin versus temperature.
12   Q.  Right.  Now, is that somebody's, like, skin,
13 like, you know, a person or a child walking around, or
14 is this table based upon burns -- third-degree burns to
15 cadaver skin?
16   A.  I'm almost certain that they would do it on
17 cadaver skin instead of real people.
18   Q.  Okay.  Didn't know.
19   A.  There's a whole bunch of protocols --
20      MR. KRISTAL:  You'd be hard pressed to get
21 through an IRB if you were burning people's skin.
22      THE WITNESS:  It may be also partially based
23 on accidents, you know what I'm saying.
24 BY MR. UPSHAW:
25   Q.  People do get burned, that's true.

Page 224

1  Okay.  And the skin in your opinion would look
2  the same, so you'd have to know that it was burned, or
3  third-degree burns on skin look like they would if you
4  were not burned?
5    A.  No, I'm not saying that at all.  I'm saying
6  that if you compare the amount of time and temperature
7  for the skin that was used in the DTL studies, in other
8  words, 140 degrees for 40 to 45 seconds, and you compare
9  it to what -- I'm trying to give a point of reference
10 for people that wouldn't understand what that means to
11 skin.  I'm just saying that third-degree burns are where
12 the skin is significantly damaged.
13   Q.  Right, which damage you would see.  It's
14 visible damage; right?  I mean, it's a third-degree
15 burn, not a first-degree burn or a second-degree burn.
16   A.  Exactly.  And there's --
17   Q.  Let me ask the question.  So if a skin sample
18 was left in this very high temperature water for
19 approximately 42 seconds over what this table 2 -- table
20 4-10 indicates, the skin would look pretty much cooked,
21 wouldn't you think?
22   A.  I would think.
23   Q.  Okay.
24   A.  But my point is -- my point isn't that.  My
25 point is different than that.  My point is simply that

Page 225

1  it's more likely than not that that skin is unreflective
2  of undamaged human skin.
3    Q.  All right  Got you
4    A.  Are we ready to move on?
5    Q.  Yes, sir
6    A.  The next study I want to talk about a little
7  bit is -- and the opinions I have is on the Maibach '86
8  dermal skin irritation study that begins on page -- my
9  document here talks about that beginning on page 55 of
10 Exhibit 7.
11   Q.  Section 4 5 6?
12   A.  Correct.  And this was a study where they were
13 looking at the impacts of putting glyphosate herbicide,
14 Roundup; Pine-Sol liquid, a so-called cleaner; Johnson's
15 Baby Shampoo, and Ivory liquid dishwashing detergent on
16 skin of human volunteers and looking for skin irritation
17 effects.
18   Q.  Okay  Who did this study?
19   A.  This was done by Maibach.
20   Q.  Okay  But at the California School of
21 Medicine?
22   A.  Right.
23   Q.  Okay  Not Monsanto?
24   A.  I believe they funded it.  I say they
25 contracted with Maibach to do this work.

57 (Pages 222 to 225)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 226

1  Q. Oh, okay.
2  A. It was their funding.
3      They did five sets of experiments as I've
4  indicated there below. Only the first one really has
5  much relevance. We can get into that if you want or
6  not, but I'll say why I say that. The last three tests,
7  three, four and five -- and you'll see it represents a
8  large portion of the volunteers. They didn't see any
9  effects on anything put on the skin, so that tells you
10 that the test was kind of a null test.
11     In other words, either the skin area or
12 whatever was -- the way in which the methodology was set
13 up didn't result in any effects, whether it be water,
14 Johnson's Baby Shampoo, Pine-Sol, nothing. So there's
15 nothing to be learned from that.
16     Does that make any sense?
17 Q. Which tests are you referring to? 3 and 5?
18 A. 3, 4, and 5.
19 Q. 3, 4, and 5. That's not what you say in the
20 paragraph under there. I was just reading. It says,
21 "No skin effects were observed for any of the subjects
22 in tests 3 and 5."
23 A. 3 and 5.
24 Q. You just said "3, 4, and 5."
25 A. You are correct that that text is incorrect,

Page 227

1  but it should say "3, 4 and 5," because the number of
2  243 is the sum of 204 volunteers, 15 volunteers and 24
3  volunteers.
4  Q. So that's just a typo; right?
5  A. It's a typo.
6  Q. Okay.
7  A. And one of the comments I have -- or one of
8  the opinions I have is -- and we'll get to how this
9  information was transferred to EPA -- is that they refer
10 both to EPA and other public documents that these tests
11 were done on hundreds of volunteers. Well, technically
12 that's true, but in 84 percent of the subjects, there
13 was no observations of any kind, so you really can't
14 draw any conclusions one way or the other from that
15 data. The data that you can draw the most conclusions
16 from, when you go through this, is study number 1, which
17 I talk about at length in -- on page 56.
18 Q. So when you have a null response, you can't
19 draw any conclusion from that?
20 A. Generally, you wouldn't. And you have to look
21 at the test and how they did it. You have to look at
22 the amount of material that was applied, how long it was
23 applied, what surface area it was applied.
24 Q. Right. So you can't make that general
25 statement; right?

Page 228

1  A. What's that?
2  Q. That you can't draw a conclusion from a null
3  response test. You'd have to look at more of the
4  detail.
5  A. Well, I did look at the detail.
6  Q. I'm not questioning that. I was just
7  saying -- I'm questioning your statement.
8  A. I understand. But what I'm saying is those
9  experiments were intended to see if there were results,
10 and they didn't. So they're kind of null test results
11 because they just basically were done at low enough
12 levels that there weren't any effects seen for anything.
13     Now, the other -- the test 1 that they did
14 with 24 people, they basically used both what we call
15 unabraded and abraded skin.
16 Q. That's the acute irritation test?
17 A. Right, right.
18 Q. Okay.
19 A. And remember, most of the OSHA -- or not
20 OSHA -- EPA signal words are based on acute exposures,
21 not chronic or subchronic. So that's why I say this
22 test is of interest, because remember, there's that
23 whole section on acute irritation.
24 Q. All right.
25 A. And what they did was they -- as I've said in

Page 229

1  the information at the top of the page, there are really
2  six categories of observation: Zero, meaning a negative
3  reaction; plus or minus equivocal, meaning we can't
4  really tell -- I'm sorry. I should have moved you to
5  56.
6  Q. It's all right. I'm there
7  A. You begin to see effects with when the
8  classification is given a number 1. "Erythema" means
9  reddening of the skin -- erythema, then duration. So
10 each of these numbers represents an increasing skin
11 irritation effect, if you will. 1 is not as bad as 4.
12     Does that make any sense?
13 Q. Yes. Go ahead
14 A. So I took their data, and for -- they
15 tested -- water was obviously used as kind of a control.
16 And then they also looked at Johnson's Baby Shampoo, the
17 dish washing detergent, the liquid cleaner, and then the
18 glyphosate herbicide. And I just presented the data for
19 both the abraded and unabraded skin. They did
20 observations at 24 hours and 48 hours in both cases.
21 That's what's shown on the table. And so what you look
22 for is, out of the 24 people or so, how many show
23 various degrees of irritation.
24     So pick a row. For the glyphosate level 2,
25 they didn't see that in any of the samples, right, zero,

58 (Pages 226 to 229)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 230

1    zero, zero, zero.  For erythema 1, they see effects at
2    48 hours for one person.  On the abraded skin, they see
3    10 at 24 hours and 8 at 48 hours.  And you can look at
4    the data similarly.
5        So what I did was, I said, okay, how do we
6    aggregate this?  I said, well, I really don't care about
7    any of the data that's equivocal because we don't
8    know -- we can't draw any conclusions from that, or it
9    would be zero.  What I care about is any data where we
10   show effects 1, 2, 3, 4, et cetera.  So -- and I care
11   about the effects both of abraded and unabraded skin,
12   because in the workplace, we know dermally that abraded
13   skin, which is just skin that's been rubbed raw that's
14   not -- we call it nonvirgin skin -- is always going to
15   have higher dermal transfer rates than unabraded skin.
16   And you sort of see the irritation effects here reflect
17   that.
18       So I said, let's add up all the effects seen
19   by the various materials, whether it be unabraded or
20   abraded skin.  For glyphosate, as I say on the top of
21   page 57 -- well, it's actually the Roundup herbicide.
22   There's 19 total observations, 1 non-abraded skin and 18
23   on abraded skin, and that comes from -- if you look on
24   table 4-11 on the previous page, you can see the 1 comes
25   from the 48-hour result, and the 18 for the abraded come

Page 231

1    from the 24, which is 10, and the 48, which is 8.
2        Q.  Just to be clear, on the abraded skin under
3    "Glyphosate Herbicide," the way you have the table set
4    up is there were an additional eight people at the
5    48-hour point or two people got better?
6        A.  Well, that's an -- you're very observant, and
7    I have no idea how they got better.  But, apparently,
8    the irritation diminished on 2 of the 10.  It wasn't
9    there anymore.
10       Q.  You just added them all together, though.
11       A.  Yeah, because --
12       Q.  It should have been 11 in the subjects.
13       A.  No.  Why would it be 11?
14       Q.  You just said it's possible that two of them,
15   the erythema went away in 48 hours.
16       MR. KRISTAL:  Well, it may not be the same
17   people.
18   BY MR. UPSHAW:
19       Q.  Or it may not be the same people.  That's what
20   I'm saying.  So it could be 19, but it could be 11.
21       A.  No, no, no.  There's 24 people -- 24
22   volunteers in this study, always 24.  And so if you add
23   up -- if you go vertically on these, you always get to
24   24.  Does that make sense?  In other words, in the first
25   unabraded 24 hours for glyphosate, you add all the

Page 232

1    numbers and you get to 24.
2        If you go to the unabraded, you add all the
3    numbers up, it's 1 and 23, you get to 24.  Similarly,
4    you can move across and you add those up, you'll get to
5    24.  In the last column, you get to 24.
6    BY MR. UPSHAW:
7        Q.  Right.  So if you look at that, when you add
8    them up, under "Abraded," under "Glyphosate Herbicide,"
9    in 24 hours, four people had an equivocal reaction; and
10   at 48 hours, of the 24 people, 6 people had an equivocal
11   reaction.  So 2 of the 10 people at 24-hour erythema
12   actually got better and moved up?
13       A.  No.  There were two that got worse on the
14   equivocal; right?
15       Q.  No.  You have more equivocal at 48 hours.
16       A.  We said the same thing.
17       Q.  So they didn't get worse.
18       A.  Well, there were more in the -- yes.  There
19   were more in the equivocal category at 48 hours than
20   there were at the 24 hours; that is true.
21       Q.  Right.  So two of the -- if it's the same
22   number at erythema -- which is a worse category; right?
23       A.  Right.
24       Q.  There were 10 of them?
25       A.  Right.

Page 233

1        Q.  When they looked at them again after an
2    additional 48 hours, there were only 8 of them?
3        MR. KRISTAL:  Object to form.
4        A.  Right.
5        Q.  I'm trying to just follow the numbers so we're
6    all on the same page.
7        A.  All I'm saying is I'm simply adding up the
8    number of people events recorded.
9        Q.  But you said you don't include the equivocal?
10       A.  I do not, because "equivocal" means they're
11   not sure.
12       Q.  Okay.
13       A.  I'm not adding equivocal into anybody.
14   "Equivocal" means, by definition, we just don't know;
15   maybe, maybe not.  So I think, well, that's not really
16   fair to add those in one way or the other.  We just
17   don't know.  That's my choice.
18       I did the same thing for all the other
19   materials.  And what you end up with is, in terms of
20   total people events, you end up with the Roundup at 19,
21   the all-purpose liquid cleaner at 11, the dish washing
22   detergent at 16; baby shampoo, zero; water, zero.  So
23   the difficulty that -- my opinion is that when -- and
24   there are statements made, and I can go back and find
25   them for you if you want, but there are marketing

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

## Page 234

1  statements made -- well, they're not only marketing
2  statements made.  I think Donna Farmer said it as well,
3  that the Roundup is no less irritating than shampoo;
4  it's just not true.
5      Q.  Based on this study?
6      A.  Well, that's what -- that's what -- that's
7  what was submitted.  At the bottom of this page, this is
8  what was submitted to EPA.  If you look at the very last
9  paragraph it says, on page 57, "Monsanto is now
10  submitting a report entitled 'Irritation, Sensitization,
11  Photoirritation and Photosensitization Assays with
12  Glyphosate Herbicide'" by Maibach, California Berkeley,
13  '86.
14      "In this study, it was evaluated for acute --
15  or cumulative irritation in 346 volunteers.  These data
16  show that glyphosate herbicide was less irritating than
17  standard liquid dishwashing detergent and general
18  purpose -- all-purpose cleaner."  And as I show above,
19  that's not true.
20      Q.  When you take out all the other -- when you
21  take out everything else other than the glyphosate
22  herbicide?
23      A.  Well, no, you just --
24      Q.  I'm sorry.  When you take out all the other
25  tests other than acute irritation?

## Page 235

1      A.  Well, yeah, but clearly they're referring to
2  this test.  They're not referring to those other -- they
3  mix and match.  In this sentence, they're combining all
4  five experiments with the results from a single
5  experiment.
6      Q.  I don't know.  Let's see.  Let's read that
7  again together.
8      "In this study, glyphosate herbicide was
9  evaluated for acute irritation, cumulative irritation,
10  photoirritation, allergic and photoallergic potential in
11  346 human volunteers."
12      Is that accurate so far?
13      A.  I'm not getting -- that's the other issue.  If
14  you look at the bottom of 55, and I -- from these five
15  tests, I have 290.
16      Q.  Right.  So there's some discrepancy in the
17  total number.
18      A.  That's not my main point, though.
19      Q.  I get you.  I understand.  You're saying they
20  relied on this data.  I'm trying to find out where you
21  find that this statement made by Monsanto is inaccurate.
22      So you're saying that the 346 human volunteers
23  may be inaccurate.  We don't know; that could just be
24  mathematical; right?
25      A.  Yeah.

## Page 236

1      Q.  Okay.
2      A.  My comment comes after the next sentence.
3      Q.  Right.  And then you said -- then the next
4  sentence is, "These data show glyphosate herbicide was
5  less irritating than a standard liquid dishwashing
6  detergent and a general all-purpose cleaner."
7      And you say that that's a false statement
8  because of the work you did on page 57 in adding up the
9  numbers with regard to --
10      A.  Where there's actual irritation seen.
11      Q.  -- the one test, not all five, the one test,
12  which was acute irritation.  I just want to make sure
13  I'm clear on your opinion.
14      A.  I'm saying, when they make the statement --
15  regardless of that, if you look at this data, and you
16  make that statement, it's not true.
17      Q.  Okay.  But you get to that opinion because you
18  discount all the other data and you only look at the
19  acute irritation data; is that correct?
20      A.  No.  I don't even have to do that.  All I have
21  to do is look at -- logically, that doesn't make sense.
22  In other words, regardless of what the other data said,
23  if -- that statement doesn't apply to this set of data.
24      If you wanted to use that overall statement,
25  you would have to clarify it for the specific test to

## Page 237

1  say that, but I don't know how you'd say that in the
2  face of the fact that one of the tests proves that not
3  to be true.  Does that make any sense?
4      Q.  Okay.
5      A.  You can't make that general statement when you
6  have a subset of the data that clearly shows it not to
7  be true.
8      Q.  Right, but even if this statement is correct
9  when you look at all the data?
10      A.  How could it be?
11      Q.  You're the scientist.
12      A.  I'm just saying --
13      Q.  If you look at 346 or 290 people --
14      A.  But the other results show nothing.  So let's
15  add all of them in and it's all zeros, right.  It's all
16  in the zero category.  Then when you add the data up, we
17  just add -- whether it's the balance of however many
18  there are, we're just going to add 19 to that total or
19  11 to that total.
20      Do you see what I'm saying?
21      Q.  I do.
22      A.  So it's still not going to change the fact
23  that the glyphosate number's greater than -- if you add
24  a bunch of cases where they're all -- they don't show
25  any effect, it's not going to help you with the math in

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 238

1    the sense that if I have 19 of 24 or I have 19 of 300,
2    and the balance from 24 to 300 are all zeros in terms of
3    irritation, it's not going to make those numbers
4    flip-flop.
5        Q.   Okay.  Was that the conclusion that Maibach
6    came to in 1983 and a subsequent study in 1986?  Did he
7    agree with you?  Did he come out afterwards and say
8    Monsanto was totally wrong about my data?
9        A.   I don't have any correspondence to know one
10   way or the other.  All I'm telling you is what we do
11   have is we have -- this is during the period where
12   Monsanto was trying to get the -- get the word "caution"
13   as a signal word rather than "warning," and they're
14   using this work to influence the EPA into making that
15   decision.  That's what I'm saying.
16       Q.   And when you say "using it to influence the
17   EPA," you mean they submitted it to the EPA?
18       A.   That's what this says.  This is the cover
19   letter.
20       Q.   I understand that.  I'm just asking you
21   questions about your word "influence" versus
22   "submission."
23            Any submission would influence the EPA; right?
24       A.   Well, it's influencing them to get away from
25   having to use worker safety rules, but it was also being

Page 239

1    used -- at that time, when you look at the balance of
2    the correspondence, there's a whole series of
3    correspondence in 1987 through 1992 where Monsanto
4    clearly wants to move away from -- to the word "caution"
5    as opposed to "warning."  I say that's influence.
6            Now, you can have good influence or bad
7    influence.  I'm not commenting -- I don't think that
8    that's appropriate, but it's certainly -- this letter is
9    clearly an attempt to use this study to influence the
10   EPA.
11       Q.   Okay.
12       A.   And I don't think it -- it certainly
13   doesn't -- in terms of a standard of care, it's not
14   doing what's necessary to minimize the exposure of end
15   users to hazardous materials, in this case Roundup,
16   because the movement of the word from -- we talked
17   about -- from the marketing studies, at other times
18   during my deposition, we've talked about the
19   implications of using the different signal words.
20   Specifically, I'm interested in this because it impacts
21   the dermal exposure portion, which we've talked about at
22   length, meaning that's the majority of exposure that end
23   users would typically see to the Roundup product.
24       Q.   Are there glyphosate products, Roundup
25   products, that use the word "warning"?

Page 240

1        A.   Use the word "warning"?
2        Q.   As the signal word that you've been talking
3    about.
4        A.   Well, I don't know that that's necessarily
5    a signal -- the signal words traditionally -- acute
6    signal words have been "danger" -- I drew a blank.
7    "Danger" -- I drew a blank.
8            MR. KRISTAL:  It's been a long day.
9            THE WITNESS:  "Danger," "warning," and
10   "caution."
11   BY MR. UPSHAW:
12       Q.   Okay.  Right.  So "warning" is one of the
13   signal words; right?
14       A.   It is.  And I apologize.
15       Q.   I was a little worried there for a second
16   because we talked a lot about that.
17       A.   Yeah, yeah.
18       Q.   And we're going to make sure -- I was going to
19   make sure you got back to where we needed to be.
20       A.   Thank you.
21       Q.   Now, are there products -- are there Roundup
22   products that use the signal word "warning" in their
23   labeling?
24       A.   Early on, there were.  And I show some of
25   those in this document.

Page 241

1        Q.   Is it your testimony that since the EPA has
2    had the Maibach '83 and '86 studies submitted by
3    Monsanto, that they have been somehow influenced to only
4    use the word "caution" as the signal word since then?
5            MR. KRISTAL:  Object to the form of the
6    question.
7        A.   It was part of that process.  In other words,
8    I think I just testified to the fact that there was a
9    lot of back and forth still going on in '88 through '92
10   where the EPA wanted the word -- they're suggesting the
11   word "warning" should be used and that PPE should be
12   used.  Particularly, they were concerned about some of
13   the advertising that showed workers without any dermal
14   protection at all.  They were in shorts and short-sleeve
15   shirts.  And so there was that back and forth in '88 and
16   '92, so -- but they're still using that as part of their
17   overall effort to see that that word gets changed from
18   "warning" to "caution."
19            But yes, early on, in fact, the very first
20   warning was "danger," as I recall.
21       Q.   Let me step back because you said "they," and
22   I want to make sure that we keep clear that "they" is
23   not EPA or Monsanto, that we're not interchanging them.
24            So can you read that back for me, Matt?  I
25   don't want to misquote him.

61 (Pages 238 to 241)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 242

1      (The preceding answer was read back by the
2  reporter.)
3  BY MR. UPSHAW:
4      Q.  So you said "they're still using that."
5      A.  I'm saying that --
6      Q.  Who's the "they're"?
7      A.  "They" would be Monsanto.
8      Q.  Okay.  I was making sure it wasn't EPA is
9  still using it.  That's where I was confused.
10     A.  Yes.
11     Q.  So it's your contention -- testimony that
12  Monsanto is still using the Maibach test when it submits
13  registrations for new products since 1990?
14     A.  No, that's an interesting slice of a question.
15  The -- what they submit now, as I recall for
16  re-registration, is some rabbit studies I think for
17  acute dermal toxicity.
18     Q.  I didn't mean to mislead you.
19     A.  But they don't necessarily submit -- because
20  that issue supposedly is resolved, they don't resubmit
21  information on the dermal irritation.
22     Q.  I wasn't asking about re-registration.  I was
23  asking about new product registration, which is not
24  re-registration.  And you are aware that when a new
25  product is registered, they have to resubmit the entire

Page 243

1  package, not the re-registration package; right?  You
2  know that; right?
3      A.  We had that conversation this morning.  And in
4  general that's true, but I thought that if there were
5  slight variance, that in some cases they wouldn't have
6  to.
7      Q.  Okay.
8      A.  But it's not a part of my opinions one way or
9  the other.
10     Q.  Well, you made the statement that Monsanto is
11  still using this Maibach test, the '83 and '86 test.
12  I'm questioning that statement.
13         MR. KRISTAL:  I think you're --
14         MR. UPSHAW:  I appreciate your input here,
15  Jerry.
16         MR. KRISTAL:  Go ahead.  I think you used the
17  word still differently than Mr. Petty.
18         THE WITNESS:  They're -- I don't believe that
19  the -- and we haven't gotten to the '83 -- well, we
20  have briefly, the '83 study.  But to my knowledge,
21  there is not any additional dermal irritation study
22  beyond the '86 Maibach.  I've not seen it in any
23  production.
24  BY MR. UPSHAW:
25     Q.  Okay.  All right.  So you said we haven't

Page 244

1  gotten to the '83 study?  That's not what we've been
2  talking about?
3      A.  We're talking about '86, Maibach '86.
4         MR. KRISTAL:  So we may back up to '83.
5         THE WITNESS:  So the next one hopefully will
6  be '83.
7         So we have touched on the '83 study for a
8  different reason, where I said it's clear the
9  dermal irritation for Roundup as a product occurs
10  more quickly than with glyphosate alone, and that
11  was the figures on pages 69 and 72.  So we touched
12  on the Biodynamics '83 study, which is different
13  than the Maibach '86 study.
14  BY MR. UPSHAW:
15     Q.  Okay.
16     A.  I just want to make sure we're all on the same
17  page.
18         And so this study clearly shows dermal
19  irritation in animals as early as the end of one week,
20  including edema.
21     Q.  Not animals.  Guinea pigs?
22     A.  Well, a guinea pig's an animal.
23     Q.  True.  But we're being a little more specific
24  than an animal.
25     A.  That's fine.

Page 245

1         And so we talked about that before, that I
2  think it's clear from this study that my opinion would
3  be that Roundup sensitizes the skin more quickly than
4  glyphosate alone.  Again, that's based on this study,
5  but it's also based -- remember I talked about that
6  earlier Roundup testimony about effects on human skin?
7  Part of it was irritation associated with a surfactant.
8      Q.  Your testimony?
9      A.  Well, no, no.  It's actual -- I was citing the
10  language on pages 66 and 67 from Monsanto, regarding the
11  fact -- specifically items 5 and 6, that the surfactant
12  is a factor in causing irritation of the skin.
13         Well, we -- that isn't a surprise when they
14  say that in 2001, because in 1983, they've got these
15  results in hand which clearly show, if you look at these
16  two figures, as you move from left to right, you're
17  going out in time.
18     Q.  What two figures are you looking at?
19     A.  The figures on pages 69 and 70 -- or 72.
20     Q.  72
21     A.  And the first one, recall, is Monsanto
22  formulation.
23     Q.  That's 4-22  I'm just trying to keep up with
24  you
25     A.  Yeah.  And the second figure is 4-23 on page

62 (Pages 242 to 245)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 246

1    72, and that's for glyphosate.  That's how it's defined.
2    And what you see is you see irritation effects,
3    including edema, beginning in the first period under
4    what they call 3.
5         Now, appreciate if you go back and look at
6    this, it's a little confusing.  But 1, 2, 3 represent
7    the first week.  4, 5, 6 represent test results from the
8    second week.  And 7, 8, 9 represent test results from
9    the third week.
10        Is that clear?
11   Q.   Sure.  So if you look at column 3 at 24 --
12   A.   You're starting to see some effects.
13   Q.   So it's saying that one animal had some edema
14   effect?
15   A.   Well, no.  There's multiple animals here,
16   right.  1, 2, 3, 4, 5, 6, 7, 8, 9, 10.  So you're seeing
17   1s and edema.  They're seeing -- I define what those
18   mean on the next page in table 4-12, just FYI, but
19   you're seeing the first animal, the second animal, the
20   third animal, the fourth animal --
21   Q.   Got it.
22   A.   -- et cetera.  So there's multiple animals --
23   there's some animals that don't see effects.  There's
24   three of them, I think.
25   Q.   7 out of 10.

Page 247

1    A.   Yeah.  But if you go and look at -- so if you
2    look at Roundup versus glyphosate, you don't see any
3    real effects show up.  The very first time you see one
4    is in the column marked 6, where 1 animal out of the 10
5    has a 1.
6    Q.   At 24?
7    A.   Yeah, it's at the end of week 2, after 24
8    hours.  They basically did some exposures three days a
9    week and then they looked at the results at 24 and 48
10   hours.  It's a little confusing until you go back and
11   read the thing.  But, basically, it's a three-week
12   study, and so you have three -- you have three events --
13   well, not three events.  You have data from three
14   different periods -- well, how would I say that?
15        You're looking at the animal six times a week.
16   I guess that's the best way to describe it.  And it's
17   clear that certainly before the end of the first week,
18   Roundup formulation irritates the skin of these guinea
19   pigs long before it irritates the skin of guinea pigs
20   when they're just using glyphosate alone.
21   Q.   And that was to be expected because the
22   surfactant's a skin irritant?
23   A.   I don't know if it's to be expected in 1983 or
24   not, but certainly by 2001, we have independently
25   information from Monsanto that they understood that.

Page 248

1    Q.   You would agree that soap is a skin irritant?
2    A.   It can be.  It depends.
3    Q.   How about other tallow amines, you know,
4    animal fat?
5    A.   I just haven't looked into that.  I'm just
6    looking at the POEA and what the literature is saying
7    about that.
8    Q.   Do you know what POEA is?
9    A.   Yeah.  It's a polyoxylated [sic] ethylene
10   alkylamine.
11   Q.   Tallow amine.
12   A.   Tallow amine?
13   Q.   Tallow amine.
14   A.   I did look it up.  I've got to find it.  I
15   looked it up because it's got an abstract service
16   number, CAS number.  I just need to find it.
17        MR. KRISTAL:  I think that's Idi Amin's
18   brother.
19        MR. UPSHAW:  Coming in hot and heavy today.
20        MR. KRISTAL:  You're getting all this down,
21   right, Matt?
22        MR. UPSHAW:  He gets paid by the joke.
23        THE WITNESS:  Page 20.
24   BY MR. UPSHAW:
25   Q.   I'm getting there.  I knew it was in that

Page 249

1    area.
2    A.   He was laying in the weeds.
3    Q.   I was close.  I wasn't there yet.
4    A.   So the second paragraph on page 20, the MSDS
5    gives that CAS number, which is defined as PEG-10,
6    hydrogenated tallow amine, or other words, POEA.
7    Q.   Right.  So tallow amine.
8    A.   So what's the question?
9    Q.   The question was did you know what POEA was,
10   and you gave me something else, and I said, "It's tallow
11   amine," and you said, "Let me look it up."
12   A.   Well, the same substance can have different
13   names.
14   Q.   True.
15   A.   So what I'm saying is POEA is short for
16   polyoxylated ethylene alkylamine.  So that -- it's not
17   unusual to see chem abstracts give a chem abstract's
18   definition and other people call it something else.
19   Q.   Right.  The whole point of calling it
20   something else is one is the chemical compound and the
21   other is a more colloquial term for it.
22        Tallow amine is animal fat, is it not?
23   A.   At some level it is, yes.  But this is treated
24   material.
25   Q.   Yeah, I know.  It's not like it's just boiled

63 (Pages 246 to 249)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 250

1   down, you know, pig fat. I understand it's a little
2   more surgical than that. But it's hydrogenated animal
3   fat, which is POEA?
4       MR. KRISTAL: Objection.
5   BY MR. UPSHAW:
6       Q. For the common person; right?
7       A. Well, it's -- we'll just call it POEA, and
8   that's how Monsanto refers to it in their formularies.
9       Q. There's more than one type of POEA, is there
10  not?
11      A. I'd have to look into that. It wasn't part of
12  my opinions.
13      Q. Okay. Okay. Were we done with Maibach?
14      A. Well, we were actually not on Maibach. We
15  were -- you like Maibach '86, but we were on --
16      Q. No, I thought we were on Maibach '83, and you
17  just told me about the --
18      A. No, it's not Maibach '83. It's Biodynamics
19  '83, Maibach '86.
20      Q. Okay. Well, I guess I'm confused. Hold on.
21  I want to make sure I'm not doing this wrong.
22      A. I'm talking about the stuff that begins on
23  page 68, with the guinea pigs.
24      Q. Right.
25      A. You keep calling it Maibach.

Page 251

1       Q. It's not?
2       A. It's by Biodynamics.
3       Q. I thought myself and Mr. Kristal called that
4   '83 and '86. I guess we were not right.
5       A. '86, if you go back to -- now, the confusion
6   may lie in the fact that there was a Maibach '83 that's
7   on page 57.
8       Q. Right.
9       A. But that's different than what we've been
10  talking about on the tables on pages 69 and 72, which is
11  work by Biodynamics, because we moved from --
12      Q. All right.
13      A. We've moved from the dermal absorption studies
14  to the two studies that are associated with irritation.
15      Q. So what we're talking about with the guinea
16  pigs is '83 Biodynamics study?
17      A. Right. There were actually -- there were
18  actually two studies. One was with the Roundup
19  formulation, and one was with the glyphosate.
20      Q. Okay. All right. Anything else on those? I
21  think you told us how those fit into your -- or support
22  your general opinion; right? I want to give you a
23  chance to say that if you did not.
24      A. I believe that that's -- yes, I think we
25  covered it.

Page 252

1       Q. Okay
2       A. We may have covered the UK POEM yesterday to
3   some extent, but it would fall into the same opinions
4   that the -- that the -- clearly, the work by Monsanto
5   shows that even with, I'll call it, conservative
6   assumptions in terms of PPE and dermal penetration
7   through the PPE -- this is the infamous where they
8   assume only 10 percent or 5 percent of the material gets
9   through -- that in most of the cases, they still exceed
10  the normalized .2 milligram per kilogram body weight per
11  day recommended limits. And when you take less
12  conservative assumptions, they greatly exceed those.
13      So there's clear knowledge here that without
14  adequate dermal PPE, you're not meeting a standard of
15  care of being protective of end users in terms of
16  minimizing their exposure risks.
17      Q. Oh, so this goes back to -- okay   The
18  standard of care
19      A. Yeah. All of these go back to whether or not
20  Monsanto met their own industry or governmental standard
21  of care to protect end users or minimize end users'
22  exposure to Monsanto products. And, again, since dermal
23  is by all accounts -- even here, on page 77, you'll see
24  that the -- at the very bottom of the page, Monsanto is
25  saying that the inhalation portion of the calculated

Page 253

1   exposure's 17.6 percent, and the dermal is 82.4.
2       This is not the only place that that sort of
3   information is out there; that is, that dermal is the
4   primary root of exposure for end users of Roundup. So
5   that's -- that's really why I focus so much on the
6   dermal side of the equation, both with respect to the
7   studies as well as respect to adequacy of warnings, in
8   terms of what caution words were used and whether or not
9   the standard of care of minimizing those exposures -- or
10  minimizing the exposure level to end users was met.
11      And my conclusion with respect to that, with
12  respect to what Monsanto's standard of care was,
13  industry's or governmental, is that they didn't meet
14  those standards of care.
15      Q. They did not?
16      A. They did not. And those conclusions would
17  roll up from a lot of information shown in Section 9 of
18  this document.
19      Q. Okay   Are we there yet, or do you need to go
20  over the EPA model?
21      A. I think we've covered that yesterday, that it
22  would support my opinions, because you see the dramatic
23  impact of -- on page 80, for instance, in figure 4-29,
24  the dramatic impact of simply gloves and no gloves --
25  protective gloves, by the way.

64 (Pages 250 to 253)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 254

1    Q.  And what makes these gloves protective?
2    A.  Because you see a dramatic decrease -- a
3  factor of 5 decrease.  You wouldn't see that if you just
4  had cotton gloves on because they're not protective.
5    Q.  So this test was with cotton gloves?
6    A.  No, no.  I'm saying this had to be protective
7  gloves because you see the dramatic decrease in
8  normalized transfer rate from 75.4, no gloves, 75.6, no
9  gloves, to 19.3.  That's a drop of almost 5, a factor of
10 5.
11   Q.  What's the difference between an open transfer
12 system and a closed transfer system?
13   A.  An open transfer system would be -- well,
14 generally, an open -- from an engineering standpoint, an
15 open system is where the operation takes place with
16 one -- where the product is open to the atmosphere.  A
17 closed system is usually where it's enclosed within
18 piping, valves, pumps, tanks.
19       Now, all those systems can leak.  That's where
20 you would get your exposure.  But, generally, you're
21 trying to contain the process.  This goes back to the
22 whole concept -- industrial hygiene concept of how you
23 protect -- they call it the hierarchy of controls.
24       Have you ever heard of that?
25   Q.  Why don't you tell me?

Page 255

1    A.  It's the concept in industrial hygiene when
2  you're trying to protect workers or individuals from
3  exposure to a hazardous substance.  There are four ways
4  that typically you can do that, in order of priority.
5  The first is substitution; that is, get the product out
6  of the process so that it's just not available for
7  exposure.  That's the ideal solution.
8        The second is what we call engineering
9  controls.  And "engineering controls" means simply that
10 you enclose the chemicals of concern inside containers.
11 They contain them so that they're not open and -- open
12 to people, like an open tank versus a closed tank.
13 Engineering controls are you contain the product so it
14 doesn't get out to an individual.
15       The third is administrative controls, which
16 means -- my words are you don't let the person spend
17 time in the area where there is potential exposure.  In
18 other words, you keep them out of there.
19       And then the last and least desirable set of
20 controls is personal protective equipment, meaning, you
21 know, appropriate gloves, respirator, aprons,
22 appropriate shirts or pants that are -- so that the
23 material can't get to the individuals, either to their
24 lungs or to their skin.  And the reason they're the
25 least desirable is because industrial hygiene experience

Page 256

1  is particularly in hot --
2        I don't know if you've ever had an opportunity
3  to wear a respirator when it's like 100 degrees, but
4  it's really hard because it puts an additional burden on
5  you to actually breathe through it, but also it gets so
6  sweaty, and it's just -- what you find in the real world
7  is that people will break the seals or they won't wear
8  them because they're just so uncomfortable.  So we know
9  from the human-factor side, as we talked about earlier,
10 from an industrial human-factor standpoint, that that's
11 the least desirable in the industrial hygiene hierarchy
12 of controls method to protect workers.
13       I just sort of wanted -- when you asked about
14 an open transfer system and a closed one, that really is
15 kind of an engineering controls concept on paper, and
16 that's why you see a dramatic difference in exposures
17 here, because if the process is enclosed, you're much
18 less likely to be exposed to the product than if it's in
19 an open system.
20   Q.  Thank you.  I actually meant:  Why would they
21 be looking at an open transfer system versus a closed
22 transfer system in this particular study, which is at
23 Exhibit 840 -- 481?
24   A.  I'm not certain, but the open transfer system
25 would be a system where -- for instance, say you were

Page 257

1  mixing a product.  You were taking a concentrate and
2  mixing it with water.  The open system would be one
3  where you had an open tank or vessel or sprayer or
4  whatever, and you're dropping both the concentrate and
5  the product and mixing them in an open container.
6        Whereas a closed system, theoretically, would
7  be where they're closed, and they're being piped into
8  that container and mixed.  I don't know the specific
9  details.  They're not -- they don't specify in here
10 necessarily, but I know from an industrial hygiene
11 hierarchy of controls and looking at the data itself, it
12 tells you that -- it shows you what you would expect,
13 that if you have a closed system, you're going to have
14 less exposure than if you have an open system.
15   Q.  So the reason you added Section 4.5.9 to your
16 factual summary in support of your opinions that you are
17 going to give us in this case all comes down to the last
18 line of that section on page 81, which is, "Clearly
19 gloves can have a dramatic effect on dermal doses"?
20   A.  That's what -- that's what this data, as well
21 as the -- I'm also combining that Office of Pesticides
22 Program in there as well, so I don't want to leave you
23 confused.  There's two particular studies that I'm
24 referring to, but in both cases I'm just illustrating
25 the impact the gloves by themselves have.

65 (Pages 254 to 257)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 258

1    Q.  So long pants and long sleeves, in your
2  determination, didn't have as much impact as to whether
3  there were gloves or no gloves?
4        A.  Well, you -- the difference is movement from
5  no gloves and short sleeves to long sleeves and no
6  gloves.  So whatever --
7        Q.  The other way around.  Go ahead.  Moving us
8  from long sleeves and gloves to short sleeves and no
9  gloves.  You just mixed them up.  Don't worry about it.
10       A.  Well, I don't know how those studies were done
11  in which order.  It doesn't really matter.  What does
12  matter is that if you have no gloves and short sleeves,
13  you have a much higher exposure than -- because long
14  pants appear to be the same in both cases.  But if you
15  have no gloves and short sleeves versus gloves and long
16  sleeves, your dermal exposures are greatly increased.
17       Q.  Okay.  So when you say at the end, "Clearly,
18  gloves have a dramatic effect on dermal doses," that's
19  not really a whole truth to the statement, is it, based
20  upon what you just went over here?
21       A.  Well, then I -- I also look at that because we
22  don't -- they don't separate out the effect of having
23  short sleeves and long sleeves.  But appreciate that
24  that's not PPE anyway.
25             But what I did do is I went to the U.S. EPA

Page 259

1  pesticide handler unit exposure reference tables just to
2  see what the impact was on gloves alone for two
3  different scenarios.
4        Q   Okay
5        A.  One is a mixer-loader using a manualized,
6  pressurized hand wand, et cetera -- there's a lot of
7  data there, but I picked two of them that kind of go
8  across the range of data.  And in that case, the
9  no-gloves only unit exposure is 100,000 micrograms per
10  pound of glyphosate -- or AI, and the gloves unit
11  exposure, it drops it from 100,000 to 430.  Pretty
12  dramatic, a factor of under 1,000, but between 500 and
13  1,000.
14             On the mixer-loader applicator using the
15  equipment that's specified there, the no-glove scenario
16  has a unit exposure that's about a factor of three
17  greater than where you have gloves.  So you can see that
18  the glove effects alone have unit exposure factors
19  between -- somewhere between about 3 and 500 increase in
20  exposure just from gloves alone.
21       Q   Okay
22       A.  So, you know, I would say that the -- that
23  statement's mostly referring to those unit exposure
24  factors.
25       Q   The ones right above it?

Page 260

1        A.  Yes.
2        Q.  Okay.  Anything else on the dermal studies?
3        A.  Not that I can think of.
4        Q.  Okay.  Do you agree that all inert ingredients
5  must be approved by EPA before they can be included in a
6  pesticide?
7        A.  That's kind of a yes or no answer.  Certainly,
8  they have the responsibility to approve them, but
9  it's -- again, it's based on the information they
10  provided.  The affirmative duty to provide data that
11  helps them make that decision is on the applicant.
12       Q.  In fact, EPA discusses inert ingredients on
13  its web page.  You say that on page 21 of your factual
14  summary, don't you?
15       A.  Your question again, I'm sorry, as I flip
16  through this?
17       Q.  That the EPA discusses what "inert
18  ingredients" means on its web page, and you refer to
19  that specifically on page 21 of your factual summary;
20  correct?
21       A.  Correct.
22       Q.  And you state right there that the EPA says,
23  "All inert ingredients must be approved by EPA before
24  they can be included in a pesticide."
25       A.  Okay.  But, I mean, my answer to the

Page 261

1  question --
2        Q.  But that's not a yes or no question.  I mean,
3  that's not a yes and no response.
4        A.  It is to the extent that the approval is
5  there, certainly, but it's predicated on the fact that
6  they're given information that allows them to make the
7  appropriate decision.
8        MR. UPSHAW:  When you discussed --
9        Yeah, let's take a break before I start
10  getting into all this, because I realize the time.
11       MR. KRISTAL:  How much longer are you going to
12  go?
13       MR. UPSHAW:  Well, that's up to you.
14       MR. KRISTAL:  I'm saying 9:30 to 5:30 is
15  reasonable, so...
16       MR. UPSHAW:  Is that reasonable for you?
17       THE REPORTER:  (Nods head.)
18       MR. KRISTAL:  Okay.
19       MR. UPSHAW:  We can take a break.  He needs a
20  finger break.
21       THE VIDEOGRAPHER:  Okay.  This --
22       MR. KRISTAL:  I'm not against taking a break.
23       THE VIDEOGRAPHER:  This marks the end of video
24  media disc number 4.  The time is 1704, and we're
25  going off the record.

66 (Pages 258 to 261)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 262

1       (Recess from 5 04 p m to 5:18 p m )
2       THE VIDEOGRAPHER: We're back on the video
3 record  This is the start of video media disc
4 number 5 of the deposition of Stephen Petty  The
5 time is 1718
6 BY MR UPSHAW:
7     Q  Okay, Mr Petty  We were talking about the
8 dermal studies  Is there another quick area we can
9 discuss this evening before we break?
10     A  Yes, sir.
11     Q  Okay  What would that be?
12     A  What I wanted to do is we pretty much covered
13 all of the material but one small area in the first
14 eight sections of this document, and I wanted to draw
15 your attention to -- I'll say page 21.  And what it has
16 to do with is some -- while I have the opinion that the
17 dermal exposure root is the major pathway, there is some
18 inhalation exposure pathway exposure, and I wanted to
19 comment on the method in which that exposure does occur.
20     And my opinion is simply that on the
21 inhalation side, it occurs as a result not of the
22 material evaporating, because it doesn't evaporate -- it
23 has a low vapor pressure -- but because of the aerosols,
24 the little particles of liquid that are created as part
25 of the spraying process.  And, specifically, what is

Page 263

1 shown on page 21 is using a formula called Stokes' Law,
2 which is a basic engineering concept, both in industrial
3 hygiene and in engineering, looking at how long
4 particles stay in the air or how fast they fall from a
5 given distance.
6     And what I'm showing on page 21 is that using
7 the mean particle diameter, mass medium aerodynamic
8 diameter of an aerosol product that Roundup claims
9 exists, which is 11 microns, that the time that a
10 particle stays in the air -- well, first of all, the
11 rate at which it falls based on Stokes' Law is about .74
12 feet per minute.  And in still air, that means it
13 drops -- it takes about 1.4 minutes to drop 1 foot or
14 about 81 seconds to drop a foot, or it means it takes
15 about eight and a half -- 8.15 minutes to drop 6 feet.
16     All that means is that when these particles
17 are emitted, they stay in the air for quite a while.
18 They don't just fall to the air in a second.  They
19 fall -- 6 feet, I'm saying based on Stokes' Law, it
20 would take almost eight minutes to get to the ground.
21 That's a long time.  And that's why, to the extent that
22 an inhalation exposure occurs, that's why it occurs,
23 because they're small particles and they stay in the air
24 for quite a while.
25     Q  Okay.  But when an inhalation exposure occurs,

Page 264

1 it's also insignificant when looking at the full
2 exposure of someone who's spraying; isn't that correct?
3     MR. KRISTAL:  Object to form.
4     A  It's less than dermal, but I wouldn't say it's
5 insignificant.
6     Q  It doesn't change the person's exposure
7 assessment to any detectable degree, does it?
8     A  No, I wouldn't agree with that.  If we go to
9 the POEM -- remember, we looked at the percentages and
10 it was like -- I want to say it was around 84 dermal
11 versus 16 inhalation --
12     Q  Okay.
13     A  -- something like that.  Well, if somebody
14 doesn't have respiratory protection, then that 16
15 percent exposure is not going to be a dose.  It goes
16 directly into the lungs.
17     So the question on the table is 16 percent, is
18 that significant or not.  I think it's significant from
19 an industrial hygiene standpoint, but it's certainly
20 less than the dermal.
21     Q  And how is it significant?  How does that play
22 into, when you are asked to do an exposure assessment
23 for someone, which you've told us you haven't been asked
24 to do in these cases -- if you were to do one, how would
25 you calculate in any portion of that exposure through

Page 265

1 inhalation?
2     A  If there was no respiratory protection,
3 and you would have to know the concentration of those --
4 what I would say is you would still have to know the
5 concentration of those particles in the air, and then at
6 that point that would be an exposure.
7     Q  Wait.  So you jumped from knowing the
8 concentration of the particles in the air to that would
9 be their exposure.  How do you get from A to B?
10     A  I didn't, but I'll explain.  What I was
11 calculating was if you have -- the mean diameter of
12 Monsanto Roundup products, according to this particular
13 study, was 11 microns.  So all I'm doing is saying if
14 you had one particle, and you said, okay, how long does
15 it take to fall a foot or how long does it take to fall
16 6 feet, it takes almost eight minutes for that one
17 particle to fall 6 feet.  And I'm just saying that means
18 that these particles are small, according to Stokes'
19 Law, and that they will stay in the air -- it takes a
20 long time to move the 6 feet.  The exposure is different
21 than that.  I'm just talking about how long it takes one
22 particle.
23     Now, obviously, you have lots of particles.
24 And what you have to know to do the exposure analysis is
25 different on inhalation.  You have to know the

67 (Pages 262 to 265)

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

---

Page 266

1  concentration; that is, how many particles are say in
2  a -- what's the concentration of glyphosate in a cubic
3  foot of air, a cubic meter.  You would have to know the
4  milligrams per cubic meter, some concentration, as
5  opposed to how fast they fall.  Does that make any
6  sense?
7      Q.  It does.  Let me ask the question, then:
8          Why raise this issue of potential inhalation
9  exposure?  What does that have to do with your opinions
10 in this case?
11     A.  It has to do with the fact that not only is
12 dermal protection important but inhalation protection is
13 important, maybe not quite as important, but it's still
14 important.  And the reason I'm -- many people might
15 think that these -- I'm trying to give perspective.
16 Many people -- and I've been in other cases where I've
17 done these sorts of analysis, and people are of the
18 impression that the particles will fall very quickly to
19 the ground.
20         And I think it's important to recognize that
21 the reason the exposure -- the inhalation exposure
22 exists isn't from the vapor, again; it's from the
23 particles.  But more importantly, the particles are very
24 small, and they stay in the air for a long time.  Eight
25 minutes to go 6 feet is a long time.  So that's

---

Page 267

1  important because it says we can't count on the fact
2  they're just going to drop to the ground; they're going
3  to hang around in the air, so that exposure is going to
4  be there unless there's some respiratory protection to
5  stop that exposure from occurring.
6      Q.  And I still don't understand how that fits
7  into any of the opinions that we've talked about.
8      A.  Well, there's not respiratory protection
9  required under the "caution" warnings.
10     Q.  So it's your opinion that because there's no
11 respiratory protection required under the warnings, then
12 that again --
13     A.  Under the "caution" warning.
14     Q.  Under the "caution" warning, then that again
15 is some failure to abide by some standard of care?
16     A.  From an -- I mean, appreciate that I'm not
17 limiting myself in terms of standard of care to simply
18 FIFRA.  What I'm saying is, as an industrial hygienist
19 and health and safety expert, my job is to look at
20 whether or not the standard of care to minimize exposure
21 occurred or not.  And part of that is not just the
22 dermal.  I've already commented at length on the dermal
23 exposure.
24         But I'm also here to say that while it's a --
25 I think we all agree it's less of an exposure, it's

---

Page 268

1  still a real exposure, and whether or not somebody
2  believes that 16 percent of the available exposure is
3  minimal or not, we'll let somebody else decide on that.
4  I don't think it's minimal.  I think it's real and it
5  still should be addressed as part of the standard of
6  care from an industrial hygiene standpoint.
7      Q.  Okay.  Anything else on that point?
8      A.  No.
9          MR. UPSHAW:  All right.  Let's break for the
10 evening, and we will reconvene tomorrow morning.
11         THE WITNESS:  Thank you, sir.
12         THE VIDEOGRAPHER:  This marks the end of video
13 media disc number 5.  The time is 1727 and we're
14 going off the record.
15         (Deposition adjourned at 5:27 p.m.)
16              - - -
17
18
19
20
21
22
23
24
25

---

Page 269

1              CERTIFICATE OF OATH
2
3  STATE OF FLORIDA  )
4  COUNTY OF BROWARD )
5
6
7      I, MATTHEW McKINNEY, Florida Professional
8  Reporter, Notary Public, State of Florida, certify that
9  STEPHEN E. PETTY personally appeared before me on
10 July 9, 2019, and was duly sworn, continuing to
11 July 10, 2019.
12
13     Signed this 15th day of July, 2019.
14
15
16         _____
           Matthew McKinney, FPR
           Notary Public, State of Florida
17         Commission No.:  GG 099111
           Expires: June 9, 2021
18
19
20
21
22
23         Personally Known_____
24         Or Produced Identification___X___
25         Type of Identification Produced___DL___

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Stephen E. Petty, P.E., C.I.H., C.S.P.
July 10, 2019

Page 270

```
 1              CERTIFICATE OF REPORTER
 2
 3    STATE OF FLORIDA  )
 4    COUNTY OF BROWARD )
 5
 6        I, MATTHEW McKINNEY, Florida Professional
 7    Reporter, do hereby certify that I was authorized to and
 8    did stenographically report the videotaped deposition of
 9    STEPHEN E. PETTY, Volume II, that a review of the
10    transcript was requested, and that the foregoing
11    transcript is a true and complete record of my
12    stenographic notes.
13
14        I FURTHER CERTIFY that I am not a relative,
15    employee, or attorney, or counsel of any of the parties,
16    nor am I a relative or employee of any of the parties'
17    attorney or counsel connected with the action, nor am I
18    financially interested in the action.
19
20        DATED this 15th day of July, 2019.
21
22
23
24
      _____
25          Matthew McKinney, FPR
```

Page 271

```
 1          DEPOSITION ERRATA SHEET
 2    Our Assignment No.: 12247
 3    Case Caption:    Walter Winston, et al.,
 4                vs.
 5          Monsanto Company.
 6
 7
 8        DECLARATION UNDER PENALTY OF PERJURY
 9
10        I declare under penalty of perjury that I have
11    read the entire transcript of my Deposition taken in the
12    captioned matter or the same has been read to me, and
13    the same is true and accurate, save and except for
14    changes and/or corrections, if any, as indicated by me
15    on the DEPOSITION ERRATA SHEET hereof, with the
16    understanding that I offer these changes as if still
17    under oath.
18
19        Signed on the _____ day of _____, 20___.
20
21
22
23    _____
24          STEPHEN E. PETTY
25
```

69 (Pages 270 to 271)