# EXHIBIT 7

Page 1

IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS

STATE OF MISSOURI

~~~~~~~~~~~~~~~~~~~~

WALTER WINSTON, et al.,

        Plaintiffs,


    vs.          Case No.  1822-CC0515


MONSANTO COMPANY,

        Defendant.

~~~~~~~~~~~~~~~~~~~~

Videotaped Deposition of

STEPHEN E. PETTY, P.E., C.I.H., C.S.P.

VOLUME IV



Tuesday, August 27, 2019
12:02 p.m.

Taken at:
EES Group, Inc.
6321 Irelan Place
Dublin, OH  43016


Michelle L. Harper, RPR

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

## Page 2

```
 1   APPEARANCES:
 2
 3   On behalf of the Plaintiffs:
 4       Weitz & Luxenberg, by
         ROBIN L  GREENWALD, ESQ
 5       New York Office
         700 Broadway
 6       New York, New York  10003
         212 558 5500
 7       rgreenwald@weitzlux com
 8
 9   On behalf of the Defendant:

10       McDermott Will & Emery, LLP, by
         ANTHONY N  UPSHAW, ESQ
         MELISSA R  ALVAREZ, ESQ
11       333 Southeast 2nd Avenue
         Suite 4500
12       Miami, Florida 33131
         305 347 6540
13       Aupshaw@mwe com
         Malvarez@mwe com
14
             ~ ~ ~ ~ ~
15
     ALSO PRESENT:
16
     BARRY HERSCH, VIDEOGRAPHER
17
             ~ ~ ~ ~ ~
18
19
20
21
22
23
24
25
```

## Page 3

```
 1            I N D E X
 2    EXAMINATION OF STEPHEN E. PETTY
 3    BY MR. UPSHAW:            7
 4
 5          EXHIBITS MARKED
 6    Exhibit 17, Notice of Deposition      19
 7    Exhibit 18, revised list of reliance   33
 8    materials
 9    Exhibit 19, Food and Agricultural     40
10    Organization (FAO) Reliance Documents
11    Exhibit 20, 1985 International Code of   40
12    Conduct on the Distribution and Use of
13    Pesticides
14    Exhibit 21, 2002 International Code of   41
15    Conduct on the Distribution and Use of
16    Pesticides
17    Exhibit 22, PowerPoint marked Exhibit   49
18    515 on the reliance list
19    Exhibit 23, Guidelines on Good        54
20    Labelling Practice for Pesticides
21    Exhibit 24, 1988 FAO Pesticide        55
22    Labelling Legislation
23    Exhibit 25, 1985 Guidelines for the    56
24    Registration and Control of Pesticides
25
```

## Page 4

```
 1       EXHIBITS MARKED (CONTINUED)
 2    Exhibit 26, 2010 International Code of   57
 3    Conduct on the Distribution and Use of
 4    Pesticides, Guidelines for the
 5    Registration of Pesticides
 6    Exhibit 27, Section 7.3.1.1,         60
 7    Additional Material for Section 7 of
 8    Factual Summary
 9    Exhibit 28, Section 4.5.1, Additional   62
10    Material for Factual Summary
11    Exhibit 29, Article Titled Frequently   88
12    Asked Questions on the Re-evaluation
13    of Glyphosate
14    Exhibit 30, Revised Glyphosate Issue   102
15    Paper:  Evaluation of Carcinogenic
16    Potential dated 12/12/17
17    Exhibit 31, Document Titled Petty     121
18    Methodology Utilized in Forming
19    Overall Opinions and Overall Summary
20    Opinions
21    Exhibit 32, Mr. Winston's Interview   152
22    Summary Sheet
23    Exhibit 33, Mr. Chaplick's Interview   186
24    Summary Sheet
25
```

## Page 5

```
 1       EXHIBITS MARKED (CONTINUED)
 2    Exhibit 34, Mr. Cole's Interview      227
 3    Summary Sheet
 4    Exhibit 35, Mr. Cook's Interview      244
 5    Summary Sheet
 6    Exhibit 36, Mr. Gatewood's Interview   260
 7    Summary Sheet
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2  (Pages 2 to 5)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 6

1　　　THE VIDEOGRAPHER:  We are on the record.
2　　This is a videotaped deposition of Stephen E.
3　　Petty.  Today's date is August 27, 2019.  The
4　　time is approximately 12:02.  This is a case of
5　　Walter Winston, et al., versus Monsanto Company,
6　　Case Number 1822-CC0515.  Case is pending in the
7　　Circuit Court of the City of Saint Louis, State
8　　of Missouri.
9　　　My name is it Barry Hersh, and I'm
10　representing Paszkiewicz Court Reporting.  The
11　court reporter is Michelle Harper, also
12　representing Paszkiewicz.  The deposition is
13　taking place at 6321 Irelan Place, Dublin, Ohio
14　43016.
15　　　Will counsel please identify themselves
16　for the record.
17　　　MS. GREENWALD:  Robin Greenwald for the
18　plaintiffs.
19　　　MR. UPSHAW:  Anthony Upshaw and Melissa
20　Alvarez for the defendant.
21　　　THE VIDEOGRAPHER:  Thank you very much.
22　You may swear in the witness.
23　　　STEPHEN E. PETTY, of lawful age, called
24　for examination, as provided by the Applicable
25　Rules of Civil Procedure, being by me first duly

Page 7

1　sworn, as hereinafter certified, deposed and said
2　as follows:
3　　　EXAMINATION OF STEPHEN E. PETTY
4　BY MR. UPSHAW:
5　　Q.　Mr. Petty, good afternoon.  We are back
6　again today to continue your deposition that we
7　started in July.  I think our last day was July
8　11th, if my math serves me correctly.
9　　A.　Okay.  It was a while ago, but yeah.
10　　Q.　Right.  So we will pick up where --
11　somewhat where we left off, but let me -- let me
12　go through a few housekeeping items and welcome
13　you back.
14　　　Since we adjourned in July, have you
15　performed any additional research in connection
16　with this case?
17　　A.　I have.
18　　Q.　Okay.  What research have you done?
19　　A.　There were some documents brought in to
20　the third day of the deposition that I got a
21　chance to look at further, and so I -- I
22　incorporated those into what I call the revised
23　section where they applied there.  There was some
24　questions about the relationship between ▇▇▇▇
25　and Syngenta and the relationship between them

Page 8

1　and the tox working group, and so I was able to
2　ferret that out by reading those documents a
3　little more closely.
4　　　And then the second issue was you had
5　asked me during one of the days how far back did
6　the FAO documents go, and I didn't have an answer
7　for you, but I now -- I went back and I looked at
8　the FAO website and pulled down the relevant
9　documents from that website, so I have an answer
10　for you on that question.
11　　Q.　Okay.
12　　A.　And the result of that was probably
13　about 20 documents, I don't know the exact
14　number, but anyway, those were -- my
15　understanding is that you received a supplemental
16　list of reliance materials.  I know I prepared it
17　about a month ago.  I don't know when you got it,
18　but, and then there was a request for some of the
19　documents, the additional documents, which I
20　think you guys received yesterday.
21　　Q.　Okay.  The documents you referred to
22　that were presented on the last day of your
23　deposition in July, were those documents that you
24　had found or your counsel had found or were those
25　documents that we presented to you?

Page 9

1　　A.　I'd have to go back and check.  I know
2　for a fact that they were brought in by
3　plaintiff's counsel, those three documents, but
4　what I don't know is I think two of the three I
5　already had, but nevertheless, I hadn't gone over
6　them as thoroughly as I have since then.
7　　Q.　Okay.  And the relationship between
8　▇▇▇▇ and Syngenta, that was in response to one
9　of my questions?
10　　A.　Yeah, because there was some -- yeah,
11　there was some discussion.  Let me see if I can
12　find it real quick.
13　　　This was on -- on this document that
14　we've been using in the previous three days.
15　There was some questions you asked in Section
16　4.5.1.
17　　Q.　Which page are you referring to?
18　　A.　37 and 38.
19　　Q.　Okay.
20　　A.　And you had made the point that the
21　quotes that I had on page 38 were from a
22　gentleman by the name of ▇▇▇▇ as I recall, and
23　that he was not a Monsanto employee.  I think
24　that was the nature of the questioning.
25　　Q.　Okay.

3　(Pages 6 to 9)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 10

1  A.   And what I did was go back and look at
2  those documents at length and I -- that were
3  associated with that -- those quotes.  And I
4  developed a revised input to Section 4.5.1 that
5  really comes out of this Exhibit 515, where it
6  explains the relationship of the tox working
7  group.
8  Q.   Right.  We're going to go into -- just
9  so we don't get ahead of ourselves --
10  A.   So I just want to -- you know, so when
11  you asked if I did additional work, yeah, I
12  wanted to look at the nature of the relationship
13  between Synergist and Monsanto, especially with
14  the respect to the dermal work that was being
15  done and what they were talking about here in
16  these quotes.
17  Q.   Okay.  All right.  And I'm going to give
18  you an opportunity to go into --
19  A.   Sure.
20  Q.   -- the supplements and the changes
21  you've made to your factual summary in a second.
22      So since we've adjourned, have you
23  conducted any studies or analysis in connection
24  with the case, other than what we just talked
25  about?

Page 11

1  A.   Sure.  I also looked -- I did, and I
2  think you were sent a copy of it, I looked at
3  additional Food and Agricultural Organization,
4  FAO documents, because the question I wasn't able
5  to answer at the last deposition was I was citing
6  a two thousand -- I'll call it '02, '03, because
7  it was approved in '03 and issued -- or '02, late
8  2002, and issued in '03, so there's some debate
9  as to what the date is on that document.
10      And we spent a lot of time going over
11  what elements of that document I would be relying
12  on.  And then you asked the question, do you know
13  how far back it went?  In other words, were there
14  earlier editions?  And I went back and did
15  additional research, and I basically went to
16  their website.  And I'm able to answer those
17  questions now.
18  Q.   Okay.  But you haven't conducted any
19  studies, right?
20  A.   I guess I'm not sure what you mean by
21  "studies."  I mean, I didn't -- I did research
22  into these documents.  If that's called a study,
23  yes.  If it's not, then the answer is no.  I
24  guess I'm trying to answer your question.
25  Q.   Understood.  And I think you have.  And

Page 12

1  I'm trying to be more specific, because I group
2  studies and analyses together.
3      So if I'm correct in what you said,
4  you've conducted some analyses of additional
5  documents?
6  A.   Correct.
7  Q.   Okay.
8  A.   Or some documents I had, but mostly new
9  documents, yes.
10  Q.   All right.  And we're going to go
11  through those in a second.
12      Now, since we've adjourned, have you had
13  any communication or correspondence with any of
14  the plaintiffs in this case?
15  A.   No.
16  Q.   Have you had any communication or
17  correspondence with plaintiff's counsel,
18  Ms. Greenwald, Mr. Kristal, or anyone else?
19  A.   Sure.
20  Q.   Okay.  Let's review that quickly.
21      So since July 11th, did you have any
22  e-mails with plaintiff's counsel?
23  A.   I'm sure I did.  Probably with respect
24  to scheduling of this deposition or continued
25  deposition.  And then documents that I've sent to

Page 13

1  them that they've forwarded to you.
2  Q.   Okay.  Did you maintain copies of those
3  e-mails?
4  A.   I have not.
5  Q.   Okay.  We're going to get to the notice
6  of deposition for this, and it's going to ask
7  whether or not you have any correspondence,
8  including e-mails.
9      Can you obtain those, since we're now
10  sitting at the offices of EES Group?
11      MS. GREENWALD:  Are you asking for
12  e-mails between Mr. Petty and our firm?
13      MR. UPSHAW:  Yeah.
14      MS. GREENWALD:  We have an agreement in
15  this case that those are privileged.
16      MR. UPSHAW:  Okay.  I'll check on that.
17      MS. GREENWALD:  Just so you know.
18      MR. UPSHAW:  But, yeah, if they are,
19  then we won't need them.
20      MS. GREENWALD:  I was just sort of taken
21  aback by that.  That's been for a long time in
22  this case.
23      MR. UPSHAW:  That's fine.  If we do,
24  then we won't need them, right?
25      MS. GREENWALD:  Right.

4 (Pages 10 to 13)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 14

1          MR. UPSHAW: Okay.  And not a problem
2    with that if we have an agreement.
3          MS. GREENWALD: But anyway, we can -- I
4    didn't mean to interfere.
5          MR. UPSHAW: Not a problem.
6    BY MR. UPSHAW:
7      Q.  All right.  And did you have the
8    opportunity to speak with plaintiff's counsel
9    before today's deposition?
10     **A.  I think mostly in context with the**
11   **documents that I was going to send to them, or**
12   **these -- I've said that I've done additional**
13   **analyses and I have these additional documents,**
14   **so I -- the correspondence would have been**
15   **documents that I've referred to already.**
16   **Statement -- additional -- well, the updated**
17   **reliance material list, and as well as the**
18   **documents that have been sent to both plaintiff**
19   **and defense counsel, as far as I know.  And then**
20   **there was some discussion about setting dates for**
21   **continued deposition.**
22     Q.  Okay.
23     **A.  As far as discussions this morning, not**
24   **really.  I mean, that's -- I don't think we've**
25   **had any discussion really about the case this**

Page 15

1    **morning.  It was pretty informal, you know, here**
2    **are drinks, here's food, whatever.**
3      Q.  Sure.  Since July, have you read any
4    deposition transcripts of any of the witnesses in
5    the case?
6      **A.  Not for these cases.**
7      Q.  When you say "not for these cases," can
8    you be more specific?
9      **A.  I've been retained, but not disclosed**
10   **for other cases.**
11     Q.  Okay.  Let me ask you a different way
12   then.  Have you read any deposition transcripts
13   from the Winston case since our last deposition?
14     **A.  I don't believe so.**
15     Q.  Only you would know that.  When you say,
16   "I don't believe so," either you remember or you
17   don't remember.
18     **A.  Well, it's been two months and I've had**
19   **a trial in between there and multiple other cases**
20   **to work on.  I don't -- I don't recall.  And I'm**
21   **not trying to dodge your question.  I just don't**
22   **recall reading any other depositions in these**
23   **cases.**
24     Q.  Okay.  And that would include either the
25   fact witnesses, any coworkers, depositions of any

Page 16

1    of the Winston plaintiffs?  And I recognize there
2    are 14 of them.
3      **A.  No, I don't believe so.**
4      Q.  Okay.  Any expert depositions of any of
5    the other experts in the Winston matter?
6      **A.  I have not seen any additional documents**
7    **from say our experts or the other side's experts,**
8    **to my knowledge.**
9      Q.  Not just documents, but have you read
10   any deposition transcripts?
11     **A.  Not that I recall.**
12     Q.  Okay.  Did you read your transcript from
13   the first few days of our deposition?
14     **A.  I did.  I submitted -- yes.**
15     Q.  Okay.
16     **A.  I submitted a few typos, or at least I**
17   **found a few.**
18     Q.  All right.  So you submitted an errata
19   sheet?
20     **A.  I believe so, yes.**
21     Q.  I don't recall seeing that, but that
22   doesn't mean it didn't go out.
23         MR. UPSHAW: Do you know, Ms. Greenwald,
24   whether the errata sheet has been produced?
25         MS. GREENWALD: I'll find out at the

Page 17

1    break.  I'll ask Stephen.
2          MR. UPSHAW: Okay.
3      **A.  I think it was -- well, that's where it**
4    **gets a little fuzzy.  I know that it was done, I**
5    **know that it was sent out, but I don't know**
6    **exactly -- I thought it went to the court**
7    **reporter, but --**
8          **MS. GREENWALD: Oh.**
9      Q.  Okay.  Well, we'll research that and
10   follow up.
11         Okay.  So since we've adjourned, since
12   we adjourned back in July, have you had any
13   communications or correspondence with any of the
14   expert witnesses in the Winston case?
15     **A.  No.**
16     Q.  Are you sure about that?
17         MS. GREENWALD: Objection.
18     Q.  Are you secure in your response to that
19   last question?
20         MS. GREENWALD: Same objection.
21     **A.  I don't -- any experts in -- to my**
22   **knowledge, I have not.**
23     Q.  All right.  During our previous time
24   together, you mentioned that you knew Dr. Sawyer
25   would refer to your materials and that they were

5  (Pages 14 to 17)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

---

Page 18

1 being sent to Dr. Sawyer.
2 Do you recall that?
3 **A.  I do.**
4 Q.  And you -- it's your testimony you have
5 not spoken with Dr. Sawyer?
6 **A.  Since then?  I mean, I was on the phone**
7 **with him briefly before my previous depositions,**
8 **but I have not spoken to him since then or with**
9 **him.**
10 Q.  Okay.  Do you know whether or not
11 Dr. Sawyer has testified since we last met in
12 July?
13 **A.  I believe that I was told that he was**
14 **going to be deposed, because they were trying**
15 **to -- initially, we were scheduled to do this at**
16 **the beginning of the month, and then my schedule**
17 **got complicated.  And then they said well, then**
18 **Sawyer's continued deposition was in the way of**
19 **other available dates.  So yeah, I mean, it came**
20 **up in context with scheduling deposition time.**
21 Q.  All right.  Let's mark as exhibit -- I
22 don't know where we left off.
23 MS. ALVAREZ:  17 should be our next
24 number.
25 MR. UPSHAW:  17 is the next one?  Okay.

---

Page 19

1 - - - - -
2 (Thereupon, Petty Deposition Exhibit 17, Notice of
3 Deposition, was marked for purposes of
4 identification.)
5 - - - - -
6 Q.  Okay.  Let's mark as Exhibit 17 the
7 notice of today's and tomorrow's deposition.
8 Have you seen this?
9 **A.  No.**
10 Q.  Okay.
11 **A.  It might have been sent to the Florida**
12 **office, but I didn't get it up here.**
13 Q.  It was sent to your counsel -- well,
14 actually, to plaintiff's counsel.
15 **A.  Okay.  Well, regardless, I haven't seen**
16 **it before, but that's fine.**
17 Q.  All right.  Let's review it quickly, if
18 we might, understanding this to be the first time
19 you've seen it.  I'm going to flip to page 3,
20 which are the requests for production.
21 And you would probably be familiar with
22 most of these, so let me just ask you, any
23 documents in your possession that you brought
24 today with regard to item 1, that you haven't
25 otherwise produced?

---

Page 20

1 **A.  I think I gave -- well, I produced a**
2 **thumb drive at the last deposition, I don't know**
3 **where that ended up, but this is the same**
4 **material, plus the additional reliance materials,**
5 **the additional documents.**
6 Q.  Okay.
7 **A.  So -- and they were in the 500s, as I**
8 **recall.**
9 Q.  Okay.  And that's a copy for us?
10 **A.  Yeah, that's a copy for everyone.**
11 Q.  Okay.
12 **A.  So I'm hoping that that's responsive to**
13 **1.**
14 Q.  Okay.  Perfect.  And would that be
15 responsive to Number 2 as well?  Again, with the
16 caveat of things that were not produced at our
17 previous meeting.
18 **A.  Well, let me make sure I'm correct when**
19 **I respond.  The way in which I write these**
20 **documents is at the end of my signature page, I**
21 **have what I call references materials.  I think**
22 **we covered this before.  And then my Appendix A**
23 **is always materials that are either case specific**
24 **or hard to find, things that aren't readily**
25 **available.**

---

Page 21

1 **What this thumb drive represents is that**
2 **list, Appendix A materials.  I do not -- do not**
3 **generally provide the textbooks and stuff that**
4 **are readily available as listed in my references.**
5 **So it's the same answer I gave before in my**
6 **deposition.**
7 Q.  Okay.
8 **A.  The only difference today is that**
9 **there's some additional 20 or 25 documents that**
10 **are on that thumb drive.**
11 Q.  All right.  Now, has your curriculum
12 vitae changed since we met in July?
13 **A.  I have not changed it, no.**
14 Q.  All right.  Have you sent out any
15 invoices since we met in July to plaintiff's
16 counsel?
17 **A.  Sure.  I would have sent a June invoice**
18 **that would have -- or I would have sent a July**
19 **invoice, pardon me, that would have reflected**
20 **deposition time and prep time for the deposition,**
21 **and then a little bit of analysis time.**
22 Q.  Okay.  Did you bring that with you
23 today?
24 **A.  I did not.**
25 Q.  Can you get that for us at the break?

6 (Pages 18 to 21)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 22

1   **A.   Not easily.**
2   Q.   Why?
3   **A.   I don't have any -- I don't own the**
4   **business here anymore.**
5   Q.   Okay.
6   **A.   After my son passed, I sold all Ohio**
7   **operations.**
8   Q.   Yeah, I think we discussed that.
9   **A.   I own the buildings, so I have access to**
10  **them, but I don't have any way electronically**
11  **to -- I can try to call -- my wife's on a plane**
12  **this afternoon, but I can try to call and see if**
13  **she can send some.**
14  MS. GREENWALD:  Let me try to find it.
15  You don't worry about it.  I'll get it from
16  Nicole and we'll be good.
17  THE WITNESS:  We've sent one to them, I
18  guess.
19  MS. GREENWALD:  No problem.
20  THE WITNESS:  It's an easier way to get
21  it.
22  MS. GREENWALD:  Nicole will have it.  No
23  problem at all.
24  THE WITNESS:  There we go.  Solves that.
25  MS. GREENWALD:  And I'll e-mail it to

Page 23

1   you, Melissa.
2   MS. ALVAREZ:  Perfect.
3   BY MR. UPSHAW:
4   Q.   Okay.  No changes, I suspect, to your
5   retention letter or contract, which we reviewed
6   during your last deposition --
7   **A.   No.**
8   Q.   -- and the intricacies of that.
9   You don't have an expert report in this
10  case, but you did provide a factual summary and
11  you've amended that, amended two sections of
12  that, which we'll discuss; is that correct?
13  **A.   Correct.**
14  Q.   Okay.  So we're on to Number 7, which I
15  believe we just discussed as Number 6.  Would you
16  agree?
17  **A.   Yes, I would agree.**
18  Q.   All right.  With regard to Number 8, did
19  you do any further calculations with regard to
20  any of the plaintiffs in this action?
21  **A.   Not in this case, no.  Or cases, I guess**
22  **I should say.**
23  Q.   Right.  Yes, there are 14 of them.
24  Number 9 is a list of all organizations
25  which you have entered into consulting agreements

Page 24

1   within the past 10 years.  I don't recall
2   discussing that last time.  It was on the sheet.
3   I think we skipped it.
4   **A.   Yeah, I produced that in quadruplicate**
5   **at the last deposition.**
6   Q.   Okay.  Any changes since then?
7   **A.   I have committed to two additional**
8   **projects, but I have not been disclosed, so there**
9   **would be no additions to it.**
10  Q.   Okay.
11  **A.   Again, that list is just projects where**
12  **I've been disclosed as a testifying expert.**
13  Q.   All right.  So you've been retained now,
14  at the moment, as a consulting expert, but not as
15  a testifying expert?
16  **A.   Well, in my mind, that's the way it is.**
17  **I mean, that -- it may not be that way with the**
18  **attorneys on the other side, but that's -- yes.**
19  **And the way I look at that is there's always a**
20  **disclosure announcement at some point that I**
21  **generally have input to.  At that point, I'm**
22  **disclosed.**
23  Q.   Okay.  Since we last met in July, any
24  abstracts, articles, draft articles, any of the
25  materials identified in Number 10 of the notice?

Page 25

1   **A.   No, nothing new.**
2   Q.   Number 11 would be any new handouts,
3   PowerPoint or other documents as described in
4   Number 11?
5   **A.   Nothing new, no.**
6   Q.   Okay.
7   **A.   I assume you're asking that in context**
8   **since we've last met.**
9   Q.   That is correct.  And I'm asking all of
10  these in that context, so you can make that
11  assumption, okay?
12  **A.   Okay.**
13  Q.   That way I won't repeat it every time.
14  **A.   Thank you.**
15  Q.   Number 12, again, anything since our
16  last meeting?
17  **A.   No.**
18  Q.   So is your testimony then that you
19  haven't seen the latest communique from the
20  California Office of Environmental Health Hazard
21  Assessment or from the United States
22  Environmental Protection Agency that came out
23  since January 11, 2019?
24  **A.   Oh, I thought you were talking about --**
25  Q.   I'm sorry, July 11th.  Did I say

7  (Pages 22 to 25)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 26

1  January? Sorry.
2      **A.   I haven't seen anything that has come**
3  **out since July 11th, no.**
4      Q.   Okay.  I don't believe you have anything
5  that would be covered under Number 13 of the
6  notice, correct?
7      **A.   I don't know what you mean by that.  Any**
8  **device, equipment, or other item used by you in**
9  **connection with your report.  Does that mean like**
10  **my computer?**
11      Q.   Well, it would, but I don't want your
12  computer or a copy of it.  But if you had any
13  device you used, we normally like you to bring
14  it.  So if you used some testing equipment or
15  that nature, but that doesn't apply to you
16  necessarily.
17      **A.   Okay.  I mean, I understand if I was out**
18  **doing a forensics project and I using equipment**
19  **for that.**
20      Q.   Right.
21      **A.   But I'm not going out and doing an**
22  **inspection of someone's home.**
23      Q.   I want the pencil and a calculator you
24  used to do your calculations here.
25      **A.   I still use an HP from 1985, with**

Page 27

1  **reverse programming language, so you probably**
2  **would be completely confused.**
3      Q.   I think we've talked about Number 14
4  earlier.  Since you haven't talked to any of
5  these plaintiffs since then, I doubt if you would
6  have any notes or recordings or interviews?
7      **A.   They would simply be the interview notes**
8  **that I provided previously.**
9      Q.   And have you come across any
10  photographs, videotapes, or audio logs that were
11  not provided or presented in July of this year?
12      **A.   No, sir.**
13      Q.   I'm walking through these, and I hope
14  you are, too, that there's nothing new for you to
15  provide with regard to items 16, 17, 18, or 19?
16      **A.   Well, I think 16, I brought some stuff,**
17  **so technically, I brought some updates of a**
18  **couple of sections and I brought a summary of**
19  **some of the FAO documents.**
20      Q.   Okay.
21      **A.   So I think you have those, but they are**
22  **new since July.  I brought copies here as well.**
23      Q.   Okay.  And we're going to walk through
24  what you've actually brought here in a second, so
25  you can actually identify each one and we can

Page 28

1  have it marked for the deposition.
2      **A.   So in answer to your question, 16 --**
3      Q.   16, yes.
4      **A.   -- I think the answer is yes.  And 17, I**
5  **think they're -- there's nothing new for me to**
6  **add to my testimony from when we last talked on**
7  **17 or 18.**
8      Q.   All right.  We're going to get to your
9  deposition testimony.
10      Have you provided any reports,
11  declarations, or affidavits by you as an expert
12  since then -- that weren't provided in July?  And
13  that's not limited to this case.
14      **A.   Oh, I'm sure I have.  There were**
15  **depositions like in this case that I reviewed**
16  **where I had to have a notary sign changes.  There**
17  **were other cases where that occurred.**
18      Q.   That's not what 20 asks for, Mr. Petty.
19  Let me clarify.
20      If you have done any reports,
21  declarations or any affidavits --
22      **A.   Yeah, I'm --**
23      Q.   -- since the last four years, that is,
24  if you've done any expert reports, you've done
25  declaration asked for by some counsel somewhere

Page 29

1  or any affidavits?
2      **A.   But you're asking since we last talked,**
3  **right?**
4      Q.   Yes, um-hum.
5      **A.   I think I have.**
6      Q.   Okay.
7      **A.   I think there was a -- I think there was**
8  **one expert report where I was then asked to**
9  **provide an affidavit regarding the report, so I**
10  **did so.**
11      Q.   And did you bring copies of those with
12  you today?
13      **A.   No.**
14      Q.   Can you obtain them today?
15      **A.   Well, they're under a nondisclosure.  I**
16  **mean, those -- so I think that I wouldn't provide**
17  **those because that information is confidential to**
18  **that client.**
19      Q.   What -- okay.
20      **A.   I would have to have permission from**
21  **them to do so.**
22      Q.   Obviously, these are in other cases.
23  Are those cases related to glyphosate?
24      **A.   No.**
25      Q.   Okay.  In those other cases, have those

8  (Pages 26 to 29)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 30

1 reports or affidavits been presented to the
2 courts?
3    **A.   I assume so, but I don't know.  I don't**
4 **have -- I don't -- that's not my action.  I give**
5 **them to the attorneys and then they do whatever**
6 **they do with them.**
7    Q.   Okay.  What attorney have you given them
8 to, so we can find out if we can get permission
9 to get those, that report or affidavit?
10    **A.   If it happened, it would be Guy Bucci**
11 **and Diane Crutchfield, two different attorneys,**
12 **two different firms.**
13    Q.   Would that be B-U-S-S-E-Y?
14    **A.   B-U-C-C-I.**
15    Q.   B-U-C-C-I.  And what firm is Mr. Bucci
16 with?
17    **A.   Hendrickson, Long, and I forget the**
18 **third name.  Hendrickson, Long, and the third**
19 **name.**
20    Q.   Okay.  And the second person?
21    **A.   Diana Crutchfield.  She's a partner**
22 **in -- it's three names as well.  I just remember**
23 **her name.**
24    Q.   How do you spell her name?
25    **A.   C-R-U-T-C-H-F-I-E-L-D.  I would think**

Page 31

1 **you guys would have it.  It's a Bayer case.  It's**
2 **a Bayer case.  It was supposed to go to trial a**
3 **week ago and I was supposed to testify on a**
4 **Monday and it got delayed on Friday.  So I would**
5 **think the Bayer folks have it, have that material**
6 **if it's been presented, of course.**
7    Q.   Is there a Bayer product at issue?
8    **A.   Yes.**
9    Q.   What's the product?
10    **A.   TDI, toluene diisocyanate.**
11    Q.   Okay.  As to item 21, I believe we've
12 asked this question, but I'll ask it in context
13 of this request for any communications, and these
14 are all folks who have been identified in this
15 case.
16       Would you read through that list and let
17 me know your response, please.
18    **A.   And this is since we've last --**
19    Q.   Yes, sir.
20    **A.   -- been deposed?**
21    **I have not any additional communications**
22 **with these folks since our last deposition.  Not**
23 **that I recall.**
24    Q.   And the same question with regard to the
25 communications identified in Number 22.

Page 32

1    **A.   I don't believe I have, no.**
2    Q.   Okay.  Any other documents that you have
3 brought today for this part of your deposition
4 being provided to you by counsel for plaintiffs?
5    **A.   I think we talked about that right off**
6 **at the beginning.  I think some of those, the**
7 **first two or three documents in the additional**
8 **list of materials were provided at the last**
9 **deposition.  I don't recall whether they were**
10 **marked or not.  But they're now included formally**
11 **in that list of materials, so -- but most of them**
12 **were what -- were documents that I got off the**
13 **FAO website.**
14    Q.   Okay.  So anything else, other than the
15 three documents that we just talked about that
16 you know were provided by plaintiff's counsel?
17    **A.   I did not bring that supplemental list**
18 **of reliance materials.  Does anybody have it**
19 **here?**
20    Q.   So I'll tell you what, we're going to
21 flip through those and mark those.  If you see
22 one come across, instead of me asking you each
23 time was this provided by plaintiff's counsel,
24 bring it up, okay?
25    **A.   Yeah.**

Page 33

1    Q.   All right.  With regard to Number 24,
2 are we talking about the same thing?
3    **A.   Yeah, it would be the -- it would be**
4 **the -- well, obviously, I would still rely on the**
5 **materials that I've had before.**
6    Q.   Of course.
7    **A.   But the additional material would be the**
8 **additional reliance materials that I provided to**
9 **both sides, I believe.**
10    Q.   All right.  Okay.  The revised reliance,
11 the list of reliance materials was dated July 24,
12 2019.  We're going to mark that as Exhibit 18.  I
13 know you have a copy there in your stack, but
14 let's mark this one.
15    **A.   No, I do not, actually.**
16       - - - - -
17 **(Thereupon, Petty Deposition Exhibit 18, revised**
18 **list of reliance materials, was marked for purposes**
19 **of identification.)**
20       - - - - -
21    Q.   Okay.
22    **A.   Well -- yeah, I do not.**
23    Q.   So here's my question.  The documents
24 that you've added to that revised list are the
25 documents that are on this particular thumb

9  (Pages 30 to 33)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 34

1  drive, correct?
2  A.  They --
3  Q.  Along with the others?
4  A.  Correct.  Correct.
5  Q.  And the new documents are from documents
6  511 to 546.  Does that sound correct?
7  A.  That looks to be correct.  And I think I
8  italicized those in this listing.  Yes.
9  Beginning on page 48 of this exhibit.
10 Q.  Okay.
11 A.  I think it's 18.  18.
12 Q.  Correct.  And I'd see that they are in
13 a different type, so you've italicized the
14 additional documents?
15 A.  Yes.  I made it easy on myself.
16 Q.  All right.  Let me ask you a question.
17 Document 530 and 531 appear to be the same
18 document.  And you, in fact, in 531 say duplicate
19 of 530?
20 A.  Yes.
21 Q.  Why are there two copies of the same
22 document as --
23 A.  Just an error on my part on keying them
24 in.
25 Q.  Okay.  So even though your description

Page 35

1  says it is a duplicate, you still leave it on the
2  list?  I don't understand that.
3  A.  What happened is I probably keyed them
4  in and then when I started looking at them, I
5  realized it was a duplicate and I didn't want to
6  go back and pull the stickers and the numbers off
7  all the documents, so I just --
8  Q.  So you didn't want to leave a hole?
9  A.  I didn't want to leave a hole in the
10 list.
11 Q.  Okay.  And is the same true for document
12 535 and 536?
13 A.  It would be -- that would be the case as
14 well.
15 Q.  So these new documents were reviewed
16 after we completed your deposition, or actually
17 we adjourned your deposition on July 11th?
18 A.  They were.
19 Q.  Okay.  And I think --
20 A.  I think some of the initial, the 511,
21 12, and 13, I think those were actually, and 14,
22 I'm pretty sure those were brought to the
23 deposition.  So they were looked at before the
24 conclusion of the deposition, to be technically
25 correct, but the balance of those would have been

Page 36

1  looked at after the deposition concluded.  I also
2  looked at those first four again.
3  Q.  And are you satisfied with the
4  explanation you just gave us a few minutes ago as
5  to why you added these documents?
6  A.  I'm not sure what you're asking.
7  Q.  Well, we talked earlier about what you
8  brought and what you've added.  And you gave an
9  explanation as I looked at the documents, three
10 documents for a particular reason.  I looked at
11 the FAO documents for a particular reason.
12      Does that fully explain why you've added
13 these documents since your deposition of July
14 11th?
15      MS. GREENWALD:  Objection.  Form.
16 A.  Well, the primary reason that I added
17 those documents was to address the two areas
18 where I felt that my answers weren't complete.
19 And what did happen is that the question you
20 asked me about when was the FAO document on
21 distribution of pesticides first issued.  What
22 came from that was, in reviewing the FAO website
23 and reviewing those documents at length, I
24 realized that they also referenced additional FAO
25 documents, so that's what pulled the additional

Page 37

1  documents in.
2      That's why the question isn't -- the
3  answer to your question isn't explicitly that I'm
4  answering those two questions.  It's as a
5  consequence of looking at those documents, it
6  drew me to pull additional documents, if that
7  makes any sense.
8  Q.  It does.
9      Did your review of any of these
10 documents change any of the opinions that you
11 provided in July?
12 A.  They will simply support those opinions.
13 They won't change them, no.
14 Q.  Okay.  All right.  Let's go through what
15 you brought here and then we'll move on.  You
16 have a stack of documents in front of you.
17      MS. GREENWALD:  Let me just say what
18 these -- I told you I'd bring copies of these for
19 you in an e-mail last night, in case you didn't
20 have a copy machine.
21      MR. UPSHAW:  Okay.  We'll take those out
22 because those are from you.
23      MS. GREENWALD:  Yes.  Okay.  I just told
24 them I would give them copies, so you go from
25 there.

10 (Pages 34 to 37)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 38

1    THE WITNESS:  I'm just trying to see
2  what I got here to see if they're in order.  I
3  think there's another set that matches with this
4  set.  I think they've gotten scrambled, so let me
5  leave those with you.
6    MS. GREENWALD:  Yep.
7    A.  The -- I don't know if you just want --
8  you can have the whole -- - I brought four
9  copies.
10   Q.  I'm just going to mark one.
11   A.  This is a one-pager that goes over the
12 additional FAO materials that I've added to the
13 reliance list.  The first -- and they're also
14 marked as exhibits.  Those exhibit numbers are
15 referring to my exhibit numbers in Appendix A,
16 just so there's no confusion.
17   Q.  Okay.
18   A.  And because last time we spent a
19 considerable time you asking me what particular
20 subsections of these documents would you be most
21 relying on, and we spent a lot of time going on
22 those, and in an effort to facilitate this
23 deposition, I've listed for each of these
24 additional documents the sections I would be
25 primarily relying on.

Page 39

1    And the answer to the question that you
2  asked that I couldn't answer last time on
3  International Code of Conduct on Distribution and
4  Use of Pesticides, I had a two thousand -- I'll
5  call it 2/3 version that we talked about at
6  length, and you asked, well, when was it first
7  issued?  I didn't know the answer to that, but I
8  do now.  It's 1985.  And that is now Exhibit 519.
9    And I -- what I've done on those that
10 I've thought, well, we have them on the thumb
11 drive, but I brought two copies of those if we
12 really want to get into it, so that we have
13 something to actually look at.
14   Q.  Okay.  So let's do this, if I may
15 interrupt.
16   A.  And that's the case for all of these
17 that step down this page.
18   Q.  All right.  So for our purposes today,
19 let's mark your one-page reference.
20   A.  I guess it's technically --
21   Q.  It's technically one and a quarter,
22 because it's front and back, as Exhibit 19.  So
23 put that in your list.
24    And in correspondence with Exhibit 19,
25 you have copies of what documents?  And we'll

Page 40

1  mark those just so we have them marked.
2    - - - - -
3  (Thereupon, Petty Deposition Exhibit 19, Food and
4  Agricultural Organization (FAO) Reliance Documents,
5  was marked for purposes of identification.)
6    - - - - -
7    A.  Yeah, I'll let you look at -- my exhibit
8  number is up here in the top, and I've indicated
9  the dates.  I only brought two of each, so
10 there's one for us to look at and one to mark.
11   Q.  Okay.
12   A.  Because I told you before, Weyerhaeuser
13 put me through school, and I promise to use lots
14 of trees, but not too many trees.
15    So what you'll see there is that's the
16 1985 version of the FAO Code of Conduct and
17 Distribution Use of Pesticides.
18   Q.  All right.
19   A.  So that's what you see.  There's two
20 copies of that there.
21   Q.  Perfect.  We'll mark this document as
22 Exhibit 20.
23   A.  Okay.
24    - - - - -
25 (Thereupon, Petty Deposition Exhibit 20, 1985

Page 41

1  International Code of Conduct on the Distribution
2  and Use of Pesticides, was marked for purposes of
3  identification.)
4    - - - - -
5    Q.  Okay.  And the next document is your --
6  is a combination of exhibits on your list, but
7  the document is International Code of Conduct on
8  the Distribution and Use of Pesticides?
9    - - - - -
10 (Thereupon, Petty Deposition Exhibit 21, 2002
11 International Code of Conduct on the Distribution
12 and Use of Pesticides, was marked for purposes of
13 identification.)
14    - - - - -
15   A.  That's -- we had that before, but out of
16 completeness, so that's the two -- that's the 2002/3
17 version, so we've seen that before.
18   Q.  So we've seen that.  I note that it was
19 document 1 -- Exhibit 172 in your factual
20 summary, correct?
21   A.  Yeah, well, you can -- yes.
22   Q.  Are there certain sections that you have
23 redesignated as Exhibit 520 and Exhibit 535?
24   A.  Not beyond what we've talked about
25 before.

11 (Pages 38 to 41)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 42

1    Q.   Okay.  So I'm not sure why you have it
2  now three times on your list.
3    **A.   Just out of completeness in case you**
4  **were going to go back over it and we needed a**
5  **hard copy.  Because last time it was -- we were**
6  **looking at pieces of it in the report.  Just out**
7  **of completeness.**
8    Q.   Okay.
9    **A.   There is one section in there that we**
10  **didn't talk about that I -- that I would rely on,**
11  **and it's in part 11, just trying to find it in**
12  **this report.**
13    Q.   All right.  Well, let me make sure that
14  I understand what you're doing.  So mark that for
15  a second.
16    **A.   Sure.**
17    Q.   Or once you find where you're talking
18  about, let's mark that and hold it for a second.
19  I'll let you get to where you want to be at.
20    **A.   What I referenced, it was on page 215,**
21  **but we actually went through this document, this**
22  **exhibit -- I forget what exhibit it was.**
23    Q.   7.
24       MS. ALVAREZ:  7.
25    Q.   7.

Page 43

1    **A.   7.  It's going to be easier to go**
2  **through the document to show you line that I'm --**
3    Q.   Yeah.
4    **A.   -- talking about.**
5    Q.   So that's why I said find that, and let
6  me clarify what we got, and then we'll go back
7  and identify through the document.
8       All right.  So you've written on the top
9  of -- we have this marked as an exhibit number --
10    **A.   Yeah, 21.**
11    Q.   -- 21.  And I'll hand that to you.
12    **A.   Thank you.**
13    Q.   All right.  You've got written in pencil
14  on the top of 21, Exhibit 172, 520, and 538?
15    **A.   Correct.**
16    Q.   All right.  So when I go back to your
17  list, don't lose your spot in your factual
18  summary, 172 is identified as a July 25, 2006
19  farmer e-mail to Hilton, re:  FAO code.
20       Now, it's 40 pages.  Is it your -- does
21  this include this document with the e-mail?
22  Actually, this document is 36 pages.
23    **A.   That's my recollection.  You'd have to**
24  **look at it on the thumb drive to confirm that**
25  **but --**

Page 44

1    Q.   Okay.  Now, we'll go to -- now I turn
2  your attention to Exhibit 520, which just
3  identifies Exhibit 21 as Rome 2002 International
4  Code of Conduct on the Distribution and Use of
5  Pesticides.  That's this 35-page document as
6  well?
7    **A.   Correct.**
8    Q.   Okay.  And then you've also listed it as
9  538, and it has a MONGLY number, and you put in
10  here duplicate of 533.  So we're all clear that
11  these are all three the same document?
12    **A.   Essentially.  The one has a cover**
13  **letter, I think.  172 has some cover letter**
14  **associated with it.  It's attached to -- it's**
15  **attached to that document.**
16    Q.   Right, okay.  Right.
17    **A.   They're not identical, but they --**
18  **certainly, the code is in all three of those.**
19    Q.   Sure.  Well, 520 and 533 should be
20  identical.  I'm sorry, 538.
21    **A.   Well, they're not identical, because one**
22  **came -- obviously was -- has a MONGLY number on**
23  **it, and the other one I took directly from their**
24  **website.**
25    Q.   Okay.  Which is also identical to -- so

Page 45

1  520, 533, and 538 are all the same documents?
2    **A.   I believe so, yes.**
3    Q.   Okay.
4    **A.   And I call it 2002, 2003, because what**
5  **you learn is that it was approved in late 2002,**
6  **but it actually issued in '03, so there's --**
7  **people make different references to this**
8  **document, so I just call it 2002/2003.**
9    Q.   Understood.  All right.  So let's use
10  document 21, before we go further, and identify
11  or discuss the section that you've referred to,
12  and you have open in the factual summary and so
13  we can go line by line on that.
14       Now, what page are you on in the factual
15  summary, which is Exhibit 7 to the deposition?
16    **A.   Well, what I did is I said that I was**
17  **relying on this document.  And what we did in the**
18  **last -- well, part of one of the last deposition**
19  **days was to go through this document line by**
20  **line.**
21    Q.   Okay.
22    **A.   And I'm just saying there was another --**
23  **one more line that I noticed that I would rely**
24  **on.  That's what I'm telling you.**
25    Q.   Okay.  Then let's do that.  What's the

12  (Pages 42 to 45)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 46

1   other line that you would rely upon?
2       A.   That would be on Exhibit 21, page 25, it
3   would be under 11.2.16, which says, "All staff
4   involved in sales promotion are adequately
5   trained and possess sufficient technical
6   knowledge to present complete, accurate and valid
7   information on the product sold."
8       Q.   Okay.
9       A.   And I would compare and contrast that
10  with the deposition testimony I have in
11  section -- in the last section of my report.
12      Q.   Which, section 9?
13      A.   Yes.
14      Q.   What page?
15      A.   That I would be comparing and
16  contrasting that with?
17      Q.   Yes, sir.
18      A.   For example, for instance, on page 23,
19  Mr. Ford's --
20      Q.   Page 23?
21      A.   223.
22      Q.   223.
23      A.   I apologize.
24      Q.   That's all right.  I knew you were
25  further into the document than that.

Page 47

1       A.   222 to -- I guess this starts on 222 and
2   then goes on to 223, where I've cited portions of
3   Mr. Ford's deposition testimony, for example.
4   And he was providing information to his customers
5   that Roundup was biodegradable when it clearly
6   was not.
7            He was telling them it was safer than
8   table salt, where you're not really allowed under
9   FIFRA to make those comparisons.  So there's a
10  number of examples given here where in my mind,
11  he's not up to speed.  At least his -- the
12  information he's conveying as part of the sales
13  staff, the marketing staff, he's not adequately
14  trained, because he's giving customers false
15  information.
16      Q.   Well, let me use one example here, and
17  I'm not sure that --
18      A.   And he relied on the Backgrounder here.
19  That's the big one on 224.
20      Q.   Well, let me ask you, on page 223,
21  because you said that Mr. Ford made the statement
22  to his customers that Roundup was as safe as
23  table salt.
24           Did I understand you correctly?  Because
25  that's not what he said.

Page 48

1       A.   No, no, no, no, that's not what he said.
2       Q.   Okay.
3       A.   But he admitted he told distributors
4   multiple times that the oral toxicity of Roundup
5   was lower than table salt.
6       Q.   Correct.
7       A.   That was his testimony.
8       Q.   All right.  And you started to refer to
9   the Backgrounder.  I'm not sure what you're
10  referring to.
11      A.   Yeah, this Backgrounder is cited by many
12  people many times.  And I went through that at
13  length.  Let me get back to -- it -- I talk a
14  little bit about this Backgrounder on page 186,
15  for example.  And we went through this at length
16  last time, but this was issued in 2002.  It's
17  still being used into the 2000-teens, as I cite.
18           But for instance, they're making this
19  comparison, which you're not allowed to do under
20  the FAO guidelines.  And I brought some material.
21  This was the Saltmiras -- I can pronounce his
22  name right.  Saltmiras.
23      Q.   Saltmiras.
24      A.   We know that they're not allowed to
25  do -- that Monsanto knows that they're not

Page 49

1   allowed to do that because of what he says in
2   this presentation.  This is Exhibit 5 -- my
3   Exhibit 515.  It's the same sort of chart with
4   some additional information.
5            One, they put in the Monsanto 0818,
6   which is POEA, but it says here in red, as per
7   FAO Code of Conduct, we would not publicly
8   compare these products, yet that's what they're
9   doing.
10      Q.   Okay.  Let me ask you some questions
11  about that then.  You've referred to another
12  document.  Let's mark that as exhibit 22, so --
13           - - - - -
14  (Thereupon, Petty Deposition Exhibit 22, PowerPoint
15  marked Exhibit 515 on the reliance list, was marked
16  for purposes of identification.)
17           - - - - -
18      A.   I brought two of those as well.
19      Q.   -- so we know what's being discussed.
20  Now, Exhibit 22 is Exhibit 515 on your reliance
21  list, correct?
22      A.   Correct.
23      Q.   And it appears to be a PowerPoint, which
24  on the cover, or the first page of Exhibit 22,
25  says David Saltmiras, February 16, 2009.  So

13  (Pages 46 to 49)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

---

Page 50

1　we're talking about the same thing?
2　　**A.   Correct.**
3　　Q.   Okay.  Now, in this Exhibit 22, you
4　refer to page --
5　　**A.   Page 8.**
6　　Q.   -- 8 of that exhibit, with a chart
7　that's entitled Acute Toxicity Comparison.  And
8　you juxtapose that page 8 with a Figure 7-36 on
9　page 186 of Exhibit 7, which is your factual
10　summary, correct?
11　　**A.   Correct.**
12　　Q.   And you indicate they are not the same,
13　right?
14　　**A.   Well, they're very similar.  There are**
15　**slight differences.**
16　　Q.   Okay.  So they are not the same,
17　correct?
18　　**A.   They're essentially the same.  I mean,**
19　**this is -- here's the --**
20　　Q.   I'm going to point out the differences
21　for you and you tell me whether or not these
22　differences are not on -- the differences, the
23　items on page 8 of Exhibit 22, tell me whether or
24　not they are on the chart you have listed at
25　Figure 7-36 on page 186.

---

Page 51

1　　**A.   I'd like to finish my answer before.**
2　　Q.   Okay.  You go right ahead.
3　　**A.   The answer to your question has the**
4　**infamous yes and no components.  It reminds me of**
5　**a question asked of a mathematician and a**
6　**scientist.**
7　　Q.   Hold on.
8　　**A.   Let me finish.**
9　　Q.   No, I'm not going to let you finish,
10　because I don't need a story about a
11　mathematician.  We have limited time.
12　　**A.   I understand.  It's very quick.  The**
13　**question is --**
14　　Q.   But just answer the question, Mr. Petty.
15　A mathematician story does not answer the
16　question of whether or not these two --
17　　**A.   Absolutely, it does.**
18　　　　MS. GREENWALD:  You have to let him
19　answer the question.  Answer the question, and
20　then if there's an issue, we can deal with it,
21　but he needs to answer the question.
22　　　　MR. UPSHAW:  Okay.  Thank you,
23　Ms. Greenwald.  I appreciate that.
24　　Q.   Go ahead.
25　　**A.   So I'm saying if a scientist -- if a**

---

Page 52

1　mathematician and engineer are asked the
2　question, if I half the distance from where I'm
3　sitting right here to that wall, and I half it
4　again and I half it again and I half it again and
5　I half it forever because I keep getting closer
6　and closer to the wall, you will ask the
7　mathematician, do you get to the wall?  He'll say
8　no, there's still a little bit of a distance if
9　you half it each time.  And you ask the engineer,
10　and he'll say yes, close enough.  That's --
11　that's the distinction here.
12　　　　In my opinion, as an engineer, they're
13　essentially the same.  Are there slight
14　differences?  Yes.
15　　Q.   On your Figure 7-36, there's no
16　indication of salt, correct?
17　　**A.   The word salt does not appear on 7-36,**
18　**that is correct.**
19　　Q.   Okay.  The word aspirin doesn't appear
20　on 7-36, does it?
21　　**A.   It does not.**
22　　Q.   Does the word acetaminophen appear on
23　7-36?
24　　**A.   It does not.**
25　　Q.   And does MON 0818 appear on 7-36?

---

Page 53

1　　**A.   It does not.**
2　　Q.   Does caffeine appear on 7-36?
3　　**A.   It does not.**
4　　Q.   Are those all products, caffeine,
5　aspirin, salt, and acetaminophen?
6　　**A.   I don't know if caffeine is a product.**
7　**It's an ingredient.  I mean, it's a component of**
8　**a product, say coffee or other things.**
9　　Q.   Does chloroform appear on Exhibit 22?
10　　**A.   It does not.**
11　　Q.   Okay.  But in your mind, these are the
12　same?
13　　**A.   They're essentially --**
14　　　　MS. GREENWALD:  Objection.  Form.
15　　**A.   They are -- they are making comparisons,**
16　**which is a violation of FAO code.  And it's clear**
17　**that even though -- that Monsanto understands it.**
18　**That's my point.**
19　　Q.   Okay.
20　　**A.   They're both making comparisons.  We'll**
21　**let others judge whether those are very similar**
22　**in terms of what they're illustrating.**
23　　Q.   And it's your testimony that the 2002
24　Monsanto Backgrounder was for public consumption?
25　　**A.   It was distributed to the public.  There**

---

14  (Pages 50 to 53)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 54

1  are multiple examples in this document where it
2  was distributed to the public.
3      Q.   Okay.  Any other references to Exhibit
4  21 that we didn't discuss when we discussed this
5  document in July?
6      A.   Not that I recall.
7      Q.   Okay.
8      A.   The only reason that came up is that I
9  pulled that same section out of the earlier
10  version, and I know we hadn't talked about it.
11      Q.   All right.  This was also in your stack
12  of documents that you brought today, and you have
13  it identified in your reliance materials as 534.
14  I'm going to mark it as Exhibit 23.
15           - - - - -
16  (Thereupon, Petty Deposition Exhibit 23, Guidelines
17  on Good Labelling Practice for Pesticides, was
18  marked for purposes of identification.)
19           - - - - -
20      A.   Okay.
21      Q.   And you have here in pencil 1995?
22      A.   Yes.
23      Q.   And why did we bring this today?
24      A.   Because this document is -- when you
25  read the Exhibit 21, which is International Code

Page 55

1  of Conduct and Distribution Use of Pesticides, it
2  refers to this document.
3      Q.   Okay.
4      A.   So it incorporates by reference this
5  document, so I also looked at it.
6      Q.   All right.  We'll add Exhibit 24, which
7  you have as Exhibit 542 in your reference
8  materials.
9           - - - - -
10  (Thereupon, Petty Deposition Exhibit 24, 1988 FAO
11  Pesticide Labelling Legislation, was marked for
12  purposes of identification.)
13           - - - - -
14      A.   Oh, oh, oh, okay.  I'm sorry.
15      Q.   I think there may -- are there two
16  copies of that or are there just one?
17      A.   Hopefully there's two.  I don't know if
18  these got scrambled.
19      Q.   I got it.  And in pencil, you have 1988.
20  Why did you bring that today?
21      A.   That was also, as I was going through
22  these cross-references, this was also referenced
23  as well when I was at the FAO website regarding
24  best practices documents for pesticides.
25      Q.   Okay.

Page 56

1      A.   So I looked at it as well.
2      Q.   We'll mark as Exhibit 25 a document you
3  have identified in pencil as Exhibit 541.
4           - - - - -
5  (Thereupon, Petty Deposition Exhibit 25, 1985
6  Guidelines for the Registration and Control of
7  Pesticides, was marked for purposes of
8  identification.)
9           - - - - -
10      A.   Okay.
11      Q.   Registration and control of pesticides,
12  also in pencil 1985.
13           Why did you bring this today?
14      A.   It's the same -- it was the same reason
15  as I brought 541.  It was -- it was part of -- in
16  researching the FAO documents, this was another
17  document that was listed as one of the -- their
18  FAO standard practice documents for pesticides.
19      Q.   And you meant same reason as 542,
20  because this is --
21      A.   542, I apologize.  That's correct.
22      Q.   No, just keeping us all on the same
23  page.
24      A.   You are correct.
25      Q.   Okay.  And the last document that you

Page 57

1  handed me that you brought today, you have
2  identified as Exhibit 521, and we'll identify it
3  as Exhibit 26 for the deposition.
4           - - - - -
5  (Thereupon, Petty Deposition Exhibit 26, 2010
6  International Code of Conduct on the Distribution
7  and Use of Pesticides, Guidelines for the
8  Registration of Pesticides, was marked for purposes
9  of identification.)
10           - - - - -
11      Q.   You have here written in pencil 2010,
12  which is also at the bottom of the first page.
13           Why did you bring that today?
14      A.   Same reason as the previous two
15  documents.  It was a document that I encountered
16  in going through the FAO website on documents
17  related to industry best practices for
18  pesticides.
19      Q.   Okay.
20      A.   So I went ahead and looked at that as
21  well.
22      Q.   Okay.  Did you make reference to any of
23  the exhibits that we've just covered in your
24  factual summary prior to July 11th?
25      A.   Yes and no.  I referenced the 2002/2003

15  (Pages 54 to 57)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 58

1 version, which we have, and it referenced the
2 good labelling practice for pesticides, so it's
3 indirect there.
4 Q. Okay.
5 A. Does that make any sense?
6 Q. Yes, um-hum.
7 A. So it would have been pulled in by
8 reference, but it wasn't -- I didn't explicitly
9 list that document.
10 Q. How about any of the other documents
11 that you brought with you today?
12 A. I think those were just identified when
13 I was pulling down the older versions of the
14 documents to answer the question that you asked
15 about when did that 2002/2003 International Code
16 of Conduct and Distribution Use of Pesticides
17 document, when did that first -- when was that
18 first written, and it was just as part of that
19 exercise, doing that analysis.
20 Q. Okay. And I think you've stated doing
21 that analysis, you came across documents which
22 are obviously more recent than 2002/2003, such as
23 the document I have in my hand, which is 2010.
24 A. Absolutely.
25 Q. In the amended sections of your factual

Page 59

1 summary, which we will review in a second, do you
2 reference any of the documents that you brought
3 with you today?
4 A. Yes. Some additional text that would be
5 in the factual summary in 7.3.1.1, I've written
6 out and referenced those documents.
7 Q. Okay. We're going to -- let's mark
8 those and then we're going to go through those in
9 a second. This is the amended section 7 of your
10 factual summary that you've handed me a copy of?
11 A. It's the additional material that would
12 go into it. I didn't reproduce the material
13 that's was already there. Does that make any
14 sense?
15 Q. Yes, it does.
16 A. This is additional text.
17 Q. Okay. So I would -- in looking at your
18 factual summary now, I should read what you've
19 provided and we discussed in July, and then
20 supplement that with what you've just discussed
21 today?
22 A. Correct.
23 Q. So it doesn't replace the old 7.3.1?
24 A. That's correct. It's in addition, it's
25 an add-to.

Page 60

1 Q. Okay. I'm going to mark that as 27 and
2 then I'm going to go back to that, okay?
3 - - - - -
4 (Thereupon, Petty Deposition Exhibit 27, Section
5 7.3.1.1, Additional Material for Section 7 of
6 Factual Summary, was marked for purposes of
7 identification.)
8 - - - - -
9 A. Okay.
10 Q. Actually, before we do that, just so we
11 keep things in context, you said there was some
12 reference here. Is there a specific reference
13 to --
14 MS. ALVAREZ: This is Exhibit 26.
15 Q. -- Exhibit 26 in your supplemental, or
16 25?
17 MS. ALVAREZ: No, this is 25 --
18 A. It would be on the -- they're not
19 numbered, but the last page, the bullet items on
20 the top of that page.
21 Q. This is my last page.
22 A. Which one are we looking at?
23 Q. 7 -- we've marked it --
24 A. 7.3.1?
25 Q. Yeah, we've marked it as Exhibit 27.

Page 61

1 Are you looking at Exhibit 27?
2 MS. GREENWALD: Second-to-last page.
3 A. Oh, yeah, I'm sorry. I'm sorry. It's
4 the last page, but it's two-sided printed. So
5 the front of the two-sided printed.
6 Q. I understand.
7 A. My apologies. And there they're
8 referenced, those other documents.
9 Q. Okay. Under "Other FAO Standard of Care
10 Codes of Conduct that apply are to Monsanto's
11 Standard of Care." Okay. Don't understand the
12 language, but okay. Understood.
13 Okay. So as I understand it, you made
14 changes to -- or, I'm sorry, supplements to
15 section 7.3.1.1 and section 5.3; is that correct?
16 A. 4.5.1.
17 MR. UPSHAW: Okay. And Ms. Greenwald,
18 do you have a copy of the other section that's
19 been supplemented? I had that one.
20 MS. GREENWALD: Did you -- we have this
21 one.
22 THE WITNESS: Yeah, this -- yeah, that's
23 the other.
24 MS. GREENWALD: Is this the one? I
25 thought I -- is that the one you mean?

16 (Pages 58 to 61)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 62

1    THE WITNESS: No, that's the only two.
2  Those were the only two --
3    MS. GREENWALD: Okay. There were only
4  two. I sent you two documents last night, yeah.
5    THE WITNESS: Well --
6    MS. GREENWALD: I mean, I sent you two
7  updates. There were other documents that
8  Mr. Kristal sent you.
9    Q.  All right. So let's look at the -- and
10  just to be clear, these are not updates, these
11  are supplements?
12    A.  Supplements, yes.
13    Q.  They don't change what you've written
14  before. I don't pull out what you've written
15  before and insert this. I just -- I read this --
16    A.  Just add it.
17    Q.  -- in addition to?
18    A.  We just add it.
19    Q.  Okay. Let's mark the 4.5.1 section as
20  Exhibit 28. That way they're both identified.
21         - - - - -
22  (Thereupon, Petty Deposition Exhibit 28, Section
23  4.5.1, Additional Material for Factual Summary, was
24  marked for purposes of identification.)
25         - - - - -

Page 63

1    Q.  Okay. I understand we're a little out
2  of order, but it's better for me. So let's
3  turn -- using Exhibit 28, let's turn in Exhibit 7
4  to Section 4.5.1, which --
5    A.  Pardon me, do you want to mark this? I
6  know this went on early, or not? I don't know
7  how you want to handle that.
8    Q.  No, we're not going to mark it, because
9  we've identified what's on it.
10    A.  Okay.
11    Q.  I think we've identified the other --
12  we'll obviously take it to make sure we have the
13  documents and do all that, and I'm glad to give
14  it back to you if you wish.
15    A.  No, no, no. That's for you folks.
16    Q.  Okay.
17    A.  Or for the court reporter.
18    Q.  All right. Let's go to 4.5.1 in Exhibit
19  7. And my question is where is 4.5.1?
20    A.  37.
21    Q.  Okay.
22    A.  Bottom of 37.
23    Q.  Okay.
24    A.  Now, I have included some of the text in
25  this addition just to kind of get us started. In

Page 64

1  other words, if you look at Exhibit 28 and 4.5.1,
2  you'll see that the text starts with -- on the
3  bottom of 37, and the top of 38, you'll see that
4  the text follows those the quotes, the bolded
5  quotes, and then I've inserted some text.
6    I just want to have context. In other
7  words, to answer your question, this is material
8  to be added, but I've tried to show context as to
9  where it would be added.
10    Q.  Understood. And why is it that you
11  added this additional supplement?
12    A.  To have context for the quotes coming
13  from -- from [        ] or [        ], I should
14  say, and especially in context with how they were
15  going about the dermal work, because that's what
16  this is -- what I'm talking about in the Exhibit
17  7.
18    And it's clear when you read these
19  additional documents that the -- that there was a
20  very close relationship between the three
21  companies in terms of collaborating how they were
22  going to do dermal work. The tox -- based on
23  these documents, the toxicological TWG group was,
24  as it said here, that they were -- consisted of
25  toxicologists and regulatory managers from

Page 65

1  Monsanto, Cheminova and Syngenta.
2    So -- and that they -- where that comes
3  from, just so that this doesn't come out of left
4  field, that's the real reason originally I
5  printed 515, was it showed me the relationships
6  between these three companies and what they were
7  doing with respect to dermal, at least that's
8  where my interest lied. I'm sure they had other
9  purposes as well.
10    But if you go to -- again, I'm referring
11  in the middle of that page to Exhibit 515, page
12  18. Do you see that?
13    Q.  Yes, sir.
14    A.  So I'm just quoting from this
15  presentation, the relationship between these
16  companies and how they were collaborating, if you
17  will.
18    Q.  And this is the previously marked
19  Exhibit 22, right?
20    A.  22, yes.
21    Q.  For this deposition?
22    A.  For the deposition.
23    Q.  Right.
24    A.  And specifically -- so first of all,
25  that gives me an idea of what's the relationship,

17 (Pages 62 to 65)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 66

1  why are they writing each other and why are they
2  always copying each other on the e-mails. When
3  you look at it, the individuals from these three
4  companies copy each other continuously on these
5  e-mails.
6      Q.  Do you know why?
7      A.  Because they're part of this
8  toxicological TWG.
9      Q.  Do you know what the purpose of the
10  Toxicology Technical Working Group was?
11      A.  It was clearly -- one of the reasons was
12  stated here.
13      MS. GREENWALD:  You might want to
14  reference the page number, just so it's clear on
15  the record.
16      A.  Yeah.  I'm talking specifically exhibit
17  to the deposition 22.
18      Q.  22?
19      A.  And specifically, they talk about this,
20  this Toxicology Technical Working Group on page
21  18 of this presentation by Saltmiras.  And it was
22  simply a group set up by these three companies.
23  They initially met in 2009, and they were going
24  to look at data gaps for gland lesions in
25  rodents, I don't know anything about that, but

Page 67

1  also, on dermal absorption, they were going to
2  collaborate on dermal absorption.  That's what
3  this presentation indicates was their purpose.
4      Q.  Looking for gaps in dermal absorption,
5  correct?
6      A.  Well, no.  It says data gaps and
7  undertake necessary study.  So it might not --
8  well, it could be or it could be what they
9  consider a necessary study.  And then what --
10  they go on with respect to the dermal side of it.
11  Because remember, this is what I'm focused on in
12  this section 4, that it says on page 20, and I
13  quote it here as well, but it says, The
14  toxicological TWG agree all three companies will
15  undertake the same regulatory driven in vivo
16  human skin absorption study design as Syngenta on
17  relevant formulated products.
18      So they're clearly collaborating on the
19  same -- they're using the same study design.  So
20  there's clear collaboration on how they're going
21  to do their dermal work.
22      Q.  Okay.  Do you know whether Monsanto,
23  Cheminova, and Syngenta all had
24  glyphosate-containing products?
25      A.  I don't know at the time whether they

Page 68

1  did or did not.
2      Q.  Do you know the purpose of the Joint
3  Glyphosate Task Force?
4      A.  The joint -- I did not study that.  I
5  was simply looking at it from --
6      Q.  No, just a question.  I'm just asking
7  whether you knew.
8      A.  I don't know off the top of my head.
9      Q.  I'm not asking you to study about them
10  right now.
11      A.  I don't know.  But it's clear that these
12  e-mails, they're going to use the same approach,
13  so there's -- the only thing I'm saying is
14  there's a close relationship between those folks
15  doing the dermal work, because they're going to
16  use the same methodologies.  They say so.
17      Q.  And are you saying whether there's
18  something wrong with that?
19      A.  I think that when I made -- when I noted
20  these quotes about -- there was the suggestion
21  that somehow there was more space between
22  Syngenta and their comments and Monsanto and what
23  they were doing.  When I quoted these two things,
24  that was the nature of the questioning that I was
25  asked the last time we talked about this.  It's

Page 69

1  clear --
2      Q.  I asked you about the separation between
3  Monsanto and Syngenta?
4      A.  No, no, no.  You made the point that
5  ███████ --
6      Q.  ███████?
7      A.  -- ███████ was not a Monsanto
8  employee.
9      Q.  Correct.
10      A.  -- suggesting that somehow or another
11  these comments would have any relevance to
12  Monsanto.
13      I think their relationship was quite
14  close with respect to dermal work.  And when he
15  says I think it's in everyone's best interest to
16  get a lower dermal absorption value, that's
17  clearly -- "everyone" here is these companies
18  that are part of that group.  And it's clear from
19  this presentation who the -- who that group is
20  and what their intent is in terms of doing dermal
21  work.
22      Q.  Who was that presentation made to,
23  Exhibit 22?
24      A.  It does not say.
25      Q.  So you don't know the audience?

18 (Pages 66 to 69)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 70

1    A.  Do not know the audience.
2    Q.  All right.  Let's move to Exhibit 27
3  then.
4        I'm sorry, before we do that, anything
5  else on Exhibit 28 as to why you included this?
6    A.  Yes, there is.
7    Q.  Okay.  Didn't mean to --
8    A.  I just don't want to jump, you know, I
9  just --
10    Q.  That's all right.
11    A.  I just want to answer your questions.
12    Q.  That's why I went back and asked the
13  question.
14    A.  There were other things in that
15  presentation that were supportive of my opinions,
16  and so I included them here on what would be
17  pages 2 and 3.
18    Q.  Let me interrupt.  Can you tell me which
19  opinions you're referring to?  We talked about a
20  lot of opinions in July.
21    A.  I -- the opinions that I had were that
22  the dermal work clearly suggested that
23  Monsanto -- that the Roundup products would
24  irritate the skin and that that would require a
25  higher level of warning or personal protective

Page 71

1  equipment than what Monsanto was trying to
2  convince the EPA to move towards, which was
3  essentially no PPE, except for goggle protection
4  of the eyes.
5        And it's clear when you look at --
6  analyze these dermal studies -- and we talked a
7  lot about them last time -- that Roundup does
8  irritate the skin, which by definition puts you
9  into a warning kind of category under dermal
10  irritation.
11    Q.  Okay.
12    A.  And so what -- what came out of this
13  presentation was some additional information to
14  support that opinion.
15    Q.  Okay.
16    A.  And specifically in 4-10 --
17    Q.  That's figure 4-10?
18    A.  Figure 4-10 in Exhibit -- Deposition
19  Exhibit 28, there's a table given on page 25 of
20  Mr. Saltmiras's presentation, which is Exhibit
21  22.
22    Q.  Okay.
23    A.  And under it, there's various products
24  listed, one of which is a Roundup product.  Well,
25  several Roundup products.  Then glyphosate, acid

Page 72

1  and then aniline 0818, which is 75 percent POEA,
2  severely irritating.  And then for the other
3  product, one of the products is slightly
4  irritating.
5        And then there's the statement that
6  contradicts that given on page -- the following
7  page of Exhibit 22, in the Saltmiras presentation
8  that I've got on the last page of Exhibit 28,
9  which says that it has low acute toxicity and
10  irritation potential except eye.  And I'm not in
11  agreement that it has low irritation potential.
12    Q.  Is that because of the chart or the
13  presentation, page 25, which refers to Monsanto
14  0818?
15    A.  In part.  I mean, I've gone through the
16  earlier work from '83 forward to show that it's
17  shown as being irritating from 1983 forward.
18    Q.  Do you have --
19    A.  But this is also showing that -- again,
20  I'm not saying it's a new opinion.  It's just
21  supporting my opinion that Monsanto knew that
22  particularly the POEA, the surfactant was very
23  irritating, and you see evidence of that in this
24  chart again where the product itself -- and they
25  say slightly irritating and then they say the

Page 73

1  glyphosate is nonirritating.
2        So there's always this slicing of the
3  onion where are we talking about the product or
4  are we talking about glyphosate?  Well, it's
5  clear from a skin irritation product standpoint,
6  based on this and based on a whole bunch of other
7  stuff that we've already talked about, that in
8  fact this product is a skin irritant.
9    Q.  All right.  So we've talked about the
10  other stuff.  So let's talk about this a little
11  bit.
12        Do you know what product is Monsanto
13  0818?
14    A.  It's defined in here.
15    Q.  "In here" being what?
16    A.  In 22.  It's on page 25 of Exhibit 22.
17        It says surfactant blend contains 75
18  percent POEA.
19    Q.  Okay.  Do you know whether or not that
20  product, MON 0818, was ever provided to the
21  public?
22    A.  Well, I have -- I have -- certainly, the
23  POEA was an ingredient.
24    Q.  Not my question.
25        Product 0818, which is shown as a

19  (Pages 70 to 73)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 74

1  surfactant blend with 75 percent POEA, do you
2  know whether that product was ever provided to
3  the public?
4       A.   Well, let me check.
5            What I'm going to is Exhibit 7, and I'm
6  going to look and see.  The only data that I'm
7  aware of that goes through this at length is on
8  page 13 of Exhibit 7.  In the Freedom of
9  Information, there was a bunch of products
10  listed.
11       Q.   Are you referring to table 4-1?
12       A.   I am.
13       Q.   That's an inert ingredient table, right?
14       A.   Yes.
15       Q.   Did you create that table or did you
16  pull that from somewhere?
17       A.   I created that table from the MONGLY
18  Bates numbers listed above.
19       Q.   Anywhere other than on page 13, do you
20  list -- well, actually, it's not on page 13.  I'm
21  trying to find out where you list POEA as an
22  inert ingredient.
23       A.   Oh, it's on the very first row.
24       Q.   Okay.  Anywhere else other than that do
25  you list POEA?

Page 75

1       A.   Yeah.  All the text before then list
2  POEA as the surfactant most used in Roundup.  For
3  instance, on page 12 --
4       Q.   I was referring to -- I asked you about
5  table 4-1.
6       A.   Are we done with 4-1 or not?
7       Q.   No.  I asked you about table 4-1.
8  Anywhere else other than in 4-1 do you refer to
9  POEA in the table that you've created?
10       MS. GREENWALD:  Objection.  Form.
11       A.   Within the table itself?
12       Q.   Yeah.
13       A.   The POEA is always listed in the first
14  row that the product's listed.
15       Q.   Right.  And as you've indicated, all the
16  products that you have on this page, one, two,
17  three, four, five -- 10 products, all of them
18  have POEA as an inert ingredient, correct?
19       A.   Well, I think if you look at the top of
20  page 17 of Exhibit 7, because this is a continued
21  table, there's 17 products listed, 16 had POEA,
22  only one did not.
23       Q.   Okay.  So the next page has an
24  additional products and then the last page --
25       A.   The table continues --

Page 76

1       Q.   I got you.  Okay.
2       A.   -- out into the space.
3       Q.   Okay.  And in any of those products, do
4  you know whether any of those products were
5  Monsanto 0818?
6       A.   I don't know if they were 0818, but they
7  were certainly -- they all contained POEA.  And
8  this product is a majority POEA, which is known
9  as an irritant.
10       Q.   I'm just asking you.
11       A.   Yeah.
12       Q.   Do you -- can you correlate -- because
13  you refer to a page in Exhibit 22 that refers
14  directly to MON 0818, right?
15       A.   No, no, no, no.  I said -- what I've
16  said is I would look in this section to see if I
17  could find MON 0818.
18       Q.   Right.  So we're going back to answering
19  my question, though.  Do you know whether or not
20  MON -- the product identified in Exhibit 22, page
21  25 of that exhibit, which is entitled Acute
22  Toxicity and Irritation Potential, and the last
23  column there is MON 0818 with two asterisks,
24  which says, "Surfactant blend of 75 percent
25  polyethoxylated tallow amine," which is POEA.

Page 77

1       A.   Right.
2       Q.   My question is, can you tell me if that
3  product was provided to the public?
4       MS. GREENWALD:  Objection.  Form.
5       A.   As the -- the POEA in it was routinely.
6  That's my point.
7       Q.   No, no, no.  I understand your --
8       A.   This is my --
9       Q.   Hold on.  Hold on, because we have
10  limited time.
11       A.   I understand.
12       Q.   I want you to answer my question.  I'm
13  not asking you whether POEA was ever a surfactant
14  or whether it was included in number of other
15  Roundup --
16       A.   Well, it was the primary surfactant.
17       Q.   I'm not asking whether it was the
18  primary surfactant.  I'm asking did this product,
19  MON 0818, was that product, which says it has a
20  75 percent blend, ever provided to the public?
21  Not whether the surfactant was used, not anything
22  else.  That's a very simple and direct question,
23  Mr. Petty.
24       MS. GREENWALD:  Objection to form.
25       A.   Well, it's not a simple question,

20  (Pages 74 to 77)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

---

Page 78

1  because that's not where I form my opinion.
2      Q.   Okay.  I understand that.  I understand
3  that's not where you form your opinion.  Just
4  answer my question.
5          Do you know whether that product was
6  ever provided to the public?  Either you do or
7  you don't.  I can move on from there.
8      A.   I'm not sure.  I'd have to go and look
9  at all the formularies to see.  I just don't know
10  off the top my head.
11     Q.   All right.  From the formularies that
12  you are familiar with, do you know of any
13  formulary that provided to the public, a Roundup
14  formulary that included a 75 percent POEA
15  mixture?
16     A.   Without looking at it, I just can't tell
17  you off the top of my med.
18     Q.   Do you have the formulation in Exhibit
19  7?
20     A.   Not all of them.
21     Q.   Okay.  Which ones do you have?
22     A.   The ones that I've listed.
23     Q.   Listed in table 4-1?
24     A.   Some of them.  And then I've also listed
25  some of the -- the section beginning -- really, I

---

Page 79

1  took a preliminary look at some of the
2  composition and physical property data beginning
3  on page 9 of this report or this document on
4  page -- I guess it's called Exhibit 7.  And I
5  start on page 11, beginning to look at documents
6  where they list various formulations or
7  formularies.
8      Q.   Um-hum.
9      A.   Some of which they -- I mean, you see at
10  the bottom, I have -- I think it's right there
11  where we have poly -- oh, it's MON 0818 is how
12  they define POEA.  So that product, when they
13  define it as POEA, and then it's listed as POEA
14  in the formularies, I'm saying, yeah, it's used
15  as POEA.
16     Q.   That's what I'm getting to, Mr. Petty.
17  You're making a reference as a supporting item of
18  your opinion in this supplement and you refer to
19  a PowerPoint that you don't know who the audience
20  was and you don't understand what MON 0818 is.
21     A.   Yes, I do.  I just told you what it is.
22  It's in my report on the bottom of page 11.  It's
23  defined in a memo by [REDACTED] as POEA.
24  That's how they're defining it.
25     Q.   Right.  I understand what you're trying

---

Page 80

1  to say.  You're missing what I'm trying to say.
2      A.   I don't think so.
3      Q.   Okay.  Well, let me ask you another
4  question then.
5          Is it your testimony that there was a
6  product put out to the public that mixed MON
7  808 -- 0808, was put out to the public as Roundup
8  that included MON 0808?
9          MS. GREENWALD:  Objection.  Form.
10     A.   As [REDACTED] says, MON 0818 is POEA.
11  The products clearly show -- in fact, there's
12  testimony -- if you go to the -- where I cite on
13  page 11 of Exhibit 7, here in Kirkland, Exhibit
14  453, the original Roundup branded formulation,
15  Mon 2139 contained 41 percent IPA and 15.4
16  percent MON 0818, a poly -- a POEA-based
17  surfactant blend.
18     Q.   Blend?
19     A.   So the answer is yes, it was sold as --
20  it's an ingredient that was part of the original
21  formulation.
22     Q.   Right.  So the table you're referring
23  to -- and I'll get back to my main point -- is
24  actually looking at your table in Exhibit 28,
25  which refers to a slide that Mr. Saltmiras

---

Page 81

1  presented to an audience -- we do not know who
2  was in that audience -- is really showing that
3  when you just have by itself the surfactant blend
4  by itself, it can be severely irritating to skin?
5          MS. GREENWALD:  Objection.  Form.
6      A.   Well --
7      Q.   The only Roundup product on that slide
8  is Roundup Pro.  Do you agree with that?
9      A.   Correct.  That's the only one listed.
10     Q.   Right.  And that has a skin irritation
11  of slightly irritating, correct?
12     A.   It's still irritating the skin, and we
13  can debate as to whether it's slightly or not
14  based on all the other -- the actual data which
15  we covered last time at length.
16     Q.   Yes, we did.  I don't intend to go back.
17     A.   All I'm saying is that Monsanto clearly
18  understood that one of its ingredients was
19  severely irritating in the product.  And from an
20  industrial hygiene standpoint, where you have the
21  recognition -- anticipation and recognition
22  requirements to protect public health, Monsanto's
23  not arguing that their product is irritating to
24  the skin.  That's my point.
25     Q.   Okay.  You keep adding that sentence

21  (Pages 78 to 81)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 82

1    when POEA is in the product, that it's severely
2    irritating within the product.  You were just
3    referencing a slide which shows that when POEA is
4    in the product, it's slightly irritating,
5    correct?
6            MS. GREENWALD: Objection. Form.
7    A.   I -- they're still showing as
8    irritating.  I would argue with the adjective
9    about slightly based on the --
10   Q.   You use the adjective in your sentence
11   severely, and that's not what this -- what we
12   just pointed at.
13   A.   No, no, no.  I'm talking about the --
14   I'm talking about the POEA.
15   Q.   The POEA alone?
16   A.   You're a chemical engineer like I am and
17   you're putting together a product, and you've got
18   a constituent that's severely irritating to the
19   skin.  Well, your objective should be to take it
20   out.
21   Q.   Okay.  That's your testimony?
22   A.   Sure.
23   Q.   Okay.  I'll take that.
24   A.   From the standpoint of an engineering
25   and an industrial hygiene standpoint, absolutely.

Page 83

1    Q.   And you've engineered pesticides with
2    different surfactants in your career?
3            MS. GREENWALD: Objection. Form.
4    A.   No, I haven't engineered --
5    Q.   Engineered any pesticides?
6    A.   I don't have to engineer materials as a
7    certified industrial hygienist to know something
8    that's severely irritating shouldn't be in the
9    product.
10   Q.   Not my question, sir.  My question is
11   have you ever engineered a pesticide?
12   A.   I have not engineered a pesticide.
13   Q.   Have you ever formulated a pesticide?
14   A.   I have not.
15   Q.   Have you ever worked with any company as
16   a consultant on the formulation of any pesticide?
17   A.   Not that I recall.
18   Q.   And --
19   A.   I think I testified on my background on
20   pesticides the first day.
21   Q.   Okay.  When we last met in July, you
22   refused to provide copies of transcripts of your
23   testimony as an expert witness in the last four
24   years.  Are you still refusing to provide those
25   copies?

Page 84

1            MS. GREENWALD: Objection to form.
2            MR. UPSHAW: I'll correct it if you'd
3    like, Ms. Greenwald.  What's the objection?
4            MS. GREENWALD: I'd like to see his
5    testimony that said I refuse to do that.  I
6    wasn't there the whole time, but I don't recall
7    that.
8            MR. UPSHAW: All right.  We'll get it.
9    If you want me to provide it for you, we'll get
10   it.  Line 1, page 96 and 97.
11   A.   It's an impossible task because I don't
12   even have it.
13   Q.   So you're not refusing?  You're just
14   saying it's not in your possession now?
15   A.   All of the cases I've been in, no.  Some
16   of them, yes; some of them, no.  But --
17   Q.   So the ones that you have in your
18   possession, would you provide them?
19   A.   It would be very difficult.
20   Q.   All right.  I'm not suggesting that it
21   wouldn't be.  Are you refusing to provide it or
22   are you going to provide it?
23   A.   I don't intend to provide it.  I've
24   never been asked to do that in the past and I
25   don't intend to do it at this point.

Page 85

1    Q.   So you're still refusing to provide that
2    testimony?
3            MS. GREENWALD: Objection.  Why don't we
4    talk about that at a break and not put Mr. Petty
5    in the situation where -- these are legal
6    questions you're asking as well.  So we'll talk
7    about it and we'll talk about it after the break.
8            MR. UPSHAW: Happy to allow you have to
9    that conversation.  I was just following up from
10   our last deposition.  So I will give you a little
11   bit more time.
12   Q.   Since July of this year, have you looked
13   at the NAPP?
14   A.   No.
15   Q.   Have you looked at the Health Canada
16   evaluation decision on glyphosate?
17   A.   When was it issued?
18   Q.   It was issued --
19   A.   By the way, going back to the first
20   question, the NAPP, I'd like to see that document
21   as well if you're referring to a document.
22   Q.   Okay.  We looked at this during the last
23   deposition, I don't recall the exhibit number,
24   but we'll find it.  Let me show it to you to
25   refresh your recollection at this point.

22 (Pages 82 to 85)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 86

1    Have you seen that before?
2    A.   I don't know, but I wouldn't have
3    studied it at all because it looks to me to be a
4    causation.  I'm not a causation expert.
5    Q.   And also, I believe we looked at this as
6    well.  I'm going to check before I mark it again
7    so we don't have duplicates.  But this --
8    MS. ALVAREZ:  It was marked.
9    Q.   Yeah.  So it was marked before.  So I'm
10   not going to mark it again.  I'll refresh your
11   recollection of the statement from Health Canada
12   on glyphosate, frequently asked questions on the
13   reevaluation of glyphosate.  One is dated April
14   2017, the frequently asked questions.
15   MS. ALVAREZ:  This one was not marked.
16   This one was.
17   Q.   Okay.  So the document that we marked
18   previously was dated January 11, 2019.  Showing
19   you that.  And I'll show you the frequently asked
20   questions, which was 2017.
21   Have you reviewed either of those
22   documents before my showing them to you today?
23   MS. GREENWALD:  Objection.  You said
24   that one of them was marked last time, so clearly
25   he saw one of them.

Page 87

1    MR. UPSHAW:  Oh, you're right.
2    MS. GREENWALD:  Sometimes I'm right.
3    MR. UPSHAW:  I think you're right a lot
4    of times.
5    I asked him a bunch of questions, too,
6    but I'll withdraw those and start again after
7    he's had a chance to look at them.
8    A.   I was going to get there, but I thought
9    I'd look at it before I -- please ask your
10   question again.  I apologize.
11   Q.   No problem.  So I started off with the
12   question, have -- since the last time we spoke,
13   have you looked at this one, which was the
14   statement from Health Canada on glyphosate?
15   A.   Have I looked at it beyond the time
16   where I saw it in the deposition?
17   Q.   Correct.
18   A.   No.
19   Q.   Okay.  And just for today, have you ever
20   seen or looked at the frequently asked questions
21   on the reevaluation of glyphosate dated April
22   2017?
23   A.   Unless it -- I don't recall it.  Because
24   it's primarily to do with cancer and causation,
25   and I wasn't -- I wasn't -- I'm not a medical

Page 88

1    expert, so.
2    Q.   Okay.
3    A.   The question of whether I've seen them
4    or not, if they were attached to -- I noticed
5    some of the early documents I have are deposition
6    testimony of some of the medical experts, and
7    whether they were attached to the depositions or
8    not, I don't know.  I just don't recall.
9    Q.   All right.  Since I don't believe this
10   was marked before, let's mark it as 29.
11   - - - - -
12   (Thereupon, Petty Deposition Exhibit 29, Article
13   Titled Frequently Asked Questions on the
14   Re-evaluation of Glyphosate, was marked for
15   purposes of identification.)
16   - - - - -
17   Q.   Okay.  During your deposition in July,
18   we showed you the EPA 2019 interim report on
19   glyphosate.  Have you reviewed that document
20   since then?
21   A.   I'm not sure what you mean by interim
22   report.  I have -- I don't even know if we talked
23   about it the last time.  I have reviewed the EPA
24   risk assessment on glyphosate.  I don't know if
25   that's what you're referring to or not, so I

Page 89

1    don't know -- I'm not sure which document you're
2    referring to from the EPA side.  I know I've
3    looked at the risk assessment because that would
4    be relevant and something I'd be interested in
5    reviewing because I've done an expert risk
6    assessment.  But I'm not sure if that's what
7    you're referring to.
8    Q.   All right.  I'll get it for you now.
9    Okay.  It was Exhibit 12 in your
10   deposition in July.
11   A.   All right.
12   Q.   And at the time, if I recall your
13   testimony, you knew about it but had not reviewed
14   it.
15   A.   And is the question have I looked at it
16   since my -- I have not.
17   Q.   That is correct.
18   A.   I have not.
19   Q.   And so is it your opinion that this
20   document would have no relevance to your opinions
21   in this case?
22   MS. GREENWALD:  Objection.  Form.
23   A.   No, I wouldn't say that.  My presumption
24   would be part of that decision was the risk
25   assessment or the various risk assessments that

23  (Pages 86 to 89)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 90

1  were done.  So to the extent that they relied on
2  their risk assessments, then it would be
3  relevant, but I was more interested in the
4  baseline document of what they did in their risk
5  assessment, what assumptions they made, what
6  pathways they considered and what pathways they
7  didn't consider.
8      Q.   And how do you know whether or not they
9  relied on their risk assessments if you haven't
10 read it?
11     A.   Well, the risk assessment would be part
12 of the reregistration decision under the FIFRA
13 requirements.
14     Q.   And they would be using a new risk
15 assessment?
16     A.   Well, yeah, they would be using the most
17 current risk assessment, and there was new risk
18 assessment issued.
19     Q.   Okay.
20     A.   And that's -- so that's what I'm saying
21 is that that would be part of -- that would be
22 embedded in their decision, I'm sure.
23     Q.   Do you know whether or not there's any
24 reference to any other risk assessments or the
25 new reregistration risk assessment in the

Page 91

1  proposed interim registration review decision
2  dated April 2019?
3      MS. GREENWALD: Objection. Form. Asked
4  and answered.
5      A.   I'm not sure -- I think you asked
6  multiple questions.  But what I've said is that
7  the risk assessments would be inherently part of
8  the RED process.  And to that extent, they would
9  be embedded, if you will, ultimately in their
10 conclusions.
11     I had -- I disagree with -- since I
12 taught risk assessment to the regulators in the
13 State of Ohio, I'm pretty -- and I've done many,
14 many risk assessments myself, I was very
15 interested in the pathways they considered and
16 didn't consider, and the impact that would have
17 on their final conclusions in their risk
18 assessment and so I do have opinions about that.
19 But that's -- that's one element of their
20 ultimate decision.
21     Q.   You have opinions about the EPA risk
22 assessment?
23     A.   I do.
24     Q.   I don't recall discussing those opinions
25 with regard to the EPA when we were together in

Page 92

1  July.
2      A.   We did not.  You did not ask those
3  questions.  And I think I said that earlier today
4  that I do have opinions on the EPA -- I did
5  review the -- that's why I had you pull this
6  document to see -- to make sure it wasn't the
7  risk assessment document.
8      Q.   Do you intend -- or rather, have you
9  been asked to provide opinions with regard to the
10 EPA risk assessment at the trial of this matter?
11     MS. GREENWALD: Objection to form.
12     A.   I don't think I've been asked one way or
13 the other.  But because it ties into my expertise
14 in dermal, I certainly would have -- and my
15 expertise as a risk assessor, if asked questions
16 in that area, I would give my opinions.
17     Q.   Let me ask you, what is your opinion
18 with regard to the EPA risk assessment for the
19 reapplication for glyphosate -- or Roundup,
20 rather?
21     A.   Well, first of all, if you look at --
22 the key to risk assessment is the pathways you
23 consider or don't consider.  In this risk
24 assessment, they eliminated a cancer pathway, so
25 that's going to lower your risk score, and they

Page 93

1  eliminated the dermal pathway, which is really
2  surprising to me.
3      Q.   So let me get this down, because I don't
4  want to miss anything.
5      It's your opinion that the EPA
6  eliminated both the dermal and cancer pathways?
7      A.   Yes.  And I like to say, as I taught in
8  my classes, if you assume away all the risks, you
9  don't have any risk.
10     Q.   And are you saying that the EPA was
11 wrong to eliminate the dermal and cancer
12 pathways?
13     A.   It certainly wasn't -- well, on the
14 cancer side, it wasn't conservative, that's for
15 sure.  In other words, I'll let the medical guys
16 argue whether it's a carcinogen or not, but they
17 made the decision it wasn't.  That eliminates a
18 huge chunk of the risk.
19     But the other thing that they -- that
20 they didn't consider, and the one most
21 interesting to me, was that they eliminated the
22 dermal pathway for skin irritation.  And I don't
23 think the data show that at all.  In fact,
24 it's -- typically, when you do a risk assessment,
25 you're being conservative by not assuming away

24  (Pages 90 to 93)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 94

1    risks.
2          But in this case, they did.  If you
3    assume away the dermal pathway -- which we know
4    that the primary route of exposure for Roundup
5    and glyphosate is dermal.  I mean, there's no
6    disagreement about that.
7    Q.   Is there something that --
8    A.    Then if you assume away that pathway,
9    you assume away a big chunk of the risk.
10   Q.   Is there something that you've seen that
11   the EPA hasn't seen with regard to the dermal
12   pathway of Roundup?
13         MS. GREENWALD:  Objection.  Form.
14   A.   I read the risk assessment.  They just
15   say that -- I try -- you know, I've read what
16   they say and they say they've eliminated it.
17   They don't really give you -- it's not like a --
18   you know, like a preamble to a regulation where
19   you can kind of get the back and forth
20   discussion.
21         The risk assessment doesn't say anything
22   to me other than it was not considered.  I find
23   that odd in the face of -- first of all, being
24   the primary route of exposure, and secondly, the
25   analysis that I've done on dermal.

Page 95

1    Q.    And is it your opinion that your
2    analysis is more complete than the analysis of
3    the EPA?
4    A.   I haven't seen their analysis, so I
5    can't form an opinion on that.  But I will say
6    that I am very well qualified in doing analysis
7    of dermal exposures.
8    Q.   Are you more qualified than the EPA to
9    do dermal exposure analysis?
10         MS. GREENWALD:  Objection to form.
11   A.   I think I just answered that question.
12   Q.   Mine was just yes or a no.
13   A.   No.
14         MS. GREENWALD:  Same objection.
15   A.   My answer was I haven't seen their
16   analysis and I haven't seen their people.  But my
17   opinion is that that should not have been
18   eliminated.
19   Q.   And my question was, do you believe that
20   you can perform a better analysis than the
21   scientists of the EPA with regard to dermal
22   absorption?
23         MS. GREENWALD:  Objection.  Form.  Asked
24   and answered.
25   Q.   Not whether you've seen it or not.

Page 96

1          MS. GREENWALD:  Same objection.
2    A.   Well, unless I've seen how they've done
3    their analysis, then how can I form an opinion on
4    the people that did it?
5    Q.   So -- but it's your conclusion that
6    whatever their analysis was to eliminate dermal
7    exposure, it was incorrect, based upon your
8    review of the dermal exposure literature?
9          MS. GREENWALD:  Objection to form.
10   Mischaracterizes his testimony.
11   A.   You've got some adjectives in there that
12   make it difficult to answer that question.
13   Q.   Okay.
14   A.   The -- what I'm saying again is based on
15   my education, training, and experience in dermal,
16   which is extensive, based on my training in risk
17   assessment, which is extensive, I was selected by
18   the State of Ohio to train on risk assessment the
19   regulators, the people that evaluate risk
20   assessments.
21         Based on a review of the risk assessment
22   studies done in this particular situation, as
23   I've outlined in my outline of facts, and based
24   on the fact that, by all accounts, the dermal
25   exposure pathway is the primary exposure pathway

Page 97

1    for workers and those applying Roundup, it is
2    very odd to me that the EPA -- and given that
3    it's showing that it is a skin irritant after as
4    little as a week, in the '83 study, it's really
5    surprising to me that based on all the
6    information we have about it being a skin
7    irritant, that that wasn't part of the risk
8    assessment.
9    Q.   Okay.  So you've reviewed risk
10   assessment studies?
11   A.   Oh, absolutely.  Absolutely.
12   Q.   Is it your opinion that --
13   A.   I mean, I've gone back all the way to
14   the ASTM 1739, which was the 1995, which was the
15   beginning of risk assessment.  I was in the first
16   State of Ohio training on risk assessment.
17   Q.   Okay.  And that has nothing to do with
18   what we are talking about with regard to
19   glyphosate.
20   A.   No.  It has to do with studies.  You
21   asked the question about studies.
22   Q.   Right.  So the studies that you've
23   reviewed with regard to risk assessment are
24   historical studies as to the methodology of risk
25   assessment?

25  (Pages 94 to 97)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 98

1    A.   Well, the ASTM standard is standard on
2  how to do risk assessment.
3    Q.   Right.  So it's methodology?
4    A.   Sure, one of them.  At the very
5  beginning ASTM 1739 1995.
6    Q.   And I'm just trying to get your opinion
7  here.
8    A.   I'm just trying to give you the
9  information.
10   Q.   Okay.  When you say that it's
11 quote-unquote odd, what do you mean by odd?
12   A.   Based on all the information that I have
13 available to me, I would not have eliminated
14 dermal pathway.
15   Q.   Okay.  So you disagree with the EPA's
16 elimination of the dermal pathway?
17   A.   That is correct.
18   Q.   You said you also disagree with the
19 EPA's elimination of cancer, but you would leave
20 that to the physicians and the cancer
21 specialists; is that correct?
22   A.   Yes, in context with the fact that I
23 know the process of risk assessment very well.
24 And as I've said before, if you begin to
25 systematically eliminate, this is -- remember, I

Page 99

1  taught the Ohio regulators how to treat a risk
2  assessment.  I have old data related to that.
3  And one of the keys is that if you -- there's a
4  whole bunch of ways that you can eliminate
5  pathways.  And if you do, you inherently have a
6  low risk.  And the standard position is that if
7  you eliminate all the risky pathways, you don't
8  have a risk.
9       And when I looked at the EPA risk
10 assessment, the -- if you eliminate the cancer
11 risk and you eliminate the dermal risk, which is
12 the pathway that would most likely affect people,
13 then you're inherently going to have a low risk.
14   Q.   So the elimination of the cancer pathway
15 is secondary to the -- in your opinion, to the
16 elimination of the dermal pathway?
17        MS. GREENWALD:  Objection.  Form.
18   A.   I didn't have any ranking on them.
19   Q.   Okay.
20   A.   I've just said over and over again here,
21 the elimination of critical pathways.
22   Q.   Critical in your mind.
23        MS. GREENWALD:  Objection.  Form.
24   A.   No, not in my mind.  Go and look at ASTM
25 1739 1995 or any of the courses since then.

Page 100

1  There are -- I can take you to UST background,
2  where we look at the primary components
3  generally, or BTEX and the pHs.  And what are the
4  two that everybody looks at that will knock you
5  out fastest when I'm working for the petroleum
6  industry?  Benzene, a carcinogen out of the BTEX,
7  and Benzo[a]pyrene, which is also a carcinogen.
8       If you have those in your samples,
9  whether it be wastewater, soils, et cetera, at
10 elevated -- at almost any level, but at elevated
11 levels, they will push you above the ten to the
12 minus sixth or ten to the minus fifth criteria.
13   Q.   All right.  Let me bring us back -- and
14 we're not talking about the chemical industry.
15 Let's bring us back to what we're talking
16 about --
17   A.   Well, we are talking about -- I mean, we
18 are the petrochemical industry.
19   Q.   Let me bring us back to your opinions
20 with regard to the EPA, which has nothing to do
21 with the oil and gas industry.
22       It's your opinion that the EPA -- and I
23 asked you about the dermal pathway.  Is it your
24 opinion that the EPA incorrectly eliminated the
25 cancer pathway?

Page 101

1       MS. GREENWALD:  Objection.  Form.
2       And you only have one minute to give an
3  answer because that's all that's left on the
4  tape.  Go on.
5    A.   I disagree with their elimination.  I
6  think overall -- my first opinion is that by
7  eliminating the key pathways, you have a low risk
8  inherently.  And secondly, I certainly disagree
9  with their elimination of the dermal pathway for
10 the reasons I've talked about.
11       MR. UPSHAW:  Okay.  We can go off the
12 tape, but my question was to cancer.
13       THE VIDEOGRAPHER:  Off the record, 2:01,
14 end of disk 1.
15       (Recess taken.)
16       THE VIDEOGRAPHER:  Okay.  We are back on
17 the record, disk 2, it's 2:12.
18 BY MR. UPSHAW:
19   Q.   Okay.  In reviewing your responses, I
20 think you answered the question with regard to
21 eliminating the cancer pathway, and that is that
22 you disagree with the EPA.
23       Did I categorize that correctly?
24   A.   No.  I think I said I would leave the
25 whole cancer discussion up to the medical guys,

26 (Pages 98 to 101)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

---

Page 102

1 but I said in an overall sense, when you
2 eliminate the cancer and the dermal pathways,
3 there's not much left from a risk assessment
4 standpoint. And that's my criticism, is that if
5 you clearly eliminate the critical pathways, then
6 you're going to have a low risk.
7     Q. Before --
8     A. But I certainly disagree -- I can
9 testify on the dermal pathway for sure. I -- for
10 all the reasons I've talked about, I disagree
11 with them eliminating that pathway.
12     Q. Okay. Let me mark as Exhibit 30 the
13 evaluation of carcinogenic potential from the EPA
14 Office of Pesticides dated December 12, 2017,
15 with regard to glyphosate. I think this is what
16 you are making a reference to with regard to the
17 risk assessment; is that correct?
18         - - - - -
19 (Thereupon, Petty Deposition Exhibit 30, Revised
20 Glyphosate Issue Paper: Evaluation of Carcinogenic
21 Potential dated 12/12/17, was marked for purposes
22 of identification.)
23         - - - - -
24     A. No, this is a -- the document I'm
25 referring to is relatively more recent, and it

---

Page 103

1 was -- I want to say it was in 2018. But it's
2 titled Risk Assessment and it has the words "risk
3 assessment."
4     This is -- this would be a subset of
5 looking at the issue of whether or not glyphosate
6 is a carcinogen or not, and I'm not here to
7 testify on that one way or the other.
8     Q. And so you've never seen that before?
9     A. I'm not saying I've never seen it.
10     Q. Oh. So my question is have you seen it
11 before?
12     A. I may have seen it in going through -- I
13 did go through the EPA webpage, but my focus was
14 on the risk assessment documents. Whether I saw
15 it as a document that was there or not, I didn't
16 go in and review it. Does that make sense?
17     Q. Okay. So you're not relying on it and
18 you haven't read that document through in
19 detail --
20     A. No.
21     Q. -- as part of your opinion?
22     A. No.
23     Q. Okay.
24     A. I suppose this goes here.
25     Q. That goes in the pile.

---

Page 104

1     Going back to Exhibit 12, which was the
2 document dated April 2019, where we started this
3 discussion, and I was asking you that -- I just
4 want to be clear.
5     Again, you haven't reviewed this
6 document -- which you may have answered this
7 already, but I'm trying to get us back on the
8 same page -- you haven't reviewed this document
9 and it does not -- and it has not had any
10 influence on your opinions that you intend to
11 provide in this case; is that correct?
12     MS. GREENWALD: Objection. Form.
13     A. Can I see the document again? I
14 apologize. It's been a while.
15     Q. Yeah, of course. No, no. I want to
16 make sure I'm not paraphrasing you incorrectly.
17     A. You wouldn't do that.
18     Q. I would try not to do that. I want to
19 paraphrase you correctly so I can use it later.
20     A. I think I answered your question before
21 in the sense that I didn't rely on this document
22 directly, but it would contain -- and I found
23 that -- it would contain elements -- or it would
24 contain information related to the risk
25 assessment, which is referred to on page 19 of

---

Page 105

1 this document. It's called Glyphosate Draft
2 Human Health Risk Assessment for Registration
3 Review, which is available in the public docket,
4 or that's where I saw it. And I certainly
5 reviewed that document, the health risk
6 assessment -- human health risk assessment, and
7 that's where my criticisms lie.
8     I didn't rely on this document, per se,
9 but indirectly I do, because I'm critical of the
10 risk assessment itself, which is one of the bases
11 for the decision they make in this RED review.
12     Q. Just to put it more squarely, you rely
13 on a document that's referenced in here, but not
14 this document?
15     MS. GREENWALD: Objection. Form. Asked
16 and answered.
17     A. Well, I would disagree with the RED
18 review if in fact it relied on a risk assessment
19 that I didn't agree with. Does that make sense?
20 But there are other elements in that RED decision
21 as well if the -- terrestrial risk assessment.
22 You know, other -- there are other elements that
23 go into the RED decision.
24     Q. Correct.
25     A. But specifically, I would not -- I

27  (Pages 102 to 105)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 106

1 wouldn't say that I don't rely on it.  In the
2 sense that they have used the risk assessment in
3 a way that I don't think is appropriate, then I
4 would -- then I'd have opinions that -- to the
5 effect -- to the extent that it affected that RED
6 decision, then yeah, I would rely on it.
7 Q.  Okay.
8 A.  My opinions lie with the human risk
9 assessment and the pathways not considered.
10 Q.  Right.  That's what I understand.
11 A.  But to the extent that they're embedded
12 in that document, then I would have opinions on
13 it.
14 Q.  You would have opinions on this
15 document?
16 A.  To the extent that they rely on that
17 human health risk assessment.
18 Q.  Right.  My understanding was as of your
19 depo in July, you had not reviewed this document.
20      Have you since then reviewed this
21 document?
22 A.  Just now, I did.
23 Q.  Okay.
24 A.  Well, I mean, I've read pieces of it.
25 Q.  You've had an opportunity to flip

Page 107

1 through portions of it.
2 A.  Right.
3 Q.  Okay.  But you haven't thoroughly
4 reviewed this document so that you can comment on
5 different sections of it before you just flipped
6 through it for 30 seconds there.
7      MS. GREENWALD:  Objection.  Form.  That
8 was not 30 seconds.
9 Q.  Okay.  Two minutes.
10 A.  But I did read the human risk assessment
11 section, and again, it shows that they assumed
12 away pathways that I think inherently make the
13 risk low, as I've discussed at length.
14 Q.  All right.  Did you have the continuity
15 at our break to -- I guess this is more for
16 Ms. Greenwald -- to get the invoice?
17      MS. GREENWALD:  I sent it a little while
18 ago to you.
19      MS. ALVAREZ:  Oh, I'm sorry.  I'm just
20 not looking.
21      MS. GREENWALD:  I sent it within five
22 minutes of --
23      MR. UPSHAW:  I'm just trying to catch up
24 with stuff that we left hanging.
25      MS. GREENWALD:  I only sent it to

Page 108

1 Melissa, not you.  I figured she's on a computer.
2      MR. UPSHAW:  I only have -- that's fine.
3      MS. GREENWALD:  Do you have it?
4      MS. ALVAREZ:  Let me check right now.
5      MS. GREENWALD:  From an hour and a half
6 ago.
7      MS. ALVAREZ:  Yes, I've got it.
8      MS. GREENWALD:  Good.
9      MR. UPSHAW:  Okay.  Then we'll get that
10 printed at the next break.
11 Q.  I also want to clarify something you
12 said earlier about your discussions with -- or
13 your potential of having a discussion with
14 Dr. Sawyer.
15      Is it your testimony that you spoke to
16 Dr. Sawyer prior to our deposition in July?
17 A.  I was -- I was brought into a
18 conversation to fully explain the basis of my
19 calculations.  I think I went through one
20 example.  Yeah, the answer is yes, it was
21 before -- I'm pretty sure -- I know it was before
22 I was deposed.
23 Q.  Okay.  So back on July 9th, you
24 testified, and I can show -- you said you looked
25 at your testimony, but I can show it to you

Page 109

1 again -- on page 99 -- at line 6 on page 99, I
2 asked you have you -- "You haven't talked to
3 Dr. Sawyer?"
4      And your answer was, "I have not."
5      Do you need to see that question and
6 answer?
7 A.  I think there's other testimony where --
8 I'm sure that there was testimony that I said
9 that there was a phone call in which I was pulled
10 in and I thought I talked to Dr. Sawyer before my
11 last deposition, briefly.
12 Q.  You said -- and I'll read the whole
13 section.
14      Trying to figure out how far I need to
15 go back.
16      You were reviewing the items in the
17 notice of deposition, and you were referring to
18 item 21.
19 A.  Is this the first day?
20 Q.  This is the first day.  And I asked you
21 about item 21, I asked you have had any
22 communications with experts or plaintiffs.  And
23 your answer was, "Well, I've contacted the
24 plaintiffs because I've interviewed them."  And
25 that's at the beginning of page 98.

28  (Pages 106 to 109)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 110

1    A.   Okay.
2    Q.   Then I asked you, "How about any of
3  these experts?  And I'll go through the list."
4  And I started with Dr. Lacasce.
5         And you said no.
6         "Any communications with her?"
7    "No."
8    "Any communication with Dr. Portier?"
9    "No."
10   "Any communications with Dr. Siegel?"
11   "Well, not in this case.  He was an
12  expert in C8."
13   A.   That's true.
14   Q.   And then you said, "So I knew him from
15  that case."
16        My question then was, "Well, this would
17  be regarding glyphosate or glyphosate-based
18  herbicides, Roundup or IARC."
19        And then you said, "Well, I mean, IARC
20  is so broad, I mean..."
21        Then Mr. Kristal said, "Well, it relates
22  to this litigation, not some other litigation."
23        And your response was, "Yeah, I mean, I
24  haven't talked to any of these experts."
25        Then I continue, "So you haven't talked

Page 111

1  to Dr. Staller or Dr. Ritz?"
2    "No."
3    "Dr. Jameson, Dr. Weisenburger,
4  Dr. Shustov, or Dr. Sawyer?"
5    "No."
6    Question, "You haven't talked to
7  Dr. Sawyer?"
8    "I have not."
9    "Dr. Nabhan, Mr. Johnson, Mr. Mills, or
10  Dr. Blair?"
11   "No.  I think I've answered your
12  question, but you can go through all of them if
13  you like."
14        Does that refresh your recollection or
15  your response at that time?
16   A.   No, but the right response is Dr. -- at
17  some point I talked to Dr. Sawyer briefly.  So
18  that's the correct response.
19   Q.   You don't know when you talked to
20  Dr. Sawyer; is that correct?
21   A.   Well, that's not correct.
22   Q.   Okay.  When did you speak with
23  Dr. Sawyer?
24   A.   I do not know.
25        MR. UPSHAW:  Can you read back my last

Page 112

1  question, please?
2    (Record read.)
3    A.   I don't know when, like what day.  Is
4  that what -- that's what I thought you were
5  asking.
6    Q.   Okay.  You don't know what day you
7  talked to Dr. Sawyer?
8    A.   I do not.
9    Q.   Okay.  Did you talk to Dr. Sawyer before
10  your deposition with me or after your deposition?
11       MS. GREENWALD:  Objection.  Asked and
12  answered.
13       MR. UPSHAW:  Nope.  I asked him what day
14  and he didn't know.
15       MS. GREENWALD:  No, earlier before the
16  break you asked him that question like four times
17  and he told you what he recalls.  He
18  clearly recalls what he recalls.
19   Q.   Okay.  So then to bring this into
20  context, would you please answer my question?  Do
21  you remember whether it was before or after?
22       MS. GREENWALD:  Same objection.
23   A.   I honestly don't recall.  I thought it
24  was before, but I don't recall.  I know -- all I
25  can tell you is that I talked to him for maybe --

Page 113

1  there was a call in to me about questions that he
2  had on calculations that I had done.
3    Q.   When you say it was a call in to you,
4  you didn't initiate a call to Dr. Sawyer?
5    A.   I did not.
6    Q.   And did Dr. Sawyer call you directly?
7    A.   No, I don't believe so.  I believe
8  counsel called me.  Well, there was a conference
9  call or something and I was pulled into it.
10   Q.   Okay.  So your recollection now is that
11  you were pulled into a conference call that
12  Dr. Sawyer was on?
13   A.   Yes, I definitely talked to Dr. Sawyer.
14   Q.   Oh.  And do you recall the -- again,
15  this is obviously a phone call -- do you recall
16  what was discussed?
17       MS. GREENWALD:  Objection.  Form.  And
18  an attorney was present during the conversation.
19   Q.   Did you discuss your notes that you
20  provided -- did you provide your notes to
21  Dr. Sawyer?
22   A.   I didn't provide them to Dr. Sawyer, no.
23   Q.   Okay.  Did you discuss your notes with
24  Dr. Sawyer?
25   A.   Not so much the notes, but I had that

29 (Pages 110 to 113)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 114

1 summary sheet of calculations.
2 Q. Which we talked about when we were
3 together before.
4 A. So by notes, do you mean my interview
5 notes --
6 Q. Yes.
7 A. -- or are you talking about my
8 calculations?
9 Q. Both.
10 A. I think the conversation was on his
11 calculations, how I derived those numbers.
12 Q. I want to know how you got to the
13 numbers that were on that -- that --
14 A. Right. So, I mean, I guess --
15 Q. -- summary of a summary, as you called
16 it.
17 A. I mean, it would be -- the interviews
18 would be -- I think I said something like if you
19 want to get the ultimate basis of the rollup of
20 the rollups, you would go back to the interviews,
21 but that's where they ultimately come from.
22 Q. Did you discuss changing anything with
23 regard to your calculations?
24 A. No.
25 Q. Okay. Did you discuss the basis for

Page 115

1 your numbers that were included in your
2 calculations, that is, your exposure numbers from
3 the various plaintiffs?
4 A. Only to the extent that I was showing
5 them from the rollup table at the bottom, how I
6 derived at the summary numbers at the top.
7 Q. Did you have any disagreement with them
8 about the -- did you have any disagreement as to
9 your determination of the number of exposures?
10 A. No, there was no discussion in that
11 dimension at all. It was simply how I -- how I
12 generated the summary tables at the top.
13 Q. Was there any discussion about whether
14 or not Dr. Sawyer was going to use your
15 calculations in support or in determining or
16 deriving his opinions?
17 A. Well, it would just be a presumption on
18 my part. I mean, he was asking me questions
19 about those calculations, but I assume he was
20 looking at them. I don't know what he did with
21 them. I've not seen any report from him or seen
22 any subsequent analysis.
23 Q. And I think from your previous testimony
24 you haven't reviewed Dr. Sawyer's deposition
25 transcript, right?

Page 116

1 A. I have not.
2 Q. Did you speak with Dr. Sawyer other than
3 that one time?
4 A. No. No, that was the one time.
5 Q. Okay. Any plans to speak with him again
6 prior to trial?
7 A. I don't know how to answer that
8 question. I don't intend to, but I could. I
9 don't know.
10 Q. So that's why I said if you had any
11 plans. Obviously, if you have a scheduled call,
12 you would know, right?
13 A. Well, yeah. I don't have a scheduled
14 call.
15 Q. Let me expand on that. Do you have any
16 scheduled calls or intentions to speak with any
17 other experts in this case prior to trial?
18 A. I don't intend to. It doesn't mean I
19 won't. I don't have any intention to do so.
20 Q. And just so I'm clear, during your
21 conversation, you did not discuss the individual
22 interviews or your interview notes, just the
23 rollup calculations and the rollup of the rollup,
24 which was the summary page calculations; is that
25 correct?

Page 117

1 MS. GREENWALD: Objection to form.
2 A. I just answered that.
3 Q. I'm just making sure, because I want to
4 make sure that I'm not leave things hanging.
5 A. But I told you. I mean, I -- you can
6 read it back. I said I think the -- other than
7 what you just said, I said that I told him, I
8 said the ultimate basis is the individual
9 interviews, so --
10 Q. I know you said that.
11 A. So, I mean --
12 Q. I understand.
13 A. I thought I answered that question.
14 Q. Right. And you said -- you made that
15 comment, and my comment was -- my question is, so
16 you didn't go into the individual ones?
17 MS. GREENWALD: Objection. Form. Asked
18 and answered.
19 A. Well, I mean, I did in the sense of
20 the -- the initial rollup is in fact the -- each
21 line item is data from the interviews.
22 Q. Okay. So let me ask it this way. When
23 you were on a conference call with Dr. Sawyer,
24 did you open and refer to your individual summary
25 sheets that you've provided us for each of these

30 (Pages 114 to 117)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 118

1  plaintiffs during that call?
2      MS. GREENWALD: Objection. Form. Asked
3  and answered.
4      A.  I don't recall doing that other than
5  referencing him to the initial rollup. You can
6  go back and get those -- and I may have shown him
7  one example of where those came from, but other
8  than that, no. I said if you really want to
9  ultimate basis, it's the interviews.
10     Q.  Okay. And I understood that. I just
11 didn't -- fine. Thank you. You've answered
12 my question.
13     A.  I mean, I'm not saying -- I'm not saying
14 that I didn't say something about the interviews,
15 but the focus was on the calculations.
16     Q.  Right. Okay. Understood.
17         We've talked about a lot of -- of your
18 opinions when we were together in July. Is there
19 any opinion that you've created since we talked
20 that you intend to offer in this case?
21         Again, based upon your factual summary
22 and your supplements to the factual summary that
23 we haven't already discussed?
24     MS. GREENWALD: Objection. Form.
25     A.  Remembering that discussion -- we've had

Page 119

1  a lot of discussions in the previous three
2  days -- but I talked about individual opinions
3  section by section. We went through a lot of
4  those.
5      Q.  Right. Well, we didn't go through any
6  of those, actually, but --
7      A.  And then we --
8      Q.  I mean, the sections we did. I'm sorry.
9      A.  Yes, we did.
10     Q.  I was thinking about the plaintiffs. My
11 fault. I apologize. We did go through section
12 by section.
13     A.  We spent a good two days doing that.
14     Q.  Yes, we did. Yes, we us.
15     A.  And then we had sort of my rollup
16 opinion at the end, right? What would be my --
17 that the other sub opinions really support the
18 primary opinions in the end. And I've reduced
19 those down to a one-pager that I've brought here
20 that we can -- so to that extent, yeah, I've --
21 I've tried to summarize that last page even more
22 succinctly about the overall opinions that I
23 have, and I've brought that with me.
24     Q.  Okay. Have you provided that to me yet?
25     A.  I believe I have.

Page 120

1      Q.  Okay. And that was Exhibit --
2      A.  Oh, as far as today?
3      Q.  Yes.
4      A.  I misspoke. Because I know it's been
5  sent to you, but as far as -- we haven't put it
6  out there as a new exhibit.
7      Q.  Oh, okay. So let's mark it now, if we
8  can.
9      A.  There's four pages.
10     MR. UPSHAW: I thought when we went
11 through that whole stack, we marked everything
12 you brought today.
13     MS. GREENWALD: No. We held one back
14 from you, not on purpose.
15     MR. UPSHAW: Oh, okay. See, yeah.
16 You're just trying to tease me. Trying to tease
17 me, I get it.
18     THE WITNESS: I didn't want to interrupt
19 you.
20     MS. GREENWALD: I didn't want you to get
21 too excited.
22     THE WITNESS: I'm trying not to
23 interrupt you.
24     MR. UPSHAW: All right. We'll mark that
25 as 31.

Page 121

1          - - - - -
2  (Thereupon, Petty Deposition Exhibit 31, Document
3  Titled Petty Methodology Utilized in Forming
4  Overall Opinions and Overall Summary Opinions, was
5  marked for purposes of identification.)
6          - - - - -
7      MR. UPSHAW: You sent this before,
8  Ms. Greenwald, or no?
9      MS. GREENWALD: I don't know that I saw
10 it before today. Did we get it before today and
11 it didn't get sent?
12     THE WITNESS: You've had it for a while.
13     MS. GREENWALD: Okay. I think this was
14 the -- the exchange between us.
15     THE WITNESS: I sent it again yesterday,
16 remember?
17     MS. GREENWALD: Okay. So I don't know
18 why this one didn't go, but apologies. But you
19 have tomorrow morning.
20     Q.  Yeah. I was going to say, you know
21 what, rather than taking the time to for me to
22 read this and figure out what I'm going to talk
23 to you about, I'm going to save this for --
24     A.  It's really the last page of Exhibit 7,
25 but --

31 (Pages 118 to 121)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 122

1    Q.   Right.  So okay.  Given that statement,
2  let me look at this in detail later.
3        All right.  Let me take you to Exhibit
4  7, which is your factual summary, and ask you
5  some questions about that.  And I'm going to ask
6  some questions about a section that we really
7  didn't talk about, and that's at the beginning of
8  this document.
9        Specifically, pages 2 to 4, you
10  considered facts -- let me ask it as a question.
11       On pages 2 to 4 of Exhibit 7, did you
12  consider facts regarding the product used by the
13  plaintiff Winston and you included pictures of
14  those products in figures 1-1 and 1-2; is that
15  correct?
16       A.   I did show pictures of products, yes.
17       Q.   Okay.  So on page 2, you say while this
18  summary is about Roundup generally, I also
19  specifically considered regarding the Roundup
20  products -- specifically considered facts
21  regarding the Roundup products used by trial
22  plaintiff Mr. Winston.
23       The following use of Roundup --
24  following the use -- following use of Roundup,
25  Mr. Winston was diagnosed with non-Hodgkin's

Page 123

1  lymphoma.  Photos of Roundup Weed and Grass
2  Killer Super Concentrate are illustrated in
3  figures 1-1 and 1-2.
4        So my question is, figures 1-1 and 1-2,
5  are they products that you contend were used by
6  plaintiff Winston?
7        A.   Not necessarily.  There is a separation
8  of the paragraphs intentionally, because
9  there's -- this outline of facts is for 14
10  separate -- ultimately would be used for 14
11  different plaintiffs.
12       Q.   I don't understand then the addition of
13  Mr. Winston in your -- in the paragraph I just
14  read.
15       A.   Because that's the title -- that's the
16  first initial case.  It's the title -- it's the
17  title of the case.
18       Q.   So what specific facts did you consider
19  regarding the products used by the plaintiff,
20  Mr. Winston?  What products did he use?  You want
21  to go back to that?
22       MS. GREENWALD:  Objection.
23  Mischaracterizing his testimony.
24       Q.   Okay.  You can go ahead and answer my
25  question.

Page 124

1        A.   I'm not -- I'm not -- what I did was
2  look at -- especially the MSDSs -- I looked at
3  dozens of Roundup products and commented on the
4  products that Mr. Winston used are -- were either
5  determined through the interview or through
6  documents from his employer.
7        Q.   So --
8        A.   I'm not tying these photographs to
9  Mr. Winston.
10       Q.   Okay.  Did you use the specifically
11  considered facts of any of the other plaintiffs
12  in putting together this factual summary?
13       A.   Yeah.  I mean, they're -- I looked at
14  all of the -- there's a whole host of different
15  products that were used, and I'm trying to
16  develop a factual summary that will cover that
17  waterfront in a summary fashion.
18       That's why I have this huge appendix
19  where I looked at the labels and the MSDSs, if
20  you will, for dozens of products.  And that's why
21  I tried to show -- the real intent of these
22  photographs is to ultimately show how the
23  labelling focused on using color to designate
24  different product classes or product names, but
25  also to focus -- the real intent of this section

Page 125

1  is to focus on the fact that Monsanto did not
2  make it a priority to -- in terms of warnings on
3  their labelling.  And that's what I'm setting the
4  table for in these first three or four figures,
5  and that that is inconsistent with FAO best
6  practices documents where the warnings should be
7  a primary consideration in the labelling.  That's
8  what I'm doing with this section.
9        Q.   So I'm asking you, why do you make the
10  comment in the last paragraph -- actually, the
11  penultimate paragraph on page 2 that I also
12  specifically considered facts regarding the
13  Roundup products used by trial plaintiff
14  Mr. Winston?
15       MS. GREENWALD:  Objection.  Asked and
16  answered.
17       A.   Where are you at?
18       Q.   Page 2.
19       A.   Page 2.
20       Q.   Penultimate paragraph.
21       A.   Well, the last paragraph is photos of --
22       Q.   Right.  So the penultimate paragraph
23  would be, "While this summary is about Roundup
24  generally, I also specifically considered facts
25  regarding the Roundup products used by trial

32  (Pages 122 to 125)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

---

Page 126

1  plaintiff Mr. Winston."
2  **A.  Sure.**
3  Q.  Okay.  I'm asking you here, what
4  specifically considered facts did you use with
5  regard to the rest of this factual summary that
6  deal with Mr. Winston?
7  MS. GREENWALD: Objection.  Asked and
8  answered.
9  **A.  Well, almost all of my opinions would**
10 **apply to Mr. Wilson with respect to did he**
11 **receive adequate warnings that would allow him to**
12 **protect himself from harm caused by this product.**
13 Q.  Okay.  It's Mr. --
14 **A.  And so I go through that whole -- almost**
15 **all of this stuff is ultimately related.  This**
16 **first -- this first section, what I'm talking**
17 **about is that the labelling priorities for**
18 **Roundup products have not -- don't -- the first**
19 **four, by their own label communications priority**
20 **paragraph, the first four items that they want to**
21 **communicate do not have to do with warnings, and**
22 **that conflicts with -- remember, this isn't an**
23 **opinions report; this is a facts report.**
24 **The reason that's being set up is**
25 **because I have an opinion that the FAO says that**

---

Page 127

1  **warnings should be a priority on labelling.**
2  Q.  Okay.  I understand.  I'm trying to
3  understand --
4  **A.  So that applies to Mr. Wilson -- or**
5  **Mr. --**
6  MS. GREENWALD:  Winston.
7  **A.  -- Winston.  I can't even talk.**
8  Q.  That's okay.  What I'm trying to ask,
9  Mr. Petty, is I'm trying to understand your
10 sentence here, which I've read several times now,
11 that you specifically considered facts regarding
12 Mr. Winston's Roundup products.
13 What are those, as you say, specifically
14 considered facts?  What are those specifically
15 considered facts?  I get it that's your opinion.
16 I get it.  I understand.  I'm trying to
17 understand how Mr. Winston -- you've pulled in
18 Mr. Winston specifically in this paragraph.  I'm
19 trying to figure out how -- what facts you used
20 of Mr. Winston.
21 MS. GREENWALD:  I'm going to object.
22 Asked and answered.  What he said was when he
23 said Mr. Winston, he's referring to the
24 Mr. Winston plaintiffs.  It's what he -- if you
25 read back his answer from about ten ago, it's

---

Page 128

1  what he said.
2  Q.  Okay.  Well, let's make sure that's what
3  he said.
4  So when you say by trial plaintiff
5  Mr. Winston, you're referring to the case
6  Mr. Winston and all of the plaintiffs?
7  **A.  That's what this -- yes, because I'm**
8  **titling it the -- it's titled the Winston case**
9  **because he's the first plaintiff.**
10 Q.  I got it.  I understand that.
11 When you refer to trial plaintiff
12 Mr. Winston, that's one person.
13 MS. GREENWALD:  Objection.  Form.  Asked
14 and answered and mischaracterizes his testimony.
15 Q.  So that's my -- that's the source of my
16 confusion.  Do you understand that's where we're
17 going?
18 **A.  I don't understand your confusion.  I**
19 **don't think there's real confusion.  I think that**
20 **this report stands as -- this document is simply**
21 **going through a series of facts regarding what**
22 **Roundup knew, when they knew it, how they handled**
23 **data, particularly in the dermal arena and in the**
24 **area of warnings and that would apply to**
25 **Mr. Winston and the plaintiffs in this first**

---

Page 129

1  **document.**
2  Q.  Gotcha.  All right.  So you're not
3  picking out Mr. Winston, the plaintiff himself
4  specifically, you're looking at the group?
5  **A.  I'm looking -- this report is intended**
6  **for the group.  Or this document or whatever we**
7  **want to call it.**
8  Q.  All right.
9  **A.  Document of facts.**
10 Q.  These pictures in pages 3, 4, and 5,
11 were these provided to you?
12 **A.  I believe they were, because they're**
13 **MONGLY documents.**
14 Q.  Okay.  Figure 1 --
15 **A.  Figure 1 may not be.**
16 Q.  -- 3 is a MONGLY document.  Figure 1 is
17 not.
18 **A.  The first two -- the first two, yes.  I**
19 **should be careful in my answer.  The first two,**
20 **I -- clearly, I got off the Internet, because**
21 **I've listed the HTTP and URL sites.**
22 Q.  Okay.
23 **A.  The figures 1-3 on page 4 and figures**
24 **1-4 on page 5 of Exhibit 7 were likely provided**
25 **because I'm referencing Exhibit 272 under a Bates**

---

33 (Pages 126 to 129)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 130

1    MONGLY number.  So --
2        Q.   Okay.  You have a picture here for a
3    Roundup product called Roundup Weed and Grass
4    Killer Concentrate.  I'm sorry, Weed and Grass
5    Killer Super Concentrate, right?
6        A.   Correct.
7        Q.   Weed and Grass Super Concentrate.
8    That's figure 1-1, right?
9        A.   Correct.
10       Q.   This is a lawn and garden product?
11       A.   I didn't characterize it one way or the
12   other.
13       Q.   Do you know whether or not this is a
14   lawn and garden product?
15       A.   I didn't make that distinction one way
16   or the other.  I was just looking at the color
17   coding on it, and then what was -- my focus here
18   was simply to look at what was said in the fine
19   print on the label.  I didn't -- I didn't make a
20   distinction of that one way or the other.
21       Q.   So my question remains, because you have
22   a number of different tables and other reference
23   materials here in your factual summary.
24           Do you know whether or not the product
25   that's in figure 1-1 and the close-up of the

Page 131

1    label, which is figure 1-2, whether or not that
2    product is a lawn and garden product for
3    residential use?
4        MS. GREENWALD:  Objection.  Form.
5        A.   I -- I didn't look into that, so I don't
6    know one way or the other.
7        Q.   And you can't look into any of your
8    tables that are included here in Exhibit 7 to
9    determine that?
10       A.   Well, I can try.
11           What I'm looking through is the pages
12   beginning on page 278 of Exhibit 7.
13       Q.   Thank you.
14       A.   And then what I'm going to look for is
15   the weed and -- the Roundup Weed and Grass Killer
16   Concentrate.
17       Q.   Super Concentrate.  There is a Weed and
18   Grass Killer Concentrate and there's a Weed and
19   Grass Killer Super Concentrate.
20       A.   Yes.  So it's towards the bottom of 278,
21   and it will be towards the end of this table.
22   See, if it -- it looks like the super concentrate
23   killer -- Weed and Grass Killer Super Concentrate
24   begins on 431.
25           And I didn't extract the rest of the

Page 132

1    information on the MSDS, so I would have to go
2    back and look at the MSDSs that are on this to be
3    able to answer your question.  There was a time
4    when I looked at every one of these.
5        Q.   Okay.
6        A.   I just don't recall.
7        Q.   All Right.  Do you know if any of the
8    plaintiffs in this case actually used this
9    product?
10       A.   I'd have to go back and crosscheck the
11   interviews with this to know, to answer that
12   question.
13       Q.   Okay.  All right.  Let me turn to page
14   Exhibit 191 of your Exhibit 7.  That's in section
15   7, I believe.  Yes.
16       A.   Okay.  I'm there.
17       Q.   Okay.  I think it's section 73217,
18   that's 7.3.2.17.
19       A.   Okay.
20       Q.   You have criticisms of Roundup Weed and
21   Grass Killer for Lawns.  It's Petty Video Clip
22   10.
23       A.   Correct.
24       Q.   And what's your criticism of that?
25       A.   My criticism is that they're -- there's

Page 133

1    an implication that they can use this product
2    without dermal protection.
3        Q.   Okay.
4        A.   You've got visible skin on the hands and
5    the forearm where he's pouring the product into
6    that cap.
7        Q.   Right.  And that would be figure 7-40,
8    correct?
9        A.   Correct.  Well, that's a clip --
10       Q.   That's a clip out of the --
11       A.   Out of the video.
12       Q.   -- out of the movie.
13       A.   I took a movie program and just clipped
14   the --
15       Q.   Understood.
16       A.   -- clipped a small section of it.
17       Q.   And since you've criticized this
18   product, you're aware of the product contents,
19   correct?
20       A.   It would be back in the MSDSs, yes.
21       Q.   Okay.  Well, take a look at that, if you
22   would, Mr. Petty, and let me know if you find out
23   whether or not Roundup Weed and Grass Killer for
24   Lawns even contains glyphosate.  Do you find it
25   on your list on page 278?

34  (Pages 130 to 133)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 134

1    A.  That's what I'm looking for.  I do not
2  see it on this list, so I don't know the answer
3  to that question.
4    Q.  Right.  Because you've looked at or
5  tabulated the MSDSs for the products you have
6  listed on page 278, right?
7    A.  Correct.  So I don't know the answer to
8  that question.
9    Q.  Right.
10   A.  My point is that there -- it's an
11 ongoing implication that you can use Roundup
12 products without -- without dermal protection.
13 That's the point I'm making.  That's what I talk
14 about on the next page.
15   Q.  Yeah.  Your point is that you can use
16 Roundup products that contain glyphosate without
17 PPE or dermal protection.
18     MS. GREENWALD:  Objection to form.
19   A.  No, I never said that.
20   Q.  Oh.  So whatever Roundup products,
21 whether it includes glyphosate or not, you're
22 saying that they should -- they should all have
23 the same PPE requirement?
24   A.  Some --
25     MS. GREENWALD:  Objection.  Form.  That

Page 135

1  was not his testimony.
2    A.  No, that was not my testimony.  What I'm
3  trying to illustrate here is an implication that
4  this product is so safe that you don't have to
5  wear any PPE.
6    Q.  Okay.  And you --
7    A.  The consumer doesn't necessarily know
8  all the time.  When they're -- when they're being
9  provided this information, I doubt most of the
10 time they know those nuances of what exactly is
11 in the product.  They associate it as Roundup.
12   Q.  You're not here, Mr. Petty, to speak for
13 all consumers, right?  So when you say something
14 like I doubt if they know, that's pure, pure
15 conjecture, isn't it?
16     MS. GREENWALD:  Objection to form.
17   A.  What I'm talking about is from the
18 advertisements that Monsanto is giving -- and I'm
19 citing them as examples of how this product is to
20 be applied, that's what I'm getting at.  I'm not
21 talking about knowing what everybody's thinking.
22 I'm talking about what do these advertisements
23 imply about personal protective equipment one
24 needs to wear in order to protect themselves from
25 any hazards from Roundup products.

Page 136

1    Q.  Right.  And in the clip that you've
2  got -- in the photo that you've got in your
3  factual summary, which I understand is a clip
4  from video 10, the person who has the Roundup for
5  weed -- or, I'm sorry, weed and grass killer for
6  lawns has on long pants, doesn't he?
7    A.  Long pants are not PPE.  We had this
8  discussion.
9    Q.  Not my question.  My question -- I'm
10 just observing from the photo that you have a
11 clip.  That person has on long pants, do they
12 not?
13   A.  It appears they have some sort of pants
14 on, yes.
15   Q.  And it appears that they have some
16 long-sleeved shirt on, albeit it does look like
17 the sleeves are rolled up.  Would you agree with
18 me?
19   A.  I don't know if I'd call that
20 long-sleeved when you can see deep onto the
21 forearm.  If you -- the hand is bent, so I would
22 argue that that's short-sleeved, not
23 long-sleeved.
24   Q.  Okay.  We can argue about whether or not
25 that's a cuff on the sleeve or not.  I agree with

Page 137

1  you the forearm is uncovered.
2    A.  That's what I'm saying.
3    Q.  Okay.  And --
4    A.  And then you see in the little diagram
5  down below, you can see the hand and the forearm
6  are uncovered.
7    Q.  Right.  And it's your opinion that this
8  product from this picture, a product that does
9  not include glyphosate, is misleading, right?
10   A.  It's -- it's an example of illustrating
11 that when a consumer uses a Roundup product,
12 they're not wearing PPE that will protect them
13 from dermal exposure because pants aren't
14 considered PPE.  We had that discussion before.
15   Q.  Okay.  All right.  I wanted to hear the
16 rest of that.  Okay.
17     You'd agree with me that not all Roundup
18 products are the same, right?
19   A.  Sure.  They're different formulations.
20   Q.  And you would also agree that each
21 formulation has to be approved by the EPA before
22 it's sold to the public, correct?
23   A.  There's some nuances there as to how
24 much they change it or not.  There's initial
25 approvals of a -- I'll call it a formulation, but

35  (Pages 134 to 137)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 138

1  then there are small deviations from it.
2  Sometimes they do and sometimes they don't.
3      But, again, the whole process is -- I --
4  whether EPA approves it or not is not my
5  criticism. My criticism is that their approval
6  is based on the input that they get.
7      Q.  I understand that. Turning to your --
8  well, I'll refer back to what we talked about in
9  July, and to connect it with what we're doing
10  today with regard to the 14 plaintiffs that we
11  have, you did not do a full risk and exposure
12  assessment of each plaintiff --
13      (Interruption.)
14      MR. UPSHAW:  Okay.
15      THE WITNESS:  What did you find?
16      MS. GREENWALD:  I found something, too.
17  There you go.
18      Q.  So I'll ask the question again since
19  that was --
20      A.  Yes, sir.
21      MS. GREENWALD:  Too much fun.
22      Q.  For each -- for each of the 14
23  plaintiffs, you've not done a full risk and
24  exposure assessment, right?
25      A.  Boy, that's -- I certainly haven't done

Page 139

1  a traditional risk assessment. You asked a
2  multiple question there. An exposure assessment,
3  I've certainly done an exposure assessment.
4      Q.  Let me split it up. I'll make it easier
5  for you. That way you don't have to -- you did
6  not do a risk assessment for these 14 plaintiffs?
7      A.  I did not do a risk assessment.
8      Q.  Okay. You did a form of exposure
9  assessment that we talked about, which was a
10  calculation that you derived after the interviews
11  with each individual plaintiff?
12      A.  I did my traditional industrial hygiene
13  interview, which primarily consists of obtaining
14  exposure information, which then can be used to
15  do an exposure assessment, yes.
16      Q.  All right.
17      A.  And then I did -- the question on what
18  constitutes an exposure assessment is a very
19  broad -- the answer to that is very broad.
20      Technically, the fact that I determined
21  numbers of events, the type of product, and
22  number of times would be considered an exposure
23  assessment. There are other ways to do exposure
24  assessments.
25      Q.  Okay. That's what my point was going to

Page 140

1  be.
2      Other industrial hygienists would call
3  what you've done, you've collected and organized
4  front-end information.
5      A.  I wouldn't describe it that way at all.
6      Q.  So you've taken the information down.
7  As part of your interview, you've done an
8  interview sheet, you've tabulated that
9  information, you've collated that information,
10  you've looked at how many events there are, and
11  put that into a table. And then -- and then, in
12  another table, you look at how many -- the
13  duration of their exposures, correct?
14      A.  And I looked at the dermal and the
15  portion of the time that they were -- that the
16  skin area is impacted and the times that -- the
17  percent time they were impacted. So there's --
18  there's a considerable exposure assessment just
19  in that rollup.
20      Q.  Well, you've got a table on each
21  particular plaintiff based upon the information
22  you collected during your interview, right?
23      A.  Correct.
24      Q.  Okay.
25      A.  I think you're -- to try to help you

Page 141

1  out, I think you're trying to distinguish between
2  dose and exposure, but we've had that
3  conversation before.
4      Q.  Well, I'm just figuring out where we
5  are. And we did have that conversation before.
6      After you completed your each individual
7  table, you then did two tables. One was on the
8  total time for each individual, the number of
9  hours you determined that they had -- you had
10  here spraying, but sometimes the person wasn't
11  spraying, right?
12      A.  First of all, I didn't determine. The
13  data came from the individual plaintiffs
14  themselves. I just recorded it.
15      Q.  Certainly.
16      A.  Secondly, I recorded both application
17  times as well as post-application times. The
18  details of -- along with numbers of events of
19  those times, and then I also reported the
20  dermal -- specific dermal areas of exposure, both
21  in terms of skin area and time. Those are in the
22  initial rollup tables straight from the
23  interviews.
24      And then I extracted from those a rollup
25  of total time and total events for each

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 142

1    individual.
2        Q.   Okay.  And as you just mentioned, and I
3    know we talked about it, this is not a dose
4    assessment, a dose exposure assessment, is it?
5        A.   It is not a dose, but rarely in
6    industrial hygiene are doses done.  Most of the
7    time they're exposure assessments because it's
8    inhalation.  There are some distinctions.  And
9    benzene, I do -- I'm one of the few that do
10   dermal assessments with dose converted back to
11   exposure, because the FE people want it in terms
12   of exposure, not dose.
13       So it's certainly -- now that I -- I did
14   not intend and did not offer up to do a dose
15   exposure -- or dose analysis early on.  But now
16   that I've had the chance to review -- you know,
17   it's been a year and a half later -- it's
18   certainly -- I'm certainly more than capable of
19   doing that, but I've not been asked and don't
20   intend to do so.
21       Q.   Right.  Which I think you explained
22   before, and you really led me to my next
23   question.
24       So you haven't done a dose analysis
25   since your last deposition?

Page 143

1        A.   Other than -- other than qualitatively,
2    I've indicated the skin areas and the percent
3    time they're wetted, right.
4        Q.   Other than the information that you
5    provided to us in July.
6        A.   Correct.
7        Q.   Do you know if any other expert in the
8    case has used your information to perform a full
9    dose analysis?
10       A.   I -- I've not seen anything.  I could
11   speculate that if Sawyer was asking me questions
12   about those, maybe he did.  But I've not seen it.
13   I've not talked to him about his analysis.  So I
14   don't really know.  I haven't seen anything, but
15   perhaps someone is.
16       Q.   Your opinions, which we haven't I think
17   thoroughly gone through, but maybe we have.  I'll
18   check that.
19       Does your opinion with respect to any of
20   the individual exposure assessments that you did
21   perform have anything to do with the
22   Monsanto-specific documents that you've reviewed?
23       A.   I'd have to think about that question.
24   I'm not trying to -- can you ask it again?  You
25   came it -- I wasn't expecting the direction you

Page 144

1    were coming at.
2        MR. UPSHAW:  Since it was so eloquently
3    stated, would you read that back?
4        (Record read.)
5        A.   Oh, yeah.  The whole report where I've
6    done -- knowing that they had -- knowing what
7    they've told me about warnings, about how PPE,
8    about -- and then comparing and contrasting that
9    with documents about how the PPE developed with
10   time.  Also, looking at all the dermal analysis I
11   did of the individual dermal studies and the
12   implications they had for exposure.
13       So there's -- they're certainly related.
14   I mean, I'm certainly going to have opinions
15   about how they used the product and how they were
16   exposed and how they were warned or at least they
17   believe they were warned versus what the best
18   practices should have been and what was known by
19   Monsanto as various points in time about, for
20   instance, dermal exposure.
21       So yeah, there are dozens of documents
22   that I would tie back to them based on that.  And
23   I've tried to organize those in similar
24   categories with this document of facts.
25       Q.   Okay.

Page 145

1        A.   But I would relate each of those
2    sections to the individual person based on their
3    situation and how those documents apply to them.
4        Q.   All right.  Well, maybe my question
5    wasn't so eloquently -- because you missed the
6    last part of it.
7        A.   It was broad.
8        Q.   Your opinions with regard to an
9    individual exposure assessment, let's pick out
10   one.  Kyle Chaplick.  Your opinions with regard
11   to Kyle Chaplick and the numbers that you've
12   calculated with regard to Kyle Chaplick, with
13   regard to values, the dermal data, references,
14   exposure areas, did any of that have to do with
15   Monsanto-specific documents?
16       MS. GREENWALD:  Objection.  Form.
17       A.   Yeah, I just covered a lot of that.  For
18   instance, I've just -- things that jumped out in
19   my mind right away, you've got the -- the
20   documents where they're looking at -- the
21   Monsanto documents looking at the DTL exposures
22   and the percent skin area that's impacted and how
23   much of that is impacted versus what happens in
24   the real world.
25       The -- the discussions from Monsanto

37  (Pages 142 to 145)

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 146

1  makes arguments to the EPA that they don't need
2  to follow worker protection rules, I don't need
3  all this PPE.
4      Q.   I'm sorry, stick with that for a moment.
5          Monsanto's discussions with the EPA, how
6  do they relate to Kyle Chaplick specifically?
7  I'm not talking about your general opinions.
8  Specifically to Kyle Chaplick and your numbers
9  with regard to Kyle Chaplick.
10         MS. GREENWALD:  Objection to form.
11  Asked and answered.
12     A.   Because ultimately, they affect his
13  exposures because he's not given adequate PPE or
14  warnings.
15     Q.   Oh, Okay.  All right.  Now I understand.
16     A.   His exposures are greater than they
17  otherwise should have been.
18     Q.   And that would hold true for all 14 of
19  the plaintiffs in your opinion?
20     A.   I would have that opinion of all 14.
21     Q.   Does your opinion with respect to any of
22  the exposure assessments for each of the
23  individual 14 plaintiffs have anything to do with
24  non-Hodgkin's lymphoma?
25     A.   I'm not the causation expert.  So

Page 147

1  traditionally, what happens is I do the exposure
2  assessment and then medical -- epidemiologists,
3  medical people look at that exposure and make
4  some determination about whether or not that's
5  causal.
6      Q.   So is that a yes or a no answer?
7      A.   I'm not a causation expert.
8      Q.   Okay.  I understand you're not a
9  causation expert.  Do any of the exposure
10  assessments that you've performed have anything
11  to do with non-Hodgkin's lymphoma?
12         MS. GREENWALD:  Objection.  Asked and
13  answered.
14         MR. UPSHAW:  No, his answer was I'm not
15  an exposure expert.  That's not yes or no.
16         MS. GREENWALD:  He said it's used by the
17  oncologists.
18         MR. UPSHAW:  Whoever.  Then answer my
19  question.  It should be --
20         MS. GREENWALD:  He did.
21         MR. UPSHAW:  It should be a pretty -- it
22  should be as fairly straightforward answer.
23     Q.   No, they have nothing to do with it, or
24  yes, they have everything to do with it?
25     A.   No, because you're trying to get me to

Page 148

1  give a specific causation opinion and I'm not
2  willing to do that.
3      Q.   No.  I don't want a causation opinion.
4  I want to know whether any --
5      A.   That's exactly what you've asked.
6      Q.   No.  I want to know does anything to do
7  with, not whether you believe it caused, it
8  doesn't cause.  Did it have anything to do with
9  the diseases that are claimed by these 14 people?
10         MS. GREENWALD:  Objection.  Form.
11     A.   That will be up to the causation experts
12  to make that determination like it is in all the
13  cases where I'm an exposure expert.
14     Q.   Okay.  Do you know whether all these
15  plaintiffs were diagnosed with non-Hodgkin's
16  lymphoma?
17     A.   It's in their interview what they said
18  their diagnosis was, so.
19     Q.   So whatever they said, that's what you
20  went by?
21     A.   Well, I'm not saying that's what I went
22  by, but that's -- my knowledge as to what their
23  disease, diseases were is based on what -- what
24  they've told me in their interviews.
25     Q.   The interview.  So you go by what they

Page 149

1  said?
2      A.   Well --
3      Q.   Why is this so tough?
4      A.   Well, because there may be nuances in
5  the -- in the specific -- let me give you an
6  example that I get in all the time more commonly
7  in benzene.  I'll say it causes leukemia.
8      Q.   Okay, okay.
9      A.   But I'm not going to try to parse it
10  between AML, MM.
11     Q.   So I understand your benzene background.
12  You've told me 600 times --
13     A.   But I'm saying there are different forms
14  of leukemia and I'm not going to get into whether
15  or not they know --
16     Q.   I understand that.
17     A.   -- exactly the form that they had.
18     Q.   My question is, the only information
19  that you took into account was -- with regard to
20  each of these plaintiffs' diagnosis was what they
21  told you during the interview.
22         MS. GREENWALD:  Objection.  That's not
23  the testimony and it's not --
24     Q.   So that's my question right now,
25  regardless of whatever you've answered before.

38  (Pages 146 to 149)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 150

1    A.  I don't think that's true.
2    Q.  Where else did you get information with
3  regard to their diagnosis?
4    A.  No, it's not true with respect to the --
5  to the -- you're making a hypothetical and I'm
6  not agreeing to the -- to that hypothetical.  I'm
7  just saying that I'm not here and I have no role
8  in anything to do with their -- with the causes
9  or their diseases.
10    I'm simply recording it as what they
11  said to me.  Those details on their diseases are
12  left up to the medical experts, not me.
13    Q.  Understood.
14    A.  And I'm not going to have an opinion as
15  to exactly what their disease is or not.
16    Q.  Understood.  So you -- the only
17  information you have about their diseases, based
18  upon what you just said, is from the interview;
19  is that correct?
20    MS. GREENWALD:  Objection.  Form.
21    Q.  I would agree with you.
22    MS. GREENWALD:  Same objection.
23    A.  I don't know.  I don't know what --
24  there is 500-and-some documents.  Whether or not
25  there's something else in those or not, I don't

Page 151

1  know.  It's -- it's not -- it's not what my focus
2  was.  My focus was on exposure and warnings.
3    Q.  All right.  I'm going to ask you a
4  series of questions about each of the plaintiffs.
5  You may believe that they -- they may become
6  repetitive, but because these questions are about
7  each individual case, I have to ask questions
8  about each individual case.
9    A.  Sure.
10    Q.  All right?  So that you understand.  At
11  some point, they may be separated, so I don't
12  have to come back and ask you about each
13  individual.
14    A.  Now, if you're going to go through the
15  interviews, I brought four sets last time.  I
16  don't know where they ended up.
17    Q.  Yep.  We got them.
18    A.  But will I be able to see them as you go
19  through them?
20    Q.  Yep.
21    MS. GREENWALD:  You can ask for anything
22  you want when you're asked a question.
23    MR. UPSHAW:  You certainly can.  I agree
24  100 percent with Ms. Greenwald.
25    THE WITNESS:  You guys are getting along

Page 152

1  so well.
2    MR. UPSHAW:  You heard that grumble?
3    Q.  All right.  Let's start out with
4  Mr. Walter Winston.  And this is the packet that
5  you provided us.  We're going to mark it as
6  Exhibit 32.
7    - - - -
8  (Thereupon, Petty Deposition Exhibit 32, Mr.
9  Winston's Interview Summary Sheet, was marked for
10  purposes of identification.)
11    - - -
12    Q.  Okay.  Now you spoke personally to
13  Mr. Winston, correct?
14    A.  I did.
15    Q.  Was that in person or by telephone or
16  FaceTime?
17    A.  Well it says on here by phone, so it's
18  telephone.
19    Q.  Okay.  And how many times did you speak
20  to Mr. Winston?
21    A.  At the very top of the page, I spoke to
22  him on December 11, 2018, from 11:04 to 1:01 p.m.
23  One time.
24    Q.  Okay.
25    A.  If I've spoken to him multiple times,

Page 153

1  you'll see multiple lines for dates and times.
2    Q.  And I understand that you are referring
3  to the document as an exhibit, but I'm going to
4  run through this series of questions.  So if
5  it -- you can refer to the document to answer my
6  question, then we'll --
7    A.  I'm just trying to facilitate it for
8  you.
9    Q.  I am doing the same thing.
10    A.  So you understand how I do these
11  interviews.
12    Q.  Okay.
13    A.  Because you've never sat in on one of
14  my interviews.
15    Q.  That is correct.  Did you have any
16  e-mail correspondence with Mr. Winston?
17    A.  No.
18    Q.  Was anyone else present during your
19  interview?
20    A.  Yeah.  I listed the outside parties
21  there that were on the phone, as far as I know,
22  at least for part of the time.
23    Q.  Okay.  And who may they be?
24    A.  They're listed here.  Do you want me to
25  go through and just list them each time?

39 (Pages 150 to 153)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 154

1    Q.   Yes.  It's easier if you just do it and
2  we --
3    A.   Okay.
4    Q.   -- we'll go through these much quicker.
5    A.   I think it'd be much quicker if I said
6  they were on the list.
7       In this case, Ms. Greenwald, I believe
8  it's Ms. Hanson, Elisse Hall.  They were all, I
9  believe, from Weitz Luxenberg.
10   Q.   Okay.  Do you know or do you indicate
11  whether there were any family members who were
12  also present on the phone call?
13   A.   If they are, I indicate them, if I know
14  them.  If I know they're there.
15   Q.   Okay.  And in this case, you indicate
16  that there were none; is that correct?
17   A.   I was not aware of anybody else, like
18  the spouse or whatever.  I wasn't -- some of
19  those, I think I do indicate other family members
20  were present.
21   Q.   Okay.  And I understand you have not
22  read his deposition transcript?
23   A.   I have not.
24   Q.   Did you review any of his plaintiff fact
25  sheets?

Page 155

1    A.   I'm trying to remember if I -- there are
2  so many different cases.  I think I have some
3  plaintiff fact sheets.
4    Q.   I don't recall everything that you have
5  produced, but we asked you about all the
6  documents that you have reviewed with regard to
7  these plaintiffs, and I don't believe the
8  plaintiff fact sheets were included in this.
9    A.   Yeah.  I just have to -- I just don't
10  recall if I did or didn't, because there are --
11  I've done seven interviews since we last talked.
12  So I have a hard time remembering which ones I
13  have plaintiff fact sheets on and ones I don't.
14   Q.   Would you --
15   A.   This was done in 2018.
16   Q.   Understood.  Would you and Ms. Greenwald
17  please check on that before we get too far down
18  the line on our next break?
19       MS. GREENWALD:  Doing that right now.
20   A.   Yeah.  I just don't recall, to be honest
21  with you.  It's been a while.
22   Q.   That's why we have Ms. Greenwald here,
23  for that and a number of others.
24       MS. GREENWALD:  I can't believe that's
25  all I'm good for.

Page 156

1       MR. UPSHAW:  See, I add that in.  Number
2  of others.  I didn't enumerate.
3    Q.   Did you analyze any of Mr. Winston's
4  discovery responses, such as interrogatories or
5  requests for production?
6    A.   I don't believe so.
7    Q.   When you do an interview, would you
8  normally have access to that plaintiff's
9  discovery responses?
10       MS. GREENWALD:  Objection to form.
11   A.   It depends on the circumstances.  If --
12  it just depends when I'm retained.
13       Generally, I ask people to let me
14  interview them ASAP, because I've had many
15  plaintiffs pass away when -- a month or so -- I
16  think I've had 20 or 30 people pass away within
17  two months of when I've interviewed them, so
18  they're very -- they're very sick.
19       So I want to get the industrial hygiene
20  information recorded, because I've never seen
21  ever in 20 years a deposition that takes the
22  dermal information I need in total.
23   Q.   And it's always better to get the
24  information directly from the person affected,
25  correct?

Page 157

1    A.   It's much better than coworkers or
2  somebody else.
3    Q.   Or spouses or family members, right?
4    A.   Yeah.  So in that case -- in many cases,
5  I'm asked -- in fact, almost all cases now I'm
6  asked do the interview right away.
7       Now, there are cases where they've been
8  deposed or there are interrogatories, and I
9  always ask for that information, and I want
10  Social Security records as well if I can get
11  them.
12   Q.   Okay.
13   A.   And if I have that, then I'll go through
14  that material before I interview them.
15   Q.   Okay.
16   A.   But it just depends on the circumstance.
17   Q.   In this circumstance with regard to
18  Mr. Winston, do you know whether you had any
19  interrogatories or requests for production or
20  Social Security information prior to your
21  interview?
22   A.   I don't think so, no, or I would have --
23  I would have incorporated it.
24   Q.   Did you look at any of that information
25  I just discussed or enumerated after you had your

40  (Pages 154 to 157)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 158

1  discussion with Mr. Winston?
2  **A.  No.  I mean, the interview is the**
3  **interview.  It's what I record at the time I**
4  **interview.**
5  Q.  Right.  Okay.  Did you review any --
6  I'll call it non-plaintiff fact witness
7  transcripts, that is, coworkers, family members,
8  employer?
9  **A.  I have not.**
10  Q.  Did you visit any of the locations the
11  plaintiff claims to have used or been exposed to
12  Roundup?
13  **A.  I have not.**
14  Q.  Do you know what type of formulation of
15  Roundup Mr. Winston used?
16  **A.  To the extent that I knew it, it would**
17  **be recorded in the interviews.  I know in his**
18  **case, there were some requests from the city to**
19  **get information on products used, because he had**
20  **a hard time remembering exactly what he was**
21  **using.  I do remember that with his interview.**
22  Q.  Your basis for information with regard
23  to Mr. Winston was based on his interview,
24  correct?
25  **A.  Correct.**

Page 159

1  Q.  Okay.  So do you know, based upon your
2  interview with Mr. Winston, what type of
3  formulation of Roundup he used?
4  **A.  Let me just check the interview.**
5  Q.  Sure.
6  **A.  Yeah.  I'm looking at this interview,**
7  **pages 5, 6, and he did not know the specific**
8  **formulation when I talked to him.  Or**
9  **formulations.**
10  Q.  Okay.  Was his exposure, his alleged
11  exposure to Roundup occupational or residential
12  or both?
13  **A.  From my interview, his exposure to**
14  **Roundup was when he was at work.**
15  Q.  Okay.  And what method of application
16  did he use?
17  **A.  It was -- ultimately, it was a spray**
18  **nozzle.  There was a tank holding the product on**
19  **a truck, and then there was a hose -- a pump and**
20  **a hose, reel and a hose, from the tank to the**
21  **spray nozzle, and he would obviously spray it**
22  **through the spray nozzle.  So it was a pump**
23  **system.**
24  Q.  Was he involved in any mixing of the
25  product based upon your interview?

Page 160

1  **A.  To my knowledge, he was not.**
2  Q.  When you conduct your analysis, do you
3  take into account exposures to other pesticides,
4  insecticides, or chemicals?
5  **A.  I would ask them other chemicals that**
6  **they would have used, yes.  You'll see that in**
7  **the interviews.  I'll ask other products used.**
8  Q.  Did Mr. Winston indicate his use or
9  exposure to any other products?
10  **A.  Well, he said gasoline and motor oil.**
11  **That was two of the other products he said that**
12  **he was exposed to when he was at work.  And those**
13  **are the only two he told me about.**
14  Q.  Okay.
15  **A.  Because I have a specific question, what**
16  **are some -- what are the other products you used.**
17  Q.  Okay.
18  **A.  And to the best they can, they tell me.**
19  Q.  Right.  And why is his exposure to
20  gasoline important to you?
21  **A.  It isn't, necessarily.  I just want to**
22  **know out of completeness other products.**
23  Q.  Okay.  Same true for motor oil?
24  **A.  Yeah.  I'm just trying to do it out**
25  **of -- it's a straight balls and strikes**

Page 161

1  industrial hygiene interview.
2  Q.  When you assess his exposures, do you
3  take into account these other products that have
4  been identified by the person you are assessing?
5  MS. GREENWALD:  Objection.  Form.  Asked
6  and answered.
7  **A.  Well, of course I take it -- I mean, I**
8  **record it.**
9  Q.  Okay.
10  **A.  I mean, I didn't do a full-up dose**
11  **assessment here.**
12  Q.  Right.
13  **A.  So it depends on the specific situation**
14  **as to -- you know, if it were a benzene case, I**
15  **would be looking at gasoline and not motor oil,**
16  **for example, if there were other products that he**
17  **used in addition to gasoline.**
18  **But in this case, I'm just recording it**
19  **because he said those are things that he did and**
20  **used.  And so out of completeness for his**
21  **chemical exposures, I want to know that**
22  **information.**
23  Q.  Okay.  And when you do an assessment, do
24  you take into account family history and prior
25  health?

41  (Pages 158 to 161)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 162

1      A.   I don't.  That's -- that's on the
2  medical side.
3      Q.   Do you consider other risk factors or is
4  that on the medical side?
5      A.   Well, yes and no.  I mean, it depends on
6  the exposure, but if I'm -- appreciate that --
7  that I'm tested on what we call general
8  causation; and that is, is the chemical generally
9  associated with that class of diseases.  Because
10  that's what we have to do in everyday life.  When
11  I go out of here and somebody says they're not
12  feeling good, I've got to try to figure out, as
13  part of the interview, the inspection, to figure
14  out what are they doing, what's in their
15  environment, and what might be correlated to
16  their symptoms.
17      I can't give that diagnosis, but my
18  report will go to the doctor as part of their
19  assessment for specific causation.  But we're
20  tested, 40 percent of our CIH exam is on
21  toxicology.  So we have to know, you know, I
22  remember the question, you know, what disease is
23  benzene associated with?  Leukemia.  Now, they
24  don't -- we don't have to know AML, MM, whatever.
25  And so we had closed book, and so we have to know

Page 163

1  those associations.
2      And I gave you the example in our
3  earlier thing between the case where I was asked
4  to do a mold assessment and I said, well, there's
5  feces on the ground; I want to do bacteria.
6      So we have to have a general causation
7  knowledge.  I'm not being offered here as an
8  expert in that area, but in my day-to-day life,
9  in my real -- you know, when I'm going out and
10  doing private sector work to figure out what
11  might be causing somebody their illness, I'm kind
12  of taking the world from here and whittling it
13  down to here.
14      Then the doctor is taking my report, his
15  analysis of the individual, and he's doing the
16  specific causation of that person.  In other
17  words, I can say mold's associated with diseases
18  of the respiratory tract, or health effects of
19  the respiratory tract, but I can't say mold
20  caused this person to get sick.  That has to be
21  done by a physician.
22      Q.   So --
23      A.   So when I'm doing this, to answer your
24  question -- I know I've been a roundabout -- I
25  still have to know whether -- I have to know

Page 164

1  whether or not these products might be associated
2  with that disease.  Not whether it's causal for
3  sure.
4      But I want -- so, for instance, I always
5  ask the questions, you'll see earlier on about
6  smoking.  Because in many cases, smoking is a
7  confounder, if you will, to certain diseases.  So
8  you've got to -- you know, I ask those questions.
9  Were you a smoker?  Did you use tobacco products?
10      So this has developed over doing this
11  for 20-some years, these interviews, that
12  certainly, I try to look for those things that
13  might be related to their disease.
14      Q.   Have you done these type of assessments
15  on non-Hodgkin's lymphoma before?
16      A.   In benzene cases I have, yes.
17      Q.   Okay.  You said earlier when you started
18  your response that you give a diagnosis to the
19  doctors?
20      A.   No, no, no, no, no.
21      MR. UPSHAW:  Can you read back the
22  beginning of his --
23      A.   I don't give a diagnosis.
24      MR. UPSHAW:  Well, I'm just going to
25  have you read it back.  Maybe you misstated what

Page 165

1  you -- what you meant.
2      Can you read back the beginning of his
3  answer, please?
4      A.   I can make that absolutely clear if you
5  want to move on.
6      Q.   Let her read it, but --
7      (Record read.)
8      Q.   So when you say you can't give that
9  diagnosis, you're not giving a diagnosis, right?
10      A.   I do not have a medical degree, so I
11  cannot give a specific causation diagnosis.
12      Q.   Okay.
13      A.   But my input is relied upon as part
14  of -- typically from the physician's diagnosis.
15  They do the specific -- I was trying to make the
16  distinction, which you probably know well,
17  between specific causation and general causation.
18  I am precluded and not allowed to give specific
19  causation opinions because I'm not a medical
20  doctor.  I can give -- in some cases I do give
21  and the courts have qualified me to give general
22  causation opinions.  I'm not going to do those in
23  this case.
24      Q.   So when I ask you what disease is
25  associated with Roundup, what's your response?

42  (Pages 162 to 165)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 166

1      A.   There is some association with -- with
2  non-Hodgkin's lymphoma.
3      Q.   Based on what?
4      A.   IARC.
5      Q.   Anything else?
6      A.   I don't know.  I'm not the medical guy.
7  That's the one that comes --
8      Q.   You gave the opinion.  So I want to find
9  out what -- what's the basis of your opinion?
10     A.   I'm not going to give a medical opinion
11 on causation.
12     Q.   Okay.
13     A.   I told you that.  But you just want to
14 dive into there, but I've said multiple times I'm
15 not going to be giving those opinions.
16     Q.   Is smoking a cause of non-Hodgkin's
17 lymphoma?
18     A.   I don't know.
19     Q.   You do ask -- you did ask in these
20 interviews whether or not these particular 14
21 plaintiffs smoked, correct?
22     A.   Yes, or used chewing tobacco or smoked
23 cigars.
24     Q.   Why?
25     A.   It's a standard question I ask because

Page 167

1  it -- it's a cofounder on many diseases.
2      Q.   Is smoking a cofounder on non-Hodgkin's
3  lymphoma?
4      A.   I don't know.
5      Q.   Then why did you ask it on this
6  particular interview?
7      MS. GREENWALD:  Objection.  Asked and
8  answered.
9      A.   I don't know how to give you a better
10 answer than I just gave you.
11     Q.   Other than it's just part of what you
12 normally ask, whether it's a cofounder or not?
13     MS. GREENWALD:  Objection.  Asked and
14 answered.
15     A.   It's part of my -- it's the first page
16 background.  I always ask about their smoking
17 history.
18     Q.   Okay.  That's fine.
19     With Mr. Winston, did you have access to
20 any of his actual product containers or sprayers
21 that he claimed to use?
22     A.   No.
23     Q.   And with regard to Mr. Winston, did you
24 try to corroborate any of his statements with
25 regard to his use of Roundup with any other

Page 168

1  individuals?  Like a coworker or a family member
2  or anything?
3      A.   No, I have not.  Because at the time, I
4  didn't have that information.
5      Q.   All right.  Do you have that information
6  now?
7      A.   I do not.
8      Q.   Okay.
9      A.   I just haven't done that.  But I'm just
10 saying the interviews were done before when I --
11 you asked that question before and I said if I
12 had the information, I would do that.
13     Q.   Right.
14     A.   But in this case, I did not.
15     Q.   And have you so far?
16     A.   I have not.
17     Q.   Okay.  Do you intend to?
18     A.   No, I don't believe so.
19     Q.   Perfect.  Okay.  This was Exhibit 13,
20 which was discussed in July.
21     A.   Okay.
22     Q.   And let's turn to page 19.  And table 15
23 near the bottom of page 19 of Exhibit 13 -- I'm
24 thoroughly confused by now -- is Mr. Walter
25 Winston's Roundup exposures, correct?  That's

Page 169

1  the --
2      MS. GREENWALD:  What page are you on?
3  I'm sorry.
4      MR. UPSHAW:  Page 19.
5      A.   19.
6      MS. GREENWALD:  19.  Okay.
7      A.   Your question again?  I'm sorry.
8      Q.   Table 15 is Mr. Winston's table, right?
9      A.   This information I pulled from his
10 interview.
11     Q.   Right.
12     A.   I hope, yeah.
13     Q.   I hope, too.  Otherwise we don't know
14 where it came from.
15     A.   Well, I tried to indicate where it came
16 from, I'm just saying.
17     Q.   Okay.  All right.  Does this depict the
18 time he spent using the product based upon your
19 interview?
20     A.   Yes.  That's the goal.
21     Q.   I'm just trying to go through it.
22     Now, you have another section that says
23 dermal data, and explain to me what that is.
24 This is the first time we've really gotten into
25 these charts, right?  I mean, we didn't talk

43 (Pages 166 to 169)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 170

1  about these in July, right?
2  **A.   Yeah.  I forgot you're not a dermal guy.**
3  Q.   So let's talk about -- and we'll use
4  Mr. Winston as your example -- what you're
5  showing here and what's in each column and what's
6  in each row of each column, okay?
7  **A.   Okay.**
8  Q.   All right.  So let's start -- and let's
9  start from the beginning with the values.  You
10  have low, high, midpoint, and units.
11     Tell me what that means.
12  **A.   Okay.  Let's give an example.  The third**
13  **row says season, April to September, October.**
14  **Well, I don't know if it's September or October,**
15  **right?  So if it was September, it would be six**
16  **months.  If it's October, it would be seven**
17  **months.  So that's why there's two numbers there,**
18  **and one of those is six and a half.**
19  Q.   Right.  And you skipped over years.  So
20  that's two seasons plus six weeks and a third
21  season.  Okay?
22  **A.   Oh, okay.  I use that down below, but**
23  **fine.  Yeah.**
24  Q.   Understood.  I'm just trying to go row
25  by row so I don't miss anything.

Page 171

1  **A.   Yeah.  I was just trying to look through**
2  **where there's actually numbers in an individual**
3  **column.**
4     **Where do you want me to go to next?**
5  Q.   So how do -- you say weeks, months, you
6  have 4.33.  How do you get to that midpoint?  You
7  just -- how do you get to that midpoint?
8  **A.   Well, there's -- it's constant.  In**
9  **other words, there's 52 weeks in a year, right,**
10  **and there's 12 months in a year.  So 52 by 12 is**
11  **4.33.**
12  Q.   Okay.  So you don't count whether or not
13  the months are 30 or 31 days or whether sometimes
14  it's four weeks or five weeks in a particular
15  month?
16  **A.   No.**
17  Q.   Okay.  And weeks per season, is that
18  what that is?
19  **A.   Correct.**
20  Q.   Okay.
21  **A.   So that's simply multiplying -- in one**
22  **case, you've got 6 multiplied by 4.33.  The value**
23  **is 26.0, I hope.  The second case -- the**
24  **second -- or third column is 7 times 4.33 is**
25  **30.3, and then the 28.2 is the average of those**

Page 172

1  **two numbers.**
2  Q.   Okay.  And again, you don't make any
3  adjustments for certain seasons which have more
4  than 31 days and so, or if they include February,
5  you only have 28 days in a particular year?
6  **A.   I'm just using the weeks per month.**
7  Q.   Okay.  And then what's the next column,
8  two seasons and six weeks?
9  **A.   Then that's the total weeks in -- what**
10  **that is is it's multiplying -- if I've done my**
11  **math right, and I think I have -- under the low**
12  **column, you'll see two seasons would be 2 times**
13  **26, right, which would be 52.  And then if I add**
14  **6 to that, it's 58.**
15  **So it's just doing a calculation.  And**
16  **then similarly, the next column, multiply the**
17  **value by 2 and add 6, and then you have an**
18  **average for the two, the high and the low value**
19  **to get the midpoint.**
20  Q.   Okay.  And then events or days per week,
21  is it your testimony that Mr. Winston said he
22  worked between four and six days a week?
23  **A.   Yes.  Well, in terms of the times he was**
24  **spraying, yes.**
25  Q.   So he sprayed four to six days --

Page 173

1  four to six days a week?
2  **A.   When he was spraying, he said that the**
3  **range of times that he would spray would be**
4  **between four and six days a week.**
5  Q.   Okay.  Did he mention that he was on the
6  spray crew for his employer?
7  **A.   I don't know if he used that language or**
8  **not, but that's what I recall.**
9  Q.   Okay.  All right.  So how do you get to
10  events total and spraying?
11  **A.   So we have just straight math.  We have**
12  **4 times 58 is 232, and hopefully 66.67 or**
13  **whatever it is times 6 is 400.  And then the**
14  **midpoint -- note that I use the midpoint.  So I'm**
15  **not using the word "average," and that's**
16  **intentional.**
17  Q.   Understood.
18  **A.   And -- so that's how that's done.  And**
19  **then the hours per event is --**
20  Q.   Okay.  It says time/event.  So that's --
21  **A.   Time per event.**
22  Q.   Okay.  So how long each of these events
23  happened.
24  **A.   During a day, it could be anywhere from**
25  **three to ten hours spraying.**

44  (Pages 170 to 173)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 174

1    Q.   So is that his testimony or that's your
2  assumption?
3    A.   No, that's -- no.  If you go to the far
4  right, I've documented where those numbers come
5  from.
6    Q.   Okay.  And then the next line would be
7  event total time spraying.
8    A.   See, I'm an engineer.  I'm pretty -- I
9  mean, I may make mistakes in math from time to
10  time, but I'm pretty detailed in terms of trying
11  to show everyone exactly what I'm doing.
12       So in the next column -- or next row
13  with the three -- columns 2, 3, and 4 is simply
14  multiplying the hours per event times the number
15  of events to get hours, and that ranges from 696
16  to 4,000, for the midpoint of a little over
17  2,000.
18    Q.   Okay.  And then what's "events spraying"
19  separately at the bottom?
20    A.   "Events spraying" is --
21    Q.   It seems to me to be the same as "events
22  total spraying" that was in -- from up earlier.
23    A.   Yes.  It's just pulled down from up
24  above.
25    Q.   Okay.  And why is that?

Page 175

1    A.   Just because I have a total there, and
2  sometimes I have people that have multiple
3  locations or systems, so this is going to be a
4  total.  This is where I just total everything.
5    Q.   Okay.
6    A.   In this case, since he only had one --
7  one situation, I just pull the numbers down.
8    Q.   Understood.
9    A.   But this is going to be a summary
10  section in case there's multiple locations or
11  multiple activities where I'm doing the same
12  calculations, but there's more than one.  In this
13  case, Mr. -- this was a relatively simple one
14  because Mr. Winston just has one -- one location.
15    Q.   Okay.  And for Mr. Winston, he did not
16  discuss any post-application exposure?
17    A.   He didn't.  He just couldn't -- well, it
18  wasn't -- it wasn't that I asked him the
19  question.  He just couldn't recall.
20    Q.   Okay.
21    A.   So I just put unknown.
22    Q.   Okay.
23    A.   So if they don't know, they don't know.
24    Q.   Okay.  And from this information, do you
25  make any conclusion regarding Mr. Winston's

Page 176

1  exposure?
2    A.   Yeah.  I make conclusions that the
3  number of events or days that he was exposed to
4  Roundup was somewhere between 232 and 400 or the
5  midpoint of 316 and that the hours would be
6  somewhere between 696 and 4,000 with a midpoint
7  of 2054.
8    Q.   Okay.  Let's move over to the section
9  you've entitled dermal data.
10       Okay.  So area would be the area of the
11  body that Mr. Winston told you that --
12    A.   Got wetted with Roundup.
13    Q.   Okay.  And what's the 100 percent?
14    A.   Means that if you looked at the skin
15  area of both hands, you see both those hands, the
16  whole skin area was wetted.  When he was
17  spraying, it was completely wetted.
18    Q.   So as if he put his hand in a bucket?
19       MS. GREENWALD:  Objection to form.
20    A.   No, I'm not saying that.  But he could
21  even have cotton gloves on and it could soak
22  through.  So --
23    Q.   There's no indicating that he wore
24  cotton gloves, right?
25    A.   I'm just -- do you want me to finish?

Page 177

1       What I'm trying to say is we had this
2  discussion last time about does it matter what
3  clothing they wore.  And I just said the way I
4  asked the questions is I just want to know what
5  portion of the -- what skin areas got wetted and
6  what portion got wetted and how often.
7    Q.   And what's your definition of wetted?
8  Do you tell the person who you're interviewing
9  what you mean by wetted?
10    A.   They felt the product on their skin.
11    Q.   Okay.  And so for Mr. Winston, two
12  hands, I assume, would be both hands?
13    A.   Right.
14    Q.   He said 100 percent of his hands were
15  wetted 25 to 35 percent of the time, and that he
16  cleaned up at home.
17    A.   Correct.
18    Q.   Is that a correct reading?  Okay.
19    A.   So we know he has some post-dermal, but
20  we don't know how long.  He couldn't -- he
21  wouldn't give me a time.
22    Q.   Some post-dermal.  What do you mean by
23  post-dermal?
24    A.   You have -- you have initial dermal
25  exposure when you're applying the product.  It

45 (Pages 174 to 177)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 178

1  gets on your skin.  And then when you quit
2  applying the product, unless you clean up, unless
3  you wash up with soap and water or get that
4  product off your skin, it will continue to absorb
5  through the skin.  So I call that post-dermal
6  application exposure.  I shorten it by saying
7  post-dermal.  But there's additional exposure
8  until you clean up or it evaporates or whatever.
9  In this case, Roundup doesn't evaporate all that
10  well.
11        But I just always ask that question
12  because there's additional exposure that would
13  occur as a result of that.  He, unfortunately, or
14  whatever, he just said he didn't.  He waited
15  until he got home, but wasn't sure how long that
16  was.
17     Q.    All right.  Now, so for wrists, I assume
18  you say two wrists, that's left and right?
19     A.    Correct.
20     Q.    A hundred percent of his wrist.  What's
21  the wrist area you're referring to?  Show me.
22     A.    Well, it's from the base of the hand to
23  the start of the forearm.
24     Q.    Okay.
25     A.    It's -- the way I look at it, it's

Page 179

1  ultimately when I do dermal dose calculations,
2  it's -- it's defined in the EPA risk exposure
3  factors handbooks and they -- there have been
4  several generations of them.  But they give you
5  data for children by age and they give you a data
6  for male and female, and they give you
7  percentile.  So they define the skin area of a
8  male wrist, for example, or a female wrist.
9     Q.    Okay.  And you -- you apply those
10  definitions?
11     A.    I apply -- I would use the same
12  definitions that the EPA uses in their risk
13  assessment -- risk assessment factors handbook.
14     Q.    Right.  And you asked Mr. Winston did he
15  ever have exposure to his wrists or do you just
16  ask the general question what areas of your
17  bodies -- of your body was wetted?
18     A.    I'll go through a whole list of areas,
19  and then I only record the ones where they say
20  they were wetted.
21     Q.    Okay.
22     A.    If they -- for instance, if I ask him,
23  let's go through a sequence of skin areas, and
24  I'll go through chest, I'll go through legs, I'll
25  go through feet.  If they say zero, then I don't

Page 180

1  put it down.
2     Q.    Do you follow a script?
3     A.    Not a script.  I think you asked last
4  time if I had a standard sort of outline that I
5  start from and I -- I think we've produced that.
6  So that would be the type of outline I would
7  start from.
8        And then of course, like all good people
9  doing interviews or depositions, depending on
10  what you would hear, you deviate from that and
11  ask additional questions or follow up on things
12  that are said during the interview.
13     Q.    Okay.  Yeah, I remember that.  Okay.
14        So for Mr. Winston, both wrists, 100
15  percent of the wrist area.  And who gives that
16  percentage?  He does or do you make that
17  determination after you've heard what he said?
18     A.    They give me those numbers.  I don't
19  know --
20     Q.    Okay.  And does he give you the number
21  35 percent of the time?
22     A.    Yeah.  I'll tell them, you can give me a
23  value or give me a range of values.  I don't
24  care.  But tell me what your recollection is on
25  average what -- you know, what percent of the

Page 181

1  area was wetted, what percent of the time.
2  Sometimes they give ranges; sometimes they give
3  specific values.
4     Q.    Okay.  So for Mr. Winston, it was his
5  statement, not testimony, that both his wrists,
6  100 percent of that area was wetted by
7  glyphosate, actually Roundup, 35 percent of the
8  time, and he cleaned up at home when that
9  occurred.  Is that a right -- is that a correct
10  reading?
11        MS. GREENWALD:  Objection.  Form.
12     A.    Is this wrists that you were talking
13  about or hands?
14     Q.    Yes, wrists.  We did -- we did hands
15  already.  I'm moving down to wrists.
16     A.    So he would have said yes, my hands --
17  my two wrists got wetted and 100 percent of the
18  skin area.  The way the interviews occur is
19  different than you suggest.  It's I go down all
20  the skin areas, say let's just list the skin
21  areas that you recall getting wetted.
22     Q.    Okay.
23     A.    Then I say okay.  I'm going to ask you
24  for each of those skin areas, what percent of
25  those areas or range of percent of those areas do

46 (Pages 178 to 181)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 182

1  you recall getting wetted typically, and we'll go
2  through them again.
3       And then the third time I'll say, okay,
4  this question is different, that is -- well, it
5  may have gotten wetted 100 percent of the time --
6  or 100 percent of the area may have gotten
7  wetted. Did that happen 100 percent of the time
8  or some portion of the time? And then they give
9  me those answers as well as I go down that
10  column. And then I ask the post-dermal
11  questions. So I literally go through the
12  columns. That's how I go through the
13  questioning, just so you know.
14       Q.   And then your reference, which you told
15  me you refer to, what does constant mean?
16       A.   A constant means that it's -- it's a
17  math term, I guess. To me, it just means it's a
18  fixed value. I mean, 12 months by 52 weeks by 12
19  months is just a constant.
20       Q.   I'm talking about your reference column.
21  You put here specifically where in the interview
22  certain statements were made by Mr. Winston, and
23  then with regard to his wrist, you put constant.
24       A.   Constant refers to the 4.33, not to the
25  interview. Sometimes it's not --

Page 183

1       Q.   Ah, okay.
2       A.   I'm trying to deal with a whole line of
3  data.
4       Q.   Got you. Just didn't understand what
5  that meant.
6       A.   That's referring back to the 4.33, I'm
7  sorry.
8       Q.   Okay.
9       A.   But that data, I believe, would have
10  come off page 7 of his interview. I don't have
11  it in front of me. Or yeah, I do. Yeah, this
12  would have come off of page 7 in the interview.
13       Q.   That's the table you put in each
14  interview?
15       A.   Or tables, yeah.
16       Q.   Tables, right. Okay. Just finishing up
17  so we understand the chart.
18       The other areas that you asked about and
19  that Mr. Winston responded positively about were
20  both forearms at 2 to 5 percent of the time?
21       A.   Yep, that's what he said.
22       Q.   His face, 10 to 15 percent of the time;
23  is that right?
24       A.   Yep, that's what he said.
25       Q.   And the calculated in the reference

Page 184

1  refers back to the value section, right?
2       A.   Yeah. And if you want a better -- I've
3  done it better in some places, but it should
4  say -- if I really wanted those references to be
5  right, it should say constant and interview, page
6  7.
7       Q.   Which is what you did for the neck --
8       A.   Which is --
9       Q.   -- 10 to 15 times you put calculated and
10  the interview.
11       A.   Could have been better if I'd have put
12  that same set of notes wherever I have a dermal
13  value.
14       Q.   Okay.
15       A.   And a calculated value.
16       Q.   And for Mr. Winston, you are not going
17  to have an opinion as to what caused his disease,
18  are you?
19       A.   I am not -- yes, I'm not the medical
20  expert. I'm not the causation expert.
21       Q.   So -- Okay. That was like a double --
22       A.   Well, I mean --
23       Q.   Let me ask the question better so that
24  we get like a straight answer, but it was like
25  the double yes and no.

Page 185

1       Do you intend to provide an opinion as
2  to what caused Mr. Winston's disease?
3       MS. GREENWALD: Objection. Form. Asked
4  and answered.
5       A.   I am not going to offer specific
6  causation opinions. I am not a medical doctor
7  and I'm precluded from doing so.
8       Q.   Understood. Are you considering that
9  the opinion as to what caused his disease to be a
10  specific causation opinion?
11       A.   Ultimately, it is. From a legal sense,
12  it is.
13       Q.   And you're not going to do that, right?
14       A.   I'm not going to give a specific
15  causation opinion.
16       Q.   All right.
17       A.   I mean, I made the distinction with
18  general causation.
19       Q.   I understand. I just want to make it
20  clear so I don't ask you at some point later
21  about it.
22       Okay. Let's go next to Exhibit 33,
23  which would be Mr. Kyle Chaplick.
24       A.   Okay.
25       MR. UPSHAW: Before that, I should ask

47 (Pages 182 to 185)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

|  | Page 186 |
|---|---|

1    our court reporter, we've been going about an
2    hour and 45 minutes.  Are you okay?
3        THE REPORTER:  I'm okay.  Whenever -- I
4    mean, I'd be happy to break, but whenever you're
5    ready, I'm good.  I can stay -- I can keep going
6    for a bit.
7        MR. UPSHAW:  How are we doing on time?
8        THE VIDEOGRAPHER:  15 -- 17 minutes.
9            - - - - -
10   (Thereupon, Petty Deposition Exhibit 33,
11   Mr. Chaplick's Interview Summary Sheet, was marked
12   for purposes of identification.)
13           - - - - -
14       Q.   Okay.  Mr. Chaplick.  Did you personally
15   speak with Mr. Chaplick?
16       A.   I did.
17       Q.   By telephone, in person, or Skype or
18   FaceTime?
19       A.   By telephone.  No Skype.
20       Q.   How many times did you speak with him?
21       A.   One time.
22       Q.   Any e-mail correspondence?
23       A.   No.
24       Q.   Who was present for the interview?
25       A.   Ms. Greenwald, Mr. Hans from Weitz

|  | Page 187 |
|---|---|

1    Luxenberg, and myself.
2        Q.   Okay.  Any other --
3        A.   Along with Mr. Chaplick.
4        Q.   Okay.  Any other individuals besides the
5    people you just mentioned, that is, coworkers,
6    family, friends?
7        A.   Not that I was aware of.
8        Q.   Okay.  Did you read his depo transcript?
9        A.   I have not.
10       Q.   Did you review the plaintiff fact sheet?
11       A.   I think we're still looking to see the
12   answer to that.
13       Q.   Right.  So let me ask --
14       A.   I just don't recall.
15       Q.   All right.  So let me ask it this way.
16   If it was provided to you, which we will
17   determine, would you have reviewed it prior to
18   the interview?
19       A.   I would have.
20       Q.   Okay.  And if it was provided to you
21   after the interview, would you have included that
22   information somewhere in your assessment of
23   Mr. Chaplick?
24       A.   No.  Well, if -- here's -- if I get
25   information afterwards, there are times where

|  | Page 188 |
|---|---|

1    I'll -- there's additional information that comes
2    in, say, that I didn't either hear or didn't ask
3    the question, then I'll re-interview them to get
4    that information.  And if I do so, then you'll
5    see -- I think there's one interview here
6    where -- it wasn't for those reasons, but I see
7    I hadn't finished the interview, so you'll see two
8    lines where I've interviewed him twice.  But in
9    this case, I didn't.
10       Q.   All right.  If there -- if there's
11   something on the plaintiff fact sheet that
12   doesn't require you to re-interview the
13   plaintiff, would you just include it in your
14   assessment?
15       Let me give you an example.  If the
16   plaintiff fact sheet says that they smoked, and
17   on the interview they said they didn't smoke, do
18   you have to re-interview the plaintiff to answer
19   that question or do you just put it on your -- in
20   your assessment that the plaintiff smoked?
21       A.   It depends on the situation.  I mean, in
22   this -- if I were doing a full-up exposure dose
23   analysis, I would do that.
24       Q.   Right.
25       A.   But that wasn't really my role.

|  | Page 189 |
|---|---|

1        Q.   I understand.
2        A.   I'm just trying to answer it.  So to
3    answer your question honestly and truthfully -- I
4    mean not honestly, but to answer it succinctly,
5    if I'm -- if I'm doing a detailed benzene
6    exposure where I do a dose -- that's the only
7    other area I do doses, so that's why I keep
8    bringing it up, and I've done dozens of them --
9    and I do an earlier interview, not a later
10   interview where I have stuff come in afterwards,
11   then either I will re-interview them or if I'll
12   have -- if I'm actually doing the full-up
13   exposure analysis, I'll have all of that data --
14   like smoking, I'll have the interview and then
15   I'll have what's said in the deposition or what
16   his spouse said or whatever under smoking.  And
17   it is what it is.  And then I'll form some
18   judgment -- that's where I get asked a lot of
19   questions in benzene depositions, is well, why
20   did you do this -- take this data and not this
21   one?
22       Now, if there are direct conflicts with
23   data that I'm going to use to determine the dose,
24   then I don't know that I would necessarily
25   re-interview them because I'd have to make a --

48  (Pages 186 to 189)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 190

1    I've rarely seen that.  I mean, most of the time
2    on dermal, I never see the data that I'm just
3    showing you on percent skin area wetted versus
4    percent time.  I never see a complete analysis of
5    that by work location.
6        So I never have conflicts there, but I
7    might have conflicts between -- say he gives
8    me -- in the interview he tells me -- this is
9    where the conflicts usually arise.  He tells me
10   he worked at a certain location from one time to
11   another, but his Social Security records say he
12   was there from a different time.  If I just use
13   the Social Security records, I don't re-interview
14   him.  I say those things are probably a better
15   indication of when he was there than his
16   interview.
17   Q.   Okay.
18   A.   So there's always that conflict
19   resolution that I have to go through when I do a
20   full-up exposure analysis.  In this case, I
21   wasn't doing that, so I didn't --
22   Q.   Didn't have to do that conflict
23   resolution.
24   A.   I didn't really have to do that.
25   Q.   Right.

Page 191

1    A.   I was asked to do initial interviews and
2    that's what I did.
3    Q.   Okay.  Understood.  Thank you.
4    A.   But in other situations, yes, those are
5    resolved.
6    Q.   Okay.  Do you know and did you get the
7    opportunity to review any of Mr. Chaplick's
8    discovery responses, interrogatories, requests
9    for production, Social Security records?
10   A.   No.
11   Q.   Any review of Mr. Chaplick's fact
12   witness transcripts, if there were any, of family
13   members, employers, coworkers?
14   A.   I don't recall any.  I mean, if I had
15   those, they would be listed in the exhibits in
16   Appendix A, and I don't recall any.  That's the
17   quick way to answer those questions.
18   Q.   All right.  Let's keep that in mind.
19       Did you visit any of the locations the
20   plaintiffs claimed -- the plaintiff claimed to
21   have used or been exposed to Roundup?
22   A.   I did not.
23   Q.   Do you know what type of formulation of
24   Roundup that he used?
25   A.   Let me check.

Page 192

1    Q.   Okay.
2    A.   The information that he presented to me
3    on specific products is on page 7 of the
4    interview, which is Exhibit 33, and this is what
5    he told me.  He said it was a 1.33-gallon product
6    in a white container with a black handle, pull
7    down to pressurize the container and a trigger
8    for pull to deliver the product through the
9    nozzle.
10       He said that he used two ready-to-use
11   products both purchased at Lowe's or Home
12   Depot -- I should have prefaced that way -- and
13   the second one was -- the first one was a 1.33
14   product -- gallon product in a white container,
15   ready-to-use, and the second was a 1.33-gallon
16   product in a silver container, and he said that
17   the name on it changed from -- he thought it
18   changed from Max to Max 365.  And he recalled
19   later on that it had a battery to pressurize the
20   container.
21       So to that extent, that's what we know
22   about the products he used.
23   Q.   Okay.
24   A.   At least from the interview.
25   Q.   All right.

Page 193

1    A.   And he talks about how often he used one
2    versus the other.
3    Q.   Okay.  In your chart of MSDSs -- I
4    shouldn't say that.  Let me rephrase that.
5        On page 278 of your -- of Exhibit 7,
6    your factual summary, where you charted out the
7    Monsanto Roundup MSDSs, I do not see any product
8    called Max or Max 365.  I see an Ultra Max, and
9    an Ultra Max II.  Did you make any correlation
10   between those products and the products
11   identified by Mr. Chaplick?
12   A.   Beyond what he told me, no.
13   Q.   Okay.  Do you know if those are the same
14   product?
15   A.   If what?
16   Q.   If Max is the same as the Ultra Max or
17   Ultra Max II?
18   A.   What I'm looking at is page 4 where the
19   color coding is defining the products.
20       Nope, that doesn't necessarily help.
21   Q.   Oh, wait.  Hold on.  Let's help out.
22       Page 277 has more, right?  They're not
23   all on 278.  There's two pages' worth of products
24   you've got going on there.
25   A.   Oh, yeah.  There you go.  You know this

49  (Pages 190 to 193)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 194

1    better than me sometimes.
2        Q.   Okay.  So there is a Max Control 365
3    Concentrate and a Max Original Herbicide that you
4    have listed --
5        A.   Right.
6        Q.   -- on MSDSs.  And for that, did you make
7    any correlation or review the products any
8    further after you knew that Mr. Chaplick used
9    those two products and include that in your
10   assessment?
11       A.   Other than listing what they said they
12   used, no.  I'm just looking at the hours and
13   events, because I didn't take it further in terms
14   of an exposure assessment.
15       Q.   All right.
16       A.   I mean, if you took it further in terms
17   of exposure assessment, you'd want to know the
18   composition to go and determine the dose based on
19   dermal fluxes based on say glyphosate
20   concentration.
21       Q.   Right.  And we've talked about that.
22   And that's not what you did.
23       A.   I did not do that.  I wasn't asked to do
24   that.
25       Q.   Did you determine from the interview

Page 195

1    whether Mr. Chaplick considered his exposure
2    occupational or residential or both?
3        A.   If you look at page -- well, it doesn't
4    matter which page, but anytime I'm describing a
5    time in his life or an event in his life where
6    he's using products, and in this case, on page 7,
7    at the top of the page, and I'm talking
8    specifically about the pesticide use home, 358
9    Merlot Drive, I will indicate the location,
10   whether it be home or work, and in that case, I
11   think I've indicated that it was at home.
12       Q.   Okay.  And what was his method of
13   application?
14       A.   It was a -- I think on page 7 it
15   describes it, but it was a ready-to-use product
16   that initially had a pump -- a pumped container
17   with a nozzle.  And later on, towards the very
18   end, it had a battery pressurized -- it had an
19   energized, if you will, pump.
20       Q.   Any indication whether that nozzle had a
21   wand?  Was a pump wand applicator?
22       A.   He did not indicate that it had a wand.
23   But, you know, I don't know if the question just
24   wasn't asked.  There's nothing in the interview
25   that says one way or the other.

Page 196

1        Q.   And just so I understand your interview
2    process, do you make notes contemporaneously
3    with -- during the interview?
4        A.   I do.
5        Q.   And then is -- what's your process after
6    those notes?  Those notes are handwritten or
7    they -- are they typed?
8        A.   These here or --
9        Q.   No, no.  When you're in the middle of an
10   interview, are you handwriting notes or are you
11   typing as you go along?
12       A.   Handwriting.
13       Q.   Okay.
14       A.   And they're cryptic and then I -- I use
15   lots of abbreviations and then I -- I almost
16   immediately type the notes up.
17       Q.   Okay.
18       A.   And the reason for that is a lot of
19   times the information -- what I try to do with
20   the notes is I group like information in like
21   places, if that makes any sense.  So all the
22   information about one location, I'll have it all
23   in one -- he may jump around or she may jump
24   around in the interview or cycle back on stuff.
25       Q.   Understood.  And so you try to take your

Page 197

1    cryptic notes and put them in the format that we
2    see here?
3        A.   Yeah.  But appreciate that they're being
4    written on that outline that I've provided to
5    you.  So it's -- it's only cryptic in the sense
6    that my handwriting -- being able to read my
7    handwriting.
8        Q.   Understood.
9        A.   But they're being written on -- but I
10   always have the interview sheets so that I don't
11   have it back to back.  So that if I need to
12   continue to explore an area, then I'll write on
13   the back or whatever, and then --
14       Q.   And is it important for you, when you're
15   taking notes contemporaneously during your
16   interview, to record exactly what the
17   interviewee, in this case, the plaintiffs, have
18   said to you?
19       A.   I don't know how to answer that
20   question.  I try to record it as accurately as I
21   can.  The reason I -- well, I've been doing it
22   this way forever, whether that's good or bad.
23   But the reason I like to handwrite the notes as
24   well is it slows the process down so that I make
25   sure I understand the response.  Whereas if it's

50  (Pages 194 to 197)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 198

1  just recorded, you tend to run through things.
2  This gives me time to think about the answer and
3  see if I need to follow up in any way.
4       MR. UPSHAW: Okay. All right. Let's
5  break.
6       THE VIDEOGRAPHER: Off the record. It's
7  4:11. End of disk 2.
8       (Recess taken.)
9       THE VIDEOGRAPHER: We are back on the
10  record. This is disk number 3. It's 4:31.
11  BY MR. UPSHAW:
12    Q.   Okay. Mr. Petty, we were talking about
13  Mr. Chaplick.
14    A.   Okay.
15    Q.   For Mr. Chaplick, did you take into
16  account other exposures to other pesticides,
17  insecticides or chemicals?
18    A.   Yes, I try to. You'll see on each of
19  the -- for instance, on -- I try to -- the way
20  the interviews proceed is I try to go back to the
21  very first -- after I get some background
22  information, I try to go back to their very first
23  job. I say, tell me the first job as you
24  remember and we talk about that.
25       I try to get some basic information

Page 199

1  about each job they've had over their career.
2  And you'll see, like on page 2 of Exhibit 33,
3  I'll ask them, any other chemical products that
4  you've used? And in this case, he says no known
5  chemical exposures while working at this
6  location.
7       So I do ask the question, and if they
8  give me a response, then I will indicate that.
9  But it's a specific question asked for each
10  location where they work.
11    Q.   Okay. Do you take into account family
12  history and prior health in your assessment of
13  Mr. Chaplick?
14    A.   Rarely. I mean, if they work for their
15  father or something, I guess. But, you know,
16  only if there was some relationship between their
17  exposure and their family.
18    Q.   During the interview, do you indicate
19  any other risk factors?
20    A.   Same answer as before. I ask about
21  smoking and other chemicals that they're exposed
22  to, for example.
23    Q.   Yeah. And again, I understand sometimes
24  these seem like repetitive, but I have to split
25  each case separately, because if the case gets

Page 200

1  severed or something else, I don't want to have
2  to come back and ask you --
3    A.   So you can't ask me in cases 1 through
4  12 --
5    Q.   Yeah.
6    A.   -- is your answer the same?
7    Q.   No. Because we -- if six, seven and
8  three come out, then we'd have to come back and
9  ask you specifics on that one and specific
10  interviews.
11    A.   I understand.
12    Q.   And I realize it's a little laborious,
13  but we'll try to work through it as best we can.
14       Did you make any attempt to
15  collaborate -- I'm sorry, corroborate any of the
16  statements Mr. Chaplick made about his use of
17  Roundup with any other individuals, coworkers,
18  employers, family members, et cetera?
19    A.   No.
20    Q.   Okay. All right. Mr. Chaplick's table
21  is on -- under Exhibit 13, it's on page 3.
22    A.   Okay.
23    Q.   Before I get to the table, do you have
24  any idea about what Mr. Chaplick's non-Hodgkin's
25  lymphoma subtype is?

Page 201

1    A.   I didn't write any subtype down in my
2  interview. And if I saw it, I don't recall.
3    Q.   Okay. And do you know as of today what
4  it is?
5    A.   I do not.
6    Q.   Okay.
7    A.   I mean, other than if I was to go -- if
8  I have the other documents that show that, then I
9  guess I could look at those, but --
10    Q.   You mean the plaintiff factual sheet?
11    A.   Yeah, yeah, yeah.
12       MR. UPSHAW: Okay. Did you determine,
13  Ms. Greenwald, whether or not the plaintiff fact
14  sheets were provided to --
15       MS. GREENWALD: So --
16       MR. UPSHAW: Let me finish the
17  question -- provided to Mr. Petty? I'm delaying,
18  and then I'm going to --
19       MS. GREENWALD: So Mr. Petty has -- if
20  you see on his materials considered list, he got
21  their depositions. And some of the exhibits of
22  the depositions included in the deposition
23  exhibits of the plaintiff fact sheets. If you go
24  to the materials considered list --
25       MR. UPSHAW: The most recent version?

51 (Pages 198 to 201)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 202

1    MS. GREENWALD: It's the one I looked at
2  that's the only one I have with me, but I can't
3  speak for the other ones. I can tell you, I just
4  looked earlier. I just got word from my office.
5  Let me find it. I just had it. How could I have
6  misplaced it?
7    Here it is. Start on page like
8  numbers -- starting on page 42, 43. Yeah, that's
9  where it starts, 42.
10    MR. UPSHAW: Okay.
11    MS. GREENWALD: And it keeps going --
12    MR. UPSHAW: Right.
13    MS. GREENWALD: -- through page 47.
14    MR. UPSHAW: Okay. Thank you.
15   Q. All right. So, Mr. Petty, why don't you
16  turn to your list of reliance materials.
17   A. That's what I was looking for, but I
18  can't seem to --
19   Q. Yes. It's going to be in the exhibits
20  there, because you amended it.
21   A. I'm going to organize this real quick.
22    MS. GREENWALD: I'm looking at the one
23  from July -- oh, no, I'm looking at the one from
24  July 1st, 2019. I'm so sorry. I'm looking at
25  the earlier one.

Page 203

1    MR. UPSHAW: It's on this --
2    MS. GREENWALD: Okay. But I just wanted
3  to let you know, that's the one I was looking at.
4   A. Okay. I'm sorry. We'll stop here.
5    MR. UPSHAW: All right. It's Exhibit
6  17.
7    MS. ALVAREZ: Exhibit 18.
8   A. 18.
9   Q. Okay.
10   A. I had every one but 18. That was the
11  problem.
12   Q. All right.
13   A. Okay.
14   Q. Flip to page 42. You there?
15   A. I am there.
16   Q. It looks like from Exhibit 491 to
17  Exhibit 507-9, you have various exhibits and
18  deposition transcripts of various plaintiffs in
19  this matter on this list.
20   A. Yep.
21   Q. Is that correct?
22   A. That is correct.
23   Q. Do you recall reviewing those various
24  depositions and exhibits on this list?
25   A. Not -- I mean, I know I got them, but

Page 204

1  you can tell by the sequence in which they are
2  listed, they were right at the end. You don't
3  know that, but I'm just telling you that that's
4  the case, because they get numbered sequentially
5  as they come in.
6    So I know I have them, but I know that I
7  haven't read through all of them.
8   Q. Do you have any intention of reading
9  through all of these?
10   A. I do not.
11   Q. So with regard to, for example,
12  Mr. Chaplick, since we're talking about him, you
13  have his deposition as Exhibit 492, with Exhibits
14  1 through 7, numbered as we've discussed
15  previously. Do you see that?
16   A. Yes.
17   Q. And the last one would be Exhibit 7, his
18  plaintiff fact sheet. Do you see that, 492-07?
19   A. Yes, I see that.
20   Q. And just to be clear, you don't have an
21  intention between now and the time you appear at
22  trial to review Exhibit 492-07 to influence your
23  opinion with regard to Mr. Chaplick, do you?
24   A. Well, I scanned through them -- I
25  scanned through a couple of them to see if they

Page 205

1  provided the dermal -- questions were asked the
2  way I asked them in my interviews with respect to
3  dermal. I didn't see any of that.
4    So -- and I've never, I'm telling you,
5  I've never seen in hundreds of depositions any
6  defense expert ask the dermal questions that I
7  ask, even when they know that I had my interview
8  ahead of time. So it will be highly unlikely to
9  change my dermal interview information.
10    The answer to your question is no, I do
11  not intend to go back through them, because
12  remember, we talked about this earlier, I'm not
13  doing the full-up exposure analysis. Absolutely,
14  if I was going to testify to his -- other
15  than the summary of what I got from the
16  interviews, if I was going to have to testify
17  beyond that and actually do a dose calculation, I
18  would absolutely go through all those.
19   Q. Okay. Just to be clear, for
20  Mr. Chaplick, you know, the summary is the
21  summary, right? Whatever he said he said, you
22  wrote it down in an interview, you provided it to
23  whoever needs it?
24   A. Right.
25   Q. Okay.

52 (Pages 202 to 205)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 206

1    A.   These were done quite a while ago early
2  on -- relatively early on, and they are what they
3  are.
4    Q.   Right.  And it's not your intention or
5  have you been asked to go back and look at the
6  depositions that you were provided, exhibits to
7  the depositions of the plaintiffs that you were
8  provided and to somehow supplement your interview
9  or information you're providing with regard to
10  the plaintiffs, correct?
11    MS. GREENWALD:  Objection.  Form.
12    A.   I tried to answer that before.
13    Q.   I know.
14    A.   And the answer is the same.  And what it
15  is, is that if I were going to do a dermal dose,
16  then I would put down all the various sources of
17  input on a given subject, whether it be smoking
18  or whatever the topic is, including the Social
19  Security records hopefully I would have.  And
20  then I would use those to make decisions on time,
21  location, et cetera, along with the interview
22  information.
23    But I'm not doing a dermal dose set of
24  calculations here.  So normally I would, but I
25  don't really intend to for purposes of this,

Page 207

1  because I don't -- I'm not doing the dermal dose
2  analysis.
3    Q.   Okay.
4    A.   I don't know if that makes any sense or
5  not, but --
6    Q.   It does.  All right.  Well, let's turn
7  then to Exhibit 13 and page 3 of that exhibit.
8  And table 1 is Mr. Chaplick's Roundup exposures;
9  is that correct?
10    A.   Correct.
11    Q.   Okay.
12    A.   These are alphabetical, by the way.
13    Q.   Okay.
14    A.   I hope.
15    Q.   Now, in the value section, the units,
16  those units are based upon the interview
17  information, right?
18    A.   Unless they're calculated, and then
19  they're based on calculations.
20    Q.   Okay.
21    A.   In other words, the -- you'll see there
22  where I'm looking at events per year, on the far
23  right, I have reference calculation and Chaplick
24  interview, page 9.  Well, the dermal data would
25  come from the interview, but the events per year

Page 208

1  clearly calculated; in other words, I'm just --
2  I'm just multiplying the number per month times
3  the number of months, times the number of years.
4    Q.   Right.  He didn't say to you that the
5  range of events was 20 to 40; that's your
6  calculation from the information you derived?
7    A.   Correct.  Correct.  Absolutely correct.
8    Q.   But he did tell you how many hours he
9  would take to apply -- apply whatever pesticide
10  he was using?
11    A.   Yeah.  In this case, he --
12    MS. GREENWALD:  Objection.  Form.
13    A.   In this case, though, he -- well,
14  partially.  In this case, for example, the event
15  times are split by season between the warmer and
16  the cooler months, and those are defined above.
17  So there are different event times, depending on
18  the time of year.
19    Q.   So that's what I'm not sure, and let's
20  go through this, if we can.
21    Where you have here under the year
22  2006/2007, Roundup usage at home is ten years.
23  And if you used up to 2000 -- and I don't
24  understand -- up to 2017, 11 years?
25    A.   Yeah.  Because appreciate that if I use

Page 209

1  2007 to 2017, that's ten, right?
2    Q.   Uh-huh.
3    A.   That's the minimum number.  But if I use
4  2006 to 2017, that's 11.  So the midpoint of that
5  was ten and a half.  So I'm looking at the
6  low-end range.  I don't want to put the high
7  value under the low column.
8    Q.   Right.  And so the months under events
9  is -- I don't understand.  What's the 2, 4 and
10  the 3?  And you have by month -- I guess --
11    A.   What he's saying -- what he told me in
12  the interview is that during the warmer months,
13  which range from March to November, he would
14  spray Roundup products from two to four times per
15  month during those months.  But in the colder
16  months, he did less spraying, which kind of makes
17  sense, and he would do one to two sprayings per
18  month when it was cooler during the months of
19  November through March.
20    Q.   And did you ask him how long one of
21  these spraying events would last?
22    A.   Yes.  Now, if you go down below where it
23  says event times, warmer months, event times,
24  cooler months, the event times in the warmer
25  months were 45 to 60 minutes, and in the cooler

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 210

1    times were 20 to 45 minutes.
2        Q.   And in your calculations, do you ever
3    take into account the area that the person who's
4    claiming to have sprayed was trying to cover or
5    trying to apply Roundup to?
6        MS. GREENWALD:  Objection.  Form.
7        A.   They may describe -- I'm trying to see
8    in this case to answer your question.
9            In the interview on page 7, I mean, I
10   did ask -- or he volunteered where he sprayed it
11   and he said in his yard, the mulched areas, the
12   garden areas, the fence line, the backyard near
13   the nature preserve.  I didn't get a square
14   footage or anything like that, but I did get a
15   qualitative description of where he was spraying.
16       Q.   Okay.  And I guess that's my point.  Do
17   you look at how many square foot or try to
18   estimate how many square feet the person was
19   spraying?
20       A.   I didn't ask that question in this case,
21   no.
22       Q.   Okay.  Did you ask it in any case?  Is
23   that something you would normally ask in your
24   interviews?
25       A.   Sometimes I get information if I'm

Page 211

1    interviewing -- well, I really can't talk about
2    other cases.  In other cases I have.
3        Q.   Okay.  But you didn't in this case,
4    Mr. Chaplick's case?
5        A.   Not in this case, I did not.
6        Q.   Okay.  All right.  And going to the
7    dermal data, correct me if I'm wrong, but
8    Mr. Chaplick indicated that one time, he had
9    exposure on his face and it was 100 percent of
10   the area; is that correct?
11       A.   Yes.
12       Q.   And that he, I guess, cleaned his face
13   greater than two hours after the event?
14       A.   Correct.
15       Q.   So I'm not sure what the yes, greater
16   than two hours.  What's the question?
17       A.   Yes -- yes means that -- post-dermal to
18   me, again, means that after the application where
19   you got product that wet some portion of his skin
20   or her skin, did they clean up immediately or did
21   that product remain on their skin for some period
22   of time until they showered, for example.
23           In other words, it's different if you
24   wipe it off as opposed to go and -- there's still
25   a film left.  So when did you use soap and water

Page 212

1    or shower or do something to physically clean
2    your skin?  And that's the question I want them
3    to answer to.  And in this case, he just said,
4    well, it was always more than two hours later
5    before I finally went in and cleaned up.
6        Q.   And is it your opinion that if someone
7    does get wetted by a particular pesticide and
8    they wipe it off, that that doesn't reduce the
9    amount of pesticide on their skin available for
10   absorption?
11       A.   No, I don't say that at all, but there's
12   still a layer.  It may reduce the total amount
13   that's there, but this stuff doesn't evaporate
14   very well by all accounts.  And as long as
15   there's a film there, there's still a potential
16   to provide dose.
17           Now, I have not calculated what that
18   post-dermal dose is, but the potential still
19   exists.  Usually, if they've wiped -- if they
20   said I took a rag or something and I wiped my
21   face, I will indicate that, because I want to
22   know.  There was no indication from him that he
23   did so.
24       Q.   Oh, okay.  So let me finish off on the
25   face.

Page 213

1            What defines the facial area so I know
2    what 100 percent is?
3        A.   I would use the EPA Risk Assessment
4    Factors Handbook for facial area, depending on
5    the individual, whether male or female.  I
6    usually use the 50th percentile unless they're a
7    child.  Then I want the age range, how that
8    changes with age and gender.
9        Q.   Did you explain that to Mr. Chaplick
10   when he said it's 100 percent of his face, did
11   you have him describe what he means by that?
12       A.   In terms of square centimeters of his
13   face area?
14       Q.   No.  I mean, when he says on that one
15   event, I got my face wet -- I'm sure he didn't
16   use the term "wetted," did he?
17       A.   Yeah, I asked him, was your face wetted
18   by the -- that's the term I use constantly.
19       Q.   Okay.  And did he ask you what do you
20   mean by face or you just both made the assumption
21   of that area?
22       A.   I asked him if -- I mean, I don't know
23   what you're asking.  I asked him if his face or
24   his hands or -- you know.  He defines, I guess --
25   ultimately, when I ask him the face area, he's

54  (Pages 210 to 213)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 214

1  telling me that the skin on his face was wetted.
2  Q.  Okay.
3  A.  And what I actually use when I go back
4  to do a calculation is I'll look up what the skin
5  area is for one's face.
6  Q.  But you didn't have to do that in this
7  case?
8  A.  I didn't have to do that in this case.
9  And I wouldn't expect him to know how many square
10 centimeters of face area he has.
11 Q.  And he said, with regards to the neck,
12 50 percent of the neck, one time only.  Was this
13 the same event, do you know?  Did he explain
14 that?
15 A.  I don't recall, but I would expect it
16 would be, because it sounds like it was a major
17 splashing event since it's a one-time event.  The
18 50 percent means the front half of the neck as
19 opposed to the back, typically.
20 Q.  Okay.
21 A.  I don't recall if he -- I just don't
22 recall whether he said -- I'd have to look back
23 here and see if he reported that as a one-time
24 event.
25 Q.  Okay.

Page 215

1  A.  I don't see anything here where he
2  specifically said that.  I mean, I've had people
3  do that, but I don't see that he told me that
4  here.
5  Q.  Okay.  I have one other question on
6  page -- on page 3 here, just for clarification.
7  So under values, you have at the bottom
8  post-application time event, and your midpoint is
9  2.  That means he didn't give you any range
10 because all of his were greater than 2?
11 A.  What?
12 Q.  I don't know how -- where does that 2
13 come from in --
14 A.  Well, the 2 comes from being the most
15 conservative I can be.  If the value is greater
16 than 2, I've got a -- it's not a less than.  If
17 it were less than, I'd have to do something else.
18 But if it's greater than 2, then that means it's
19 at least two hours.
20 So when I'm going to go do calculations,
21 it could be a lot more than that.  But that would
22 just mean his exposure is bigger than that.  So
23 when I calculate the post-dermal time, if I were
24 going to write text around this, I would say I
25 conservatively estimated his post-dermal

Page 216

1  application time to two hours.
2  Q.  Okay.  I'm just trying to get where that
3  number came from.  And it comes from the
4  post-dermal time that you have listed over here
5  in dermal data?
6  A.  Yeah.  I mean, it's because it's the
7  most conservative value I could use based on that
8  information.
9  Q.  All right.  Understood.  We didn't do it
10 before.  I need to do it so I understand your
11 interview summary.  So let's look at Exhibit 33.
12 A.  Okay.
13 Q.  That's Mr. Chaplick's summary.
14 Okay.  In this, I won't go back and ask
15 you about, Mr. Winston.  I'm just trying to
16 figure out how you put this together.
17 Okay.  When you put together an
18 interview summary sheet, again, this is your --
19 is this a standard format?
20 A.  Well, it starts from that -- I produced
21 that standard form at the last -- I don't know
22 which day it was, but it was produced to you
23 folks and that's where I start from.
24 Q.  Okay.
25 A.  And then I'll be writing my notes on

Page 217

1  that form.  A lot of it's pretty easy.  I can
2  check plaintiff, yes.  I can write down who's
3  been there.  I write -- I put the start time and
4  the finish time.  I can look at the phone and get
5  those times.  And I know what day it is that I'm
6  talking to the person.
7  So the first page is always sort a --
8  just some really background information.  I want
9  to know birthday, location, disease, as they
10 recall, their education, their training, whether
11 they served in the armed forces and then their
12 smoking history.  That's just standard -- I ask
13 everyone that.  It's a standard, I've done it
14 forever and I guess I'm a creature of habit.
15 Q.  All right.  And then the next few pages
16 are the various locations that the person being
17 interviewed identified as places where they were
18 exposed?
19 A.  No.  These are locations where they
20 worked.  I want to go through their entire work
21 history from day one as far as the first job they
22 recall, then the next job, then the next job.
23 And I want to -- because a lot of times, I'll
24 have a situation where I'm told the primary
25 exposure is working at work at someplace,

55  (Pages 214 to 217)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 218

1   whatever.
2       But out of completeness, I want to know
3   where else they worked and what other exposures
4   they might have had.  And maybe they had some of
5   the exposures to the same chemical, maybe
6   different chemicals.  So the very first thing I
7   do is walk through their work history; first job
8   they can remember, second job, third job, et
9   cetera.
10      Then once I get to the chemicals of
11  concern, I then bore in on those job locations to
12  get very specific information about how to
13  utilize that.  And that's how these are
14  organized.  And then the last two sections are
15  after I get sort of more detailed information on
16  the products of concern that they've used, then
17  I'll ask the dermal questions.  And then lastly
18  but not least, I'll ask questions about their
19  knowledge of warnings.
20   Q.   When you bore in you said on the
21  products of concern, the product that you
22  consider of concern is the product that you've
23  been hired to discuss, right?  Such as in this
24  case, the product of concern was Roundup?
25   A.   That's certainly one of them.  But if

Page 219

1   there were other chemicals of concern, I would
2   list them.
3    Q.   And what do you consider chemicals of
4   concern?
5    A.   In this case, it would be other
6   pesticides or herbicides or --
7    Q.   Do you bore down into pesticides,
8   herbicides in Mr. Chaplick's case and the other
9   plaintiffs here, first at work and then at home,
10  or do you get all of the exposure locations and
11  then bore down into the products of concern?
12   A.   Typically, I will go through their work
13  history -- or their work history first.  And then
14  if there are products that they use at home, I'll
15  go through their home exposure history.
16   Q.   Okay.
17   A.   I think that's how, if you read these,
18  that's how they'll show up.
19   Q.   All right.  And then on the last portion
20  of an interview sheet -- interview summary sheet,
21  sorry.
22   A.   I just call it an interview.  But yeah.
23   Q.   I just go by the title that you have on
24  each one.  You put together a table, pesticide
25  usage data table; is that right?

Page 220

1    A.   Yeah.  This is where when I -- when
2   there's a location where there's pesticides used,
3   that's where I'll start to bore in on the type of
4   equipment, the type of products, the times they
5   used it.  Everything pretty much but dermal.
6    Q.   Okay.
7    A.   What you'll find on the dermal page is
8   that it ends up being also the first part of the
9   summary of what you'll see on the detailed page.
10   Q.   When you say the dermal page, you mean
11  the section that's labeled "Dermal Exposures" in
12  your chart?
13   A.   When I -- yes.  When I ask questions,
14  the first thing that I do when they -- when I --
15  when I say, in this case, I'm asking about
16  Roundup usage is I'll focus in on, you know, all
17  these topics, and I'm really trying to get the
18  timeline, how often they used it, when they used
19  it, what product they used, what did they mix or
20  did they have -- did they -- how did they apply
21  it?  All those questions I'll ask and then I
22  report that information.
23       Then after I've gone through each of
24  these areas where I've asked that information, I
25  go back and fill in the questions primarily -- I

Page 221

1   reconfirm the -- on page 8 or 9 of this, I'll
2   reconfirm the data in the first six columns,
3   because I've already asked that data.
4        But then I start asking the questions
5   in -- it would be the fifth column from the right
6   and then the balance of the columns.  Mainly --
7   it's mainly dermal.  I don't say it's all dermal
8   because the -- the data in the middle could be
9   associated with inhalation as well.
10       The reason I'm interested in distance
11  away is if I'm going to do an inhalation
12  modeling, then I want to know how far -- I always
13  ask them how far is your nose from where the
14  product was dispensed, the nozzle.
15   Q.   And that's what the distance away is?
16  Your nose --
17   A.   Nose to the product, right.  Where -- at
18  the end of the nozzle.
19   Q.   So according to your chart, Mr. Chaplick
20  was spraying his yard and driveway with his nose
21  a foot to three feet away from the end of the
22  applicator.
23   A.   Yes.
24   Q.   A foot being 12 inches?
25   A.   Depends on if his arm was bent or not

56  (Pages 218 to 221)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 222

1    and if he's bent over looking at something close.
2    That's not unusual, by the way.  That's a
3    general --
4        Q.  Didn't ask that, but okay.
5        A.  Well, I'm just telling you.  I've done
6    hundreds of these.  But whatever it is, it is.
7    They tell me.  I mean, you see in these
8    interviews --
9        Q.  Right.  If he told you six inches, you
10   would have put six inches, right?
11       A.  Right.  I'm not -- you know, it's
12   whatever they tell me.
13       Q.  You're not passing judgment.
14       A.  Nope.
15       Q.  Okay.  Do you come to a conclusion with
16   regard to Mr. Chaplick's exposure other than the
17   numbers and calculations you've provided?
18       A.  Well, yeah, I've come to conclusions
19   with regards to times of year he used it,
20   locations, the dermal exposure levels.  The
21   conclusions I would reach with respect to his
22   exposure are primarily the -- I mean, it would be
23   summarized pretty much in the data in this last
24   table.  That rolls it up pretty well.
25           And then that's used to do some of these

Page 223

1    summary calculations that we've talked about as
2    well.  But then I also will -- I've asked some
3    questions about warnings and PPE.  And so I --
4    the -- whatever data are associated with the
5    interview that would relate to his exposure, I
6    would opine on, that he told me.
7        Q.  You -- I guess I'm confused what you
8    mean by the data you would opine on versus what
9    he told you.  What he told you was just a factual
10   rendition of what he told you.  Like we said, if
11   he said six inches away, it's six inches, right?
12       A.  Right.
13       Q.  Your opinion would be when you look at
14   the data in total.
15           Do you have any opinion with regard to
16   Mr. Chaplick's exposure when you look at the data
17   from Mr. Chaplick in total?
18           MS. GREENWALD:  Objection to form.
19   Asked and answered.
20       A.  Yeah.  But your question was -- before,
21   you said just related to these calculations.
22       Q.  Right.
23       A.  And I said that's part of it, but it's
24   not all of it.
25       Q.  Okay.

Page 224

1        A.  Because there's the dermal aspect that
2    isn't covered by those calculations.
3        Q.  You're correct.
4        A.  And then there's the PPE and the
5    warnings that are also related to his exposure.
6    The PPE being is his skin being protected or not.
7            So it's more than just -- all I'm
8    telling you is it's -- I'm trying to be
9    succinct -- but it's more than just simply those
10   calculations.
11       Q.  Understood.  Given all of those
12   calculations in total, did you have a conclusion
13   regarding Mr. Chaplick's exposure?
14       A.  Yeah, I have many conclusions.
15       Q.  What would they be?
16       A.  They'd be the numeric conclusions on
17   numbers of events or days, numbers of hours,
18   products used to the extent they're identified,
19   the amount of times and areas the skin was
20   exposed to the products, the times of year that
21   he used the product.
22       Q.  So let me ask you.  Do you -- I'm sorry.
23   Do you have an opinion with regard to the times
24   of year he used the product or you just purported
25   the factual information?

Page 225

1        A.  Well, I'm saying that -- the times of
2    year can depend on how much clothing or how much
3    skin gets wetted.  Remember, in this case, we
4    have -- he uses it at different times of the
5    year, so that's why it's important.  Somebody may
6    want to know is the exposure uniform over the
7    year, and I would say no.  It's more in the
8    warmer months than in the winter months.
9            So it's more than just giving you -- not
10   you, but whoever asks -- a rollup of the values,
11   it's -- it's providing the detail below those
12   values that, if asked, you know, was it just
13   uniform that he used this during the year or did
14   it vary by time of year, and I would have an
15   opinion on it.  I would say, you know, he used
16   more in the summer -- in the warmer months than
17   the cooler months, as one might expect.
18       Q.  Right.  You would be repeating the
19   factual information that's listed in the tables
20   that we just looked at, correct?
21           MS. GREENWALD:  Objection.  Form.
22       A.  I don't know how to answer that.  I
23   mean, I -- we keep repeating the same questions
24   and the same answers.
25       Q.  Yeah.  All I'm trying to figure out is

57 (Pages 222 to 225)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 226

1    what's the difference in your mind between a
2    question regarding some factual information
3    you've obtained during your interview and an
4    opinion with regard to that factual information?
5         MS. GREENWALD: Objection. Form.
6    **A.   Well, we -- again, we've answered that.**
7    **I'll try to answer it again.**
8    Q.   Okay.
9    **A.   The -- remember I talked about the fact**
10   **that the dermal area exposed is much greater**
11   **than, for instance, is represented in the -- in**
12   **the modeling work that I have in my report.  So I**
13   **would say that the modeling work does not reflect**
14   **actual users' skin exposure.  That would be an**
15   **opinion based on comparing what's used in certain**
16   **baseline models by -- and versus what actually**
17   **happens in the real world.**
18   Q.   Okay.  So I understand that you would
19   have an opinion with regard to the modeling.  And
20   you could compare that to the real-world
21   information that you've received from
22   Mr. Chaplick.
23        My question is with regard to
24   Mr. Chaplick, not the modeling, do you have an
25   opinion given all the factual things you have

Page 227

1    with regard to his exposure -- maybe I should add
2    in general?
3         MS. GREENWALD: Objection to form.
4    **A.   It would -- it would be -- in an overall**
5    **sense, it would be the same opinion I offered**
6    **before, which was that due to what I view as an**
7    **opinion as inappropriate warnings and**
8    **inappropriate recommendations for PPE, his**
9    **exposures were greater than they otherwise had to**
10   **be.**
11   Q.   Okay.  Remember, I had to ask you this
12   on each person.  So if that relates to each
13   person, then that would be the conclusion we're
14   going to come at.
15   **A.   You just say remember your last answer.**
16   Q.   Which I don't want to do, but, okay,
17   just a reminder.
18   **A.   I'm trying.**
19   Q.   All right.  Let's move forward to
20   Mr. Cole.
21   **A.   Progress.**
22   Q.   All right.  Mr. Cole's interview summary
23   sheet has been marked as Exhibit 34.
24              - - - - -
25        (Thereupon, Petty Deposition Exhibit 34, Mr. Cole's

Page 228

1    Interview Summary Sheet, was marked for purposes of
2    identification.)
3              - - - - -
4    **A.   Thank you.**
5    Q.   Okay.  Did you personally speak with
6    Mr. Cole?
7    **A.   Yes, I did.**
8    Q.   Okay.  Telephone, in person, or
9    FaceTime?
10   **A.   Telephone.**
11   Q.   How many times?
12   **A.   One time, December 10 from 2:06 p.m. to**
13   **4:07 p.m.**
14   Q.   Okay.  So a two-hour interview?
15   **A.   Correct.  And a minute.**
16   Q.   Okay.  Any e-mail correspondence?
17   **A.   No.**
18   Q.   Any attorney for plaintiff present?
19   **A.   Yes, sir.  There was -- well, ███████**
20   **Cole was present.  I believe that -- I think that**
21   **was his wife.  And then Ms. Greenwald, Claire,**
22   **Elisse, and Matt from Weitz Luxenberg were also**
23   **on the phone at times.  They would come in and**
24   **out.**
25   Q.   Okay.  So three attorneys from

Page 229

1    Luxenberg.
2    **A.   Four.**
3    Q.   Four.  Sorry.  Miscounted.
4         Okay.  We know -- did you read the
5    deposition transcript of Mr. Cole?
6    **A.   I have them.  But if I read them, it was**
7    **just very cursory.**
8    Q.   Do you know whether you reviewed his
9    plaintiff fact sheet?
10   **A.   Probably.**
11   Q.   Did you review it before or after his
12   interview?
13   **A.   It would have been after.**
14   Q.   Is the review of his fact sheet -- is
15   your review of his fact sheet related -- strike
16   that.
17        Is the review of his fact sheet
18   identified in any of the interview summary
19   sheets?
20   **A.   No, because the interview happened long**
21   **before I had got that information.**
22   Q.   Is there anything in his plaintiff fact
23   sheet that would influence or change your opinion
24   with regard to the information that you've
25   provided about Mr. Cole?

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

---

Page 230

1    A.   With respect to the dermal side, no.
2  Because that sort of information wasn't present
3  there.
4       The answer is sort of the same as the
5  previous plaintiff in the sense that I wasn't --
6  if I were doing a full-up dose analysis, I would
7  have done a report where I parallel all the
8  information -- like information the same place
9  and make decisions one way or the other on what
10  information to use.
11       Because the interview is the interview.
12  And the only reason I re-interview is if I forget
13  to ask dermal information, for example, and I'll
14  say, oops, I forgot to ask him about, you know,
15  how far away he was or how long it stayed on his
16  skin.  I might forget to ask one of those
17  questions and I'll go back and fill those blanks
18  in.
19       But in this particular situation, since
20  I wasn't doing the full-up dose analysis, I had
21  no real reason to do so.
22    Q.   Okay.
23    A.   Normally I would, if I were doing a dose
24  analysis.
25    Q.   Does the same hold true -- well, let me

---

Page 231

1  ask the question.
2       Did you review any of the discovery
3  responses from Mr. Cole?
4    A.   At best, it would be cursory, if they
5  were included in the list of documents I
6  received.  I don't know if they were part of the
7  attachments to the depo or not.
8    Q.   And would you have the same response to
9  whether or not you took them into account in your
10  evaluation of Mr. Cole that you just told us
11  about the fact sheets?
12    A.   Well, I would have the same response
13  that you asked me earlier about the deposition
14  testimony.  It's -- where -- I would be more
15  interested in his Social Security records,
16  because that would have the most impact on
17  affecting time.  But since I -- I wasn't really
18  here to do a full-up dermal dose, I just let the
19  interview stand as the interview.
20    Q.   Okay.  Do you know what questions
21  Mrs. Cole responded to during your interview?
22       MS. GREENWALD:  Objection.  Form.
23    Q.   I'm assuming it's Mrs. Cole, but maybe I
24  shouldn't.
25       MS. GREENWALD:  That's not why I'm

---

Page 232

1  objecting.
2       MR. UPSHAW:  No, I understand.
3    A.   I don't recall her answering any of the
4  questions.  I just recall her being there at the
5  introductions.  I don't recall answering any
6  specific questions.  Usually, I will -- like
7  there's one interview coming up where you'll see
8  there's different people answering questions and
9  I try to indicate that.
10    Q.   Okay.  So on Exhibit 34 --
11    A.   34.
12    Q.   -- where it says "discussion items" and
13  then you have boxes to check for plaintiff's
14  spouse, children, coworkers, I see you left that
15  blank.  Why is that?
16    A.   Because I wasn't sure at the time.
17  Remember, these people get introduced real
18  quickly and then the interview goes.  Like you
19  can see here, I didn't even get the last names of
20  some of the attorneys and then they're gone
21  sometimes.  So if I don't know for sure they're
22  the spouse, I just leave it blank.  It was never
23  identified to me for sure she was the spouse.
24  That's why -- maybe she was.  I wasn't going to
25  speculate.

---

Page 233

1    Q.   Okay.  And you didn't ask the question
2  during the interview?
3    A.   No, because she was just introduced
4  right at the beginning and that's the last I
5  remember hearing from her.  And I don't even know
6  if she stood in the line the whole time.  You
7  know, she was just in the background.
8    Q.   Right.  Did you review any of the
9  non-plaintiff fact witness transcripts, that is,
10  spouses, kids, coworkers, employers?
11    A.   Not that I recall.  Not unless -- unless
12  they're listed on that list of exhibits, and I
13  think we pretty much went over those.  I think
14  it's mainly just the depositions and the exhibits
15  attached to those depositions is what I would
16  have received.
17    Q.   Okay.  Did you visit any of the
18  locations the plaintiff claims to have used or
19  been exposed to Roundup?
20    A.   No.
21    Q.   What type or formulation of Roundup did
22  Mr. Cole indicate during his interview that he
23  used?
24    A.   I'm moving to -- to the extent that I
25  was provided by Mr. Cole about the products he

---

59 (Pages 230 to 233)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 234

1  used, they would be on -- in Exhibit 34, pages 16
2  through 20. And on page 16, the first location,
3  he said that it was a ready-to-use product, so
4  about a one and a half -- approximately
5  one-and-a-half-gallon plastic spray container
6  that could be pumped to pressurize. And it had a
7  wand that was about 12 inches long with a nozzle.
8  That's what he recalls about the product in that
9  particular location.
10      The second location on page 17 of
11  Exhibit 34, he says that he definitely recalls
12  using concentrate, but he didn't recall anything
13  more about the product. So that's -- that's all
14  I have from him during the interview, anyway.
15      And the third location, he says this
16  time he used a ready-to-use product. The
17  description was the same as the first pesticide
18  use location. And then at a work location,
19  pesticide use location number 4, his description,
20  as is indicated here, he said the product came in
21  about a 1.3-gallon plastic spray container that
22  could be pumped to pressurize. The only things
23  he remembers about the container was the name
24  Roundup and the letters were in red, green and
25  brown, and it was a ready-to-use product.

Page 235

1      And then the second work location on
2  page 20 of Exhibit 34, he had the same
3  recollections about the product he used there as
4  with the fourth location. So to the extent that
5  that's what he told me, that's what I know.
6   Q.   Okay. So given what you just said, it
7  appears he had both occupational and residential
8  exposure?
9   A.   That's -- that's my -- that's what I
10  gathered from interviewing him, yes.
11   Q.   Okay. And his method of application in
12  both locations was from a bottle with a wand?
13   A.   Well, he had five locations, so --
14   Q.   I meant both as in both -- I should be
15  more clear. You're right.
16      In both occupational and residential
17  alleged exposures, he used the same type of
18  application?
19      MS. GREENWALD: Objection to form.
20   A.   Well, we talked about the first location
21  with the 12-inch-long nozzle with a wand -- or
22  wand with a nozzle. The second location wasn't a
23  ready-to-use product, so he mixed it. And he
24  says it was in about a five-gallon spray
25  container that had a wand and a nozzle, that he

Page 236

1  would pump and then spray. He had a spray
2  trigger on location 2. And then on location 3,
3  it looks like it's the same as location 1 in
4  terms of the method dispensed.
5   Q.   Okay.
6   A.   The first work location, he did use a
7  ready-to-use product -- God bless you -- and,
8  again, it was, as you suggest, it was a wand with
9  a spray nozzle.
10   Q.   Okay.
11   A.   And then the same -- both work locations
12  appear that it was a -- the application was using
13  the same sort of container method.
14   Q.   All right. Did you take into account
15  Mr. -- whether Mr. Cole had exposure to any other
16  pesticides, insecticides, or chemicals?
17   A.   Yes. I'll just go to page 9, which is
18  the first one, where he was working at Wayne
19  Davis Concrete Company and didn't recall any
20  chemical exposures, but he was exposed to
21  concrete and sugar. He said they used sugar in
22  keeping the concrete from hardening. I didn't
23  know that. That was kind of interesting.
24   Q.   Okay.
25   A.   Then we go on. On page 14 of Exhibit

Page 237

1  34, location 13, this is a work location. He
2  mentioned using obviously Monsanto Roundup, but
3  he mentioned using gasoline and then two-cycle
4  oil where he mixed with the gasoline to power
5  equipment. So there's some other products.
6      So to the extent that he told me there
7  were other products, I tried to list them.
8   Q.   Okay. Take into account any of his
9  family history or prior health?
10   A.   Not specifically, no.
11   Q.   Okay. Did you consider any other risk
12  factors?
13   A.   Sure. The same answer as before, but I
14  know I've got to repeat it. I looked at the
15  ██████, time in the military, was there anything
16  he did in the military that was an issue. He
17  wasn't in the military. ██████
18  ██████████████████████ other
19  products like gasoline and motor oil. So yeah,
20  there were other -- other things that I tried to
21  determine --
22   Q.   I know you asked a question about -- I'm
23  sorry, I didn't let you finish.
24   A.   Okay.
25   Q.   I know you asked a question about

60 (Pages 234 to 237)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 238

1    military service.  Military service is a risk
2    factor?
3        A.   It can -- well, it can be if they -- if
4    they're exposed to certain things.  We've got
5    everything from Agent Orange in Vietnam to some
6    of the -- supposedly, some of the spent uranium
7    in the Gulf War states.  So, yeah, there's all
8    kinds of risk factors, depending on what their --
9    their MOS was.
10       Q.   Okay.  All right.  And that's a standard
11   question you ask of each person you interview?
12       A.   Yeah.  And if they're in the military, I
13   usually have a separate page where I'll try to
14   bore in on what they did and where they were and
15   what exposures they had.
16       Q.   Did you have access to any of Mr. Cole's
17   actual product containers or sprayers that he may
18   have used?
19       A.   I did not.
20       Q.   Did you make any attempt to corroborate
21   any of statements Mr. Cole made about his use of
22   Roundup with any other individual?
23       A.   Only in a cursory sense, but I certainly
24   had those materials.  But since I wasn't going to
25   do the full dose analysis, there really wasn't

Page 239

1    any reason for me to do so.
2        Q.   All right.  Let's go to Exhibit 13,
3    let's turn to -- starting on page 4.
4        A.   Okay.
5        Q.   And I believe his chart goes on to page
6    5 as well.
7        A.   This is where you'll see a rollup of --
8    this is the one that's a little more complicated
9    than the previous two.  So the data on page 5 of
10   this exhibit are really the totals for all the
11   individual locations, the five locations or five
12   exposures.
13           In other words, you'll see a series of
14   calculations on page 4, and the way you can tell
15   this is if you look at the -- I've tried to help
16   by putting a timeline up above, like '97 to
17   2000/2001 and then 2013 to 2015 --
18       Q.   Um-hum.
19       A.   -- et cetera.  So you can go back and
20   correlate them.  There were five different
21   scenarios where he used Roundup, and I'm doing
22   the calculations for each of those scenarios.
23   And then there are the events and the time for
24   each of those five are then totaled at the bottom
25   of the page, which is, for purposes of printing

Page 240

1    this, are shown on page 5, the next page.
2            So each one of these sub-blocks on page
3    4 is like the individual blocks we looked at for
4    the previous two clients or plaintiffs.  And --
5    and it's just, in this case, we have him doing --
6    you know, applying Roundup in different
7    scenarios.  So I have to account for those
8    different scenarios.
9        Q.   All right.  So let's take the first
10   scenario here, his work with Cobb Parks and
11   Recreation from 1997 to 2000 and 2001.  You have
12   Roundup usage and just a midpoint 4.  So he
13   remembers using it four times in that time
14   period?
15       A.   Four seasons or yeah, four times, yeah.
16       Q.   Four seasons or four times?
17       A.   We'll he only used it in the warmer
18   months.  I'm just using -- if you look down below
19   the third row, it's the warmer months.
20       Q.   That's what I don't understand.  So in
21   the warmer months, he used it -- is that 6.5 --
22       A.   I'm using the midpoint between April and
23   March to October, 6.5 months.
24       Q.   Okay.  For four years, six and a half
25   months.

Page 241

1        A.   Per year.
2        Q.   Three days a week.
3        A.   Three to four.
4        Q.   Three to four.
5        A.   Yes.
6        Q.   Okay.
7        A.   And when you take that data and run it
8    through the math that we've been talking about
9    before you calculate somewhere between 338 and
10   451 events with a midpoint of 394 and change.
11   And then the event times that he provided were
12   one to two hours per event.
13           So you multiply the events times the
14   hours, and then you get that range of hours for
15   that particular location and time.
16       Q.   Okay.
17       A.   And then you have the dermal data to the
18   right, in columns -- I want to say 7, 8, and 9,
19   and it's whatever he reported again for skin area
20   wetted and the percent time it happened.
21       Q.   Right.  So he reported that his hands,
22   his wrists, and his forearms were wetted each and
23   every time he used the product.  That would be
24   the 100 percent time?
25       A.   In terms of percent time, yes.  I

61  (Pages 238 to 241)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 242

1  thought you were on percent area, but yeah.
2  Percent time, you are correct.
3      Q.  Right.  And then his face would be
4  wetted half the time?
5      A.  Half -- half the events, he would have
6  his face wetted, yes.  And there, I've been a
7  little more explicit over there on that constant.
8  I guess I got a little better with time.  But
9  you'll see that where I've got the 4.3, that's
10 actually 4.33, if you want more figures.
11     But anyway, that number is evolved from
12 52 weeks per year divided by 12 months per year.
13 So I've done a little bit better about explaining
14 where that's coming from.
15     Q.  Okay.
16     A.  So then I do the same thing for the
17 other four locations and get both numbers of a --
18 a range of numbers of events and the midpoint and
19 range of numbers of hours and midpoints.  I do
20 that.  And then I have the dermal information for
21 those locations as well.  And then on page 5, I
22 just take the total events for all five
23 situations and the total time for all five
24 situations and just simply add those up from
25 above.

Page 243

1      Q.  Right.  And you've done nothing else
2  with this data from Mr. Cole to date, that is, to
3  perform any further analysis or dermal
4  assessment, correct?
5      A.  Well, I mean I took this data and then I
6  summarized in the rollup table in the top.
7      Q.  Right, which is pages 1 and 2.
8      A.  Yeah.  No, I've done no -- I mean, I had
9  a brief conversation with -- I'm losing the
10 name -- had that brief conversation where I was
11 asked questions about the numbers.
12     Q.  With Dr. Sawyer?
13     A.  Sawyer.  But other than that, no.
14     Q.  Okay.  And what's your conclusion, after
15 doing all of this work that's recorded here with
16 regard to Mr. Cole and calculating all these
17 values, what's your conclusion regarding his
18 exposure?
19     A.  Well, my -- my conclusions first would
20 be that he had thousands of events, exposure
21 events, covering thousands of hours and that he
22 had significant dermal exposures, both during
23 application and post-application, associated with
24 those events.  That would be my primary
25 conclusions.

Page 244

1      Q.  Okay.  All right.  Let's go to Mr. Cook.
2      Mr. Cook's interview summary sheet is
3  going to be Exhibit 35.
4          - - - - -
5  (Thereupon, Petty Deposition Exhibit 35, Mr. Cook's
6  Interview Summary Sheet, was marked for purposes of
7  identification.)
8          - - - - -
9      A.  Thank you.
10     Q.  Did you personally speak with Mr. Cook?
11     A.  I did.
12     Q.  By telephone, in person, or FaceTime?
13     A.  By telephone.
14     Q.  How many times?
15     A.  One time, December 20, 2018 from 10:02
16 to 12:33.
17     Q.  Okay.
18     A.  Ten in the morning to just after noon.
19     Q.  All right.  Any e-mail correspondence?
20     A.  No.
21     Q.  Were attorneys for the plaintiff
22 present?
23     A.  Yes.  Mr. Kristal -- well, Jerry
24 Kristal, Josh Kristal, Elisse Hall, all from
25 Weitz Luxenberg.

Page 245

1      Q.  Okay.  Any other individuals besides
2  yourself, the plaintiff, and the three attorneys
3  present on the call?
4      A.  Not to my knowledge.  I mean, I don't
5  know if somebody's in the back of the house.
6      Q.  Sure.  Not that was identified.
7      A.  Yeah.
8      Q.  And again, we're going from your
9  interview summary sheet.  So you didn't identify
10 anybody else on the call?
11     A.  Yeah.  I mean, if I was aware of
12 somebody else there, I would write them down.
13     Q.  Okay.
14     A.  But I'm not saying there isn't somebody
15 else in the house.
16     Q.  Understood.
17     Did you read Mr. Cook's deposition
18 transcript?
19     A.  I only skimmed it much later.
20     Q.  How about his plaintiff fact sheet?
21     A.  Same answer.
22     Q.  Did they -- either of those documents
23 influence your opinion with regard to Mr. Cook?
24     A.  My opinions.  I guess as opposed to
25 changing the interview or -- I mean, you changed

62  (Pages 242 to 245)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 246

1  the question. That's why --
2  Q. I did, and I was trying to make it
3  easier on you.
4  A. I'm remembering the questions.
5  Q. So you've skimmed his deposition
6  transcript and his fact sheet?
7  A. Correct.
8  Q. Let me ask it this way, then: Is any
9  information that you gleaned from those two
10 documents reflected in the interview summary
11 sheets?
12 A. I would have -- I mean, no, because they
13 came to me after I had done the interviews.
14 Q. Okay. And did you find any information
15 in the transcript or fact sheets that would
16 contradict the information that you obtained
17 during the interview?
18 A. Well, I -- I honestly -- I can't answer
19 that question fully because I didn't detail -- do
20 a detailed summary of all of the information in
21 the depositions or fact sheets. But with respect
22 to questions about dermal exposure, those
23 questions -- I'm not saying there weren't any
24 dermal questions asked, but they never asked by
25 skin area, time wetted, area wetted, I don't see

Page 247

1  that in any of those. So it wouldn't have
2  impacted the interview from that sense.
3      The thing that would have -- if I had
4  gone the next step, which would have been to do a
5  full-up exposure analysis, which I didn't do in
6  this case, then I would have developed tables of
7  the interview information and all the other
8  sources of information by topic and then formed
9  opinions on which information I was going to use.
10 And that's generally where I get asked questions
11 about in depositions. But I didn't do that in
12 this case.
13     So it didn't have any impact on the
14 interview because the interview occurred before
15 then.
16 Q. Did you have the opportunity to review
17 any of Mr. Cook's discovery responses?
18 A. Unless they were an exhibit to his
19 interview -- and I don't know the answer to that
20 right off the top without looking -- but at best,
21 I would have done a cursory review of that
22 information.
23 Q. Okay. Do you know whether you had the
24 opportunity to review any non-plaintiff fact
25 witness transcripts?

Page 248

1  A. I don't believe so.
2  Q. Did you visit the location the plaintiff
3  claims he used or had been exposed to Roundup?
4  A. No.
5  Q. What types of Roundup did the plaintiff
6  tell you he had used?
7  A. Okay.
8  Q. I should say types or formulations.
9  A. Again, I'm going to be referring to
10 Exhibit 35.
11     He didn't give me any specifics on the
12 type of Roundup used at the first work location.
13     He did say on page 14 on the second --
14 well, he was self-employed, so it was both home
15 and work. This is the period from July of '92 to
16 September of 2016, he says that he used a -- he
17 used a concentrate.
18 Q. Okay.
19 A. That's all he tells us.
20 Q. And the --
21 A. And then --
22 Q. I'm sorry.
23 A. -- yeah, it appears, based on 15, he's
24 saying that he always used a concentrate. But
25 beyond that -- and he said that he got most of

Page 249

1  the product at -- he gave the locations where he
2  got it, Naples Fertilizer and Garden Center, but
3  he also got some from Walmart and Small Engine
4  World, and then he described how he mixed it.
5  But beyond that, he doesn't describe the product
6  other than it's a concentrate, at least in the
7  interview.
8  Q. Okay. No brand names? He didn't recall
9  any brand names during the interview?
10 A. He didn't -- no, he didn't tell me any
11 brand names other than the concentrate.
12 Q. Okay. All right. So did Mr. Cook use
13 the -- claim to use Roundup occupationally as
14 well as residential?
15     MS. GREENWALD: Objection to form.
16 A. Well, he was self-employed. So yes,
17 it -- it appears that -- I'm looking at pages 14
18 and 15 just to get a feel for that.
19 Q. Um-hum.
20 A. He's indicating to me that he used it
21 both at home and at work. But since his primary
22 job was an owner-operator of a lawn care company,
23 his primary usage was occupational.
24 Q. Okay. What was his method of
25 application?

63 (Pages 246 to 249)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 250

1    A.   He said that he used -- first of all, he
2  would mix a concentrate, three ounces of
3  concentrate to a gallon of water.  He said that
4  it was based on the label.  And then he said that
5  he used one of two types of -- he either used a
6  solo backpack sprayer or a Roundup four-gallon
7  backpack sprayer.  Those were the two devices he
8  used.  So those would've been pumped with a wand
9  and a nozzle.
10   Q.   Okay.  Did you take into account any
11  exposures to other pesticides, insecticides, or
12  chemicals?
13   A.   Yeah.  Like, for instance -- yes, I
14  should say.  On page 14, there's some examples.
15  Location 13, he said he'd used the Monsanto
16  Roundup concentrate, but he used fertilizers and
17  then he used a Hi-Yield Killzall, but he said he
18  didn't use that product till after he got sick.
19  So there's some examples of things that he used.
20   Q.   Do you know what Killzall is?
21   A.   Not specifically.
22   Q.   Do you know whether it's an herbicide or
23  a pesticide?
24   A.   I do not know.  The reason I hesitate is
25  I use a Killzall product.  I did for -- on the

Page 251

1  back area here at times, but it was a -- it
2  wasn't a Monsanto product.  So I don't know.  The
3  answer is I don't know.
4   Q.   All right.  So you're -- and you're not
5  familiar with what the active ingredient in
6  Killzall is, right?
7   A.   I am not.  The reason I didn't explore
8  it more was he said he didn't use it till after
9  he got sick.
10   Q.   After he got sick or he used it up to
11  the point he got sick?
12   A.   Until after he got sick.
13   Q.   Okay.  And why does that make a
14  difference in his exposure?
15   A.   Well, because when I do exposure
16  analysis, the courts and the defense, if they
17  were on the other side, would preclude me from
18  using an exposure that postdates their date of
19  disease.
20   Q.   Do you take into account any -- did you
21  take into account any family history or prior
22  health of Mr. Cook?
23   A.   Not that I recall.
24   Q.   ████████████████████████?
25   A.   Yeah.  I mean, those are confounding

Page 252

1  factors.
2   Q.   Which is my next question.  Did you
3  consider any other risk factors?
4   A.   I did.  I looked at his service in the
5  military, ██████████████████████
   ██████████████████████████████
7  Then I looked at alternative or other -- not
8  alternative -- I looked at other products, other
9  products he might have used over his lifetime.
10       That's -- frankly, the reason that I do
11  this whole analysis of all the places he worked
12  is because if I don't do that, somebody's going
13  to say, well, you don't know what exposures he's
14  had at these other locations.  So I want to know
15  that.  I want to know where else he worked and
16  what other chemicals he used.
17   Q.   Okay.  Did you have access to any of the
18  actual product containers or sprayers that
19  Mr. Cook indicated he used?
20   A.   No.
21   Q.   Did you make any attempt to corroborate
22  any of the statements Mr. Cook made about his use
23  of Roundup with any other individuals?
24   A.   Well, I did a cursory look at his
25  deposition to look for the word "dermal" and see

Page 253

1  to the extent that they were covering the dermal
2  area, but it's weakly covered, I guess is the
3  best way to describe it, in comparison to the
4  data that I'm looking for to do a dose analysis.
5   Q.   But the question was did you corroborate
6  any of his statements with other individuals?
7   A.   Oh, I'm sorry.
8   Q.   That's okay.
9   A.   I misunderstood your question.  No, I
10  did not.
11   Q.   Okay.  All right.  Let's look at page 6
12  in Exhibit 13.
13       Looking at table 3, for Mr. Cook's
14  reported Roundup exposures.  Now, did you break
15  out his exposures between any home usage and
16  own -- his own business usage?
17   A.   I did not.
18   Q.   Okay.  Did you --
19   A.   My -- my impressions were that it was
20  minimal in comparison to his occupational usages.
21   Q.   Okay.  You have an asterisk here which
22  says "Used Roundup after getting sick from
23  November 2014 until September 2016," and you
24  didn't add those years into your calculations,
25  correct?

64  (Pages 250 to 253)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 254

1    A.  I didn't add the years of the event,
2   yes.  I cut off the calculations at the point
3   where he reported getting sick.
4    Q.  Okay.  Now, Mr. Cook reported that on
5   both of his hands, only 25 percent or a quarter
6   of his hands would be wetted and that only
7   happened 5 percent of the time.  Is that what he
8   reported?
9    A.  That's what he reported.
10    Q.  And what would be a quarter of the area
11   of someone's hands or 25 percent?
12    A.  Typically, it would be one hand and then
13   it would be half of one hand, either the --
14   typically it's the top, top of the hand and the
15   top of the fingers to the sides halfway down, and
16   then -- or another way it could be, this isn't
17   the case, I don't think, I didn't ask him what
18   side, but if you grab stuff a lot of times and
19   you're cleaning equipment, in other cases you'll
20   see that it's actually the palm side that's
21   wetted.
22       But in this case, I just asked him of
23   both hands, what portion of both hands was wetted
24   and he gave me that -- that --
25    Q.  Gave you those numbers, okay.

Page 255

1       And for his legs, he didn't give you an
2   area of his legs that was wetted?
3    A.  He didn't.  Well, he didn't.  And that's
4   obviously a hole in my interview, and I never
5   went back and asked him about it.
6    Q.  And that happened four to five times?
7   Four or five times?
8    A.  Yes.  That would be example where if I
9   were going to do a full-up dermal, I would have
10   to go back, if I wanted to do anything with that
11   particular data one, I'd have to go back and
12   re-interview him.
13    Q.  Now, I don't understand how you split up
14   the dermal data.  Where you have all months, is
15   that for --
16    A.  Own.
17    Q.  So you have here "years - own business -
18   spraying" and "years - own business - mixing."
19    A.  Let me help you.  The first block in
20   this page 6 of Exhibit 13 is events and times
21   associated with spraying.  The second block is
22   just the number of events and exposure associated
23   with mixing, okay?
24       Now, there's not -- what I didn't do for
25   you is towards the bottom, I didn't put a line --

Page 256

1   the last two rows say events mixing and spraying,
2   times mixing and spraying.  I guess I should have
3   put an empty row above those last two rows, and
4   that would have separated out that block of
5   mixing a little better.  Does that make sense?
6    Q.  And so on the dermal data, when he was
7   mixing, if I'm reading this correctly, he wetted
8   a quarter of his hands three to four times?
9    A.  Right, saying he had very little dermal
10   exposure in mixing.  That's what he said.
11    Q.  And legs is different than feet?
12    A.  Yeah, they are.
13    Q.  On your chart?
14    A.  Yes.
15    Q.  So when someone says feet, are you
16   assuming that they're not wearing shoes?
17    A.  They can soak through their shoes.
18    Q.  Do you --
19    A.  I'm not -- I'm not --
20    Q.  Do you ask that question specifically?
21   I mean, how do you ask the question, did you get
22   your feet wet?
23    A.  That's different than that.  I go
24   through all the skin areas, right?  And I
25   don't -- I don't ask the questions about clothing

Page 257

1   or gloves or how -- what portion of the time
2   you're wearing gloves.  What I'm interested in is
3   to drill down to the bottom line, which is what
4   skin areas got wetted.  What portion of the skin
5   area and what portion of the time, regardless of
6   what they're wearing.
7       And so in this case, it's -- I want to
8   say it's not that it has no importance, but it
9   has very limited importance to me.  I'd want to
10   know what areas got wetted.  And in this case, he
11   indicates he got his feet wet three or four
12   times.  This sounds to me like there were just a
13   few incidences where mixing process got messy or
14   whatever you want to say, and so there was
15   considerable exposure for those few events.
16   That's what that indicates based on my
17   experience.
18    Q.  And is it your opinion that considerable
19   exposure would be a quarter of the hands, 12.5
20   percent of your legs -- we haven't even gotten to
21   figure out how to calculate that -- and 50
22   percent of your feet, so I guess that's one foot,
23   would be significant exposure, three to four
24   times, during the --
25    A.  I think when -- based on my experience

65 (Pages 254 to 257)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 258

1  as an industrial hygienist doing this, when
2  people get exposure to their legs and their feet,
3  and generally, dermal exposures occur to the
4  hands, the forearms, occasionally the wrists, and
5  then occasionally upper arms and occasionally
6  face and neck.  Even if they get it on their
7  chest, they won't wet all the way through,
8  although in some cases, I've seen where they do
9  report that.
10      With the legs and the feet, I'm just
11  saying it's significant in the sense there's a
12  lot of surface area in your legs.  And so that --
13  when I make the comment about it being
14  significant dermal exposure events, it has to do
15  with the fact that there's a large surface area
16  involved there.  It'd be just like if somebody
17  said their whole torso got wetted.  That's a lot
18  of skin area.
19      Q.  So let me ask you then, when he says --
20  when you report here that Mr. Cook says he
21  had exposure on two legs and it was 12.5 percent
22  of the area, how much of the leg are we talking
23  about, or where on the leg are we talking about?
24      A.  The way -- obviously, if you had all of
25  one leg wetted from the ankle to the thigh -- up

Page 259

1  through the thigh, that would be 50 percent of
2  both legs.
3      Q.  Right.
4      A.  So if you just have the front of one leg
5  to the perimeter, that would be like a quarter of
6  two legs.  So when you say 12 and a half percent,
7  what he's saying to me in that case is that half
8  of the front of one leg was wetted.
9      Q.  Okay.
10      A.  That's how that would come about.
11      Q.  Okay.  Let's turn -- actually, not yet.
12      What's your conclusion regarding
13  Mr. Cook's exposure?
14      A.  It would be, as I'm going back to pages
15  1 and 2 of this Exhibit 13, that he had hundreds
16  to thousands of exposure events over his time
17  using Roundup and that that resulted in thousands
18  of hours of exposure time, including the
19  post-dermal time.
20      And that he had significant skin areas
21  that were impacted or wetted by the -- by Roundup
22  products, and that these -- that I guess
23  that's -- you're just asking about this document,
24  so those would be my opinions there.
25      Q.  Okay.  Let's go to Mr. Gatewood, and

Page 260

1  we'll mark his interview summary sheet as 36.
2      - - - - -
3  (Thereupon, Petty Deposition Exhibit 36, Mr.
4  Gatewood's Interview Summary Sheet, was marked for
5  purposes of identification.)
6      - - - - -
7      A.  Okay.  Thank you.
8      Q.  Okay.  Did you speak to Mr. Gatewood in
9  person or by telephone?
10      A.  I spoke to him by phone.
11      Q.  And you personally spoke with him,
12  correct?
13      A.  I did.
14      Q.  Anyone else present?
15      A.  Mr. Walsh and Mr. Hans from Weitz
16  Luxenberg were on the line as well, as I was, and
17  Mr. Gatewood.
18      Q.  How long -- how many times did you speak
19  with him?
20      A.  Just once.  December 12th from 3:05 p.m.
21  to 4:40 p.m.
22      Q.  You note in -- I don't know that you
23  note.
24      Do you know whether or not his wife was
25  also a plaintiff in this litigation?

Page 261

1      A.  Yes, I interviewed her separately.
2      Q.  Okay.  Do you know whether she was
3  present for his interview?
4      A.  I don't know whether or not she was in
5  the house, but she wasn't on the line answering
6  questions.
7      Q.  That you're aware of.
8      A.  That I'm aware of.
9      Q.  And did you ask that she not be present
10  since you knew you had to interview both of them?
11      A.  No, I didn't.  The interviews were set
12  up by individual, and I -- I really didn't set
13  them up.  They were set up by plaintiff's
14  counsel.
15      Q.  Okay.  Any e-mail correspondence?
16      A.  No.
17      Q.  Did you read Mr. Gatewood's depo
18  transcript and review his plaintiff fact sheet?
19      A.  Long after I had done the interview,
20  yes, in a cursory sense.
21      Q.  And why would you have done that?
22      A.  Because the material came to me.  I
23  mean, I got those -- I think I got that material
24  not long before the first round of depositions.
25      Q.  Okay.  But why would you have gone and

66 (Pages 258 to 261)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 262

1 looked at the depo transcript and the plaintiff
2 fact summary sheet?
3    A.   I was really mostly interested in the
4 dermal data. I wanted to see what dermal
5 questions were asked. That's where I really go.
6 I want to see whether or not there was a
7 complete -- since -- since I believe that the
8 primary route of exposure from an industrial
9 hygiene standpoint is dermal, as I've indicated
10 in the fact document, Exhibit 7, I am most
11 interested in information from an exposure
12 standpoint related to their dermal exposure. And
13 so I'm looking to see whether the attorneys have
14 asked the kind of questions that I would ask.
15    Q.   Okay.
16    A.   And generally, the answer is no.
17    Q.   You do realize that the plaintiff fills
18 out the plaintiff fact sheet, right?
19    A.   The plaintiff's fact sheet, that's true.
20 But the plaintiff rarely would -- believe me,
21 I -- it's -- it's an experience for these folks
22 to sit down with me for two hours or more
23 sometimes and go through all these questions
24 about skin area and percent time wetted and
25 percent time -- they've not gone through that

Page 263

1 before.
2         And their response is, man, you are
3 thorough. And I just say hopefully, I haven't
4 bored you to death. But that information is what
5 you need in order to do a dermal dose analysis.
6    Q.   Okay. If you had come across anything
7 when you reviewed Mr. Gatewood's deposition or
8 his plaintiff fact sheets, would that have been
9 indicated anywhere in the materials we've looked
10 at or that you've provided to me?
11    A.   Those materials came after the -- well
12 after the interviews. And like I said, if I had
13 done a dose analysis of -- in this case, Mr. --
14    Q.   Mr. Gatewood.
15    A.   -- Gatewood, I would have clearly gone
16 through all of those in detail for a whole host
17 of reasons. But since I was just asked to do the
18 interview and summarize events and time, that's
19 what I did. I wasn't asked to do a dermal dose
20 analysis.
21    Q.   Right.
22    A.   And if I were, I would be -- I would
23 have to do that. I would have to go through all
24 those other documents and reconcile any
25 differences.

Page 264

1    Q.   I know we've been going through the
2 plaintiffs. Do you know who the plaintiffs -- do
3 you know the names of the plaintiffs in this
4 case?
5    A.   Yeah.
6    Q.   What are they, without looking at
7 anything?
8    A.   Chadlick, Cole, the Gatewoods, Winston.
9 Those are the names that come to mind.
10    Q.   That's six. Got eight more.
11       MS. GREENWALD:   Are you really having a
12 test at six o'clock at night for him to remember
13 the names?
14       MR. UPSHAW:   I'll try again in the
15 morning.
16    A.   That's fine.
17    Q.   Just wondering.
18    A.   Yeah.
19    Q.   You're right, that was unfair. I should
20 ask you that question in the morning. We're all
21 slow today. I agree with Ms. Greenwald.
22    A.   I don't think I'm slow.
23    Q.   It's late and I should give you memory
24 tests in the morning.
25       Did you have the opportunity to review

Page 265

1 Mr. Gatewood's analysis -- I'm sorry,
2 Mr. Gatewood's discovery responses?
3    A.   Discovery responses?
4    Q.   That would be his interrogatory
5 responses or requests for production.
6    A.   If they were part of his attachments to
7 his deposition, then I would have scanned it. If
8 not, I would not have.
9    Q.   Okay. Did you review any of the -- of
10 the fact witness transcripts, either his wife's
11 transcript -- well, she's a fact witness in her
12 own case -- but his wife's transcript or any
13 employees, coworkers?
14    A.   Well, I would have seen his wife's
15 transcript and attachments and cursory reviewed
16 those as well.
17    Q.   Do you recall any reference to her
18 husband's case in that review?
19    A.   I don't recall, but it would be a
20 surprise to me if she didn't mention her husband
21 at some point in the deposition.
22    Q.   If you had noted anything material,
23 where would you have indicated that in the
24 materials that you provided with regard to
25 Mr. Gatewood?

67 (Pages 262 to 265)

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 266

1     A.   In terms of this interview?
2     Q.   Either the interview or any of the other
3   materials you provided regarding Mr. Gatewood,
4   was there somewhere for you to note there was --
5   that you looked at some additional information
6   other than the interview?
7     A.   Well, I listed it in my list of
8   reference materials.  So I received that
9   material.
10    Q.   Understood.
11    A.   But as I said before, any -- what I did
12  was I looked up in the keywords, I looked for the
13  word "dermal" and I wanted to see what kind of
14  questions were asked and they never asked the
15  questions to the degree that I do about dermal
16  exposure.  And, again, that's the primary route
17  of exposure in my opinion.
18    Q.   So other than looking in the index of
19  the transcripts and see if the word "dermal" was
20  used and then referenced those sections, did you
21  look up any other keywords?
22    A.   I remember specifically looking up that
23  keyword.  I don't know.  But that's definitely
24  what I was looking for, was there any dermal
25  testimony.

Page 267

1     Q.   What else would you have looked for?
2   What other keyword would you look for when you're
3   reviewing a depo transcript?
4     A.   Well, it depends on the situation.  If
5   it was --
6     Q.   Okay.  I'll be more specific.
7     A.   If I were doing a full-up exposure
8   analysis, believe me, I'd have every page marked
9   and record whether it was exposure information of
10  any kind.
11    Q.   And I understand you didn't do that
12  here.
13    A.   I didn't do that here.
14    Q.   But for what you did here, and you said
15  you did a cursory review of Mr. Gatewood's
16  deposition, what other keywords other than
17  "dermal" would you have looked at?
18    A.   When I was looking -- under the dermal,
19  I would look -- I would read around those
20  sections to see times, where, locations, who he
21  worked for, et cetera.
22    Q.   Okay.  Anything else in your cursory
23  review of Mr. Gatewood's deposition that would be
24  important to you other than the sections around
25  the keyword "dermal"?

Page 268

1     A.   If I was doing a full dermal exposure
2   analysis with determining dose, there would be
3   all sorts of things that -- I would be pulling
4   any piece of information that was there that was
5   relevant to exposure, whether it be inhalation,
6   dermal, otherwise.  I would have pulled that.
7     Q.   Right.  I understand.  I understand.
8   But that's not what you did here or were asked to
9   do and I understand that.
10    A.   Right.
11    Q.   So I'm just trying to find out how in
12  depth you got into Mr. Gatewood.
13         Other than the dermal, did you look for
14  any other areas?
15    A.   Very pre -- very little.  I mean, it was
16  very cursory.
17    Q.   Okay.
18    A.   It had to do a lot with timing, when I
19  got the material, and when the depositions were
20  occurring and when my deposition was occurring.
21    Q.   Okay.  Did you review any transcripts of
22  coworkers or the employer?
23    A.   No.
24    Q.   Okay.  Visit any locations that
25  Mr. Gatewood claimed he used or had been exposed

Page 269

1   to Roundup?
2     A.   No, I did not visit a site or sites.
3     Q.   Did you determine what type of
4   formulation of Roundup Mr. Gatewood claimed to
5   use?
6     A.   Again, I'm going to look at Exhibit 36
7   to the deposition.
8     Q.   Certainly.
9     A.   I'm on page 10 of Exhibit 36, and that's
10  where I'm starting.
11    Q.   Okay.
12    A.   Said that he always purchased one-quart
13  Roundup concentrate containers from Lowe's or
14  Home Depot that were either red, yellow or
15  purple.  He used the one with the red top first
16  and then the purple and yellow tops next.  And
17  they would mix the concentrate, six ounces to a
18  gallon of water.
19         That's what we know about the products
20  that he used at -- at his home.
21    Q.   Okay.  So those would have been
22  concentrates according to his interview?
23    A.   Concentrate.  And then beginning with
24  the red-topped container and then moving to the
25  yellow and the purple containers.  Purple and

68  (Pages 266 to 269)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 270

1  yellow.
2      Q.   Okay.  Was his use occupational or
3  residential or both?
4      A.   Residential.
5      Q.   And his method of application?
6      A.   He had two, at least according to his
7  interview.  The -- again, I'm on page 10.  He
8  said that the first time he used a Roundup
9  one-gallon spray container that was hand-pumped
10  and contained a wand and a nozzle and he used
11  this from the mid '80s to 2009.  He used more
12  than one of these containers because they would
13  wear out with time, he said.
14      And then after that period, he used a
15  three-gallon backpack sprayer.  He didn't recall
16  the manufacturer.  But he said it was heavy if
17  you filled it all the way to three gallons, so he
18  mixed a gallon and a half into it, a gallon of
19  combined concentrate and water.  So he filled it
20  half full.  And so towards the end, 2010 forward,
21  he used this backpack sprayer.
22      Q.   Okay.  Did you take into account his
23  exposure to any other pesticide, insecticide, or
24  chemical?
25      A.   I did because he had a long work

Page 271

1  history, and I -- beginning on page 2, all the
2  way to page 9, I asked him what other products he
3  used.  And I'm just flipping through it, but on
4  page 9, for example, this was a work location for
5  about six years in the late '80s, mid to late
6  '80s, he said he used lacquer finishing product
7  one time, but he never used it again and then he
8  painted, but he always used latex paints.
9      So I'm asking him whether or not he's
10  used any chemical products.  Most of the
11  locations, he indicates he did not.  So I've gone
12  through his full work history to try to see what
13  other products he used.
14      And then of course I asked him the
15  introductory questions about his ▮▮▮▮▮▮▮▮▮▮
16  ▮▮▮▮▮▮▮▮▮▮▮▮
17      Q.   Okay.  And rather than go through it
18  that way, let's continue how we've done before.
19      What pesticides, insecticides or
20  chemicals did you indicate that he had exposure
21  to during the interview?
22      A.   The only one that he reported having
23  exposure to was the Roundup concentrate that he
24  mixed.
25      Q.   Okay.  Did you take into account any

Page 272

1  family history or prior health?
2      A.   Family history -- not that I recall.
3      Q.   Okay.  Did you consider any other risk
4  factors?
5      A.   Sure.  ▮▮▮▮▮▮▮▮▮ service in the
6  military, he didn't serve in the military, other
7  chemicals that he used at other locations.
8      Q.   Okay.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮?
9      A.   ▮▮▮▮▮▮▮▮.
10      Q.   Did you have access to any of the actual
11  product containers, sprayers that he claims to
12  have used?
13      A.   No.
14      Q.   Did you make an attempt to corroborate
15  any of the statements Mr. Gatewood made about his
16  Roundup use with any other individual?
17      A.   No.  Well, no.  Because it came from
18  him.  I was just questioning whether any of it
19  came from his wife, but I don't recall it coming
20  from his wife.
21      Q.   Okay.
22      A.   Because she wasn't on the line.  That's
23  why I hesitated.
24      Q.   No problem.  Okay.  Let's go to Exhibit
25  13, page 6, and he goes over to page 7 as well on

Page 273

1  his table, which is table 4 in your exhibit.
2      So you have a header, first home and
3  sprayer.  And then on page 7, you have other
4  headers, first and second home and first sprayer,
5  then first and second home and first sprayer.
6      How is it that you split these up?  Is
7  it by year or when you use -- tell me how you
8  split these up.
9      A.   I'm splitting these up by both time and
10  the sprayer that he used.  So in the first case,
11  it's the time where he used the first sprayer,
12  and the second block of data, it's the times
13  where he used the second sprayer.
14      Q.   Okay.  Because none of them indicate a
15  second sprayer.  They all indicate first sprayer,
16  but they change in home.  That's why I'm
17  confused.
18      A.   I'm not following you.  On page 7, it
19  says second sprayer.
20      Q.   Oh.  See, I'm looking in the middle
21  where you have home first and second, first
22  sprayer.  On page 7, the first line, it says
23  years, home.
24      A.   That's what I just answered.
25      Q.   First/second home, first sprayer.

69 (Pages 270 to 273)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 274

1    A.   Don't mean to be impolite, but I
2  think -- I think I answered your question.
3    Q.   You might have.  I'm just trying to
4  figure out what you're doing here and then you
5  may have.
6    A.   I'm talking about the times associated
7  with the first sprayer.  There's the first home
8  and then there's -- over a certain time interval
9  and then there's the first and second homes where
10 he's still using the first sprayer.  And then
11 there's the first and second homes where he's
12 using the second sprayer.  So I'm dividing the
13 times by time and sprayer that he used.
14   Q.   Right.  I see where --
15   A.   That's what I was trying to say.
16   Q.   I see where the mystery occurs.  If you
17 look in the middle of page 7 in the last block,
18 you've got first and second home and first
19 sprayer again, it doesn't say second sprayer.
20   Do you see where I'm talking about?
21   A.   Yeah, but it's a different time
22 interval.  Remember I said that I'm dividing it
23 by both time and sprayer.
24   Q.   Okay.
25   A.   So in the first case, it's the first

Page 275

1  home, first sprayer, '87 to 2008.
2    Q.   Okay.
3    A.   The second case, we have two homes, but
4  he's still using just the first sprayer.  But
5  it's from -- it's in the 2009 time frame, just
6  one year.
7    Q.   Okay.  And then keep going.
8    A.   And then the third block, if you will,
9  is now at both homes, but he's using the second
10 sprayer.
11   Q.   Which you say in the far left-hand
12 column, right?
13   A.   Yes.  Yes.  And that's from 2010 to --
14   Q.   To 2011.  And then what does it say
15 next -- on that same line, in the middle column,
16 underlined?
17   A.   Oh, I see.  That's just a mistake on my
18 part.
19   Q.   Right, that's what I'm trying to point
20 out.  I'm looking at the sentence what I said and
21 it still said first sprayer.
22   A.   Yeah.  But I'm looking at the left rows.
23 But yeah.  Okay.  I see what you're saying.  So I
24 should have just put second sprayer on that last
25 block.

Page 276

1    Q.   Yeah.  That's why I was confused, and
2  so --
3    A.   But, I mean, it's clear on the left
4  where I start what that is.
5    Q.   Yes, understood.  I just wanted to
6  clarify any confusion with first sprayer and
7  first sprayer in the middle.  I get it.
8    A.   You're right that that should be in that
9  underlined designation in the middle.  It should
10 say second sprayer in that third block.
11   Q.   Okay.  Let's see if there's anything
12 else that I don't understand about Mr. Gatewood's
13 table.
14   It was Mr. Gatewood's statement during
15 his interview that when he had some dermal
16 exposure, he would not wash it for upwards to ten
17 hours after that exposure?
18   A.   Yeah.  He'd say if I were applying this
19 in the morning, I wouldn't shower until the
20 evening.  So if I applied it at ten o'clock in
21 the morning, it might be eight o'clock at night
22 before I shower.  So I'm not saying he said those
23 exact words, but he's saying basically, if the
24 application occurred in the morning, he would
25 continue to work in the yard during the rest of

Page 277

1  the day and he might not clean up until that
2  evening.
3    Q.   And so as you've said on others, you use
4  the most conservative number.  With Mr. Gatewood,
5  you used the maximum number when you did
6  post-application time, event in your totals?
7    A.   Right.  Because he didn't give me a low
8  range.  So he's saying essentially ten hours.
9    Q.   Well, he said upwards of ten hours.
10   A.   Well, upwards to me doesn't mean less
11 than ten hours.
12   Q.   It doesn't?
13   A.   No.  Upwards means approximately ten
14 hours to me.  That's what that means to me.
15   Q.   Okay.  You didn't include any data here
16 or separate out any data with regard to mixing --
17 any mixing events?
18   A.   I didn't.
19   Q.   Did he not indicate that he did any
20 mixing?
21   A.   He did.  So I've underestimated his
22 exposure times.
23   Q.   Okay.
24   A.   That's the short answer to that.
25   Q.   That's fine.  So what's your conclusion

70  (Pages 274 to 277)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 278

1  with regard to Mr. Gatewood's exposure?
2      A.   You know, again, reading from the first
3  two pages of Exhibit 13, I would say that he had
4  hundreds to thousands of exposure events to
5  Roundup, and -- not including mixing, obviously.
6  And then also, that he had thousands of exposure
7  hours to Roundup as well including post-dermal
8  times, and that he had significant skin exposure
9  to the product as well.
10     Q.   Now, on page 1 and page 2 of Exhibit 13
11  with regard to Mr. Gatewood, also with regard to
12  Vickie Gatewood, you say spraying in parentheses
13  and then add also soils.  What does that mean?
14     A.   During their interview, and it's in the
15  interview, they put in -- I think it was an
16  irrigation system or something.  And right after,
17  they had really sprayed a lot, they were working
18  in the soils, and it was their belief that they
19  had dermal exposure from Roundup that was on the
20  soils.
21          I noted that qualitatively in the
22  interview, but doing -- it can be done, but it's
23  complicated -- but doing a dermal exposure to
24  dust or to dirt is a little different than doing
25  dermal exposure to just products sitting on your

Page 279

1  skin, because it's a secondary way of getting
2  dermal exposure.
3          So I noted it, but trying to quantitate
4  how much dirt or dust got on their skin is not
5  easy.  It can be done through the Exposure
6  Factors Handbook.  Believe it or not, they have
7  factors about how much dirt you get on you when
8  you're playing in dirt, but I just simply noted
9  there that there was additional dermal exposure.
10  They claimed in their interview there was
11  additional dermal exposure from the Roundup that
12  was in dirt.
13          Of course, the other complication there
14  is how much is in the dirt?  How much Roundup is
15  in the dirt?  So I simply noted it qualitatively
16  that they believed that they got some exposure
17  from the times where they were doing
18  landscaping -- I think they were putting in an
19  irrigation system -- and they believe that they
20  got -- that's their opinion, that they got
21  exposure from that dirt.
22     Q.   All right.  It didn't change any of your
23  numbers, events or hours, correct?
24     A.   It didn't play into the calculations,
25  no.

Page 280

1      Q.   All right.  Let's go with Vickie
2  Gatewood, Exhibit 37.  Here is her interview
3  summary sheet.
4      A.   Thank you.
5      Q.   Did you personally speak with
6  Ms. Gatewood?
7      A.   I did.
8      Q.   Phone, in person, or Skype?
9      A.   Via phone.
10     Q.   How many times?
11     A.   One time, December 20, 2018, from 5:32
12  in the evening to 7:35 in the evening.
13     Q.   Okay.  Any attorneys present during that
14  interview?
15     A.   Yes, sir.  Mr. Hans, Mr. Walsh from
16  Weitz Luxenberg.
17     Q.   Okay.  Do you know whether or not her
18  husband was present when you interviewed her?
19     A.   I don't -- I don't recall him on the
20  phone.  I don't know if he was in the home or
21  not.  I would suspect he might be in the house,
22  but I don't recall him answering any questions
23  for her.  And she's a strong personality, so I
24  doubt that he would.
25     Q.   Okay.  You indicated the date and time

Page 281

1  of the interview, but I didn't write it down.
2  I'm sorry.  What was the date and time again?
3          MS. GREENWALD:  I think it's time to
4  call it a day soon.
5      A.   December 20, 2018, from 5:32 to
6  7:35 p.m.
7      Q.   I don't have it in front of me.  What
8  was the date of Mr. Gatewood?
9      A.   December 12th.
10     Q.   Okay.  So that's what I was trying to
11  get at.  So Ms. Gatewood's interview was a few
12  days before Mr. Gatewood?
13     A.   No, the other way around.
14     Q.   Mr. Gatewood was before?
15     A.   I mean, he was the 12th and she was the
16  20th of December.
17     Q.   Okay.  That's what I was trying to get
18  straight.
19          Did you make a request during either
20  Mr. Gatewood's or Ms. Gatewood's interview to
21  make sure their spouse wasn't there?
22     A.   No.
23     Q.   Did it matter to you whether their
24  spouse was there?
25     A.   No.  If they'd have been there, I would

71 (Pages 278 to 281)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 282

1    have indicated that they were there and indicated
2    any questions that they chimed in on.
3       Q.   Right.  But would you have asked them to
4    leave had you had some indication that one or the
5    other was there at the other's interview?
6       A.   No, I'd never do that.  If the spouse
7    was there, if they could provide additional
8    information that's helpful, then I'll note that
9    and take that information into account.
10      Q.   Okay.  Even if the spouse is also a
11   plaintiff in the same case?
12      A.   Well, this is the first time I recall a
13   situation like that, so I don't really know how
14   to answer that question.  But in general, if the
15   spouse or the children or a relative is there,
16   I'll indicate that they're there and then I'll
17   indicate, like I did in one of these interviews,
18   who was there and kind of what questions they
19   answered versus, say, the plaintiff.
20      Q.   Okay.  Did you read her depo transcript?
21      A.   Same response I've given you before.
22   Only in a cursory sense, primarily looking at the
23   dermal information.
24      Q.   And again, you would have used the
25   keyword you mentioned previously and looked at

Page 283

1    information, or around those keywords?
2       A.   That would have been one of the
3    keywords, yes.
4       Q.   Any other keywords you can recall
5    searching for?
6       A.   I might have looked for like exposure or
7    PPE, those sorts of words.
8       Q.   Okay.
9       A.   I'm after the -- I'm really after the
10   exposure and the warnings.  That's what I'm
11   after.
12      Q.   Do you recall specifically looking at
13   her plaintiff fact sheet?
14      A.   I'm pretty sure I did.  But a specific
15   recollection, it's been a while.
16      Q.   Okay.  Do you recall looking at her
17   discovery responses, that's her interrogatory
18   answers or her request for production responses?
19      A.   If they were included as an attachment
20   to her deposition, then I would have seen them.
21   Otherwise, I would not have seen them.
22      Q.   Okay.
23      A.   And if they were attached, then I would
24   have done a periphery scan through those
25   documents.  I would not have done it in the

Page 284

1    detail I would have done it if I was doing a
2    full-up dermal exposure analysis.
3       Q.   And because you weren't doing a full-up
4    detailed exposure analysis, you didn't request
5    those documents either from plaintiff's counsel?
6       A.   Well, that presumes that I know they
7    exist.  I mean, it's hard to request something
8    you don't know exists.  I mean, I assume that --
9    the stuff that's coming from plaintiff's counsel
10   comes.  I mean, there are times where once in a
11   while I will -- I usually request documents
12   early.  Like I'll say do you have Social Security
13   records?  Do you -- there are certain things --
14   do you have a complaint?  I want to see the
15   complaint, Social Security work records.  Those
16   are the sorts of things I'll ask for.
17           If I -- and not in this case, but if I'm
18   doing a full-up dermal like -- well, I'll say it,
19   in the Bayer case that I was just going to
20   testify earlier -- or earlier last week, I made
21   specific requests for additional versions of
22   certain documents.  I had one version.  I said do
23   they have an earlier version?
24           So those things do happen, but that's
25   when I'm doing -- I'm doing the full-up exposure

Page 285

1    analysis.
2       Q.   Okay.  But in this case, you didn't --
3       A.   I wasn't doing the dermal dose.
4       Q.   Right.  So you didn't affirmatively ask
5    for additional documents and discovery and the
6    complaint or things of that nature from
7    Ms. Gatewood or anybody else?
8       A.   Yeah.  My primary -- my primary
9    responsibilities in this particular set of cases
10   was because I'm known for doing interviews, I've
11   done hundreds of them, to do those, and then
12   separately and most importantly was to do a
13   comparison of basically with respect to knowledge
14   of exposure on the dermal side, what did Bayer
15   know and when did they know it and how did they
16   handle that information and how did they handle
17   information that would affect warnings with PPE.
18   That was my focus, and that's -- this factual
19   document reflects that.
20      Q.   Okay.
21      A.   If I had done a detailed exposure
22   analysis, it would be another 500 pages or more.
23   Because there's so many plaintiffs.
24      Q.   Okay.
25           MR. UPSHAW:  Move to strike the

72 (Pages 282 to 285)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 286

1  reference to Bayer and mark the time for me,
2  please.
3      Q.   Did you look at Ms. -- Ms. Gatewood's --
4      A.   See who runs out of juice first.
5      Q.   Okay. I'm ready to go. We'll see if my
6  court reporter will hang in there.
7      Type or formulation of Roundup used?
8      A.   Again, I'll look at Exhibit 37 and see
9  what Ms. Gatewood had to say.
10     I'm looking specifically at page 11. In
11  her interview, she -- she stated that they
12  definitely used a concentrate, but that
13  typically, she didn't do the mixing. Her husband
14  bought the product. So she really didn't have a
15  lot of details regarding the product itself over
16  than she knew it was a Roundup concentrate.
17     In terms of how she used -- or is that
18  the end of that question and answer?
19     Q.   Okay. We'll -- we're going to get to
20  the application. I'll ask you that now.
21     What was her method of application?
22     A.   It was similar to what her husband
23  reported the first -- was the first period of
24  time that they used Roundup, they used a Roundup
25  one-gallon spray container with a hand pump and a

Page 287

1  wand and a nozzle. And -- well, I should -- and
2  then she mentioned there was a second sprayer,
3  but -- the backpack sprayer, but she never used
4  it. So I misspoke. There was only a single way
5  in which she applied product, and that was this
6  one-gallon Roundup spray container that was
7  hand-pumped with a wand and a nozzle.
8      Q.   And all of her use -- all of her
9  reported use was residential, correct?
10     A.   Yes, that is correct.
11     Q.   Did you visit any locations that
12  Ms. Gatewood claims to use or had been exposed to
13  Roundup?
14     A.   No.
15     Q.   Okay. Did you take into account any
16  exposures to other pesticides, insecticides, or
17  chemicals?
18     A.   I tried to take into -- well, I did take
19  into account -- I asked that each work location
20  as well as residential, what other chemicals you
21  used. So yes.
22     Q.   Did she report any?
23     A.   She was mainly an IT, a computer kind of
24  person. So I'm just scanning through these
25  before I answer your question. Whether she had

Page 288

1  any work locations where she reported chemical
2  exposures.
3      It says she worked at a liquor store
4  when she was younger and her exposure -- one
5  exposure she had was to alcohol.
6      MS. ALVAREZ: Is that rain?
7      MS. GREENWALD: I hope that's the air
8  conditioner.
9      A.   Then we have -- go through all of her
10  work locations. She's reporting no known
11  chemical exposures at these work locations.
12  So -- she did not report to me any other chemical
13  exposures --
14     Q.   Okay.
15     A.   -- that I see.
16     Q.   All right. Did you take into account
17  her family history and prior health?
18     A.   Well, the answer to all of those is that
19  I do ask what the date of diagnosis was for the
20  disease. So I guess I should qualify my earlier
21  answers for all of these plaintiffs and say that
22  to the extent that I do ask them when they --
23  when they got NHL, I am asking about when that
24  happened. So I guess by definition, I'm asking
25  about their prior health history.

Page 289

1      I'm looking at it more from a standpoint
2  of when does the exposure end in terms of the
3  exposure I can associate with doing the exposure
4  calculations.
5      Q.   Okay.
6      A.   But in terms of any other additional
7  information, the answer would be no.
8      Q.   All right. Did you consider other risk
9  factors?
10     A.   I did.
11     Q.   Okay. And what would those have been?
12     A.   Those would have been ▮▮▮▮▮
13  ▮▮ ▮▮▮▮▮▮▮ service in the military, and whether she
14  had exposures in her job functions in the
15  military. I went through all -- all of her
16  job -- work locations and asked her about any
17  exposures to chemicals at those locations and --
18  I'm sorry. Go ahead.
19     Q.   No, I'm sorry. I want to let you
20  finish.
21     A.   No, that's good.
22     Q.   Okay. On Ms. Gatewood's interview
23  summary sheet which you're referring to there,
24  unlike several others we've looked at, there's no
25  block that says no military service, unless I'm

73 (Pages 286 to 289)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 290

1   missing it, and there's no block ████
2   ████.
3       A.   I don't think that's true, because --
4       Q.   Am I missing it on the --
5       A.   -- on page 2 --
6       Q.   Oh, I got it.  I missed it.
7       A.   There was so much detail that it kind
8   of -- my first page spun over to the second page
9   here.
10      Q.   My fault.  Okay.  So she did have a
11  ████████, as noted?
12      A.   ████.
13      Q.   All right.  My mistake.
14           Did you have access to any of the actual
15  product containers or sprayers?
16      A.   No.
17      Q.   Did you make any attempt to corroborate
18  any of her statements made about her use of
19  Roundup with any other individuals, including her
20  husband?
21      A.   No.
22      Q.   All right.  Let's turn to Exhibit 13.
23           THE VIDEOGRAPHER:  I've got about 30
24  seconds.
25           MR. UPSHAW:  Oh, let's stop then.

Page 291

1            THE VIDEOGRAPHER:  Off the record.  6 --
2   it's 6:30.  End of disk 3.
3            MS. GREENWALD:  So we're going to call
4   it a day, right?
5            MR. UPSHAW:  It's up to you.  Actually,
6   it's not up to you.  It's up to the --
7            MS. GREENWALD:  Yeah.  I think we should
8   call it a day.  We've had a long day.  It's
9   6:30.  I think you're probably tired.  We have
10  four hours tomorrow to go through this stuff.  We
11  said ten and a half hours.
12           MR. UPSHAW:  No, we did not say ten and
13  a half.  We said a day and a half.
14           MS. GREENWALD:  Okay.  But wait, wait,
15  wait.  Time out.
16           THE REPORTER:  Do you want this on the
17  record?
18           MS. GREENWALD:  Yes.  Okay.  Because
19  this is -- we're going to have to go to Judge
20  Norton on this if we don't agree.  So it's on the
21  record.
22           Okay.  Your conversations with Jerry
23  were very clear that they were 9 to 5 and then a
24  half a day.  So 9 to 5 is eight hours with a
25  lunch break, right?  Everyone takes lunch.  So we

Page 292

1   started today at noon and we did not have a lunch
2   break.  So we went six and a half hours today.
3            And then tomorrow, there's no point in
4   taking a lunch break if we're about to start at 9
5   and go 9 to 1, and that's the equivalent of a day
6   and a half.  If you don't agree, you need to tell
7   me now because we need to take this up with the
8   judge tonight.
9            MR. UPSHAW:  All right.  I don't agree,
10  and I don't agree that we discussed specifically
11  9 to 5, okay?  We know what a regular workday is,
12  all right?  I also know that we have a lot of
13  material to cover.  And if you want us to go to
14  Judge Norton and have to ask for more time, when
15  an hour would suffice, then we can do that.  But
16  I don't agree that we are limited to ten and a
17  half hours.  We went a half a day today and we
18  went long today on purpose.
19           THE WITNESS:  This wasn't a half a day.
20           MS. GREENWALD:  I was just about to say,
21  this was not a half a day.
22           MR. UPSHAW:  I'm with you.
23           MS. GREENWALD:  We've been here six and
24  a half hours.
25           MR. UPSHAW:  Which is only an hour and a

Page 293

1   half over what we would normally go.
2            THE WITNESS:  Very limited breaks.
3            MS. GREENWALD:  And with very short
4   breaks, which will be clear on the tape.  They
5   were --
6            MR. UPSHAW:  Well, that's fine.  We
7   actually didn't take that short of breaks.
8            MS. GREENWALD:  Well, I'm just saying --
9            THE WITNESS:  And we had no chance to
10  eat or anything else.
11           MR. UPSHAW:  We weren't going to do that
12  anyway by agreement.
13           THE WITNESS:  Well, not by my agreement,
14  because --
15           MR. UPSHAW:  Well, by your counsel's
16  agreement.
17           THE WITNESS:  -- I brought food in
18  because I didn't have -- I came in here at nine
19  o'clock and I didn't have lunch.
20           MS. GREENWALD:  Okay.  So anyway, I
21  thing that we can go off the record now.  I just
22  wanted that to be clear, because this was heavily
23  negotiated with you and Jerry Kristal on how long
24  this deposition was going to be.
25           MR. UPSHAW:  That's right.

74  (Pages 290 to 293)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 294

```
 1          MS. GREENWALD:  And I will talk to Jerry
 2   and make sure that I am clear, but that was the
 3   understanding that I had, that it was one day, as
 4   I say, 9 to 5, always with an hour lunch, and
 5   then a half of the next day, which would be three
 6   and a half hours.
 7          (Deposition adjourned at 6:33 p.m.)
 8                ~ ~ ~ ~ ~
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 296

```
 1                 AFFIDAVIT
 2   The State of Ohio,  )
 3                       ) SS:
 4   County of        )
 5
 6          Before me, a Notary Public in and for said
 7   County and State, personally appeared STEPHEN E.
 8   PETTY, who acknowledged that he did read his
 9   transcript in the above-captioned matter, listed
10   any necessary corrections on the accompanying
11   errata sheet, and did sign the foregoing sworn
12   statement and that the same is his free act and
13   deed.
14          In the TESTIMONY WHEREOF, I have hereunto
15   affixed my name and official seal at this_____
16   day of _____ A.D. 2019.
17
18
19         _____
20         Notary Public
21
22         _____
23         My Commission Expires:
24
25
```

Page 295

```
 1                 CERTIFICATE
 2   The State of Ohio,  )
 3                       SS:
 3   County of Medina  )
 4          I, Michelle L. Harper, a Notary Public
 5   within and for the State of Ohio, duly commissioned
     and qualified, do hereby certify that the above-
 6   named witness, STEPHEN E. PETTY, was by me first
     duly sworn to testify the truth, the whole truth
 7   and nothing but the truth in the cause aforesaid;
     that the testimony then given by the
 8   above-referenced witness was by me reduced to
     stenotypy in the presence of said witness;
 9   afterwards transcribed, and that the foregoing is a
     true and correct transcription of the testimony so
10   given by the above-referenced witness
            I do further certify that this deposition
11   was taken at the time and place in the foregoing
     caption specified and was completed without
12   adjournment
            I do further certify that I am not a
13   relative, counsel or attorney for either party, or
     otherwise interested in the event of this action
14          IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my seal of office at Medina, Ohio,
15   on this 29th day of August, 2019
16
17         _____
18         Michelle L. Harper, Notary Public
           Within and for the State of Ohio
19   My commission expires December 25, 2023
20
21
22
23
24
25
```

Page 297

```
 1          DEPOSITION ERRATA SHEET
 2
 3   RE:  WALTER WINSTON, et al , vs  MONSANTO COMPANY
 4   Case No :      1822-CC0515
 5   Deponent:      STEPHEN E  PETTY
 6   Deposition Date:   08/27/2019
 7
 8   To the Reporter:
 9   I have read the entire transcript of my Deposition
10   taken in the captioned matter or the same has been
11   read to me  I request that the following changes
12   be entered upon the record for the reasons
13   indicated  I have signed my name to the Errata
14   Sheet and the appropriate Certificate and authorize
15   you to attach both to the original transcript
16
17
18
19
20         _____
           STEPHEN E  PETTY
21
22
23
24
25
```

75  (Pages 294 to 297)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 27, 2019

Page 298

```
 1    PAGE  LINE      CORRECTION
 2          _____
 3          _____
 4          _____
 5          _____
 6          _____
 7          _____
 8          _____
 9          _____
10          _____
11          _____
12          _____
13          _____
14          _____
15          _____
16          _____
17          _____
18          _____
19          _____
20          _____
21
22    ____  NO CHANGES
23
24    _____
      STEPHEN E. PETTY
25
```

76 (Page 298)