# EXHIBIT 8

Page 1

IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS

STATE OF MISSOURI

~~~~~~~~~~~~~~~~~~~~

WALTER WINSTON, et al.,

            Plaintiffs,


        vs.           Case No.  1822-CC0515


MONSANTO COMPANY,

            Defendant.

~~~~~~~~~~~~~~~~~~~~

Videotaped Deposition of

STEPHEN E. PETTY, P.E., C.I.H., C.S.P.

VOLUME V



Wednesday, August 28, 2019
8:59 a.m.

Taken at:
EES Group, Inc.
6321 Irelan Place
Dublin, OH  43016


Michelle L. Harper, RPR

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

---

Page 2

```
1   APPEARANCES:
2
3   On behalf of the Plaintiffs:
4       Weitz & Luxenberg, by
        ROBIN L  GREENWALD, ESQ
5       New York Office
        700 Broadway
6       New York, New York  10003
        212 558 5500
7       rgreenwald@weitzlux com
8
9   On behalf of the Defendant:
10      McDermott Will & Emery, LLP, by
        ANTHONY N  UPSHAW, ESQ
        MELISSA R  ALVAREZ, ESQ
11      333 Southeast 2nd Avenue
        Suite 4500
12      Miami, Florida 33131
        305 347 6540
13      Aupshaw@mwe com
        Malvarez@mwe com
14                   ~ ~ ~ ~ ~
15  ALSO PRESENT:
16      BARRY HERSCH, VIDEOGRAPHER
17                   ~ ~ ~ ~ ~
18
19
20
21
22
23
24
25
```

---

Page 3

```
1              I N D E X
2       EXAMINATION OF STEPHEN E. PETTY
3   BY MR. UPSHAW             6
4   BY MS. GREENWALD        217
5
6           EXHIBITS MARKED
7   Exhibit 38, Two Invoices         5
8   Exhibit 39, Mr. Haley's Interview    14
9   Summary Sheet
10  Exhibit 40, Mr. Hammond's Interview   24
11  Summary Sheet
12  Exhibit 41, Mr. Jenkins' Interview    39
13  Summary Sheet
14  Exhibit 42, Mr. Karr's Interview     53
15  Summary Sheet
16  Exhibit 43, Mr. Miller's Interview    71
17  Summary Sheet
18  Exhibit 44, Mr. Puchbauer's Interview  107
19  Summary Sheet
20  Exhibit 45, Mr. Sanders' Interview   128
21  Summary Sheet
22  Exhibit 46, Mr. Sessions' Interview   154
23  Summary Sheet
24
25
```

---

Page 4

```
1       EXHIBITS MARKED (CONTINUED)
2   Exhibit 47, Chapter 7 of the Label    194
3   Review Manual
4   Exhibit 48, Document Titled Label     196
5   Chapter Review:  Chapter 10: Worker
6   Protection Label
7   Exhibit 49, Document Titled EPA Takes   204
8   Action to Provide Accurate Risk
9   Information to Consumers, Stop False
10  Labeling on Products
11  Exhibit 50, CFR 158.500            209
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 5

```
1       MR. UPSHAW:  Okay.  We'll mark for the
2   record Exhibit 38, which is a composite of two
3   invoices.
4           - - - - -
5   (Thereupon, Petty Deposition Exhibit 38, Two
6   Invoices, was marked for purposes of
7   identification.)
8           - - - - -
9       THE VIDEOGRAPHER:  We are on the record.
10  The time is 8:59.  This is a continuation
11  deposition of Stephen Petty.  Today is August 28,
12  2019.
13      MS. GREENWALD:  I just want to ask you,
14  I realize when Nicole sent these yesterday, she
15  sent one that I've marked up.  So can we
16  substitute out, if you're ever going to use this
17  at trial, the one without my approval on the
18  bottom?
19      MR. UPSHAW:  Oh, yes.
20      MS. GREENWALD:  She sent the wrong
21  version.  I just realized that.
22      MR. UPSHAW:  Okay.  Well, we'll attach
23  this one.  If we ever get the opportunity, if you
24  ever need them, yeah.
25      MS. GREENWALD:  I'll send you -- I'm
```

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 6

1   going to send -- I know, but I just wanted to let
2   you know that she sent the wrong one.  I just
3   noticed that.  Sorry.
4          MR. UPSHAW:  No worries.
5          MS. GREENWALD:  Okay.
6          MR. UPSHAW:  And that -- we're talking
7   about Exhibit 38?
8          MS. GREENWALD:  Yep.
9          MR. UPSHAW:  Okay.
10         EXAMINATION OF STEPHEN E. PETTY
11  BY MR. UPSHAW:
12     Q.   Good morning.
13     A.   Good morning.
14     Q.   Mr. Petty, how are you?
15     A.   Great.
16     Q.   Good.  Let's pick up where we left off
17  last night.  We were talking about Ms. Gatewood,
18  and we were going to turn to Exhibit 13, page 7,
19  I think, and her table rolls over to page 8.  And
20  I think yesterday you explained to us how the
21  table for each plaintiff works, correct?
22     A.   Just the ones we covered.
23     Q.   Right.  But you explained how the tables
24  work.  I mean, all the tables work the same, they
25  have values on the left side, dermal data on the

Page 7

1   right side, you have different data entries,
2   headings on the first column and then you add
3   your values in the center, correct?
4      A.   Well, it's a combination of input data
5   from the interviews as well as calculations.
6      Q.   Okay.  And so you split up
7   Ms. Gatewood's data by her information she
8   provided in the interview by the homes; is that
9   correct?
10     A.   Homes and time frame, yes.
11     Q.   Okay.  On page 7, in the Holly Oaks Lake
12  second home, under events per week, you have a --
13  one value of .5 for that year.
14     A.   Okay.
15     Q.   What does that .5 mean under events per
16  week?  Can you explain that?
17     A.   Yeah, that would mean that she had one
18  event every two weeks.
19     Q.   Got it.
20     A.   One by two is half.
21     Q.   And according to her interview, every
22  two weeks, she would spray 20 to 25 minutes?
23     A.   Correct, for that particular location
24  and time frame.
25     Q.   Okay.  And at the beginning of page 8,

Page 8

1   you have another entry under that location and
2   time frame of additional dermal exposure on
3   ground.  What does that mean?
4      A.   This is where she was talking about
5   working in the ground.  I think we talked a
6   little bit about that yesterday.  So she had
7   specific recollections of working in the soil on
8   that particular site for that time frame.
9      Q.   Okay.
10     A.   So that's the information she provided
11  regarding that situation.
12     Q.   So you did add that soil time, or
13  working in the soil time, to her overall events
14  and time spent, correct?
15     A.   For -- for Ms. Gatewood, yes.
16     Q.   Okay.  Because we made the reference
17  back -- back on page 1 where you said also soils
18  in the events and time entry for Mr. Gatewood and
19  Ms. Gatewood, correct?  Page 1, where you have
20  the rollup?
21     A.   Page 1, I'm trying to see where you --
22     Q.   All right.  If you go to page 1, which
23  is your events summary.
24     A.   Right.
25     Q.   And you go to the Gatewoods, you added

Page 9

1   that extra line, it says also soils?
2      A.   Yes.
3      Q.   Right?
4      A.   Yes.
5      Q.   So that's because you included the time
6   that Ms. Gatewood indicated she was working with
7   the dirt in her yard?
8      A.   That's correct.
9      Q.   Okay.  Then I don't understand the
10  caveat you have at the bottom of Ms. Gatewood's
11  table, which says "does not included" -- I think
12  you meant does not include -- "dermal associated
13  with soils and vegetation when repairing and
14  replacing sprinkler system in second home," but
15  actually it does.
16     A.   I'd have to go back and see if I added
17  that into the total.  I don't know if I did or
18  not.
19     Q.   Well, I mean, we can look here at the
20  totals, right?
21     A.   Right, and see -- see if that's correct
22  or not.
23     Q.   So if you used your event time total for
24  the first home, spring '87 to 2016, and you had
25  30 events there, and then you go to the second

3 (Pages 6 to 9)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

1 home, 2009 to 2010, and you had 26 events, now
2 we're at 56.
3    **A. Where are we -- which are you --**
4    Q. I'm adding up Ms. Gatewood, and you have
5 events total?
6    **A. Are you doing low or high or midpoint?**
7 **That's what I'm asking.**
8    Q. Well, let's go -- let's start at the
9 beginning.
10    On the first home, Olga Place --
11    **A. Right.**
12    Q. -- from '87 to 2016, you have events
13 total as an entry, which is the third from the
14 bottom, and you have one value which is 30; is
15 that correct? On page 7.
16    **A. Page 7?**
17    Q. At the bottom is Ms. Gatewood, correct?
18    **A. Right.**
19    Q. The first block you have is first --
20 first home, Olga Place, spring '87 to 2016,
21 right?
22    **A. Right.**
23    Q. And then you have for events total, you
24 have only one entry which is under midpoint, and
25 it says 30. Did I read that right?

1    MS. GREENWALD: You mean event times. I
2 think that's what's throwing him off.
3    **A. No, no, no, no. That's what's confusing**
4 **to me. The event total --**
5    MR. UPSHAW: Okay. I'm sorry. Event --
6    MS. GREENWALD: You keep saying total.
7 It's times.
8    MR. UPSHAW: You're right. Event times.
9 You're absolutely right. I apologize.
10    **A. No, the events is above that --**
11    Q. Right. Events --
12    **A. -- which is 118. That's why you keep**
13 **saying 30, and I'm not understanding.**
14    Q. My mistake. I was saying -- I was
15 saying total, but it's actually event times.
16    **A. Well, event times is -- that's just the**
17 **time per event. But when we're adding up the**
18 **total, we either add up total events or total**
19 **time.**
20    Q. Okay. Either one. I thought events
21 would be a little lower. So 118.
22    **A. Well, no, no, no. The 30 is the time**
23 **per event.**
24    Q. Per event. Right.
25    **A. So that's what's got me -- I kept trying**

1 to understand where you're coming with the 30.
2    Q. Okay. So --
3    **A. The numbers would be either we pick a**
4 **low, medium, high or midpoint and we try to add**
5 **them up and see how the total is going.**
6    Q. See if we added it in, right?
7    **A. Right. But we started with 30, that**
8 **confused me.**
9    Q. All right. I think an easier way is
10 don't you have an events total or totals of 183?
11    **A. Right. And that's what I said. I said**
12 **what I've got to do is see if those all add in**
13 **and see if that was added in or not. That's all**
14 **I'm saying. I agree with that.**
15    **So we've got 118 on a midpoint plus 26,**
16 **which is 144. Then we've got a 26, which is 170,**
17 **174, 178, and 5 is 183, so it is added in.**
18    Q. Okay.
19    **A. That -- that event total does include**
20 **that soils number of 26 events.**
21    Q. Okay. So the asterisk below per entry
22 is not applicable?
23    **A. The only cross-check I would have to**
24 **make is -- I believe that is correct -- is to see**
25 **whether or not there was additional time**

1 **associated with that sprinkler system. I just**
2 **have to cross-check that with the interview.**
3    Q. So are you saying that you wouldn't have
4 included all of the time in her interview in this
5 section you've identified as on ground-additional
6 dermal exposure?
7    MS. GREENWALD: Objection. Form.
8    **A. I'm not sure of that. That's all I'm**
9 **saying is I'd have to check that.**
10    Q. Is --
11    **A. It either is or -- I mean, it is. I**
12 **just have to go back to the interview, and see if**
13 **it was in her interview. To get a quick answer.**
14    Q. Okay.
15    **A. I believe you are correct, that that**
16 **particular -- that the soils times and events are**
17 **included in there. So that -- that footnote**
18 **should not apply for her.**
19    Q. Okay.
20    **A. I think you are correct, looking at the**
21 **interview.**
22    Q. All right.
23    **A. Okay.**
24    Q. So we can strike that.
25    If you were going to redo this, which

4 (Pages 10 to 13)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 14

1  I'm not asking you to, we would take that out?
2  A.  Yes.
3  Q.  All right.  Let's move on to Mr. Haley.
4  We'll mark his interview summary sheet as Exhibit
5  39, and here's a copy.
6  - - - - -
7  (Thereupon, Petty Deposition Exhibit 39, Mr.
8  Haley's Interview Summary Sheet, was marked for
9  purposes of identification.)
10  - - - - -
11  A.  Okay.
12  Q.  Did you personally speak with Mr. Haley?
13  A.  I did.
14  Q.  By telephone?
15  A.  I did.
16  Q.  How many times?
17  A.  One time.
18  Q.  Any e-mail correspondence?
19  A.  No.
20  Q.  Were there any attorneys present?
21  A.  Yes.
22  Q.  Who?
23  A.  Mr. Jerry Kristal, Mr. Josh Kristal,
24  Mr. Matt Hans, all from Weitz & Luxenberg.
25  Q.  Any other individuals that you were

Page 15

1  aware of on the telephone call?
2  A.  No.
3  Q.  Did you read the depo transcript of
4  Mr. Haley?
5  A.  Only in a cursory sense.
6  Q.  Okay.
7  A.  Long after I had done the interviews.
8  Q.  All right.  How about his plaintiff fact
9  sheet?
10  A.  I believe that I had his plaintiff fact
11  sheet, and it's attached to the depo, as I
12  recall.
13  Q.  All right.  And what would you be
14  looking for in your review of Mr. Haley's
15  plaintiff fact sheet and depo transcript?
16  A.  Any information that -- well, I would
17  just read it in total and see what information
18  was there that was consistent with the types of
19  questions and discussions that I would have with
20  him in an interview.  So I would try to strip out
21  of that anything that's there, and -- but I don't
22  recall any detailed discussion of dermal
23  exposures in those fact sheets.
24  Q.  Okay.  And you didn't read it in detail,
25  right, you said you just skimmed it, or --

Page 16

1  A.  Well, I mean, they're not very long,
2  yeah.  Those plaintiff facts sheets aren't very
3  long.
4  Q.  Right.  How about the depo transcript?
5  A.  I just skimmed those.
6  Q.  Okay.  Did you have the opportunity to
7  review any of his discovery responses,
8  interrogatories or requests for production?
9  A.  Only if they were attached as part of
10  the attachments to the deposition.
11  Q.  Okay.  And anything that was attached to
12  Mr. Haley's deposition would have been included
13  in your list of relative materials?
14  A.  Correct.
15  Q.  Did you do -- did you review any
16  non-plaintiff fact witness transcripts,
17  coworkers, employers, family members?
18  A.  I don't believe so, no.
19  Q.  Did you visit any of the locations that
20  Mr. Haley claimed to have used or been exposed to
21  Roundup?
22  A.  No.
23  Q.  Can you tell me what type of formulation
24  of Roundup Mr. Haley allegedly used?
25  A.  I'm going to Exhibit 39, and there he

Page 17

1  talks about the product that he used.  He used,
2  he said it was a Roundup concentrate in
3  approximately a one-gallon white plastic
4  container which was purchased by the city, and he
5  just said that during the entire time that he
6  used it, it was the same container.
7  And so that's what we -- that's what he
8  told me.
9  Q.  Okay.  So from 1987 to 1999, he only had
10  one container of Roundup?
11  A.  He said he believed -- well, he said he
12  believed it was the same size container and he
13  thought it was the same material.
14  Q.  Right.  And he said concentrate, right?
15  A.  He said it was a concentrate.
16  Q.  Okay.  Was his use of Roundup
17  occupational or residential or both?
18  A.  It was occupational.
19  Q.  What was his occupation?
20  A.  He worked for the city of St.
21  Petersburg, Florida, and I think he was in a
22  water -- he was a water line technician.  And
23  it's described on page 5 what his primary
24  responsibilities were.
25  Q.  Okay.  What was his method of

5  (Pages 14 to 17)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 18

1  application?
2      A.  He said that it was a one-gallon plastic
3  spray container in which he mixed the concentrate
4  in water and -- so he said it was just a pump
5  spray container.
6      Q.  Okay.  So he didn't identify whether
7  there was a wand on that container or nozzle?
8      A.  I didn't -- I don't -- well, clearly, it
9  had to be dispersed.  But no, he didn't -- I
10  don't recall -- or I didn't write down whether he
11  said it was -- it had a nozzle or a wand.
12      Q.  Okay.  Did you take into account any
13  exposures to other pesticides, insecticides or
14  chemicals?
15      A.  Sure.  I asked him on each of -- as I
16  went through each of the jobs that he had had
17  with time, I asked him what chemical products
18  he'd been exposed to, did he remember any of
19  them.  If so, he would tell me that.
20      Q.  And did he tell you any?
21      A.  Sure.  He said -- his first job, he said
22  he had some exposure to asbestos and asbestos
23  dust.  He was in the military, but he didn't
24  recall any particular chemical exposures in the
25  military.  The other jobs -- he had one job where

Page 19

1  he recalled getting exposure to some concrete
2  dust because of ground concrete at times.
3      Q.  Is that an exposure that is significant
4  for you, concrete dust?
5      MS. GREENWALD:  Objection.  Form.
6      A.  Based on my experience, I wouldn't
7  consider it to be -- it -- I don't know about the
8  word "significant."  I would say that it would be
9  a low-level exposure, simply because the time
10  frame was short, six months, and he was mainly a
11  concrete finisher.  So that the cutting aspect of
12  that job probably would not be a dominant portion
13  of the job.  So the combination of time at that
14  exposure I think would be relatively small for a
15  work career.
16      Q.  All right.  So time and exposure equal
17  dose?
18      A.  No, no, no.  Dose is what gets through
19  the -- into the body, usually into the
20  bloodstream.  So exposure is the material that's
21  present that can contribute to a dose, but it
22  still has to get -- for instance, if we have
23  Roundup in the air around the person as an
24  aerosol, for example, exposure is what that
25  concentration is in the air.  The dose would be

Page 20

1  if they breathe it in and it actually got through
2  their lung tissue into their bloodstream.
3      So there's always a difference between
4  exposure, which is the potential to create a
5  dose, and dose.
6      Q.  What's the formula for dose?  I know
7  that's something that -- and maybe I gave you the
8  wrong one.  But maybe it's time and duration,
9  something like that?
10      A.  Well, it depends on whether you're
11  talking about inhalation or you're talking about
12  dermal.  Dermal, the way that I would do dose is
13  I would use a -- there are multiple -- there's
14  multiple ways to do it.  But the way that I do it
15  is I use Fick's flux equation, which is simply
16  the rate of transfer through a fixed area per
17  unit time.
18      So the parameters you need to get a dose
19  for a person is the skin area impacted and the
20  time for a given event times whatever that flux
21  would be.  And then that determines -- so if the
22  flux is like milligrams per centimeter squared
23  per hour and I know the centimeters squared of
24  the area and I know the hours, then I get the
25  milligrams.

Page 21

1      Q.  Okay.
2      A.  But the dose is different than exposure.
3      Q.  Okay.  Thank you.  All right.  I'll go
4  back to Mr. Haley.
5      Did you take into account the family
6  history or -- and prior health?
7      A.  To the extent that I asked him about
8  when he contracted his disease, I did.  Beyond
9  that, I did not.
10      Q.  Okay.  Did you consider other risk
11  factors?
12      A.  Yes, I did.  I asked him about what he
13  did in the service. ████████████████████
   ██
   ████████████████████████████████████
15                            I asked him about his
16  exposure to all the other jobs, some of which
17  we've touched on already.
18      Q.  Right.
19      A.  And that's clearly the approach as an
20  industrial hygienist that you have to take is to
21  not only look at the particular chemical
22  concerned, but also look at the other jobs that
23  he had and what exposures he might have had on
24  those other jobs.  So you're trying to do that as
25  you should for completeness.

6 (Pages 18 to 21)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 22

```
 1        Q.   Okay.  Did you have access to any of the
 2   actual product containers or sprayers he claims
 3   he used?
 4        A.   I did not.
 5        Q.   Did you make any attempt to corroborate
 6   any of the statements Mr. Haley made about his
 7   use of Roundup with other individuals?
 8        A.   With other individuals?  No.
 9        Q.   All right.
10        A.   I certainly -- you know, I would -- I
11   mean, the interviews are always pretty lengthy in
12   discussions, and particularly in the dermal area,
13   where I'll question -- I mean, the net result of
14   the interview is the net result of those
15   discussions.
16        So, you know, if they -- if they tell me
17   they have dermal exposure to their hands and then
18   they say the wrists they don't, and then they say
19   their forearms, they do, then I would say, are
20   you sure?  I mean, it doesn't seem reasonable to
21   me that you would have exposure to your hands and
22   your forearms but not your wrists.
23        And they'll say -- and they'll either
24   say, yeah, but for sure I had some band or
25   something there that it didn't get the wrist, or
```

Page 23

```
 1   they'll say oh, yeah, you're right.  The wrist
 2   should be included.
 3        So there is that discussion and this
 4   reflects that discussion.
 5        Q.   Okay.
 6        A.   So I do try to do a sanity check, if you
 7   will, on numbers.  Or if they say something that
 8   doesn't make sense to me based on my experience
 9   in doing these, then I will question them and the
10   interview then reflects the net result of those
11   discussions.
12        Q.   All right.  Let's turn to Exhibit 13.
13        A.   Okay.
14        Q.   And Mr. Haley's table, which is table 6,
15   begins on page 8 and continues to page 9.
16        A.   I'm there.
17        Q.   In your calculations of post-dermal
18   time, from what I'm reading -- and please correct
19   me if I'm wrong -- that Mr. Haley indicated that
20   he would wash or clean the area of exposure
21   upwards of one to two hours.  Which number did
22   you use in your calculations?
23        A.   I used a range of values of one to two
24   hours.
25        Q.   Okay.  And in the weeks per year you
```

Page 24

```
 1   used 48 and your reference was use 48 weeks
 2   worked per year.  Was that from his interview?
 3        A.   That's a standard industrial hygiene --
 4   let's see.  Did I say that was from his
 5   interview?  No, I didn't say it was from his
 6   interview.
 7        That's a standard industrial hygiene
 8   value on weeks worked per year.  It's based on a
 9   40-hour workweek, 48 weeks per year.  1920 hours
10   is what I will use for a work year, and that's
11   the standard industrial -- Mark Nicas uses it at
12   Berkeley, and that's based on the fact that
13   people typically don't work 52 weeks a year,
14   they've got at least a couple weeks' vacation and
15   a couple weeks' holiday.
16        Q.   Okay.
17        A.   So we discount the weeks per year
18   assuming there's some time off.
19        Q.   All right.  Let's move onto Mr. Hammond.
20   And we've marked Mr. Hammond's interview summary
21   sheet as Exhibit 40?
22             - - - - -
23   (Thereupon, Petty Deposition Exhibit 40, Mr.
24   Hammond's Interview Summary Sheet, was marked for
25   purposes of identification.)
```

Page 25

```
 1             - - - - -
 2        A.   Thank you.
 3        Q.   Did you personally speak with Mr.
 4   Hammond?
 5        A.   I did.
 6        Q.   By telephone or FaceTime?
 7        A.   Telephone.
 8        Q.   How many times?
 9        A.   One time.
10        Q.   Any e-mail correspondence?
11        A.   No, sir.
12        Q.   Were there any attorneys present?
13        A.   Yes, Mr. Matt Hans and Mr. Todd Drayton
14   from Weitz Luxenberg.
15        Q.   All right.
16        A.   I believe they're attorneys.
17        Q.   Okay.
18        A.   Well, I know Matt is.  I'm not -- I
19   don't know their titles.
20        Q.   Oh, okay.
21             MS. GREENWALD:  Matt's not.
22             THE WITNESS:  Matt is not?
23             MS. GREENWALD:  No.  He's just really
24   smart.
25        Q.   All right.  So --
```

7 (Pages 22 to 25)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 26

1    A.   I just wanted to correct the record.
2    I'm not sure they're attorneys.
3         MS. GREENWALD:  No, that's okay.  That's
4    okay.
5    A.   I'm just saying that they're on the
6    phone.
7    Q.   That's fine.  You identified them from
8    the law firm of Weitz Luxenberg?
9    A.   Yeah.  I didn't ask them their titles.
10        MS. GREENWALD:  I will confirm they work
11   at our firm.
12   Q.   Okay.  Any other individuals that you
13   were aware of on the phone during the interview?
14   A.   No.  Other than the plaintiff, myself
15   and those two individuals.
16   Q.   All right.  Did you read Mr. Hammond's
17   transcript, deposition transcript?
18   A.   Only in a cursory sense, well after I
19   did the interview.
20   Q.   Okay.  And did you review his plaintiff
21   fact sheet?
22   A.   I did.
23   Q.   Any information from your cursory review
24   of his depo transcript or his plaintiff fact
25   sheet that you found to be material or

Page 27

1    significant?
2    A.   On the dermal side, typically what I
3    found was that the -- well, in all cases, I
4    didn't find that the dermal questions asked by
5    the defense counsel ever matched what I asked in
6    the interview in terms of completeness and what I
7    would need in order to do a dermal dose
8    calculation.
9         On the times in general, they were very
10   close.  There might be some slight differences,
11   but they were minor.
12   Q.   And because you were not doing a full
13   dose analysis, you didn't indicate those slight
14   differences anywhere in your materials that you
15   presented with regard to Mr. Hammond, correct?
16   A.   Well, the only information I've ever
17   presented with respect to Mr. Hammond is the
18   interview.
19   Q.   Right.
20   A.   So I don't know what other materials
21   you're referring to.  I did not do the dermal
22   dose calculations for Mr. Hammond.  So if I had,
23   then that would have been a different report.
24   Q.   Okay.  Any analysis by you of his
25   discovery responses?  Let me ask a preliminary

Page 28

1    question to that.
2         Did you see or review his discovery
3    responses?
4    A.   Only to the extent they would be
5    attachments to his deposition.
6    Q.   And if they were attached to his
7    deposition or any other times they may have been
8    provided to you, they would have been listed on
9    your material reliance sheet?
10   A.   Correct.
11   Q.   Okay.  Or reliance material sheet.
12        Did you visit any of the locations the
13   plaintiff claims to have used or been exposed to
14   Roundup?
15   A.   I did not.
16   Q.   Did Mr. Hammond indicate the type of
17   formulation of Roundup he used?
18   A.   I'm again looking at Exhibit 40 now, and
19   what he -- how he described the container.  He
20   said that he would purchase -- I'm again citing
21   Exhibit 40, page 7 and 8 of my interview -- he
22   says that he purchased approximately one and
23   two-gallon Roundup concentrate containers at
24   Southern States Feed & Farm Supply, and that they
25   were Roundup concentrate with green and gold

Page 29

1    lettering on the containers.  That's how he
2    recalled them.
3    Q.   Okay.
4    A.   And then at both locations he indicated
5    that he purchased from the same supplier and same
6    size containers for the same description of those
7    containers.  So I'm looking at page 7 and 8.
8    Q.   All right.  Was his use occupational,
9    residential or both?
10   A.   He indicated both.  It appears to me
11   primarily -- he was self-employed again.  So
12   primarily he was working outside the home, but he
13   would also use it at home as well.
14   Q.   And his self-employment was in the lawn
15   business?
16   A.   He owned a company called -- well, two
17   companies -- one called Dixie Lawn Maintenance
18   and another called B&H, Burton and Hammond,
19   Farms.  That's how he indicated it.  Again, I'm
20   citing pages 7 and 8.
21   Q.   Okay.  Did he indicate his method of
22   application?
23   A.   He did.  In the first -- at the first
24   location -- again, I'm citing page 7 of the
25   interview -- he said he used a Fimco 15-gallon

8  (Pages 26 to 29)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

---

Page 30

1  tank sprayer that was mounted on a four-wheeler,
2  that he had -- he obtained this tank sprayer
3  from, again, the Southern States Feed & Farm
4  Supply, and it contained an electric pump powered
5  by a battery on the four-wheeler and it had about
6  a 10-foot hose and a wand and a nozzle.
7      And then at the second company, he
8  described the -- it has a approximately
9  four-gallon Fimco backpack sprayer with a
10  handheld -- it was handheld -- a hand pump
11  pressurized container with a wand and a nozzle.
12  Q.  Okay.  Did you take into account any
13  exposures to other pesticides, insecticides, or
14  chemicals?
15  A.  I asked him at each of his work
16  locations chemical products that he used, and he
17  either indicated what they were or that he
18  didn't -- he indicated there weren't any.
19  Q.  There were none.  Okay.
20  A.  Well, I asked him the question for
21  each -- I went through his whole work history and
22  I asked him at each location were there any
23  chemicals that you believe you were exposed to?
24  And he would either say yes, there were, or he
25  would say no, he didn't recall any.

---

Page 31

1  Q.  All right.  And --
2  A.  And to the extent that they were there,
3  they're listed.
4  Q.  Okay.  So what chemicals did you
5  indicate he was exposed to?
6  A.  So his first work location, he didn't
7  recall chemical exposures.  The second work
8  location, he recalls using a Safety-Kleen parts
9  washer.  So he was using a Safety-Kleen solvent
10  at that location.
11  Q.  Okay.
12  A.  At the Dixie Lawn Maintenance, I'm
13  citing on page 4, he talked about using gasoline
14  and oil for lawn equipment, talked about using
15  the Roundup concentrate, and he talked about
16  using Eraser concentrate.
17      And then at the fourth location, I'm
18  citing page 5 of Exhibit 40, again, he said that
19  he used gas and oil for the lawn equipment, he
20  used Roundup concentrate that we talked about, he
21  used Eraser concentrate, he used some 2,4D
22  Weedkiller, and he used Grayzon Weedkiller.
23  Q.  Grayzon?
24  A.  Gray -- the way that I have it spelled
25  is G-R-A-Y-Z-O-N.  Again, on the bottom of page

---

Page 32

1  5.
2  Q.  All right.
3  A.  So I've indicated other products that he
4  used at other locations and these locations.
5  Q.  Okay.  Did you take into account any
6  family history or prior health?
7  A.  To the extent that I asked him when he
8  was -- when he was diagnosed with cancer and what
9  form of cancer that was.  I do it mainly from the
10  standpoint of if you're going to do an exposure
11  analysis, you -- the protocol is you don't count
12  the exposure after date of diagnosis.
13      So to that extent, that's what I asked
14  him.  Beyond that, I did not.
15  Q.  Okay.  Did you consider other risk
16  factors?
17  A.  Certainly.  I mean, I asked him about
18  his service in the military.  He wasn't. ▮▮▮▮▮▮
19  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
20  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
21  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
22      I went through each job that he had over
23  his career and I asked him what chemicals he was
24  exposed to to the best of his knowledge and he
25  gave me those -- that information that we just

---

Page 33

1  talked about.
2  Q.  All right.  Did you have access to any
3  of the actual product containers, sprayers -- or
4  sprayers that plaintiff claims he used?
5  A.  I don't know about access.  I mean, I
6  suppose technically, you know, you might have
7  access.  I did not look at any of those -- I did
8  not visit his site, so I didn't -- I didn't look
9  at those containers.
10  Q.  Okay.
11  A.  The question about access is different
12  than did I actually look at them.
13  Q.  Okay.  Did you make any attempt to
14  corroborate any of the statements Mr. Hammond
15  made about his Roundup with any other individual?
16  A.  No.  Other than during the interview, I
17  would try to, if there were things he said that
18  didn't make sense, then I would try to circle
19  back on that and see if it -- you know, I would
20  always do a sanity check on things that he would
21  tell me.
22  Q.  Right.
23  A.  But I didn't check with other
24  individuals.
25  Q.  Okay.  All right.  Let's turn to Exhibit

---

9  (Pages 30 to 33)

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 34

1  13, page 9.  In that exhibit, you have a table 7
2  with regard to the information you obtained from
3  Mr. Hammond.
4      A.  I'm there.
5      Q.  When you ask -- or you enumerate the
6  parts of the body for the person being
7  interviewed, and you walk them through the face,
8  the neck, so on and so forth, their legs, do you
9  separate out the ankle area like you do with
10  hands and separating out the wrists before you
11  get to forearms?
12      MS. GREENWALD:  Objection.  Form.
13      A.  You can.  I typically don't because I
14  can use a combined -- if there's leg and foot
15  exposure.  When you look at the exposure factor
16  handbook, you can -- they have all sorts of --
17  the way that they present the skin area data is
18  you can have like arms including wrists and hands
19  or you can just have arms alone.
20      And so if they're indicating a similar
21  exposure to their legs and their -- if they're
22  indicating their legs and their feet are exposed,
23  then I would use -- I hadn't gone through that
24  exercise, but I could use the legs including
25  ankles.  So -- but I didn't do that analysis

Page 35

1  here, so.
2      Q.  Okay.
3      A.  Again, like I said, these discussions
4  take a long time because I'm asking about lots of
5  skin areas and then I'm asking about the percent
6  areas that are wetted.  Is it a range?  Is it a
7  constant?  And then if -- if there's
8  inconsistencies, then I'll cycle back as best as
9  I can.
10      I mean, if -- like I said, if they say
11  their hands are wetted and their forearms are
12  wetted, but they say their wrists aren't, then
13  I'll say, well, it kind of doesn't make sense to
14  me that your hands would be wetted and your
15  forearms would be wetted.  Why wouldn't your
16  wrists be wetted?  And they'll either say, well,
17  they weren't and I say okay.  Or they'll say,
18  yeah, you're right.
19      So, I mean, these discussions are -- the
20  interviews are the result of the summary of those
21  discussions.
22      Q.  Okay.
23      A.  And so that's -- it takes a while to
24  explain to these plaintiffs that even the
25  distinction between area wetted and percent time

Page 36

1  wetted -- in other words, they want to blend at
2  times those two parameters.  And I'll say no, I
3  want to distinguish between did you ever have
4  these skin areas -- did you ever feel that they
5  were wetted, and I wanted to separate that from
6  the percent time that you've had that happen.
7      And what I do find is that they will at
8  times mix up those two terms.  So I have to bring
9  them back and say no, no, I'm only talking about
10  the areas in terms of the percent area wetted.
11  We'll get to the percent time later.
12      As I described yesterday, I go through
13  each of the -- I have a list of all skin areas
14  and to indicate that those are -- or portions of
15  skin areas, to indicate those that are -- that
16  they recall them being wetted, then I list those.
17  If they don't, then I don't.
18      Q.  Right.  And that's why I ask the
19  question, does your list of skin areas include
20  ankle, which you've just explained.
21      A.  Right.  I mean, I'm not sure that it
22  does.  It does include chest, torso.  Usually the
23  ankles are considered part of the legs.
24      Q.  Okay.  But the wrists are not considered
25  part of the hand or forearm?

Page 37

1      A.  No.  Because when people are using
2  products, typically, the areas where they get
3  dermal exposure are hands, wrists, and forearms.
4  So you do want them to distinguish between those
5  areas.  It's more unusual that the legs and the
6  chest and the torso are wetted.
7      Q.  Okay.  In Mr. Hammond's data on the
8  bottom of page 9, you list his work at B&H Farms.
9  You note a ten-year period between 1990 and 2000,
10  correct?
11      A.  Yes.
12      Q.  Okay.  Then if you flip the page to page
13  10, you have a second block of work at BH Farms
14  from 2000 to 2016, right?
15      A.  Correct.
16      Q.  Okay.  So ten years is 1990 to 2000, I
17  understand that.  But you have in the second
18  block from 2000 to 2016 seven years.
19      A.  Right.  But if you -- if you go up
20  through -- if you include 1990 and you -- and you
21  go all the way through '99, that's -- '09 plus
22  '90 is ten years, right?  Then if you include
23  2000 and then -- you've got 2000, 2001, 2002,
24  2003, 2004, 2005, 2006, that's seven.
25      Q.  Okay.  So I don't know -- so the first

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 38

1  block of B&H Farms should have been '90 to '99?
2  A.  Well, it's up to 2000.
3  Q.  Okay.  Just trying to make sure I
4  understand your math here.
5  A.  Right.
6  Q.  That's fine.
7  A.  No, no.  I understand what you're
8  saying.  But there's not double counting, if
9  that's what you're asking.
10  Q.  I was just making sure, yeah, how you
11  calculated the years here between the two.
12      And why did you split up the time
13  between 1990 to 2000 and then again from 2000 to
14  2016?
15  A.  I'm just looking to see if any of the
16  info parameters changed.
17  Q.  Okay.
18  A.  It was simply a reflection.  I'm looking
19  back on Exhibit 40, page 8.  I certainly could
20  have combined those, but the way that he
21  described to me the time frames, he wanted to
22  describe them separately.  But it turns out that
23  the input data in terms of rate of use per week
24  and time per use were the same.
25      So I guess theoretically, you could have

Page 39

1  combined them into one time frame, but that's not
2  the way he was -- because he wanted to talk about
3  when he got sick during the second time frame.
4  Well, I didn't include that time anyway.
5  Q.  Right.
6  A.  So technically, you could have just
7  blended those two, but it doesn't make any
8  difference mathematically.
9  Q.  Okay.  So with regard to Mr. Hammond,
10  what was your conclusion?
11  A.  With respect to just Exhibit 13 and the
12  calculations that I've made, my conclusions would
13  be that he had thousands of exposure events and
14  thousands of hours of exposure to Roundup
15  spraying it, so -- along with significant dermal
16  exposure, skin contact areas.
17  Q.  Okay.  All right.  Let's turn to
18  Mr. Jenkins, which we've marked his interview
19  summary sheet as Exhibit 41.
20      - - - - -
21  (Thereupon, Petty Deposition Exhibit 41, Mr.
22  Jenkins' Interview Summary Sheet, was marked for
23  purposes of identification.)
24      - - - - -
25  Q.  Did you personally interview

Page 40

1  Mr. Jenkins?
2  A.  I did.
3  Q.  Speak to him by telephone?
4  A.  I did.
5  Q.  How many times?
6  A.  One time, December 7, from 3:30 to 4:47.
7  Q.  Any e-mail correspondence with
8  Mr. Jenkins?
9  A.  No.
10  Q.  Were there any attorneys present for the
11  phone call?
12  A.  Well, there were other people on the
13  line.  Whether they were all attorneys now is the
14  question.  But I've listed the parties from Weitz
15  Luxenberg.  They were all Weitz Luxenberg
16  employees.  Ms. Lafayette, Ms. Greenwald, Claire
17  and Matt.  So there were four people that
18  generally, they didn't stay on the line the whole
19  time.  Some would be on and off.  But at times,
20  they were on the -- they were on the line.
21  Q.  All right.  Did you note any other
22  individuals on the line other than the folks
23  you've already mentioned and Mr. Jenkins?
24  A.  And myself.
25  Q.  And yourself, of course.

Page 41

1  A.  Other than -- those were the only folks
2  that I was aware of that were on the line.
3  Q.  All right.  Did you read Mr. Jenkins'
4  deposition transcript and plaintiff fact sheet?
5  A.  I did.  The deposition more in a cursory
6  sense.
7  Q.  Did you obtain any material information
8  from those readings?
9  A.  It's the same as I've described before,
10  I was looking primarily at exposure information.
11  And in those cases, the questions -- not that
12  there were no questions asked about dermal, but
13  they were very much limited in comparison to the
14  questions that I asked and information that I
15  would need to do dermal exposure dose
16  calculations.  So there was nothing there that --
17  that would change my dermal input information.
18      There were slight differences in time,
19  but they weren't significant.
20  Q.  Did you review Mr. Jenkins' discovery
21  responses?
22  A.  Only to the extent they would be a part
23  of the attachments to his deposition.  Or they
24  would be included separately in the list of
25  reliance materials.

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 42

1    Q.   Okay.  Did you have the opportunity to
2    review any non-plaintiff fact witness transcripts
3    such as --
4    **A.   I do not believe so.**
5    Q.   Okay.  Did you visit the location of
6    where Mr. Hammond claims -- I'm sorry,
7    Mr. Jenkins claims to have used or been exposed
8    to Roundup?
9    **A.   I did not.**
10   Q.   Did Mr. Jenkins identify the type of
11   formulation of Roundup he used?
12   **A.   Again, I'm looking at now Exhibit 41,**
13   **page 7, he says that he used QuikPRO -- Monsanto**
14   **QuikPRO concentrate, and he mixed it with --**
15   **well, you didn't ask the next question on how it**
16   **was dispensed.**
17   Q.   I'll ask you now.  What was his method
18   of application?
19   **A.   He mixed the concentrate with water in a**
20   **four-gallon Solo backpack sprayer and applied it**
21   **using that pump backpack sprayer.**
22   Q.   Was his exposure and use occupational,
23   residential or both?
24   **A.   I believe it was residential based on**
25   **the interview information on page 7 of Exhibit**

Page 43

1    **41.**
2    Q.   Okay.  Did you take into account any
3    exposures to other pesticides, insecticides, or
4    chemicals?
5    **A.   I did.  I asked him again about his**
6    **history in the service and whether he had any**
7    **exposure in the service.  He wasn't in the**
8    **service.  I asked him if he smoked either**
9    **cigarettes or cigars or chewed tobacco and he**
10   **said no to all of those three.**
11   **I went through his -- I started from his**
12   **very first job to his last job and asked him**
13   **about his work history and any chemical products**
14   **that he would use at each of those locations.**
15   **And where he recalled chemicals that he used, he**
16   **told me what those were.**
17   **For example, on page 3 of Exhibit 41, he**
18   **said he used glass cleaner when he worked for**
19   **Southern Building Services when he worked as a**
20   **janitor, and he also said he used chemical**
21   **cleaners for disinfecting.**
22   **The other jobs he -- I asked him about**
23   **that.  He doesn't really recall any other**
24   **exposure to chemicals until -- other than his**
25   **home use where he -- so at the jobs he had, that**

Page 44

1    **was what he described.  Only the one job where he**
2    **described any chemical exposures when he was a**
3    **janitor.  And then the other chemical exposures**
4    **that he recalled were when he was using Roundup**
5    **in and around the home.**
6    Q.   Did you take into account any family
7    history and prior health of Mr. Jenkins?
8    **A.   To the extent that I wanted to know what**
9    **disease he had and the date of that diagnosis or**
10   **approximate date of that diagnosis, I would ask**
11   **him that, again, from a -- anticipating having to**
12   **do an exposure analysis where the exposures that**
13   **would occur postdate of diagnosis would not be**
14   **included.  So to that extent, I did.  Beyond**
15   **that, I did not.**
16   Q.   Okay.  And you asked him in general what
17   his disease was; you didn't ask him what subtype
18   of non-Hodgkin's lymphoma he --
19   **A.   I did not.  I was most interested in**
20   **simply when he was diagnosed.**
21   Q.   I think you've answered this question,
22   but did you consider other risk factors?  And I
23   think you told us military, smoking.  Any others?
24   **A.   Any other chemical exposures that he may**
25   **have --**

Page 45

1    Q.   No, any other risk factors you indicated
2    during the interview?
3    **A.   Yeah, any other chemical exposures.**
4    Q.   Oh.  Go ahead.  Your answer.
5    **A.   So the other exposure factors would be**
6    **was there any exposure in the military.  He**
7    **wasn't in the service.  Did he smoke cigarettes**
8    **or cigars or chew tobacco.  Did he have any other**
9    **chemical exposures that he recalled at other**
10   **work locations -- at work locations, since this**
11   **was a residential Roundup exposure situation.**
12   **And then of course I asked him about any**
13   **other products he used at home, and that's -- you**
14   **know, those are the answers that he gave me.**
15   Q.   Okay.  Did you look at any product
16   containers or sprayers that he claims to have
17   used?
18   **A.   I did not visit his site, so I did not**
19   **look at containers he may have used.**
20   Q.   Did you attempt to corroborate any of
21   the statements Mr. Jenkins made about his Roundup
22   use with any other individuals?
23   **A.   Not with -- not with other individuals,**
24   **but I certainly would do sanity checks with**
25   **information he would give me during the**

12  (Pages 42 to 45)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 46

1  interview.
2  Q.  Okay.  Let's turn to page 13.
3  Mr. Jenkins' table is on page 10 of that exhibit.
4  **A.  Almost there.**
5  **Okay.  I'm there.**
6  Q.  All right.  You've arranged his data
7  from the interview into blocks that consider
8  mixing versus spraying.  And then the third block
9  is cleaning nozzle with mouth?
10  **A.  Yeah.  He -- he -- he made a distinct**
11  **point of saying that when the nozzle would clog,**
12  **he would blow it out with his mouth -- part of**
13  **the cleaning process was to blow it out with his**
14  **mouth.  So I indicated that information.**
15  Q.  Okay.  With regard to the dermal data,
16  he claims that he only had skin contact on his
17  legs, neck, and back; is that correct?
18  **A.  Yes.**
19  Q.  Okay.  When you say legs -- well, let's
20  look at legs, and he puts 5 to 10 percent of the
21  area every time he used Roundup.
22  Did I read that correctly?
23  **A.  Yes.**
24  Q.  And what would 5 to 10 percent of the
25  leg area be?

Page 47

1  **A.  Well, it's -- you take the total leg --**
2  **I mean, we went through that sort of discussion**
3  **about leg area before, yesterday.**
4  Q.  It was easier when it was just a
5  quarter.  We kind of figured that out.
6  **A.  No, we did 12 and a half percent,**
7  **remember?**
8  Q.  Oh, yeah.  Right.  We even went to 12
9  and a half percent, you're absolutely correct.
10  **A.  So he's describing an area -- we went**
11  **through the discussion of 12 and a half percent.**
12  **I can go through that again as to what that would**
13  **constitute, which is sort of half of the front**
14  **half of one leg.  I think that was my testimony.**
15  Q.  Um-hum.
16  **A.  And so you're looking at a quarter or so**
17  **of the front half of one leg.**
18  Q.  And this is during spraying, as you've
19  indicated, right?
20  **A.  Yes.  Correct.**
21  Q.  And he said he used a backpack?
22  **A.  Correct.**
23  Q.  Okay.  Did you question him on that
24  percentage using, as you said, your --
25  **A.  Oh, I always --**

Page 48

1  Q.  -- sanity or reality check?
2  **A.  I always ask are you sure it was 100**
3  **percent when they say approximately 100 percent,**
4  **and they say yes, it was all the time, every**
5  **time, that's how it happened.  Absolutely.**
6  **And then I also there would have asked**
7  **him, how about, you know, the skin area on your**
8  **hands, arms, wrists, as well?  And he indicated**
9  **that no, he didn't believe he got it on those**
10  **parts for that particular activity.**
11  Q.  And he confirmed this 5 percent -- 5 to
12  10 percent on his legs?
13  **A.  Yes.  I would ask him, the -- sometimes**
14  **you would -- oftentimes you will hear a**
15  **hesitation, like he'll say -- you know, when**
16  **people talk, they'll say well, I think it's like,**
17  **you know, 5 percent and there's kind of a**
18  **hesitation.  And I'll say was it more or less?**
19  **And they'll say, well, actually, I think it's a**
20  **little less or it's a little more.  And I'll say,**
21  **well, is there a range that fits better than a**
22  **single value and then they'll either say yes or**
23  **no.**
24  **So I do -- there's a back and forth that**
25  **goes on and the numbers that are produced here**

Page 49

1  are what the net result of what those discussions
2  are.
3  Q.  And even when he claimed he was cleaning
4  the nozzle with his mouth, he said he had
5  exposure to his back --
6  MS. GREENWALD:  Objection.  Form.
7  Q.  -- 100 --
8  MS. GREENWALD:  I'm sorry.
9  Q.  -- percent of the time?
10  MS. GREENWALD:  Objection to form.
11  MR. UPSHAW:  Okay.
12  MS. GREENWALD:  Sorry.
13  MR. UPSHAW:  It's okay.
14  **A.  Let me check.  The reason that he was**
15  **describing it that way was he's cleaning the**
16  **nozzle in the process -- it clogs while he's**
17  **spraying and so -- he's saying well, those areas**
18  **are already wetted as part of the spraying.**
19  **That's what he's reflecting.**
20  Q.  Okay.
21  **A.  So that's why it might otherwise not**
22  **seem to make sense, but he's doing -- you know,**
23  **he's spraying the clog, he's got to get it off**
24  **and clean the nozzle.  So that's -- he's already**
25  **wetted.  So he's -- he's describing how he's**

13  (Pages 46 to 49)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 50

1    wetted at that time.
2       Q.   All right. So this is just a
3    continuation of the spraying process?
4       A.   It is.
5       Q.   All right. But you calculated it
6    separately as a separate exposure time?
7       A.   Well, the time -- the times would be
8    separate, because he's not spraying if he's off
9    cleaning, right?
10      Q.   But they're exactly the same amount of
11   time.
12      A.   Let's see.
13           No, they're not.
14      Q.   Well, actually you put the event time as
15   .008.
16      A.   It's 30 seconds. It's not the same
17   time.
18      Q.   Okay. All right. What I meant by the
19   same time, it was everything else, total weeks,
20   five events.
21      A.   Well, yeah. He was cleaning during the
22   spraying activities, but the time per event is
23   very small.
24      Q.   All right. So let me rephrase my
25   question.

Page 51

1       A.   I was like --
2       Q.   Every time he sprayed, he cleaned the
3    nozzle with his mouth?
4       A.   No. He said five events per year,
5    right?
6       Q.   Yeah. I'm trying to follow -- if I'm
7    making a mistake, I'm just trying to follow what
8    you've got.
9       A.   And his spraying above is say events per
10   week is one to two events a week.
11      Q.   Okay.
12      A.   So that's something like 40 to -- you
13   know, ballpark, 48 to 100 or so events per year
14   spraying. But he's saying that the number of
15   times that he would clean this out with his mouth
16   is only five per year. It's much less.
17      Q.   Okay. And then there's a --
18      A.   And the time is much less.
19      Q.   Right. There is another block of time
20   on page 11 for Mr. Jenkins that reflects his
21   spraying trees?
22      A.   Correct.
23      Q.   And why is that a different block?
24      A.   Because that was a different activity.
25   He would also -- let me check on the interview.

Page 52

1       Yeah, if you look on the interview on --
2    this is Exhibit 41, page 8 -- he -- he sprayed
3    weeds, but he also sprayed trees. And I indicate
4    there see also below under spraying, so there was
5    two distinct activities where he felt he sprayed.
6    So I blocked those out separately.
7       Q.   Okay. And what's your conclusion with
8    regard to Mr. Jenkins' exposure?
9       A.   Well, that's a broad question, but I at
10   least answer it in part by saying that looking at
11   Exhibit 13 in terms of -- I did not do a full
12   dermal dose. So what I did do with respect to
13   exposure was calculate numbers of hours of
14   exposure and number of events, and the number of
15   events are on pages 1 -- page 1 of Exhibit 13.
16      And for Mr. Jenkins, it was thousands
17   of -- on the order of 1,000 to 2,000 events. And
18   the exposure times on page 2 of that exhibit for
19   Mr. Jenkins was on the order of 1500 -- 1600 or
20   so to 8,000 hours of exposure time, including the
21   post-dermal. And then I would indicate that he
22   had significant exposed skin areas that clearly
23   would be -- impacted by the lack of PPE and
24   the lack of adequate warnings to protect your
25   skin.

Page 53

1       Q.   Okay. All right. Let's move next to
2    Mr. Karr. His interview summary sheet is
3    identified for this deposition as Exhibit 42.
4           - - - - -
5    (Thereupon, Petty Deposition Exhibit 42, Mr. Karr's
6    Interview Summary Sheet, was marked for purposes of
7    identification.)
8           - - - - -
9       A.   Thank you.
10      Q.   Did you personally speak with Mr. Karr?
11      A.   I did.
12      Q.   By telephone?
13      A.   I did.
14      Q.   How many times?
15      A.   One time, December 28th of 2018 from
16   5:01 p.m. to 7:37 p.m.
17      Q.   Any e-mail correspondence with Mr. Karr?
18      A.   No.
19      Q.   Any attorneys present for the interview
20   or members of the Weitz & Luxenberg firm?
21      A.   There were two members of the Weitz
22   Luxenberg firm that were on the phone, at least
23   at times: Ms. Greenwald and Ms. Elisse Hall.
24      Q.   Did you note anyone else on the
25   conference call?

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 54

1    A.   I was not aware of anybody else other
2   than myself on the conference call.
3    Q.   Did you have the opportunity to review
4   Mr. Karr's depo transcript and plaintiff fact
5   sheet?
6    A.   I did.
7    Q.   And you received those before or after
8   the interview?
9    A.   After the interview.
10   Q.   Did you determine any information you
11  felt material from reviewing those documents?
12   A.   Again, the -- the dermal information was
13  significantly incomplete as compared to the
14  interview information that I obtained.  It would
15  not be adequate to do a dermal dose -- the
16  deposition testimony would not be adequate to do
17  a dermal dose calculation.
18       The exposure times were -- in terms of
19  times they were maybe slight differences, but
20  they weren't significant.
21   Q.   Did you --
22   A.   I'm sorry.  Go ahead.
23   Q.   Did you have the opportunity to review
24  his discovery responses, interrogatories,
25  requests for production?

Page 55

1    A.   Only to the extent they would be
2   attachments to his deposition.
3    Q.   And did you have access to his Social
4   Security records?
5    A.   I did not.
6    Q.   Did you review any non-plaintiff fact
7   witness transcripts?
8    A.   I don't believe so, no.
9    Q.   Did you have the opportunity to visit
10  any of the locations that he claimed to have used
11  or been exposed to Roundup?
12   A.   I suppose I had the opportunity, but I
13  did not visit -- I mean, there's always the
14  opportunity.  I did not visit the locations where
15  he sprayed Roundup.
16   Q.   What type of formulation of Roundup did
17  Mr. Karr indicate that he used?
18   A.   Okay.  Again, I'm on Exhibit now 42, and
19  I'm moving to page 17, and he says that the
20  product he used was a weed and grass killer
21  concentrate from approximately age 12 to 2016.
22   Q.   You say it was approximately what?
23   A.   He says from approximately age 12 to
24  2016.
25   Q.   From age 12 to 2016?

Page 56

1    A.   He mixed it, yes.
2    Q.   So do we know the year range?
3    A.   Well, it's back in the back under the
4   calculations, yeah.  But you were asking about
5   the product.  He said --
6    Q.   Right.  Roundup.
7    A.   He said he used Roundup Weed and Grass
8   Killer Concentrate.
9    Q.   Okay.
10   A.   Plus, I should say.  I made a mistake
11  there.  It's Roundup Weed and Grass Killer
12  Concentrate Plus.
13   Q.   Okay.  Is that the only product he
14  identified?
15   A.   Looking on page 19, again, he says that
16  he used Roundup Weed and Grass Killer Concentrate
17  Plus.
18   Q.   Okay.
19   A.   Then on page 20, the fourth location, he
20  said that he used two different products, Roundup
21  Weed and Grass Killer Concentrate Plus and
22  ready-to-use Roundup.  He said that the ratio of
23  use at that location was 60 percent of the time
24  he used the Roundup Weed and Grass Killer Plus,
25  and 40 percent of the time he used the Roundup --

Page 57

1   ready-to-use Roundup.
2    Q.   Okay.
3    A.   And then the next location on page 21,
4   he said that he used Roundup -- he used a
5   ready-to-use weed and grass killer Roundup
6   product.
7       Then the sixth location, he said that,
8   on page 22 of this exhibit, he used Roundup
9   Ready-to-Use Poison Ivy Plus Tough Brush Killer.
10  Then at the seventh use location, he said that he
11  used Roundup Weed and Grass Killer Concentrate
12  Plus.  I believe that's it.
13   Q.   Okay.  Did you determine whether
14  Mr. Karr's exposure was occupational,
15  residential, or both?
16   A.   It was primarily -- well, it was both.
17  It was both.
18   Q.   Okay.  And what was his method of
19  application?
20   A.   It depended on -- the best way to get
21  that, and I can read it if you'd like, is on
22  Exhibit 42, his methods of application are listed
23  on pages 24 through -- or 17 through 23 for seven
24  different locations.
25   Q.   Were they the same for each location or

15  (Pages 54 to 57)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 58

1  different?
2      A.  Different.
3      Q.  In each location, he used a different
4  method of application?
5      A.  I don't know that each used a different,
6  but there were different methods used at
7  different locations.
8      Q.  Can you tell me what those are, please.
9      A.  Sure.  At the locations 1 and 2 on page
10  17, he says the concentrate was mixed into either
11  a one or two-and-a-half-gallon backpack sprayer
12  that had a side hand pump with a wand and nozzle,
13  or a one-gallon hand pump sprayer with a wand and
14  nozzle.  And then he said ready-to-use product
15  was dispensed directly from the container,
16  clearly.
17      He said the ratio of method dispensed
18  with the backpack was about, in terms of when he
19  was using concentrate, the ratio of dispensing
20  was 30 percent of the time from the backpack and
21  the handheld was 70 percent of the time.
22      And I'm not sure that I need to not
23  correct my answer on the first two locations.  I
24  think I said he used Roundup Weed and Grass
25  Killer Concentrate Plus, but I see he also said

Page 59

1  he used a ready-to-use Roundup Poison Ivy Plus
2  Tough Brush Killer.
3      Q.  On both of those locations?
4      A.  Yes.
5      Q.  Okay.
6      A.  I think I left off the second one.
7      Now, in terms of the third location on
8  page 19, he said again that he used -- in this
9  case he was always using a concentrate and he was
10  mixing it.  He wasn't using any ready-to-use --
11  or wait a second.  Yeah.
12      And so that was used in a one to
13  two-and-a-half-gallon backpack sprayer with a
14  side hand pump and a wand and nozzle or a
15  one-gallon hand-pumped hand sprayer with a wand
16  and nozzle.  And again, he said that he would use
17  the backpack about 30 percent of the time and the
18  hand pump sprayer about 70 percent of the time.
19      On the -- let me continue to the fourth
20  location on page 20.  Here, he used both a
21  concentrate and a ready-to-use.  And he talks
22  about on the concentrate it was mixed into a
23  one-gallon backpack sprayer with a side hand pump
24  and a wand, or a one-gallon hand pumped hand
25  sprayer with a wazzle -- wand and nozzle.

Page 60

1      The ready-to-use was dispensed directly
2  from the container.  He said he -- with respect
3  to the concentrates, he used the backpack sprayer
4  20 percent of the time and the hand sprayer --
5  hand-pumped sprayer 80 percent of the time.
6      With respect to location 5, Turner's
7  Feed and Seed on page 21 of Exhibit 42, the
8  method dispensed, the ready-to-use product was
9  dispensed directly from the container.  80 to 90
10  percent of the time, he used a ready-to-use
11  product.  Or from a one-gallon hand pumped
12  sprayer where he used a concentrate with a wand
13  and nozzle, and he used that about 10 to 20
14  percent of the time.
15      Location number 6, this was a
16  ready-to-use product and he dispensed it directly
17  from the container.
18      And then location number 7 on page 23 of
19  Exhibit 42, the method dispensed was -- again, it
20  was a concentrate that was mixed into either a
21  one or 2.5-gallon backpack sprayer with a side
22  hand pump with a wand and a nozzle or a
23  one-gallon hand pump hand sprayer with a wand and
24  nozzle.
25      With respect to the concentrates, he

Page 61

1  used the backpack sprayer 70 percent of the time
2  and the hand pumped sprayer 30 percent of the
3  time.  And that's -- that's what I got.
4      Q.  Okay.  Did you take into account
5  exposures to other pesticides, insecticides,
6  and/or chemicals?
7      A.  Yes.  I would ask him -- I went through
8  his entire job history and I would ask him what
9  products he used at the various locations, and I
10  also asked him about his home history.
11      So, for example, in Exhibit 42, if you
12  go to page 2, location 1, where he's sort of
13  self-employed, but he's working on his -- his
14  grandfather's farm and other people's properties,
15  and he used Roundup, but he also said that he
16  used gasoline and oil for equipment, and then he
17  said that he used Sevin Dust for gardens.
18      Q.  Okay.
19      A.  And then location 2, I asked him again.
20  Aside from Roundup, he said he used gasoline and
21  oil for the equipment.  Same with location 3.
22      Location 4, where he's working as a
23  handyman and a landscaper, on page 5 of Exhibit
24  42, he says he used gas and oil for equipment,
25  diesel, again, for equipment, fertilizer, mostly

16  (Pages 58 to 61)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 62

1  granular from Scotts Miracle-Gro, and then he
2  used Sevin Dust from Ortho as well as Roundup.
3      Location 5, gasoline and oil for a weed
4  eater, along with Roundup.
5      Location 6, he used motor oil and he
6  used a Safety-Kleen parts washer along with
7  gasoline.
8      Location 7, he wasn't aware of any other
9  chemical exposures at that location, other than
10  the -- and then same with location 8, location 9,
11  location 10, he didn't recall any chemical
12  exposures.  Location 11, no chemical exposures.
13  Location 12 when he was at the -- worked at the
14  Douglas County Sheriff's Department, other than
15  pepper spray about one time a month, he said he
16  wasn't aware of any chemical exposures.
17      Then we go to location 13, and he
18  describes exposures to gas and oil, greases,
19  parts washer solvent, mineral spirits, paints,
20  mostly Rust-Oleum, carb and choke cleaner, and
21  Roundup.
22      And then location 14, no recalled
23  chemical exposures.  Locations 15, gasoline and
24  oil for equipment, and Roundup.
25      So yes, I went through and asked him

Page 63

1  about chemical exposures at lots of work
2  locations and I tried to describe those here.
3      Q.  Okay.  Very good.  Did you take into
4  account family history and prior health?
5      A.  To the extent that I wanted to know what
6  form of cancer he had and when he was diagnosed
7  with it, yes.  Beyond that, no.
8      Q.  Okay.  And he just told you the general
9  form of cancer.  Did he tell you the subtype of
10  non-Hodgkin's lymphoma he was diagnosed with?
11      A.  He did not tell me that.
12      Q.  Did you consider other risk factors?
13      A.  Sure.
14      Q.  What would those have been?
15      A.  Again, I asked him if he served in the
16  service and he did not, so there weren't -- then
17  ███████████████████████████████████
   ███████████████████████████████████
   ███████████████████████████████████
   ███
22      And then of course I asked him through
23  all these multitude of jobs that he had, I asked
24  him about his exposures to chemicals including
25  Roundup that we just went through --

Page 64

1      Q.  Okay.
2      A.  -- throughout his -- both his job
3  history as well as his at-home history.
4      Q.  Did you have the opportunity to inspect
5  any of the containers or sprayers that he claimed
6  to have used?
7      A.  I did not visit his site, so I did
8  not -- I have not seen the containers that he
9  used.
10      Q.  Okay.  Did you make any attempt to
11  corroborate any of the statements Mr. Karr made
12  about his Roundup use with other individuals?
13      A.  Not with other individuals, but I
14  certainly during the interview did numbers of
15  sanity checks on the information he was providing
16  to me.
17      Q.  Okay.  So let's turn to Exhibit 13 of
18  this deposition.  I think Mr. Karr's table begins
19  on page 12.  I think you have a typo there,
20  because you have him as Mr. Kerr, but I think
21  we're talking about the same person.
22      A.  Yeah, you're correct.  It should be
23  K-A-R-R.
24      Q.  You've split his information or the
25  information he provided to you in several

Page 65

1  different blocks.  How did you come to create
2  this chart in this manner?  Better question is
3  why did you split them the way you split them up?
4      A.  Well, that's -- that's how the pesticide
5  usage history of Roundup was described, whether
6  it be -- I'll call it residential or
7  self-employed versus externally employed, that
8  was -- he's simply had different recollections of
9  the way and the times that he used Roundup
10  products with time.  So it just reflects those
11  different blocks of times and locations.
12      Q.  Okay.  I was just somewhat confused.  If
13  you look on page 13, the first block there says
14  '94, '95 to 2016.  Do you see where I'm at?  It
15  says 16 plus?
16      A.  Yes.
17      Q.  And then it says Roundup usage, and if
18  I'm reading that correctly, it says four years.
19      A.  Yes.
20      Q.  Which four years over that --
21      A.  That's what he's saying.
22      Q.  -- period of '94 to 2016?
23      A.  He didn't do it all the time, yes.
24      Q.  Okay.  All right.  And then the next
25  block says John Bleakley Farm.

17 (Pages 62 to 65)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 66

1    A.   Correct.
2    Q.   I guess that's in the same time frame,
3  and he used Roundup for three months at that farm
4  in that same time frame?
5    A.   Correct.
6    Q.   Okay.  Got it now.
7    A.   Correct.  He wanted to distinguish
8  between the two situations.
9    Q.   Understood.  The same true for Turner's
10  Feed and Seed, he used it for one season within
11  the '95-'96 to 2016 time period?
12    A.   Correct.
13    Q.   And on page 14, you have a section that
14  says years, DBCI.  What is that?
15    A.   That's a work location.  It's on page 14
16  of Exhibit 42.  It's an acronym for Doors &
17  Building Components, Inc.
18    Q.   Okay.  And under Roundup usage, it says
19  not applicable.  But he used it for five months?
20    A.   No, no, no, that's not what that's
21  saying.  That's just the length of the season.
22    Q.   Okay.  I'm just -- I'm confused.  Can
23  you tell me what this block means?
24    A.   What this block means is that he
25  recalled one spraying event.  So I always asked

Page 67

1  them, if it's a seasonal situation, what months
2  they spray, because they don't necessarily spray
3  all months of the year.  So this is just simply
4  out of complete -- again, I'm doing these blocks.
5      When I say N/A, it's not -- I'm not
6  going to then include a whole season where he
7  sprayed, because he only had one time --
8    Q.   It's one event.
9    A.   One event.  So I'm just saying, well, it
10  isn't a whole season.  There aren't any seasons.
11  That's all I'm saying.
12    Q.   Got it.  Okay.  Now I understand.  So
13  this adds to my misunderstanding of this section.
14  So he had one event and during the one event, 25
15  percent of his hands was covered, because that
16  would be 100 percent of the time, his face would
17  have 10 percent, one total, I guess it was one
18  event?
19    A.   Yeah.
20    Q.   And then his feet had 50 to 60 percent
21  and it was five to ten times, but there was only
22  one event.
23    A.   Let me see that.  That's -- looking at
24  the interview, and I'm on page 25 of Exhibit 42,
25  that's simply a mistake.  There's no dermal

Page 68

1  exposure for that single event.  That's what it
2  says in here.
3    Q.   Okay.
4    A.   So that's just a mistake on my part.
5    Q.   And so the dermal exposures and the
6  post-dermal times, how does that affect your
7  calculations in the value section?
8    A.   Well, the times of exposure are
9  different than the -- that would affect it by a
10  half hour for the event.
11    Q.   Because you put in -- where you add the
12  value of two to five years is in the
13  post-application time/event, right?
14    A.   Right.  For the -- for the events of
15  spraying, it would change those totals by -- out
16  of say 3,470, it would be 3,469.5, okay?  For
17  the -- or not -- for the time, I'm sorry, I'm
18  incorrect.
19      For the event times of spraying, we have
20  a post-dermal of two to five hours for one event.
21  So that would change the post-dermal time by two
22  to five hours.  So the four -- the
23  post-application time of 2,656 to 28,000 would
24  change by two to five hours.
25    Q.   So really, the dose should have been

Page 69

1  zero; it shouldn't have changed at all?
2    A.   I'm saying in the last one event --
3    Q.   Right.
4    A.   -- there shouldn't have been two to five
5  hours out of the 2,000 to 28,000.
6    Q.   Right.  So I'm just looking at where --
7    A.   I mean, it's a minimal change.
8    Q.   -- where you have events spraying, and
9  it has 1,328.
10    A.   Right.
11    Q.   And then the high of 5,611, and then --
12    A.   Well, those are still spraying events.
13    Q.   Okay.
14    A.   So, I mean, that's still an event, but
15  even if you wanted to take it off as a dermal
16  event, it would change it from 3,470 to 3,469.
17  It's one event out of several thousand.
18    Q.   Understood.
19    A.   But it's still a spraying event, so it
20  doesn't really get subtracted out there.
21    Q.   And then the next line there,
22  post-application time event, like, how do you
23  get -- let's just use the first column.
24      How do you get from 1,328 to
25  post-application time of 2,656?  You multiply it

18  (Pages 66 to 69)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 70

1  by the post-application time event, right?
2  **A.   Yes.  Two to five hours, correct.**
3  Q.   But for this, because there's no dermal,
4  it should have been not multiplied; it should be
5  zero.
6  **A.   No, because you have all the other**
7  **activities -- you have all the other activities**
8  **listed above.  This -- this two to five, what I'm**
9  **saying is -- no, not at all.  If you -- if you**
10  **wanted to make that correction for**
11  **post-application dermal time, you would take the**
12  **number of events and reduce them by one --**
13  Q.   Understood.
14  **A.   -- and then multiply by the two to five**
15  **hours.  It would be a trivial change, but it**
16  **would drop it two to five hours.**
17  Q.   I understand.  Because you used the two
18  to five hours because that's what he said for
19  everything throughout.
20  **A.   For all the events.**
21  Q.   Okay.
22  **A.   I mean, it does technically change it,**
23  **but it's trivial.**
24  Q.   Okay.  And what's your conclusion
25  regarding Mr. Karr's exposure?

Page 71

1  **A.   Again, going to Exhibit 13, in terms of**
2  **events, I have Mr. Karr being exposed to**
3  **thousands of exposure events and thousands of**
4  **exposure hours to Roundup with significant dermal**
5  **skin exposure that would have been reduced if he**
6  **would have been told to wear PPE to cover those**
7  **skin areas where he had exposure, or given**
8  **warnings that he should have used PPE to cover**
9  **those skin areas.**
10  MR. UPSHAW:  Okay.  All right.  Let's
11  take a quick break and we'll finish up with the
12  rest of the plaintiffs.
13  THE VIDEOGRAPHER:  Off the record,
14  10:35, end of disk 1.
15  (Recess taken.)
16  THE VIDEOGRAPHER:  We are back on the
17  record.  Disk 2, 10:46.
18  BY MR. UPSHAW:
19  Q.   Okay.  Mr. Petty, let's move on to the
20  next plaintiff.  That would be Robert Miller.  We
21  have his interview summary sheet identified as
22  Exhibit 43 for this deposition.
23  - - - - -
24  (Thereupon, Petty Deposition Exhibit 43, Mr.
25  Miller's Interview Summary Sheet, was marked for

Page 72

1  purposes of identification.)
2  - - - - -
3  Q.   Did you personally speak with
4  Mr. Miller?
5  **A.   I did.**
6  Q.   Okay.  Did you speak to him by phone or
7  FaceTime?
8  **A.   Phone.**
9  Q.   How many times, sir?
10  **A.   One time, December 27, 2018, from**
11  **11 a.m. to 1:30 p.m.**
12  Q.   Any e-mail correspondence with
13  Mr. Miller?
14  **A.   No.**
15  Q.   Were any members of the Weitz Luxenberg
16  firm present during the interview?
17  **A.   Yes.**
18  Q.   How many and who?
19  **A.   It looks to be four:  Ms. Cheryle**
20  **Miller, Mr. Jerry Kristal, Mr. Josh Kristal, and**
21  **Ms. Elisse Hall, all from Weitz Luxenberg.**
22  Q.   Okay.  Were you aware of any other
23  individuals on the call?
24  **A.   I was not aware of -- other than myself,**
25  **I was not aware of anybody else on the call.**

Page 73

1  Q.   Did you have the opportunity and read
2  the depo transcript and plaintiff fact sheet of
3  Mr. Miller?
4  **A.   Yes, but after I had done the interview.**
5  Q.   Did you, in your review of those
6  documents, find anything material to add to your
7  discussion of Mr. Miller today?
8  **A.   Add to the discussion.  Just that the --**
9  **as is typical, the questions asked didn't really**
10  **cover the dermal area from the standpoint of**
11  **doing a dermal dose analysis.  As I've said**
12  **before, that's not unusual.  I've never seen it**
13  **done in dozens of depositions.**
14  **And -- but -- so the dermal -- there**
15  **wasn't -- it wasn't that there weren't any dermal**
16  **questions asked, but they weren't -- in no sense**
17  **were they complete like what you see here.  So I**
18  **really -- there was no basis for me to want to**
19  **change anything from that standpoint.**
20  **With respect to times, there's some**
21  **nuances or differences in time, but like I said**
22  **before, if I was going to do a full-up dose**
23  **analysis, I would probably rely more on Social**
24  **Security records and -- and employment personnel**
25  **file records.  That would be traditionally how**

19  (Pages 70 to 73)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 74

1  you would dial in times if they were
2  employer-based occupational exposure.
3      So I had no basis based on the
4  deposition to really adjust my times either, for
5  reasons that there weren't many differences, but
6  I would also, if I was going to do a full-up
7  dose, I would have -- I wasn't asked to do that,
8  but I would be drawing on that and additional
9  information as well.
10     Q.   Did you review any of Mr. Miller's
11  discovery responses, that is, interrogatories or
12  requests for production?
13     A.   To the extent that they were included as
14  attachments to his deposition or listed in my
15  listing of reliance materials, I would have.
16  Otherwise, I would not have.
17     Q.   All right.  Did you review any
18  non-plaintiff fact witness transcripts?
19     A.   Not to my recollection.
20     Q.   Did you visit the locations or --
21  location or locations Mr. Miller claims to have
22  used or been exposed to Roundup?
23     A.   Well, I've been to -- okay.  I've been
24  to all these locations, Cocoa Beach and Cape
25  Canaveral, but I have not been to the specific

Page 75

1  locations, to my knowledge, where he used
2  products.
3      Q.   When you say you've been to Cocoa Beach
4  and Cape Canaveral, have you been to the Palm and
5  Magnolia Golf Course?
6      A.   I don't think I've golfed there, no.
7      Q.   The Bonnet Golf Course?
8      A.   Bonnet.  No, I have not been to either
9  one of those golf courses.
10     Q.   Did Mr. Miller indicate the type or
11  formulation of Roundup that he used?
12     A.   Again, I'm going to rely on his
13  interview notes, Exhibit 43, and let me get to
14  the right page.  Again, I'm going to start on
15  page 14 of Exhibit 43.  And the first pesticide
16  use location, which was at the Palm and Magnolia
17  Golf Course in Disney World, he said he used --
18  I'm just hesitating because I think I have golfed
19  on that golf course like 4th of July weekend, but
20  that was well after he used the products there.
21      He said that he used at that location
22  Roundup Pro Concentrate.  At the Bonnet Golf
23  Course, he said that he also used Roundup Pro
24  Concentrate that was mixed.
25      And then at home, at his first home, he

Page 76

1  said that he used Roundup Pro Concentrate that
2  was then mixed with water.
3      And his second home, he said he used
4  Roundup Pro Concentrate again, mixing it with
5  water.  And then the third home location -- or
6  locations, I guess I should say, was the Roundup
7  Pro concentrate again was used diluted with
8  water.  And that -- I was taking those
9  descriptions from pages 14 through 18 of Exhibit
10  43.
11     Q.   Okay.  Was it your conclusion from your
12  interview that Mr. Miller used Roundup both
13  occupationally and residentially?
14     A.   Correct.
15     Q.   What was his method of application?
16  Methods.
17     A.   And again, I'm going to go to pages 14
18  through 18 of Exhibit 43.  Specifically describes
19  using Roundup Pro Concentrate mixed in his third
20  and fifth jobs there at the Palm and Magnolia
21  Golf Course.  And he said that the product was
22  mixed into a approximately 40 to 60-gallon tank
23  that was put on Cushman vehicles or carts that
24  had a pump and spray booms, and his -- his
25  exposure mainly in this situation was from

Page 77

1  repairing the pumps and the spray booms, not
2  actually spraying.
3      In the second work location at the
4  Bonnet Golf Course, the product was mixed in
5  varying size tanks that were installed on Toro
6  vehicles or golf carts -- I shouldn't say golf
7  carts, just carts, and they ranged in size -- he
8  said that the tanks ranged -- there were tanks at
9  approximately 130 gallons, 175 gallons, 200
10  gallons, and 300 gallons, and the product was
11  delivered via pump and spray booms.  But again,
12  his exposure wasn't from spraying, but from
13  repairing the pumps and the spray booms.
14      Then the first residential location that
15  I've described on page 16 of Exhibit 43 says that
16  he made a mixture in one or two-gallon sprayers
17  that were hand-pumped with a wand and a nozzle.
18  And he said that they would last anywhere from
19  six to eight months before they wore out and then
20  he would buy another one, and -- or at times, he
21  would also buy parts and repair them.  So this
22  was a hand-pumped sprayer with a wand and a
23  nozzle.
24     Q.   Okay.
25     A.   The second residential location, same --

20  (Pages 74 to 77)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 78

1    same description of the types of sprayers that he
2    used as before.  They were one or two-gallon
3    sprayers that were hand pumped with a wand and a
4    nozzle and that he would either -- when they
5    broke, he would either fix them or buy a new one.
6         The fifth -- the third home location,
7    which was really two homes, apparently his
8    sister's home and then a home next door that he
9    was building when he lived with his sister along
10   with living there later on.  And he said that he
11   made the mixture in a 15-gallon tank,
12   approximately 15-gallon tank that was mounted on
13   an electric cart and there was an electric motor
14   hose, wand, and nozzle that he used to apply that
15   product.
16   Q.   Okay.  Did you take into account other
17   exposures to pesticides, insecticides, or
18   chemicals?
19   A.   I did.  In context with going through
20   his both work and home histories, I would ask him
21   what products, chemical products he was exposed
22   to.  That begins on page 2 of Exhibit 43.
23   The first two work locations, he doesn't
24   recall any other chemical exposures.  And the
25   third location, he worked with Safety-Kleen parts

Page 79

1    washer, and so he had some exposure to the parts
2    washer solvent, and then he also felt he had --
3    he worked on transmissions or was around
4    transmissions, and he also said he was exposed to
5    transmission fluid.
6         Fourth location, he has similar other
7    chemical exposures to the Safety-Kleen parts
8    washer solvent as well as transmission fluid.
9         The fifth work location was an AAMCO
10   transmission location and he said that he had --
11   that AAMCO had their own parts washer and he was
12   exposed to that parts washer solvent, and also
13   was exposed to transmission fluid.
14        Sixth location he said the things he was
15   exposed to again were Safety-Kleen parts washer
16   solvent as well as transmission fluid.
17        Sounds repetitive, I know.
18   Q.   It's okay.
19   A.   Location 7, again, he said that the
20   chemical exposures were Safety-Kleen parts washer
21   solvent as well as transmission fluid, at the
22   first job at that location.  Then he had a second
23   job at that location and he was also exposed to
24   motor oil and hydraulic fluid, he said.
25        And then he had a third -- well, this is

Page 80

1    where he had lots of jobs, so.
2    Q.   Right.
3    A.   So I'll just say for job 7, I'll try to
4    cover all the other materials other than Roundup.
5    Motor oil, hydraulic fluid again.  Fourth job, he
6    didn't recall any chemical exposure.  The
7    fifth -- the fifth sub-job at location 7 was
8    motor oil, Safety-Kleen parts washer solvent,
9    hydraulic fluid, and Monsanto Roundup.
10        Sixth location, he had some exposure to
11   grease and lubricants, but other than that, he
12   didn't recall any chemical exposures.
13        The seventh job at location 7, he had
14   some exposure to Safety-Kleen part washer
15   solvent, motor oil, hydraulic fluid, and Monsanto
16   Roundup, and then that's it.
17   Q.   Okay.
18   A.   So that -- those were the other
19   chemicals that he described to me in all his
20   other jobs with time.
21   Q.   All right.  Did you take into account
22   family history and prior health?
23   A.   To the extent that I wanted to know when
24   he was -- approximately when he was diagnosed
25   with cancer and what form of cancer that was,

Page 81

1    yes.  Beyond that, no.
2    Q.   And did he identify the subtype of
3    non-Hodgkin's lymphoma that he was diagnosed
4    with?
5    A.   I don't recall had him doing that, no.
6    Q.   Did you consider other risk factors?
7    A.   From an industrial hygiene standpoint,
8    yes.  I looked at his service in the military,
9    which he did serve in the military, but by all
10   accounts, didn't really have any exposure there.
11        I asked him about -- I remember asking
12   him about basic or something.  Don't they go
13   through and make you run through the -- with a
14   mask on through that chemical and make you take
15   it off once, you know, as part of your basic
16   training?  And he says, well, yeah, that one time
17   or something like that.
18   ████████████████████████████████████████
19   ████████████████████████████████████████████
20   ████████████████████████████████████████████
21   ████████████████████████████████████████████
22   ████████████████████████████████
23        Then I went through, in terms -- from an
24   industrial hygiene standpoint, I asked him about
25   his other exposures at all the work locations

21  (Pages 78 to 81)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 82

1  that we just covered.
2     Q.  You also asked Mr. Miller about his
3  education?
4     A.  I did.
5     Q.  Why do you do that?
6     A.  It's just been a series -- it's part of
7  the initial background questions. I want to know
8  from a standpoint of warnings and training, what
9  sorts of training he may have had -- does he have
10 any specific background in industrial hygiene
11 warnings, safety, things like that. And
12 sometimes they do, sometimes they don't.
13    Q.  Okay. Did you have -- did you inspect
14 the -- any of the actual product containers that
15 he said he used?
16    A.  I did not.
17    Q.  Did you attempt to corroborate any of
18 the statements Mr. Miller made about his use of
19 Roundup with any other individuals like coworkers
20 or employers?
21    A.  Not with other individuals or employers,
22 no.
23    Q.  Okay. All right. Let's turn to Exhibit
24 13 of this deposition, and in that exhibit, flip
25 to page 14 for table 11, which seems to indicate

Page 83

1  those are Mr. Millers exposures; is that correct?
2     A.  Well, the input data -- yeah, the input
3  data associated with me determining numbers of
4  events and numbers of hours along with just
5  pulling out the dermal skin, I've not done a dose
6  or anything there in terms of exposure, but I've
7  certainly shown -- summarized, if you will, the
8  portions of skin that were impacted by, in this
9  case, Roundup.
10    Q.  Okay. So for Mr. Miller, you indicated
11 that -- or you've told us that during his
12 interview, he said that he was not an applicator
13 of Roundup?
14    A.  Well, no, I said that during certain job
15 functions. But he also used it residentially,
16 so --
17    Q.  I should have clarified that question.
18 Mr. Miller indicated that he did not apply
19 Roundup at his workplace?
20    A.  That's what I understand. That's right.
21 He was doing maintenance work on the equipment.
22    Q.  Right. He was -- okay. So with regard
23 to the blocks that you refer to his work
24 exposure, these are exposures that he told you
25 during the interview occurred when he was

Page 84

1  maintaining the vehicles, which contained tanks
2  which dispensed Roundup?
3     A.  No, I think specifically what I said was
4  that his was primarily associated with the
5  maintenance on the pumps that pumped the Roundup
6  out to the spray bars and the spray bars
7  themselves, the nozzles on the spray bars.
8  That's where he was talking about his Roundup
9  exposure. I think if you go back and look at the
10 interviews, that's what he said.
11    Q.  All right. So walk us through the first
12 block here. He says years worked, Palm and
13 Magnolia Golf Course, and the first entry you
14 have for Roundup usage is 6.5 seasons?
15    A.  Correct. Meaning that it's not full --
16 it's not 12 months out of the year.
17    Q.  Okay. And then a season, which you've
18 identified as March 1st to October 1st --
19    A.  Well, I didn't identify it, he
20 identified it.
21    Q.  He identified, okay, correct. And
22 that's seven months out of the year?
23    A.  Correct. So a season consists of seven
24 months.
25    Q.  And then --

Page 85

1     A.  If I would have put -- just to
2  clarify -- if I would have put instead of the
3  word seasons, years, then I would have defined
4  -- you know, it could be that -- if it were an
5  occupational exposure where it wasn't seasonally
6  adjusted work, then you normally would just have
7  years and then you adjust the months per year and
8  the weeks per month that he worked.
9        But here, it's seasonal work, so I'm
10 simply identifying the fact that it's not full
11 year -- he's not doing this year-round.
12    Q.  Okay. And then weeks per month, so
13 that's weeks per month, and you told us you just
14 calculated -- right?
15    A.  Yeah. It's off to the right there, 52
16 by 12.
17    Q.  Right.
18    A.  It's just a constant.
19    Q.  All right. Now, the next line is events
20 per week during season, you have a low of a half
21 of an event and a high of three.
22    A.  Right. So a half is he would say -- if
23 you look at the thing -- he will say on the low
24 end of the range, it will be once every two
25 weeks. So mathematically, you have to show one

22  (Pages 82 to 85)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 86

1    per two weeks is 1 by 2 or 0.5.
2    Q.  Okay.
3    A.  You like that 0.5, don't you?
4    Q.  It's interesting how you have a half of
5    an event.
6        And that would be three events per week?
7    A.  Yes.
8    Q.  Okay.  And you count an event as what?
9    A.  When he was doing the repairs on these
10   carts that either it was a repair event
11   associated with a pump, nozzles, or both.
12   Q.  So just when he was doing a repair or a
13   repair where he claimed he was exposed to
14   Roundup?
15   A.  Where he was exposed.  I'm sorry, this
16   is all associated with his exposure to Roundup.
17   Q.  Okay.  So at a high, three times a week,
18   when working --
19   A.  And then to clarify, I mean, recall in
20   there that I describe all sorts of other
21   chemicals and other things he was doing repairs
22   on.
23   Q.  Sure.
24   A.  So yeah, this is just associated with
25   the Roundup.

Page 87

1    Q.  Right.  I'm just trying to clarify for
2    when I look at this chart again.  So at the Palm
3    and Magnolia Golf Course, for example, on the
4    high end, he -- we don't know how many times he
5    actually worked on the pumps on the tanks -- I'm
6    sorry, that he worked on the pumps on the
7    vehicles that had tanks where Roundup was
8    sprayed, but we know that at least three times a
9    week, when he was working on the pumps on the
10   vehicles that had the tanks that sprayed Roundup,
11   he would be exposed.
12       MS. GREENWALD:  Objection.  Form.
13   A.  Well, the exposure isn't simply when he
14   works on the pumps.  I'm not trying to be anal.
15   It's times when he worked on the pumps, the
16   nozzles, the spray bars and he would have had
17   exposure.  He's lumping that maintenance activity
18   associated with those systems.
19   Q.  Did he tell you during his interview
20   that he worked on spray bars?
21   A.  He worked -- I'm pretty sure.  Let me
22   check.
23   Q.  Okay.
24   A.  Exposure -- I'm going to page 15, I'm
25   just picking one that just flipped open.

Page 88

1    Exposures occurred mainly when repairing the
2    pumps and the spray booms.
3    Q.  Okay.
4    A.  I just -- your question --
5    Q.  No, I'm just trying to be specific.
6    A.  -- was limited to pumps, and I don't
7    want to have it limited to just pumps.
8    Q.  Okay.  All right.  So when he's working
9    at the Palm and Magnolia Golf Course, at a high
10   of three times a week during that -- during those
11   seasons, he would be exposed to Roundup remaining
12   in the spray bar and/or the pump?
13   A.  Spray boom.
14   Q.  Spray boom, I'm sorry.
15   A.  Or the pumps, yes.
16   Q.  Or the pump.
17   A.  Mainly.
18   Q.  And during that exposure, moving over to
19   the dermal data --
20   A.  Okay.
21   Q.  -- 75 percent of the times, using the
22   high of the three times, he would have exposure
23   to three-quarters, if not all, of his both hands;
24   is that a correct reading?
25   A.  Well, in the cases of all the range of

Page 89

1    events, he said that his best recollection is
2    that he would be doing these maintenance
3    activities where Roundup was the product involved
4    between one time every two weeks and three times
5    a week.
6        So he's saying during that range of
7    events, specifically, the skin on my hand area,
8    75 to 100 percent, somewhere in that range, my
9    hands would get wetted with the mixed Roundup
10   product 75 percent of the time.
11   Q.  Okay.  So let's use chest, for example,
12   here.  So in the every two -- once every two
13   weeks to three times a week, Mr. Miller's chest,
14   10 percent of his chest area would be exposed 10
15   percent of the time?
16   A.  Or one time out of 10, 10 percent of his
17   chest area was exposed.  That's what he said,
18   yes.
19   Q.  And for this information, because you're
20   not doing a full dose assessment, these
21   percentages really didn't come into play with
22   regard to your overall opinion with regard to
23   Mr. Miller's exposure, right?
24       MS. GREENWALD:  Objection.  Form.
25   A.  Well, no.  I mean, I would -- it's clear

23  (Pages 86 to 89)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 90

1  relative to the -- for example, the other
2  plaintiffs that we've talked about that he's --
3  he's one of the few, if only, where he describes
4  having chest exposure.  And I think that's
5  because he's doing maintenance activity.
6      Q.   Yeah, I was just using that as an
7  example.  We can use hands or wrists.
8      A.   But I certainly would have the opinion
9  that he has significant exposed skin area because
10  there's not PPE that's keeping that material from
11  reaching his skin.
12     Q.   Okay.  Be that as it may, and I
13  understand your general --
14     A.   I mean, I'm not doing a milligrams dose,
15  but I would still certainly -- I would certainly
16  have the opinion there's very significant
17  exposure to his skin.
18     Q.   And to get to that opinion, what I'm
19  getting at, Mr. Petty, is to get to that opinion,
20  you don't have to take into account any
21  variations between 75 and 100 percent of skin
22  area or that for each -- for the number of
23  events, a certain part of the body was only
24  exposed 20 to 25 percent of the time?
25     A.   No, that's absolutely incorrect.  I

Page 91

1  haven't done that analysis --
2      Q.   Right.
3      A.   -- but you're not seeing my dermal
4  analysis, and I understand that.  But I also run
5  what we call a Monte Carlo analysis, and a Monte
6  Carlo analysis, instead of -- you're just using a
7  midpoint and calculating an absolute number.
8  Like -- let's make something really simple.
9  Let's say that the flux is 1 and he's got five
10  hours, and the skin area is 5.  We don't even
11  care about the units.  So that exposure would be
12  1 times 5 times 5 is 25, whatever the units are,
13  and whatever the situation is.  And I use the
14  midpoint values.
15         Well, the other thing that I do in Excel
16  is there's an add-on called -- by Decisioneering
17  called Crystal Ball.  I've used it for 20 years.
18  And where I have a range of values, I can --
19  instead of just putting in the cell the value 1
20  or 5, if the 5 is actually 3 to 10 or whatever it
21  is, I don't know what it would be, but I can put
22  in 3 to 10, and I can give it a distribution,
23  typically normal, and then I can do that for all
24  the other parameters.
25         So that I get all these distributions

Page 92

1  for the input side, and then I get an output
2  distribution, because I'll run the model 100,000
3  times or a million times.  And then I'll get a 95
4  percent confidence interval of -- I'll have the
5  midpoint value, but I'll also have a 95 percent
6  confidence interval on what that output would be.
7  Two and a half to 97.5 percent will be the 95
8  percent confidence interval.
9          So when I actually run these dermal
10  models, I don't just simply -- I take into
11  account not only the midpoint values, but I take
12  into account the variability of the data so that
13  I've accounted for statistically that
14  variability.
15     Q.   Right.  And all I'm saying is --
16     A.   And so if I had done that, that would
17  have been done.
18     Q.   Right.  I'm not questioning that.  All
19  I'm saying is there are other variables that you
20  would also take into account if you were doing a
21  Monte Carlo assessment or your other assessment,
22  and that is the differences in percentages of
23  area and percentage of time for different -- for
24  different areas, skin areas?
25     A.   Oh, of course.

Page 93

1      Q.   Right.  That's all I was trying to get
2  to.  All I'm trying to figure out is or ask you
3  about is that there's variability that you have
4  listed here that we're not really, you know,
5  using full advantage of for us to provide the
6  opinions that you're providing us today because
7  you could have done more calculations.
8      A.   Not necessarily.  I mean, I wouldn't
9  have done more calculations on this data by
10  itself, because I have no problem with the fact
11  this is what the interview is and this is what
12  the data show, and there's no doubt that it shows
13  significant numbers of events and significant
14  numbers of exposures, times, and significant
15  amounts of skin exposure area.
16         But if I'm going all the way to dose,
17  and you haven't had the benefit of seeing one of
18  those, you're going to see hundreds of pages of
19  analysis of Social Security records, employment
20  records, coworker testimony, other testimony, et
21  cetera, as well as the interview.
22         Now, none of that will probably produce
23  the dermal data that I have, but it may produce
24  some corrections to some of the timing, because I
25  generally believe that the employer records or

24  (Pages 90 to 93)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 94

1  the Social Security records are probably about
2  the best indicator of when somebody, at least
3  from an occupational exposure, of where they were
4  someplace.
5      Q.   Okay.  So does exposure happen every
6  time you -- or every time one of these plaintiffs
7  sprays or mixes Roundup?
8      A.   Exposure does, because by definition
9  exposure is the presence of a material near your
10  body.
11     Q.   Okay.  So does exposure happen -- so
12  does there have to be some dermal event to have
13  exposure?
14     A.   Well, now you're -- from an industrial
15  hygiene standpoint, exposure can occur one of
16  four ways:  Inhalation, breathe it; ingestion,
17  eat or drink it; dermal, get it on your skin;
18  injection.  Most people don't inject chemicals,
19  but -- so the two that we pay the most attention
20  to from an industrial hygiene standpoint are
21  ingestion -- or not ingestion -- inhalation and
22  dermal.
23        So when you say, well -- so my answer to
24  your question is, even if there wasn't -- say in
25  that one instance where I had the data wrong, but

Page 95

1  he said there was no dermal exposure, it doesn't
2  mean there wasn't inhalation exposure.  Because
3  remember, early, early on in my deposition, I
4  pointed out that while it doesn't evaporate,
5  Roundup doesn't evaporate very much, the sprayers
6  produce very fine small particles and they stay
7  in the air -- they stay in the air a long time,
8  like minutes.  So that exposure is still there on
9  the inhalation side.
10        So you've got two components to look at,
11  both dermal and inhalation.
12     Q.   Okay.
13     A.   And you were focusing on the dermal.  I
14  just wanted to clarify that when you talk about
15  exposure, it's all the pathways that you have to
16  consider.
17     Q.   All right.  So every time someone uses
18  an application device, a sprayer or whatever that
19  might be or they're mixing, that would be
20  considered an exposure?
21     A.   Well, if you put them in a moon suit,
22  no.  I mean -- I mean, it depends on the PPE.
23     Q.   Okay.  So it depends on the PPE.
24     A.   I mean, if you had applied it in a way
25  that there wasn't dermal exposure or there was

Page 96

1  PPE to protect the areas where there could be
2  dermal exposure, and you had adequate respiratory
3  protection, you could get to a scenario where you
4  have very limited exposure.
5      Q.   Well, if you had the appropriate PPE,
6  you wouldn't have any exposure.
7      A.   That's not true.
8      Q.   Okay.
9      A.   The PPE doesn't stop 100 percent of
10  stuff.  Like, for example, a respirator -- a
11  half-face respirator, is only good to certain
12  concentrations and then you need a full-face
13  respirator.  So there are -- there are
14  fit-factors, if you will, that determine the
15  effectiveness of certain types of equipment.
16        That's why when I say you go to level A
17  or a moon suit, we call them moon suits, that's
18  about as protected as you can be, but that's not
19  practical in the real world too often.
20     Q.   Right.
21     A.   So even with the PPE, it depends on the
22  PPE and the effectiveness of that PPE.  I mean,
23  there's -- I -- I testify all the time on gloves
24  and, you know, somebody will say, well, they wear
25  gloves.  Well, I say, if they're cotton or

Page 97

1  leather, that's not PPE, that's not very
2  protective.
3        Even if they're latex, it turns out,
4  latex is actually worse than not wearing gloves,
5  it turns out, based on University of Michigan
6  studies.
7      Q.   Okay.
8      A.   Because the chemicals preferentially
9  penetrate -- I did my initial research of
10  Battelle on membranes, how fast stuff moves
11  through materials.  Did a lot of research on --
12     Q.   We're well beyond my point, my question.
13     A.   No, no, no.  But we're talking about
14  PPE, not just --
15     Q.   No, we're not talking about PPE.  I was
16  asking you specific questions --
17     A.   Not exposure.
18     Q.   -- about exposure.  So let me get back
19  to my exposure questions rather than tell me
20  about your research at Battelle, okay?
21     A.   Okay.  You're not going to let me
22  finish, but that's fine.
23     Q.   No, because I want to -- I want to get
24  through some specific questions, and I understand
25  your response.  So it's not that you didn't get

25  (Pages 94 to 97)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 98

1    your point across. You were about to -- you were
2    about to elaborate on your point.
3        Let me ask you this --
4        MS. GREENWALD: I'd rather you not
5    mischaracterize. He was trying to answer your
6    question, but if you're not going to let him
7    answer, go ahead and go to your next question.
8        MR. UPSHAW: Fine.
9        MS. GREENWALD: But I object to the
10   mischaracterization.
11       MR. UPSHAW: Okay. Objection noted.
12   Q.   Does exposure equal when the skin is
13   wetted or just the use of Roundup when we're
14   talking about Roundup and these plaintiffs?
15   **A.   It depends on the pathway.**
16   Q.   Well, I'm talking about these
17   plaintiffs. So did we look at any other pathway
18   other than dermal for these plaintiffs?
19   **A.   Well, yeah. There's inhalation pathway.**
20   Q.   And is that indicated anywhere in the
21   materials or the interviews that you --
22   **A.   That's what all these initial parameters**
23   **are, distance away, in the interviews. The**
24   **initial -- the initial set of columns are the**
25   **columns that I would use for the inhalation**

Page 99

1    **exposure determination.**
2    Q.   Okay.
3    **A.   They would -- some of them would also be**
4    **used for the dermal, but the amount used per**
5    **event, the time, the distance away from their**
6    **nose -- remember, I'm asking that question all**
7    **the time, how far is your face from where this is**
8    **applied. Because I'm going to -- if I'm going to**
9    **do a near-field Nicas modeling of inhalation**
10   **exposure, I need to know that distance.**
11   Q.   Okay.
12   **A.   So the answer to your question is on**
13   **dermal, the exposure is, is the skin wetted?**
14   **On -- we still haven't made that determination as**
15   **to whether it's penetrating and how much of it's**
16   **penetrating. That would be dose.**
17       **On exposure with regard to inhalation,**
18   **if the material is in an aerosol presence that's**
19   **breathable, then that's also an exposure.**
20   Q.   All right. All right. Let me go back
21   to Mr. Miller.
22   **A.   Okeydoke. Page --**
23   Q.   Page 14 --
24   **A.   Okay.**
25   Q.   -- table 11.

Page 100

1    **A.   I'm there.**
2    Q.   -- in Exhibit 13. Let me see if there
3    was another point that I needed to clarify.
4        Just so I understand your table, when
5    you have at the bottom of page 14, years worked,
6    Jane Eyre Home, that information is actually
7    located on page 15, right? Is that the way it
8    broke down?
9    **A.   Yeah. It was -- when I tried to convert**
10   **the Excel into something that's printable, it's**
11   **always a challenge for the page breaks.**
12   Q.   Right.
13   **A.   And that's just how it played out.**
14   Q.   That's fine. I just want to make sure
15   I'm following --
16   **A.   Yes. It should be --**
17   Q.   -- the information correctly.
18   **A.   That title applies to the next block.**
19   Q.   Got it. So here with Mr. Miller, you
20   indicate his years of working with Roundup after
21   he was sick, where in other plaintiffs' materials
22   you did not count, as you said according to
23   industrial hygiene standards, the exposure time
24   after he was sick.
25       Is there a reason why we added it on to

Page 101

1    Mr. Miller and not others?
2    **A.   Bear with me while I go through the**
3    **interview --**
4    Q.   Not a problem.
5    **A.   -- to answer your question.**
6    Q.   Okay.
7    **A.   It looks like the only reason I'm doing**
8    **that is just to split -- because there was a time**
9    **interval where he got -- he said that he got sick**
10   **for six to seven months. I'm just splitting out**
11   **the time before and after he got sick.**
12   Q.   Yes. But as you told me, you don't add
13   time after he was sick.
14   **A.   Not if I'm going to do a full-up dermal**
15   **dose, no.**
16   Q.   Correct.
17   **A.   But I'm just simply adding up -- in this**
18   **case, he gave me some times afterwards, so I'm**
19   **just calculating what they were.**
20   Q.   But you were given times of people using
21   Roundup after they were sick for other plaintiffs
22   and you decided not to include that information.
23   I'm just trying to determine why you decided to
24   include it for Mr. Miller on his table where you
25   refused or determined not to include it on other

26 (Pages 98 to 101)

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 102

1  plaintiffs' tables.
2     A.   It's not that I refused.
3     Q.   Okay.  You determined not to -- not to
4  include it on them.
5     A.   I mean, I don't --
6     Q.   I just don't know why on him and not
7  others.  That's the only question.
8     A.   And the main reason was because his --
9  at his home usage, he was at so many different
10  places at different intervals and different
11  things he was doing and I just wanted to split
12  that time up between the time before and after,
13  and I just reported that.
14     Q.   Well, you also reported it for his work
15  time at the Bonnet Golf Course post sick, too.
16     A.   Right.  Exactly.  I'm just trying to
17  split that out, so I know if -- this is a setup.
18  So if I go and I do a more detailed analysis, I
19  can split that time away from the total.  That's
20  all.  In this case, I didn't, but it -- there's
21  no implication one way or the other.
22     Q.   Well, the implication is, Mr. Petty,
23  that when you create table 1 and table 2 or page
24  1 and page 2 of Exhibit 13, it I think falsely
25  inflates Mr. Miller's events and hours.

Page 103

1     A.   It doesn't falsely --
2     MS. GREENWALD:  Wait, wait.  Objection.
3  Form.
4     MR. UPSHAW:  Wait.
5     MS. GREENWALD:  Go ahead and answer.
6     A.   Well, it doesn't falsely inflate
7  anything.  I'm absolutely transparent about what
8  the numbers are, and that's why you can determine
9  that.
10     Q.   All right.  But you have no asterisks
11  next to Mr. Miller on page 1 or page 2 of his
12  events or total time that says included time
13  after sick, whereas you didn't include it on the
14  other ones.
15     A.   I didn't -- yeah, but I didn't -- I'm
16  very transparent in here about what those times
17  and events are.  I even described them.
18     Q.   Okay.  You're not --
19     A.   That's why you -- that's why you know.
20     Q.   You're not listening to what I'm saying.
21     A.   No, I am listening.
22     Q.   So on page 1, when you go through the
23  events and you give the low, the high and the
24  midpoint for each of the plaintiffs in this case,
25  page 1 of Exhibit 13.

Page 104

1     A.   Right.
2     Q.   The person who you added in both pre
3  sickness and post sickness was Mr. Miller, right?
4  We just talked about that.
5     A.   I just -- I --
6     MS. GREENWALD:  You're also
7  mischaracterizing him on page 2.  There is an
8  asterisk right there.
9     MR. UPSHAW:  I'm on page 1.
10     MS. GREENWALD:  Oh, sorry, sorry.
11  That's on page 2.  I'm on page 2.  Go on.  Sorry.
12     MR. UPSHAW:  No asterisks on page 1.
13  We'll get to page 2.
14     A.   Okay.
15     Q.   All right.  So --
16     A.   So --
17     Q.   -- what I'm saying is when the reader
18  reads page 1 and looks at the various plaintiffs
19  here listed and the events, there's nothing to
20  distinguish amongst those plaintiffs listed that
21  Mr. Miller's numbers include both pre and post
22  sickness?
23     MS. GREENWALD:  Objection.  Form.
24  Go ahead.
25     A.   Sure, there is.  They're all attached as

Page 105

1  a single example.  And, in fact, I've said to
2  you, the rollup of the rollups is based on the
3  information that's below there, and I'm
4  absolutely transparent about what's there.
5     Q.   Okay.  Just for completeness --
6     A.   Otherwise, you wouldn't know.
7     Q.   Well, you wouldn't know if you just read
8  page 1, right?  You wouldn't know that you
9  included both post -- both pre and post sickness
10  if you just look at just page 1, would you?
11     MS. GREENWALD:  Objection.  Form.
12     A.   Well, you wouldn't know a lot of the
13  stuff that's in these subsequent tables.  You
14  wouldn't know the dermal, you wouldn't know the
15  basis for the constants.  I mean, the reality is,
16  that if you're going to use a rollup of a rollup,
17  and I've attached the detailed basis for it,
18  it -- it constitutes one set of calculations.
19     Q.   All right.  Just for completeness,
20  because I mentioned page 2, page 2 is your total
21  time of hours by individual, you do have an
22  asterisk there to give more information, which
23  says, "Some of the entries contain significant
24  post-dermal application exposure times," right?
25     A.   Sure.

27  (Pages 102 to 105)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 106

1    Q.   Okay.  But nothing that says triple
2  asterisks, some of these also include pre and
3  post sickness hours?
4    A.   Candidly --
5       MS. GREENWALD: Objection.  Form.
6    Go ahead.
7    A.   -- I could -- I could -- I could put --
8  I could put dozens of asterisks.  The fact of the
9  matter is the reader is compelled to look at the
10 individual tables to see the basis for the rollup
11 of the rollups.
12   Q.   Okay.  Just to be clear, the IH standard
13 that I think you told me yesterday, was that you
14 don't look at post-diagnosis exposure, right?
15   A.   If I was going to do an exposure
16 assessment, absolutely.  A dose -- exposure dose
17 assessment, I would not have.
18   Q.   Okay.
19   A.   I didn't do that.
20   Q.   I understand.  And we've established
21 that.
22   A.   You know, I disagree with your
23 characterization.  I'm absolutely transparent
24 about what that data is.
25   Q.   Okay.  What is your conclusion regarding

Page 107

1  Mr. Miller's exposure?
2    A.   He would have had hundreds to thousands
3  of -- well, certainly hundreds of exposure
4  events, and he would have had hundreds to
5  thousands of exposure hours, and he had
6  significant -- very significant exposure of his
7  skin to Roundup products.
8       And more importantly, which is the focus
9  of my -- my -- the reason that I'm here is that
10 the lack of warnings and resulting appropriate
11 PPE is a primary reason why he -- he would have
12 had the extensive dermal exposures that he would
13 have had.
14   Q.   Okay.  All right.  Let's move to Exhibit
15 44, which would be Mr. Puchbauer's interview
16 summary sheet.
17       - - - - -
18 (Thereupon, Petty Deposition Exhibit 44, Mr.
19 Puchbauer's Interview Summary Sheet, was marked for
20 purposes of identification.)
21       - - - - -
22   Q.   Did you get the opportunity to speak
23 personally to Mr. Puchbauer?
24   A.   I did.
25   Q.   And did you speak to him by telephone?

Page 108

1    A.   I did.
2    Q.   How many times?
3    A.   One time, December 17 from 2:06 p.m. to
4  4:02 p.m.
5    Q.   All right.  Any e-mail correspondence
6  with Mr. Puchbauer?
7    A.   No, not that I recall.
8    Q.   Okay.
9    A.   I mean, he may have had e-mail
10 correspondence with them, but I have not seen it.
11   Q.   Right.  This is if there's an e-mail
12 correspondence with you and Mr. Puchbauer.
13   A.   Yeah.  No.  I don't even know his e-mail
14 address.
15   Q.   Was there anyone from the plaintiff's
16 firm present for the interview?
17   A.   There was.
18   Q.   And who was that?
19   A.   Ms. Greenwald and Mr. Matt Hans from
20 Weitz Luxenberg.
21   Q.   And were you aware of anyone else on the
22 phone other than the Weitz Luxenberg folks,
23 yourself, and Mr. Puchbauer?
24   A.   I was not.
25   Q.   Did you review Mr. Puchbauer's

Page 109

1  deposition transcript and plaintiff fact sheet?
2    A.   I did, but after I did the interview.
3    Q.   All right.  Did you read anything or
4  note anything of material significance in your
5  review of those documents?
6    A.   With respect to the dermal skin exposure
7  areas and times, they were very incomplete.
8  My -- and I've talked about this before for the
9  other plaintiffs, so I saw no reason to change
10 anything with respect to the dermal skin exposure
11 areas in terms of percent area or percent time.
12       There were slight differences perhaps in
13 the times of exposure, but they weren't
14 significant.  But again, if I was going to go
15 full up and do a dose exposure calculation, I
16 would have relied on many more materials aside
17 from this and -- and the deposition transcript.
18   Q.   Okay.  Did you review --
19   A.   But that wasn't my scope of work.
20   Q.   All right.  Did you review any of
21 Mr. Puchbauer's discovery responses,
22 interrogatories, or requests for production?
23   A.   Only to the extent they were included as
24 part of the deposition, the exhibits, or if it
25 was in my list of reference materials.  Other

28  (Pages 106 to 109)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 110

1  than that, I would not have.  But if they were
2  there, I would have.
3      Q.   Did you review any of the non-plaintiff
4  fact witness transcripts?
5      A.   I don't believe I did.
6      Q.   Did you visit the location that
7  Mr. Puchbauer claims to have used or been used --
8  or been exposed to Roundup?
9      A.   I did not.
10     Q.   What types of formulations of Roundup
11 did Mr. Puchbauer indicate during his interview
12 that he used?
13     A.   I'm going to go to Exhibit 44, which
14 counsel has just provided to me, and
15 specifically, he said early on when he was at
16 farms, I'm on page 5, that he used the original
17 Roundup in concentrate form.
18     On page 6, he says that he used the
19 Roundup concentrate again.
20     Page 7, he refers to that same Roundup
21 concentrate.  This is all spraying around farms.
22     And then he talks about a period --
23 another period where he's doing farms around Cape
24 Girardeau, he used a Roundup concentrate again.
25 He did say it was purchased in one to

Page 111

1  two-and-a-half-gallon containers or packaged two
2  to a box up through the mid-'90s and then after
3  that, he would use it -- he would purchase it in
4  drums, 55-gallon drums.
5      And again, he says for the home work, on
6  page 9, he says he used Roundup concentrate up to
7  the mid-'90s in one and two-gallon containers
8  packaged two to a box.  And then after the
9  mid-'90s, or as soon as it was available in
10 drums, he used the concentrate in the 55-gallon
11 drums.
12     Q.   All right.  Did you determine his
13 primary exposure was occupational or residential
14 or both?
15     A.   Well, I don't know about primary, but he
16 had both occupational and residential or home
17 exposure.
18     Q.   Okay.  Did you determine that one was
19 more than the other?
20     A.   That question is difficult, because he's
21 working on family farms, so they're producing
22 farms.  So it's sort of a self-employment thing,
23 but they're also -- I don't know, I check that as
24 home and work.  I don't know how you -- the
25 description is what it is, but it's not really in

Page 112

1  my view residential or occupational, it's sort of
2  a self-employment -- it's not his home per se if
3  it's his grandfather's farm, but it's family
4  farms.
5      So --
6      Q.   You would consider farm work to be
7  residential work?
8      A.   I would say that it's a combination,
9  because if you're going to work on the farm,
10 you're also going to work around the house as
11 well.  And if you're spraying fence rows, it's
12 going to be part of the farm, part of the home.
13     I grew up on a farm, so --
14     Q.   Did you use Roundup?
15     A.   I don't think we used Roundup.  We were
16 poor.  I don't think we -- I don't think we
17 sprayed anything.
18     Q.   You used nothing for weed control on
19 your farm?
20     A.   We raised cattle, chickens, hogs.  We
21 had a -- and we didn't raise crops.
22     Q.   Different kind of -- different kind of
23 farm, then?
24     A.   Hauled manure.  Lots of days of mucking
25 manure.

Page 113

1      Q.   Okay.  More of a -- more of a ranch than
2  a farm, say?
3      A.   I don't know.  We had a huge garden.
4      Q.   And you used no weed control in your
5  garden?
6      A.   No.  My parents -- no, they used kids.
7  We had a hoe and four boys.  That was weed
8  control, was manual labor.
9      Q.   Okay.
10     A.   No, we didn't use -- I even remember we
11 had a weed that would hurt cattle called tansy
12 and foxgloves.  And you know how we got rid of
13 it?  We had to go out there and pull it by hand.
14     Q.   Okay.  That kept you off the street as a
15 child then.
16     A.   Oh, yeah.
17     Q.   Okay.  Getting back to Mr. Puchbauer.
18     A.   So, you know, when you're on a farm, I'm
19 just saying, I check home and work -- it is what
20 it is.  However you want to define occupational,
21 if you're working on a farm and selling crops, on
22 one hand, that's occupational, but you're also
23 working around -- your home is there as well.
24     So to me, it's -- it's a combination,
25 but primarily probably work.

29 (Pages 110 to 113)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 114

1     Q.   Does it make a difference to you in your
2  assessment of Mr. Puchbauer whether or not -- or
3  any of these plaintiffs -- whether or not the
4  exposure was occupational or residential?
5     A.   Well, that's such a broad question.  It
6  depends on what aspect from an industrial hygiene
7  standpoint I'm looking at it from.  If I'm
8  looking at it purely from determining dose,
9  probably not.  If I'm looking at it with respect
10 to what regulations apply, then certainly.
11        I mean, OSHA would apply to occupational
12 and it wouldn't apply to residential.  You know,
13 the National Safety Council documents would apply
14 to residential.
15        So it just depends on what aspect I'm
16 looking at with respect to the exposure analysis.
17    Q.   Okay.  Which I think you've already made
18 clear.  And with regard to Mr. Puchbauer
19 specifically, you did not do a full exposure
20 analysis for Mr. Puchbauer?
21    A.   I did not do a full -- well, I did not
22 do a -- in this case, it would be a dose
23 analysis, yes.  I did not do a dose analysis.
24    Q.   Right.  But you've --
25    A.   I've done some exposure analysis.

Page 115

1     Q.   You have?
2     A.   Well, that's what this data is.
3     Q.   Okay.  And so my question is --
4     A.   Not all of it, but I've done some.
5     Q.   Some.  Okay.  And in the exposure
6  analysis that you've completed, does it matter
7  whether or not the exposures that you analyzed
8  were residential or occupational?
9     A.   It's the same answer.
10        MS. GREENWALD:  Objection.  Form.
11    A.   I mean, I think I just answered that
12 question.  With respect to doing a dose
13 calculation, it would be whatever the values are
14 wherever he was or she was.  So no, it wouldn't
15 necessarily affect that.  But with respect to
16 looking at the issues of PPE and warnings, which
17 is also part of my exposure analysis, that would
18 have -- that would change because it would change
19 which regulations I would be looking at.
20    Q.   And did you do that?  Did you look at --
21 or do you have an opinion with regard to
22 Mr. Puchbauer on the topics of PPE or warnings?
23    A.   Well, I do.  I've put the facts forward,
24 but it's clear to me that the dermal warnings
25 were inadequate by Monsanto.  And based on the

Page 116

1  science that was available to them back as far as
2  the 19 -- early 1980s, and that the -- you know,
3  we talked about this before where they're
4  recommending as PPE work clothes, whereas EPA
5  FIFRA under 170 says flat out, that is not PPE.
6  So that's a misrepresentation to the user of
7  what's protective.
8     Q.   The user as a residential user or the
9  user as an occupational user on a farm?
10    A.   Both.
11    Q.   Both.  Okay.
12    A.   In terms of -- if that -- the issue of
13 warnings applies to both.  The question as to
14 what regulatory history applies depends on
15 whether it's occupational or otherwise.
16    Q.   So what regulatory history applies to
17 Mr. Puchbauer?
18    A.   Both.
19    Q.   Both?
20    A.   I mean, he's got some occupational
21 exposure because he's doing it for others.
22    Q.   Okay.
23    A.   The challenge -- there is a nuance here
24 and it's an important one.  The challenge is that
25 OSHA technically relates to employment and

Page 117

1  employers, whereas EPA is outside of the
2  employment, for example, or National Safety
3  Council stuff would be all of the above.
4         So you have to look at that scenario
5  with respect to appropriate regulatory activity.
6  But the issue on material safety data sheets is
7  an interesting one, because OSHA recognizes
8  through their -- they have what they call
9  interpretation letters.  I'm sure you're familiar
10 with those.  And where there are areas of maybe
11 potential misunderstanding of what they've
12 regulated, they will issue these interpretation
13 letters.
14        And on MSDSs, the big -- the big concern
15 they have and what they've written about is when
16 some -- how do you know -- if you're a
17 distributor, because a distributor is considered
18 a manufacturer, so say you're a Lowe's or a Home
19 Depot and the person that comes in and buys it is
20 self-employed.  Technically, he is to be provided
21 an MSDS sheet, right?  The first time he buys it,
22 at least, or if anything changes.  But how do you
23 know whether that person -- you know, you don't
24 have all the clerks asking that question.
25        So what OSHA said is that they have to

30  (Pages 114 to 117)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 118

1 be available in case -- for that scenario.
2 That's how OSHA interprets it. So that's always
3 the -- that's always the nuance, is that OSHA
4 understands they're going to have both private
5 individuals and employees buy products, but when
6 they're buying them from distributors, how is
7 that distinction made? It's not always made.
8     And so they want to make sure -- it's
9 clear from that interpretation language -- they
10 want to make sure that non-employees still get
11 that information.
12     And the other issue is, well, everybody
13 says, well, OSHA's only for employers, but that's
14 really not true. There's overlap now in the
15 process safety management arena because things
16 that go on in facilities can affect people
17 outside the facilities.
18     So there's a whole bunch of -- and then
19 there's also the equivalent of risk management
20 plans, which are the EPA side, which goes in to
21 look at facilities and how they impact people.
22 So you see that the agencies, even though they
23 supposedly have these silos, they don't really
24 have silos.
25     And that's what I'm saying about this

Page 119

1 whole MSDS thing is that you have to understand
2 those nuances to reflect on how those warnings
3 should or should not have gotten to people. But
4 it also implies -- you also have to look at the
5 warnings themselves, and that's what I've done
6 here, is whether those warnings themselves are
7 adequate regardless of how they got there.
8     Q. Okay. Move to strike as nonresponsive.
9     All right. Did Mr. Puchbauer indicate
10 his methods of application during his interview?
11     A. I believe he did.
12     Q. Okay.
13     A. Let me go to Exhibit 44.
14     Q. All right.
15     A. And I'm starting on page 5.
16     Q. Okay.
17     A. This is the first scenario where he's --
18 okay. I should move to page 6, because he's got
19 a whole different -- a whole series of where he's
20 spraying fields or fence rows or et cetera.
21     Q. Right. He has several different
22 methods, I assume.
23     A. Right. So this is a concentrate that
24 was mixed, and he said that in this case, where
25 he's spraying fields, he says burning off fields,

Page 120

1 before he -- at and before he finished school.
2 He says that the method was that they would make
3 up a mix of 500 gallons at a time, and that it
4 was on a tank that was carried by a tractor and
5 that there was a spray bar located near the back
6 tires of the tractor and that's how -- it was
7 pumped from the 500-gallon tank to the spray bar
8 and then applied.
9     Then -- when he talked about doing --
10 spraying fence rows at times and he said in that
11 scenario, he would mix the concentrate in a
12 two-gallon backpack spray -- approximately
13 two-gallon backpack sprayer. Well, I should say
14 he said he mixed the product into two-gallon
15 quantities and he put two gallons into the
16 backpack sprayer.
17     Q. Okay.
18     A. And that the sprayer was equipped with a
19 wand and a nozzle. So it was applied obviously
20 manually.
21     The next scenario is when he was
22 spraying fields in the -- from the mid '80s
23 onwards, and he said that in this scenario,
24 again, they would mix 500 gallons at a time with
25 a concentrate with water and the 500-gallon tank

Page 121

1 was put on a tractor and the spray bar was
2 located near or just behind the tractor.
3     And he added further that the initial
4 tractors changed over time, so he described the
5 tractors. They were John Deere tractors
6 beginning with a 4020, a 5020 and then a 6030.
7 And then he also described one that's called a
8 4840. So that's the next one.
9     And then some additional spraying of
10 fence rows in the -- up into the mid-'90s. He
11 said that he used -- he mixed -- made up a mix of
12 two gallons that was put in a plastic container
13 in a backpack sprayer. The sprayer was equipped
14 with a wand and a nozzle. And that was the first
15 method he used during this particular scenario.
16     And then after the mid-'90s, he put a --
17 he made a mix in a 40-gallon tank that was placed
18 on a four-wheeler and the system was equipped
19 with an electric pump, hand wand and nozzle to
20 deliver the product.
21     And those are the different methods he
22 described to me in his interview.
23     Q. Okay. Did you take into account
24 exposures to other pesticides, insecticides or
25 chemicals when you were interviewing

31 (Pages 118 to 121)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 122

1  Mr. Puchbauer?
2      A.  I did.
3      Q.  Okay.  Did he identify any that you
4  noted?
5      A.  I'll just walk through -- beginning on
6  Exhibit 44, I walked through his entire work-home
7  history, I tried to, and it starts on page 2
8  where I ask him about products that he used.  The
9  first job he had was in a fast food facility and
10  he said he didn't really have any known chemical
11  exposures there.
12          He then worked at an auto parts store on
13  page 3, and he said that he did recall mixing
14  some paints, particularly enamel paints from
15  DuPont, a Centari, and a Ditzler -- a Ditzler
16  paint from PPG.  It says PPE.  It should say PPG.
17  That's a typo.  And that he mostly mixed green
18  and yellow paints, surprise, surprise, for John
19  Deere equipment.
20          So we have some exposure to paint
21  products in that second job.
22          In the -- on page 5, he talks about not
23  only did he use the original Roundup formulation
24  concentrate, he said he never used ready-to-use
25  products, but he also said he used also Lasso a

Page 123

1  few times, he used Lorox a few times, he used
2  2,4-D a few times, and he used Treflan a few
3  times.  So he named some of the other products
4  that he was using.
5          And that was associated with the times
6  when he was using Roundup, that he said he also
7  used those products a few times.
8      Q.  Okay.  Did you note any family history
9  or prior health --
10      A.  Again --
11      Q.  -- for --
12      A.  -- from an industrial hygiene
13  standpoint, I was interested in date of diagnosis
14  of when he had -- got cancer.  So on the first
15  page of Exhibit 44, he indicated the date of
16  diagnosis and that he had NHL.  And so to that
17  extent, I did ask that information.
18

Page 124

1
5  his work histories and asked about products that
6  he used, and we've covered that.  But to each of
7  those jobs, I did ask about chemical exposures to
8  not only Roundup, but other substances.  And
9  again, that's from an industrial hygiene
10  standpoint.
11      Q.  All right.  Did you inspect any of the
12  tractors, containers, or sprayers that
13  Mr. Puchbauer claims he used?
14      A.  I did not.
15      Q.  Did you make any attempt to corroborate
16  any of the statements Mr. Puchbauer made about
17  his Roundup use with any other individuals?
18      A.  Not with other individuals.  But during
19  the interview, I certainly would challenge him if
20  answers were inconsistent with other answers he
21  gave, then I would -- I would go back -- circle
22  back and say are you sure about that or something
23  like that.
24      Q.  Okay.  Let's turn to Exhibit 13, page 16
25  of that exhibit, table 12 you have listed as

Page 125

1  Mr. Puchbauer's exposures.
2      A.  Okay.  I'm almost there.
3          I'm there.
4      Q.  Okay.  You've delineated his reported
5  exposures by the equipment he was using?
6      A.  And time frame.
7      Q.  And time frame, and then there's one
8  entry -- or one section for fence rows; is that
9  right?  The second block.
10      A.  Yes.
11      Q.  Okay.  And in the block from the
12  mid-'90s to October 2005, it says later years
13  tractor.  You note that there was minimal dermal,
14  in cab most of the time except for mixing.
15      A.  Correct.
16      Q.  So he didn't report any dermal exposures
17  even during mixing during this period?
18      A.  He just felt that it was minimal.
19      Q.  Okay.
20      A.  So I remember asking him about that.  I
21  said, do we want to try to, you know, quantitate
22  that?  And he said especially at the end when
23  they had enclosed cabs, he said I just think it
24  was really limited.
25      Q.  Okay.

32 (Pages 122 to 125)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 126

1    A.   An honest broker.  But I did circle back
2  as far as -- you know, that's one of those areas
3  where I would cycle back.  And you don't see it
4  here, but I would have asked him on each of those
5  skin areas and he would just say no or not
6  really.
7    Q.   Okay.
8    A.   So that's how I summarized it.
9    Q.   Okay.
10   A.   That's an indication of the fact we've
11  had a conversation about all those, but he's
12  basically indicating that he really doesn't think
13  there was much dermal exposure.
14   Q.   Right.  And on each of the blocks you
15  note the total event time for spraying, and you
16  don't break out mixing it for Mr. Puchbauer; is
17  that correct?
18   A.   I did not.
19   Q.   Okay.
20   A.   That would be additional exposure time,
21  I guess.
22   Q.   It would be additional exposure time or
23  exposure time included in what you've already
24  shown us?
25   A.   No, no.  Because you would do the mixing

Page 127

1  before you would go out into the field and spray.
2    Q.   I understand.
3    A.   Or at least there would be a break in
4  time.  I always try to make that distinction.
5    Q.   Okay.  So is it your testimony today
6  that you just didn't ask about that or you just
7  didn't --
8    A.   It's my testimony that I did not ask him
9  about his mixing exposures -- let me go back and
10  check.
11       Well, I did ask about them.  I just
12  didn't quantitate the time and the dermal.
13   Q.   Okay.
14   A.   But I certainly -- he certainly did have
15  time doing that.  I just didn't quantitate it as
16  I have in other cases.
17   Q.   Right.  And we don't know whether he
18  actually had any dermal exposure during those as
19  well, right?
20   A.   Well, right now, it assumes zero.  So
21  it's about as conservative as you can be.
22   Q.   All right.  And what is your conclusion
23  regarding Mr. Puchbauer's exposure?
24   A.   Again, looking on page 1 of Exhibit 13,
25  he had hundreds of exposure events to Roundup,

Page 128

1  encompassing on page 2 thousands of hours of
2  exposure time.  He had significant skin areas in
3  many of the -- not all, but in many of the
4  specific applications that he described.  And
5  those skin exposures -- my opinion would be those
6  skin exposures could have been greatly reduced if
7  he had been given appropriate warnings and PPE.
8    Q.   All right.  Let's move forward with
9  Exhibit 45, and that would be Mr. Sanders'
10  interview summary sheet.
11            - - - - -
12  (Thereupon, Petty Deposition Exhibit 45, Mr.
13  Sanders' Interview Summary Sheet, was marked for
14  purposes of identification.)
15            - - - - -
16   A.   Thank you.
17   Q.   Did you personally speak with
18  Mr. Sanders?
19   A.   I did.
20   Q.   Did you talk to him by phone or
21  FaceTime?
22   A.   Phone.
23   Q.   Do you always do phone interviews or do
24  you ever do face-to-face interviews?
25       MS. GREENWALD:  Objection.  Form.

Page 129

1    A.   I've done face-to-face interviews.  I
2  mean, I've been -- particularly, if I'm at a
3  facility where there's multiple people in a
4  facility, then I'll be asked to come to a
5  facility and interview two or three people, for
6  instance.
7    Q.   Understood.  Would you know what
8  Mr. Sanders looks like if you saw him?
9    A.   I've never seen him, so I wouldn't --
10   Q.   Okay.
11   A.   -- know him as far as his physical
12  features.
13   Q.   Okay.  And how many times did you
14  interview him?
15   A.   Well, he was present when I interviewed
16  three different times.
17   Q.   And what do you mean by that, he was
18  present when you interviewed three different
19  times?
20   A.   Well, because some of the input was from
21  his father, mostly, and some of the input was
22  directly from him.
23   Q.   Okay.
24   A.   This is one of those cases where I've
25  described information that comes from not only

33  (Pages 126 to 129)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 130

1  the plaintiff, but his family.
2      Q.  All right.  And did you ever have any
3  e-mail correspondence with Mr. Sanders or his
4  family?
5      A.  I did not.
6      Q.  All right.  And who was present --
7  strike that.  Let me rephrase that.
8          Was anyone from the Weitz Luxenberg law
9  firm present during the interview?
10     A.  Yes.
11     Q.  Okay.  How many total interviews were
12  there?
13     A.  Three.
14     Q.  Okay.  And who was present?
15     A.  At the first two interviews, Deion, the
16  plaintiff, his father, ███████ and his mom were
17  present.  At the last interview, Deion was only
18  present, to my knowledge.
19     Q.  Did his mother provide any information
20  during the interviews?
21     A.  Very limited.  The only information I
22  recall her -- because most -- the first two
23  interviews was mostly from his father.  The
24  mother would -- when they were trying to remember
25  where they'd lived, which home locations, or when

Page 131

1  they moved from one location to another, they
2  would go back and forth about when they moved
3  from one place to the other and what the address
4  was and things like that.  So it was mainly she
5  would chime in about timing on when they moved
6  from one place to another.
7      Q.  Okay.  Anyone else that you know was on
8  the phone other than the folks we've just talked
9  about?
10     A.  I was.
11     Q.  Okay.  I hope, since you were conducting
12  the interview, that you were on the phone.
13     A.  But other than Deion, the father and the
14  mother, myself, and the three individuals from
15  Weitz Luxenberg, to my knowledge, that's the only
16  people that were present.
17     Q.  Okay.
18     A.  But they weren't all present at all
19  interviews, as I've described earlier.
20     Q.  Correct.  Okay.  Did you review
21  Mr. Sanders' deposition transcript and plaintiff
22  fact sheet?
23     A.  Yes.  But after the interview.
24     Q.  After the interview.  And did you note
25  any -- anything of material substance in your

Page 132

1  review of those documents?
2      A.  Well, I noted again that the -- the
3  information that I'm seeking in order to
4  ultimately do a dermal dose calculation.  That's
5  what I'm looking -- I'm doing this interview as
6  if I might do an exposure analysis.  This is
7  really an industrial hygiene exposure interview
8  sheet.
9          And there -- the questions asked by
10  defense counsel were on the dermal area with
11  respect to the skin areas by event and time,
12  portion wet, time portion wet, minimal
13  information there.  So there was nothing there to
14  really compare with or cause me to want to change
15  anything in the interview.
16         With respect to times or timing
17  location, it might be some small differences in
18  where they said they were at one place or the
19  other, but it wasn't significant.
20     Q.  Okay.  At the time you conducted the
21  three interviews for Mr. Sanders' case, had you
22  been asked to do a dermal assessment?
23         MS. GREENWALD:  Objection.  Form.
24     A.  I was asked, when I first was retained,
25  if I would be willing to do a dermal assessment,

Page 133

1  and I said I would not without -- without the
2  opportunity to go through and -- because at that
3  point, I had not -- while I'm certainly very
4  capable of doing dermal assessments, I had not
5  reviewed the dermal literature with respect to
6  glyphosate.
7          So I wasn't comfortable initially
8  committing to doing those assessments.  As I've
9  said before in this deposition, based on all the
10  work that I've done since then, I certainly am
11  more than confident I could do those analysis,
12  but I had declined to do them initially.  So I
13  wasn't retained to do them ultimately.
14     Q.  So when you took the interviews of
15  Mr. Sanders and others, it was not -- it was not
16  in your mind that you would need this information
17  to complete a dermal assessment?
18     A.  Well, not necessarily.  I didn't know
19  whether that -- I mean, I always reserve the
20  right to maybe change my position on that.
21     Q.  Okay.
22     A.  It's just by that point, I think -- by
23  the time that I had completed this work, they
24  were well into the process, and I gather they
25  made other decisions.  I don't know.  But --

34  (Pages 130 to 133)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 134

1     Q.   I know you can't talk for anyone else.
2  I was just asking about you and your mindset when
3  you were taking the interview.
4     A.   Well, the interviews were taken -- they
5  were really taken before I had done a lot of the
6  analysis of the dermal.  So I was still in that
7  position of, well, if I'm going to do the
8  interview, why not take the information?  Because
9  if I choose to do so, I'm going to need it.
10        I know for a fact that the defense --
11 that the depositions will not provide the
12 information I would need in order to do the
13 analysis.  I know that for a fact.
14        And so I go ahead and collect that.  I
15 collect that information almost as a matter of
16 routine on all projects, whether I'm -- there are
17 some projects where I'm -- I collect the
18 information and I'm not asked to do a detailed
19 exposure analysis.  They don't want it.  I don't
20 know why, but they don't.  They just want me to
21 do warnings or something else.
22        But I will -- if I have the opportunity
23 to talk to somebody from an industrial hygiene
24 standpoint, particularly if I don't know their
25 health, I always do -- I always collect that

Page 135

1  information because I don't know whether -- how
2  long they might live.  And I've had the
3  experience of -- I've had known experiences where
4  I was scheduled to do an interview and the person
5  died the day before I did the interview.
6     Q.   Um-hum.
7     A.   So -- and I've had also the experience
8  of people have died -- and I think I talked about
9  this before -- at least 30 people have died after
10 I interviewed them, but before the case moved on,
11 and it's just more difficult to get that same
12 information.
13        The best information you get is from the
14 person themselves as opposed to coworkers and
15 others.  So -- because they know what they did.
16    Q.   Right.
17    A.   And so I do it -- I do that because I
18 don't know what the future holds for that
19 individual.  That's the main reason I take that
20 information.  Not because I wasn't going to do a
21 dermal analysis.  It's just because I have that
22 opportunity to talk to them while they're still
23 healthy and alive.  And so I collect as much
24 information as I can at that time.
25    Q.   Okay.  Did you review the discovery

Page 136

1  responses for Mr. Sanders?
2     A.   To the extent that they would be in the
3  deposition attachments or exhibits or was in my
4  list of reference materials I would have.
5  Otherwise, I would not.
6     Q.   And what would you be looking for in
7  those interrogatory responses?
8     A.   The same information I'd be looking for
9  in deposition testimony.  Anything that would
10 give me information on products, dermal exposure,
11 times, employment locations and times, that sort
12 of stuff.
13    Q.   Same thing for any request for
14 production responses?
15        MS. GREENWALD:  Objection.  Form.
16    A.   It depends because a lot of these -- a
17 lot of these are medically related.  They're not
18 really -- I mean, I get a lot of stuff that
19 really isn't pertinent to what I'm going to do.
20 I mean, what I might take out of that is date of
21 diagnosis and disease or something, and just put
22 it in the front end of the report for
23 completeness, but it just depends on the nature
24 of the material.
25        But I'm mainly -- in almost every

Page 137

1  project that I've done, my primary role is
2  exposure and warnings.  That's been my
3  assignment, if you will.
4     Q.   Okay.
5     A.   And in some cases, general causation.
6  Never specific causation, because I can't.
7     Q.   Did you review any non-plaintiff fact
8  witness transcripts?
9     A.   Not that I recall, no.
10    Q.   Did you visit any of the locations
11 Mr. Sanders claims to have used or been exposed
12 to Roundup?
13    A.   I did not.
14    Q.   Did Mr. Sanders and his family identify
15 the type or formulation of Roundup they used?
16    A.   I'm going to go again to Exhibit 45 and
17 look up what they said to me.
18    Q.   Okay.
19    A.   I'm on page 4.  Appreciate that part of
20 Deion's initial exposures were when his father
21 was applying it and he was nearby.  So when I
22 answer these questions, it's not necessarily that
23 he applied it, but the product was used.  I just
24 want to make that distinction when you ask about
25 products he used.

35 (Pages 134 to 137)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 138

1    Q.   Okay.
2    A.   It's products both he or his father
3    used.
4    Q.   All right.
5    A.   And the initial -- page 4, the
6    initial products that were recalled were Roundup
7    Weed and Grass Killer Concentrate Plus, Roundup
8    Ivy Plus Tough Brush Killer, and Roundup
9    Ready-to-Use Weed and Grass Killer 3.
10        The -- the second location, it starts on
11   page 6 of Exhibit 45, again, was the same three
12   products, Roundup Weed and Grass Killer
13   Concentrate Plus, Roundup Ivy Plus Tough Brush
14   Killer, and Roundup Ready-to-Use Weed and Grass
15   Killer 3.
16        At the -- on page 8, the third location,
17   ████████████ Fairburn, Georgia, the
18   products used were ready -- Roundup Ready-to-Use
19   Weed and Grass Killer 3 and he said it was in a
20   white and blue container, and they used that
21   about 95 percent of the time.  And then he just
22   described the other as a Roundup product in a
23   dark red, yellow, and gold container.
24        And then the use location 4 on page 9 of
25   Exhibit 45 describes the product as a Roundup

Page 139

1    Ready-to-Use Weed and Grass Killer 3 in a white
2    and blue container.
3        So that's the descriptions I got from
4    this interview.
5    Q.   Okay.
6    A.   Or interviews.
7    Q.   Okay.  Was Mr. Sanders' exposure
8    residential --
9    A.   Yes.
10   Q.   -- or occupational?
11   A.   It was residential.
12   Q.   Okay.  And what were the methods of
13   application used around him?
14   A.   All righty.  Again, referring to Exhibit
15   45, page 4, initially, this is when he was --
16   this is when his father --
17   Q.   That's why I said around him.  Then I'm
18   going to ask you what methods of application he
19   used, is the next question.
20   A.   So do you want me to go through them all
21   or just the ones that are around -- I'm trying
22   to --
23   Q.   Well, I'm going to make it -- I'm trying
24   to --
25   A.   Make it efficient?

Page 140

1    Q.   Yeah.  So I was going to ask just to the
2    ones around him, and then you can go to the
3    ones --
4    A.   Okay.
5    Q.   -- that he actually did the applicating.
6    A.   Fair enough.
7    Q.   The application.
8    A.   So the application methods when he was
9    around the product were the concentrate was mixed
10   into a one to one-and-a-half-gallon sprayer with
11   a hand pump, wand and nozzle from when he was --
12   and then go to the second.  This is a combined
13   situation, so it kind of -- both he and his
14   father -- he was around when his father sprayed,
15   but he also sprayed --
16   Q.   Okay.
17   A.   -- under page 6.  So we're kind of
18   blending here the answer.  But he said that the
19   method again was they used this one to
20   one-and-a-half-gallon sprayer with a hand pump,
21   wand, and nozzle where they mixed the
22   concentrate.
23   Q.   All right.
24   A.   Now I'm moving to a period where Deion
25   was 10 to 15 years old and he says he was

Page 141

1    spraying a ready-to-use product that had a hand
2    pump and a wand with a nozzle.  This is on page
3    8.
4    Q.   Did he say this was out of the container
5    or was it a separate hand sprayer?
6    A.   He said that it was a ready-to-use
7    product, so it wasn't put in something separate.
8    Q.   Okay.
9    A.   And then again, as he's a little older
10   from 15 to 18, he's again using a ready-to-use
11   product with a hand pump and a wand and nozzle.
12   That's how he described it.
13   Q.   Okay.
14   A.   This is Deion now.
15   Q.   Did you take into account exposures to
16   other pesticides, insecticides, and chemicals?
17   A.   Yes, I did go through Deion's work
18   history and it begins on page 2.  He apparently
19   is a welder, that's what his -- or at least
20   that's part of his occupation.  So he said that
21   he didn't recall any chemical exposures, there
22   might have been some welding fumes.  That's how
23   he described it.
24   Q.   And what year, or how old was he when
25   his occupational -- when he started working?

36  (Pages 138 to 141)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 142

1    A.   From high school, he graduated in 2012.
2    Q.   Okay.
3    A.   So from high school until he says about
4 a year and a half on page 2 was his first work
5 location.  So I don't know exactly what his age
6 is, I'd have to look at his birth date here to --
7 so he would have been -- '94 -- so we've got --
8 so he would have been 18 to say 19 and a half or
9 so.
10   Q.   Okay.
11   A.   That's the reason I take this background
12 information, so I can go back and get how old
13 they are and that sort of information.
14   Q.   And just so we're clear along with that
15 information, what did you determine his date of
16 diagnosis or his date of disease?
17   A.   It's on page 1, it was -- he -- it was
18 July 27, 2011.
19   Q.   Okay.
20   A.   So I went ahead and went through his
21 work history.  Again, the second location, he
22 says maybe some welding fumes.  I asked them --
23 you know, when I asked them what products they
24 used around the home, they just -- that's what
25 they said was that they used the -- either the

Page 143

1 Monsanto in the concentrate or in a ready-to-use
2 product, that's all.  And then various types.
3 They didn't describe any other products used that
4 I see.
5    Q.   All right.  Did you take into account
6 family history and prior health?
7    A.   To the extent that I wanted to know when
8 he was diagnosed and what he was diagnosed with,
9 yes.  But beyond that, no.
10   Q.   Okay.
11   A.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
16        MS. GREENWALD:  Objection.  Form.  Go
17 ahead.  Sorry.
18   A.   From an industrial hygiene standpoint, I
19 obviously ask questions about ▮▮▮▮▮▮▮▮
    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
23        And then I went through his work
24 history, although most of that postdates his
25 exposure history, but I did ask him anyway what

Page 144

1 his work history was.  He had some welding fumes.
2 He's -- he's a little bit different in the sense
3 that his exposures were when he was very young.
4    Q.   Did you inspect any of the actual
5 products or containers that he claims to have
6 used or been around when they were used?
7    A.   I did not.
8    Q.   And did you make any attempt to
9 corroborate any of the statements that
10 Mr. Sanders made about his use of Roundup with
11 any other individual?
12   A.   Try that again, I'm sorry, I was looking
13 at this.
14   Q.   That's okay, because it's a little
15 different than we've had for other plaintiffs.
16        Did you attempt to corroborate any of
17 the statements Mr. Sanders made about his use of
18 Roundup with any other individuals?
19   A.   Well, with his father and his mother to
20 some extent, yes.
21   Q.   Okay.  And so were there times during
22 the interview that Mr. Sanders would make some
23 mistake about his exposure that was corrected by
24 his parents?
25        MS. GREENWALD:  Objection.  Form.

Page 145

1    A.   Not so much.  The distinction was
2 different than that.  It was that -- I finally
3 was able to interview the third time Deion by
4 himself, and I walked backwards from the last
5 time he used Roundup and started marching towards
6 when he was younger.
7        And so the input that I have in the
8 interview from down to age nine comes from Deion
9 alone.  The input that I have from age nine and
10 less is from his -- primarily from his father.
11   Q.   Okay.
12   A.   And, in fact, Deion, I asked him, I
13 said -- because I started down there and he was
14 having a hard time, and I said so is your
15 father's recollection of what he did and what you
16 did together better than yours would be, and he
17 said yes, I was very young and I have a hard time
18 remembering some of that stuff when I was real
19 young.
20        So the simplest way to explain is it
21 that the Roundup exposure information from above
22 age nine is from Deion primarily, and from below
23 age nine is primarily from his father.
24   Q.   Okay.  I knew the answer would be a
25 little different to that question than we

37  (Pages 142 to 145)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 146

1  previously have asked.  So thank you.
2      **A.  Thank you.**
3      Q.  All right.  Let's turn to Exhibit 13 and
4  move to the table in there which refers to Mr.
5  Sanders' exposures.  I believe it's on page 17
6  and 18.
7      **A.  Okay.**
8      Q.  Okay.  So when Mr. Sanders was diagnosed
9  with his disease, how old was he?  He was
10 diagnosed in 2011.  He was born in 1994.
11     **A.  '94.  So he was -- I apologize, but I've**
12 **got to look.**
13         **So he would have been -- six plus 11 is**
14 **17.**
15     Q.  17?
16     **A.  17 years old.**
17     Q.  All right.  And you indicate in his
18 table, table 13, you've broken out the blocks by
19 age; is that right?
20     **A.  Age and also whether he was a bystander**
21 **or -- well, yeah, it's by age as well, but I'm**
22 **also trying to indicate, for instance, the early**
23 **times where he was just a bystander.**
24     Q.  So on table 13, the only indication I
25 see for bystander exposure is father sprayed and

Page 147

1  you have that by asterisk is just by the initial
2  block?
3      **A.  Correct.**
4      Q.  So at age six-seven to age nine, are you
5  indicating here that Mr. Sanders or Deion Sanders
6  was spraying on his own?
7      **A.  Part of the time, because his father ███**
8  **██████████████████, and he didn't**
9  **do all of the spraying, but he would do -- he's**
10 **indicating he did some of it.**
11     Q.  And so what you have here is the
12 spraying he did?
13     **A.  Correct.  Now, that's reflected -- that**
14 **data though comes from his father.**
15     Q.  Of the times and as you state them
16 events that he actually conducted.
17     **A.  Correct.**
18     Q.  Okay.  And just so I'm clear, so for --
19 from the age of six to seven, you have two years
20 of spraying, 52 weeks --
21     **A.  Two to three years.  I'm sorry, I'm not**
22 **trying to correct you.**
23     Q.  No, you're right, I'm sorry.  I was just
24 reading the below, but we can read the whole
25 thing.

Page 148

1      So two to three years with a midpoint of
2  25.
3      **A.  Sure.**
4      Q.  Season of six months; is that right?
5      **A.  Correct.**
6      Q.  And as a constant, that's 52 weeks a
7  year?
8      **A.  That's the number of weeks in -- that's**
9  **the number of weeks in a month, so it's 52 by 12,**
10 **yeah.  It's just a constant.**
11     Q.  Okay.  And total events spraying were
12 52.  So he sprayed every week?
13     **A.  No, no, no.  That's the number of**
14 **weeks -- that number comes about from -- the 52**
15 **is, if I'm doing the math right, it would be**
16 **two -- the low value of two up there, two years**
17 **times six months per year or six months per**
18 **season, so that's 2 times 6 is 12, times the**
19 **weeks for those six months, 4.33.  So that ends**
20 **up being 52.**
21     Q.  Okay.  And then total events spraying
22 you have as 52?
23     **A.  Right, because he did it one time a**
24 **week.**
25     Q.  That's what I just said.

Page 149

1      **A.  No, no, no.  But I thought you --**
2      Q.  So he sprayed once a week.
3      **A.  Oh, I'm sorry.  I thought you were**
4  **wondering where the 52 came from.**
5      Q.  No.  I kind of got to that that in his
6  interview he said he sprayed every week or once a
7  week.
8      **A.  Once a week for those six months.**
9      Q.  Over two years.
10     **A.  Over two to three years, yes.**
11     Q.  Right.  Okay.  And you don't have any
12 indication of how long he sprayed or is it one
13 hour?
14     **A.  One hour per event.**
15     Q.  One -- oh, okay.  One hour per event.
16     So every week during season -- and do we
17 know how long the season was?  Sometimes we put
18 that in here.
19     **A.  Six months.  It's the second line.**
20     Q.  Okay.  But I guess -- is that six months
21 in the summertime?  You usually indicate what the
22 season is.
23     **A.  I know, but I didn't here.  But it's six**
24 **months.**
25     Q.  All right.  Okay.  And again, making

38 (Pages 146 to 149)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 150

1    sure I'm understanding this correctly, staying in
2    the same block, every time he sprayed during
3    season, one day out of the week, he would get his
4    hands wetted and a quarter of his hands wetted?
5        **A.   Equivalent to half of one hand, yes.**
6        Q.   Right.  And 25 percent of the time, so
7    25 percent of the 52 events, he would wet half of
8    his face?
9        **A.   That's -- yes.**
10       Q.   Okay.
11       **A.   One time out of four.**
12       Q.   And age nine through 10, those are all
13   events, which there were 19.5 of them, that
14   were -- consist of Mr. Sanders -- or I should say
15   Deion Sanders doing the actual spraying?
16       **A.   Correct.  Correct.**
17       Q.   And then on page 18 in the first block,
18   you determine the amount of events and time per
19   event of mixing?
20       **A.   I did.**
21       Q.   And maybe I missed it, but when I asked
22   about what types of formulations he used, I did
23   not recall you mentioning any of those being a
24   concentrate.
25       **A.   Oh, yeah.  I sure did.**

Page 151

1        Q.   And again, I apologize if I missed it,
2    but I just didn't write it down.
3        **A.   Yeah.  They're -- remember the first, it**
4    **was Roundup Weed and Grass Killer Concentrate**
5    **Plus, and then the Roundup -- so that was a**
6    **concentrate.**
7        Q.   Right.
8        **A.   And it says that that was mixed.**
9        Q.   But I thought that was what his father
10   was mixing, not his mixing?
11       **A.   Yeah, but from nine to 10, on page 6,**
12   **Deion -- Mr. Deion Sanders mixed the product 50**
13   **percent of the time, and he sprayed the product**
14   **approximately 75 percent of the time as his**
15   **father remained ill.**
16       Q.   Got it.
17       **A.   He was helping out his dad** ████████
18   ████████████████████████████████████████████████
19   ██████████████
20       Q.   Okay.  So another thing I note that's a
21   little different on Mr. Sanders, in his ████████
22   ████████ and under the ████████████████, you
23   indicate one hand and don't -- and change that
24   from the two-hand percentage.
25       So are you saying it's just one hand,

Page 152

1    like either the left or the right?
2        **A.   One hand, yep.**
3        Q.   Okay.
4        **A.   So 75 percent of one hand.**
5        Q.   And is there a reason why that kind of
6    constant changed there from the regular two hands
7    and then we had to do the math to figure out if
8    it was the front or the back of one of them?
9        **A.   Well, remember, he's primarily using a**
10   **ready-to-use.  It's -- he's moved on to -- I**
11   **think all of these times are ready-to-use**
12   **products, so it's a little different application.**
13   **I'm almost certain of that.**
14       Q.   All right.  And so that modification is
15   something he would have said, right?  Because you
16   go do you have any on your hands, do you have any
17   on your wrists, do you have any on your forearms,
18   you go through your list of body --
19       **A.   Oh, yeah.  I would have said both hands,**
20   **and then he -- the way that he recalled it was**
21   **just one hand, and I said fine, we can -- we can**
22   **use that.**
23       Q.   Okay.
24       **A.   We'll just use one hand and we'll talk**
25   **about one hand.**

Page 153

1        Q.   Got it.
2        **A.   But I would have gone through all the**
3    **skin areas, appreciate that.  It's just I don't**
4    **record the stuff that's zero.**
5        Q.   Says no, right.  I'd assume.  Otherwise
6    this chart would be 20 or 30 pages.
7        Okay.  What's your conclusion regarding
8    Mr. Sander's exposure?
9        **A.   Well, at least with respect to these**
10   **calculations, my -- looking again on Exhibit 13,**
11   **page 1 to start, he would have had hundreds of**
12   **exposure events covering thousands of hours of**
13   **exposure time.  He clearly had skin exposure to**
14   **skin areas that, in my opinion, would have been**
15   **reduced had he been provided with proper warnings**
16   **and proper PPE.**
17       Q.   Okay.  We have one more plaintiff to go
18   over, but I'm going to check with our court
19   reporter.
20       MS. GREENWALD:  I have a request.  I
21   have to make a quick phone call, less than five
22   minutes, but someone asked me to call at 12:30.
23   So if we could take a few minutes --
24       MR. UPSHAW:  There we go.
25       MS. GREENWALD:  I am so sorry.

39  (Pages 150 to 153)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 154

1     THE WITNESS:  Do you want to take a
2  ten-minute break or something, or a five-minute
3  break?
4     MR. UPSHAW:  We'll take a five-minute
5  break.
6     MS. GREENWALD:  I appreciate it.
7     THE VIDEOGRAPHER:  Off the record,
8  12:36, end of disk 2.
9     (Recess taken.)
10     THE VIDEOGRAPHER:  We are back on the
11  record.  Disk number 3, it's 12:50.
12  BY MR. UPSHAW:
13  Q.  Very good.
14  A.  Pardon me.
15  Q.  It's okay, Mr. Petty.  All right.  Let's
16  get -- let's continue forward.  I'm going to hand
17  you Exhibit 46, which is the interview summary
18  sheet for Mr. Sessions.
19     - - - - -
20  (Thereupon, Petty Deposition Exhibit 46, Mr.
21  Sessions' Interview Summary Sheet, was marked for
22  purposes of identification.)
23     - - - - -
24  A.  Thank you.
25  Q.  Did you personally interview

Page 155

1  Mr. Sessions?
2  A.  I did.
3  Q.  Okay.  On the telephone?
4  A.  Yes.
5  Q.  How many times?
6  A.  Once on December 11, 2018, from 2:00 to
7  3:24.
8  Q.  All right.  Any e-mail correspondence
9  with Mr. Sessions?
10  A.  No.
11  Q.  Were any members or personnel from the
12  Weitz & Luxenberg present during the interviews?
13  A.  Yes.
14  Q.  Who would that have been?
15  A.  Ms. Elisse Hall and Todd, I don't have a
16  last name, both from Weitz Luxenberg.
17  Q.  Okay.  Were you aware of anyone else
18  other than the folks we previously mentioned,
19  yourself, and Mr. Sessions on the phone at the
20  time of the interview?
21  A.  I was not, no.
22  Q.  Did you read Mr. Sessions' deposition
23  transcript and plaintiff fact sheet?
24  A.  I did.
25  Q.  And that was post interview?

Page 156

1  A.  It was.
2  Q.  Did you learn any information from those
3  documents that would add to the information
4  you've provided in his interview summary sheet
5  and Exhibit 13?
6  A.  Well, again, I noted that the nature of
7  the dermal questioning would not have
8  supplemented my dermal questions from the
9  interview, that they were -- it's not that,
10  again, that they didn't ask any dermal questions,
11  but they didn't ask the type of questions by skin
12  area, percent time wetted, percent area wetted,
13  et cetera.  The -- again, the times, there were
14  some slight differences in times, but not
15  substantial.
16     So I really -- there was really no --
17  nothing in those that would cause me to want to
18  change the interview, at least at this point.
19  Q.  Okay.  Did you have --
20  A.  And not change, but re-interview,
21  clarify things.
22  Q.  Okay.  Did you review any discovery
23  responses from to Mr. Sessions?
24  A.  To the extent that they were associated
25  with exhibits to his deposition or associated

Page 157

1  with the reliance document list that I provided,
2  if they were there, I did.  If they were not, I
3  did not.
4  Q.  Right.  But you don't recall offhand
5  reviewing any of those?
6  A.  Well, if they were associated with the
7  attachments to his deposition, I would have.
8  Q.  Okay.
9  A.  Or again, if they were in the reliance
10  list.
11  Q.  All right.  And what would you have been
12  looking for in those answers to interrogatories?
13  A.  Same sorts of information.  Information
14  related to exposure as well as information
15  regarding his PPE.
16  Q.  Okay.  And had you found any of that
17  information, where would you have indicated that?
18  On --
19  A.  I would -- if I had found information
20  there that caused me to think that there was
21  something grossly wrong with my interview in
22  terms of the information I asked for, then I
23  would re-interview the person and try to
24  reconcile the differences.
25  Q.  Okay.  Did you review any non-plaintiff

40  (Pages 154 to 157)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 158

1  fact witness transcripts?
2  **A.  Not to my knowledge.**
3  Q.   Did you visit the location that
4  Mr. Sessions claims to have used or been exposed
5  to Roundup?
6  **A.  I have not.**
7  Q.   Did Mr. Sessions identify the type or
8  formulation of Roundup he used?
9  **A.  I believe so.  And I'll go to the**
10 **Exhibit 46 you just provided to me, which is his**
11 **interview and notes.**
12 Q.   Okay.
13 **A.  And specifically, I'm looking on page --**
14 **page 7 -- bear with me for a second.**
15 Q.   No worries.
16 **A.  Page 8, I'm sorry.  Of Exhibit 46.**
17 **We -- all we know is he was supporting**
18 **contractors who were spraying weeds in this case**
19 **in the Cape Canaveral Air Force Station in the**
20 **Kennedy Space Center.  And --**
21 Q.   I'm sorry.  What do you mean by
22 supporting contractors?
23 **A.  In other words, he wasn't actually**
24 **spraying, but he was nearby.**
25 Q.   Okay.

Page 159

1  **A.  It was applied by contractors.  And all**
2  **he knows is that they -- by the time they were**
3  **spraying it, it was in a 200-gallon tank, and he**
4  **was told by the contractors it was Monsanto**
5  **Roundup.  So in that case, that's all we know**
6  **about the product.**
7  **Now, on page 9, when he used Roundup at**
8  **home, he said he used a Roundup concentrate**
9  **product.  That's how he described it.  He said it**
10 **was purchased at Sam's Club and it came in -- he**
11 **either purchased it at Sam's Club where he said**
12 **it came in about a half-gallon container or he**
13 **purchased it from Home Depot where it came in**
14 **about a one-quart container.  That's how he**
15 **described it.**
16 Q.   Okay.
17 **A.  Then he also described using some**
18 **product -- some Roundup product at home, a second**
19 **home, vacation home.  And he said that it was a**
20 **ready-to-use product that was in about a**
21 **one-gallon spray container with a trigger and**
22 **white coil tubing and a nozzle, and he said he**
23 **purchased it at Walmart.**
24 Q.   All right.
25 **A.  So those are the descriptions we have of**

Page 160

1  the products he was either using or nearby.
2  Q.   Mr. Sessions had both occupational and
3  residential exposures?
4  **A.  Correct.**
5  Q.   What methods of application did he tell
6  you during the interview?
7  **A.  Well, in one case he didn't apply it,**
8  **but do you just want to know which ones how he**
9  **applied it or --**
10 Q.   Yeah.  We know, as you've already
11 stated, he did not apply the materials a work, he
12 was just nearby.  So how did he apply it?
13 **A.  Well, he personally only applied Roundup**
14 **at home.  And in the first case, he said that he**
15 **would add the concentrate to a three-gallon Solo**
16 **plastic pump sprayer -- I'm on page 9 of Exhibit**
17 **46, just for clarification.  And then he would --**
18 **that he would mix it, you know, with water to**
19 **produce -- he didn't fill the container full each**
20 **time.  He only used about two gallons out of the**
21 **three-gallon capacity.**
22 **And then he said he would pump up the**
23 **Solo sprayer with a hand pump and then he would**
24 **spray it with a spray wand and a nozzle.**
25 **The vacation home, he used a**

Page 161

1  ready-to-use product rather than a concentrate.
2  **This is on page 10 of Exhibit 46.  And he said**
3  **that he would use the ready-to-use container that**
4  **had a trigger hand, a white coil -- with a white**
5  **coil tubing and a nozzle.  So he was spraying**
6  **from the ready-to-use container.**
7  Q.   Okay.  Did you take into account
8  exposures to other pesticides, insecticides, and
9  chemicals?
10 **A.  I did.**
11 Q.   Did he identify any?
12 **A.  Yes.  I mean, I asked him about his time**
13 **in the service and what his exposures were in the**
14 **service.  And then I asked about his smoking**
15 **history, both cigars and cigarettes.  And then I**
16 **asked him about his chewing tobacco history.**
17 **And then I went through his job work**
18 **history from early on till later on, until the**
19 **beginning that he could recall his first job to**
20 **his last job, and that begins on page 2 of**
21 **Exhibit 46.**
22 **The very first job he worked at a**
23 **grocery store as a stock boy or stock person.**
24 **I'd say stocker, but that sounds bad.  But we all**
25 **know I've worked at a grocery store, so.  And he**

41 (Pages 158 to 161)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 162

1    said there, there was no known chemical
2    exposures.
3         Then he next worked as a laborer at the
4    Stennis Space Center in Picayune, Mississippi.
5    He said that he did use gasoline in the mowers,
6    so he had -- but he wasn't aware of any -- of
7    being exposed to pesticides or other chemicals
8    when he worked there, because I did ask him that
9    since he was doing lawn work.
10        Then he installed shingles at the third
11   job.  He doesn't recall any chemical exposures
12   there.
13        When he was in the service, he said he
14   did have some exposure to gun-cleaning chemicals
15   because they would have to clean their guns and
16   artillery.  And he said it was limited on the
17   artillery side because he was one of the -- you
18   know, he was a supervising person.  He didn't
19   really have to do a lot of it himself.
20        Next job, no known chemical exposures.
21   Again, he worked as a federal officer at Cape
22   Canaveral Air Force Station on page 7 of Exhibit
23   46.  And he said the exposures were, again, he
24   would clean his guns with solvents about one time
25   per 90 days after using the gun on the gun range.

Page 163

1         And then he had exposure to the Roundup
2    weed killer, which we've talked about.  He didn't
3    describe any other pesticides at that location.
4         Now, at home, he -- oh, I should --
5    yeah, at home, he did describe -- he lived in
6    Cocoa Beach, apparently.  He did describe using
7    the Roundup concentrate, but he also said he used
8    some Sevin Dust for killing bugs on flowers about
9    two times a year and then he did use Raid to kill
10   bugs maybe two or three times a year.
11        So those were the other chemicals that
12   he described using as part of my interview.
13   Q.   Okay.  Did you take into account family
14   history and prior health?
15   A.   Well, again, just from an industrial
16   hygiene standpoint, because I'm interested in
17   disease and when he was diagnosed, I did ask him
18   those questions, and that information was
19   provided.  But beyond that, no, I did not explore
20   that.
21   Q.   And he didn't identify any non-Hodgkin's
22   lymphoma subtype?
23   A.   No, not to me he didn't.
24   Q.   Okay.  You mentioned other -- you
25   mentioned smoking.  Did you consider other risk

Page 164

1    factors?
2    A.   Sure, I considered the risk factors of
3    exposures he might have had when he served in the
4    military that we talked about, ▮▮▮▮▮▮▮▮▮▮▮▮
5    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
6    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  And then I walked
7    through all the other exposures that he
8    could recall at all of his job positions as well
9    as at home, and I talked about those.  So those
10   were the things, from an industrial hygiene
11   standpoint, that I considered as well.
12   Q.   Okay.  Did you inspect any of the
13   containers or the sprayer that he walked behind?
14   A.   I did not inspect the containers, no.
15   Q.   Did you make any attempts to corroborate
16   any of the statements Mr. Sessions made about his
17   use of Roundup with any other individuals?
18   A.   Not with other individuals.  Certainly I
19   did within the interview itself, but not with
20   other individuals, no.
21   Q.   Okay.  Let's go to Exhibit 13, if we
22   would -- if we can.
23        And Mr. Sessions -- table 14 starts on
24   page 18 of that exhibit.
25   A.   I'm there.

Page 165

1    Q.   Okay.  You've broken down the blocks of
2    his reported exposure, the first block would be
3    following contractor, that was at his job, I
4    assume?
5    A.   Yes.
6    Q.   Okay.  And you have here events total
7    spraying, but he wasn't spraying, right?
8    A.   He wasn't spraying, but he was being
9    exposed from the spraying activity.  I'm -- for
10   clarification, he did not spray, but this is --
11   his exposure is a result of spraying activity as
12   opposed to say mixing or cleaning or something
13   else.
14   Q.   And did you ask him how was it that his
15   following the contractor exposed him to whatever
16   was being sprayed by the contractor?
17   A.   Sure.  He said that there was mist of
18   product in the air and that that would --
19   depending on the wind direction and speed, that's
20   how he would get -- it would get on his skin.
21   Q.   And how close was he -- well, was he
22   following the contractor's truck, tractor?  Or
23   what was he following?
24   A.   It was a -- let me look.  I'm on page 8
25   of Exhibit 46.

42  (Pages 162 to 165)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 166

1    Q.   Okay.
2    A.   And the description of how -- what was
3  going on, he said that these contractors had
4  product in a 200-gallon tank that was on the back
5  of a truck and they had a gas engine powered pump
6  which pressurized the Roundup and then it was
7  sprayed with a reel hose or the wand and a
8  nozzle.
9         And they were sort of doing these areas
10  along the fence, and because they were secure
11  areas, he had to stay nearby and follow them
12  because he would allow them in and out and then
13  he was obviously supervising their presence
14  there.
15        He didn't mention that the contractors
16  were the same individuals, but that the name
17  changed many times.
18        But that's what we know about kind of
19  what was going on when he was getting that
20  standby exposure to his skin.
21    Q.   Did he report how close to this pickup
22  truck he was located?
23    A.   Yes.  On page 11 of my -- Exhibit 46, I
24  should say, he says that on average he was
25  between 10 and 20 feet from where the material

Page 167

1  was being sprayed.  Not necessarily the truck,
2  but from the end of the spray nozzle.
3    Q.   Would you consider that a
4  significant distance away from the source of the
5  pesticide?
6    A.   Not if he's getting the dermal exposures
7  he's talking about getting, no.
8    Q.   Not if he's getting the dermal exposures
9  that he's reported, do you --
10    A.   Right.
11    Q.   Okay.
12    A.   Recall that I did the Stokes law
13  analysis early on, how many minutes this stuff
14  will stay in the air.  How long it takes to fall
15  six feet, it's a long time.
16    Q.   Right.
17    A.   So if he's following it and walking
18  behind at least part of the time, that -- you
19  know.  The bottom line is I'm looking at were any
20  areas wetted and if so, what percent of those
21  areas were they wetted and what percentage of
22  time.  So that accounts for where he was in
23  proximity, but he did say that typically, he was
24  10 to 20 feet away.
25    Q.   You're also looking at how many times

Page 168

1  the area was wetted, aren't you?
2    A.   How many times?
3    Q.   How many events.
4    A.   Yes, absolutely.
5    Q.   Okay.  All right.  So back to table 14
6  in Exhibit 13.  If I'm -- again, correct me if
7  I'm reading this incorrectly, that they -- from
8  1985 to 2009, there were 24 events?
9    A.   Correct.
10    Q.   Okay.  Over that time frame.  Any
11  indication of --
12    A.   About once a year.
13    Q.   Okay.  You anticipated my question, but
14  let me get the question out.
15        Any indication from Mr. Sessions as to
16  whether that happened once a year or ten times in
17  one year?
18    A.   Let me go back to Exhibit 46.  You know
19  what's interesting about those calculations is
20  that I'm really conservatively -- I made a really
21  conservative error because I do write properly
22  that the number of events per month is one, so
23  the total number of events is low by a factor of
24  12.  I just checked the interview.  So I should
25  have had 12 months per year because he -- I

Page 169

1  remember asking him, did you do that year-round,
2  and he said yes.
3        So what you see here is where I have on
4  table -- page 18, table 14, everything's correct.
5  The 24.25 years is correct, the once per month is
6  correct, but the number of events should be 24
7  times 12.  Because there's 12 months in a year.
8    Q.   Okay.  That would mean he had two events
9  per month.
10    A.   No, it would mean one event per month --
11  he's doing this just slightly over 24 years, and
12  if there's one event per month, that's 12 events
13  per year, correct?
14    Q.   Correct.
15    A.   So I should then multiply 24 by 12, not
16  24 by 1.
17    Q.   Okay.
18    A.   So that calculation is incorrect.  It's
19  incorrect in terms of the numbers of events is
20  much less than it should be by a factor of 12.
21    Q.   Okay.
22    A.   That's all I'm saying.
23    Q.   All right.  And he reported that the
24  time of the event would be from two to eight
25  hours following this pickup truck?

43  (Pages 166 to 169)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 170

1  A.  Yes, yes.  That's what he reported on
2  page -- I have it on page 6 of Exhibit 46.
3       So you'll see both the events and the
4  hours for that particular activity are low by a
5  factor of 12.
6  Q.  Okay.  All right.  Going to page 19.
7  A.  Okay.
8  Q.  Sorry, I don't have my headings on here.
9  A.  It's the home usage and the vacation
10  home usage.
11  Q.  Right.  So at home, over 31 years in
12  nine-month seasons, he would have one event per
13  month?
14  A.  Correct, for just the nine months out of
15  a year.
16  Q.  Right.  So nine events per year.
17  A.  Right, times 31 years.
18  Q.  Times 31 years.
19  A.  I'm sorry.  I did the math right there.
20  Q.  Okay.  And each time, he would spray for
21  an hour?
22  A.  That's what he said, yes.
23  Q.  Okay.  And basically, from a quarter to
24  a half the time, he would get some portion of his
25  hands, wrists, forearms, face, neck and legs

Page 171

1  wetted?
2  A.  No.  Oh, a quarter of the time, he'd get
3  some portion --
4  Q.  A quarter to half of the time.
5  A.  Yeah, he'd get some portion of those
6  skin areas wetted, correct.
7  Q.  All right.  And for the vacation home,
8  the parameters of the calculation changes because
9  you're not using weeks to months or months to
10  year; you're using events per year and then just
11  events spraying?
12  A.  Yeah, yeah.  It's -- the units are
13  changing in terms of the events per unit time.
14  It's not months or weeks; it's per year.
15  Q.  Okay.
16  A.  So that's pretty straightforward.  I
17  mean, the math's, you know, three years times
18  three to five events per year, so -- or 4 --
19  Q.  4 to 6?
20  A.  I'm sorry, 4 to 6 with 5 as the
21  midpoint.  So you've got 12 to 8.  And 3 times 4
22  is 12 and 3 times 6 is 18.
23  Q.  And on each of those occasions he
24  sprayed?  Or actually, when you have time per
25  year, you have six to nine hours per year?

Page 172

1  A.  Yes.
2  Q.  Rather than hours per event.
3  A.  Yeah.  That was interesting, because I
4  usually would go hours per event, and he says,
5  look, I'm telling you that overall -- he just
6  said I'll give you -- I'm more comfortable giving
7  you -- because that's another area where we have
8  this discussion.  I'm just not recording
9  everything like a transcript.  It's -- there's a
10  discussion going on and I'm like, well, normally,
11  I would ask you hours per event and then we could
12  calculate this.
13       And he said, well, I don't want to tie
14  it that way.  My memory is that I would use -- on
15  an annual basis, I would use the product
16  somewhere between six and nine hours total.
17       And I said fine, that works.  I mean, we
18  get to the total times.  You know, if you just
19  want to tell me straight up how much time that
20  is, that's fine.
21  Q.  Okay.
22  A.  But yeah, your question is the same
23  questions that I asked him, because it's a little
24  different than you see the data typically, the
25  way you generate the information typically.

Page 173

1  Q.  Right.  And what is your conclusion
2  regarding Mr. Sessions' exposure?
3  A.  Well, he would have had hundreds of
4  exposure events and his exposures times would
5  have been hundreds to thousands of hours, and he
6  had significant skin exposure areas, which could
7  have been limited if he had appropriate PPE and
8  warnings.
9  Q.  Okay.  All right.  Mr. Petty, let me
10  turn your attention to your Exhibit 7, which is
11  your factual summary in support of your opinions.
12  A.  Okay.
13  Q.  And section 7 of that document, table
14  7-1, which begins on page 113, I believe.  Let me
15  make sure.
16  A.  You are correct.
17  Q.  All right.  So that I understand table
18  7-1 correctly, which is entitled "Roundup Labels
19  Warnings by Product and Time," this table covers
20  those MSDSs and the corresponding criticisms that
21  you have for certain Roundup formulations; is
22  that right?
23  A.  Well, it's an example of those.  And
24  rather than have that table extend so that it
25  dominates the report, I've also done -- I'm

44  (Pages 170 to 173)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 174

1  providing examples of that here with time.  But
2  I've also done that same extract -- set of
3  extractions, if you will, or a lot of it, back in
4  the appendix.  It's -- it's only part of -- to
5  not bulk up the body of the report, I have not
6  put all of the products and extractions of those
7  warnings at this location.  And the rest of them
8  are -- we've talked about them before -- are in
9  Appendix B.
10        So my -- my criticisms of the warnings,
11  these are just being used as examples, but they
12  would apply to -- I have the similar -- I would
13  have similar criticisms of those warnings for
14  those other MSDSs that follow in Appendix B.
15      Q.  Right.  Now, we'll get to that, but we
16  -- and I know that we talked about extensively
17  what your criticisms were, and in fact, we, I
18  think, concentrated on this first one, the
19  post -- the Roundup Postemergent Herbicide, if
20  you recall?
21      A.  Yes.  Or we've had some discussion in
22  the past, yes.
23      Q.  Right.  Now, the difference between the
24  Table 7-1 and the Appendix B is Appendix B
25  doesn't include your criticisms and analysis,

Page 175

1  right?
2      A.  Correct.  But my -- my criticisms would
3  be -- I felt that by going through this many
4  over -- over that time frame that the criticisms
5  that I would have, which are the same in 7-2,
6  while they would obviously be slightly different
7  from product to product depending on the words
8  that are used or the warnings that are are used,
9  these capture, if you will, the essence of what
10  my criticisms are of these MSDSs.
11      Q.  Okay.  So let's go to 7-2, which is on
12  page 130.
13        So you've looked -- and again, these
14  correspond to 7-1, right?
15      A.  Correct, they should.
16      Q.  Okay.
17      A.  I hope they do.
18      Q.  All right.  I hope they do, too.
19      A.  That's the intent.
20      Q.  Because that's the assumption that I'm
21  making.
22      A.  And to the best of my knowledge, that's
23  the way it should be.
24      Q.  Okay.  Now, this -- certain MSDSs that
25  we've talked about that have similar signal

Page 176

1  words, right?  So they're in categories, right?
2      A.  Sure.
3      Q.  Caution and warning, we've talked about
4  that?
5      A.  Danger.
6      Q.  Danger.  And there are certain MSDSs
7  that use the signal word "caution," and we can --
8  we can kind of group those together.  And then I
9  think you've done that here in table 7-1 and 7-2,
10  right?  Because you can see from the first three
11  entries -- the first four entries, that you've
12  got danger, warning, warning, and caution.
13      A.  Yeah.  Part of what I was trying to show
14  there, because I'm taking a slice of some of
15  these MSDSs rather than putting that whole
16  massive table in here, is to show also the
17  changing in the signal words with time.
18      Q.  That was my next question.  So in fact,
19  the signal word has not stayed -- stayed the same
20  throughout the life of a particular Roundup
21  product, correct?
22      A.  Right.  And that's -- and in other
23  places, I talk at length about the back and forth
24  between EPA and Monsanto, for example, and signal
25  words and language.

Page 177

1      Q.  Right.
2      A.  And of course, my opinion is that the
3  signal word should have always stayed at least at
4  the warning level.
5      Q.  Okay.  And so for products such as the
6  QuikPRO, from 7/17/2002, you think that that
7  word -- that signal word should be warning and
8  not caution?
9      A.  Based on -- yes, particularly based on
10  what was known and -- was known about the dermal
11  irritation effects to skin that has -- goes as
12  far back as 1983.
13      Q.  And is it your position that all of the
14  products that currently or previously had a
15  signal word of caution should have had a
16  different signal word?
17        MS. GREENWALD:  Objection.  Form.
18      A.  To the extent that they -- Monsanto
19  represented through limited studies with limited
20  products, they did dermal analysis on a limited
21  number of products and they use that to represent
22  the dermal effects of the products that they
23  would submit.  So I'm not saying Monsanto
24  necessarily tested every formulation for dermal
25  effects, in fact, we know they didn't

45 (Pages 174 to 177)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 178

1   necessarily, because we've summarized those
2   dermal studies.
3       But those studies were used to attempt
4   to convince the EPA to change the warning word --
5   the warning signal words. And I think that, one,
6   the studies were misleading in terms of how they
7   were represented; and two, the way in which they
8   represented the information -- there's some
9   examples where you see the chronic exposures
10  after as little as a week show, you know, edema
11  and irritation of the skin, and yet at one time
12  exposure doesn't.
13      Well, in the real world where people use
14  a product over and over again, that's what
15  happens. We know that it degrades the surface
16  characteristics of the skin and the skin is more
17  accurately represented by repeated exposures.
18      So what I'm saying is, you've said,
19  well, does this represent every product? Well,
20  it does in the sense that Monsanto is
21  representing a lot of different products'
22  formulations by a small number of studies.
23      So to that extent, the answer is they're
24  saying based on these studies, these limited
25  studies on these products, we shouldn't have to

Page 179

1   provide dermal warnings, for example, above and
2   beyond what's required under the caution word.
3       And I'm saying, well, if you move to the
4   warnings word, you get significantly different
5   PPE protection.
6   Q.   Who makes the final determination of
7   whether the signal word is "warning" or
8   "caution"?
9       MS. GREENWALD: Objection. Form.
10  A.   The determination is made by EPA, but it
11  also is -- it's clear from the law, the FIFRA
12  law, that -- or regulation, I should say -- that
13  they are completely relying on the input from the
14  manufacturer.
15  Q.   And is it your testimony that the dermal
16  studies that you've reviewed in this factual
17  summary are the only studies that have been
18  submitted to the EPA --
19      MS. GREENWALD: Objection, sorry.
20  Q.   -- with regard to dermal issues?
21      MS. GREENWALD: Objection. Form.
22      MR. UPSHAW: Sorry.
23      MS. GREENWALD: I'm so sorry.
24  A.   I'm not saying they're the only studies,
25  but I'm saying they're the significant studies.

Page 180

1   They're the studies that show -- they show
2   repeated exposures, and they show -- and they're
3   especially studies that not only show irritation,
4   but they show the -- it's not just the irritation
5   part of it. It's also the dose.
6       And -- for instance, the TNO study
7   showed very high fluxes, if you will, dermal
8   fluxes well beyond the 3 percent that they
9   were -- and in fact they shut the study down
10  because they -- and they say explicitly, this is
11  bad, this is not good.
12      Well, that's work that should have been
13  submitted to the EPA. They don't have a choice
14  of saying well we're only going to submit to the
15  EPA studies we like or results we like. That was
16  a significant study by all accounts, because it
17  had very elevated levels.
18      And so it's the combination of -- it's
19  not just -- when you say any studies, you have to
20  look at the studies that are impactful. One --
21  the big impactful one, first of all, was dermal
22  dose rates, what's getting into people or animal
23  systems.
24  Q.   Does the EPA --
25  A.   But the other side of it is --

Page 181

1   Q.   I'm sorry. Does the EPA require you to
2   submit studies on dermal dose rates?
3   A.   They require you to submit any
4   significant information that comes to your
5   attention.
6   Q.   That's your opinion, they require you to
7   submit any significant information that comes to
8   your attention? Is that the EPA rule?
9       MS. GREENWALD: Objection. Form.
10  A.   That would impact the -- the
11  registration of that product, yes.
12  Q.   Is there a required number and certain
13  types of studies that must be submitted to the
14  EPA for registration of a new product?
15  A.   Oh, I don't know about that, but what
16  I'm talking about is the specific language --
17  I'll grab the language. It's very specific
18  language. Bear with me.
19      Under 168 -- or 162.8, data support of
20  registration classification, under section D2,
21  which is page 110 of -- which I repeat the
22  language under -- under Exhibit 7, I guess it is,
23  page 110, "If at any time after the registration
24  of a pesticide product the registrant has
25  additional information regarding any adverse

46  (Pages 178 to 181)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 182

1   effect on man or the environment, he must submit
2   such information to the administrator."
3       Q.   All right.  But it doesn't answer my
4   question.  My question to you was, at the time of
5   registration, does the EPA require a certain set
6   of studies be submitted?
7           MS. GREENWALD:  Objection.  Form.
8       A.   Well, there's certain requirements,
9   under -- I'm not talking about registration.  I'm
10  talking about the TNO study that was post
11  registration.
12      Q.   I didn't ask you about that.  My
13  question was really straightforward and simple,
14  and I think you've answered the question, so I
15  can move on.  I know you want to answer something
16  else, but that's not what I'm asking.
17          MS. GREENWALD:  That's actually not
18  true.  You asked him about the dermal studies and
19  that's exactly what he's talking about.
20          MR. UPSHAW:  That was three questions
21  back, Ms. Greenwald.
22          MS. GREENWALD:  I have to say I have the
23  same misunderstanding he does then, if that's
24  really what it is.  But anyway.
25          MR. UPSHAW:  All right.  That's

Page 183

1   unfortunate.
2       Q.   All right.  You've also identified in
3   table 7-2 two MSDSs which use the signal word
4   "warning," and that's RU Herbicide and Roundup
5   Herbicide both from February and April of 1977.
6   And I'll have to locate those for you if you
7   don't know them in order.
8           They're number 1 and number 2 in table
9   7-2.  Do you see those?
10      A.   Yes.
11      Q.   Okay.
12      A.   But this table is not focused on signal
13  words.  It's focused on language within the
14  warnings.  So that's what's confusing to me with
15  your questioning.
16      Q.   Well, each -- under each label issue --
17      A.   I mean, I'm giving you -- under each one
18  of them, I'm giving you my specific criticisms.
19      Q.   I understand that.  And the way you
20  start each and every label issue is by
21  identifying what the signal word is, don't you?
22      A.   Sure.
23      Q.   Okay.  So that's all I'm going on.  I'm
24  merely --
25      A.   But that has nothing to do with what the

Page 184

1   intent of this table is, really.
2       Q.   Understood and point taken.
3           The table also recognizes certain MSDSs
4   that use the signal word "danger," correct?
5       A.   Very early on.  I mean, appreciate this
6   was like the very beginning, in early 1974, is
7   the only time I saw that signal word "danger"
8   used.
9       Q.   Really?  So how about you go to page 131
10  for a label dated February 2006, for Landmaster
11  herbicide.
12      A.   Okay.
13      Q.   What's the signal word there?
14      A.   I'm incorrect on that statement.
15      Q.   What's the signal word there, Mr. Petty?
16      A.   I said I'm incorrect.  There's a danger
17  there.  But I'm saying if you look at the body --
18  if you go back to the back and you look at the
19  body of signal words that are used, the vast
20  majority of them -- the vast majority of them use
21  the signal word "caution."
22      Q.   All right.
23      A.   And that's my overall criticism is that
24  the signal word "caution" should not have been
25  used.

Page 185

1       Q.   So what about Landmaster herbicide.
2   Should the signal word have not been "danger" for
3   that particular purpose?
4       A.   No, I have no problem -- I have -- I
5   have no criticism of the use of that signal word.
6   I don't have any criticisms of the signal word
7   "danger."  In fact, in both cases, my criticisms
8   are the use of the word "avoid contact with eye,
9   skin, and clothing," and I always say, how do you
10  do that?
11      Q.   That's what you say in the label issue
12  for the Landmaster herbicide?  Am I reading
13  something different?
14      A.   No, I say that in 3-13-74, where it uses
15  the word "danger."   And in the Landmaster one,
16  my criticism isn't of the word "danger."
17      Q.   What is your criticism?
18      A.   My criticism is that it has implied
19  increases in PPE to protect the eyes, skin and
20  lungs, and there were no specific eye, skin, or
21  respiratory protection PPE listed in the MSDS.
22      Q.   Okay.
23      A.   So I'm not criticizing the use of the
24  word "danger."  In fact, I think that's fine.
25  I'm criticizing the fact that when you that use

47  (Pages 182 to 185)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 186

1  word, you're then -- you have to tell the user
2  let's wear some equipment to protect ourself.
3      Q.   You list in table 7-2 two herbicides
4  that have no signal word.  They're the last --
5  one of them is no date on page 134, RD 1686
6  herbicide?
7      A.   134?
8      Q.   Page 134 of Exhibit 7.  The first -- the
9  first herbicide listed.
10     A.   Yeah, yeah.
11     Q.   Okay.
12     A.   Apparently -- I mean, I didn't see it
13  when I did these extractions.  Unless I missed
14  it, I didn't see it.
15     Q.   So you would say you just missed it or
16  is there a reason why you think that there's no
17  signal word?
18     A.   I didn't see it.
19     Q.   Okay.
20     A.   But again, my criticisms have less to do
21  with -- appreciate what I'm looking at is what is
22  the PPE.  I'm interested in protecting the
23  worker, more so than I am the signal word.
24          I am against the fact that the signal
25  word has implications about PPE, but that's where

Page 187

1  my main criticism of the signal words are is that
2  by going to the word "caution," you don't -- you
3  don't adequately protect the worker.
4          But beyond that, there's specific
5  language in the MSDSs that's nonactionable or is
6  inconsistent with industrial hygiene and health
7  and safety concepts.
8      Q.   And when you say nonactionable, you're
9  referring to the term "avoid"; is that right?
10     A.   There's a whole bunch of terms that I
11  say are not actionable.
12     Q.   Okay.  Well, let's look at page 133 of
13  Exhibit 7.  The second entry on that page --
14     A.   137?  I'm sorry.
15     Q.   133?
16     A.   133?
17     Q.   Yes, sir.
18     A.   Thank you.
19     Q.   Second entry.
20     A.   Okay.
21     Q.   Date of the label is January 1, 2015,
22  it's the Roundup WeatherMAX with Transorb 2
23  Technology Liquid Herbicide.
24     A.   Okay.
25     Q.   Your statement is that you didn't -- you

Page 188

1  either didn't see or you say the signal word is
2  missing.
3      A.   I didn't see the signal word when I did
4  that extraction.
5      Q.   And then you go on to indicate what the
6  label does say with regard to warnings, and your
7  criticism there is that it uses the word "avoid."
8      A.   Yeah.
9      Q.   Okay.  Which is not defined or
10  actionable.  So the word "avoid" is not
11  actionable?
12     A.   Yeah.  I don't -- I don't know how
13  you -- if your job -- say your job is to go out
14  and spray and this stuff stays in the air for six
15  minutes before it falls six feet and you're
16  walking along spraying, and you're not told to
17  wear a respirator or you're not told to wear skin
18  protection in all the areas where it would have
19  impacted your skin, how do you technically avoid
20  it if it's your job to spray the product?  You
21  either --
22     Q.   So you're saying its unavoidable, is
23  what you're saying?
24     A.   It's nonactionable.  In other words,
25  it's a word with no meaning.

Page 189

1      Q.   Okay.  And --
2      A.   In other words --
3      Q.   All right.  I'll let you finish your
4  answer.
5      A.   In orders words, you either use the
6  product or you don't use the product.
7      Q.   So are you saying --
8      A.   And then if you use the product, then
9  you -- then you have to warnings that protect the
10  user, assuming it has properties that require
11  them to protect the user.
12     Q.   I apologize for interrupting you.
13          Are you saying, Mr. Petty, that it's
14  unavoidable that you would have some contact to
15  your eyes or skin if you use the product that
16  we're talking about here, the Roundup WeatherMAX?
17          MS. GREENWALD:  Objection.  Form.
18     A.   If you put them in a moon suit, probably
19  not.
20     Q.   I'm trying to understand, sir, without
21  being facetious, how you are determining that the
22  word "avoid" is not actionable.  Which sounds
23  like an action word to me.
24          But you're the expert, so I'm trying to
25  determine what you mean by that?

48  (Pages 186 to 189)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 190

1    **A.   Avoid.**
2         MS. GREENWALD: Objection. Form. Asked
3    and answered. Now you can answer.
4    **A.   Yeah. If your job is to use the**
5    **product, you can't avoid the product because**
6    **you're -- if you're going to -- even if you're**
7    **going to just purchase and use the product and it**
8    **has the ability to wet your skin, which in every**
9    **instance where I've interviewed people, at least**
10   **some of the time, their skin is wetted.**
11   Q.   Okay.
12   **A.   Then how practically if your situation**
13   **is either as a residential user or as an**
14   **occupational user, you have to use a product, how**
15   **do you avoid coming in -- being exposed to it?**
16   **Remember the concept of exposure is it's present**
17   **there.**
18   Q.   Let me ask you --
19   **A.   I don't know how you do that.**
20   Q.   Let me ask you one question. The
21   warning says, according to your chart, "Avoid
22   contact with eyes, skin, or clothing and avoid
23   inhaling spray mist."
24        My only question there, sir, is did you
25   accurately reproduce the words from the label

Page 191

1    here in table 7-2?
2    **A.   Well, first of all --**
3         MS. GREENWALD: Objection. Form. Asked
4    and answered.
5         Go on.
6    **A.   First of all, it's not a label. It's an**
7    **MSDS.**
8    Q.   Okay.
9    **A.   They're different things. Now, the MSDS**
10   **is --**
11   Q.   Then let me change my question.
12   **A.   -- considered part of the label, but I**
13   **think you're using it differently.**
14   Q.   Okay. So let me -- let me rephrase my
15   question.
16        In table 7-2, did you accurately repeat,
17   copy, reflect the language in the MSDS with
18   regard to what the warning says, that is, avoid
19   contact with eyes, skin, or clothing, so on and
20   so forth?
21        MS. GREENWALD: If you're asking him
22   whether he made a typo, it would be helpful if
23   you showed him.
24        MR. UPSHAW: I'm not asking him. I'm
25   just saying is this -- is this right. Is this

Page 192

1    what it says. And my question is pretty clear.
2    Yeah, I did it, I copied it right, or I didn't
3    and I made a typo.
4         MS. GREENWALD: How would he know? Do
5    you want him to go look at a computer in the last
6    few minutes and see if he got it right?
7         MR. UPSHAW: I think it's pretty simple.
8    **A.   The intent was --**
9    Q.   Okay.
10   **A.   -- to type in table 7-1 the language**
11   **that was present on those MSDSs.**
12   Q.   Okay. That's all.
13   **A.   If there was a typo or something, you**
14   **know.**
15   Q.   It's a typo, right? It's a mistake?
16   **A.   Yeah. If --**
17   Q.   That's fine. All right. In Exhibit 7,
18   you include chapter 12 of the Label Review Manual
19   as an appendix?
20   **A.   Yes.**
21   Q.   Right? Did you review any other
22   chapters of the label review manual?
23   **A.   Sure, I read the manual. But I'm --**
24   Q.   Which ones?
25   **A.   I believe I read the whole thing.**

Page 193

1    Q.   The entire manual?
2    **A.   I'm pretty sure I did.**
3    Q.   Okay. And you chose only to include
4    chapter 7 -- I'm sorry, chapter 12?
5    **A.   Because I'm interested in the warnings,**
6    **the warnings aspect, that's what I'm being asked**
7    **to look at. At least one of the major areas is**
8    **warnings or labeling.**
9         **So of course I could have -- I could**
10   **have, I guess, scanned and put the entire chapter**
11   **back there, but -- or the entire booklet, but the**
12   **most relevant part of that booklet was that**
13   **section, so that's why I incorporated it. I**
14   **mean -- and I never get accused of doing thin**
15   **reports.**
16   Q.   Okay. And you've included that because
17   as you said, you're interested in the warnings
18   and the warnings as they relate to the user
19   having the appropriate PPE, right, in your
20   opinion?
21        MS. GREENWALD: Objection. Form.
22   **A.   Well, all aspects of the -- no, all**
23   **aspects of the warnings. I'm interested also in**
24   **how they advertise the product, what does the**
25   **advertising imply about the safety of the product**

49 (Pages 190 to 193)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 194

1  or does it mislead regarding the safety of the
2  product.
3       Q.   Okay.  Did you review chapter 7 of the
4  Label Review Manual?
5       A.   Chapter 7?
6       Q.   Yes.
7       A.   I'm sure that I read it, because I
8  printed the whole thing off and I read -- I would
9  have had to read through it to get to this
10  chapter.
11       Q.   Okay.  Let me show you Exhibit 47, which
12  is chapter 7 of the Label Review Manual.
13            MR. UPSHAW:  Here you are,
14  Ms. Greenwald.  You don't have to look over his
15  shoulder.
16            - - - - -
17  (Thereupon, Petty Deposition Exhibit 47, Chapter 7
18  of the Label Review Manual, was marked for purposes
19  of identification.)
20            - - - - -
21       Q.   So you recall reading that, right?
22       A.   I recall that this chapter existed, yes.
23       Q.   I want you to turn to page 77-2.
24       A.   Okay.
25       Q.   And there's a section 3 there that says

Page 195

1  acute toxicity classification, right?
2       A.   Okay.  Yes.
3       Q.   Okay.  And it says the, "Signal word
4  hazards to humans and domestic animals, non-WPS
5  PPE" -- what does that mean?
6       A.   Nonworker protection standard.
7       Q.   Um-hum -- "PPE, and the first aid
8  statements are typically determined by the
9  results of six acute toxicity studies performed
10  with the product formulation."
11            Were you aware of that?
12       A.   Of course, I talk about it at length in
13  my outline of facts.  In fact, I show them all.
14       Q.   And for each -- well, you show them all
15  for -- in general.
16            Do you show in your Exhibit 7 the six
17  acute toxicity studies for each product
18  formulation that you refer to in table 7-1 and
19  7-2?
20            MS. GREENWALD:  Objection.  Form.
21       A.   No, I'm -- what I'm talking about in
22  this outline is the specific FIFRA -- and
23  that's -- the key to this -- this particular
24  paragraph is -- is the qualifier are typically
25  determined.

Page 196

1       Q.   So you have a problem with the word
2  "typically:
3       A.   No, I think it's an excellent word
4  because it doesn't mean this is an absolute.
5       Q.   Okay.
6       A.   I mean, that word is a qualifier.
7       Q.   Are you familiar with chapter 10 of the
8  Label Review Manual?
9       A.   I'm sure I looked at it as well.
10       Q.   I'm going to hand you what we've marked
11  as Exhibit 48.
12            - - - - -
13  (Thereupon, Petty Deposition Exhibit 48, Document
14  Titled Label Chapter Review:  Chapter 10: Worker
15  Protection Label, was marked for purposes of
16  identification.)
17            - - - - -
18       Q.   Does Exhibit 48 refresh your
19  recollection of the worker protection label
20  chapter of the Label Review Manual?
21       A.   To some extent.
22       Q.   Would you turn to page 10-6.
23       A.   10-6, okay.
24       Q.   Let me get there.  There's a table there
25  that's labeled table 1 that says, "Handler PPE

Page 197

1  for WPS products."  And again, WPS means what?
2  Worker protection, right?
3       A.   Standard, yeah.
4       Q.   Worker protection standard, right.
5            So you also refer to this table in your
6  chapter, correct?  In your Exhibit 7?
7       A.   Well, a variant of that, yes.
8       Q.   A variant of it.  Okay.  So this is a
9  little different than what you have in your
10  factual summary --
11       A.   Well, I'm not sure.
12       Q.   -- manual, right?
13       A.   The stuff that I have in my summary
14  manual is the stuff straight from the statute as
15  opposed to the implementation diagram.
16       Q.   And as opposed to what the EPA actually
17  uses.
18       A.   No.
19            MS. GREENWALD:  Objection.  Form.  And
20  it mischaracterizes his testimony big time.  I
21  think statutes are pretty significant.
22       A.   No.  What I'm -- what I'm producing here
23  in section 6.3 is the actual statute language --
24       Q.   What page are you on, sir, so I can keep
25  up with you?

50 (Pages 194 to 197)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 198

1    A.   103.
2    Q.   Okay.
3    A.   And there's a series of tables in
4  that --
5    Q.   Sure.
6    A.   -- section that I've pulled straight
7  from section 156.6 through 8 of the statute.
8    Q.   All right.  And what I've shown you in
9  Exhibit -- shoot, I forgot the number -- 48?
10   MS. GREENWALD:  48.
11   A.   Yes, sir.
12   Q.   All right.  Is what the EPA uses as its
13 table regarding route of exposure and then the
14 toxicity category by route of exposure of end use
15 product.  Would you agree with that?
16   MS. GREENWALD:  Objection.  Form.
17   A.   Let me read this.
18   Q.   And I'll direct you, if you're reading
19 it, to the first line behind the numeral 1, which
20 says, "Identifying the correct product-specific
21 handler protective clothing."
22   A.   And that goes to the heart of what I've
23 been -- the heart of one of my major opinions is
24 that the correct toxicity category of moving --
25 and not only the fact that Monsanto -- the fact

Page 199

1  that Monsanto clearly knew from marketing studies
2  that we talked about earlier, as well as you see
3  the back and forth with the agency about Monsanto
4  pushing to move to the word "caution," this
5  clearly illustrates the -- the decrease, if you
6  will, in protective PPE that occurs when you move
7  down category.
8    Q.   Okay.
9    A.   Now, I would disagree with the title in
10 this -- this particular -- this is an
11 implementation document and I don't necessarily
12 agree with everything that's in here.  Remember
13 that I said --
14   Q.   Haven't asked you that yet.
15   A.   No, no, no.
16   Q.   But go ahead.
17   A.   No, this title is -- you're the one that
18 brought the table up.
19   Q.   Oh, yes.  But I haven't asked you a
20 question about it yet.  Go ahead.
21   A.   It says handler PPE and worker
22 protection products, right?
23   Q.   Yes, sir.  It sure does.
24   A.   And we know that some of these materials
25 are not PPE.

Page 200

1    Q.   Well, there we go.  So now you lead me
2  to my next question.
3        This is an EPA document that I've handed
4  you, you would agree?  A copy of it?
5    A.   That's not the statute.
6    Q.   No, no, no.  Answer my question.  This
7  is an EPA document that I've handed you, a
8  chapter from one, is it not?
9    A.   Right.
10   Q.   And the EPA document that I've handed
11 you in table 1 on page 10-6, the title says,
12 "Handler protective equipment, protective
13 equipment for WPS products."  And in there, the
14 EPA identifies PPE as long-sleeved shirt and long
15 pants.  Yes or no?
16   A.   No.
17   Q.   Okay.  So they don't -- under caution
18 3 --
19   A.   No, I know where you're --
20   Q.   Hold on.
21   A.   No, no, let me answer it.
22   Q.   You've answered it.
23   A.   No, no, I didn't finish my answer.
24   Q.   Then you go right ahead.
25   A.   You've got to let me finish my answer.

Page 201

1    Q.   Please do.
2    A.   Because the title says that, but you
3  have to go back to the statute and the statute is
4  black and white about what constitutes PPE and
5  what doesn't.  And all the elements -- you're
6  assuming that all the elements in this table mean
7  that they're all PPE.  You have to go back to the
8  statute to realize some of these are PPE and some
9  of these are not.
10   Q.   Okay.  So the EPA was wrong in labeling
11 this table?
12   MS. GREENWALD:  Objection.  Form.
13 Mischaracterizes the testimony.
14   A.   That's not what I said.
15   Q.   Well, I'm asking you the question, sir.
16 It's very simple.  Let's read together, if we
17 can, numeral 1, "Identifying the correct
18 product-specific handler protective clothing."
19 Next line, "Once the correct toxicity category
20 has been established, the product-specific
21 handler PPE can be identified."
22       So let's go to the specific toxicity
23 category.  The category of 3, which is caution,
24 identifies the product-specific PPE to be worn as
25 long-sleeved shirt and long parts, socks, shoes,

51  (Pages 198 to 201)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 202

1 waterproof or chemical-resistant gloves, and then
2 there's no minimum on inhalation or eye
3 irritation.
4     Did I read that correctly based upon
5 what's written here?
6     **A. Well, you've asked multiple questions.**
7 **If you ask -- if you read the words correctly, I**
8 **would say yes, but your preface that they**
9 **represent PPE is incorrect.**
10     Q. Okay.
11     **A. And we know that, as I've said before,**
12 **because the only item there that would be**
13 **considered PPE would be waterproof or**
14 **chemically-resistant gloves.**
15     Q. So --
16     **A. The other materials are not PPE and you**
17 **can tell that because the PPE equipment is**
18 **clearly -- the language that's used there would**
19 **be -- if you go to the statute, which I provided**
20 **under 170, and in fact -- I don't know if it's**
21 **here or not.**
22     MS. GREENWALD: I don't think you
23 brought it.
24     **A. I brought a copy of it.**
25     **There is a clear definition in the**

Page 203

1 statute of what is PPE and not PPE. And you're
2 simply trying to conflate non-PPE requirements or
3 equipment with PPE requirements or equipment, and
4 that's not the case.
5     Q. Okay.
6     **A. And I don't think that's the case in**
7 **this table.**
8     Q. All right.
9     **A. No industrial hygienist would interpret**
10 **either the statute or this to imply that. No**
11 **reputable industrial hygienist.**
12     Q. Mr. Petty, are you familiar with the
13 EPA's August 8, 2019 press release?
14     **A. No, I don't believe so.**
15     Q. Do you watch the news, sir?
16     MS. GREENWALD: Objection. You know
17 what, it's eight minutes to 2:00, by the way. So
18 you have eight minutes to go.
19     MR. UPSHAW: It's just a simple
20 question. Then it would be easy if he says yes
21 or no.
22     MS. GREENWALD: He just said no.
23     MR. UPSHAW: No, I asked him if he
24 watched the news and he didn't answer because you
25 objected.

Page 204

1     **A. I mean, I watch very little TV actually.**
2     Q. Okay. Let me hand you --
3     **A. I'm sure I see the news once in a while,**
4 **but I watch very little TV. Anybody that knows**
5 **me knows I don't know watch a lot of TV. That's**
6 **it. That's it.**
7     Q. Exhibit 49.
8     - - - - -
9 (Thereupon, Petty Deposition Exhibit 49, Document
10 Titled EPA Takes Action to Provide Accurate Risk
11 Information to Consumers, Stop False Labeling on
12 Products, was marked for purposes of
13 identification.)
14     - - - - -
15     **A. Yes, sir, I have it.**
16     Q. Okay. Have you seen this before?
17     **A. I have not.**
18     Q. Okay. Were you aware that the EPA had
19 issued guidance for registrants of glyphosate
20 regarding clarity on labeling?
21     MS. GREENWALD: Objection. Form.
22     **A. I just said I haven't seen this.**
23     Q. I understand that. I just asked if you
24 were aware in general.
25     **A. Well, in general? Of course in general.**

Page 205

1     Q. Okay.
2     **A. But -- that has almost no meaning, it's**
3 **so broad. I mean, I have not seen this document.**
4     Q. All righty. All right. Let me ask you
5 some wrap-up questions. These should be fairly
6 quick.
7     All right. Let me sum up a few things
8 and ask you some questions in general that I
9 don't believe I asked you throughout this
10 deposition, including July.
11     Have you ever been employed by a
12 pesticide company?
13     **A. No.**
14     Q. Okay. And you've never submitted a
15 pesticide label to the EPA, correct?
16     **A. I have not.**
17     Q. And you've never been asked by the EPA
18 to review a pesticide label, correct?
19     **A. No, no. I've -- not by -- well, I have**
20 **to answer that differently. When I -- remember**
21 **we talked about the CHRIS database --**
22     Q. Yes.
23     **A. -- way back at the very beginning. I**
24 **think you're familiar with it because of the**
25 **Coast Guard.**

52 (Pages 202 to 205)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 206

1    In '79 and '80, we included pesticides
2 in the CHRIS database. So I guess that would
3 have been for the U.S. Coast Guard rather than
4 the EPA.
5    Q. Right. I was wondering where you were
6 going with the CHRIS database and the EPA,
7 but okay.
8    A. It would have been -- but I was
9 certainly reviewing information on pesticides.
10   Q. Right.
11   A. But it was with respect to Coast Guard,
12 not with respect to the EPA.
13   Q. Okay. So I'll ask the question again.
14 You've never been asked by the EPA to review a
15 pesticide label?
16   A. I believe that's correct.
17   Q. Okay.
18   A. But by other agencies I have.
19   Q. All right. Just so I'm familiar, and I
20 hadn't touched on this, we marked as Exhibit 31 a
21 document you provided yesterday, the one-page
22 Petty methodology utilized in forming overall
23 opinions and overall summary of opinions.
24   A. Okay.
25   Q. Okay.

Page 207

1    A. I don't see it, but --
2    MS. GREENWALD: Give me your pile.
3    A. They're out of order.
4    MR. UPSHAW: It's 31 if they're not in
5 order.
6    MS. GREENWALD: It's just one page.
7    Q. I think you'll recognize it. Let me ask
8 some questions while Ms. Greenwald looks for
9 that.
10   A. Yeah, yeah. Go ahead.
11   Q. When did you prepare this?
12   A. Sometime between the two -- between this
13 period of deposition testimony and the -- well,
14 most of it is the same as what's in the tail end
15 of -- it's just an -- some of it was prepared
16 months and months ago, and then I adjusted some
17 of the words in it in the last three to four
18 weeks.
19   Q. Okay. So let me just ask it a better
20 way.
21   When did you prepare this document, not
22 that you didn't pull things from other documents,
23 when did you prepare this sheet?
24   A. I wasn't pulling it. It's the very last
25 page before my signature, and I just -- I just

Page 208

1 put some words on top of it. But it was prepared
2 in the last three to four weeks.
3    Q. Okay. And at whose direction did you
4 prepare these?
5    A. Nobody's.
6    Q. This was of your own accord?
7    A. It was.
8    Q. Okay. All right. And I think we
9 established in July that you have not interviewed
10 any Monsanto employees, officers, directors?
11   A. That is -- that's correct.
12   Q. Okay. And you've never been employed by
13 Monsanto. I think we established that, correct?
14   A. No, I've never been employed by
15 Monsanto.
16   Q. Okay. And to formulate your opinion,
17 you rely on e-mails and certain communications
18 that you've chosen to put in Exhibit 7?
19   MS. GREENWALD: Objection. Form.
20   A. Only in part. But in part.
21   Q. Okay. All right. You're familiar with
22 the term "the EPA six-pack"?
23   A. Not necessarily.
24   Q. Okay. Do you know that there is a
25 required six specific studies that must be

Page 209

1 submitted --
2    A. Oh, under the RED; is that what you're
3 talking about?
4    Q. -- whenever a product is being presented
5 for registration?
6    A. I believe I'm -- in reviewing the
7 regulatory history, and I remember reading the
8 REDs for -- or at least some of them for Roundup.
9 So in a -- in a small sense, yes, I'm familiar
10 with that term.
11   Q. Okay. Just to make sure you know where
12 that's coming from, let me hand you Exhibit 50 --
13        - - - - -
14   (Thereupon, Petty Deposition Exhibit 50, CFR
15   158.500, was marked for purposes of
16   identification.)
17        - - - - -
18   Q. -- which is CFR 158.500. And that's
19 just a background. I'm not going to ask you
20 specific questions on that document.
21   Let me ask you this: Are you aware that
22 Monsanto has submitted and registered and
23 reregistered numerous formulations of Roundup
24 over the years, right?
25   A. I am.

53 (Pages 206 to 209)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 210

1    Q.   And you know that for each formulation
2  that's submitted it's subject to this six-pack of
3  testing, right?
4        MS. GREENWALD:  Objection.  Form.
5    A.   I'm not -- I'm not here to opine on the
6  reregistration process.  I'm here to opine on
7  specifically the dermal data that was used and
8  the adequacy of that data and how it was
9  presented.  The key to this whole process is that
10  it's -- it truly is a garbage in/garbage out
11  process.  In other words, if they're not fed --
12  I've testified to this multiple times.
13        The EPA cannot know what they don't
14  know.  And it's clear based on the FIFRA
15  standards that it's incumbent on the registrant
16  to provide all relevant information, and not only
17  during the registration process, but also if they
18  discover new information along the process.
19        And as I've said before, in the area in
20  which I'm an expert, particularly on exposure and
21  dermal exposure, I do not believe that Monsanto
22  was fully transparent in either the registration
23  or the reregistration process for Monsanto
24  Roundup products.
25    Q.   For any Monsanto Roundup product?

Page 211

1    A.   I'm not saying any.  But particularly
2  the -- for the studies that I reviewed with
3  respect to glyphosate and the Roundup products,
4  that the product had glyphosate in it, the
5  Roundup product, then I don't believe that the
6  information that was conveyed to the EPA was
7  either transparent or in some cases even provided
8  to them.
9    Q.   Okay.  Is there anything that we've not
10  discussed on which you intend to offer on expert
11  opinion?
12        MS. GREENWALD:  Objection.  Form.
13    A.   Well, I've given you my kind of overall
14  opinion.
15    Q.   Yes, you have.
16    A.   And I would just say that I would -- I
17  would be offering opinions -- and we've covered
18  many of them over the last five or portions of
19  five days.  This document on statement of facts,
20  I would -- I would be rendering, if asked,
21  opinions on -- sub opinions that would support my
22  overall opinion with respect to the dermal work,
23  with respect to the labels, with respect to the
24  MSDSs, with respect to e-mails related to
25  warnings or dermal studies.

Page 212

1        I would have individual opinions about
2  those, but they would still be supportive of my
3  overall opinion, and I don't think we've gone
4  through of all those.
5    Q.   You don't think we've gone through all
6  of your sub opinions or we haven't gone through
7  all of your opinions?
8    A.   Sub -- well, as I've given you -- this
9  is sort of my -- I'll call it my rollup at the
10  end of opinions based on this document, statement
11  of facts.  But I would have sub opinions that
12  would support those for individual sections of
13  the facts that are presented in this document.
14    Q.   All right.  Do you intend to make any
15  revisions or amendments or corrections to your
16  factual summary document between now and the time
17  of trial?
18    A.   The only changes I might make would be
19  anything identified in the deposition where I've
20  had typos or something wasn't quite right.  I
21  might make changes in that sense, but not -- not
22  substantial.
23    Q.   Okay.  My question was, do you intend to
24  make any revisions, amendments, or corrections to
25  your factual summary document?

Page 213

1    A.   Correct.  And I said to the extent that
2  we've identified in the deposition typos --
3    Q.   That would be in the depo.
4        MS. GREENWALD:  No.  In this deposition,
5  to the extent he's -- you've identified things in
6  the questions that there's a mistake, he may
7  correct it.
8    A.   To the extent I've identified typos or
9  something in here, I may correct that --
10        MS. GREENWALD:  Names --
11    A.   I may have misspoke.  But anyway --
12        MR. UPSHAW:  She clarified it for you.
13  We got it down.  Done.
14        MS. GREENWALD:  I just want to make sure
15  everybody understands.
16        MR. UPSHAW:  All right.
17    A.   I'm just saying, if we identified some
18  misspelling or, you know, like Karr to Kerr or
19  whatever, I would change that.
20        MS. GREENWALD:  Kerr is going to become
21  Karr.
22        MR. UPSHAW:  Got it.  I got it.  Now I
23  understand.  Thank you, Ms. Greenwald.
24  BY MR. UPSHAW:
25    Q.   Do you intend to conduct any additional

54  (Pages 210 to 213)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

---

Page 214

1  or revised risks or exposure assessments on any
2  of these 14 plaintiffs prior to litigation?
3  **A.  I've not been asked to do so and I don't**
4  **intend to do so.**
5  Q.  Okay.
6  **A.  I assume if I did, that you'd want to**
7  **talk to me again.**
8  Q.  Okay.  That is correct.
9  **A.  Or maybe not.**
10  Q.  All right.
11      MR. UPSHAW:  I promised Ms. Greenwald I
12  would try to end at 2.  I actually went over, I
13  apologize.
14      MS. GREENWALD:  It's okay.  I forgive.
15      MR. UPSHAW:  It's 2:04.
16      MS. GREENWALD:  I just want a couple
17  minutes with Stephen, because I have a couple of
18  little questions.  Short.  Less than five
19  minutes.
20      MR. UPSHAW:  Oh, okay.  I didn't know if
21  you want to ask them now or you want to --
22      MS. GREENWALD:  I'm going to take a
23  two-minute break just so he knows what they are
24  and then we'll come right back.
25      THE VIDEOGRAPHER:  Off the record, 2:04.

---

Page 215

1      (Recess taken.)
2      THE VIDEOGRAPHER:  Okay.  We are back on
3  the record, 2:07.
4  BY MR. UPSHAW:
5  Q.  Okay.  I do have two more questions for
6  you -- two more areas of questions for you, Mr.
7  Petty.
8  **A.  Sure.**
9  Q.  On Exhibit 38, we included your
10  invoices.  We did not discuss those.
11  **A.  Okay.**
12  Q.  The first invoice I am looking at is
13  dated July 31, 2019.  In the item column, it says
14  SEP admin.  Can you explain what that is?
15  **A.  SEP is me, Stephen E. Petty.**
16  Q.  Okay.
17  **A.  And then admin would be secretarial time**
18  **to do typing, copying, whatever.**
19  Q.  And 49 is minutes?
20  **A.  I'm sorry.  Can I see this?**
21  Q.  Under quantity.  I don't understand what
22  the quantity is.
23  **A.  Those are hours.**
24  Q.  49 hours?
25  **A.  Those are hours.**

---

Page 216

1  Q.  Okay.  And admin is 23.5 hours?
2  **A.  Correct.**
3  Q.  Okay.  And then copying material?
4  **A.  What that is we keep track of all the**
5  **copy -- we print thousands of copies, so we keep**
6  **track of copies and we charge -- I think it's**
7  **three cents a page or something.**
8  Q.  Okay.  And that's 4,743?
9  **A.  Yeah.**
10  Q.  Okay.  Whatever the number says would
11  be --
12  **A.  Whatever it is.**
13  Q.  And then there's one other page, and
14  this is an invoice for $15,000.  And what is
15  this?
16  **A.  This is for the three days of**
17  **deposition, the 5,000 per day.**
18  Q.  Okay.  And do you know whether that was
19  paid by the plaintiff's law firm?
20  **A.  I don't know, but we've never had an**
21  **issue with them.**
22      MR. UPSHAW:  Okay.  That's all I have.
23      MS. GREENWALD:  Okay.  Let me see that
24  for a second.
25      EXAMINATION OF STEPHEN E. PETTY

---

Page 217

1  BY MS. GREENWALD:
2  Q.  Okay.  Mr. Petty, I just have a couple
3  of questions.  You were asked many questions
4  yesterday and today relating to each plaintiff,
5  and one of the lines of questions was whether
6  you've considered, quote, "other risk factors."
7      Do you recall that?
8  **A.  I do.**
9  Q.  Okay.  What do you mean when you've been
10  testifying and answering those questions?  What
11  do you mean by other risk factors in connection
12  with your work in this case as to each plaintiff?
13  **A.  Those risk factors would be from the**
14  **viewpoint of me as a certified industrial**
15  **hygienist or a certified safety professional.  So**
16  **they'd be related to industrial hygiene or health**
17  **and safety.**
18  Q.  Okay.  Are you considering these other
19  risk factors as risk factors for non-Hodgkin's
20  lymphoma?
21  **A.  No.**
22      MS. GREENWALD:  Okay.  I don't have any
23  other questions.
24      MR. UPSHAW:  That was fast.  And I don't
25  have any questions after that.

---

55 (Pages 214 to 217)

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

---

Page 218

```
1              MS. GREENWALD:  I told you.
2              MR. UPSHAW:  All right.  That will
3    conclude the deposition in the Winston matter.
4              THE VIDEOGRAPHER:  Okay.  We are off the
5    record.  It's 2:09.
6              (Deposition concluded at 2:09 p.m.)
7                    ~ ~ ~ ~ ~
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 220

```
1                      AFFIDAVIT
2    The State of Ohio,  )
3                       ) SS:
4    County of        )
5
6         Before me, a Notary Public in and for said
7    County and State, personally appeared STEPHEN E.
8    PETTY, who acknowledged that he did read his
9    transcript in the above-captioned matter, listed
10   any necessary corrections on the accompanying
11   errata sheet, and did sign the foregoing sworn
12   statement and that the same is his free act and
13   deed.
14        In the TESTIMONY WHEREOF, I have hereunto
15   affixed my name and official seal at this_____
16   day of _____ A.D. 2019.
17
18
19        _____
20        Notary Public
21
22        _____
23        My Commission Expires:
24
25
```

---

Page 219

```
1                    CERTIFICATE
2    The State of Ohio,  )
                          SS:
3    County of Medina    )
4         I, Michelle L  Harper, a Notary Public
     within and for the State of Ohio, duly commissioned
5    and qualified, do hereby certify that the within
     named witness, STEPHEN E  PETTY, was by me first
6    duly sworn to testify the truth, the whole truth
     and nothing but the truth in the cause aforesaid;
7    that the testimony then given by the
     above-referenced witness was by me reduced to
8    stenotypy in the presence of said witness;
     afterwards transcribed, and that the foregoing is a
9    true and correct transcription of the testimony so
     given by the above-referenced witness
10        I do further certify that this deposition
     was taken at the time and place in the foregoing
11   caption specified and was completed without
     adjournment
12        I do further certify that I am not a
     relative, counsel or attorney for either party, or
13   otherwise interested in the event of this action
          IN WITNESS WHEREOF, I have hereunto set my
14   hand and affixed my seal of office at Medina, Ohio,
     on this 29th day of August, 2019
15
16
17        _____
          Michelle L  Harper, Notary Public
18        Within and for the State of Ohio
19   My commission expires December 25, 2023
20
21
22
23
24
25
```

---

Page 221

```
1               DEPOSITION ERRATA SHEET
2
3    RE:  WALTER WINSTON, et al , vs  MONSANTO COMPANY
4    Case No :     1822-CC0515
5    Deponent:     STEPHEN E  PETTY
6    Deposition Date:   08/28/2019
7
8    To the Reporter:
9    I have read the entire transcript of my Deposition
10   taken in the captioned matter or the same has been
11   read to me   I request that the following changes
12   be entered upon the record for the reasons
13   indicated  I have signed my name to the Errata
14   Sheet and the appropriate Certificate and authorize
15   you to attach both to the original transcript
16
17
18
19
20        _____
          STEPHEN E  PETTY
21
22
23
24
25
```

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Stephen E. Petty, P.E., C.I.H., C.S.P.
August 28, 2019

Page 222

1    PAGE  LINE        CORRECTION
2        _____
3        _____
4        _____
5        _____
6        _____
7        _____
8        _____
9        _____
10       _____
11       _____
12       _____
13       _____
14       _____
15       _____
16       _____
17       _____
18       _____
19       _____
20       _____
21
22       ____  NO CHANGES
23
24       _____
         STEPHEN E. PETTY
25

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577