# EXHIBIT 9

Stephen E. Petty, PE, CIH, CSP

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

MDL No. 2741

Case No. 3:16-md-02741-VC

IN RE:  ROUNDUP PRODUCTS
LIABILITY LITIGATION

This document relates to:

Mendoza v. Monsanto
Company

Case No.3:16-cv-06046-VC
_____/

VIDEOTAPED DEPOSITION OF
STEPHEN E. PETTY, PE, CIH, CPS

|  |  |
|---|---|
| DATE TAKEN: | November 6, 2019 |
| TIME: | 4:01 - 6:16 p.m. |
| LOCATION: | Best Western Plus Oceanside Inn<br>1180 Seabreeze Boulevard<br>Fort Lauderdale, Florida 33316 |
| COURT REPORTER: | Lori G. Erwin, RPR<br>Notary Public - State of Florida |

Stephen E. Petty, PE, CIH, CSP

## Page 2

1  APPEARANCES:
2  JERRY KRISTAL, ESQUIRE
   Weitz & Luxenberg
3  700 Broadway
   New York, New York 1000
4  212-558-5500
   jkristal@weitzlux.com
5  Appearing on behalf of the Plaintiff
6  JOHN M. KALAS, ESQUIRE
   Hollingsworth LLP
7  1350 I Street, N.W.
   Washington, DC 20005
8  202-898-5800
   jkalas@hollingsworthllp.com
9  Appearing on behalf of the Defendant
10
   Also Present:
11
   ELYSE SHIMADA, ESQUIRE
12 DANIEL MURNER, ESQUIRE
   Hollingsworth, LLP
13 1350 I Street, N.W.
   Washington, DC 20005
14
   Danielle DeSantis, Videographer
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1           INDEX
2  Witness                    Page
3  Stephen E. Petty, PE, CIH, CSP
4    DIRECT EXAMINATION
     BY MR. KALAS              6
5
     CROSS EXAMINATION        104
6    BY MR. KRISTAL
7    REDIRECT EXAMINATION     116
     BY MR. KALAS
8
9         EXHIBITS
10 Exhibit                    Page
   (Exhibits attached to transcript)
11 (Exhibits 1-8 were marked
    in Janzen case )
12
   DEFENDANT'S EXHIBIT 1, MONSANTO        --
13 COMPANY'S NOTICE TO TAKE ORAL AND
   VIDEOTAPED DEPOSITION OF STEPHEN E. PETTY
14
   DEFENDANT'S EXHIBIT 2, SUMMARY OF      --
15 EXPERT WITNESS CASES
16 DEFENDANT'S EXHIBIT 3, DECEMBER 12,    --
   2017 AMENDED RESIDENTIAL EXPOSURE
17 ASSESSMENT FOR RESIDENTIAL REVIEW
18 DEFENDANT'S EXHIBIT 4, OVERVIEW OF
   FACTORS AFFECTIVE DERMAL ABSORPTION
19 OF GLYPHOSATE THROUGH SKIN
20 DEFENDANT'S EXHIBIT 5, PETTY REVIEW    --
   COMMENTS ON DAVIES DERMAL REPORTS
21
   DEFENDANT'S EXHIBIT 6, STEPHEN E.
22 PETTY CURRICULUM VITAE
23 DEFENDANT'S EXHIBIT 7, RETENTION       --
   AGREEMENT OF STEPHEN E. PETTY
24
25

## Page 4

1           E X H I B I T S
2
   DEFENDANT'S EXHIBIT 8, EES GROUP       --
3  INVOICES
4  DEFENDANT'S EXHIBIT 9, FACTUAL         7
   SUMMARY AND EXPERT OPINIONS REPORT,
5  IN RE:  MENDOZA
6  DEFENDANT'S EXHIBIT 10, RE-EVALUATION  16
   DECISION, HEALTH CANADA
7
   DEFENDANT'S EXHIBIT 11, TNO REPORT     36
8
   DEFENDANT'S EXHIBIT 12, ROUNDUP
9  PROMAX LABEL              78
10 DEFENDANT'S EXHIBIT 13, EFSA STATEMENT 96
   REGARDING THE EU ASSESSMENT OF GLYPHOSATE
11 AND THE SO-CALLED MONSANTO PAPERS
12 DEFENDANT'S EXHIBIT 14, THOMAS J. FRANZ, 119
   M.D. STUDY
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 5

1   Fort Lauderdale, Florida
2   Wednesday, November 6, 2019
3   4:01 p.m.
4       THE VIDEOGRAPHER:  We are now on the
5   record.  My name is Danielle DeSantis.  I'm a
6   videographer for Golkow Litigation Services.
7   Today's date is November 6, 2019, and the time
8   is 4:01 p.m.
9       This video deposition is being held at
10  Fort Lauderdale, Florida -- I'm sorry -- being
11  held in Fort Lauderdale, Florida, in the
12  matter of Mendoza versus Monsanto Company for
13  the United States District Court, Northern
14  District of California.
15      The deponent is Stephen E. Petty.
16  Will counsel please identify themselves.
17      MR. KRISTAL:  Jerry Kristal from Weitz &
18  Luxenberg, on behalf of Ms. Mendoza.
19      MR. KALAS:  John Kalas, Elyse Shimada, and
20  Daniel Murner from Hollingsworth LLP, on
21  behalf of Monsanto Company.
22      THE VIDEOGRAPHER:  The court reporter is
23  Lori Erwin and will now swear in the witness.
24      THE COURT REPORTER:  Would you raise your
25  right hand.

2 (Pages 2 to 5)

Stephen E. Petty, PE, CIH, CSP

## Page 6

1    Do you swear or affirm the testimony you
2  give will be the truth, the whole truth, and
3  nothing but the truth?
4    THE WITNESS: I do.
5    STEPHEN E. PETTY, PE, CIH, CSP,
6  was thereupon called as a witness herein, and after
7  having been first duly sworn or affirmed to testify to
8  the truth, was examined and testified as follows:
9    DIRECT EXAMINATION
10 BY MR. KALAS:
11   Q. Good afternoon, Mr. Petty.
12   A. Welcome, Counselor.
13   Q. We're going to talk about the Mendoza matter
14 now.
15   A. Okay.
16   MR. KALAS: Mr. Kristal and I spoke before
17 we got on the record and Mr. Kristal agreed to
18 stipulate to the admission of Exhibits 1
19 through 8 in the Janzen deposition taken
20 earlier today as Exhibits 1 through 8 in the
21 Mendoza deposition.
22   Do you agree, Jerry?
23   MR. KRISTAL: Yes, I do.
24   MR. KALAS: So we'll mark as Exhibit 9
25 your Factual Summary and Expert Opinions

## Page 7

1  report in the Mendoza matter.
2    (Defendant's Exhibit 9 was marked.)
3    MR. KALAS: There you go, sir.
4    THE WITNESS: Thank you, sir.
5    MR. KALAS: Once you get that gathered up,
6  I'll ask you a few questions.
7    THE WITNESS: Just identify -- oh, yeah.
8  It does. It's the same as before. I
9  apologize.
10 BY MR. KALAS:
11   Q. No worries. In this report you discuss at
12 various points statements regarding the toxicity of
13 Roundup; is that true?
14   A. If you point me to a section and -- it's such
15 a broad question, I'm not -- I'm sure that I've
16 mentioned toxicity in there somewhere, but I don't know
17 really how to answer the question because I don't know
18 the context.
19   Q. Okay. So, for instance, let me give you an
20 example.
21   A. Thank you.
22   Q. You state --
23   A. Can you help me with the page number?
24   Q. Yeah. Page 28.
25   A. I'm there. Thank you.

## Page 8

1    Q. Okay. You state in the bracket at the bottom,
2  roman numeral little three: Roundup as a product
3  appears to be more toxic than its active ingredient
4  glyphosate. Correct?
5    A. Yes.
6    Q. Okay. And so that's what I'm talking about in
7  the context of the questions that are going to come up
8  here about toxicity.
9    A. Okay.
10   Q. So you have training, as we talked about in an
11 earlier deposition today, in toxicology, right?
12   A. Yes.
13   Q. And the term toxicity does not mean the same
14 thing as the term carcinogenicity, true?
15   A. Sure. That's true.
16   Q. Okay. Toxic as a term is broader than the
17 term carcinogenic, correct?
18   A. I would agree with that.
19   Q. Okay. Toxic effects may be acute, right?
20   A. Sure.
21   Q. Okay. For instance, when I get soap in my eye
22 in the shower and I have some eye irritation, that's a
23 toxic effect, right?
24   A. I guess, technically.
25   Q. Okay. A rash when I touch poison ivy is a

## Page 9

1  toxic effect, true?
2    A. If you have a reaction to it.
3    Q. Okay. A person drowning in a pool is a toxic
4  effect, true?
5    A. Sure.
6    Q. Okay.
7    A. Well, I don't know if it's a toxic effect. I
8  guess it is. It's over-ingestion of water, but it's
9  really a lack of oxygen. I guess that's a little
10 different animal.
11   Q. Okay.
12   A. Ultimately it's a lack of oxygen, I think, but
13 I guess that's a toxic effect.
14   Q. Okay. None of the examples I just gave you in
15 those preceding three questions are carcinogenic
16 effects, true?
17   A. That's true. That's true.
18   Q. Okay. And the term carcinogenicity describes
19 a specific process in our body in which there's either
20 deregulated apoptosis of cells or unregulated cell
21 replication, correct?
22   MR. KRISTAL: Objection.
23   THE WITNESS: I'm not sure about that.
24   I look at -- the toxicity that I'm looking
25   at from an industrial hygiene standpoint is an

3 (Pages 6 to 9)

Stephen E. Petty, PE, CIH, CSP

Page 10

1  acute toxin subchronic, chronic.
2      In my view, acute is from an
3  instantaneous, a burn or something like that,
4  to somewhere, a day or less.  And then
5  subchronic is typically a couple of weeks to
6  thirty days.  And then chronic studies are,
7  you know, months to years in length so -- and
8  what you're looking at in each of those is
9  what are the effects, whether it be irritation
10 of skin, eyes, morbidity, tumors, et cetera.
11     So, to me, I look at toxicity from a
12 standpoint of length of time test, as does
13 FIFRA.  And within -- within that, we can talk
14 about definitions of terms of things you might
15 see or encounter.
16 BY MR. KALAS:
17     Q.  Do you --
18     A.  Go ahead.
19     Q.  I'm sorry.  I don't mean to cut you off.
20     A.  No.
21     Q.  Do you have a definition for the term cancer
22 that you use professionally?
23     A.  I would -- I would, as a carcinogen, I would
24 use the NTP, IARC definitions of that, carcinogen.
25     Q.  Okay.  Of what carcinogen is, okay.  I'll

Page 11

1  defer to those then.
2      Let me ask you this.  With your toxicology
3  training --
4      A.  And I should say EPA.  I mean, the IRIS
5  database, for example.
6      Q.  With your toxicology training, if you wanted
7  to talk about a substance to a professional colleague
8  being carcinogenic, would you use the term carcinogenic
9  or toxic in correspondence with that colleague?
10     A.  Ask the question again.  I'm trying to figure
11 out what you're asking.  I'm sorry.
12     Q.  Sure.  You have toxicology training, true?
13     A.  Yes.
14     Q.  And if you were talking to a colleague who
15 also has toxicology training and you want to talk about
16 a compound being carcinogenic, would you use the term
17 carcinogenic or toxic to describe that compound?
18     MR. KRISTAL:  Objection to form.
19     THE WITNESS:  It depends on the context.
20 I don't know.  I haven't -- it's a
21 hypothetical and I don't -- I just can't put
22 my arms around in what scenario I'd be
23 describing that.
24 BY MR. KALAS:
25     Q.  Okay.  If you can't answer it, that's fine.

Page 12

1      When the toxicology --
2      A.  It's the context that I'm -- I'm just trying
3  to figure out in a hypothetical how I might answer that
4  and under what sort of situation.  I just don't know
5  how I would answer that.
6      Q.  In all of the emails and what have you that
7  you reviewed from the Monsanto toxicologist, did you
8  see any document that you talk about in your report or
9  have on your materials considered list where the
10 Monsanto scientists say they mean that a compound is
11 carcinogenic when they use the term toxic?
12     MR. KRISTAL:  Objection to form.
13     THE WITNESS:  When they mean the compound
14 is carcinogenic?  I don't -- just don't
15 recall.
16 BY MR. KALAS:
17     Q.  Okay.  It's true, from an acute toxicology
18 point of view, that Roundup is more toxic than
19 glyphosate alone, right?
20     A.  It's -- on the acute side?
21     Q.  Yes, sir.
22     A.  That the glyphosate is more toxic than the
23 Roundup itself?
24     Q.  My question is, it's your opinion that it's
25 true that Roundup, from an acute toxicology point of

Page 13

1  view, is more toxic than glyphosate alone?
2      A.  Not necessarily.  That's why I went with the
3  definitions of acute and subchronic because you can
4  have subchronic tests that are more than a day that
5  would show -- that, in fact, I show at length in there,
6  that early study on dermal, where you have glyphosate
7  versus Roundup and the various skin effects, right.
8  And it's a complex thing to read, but it's basically a
9  theory of tests with three intervals per week.
10     And you see in there that you get major skin
11 irritation at the end of the first week with Roundup as
12 the product, but it's to the end of the second or third
13 week, second or third week, I forget, the end of the
14 second week, first of the third week, where you see
15 lesser but skin effects.
16     So technically those aren't acute effects,
17 right.  I mean, they're more than a day or however we
18 want to define it, a few hours, however you want to
19 define acute.  So they're subchronic and they
20 definitely show that Roundup has deeper and quicker
21 health effects than glyphosate alone.  So that's --
22 that's the context of what I was talking about, if
23 you're asking me.
24     Q.  Well, I guess what I'm getting at more is from
25 an acute point of view, the eye irritation on the

Stephen E. Petty, PE, CIH, CSP

## Page 14

1  labeling, the Roundup causes greater eye irritation
2  than glyphosate alone, true?
3      A.  I believe that's true.
4          Well, I'd have to go back and look at the eye
5  irritation studies.  I was focused primarily on the
6  skin irritation because of the dermal focus.  So I
7  would be careful if I weren't answering the eye
8  irritation stuff because my focus was dermal.
9      Q.  Okay.  It would be incorrect to say ipso
10 facto, in other words, irregardless of anything else,
11 it would be incorrect to say that just because
12 something is more toxic than something else, it is
13 therefore more carcinogenic than something else, true?
14     A.  Well, FIFRA doesn't necessarily look at
15 carcinogenic.  It looks at whether it's an ocagen,
16 right, whether it has the potential to create a tumor.
17     Q.  I'm asking you --
18     A.  So I don't know about your hypothetical.  I'm
19 just -- I don't look at the question that way, I guess.
20 That's the problem.  So I don't even know how to answer
21 that.
22     Q.  Well, okay.  If I -- let me back it up.  I'm
23 not asking about FIFRA.  I'm asking about your
24 toxicology training that you have.  Okay?
25     A.  Okay.  I'm just -- it's just hard to

## Page 15

1  differentiate that from actually the work that I've
2  done on this case.
3      Q.  So taking away, though, regulations -- and I'm
4  just asking about science.  Okay?
5      A.  Okay.  Well, hopefully they're tied together.
6      Q.  Okay.  But I'm asking about science here.
7  Okay?  It would be incorrect to say scientifically that
8  just because I know something is more toxic than
9  something else, I therefore know it is more
10 carcinogenic than something else?
11     A.  I don't know how to answer that question.
12         MR. KRISTAL:  Object to form.
13         THE WITNESS:  I'm not in a position to
14 answer that one way or the other.
15 BY MR. KALAS:
16     Q.  Okay.
17     A.  I'd have to have specifics.
18     Q.  Okay.  Now, you talk some in your report about
19 the effect of surfactants on the Roundup formulation,
20 right?
21     A.  In terms of the Franz study, yeah.  If that's
22 what you're referring to.  I don't know if you are.
23     Q.  I'll mark as Exhibit 11 --
24         MR. KRISTAL:  I have 10.
25         MS. SHIMADA:  I have 10 too.

## Page 16

1          MR. KALAS:  Oh, excuse me.  10.  I
2  apologize.  Getting ahead of myself.  A
3  document that's been put out by the government
4  of Canada.
5          (Defendant's Exhibit 10 was marked.)
6          THE WITNESS:  Okay.
7          MR. KRISTAL:  (Speaking French)
8          MR. KALAS:  Happily, this one's in
9  English.
10         THE WITNESS:  Not French.
11 BY MR. KALAS:
12     Q.  Let me ask you this.  In your report, I looked
13 through your report, I didn't see any criticisms of the
14 risk assessment done by the government of Canada in
15 your report.
16         Do you have any criticisms of the risk
17 assessment done by the government of Canada in your
18 report?
19     A.  I haven't looked at it, so I don't know.
20     Q.  Okay.  So let's look at what they had to say
21 about surfactants.
22     A.  I can tell you what my criticism -- I mean, I
23 have presented you that document.  I can tell you what
24 those criticisms are of the EPA risk.
25     Q.  Right, the EPA.  But I'm asking about the

## Page 17

1  Health Canada assessment.
2      A.  I haven't looked at the Health Canada risk
3  assessment.
4      Q.  Okay.  So let's look at what Health Canada had
5  to say.  If you go to page 5.  Do you see the bottom of
6  page 5?  It says occupational risks from handling
7  glyphosate.
8      A.  Okay.  But I don't -- I'm not familiar with
9  too many people other than in the manufacturing
10 facility that handled just glyphosate.
11     Q.  Okay.  Well, we're going to get there.  But do
12 you see where it says that?
13     A.  I do see that.
14     Q.  Well, let me ask you this.  Has Mr. Kristal
15 shared with you any cancer surveillance data on the
16 manufacturing facilities where glyphosate is made?
17         MR. KRISTAL:  Be nice if Monsanto had done
18 one.
19 BY MR. KALAS:
20     Q.  Has he shared it with you?
21     A.  I don't -- I haven't gotten -- whatever I've
22 gotten from Mr. Kristal would be included in Appendix
23 A.  That's the quick answer.  If it's there, yes.  If
24 not, then I didn't.
25     Q.  Okay.  Do you have any opinions about any

Stephen E. Petty, PE, CIH, CSP

Page 18

1  cancer surveillance done by Monsanto in their
2  manufacturing facilities?
3       A.  I'm not the epidemiologist in this project,
4  remember.  Why would I have any opinions on that
5  because I'm not being -- if I could answer questions on
6  epidemiology in a cross and I thought I could answer
7  them, I might, but probably not because I'm not being
8  proffered as the epidemiologist in this case.
9       Q.  Okay.  So let's look at what the government of
10 Canada had to say here.  It says under occupational
11 risk to handlers -- excuse me.  In the second, the
12 second bolded line states:  Occupational risk to
13 handlers are not of concern when used according to
14 label directions.
15      Did I read that correctly?
16      A.  That's what those words say.
17      Q.  Okay.  The paragraph states:  Risk to handlers
18 are not of concern for all scenarios.  Based on the
19 precautions and directions for use on product labels
20 reviewed for this re-evaluation, risk estimates
21 associated with mixing, loading and applying activities
22 met the target dermal and inhalation MOEs and are not
23 of concern.
24      Did I read that correctly?
25      A.  You read those words correctly, yes.

Page 19

1       Q.  Okay.  And do you have any reason to disagree
2  that the government of Canada has determined that risk
3  to handlers are not of concern for all scenarios using
4  glyphosate according to the label instructions?
5       MR. KRISTAL:  Objection to form.  You want
6  him to read this document and ask him if he
7  agrees with that?
8       MR. KALAS:  I'm asking if he has any
9  reason to disagree that the government of
10 Canada has concluded that.
11      THE WITNESS:  I guess my first opinion
12 would be until I read the risk assessment,
13 then I could form an opinion as to whether I
14 agree or disagree with it and to the extent to
15 whether I agree or disagree with it.  But some
16 global statement on the front end of a whole
17 bunch of work, I'm not going to -- I can tell
18 you that I've seen work that's done well and
19 work that's done really poorly.  And until I
20 get into the meat of what was actually done,
21 then I would be able to have an opinion as to
22 whether I agree or disagree with that
23 statement.
24 BY MR. KALAS:
25      Q.  So I'm not asking you if you agree or disagree

Page 20

1  with the government of Canada.  I'm asking you if you
2  have any reason to disagree that the government of
3  Canada concluded that.
4       MR. KRISTAL:  In this particular document?
5       MR. KALAS:  In this particular document.
6       MR. KRISTAL:  It says what it says.
7       THE WITNESS:  I mean, the words are the --
8  if you're asking me that's what the words are,
9  I'll say that's what the words are.
10      If you're asking me whether I agree or
11 disagree with it, I would say I have to look
12 at the risk assessment, not unlike what I do
13 with the EPA risk and give you my opinion.
14      I'm a risk -- I mean, I'm an expert in
15 risk assessment, believe me.  So, but I,
16 because somebody makes a statement, I'm not
17 going to disagree with you that they made that
18 statement.
19 BY MR. KALAS:
20      Q.  Okay.  That's my question, do you --
21      A.  But, I mean, that's what those words say.  But
22 do I agree that it's necessarily true or not --
23      Q.  And I'm not asking you to.
24      I'm asking you do you agree that the
25 government of Canada made that statement in this paper.

Page 21

1       A.  Well, apparently they did.
2       Q.  Let's go on to polyethoxylated tallow amines.
3       MR. KRISTAL:  I'll stipulate that the
4  government of Canada made whatever statement
5  is contained in this document in this
6  document, if that's what you're looking for.
7       MR. KALAS:  No.  I want to ask him about
8  this section.  So I'm going to keep going.
9  BY MR. KALAS:
10      Q.  Polyethoxylated tallow amines, do you see that
11 section?
12      A.  I do.
13      Q.  Okay.  And one of the criticisms that you have
14 of the risk assessment process for glyphosate is it
15 does not take into, in the United States, is that in
16 your opinion it does not take into account formulated
17 products, correct?
18      A.  Well, it's not -- Monsanto themselves is
19 saying it doesn't.
20      Q.  I'm asking about your criticisms.  Let's put
21 aside what you think Monsanto said or didn't say.
22      Is one of your criticisms --
23      A.  No.  I'm saying that's what Monsanto says.
24 It's not -- it's their -- it's not my words.  It's
25 their words.

6 (Pages 18 to 21)

Stephen E. Petty, PE, CIH, CSP

## Page 22

1    Q.   Monsanto has criticized the EPA risk
2  assessment on glyphosate?
3    A.   No.  They're saying that they haven't -- that
4  they haven't test, for example, for the carcinogenicity
5  of products versus the glyphosate.  We're okay with the
6  molecule but maybe not the product.
7    Q.   Sir, can you please focus on my question.
8    A.   I'm trying to.
9    Q.   Which is -- okay.  One of your criticisms --
10  take Monsanto out of it.
11    A.   Well, show me where that is.  Tell me where
12  that is.  I mean, I'm okay agreeing or disagreeing with
13  your question if you'll show me what you're referring
14  to.
15    Q.   Okay.  Well, let me just ask you more
16  directly.  Do you believe that it has been an
17  appropriate risk assessment by the United States EPA to
18  look at the glyphosate, the molecule, and not
19  formulated products, in your opinion?
20    MR. KRISTAL:  Objection to form.
21    THE WITNESS:  I haven't even looked.  I
22  don't know that they've done that, so I don't
23  know whether I would have a criticism or not.
24    My understanding is that the risk
25  assessment was on glyphosate, period.

## Page 23

1  BY MR. KALAS:
2    Q.   Okay.  And do you have a criticism --
3    A.   And I have criticisms of the glyphosate risk
4  assessment, but I'm not aware -- I have not reviewed a
5  Roundup risk assessment from the EPA.
6    Q.   Do you think EPA should assess Roundup as
7  opposed to glyphosate?
8    A.   I believe from a health and safety standpoint
9  that they should, yes.
10    Q.   Okay.  So let's look at what Canada had to say
11  about surfactants in Roundup products.
12    It says:  Polyethoxylated tallow amines, POEA,
13  is a family of several compounds that are used as
14  surfactants in many glyphosate products registered in
15  Canada.  No human health risks of concern were
16  identified for these end-use products, provided that
17  they contain no more than 20 percent POEA by weight.
18  All of the currently registered glyphosate end-use
19  products in Canada meet this limit.
20    Did I read that correctly?
21    A.   You read those words correctly.
22    Q.   Okay.  Is it your -- well, strike that.
23    Is POEA one of the surfactants in Roundup
24  products?
25    A.   Absolutely.

## Page 24

1    Q.   Okay.  Did the government of Canada conclude
2  in this paper that there were no human health risks of
3  concern for products with no more than 20 percent POEA
4  by weight?
5    MR. KRISTAL:  We'll stipulate that the
6  government of Canada said whatever you want to
7  pull out of this document in this document.
8    Mr. Petty's not here to agree that this is
9  what the words say in any document.  And if
10  you're going to ask multiple questions along
11  these lines, then I think we've come to the
12  end of the day and you've run out of real
13  questions.
14    MR. KALAS:  Okay.  Well, if you're going
15  to shut down the deposition --
16    MR. KRISTAL:  Well, if you keep asking
17  those questions, I'm going to shut down that
18  line of questioning because Mr. Petty is not a
19  parrot.  He's an expert.
20    MR. KALAS:  Jerry, Jerry, you can do
21  whatever you feel like you need to do.
22    MR. KRISTAL:  If you ask him if he agrees
23  or disagrees, that's an appropriate question.
24    MR. KALAS:  I'm not going to ask him --
25  I'm not going to have you tell me how to ask

## Page 25

1  questions.
2    MR. KRISTAL:  I understand that, but I'm
3  just telling you what I'm going to be doing if
4  you simply ask him is that what Canada says in
5  this document.
6  BY MR. KALAS:
7    Q.   So let me ask the question again.  Did the
8  government of Canada state in this document that there
9  were no human health risks of concern for products with
10  no more than 20 percent POEA by weight?
11    MR. KRISTAL:  Same objection.
12    THE WITNESS:  This entity within the
13  government of Canada wrote down those words.
14  If you're asking me if that's what those words
15  are on the paper, I'll say that's what those
16  words are on the paper.
17  BY MR. KALAS:
18    Q.   Okay.  And have you reviewed a glyphosate
19  formulation sold in the United States with greater than
20  20 percent POEA by weight?
21    A.   I'd have to look.
22    Q.   So go ahead.
23    A.   Oh, okay.
24    And I will add, while I'm looking, that in
25  many cases they don't tell you what the percentage is.

Stephen E. Petty, PE, CIH, CSP

Page 26

1    Q.  Mr. -- we have --
2    A.  So to the extent that I have -- whatever my
3  answer is, it's going to be based on what information
4  I've been able to find.
5    Q.  That's every answer today, right?
6    A.  No.
7    Q.  Every answer today has been based on what
8  you've been able to find, right?  You're not
9  speculating here?
10    A.  No.  I've given you answers with regards to
11  marketing and all sorts of things.
12    Q.  Right.  But you're speaking within the realm
13  of your personal knowledge, right?
14    A.  That's not what I'm talking about here.
15      What I'm talking about here is we can start
16  with the very early analysis.  Where I was trying --
17  that's what I was trying to do is figure out what the
18  formulations are.  In fact, that's one of my big
19  criticisms is that we have proprietary materials with
20  huge portion of the formulations in many cases.
21      So how do I, as an IH, protect against
22  something I don't know what it is?  So I'm saying --
23  and in some cases, the POEA, it appears that it's
24  there, but we don't know.
25    Q.  So let me narrow --

Page 27

1    A.  And I'll give you an example.
2    Q.  Let me narrow my question.  My question is,
3  are you aware, sitting here today, of a formulation
4  you've reviewed where you can tell how much POEA is in
5  the formulation and there's greater than 20 percent?
6    A.  Well, let me move you to -- the answer is to
7  move you to table 4-1, which is my best source of
8  information on POEA.
9    Q.  What page, sir?
10    A.  Beginning on page 15.
11    Q.  50?
12    A.  15.
13    Q.  Yeah, 1-5.  Got it.
14    A.  And we have a list of products that contain
15  POEA, but we don't have percentages.  And that's one of
16  my criticisms.
17      So the vast majority of what I've got doesn't
18  tell me what the percentage is.  I mean, that's --
19  that's 16, 16 of 17 there of POEA, and none of them
20  list a percentage.
21    Q.  Roundup Original contained 15.4 percent POEA,
22  correct?
23    A.  Where are you?  Where are you calling that out
24  from?
25    Q.  Page 13 of your report.

Page 28

1    A.  I'm on 21.
2      Okay.  Let me get to -- which page?
3    Q.  13, sir.
4    A.  Okay.
5    Q.  Do you see your discussion on Kier and
6  Kirkland paper?
7    A.  Yes.
8    Q.  You stated Roundup -- you stated there,
9  reporting what they stated in the paper, that the
10  original Roundup had 15.4 percent POEA in it, true?
11    A.  Correct.
12    Q.  That's less than 20 percent, right?
13    A.  Okay.
14    Q.  And if you go down to your citation to the
15  Peluso paper, can you read into the record what your
16  call-out there from the Peluso paper is -- or excuse
17  me -- the Martinez paper.
18    A.  Well, that -- the Peluso would be the --
19    Q.  Yeah.  I'm reading --
20    A.  That would be the great one to read.
21    Q.  I'm reading Martinez.
22    A.  If you want me to read Peluso, I'd like to
23  read that.
24    Q.  You can read it after, but let's talk about
25  Martinez real quick.  What did you write about

Page 29

1  Martinez?
2    A.  It's available in three usual formulations.
3  41 percent glyphosate, 15 percent POEA, 18 percent
4  glyphosate, 7 percent POEA, and 1 percent glyphosate,
5  .4 percent POEA.
6    Q.  Are any of those POEA concentrations greater
7  than 20 percent?
8    A.  No.
9    Q.  Okay.  Now, you stated you wanted to talk
10  about the Peluso paper.  I'll give you that
11  opportunity.  Does the Peluso paper discuss any
12  percentage of POEA in formulations?
13    A.  It doesn't.  That's -- that's -- that's my
14  criticism is when you ask me -- well, you're trying
15  to -- you're trying to ask me if I know what the
16  typical or what the range of POEAs might be in these
17  products.  And the vast majority of them, I don't know.
18    Q.  Okay.  Has Mr. Kristal shared with you all of
19  the responses to requests for admissions and
20  interrogatories where confidential statements of
21  formulas were disclosed by Monsanto?
22    A.  I don't know how I'd answer that question.
23    Q.  Okay.
24    A.  How would I answer a question about
25  something -- has he shared everything he has, I don't

8  (Pages 26 to 29)

Stephen E. Petty, PE, CIH, CSP

Page 30

1  know how I'd ever answer that question.
2  Q.  Okay.  That's fine.
3      Okay.  Let's keep going in this Health Canada
4  document.  Health Canada states in the environmental
5  consideration section, underneath the bold listing:
6  When glyphosate is released into the environment, it
7  can enter soil and surface water.  Glyphosate breaks
8  down in soil and water and is not expected to remain
9  for long periods of time.
10     Did I read that correctly?
11     A.  Are you asking me if that's what the words
12  say?
13     Q.  Yes, sir.
14     A.  That's what the words say.
15     Q.  Okay.  Do you know what data they base that
16  conclusion off of?
17     A.  It's not referenced right here.
18     Q.  Okay.  Do you know if you've reviewed the same
19  data Health Canada has reviewed?
20     MR. KRISTAL:  Well, how would he possibly
21     know that?
22     THE WITNESS:  I haven't seen this before,
23     so how -- I mean, you're asking -- I mean,
24     I've already answered this question in a
25     general sense, but you have this tendency to

Page 31

1  want to ask me continuing questions about
2  whether I know some sub detail of a report
3  that I tell you I haven't looked at.
4      So, I mean, if you want to do that, it's
5      your time and it's your deposition.  You can
6      waste the time any way you want.
7  BY MR. KALAS:
8      Q.  Do you know if you've reviewed the same data
9  Health Canada has reviewed?
10     A.  I don't know the answer to that question
11  because I haven't reviewed this study.
12     Q.  Is this something you would have liked to have
13  seen in forming your opinions in your report?
14     A.  No.  I would want to see the actual risk
15  assessment.
16     Q.  Okay.  Let's keep going.
17     A.  I want to see what goes into this report.
18  That's what I'm interested in.
19     Q.  Okay.  Go to page --
20     A.  Same deposition -- or same document?
21     Q.  Yep.  Page 32.  1.1.15.
22     A.  Okay.
23     Q.  Health effects of the glyphosate formulated
24  products.  Do you see that?
25     MR. KRISTAL:  What page are we on?

Page 32

1      MR. KALAS:  Page 32.
2      MR. KRISTAL:  Thank you.
3      THE WITNESS:  I do.
4  BY MR. KALAS:
5      Q.  And it says, comment:  A number of comments
6  questioned why glyphosate formulated products were not
7  assessed for their health effects, stating that the
8  health effects discussed in PRVD2015-01 were based on
9  the active substance, glyphosate acid.
10     Did I read that correctly?
11     A.  I believe so.
12     Q.  And if you go to the second paragraph, it
13  states:  In addition, as part of the glyphosate
14  re-evaluation, an assessment was conducted on
15  polyethoxylated tallow amines, POEA, which are a family
16  of compounds often used as formulants in pest control
17  products that function as surfactants.  POEA substances
18  are included on list 4B of PMRA's list of formulants,
19  see REG2005-01, page 28.  Currently formulants are
20  categorized into one of the five lists which rank them
21  in descending order of concern.  List 4B contains
22  formulants that are of minimal concern under specific
23  conditions of use.  For more details on the regulations
24  of formulants in pest control products, refer to PMRA
25  Regulatory Directive DIR2006-02.

Page 33

1      Did I read that correctly?
2      A.  Except for the superscripts, yeah.
3      Q.  Okay.  And do you know, sitting here today --
4  I believe I know what the answer will be, but I need to
5  ask -- do you know what data the Canadian Pest
6  Management Regulatory Agency relied upon to reach that
7  conclusion regarding POEA?
8      A.  Well, it looks like it's referencing some
9  reports.
10     Q.  Okay.  Have you reviewed those reports?
11     A.  No.
12     Q.  Okay.
13     A.  I haven't reviewed this document, so I
14  wouldn't have reviewed the underlying material, which
15  is, you know, like I said, I would have wanted to see
16  the risk assessment and the basis for pathways
17  considered, not considered, input data to those
18  pathways.
19     Q.  Have you reviewed Australia's risk assessment
20  of glyphosate?
21     A.  I have not.
22     Q.  Okay.  Are you aware Australia has classified
23  glyphosate as not carcinogenic?
24     A.  I don't know one way or the other.
25     Q.  Okay.  Have you reviewed New Zealand's risk

Stephen E. Petty, PE, CIH, CSP

Page 34

1    assessment of glyphosate?
2        A.  I have not.
3        Q.  Are you aware New Zealand has classified
4    glyphosate as not carcinogenic?
5        A.  I haven't -- no.  I'm looking at the three, as
6    a U.S. expert on labeling and warnings, the primary
7    sources of data are going to be EPA, NTP, and IARC with
8    respect to -- because that's what's required under the
9    MSDS.
10       Q.  But you're looking outside the U.S. for
11   advertisements.  You didn't look outside the U.S. for
12   regulatory decisions?
13       A.  That's -- I think that's a non sequitur.
14       Q.  Okay.  Are you aware that the government of
15   Japan Food Safety Commission has classified glyphosate
16   as not carcinogenic?
17           MR. KRISTAL:  Objection.  Beyond the
18       scope.
19           THE WITNESS:  I'm not the cancer expert.
20       So you can ask me all the questions you want
21       about determination of cancer.  I think we've
22       had that discussion at length today.
23           MR. KALAS:  I will ask my question again.
24       Motion to strike as nonresponsive.
25   BY MR. KALAS:

Page 35

1        Q.  Are you aware the Japanese Food Safety
2    Commission has classified glyphosate as not
3    carcinogenic?
4            MR. KRISTAL:  Same objection.
5            THE WITNESS:  I don't know one way or the
6        other.
7    BY MR. KALAS:
8        Q.  Okay.  Are you aware --
9        A.  I'm not the cancer expert.
10       Q.  Are you aware the European Chemicals Agency
11   has classified glyphosate as not carcinogenic?
12           MR. KRISTAL:  Same objection.
13           THE WITNESS:  I'm not aware one way or the
14       other.  I'm not the cancer expert.
15   BY MR. KALAS:
16       Q.  Are you aware the European Food Safety Agency
17   has classified glyphosate as not carcinogenic?
18           MR. KRISTAL:  Same objection.
19           THE WITNESS:  I don't know one way or the
20       other.  I'm not the cancer expert.
21   BY MR. KALAS:
22       Q.  Are you aware the United Nations JMPR has
23   classified glyphosate as not carcinogenic in humans?
24           MR. KRISTAL:  Same objection.
25           THE WITNESS:  I don't know one way or the

Page 36

1        other.  I'm not the cancer expert.  You're
2        asking me questions outside of my scope.
3    BY MR. KALAS:
4        Q.  One of the studies you talk about in your
5    report is the so-called TNO study.  Are you familiar
6    with that study?
7        A.  I am.
8        Q.  I'm going to mark it as Exhibit 11.
9            (Defendant's Exhibit 11 was marked.)
10   BY MR. KALAS:
11       Q.  And you go to the second page, Bates No. 807
12   of this.  The date of this report is the 29th of July,
13   2003, correct?
14       A.  Okay.
15       Q.  And the status report on this is final report,
16   correct?  It's on that page, right underneath sponsor
17   study code.  Middle of the page, about here.
18       A.  Oh, I see.  Okay, yes.
19       Q.  Okay.  Now, if you go to Bates No. 809 --
20   well, let me back up real quick.
21           This is done by a contract lab called TNO,
22   right?
23       A.  Yes.  That's my understanding.
24       Q.  Okay.  And you've worked in a contract lab
25   before, right?  Battelle?

Page 37

1        A.  Yeah, I worked at Battelle.  I worked at
2    National Labs.
3        Q.  Okay.
4        A.  I was actually working at PNNL but --
5        Q.  Okay.  And is it your understanding that
6    contract labs are -- well, strike that.
7            This is not a study that was conducted
8    actually by Monsanto, correct?  They sponsored it but
9    they didn't conduct it.
10       A.  Okay.
11       Q.  Is that true?
12       A.  That's my understanding.
13       Q.  Okay.  So let's go to page 809.
14       A.  809?
15       Q.  Yes, sir.  Do you see paragraph 6?
16       A.  Yes.
17       Q.  Okay.  And the last two sentences state:  Due
18   to the high variation in dermal penetration within the
19   test groups and the poor recoveries, the data presented
20   in this report are not acceptable for regulatory use
21   and risk assessment.  The study should be regarded as a
22   sighting study rather than a definitive study.
23           Did I read that correctly?
24       A.  You did.
25       Q.  Was that the conclusion of the study authors

10 (Pages 34 to 37)

Stephen E. Petty, PE, CIH, CSP

Page 38

1  in the TNO study?
2      MR. KRISTAL: Object to the form.
3      THE WITNESS: That was the conclusion.
4      It's written. The words are what they are.
5  BY MR. KALAS:
6      Q. Okay. And you weren't there when they
7  conducted the TNO study, right?
8      A. What?
9      Q. You weren't in the room when they conducted
10  the TNO study, right?
11     A. Of course not.
12     Q. Okay. You haven't looked at the receptor
13  fluid in the TNO study to see what the authors thought
14  of that receptor fluid in the dermal absorption test?
15     A. Well, you can see what I did with the study
16  results and, yeah, I looked at what came through the
17  membranes and what was in the receptor fluid.
18     Q. Well, you looked at the data.
19     A. Right.
20     Q. But you didn't look at the actual receptor
21  fluid, the tangible thing?
22     A. How could I go back in time and do that?
23     Q. Okay. They were there and they looked --
24     A. You're asking me questions about -- these are
25  silly questions because you're asking me time warp

Page 39

1  questions, which is -- how in the world could I go back
2  in time to look at something that happened in the past?
3      Q. But these authors were there back in time in
4  the past and saw it.
5      A. Well, that's fine. That's different. But to
6  ask me whether I was there at the time is kind of
7  silly.
8      Q. Okay. Do you agree the authors who wrote this
9  were there at the time?
10     MR. KRISTAL: Objection.
11     THE WITNESS: I don't know if they were
12     physically there or not or if they had
13     technicians doing the work. I have -- I mean,
14     I've been in a -- I've worked in the lab for
15     twenty years. A lot of times the authors are
16     not the people doing the work, by the way.
17  BY MR. KALAS:
18     Q. Okay. This was done in rats, right, not human
19  skin?
20     A. Correct.
21     Q. Rat skin's different than human skin?
22     A. Well, of course it's different. But, I mean,
23  the question is whether or not they're acceptable to
24  use. I mean, it's -- there's a whole OECD methodology
25  section on all of that. So I'll look --

Page 40

1      Q. Let me ask you a different question, maybe an
2  easier one to answer. Is rat skin identical to human
3  skin?
4      A. I think the first answer is of course not, but
5  even human skin is very variable.
6      Q. That's fine.
7      All right. Let's go to page 824. And I'm
8  going off the Bates numbers here.
9      A. Okay.
10     Q. Do you see the section called deviations of
11  the protocol?
12     A. Okay.
13     Q. What does it mean to deviate from a protocol?
14     A. Depends on what protocol and what they're
15  talking about as far as the deviations.
16     Q. Okay. When you worked at Battelle, what would
17  it mean to deviate from a study protocol you were
18  working on?
19     A. We rarely had protocols because everything
20  was -- we were inventing things brand new. I mean, I
21  was developing new science. I mean, I was developing
22  science of radionuclides in salt that didn't exist.
23     Q. Okay. Have you ever worked on a study that
24  had a study protocol before you started it?
25     A. Well, there are ASTM -- you're looking at this

Page 41

1  from a medical side, not an engineering side.
2      What our protocol -- if you want to call them
3  protocols. They wouldn't be protocols. We would be
4  looking at ASTM standards or something like that.
5      Q. So you can't --
6      A. Your questioning comes from a dimension that
7  isn't where I come from.
8      Q. Okay. Do you know where these authors come
9  from when they say deviations of the protocol?
10     A. Well, we can read what they say.
11     Q. Okay. So let's read what they say.
12     Look at the second paragraph. It states: The
13  results of the present study show high variation within
14  the test groups and the recovery of the applied test
15  compounds were found to either -- to be either too low,
16  groups B and D, or too high, groups A and C. It is
17  considered to be necessary to find out the reason for
18  the variation and poor recovery before continuing the
19  experiments. Therefore, upon request of the sponsor,
20  the experiment has not been performed using viable
21  human skin membranes.
22     Did I read that correctly?
23     A. You read the words correctly, but that's not
24  my criticism in my report of what went on.
25     Q. Okay. Do you know if the TNO authors ever

11 (Pages 38 to 41)

Stephen E. Petty, PE, CIH, CSP

Page 42

1  found out why there was variation and poor recovery in
2  their study, in their particular study?
3      A.  I don't know.  That's a difficult question to
4  answer.  The study was shut down by Monsanto, even
5  though they volunteered to redo it for free.
6      So I will tell you, as a scientist, as
7  a lab -- I mean, I was a senior research scientist for
8  a big -- and I was very well known as a scientist in
9  where I worked.  And I will tell you -- and I also had
10  a year's worth of graduate level statistics.
11      So when I read a sentence like this, and I
12  commented on this other document that I gave you, that
13  the outliers, if you want to call them that, in an
14  experiment are the most interesting parameters.  And
15  you cannot discard outliers because you don't like the
16  results.  You have to have justification for discarding
17  them.
18      So this was shut down.  You have to have an
19  absolute basis for throwing out a data point you don't
20  like.  You can't just say it's a bunch higher than the
21  other ones so we're not going to consider it.
22      What you would normally do is you would
23  consider it in one set of data in the summary, so it's
24  obvious to everyone, and then you would, if you so
25  choose, say, well, I'd like to kick these values out

Page 43

1  and do another average or summary or calculation.  But
2  you make it clear to the reader why you're doing what
3  you're doing and the basis for it.
4      And so when I see a statement here, knowing
5  what I know from the correspondence that occurred at
6  the time the study was shut down -- the fact that
7  there's variation in the data don't bother me.
8      You know, I laughed earlier about my early
9  engineering experience where we used to be told by an
10  early professor if you had two data points and you plot
11  it, it's a straight line.  And he used to laugh and say
12  don't take the third data point because it will just
13  confuse things.
14      Well, the reality in science is that the data
15  don't always flow naturally and nicely.  And so my
16  criticism is that you can't necessarily throw the data
17  out just because they make the statement about these
18  variations.
19      MR. KALAS:  Motion to strike as
20  nonresponsive.
21      Do you mind going back to my question,
22  please.
23      (A portion of the testimony was read back by
24  the court reporter.)
25  BY MR. KALAS:

Page 44

1      Q.  My question was, do you know if the TNO
2  authors -- I didn't ask you a thing about Monsanto.  Do
3  you know if the TNO authors ever found out why they had
4  variation and poor recovery in this study?
5      A.  I've read through this, but I just have to go
6  back.  I don't recall.  I know it was shut down.
7      Q.  Okay.  But you don't know -- you don't know
8  right now?
9      A.  Off of top of my head.  But, I mean, I've read
10  this so I'd have to go back and look.  If we want to do
11  that, I can answer your question.
12      Q.  So let's go to page 825.
13      A.  I am there.
14      Q.  Section 3.2.  It states, in some -- I'm
15  looking at the second to last paragraph there that
16  starts, in some cases:  In some cases the cumulative
17  absorption of glyphosate decreased with time, Appendix
18  4.  The application of the formula given in section
19  2.11 gives rise to a decrease in cumulative absorption
20  when low radiation in a receptor fluid sample follows
21  high radiation in the receptor fluid sample of the
22  preceding time point.  Since cumulative absorption can
23  never decrease in time, the decrease that was found was
24  caused by an artifact due to the application of the
25  formula.  We have no clear explanation for the decrease

Page 45

1  that was found, but contamination of the high radiation
2  receptor fluid sample could cause the effect above.
3      Did I read that correctly?
4      A.  You did.
5      Q.  Do you agree with those authors, that
6  cumulative absorption can never decrease in time?
7      A.  It shouldn't theoretically, but with
8  measurement error you can see that.
9      Q.  Did they ever explain, the TNO authors, why
10  they had a decrease in absorption in their study over
11  time?
12      A.  Well, it's not in all their studies.
13      Q.  Okay.  In portions of their studies.
14      A.  In portions.
15      Q.  Did they ever figure it out, that you know of?
16      A.  Did they ever figure out what?
17      Q.  Why they had a decrease in absorption over
18  time in portions of their study.
19      A.  What you -- what I've got to look at here is
20  go back to Appendix 4 and see which data points that
21  was and for how much of the samples that was.
22      Q.  Okay.  So Appendix 4, just to help you out,
23  that is on page 1285843 and 42.
24      A.  Okay.  So when I look at this test, you can
25  see, if you look at figure II, the top curve, you've

12 (Pages 42 to 45)

Stephen E. Petty, PE, CIH, CSP

Page 46

1  got a zigzag early on in the data, but then it
2  continues on up. That's not -- that's not unusual
3  that -- I mean, you'd rather it be nice and smooth.
4  Like I said before, when you do experiments, you hope
5  that everything behaves exactly like you expect.
6  Sometimes it doesn't.
7       Q. Let me ask you --
8       A. I can tell you that from doing this for twenty
9  years.
10      Q. I didn't ask -- I'm sorry.
11      A. No, no. You're asking me to look at --
12      Q. I didn't ask your interpretation. I didn't
13  ask your interpretation, but you can finish your
14  answer.
15      A. I said that if I looked at the Appendix 4, I
16  could then form some opinions. And you said, fine, go
17  to Appendix 4. Now you want to cut me off on what I'm
18  talking about.
19      Q. No. Go ahead and finish your answer. Waste
20  your time. Go ahead.
21      A. Seriously, are you going to make --
22      MR. KRISTAL: Objection, counsel.
23      THE WITNESS: -- that sort of comment as
24  an attorney and in a deposition?
25      MR. KALAS: Go ahead.

Page 47

1       THE WITNESS: Is that how professional you
2  are?
3       MR. KALAS: Please finish.
4       MR. KRISTAL: Make I make a suggestion
5  that everybody just relax a little bit.
6  Things seem to be heating up beyond what's
7  necessary. We're just asking questions and
8  answers.
9       So let Mr. Petty finish and then ask your
10  next question. I'll object or not object.
11      THE WITNESS: So when I look at this data,
12  most of the absorption tests -- in fact, all
13  of them until the very last time, increase
14  with time. So there's nothing wrong with the
15  data up through forty hours.
16      It's right at the tail end that they make
17  the statement for some of the curves.
18      MR. KALAS: Motion to strike as
19  nonresponsive.
20  BY MR. KALAS:
21      Q. Sir, my question was about what the study
22  authors concluded, not what you concluded.
23      Did the study authors conclude in this study
24  or figure out in this study what the explanation for
25  that decrease was? Did they report it?

Page 48

1       A. They did.
2       Q. They reported it?
3       A. They weren't certain of it, but they did
4  report it.
5       Q. Okay.
6       A. That's what that -- you just asked -- you just
7  read those words, and that's what they said. They were
8  talking about the strength of the -- where's that page?
9  What page were you on?
10      Q. I was on page 825.
11      A. 825. Yes. They're talking about the
12  application of the formula given in section 211 gives
13  rise to a decrease in cumulative absorption when low
14  radiation in a receptor fluid sample follows high
15  radiation in the receptor fluid sample of the preceding
16  time.
17      So they're saying that they had two adjacent
18  samples where one was higher than the other and they're
19  not sure why -- they're saying -- they're saying the
20  explanation is that there's different levels of
21  radiation levels in consecutive samples. That's what
22  they're saying. And they're saying then, we have no
23  clear explanation for the decrease that was found but
24  contamination of the high radiation receptor fluid
25  could cause the effect.

Page 49

1       So they're offering an explanation.
2       Q. Okay. My question maybe wasn't narrow enough
3  then. Where do they offer their clear explanation of
4  the effect found in this report?
5       A. I don't know how to answer that question. The
6  explanation they offer is the last sentence.
7       Q. Okay.
8       A. But you said that they offered no explanation.
9  That was your initial round of questioning.
10      Q. Let's go to 831.
11      A. I am there.
12      Q. Let's look at the last paragraph. This is in
13  a section, by the way, just so the record's clear,
14  called discussion and conclusions. Okay?
15      A. Okay.
16      Q. Last paragraph says: In general, the poor
17  recoveries combined with the high variation within the
18  glyphosate test groups make the data generated in this
19  study unsuitable for risk assessment.
20      Did I read that correctly?
21      A. Those are what the words say.
22      Q. Okay. Did the authors anywhere else in this
23  study that's been marked as Exhibit 11 state that this
24  data was suitable for risk assessment?
25      In other words, did they contradict themselves

13 (Pages 46 to 49)

Stephen E. Petty, PE, CIH, CSP

Page 50

1  anywhere else in this study?
2      A.  I don't know.  I haven't read it all right
3  now.
4      Q.  Okay.  Going on to the --
5      A.  I mean, are you asking me right now to sit
6  down and see if there's a contradiction in here?
7      Q.  If you don't know right now, that's fine.  We
8  can move on.
9      A.  Okay.  That's what I'm asking.  Do you want me
10  to look or not?
11      Q.  If you don't know right now, we can move on.
12      A.  Fine.
13          MR. KRISTAL:  Well, he can find out right
14      now by looking or you can move on.
15          MR. KALAS:  We can move on.
16          MR. KRISTAL:  Okay.
17  BY MR. KALAS:
18      Q.  Third sentence states:  The properties of the
19  formulation made it difficult to quantify the exact
20  amount applied onto the skin and to guarantee contact
21  of the fluid with the entire skin surface.
22      Did I read that correctly?
23      A.  Correct.
24      Q.  Was it the conclusion of the authors in this
25  study that they could not -- strike that.

Page 51

1          Was it the conclusion of the authors of this
2  study that it was difficult to quantify the exact
3  amount of glyphosate on the rat skin in this study?
4      A.  Let me read that sentence.  It's complex.
5          I have know idea what that means when you say
6  the exact amount because I don't know any scientific
7  process that's almost exact.  That's an extreme.
8      Q.  So you don't know what the authors meant
9  there?
10      A.  Well, no, no, no.  I know that they're --
11  they're using the words quantify the exact amount.  I
12  just think that's a strange phrase.
13      Q.  Okay.  I understand you think that.
14      A.  No, no, no.  Look at any of the other studies
15  and they'll always have a plus or minus.  So it's rare
16  that you give a value with certainty.  That's almost
17  impossible to do.
18      Q.  My question was about what the authors
19  concluded, not your opinion on the study.
20          Was it the conclusions of the authors that it
21  was difficult to quantify the exact amount applied onto
22  the skin in this study?
23          MR. KRISTAL:  Asked and answered.
24          MR. KALAS:  Not answered.
25          THE WITNESS:  I don't know that it's a

Page 52

1  conclusion.  It's a statement, but it's a
2  statement that is odd.  I'll just leave it at
3  that.  And I've reviewed hundreds of research
4  projects.
5  BY MR. KALAS:
6      Q.  Okay.  The next sentence states:  These
7  problems may have caused the irregular recovery and the
8  high variation of the absorption data.
9          Did I read that correctly?
10      A.  You read the words correctly, but I'm not sure
11  grammatically what they're referring to as problems.  I
12  mean, it's grammatically difficult to understand.
13      Q.  Okay.  If you can't understand, that's fine.
14      A.  No, no, no.  I'm just trying to refer back
15  to --
16          MR. KRISTAL:  Would you please not throw
17      in these add commenting comments.  You're
18      going to have a jury and you can make whatever
19      arguments to a jury you want.  It's not
20      necessary here.
21  BY MR. KALAS:
22      Q.  Moving on:  To avoid these problems, this
23  experimental procedure needs to be adapted to the
24  physicochemical behavior of the test material.
25          Did I read that correctly?

Page 53

1      A.  You did.
2      Q.  Okay.  Did the TNO authors anywhere in this
3  report adapt their experimental procedure to the
4  physicochemical behavior of glyphosate and/or Roundup
5  formulations?
6      A.  Are you defining that as what they mean by
7  physicochemical behavior?  Is that what you just said?
8  You just defined it that way?
9      Q.  Yeah.  That's my question.
10      A.  Read it again.  I want to see if counselor has
11  defined physicochemical the way he's defined it.
12      Q.  I said, did the TNO authors anywhere in this
13  report adapt their experimental procedure to the
14  physiocochemical behavior of glyphosate and/or Roundup
15  formulations?
16      A.  All we know is they were shut down.  They
17  volunteered to redo it for free and they were shut
18  down.
19      Q.  My question was about what's in this report,
20  sir.
21      A.  And that's what's in this report.  So we
22  don't -- they didn't get the chance.  They were shut
23  down.
24      Q.  Okay.  So the authors did not, regardless of
25  why they did not, they did not adapt their experimental

14 (Pages 50 to 53)

Stephen E. Petty, PE, CIH, CSP

Page 54

1  procedures to the physicochemical behavior of Roundup
2  and/or glyphosate, true?
3      A.  I don't know what that means.
4      Q.  Okay.
5      A.  I don't -- I don't -- and I'm a dermal expert.
6  I don't know what that physicochemical behavior of test
7  material means.
8      Q.  Okay.
9      A.  And it's not defined here and -- so those
10  words are those words.  I just don't -- I would have to
11  know what they mean by that in order to see if I agree
12  with that statement or not.
13      Q.  Okay.  Last question about this study and
14  we'll move on.  Was this study conducted pursuant to
15  OECD skin absorption protocols?
16      A.  I would have -- they're referencing them in
17  the references, so I'll have to see what they say.
18      Q.  Okay.
19      A.  It says on page MONGLYO -- 814, I guess, is
20  the best way to describe it:  This unit is operating in
21  full compliance with the OECD GLP principles.
22      Q.  And GLP is not what I asked about, with all
23  due respect.
24      A.  Well, I'm reading the sentence where OECD is
25  listed.

Page 55

1      Q.  Okay.  So I asked about skin -- there are OECD
2  skin absorption protocols, correct?
3      A.  Correct.  And they're referencing --
4      Q.  GLP.
5      A.  They're referencing in the back skin
6  absorption OECD 2000.
7      Q.  So show me where in here they say that they
8  are using OECD protocols for skin absorption in vitro
9  method.
10      A.  It says, this unit is operating.  That's what
11  that says, right?  Where else do we find OECD?
12          We find it in the references in the back on
13  MONGLY832.
14      Q.  Okay.  All right.  Let's move on.
15          Let's go to Ms. Mendoza.  Do you need a break
16  before we go to the report?
17      A.  Well, in just being courteous for Jerry and
18  others who maybe have time limits, I'll continue if
19  it's okay with everyone else.
20      Q.  I'm fine if everybody is else is.
21          Okay.  Let's go to Ms. Mendoza.  You talked to
22  Ms. Mendoza once in October, true?
23      A.  I just need to get to it.  Sorry.
24      Q.  No worries.
25      A.  That is correct.

Page 56

1      Q.  Let me find the page as well.
2      A.  517.
3      Q.  517.  I should know by now, right.
4      A.  I guess they're pretty much the same.
5          MR. KRISTAL:  They're all the same.  The
6  report ends at 266.  Appendix F begins at 516.
7  BY MR. KALAS:
8      Q.  All right.  So if we go back to here, you
9  talked to her on October 1st, right?
10      A.  Correct.
11      Q.  And you talked to her for about one-and-a-half
12  hours, right?
13      A.  Yes.  That's correct.
14      Q.  Okay.
15      A.  In the evening.
16      Q.  I'm sorry.
17      A.  In the evening.
18      Q.  And again I'm going to ask some questions I
19  asked before but --
20      A.  That's fine.  I understand.
21      Q.  Okay.  You have not reviewed Ms. Mendoza's
22  deposition transcript, true?
23      A.  That's correct.
24      Q.  Okay.  And, therefore, you don't know what
25  questions she was asked about her exposure history at

Page 57

1  deposition by either attorneys for Monsanto or for
2  Ms. Mendoza, correct?
3          MR. KRISTAL:  Objection.
4          THE WITNESS:  What I don't know is whether
5  this was part of that deposition or not.
6          So if this was part of it, then she may
7  have been asked questions associated with
8  this.
9  BY MR. KALAS:
10      Q.  Okay.  If she was deposed -- assuming she was
11  deposed before your interview with her --
12      A.  Well, yeah.  Then that won't be feasible,
13  yeah.
14      Q.  Okay.
15      A.  That's correct.
16      Q.  That's the time machine issue, right?
17      A.  Yes.  We're on the same page there.
18      Q.  Okay.  And, again, you have not reviewed
19  Ms. Mendoza's plaintiff fact sheet, correct?
20      A.  Correct.
21      Q.  Okay.  And when you had this call with
22  Ms. Mendoza on October 1st, she was not sworn in under
23  oath, correct?
24      A.  That's correct.
25      Q.  There wasn't a court reporter there taking

15 (Pages 54 to 57)

Stephen E. Petty, PE, CIH, CSP

Page 58

1  down a transcript like we have here today, right?
2      A.  Correct.
3      Q.  And, in fact, you note right here on this, on
4  page 517, that this phone log is not an official
5  transcript of the phone conversation, right?
6      A.  Right.  I'm fully transparent on what it is.
7      Q.  Okay.  And like the other cases we talked
8  about today, you yourself took down notes for the call?
9      A.  I did.
10     Q.  Okay.  And beyond you and Ms. Mendoza,
11 Ms. Greenwald was on the call, correct?
12     A.  At least for part of the time.
13     Q.  Okay.  And she's an attorney, right?
14     A.  Correct.
15     Q.  With the Weitz & Luxenberg firm, correct?
16     A.  That is correct.
17     Q.  Okay.  Did Ms. Greenwald speak on the call?
18     A.  She did.  My recollection is she introduced us
19 and said goodnight.
20     Q.  Okay.
21     A.  Or something to that effect.
22     Q.  There were no attorneys from Monsanto on the
23 call, correct?
24     A.  That's correct.
25     Q.  Okay.  There were no experts who'd been

Page 59

1  offered by Monsanto on the call, correct?
2      A.  I don't know whether they were offered or not.
3  I mean, I was just -- the call was set up and I got on
4  the line.  I don't know what the mechanisms between the
5  law firms are and whether they had discussions about
6  whether your people could be involved in it or not.  I
7  have no idea.
8      Q.  Sorry.  My question was -- when I used the
9  word offered, I probably wasn't clear.
10         There was no experts who'd been designated by
11 Monsanto in the litigation on the call you had with
12 Ms. Mendoza, correct?
13         MR. KRISTAL:  Objection.  That assumes
14     experts had been designated at the time of the
15     call.
16         THE WITNESS:  I mean, I just don't know
17     because I just got the defense expert reports
18     the last Thursday or so.  So, I mean, I didn't
19     even know who they were.
20 BY MR. KALAS:
21     Q.  Okay.  You wrote down everybody on the call,
22 right?
23     A.  Right.
24     Q.  Were there any other CIHs on the call besides
25 you?

Page 60

1      A.  No.
2      Q.  Okay.
3      A.  But you're asking if I had invited or whatever
4  these folks.  I don't even know who these folks are.
5      Q.  You anticipate my questions that are coming.
6  That wasn't the question there.
7      A.  Okay.  I'm just trying to help us along.
8      Q.  Okay.  My next question, did you yourself
9  invite attorneys from Monsanto to participate in this
10 call?
11         MR. KRISTAL:  We'll stipulate that
12     Mr. Petty didn't invite anybody to be on the
13     call, that the only people who were on the
14     call and the only people invited to be on the
15     call by others were the ones that are listed
16     on the document.
17         You're asking silly questions.  He said
18     this document reflects who was on the call.
19     I'm stipulating no one else was invited on the
20     call.
21 BY MR. KALAS:
22     Q.  Okay.  Mr. Petty, can -- let me ask this.  I
23 understand Mr. Kristal will stipulate that nobody else
24 was invited on the call.  Did you yourself invite any
25 attorneys for Monsanto to be on the call?

Page 61

1      A.  I didn't even know who they were.
2      Q.  You knew Mr. Upshaw.
3      A.  Yeah.  But I didn't know he was working on the
4  federal cases.
5      Q.  Okay.  You knew Mr. Upshaw rep --
6      A.  From the St. Louis cases.  That was the only
7  attorney I had met and it was for St. Louis city cases.
8      Q.  Okay.
9      A.  I didn't know you.
10     Q.  You know me now, right?
11     A.  Wonderful.
12         MR. KRISTAL:  And he's still not going to
13     invite you on the next call.
14 BY MR. KALAS:
15     Q.  You'll invite me next time?
16     A.  I got a feeling it won't be my decision.
17         MR. KRISTAL:  And I can tell you the
18     answer is no.
19         MR. KALAS:  Okay.
20         MR. KRISTAL:  Just like you won't invite
21     us to anything to do with your experts.  But
22     if we want to have that kind of protocol,
23     happy to discuss it.
24 BY MR. KALAS:
25     Q.  Do you know if Dr. Labow who has been

16 (Pages 58 to 61)

Stephen E. Petty, PE, CIH, CSP

Page 62

1    designated as the exposure expert in the Mendoza case
2    has had an opportunity to conduct an interview of
3    Ms. Mendoza like you have had?
4        A.  I don't know who that is, so I don't know.
5        Q.  You haven't reviewed his report yet?  It's on
6    the stack on your desk?
7        A.  Probably.
8        Q.  Okay.  So, hypothetically, if an expert by the
9    name of Dr. Labow has been designated in the Mendoza
10   case --
11       A.  Okay.
12       Q.  I want you to -- let me back up.  I want you
13   to -- let me back up again.  Are you aware that an
14   expert on exposure has been designated by Monsanto in
15   the Mendoza case, regardless of whether you know his
16   name or not?
17          MR. KRISTAL:  Objection to form.
18          THE WITNESS:  I wouldn't know.  I mean, I
19       can speculate that traditionally after I issue
20       my reports I find out that there's a defense
21       report that's written and criticizes whatever
22       I did or whatever.
23          It wouldn't surprise me, but I didn't have
24       any of that knowledge.
25   BY MR. KALAS:

Page 63

1        Q.  When you talked to Ms. Mendoza, was anybody in
2    the room with Ms. Mendoza?
3        A.  Not to my knowledge.
4        Q.  Okay.  But it wasn't a video conference,
5    right?  You weren't looking at her?
6        A.  No.
7          MR. KRISTAL:  That doesn't mean somebody
8       couldn't have been in the room, but go ahead.
9    BY MR. KALAS:
10       Q.  This is true.
11       A.  There was nobody identified when -- the call
12   was made and everybody identifies themselves.
13   Typically if there's a spouse or somebody that the
14   plaintiff wants in the room with them, they'll identify
15   themselves.  That did not occur here.
16       Q.  And is there anywhere I can find an audio
17   recording of your conversation with Ms. Mendoza?
18       A.  Not to my knowledge.
19       Q.  Okay.  Now, Ms. Mendoza was diagnosed with NHL
20   in 2013, right?
21       A.  That is correct.
22       Q.  Okay.  And she was born in a location
23   called -- and I'm going to butcher this because my
24   Spanish is quite bad -- Michocan, Mexico; is that
25   correct?

Page 64

1        A.  It's close but whatever the -- however it's
2    said -- I think it's Michocan, but that's fine.
3        Q.  Okay.  That's why I got B's.
4          But at any rate --
5        A.  That's all right.  Doesn't matter.  But
6    however it's spelled there, it's -- I remember looking
7    it up on the internet to make sure I spelled it right.
8        Q.  When you looked it up on the internet, did you
9    look at what the main industry in that area was?
10       A.  I don't recall doing that, no.
11       Q.  Are you aware that it's the largest avocado
12   growing region in the world?
13       A.  I was not aware of that.
14       Q.  Okay.  Did you --
15          MR. KRISTAL:  Nor does the question mean
16       it was or it wasn't.
17   BY MR. KALAS:
18       Q.  ████████████████████████████████
19   ████████████████████████████████████████
20   ████████████████████████████████████████
21   ████████████████████████████████████?
22       A.  I'm trying to understand.  I know she was born
23   there.  Is that what you're asking?
24       Q.  ███████████████████████████
25   █████████████████████████████.  Do you know the

Page 65

1    answer to that?
2        A.  I don't -- I mean, she was there the day she
3    was born.
4        Q.  And that's all you know?
5        A.  Well, I would assume so.
6        Q.  Okay.  Do you know how long of her childhood
7    she spent there?
8        A.  Not specifically.  The first time I know when
9    she was in the U.S. would have been when she was in
10   high school in Merced in '94.
11       Q.  Now, do you know from your work on other
12   cases, on these cases, what pesticides are used around
13   avocado fields?
14       A.  I do not.
15       Q.  Did you ask what pesticides or herbicides or
16   insecticides or rodenticides Ms. Mendoza may have been
17   exposed to either in utero or in childhood in that area
18   of Mexico?
19       A.  No.
20       Q.  Okay.  Now, then you went through an
21   occupational history of Ms. Mendoza, right?
22       A.  Correct.
23       Q.  Okay.  And on the summary of jobs where she
24   worked, the third job was at Burger King, right?
25       A.  That's correct.

17 (Pages 62 to 65)

Stephen E. Petty, PE, CIH, CSP

Page 66

1    Q.   And you stated here that she had no known
2  chemical exposures when working at that location other
3  than that she would wipe down tables and clean floors
4  at times; is that correct?
5    A.   Correct.
6    Q.   Now, have you read the IARC monograph on shift
7  work?
8    A.   I commented on that because of the
9  misrepresentation of Monsanto's literature claiming
10  it's also a category 2 carcinogen for shift work. And
11  it turns out there is no category 2. There's 2A and
12  there's 2B.
13      So what Monsanto's done in their literature is
14  that they've -- to answer your question, shift work was
15  one of the things that Monsanto listed as a category 2
16  exposure. And I thought, well, that's interesting
17  because there is no category 2. So there's a category
18  2A and a category 2B, and they're completely really
19  different designations.
20      So Monsanto -- and I'm critical of that in my
21  report, as you probably know, of the way in which they
22  commingle 2A and 2B, the classifications, to imply
23  one's the same as the other.
24    Q.   Okay. You're aware IARC just came out this
25  year with a classification of shift work as 2A,

Page 67

1  probably carcinogenic?
2    A.   I don't know if I've seen it since I've -- I'm
3  not sure I've seen the most -- I would've looked it up
4  at the time I wrote this report.
5    Q.   Okay. So in June of this year --
6    A.   You have to look -- let me add, I have read
7  that at length and it's -- the designation of shift
8  work is misrepresentative because it depends on the
9  shift and it depends on whether you're rotating or
10  whether you're just working days or -- I mean, I've
11  worked shift work in my earlier days, whether I'm
12  working days, swing, or graveyard.
13      And then there's people that work those shifts
14  steady or there's people that work, do what we call a
15  rotating shift. The rotating shift is difficult
16  because you're constantly changing your sleep patterns.
17      But what they're talking about is shift work
18  associated with this -- I forget -- called circadian
19  rhythm effects. So when somebody defines it as shift
20  work, you have to go into the bows of specifically what
21  IARC is talking about with respect to shift work. It's
22  not just because you work nights or not just because
23  you work swing, because shift work, by its very
24  designation, is either day, swing, graveyard, or
25  rotating.

Page 68

1      So, yes, I reviewed those articles and I've
2  read that. And you have to be very careful about how
3  you designate shift work as being a classification 2A
4  because it's only a portion of the shift, types of
5  shift work.
6    Q.   Is it true that IARC has classified night
7  shift work as a 2A carcinogen this very year?
8      MR. KRISTAL: Objection. Beyond the
9  scope.
10      THE WITNESS: I'd have to look at the
11  exact words. Obviously you're reading it from
12  something. So if you're representing that's
13  what it says, then that's what it says.
14      I mean, I don't have a hundred percent
15  recall of everything I've read. I do comment
16  on that, though, in my report.
17  BY MR. KALAS:
18    Q.   Did Ms. Mendoza work at night on shift work?
19    A.   What, at Burger King?
20    Q.   Yes, sir.
21    A.   Well, it's how you define night.
22    Q.   Is 8:00 to 1:00 night?
23    A.   It's evening. I mean -- I always -- the shift
24  work that gives people the most trouble is graveyard,
25  midnight to 8:00 a.m. And even worse than that is the

Page 69

1  rotating shift work.
2      This is kind of -- this is really called swing
3  shift -- it's a little bit of a late swing shift, but
4  typically from 4:00 to midnight's a swing as opposed to
5  night shift, which is graveyard.
6    Q.   So let me tell you what I'm getting at.
7    A.   No. I'm just trying to tell you that's the
8  way it is.
9    Q.   So what I'm getting at is you talked about no
10  known chemical exposures when working at Burger King,
11  right?
12    A.   No. That's not what I wrote.
13    Q.   You wrote, products used: No known chemical
14  exposures when working at this location other than that
15  she would wipe down tables and clean floors at times.
16  That's what you wrote?
17    A.   Right. But that doesn't say no known
18  chemicals. You cut me off on how you paraphrased what
19  I said. There's an implication that there's some
20  chemicals in cleaning materials.
21    Q.   There are things beyond chemicals that
22  agencies like IARC have determined contribute to cancer
23  burdens, correct?
24      MR. KRISTAL: Objection. Beyond the
25  scope.

18 (Pages 66 to 69)

Stephen E. Petty, PE, CIH, CSP

Page 70

1    THE WITNESS:  I don't even know how to
2  answer that question.  It's so broad as to
3  the -- I haven't, for purposes of this
4  deposition, reviewed all the chemicals under
5  IARC.
6  BY MR. KALAS:
7    Q.  I didn't ask about chemicals.  I asked about
8  everything other than chemicals.  So that was the
9  question.
10    A.  Ask the question again.
11    MR. KRISTAL:  Same objection.  I'll do the
12  same objection.
13  BY MR. KALAS:
14    Q.  The question was, there are things beyond
15  chemicals that agencies like IARC have classified as
16  contributing to cancer burdens, true?
17    MR. KRISTAL:  Objection to form and beyond
18  the scope.
19    THE WITNESS:  Cancer burdens?  I don't
20  know if that's how they define it, but there
21  are other chemicals they've looked at for
22  listing as various categories within their
23  carcinogenic listings, or categories.
24  BY MR. KALAS:
25    Q.  I know it's late in the day.  You answered

Page 71

1  other chemicals.  I'm not asking about other --
2    A.  Other items, whatever you want to call it.
3    Q.  Are there things besides chemicals, besides
4  chemicals, IARC has classified as carcinogenic under
5  its rubric?
6    A.  Either possible or potential --
7    MR. KRISTAL:  Objection to form.  Beyond
8  the scope.
9    THE WITNESS:  To the extent that I know
10  how to answer that question, it would be the
11  response that I have where I go through the
12  ones where Monsanto made the comparison to
13  Roundup and the other -- some of those were
14  chemicals, some of them were not chemicals.
15  BY MR. KALAS:
16    Q.  Okay.  And you, when you did your products
17  used -- well, strike that.
18    Let's go to job number 5.
19    A.  I am there.
20    Q.  She worked at a -- as a security officer at an
21  office on an old base, Castle Air Force base property,
22  correct?
23    A.  Correct.
24    Q.  Okay.  Tell me what she told you about her
25  work at Castle Air Force base property.

Page 72

1    A.  What she's saying is that that's where their
2  offices were.  She worked at this location -- she said
3  she worked at it from about age 20 to age 21, for about
4  twelve months.  And she provided security at weddings,
5  birthday parties, football games, et cetera.
6    Basically it sounds like she was -- when I
7  asked her what that meant, she said, well, like making
8  sure the right people were coming in, for example.
9  They had the invitations or they had tickets.  So she's
10  working off site primarily.  These parties aren't
11  occurring on the base.  These weddings aren't occurring
12  on the base.  The football games aren't occurring on
13  the base.  That's just where the office was.
14    Q.  So when you say she worked at this location --
15  you talk about a single location there.
16    A.  Right.
17    Q.  This location there means the Castle Air Force
18  base office, correct?
19    A.  That means where the office was.  That doesn't
20  mean where she worked.  I mean, I go through in detail
21  below and clarify that.
22    Q.  How long -- how much time did she spend on the
23  Castle Air Force base location?
24    A.  I don't know specifically, but minimally she
25  was getting paid to be at these locations where she was

Page 73

1  dispensed.
2    Q.  Okay.  When you say ensured people entering
3  had invitations or tickets -- okay.  I think I
4  understand that.
5    A.  I think that's...
6    Q.  Okay.  So let me keep moving.  Did you Google
7  the Castle Air Force base or look up the Castle Air
8  Force base after she told you that?  Did it ring any
9  bells?
10    A.  I did.  I wanted to make sure I -- on names, I
11  always Google them just to make sure I spell things
12  right.
13    Q.  Did you find out anything interesting about
14  the Castle Air Force base?
15    A.  Not that I recall.
16    Q.  You're not aware it's a superfund site?
17    A.  I didn't look at that portion.  Could be.
18    Q.  You said no known chemical exposures when
19  looking at that location.  Do you know what chemicals
20  are on the Castle Air Force base superfund site?
21    A.  She's not working at -- we've gone through
22  that.
23    Q.  Sir, I asked -- you said you Googled it, and
24  now I'm asking what you learned about it.
25    A.  You just said when she was working on the

Stephen E. Petty, PE, CIH, CSP

Page 74

1  base, and I'm saying that's a non sequitur. She's
2  working at these parties.
3      Q.  You're reading in to my questions. I asked do
4  you know what chemicals --
5      A.  You can define --
6      Q.  -- are on the Castle Air Force base site.
7  That was my question so --
8          MR. KRISTAL:  Objection. Beyond the
9      scope. Completely irrelevant.
10  BY MR. KALAS:
11     Q.  Do you know what chemicals are on the Castle
12  Air Force base site?
13     A.  I don't even know what that means exactly, but
14  no.
15     Q.  Okay. You didn't note here that the Castle
16  Air Force base site in your follow-up research was a
17  superfund site, did you?
18         MR. KRISTAL:  Beyond the scope.
19         THE WITNESS:  I thought -- even if I had
20      known that, it would be of minimal concern
21      because most of the time she was working at
22      parties, games.
23  BY MR. KALAS:
24     Q.  Okay. Do you know how far the plume of the
25  VOCs on the Castle Air Force base site extends into the

Page 75

1  city of Atwater?
2          MR. KRISTAL:  Objection.
3          THE WITNESS:  I didn't even know it was a
4      superfund site.
5      I've done many risk assessments on
6      underground storage tanks and all the rest of
7      that. If you're going to make the argument
8      that somehow she had inhalation exposure from
9      VOCs from a plume for fractions of the time
10     she was there or -- I've done those
11     calculations. I've done those risk
12     calculations of ground water to outdoor and
13     indoor air.
14     It's very difficult to get high levels
15     because you get a dilution effect whenever you
16     start running those calculations. So the
17     answer is I haven't done that analysis. But
18     based on my experience in this scenario, given
19     all that I knew, the presence of chemicals on
20     that base was -- would be of limited interest
21     or value to me.
22  BY MR. KALAS:
23     Q.  All right. Now, you also looked into what
24  Ms. Mendoza applied on her property, right?
25     A.  Yes, sir.

Page 76

1      Q.  And that's 528, 529, 530, 531, 532, right?
2      A.  Correct.
3      Q.  Okay.
4      A.  I'm sorry. You're just reading so quickly. I
5  just want to make sure.
6      Q.  Sorry. I apologize.
7      A.  It actually goes all the way through to 534,
8  but I don't want to be picky. I'm just saying.
9      Q.  Well, I'm getting into what she applied, not
10 how she applied. But that's fine. We'll keep going.
11     A.  Well, it also -- I mean, the very first column
12 is what she applied. But anyway...
13     Q.  Okay. So 528 to 534 contains your notes on
14 what she applied, correct?
15     A.  Correct.
16     Q.  Okay. Now, she applied for a short time a
17 pre-mixed product; is that right?
18     A.  That's what she told me.
19     Q.  Okay. But then she transitioned to a
20 concentrated product, correct?
21     A.  Correct.
22     Q.  Okay. And she had a backpack sprayer, right?
23     A.  For part of the time, yes.
24     Q.  Okay. And are you aware that she was actually
25 interviewed by CBS News and the backpack sprayer was

Page 77

1  videotaped in that interview?
2      A.  I was not aware of that.
3      Q.  Did you watch -- so because -- strike. Let me
4  make sure my --
5      A.  If I wasn't aware of the interview, I didn't
6  watch it, no.
7      Q.  Okay. Now, the notes here -- and maybe I've
8  missed them, so I'm actually asking for some help here
9  if I have.
10     The notes here don't appear to discuss what
11 she wore when mixing or applying the concentrate
12 product, but maybe I missed that. So did you write
13 that down? Did you ask her about that?
14     A.  No. That's of minimal interest to me.
15     Q.  Okay. It's of minimal interest, okay.
16     A.  The reason for it is -- and there needs to be
17 an explanation for that. The reason is that
18 ultimately, as I've said before in this deposition,
19 these depositions, I'm ultimately asking her what parts
20 of the skin were wetted, whether they were clothes,
21 PPE, or no clothes, no PPE.
22     It cuts to the chase when I ask -- it's not
23 that it's of zero interest, but it's of limited
24 interest because I'm going to cut right to the chase
25 and I'm going to ask what skin areas are wetted, what

Stephen E. Petty, PE, CIH, CSP

Page 78

1    percent of those areas are wetted, what percentage of
2    the time were they wetted, and how long did it stay on
3    them.
4            And so whether she wore gloves or didn't wear
5    gloves, she's going to tell me what percent of the
6    time, what percent of the skin area of her hands, for
7    example, were wetted.
8        Do I record gloves, for example?  I will.
9    I'll try to record that information as sort of my
10   standard process of asking questions.  But in dermal,
11   what I'm concerned about, not so much what gets on the
12   clothes.  I'm more concerned about what gets on the
13   skin because that's where the transfer occurs.
14       Q.   Well, what gets on the skin is what the
15   exposure is.  Of course it still needs to be absorbed
16   from the skin to be a dose, correct?
17       A.   Absolutely.
18       Q.   Okay.
19       A.   But the exposure information I'm interested in
20   is the information related to the wetting of the skin.
21       Q.   So let's keep going.
22       We'll mark as Exhibit 12 a label for Roundup
23   ProMax herbicide.
24           (Defendant's Exhibit 12 was marked.)
25           MR. KALAS:  There you go.

Page 79

1            MR. KRISTAL:  Thank you.
2    BY MR. KALAS:
3        Q.   Does this appear to be a label from the time
4    period when she was using the Roundup ProMax product?
5        A.   The last page says 2010.  I'm just trying to
6    compare time frames.
7        Q.   Sure.  It might help you to go to 531,
8    application times.
9        A.   So this would be in that time frame.
10       Q.   Okay.  And if we look at the label that was
11   operative during the time frame that Ms. Mendoza was
12   using the product, go to the left-hand column of the
13   first page, please.  It says right underneath Group 9
14   herbicide:  Read the entire label before using this
15   product.
16           Did I read that correctly?
17       A.   That's what those words say.
18       Q.   Okay.  Do you know if Ms. Mendoza read the
19   entire label before using Roundup products?
20       A.   I don't know one way or the other.
21       Q.   Next -- you didn't ask her?
22       A.   Let me take a second to see what I did ask
23   her.
24           She says on page 536, she never thought
25   Roundup had the potential to harm her.  She read the

Page 80

1    warnings on the label and did not find anything of
2    concern.
3            If the label had contained the warning could
4    cause cancer, she would not have used the product in
5    order not to endanger not her but her children and
6    pets.
7        Q.   Okay.  So she did --
8        A.   So she said she read the label.  That's all I
9    know.
10       Q.   So it's your understanding that, based on your
11   interview, that Ms. Mendoza, when using Roundup, would
12   have read this document if it were affixed to the
13   Roundup bottle she used?
14       A.   Assuming this document was affixed to the --
15   if she bought this at Walmart, I'd be surprised if this
16   was affixed to every container on the shelves in
17   Walmart.
18       Q.   Okay.  If this was affixed to the document she
19   used in accordance with federal law -- excuse me -- the
20   document she used -- word vomit -- if this were affixed
21   to the bottle of Roundup ProMax she purchased in
22   accordance with federal law, Ms. Mendoza testified that
23   she would have read this document, right?
24       A.   She indicated that she read the warnings on
25   the label.  She's talking about the container.

Page 81

1        Q.   Okay.  Is this a label that would be affixed
2    to a container?
3        A.   I'm not saying it doesn't have that potential
4    but I -- I think she was purchasing this stuff at
5    Walmart, and I doubt that every container of Roundup
6    has this multipage document affixed to it.
7        Q.   How do you know?  Did you go to Walmart and
8    survey all the containers of Roundup in it?
9        A.   No.  I didn't say that.  I said I doubt.  I
10   didn't say for certain.
11       Q.   But why do you doubt it?  What's your basis
12   for that?
13       A.   Having been in Walmart, buying various items,
14   I've been buying that herbicide for years, the Ortho.
15   I never got a document like this one every time I
16   bought that container of Ortho.
17       Q.   Okay.  Was it affixed to the Ortho bottle?
18       A.   No.  I never saw a document like this ever
19   attached to the Ortho bottle.
20       Q.   Okay.  Do you know if it's attached to the
21   Roundup bottle at Walmart, since you've never purchased
22   Roundup?
23       A.   I'm not absolutely certain.
24       Q.   Okay.  So we'll keep going.
25           This label states underneath the statement we

21 (Pages 78 to 81)

Stephen E. Petty, PE, CIH, CSP

Page 82

1  just read: Use only according to label instructions.
2      Did I read that correctly?
3      A. Where are you at? Okay, I see that.
4      Q. Okay. Do you know if Ms. Mendoza used Roundup
5  ProMax according to label instructions?
6      A. Well, ask me which instruction you're asking
7  about and I'll try to answer that question.
8      Q. I'm asking about the entirety of this
9  document.
10     A. I understand, but I don't know that I can
11 answer that question without you asking me a specific
12 instruction and whether or not I think she followed
13 that instruction.
14     Q. Okay. So right now you can't answer the
15 question globally; I need to talk about specific areas.
16 Is that correct?
17     A. I would say yes, that if there are specific
18 labeling instructions -- that, in fact, is the problem
19 with this is -- when it says use according to labeling
20 instructions, is this -- I mean, this is one of the
21 criticisms I have. Is this -- in fact, I would like to
22 survey a lot of lawyers and ask them how many times
23 they've read a document like this before they've
24 applied a product.
25     Q. Well, so -- finish up.

Page 83

1      A. So my question is what they're reading is
2  typically the instructions on the container.
3      So when I look at something like this, as a
4  pragmatic matter -- because, again, remember, I have
5  background in behavioral sciences.
6      Q. Sure.
7      A. That's why I spent a whole section here
8  talking about what the problems have been historically,
9  back into the 1980s. Actually, I go back to the 1940s
10 with labeling and warnings and all the difficulties
11 with those for real people.
12     And so all I'm saying is if there are specific
13 instructions -- that's such a generic statement that,
14 you know, if it said use only according to label
15 precautionary statements or something, then you
16 would -- the reader could go right away and know what
17 they're supposed to read. But does use according to
18 label instructions tell them they have to know and
19 understand, one, ingredients, important phone numbers.
20     You see what I'm saying? You're not directing
21 the reader to what it is they're supposed to pay
22 attention to.
23     MR. KALAS: Motion to strike as
24 nonresponsive.
25 BY MR. KALAS:

Page 84

1      Q. Let's keep moving. 3.1 says: Keep out of
2  reach of children, caution.
3      Did I read that correctly?
4      A. Except for you left the exclamation point off,
5  but yes.
6      Q. It's hard to say exclamation point. I tried
7  to be emphatic.
8      Okay. I read that correctly though?
9      A. Yeah. I believe you did.
10     Q. Okay. Now, this product label told the
11 reader -- and, hypothetically, that would have been
12 Ms. Mendoza -- to keep this product out of reach of her
13 children, correct?
14     A. It did.
15     Q. Okay. Let's keep going.
16     Personal protective equipment, do you see that
17 area?
18     A. I do.
19     Q. Okay. Now, I know you have criticisms about
20 the listing of certain clothing items in the personal
21 protective equipment section of the label; is that
22 right?
23     A. I have criticisms of what is viewed as PPE
24 from an industrial hygiene standpoint and what isn't.
25 And I always say to you folks if I'm here to make you

Page 85

1  safe to a product or chemical -- that's my job, I'm a
2  professional, that's what I'm supposed to do -- would I
3  ever tell you to wear jeans and regular socks to
4  protect you from chemical exposures. And I think the
5  answer is clearly that that's not protecting you.
6      Q. You're not going to tell the jury that cotton
7  clothing provides zero percent protection from
8  glyphosate penetration, are you?
9      A. Zero percent? I don't know if I'll use those
10 words, but I'll say it is not considered PPE and should
11 not be considered effective in preventing and
12 eliminating exposure.
13     Q. Do you have a figure of the effectiveness of
14 cotton in preventing exposure to glyphosate when it is
15 used in the field? Do you have a figure you're going
16 to offer the jury?
17     MR. KRISTAL: Objection to form.
18     THE WITNESS: I'm not going to offer --
19 for just regular clothing?
20 BY MR. KALAS:
21     Q. Yes, sir. For cotton.
22     A. I'm going to go through that write-up I have
23 on the effectiveness of various materials and I'm going
24 to say that there's no way that cotton clothing should
25 be considered PPE.

22 (Pages 82 to 85)

Stephen E. Petty, PE, CIH, CSP

Page 86

1    Q.  Let me ask --
2    A.  As an industrial hygienist, I would never ever
3  make that recommendation.
4    Q.  Let me ask this.
5    A.  And I would hope that if I were protecting
6  you, as much as we're adversaries here in this
7  relationship, I would hope you would never allow me to
8  ever protect you by saying wear cotton clothing.
9    Q.  When I apply Roundup, I wear shorts and
10  flip-flops.  But that's just me.
11    A.  That explains some things.
12    Q.  Okay.
13    A.  I'm just kidding.
14    Q.  If we continue on --
15      MR. KRISTAL:  And that may be a decision
16    that you've chosen to make with knowledge of
17    what the hazards are.  Nobody's saying people
18    shouldn't be allowed to do that with the
19    knowledge.
20  BY MR. KALAS:
21    Q.  If I were applying Roundup and some reached my
22  forearm --
23    A.  Okay.
24    Q.  -- would less come into contact with my skin
25  if I had a long-sleeve shirt on than if I had a

Page 87

1  short-sleeve shirt on?
2    A.  Well, it depends on the definition -- whatever
3  the defining event is.
4      If it's a short-term mist as opposed to a
5  drenching situation, those are two different scenarios.
6  In a drenching situation, it wouldn't make any
7  difference.
8    Q.  Okay.  So let me be more precise.
9    A.  In a short-term aerosol, probably wouldn't
10  make a difference.
11    Q.  Let me be more precise.  If I were applying
12  Roundup and I did not drench myself in Roundup and some
13  Roundup came in contact with my forearm area, would I
14  be exposed to less Roundup on my skin if I had a
15  long-sleeved shirt on, made out of cotton, than if I
16  had a short-sleeved shirt on with no cotton covering on
17  my skin?
18    A.  That's so scenario specific.
19      If you're sweating and the clothing is soaked,
20  it's actually worse than no clothing.  So, I mean,
21  that's why I don't offer opinions in that dimension.
22  If you're going to offer PPE, you offer real PPE.  If
23  you're going to look at it from an exposure standpoint,
24  I look at how the skin is wetted, regardless of the
25  clothing.

Page 88

1    Q.  Have you reviewed the Lavy study?
2    A.  The what?
3    Q.  Lavy study, L-A-V-Y, 1992.  Have you reviewed
4  it?
5    A.  If I -- if it's in my list of materials, I
6  would have.  I just don't know off the top of my head.
7    Q.  Do you recall that the Lavy study showed that
8  cotton clothing provided an 80 percent protection
9  factor on glyphosate contact to the skin.  Do you
10  recall that?
11    A.  I don't -- I'm not sure, but I would say that
12  it's -- that that value is completely dependent upon a
13  specific scenario.
14    Q.  Did you review the Wester 1996 in vitro study
15  on dermal absorption?
16    A.  I did.
17    Q.  Okay.  Did you see that they used cotton
18  patches in that study to test the effectiveness of
19  cotton in preventing glyphosate penetration?
20    A.  I believe so.  I was more focused on the
21  actual dermal penetration rates, to be candid.
22    Q.  Do you recall that in the Wester 1996 study
23  cotton provided a 50 percent protection in the in vitro
24  model?
25    A.  It's completely scenario specific.

Page 89

1      So if you're going to --
2    Q.  I'm asking if you recall the study.  I'm not
3  asking about scenarios.
4      MR. KRISTAL:  Because he said it doesn't
5    mean it's so.  He's asking if you recall does
6    it say that.
7      THE WITNESS:  I don't recall one way or
8    the other.
9  BY MR. KALAS:
10    Q.  Okay.  Do you recall any of the actual,
11  experimental or field data, sitting here right now, on
12  the penetration of glyphosate through cotton covering?
13    A.  I summarized some of that in my report and
14  criticized some of that as well.
15    Q.  But sitting here right now, can you give me a
16  figure that you would believe is accurate in an non
17  drenching situation for the penetration of glyphosate
18  through cotton clothing?  And if it's too scenario
19  specific, we can move on.
20    A.  I would, as an industrial hygienist, I would
21  never advise for application of a pesticide to use
22  non-recognized PPE materials for protection.  So cotton
23  is a non PPE material, so I would not ever recommend or
24  advise to do that.
25      MR. KALAS:  Motion to strike as

23 (Pages 86 to 89)

Stephen E. Petty, PE, CIH, CSP

Page 90

1  nonresponsive.
2      THE WITNESS:  So in that sense, I would
3  never use a number of any sort because I would
4  never make that recommendation.
5      And more importantly, if, in fact, I was
6  then in a different dimension, I was supposed
7  to have to use that number to look at a dermal
8  dose experiment, I'd cut to the chase by
9  simply looking at the individual.
10     That's why I interview them to see what
11  skin areas were wetted, regardless of whether
12  it was cotton or PPE or whatever.  So that
13  parameter, first of all, for the way that I do
14  dermal exposure assessments really is not --
15  it's not a parameter that I would use in my
16  modeling.
17  BY MR. KALAS:
18     Q.  Is there any study in the peer-reviewed
19  literature you can point me to that disregards the
20  presence of cotton clothing as protective for
21  glyphosate exposure to the skin?
22     MR. KRISTAL:  Objection to form.
23     THE WITNESS:  Protective?
24  BY MR. KALAS:
25     Q.  Yes, sir.

Page 91

1      A.  I'm not sure one way or the other.
2  I would just say that I don't believe that non
3  PPE clothing is protective, by definition.
4      Q.  Okay.  So if we go to the PPE section of this
5  label which we were talking about, it says:
6  Applicators and other handlers must wear long-sleeved
7  shirt and long pants, shoes, plus socks.
8      Did I read that correctly?
9      A.  You did.  And that is not PPE.
10     Q.  Okay.  I asked you if I read it correctly.  I
11  didn't ask your opinion.
12     A.  But it's under PPE.
13     Q.  Okay.  I asked you if I read it correctly,
14  sir.
15     So I'll ask the question again.  Does that
16  sentence say: Applicators and other handlers must wear
17  long-sleeve shirt and long pants, shoes, plus socks.
18     Did I read that correctly?
19     MR. KRISTAL:  Asked and answered.
20     THE WITNESS:  If you're here to ask me if
21  the words on these pages are the words on
22  these pages, I'll say fine.  If you're here to
23  ask me my opinions, great.  But I'm not -- I
24  don't understand the value of you telling me
25  is that what these words are.

Page 92

1  BY MR. KALAS:
2      Q.  You may understand with my next question.  Can
3  you answer this one, please.  I will ask it again.
4      MR. KRISTAL:  It's already been answered.
5      MR. KALAS:  It has not.
6  BY MR. KALAS:
7      Q.  Does the PPE section say here:  Applicators
8  and other handlers must wear long-sleeve shirt and long
9  pants, shoes, plus socks.
10     Is that what it says?
11     MR. KRISTAL:  Asked and answered.
12     THE WITNESS:  That's what those words say.
13  BY MR. KALAS:
14     Q.  Okay.  Do you know if Ms. Mendoza wore
15  long-sleeved shirts and long pants, shoes, plus socks
16  when applying Roundup?
17     A.  I didn't ask that question.
18     Q.  Okay.  Moving on to user safety
19  recommendations.  It states:  User should wash hands
20  before eating, drinking, chewing gum, using tobacco, or
21  using the toilet.
22     Did I read that correctly?
23     A.  Where are you at?  I'm sorry.
24     Q.  User safety recommendations in the black box.
25     A.  Oh, okay.

Page 93

1      Q.  I'll ask the question again.  Under user
2  safety recommendations, does it say:  User should wash
3  hands before eating, drinking, chewing gum, using
4  tobacco, or using the toilet.
5      Did I read that correctly?
6      A.  That's what those words say.
7      Q.  Okay.  Do you know if Ms. Mendoza washed her
8  hands before eating, drinking, chewing gum, using
9  tobacco, or using the toilet?
10     A.  Well, I know she didn't use tobacco.
11     Q.  Okay.  How about the others?  Do you know if
12  she did that before the others?
13     A.  I didn't ask her if she washed up before using
14  the toilet, no.  I didn't ask her that question.
15     Q.  Okay.  Moving to the next bullet point, it
16  states: Remove clothing immediately if pesticide gets
17  inside.  Then wash thoroughly and put on clean
18  clothing.
19     Did I read that correctly?
20     A.  That's what those words say.
21     Q.  Okay.  You asked Ms. Mendoza if she recalled
22  having wetting of the skin underneath areas where she
23  had clothing on, right?
24     A.  No.  I don't think I asked that question.  I
25  think I asked the question what skin areas were wetted

Stephen E. Petty, PE, CIH, CSP

Page 94

1  and what percent time they were wetted. I don't know
2  that I asked her whether she had clothing on or not.
3      Q.  Okay. So you don't know if she had wetting
4  underneath areas that were clothed?
5      A.  Well, I don't think her hands were clothed.
6  And most of her exposure was hands and wrists.
7      Q.  Okay. How about her legs? You have legs on
8  here. Do you know if her legs were clothed?
9      A.  She's only saying a quarter of her leg area.
10  I didn't ask her about how much of her leg area was
11  clothed.
12      Q.  So you don't know whether or not if
13  Ms. Mendoza had pesticide inside her clothing she
14  washed thoroughly, removed that clothing, and put on
15  clean clothing, right?
16      A.  Well, it's an interesting instruction because
17  what does pesticide inside mean? What does it mean to
18  you?
19      Q.  Sir, I asked you if you know what she did. I
20  don't -- I'm not asking you about your take on the
21  instruction.
22      A.  Well, that's why I'm here. I'm here to give
23  opinions on warnings.
24      Q.  My question is if you know what she did.
25          Do you know what she did? Did she report to

Page 95

1  you that she felt pesticide inside her clothing,
2  removed the clothing, and washed thoroughly?
3      A.  I've answered these questions a hundred times.
4  Whatever she reported to me, I wrote down.
5      Q.  Okay.
6      A.  By absence, if I didn't report it, then she
7  didn't tell me that. I don't know how long we've got
8  to do the same thing. There's a concept of insanity.
9          MR. KALAS: Can we go off the record real
10  quick.
11          THE VIDEOGRAPHER: 5:43 p.m. Going off
12  the record.
13          (A brief interruption)
14          THE VIDEOGRAPHER: 5:47 p.m. Back on
15  record.
16  BY MR. KALAS:
17      Q.  Okay. Mr. Petty, do you hold any opinions
18  regarding ghostwriting in this matter?
19      A.  Yes.
20      Q.  Okay. What opinion do you hold?
21      A.  My opinions are that it's unethical to
22  ghostwrite papers and not disclose that in fact -- not
23  disclose the people that actually participated in
24  writing the paper.
25      Q.  Do you hold an opinion that Monsanto

Page 96

1  ghostwrote papers in the glyphosate literature?
2      A.  I do.
3      Q.  Okay. I'm going to mark as Exhibit -- if I
4  can find my stickers.
5          MS. SHIMADA: 13.
6          MR. KALAS: Thanks. Exhibit 13 a
7      statement from the European Food Safety
8      Authority.
9          (Defendant's Exhibit 13 was marked.)
10  BY MR. KALAS:
11      Q.  Have you seen this document before, sir?
12      A.  I don't think I've seen this.
13      Q.  Okay. Let's just walk through it real quickly
14  since you haven't seen it.
15          It states at the title, EFSA statement
16  regarding the EU assessment of glyphosate and the
17  so-called Monsanto papers.
18          Did I read that correctly?
19      A.  Yes.
20      Q.  Okay. In the background section it states:
21  On 29 May, 2017, EFSA received a request from the
22  European Commission to produce a statement concerning
23  the EU assessment of glyphosate following allegations
24  made in the so-called Monsanto papers. The requester
25  asked EFSA to provide responses to the following

Page 97

1  points. What impact the allegations about Monsanto
2  ghostwriting scientific review articles would have on
3  the overall EU assessment of glyphosate if they were
4  confirmed; the role of scientific review articles in
5  question, including the type of publication, amount of
6  information or available information, transparency of
7  industry support for some articles, the legal
8  provisions on the assessment of open scientific
9  literature in the EU legislation on pesticides in their
10  implementation of the EU peer review; the steps taken
11  during the assessment to ascertain the reliability of
12  guideline studies and those from the open literature.
13          Did I read that correctly?
14      A.  Yeah. We're in this mode again of you reading
15  stuff, and I'll agree that that's what those words say.
16      Q.  I'm just laying some foundation. Did I read
17  it correctly?
18      A.  I hope so.
19      Q.  Let's go to page 4 of this document.
20          MR. KRISTAL: If you need to read this
21      document to answer whatever questions are
22      coming, unless they're "did I read that
23      correctly," you should take the time to do
24      that.
25  BY MR. KALAS:

25 (Pages 94 to 97)

Stephen E. Petty, PE, CIH, CSP

Page 98

1    Q. If you go to the statement that says, as
2 regards, about a third of the way down, it says: As
3 regards, the second type of publication.
4        Do you see that?
5    A. I'm not -- I'm not wherever you are.
6    Q. Right here, sir.
7    A. Page 4?
8    Q. Yeah.
9    A. Okay. I see where you're at.
10   Q. Okay. It says: As regards the second type of
11 publication mentioned above, scientific review papers,
12 the weight of review papers is very limited in the
13 overall risk assessment because Member State and EFSA
14 experts have access to, and rely primarily on, the
15 original safety studies themselves to verify the
16 interpretation of the authors and to produce their
17 final conclusions.
18        Did I read that correctly?
19   A. That's what those words say apparently, yes.
20   Q. Okay. Are you arguing at all that any of the
21 ghostwriting that occurred in your opinion in this case
22 occurred in original safety studies, or are you arguing
23 that they only occurred -- that it only occurred in
24 scientific review papers?
25        MR. KRISTAL: Objection to form.

Page 99

1        THE WITNESS: Ask the question again. I'm
2    not quite understanding what you asked, but
3    maybe I can understand it if you ask it again.
4 BY MR. KALAS:
5    Q. One of the articles you think is ghostwritten
6 is Williams 2000, correct?
7    A. I don't think. There's -- there's evidence
8 that it was.
9    Q. Okay. That's one of the ones you are arguing
10 that it was ghostwritten, correct?
11   A. I'm not arguing. I'm just making the point
12 that --
13       MR. KRISTAL: It's the one that Monsanto
14   said they ghostwrote, that one?
15       MR. KALAS: Thanks for testifying, Jerry,
16   again.
17       THE WITNESS: Yeah. Because that was a
18   critical paper at the time because it was a
19   risk assessment which I've criticized. And
20   the fact that it appears to be independently
21   written, because it was a -- it was an
22   important paper at the time to -- it was one
23   of the first big risk assessment papers, and
24   it was relied on and it has a lot of flaws.
25       It relied on Wester and urine only, et cetera.

Page 100

1        And it relied on a skin area that was
2    incredibly small when you back-calculate it.
3        But, anyway, the problem with that is if
4    you're asking me will I criticize that
5    particular paper as being ghostwritten and it
6    shouldn't have been ghostwritten, or at least
7    the involvement of the Monsanto people should
8    have been transparent -- I mean, my positions
9    on all of these are if you ask the honest
10   question -- not the honest question -- if you
11   ask the question is the information being
12   provided transparent or not, are the roles of
13   the people involved transparent, does the
14   public getting the level picture of what's
15   happening -- and if in the Williams 2000 paper
16   is indicated as being authored by two people
17   and not having involvement in Monsanto,
18   then -- whereas that's not the case. As a
19   scientist, I don't have any problem
20   necessarily that Monsanto's involved with the
21   project. I just think it needs to be
22   disclosed.
23 BY MR. KALAS:
24   Q. The Williams 2000 paper lists Monsanto's
25 sponsorship and involvement in that article in the

Page 101

1 acknowledgments, does it not?
2        MR. KRISTAL: Objection to form.
3        THE WITNESS: That's different than being
4    an author.
5 BY MR. KALAS:
6    Q. Does it list it in the acknowledgments, sir?
7        MR. KRISTAL: Objection to --
8        THE WITNESS: If you pull it out, I'll say
9    yes or no.
10 BY MR. KALAS:
11   Q. Do you know if the Williams 2000 paper is a
12 review paper or an original study?
13   A. Well, it's a little of both because they're
14 doing a risk assessment based on things that they're --
15 they're using data from other studies and calculating
16 other parameters. So it's a little bit of a mix.
17   Q. Is there any original data generated in that
18 study?
19   A. On the risk side, there is.
20   Q. Okay. Let's go to the next page of this
21 document. The second bullet point states --
22   A. Where are you at? I'm sorry.
23   Q. I'm on the next page at the top.
24   A. Next page of what? I apologize.
25   Q. 5, page 5 at the top. It starts, of the

Stephen E. Petty, PE, CIH, CSP

Page 102

1    various.
2        A.  Okay.
3        Q.  It says:  Of the various scientific review
4    articles mentioned in the Monsanto papers, two were
5    considered in the EU assessment of glyphosate, Kier and
6    Kirkland 2013 and Williams et al 2000.
7        Did I read that correctly?
8        A.  It appears to be, yes.
9        Q.  Okay.  Let's go to the second bullet point:
10   Notwithstanding the fact --
11       MR. KRISTAL:  Where -- okay.  Got it.
12       Go ahead.
13   BY MR. KALAS:
14       Q.  It states:  Notwithstanding the fact that
15   these two review papers might have been ghostwritten by
16   Monsanto, their provenance was evident from the
17   declarations of interests and acknowledgments in the
18   papers themselves.
19       Did I read that correctly?
20       A.  Yes.
21       Q.  Okay.  For example, the Kier and Kirkland
22   paper states that the authors were paid by the
23   glyphosate task force to carry out the review.  And the
24   Williams et al paper acknowledges that Monsanto
25   facilitated the authors' work by providing them with

Page 103

1    original, unpublished studies.  This means that Member
2    State and EFSA experts were under no illusion about the
3    links between the study authors and the companies that
4    funded or facilitated their work when the experts
5    carried out the risk assessment.
6        Did I read that correctly?
7        A.  You read the words right.  I totally disagree.
8        Q.  You disagree with what EFSA -- you told me
9    earlier today --
10       A.  I'm saying --
11       Q.  No question's pending.
12       A.  No, no, no.  I dis -- you've got to let me
13   finish.  You can't cut me off in the middle of a
14   sentence.
15       I disagree because, as I said earlier, to my
16   earlier answer, Monsanto had an obligation to indicate
17   they were authors, not an acknowledgment.  That is well
18   understood in the scientific community and
19   peer-reviewed papers.  The authors have to be the
20   authors, particularly if there's a potential conflict
21   of interest.
22       Q.  Do you disagree with the statement by EFSA
23   that the Member State and EFSA experts were under no
24   illusion about the links between the study authors and
25   the companies that funded or facilitated their work?

Page 104

1        Do you disagree with that statement by EFSA?
2        A.  Well, it's interesting they know what's in the
3    minds of these people.  I don't know what's in their
4    minds.
5        Q.  Okay.  I'm going to --
6        A.  I mean, they're saying they have no illusion.
7    How are these people saying they know what these people
8    think?
9        MR. KALAS:  I'm going to reserve my time.
10       MR. KRISTAL:  Which is four minutes.
11       CROSS EXAMINATION
12   BY MR. KRISTAL:
13       Q.  All right.  If we look at the label, the
14   Roundup ProMax label, Exhibit 12 -- do you have that
15   before you?
16       A.  I -- yes.
17       Q.  As a warnings expert, is the size of the font
18   of language on the label important with respect to the
19   adequacy of warnings?
20       A.  Absolutely.
21       MR. KALAS:  Objection.
22       THE WITNESS:  As I -- not only is it my
23   opinion, but it's the opinion of others, as
24   I've cited in this report.  That's very
25   important.

Page 105

1    BY MR. KRISTAL:
2        Q.  Okay.  And is the highlighting of language on
3    the label with respect to warnings, does that matter
4    with respect to the adequacy of any warnings?
5        A.  It does.  And for the same resources, based on
6    my expert opinion as well as the expert opinions of
7    people I've cited.
8        But, more importantly, even Monsanto
9    understands, in terms of the concept of communicating
10   on a label, they indicate, as I said, I think on page 4
11   or 5, they're -- they understand that the label is
12   communicating information.  And their first four
13   priorities have, by their own admission, do not have
14   anything to do with health and safety.
15       Q.  Does a statement as to why certain actions
16   should be taken matter with respect to the adequacy of
17   any warnings on a pesticide label?
18       MR. KALAS:  Objection.
19       THE WITNESS:  Yes.
20   BY MR. KRISTAL:
21       Q.  And how so?
22       A.  Well, I've always said that the warnings have
23   to, first of all, be actionable so that the words --
24   and I go back to a lot of language from Goodrich and
25   others, where if the language is an actual -- in other

27 (Pages 102 to 105)

Stephen E. Petty, PE, CIH, CSP

Page 106

1  words, in most cases you're providing this information
2  to non-scientific people. There are exceptions. But
3  usually -- you have to anticipate -- the interesting
4  thing about the MSDS and HAZCOM standards, it requires
5  you to anticipate worst case use. It's kind of unique
6  that way. And as a consequence, you have to provide
7  instructions in a way that allows somebody to actually
8  utilize those.
9        So, for example, I'm very critical of the term
10  "use protective clothing" because the person in
11  superior knowledge is the manufacturer of the product
12  who -- I mean, even I can't memorize the compatibility
13  chart between all the chemicals or toxins that are out
14  there and the glove types that work.
15        But given the time to sit down and look up
16  what the properties are of the individual components of
17  chemicals, I can look at what glove type works the
18  best. So if I'm going to say use protective gloves,
19  why not just say use Nitrile gloves. Now, as a user, I
20  know what to go buy.
21        But if I'm asked to go buy protective gloves,
22  maybe I'll buy latex, and maybe latex is terrible for
23  that match. In fact, latex gloves have been shown to
24  be worse in many cases than no gloves at all.
25        So that's why I say that if the instructions

Page 107

1  are not actionable, they're ineffective. And, in fact,
2  I don't say that, but people back as far as 1983 say
3  that.
4        Q. Okay. I want to focus on the label now and
5  compare and contrast just two statements that are on
6  here. Fairly close to the beginning of the label, do
7  you see under complete directions for use, there's a
8  statement about avoiding contact?
9        A. Yes.
10        Q. Okay. And is that in all capital letters?
11        A. It is.
12        Q. And is that statement bolded? Is it in bold
13  font?
14        A. It is.
15        Q. And what significance does having all capital
16  letters and bolded font have with respect to drawing a
17  user of this product's attention to that statement?
18        MR. KALAS: Objection to form.
19        THE WITNESS: That obviously is -- I mean,
20  as a health and safety expert and a warnings
21  expert, whenever you increase the size of the
22  font, increase the bolding, then that implies
23  emphasis.
24  BY MR. KRISTAL:
25        Q. Okay. Let's read the all capitals and bolded

Page 108

1  statement at the beginning of this label. Quote, avoid
2  contact of herbicide with foliage, stems, exposed
3  non-woody roots or fruit of crops, desirable plants and
4  trees, because severe injury or destruction is likely
5  to result.
6        Do you see that statement?
7        A. I do.
8        Q. Does the because clause have significance with
9  respect to getting people to follow that direction?
10        MR. KALAS: Objection to form.
11        THE WITNESS: Sure. Absolutely.
12  BY MR. KRISTAL:
13        Q. And if you look at, under the word caution,
14  there's a statement that says avoid contact with eyes
15  or clothing. Do you see that?
16        A. I do.
17        Q. Is that in -- is that all in capital letters?
18        MR. KALAS: Objection to form.
19        THE WITNESS: No. It's the smallest --
20  one of the smallest fonts on the whole page.
21  BY MR. KRISTAL:
22        Q. Is that statement in bold font to draw the
23  attention of the user?
24        MR. KALAS: Objection to form.
25        THE WITNESS: No. And it's a

Page 109

1  non-actionable -- I've testified earlier that
2  this stuff will stay suspended -- and I have
3  it in my reports -- be suspended in the air
4  for minutes.
5        So the -- what that means is that you can
6  interface with that material as you move
7  through an area you've sprayed because it's
8  going to stay in the air for a while.
9        So the reality of -- the only true way to
10  know that you've avoided it is not to use it.
11  BY MR. KRISTAL:
12        Q. And does Monsanto provide any reason to avoid
13  contact with clothing of this product in that
14  statement, avoid contact with eyes or clothing?
15        MR. KALAS: Objection to form.
16        THE WITNESS: No.
17  BY MR. KRISTAL:
18        Q. In other words, do they give a because
19  something might happen?
20        A. No.
21        Q. But they do give that when they're talking
22  about harm to other plants. They give a because
23  statement?
24        A. They do.
25        I'm sorry. Did you want to...

28 (Pages 106 to 109)

Stephen E. Petty, PE, CIH, CSP

---

Page 110

1           MR. KALAS:  That's fine.
2    BY MR. KRISTAL:
3       Q.  Last couple of questions.  If you turn to your
4    report, page 51 and 50 -- I'm sorry -- 50 and 51 with
5    respect to TNO.
6           The TNO studies, it's all caps, three letters.
7       A.  I am there.
8           MR. KALAS:  Sounds like a pro wrestling
9    league.
10          MR. KRISTAL:  Exactly.
11   BY MR. KRISTAL:
12      Q.  There was a discussion about the use of rat
13   skin in TNO's study.  Do you recall that --
14      A.  I do.
15      Q.  -- with Mr. Kalas?  Okay.
16          Did Monsanto sponsor this study?
17      A.  They did.
18      Q.  So, in your opinion, did Monsanto see value in
19   using rat skin for the rat skin part of the study?
20          MR. KALAS:  Objection to form and outside
21      the scope.
22          THE WITNESS:  Well, certainly Franz, who
23      was, obviously had the patent, and then went
24      to University of Washington, my alma mater,
25      for a while back about when I was there, and

---

Page 111

1       did dermal work, which I cite, he certainly
2       would have been a dermal expert.  And he's a
3       Monsanto employee.
4          So logical conclusion would be that if
5       they're -- if I'm sponsoring work, I'm
6       certainly going to -- and I'm paying for it --
7       I'm generally going to prove the scope of work
8       and how that work is done.
9          And so certainly Monsanto would have some
10      say on what -- they certainly would be in a
11      position to say don't do -- don't use rat
12      skin, if they have that inclination.
13   BY MR. KRISTAL:
14      Q.  And when the initial protocol was developed
15   and the studies were begun, was there supposed to be a
16   human skin portion of the study?
17      A.  There was.
18          MR. KALAS:  Objection to form.
19   BY MR. KRISTAL:
20      Q.  And does TNO in the section Mr. Kalas was
21   pointing you of deviations of the protocol indicate
22   that the sponsor -- let me read it -- quote, therefore
23   upon request of the sponsor, the experiment has not
24   been performed using viable human skin membranes.
25          Is that statement under deviations of the

---

Page 112

1    protocol, section 213.
2       A.  I'm sorry.
3       Q.  It's the last sentence of the second
4    paragraph.
5       A.  Right.  So they're taking direction from
6    Monsanto and doing what the sponsor wants them to do.
7       Q.  Okay.  And do you -- have you reviewed
8    internal Monsanto documents about the TNO study?
9       A.  I have.
10      Q.  And do you quote from some of them, for
11   example, at the bottom of page 50?
12      A.  I do.
13      Q.  And in the email from Mr. Heydens, he wrote,
14   quote, my primary concern is with the glyphosate in
15   terms of the potential for this work to blow Roundup
16   risk evaluations, getting a much higher dermal
17   penetration than we've seen before, end quote.
18          Was that a statement made by this Monsanto
19   employee regarding the results they got on the rat skin
20   from the TNO study?
21          MR. KALAS:  Objection to form.
22          THE WITNESS:  It was part of his email on
23      the 2nd -- well, on April 2, 2002.
24   BY MR. KRISTAL:
25      Q.  And you cite from another email from

---

Page 113

1    April 4th, 2002, on page 51.  And the section you
2    quoted from the Monsanto employee is, quote, we came to
3    the conclusion that the penetration of glyphosate would
4    have been probably greater than the 3 percent already
5    imposed by the German authorities.  We decided to stop
6    this study effective today morning, end quote.
7          Do you see that?
8       A.  And they put stop in caps.
9       Q.  Right.  So did Monsanto express a reason why
10   they stopped the TNO study from going to completion?
11          MR. KALAS:  Objection to form.
12          THE WITNESS:  They did.
13   BY MR. KRISTAL:
14      Q.  And do you have another email from Garnett,
15   April 5th, 2002, that you quote in the middle of the
16   page; quote, we dropped the program for glyphosate
17   because a further study was not likely to help us meet
18   the project objective.
19      A.  Yes.
20      Q.  And in the second --
21          MR. KALAS:  Sorry.  Let me object to that
22      last one.
23          Go ahead.
24   BY MR. KRISTAL:
25      Q.  And the second bullet point that you quote

---

29 (Pages 110 to 113)

Stephen E. Petty, PE, CIH, CSP

Page 114

1    from this email; quote, the results of the rat skin
2    studies show levels of absorption for glyphosate of a
3    similar order to the annex one end point also confirm
4    our expectation that surfactant concentration affects
5    the dermal absorption, end quote.
6        A.  Yes.
7        Q.  And is that related to why the TNO study was
8    stopped?
9        MR. KALAS:  Objection to form.
10       THE WITNESS:  The next line kind of nails
11       it.  It says:  Therefore, from a regulatory
12       angle, there is no point in pursuing the
13       studies further.
14   BY MR. KRISTAL:
15       Q.  Okay.  And down at the bottom of page 51, you
16   have another quote from an email from a Monsanto
17   employee which indicates that TNO had offered to
18   re-check and re-do the rat skin test on their own
19   expense, correct?
20       MR. KALAS:  Objection to form and
21       mischaracterizes the email.
22   BY MR. KRISTAL:
23       Q.  All right.  Let's read it.
24       Quote, shouldn't TNO at least try to find out
25   what caused these unexpected results?  We are left with

Page 115

1    too many questions after this.  I thought they offered
2    to re-check their system and re-do the rat skin test on
3    their own expense.  If so, I don't really see why we
4    would not accept that.
5        Did you quote that from the Monsanto email
6    April 5th, 2002?
7        A.  I did.
8        Q.  And then in a later email of that same date,
9    did you quote the Monsanto response to that; quote,
10   without a clear understanding of what happened, I see
11   no way we could or should move forward with any other
12   work at the moment, end quote.
13       A.  That's what they said.
14       Q.  Okay.  And regardless of whether or not TNO
15   stated that the work was not suitable for risk
16   assessment, did Monsanto have an obligation under FIFRA
17   to submit the study to the EPA?
18       MR. KALAS:  Objection to form.
19       THE WITNESS:  Sure.  It was significant
20       results because they were -- as I show in my
21       analysis of the TNO data, it was showing --
22       especially it was showing, for the first time,
23       the effect of the surfactant on dermal rates.
24       And they were, by Monsanto's own admission,
25       higher than they expected.  And, in fact, they

Page 116

1    were going to get close to -- they were going
2    to meet or exceed the 3 percent penetration
3    rate that they were -- that was a regulatory
4    limit in Europe.
5        So they clearly didn't want to have
6    that -- I mean, that information wasn't going
7    to support a finding that those dermal
8    transfer rates were less than that value.
9        MR. KRISTAL:  Those are all the questions
10   I have, subject to any other questions.
11       MR. KALAS:  Yeah.  I have just two very
12   quick follow-ups.
13            REDIRECT EXAMINATION
14   BY MR. KALAS:
15       Q.  One, you noted in the answer to something
16   Mr. Kristal asked you that Thomas Franz was a Monsanto
17   employee.  Is that your understanding?
18       A.  Who now?  I'm sorry.
19       Q.  Franz.  Is he a Monsanto employee?
20       A.  Did I misspeak?
21       Q.  That's what I want to make clear.
22       A.  Yeah.  Let me check.  I want to answer your
23   question fully.
24       Do you have the ability to search for the word
25   patent?

Page 117

1        Q.  Patent?
2        A.  Yeah.
3        Q.  Yeah.  Give me a sec.
4        A.  I apologize for asking but it --
5        Q.  You know, Dr. Sawyer started bringing his
6    laptop and just searching.
7        A.  I didn't know that I could do that.
8        Q.  I wouldn't have a problem with it if you
9    stipulated it was just --
10       A.  Just to be able to find things quicker?
11       Q.  Yeah.
12       A.  Should be early on.
13       Q.  I don't see the word patent in my search of
14   the Mendoza study -- or Mendoza.
15       MR. KRISTAL:  Yeah.  Second page -- page
16       8, I'm sorry, middle of the paragraph.
17       THE WITNESS:  Yeah.  It has to do when I
18       was looking at the chemistry of the original
19       patent, including metals.
20       MR. KRISTAL:  Got it.  Quote, John Franz,
21       with a Ph.D. in chemistry, began working with
22       Monsanto's agricultural division in 1967.  By
23       1970 he discovered the herbicidal properties
24       of glyphosate and was issued a patent for such
25       use on March 26, 1974.

30 (Pages 114 to 117)

Stephen E. Petty, PE, CIH, CSP

## Page 118

1    BY MR. KALAS:
2        Q.  Okay.  And my question was about Thomas Franz,
3    the inventor of the Franz Diffusion Method.  Did he
4    work for Monsanto?
5        A.  Oh, I was referring back to -- yeah, that's a
6    different -- I want to cross-check this -- just help me
7    there.  We have John Franz and then reviewed the Franz
8    work at the University of Washington.  I want to check
9    the name there.
10       Q.  Okay.
11       A.  I apologize for taking the time.
12       Q.  I can mark the Franz study, if that would
13   help, the Franz '83 study.
14       A.  Yeah.  It's -- well, I don't know if it helps
15   to mark it, but I just wanted to check the first name
16   on that.
17           I'm there.  I found it.  It's on page 60.  The
18   one I've got to cross-check is Exhibit 346.  Do you
19   have the --
20       Q.  Yeah.  I got it.
21       A.  You have it actually?
22       Q.  Yeah.  I got it.
23       A.  I want to see if the names --
24           MR. KALAS:  So what are we at now, 12?
25           MS. SHIMADA:  14.

## Page 119

1            MR. KALAS:  14?
2            THE WITNESS:  Yeah.  Just so I can
3    cross-check names.
4            (Defendant's Exhibit 14 was marked.)
5    BY MR. KALAS:
6        Q.  Here's the Franz study.  If you can look at
7    page 634, that should give you the first name of the
8    author.
9            MR. KALAS:  If you need it.
10           MR. KRISTAL:  I don't.  Thank you.
11           MR. KALAS:  Okay.  Sorry.
12           THE WITNESS:  So they were different
13   people.  I stand corrected on that.
14   BY MR. KALAS:
15       Q.  Okay.  So Thomas Franz who wrote the Franz '83
16   study did not work at Monsanto, correct?
17       A.  He did not work at Monsanto.
18       Q.  One last question about your CV that
19   goes to something Mr. Kristal brought up.
20           On your CV I didn't see any citations to
21   emails where you came to scientific conclusions.
22           MR. KRISTAL:  Object to form.
23   BY MR. KALAS:
24       Q.  Is that true, you don't have any emails in
25   your peer-reviewed articles or a section or anything

## Page 120

1    like that?
2            MR. KRISTAL:  Object to form.
3            THE WITNESS:  I'm not sure what -- I'm
4    sorry.  I'm just lost.  What are you asking?
5    BY MR. KALAS:
6        Q.  I guess what I'm getting at is this --
7            MR. KRISTAL:  We'll stipulate that there
8    are no emails listed as publications on
9    Mr. Petty's CV, if that's what you're asking.
10   BY MR. KALAS:
11       Q.  Okay.  And when you come to scientific
12   collusions that you hold to a reasonable degree of
13   scientific certainty and want to put out in the public,
14   do you send those in emails or do you try to publish a
15   paper in the peer-reviewed literature?
16           MR. KRISTAL:  Object to form.
17           THE WITNESS:  My experience in working for
18   industries, we rarely -- in fact, we were
19   prohibited at Columbia.  When I was at the
20   National Lab, I published like crazy through
21   NTIS.  As soon as I went to the private
22   sector, it was like proprietary.
23           So early on, emails didn't exist.  I'll go
24   through another story about that at some point
25   that tells you how old I am.  But when I

## Page 121

1    was -- even when I was at Columbia when emails
2    started, there was no way that the vice
3    president of research and development would
4    let us publish.  We wanted to.
5    BY MR. KALAS:
6        Q.  If I go to -- sorry.
7        A.  So the results were transferred internally,
8    yes, electronically.
9        Q.  If I go to PubMed, which is sponsored by the
10   National Institute of Health, to look for scientific
11   findings in the published literature, will emails be
12   found on there?
13       A.  Oh, I -- I doubt it.
14       Q.  Okay.
15       A.  That's a different question.
16           MR. KALAS:  Okay.  I don't have any
17   further questions if you're done with your
18   answer.
19           THE WITNESS:  I'm done.
20           Thank you, sir.
21           MR. KALAS:  One thing before we go off the
22   record.
23           THE WITNESS:  I do want to read.  I'm
24   sorry.
25           MR. KALAS:  Note that we're going to

31 (Pages 118 to 121)

Stephen E. Petty, PE, CIH, CSP

## Page 122

1    assess confidentiality under the protective
2    order, as we have in the previous depositions
3    for all three that occurred today.  And we'll
4    send our letter in proper time.
5        MR. KRISTAL:  Sounds good.
6        THE VIDEOGRAPHER:  6:16.  Going off the
7    record.
8        THE COURT REPORTER:  Mr. Kristal, would
9    you like to order copies of the transcripts?
10       MR. KRISTAL:  Yes.
11       (Deposition concluded at 6:16 p.m.)
12       (Signature not waived.)
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 124

1            ERRATA SHEET
2    RECORD CHANGES HERE - DO NOT WRITE ON THE TRANSCRIPT
3    IN RE:  Mendoza vs  Monsanto Company
4    DATE:  Wednesday, November 6, 2019
5    PAGE  LINE     CHANGE          REASON
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   Under penalties of perjury, I declare that I have read
     the foregoing document and that the facts stated in it
23   are true
24   _____    _____
25   Date            STEPHEN E  PETTY, PE

## Page 123

1            CERTIFICATE OF DEPONENT
2
3    STATE OF FLORIDA
4    COUNTY OF PALM BEACH
5
6        I, the undersigned, declare under penalty of
7    perjury that I have read the foregoing transcript, and I
8    have made any corrections, additions, or deletions that
9    I was desirous of making; that the foregoing is a true
10   and correct transcript of my testimony contained herein.
11       EXECUTED this _____ day of _____,
12   20___, at _____, _____.
13        (City)        (State)
14
15
16       _____
17        STEPHEN E. PETTY, PE, CIH, CSP
18
19
20
21
22
23
24
25

## Page 125

1            CERTIFICATE OF OATH
2
3    STATE OF FLORIDA
4    COUNTY OF PALM BEACH
5
6
7        I, Lori G. Erwin, Registered Professional
8    Reporter, Notary Public, State of Florida, certify that
9    STEPHEN E. PETTY, PE, CIH, CSP, personally appeared
10   before me on the 6th day of November, 2019, and was duly
11   sworn.
12
13       Signed this 11th day of November, 2019.
14
15
16
17       _____
18        Lori G. Erwin, RPR
        Notary Public, State of Florida
19      My Commission GG 297744
        Expires: 02/16/2023
20
21
22
23
24
25

Stephen E. Petty, PE, CIH, CSP

Page 126

1                    CERTIFICATE OF REPORTER
2
3        THE STATE OF FLORIDA
4        COUNTY OF PALM BEACH
5
6            I, Lori G. Erwin, Registered Professional
         Reporter, do hereby certify that I was authorized to
7        and did stenographically report the deposition of
         STEPHEN E. PETTY, PE, CIH, CSP; that a review of the
8        transcript was requested; and that the foregoing
         transcript, pages 4 through 122, is a true and
9        complete record of my stenographic notes.
10           I further certify that I am not a relative,
         employee, attorney, or counsel of any of the parties,
11       nor am I a relative or employee of any of the
         parties' attorney or counsel connected with the
12       action, nor am I financially interested in the
         action.
13
             The foregoing certification of this transcript
14       does not apply to any reproduction of the same by any
         means unless under the direct control and/or
15       direction of the certifying reporter.
16
17           Dated this 11th day of November, 2019.
18
19
         _____
20
             Lori G. Erwin, RPR
21           Registered Professional Reporter
22
23
24
25

Golkow Litigation Services - 1.877.370.DEPS